1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  VIOXX PRODUCTS          *    Docket MDL-1657-L
       LIABILITY LITIGATION         *
6                                   *    December 3, 2009
                                    *
7                                   *    9:00 a.m.
    * * * * * * * * * * * * * * * * *

8

9
                     STATUS CONFERENCE BEFORE THE
10                     HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                  BY:  RUSS M. HERMAN, ESQ.
14                                820 O'Keefe Avenue
                                  New Orleans, Louisiana 70113
15

16                                Beasley Allen Crow Methvin
                                     Portis & Miles
17                                BY: ANDY D. BIRCHFIELD, JR., ESQ.
                                  234 Commerce Street
18                                P.O. BOX 4160
                                  Montgomery, Alabama 36103
19

20   For the Defendant:          Williams & Connolly, LLP
                                  BY:  DOUGLAS R. MARVIN, ESQ.
21                                725 Twelfth Street, NW
                                  Washington, DC 20005
22

23

24

25

1    APPEARANCES:

2    For the State Liaison
     Committee:                    Barrios, Kingsdorf & Casteix, LLP
3                                   BY: DAWN M. BARRIOS, ESQ.
                                    701 Poydras Street
4                                   Suite 3650
                                    New Orleans, Louisiana 70139
5

6    Claims Administrator:         BrownGreen, PLC
                                    BY:  ORRAN BROWN, ESQ.
7                                   BY:  LYNN GREER, ESQ.
                                    115 South 15th Street
8                                   Suite 400
                                    Richmond, Virginia  23285
9

10   Special Master:               Juneau Law Firm
                                    BY:  PATRICK A. JUNEAU, ESQ.
11                                  1018 Harding Street
                                    Suite 202
12                                  Lafayette, Louisiana  70503

13

14   Curator:                      Johnston, Hoefer, Holwadel &
                                      Eldrige
                                    BY:  Robert M. Johnston, ESQ.
15                                  601 Poydras Street
                                    Suite 2490
16                                  New Orleans, Louisiana  70130

17

18   Lien Resolution               The Garretson Firm
     Administrator:                BY:  MATT L. GARRETSON, ESQ.
                                    7775 Cooper Road
19                                  Cincinnati, Ohio 45242

20

21   For Louisiana Attorney        Attorney General's Office
     General's Office:             State of Louisiana
                                    BY:  JAMES DUGAN, ESQ.
22                                  1885 North Third Street
                                    6th Floor
23                                  Baton Rouge, Louisiana 70804

24

25

          JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA

1    APPEARANCES:

2    Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                     500 Poydras Street
3                                    Room B-406
                                     New Orleans, Louisiana 70130
4                                    (504) 589-7780

5
     Also Present:                   Kristin Johnson Parker
6                                     Ben Barnett

7

8
     Proceedings recorded by mechanical stenography, transcript
9    produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1

2                              **PROCEEDINGS**

3                            **(December 3, 2009)**

4              **THE DEPUTY CLERK:**  All rise.

5              **THE COURT:**  Be seated, please.  Let's call the case.

6              **THE DEPUTY CLERK:**  MDL 1657, *In re:  Vioxx*.

7              **THE COURT:**  Counsel, make their appearance for the

8     record.

9              **MR. HERMAN:**  May it please the Court, Judge Fallon,

10    Russ Herman for the plaintiffs.

11             **MR. MARVIN:**  And, Your Honor, may it please the

12    Court, Douglas Marvin for Merck.

13             **THE COURT:**  We're here today in our monthly status

14    conference.  I've received, from the parties, a proposed

15    agenda.  I've met with the lead counsel and liaison counsel to

16    discuss a matter with them.  We'll take it in the order

17    presented.

18                  First, the settlement agreement.  Any report on

19    that?

20             **MR. HERMAN:**  May it please the Court, at this time,

21    BrownGreer can make its report.

22             **THE COURT:**  Okay.

23             **MR. HERMAN:**  Good morning, Your Honor.  I'm Lynn

24    Greer from BrownGreer, and with me is Orran Brown.  We are

25    BrownGreer, who is the claims administrator in the Vioxx

1   settlement program.

2                   Today, Your Honor, we would like to first focus

3   on the stroke reviews that we are undertaking with the goal of

4   making final payments on those stroke claims by the first

5   quarter of next year.  I will cover that, and then Orran will

6   conclude the presentation with a discussion of the

7   extraordinary injury program.

8                   Your Honor, the stroke gates process is moving

9   along very quickly and very well.  As this slide shows, there

10  are currently no claims in the initial queue for gates review.

11  There are three claims that we are reviewing.  These were

12  claims that we initially failed.  We sent a notice of

13  ineligibility to the claimants and they submitted new

14  documentation.  And there are three claims in that queue.

15  Those probably have already been reviewed this morning.  These

16  statistics are as of yesterday.

17                  There have been 8,340 claims that have passed

18  and that have entered the gates under the points process.  Some

19  of those have already been paid, and we'll show those numbers

20  in a moment.  9,158 notices of ineligibility have been issued.

21  It's important to note, however, Your Honor, that these are

22  preliminary notices of ineligibility.  These are claims that

23  are still winding their way through the process.  We have

24  failed them according to the strict criteria of the settlement

25  agreement.  The gates committee and then Merck ultimately can

1  decide whether they qualified and were intended to be in the

2  program.  There are 49 that are still under consideration by

3  the gates committee.  And there are a total of 17,545 stroke

4  claims that are in the program.

5              This slide shows where we are with the claims

6  that have made their way through the points and into the points

7  process.  There have been 3,827 that have already been paid

8  through November.  There's 1,704 where we have issued notice of

9  points awards, and those payments are outstanding.  Some of

10  those claims have not yet been accepted.  924 of those have

11  been accepted, and those will be paid this month.  661 are

12  still considering whether to accept or appeal.  There are 119

13  who have appealed.

14              And, Your Honor, the current appeal rate with

15  strokes is about where we were with the heart attack claims.

16  It's slightly higher at 16 percent.  The final appeal numbers

17  for the heart attacks were right around 15 percent.

18              There are 124 claims where we have completed our

19  QC, but these are ones we always discussed that are being held

20  momentarily -- and usually it's just a day or two -- where

21  we're awaiting lien information.  Some of these are in audit.

22  And these will get processed and notices will be issued.  There

23  are 1,617 that are pending our final quality control review.

24  These will be issued this month for notice of points awards.

25              There are 739 that are incomplete for points

1    review.  This is a number that Your Honor asked me to keep you

2    apprised of.  This is a little troubling.  It's about a

3    25 percent deficiency rate.  And what this means is that when

4    we pick up a claim to review for points -- and these are claims

5    that were complete enough to pass gates, but when we look at

6    them to try to assess risk factors or injury level, they're

7    incomplete and we can't do it.  It's about a 25 percent

8    deficiency rate as opposed to about a 15 percent deficiency

9    rate in the heart attack population.

10                   The important thing here is that counsel be

11   mindful of the notices that we send them.  There are pretty

12   short turnarounds for them to be able to get the documents.

13   Counsel should be knowledgeable about what it is that completes

14   a claims package.  So they need to make sure that now they are

15   gathering whatever information is necessary because we will not

16   have time to grant extensions on these incomplete claims

17   packages.

18             **THE COURT:**  Yes.  I will reinforce that.  But one

19   aspect that is very, very important in these matters, at least

20   from the administrative review, is that they have all of the

21   material so that they can enforce the settlement agreements and

22   give life to the settlement agreement as it is written.

23                   When they don't have the material, they ask for

24   it.  If it's not delivered within a certain period of time,

25   then the claim is going to have to be rejected, and that's

1    problematic.  It's, unfortunately, the responsibility of the

2    attorney to provide this information; and if the attorney

3    doesn't provide it, then it's their fault for not getting

4    through the gate, and that's a problem both for their clients

5    as well as for their malpractice insurers.

6              So that's something that they have to focus on

7    and give immediate attention to.

