1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4
   IN RE:  VIOXX PRODUCTS            *
5          LIABILITY LITIGATION      *
                                     *
6  This Document Relates to:        *    MDL No. 1657
                                     *
7        STATE OF LOUISIANA, *ex rel.* *    Section L
         JAMES D. CALDWELL JR.,      *
8        Attorney General            *    New Orleans, Louisiana
                                     *
9            versus                  *    July 28, 2009
                                     *
10       MERCK & CO., INC.           *
                                     *
11                                   *
         Case No. 05-CV-3700         *
12                                   *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13

14
                    ORAL ARGUMENT BEFORE THE
15                  HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE
16

17 <u>APPEARANCES</u>:

18
   For the Plaintiff:          Murray Law Firm
19                             BY:  JAMES R. DUGAN II, ESQ.
                                    STEPHEN B. MURRAY JR., ESQ.
20                             650 Poydras Street, Suite 1100
                               New Orleans, Louisiana 70130
21

22 For the Plaintiff:          Louisiana Department of Justice
                               BY:  BRYAN MCMINN, ESQ.
23                                  L. CHRISTOPHER STYRON, ESQ.
                               1885 North Third Street, 6th Floor
24                             Baton Rouge, Louisiana 70802

25

1    Appearances:

2

3    For the Defendant:          Skadden Arps, LLP
                                     BY:  JOHN H. BEISNER, ESQ.

4                                         GEOFFREY M. WYATT, ESQ.
                                 1440 New York Avenue, NW

5                                  Washington, D.C. 20005

6    Also Present:               Leonard A. Davis, Esq.

7

8    Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room HB-406

9                                  New Orleans, Louisiana 70130
                                 (504) 589-7778

10

11

12

13

14    Proceedings recorded by mechanical stenography, transcript
produced by computer.

15

16

17

18

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(July 28, 2009)**

    **THE DEPUTY CLERK:**  Everyone rise.

    **THE COURT:**  Be seated, please.  Good morning, ladies and gentlemen.  Call the case, please.

    **THE DEPUTY CLERK:**  MDL 1657, *In Re: Vioxx*.

    **THE COURT:**  Counsel make their appearance for the record, please.

    **MR. DUGAN:**  Good morning, Your Honor.  James Dugan on behalf of the Louisiana Attorney General.

    **MR. MURRAY:**  Good morning, Your Honor.  Stephen Murray Jr. on behalf of the Louisiana Attorney General.

    **MR. MCMINN:**  Bryan McMinn with the Attorney General's office.  Good morning.

    **MR. DAVIS:**  Good morning, Your Honor.  Leonard Davis on behalf of the plaintiffs' liaison counsel.

    **MR. STYRON:**  Your Honor, Chris Styron with the Attorney General's office.

    **THE COURT:**  Defense.

    **MR. BEISNER:**  Good morning, Your Honor.  John Beisner for Merck, and with me is Geoff Wyatt.

    **THE COURT:**  I have a motion before me on the basis of several grounds.  First, the Louisiana Attorney General filed suit against Merck in state court seeking injunctive relief and damages.  The plaintiff in its suit alleges that Merck's

1  conduct caused the State of Louisiana, as well as its citizens,

2  to pay for Vioxx that they would not have otherwise purchased.

3  The plaintiff seeks to recover monies that the state expended

4  through its Medicare program as well as monies that the

5  Louisiana citizens expended on Vioxx.  Merck removed the case

6  to federal court, after which it was transferred to the *Vioxx*

7  MDL 1657.

8              The plaintiff asserts claims for redhibition,

9  violation of the Louisiana Unfair Trade Practices Act,

10 violation of the New Jersey Consumer Fraud Act, and unjust

11 enrichment.  Merck has filed this motion to dismiss all the

12 claims pursuant to 12(b)(6).

13             I think it would be helpful to me if we cabined

14 this argument on the various claims.  For example, Merck first

15 takes the position that the Attorney General lacked discretion;

16 second, that the plaintiff's redhibition claims fall; third,

17 that LUTPA is not applicable, and they argue five points on

18 that; fourth, that the New Jersey Consumer Fraud Act is not

19 applicable; and, fifth, that the unjust enrichment claim falls.

20 If Merck could argue that, then I will give the plaintiff an

21 opportunity to respond, and we'll cabin the argument that way.

22             **MR. MURRAY:**  Your Honor, I may be able to abbreviate

23 these proceedings somewhat.  We have decided the Louisiana

24 Attorney General is not going to contest the motion to dismiss

25 on the New Jersey Consumer Fraud Act.  We would rather the

1    Court pass on those actions.  If we had to file an amended

2    complaint to that effect, we would.  I don't want to prejudice

3    any other parties who may wish to proceed with that type of

4    action.

5              **THE COURT:**  Right.  I see that.  I think that it's

6    clear to me that Louisiana law is applicable and that we are

7    not dealing with New Jersey law, so I would grant the dismissal

8    on that.  Let's go with the four arguments, then.

9              **MR. BEISNER:**  Okay.

10             **THE COURT:**  The first argument that Merck raises is

11   that the plaintiff's Medicaid claim fails because the State of

12   Louisiana lacked discretion to deny payment for Vioxx.

13             **MR. BEISNER:**  Good morning, Your Honor.  John Beisner

14   for Merck.  Your Honor is correct that that's the first

15   argument that we make is that there really is not causation

16   here.  What I would note on that is that, under the federal

17   Medicaid scheme, a state has two choices:  It can choose to

18   abide by a formulary that is set by the federal government or

19   it can set its own formulary.

20                  Here, Louisiana, through the entire period that

21   Vioxx was on the market, abided by the federal formulary.

22   Indeed, if you look at the Louisiana statute on the Medicaid

23   program, it says that the state is obliged to -- and I'm

24   quoting now from La. Rev. Stat. Ann. 46:153.3(B)(2).  It says

25   the state is required to provide reimbursement for any drug

1    prescribed by a physician that, in his professional judgment

2    and within the lawful scope of his practice, he considers

3    appropriate for the diagnosis and treatment of the patient.  So

4    it's very clear that the state was without authority to say

5    that it wouldn't pay for Vioxx if a physician prescribed it.

6              Now, one little tweak in this, Your Honor, we

7    need to know is about halfway through the period in which Vioxx

8    was on the market, the state -- as the federal government at

9    that point permitted it to do -- implemented a prior

10   authorization scheme.  Under that, the state could provide

11   certain drugs are covered automatically, and then other drugs

12   are covered only if the physician took the additional time to

13   call the state and say, "I want to prescribe this.  Is that

14   okay?"

15             The thing that needs to be kept in mind with

16   respect to that, though, is that the state could raise some

17   questions, but at the end of the day, as the *Edmonds v. Levine*

18   case that we cite in our brief and the Eleventh Circuit

19   decision in *Pharma. v. Meadows* says, the prescribing physician

20   retained the ultimate authority.  The state could make some

21   suggestions; but at the end of the day, if the physician wanted

22   to prescribe the drug, that physician could.

