# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

|                                          |   |                       |
|------------------------------------------|---|-----------------------|
|                                          | : | MDL NO. 1657          |
| IN RE: VIOXX                             | : |                       |
|     PRODUCTS LIABILITY LITIGATION | : | SECTION: L  |
|                                          | : |                       |
|                                          | : | JUDGE FALLON          |
|                                          | : | MAG. JUDGE KNOWLES    |

THIS DOCUMENT RELATES TO: *Gene Weeks v. Merck & Co., Inc.*, Case No. 05-4578

## ORDER & REASONS

Currently before the Court are several motions pertaining to Vioxx claimant, Gene Weeks, and his decision to participate in the Vioxx Settlement Program. On January 27, 2010, the Court heard oral arguments on these motions. For the following reasons, these motions are all DENIED.

## I.    FACTUAL BACKGROUND

### A.    General Information About the Vioxx Settlement Agreement

To put this matter in perspective, a brief review of this litigation is appropriate. This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States. Vioxx remained publicly available

until September 20, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004. Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[1]

On February 16, 2005, the Judicial Panel on Multidistrict Litigation conferred multidistrict litigation status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005). One month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to consider strategies for moving forward with the proceedings. Shortly thereafter, the Court appointed committees of counsel to represent the parties and to meet with the Court once every month to review the status of the litigation.[2]

One of this Court's first priorities was to assist the parties in selecting and preparing certain test cases to proceed as bellwether trials. In total, the Court conducted six Vioxx

---

[1]For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

[2]The Court appointed twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6 (Apr. 8, 2005), and five attorneys to serve on the Defendant's Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005).

bellwether trials.³ The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina. The five subsequent bellwether trials took place in New Orleans, Louisiana. Only one of the trials resulted in a verdict for the plaintiff. Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the defendant. During the same period that this Court conducted six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida.

The Court convened a conference in New Orleans on December 8, 2006. In addition to the undersigned Transferee Judge, state judges from Texas, New Jersey, and California attended. Also in attendance was an official of the Defendant, lead and liaison counsel for the Defendant, and lead and liaison counsel for the Plaintiffs' Steering Committee. The Judges expressed the view that it was timely for the parties to begin serious settlement discussions. With the benefit of experience from the bellwether trials, as well as this encouragement from the several coordinated courts, the parties soon began settlement discussions in earnest.⁴

On November 9, 2007, Merck and the NPC formally announced that they had reached a

---

³*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. Filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. Filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. Filed Feb. 16, 2006 (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. Filed June 21, 2005) (sixth bellwether trial).

⁴In their efforts to develop a comprehensive, joint settlement agreement, counsel for Merck and the Negotiating Plaintiffs' Counsel ("NPC") met together more than fifty times and held several hundred telephone conferences. Although the parties met and negotiated independently, they kept this Court-as well as the coordinate state courts of Texas, New Jersey, and California-informed of their progress in settlement discussions.

Settlement Agreement.  *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D.La. Nov. 9, 2007) ("Settlement Agreement"), *available at* http://www.browngreer.com/vioxxsettlement.[5]  The private Settlement Agreement establishes a pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion.  *Id.* § "Recitals".[6]  The Settlement Agreement is a voluntary opt in agreement.  Once a claimant has opted in to the Settlement Program, they are bound to proceed according to the terms and conditions outlined in the Settlement Agreement.  The terms of the Settlement Agreement provide that "[s]ubmission of an Enrollment Form is irrevocable.  No Program Claimant . . . may under any circumstances or any reason withdraw an Enrollment Form, request the return of his Release of Dismissal With Prejudice Stipulation . . . or otherwise unilaterally exit the Program."  *Id.* § 1.2.4.

In order to determine eligibility and valuation of individual claims submitted for enrollment, the Settlement Agreement provides that an independent Claims Administrator will review claims and calculate the total number of points awarded to each claimant during the claims valuation process.  *Id.* § 2.  Pursuant to the terms of the Settlement Agreement,

---

[5]When the parties formally announced the Settlement Agreement, Vioxx-related discovery had been moving forward in the coordinate jurisdictions for more than six years.  Over 50 million pages of documents had been produced and reviewed, more than 2,000 depositions had been taken, and counsel for both sides had filed thousands of motions and consulted with hundreds of experts in the fields of cardiology, pharmacology, and neurology.

