UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
| Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
| | * | |
| STATE OF LOUISIANA, *ex rel.* JAMES D. | * | SECTION L |
| CALDWELL, JR., Attorney General, | * | |
| | * | JUDGE ELDON E. FALLON |
| Plaintiff, | * | |
| | * | MAGISTRATE JUDGE |
| versus | * | KNOWLES |
| | * | |
| MERCK SHARP & DOHME CORP., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| Case No. 05-3700. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF JEFFREY E. HARRIS, M.D., PH.D.

**(Expert Challenge No. 1)**

# TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................................... 2

    A.    Dr. Harris's Methodology ........................................................................ 4

        1.    Identification Of Medicaid Participants ..................................... 5

        2.    Identification Of "Active Vioxx Patients" ................................ 6

        3.    Identification Of "Regulatory Interventions" ............................ 9

    B.    Dr. Harris's Opinions ............................................................................ 10

        1.    Total Expenditures On Vioxx Net Of Rebates ........................ 10

        2.    Impact Of Exclusion Of Vioxx From The PDL On Vioxx
            Expenditures ............................................................................. 11

        3.    "Compensating Expenditures" On Other NSAIDs After Vioxx
            Withdrawal ............................................................................... 12

        4.    Impact Of DUR Program On Bextra And Celebrex Expenditures ........... 14

ARGUMENT ............................................................................................................. 17

    I.    DR. HARRIS'S OPINIONS REGARDING THE STATE'S TOTAL
        EXPENDITURES ON VIOXX SHOULD BE EXCLUDED AS
        IRRELEVANT. ........................................................................................ 19

    II.    DR. HARRIS'S COHORT OPINIONS SHOULD BE EXCLUDED
        BECAUSE HIS COHORTS ARE NOT METHODOLOGICALLY
        SOUND. .................................................................................................. 21

    III.    DR. HARRIS'S OPINION THAT LDHH EXPENDITURES ON
        NSAIDS DECREASED AFTER THE WITHDRAWAL OF VIOXX
        SHOULD BE EXCLUDED BECAUSE IT IS UNRELIABLE. ......................... 24

    IV.    DR. HARRIS'S OPINION ON THE DUR PROGRAM SHOULD BE
        EXCLUDED BECAUSE IT IS THE PRODUCT OF
        COMPUTATIONAL ERROR AND IS OTHERWISE UNRELIABLE. ............ 26

CONCLUSION .......................................................................................................... 28

1008360v.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Baker v. Chevron USA, Inc.*,
  No. 1:05-CV-227, 2010 U.S. Dist. LEXIS 698 (S.D. Ohio Jan. 6, 2010).....................21, 22

*Daubert v. Merrell Dow Pharmaceuticals., Inc.*,
  509 U.S. 579 (1993)..........................................................................................................17, 18

*Dethmers Manufacturing Co. v. Automatic Equip. Manufacturing Co.*,
  73 F. Supp. 2d 997 (N.D. Iowa 1999).......................................................................... 19

*In re Diet Drugs Products Liability Litigation*,
  MDL No. 1203, 2001 U.S. Dist. LEXIS 1174 (E.D. Pa. Feb. 1, 2001)............................ 26

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997).......................................................................................................... 18

*LeBlanc v. Chevron USA Inc.*,
  513 F. Supp. 2d 641 (E.D. La. 2007) ............................................................................. 21

*McClain v. Metabolife International, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ...................................................................................... 18

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
  306 F. App'x 781 (3d Cir. 2009) ................................................................................26, 28

*Munoz v. Orr*,
  200 F.3d 291 (5th Cir. 2000) ........................................................................................24, 27

*Peters v. Five Star Marine Serv.*,
  898 F.2d 448 (5th Cir. 1990) .......................................................................................... 19

*In re Propulsid Products Liability Litigation*,
  261 F. Supp. 2d 603 (E.D. La. 2003) ............................................................................. 18

*In re Rezulin Products Liability Litigation*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004)............................................................................. 26

*Rosen v. Ciba-Geigy Corp.*,
  78 F.3d 316 (7th Cir. 1996) ...........................................................................................17, 18

*Schwab v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 992 (E.D.N.Y. 2006).............................................................................19, 20

*Tagatz v. Marquette University*,
  861 F.2d 1040 (7th Cir. 1988) .....................................................................................24, 25, 28

*United States v. Hall*,
  165 F.3d 1095 (7th Cir. 1999) ........................................................................................ 19

*Valentine v. Pioneer Chlor Alkali Co.*,
  921 F. Supp. 666 (D. Nev. 1996)..................................................................................... 22

1008360v.1

## STATE CASES

*Smith v. General Motors Acceptance Corp.*,
    542 So. 2d 831 (La. Ct. App. 3d Cir. 1989) ................................................................... 20

## FEDERAL RULES

Fed. R. Evid. 403 ..............................................................................................................19, 21
Fed. R. Evid. 702 ................................................................................................................ 17

## STATE STATUTES

La. Civ. Code art. 2532 ........................................................................................................ 20
La Civ. Code art. 2541 ......................................................................................................... 20

## OTHER AUTHORITY

Federal Judicial Center, *Reference Manual on Scientific Evidence* ........................................... 22

1008360v.1

Defendant Merck Sharp & Dohme Corp. ("Merck") respectfully moves to exclude the testimony of Dr. Jeffrey E. Harris.

Although he is the sole witness designated by Plaintiff as a "damages" expert, Dr. Harris – by his own admission – does not offer a single damages opinion.  Instead, he simply answered five questions posed to him by Plaintiff.  Some of the questions ask nothing more than what the Louisiana Department of Health and Hospitals ("LDHH") spent on Vioxx during particular periods – hardly something as to which expert testimony is needed, and a figure that is wholly irrelevant to the calculation of a remedy in this case.  Other questions ask what effect certain historical milestones – like the withdrawal of Vioxx – had on arbitrary categories of LDHH expenditures.  Dr. Harris conceded at his deposition that every one of his opinions would have to be adjusted to be useful in calculating a remedy, depending on what causal theories Plaintiff chooses to pursue.  Yet Dr. Harris freely admitted that he offered no methodology or opinion as to whether or how those adjustments could even be made.  In short, Plaintiff asked Dr. Harris the wrong questions.  And even as to these misguided questions, Dr. Harris's answers are unreliable.

As explained more fully below, Dr. Harris's testimony should be excluded for several reasons.

- ***First***, Dr. Harris's opinions regarding LDHH's aggregate Vioxx expenditures are premised on the erroneous assumption that Plaintiff would be entitled to restitution of all the money LDHH spent on Vioxx.[1]

- ***Second,*** Dr. Harris's opinions regarding the effects of various regulatory milestones on the State's expenditures for Vioxx and other nonsteroidal anti-inflammatory drugs ("NSAIDs") are based on incomplete, skewed data, rendering those opinions unreliable.

- ***Third***, in analyzing the purported effect of the withdrawal of Vioxx on the State's NSAID expenditures, Dr. Harris fails to account for other possible reasons why

---

[1]     As set forth in Merck's motion for summary judgment, Plaintiff has no right to recover the entire purchase price of Vioxx.  Such a remedy is in the nature of rescission, which is not possible here since Plaintiff cannot return Vioxx to Merck.  (*See* Mot. for Summ. J. at 40.)

