# EXHIBIT 2

Jeffrey E. Harris, M.D., Ph.D.

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

        *************************************
 3

        IN RE:  VIOXX PRODUCTS        MDL No. 1657
 4      LIABILITY LITIGATION

                                      Section L
 5      This Document Relates To:
 6      STATE OF LOUISIANA, ex rel.
        JAMES D. CALDWELL, JR.,       Judge
 7      Attorney General,            Eldon E. Fallon
                      Plaintiffs,
 8
            v.                        Magistrate
 9                                    Judge Knowles
        MERCK SHARP & DOHME CORP.,
10                 Defendant.      Case No. 05-3700
11      *************************************
12
13       DEPOSITION OF JEFFREY E. HARRIS, M.D., Ph.D.
14             Friday, January 29th, 2010
15                   10:08 a.m.
16
17
18                    Held At:
19        Hagens Berman Sobol Shapiro, LLP
20              55 Cambridge Parkway
21           Cambridge, Massachusetts
22
23      REPORTED BY:
24      Maureen O'Connor Pollard, RPR, CLR, CSR
```

Jeffrey E. Harris, M.D., Ph.D.

Page 24

1    computer runs that underlie figure one and the

2    alternative calculations on Page 97, my task was

3    at minimum made much more difficult.

4         Q.    All right.  You --

5         A.    Given six days from the day in which I

6    received all the materials as well as this

7    report, as well as my other professional

8    calculations, I made a decision about which

9    portions of the report I should focus on.  And

10   given that I could not verify the statement at

11   the top of Page 6 -- or 39, I decided to

12   continue with other work.

13            Had there been more time and had I

14   received all the materials that I would normally

15   expect in the course of professional

16   communication, it could have been different.

17        Q.    All right.  First of all, the

18   deposition was moved up at your request, right?

19        A.    I don't know that one way or another.

20        Q.    Did you tell Plaintiff's counsel that

21   you needed to have the deposition moved from

22   next week because school started and we had to

23   do it today?

24        A.    I did tell counsel that it would be

Jeffrey E. Harris, M.D., Ph.D.

Page 25

```
 1    difficult for me to give a deposition during the

 2    semester which starts next week.

 3         Q.    Great.  So --

 4         A.    And I offered to give a deposition

 5    today.

 6         Q.    Okay.  So we moved up the deposition

 7    at your request.  And you seem to have enough

 8    data in your possession to check the statement

 9    that there were Vioxx expenditures that occurred

10    after the withdrawal of the drug.  Similarly,

11    you have enough data in your possession to

12    confirm or deny whether your program assigned

13    Bextra expenditures after that drug was

14    withdrawn.  You could have done that work,

15    correct?

16         A.    Yes, I could have.

17         Q.    And you didn't, correct?

18         A.    That is correct.

19         Q.    Now, what other documents do you have

20    there in that folder of yours?

