Jeffrey E. Harris, M.D., Ph.D.

1    follow-up period more than a year before the

2    removal of Vioxx from the market, and then

3    continued to take Vioxx up to the date of

4    withdrawal and then switched, then that

5    individual would only be followed for one year,

6    and would only be included as a control

7    individual, that is somebody not subject to

8    withdrawal of the drug, who took Vioxx

9    continuously for one year.  But my procedure

10   would indeed exclude his continued use of Vioxx

11   after that year of follow-up and under the

12   hypothetical his switch to another drug.

13        Q.    Okay.  So if your real focus was to

14   understand what happened to current Vioxx users

15   as a result of the withdrawal, you did not

16   analyze anyone who was actually taking Vioxx for

17   more than a year before the withdrawal, correct?

18        A.    Correct.

19        Q.    And if you wanted to understand the

20   impact of the withdrawal on compensating

21   expenditures in the State of Louisiana, you

22   would want to include everyone who was currently

23   a Vioxx user as of the date of the withdrawal

24   and follow them to see what their switching

1          What's more, if I were to, say, take

2     this individual, and he had a Vioxx prescription

3     one month right before the withdrawal, then I

4     had to decide how about two months and three

5     months.  In that case I'm getting into problems

6     of retrospective design which I thought were

7     inappropriate.

8          The correct design, in my opinion, is

9     what analysts call a prospective design, that is

10    we start on the day of treatment.  It most

11    closely mimics a clinical trial.

12    Q.    I appreciate that answer, but that's

13    not really what I asked.

14          If your stated objective for your

15    analysis was to see what was the effect of the

16    withdrawal on expenditures for the State of

17    Louisiana, that analysis should include patients

18    who were taking Vioxx for more than one year

19    before the withdrawal and then switched to

20    another medicine, correct?

21    A.    Ideally, yes.

22    Q.    And for any patient who was in your

23    cohort in this twelve month follow-up who was

24    taking Vioxx on the day the medicine was

Jeffrey E. Harris, M.D., Ph.D.

Page 135

 1    we'll just say the year.  In that case he also

 2    was an active Vioxx user under my definition

 3    during the follow-up, but his spell of active

 4    Vioxx use, as I've defined it, did not overlap

 5    that regulatory intervention, and he is the

 6    control, in essence.

 7          Q.    Okay.  Then for the class, you call

 8    the four medication class of -- the four

 9    medication class includes Vioxx, Celebrex,

10    Bextra and other NSAIDs, correct?

11          A.    Yes, that's on table F.

12          Q.    Does your four medication class

13    include PPI expenditures?

14          A.    I believe not.  There is an output in

15    the computer log referred to in table F which

16    shows that result, but I believe what is

17    reported in the table excludes the PPI

18    expenditures.

19          Q.    All right.  So if you look at that

20    event in the model that you employed, for the

21    four medication class you saw a decline of $1.13

22    in average per month expenditures, correct?

23          A.    Correct.

24          Q.    And so to properly interpret that

Page 137

1      Q.    Have you used the methodology you've

2   described here in other situations in

3   pharmaceutical sales in which there are

4   regulatory events?

5      A.    If by "used" you mean wrote my own

6   research paper, I'm not sure.  If you mean

7   taught in class, there are numerous papers who

8   use this, that use this design.

9      Q.    All right.  Let's break that down.

10          Have you ever published an analysis of

11   pharmaceutical sales that employed the

12   methodology you used in this case, speaking

13   specifically of the cohort analysis?

14      A.    No, I've not.

15      Q.    Have you seen anyone else publish a

16   research paper that employs the methodology you

17   used in this case for pharmaceutical sales?

18      A.    Yes.

19      Q.    Can you identify those papers?

20      A.    The initial group of papers in this

21   field focused on the drug Zantac that was

22   introduced in competition with Tagamet by Glaxo

23   in the 1980s, numerous papers used both

24   components of the methodology, number one having

Jeffrey E. Harris, M.D., Ph.D.

