# EXHIBIT 3



INTERNATIONAL

# EXPERT REPORT OF STEVEN N. WIGGINS

### SUBMITTED IN THE MATTER OF:

*The State of Louisiana, ex rel. James D. Caldwell, Attorney General,*

*v.*

*Merck Sharpe & Dohme Corp.*

**Submitted By**

**Steven N. Wiggins**

**Senior Consultant**

**CRA International, Inc.**

**1716 Briarcrest Drive, Suite 600**

**Bryan, Texas   77802**

**Date:  January 21, 2010**

Charles River Associates                                    January 21, 2010

## I.    INTRODUCTION

1.      My name is Steven N. Wiggins.  I am a Professor of Economics at Texas A&M
        University.  I received my B.A. from Oklahoma State University in 1975 and my Ph.D. in
        Economics from the Massachusetts Institute of Technology in 1979.  I have taught at
        Texas A&M since that time.  My fields of specialization include Industrial Organization
        and Econometrics.  My Curriculum Vitae is attached as Exhibit A.

2.      My research has been funded by public and private entities including the National
        Science Foundation, the Federal Trade Commission, and the Sloan Foundation.  My
        research has been published in leading journals in economics, including the *American
        Economic Review* and the *Journal of Political Economy*.  I have also served as an
        editorial board member for the *Journal of Regulatory Economics* and the *Journal of
        Corporate Finance*.  I have refereed for over twenty journals including the *American
        Economic Review*, the *Journal of Political Economy*, and the National Science
        Foundation.

3.      I have conducted research in the pharmaceutical industry for more than thirty years,
        beginning with my Ph.D. dissertation at MIT.  My pharmaceutical research has covered a
        wide array of topics, including the drug development process, FDA regulation and the
        drug approval process, price competition, rates-of-return to pharmaceuticals, and the
        quality of new drugs.  My research in this industry has been funded by various entities,
        including the National Science Foundation, the Sloan Foundation, and the Office of
        Technology Assessment.  My pharmaceutical research has been published in leading
        economics journals such as the *Review of Economics and Statistics* and *Economic
        Inquiry*.  I have presented the results of my research at leading universities throughout the

United States and at national and international symposia.  I have also refereed

pharmaceutical research papers for leading economics journals and for the National

Science Foundation, advising editors of leading journals and funding agencies regarding

the merits of a particular works and the soundness of their methodologies.

4.      I also provide consulting and expert services to companies in varied circumstances.  My

consulting work has included assignments dealing with damages, damage methodologies,

class certification, intellectual property, antitrust, and contracting issues.  As an economic

expert, I have rendered opinions regarding a wide variety of issues related to Industrial

Organization involving the health care industry including pharmaceuticals, hospitals, and

managed care.  I have also testified in matters involving the pharmaceutical industry.  A

list of the cases in which I have provided deposition or trial testimony in the past four

years is included in my Curriculum Vitae.

5.      I have been asked to investigate damages issues and address the analyses, methodologies,

and opinions of Plaintiff's economic expert, Dr. Jeffrey E. Harris.  In particular, I have

been asked to investigate damages issues and whether Dr. Harris' analyses and

methodologies form a reliable basis for measuring economic damages related to Merck's

alleged behavior.  In reaching the conclusions expressed below, I have considered

numerous issues, including issues raised by Plaintiff and Plaintiff's experts.  Exhibit B

provides a list of the materials I have considered in connection with forming an opinion

in this matter.  In reaching the opinions set forth in this report, I also rely on my general

training in economics, my knowledge of pharmaceuticals and managed care industry

practices, as well as my teaching and research background in Industrial Organization,

Econometrics, and Economic Theory.  I am being compensated at the rate of $600 per hour for my billings on this case and I do not have a financial interest in the outcome.

## II.   SUMMARY OF CONCLUSIONS

- **Plaintiff does not offer a methodology for calculating economic damages**
  - Dr. Harris does not offer an opinion on economic damages nor does he offer a reliable methodology through which damages can be measured.
  - The various calculations provided in Dr. Harris' report cannot be used to reliably estimate economic harm to Louisiana and Louisiana Department of Health and Hospitals caused by Merck's alleged wrongdoing.
  - Dr. Harris acknowledges that adjustments may be required before using his calculations to estimate damages, but Dr. Harris does not offer a methodology or a factual foundation by which such adjustments could be made.

- **Plaintiff does not identify what would have occurred "but-for" Merck's alleged wrongdoing**
  - Dr. Harris' calculations refer to legal theories appearing to assert that events occurring in 2004 and 2005 would have occurred in March 2000 but-for Merck's alleged wrongdoing.  Dr. Harris offers no factual foundation to support such an assertion.
  - Dr. Harris does not tie any of his calculations to any but-for world of an alleged earlier withdrawal of Vioxx.
  - Dr. Harris offers no reliable evidence to support the assertion that Vioxx would have remained on the non-Preferred Drug List after June 14, 2003.
  - Even if Plaintiff demonstrates certain events would have occurred earlier, Plaintiff has not offered a methodology for calculating the damages associated with such events.

- **Dr. Harris' programs contain serious methodological and programming errors rendering his calculations inappropriate and unreliable**
  - Dr. Harris' Aggregate Expenditure analysis fails to account for patients receiving alternative treatment and does not account for dispensing fees.
  - Dr. Harris' arbitrarily removes relevant data from his cohort analyses, thereby biasing his sample and rendering his results inappropriate and unreliable.
  - Dr. Harris improperly measures effects associated with the Vioxx withdrawal by incorrectly including the effects of several other events.
  - Dr. Harris' Bextra-Celebrex cohort analyses contain significant programming errors rendering his results wholly unreliable.

Charles River Associates                                          January 21, 2010

## III.   BACKGROUND AND OVERVIEW

### A.   NSAIDs, Vioxx, and Other Cox-II Inhibitors

6.   Non-steroidal Anti-inflammatory Drug products ("NSAIDs") are used to treat pain and

inflammation.[1]  There are a number of different NSAID products approved and marketed

in the United States.  These products can be divided into two subcategories including

non-selective NSAIDs and Cox-II inhibitors.  Both types of NSAIDs relieve pain and

inflammation by blocking an enzyme called cyclooxygenase.  This enzyme comes in two

forms, Cox-I and Cox-II.  Non-selective NSAIDs block both Cox-I and Cox-II, while

Cox-II inhibitors selectively block only the Cox-II enzyme.

7.   Three drugs that selectively block only the Cox-II enzyme ("Cox-IIs") were developed

and approved for sale in the United States.  The first marketed drug of this type, Celebrex

(celecoxib), was approved for sale by Pfizer in the United States on December 31, 1998.[2]

Shortly thereafter, in May 1999, Merck began marketing the Cox-II inhibitor Vioxx

(rofecoxib).  Vioxx was initially approved by the FDA to be used in the treatment of

osteoarthritis, acute pain, and menstrual pain.[3]  The final Cox-II inhibitor to be marketed

in the United States, Bextra (valdecoxib), another Pfizer product, was approved for sale

on November 16, 2001.[4]  By selectively blocking only the Cox-II enzyme, the Cox-II

inhibitors were believed to be able to reduce pain like other NSAIDs but with reduced

gastrointestinal side effects.

8.   Merck voluntarily withdrew Vioxx from the United States drug market on September 30,

2004.  Bextra was later withdrawn on, or shortly after, April 7, 2005 at the request of the

---

[1] http://www.fda.gov/cder/drug/analgesics/QandAanalgesics.htm and
http://www.fda.gov/cder/meeting/acetaminophen/Questions_Answers.htm.
[2] http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=020998&TABLE1=OB_Rx.
[3] http://www.fda.gov/bbs/topics/ANSWERS/ANS00956.html.
[4] http://www.fda.gov/cder/foi/nda/2001/21-341_Bextra.htm.

4

Charles River Associates                                              January 21, 2010

FDA because of adverse skin reactions.[5]  Importantly, the FDA's determination regarding Bextra's propensity to cause fatal skin reactions and withdrawal did not apply to Vioxx and Celebrex.  Bextra was the only Cox-II determined to have serious adverse skin reactions thus warranting removal from the U.S. market.[6]

9.    Several events involving the release of new information affecting the entire NSAID class of drugs occurred in late 2004 and early 2005.  The information included safety concerns for Cox-IIs and non-selective NSAIDs including naproxen.  Below is a list of various events occurring in late 2004 and early 2005:

- December 9, 2004: The FDA approves a new label for Bextra that adds additional warnings about possible heart and blood clotting problems and also addressed an increased risk of potentially deadly skin disorders associated with the use of Bextra.[7]
- December 17, 2004: FDA announces halting a Celebrex clinical trial because of increased risk for cardiovascular events.[8]
- December 2004:  The ADAPT trial is halted following apparent concern surrounding increased risk of cardiovascular events from use of naproxen.  The trial is never completed.[9]
- December 23, 2004: FDA releases a "Public Health Advisory" regarding all NSAIDs.  The advisory outlined the possible association between cardiovascular events and the use of all NSAIDs including Cox-IIs and non-selective NSAIDs.  The advisory discussed results for a long term clinical trial indicating possible increased cardiovascular risks for naproxen as compared to a placebo.  The advisory also discussed the cardiovascular risk of over-the-counter NSAIDs.[10]

---

[5] http://www.fda.gov/cder/drug/InfoSheets/HCP/valdecoxibHCP.htm.
[6] "The increased risk of serious adverse CV events alone, however, would not be sufficient to warrant withdrawal of Bextra since we have no data showing that Bextra is worse than other NSAIDs with regard to CV risk. Our recommendation for withdrawal is based on the fact that, in addition to this CV risk, valdecoxib already carries a boxed warning in the package insert for serious, and potentially life-threatening, skin reactions (e.g., toxic epidermal necrolysis, Stevens-Johnson syndrome, erythema multiforme) and FDA has received 7 spontaneous reports of deaths from these reactions." See Memorandum from John K. Jenkins of the Food and Drug Administration, April 6, 2005 on *"Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risks,"* p. 17, available at http://www.fda.gov/cder/drug/infopage/COX2/NSAIDdecisionMemo.pdf. (hereafter "FDA NSAID Memo").
[7] http://www.fda.gov/drugs/drugsafety/postmarketdrugsafetyinformationforpatientsandproviders/ucm106255.htm
[8] http://www.fda.gov/newsevents/newsroom/pressannouncements/2004/ucm108384.htm
[9] http://www.rheumatology.org/publications/hotline/0305COX2.pdf,
http://www.theheart.org/article/375785.do, http://www.medscape.com/viewarticle/538165.
[10] http://www.fda.gov/Drugs/DrugSafety/PublicHealthAdvisories/ucm051900.htm

Charles River Associates                                             January 21, 2010

- February 16 – 18, 2005:  Joint Meeting of the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee.  At this committee meeting 32 out of 32 doctors surveyed stated that use of any of the three Cox-IIs increased risk for cardiovascular events.  The survey indicated 17 of 32 doctors believed the benefits of Bextra outweighed the increased risks of any negative side effects.  The committee also unanimously voted for new labeling standards for Cox-IIs regarding cardiovascular risks.[11]

- March 1, 2005:  LADHH implements prospective deny edit on Cox-II prescriptions for patients who do not meet a specific set of criteria.[12]

**B.      The Louisiana Medicaid Program**

10.      Medicaid is a state and federal cooperative venture that provides medical coverage to eligible needy persons. State and federal governments share the costs of providing Medicaid benefits to eligible enrollees.[13]  Between fiscal years 1999 and 2004, the federal government funded approximately 70 percent of the cost of the Louisiana Medicaid program while the State funded the remaining portion.[14]

11.      Prior to 2002, the Louisiana Medicaid program operated an open formulary without any restrictions so that any FDA approved drug could be prescribed and dispensed and paid for by Medicaid, except for certain limited categories that are not relevant here.[15]  The Louisiana legislature approved the implementation of a Preferred Drug List ("PDL") which became effective in June 2002.

