# EXHIBIT 4

Melwyn Wendt, Pharm.D.

Page 1

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF LOUISIANA
3                         - - -
4

   IN RE:  VIOXX PRODUCTS           :  MDL NO. 1657
5  LIABILITY LITIGATION             :
                                    :  SECTION L
6  This Document Relates to:        :
                                    :  JUDGE ELDON
7     STATE OF LOUISIANA, ex rel.   :  E. FALLON
      JAMES D. CALDWELL, JR.,       :
8     Attorney General,             :  MAGISTRATE
         Plaintiff,                 :  JUDGE KNOWLES
9                                   :
         versus                     :
10                                  :
   MERCK & CO., INC.,               :
11       Defendant.                 :  NO. 05-3700
12                        - - -
13          Monday, December 14, 2009
14                        - - -
15
16       Deposition of MELWYN WENDT, PHARM.D., held
17 at LOUISIANA DEPARTMENT OF HEALTH & HOSPITALS, 628
18 North 4th Street, Baton Rouge, Louisiana, commencing
19 at approximately 9:24 a.m., before Cheryl Sletta,
20 Certified Court Reporter, Registered Professional
21 Reporter.
22
23
24
25
```

Melwyn Wendt, Pharm.D.

Page 113

1         yes.
2    Q    What do you remember about how the prospective
3         deny edit proposal here on page 4 was conceived?
4    A    What do I remember about how it was conceived?
5    Q    How did it happen?
6    A    Can you -- can you ask me some other way?  I don't
7         know how to answer you.
8    Q    Sure.  How is it that you all came up with these
9         criteria to include as the prospective deny edit
10        proposal?
11   A    Well, it was considered that if a patient were
12        sick -- I don't know if this is what you're asking
13        me.  But if a patient were older than 60, they
14        could be more at risk to have a GI issue.  If they
15        were -- if they were on a PPI or an H2 antagonist,
16        they could have a GI issue.  That's why they're on
17        these, so that it would look like appropriate use.
18        And if they were on a chronic corticosteroid or
19        warfarin that there would be some value in using a
20        COX-2.
21             And then they -- so you were going to deny
22        unless -- in other words, if one of these issues
23        happened, then the initial claim would not deny.
24   Q    So if patients were older than 60 years old, then
25        they would be able to have their prescriptions for

| | | |
|---|---|---|
| 1 | | Celebrex or Bextra reimbursed by the State? |
| 2 | A | Without a denial. Without an initial denial, yes. |
| 3 | Q | And if patients were on a PPI or an H2 antagonist, |
| 4 | | then they'd be able to get -- |
| 5 | A | That's right. |
| 6 | Q | -- their COX-2 inhibitors reimbursed? |
| 7 | A | Right. |
| 8 | Q | And then there's a statement that says, "Override |
| 9 | | provision available with an appropriate diagnosis |
| 10 | | code/reason supplied by the prescriber." |
| 11 | A | Right. |
| 12 | Q | "GI diagnosis, treatment failure." |
| 13 | | What does that mean? |
| 14 | A | That would mean if -- if a patient -- if a |
| 15 | | prescriber wrote a prescription for one of these |
| 16 | | two COX-2s and we didn't know that there was a GI |
| 17 | | diagnosis, it wasn't apparent or whatever, and if |
| 18 | | they said there is a gastrointestinal diagnosis |
| 19 | | and they supplied a diagnosis code, then they |
| 20 | | could -- the pharmacist could override the claim. |
| 21 | | So the denial would then be null and void as such. |
| 22 | | The same thing if they had said they had treatment |
| 23 | | failure with other nonsteroidals. |
| 24 | Q | Okay. Do you see in the next sentence down, it |
| 25 | | says -- is it -- how do you -- |

```
 1        from Provider Synergies in April of 2003?
 2              MR. PLYMALE:
 3                  Objection.
 4              THE WITNESS:
 5                  I'm not sure what I would have done.
 6     BY MR. GOLDMAN:
 7     Q  Is -- I'm sorry.
 8     A  It's just -- it could have been an issue that
 9        would be brought up to the DUR Board.  It -- it
10        could not have -- we work on cycles in drug
11        utilization review, looking at certain disease
12        states at meetings.  So it could have -- it could
13        have come up and it could not have.  I can't tell
14        you for sure what I would have done.  I don't
15        know.
16     Q  But is it fair to say, Dr. Wendt, that you
17        wouldn't be able to say today what you would have
18        done in terms of raising issues with the ULM --
19        withdrawn.
20              Is it fair to say, Dr. Wendt, that it would
21        be speculation for you to say what you or the DUR
22        Board would have done back in 2003 if you had
23        learned about potential cardiovascular concerns
24        with Vioxx?
25              MR. PLYMALE:
```

```
 1                    Objection.
 2             THE WITNESS:
 3                    I can never tell you what the DUR Board
 4              would do.
 5    BY MR. GOLDMAN:
 6    Q    And even you, is it fair to say that you would be
 7         speculating to say what you would have done had
 8         you known about potential cardiovascular concerns
 9         with Vioxx in 2003?
10             MR. PLYMALE:
11                    Objection.
12             THE WITNESS:
13                    I can't say for certain what I would
14              have done.
15    BY MR. GOLDMAN:
16    Q    Because if you -- withdrawn.
17    A    It wasn't here.
18    Q    Well, what do you mean, "It wasn't here"?
19    A    I just -- I'm not certain positively what I would
20         have done.  We could have taken issues, and we
21         have taken issues to the DUR Board based on those
22         things that I've told you.  Sometimes it is an
23         issue that I bring up.  Sometimes it's an issue
24         that the pharmacy director brings up or a DUR
25         member or a committee member or something that
```