UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
| | * | |
| STATE OF LOUISIANA, *ex rel.* JAMES D. | * | SECTION L |
|     CALDWELL, JR., Attorney General, | * | |
| | * | JUDGE ELDON E. FALLON |
|         Plaintiff, | * | |
| | * | MAGISTRATE JUDGE |
|    versus | * | KNOWLES |
| | * | |
| MERCK SHARP & DOHME CORP., | * | |
| | * | |
|         Defendant. | * | |
| | * | |
| Case No. 05-3700. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
EXCLUDE THE TESTIMONY OF DAVID Y. GRAHAM, M.D.**

**(Expert Challenge No. 4)**

1008363v.1

# TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................................. 1

ARGUMENT ..................................................................................................................... 5

I. DR. GRAHAM CANNOT REGURGITATE THE FINDINGS OF DR. JEWELL BECAUSE HE DID NOT INDEPENDENTLY ASSESS OR ANALYZE THE JEWELL PAPER. ............................................................................................. 6

II. THE JEWELL PAPER DOES NOT CONSTITUTE FACTS OR DATA "OF A TYPE REASONABLY RELIED UPON BY EXPERTS" UNDER RULE 703. .............. 9

III. DR. GRAHAM'S TESTIMONY IS UNRELIABLE FOR OTHER REASONS AS WELL. ........................................................................................................ 11

    A. Dr. Graham's Opinions Are Exclusively Litigation Driven. ............................... 12

    B. Dr. Graham's Opinions Lack Acceptance In The Scientific Community. ........... 13

CONCLUSION ................................................................................................................ 14

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*In re Bextra & Celebrex Marketing Sales Practices & Product Liability Litigation*,
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) .................................................................................. 9

*Cuevas v. E.I. DuPont de Nemours & Co.*,
  956 F. Supp. 1306 (S.D. Miss. 1997) .............................................................................. 12, 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ............................................................................................................ 5, 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ............................................................................................... 12

*Dura Automobile Systems of Indiana, Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ................................................................................................. 9

*Eberli v. Cirrus Design Corp.*,
  615 F. Supp. 2d 1357 (S.D. Fla. 2009) .............................................................................. 6, 7

*Ellipsis, Inc. v. Color Works, Inc.*,
  428 F. Supp. 2d 752 (W.D. Tenn. 2006) ............................................................................ 11

*Fabrizi v. Rexall Sundown, Inc.*,
  No. 01-289, 2004 U.S. Dist. LEXIS 9859 (W.D. Pa. June 2, 2004) ................................... 6

*Fowler v. United States*,
  No. 08-216, 2009 U.S. Dist. LEXIS 78805 (W.D. La. Sept. 1, 2009) ................................ 6

*In re Imperial Credit Industries Securities Litigation*,
  252 F. Supp. 2d 1005 (C.D. Cal. 2003) ................................................................................ 9

*King-Indiana Forge, Inc. v. Millennium Forge, Inc.*,
  No. 1:07-cv-00341-SEB-DML, 2009 U.S. Dist. LEXIS 96131 (S.D. Ind. Sept. 29,
  2009) ........................................................................................................................................ 7

*LeBlanc v. Chevron USA Inc.*,
  No. 05-5485, 2009 U.S. Dist. LEXIS 106339 (E.D. La. Nov. 13, 2009) ........................... 9

*In re Rezulin Products Liability Litigation*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) .................................................................... 9, 10, 11

*Robinson v. Ford Motor Co.*,
  967 F. Supp. 482 (M.D. Ala. 1997) ...................................................................................... 6

*TK-7 Corp. v. Estate of Barbouti*,
  993 F.2d 722 (10th Cir. 1993) ........................................................................................... 7, 8

*Vienne v. America Honda Motor Co.*,
  No. 99-3716, 2001 U.S. Dist. LEXIS 1301 (E.D. La. Jan. 26, 2001) ............................... 10

*Young v. Burton*,
  567 F. Supp. 2d 121 (D.D.C. 2008) .................................................................................... 13

## FEDERAL RULE

Fed. R. Evid. 703................................................................................................................. 9

Defendant Merck Sharp & Dohme Corp. ("Merck") respectfully moves to exclude the testimony of Plaintiff's expert, Dr. David Y. Graham.

