# EXHIBIT 2

David Y. Graham, M.D.

Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
    In re:  VIOXX          §  MDL No. 1657
 3  Products Liability     §
    Litigation             §  SECTION L
 4  _____        §
                           §
 5  STATE OF LOUISIANA,    §
    ex rel. JAMES D. CALDWELL, §  JUDGE ELDON E.
 6  JR., Attorney General, §  FALLON
                           §
 7        Plaintiff,       §
                           §
 8  v.                     §  MAGISTRATE
                           §  JUDGE KNOWLES
 9  MERCK SHARP & DOHME CORP., §
                           §
10        Defendant.       §  Case No.
                           §  05-3700
11                         §
12
13            FRIDAY, JANUARY 15, 2010
14                    -  -  -
15        Oral deposition of DAVID Y.
16  GRAHAM, M.D., held in the offices of
17  Matthews & Associates, 2905 Sackett Street,
18  Houston, Texas 77098, Houston, Texas
19  commencing at 9:30 a.m., on the above date,
20  before Minnie Cadena-Meche, Registered Merit
21  Reporter.
22                    -  -  -
23            GOLKOW TECHNOLOGIES, INC.
          877.370.3377 ph | 917.591.5672 fax
24                deps@golkow.com
```

David Y. Graham, M.D.

Page 18

1    trials who has expertise in biostatistics.

2    You've seen that in some of the clinical

3    trials?

4         A.    Most large clinical trials have

5    a biostatistical component.

6         Q.    Okay.  And do you hold yourself

7    out as a biostatistician?

8         A.    Again, I do some biostatistics

9    for my own clinical trials particularly; but

10   I'm not a card-carrying biostatistician.

11        Q.    I understand.

12              Let me ask you then going back

13   to the work that you did and -- would it be

14   fair to say that you were asked to look into

15   the gastrointestinal effects of Vioxx?  Was

16   that one of the things that you were asked to

17   do?

18        A.    Well, that's probably more

19   broad than I was asked to do; but that was

20   the area that we were discussing.

21        Q.    Okay.  You were asked to look

22   at -- one of the things you were asked to

23   look at specifically would have been whether

24   Vioxx was gastrotoxic when compared to

David Y. Graham, M.D.

1    name were, obviously, not sent to you by the

2    plaintiff's attorneys.  Would that be a fair

3    statement?

4          A.    Yes.

5          Q.    All right.  So which reports in

6    Exhibit 6 do you recall were actually sent to

7    you by the plaintiff's attorneys, if you

8    recall?

9          A.    In which of the publications?

10         Q.    Publications, I'm sorry.

11         A.    He sent me Langman.  Of course,

12    I had seen it before; but he did send it to

13    me.

14         Q.    Okay.

15         A.    He sent me the APPROVe study

16    which also I had seen before.  He sent me the

17    VIGOR study.

18         Q.    I assumed you had seen that

19    before?

20         A.    Of course.  It's easier to get

21    his copies than to go through my file.

22         Q.    All right.

23         A.    I've got, of course,

24    Dr. Jewell's report.

David Y. Graham, M.D.

1          Q.      Is that a two-page report?

2          A.      Two-page report.

3          Q.      All right.  Let me ask you

4     about doctor -- is this Dr. Nicholas Jewell

5     who is referred to in page 14 of your report?

6          A.      Yes.

7          Q.      Had you worked with Dr. Jewell

8     before?

9          A.      Never.

10         Q.      Had you met Dr. Jewell?

11         A.      Never.

12         Q.      Had you spoken with Dr. Jewell?

13         A.      Never.

14         Q.      Do you know anything about

15    Dr. Jewell's qualifications from personal

16    knowledge?

17         A.      Well, only that he's a

18    professor at Berkeley.

19         Q.      Okay.  But he hasn't done any

20    work with you before, correct?

21         A.      No.

22         Q.      Was the report that -- this

23    two-page report that Dr. Jewell sent you from

24    a medical journal, or was it just two pieces

David Y. Graham, M.D.

1    of paper?

2                MR. ARBITBLIT:   Objection,

3        form.

4        A.     Best I can tell, it was his own

5    analysis of the data.

6    BY MR. JOSEPHSON:

7        Q.     Okay.  Do you know if Dr. --

8    were you ever informed whether Dr. Jewell had

9    served as an expert for Don in this or other

10   litigation?

11       A.     We never discussed Dr. Jewell's

12   previous works.

13       Q.     Okay.  So is it fair to say

14   that in terms of your own personal knowledge,

15   you've never worked with him, talked to him

16   or had any hand in the preparation of his

17   report?

18       A.     I had nothing to do with the

19   preparation of his report.

20       Q.     Okay.  And is it fair to say

21   that you rely upon Dr. Jewell's two-page

22   report?

23       A.     Oh, yes.

24       Q.     Okay.  And we'll come -- we're

David Y. Graham, M.D.

Page 52

1    for the fact that it was eventually

2    published.

3    BY MR. JOSEPHSON:

4         Q.    Now, have you had any

5    conversations with any of the authors of the

6    paper directly about the point regarding

7    corticosteroid use with either Vioxx or with

8    naproxen?

9         A.    No.

10        Q.    Have you had any conversations

11   directly with the editor of this paper who

