# EXHIBIT E

Jeffrey E. Harris, M.D., Ph.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| This Document Relates To: | |
| STATE OF LOUISIANA, ex rel. JAMES D. CALDWELL, JR., Attorney General, | Judge Eldon E. Fallon |
| Plaintiffs, | |
| v. | Magistrate Judge Knowles |
| MERCK SHARP & DOHME CORP., | |
| Defendant. | Case No. 05-3700 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF JEFFREY E. HARRIS, M.D., Ph.D.

Friday, January 29th, 2010

10:08 a.m.

Held At:

Hagens Berman Sobol Shapiro, LLP

55 Cambridge Parkway

Cambridge, Massachusetts

REPORTED BY:

Maureen O'Connor Pollard, RPR, CLR, CSR

Golkow Technologies, Inc. - 1.877.370.DEPS

Jeffrey E. Harris, M.D., Ph.D.

Page 18

1    "Further evidence of this error can be
2    demonstrated by observing Vioxx expenditures
3    long after Vioxx was withdrawn in September,
4    2004."
5         It is the latter sentence that I
6    checked, or its accuracy is what I checked by
7    running a program that I just described.
8         BY MR. ISMAIL:
9    Q.   All right. Let's go ahead and mark
10   your copy of the report as Exhibit 2.
11        (Whereupon, Harris Exhibit Number 2
12        was marked for identification.)
13        MR. ISMAIL: And let's mark whatever
14   tabulation you ran as Exhibit 3.
15        (Whereupon, Harris Exhibit Number 3
16        was marked for identification.)
17        BY MR. ISMAIL:
18   Q.   You only have one copy of it?
19   A.   Yes.
20   Q.   Let me take a look.
21        So Exhibit 3 is the tabulation,
22   printout of the tabulation that you ran to check
23   the statement of Paragraph 96 of Dr. Wiggins's
24   report that Vioxx expenditures can be observed

Page 19

1    after September of 2004, correct?
2    A.   Correct.
3    Q.   And so you have in column one "T
4    month," then you've got summary of payment, and
5    it goes out to month 70 with values in the mean
6    summary of payment for that month?
7    A.   Correct.
8    Q.   And then month 70 corresponds to what
9    calendar month?
10   A.   There's a line in the computer program
11   indicating that it is September, 2000 -- not in
12   the computer program but in the results which I
13   believe are on the last page, indicating that it
14   is September, 2004.
15   Q.   Did you check Dr. Wiggins's statement
16   that you have a mismatch between your
17   Bextra-Celebrex expenditures and calendar
18   months?
19   A.   I was not in a position to do so given
20   the time available and the limited materials
21   supplied to me.
22   Q.   Well, Dr. Wiggins went into your
23   backup materials and identified dates that don't
24   match the right calendar months; for example,

Page 20

1    Bextra sales that occur well after Bextra was
2    withdrawn. Did you do anything to confirm or
3    deny that Dr. Wiggins is correct that there was
4    a programming error in your Bextra-Celebrex
5    cohort?
6    A.   Given the limited time and given the
7    absence of a complete delivery of all relevant
8    files, I could not.
9    Q.   What do you mean "an absence of a
10   complete delivery of all relevant files"?
11   A.   To answer your question completely, I
12   would have to show you my list of what files I
13   received, and my comparison of the files that I
14   received with the files that Dr. Wiggins refers
15   to in his calculation.
16   Q.   Okay. We'll do that in a minute.
17        How hard would it have been to go into
18   your own data and identify Bextra sales that
19   you say occurred but yet show up as being in
20   time periods well after the Bextra withdrawal?
21   A.   Given adequate time, it would not be
22   difficult at all.
23   Q.   What's the time commitment you think
24   would have been necessary for you to check your

