# EXHIBIT G

Transcript of the Testimony of

**Steven Wiggins**

**Date:** February 9, 2010

**Case:** STATE OF LOUISIANA v. MERCK SHARP & DOHME

**HOUSTON REPORTING SERVICE**
**1010 LAMAR, SUITE 1400**
**HOUSTON, TEXAS 77002**
**Phone:713-739-1400**
**Fax: 713-739-1410**
**Fax:713-739-1421**
**Email: houstondepos@earthlink.net**
**cc: houstonproduction@gmail.com**
**Internet: www.houstoncourtreporting.com**

Page 5

1  Exhibit 1 a document entitled "Notice of Deposition."
2       Do you recognize this document?
3    A.  I do.
4    Q.  When did you first see this document?
5    A.  Several weeks ago, if memory serves, on that
6  order.
7    Q.  And what is your understanding of the nature
8  of this case?
9       MR. SALES: Objection to the form of the
10  question; overbroad.
11    A.  It is a case involving the State of Louisiana
12  and alleged overpayment of moneys to Merck for the drug
13  Vioxx.
14    Q.  (BY MR. PLYMALE) If you'll go to Exhibit A,
15  the third page of this document.
16       Exhibit A requested that you bring certain
17  materials with you to the deposition today.
18       Did you bring such materials?
19    A.  I did.
20    Q.  Are they in those two boxes there?
21    A.  Yes; and the file on the table.
22    Q.  Okay. When were you first contacted regarding
23  your retention in this case by Merck?
24    A.  I was first contacted regarding a potential
25  retention a couple of years ago.

Page 6

1    Q.  In connection with the Louisiana Attorney
2  General case?
3    A.  In connection with several Attorney General
4  cases, of which Louisiana was one.
5    Q.  Have you done any work to date on cases --
6  Vioxx cases that are Attorney General cases, other than
7  Louisiana?
8    A.  I have done so in -- with regard to the Texas
9  case, and that's all.
10    Q.  Who -- who first contacted you regarding your
11  retention in the AG cases?
12    A.  George Demos.
13    Q.  And who is he with?
14    A.  I'm drawing a blank.
15       O'Melveny. O'Melveny & Myers. I'm sorry.
16    Q.  Did he contact you directly, or did he contact
17  CRA?
18    A.  He contacted me.
19    Q.  What was the nature of the work that you did
20  for the Texas AG case?
21    A.  I prepared a report and I testified in a
22  deposition.
23    Q.  Did you testify at trial?
24    A.  There was no trial, to the best of my
25  knowledge.

Page 7

1    Q.  You've been deposed many times before,
2  correct?
3    A.  That's correct.
4    Q.  All right. I won't go over the nuances of
5  the basics of the deposition. But you do understand
6  that your testimony today is under oath, as if it were
7  in a trial setting?
8    A.  Yes, I do understand.
9    Q.  The materials you identified that you've
10  brought in response to Exhibit A to Deposition
11  Exhibit 1, do those materials contain everything that
12  you relied upon in writing your expert report in the
13  Louisiana case?
14    A.  Yes, I believe so.
15    Q.  Okay.
16    A.  With the -- with the provision, as noted in
17  my report, that I also rely on my background and
18  training in economics and so forth. But the specific
19  materials that I reviewed for this case.
20       MR. PLYMALE: Let's go ahead and mark
21  the report as Exhibit 2.
22       (Exhibit No. 2 was marked for
23        identification.)
24       MR. PLYMALE: I'd also like to mark
25  Exhibit 3.

Page 8

1       (Exhibit No. 3 was marked for
2        identification.)
3    Q.  (BY MR. PLYMALE) Let me direct your attention
4  to Exhibit 3, your curriculum vitae that was submitted
5  in this case as an exhibit to your report.
6       Could you just walk me through your -- well,
7  strike that.
8       You graduated from MIT in 1979 with a Ph.D.
9  in Economics, right?
10    A.  That's correct.
11    Q.  Could you walk me through your professional
12  experience since that time.
13    A.  I was hired as an assistant professor in the
14  Department of Economics in 1979. I served in that -- in
15  various capacities, including promotions, up through to
16  the present, to where I am now, a full professor of
17  Economics.
18       I have held various chairs during that period,
19  and had different honors and awards that are listed here
20  on the vitae.
21       I've also been a senior consultant with LECG
22  and with CRA International.
23    Q.  What is LECG?
24    A.  It is another consulting firm.
25    Q.  And what type of consulting do they do?

Page 13

1  for the Vioxx Louisiana AG case?
2     A.  No.  What happened was, there was -- there
3  were these initial discussions.  Nothing was done on
4  individual cases at that time.  This was a couple of
5  years ago.
6          And then everything got put on hold.  I knew
7  that there were -- there was a variety of legal activity
8  going on with regard to Vioxx, but I wasn't involved in
9  it.
10         And then the Texas case work began on that
11 last year, because it was at a point where it made sense
12 to begin active work on the case.  And then last fall,
13 work -- active work began on the Louisiana case.
14    Q.  So from the time you had the initial
15 discussions about the collective AG Vioxx cases until
16 sometime in the fall of 2009, you didn't do any work on
17 the Louisiana Vioxx AG case?
18    A.  That's correct.
19    Q.  After this period of hold, when was the first
20 discussion that was specific to the Louisiana AG case
21 that you had?
22    A.  I had a discussion -- I believe it was in
23 October of last year -- with Mr. Sales and
24 Mr. Cancienne, if I've got the pronunciation correct.
25         And there may have been somebody else present

Page 14

1  at that meeting, as well, but I remember those two being
2  there.
3     Q.  And what did you discuss in that meeting?
4     A.  We discussed the data, the various data that
5  had been supplied -- I believe it had been supplied by
6  that time, or it was going to be supplied shortly.
7          And there was a need to become familiar with
8  the data, what was in it, how to analyze it, how one
9  might go about analyzing it.  But the first big issue
10 with data is always, get it in a form that you can look
11 at it.
12    Q.  And by "data," you're referring to the
13 Louisiana Medicaid claims data?
14    A.  Yes.
15    Q.  Did you look at the Louisiana Medicaid claims
16 data in October of 2009 during those meetings?
17    A.  Not during the meeting.  No data was looked at
18 during the meeting.
19         I don't remember the exact date of when the
20 data was received.  But sometime in the fall, the data
21 was received and we began to look at it.
22    Q.  When did you first look at the data?
23         MR. SALES:  Objection; asked and
24 answered.
25    A.  Meaning I personally, or people working at my

