# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, | JUDGE ELDON E. FALLON |
| Plaintiffs, | MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., | Case No. 05-3700 |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY AND STATEMENTS OF MERCK'S EXPERTS CONCERNING THE SAFETY AND EFFICACY OF VIOXX BASED ON "PERSONAL EXPERIENCE"**

858762.4

**TABLE OF CONTENTS**

| | | Page |
|---|---|---:|
| I. | Introduction | 1 |
| II. | To be Admissible, Expert Testimony Must be the Product of Reliable Principles and Methodology | 2 |
| III. | Merck's Witnesses Should Not Be Permitted to Offer Opinions and Statements based on their "Personal Experience" Where Such Testimony Contradicts DBRCT Results | 4 |
| IV. | Dr. Curtis's Opinion That Vioxx is More Effective than other NSAIDs Is Not Supported by Scientifically Reliable Data | 7 |
| V. | Dr. Parnell's Opinion that Vioxx is More Effective than Celebrex in Decreasing Pain and Inflammation and in Increasing Function is Not the Product of Reliable Methods | 10 |
| VI. | Dr. Curtis's Statement that None of his Patients Experienced a Cardiovascular Thrombotic Event While Taking an NSAID Should Not be Admitted to Prove the Cardiovascular Safety of Vioxx, as Such Anecdotal Evidence is Not Supported by Reliable Scientific Data | 11 |
| VII. | CONCLUSION | 14 |

## TABLE OF AUTHORITIES

**Page**

### CASES

*Cantrell v. GAF Corp.*,
 999 F.2d 1007 (6th Cir. 1993) ............................................................................................ 7

*Chan v. Coggins*,
 294 Fed. App'x. 934 (5th Cir. 2008) .................................................................................... 3

*Daubert v. Merrell Dow Pharmaceuticals*,
 509 U.S. 579 (1993) ......................................................................................................... 2, 4

*Gen. Elec. Co v. Joiner*,
 522 US. 136 (1997) .......................................................................................................... 4, 5

*Haggerty v. Upjohn Co.*,
 950 F. Supp. 1160 (S.D. Fla. 1996) ..................................................................................... 6

*Huss v. Gayden*,
 571 F.3d 442 (5th Cir. 2009) ............................................................................................ 2, 5

*In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*,
 524 F. Supp. 2d 1166 (N.D. Cal. 2007) ............................................................................... 7

*In Re Neurontin Marketing and Sales Practices Litigation*,
 No. 04-10981 (D. Mass. February 12, 2010) ........................................................... 6, 7, 8, 12

*Knight v. Kirby Inland Marine, Inc.*,
 482 F.3d 347 (5th Cir. 2007) ............................................................................................... 4

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999) ............................................................................................................ 3

*Moore v. Ashland Chem., Inc.*,
 151 F.3d 269 (5th Cir. 1998) ............................................................................................ 3, 5

*Norris v. Baxter Healthcare Corp.*,
 397 F.3d 878 (10th Cir. 2005) ............................................................................................. 6

*Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*,
 401 F. Supp. 2d 565 (E.D. La. 2005) ............................................................................ 3, 7, 9

- iii -

# TABLE OF AUTHORITIES
## (continued)

**Page**

**TREATISES**

David H. Kaye & David A. Freedman,
   Reference Guide on Statistics, in Federal Judicial Center, Reference Manual on Scientific
      Evidence 91-92 (2d ed. 2000) ........................................................................................ 4, 6, 14

**TO THE HONORABLE JUDGE FALLON:**

PLAINTIFF, CHARLES C. FOTI, JR., files this Memorandum in Support of Plaintiff's Motion to Exclude Certain Opinion Testimony and Statements of Dr. Curtis, including (1) Dr. Curtis and Dr. Parnell's opinion that Vioxx is more effective than other NSAIDs in treating osteoarthritis; and (2) Dr. Parnell's opinion that Vioxx is more effective than Celebrex in decreasing pain and inflammation and in increasing function; and (3) Dr. Curtis's statement that none of his patients experienced cardiovascular thrombotic events while taking Vioxx, and in support thereof shows:

**I.      Introduction**

In the field of pharmaceutical research, proper methods of data collection and analysis are well-developed, standardized, and generally agreed. When evaluating the safety and efficacy of a drug, it is undisputed that the highest quality evidence arises out of double-blind, randomized, controlled trials ("DBRCT"). Multiple DBRCTs have been conducted concerning Vioxx's safety and efficacy. Published studies show that Vioxx provided comparable pain relief to other non-steroidal anti-inflammatory medications (NSAIDs), and that Vioxx significantly increased the risk of cardiovascular thrombotic events.

