# EXHIBIT 11

# MELVIN L. PARNELL, JR.

 ## A.P.M.C. 

ORTHOPAEDIC SURGERY & SPORTS MEDICINE

DIPLOMATE OF
THE AMERICAN BOARD
OF ORTHOPEDIC SURGERY

December 7, 2009

MELVIN L. PARNELL, JR., M.D.
SUSAN RAGGIO, PRACTICE MGR.

Expert Opinion:  Louisiana AG v. Merck

I have always wanted to be a physician, even from early childhood days, and I have been fortunate enough to accomplish that dream. As the son of a professional baseball player, I have always had an interest in sports and I have been able to combine my interests as an orthopedic surgeon. Following my graduation from the University of New Orleans in 1972, I attended the school of Public Health and Tropical Medicine at Tulane receiving a degree in Health Information Systems in 1976. I then attended Tulane Medical School and graduated in 1980, followed by an orthopedic residency at Tulane which I completed June 30, 1985. I have been in the private practice of orthopedic surgery since July 1, 1985 and practice general orthopedics with specialty interests in sports medicine and joint replacement. Further information regarding my background and experience is detailed in my curriculum vitae.

My practice consists of a significant percentage of Medicare patients which requires me to deal with significant bone and joint problems on a regular basis with patients coming to see me requesting relief of pain and improvement in function. My sports background has given me a higher goal in treating my patients to not only decrease pain but also optimize function and improve quality of life. Based on my Medicaid population and review of materials, I am familiar with the State of Louisiana's Medicaid prescription drug program. Prior to approximately 2002, Louisiana Medicaid had an open formulary for non-steroidal anti-inflammatory medicines. In June of 2002, a Preferred Drug List and prior authorization program was implemented for COX 2 selective inhibitors. If a medication was on the Preferred Drug List I could prescribe that medication without prior authorization; however, if I wanted to prescribe a drug not on the Preferred Drug List, I had to obtain prior authorization. It is my understanding that Pharmacy & Therapeutics Committee made recommendations to the Department of Health and Hospitals regarding which medicines should be included on the Preferred Drug List. It appears that a third party, Provider Synergies, prepared monographs that contained detailed clinical information that the P&T Committee used in formulating their recommendations. Provider Synergies was also responsible for obtaining supplemental rebates from the manufacturers of the medicines. I have had an opportunity to review the monographs prepared by Provider Synergies with respect to the non-steroidal anti-inflammatories.

I rarely see patients in my office who are not having significant orthopedic problems. Most of my new patients have already been treated by their primary care

option in my patient population - as they have already failed to improve with active treatment. Further, placebo has never listed on the Preferred Drug List and again the majority of my patient population has already failed treatment with OTC medications. Numerous treatment options are available for the treatment of acute and chronic pain. As a result, when making prescribing decisions, it is my opinion that the most relevant analysis is to determine the benefits and risks among the available treatment options and medications. Treatment options include home exercises, physical therapy, steroid or epidural injections, analgesics, anti-inflammatories, oral steroids, Tylenol, aspirin, or combinations of the above. Although there are benefits to be derived from the treatments listed above, as with any treatment regimen, there are significant side effects associated with these treatments as well. For example, if started too soon, physical therapy or home exercises may lead to an exacerbation of the problem. Steroids have the potential side effects of elevation of blood pressure or blood sugar, personality changes, increased appetite, and weight gain just to mention a few. Epidural injections, among other things, may result in infection and spinal fluid leak. Narcotics may lead to problems with tolerance and addiction and become less effective over time. There are even studies that show long term use of narcotics can actually have the opposite effect and can actually exacerbate pain rather than alleviate pain. Tylenol, among other things, may affect liver function, while aspirin inhibits platelet aggregation and may lead to bleeding problems.

