**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, | JUDGE ELDON E. FALLON |
| Plaintiffs, | MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., | Case No. 05-3700 |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY OF MERCK'S EXPERTS CONCERNING THE RELATIVE SAFETY AND EFFICACY OF VIOXX COMPARED TO OTHER MEDICATIONS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 2

I.     Relevant Background ................................................................................ 4

       A.     Pre-Market Clinical Trials ............................................................. 5

       B.     Review Studies ............................................................................... 6

       C.     VIGOR ............................................................................................ 6

II.    Merck's Clinical Trials Used Uniformly High Doses of Comparator Drugs
       that Guaranteed High Rates of Adverse Events in Artificial Trial Settings
       that Bore No Relation to Real World Use of tNSAIDS ........................... 7

       A.     There is an Undisputed Dose-Response Relationship between
              Higher Doses of NSAIDs, including Ibuprofen, and Higher
              Incidence of GI Events .................................................................. 7

       B.     Merck's OA Clinical Trials Violated the Standard of Care in
              NSAID Treatment, Which Required Doses Tailored to the
              Individual Patient and Use of the "Lowest Effective Dose" ....... 9

       C.     Osteoarthritis Patients Generally Require and Use a Lower Dose of
              Ibuprofen than 2400 mg/day ....................................................... 10

       D.     The Greater Toxicity of Ibuprofen at the 2400 mg/day Dose Used
              in the Vioxx Osteoarthritis Clinical Trials was not only Generally
              Accepted, but Was Also Well-known to the Defendant ............ 14

III.   DEFENSE EXPERTS' METHODS ARE UNRELIABLE BECAUSE
       THEY IGNORE DOSE-RELATED TOXICITY AND REAL-WORLD
       PRACTICES THAT REDUCE GI RISK .................................................. 17

       A.     Defendants' Experts Testimony Concerning the Relative GI Safety
              of Vioxx Compared to Other Medications ................................. 17

              1.     Failure to Address the Dose-Response Relationship ........ 18

              2.     Improper Extrapolation from High Doses ........................ 18

              3.     Reliance on Studies that Do Not Reflect Real World
                     Clinical Practice .............................................................. 18

IV.    LEGAL STANDARDS ........................................................................... 19

V.     Argument ................................................................................................ 21

## TABLE OF CONTENTS
### (continued)

Page

A.  Merck's Experts May Not Testify to the Relative GI Safety of Vioxx Because of the Failure to Account for Dose-Response, a Fundamental Principle of Medical/Scientific Research that Has Been Universally Accepted by the Courts, the Defendants and the Experts in this Case ................................................................................... 21

B.  Merck's Experts Improperly Extrapolate from High Doses to Infer that Low Doses would Cause the Same Effect ........................................ 23

C.  Merck's GI Safety Studies Are Not Reliable Because the Clinical Trials Do Not Reflect the Real World Treatment of Osteoarthritis Patients ................................................................................................... 25

   1.  All of Merck's Osteoarthritis Clinical Trials Used Excessive and Unnecessary Doses of Comparator Drugs which Biased the Results in Favor of Vioxx ............................... 25

   2.  Merck' Experts May Not Rely on Review Articles to Testify to the Relative GI Safety of Vioxx, where Such Review Articles Were Based on the Same Merck Studies that Used Excessive and Unnecessary Doses of Comparator Drugs, and also Ignored the Undisputed Dose-Response Relationship ................................................................................ 28

   3.  Despite Universal Agreement that Rheumatoid Arthritis Patients Require Higher Doses of NSAIDs than Osteoarthritis Patients, Merck Used the Identical Dose of Naproxen in Rheumatoid Arthritis and Osteoarthritis Patients, thereby Exposing OA Patients to Unnecessary and Unrealistically high Rates of GI Adverse Events ....................... 29

D.  Merck's Experts May Not Rely on Personal Experience to Testify to the Relative GI Safety of Vioxx Because Such Testimony is Unsupported by Reliable Scientific Evidence ......................................... 29

VI.  The Record on this Motion and the Current Scientific Literature Concerning Vioxx's GI Toxicity Have Changed Substantially Since a Ruling of this Court in Another Case in 2005 ..................................... 30

VII.  CONCLUSION ............................................................................. 33

## TABLE OF AUTHORITIES

**Page**

### CASES

*Allen v. Pennsylvania Engineering Corp.*,
   102 F.3d  (5th Cir. 1996) .................................................................................... 22

*Black v. Food Lion, Inc.*,
   171 F.3d 308 (5th Cir. 1999) ............................................................................... 20

*Burleson v. Texas Dep't of Crim. Justice*,
   393 F.3d 577 (5th Cir. 2004) ...................................................................... 20, 22, 23

*Christophersen v. Allied-Signal Corp.*,
   939 F.2d 1106 (5th Cir. 1991) .......................................................................... 21, 22

*Daubert v. Merrell Dow Pharmaceuticals*,
   509 U.S. 579 (1993) ................................................................................... 19, 20, 21

*Gen. Elec. Co v. Joiner*,
   522 US. 136 (1997) .......................................................................................... 21, 25

*Huss v. Gayden*,
   571 F.3d 442 (5th Cir. 2009) ............................................................................ 19, 21

*In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) ................................................... 3, 23, 24, 25

*Knight v. Kirby Inland Marine, Inc.*,
   482 F.3d 347 (5th Cir. 2007) ............................................................................ 20, 23

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) .......................................................................................... 20, 28

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) .................................................................. 21, 22, 23

*Moore v. Ashland Chem., Inc.*,
   151 F.3d 269 (5th Cir. 1998) ............................................................................ 19, 21

*Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*,
   401 F. Supp. 2d 565 (E.D. La. 2005) ................................................................ 19, 30

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Vice v. Northern Telecom, Inc.*,
   Civ. A. No. 94-1235, 1996 WL 200281 (E.D. La. April 23 1996).....................................25, 28

**RULES**

Federal Rule of Evidence 702..........................................................................................19

**TREATISES**

David L. Eaton, Scientific Judgment and Toxic Torts—A Primer in Toxicology
   for Judges and Lawyers, 12 J. L. & Pol'y (2003)......................................................21

Reference Manual on Scientific Evidence, Federal Judicial Center, 2d. ed. (2000) ...................22

**TO THE HONORABLE JUDGE FALLON:**

PLAINTIFF, CHARLES C. FOTI, JR., files this Memorandum in Support of Motion to Exclude Certain Opinion Testimony of Merck's Experts Concerning the Relative Safety of Vioxx Compared to Other Medications, including Dr. Sales, Dr. Curtis, Dr. Silvers and Dr. Parnell's opinions that Vioxx is safer for the gastrointestinal tract than other non-steroidal anti-inflammatory drugs.

## INTRODUCTION

This motion proceeds from the fundamental principle of the dose-response relationship, which applies to both the real world understanding of scientific evidence and its admissibility in the courts.  It is universally acknowledged, by scientists generally, by all of the experts in this case, and by the courts, that toxicity is related to dose; the higher the dose, the greater the risk of adverse side effects.

The gastrointestinal (GI) side effects of non-steroidal anti-inflammatory drugs ("NSAIDs") are no exception to the rule.  Such effects are known to occur with increased frequency among patients exposed to higher doses of the drugs.  The undisputed evidence in this case shows that Merck conducted its clinical trials of Vioxx among arthritis patients against uniformly high doses of traditional NSAIDs, at a constant daily dose, for prolonged periods ranging from six weeks to eighty-six weeks in duration.  It has been pointed out in the scientific press that Merck's arthritis trial study designs were biased in favor of Vioxx, since maximal doses of the comparator drugs guaranteed high rates of GI side effects among the populations to which Vioxx was compared.  Merck consciously chose not to test the safety or efficacy of Vioxx against moderate or low doses of comparator NSAIDs.  As a result of this choice, there is simply no evidence that lower doses of the comparator drugs would cause more side effects than Vioxx or be less effective in relieving pain than Vioxx.

Despite the controlling role of dose in the evaluation of toxicity, and despite the uniformly high doses of comparator drugs against which Vioxx was tested, Merck's experts propose to testify that Vioxx is safer for the GI tract than traditional NSAIDs, without regard to the doses at which such medications are administered.  Such opinions are antithetical to the scientific method and inadmissible under *Daubert*.

