# EXHIBIT 1

# Report of

# John David Abramson, M.D.

# Table of Contents

I.     Introduction .................................................................................. 4

II.    Qualifications ................................................................................ 4

III.   Summary of Opinions .................................................................. 8

IV.    Background................................................................................. 10

V.     Merck Designed Its Clinical Trials of Vioxx to Minimize Risk and
       Maximize Appearance of Benefit ............................................... 12

       A.     Early Evidence of Potential CV Risk Associated with Selective
              COX-2 Inhibition.................................................................. 12

       B.     Merck's Clinical Trials - Including VIGOR - Hid Suspected
              CV Risks and Maximized Appearance of GI Benefit ..................... 17

              Figure 1 ....................................................................... 19

VI.    Results of Merck's VIGOR Trial ................................................ 21

       A.     Prior to Completion of the Trial.......................................... 21

       B.     Publication of the Results of the VIGOR Trial in the *NEJM*........... 24

       C.     The Complete and Unbiased Results from the VIGOR Trial:
              What Merck Knew and When They Knew It................................. 27

              Figure 2 ....................................................................... 28

              Figure 3 ....................................................................... 29

              Figure 4 ....................................................................... 30

              Figure 5 ....................................................................... 36

       D.     Merck Omitted Important Thrombotic Cardiovascular Events
              Including Three Myocardial Infarctions that Occurred in the
              VIGOR Trial from the *NEJM* Article.................................... 37

       E.     VIGOR Showed that Vioxx Did Not Reduce the Risk of
              Complicated GI Events for Those Not Taking Steroids................. 41

       F.     Other Merck-Sponsored Clinical Trials of Vioxx ......................... 46

VII.   Marketing, Detailing, and Public Relations.............................. 52

       A.     Misrepresentation of the CV Risk of Vioxx .................................... 53

       B.     Merck Used the Cardiovascular Card to Mislead Physicians ........ 55

C.      Merck-Sponsored Publications Misled About CV Risk/Safety of Vioxx ................................................................................. 61

        Figure 6 ...................................................................................... 64

D.      PIRs Misled Physicians .............................................................. 71

E.      Medical Journal Advertising ...................................................... 75

F.      Press Releases ........................................................................... 75

G.      Direct to Consumer Advertising................................................. 82

VIII.   Marketing in Louisiana Reflected Merck's National Marketing Strategy ................................................................................................... 82

A.      Tutorials ...................................................................................... 83

B.      Call Notes.................................................................................... 84

        Figure 7 ...................................................................................... 87

        Figure 8 ...................................................................................... 88

C.      Louisiana Department of Health and Hospitals ............................ 89

IX.     Celebrex Was Not a Reasonable Alternative to Vioxx .............................. 91

        Figure 9 ...................................................................................... 93

        Figure 10 .................................................................................... 94

X.      Formulary Dossier and Cost-Effectiveness Articles ................................. 96

A.      Formulary Dossier ....................................................................... 96

B.      Cost-Effectiveness Reports......................................................... 98

XI.     Conclusion ............................................................................................ 102

On November ___, 2009, I, John David Abramson, M.D., of 39 Spring Street, Ipswich, Massachusetts, state as follows:

## I.  Introduction

1.     Based on my education, training and experience in medicine, epidemiology, statistics and research design, I believe I am qualified to testify regarding the risks and benefits of drugs (including Vioxx), and the design and analysis of data in clinical studies pertaining to Vioxx and other anti-inflammatory drugs.  I am further qualified to testify regarding the type and form of delivery of information physicians need and expect regarding the efficacy and safety profiles of drugs (including Vioxx) to make informed decisions about prescribing and impact on patient care.

## II. Qualifications

2.     I am a medical doctor licensed to practice medicine in the State of Massachusetts since 1982.  I have been Board Certified in Family Medicine and a Diplomate of the American Board of Family Practice since 1982.  I graduated cum laude from Harvard College in 1970 with a Degree in Social Relations.  I attended Dartmouth Medical School and graduated with a Degree in Medicine from Brown Medical School in 1976.  I performed my internship at the University of North Carolina from 1976 to 1977. I then served as a primary care physician in the National Health Service Corps of the U.S. Public Service in Monroe County, West Virginia (1977 to 1979).  I completed my residency at Case Western Reserve University from 1979 to 1981.  I also completed a Robert Wood Johnson Fellowship in Family Medicine at Case Western University from 1980 to 1982, earning a Master of Science in Family Practice Degree.   During this two-year fellowship, which included study of epidemiology, statistics, research design and health policy, I received training in the interpretation of scientific data.  Additionally,

I was a Senior Research Associate on the Faculty of the Institute for Health Policy, Heller School, Brandeis University from 1992 to 1993, during which I participated in a project that explored local control of healthcare resources to optimize allocation and health outcomes.  I served as Chair of the Department of Family Practice at Lahey Clinic in Burlington, Massachusetts, from 1994 to 2001.  I have been a clinical instructor at Harvard Medical School since 1997.  In recent years, I have published on health policy and the growing commercial bias in the scientific evidence that doctors rely on to guide their clinical practice.  Before Vioxx was removed from the market and before I was consulted in any litigation involving Vioxx, I had spent hundreds of hours researching the safety and efficacy of cyclooxygenase-2 (COX-2) inhibitors, including Vioxx and Celebrex, as well as the omission of key aspects of the results of manufacturer-sponsored studies of both these drugs in our most trusted medical journals, and had completed a book chapter about the safety and efficacy of Vioxx and Celebrex.

       3.      Throughout my 26 years as a physician, I have had firsthand experience in multiple practice arenas that further qualifies me to render opinions in this litigation. My first experience as a primary care doctor was in a rural health clinic in Appalachia with the National Health Service Corps, then a part of the U. S. Public Health Service. From 1982 to 2002, I practiced family medicine in Hamilton, Massachusetts.  As a treating physician, I was responsible for the evaluation, care and treatment of numerous patients for both wellness care and disease diagnosis, and treatment and management. I have prescribed many different drugs, including Vioxx and other non-steroidal anti-inflammatory drugs (NSAIDs), in the scope of my clinical practice for over two decades and have firsthand experience regarding the type and content of information a

5

physician needs to make informed decisions about prescribing drugs to a patient (including Vioxx and other NSAIDS), including performing risk/benefit analyses and evaluating safety and efficacy of drugs for a given patient. I carefully read medical journals both as a practicing physician - to keep up-to-date on the latest developments that would impact the care and treatment of my patients, and as a researcher - to evaluate the quality of the scientific evidence presented therein.

4.     I also have experience with the healthcare industry. From 1986 to 1993, I served as Associate Medical Director of Pru-Care of Massachusetts. I am currently the Executive Director of Health Management for Wells Fargo Complete Health Solutions. In that role, I participate in designing health benefits for self-insured companies that reflect the best scientific evidence about effective healthcare: integrating the best of medical science, predictive health modeling, and the largely untapped health benefits of helping people to adopt healthier lifestyles.

5.     Teaching has also been an important lens through which I have observed and experienced the changes in medicine that have taken place throughout my career. I have taught both medical students and postgraduate students and also lectured extensively as an invited speaker regarding the growing challenge to clinicians trying to make informed decisions about optimal pharmacotherapy for their patients. My academic appointments include serving as a clinical instructor in ambulatory care and prevention at Harvard Medical School since 1997. From 1993 to 1995, I was the Chair of the Graduate Medical Education Committee (Family Practice Residency) at Beverly Hospital. I have also served as a mentor for first year medical students in the Primary Care Mentorship Program at Harvard Medical School and also as a Preceptor in the Primary Care Clerkship Program at Harvard Medical School. I continue to serve as a

6

tutor in the Primary Care Clerkship Program there.   In these roles, I have taught students how to critically interpret and integrate medical literature and data into a risk/benefit analysis for prescribing drugs to patients.

6.     The issue of public health and health policy and how doctors process information from various sources has been of importance and interest to me throughout my career as a physician.   Because of the changes that I was observing in American medicine and experiencing in my own practice, I left clinical practice to devote full-time to research this topic, specifically in regard to the pharmaceutical industry and its impact on public health, public safety, and the quality of American healthcare.   Since the beginning of 2002, I have been researching, writing, lecturing, and teaching about how the information and misinformation about drugs and other medical products available to practicing physicians impacts their medical decisions and the overall quality, effectiveness, and cost of American healthcare.

7.     As noted in my curriculum vitae, I have been invited to lecture at medical schools, hospital Grand Rounds and health insurers about the growing commercial influence on the production and dissemination of medical information available to physicians, the public, and health policymakers.

8.     Thus, based on my education, training, two decades of clinical practice and my independent research, I am qualified to testify regarding how pharmaceutical company-sponsored research and marketing affects doctors' clinical decisions, patients' expectations and the overall quality and effectiveness of medical care, and as to whether Merck's marketing of Vioxx was likely to deceive physicians.   Prior to being consulted in this litigation, I published articles and a book on this subject as listed in my curriculum vitae.   A true and correct copy of my curriculum vitae, further outlining my

education, training, publications, and experience, as well as my hourly rate is attached as *Exhibit 1*.

9.     The opinions expressed in this declaration are my own and are based on my education, training, research and experience, my review of the peer-reviewed medical literature, and on corporate documents and depositions produced in this litigation by Merck.  A list of the articles, depositions and documents upon which I relied in forming my opinions is attached as *Exhibit 2* and are incorporated into my opinions stated below.   My opinions as stated in this declaration are stated to a reasonable degree of medical probability.

10.     A list of testimony I have given within the past 4 years as an expert either at deposition or at trial is attached as *Exhibit 3.*

### III.  Summary of Opinions

11.     It is my opinion, based on my education, training, experience and review of the literature and documents listed in *Exhibit 2*, that Merck failed to communicate to physicians, healthcare providers, and consumers in a fair, balanced, and reasonably complete manner the true overall and cardiovascular (CV) risks associated with Vioxx that were known to them.   In addition, Merck exaggerated the relative gastrointestinal (GI) safety of Vioxx.   Merck's actions thus deprived patients of the right to make informed decisions about their healthcare and exposed them unnecessarily to excess risk of serious harm and injury, including heart attack and death.   It is my opinion that the true risks of Vioxx far outweighed the benefits and there were safer and equally effective alternatives on the market, such as naproxen and ibuprofen.

12.     It is my opinion that Merck's sponsorship of medical studies and journal articles, detailing of physicians by its sales force, medical journal advertisements, and

issuance of press releases provided the physicians who prescribed Vioxx, the consumers who ingested Vioxx, and the purchasers who paid for Vioxx with material misrepresentations and omissions regarding the true safety profile of Vioxx.

13.     Although Merck's own VIGOR trial showed that Vioxx was significantly less safe overall than the older, far less expensive, and no less effective NSAID, naproxen, Merck systematically minimized the risks associated with Vioxx and overstated its benefits in both the medical articles it funded and in its communications to physicians, other healthcare providers and consumers, thus depriving them of the right to make educated, informed decisions about the true risks and benefits of Vioxx. Physicians, consumers, and purchasers had both a right and a need for Merck to be forthright and thorough in communicating the clinical risks of Vioxx, as well as the benefits.    Having reviewed corporate depositions, documents, congressional and governmental hearing briefs and materials, and underlying clinical trial data, it is my opinion that there was much information that Merck had that was critical to physician decision-making, but was withheld from doctors.   Instead, the information that was reported to physicians was incomplete and at times without scientific basis.

14.     With specific reference to Louisiana, Merck documents show that the national strategy to maximize Vioxx sales by minimizing the risks and exaggerating the benefits of Vioxx took place in Louisiana.   Specifically, Merck's sales activities in Louisiana included (but were not limited to): using drug representatives to carry the national sales messages into doctors' offices, developing "qualified experts" to present the advantages of Vioxx, paying doctors to participate in so-called tutorials with drug representatives, providing financial incentives to drug representatives to increase Vioxx sales, and conducting "Consultants' Meetings" designed to increase Vioxx use.

9

15.    Finally, it is my opinion that had full and accurate information been reasonably provided to physicians, patients, and purchasers about the risks and benefits of Vioxx, not only would it have been prescribed extremely rarely if at all, as there were other alternative non-steroidal anti-inflammatory (NSAID) agents on the market that were as effective, safer, and far less expensive, but it would not have commanded a premium price because it was no more effective and was less safe than other far less expensive alternatives.  Rational buyers knowing the full truth about the safety of Vioxx would not have purchased the drug, or at most would have made it available to only a small subset of patients being treated with steroids who absolutely required NSAID therapy, had tried and failed on other NSAIDs (especially ibuprofen) at low doses, did not have a previous history of CV disease, and were at high risk of serious GI complications.

## IV. Background

16.    Vioxx, a selective COX-2 inhibitor, was approved by the Food and Drug Administration (FDA) in 1999 for the treatment of arthritis, acute pain, and primary dysmenorrhea.  When Vioxx was approved, I was engaged in active clinical practice of family medicine and had patients diagnosed with these conditions.

17.    In response to the intense advertising to consumers, many of my patients came to me requesting prescriptions for Vioxx.  This led me to engage in further research of these drugs.  The results of a Merck-sponsored study, VIGOR (Vioxx Gastrointestinal Outcomes Research), which compared the safety of Vioxx and naproxen, another NSAID, were published in the November 23, 2000, issue of the *New England Journal of Medicine (NEJM)*.  Though this article reported more myocardial infarctions in the patients exposed to Vioxx, the authors (all 13 of whom were either

10

employees of or had financial ties to Merck) concluded that this finding was due to the cardioprotective properties of naproxen, that Vioxx did not significantly increase the risk for heart attack in people without a previous history of CV disease, and that Vioxx offered the advantage of causing significantly fewer GI complications than naproxen.

18.   In 2001, I began more in-depth research regarding this finding and discovered the data from the VIGOR study that Merck had submitted to the FDA, which demonstrated significantly more serious CV complications in the people taking Vioxx - whether or not they had a previous history of CV disease - and that Merck's argument that it was not Vioxx that increased the risk of heart attacks but naproxen that decreased the risk of heart attack, was without reasonable scientific basis and clinically misleading.  This prompted me to engage in yet more research on this issue.  My long-term personal interest in public health and safety and a concern about the growing misrepresentation of research by drug and other medical industries and its negative impact on American healthcare led me to spend hundreds of hours over the next three years researching this issue in general and Vioxx specifically.

19.   A practicing physician (not engaged in such research) could not reasonably have been expected to spend so much time reviewing and evaluating primary data, rather he or she would have relied on information provided by Merck or would have taken the *NEJM* article at face value.  Even the most disciplined practicing physicians rarely have the time and often do not have the training to do independent critical analysis of scientific evidence presented in their most trusted sources of information.

11

## V. Merck Designed Its Clinical Trials of Vioxx to Minimize Risk and Maximize Appearance of Benefit

### A. Early Evidence of Potential CV Risk Associated with Selective COX-2 Inhibition

20.     As early as 1996, Merck officials were aware that selective COX-2 inhibition by Vioxx could potentially increase the risk of thrombotic CV events - a risk that might be mitigated by allowing people at high risk of developing CV problems to take prophylactic aspirin.  Yet corporate documents reveal that in 1996 Merck officials also understood that in order to accentuate the primary theoretical GI advantage of Vioxx, patients in clinical trials should not be allowed to take aspirin.  (Aspirin, it was surmised, would increase the risk of adverse GI events, such as bleeding and ulcers, more in patients taking Vioxx than in patients taking other NSAIDs.)  A 1996 memo discussed Merck's dilemma: in trials disallowing the use of aspirin, "there is a substantial chance that significantly higher rates" of CV problems would manifest in the Vioxx group.[1]  Merck was thus aware of the potential risk of increased thrombotic CV events and was strategizing to design trials that would minimize this risk and maximize the potential GI advantage of Vioxx even during its pre-approval development phase.

21.     While the potential risk of increased CV complications with Vioxx compared to non-selective NSAIDs in the memo described above was based on the possible anti-platelet activity in non-selective NSAIDs, Merck's plan to evaluate the incidence of CV serious adverse events in the Phase IIb/III osteoarthritis clinical trials, dated December 30, 1997, revealed the concern that Vioxx would exert a pro-thrombotic effect:

---

[1] MRK-AAX0002413 to 2420.

12

> The clinical implications of partially inhibiting the production of PGI2 without inhibiting thromboxane generation systemically are unknown. These findings raised concern about the potential for Vioxx to predispose to CV thrombotic events; however, there has not been any evidence of an increased incidence of such events in clinical trials of Vioxx to date.[2]

22.   Thus, Merck was aware that replacing a non-selective NSAID with Vioxx had the potential to increase CV risk by two separate mechanisms: 1) removing potential (though undocumented) anti-platelet clinical effect; and 2) creating a pro-thrombotic environment by selectively inhibiting prostacyclin without offsetting inhibition of thromboxane.

23.   The potential for Vioxx to exert a pro-thrombotic effect and thus increase thrombotic CV complications was specifically addressed in the Vioxx Project Team meeting minutes of January 12, 1998.[3]  Merck's Study 023 had shown that both Vioxx and indomethacin significantly reduce urinary excretion of PGI-M (a metabolite of prostacyclin), suggesting a reduction in prostacyclin biosynthesis.  Indomethacin also inhibited thromboxane, but because of its COX-2 selectivity, Vioxx had no effect on thromboxane.  The minutes reflect concern about the potential effect of these findings:

> "The clinical relevance of partially inhibiting thromboxane are unknown.  These findings raised a concern about the potential for Vioxx to cause cardiovascular thrombotic events."[4]

Despite this concern and the statistically significant doubling the risk of thrombotic CV events in women in still- blinded osteoarthritis studies (see below), the minutes reflect the recommendation to make no change in the conduct of Vioxx clinical trials.

---

[2] MRK-ABS0037036; pg MRK-ABS0037039-40.

[3] MRK-ABC0009947; pg MRK-ABC0009949.

[4] Ibid.

13

24.     The plan to evaluate CV adverse events referenced in paragraph 20 resulted in a report authored by Doug Watson, Merck employee, dated February 2, 1998.[5]  Watson's analysis revealed a statistically significant excess risk of thrombotic CV events among women in the blinded Vioxx clinical trials of osteoarthritis (included all patients: Vioxx, non-selective NSAIDSs, and placebo) compared to the control group in Merck's Fosamax trials, adjusted rate ratio 2.16 (95% CI 1.14-3.94).[6]  The Watson report downplayed the importance of this finding in two ways: first, it claimed (post hoc) that the incidence of CV events in the Fosamax was "atypically low."  And second, again post hoc, Watson changed the design of the study to also use the Cardiovascular Health Study as a comparator population with its reassuringly high (38%) rate of CV disease.  However the population in the Cardiovascular Health Study was considerably older (average age for women was 72)[7] than the populations  the Vioxx and Fosamax trial databases (median ages in the 60-69 range), and the comparative rates of CV events in the Cardiovascular Health Study were not age adjusted in relationship to the other two data sets.   In addition the 38% rate of CV events documented in the Cardiovascular Health Study includes congestive heart failure, which accounted for 30% total incident events, but is not a thrombotic CV event and, therefore, was not included in the Vioxx and Fosamax databases.  For men the increase in risk of thrombotic CV events was 1.28 (NS) among the blinded Vioxx osteoarthritis studies.

25.     On April 13, 1998, Merck officer, Dr. Alan Nies, prepared a write-up for the meeting of the Board of Scientific Advisors, which discussed the results of Study 023

---

[5] MRK-NJ0272249.

[6] MRK-NJ0272249; MRK-NJ0272250.

[7] Mittelmark MB Psaty BM Rautaharju TM et al Prevalence of Cardovascular diseases among Older Adults *American Journal of Epidemiology* 1993;137:311-17.

(the imbalance between thromboxane and prostcycline resulting from selective COX-2 inhibition). However, Dr. Nies' write-up failed to include the results of Watson's analysis as described above. Instead Dr. Nies wrote:

> "To assess the potential implication of these biochemical findings on cardiovascular health, the clinical team and epidemiology have analyzed the blinded Vioxx database for serious cardiovascular events. **The analysis does not suggest a concern.**"[8] [Emphasis added.]

The Scientific Advisor's Meeting Programmatic Review, May 3, 1998 to May 6, 1998, contains an entire section describing the mechanism whereby Vioxx could potentially promote destabilization of plaque and promote thrombotic CV events: by selectively decreasing prostacyclin production, COX-2 inhibitors might enhance "the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation."[9] Yet, as shown below, when Merck's worst fears were realized and the increased risk of thrombotic events became evident in the VIGOR trial, as detailed below, in my opinion Merck attempted to hide the true risk of CV events associated with use of Vioxx and failed to communicate this risk to physicians, healthcare providers, and consumers in a forthright and timely manner.

26.   In an email dated February 25, 1997 (more than two years prior to the approval and marketing of Vioxx), Dr. Briggs Morrison wrote to Merck colleagues that he "would allow low dose aspirin - I know this has been discussed to death but real world is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill the drug."[10] Merck came up with a solution that would avoid the use of aspirin (and the risk of neutralizing any potential GI benefit of Vioxx) and still

---

[8] MRK-AIR0041448; pg MRK-AIR0041457.

[9] MRK-AEI0002734 to 2746.

[10] MRK-NJ0315892 to 5894.

15

minimize the increased CV complications that might result from not allowing people to take aspirin during the clinical trials of Vioxx:   exclude people who qualify for prophylactic aspirin from the major clinical trials.  This tactic could - at the same time - avoid blunting the potential GI benefit and minimize the potential CV risk of Vioxx by excluding people at high risk of CV complications.  In other words, Merck came up with a design for its clinical trials that biased the results from the outset by a) excluding patients with a previous history of CV disease, thereby minimizing the risk of CV complications (which might make Vioxx look bad) and b) not allowing any patients to take aspirin, thereby maximizing any GI benefit of Vioxx.

27.    This is exactly the way that the pre-approval osteoarthritis studies, the VIGOR trial, and the Alzheimer's studies were designed - people with recent CV disease or qualifying for prophylactic aspirin were excluded from these studies.  This strategy increased the likelihood of Merck's studies casting Vioxx in a favorable light, but there were three problems.  First, it created unrepresentative, not "real world," study populations so that the results of these studies should have been applied only to similar low-CV risk patients and not to the general population that Merck knew would be taking Vioxx based on the results of these studies.  Second, it ignored the recommendations from Merck's own scientists and medical advisors to conduct clinical trials specifically designed to assess the CV risk of all of its COX-2 drugs, including Vioxx.  And third, as shown below, the strategy failed: *despite creating an artificially low-CV risk population, the people in the VIGOR trial taking Vioxx still developed significantly more CV complications and serious complications overall than the people taking naproxen.*

B.    **Merck's Clinical Trials - Including VIGOR - Hid Suspected CV Risks and Maximized Appearance of GI Benefit**

16

28.    Merck failed to adequately test Vioxx in the populations in which it would be used to ensure that the drug's overall benefits outweighed the risks of ingestion for that population.  As stated above, Merck knew as early as 1996 that Vioxx had the potential to increase CV thrombotic events.  As such, the clinical trials should have been designed to monitor closely for the occurrence of this serious and potentially fatal set of adverse events.  In 1998, Merck executive, Alan Nies, wrote in response to specific requests from its scientific consultants to design studies to explore Vioxx's pro-thrombotic potential:

> "We would not be doing clinical studies [of the pro-thrombotic potential of Vioxx] at this time.  When the drug is out many investigators will probably do such studies with or without our help."[11]

29.    Instead of designing studies that would have explored what Merck knew were legitimate scientifically based concerns about the potential CV risks of Vioxx, Merck designed clinical trials that would minimize the occurrence of CV adverse events and exaggerate any potential GI benefit.