8              **MS. GREER:**  Your Honor, in the points world, when we

9    issue a notice we tell counsel what is needed.  And at the end

10   of the day -- we adopted this with the heart attack

11   processing -- if counsel cannot come up with the records, in

12   order to be able to move forward and to close this out, we do

13   apply a standard deduction, which is an average that is

14   assessed across the entire stroke population, and it is a

15   deduction of either 10 or 30 percent.

16             And that is a final decision.  And counsel and a

17   client can decide either to go that route, or to become

18   non-submitting program claimants.  Those are the only options

19   at that point.  Because a non-submitting program claimant is

20   one who cannot complete a claims package.  And those can then

21   be appealed to the special master.  So the end result is we can

22   close the claim, but it may not be to counsel's liking.

23             **THE COURT:**  Right.

24             **MS. GREER:**  There are 57 claims where we have

25   started -- we picked up the claim for our initial points

1   review, and 272 that are in the queue awaiting our initial

2   points review.  The main message here, Your Honor, is that the

3   stroke points reviews are moving.  It does take longer because

4   1 in every 4 we have to put aside to await completion.  But we

5   feel that we are on track to make the final stroke payments by

6   the end of the first quarter.

7                 Your Honor, again, I will not read these point

8   averages, but this slide, for the benefit of those listening on

9   the phone -- and these slides are made available on our Web

10  site.  They will be present this afternoon.  People who want to

11  access them can look down the left-hand side of our Web site

12  and they're under a button called "MDL status reports" -- but

13  this slide shows the average points by injury level on the

14  stroke claims.

15                And it also shows that 6.74 percent of the

16  claims are coming in at the special marker level, which is

17  below 2 points.

18                THE COURT:  Now, is that a moving target --

19                MS. GREER:  It is.

20                THE COURT:  -- and you expect it to change?

21                MS. GREER:  It is.  It is.  It stays fairly constant,

22  but it does move as we review claims.

23                This slide shows and summarizes the payments

24  that have been made to stroke claims.  And you'll see that

25  through November we had paid over $116 million.  With the

1  various claims that can possibly be paid in December, we are on

2  pace to possibly pay out $158 million by the end of the year.

3             Again, we do expect for final payments to be

4  made at the end of the first quarter.  And all of that is

5  contingent on all of us sticking to the deadlines and moving

6  forward.

7             **THE COURT:**  Okay.

8             **MS. GREER:**  Your Honor, that concludes my part of the

9  presentation unless you have any questions.

10            **THE COURT:**  No.  But I do want to keep in touch with

11 you on that high percentage of people not responding.  So

12 you've got to get me involved in that and I'll take whatever

13 action is necessary.

14            **MS. GREER:**  Okay.  Thank you, Your Honor.

15            **THE COURT:**  All right.

16            **MR. BROWN:**  Good morning, Your Honor.  I'm Orran

17 Brown.  And as Lynn mentioned, I'd like to review for the

18 Court, and the parties, where we stand on the other phase of

19 the Vioxx settlement program that is currently underway, the

20 extraordinary injury program.

21            We have begun working on these claims over the

22 course of the summer.  The filing deadline for these claims was

23 September 1st.  It's past September 1st.  And these are folks

24 who are seeking money for economic losses exceeding $250,000 or

25 for a special medical injury that's not reflected on the grid.

1    I want to review with the Court today where we are in the

2    process and highlight a few issues that we're seeing in this

3    program.

4              First, this is an assessment, or kind of an

5    explanation, processing that we're going through on this.  This

6    is much like the regular MI/IS claims processing, but it has a

7    couple of wrinkles that we want counsel and the parties to get

8    used to.

9              We do our initial review of the claim

10   submissions that we receive, the claim form and the required

11   documentation that we receive; and on the basis of that, we

12   will issue a notice of EI assessment which tells folks what we

13   determined on the basis of what they turned in to us.

14             Now, this is a complicated step.  Because on the

15   economic loss, it means we go through each source of income,

16   each employer a person had for each period that they claim.

17   And we have to measure what they were making at the time of

18   their heart attack or stroke, and then project what they would

19   have made had there not been a heart attack or stroke, and then

20   look at other income that they did have from other sources

21   after their heart attack or stroke.

22             It's a complicated process for the wage loss

23   claims and for the medical expense claims to see what medical

24   expenses were incurred that were related to their heart attack

25   care or their stroke care, and then identify for the parties,

 1  the claimants, which ones we saw were supported in the
 2  documents and which ones were not.  So this notice that we
 3  issue to counsel, through their portal, will explain each of
 4  those details about the claim and which ones we saw were
 5  proven, which ones were not and why.
 6              And on the basis of that then, if the claimant
 7  and the counsel want to, they can ask us to make a second
 8  review of the claim.  And this is where we have folded in the
 9  deficiency process on the EI program.
10              Rather than spend a long time looking at the
11  files and then identifying that you're missing a tax return for
12  a year that you claimed, or you're missing a W-2, or you're
13  missing a medical record from a hospital about the charges that
14  you had, we have decided that we will issue an assessment that
15  tells them what was awarded and what's not and what's missing
16  and what they can then fill in to -- if they can find it, or
17  they have it, or wish to -- enhance their award and fill in the
18  gaps, and then their award will go up.
19              So we have collapsed that document deficiency
20  process into one step with the notice of the claims review to
21  save time and effort by all the parties.  But if a party
22  receives this assessment, they have other materials that they
23  can round up, then they can send it to us and ask for a second
24  review.  We will review it again.  We'll make a complete
25  re-haul of the claim to make sure that we have touched

1  everything that they've sent us, issue a second review
2  assessment.
3            And at that point, if the claimant is still
4  unhappy with the outcome, they have a right to appeal to
5  Special Master Juneau upon payment of a $700 appeal fee which
6  covers the special master's costs.  That fee will be paid to
7  us.  We're going to handle the money on that if there are any
8  appeals.
9            And at that point, the special master will
10 review these appeals, using the special master portal.  We're
11 doing all this electronically just as before.  It's important
12 to mention that at that point the record is closed.  We don't
13 want new documents coming in at this stage because then the
14 special master won't have the benefit of our review of them.
15 So the record closes after this second review request step with
16 us.
17           The special master will review the record that
18 exists, that we had, and only that record, issue a decision on
19 it.  And then if, on the basis of that decision, we would issue
20 a final notice on the outcome of the claim.
21           Those are the steps in the process.  It's a
22 fairly straightforward process.  We've designed this to
23 collapse this and try to make it happen as quickly as we can.
24 This program, like the other aspects of the Vioxx program, is
25 on a tight time table.  It's on a fast time table.  We and the

1    parties want it to be.

2              And that means that all of those steps that we

3    just mentioned have to happen in due order without delay in

4    between them.  Part of our job is to make sure that we do our

5    part.  But some of those decision points that counsel or

6    claimants have have deadlines on them.

7              And these are the key ones we have.  We're going

8    to have a 20-day period for people to react to these

9    assessments to send us additional materials or to appeal if

10   they wish.  And this slide shows us -- the notice of EI

11   assessment is the second one -- once they get that, they can

12   accept it, they can ask for a second review, they can send in

13   additional documents.  That's a 20-day opportunity.  To make

14   this program finish as we want it to by June 30th of next year,

15   that's what this segment has to allow is a 20-day period.  Then

16   after our second review, they'll have 20 days to accept that or

17   appeal to the special master.

18             The first row up here is a special step in this

19   process that we have decided is necessary because of the nature

20   of the materials we have received.  Many of the claims that we

21   got for medical expenses, when the claim form -- the EI claim

22   form -- was filled out online, it required parties to indicate

23   which hospital, which pharmacy, they were claiming as medical

24   costs related to their Vioxx-related event, their heart attack

25   or stroke.