23             Indeed, I would note that what LDHH published in

24   the *Louisiana Register* commenting on this new procedure, it

25   says:  "Those drug products subject to mandatory coverage as a

1    result of the rebate agreement with the federal government will

2    be covered."  So the state continued the position that if the

3    drug was on the federal formulary, which Vioxx was during the

4    entire period since it was FDA approved, that the state was

5    without authority to say, "We are not going to buy it."

6              **THE COURT:**  But don't they also take the position

7    that the reason doctors approved the drug is that the doctors

8    were misled, and that's what they want to do something about or

9    say that they have a right to do something about?

10             **MR. BEISNER:**  Well, that's the second part of the

11   argument.  I think, Your Honor, I should make clear up front

12   there are sort of two arguments they make.  The first is, "We

13   wouldn't have paid for it if we had known," as they first

14   argued in the complaint.  There we are saying because

15   redhibition, LUTPA, and unjust enrichment all require

16   causation, there was no way to say, "We wouldn't have paid for

17   it at that point."

18             As Judge Kaplan said in dealing with precisely

19   the same kind of claim made by the Louisiana AG under the same

20   regulatory scheme, he concluded that Louisiana allegedly was

21   injured only because it was obligated by law to pay for the

22   drugs prescribed by Medicaid, and as a result of that he found

23   that there couldn't be causation.

24             Now, the second argument that they make,

25   Your Honor, "Well, there wouldn't have been as much prescribed

1  if there had been further information out there," the problem

2  with that, Your Honor, is precisely the issue that you face in

3  the class action that we presented to you on personal injury

4  and that Judge Higbee has confronted in the consumer class

5  actions in New Jersey.  The problem with that argument,

6  Your Honor, is that you would have to look at each case in

7  order to determine whether there was causation.  I would note,

8  Your Honor, this applies to all of the claims that the AG is

9  talking about here.

10            I think that Judge Conway's decision in the

11 *AstraZeneca* case, which is fairly recent out of the Middle

12 District of Florida, points out the problem here, that the

13 connection is just simply too attenuated.  There isn't really

14 direct causation because you have to go so far back in the

15 process here and look at these cases individually.  As

16 Your Honor noted in ruling on the class action PI context, this

17 just isn't feasible, and from a causation standpoint it's just

18 simply too attenuated.

19            THE COURT:  You talked about a formulary.  As I

20 understand it, Louisiana had the opportunity after 2001 to

21 establish a formulary.  Had they established a formulary or

22 excluded Vioxx from the formulary -- they may not have done it,

23 but couldn't they do it?

24            MR. BEISNER:  They had the authority to establish

25 their own formulary, but the legislature made the decision not

1    to go that direction even though there came a point when the

2    federal law permitted them to do that.

3            THE COURT:  Isn't that the point that they raise,

4    though; that had they known what they know today, they would

5    have done it?

6            MR. BEISNER:  Your Honor, I don't think that that

7    works because there wasn't a threshold decision to establish a

8    process under which they could have excluded it.  We are not

9    talking here about somebody making a decision about excluding

10   or including Vioxx.  The state never established a framework at

11   all in order to do that with any drug.  So we are really off in

12   a world of speculation here because they never set up the

13   framework to set up an exclusive formulary.  The state made the

14   considered decision to abide in all respects with the federal

15   formulary.

16           THE COURT:  Let me hear from the plaintiff on that

17   point.

18           MR. MURRAY:  Your Honor, on that specific point, I

19   think it's important first to address the backdrop or the

20   context in which the Attorney General acts in these cases.  The

21   Attorney General is expressly empowered by 51:1408, the

22   Louisiana Unfair Trade Practices Act, to seek redress for

23   unfair trade practices such as those perpetrated by Merck.

24           And it's a good thing, Your Honor, because

25   according to Merck, if the Attorney General couldn't proceed

1   under § 1408, there is no one who can proceed to seek redress

2   for these unlawful marketing practices that cost consumers in

3   Louisiana and the state of Louisiana millions upon millions of

4   dollars.  It is under that background and the relaxed causation

5   requirement under that backdrop that we proceed.

6                   So with respect to the entire time frame at

7   issue, Your Honor, there is the question of whether or not

8   there is essentially a requirement of direct reliance, I think

9   is the way to couch the argument.  They say it's causation, but

10  really what they are saying is does the Attorney General need

11  to show that the Louisiana Department of Health and Hospitals

12  would have done something different in order to prevail.

13          THE COURT:  Well, they take the position, frankly,

14  that the Medicare claims fail because the State of Louisiana

15  lacked discretion to deny payments of Vioxx --

16          MR. MURRAY:  Correct.  I was --

17          THE COURT:  -- that Vioxx was included in the federal

18  formulary, you never had a formulary in-state, and therefore

19  you didn't have any discretion.  It was in the formulary and

20  you agreed to pay money for whatever was included in the

21  formulary.  Had you wanted to do your own formulary and exclude

22  Vioxx from that formulary, you could have done so, but you

23  didn't.

24          MR. MURRAY:  Well, Your Honor, I think that what

25  they're saying is that the State of Louisiana was precluded by

1  law from adopting an exclusive formulary.

2        **THE COURT:** In 2001, that exclusion was removed. You

3  did have that before 2001. In 2001, you could do it, but he

4  says you never did it.

5        **MR. MURRAY:** Your Honor, we had the authority to do

6  it. We were not faced with the circumstances under which we

7  would have done it. Whether or not we would have done it is a

8  question of fact which can't be resolved on these pleadings.

9  Here we are just dealing with the law.

10        **THE COURT:** Your position is: Had you known what you

11  know today, you would have done it.

12        **MR. MURRAY:** Correct, Your Honor. We were empowered

13  by the Louisiana legislature to do that. I would read to

14  Your Honor from 46:153.3(B)(2)(a), which Mr. Beisner cited,

15  which after March of 2001 provides:

16        The department may establish a drug list that

17  utilizes a prior approval process or any other process or

18  combination of processes that prove to be cost-effective in the

19  medical assistance program.

20        It's not just a prior authorization program that

21  the legislature empowered LDHH to adopt. The legislature

22  empowered LDHH to enact any type of formulary that it decided

23  would inure to its financial benefit. Our position -- and it

24  can only be tested at trial of this matter, Your Honor -- is

25  that we would have adopted a formulary with respect to Vioxx

 1   had that been the case, had the information been disclosed,

 2   which it was not.

 3             *Rezulin* is easily distinguished because *Rezulin*

 4   was decided pre-March 2001.  Well, I mean decided after, but

 5   the applicable time period was pre-2001.  In fact, Judge Kaplan

 6   recognized that after 2001 there would have been a cause of

 7   action.

 8             Now, Your Honor, on the broader issue, which is

 9   for the entire class period can we rely on the

10   misrepresentations to doctors to establish causation, I would

11   assert that that's not an issue that Your Honor can determine

12   at this stage of the proceedings.  There's only one case that

13   has held that you can determine that issue as a matter of law

14   at this stage in the proceedings and that was the *Ironworkers*

15   case.