[6]For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, *see In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

BrownGreer, PLC was appointed as the Claims Administrator. *Id.* § 6.1.2.[7]

In determining whether a claim is eligible for enrollment in the Vioxx Settlement Program, the Claims Administrator must decide whether the claim satisfies certain criteria necessary to pass through each of three "gates": (1) evidence of a qualifying injury, (2) duration of use, and (3) proximity of injury to usage. *Id.* § 2.2. If the Claims Administrator determines that a claim is ineligible for enrollment in the program, the claim is automatically reviewed by an independent Gates Committee, which consists of six members, three of whom are appointed by Merck and three of whom are appointed by the NPC. *Id.* § 2.5. The Gates Committee reviews each claim pursuant to the three gate requirements set forth in the Agreement. *Id.* In reviewing a claim previously deemed ineligible by the Claims Administrator, the Gates Committee has the authority to overrule the initial determination if it finds that the claim is eligible for enrollment. *Id.* If, however, the Gates Committee determines that the claim is ineligible for enrollment, the claimant may still appeal the Committee's decision to a Special Master, who will determine *de novo* whether the claim meets the three eligibility requirements. *Id.* § 2.6.[8] *Id.* If the claimant decides to appeal to the Special Master, the ruling of the Special Master is final and binding. Alternatively, the claimant may choose not to appeal to the Special Master and may instead

---

[7]BrownGreer, PLC, is a Virginia-based law firm specializing in multiple claims management and claims administration. The firm has created a comprehensive website containing resources for claimants and attorneys, as well as a limited-access Vioxx Portal by which attorneys may check on the status of their cases. The website can be accessed at http://www.browngreer.com/vioxxsettlement.

[8]On January 14, 2008, the Court formally appointed Mr. Patrick A. Juneau to serve as Special Master under the terms of the Settlement Agreement. On January 16, 2008, the Court appointed Justice John Trotter (Ret.) and Judge Marina Corodemus (Ret.) to serve as Deputy Special Masters to assist Special Master Juneau.

decide to exit the Settlement Program and reenter the litigation process by filing a future evidence stipulation. In other words, the decision to enroll in the Settlement Program does not foreclose the possibility of a trial for a claimant who is deemed ineligible.

The final claims valuation process involves an objective, numerical determination that takes into consideration such individual factors as: age, injury, duration of usage, consistency of use, whether the claimant used Vioxx pre- or post-label adjustment, and the claimant's general health and medical history. *Id.* § 3.2. Factors in the claimant's medical history that might affect the points award include smoking, cholesterol levels, and whether the claimant or the claimant's family has a history of heart attacks or ischemic strokes. *Id.*[9]

### B. The history of Mr. Weeks' claim

Mr. Weeks was prescribed Vioxx in 1999 following neck surgery to remedy damage to his cervical spine and he took the drug on a daily basis from approximately August of 1999 through July of 2001. On March 5, 2004, more than two and a half years after his Vioxx use ended, Mr. Weeks suffered a heart attack. Several months later, Mr. Weeks learned through certain advertisements that Vioxx had been withdrawn from the market. Responding to these advertisements, Mr. Weeks contacted and eventually hired the law firm of Martinez, Manglardi, Dies-Arguelles & Tejedor to represent him in a lawsuit against Merck.

On October 5, 2005, Plaintiff filed his complaint in this Court and the case was

---

[9]*See e.g.*, Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's "inherent authority over this multidistrict litigation" as well as its express authority under Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving the right to "issue subsequent Orders governing the procedure by which the Allocation Committee shall carry out its function"; and providing that members appointed to the committee may not be substituted by other attorneys "except with the prior approval of the Court").

consolidated with Vioxx MDL.  On November 21, 2007, Maria Tejedor, Plaintiff's attorney at the time, sent a letter to Mr. Weeks to notify him of the Settlement Agreement and to recommend his participation in the Settlement Program.  Enclosed with this letter was a form captioned "Vioxx Settlement Program Election to Participate," which Mr. Weeks signed on November 22, 2007.  By signing this form, Mr. Weeks agreed to "accept the terms of the Vioxx Settlement Program as set forth in the enclosed letter and Description of Settlement Program and . . . to participate in the Settlement Program."  On February 18, 2008, Mr. Weeks enrolled in the Settlement Program and submitted an executed release along with a stipulation of dismissal.