NSAID expenditures would have dropped, assuming, for example, that all reductions in NSAID use after 2004 resulted solely from the withdrawal of Vioxx.  Dr. Harris also admitted that his opinion, even if otherwise reliable, would say nothing whatsoever about what would have happened if Vioxx had been withdrawn earlier (and the State, in any event, has no evidence that an earlier withdrawal would have occurred).

- ***Fourth***, Dr. Harris's opinion regarding the purported effect of a 2005 LDHH drug-utilization program on Bextra and Celebrex expenditures by the State is tainted by a computational error that affected his findings.  And even if this opinion were not erroneous, it would still be irrelevant because Plaintiff has no proof that LDHH would have imposed a similar program for Vioxx – or that a Vioxx drug-utilization program would have had the same effect as the Bextra/Celebrex program.

## BACKGROUND

Plaintiff claims that Merck made misrepresentations about Vioxx that caused LDHH and Louisiana citizens to pay for Vioxx prescriptions that they otherwise would not have paid for. (*See, e.g.*, Second Am. Compl. ("Compl.") ¶ 193 (alleging that "citizens of Louisiana, the State of Louisiana and/or DHH" spent "millions of dollars to purchase Vioxx" due to "the Defendant's unlawful conduct").)  Plaintiff has designated Dr. Jeffrey E. Harris as an expert in the field of economics.  (Report of Jeffrey E. Harris, M.D., Ph.D. ("Harris Rep.") ¶ 7, Dec. 22, 2009 (attached as Ex. 1).)  Dr. Harris is a professor of economics at the Massachusetts Institute of Technology, and from 1977 to 2006, he practiced medicine as a primary care physician at Massachusetts General Hospital.  (*Id.* ¶¶ 1-2.)  He is also an active plaintiffs' expert.  (Dep. of Jeffrey E. Harris, Jan. 29, 2010 ("Harris Dep.") 37:8-38:2 (attached as Ex. 2) (testifying that he earns $150,000-200,000 annually from expert testimony, "[n]early all" for plaintiffs).)  Dr. Harris intends to offer several opinions that purportedly relate to the calculation of damages with respect to the State's Medicaid-related claims, although they are not "damages" opinions in the traditional sense.  Specifically, Dr. Harris seeks to opine on several questions propounded to him by Plaintiff:

2

(a)     What were the total expenditures on Vioxx, net of rebates, by LDHH?

(b)     If Vioxx had been withdrawn from the U.S. market in March 2000, what would have been the reduction in total expenditures on Vioxx, net of rebates, by LDHH?

(c)     What was the impact of the decision by the Louisiana Medicaid Pharmaceutical and Therapeutics Committee ("PTC") to exclude Vioxx from its Preferred Drug List ("PDL") from June 10, 2002 through July 13, 2003 on LDHH expenditures on Vioxx?

(d)     What was the impact of Louisiana's Drug Utilization Review ("DUR") program, instituted on March 15, 2005, on LDHH expenditures on the two COX-2 inhibitors Bextra and Celebrex?

(e)     Did the withdrawal of Vioxx from the U.S. market by Merck & Co. on September 30, 2004 result in a compensating increase in expenditures by LDHH on non-steroidal anti-inflammatory drugs ("NSAIDs") or on the other two COX-2 inhibitors (Bextra and Celebrex) that remained on the market?

(Harris Rep. ¶ 7.)

As Dr. Harris himself acknowledged, these questions do not call for a calculation of damages.  Indeed, Dr. Harris made it very clear at his deposition that he offers no opinion about the economic harm to LDHH allegedly caused by Merck and that his report "does not calculate any economic . . . damages."  (Harris Dep. 59:24-60:4, 63:10-21.)  Dr. Harris believes that his calculations will be used by Plaintiff to develop a damages theory "according to certain legal standards."  (*Id.* 59:2-14.)  He further believes that those "legal standards" – apparently, principles of restitution – would allow calculation of a remedy in the form of "the entire amount spent by the State of Louisiana on Vioxx."  (*Id.* 61:11-18.)  Dr. Harris concedes that adjustment may be required before his calculations can be used to calculate a remedy, and he offers no methodology or factual foundation for making such adjustments.  (*Id.* 67:9-21.)

1008360v.1

A.    **Dr. Harris's Methodology**

In preparing his expert report, Dr. Harris analyzed a database of nearly eight million individual Medicaid claims by Louisiana Medicaid beneficiaries for Vioxx, Bextra, Celebrex, NSAIDs and proton pump inhibitors ("PPIs") from 1998 to November 2009 ("Medicaid database"). (Harris Rep. ¶ 9(b).) Dr. Harris also relied on a database of over 395,000 Louisiana prescriptions for Vioxx, Bextra, Celebrex and other anti-arthritis drugs ("IMS Xponent data"), although he acknowledges that the prescriptions in the IMS Xponent database "were not necessarily written for Louisiana Medicaid patients." (*Id.* ¶ 9(c).)

Dr. Harris established variables in the data to capture time periods during which certain "relevant regulatory interventions" were in effect. (*Id.* ¶ 28 & app'x tbl. E.) These "regulatory interventions" are a series of milestones that Dr. Harris believes might have affected LDHH's expenditures on Vioxx and other drugs. (*Id.*) For example, one such regulatory intervention was Vioxx's withdrawal from the market in September 2004. (*Id.*) The others were: the exclusion of Vioxx from LDHH's PDL in 2002; the implementation of a DUR program for Bextra and Celebrex in March 2005; the withdrawal of Bextra from the U.S. market in April 2005; the adoption of a "black box" warning on the Celebrex label in September 2005; Hurricane Katrina, also in September 2005; and the exclusion of Celebrex from the LDHH PDL (in 2003 and 2005). (*Id.*)

Several of Dr. Harris's opinions were derived from analyses of cohorts he constructed from the databases. Using these cohorts, Dr. Harris ran a series of regression models on payments for Vioxx, Celebrex, Bextra, and other NSAIDs, as well as on payments for combinations of medication classes. (*Id.* ¶ 28.) His intent was to determine what effect (if any) the various "regulatory interventions" listed above had on LDHH expenditures. (*Id.* ¶ 29.) Patients whose Vioxx use overlapped with one of the "regulatory interventions" listed above

4

were part of the comparison group used to measure the purported effect of that intervention.  (*Id.* ¶ 29.)  Patients whose Vioxx use did not overlap with any of the regulatory interventions mentioned above were placed in the control group.[2]  (*Id.*)

Dr. Harris's cohorts were constructed according to certain criteria.  For example, in constructing his primary cohort – which looked at Vioxx patients – Dr. Harris had to identify which patients he thought were Medicaid participants during the entire study period; he had to identify "active Vioxx patients"; and he had to select what he thought were the relevant "regulatory interventions."  Dr. Harris applied some or all of these criteria to cohorts he constructed for Bextra-Celebrex patients and for IMS Xponent data as well.  Notably, Dr. Harris has never "published an analysis of pharmaceutical sales that employed the methodology [he] used in this case" (Harris Dep. 137:9-14), and as he acknowledged, each of the criteria he applied suffered from significant limitations.

1.      **Identification Of Medicaid Participants**

Dr. Harris first had to find some way to identify patients in the database who were Medicaid participants for a long enough period to be studied.  As explained in more detail in the next section, Dr. Harris decided that he would follow each patient in his study for one year.  Thus, he needed to be sure that his analysis was limited to patients who were Medicaid eligible for at least a year.  (*See* Harris Rep. ¶ 26.)