21         A.    I have an index that I prepared

22    entitled "Documents Received" which, strictly

23    speaking, is not one of the documents, it's

24    rather just a summary.
```

Jeffrey E. Harris, M.D., Ph.D.

Page 37

1      A.    I think there are some old testimony
2    that is not on this list that goes back probably
3    more than ten years.
4      Q.    Do you believe this is a complete
5    listing of your expert testimony over the last
6    ten years?
7      A.    Yes.
8      Q.    Okay.  How much money do you make per
9    year doing legal work?
10     A.    In the last few years, between 150 and
11   $200,000 gross, possibly 250.
12     Q.    Annually?
13     A.    Annually, correct.
14     Q.    Is that number higher or lower than it
15   was in the preceding five years?
16     A.    Approximately the same.
17     Q.    What percentage of your time is spent
18   doing legal work on behalf of Plaintiffs?
19     A.    Given that I work 80 to 120 hour
20   weeks, probably ten percent at the most, maybe
21   five percent.
22     Q.    Let me rephrase my question.
23           What percentage of your legal work is
24   done on behalf of Plaintiffs?

Jeffrey E. Harris, M.D., Ph.D.

Page 38

1      A.      Nearly all of it.  Let me think for a
2   moment.
3              With respect to class actions, for
4   example, in tobacco, or all tobacco matters I
5   have represented or been asked to testify on
6   behalf of Plaintiffs including, for example, the
7   United States versus Philip Morris, Et Al.
8              From time to time there are matters in
9   which a potential or actual Defendant may ask my
10  advice, but to my knowledge they have never led
11  to testimony either as an expert witness in a
12  deposition or at trial.
13     Q.      Have you ever been retained by a
14  pharmaceutical company in connection to legal
15  work?
16     A.      As an expert witness either to provide
17  a report or to appear at trial, no.
18     Q.      Are you excluding something by
19  answering that way?
20     A.      I believe approximately ten years ago
21  I was asked by a biotechnology company to serve
22  as a consultant, but to my knowledge this had
23  nothing to do with legal work.  And going back
24  more than twenty years, I can think of cases

Jeffrey E. Harris, M.D., Ph.D.

Page 59

1    damages.

2       Q.     No one will interpret your answer as

3    such.

4       A.     But from time to time I have been

5    asked as an economist to calculate damages,

6    given that I have been supplied with specific

7    legal standards as to how to define those

8    damages, and I understand that Plaintiff's

9    counsel has in mind pleading damages according

10   to certain legal standards.  And if and when

11   Plaintiff's counsel does so, it's my

12   understanding that the calculations will be used

13   by Plaintiff's counsel to assert damages

14   according to those standards.

15      Q.     How did you get that understanding?

16      A.     Plaintiff's counsel informed me during

17   our conversations that my task was to make

18   calculations, and counsel had certain legal

19   approaches or legal standards in mind, but it

20   was not my task to serve as counsel and invent

21   those standards, nor was it my assignment to

22   calculate damages according to any specific

23   standard at this time.

24      Q.     Am I correct, sir, that nowhere in

Jeffrey E. Harris, M.D., Ph.D.

```
 1      your expert report do you provide an opinion as

 2      to the economic harm to the State of Louisiana

 3      by Merck's alleged wrongdoing?

 4          A.    That is correct.

 5          Q.    What is your understanding of the

 6      alternative legal approaches to the calculations

 7      of damages that are being pursued by Plaintiff's

 8      counsel in this case?

 9          A.    I'd have to give a long answer.

10          Q.    Is this one of these fifteen minute

11      deals?

12          A.    I don't appreciate your sarcasm, sir.

13          Q.    It was meant in jest, I apologize.

14          A.    No, but it would be on a page of -- it

15      would be more than a page or two of transcript.

16          Q.    All right.  Go ahead.

17                Let me back up one second before you

18      begin, if you don't mind.

19                The alternative legal approaches that

20      you mention in Paragraph 7 of your report, have

21      those been communicated to you by Plaintiff's

22      counsel?