Page 143

1    Q.    So the reason or the compromise that
2    you decided upon you said was "based upon my
3    clinical experience as a physician," right?
4    A.    Correct.
5    Q.    Okay.  Well, we talked about your
6    clinical experience as a physician earlier, but
7    just to review; you were a very infrequent
8    prescriber of Vioxx, correct?
9    A.    Correct.
10   Q.    And five years later you express some
11   difficulty remembering the frequency with which
12   you prescribed Vioxx, right?
13   A.    Vioxx specifically, that's correct.
14   Q.    And you have done no research into the
15   mix between chronic and acute users of Vioxx,
16   correct?
17   A.    The answer is yes, I have, and it's
18   contained within my analysis here above and
19   beyond my own clinical experience with the use
20   of anti-inflammatory drugs in general.
21   Q.    What specific analysis -- let me back
22   up one second.
23         What percentage of the Vioxx patients
24   who have at least one Vioxx prescription in

Jeffrey E. Harris, M.D., Ph.D.

1   Vioxx were abruptly withdrawn at that time,

2   those individuals' responses would not be part

3   of my cohort analysis.

4           The problem is finding those

5   individuals, that is finding a rule that the

6   investigator can apply systematically.  We are

7   not in the business of doing an after the fact

8   investigation of each and every person's record

9   to make a judgment as to who was a Vioxx user

10  and who wasn't given the available data.

11      Q.    What do you mean that "we are not in

12  the business of"?  Who is "we"?

13      A.    An investigator who is attempting to

14  assess in an unbiased and accurate manner the

15  causal effect of an interruption of Vioxx

16  availability among active Vioxx users needs to

17  come up with a design that can be applied before

18  the fact, that is before seeing the results in a

19  uniform manner to what amounted to tens of

20  thousands of patients and millions of

21  observations.

22      Q.    By limiting the cohort and the

23  observations in which you do, does your

24  resulting model reflect a composition of Vioxx

Jeffrey E. Harris, M.D., Ph.D.

Page 147

1   users that are skewed more towards the acute

2   than might have been the case in real life in

3   the Medicaid database?

4       A.   It is entirely possible that the

5   design excludes longer term Vioxx users who, in

6   fact, reacted or their physicians reacted to the

7   withdrawal of Vioxx. It includes only their

8   experience in the first year. But whether there

9   is a better design that can identify these

10  people, my judgment was no. Extending the

11  cohort well beyond one year not only resulted in

12  a loss of observations, but ran the risk that

13  what changes in NSAID use were observed were

14  purely coincidental rather than causal.

15      Q.   Okay. I understand your point that

16  you think you got the right model, but one of

17  the jobs of an analyst is to identify biases

18  that exist in the model they chose, right?

19  That's often times pointed out in research

20  papers?

21      A.   Correct.

22      Q.   Okay. So let's identify the biases in

23  your model.

24          The model you chose in the cohort

```
 1    to make a compromise between acute and chronic

 2    use of a drug.

 3              In my example, the Jeff who lifted a

 4    box is the same person who lifted the box and

 5    pulled his back out that would see a primary

 6    care or internist physician whether he took

 7    Vioxx, Celebrex or Codeine.

 8        Q.    You didn't analyze Codeine, did you?

 9        A.    In the Louisiana database, analgesic

10    drugs other than -- anti-inflammatory drugs were

11    not included, and I did not, not in the

12    Louisiana database.

13        Q.    That's a good point.  I'm glad you

14    brought it up.

15              So there are patients at these

16    regulatory events that you've been describing

17    who could have switched off Vioxx and switched

18    to a narcotic analgesic, correct?

19        A.    Yes.  As I was explaining before the

20    lunch break, if an economist were interested in

21    the various dimensions of economic impact, they

22    can include a much wider range of medications

23    than non-steroidal anti-inflammatories or proton

24    pump inhibitors.
```

Jeffrey E. Harris, M.D., Ph.D.

Page 155

1     Q.    Are you an economist who is interested

2  in the various dimensions of economic impact?

3     A.    Definitely I teach that all the time.

4     Q.    You didn't do that here, though?

5     A.    No, I was not asked to do so.

6     Q.    Just so I'm clear, patients who

7  switched from Vioxx to narcotic medications, the

8  increase in compensation expenditures per month

9  to the state for those narcotics were not

10  included in your cohort analysis; true?

11     A.    If there were such expenditures they

12  were not included, that's correct.

13     Q.    Okay.  And just so we can finish this

14  discussion about your experience with COX-2s, I

15  think we were describing that before we got back

16  to Jeff and the box, so with respect to COX-2s

17  you had by your own description little clinical

18  experience with Vioxx, not very much clinical

19  experience, and recently not very much

20  experience with Celebrex, correct?

21        MR. DUGAN:  Objection.  Asked and

22  answered --

23        BY MR. ISMAIL:

24     Q.    You can answer.

Jeffrey E. Harris, M.D., Ph.D.