---

[11] Joint Meeting of the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee; Hilton, 620 Perry Parkway, Gaithersburg, MD; February 16, 17, and 18, 2005 "Talking Points and Meeting Minutes." http://www.fda.gov/OHRMS/DOCKETS/AC/cder05.html#DrugSafetyRiskMgmt
[12] Louisiana Drug Utilization Review Board, Chronic Pain Disorders: Appropriate use of COX2 Inhibitors (pp. 4-5), in Louisiana Drug Utilization Review Board Meeting Minutes (Terrebonne Deposition Exhibit 25), January 26, 2006: Baton Rouge LA.
[13] Deposition of Ben Bearden, October 12, 2009, at pp. 30-31.
[14] The federal government funded 80 percent for an approximately one-year period around 1996.  The federal government funding reverted to 70 percent of total Medicaid expenditures thereafter.  See Deposition of Ben Bearden, October 12, 2009, at pp. 31-32.
[15] Deposition of Ben Bearden, October 12, 2009, at p. 42.

Charles River Associates                                      January 21, 2010

C.    **Vioxx, the LADHH, P&T Committee, and the DUR**

12.    The Medicaid Pharmacy Benefit Program in Louisiana is administered by LADHH.

Prior to June 10, 2002, LADHH administered its Medicaid Pharmacy Benefit Program

using an open formulary without restrictions.[16]  LADHH provided reimbursement for all

prescription drugs that were approved by the FDA.[17]  Prescription drugs were added to

the formulary based on FDA approval and without review by LADHH.  During the open

formulary period, limitations were generally only placed on prescription drug

reimbursements by the DUR process in the case of a "lock-in" situation – a situation

involving suspected doctor or patient level abuse.[18]  Between its initial FDA approval in

1999 and June 10, 2002, "all Vioxx prescriptions within the Medicaid system were

automatically reimbursed" by LADHH.[19]

13.    In accordance with 42 CFR Subpart K (part of the federal ***Omnibus Budget***

***Reconciliation Act of 1990***) Louisiana established a Drug Utilization Review (DUR)

program in January of 1991.[20]  The prospective DUR screening program in Louisiana

was limited to a review of a patient's profile primarily to identify potential abuse.  At the

time a pharmacist dispenses a drug, the pharmacist is required to screen for the following:

incorrect dosages, drug allergies, duration of therapy, clinical abuse and misuse,

therapeutic duplication, and drug-drug and drug-disease interactions.[21]

14.    Prospective clinical DUR edits were used "to address special areas of concern."  The first

prospective DUR edit in Louisiana began in 1997 and covered gastrointestinal disorders

---

[16] Deposition of Ben Bearden, October 12, 2009, p. 41.
[17] Deposition of Ben Bearden, October 12, 2009, p. 42-43.
[18] See, for example, Deposition of Ben Bearden, October 12, 2009, p. 43 and Deposition of Gina C. Biglane, Pharm. D., October 28, 2009, pp. 27-30.
[19] Deposition of Ben Bearden, October 12, 2009, p. 183. See also Deposition of Charles F. Castille, Thursday, December 10, 2009, pp. 26, 30-32, 45-49.
[20] http://www.lamedicaid.com/providerupdate/provider_update1292.htm
[21] http://www.lamedicaid.com/providerupdate/provider_update1292.htm

and required the prescriber's diagnosis for use of acute dosages of gastric-acid reducing agents beyond sixteen weeks.[22]  The next prospective DUR edit was implemented in 2001, requiring "discussion with and approval from the prescriber" for prescriptions of therapeutic duplicates within six classes of drugs including NSAIDs.  Another prospective drug edit implemented in 2001 involved prescriptions for drugs in "FDA Pregnancy Category X" for patients who are pregnant.  Pain disorders and behavioral health were added to the LADHH prospective drug edits in 2005.  The pain disorder edit provided rules and guidelines for prescribers of Cox-IIs.[23]  No DUR prospective deny edit was implemented relating to clinical safety or benefits of Vioxx or any other Cox-II or NSAID prior to 2005.[24]

15.     In 2001, the Louisiana state legislature passed Act 395 allowing the use of a Prior Authorization ("PA") process and a PDL for administration of its prescription drug benefits.[25]  Oversight of the PA process was conducted through the "Medicaid Pharmaceutical and Therapeutics Committee" ("P&T Committee").  The P&T Committee held its initial meeting to create a plan for the development of a PDL formulary on August 8, 2001.[26]

---

[22] State of Louisiana Department of Health and Hospitals, "Drug Utilization Review Annual Report," prepared by Unisys, June 30, 2008, at pp. 5-6.
[23] State of Louisiana Department of Health and Hospitals, "Drug Utilization Review Annual Report," prepared by Unisys, June 30, 2008, at p. 6.
[24] See, for example, Deposition of Gina C. Biglane, Pharm. D., October 28, 2009, pp. 38-40 and Deposition of Ben Bearden, October 12, 2009, pp. 33-34, 44, and 248-249.  Dr. Joseph Adams, a P&T Committee member asked whether there had been "any discussion in terms of using step therapy in this [Cox-II] class?"  Dr. Vincent Culotta, also a P&T Committee member, responded that "…if you want to make a recommendation to [LADHH]…we can, as a committee, recommend that, but this is not the place to make that determination."  Transcript of the Testimony of Hearing, Medicaid Pharmaceutical & Therapeutics Committee Hearing, May 21, 2003 (LaAG-VIOXX-000376 through 000459 at 000422).  See also Louisiana Department of Health and Hospitals, Medicaid P&T Committee Meeting Minutes, May 21, 2003.
[25] LADHH Letter from David W. Hood to Drug Manufacturers Participating in the Federal Drug Rebate Program, "Re: Act 395 of 2001 Regular Legislative Session" dated November 9, 2001.
[26] Deposition of Ben Bearden, October 12, 2009, p. 85.

16.     The PA process created a list of specific drugs from particular therapeutic classes to either remain on the PDL or be removed and placed on the Non-Preferred Drug List ("NPDL").[27] According to this plan "all drugs which [were] currently covered [would] remain on payable status without requiring prior authorization until the Pharmaceutical and Therapeutics Committee reviews drugs or therapeutic classes."[28] In effect the Louisiana open formulary would continue until the P&T Committee could review specific therapeutic classes and develop a PDL.

17.     Once reviewed, drugs that remained on the PDL would continue to be automatically reimbursed. Drugs on the NPDL would require PA from LADHH for reimbursement. The Louisiana PA system was modeled closely after the existing Florida PA system and was primarily used as a cost saving device not as a device to limit FDA approved use of a product based on actual or perceived safety issues.[29]

18.     The LADHH used prior authorization to control costs by encouraging drug manufacturers to provide supplemental rebates in order for drugs to be placed on the PDL.[30] The LADHH originally contracted with the University of Louisiana at Monroe College of Pharmacy to develop and administer the prior authorization program. If a prescriber wanted to prescribe a drug on the NPDL, the prescriber would call pharmacists on staff at the University of Louisiana at Monroe to request reimbursement of the drug. The administrators would "discuss the drug that [the prescriber] was recommending and other drugs that were on the PDL that could be just as effective as the drug he was

---

[27] Letter from Ben A. Bearden to Prescribing Practitioners and Pharmacy Providers, May 24, 2002, available at http://www.lamedicaid.com/provweb1/forms/rxpa/PDLLetter.pdf.
[28] Deposition of Ben Bearden, October 12, 2009, p. 94-95.
[29] Deposition of Ben Bearden, October 12, 2009, p. 55-56.
[30] See Deposition of Charles F. Castille, Thursday, December 10, 2009, pp. 32, 56, and 78.

prescribing."[31]  The prior authorization program in Louisiana was not used to limit the choice of drugs based on clinical factors.  In fact, according to the testimony of Ben Bearden, prior authorization administrators would not deny an authorization request.[32]

19.   At the March 6, 2002 P&T committee meeting, the state of Louisiana contracted with Provider Synergies to aid the P&T Committee with the implementation of the PDL.[33] Provider Synergies claims to be a "premier company in the management of Preferred Drug Lists (PDLs) and the negotiation of Supplemental Rebates for state Medicaid agencies."[34]  Provider Synergies replaced the University of Louisiana at Monroe College of Pharmacy for the implementation and development of the PDL by gathering, analyzing, and presenting information regarding cost and effectiveness of drugs in each therapeutic class to committee members.[35]  Provider Synergies would also present the P&T Committee with recommendations regarding the inclusion of drugs on the PDL and the P&T Committee would then recommend to LADHH which drugs should be included on the PDL.  LADHH would then issue final approval of the PDL.

20.   Prior to each meeting with the P&T Committee, Provider Synergies would negotiate supplemental rebates with manufacturers.  Provider Synergies would also prepare detailed monographs for drug classes including analysis of various drugs and clinical information such as independent reviews, peer reviewed studies, and current FDA labeling.[36]

---

[31] Deposition of Ben Bearden, October 12, 2009, p. 78.
[32] Deposition of Ben Bearden, October 12, 2009, p. 78.
[33] Louisiana Department of Health and Hospitals, Medicaid P&T Committee Meeting Minutes, March 6, 2002, p. 3 and Louisiana Department of Health and Hospitals, Medicaid P&T Committee Meeting Minutes, May 8, 2002, p. 2. See Deposition of Charles F. Castille, December 10, 2009, pp.49-54.
[34] http://www.providersynergies.com/
[35] See, for example, Deposition of Gina C. Biglane, Pharm. D., October 28, 2009, pp. 43-45 and 60-66.  See also Deposition of Charles F. Castille, December 10, 2009, pp.40-42.
[36] See, for example, Exhibits 12, 16, and 26 to the Deposition of Charles F. Castille, December 10, 2009.