Dr. Graham seeks to provide expert testimony regarding "whether [Vioxx] is damaging or toxic to the gastrointestinal tract and if it is, whether it differs substantially from other [non-steroidal anti-inflammatory drugs ("NSAIDs")]." (Report of David Y. Graham, M.D., Regarding Rofecoxib (Vioxx) ("Graham Rep.") ¶ 10, Nov. 6, 2009 (attached as Ex. 1).) Dr. Graham plans to testify that, with respect to gastrotoxicity, Vioxx "clearly has greater risk compared to placebo and is difficult if not impossible to differentiate from traditional NSAIDs in terms of clinically important upper GI events especially bleeding." (*Id.* ¶ 37.) As explained more fully below, this testimony should be excluded for three independent reasons: (1) Dr. Graham is merely parroting a report authored by a statistician, Dr. Nicholas Jewell – he has not independently analyzed or assessed Dr. Jewell's findings; (2) Dr. Graham's reliance on Dr. Jewell's unpublished report was unreasonable under Federal Rule of Evidence 703; and (3) Dr. Graham's opinions are highly suspect under *Daubert* and its progeny because they are contrary to his own pre-litigation scholarly research and writings and are not generally accepted in the medical community.

**BACKGROUND**

Dr. David Y. Graham is a board-certified gastroenterologist and a professor of medicine at Baylor College of Medicine. Dr. Graham intends to testify at trial regarding "whether rofecoxib is damaging or toxic to the gastrointestinal tract and if it is, whether it differs substantially from other NSAIDs." (Graham Rep. ¶ 10.) In his report, Dr. Graham states that Vioxx "clearly has greater risk compared to placebo and is difficult if not impossible to

1

differentiate from traditional NSAIDs in terms of clinically important upper GI events especially bleeding." (*Id.* ¶ 37.)

Dr. Graham's opinion is largely a post-hoc critique of the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study, which compared Vioxx's efficacy and gastrointestinal safety to a traditional NSAID, naproxen, in over 8,000 rheumatoid arthritis patients. (*See* Second Am. Compl. ¶ 81; Graham Rep. ¶¶ 32-35.) The VIGOR study, which was peer-reviewed and published in the New England Journal of Medicine in 2000, found that, while rofecoxib (Vioxx) and naproxen were comparably effective against rheumatoid arthritis, rofecoxib users suffered fewer "gastrointestinal events" than naproxen users. (Graham Rep. ¶ 32.) Prior to being hired as an expert by Plaintiff, Dr. Graham believed that the VIGOR study was methodologically sound and supported the proposition that Vioxx was effective in reducing gastrointestinal side effects. (*See* Dep. of David Graham ("Graham Dep.") 61:13-62:10, Jan. 15, 2010 (attached as Ex. 2).) With respect to the VIGOR paper, Dr. Graham stated at his deposition that "[w]hen they finished the paper, [he] said this was a very well-done study that proved their point." (*Id.* 93:5-7.)

Dr. Graham's own published research is consistent with the general conclusions of the VIGOR study. For example, Dr. Graham coauthored a paper in 2002 that concluded that COX-2 inhibitors were among the most cost-effective therapies for pain when gastrointestinal effects are considered. *See* H.B. El-Serag, D.Y. Graham, et al., *Prevention of complicated ulcer disease among chronic users of nonsteroidal anti-inflammatory drugs: the use of a nomogram in cost-effectiveness analysis*, 162 ARCH. INTERN. MED. 2105, 2107 (2002) ("*Prevention*") (attached as Ex. 3). Likewise, in a 2004 editorial, Dr. Graham concluded that research results "indicate an advantage for coxibs [over NSAIDS]," even though "their use is not devoid of serious gastrointestinal events." *See* David Y. Graham & Francis K.L. Chan, *Is the Use of COX-2*