12   approved it about those particular issues?

13        A.    No.

14        Q.    And this person who comes along

15   and does an analysis, as I understand it,

16   this Dr. Jewell who comes along and does an

17   analysis, his analysis of corticosteroid use

18   with naproxen and Vioxx and the significance

19   of it in 2009 or 2010 is someone you've never

20   met or talked to about his analysis, correct?

21        A.    It is someone I've never met

22   and talked to about his analysis, professor

23   at Berkeley.

24        Q.    Okay.  Well, whether he's a

David Y. Graham, M.D.

Page 53

1       professor at the LeTourneau College of

2       Business or whether he's a professor at

3       Berkeley, you've never had a single discussion

4       with him or asked him about his methodology

5       or the work that -- the work that he did in

6       this two-page analysis, correct?

7                    MR. ARBITBLIT:   Objection,

8          form.

9          A.      I actually would -- I actually

10      thought about it a different way.

11      BY MR. JOSEPHSON:

12         Q.      Well, first, answer my

13      question.  Then you can tell me how you

14      thought about it.

15         A.      Well, I did not even imagine

16      calling him up and querying him about the

17      details of what he did.  He had the database

18      that they had, and he could push the same

19      button that they could push.  So my

20      assumption was, first of all, that he was a

21      card-carrying statistician and knew what he

22      was doing.

23                    Secondly, that if he were

24      wrong, and this is such an important issue,

David Y. Graham, M.D.

Page 54

1    that, speaking Texan, that Merck would have

2    been on him like a toad on a June bug as far

3    as the data and the rebuttal would have

4    contained the statistical reviews from Merck

5    that showed that his analysis was incorrect.

6         Q.    Well, Doctor, as a Merck

7    lawyer, I just received this two-page

8    document yesterday.  So if that's true and

9    Merck has never seen the document and their

10   experts have never seen the document, would

11   you agree with me that it would have been

12   very difficult to respond to this two-page

13   document for a rebuttal report that you

14   wrote --

15             MR. ARBITBLIT:  Objection,

16        form.

17   BY MR. JOSEPHSON:

18        Q.    -- a few weeks ago?  Wouldn't

19   that be correct?

20             MR. ARBITBLIT:  Objection,

21        form.

22        A.    My initial review back in

23   November quotes him verbatim; and so

24   therefore, at least it gave them that data

David Y. Graham, M.D.

Page 61

1    find out, Doctor, going back to my basic

2    question:  Did you know from reviewing the

3    VIGOR paper that when Vioxx was compared to

4    users of naproxen who were taking steroids,

5    that there was a statistically significant

6    difference between the gastroprotective

7    effects of Vioxx under those circumstances?

8              MR. ARBITBLIT:  Objection,

9         form.

10         A.    I can tell you what I did know,

11   if that's what your question is.

12   BY MR. JOSEPHSON:

13         Q.    All right.  Tell me what you

14   knew.

15         A.    And if you look -- if you look

16   at the data, even in the most critical way,

17   and that was to say did the -- how you do

18   these studies is you do double-blind placebo

19   control trial, carefully selected.  And the

20   question you're asking is:  Do you have

21   reduced significant events with this drug

22   compared to the comparer?

23              And when they did that study,

24   they did it, first of all, looking at a broad

David Y. Graham, M.D.

Page 62

1    mishmash of events; and they found

2    significance.  But then when you went down

3    and looked at even the most important group,

4    those with confirmed complicatedness, they

5    still won.

6              So at that point, you would say

7    this was a successful study; and the

8    hypothesis is proven that Vioxx is less

9    dangerous, as far as these important events,

10   than is naproxen.

11        Q.    Okay.  Go ahead.

12        A.    And then you go home.  And then

13   you say then Dr. -- but the reviewer now is

14   saying, Is this really true, or is this

15   really true or not?  You got to do this

16   analysis.  So Dr. Jewell does the analysis;

17   and he shows it's not true.  That when I take

18   out the people who are taking steroids, the

19   difference goes away; and it statistically

20   goes away.  So therefore, what I felt when I

21   got the data and read it, they fooled me; and

22   they had, therefore, fooled everyone.

23        Q.    Okay.

24        A.    And, therefore, people were

David Y. Graham, M.D.

Page 70

1      Q.      Okay.  And did you have -- has

2    Dr. Jewell's work ever been published, to

3    your knowledge?

4      A.      Well, I understand it's under

5    restraining order; and I hope that will be

6    released so that it can be published.

7      Q.      And who told you that it would

8    be impossible for someone to do an analysis

9    in a peer-reviewed medical journal about the

10   data in the VIGOR trial and what it meant?

11     A.      No one told me that at all.

12     Q.      So when you say it's under a

13   restraining order and it would be impossible

14   for someone to do analysis of the VIGOR