Page 21

1    own data?
2    A.   In an ideal world with no other
3    professional commitments and with an adequate
4    delivery of all intermediate files, it would
5    have taken an afternoon.
6    Q.   Okay. So four hours?
7    A.   I don't think I can be any more
8    specific than that.
9    Q.   Right. You've had enough time over
10   the last week or so to spend fifteen hours
11   preparing for your deposition, run some
12   calculations on Vioxx, speak with Plaintiff's
13   counsel, and you're saying you couldn't find an
14   afternoon to check to see whether Dr. Wiggins
15   was correct and you had a serious programming
16   error in your Bextra cohort?
17   A.   That is correct, sir. And that is in
18   great part due to the lack of delivery of
19   sufficient material for me to make what I would
20   call a straightforward professional check. In
21   particular, there were numerous data files that
22   I did not receive from defense counsel, or at
23   least were not forwarded to me, which would have
24   permitted me to do that calculation, and to

Page 22

1  understand whether or not such an error was
2  present in a much more straightforward and
3  timely manner.
4      Q.   Why don't you just go to your own data
5  wherein the programming error is apparent and
6  see, "well, gee, is he right, did I really screw
7  this up and have expenditures assigned to the
8  wrong calendar date?" You could have done that
9  from your own data, couldn't you?
10     A.   In an ideal world with adequate time,
11 perhaps.
12     Q.   This is the afternoon we're talking
13 about again?
14     A.   The response of an afternoon is my
15 best estimate of how long it would take in an
16 attempt to be responsive to your question.
17     Q.   All right.
18     A.   However --
19     Q.   Go ahead.
20     A.   I don't know whether it's Professor
21 Wiggins, I don't know whether it's CRA
22 International, I don't know whether it's defense
23 counsel, so I will speak in the passive voice
24 and say in connection with this purported error,

Page 23

1  I received one computer file in which two lines
2  were marked.
3      Q.   You're missing my question.
4      A.   I'm not done with my answer.
5      Q.   Because you're not answering my
6  question. My question doesn't relate to what
7  data files you received from the defense.
8          My question related to; you have in
9  your possession your own data and the analyses
10 you ran for the Bextra-Celebrex cohort,
11 correct?
12     A.   Correct.
13     Q.   Did you take the time to go into your
14 own data to see whether Dr. Wiggins was correct
15 and you had a programming error in your data?
16     A.   To the extent that I could, yes. And
17 in particular, to the extent that Dr. Wiggins
18 described the error, it was my understanding
19 that the error predicted the sentence at the top
20 on Page 39. Since Dr. Wiggins did not provide
21 the original program but rather a log file,
22 since Dr. Wiggins or whoever it was did not
23 produce the corrected data file, and furthermore
24 since Dr. Wiggins did not produce the underlying

Page 24

1  computer runs that underlie figure one and the
2  alternative calculations on Page 97, my task was
3  at minimum made much more difficult.
4      Q.   All right. You --
5      A.   Given six days from the day in which I
6  received all the materials as well as this
7  report, as well as my other professional
8  calculations, I made a decision about which
9  portions of the report I should focus on. And
10 given that I could not verify the statement at
11 the top of Page 6 -- or 39, I decided to
12 continue with other work.
13         Had there been more time and had I
14 received all the materials that I would normally
15 expect in the course of professional
16 communication, it could have been different.
17     Q.   All right. First of all, the
18 deposition was moved up at your request, right?
19     A.   I don't know that one way or another.
20     Q.   Did you tell Plaintiff's counsel that
21 you needed to have the deposition moved from
22 next week because school started and we had to
23 do it today?
24     A.   I did tell counsel that it would be

Page 25

1  difficult for me to give a deposition during the
2  semester which starts next week.
3      Q.   Great. So --
4      A.   And I offered to give a deposition
5  today.
6      Q.   Okay. So we moved up the deposition
7  at your request. And you seem to have enough
8  data in your possession to check the statement
9  that there were Vioxx expenditures that occurred
10 after the withdrawal of the drug. Similarly,
11 you have enough data in your possession to
12 confirm or deny whether your program assigned
13 Bextra expenditures after that drug was
14 withdrawn. You could have done that work,
15 correct?
16     A.   Yes, I could have.
17     Q.   And you didn't, correct?
18     A.   That is correct.
19     Q.   Now, what other documents do you have
20 there in that folder of yours?
21     A.   I have an index that I prepared
22 entitled "Documents Received" which, strictly
23 speaking, is not one of the documents, it's
24 rather just a summary.