Page 15

1  direction?
2     Q.  (BY MR. PLYMALE)  Let's start with you
3  personally.
4     A.  It would have been sometime in the fall.  I
5  can't -- I can't be more specific than that.
6          And my people had gotten the data, had figured
7  out how to put it up so you could see it, do simple
8  things with it like figure out how many claims there
9  were in a year and address various issues like that.
10 And I took a look at the data at that point.
11    Q.  And when you say your people, who are you
12 referring to?
13    A.  Rob Maness, M-A-N-E-S-S; Alex Knight,
14 K-N-I-G-H-T; Kris Buchan, K-R-I-S, B-U-C-H-A-N.  And
15 Brian Segers, S-E-G-E-R-S, was also involved to some
16 degree.
17    Q.  These four individuals are also consultants
18 with CRA?
19    A.  They're employees of CRA.  They have various
20 titles.
21    Q.  Do you recall those titles?
22    A.  Not very well.  Rob Maness is the more senior.
23 He's a Ph.D. in Economics, and I believe he is a vice
24 president.
25         The others are senior associates and have

Page 16

1  titles like that, but I don't -- I couldn't tell you
2  what the titles are.
3     Q.  Do you know what their credentials are?
4     A.  Yes.
5     Q.  What's Alex Knight's credentials?
6     A.  He has a bachelor's degree from the University
7  of Texas in Mathematics, and with -- he may have a
8  minor -- he has a lot of economics background.  He may
9  have a minor in Economics.  I'm not sure.  It might
10 even be a double major.
11    Q.  And what are the qualifications of Kris --
12 I'm sorry.  Kris Buchan?
13    A.  Buchan.
14    Q.  Buchan.
15    A.  I know.  It looks like Buchan, but it's
16 Buchan.
17         Kris is a -- had a bachelor's degree in
18 Economics from Texas A&M, and an MBA from Texas A&M.
19    Q.  Was he a student of yours?
20    A.  Yes, he was, as an undergraduate.
21    Q.  And do you know the qualifications of Brian
22 Segers?
23    A.  He has a bachelor's degree -- I believe it is
24 in Economics -- from Texas A&M, and a master's degree in
25 Economics from Texas A&M.

Page 17

1  Q. Was he a student of yours?
2  A. No.
3  Q. I think you said they would look at the data
4  at your direction.
5      What -- what do you mean by at your direction?
6  What did you ask them to do?
7  A. The first thing I asked them to do was to get
8  the data up, which is a technical term for put it on the
9  computer, read the files, put the files in a format in
10 which they can be analyzed.
11     We use a computer program called Stata,
12 S-T-A-T-A. Some people say "Stata," but it rhymes with
13 the word "data." However you say the word "data" is how
14 you should say "Stata."
15     So we used Stata. It is a program that
16 calls -- reads the data off of a disk and puts it up in
17 memory, and then you can write different codes to do
18 different kinds of things with the data.
19     It is a similar program to SAS, S-A-S, or
20 SPSS, except the logic of the program is very different,
21 the logic of how you do commands.
22     And by that, I mean, if you've ever used an
23 HP calculator versus any other kind of calculator, the
24 logic is different, but they do the same things.
25 Q. I do actually have an HP.

Page 18

1  A. Yeah. And the logic is different.
2      And Stata's logic is a little different, and I
3  actually think it's a much easier program to use than a
4  lot of them in terms of how you write the commands.
5      But they got it up, and that's the first thing
6  I asked them to do.
7  Q. What were the issues with getting the data up?
8      MR. SALES: Objection to form; vague and
9  ambiguous.
10 A. I don't know what issues they ran into. There
11 are always issues putting up a data set in terms of
12 making sure all the fields are right, making sure that
13 you understand exactly what is in the data, what's in
14 the format, and it takes some time to get it up.
15 Q. (BY MR. PLYMALE) And would you consider it a
16 fairly large data set?
17 A. Yeah, that's fair. But not an enormous data
18 set.
19 Q. Let me jump back to your CV.
20 A. Okay.
21 Q. You list the last four years of deposition
22 and trial testimony.
23     MR. SALES: What page are you on?
24     MR. PLYMALE: 2 and 3.
25 Q. (BY MR. PLYMALE) Is the Texas AG Vioxx case

Page 19

1  listed here?
2  A. No. This was not updated before it was
3  attached. And there may have been another deposition
4  last year that is not on here.
5      But this was current as of April 2009, and it
6  does not include that deposition.
7  Q. Your report in this case was submitted in
8  January 2010, right?
9  A. I believe so.
10 Q. Is there a more current version of your CV
11 that you have?
12 A. I can certainly supply a more current version,
13 one that is current. I don't know what physically
14 exists right now, but I can make sure that you have a
15 copy that has any depositions that were done after this
16 one was prepared to the present.
17 Q. This April 2009 CV lists 13, by my count,
18 deposition or trial testimony entries.
19     Would there have been a report submitted by
20 you in connection with these cases?
21 A. Generally, yes.
22 Q. Do you generally submit your -- your most
23 recent version of your CV with your reports?
24 A. Yes. Apparently, somebody went to the file
25 and pulled this down and didn't check the date on it and

Page 20

1  didn't check whether there was a more -- whether it had
2  been updated and whether it was current.
3  Q. Other than the Texas AG testimony, what other
4  testimony may not be included in this April 2009 version
5  of your CV?
6  A. I don't recall any as I sit here today, but I
7  would have to go back and check my records.
8  Q. Other than your retention and work on the
9  Vioxx Attorney General cases, have you done any other
10 work as an expert witness on behalf of pharmaceutical
11 companies?
12 A. Yes.
13 Q. What was the nature of those cases?
14 A. I have done work on the patent for -- it's one
15 of the H2s. It's the big H2. It's not Pepcid and it's
16 not Zantac. Anyway, the patent for Glaxo's big H2
17 antagonist.
18     I have done work in the brand name
19 prescription drug antitrust litigation. I have done
20 work on a drug, an allergy drug, and -- involving a
21 theft of trade secrets. I have done work for Merck &
22 Company on a transfer pricing case.
23     Those are the ones I recall right now.
24 Q. When was your work on the transfer pricing
25 case for Merck?