Dr. Curtis and Dr. Parnell acknowledge that DBRCTs are the most credible source for data when making treatment decisions in clinical medicine. Dr. Curtis readily admits that the majority of published studies contradict his opinions, and does not disagree with their results. Yet, both Dr. Curtis and Parnell attempt to offer opinions concerning the safety and/or efficacy of Vioxx, based on their "personal experience," that are not supported by, and flatly contradict, scientifically reliable data.

Moreover, internal documents reveal data from unpublished Merck-sponsored DBRCTs showing that Vioxx is actually less effective than some other NSAIDS with respect to pain relief,

858762.4

and that Vioxx was associated with significant excess of thrombotic events.  Merck suppressed this data, however, under a "publish if positive" strategy, leaving clinicians and their own experts with incomplete and misleading information upon which to form their opinions.

Dr. Curtis and Dr. Parnell's opinions concerning the superior efficacy of Vioxx, as well as Dr. Curtis's statement that none of his patients experienced cardiovascular thrombotic events while taking Vioxx, should be excluded as irrelevant and unreliable under *Daubert* for multiple reasons.  First, personal experience should not be admissible to contradict DBRCT evidence— the gold standard of scientific reliability.  Second, the majority of published studies concerning Vioxx's safety and efficacy contradict their patient observations.  Finally, these experts did not and could not rely on all available DBRCT data, since Merck suppressed statistically significant negative results.

## II.  To be Admissible, Expert Testimony Must be the Product of Reliable Principles and Methodology

The Federal Rules of Evidence govern the admissibility of expert testimony.  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  Under Federal Rule of Evidence 702, a party seeking to introduce expert testimony must show: (1) the expert is qualified through knowledge, skill, experience, training, or education; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case.

The trial court acts as a "gatekeeper" and should exclude expert testimony unless it is both "reliable" and "relevant."  *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993).  The focus is on the experts' qualifications and methodology, rather than results or conclusions.  *Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565, 574 (E.D. La. 2005) (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998)).

As part of its gate keeping role, the district court must make certain that an expert basing testimony on personal experience "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Chan v. Coggins*, 294 Fed. App'x. 934, 937 (5th Cir. 2008) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). In other words, there cannot be a double standard between courtroom science and real-world science, and a litigation expert cannot employ a research methodology that would not be followed by real-world clinicians in the same field. *Id.*

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court set forth the following non-exclusive list of factors to consider in determining the scientific reliability of expert testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id*. at 593-95. The "reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

Scientific testimony is relevant only if the expert's "reasoning or methodology properly can be applied to the facts in issue," meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is irrelevant when "there is simply too great an analytical gap between the data and the

858762.4

opinion proffered." *Gen. Elec. Co v. Joiner*, 522 US. 136, 146 (1997).

To satisfy its gatekeeping responsibility, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Huss*, 571 F.3d at 452 (5th Cir. 2009) (quoting *Daubert*, 509 U.S. at 592-93). In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147. Instead, when expert testimony is demonstrated to be speculative or lacking in scientific validity, trial courts should exclude it. *Moore*, 151 F.3d at 279.

### III. Merck's Witnesses Should Not Be Permitted to Offer Opinions and Statements based on their "Personal Experience" Where Such Testimony Contradicts DBRCT Results

Not all scientific evidence is equally reliable. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, in Federal Judicial Center, Reference Manual on Scientific Evidence 91-92, 338 (2d ed. 2000) ("Inferences based on well-executed randomized experiments are more secure than inferences based on observational studies.").