The medication most often prescribed for symptomatic relief of pain and to reduce inflammation is the class of medications referred to as NSAIDS – non-steroidal anti-inflammatories. For many years the only options were the traditional NSAIDS – such as Motrin, Naprosyn, Indocin and others. While effective for clinical relief of arthritis symptoms, again as with all medications, these medicines are associated with adverse side effects. The most common side effects of NSAIDS are photosensitivity reactions, fluid retention and increased blood pressure, and especially gastrointestinal problems. The medical literature indicates that over 100,000 people are hospitalized and thousands of people in the United States die each year from the GI side effects of these medications. These medications also have the potential to interact with blood thinners such as coumadin and Plavix and with more and more Americans being placed on anticoagulants every day, this potential problem continues to grow. The GI problems with traditional NSAIDS are thought to be derived from the fact that traditional non-selective NSAIDS inhibit the COX 1 enzyme which is thought to be involved in the production of prostanoids that maintain the integrity of the GI mucosal lining. The discovery of the fact that there were two cyclooxygenase enzymes (COX 1 and COX 2) led to further research and the development of new medicines. Since COX 2 is involved with pain and inflammation, the theory developed that a COX 2 selective inhibitor could have efficacy similar to traditional NSAIDS (through inhibition of COX 2), but improved GI safety (through lack of inhibition of COX 1).

Subsequent research has shown that COX 2 selective inhibitors (i.e., sparing COX 1 inhibition) provided the goal of decreasing pain and inflammation with less of the undesirable side effects related to COX 1 inhibition. I have substantial clinical experience treating patients with all the COX 2 selective inhibitors. The first such medication to be released was Celebrex and this medication is still today prescribed widely worldwide. As

2



with all COX 2 selective inhibitors, Celebrex does not interfere with platelet aggregation and thus can be used with less potential for interaction in patients taking anticoagulants. From my experience, there is also a lower rate of gastrointestinal problems with Celebrex as compared to traditional NSAIDS. Following the introduction of Celebrex, other COX 2 selective inhibitors, Vioxx and Bextra were released. In my clinical experience, Vioxx and Bextra tended to be more effective than Celebrex in decreasing pain and inflammation and in increasing function, but with a similar safety profile.

There is no denying the clinical efficacy of the COX 2 selective inhibitors based on numerous articles in the medical literature. In general, these articles support the fact that the COX 2 selective inhibitors had similar efficacy to prescription dose traditional NSAIDS and superior efficacy to Tylenol. Medications such as ibuprofen 400mg may help some patients with acute pain, but in my experience it does not work well for the chronic pain experienced by most of my patients. There are hundreds of patients in my practice that can attest to the efficacy of these COX 2 selective medications. Even today, I have numerous patients still requesting Vioxx as they feel this was the best medication they have ever taken for their orthopedic problems. This is not unexpected as medications can affect people in different ways and one medication may provide better symptomatic relief for a particular patient. Thus, it is beneficial to physicians to have a variety of treatment options and I encourage broad treatment options for these very reasons. As described above, if I had not used Vioxx for my patients, I would have prescribed a different treatment regimen, such as Celebrex, Bextra, or other combination of medicines.

In my opinion, the medical literature still supports the safe use of Vioxx. As referenced above, Vioxx has a proven efficacy profile, and in many patients, provided the best relief for their problems. Vioxx was safe and effective for my patients, and I have seen no evidence that Vioxx was not a safe and effective medication for the vast majority of people who took it in the State of Louisiana. As a practicing physician in Louisiana, I felt that I had all of the necessary and appropriate medical information available to me to make an appropriate risk-benefit determination for my Medicaid patients.