This issue is not merely academic, but instead bears directly upon the relative safety of

Vioxx and traditional NSAIDs in the real world.  Peer-reviewed literature known to Merck at all times relevant to the testing and marketing of Vioxx showed that NSAIDs were rarely used at high, uniform daily doses by actual patients.  Indeed, Merck's witnesses testified that they rarely used such high doses in their own clinical practices, and that if they did, they lowered the daily dose as soon as an acute episode abated, in accordance with the labeling instructions and standard of care for use of such medications.  In the planning phases for the Vioxx clinical trials among OA patients, Merck's own consultants advised them that the use of uniform, high doses of such medications as ibuprofen might not be ethical and did not conform to real world practices.  Merck's experts should not be permitted to testify that Vioxx was safer for the GI tract than traditional NSAIDs based on clinical trials at high doses, without regard to the safer, lower doses at which such medications were given in the real world.

In the *Bextra/Celebrex Cases*, *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*, 524 F. Supp. 2d 1166, 1180 (N.D. Cal. 2007), an analogous issue was decided by the District Court on a *Daubert* motion that is directly relevant to this case. Specifically, Judge Breyer held that plaintiffs would be permitted to offer expert testimony based on clinical trial evidence that Celebrex at 400 mg./day was capable of causing heart attacks, but that plaintiffs' experts could *not* testify that 200 mg. Celebrex/day could cause heart attacks, because there was no clinical trial evidence to support that claim.

The circumstances are parallel here.  Defendants may only testify that Vioxx was associated with fewer GI adverse events than ibuprofen at 2400 mg./day, at a constant daily dose over an extended period of time, because that is what the clinical trials tested.  However, defendant's experts may not testify to the broad generalization that Vioxx is safer than NSAIDs for the GI tract, without regard to dose, when no clinical trial evidence supports such a claim.

- 3 -

## STATEMENT OF FACTS

I.    **Relevant Background**

In 1999, the FDA approved the sale and distribution of Vioxx, the brand name for rofecoxib, for the treatment of arthritis, acute pain, and primary dysmenorrhea. (Abramson Rep. at 7 [Declaration of Sarah R. London in Support of Plaintiff's Motion to Exclude Certain Opinion Testimony of Merck's Experts Concerning the Relative Safety of Vioxx Compared to Other Medications, hereinafter "SRL Decl." Ex. 1].) Vioxx is a member of a class of pain relievers called non-steroidal anti-inflammatory drugs ("NSAIDs"). (Vioxx Label, 2002, marked as Curtis Ex. 32 [SRL Decl. Ex. 2]). Other pain relievers in this class of drugs include, among others, aspirin, naproxen (such as ALEVE®), ibuprofen (such as ADVIL® and MOTRIN®), diclofenac (such as VOLTAREN®), and nabumetone (such as Relafen®).

NSAIDs act to relieve pain and inflammation by inhibiting production of an enzyme called prostaglandin G/H synthase. (Silvers Rep. at 2-3 [SRL Decl. Ex. 3]). This enzyme consists of two similar forms, cyclooxygenase-1 ("COX-1") and cyclooxygenase-2 ("COX-2"). *Id.* In the medical and pharmacological literature, COX-2 is generally associated with effects on pain and inflammation; and COX-1 is associated with, among other things, platelet aggregation and the integrity of the gastrointestinal tract. *Id.*

Traditional NSAIDs have been associated with negative gastrointestinal ("GI") side effects including perforations, ulcers, and bleeds ("PUBs"). (Sales Rep. at 2 [SRL Decl. Ex. 4].) There was great hope that highly selective COX-2 inhibitors, such as Vioxx, would provide for relief of pain and inflammation without the negative gastrointestinal effects of traditional NSAIDs (hereinafter, "tNSAIDS"). (Graham Rep. at 5 [SRL Decl. Ex. 5]; Silvers Rep. at 3.) However, that hope was not realized as to Vioxx, which is itself gastrotoxic and has a GI safety profile that is indistinguishable from tNSAIDS (Graham Rep. at 5; Julie Rep. at 4-9 [SRL Decl.

- 4 -

Ex. 6].)

### A.     Pre-Market Clinical Trials

To test the hypothesis that Vioxx was safer for the GI tract than tNSAIDs, Merck conducted a series of pre-market clinical trials, known as the osteoarthritis (OA) trials, sometimes referenced as "Protocol 069," a pre-specified pooled analyses.  (Julie Rep. at 7.) Merck published certain studies arising from the OA trials, including Protocols 044 and 045,[1] which compared rofecoxib to placebo and high dose ibuprofen among patients with OA. (Graham Rep. at 10; Laine L., et al., 1999 [SRL Decl. Ex. 7]; Hawkey, C., et al., 2000, marked as Sales Ex. 27 [SRL Decl. Ex. 8].)  Results from Merck Protocol 069 were published in a 1999 study by Langman, et al.  (Langman, M.J., et al., 1999 ("Langman study") (Sales Ex. 31) [SRL Decl. Ex. 9].)   Merck's experts rely on data from Protocol 069 in forming their opinions concerning the relative GI safety of Vioxx.  (Curtis Rep. at 10 [SRL Decl. Ex. 11]; Sales Rep. at 5 [SRL Decl. Ex. 4]; Silvers Rep. at 4-5.)

The Langman study examined whether rofecoxib was safer for the gastrointestinal (GI) tract than the tNSAIDs, in terms of clinically significant PUBs.  (Langman, M.J., et al., 1999). The Langman study (p. 1931) reports that three different doses of Vioxx were administered (12.5, 25 and 50 mg); however, each comparator drug was only administered at a single dosage level:  ibuprofen 2400 mg/day; diclofenac 150 mg/day; and nabumetone 1500 mg/day.

It is undisputed that these doses of tNSAIDs are at or near the maximum permissible for OA; that the same dosage regimen was applied in the Merck OA pre-market clinical trials for all tNSAID patients; that such doses are appropriate only for patients with severe or acute OA; and that the large majority of patients in the OA clinical trials were in the mild to moderate range

---

[1] Protocols 044 and 045 were two of the studies whose data were included in the pooled analysis of Protocol 069.  (Graham Rep. at 10.)

rather than severe range of OA.  (See sections II(B),(C), and (D) below).

**B.    Review Studies**

Merck's experts also relied on review articles that summarized data from a number of company-sponsored trials.  (Graham Reb. at 1 [SRL Decl. Ex. 11]; Curtis Rep. at 9; Sales Rep. at 6; Silvers Rep. at 5-6; Parnell Rep. at 3 (SRL Decl Ex. 12])  These include a review study authored by Rostom, et al., 2007, and another by Watson, et al., 2004.  (Rostom, et al., 2007 [SRL Decl. Ex. 13]; Watson DJ et al., 2004, marked as Sales Ex. 38 [SRL Decl. Ex. 14].)

The review studies relied upon by Merck's experts are based on Merck studies, such as the Langman article, and necessarily rely on the same data arising from high doses of tNSAID comparators.  *Id.*  For example, the Rostom and Watson studies include data from the eight OA trials combined in Protocol 069, including Protocols 044 and 045.  *Id.*  The high doses of ibuprofen, diclofenac and nabumetone reviewed in the Watson and Rostom articles were identical to those listed in Langman (1999).  *Id.*  In addition, Watson and Rostom's review presented data for OA patients exposed to 1000 mg/day of naproxen.  *Id.*

**C.    VIGOR**

Merck experts rely upon the VIGOR study in support of their opinions of the GI safety profile of Vioxx.  (Bombardier, C., et al, 2000, marked as Curtis Ex. 18 [SRL Decl. Ex. 15]; Curtis Rep. at 9; Sales Rep. at 5; Silvers Rep. at 4; Parnell Rep. at 3.)  There are several important limitations upon the generalizability of the VIGOR study to other populations.  First, Vioxx was only compared to a high dose of naproxen (1000 mg./day) for an average of approximately nine months.  (Bombardier, C., et al, 2000).  Thus, VIGOR provides no evidence of Vioxx's relative GI safety compared to lower doses or intermittent use, which would typically occur in real world conditions.  Second, defense experts admit that RA patients, such as the subjects of the VIGOR study, have more severe symptoms and require higher doses of

medication than osteoarthritis (OA) patients, discussed in detail below in section II(C).  Thus, the

high doses of naproxen and the resulting dose-related GI toxicity are not applicable to OA

patients, who outnumber those with RA by a factor of approximately 20 to 1.  (Julie Rep. at 16.)