30.    In response to the February 25, 1997, email by Dr. Morrison (noted above), expressing concern that failure to use aspirin in clinical trials of Vioxx may result in more thrombotic events and kill the drug, Dr. Alise Reicin of Merck responded:

> "I HEAR YOU!  This is a no win situation.  The relative risk may be as high as 2-4 fold.  Yet the possibility of increased CV events is of great concern (I just can't wait to be the one to present those results to senior management!)  What about the idea of excluding high risk CV patients - i.e. those that have already had an MI, CABG or PTCA?  This may decrease the CV event rate so that a difference between the two groups would not be evident.  The only problem would be - Would we be able to recruit any patients?"[12]

---

[11] MRK-ABK0311068.

[12] MRK-NJ0315892.

31.     This exclusion was implemented for the pre-approval osteoarthritis trials, as well as the VIGOR and Alzheimer's disease trials - gathering scientific data on the CV risk of Vioxx from artificially constructed study populations designed to minimize the CV risk of Vioxx while creating results that were not applicable to the "real world" population of people to whom Merck intended to and did market Vioxx.

32.     Merck's studies comparing Vioxx to ibuprofen for pain control used a relatively high dose of Vioxx, 50 mg, and a relatively low dose of ibuprofen, 400 mg. Even so, Merck's studies showed that at these doses the two drugs provide equivalent pain relief for 6-8 hours.[13]   These findings are reflected in the product label, which states:

> "The analgesic effect (including onset of action) of a single 50-mg dose of Vioxx was generally similar to ...400 mg of ibuprofen."[14]

Notwithstanding the equivalent pain relief provided by ibuprofen 400 mg, Merck's studies of GI safety (as opposed to pain relief) compared twice the dose of ibuprofen (800 mg three times daily) to Vioxx.  No studies of GI safety were done with the lower dose.

33.     Such studies would have been of great importance to clinicians because there was strong evidence (available in 1996) that the lower, yet equally pain relieving, dose of ibuprofen was far less likely to cause serious GI complications than the dose that was used in Merck's trials of GI safety, 800 mg three times daily.  A meta-analysis

---

[13] Morrison BW, Christensen S, Yuan W, et al, Analgesic Efficacy of the Cyclooxygenase-2-Specific Inhibitor Rofecoxib in Post-Dental surgery Pain: A Randomized, Controlled Trial, Clinical Therapeutics, 1999;21:943-53.

[14] Vioxx Product Label, 1999, 2002.

performed by Henry, et al,[15] found ibuprofen at less than maximal dose was the least likely of the NSAIDs for which there were comparative studies (nabumetone was not included) to cause serious GI complications - defined as "admission to the hospital for hemorrhage or perforation." The findings from this meta-analysis are summarized in the following table (created from data in the article):

### Relative Risk of Serious GI Event by Drug and Dose

| Daily Dose | Ibuprofen | Naproxen | Indomethacin |
|---|---|---|---|
| Low | 1200-1500 | 500-750 | 75 |
| Relative Risk | 1.6 | 3.7 | 3.0 |
| High | 2400 | 1000 | 100 |
| Relative Risk | 4.2 | 6.0 | 7.0 |

Figure 1.

Low doses of ibuprofen (1200-1500 mg per day) were far less likely than the 2400 mg dose to cause serious GI complications. This is approximately the same benefit that is claimed for Vioxx in comparison to other NSAIDs. Furthermore, low dose ibuprofen was also far less likely to cause serious GI complications than naproxen 1000 mg per day (the dose used in the VIGOR trial). These data show that the relatively low doses of ibuprofen used by most patients confer far less risk of serious GI events than the high doses of ibuprofen and naproxen used as comparators to Vioxx in Merck's clinical trials. But besides very short-term studies of acute pain, Merck's studies failed to compare the safety and efficacy of Vioxx to ibuprofen 1200 mg per day. The article by Henry, et al, concluded:

> "It should not be assumed that the apparent advantage of ibuprofen persists when doses are increased beyond

---

[15] Henry D, Lim L L-Y, Rodriguez LAG, et al, Variability in risk of gastrointestinal complications with individual non-steroidal anti-inflammatory drugs: results of a collaborative meta-analysis, British Medical Journal, 1996;1563-6.

1600 mg daily.  **The evidence reviewed indicates that it does not.**" [Emphasis added.]

Another study showed that patients treated with ibuprofen in doses of approximately 1200 mg per day were as satisfied with the relief provided as those treated with diclofenac or naproxen.[16]

34.    In summary, Merck's pain studies showed that ibuprofen 400 mg and Vioxx 50 mg provide equivalent relief.  But Merck's safety studies compared Vioxx to ibuprofen 2400 mg daily - a dose that was far more likely to cause serious GI complications.  Clinicians were thus deprived of critically important information required to determine which NSAID was in their patients' best interest.

35.    The VIGOR trial included over 8,000 patients with rheumatoid arthritis who were randomly assigned to take Vioxx 50 mg or naproxen 1000 mg daily, which was at the time the most commonly used NSAID used to treat rheumatoid arthritis.  The study design excluded patients who had experienced a "cerebrovascular event" within two years of the study or a myocardial infarction or coronary bypass within the year prior to enrollment were explicitly excluded.  But having far more effect in biasing the study population toward lower CV risk, people taking low-dose prophylactic aspirin were also excluded - this meant that anyone with a past history of stroke, transient ischemic attack, myocardial infarction, unstable angina, stable angina, coronary artery bypass surgery, or coronary angioplasty was excluded.  After the study results became available, in a post-hoc re-evaluation of patient data, Merck found 4% of the patients had qualified for low dose aspirin (and; therefore, were at increased risk for CV events), but had not been identified as such during the intake process of the VIGOR study.  In

---

[16] Hawkey CJ, Cullen DJE, Pearson G, et al, Ibuprofen versus other non-steroidal anti-inflammatory drugs: use in general practice and patient perception, Aliment Pharacol Ther, 2000;14:187-91.

other words, Merck's separate analysis of the CV risk for "aspirin-indicated" patients in the VIGOR trial was a post-hoc analysis that had not been included in the original experimental design.   A natural population of people requiring ongoing anti-inflammatory therapy would realistically include at least 20% of people taking low-dose aspirin.[17]   Thus the CV risk of the people included in the VIGOR trial was successfully minimized.

36.    Further, 56% of the patients enrolled in the VIGOR study were taking steroids to control their arthritis concurrent with their NSAID.  Among the real world of people taking Vioxx and other NSAIDs, outside the artificial context of this drug study, only 7% or fewer take steroids with NSAIDs.[18]  The disproportionately high number of patients in the VIGOR study on steroids skewed the results by exaggerating any potential GI benefit of Vioxx and rendered the results of the study not generalizable to the real-world population of NSAID users.

## VI. Results of Merck's VIGOR Trial

### A.    Prior to Completion of the Trial

37.    Even before the VIGOR trial was completed, the Data Safety Monitoring Board (DSMB) was aware at both its second and third meetings that significantly more people in "Group A" were developing more serious CV complications perhaps "due to a cardioprotective effect of Treatment B" and that "no cardiovascular analysis plan was in place for VIGOR or Vioxx."  On December 20, 1999, in a letter to Dr. Reicin, the Chair of the DSMB requested that a plan be developed to analyze and report the thrombotic CV

---

[17] Graham DJ, Campen D, Hui R, et al, Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study, The Lancet, 2005;365:475-81.

[18] Ibid.

21

complications that occurred in the VIGOR study.  The letter from Dr. Weinblatt of the DSMB stated:

> "Due to the interest about COX 2 inhibitors and their potential role in vascular events, we recommend that an analysis plan be developed to analyze adjudicated serious vascular events in the VIGOR trial separately from any other planned analyses of these data."[19]

38.     Despite the importance to clinicians and patients of knowing the truth about the CV risk data, Merck management made a request to the VIGOR DSMB on January 24, 2000, that a separate analysis of the VIGOR data not be performed.[20] Deborah Shapiro, a Merck statistician, confirmed in her deposition that she had received senior management approval not to pursue a CV data analysis plan.[21]  The DSMB rejected Merck's request not to do a separate analysis on the CV events from VIGOR.[22]  Nonetheless, when Merck published the results of its VIGOR study in the *NEJM*, the data on "serious thrombotic cardiovascular events," the pre-specified CV outcome, was simply not presented.  Instead, Merck presented data on myocardial infarctions alone - a post-hoc endpoint that was then incompletely and misleadingly reported.

39.     Thus, the VIGOR trial was designed and carried out in a population such that CV events were minimized, GI benefit was exaggerated, and the true risk and benefit were not tested in the population the drug was intended to treat.

40.     Even so, the overall design of the VIGOR trial is to be commended: Merck tested the safety of Vioxx "head-to-head" against the specific NSAID and the

---

[19] MRK-AAX0002759.

[20] MRK-NJ0071309.

[21] Deposition of Deborah Shapiro, 4/29/04 p 227.

[22] MRK-AAX0002760.

specific dose that was being used most to treat rheumatoid arthritis, naproxen 500 mg twice a day. Despite the unrepresentative population included in this trial, had Merck disclosed the comprehensive CV, GI, and overall safety data in the *NEJM* article and its communications with physicians and other healthcare providers - which it failed to do - the results would have provided a clear and unambiguous answer to the question that mattered most to a clinician such as myself: Is Vioxx a safer and/or more effective NSAID treatment for rheumatoid arthritis than the current treatment of choice? Despite the unrepresentative study population, the answer came back loud and clear (if one had access to the complete data): Overall Vioxx is no more effective than naproxen and significantly more dangerous. Merck's failure to disclose the comprehensive CV, GI, and overall safety data and its promulgation of an unfounded theory to explain the heightened CV risk associated with Vioxx in comparison to naproxen, described below, left healthcare providers - even those reading the scientific articles in their most trusted journals - unaware of the true risks associated with Vioxx use and resulted in its being prescribed for millions patients, which would not have been the case if full and complete information had been provided to physicians and decision makers. The bottom line is that even after Merck had definitive evidence that Vioxx was significantly more dangerous and no more effective than naproxen, Merck continued its aggressive and misleading sales and marketing campaign of Vioxx without disclosing its true CV and overall risk profiles.

B.     **Publication of the Results of the VIGOR Trial in the *NEJM***

41.     Results of the VIGOR study were published in the November 23, 2000, issue of the *NEJM,* one of physicians' most trusted medical journals. The *NEJM* has the highest "impact factor" of any medical journal meaning, it is "the most widely read

and influential medical journal in the world."[23]  All 13 of the authors of the *NEJM* article were either employed by Merck or had financial ties to Merck.  Besides the GI findings, the data from the study showed that serious thrombotic CV events (including coronary events, cerebrovascular events, and peripheral blood clots) occurred 2.4 times more frequently in Vioxx users than in naproxen users (P=0.0016).  And on the broader measure of overall safety, Vioxx users developed significantly more serious adverse events overall than naproxen users (RR=1.21, P=0.013).[24]  But Merck failed to include either of these fundamentally important and pre-specified measures of safety to physicians in the *NEJM* article that reported the findings of the VIGOR study.  In their stead, data on only a post-hoc subset of serious thrombotic CV events, heart attacks (which were then incompletely reported, see below), were presented.  Merck then subdivided data on the post-hoc CV outcome measure of myocardial infarction into post-hoc subgroups of aspirin indicated and aspirin not indicated patients, and claimed that the significant increase in myocardial infarction was limited to the 4% of patients who were aspirin indicated, but not allowed to take aspirin because of the study design. The article claimed, "In the other [aspirin not indicated] patients the difference in the rate of myocardial infarction between groups was not significant..."  Merck then "explained" in the *NEJM* article that the greater number of heart attacks in Vioxx users was due to the cardioprotective properties of naproxen without any mention that its own scientific advisors had informed them in 1998 of the possibility of Vioxx being pro-thrombotic and despite Merck's being aware that there was no published scientific basis for

---

[23] Ovid Products and Services: http://www.ovid.com/site/catalog/Journal/624.jsp?top=2&mid=3&bottom=7&subsection=12 (accessed 5/14/08).
[24] Li Q, Statistical Reviewer Briefing Document for Advisory Committee, Rofecoxib, N21-042 s-007 (Period of Review June-December 2000).

24

this statement.   Furthermore, this explanation contradicted Merck's own document

describing the Standard Operating Procedure (SOP) for analysis of CV complications in

studies of Vioxx and other COX-2 selective inhibitors:

> "[PGI2] is the most potent of all inhibitors of platelet aggregation, and has vascular dilatory properties as well. Conversely, thromboxane A2, a potent platelet aggregator and vasoconstrictor, is synthesized primarily by the platelet. The clinical implications of partially inhibiting the production of PGI2 without inhibiting thromboxane generation systemically are unknown."[25]

42.     Dr. Alise Reicin, a Merck employee directly involved in this trial and a

co-author of the *NEJM* article, looked unsuccessfully for corroboration from the medical

literature to support the theory that naproxen reduced the risk of CV complications.[26]

Further, Merck was informed on March 28, 2000, that its own consultant, Dr. Carlo

Patrono, did not believe that naproxen could have reduced CV events enough to explain

the difference between CV events occurring in Vioxx users versus naproxen users.[27]

Merck thus had knowledge from its own employees and consultants that there was no

scientific evidence in March 2000 for dismissing the greater number of serious CV

complications occurring in the VIGOR study among patients taking Vioxx as the

consequence of a cardioprotective property of naproxen and had been explicitly

warned, by its own advisors, of the possibility that Vioxx could actively cause CV harm.

43.     Merck's post-hoc claim that the difference in rates of myocardial infarction

between those taking naproxen and those taking Vioxx in the VIGOR trial was due to

the anti-platelet activity of naproxen was belied by Merck's own "Analysis Strategy for

the Incidence of Serious Thromboembolic Events in COX-2-Specific Inhibitor Program,"

---

[25] MRK-18940077810; pg MRK-18940077815.

[26] MRK-ABH0017386.

[27] MRK-NJ0189508 to 9509.

dated January 6, 1999.[28]  This report acknowledged that lack of platelet inhibition "is a theoretical mechanism by which [COX-2 selective inhibitors] might have an elevated incidence of thromboembolic events compared to NSAIDs."  However, the report then stated that this theoretical risk has not been borne out in clinical studies:

> "Although NSAIDs are known to affect platelet function, there's little direct evidence that there is a decreased incidence of thromboembolic events among NSAID users compared to those not using NSAIDs."[29]

44.    Merck's theory about the cardioprotective property of naproxen was also rejected by its own consultants, FitzGerald and Patrono, in their August 2001 *NEJM* Drug Therapy review article on Coxibs:

> "There is no convincing evidence from epidemiologic studies that NSAIDs, including naproxen, protect against cardiovascular events."[30]

45.    Despite knowing from its own employees and consultants - at least one of whom was a co-author of this very article - that there was no reasonable scientific evidence to support its theory that the increased incidence of myocardial infarctions seen in Vioxx users was due to the cardioprotective nature of naproxen (and substantial concern expressed in Merck's own documents that Vioxx might create a pro-thrombotic state, described above), Merck proffered this as the sole explanation of the finding of increased heart attacks in the people taking Vioxx in the VIGOR trial in its November 23, 2000, *NEJM* article.

46.    Further, an article by Susan Jick, published in July 2000, showed that naproxen was not, in fact, cardioprotective in comparison to other NSAIDS.[31]  Despite

---

[28] MRK-AGV0021318.

[29] MRK-AGV0021318; pg MRK-AGV0021320.

[30] FitzGerald GA, Patrono C, The Coxibs, Selective Inhibitors of Cyclooxygenase-2, New England Journal of Medicine, 2001;345:433-42.

Jick's study having been available to Merck four to five months prior to publication of the VIGOR article in November 2000, Merck failed to modify its unfounded explanation for the excess CV risk seen with Vioxx in that study - that naproxen was cardioprotective - and failed even to cite this highly relevant study in its *NEJM* article.

47. At the same time, Merck failed to inform physicians of the more plausible explanation of the increased number of CV complications in general and heart attacks in particular that occurred in people taking Vioxx in the VIGOR trial - expressed by its own scientific advisors two years earlier - that by selectively inhibiting prostacyclin without also inhibiting thromboxane, Vioxx could exert a pro-thrombotic effect.

**C.    The Complete and Unbiased Results from the VIGOR Trial: What Merck Knew and When They Knew It**

48. In my opinion, as a physician and scientist, in order to provide physicians with complete and balanced information, Merck's November 2000 *NEJM* article should have informed doctors of the significant increase in the risk of CV complications  (the pre-specified CV complication identified in the SOP for Vioxx studies in general and VIGOR in particular[32] associated with taking Vioxx instead of naproxen, whether or not patients had a previous history of heart disease, and of the potential pro-thrombotic mechanism of selective COX-2 inhibition to explain the increased CV risk associated with Vioxx.  But this was not done.  Instead, Merck's failure to report CV events in toto and overall serious adverse events and its presentation of a single unproven theory to explain the significantly increased risk of the post-hoc outcome measure myocardial infarction in people taking Vioxx in its VIGOR study left physicians and healthcare

[31] Jick SS, The Risk of Gastrointestinal Bleed, Myocardium Infarction, and Newly Diagnosed Hypertension in Users of Meloxicam, Diclofenac, Naproxen, and Piroxicam, Pharmacotherapy, 2000;20:741-744.

[32] MRK-AB10002269; pg MRK-AB10002273, 74.

providers misinformed about the true and significant risks associated with use of Vioxx. A striking example of the imbalance in the *NEJM* article is that Figure 1 presents a graph of the cumulative incidence of confirmed upper GI events, providing a dramatic graphical image of the purported GI benefit of Vioxx:



| No. at Risk | | | | | | |
|---|---|---|---|---|---|---|
| Rofecoxib | 4047 | 3641 | 3402 | 3180 | 2806 | 1073 | 633 |
| Naproxen | 4029 | 3644 | 3389 | 3163 | 2796 | 1071 | 513 |

Figure 1. Cumulative Incidence of the Primary End Point of a Confirmed Upper Gastrointestinal Event among All Randomized Patients.

**Figure 2.**

A Merck memo from July 5, 2000, shows that at least four and a half months prior to publication of the VIGOR article in the *NEJM*, Merck had an analogous and equally dramatic diagram of the cumulative index of the increased frequency of serious thrombotic CV events that occurred in people taking Vioxx in the VIGOR trial:[33]

---

[33] Curfman GD, Morrissey S, Drazen JM, Expression of Concern Reaffirmed, N Engl J Med, 2006;354:1193 and Supplementary Appendix 1.



Figure 1
Confirmed Thromboembolic Cardiovascular Serious Adverse Experiences
in Rheumatoid Arthritis Patients in the VIGOR Study
Time-to-Event Plot (All Patients Randomized)
Safety Update Report

**Figure 3.**

49.     But neither this diagram nor any presentation of the comparative rates of

serious thrombotic CV complications between patients taking Vioxx and those taking

naproxen in the VIGOR trial was included in the *NEJM* article.

50.     The discrepancies between Merck's early draft of the VIGOR article, dated

April 16, 2000,[34] and the final version of the article highlight the extent to which Merck

withheld critically important CV information from the *NEJM* article.  Table 5 of the draft,

---
[34] MRK-NJ0346560.

presenting "pre-specified analyses of adverse events,"[35] was not included in the *NEJM* article:

Table 5: Adverse events and/or withdrawals for adverse events by treatment group

| Adverse event | Rofecoxib (n = xxx) | | Naproxen (n = xxx) | | Difference (95% CI) [?OR RELATIVE RISK] | |
|---|---|---|---|---|---|---|
| | Events | Withdrawals | Events | Withdrawals | Events | Withdrawals |
| Upper GI symptoms[1] | 855 (21.1%) | 159 (3.9%) | 944 (23.4%) | 202 (5.0%) | | |
| Edema | 207 (5.1%) | 24 (0.6%) | 139 (3.4%) | 14 (0.3%) | | |
| Hypertension | 360 (8.9%) | 28 (0.7%) | 215 (5.3%) | 7 (0.2%) | | |
| Renal Disease | 35 (0.9%) | 5 (0.1%) | 26 (0.6%) | 3 (0.1%) | | |
| Hepatic Disease | 65 (1.6%) | 11 (0.3%) | 39 (1.0%) | 2 (0.0%) | | |
| Serious Cardiovascular[2] Thromboembolic[3] Congestive Heart Failure | xx (yy) | xx (yy) | xx (yy) | xx (yy) | | |
| Total number of patients with adverse event | 2597 (64.1%) | 604 (14.9%) | 2553 (63.3%) | 587 (14.6%) | | |

**Figure 4**.

51.    Had this table (with the column indicating statistical significance completed) and the accompanying text been included in the *NEJM* article, readers would have been informed that there were significantly more hypertensive, serious CV in total, and serious thromboembolic CV complications among people taking Vioxx.[36] After statistical calculations of significance had been entered in Table 5, readers would have seen that patients who took Vioxx experienced a significant increase in the risk of

---

[35] MRK-NJ0346560; pg MRK-NJ0346589.

[36] MRK-NJ0346560; pg MRK-NJ0346574.

the edema-related adverse events (RR=1.5, P=0.0002); hypertension (RR=1.7, p=0.0000001); withdrawal because of hepatic disease (RR=5.5, P=0.013), and thromboembolic CV complications (RR=2.36, P=0.001).[37]

52.    The draft presents the discrepancy in serious thromboembolic CV events:

"A significantly lower incidence of serious thromboembolic cardiovascular events was noted with naproxen as compared to rofecoxib: the relative risk reduction was 47%."[38]

53.    This finding was omitted from the *NEJM* article, replaced by the post-hoc outcome measure of myocardial infarction alone.  And even then, three myocardial infarctions that occurred during the trial were not included in the *NEJM* article, allowing the (false) claim that the significantly increased risk of myocardial infarction did not extend to people for whom aspirin was not indicated.  Had the article presented the prespecified CV outcome measure, serious thrombotic CV events, there would have been no doubt that the significantly increased risk extended to those with and without a previous history of CV disease.[39]

54.    The argument in defense of Vioxx put forth in the November 2000 *NEJM* article that it was not Vioxx that increased the risk of heart attacks but naproxen's anti-platelet properties that decreased the risk was predicated on there not being an intrinsic pro-thrombotic property of Vioxx.  But Merck's own study 023, completed in 1997, had shown that Vioxx inhibits prostacyclin synthesis more than thromboxane

---

[37] MRK-NJ0346560; pg MRK-NJ0346589 (statistical significance calculated using openepi.com).

[38] MRK-NJ0346560; pg MRK-NJ0346578.