1          Those are the medical expenses that are
2   compensable in this program to see if you meet this $250,000
3   threshold.  On about 50 of the claims we got, the claim form
4   was not filled out, it just said "various" and "see
5   documentation."
6          So then we just had a stack of documentation
7   that is long lists of prescription names or various hospital
8   visits and doctor visits and we cannot tell which ones amidst
9   that pile that they are claiming are related to their Vioxx
10  event.  So usually in a program like this, that means the claim
11  just gets denied because we cannot tell if it's been proven.
12          In this, however, rather than deny those claims
13  outright, we designed a system on the Vioxx portal where the
14  law firm can go on the portal, answer a series of questions
15  identifying which ones they're claiming and where they are in
16  the records, which page they're on.
17          Because very often we have a long list of
18  prescription names and they cover all sorts of treatment.
19  There are obviously some prescription medications on there
20  completely unrelated to cardiac care or neurological care, and
21  we can't tell which ones they're claiming.  So we're going to
22  ask them to tell us more precisely.  And that's a 20-day
23  period.  We're providing that opportunity rather than denying
24  those claims outright.  That was rolled out yesterday.  So
25  people will be getting those notices to do that step in the

1    process if you have one of those claims.

2                    These are some of our numbers on the EI claims

3    that we have received.  We had 2,657 claimants who sent us

4    something by the September 1st deadline relating to the EI

5    program.  Now, some of them -- 51 of them, as it shows in row

6    2, sent us some records, but no claim form -- no EI claim form.

7    We had made very clear from the time this program was announced

8    in April of this year, we had to have a claim form and we have

9    to have certain documents to be able to review a claim.

10                    51 folks sent us some materials but no EI claim

11   form.  We do not count them as an EI claim if we don't have a

12   claim form.  That gives us a net number of 2,606 claimants who

13   sent in an EI claim form and materials by the September 1st

14   deadline.  It didn't have to be all the materials.  We hoped it

15   was.  But, as I mentioned earlier, we're going to tell them

16   what they're missing as we go through the process.

17                    Now, those folks, the 2,606 people, need a

18   little bit further explanation, because not all of them are

19   eligible for this program.  As this slide shows us, working

20   down from that 2,606, we have 2 people who have already

21   withdrawn their claims and changed their mind.

22                    We have issued 1,054 notices of ineligibility.

23   And the reasons are shown here.  There are 36 people who have

24   already had a final failure on their underlying claim.  The EI

25   program in the settlement agreement says you have to be a

1  qualifying program claimant.  You have to have passed on your
2  heart attack or stroke claim to be in this program.
3  　　　　　We had 36 folks who sent in EI forms, but they
4  have not passed on a final failure on their underlying claim.
5  We have 2 that we've denied because it came in after the
6  September 1st deadline.  It was untimely.  We have 116 now that
7  we have denied because they sent us a form but no
8  documentation.  We've issued those notices.
9  　　　　　That gives us a net of 2,450 claims that we are
10 processing for reviewing the documents and making an
11 evaluation.  This is where we are in that 2,450 claims.  Now,
12 that's 2,450 people.  Many of these folks made more than one
13 claim.  They claimed a special medical injury.  They also
14 claimed lost wages.  They also claimed medical expenses.  They
15 also claimed future wages and expenses.
16 　　　　　Among that sort of smorgasbord of claims, some
17 people made one, some folks made all five.  If you take those
18 2,450 people, it's about 3,800 different types of claims we're
19 looking at to walk through them and evaluate them.  We have
20 issued, as row 2 shows us, 139 assessments, that I've
21 mentioned, after our review.  We've already started issuing
22 these things.  They were fairly recent so we're waiting on
23 decisions, 136 of them.  They're in that 20-day window to
24 accept or object to it.  We already have 3 people among the 139
25 who have asked for a second review.  So that process is

1    underway.

2              We have 368 we've got still in initial review;

3    and then we've done our quality control review on it, so we're

4    about ready to issue their assessments.  1,336 claims where

5    we've done our first look at it and now we're doing our quality

6    control step.  And then 607 who are still in the initial review

7    queue.

8              So these numbers are smaller numbers than we've

9    dealt with on the heart attack and stroke side.  The claims are

10   really complicated because they involve this elaborate analysis

11   of their wages, their income, their medical expenses.  And on

12   the special medical injury claims, we have to look at all their

13   hospital records to see what it is that they think was an

14   extraordinary injury.

15             To make this program work, we had to develop

16   review criteria.  Long ago, back when we announced the program

17   in March, we developed and wrote out an instruction manual that

18   we posted on each counsel's Web site and posted on our general

19   public Web site.  It explained the basic outlines of the

20   program.  The fundamental rules for submitting a claim, what

21   document was required, and all the various types of materials

22   you had to submit, and when they had to be in, and basic rules

23   about what types of claims you could make.

24             It put some flesh on the bones of the settlement

25   agreement which just says, "There will be an extraordinary

1    injury program, and the claims administrator has discretion
2    about how to design it."  We worked with the parties at that
3    stage to lay out that initial kind of playbook for the program
4    and had it posted during the period that people were submitting
5    claims.

6                   Now, beyond that, once we get the claims in, we
7    have to have detailed evaluation criteria.  How do we determine
8    which wages are associated with the heart attack or stroke; and
9    which are not; how do we calculate the anticipated earnings
10   versus the actual earnings; how do we go through the medical
11   expenses and see what's related; and what's proven and what's
12   not; and on the special medical injury side, what types of
13   injuries count as truly extraordinary?

14                   So we, over the course of the summer, developed
15   detailed evaluation criteria.  So when our reviewers go through
16   these files, they know what to look for, we know what
17   qualifies, we know how to do the math, we know how to tell
18   what's established or not.

19                   And in most programs, that review material is
20   internal.  It is something we use on our own people and the
21   rest of the world never sees it.  This program, we and the
22   parties wanted to do different from that.  We wanted greater
23   transparency in how these claims are being reviewed.  So this
24   manual is public.  We codified all of our review criteria and
25   put it in this Review Criteria Manual and posted it on the Web

1  site for each firm, and on our general Web site, this past
2  Monday, November 30th.

3           Now, what that enables people to do, counsel and
4  claimants, is to see exactly how their claims are going to be
5  reviewed.  And when they get these notices from us, then
6  they'll be able to look at that and see exactly why they got
7  disallowed and why this did not get allowed.  It's complete
8  transparency.  We want people to understand how we're doing
9  this.

10          Now, that meant that there had to be some
11 detailed decisions made about how these claims will be
12 reviewed.  This document is a 46-page document.  It's got
13 everything in it you'd like to know about how these claims go.
14 Because some of this is going to be new to people.  Because
15 people are not accustomed to seeing the details of how these
16 types of claims are reviewed, I want to highlight about six
17 points of it.  So that we call the attention of counsel and
18 claimants to some of the key review criteria highlights that
19 are in that manual, and you can read the details on it.

20          The first thing is what we call the "relative
21 points value adjustment."  This, Your Honor, is a method that
22 enables us to review the EI claims without having to have a
23 whole another regime of looking at age, looking at duration of
24 use, looking at the relative risk factors about how -- other
25 causes of heart attack or stroke.

1          In a claims process, you have to accommodate all

2    of those factors.  But here, those factors are taken into

3    account in the underlying grid.  The underlying MI and IS grid

4    takes into account those types of things that affect the

5    relative strength of each claimant's claim:  The younger you

6    are, the more money you get; the fewer risk factors you have,

7    the more money you get paid on your underlying claim.

8          On the EI side, we just borrow from that.

9    Rather than graft on to this a whole another grid, we take the

10   claimant's underlying points score on their IS or MI claim and

11   take whatever ratio that is out of a perfect score.  Because a

12   perfect score on the underlying claim is 1,000 points.  If you

13   had a point award of 500, then you've got a 50 percent ratio.

14         And that enables us to then look at all of the

15   dollars that have been shown on the EI award.  If somebody had

16   a million dollars of lost wages and a 500-point score on their

17   underlying claim, that means they have a 50 percent relative

18   value ratio, they get $500,000 awarded here.