16             The *Ironworkers* case, I would, first of all,

17   respectfully submit that the court was wrong in those

18   circumstances, but it's also easily distinguished.  One, it was

19   not subject to appellate review.  Your Honor is not bound to

20   follow it.  That rationale was rejected by *In re Zyprexa*, in

21   which a factual record was proffered on which the court was

22   able to determine that, yes, you can demonstrate a causal link

23   from misrepresentations to doctors and it's not too attenuated.

24             Finally, Your Honor, it was decided on the RICO

25   proximate cause analysis, which is different from Louisiana.

1   In Louisiana, we have a duty/risk analysis and under § 1408,

2   under which the Attorney General seeks restitution, we have a

3   much more relaxed causation standard.  We only need to show --

4   in fact, there's no causation standard to speak of.  We only

5   need to show that the monies acquired by Merck may have been

6   acquired by reason of an unfair trade practice.

7          Your Honor, I would liken it to a disgorgement

8   cause of action.  They have engaged in an unfair trade

9   practice.  We have to show that that may have caused a loss,

10  but we don't have to prove specific causation with respect to

11  the loss.  We have a relaxed standard, and there's a reason for

12  that; that is, the Louisiana Attorney General has to be able to

13  protect Louisiana citizens against mass-marketing campaigns of

14  this sort.

15         That's why we have that.  Otherwise, as Merck

16  contends throughout their briefs, they are immune for this type

17  of conduct.  That simply can't be the law.  Someone has to be

18  able to step in, and the Louisiana legislature has clearly

19  empowered the Louisiana Attorney General to be that person to

20  step in.

21         I would point out, Your Honor, that there are

22  ways that we can show that that link is not too attenuated, and

23  we would hope we would have an opportunity to develop a factual

24  record on this issue.  For instance, we have alleged that Merck

25  forecast the impact of its failure to disclose certain facts on

1   its sales, what certain warnings would have done to its sales.

2   If they can rely on that type of information in making their

3   business plans, the Court should be able to rely on that type

4   of information or at least should explore the possibility of

5   relying on that type of information to determine what the

6   impact of the fraud was and to determine causation.

7           Also, as in *In re Zyprexa*, there's a possibility

8   of establishing a pricing model, and we should be given the

9   opportunity -- we did allege a pricing model.  They say that we

10  haven't in their papers, but it's clear from our complaint we

11  have alleged that in addition to buying too many prescriptions,

12  we paid too much, and the price would have been different had

13  the information been disclosed.  We should also be given the

14  opportunity to make that record, Your Honor.

15          **THE COURT:**  Okay.  Any response to that?  Basically,

16  part of his argument on causation that he makes *sub silentio* is

17  that this may be fodder for a summary judgment motion later on,

18  but that he has pled enough to get him through 12(b)(6).

19          **MR. BEISNER:**  Well, Your Honor, I don't agree with

20  that proposition because I think where the fundamental

21  disagreement is on the state structure is there was no

22  mechanism in place for the state to make these decisions.  It

23  had not established a program to go through and establish some

24  sort of exclusive formulary.

25          **THE COURT:**  He makes a distinction, though, between

1  2001 and prior.  He says, 2001, he might buy your argument

2  because he couldn't because there's a specific exclusion prior

3  to 2001 that doesn't allow the state to give a formulary, makes

4  them buy what the federal government is selling on their

5  formulary.  In 2001, the legislature said you can draft a

6  formulary.  Although they didn't do it, he says that they would

7  have and he pled that they would have.  How do you deal with

8  that?

9          **MR. BEISNER:**  Well, again, this whole causation thing

10  becomes very attenuated at that point because the state didn't

11  set up a mechanism.  You have to go through a very long process

12  of establishing the individuals and the people and complying

13  with the federal program to set up the exclusive formulary, and

14  they didn't go through any process to do that.  They took no

15  steps in that direction.  So we are all sort of in never-never

16  land.  It's not a question of saying, "We had the mechanism to

17  do it and we would have done it," but the mechanism was never

18  established.

19          Your Honor, I think another point to be made in

20  this regard which takes it out of the realm of summary

21  judgment -- because this is something that is in the complaint

22  in this regard, as set forth in footnote 5 of our reply brief:

23          Even if Louisiana had established an exclusive

24  formulary, it could only exclude drugs based on the labeling on

25  the drug and the conclusion that, based on the labeling, the

1    drug doesn't have a significant, clinically meaningful

2    therapeutic advantage.  The state had no capacity to

3    second-guess the labeling that was on the product, and that's

4    laid out in 42 U.S.C. § 1396r.  It says:

5                When based on the drug's labeling, a product may

6    be excluded from the formulary if the excluded drug does not

7    have a significant, clinically meaningful therapeutic advantage

8    on other drugs included in the formulary.

9                The complaint, Your Honor, paragraph 131, makes

10   clear that in April 2002, the new Vioxx label which went into

11   effect at that time indicated that the product did have an

12   advantage, a clinical advantage.  Therefore, they would have

13   had to include it on the formulary, in any event, based on the

14   allegations in the complaint.  So they would have had no

15   capacity to exclude it.

16               Bear in mind the Medicare exclusive formulary

17   process doesn't allow the state to go through and just make

18   judgments and say, "We are not going to put that drug on

19   there."  They have to look at the label and make their

20   judgments based on the FDA label.

21          **THE COURT:**  Of course, their position is that the

22   label was improper.  The whole theory of liability in *Vioxx* is

23   failure to warn.  They say that the label was suspect;

24   therefore, to force them to comply with an improper or false

25   label is not appropriate.

1          **MR. BEISNER:**  Well, but that's a fraud-on-the-FDA

2     argument, Your Honor, as you well know.  *Buckman* says that

3     would have been an FDA determination, and no determination has

4     been made.  And, again, talking about causation, this is really

5     a very attenuated analysis and we think, as a matter of law,

6     the state would have had no judgment in that regard.

7               Your Honor, one other quick point that I would

8     make is that I think that the *Iqbal* case, the Supreme Court

9     decision that came down a few weeks ago on motion-to-dismiss

10    standards, says that the court, in assessing a motion to

11    dismiss, is supposed to be looking through and engage in a

12    content-specific task that requires a reading court to draw on

13    its judicial experience and common sense in deciding whether a

14    complaint is viable.  The test here is whether it's facially

15    plausible.

16              With respect to the second causation theory

17    that's articulated here and what counsel is saying about

18    *Seroquel*, the Court has been here through this analysis and in

19    the class action context has determined in its decision that

20    this physician-by-physician/prescription-by-prescription

21    analysis simply is not practical.  It's too attenuated, as the

22    *Seroquel* court notes.

23              I want to make two observations about *Seroquel*.

24    There's a suggestion counsel made that *Zyprexa* came out

25    differently.  *Zyprexa* really talked about insurance companies

1   and representations made directly to them as to whether they

2   would put the product on the formulary.  It doesn't get into

3   this analysis, which is a suggestion of what did the physicians

4   know.  It doesn't get into that attenuated analysis.  I don't

5   think *Zyprexa* can be said to be inconsistent with the decision

6   in *Seroquel*.

7                 I would also note *Seroquel* was, in part, a RICO

8   case, but there were also Consumer Protection Act claims in

9   that case, just as there are here, and the court said that the

10  causation part of that was too attenuated for those claims as

11  well.