Initially, Mr. Weeks claim was deemed ineligible to participate in the Settlement Program because Mr. Weeks had failed to meet the proximity gate.  Upon further review, however, the Claims Administrator issued a Notice of Eligibility to Mr. Weeks on May 4, 2009.  On May 8, 2009, Mr. Weeks received notice that he had been awarded 120.74 points which meant that his settlement amount would total approximately $229,406.00.  Believing that there had been an improper deduction in Mr. Weeks' points award, Ms. Tejedor filed a Notice of Points Award Appeal.  This appeal was successful and Mr. Weeks' settlement amount was increased to approximately $286,000.00.  Subsequently, the Claims Administrator released this amount to Ms. Tejedor who has been holding these funds in a trust account pending resolution of the present motions.

While his claim was being reviewed by the Claims Administrator, Mr. Weeks apparently believed that his claim had been conclusively rejected and decided to hire Ronald Benjamin to represent him instead of Ms. Tejedor.  At this time, it is unclear to the Court exactly when this change occurred.  However, for the Court's present purposes it is sufficient to note that it is

undisputed that Mr. Weeks was represented by Ms. Tejedor at the time he enrolled in the Settlement Program and that he is presently represented by Mr. Benjamin, and has been since at least May 14, 2009.

## II.　PRESENT MOTIONS

On April 22, Mr. Benjamin filed a motion to rescind and vacate Plaintiff's enrollment in the Settlement Program (Rec. Doc. 18338). In this motion, which was filed prior to Plaintiff's receipt of his notice of eligibility, Plaintiff asserts that he did not meet the proximity gate but that Ms. Tejedor essentially forced him to enroll in the Settlement Program nonetheless. Plaintiff claims that it was not in his best interests to enroll in the Settlement Program, that Ms. Tejedor knew this, and that she only recommended enrolling because, pursuant to the Settlement Agreement, she would have to withdraw if he chose not to. Plaintiff further claims that Ms. Tejedor had a conflict of interest that was never disclosed and that she coerced him into enrolling by threatening to withdraw. According to the motion, Ms. Tejedor "repeatedly cajoled [Mr. Weeks] into signing onto the settlement program by giving him advice that distorted his actual legal options, telling him his case would never get to trial, and insisting he agree because it was his only option." Additionally, the Plaintiff has moved for the recusal of this Court because the Court serves as the Chief Administrator of the Settlement Agreement and has therefore become "too close to the settlement negotiations."

Instead of opposing Mr. Benjamin's motion to rescind or vacate, on July 2, 2009, Ms. Tejedor filed a motion to enforce the settlement between Mr. Weeks and Merck (Rec. Doc. 20328). In this motion, Ms. Tejedor asserts that she represented Mr. Weeks diligently and fully

-8-

informed him of all material information regarding the Settlement Agreement. She argues that he chose to enroll in the Settlement Program knowingly and of his own volition. Accordingly, Ms. Tejedor claims that the settlement between Mr. Weeks and Merck should be enforced and that she is entitled to attorneys' fees and costs for her work on Mr. Weeks' claim.

On July 22, 2009, Mr. Benjamin filed a response to Ms. Tejedor's motion. In his response, he argues that, at the latest, Ms. Tejedor's representation of Mr. Weeks was terminated on January 23, 2009 when Mr. Weeks sent an email discharging her. Accordingly, they assert that Ms. Tejedor lacks standing to bring the instant motion. Additionally, Mr. Benjamin argues that Merck was on notice of Plaintiff's desire to opt out of the Settlement Program when Mr. Benjamin's motion to vacate was filed, which occurred prior to the issuance of a notice of eligibility. Also, in his response, Mr. Benjamin once again requests the recusal of this Court.

On, July 2, 2009, Ms. Tejedor filed a motion for sanctions against Mr. Benjamin (Rec. Doc. 20319). This motion is based on certain allegedly fraudulent statements contained in Mr. Benjamin's motion to vacate or rescind the settlement agreement between Mr. Weeks and Merck. In her motion, Ms. Tejedor asks that this Court sanction Mr. Benjamin by "striking the false allegations made as to the actions of the Plaintiff's counsel[,] find[ing] that [Ms. Tejedor] was the legal representative of Mr. Weeks at the time the settlement was reached on Mr. Weeks' behalf[,] and preclud[ing] Mr. Benjamin from filing any further pleadings on Mr. Weeks behalf."