For reasons that Dr. Harris could not explain, the database that Plaintiff gave him did not indicate the duration of each individual's Medicaid eligibility.  (*See* Harris Dep. 103:5-104:20.)  Dr. Harris thus had to find another way to ensure that he was only looking at patients who were

---

2       For reasons explained in further detail below, the relevant "Vioxx use" studied by Dr. Harris was only the use of Vioxx and other NSAIDs that occurred in the first year following each patient's first prescription of Vioxx.  Thus, while it was possible that some control-group patients continued to use Vioxx after their first year, those patients remained in the control group even if their Vioxx use overlapped a regulatory intervention that occurred more than a year after their first use of Vioxx.

1008360v.1

Medicaid-eligible for at least a year.  The method he chose was to include only those patients who had a Medicaid-covered prescription for any NSAID or PPI more than one year after their first Vioxx prescription.  (Harris Rep. ¶¶ 24-25; Harris Dep. 115:18-117:9.)

Dr. Harris's methodology forced him to exclude from his cohort 18,575 of the 67,988 individuals in the Louisiana Medicaid database who were prescribed Vioxx.  (Harris Rep. ¶ 27.)  As Dr. Harris admitted at his deposition, that means over a quarter of the Vioxx users in the database were simply ignored.  (*See* Harris Dep. 162:16-163:6.)  Dr. Harris admitted that not having complete information on the Medicaid eligibility of the individuals in the database adversely affected his analysis.  (*Id.* 105:6-106:14.)  According to Dr. Harris, "The precision of [his] cohort analyses of the Louisiana Medicaid data would be improved if [he] had information on the exact time period during which each individual was an eligible Medicaid participant." (Harris Rep. ¶ 45.)

### 2.    Identification Of "Active Vioxx Patients"

Dr. Harris testified that he also needed to be sure that he was only looking at "active Vioxx patients" in his study.  (Harris Dep. 106:15-107:3.)  What Dr. Harris apparently meant is that he needed some way to focus his study on patients who remained indicated for Vioxx during the entire study period.  (*See id.* 102:9-14 ("The focus was sharply on those individuals who I could reasonably assume were current Vioxx patients . . . .").)  Dr. Harris testified that this limitation was important in order to have any confidence that his study would detect a causal relationship – rather than a mere association – between a regulatory intervention and any change in LDHH expenditures.  (*See id.* 106:15-107:3 ("As I testified a couple of minutes ago, my focus is on attempting to find the causal effect of the Vioxx withdrawal, abrupt as it was, on compensating clinical behavior by doctors and patients.").)

6

In reality, Dr. Harris's methodology ensured that many "active Vioxx patients" were excluded from his analysis. According to Dr. Harris, there was no way to identify "active Vioxx patients" using the database. Although the database contained diagnostic codes, Dr. Harris "did not think that the diagnostic codes or physician codes were sufficiently reliable" indicators of why a patient was taking a drug or how long he or she would be taking it. (*Id.* 99:6-15.) Instead, as a proxy for more direct evidence of who was an active Vioxx patient, Dr. Harris decided to limit his observation of each patient to one year after his or her first Vioxx prescription. (Harris Rep. ¶ 26.) Dr. Harris asserted at his deposition that "[t]o go beyond one year is, in my judgment and experience, to run the serious risk that the patient no longer has the Vioxx indication, and that the sample is contaminated with individuals who just weren't Vioxx patients anymore." (Harris Dep. 111:24-112:16.) Thus, Dr. Harris arbitrarily concluded that his one-year limitation was a proper "compromise between the acute indications for an anti-inflammatory drug such as Vioxx . . . and the chronic indications." (Harris Rep. ¶ 26.) Although Dr. Harris claimed that his one-year follow-up period was based on his "own clinical experience and from examining the regression results that the large majority of people actually only had one Vioxx prescription and did not come back repeatedly" (Harris Dep. 117:21-118:16), Dr. Harris could not recall the details of his limited experience in prescribing Vioxx (*id.* 143:5-13).

Dr. Steven Wiggins, who analyzed Dr. Harris's report, found that, after excluding the 27.4 percent of Vioxx patients who were not known to be Medicaid recipients for at least a year after their first Vioxx prescription, Dr. Harris's one-year follow-up rule excluded an additional 73.8 percent of the observations for those remaining in the cohort. (Report of Steven N. Wiggins ("Wiggins Rep.") ¶ 57, Jan 21, 2010 (attached as Ex. 3).) Among the excluded observations would be anyone who was taking Vioxx for more than one year as of the Vioxx withdrawal date

7

and who then switched to another NSAID after the withdrawal; these patients "would only be included as . . . control individual[s]," and Dr. Harris's analysis would thus "exclude [their] continued use of Vioxx after that year of follow-up" and "[their] switch to another drug." (Harris Dep. 122:17-123:12.)  Dr. Harris agreed that excluding such chronic Vioxx users rendered his study less useful:

> **Q.**     If your stated objective for your analysis was to see what was the effect of the withdrawal on expenditures for the State of Louisiana, that analysis should include patients who were taking Vioxx for more than one year before the withdrawal and then switched to another medicine, correct?
>
> **A.**     Ideally, yes.

(*Id.* 125:14-21.)

> **Q.**     By limiting the cohort and the observations in [the way] which you do, does your resulting model reflect a composition of Vioxx users that are skewed more towards the acute than might have been the case in real life in the Medicaid database?
>
> **A.**     It is entirely possible that the design excludes longer term Vioxx users who, in fact, reacted or their physicians reacted to the withdrawal of Vioxx.  It includes only their experience in the first year.

(*Id.* 146:22-147:8.)

Dr. Harris also admitted that his cohort model was affected by his choice of a one-year follow-up period.  (*Id.* 113:3-6 ("To some degree, yes.").)  In fact, increasing Dr. Harris's follow-up term to 18 months, 24 months, or 36 months results in very different expenditure estimates.  (*See* Wiggins Rep. ex. F.)  For example, while Dr. Harris estimated that the State's monthly expenditures on Vioxx declined by $28.74 per patient as a result of Vioxx's withdrawal from the market, the amount drops to $22.16 for an 18-month follow-up, to $17.98 for a 24-month follow-up, and to $8.88 for a 36-month follow-up.  (*Id.*)

8

As another example, Dr. Harris's calculations using a 12-month follow-up found that, for every dollar decline in Vioxx expenditures due to Plaintiff's decision to remove Vioxx from the PDL in June 2002, there was a corresponding increase in expenditures on the alternative medications of 87 cents.  (*See* Harris Dep. 173:22-174:15, 176:9-12.)  However, using an 18-month follow-up increases this per-dollar amount to 94 cents, using a 24-month follow-up increases the amount to 97 cents, and using a 36-month follow-up increases the amount to $1.01 – more than fully offsetting the per-dollar decrease in Vioxx spending.  (*See* Wiggins Rep. ex. F.)