23          A.    Not with great precision, but yes.

24          Q.    All right.  And am I correct that
```

Jeffrey E. Harris, M.D., Ph.D.

Page 61

```
 1    Plaintiff's counsel -- withdrawn.
 2              Did you ever ask Plaintiff's counsel
 3    "do you want me to give an opinion about damages
 4    owed to the state?"
 5        A.    Yes.
 6        Q.    And Plaintiff's counsel responded?
 7        A.    "No, your assignment is to make
 8    calculations.  It is our task," speaking in the
 9    plural, "to make use of the results of those
10    calculations in our legal pleadings."
11        Q.    What legal approaches to the
12    calculation of damages did Plaintiff's counsel
13    tell you were being pursued in this case?
14        A.    First, it is my understanding that
15    Plaintiff's counsel may seek restitution of the
16    entire amount spent by the State of Louisiana on
17    Vioxx.  I cannot give you the name of a statute
18    or anything beyond that.
19              Second, it is my understanding that
20    Plaintiff's counsel may seek, I don't know what
21    the right word is, a refund of all expenditures
22    on Vioxx net of rebates from March, 2000, at
23    which time Plaintiff will allege that Defendant
24    Merck was on notice concerning certain
```

Jeffrey E. Harris, M.D., Ph.D.

Page 62

1  cardiovascular and other side effects, and

2  should have withdrawn the drug.

3          Third, it is my understanding that

4  Plaintiff will allege that but for Merck's

5  alleged concealment of cardiovascular and other

6  side effects, Plaintiff would have maintained

7  Vioxx on its non-preferred drug list rather than

8  putting it back on the preferred drug list.

9          And finally, had Plaintiff been

10 apprised of the actual risks it alleges,

11 Plaintiff, the State of Louisiana, would have

12 instituted a drug utilization or pharmacy audit

13 program of the type it later instituted for the

14 drug Vioxx.

15         Finally, it is my understanding that

16 Plaintiff's counsel will contend that damages

17 should be gauged solely by its expenditures on

18 Vioxx, and that any compensating increases in

19 expenditures for any other medications or any

20 other changes in medical care costs should not

21 be included in the calculus of damages.

22         I think that's it.

23     Q.    Focusing on that last component, what

24 is your understanding as to the rationale by any

Page 63

1    calculation of damages would exclude the amount

2    of expenditures the state had on compensating

3    therapies?

4        A.    I understand that Louisiana has a

5    specific statute which I believe refers to the

6    word redhibition, R-E-D-H-I-B-I-T-I-O-N.   My

7    best recollection is that Plaintiff intends to

8    pursue that statute or possibly other statutes

9    as the basis for such an analysis.

10       Q.    Okay.  Let's focus on the economic

11   principles at work.

12             Focusing on the legal approaches you

13   just described, reflecting this March of 2000

14   data that claimed that Vioxx should have been

15   withdrawn as of that date, your report does not

16   contain an opinion as to what the economic

17   damages are to the State of Louisiana by the

18   failure of Merck to withdraw Vioxx in March of

19   2000, correct?

20       A.    My report does not calculate any

21   economic or any damages.

22       Q.    Nor does your report provide a

23   methodology by which someone could derive what

24   the economic damages were to the State of

Jeffrey E. Harris, M.D., Ph.D.

Page 64

1    Louisiana by the failure to withdraw Vioxx as of

2    March of 2000, correct?

3        A.    I'm not in a position to answer that

4    question above and beyond what I've just

5    testified to.

6        Q.    Nowhere in your report do you say

7    "now, if you actually wanted to find out what

8    the economic damages to the state are, this is

9    what you would need to do"?  You don't actually

10   set forth a methodology like that in your

11   report, correct?

12       A.    Your question refers to economic

13   damages.  As an economist, I would be interested

14   in many of the economic consequences of the

15   withdrawal of Vioxx, of Louisiana's decisions,

16   and of the alleged misconduct of the Defendant.

17   But with respect to damages in the legal sense,

18   I have not specifically articulated a formula, I

19   have just responded to Plaintiff's counsel's

20   request to make calculations that I understand

21   will be used by counsel to articulate that

22   formula.

23       Q.    So you have no plans to take the stand

24   in this case and tell the jury what you believe

Jeffrey E. Harris, M.D., Ph.D.

Page 67

1      Q.      But you don't purport to say that the

2    computations you make in your report calculate

3    economic damages, correct?

4      A.      No, that's a legal question.  As to

5    whether or not my computations coincide with

6    specific legal criteria in any way, shape or

7    form, reliably or unreliably is not an opinion I

8    can render in this case.

9      Q.      All right.  Look at the third bullet,

10   "Dr. Harris acknowledges that adjustments may be

11   required before using his calculations to

12   estimate damages."  I'll stop there.  Close

13   quote.

14            Is that correct?

15     A.      That's correct.

16     Q.      Dr. Wiggins goes on, quote, "but

17   Dr. Harris does not offer a methodology or a

18   factual foundation by which such adjustments can

19   be made," close quote.

20            Is that statement correct?

21     A.      At this time that is correct.

22     Q.      Second major bullet point, second

23   sub-point, quote, "Dr. Harris does not tie any

24   of his calculations to any but for world of an

Page 79

```
 1    to some number of medical patients who would not

 2    have been prescribed Vioxx, correct?

 3         A.    Correct.

 4         Q.    And those patients may very well

 5    have -- if they weren't taking Vioxx would

 6    require some other pharmaceutical therapy?