Page 162

1    remember how the change in the follow-up period

2    affected your results, right?  Is that still the

3    case?

4         A.    I would prefer to actually look at the

5    documents to give an accurate answer rather than

6    to rely on my recollection at this time.

7         Q.    Where Dr. Wiggins reflects in Exhibit

8    C your twelve month cohort, that your cohort

9    analysis includes only 72.6 percent of the

10   patients who had a Vioxx prescription in the

11   Louisiana Medicaid database, do you know one way

12   or another whether that's an accurate number?

13        A.    That's approximately correct.  I don't

14   know if that's the number exactly, but it is on

15   the order of three-quarters.

16        Q.    And when you go to column D --

17   withdrawn.

18             Just so the record is clear, when you

19   give computation results in your report for the

20   effect or the cause in your view of certain

21   regulatory events, that is excluding 25 percent

22   of the patients from your analysis, correct?

23        A.    When I analyze the twelve month cohort

24   and adhere to my criteria as to who is an active

Jeffrey E. Harris, M.D., Ph.D.

Page 163

1    Vioxx user who can be followed accurately for

2    twelve months, then my analysis identifies

3    approximately three-quarters of the individuals.

4    There are a remaining one-quarter who had a

5    Vioxx prescription but are not analyzed in the

6    statistical sample.

7         Q.    In column D, Dr. Wiggins reports that

8    your twelve month cohort excludes 80 percent of

9    the observations from the database?

10        A.    That's not what column D says.

11        Q.    Okay.  Tell me what column D says to

12   you.

13        A.    It says "percent of all non-missing

14   observations in sample," and here I believe

15   Professor Wiggins has incorrectly characterized

16   any zero expenditure as missing, and therefore I

17   do not know what the meaning of this calculation

18   is.

19        Q.    Then let's go to column H.  "Percent

20   of cohort member observations excluded from

21   analysis."  In the twelve month cohort line,

22   Dr. Wiggins reports that 73.8 percent of the

23   observations from the patients you included in

24   the cohort were not subject to your analysis.

Jeffrey E. Harris, M.D., Ph.D.

Page 173

1    subset of the patients and a subset of the

2    observation of those patients; true?

3        A.    Correct.

4        Q.    The number you give for Vioxx excluded

5    from the Louisiana PDL, the negative 8.56 and

6    negative 1.13?

7        A.    Yes.

8        Q.    I think elsewhere in your report you

9    describe that as a thirteen percent net drop in

10   expenditures for the four medication class?

11       A.    You'll have to direct me to where I

12   wrote that.

13       Q.    Either that, or I did the math myself.

14             If you go to Paragraph 33, if we

15   wanted to convert that to percentages, will you

16   take 1.13 over 8.56?

17             (Witness reviewing document.)

18       A.    That would be a percentage.  It would

19   not correspond to a thirteen percent decline,

20   but it would be a thirteen percent of something.

21             BY MR. ISMAIL:

22       Q.    Okay.  Can you then tell me what table

23   F reflects is the percentage impact of the Vioxx

24   excluded from PDL regulatory event?

Jeffrey E. Harris, M.D., Ph.D.

1    A.    On average per month, my best estimate

2    is that exclusion of Vioxx from the Louisiana

3    PDL reduced average Vioxx expenditures causally

4    by $8.56 per month, whereas total expenditures

5    for the four medication class were reduced by

6    only $1.13 per month.  Put differently, there

7    was a $7.43 counterbalancing increase in

8    expenditures for other non-Vioxx medications as

9    a causal result of the exclusion of Vioxx from

10   the PDL.  If I divide the 7.43, which is in the

11   text in Paragraph 33, by the 8.56, which is the

12   coefficient in table F, I would get a measure of

13   the percentage compensation where 100 percent

14   compensation would correspond to no net causal

15   change for the four medication class.

16       Q.    And the result of that computation is

17   approximately 87 percent net causal change for

18   the four medication class?

19       A.    No.  You mean net compensation?

20       Q.    Sure.  Is the number right?

21       A.    The percentage compensation in this

22   case is the ratio of 7.43 to 8.56.

23       Q.    Okay.  Just for the sake of doing it,

24   give me the numbers again.

Jeffrey E. Harris, M.D., Ph.D.