21.  On May 8, 2002, the P&T Committee held its first review of Cox-IIs.  Provider Synergies recommended that Bextra and Celebrex be placed on the PDL and that Vioxx be placed on the NPDL.[37]  The P&T Committee agreed with the recommendations.[38]  Vioxx was placed on the NPDL effective June 10, 2002.[39]  Vioxx was initially placed on the NPDL in June 2002 for cost reasons and because Merck had declined to participate in supplemental rebates at that time.[40]

22.  On May 21, 2003, the P&T Committee held its second review of Cox-IIs.  At the May 2003 meeting, Provider Synergies recommended that Vioxx be added to the PDL and Celebrex be placed on the NPDL.[41]  The Provider Synergies monographs and presentations provided to the P&T Committee discussed medical research and data related to the risks and benefits regarding Cox-IIs including Vioxx.[42]  For example, a representative for Provider Synergies noted, "[t]here are cardiovascular concerns with the COX-2 products at this point."[43]  Provider Synergies recommended Mobic, Bextra, and Vioxx be kept on the PDL, while Celebrex remain on the NPDL.  The P&T Committee accepted Provider Synergies' recommendations and the LADHH approved these recommendations.[44]  Vioxx was placed on the PDL effective July 14, 2003.[45]

---

[37] Deposition of Ben Bearden, October 12, 2009, p. 172-173.
[38] Deposition of Ben Bearden, October 12, 2009, p. 173.
[39] Letter from Louisiana Department of Health and Hospitals to Prescribing Practitioners and Pharmacy Providers, May 24, 2002 (LaAG-VIOXX-002294).
[40] Transcript of Medicaid Pharmaceutical & Therapeutics Committee Hearing, May 8, 2002 (LaAG-VIOXX-002608 through 002668 at 002643-002645). See also Deposition of Charles F. Castille, December 10, 2009, pp. 56-57.
[41] Deposition of Ben Bearden, October 12, 2009, p. 197.  See also Deposition of Charles F. Castille, December 10, 2009, pp. at 57.
[42] "Nonsteroidal Anti-inflammatories (NSAIDs)," prepared by Provider Synergies, April 2003 (LaAG-VIOXX-003338 through 003352 at 003347). ).  See also Deposition of Ben Bearden, October 12, 2009, p. 194-198.
[43] Transcript of the Testimony of Hearing, Medicaid Pharmaceutical & Therapeutics Committee Hearing, May 21, 2003 (LaAG-VIOXX-000376 through 000459 at 000421-000425).  Medicaid P&T Committee Meeting Minutes, May 21, 2003, p. 10.
[44] Transcript of the Testimony of Hearing, Medicaid Pharmaceutical & Therapeutics Committee Hearing, May 21, 2003 (LaAG-VIOXX-000376 through 000459 at 000421-000425).  Medicaid P&T Committee Meeting Minutes, May 21, 2003, p. 10.

Charles River Associates                                                                    January 21, 2010

23.     On December 17, 2003, the P&T committee addressed Celebrex's absence from the PDL, cardiovascular risks associated with Vioxx, and a new package insert.  No changes were made to the Cox-II PDL at that time.[46]

24.     On May 5, 2004, the P&T Committee once again reviewed Cox-IIs.  Provider Synergies reported to the P&T Committee that Provider Synergies "did go back to the manufacturer for Celebrex.  They did offer some additional rebate to the State of Louisiana.  However, at this point, Celebrex still remains the premium-priced product in the category…At this point, the recommendation that we're making is that we maintain the PDL as it is with all of the generics, Bextra, Mobic, Ponstel and Vioxx as PDL products."  The P&T Committee accepted the recommendations from Provider Synergies.[47]

25.     On August 11, 2004 the P&T Committee addressed the NSAID and Cox-II classes for a fourth time.  At that time, the P&T Committee agreed to add Celebrex to the PDL along with Vioxx and Bextra.  The effective date of Celebrex being added to the PDL was October 1, 2004.[48]

**D.      Plaintiff's Assertions Regarding Safety Information Allegedly Withheld by Merck**

26.     In this matter, the State of Louisiana alleges that Merck defrauded the Louisiana Medicaid program through deceptive marketing practices by misrepresenting the safety and benefits of Vioxx, including suppressing information about the cardiovascular risks

---

[45] LaAG-VIOXX-002333.
[46] See Transcript of the Testimony of Hearing, Medicaid Pharmaceutical & Therapeutics Committee Hearing, December 17, 2003 (LaAG-VIOXX-000460 through 000536 at 000506). See also Transcript of the Testimony of Hearing, Medicaid Pharmaceutical & Therapeutics Committee Hearing, May 5, 2004 (LaAG-VIOXX-000537 through 000639 at 000550-000552).
[47] Transcript of the Testimony of Hearing, Medicaid Pharmaceutical & Therapeutics Committee Hearing, May 5, 2004 (LaAG-VIOXX-000537 through 000639 at 000550-000553).
[48] See Deposition of Charles F. Castille, December 10, 2009, pp. 101-102.

of Vioxx.[49]  Thus Plaintiff claims that Merck allegedly withheld Vioxx safety and benefit information, causing harm to Plaintiff.

27.     None of Plaintiff's experts, including Dr. Harris, address any damages or costs associated with non-Medicaid Louisiana consumers of Vioxx.  In fact, Dr. Harris strictly confines his attention to expenditures by Louisiana Medicaid.  There is also no attempt by Dr. Harris to analyze what effect, if any, Merck's marketing activities had on prescriptions, market share, or costs to Louisiana Medicaid or to Louisiana citizens who received Vioxx.

## IV.  PLAINTIFF OFFERS NO METHODOLOGY FOR DETERMINING ECONOMIC DAMAGES

### A.     Overview of Calculating Economic Damages

28.     Economic damages are generally measured by comparing what actually occurred to what would have occurred "but-for" a Defendant's alleged behavior.  It is my understanding Plaintiff alleges that Merck withheld information regarding the safety and benefits of Vioxx.  In this matter economic damages must be measured by comparing Plaintiff's actual expenditures to the amount Plaintiff would have spent "but-for" Merck's alleged wrongdoing.  The first step in the process is to understand how behaviors or actions would have been different in the "but-for" world.

29.     Hence defining a "but-for" world is central to any measure of economic damages.  In this case damages would consist of the difference between actual LADHH expenditures and such expenditures in a but-for world, that is, expenditures incurred but-for the alleged wrongdoing.  Dr. Harris does not offer opinions regarding the but-for world.  Indeed, Dr.

---

[49] Plaintiff's Second Supplemental and Amending Complaint for Injunctive Relief and Damages, May 11, 2009 ("Complaint").

Harris does not provide any description or statement of what would have been different in the but-for world. As a result, Dr. Harris cannot and does not measure the difference between actual and but-for expenditures and does not offer a damages calculation. Dr. Harris, moreover, does not attempt to identify a methodology for linking any of his calculations of various "regulatory interventions" with *any* but-for world.[50]

## B.      Dr. Harris Provides No Methodology to Calculate Economic Damages

30.     Dr. Harris offers a series of calculations purportedly addressing specific questions posed by Plaintiff's counsel. Specifically, Dr. Harris was asked to: i) calculate "total expenditures on Vioxx, net of rebates" by LADHH; ii) calculate "what would have been the reduction in total expenditures on Vioxx, net of rebates" by LADHH "if Vioxx had been withdrawn from the U.S. market in March 2000"; iii) calculate the "impact of the decision [by LADHH]…to exclude Vioxx from its PDL"; iv) calculate the impact of LADHH's DUR program on LADHH expenditures on Bextra and Celebrex; and v) determine whether the withdrawal of Vioxx in September 2004 resulted in a compensating increase in LADHH expenditures on other NSAIDs or Cox-IIs.[51]

31.     Dr. Harris conducts a series of analyses attempting to measure the impact of these actual events, including the movement of Vioxx to NPDL status in June 2002 and its voluntary withdrawal in September 2004. Dr. Harris, however, has made no attempt to use his calculations to estimate damages. Dr. Harris, in general, does not apply his calculations

---

[50] The term "regulatory interventions" is used herein in the same way as used by Dr. Harris (Harris Report, p. 14, ¶28).
[51] Harris Report, pp. 3-4, ¶7.

of the impact of his so-called "regulatory interventions" to any alternative period,[52] or use those calculations to calculate but-for LADHH expenditures under any scenario.

32.    Dr. Harris does not offer the opinion that Vioxx would have been voluntarily withdrawn or otherwise removed from the market at any time prior to its actual withdrawal in September 2004.  He also does not tie any of his calculations to any such withdrawal.

33.    Dr. Harris also cites no evidence or method indicating that Vioxx's PDL status more-likely-than-not would have changed in the but-for world or that Vioxx more-likely-than-not would have been withdrawn from the market at an earlier time.  Vioxx could not have been placed on the NPDL prior to 2002 since the Louisiana PDL did not exist.  Further, no available evidence indicates LADHH would have made different decisions regarding Vioxx's inclusion or exclusion from the PDL had the information allegedly withheld by Merck been known earlier.[53]  Hence Vioxx would likely have remained on the PDL in Louisiana during the period in which it was on the PDL, and there would be no economic damages to the State of Louisiana.

34.    Similarly, Dr. Harris cites no evidence or method indicating that LADHH would more-likely-than-not have instituted a prospective DUR step edit program for Vioxx or Cox-IIs at an earlier date.  Dr. Harris, moreover, cites no evidence or method that would link any of his calculations to any injury sustained by Louisiana.

35.    In addition, these events and Dr. Harris' calculation of their effects cannot be directly used to calculate damages under any legal theory of damages that would assert a but-for

---

[52] The single exception is when Dr. Harris' estimates the purported effect of Vioxx's placement on the NPDL from June 10, 2002 through July 14, 2003, and to apply his estimate to a hypothetical scenario where Vioxx remains on the NPDL from July 14, 2003 until its voluntary withdrawal in September 2004. See Harris Report, pp. 10-11. This calculation is discussed later.

[53] See, for example, Provider Synergies, L.L.C., "Selective Cyclooxygenase (COX)-2 Inhibitors," February 2002, at p. 6. See also Transcript of the Testimony of Hearing, Medicaid Pharmaceutical & Therapeutics Committee Hearing, May 21, 2003 (LaAG-VIOXX-000376 through 000459 at 000421-000425).  Medicaid P&T Committee Meeting Minutes, May 21, 2003, p. 10.

period beginning in March 2000.  Bextra, for example, did not exist in the market in
March 2000, yet Dr. Harris' calculations necessarily measure patients using Bextra and
more generally his calculations are influenced by Bextra's presence.  There also existed
different competing drugs with different pricing and different rebate structures in 2005
than in 2000.  Perhaps most important, the entire structure of information changed
between 2000 and 2005.  For example, Pfizer and others conducted studies, and much
data emerged from third party evaluations of clinical data.  The information from these
studies and evaluations, which likely affected users and prescribers of pain relievers
included in Dr. Harris' models, would not have been available in 2000.

36.   Hence Dr. Harris' calculations measuring the effects of certain events occurring in one
period would require very substantial adjustments before they could be used to measure
but-for sales in other periods.  Dr. Harris acknowledges as much, stating that "[t]he extent
of the compensating increase in… [other] expenditures might have been different if
Vioxx had been withdrawn from the U.S. market earlier."[54]  Dr. Harris acknowledges that
the effects he measures "might have been different" in an earlier time.  This
acknowledgement means his calculations regarding the impact of Vioxx's withdrawal
cannot be applied to an earlier date.  It is important to note that Dr. Harris has similarly
not offered any opinions regarding how changes in the PDL status of Vioxx could be
measured at any time before June 2002.  Dr. Harris has also not offered any opinions
regarding how a DUR prospective deny edit for Vioxx could be measured.  Further, no
expert from Plaintiff has offered a methodology by which one can use Dr. Harris'
calculations to estimate economic damages.

---

[54] Harris Report, p. 19.

37.    Thus, Plaintiff does not provide any measure of economic damages, or any methodology
       by which to assess damages.

## V.    DR. HARRIS' CALCULATIONS ARE NOT A RELIABLE MEASURE OF ECONOMIC DAMAGES

38.    Holding aside that Dr. Harris offers no methodology for linking his calculations to
       economic damages, I now turn to Dr. Harris' specific calculations to identify significant
       flaws rendering his calculations economically inappropriate and unreliable.