2

*Inhibitors in Gastroenterology Cost-Effective?*, 1 GASTROENTEROLOGY & HEPATOLOGY 60-61 (2004) (attached as Ex. 4).  In March 2004, Dr. Graham coauthored a review article that stated: "Selective cyclo-oxygenase-2 (COX-2) inhibitors provide good analgesia with increased safety but at greater expense [than other NSAIDs]. . . . If all things including costs were equal, we would only prescribe selective COX-2 inhibitors for any indication where an NSAID is needed." F.K.L. Chan & D.Y. Graham, *Review Article: Prevention Of Non-Steroidal Anti-Inflammatory Drug Gastrointestinal Complications – Review And Recommendations Based On Risk Assessment*, 19 ALIMENT PHARMACOL THER. 1051, 1053 (2004) (attached as Ex. 5).  And as recently as 2006, Dr. Graham regarded COX-2 inhibitors as a valid means of reducing the frequency of peptic ulcer disease.  Hong Lu & David Y. Graham, *New Development in the Mechanistic Understanding of Peptic Ulcer Diseases*, 3 DRUG DISCOVERY TODAY 431-37 (2006) ("*New Development*") (attached as Ex. 6).

After being retained as an expert for Plaintiff, Dr. Graham changed his mind.  He now opines that the gastrointestinal benefit reported in the VIGOR study was statistically significant only for a subset of patients in the trial.  (Graham Rep. ¶ 33.)  Specifically, Dr. Graham believes that the "VIGOR study showed an overall reduction in [perforations, ulcers and bleeds ("PUBs")] but this result was largely related to an effect on patients that were concomitant steroid users."  (*Id.* ¶ 37.)  The key factor in changing Dr. Graham's opinion of the VIGOR study was an unpublished two-page report provided to him by Plaintiff's counsel and authored by Dr. Nicholas Jewell, a statistician who was designated by plaintiffs as an expert in several personal injury cases (though he never testified).  (*See* Graham Dep. 27:22-29:23; 70:1-20.)  *See also* Pl.'s Am. Designation of Experts & Lay Witnesses), *Smith v. Merck & Co., Inc.*, No. 2:05-cv-4379 (E.D. La. July 9, 2006); Pl.'s Witness List, *Dedrick v. Merck & Co., Inc.*, No. 2:05-cv-2524

1008363v.1

(E.D. La. Sept. 25, 2006); Pl.'s Designation of Expert Witnesses, *Berwick v. Merck & Co., Inc.*, No. BC328855 (Cal. Super. Ct. Los Angeles County Feb. 26, 2007) (attached collectively as Ex. 7).  According to Dr. Graham, Dr. Jewell reanalyzed the VIGOR data and discovered that the gastrointestinal benefits of Vioxx extended only to those patients who were also receiving glucocorticoid therapy.  (Graham Dep. 62:11-22; Graham Rep. ¶ 34.)  As Dr. Graham acknowledged, Dr. Jewell's two-page report was never published or peer-reviewed.  (Graham Dep. 188:10-22.)

Dr. Graham has never met or spoken to Dr. Jewell.  (*Id.* 28:10-13.)  Nor has he sought to analyze or confirm Dr. Jewell's results.  (*Id.* 52:4-13.)  Instead, he simply assumed that the unpublished, two-page report was reliable because Dr. Jewell is a professor at "Berkeley" and a "card-carrying statistician."  (*Id.* 28:14-18, 53:12-54:5.)  In making this assumption, Dr. Graham was unaware that Dr. Jewell has previously served as a paid expert in Vioxx litigation:

> **Q.**     Okay.  Do you know if Dr. – were you ever informed whether Dr. Jewell had served as an expert for Don in this or other litigation?
>
> **A.**     We never discussed Dr. Jewell's previous works.

(*Id.* 29:7-12.)