15   trial --

16     A.      I didn't say that.  I said my

17   understanding of his report right now was

18   under a restraining order and that I hoped

19   that that would be released so that we -- or

20   someone could publish it.

21     Q.      And who told you that his

22   report -- the two-page report that you

23   read -- or one-and-a-half-page report that

24   you read was under a restraining order?

David Y. Graham, M.D.

1    difference, but it wasn't statistically

2    significant?

3              MR. ARBITBLIT:  Objection,

4         form.

5         A.    When they finished the paper, I

6    said this was a very well-done study that

7    proved their point.

8    BY MR. JOSEPHSON:

9         Q.    Okay.  And let me ask you this

10   --

11        A.    I no longer have that opinion,

12   but my opinion would have been that.

13             MR. JOSEPHSON:  Objection,

14        nonresponsiveness.

15   BY MR. JOSEPHSON:

16        Q.    But you've gained your new

17   opinion through work as an expert witness for

18   the plaintiffs in connection with this case,

19   correct?

20        A.    Correct.

21             (Whereupon, Deposition Exhibit

22        Graham-10, "Stratifying the Risk of

23        NSAID-Related Upper GI Clinical

24        Events: Results of a Double-Blind

David Y. Graham, M.D.

Page 188

1    BY MR. JOSEPHSON:

2         Q.    When were you first told about

3    the existence of this Dr. Jewell?

4         A.    Early on, when I received his

5    material.

6         Q.    Well, I guess, did that come

7    with the original package?

8         A.    I don't think this document

9    came with the original package, no.

10        Q.    Well, were you told in the

11   original call by the plaintiff's lawyers that

12   they had asked this statistician to prepare a

13   report and it showed that Vioxx wasn't any

14   different than naproxen regarding

15   gastrotoxicity and we really want you to look

16   at this, Dr. Graham?

17             MR. ARBITBLIT:  Object to form.

18        A.    I don't remember the exact

19   details.  I mean, it was clear that they had

20   new information that was not in the published

21   domain that they were wanting to share with

22   me if I was interested in pursuing this.

23   BY MR. JOSEPHSON:

24        Q.    Okay.  And did that new

David Y. Graham, M.D.

Page 270

1    I could compare passes per yard with the

2    Texans against all other football teams in

3    the last -- forever; and I bet I could show

4    it looks pretty good.  And you could say, You

5    did against all other football teams?  And he

6    did it against all other NSAIDs -- potent

7    ones, weak ones?  You've got to be kidding

8    me.  Who could do an analysis when you mix

9    piroxicam with drugs like Nabumetone?

10              MR. JOSEPHSON:  Objection,

11         nonresponsive.

12   BY MR. JOSEPHSON:

13         Q.    Doctor, my question is simply:

14   If I picked another study -- if I picked

15   Laine published in JAMA, if I picked -- which

16   you told me is a journal right below the New

17   England Journal of Medicine, okay, have you

18   written any article refuting the results of

19   Laine, refuting the results of your friend,

20   Loren Laine?

21         A.    Yes, I have.

22         Q.    On Vioxx?

23         A.    Not on Vioxx.

24         Q.    Well, that's what I'm asking

David Y. Graham, M.D.

Page 271

1    you.

2          A.      I don't write about Vioxx.   But

3    I could take this one.   If you go back and

4    look at the data -- they gave me the data,

5    64-page data that this came from and you look

6    at the selectivity, you see there's against

7    the Nabumetone.   There were no events in the

8    Nabumetone.   Nabumetone was equal or better.

9    You look against Arthrotec, there was no

10   events in Arthrotec.   Big number -- pick 900

11   patients.

12              And you say, where did those

13   go?   You look at this picture they show me

14   and then you look at the other pictures they

15   had of -- this is the one out of Langman,

16   basically out of Langman -- you look at the

17   other pictures they have looking at all

18   NSAIDs for significant effects and rofecoxib

19   is higher than the NSAIDs.

20              So you'd say, How did they

21   select this?   What criteria do they use to

22   put these things together and to select the

23   ones that looked best?   And then you would

24   say, My goodness, what kind of garbage is

David Y. Graham, M.D.

Page 272

1    this?

2         Q.    So basically, your friend who

3    you just told me was your -- this is your

4    friend who you, I think, just told me was

5    ethical and had helped you out, Thomas Simon.

6         A.    I helped him out.

7         Q.    "You helped him out," is now

8    unethical and is a coauthor on a paper that

9    you believe has no merit?

10        A.    I don't know if he ever read

11   it.

12        Q.    Okay.  So now, he didn't read

13   it?

14        A.    I don't know.

15        Q.    Okay.  Langman, if I just use

16   that paper.

17        A.    We discussed Langman.

18        Q.    Yeah.  But Langman, you agree,

19   was published in a peer-reviewed journal, the

20   JAMA.

21        A.    Yeah.

22        Q.    That's a prestigious, prominent

23   journal?

24        A.    It was at a time when this was

David Y. Graham, M.D.

Page 273