Page 86

1   Q.  In your aggregate analyses, did you
2   ever attempt to calculate what the aggregate
3   expenditures were in total on both NSAIDs and
4   COX-2 inhibitors in the Louisiana Medicaid
5   program over the various time periods you
6   analyzed?
7   A.  No, I did not.
8   Q.  For example, the decision to put Vioxx
9   on the preferred drug list in June of 2003, did
10  you look at the aggregate expenditures to see --
11  well, did that decision have an impact on the
12  overall cost to the state for these classes of
13  medicines?
14  A.  No, I did not.
15  Q.  Did you have the ability to make those
16  calculations?
17  A.  Yes, I did.
18  Q.  Did you see in Dr. Wiggins's report
19  he, in fact, made -- he did analyze what the
20  total expenditures were to the State of
21  Louisiana over the time period that Vioxx was on
22  the market?
23  A.  He did an analysis, but it is -- your
24  description does not accurately reflect what I

Page 87

1   understood he did.
2   Q.  Okay.  Why don't we turn to Paragraph
3   50 of Dr. Wiggins's report.
4       At Paragraph 50 and continuing through
5   Paragraph 51, 52, Dr. Wiggins describes an
6   analysis he did on the aggregate expenditures on
7   all NSAIDs including COX-2s.
8       Did you review Dr. Wiggins's
9   description of the analysis he did?
10  A.  I reviewed not only Dr. Wiggins's
11  description in this Paragraph 51 and 52, but the
12  associated electronic materials that were
13  supplied in connection with that analysis.
14  Q.  Do you have any criticisms of the
15  analysis and/or the conclusions that Dr. Wiggins
16  reached?
17  A.  Yes, I do.
18  Q.  Can you please share them with us?
19  A.  To do so I would have to refer back to
20  the copies of the electronic materials that were
21  marked earlier in the deposition.
22  Q.  Please do so, and identify what
23  exhibit you're looking at.
24  A.  Okay.  I have a lot of paper in front

Page 88

1   of me.
2       (Witness reviewing documents.)
3   A.  Okay.  I'm looking at two exhibits,
4   the first is Exhibit 6 and the second is
5   Exhibit 7.
6       Exhibit 6 represents my screen shots
7   of Appendix 1.  Appendix 1 had three folders,
8   one was named "Inputs" which was empty as
9   delivered to me, one was named "Outputs" which
10  was also empty, and the third was called
11  "Programs."
12      Referring specifically to Programs
13  there were three.  The first was entitled
14  "Append Harris's Data To Create 1 Database.do."
15  "Do" being the abbreviation in this data
16  program, data programming language.  The text of
17  that program is given as the first of the three
18  documents in Exhibit 7.  At the very end of the
19  commands there is a command to save a file named
20  "regression_data.DTA" in the folder named
21  "Inputs."  The folder named "Inputs," however,
22  was empty as delivered to me.
23      The second program is entitled, "2.
24  Aggregate Regressions.Do," and the output of

Page 89

1   that program includes a file called "Aggregate
2   Regressions.log" where the log records
3   everything essentially that comes across the
4   computer screen of the analyst.  When I looked
5   at this particular file, I found an
6   inconsistency, namely the output file was
7   produced at 1:24 in the afternoon, while the
8   input program was produced at 3:32 in the
9   afternoon.  I do not know the source of this
10  inconsistency, except ordinarily the output
11  should come after the input.
12      With respect to the specific program,
13  I turn your attention to "2. Aggregate
14  Regressions.Do" in Exhibit 7, the very first
15  line of commands after some introductory
16  material is asking the program to use a file
17  called "Regression_Data.DTA."  This file was not
18  delivered to me.
19      The output entitled "Aggregate
20  Regressions.log," which is the last section of
21  Exhibit 7, memorializes that, in fact, this log
22  was created at some time around 1:20 in the
23  afternoon on January 22nd.
24      I noted further in examining this that