Page 45

```
 1   documents.  And I don't -- I'd have to go back and look,
 2   because I don't think of documents in that category.
 3   I'm sure you do, but I don't.
 4          The documents would include ones that I have
 5   footnoted in various footnotes in my report.  I have
 6   looked at those documents, and I don't recall whether
 7   Merck documents fall into that category or not.
 8          I don't recall going and looking at Merck
 9   documents, but I -- I couldn't tell you for sure I
10   didn't.
11      Q.  Okay.  So other than the Merck documents
12   listed in your report, or that may have been exhibits
13   to the depositions you've reviewed, did you review any
14   other internal Merck documents to prepare for the
15   deposition today?
16      A.  I don't recall -- anything would be on
17   Exhibit B.  I don't recall separately going and looking
18   at such a document.
19          I'm just trying to tell you my method, because
20   you're asking the question in a way that's hard for me
21   to answer.
22      Q.  I understand.  And I appreciate --
23      A.  There could be some that were attached to
24   those depositions, as you noted.  There could be some
25   that are referenced in my report, in which case I would
```

Page 46

```
 1   have looked at them.
 2          But I was just going through documents and
 3   trying to read and check, look through what was said in
 4   the document, look at what was said in my report, trying
 5   to remember the context of different statements that
 6   were made, trying to look through the depositions, look
 7   at the exhibits that were associated with them.
 8          So that's what I did.  And to the extent that
 9   that process caused me to cross paths with a Merck
10   document, I read it.  But I didn't separately go and
11   say, "All right.  Here's the Merck documents," and read
12   those in that way.
13      Q.  Between the time of your report and the
14   deposition, did Merck's counsel present you with new
15   documents, other than the deposition transcripts and
16   Dr. Harris's report?
17          MR. SALES:  Objection to the extent he
18   had Dr. Harris's report when he did his report.  If you
19   didn't mean --
20          MR. PLYMALE:  I'm sorry.  I misspoke.
21   Let me rephrase that.
22      Q.  (BY MR. PLYMALE)  Other than Dr. Harris's
23   deposition transcript and the deposition transcripts of
24   witnesses you just mentioned that you reviewed, has
25   Merck's counsel presented you with any other new
```

Page 47

```
 1   documents that you had not reviewed as of January 21st,
 2   2010 in preparation for this deposition?
 3      A.  Not that I'm aware of, meaning that except
 4   for the categories you've talked about, I believe that
 5   Exhibit B is complete.
 6          MR. PLYMALE:  The version I gave you
 7   doesn't have any highlighting on it, does it?
 8          MR. SALES:  Wiggins' report?
 9          MR. PLYMALE:  The list.
10          MR. SALES:  No.
11          MR. PLYMALE:  Thanks.
12          THE WITNESS:  I didn't see any.
13          MR. PLYMALE:  Okay.  Thanks.
14      Q.  (BY MR. PLYMALE)  The materials you list in
15   Exhibit B of your report are all ones that you
16   personally reviewed?
17      A.  I perused many of these.  I could not say that
18   I have perused all of them, but I have perused a fair
19   number of these.
20      Q.  Did your -- strike that.
21          Did the other CRA employees -- strike that,
22   too.
23          Did the other people working with CRA on this
24   case with you review these materials?
25      A.  Many of them.  But I can't say that they
```

Page 48

```
 1   reviewed all of them.
 2          This list is intended to be a list of
 3   everything that came into the office that was related
 4   to this case, to be sure that you had notice that this
 5   document potentially formed part of the basis of my
 6   opinion.
 7          So the goal here was to be inclusive, and I
 8   believe that it is inclusive.
 9          How carefully a particular document was
10   reviewed -- it may have been looked at and thought,
11   "This isn't very relevant," but it still makes the
12   list.
13      Q.  Did you compile this list yourself?
14      A.  No, I did not.
15      Q.  Who did?
16      A.  I believe Deborah Rittenhouse did.
17      Q.  Did the other CRA consultants working on this
18   case ever compile a summary of any of these materials?
19      A.  Not that I know of, and not that I have seen.
20      Q.  Did you discuss any of these materials with
21   the other CRA employees working on this case with you?
22      A.  Yes.
23      Q.  How did -- how did that process work with the
24   other CRA employees?  And by those, I mean the people
25   identified in the invoices, in addition to Alex Knight
```

Page 49

1  and Brian Segers.
2       How did the process work of the review of the
3  materials in connection with writing your report?
4       MR. SALES:  Objection; vague and
5  ambiguous.
6   A.  Well, there's a long list of documents here.
7  And the bottom line is, it's fairly informal.
8       But at the same time, I'm trying to get my
9  arms around relevant facts.  And these documents get
10 reviewed and read.  Over time, they -- I will look
11 through them myself.  Sometimes someone will hand me
12 a document and say, "You've got to read this."
13      So I'm looking through them actively, they're
14 looking through them actively.  We're trying to find
15 relevant documents that would help me understand what
16 was going on, what actually happened, to some extent,
17 why it happened, and trying to understand Louisiana's
18 situation, the situation of Louisiana Medicaid and how
19 this whole process worked, and anything that advances
20 the ball of understanding what went on better.
21      And I find that if you try to give really
22 specific instructions, you can't do it.  So it's -- it
23 happens in a variety of ways.
24  Q.  (BY MR. PLYMALE)  Are these materials kept in
25 a central location?

Page 50

1   A.  There is a file cabinet that physically
2  contains this list, and that's where those boxes came
3  from.
4   Q.  Very good.
5   A.  Because if it's not that way, it will --
6  you'll never be able to find them.
7   Q.  And is there a similar electronic version
8  that you keep of these materials --
9   A.  I think --
10  Q.  -- like, on a central computer system, or a
11 laptop or hard drive?
12  A.  I think that some of these may be in
13 electronic format, but I don't know -- I'm less sure
14 that that's -- we are transitioning to more electronic
15 storage right now, so some of these, or maybe all of
16 them, are in an electronic format.
17  Q.  Would you review just hard-copy documents?
18  A.  I personally mostly review, as the dinosaur
19 that I am, hard-copy documents.
20      MR. SALES:  There's a few of us left.
21      THE WITNESS:  Well, so be it.
22  Q.  (BY MR. PLYMALE)  Would the other members of
23 the CRA team on this case have access to these
24 documents?
25  A.  Yes.