"Evidence-based medicine" is founded upon "a well-established hierarchy of study designs based on the degree to which the design protects against bias."[1] (Graham Rebuttal at 2 [SRL Decl. Ex. 1].) DBRCTs are the top of the hierarchy, as "the gold standard of scientific evidence." *In Re Neurontin Marketing and Sales Practices Litigation*, No. 04-10981, slip op. at 2 (D. Mass. February 12, 2010). (Julie Rep. at 4 [SRL Decl. Ex. 2].) "Clinical experience," on

---

[1] Dr. Graham's rebuttal report describes the hierarchy of evidence-based medicine as follows: (1) randomized controlled trials, (2) systematic reviews of randomized trials, (3) single randomized trials, (4) systematic reviews of observational studies addressing patients important outcomes, (5) single observational studies addressing patient important outcomes, (6) physiologic studies (e.g., studies of blood pressure, cardiac output, and so forth), and finally (7) unsystematic clinical observations (Graham Rebuttal at 2).

- 4 -

the other hand, is generally considered to be the least reliable of all scientific evidence.  *See* Ref. Guide on Statistics, at 90-92 ("[A]necdotal reports . . . are more useful as a stimulus for further inquiry that as a basis for establishing association." (quoting *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1163-64 (S.D. Fla. 1996)).  (Graham Rebuttal at 2.)

To survive *Daubert*, "experts must accord appropriate weights to different levels of evidence, i.e. a randomized, controlled trial, as the 'gold standard' of evidence, must be accorded greater weight than observational, non-controlled studies or case reports." *In Re Neurontin*, No. 04-cv-10981, slip op. at 2; *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005) ("While the presence of epidemiology [as opposed to anecdotal evidence] does not necessarily end the inquiry, where epidemiology is available, it cannot be ignored."); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1175-76, 1179 (N.D. Cal. 2007) (holding that experts may not "cherry-pick[]" observational studies to support a conclusion that is contradicted by randomized controlled trials, meta-analyses of such trials, and meta-analyses of observational studies and excluding an expert who "ignores the vast majority of the evidence in favor of the few studies that support her conclusion").  An expert who "does not give appropriate weight to DBRCTs in rendering an opinion on a drug's effectiveness or who ignores negative DBRCTs flunks the *Daubert* test of reliability."  *In Re Neurontin*, No. 04-cv-10981, slip op. at 3.

Plaintiffs acknowledge that this Court has allowed experts to testify concerning their personal experiences, "provided that their opinions are confirmed by scientifically reliable data." *Plunkett*, 401 F. Supp. 2d at 579, 580 (allowing Merck's experts to testify, *e.g.*, that "Vioxx was an important medicine for physicians") (citing *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1014 (6th Cir. 1993)).  The "personal experience" that Merck's experts seek to offer in this case, however,

is not only unsupported by, but *contradicts* the great weight of scientific authority according to the well-established and recognized hierarchy of scientific evidence.

Plaintiffs urge this court to adopt the same rule that Judge Saris did in *In Re Neurontin*: "Clinical experience alone will not suffice as a reliable scientific methodology in assessing the efficacy of a drug." *See* No. 04-cv-10981, slip op. at 3. Such a rule makes sense in this case, in light of the wealth of high-quality reliable DBRCT studies available to prove the safety and efficacy of Vioxx. In contrast, no scientifically valid conclusions can be drawn from doctors' experiences with individual patients, as there are many reasons why patients get better or get worse while taking a particular medication. (Ref. Man. Sci. Evid. at 93.) Questions of safety and efficacy of a drug are answered by statistical analysis of clinical trials; they cannot be answered through the "clinical experience" of individual physicians and patients which have not been subjected to the rigors of the scientific method.[2] (Graham Reb. at 2-3). As the Reference Manual on Scientific Evidence explains:

> "Anecdotal evidence" means reports of one kind of event following another. Typically, the reports are obtained haphazardly or selectively, and the logic of "post hoc, ergo propter hoc" does not suffice to demonstrate that the first event causes the second. Consequently, while anecdotal evidence can be suggestive, it can also be quite misleading.

Ref. Man. at 91 (citations omitted). DBRCTs are the gold standard for determining the safety or efficacy of a drug. (Julie Rep. at 4; Graham Rebuttal at 2-3.) Dr. Curtis agrees. (Curtis Rep. at 12 ("Therefore, the most reliable data on cardiovascular events, along with data on GI outcomes and efficacy in association with Vioxx use, are found in the Vioxx RCTs.").)