With respect to GI safety, Vioxx has demonstrated to be associated with fewer GI perforations, ulcers, and bleeds compared to traditional non-selective NSAIDS. The VIGOR study was conducted with 8,076 patients and compared 50mg of Vioxx (two times the maximum recommended chronic dose) and Naprosyn 500mg twice daily. The VIGOR study showed a significant reduction in GI events compared to Naprosyn (Bombardier 2000). The monographs prepared by Provider Synergies for the P&T Committee's review and consideration discussed the VIGOR trial and noted this reduction in risk compared to Naprosyn. Further studies have shown similar GI benefits compared to traditional NSAIDS (Watson 2004, Rostom 2007). A difference in cardiovascular events was noted in the VIGOR trial that was driven by a difference in myocardial infarctions. Again, the monographs prepared by Provider Synergies consistently noted this difference in cardiovascular risk, and it appears the P&T Committee discussed and considered the potential cardiovascular concerns with Vioxx. The monographs appear to accurately and adequately discuss the fact that there was a

difference in cardiovascular risk between Vioxx and Naprosyn, but that there was no evidence of a difference in cardiovascular risk between Vioxx and other NSAIDS. This is consistent with the published data at this time. With the wide discussion of the VIGOR data in the medical community, I was well aware of the difference in cardiovascular risk between Vioxx and Naprosyn. The data was also contained in the updated label from April 2002, as well as letters to physicians like myself. Indeed, even representatives discussing Celebrex and Bextra would often mention the potential cardiovascular concerns with Vioxx. Again, the P&T Committee discussed the potential cardiovascular risks with Vioxx during their meetings. While the reason for the difference in cardiovascular risk was debated in the medical community, the difference in risk was noted and I incorporated that fact into my prescribing habits.

In June 2002, at the beginning of the Preferred Drug List and prior authorization program for COX 2 selective inhibitors, Vioxx was not included in the Preferred Drug List and was only available by obtaining prior authorization. During this time, if all things were equal, I would prescribe Celebrex or Bextra – both of which were on the PDL. However, there were many times where I requested prior authorization for Vioxx because it was the only treatment that worked for the patient and I never experienced any resistance when I sought prior authorization for Vioxx or any other NSAIDS. In July 2003, Vioxx was added to the PDL. I agreed with this decision and supported adding Vioxx to the PDL as it was a useful treatment option for many of my patients. Further, it is my opinion that it was the correct decision to have Vioxx on the PDL up to the voluntary withdrawal of Vioxx from the market. Based on my review of the materials in this case, the information provided to the P&T Committee by Provider Synergies was accurate, reflected the scientific knowledge, and was adequate to inform the P&T members of the potential benefits and risks of NSAIDS. Further, based on my review of the depositions of Mr. Bearden and Ms. Terrebonne, it appears that the most significant consideration of the P&T Committee regarding which COX 2 selective inhibitors should be on the PDL was the cost of medications to the State of Louisiana.

The first study to show a statistically significant risk of thrombotic events compared to placebo was the APPROVe study. Although the APPROVe study did show an increase in thrombotic cardiovascular events, this increase did not appear until after 18 months of continuous treatment. In light of the results of the APPROVe trial, Merck withdrew Vioxx from the market. More recent analyses of the cardiovascular data with all NSAIDS show that, consistent with prior publications, any cardiovascular risk with Vioxx is not different than other selective COX 2 inhibitors like Celebrex, and the risk is not different than other traditional NSAIDS (with the exception of Naprosyn) (Kearney 2006). In my practice and for all physicians treating pain syndromes, this is the most relevant analysis of cardiovascular risk as my patients are in need of symptomatic relief and must take medication for their problems. Again, placebo is simply not an option to treat their pain syndromes.

I still consider Vioxx to be a good medication that provided significant relief and improvement in the quality of life for hundreds if not thousands of my patients and would continue to prescribe it if it were available today. It is my opinion that the medical

4

literature clearly indicates that Vioxx is acceptably safe and efficacious and would continue to be a useful treatment option for physicians if it were available today.

I reserve the right to supplement my opinions should new information become available, and I reserve the right to comment on the testimony of other experts. I am compensated at a rate of $600 per hour for my time in this case.

Melvin L. Parnell, Jr., MD