Third, as noted in the FDA Medical Officer Review dated March 30, 2001, "different NSAIDs

are associated with different risk of developing serious GI events.  The only non-selective

NSAID comparator included in this study [VIGOR] was naproxen.  Therefore, claims of GI

superiority could only be [sic] made in comparison to naproxen, not to all NSAIDs."  (FDA

Medical Officer Review at 5, marked as Sales Ex. 23 [SRL Decl. Ex. 16].)  Finally, as set forth

in detail in Plaintiff's Motion for Summary Judgment filed contemporaneously with this motion

to exclude evidence, essentially all of the difference in complicated, serious GI events in the

VIGOR trial occurred in the patients who used corticosteroids for treatment of RA.  "The RA

population is known to be non-representative of the general arthritis population due to more

severe illness, higher mortality and hospitalization rates, and concurrent use of corticosteroids

which magnify the GI toxicity of NSAIDs."  (Julie Rep. at 16.)  For these reasons, defense

experts' methodology in generalizing the VIGOR data to all users of all NSAIDs at all doses is

unreliable and should not be permitted.

II.    **Merck's Clinical Trials Used Uniformly High Doses of Comparator Drugs that Guaranteed High Rates of Adverse Events in Artificial Trial Settings that Bore No Relation to Real World Use of tNSAIDS**

A.    **There is an Undisputed Dose-Response Relationship between Higher Doses of NSAIDs, including Ibuprofen, and Higher Incidence of GI Events**

According to the Reference Manual on Scientific Evidence, a dose-response relationship

means that "the more intense the exposure, the greater the risk of disease." Ref. Man. Sci. Evid.

at 390 [SRL Decl. Ex. 17].  Plaintiff's and Merck's experts agree that a dose-response

relationship exists between NSAIDs and higher incidence of adverse gastrointestinal (GI) effects.

(Silvers Dep. 247:24-248:2 ("Q; In patients taking NSAIDS, is dose a risk factor for GI

complications?  A; Yes.  The higher doses are more risky than low doses.") [SRL Decl. Ex. 18];

Sales Dep. 100:6-12 [SRL Decl. Ex. 19]; Parnell Dep. 185:7-11; 193-312; 202:7-203-3 [SRL

Decl. Ex. 20]; Curtis Dep. 113:18-114:3 [SRL Decl. Ex. 21]; Graham Rep. at 7; Graham Reb. at

3.)

        For example, ibuprofen is widely considered to be one of the safest NSAIDs when

administered in low doses.  (Julie Rep. at 9-10; Laine Dep. 270:6-12;[2] 272:15-17 ("there is no

doubt that ibuprofen is overall safer, but that the risk goes up") [SRL Decl. Ex. 23]; *see* Hawkey

C., et al., 2000; Julie Rep. at 9-10; Garcia Rodriguez & Jick, 1994 [SRL Decl. Ex. 24].)  Merck

experts agree that above 1600 mg, however, ibuprofen loses its comparative advantage regarding

GI safety, as the risk of PUBs goes up.  (Hawkey C., et al., 2000; Curtis Dep. 134:19-135:3;

Parnell Dep. 210:4-10.)

        Despite the undisputed dose-response relationship between NSAIDs and GI safety,

Merck's OA clinical trials did not compare Vioxx with different doses of comparator drugs, but

instead used a uniform regimen of high doses appropriate only for severe OA patients, or for RA

patients.  (Julie Rep. at 10.  *See* Langman, M.J., et al., 1999; Laine L., et al., 1999; Hawkey, C.,

et al., 2000.)

---

[2]             "Q.  Are you familiar with any data showing the relative risk of
            doses lower than 2400 milligrams daily compared to the higher dose?

            "A.  There are data for all NSAIDs that higher dose [sic] are
            associated with an increased risk of developing GI ulcers and GI
            complications."

(Laine Dep. 270:6-12.)

**B.      Merck's OA Clinical Trials Violated the Standard of Care in NSAID Treatment, Which Required Doses Tailored to the Individual Patient and Use of the "Lowest Effective Dose"**

In light of the well-established dose-response relationship between NSAIDs and negative GI effects, Merck's experts agree that the standard of care requires the dosage of any NSAID to be tailored to the individual patient, such that the lowest effective dose should be administered. Sales Dep. 128:23-129:4; Silvers Dep. 248:17-21; 249:8-14; 253:6-10; Curtis Dep. 108:2-11; 109:14-21; 117:12-21; 117:6-11 ("A:  So all things being equal in a patient who has no particular risk factors, I would explain to the patient that a dose of 200 mg as needed, which might be two or three times a day, would be for the mild case and would also be for the moderate case….I would try to use the lowest dose that relieves their symptoms."); Physician's Desk Reference (PDR), Motrin entry, 1995, marked as Curtis Ex. 14 [SRL Decl. Ex. 25]; Vioxx Label, 2002; Parnell Dep. 191:11-18; 184:19-185:6 ("If I feel a patient needs 500 mg of Naprosyn a day, I'm not going to prescribe more than that, so you try to match what you feel is the best dose with patient's needs and not give them any more than they need.").)

It is also undisputed that the standard of care for arthritis requires that after a satisfactory response has been achieved, the patient's dose of ibuprofen should be reviewed and adjusted as required.  (Curtis Dep. 111:13-18; Sales Dep. 138:12-139:2.)  Adjusting dose according to the patient's need is also known as "dose titration."  (Sales Dep. 128:16-22; Curtis Dep. 111:14-18.) Merck's own Regional Medical Director, Fran Kaiser, M.D., agreed with these undisputed facts:

> Q:  Did you ever prescribe ibuprofen for a patient with mild osteoarthritis?
>
> A.  Yes.
>
> Q.  What dose did you generally use?
>
> A.  Usually the lowest dose that provided efficacy and pain relief.
>
> Q.  And that was consistent with the Physicians' Desk Reference

- 9 -

and the package insert and the standard of care on prescribing,
right?

A.  Right.  But some patients did not respond, and you would have
to escalate the dose.

Q.  And that's called dose titration; you could either go up or down,
depending on response, right?

A.  Right.

(Kaiser Dep. 199:8-21 [SRL Decl. Ex. 26].)

Merck's internal documents from the pre-market period showed awareness of this standard of care.  In particular, the PDR entry for ibuprofen was incorporated into the planning document for one of the major pre-market OA studies, Protocol 045.  (Protocol 045, marked as Sales Ex. 26 at MRK-ABS003783 [SRL Decl. Ex. 27].)  The identical requirements for tailoring of dosage to the individual, dose titration, and use of the lowest effective dose were all referenced in the version of the ibuprofen PDR incorporated into the Protocol 045 planning document.  (Sales Dep. 137:15-138:20.)

Despite the undisputed standard of care in treating osteoarthritis, Merck's clinical trials did not tailor NSAID dose to each individual patient, nor use titration to adjust dosage to the "lowest effective dose," but instead used uniformly high doses.  (Julie Rep. at 10.  *See* Langman, M.J., et al., 1999; Laine L., et al., 1999; Hawkey, C., et al., 2000.)

### C.    Osteoarthritis Patients Generally Require and Use a Lower Dose of Ibuprofen than 2400 mg/day

Osteoarthritis is a disease of varying severity, ranging from asymptomatic conditions to chronic and disabling pain.  (Hochberg, M., et al., 1992, marked as Curtis Ex. 13 [SRL Decl. Ex. 28].)  The American College of Rheumatology (ACR) adopted a classification of disease severity that clinicians and researchers use to describe functional status for patients with osteoarthritis.  (Curtis Dep. 103:19-21; Hochberg, M., et al., 1992; Curtis Dep. 103:5-13; Parnell Dep. 186:3-8.)

858763.1

Clinicians also use the terms "mild," "moderate," and "severe" to describe disease severity.

(Curtis Dep. 104:2-5; Parnell Dep. 183:7-16.)  These terms overlap and correspond with the

functional classes set forth by the ACR.[3]

> Q.  Do the mild, moderate, and severe generally match up well with Class I, II and III, respectively, on this table?
>
> . . .
>
> THE WITNESS; Actually they match up better with II, III, and IV.
>
> Q.  So II, III, and IV?
>
> A.  If patients have normal capacity they can be managed with over-the-counter medication, so I usually don't see those patients. Usually the ones I see are having some problems.  They usually have some impairment or some decrease in functional activity level that prompts them to come to the office, so I think II, III, and IV, II being mild, III being moderate, and IV being severe.
>
> Q.  Class I is more comparable to asymptomatic patients?
>
> A.  It is.  It's patients who appear to be doing well, because they can carry out all their usual duties without handicaps.