[39] Targum SL, FDA Memorandum: Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001, P. 20, www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf Accessed July 16, 2009.

synthesis.[40]  In 1998, Merck's own scientific advisers had advised them of the potential CV risk associated with selective prostacyclin inhibition.  Notwithstanding this early awareness, Merck did not even mention in the November 2000 *NEJM* article the possibility that the significant difference in serious CV events might be due to a pro-thrombotic effect of Vioxx rather than an anti-platelet effect of naproxen.  The FDA Cardio-Renal reviewer rejected the "naproxen protected against heart attacks" explanation of the greater number of CV complications experienced by those taking Vioxx in the VIGOR trial:

> "The sponsor claims that the difference in myocardial infarctions between the two groups is primarily due to the antiplatelet effects of naproxen.  This hypothesis is not supported by any prospective placebo-controlled trials with naproxen.  One can further argue that, no matter what the attribution, the results (from a cardiovascular standpoint) are favorable for naproxen." [Emphasis in original.][41]

55.    And finally, the draft, like the final version of the *NEJM* article, offered the hypothesis that the discrepancy in CV events (or myocardial infarctions) was due to the anti-platelet effect of naproxen.  But unlike the published article, the draft also informed readers of the possibility that the discrepancy in CV events was due to a pro-thrombotic effect of Vioxx:

> "Finally, the question of whether COX-2 specific inhibitors could increase thromboembolic events needs to be considered. Production of prostacyclin, which is produced in the vascular endothelium and acts as a vasodilator and an inhibitor of platelet aggregation, is mediated by COX-2. Thus, COX-2 specific inhibitors and nonselective and NSAIDs both decrease prostacyclin production. **It has been theorized that the inhibition of prostacyclin without the**

---

[40] MRK-AHR0009546.

[41] Op. cit. Targum, p. 34.

concomitant inhibition of thromboxane could potentially be pro-thrombotic." [My emphasis.][42]

56.    The possibility of Vioxx exerting a pro-thrombotic effect was presented even more forthrightly in a slide set titled "VIGOR Preliminary Results":

"COX-2 specific inhibitors could theoretically cause an imbalance in the platelet aggregation for the inhibition of prostacyclin without inhibition of thromboxane.   This imbalance could potentiate thrombotic events."[43]

57.    This possibility was not included in the *NEJM* VIGOR article, so readers were not informed of the possibility that the discrepancy in thrombotic CV complications was due to this potentially harmful pro-thrombotic effect of Vioxx (as opposed to the hypothetical benefit of the anti-platelet activity of naproxen).  Nor were readers of the Merck's Dear Healthcare Professional letter, issued in April 2002, informed of this possibility.[44]

58.    Language included in the draft would have provided readers with a simple way to understand the practical implications of the study findings - number needed to treat (NNT):

"...101 patients would need to be treated with naproxen instead of rofecoxib to avoid one serious thromboembolic event in one year."[45]

59.    In contrast to serious CV complications, the draft reported that 125 patients needed to be treated with Vioxx for a year in order to prevent one complicated GI event (see below for explanation of the misrepresentation included in even this number).  And this finding was skewed by the experimental design in which

---

[42] MRK-NJ0346560; pg MRK-NJ0346581.

[43] MRK-NJ048967; pg MRK-NJ048995.

[44] Merck Dear Healthcare Professional letter re: Vioxx label change, sent April 2002.

[45] MRK-NJ0346560; pg MRK-NJ0346575.

56% of people in the VIGOR trial were taking steroids concurrently with naproxen or Vioxx (doubling the risk of so-called PUB GI complications for people taking naproxen, and tripling the risk of serious GI complications - so-called POBs, see below) and people experiencing GI symptoms were not allowed to take proton pump inhibitors or prescription strength doses of $H_2$ blockers.   Nonetheless, had the NNT for serious thrombotic CV complications and serious GI complications been presented in the *NEJM* article, readers would have seen quickly that taking Vioxx instead of naproxen caused more serious CV harm than it prevented serious GI harm.

60.     The FDA Cardiovascular Safety Review of the CV data from the VIGOR trial summarized the clinical import of the greater number of CV events in people taking Vioxx:

> "This analysis could lead one to conclude that naproxen, with a 51% risk reduction compared to rofecoxib, would be the <u>preferred</u> drug." [Emphasis in original.][46]

But readers of the *NEJM* article had no way of knowing this.

61.     Data from the VIGOR trial that Merck submitted to the FDA show that the incidence of serious thrombotic CV events overshadowed the incidence of serious GI events.  Patients taking Vioxx were 2.37 times more likely to suffer a serious thrombotic CV event than patients taking naproxen (p=0.0016).  Patients taking Vioxx were 5 times more likely to suffer a myocardial infarction (RR 5, p=0.0015).  To put the enormity of this increase of risk in perspective, the 400% *increase* in risk of heart attack associated with Vioxx must be compared with the 30% decrease in the risk of heart attack achieved by treating people at increased risk with a cholesterol-lowering statin (the mainstay of

---

[46]  Targum SL, FDA Memorandum: Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001, P. 12, www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf Accessed July 16, 2009.

preventive cardiology).   In other words, Vioxx increases the risk of heart attack many times more (without providing greater relief) than statin therapy reduces this risk.  Yet the conclusion expressed in Merck's publication of the VIGOR results in the *NEJM* was that treatment with Vioxx was associated with fewer clinically significant GI events than treatment with naproxen - exaggerating the benefits and minimizing the risks in a biased and unbalanced manner.  In the VIGOR study, Vioxx users did experience 21 fewer serious GI complications than those who took naproxen, but they experienced 27 more serious CV events.  Nonetheless, the only CV data included in the *NEJM* article was the post-hoc outcome measure of heart attacks.  The data for confirmed thromboembolic CV serious adverse experiences were simply not included in the article.  Thus, the presentation of the results of the VIGOR study, which was funded by Merck and all of the authors of which had financial ties to Merck, in the most influential medical journal in the world left physicians uninformed about the true incidence of serious CV risks associated with Vioxx.

62.    Other important outcome measures in clinical trials are overall serious adverse events and hospitalizations.  Merck's Clinical Study Report for the VIGOR trial, dated June 20, 2000, listed "Serious clinical adverse experiences (overall)" (aka "serious adverse events" or SAEs), first among the pre-specified adverse experiences to be analyzed.[47]   In the VIGOR trial, there were 21% more serious adverse events (causing hospitalization, prolongation of hospitalization, permanent disability, cancer or death) among those taking Vioxx (P=0.013).  This finding was appropriately listed first in Table 44 of Merck's CSR (dated June 20, 2000), but was not included anywhere in the *NEJM* article published November 23, 2000, the April 2002 label change, or the Dear

---

[47] MRK-AFV0451455; pg MRK-AFV0451532.

35

Healthcare Provider letter that was issued in April 2002.[48]   And, as shown in the following slide prepared by FDA Medical review officer Dr. Lourdes Villalba, overall there were 27% more hospitalizations in patients taking Vioxx than in those taking naproxen (RR=1.27, P=0.002).   Specifically, there were 20 fewer GI hospitalizations and 41 more CV hospitalizations.[49]



## VIGOR General Safety Hospitalizations

|  | Rofecoxib N=4047 | Naproxen N=4029 |
|---|---|---|
| Any | 338 | 265 |
| CV | 65 | 24 |
| GI | 29 | 49 |
| Hematologic | 7 | 6 |
| Hepatobiliary | 12 | 8 |
| Renal | 6 | 6 |
| Other |  |  |

**Figure 5.**

63.    Neither of these important findings was reported in the *NEJM* article, though the data were known to Merck.  Merck failed to disclose to physicians the true incidence of overall risk of serious adverse events and hospitalizations associated with

---

[48] MRK-AFV0451455; pg MRK-AFV0451606.

[49] www.fda.gov.lilac.une.edu/ohrms/dockets/ac/01/slides/3677s2_06_villalba.PPT (link no longer active).

use of Vioxx, despite funding the study, having access to the data, and having two Merck employees co-authoring the manuscript.

**D.    Merck Omitted Important Thrombotic Cardiovascular Events Including Three Myocardial Infarctions that Occurred in the VIGOR Trial from the *NEJM* Article**

64.    Notwithstanding Merck's replacement in the published *NEJM* article of the pre-specified CV complication - serious thrombotic CV events - with the single CV complication of myocardial infarction, Merck was aware of, but failed to include in its *NEJM* report, three heart attacks that had occurred in people treated with Vioxx.[50] Deborah Shapiro of Merck confirmed in her deposition of April 29, 2004, that she became aware around the end of May 2000, that the statement in the November 23, 2000 *NEJM* article, "The difference in the rate of myocardial infarction between groups was not significant" for patients without a previous history of heart disease was "no longer true." Thus, Merck knew or should have known since approximately the end of May 2000 (six months before the *NEJM* article was published), that there were three more heart attacks that occurred in people taking Vioxx in the VIGOR trial that had not been included in the data analyzed for the *NEJM* article, and that the inclusion of these three heart attacks in the calculations invalidated Merck's claim that the increased risk of heart attack extended only to people with a previous history of CV disease.[51]

65.    Part of Merck's justification for excluding these three heart attacks from the *NEJM* article was that the "pre-specified" cutoff date for the inclusion of reported CV events in the VIGOR trial was February 10, 2000. However, this so-called "pre-specified cutoff date" for including reported CV events had not been identified at

---

[50] MRK-AJA0119085-MRK-AJA0119087.

[51] Deposition of Deborah Shapiro, 4/29/04 p 273-274.

the inception of the trial, but only three days earlier, on February 7, 2000.[52] Furthermore, CV events in the VIGOR trial that were <u>reported after</u> February 10, 2000, were not included in the analysis of data that was published in the *NEJM*, but GI complications that <u>occurred</u> through the end of the study on March 9, 2000, were included in this analysis.[53]

66.    A memo dated July 5, 2000, from Deborah Shapiro to Alice Reicin, Eliav Barr, and Dennis Erb,[54] leaves no doubt that Merck scientists were aware of the additional three heart attacks at least two weeks before the first of two revisions of the VIGOR article were submitted to the *NEJM*.[55] Yet the *NEJM* article (with Alise Reicin and Deborah Shapiro included as co-authors) falsely reassured doctors that in patients without a previous history of CV disease prescribing Vioxx instead of naproxen did not increase their patients' risk of heart attack, when exactly the opposite was true. Merck scientists - two of whom were listed as authors on the *NEJM* article - knew six months earlier that this statement was simply not true.

67.    On the other hand, the 11 non-Merck employee authors (including the lead author) knew about neither the differential cutoff dates for CV and GI events that occurred in the VIGOR trial, nor the three unreported heart attacks. These authors were left unaware of the inaccurate conclusion that Vioxx did not increase the rate of heart attack in patients who did not have a previous history of CV disease. In their

---

[52] MRK-AAX0002761.

[53] Kim PS, An Open Letter from Merck, December 15, 2005. http://www.merck.com/newsroom/Vioxx_withdrawal/Merck_Letter.swf (accessed May 14, 2008).

[54] Curfman GD, Morrissey S, Drazen JM, Expression of Concern Reaffirmed, N Engl J Med, 2006;354:1193 and Supplementary Appendix 1

[55] Curfman GD, Morrissey S, Drazen JM, Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," N Engl J Med 2000;343: 1520-8, 2005;353:2813-4

response to the "Expression of Concern"[56] issued by the editors of the *NEJM* about the three heart attacks that occurred in the VIGOR trial but were not included in the November 23, 2000 *NEJM* article reporting the results, the non-Merck employed authors wrote:  "These events were neither in the locked database used in the analysis for the VIGOR paper nor known to us during the [manuscript] review process."[57]

68.    In November 2000, Dr. Weinblatt was concerned about the statistically significant difference in the rate of CV events occurring in the two groups of the VIGOR trial.[58]   In a letter, dated December 20, 1999,[59] he recommended that standard operating procedures (which had been established but abandoned with acknowledgement of Merck senior management)[60] be developed for analyzing the serious CV events that occurred in the VIGOR trial.  In another letter, dated January 24, 2000, Dr. Weinblatt indicated that it would be acceptable for Merck to do a subsequent meta-analysis of CV events that included other clinical trials involving Vioxx, but reiterated the need for a separate plan to analyze CV data from the VIGOR trial prior to unblinding.[61]  Merck informed Dr. Weinblatt on February 7, 2000, it would present only the total number of serious thrombotic and embolic CV adverse events in each group unless "the results indicate a potential safety concern, [in which case] additional analyses will be performed to provide better understanding of the initial results."[62]  The February 7, 2000 letter also stated that the cutoff for CV events was going to be those

---

[56] Ibid.

[57] Bombardier C, Laine L, Burgos-Vargas R, et al, Response to Expression of Concern Regarding VIGOR Study.  *NEJM*, 2006;354:1196-8.

[58] MRK-GUE0035229.

[59] MRK-AAX0002759.

[60] MRK-AAX0002908; pg MRK-AAX0002908.

[61] MRK-AAX0002760.

[62] MRK-AAX0002761; pg MRK-AAX0002761.

*reported* by February 10, 2000,[63] while the cutoff for GI events was going to be those *occurring* through the later date of March 9, 2000.[64]  (Moreover, no steps were taken after the VIGOR DSMB meetings of November and December, 1999, to stop the VIGOR trial, despite the statistically significant increase in serious thrombotic CV events in people taking Vioxx, as the APPROVe DSMB later did when faced with similar statistically significant different CV rates.)

69.   In their Expression of Concern about the November 2000 article by Bombardier, et al, *NEJM* editors stated:

> "Three myocardial infarctions, all in the rofecoxib group, were not included in the data submitted to the *Journal.* Until the end of November 2005, we believed that these were late events that were not known to the authors in time to be included in the article published in the *Journal* on November 23, 2000.  It now appears, however, from a memorandum dated July 5, 2000, that was obtained by subpoena in the Vioxx litigation and made available to the *Journal,* that at least two of the authors knew about the three additional myocardial infarctions at least two weeks before the authors submitted the first of two revisions and 4½ months before publication of the article."

70.   The editors then explained the impact that the three omitted myocardial infarctions would have had on the article by Bombardier, et al.  Omission of the three myocardial infarctions resulted in the article understating the increase in risk of myocardial infarction associated with taking rofecoxib instead of naproxen.  But far more important, omission of the three heart attacks misled readers about the increased risk of myocardial infarction associated with Vioxx in people without a previous history of CV disease ("aspirin not indicated" patients):

---

[63] Ibid.

[64] Op. Cit. Kim.

"[Omission of the three myocardial infarctions] also resulted in the misleading conclusion that there was a difference in the risk of myocardial infarction between the aspirin indicated and aspirin not indicated groups."[65]

71.    Readers of the November 23, 2000, article, thus, were falsely reassured that Vioxx did not significantly increase the risk of myocardial infarctions in patients for whom aspirin was not indicated:

"In the [aspirin not indicated] patients the difference in the rate of myocardial infarction between groups was not significant (0.2 percent in the rofecoxib group and 0.1 percent in the naproxen group)."[66]

72.    Despite the above evidence of increased overall risk, CV risk, and heart attack risk occurring in the VIGOR trial with Vioxx instead of naproxen, Merck failed to disclose to physicians and healthcare providers the true CV and overall risks of Vioxx.

**E.    VIGOR Showed that Vioxx Did Not Reduce the Risk of Complicated GI Events for Those Not Taking Steroids**

73.    One of the pre-launch Key Issues identified in the January 29, 1999 National Cross - Functional Team Meeting for Vioxx was "Label needs to differentiate Vioxx from NSAIDs & Celebrex."[67]    The following paragraphs explain how Merck misrepresented the most important GI results of the VIGOR trial, falsely claiming that people who were not taking steroids concurrently (like the vast majority taking Vioxx and other NSAIDs) developed fewer serious GI complications when treated with Vioxx instead of naproxen.  Merck did successfully achieve its goal of having the product label

---

[65] Curfman GD, Morrissey S, Drazen JM, Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," New England Journal of Medicine, 2000;343: 1520-8, 2005;353:2813-4.

[66] Op. Cit. Bombardier, et al, 2000.

[67] MRK-EBES0039480; pg MRK-EBES0039483.

differentiate the GI risk of Vioxx compared to other NSAIDs, but it did so by including this affirmative misrepresentation of the results of the VIGOR trial.

74.     Myocardial infarction was not a pre-specified outcome measure in the VIGOR trial, and "aspirin indicated" versus "aspirin not indicated" was not a pre-specified subgroup analysis. Nonetheless, the *NEJM* article reported an analysis of these subgroups, stating that the 4% of patients who met the FDA's criteria for secondary CV prophylaxis with aspirin, but were not taking aspirin, accounted for 38% of the myocardial infarctions in the study.   The article then reported that in the non-aspirin indicated patients:

> "The difference in the rate of myocardial infarction between groups was not significant (0.2 percent in the rofecoxib group and 0.1 percent in the naproxen group)."    (As described above this claim of significant heterogeneity of treatment effect on the aspirin indicated and non-aspirin indicated subgroups were no longer valid when the three missing myocardial infarctions were included in the analysis.)

75.     Unlike myocardial infarction, complicated confirmed upper GI events (also referred to as complicated PUBs) was a pre-specified end point in the VIGOR trial. And unlike aspirin-indicated status, glucocorticoid (like prednisone, for arthritis) therapy at baseline was a pre-specified subgroup analysis. The Statistical Analysis section of the *NEJM* article stated:

> "Interactions between treatments and subgroups were assessed to determine whether the effect of rofecoxib as compared with that of naproxen was consistent in the subgroups."

76.     However, unlike myocardial infarction, the subgroup analysis for complicated confirmed upper GI events was not presented in the *NEJM* article, which

reported 16 such events among patients treated with Vioxx versus 37 in those treated with naproxen:

> "The respective rates of complicated confirmed events (perforation, obstruction, and severe upper gastrointestinal bleeding) [for rofecoxib and naproxen] were 0.6 per 100 patient-years and 1.4 per 100 patient-years (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.8; P=0.005)."

77.    Had the pre-specified subgroup analysis been presented, it would have shown that among the 56% of patients who were taking steroids at baseline, there were 27 complicated PUBs among those who took naproxen versus 7 complicated confirmed upper GI events among the Vioxx-treated patients (RR=3.9,  p=0.0004).  However, among the 44% of patients not taking glucocorticoids at baseline, there were 10 complicated confirmed upper GI events among those who took naproxen and 9 among the Vioxx-treated patients (RR=1.1, p=0.82).  Most important, reporting of this pre-specified subgroup analysis would have included the finding that the incidence of confirmed complicated GI events was significantly different in the subgroups that were and were not taking glucocorticoids at baseline.[68]   (In statistical terms: there was statistically significant heterogeneity of naproxen versus Vioxx effect on complicated GI events between those who were and were not taking steroids concurrently.)  And it would, therefore, have reported that the benefit of reduced incidence of complicated GI events associated with Vioxx occurred only in those patients taking steroids at baseline.  For the patients in the VIGOR trial not taking steroids at baseline there was almost no numerical difference and not a statistically significant reduction in the incidence of complicated GI events for those taking Vioxx.

---

[68] See Report of Nicholas Jewell.

43

78.    An accurate and not misleading presentation of the results would have disclosed the data described above, showing no benefit for non-steroid users with respect to confirmed complicated PUBs.  Had the *NEJM* article reported this significant interaction of baseline glucocorticoid use on complicated GI events the same way it reported the (purportedly) significant interaction between aspirin indicated status and myocardial infarction, it would have included the following statement:

> "However, the reduction in confirmed complicated GI events among patients taking Vioxx was limited to those patients who were taking steroids at baseline.  Among the 44% of patients not taking steroids at baseline the incidence of complicated PUBs was the same for patients taking Vioxx and naproxen."

79.    But this information was not included in the *NEJM* article, leaving readers with the impression that treatment with Vioxx instead of naproxen significantly reduces the risk of complicated GI events, in patients who were and were not taking glucocorticoids at baseline.  The article avoided reporting this significant interaction by presenting subgroup analysis (by baseline glucocorticoid use) for the risk of clinical GI events in toto without presenting analysis of the risk for complicated GI events.  The 2002 label for Vioxx went one step further, affirmatively misrepresenting the results of such subgroup analysis:

> "The risk reduction for PUBs and complicated PUBs for Vioxx compared to naproxen (approximately 50%) was maintained in patients with or without the following risk factors…A similar risk reduction for PUBs and complicated PUBs (approximately 50%) was also maintained in patients with or without…concomitant corticosteroid use." [Emphasis added.]

80.    The language adopted in the 2002 label, thus, misrepresents the results of the VIGOR trial.  There was no reduction in the incidence of complicated PUBs for non-steroid taking patients treated with Vioxx versus naproxen, and because the test for

44

interaction of baseline glucocorticoid use was statistically significant, the two subgroups - with and without baseline corticosteroid use - could not be legitimately combined. Therefore, presentation of the finding that Vioxx produced fewer complicated GI events would have to be accompanied by the finding that this was not true for patients not taking steroids at baseline.   Failure to present the former without the latter was a misrepresentation of the VIGOR trial results.

81.   The same language that appeared in the 2002 label was included in Merck's April 2002 Dear Healthcare Professional letter, repeating the affirmative misrepresentation that patients taking Vioxx in the VIGOR study experienced approximately 50% fewer complicated PUBs whether or not they were taking corticosteroids concomitantly.[69]

82.   In the VIGOR trial 56% of patients were taking steroids to treat rheumatoid arthritis[70] concurrently with an NSAID, but in the general population only a small minority of people taking NSAIDs take steroids concurrently.   Based on available information from Merck documents and peer reviewed articles, I have estimated that prior to rheumatoid arthritis becoming an approved indication for Vioxx in 2002, approximately 6.8% of patients taking Vioxx were also taking steroids concurrently.[71] After RA became an approved indication for Vioxx in 2002, the number of patients

---

[69] Dear Healthcare Professional letter, Merck, April 2002.

[70] MRK-AFV0451455;  pg MRK-AFV0451726.

[71] Graham, et al, found that 5% of patients taking Vioxx and Celebrex were taking prednisone concurrently (defined as >1000 mg total dose).  Correcting this for the finding in VIGOR that 73% of patients taking steroids were taking prednisone, approximately 6.8% of patients taking COX-2 inhibitors would have been taking steroids concurrently.  [Graham, DJ, Campen D, Hui R, et al, Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study. Lancet, 2005;365:475-81]

taking an NSAID concurrently with Vioxx would have increased by 1.4% to a total of 8.2%.[72]

F.      **Other Merck-Sponsored Clinical Trials of Vioxx**

83.     The results of other Merck-sponsored studies reinforced its early knowledge regarding the adverse risk profile of Vioxx, but were similarly inadequately disclosed.

84.     The results of Merck's studies 085 and 090, available to Merck no later than February 2000,[73] were submitted to the FDA on June 29, 2000, along with the VIGOR data.[74]   These two studies, although short-term (lasting 6 weeks), provide important information because the dose of Vioxx was only 12.5 mg/day (compared to nabumetone 1000 mg daily) and patients with a previous history of CV disease were allowed to take prophylactic aspirin.[75] [76]   In study 090, the incidence rate of serious adverse events was statistically significantly greater in patients taking Vioxx than in those taking nabumetone.[77]   Commenting on studies 085 and 090, the FDA's Cardio-

---

[72] According to a Merck document in 2001 2.5% of patients taking Vioxx had rheumatoid arthritis. Merck projected an increase to 5% of Vioxx users with rheumatoid arthritis after the label change. [MRK-AAD0106697; pg MRK-AAD0106844].  About 40% of patients with rheumatoid arthritis are treated with prednisone. [Tutuncu Z, Reed G, Kremer J, Kavanaugh A, Do patients with older-onset rheumatoid arthritis receive less aggressive treatment? Ann Rheum Dis, 2006;65:1226–29]  In the VIGOR trial, 73% of patients treated with steroids were taking prednisone. [MRK-AFV0451455;  pg MRK-AFV0451752]  Thus, 55% of patients with rheumatoid arthritis are treated with prednisone or another steroid, meaning that prior to the approval of Vioxx for the treatment of rheumatoid arthritis, among patients taking Vioxx 55% of the 2.5% of rheumatoid arthritis patients, equaling 1.4% of could be expected to be taking a steroid concurrently.  After the label change in 2002, this number doubled to 2.8% of patients taking Vioxx also taking a steroid concurrently.