19         This enables us to preserve the relative

20   positions of the parties to each other in the EI world the same

21   way they stand with respect to each other on their underlying

22   claims.  So that someone who has a point score of 100 or 50

23   because they had four risk factors and were older when the

24   claim occurred doesn't, in the EI world, get as much or even

25   more than someone who had a point score of 500, or 600, or 700.

1    We're borrowing from that and mimicking it in this world.  And
2    that's the relative points value adjustment.
3                    But it does mean that if someone has a million
4    dollars in lost wages, then you look to see their underlying
5    award, it cuts it down by whatever percentage of a thousand
6    their underlying award was.  That's been in the manual since
7    March.  It's a known factor.  But it's a mathematical step we
8    have to do to avoid unfairness in the awards, depending upon
9    what their underlying score was.
10                   Another, thing, Your Honor, that we had to do
11   was decide what the cutoff is.  Because when you're talking
12   about future, or income, or medical expenses -- and here we're
13   talking really about wage earning -- how long do you go?  It's
14   just like in a tort case:  How long do you expect someone to
15   work?
16                   Here, we had several choices.  We could say,
17   well, everybody is going to be assumed to retire at 65, or
18   everybody retires at 60, or 62, or 70.  We decided to borrow
19   the Social Security Administration age table.  And for purposes
20   of determining eligibility for social security benefits, the
21   Social Security Administration uses a table that picks an
22   assumed retirement age depending upon when you were born.
23                   The folks that were born in earlier years are
24   assumed to retire a tad earlier.  If you're born after 1960,
25   your assumed retirement age is 67 years of age.  So the range

1   drops it from 65 to 67.  Now, what that means is is that

2   someone who is claiming lost wages, we had to adopt a

3   bright-line, uniform, federally-approved rule to say when you

4   stop.  Because otherwise we're guessing how long you would have

5   worked, how long your job would have been there, what the

6   economy would have been downstream.  You get bogged down in

7   trying to guess at future wages, which are in every trial kind

8   of a conjectural issue.

9               So we picked this bright-line date.  What that

10  means is is that people claiming wages, we stop when you hit

11  that retirement age.  It does mean, for example, there are a

12  handful of people who had already hit this age before their

13  Vioxx injury.

14              So if you were 67 when you had your heart attack

15  or stroke, under this rule, you do not have a wage loss claim

16  because you're already past the age when you're presumed to

17  have retired.  And that's what that rule means.

18              Across the board, it's a rule that achieves

19  systemic fairness because it's a bright-line and it avoids

20  penalizing people who were younger when their event happened

21  and then awarding people who were older when it happened.  But

22  it's an issue that we had to have some bright-line and this is

23  what we settled upon with the parties' approval.

24              Another issue that these programs often bog down

25  on is disability.  When you're considering lost wages, if you

1   were able to work and chose not to work voluntarily, you don't

2   have a loss wages claim.  A lot of these wage programs really

3   bog down on this issue.  That's why it takes so long to get a

4   social security disability benefits determination from the

5   Social Security Administration.

6                    Here, we've got some bright-lines.  We're

7   assuming that if you're deceased, then that's a total

8   disability; if you're on stroke level II, that's a total

9   disability; if your underlying stroke claim is on levels III or

10  IV, that's a partial disability because of the level of

11  impairment that those levels involve.

12                   Everyone else has to show us their disability

13  level with a medical records or a doctor's finding and a

14  medical record.  But we -- if you don't have any proof in on

15  that, rather than bog down and make you give us percentage

16  disabilities, we're going to assume 50 percent disability.

17  We're just going to have a bright-line on that.  Folks can come

18  in and show us that they're more than that.

19                   But what that means is if you don't give us any

20  disability proof -- and a lot of people haven't -- we're going

21  to assume that you could have made half of what you were making

22  before this injury happened.

23                   Future medical expenses, also an inherently

24  conjectural issue.  The settlement agreement does not guarantee

25  any future EI payments.  We said with the parties' direction

1    and approval back when we were designing this program, and we

2    would roll this out in March, that future expenses, future lost

3    wages, future medical expenses, would be a factor in the

4    evaluation of these claims.  And here "future" means anything

5    after the date of the settlement agreement.  11/9/07 was the

6    date that fixed what's past and what's future for our program.

7                    On the medical expense side, rather than get

8    into all the analysis about how long you need medical care,

9    what conditions were prompting the need for medical care, how

10   long would you live, we picked a period to allow it to be a

11   factor for medical expenses of the date after the settlement

12   agreement up through the date that people file their EI claims.

13   So that gives us more of a picture.  It's not as speculative.

14   We can tell exactly what they've incurred.  That's in the

15   manual, fixing that period for medical expenses.

16                   We also, because of future lost wages, when

17   you're guessing at how much people would continue to make until

18   age 67, you have to discount it to present value, for starters.

19   You also know, as the Court is well aware, that is inherently

20   conjectural because of many variations or variables that affect

21   future income.  So we've adopted a bright-line there.  That if

22   you're having future lost wages, we're going to guess as to how

23   much you would have accrued until age 67, discount it to

24   present value, and take out the uncertainty of it with a

25   50 percent across-the-board for every claimant discount.

1          That means that if we projected you would have a
2   million dollars of earnings, we're going to award 500,000 to
3   discount to present value and avoid the conjecture that is
4   inherent in guessing at how long people will work.
5          The last thing to mention is on the special
6   medical injury claims.  This is the bulk of what we have of
7   people claiming that they have a medical condition that was not
8   adequately reflected on the underlying MI or IS grid.  And that
9   has presented a lot of challenges for us.  Because we had to
10  make sure that we developed our review criteria in a manner
11  that was consistent with what the parties intended this to be
12  and in a manner that's workable, administrable.
13         So we had to go through on all of these factors,
14  but particularly here, and come up with some evaluation rules
15  that we thought were across-the-board fair to claimants; that
16  they were workable; that we could do them without spending
17  years doing it; and that they were, as best we could tell, more
18  objective than subjective, just like the underlying program,
19  turning on medical records; and at the same point, not
20  requiring mountains of paper that would take us a long time to
21  review.
22         So we came up with ten basic rules for the
23  review of these claims of special medical injury.  They're in
24  the manual.  Basically, they tell us that what counts as a
25  special medical injury cannot be something that's already on

1    the grid.  It cannot be a heart attack.  It cannot be a stroke.

2    It has to be something that's different from that.  It can't be

3    reflected on that.

4                    And we go through, if it is something that's

5    different, we look at, was it caused by the heart attack or

6    stroke; did it stem from that in kind of a reasonably

7    foreseeable proximate cause kind of way -- we have some people

8    that turned in injuries as extraordinary injuries that happened

9    before their heart attack or stroke.  So we can't pay them

10   because they obviously were not causally related to the heart

11   attack or stroke -- is it severe; and what is the level of

12   severity; how atypical is it?

13                   Because the problem that we've had with this is

14   is that things that are normally associated with a heart attack

15   or stroke, which in themselves are severe injuries, do not

16   count as extraordinary.  And we've had a lot of folks turn in

17   claims that sort of see this as sort of a second bite at the

18   apple, that they feel like they didn't get enough money on the

19   heart attack or stroke claim itself, or they failed to appeal

20   something and now they kind of wish they had, or they didn't

21   turn in something before.

22                   And we're trying to make this program not a

23   do-over, not a second bite at the apple for the underlying

24   claim.  This has to be something that is really different.  And

25   that's what "extraordinary" or "catastrophic" means.

1            Every injury, if you have it, is serious to the

2    person.  We don't mean to belittle any of that.  But we're

3    looking for things that are really different from the normal

4    course of a heart attack or stroke disease progression or care.

5    It has to be different.  And it also then has to show up in the

6    record.  We have to have an objective medical record that says,

7    from the doctor, this person has anoxic brain injury, or a

8    heart transplant, or something that really is different from

9    what normally happens in a heart attack or stroke patient.

10           Then we also have to put values on these medical

11   injuries.  If we find an injury that we think is really

12   extraordinary, caused by the event, it's different from what

13   normally happens, then we're going to put it in, according to

14   the severity, one of three tiers.