12                Finally, Your Honor, I would just note, with

13  respect to the causation, there is reference here to a relaxed

14  causation requirement that the AG has.  There may be some basis

15  for that where you are talking about the Louisiana Attorney

16  General seeking injunctive relief.  If the AG sees false

17  advertising or something out there, the AG can go and seek an

18  injunction of that without necessarily showing all the specific

19  effects on individual consumers.

20                They're talking here about proceeding under

21  § 1408, which has got the "by means of" language in it; that if

22  you are trying to get a monetary recovery, you have to show

23  that the loss was by means of the allegedly improper act.

24  There's nothing in there that suggests that there's a relaxed

25  requirement where you are trying to get damages, which is what

 1    they are trying to seek here.

 2            **THE COURT:** Okay. I understand both arguments. The

 3    next argument is redhibition.

 4            Merck takes the position that the redhibition

 5    claim fails because the state was not a buyer of Vioxx and

 6    lacks the statutory authority to recover on behalf of the

 7    consumers under the theory of redhibition.

 8            As I read the Attorney General, they take the

 9    position that they do qualify as a buyer of Vioxx, even though

10    they never possessed the drug, because they paid the entire

11    purchase price. They also argue that the action gave to them

12    ownership of the drug upon payment. As an alternative, they

13    argue that Louisiana law broadly empowers the Department of

14    Health to stand in the shoes of persons upon whose benefit it

15    paid Medicare benefits to collect the amounts which were paid.

16            How do you deal with those arguments?

17            **MR. BEISNER:** Well, Your Honor, I think that what you

18    have to look at is the redhibition statute itself. We are

19    bound by what the statute says. It's clear from Article 2520

20    that a buyer is a person to whom a sale is made. As the

21    Attorney General admits, the Louisiana Civil Code defines a

22    sale as the transfer of ownership of a thing to another for a

23    price in money. The code also describes an ownership right as

24    being that which confers on a person direct, immediate, and

25    exclusive control over a thing.

1          Well, if I'm a person who has gone to a

2   physician and received the product from my physician, even

3   though it may be paid for by the state, I'm the person in

4   control of it.  I own it.  I don't think there's any suggestion

5   there that the state owns the drug.  It's obliged to pay for it

6   under the Medicaid regime, but the ownership of it is in the

7   patient.  They're the ones taking it.

8          **THE COURT:**  They take the position:  Under your

9   theory, nobody would own it, then, and nobody would have a

10  redhibition claim.

11         **MR. BEISNER:**  No.

12         **THE COURT:**  The state paid for it, and the other

13  person took it.

14         **MR. BEISNER:**  No.  The owner is the patient in this

15  case.  I think that this is what the *Rezulin* case I think

16  concluded, which was looking under the same statutory regime we

17  are talking about here.  This is a Louisiana AG case.

18         Your Honor, I suggest looking at the *McNeely*

19  case, which is not a drug case, *McNeely v. Ford Motor Company*,

20  which is analogous in the sense that there you had a person who

21  had a car and alleged a defect in the vehicle, sued under the

22  redhibition statute.

23         The argument was made there sort of coming at it

24  from the opposite direction:  "Well, Wait a minute.  We can't

25  sue in redhibition because somebody else paid for it."

1          The court said:  "No, no, no, no.  You are the

2     possessor.  You are the owner of it, even though somebody else

3     may have bought the vehicle, and you have the right to bring

4     the action."

5          So I think that that is the proper way to look

6     at this, Your Honor, is that the redhibition statute requires

7     that you have a buyer.  And the state is, at best, a payor

8     here, but they don't have ownership, never took possession of

9     the product.

10         **THE COURT:**  How about their argument that the

11    Louisiana Department of Health stands in the shoes of those

12    persons on whose behalf it paid Medicare benefits and that the

13    AG is representing them?

14         **MR. BEISNER:**  Well, I think that the problem is:

15    Where do you find that in the redhibition statute?  It's not

16    there.  There's no statutory basis for saying that.  The claim

17    that they are asserting here is under the redhibition statute.

18    It doesn't make any exception for the state coming in, in that

19    capacity, in this instance.  It basically says:  If there's a

20    claim to be asserted here, it has to be asserted by the patient

21    in this instance.

22         **THE COURT:**  He says that the code article 2520

23    clearly states that you need to be a buyer in order to have

24    redhibition and you weren't a buyer.

25         **MR. MURRAY:**  Well, Your Honor, I would first point

1   out the term *buyer* is not defined anywhere in the Civil Code.

2   So what is a buyer is, I think, going to have to be determined

3   by this Court.  It has been recognized -- including by the

4   *Desiano* court, the Second Circuit -- that in many instances a

5   third-party payor who pays for a drug on behalf of somebody

6   else is, in fact, a buyer.

7                    THE COURT:  Louisiana paid the entire price.

8                    MR. MURRAY:  We paid the entire price, that's

9   correct, Your Honor.  *Sale* is defined as a transfer of

10  ownership for a price.  What's interesting is it doesn't say

11  transfer of ownership to the buyer.  It is a transfer of

12  ownership.

13                    There is no doubt that there has been a transfer

14  of ownership.  We paid the price.  We are seeking refund of

15  that price.  Under redhibition, I think we are the buyer, and

16  it's not defined under the statute.  For them to say that as a

17  matter of law we are not allowed to come in and assert that we

18  are the buyer is simply wrong.  There is no legal support for

19  that whatsoever in the code.

20                    What's interesting is although Mr. Beisner says

21  that contrary to our assertion the patient does have the right

22  to assert a claim, that's not what they said in their papers,

23  Your Honor.  In their reply brief, they made it quite clear

24  that Louisiana doesn't have the right to come in because they

25  are not the buyer, and the patient doesn't have to right to

1   come in because they didn't pay anything.  So according to

2   them, they are immune under redhibition, and that simply can't

3   be the law.  Someone has to have that claim.  I would assert,

4   Your Honor, that it's the party who paid the entire purchase

5   price and has suffered the economic harm as a result of it.

6              I would also note, as Your Honor noted, that we

7   have the authority to stand in the shoes of a plaintiff.  That

8   authority is granted not by the redhibition statutes but by

9   LSA-R.S. 46:446, which grants the Louisiana Department of

10  Health and Hospitals broad authority to stand in the shoes and

11  assert any claim.  It's not limited to legal theories; assert

12  any claim that could have been asserted by the individual on

13  whose behalf they paid for Medicare benefits.

14             That's what we are doing.  We are suing on

15  behalf of the Louisiana Department of Health and Hospitals, who

16  is asserting the claim that they could assert under 46:446.

17             **THE COURT:**  Okay.  Thank you.  He also takes the

18  position that redhibition gives a party a right to get his

19  money back.  Under your theory, the patient didn't pay

20  anything, so why would you give them back money?  So he may not

21  have a claim because he didn't pay anything to get back.

22             **MR. BEISNER:**  There is reimbursement.  It may well be

23  that if the individual asserted the claim, they might have to

24  give the money to the state, but --

25             **THE COURT:**  Get it back, then give it to the state.