On July 22, 2009, Mr. Benjamin filed an opposition to Ms. Tejedor's motion for sanctions and additionally cross-moved for sanctions against Ms. Tejedor (Rec. Doc. 21310). Mr. Benjamin also moved for the recusal of this Court once again. Mr. Benjamin argues that the statements made in his motion to vacate or rescind were accurate and justified. Additionally, he

points out that Ms. Tejedor continues to file motions on behalf of Mr. Weeks despite being discharged no later than January of 2009. Finally, Mr. Benjamin asserts that Ms. "Tejedor's motion for sanctions is itself sanctionable." Accordingly, he requests that her "Rule 11 motion and separate motion to enforce the settlement against plaintiff should be stricken, and attorney's fees and costs should be awarded."

On August 5, 2009, Merck filed an omnibus response to these motions. In their response, they ask that Mr. Weeks' settlement agreement be enforced and point to several undisputed facts that they feel are dispositive. First, they point out that Mr. Weeks chose to enroll in the Settlement Program and submitted all of the required forms. Next, they point out that it is undisputed that Mr. Weeks was represented by Ms. Tejedor at the time of his decision to enroll. Additionally, they point out that pursuant to the Settlement Agreement, a Plaintiff's decision to enroll is irrevocable. The only way that a Plaintiff may reenter the tort system is when his claim has been denied and he files a future evidence stipulation, which Mr. Weeks did not do in this case. It should be noted that in their response, Merck also opposes Mr. Benjamin's numerous requests for the recusal of this Court but does not address the cross-motions for sanctions filed by Ms. Tejedor and Mr. Benjamin.

### III. LAW & ANALYSIS

#### A. Recusal

In each of his filings in this matter, Mr. Benjamin has requested the Court's recusal. In support of this request, he points to the fact that the Court also serves as the Chief Administrator of the Settlement Agreement. Title 28, United States Code, Section 455 provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be

-10-

questioned." 28 U.S.C. § 455. The Court, however, has previously explained that serving as the Chief Administrator of the Settlement Agreement is not grounds for this Court's recusal (Rec. Doc. 17394, Order and Reasons, at 6.) As the Court has stated:

> "[a]s Chief Administrator of the Vioxx Master Settlement Agreement, the Court serves in an administative capacity that has no substantive effect on its management of the MDL proceedings. The Court played no role in drafting the private settlement agreement reached by the parties; the Court has taken no position as to what types of claims should or should not have been included in the settlement; and, finally, the Court has consistently stated that it neither encourages nor discourages participation in the settlement."

*Id.* (citations omitted). In light of the administrative nature of the Court's role as Chief Administrator, there is no risk of impartiality or the appearance of impartiality. In fact, this is the role a Court assumes in every case in which the terms or effectuation of a settlement is contested. It is the inherent power and concomitant duty of a Court over cases proceeding before it. Thus, Mr. Benjamin's requests for recusal on each of the instant motions is denied.

### B. The attorney-client relationship between Mr. Weeks and Ms. Tejedor

The law is clear that "a client has the absolute right to discharge his or her lawyer" and that he or she may exercise this right at any time, with or without cause. *Farrar v. Kelly*, 440 So. 2d 939, 941 (La. App. Ct. 1983). However, after discharge without cause an attorney may be entitled to recover fees for any work that they previously performed under a contingent fee agreement. *Id.*; *see also* 7 Am. Jur. 2D *Attorneys at Law* § 281. In this case, it is clear that the attorney-client relationship between Mr. Weeks and Ms. Tejedor was terminated on or before May 14, 2009. On July 2, 2009, Ms. Tejedor filed the instant motion to enforce settlement. However, she had been discharged by Mr. Weeks prior to filing this motion. Thus, the motion could not have been filed on his behalf, and is in fact directly contrary to the motion filed on his

behalf by his current attorney, Mr. Benjamin. Furthermore, Ms. Tejedor is not herself a party to the settlement agreement between Merck and Mr. Weeks. Therefore, she lacks standing to bring a motion to enforce settlement under the circumstances presented here. Accordingly, her motion must be denied. If Ms. Tejedor feels that she is entitled to fees for the work that she completed on Mr. Weeks case, the appropriate remedy is to assert a fee lien in compliance with Pretrial Order No. 47.