### 3.    Identification Of "Regulatory Interventions"

As discussed above, Dr. Harris's Vioxx cohort analyses seek to determine what effects certain "regulatory interventions" had on LDHH's expenditures on Vioxx and other drugs. (Harris Rep. ¶¶ 28-29 & app'x tbl. E.)  Dr. Harris claims that "[t]he fact that various regulatory interventions were in effect at different times permits the analyst to identify the separate effects of each" milestone.  (*Id.* ¶ 29.)  For example, when Dr. Harris concludes that Merck's withdrawal of Vioxx from the U.S. market in September 2004 was associated with a $12.42 monthly decline per patient in Louisiana Medicaid expenditures on the medication class (Vioxx, Bextra, Celebrex, and other NSAIDs) (*id.* app'x tbl. F), he ascribes this entire class-wide effect to the Vioxx withdrawal (Harris Dep. 194:17-195:20).  Thus, between October 2004 and the next "regulatory event" on Dr. Harris's list (the adoption of a DUR program for Bextra and Celebrex in March 2005), Dr. Harris's model assumes that all fluctuations in medication use and costs resulted from a single event – the Vioxx withdrawal.  (*See* Harris Dep. 195:21-196:5.)

Dr. Harris admitted that this analysis would be flawed if, in fact, there were reasons other than the Vioxx withdrawal for doctors and patients to move away from prescribing COX-2 drugs after September 2004.  (*Id.* 198:3-199:5.)  Nonetheless, Dr. Harris ignored two highly relevant

9

milestones that occurred in December 2004 – and that he himself listed in his report as "Critical Events":  (1) the FDA approval of a new label for Bextra adding a warning about possible heart and blood clotting problems, and (2) the FDA's announcement that a Celebrex clinical trial had been halted because of an increased risk of cardiovascular events.  (Harris Rep. tbl. 1.)  When asked whether he believed it was reasonable that these "Critical Events" could have had an effect on his causal analysis of the Vioxx withdrawal, Dr. Harris responded, "[i]t's possible," but he did not think they were important enough to take into account.  (Harris Dep. 187:9-17; *see also id.* 198:20-199:5.)  Dr. Harris admitted that he made no effort to determine whether these other "regulatory interventions" had a statistically significant effect on the data.  (*Id.* 226:3-228:7.)

## B.   Dr. Harris's Opinions

### 1.   Total Expenditures On Vioxx Net Of Rebates

The first two questions posed by Plaintiff asked Dr. Harris to calculate the amount of money that LDHH spent on Vioxx (not including money it received back in rebates) during specified time periods.  The first question asked for a calculation of such expenses during the entire time Vioxx was on the market, and the second asked for a calculation of such expenses from the end of March 2000 through withdrawal.  (*See* Harris Rep. ¶¶ 7(a)-(b).)  The apparent aim of the second question was to determine how much less LDHH would have spent on Vioxx had the drug been withdrawn in March 2000, after Merck received the results of the VIGOR study.  (*See* Harris Dep. 61:19-62:2 (explaining that one causation theory Plaintiff plans to pursue at trial is that Merck should have withdrawn Vioxx in March 2000).)

In response to the first question, Dr. Harris concluded that LDHH spent $20,663,672 on Vioxx between 1999 and 2005.  (Harris Rep. ¶ 8(a).)  In response to the second question, Dr. Harris concluded that LDHH spent $18,316,860 on Vioxx in the time period between "the end of March 2000" and the withdrawal of Vioxx from the market.  (*See id.* ¶ 8(b).)

10

Dr. Harris admitted at his deposition that these numbers only reflect expenditures on Vioxx (net of rebates). They do not report "what the economic damages are to the State of Louisiana." (Harris Dep. 63:10-21.) Dr. Harris also conceded that he has "not specifically articulated a formula" for applying these calculations to determine what damages would be. (*Id.* 64:6-22.)

2. **Impact Of Exclusion Of Vioxx From The PDL On Vioxx Expenditures**

Plaintiff next asked Dr. Harris to determine the impact of the PTC's decision to exclude Vioxx from the PDL between 2002 and 2003 on Vioxx expenditures by the State.

Dr. Harris reached two conclusions in response to this question. First, he opines that, "if Vioxx had not been excluded from the PDL," then LDHH expenditures on Vioxx "would have been approximately $4,200,000 greater." (Harris Rep. ¶ 8(c).) Second, he opines that LDHH expenditures on Vioxx "would have declined by approximately $2,000,000" if Vioxx had never been placed on the PDL. (*Id.*) Once again, these opinions relate only to expenditures on Vioxx; Dr. Harris admittedly did not investigate whether LDHH actually sustained any damages as a result of placing Vioxx on the PDL in 2003. (Harris Dep. 82:22-83:10.) He also did not calculate what "additional expenditures the state would have had to pay for alternative therapies for those patients who would not have taken Vioxx had the drug stayed on the non-preferred drug list." (*Id.* 79:14-21.) And he did not determine how much LDHH spent in the aggregate on alternative therapies during the period that Vioxx was not on the PDL.[3] (*Id.* 85:18-23.)

---

[3]     Dr. Harris did purport to estimate that LDHH's expenditures on Vioxx were reduced by $8.56 per patient, per month while Vioxx was off the PDL (Harris Rep. ¶ 32), with a resulting counterbalancing increase in the non-Vioxx medications of $7.43 per patient, per month (*see* Harris Dep. 173:22-174:15). Thus, for every one dollar decline in Vioxx expenditures, he opines that there was a compensating increase for the other medications of 87 cents, or a 13% savings. (*See* Harris Dep. 176:9-12.) In other words, even if Dr. Harris's analysis were sound, his opinion amounts to a conclusion that exclusion of Vioxx from the PDL in 2002 saved $261,430 (13% of $2,011,000).

11

Dr. Harris's first opinion – that LDHH would have spent $4,200,000 more on Vioxx if it had been placed on the PDL from 2002 through withdrawal – was derived using an analysis of the Vioxx cohort he constructed, as described above.  (Harris Rep. ¶ 8(c).)  Dr. Harris' second opinion – that LDHH would have spent $2,011,000 less on Vioxx had Vioxx remained off the PDL in 2003 – was derived using an "aggregate linear trend" model.  (*Id.* ¶¶ 8(c), 20.)  For this aggregate analysis, Dr. Harris plotted a graph of Louisiana Medicaid's monthly gross payments for Vioxx from 1999 to 2004.  (*Id.* fig. 2.)  He then employed linear trend models in order to predict what the gross expenditures on Vioxx would have been if Vioxx had continued to be excluded from the PDL in July 2003.  (*Id.* ¶ 20 & fig. 3.)  Dr. Harris's aggregate analysis consisted of a linear trend that derived predictions about future outcomes purely from past results.  (*See id.*)  In other words, Dr. Harris simply drew a straight line that approximated the Vioxx usage trend from 2002 to 2003 and then extended that straight line forward to the date of withdrawal to estimate what expenses on Vioxx would have been had it remained off the PDL.  (*Id.*)  Necessarily, the analysis presupposed that changing information in the 2003-2004 period would not change the trend in Vioxx usage, and Dr. Harris freely admitted that he conducted this analysis "without any reference to other possible influences, including any other regulatory events."  (Harris Dep. 93:13-94:6.)