 7         A.    Correct.

 8         Q.    And that additional pharmaceutical

 9    therapy of the patients who did not take Vioxx

10    would have resulted in expenditures to the

11    Louisiana Department of Health & Hospitals,

12    correct?

13         A.    Correct.

14         Q.    Do you provide any opinion in your

15    report as to what the additional expenditures

16    the state would have had to pay for alternative

17    therapies for those patients who would not have

18    taken Vioxx had the drug stayed on the

19    non-preferred drug list?

20              (Witness reviewing document.)

21         A.    No, I do not.

22              BY MR. ISMAIL:

23         Q.    The economic consequences to the State

24    of Louisiana in placing Vioxx on the preferred
```

Jeffrey E. Harris, M.D., Ph.D.

Page 82

```
 1                  AFTERNOON SESSION
 2                  1:29 O'CLOCK P.M.
 3                  BY MR. ISMAIL:
 4        Q.    Doctor, we were talking about your
 5   linear trend analysis, and you were focusing on
 6   figure three and the related text that describes
 7   your opinions as to how much less Vioxx the
 8   state would have reimbursed if it had not put
 9   Vioxx on the preferred drug list.
10             Do you recall that discussion?
11        A.    Yes, I do.
12        Q.    And the estimate you gave of
13   $2,011,000, right?
14        A.    Net of rebates, yes.
15        Q.    And I think where we were is that you
16   agreed that you did not make an estimate or have
17   a calculation in your report whereby you
18   calculated how much the state would have spent
19   on alternative therapies for those patients who
20   did not take Vioxx, correct?
21        A.    That is correct.
22        Q.    And so you do not know what the
23   economic damages are to the State of Louisiana
24   as a result of its decision to place Vioxx on
```

Jeffrey E. Harris, M.D., Ph.D.

Page 83

1    the PDL in June, 2003; true?

2        A.    I would prefer to say that I've not

3    investigated the full scope of all of the

4    economic consequences.

5        Q.    The only consequences you investigated

6    were the reduction in Vioxx expenditures, right?

7        A.    That's what I was asked to do,

8    correct, and that's all I did with respect to

9    the issue of the removal from the preferred drug

10   list.

11       Q.    Do you mean the inclusion onto the

12   preferred drug list?

13       A.    With respect to my investigation as to

14   what additional expenditures were incurred as a

15   result of re-inclusion in the preferred drug

16   list.

17       Q.    Why do you call it re-inclusion?  When

18   was Vioxx previously on the preferred drug list?

19       A.    At one point there was no preferred

20   drug list, and in essence all drugs were

21   preferred drugs.

22       Q.    All right.  So just so the -- okay.

23             In figure four, you have an analysis

24   of how much the state would have spent on Vioxx

Jeffrey E. Harris, M.D., Ph.D.

Page 85

1    the preferred drug list had a very substantial

2    effect.  As to whether counsel will use this

3    specific number in a particular damage

4    calculation, I do not know.

5        Q.    In any event, the number that you

6    estimated, which I think came out to be in

7    Paragraph 21 4.261 million?

8        A.    Yes, in Paragraph 21.

9        Q.    Do you in your report calculate --

10   withdrawn.

11            That 4.261 million reflects additional

12   prescriptions for patients for Vioxx, in your

13   opinion that would have occurred had Vioxx been

14   on the preferred drug list beginning in June,

15   2002, correct?

16       A.    And stayed on the preferred drug list,

17   yes.

18       Q.    So do you in your report anywhere

19   calculate how much the state spent on

20   compensating therapies for patients you believed

21   would have gone on Vioxx instead?

22            (Witness reviewing document.)

23       A.    No, I do not.

24            BY MR. ISMAIL:

Jeffrey E. Harris, M.D., Ph.D.

Page 99

1    Q.    Okay.

2    A.    If they are prescribed

3  anti-inflammatory drugs, it is likely that they

4  had pain, arthritis, or some indication for the

5  use of the drugs.

6          I can also conclude that if a person

7  was prescribed a drug, whether in this case it

8  be Bextra or in other case Vioxx, that at least

9  after the initial prescription the patient must

10 have had some condition for which the physician

11 thought it was indicated, but I cannot say

12 anything definite at the individual patient

13 level, and I did not think that the diagnostic

14 codes or physician codes were sufficiently

15 reliable to investigate them in order to answer