Page 176

```
 1       Q.     So if we took your ratio from table F,
 2   would we be able, using your numbers, to
 3   determine what the compensating expenditures
 4   would have been for those patients that make up
 5   the $2,011,000?
 6       A.     Yes, I think that would be a
 7   reasonable, it is not the only way to do it, but
 8   that would be a reasonable calculation.
 9       Q.     Okay.  And so the economic
10   consequences -- so the ratio of 7.43 over 8.56
11   is approximately 87 percent?
12       A.     I'll accept that.
13       Q.     Though if we were to carry that
14   analysis further, 87 percent of the $2,011,000
15   that you say was the excess the state spent on
16   Vioxx as a result of including it in the PDL
17   would have been spent on one of the other
18   medications in the four medication class; true?
19       A.     In fact they were, yes, although I
20   can't say it would be exactly that number.  In
21   fact, there was a substantial compensating
22   increase in Bextra prescriptions.
23       Q.     So that if we were to take the two
24   parts of your analysis, we would take
```

Jeffrey E. Harris, M.D., Ph.D.

Page 182

1          A.      A fair estimate and my best estimate

2     of the causal effect of both short-term and

3     long-term, in fact all active Vioxx users.

4          Q.      The withdrawal number that you came

5     to, 2,874, negative 2,874 and negative 1,242,

6     table F?

7          A.      I see that, yes.

8          Q.      I believe you did that percentage in

9     your report, and it's 57 percent net?

10         A.      Net compensation, yes.

11         Q.      So a 43 percent savings?

12         A.      Well, again it's a 43 percent, I'm not

13    sure I would use the word savings.

14         Q.      Then let's not.

15                 If you go to Paragraph 42 of your

16    report.  So you're talking here about your Vioxx

17    twelve month cohort and your analysis of the

18    causal effect, as you describe it, of the

19    withdrawal?

20         A.      Yes.

21         Q.      You write in the last sentence of that

22    paragraph, quote, "The extent of the

23    compensating increase in NSAID and other COX-2

24    inhibitor expenditures might have been different

Jeffrey E. Harris, M.D., Ph.D.

Page 183

1    if Vioxx had been withdrawn from the US market

2    earlier," close quote.

3            What do you mean by that?

4        A.    While I attempted to take into account

5    the most important contemporaneous events, in

6    particular regulatory events, it is nonetheless

7    the case from my point of view as an economist

8    that the projection of the compensating increase

9    to any other point in time needs to be done with

10   care.

11       Q.    How would you do it if you wanted to

12   be careful?

13       A.    While it is outside the scope of my

14   testimony, I understand that Plaintiff will

15   propose as facts that Defendant Merck could have

16   and should have disclosed certain cardiovascular

17   risks earlier as a result of data it knew

18   internally in a clinical trial; for example, in

19   March of 2000 in the VIGOR Trial.

20            If Plaintiff proposes that the buyer,

21   namely Louisiana Medicaid, could have taken

22   certain regulatory reactions in response to that

23   information, then normally it would be

24   appropriate for Plaintiff to establish the facts

1    that Louisiana's action at that time are not

2    materially different from the actions that it

3    took a few years later.  I'm not in a position

4    to make that evaluation.

5             It might, for example, include what

6    would have been the consequences to the

7    scientific community and to government

8    regulation in general, not only about Vioxx but

9    other drugs in the class had the alleged

10   concealment not occurred.

11        Q.    The decisions of the patients and the

12   doctors in September of 2004 and thereafter for

13   current Vioxx patients reflects the information

14   and state of knowledge that had been generated

15   by that date, correct?

16        A.    Correct.

17        Q.    Though if we wanted to look at earlier

18   time periods, necessarily the information and

19   knowledge was different than it was in September

20   of 2004; true?

21        A.    I don't have an expert opinion on

22   that, but that's my general understanding.

23        Q.    So if you want to go all the way back

24   to March of 2000, there certainly were studies

Jeffrey E. Harris, M.D., Ph.D.

Page 186

1    compensating expenditures as a result of the

2    Vioxx withdrawal in September of 2004 can

3    validly be applied to any data?

4        A.    Having given my best estimate of the

5    causal effect of withdrawal in September, 2004

6    and the compensating increase, I satisfied what

7    I understood to be my assignment with respect to

8    that aspect of Plaintiff's counsel's request.

9              In the event that that estimate were

10   to be applied to an earlier time period, it is

11   my own economic, not necessarily legal opinion

12   that counsel will have to develop the necessary

13   facts to ensure that the projection to an

14   earlier time period is valid, but I did not do

15   that in my report.