### A.    Aggregate Vioxx Expenditure Analysis

39.    The first data analysis performed by Dr. Harris is based on "aggregate" Vioxx
       expenditures by LADHH.  Dr. Harris calculates the total aggregate expenditures by
       LADHH from June 2, 1999 through October 1, 2005.[55]  These expenditures are then
       adjusted by subtracting the rebates received by LADHH for Vioxx prescriptions.[56]  Dr.
       Harris does not appear to account for dispensing fees (see below).

40.    Dr. Harris also estimates two linear trend models designed to determine the impact of
       particular events on LADHH expenditures on Vioxx.  Both models use aggregate
       Louisiana Medicaid data regarding total expenditures on Vioxx.[57]

41.    The first linear trend model is estimated using data from when Vioxx was on the NPDL.[58]
       Dr. Harris then projects Vioxx expenditures from July 14, 2003 until Vioxx was

---

[55] The Louisiana Medicaid Claims Data includes claims for this period.  See Dr. Harris' workpapers, "Louisiana Medicaid Vioxx Expenditures through Mar-2000.log" at lines 6-8.

[56] Harris Report, pp. 9-10.

[57] See Harris Report, pp. 10-12.

[58] Dr. Harris uses data from July 2002 through June 2003.  See Dr. Harris workpapers, "Projected Louisiana Medicaid Vioxx Payments under Continued NPDL.log" at lines 9-10.  It should be noted that Dr. Harris appears to exclude June 2002 from his aggregate trend analysis and to apply July 2003 to the Vioxx PDL period.

voluntarily withdrawn under the hypothetical assumption that Vioxx had remained on the NPDL.[59]

42.      The second linear trend model performed by Dr. Harris attempts to measure the impact of Vioxx NPDL status on LADHH Vioxx expenditures during the period June 10, 2002 through July 14, 2003.  Specifically, Dr. Harris estimates trend changes in LADHH Vioxx expenditures using data from before Vioxx was placed on the NPDL and data from immediately after the NPDL period.[60]  Dr. Harris also uses data during Vioxx's NPDL period but includes a variable to measure the impact of NPDL status on expenditures during that period.  Dr. Harris then uses this trend to purportedly estimate Louisiana Medicaid expenditures on Vioxx if Vioxx had not been placed on the NPDL from June 10, 2002 through July 14, 2003.[61]

43.      Dr. Harris' aggregate linear trend analyses do not form a reliable basis on which to estimate economic damages.  First, Dr. Harris' aggregate calculations and projections do not account for alternative therapies and dispensing fees that would be incurred by LADHH in any but-for world.  Second, Dr. Harris fails to identify any but-for world to which his analyses could be applied or how they would be applied.  Third, if a but-for world was identified as, for example, the earlier withdrawal of Vioxx or Vioxx remaining on the NPDL after July 14, 2003, Dr. Harris does not identify the specific but-for world or how his models could be applied to such a but-for world.  As a result, Dr. Harris has not provided a damages analysis.

---

[59] See Harris Report, pp. 10-12, Figure 3, and relevant workpapers.
[60] Dr. Harris uses Vioxx expenditures from March 2001 through May 2002 and July 2003 through July 2004.  See Dr. Harris workpapers, "Projected Louisiana Medicaid Vioxx Savings during NPDL.log" at lines 8-9.
[61] See Harris Report, pp. 10-12, Figure 4, and relevant workpapers.

Charles River Associates                                                     January 21, 2010

1.   **Dr. Harris' aggregate Vioxx expenditure models do not account for
     alternative treatments and dispensing fees.**

44.   Dr. Harris' aggregate trend analyses cannot be used to measure economic damages to
      LADHH because they do not account for alternative treatments patients would have
      received if they did not receive Vioxx.  Dr. Harris' own report clearly demonstrates this
      conclusion.  His individual patient analyses show that the large majority of patients who
      did not receive Vioxx due to a "regulatory event" received another pain medication
      instead.  The cohort analyses conducted by Dr. Harris demonstrate that any reliable
      assessment of damages must account for these alternative therapies and their costs.
      Because reduced Vioxx expenditures are generally wholly or partially offset by increased
      expenditures on other drugs, Vioxx expenditures alone do not measure economic
      damage.  As a result, Dr. Harris' analyses based on aggregate Vioxx expenditures do not
      provide a measure of economic damages.

45.   Further, LADHH would bear dispensing fees for alternative prescriptions, which means
      there is likely to be minimal savings, if any, of dispensing fees in any but-for world
      where patients received another form of pain relief instead of Vioxx.  Louisiana Medicaid
      pays a dispensing fee to pharmacies for each prescription filled.[62]  Those patients who
      would not have received Vioxx in some but-for world would have likely received a
      prescription for another pain drug and Louisiana Medicaid would have paid the
      dispensing fees associated with filling those prescriptions.  Thus, Louisiana Medicaid
      would not have avoided the dispensing fees.  Of the approximately $18 million in Vioxx

---

[62] Dispensing fees are included in the Louisiana Medicaid claims data.

expenditures from April 1, 2000 through September 30, 2004, fully $1,583,894 represent dispensing fees.[63]

### 2.     Dr. Harris' linear trend analyses do not represent economic damages.

46.     Dr. Harris' first aggregate analysis attempts to measure the reduced expenditures on Vioxx if it had remained on the NPDL after July 14, 2003. Dr. Harris concludes that LADHH expenditures on Vioxx would have been approximately $2 million lower than actual expenditures. As noted above, Dr. Harris does not provide a methodology regarding how to use this calculation (even assuming it is correct) to estimate economic damages from either a withdrawal or any form of prior authorization requirement prior to June 2002.

47.     As with Dr. Harris' other aggregate calculations, his estimated $2 million does not include expenditures on alternative products, and so it does not measure damages. Specifically, Dr. Harris' own cohort analysis, which understates the increase in expenditures on other products (discussed below beginning in ¶72), indicates that 87 percent of reduced Vioxx expenditures during this period were required to pay for alternative therapies. Hence Dr. Harris' own calculations indicate that LADHH would have spent approximately $1,746,029 on other pain drugs, thus implying a net decrease in LADHH expenditures of $265,547.[64]

48.     Dr. Harris' second aggregate analysis attempts to measure reduced expenditures on Vioxx from its placement on the NPDL from June 10, 2002 through July 14, 2003. Dr.

---

[63] Calculated from Louisiana Medicaid Claims Data using service dates from April 2000 through June 2005. Dr. Harris calculates expenditures using "payment" from the Louisiana Medicaid Claims Data, which include dispensing fees. See letter from Douglas R. Plymale to Rebecca Bjork, December 14, 2009.

[64] $2,011,576 x [100% − 86.8%] => $2,011,576 x 13.2% = $265,547. See Harris Report, pp. 10-11 and workpapers, "Projected Louisiana Medicaid Vioxx Payments under Continued NPDL.log" for the $2,011,576 figure. See Harris Report, p. 16, ¶33 for the 87 percent figure. Any differences in final figures due to rounding.

Charles River Associates                                          January 21, 2010

Harris concludes that the NPDL status of Vioxx resulted in reduced LADHH Vioxx expenditures of $4.261 million.[65]  This analysis does not measure damages to LADHH. Specifically, these calculations do not account for alternative expenditures to affected patients and Dr. Harris provides no guidance regarding how to apply these calculations to any but-for world.  Hence they are not useful in measuring damages.

49.     In summary, Dr. Harris' aggregate Vioxx expenditure analyses as outlined in his report, even assuming they are correct, are not and cannot be applied to other periods, and do not measure damages to LADHH.

**3.      Aggregate expenditures on all NSAIDs do not show a decrease.**

50.     While Dr. Harris confines his attention to aggregate Vioxx expenditures, the LADHH data produced by Plaintiff permit a more comprehensive analysis of expenditures on all NSAIDs, including other Cox-IIs.  Thus, one can measure the impact of placing Vioxx on NPDL status on total expenditures for all NSAIDs and COX-II's.  This measure is the only economically relevant measure of the impact of the change in PDL status of Vioxx on LADHH expenditures because it accounts for the movement of patients to other products.

51.     Analysis of these aggregate expenditure data show no decline in total NSAID expenditures during the period Vioxx was on NPDL status compared to the period before June 2002 below.  Indeed, regression analysis on the aggregate data shows that there was no statistically significant difference in total expenditures before and during the period Vioxx was on NPDL status, even accounting for the trend in NSAID expenditures over

---

[65] Harris Report, p. 11, ¶21.

time.[66]  These results indicate that the NPDL status of Vioxx shifted expenditures to other selective and non-selective NSAIDs but did not reduce total LADHH expenditures.

52.     Similarly, focusing just on overall COX-II usage (Vioxx plus Celebrex plus Bextra, but no other NSAIDs), yields the same results; placing Vioxx on NPDL status did not reduce overall LADHH expenditures on COX-II's. These results indicate that the NPDL status of Vioxx shifted patients (and expenditures) from Vioxx to other Cox-IIs and NSAIDs, but did not reduce LADHH expenditures.

## B.     Cohort Analysis

53.     Dr. Harris uses his aggregate expenditure analysis to calculate LADHH expenditures. However, Dr. Harris acknowledges that his aggregate Vioxx expenditure analysis does not "take advantage of the individual-level transactions contained in the Louisiana Medicaid data."[67] Dr. Harris analyzes these data in what he calls a "cohort analysis" to calculate net changes in LADHH expenditures associated with various "regulatory interventions."

54.     Dr. Harris begins by substantially restricting the individual data he uses in his analysis. More specifically, he uses Louisiana Medicaid data to determine the date of the first Vioxx usage for each patient.  Dr. Harris identifies each patient who received another prescription for any kind in the claims data at least twelve months after the first Vioxx prescription.  Dr. Harris then discards the data for any patient who cannot be so identified.  Dr. Harris labels this dataset his "Vioxx Cohort."[68]  Even for the identified patients he kept in the data, Dr. Harris also discards data for all prescriptions received

---

[66] Detailed regression results using aggregate LADHH expenditures are included in Appendix 1.
[67] Harris Report, p. 12.
[68] Harris Report, pp. 12-16.

more than twelve months after the initial Vioxx prescription.  Both of Dr. Harris' data exclusions – patients whose data was limited to twelve months or less and all data beyond twelve months after a patient's first Vioxx prescription – are arbitrary, could lead to obvious biases, and reduce the scientific reliability of his results.  Further, to the extent that Dr. Harris sought to ensure continued Medicaid enrollment, which his statistical analysis did not require for reliability, he could have requested such information from Plaintiff.

55.     Dr. Harris does not offer a clear explanation regarding his restriction regarding use of just the first twelve months after the initial Vioxx prescription.  Dr. Harris' stated justification for this is that a one-year follow-up after the first prescription is a "compromise between the acute indications for anti-inflammatory drugs such as Vioxx…and the chronic indications."[69]  His analysis does not require such a "balance."  Instead what is required is for the data used to be representative of *all* LADHH expenditures.  By restricting the sample, Dr. Harris distorts the data used so that it does not accurately represent the true balance between chronic and acute use.  By keeping the first twelve months of data for each patient he likely oversamples acute usage patients.  Such oversampling – where short term usage patients constitute a greater percentage of his sample than the actual population – will lead to reduced reliability and possible bias.