Dr. Graham's dismissal of the VIGOR study findings puts him in direct disagreement with other gastroenterology researchers and experts.  He admitted that his views are out of line with those of the American College of Gastroenterology, which has issued guidelines stating that COX-2 inhibitors such as Vioxx significantly lower incidences of gastric and duodenal ulcers when compared to traditional NSAIDs.  (*See id.* 316:24-317:16.)  *See also* F. Lanza, et al., *Guidelines for Prevention of NSAID-Related Ulcer Complications*, Am. J. Gastroenterology Vol. 104 (Mar. 2009) (attached as Ex. 8).  They are also at odds with the findings of researchers at the American Gastrological Association, who have concluded that "aggregate epidemiological data

suggests that the introduction and broader use of coxibs has led to a significant decrease in deaths owing to the GI effects of NSAIDs among chronic users." (Graham Dep. 327:7-15. *See also* C.M. Wilcox, et al., *Consensus Dev. Conference on the Use of Non-Steroidal Anti-Inflammatory Agents, Including Cyclooxygenase-2 Enzyme Inhibitors and Aspirin*, Clinical Gastroenterology & Hepatology (2006) (attached as Ex. 9).[1]  And Dr. Graham's new-found opinions are also contrary to a number of peer-reviewed and published articles about the gastrotoxicity of Vioxx and other COX-2 inhibitors.  (*See* Graham Dep. 270:13-276:2.)

Dr. Graham's views are also contrary to those of the FDA, which maintains – to this day – that Vioxx "has been shown to reduce the risk of serious GI bleeding compared to a non-selective NSAID (naproxen) following chronic use." *Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk*, Apr. 6, 2005, at 2, *available at* http://www.fda.gov/downloads/Drugs/DrugSafety/Postmarket DrugSafetyInformationforPatientsandProviders/ucm106201.pdf (last visited Feb. 19, 2010).

## ARGUMENT

The general legal standard for the admission of expert testimony in federal courts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is discussed in detail in Defendant's Memorandum Of Law In Support Of Its Motion To Exclude The Testimony Of Jeffrey Harris, which is incorporated herein by reference.

---

[1]  In addition, the American Pain Society, the American College of Rheumatology's Subcommittee on Osteoarthritis, and the American Geriatrics Society also disagree with Dr. Graham's opinions in this case.  *See* Am. Pain Soc'y, *Guideline for the Management of Pain in Osteoarthritis, Rheumatoid Arthritis, and Juvenile Chronic Arthritis* 44-47 (2d ed. 2002) (attached as Ex. 10); Am. Coll. of Rheumatology Subcomm. on Osteoarthritis Guidelines, *Recommendations for the Medical Management of Osteoarthritis of the Hip and Knee*, 43 ARTHRITIS & RHEUMATISM 1905-15 (2000) (attached as Ex. 11); AGS Panel on Persistent Pain in Older Persons, *The Management of Persistent Pain in Older Persons*, 50 J. AM. GERIATRICS SOC'Y S205-24 (2002) (attached as Ex. 12).

As explained below, Dr. Graham's proffered testimony fails to meet these requirements for three independent reasons and should therefore be excluded at trial. ***First***, Dr. Graham's opinion merely parrots Dr. Jewell's report without any independent analysis or assessment of Dr. Jewell's findings. Thus, his testimony will not "assist the trier of fact" as required by Rule 702. ***Second***, Dr. Graham's testimony is also inadmissible under Federal Rule of Evidence 703, which bars experts from relying on materials that are not "of a type reasonably relied upon by experts in the particular field." And ***third***, Dr. Graham's proposed testimony bears two indicia of unreliability under *Daubert* and its progeny: (1) he developed an opinion as a result of his work on this litigation that is contrary to his own scholarly research and writings; and (2) his newly adopted views are not generally accepted in the scientific community.

## I. DR. GRAHAM CANNOT REGURGITATE THE FINDINGS OF DR. JEWELL BECAUSE HE DID NOT INDEPENDENTLY ASSESS OR ANALYZE THE JEWELL PAPER.