```
 1    really hot.
 2         Q.    Okay.  My question is:  If I go
 3    through all --
 4         A.    And Langman showed no
 5    significant difference.
 6         Q.    No significant difference
 7    between what?
 8         A.    Between whatever you want to
 9    call it.  You've looked at individual ones.
10    I have discussed Langman in detail here.
11         Q.    You do?
12         A.    Yeah.
13         Q.    And I don't want to go over it
14    because I've read your -- I've read your
15    paper but --
16         A.    I'm not surprised; but I say
17    negative things about it, not about Langman.
18    But I say that the answers are different,
19    there is bias here and there; but, you know,
20    that's life.
21         Q.    So basically, Langman wrote --
22    was published in the JAMA; and he concludes
23    our analysis shows that COX-2 specific
24    inhibition with rofecoxib was associated with
```

David Y. Graham, M.D.

Page 274

1    the significantly lower risk of PUBs relative

2    to NSAIDs.  These findings are consistent

3    with the results of studies of intestinal

4    permeability, fecal red blood cell loss and

5    upper GI endoscopy with rofecoxib and

6    indicate that risks of GI toxic effects

7    associated with NSAIDs can be reduced by

8    COX-2 specific inhibition.

9            Now, did you ever write a

10   peer-reviewed, published article that

11   disagreed with that finding?

12            MR. ARBITBLIT:  Object to form.

13       A.      Probably.  If you'd like, I

14   could do it.  I could go do it this

15   afternoon.  I would suspect that I could show

16   you several of my papers that would disagree

17   with that as a concept.  But even if you look

18   at his own data -- that when you look at --

19   he was very careful, they were very careful

20   to define what a real event was; 3-centimeter

21   gastric ulcer, 2-centimeter duodenal ulcer,

22   all these criteria for bleeding.

23            And when you did that and you

24   came down to the bottom line, the

David Y. Graham, M.D.

Page 275

1    accumulative incidence for rofecoxib, as I

2    pointed out in No. 25 is 1% compared to 1.39

3    percent among NSAID users, not significant.

4    And then actually, when they went down to the

5    real ones, which are the GI PUBs that were

6    complicated, the incidence was 0.45 versus

7    0.55, the number that I had wrong, which is

8    not significant.

9              So when you just analyze the

10   data for what it is, you can't agree with

11   that summation.  And it's my analysis.  It

12   could be easily a peer-reviewed analysis.

13             MR. JOSEPHSON:  Objection,

14        nonresponsive.

15   BY MR. JOSEPHSON:

16        Q.    Basically, then, you disagree

17   with Watson.  You disagree with Langman.  You

18   disagree with Loren Laine.  You disagree with

19   just about anybody who has written an

20   article.  You disagree with the VIGOR

21   results.  Would that be a fair statement?

22             MR. ARBITBLIT:  Object to form.

23        A.    I agree with the VIGOR result.

24   I absolutely agree.  I wrote papers that said

David Y. Graham, M.D.

Page 276

1    the VIGOR result was right because I was

2    misled.

3    BY MR. JOSEPHSON:

4         Q.    Now, let me ask you about --

5         A.    But I gave you the details

6    here in the specific details, line and

7    numbers and references, et cetera,

8    background.

9         Q.    I understand.

10        A.    And worse than that, it's all