Page 90

1  while Dr. Wiggins's report was delivered to me
2  on January 21st with all of his conclusions,
3  every one of the files in this section called
4  Appendix 1 was dated January 22nd.
5       With respect to the specific text
6  called "Aggregate Regressions.log," there is a
7  command on my second page of the text in which
8  it says "keep if month is after the third month
9  of 2001," and the next line is "keep if month is
10 before the seventh month of 2003."
11      Accordingly, this analysis which
12 appears to memorialize Dr. Wiggins's conclusions
13 concerning aggregate expenditures is confined
14 entirely to March of 2003 -- I'm sorry, March of
15 2001 to June of 2003. That hardly covers the
16 entire period. And what's more, it does not
17 even cover the period that I addressed in my
18 figure --
19    Q.  Four.
20    A.  You're correct, I believe it is four.
21      In addition, this code includes a
22 command to generate a new variable which is
23 called "Counter X NPDL." This is a familiar
24 type of command in that it generates what is

Page 91

1  called an interaction between two variables by
2  multiplying them together, and has the clear
3  purpose of investigating whether or not removal
4  or presence from the NPDL, or non-preferred drug
5  list, affected not only the level of
6  expenditures but also the trend. Although this
7  variable is defined in the analysis, it is
8  nowhere used in either the commands or the
9  printouts that I received.
10      Without speculating as to what
11 happened, I asked myself the question as to
12 whether or not an analysis was performed using
13 this variable, but subsequently omitted from
14 what was delivered to me.
15      Likewise, there are commands using the
16 word "predict." Those commands in Stata
17 language allow the program to actually estimate
18 the value of the predicted expenditures, in this
19 case total expenditures on all NSAIDs. Such a
20 command would ordinarily be used either to draw
21 a graph, and what is more to calculate the
22 difference between observed and predicted,
23 something that I did in my own report. Yet the
24 calculation of observed and predicted is omitted

Page 92

1  from what I received, leaving me to ask the
2  question once again as to why it was left out.
3       Accordingly, having reviewed this in
4  some detail and having taken quite a bit of time
5  to do so, I have questions about what I did not
6  see, if anything, why the analyst included
7  variables that do not appear in the final
8  analysis, why variables were predicted but then
9  the prediction was never used, why the analyses
10 are dated after the report is due, why the
11 outputs have a timestamp before the inputs, and
12 why the analyst only used a very restricted time
13 period rather than the full-time period of
14 figure four, or the entire time period under
15 discussion in Professor Wiggins's report.
16    Q.  Okay. Just so the record is clear,
17 you have not attempted to determine yourself
18 what the aggregate expenditures are on the
19 class, but you have raised questions about the
20 methodology that Dr. Wiggins has stated that he
21 followed; is that fair?
22    A.  I didn't know that this was a class
23 action lawsuit. You mean the class of people or
24 the class of drugs? The therapeutic class?

Page 93

1    Q.  Class of drugs, sir.
2    A.  I think I've answered that question
3  already. I did not produce an aggregate
4  calculation of total expenditures in the
5  therapeutic class.
6    Q.  So Dr. Wiggins could very well be
7  correct in his statements that the aggregate
8  expenditures showed no decline in total NSAID
9  expenditures during the period Vioxx was on the
10 NPDL status compared to the period before?
11   A.  Under the circumstances, I can't
12 render an opinion one way or the other.
13   Q.  All right. Okay. Let's turn to your
14 cohort analyses, Page 12. You begin on
15 Paragraph 23 by saying, quote, "The aggregate
16 linear trend models of the previous section do
17 not take advantage of the individual level
18 transactions contained in the Louisiana Medicaid
19 data," close quote.
20      What does that mean?
21   A.  With respect to the first sentence,
22 the Louisiana Medicaid data had encrypted
23 individual identifiers that allowed an analyst
24 to link one claim of the one individual with a