Page 51

1   Q.  To all of them, all the documents?
2   A.  Yeah, I think so.  Yes, I think so.
3   Q.  Do you know if the other CRA team members
4  actually did review these documents?
5       MR. SALES:  Objection; asked and
6  answered.
7   A.  They would fit into the various categories I
8  described before.
9   Q.  (BY MR. PLYMALE)  Did you assign any of these
10 materials to particular CRA team members to review.
11      MR. SALES:  Objection; asked and
12 answered.
13  A.  I do not work by personally assigning, "Take
14 this document and go read it."  The documents come in,
15 and we try to get through them and identify material
16 that are -- that is economically relevant.
17      And we determine -- I discuss with the staff
18 different kinds of issues that are -- that I'm focussing
19 on, but also any other that -- any other issue that's
20 economically relevant.
21      And you find documents that have economic
22 relevance; other documents don't.  And there's a process
23 by which you cover those.
24      It's always an issue to try to make sure that
25 you get -- if it's economically relevant and in a

Page 52

1  document, you make sure that you find it, and that I get
2  to focus on it.
3       So I don't -- some of the documents would be
4  looked at and discarded.  Or not discarded, but laid
5  aside; "No, that's not very economically relevant."  And
6  others would be looked at and thought, "Oh, we need to
7  really read this very carefully because there's a lot of
8  economically relevant information."
9       So there's not a -- there's not a general
10 rule.
11  Q.  (BY MR. PLYMALE)  What was Rob Maness's role
12 in this project?
13  A.  Rob Maness was the primary person within CRA
14 assisting me.  He was -- they don't call them team
15 leaders; but in everyday terms, he would be the team
16 leader.
17  Q.  What activities, as a team leader, did Rob
18 Maness actually do?
19  A.  He would make sure all the documents get
20 reviewed, he would help with data analysis, he would
21 help with regressions.
22      We would discuss issues in the case, trying
23 to make sure that -- that different things in the report
24 reflect a fair representation of the documents and the
25 testimony and the data analysis.

Page 53

1  Q. Would Rob Maness assign different materials
2  to be reviewed by different team members?
3  A. I don't think of this process apparently the
4  way you do in terms of assignments.
5     These come in, and they get divided up in some
6  way. And I don't -- I don't know the details of exactly
7  how all that happens.
8  Q. But -- go ahead. Are you finished?
9  A. That's it.
10 Q. But there is some system in place to make sure
11 that all of these materials got reviewed by some member
12 of the team at some time, right?
13 A. The primary responsibility for reviewing new
14 documents that come in from the attorney would fall to
15 Alex and Kris Buchan. They would spend more time doing
16 that, the de novo review of documents.
17    But I do some of that, as well, and Rob Maness
18 does some of it, as well.
19 Q. Going back to getting the data up like we
20 talked about earlier -- remember?
21 A. Yes.
22 Q. What were the next steps for the team after
23 getting the data up?
24 A. There was some very preliminary investigation
25 of the number of claims, the number of Vioxx

Page 54

1  prescriptions. The issue of reverse charges, I believe
2  is what Dr. Harris calls it, came up in that process.
3     So becoming familiar with the data and
4  different issues that would be present in the data. A
5  top-level review, would be the way I would describe it.
6  Q. And the data that you're talking about is the
7  data from the Louisiana Medicaid claims for Vioxx and
8  other drugs that was produced in July or August of
9  2009?
10 A. I don't know when it was produced. It's the
11 data that Dr. Harris used in his analysis, and the data
12 that I used in my investigation of the issues that
13 Dr. Harris raised that came from Louisiana.
14    There's also IMS data, two groupings of IMS
15 data, that Dr. Harris used. This is the Louisiana data,
16 not the IMS data. That data.
17 Q. Did you ever receive any data set of
18 Vioxx-only claims that had been produced in 2006?
19    MR. SALES: Objection; form.
20 A. Meaning Louisiana data?
21 Q. (BY MR. PLYMALE) Yes.
22 A. I don't recall it, but I couldn't say for
23 sure that I didn't -- that we never received it.
24 Q. And the issues you mentioned on reverse
25 charges and the nature of the data, did you have any

Page 55

1  questions or concerns about the data that you brought
2  to the attention of counsel?
3     MR. SALES: Objection; form.
4  A. I did not -- no. I did not discuss the data
5  with counsel at that time.
6  Q. (BY MR. PLYMALE) What did you understand
7  your assignment to be from counsel in this case?
8  A. I was asked to address issues that would --
9  that were raised by Dr. Harris, and potentially others
10 that eventually became Dr. Harris, and to be ready and
11 able to respond to any experts that were put forward by
12 plaintiff regarding damages and damage issues.
13    And potentially, certain marketing issues that
14 would -- as they would be related to damages, I knew
15 that there was a possibility that I might be asked to
16 investigate some of those issues.
17 Q. And you've referred to "plaintiff" in your
18 testimony just now and in your report.
19    Which plaintiff are you referring to?
20 A. The plaintiffs that are listed in the
21 complaint -- in this notice of deposition.
22    And I -- I understand the style of the case
23 is the State of Louisiana -- as an economist, I don't
24 know what "ex rel." means -- and James D. Caldwell,
25 Attorney General, Plaintiff.

Page 56

1     So those plaintiffs.
2  Q. I see.
3     So your understanding is that there is only
4  one plaintiff in the case?
5  A. No. I have no understanding --
6  Q. Okay.
7  A. -- about how many plaintiffs there are or
8  what the legal structure is.
9  Q. So if there were more than one plaintiff in
10 the case, and you referred to a singular plaintiff in
11 your report, you're not singling out one plaintiff
12 versus another, are you?
13 A. No.
14 Q. Okay.
15 A. I am -- to the extent that there are -- that
16 singular should be plural, fine. I'm not trying to
17 single out a plaintiff.
18 Q. Thank you. Very good.
19    MR. SALES: Are you at a stopping point?
20    MR. PLYMALE: A couple of minutes.
21 Q. (BY MR. PLYMALE) When you were getting the
22 data up, did you have discussions with Merck's counsel
23 about the data?
24 A. No. I think I -- I think I told you a minute
25 ago that I did not.