Defendant agrees, as Merck argued in previous Vioxx cases, that anecdotal evidence such

---

[2] *See generally*, Ref. Guide on Statistics, at 121-25 (discussing p-values and statistical significance); a cause-and-effect relationship is inferred from a statistically significant difference ($p<0.05$) in a randomized clinical trial.

as clinical experience cannot establish a cause and effect relationship because it "do[es] not— and cannot—control for the role of chance, bias, or confounding."  Merck & Co. Inc.'s Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at 37, *Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565 (E.D. La. 2005) (No. 05-4046).

Vioxx safety and efficacy issues have been addressed by DBRCTs, the strongest, most robust evidence in the hierarchy of scientific evidence reliability.  (Graham Rebuttal at 3).  Dr. Curtis readily agrees that the highest level of evidence comes from DBRCTs.  (Curtis Dep. 67:1-3 [SRL Decl. Ex. 3]).  Given such a wealth of undisputed, high-quality evidence, defense experts are not permitted to rely on lesser levels of evidence that contradict the DBRCT results.

Accordingly, this court should exclude Dr. Parnell and Dr. Curtis's opinions and statements that are based on personal experience, described in sections IV, V, and VI below, where such testimony contradicts DBRCT evidence.

## IV.     Dr. Curtis's Opinion That Vioxx is More Effective than other NSAIDs Is Not Supported by Scientifically Reliable Data

Dr. Curtis intends to testify that Vioxx provided superior pain relief to other NSAIDs.  (Curtis Rep. at 11 ("In my own clinical experience, Vioxx was consistently more effective than other NSAIDS and Celebrex in the treatment of osteoarthritis.") [SRL Decl. Ex. 4]; Curtis Dep. 69:10-70:10.)  To support this opinion, Dr. Curtis relies on his "personal experience," as well as a "review of the literature."  *Id.*

Alan Nies, M.D., Director of Clinical Therapeutics and Head of the Vioxx Project Team, testified that Merck never claimed Vioxx was more effective at treating pain than any other NSAID.  (Nies Dep. 647:25-648:3, 650:16-19 [SRL Decl. Ex. 5]).  In fact, the Vioxx label states that Vioxx was "shown to be comparable" —not superior—to other NSAIDs for treatment of the

- 7 -

858762.4

signs and symptoms of osteoarthritis.  (Vioxx Label, 1999, marked as Curtis Ex. 32 , [SRL Decl. Ex. 6].)  Thus, Dr. Curtis's opinion is contrary to the label and the admissions of Merck's chief Vioxx scientist.

Additionally, the vast majority of published studies, including DBRCTs and meta-analyses, showed that Vioxx provided comparable, not superior pain relief.  (*See e.g.*, Bombardier et al, 2000 ("VIGOR"), marked as Curtis Ex. 18 [SRL Decl. Ex. 7]; Laine L, et al., 1999 [SRL Decl. Ex. 8]; Saag, K., et al., 2000, marked as Sales Ex. 39 [SRL Decl. Ex. 9].)  Dr. Curtis agrees that "the majority of studies suggest and show that Vioxx is equally effective at pain relief."  (Curtis Dep. 70:2-4.)  Thus, Dr. Curtis admits his personal experience is unsupported by the great weight of reliable scientific evidence.  (*See* Curtis Dep. 66:14-18; 67:1-3).

Merck's other experts agree that Vioxx is only "as effective" as other NSAIDs.  (Sales Rep. at 4; ("Clinical trials have shown that Vioxx is as effective as high doses of NSAIDs for osteoarthritis treatment.") [SRL Decl. Ex. 10]; Parnell Rep. at 3 ("[A]rticles support the fact that COX 2 selective inhibitors had similar efficacy to prescription dose traditional NSAIDs…") [SRL Decl. Ex. 11]; Silvers Rep. at 3 ("Vioxx…was subsequently shown to be effective in treating arthritis with comparable efficacy as the prescription doses of traditional NSAIDs.") [SRL Decl. Ex. 12].)

Moreover, Merck suppressed studies showing that Vioxx provided inferior pain relief to other NSAIDs.  For example, Merck's internal documents reveal the existence of Protocol 906, a study designed to test whether Vioxx provided more effective pain relief than Celebrex in the treatment of osteoarthritis.  (Protocol 906, MRK-AGU 0006035, marked as Curtis Ex. 9 [SRL Decl. Ex. 13]; Curtis Dep. 76:13-77:14.)  According to an internal statistical analysis of Protocol

- 8 -
858762.4

906, Vioxx fared worse than Celebrex in relieving pain at night and in overall patient response after treatment. *Id.* Clearly Merck did not like these results, as demonstrated through the following series of emails regarding Protocol 906 and a companion study (Protocol 907):

> "Anne, neither study looks particularly good for Vioxx actually."