(Parnell Dep. 187:7-188:6.)

It is undisputed that NSAID dosage should reflect the severity of a patient's disease.

(Parnell Dep. 182:18-19 ("Severity of any medical condition has to be factored into your

treatment decision."); *Id.* at 183:22-184:2 ("Now, if you ask me in a patient with severe

deformity am I going to give the same dose as a patient with minimal deformity, the answer

obviously is no, and that's an assessment that you have to make as far as what the patient

needs."); Curtis Dep. 118:11-13; Sales Dep. 173:9-18 ("Q.  What are the factors you take into

account in making that decision?  Recognizing that you're treating individual patients, what are

---

[3] Clinicians and researchers also use the "patient's global assessment of disease (0-4)" to categorize osteoarthritis severity.  (*See, e.g.*, Laine, L., et al., 1999; Hawkey, C., et al., 2000.) The global assessment ranges from zero to four, and largely mirrors the functional class categories and the "mild, moderate, and severe" descriptions above.

the factors that you would take into account?  A.  It would depend on the character of their

symptoms which might have to do with the time course of the symptoms, the severity. . .").)

     Merck's experts agree that OA patients require lower doses of NSAIDs, including

ibuprofen, than patients with rheumatoid arthritis (RA).  (Physician's Desk Reference, Motrin

entry, 1995; Parnell Dep. 191:5-10; 199:19-24; Busson, M., et al., 1986, marked as Curtis Ex. 15

[SRL Decl. Ex. 29]; Curtis Dep. 109:5-13; 122:3-11; Julie Rep. at 9-10.)  OA patients also take

NSAIDs such as ibuprofen more intermittently than RA patients, on an "as needed" basis.

(Curtis Dep. 113:8-16; Julie Report at 9-10; Kaiser Dep. 200:3-6.)  Further, it is undisputed that

OA patients do not require constant medication at the same dosage, as the disease pattern

commonly involves flares that are treated with a higher dose, followed by reduction of the dose

as soon as the flare has eased.  (Busson, M., et al., 1986; Curtis Dep. 113:8-16.)  Lower doses

and less frequent use substantially reduce frequency of complications.  (Julie Rep. at 9-10; Fries,

J., et al., 2004, marked as Sales Ex. 35 [SRL Decl. Ex. 30].)

     A number of peer reviewed studies have shown that of the comparators used by Merck in

its Vioxx clinical trials of OA patients, ibuprofen was far more commonly used in the general

population in the United States.  (Julie Rep. at 9; Fries, J., et al., 2004.)  Such studies have also

shown that the vast majority of arthritis patients taking ibuprofen use less than 1500 mg per day.

(Julie Rep. at 9; Garcia Rodriguez & Jick, 1994.)  Merck's experts agree that in practice, doctors

generally prescribe a daily dose of not more than 800-1200 mg of ibuprofen to arthritis patients

in the "mild" category, and lower doses if possible.  (Busson, M., et al., 1986; Parnell Dep.

194:18-21, 24-25.)  For example, Dr. Curtis testified that:

        A. Class II, those patients are at this particular time going to get
        over-the-counter ibuprofen or have already tried over-the-counter
        ibuprofen, and it either helps them or gives them side effects.

        Q. And by over-the-counter ibuprofen do you mean 200 mg per

> pill with a maximum of 1,200 mg per day?
>
> A. That may be what patients are doing on their own, and that may be what I would do. If I had an individual patient, I might suggest that they try up to that amount of medication on they're own to see if that would help them.

(Curtis Dep. 245:5-249:10.)  Merck's experts also agree that 1800 to 2400 mg of ibuprofen should be limited to severe cases, and to those who fail to respond to lower doses.  (Busson, M., et al., 1986; Parnell Dep. 199:19-200:5.)  It is also undisputed that 2400 mg of ibuprofen is generally limited to patients experiencing acute pain for short periods of time.  (Sales Dep. 200:10-14.)  Merck's Regional Medical Director, Dr. Kaiser, agreed that the lowest effective dose should be used, and that if a higher dose is needed for an acute episode she would back off as soon as possible.  (Kaiser Dep. 201:9-20.)

The evidence described above is summarized in the following table, which shows each ACR functional class, with the corresponding "vernacular" disease severity description and recommended dosage for ibuprofen, as provided by Merck's experts:

| Functional Class | ACR Revised Criteria | Disease Severity | PDR—Motrin Recommended Dose |
|---|---|---|---|
| Class I | Completely able to perform usual activities of daily living (self-care, vocational, and avocational) | Asymptomatic to mild | Zero to 1200 mg/d |
| Class II | Able to perform usual self-care and vocational activities, but limited in avocational activities | Mild to moderate | 800-1800 mg/day |
| Class III | Able to perform usual self-care activities, but limited in vocational and avocational activities | Moderate | 1200-1800 mg/day |
| Class IV | Limited in Ability to perform usual self-care, vocational, and avocational activities | Severe | 1800-2400 mg/day |

Merck applied the ACR functional class criteria to categorize severity of OA and RA in its clinical trials.  (*See, e.g.*, Bombardier, C., et al, 2000 ("VIGOR"); Saag, K., et al., 2000, marked as Sales Ex. 39 [SRL Decl. Ex. 31]; Sales Dep. 198:2-199:3; Cannon, G., et al., 2000

- 13 -

[SRL Decl. Ex. 32].)  These trials excluded patients in the most severe category (Class IV), and published Vioxx studies show that the large majority (70 to 80%) of OA patients were in the mild-to-moderate categories, Classes I and II.  (*See, e.g.*, Saag, K., et al., 2000; Cannon, G., et al., 2000.)

Despite the undisputed fact that OA patients generally use lower doses of NSAIDs than rheumatoid arthritis patients, and that participants in Merck's clinical trials had mild to moderate disease severity, Merck's OA trials used a prolonged and continuous regiment of high dose comparators appropriate for rheumatoid arthritis patients and those suffering from severe, acute pain.  This regimen guaranteed a high risk of GI events in the NSAID arms of the trials, which made Vioxx look better by comparison.

> **D.**    **The Greater Toxicity of Ibuprofen at the 2400 mg/day Dose Used in the Vioxx Osteoarthritis Clinical Trials was not only Generally Accepted, but Was Also Well-known to the Defendant**

The OA trials against ibuprofen used only the 2400 mg/day dosage regimen.  None of the OA trials were conducted with a lower dose of ibuprofen.  (Abramson Rep. at 18; Sales Dep. 131:14-17; Parnell Dep. 203:5-204:15; Curtis Dep. 123:25-124:12, 137:6-9.)  Yet, there was strong evidence available by 1996 that lower doses of ibuprofen provided effective pain relief and were far less likely to cause serious GI complications than the 2400 mg dose that Merck used in the OA trials.  (Abramson Rep. at 18; Graham Rep. at 12-13.)

In 1998, prior to marketing Vioxx, Merck conducted a review of clinical trials that compared efficacy of different NSAID doses (Sales Dep. 200:24-202:1; Emery, P., et al., 2002, marked as Sales Ex. 40 [SRL Decl. Ex. 33].)  One of the cited articles was co-authored by Merck consultant Kenneth Brandt, M.D.  (Julie Response at 3 [SRL Decl. Ex. 34]; Bradley & Brandt, et al., 1991, marked as Sales Ex. 41 [SRL Decl. Ex. 35].)  Brandt's 1991 study showed no statistically significant difference between 2400 mg per day of ibuprofen and 1200 mg per day

858763.1

for pain relief among osteoarthritic patients.[4]  *Id.*  Additionally, the Merck 1998 review found no other OA studies that used only the extreme fixed dose 2400 mg of ibuprofen.  (Emery, P., et al., 2002.)  Dr. Sales confirmed as much:

> Q.  So then is it correct that of these studies that Merck collected during the time of the premarketing investigation of VIOXX there was not a single study on this list that exclusively used 2,400 mg of ibuprofen for osteoarthritis patients?
>
> MR. BAUM; Objection.
>
> BY THE WITNESS;
>
> A.  That's correct.