[73] MRK-ABP0015346; pg MRK-ABP0015368.

[74] MRK-00420008018; pg MRK-00420008019.

[75] Targum SL, FDA Medical Officer Division of Cardio-Renal Drug Products, Consultation NDA 21-042, S-007, Review of cardiovascular safety database,  February 1, 2001. p. 24.

[76] Targum SL, FDA Medical Officer Division of Cardio-Renal Drug Products, Consultation NDA 21-042, S-007, Review of cardiovascular safety database,  February 1, 2001. p. 28-29,

[77] Targum SL, FDA Medical Officer Division of Cardio-Renal Drug Products, Consultation NDA 21-042, S-007, Review of cardiovascular safety database,  February 1, 2001. p. 31.

46

Renal Reviewer stated: "Despite lower dose, smaller sample size and aspirin use, the trend is against rofecoxib."[78]

85.    Publication of the results of the ADVANTAGE study in the *Annals of Internal Medicine (Annals)* in 2003[79] provides another example of Merck's effort to minimize the effect of the CV precautions and VIGOR data added to the April 2002 label.  (The ADVANTAGE trial, Study 102, had been completed in March 2000, but the complete study report was not submitted when the VIGOR data was submitted.)[80] [81] The FDA Medical Officer Review of the results of the ADVANTAGE study, submitted to FDA on July 12, 2001 and completed November 28, 2001,[82] found:

a.    Vioxx 25 mg "showed no overall safety advantage over naproxen 500 mg twice daily...   This is somewhat striking, given the theoretical assumptions of the COX-2 hypothesis and literature publications suggesting that COX-2 selectivity would provide superior safety than non-selective NSAIDs."

b.    "Consistent with VIGOR, there was a trend of excess in serious cardiac thrombotic events in the rofecoxib 25 mg group, compared to the naproxen group (ten and three events, respectively, as per FDA review)."

---

[78] Targum SL, FDA Medical Officer Division of Cardio-Renal Drug Products, Consultation NDA 21-042, S-007, Review of cardiovascular safety database,  February 1, 2001. p. 34.

[79] Lisse JR, Perlman M, Johansson G, et al, Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis, *Annals of Internal Medicine*, 2003;139:539-546.

[80] Villalba ML, FDA Advisory Committee Briefing Document, NDA 21-042, s007, Vioxx Gastrointestinal Safety, February 8, 2001, Overall Safety, p. 17.

[81] Villalba ML, Medical Officer Review, Vioxx S007 (Gastrointestinal Safety), March 30, 2001. p. 3.

[82] http://www.fda.gov/ohrms/dockets/AC/05/briefing/2005-4090B1_09_J-FDA-Tab-F-1.htm (Accessed May 14, 2008).

c.   "Consistent with VIGOR twice the number of patients discontinued due to cardiovascular related adverse events (40 and 21 from the rofecoxib and naproxen groups, respectively).   More patients discontinued due to HTN related events (15 and 7); edema related events (19 and 12) and laboratory adverse events (11 and 6) in the rofecoxib 25 mg group as compared to the naproxen group.  There were more CHF related events (11 and 6) in the rofecoxib group as compared to the naproxen group."

d.   "...prophylactic ASA may not eliminate the excess of cardiovascular events on rofecoxib compared to naproxen."

e.   "Data suggest that the of use low dose aspirin - such as the dose used for cardiovascular prophylaxis - may eliminate the GI advantage of rofecoxib over naproxen."

f.   The CV findings of ADVANTAGE "are of concern because this is only a 12-week study," the dose of Vioxx was 25 mg (not 50 as in VIGOR), and the population had osteo- rather than rheumatoid arthritis.

g.   Data from Alzheimer's disease studies 091 and 126 Vioxx (submitted by Merck October 1, 2001) show Vioxx is associated with significant risk compared to placebo: hypertension RR=3.3, P=0000004; edema-related complications RR=3.4, P=0.004; CHF-related complications RR=2.7, P=0.03.[83]   The reviewer's comment on this data was: "...*consistent with prior databases,*

---

[83] Calculated using openepi.com.

*rofecoxib 25 mg is associated with higher incidence of hypertension, edema, and CHF related events than placebo.*"

86.    The article reporting the results of this study published in the *Annals* in 2003 presented a very different picture:  Vioxx "had statistically significantly superior GI tolerability and led to less use of concomitant GI medications."  And specifically about the CV risk seen in the ADVANTAGE study the article reported:

> "The rofecoxib and naproxen groups did not differ significantly in the number of thrombotic cardiovascular events, as defined by the combined Antiplatelet Trialists' Collaboration end points (10 [0.4%] vs. 7 [0.3%]; *P* = 0.2) (17), or in adjudicated confirmed thrombotic events (9 [0.3%] vs. 12 [0.4%]; *P* 0.2)."

87.    The FDA Medical Officer Review of the CV events that occurred in the ADVANTAGE trial, dated November 28, 2001, disagreed with these results.  Merck reported to the FDA and in the Lisse article 9 versus 12 serious CV events for Vioxx and naproxen, respectively.  However, Table 16 of the Medical Officer Review shows the "FDA re-adjudicated" serious CV events as 12 for Vioxx and 10 for naproxen, respectively.  And instead of the statistically significant greater number of strokes in people taking naproxen (6) compared to Vioxx (0) reported in the article by Lisse, et al, the FDA re-adjudicated numbers were 4 and 1, respectively (no longer statistically significant).[84]

88.    As quoted in the *New York Times*,[85] the lead "author" of the *Annals* 2003 article said:

> "Merck designed the trial, paid for the trial, ran the trial… Merck came to me after the study was completed and said,

---

[84] http://www.fda.gov/ohrms/dockets/AC/05/briefing/2005-4090B1_09_J-FDA-Tab-F-1.htm (Accessed May 14, 2008).

[85] Berenson A, Evidence in Vioxx Suits Shows Intervention by Merck Officials, NY Times, April 24, 2005.

'We want your help to work on the paper.' The initial paper was written at Merck, and then it was sent to me for editing."

89.     This article, published in a respected peer-reviewed journal, was ghost-written and violated the standard of the International Committee of Medical Journal Editors (ICMJE) that authors make "substantial contributions" to the study, drafting of the article, and final approval of the published version.[86]  In addition, the standards of the ICMJE require that the funding source of writing assistance should be disclosed.[87]

90.     As discussed above, the November 2000 *NEJM* article left readers with the false impression that the increased risk of heart attacks that occurred in the VIGOR patients with a previous history of CV disease was the result of these patients not being allowed to take prophylactic low dose aspirin, due to the design of the study.  The article states that the patients taking naproxen were not similarly deprived of the benefit of anti-platelet therapy and thus developed fewer heart attacks, and implies that treatment with low-dose aspirin would mitigate the increased risk:

> "When the data showing a reduction in the rate of myocardial infarction in the naproxen group became available after the completion of this trial, Merck, the manufacturer of rofecoxib, notified all investigators in ongoing studies of a change in the exclusion criteria to allow patients to use low-dose aspirin."

91.     But Merck knew and did not disclose that the results of its own ADVANTAGE study (which like the VIGOR results were available to Merck in March 2000), suggested that concurrent low dose aspirin therapy in patients with a previous history of CV disease did not, in fact, protect them from the increased risk of CV

---

[86] Uniform Requirements for Manuscripts Submitted to Biomedical Journals: Writing and Editing for Biomedical Publication, ICMJE, updated October 2007, http://www.icmje.org/#author (accessed May 14, 2008).

[87] Sean P. Wajert, Dechert LLP, Assessing the Impact of Medical and Scientific Journals on Drug and Device Litigation-Part one (of Three).

complications associated with taking Vioxx 25 mg instead of naproxen.  And therefore, wrote the FDA Medical Reviewer of the ADVANTAGE study,[88] the results of ADVANTAGE argued against Merck's explanation that the increased risk of CV events seen in people taking Vioxx in the VIGOR trial could be explained entirely by the anti-platelet effect of naproxen, because unlike the VIGOR trial, people in the ADVANTAGE study taking Vioxx who had a past history of CV disease were not similarly deprived of antiplatelet therapy.

> "If the cardiovascular findings in VIGOR were all explained by naproxen anti-platelet effect, a difference would not be expected between naproxen and rofecoxib in ADVANTAGE, when patients at risk in both treatment groups were already maximally protected by ASA."[89]

92.    The FDA Medical Officer Review of the ADVANTAGE trial data concluded that the ADVANTAGE "findings are not inconsistent with VIGOR" in demonstrating an increased risk of Vioxx in people with a previous history of heart disease, whether or not they were taking aspirin (see footnote below).[90]   Furthermore, the results of 085 and

---

[88] http://www.fda.gov/ohrms/dockets/AC/05/briefing/2005-4090B1_09_J-FDA-Tab-F-1.htm (accessed May 14, 2008).

[89] Op. Cit., Villalba.

[90] Special populations: co-use of low dose ASA for cardiovascular prophylaxis.
Data suggest that the use of prophylactic ASA may not eliminate the excess of cardiovascular events on rofecoxib compared to naproxen.

The number of investigator reported serious cardiovascular adverse events for all patients (ASA users and non-users) was 23 (0.8 %) and 17 (0.6%) in the rofecoxib and naproxen groups, respectively.  The number of these events in the subgroup of patients at known cardiovascular risk – as defined by concomitant use of low dose ASA – was 7/ 352 (2.0 %) and 2/ 367 (0.5 %) in the rofecoxib and naproxen group, respectively.  These findings are not inconsistent with VIGOR, in which a post-hoc analysis conducted by the sponsor showed that the relative risk of developing serious cardiovascular thrombotic events for rofecoxib compared to naproxen increased from two fold in the whole population (RR:2.37, p= 0.001 for rofecoxib vs. naproxen) to five fold among those patients who might have benefited from prophylactic ASA (RR: 4.89, p= 0.01 for rofecoxib vs. naproxen).

If the cardiovascular findings in VIGOR were all explained by naproxen anti-platelet effect, a difference would not be expected between naproxen and rofecoxib in ADVANTAGE, when patients at risk in both treatment groups were already maximally protected by ASA.

090 combined with the preliminary results of the ADVANTAGE trial (Vioxx 25 mg versus naproxen 500 mg twice daily for 12 weeks in people with osteoarthritis) led the FDA Cardio-Renal Reviewer to cast doubt upon Merck's claim (put forth in the November 2000 *NEJM* article) that, but for the 4 percent of patients in the VIGOR trial taking Vioxx who had a history of CV disease and who were prevented from taking prophylactic aspirin because of the study design, there would not have been a significant disparity in thrombotic CV complications between Vioxx and naproxen users:

> "The sponsor claims that the majority of cardiovascular events in the VIGOR study occurred in those patients who should have been on aspirin for cardioprotection. This claim has not convinced this Medical Reviewer. The VIGOR data are consistent (i.e., increased events in the rofecoxib group) even in patients who did not fall into the 'aspirin-indicated' subgroup." [Emphasis in original.][91]

## VII. Marketing, Detailing, and Public Relations

93.    Drug representatives are a common sight in doctors' offices.  Even though their purpose is obviously to increase prescribing of the drugs they are "detailing," they have an effect on doctors' beliefs about drugs and their prescribing choices.  According to a 2002 survey conducted by the Kaiser Family Foundation, 74% of doctors consider the information provided by drug representatives very or somewhat useful, and 81% of doctors consider the information provided by drug representatives very or somewhat accurate.[92]  Thus drug representatives - acting as agents of the drug companies - exert a major influence on doctors' prescribing decisions.  Though most doctors find the information presented by drug representatives both useful and accurate, an article

---

[91] Op. cit. Targum p. 35.

[92] National Survey of Physicians *Part II: Doctors and Prescription Drugs,*  The Kaiser Family Foundation, March 2002. http://www.kff.org/rxdrugs/loader.cfm?url=/commonspot/security/getfile.cfm&PageID=13965 accessed 1/8/07.

published in the *Journal of General Internal Medicine* shows that nearly half (42%) of the material given to doctors by drug representatives made claims in violations of FDA regulations.  And only 39% of the material provided by drug representatives provided scientific evidence to back up claims.[93]  The marketing of Vioxx by drug representatives was no exception.

A.   **Misrepresentation of the CV Risk of Vioxx**

94.   In 2000 and 2001, Merck purchased approximately 370,000 reprints of the *NEJM* VIGOR article, containing the knowingly false conclusions that a) Vioxx significantly reduced the risk of complicated PUBs for patients not taking steroids concurrently, and a) did not increase the risk of heart attack for patients without a previous history of CV disease.  Then in 2002 alone, the year of the label change and Dear Healthcare Provider letter, Merck purchased 549,500 reprints of the *NEJM* VIGOR article[94] - virtually one for every prescribing physician in the U.S.  These reprints carried forward false claims of benefit and safety that detracted from the impact of the inclusion of some of the CV data from the VIGOR trial in the April 2002 label and Dear Healthcare Provider letter.  Indeed, some of the most important errors and omissions from the November 2000 *NEJM* article were not corrected in the April 2002 label change and Dear Healthcare Provider letter (the significant increase in overall serious adverse events associated with Vioxx, the risk applying to those without a previous history of CV disease, failure of aspirin to mitigate the increased risk of Vioxx in people with a previous history of CV disease, and reporting that among patients not taking glucocorticoids concurrently Vioxx caused significantly fewer complicated PUBs).

---

[93] Stryer D, Bero LA, Characteristics of Materials Distributed by Drug Companies: An Evaluation of Appropriateness, *Journal of General Internal Medicine*, 1996;11:575-583.

[94] Curfman deposition, 11/21/05, Exhibit 42; Armstrong D, How the New England Journal Missed Warning Signs on Vioxx, Wall Street Journal A-1 (May 15, 2006).

Merck knew that the overall effect of distributing the November 2000 *NEJM* article to physicians in 2002 would be exactly the opposite of the CV information from the VIGOR trial that was incorporated into the 2002 label change and Dear Healthcare Provider letter. Merck's success in minimizing the impact of the 2002 label change on physicians' attitudes about the CV risk associated with Vioxx was documented by marketing research in the first quarter of 2003. The conclusion drawn from in depth interviews of 31 physicians was:

> "Physicians do not know how to interpret the information regarding the CV data – to some, it appears to contain conflicting results. Some said that they would have to see more information, some said they have never believed VIOXX has CV [cardiovascular] issues, and yet cannot, and will not, fight patients who might ask for another COXIB by name. Only one physician (in Scottsdale) said that he proactively warns he [his] patients, and rarely starts any patients on Vioxx."[95]

95.    On February 8, 2001, the FDA Advisory Committee unanimously recommended that physicians be informed of the CV risk associated with taking Vioxx instead of naproxen in the VIGOR trial. But Merck instructed its sales representatives to do just the opposite: not to discuss the results of the VIGOR trial and to avoid bringing up the CV risk issue.[96] The day after the Advisory Committee's suggestion was made, Merck sent out a bulletin to all field personnel with responsibility for Vioxx, National Account Executives and Customer Managers instructing:

> "DO NOT INITIATE DISCUSSION ON THE FDA ARTHRITIS ADVISORY COMMITTEE (ADVISORY COMMITTEE) REVIEW OR THE RESULTS OF THE VIOXX GI OUTCOMES RESEARCH (VIGOR) STUDY. YOU MAY

---

[95] Expert Report of Cornelia Pechmann PhD, pp 55-6.

[96] Waxman H, The Lessons of Vioxx - Drug Safety and Sales, *NEJM*, 2005;352:2576-8.

RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW."[97]

96.    Even after the FDA Cardio-Renal reviewer had rejected Merck's hypothesis that the increased rate of CV complications that occurred in people taking Vioxx in the VIGOR trial was due to the anti-platelet effect of naproxen, Merck persisted in making this argument.  Its Scientific Communication Plan for Vioxx, dated March 27, 2001, stated that the CV messages for February through May 2001 included that CV effects of Vioxx were similar to placebo (despite osteoarthritis studies 010 through 090 showing a relative risk for Vioxx of 1.9 as of that date, see below), and still made the rejected argument that "difference in MIs in VIGOR due to cardioprotection with naproxen…"[98]

B.    Merck Used the "Cardiovascular Card" to Mislead Physicians

97.    Rather than presenting the most up-to-date and complete risk information about Vioxx, Merck's sales representatives were instructed specifically how to "dodge" healthcare providers' concerns about the safety of Vioxx and incentivized to increase Vioxx sales[99] and given "obstacle handling" tools, including a "Cardiovascular Card"[100] - first available on April 28, 2000[101] - that substituted far less "hardy" scientific data than was available and failed to present the VIGOR CV risk results.

98.    The Cardiovascular Card presented data from small dissimilar pre-approval studies of varied duration (completed by the end of 1998) that Merck's drug representatives used to "educate" doctors about the CV safety of Vioxx.  But Merck's

[97] MRK-H.3STM001173.

[98] MRK-ABO0000257.

[99] MRK-AAR0007240-MRK-AAR0007248, MRK-AAR0021103-MRK-AAR0021108.

[100] http://oversight.house.gov/features/Vioxx/Tab5.pdf (accessed May 14, 2008).

[101] Rep. Henry A. Waxman, Memorandum re: The Marketing of Vioxx to Physicians, May 5, 2005, p. 17. http://oversight.house.gov/documents/20050505114932-41272.pdf Accessed July 15, 2009.

"education" failed to inform doctors of known risks and failed to update information about those risks as more data became available.

99.    The data presented in the Cardiovascular Card were pooled results from Phase IIb/III pre-approval studies completed prior to submission of the NDA for Vioxx, so-called Study 069.[102]  The FDA rejected the validity of pooling these trials because of the variability of length, dose, and comparator in 1999[103] and 2001.[104]  And again rejected such pooling in 2002, specifically referring to the proposed inclusion of the CV results from these pooled studies in the post-VIGOR label to show lack of CV risk:

> "Lack of differences [in cardiovascular thrombotic events] seen in a meta-analysis of phase IIb III studies are not adequately informative to warrant inclusion in the label. Phase IIb III studies included trials of different designs, size and duration, using different doses of Vioxx and different comparators."[105]

100.    The Cardiovascular Card provided incomplete and misleading data to prescribers in part because it failed to include all of the OA studies that were completed by April 2000, when the card was first used.   In particular, studies 085 and 090, completed in March and May 1999, respectively were not included.  The data for both studies were available no later than February 2000, [106] [107]  two months prior to the initial

---

[102] MRK-OS420124401-3 [Section B-47].  Note that the number of placebo patients in 6-week studies osteoarthritis studies (Tables E-73) is 412 and the number in 6 month OA studies is 371, totaling 783 -the number of placebo patients included in CV card.  Similarly, the number of patients taking 12.5 mg and 25 mg of Vioxx in the six week and six month OA studies is 1215 and 1614, respectively - the same as presented in the CV card.

[103] FDA Statistical Review Vioxx NDA, May 19. 1999, p. 15. http://www.accessdata.fda.gov/drugsatfda_docs/nda/99/021042_52_vioxx_statr_P2.pdf, accessed October 9, 2009.

[104] FDA Advisory Committee Briefing Document, Vioxx Gastrointestinal Safety, February 8, 2001, http://www.accessdata.fda.gov/drugsatfda_docs/nda/99/021042_52_vioxx_statr_P2.pdf (accessed May 14, 2008) p. 19.

[105] Telecon Minutes, Labeling Negotiations, February 8, 2002 p. 7.

[106] MRK-ABP0015346; pg MRK-ABP0015368, data available 4Q99.

[107] MRK-ABP0015346; pg MRK-ABP0015368, data available 2/2000.

use of the Cardiovascular Card. With the timely inclusion of data from these two additional studies (6 thrombotic CV events in people treated with Vioxx, none in people treated with placebo), the relative risk of thrombotic CV complications associated with Vioxx compared to placebo increased to 1.9.[108] This level of risk - even though not statistically significant - certainly was important for potential prescribers to know about, and would have caused concern for a drug that provided no better symptom relief than far less expensive non-selective NSAIDs.

101. Also omitted was the meta-analysis done by Merck's own statistician showing that when all data available in October 2000 were pooled together, Vioxx was more than twice as likely to cause a heart attack as other NSAIDs, RR=2.02 (1.14, 3.55),[109] belying the bar graph in the Cardiovascular Card, which showed that the risk of heart attack with Vioxx was virtually identical to that of other NSAIDS (0.6 versus 0.5 myocardial infarctions per 100 patient years, respectively).

102. The Cardiovascular Card was re-validated for use in August 2001,[110] but was not updated to include data from 085, 090, VIGOR or ADVANTAGE and; therefore, misled prescribers about the CV safety of Vioxx.

103. Cardiovascular Card mortality data showed that overall and CV mortality in patients taking Vioxx is virtually identical to those taking placebo, but did not include Alzheimer's studies mortality data known by Merck statistician, Deborah Shapiro, to be 30 versus 10 (Vioxx and placebo respectively) on January 29, 2001,[111] re-calculated by Merck statistician, Joshua Chen, on May 1, 2001, showing 38 deaths among people

---

[108] MRK-18940080095 Rofecoxib CV update—data through 10-June '03, Table 13.

[109] MRK-NJ0070364.

[110] MRK-AF10136524 [236 Email from Linda Coppola CV car 1 year Revalidation].

[111] MRK-ACF0004015.

taking Vioxx compared to 16 deaths among an equal number of people taking placebo, p = 0.001.[112]  This p-value means that there are 999 chances out of 1000 that Vioxx increases the risk of death in this population.   An April 8, 2001, internal Merck memorandum presented combined mortality data from studies 078 and 091 based on intention-to-treat analysis.  The Hazard Ratios for death among patients taking Vioxx in the two studies were 4.43 and 2.55 (both statistically significant), respectively.  At the completion of these studies there were 21 deaths from heart disease among patients treated with Vioxx compared to 6 in the placebo group (HR 3.84, P=<0.005).[113] (Despite the significantly higher death rate noted in the intention-to-treat analysis of interim data, the combined data were not published or made known to the medical community until made available through litigation.)[114]  In addition, Merck did not notify local institutional review boards about the significant increase in deaths in the study as a whole - there was no DSMB to oversee the safety of study participants - so Study 078 continued for about two years after the significant increase in the risk of death was known to Merck).[115]  Not only did Merck choose not to include this information in the Cardiovascular Card so that prescribers remained uninformed about this most serious of all drug risks, but Merck went even further and presented outdated and virtually meaningless mortality data from short studies that had been pooled together and expressed misleadingly as deaths per 100 patient-years (when the average length of these studies was in fact three months or less - hardly enough time for differences in mortality to appear when so few events occurred).

---

[112] MRK-ABY0030000 to 3030.

[113] Psaty BM, Kronmal RA, Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment, Journal of the American Medical Association, 2008;299:1813-17.

[114] Ibid.

[115] Ibid.