15           The settlement agreement doesn't tell us how to

16   value these.  It's not like we have a grid or points or a pro

17   rata division.  It's we have to value these on their own, so

18   how much is it worth to someone who's had a heart attack?

19           We picked these values relative to the

20   underlying values on these Vioxx claims.  And if you're in tier

21   1, it's a million dollars; if you're in tier 2, it's $750,000;

22   and tier 3 is $500,000.  And then that number is your total

23   assessment.  It then gets applied -- or subject to this

24   relative value adjustment.

25           Because, again, that's your perfect score of a

1  million.  If you had a points award of 500 points, then you get

2  $500,000.  We have to do the same mathematical adjustment to

3  these as we do on the economic losses to maintain the relative

4  positions of each claimant.

5              So those are some highlights, Your Honor, of the

6  program.  Those are some key evaluation criteria we want people

7  to focus on.  Because we had to have some rules about how to do

8  this.  They're in the manual.  We want people to look to make

9  sure they understand them, and if they have questions to ask

10 us.  We want this to work in a way that people can follow.

11              Thank you, Your Honor.

12         **THE COURT:**  Okay.  Thank you very much.

13         **MR. MARVIN:**  Your Honor, if I may just make a brief

14 statement.  As Your Honor knows, the settlement agreement vests

15 in BrownGreer the discretion in determining what qualifies as

16 an extraordinary injury and the amount to be allocated among

17 those who do qualify.

18              Mr. Brown showed to you the first page of the

19 manual that they have used to set out the protocol for the

20 calculations that they are making.  It was only the first page,

21 and we would like to present to Your Honor -- I'm sure

22 BrownGreer will -- the actual manual.  It's a very substantial

23 manual.  I think it's important to point out that this is

24 entirely transparent as to how the calculations are being done

25 and what actually qualifies.

1          In fact, I'm not aware of any other program that

2    is this transparent with respect to a program like this.

3          **THE COURT:**  Yes.  We've tried to do that throughout

4    the course of this litigation.  If you can give that manual to

5    me in some electronic format, I'll post it on our Web site.

6    I've been very conscious of that throughout the litigation.

7    That's why I have these open-court meetings, invite everybody

8    to attend, the lawyers and litigants, and then we post the

9    transcript of these meetings on the Web site, make that

10   available to everyone.  We post all of the material that we

11   have on the court's Web site.

12          So I'm doing the very best I can to make it

13   transparent, to give everybody an opportunity to see what's

14   going on as it's going on, and this is another instance.

15          **MR. MARVIN:**  Your Honor, the only other point that I

16   want to make is that in any other program like this, lines have

17   to be drawn.  And while everyone could quibble -- reasonable

18   men could quibble about whether the lines should be here or

19   whether the lines should be there, we do know that through this

20   exercise BrownGreer has used fairness as its guidepost.

21          **THE COURT:**  And consistency.  That's important.

22          **MR. MARVIN:**  And consistency.  And from our review of

23   the manual and the program, we believe that they've achieved

24   that.

25          **THE COURT:**  All right.  Good.  Thank you.

1          The next item is the lien administrator.

2          **MR. HERMAN:**  Your Honor, I just want to point out

3    that Merck does have some motions that will be heard following

4    the conference.  And Matt Garretson is here to address those

5    lien issues.

6          **MR. GARRETSON:**  Good morning, Your Honor.  I'm Matt

7    Garretson here to report as the lien resolution administrator.

8                As before, I've isolated this report to just the

9    MI and SCD, myocardial infarctions, sudden cardiac death cases,

10   since those are the cases eligible for final payment.

11               Further, I'd just like to reiterate, for those

12   dialing in and those here in the courtroom, that we continue to

13   work with BrownGreer to make sure that primary counsel has

14   access to the lien obligations and the status of those lien

15   obligations, whether they're in hold-back mode or final mode.

16               As I reported at the last hearing, BrownGreer

17   has assisted us with putting functionality on their Web portal

18   that allows primary counsel to export to Excel a listing of

19   their claimants and their lien resolution obligations.  I want

20   to reiterate that because we still get a lot of questions about

21   how to access that information.

22               Further, as I did at the last hearing, I'll just

23   speak briefly about governmental lien obligations and then

24   speak about the private lien resolution program.

25               With respect to Medicare and Medicaid, there

1   really isn't much new to report this month, Your Honor.  We

2   have, as I reported last time, just a handful of Medicare and

3   Medicaid liens that have yet to be resolved.  And the reason

4   those have yet to be resolved is there was a discrepancy in the

5   social security number and we're just waiting for those

6   discrepancies to be cured and then the liens can be resolved.

7   It's measured and they're now on just a few hundred claims.  As

8   soon as those are finalized, I'll report to the Court.

9            **THE COURT:**  Okay.

10           **MR. GARRETSON:**  With respect to other governmental

11  liens, I reported that at the last hearing that we had about

12  430 liens that had yet to be finalized because we are trying to

13  get the claims history from the several hundred military

14  facilities which we had to go and get the paid-claims data.

15  We've made good progress.  We've cut that number down to 241

16  from the 430.  And we'll continue to report on that.  And I

17  expect that we'll keep chipping away at that and that will be a

18  non-issue very soon.

19           Moving on to the private lien resolution

20  program.  Just a couple updates to share.  As I've mentioned

21  before, we have 477 private health insurance plans

22  participating in the program.  As of today, we have 21,762

23  claimants who have signed acceptance forms in order to

24  participate in the private lien resolution program.  That's a

25  several hundred new claimant increase since our last report.

1               We speak of these claimants in terms of two

2      categories.  The first category are those who signed acceptance

3      forms prior to the June 19th, 2009 deadline.  And there's

4      approximately 20,000 in category I.  The second category are

5      those who have signed or will be signing acceptance forms as a

6      result of these enrollment extensions that have taken place

7      since June 19th, including PTO 48 and PTO 54.

8               So going to category I.  With respect to those

9      participating claimants, we're now in the process of working

10     with the third-party payer committee to finalize a release

11     document that we will give to those who signed up, who had no

12     match from any of the plans, or they had a match but the plans

13     had no paid-claims data.

14              One of our priorities will be to make sure that

15     those claimants who have gone through the program who have no

16     match are given a release from the participating plans for

17     their file.  Of course, I remind everybody that that release

18     would only pertain to those plans who have agreed to

19     participate and that primary counsel should ensure that the

20     clients don't have obligations with plans that are not

21     participating in the private lien resolution program.

22              Also, we'll report that for this category

23     I group of claimants that by now most of the claimants should

24     have seen some reprieve in their hold-backs.  We had the

25     15 percent hold-backs for many of these claimants at the time

1   of the last hearing.  Most, if not all, of those have been

2   swept and reduced in the November payment.  So I believe that

3   issue is behind us.  And I heard good things from counsel that

4   they're pleased to see those numbers go down.

5                   It's also important to know that now that we

6   have this hold-back in place for many of these claimants, a lot

7   of these liens will be further reduced by way of an audit

8   procedure that we're employing.

9                   I wanted to just speak briefly, if I could,

10  about the claims audit procedure, because several people have

11  inquired about how that process works and what it is we are

12  doing behind the scenes.  So I'll give you just a brief

13  overview.

14                  Our first step in this claims audit procedure is

15  to see if the expenditures being claimed by the plan for

16  reimbursement are contained within the range of diagnosis codes

17  or procedure codes that might be related to a Vioxx event -- a

18  claimed Vioxx event.

19                  So we use this code filter to determine if the

20  expenditures are related to a myocardial infarction or ischemic

21  stroke event.  However, just because those codes could be

22  related does not mean that they're automatically attributed to

23  the Vioxx event for which the claimant's being compensated.

24                  So once we go through this code-filter process

25  with all the plans -- they've all agreed to that code filter.