1        **MR. BEISNER:**  I think the key thing to remember here,

2   when you talk about the notion of buyer here, is you have to go

3   back to what the state is obligated to do here.  It is to

4   provide reimbursement when a physician makes the decision to

5   prescribe a drug to a patient.  That's what the state is doing

6   here.  To suggest that from that flows a buyer relationship

7   when the state statute that describes what the relationship is

8   just talks in terms of reimbursement, Your Honor, I think goes

9   too far.

10       One other thing, I guess, I would note is

11  counsel referenced the *Desiano* case and it comes up several

12  times in the brief.  I would just note there, Your Honor, that

13  *Desiano* was looking at the relationship under, as I recall, in

14  large part the New Jersey consumer protection statute.  One of

15  the problems with looking at *Desiano* is, of course, it was

16  looking at New Jersey law.

17       I think you also need to take account of the

18  fact that after *Desiano* came down, New Jersey ruled on this

19  issue in the *Papergraphics* case and said that a buyer is

20  someone who actually takes possession of the product for its

21  own personal use and sort of rejecting the notion that this

22  sort of third-party payor or a person who is simply buying the

23  product for resell or something like that is subject to relief

24  under the statute that was at issue in *Desiano*.

25       **THE COURT:**  As I recall, under that case, they didn't

1    pay the whole purchase price; they only paid part of it.

2                 **MR. BEISNER:**  In the *Papergraphics* case, Your Honor?

3                 **THE COURT:**  Yes.

4                 **MR. BEISNER:**  *Papergraphics* was a case where --

5                 **THE COURT:**  *Desiano* really.

6                 **MR. BEISNER:**  Yes.  Well, counsel is offering that as

7    support for his position.  I'm just making the point,

8    Your Honor, that that case was really looking at New Jersey

9    law, and I think New Jersey law has come out differently now

10   that the state courts have dealt with that issue.

11                **THE COURT:**  How do you deal with his position that

12   under 46:446 the statute gives the Department of Health and

13   Hospitals a cause of action against third parties to recover

14   the assistance payments and medical expenses the Department of

15   Health and Hospitals has paid or is obligated to pay on behalf

16   of the injured?

17                **MR. BEISNER:**  Well, I think, Your Honor, that is not

18   a cause of action that's been asserted here, I guess is where I

19   would start.  I think that the intent of that provision really

20   is more in line with the personal injury claims that we are

21   talking about in this case, where Your Honor well knows

22   provision has been made through the lien process for the state

23   to participate there and obtain compensation for services that

24   have been rendered, but there's been no cause of action

25   asserted here under that provision.  We are talking about these

1    statutes and causes of action that have been invoked by the

2    state.  I think that's what we are dealing with here.

3            THE COURT:  Except that he takes the position that an

4    injury may be required, but the Department of Health is not

5    suing for the injury.  They're simply saying, "Because of the

6    injury, we had to pay for medical expenses or drugs and,

7    therefore, we have a claim to get the money back that we paid

8    for those drugs."  They are not seeking, he says, money for the

9    injury.  They are seeking money to get paid back, although an

10   injury must have occurred.

11           MR. BEISNER:  Well, Your Honor, I don't think that

12   cause of action is permitted under that statute, but I guess my

13   basic position is:  They haven't asserted that here.  That

14   doesn't change the requirements, the elements that you have to

15   meet under the claims that they have asserted here.  If

16   redhibition requires you to be a buyer, you have to be a buyer.

17   If there's some other theory to be articulated here to seek

18   recovery under that statute, it hasn't been asserted at this

19   point in the case.

20           THE COURT:  Well, as I read his brief, though, he

21   says that the Attorney General is statutorily authorized to

22   assert the redhibition claims on behalf of the consumer because

23   the statute says when an injury has been sustained or an

24   illness or death occurred by any person under the

25   circumstances, creating in some third person or legal entity a

1  legal liability or obligation to pay damages or compensation to

2  that person or his spouse, the Department of Health and

3  Hospitals shall have a cause of action against such third

4  persons to recover the assistance payments and medical expenses

5  the Department of Health has paid or is obligated to pay on

6  behalf of the insured.  So he takes the position that the

7  department has a claim based on 46:446 and the AG is asserting

8  that claim.

9       **MR. BEISNER:**  I think what I'm saying, Your Honor, is

10  that claim is not in the complaint as presently asserted and

11  that you need to meet the requirements of the causes of action

12  that have been asserted.  Our position is that they have not

13  done that.

14       **THE COURT:**  LUTPA.  Merck next argues that LUTPA is

15  not applicable and, as I read your paper, that there's five

16  points there:

17            First, that the plaintiff is not a consumer or a

18  competitor;

19            Second, that the AG is not authorized to

20  recover;

21            Third, that the Louisiana Products Liability Act

22  precludes a claim under LUTPA;

23            Fourth, that there's no civil penalties under

24  LUTPA; and

25            Fifth, that the plaintiff can't satisfy his

1    burden of proof.

2         **MR. BEISNER:**  Okay.  Well, Your Honor, just briefly

3    on those because particularly with respect to the causation

4    issues, we have covered this previously.

5              On the point that it must establish that it's a

6    consumer, I think, Your Honor, probably the best case to look

7    at there is the *Hamilton v. Business Products* case, which I

8    think gives a very complete history of all of the cases, at

9    least to the point that decision was issued, on what the state

10   law position is on that.

11             Of course, in *Delta Truck* the Fifth Circuit has

12   ruled that you need to be either a consumer or a business

13   competitor in order to sue under that statute.  The *Rezulin*

14   court, that decision from 2005 very specifically, in this

15   context of the AG suing, found that a third-party payor is not

16   a consumer for purposes of the statute because it doesn't

17   purchase the drug or engage in a transaction for its own

18   personal, family, or household use, which is the way that LUTPA

19   defines *consumer* and *consumer transactions*.  So I think that's

20   succinctly, Your Honor, the reason why we think that fails.

21        **THE COURT:**  What about the injunction claim?  He says

22   that whether or not he has any claim for damages or even to

23   recover the cost of the drug, he has a right to file an

24   injunction because he feels that you are going to put Vioxx

25   back on the market.

1        **MR. BEISNER:**  Well, Your Honor, there's no basis for

2   an assumption that there's going to be an effort to put Vioxx

3   back on the market.  I think the gravamen of this lawsuit is

4   for the recovery of damages here.  I think that's fundamentally

5   what they are looking for.  I don't think there's any threat

6   being posed to put that back on the market and, therefore, no

7   grounds for asserting that.  There's certainly nothing in the

8   complaint that suggests that to be the case.

9        **THE COURT:**  What about the argument about 1407?  He

10  takes the position that in 1407 "any person" refers to a

11  different interpretation as opposed to 1408 or 1409.  The cases

12  deal with the private cause of action under LUTPA.

13       **MR. BEISNER:**  Right.  Well, Your Honor, I think that

14  the argument we are making here is that the action under 1408

15  fails for a variety of reasons.  I think that it still

16  requires, you know, what they are asserting here, that you have

17  a consumer or business competitor on whose behalf these claims

18  are being asserted when you are getting into the realm of

19  damages, which is what they are seeking here.