### C. Mr. Weeks consent to enroll in the Settlement Program

The Vioxx Settlement Agreement provides that "[s]ubmission of an Enrollment Form is irrevocable. No Program Claimant . . . may under any circumstances or [for] any reason withdraw an Enrollment Form, request the return of his Release of Dismissal With Prejudice Stipulation . . . or otherwise unilaterally exit the Program." Settlement Agreement § 1.2.4. However, in this case, the Plaintiff argues that his enrollment should be vacated or rescinded because his consent was based on the alleged fraud or duress by Ms. Tejedor. Settlement agreements are generally subject to, and enforced according to, traditional contract principles. *Denesse v. Island Operating Co., Inc.*, Case No. 03-3280, 2008 WL 466240, at *2 (E.D. La. Feb. 13, 2008). In Louisiana, courts are permitted "to look beyond the four corners of the document to ascertain the parties' intent when an otherwise valid contract suffers from a vice of consent. *See* La. Civ. Code arts. 1948 & 3079. That is, a party may avoid liability under a contract if that party's consent was obtained through error, fraud, or duress." *U.S. Fidelity & Guar. Co. V. Diggs*, Case No. 03-1023, 2004 WL 32917, at *3 (E.D. La. Jan. 5, 2004).

In this case, the Court is not persuaded that fraud or duress was a factor in Mr. Weeks' decision to participate in the Settlement Program. On November 21, 2007, Ms. Tejedor sent a

letter to Mr. Weeks which explained the Settlement Program, recommended his participation, and explained her reasons for making this recommendation. Mr. Weeks clearly understood the agreement that he was entering into, as evidenced by the "Release of All Claims" that he signed on January 1, 2008. Further, as discussed above, Ms. Tejedor was Mr. Weeks attorney at the time of this decision. She exercised her professional judgment in recommending the settlement program, which would not foreclose the possibility of reentering the tort system should Mr. Weeks fail to qualify. She was forthcoming with her client about the fact that if he chose not to enroll, her belief that enrolling in the Settlement Agreement was in his best interests would create a conflict of interest and she would have to withdraw from his representation. Because he chose to enroll, the Claims Administrator reviewed Mr. Weeks' claim. Mr. Weeks was eventually deemed eligible to participate in the Settlement Program and his payment was issued to Ms. Tejedor. Plaintiff cannot now back out of the Settlement Agreement which he voluntarily entered. Accordingly, Plaintiff's motion to vacate or rescind his enrollment is denied and Mr. Weeks is bound to accept the points award that he received.

**D.     Sanctions**

Pursuant to Federal Rule of Civil Procedure 11(b), an attorney who presents a written motion to the Court "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivilous argument for extending, modifying, or reversing existing law or for establishing new law;
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information."

Further, under Rule 11(c)(1) "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney... that violated the rule or is responsible for the violation."

In this case, the Court declines to impose sanctions upon either Mr. Benjamin or Ms. Tejedor for the filings that they have made. Neither the statements contained in Mr. Benjamin's motion to vacate, nor those contained in Ms. Tejedor's motion for sanctions, were presented for an improper purpose and the factual contentions either have some evidentiary support or are warranted inferences based on the evidence. Accordingly, the Court finds that sanctions are inappropriate in this case and the cross-motions for sanctions are therefore denied.

## IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that Plaintiff's motion to rescind and vacate Plaintiff's enrollment in the Settlement Program (Rec. Doc. 18338), Ms. Tejedor's motion to enforce the settlement between Mr. Weeks and Merck (Rec. Doc. 20328), Ms. Tejedor's motion for sanctions against Mr. Benjamin (Rec. Doc. 20319), and Mr. Benjamin's cross-motion for sanctions against Ms. Tejedor (Rec. Doc. 21310) ARE DENIED.

IT IS FURTHER ORDERED that the portion of Mr. Weeks' settlement award to which he is now indisputably entitled should be disbursed to him. The portion of the award that is allocated to attorneys fees, up to 32%, shall remain in escrow pending resolution of any fee lien that may be asserted.

New Orleans, Louisiana, this 18th day of February, 2010.

_____
United States District Judge