3.   **"Compensating Expenditures" On Other NSAIDs After Vioxx Withdrawal**

Dr. Harris also opines on what LDHH's "compensating expenditures" were for other NSAIDs after Vioxx was withdrawn from the market – *i.e.*, what LDHH spent on alternative therapies for former Vioxx users.  Using a cohort analysis, Dr. Harris concluded that the withdrawal of Vioxx from the U.S. market in September 2004 caused a decline in Louisiana Medicaid's expenditures on Vioxx of $28.74 per patient, per month.  (Harris Rep. ¶ 34 & app'x

12

tbl. F.)  Dr. Harris found that this decline was offset somewhat by a counterbalancing increase in expenditures for other comparable medications of $16.35 per patient, per month.  (*Id.*)  "Put differently, for every $1.00 decline in Vioxx expenditures, there was a compensating increase in expenditures of NSAIDs and other COX-2 agents of $0.57."  (*Id.* ¶ 34.)

Dr. Harris conceded several important limitations on this analysis.  To begin, Dr. Harris's analysis was limited to expenditures for alternative NSAIDs.  He did not look at expenditures on PPIs even though he knew that some patients in his own studies needed to use PPIs to address gastrointestinal ("GI") issues when they were on traditional NSAIDs but did not when they were using COX-2 drugs such as Vioxx.  (Harris Dep. 99:17-100:5, 135:12-18.)  Nor did he analyze whether the State experienced increased expenditures on narcotics (another alternative form of pain relief), despite admitting that a proper calculation of damages would include a "much wider range of medications than non-steroidal anti-inflammatories or proton pump inhibitors."  (*Id.* 154:8-155:12.)

Dr. Harris also acknowledged that his analysis did not take into account the possibility that factors other than the withdrawal of Vioxx were causally related to a classwide decrease in NSAID expenditures.  (*Id.* 186:16-187:17.)  For example, as noted previously, Dr. Harris was aware that in December 2004, the FDA approved a stronger Bextra label and a Celebrex clinical trial was halted due to increased cardiovascular events.  (Harris Rep. tbl. 1.)  Dr. Harris justified his decision to ignore these events on the theory that all events related to COX-2 drugs after 2004 were triggered by (and thus fairly attributable to) the withdrawal of Vioxx, even though he recognized that this conclusion was "speculative."  (Harris Dep. 187:24-188:21, 194:17-195:20, 198:20-199:5.)

13

Finally, and most fundamentally, Dr. Harris conceded that what occurred after the withdrawal of Vioxx in 2004 does not necessarily demonstrate what would have occurred if Vioxx had been withdrawn at an earlier date.  (*Id.* 182:21-183:10 (noting that the "extent of the compensating increase in NSAID and other COX-2 inhibitor expenditures might have been different if Vioxx had been withdrawn from the US market earlier" and that "the projection of the compensating increase to any other point in time needs to be done with care") (internal quotation marks omitted).)  According to Dr. Harris, he is "not in a position" to evaluate whether it would be appropriate to apply the post-2004 results to an earlier, hypothetical withdrawal of Vioxx.  (*Id.* 183:20-184:10.)  Rather, he testified, such an evaluation would entail an inquiry of, *inter alia*, "what would have been the consequences to the scientific community and to government regulation in general, not only about Vioxx but other drugs in the class." (*Id.* 184:4-10.)  Ultimately, Dr. Harris agreed that it was his "general understanding" that "necessarily the information and knowledge was different" in earlier time periods than "it was in September of 2004." (*Id.* 184:17-22.)

4. **Impact Of DUR Program On Bextra And Celebrex Expenditures**

Dr. Harris also opines about the purported effect of LDHH's DUR program for Bextra and Celebrex.  The DUR program applied a "prospective deny edit," which would initially deny a claim for Medicaid beneficiaries under the age of 60 who tried to fill a Bextra or Celebrex prescription.  (*See* Dep. of Melwyn Wendt ("Wendt Dep.") 113:8-23, Dec. 14, 2009 (attached as Ex. 4).)  The initial denial could be overridden (and the prescription filled and covered by LDHH) if the prescribing physician determined that the patient had GI problems or had not been treated successfully with other medicines.  (*Id.* 114:8-23.)  Dr. Harris concludes that the imposition of the Louisiana DUR program resulted in a decline in Bextra expenditures of $7.96 per patient, per month, and a decline in Celebrex expenditures of $1.85 per patient, per month.

14

(Harris Rep. ¶ 36, App'x Table G.)  Dr. Harris's analysis estimated a resulting increase in expenditures on other NSAIDs of $2.85 per patient, per month.  (*Id.*)  Based on these analyses, he concluded that the DUR program resulted in a 34 percent decline in monthly Bextra expenditures and an 11 percent decline in monthly Celebrex expenditures.  (*Id.* ¶ 37.)

Dr. Harris reached these conclusions by constructing a cohort "analogous" to the Vioxx cohort that included 90,573 individuals in the Louisiana Medicaid database who had at least one prescription for either Bextra or Celebrex and who were known to be on Medicaid for at least one year following their first such prescription.  (*Id.* ¶ 30.)  Other patients were not included, resulting in the exclusion of over 32 percent of individuals in the database who had Bextra or Celebrex prescriptions.  (*Id.*)  Dr. Harris then ran the same regression models on the Bextra-Celebrex cohort as he did on the Vioxx cohort.  (*Id.*)

In analyzing Dr. Harris's Bextra-Celebrex regressions, Dr. Wiggins discovered a programming error in the study.  As a result of the error, several patient observations are assigned a "missing" date by Dr. Harris's program.  (Wiggins Rep. ¶ 95.)  When the program runs, it treats "missing" dates as though they had a value of infinity.  (*Id.*)  That treatment results in computational error because "the associated observations are recorded in the data as if they occurred on a date after the last event [Dr. Harris] addresses . . . regardless of the true date when the observation occurred."  (*Id.*)  When Dr. Wiggins corrected this error and re-ran the regressions, the results changed dramatically:  Bextra expenditures fell 48 percent, rather than Dr. Harris's estimated 34 percent; and Celebrex expenditures actually ***increased*** by more than 10 percent, rather than declining by 11 percent as Dr. Harris reported.  (*Id.* ¶ 97 & fig. 1.)

Dr. Harris made no effort to either confirm or deny Dr. Wiggins's findings.  (Harris Dep. 25:6-18.)  Although Dr. Harris suggested at his deposition that he did not have sufficient time to

address Dr. Wiggins's observation, he ultimately conceded that he "could have" addressed it in the time available to him.  (*See id.* 24:4-25:16 (also agreeing that the deposition was actually moved to an earlier date at his request).)  Thus, Dr. Harris had to agree that, at the time of his deposition, he did not "know one way or another whether [his] Bextra-Celebrex cohort" contained a serious error.  (*Id.* 217:4-9.)