16 your question further.

17   Q.    So for this particular patient, they

18 began to take Mobic in March of 2004, correct?

19   A.    That's correct.

20   Q.    And soon thereafter began to take a

21 proton pump inhibitor, right?

22   A.    Correct.

23   Q.    And whereas when that same patient was

24 taking a COX-2, the patient did not require a

Jeffrey E. Harris, M.D., Ph.D.

Page 102

1    sharply on the immediate period before and after

2    the removal, a design some economists call

3    regression discontinuity.  My purpose was not to

4    identify associations.  If I were only

5    interested in what happened coincidentally or

6    contemporaneously, then there was no need to do

7    a cohort analysis, one could simply do aggregate

8    analyses of the type we were discussing.

9            The focus was sharply on those

10   individuals who I could reasonably assume were

11   current Vioxx patients, rather than those

12   individuals who once took Vioxx and then maybe

13   years later didn't even have the indicated

14   condition.

15       Q.    Okay.  So your cohort, the criteria

16   for what patients would be included in the

17   cohort were patients who had at least one Vioxx

18   prescription, and for whom you could identify or

19   determine from the claims data was an eligible

20   Medicaid recipient for at least one year?

21       A.    Correct.

22       Q.    Now, you used the one year period as a

23   method to include only eligible Medicaid

24   patients in your cohort, correct?

Jeffrey E. Harris, M.D., Ph.D.

Page 105

1    A.    I had the impression that Louisiana's

2  Medicaid contractor was being faced with

3  multiple requests at the same time from multiple

4  parties, and that those pending requests would

5  be satisfied first.

6    Q.    So your cohort analysis, your Vioxx

7  cohort analysis, you would have preferred for --

8  withdrawn.

9         For your Vioxx cohort analysis, you

10  would have preferred having the actual Medicaid

11  eligibility of the patients, correct?

12    A.    I would have preferred to know for

13  each patient in the database the time period

14  during which they were Medicaid eligible, that

15  is the start and stop dates, or if there were

16  gaps, as there sometimes are, the re-enrollment

17  dates.

18    Q.    Why were you interested in having that

19  information?

20    A.    I sought to analyze the effect, the

21  causal effect of the Vioxx withdrawal at the end

22  of September, 2004 by examining a group of

23  presumed Vioxx patients over a period of one

24  year where the one year interval would start

Jeffrey E. Harris, M.D., Ph.D.

Page 106

1   sometime before the withdrawal, and then

2   sometime afterwards.

3        For many patients in the database

4   there were no transactions whatsoever and

5   nothing that could reliably indicate that the

6   Vioxx patient, in fact, was still on Medicaid

7   for the entire year, since the patient might not

8   be eligible or, in fact, could be dead, I could

9   not include that patient in my one year cohort.

10   To do so, that is to add that patient back to

11   the cohort, would require me either falsely to

12   assume that there were no prescriptions, or to

13   make some sort of imputation that I thought was

14   unreliable.

15        Q.   Why couldn't you just analyze all the

16   patients in the Medicaid database to see what

17   the impact was of the events you have identified

18   on expenditures by the State of Louisiana?

19        A.   As I testified a couple of minutes

20   ago, my focus is on attempting to find the

21   causal effect of the Vioxx withdrawal, abrupt as

22   it was, on compensating clinical behavior by

23   doctors and patients.  I therefore identified

24   essentially a clinical cohort of individuals

Jeffrey E. Harris, M.D., Ph.D.

Page 107

1  that I regarded as active Vioxx patients, that

2  is individuals who had had a first Vioxx

3  prescription within the year.

4       Q.    The year before the withdrawal?

5       A.    Correct.  That is they were going to

6  be followed for one year, and if the withdrawal

7  occurred during that year, then it could have

8  occurred at the very beginning or the very end.

9       Q.    Okay.

10      A.    Other patients followed for a year

11 would serve as comparisons or controls.  If we

12 didn't have such a rigorous design, we would

13 have no reason to do a longitudinal study, and

14 we might as well just do associations and look

15 at aggregate data.

16      Q.    If you turn back to table C or Patient

17 2520.  Are you there?

18      A.    Yes, I am.

19      Q.    That patient first had a Vioxx

20 prescriptions in August of 2003, correct?