16       Q.    The events that took place after

17   September of 2004 include a December, 2004

18   health advisory from the FDA, correct?  I

19   believe it's on 21 of your report.

20             (Witness reviewing document.)

21       A.    There were two FDA actions in my

22   chronology in December, 2004 listed in table one

23   of my report, yes.

24             BY MR. ISMAIL:

Jeffrey E. Harris, M.D., Ph.D.

Page 187

```
 1       Q.    One of which relates to Bextra, one
 2   of which relates to Celebrex, correct?
 3       A.    Correct.
 4       Q.    And you did not separately analyze the
 5   impact of those two regulatory events on NSAID
 6   expenditures in the State of Louisiana, correct?
 7       A.    No, I did not include those as
 8   indicator variables.
 9       Q.    Do you believe it is reasonable that
10   the information that was disclosed in December
11   of 2004 about Bextra and Celebrex could have
12   had an effect on your analysis of the causal
13   effect of the Vioxx withdrawal in September of
14   2004?
15       A.    It's possible, but I did not think
16   those events were as important as those that I
17   specifically and explicitly took into account.
18       Q.    Did you look to see to what extent
19   patients who were on Vioxx in September of 2004
20   elected to not go on any alternative NSAID or
21   COX-2 inhibitor thereafter?
22       A.    Above and beyond what I've presented
23   in my report, in my work materials, no.
24       Q.    So to the extent that there was a
```

Jeffrey E. Harris, M.D., Ph.D.

Page 188

1    class-wide concern that was newly revealed after

2    September of 2004 that wasn't part of the mix of

3    information that existed earlier, that would be

4    a reason to doubt the applicability of your

5    analysis of the Vioxx withdrawal to any other

6    period, correct?

7         A.    Correct, but with one exception.

8         Q.    Which is?

9         A.    Quite often in the pharmaceutical

10   field the single key finding or the disclosure

11   of a key finding about a side effect in one

12   member of a therapeutic class leads rapidly to a

13   cascade of studies about other members of the

14   therapeutic class.  Although it would be

15   speculative on my part, I could see how another

16   expert versed in the field might reach the

17   opinion that a disclosure of Vioxx's

18   cardiovascular effects in 2000 would result in

19   an acceleration of research concerning the

20   cardiovascular effects of Bextra, Celebrex and

21   other drugs.

22        Q.    In September of 2004 there had been

23   several studies on Vioxx that were not even

24   begun by March of 2000, correct?  You can assume

Jeffrey E. Harris, M.D., Ph.D.

Page 194

 1    even a question of methodology, it's just plain

 2    wrong, and any inference drawn from it cannot be

 3    right.  People do not go to the pharmacy every

 4    month.  And if the database shows zero

 5    expenditures for that month, it is not missing,

 6    it is a genuine zero, and to call it missing is

 7    not a methodological issue, it's just a plain

 8    error.

 9         Q.    One of the statements Dr. Wiggins

10    makes in his report is that prior -- the

11    percentage of time that a patient had no

12    expenditures on NSAIDs was much greater in the

13    period after the Vioxx withdrawal than before.

14    Do you have any reason to --

15         A.    I don't know one way or another if

16    that's true.

17         Q.    One of the inferences from that data,

18    if you assume it to be true, is that there was a

19    class-wide movement away from NSAIDs in the

20    fourth quarter of 2004, or a greater reluctance

21    to use NSAIDs in the fourth quarter of 2004.  Is

22    that a fair inference from that data?

23         A.    There may have been a class-wide

24    effect, and that class-wide effect is taken into

Jeffrey E. Harris, M.D., Ph.D.

Page 195

```
 1    account in my analysis.

 2        Q.    You assigned the class-wide effect,

 3    all of that effect, to the Vioxx withdrawal,

 4    right?

 5        A.    Yes.  If Merck hypothetically had

 6    announced, as Plaintiff alleges, that Vioxx had

 7    certain cardiovascular side effects and

 8    withdrawn Vioxx as Plaintiff, I think, claims

 9    Merck should have done, then that might have

10    indeed had a ripple effect on other drugs in the

11    same therapeutic class.  But that would have

12    been a consequence of Merck's action whether it

13    took place in 2004 or any other time period, and

14    I don't see it as dissociable or detachable from

15    Merck actions.

16              Had Merck disclosed the cardiovascular

17    side effect, there may very well have been less

18    of a compensation because of the overall concern

19    that the newly disclosed information affected

20    all drugs in the class.

21        Q.    You assigned 100 percent of the

22    class-wide reluctance to use NSAIDs as a causal

23    result of the Vioxx withdrawal, correct?

24        A.    No.
```

Jeffrey E. Harris, M.D., Ph.D.