56.     To see the error of Dr. Harris' analysis, note that Dr. Harris' methodology does not exclude purely acute usage.  For instance, Dr. Harris' methodology would not exclude an individual who received a Vioxx prescription in September 2000 for pain from a neck whiplash injury after an acute accident and then received Prevacid in September 2003 due to an ulcer.  Similarly, for a patient with osteoarthritis who got a Vioxx prescription

---

[69] Harris Report, p. 13.

filled every month between September 2000 and September 2003, Dr. Harris'
methodology would merely exclude two years' worth of relevant expenditures data for
this chronic Vioxx user.  These exclusions are arbitrary, substantial, and bias the sample.

57.    Exhibit C shows the extraordinary magnitude of Dr. Harris' exclusions.  In particular
note that:

- Dr. Harris removes 27.4 percent of all Vioxx users from his "Vioxx cohort."[70]

- For the patients remaining in his "Vioxx cohort," Dr. Harris removes an
  enormous 73.8 percent of their observations, those occurring after the initial
  12 months.[71]

- These restrictions in the sample he analyses result in Dr. Harris substantially
  overstating the savings that LADHH would have achieved from any reduced
  expenditures on Vioxx.

58.    Dr. Harris attempts to similarly construct a "Bextra-Celebrex Cohort."  There are,
however, significant programming errors in his analysis, rendering that analysis incorrect
and unreliable.  These errors are discussed in greater detail below.

### 1.    The purported effects calculated by Dr. Harris cannot be applied to earlier periods.

59.    Using his cohort, Dr. Harris purportedly estimates the change in average monthly
expenditures associated with certain "regulatory interventions."  The regulatory
interventions he considers include i) Vioxx's placement on the NPDL from June 10, 2002
through July 13, 2003; ii) Celebrex's placement on the NPDL from July 2003 through

---

[70] Harris Report, ¶27.  Of the 67,899 patient IDs in the data, 49,324 (or 72.6 percent) are included in Dr. Harris'
Vioxx cohort.
[71] Results are for Dr. Harris' 12-month Vioxx cohort sample.  See Exhibit C for additional detail and results from
Dr. Harris' 9-month and 18-month cohort samples.

Charles River Associates

January 21, 2010

September 2004, labeled Celebrex "NPDL1;" iii) Celebrex's placement on the NPDL from September 2005 through September 2007, labeled Celebrex "NPDL2;"[72] iv) Merck's voluntary withdrawal of Vioxx in September 2004; v) Pfizer's withdrawal of Bextra in April 2005; and vi) a series of other changes, such as DUR edits, black box warnings, and Hurricane Katrina in the summer of 2005.

60.    Dr. Harris, in particular, estimates that the placement of Vioxx on the NPDL purportedly reduced Vioxx expenditures by $8.56 per patient per month, but only reduced expenditures on all NSAIDs (Cox-IIs plus "other NSAIDs" as defined by the State) by $1.13 per patient per month.[73] Thus, Dr. Harris' results imply that the net effect of Vioxx's placement on the NPDL was a reduction in total NSAID and Cox-II expenditures of 13 cents for each dollar of reduced Vioxx expenditures ($1.13 is approximately 13 percent of $8.56). In contrast, Dr. Harris finds that the voluntary withdrawal of Vioxx in September 2004 purportedly resulted in a 43 percent reduction in total NSAID and Cox-II expenditures.[74]

61.    Even if one were to accept Dr. Harris' calculations regarding the impact of these two events as correct, they do not provide a basis for assessing damages caused by Merck's alleged behavior. As discussed above, Dr. Harris does not address the but-for world or explain how policy or actions would have differed from the actual world. Dr. Harris provides no analysis of how his estimates could or should be applied to determine how LADHH expenditures would have differed in the but-for world. Hence, his calculations cannot be used to measure damages. Further, the calculations provided by Dr. Harris can

---

[72] See, for example, Dr. Harris workpapers for his 12-month Vioxx cohort model in "Louisiana Medicaid Vioxx Cohort, Regression Models.log" at lines 61-68.
[73] Harris Report, Appendix Table F.
[74] Dr. Harris Reports a coefficient of -12.42 for his monthly four-medication class and -28.74 for Vioxx. Note that 12.42 is approximately 43 percent of 28.74. See Harris Report, Appendix Table F.

25

not be applied to an earlier period without first making necessary and significant adjustments. Dr. Harris does not make these adjustments or provide a method by which they should or could be made. As a result, Dr. Harris' calculations do not measure economic damages.

### 2.      Dr. Harris inappropriately measures the effect of the "Vioxx Withdrawal" on LADHH expenditures.

62.      If the Plaintiff's but-for world is an earlier withdrawal of Vioxx or an earlier placement of Vioxx on the NPDL, Dr. Harris' calculations do not constitute a basis to measure damages. For instance, one effect that Dr. Harris considers is the voluntary withdrawal of Vioxx on September 30, 2004. As noted, Dr. Harris estimates that this event reduced average monthly expenditures on the four drug class (all Cox-IIs and NSAIDs, excluding PPIs) by 43 percent. This measured effect, however, would not be applicable to a hypothetical Vioxx withdrawal at an earlier period, since events and information available in the marketplace would have been significantly different. Dr. Harris admits that the effects of the regulatory interventions he identifies in his analysis of the Vioxx withdrawal, and in his cohort analyses, more generally, cannot be used for earlier dates without adjustments. He further notes that results might have been different if Vioxx had been withdrawn earlier.[75] Dr. Harris does not discuss how the results might have been different and provides no methodology or guidance regarding how to adjust for any such differences between March 2000 and the regulatory interventions between June 2002 and September 2005.

63.      Several substantial regulatory changes and other events occurred pertaining to Cox-IIs and NSAIDs during the period surrounding the withdrawal of Vioxx in September 2004.

---

[75] Harris Report, p. 19, ¶42.

For example, studies involving Celebrex and naproxen were halted,[76] the FDA approved a new label for Bextra,[77] and a "Public Health Advisory" for all NSAIDs was issued by the FDA.[78] The entire marketplace for NSAIDs and Cox-IIs changed fundamentally in the Fall of 2004 due to many events, only one of which was the withdrawal of Vioxx. Undoubtedly, patients and prescribing physicians generally reacted to these in highly varied ways. Yet Dr. Harris' model effectively attributes any changes in LADHH expenditures on all NSAIDs that occurred during this period to the voluntary withdrawal of Vioxx in September 2004. It is implausible to suggest that these events all resulted from Vioxx's withdrawal, and it is also implausible to suggest that those events would or even could have occurred in March 2000. For example, important events included the results of research relating to Bextra that clearly would not have occurred prior to Bextra's 2001 entry into the market.

64.    Dr. Harris' results measure the combined impact of all of these events and he incorrectly attributes all of these effects to the withdrawal of Vioxx. That is, the publicity surrounding all of these events led to a "class-wide" impact on the usage of these pain medications. Dr. Harris offers no methodology for separately measuring the impact of the Vioxx withdrawal.

65.    This conclusion is supported by the results reported in Dr. Harris' workpapers. For instance, the results from Dr. Harris' Bextra-Celebrex cohort analysis show that the Vioxx withdrawal led to a reduction in expenditures on Vioxx, Bextra, and Celebrex

---

[76] See, for example, http://www.fda.gov/newsevents/newsroom/pressannouncements/2004/ucm108384.htm; http://www.theheart.org/article/375785.do; and http://www.medscape.com/viewarticle/538165.

[77] http://www.fda.gov/drugs/drugsafety/postmarketdrugsafetyinformationforpatientsandproviders/ucm106255.htm.

[78] http://www.fda.gov/Drugs/DrugSafety/PublicHealthAdvisories/ucm051900.htm. See also ¶9 above for additional events.

individually, but had no measured impact on NSAID expenditures.[79]  Such a decrease is

inconsistent with any perceived effect associated solely with Vioxx, and is more

consistent with a class-wide effect related to all of the new information disseminated in

late 2004 and early 2005 discussed above.

66.     Additional evidence points to changes in patient behavior that affected the entire class of

NSAIDs.  For instance, Louisiana Medicaid claims data show a drop in the average

number of prescriptions for all NSAIDs, including Cox-IIs.

67.     In Dr. Harris' cohort analysis, the effect of a class-wide impact on all NSAIDs would

manifest in a larger number of patient months with no (or zero) expenditures.  This would

indeed tend to make average expenditures smaller, but-for reasons beyond just the

voluntary withdrawal of Vioxx.

68.     I reconstructed Dr. Harris' cohort regression models to assess the effect of this change in

patient behavior associated with dissemination of information pertaining to the entire

class.  I use Dr. Harris' 12-month Vioxx cohort and run his regressions on patient months

where only non-zero expenditures occurred.

69.     Removing these "zero" patient month observations changes the total number of patient

month observations from 641,212 in Dr. Harris' Vioxx 12-month cohort regression

(49,324 patients times 13 months) to 238,470 patient month observations in the adjusted

Vioxx 12-month cohort dataset.[80]  This means that Dr. Harris' 12-month Vioxx cohort

dataset included 402,742 observations of patient months with no expenditures on any of

---

[79] See, for example, Dr. Harris' workpapers, "Louisiana Medicaid Bextra-Celebrex Cohort Regression Models.log."
It should be noted that Dr. Harris reports different results in his Vioxx cohort and his Bextra-Celebrex cohort.  The
signs of the Vioxx withdrawal coefficients for Bextra and Celebrex in the Vioxx cohort are positive, while the signs
are negative in the Bextra-Celebrex cohort.
[80] Figures reflect observations in the four-medication class, which includes NSAIDs, Vioxx, Celebrex, and Bextra.
See Exhibit D for additional details.

the drugs in the data (see Exhibit D).  Hence, Dr. Harris assigns a "zero" value to 63 percent of the patient-month observations in his sample.[81]

70.     Excluding these zero patient months substantially changes the results of his regression models.  Dr. Harris reports the effect from the withdrawal of Vioxx that "…for every $1.00 decline in Vioxx expenditures, there was a compensating increase in expenditures of NSAIDs and other COX-II agents of $0.57."[82]  Exhibit E shows that, after removing the inappropriate zero observations from Dr. Harris' model, the compensating increase in other expenditures increases to $0.76 for every dollar decline in Vioxx expenditures. These results demonstrate that Dr. Harris' cohort regression results are highly sensitive to his treatment of the missing observations, and that the results reflect class-wide NSAID information.

71.     Importantly, the zero expenditure observations disproportionately occur after the voluntary withdrawal of Vioxx in September 2004.  In the data that forms the basis for Dr. Harris' Appendix Table F, there are a total of 641,212 patient months (49,324 patients times 13 months for each patient).  608,937 of these patient months are for the period prior to the Vioxx withdrawal.  In his four medication class, 376,367 (or 62 percent) of these patient months have zero expenditures on the four drugs.  In the period after Vioxx's withdrawal, 26,375 patient months out of a total of 32,275 (or 82 percent) have zero expenditures on the four drugs (see Exhibit D).  Thus Dr. Harris' results for the Vioxx withdrawal effect are driven largely by the overall reductions in patients' propensity to use any NSAID (non-selective or Cox-II), a result associated with class-wide effects.  Since these effects are driven by class-wide information that would not

---

[81] See Exhibit C for additional detail.
[82] Harris Report, p. 16, ¶34 and Appendix Table F.

have been available in March 2000, the effects Dr. Harris' attributes to the Vioxx
withdrawal are not applicable to the earlier period.