"An opinion which . . . simply parrots the opinion of another does not assist the trier of fact, and thus, is inadmissible under Rule 702 of the Federal Rules of Evidence." *See Robinson v. Ford Motor Co.*, 967 F. Supp. 482, 487 n.2 (M.D. Ala. 1997), *aff'd*, 144 F.3d 56 (11th Cir. 1998); *see also Fowler v. United States*, No. 08-216, 2009 U.S. Dist. LEXIS 78805, at *26 n.59 (W.D. La. Sept. 1, 2009) (an expert cannot "simply parrot the work actually done by another expert, who is not offered for testimony and cross-examination"); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1363-64 (S.D. Fla. 2009) (expert witnesses "must make some findings and not merely regurgitate another expert's opinion"); *Fabrizi v. Rexall Sundown, Inc.*, No. 01-289, 2004 U.S. Dist. LEXIS 9859, at *30 (W.D. Pa. June 2, 2004) (rejecting expert testimony where the witness "in large part piggy-back[ed] on the opinions" of another physician). Rather, in order to satisfy Rule 702 and *Daubert*, an "expert must incorporate the information supplied to him into his underlying facts, independently review the information, and then formulate, with

calculations consistent with his expertise, an opinion that relies upon that [and] any other relevant information." *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 U.S. Dist. LEXIS 96131, at *5 (S.D. Ind. Sept. 29, 2009).

In *Eberli*, for example, one of the defendants moved to exclude expert testimony that the failure of an airplane engine "was not caused by a frozen breather line" on the ground that the expert "formed this opinion based solely on the flight testing done by another expert." *Eberli*, 615 F. Supp. 2d at 1363-64. The court granted the motion, finding that an "expert must make some findings and not merely regurgitate another expert's opinion." *Id.* According to the court, the expert "made no findings regarding the breather line; instead, it appears that he simply adopted [the other expert's] conclusions regarding the flight tests. Such a methodology surely does not satisfy the *Daubert* standards." *Id.* at 1365.

Similarly, in *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993), the plaintiffs appealed a directed verdict and argued, among other things, that they had presented sufficient evidence on the issue of damages to warrant submission of the case to the jury. The appellate court disagreed. The court explained that there were only two possible sources of evidence on the issue: a market survey report prepared by D.A. Werber, who was not called to testify at trial, and the opinion of Dr. Boswell, the plaintiffs' financial expert. *Id.* at 731. Plaintiffs contended that Dr. Boswell properly adopted the hearsay conclusions in the market survey report because he concluded that Mr. Werber, its author, was an expert. *Id.* at 732. The appellate court disagreed, reasoning that it was improper for the expert to adopt the projections as his own. According to the court, "Dr. Boswell professed no expertise with regard to projecting sales," and there was "no indication in the record that Dr. Boswell had any familiarity with the methods or reasoning used by Mr. Werber in arriving at his projections." *Id.* At the

7

time of his deposition, Dr. Boswell "assumed the validity of the projections made by D.A. Werber despite the fact that he knew little or nothing at all about Werber." *Id.* "By assuming the sales projections made by Werber, Dr. Boswell in essence assumed the very matter at issue on which he was called to express his opinion." *Id.*

Dr. Graham's testimony here is no different from the rejected expert testimony in *Eberli* and *TK-7*. Dr. Graham is not a biostatistician (*see* Graham Dep. 18:8-10), and is thus incapable of performing the analysis done by Dr. Jewell. Instead, he has simply adopted Dr. Jewell's finding as his own. Nowhere in Dr. Graham's report does he explain the methodology used by Dr. Jewell to perform his "reanalysis" of the VIGOR results. In addition, Dr. Graham made no effort to independently evaluate Dr. Jewell's work. He did not attempt to discuss Dr. Jewell's work with Dr. Jewell, and he also never bothered to confirm Dr. Jewell's results with anyone else:

> **Q.** Now, have you had any conversations with any of the authors of the [VIGOR study] directly about the point regarding corticosteroid use with either Vioxx or with naproxen?
>
> **A.** No.
>
> **Q.** Have you had any conversations directly with the editor of this paper who approved it about those particular issues?
>
> **A.** No.

(*Id.* 52:4-13.) When pressed to explain why he would simply take Dr. Jewell at his word, Dr. Graham responded similarly to the expert in *TK-7*: "my assumption was, first of all, that he was a card-carrying statistician and knew what he was doing." (*Id.* 53:12-54:5.)