11   endoscopic ulcers, which we don't have

12   clinical meaning for anyway.

13        Q.    And you're giving these

14   opinions, as we sit here today in 2010,

15   correct?

16        A.    Say it again.

17        Q.    You're giving these opinions,

18   as we sit here in 2010; and there isn't a

19   single paper that you wrote in 2001, '2, '3,

20   where you were critical of the results of

21   Dr. Laine --

22        A.    Oh, that's not true.

23        Q.    -- in Vioxx?

24        A.    No, no.  We're talking about

David Y. Graham, M.D.

Page 316

1    "Well, this guy I don't know sent me this

2    two-page letter.  And in the two-page letter,

3    he told me things I didn't know; and here is

4    the letter"?

5         A.    I would send them a copy of an

6    article that I got accepted in the Annals of

7    Internal Medicine.

8         Q.    What's that article?

9         A.    About the data that I know

10   about.

11        Q.    And have you submitted that for

12   publication?

13        A.    Not yet.

14        Q.    Okay.  So as we sit here, you

15   think you might write these fellows at the

16   American --

17        A.    I might ask them to be

18   coauthors.

19        Q.    -- American College of

20   Gastroenterology; but you haven't done that

21   yet.

22        A.    I might ask the first two to be

23   coauthors.

24        Q.    So anyway, as we sit here

David Y. Graham, M.D.

Page 317

1      today, you'll agree that guidelines about the

2      use of -- that COX-2 inhibitors are

3      associated with the significantly lower

4      incidences of gastric and duodenal ulcers

5      when compared to traditional NSAIDs.  That

6      statement, which you're critical of for

7      Vioxx, don't know for Celebrex, represents

8      the current guideline of the American College

9      of Gastroenterology?

10                 MR. ARBITBLIT:  Object to form.

11         A.     It is the current guidelines,

12     and it just shows they fooled more than me.

13     BY MR. JOSEPHSON:

14         Q.     So you disagree with it is, I

15     guess, what I'm asking.

16         A.     Yes.

17         Q.     Okay.  Fair enough.  I want to

18     ask you about another guideline.  The AGA,

19     have you heard of that?

20         A.     Yep.

21         Q.     You're a member of that?

22         A.     Right.

23                 (Whereupon, Deposition Exhibit

24         Graham-17, "Consensus Development

David Y. Graham, M.D.

Page 327

```
 1    dirty -- would they agree with that?  And if

 2    they did, would it change overall the message

 3    they are trying to get out to family doctors

 4    and the answer would be, no.

 5    BY MR. JOSEPHSON:

 6         Q.     Let me ask you this sentence:

 7    Furthermore aggregate epidemiological data

 8    suggests that the introduction and broader

 9    use of coxibs has led to a significant

10    decrease in deaths owing to the GI effects of

11    NSAIDs among chronic users.

12              Do you agree with that

13    statement?

14         A.     Obviously, they never read that

15    paper.

16         Q.     This is a paper by Jim Freeze.

17         A.     Freeze.  They, obviously,

18    didn't read it because that's not what the

19    answer to that paper is.

20         Q.     He says the rise and decline of

21    nonsteroidal drug associated gastropathy in

22    rheumatoid arthritis.

23         A.     If you want to look at the

24    paper, we can look at it.
```