24 (Pages 90 to 93)

Page 198

1    just said, and then you'll interrupt me.
2         BY MR. ISMAIL:
3       Q.   So how about I start with a new
4    question.
5             If patients and doctors were reluctant
6    to use NSAIDs after September of 2004 for
7    reasons that were not related to the Vioxx
8    withdrawal, you nevertheless would have assumed
9    that reduction in expenditures was causally
10   related to the withdrawal of Vioxx; true?
11      A.   If the concerns were not causally
12   related, then I would have inappropriately
13   attributed the reduction in Vioxx expenditures
14   or the failure of an increase in other
15   expenditures to the Vioxx withdrawal.  But as I
16   understand it, it will be Plaintiff's obligation
17   to demonstrate that any such class-wide concerns
18   were, in fact, a consequence of the Vioxx
19   withdrawal.
20      Q.   So if the results from the Bextra
21   trial which were newly disclosed in December,
22   2004, or the concerns about the Celebrex
23   cardiovascular profile newly disclosed in
24   December of 2004 caused some patients or doctors

Page 199

1    to move away from NSAIDs, you would nevertheless
2    have assigned that reduction in expenditures as
3    causally related to the Vioxx withdrawal?
4       A.   In my analysis, that's correct for
5    those two particular events in December of 2004.
6       Q.   So going back to Wiggins Exhibit E, he
7    ran your analysis in Paragraph 2A, so for the
8    same patients who were in your cohort, by
9    whatever cohort eligibility criteria you had, he
10   ran it on other observations instead of just the
11   first twelve months following the Vioxx
12   prescription?
13      A.   Did you say Exhibit E?
14      Q.   I did.  Line 2A.
15           (Witness reviewing document.)
16      A.   If I understand correctly, he took all
17   of the 49,324 patients in line 2A and extended
18   their follow-up as long as those individuals had
19   some transaction which signaled they remained in
20   the cohort, or in the database to be more exact.
21   I think that's what he did here.
22           BY MR. ISMAIL:
23      Q.   And if you go to the Vioxx off PDL
24   coefficient, for that analysis he finds a number

Page 200

1    greater than 100 percent, not statistically
2    significant but greater than 100 percent?
3       A.   If you're asking me if I see a number
4    100.8 percent, the answer is yes.
5       Q.   Do you know whether -- have you done
6    anything to confirm or deny the accuracy of that
7    number?
8       A.   Yes.
9       Q.   Let me rephrase my question.
10           Have you done anything to confirm or
11   deny the accuracy of that computation?
12      A.   No, I did not and could not.
13      Q.   You could not because you say you
14   don't have the --
15      A.   Well, I'm looking at Harris
16   Exhibit 11, it's my understanding that this
17   exhibit is connected to the computation we're
18   referring to, it's entitled "LAMedicaid_Vioxx
19   regression," or "RegVariations.log."  The first
20   page, in fact, has that as a title.  I note that
21   the date timestamp in this file has been erased.
22   And as an aside, I ask the question why, since
23   Stata will not do that.
24           Second, on the fifth line of text it

Page 201

1    says "Use LAMedicaid_Vioxx_Cohort_VarLen_No_12m_
2    restr," which is an input file.  I was not
3    provided with that file.
4       Q.   Have you taken your own data set and
5    run the analysis that Dr. Wiggins says he ran in
6    Exhibit E, line 2A?
7       A.   No, I have not.
8       Q.   That wouldn't have taken very long to
9    do either, would it?
10      A.   If, in fact, Dr. Wiggins made no
11   mistakes whatsoever in the chain of computations
12   which begins with raw data, then through a data
13   management program creates one or more
14   intermediate files, and then from the
15   intermediate files creates a final output, and
16   if I had been delivered all those files it might
17   have been simple.  If at any point along the
18   chain I detected a discrepancy, then the failure
19   to deliver every intermediate file would make it
20   very difficult for me to do in any reasonable
21   amount of time.
22           So in an ideal world with plenty of
23   time and documentation that I consider normal,
24   professional -- adherence to a normal