Page 57

1  Q.  Did any of the other CRA team members have
2  discussions with Merck's counsel about the data?
3       MR. SALES:  Objection to the extent it
4  calls for speculation.
5  A.  I'm not aware.  I couldn't tell you one way or
6  the other.
7  Q.  (BY MR. PLYMALE)  But they were free to do so
8  if they had questions?
9  A.  I didn't -- they didn't have any instructions
10 from me regarding whether or not they could pick up the
11 phone and call an attorney and ask them a question.
12 Q.  Do you know if they ever did?
13 A.  I don't know.
14      MR. PLYMALE:  Okay.  Let's go off the
15 record.
16      (Recess taken for lunch.)
17 Q.  (BY MR. PLYMALE)  Good afternoon, Dr. Wiggins.
18 A.  Good afternoon.
19 Q.  During our brief lunch break, did you discuss
20 your testimony with counsel?
21 A.  No.  We talked Aggie football.  He tried to
22 talk Longhorn football, but I talked Aggie football.
23 Q.  Very good.
24      Before lunch, we were talking a little bit
25 about the other CRA team members who worked on this

Page 58

1  project, and I would like to continue my line of
2  questioning.
3       What was Alex Knight's role in this project?
4  A.  He reviewed documents, he prepared exhibits,
5  he undertook data management, which is a process by
6  which you review -- people like Kris Buchan or Rob
7  Maness or Alex Knight, they review each other's work.
8  They review drafts and make sure that there are not
9  typos.
10      So those are among the things that he did.
11 Get me copies of documents at need.
12 Q.  Was this a full-time project for him?
13 A.  I don't -- I don't know.  I'd have to go look
14 at his time records.
15 Q.  Are you aware of other projects he is working
16 on contemporaneously with work for the Vioxx case?
17 A.  I couldn't say one way or the other.
18 Q.  And what was Kris Buchan's -- did I say that
19 right?
20 A.  Buchan.
21 Q.  Buchan.  Sorry.
22      What was Kris Buchan's role in this project?
23 A.  It was similar to Alex's role, except Kris is
24 a little higher up than -- than Alex, and so he would be
25 doing -- he would be spending a little bit more time

Page 59

1  looking at data and discussing various issues with me.
2       But it's -- in our office, it's all pretty
3  informal.
4  Q.  Do you recall any specific discussions you
5  had with Kris Buchan about the data?
6  A.  Well, about various issues in the case.  This
7  morning, I discussed with him some of the data errors
8  that Dr. Harris had made, and different exhibits within
9  my report, trying to make sure that -- that they
10 conveyed the information that I thought they conveyed.
11      So I would talk to him at various times about
12 various issues.
13 Q.  To prepare for your deposition this morning,
14 did you do anything else besides have a conversation
15 with Kris Buchan?
16 A.  I read through part of my report this morning.
17 Q.  Did you meet with counsel this morning?
18 A.  Huh?
19 Q.  Did you meet with counsel this morning?
20 A.  I'm sorry.  I did not -- I did not meet for
21 any period of time.  Counsel asked me if I had any
22 questions.  I said no.  They went to their offices and
23 I sat here and read.
24 Q.  What was Brian Seager's role in this project,
25 if any?

Page 60

1  A.  If he put any time into the case, it would
2  have been handling data.  And I don't -- I don't know
3  whether he did or not.  It's possible.  Brian is good
4  with big data sets.
5  Q.  When did you start drafting your report?
6  A.  It would have been shortly after the receipt
7  of Dr. Harris's report.
8  Q.  What data analysis had you done prior to
9  receiving Dr. Harris's report?
10 A.  The kinds of things that I've described in
11 my previous answers.  There had not been any formal
12 regressions run.  It would have been mainly diagnostic,
13 and making sure that that data was up and that we were
14 familiar with it.
15 Q.  Did you type -- I apologize.  I may have asked
16 this before.
17      But did you type your report yourself?
18 A.  I typed portions of it.
19 Q.  And who typed the other portions of it?
20 A.  Rob Maness would have typed other portions of
21 it.  It's possible that Kris Buchan typed some portions
22 of it, footnotes and things of that sort.  Alex Knight
23 may have typed some portions of it.
24 Q.  Would Deborah Rittenhouse have typed any
25 portions of it?

15 (Pages 57 to 60)

Page 61

1    A.  I don't think so.
2    Q.  When you -- after you received Dr. Harris's
3  report, who first started typing the draft of your
4  report?  Could you walk me through that process.
5    A.  The process would be that there would be a
6  discussion with Dr. Maness and myself, and I would often
7  start drafting.
8        I don't -- I'm trying to remember exactly how
9  the drafting process started here.  I know there were
10 issues, and I typed up issues that became this -- well,
11 not this first part.  It would have been the background
12 and overview.
13       And then I would start drafting, and it would
14 get saved onto a common drive.  And then Rob Maness
15 would work on it, and I would work on it again.
16       But I would be the primary draftsman, and Rob
17 also would be doing some drafting and filling in things
18 that I felt needed to be filled in.
19   Q.  And prior to finalization, did you share a
20 draft of the report with counsel for Merck?
21   A.  They saw a WebEx version of the -- of the
22 draft.
23   Q.  When did you -- strike that.
24       When did they first see a draft of the report?
25   A.  It would have been in early January, a couple

Page 62

1  of weeks before the report was filed.
2    Q.  And did you have discussions with counsel
3  about the draft at that time?
4    A.  Yes.
5    Q.  What were those discussions about?
6    A.  There were some discussions about organization
7  and discussions about clarity, that this point or that
8  point wasn't made quite clear enough, what did we mean
9  by this.  And sometimes syntax.
10   Q.  Did counsel for Merck ever ask you to include
11 substantive comments in your report?
12   A.  I don't believe so.
13   Q.  Did the other team members review drafts of
14 the report?
15   A.  What do you mean by "other team members"?
16 The people at CRA?
17   Q.  Yes.
18   A.  Everybody had access to this report.  It's on
19 a common drive.  We would -- a person would go in and
20 add footnotes.  So Kris Buchan -- either Kris or Alex
21 added these footnotes on page 4.
22       And so they could go in, and they would access
23 the report and add those footnotes; and then somebody
24 else would go in and add other things, clarify a
25 discussion.