(Email from Andreas Moan to Anne Altmeyer, dated July 23, 2001, MRK-AFO 0154015, marked as Curtis Ex. 7 [SRL Decl. Ex. 14].)

> "Thank you, Kristel. This is a very serious result, and you will hardly be surprised by the idea of keeping this very tight for the moment."

(Email from Sophie Kornowski to Wendy Dixon and Barry Gertz, dated July 24, 2001, "Subject: Protocol 906-01," MRK-NJ0199449, marked as Curtis Ex. 8 [SRL Decl. Ex. 15].)

> Andreas: Thanks. I agree that Branchburg comes first now. However, I assume that the investigators will want to publish these data, even if they do not look good for Merck, which could potentially tarnish the strong efficacy image of Vioxx.

(Email from Anne Altmeyer to Andreas Moan, Karen Grosser, and Ken Truitt, dated September 20, 2001, "Re: PN 906 and 907", MRK-AFO 0154015, marked as Curtis Ex. 7 [SRL Decl. Ex. 16].)

The results from Protocol 906 were never published. (*See* Response of Defendant Merck & Co., Inc. to Plaintiff Steering Committee's First Set of Interrogatories to Defendant Merck & Co., Inc., Appendix A at 18, *In re Vioxx Prod. Liab. Lit.*, MDL No. 1657 (September 16, 2005).) Consequently, Dr. Curtis did not—and could not—rely on the data therein to form his opinion regarding Vioxx's efficacy. (Curtis Dep. 72:5-7 ("Well, if it's not available to me, if it's not published, if it's not peer-reviewed, I'm not going to pay attention to it, frankly.").) As Dr. Curtis acknowledged, experts have to "look at negative studies" as well as positive studies to form an opinion about efficacy. (Curtis Dep. 71:20-22, 71:23-72:1 ("[A]ll I can say is that I

- 9 -

would look at the negative study with the same seriousness that I would look at a positive study, if you're looking at efficacy.").) Thus, because Merck suppressed negative data, Dr. Curtis's opinion regarding efficacy is based on incomplete information, rendering his methodology unreliable under the Federal Rules of Evidence and *Daubert*.

The great weight of reliable scientific evidence shows that Vioxx was not superior to other NSAIDS in pain relief. First, the label clearly indicates that Vioxx has been shown to be "comparable" to other pain relievers—not more effective. Second, the majority of studies, including DBRCTs—the "gold standard" of scientific evidence—confirm that Vioxx is not more effective than other NSAIDs in the treatment of osteoarthritis. Third, Merck suppressed studies with data showing that Vioxx was actually *inferior* to other NSAIDs—evidence that Dr. Curtis admitted he would have reviewed had it been presented.

Dr. Curtis's personal experience with prescribing Vioxx to his patients cannot, in the face of such strong, undisputed reliable evidence, support his opinion regarding efficacy. *See In Re Neurontin*, No. 04-cv-10981, slip op. at 3. The "analytical gap" between the data and Dr. Curtis's conclusions is too broad for his opinion to be reliable. *See Joiner*, 522 US. at 146. Thus, Dr. Curtis's opinion that Vioxx provided superior pain relief to other NSAIDs should be excluded under *Daubert*.

### V.      Dr. Parnell's Opinion that Vioxx is More Effective than Celebrex in Decreasing Pain and Inflammation and in Increasing Function is Not the Product of Reliable Methods

Dr. Parnell attempts to testify that Vioxx is more effective in treating pain than Celebrex. (Parnell Rep. at 3 ("In my clinical experience, Vioxx and Bextra tended to be more effective than Celebrex in decreasing pain and inflammation and in increasing function, but with a similar safety profile.") He does not cite any studies, even though he acknowledges that clinical data is the appropriate starting point for evaluating a drug's efficacy:

> Clinical trials are a great way to start. That enables me to look at a drug and evaluate it, and determine if I think it's appropriate for my patients, and then from that, then we start relying on experience, and as new literature comes out, we use that to help us refine our technique.