(Sales Dep. 207:8-15.)  Conversely, Merck itself conducted no studies to determine whether Vioxx at any dose was equally or more effective than lower doses of ibuprofen for OA patients.

In the treatment of dysmenorrhea, however, Merck's own study showed that a 400 mg dose of ibuprofen provided equivalent pain relief to Vioxx 25 mg.  (Julie Response at 3 (citing MRK-NJ0156635).)  Even the Vioxx label acknowledged that '[t]he analgesic effect (including onset of action) of a single 50-mg dose of Vioxx was generally similar to … 400 mg of ibuprofen."  (Vioxx Label, 2002.)  However, for OA patients, only the 2400 mg dose was used.

Merck also knew by 1996 that that 2400 mg ibuprofen posed a higher risk for gastrointestinal events than 1200 mg or 400 mg.  (Sales Dep. 132:21-133:8; Laine Dep. 270:10-12, 272:15-19.)  Indeed, a major peer-reviewed meta-analysis co-authored by Merck consultant Christopher Hawkey found that ibuprofen doses above 1600 mg/day were significantly more toxic to the GI tract than doses at or below 1600 mg/day.  (Henry D, et al., 1996 ("Henry

---

[4] The lack of a significant difference is neither surprising nor unusual.  All drugs have a therapeutic plateau, above which no further efficacy is provided by increasing the doe.  Indeed, Merck itself found that 50 mg of Vioxx provided "no added therapeutic benefit" over 25 mg Vioxx in RA patients.  Van delsberg, *et al.*, 'One-Year Results from an Active Comparator Controlled Trial for Rofecoxib for the Treatment of Rheumatoid Arthritis (RA)," *Arthritis Rheum* 2002; 1:5336-5337 (SRL Decl. Ex. 43.).

Article"), marked as Curtis Ex. 16 [SRL Decl. Ex. 36].)  Dr. Loren Laine, Merck consultant and author of several published OA studies of Vioxx, acknowledged that he read the Henry article before the OA trials, and was well aware of the greater GI risk associated with high doses of ibuprofen:  "There's no doubt that 2400 is less GI safe than 1600 or 800. And I don't think anybody would have a disagreement about that."  (Laine Dep. 273:12-14.)

Merck's own consultants, including Dr. Brandt, told the company in 1996 that 2400 mg/day of ibuprofen was too high a dose for an OA population.  (Merck, Consultants Meeting, 10-24-1996; Minutes for the MK-0966 Consultants Meeting to Discuss the Design of the GI Clinical Outcomes Megatrial ("Consultants Meeting"), marked as Sales Ex. 24 [SRL Decl. Ex. 37]; Julie Dep. 260:15-261:4. SRL Decl. Ex. 38][5])  At the same Merck consultant meeting, Dr. Griffin told Merck that using such high starting doses might be unethical.  *Id.*  While the majority of Merck attendees at the meeting felt that Vioxx at 25 mg should be compared to fixed equal potent doses of the comparator agents, Dr. Griffin appropriately cautioned that equi-potent doses of Vioxx against comparator drugs were not necessarily known, (Sales Dep. 144:13-17; "1996 Consultants Meeting"), which was certainly true since no studies to establish equivalent potency at various doses had been done.

Further, Dr. Griffin told Merck that they should that start with a lower doses and only increase as necessary, as dose titration was the standard of care.  *Id.*  As of October 1996, Merck knew that a GI safety study of other NSAIDs, including ibuprofen, had been completed using titrated doses with increased doses at the physician's discretion.  (Sales Dep. 141:9-14; Consultants Meeting, at 2023.)  Following publication of a Merck OA trial, published letters to

---

[5] The 1996 consultants meeting addressed a possible outcomes study in OA patients that was not carried out.  The same principles of dose-related toxicity and the same standard practice of using lowest effective dose, are equally relevant to the OA studies Merck actually conducted.

the editor pointed out that Merck's high dose, extended exposure clinical trial bore no relation to real-world use, and that dose titration studies were both feasible and relevant to actual users. (Lesser, Letter to the Editor, *Gastroenterology* 2000, marked as Laine Ex. 38 [SRL Decl. Ex. 39.)

Merck disregarded their consultants' advice, as well as the known risk of unnecessarily inflicted GI toxicity, and designed clinical trials of arthritis patients using maximal or near maximal doses of ibuprofen (2400 mg/d), diclofenac (150 mg/d) and nabumetone (500 mg/d).

## III.   DEFENSE EXPERTS' METHODS ARE UNRELIABLE BECAUSE THEY IGNORE DOSE-RELATED TOXICITY AND REAL-WORLD PRACTICES THAT REDUCE GI RISK

### A.   Defendants' Experts Testimony Concerning the Relative GI Safety of Vioxx Compared to Other Medications

Merck experts Curtis, Sales, Silvers, and Parnell plan to testify that Vioxx is safer than traditional NSAIDs for the GI tract, based on unreliable methodology that ignores the controlling question of dose-response.  (Curtis Rep. at 20 ("[Vioxx] had superior GI safety to traditional NSAIDS as demonstrated in RCTs and in community clinical experience."); Sales Rep. at 8 ("VIOXX causes fewer gastrointestinal side effects and complications compared to nonselective NSAIDs."); Sales Rep. at 6 ("Coxibs such as VIOXX are associated with a lower incidence of injury to the small intestine and colon, similar to their benefits in the stomach."); Silvers Rep. at 6 ("Patients that take the selective COX-2 inhibitors have fewer gastrointestinal events such as ulcers, bleeds and perforations and are better able to tolerate taking them over traditional NSAIDS."); Parnell Rep. at 3 ("With respect to GI safety, Vioxx has demonstrated to be associated with fewer GI perforations, ulcers, and bleeds compared to traditional non-selective NSAIDS.")  To the extent that other experts seek to offer similar opinions, this motion applies to that testimony as well.

While Merck's experts purport to rely on randomized clinical trial evidence of safety, in fact the cited studies do not support their claims. For the reasons set forth below, Merck's expert opinions concerning GI safety are unreliable, and the Court should exclude them.

### 1. Failure to Address the Dose-Response Relationship

Merck' clinical trials and published studies concerning GI safety do not compare Vioxx with different doses of comparator drugs, despite the known dose-response relationship between NSAIDs and negative GI effects. Merck's experts rely on these studies, but neglect to address the dose-response relationship. Instead, these experts offer sweeping, unsupportable opinions that Vioxx is safer than other medications—at *any* dose. These opinions contradict well-established and fundamental principles of toxicology and should be excluded.

### 2. Improper Extrapolation from High Doses

Merck's experts do not, and in fact *cannot* rely on studies comparing Vioxx with low doses of comparator drugs, since such studies were never done. Instead, Merck's experts necessarily extrapolate from high doses studies to infer that the low doses would produce the same results. This extrapolation is grounded in neither sound science nor admissible evidence. It is undisputed that these comparator drugs have a dose effect—the greater the dose, the greater the risk of GI side effects. Merck's experts may not generalize from high-dose NSAID studies to infer that similar GI damage would occur with lower NSAID doses—particularly where peer-reviewed studies show that lower doses would have resulted in significantly lower rates of GI events.

### 3. Reliance on Studies that Do Not Reflect Real World Clinical Practice

To support their broad claims of relative GI safety, Merck's experts rely on studies that;

a.      Did not follow the undisputed standard of care for treating arthritis, which is to use the lowest effective dose, tailored to the individual patient;

      b.      Used comparator drugs at doses much higher than those used in the real world to treat osteoarthritis; and

      c.      Administered unnecessarily high doses of comparator drugs with known greater toxicity to patients with mild to moderate disease severity.

Because Merck's studies bear little resemblance to real-world clinical practice, there is an overwhelming analytical gap between the underlying data and the opinion proffered.  That is, while the data support Vioxx's GI profile compared to maximal/near-maximal doses of comparator NSAIDs, the data do *not* support claims of Vioxx GI safety compared to real world dose regimens that comply with the undisputed standards of care.

## IV.   LEGAL STANDARDS

The Federal Rules of Evidence govern the admissibility of expert testimony.  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  Under Federal Rule of Evidence 702, a party seeking to introduce expert testimony must show; (1) the expert is qualified through knowledge, skill, experience, training, or education; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case.