104.   Despite the increased CV risk, Merck  continued to instruct its sales force to focus on efficacy - which had never been shown to be superior to two Aleve tablets bought over-the-counter - and use the Cardiovascular Card to handle "obstacles" such as CV risk when questioned by physicians through its launch of marketing programs like Project Offense.   Merck's "Project Offense Meeting"[116] with drug representatives reviewed Q4 2001 goals, including:

> "1.2 Obstacle Handling: Certify rep competency handling CV obstacles utilizing CV card, obstacle response and PIR process when asked unsolicited questions regarding the CV safety of Vioxx."[117]

In other words, sales representatives were not to bring up the CV safety of Vioxx in their presentation of information about Vioxx to doctors, and they were provided with scripted responses designed to parry inquiries about the CV risk of Vioxx demonstrated in the VIGOR trial should they be initiated by physicians.   These instructions came after the February 2001 Advisory Committee had voted unanimously that physicians should be informed about the CV risks associated with taking Vioxx instead of naproxen in the VIGOR trial.[118]

105.   The recommendation presented at the sales representatives' "Project Offense" meeting was consistent with the Bulletin that Merck sent out to all its field representatives one day after the Advisory Committee's vote:   "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS COMMITTEE...OR THE RESULTS OF THE...VIGOR STUDY."[119]   If physicians asked about the VIGOR study, Merck representatives were directed to respond, "Because this study is not in the label,

---

[116] MRK-H.10STM001118.

[117] MRK-H.10STM001118; pg MRK-H.10STM001120.

[118] Waxman H, The Lessons of Vioxx - Drug Safety and Sales, *NEJM*, 2005;352:2576-8.

[119] MRK-H.3STM001173.

I cannot discuss the study with you."[120]  Accordingly, Merck's training and bulletins to its field representatives served, for the most part, to minimize the CV and overall safety risk of Vioxx seen in the VIGOR and other trials.

106.   An e-mail, dated August 22, 2001, documents Merck's "re-validation of the Cardiovascular Card for another year."[121]  Thus, Merck committed its representatives to another year of "educating" doctors about the CV risk of Vioxx using this selectively self-serving data despite:

a.   The FDA's rejection (described above) of "Study 069," which was the compilation of pre-approval studies presented in the Cardiovascular Card, and which was later deemed unacceptable for inclusion on the revised label of April 2002.

b.   The FDA Advisory Committee's unanimous recommendation six months earlier to inform practicing physicians of the CV results of VIGOR.

c.   The availability of far more comprehensive data from the VIGOR trial which showed a significant increase in the incidence of serious CV events in people taking Vioxx.

d.   Merck's May 2001 update of mortality data from its Alzheimer's studies showing that the death rate among those taking Vioxx 25 mg per day was 2.4 times greater than for those taking placebo (P=0.001).[122]

---

[120] MRK-H.10STM001118; pg MRK-H.10STM001130.
[121] MRK-AFI0136524.
[122] MRK-ABY0030000; pg MRK-ABY0030001.

107.   Nonetheless, in August 2001, Merck re-committed its representatives to misinforming physicians about the CV risk of Vioxx, and even requested "that we should increase the # of pieces that a rep can order...due to recent current events."[123]  The "recent events" referred to were most likely the publication of Mukherjee article in *Journal of the American Medical Association (JAMA)* (published the very same day as this e-mail), informing physicians for the first time in a major medical journal that the risk of serious thrombotic CV complications (the pre-specified CV complication that had not been reported in the *NEJM* article of November 2000) among those taking Vioxx in the VIGOR trial was 2.38 times greater than for those taking naproxen, p=0.002.[124]

108.   In the months following the adoption of the April 2002 label revision, Merck steadfastly stuck to its strategy of attempting to minimize the CV risk associated with Vioxx.  In Merck's "Long Range Operating Plan: 2002-2007," dated July 15, 2002, (three months after the new label for Vioxx was adopted) Merck projected $6 billion in COX-2 sales in 2007, "provided we...[e]ffectively convey the benefit-risk (CV safety) profile of our coxibs."[125]

C.     **Merck-Sponsored Publications Misled About CV Risk/Safety of Vioxx**

109.   The data in the Cardiovascular Card were reinforced by several Merck-sponsored articles that purported to show that Vioxx did not increase the risk of thrombotic CV and renovascular events:  Konstam, et al, 2001; Reicin, et al, 2002; Gertz, et al, 2002; and Weir, et al, 2003.  The purpose of these publications was identified in background material for the HHPAC Meeting on April 20, 2000 "related to

---

[123] MRK-AFI0136524.

[124] Mukherjee D, Nissen SE, Topol EJ, Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, *JAMA*, 2001;286:954-59.

[125] MRK-ABI0011027 to 1081.

the Vioxx/MK-0663 Interim review."[126]   The memo was distributed to attendees of this meeting, including Dr. Gertz and Dr. Reicin.  Marketing needs for Vioxx identified in this memo included:

> "Rapid publication and communication at opinion leader events of phase III OA results demonstrating comparable incidence of thromboembolic events with Vioxx, placebo, and NSAID comparators."[127]

> The presentation for the Arthritis and Analgesia Core Franchise meeting of April 17, 2001[128] reconfirmed this publication plan, citing Merck's objective of establishing "favorable safety profile for and within the class" for Vioxx. The publication plan for Vioxx included "renovascular, Phase IIb/III OA and IIb-V meta-analysis."[129]

110.   The article by Konstam, et al, published in *Circulation* in November 2001 and titled "Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib," relied upon data from trials that had been completed and unblinded by early September 2000, as well as interim data from Alzheimer's studies as of September 15, 2000.[130] The "major outcome" presented in this article was the "combined endpoint used by the Antiplatelet Trialists' Collaboration (APTC endpoint)."  This endpoint differs from the endpoint identified in Merck's original SOP for the analysis of thrombotic CV complications in its trials of COX-2 specific inhibitors,[131] [132] and also delineated in the

---

[126] MRK-AB10002269.

[127] MRK-AB10002269; p MRK-AB10002307.

[128] MRK-AHO0005433.

[129] MRK-AAD0226833; pg MRK-AAD0226846.

[130] Konstam MA, Weir MR, Reicin, A et al, Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib, *Circulation,* 2001; 104: 2280-8.

[131] Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Trials, December 30, 1997; MRK-ABS0037036. pp. MRK-ABS0037040, MRK-ABS0037043.

[132] Standard Operating Procedure for the Surveillance, Monitoring, and Adjudication of Acute Thrombotic Vascular Events in Clinical Trials of COX-2 specific Inhibitors, August 30, 1999, MRK-18940077810; pg MRK-18940077827.

FDA's CV safety review of the VIGOR trial data.[133]  The thrombotic CV complications in the SOP's definition include a) coronary events: myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, and sudden or unexplained death; b) cerebrovascular events: stroke and transient ischemic attack; and c) peripheral events: venous thrombosis and pulmonary embolism.[134]   (This is the primary endpoint presented in the article by Reicin, et al, 2002, although this article failed to include available data, discussed below.)  Use of APTC endpoints minimizes the apparent CV risk of Vioxx by not including peripheral venous thrombosis, unstable angina, or transient ischemic attacks.

111.   The article by Konstam, et al, made the argument that certain non-selective NSAIDs (including naproxen) can reduce the risk of CV complications, although this argument had been rejected in Merck's own SOP, it's own consultants, and the FDA's Cardio-Renal review of the VIGOR trial data (all described above).  This analysis included all osteoarthritis studies from 029 through 090.  The relative risk of APTC CV complications associated with Vioxx compared to placebo in the osteoarthritis trials was reported to be 1.53.  Had the outcome measure for this analysis been the one identified in the SOP, serious thrombotic CV complications, the relative risk for studies 029 through 090 would have been 1.78.[135]  And had the article by Konstam, et al, also included Study 010 (which had been completed no later than February 24, 1998),[136] the

---

[133] www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf Accessed July 15, 2009.  P 11: "The SOP for the vascular event monitoring and adjudication can be found in 088c: Category 3: Appendix 3.2.1(pdf. Pages 1678-1691.  Original submission 6/29/00)."

[134] Ibid.

[135] MRK-18940080062; pg MRK-18940080095.

[136] MRK-OS420045785; pg MRK-OS420045791.

relative risk for Vioxx would have been 1.9, i.e., people taking Vioxx developed 90% more thrombotic CV complications than people taking placebo.

112.   In addition to rheumatoid arthritis and osteoarthritis categories of treatment, the article by Konstam, et al, included a category called "Alzheimer's/low back pain." The relative risk of CV complications associated with Vioxx in this category is much lower than the other two, 0.68 - neutralizing the (non-significant) increases in risk associated with rheumatoid and osteoarthritis:

TABLE 3.   Pooled Analysis of APTC End Point: Rofecoxib Relative to Placebo

| Indication for Treatment | Rofecoxib | | Placebo | | Relative Risk (95% CI) |
|---|---|---|---|---|---|
| | No. of Patients | APTC Events/ Patient-Years at Risk (Rate)* | No. of Patients | APTC Events/ Patient-Years at Risk (Rate)* | |
| Rheumatoid arthritis | 1622 | 3/337 (0.89) | 989 | 1/201 (0.50) | 1.78 (0.14; 9.37) |
| Osteoarthritis | 3165 | 12/655 (1.83) | 1215 | 3/232 (1.30) | 1.53 (0.43, 5.44) |
| Alzheimer's/low back pain | 1503 | 18/1197 (1.50) | 1278 | 28/1246 (2.25) | 0.68 (0.37, 1.23) |
| Total | 6290 | 33/2189 (1.51) | 3482 | 32/1678 (1.91) | 0.84 (0.51; 1.38) |

*Rate=APTC events per 100 patient-years at risk.

**Figure 6.**

113.   Merck's SOP for the surveillance, monitoring, and adjudication of acute thromboembolic vascular events in clinical trials of Vioxx and other COX-2 selective inhibitors [137] called for analysis of studies to be performed by predetermined blocks - according to study design, indication, and date of completion.[138]   Block 3, which included studies of Alzheimer's disease (Studies 078 and 091) and the colorectal adenoma study (APPROVe),[139] was not intended to be analyzed until the fourth quarter

---

[137] MRK-18940077810 Dated August 30, 1999 and revised on January 21, 2000.

[138] MRK-18940077810; pg  MRK-18940077827.

[139] MRK-AGV0021318; pg MRK-AGV0021321.

of 2003.[140]   Merck's strategy for evaluating the incidence of serious thromboembolic events in its COX-2 specific inhibitor program did not include analysis of events that occurred in studies of low back pain.

114.   Had Konstam, et al, analyzed the two blocks of studies that had been planned to be available at the time of submission of their article[141] and had the analysis been based upon the more comprehensive endpoint of thrombotic CV complications (identified in Merck's SOP; the April 16, 2000, draft of the *NEJM* VIGOR article; and the FDA's CV safety review of the VIGOR data), the relative risk of thrombotic CV complications in patients taking Vioxx compared to placebo would have been reported as more than double and just missing statistical significance (RR 2.4, P=0.06 ).

115.   The second article, published in January 2002, was authored by Merck employees Alise Reicin, Deborah Shapiro, Rhoda Sperling, and Eliav Barr.[142]   Despite having been submitted July 2, 2001, this article included data only from the pre-approval osteoarthritis studies 029 through 058, all of which had been completed by the end of 1998.   The article provided false reassurance that in clinical trials of patients with osteoarthritis Vioxx did not increase the risk of thrombotic CV events, concluding:

> "In summary, an analysis of the rofecoxib osteoarthritis development program found no difference between rofecoxib, comparative nonselective NSAIDs, and placebo in the risks of cardiovascular thrombotic events."

116.   Had the authors included Studies 010 through 090 - which had been included in the earlier article by Konstam, et al, the data for which were available no

---

[140] MRK-AGV0021318; pg MRK-AGV0021319.

[141] MRK-18940080062: pg MRK-18940080095 As reported in Table 13 of the Updated Cardiovascular Pooled Analysis, without OA study 136, but with OA study 010.

[142] Reicin AS, Shapiro D, Sperling RS, et al, Comparison of Cardiovascular Thrombotic Events in Patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-inflammatory Drugs (Ibuprofen, Diclofenac, and Nabumetone), American Journal of Cardiology, 2002:89:204-9.

later than February 2000[143] (17 months before this article was submitted) - rather than providing reassurance about the CV safety of Vioxx, exactly the opposite message would have been conveyed:  Instead of the reported relative risk of 0.94 associated with placebo versus Vioxx, the relative risk of serious thrombotic CV complications in patients taking Vioxx instead of placebo would have been 1.9.  Although this risk did not reach statistical significance, it certainly would have sounded an alarm for potential prescribers.

117.   A bulletin for Vioxx sales representatives provided background information on using reprints of the article by Reicin, et al, and instructed them how to respond to questions.[144]  When sales representatives were asked questions about this article or the VIGOR trial, they were instructed to stay on script, offer to submit a Physician Information Request (PIR), and:

> "Then, you should transition to your approved promotional messages for Vioxx.   DO NOT initiate discussions or respond to questions about this analysis or about VIGOR."

118.   Had Merck followed through on the plan outlined in the "CRRC" meeting notes for January 3, 2001, to submit a manuscript for publication reporting the CV safety in Phase III osteoarthritis studies in December 2000[145] (033 through 090), it would have reported a 50% increase in the risk of CV complications in people taking Vioxx compared to those treated with placebo.[146]   But this did not happen because, as documented in the CRRC meeting notes of February 7, 2001, "plans to publish this data

---

[143] MRK-ABP0015346; pg MRK-ABP0015368.

[144] Bulletin for Vioxx: BACKGROUND INFORMATION ONLY: Reprint Review of "Comparison of Cardiovascular Thrombotic Events In Patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-inflammatory Drugs.

[145] MRK-ABP0015346; pg MRK-ABP0015352.

[146] MRK-18940080062: pg MRK-18940080095 Table 13.

have been terminated."[147]   Instead, the team was to "focus on submitting a meta-analysis of CV safety that was prepared to support the VIGOR Advisory committee to the Amer. J. of Cardiology in 1Q01,"[148]  the journal in which the article by Reicin, et al, was later published.

119.   An article written by Barry Gertz, et al (all Merck employees), compared renovascular adverse events in patients taking Vioxx and non-selective NSAIDs in the pre-approval osteoarthritis studies 010 through 058.[149]  Like the article by Reicin, et al, this article was published in 2002 but included only data from the osteoarthritis studies that had been completed by the end of 1998.  Unlike the article by Reicin, et al, the Gertz article included data from Study 010, showing once again that there was no reason to have left this out of the article by Reicin et al or the data presented in the Cardiovascular Card.   The article concluded that data from the pre-approval osteoarthritis studies, including over 5,000 patients, showed the renal safety profile for Vioxx "was generally similar to that of the comparator, non-selective NSAIDs which were studied."   The article made no mention of the renal safety profile from the 8,000 patient data set provided by the VIGOR trial, the Clinical Study Report for which was completed June 20, 2000.[150]  In contrast to the findings from the osteoarthritis studies presented in the article by Gertz, et al, the VIGOR trial showed (albeit with Vioxx 50 mg) significantly greater frequency of lower extremity edema in patients taking

---

[147] MRK-ABP0016015; pg MRK-ABP0016021.

[148] Ibid.

[149]  Gertz BJ, Krupa D, Bolognese, JA, et al, A Comparison of Adverse Renovascular Experiences Among Osteoarthritis Patients Treated with Rofecoxib and Comparator Non-selective Non-steroids Anti-inflammatory Agents, Current Medical Research and Opinion, 2002;2:82-91.

[150] MRK-AFV0451455.

Vioxx[151] (RR=1.7, p=0.001); significantly more hypertension in people taking Vioxx[152] (RR=1.83, p=.0000005); and significantly more discontinuations for congestive heart failure and hypertension.[153]   The VIGOR trial used Vioxx 50 mg, but the greater clinical experience and significant findings certainly would have been of great interest to the readers of the article by Gertz, et al.   Compounding this omission, the report of the VIGOR trial published in *NEJM* minimized these significant findings as well:

> "The incidence of adverse effects related to renal function was low and was similar in the two groups (1.2 percent in the rofecoxib group and 0.9 percent in the naproxen group); only 0.2 percent of patients in each group discontinued treatment because of these adverse effects."[154]

120.   Thus the significant increase in hypertension, edema and congestive heart failure that occurred in the patients taking Vioxx in the VIGOR trial were not presented in the *NEJM* article and not mentioned in the subsequent reassuring article by Gertz, et al.

121.   Yet another article purporting to show the CV safety of rofecoxib was authored by Matthew Weir (not disclosed as having a financial relationship with Merck, although he was identified as a paid consultant to Merck in the article by Konstam, et al, on which he was a co-author and as one of Merck's "preferred external speakers" [155]) and three Merck employees.[156]   The article states that among 5,435 osteoarthritis trial participants, there were similar rates of CV thrombotic events reported in patients who

---

[151] MRK-AFV0451455; pg MRK-AFV0451630.

[152] Ibid.

[153] MRK-AFV0451455; pg MRK-AFV0451652.

[154] Op. Cit. Bombardier, et al, 2000.

[155] MRK-ABO0000257; pg MRK-ABO0000263.

[156] Weir MR, Sperling RS, Reicin A, Gertz BJ, Selective COX-2 inhibition and cardiovascular effects: A review of the rofecoxib development program, American Heart Journal, 2003;146:591-604.

took rofecoxib and placebo. The manuscript for this article was submitted on May 13, 2002. According to the number of patients included in Table II, this article included patients in Studies 029 through 090. Table II of the article did not include patients in Study 010, nor did it include patients in study 136, the file for which had been frozen April 25, 2002[157] - three weeks before submission of the article. (The Clinical Study Report for Study 136 was due to be published October 14, 2002, the manuscript was accepted November 8, 2002, and published in October 2003 - certainly enough time to add important data.) Had the paper truly included all of the osteoarthritis trial participants to date - Studies 010 through 136 - it would have shown that the relative risk of CV complications in people taking Vioxx was 3.2 times higher than people taking placebo, P=0.03 (Fisher exact).[158]

122. The above four articles fulfill the objectives of the Scientific Communication Plan for Vioxx, dated March 27, 2001:

    a.    "Expedite and expand dissemination of Merck's position on CV effects and renal effects of Vioxx to key audiences..."

    b.    "Regain the offensive by shifting physicians' focus back to the superior pain relief and superior safety provided by Vioxx."[159]

123. With regard to pain relief, most studies found no significant difference between Vioxx and other NSAIDS. With regard to safety, as described above, there was strong and mounting evidence that Vioxx increased the risk of serious thrombotic CV events.

---

[157] MRK-ABS-0415816.

[158] MRK-18940080095 Rofecoxib CV update—data through 10-June '03, Table 13, plus data from Study 010.

[159] MRK-ABO0000257.

124.   The outdated and invalidly pooled data in the Cardiovascular Card and the four Merck-sponsored articles cited above served not just to convince doctors that they did not need to be concerned about the CV risks of Vioxx, but also served to insulate them from appreciating the CV risk from the VIGOR trial that was surely going to be included in the updated label for Vioxx.   In my opinion, a true and fully informative Cardiovascular Card and Merck-sponsored articles would have disclosed that the true relative risk of serious thrombotic CV events for Vioxx compared to placebo was 1.9 in Merck's osteoarthritis studies at the time of publication of the Cardiovascular Card, that the VIGOR trial found that Vioxx caused more than twice as many serious CV complications as naproxen (RR 2.38, p=0.0016) and five times as many heart attacks (RR 5.0, p=0.0016), and that in its Alzheimer's studies patients taking 25 mg of Vioxx daily were three times as likely to die as those taking placebo.   In the face of such disclosures of increased CV risk - especially in combination with the lack of reduction of complicated GI events in people not taking steroids in the VIGOR trial – few, if any, physicians would have prescribed Vioxx and those who did certainly would have had to engage in lengthy risk-reward discussions about Vioxx with patients.

125.   Another Merck-funded article, by Laine, et al, published in *Gastroenterology* in 2002, concluded that data from the VIGOR trial showed that Vioxx provided significant reduction in NSAID-related GI events in high-risk patients.[160]   The article stated that GI events were reduced for patients not taking steroids at baseline, implying statistical significance when the difference was, in fact, not significant for complicated events.   The article reported that there was a "quantitative interaction

---

[160] Laine L, Bombardier C, Hawkey CJ, et al, Stratifying the Risk of NSAID-Related Upper Gastrointestinal Clinical Events: Results of Double-Blind Outcomes Study in Patients with Rheumatoid Arthritis, Gastroenterology, 2002;123:1006-12.

(P=0.043) between treatment and baseline use of corticosteroids..." There was no mention that there was not a statistically significant reduction nor even a numerical reduction in complicated GI events associated with Vioxx in patients not taking steroids at baseline. Based on the data presented in this article, readers were left with two fundamental misconceptions: 1) the reduction in "clinically important" GI events was significant in those patients not taking steroids at baseline; and 2) that patients not taking steroids at baseline were less likely to experience complicated GI events when taking Vioxx than when taking naproxen.

### D.   PIRs Misled Physicians

126.   An example of a PIR response from Merck to a physician requesting more information about the CV effects of selective COX-2 inhibitors is provided by a PIR letter dated October 2, 2001. The letter contains several misrepresentations that minimized and obfuscated the increased CV risk of Vioxx compared to naproxen shown in the VIGOR trial. The PIR states that the article by Mukherjee, et al,[161] noted "that the rate of myocardial infarction in rheumatoid arthritis patients treated with Vioxx was greater than in patients treated with naproxen." This hides the more important and pre-specified CV endpoint reported in the article by Mukherjee, et al:

> "The results from VIGOR showed that the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attack s) with rofecoxib treatment, compared with naproxen was 2.38 (95% confidence interval, 1.39-4.00; P=.002)."

---

[161] MRK-HND0000922.

127.   The PIR that supposedly responded to physician inquiries about the article by Mukherjee, et al, thus misrepresented the findings from VIGOR presented in that article.

128.   The PIR misrepresented the GI findings of the VIGOR trial, claiming that "Vioxx had a significantly lower incidence of all primary and secondary gastrointestinal endpoints."   As discussed above, the secondary (and arguably the most important) endpoint of complicated GI events was not significantly reduced in the pre-specified subgroup of those not being treated with steroids concurrently.   The PIR failed to present the results from the pre-specified CV endpoint in the VIGOR trial: serious thrombotic CV events.   Instead it presented single components of this aggregate endpoint, with myocardial infarction being the only complication significantly increased by Vioxx.

129.   The PIR offered the single explanation for the lower incidence of MIs in people taking naproxen in the VIGOR trial as "naproxen's ability to block thromboxane A2 and platelet aggregation," i.e., the cardioprotective effect of naproxen.   As discussed above, this single explanation ignored Merck's own consultants having expressed concern about the possibility of Vioxx being pro-thrombotic; the FDA's cardiorenal reviewer having stating in her evaluation of the VIGOR data that, "This hypothesis is not supported by any prospective placebo-controlled trials with naproxen;"[162] and Merck having received a Warning Letter from Division of Marketing, Advertising and Communications (DDMAC) on September 17, 2001, stating that there were no adequate studies showing that naproxen was…

---

[162] Targum SL, FDA Memorandum: Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001 pp 34-35 www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf Accessed July 16, 2009.

"...clinically effective in decreasing the risk of MIs. Therefore, your representation that naproxen prolongs bleeding time and inhibits platelets identically to aspirin is misleading and minimizes the potential seriousness of this finding...it is also possible that Vioxx has pro-thrombotic properties."[163]

The PIR was issued two weeks after Merck had received this Warning Letter.