1    And they are essentially providing us a claims summary of

2    expenditures that match possible expenditures from that claims

3    summary -- we then analyze those expenditures to ensure that

4    they're related to the participating claimant and that no

5    duplicate expenditures are being claimed by one or more

6    participating plans.

7                    Remarkably, many of these claimants have

8    multiple plans that have insured them through this same time

9    period.  And we also recognize that there's room for error,

10   that plans might submit claims for a John Doe that is different

11   than the John Doe participating in the Vioxx settlement

12   program.

13                   So having matched the expenditures to the

14   appropriate claimant, we're then looking to make sure that the

15   expenditures occurred sometime between the date of compensable

16   injury and the date of the Vioxx settlement in November of

17   2007.

18                   Next, we're further analyzing the claimed

19   expenditures to determine if they're injury-related or

20   non-injury-related by a process of reviewing what we've

21   referred to as a "code hierarchy."

22                   The medical community utilizes diagnosis codes

23   to memorialize the primary reason that a patient received

24   treatment.  We use this then to identify and document the

25   underlying medical condition.  And then the providers, if you

1   will, once they're going through that code hierarchy to make

2   sure that they're billing correctly.

3                     So somebody could go in, for instance, for a

4   broken leg and also while they're there with their treating

5   physician, they might have a checkup on their cardiovascular

6   event or their condition.  We use the hierarchy to determine

7   that actually that visit was related to the leg for the primary

8   reason and not just some of the follow-up questions and

9   inquiries being asked by the doctor.

10                    So this code hierarchy is of particular

11  importance when we review the claims with anybody that has a

12  prior history of cardiac or ischemic stroke type events.  So we

13  go through the code hierarchy procedure.  And the purpose is to

14  truly make sure that the codes being reimbursed were tied to an

15  event that was the reason for the patient's treatment.

16                    Next, Your Honor, we're going through this

17  process of looking for preexisting treatment patterns.  When we

18  request the expenditure data from the participating plans, we

19  ask them to send us data that goes a year in advance of the

20  Vioxx event so that we can analyze the treatment patterns, such

21  that we can identify, through this history, if there are any

22  preexisting patterns that would have occurred regardless of

23  whether there was a Vioxx-claimed event.

24                    Furthermore, we're working with the claims

25  administrator to get the risk factor adjustment criteria that

1  were actually applied to the individual claimants so that we're

2  matching up our audit procedure with the true compensable event

3  for each of these claimants.

4              So, for instance, if the claims administrator

5  noted in their review a prior MI or CABG preexisting coronary

6  artery disease, or prior ischemic stroke, or TIA, we're

7  adjusting our review to mirror theirs.

8              So that's just a brief overview of how the

9  procedure is working.  To date, we've run 9,522 private liens

10 out of 14,000 that we know are in existence that have been

11 matched to actual participating claimants.

12             Perhaps, more importantly, we've audited 7,952

13 of the 8,269 MI or SCD claims.  So those are the ones that are,

14 of course, ripe for payment and pending for final disbursement.

15 2,464 of those audits have been approved by the participating

16 plans.  So you can see there's approximately 5,000 that have

17 yet to be approved by the plans.

18             But we expect to receive the balance of those

19 approvals now from the plans within the month of December.

20 Meaning we can work with the claims administrator to get those

21 audited liens posted.  There's an appeals process that I'll

22 speak to in a moment.  But then we would see a sweep for many

23 of those claimants occur in the January payment cycle.

24             At the last hearing, we brought to the Court's

25 attention that there was an issue with how preexisting

 1   conditions should impact this audit process.  We noted that it
 2   was a significant one, but we were working constructively with
 3   the parties to reach an agreement on these cases.  I'm pleased
 4   to report that that issue has been resolved and now we see this
 5   process really picking up steam and these audited liens being
 6   approved quickly.  For those that are approved, we're going to
 7   continue to post them on the Web portal on a rolling basis as
 8   they are approved by the plans.
 9                   According to the agreement between the
10   third-party payer committee and the plaintiff's steering
11   committee, claimants have the ability to appeal the audited
12   lien amounts.  So we have a ten-day period that claimants will
13   have to audit once we post our results.  So we have begun to
14   work with BrownGreer to ensure that we can post the liens and
15   then notify primary counsel of this appeals process.  We expect
16   that this process of adjusting the Web portal and posting liens
17   to be ready to be approved or appealed will be functional
18   within the next ten days.
19                   I would just, on that note, Your Honor, I would
20   just encourage primary counsel to check the Web portal at least
21   twice weekly.  Because once we post, the ten-day cycle begins
22   to run.  So they need to be on top of that to ensure that they
23   don't miss the appeals window.
24                   So then let me speak briefly about -- that's
25   category I.  The category II are the second category of

1    claimants that have come onboard by way of an extension of the

2    deadline or by way of PTO 48 and PTO 54.  As of today, we've

3    received 250 signed certifications from primary counsel that

4    were identified by on the exhibit to PTO 54.

5                     There are approximately 818 outstanding

6    certifications from primary counsel that were identified on

7    that exhibit.  For primary counsel who has yet to return the

8    certification to us, I request that they do so by

9    December 31st of this year.  If this is acceptable to the

10   Court, we would ask BrownGreer to assist us in sending a final

11   e-mail blast to those primary counsel notifying them of that

12   deadline.

13                    I would also say that November 16th was the

14   deadline for any claimants to submit acceptance forms by way of

15   PTO 54.  So my assumption is that those outstanding

16   certifications are related to firms who have no further

17   participating claimants.  Because that deadline has come and

18   gone.

19                    With respect to these category II claims, we've

20   communicated to all the plans, and they're in agreement, that

21   they will be able to provide us the claims -- their claimed

22   expenditures related to this final waive of claimants by

23   December 18th, which would give us a fighting chance to get

24   through them by the end of the year.

25                    So, Your Honor, that concludes my report as the

1    lien resolution administrator for this month.

2              **THE COURT:**  Okay.  Thank you very much.

3                   As everyone knows, we've been talking about the

4    lien resolution programs.  These liens are medical liens.

5    Oftentimes individuals who become ill have private insurance or

6    governmental insurance, those insurance companies pay the

7    medical expenses and as a result of their paying the medical

8    expenses, they have a medical lien.

9                   The advantage of a case of this sort is that

10   those individuals can come together, as a group, and through

11   the good work of the lien administrator, get a discount of

12   those liens, and that's what we've been talking about.

13                  It's been called to my attention by at least one

14   litigant, if not more, that they also have been approached

15   regarding liens by financial institutions, loan companies.

16   Individuals who are injured oftentimes have expenses and they

17   turn to individuals to get loans.

18                  These may be liens, but these are different

19   liens than what we've been talking about.  Those loan liens,

20   I'm going to look over those.  I don't want any amounts sent to

21   any company or attorney for the company's benefit.

22                  If they are liens, I'm going to ask the lawyer,

23   the litigant and the loan company to come to court and to tell

24   me what the lien's about, how much interest has been charged.

25   Because it's called to my attention that some of the loan

 1    companies are charging 50 percent, and some 100 percent,

 2    interest.  I'm not going to tolerate that.

 3                When I hear that there is a lien, I'll set a

 4    hearing.  I'll give everybody an opportunity to explain to me

 5    what the expenses were, why they were needed, why they were

 6    given, how much interest has been charged on them, and I'll

 7    make a record of that, and, of course, invite the appropriate

 8    bar associations to participate, as well as the appropriate

 9    entities that oversee the financial institutions, and I'll make

10    a record of it and submit that to whoever is interested.

11                But I don't want this type of lien to morph into

12    the liens that we've been talking about.

13            MR. BIRCHFIELD:  Your Honor, Mr. Herman had to step

14    out for just a moment.

15            THE COURT:  Okay.

16            MR. BIRCHFIELD:  But the next item on the agenda is

17    the special master and we have Mr. Juneau here to give a

18    report.

19            THE COURT:  All right.

20            MR. JUNEAU:  Good morning, and a pleasant morning to

21    you, Your Honor.  This will be a brief report.