20       **THE COURT:**  He says that there's consumer action and

21  transaction and, therefore, LUTPA is involved and that they are

22  authorized under 1408 to act on behalf of the aggrieved

23  persons.  He dissects it and says that there's consumer action

24  because somebody bought it and, therefore, LUTPA is involved

25  and their action comes under protecting aggrieved persons.

1        **MR. BEISNER:**  Your Honor, in 1408, you know, I think

2   what we are saying is that what they are asserting here, which

3   is sort of that approach that this, 1408, doesn't permit an

4   action for what they're talking about here because they're --

5   you know, for the causation reason, it does not work.  But we

6   also believe that you don't have here -- they are asserting

7   this claim, really, in the sense of being a consumer

8   competitive transaction, and that's really not what we have

9   here when the AG is bringing that claim.

10       **THE COURT:**  Okay.  How do you get under LUTPA?

11       **MR. MURRAY:**  Your Honor, we get under LUTPA because

12  we are dealing with, as is defined under LUTPA, consumer

13  interests, and consumer interests are broadly defined under

14  LUTPA, Your Honor.

15       **THE COURT:**  Do you have to be the consumer?

16       **MR. MURRAY:**  We do not have to be the consumer.  In

17  fact, Mr. Beisner has cited to a number of outside-of-Louisiana

18  cases which have held that you have to be a consumer or

19  business competitor.  Your Honor, I would note every one of

20  those cases to which he has cited deal with private rights of

21  action under 1409.  They do not deal with rights of action

22  asserted by the Attorney General under either 1407, which

23  expressly empowers the Attorney General to do so, or 1408,

24  which is an extension of the powers of 1407.

25              That has not been analyzed by any federal court,

1    but it has been analyzed by state courts, Louisiana state

2    courts.  Here's what the *Ieyoub v. Classic Soft* case said, a

3    case decided by the Louisiana Fifth Circuit.  Writs were denied

4    by the Louisiana Supreme Court.  It said, and I quote:

5                    The legislature has enacted certain regulations

6    concerning commerce in this state and has directly empowered

7    the Attorney General to enforce those laws both criminally and

8    civilly and to seek redress against violators on behalf of both

9    the state and private parties.

10                   Your Honor, the only authority we have on this

11   issue, on 1408, is Louisiana authority, it's directly on point,

12   and it says we have the authority to proceed.

13           **THE COURT:**  What would your proceeding do?  Would it

14   be just limited to an injunction or do you see that that gives

15   you the authority to get back money?

16           **MR. MURRAY:**  It absolutely gives us the authority to

17   get back money.  To that, Your Honor, I would point you to 1408

18   again, which only the Attorney General is empowered to bring.

19   1408, as I said, is an extension of 1407.  1407 empowers the

20   Attorney General to seek injunctions from the court.  1408

21   deals with what else the court can do when the Attorney General

22   has done that.  1408 says, and again I quote:

23                   The court may issue such additional orders or

24   render judgments against any party as may be necessary to

25   compensate any aggrieved person for any property -- and then

1   this is key, Your Honor -- which may have been acquired from

2   such person by means of any method, act, or practice declared

3   unlawful.

4          It lists included among those remedies

5   restitution.  So in order to get restitution, all we need to

6   show is that it may have been acquired by an unlawful practice.

7   "May have."  "May have been acquired."  I think that's critical

8   language in that statute.  I think it's there quite

9   intentionally to deal with the situation that we are presented

10  with here, where it is not always possible for an individual to

11  prove specific causation, but it is possible to show that an

12  unlawful trade practice has affected large numbers of

13  individuals and has affected the State of Louisiana exactly as

14  we have alleged here, Your Honor.

15         THE COURT:  Any rebuttal on that point?  He also

16  takes the position that the LDHH, the Louisiana Department of

17  Health, was involved in this consumer transaction.  It seems to

18  me the difference in the argument is that you take the position

19  that the AG has to be the consumer/competitor.  He takes the

20  position that that's not accurate, that there only needs to be

21  a commercial transaction to trigger LUTPA, and then under 1408

22  he has the right, as Attorney General, to come in on that.

23         MR. BEISNER:  Your Honor, I think the Fifth Circuit

24  and a lot of Louisiana courts have spoken to this issue.  He

25  has read the statute as saying you either have to be a consumer

1    or a business competitor to be raising the issue.

2                This notion of a consumer transaction, if you

3    look at all of these cases -- *Hamilton v. Business Partners,*

4    *Delta Truck*, *Orthopedic & Sports Injury*, some of these

5    Fifth Circuit, some of them Louisiana appellate cases -- they

6    all involve commercial transactions, Your Honor, but the court

7    went to look at the identity of the parties in identifying

8    whether an action could be brought.

9            **THE COURT:**  He distinguishes between 1407 and 1408,

10   though.  He is taking the position that those cases dealt with

11   1407 and, I think, with 1408, it's a different deal.

12           **MR. MURRAY:**  Correct, Your Honor.  I'm sorry, it's

13   1409.

14           **THE COURT:**  I'm sorry, 1409.  You're right, 1409.

15           **MR. BEISNER:**  I think the language there is very

16   similar among them.  And, of course, the *Rezulin* court,

17   Your Honor, went to that line of cases in interpreting 1408,

18   which was precisely what was before the court in that case.

19                Your Honor, the one other thing I would note

20   here is that I think that under 1408 the thing we cannot lose

21   sight of -- and it's a problem with this line of arguments

22   because we have so many layers of argument on these various

23   issues.  We can't lose sight of the fact that under 1408 you

24   have this problem of -- and I know we have already covered

25   it -- attenuated causation.

1          There's no suggestion here that you wouldn't

2    have to show causation with respect to each transaction that is

3    at issue here.  I think it is overreading the statute to say

4    that the burden of proof is one of "may have been acquired."  I

5    think you're raising there all sorts of takings and other

6    constitutional due process issues.  If you're saying the AG can

7    come in and claim property where there has been no relationship

8    whatsoever to whatever wrongdoing has been alleged, I think

9    that goes too far and would be an unconstitutional reading of

10   that statute.

11        THE COURT:  Except there's a pitcher-and-a-catcher

12   kind of thing.  He takes the position that "any person" under

13   some aspects is a competitor and consumer, but under other

14   aspects "any person" refers to a victim and that he is

15   asserting the rights of the victim.  In that type situation,

16   there only needs to be some commercial transaction to trigger

17   it, and then he comes in to assert the rights of the victim.

18        MR. BEISNER:  What I was getting at, Your Honor,

19   though, if I heard counsel right, I think he was saying that he

20   doesn't have to show that the wrongdoing had a causal

21   relationship to whatever loss is alleged, that it just may have

22   to be, and I think that's the part where you run into the due

23   process issues.

24        THE COURT:  Right.  I see it.

25          We skip New Jersey because I have already ruled

1    on that.  Fifth is unjust enrichment.  Merck takes the position

2    that the unjust enrichment theory fails because it's barred by

3    the Louisiana Products Liability Act, that that's the exclusive

4    remedy in the cases that take the position that it crowds out

5    unjust enrichment.