Dr. Harris also admitted that his analysis was subject to other substantial limitations.  As with his Vioxx withdrawal cohort, Dr. Harris admittedly did not account for the possible causal relationship between other regulatory interventions and a purported decrease in Bextra and Celebrex expenditures.  (*See id.* 226:3-228:7.)  Instead, he ignored those potential relationships and attributed the entire effect he found to the DUR program.  (*Id.*)  He did so even though his analysis showed a much bigger effect on Bextra than Celebrex, which forced him to concede that it was "possible" that "there was other information about Bextra that was causing the decline in usage." (*Id.* 210:18-211:4.)  Dr. Harris did "not know" why his analysis showed a bigger effect on Bextra, and he apparently did nothing to find out.  (*Id.* 210:5-8.)[4]

Dr. Harris also conceded that his analysis only looked at the effect of the DUR program on Bextra and Celebrex.  Dr. Harris made no effort to determine whether a similar DUR program, if it had been applied to Vioxx at some time while it was still on the market, would have had a comparable effect.  (*Id.* 209:15-24.)  As with his withdrawal analysis, Dr. Harris admits that an attempt to apply his analysis to a hypothetical Vioxx DUR program "would depend upon the mix of information that patients and doctors had about alternative therapies" at the time such a program would have been in effect.  (*Id.* 207:18-24.)  He also agreed that "there was a great deal of information about NSAIDs" in March 2005 "that was not available during the

---

[4]        Although Dr. Harris admitted that the study period for Bextra was extremely short because the drug was withdrawn from the market less than 30 days after implementation of the DUR program, he asserted at his deposition that this limitation did not affect the reliability of his conclusions.  (Harris Dep. 206:19-207:11.)

time Vioxx was on the market." (*Id.* 208:1-5.) Dr. Harris further agreed that his DUR analysis cannot be applied to Vioxx unless Plaintiff can "develop the facts that justify the projection from the case of Bextra and Celebrex to any other drug," which "is not something [Harris has] done." (*Id.* 228:13-22.) Dr. Harris has not provided any opinion of what would need to be done in order to "justify [such a] projection." (*Id.*)

## ARGUMENT

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In evaluating whether expert testimony satisfies the requisites of Rule 702, federal courts apply the requirements articulated by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993). Under *Daubert*, trial courts cannot admit scientific testimony without first determining that the testimony is both "reliable" and "relevant" to the facts at issue. *Id.* at 589. The proponent of the evidence bears the burden of establishing its scientific reliability and relevance and, hence, its admissibility. *See id.* at 592 n.10. Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is "derived by the scientific method" and "supported by appropriate validation – *i.e.*, 'good grounds' based on what is known." *Id.* at 590, 592-93. Testimony that is based on "speculation" cannot satisfy this standard. *See Rosen v.*

*Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("[T]he courtroom is not the place for scientific guesswork."); *see also Daubert*, 509 U.S. at 590 ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 140 (1997) (district court properly excluded expert testimony that "did not rise above subjective belief or unsupported speculation") (internal quotations and citation omitted).

Scientific testimony is relevant only if the expert's "reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593. In other words, relevance requires an appropriate "fit" between the testimony and the specific facts of the case. *Id.* at 591. By contrast, scientific testimony is irrelevant when there is "too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

As the "gatekeeper" of technical evidence, the Court must make a "preliminary assessment of . . . whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In making that assessment, the Court is not required to "'tak[e] the expert's word for it.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) (quoting Fed. R. Evid. 702 advisory committee's note (2000)). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003) (same).

Finally, an expert's opinion is inadmissible if it fails to satisfy the requirements of Federal Rule of Evidence 403. That is, the expert testimony must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation

of cumulative evidence."  Fed. R. Evid. 403; *see also United States v. Hall*, 165 F.3d 1095, 1104 (7th Cir. 1999) (noting that a "Rule 702 analysis incorporates a consideration of the Rule 403 dangers – particularly the danger of unfair prejudice").

As explained below, Dr. Harris's testimony fails to meet the requirements of Rule 702 and *Daubert*, and it is also inadmissible under Rule 403.

## I.       DR. HARRIS'S OPINIONS REGARDING THE STATE'S TOTAL EXPENDITURES ON VIOXX SHOULD BE EXCLUDED AS IRRELEVANT.

The Court should exclude Dr. Harris's opinions regarding LDHH's alleged total expenditures on Vioxx and other drugs because these opinions are premised on an erroneous understanding of the applicable remedy.

Dr. Harris offers several opinions regarding LDHH's expenditures on Vioxx and other drugs, including:  (1) LDHH's total expenditures on Vioxx; (2) LDHH's expenditures on Vioxx from March 2000 through withdrawal;[5] and (3) LDHH's Vioxx expenditures that are purportedly attributable to the placement of Vioxx on the PDL in 2003.  Each of these opinions should be excluded as irrelevant to the measure of damages in this case.

It is elementary that an expert may not testify at trial concerning "an inappropriate measure of damages," even if that testimony is based on a methodologically sound analysis. *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1057 (E.D.N.Y. 2006), *rev'd on other grounds sub nom. McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008); *see also, e.g.*, *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 73 F. Supp. 2d 997, 1013 (N.D. Iowa 1999) (excluding both parties' expert calculation of defendant's profits because disgorgement of profits

---

[5]       These first two opinions are nothing more than arithmetic calculations from LDHH records that could just as easily be accomplished by a fact-finder without expert assistance.  Thus, they should be excluded for that reason as well.  *See Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (affirming lower court's exclusion of expert testimony regarding defendant's obligation to keep boat clean of diesel fuel because "the jury could adeptly assess this situation using only their common experience and knowledge" and, thus, the "[e]xpert testimony was unnecessary").

was not the appropriate measure of damages and was therefore irrelevant, confusing and prejudicial), *aff'd in part and rev'd on other grounds by* 272 F.3d 1365 (Fed. Cir. 2001).

In *Schwab*, a case involving tobacco, Dr. Harris was offered as a damages expert and planned to opine on several theories of relief. 449 F. Supp. 2d at 1057. One of his damages models was called a "loss of market" model, under which the measure of damages "would be equal to the full purchase price of all 'light' cigarettes sold during the class period in the covered areas." *Id.* The court held that the testimony reflected an "inappropriate measure of damages" under the Racketeer Influenced & Corrupt Organizations ("RICO") Act: "Recovery under civil RICO is limited to the extent that [a plaintiff] has been injured in his business or property." *Id.* (citation and internal quotation mark omitted). The court thus excluded the testimony. *Id.* at 1166.

Dr. Harris's total-expenditure opinions should likewise be excluded from this case. The fundamental premise of Dr. Harris's opinion is that the State can recover "restitution of the entire amount spent by the State of Louisiana on Vioxx." (Harris Dep. 61:14-18.) That assumption is wrong. As Merck explains in its motion for summary judgment (Mot. for Summ. J. at 40), restitution of the purchase price is a rescissionary remedy – one that requires return of the product (in this case, Vioxx). La. Civ. Code art. 2532. The nature of the claims in this case renders return of the drugs impossible. "Thus, plaintiff's only remedy, if any, is for a reduction of the purchase price." *Smith v. Gen. Motors Acceptance Corp.*, 542 So. 2d 831, 832 (La. Ct. App. 3d Cir. 1989); La Civ. Code art. 2541. Dr. Harris has not offered any opinion on a reduction-in-price remedy; and his testimony about alleged aggregate expenditures on Vioxx is not relevant to deriving or calculating such a remedy. Accordingly, that testimony should be excluded as irrelevant.

Dr. Harris's total-expenditure opinions should also be excluded as unfairly prejudicial and unduly confusing.  It is axiomatic that evidence that tends "to suggest decision on an improper basis," particularly "an emotional one," is inadmissible.  Fed. R. Evid. 403, notes, 1972 Proposed Rules.  Because Dr. Harris's opinions are irrelevant to any remedy in this case, their only possible purpose would be to suggest an improper basis for decision by creating inflationary pressure on any award the jury might craft should it find against Merck – precisely what Rule 403 prohibits.  Moreover, admission of the testimony could well confuse the jury, which would likely assume that evidence of gross expenditures on Vioxx is relevant to some issue in the case when in fact it is not.  Accordingly, Dr. Harris's total-expenditure opinions should be excluded as unfairly prejudicial and unduly confusing.