21      A.    Yes, it was on the preferred drug list

22 at that time, and you're correct.

23      Q.    All right.  So that would be month

24 zero in your analysis?

Jeffrey E. Harris, M.D., Ph.D.

Page 111

1             In essence, my regression design

2    computes a difference in differences analysis in

3    the period immediately before and after the

4    Vioxx withdrawal for those patients who in my

5    professional judgment are most likely to be

6    active Vioxx patients.

7         Q.     Okay.  So can you tell me where --

8    just so I'm clear, when you report, say, in --

9    turn to table, I think it's F, your Vioxx

10   cohort.

11            The table F are tabular results of

12   your regression estimates on your Vioxx one year

13   follow-up cohort, correct?

14        A.     Correct.

15        Q.     So when you show a coefficient of

16   minus 28.74 in the Vioxx withdrawn from US

17   market, you are attempting to identify a

18   coefficient just on people you believe were

19   still on Vioxx as of the date of withdrawal?

20        A.     They were individuals who were most

21   likely to be either on Vioxx or to have a

22   clinical condition that would warrant the use of

23   Vioxx.

24        Q.     Why do you say that?  How did you make

Jeffrey E. Harris, M.D., Ph.D.

Page 112

1    that happen in your cohort?

2         A.    As I said in my report, a great many

3    people have Vioxx for one prescription and don't

4    come back, but there are still others who use

5    the drug on a longer term basis.   In those cases

6    most prescriptions are renewable either at six

7    months or a year, and therefore a one year

8    follow-up would be sufficient to capture those

9    individuals who decided to go back for the drug

10   or whose physicians made that decision for them.

11             To go beyond one year is, in my

12   judgment and experience, to run the serious risk

13   that the patient no longer has the Vioxx

14   indication, and that the sample is contaminated

15   with individuals who just weren't Vioxx patients

16   anymore.

17        Q.    But that concern actually is not borne

18   out by your analysis, is it, Doctor?   You did a

19   nine month, twelve month and eighteen month

20   analysis, correct?

21        A.    The answer to your first question is I

22   don't know of anything that contradicts the

23   conclusion I just stated.

24             The answer to your second question is

Jeffrey E. Harris, M.D., Ph.D.

Page 113

1    I did do by way of sensitivity a nine month,

2    twelve month and eighteen month analysis.

3        Q.    And you found that your model was

4    sensitive to the period of follow-up that you

5    employed, correct?

6        A.    To some degree, yes.

7        Q.    And in fact, what you found, the

8    direction the sensitivity pointed was that the

9    longer the follow-up period, the higher the

10   compensating expenditures became, correct?

11       A.    I'd have to refer to the work papers.

12   I don't have them all in my head in front of me,

13   or in front of me.

14       Q.    Did you see that Dr. Wiggins looked at

15   your work papers and described those nine,

16   twelve and eighteen month analyses that you did?

17       A.    I think he has that in one of his

18   appendices, yes.

19       Q.    Did you check to see whether he

20   accurately reported the analyses that you did?

21       A.    No, I didn't have time to do so.

22       Q.    How long would that have taken you?

23       A.    Well, let's look at what he did.

24       Q.    He went into your file and he pulled

Jeffrey E. Harris, M.D., Ph.D.

Page 115

1    2004 until June of 2007, well beyond not only

2    the withdrawal of Vioxx, but other regulatory

3    events that took place in the one year or so

4    period immediately after September, 2004.  Three

5    years later we do not know whether that person

6    still had any indication for Vioxx.  And

7    following such people into the summer of 2007,

8    we may simply be picking up long-term trends in

9    anti-inflammatory use in the population in

10   general that have nothing to do with that

11   specific patient, but just because doctors were

12   prescribing NSAIDs in 2007 more than in earlier

13   years.

14       Q.    While we're on the subject of

15   examples, let me see if I can understand who

16   would be in or out of your, or what -- let me

17   back up a second.

18            In addition to defining the cohort to

19   mean patients who had one Vioxx prescription and

20   for one reason or another you could identify

21   them as being eligible for twelve months, which

22   means they could have had a prescription for