Page 196

1    Q.    In what way no?

2          (Witness reviewing documents.)

3    A.    Any reductions or changes in

4    medication use after March, 2005 were assigned

5    in my analysis to other regulatory events.

6          BY MR. ISMAIL:

7    Q.    Let me rephrase my question.

8          Any class-wide movement away from

9    NSAIDs that occurred after September, 2004 and

10   before March of 2005, you assigned 100 percent

11   of that impact to the Vioxx withdrawal; true?

12         MR. DUGAN:  Objection.  Asked and

13   answered.

14         BY MR. ISMAIL:

15   Q.    Go ahead.

16   A.    I think the correct way of stating it

17   is if the withdrawal of Vioxx during the narrow

18   time period you're referring to resulted in a

19   class-wide --

20   Q.    That's not what I asked, sir.

21   A.    Well, then, I don't have anything else

22   to add to my previous answer.

23   Q.    Well, how about an answer to my

24   previous question.

Jeffrey E. Harris, M.D., Ph.D.

Page 198

1    just said, and then you'll interrupt me.

2            BY MR. ISMAIL:

3        Q.    So how about I start with a new

4    question.

5            If patients and doctors were reluctant

6    to use NSAIDs after September of 2004 for

7    reasons that were not related to the Vioxx

8    withdrawal, you nevertheless would have assumed

9    that reduction in expenditures was causally

10   related to the withdrawal of Vioxx; true?

11       A.    If the concerns were not causally

12   related, then I would have inappropriately

13   attributed the reduction in Vioxx expenditures

14   or the failure of an increase in other

15   expenditures to the Vioxx withdrawal.  But as I

16   understand it, it will be Plaintiff's obligation

17   to demonstrate that any such class-wide concerns

18   were, in fact, a consequence of the Vioxx

19   withdrawal.

20       Q.    So if the results from the Bextra

21   trial which were newly disclosed in December,

22   2004, or the concerns about the Celebrex

23   cardiovascular profile newly disclosed in

24   December of 2004 caused some patients or doctors

Jeffrey E. Harris, M.D., Ph.D.

Page 199

1    to move away from NSAIDs, you would nevertheless

2    have assigned that reduction in expenditures as

3    causally related to the Vioxx withdrawal?

4         A.    In my analysis, that's correct for

5    those two particular events in December of 2004.

6         Q.    So going back to Wiggins Exhibit E, he

7    ran your analysis in Paragraph 2A, so for the

8    same patients who were in your cohort, by

9    whatever cohort eligibility criteria you had, he

10   ran it on other observations instead of just the

11   first twelve months following the Vioxx

12   prescription?

13        A.    Did you say Exhibit E?

14        Q.    I did.  Line 2A.

15             (Witness reviewing document.)

16        A.    If I understand correctly, he took all

17   of the 49,324 patients in line 2A and extended

18   their follow-up as long as those individuals had

19   some transaction which signaled they remained in

20   the cohort, or in the database to be more exact.

21   I think that's what he did here.

22             BY MR. ISMAIL:

23        Q.    And if you go to the Vioxx off PDL

24   coefficient, for that analysis he finds a number

Jeffrey E. Harris, M.D., Ph.D.

Page 206

```
 1        A.      Correct.
 2        Q.      So same eligibility criteria at the
 3   time of Bextra-Celebrex prescriptions instead
 4   of Vioxx prescription?
 5        A.      Correct.
 6        Q.      And the same twelve month follow-up?
 7        A.      Correct.
 8        Q.      And so again, you didn't look at
 9   compensating expenditures, those weren't
10   included in your analysis for Bextra-Celebrex
11   that occurred more than twelve months after the
12   first prescription; true?
13        A.      If such compensating expenditures
14   could be accurately measured and if they
15   existed.
16        Q.      Now, table G is your tabulated results
17   from this cohort, correct?
18        A.      Correct.
19        Q.      The calendar dates between the
20   prospective deny edit and the Bextra withdrawal
21   was less than 30 days, right?
22        A.      Correct.
23        Q.      And you attempted to identify the
24   causal effect of both the deny edit and the
```

Jeffrey E. Harris, M.D., Ph.D.