### 3.      Dr. Harris inappropriately measures the effect of the NPDL on expenditures.

72.    Dr. Harris provides calculations purporting to measure the effect on LADHH
expenditures resulting from Vioxx being placed on the NPDL in June 2002 through July
2003.  In contrast to the Vioxx withdrawal effects reported by Dr. Harris, his estimate of
the purported net effect for the June 2002 Vioxx NPDL is relatively modest.  He
estimates a 13 percent reduction in total LADHH expenditures (excluding PPI's).[83]

73.    This result, however, depends crucially on Dr. Harris' arbitrary assumptions including, in
particular, his restriction of data to the first twelve months after the first Vioxx
prescription for patients in his cohort.

74.    It is more reliable to analyze all expenditures for each patient since to do otherwise is to
discard useful data.  Dr. Harris' own analysis demonstrates that his results are sensitive to
the length of the "follow-up."  For instance, Dr. Harris also performed his cohort analyses
using 9-month and 18-month follow-ups and includes the results of these regressions in
his workpapers.  The purported effect on total LADHH expenditures from the June 2002
Vioxx NPDL decreased to 6 percent using Dr. Harris' 18-month cohort, down from the
13 percent effect implied using calculations in his report for the 12-month cohort.[84]

75.    Hence, Dr. Harris' own analysis shows that the purported effect on average monthly
expenditures of the June 2002 Vioxx NPDL decreases by more than 50 percent by
expanding the period considered from twelve to eighteen months.  If one were to use Dr.

---

[83] Harris Report, Appendix Table F.  Dr. Harris' four-medication class coefficient is -1.13, which is approximately
13 percent of his Vioxx coefficient of -8.56.
[84] Compare regression results for his 12-month cohort reported in Harris Report, Appendix Table F, to the 18-month
cohort results reported in Dr. Harris' workpapers, "Louisiana Medicaid Vioxx 18-Month Cohort Regression
Models.log."

Harris' calculation to measure damages – which one should not – then damages would be twice as large using his 12-month cohort as compared to using his 18-month cohort. Dr. Harris offers no reason why the 12-month cohort is superior to the 18-month, even though the purported effects are highly sensitive to the cohort selection.

76.   To demonstrate the sensitivity of Dr. Harris' results, I also conduct a regression analysis using his cohort methodology, but extend the cohort sample to 24-month follow-ups. The 24-month cohort shows that the placement of Vioxx on NPDL status results in a very small three percent decrease in total LADHH expenditures. (See Exhibit F)

77.   Additionally, the "extended" cohort results show that the effect of Vioxx placement on the NPDL in June 2002 is further reduced as the follow-up period is extended to 36 months. In fact, using the 36-month follow-up cohort indicates total LADHH expenditures did not change following Vioxx's placement on the NPDL.[85] (See Exhibit F).

### 4.    The effect of Dr. Harris' decisions to limit the data in his Vioxx Cohort.

78.   As noted, in constructing his one-year follow-up cohort Dr. Harris has eliminated a substantial amount of useful data. He eliminates all observations for patients who do not receive another prescription twelve months or more after their initial Vioxx prescription (18,575 out of a total of 67,899 patients). For the 49,324 patients that he keeps in his cohort, he also eliminates all observations more than twelve months after the first Vioxx prescription. Thus, Dr. Harris' method excludes a great deal of relevant data.

---

[85] Note that the coefficient for the 36-month cohort shows a one percent increase in total LADHH expenditures but is not statistically significantly different from zero, thereby implying that there is no effect.

79.    Statistically, the exclusion of relevant data generally yields inferior results relative to an

identical model that includes all the relevant data.[86]  From LADHH's perspective, total

expenditures matter, regardless of when those expenditures occur.  Above, I show that, as

the follow-up period gets longer (from 12 to 18 to 24 to 36 months), the measured impact

of the Vioxx withdrawal on total expenditures declines (see Exhibit F).  In order to

further assess the effects of Dr. Harris' decisions to exclude relevant data, I conducted a

series of regressions based on Dr. Harris' models, but with modifications on the criteria

for including or excluding certain variables and observations.

80.    In the first alternate regression, reported in Exhibit E, line 1B, I assess the effect of Dr.

Harris' decisions to create observations in months in which he did not observe any

expenditures.  In his method, when a patient in his cohort has no expenditures in a given

month for his follow-up period, Dr. Harris creates an observation where expenditures are

set equal to zero and all the dummy variables are assigned their appropriate values based

on the date of the created observation.  For the regressions reported in his Appendix

Table F, reported for comparison in Exhibit E, line 1A, this method yields 641,212

observations.[87]  I re-ran the same regressions as Dr. Harris' Appendix Table F, but

removed the artificial observations that Dr. Harris added by assuming zero expenditures

when a patient month is missing.  This results in regressions based on 294,925 patient

month observations when there were actually expenditures on any drug in the Louisiana

Medicaid data.  For this regression, I retained his 12-month follow-on rule.

---

[86] Proper econometric method shows that use of all data provides more reliable estimates than using less than all available, appropriate data.  In particular, the Law of Large Numbers states that the sample mean converges in probability to the true mean as the number of observations grows.  One econometrics text book describes this result as "fundamental to the theory of parameter estimation."  See Greene, William H., *Econometric Analysis*, 6ed., Prentice Hall (2008), at pp. 1042-1043.

[87] Note that the models contain the complete set of regulatory interventions identified by Dr. Harris.

81.     Comparing line 1A and 1B in Exhibit E, note that Dr. Harris estimates that a reduction of
        one dollar in Vioxx expenditures results in a decrease in total expenditures of 43 percent.
        Line 1B shows instead a reduction in total expenditures of 24 percent.  These results
        indicate that Dr. Harris' method, by assuming missing observations are equivalent to zero
        expenditures, causes an understatement of the degree to which Vioxx users switched to
        other products after the Vioxx withdrawal.  The effect measured by the Vioxx NPDL
        variable changes only slightly, from a 13.2 percent reduction in expenditures in Dr.
        Harris' model to a 12.4 percent reduction in this model.

82.     I also assessed the effect of Dr. Harris' decision to limit follow-up on each patient to the
        first twelve months after the first Vioxx prescription.  These results are presented in
        Table E, lines 2A and 2B.  I re-ran Dr. Harris' regressions, using his same cohort of
        49,324 patients but including all subsequent patient months for these patients.  This
        increases the number of observations in the regression from the 641,212 in Dr. Harris'
        analysis to 2,733,628.[88]  Replicating Dr. Harris' regression model using the complete
        follow-up period in line 2A reduces the coefficient on the Vioxx withdrawal dummy
        variable to -11.581 in the Vioxx regression and -0.962 in the four medication class
        regression.  Thus, including all patient months for his Vioxx cohort implies that 91.7
        percent of the reduction in Vioxx expenditures after the Vioxx withdrawal was offset by
        increased expenditures on other products.  This estimate is more reliable and substantially
        larger than the 56.8 percent offset that Dr. Harris measures.

---

[88] Because I extended the follow-up period to include all months after a patient received their first Vioxx
prescription, I also created more dummy variables to measure the effect of "months since first Vioxx prescription."
Whereas Dr. Harris' main analysis includes only 12 of these "months since first Vioxx prescription" dummy
variables, the full follow-up model includes 124 of these dummy variables.

83. Note also that Exhibit E, Line 2A reports results for Dr. Harris' evaluation of the PDL status of Vioxx. As in the results above, more than 100 percent of the reduction in Vioxx expenditures after the Vioxx NPDL was offset by expenditures on other drugs (see Exhibit E).

84. I also performed, as reported in Exhibit E, line 2B, the same regression excluding the patient months with no expenditures. This results in a regression with 1,154,613 observations. The Vioxx withdrawal coefficient is similar to the Vioxx NPDL coefficient.

85. Finally, I also performed regression analyses including all 67,899 patients who received at least one Vioxx prescription, regardless of whether they received another prescription more than twelve months later. These results are reported in Exhibit E, lines 3A and 3B. Using all patient months results in 2,806,237 observations. I find that, after the withdrawal of Vioxx, 92.3 percent of the decline in Vioxx expenditures is offset by increased expenditures on other drugs in the four medication class, and more than 100 percent of the decline in Vioxx expenditures after the Vioxx NPDL is offset by increased expenditures on other products. If one includes only months for which there were actual expenditures (excluding the months where Dr. Harris added zero expenditure observations), 97.8 percent of the decline in Vioxx expenditures after the Vioxx withdrawal are offset by increased expenditures on other products.

86. Put together, these results show that Dr. Harris' finding of substantial declines in total LADHH expenditures when Vioxx was on the NPDL and after the Vioxx withdrawal are an artifact of his arbitrary decision to limit his data. Using the more statistically appropriate method of retaining all relevant data, Dr. Harris' own regression models

show that virtually the entire decline in Vioxx expenditures after the Vioxx withdrawal

and after the Vioxx NPDL was offset by increased expenditures on other pain products.

This result regarding the lack of financial impact to Louisiana Medicaid is confirmed by

the testimony from Dr. Valerie Taylor, Clinical Director for Provider Synergies.[89]

### 5.    Dr. Harris inappropriately measures the effect of the prospective DUR edits on Bextra and Celebrex on LADHH expenditures.

87.    In addition to his Vioxx cohort, Dr. Harris constructs a "Bextra-Celebrex one-year

follow-up" cohort.  Dr. Harris creates this "Bextra-Celebrex cohort" using the same

methodology as for his Vioxx cohort analysis.[90]  As noted above, Dr. Harris constructed

his cohort by determining the date of the first prescription that a patient received of a

particular drug (in this case, Bextra or Celebrex), and for those patients who received at

least one other prescription twelve or more months after that, he includes monthly

expenditures for the next twelve months.

88.    The analysis above regarding the weaknesses in the construction of the Vioxx cohort

applies equally to the construction of the Bextra-Celebrex. Namely, Dr. Harris'

methodology arbitrarily excludes Bextra and Celebrex patients from his cohort, excludes

meaningful data from patients within his cohort, and fails to adequately account for

confounding events.  Hence Dr. Harris' Bextra-Celebrex cohort methodology suffers

from the same significant flaws that render his analysis unreliable as a measure of

economic damages.

89.    Dr. Harris appears to use his Bextra-Celebrex cohort primarily in an attempt to estimate

the effect of LADHH's prospective DUR edits policy on expenditures of Bextra and

---

[89] Rough Draft Deposition Transcript of Valerie E. Taylor, Pharm. D., January 15, 2010, at pp. 83-85 and pp. 129-131.
[90] See Harris Report, p. 17, and relevant workpapers provided by Dr. Harris.

Celebrex.  Dr. Harris' Bextra-Celebrex calculations purportedly show that "the DUR

program was associated with a … 34% decline in monthly Bextra expenditures and a …

11% decline in monthly Celebrex expenditures."[91]

90.   To the extent that the plaintiff would attempt to use these calculations to measure

damages in a but-for world where the DUR edits would have been instituted sooner, Dr.

Harris' methods are insufficient to make such a determination.  First, one would have to

determine how the DUR would operate in such a more-likely-than-not but-for world.  Dr.

Harris provides no analysis of what such a but-for world would look like.  In particular,

one would need to address several questions to determine the but-for world, including:

(1) When would the but-for DUR have been instituted? (2) How would the but-for DUR

operate? and, (3) Would it cover just Vioxx, all Cox IIs, or something else?