In sum, Dr. Graham made no effort to verify or independently investigate the methods or conclusions in Dr. Jewell's "report" – he simply adopted those conclusions as his own. Because "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a

scientist in a different specialty," *Dura Automobile Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002), Dr. Graham's testimony must be excluded.

## II.     THE JEWELL PAPER DOES NOT CONSTITUTE FACTS OR DATA "OF A TYPE REASONABLY RELIED UPON BY EXPERTS" UNDER RULE 703.

Dr. Graham's report and testimony must also be excluded under Federal Rule of Evidence 703 because Dr. Jewell's unpublished report is not the type of material "reasonably relied upon by experts." Fed. R. Evid. 703.

Rule 703 bars expert witnesses from basing opinions and conclusions on inadmissible hearsay evidence – such as reports and studies prepared by third parties – unless such evidence is "of a type reasonably relied upon by experts in the particular field." *Id.* Dr. Jewell's unpublished, attorney-commissioned report falls far short of this standard. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 561 (S.D.N.Y. 2004) (plaintiffs' expert could not rely on unpublished report provided by third party where the report was not "of a type reasonably relied upon by experts in the particular field"); *LeBlanc v. Chevron USA Inc.*, No. 05-5485, 2009 U.S. Dist. LEXIS 106339, at *9-10 (E.D. La. Nov. 13, 2009) (unpublished documents that were not subjected to peer review did not "constitute reliable scientific evidence establishing a causal relationship" upon which experts could rely); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1179 (N.D. Cal. 2007) (unpublished, non-peer-reviewed study was "not a scientifically valid basis" for forming expert testimony); *In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003) (Rules 702 and 703 "do not permit an expert to rely on excerpts from opinions developed by another expert for the purposes of litigation"); *Vienne v. Am. Honda Motor Co.*, No. 99-3716, 2001 U.S. Dist. LEXIS 1301, at *10 (E.D. La. Jan. 26, 2001) (articles in driving magazines were not of a type reasonably relied on by experts and thus could not form the basis of expert testimony).

In *In re Rezulin*, for example, plaintiffs asserted personal injury claims stemming from liver injuries allegedly caused by the diabetes drug Rezulin. One of plaintiffs' experts sought to testify that the risks of the drug outweighed any benefits. *In re Rezulin*, 309 F. Supp. 2d at 561. This conclusion was based on a determination that the risk of Rezulin-induced liver failure is 1 in 1000, a ratio derived from an unpublished report prepared by an employee at the Food & Drug Administration ("FDA"). *Id.* In assessing the reasonableness of the expert's reliance on the unpublished report, the court first noted that the expert viewed the report as final and definitive, despite the fact that "under the FDA's own regulations the unpublished report did not qualify as an official position of the FDA, a fact of which [the expert] apparently was unaware." *Id.* at 562. The court was further troubled by the expert's willingness, "in a report prepared for this litigation, [to] rely on the 1:1000 ratio expressed in an unpublished study authored by another person, while eschewing his own ***published, peer-reviewed*** view that the ratio was in the far lower range of 1:8000 to 1:20,000." *Id.* (emphasis added). According to the court, that fact suggested that the expert's "reliance on the unpublished [FDA] report was not based on [the] scientific method but on the expediencies of this particular litigation." *Id.* The court concluded that "[t]aken together, all of these factors lead the court to conclude that [the expert's] reliance on the unpublished . . . report does not comport with Rule 703." *Id.* at 562-63.

The same result should obtain here. Dr. Graham acknowledged that he initially believed the VIGOR study was "a very well-done study that proved [the author's] point." (Graham Dep. 93:5-7.) Now, however, like the expert in *In re Rezulin*, Dr. Graham has been retained by Plaintiff and suddenly "eschew[s]" his prior opinion – and his own published works supporting that opinion – based on an unpublished report. But Dr. Graham's reliance on Dr. Jewell's "report" is wholly improper because that work bears none of the traditional indicia of reliability.