Page 202

1  professional standard, yes, ideally I could have
2  repeated the calculation.
3      Q.   You think Dr. Wiggins's analysis in
4  Exhibit E, line 2A is wrong methodology-wise
5  because why?
6      A.   To repeat myself, the analysis in 2A
7  is taking the individuals who were active Vioxx
8  users for twelve months and extending their
9  follow-up for a time period that, in fact, could
10 have lasted ten years.
11          I refer you, for example, to one of
12 the regression output tables in Exhibit 11 in my
13 copy which I printed out after my own title
14 page, there is Pages 1, 2, and then we come to
15 Page 3 where a regression output begins, and
16 where each row corresponds to an indicator
17 variable for the number of months since the
18 initial Vioxx prescription, and this continues
19 up until and including month 126, which means
20 ten years after the last Vioxx prescription --
21 or I'm sorry, the first Vioxx prescription.
22          As I've said repeatedly, inclusion of
23 prescription claims ten years after the first
24 prescription may, may not, maybe, or perhaps

Page 203

1  better said is likely to reflect coincidental
2  events rather than causal consequences.  But to
3  add more, I would just be repeating myself
4  again.
5      Q.   We don't want that.
6          And so if you go to lines 3A and -- if
7  you just go to line 3A, excuse me, this is
8  Dr. Wiggins's analysis of all patients who have
9  at least one Vioxx prescription for all
10 observations.
11         And just so we're clear, you did not
12 do a similar analysis yourself on the data set;
13 true?
14     A.   That is correct.
15     Q.   And you, I'll assume your answer, you
16 could not verify the accuracy of Dr. Wiggins's
17 calculations because you believe certain files
18 are missing from what was provided to you?  How
19 did I do?
20     A.   Given the available time, I was not
21 able to independently verify the calculations in
22 Exhibit E, especially in view of my
23 determination that certain critical intermediate
24 files were not provided to me.

Page 204

1      Q.   Exhibit F to Dr. Wiggins's report
2  reflects your analysis for the twelve month and
3  eighteen month follow-up, correct?
4      A.   And continues beyond that, yes.
5      Q.   Did you seek to determine whether
6  Dr. Wiggins accurately reports in Exhibit F your
7  own calculations?
8      A.   I have not done so line by line, no.
9      Q.   Have you done so in sufficient fashion
10 to see whether he got it right?
11     A.   No.
12     Q.   Have you done so at all?
13     A.   No.
14     Q.   So as you sit here today, you have no
15 idea whether Dr. Wiggins correctly reported your
16 regression results from your work papers for any
17 follow-up longer than twelve months, is that
18 your testimony?
19     A.   I have not verified, in fact, whether
20 Dr. Wiggins's Exhibit F even for twelve months
21 accurately reproduces the results in my own work
22 papers.
23     Q.   So if we assume that Dr. Wiggins, in
24 fact, did report your own results correctly, and

Page 205

1  there was a sensitivity to the length of
2  follow-up whereby the increase in other NSAID
3  expenditures went up the longer the follow-up
4  period -- are you with me so far?
5      A.   No, could you please repeat the
6  question?
7      Q.   These tables in Exhibit F reflect that
8  the amount of expenditures on non-Vioxx NSAIDs
9  went up the longer the follow-up period took
10 place, or the longer the follow-up period in the
11 analysis, right?
12     A.   Generally speaking, I think that's
13 correct.
14         MR. DUGAN:  Can we interrupt for one
15 second?
16         (Off the record discussion.)
17         (Whereupon, a recess was taken from
18         5:33 p.m. to 5:38 p.m.)
19         BY MR. ISMAIL:
20     Q.   Let's turn to your Bextra-Celebrex
21 cohort, sir.
22         The methodology you employed there was
23 similar to what you used for your Vioxx cohort,
24 correct?