Page 63

1  And that's -- that's how the process worked.
2    Q.  Did you ever print up drafts prior to the
3  final report?
4    A.  I did not.
5    Q.  Do you know if any of the other CRA team
6  members did?
7    A.  I'm not aware of it if they did.  I don't
8  believe they did, and I'm not aware of it if they did.
9    Q.  On this common drive, were there draft
10 versions saved at particular points in time?
11   A.  No.  There's one draft.
12   Q.  It was a working draft, then?
13   A.  It's a working draft.
14   Q.  And it became the final product?
15   A.  Yes.
16   Q.  After that review by Merck's counsel of a
17 draft a couple of weeks before finalization of your
18 report, were there other conversations with Merck's
19 counsel about your report?
20   A.  There was a conversation eight or ten days
21 later, a few days before the filing of the report.
22   Q.  What was the nature of that conversation?
23   A.  Similar to the first conversation, just
24 looking through -- there was a discussion of too much
25 redundancy, which I'm very capable of being a little

Page 64

1  bit redundant, and there was -- the same issue got
2  discussed in several different places.
3        And so in moving from that -- and I noticed in
4  the final report that there's a little bit of that still
5  there.
6        So they wanted to review it again to make sure
7  those -- those -- that had been taken care of.  And I
8  think we had footnotes that we were adding.  They wanted
9  to look at the new footnotes, make sure that it was all
10 complete.
11   Q.  And when was this second conversation?
12   A.  It was on the order of three to five days
13 before the report was filed.
14   Q.  Were there any conversations about the report
15 with Merck's counsel that you had between then and the
16 submission of the report --
17   A.  Not that --
18   Q.  -- in that three- to five-day window?
19   A.  Not that I recall.
20   Q.  The first conversation you had with Merck's
21 counsel regarding your draft report, when -- not when.
22 Who was that with?
23   A.  It was with the Baker Botts attorneys.  And
24 Tarek Ismail, I believe, was on the call, Elysia Solomon
25 was on the call, Rebecca Bjork may have been on the

16 (Pages 61 to 64)

Page 69

1  your question is a very general question, and I don't
2  know -- I don't know who's on the list.
3      Q.  Okay.
4      A.  So have I ever spoken to a person -- anybody
5  on a list?  I'd have to see the list.
6      Q.  But without referring to a list, you're not
7  aware of who are the other experts Merck has retained
8  in this matter, correct?
9      A.  I'm -- I'm not -- I could not name who the
10 other experts are, any of the other experts, without --
11 there may be some specific reference to an expert in my
12 report.  I don't think so.  I did not have discussions
13 with them in preparing my report or reaching the
14 conclusions that I reached.  But --
15     Q.  Did you ever meet with any of Merck's other
16 experts --
17     A.  Not in --
18     Q.  -- in this case, prior to today?
19     A.  No, not that I recall.
20     Q.  Okay.
21     A.  I don't believe I have.
22     Q.  Do you recognize the data fields listed in
23 Item 8 in this letter?
24     A.  No, I don't.  I don't recognize those.  I
25 recognize them as somehow being related to the data we

Page 70

1  received in this case, but I don't recognize the names.
2      Q.  Did you review the data dictionary for the
3  Louisiana Medicaid claims data?
4      A.  You'll have to be careful with the word "data
5  dictionary."  I want to make sure what you mean -- that
6  I know what you mean by "data dictionary."
7          I have seen data dictionaries, but I'm not --
8  it may or may not be the one you're thinking about.
9      Q.  Have you seen the data dictionary that was
10 produced by the plaintiffs in this case for the
11 Louisiana Medicaid claims database from Unisys?
12     A.  I'm still not sure I understand.
13         But it's a SAS data file, and SAS data files
14 have data dictionaries.
15         If that's what you're referring to, I have not
16 seen the SAS data dictionary.
17     Q.  Did you ever ask to see it?
18     A.  No.  It would not be something that I would
19 need to look at.
20     Q.  In Item 4 of Mr. Anderson's letter, he
21 requests a data dictionary explaining the fields.
22         Do you see that?  Let me -- let me clarify
23 that.
24         In Item 4 of Mr. Anderson's letter, he refers
25 to some Excel files and requests that a data dictionary

Page 71

1  be provided for the fields that those files contain,
2  right?
3      A.  I understand in the context what this
4  dictionary means, which may or may not be the same as
5  the dictionary you're referring to in your previous
6  question.
7      Q.  Fair enough.
8      A.  But a dictionary -- he's asking -- I
9  understand this request to be, "Tell me what -- tell
10 me what's in these different spots in this data set."
11 That's what he -- that appears to be how he's using the
12 word "dictionary" in Paragraph 4.  And so --
13     Q.  And at any time, did you ask Merck's counsel
14 if they could get a data dictionary for any of the data
15 sets that plaintiffs have produced in this litigation?
16     A.  I did not personally ask for a data dictionary
17 of the type that's being described here, or of any type.
18 I did not -- I didn't use that term.
19         I wanted data.  I wanted to understand what
20 was in the data.  If that's the way you're using the
21 term "data dictionary," I certainly wanted to get the
22 data, wanted to understand what was in it.
23         I believe I received the data.  I believe I
24 understand what is in it.
25         MR. PLYMALE:  Okay.  I want to go to the

Page 72

1  next -- to mark another exhibit, Exhibit 7.
2           (Exhibit No. 7 was marked for
3           identification.)
4      Q.  (BY MR. PLYMALE)  Dr. Wiggins, you'll see
5  that Exhibit 7 is an October 27, 2009 letter to me from
6  Rebecca Bjork, further discussing issues of claims data.
7          Have you ever seen this letter before?
8      A.  No, I have not.
9      Q.  Please take a moment and familiarize yourself
10 with it.
11     A.  (Witness complies.)
12         Okay.  I've read it.
13     Q.  Okay.  The letter starts out, quote, "As
14 discussed in a teleconference with you, Ms. Sullivan and
15 representatives of Unisys, Inc. on October 13th, experts
16 for Merck have some questions about the Medicaid claims
17 data you produced on September 17th."
18         Is Ms. Bjork referring to you when she states
19 in her letter, quote, "Experts from Merck have some
20 questions"?
21         MR. SALES:  Objection; calls for
22 speculation.
23     A.  I don't know who she was referring to.  I do
24 not think it would be me, because I wasn't asking
25 questions about Louisiana data during this timeframe.