(Parnell Dep. 60:5-11 [SRL Decl. Ex. 17].)

Dr. Parnell's opinion concerning the relative efficacy of Vioxx versus Celebrex should be excluded for the same reasons discussed in section V above: First, Merck has never claimed that Vioxx is more effective than Celebrex, as both the Vioxx label and Merck's Director of Clinical Therapeutics confirm. (Nies Dep. 647:25-648:3, 650:16-19; Vioxx Label, 1999.) Second, the majority of published studies show, and Merck's other retained experts agree, that Vioxx is no more effective than other NSAIDs. (*See, e.g.*, Bombardier et al, 2000; Laine L, et al., 1999; Saag, K., et al., 2000; Sales Rep. at 4.) Finally, Merck suppressed DBCRTs showing that Celebrex was actually superior to Vioxx in pain relief (Protocol 906, MRK-AGU 0006035)—a study that Dr. Parnell did not, and could not rely on in forming the opinion at issue.

Dr. Parnell's personal experience contradicts the great weight of reliable, scientific evidence. His opinion is not the product of reliable scientific methods, and should be excluded under *Daubert*.

**VI. Dr. Curtis's Statement that None of his Patients Experienced a Cardiovascular Thrombotic Event While Taking an NSAID Should Not be Admitted to Prove the Cardiovascular Safety of Vioxx, as Such Anecdotal Evidence is Not Supported by Reliable Scientific Data**

Dr. Curtis attempts to testify that he has not (or cannot recall ever having) a patient that experienced cardiovascular thrombotic events while taking Vioxx. (Curtis Rep. at 1 ("I do not recall any cardiovascular thrombotic events in a patient I cared for who was on a NSAID."); Curtis Dep. 252:4-6 ("I have no recollection of ever having a patient that I made an association with a cardiovascular event who was prescribed Vioxx.").)

Dr. Curtis acknowledges that "there are certain types of evidence that should carry or does carry more weight in interpreting results or interpreting clinical activity." (Curtis Dep. 66:14-18). In particular, "randomized controlled trials are given the most credibility for providing data to make decisions in clinical medicine." (Curtis Dep. 67:1-3). Yet, in forming his opinion concerning the safety of Vioxx, Dr. Curtis relies on non-controlled, non-blinded observations of his patients. (Curtis Dep. 266:5-10 ("Q: Did you do a study of your patients where you randomized them for various cardiovascular risk factors and what drugs they were on?…A. No, I did not do that study.").)

Peer-reviewed DBRCTs concerning cardiovascular safety of Vioxx are readily available. The most relevant re studies compare Vioxx to placebo, such as the APPROVe trial. At his deposition, Dr. Curtis reviewed the Merck-funded, peer-reviewed 2008 update of the APPROVe clinical trial, which included analysis of thrombotic events during both the on-drug period and for approximately one year after discontinuation. (Baron, et al., 2008, marked as Curtis Ex. 31, [SRL Decl. Ex. 18].) Dr. Curtis admitted that the 2008 article showed excess risk of thrombotic events on Vioxx:

> Q. With that understanding, do you agree that for the entire period, the study showed that rofecoxib increased the risk of the combined APTC endpoint of myocardial infarction, stroke, and vascular death?
>
> A. I do.

(Curtis Dep. 236:17-22.) In other words, Dr. Curtis openly acknowledges that his personal experience of not observing a thrombotic event among his patients is contradicted by reliable scientific evidence that Vioxx did increase the rate of such events in a randomized clinical trial.

Additionally, at the February 16 to 18, 2005 Joint Meeting of the Arthritis Advisory Committee and Drug Safety and Risk Management Advisory Committee of the FDA,

participants voted on the following: "Do the available data support a conclusion that rofecoxib significantly increases the risk of cardiovascular events?" (marked as Curtis Ex. 29, [SRL Decl. Ex. 19].) The vote was unanimous—32 yes, 0 no. *Id.* Dr. Curtis admitted he would have voted with the 32, not the zero:

> Q. Setting aside your opinions about any other drug, this question is about rofecoxib. So my question is: Do the available data support a conclusion that rofecoxib significantly increases the risk of cardiovascular events?
>
> . . .
>
> THE WITNESS: If I understand cardiovascular events to be the range of cardiovascular side effects that we know are associated with Vioxx as well as other nonsteroidals, I agree that Vioxx/rofecoxib increases the risk.
>
> . . .
>
> Q. And which events were you referring to in your previous answer?
>
> A. Edema. Congestive heart failure. Hypertension. And there's an association in studies with myocardial infarctions.