The trial court acts as a "gatekeeper" and should exclude expert testimony unless it is both "reliable" and "relevant."  *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993).  The focus is on the experts' qualifications and methodology, rather than results or conclusions.  *Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565, 574 (E.D. La. 2005) (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998)).  The purpose of the court's gatekeeping role is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  In other words, there cannot be

a double standard between courtroom science and real-world science, and a litigation expert

cannot employ a research methodology that would not be followed by real-world scientists in the

same field.  *Id.*

      Scientific testimony is reliable only if "the reasoning or methodology underlying the

testimony is scientifically valid," meaning that such testimony is based on recognized

methodology and supported by appropriate validation based on what is known.  *Daubert*, 509

U.S. at 592-93.  In *Daubert*, the Supreme Court set forth the following non-exclusive list of

factors to consider in determining the scientific reliability of expert testimony; (1) whether the

theory has been tested; (2) whether the theory has been subject to peer review and publication;

(3) the known or potential rate of error; (4) whether standards and controls exist and have been

maintained with respect to the technique; and (5) the general acceptance of the methodology in

the scientific community.  *Id*. at 593-95.  The "reliability analysis applies to all aspects of an

expert's testimony; the methodology, the facts underlying the expert's opinion, the link between

the facts and the conclusion."  *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir.

2007).

      In addition to the five factors laid out in *Daubert*, a trial court may consider additional

factors in assessing the scientific reliability of expert testimony.  *Black v. Food Lion, Inc.,*

171 F.3d 308, 312 (5th Cir. 1999).  Some of these factors may include; (1) whether the expert's

opinion is based on incomplete dosage data; (2) whether the expert has neglected to address the

dose-response relationship; and (3) whether the expert has unjustifiably extrapolated from an

accepted premise to an unfounded conclusion.  *See, e.g.*, *Burleson v. Texas Dep't of Crim.*

*Justice*, 393 F.3d 577, 586-587 (5th Cir. 2004); *Christophersen v. Allied-Signal Corp.*, 939 F.2d

1106, 1114 (5th Cir. 1991); *Moore*, 151 F.3d at 278-79; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005).

Scientific testimony is relevant only if the expert's "reasoning or methodology properly can be applied to the facts in issue," meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is irrelevant when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co v. Joiner*, 522 US. 136, 146 (1997).

To satisfy its gatekeeping responsibility, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue." *Huss*, 571 F.3d at 452 (quoting *Daubert*, 509 U.S. at 592-93). In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts should exclude it. *Moore*, 151 F.3d at 279.

## V.  Argument

### A.  Merck's Experts May Not Testify to the Relative GI Safety of Vioxx Because of the Failure to Account for Dose-Response, a Fundamental Principle of Medical/Scientific Research that Has Been Universally Accepted by the Courts, the Defendants and the Experts in this Case

The relationship between the dose and effect of a drug (the dose-response relationship) is "the hallmark of basic toxicology." *McClain*, 401 F.3d at 1242 (citing David L. Eaton, Scientific Judgment and Toxic Torts—A Primer in Toxicology for Judges and Lawyers, 12 J. L. & Pol'y 5, 11 (2003) (published by Federal Judicial Center). Indeed, "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Id.* (excluding expert's opinion based in part on failure to provide dose-response evidence).

"[A]ll chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose." Ref. Man. Sci. Evid. at 403.

The Fifth Circuit has repeatedly reaffirmed the need to scrutinize the dose-response relationship in pharmaceutical and toxic tort cases when assessing the admissibility of expert testimony under *Daubert* and the Federal Rules of Evidence.  *Burleson*, 393 F.3d at 586-587 (5th Cir. 2004); *Allen v. Pennsylvania Engineering Corp.,* 102 F.3d at 198 (5th Cir. 1996); *Moore*, 151 F.3d at 278-79; *Christophersen*, 939 F.2d at 1114 (5th Cir. 1991) (en banc), *cert. denied*, 503 U.S. 912 (1992).

Other circuits have likewise recognized the critical importance of the dose-response relationship.  For example, in *McClain*, the court reversed a jury verdict in a pharmaceutical products liability action against Metabolife International, Inc.  401 F.3d at 1236.  The court held that the trial court erroneously admitted expert testimony, where the expert did not follow the basic methodology that scientists use—the dose-response relationship—in forming an opinion that a drug caused a specific adverse effect.  *Id.* at 1336, 1242.  The court explained, "[t]he expert who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology."  *Id.* at 1242.

Merck agrees that "the dose-relationship is critical in pharmaceutical cases."  Merck & Co. Inc.'s Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation, *In re: Vioxx Products Liability Litigation*, No. 05-4046, (E.D. La. October 21, 2005).  It is undisputed that the dose at which a drug is ingested is critically important when evaluating the drug's alleged health effects.  (Graham Reb. at 3; Sales Dep. 100:6-12; Silvers Dep. 247:24-248:2 ("higher doses are more risky than low doses"); Parnell Dep. 185:7-11,193-312, 202:7-203-3, 219:5-7 ("The only thing I can say with any certainty is

that when planning a study, one has to consider different dosages.").)

Despite the critical importance of the dose-response relationship, Merck attempts to offer expert testimony that Vioxx is safer for the GI tract than traditional NSAIDs—at *all* doses—based on studies that never considered different doses of comparator drugs.  *See* § II(A), above.  All of Merck's experts agree that the GI safety of traditional NSAIDs is dose-dependent.  *Id*.  Like the expert at issue in *McClain*, Merck's experts ignore the "hallmark of basic toxicology"—dose-response—in forming their opinions regarding the relative GI safety of Vioxx.  *See McClain*, 401 F.3d 1242.  Therefore, the link between the data and the conclusions is too tenuous.  *See Knight*, 482 F.3d at 352.  Accordingly, these opinions are not the product of sound science, and this court should exclude any testimony concerning the relative GI safety of Vioxx that fails to account for the undisputed dose-response relationship between higher doses of NSAIDs and a higher risk of GI events.

### B. Merck's Experts Improperly Extrapolate from High Doses to Infer that Low Doses would Cause the Same Effect

Courts routinely exclude opinions from experts who extrapolate from studies involving a high dose of exposure to infer that a lower dose would cause the same injury.  *Burleson*, 393 F.3d at 586 (excluding opinion of expert who "concede[d] his theory assumes a high dose of radiation," while the welding electrodes at issue contained "a very low level of radiation," and "epidemiological studies have demonstrated no adverse health effects from exposure to small doses of radiation"); *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*, 524 F. Supp. 2d 1166, 1180 (N.D. Cal. 2007).

In the *Bextra/Celebrex* case, consumers brought pharmaceutical personal injury claims against the medication's manufacturer, resulting in multi-district litigation in the Northern District of California.  524 F. Supp. 2d 1166, 1180.  The court granted Pfizer's motion to exclude

a cardiology expert's opinion that Celebrex could cause heart attacks when taken in doses of 200 mg per day (mg/d) based on studies of Celebrex involving 400 mg/d. *Id.* The court held that the "analytical gap" between the expert's opinion and the data "is simply too great" to make the opinion admissible. *Id.* at 1181. The cardiologist acknowledged that there was a dose effect with Celebrex, but simply took the relative risk for 400 mg/day dosage and cut it in half to estimate the risk for 200 mg/day. *Id.* at 1180. The court found that the expert's extrapolation methods did not support the proffered opinion and lacked support in scientific literature, as "studies show that there is no statistically significant association between Celebrex 200 mg/d and the risk of strokes or heart attacks." *Id.*

The *Bextra/Celebrex* decision is directly relevant to this case. Merck's experts plan to testify that NSAIDs cause more GI damage than Vioxx, based on studies that evaluated only the high doses of comparator drugs, and despite their acknowledgement of a dose-dependent relationship between NSAIDs and GI safety. (*See* § II(A), above.) None of Merck's experts can point to an arthritis study comparing Vioxx with lower doses of traditional NSAIDs, since no such studies were done. (*See* § II(C), above.) Like the plaintiff's experts in *Bextra/Celebrex*, Merck's experts take data from studies involving 2400 mg of ibuprofen and assume that the Vioxx is safer for the GI tract than ibuprofen at lower doses, such as 1200 mg, the maximum recommended dose for mild arthritis, or even 1600 mg, the threshold above which ibuprofen loses its comparative advantage over other NSAIDs. (*See* Curtis Dep. 135:1-3; Laine Dep. 272:5-15; Henry, P. et al., 2000.) Just like the experts in *Bextra/Celebrex*, Merck's experts improperly extrapolate from high dose studies to infer that Vioxx is safer than other medications at lower doses. *See Bextra/Celebrex*, 524 F. Supp at 1180. This court should likewise exclude or limit such testimony because the "analytical gap" between the experts' opinion and the data is

- 24 -

"simply too great."  *See id.* at 1181; *Joiner*, 522 U.S. at 147.  There is no evidence that Vioxx

would be safer for the GI tract than the lower doses of NSAIDs used by most patients, because

Merck consciously chose not to test its drug against safer levels of NSAIDs.