130.   And finally, the PIR provided reassuring data on the APTC endpoint for a meta-analysis of Phase IIb-V studies of Vioxx - similar to the article by Konstam, et al. Like Konstam, this meta-analysis diluted the evidence of excess CV risk in two ways. First, the endpoint was changed from serious thrombotic CV complications to APTC events, removing endpoints that Merck had prespecified for the analysis, and thus, artificially lowering the apparent relative risk of Vioxx treatment in both osteoarthritis and rheumatoid arthritis populations.   Second, the evidence of excess risk in the arthritis trials was diluted by the addition of patients from the Alzheimer's disease trials that were not scheduled to be analyzed until the fourth quarter of 2003.   (Osteoarthritis and Rheumatoid Arthritis trials in Blocks 1 and 2 had been planned to be analyzed in the fourth quarter of 2001.[164])   Further, neither the Konstam article nor the subsequent meta-analysis disclosed that the Alzheimer's studies were compromised by poor compliance, with a substantial percentage of patients (39%) who did not take Vioxx as described in the study protocol.[165]   As shown above, had the data been presented as planned for Blocks 1 and 2 with the pre-specified endpoint (serious thrombotic CV events rather than APTC endpoints), the PIR would not have been nearly as reassuring:

---

[163] Letter from Thomas W. Abrams dated 9-17-01, Director, DDMAC, FDA to Raymond Gilmartin, President and CEO Merck & Co., Inc.

[164] MRK-AGV0021318; pg MRK-AGV0021319.

[165] Study 078 CSR MRK-1290007833; pg MRK-1290007951.

Vioxx would have been shown to more than double the risk of serious thrombotic CV complications in comparison to placebo (RR=2.4, p=0.06).

131.   Another PIR, dated May 17, 2004, parallels the one described above in containing a similarly truncated summary of the article by Mukherjee, et al, and citing the incomplete and misleading articles by Konstam, et al (2001), and Reicin, et al (2002), described above.[166]   This PIR also included another study by Reicin, et al, published in 2003 (not published at the time of the PIR described above) purporting to present CV safety data (serious thrombotic CV and APTC events) from the pooled studies of patients with Alzheimer's Disease or cognitive impairment.   The article concluded, as reported in the PIR:

> "...rofecoxib continued to have a similar CV profile to placebo in this analysis of serious cardiovascular adverse events in elderly patients."[167]

The PIR failed to report that data from these same studies had shown the overall death rate was two and a half times higher among people taking Vioxx than people taking placebo, 38 versus 16, respectively (RR 2.49, p=0.001);[168] and the death rate from heart disease in particular was more than three and a half times higher for Vioxx than placebo, 21 versus 6, respectively (RR 3.84, p<0.005).[169] [170]

---

[166] LaAG-VIOXX-003290; pp LaAG-VIOXX-003293-8.

[167] LaAG-VIOXX-003290; pg LaAG-VIOXX-003294.

[168] MRK-ABY0030000; pg  MRK-ABY0030001.

[169] Analysis is based on the July 2001 Safety Update Report for study091 and the Clinical Study Report for study 078 filed with the FDA in July 2003.  (The latter occurred after publication of the article by Reicin et al, however data from these studies had been viewed intermittently and it is extremely unlikely that the ratio of deaths from heart disease differed in the months prior to publication of this article.)

[170] Psaty BM, Kronmal RA, Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment: A Case Study Based on Documents from Rofecoxib Litigation, *JAMA*, 2008 ;299(15):1813-17.

E.    **Medical Journal Advertising**

132.    Merck ran advertisements for Vioxx in medical journals that provided materially incomplete impressions about the safety and efficacy of Vioxx in comparison to other NSAIDs.  For example, a medical journal advertisement that ran from October 2000 through August 2001 led with "Once Daily," then under "Selected Safety Information" made no mention of the potential to increase the risk of CV complications, or that Merck's VIGOR trial had shown that overall Vioxx causes significantly more serious adverse events than naproxen.  This ad also misleadingly said the 50 mg daily dose can be "used as needed," rather than stating the 50 mg dose should be used for no more than five days.[171]  Another medical journal ad that ran during the same time period stressed, "Strength, Safety, QD Simplicity."[172]  This and other ads like it created the false impression Vioxx has a "strength" advantage over conventional NSAIDS; whereas, studies consistently showed effectiveness in relieving symptoms of arthritis and pain that was equal, but not superior to, other NSAIDs.  Merck had data from the VIGOR trial during the prime period these ads ran that showed that not only did Vioxx not have a safety advantage, but that it was significantly more dangerous than naproxen.

F.    **Press Releases**

133.    As discussed above, Merck knew from its own employees and consultants that there was no scientific evidence in March 2000 for dismissing the greater number of serious CV complications occurring in the VIGOR study among patients taking Vioxx as the consequence of a cardioprotective property of naproxen as opposed to CV harm

---

[171] MRK-P0001726.

[172] MRK-P0001815.

caused by Vioxx. And Merck knew from its own Phase IIb/III osteoarthritis studies 010 through 090 (data from the last was available in February 2000, as discussed above) that the relative risk of serious thrombotic CV complications with Vioxx was 1.9 compared to placebo. Notwithstanding Merck's knowledge of this increased CV risk and the theoretical possibility that this risk could be caused by a pro-thrombotic effect of selective COX-2 inhibition by Vioxx, Merck issued a series of misleading press releases. On March 27, 2000, Merck issued a press release titled "Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with Vioxx."[173] Merck included the following misleading information about its own data:

> "An extensive review of safety data from all other completed an ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events with Vioxx, placebo and comparator NSAIDs."[174]

134. Had Merck told the truth, it would have revealed that in its osteoarthritis trials to date showed 90% greater risk of CV complications in people taking Vioxx than in people taking placebo.

135. Despite this knowledge of increased risk of Vioxx in comparison to placebo in its osteoarthritis studies, and despite knowing that the study data from the VIGOR trial demonstrated the increased CV risk in Vioxx users overshadowed any presumed GI benefit, Merck misleadingly titled its press release of April 28, 2000, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx."[175] Again, Merck misrepresented what it knew to be the increased CV risk of Vioxx compared to placebo in its pre-approval osteoarthritis studies:

---

[173] MRK-PRL0000114.

[174] MRK-PRL0000114; pg MRK-PRL0000115.

[175] MRK-PRL0000122.

"In response to speculative news reports, Merck & Co., Inc. today confirmed the favorable cardiovascular safety profile of Vioxx..."

"Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx... have shown <u>no difference</u> in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx, other NSAIDs and placebo."

136.   Regarding the findings of the VIGOR clinical trial, this press release stated that while fewer heart attacks occurred in the naproxen users, "this result is consistent with naproxen's ability to block platelet aggregation."   As shown above, there was no scientific basis for making this statement, which was likely to misled physicians regarding the true CV risk associated with Vioxx use.

137.   Merck's documents demonstrate that Merck focused its efforts on defusing and obfuscating instead of disclosing the CV and overall risks of Vioxx.   Margie McGlynn's email to Alise Reicin and copied to Ed Scolnick, dated May 25, 2000 (prior to publication of VIGOR), is evidence for this point.   In this memo, Ms. McGlynn stated "Alise, attached are 2 [stock market] analysts reports which most clearly demonstrate the success of our efforts to defuse the CV risk issue for Vioxx.   You played a major role in making this happen..."[176]

138.   Merck continued to issue a series of press releases specifically designed to prevent (or slow) the truth about the increased CV risk of Vioxx from becoming known:

a.   On February 8, 2001, Merck issued a press release entitled, "FDA Arthritis Advisory Committee Reviews Merck's Application for Revised Labeling for Vioxx Based on Vioxx Gastrointestinal

---

[176] MRK-NJ0320174.

77

Outcomes Study."[177]   A Merck Senior Vice President is quoted extolling the "excellent safety profile of Vioxx" in the data presented to the FDA Advisory Committee that met on the day of press release.   The data from the VIGOR trial showed; however, that overall Vioxx is significantly less safe than naproxen.   The press release reported that people taking naproxen in the VIGOR trial developed fewer heart attacks, but - despite the lack of evidence to support its theory - "Merck scientists said the VIGOR finding is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1 like aspirin…" and went on to report that "other explanations were advanced by the FDA review and were discussed with the Advisory Committee,"[178] but failed to mention the possibility that Vioxx might have a pro-thrombotic effect.

b.   On May 22, 2001, Merck issued a press release entitled, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx."[179]   This press release was apparently issued in response to an article in the *New York Times* published the same date, which reported that a pharmaceutical industry stock market analyst had warned his clients on April 27, 2001, that "disturbing data" from the VIGOR trial could hurt the company's stock price.[180]   The explanation of the

---

[177] MRK-PRL0000170.

[178] MRK-PRL0000170; pg MRK-PRL0000171.

[179] MRK-ABI0003228.

[180] Petersen M, Doubts are Raised on Safety of 2 Popular Arthritis Drugs, *New York Times,* May 22, 2001. P. C1.

disparity in heart attack rates seen in the VIGOR trial is the same disinformation as in the February 8, 2001 press release.

c.   On August 21, 2001, Merck issued a press release entitled "Merck Stands Behind the Cardiovascular Safety Profile of Vioxx."[181]  This press release was issued the day before the Mukherjee, et al, article was to be published in *JAMA*, showing physicians for the first time in a major medical journal that the people taking Vioxx in the VIGOR trial developed significantly more serious thrombotic CV complications than those taking naproxen, RR=2.38 (P=0.002).[182] Despite the FDA's Medical Reviewer having rejected this explanation six months earlier, the press release explained the greater number of heart attacks seen in patients taking Vioxx in the VIGOR trial as "consistent with the ability of naproxen to inhibit platelet aggregation in a manner similar to aspirin."

d.   On August 23, 2001, Merck issued a press release entitled, "Merck Stand Behind Cardiovascular Safety Profile of Vioxx."  This press release offered no data on the CV risk of Vioxx, simply stating, "Merck said the Company stands behind the overall and cardiovascular safety profile and the favorable gastrointestinal (GI) profile of Vioxx."[183]

---

[181] MRK-PRL0000214.

[182] Mukherjee D, Nissen SE, Topol EJ, Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, *JAMA*, 2001, 286:954-59.

[183] MRK-PRL0000218.

139.   DDMAC of the FDA sent Merck a formal Warning Letter, dated September 17, 2001, in response to serious marketing violations of Vioxx and the persistence of its "violative promotion of Vioxx," despite the FDA's "prior written notification regarding similar violations."  The DDMAC Warning Letter specifically cited the title of Merck's press release "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," as "simply incomprehensible" in the face of the data from the VIGOR study.[184]

140.   Even after receiving this Warning Letter from DDMAC, Merck continued to issue misleading press releases:

a.   On March 4, 2002, Merck issued a press release entitled, "Vioxx 50 mg Compared to Oxycodone 5 mg/Acetaminophen 325 mg for Acute Pain After Dental Surgery in New Study"[185]  The study found that "Vioxx 50 mg provided superior pain relief over six hours" compared to Percocet, but the press release lacks reasonable balance by failing to also report that previous studies of dental pain had shown that the pain relief provided by Vioxx was equivalent - but not superior - to a single dose of naproxen sodium 550 mg or ibuprofen 400 mg (the equivalent of two over-the-counter Advil tablets).

b.   On June 25, 2002, Merck issued a press release entitled, "Cardiovascular Event Rates in Analysis of Combined Studies Of

---

[184] Letter from Thomas W. Abrams dated 9-17-01, Director, DDMAC, FDA to Raymond Gilmartin, President and CEO Merck & Co., Inc.

[185] MRK-PRL0000241.

80

Nearly 2,900 Elderly Patients Taking VIOXX or Placebo."[186]  This press release reported that CV complications were no higher in patients taking Vioxx compared to placebo in its Alzheimer's disease studies, but failed to provide the highly significant greater death rate in the those who took Vioxx (RR=2.38, P=0.001).  More important, the press release failed to inform readers of other finding reported in its own Safety Update Report from Studies 091 and 078, dated July 2001 - almost a year before this press release.  In these studies Vioxx almost quadrupled the risk of death from heart disease: 21 versus 6 for Vioxx and placebo, respectively, RR=3.84, p<0.005.[187]  This press release was misleading in claiming no increase in CV risk when the CV death rate was known to be so much greater in those taking Vioxx.

141.   Merck's U.S. public affairs manager for Vioxx from 1999-2001 testified in deposition that it was her job to keep the CV risk of Vioxx out of the news.  She was praised in her 2000 performance review for achieving her goal "to minimize the attention to heart attack issues" in the media coverage of Vioxx.  Merck's 2000 Year-End Media Analysis" reported that Merck's Public Affairs group was responsible for conveying 1 Billion positive media messages about Vioxx in the 2000 alone.[188]

---

[186] MRK-ADJ0042906.

[187] Psaty BM, Kronmal RA, Reporting Mortality Findings in Trials of rofecoxib for Alzheimer Disease or Cognitive Impairment, *JAMA,* 2008;299:1813-17.

[188] Expert Report of Corneial Pchmann, p 20.

### G.    Direct to Consumer Advertising

142.    In 2000, the first full year that Vioxx was on the market, more was spent on direct to consumer advertising for Vioxx than for any other drug, $160.8 million.  To put the magnitude of Merck's investment in perspective, in 2000 more money was spent advertising Vioxx to consumers than was spent advertising Pepsi or Budweiser beer.[189]  Merck's "2001 Profit Plan for Vioxx" reported that the same amount would be spent again on direct to consumer advertising for Vioxx in 2001.[190]

143.    I was practicing family medicine in 2000 and 2001 and experienced the consumer demand for Vioxx created by this advertising campaign.  Merck's "Operations Review for Vioxx January 31, 2003" documented the success of Merck's advertising of Vioxx:

> "Consumer requests drive brand choice: Consumers are generally knowledgeable, willing to ask for a brand by name, and highly influential in physicians' brand choice.  Brand awareness of 85% among targets.  Physicians honor 90% of requests for VIOXX."[191]

## VIII.  Marketing in Louisiana Reflected Merck's National Marketing Strategy

144.    Slides from the national cross – functional team meeting for Vioxx, dated January 29, 1999, show that Louisiana was part of the national sales strategy for Vioxx.[192]    After presenting the pre-launch strategy for Vioxx, which included differentiation from Celebrex and NSAIDs,[193] goals to be achieved included:  developing 1250 "qualified advocates" and expanding the "definition of risk associated with an

---

[189] http://nihcm.org/~nihcmor/pdf/DTCbrief2001.pdf  Accessed November 1, 2009.

[190] Expert Report of Cornelia Pechmann PhD, p 25.

[191] Expert Report of Corneial Pchmann, p 49.

[192] MRK-EBES0039480.

[193] MRK-EBES0039480; pg MRK-EBES0039483.

NSAID gastropathy [see comments on Merck's exaggeration of this risk by Laine during promotional video taping above],"[194] and conducting tutorials (described below).[195]  PCP Consultants' Meetings were scheduled in 13 locations around the country, including New Orleans Louisiana, thus showing that the approach outlined at a national level was, in fact, implemented locally in Louisiana.[196]

### A.    Tutorials

145.   Merck's Policy Letter No. 128 described "the regulations and principles Merck follows when considering the type and manner of educational programs it can support."[197]   Among these programs were tutorials, for which the healthcare professional was paid $250 to "reinforce the representative's basic knowledge and provide a training forum to interact with the healthcare professional."[198]   A January 5, 2001, memo to the "Arklahoma Executive Team," titled "TUTORIAL Best Practices," identified Vioxx as important to success in 2001 and specifically described "the importance of conducting tutorials to maximize our success in 2001."[199]   Best practices on how to ensure a successful tutorial included several steps.  First, databases were consulted "to identify cluster weaknesses and target the physicians that are responsible for the weakness."   Recipients of the memo were instructed to "target the culprits!" (i.e., low Vioxx prescribing physicians).[200]   The goals identified in the second step show that the true purpose of the tutorials was not to educate the drug representatives, but to

---

[194] MRK-EBES0039480; pg MRK-EBES0039486.

[195] MRK-EBES0039480; pg MRK-EBES0039494.

[196] MRK-EBES0039480; pg MRK-EBES0039507.

[197] MRK-EBES0030855.

[198] MRK-EBES0030855; pg MRK-EBES0030872.

[199] MRK-EBES0047057.

[200] Ibid.

83

influence the physician-tutor who was getting paid.    These goals were to get the physician "to read some information," "to start an advocate relationship," or "to change prescribing habits."    The drug representatives conducting tutorials were instructed to approach them as "marketing research" and to "act as if you truly need their help to educate you."[201]    And finally, representatives were instructed to, "Track your ROI [return on investment] with that physician by looking at future Rx habits."    In other words, these so-called tutorials were really events at which "culprit" (i.e., low Vioxx prescribing) doctors were paid to sit with drug representatives and the measure of a tutorial's success was the subsequent increase of the "tutor's" prescribing of Vioxx.[202]    The tutorial program was suspended on May 14, 2001,[203] but was in effect during the crucial time before and after the February 2001 Advisory Committee Meeting, at which the results of the VIGOR trial showing the increased risk of serious CV events associated with Vioxx were at risk of becoming known by physicians and the public.

**B.    Call Notes**

146.  Merck's campaign to provide false reassurance of Vioxx's safety was brought to physicians in Louisiana, as demonstrated by sales representatives' call notes showing use of the "CV card" and distribution of reprints by Reicin, et al; Weir, et al; and Laine, et al, as well as the PIR on VIGOR described above.

147.  The text of Merck drug representatives' call notes for Dr. Ernest W. Kinchen, Jr. (a member of the Louisiana DHH P&T Committee) from May 14, 2001, and July 3, 2001, show a plan to "follow up with Key Core Messages."[204]    Such "Core

---

[201] Ibid.

[202] MRK-EBES0047057; pg MRK-EBES0047058.

[203] MRK-EBES0030855; pg MRK-EBES0030872.

[204] Kinchen Call Notes produced by Merck.

Messages" are outlined in Merck's national marketing documents from the preceding months.  "Positioning/Messages" defined by the Vioxx Commercialization Team in a March 13, 2001, memo as follows:[205]

> "C.  Positioning/Messages
>   1. Positioning
>
> For          Physicians who treat chronic pain and inflammation
> VIOXX® is the Best product in the breakthrough Coxib class
> That will    Enable you to provide more relief for more of your patients
> Because of   Strength
>              Safety
>              Simplicity
>              Selectivity"

"Strong" was defined in this document as being "as effective as very high doses of traditional NSAIDs," which is true but Merck's studies also showed that Vioxx was as effective as low dose NSAID (ibuprofen 400 mg) for the treatment of pain.  And "Safe" was defined as "the first and only Coxib to demonstrate a significant reduction in all GI safety endpoints…" despite the fact that Vioxx did not demonstrate significant reduction of complicated GI events in people not taking steroids concurrently.  Omitted from this claim of safety was the significant increase in serious adverse events overall, more than doubling of the risk of serious thrombotic CV events overall, and five times the risk of myocardial infarction associated with Vioxx compared to naproxen in the VIGOR trial.

148.  Merck's Scientific Communication Plan for Vioxx, dated March 27, 2001, presented "an evolved message platform" for Vioxx that included CV effects:

> "CV effects similar to placebo and NSAIDs without potent, sustained antiplatelet effects; difference in MIs in VIGOR due to cardioprotection with naproxen (epidemiology, primate, assay-based data); CV effects of Coxibs that are comparable."[206]

---

[205] MRK-AAD0106697; pg MRK-AAD0106721.

[206] MRK-ABO0000257.

85

These are the misleading conclusions from Merck-sponsored articles, as described above. Although not sent until September 2001, DDMAC's Warning Letter to Merck reiterated the FDA's cardio-renal review of the VIGOR data that the anti-platelet activity of naproxen is only one possible explanation of the lower incidence of myocardial infarction among patients taking naproxen in the VIGOR trial, and that this hypothetical explanation "has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." Thus, the "Key Messages" that had been developed on a national level included misrepresentations about the "strength," GI safety, and the CV safety of Vioxx.

149. The CV and renal review of Vioxx presented to Merck's September 10, 2001 Human Health Marketing Committee (HHMC) presented the "Objectives/Strategy/Actions" and "Key messages" that would be used to "shape the customers perceptions" of CV and renal issues.[207] The following slide from that meeting shows the specific strategic objectives: [208]

---

[207] MRK-ABW0008495; pg MRK-ABW0008497.

[208] MRK-ABW0008495; pg MRK-ABW0008503.

86



**Strategic Objectives**
*Shape the Customers Perceptions*

**Renal**
- Decrease perception of renal disadvantage of VIOXX vs Celecoxib showing that renal effects of Coxibs are similar to NSAIDs

**CV**
- Pre-empt growing perception that Coxibs may be pro-thrombotic
- Break the link between mechanism-based renal and CV events suggested by Pharmacia/Pfizer

*While focusing communication on proactive, powerful efficacy messages*

9

Figure 7.

As shown above, Merck was aware that Vioxx had caused more hypertension and edema, as well as more serious thrombotic complications than naproxen in its VIGOR trial and that the findings from its ADVANTAGE study (using Vioxx 25 mg instead of 50 mg), completed the same month as VIGOR, showed the same pattern.  Merck was also aware from its own Study 023 and its own consultants that there was a possibility that Vioxx was pro-thrombotic.   These key core messages and strategies were designed to mislead customers.  Rather than sharing these critically important scientific findings with doctors and the public, Merck's approach was to "Shape Customers Perceptions," but was in reality misleading customers on critical safety issues.

150.   The "XXceleration Tactical Plan for Vioxx" presented at the South Central Business Group shows that these strategies and goals were not just theoretical, aspirational, or discussed at a national level, but not implemented on a local level.  Two

of the messages that were to be delivered by Merck drug representatives to physicians were:[209]

| |
|---|
| • Completely resolve all physician concerns regarding renal issues (including high blood pressure and edema) using the renal card and the new PIR available from MEDSA. |
| • Completely resolve physicians' concerns regarding cardiovascular issues as outlined in the teleconference on DDW and Bulletin 47 on VIGOR and CLASS. Effectively use the PIRs available from MEDSA. |

**Figure 8.**

The limitations of the information presented in the Cardiovascular Card are discussed above.   According to a memo by Edward Scolnick, dated May 8, 2000, all drug representatives were provided with the Cardiovascular Card (the limitations and misrepresentations of which are described above), as well as the Renal Card "that highlights the demise and hypertension tolerability data" from the same outdated and inappropriately grouped studies relied upon in the Cardiovascular Card.[210]   These messages used to "completely resolve" physicians' concerns are the exact opposite of the conclusions reported in the FDA review of Merck's ADVANTAGE study (comparing Vioxx 25 mg to naproxen 1000 mg daily), the results of which were available to Merck in March 2000:

> "Consistent with the VIGOR study, a 8000-patient study of rofecoxib 50 mg and naproxen 1000 mg in patients with RA, the Data reviewed in this submission (ADVANTAGE, SUR, RA efficacy) suggest an increased cardiovascular risk (cardiovascular thrombotic events, hypertension, edema, congestive heart failure) in patients treated with rofecoxib 25 and 50 mg as compared with naproxen 1000 mg daily." [211]

---

[209] MRK-EBES0030779.

[210] MRK-ABI10002126; pg MRK-ABI10002127.

[211] http://www.fda.gov/ohrms/dockets/AC/05/briefing/2005-4090B1_09_J-FDA-Tab-F-1.htm (Accessed May 14, 2008).