22                I'm very pleased to report, Your Honor, that we

23    are fully up to speed on the appeals that have been filed in

24    this matter relating to the heart attack cases.  There's a

25    subset of that that had to be with the special marker cases

1   involved in that.  All of that has been handled.  I've

2   addressed all those recently.  It affects other cases involved

3   in the category.  I'm advised by BrownGreer that those cases

4   have actually been paid now.  So that's fait accompli at this

5   point.

6                  We're now dealing with the regular flow that you

7   could expect from the stroke cases.  We anticipate, as we did

8   previously, there will be a bubble effect with regard to those

9   claims that may be in the appeal process.  And it looks like

10  that will occur sometime after the first of the year, probably

11  mid-January if I had to anticipate.

12                 I have alerted the other two special masters

13  about this bubble that's expected.  They're geared up to handle

14  it as we were with regard to the first bubble.  It will not be

15  as severe or as large as the matter involving the heart attack

16  cases.

17                 I have astutely observed and have reviewed, Your

18  Honor, the posting by BrownGreer on the information related to

19  the extraordinary claim fund.  Those appeals -- because that's

20  a matter that I will have to address, and I'm prepared to

21  address that -- I'm acutely aware of what the criteria has

22  been.  I've reviewed that and have prepared ourselves to

23  address that through the electronic procedures that have been

24  developed in this case.

25                 With that being said and done, Your Honor, it

1    looks like we're up to speed.  I'm, quite frankly, amazed that

2    all of this has been done.  It took the effort of an awful lot

3    of people in this room.  A lot of times that goes unnoticed.

4    This has been a remarkable journey over the past months to

5    watch this thing unfold, but it has occurred.

6              The last and parting comment I'll make, and I

7    say this, Your Honor, on behalf of myself, the two deputy

8    special masters, and I know I speak for everybody in this

9    courtroom, and the parties, to wish you and your staff a merry

10   and happy holiday season.  Because it looks like we will

11   adjourn probably until sometime after the first of the year, so

12   we will not be able to convey it.  We appreciate the courtesies

13   extended by you to all the of us.  It's not been an easy

14   process, but it has been a worthwhile process and something

15   that has worked very well.  Thank you very much.

16        **THE COURT:**  Good.  Well, thank you, and I, of course,

17   return good wishes to you and your group.

18              As I mentioned before, we've tried, as best as

19   the Court can, to give appropriate due process to everyone.  In

20   a case of this sort, 50,000 claimants, not everybody is going

21   to be satisfied.  That's just the way of the world.  But I was

22   concerned and interested in giving as much due process as can

23   be given.

24              We have a settlement program that is plugged

25   into three levels of review.  We have the administrative

1    review.  You've heard the administrative review.  Their job is

2    to strictly construe the settlement provisions and make sure

3    all the i's are dotted and t's crossed and the material

4    obtained and all of that sort of thing for that review.

5                Then if they fail someone, then that individual

6    has another course, another review, the gates committee review.

7    This gates committee review consists of lawyers from the

8    plaintiffs and lawyers from the defendants and they look at the

9    material and they also apply and take into consideration other

10   factors.

11               The third level of review is a total independent

12   review.  With the help of Special Master Juneau, a very

13   experienced and talented lawyer who has been doing this for

14   many years, and he's been assisted by a retired justice of the

15   Supreme Court of California and a retired judge from New

16   Jersey, they look at it from a third-party aspect and they give

17   the third level of review.

18               That's the best due process that anyone can be

19   afforded.  And if they don't get through, at least they should

20   understand that they've been given three strikes to get

21   through.  Three opportunities to get through.  And that's the

22   most that someone can ask of a court or of the parties.

23               It's worked because of the experience and the

24   ability of the attorneys who have handled this matter.  We've

25   been able to resolve it in two and a half years.  We've been

1   able to pay it out in a little over three years.  Some

2   $4.5 billion has just about been paid out.  So that's a tribute

3   to the attorneys and the Court appreciates all of their good

4   work.

5                  The next item on the agenda is state court trial

6   settings.  Anything on that, Counsel?

7              **MR. MARVIN:**  Your Honor, there are no cases set for

8   trial in the state courts through December 31; or, for that

9   matter, through the first quarter of 2010.

10             **THE COURT:**  Any class actions?

11             **MR. MARVIN:**  There is no new developments there, Your

12  Honor.

13             **THE COURT:**  Okay.  I received something from the

14  Court of Appeal on the international class actions.

15             **MR. MARVIN:**  Yes, Your Honor.  There was an appeal of

16  your order with respect to forum non-convenience for foreign

17  plaintiffs; and I believe it's within the last week that the

18  Fifth Circuit affirmed Your Honor's order.

19             **THE COURT:**  State/federal coordination.  Anything on

20  that?

21             **MR. HERMAN:**  Ms. Barrios will make a report.

22             **MS. BARRIOS:**  Thank you, Mr. Herman.  Good morning,

23  Your Honor.

24                  Since my last detailed report, we've been able

25  to ascertain that your court is burdened less by 66 remand

1    motions.  We've determined that through looking through the
2    dismissals that you've been entering pursuant to Ms. Wimberly's
3    various motions.  We have still yet some additional work to do
4    along with BrownGreer to determine some plaintiffs who have
5    filed motions for remand, who registered in the settlement but
6    did not enroll in the settlement.  So we're working with
7    BrownGreer and handling in that.
8              This information, Your Honor, is current through
9    CTO 159.  Thank you, Your Honor.
10         THE COURT:  Thank you very much, and thank you for
11   your help.
12         MR. HERMAN:  Your Honor, Mr. Robert Johnston is here
13   with regard to pro se claimants.
14              While he's taking the mic, I'd like to report
15   that we've had a number of increased inquiries from various
16   claimants.  We've explained to them that if they're represented
17   by an attorney, there's a prohibition against us really talking
18   with them.  But we are attempting, and have attempted, to
19   resolve any of those controversies.  If they're unrepresented,
20   we've continued to refer them to Mr. Johnston.
21         THE COURT:  Okay.
22         MR. JOHNSTON:  Thank you, Your Honor.  Bob Johnston,
23   the court-appointed curator.
24              The Court has been provided with substantial
25   information today.  I'm going to be very, very brief.  As we do

1  with each of these status conferences, we have filed with the
2  court the curator's status report No. 17.

3              I can tell you that there has been a slow but
4  regular diminishment of the number of calls that we have had
5  subject to a recent uptick that is related to the motions to
6  withdraw that the Court is going to be addressing.

7              As always, we have done our very best to try to,
8  as you've just described, provide to the pro se's the same
9  level of appropriate due process that those who have counsel of
10 record are being provided.

11             **THE COURT:**  Good.

12             **MR. JOHNSTON:**  I think there's no other information
13 that I need to provide to the Court.

14             **THE COURT:**  Thank you very much for your input.

15             **MR. JOHNSTON:**  Thank you.

16             **THE COURT:**  We've tried over the years to recognize
17 that there's some individuals who either can't or do not want
18 to get an attorney, but want to actively participate or be kept
19 advised of the litigation.  They can do so by going to the Web
20 site, but they can also do so by contacting the pro se
21 attorney.

22             The pro se attorney is there, willing and
23 able -- certainly able -- to give them some information, some
24 assistance.  He's been doing that and that's been very helpful
25 to the overall aspect of this litigation.  The Court

1   appreciates his work.

2             **MR. JOHNSTON:**  Thank you, Your Honor.

3             **THE COURT:**  Okay.

4             **MR. HERMAN:**  Your Honor, there's nothing new under

5   item 9, the MDL trial package, other than should attorneys have

6   materials they want reviewed for inclusion, we're still looking

7   at materials.

8             With regard to item No. 10, Your Honor, has

9   extended condolences to Chris Seeger and his family, as does

10  the PSC and Merck, on the recent passing of his mother.  He

11  will not be here to address that and I understand that Jim

12  Dugan would like to address the Court very briefly in

13  connection with the third-party payer cases.

14            **THE COURT:**  Okay.