6              MR. BEISNER:  I think our position on that is fairly

7    simple, and that is that if you have a claim in this realm

8    which is fundamentally a product liability claim, a

9    failure-to-warn sort of claim, as Your Honor suggested earlier,

10   that you had a choice of either suing under the LPLA or under

11   the redhibition statute and that these other cause of actions

12   are foreclosed by that.  If there was an intent to include

13   other causes of action in the exception, the legislature would

14   have said that, but it didn't put either LUTPA or the unjust

15   enrichment claim in that realm, didn't list it in the statute.

16   Therefore, there's really no basis for asserting that cause of

17   action here.

18             THE COURT:  Well, he takes two positions:

19                  One, of course, he says that specifically

20   excluded is redhibition;

21                  Secondly, he says his theory of liability is not

22   under the Louisiana Products Liability Act.  It's not based on

23   the damage that was caused by the product but instead by

24   Merck's deceptive trade practices, which is more tortious than

25   the Products Liability Act and, therefore, his whole claim is

1    outside the Products Liability Act.

2            **MR. BEISNER:**  Well, Your Honor, as the *Giammanco* case

3    that we cite in there indicates, the notion of "damage" refers

4    to loss/hurt/harm which results from the invasion of a legal

5    right, whereas "damages" are the recompense or compensation

6    awarded for the damage suffered.  There's a difference between

7    damages and damage here.  We think by using the word *damage* the

8    LPLA was providing it is the exclusive theory of liability for

9    any harm caused by a manufacturer's product, not just limited

10   to personal injury here.

11           I think the *Air Bag* litigation case covers that

12   because it really was getting at the fact that the statute

13   covers product liability claims that are based on economic loss

14   arising from deficiency and/or loss of use of the product as

15   well.  We think that redhibition is really the only way to go.

16           **THE COURT:**  Of course, he cites the *Lupron* case in

17   support of his position there.  How do you deal with that?

18           **MR. BEISNER:**  Well, *Lupron*, Your Honor, I don't think

19   is a product liability case.

20           **THE COURT:**  No, his case is not a product liability

21   case.

22           **MR. BEISNER:**  *Lupron* is a pricing case, basically,

23   that had to do with the fact that doctors were being given the

24   opportunity to achieve an extra profit off of the prescription

25   of that drug.  There was no allegation there of failure to warn

1  or anything that sounded in any way like a product liability

2  case.

3          What we have here, Your Honor, if you read the

4  complaint, as I'm sure Your Honor has observed, it looks like

5  all the complaints in the product liability cases, the personal

6  injury actions that Your Honor has been dealing with

7  previously.  So we think the exclusion under the LPLA ought to

8  apply.

9          THE COURT:  How do you get around that?  You cite

10  *Lupron*, and *Lupron* says what you said it says.  *Lupron* is a

11  whole different ballgame, the defense says; that we are dealing

12  now with the realm of product liability, and you're seeking to

13  carve out a theory that's separate and apart, and it's a

14  camouflaged product liability claim.

15          MR. MURRAY:  Well, Your Honor, first I would assert

16  that this is a whole different ballgame.  We are not here about

17  the personal injury claims.  We are not asserting the

18  subrogation claims, which we could have asserted.  We are

19  asserting the fraudulent marketing claims.  It is about the

20  marketing, not the product.  It is about paying too much for

21  the product or buying more of the product than we would have

22  otherwise.  It's about marketing.  It's about failure to

23  disclose.  The LPLA provides the exclusive remedy for damage

24  caused by a product.  Here, the damage is not caused by the

25  product; it's caused by marketing.

1          Your Honor, I apologize.  I don't have the cite

2     at my fingertips, but there is a Louisiana Third Circuit case

3     that's very interesting.  It notes that a manufacturer is not

4     always acting as a manufacturer such that the LPLA is invoked

5     any time you are dealing with what is a product as defined by

6     the LPLA.

7          It was a case involving, of all things, a

8     waitress spilling hot soup on a customer at a restaurant.  If

9     you read the LPLA as written, that hot soup was a product.  It

10    was manufactured by the restaurant.  The defendant there said,

11    "Wait a minute.  The LPLA is an exclusive theory of liability."

12    The court said no because when the waitress spilled the suit,

13    they weren't acting as a manufacturer.  They were acting as

14    someone who was delivering the product to the consumer, to the

15    plaintiff.

16         What we have here is the harm is caused not by

17    Merck's manufacture of a product, not by them acting, acting as

18    a product, not by the product itself, but by their marketing.

19         **THE COURT:**  Suppose, in your soup case, the waitress

20    says it's not hot, and then all of the sudden he eats it and

21    burns his mouth?

22         **MR. MURRAY:**  I think it's the same thing.  She is

23    acting as a waitress at that point.  She is not acting as the

24    manufacturer of the product.  I think that that's a key

25    distinction to be made, particularly when the claim is being

1    asserted under the Louisiana Unfair Trade Practices Act and by

2    redhibition.

3              Now, redhibition is exclusively carved out from

4    the statute.  But, Your Honor, I would note that not only is

5    redhibition exclusively carved out from the statute, from the

6    LPLA, but also the damages that are available under

7    redhibition.

8              Now, Mr. Beisner makes a big point of

9    distinguishing between damage from a product, the word *damage*,

10   and damages.  However, the reason I go into the discussion

11   about damages in my papers is that when the LPLA lists what is

12   exclusively covered by it, it excludes those things which could

13   be recovered under redhibition.  It doesn't say -- I'm sorry.

14   It excludes from its exclusion, if you would.  I hope I was

15   clear there.  It doesn't say, "We are just carving out

16   redhibition."  It says, "We are carving out those things which

17   could be recovered under redhibition."

18             So when you are talking about economic loss and

19   whether economic loss falls under the LPLA, if it is the type

20   of damage that is recoverable under redhibition, it is not

21   subject to the LPLA's exclusivity provisions.  Louisiana

22   courts -- again citing Your Honor to the *Guste v. Classic Soft*

23   case and others in our papers -- have time and again recognized

24   that the claim for restitution that the Attorney General can

25   bring under 1408 is akin to a redhibition claim.  Of course,

1  our redhibition claim is a redhibition claim, which even Merck

2  concedes is not subject to LPLA's exclusivity provision.

3  **THE COURT:**  What about your claim for civil

4  penalties?

5  **MR. MURRAY:**  Your Honor, the civil penalties statute

6  was enacted in 2006.  Again, without conceding a point that my

7  client might not wish me to concede, I think we'll just say in

8  this case we are not proceeding with a claim for civil

9  penalties.

10  **THE COURT:**  Okay.  Any response to any of the points

11  that counsel made under LUTPA?

12  **MR. MURRAY:**  I'm sorry, Your Honor.  Before I finish,

13  there were a couple points.  I don't know if I will have an

14  opportunity to go back and address a couple of things that

15  Mr. Beisner addressed on some points I had passed on.

16  Just very quickly, Mr. Beisner said that with

17  respect to the labeling issue under 1408 and whether -- I'm

18  sorry, under the Louisiana formulary exception and the federal

19  exception that we can establish a formulary, he said that that

20  claim would be dependent on a fraud on the FDA.  I think *Wyeth*

21  *v. Levine* has dealt with that.  They have an ongoing obligation

22  to update their warnings as information becomes available, so

23  it would not be dependent on a fraud-on-the-FDA claim.