## II.    DR. HARRIS'S COHORT OPINIONS SHOULD BE EXCLUDED BECAUSE HIS COHORTS ARE NOT METHODOLOGICALLY SOUND.

The Court should also exclude each of Dr. Harris's opinions that is based on his one-year cohorts because those cohorts are fundamentally flawed.

Dr. Harris relied on one-year cohorts in formulating:  (1) his opinion that LDHH reduced its Vioxx expenditures by not placing Vioxx on the PDL from 2002 to 2003; (2) his opinion regarding the State's expenditures on alternative therapies after the withdrawal of Vioxx; and (3) his opinion regarding the purported effect of LDHH's DUR program on LDHH expenditures on Bextra and Celebrex.  These opinions are unreliable because the cohorts Dr. Harris constructed are not representative.

A cohort study is an unreliable basis for an expert opinion when it is not fairly representative of the population to which it is applied.  *Baker v. Chevron USA, Inc.*, No. 1:05-CV-227, 2010 U.S. Dist. LEXIS 698 (S.D. Ohio Jan. 6, 2010); *see also, e.g.*, *LeBlanc v. Chevron USA Inc.*, 513 F. Supp. 2d 641, 651-53 (E.D. La. 2007) (holding that cohort studies of workers

exposed to benzene in refineries were not a reliable basis for an expert opinion that exposure to benzene in shipping operations caused the plaintiff's injury because, among other things, plaintiff failed to establish that the cohort studies could reliably be applied to the general population), *vacated on other grounds*, 275 F. App'x 319 (5th Cir. 2008); *Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666, 677 (D. Nev. 1996) (excluding one expert's testimony in part because selection of patients for study was flawed and had obvious potential to inflate causal finding); Federal Judicial Center, *Reference Manual on Scientific Evidence* 363-65 (2d ed. 2000), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/ sciman00.pdf (describing the problem of selection bias in cohort studies); *id.* at 99 (describing a "classic example" of selection bias in which a poll badly mispredicted the results of the 1936 presidential election because it relied on the phone book to conduct its poll, at a time when only one in four homes had telephones, resulting in a survey pool that "overrepresented the affluent").

In *Baker*, for example, the court held that an expert could not rely on a cohort study of workers exposed to benzene to support his opinion that the plaintiffs – residents of towns near a refinery who alleged that the defendant had emitted benzene into the air – had sustained an injury from benzene exposure. 2010 U.S. Dist. LEXIS 698, at *2-3. Among other things, the court found that the composition of the cohort studied was not comparable to the plaintiffs: "297 out of the 338 cohort members were in the 'high' exposure subgroup and contributed 90% of the person-years to the study. Thus, if anything, the [cohort] study reflects the results of high exposures to benzene. In this case, however, Plaintiffs' exposure to benzene was much, much lower." *Id.* at *43. Thus, the court concluded that the study was "an insufficient basis" for an expert opinion. *Id.* at *44.

Dr. Harris's cohort studies suffer from similar problems.  As Dr. Harris acknowledged, his use of a one-year follow-up limitation meant that his cohorts overrepresented short-term users relative to the actual Medicaid population.  (Harris Dep. 146:22-147:14.)  This kind of selection bias likely skewed the results of his analysis toward findings favorable to Plaintiff. After all, acute users are more likely to be sporadic users of prescription painkillers – and thus less likely to use another drug within a year of their first prescription.  Thus, the study design likely resulted in a disproportionate percentage of patients switching to no drug after the various "regulatory interventions" considered by Dr. Harris.

Notably, Merck's economics expert, Dr. Wiggins, reanalyzed Dr. Harris's cohorts using longer follow-up periods and determined that the regulatory interventions identified by Dr. Harris had little, if any, effect on overall drug expenditures by LDHH.  (*See* Wiggins Rep. ex. F.) For example, while Dr. Harris found that the decision to exclude Vioxx from the PDL in June 2002 caused an overall 13 percent reduction in NSAID expenditures by LDHH (*see* Harris Dep. 173:22-174:15, 176:9-12), Dr. Wiggins found that NSAID expenditures actually increased by 1 percent using a 36-month follow-up period (*see* Wiggins Rep. ex. F).

Dr. Harris was shown these results at his deposition but had no real response, simply asserting that his one-year follow-up rule was a "compromise" that was justified by his purported "experience" and "judgment."  (Harris Rep. ¶ 26; Harris Dep. 116:21-118:3, 112:11-16.)  In fact, Dr. Harris had very little experience either with Vioxx specifically or his cohort model generally. (Harris Dep. 137:9-14, 143:5-13.)  In other words, Dr. Harris's one-year follow-up rule was not based in experience or judgment at all; instead it was *ipse dixit*.  The Court need not and should not accept Dr. Harris's cohort construction as methodologically sound based solely on his say-so.

23

For all of these reasons, Dr. Harris's cohorts are not a reliable basis for his opinions, and any opinion based on those cohorts should be excluded.

### III.    DR. HARRIS'S OPINION THAT LDHH EXPENDITURES ON NSAIDS DECREASED AFTER THE WITHDRAWAL OF VIOXX SHOULD BE EXCLUDED BECAUSE IT IS UNRELIABLE.

Dr. Harris's opinion concerning the purported decline in LDHH's overall expenditures on NSAIDs after the withdrawal of Vioxx should be excluded because it is both unreliable and irrelevant.

***First,*** the opinion is unreliable because it fails to account for other factors that could explain why the State's NSAID expenditures dropped after Vioxx was withdrawn from the market.

A statistical analysis that fails to account for other possible explanatory variables cannot form the basis of a reliable expert opinion.  *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).  In *Munoz*, for example, the U.S. Court of Appeals for the Fifth Circuit affirmed a trial court's ruling that a proffered expert causation opinion in a Title VII case lacked probative value because the expert "admitted to failing to consider other variables such as education and experience as explanations for any observed discrepancy between promotion rates."  *Id.*; *see also, e.g.*, *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045-46 (7th Cir. 1988) (excluding expert's statistical evidence as "essentially worthless" in case where plaintiff professor alleged that he received lower pay increases than other professors on account of religion and age because, among other things, analysis failed to account for other plausible explanations, such as scholarly achievement).

Dr. Harris's analysis suffers from similar flaws.  To begin, Dr. Harris looked only at the State's expenditures on NSAIDs after the Vioxx withdrawal, ignoring the possibility that some patients switched from Vioxx to a narcotic.  He also ignored the possibility that expenditures for

24

PPIs – required by many patients to avoid GI problems while taking non-selective NSAIDs (such as naproxen) – increased.  These failings highlight the fact that Plaintiff asked Dr. Harris to answer the wrong question – even Dr. Harris admitted that a proper calculation of damages would include a "much wider range of medications than non-steroidal anti-inflammatories or proton pump inhibitors."  (Harris Dep. 154:8-155:12.)