23   anything, right, within the database, that to

24   you would signal to you they're Medicaid

1    eligible, correct?

2        A.    Yes.  But your question identifies

3    another limitation, which is that we did not

4    have every prescription, we only had NSAIDs and

5    proton pump inhibitors.

6        Q.    So somebody could have been on Vioxx

7    for five months, and then stopped taking Vioxx

8    and was still Medicaid eligible, but you would

9    have tossed them out of the cohort, right,

10   because you couldn't find -- if they didn't have

11   any other NSAID or PPI use following those first

12   five months?

13       A.    If I could make no observations that

14   guaranteed that the individual remained in the

15   Medicaid cohort, then I could not include him in

16   the one year follow-up analysis, unless there

17   were transactions that occurred one year or more

18   after the first Vioxx prescription.

19       Q.    So let me clean up my example a little

20   bit and see if we can come to an agreement.

21             You have a patient who is taking Vioxx

22   for five months, and you see no other NSAID or

23   PPI prescriptions after those first five months,

24   is that patient in or out of your cohort?

Jeffrey E. Harris, M.D., Ph.D.

1      A.      It's not in my cohort because I could

2   not follow him for twelve months.

3      Q.      Okay.  You have a patient who takes

4   Vioxx for fourteen months, loses eligibility,

5   but you don't know that, but you see

6   fourteen months of Vioxx prescriptions, that

7   patient is in, right?

8      A.      He is in for the first twelve months,

9   that's correct.

10      Q.      You have a patient who's taking Vioxx

11   for two years as of the date of the

12   withdrawal -- or let me back up.  That's cohort

13   eligibility.

14           Once a patient is in the cohort, you

15   then limit what observations for those patients

16   you're going to include in your analysis, right?

17      A.      I limit that to those people who can

18   be followed for twelve months and only for

19   twelve months.

20      Q.      Right.

21           So for patients who were eligible for

22   your cohort and then are included in your

23   analysis, you did not look at any expenditures

24   after twelve months, right?

Page 118

1      A.      That's correct, and for a good reason.

2      Q.      Well, since I'm going to ask you

3   eventually, you might as well tell me now.

4      A.      As we've previously discussed, or as

5   I've previously testified in response to your

6   questions, we do not have individualized

7   clinical data on these patients.  I do know from

8   my own clinical experience and from examining

9   the regression results that the large majority

10   of people actually only had one Vioxx

11   prescription and did not come back repeatedly.

12   After one year I cannot be sure that this person

13   still is a Vioxx patient.  And as I extend the

14   time further, I may be simply picking up

15   incidental NSAID prescriptions rather than a

16   general response to the withdrawal of Vioxx.

17            To take a simple example, take

18   somebody who began Vioxx in the year 2000, let's

19   say that we followed that individual throughout

20   the entire time period because we had data all

21   the way to the end of 2009, as Professor Wiggins

22   did in one of his analyses, I do not think we

23   can reliably assume that because that individual

24   began Vioxx in 2000 that that individual is

Jeffrey E. Harris, M.D., Ph.D.

Page 122

1    some sort of NSAID therapy?

2        A.    In that particular hypothetical case,

3    the person is on Vioxx therapy, but since I

4    cannot make that analysis for every one of the

5    patients, and since I have to treat them in a

6    standardized manner, I have to set a cutoff for

7    when the typical person is a Vioxx patient.

8        Q.    Okay.  I'll get to your analyses in

9    the aggregate, but I want to understand if your

10   purpose was to understand what did active Vioxx

11   users do as of the withdrawal, and did the state

12   have to have compensating expenditures for those

13   patients.  Somebody who took Vioxx for two years

14   and then switched to naproxen should be someone

15   you'd want to analyze, right?

16       A.    Yes.

17       Q.    So when you have this twelve month

18   follow-up limit the way you did, any patient as

19   of the date of the withdrawal who was taking

20   Vioxx for more than one year and had some switch

21   to another NSAID, you never considered the

22   expenditures post-withdrawal on the other

23   NSAIDs; true?

24       A.    If an individual began a twelve month