Page 207

1    Bextra withdrawal in table G, correct?

2         A.    Correct.

3         Q.    Do you believe your methodology that

4    you employed was able to single out the causal

5    effect of the deny edit on Bextra-Celebrex and

6    other expenditures from the Bextra withdrawal

7    effect?

8         A.    Although the window in which the

9    prospective deny edit was in effect and the

10   Bextra was still on the market is only one

11   month, yes.

12        Q.    Now, with respect to the prospective

13   deny edit, has counsel asked you to make an

14   estimate of what the compensating expenditures

15   would be as a result of a prospective deny edit

16   at any time prior to March, 2005?

17        A.    No.

18        Q.    The compensating expenditures that the

19   State of Louisiana would have to incur as a

20   result of a prospective deny edit would depend

21   upon the mix of information that patients and

22   doctors had about the alternative therapies,

23   right?

24        A.    Correct.

Jeffrey E. Harris, M.D., Ph.D.

Page 208

1        Q.      And in March of 2005, there was a

2    great deal of information about NSAIDs that was

3    not available during the time Vioxx was on the

4    market, correct?

5        A.      Yes, correct.

6        Q.      There was an FDA Advisory Committee

7    that took place in 2005 that discussed the

8    entire class of NSAIDs that received a great

9    deal of publicity, right?

10       A.      I don't know.

11       Q.      You have made no effort to determine

12   what the impact was of the information that

13   existed about NSAIDs after September of 2004

14   that would have impacted expenditures per month

15   for the four medication class, correct?

16       A.      Above and beyond the specific events

17   taken into account in my analysis, no.

18       Q.      So to the extent there were new

19   studies reported, announcements by FDA, Advisory

20   Committees, widespread media publicity about

21   NSAIDs, to the extent those events influenced

22   the prescribing decisions within Medicaid, those

23   are not separately accounted for in table G,

24   correct?

Jeffrey E. Harris, M.D., Ph.D.

Page 209

1      A.    I can only repeat that I took into

2  account exactly those events which I listed in

3  my analysis.  My experience is that local state

4  level regulations tend to have a much greater

5  impact on Medicaid expenditures than nationwide

6  advisories, because they actually affect the day

7  to day practice of medicine.  Hence, as a

8  general matter, I would place credence on even a

9  one month effect of the prospective deny audit.

10          Nonetheless, if there were any other

11  events or disclosures of information in the same

12  time period above and beyond those that I have

13  explicitly accounted for, they could have

14  affected the results.

15      Q.    The DUR prospective edit necessarily

16  does not measure any impact on Vioxx users,

17  correct?

18      A.    It took place thereafter, and does

19  not.

20      Q.    Nowhere in your report do you disclose

21  an opinion as to what effect a prospective deny

22  edit on Vioxx would have had on compensating

23  expenditures in the State of Louisiana; true?

24      A.    Correct.

Jeffrey E. Harris, M.D., Ph.D.

Page 210

1      Q.     And by State of Louisiana I mean

2  within the Medicaid program, correct?

3      A.     That's what I understood.

4      Q.     Thank you.

5             Why did the prospective deny edit have

6  a much greater impact on Bextra payments than

7  it did on Celebrex payments?

8      A.     I do not know.

9      Q.     Do your data support the conclusion

10  that there was a much more significant reduction

11  in Bextra use in the Louisiana Medicaid system

12  in March of 2005 than was reflected in Celebrex

13  users?

14      A.     My estimates indeed indicate that the

15  effect of the prospective deny audit in

16  depressing expenditures for COX-2 inhibitors was

17  considerably larger in the case of Bextra.

18      Q.     Does the fact that there was a much

19  greater reduction in Bextra usage than Celebrex

20  usage suggest that there was other information

21  about Bextra that was causing the decline in

22  usage?

23      A.     It's entirely possible that if

24  physicians had more concerns about Bextra than

Jeffrey E. Harris, M.D., Ph.D.

Page 211

1    Celebrex, then in response to a required

2    pharmacist inquiry into the indications for the

3    drug the physician might abandon the

4    prescription.

5        Q.    And that decision, in the example that

6    you just described, would have been based on

7    information that was newly disclosed about

8    Bextra after September, 2004, correct?

9        A.    Correct.  Or it could have been

10   before, but it was available at the time.