91.   Further, while Dr. Harris does not address these issues, the available evidence indicates

that the LADHH would not have instituted at an earlier data a DUR edit of the kind it

instituted in March 2005.  For instance, the DUR process was generally only placed on a

drug in the case of a "lock-in" situation – a situation involving suspected doctor or patient

level abuse. [92]  No DUR prospective deny edit was implemented relating to clinical safety

or benefits of Vioxx or any other Cox-II or NSAID prior to 2005.[93]  Dr. Harris provides

no evidence, method, or analysis to support a damage calculation of some hypothetical

---

[91] Harris Report, p. 17.
[92] See, for example, Deposition of Ben Bearden, October 12, 2009, p. 43 and Deposition of Gina C. Biglane, Pharm. D., October 28, 2009, pp. 27-30.
[93] See, for example, Deposition of Gina C. Biglane, Pharm. D., October 28, 2009, pp. 38-40 and Deposition of Ben Bearden, October 12, 2009, pp. 33-34, 44, and 248-249.  Dr. Joseph Adams, a P&T Committee member asked whether there had been "any discussion in terms of using step therapy in this [Cox-II] class?"  Dr. Vincent Culotta, also a P&T Committee member, responded that "…if you want to make a recommendation to [LADHH]…we can, as a committee, recommend that, but this is not the place to make that determination."  Transcript of the Testimony of Hearing, Medicaid Pharmaceutical & Therapeutics Committee Hearing, May 21, 2003 (LaAG-VIOXX-000376 through 000459 at 000422).  See also Louisiana Department of Health and Hospitals, Medicaid P&T Committee Meeting Minutes, May 21, 2003.

DUR edit program at an earlier date. His calculations cannot be applied to an earlier period without first making necessary and significant adjustments. Dr. Harris does not make these adjustments or provide a method for doing so. As a result, his calculations cannot be used to measure economic damages.

92.     Dr. Harris also offers no analysis linking DUR effects that he measures on Bextra and Celebrex to hypothetical DUR effects on Vioxx. Dr. Harris' calculations are limited to the purported effects of the 2005 prospective DUR edits on Bextra and on Celebrex. Since Vioxx was already withdrawn from the market at the time of the DUR, Dr. Harris' does not measure any effect on Vioxx expenditures. Dr. Harris' DUR coefficient also measures the effects of confounding events, such as the withdrawal of Bextra just one month after the institution of the DUR edits and the black box warnings/Hurricane Katrina effects in late summer 2005. To the extent that the information that led to the Bextra withdrawal and the black box warnings was already in the marketplace prior to those events, that information would have affected behavior in earlier periods. To the extent that his DUR variable even partially captures the effects of these confounding events, those same events would not have been present at an earlier time period, rendering his measurements of the DUR effect unusable to estimate the effects of an earlier, but-for DUR program.

93.     In addition to all these problems with Dr. Harris' Bextra-Celebrex cohort analysis, an error in Dr. Harris' programs generates errors in his data that affect the results of the analyses contained in his Appendix Table G.

January 21, 2010

94.     Dr. Harris attempted to construct his Bextra-Celebrex cohort using programming similar

        to the programming used to construct his Vioxx cohort.[94]  Dr. Harris' program, however,

        generates errors when it is applied simultaneously to two drugs, as in his Bextra-Celebrex

        cohort, rather than to a single drug, as in his Vioxx cohort.

95.     Dr. Harris begins constructing his cohort by identifying the date of the first prescription

        of Bextra or Celebrex for each patient.  Next, he determines whether a patient received at

        least one additional prescription (for any drug in the data) twelve or more months after

        their first prescription.  If so, Dr. Harris keeps the relevant monthly expenditures for the

        patient for the *first* twelve months after the first prescription.  Dr. Harris then assigns a

        series of variables to identify certain "regulatory interventions."  In order to properly

        identify the dates for each "regulatory intervention," Dr. Harris must match each

        observation with the relevant calendar date.  In the case of the Bextra-Celebrex cohort,

        his program fails to properly match patient months to calendar time.  When a match fails,

        Dr. Harris' statistical software program assigns a missing value as the date.  These

        missing values are treated as if they were equal to infinity—thus assigning a date of

        infinity to those observations.  As a result of these "missing" dates, the associated

        observations are recorded in the data as if they occurred on a date after the last event he

        addresses (Celebrex black Box, Hurricane Katrina in August/September 2005), regardless

        of the true date when the observation occurred.

96.     As a result of this error in Dr. Harris' program, more than $4 million of the $64 million in

        total expenditures by patients in the Bextra-Celebrex cohort are assigned to the wrong

---

[94] See Dr. Harris' workpapers, "Louisiana Medicaid Bextra-Celebrex Cohort Regression Models.log."

Charles River Associates                                             January 21, 2010

event.[95]  Further evidence of this error can be demonstrated by observing Vioxx

expenditures long after Vioxx was withdrawn in September 2004.

97.      Figure 1 summarizes the effect of correcting the erroneous values for "regulatory

intervention" dates found in Dr. Harris' Bextra-Celebrex cohort program.

**Figure 1**
Estimated DUR Effect for the Bextra-Celebrex One-Year Follow-Up Cohort Analysis
Comparison of Harris' Estimates with Corrected Estimates

|  | Effect of DUR on Bextra | | | Effect of DUR on Celebrex | | |
|---|---|---|---|---|---|---|
|  | Mean Expenditure | Estimated Effect | % Decline in Expenditures | Mean Expenditure | Estimated Effect | % Decline in Expenditures |
| Dr. Harris Specification (Appendix Table G) | 23.03 | -7.96 | -34.6% | 17.29 | -1.85 | -10.7% |
| *Corrected* Dr. Harris Specification | 16.79 | -8.09 | -48.2% | 11.83 | 1.23 | 10.4% |

98.      The results associated with Dr. Harris' DUR effect are particularly telling.  While Dr.

Harris finds that Celebrex expenditures fell by $1.85 per month on average after the

imposition of the DUR edits, the regressions using the corrected data show that Celebrex

expenditures actually *increased* by $1.23 per month on average.  In fact, after correcting

the errors in Dr. Harris' program, each and every regulatory intervention coefficient in

the Celebrex regression reverses signs from negative to positive.

99.      While correcting for these errors changes the underlying results, even these results would

not be applicable to measuring damages in an earlier time period for the reasons

discussed above.


**C.      Xponent Cohort Analysis**

100.    In addition to the Louisiana Medicaid data, Dr. Harris performed his regression analysis

using data from a separate source.  Xponent data from IMS tracks physician prescribing

---

[95] Using Dr. Harris' Bextra-Celebrex cohort database, $6.6 million in Louisiana Medicaid expenditures occur after
Hurricane Katrina.  After correcting for Dr. Harris' error, Louisiana Medicaid expenditures after Hurricane Katrina
decrease to $2.3 million, leaving a difference of $4.3 million incorrectly attributed to the period after Hurricane
Katrina.

behavior.  In particular, the Xponent data tracks the number of prescriptions that each physician in its survey writes for each product in a given sample period month.  The Xponent data provided in this case tracks numbers of prescriptions in the NSAID medication class, including prescriptions for Cox-IIs.  Dr. Harris used the Xponent data to construct a cohort of prescribing physicians in Louisiana and track the number of prescriptions for Vioxx, Celebrex, Bextra, and NSAIDs prescribed by each physician each month.[96]  In particular, Dr. Harris tracks the number of new prescriptions in each month and the number of total prescriptions.

101.   Unlike his patient cohorts, which were limited to twelve months for each patient, Dr. Harris used the whole prescribing history of each physician in this dataset.[97]  Dr. Harris uses this cohort, along with the same "regulatory interventions" from his patient cohort analysis.[98]  Importantly, the Xponent data, since it measures prescriptions at the physician level, is not limited to prescriptions for Medicaid patients, but includes all prescriptions that a physician wrote, regardless of payer.  Changes in NSAID and Cox-II coverage in private insurance plans could affect physician behavior.  Dr. Harris does not include explanatory variables to account for any changes in the private payor insurance side.  Hence, the coefficient estimates on the Medicaid-related events can suffer from omitted variable bias, and is therefore potentially unreliable.

102.   Dr. Harris' regressions contain a number of anomalous results regarding the impact of his regulatory interventions.  For instance, according to Dr. Harris' regression results, placing Vioxx on the NPDL *increased* the number of Vioxx prescriptions (coefficient equals 0.06, with standard errors equal to 0.03) and substantially decreased the average

---

[96] Harris Report, pp. 18-19
[97] Harris Report, p. 18, ¶38.
[98] Harris Report, p. 18, ¶39.

number of NSAID prescriptions (-5.10, with standard errors equal to 0.04).[99]  Similarly, according to Dr. Harris' result, placing Celebrex on the NPDL *increased* Celebrex prescriptions by 0.38 per month.  These effects are not consistent with the purpose of these regulatory interventions, and are not consistent with the results from Dr. Harris' patient cohorts or his results using the aggregate data.

103.   In addition, the results reported in Dr. Harris' Appendix Table H are based on data covering patients from a wide variety of payers, not just Medicaid.  There is no *a priori* reason to expect that the placing of Vioxx on NPDL status within the Medicaid system would have a substantial effect on the prescribing behavior of physicians treating patients covered by other payers.  As a result, one cannot apply the effects that Dr. Harris measures in his Xponent analyses to determine alleged damages to Louisiana Medicaid.

104.   Furthermore, many of the same comments regarding the patient cohort analysis discussed above apply here as well.  Dr. Harris does not specify what his but-for world would look like and does not discuss how his calculations and methods can be used to measure damages from Merck's alleged actions.  Dr. Harris does not provide any analysis of how his effects in one period can be applied to changes in different periods in the but-for world.

---

[99] Dr. Harris' Appendix Table H.

Charles River Associates                                             January 21, 2010


_Steven N. Wiggins_
Steven N. Wiggins

January 21, 2010

Charles River Associates

# EXHIBIT F

## Summary of Dr. Harris' Regression Results
### 12 Month Vioxx Cohort Analysis

| Event | Individual Results | | | | 4-Meds [COX2+NSAID] | Effect on Non-Vioxx | Increase in Other per $1 Decrease in Vioxx |
|---|---|---|---|---|---|---|---|
| | Vioxx | Bextra | Celebrex | NSAID | | | |
| Vioxx Withdrawn | -28.74 (-35.11) | 10.79 (34.39) | 2.04 (3.75) | 3.84 (13.75) | -12.42 (-12.24) | -16.32 | 0.57 |
| Vioxx NPDL | -8.56 (-42.13) | 5.19 (66.64) | 2.40 (17.80) | -0.23 (-3.38) | -1.13 (-4.49) | -7.43 | 0.87 |
| Bextra Withdrawn | | -3.44 (-13.85) | -0.91 (-2.11) | 1.56 (7.04) | -1.92 (-2.38) | 1.92 | |
| DUR | | -3.44 (-15.21) | -3.17 (-8.1) | 1.47 (7.33) | -2.99 (-4.09) | 2.99 | |
| BB / Katrina | | | -2.20 (-1.9) | 1.90 (3.20) | 0.75 (0.35) | -0.75 | |
| Celebrex NPDL | -11.29 (-14.85) | 7.50 (-13.23) | 0.05 (0.10) | 0.23 (0.88) | -3.37 (-3.58) | -7.92 | 0.70 |

Notes:
T-statistics are included beneath each coefficient estimate in ( ).