10

Dr. Jewell's report is less than two pages long. It does not reveal the methods employed to reach the proffered conclusion, and it does not state precisely which figures from the VIGOR study he used to perform many of his calculations. (*See* Jewell Report, Sept. 17, 2009 (attached as Ex. 13).) Dr. Jewell's analysis – much like the non-final FDA report in *In re Rezulin* – has never been tested or published and has never been subjected to peer review. (Graham Dep. 188:10-22.) As Dr. Graham acknowledged, Dr. Jewell's report is nothing more than two pieces of paper:

> **Q.** Was the report that – this two-page report that Dr. Jewell sent you from a medical journal, or was it just two pieces of paper?
>
> \*     \*     \*
>
> **A.** Best I can tell, it was his own analysis of the data.

(*Id.* 28:22-29:5 (objection removed).)

Put simply, Dr. Jewell's "report" is "so lacking in probative force and reliability that no reasonable expert could base an opinion on" it. *Ellipsis, Inc. v. Color Works, Inc.*, 428 F. Supp. 2d 752, 760 (W.D. Tenn. 2006) (citation omitted). Because Dr. Graham's "opinions regarding the [gastrotixicity of Vioxx] are based on the [the unpublished Jewell paper] they . . . are inadmissible." *In re Rezulin*, 309 F. Supp. 2d at 563. For this reason too, the testimony should be excluded.

### III. DR. GRAHAM'S TESTIMONY IS UNRELIABLE FOR OTHER REASONS AS WELL.

Finally, Dr. Graham's opinions should be excluded because they bear two indicia of unreliability recognized by *Daubert* and its progeny. First, he developed an opinion as a result of his work on this litigation that is contrary to his own scholarly research and writings. And second, his recently adopted views are not generally accepted in the relevant scientific community. For these reasons too, the testimony should be excluded.

A.     **Dr. Graham's Opinions Are Exclusively Litigation Driven.**

*Daubert* and its progeny have advised district courts to be highly skeptical of expert opinions that were developed for litigation purposes, as opposed to opinions that flow from research conducted independently of litigation:

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); *see also Cuevas v. E.I. DuPont de Nemours & Co.*, 956 F. Supp. 1306, 1312 (S.D. Miss. 1997) (excluding expert testimony where the proffered expert "was specifically employed by plaintiffs to state an opinion concerning" the herbicide to which plaintiff was exposed and "[n]one of his opinions [were] an outflow of natural research done prior to being employed by the plaintiffs").

Dr. Graham's opinion here deserves the absolute highest level of skepticism under this case law. After all, prior to being retained by counsel for Plaintiff, Dr. Graham held an opinion that was precisely the ***opposite*** of the one he holds now. In 2002, for example, Dr. Graham coauthored a paper, which concluded that COX-2 inhibitors were among the most cost-effective therapies for pain when gastrointestinal effects are considered. *See Prevention*, *supra*, at 2107. And as recently as 2006, Dr. Graham regarded COX-2 inhibitors as a valid means of reducing the frequency of peptic ulcer disease. *See New Development*, *supra*, at 431-37. It was not until counsel for Plaintiff supplied Dr. Graham with Dr. Jewell's unpublished paper (also prepared for litigation purposes) that Dr. Graham adopted his current position that the VIGOR study results were flawed. And Dr. Graham has not made any effort to analyze the Jewell findings independently of this litigation. Indeed, as noted above, he has made no effort to analyze the findings at all.

1008363v.1

In short, "[n]one of [Dr. Graham's] opinions are an outflow of natural research done prior to being employed by the plaintiffs." *Cuevas*, 956 F. Supp. at 1312. For this reason too, his testimony is unreliable and should be excluded.

### B. Dr. Graham's Opinions Lack Acceptance In The Scientific Community.

Dr. Graham's opinions should also be excluded because they lack acceptance in the scientific community. *See Young v. Burton*, 567 F. Supp. 2d 121 (D.D.C. 2008).