Page 210

1 Q. And by State of Louisiana I mean
2 within the Medicaid program, correct?
3 A. That's what I understood.
4 Q. Thank you.
5 Why did the prospective deny edit have
6 a much greater impact on Bextra payments than
7 it did on Celebrex payments?
8 A. I do not know.
9 Q. Do your data support the conclusion
10 that there was a much more significant reduction
11 in Bextra use in the Louisiana Medicaid system
12 in March of 2005 than was reflected in Celebrex
13 users?
14 A. My estimates indeed indicate that the
15 effect of the prospective deny audit in
16 depressing expenditures for COX-2 inhibitors was
17 considerably larger in the case of Bextra.
18 Q. Does the fact that there was a much
19 greater reduction in Bextra usage than Celebrex
20 usage suggest that there was other information
21 about Bextra that was causing the decline in
22 usage?
23 A. It's entirely possible that if
24 physicians had more concerns about Bextra than

Page 211

1 Celebrex, then in response to a required
2 pharmacist inquiry into the indications for the
3 drug the physician might abandon the
4 prescription.
5 Q. And that decision, in the example that
6 you just described, would have been based on
7 information that was newly disclosed about
8 Bextra after September, 2004, correct?
9 A. Correct. Or it could have been
10 before, but it was available at the time.
11 Q. If you look at the third and fourth
12 lines of your table G, is it just coincidental
13 that the four medication impact is the exact
14 same coefficient?
15 A. I think it's coincidental because the
16 estimated standard errors are different. But I
17 can -- to give you a further answer I would have
18 to check my computer output.
19 Q. If you go to Paragraph 94 of
20 Dr. Wiggins's report.
21 A. (Witness complies).
22 Q. Actually in Paragraph 95 Dr. Wiggins
23 describes what he believes is a programming
24 error in your analysis, correct?

Page 212

1 A. Correct.
2 Q. And Dr. Wiggins described this
3 analysis only in your Bextra-Celebrex cohort,
4 correct?
5 A. Correct.
6 Q. And you brought with you today as
7 Exhibit 2, I believe, the analysis of Vioxx
8 expenditures. If you don't mind pulling it out,
9 I don't want to misidentify the exhibit.
10 A. There's an Exhibit 3.
11 Q. Is Exhibit 3 the analysis you did to
12 check to see whether you assigned Vioxx
13 expenditures after the withdrawal?
14 A. It's the analysis that I did to check
15 the statement at the top of Page 39 of Professor
16 Wiggins's report.
17 Q. Did you do that analysis in the Vioxx
18 cohort or the Bextra-Celebrex cohort?
19 A. In the Bextra-Celebrex cohort.
20 Q. If you look at Paragraph 95, do you
21 see Dr. Wiggins's narrative description of the
22 programming error he believes you had in your
23 analysis?
24 A. I see that, yes.

Page 213

1 Q. Do you have any reason to dispute his
2 characterization of how your analysis worked by
3 his description of it?
4 A. I didn't understand it.
5 Q. All right. You went into the
6 Bextra-Celebrex cohort and you produced
7 Exhibit 3, which was an analysis of Vioxx
8 expenditures.
9 Did you ever go into the
10 Bextra-Celebrex cohort to see whether
11 Dr. Wiggins was correct that you had mismatched
12 Bextra-Celebrex expenditures?
13 A. I can only testify as to what I did
14 and what I could do in order to give as accurate
15 an answer as I can. There is a program that
16 generates an analytic file which in turn is then
17 used for statistical analysis. The name of the
18 analytic file generated is called "LAMedicaid
19 Bextra-Celebrex Cohort 12 Month Follow-Up.DTA."
20 I had a copy of my own analytic file.
21 The conclusion I drew from
22 Paragraph 95 is that the program I wrote myself
23 to generate that analytic file had an error near
24 the end of the code. However, I did not receive