18 (Pages 69 to 72)

Page 73

1   But -- so I wouldn't think that that would be me.
2         I do not recall a conversation with Ms. Bjork
3   about this data set and these kinds of issues during
4   this time, or anytime, actually.  These kinds of issues,
5   I don't recall ever -- ever dealing with.
6         Q.  (BY MR. PLYMALE)  Do you recall a
7   teleconference on October 13th, 2009 --
8         A.  I --
9         Q.  -- with myself, a representative from Unisys,
10  Ms. Sullivan, who I will represent is an attorney
11  in-house in the Louisiana Department of Health and
12  Hospitals, and Merck's counsel?
13        A.  I do not recall such a conversation.
14        Q.  Could the experts referred to here possibly
15  be the other CRA team members on this Vioxx project?
16        A.  Well, to the best of my knowledge, these
17  people are not anybody that I was working with at CRA.
18        I don't -- this is -- I do not believe work
19  had begun on this project, so I don't know what experts
20  are being referred to here.  And I do not personally
21  recall a conversation of this type.
22        Q.  What data sets did you review from the
23  Louisiana Medicaid claims data?
24        A.  I believe we had some data.  The data that
25  was actually analyzed to reach the conclusions that were

Page 74

1   reached in my report all came from Dr. Harris.
2         I believe -- I believe that we had some data
3   before that, and it was my understanding that it was
4   basically the same kind of data that Dr. Harris was
5   looking at.
6         But the ones that actually were analyzed to
7   reach the conclusions in this report are ones that came
8   from Dr. Harris.
9         Q.  Were any analyses done by you or the other
10  CRA members on the prior data sets, as you referenced
11  them?
12            MR. SALES:  Objection; vague and
13  ambiguous.
14        A.  I believe that we had some data that we
15  looked at, but I would describe it as looking at the
16  data, trying to see what -- what was there.  There was
17  nothing -- and that's done in Stata on the screen.  You
18  tell it to count the number of observations.
19        So there was no -- there was no formal
20  analysis, no regressions, nothing of that sort done
21  until we received Dr. Harris's data, and then the real
22  analysis took place on that data set.
23        Q.  (BY MR. PLYMALE)  In Exhibit 7, Ms. Bjork
24  requests, in the third paragraph, a new production of
25  claims data.

Page 75

1   Do you see that?
2         A.  I understand the request for additional
3   fields, which I -- she calls that a new production of
4   claims data, with -- it appears to me to be within
5   these -- with additional fields.
6         So extra information about the claims data
7   that was already being produced -- or already had been
8   produced.  That's what it appears to me.
9         Q.  And that request for additional data didn't
10  originate with you?
11        A.  It did not.
12        Q.  Do you know if it originated with any of the
13  other CRA team members?
14        A.  What I've said is, I'm not aware of work of
15  this type, asking for this additional data, going on
16  among the team of people that helped me with the report,
17  and I don't know who might or -- so I do not believe
18  that any of the people that worked with me on my report
19  or anybody in College Station was involved in this.
20        Q.  But you don't know for sure?
21        A.  But I could not say for sure.
22        Q.  And I'll represent, there's a whole series of
23  letters between myself and Rebecca Bjork on various
24  specific data issues.
25            And my question is, to your knowledge, none

Page 76

1   of those questions that Merck's counsel have asked
2   regarding data sets prior to the data set that
3   Dr. Harris used, to your knowledge, originated from
4   you or your CRA team members?
5         A.  And all I can say is, I'm not aware of it.
6         Q.  Okay.
7         A.  I'm not aware of these specific letters.  I'd
8   have to look at other letters.  But I'm not aware of
9   that process that you're describing.
10        Q.  Okay.  Do you have any experience in designing
11  clinical trials?
12        A.  Is your question have I ever tried to design
13  a clinical trial, or done anything of that sort?  If so,
14  the answer is no.
15        Q.  Okay.  Have you had any experience broader
16  than that in clinical trials?
17        A.  As an economist who studies the pharmaceutical
18  industry, I have had occasion to analyze the design
19  issues associated with clinical trials, but purely from
20  an economic, not a medical perspective.
21        Q.  Do you consider yourself an epidemiologist?
22        A.  No, I do not.
23        Q.  Do you consider yourself a biostatistician?
24        A.  I am an econometrician who is certainly
25  familiar with the methodologies that often are used in

19 (Pages 73 to 76)

Page 129

1  opinions that he has offered, and I'm not aware of any
2  other opinions that he's offered.
3      Q.  (BY MR. PLYMALE) Okay.  In Paragraph 103, the
4  second sentence --
5      A.  Of my report?
6      Q.  Of your report.  Excuse me.
7          You're addressing spillover from Medicaid to
8  the rest of the State of Louisiana, and you state,
9  "There is no a priori reason to expect that the placing
10 of Vioxx on NPDL status within the Medicaid system would
11 have a substantial effect on the prescribing behavior
12 of physicians treating patients covered by other
13 payers."
14         Did I read that right?
15     A.  Yes, you did.
16     Q.  In general, isn't the Medicaid system one of
17 the largest third-party payors for prescription drugs
18 in a state?
19     A.  Yes.
20     Q.  And isn't the formulary status of a drug on a
21 State's Medicaid formulary or preferred drug list, as is
22 the case in Louisiana, of interest to pharmaceutical
23 manufacturers?
24         MR. SALES:  Objection to the form.
25     A.  Yes.  And to clarify, I think this sentence

Page 130

1  here is not very artfully stated, because you seem to be
2  concerned about it.  And I would -- as I read it, it is
3  not as clear as I would like it to be.
4      Q.  (BY MR. PLYMALE) How would you adjust it?
5      A.  The focus here should be on having a greater
6  effect in other areas than it does in the area itself.
7  So -- and that word "greater than" isn't here.
8          So I understand -- I would agree that I
9  would modify this to say they do -- it would have some
10 effect on expenditures elsewhere.
11         It's the idea that if you look at his
12 estimates, it had a greater effect -- to explain his
13 results, it would have to have a greater effect on the
14 non-Medicaid prescriptions than it did on the Medicaid
15 ones.  And that would not make economic sense, and
16 there's no a priori reason to believe that.
17         So this is not -- this is not very artfully
18 stated.
19     Q.  Okay.  Thank you.
20         Have you reviewed any deposition transcripts
21 of Merck's fact witnesses in this case?
22     A.  I don't recall such a review at this time.
23     Q.  Are you aware that Merck heavily targeted
24 State Medicaid systems to get Vioxx on the formulary,
25 or on a preferred formulary status?