(Curtis Dep. 209:2-19.)

Dr. Curtis also admits that heart attacks are "a known side effect" of Vioxx:

> Q. Do you agree with Ms. Cannuscio that it's probably true that some of the estimated 20 million persons who took Vioxx have suffered heart attacks as a result?
>
> . . .
>
> THE WITNESS: Again, someone is saying that 20 million people took Vioxx and someone is saying of those 20 million people, they suffered heart attacks because they took Vioxx. And all I can say is there is an association of nonsteroidals in cardiovascular side effects, including MIs, so it is reasonable to say that somebody taking a nonsteroidal suffered a heart attack as a result of taking -- at least precipitated or caused a heart attack, however you want to phrase it, and Vioxx is in that group. But I wouldn't put a number on it. Some, I don't know. I would assume. I assume so, if that's your question, since it's a known side effect, it's a side effect that's

- 13 -

in the label, it's a side effect that hasn't been hidden. Yes.

(Curtis Dep. 186:2-5, 10-25.)

Dr. Curtis also testified that he was unfamiliar with the results of Protocol 203, another Merck-sponsored study that the company failed to publish. (Curtis Dep. 190:1-25.) In particular, Protocol 203 was a pre-specified pooled analysis of cardiovascular thrombotic events from three studies of Vioxx 25 mg. compared to placebo (APPROVe, VICTOR, and ViP). The company sought FDA approval of the study design and planned to include the results in the Vioxx label. However, the hypothesized equivalence of Vioxx to placebo was contradicted by the data, which showed a statistically significant excess risk of thrombotic events in the Vioxx patients (RR = 1.67, 95% C.I. 1.15-2.43). (Braunstein Slide 53, February 2005, marked as Curtis Ex. 27 [SRL Decl. Ex. 20].) Because Merck never published these results, Dr. Curtis' opinions are based on unreliable and incomplete data, and this data gap cannot be filled by anecdotal personal experience of his patients' use of Vioxx. (Curtis Dep. 252:4-6.)

In summary, no scientifically reliable conclusion can be drawn from the fact that Dr. Curtis did not have (or could not recall having) any patients that experienced cardiovascular thrombotic events while taking Vioxx. These observations are nothing more than irrelevant anecdotal evidence "obtained haphazardly or selectively." *See* Ref. Man. Sci. Evid. at 91. Given the availability of DBRCTs—the gold standard of reliable methodology—concerning the cardiovascular safety of Vioxx, as well as Dr. Curtis's admissions that he cannot disagree with their results, this court should exclude his statements concerning his patients and cardiovascular events under *Daubert*.

## VII. CONCLUSION

For the reasons stated herein, these opinions do not meet the standards for expert testimony. Plaintiff respectfully requests that the Court issue an order precluding testimony from

- 14 -

858762.4

Merck's experts on the matters set forth above, and for such other and further relief to which Plaintiff may be entitled.

Date: February ___, 2010                                        Respectfully submitted,


                                                                /s/ *James R. Dugan, II*
                                                                James R. Dugan, II
                                                                THE DUGAN LAW FIRM
                                                                650 Poydras Street, Suite 2150
                                                                New Orleans, LA  70130
                                                                Telephone:  (504) 648-0180
                                                                Facsimile:  (504) 648-0181

- 15 -

858762.4

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Memorandum in Support of Motion to Exclude Certain Opinion Testimony of David Curtis, M.D. has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United State District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this the 19th day of February, 2010.

                 */s/ Trudy V. Bryant*
                 Trudy V. Bryant
                 THE DUGAN LAW FIRM & MURRAY LAW FIRM
                 Paralegal to James R. Dugan, II & Douglas R. Plymale, Ph.D.
                 650 Poydras Street, Suite 2150
                 New Orleans, LA  70130
                 Telephone:  (504) 648-0180
                 Facsimile:  (504) 648-0181
                 Email:  trudy@dugan-lawfirm.com