   **C.    Merck's GI Safety Studies Are Not Reliable Because the Clinical Trials Do
          Not Reflect the Real World Treatment of Osteoarthritis Patients.**

         **1.    All of Merck's Osteoarthritis Clinical Trials Used Excessive and
                Unnecessary Doses of Comparator Drugs which Biased the Results in
                Favor of Vioxx**

   Expert opinions must reflect sound science, and courtroom methodologies must be as

intellectually rigorous as those used by clinicians practicing medicine in the real world.  *See*

*Kumho Tire*, 526 U.S. at 152.  Doctors make decisions "informed by evidence," through the

"interpretation of clinical trials" and "scientific evidence," in order to provide appropriate care

for their patients.  (Curtis Dep. 68:9-17).

   As this court recognized, the strongest evidence of a cause-effect relationship between a

risk factor and an adverse outcome is "epidemiological data, derived from studies carefully

constructed to eliminate bias, demonstrating a positive, statistically significant exposure-

response relationship."  *Vice v. Northern Telecom, Inc.*, Civ. A. No. 94-1235, 1996 WL 200281,

at *7 (E.D. La. April 23 1996) (J. Fallon).

   As described in detail above (§§ II(B), (C)), and summarized below, Merck's OA trials of

GI safety were not based on real-world clinical practice, but instead were designed to obtain

results biased in favor of Vioxx by comparing it to maximal doses of comparator drugs.  (*See,*

*e.g.*, Rofecoxib; a disappointing NSAID analgesic, Prescrire International, Dec 2000 [SRL Decl.

Ex.40]; Julie Response at 2; Julie Rep. at 10; Abramson Dep. 211:8-22; Lesser Letter to the

Editor, 2000 (arguing that the "unchanging 2400 milligram daily dose of Ibuprofen over many

months does not conform to usual practice," and that a study that adjusted doses according to

clinical response "would have provided much more information directly pertinent to clinical practice.").)

It is undisputed in this case that the standard of care requires the dosage of any NSAID to be tailored to the individual patient, such that the lowest effective dose should be administered. (*See* § II(B), above.)  Further, it is undisputed that patients do not require constant medication at the same dosage; the disease pattern commonly involves flares that are treated with a higher dose, followed by reduction of the dose as soon as the flare has eased.  (*See* § II(C), above.) Merck categorized arthritis severity in its clinical trials according to the ACR classifications of disease severity (Classes I through IV).  *Id.*  The Vioxx clinical trials excluded patients in the most severe category, and published studies show that the large majority of arthritis patients were in the mild-to-moderate categories.  *Id.*

Despite these undisputed facts, Merck's OA pre-market clinical trials used extended periods of up to 86 weeks of uniform daily doses of comparator NSAIDs that were at or near the maximal levels of the permissible dosage range for each drug; 2400 mg ibuprofen, 150 mg diclofenac, and 1500 mg nabumetone.  (*See* §§ II(C),(D), above.)  Doses were not tailored to individual patients, nor were doses lowered when pain subsided; instead, a constant regimen of high dose NSAIDs was administered to all patients at all levels of severity.  *Id.*

Merck administered these uniform high doses of comparator drugs in the face of known, peer-reviewed, published studies that these doses would expose patients to an unnecessarily high GI toxicity.  (*See* § II(D), above.)  Most notably, Merck's own consultant and collaborator Christopher Hawkey was co-author of a meta-analysis published in the highly regarded British Medical Journal in 1996, which found that ibuprofen was the safest NSAID when administered at doses of 1600 mg per day or below; however, the apparent safety advantage of ibuprofen did

not persist at doses above 1600 mg per day.  (Henry D, et al., 1996.)  Thus, while the Hawkey, Laine and Langman articles claimed Vioxx was safer than ibuprofen, a relatively safe NSAID, those same articles failed to mention that Vioxx was only tested against a dose of ibuprofen known NOT to be safer than other NSAIDs.  (*See* Langman, M.J., et al., 1999; Laine L., et al., 1999; Hawkey, C., et al., 2000.)

Moreover, Merck's decision to use this trial plan contradicted the advice of multiple consultants who told the company in 1996 that the suggested NSAID doses were too high; and that such a trial plan might be unethical because it did not conform to the standard of care requiring dose titration (i.e., downward or upward adjustment of dose depending on patient response and clinical need).  (*See* § II(D), above; Consultants Meeting, 1996.)  When Merck's employees said that they wanted to use uniform "equi-potent" doses of NSAIDs, the consultant responded that equi-potent doses were not necessarily known.  *Id.*  Yet, Merck never tested Vioxx against any lower doses of NSAIDs that would have provided data on the issue of equivalent potency among OA patients.  (*See* § II(D), above.)

Merck's experts admit that the OA trials do not reflect the actual doses used in the real world when treating patients with mild to moderate disease severity.  (*See* § II(C), above.)  Moreover, Merck expert Dr. Curtis acknowledged that clinicians would derive only limited clinically relevant information from studies involving Class I osteoarthritis patients—a significant population in Merck's clinical trials.  (Curtis Dep. 245:5-249:10.)  Dr. Curtis described clinical trials involving Class I osteoarthritis patients as, "a waste of time," because Class I people are so "barely symptomatic that you're not going to get a very robust answer." (Curtis Dep. 245:5-249:10.)  He expressed concern that;

> [Y]ou might have trouble getting that through an IRB because it
> would not be considered clinically important.  Whatever risk you

> subjected those subjects to would not be justified by the potential
> outcome data, so it would probably get stopped very quickly.  So
> it's not either an important question or it's not a question that
> would justify that kind of money and that kind of potential risk to
> the subjects.

(Curtis Dep. 245:5-249:10.)

Favoritism to Vioxx may have served Merck's purpose in marketing Vioxx as a "safer"

pain reliever, but as a result, Merck's experts now have no reliable scientific evidence to support

opinions as to whether Vioxx would be safer for the GI tract under the actual conditions of use

by the vast majority of real world patients.  *See Vice*, 1996 WL 200281, at *7.  Under the Federal

Rules of Evidence and applicable precedent, Merck's experts must be restricted to testimony in

accordance with the limitations on scientific opinions resulting from Merck's own trial design.

Thus, a statement such as "Vioxx was associated with fewer GI events than ibuprofen" is

impermissible because it fails to account for the undisputed difference in GI event rates for

higher versus lower doses of tNSAIDs."  Such a ruling will ensure that the scientific methods

used in the courtroom match the intellectual rigor that clinicians use in the field.  *See Kumho*,

526 U.S. at 152.

> **2.      Merck' Experts May Not Rely on Review Articles to Testify to the
> Relative GI Safety of Vioxx, where Such Review Articles Were Based
> on the Same Merck Studies that Used Excessive and Unnecessary
> Doses of Comparator Drugs, and also Ignored the Undisputed Dose-
> Response Relationship**

Merck's experts refer to review studies, such as Watson and Rostom (Watson, D.J., et al.,

2004; Rostom, A., et. al., 2007), to support their claim that Vioxx is safer for the GI tract than

other medications.  (See § I(B), above.)  These review studies are based on data from the same

Merck clinical trials that used excessive and unnecessary doses of comparator drugs, as

described above.  It necessarily follows that the review articles relied upon by Merck's experts

do not address the dose-response relationship, nor do they include any data comparing Vioxx

- 28 -

with lower doses of other NSAIDs.  Thus, for the same reasons set forth above, Merck's experts

may not rely on these review studies to testify concerning the relative safety of Vioxx.

3. **Despite Universal Agreement that Rheumatoid Arthritis Patients Require Higher Doses of NSAIDs than Osteoarthritis Patients, Merck Used the Identical Dose of Naproxen in Rheumatoid Arthritis and Osteoarthritis Patients, thereby Exposing OA Patients to Unnecessary and Unrealistically high Rates of GI Adverse Events**

Merck's experts rely on the ADVANTAGE study to support the claim that Vioxx is safer

than tNSAIDs for the GI tract.  (Silvers Rep. at 5; Lisse, J., et. al., 2003 [SRL Decl. Ex. 41].)