The 2001 South Central Business Group Tactical Plan for Vioxx called for successful completion of "all aspects of 'project XXceleration tactical plan' by July 31."[212]  One aspect of this plan was described in a voice message from Jo Jerman, dated April 27, 2001, titled "Project A & A XXceleration," sent to field sales representatives.  The message comments on the success of Vioxx, having gained 51.2% of the Coxib market: "Woo Doggie!  That is exciting."  The message concluded with a description of the financial rewards that can be achieved by successful implementation of the program described above:

> "Last, but certainly not least, you've got some extra dollars to shoot for as well.  As you recall from the incentive program, if you hit those 2-4 share points increases, you'll be rewarded handsomely - both in the short term with the incentive program and the long term with overall PPO. Go get em guys, Good luck and Great selling!"[213]

151.    The bottom line is that strategies Merck developed at a national level were designed specifically to minimize, obfuscate, and misrepresent the growing body of the data from Merck's own trials in order to maximize Vioxx sales.  These national strategies and incentives were brought into play in Louisiana to provide false and misleading reassurance to Louisiana physicians about the CV and renal safety of Vioxx.

C.    **Louisiana Department of Health and Hospitals**

152.    Data from Louisiana Medicaid for October – December 2001 show that even though Vioxx was not on the preferred drug list, 42.6% of COX-2 Inhibitor prescriptions, totaling 24,606 prescriptions were filled.[214]

---

[212] MRK-EBES0030786.

[213] MRK-H.10STM001203.

[214] Beardon Exhibit #12 p 11.

153.   At the March 6, 2002 meeting of the Louisiana Medicaid P&T Committee Provider Synergies made a presentation as a prelude to providing their services to the Louisiana Department of Health and Hospitals Medicaid Pharmaceutical and Therapeutics Committee Meeting to advise about formulary management, specifically to establish and maintain a preferred drug list.[215]   The first of a series of reviews of anti-inflammatory medications prepared by Provider Synergies is dated February 2002.[216]  The VIGOR trial was summarized: greater than 50% reduction in the incidence of "confirmed GI events" and "serious GI events" in patients taking Vioxx compared to those taking naproxen.   The CV risk of Vioxx shown in the VIGOR trial was summarized:

> "The incidence of myocardial infarction was lower in the naproxen group (0.1 percent) than the rofecoxib group (0.4 percent), but the overall mortality rate and rate of death from cardiovascular causes was similar in both groups."[217]

154.   It is noteworthy that even a year after the correct CV data were available on the FDA website, this monograph relied on the erroneous incidence rates of myocardial infarction that had been published in the *NEJM* in November 2000, which misrepresented the risk of myocardial infarction as limited to those people who should have been taking aspirin prophylactically but weren't allowed two because of the study design.   Also, the statistically significant increase in risk of serious adverse events overall associated with Vioxx and the failure of Vioxx to reduce the risk of complicated GI events in people who were not taking steroids concurrently were not reported in the monograph.   The article by Mukherjee, et al, in *JAMA* was mentioned, but the

---

[215] Beardon Exhibit #8.
[216] #12.
[217] #12 p 5.

monograph did not report (as did Mukherjee, et al) the 2.38 increase in relative risk of thrombotic CV events associated with Vioxx in the VIGOR trial.[218]    The monograph concluded that all three COX-2 selective inhibitors "have been shown to have a lower incidence of ulcer rates than standard NSAIDs," despite not being true for complicated GI events for people not taking steroids concurrently for Vioxx.

155.    A subsequent version of this review provided by Provider Synergies in April 2003[219] included the findings of the articles by Reicin, et al, and Konstam, et al, described above, which provide incomplete and misleading reassurance about the CV safety of Vioxx.[220]    Although the monograph concluded that the VIGOR study "raised some questions regarding the cardiovascular safety of rofecoxib,"[221] its final recommendations were to include Vioxx and Bextra on the preferred drug list, but not Celebrex.[222]    Similar reports were issued in December 2003[223] and April 2004.[224]

## IX.  Celebrex Was Not a Reasonable Alternative to Vioxx

156.    The argument might be made that had patients not taken Vioxx, they would have taken Celebrex, which actually could have cost more.    But for Pfizer's misrepresentations about the clinical usefulness of Celebrex, prescribers and patients would have known that this drug provided neither efficacy nor safety advantage over the non-selective NSAIDs.

---

[218] #12 p 6.

[219] LaAG-VIOXX-003338.

[220] LaAG-VIOXX-003338, pg  LaAG-VIOXX-003347.

[221] LaAG-VIOXX-003338, pg  LaAG-VIOXX-003349.

[222] Ibid.

[223] Merck-Vioxx-00987.

[224] Merck-vioxx-00793.

157.   A manufacturer-sponsored study reported in *JAMA* in 1999 found:

"All Celecoxib doses generally demonstrated similar efficacy, and all were comparable to naproxen 500 mg twice per day."[225]

158.   The FDA medical reviewer of the manufacturer-sponsored CLASS trial concurred:

"Celecoxib does not appear to be more effective for treating the signs and symptoms of OA or RA than the NSAID comparators."[226]

159.   Given the lack of efficacy advantage over non-selective NSAIDs and the 10-fold or more higher cost, the only reason for the vast majority of Celebrex prescriptions was the belief that it was less likely to cause GI adverse events than non-selective NSAIDs.  Certainly this is the message that was received from the largest study evaluating the risk of GI complications with Celebrex compared to non-selective NSAIDs.  In September 2000, the results of the CLASS study were presented in *JAMA*:

"This study determined that celecoxib, A COX-2-specific inhibitor, when used for 6 months in a dosage 2 to 4 times the maximum therapeutic dosage, is associated with a lower incidence of combined clinical upper GI events than comparator NSAIDs (ibuprofen and diclofenac) used at standard therapeutic dosages."[227]

160.   The following graph adapted from the *JAMA* article provided visual evidence of the reduction in GI complications in the CLASS study:

---

[225] Simon LS, Weaver AL, Graham DY, et al, Anti-inflammatory and Upper Gastrointestinal Effects of Celecoxib in Rheumatoid Arthritis, *Journal of the American Medical Association,*  1999,282:1921-8.

[226] FDA Medical Reivew, Celebrex NDA 20-998/S-009, September 20, 2000 p. 82.

[227] Silverstein FE, Faich G, Goldstein LS, et al, gastrointestinal Toxicity with Celecoxib vs Nonsteroids Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis, *Journa of the American Medical Association,* 2000;284:1247-55.



**Figure 2.** Annualized Incidence of Upper Gastrointestinal Tract Ulcer Complications Alone and With Symptomatic Gastroduodenal Ulcers

Numbers above bars indicate events per patient-years of exposure. NSAIDs indicates nonsteroidal anti-inflammatory drugs.

**Figure 9.**

161.   Although the *JAMA* article provided convincing evidence that people treated with Celebrex would experience fewer GI complications than those treated with non-selective NSAIDs, the article misrepresented the data from the clinical trial.   The study had actually lasted 12 months not 6, and the FDA Medical Officer's GI Review rejected the manufacturer's justification for the post-hoc change from 12 to 6 months after the study was completed:

> "The sponsor has not adequately justified the value of an analysis limited to 6-month data nor adequately justified replacing the original analysis with this post hoc analysis."[228]

162.   At the end of the 12 months of the trial, patients taking Celebrex did not experience fewer GI complications.   The FDA Medical Reviewer of the CLASS study concluded:

---

[228] http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b1_05_gi.doc P. 23 Access verified July 15, 2009.

"Celecoxib did not demonstrate statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of [clinically significant upper gastrointestinal events] at any point in the trial…"

163    The following graph shows that during the first 6 months of the CLASS study people taking Celebrex were experiencing numerically fewer ulcer complications (a subset comprised of the more serious GI complication related to anti-inflammatory therapy), but during the second half of the study this trend actually reversed so that by the end of the study there was no advantage for Celebrex:[229]



**Figure 10.**

164.    DDMAC sent a Warning Letter to Pharmacia on February 1, 2001, citing promotional materials for Celebrex that were "false, lacking in fair balance, and otherwise misleading…"[230]    Among other violations, DDMAC cited unsubstantiated comparative claims of superior efficacy:

---

[229] Adapted from: Juni P, Rutjes AS, Dieppe PA, Are selective COX 2 inhibitors superior to traditional non steroidal anti-inflammatory drugs, *British Medical Journal,* 2002;324:1287-8.

[230] DDMAC Warning Letter to Pharmacia RE: NDA 20-998, Celebrex (celecoxib) Capsules, MACMIS ID# 8432, February 1, 2001.

"Another example of your unsubstantiated comparative claims, is your claim that, '...in rheumatoid arthritic patients taking Celebrex at 200 mg twice a day, this was more efficacious than 1000 mg of Naprosyn in rheumatoid arthritics.' The study that you cited to support this superiority claim actually concludes that Celebrex produced improvement in the signs and symptoms of RA comparable to the improvements produced by Naprosyn. Therefore, your claim of Celebrex's superior efficacy to Naprosyn is false or misleading."

165.   This Warning Letter stated that two previous "untitled" letters from DDMAC to Pharmacia had cited violative promotion of Celebrex, and - despite Pharmacia's written assurances that such violative promotion had been stopped - promotional activities for Celebrex that "raise significant health and safety concerns" had continued.

166.   The bottom line is that notwithstanding Pharmacia's attempts to convince prescribers, consumers, and purchasers that Celebrex provided the safety and or efficacy advantage over non-selective NSAIDs, such was not the case.  The FDA never accepted the claim that (based on the CLASS study) Celebrex caused significantly fewer GI complications than other non-selective NSAIDs:

"*The sponsor has failed to demonstrate a statistically significant lower rate of* [clinically significant upper GI events] *compared to NSAIDs as a group or either individual comparator.*" [Emphasis in original.][231]

"*A secondary endpoint of* [both clinically significant and less serious upper GI events] *reflects the same trends as the primary analysis of CSUGIEs.*"[232]

167.   With no efficacy advantage, no substantial scientific evidence of significant GI safety, and the FDA not allowing the manufacturer to change the GI warning in its

---

[231] FDA Medical Officer's Gastroenterology  Advisory Committee Briefing Document, **NDA 20,998: Supplement # 9, Sponsor: Searle. P** http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b1_05_gi.doc Access verified July 16, 2009.

[232] Ibid.

product label from the standard NSAID GI warning, the only reason that Celebrex might have appeared to be a reasonable alternative to Vioxx (instead of a less expensive non-selective NSAID) was the success of the manufacturer's false and misleading marketing and promotional campaign.

## X.  Formulary Dossier and Cost-Effectiveness Articles

### A.    Formulary Dossier

168.    Merck's literature cited estimates that non-selective NSAIDs caused 16,500 deaths and 100,000 hospitalizations each year.[233]  The 2003 formulary dossier for Vioxx included claims of pharmacoeconomic benefit of treatment with Vioxx compared to naproxen in the VIGOR trial, based on the assertion that treating patients with Vioxx instead of non-selective NSAIDs reduced the hospitalization rate for GI complications.   Data presented in the formulary dossier show that the rate of hospitalization for upper GI clinical events in the VIGOR trial was twice as high for naproxen as for Vioxx: 0.8% and 0.4%, respectively.[234]   A reference by Laine, Bombardier, Reicin, et al, is cited as providing evidence of the lower hospitalization rate.[235]  The remarks in the dossier were:

> "Patients treated with rofecoxib…were hospitalized for upper GI clinical events significantly less often than patients treated with naproxen."[236]

169.    Although not noted as such in the dossier, this reference is not to a peer-reviewed article, but to a published abstract.

---

[233]Op. Cit., Bombardier.

[234]  MRK-EAK0000063; pg MRK-EAK0000141.

[235] Laine L Bombardier C, Reicin A, et al, Gastrointestinal (GI) co-therapy, procedures, and hospitalizations in a GI outcomes study of rofecoxib vs. naproxen in rheumatoid arthritis, *American Journal of Gastroenterology,* 2000; 95(9): 762.

[236] MRK-EAK0000063; pg MRK-EAK0000141.

170.   Hospitalization rate is certainly an important endpoint, from the point of view of both clinical and economic outcomes.   And, as shown in the slide above prepared by Dr. Villalba of the FDA, it was true that there were fewer hospitalizations for GI complications among people taking Vioxx versus naproxen in the VIGOR trial, 29 and 49, respectively.   However, Merck's claim that the lower rate of GI hospitalizations among people taking Vioxx provided evidence of an overall health and economic benefit was grossly misleading.   Far overshadowing the 20 fewer GI hospitalizations among people taking Vioxx was the increase in CV hospitalizations: 65 versus 24 for Vioxx and naproxen, respectively, RR=2.7, P=.00001.   And the most important statistic about hospitalizations from the VIGOR trial was the overall total in each group: 338 for Vioxx compared to 265 for naproxen, RR=1.27, P=0.002.   Thus, the data from the VIGOR trial (even in the unrepresentative population in which 56% of participants taking naproxen had their risk of GI complications doubled by concurrent steroid) showed that treatment with Vioxx rather than naproxen led to a significantly higher hospitalization rate that would certainly have led to significantly higher hospital costs.

171.   Another way of looking at the significantly higher hospitalization rate in the people taking Vioxx in the VIGOR trial is that for every 100 people who took Vioxx instead of naproxen for one year, there were 2.4 additional hospitalizations.   Rather than compensating for the increased cost of Vioxx compared to naproxen by reducing the overall need for hospitalizations, the VIGOR trial showed that the higher cost of Vioxx was compounded by the additional cost of Vioxx of 2.4 hospitalizations per 100 patients treated per year.   By presenting just the reduction in GI hospitalizations the

formulary dossier misrepresented the overall economic impact of Vioxx on third party payors.

172.   Dr. Loren Laine, in outtakes during taping of a promotional video for Merck, commented on the estimated 100,000 hospitalizations and 16,500 deaths in the United States each year as a result of NSAID-associated GI events, presented in the *NEJM* VIGOR article (of which he was a co-author):  "Those numbers that people use are totally incorrect...There's about five different reasons why those numbers are totally bogus...it's an impressive soundbite...The death rate is probably wrong, the hospitalization rate is probably right."  Then for the record he said: "In patients who take non-steroidal anti-inflammatory drugs such as Advil, Motrin, Aleve, it's been estimated that over 100,000 people are hospitalized for stomach problems such as bleeding and that over 16,000 die due to these problems every year."  And commented: "This is exactly what you have written."[237]

**B.      Cost-Effectiveness Reports**

173.   Merck attempted to justify use of Vioxx by publishing a series of articles based upon cost-modeling that purported to show that, despite its higher cost, Vioxx reduced overall medical costs compared to treatment with non-selective NSAIDs.

174.   An article published by Merck employees in *Clinical Therapeutics* in 2001 relied on a decision analytic model to argue that use of Vioxx instead of non-specific NSAIDs in the United States would lead to a cost per PUB avoided of $4,738 and a cost per year of life saved of $18,614.  The article concluded:

> "Cost differences between rofecoxib and NSAIDs were markedly offset by expected cost savings in GI problems and co-medications averted with rofecoxib.  Cost per year of life

---

[237] Laine video clip.

saved with rofecoxib versus NSAIDs were well within accepted benchmarks for cost – effectiveness."[238]

175.   The model used to arrive at these conclusions relied upon the assumption that use of gastroprotective medication would be 75% lower among patients taking rofecoxib than among patients taking conventional NSAIDs.  This assumption was not, however, based on scientific evidence but, as described in the article, was based on the "input of an expert panel consisting of gastroenterologists, rheumatologists, and general practitioners," i.e., based upon the panelists' opinions only.  (The article was funded by Merck and written by Merck employees.)

176.   Another article published in 2001, also funded by Merck and written by Merck employees, concluded that the total cost per day of therapy (including the cost of both anti-inflammatory and gastroprotective medication) in Canada was $1.60 (Canadian) for non-selective NSAIDs and $1.67 (Canadian) for rofecoxib.  According to this model, the cost of avoiding one PUB by substituting rofecoxib for non-selective NSAIDs was $2,247 (Canadian).  These conclusions were based on the assumption that people using rofecoxib would be 90% less likely to be prescribed a gastroprotective agent (no explanation of the derivation of the 90% estimate was provided, other than it "was assumed to be…").[239]

177.   A third Merck-sponsored article about the cost effectiveness of rofecoxib versus non-selective NSAIDs for patients in the United Kingdom concluded that switching patients to rofecoxib would cost the National Health Service £ 0.32 more per

---

[238] Pellisier JM, Straus WL, Watson, et al, Economic evaluation of rofecoxib vs. nonselective nonsteroidal anti- inflammatory drugs for the treatment of osteoarthritis, *Clinical Therapeutics,* 2001, 23:1061-79.

[239] Marshall, JK, Pellissier JM, Attard CL, et al, Incremental cost – effectiveness analysis comparing rofecoxib with nonselective NSAIDs in osteoarthritis:  Ontario Ministry of Health Perspective, *PharmacoEconomics,* 2001;19:1039-1049.

day, but cost only £15,647 per year of life saved. This analysis was also based on the consensus of the expert panel that had opined that users of rofecoxib would be prescribed 75% fewer gastroprotective medications than those taking NSAIDs.[240]

178.   The lack of validity of the above three Merck-sponsored cost effectiveness studies was shown in data that calculated the actual rates of gastroprotective agents (GPA) use in people taking selective COX-2 inhibitors compared to those taking non-selective, anti-inflammatory medication in a large preferred provider organization.[241] In the three studies described above, use rates of GPAs in combination with non-selective NSAIDs were 25.5%, 23%, and 20%, respectively. Rather than the 75% to 90% lower rate of GPA use assumed in the models employed in the above studies, data from a population base of 320,000 patients enrolled in a PPO provide a very different picture: Among new users of any NSAID (COX-2 selective or non-selective) matched for GI risk and the length of time they took the NSAID, patients taking COX-2s actually had a higher (rather than lower) rate of GPA use than patients taking conventional non-selective NSAIDS, 20% versus 18%, respectively.[242] Thus, the purported savings on GPA use associated with rofecoxib based upon unsubstantiated assumptions in the Merck-sponsored studies was actually the reverse, the use (and therefore cost) of GPAs was greater in people taking rofecoxib. The article by Cox, et al, concludes:

---

[240] Moore RA, Phillips CJ, Pellissier JM, Kong SX, Health economic comparisons of rofecoxib vs. conventional nonsteroidal antiinflammatory drugs for osteoarthritis in the United Kingdom, *Journal of Medical Economics,* 2001;4:1-17.

[241] Cox RC, Motheral B, Mager D, Verification of the decision analytic model assumption using real – world practice data: Implications for the cost effectiveness of cyclo-oxygenase 2 inhibitors (COX-2s), *American Journal of Managed Care,* 2003;9:785-94.

[242] Ibid.

"Contrary to COX-2 cost – effectiveness model assumptions, the rate of GPA use is positive and marginally higher among COX-2 users than among nonselective NSAID users. These findings call into question the use of expert opinion in estimating practice pattern modeled inputs prior to a product's use in clinical practice."

179.    A potential weakness in the above argument is that the higher rate of GPA use in COX-2 users compared to non-selective NSAID users was not specifically about Vioxx-users, but patients taking both Vioxx and Celebrex.  The purported GI-protective advantage of Vioxx over Celebrex might have skewed the results for concomitant GPA use with Vioxx presented in the study by Cox, et al.  However, a study presented in the Vioxx Formulary Dossier (Schnitzer, et al, 2003) shows that this was not the case.[243] The study was based on 226,000 users of Vioxx and Celebrex.  Prior use of GPAs was the same for both groups, 17.11% and 17.09%, respectively.  The difference in rates of GPA use for patients taking Vioxx and Celebrex also turned out to be minimal:  Among the patients who had never used a GPA before, 6.99% of patients taking Celebrex and 6.29% of patients taking Vioxx, respectively started a GPA.  Among patients who had used a GPA before, 70.00% of patients taking Celebrex and 69.10% of patients taking Vioxx also used a GPA concurrently.  Although the small difference in rates of GPA use among those treated with Vioxx and Celebrex was statistically significant, the absolute difference was not large enough (no more than 0.9%) to change the findings presented by Cox, et al, with respect to Vioxx, showing a greater use of GPAs among patients taking Vioxx than among patients taking non-selective NSAIDs.

---

[243] MRK-EAK0000063; pg MRK-EAK0000136 [Tavs06].

## XI.  Conclusion

180.   Merck systematically failed to disclose and affirmatively misrepresented the CV risk and exaggerated the GI benefit of Vioxx in comparison to placebo and other non-selective NSAIDs.  At the same time, Merck engaged in a comprehensive and systematic campaign to mislead physicians, consumers, and payors to believe that Vioxx was a superior drug worth a premium price when, in fact, it was of equal but not superior efficacy and carried significant safety risks.  Given that the only reason for Vioxx to be used was its purported greater safety, rational buyers knowing the full truth about the safety of Vioxx would not have purchased the drug, or at most would have made it available to a small subset of patients being treated with steroids who required concurrent NSAID therapy.

181.   I reserve the right to expound upon my opinions as stated in this declaration and to respond as necessary to other areas or topics raised in deposition or trial.  As new information and literature becomes available, I reserve the right to supplement my opinions.


Dated:  November ___, 2009          _____

John David Abramson, M.D.

EXHIBIT 1

John Abramson, MD

Professional Address:   39 Spring Street, Ipswich, MA  01938

Email:  john_abramson@hms.harvard.edu          Phone: 978-312-1225

Place of Birth: Cambridge, MA

Education:

| | | | |
|---|---|---|---|
| 1970 | BA cum laude | Harvard College | Social Relations |
| 1971-2 | | Harvard College | Premedical courses |
| 1974 | BMS | Dartmouth Medical School | Medicine |
| 1976 | MD | Brown Medical School | Medicine |

Postdoctoral Training:

| | | | |
|---|---|---|---|
| 1982 | MS | Case Western Reserve University | Family Medicine |
| 1976-77 | Internship | Memorial Hospital, Chapel Hill, NC | Family medicine |
| 1979-81 | Residency | University Hospitals of Cleveland, OH (Case Western Reserve University) | Family practice |
| 1980-82 | Fellow | Case Western Reserve University | Robert Wood Johnson Fellow in Family Medicine |

Licensure and Certification:

| | |
|---|---|
| 1982 | Massachusetts Board of Registration in Medicine. License No. 49182 |
| 1982 | Diplomate, American Board of Family Practice 1982, recertified 1989, 1995, 2001, 2007 |

Academic Appointments:

| | |
|---|---|
| 1992-3 | Senior Research Associate, Institute for Health Policy, The Heller School, Brandeis University |
| 1997-School | Clinical Instructor, Dept. of Ambulatory Care and Prevention, Harvard Medical School |

Hospital or Affiliated Institution Appointments:

| | | |
|---|---|---|
| 1982-2002 | Medical Staff | Beverly Hospital |
| 1994-2002 | Medical Staff | Lahey Clinic |

Other Professional Positions and Major Visiting Appointments:

| | |
|---|---|
| 1977-9 | National Health Service Corps, US Public Health Service |
| 1982-2002 | Family physician, Hamilton-Wenham Family Practice, Hamilton, MA |
| 1986-1993 | Associate Medical Director, Pru-Care of MA |
| 1994-2001 | Chair, Department of Family Practice, Lahey Clinic, Burlington MA |
| 2005-present | Executive Director of Health Management, Wells Fargo Health Solutions |

Hospital and Health Care Organization Service Responsibilities:

| | |
|---|---|
| 1989-1991 | Member, Board of Trustees, Beverly Hospital |

Major Committee Assignments:

| | |
|---|---|
| 1993-5 | Chair, Graduate medical Education Committee (Family Practice Residency), Beverly Hospital |

Professional Societies:

| | |
|---|---|
| 1982-2002 | Massachusetts Medical Society |

1982                  American Academy of Family Practice

Awards and Honors:
1996, 1999     Community Newspapers "Readers' Choice Award for Best Doctor", Beverly,
                     Hamilton, Wenham
1999              Center for the Study of Services "Guide to Top Doctors"
2000              Castle Connolly/Town and Country's Guide to Primary care Physicians
2001              Castle Connolly/AOL-Digital City "Guide to Top Doctors"
2002              Selected to be included in Lady's Home Journal: The Best Family Doctors in
                     America (had left practice to write book so name did not appear in magazine)
2003              Profiled in Harvard Magazine article: "Doctored Research?" Nov-Dec issue

Part II:
Research, Teaching, and Clinical Contributions

A. Primary Care Clerkship and mentorship program: Harvard Medical School, preceptor of third-
fourth year student for the next eight years.  Teaching activities have also included the elective
course and independent study in "Healing and Spirituality" as listed below.