15            **MR. DUGAN:**  Good morning, Your Honor.  James Dugan on

16  behalf of the Louisiana Attorney General and the governmental

17  action cases to give a quick report.  Ms. Kristin Johnson from

18  Mr. Sobol's office will do a quick report on the private

19  settlement third-party payer agreement.

20            **THE COURT:**  Okay.

21            **MR. DUGAN:**  As Your Honor is aware, on the Louisiana

22  Attorney General case, plaintiffs filed their expert reports on

23  November the 6th.  Defendant's expert reports are going to be

24  filed December the 7th.  Plaintiff's rebuttal reports will be

25  December the 21st.  The end of discovery is January the 19th.

1          We've taken approximately 20 fact depositions.

2  We have another ten fact depositions.  And probably are now

3  around another 15 or so expert depositions.  So the parties

4  have been working very diligently on the case.  We have a

5  couple of outstanding issues that we're going to be meeting and

6  conferring with and, hopefully, have been resolved.

7          We appreciate Your Honor's accommodations in

8  moving the case along.  But as far as we're concerned, the

9  April 12th trial date is intact.

10          **THE COURT:**  Good.  Okay.  I'll begin setting some

11  telephone conferences in, say, every two weeks to be kept

12  advised of this.  If there's any issues, we can discuss them at

13  that time rather than have them fester.  So I'll set up

14  meetings and then we'll handle it that way.

15          I don't want to get to the point where matters

16  have just not been handled.  So it's easier for me to do it

17  that way.  So I'll go ahead and do that and set out a program

18  for you-all.

19          **MR. DUGAN:**  Thank you, your Honor.  We appreciate

20  that.  As to the other governmental action cases, with the

21  assistance of Ms. Barrios and Mr. Young and Mr. Fox, we're in

22  the discovery phase of that and I think that's going pretty

23  smoothly also, Your Honor.

24          So that's my report.  Thank you, Your Honor.

25          **THE COURT:**  All right.  Good.  Thank you very much.

1          **MR. DUGAN:**  Ms. Johnson will speak briefly.

2          **MS. JOHNSON PARKER:**  Good morning, your Honor.

3   Kristin Johnson Parker with Hagens Berman reporting on the TPP

4   settlement.

5               The TPP settlement is well on track.  We

6   currently have 210 third-party payer plans participating in the

7   settlement.  We know for a fact that those are the total

8   participants that we will have in the settlement.

9               Based on that information, we expect that the

10  settlement will be funded next week.  Allocation amounts have

11  already been determined and reported to participating

12  plaintiffs.  And we have not yet received any objections.

13         **THE COURT:**  Good.

14         **MS. JOHNSON PARKER:**  So we intend that, based upon

15  the funding of the settlement occurring next week, we will be

16  able to make distributions approximately December 17th.

17         **THE COURT:**  Okay.  Keep me advised of that.  When the

18  distributions start, I'd like to hear from you; and if they

19  don't start, I certainly would like to hear from you.

20         **MS. JOHNSON PARKER:**  Certainly.  Thank you.

21         **THE COURT:**  Okay.

22         **MR. HERMAN:**  Your Honor, Ben Barnett would like to

23  briefly address the governmental actions.

24         **THE COURT:**  Sure.

25         **MR. BARNETT:**  Good morning, Your Honor.  Ben Barnett

1   on behalf of Merck.

2                  Just to pick up on Mr. Dugan's comments, there

3   are two issues relating to depositions within the Louisiana AG

4   case.  We have had further discussions with Mr. Dugan, with

5   Mr. Anderson, as well as Mr. Davis, and we're hopeful that we

6   can work out a resolution of those issues.  If not, we'll bring

7   them promptly to the Court for resolution, presumably on one of

8   the calls that you're going to schedule.

9              THE COURT:  All right.  And even before the calls, if

10  we have a problem, then I'd like to hear from you and Jim.

11             MR. BARNETT:  Will do, Your Honor.  Thank you.

12             THE COURT:  Okay.

13             MR. HERMAN:  Your Honor, I believe that --

14             THE COURT:  Any discovery issues?

15             MR. HERMAN:  I'm sorry, Your Honor.

16             THE COURT:  12 is the one.

17             MR. HERMAN:  I believe that covers items 10, 11 and

18  12 --

19             THE COURT:  Okay.

20             MR. HERMAN:  -- on the schedule.

21                  With item 13, there really is nothing new.  With

22  item 14, Mr. Birchfield has resolved the lien motion which he

23  brought.  Andy, do you want to address that?

24             THE COURT:  Right.  Do you want to say something

25  about that, Andy?  I received a motion and I had it set for

1    today.  I've read the material that each side has given to me

2    to brief.  I was able to hear -- or waiting to hear oral

3    argument, ready to rule on it, but the parties told me that

4    they have resolved it as of yesterday.

5              **MR. BIRCHFIELD:**  Yes, Your Honor.

6                   And, as Mr. Garretson reported, the motion had

7    two primary bases.  One was that there was a hold-back of

8    15 percent across the board.  The claims data has been

9    submitted and, as Mr. Garretson reported, a large portion of

10   that money has now been provided to the claimants.  So that

11   issue has already been resolved.

12                  Then also now all of the third-party payers are

13   in agreement with the protocol, the audit process that

14   Mr. Garretson has in place, and that was the second prong of

15   the motion.  That was an obstacle that was holding up the final

16   resolution of these liens.  That obstacle has been cleared away

17   and so we're withdrawing the motion, Your Honor.

18             **THE COURT:**  All right.  Thank you very much.

19                  Anything on 15?

20             **MR. HERMAN:**  Your Honor, if I might, with regard to

21   15 and 16, take them together.  There have been no meetings of

22   the fee allocation committee pending Fifth Circuit rulings and

23   Your Honor's further rulings.

24                  There is a mandamus pending.  There was a

25   movement to take depositions by Mr. Stratten, who's been

1   appointed the liaison for objectors.  Your Honor convened a

2   conference and the issues of discovery Your Honor has deferred

3   until after further rulings by the Court of Appeal and

4   yourself.  That relates to PTO 49 and PTO 50 in the main.

5                   With regard to 17, item 17, Merck's motions on

6   PTO 28, 29 and 43, Ms. Wimberly is here to advise the Court.

7           **THE COURT:**  Right.  We'll take that up after this

8   meeting.

9           **MR. HERMAN:**  The other motions under 18 were filed by

10  Mr. Stratten, Mr. Benjamin, relating to transfer and/or remand.

11  And the *Bethea* case is under advisement.  Nothing new with

12  regard to 19, the appeals.  The motion under No. 20 for

13  attorney's fees and to enforce attorney's lien is set on

14  December 16th at 9:00 a.m.

15                  And, as I understand it, BrownGreer will file

16  their papers today; and once those papers are filed, the PSC

17  executive committee is going to review the issue.  There's been

18  a lot of discussion and correspondence with Mr. Barry Hill

19  regarding the issue.

20                  Lastly, Merck's changed its name, and I'm

21  certain it's a good name, Judge.

22                  That concludes the issues for this morning, Your

23  Honor.  You can give us a date.

24          **THE COURT:**  All right.  Anything further from anyone

25  that we need to take up that we haven't taken up?

1        All right.  January 7th, 2010 at 9:00 a.m. in

2    open court, and I'll meet with the attorneys and committees at

3    8:30 in advance.  Thank you very much.  Everyone have a good

4    holiday season.

5                              *****

6                            CERTIFICATE

7        I, Jodi Simcox, RMR, FCRR, Official Court Reporter

8    for the United States District Court, Eastern District of

9    Louisiana, do hereby certify that the foregoing is a true and

10   correct transcript, to the best of my ability and

11   understanding, from the record of the proceedings in the

12   above-entitled and numbered matter.

13

14

15                          S/ Jodi Simcox, RMR, FCRR
                             Jodi Simcox, RMR, FCRR
16                           Official Court Reporter

17

18

19

20

21

22

23

24

25