24  Also, with respect to the due process argument

25  under 1408, Mr. Beisner has said that the relaxed causation

1   standard somehow violates due process.  Well, Your Honor, there
2   are relaxed causation standards, with respect to consumer
3   actions, in all sorts of contexts.  I would note, for instance,
4   the disgorgement provision of California 17200, for instance,
5   where a court can disgorge the profits, and they don't have to
6   show that there was direct damage to the consumer.  All that
7   has to be shown is that, for lack of a better word, the
8   defendant has been unjustly enriched or has profited from an
9   unlawful marketing practice.
10          I don't think any of those statutes have been
11  struck down as unconstitutional.  In any event, that's not
12  before Your Honor.  I just wanted to address that.  Thank you.
13          THE COURT:  All right.  Any rebuttal from the
14  defendants?
15          MR. BEISNER:  Sure.  Your Honor, back on this
16  question of the LPLA preclusion, I think I would just note
17  again that the claims that are being asserted here -- we seem
18  to be dancing around with the language here, but at the end of
19  the day, we are talking about an allegation by the state that
20  the risks of Vioxx were not adequately disclosed.  That's what
21  we are talking about.  It's a classic product liability claim
22  theory, and it's strictly product-related.  As the *Air Bag*
23  *Products Liability* case notes, the LPLA precludes all claims
24  based on an allegation that the manufacturer of a product
25  failed to adequately disclose the risk of the products.

1           The allegations here are very much like we see
2   in the personal injury cases.  I note the LPLA itself in
3   9:2800.53 says that it includes claims that are based on
4   economic loss arising from a deficiency in or loss of use of
5   the product.  What they are alleging here is a deficiency.
6   They are saying it wasn't what it was supposed to be.  That's
7   the sort of allegation they are making here, Your Honor.
8           THE COURT:  What about his argument about
9   redhibition, that you're dealing with damages flowing from
10  redhibition and, therefore, that survives and that's what he is
11  looking for?
12          MR. BEISNER:  Well, I think you get back, Your Honor,
13  with that, to all of the arguments that we made about why
14  redhibition doesn't work here.  The state itself is not a
15  buyer, and the state does not have the authority to assert the
16  redhibition claim on behalf of consumers.  I think that's the
17  problem you run into there.
18          Your Honor, I think the only thing we haven't
19  addressed -- which I can do very quickly and can note I don't
20  think that the AG responded to these arguments on the unjust
21  enrichment claim -- is the fact that it's simply a claim that's
22  not available here where plaintiff alleges that other causes of
23  action exist.  The *Garber* case from 2008 we think makes that
24  clear.  Again, I'm not sure if the AG is still pressing that
25  issue since it wasn't responded to in their brief.

1      **THE COURT:**  You take the position you don't need to

2    recover under those other issues, you just have to have a

3    claim; and since they have a claim under all of those other

4    theories, that they have no claim under unjust enrichment.

5      **MR. BEISNER:**  That's right.  That's all we're saying,

6    Your Honor.  I think the AG at some point said, "Well, we are

7    arguing those claims don't work," but that's the whole point of

8    having that reservation there is it's really preserved for a

9    circumstance where there is no cause of action that could be

10   asserted.  By virtue of the fact there's lots of causes of

11   action in this complaint, we think that that forecloses that

12   form of relief here.

13     **THE COURT:**  Do you want to respond to that?

14     **MR. MURRAY:**  Brief response to that, Your Honor.  We

15   have pled in the alternative, assuming that Merck is correct,

16   that none of the other causes of action asserted are viable,

17   then the Louisiana law of unjust enrichment is available.

18   That's the whole purpose.  If you don't have another cause of

19   action -- which is what they are saying.  They are saying, as a

20   matter of law, we don't have another cause of action.  If you

21   don't have another cause of action, then unjust enrichment is

22   the failsafe.  It's the ultimate backstop, if you will,

23   Your Honor, and we have pled it in the alternative.

24     We think we prevail under all the other causes

25   of action and don't need unjust enrichment.  In the event that

 1    the other causes of action fail as a matter of law, as Merck
 2    contends -- they fail as a matter of law -- then unjust
 3    enrichment is available.  Now, if they fail for some factual
 4    reason and not as a matter of law, then he may have a point.
 5    They are saying we don't have it and, therefore, clearly we are
 6    in the situation of unjust enrichment, of course, assuming that
 7    they are correct, which we vehemently disagree with.  Thank
 8    you, Your Honor.
 9            THE COURT:  Do you want to respond to that?  He
10    distinguishes between trial and losing as opposed to not having
11    one.  Under 12(b)(6), you're saying that they don't have one as
12    a matter of law.  You're not looking for summary judgment here
13    or, for that matter, a verdict.  You simply say they don't
14    exist as a matter of law.  He says, well, if you're right,
15    which he disagrees, he has got that claim.
16            MR. BEISNER:  Well, what we are saying here -- and I
17    read from the *Garber* case, and I quote:
18                It is not the success or failure of other causes
19    of action but rather the existence of other causes of action
20    that determine whether unjust enrichment can be applied.
21                The court goes on to say:
22                Where there is a rule of law directed to the
23    issue, an unjust enrichment action must not be allowed to
24    defeat the purpose of said rule.
25                The point is that you don't want unjust

1    enrichment to become this catchall that sort of overrules the

2    elements that are required for other causes of action, and

3    that's what I think the state is trying to argue here.

4              THE COURT:  Well, the state is saying that if you're

5    right that it doesn't exist as a matter of law, then they have

6    that; if you're right that it doesn't exist because of summary

7    judgment or because of verdict, then they don't have it.  You

8    are taking the position, according to the state, that it

9    doesn't exist as a matter of law and, therefore, you're saying

10   that these other causes of action just don't exist, as opposed

11   to the fact that they exist but they lose on them.

12             MR. BEISNER:  Well, I think *Garber* addresses that

13   directly.  Again, it says where there is a rule of law directed

14   to the issue, an unjust enrichment action must not be allowed

15   to defeat the purpose of that rule.  That's our argument here,

16   Your Honor.  Thank you.

17             THE COURT:  Thank you very much.  Both of you have

18   given me good briefs.  Your argument has helped me understand

19   them.  I appreciate it.  I'll take it under advisement, and we

20   will rule shortly.  The Court will stand in recess.

21             THE DEPUTY CLERK:  Everyone rise.

22             (WHEREUPON the Court was in recess.)

23                            *  *  *

24

25

1                          <u>**CERTIFICATE**</u>

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, do hereby certify that the foregoing is a true

5    and correct transcript, to the best of my ability and

6    understanding, from the record of the proceedings in the

7    above-entitled and numbered matter.

8

9

10                               <u>s/ Toni Doyle Tusa</u>
                                 Toni Doyle Tusa, CCR, FCRR
11                               Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25