Dr. Harris's analysis also ignored the possibility that other events caused a decrease in the State's NSAID expenditures.  For example, Dr. Harris did not consider whether regulatory milestones related to Bextra and Celebrex (*e.g.*, the strengthening of the Bextra label or the halting of a Celebrex clinical trial) contributed to a decrease in NSAID expenditures.  Instead, he simply rested on his admittedly "speculative" theory that these FDA events were themselves precipitated by the withdrawal of Vioxx.  (*Id.* 187:24-188:21, 194:17-195:20, 198:20-199:5.)  Put simply:  Dr. Harris's opinion depends on the assumption that every decision not to prescribe an NSAID after 2004 turned solely on the withdrawal of Vioxx from the market.  This is a fantasy view of history, and Dr. Harris's failure to consider other "plausible" explanations for the decrease in LDHH expenditures on NSAIDs renders his analysis "essentially worthless." *Tagatz*, 861 F.2d at 1045.

**Second,** Dr. Harris's opinion is also irrelevant.  Even if Dr. Harris's opinion accurately captured what happened in 2004 and why, it offers no window into what would have occurred if Vioxx had been withdrawn in March 2000 (or any other date before 2004).  Rather, the only way to determine the effect of an earlier withdrawal would be to conduct an inquiry into what doctors and patients would have done differently at a different time in response to a different mix of information.  As a matter of law, such proof cannot be made in the aggregate.  (*See* Mot. for Summ. J. at 42-43.)  And any attempt to short-circuit proper proof through the use of expert

25

testimony would be impermissibly speculative.  *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 309

F. Supp. 2d 531, 556-57 (S.D.N.Y. 2004) (excluding expert testimony because opinion as to how

additional disclosures would have influenced physicians' prescribing behavior was purely

speculative and therefore inadmissible); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203,

2001 U.S. Dist. LEXIS 1174 (E.D. Pa. Feb. 1, 2001) (excluding as speculative expert testimony

that greater disclosure of information on labeling for diet drugs would have influenced drug

prescriptions).  Dr. Harris admitted this limitation in his opinion, stating that Plaintiff would have

to establish facts that could justify "the projection of the compensating increase to any other

point in time."  (Harris Dep. 182:21-183:10.)

     In any event, even if Dr. Harris's opinion were reliable and even if it could somehow be

used to predict the effect of an earlier Vioxx withdrawal, Plaintiff does not have *any* evidence –

expert or otherwise – that Vioxx *would* have been withdrawn any earlier.  Thus, Dr. Harris's

analysis also fails because it does not "fit" the facts of this case.  *See, e.g.*, *Meadows v. Anchor

Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (affirming lower court's ruling

excluding expert testimony because, *inter alia*, witness's testimony regarding defendant's failure

to install a check valve on a shield "did not fit with the otherwise uncontroverted evidence before

the Court").

     For all of these reasons, Dr. Harris's opinion that LDHH's NSAID expenditures

decreased as a result of the withdrawal of Vioxx should be excluded as unreliable and irrelevant.

## IV.   DR. HARRIS'S OPINION ON THE DUR PROGRAM SHOULD BE EXCLUDED BECAUSE IT IS THE PRODUCT OF COMPUTATIONAL ERROR AND IS OTHERWISE UNRELIABLE.

     Finally, Dr. Harris's opinion concerning the purported reduction in expenditures on

Celebrex and Bextra that followed LDHH's DUR program should be excluded for three reasons:

(1) it suffers from computational error; (2) it ignores other causal factors that could help explain

1008360v.1

the decrease in Bextra and Celebrex expenditures that Dr. Harris purports to have found; and (3) it cannot be used to predict what would have happened if LDHH had implemented a DUR program for Vioxx.

*First,* Dr. Harris's conclusions regarding the purported effects of the DUR program on LDHH expenditures should be excluded because Dr. Harris's conclusions were derived from erroneous computations. (Wiggins Rep. ¶¶ 94-99.) Dr. Harris did not deny this, stating at his deposition only that he did not "know one way or another whether [his] Bextra-Celebrex cohort" contained a serious error. (Harris Dep. 217:4-9.) According to Dr. Wiggins, Dr. Harris's error had a significant effect on his analysis; indeed, when Dr. Wiggins corrected the computational error and redid the analysis, it showed an *increase* in Celebrex expenditures as a result of the DUR program, rather than a decrease. (*See* Wiggins Rep. ¶ 97 & fig. 1.) Dr. Harris's opinion on this issue is thus clearly unreliable. *See Munoz*, 200 F.3d at 301 (holding that expert's reliance on tables that contained miscalculated numbers was "necessarily misplaced").

*Second,* Dr. Harris failed to account for other reasons why Bextra and Celebrex expenditures may have fallen, simply assuming that all reductions were due to the DUR program. Among other things, he admittedly "didn't take into account the FDA Advisory Committee" that met in 2005 to discuss the potential cardiovascular risks of all NSAIDs, or "FDA statements" about COX-2s in September 2004, or "the stopping of Celebrex trials," each of which could have affected physician prescription decisions. (Harris Dep. 226:14-22.) At his deposition, Dr. Harris conceded the "possib[ility]" that "there was other information about Bextra that was causing the decline in usage," and that he did not take account of such possibilities in conducting his analysis. (*See id.* 210:18-211:4.) As noted previously, the failure to consider plausible variables in forming an opinion renders that opinion "worthless" and

27

unreliable.  *Tagatz*, 861 F.2d at 1045-46.  Thus, the analysis should be excluded for this reason as well.

*Third,* Dr. Harris's Bextra-Celebrex conclusions are irrelevant because they say nothing about what would have happened if LDHH had imposed a similar DUR program regarding Vioxx years earlier.  Even Dr. Harris recognized that "there was a great deal of information about NSAIDs" in March 2005 "that was not available when Vioxx was on the market," making any projection unreliable.  (Harris Dep. 208:1-5.)  And as discussed *supra*, courts have routinely rejected expert testimony about how a hypothetical event might have affected prescription decisions.

In any event, Plaintiff has no evidence – expert or otherwise – that the State would have adopted a DUR program for Vioxx.  As an LDHH pharmacist put it, one "can never tell . . . what the DUR Board would do."  (Wendt Dep. 131:20-132:4.)  For this reason too, Dr. Harris's opinion concerning the DUR program should be excluded as irrelevant.  *See Meadows*, 306 F. App'x at 790 (testimony that does not fit "under the facts of [a] case" is irrelevant and thus inadmissible).

For all of these reasons, Dr. Harris's Bextra-Celebrex analysis should be excluded at trial.

## CONCLUSION

For the foregoing reasons, the Court should bar Dr. Harris from testifying at trial.

Respectfully Submitted,


*/s/ Dorothy H. Wimberly*

Travis Sales
BAKER BOTTS LLP
One Shell Plaza
910 Louisiana Street
Houston, TX 77002

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130

28

Tarek Ismail
GOLDMAN, ISMAIL, TOMASELLI,
BRENNAN & BAUM LLP
1 North Franklin Street
Suite 625
Chicago, IL 60606

Brian C. Anderson
Matthew M. Shors
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006

John H. Beisner
Jessica Davidson Miller
Geoffrey M. Wyatt
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

**ATTORNEYS FOR MERCK SHARP & DOHME CORP.**

29

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Motion to Exclude Testimony of Dr. Jeffrey Harris has been served on Liaison Counsel by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Plaintiff, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 19th day of February, 2010.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

1008360v.1