11       Q.    If you look at the third and fourth

12   lines of your table G, is it just coincidental

13   that the four medication impact is the exact

14   same coefficient?

15       A.    I think it's coincidental because the

16   estimated standard errors are different.  But I

17   can -- to give you a further answer I would have

18   to check my computer output.

19       Q.    If you go to Paragraph 94 of

20   Dr. Wiggins's report.

21       A.    (Witness complies).

22       Q.    Actually in Paragraph 95 Dr. Wiggins

23   describes what he believes is a programming

24   error in your analysis, correct?

Jeffrey E. Harris, M.D., Ph.D.

Page 217

1     A.     I believe so.

2     Q.     And you didn't do that, right?

3     A.     No, I did not.

4     Q.     So as you sit here today, do you know

5   one way or another whether your Bextra-Celebrex

6   cohort assigns Bextra expenditures to a

7   calendar period that occurred after the Bextra

8   withdrawal?

9     A.     No, I do not.

10    Q.     When was Celebrex excluded from the

11  Louisiana PDL?

12           (Witness reviewing documents.)

13    A.     At various times.  Actually twice as

14  reflected in table one of my report.

15           BY MR. ISMAIL:

16    Q.     First time was June of 2002, and the

17  second time was when?

18    A.     In September of 2005.

19    Q.     In table G, which Celebrex PDL

20  exclusion event are you referencing there?

21    A.     The exclusion in 2003.

22    Q.     You mean 2002?  Or 2003, sorry,

23  correct.

24           That coincides with Vioxx's inclusion

Jeffrey E. Harris, M.D., Ph.D.

Page 226

1      observed here must be a spillover effect rather

2      than a direct effect.

3          Q.     Of course another possibility is that

4      there was other information in the market around

5      March of 2005 which caused physicians and

6      patients to turn away from COX-2 inhibitors,

7      right?

8                 (Witness reviewing document.)

9          A.     There were indeed many other events

10     and many sources of information, and in my

11     analysis I attempted to take all of them into

12     account as best I could.

13                BY MR. ISMAIL:

14         Q.     We know you didn't, right?  You didn't

15     take into account the FDA Advisory Committee,

16     you didn't take into account the FDA statements,

17     September, '04, you didn't take into account the

18     stopping of Celebrex trials; you didn't take any

19     of that into account, did you?

20         A.     I took into account those events that

21     I considered in my opinion to be most

22     significant.

23         Q.     Did you even look at those events to

24     come to an opinion whether they were significant

Page 227

1   or not?

2       A.      Not only did I look at them, but I

3   read the FDA statements and cited them in my

4   report.

5       Q.      Did you look in your model to see if

6   those events had any impact on expenditures for

7   prescriptions?

8       A.      No, I did not.  I made a judgment that

9   they were not as significant as such events as

10  black box warnings and withdrawals.

11      Q.      So to the extent that there were other

12  events such as FDA Advisory Committee and

13  resulting publicity, FDA advisory statements put

14  out about Celebrex and Bextra that influenced

15  physicians and patients to use less Celebrex and

16  Bextra, you have not attempted to identify the

17  magnitude of those effects, correct?

18              MR. DUGAN:  Objection.  Asked and

19  answered.

20      A.      There were many sources of information

21  in the marketplace, including but not limited to

22  publicity about the results of trials and

23  actions at the FDA.  Before doing the analysis

24  and not after the fact, I had isolated what I

Jeffrey E. Harris, M.D., Ph.D.

Page 228

1    considered to be the most significant and

2    attempted to take them into account and reach

3    the conclusions that are reflected in appendix

4    table H.

5            To the extent that I failed to take

6    any significant event into account, it is indeed

7    not accounted for in my analysis.

8            BY MR. ISMAIL:

9        Q.    The DUR edit that you have in table H

10   does not reflect any effect on Vioxx, correct?

11       A.    Vioxx was already off the market at

12   the time.

13       Q.    So it was definitional, right?  There

14   was nothing in table H when you analyzed the

15   Xponent data on the DUR edit that can tell us

16   specifically anything about Vioxx, right?

17       A.    If the results in table H are to be

18   used to project anything about Vioxx, it will be

19   Plaintiff's counsel's obligation to develop the

20   facts that justify the projection from the case

21   of Bextra and Celebrex to any other drug, but

22   it is not something I've done.

23       Q.    Nor have you identified or given

24   opinion as to what adjustments would be