Regression notes:
These results come from Dr. Harris's analysis of his 12 month Vioxx Cohort Database. See Dr. Harris' Work Papers "LA Medicaid Vioxx Cohort.do", and "LA Medicaid Vioxx Cohort Regression Models.do". Data in this Cohort consist of all patients who received Vioxx, and received another prescription for Vioxx, Celebrex, Bextra, Other NSAIDs, or a PPI more than 12 months after their first Vioxx prescription. For each of these cohort members, Dr. Harris keeps prescription data for the 12 months immediately after their first Vioxx prescription. This results in 13 total months of data per patient.

Dr. Harris's analysis of this Cohort Database contains 5 total Med Class regressions: 4 Individual Result regressions for each of Vioxx, Celebrex, Bextra, and Other NSAIDs, along with a regression on the 4 Med Class of Vioxx, Celebrex, Bextra, and All NSAIDs

Each of these 5 Med Class regressions is specified as follows:
Payments for the Med Class = Constant +β1(Vioxx Withdrawn) + β2(Vioxx NPDL) + β3(Bextra Withdrawn) + β4(DUR) + β5(BB / Katrina) + β6 (Celebrex NPDL) + β7 (Celebrex NPDL2) + monthly dummy variables for each of the months after the first Vioxx prescription + error term. Following Dr. Harris' methodology, all individual fixed effects are handled through a "within regression."

The Celebrex NPDL2 dummy is dropped from Dr. Harris' 12 Month Cohort analysis "since it was found to be collinear in all Vioxx cohort models." See Dr. Harris' workpapers "LA Medicaid Bextra-Celebrex Cohort Regression Models.log" at line 41.

Charles River Associates

January 21, 2010

# EXHIBIT F

## Summary of Dr. Harris' Regression Results
### 18 Month Vioxx Cohort Analysis

| Event | Individual Results | | | | 4-Meds [COX2+NSAID] | Effect on Non-Vioxx | Increase in Other per $1 Decrease in Vioxx |
|---|---|---|---|---|---|---|---|
| | Vioxx | Bextra | Celebrex | NSAID | | | |
| Vioxx Withdrawn | -22.16 (-57.72) | 9.93 (56.93) | -0.15 (-0.50) | 3.92 (25.84) | -9.13 (-18.07) | -13.03 | 0.59 |
| Vioxx NPDL | -8.12 (-60.39) | 5.92 (98.17) | 1.94 (19.15) | -0.37 (-7.14) | -0.45 (-2.60) | -7.67 | 0.94 |
| Bextra Withdrawn | | -3.17 (-16.2) | -1.02 (-3.03) | 1.40 (7.98) | -1.53 (-2.62) | 1.53 | |
| DUR | | -3.49 (-18.29) | -2.44 (-7.63) | 1.56 (9.45) | -2.50 (-4.54) | 2.50 | |
| BB / Katrina | | | -1.36 (-4.55) | -1.12 (-7.22) | -0.33 (-0.65) | 0.33 | |
| Celebrex NPDL | -6.26 (-20.11) | 7.34 (52.57) | -1.56 (-6.67) | 0.09 (0.77) | -0.01 (-0.02) | -6.26 | 1.00 |

Notes:
T-statistics are included beneath each coefficient estimate in ( ).

Regression notes:
These results come from Dr. Harris's analysis of his 18 month Vioxx Cohort Database. See Dr. Harris' Work Papers "LA Medicaid Vioxx Cohort 18-Month Follow-Up.do", and "LA Medicaid Vioxx Cohort Regression Models.do." Data in this Cohort consist of all patients who received Vioxx, and received another prescription for Vioxx, Celebrex, Bextra, Other NSAIDs, or a PPI more than 18 months after their first Vioxx prescription. For each of these cohort members, Dr. Harris keeps prescription data for the 18 months immediately after their first Vioxx prescription. This results in 19 total months of data per patient.

Dr. Harris's analysis of this Cohort Database contains 5 total Med Class regressions: 4 Individual Result regressions for each of Vioxx, Celebrex, Bextra, and Other NSAIDs, along with a regression on the 4 Med Class of Vioxx, Celebrex, Bextra, and All NSAIDS

Each of these 5 Med Class regressions is specified as follows:
Payments for the Med Class = Constant $+\beta 1$(Vioxx Withdrawn) $+\beta 2$(Vioxx NPDL) $+\beta 3$(Bextra Withdrawn) $+\beta 4$(DUR) $+\beta 5$(BB / Katrina) $+\beta 6$ (Celebrex NPDL) $+\beta 7$ (Celebrex NPDL2) + monthly dummy variables for each of the months after the first Vioxx prescription + error term. Following Dr. Harris' methodology, all individual fixed effects are handled through a "within regression."

The Celebrex NPDL2 dummy is dropped from Dr. Harris' 12 Month Cohort analysis "since it was found to be collinear in all Vioxx cohort models." See Dr. Harris' workpapers "LA Medicaid Bextra-Celebrex Cohort Regression Models.log" at line 41.

Charles River Associates

January 21, 2010

# EXHIBIT F

## Summary of Regression Results
### Harris Cohort Construction Methodology
### 24 Month Vioxx Cohort Analysis

| Event | Individual Results | | | | | Effect on Non-Vioxx | Increase in Other per $1 Decrease in Vioxx |
|---|---|---|---|---|---|---|---|
| | Vioxx | Bextra | Celebrex | NSAID | 4-Meds [COX2+NSAID] | | |
| Vioxx Withdrawn | -17.98 (-65.35) | 9.50 (62.28) | -1.91 (-7.90) | 3.79 (30.95) | -7.99 (-20.11) | -9.99 | 0.56 |
| Vioxx NPDL | -7.83 (-78.01) | 6.15 (114.00) | 1.68 (19.71) | -0.49 (-11.36) | -0.22 (-1.55) | -7.62 | 0.97 |
| Bextra Withdrawn | | -3.61 (-17.08) | -0.88 (-2.55) | 1.54 (8.76) | -1.73 (-3.03) | 1.73 | |
| DUR | | -2.84 (-12.99) | -2.51 (-7.28) | 1.28 (7.33) | -2.48 (-4.38) | 2.48 | |
| BB / Katrina | | | -1.33 (-6.19) | -2.02 (-18.58) | -0.41 (-1.16) | 0.41 | |
| Celebrex NPDL | -4.45 (-24.11) | 7.98 (82.44) | -2.94 (-19.17) | 0.01 (0.11) | 1.18 (4.68) | -5.63 | 1.26 |

**Notes:**
T-statistics are included beneath each coefficient estimate in ( ).
The data used in this regression were generated using Dr. Harris's 12 month Vioxx Cohort regression program. The parameters were changed to create a 24 month cohort.

**Regression Notes:**
These results come from my own analysis of a 24 month Vioxx Cohort Database created in the same fashion as Dr. Harris's Cohort analysis. See Dr. Harris' Work Papers "LA Medicaid Vioxx Cohort.do", and "LA Medicaid Vioxx Cohort Regression Models.do". Data in this Cohort consist of all patients who received Vioxx, and received another prescription for Vioxx, Celebrex, Bextra, Other NSAIDs, or a PPI more than 24 months after their first Vioxx prescription. For each of these cohort members, I keep prescription data for the 24 months immediately after their first Vioxx prescription. This results in 25 total months of data per patient.

My analysis of this Cohort Database contains 5 total Med Class regressions: 4 Individual Result regressions for each of Vioxx, Celebrex, Bextra, and Other NSAIDs, along with a regression on the 4 Med Class of Vioxx, Celebrex, Bextra, and All NSAIDs

Each of these 5 Med Class regressions is specified as follows:
Payments for the Med Class = Constant + β1(Vioxx Withdrawn) + β2(Vioxx NPDL) + β3(Bextra Withdrawn) + β4(DUR) + β5(BB / Katrina) + β6 (Celebrex NPDL) + β7 (Celebrex NPDL2) + monthly dummy variables for each of the months after the first Vioxx prescription + error term. Following Dr. Harris' methodology, all individual fixed effects are handled through a "within regression."

The Celebrex NPDL2 dummy is dropped from Dr. Harris' 12 Month Cohort analysis "since it was found to be collinear in all Vioxx cohort models." See Dr. Harris' workpapers "LA Medicaid Bextra-Celebrex Cohort Regression Models.log" at line 41.

# EXHIBIT F

## Summary of Regression Results
### Harris Cohort Construction Methodology
### 36 Month Vioxx Cohort Analysis

| Event | Individual Results | | | | | Effect on Non-Vioxx | Increase in Other per $1 Decrease in Vioxx |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Vioxx | Bextra | Celebrex | NSAID | 4-Meds [COX2+NSAID] | | |
| Vioxx Withdrawn | -8.88 (-44.23) | 6.76 (44.22) | -3.40 (-17.03) | 2.79 (28.54) | -2.82 (-9.00) | -6.05 | 0.68 |
| Vioxx NPDL | -7.76 (-99.19) | 6.25 (108.01) | 1.75 (23.18) | -0.35 (-9.33) | 0.08 (0.72) | -7.85 | 1.01 |
| Bextra Withdrawn | | -3.29 (-12.14) | -0.69 (-1.83) | 1.75 (9.45) | -1.83 (-3.09) | 1.83 | |
| DUR | | -2.54 (-9.14) | -1.83 (-5.10) | 1.01 (5.74) | -3.54 (-6.26) | 3.54 | |
| BB / Katrina | | | -1.18 (-5.76) | -3.10 (-30.94) | -2.46 (-7.66) | 2.46 | |
| Celebrex NPDL | -3.45 (-28.72) | 8.24 (91.92) | -3.49 (-29.70) | 0.42 (7.33) | 2.12 (11.5) | -5.57 | 1.62 |

**Notes:**

T-statistics are included beneath each coefficient estimate in ( ).
The data used in this regression were generated using Dr. Harris's 12 month Vioxx Cohort regression program.  The parameters were changed to create a 36 month cohort.

**Regression Notes:**

These results come from my own analysis of a 36 month Vioxx Cohort Database created in the same fashion as Dr. Harris's Cohort analysis. See Dr. Harris's Work Papers "LA Medicaid Vioxx Cohort.do" and "LA Medicaid Vioxx Cohort Regression Models.do".  Data in this Cohort consist of all patients who received Vioxx, and received another prescription for Vioxx, Celebrex, Bextra, Other NSAIDs, or a PPI more than 36 months after their first Vioxx prescription.  For each of these cohort members, I keep prescription data for the 36 months immediately after their first Vioxx prescription.  This results in 37 total months of data per patient.

My analysis of this Cohort Database contains 5 total Med Class regressions: 4 Individual Result regressions for each of Vioxx, Celebrex, Bextra, and Other NSAIDs, along with a regression on the 4 Med Class of Vioxx, Celebrex, Bextra, and All NSAIDs

Each of these 5 Med Class regressions is specified as follows:
Payments for the Med Class = Constant + β1(Vioxx Withdrawn) + β2(Vioxx NPDL) + β3(Bextra Withdrawn) + β4(DUR) + β5(BB / Katrina) + β6 (Celebrex NPDL) + β7 (Celebrex NPDL2) + monthly dummy variables for each of the months after the first Vioxx prescription + error term.  Following Dr. Harris' methodology, all individual fixed effects are handled through a "within regression."

The Celebrex NPDL2 dummy is dropped from Dr. Harris' 12 Month Cohort analysis "since it was found to be collinear in all Vioxx cohort models."  See Dr. Harris' workpapers "LA Medicaid Bextra-Celebrex Cohort Regression Models.log" at line 41.