In *Young*, for example, an expert testified in a personal injury suit that the plaintiffs had sustained "mold illness" after moving next door to an apartment with visible mold growth. *Id.* at 131. The court excluded the testimony because, *inter alia*, "mold illness" is not a generally accepted illness in the medical community. *Id.* It thus concluded that any opinion that "mold illness" was the most likely explanation for a patient's illness "is, by definition, unreliable." *Id.*

Dr. Graham's opinions suffer from the same flaw. Dr. Graham admitted that his views on the VIGOR study are outside the mainstream and do not enjoy "general acceptance" in the relevant scientific community. For example, Dr. Graham conceded that his views are out of line with the American College of Gastroenterology, which has issued guidelines stating that COX-2 inhibitors such as Vioxx significantly lower incidences of gastric and duodenal ulcers when compared to traditional NSAIDs. (*See* Graham Dep. 316:24-317:16.) *See also* Lanza, et al., *supra*. Dr. Graham also acknowledged that his opinions are contradicted by researchers at the American Gastrological Association, who have concluded that "aggregate epidemiological data suggests that the introduction and broader use of coxibs has led to a significant decrease in deaths owing to the GI effects of NSAIDs among chronic users." (Graham Dep. 327:7-15.) *See also* Wilcox, et al., *supra*. In addition, Dr. Graham conceded that several peer-reviewed and published articles (including some of his own) disagree with his conclusions about the gastrotoxicity of Vioxx and other COX-2 inhibitors. (*See* Graham Dep. 270:13-276:2.) And the

FDA too disagrees with Dr. Graham's views; its position is that "rofecoxib has been shown to reduce the risk of serious GI bleeding compared to a non-selective NSAID (naproxen) following chronic use."  John K. Jenkins & Paul J. Seligman, M.D.s, *Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk*, Apr. 2005 at 2, *available at* http://www.fda.gov/downloads/Drugs/DrugSafety/Postmarket DrugSafetyInformationforPatientsandProviders/ucm106201.pdf (last visited Feb. 19, 2010).

In sum, Dr. Graham's opinions are – by his own admission – outside the mainstream and not generally accepted in the relevant medical community.  For this reason too, his opinions should be excluded.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Merck's motion and exclude the report and testimony of Dr. David Y. Graham.

Respectfully Submitted,

*/s/ Dorothy H. Wimberly*

| | |
|---|---|
| Travis Sales<br>BAKER BOTTS LLP<br>One Shell Plaza<br>910 Louisiana Street<br>Houston, TX 77002 | Phillip A. Wittmann, 13625<br>Dorothy H. Wimberly, 18509<br>STONE PIGMAN WALTHER<br>WITTMANN L.L.C.<br>546 Carondelet Street<br>New Orleans, LA 70130 |
| Tarek Ismail<br>GOLDMAN, ISMAIL, TOMASELLI,<br>BRENNAN & BAUM LLP<br>1 North Franklin Street<br>Suite 625<br>Chicago, IL 60606 | John H. Beisner<br>Jessica Davidson Miller<br>Geoffrey M. Wyatt<br>SKADDEN, ARPS, SLATE,<br>MEAGHER & FLOM LLP<br>1440 New York Avenue, N.W.<br>Washington, DC 20005 |
| Brian C. Anderson<br>Matthew M. Shors<br>O'MELVENY & MYERS LLP<br>1625 Eye Street, N.W.<br>Washington, DC 20006 | Douglas R. Marvin<br>WILLIAMS & CONNOLLY LLP<br>725 Twelfth St., N.W.<br>Washington, DC 20005 |

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Memorandum in Support of Motion to Exclude Testimony of David Y. Graham, M.D. has been served on Liaison Counsel by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Plaintiff, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 19th day of February, 2010.

                                                          */s/ Dorothy H. Wimberly*
                                                          Dorothy H. Wimberly, 18509
                                                          STONE PIGMAN WALTHER
                                                          WITTMANN L.L.C.
                                                          546 Carondelet Street
                                                          New Orleans, Louisiana  70130
                                                          Phone:  504-581-3200
                                                          Fax:     504-581-3361
                                                          dwimberly@stonepigman.com

                                                          Defendants' Liaison Counsel