Page 131

1          MR. SALES:  Objection; assumes facts not
2  in evidence.
3      A.  Well, at what point in time are we -- are
4  you -- does your question refer?
5      Q.  (BY MR. PLYMALE) At any point that Vioxx was
6  on the market, '99 through 2004.  And I didn't limit my
7  question to Louisiana, either.
8      A.  Okay.  Would you mind re-asking it.
9      Q.  Sure.
10     A.  I'm --
11     Q.  Let me -- let me backtrack.
12         Are you aware that pharmaceutical
13 manufacturers market their drugs?
14     A.  I am.
15     Q.  Are you aware that Merck marketed Vioxx?
16     A.  I am.
17     Q.  Are you aware that Merck marketed Vioxx to
18 members of payor -- third-party payor P&T committee
19 members?
20         MR. SALES:  Objection to form.  Lack of
21 foundation.
22     A.  I am not -- to the extent that those people
23 are physicians, they market to physicians.
24         Exactly how they allocate their marketing
25 dollars to various groups, I've never paid much

Page 132

1  attention to that.  I've never studied that
2  independently as an area of focus.
3      Q.  (BY MR. PLYMALE) Merck stood to benefit if
4  Vioxx were on the PDL, as opposed to the NPDL, in
5  economic terms, correct?
6          MR. SALES:  Objection to the form; lack
7  of foundation.
8      A.  Yes, Merck stood to benefit.  They make sales.
9      Q.  (BY MR. PLYMALE) That's their business,
10 right?  They sell pharmaceuticals?
11         MR. SALES:  Objection to form.
12     A.  Among other things, their business is to sell
13 pharmaceuticals; yes.
14     Q.  (BY MR. PLYMALE) At the time you submitted
15 your report on January 21st, 2010, did you supply
16 counsel with any other materials.
17     A.  Shortly thereafter, we supplied them with a
18 data file and programs.  And that would have been --
19 there was a Friday that we supplied them with a lot
20 of -- a lot of computer information, what was done.
21         I don't remember the exact timing of when we
22 supplied them with documents, many of which we were
23 giving them back documents they had given to us.
24         So I don't know that it -- I don't know that
25 it was on the day of the filing of my report.

33 (Pages 129 to 132)

Page 133

```
 1      Q.  What were those materials?
 2      A.  The ones that --
 3          MR. SALES:  Objection; asked and
 4   answered.
 5          THE WITNESS:  The ones in the boxes.
 6   And then in addition, I think in the boxes is also the
 7   electronic file.  But we supplied that on that Friday.
 8          And then, of course, there's the bills
 9   which have been subsequently supplied, as in yesterday,
10   and then these documents that have been on the table
11   since the beginning of my deposition.
12      Q.  (BY MR. PLYMALE)  And you supplied the
13   programs in those materials?
14      A.  The programs were supplied on Friday -- the
15   Friday before Dr. Harris's deposition.
16      Q.  In your work, in general, do you usually
17   supply the underlying data and programs along with your
18   expert report?
19      A.  It depends upon the circumstances --
20      Q.  Are you --
21      A.  -- and what people have asked for.
22      Q.  Are you aware of any obligations in the
23   Federal Rules to supply the materials that form the
24   basis of your report?
25          MR. SALES:  Objection to the form of the
```

Page 134

```
 1   question.  It calls for a legal conclusion.  The
 2   materials were timely supplied.
 3          MR. PLYMALE:  Move to strike Mr. Sales'
 4   testimony.
 5          MR. SALES:  You can move to strike
 6   whatever you want.  Stop asking the witness about some
 7   legal rule.
 8          MR. PLYMALE:  I'm not.
 9      Q.  (BY MR. PLYMALE)  Who on the team wrote the
10   computer programs?
11      A.  Well, I know people who were involved in that,
12   and that would be -- Alex Knight was involved in some of
13   it, Kris Buchan was involved in some of it, Rob Maness
14   was involved in some of it, and there may have been
15   other people that were involved, as well.
16      Q.  Did you retain unfinished versions of the
17   computer programs?
18      A.  They're like the drafting process.  There's
19   one program that is worked on, and that program
20   eventually becomes the final program.
21      Q.  Would the log files document changes in the
22   program?
23      A.  To the extent that they reflect changes in
24   the commands.  A log file is a compilation of each
25   command as it is executed by a program.
```

Page 135

```
 1   So you can look at the log file and back out.
 2   At least in Stata, which is the program that we used,
 3   you can figure out exactly what each command was
 4   executed -- as it was executed by the program, and you
 5   can verify that a log file and a program are identical.
 6      Q.  You reviewed Dr. Harris's deposition testimony
 7   where he testifies that there were missing files in the
 8   material that was supplied to him, correct?
 9      A.  He said there was -- that intermediate files
10   were not provided, which isn't actually quite a fair
11   characterization, since all the programs necessary to
12   create the intermediate files were supplied, and all you
13   have to do is say, "Do," and put that file name there,
14   and anything you want, you've got.
15          That's what -- that's what we did, actually,
16   to create Dr. Harris's intermediate files, to recreate
17   them.
18      Q.  Did you supply those intermediate files to
19   Merck's counsel?
20      A.  No.  The intermediate files were not supplied,
21   but the code necessary to generate them was supplied.
22      Q.  And the starting point of the calculations
23   was the data set you received along with Dr. Harris's
24   report, right?
25      A.  Yes.
```

Page 136

```
 1      Q.  And the programs were all based on
 2   Dr. Harris's programs that he supplied with his report,
 3   right?
 4      A.  Yes.
 5      Q.  Were there any other programs that you or the
 6   CRA team created for the data analysis?
 7      A.  No.  There were very minor modifications, as
 8   explained in my report, adding a few lines of code here
 9   or there.
10          That is the analysis that was undertaken,
11   and that's part of why it's so easy to recreate these
12   intermediate data sets.
13          Dr. Harris is familiar with the code, and all
14   he has to do is just say, "Do it," and he's got it.
15          MR. PLYMALE:  Dr. Wiggins, I have no
16   further questions for you today.
17          But, Counsel, due to the lack of
18   production of a complete set of responsive invoices
19   and the lack of production of complete underlying
20   reliance materials for his report, I'll leave this
21   deposition open on the record.
22          MR. SALES:  We obviously totally object
23   to that.  Dr. Wiggins has been here.  He's ready to
24   answer any questions.
25          We will supplementally produce any
```

34 (Pages 133 to 136)