ADVANTAGE (Lisse, J., et. al., 2003) compared Vioxx 25 mg to naproxen 1000 mg per day in

OA patients—the same naproxen dose administered to RA patients in the VIGOR study

(Bombardier, C., et al., 2000), despite undisputed evidence that OA patients need and use lower

doses of NSAIDs.  (*See* § II(C), above.)  It was no surprise, rather it was entirely predictable that

such unnecessary and excessive naproxen doses would result in high rates of GI events.  Such

rates have no bearing on GI risk among the vast majority of OA patients, who used lower,

intermittent doses of naproxen or other tNSAIDs for pain relief.  Merck's experts may not rely

on ADVANTAGE to claim GI safety of Vioxx beyond the confines of the study itself, which

bore no relation to real-world practice or patients.

D. **Merck's Experts May Not Rely on Personal Experience to Testify to the Relative GI Safety of Vioxx Because Such Testimony is Unsupported by Reliable Scientific Evidence**

Merck's experts also seek to offer testimony concerning GI safety based on their

"personal experience."  (Graham Reb. at 2; Curtis Rep. at 9 ("I never had a patient on Vioxx

experience an upper GI hemorrhage or documented peptic ulcer. . . . My own experience was

that Vioxx was as well or better tolerated than other NSAIDS and Celebrex."); Sales Rep. at 8;

Silvers Rep. at 3-4, 6 ("I cannot recall ever seeing a patient taking Vioxx present to the hospital

with an NSAID induced ulcer or bleeding episode."); Parnell Rep. at 3.)

An expert may not base their opinions on personal experience, unless the opinions are "confirmed by scientifically reliable data." *Plunkett*, 401 F. Supp. 2d at 579, 580 (allowing Merck's experts to testify, e.g., that "Vioxx was an important medicine for physicians"). As argued in greater detail in Plaintiff's Memorandum in Support of Motion to Exclude Certain Opinion Testimony and Statements of Merck's Experts Concerning the Safety and Efficacy of Vioxx Based on Personal Experience, clinical experience should not be admitted to contradict double-blind randomized controlled trials (DBCRT)—the gold standard of reliable scientific evidence.

The "personal experience" that Merck's experts seek to offer in this case, however, is not only unsupported by, but contradicts the great weight of scientific authority, including DBCRTs as discussed in section V(C), above. Thus, any opinions concerning the relative GI safety of Vioxx based on personal experience should be excluded under *Daubert*.

## VI. The Record on this Motion and the Current Scientific Literature Concerning Vioxx's GI Toxicity Have Changed Substantially Since a Ruling of this Court in Another Case in 2005

Plaintiff acknowledges that, in a 2005 case, the Court permitted defense experts to testify generally that Vioxx was safer than NSAIDs for GI side effects. *Plunkett v. Merck*, *supra*, 401 F. Supp. 2d at 580. However, the prior ruling did not address the issues raised by the present motion, specifically, the controlling issue of dose-response in evaluating the GI toxicity of Vioxx. Also, in the intervening five years, the scientific literature has changed, and there is now a substantial array of peer-reviewed literature supporting the conclusion that the GI risk of Vioxx "can not be reliably distinguished" from that of NSAIDs. (Graham Reb. at 4 and references cited therein.)

The record on this motion also includes evidence from Merck's own clinical trials showing a statistically significant 4- to 5-fold increase in PUBs in three separate, consistent

clinical trials of Vioxx compared to placebo, which were neither published nor made available to the Court at the time of the prior ruling.  (Julie Rep. at 4-9; Sales Dep. 79:1-92:8.)  Importantly, these relative risks are in the same range as those generally accepted for traditional NSAIDs, supporting the conclusion that Vioxx has similar GI toxicity.  (Julie Rep. 6.)  Notably, defense experts were not aware of *any* of these clinical trials, showing lack of reliable methodology.

Dr. Graham's rebuttal also points out that the Watson/Merck article relied upon by defense experts for their opinions about Vioxx's safety in comparison to "all NSAIDs" suppressed adverse information that contradicted the claim of Vioxx having greater safety than "all NSAIDs."  (Graham Reb. at 1.)  In particular, a memo dated February 27, 2003, which provided data for the Watson paper, showed that the NSAID nabumetone was safer than Vioxx (zero PUBs among 930 subjects on nabumetone, compared to 2 PUBs among 1,013 patients on Vioxx).  *Id.* (citing MRK-ABY0084334).  The Watson article claimed that an analysis of Vioxx in comparison to nabumetone was not done, but in fact the underlying memo shows that the analysis was done and that Merck failed to publish it.  *See Id.*; (Watson, D.J., et al., 2004.)  The same memo showed a graph demonstrating that Vioxx had a higher cumulative incidence of complicated PUBs than the comparator NSAIDs, but again the Watson article failed to publish it. (Graham Reb. at 1-2.)

The GI toxicity of Vioxx in clinical trials is consistent with and confirmed by several recent observational studies, including an article that is cited erroneously by defense experts. Specifically, defense expert Sales relies upon a study by Garcia Rodriguez, published in *Gastroenterology*, 2007, for the proposition that "Coxibs" are safer than traditional NSAIDs. (Sales Rep. at 5.)  However,  at his deposition, Dr. Sales admitted that each drug had its own risk profile, and that the article actually showed a <u>lower</u> GI risk for ibuprofen than for Vioxx.  (Sales

858763.1

Dep. 97:12-99:8.)

Dr. Graham's rebuttal referenced the Garcia Rodriguez article and five additional studies, with the following comments:

> While case-control studies are considered a lesser grader of evidence compared to randomized clinical trials in the hierarchy of evidence, they offer a number of advantages in that they examine real life scenarios in which the doses and frequencies of administration are those actually used in practice, and they can examine events that occur during very large number of patient years of observation.  Such studies also provide comparisons of drugs that have not been examined in direct comparative trials.  All six studies showed an increased risk with rofecoxib compared to not using NSAIDs such that it is not possible to differentiate rofecoxib from traditional NSAIDs in terms of upper gastrointestinal bleeding.

(Graham Reb. at 2.)

Thus, the scientific literature and record before the Court on this motion on the subject of GI risk of Vioxx differ substantially from what was available to the Court in 2005.  Merck's own clinical trials show a four- to fivefold increase in PUBs compared to placebo, and these relative risks are comparable to those cited in the literature for tNSAIDs.  Merck experts rely upon published literature that is contradicted by unpublished data from the same studies, an unreliable methodology.  Multiple observational studies "have confirmed that rofecoxib can not be reliably distinguished from traditional NSAIDs in relation to the risk of gastrointestinal bleeding." (Graham Reb. at 4.)

In total, these data support the conclusion that defense experts may not be permitted to testify that Vioxx was safer than traditional NSAIDs where their opinions do not take into account the controlling principle of dose-response; the maximal or near-maximal doses at which comparators were given to subjects in the Vioxx clinical trials; the particular NSAIDs in question, since the data show that some were actually safer than Vioxx in the Merck clinical

trials; and Merck's clinical trial data showing substantial GI toxicity of Vioxx.

**VII.**   <u>**CONCLUSION**</u>

For the reasons stated herein, these opinions concerning GI safety do not meet the standards for expert testimony.  Plaintiff respectfully requests that the Court issue an order precluding testimony from Merck's experts on the matters set forth above, or at least requiring that any such testimony be accompanied by limiting statements as set forth above.

Date; February 19, 2010                                Respectfully submitted,

                                                                  /s/ James R. Dugan, II
                                                                  _____
                                                                  James R. Dugan, II
                                                                  MURRAY LAW FIRM
                                                                  650 Poydras Street, Suite 2150
                                                                  New Orleans, LA  70130
                                                                  Telephone; (504) 648-0180
                                                                  Facsimile; (504) 648-0181
                                                                  Email; jdugan@dugan-lawfirm.com

                                                                  /s/ Don Arbitblit
                                                                  _____
                                                                  Don Arbitblit
                                                                  LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                                                                  275 Battery Street, 29th Floor
                                                                  San Francisco, CA  94111
                                                                  Telephone; (415) 956-1000
                                                                  Facsimile; (415) 956-1008

                                                                  For the Plaintiffs' Steering Committee

- 33 -