D.  Report of Teaching
1.   Local Contributions

1992-1994     Harvard Medical School
                     Two years
                     Primary Care Mentorship Program
                     Mentor
                     One first-year medical student per year

1994-2001     Harvard Medical School
                     Eight years (One student per year)
                     Primary Care Clerkship
                     Preceptor

1999-2001     Harvard Medical School
                     Three years (average 12 students per year)
                     Healing and Spirituality in Medicine
                     Elective
                     Faculty 1999, Course Co-director 2000 and 2001

2002              Harvard Medical School
                     Independent Study
                     Healing and Spirituality

2002-2007     Harvard Medical School
                     Ongoing
                     Primary Care Clerkship
                     Tutor

2003              Harvard Medical School
                     Independent Study
                     Healing and Spirituality

2008-2009     Harvard Medical School
                     Two Years and Ongoing (Eight or nine students per group)
                     Health Policy Course (HC750)

Discussion group leader (to continue in 2009 and 2010)

2. Presentations:

| | |
|---|---|
| 1981 | A prepaid primary care network for private and AFDC patients: an alliance between the private and public sectors. National Governor's Association Conference on Primary Care Networks, New Orleans, LA. |
| 1982 | Participation of a residency based family practice center in an innovative case management program. Society of Teachers of Family Medicine, Chicago, IL. |
| 1983 | The economic impact ofa primary care network on primary care physicians and Medicaid costs. Robert Wood Johnson Foundation, Princeton, NJ. |
| 1984 | Primary care of de-institutionalized retarded adults in the community. HCFA Meeting of Federal Surveyors of Intermediate Care Facilities, Portland, ME. |
| 1991 | The role of physicians in the Michigan Comprehensive Community Health Models Project. Pew Health Policy Annual Meeting, Cambridge, MA |
| 1999 | The role of the physician/patient relationship in the healing process. Topics in Internal Medicine (Lahey Clinic), Portsmouth, NH |
| 2002-5 | Healing our Critically Ill Health Care System.  Clinical Training in Mind/Body Medicine.  Mind/Body Medical Institute/Harvard Medical School Continuing Education, Boston, MA |
| 2004 | The Quality of Our Medical Knowledge: Vioxx and Statins.  Heller School for Social Policy |
| | NCEP Recommendations: Preventing Heart Disease or Pushing Drugs?. Encino-Tarzan Regional Medical Center, CA. |
| | Grand Rounds, Beverly Hospital Beverly MA: NCEP Recommendations: Preventing Heart Disease or Pushing Drugs? |
| 2005 | Williams College; Lessons from Vioxx: Misinforming Doctors, Harming Patients, and Making money, 1/11/05 |
| | New York City Department of Public Health, Chronic Disease Grand Rounds, 2/4/05 |
| | Bellevue Hospital Medical Seminar 2/9/05 |
| | Denver Forum, Denver CO 2/10/05 |
| | Woman's National Democratic Club, Washington DC, 3/3/05 |
| | Congressional Task Force on Prescription Drugs, Washington DC, 3/3/05 |
| | Mind Body Medical Institute Harvard Medical School 3/23/05 |
| | San Diego City Club 4/8./05 |
| | Alternative Therapy Conference, San Francisco, Keynote Address: "Overdosed America." 4/9/05 |
| | University of Michigan (Undergraduate course in health policy) 4/05/05 |
| | Health Care Benefits Forum, Chicago Hyatt Regency, Keynote Address: 4/7/05 |
| | City Club of San Diego, 4/08/05 |
| | Alternative Health Conference, San Francisco CA 4/9/05 |
| | Harvard Medical School, Cabot Lecture Series, 4/25/05 |
| | Drug Therapy Conference, British Columbia 4/16/05 |
| | Lutheran Medical Center, Brooklyn NY, 4/27/05 |
| | Cooley Dickinson Hospital, Northampton MA 4/29/05 |
| | Harvard School of Public Health, 5/02/05 |
| | Southern Vermont Area Health Education Center, 5/07/05 |
| | Chilten Club of Boston, 05/26/05 |
| | Hiram B. Curry Memorial Lecture, University of S. Carolina Dept Family Practice, 6/6/05 |
| | Harvard Medical School, Mind/Body Medical Institute Continuing Medical Education 6/15/05 |
| | Vermont Citizens Campaign for Health 6/16/05 |

Medical Foundation of Boston, 6/21/05
Harvard Club of Boston, 6/22/05
Hamilton Wenham Public Library 6/23/05
World Pension Forum, Chatham MA, 7/12/05
Boulderfest, Boulder CO, 7/14/05
Center for Popular Economic, Amherst MA, 8/1/05
Public Policy Virginia, Roanoke VA, 9/17/05
Fletcher Allen Hospital, Burlington Vermont 9/26/05
University of Vermont Medical School 9/26/05
Central Vermont Hospital 9/27/05
Vermont Medical Society 9/27/05
Cayuga Medical Center of Ithica, 9/30/05
Michigan State Medical Society Bioethics Conference, 10/08/05
Harvard Medical School, Mind/Body Medical Institute Continuing Education
        Course 10/17/05
U Mass Med School, Community Medicine 10/19/05
Massachusetts Medical Society/Medical students 10/19/05
Rotary Club, Charleston, WV, 10/21/05
National Legislative Association on Prescription Drug Prices, Charleston, WV
        10/21/05
League of Women Voters, Hamilton, MA, 10/30/05
Sharp Medical Center, San Diego, CA 11/04/05
Pacific College Symposium, San Diego CA 11/05/05
Allegheny General Hospital, Pittsburgh, PA 12/7/05

2006

LA Country Employee Pension Association  1/26/06
West Virginia House and Senate 2/1/06
George Washington Medical School panel about Drug reps on campus 2/9/06
HealthFirst Conference 2/22/06
Cambridge Health Alliance Family Medicine Grand Rounds 2/24/06
Harvard Medical School Pharmacology  Patient Safety Session "The Vioxx
        example" 2/28/06
Nieman Journalism Fellowship 3/1/06
Sudbury League of Women Voters 3/5/06
Bentley College, Business Ethics Lecture 3/7/07
Northwest Pharmacy Benefits Managers-Medical Directors Conference, Seattle
        WA 3/10/06
Harvard Medical School Continuing Medical Education, Mind Body Medicine
        3/13/06
Association of Health Care Journalists, Houston TX, 3/17/06
North Shore Seminars, Beverly MA 3/19/06
New England Biolabs, Ipswich MA 3/23/06
Florida State University Medical Grand Rounds, Tallahassee FL 3/30/06
Hampden County [MA] Medical Society 4/25/06
Boston Medical Center, Family Medicine Grand Rounds 4/25/06
Cooley Dickinson Hospital Northampton MA, Grand Rounds 5/1/06
University of Colorado Family Medicine Grand Rounds 5/3/06
American College of Lifestyle Medicine, Loma Linda CA 5/24/06
Harvard Medical School Lecture to students: Statins 5/30/06
The Regence Group Pharmacy Managers, Portland OR 6/14/06
Alta Bates Hospital, Berkeley CA, Grand Rounds 6/13/06
Harvard Medical School Mind/Body Medical Institute Continuing Medical
        Education 6/21/06
Tufts Family Medicine Residency  6/23/06
Forum for Behavioral Science in Family Medicine 9/17/06
Biomedical Research and the Law, Hofstra Law School 10/4/06

Sharp Community Medical Group CME Conference 10/8/06
Harvard Medical School, Course on Mind/'Body Medicine 10/20/06
Idaho State University Family Practice Residency 10/26/06
Idaho State University Conference on Health Care 10/26/06
American Public Health Association, panelist : "Drug manufacturers, the FDA,
     and U.S. health care," Boston, MA 11/7/06


Loma Linda University, School of Pharmacy 11/3/06
Sharp Rees-Steely Community Group CME 11/4/06
Rollins College, Winter Park, FL, 11/13/06
Capital Health Plan, Tallahassee, FL, 11/15/06
National Federation of Women Legislators, Bachelor's Gulch, CO, 11/18/06
University of New Hampshire, Masters in Public Health Program Grand Rounds,
     Durham, NH, 11/28/06
Washington University, "Pharm-Free Day," St. Louis, MO, 11/30/06

2007

Panelist at George Washington University: Relations with the Pharmaceutical
     Industry, Washington, D.C., 1/25/07
Prescription Access Litigation Dinner, Keynote Speech, Washington D.C.,
     1/25/07
McDougall Program Health Conference, Santa Rosa, CA, 2/2-4//07
Sutter Medical Center, Family Medicine Grand Rounds, Santa Rosa, CA 2/5/07
Renown Medical Center, Grand Rounds, Reno NV., 2/6/07
Gila River Health Indian Community Health Center: "The Growing Gap Between
     Evidence-Based Medicine and Good Health Care," Sacaton AZ.,
     2/8/07
Harvard Medical School: "Why Primary Care Don't Get No Respect." 2/13/07
Indian Health Services, National Combined Councils: "Can We Trust the
     Evidence in Evidence-Based Medicine," San Diego CA. 2/25/07
Harvard Medical School Continuing Education: Mind/Body Medicine Clinical
     Training, Boston MA. 2/28/07
University of Michigan, Family Medicine Grand Rounds, Ann Arbor, MI 3/14/07
University of Texas, Medical Branch, Galvaston TX, 3/15/07
Puerto Rican Third Annual Public Health Conference, San Juan PR, 5/8/07
Harvard Medical School Continuing Education: Mind/Body Medicine Clinical
     Training, Boston MA. 6/25/07
International Academy of Law and Mental Health, Padua Italy, 6/29/07
Lee Memorial Health System, Continuing Education Conference, Sanibel Harbor,
     FL, 7/15/07
Orlando Regional Medical Center, Continuing Education Conference, Orlando
     FL, 7/16/07
American Association of Naturopathic Medicine Annual Meeting, Palm Springs,
     CA 8/25/07
Dept. of Psychiatry Grand Rounds, Massachusetts General Hospital, Boston, MA
     10/5/07
North Atlantic Health Sciences Libraries, When the Facts Aren't True, What's a
Librarian to Do?, Woodstock VT, 10/29/07
Canadian Coalition for Health: Is Free Speech more Important than your Health,
Toronto, CA March 4, 2008
Benson-Henry Institutre for Mind Body Medicine/Harvard Medical School
Coninuing Medical Education Program. Understanding our Critically Ill Health
Care System and Offering a Real Alternative, Boston, MA, March18, 2008
Northwest Naturopathic Physicians Convention, Can We Trust the Evidence in
Evidence-Based Medicine? Vancouver, British Columbia, April 5, 2008

Therapeutics Initiative, University of British Columbia , Lookin' For Health in All the Wrong Places: The Commercial Distortion of Efforts to Reduce the Burdent of Heart Disease, Vancouver, British Columbia, April 7, 2008

Direct to Consumer Perspectives National Convention, What's Wrong with the American Healthcare System (and How to Make it Right), Washington DC, April 16, 2008

Puerto Rican Third Annual Public Health Conference, San Juan PR, 5/8/07

Harvard Medical School Continuing Education: Mind/Body Medicine Clinical Training, Boston MA. 6/25/07

Lee Memorial Health System, Continuing Education Conference, Sanibel Harbor, FL, 7/15/07

Orlando Regional Medical Center, Continuing Education Conference, Orlando FL, 7/16/07

American Association of Naturopathic Medicine Annual Meeting, Palm Springs, CA 8/25/07

Dept. of Psychiatry Grand Rounds, Massachusetts General Hospital, Boston, MA 10/5/07

North Atlantic Health Sciences Libraries, When the Facts Aren't True, What's a Librarian to Do?, Woodstock VT,  10/29/07

2008

Canadian Coalition for Health: Is Free Speech more Important than your Health, Toronto, CA March 4, 2008

Northwest Naturopathic Physicians Convention, Can We Trust the Evidence in Evidence-Based Medicine? Vancouver, British Columbia, April 5, 2008

Direct to Consumer Perspectives National Convention, What's Wrong with the American Healthcare System (and How to Make it Right), Washington DC, April 16, 2008

Leadership and Business Strategies for Integrative Health Care, American Hospital Association, Phoenix AZ, May 17, 2008

Conference on Integrative, Complementary and Alternative Medicine and Mental Health, Toronto, Canada, May 24, 2008

Countway Library, Boston MA, June 3, 2008

Federal Bureau of Investigation, "The Systematic Distortion of Medical Knowledge: Licit and Illicit," Boston MA. June 26, 2008

Ontario Association of Naturopathic Doctors, Niagara Falls Canada, October 19, 2008

Benson-Henry Institute for Mind Body Medicine/Harvard Medical School Continuing Medical Education Program.  , Boston, MA, March18, 2008

Therapeutics Initiative, University of British Columbia , Lookin' For Health in All the Wrong Places: The Commercial Distortion of Efforts to Reduce the Burden of Heart Disease, Vancouver, British Columbia, April 7, 2008

Medical Grand Rounds, Tufts Medical Center, Boston MA. May 30, 2008

Univ. of Vermont Family Medicine Review Course, Burlington VT, June 12, 2008

Harvard School of Public Health CME course: Ethical Issues in International Health, Boston MA, June 13, 2008

Western Maine Health System, CME, August 18, 2008

N.Y. State Academy of Family Medicine CME, September 27, 2008

Benson-Henry Institute for Mind Body Medicine/Harvard Medical School Continuing Medical Education Program, Boston, MA, October 2, 2008

Boston University Medical Students, Primary Care Week, October 6, 2008

Boston University Dept of Psychiatry Grand Rounds, October 23, 2008

Cambridge Health Alliance, Family Medicine Grand Rounds, December 9, 2008

2009

Benson-Henry Institute for Mind Body Medicine/Harvard Medical School
Continuing Medical Education Program.  , Boston, MA, March18, 2008
Brookline Adult and Community Education, March 25, 2009
Cabot Lecture, Harvard Medical School, March 26, 2009
Stoeckle Center for Primary Care Innovation, Mass General Hospital, March 27, 2009
University of Michigan Family Medicine Grand Rounds, April 8, 2009
Exeter Hospital, Grand Rounds, June 2, 2009
Harvard School of Public Health, continuing education course on Ethical Issues
in International Health, June 12, 2009

E. Report of Clinical Activities
1982-2002      Family Physician, Hamilton-Wenham Family Practice
1997-2001      Hamilton-Wenham School District Physician

Bibliography

Original Articles

1987          Competition, capitation, and case management: barriers to strategic reform.
              Milbank Quarterly 1987;65:3: 348-370
2003          Medical Reporting in a Highly Commercialized Environment: A family doctor
              prescribes eight guiding principles for accurate and fair coverage of research
              findings.  Nieman Reports. 2003; Summer: 54-57
2003          Comments on the MRC/BHF Heart Protection Study. Correspondence.  The
              Lancet. 2003; 362: 745-746
2005          When Health Policy is the Problem (with Bruce Spitz).  Journal of Health Politics,
              Policy and Law, 2005; 30(2):327-366.
2005          The Effect of Conflict of Interest on Biomedical Research and Clinical Practice
              Guidelines: Can We Trust the Evidence in Evidence-Based Medicine? (With
              Barbara Starfield, MD, MPH). Journal of the American Board of Family Practice,
              2005; 18:414-418.
2007          Are Lipid-lowering guidelines evidence-based? (With James M. Wright MD,
              PhD).  The Lancet, 2007: 369:168-169.
              The Reliability of Our Medical Knowledge as a Product of Industry Relationships.
              Hofstra Law Review, 2007; 35: 691-704.

Book

2004          Overdosed America: The Broken Promise of American Medicine.  How the
              Pharmaceutical Companies Distort Medical Knowledge, Mislead Doctors, and
              Compromise Your Health (HarperCollins, Sept. 2004)

OP-EDS (Major Newspapers)
LA Times Drug Guidelines Fatten Bottom Line 7/25/04
NY Times Information is the Best Medicine 9/18/04
LA Times Physician Know Thy Patient 10/24/04
LA Times Drug Profits Infect Medical Studies 1/7/06
LA Times Healthcare Code Blue 11/3/06
Atlanta Journal Constitution Cold-hearted tug fails women 2/2/07

Partial list of National Media Appearances:

9/30/04 CBS Evening News
     Lou Dobbs
     CNN Headline News
     NPR Radio: All Things Considered
10/1/04 The Today Show
     CNN American Morning
10/18/04 FOX News Linda Vester: Bush and Kerry Health Plans
11/04/04 ABC News Vioxx article and editorial in Lancet
11/06/04 CNN "In the Money" DTC advertising
11/18/04 CNN HEADLINE NEWS Vioxx Hearings:
11/19/04 CNN AMERICAN MORNING Vioxx Hearings: Why didn't Doctors know?
11/22/04 FOX LINDA VESTER Merck's role in funding Vioxx research
11/29/04 Lou Dobbs Are We A Nation of Hypochondiracs?
12/05/04 C-Span BookTV: From Collected Works, Brattleboro, VT (Recorded 11-05-04)
12/14/04 (taped)TV Ontario, What to do after Vioxx?
12/17/04 CNN with Betty Nguyen
     CNN Wolf Blitzer (interviewed by Mary Snow)
     CNBC Closing Bell with Tyler Mathisen
     Lou Dobbs Tonight
     CNN Headline News
12/18/04 Ron Insana Show (radio)
     NBC Nightly News
12/20/04 Fox News: Neil Cavuto
     WBUR Radio: On Point
     News Night with Aaron Brown
     CNN Headline News
     NPR Radio: All Things Considered
12/21/04 CNN American Morning
     CNN Live
     MSNBC Market Wrap with Ron Insana
     MSNBC Ron Insana: The Death of a Wonder Drug
12/22/04 The Today Show
     CNN Live From
12/26/04 WSJ Report with Maria Bartiromo
1/13/05  MSNBC (Over the Counter Statins)
1/24/05 CBS Evening News: Celebrex
2/18/05 MSNBC Bull's Eye
2/19/05 CNN In the Money
     Fox News
     CNN Headline News
2/25/05 CNN Prime News
2/28/05 CNN Lou Dobbs LIve
5/27/05 CNN Lou Dobbs Live
     CNN Judy Woodruff Inside Politics
5/28/05 Fox  with Bob Sellers
7/27/05 Fox and Friends, National
8/15/05 Fox 25, Boston
3/22/06 CNBC Live interview FDA, ADHD drug labeling
6/23/06 CNBC Morning Call: Zocor pricing

Expert Witness consulting and testifying fee: $550/hr

Testimony in the past 4 years:
August 3, 2006: Deposition Vioxx Products Liability Litigation, Robert G. Smith Versus Merck &
Co., Inc.  Attorney: Larry Wright, Watts Law Firm, One Congress Plaza, Suite 1000, 111
Congress, Austin, TX 78701.  (512) 479-0500

April 30, 2007: Deposition, Zyprexa Products Liability: MDL No 1596 Litigation Zyprexa.  Attorney: Jayne Conroy, Hanly, Conroy, Bierstein, Sheridan, Fisher & Hayes LLP. 112 Madison Avenue, New York, New York 10016. 212-784-6400

May 18, 2007: Deposition,  Estratest, Susannah K. Alexander Versus Solvay Pharmaceuticals, Inc., et al.  Attorney: Ed Notargiacomo, Hagens Berman Sobol Shapiro
One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

December 12, 2007: Deposition, TriCor, Joe Lukens, Hangley Aronchick Segal & Pudlin
One Logan Square, 18th & Cherry Streets, 27th Floor, Philadelphia, PA 19103-6933

December 18, 2007: Deposition, Nexium, Ed Notargiacomo,  Hagens Berman Sobol Shapiro,
One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

March 4, 2008: Deposition, CanWest Media Inc, vs. Attorney General of Canada (re restraint of CanWest's freedom of commercial speech due to the ban on direct-to-consumer advertising of prescription drugs.

March 18, 2008: Phone Deposition, Kathleen R Skiles vs. Richard M. Fruehling MD, Richard K Waggoner, PA, and Family Practice of Grand Island. Attorney: Mark A. Weber, Walentine O'Toole McQuillan & Gordon, 11240 Davenport Street, P.O. Box 540125, Omaha, NE 68154-0125

March 24-25, 2008: Deposition, Bextra Marketing, Sales Practices and Product
Liability Litigation, MDL No. 1699

April 1, 2008: Hearing before Judge Jack Weinstein: Multiple plaintiffs vs. Eli Lilly re: Marketing and Sales of Zyprexa, Hagens Berman Sobol Shapiro, One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

July 24, 2008: Deposition, Vioxx, Consumer Plaintiff's Renewed Motion for Class Certification, Tom Sobol, Hagens Berman Sobol Shapiro, One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

October 22, 2008: Deposition, Vioxx, Consumer Plaintiff's Renewed Motion for Class Certification (CA),  Tom Sobol, Hagens Berman Sobol Shapiro, One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

January 20-21, 2009.  Deposition, Neurontin Marketing, Sales Practices and Product Liability Litigation. Tom Greene, Greene and Hoffman, 33 Broad St, 5th Floor, Boston MA 02109, Tel. 617-261-0040.

July 28, 2009: Deposition, Zyprexa: South Carolina v. Eli Lilly (Zyprexa), Harrison, White, Smith & Coggins. P.O. Box 3547. Spartanburg, SC 29304

September 29-30, 2009: Deposition, Risperdal: Foti v. Janssen, Bailey, Perrin, and Bailey, 440 Louisiana, Suite 2100, Houston, TX 77002

## XI.  Conclusion

180.   Merck systematically failed to disclose and affirmatively misrepresented the CV risk and exaggerated the GI benefit of Vioxx in comparison to placebo and other non-selective NSAIDs.  At the same time, Merck engaged in a comprehensive and systematic campaign to mislead physicians, consumers, and payors to believe that Vioxx was a superior drug worth a premium price when, in fact, it was of equal but not superior efficacy and carried significant safety risks.  Given that the only reason for Vioxx to be used was its purported greater safety, rational buyers knowing the full truth about the safety of Vioxx would not have purchased the drug, or at most would have made it available to a small subset of patients being treated with steroids who required concurrent NSAID therapy.

181.   I reserve the right to expound upon my opinions as stated in this declaration and to respond as necessary to other areas or topics raised in deposition or trial.  As new information and literature becomes available, I reserve the right to supplement my opinions.

Dated:  November 5, 2009

John David Abramson, M.D.