Report of The Honorable John S. Martin, Jr.
to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management in the
Development and Marketing of Vioxx

September 5, 2006

DEBEVOISE & PLIMPTON LLP

M00AA13725

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

I.    Overview of Scientific Issues. ...........................................................2

II.    Formation and Mandate of the Special Committee. ............................8

III.    Scope and Conduct of the Investigation. ...........................................10

IV.    Materials Reviewed. .........................................................................12

    A.    Documents Produced by Merck in Products Liability Cases,
Shareholder and ERISA Litigation and Government Investigations. ..........12

    B.    Documents Submitted by Merck to the FDA in Connection with
Advisory Committee Meetings Related to Vioxx. .....................................13

    C.    Documents Collected from External Sources. ..........................................15

V.    Witnesses Interviewed and Prior Testimony. .....................................15

VI.    The Scope and Format of This Report. ..............................................16

OUR FINDINGS ...............................................................................................19

VII.    The Overarching Issues. ...................................................................19

VIII.    Review of Specific Criticisms of Merck's Conduct. ..........................27

    A.    Summary of Principal Criticisms and Findings Concerning Merck's
Pre-approval Knowledge. ....................................................................27

        1.    Allegation No. 1:  Merck Rushed Vioxx to Market Without
Adequate Testing. .........................................................................28

        2.    Allegation No. 2:  Merck Knew in 1996 that Vioxx Was
Dangerous to the Heart. .................................................................30

        3.    Allegation No. 3:  Merck Ignored Advice From Outside
Experts Concerning Possible Prothrombotic Risks of Vioxx. ..........33

        4.    Allegation No. 4:  Merck Did Not Publish The FitzGerald
Prostacyclin Hypothesis in a Timely Manner and Did Not
Disclose it to the FDA. ..................................................................42

        5.    Allegation No. 5:  Merck Cancelled a Gastrointestinal
Outcomes Trial in 1997 Because MRL Scientists Feared that
the  Cardiovascular Results Would Be Unfavorable. .......................46

M00AA13726

Report of John S. Martin, Jr. to the Special Committee                September 5, 2006
of the Board of Directors of Merck & Co., Inc.                        Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

B.    Summary of Principal Criticisms and Findings Concerning Merck's
Scientific Response to VIGOR Trial Cardiovascular Data.........................48

    6.    Allegation No. 6:  Merck Tried to Design the VIGOR Trial in
the First Instance to Avoid Creating Negative Cardiovascular
Data.................................................................................................49

    7.    Allegation No. 7:  The Head of MRL Acknowledged the
Cardiovascular Danger of Vioxx.......................................................51

    8.    Allegation No. 8:  Merck's Naproxen Cardioprotection
Hypothesis Was an Implausible Explanation for the VIGOR
Trial Cardiovascular Data that the Scientific Community – and
Even Some MRL Scientists – Recognized Did Not Explain the
Between-Treatment Difference in Cardiovascular Events. ..............54

    9.    Allegation No. 9:  The Published VIGOR Trial Results
Intentionally Omitted Important Cardiovascular Risk
Information.....................................................................................71

    10.   Allegation No. 10:  Merck Recognized that Vioxx Was
Prothrombotic, and Secretly Tried to Reformulate It. .......................80

    11.   Allegation No. 11:  Merck's Pooled Analyses Were Flawed. ...........82

    12.   Allegation No. 12:  Merck Intentionally Withheld from the
FDA a Meta-Analysis of Myocardial Infarctions in the Vioxx
Program.........................................................................................88

    13.   Allegation No. 13:  Merck Confirmed the Cardiovascular
Safety of Vioxx Through Misleading Promotion. .............................91

    14.   Allegation No. 14:  Other Merck Studies Showed that Vioxx
Was Dangerous, But Merck Ignored or Hid the Results. .................96

    15.   Allegation No. 15:  Merck Kept the Cardiovascular Safety
Information Out of the Product Label. ...........................................104

    16.   Allegation No. 16:  Merck Announced – Then Cancelled – a
Cardiovascular Outcomes Trial to Avoid Revealing That
Vioxx Was Prothrombotic. ...........................................................107

    17.   Allegation No. 17:  Merck Ignored Mounting Epidemiological
Evidence That Vioxx Was Prothrombotic. .....................................111

    18.   Allegation No. 18:  Merck Withdrew its Application Seeking
Approval to Market Arcoxia Because MRL Scientists Knew
That it Was Not Safe and Would Invite Further Scrutiny of
Vioxx's Cardiovascular Profile.....................................................113

C.    Summary of Principal Criticisms and Findings Concerning Merck's
Marketing Practices for Vioxx. .............................................................116

    19.   Allegation No. 19:  Merck Attempted to Improve Vioxx's
Competitive Position by "Neutralizing" Physicians Who
Supported Celebrex or Were Critical of Vioxx...............................117

M00AA13727

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

20. Allegation No. 20: Merck's Marketing Department Unduly Influenced the Scientific Research Agenda. ................... 122

21. Allegation No. 21: Merck Went on the Offensive Against Doctors and Academics who Questioned Vioxx's Cardiovascular Safety. ................................................ 124

22. Allegation No. 22: Merck Sales Representatives Used Misleading Promotional Aids to Sell More Vioxx and Were Trained to Dodge Questions About Cardiovascular Risks. ............. 126

D. Summary of Principal Criticisms and Findings Concerning Merck's Post-withdrawal Analysis and Reporting of Cardiovascular Data Arising From The APPROVe Trial. ........................................ 130

23. Allegation No. 23: Merck's Claim that the Increased Risk of Cardiovascular Events on Vioxx Has Been Observed Only After 18 Months of Continuous Treatment Is Not Supported by the Data. ................................................................. 131

24. Allegation No. 24: The Article in the New England Journal of Medicine About the APPROVe Trial Cardiovascular Results and Merck's Corrective Statements Were Purposefully Misleading. ................................................................. 139

25. Allegation No. 25: New Data Collected from Patients Who Were Enrolled in the APPROVe Trial Indicate that the Relative Risk of a Cardiovascular Event on Vioxx Increases Almost Immediately – Not After 18 Months as Merck Has Claimed. .................................................................. 158

E. Summary of Principal Criticisms and Findings Concerning Financial Interests of Merck Senior Management. ................................... 168

26. Allegation No. 26: Merck Senior Managers Turned a Blind Eye to the Cardiovascular Risks of Vioxx so as not to Jeopardize Their Compensation. ................................... 168

27. Allegation No. 27: Merck Senior Executives Traded on Material, Nonpublic Information Concerning Vioxx. ..................... 173

CONCLUSION ........................................................................ 176

M00DA113728

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

## INTRODUCTION

This Report arises from Merck's announcement on September 30, 2004 that it
was voluntarily withdrawing Vioxx from the market in light of new data from a Merck-
sponsored clinical trial suggesting that Vioxx increased patients' relative risk of
cardiovascular adverse events (such as heart attacks and strokes) after 18 months of
continuous use.  Merck's voluntary withdrawal of Vioxx – a widely used prescription
pain medication – triggered immediate, extensive and often negative comments in the
media and in personal injury cases against the Company suggesting that members of the
Company's senior management were aware that Vioxx posed serious cardiovascular risks
to patients and deliberately hid this fact from the public.

As described below, a Special Committee of the Board of Directors of Merck
commissioned The Honorable John S. Martin, Jr., Of Counsel to Debevoise & Plimpton
LLP, to conduct an independent investigation of senior management's conduct with
respect to the cardiovascular safety profile of Vioxx during the period that Vioxx was
developed and marketed.[1]  Judge Martin and a team of lawyers and paralegals from
Debevoise (collectively "Debevoise") spent over 53,000 hours conducting the
investigation over a period of approximately twenty months.

In attempting to present the results of the investigation in a manner that is both
concise and comprehensive, we have determined that it is best to limit the body of this

---

[1]     Prior to joining the litigation department of Debevoise in 2003, Judge Martin, among various other
positions, served for thirteen years as a United States District Judge for the Southern District of New
York and for three years as the United States Attorney for the Southern District of New York.

M00AA13729

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Report to a summary of the principal allegations of wrongdoing that have been made

against Merck and our findings and conclusions with respect thereto and to attach to the

Report a series of Appendices that discuss in great detail all of the key actions of Merck

employees with respect to Vioxx both internally and in their communication with the

United States Food and Drug Administration (the "FDA"), the scientific community and

the public at large. This Introduction (i) provides a brief overview of the scientific issues

involved, (ii) discusses the formation and mandate of the Special Committee, and

(iii) details the scope and conduct of our investigation, including the materials reviewed.

The Report then describes the central criticisms asserted against the Company and senior

management and presents our findings and conclusions with respect to each such

criticism.

## I.

## OVERVIEW OF SCIENTIFIC ISSUES.

Vioxx, an anti-inflammatory agent indicated for the treatment of arthritis, acute

pain, and primary dysmenorrhea, was one of a new class of drugs known as "selective

Cox-2 inhibitors" that first were introduced to the market in the late 1990s. The science

behind selective Cox-2 inhibitors was new and developing when Vioxx and its leading

competitor, Searle/Pfizer's Celebrex,[2] were launched, and the scientific community's

understanding of how selective Cox-2 inhibitors operate has continued to evolve.

---

[2] Searle and Pfizer co-developed Celebrex in the mid-1990s. At the time, Searle was the
pharmaceutical business unit of Monsanto Company. In April 2000, Pharmacia & Upjohn merged
with Monsanto and Searle creating Pharmacia Corporation. Pharmacia agreed to continue Searle's
agreement with Pfizer to co-promote Celebrex. In April 2003, Pharmacia and Pfizer merged and

M00A13730

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Before selective Cox-2 inhibitors were developed, the leading drugs on the market for the treatment of arthritis were non-selective non-steroidal anti-inflammatory drugs ("NSAIDs") – such as aspirin, ibuprofen and naproxen -- that operated by inhibiting an enzyme in the human body called cyclooxygenase ("Cox"). While traditional non-selective NSAIDs were effective at relieving pain and inflammation, they often led to gastrointestinal side-effects such as ulcers, perforations and bleeds that were associated with thousands of deaths each year and severely compromised many patients' quality of life. As a result, the FDA required all NSAIDs to include a warning in the label or package insert concerning gastrointestinal side-effects (the "NSAID-class gastrointestinal warning").

In the early 1990s, however, scientists discovered that the human body creates two isoforms of cyclooxygenase: (i) Cox-1, which protects the lining of the gastrointestinal tract from ulcers and related injury; and (ii) Cox-2, which is expressed at sites of pain and inflammation. Scientists theorized that a drug targeted at suppressing Cox-2 alone would provide the relief from pain and inflammation of traditional non-selective NSAIDs (those that inhibited both Cox-1 and Cox-2) without inhibiting Cox-1's protective effect on the stomach lining. This breakthrough led to the development of selective Cox-2 inhibitors.

---

began operating as Pfizer. http://www.pfizer.com/pfizer/history/2003.jsp. We refer to either or both companies as Searle/Pfizer in connection with Celebrex in this Report.

M00AA13731

Report of John S. Martin, Jr. to the Special Committee     September 5, 2006
of the Board of Directors of Merck & Co., Inc.     Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

   In late 1997, before Vioxx was approved for sale in the United States, Dr. Garret

FitzGerald[*], a highly regarded expert on prostaglandins at the University of Pennsylvania

and a long-time consultant to Merck Research Laboratories ("MRL"), raised a theoretical

question about the cardiovascular safety of Vioxx and other selective Cox-2 inhibitors.

The question arose from a clinical trial that Dr. FitzGerald[*] had conducted with Vioxx

(and a similar trial that he had conducted with Celebrex) in which he found that inhibition

of Cox-2 suppressed urinary excretion of a metabolite of prostacyclin, a hormone-like

substance that dilates blood vessels and inhibits blood clotting.  Some scientists,

including Dr. FitzGerald[*], theorized that this meant that suppression of Cox-2 inhibited

the creation of prostacyclin in the vasculature.  Scientists previously had known that

Cox-1 mediates the production of thromboxane, a counterpart to prostacyclin that has the

opposite effect:  it constricts blood vessels and promotes clotting.  Dr. FitzGerald[*] thus

hypothesized that by inhibiting Cox-2 and not Cox-1, selective Cox-2 inhibitors might

cause an imbalance between prostacyclin and thromboxane that could place patients in a

prothrombotic state and thus put them at increased risk for heart attacks and strokes (the

"FitzGerald prostacyclin hypothesis").  Merck's clinical outcomes data on Vioxx did not

at that time provide any support for Dr. FitzGerald's[*] hypothesis, nor did Merck have any

other evidence to suggest that Vioxx was prothrombotic in humans.

   The FDA approved Vioxx in May 1999, five months after it had approved

Celebrex.  One of Merck's principal regulatory and marketing objectives for Vioxx was

---

[*] Throughout this Report, we identify scientists and others external to Merck with an "*" following
their name.

M00AA13732

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

to prove to the FDA's satisfaction that Vioxx caused fewer gastrointestinal side effects than traditional non-selective NSAIDs and thus that the FDA should not require Vioxx to carry the standard NSAID-class gastrointestinal warning included on all NSAID labels. Although Merck had hoped that the FDA would agree based on then-available clinical data that Vioxx did not require the standard warning, the FDA believed that additional data would be required in order to eliminate the warning.

In 1999, Merck commenced a clinical trial in rheumatoid arthritis patients, called the Vioxx Gastrointestinal Outcomes Research trial (the "VIGOR Trial"), to determine if Vioxx provided greater gastrointestinal safety than naproxen, a traditional non-selective NSAID. Data from the trial were blinded (meaning that MRL did not know which patients were receiving Vioxx and which were receiving naproxen) until March 9, 2000.

The VIGOR Trial proved the Cox-2 hypothesis – that Vioxx caused fewer gastrointestinal complications than the non-selective NSAID comparator – but a statistically significantly greater number of patients in the Vioxx group of the trial experienced a serious cardiovascular adverse event than in the naproxen group. Although the absolute numbers were small – based on unadjudicated data available in March 2000, 92 of the 4,047 patients in the Vioxx arm of the study were reported to have experienced a serious cardiovascular event compared to 46 of the 4,029 patients in the naproxen arm – the VIGOR Trial data raised a serious, and no longer merely theoretical, question about the cardiovascular safety of Vioxx.

After reviewing the VIGOR Trial data in detail and analyzing data from a number of other Merck clinical trials, including two ongoing trials that tested Vioxx against

M0DA13733

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

placebo, scientists at MRL came to the view that the between-treatment difference in the

cardiovascular event rates most likely was caused not by any prothrombotic effect of

Vioxx but instead by a cardioprotective effect of the comparator drug, naproxen.

Traditional NSAIDs were long understood to temporarily block platelet aggregation due

to their inhibition of Cox-1, although none except aspirin had been proven in large

clinical trials to provide cardioprotection.  Because naproxen was one of the

longest-acting traditional non-selective NSAIDs and provided a relatively high degree of

platelet inhibition, MRL scientists believed that its antiplatelet effects had provided

cardioprotection to patients in the naproxen arm of the trial.  In other words, they came to

believe that Vioxx had not increased the incidence of cardiovascular events, but that

naproxen had reduced it.

Merck submitted to the FDA complete data from the VIGOR Trial, including

cardiovascular data up through the February 10, 2000 reporting cut-off date, in June

2000.  In February 2001, the FDA convened an Advisory Committee to review, among

other things, results of the VIGOR Trial.  The FDA medical reviewers involved in the

label negotiations did not agree with Merck that the VIGOR Trial cardiovascular data

could be explained simply by a cardioprotective effect of naproxen, noting that no such

protective effect of naproxen had been demonstrated in any prospectively designed

clinical trial.  The FDA medical reviewers tasked with reviewing data from the VIGOR

Trial and other Merck clinical trials did not think that the existing data were sufficient to

show that Vioxx did not increase cardiovascular risk.  When Merck and the FDA in April

2002 reached agreement on changes to the Vioxx label to reflect data from the VIGOR

M00AA13734

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Trial, the revised label included cardiovascular information in the "Precaution" section,
but not in the "Warning" section, and did not make reference to naproxen
cardioprotection as an explanation for the VIGOR Trial cardiovascular results.

From March 2000 through September 2004, the scientific community debated the
meaning and importance of the VIGOR Trial cardiovascular data. Scientists, including
MRL scientists, conducted a number of epidemiological (or observational) studies
regarding the cardiovascular profiles of Vioxx and naproxen. These studies generated
inconsistent results. MRL scientists continued to analyze pooled cardiovascular data
from the Vioxx clinical program, which they believed confirmed that Vioxx did not pose
a cardiovascular risk and that the cardiovascular differential seen in the VIGOR Trial was
attributable to a protective effect of naproxen.

In late 2002, Merck instituted a study called Protocol 203 that would combine and
analyze cardiovascular data from three placebo-controlled clinical trials – the
Adenomatous Polyp Prevention on Vioxx trial (the "APPROVe Trial"), the Vioxx
Prostate Cancer Prevention trial (the "ViP Trial") and the Vioxx Colorectal Cancer
Therapy Optimal Regime trial (the "VICTOR Trial") – that were designed to test the
efficacy of Vioxx in preventing certain cancers. In September 2004, the External Safety
Monitoring Board for the APPROVe Trial noted that the difference in the incidence of
cardiovascular events between the Vioxx and placebo arms of the study, which the Board
members had been monitoring for some time, was statistically significant. Although the
APPROVe Trial, which had enrolled patients for a 36-month period, was just weeks from
completion, the External Safety Monitoring Board recommended, based on the

M00AA13735

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

cardiovascular data, that the study be stopped and that MRL scientists be unblinded to the data.

After reviewing the cardiovascular data from the APPROVe Trial, Dr. Peter Kim, who became the President of MRL in 2002, recommended that Vioxx be withdrawn from the worldwide market, a conclusion that Merck's Management Committee and Board of Directors endorsed.

These events have given rise to a host of criticisms of and allegations against the Company and its senior management. In connection with our investigation, Debevoise has collected and reviewed such criticisms, including those expressed in newspapers, in scientific journals, in pleadings filed in personal injury and shareholder litigation, in expert reports, at trials, and by members of Congress.

## II.

## FORMATION AND MANDATE OF THE SPECIAL COMMITTEE.

Within weeks of Vioxx's withdrawal, the number of personal injury lawsuits filed against Merck soared. In addition, the United States Securities and Exchange Commission ("SEC"), the United States Department of Justice ("DOJ"), the FDA, and three separate Congressional committees began to investigate the cardiovascular risks associated with Vioxx and the Company's development, testing and marketing of the product. On October 29, 2004, Merck's Board of Directors received a letter from a lawyer representing Merck shareholders who demanded that the Board "take legal action against Raymond V. Gilmartin, the Chairman of the Board, Chief Executive Officer and

M00AA13736

Report of John S. Martin, Jr. to the Special Committee          September 5, 2006
of the Board of Directors of Merck & Co., Inc.                 Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

President of the Company and any other individuals responsible for causing the damage

to the Company with respect to any improper marketing of Vioxx."[3]

In light of these developments, on November 23, 2004, Merck's Board of

Directors formed a Special Committee of six outside directors to conduct an internal

investigation of senior management's conduct with respect to Vioxx.[4]  In light of "the

Board's responsibility to examine and resolve whether management properly executed its

duties with respect to the study and disclosure of the cardiovascular safety profile of

Vioxx," the Special Committee was instructed to "make recommendations to the full

Board on the appropriate disposition of shareholder demands and other requests to the

Board related to Vioxx."[5]

The Board authorized the Special Committee to retain outside counsel and other

consultants, as necessary.  On December 6, 2004, Judge Martin and Debevoise were

retained to conduct a comprehensive investigation of the actions of Merck's senior

management prior to Merck's voluntary withdrawal of Vioxx and to provide other legal

advice to the Committee.

On May 22, 2006, MRL scientists became aware of an error in an article

describing the APPROVe Trial cardiovascular data that had been published in the New

---

[3]   10/29/04 demand letter from J. Abraham* (on behalf of E. Fagin* and J. Fagin*) to the Board of
      Directors of Merck.

[4]   The Special Committee is composed of:  William G. Bowen (Chairman), Lawrence A. Bossidy,
      William N. Kelley, Rochelle B. Lazarus, Samuel O. Thier, and Peter C. Wendell.

[5]   Minutes of 11/23/04 Merck Board of Directors meeting, MRK-MIAA0004155, at 56.

M00AA13737

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

England Journal of Medicine in February 2005. Because the error was potentially relevant to the accuracy of certain of the article's conclusions, it was brought to the attention of the full Board on May 23, 2006 at a regularly scheduled meeting. At that meeting, the Board extended the Special Committee's mandate to include investigation of the error in the APPROVe article and, more broadly, review of post-withdrawal analyses and reporting of cardiovascular data arising from the APPROVe Trial. The Special Committee in turn directed Judge Martin and Debevoise to extend the investigation.

## III.

### SCOPE AND CONDUCT OF THE INVESTIGATION.

From the outset, the Special Committee's overarching directive to Judge Martin was to conduct a comprehensive, independent and objective investigation. Judge Martin was instructed to evaluate and report on senior management's integrity with regard to the development, testing and marketing of Vioxx and, in particular, to determine whether management acted ethically and with scientific integrity in analyzing cardiovascular-related clinical data, in establishing clinical trials to investigate any cardiovascular risks, in reporting cardiovascular-related data to the FDA, in communicating the cardiovascular data accurately to the public, and in describing the cardiovascular risk in product labeling.

Judge Martin also was instructed to evaluate the accuracy and integrity of Merck's press releases relating to Vioxx's cardiovascular profile, to determine whether senior management inappropriately attempted to influence the Company's scientific beliefs with respect to Vioxx's cardiovascular profile, and to determine whether senior

- 10 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

management's directions to sales and marketing personnel accurately reflected the
Company's scientific beliefs at the time.

The Special Committee further instructed Judge Martin and the Debevoise team
(i) to collect and review all relevant documents, both from within the Company and in the
possession of advisors, counsel and other third parties who might have relevant
information,[6] and (ii) to conduct interviews of Company directors, employees and others
who might have information relevant to the investigation.

In addition, the Special Committee authorized Debevoise to retain expert
consultants to assist in its evaluation and analysis of scientific and regulatory issues.
With the advice and consent of the Special Committee, Debevoise retained
(i) Dr. R. Wayne Alexander[*], a prominent cardiologist who chairs the Department of
Medicine at Emory University's School of Medicine; (ii) Nancy L. Buc[*], Esq., former
Chief Counsel to the FDA, a recognized expert on FDA regulatory matters and a member
of the law firm Buc & Beardsley; and (iii) Dr. Ralph B. D'Agostino, Sr.[*], a leading
biostatistician who is Professor of Mathematics, Statistics and Public Health at Boston
University, Director of the Boston University Statistics and Consulting Unit, and
co-principal investigator of the Framingham Heart Study contract, with the assistance of
Dr. Michael Pencina[*], who is Research Assistant Professor of Statistics at Boston
University's Statistics and Consulting Unit.

---

[6]    We have not reviewed any documents that the Company has claimed are protected by the
attorney-client privilege or the work product doctrine.  The Special Committee retained special
counsel to review these documents.

M0DAA13739

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The Special Committee asked to be kept apprised of the progress of the

investigation and to be notified immediately of any evidence that appeared to reflect

negatively on the integrity of senior management.  The Special Committee also asked for

and received monthly progress reports.  Throughout the investigation, Judge Martin was

instructed to report all findings to the Special Committee candidly and objectively

without regard to the potential consequences to the Company or any of its current or

former directors, officers or employees.

IV.

**MATERIALS REVIEWED.**

A.      **Documents Produced by Merck in Products Liability Cases,
        Shareholder and ERISA Litigation and Government Investigations.**

As indicated above, the Special Committee's investigation did not occur in a

vacuum:  beginning prior to and continuing throughout the investigation, Merck was

engaged in products liability and shareholder litigation with thousands of plaintiffs

around the country and was the subject of investigations by the SEC, the DOJ, the FDA

and three Congressional committees:  (i) the Senate Committee on Finance, chaired by

Senator Charles E. Grassley[*]; (ii) the House Committee on Government Reform, chaired

by Congressman Tom Davis[*]; and (iii) the House Committee on Energy and Commerce,

chaired by Congressman Joseph L. Barton[*].

In responding to discovery requests by civil plaintiffs and to government and

Congressional subpoenas, the Company has produced over 23 million pages of

documents, computer files and electronic mail, including, but not limited to:  Board

- 12 -

M0DAA13740

Report of John S. Martin, Jr. to the Special Committee                        September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

materials; files (including electronic mail files) of current and former Merck employees

who were principally involved in developing, testing or marketing Vioxx; minutes, notes

and other records of all meetings of Merck's cross-disciplinary and departmental

committees involved in the development, testing and marketing of Vioxx; FDA

submissions and correspondence concerning Vioxx; Vioxx-related marketing and sales

materials; press releases and other public statements concerning Vioxx; SEC filings made

during the relevant period; published articles, clinical trial protocols, clinical trial data,

standard operating procedures, data analysis plans and adverse event reports relating to

Vioxx clinical trials; other internal Merck communications concerning the development,

testing, marketing and withdrawal of Vioxx; communications concerning the drafting of,

and subsequent correction to, the article on the APPROVe Trial published in the New

England Journal of Medicine; and Merck's post-withdrawal analysis and reporting of

cardiovascular data arising from the APPROVe Trial.

**B.      Documents Submitted by Merck to the FDA in Connection
         with Advisory Committee Meetings Related to Vioxx.**

Between April 1999 and February 2005, the FDA convened three expert panels,

consisting of outside independent experts, to review certain safety issues relating to

Vioxx. These panels, called Advisory Committees, provide the FDA with the benefit of

receiving outside expert recommendations. In general, the Committees invite

pharmaceutical company scientists and FDA reviewers to make written submissions

about the issue under review, and then hold public hearings, which are transcribed. The

FDA Advisory Committees then make recommendations to the FDA.

M00AA13741

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The first such Advisory Committee meeting concerning Vioxx was held on April 20, 1999, to discuss the original New Drug Application for Vioxx. The second Advisory Committee meeting was convened on February 8, 2001, to review the data from the VIGOR Trial and Merck's supplemental New Drug Application for Vioxx. The third meeting was held from February 16 through 18, 2005, after Vioxx was withdrawn from the market, for the purpose of reviewing and evaluating the safety of the entire class of selective Cox-2 inhibitors, including whether to recommend that the FDA allow Vioxx to be marketed again.

On February 18, 2005, the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee recommended at a joint meeting by a vote of 17-to-15 that Vioxx be allowed back on the market with appropriate warnings.[7] The findings and recommendations of the joint Advisory Committee were then reviewed by the FDA, which issued a memorandum on April 6, 2005 discussing the results of its review.[8]

Debevoise reviewed all background materials submitted by Merck to the three Advisory Committees, reviewed the hearing transcripts and, in the case of the February 2005 Joint Advisory Committee, attended the hearings and reviewed the findings and position statements.

---

[7]   Minutes of 2/16/06 – 2/18/06 Joint Meeting of the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee, MRK-AID0012816, at 27-28.

[8]   4/6/05 memorandum from J. Jenkins* and P. Seligman* (FDA Position Paper), MRK-AFK0222697-715.

M00AA13742

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

## C.     Documents Collected from External Sources.

Debevoise also reviewed Vioxx-related materials collected from sources external to Merck.  These materials included (i) scientific literature concerning Vioxx, other selective Cox-2 inhibitors and non-selective NSAIDs, including journal articles published before and during the investigation, (ii) documents produced by third parties in the civil litigation, (iii) press coverage concerning Vioxx, (iv) a large sampling of the personal injury and securities-related complaints filed against Merck in state and federal court, and (v) expert reports filed in connection with civil complaints.

## V.

## WITNESSES INTERVIEWED AND PRIOR TESTIMONY.

Over the course of the investigation, Debevoise interviewed approximately 115 people, including Merck employees, former employees, directors and outside consultants to Merck, and conducted many follow-up interviews, for a total of over 150 interviews. Exhibit 2 to this Report identifies all persons interviewed by Debevoise.

In addition, Debevoise reviewed the testimony of approximately 70 Merck witnesses who testified at civil depositions, before the FDA or before Congressional committees, and reviewed all exhibits used in connection with such testimony. Debevoise also monitored closely the eight Vioxx-related personal injury trials that occurred during the course of our investigation:  Ernst v. Merck (Texas state court); Humeston v. Merck (New Jersey state court); Plunkett v. Merck (federal court in Texas); Garza v. Merck (Texas state court); McDarby/Cona v. Merck (New Jersey state court);

- 15 -

M00AA13743

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                         Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Doherty v. Merck (New Jersey state court); Grossberg v. Merck (California state court);

and Barnett v. Merck (federal court in Louisiana).

As is true in any non-governmental investigation, Debevoise did not have

subpoena power and therefore was dependent upon the voluntary cooperation of persons

with relevant information. Although the vast majority of the people we contacted took

the time to speak with us, a small number of former Merck employees, including

Drs. Carolyn Cannuscio, Laura Demopolous, Peter DiBattiste, Karen Grosser, Eve Slater

and Rhoda Sperling, were not willing to take the time. Although interviewing these

witnesses might have enhanced our understanding of certain relevant facts and assisted

our investigation, in light of the substantial information and evidence, including

documentary evidence, to which Debevoise had access, we believe it unlikely that

interviewing any of these former employees would have revealed new or different facts

that would materially alter our conclusions.

## VI.

## THE SCOPE AND FORMAT OF THIS REPORT.

The Special Committee's principal concern was to determine whether senior

management of the Company acted with integrity throughout the period that Vioxx was

developed and marketed to the public. Thus, the Committee directed Judge Martin and

the Debevoise team to focus on whether anyone in senior management believed that

Vioxx was prothrombotic, intentionally acted to deceive the FDA or the public

concerning the safety of Vioxx, or failed or refused to perform necessary tests or clinical

trials in order to avoid disclosing suspected or demonstrated safety risks.

- 16 -

M00AA137744

Report of John S. Martin, Jr. to the Special Committee          September 5, 2006
of the Board of Directors of Merck & Co., Inc.          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

The Committee did not ask us to attempt to second guess decisions concerning the development or marketing of Vioxx that were made in good faith. This Report will not attempt, therefore, to pass judgment on the wisdom of each of the actions that Merck employees took in the course of the development and marketing of Vioxx.

We should note also that our investigation has focused on the issue of intentional wrongdoing and that we have not attempted to answer the question whether the conduct of Merck's employees should give rise to civil liability. As the results in the Vioxx civil litigation have demonstrated, different juries under different legal instructions have reached, and may continue to reach, different conclusions concerning the same conduct.

We have set forth in exhaustive detail in the twenty Appendices to this Report all of the relevant events in the development and marketing of Vioxx for two important reasons: First, in judging whether Merck's senior management acted with integrity with respect to any particular matter, it was important to understand the overall factual context in which they were operating. For example, in determining whether someone deliberately attempted to hide a critical fact when that fact was not disclosed in a particular document, it is important to know whether that same person disclosed that fact in another document or in other contexts. Similarly, whether a person's statement of an opinion was intended to deceive may depend upon the extent to which the person making the statement disclosed all of the data necessary to evaluate that opinion.

Second, and perhaps most important, we recognize that given the extensive controversy that has developed concerning Merck's actions with respect to Vioxx, the Board may determine to release our Report to the shareholders and the public. The

M00AA13745

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

authors of this Report have had enough experience in dealing with matters of public

concern to know that the mere fact that a particular lawyer or group of lawyers has come

to a conclusion will not put to rest the public's concern about a particular controversy.

Thus, it is important for the public to have as extensive a record as possible against which

it can judge the conclusions we reach herein.  It is our hope that by providing a very

detailed set of Appendices, we will enable all of those who have serious questions about

the conduct of Merck's management to draw their own conclusions based on the facts as

we have set them forth.  We obviously hope that they will agree with our conclusions,

but, at a minimum, we hope that they will agree that we have engaged in a rigorous and

comprehensive review of the facts and have set forth those facts in an unbiased manner

that will allow others to formulate their own conclusions.

M0DAA13746

Report of John S. Martin, Jr. to the Special Committee                        September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

## OUR FINDINGS

## VII.

## THE OVERARCHING ISSUES.

The leitmotif of Merck's critics is that MRL scientists knew that Vioxx was prothrombotic, or, at the very least, that there was a substantial likelihood that it was prothrombotic, and hid that fact from the public until the drug's withdrawal in September 2004. Critics contend that senior officials at Merck knowingly put patients at risk of cardiovascular events rather than jeopardize the profits that Merck generated from the sale of Vioxx. After an exhaustive investigation, we have concluded that there is no basis for such a claim.

In September 2004, when Dr. Peter Kim, the head of MRL, first informed Mr. Raymond Gilmartin, Merck's Chairman, that preliminary results from the APPROVe Trial indicated that Vioxx might be prothrombotic and that he was convening a group of scientists and outside advisors to review the data, Mr. Gilmartin's response was that Merck would put patient safety first, whatever the results. A few days later, on the recommendation of Dr. Kim, Mr. Gilmartin endorsed the decision to withdraw Vioxx from the market, even though some outside scientific advisors recommended keeping it on the market with a stronger cardiovascular warning. The Board of Directors ratified this decision on September 28, 2004, and Vioxx was withdrawn from the worldwide market on September 30, 2004.

M00AA13747

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

In large measure, the most dramatic evidence cited by Merck's critics in support

of the claim that MRL scientists knew that Vioxx was prothrombotic consists of

statements by MRL scientists taken out of context. For example, newspaper articles have

quoted repeatedly from an email sent by Dr. Scolnick (the head of MRL until 2002) on

March 9, 2000, the same day that he received the initial results of the VIGOR Trial, in

which he stated: "The CV events are clearly there. . . . It is a shame but it is a low

incidence and it is mechanism based as we worried it was . . . . [T]here is always a

hazard."[9]  Indeed, Dr. Scolnick has testified that his immediate reaction to the VIGOR

Trial results was that the entire class of selective Cox-2 inhibitors then on the market

might be prothrombotic.

By the end of March 2000, however, after reviewing and analyzing a substantial

amount of information, including data from other Merck trials, Dr. Scolnick and other

MRL scientists became comfortable that the between-treatment difference in

cardiovascular events in the VIGOR Trial was most likely caused by the cardioprotective

effects of naproxen.  Nonetheless, Dr. Scolnick continued to consider the meaning of the

data.  On April 12, 2000, he wrote to another MRL scientist, "I will tell you my worry

quotient is high.  I actually [sic] am in minor agony."  In the email, Dr. Scolnick

suggested doing a large outcomes study with a "safety first primary endpoint . . . . WE

---

[9]      3/9/00 email from E. Scolnick to D. Shapiro, A. Reicin and A. Nies, MRK-ABH0016220.

M00DA11374B

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS
STUDY."[10]

Critics who have focused on Dr. Scolnick's March 9, 2000 email have tended to
ignore his subsequent emails reflecting his belief based on additional data and analysis
that Vioxx was not prothrombotic. For example, on April 14, 2000, two days after
writing the above-quoted email and reviewing additional data suggesting that a
disproportionate number of the cardiovascular adverse events occurred in high-risk
patients who should have been taking low-dose aspirin to help prevent such events, he
wrote:

> READ IT! This is the latest adjudicated events tabulation.
> My anxiety level about the drug and the class is much
> alleviated [sic] by this data. It shows that the major major
> [sic] difference in events between Vioxx and naproxen is in
> patients who by FDA definition should have been on low
> dose aspirin!!!. . . . With this analysis we can stem the tide
> and save the class/ ED Scolnick[11]

In February 2001, during preparations for the FDA Advisory Committee Meeting
to review the Vioxx supplemental New Drug Application that included data from the
VIGOR Trial, Dr. Scolnick sent an email to colleagues that reflected his view of Vioxx
and its cardiovascular safety as of that time:

---

[10]   4/12/00 email from E. Scolnick to A. Reicin, MRK-ABC0033809 (emphasis in original).

[11]   4/14/00 email from E. Scolnick to R. Gilmartin, D. Anstice, M. McGlynn, K. Frazier, P. Wold-Olsen
and J. Lewent, MRK-ADI0006059. As set forth below at pages 69 and 70 and page 77, as events
developed, the subgroup analysis that Dr. Scolnick reviewed was called into question. However, the
email evidences Dr. Scolnick's state of mind at the time about the safety profile of Vioxx.

M00AA13749

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                        Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

> We all worried to death about the CV events last Spring.
> Merck is of course always an issue.  But I was sick at the
> thought we might be doing harm to patients.  I KNOW each
> of you well enough to know you felt the same way.  with
> [sic] the data now available I am no longer worried.[12]

The strength of Dr. Scolnick's belief that Vioxx was not prothrombotic also is

reflected in an internal email he sent to MRL scientists on November 8, 2001 concerning

a proposed label received from the FDA that included a cardiovascular warning for

Vioxx:

> twice in my life i have had to say to the FDA "That label is
> unacceptable, we will not under any circumstances accept
> it." . . . You WILL have to do that on the cardiac warning
> for Vioxx. . . . And i assure you i will NOT sign off on any
> lable [sic] that had a cardiac warning.  the data review
> yesterday convinces me that we do not have an unsafe drug
> and I am willing if needed to spend several hours one on
> one with anyone at the FDA going through the data until
> they in fact get it[.][13]

Those who argue that MRL scientists did not truly believe that the VIGOR Trial

cardiovascular risk ratio was a result of the cardioprotective qualities of naproxen often

point to a memorandum prepared by Dr. Thomas Musliner, an MRL scientist, more than

three years before the VIGOR Trial data were unblinded (the "Musliner Memorandum").

In that memorandum, Dr. Musliner hypothesized that in any study that tested Vioxx

against a traditional non-selective NSAID there would be "a substantial chance that

significantly higher rates of CV [Adverse Experience] events . . . will be observed in the

---

[12]    2/4/01 email from E. Scolnick to A. Nies, A. Reicin and H. Guess, MRK-ACT0009918.

[13]    11/8/01 email from E. Scolnick to D. Greene, A. Nies and B. Goldmann, MRK-ACR0009287.

- 22 -

M00AA13750

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

selective Cox-2 group . . . ."[14]  What these critics often omit from their discussion is that Dr. Musliner's hypothesis was explicitly based on the assumptions that Vioxx was cardio-neutral and would have no effect on cardiovascular events and that traditional NSAIDs like naproxen, because they block platelet aggregation, might well be cardioprotective.  Accordingly, internal documents such as the Musliner Memorandum establish simply that the theory that NSAIDs like naproxen might have cardioprotective qualities was recognized years before cardiovascular data from the VIGOR Trial were received and was not simply an after-the-fact creation to explain potentially damaging data.

On the basis of our exhaustive review of the record, we have concluded that, prior to receipt of the APPROVe Trial cardiovascular results, none of the senior scientists at MRL believed that Vioxx was prothrombotic.  Indeed, we were told by numerous witnesses, including Dr. Scolnick, Dr. Kim and Mr. Gilmartin, that they, or their family members, were taking Vioxx up until the day that it was withdrawn from the market.

To say that no senior scientists at Merck believed that Vioxx was prothrombotic before receiving cardiovascular data from the APPROVe Trial is not to endorse every action that Merck employees took with respect to Vioxx.  For example, as explained in Appendix K, in January 2001, Merck senior management received a letter from an academic scientist who criticized the manner in which Merck employees had treated other academic scientists who were critical of Merck and Vioxx.  Merck senior

---

[14]    11/21/96 memorandum from T. Musliner to B. Friedman et al., MRK-AAX0002413, at 17.

M00AA137751

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

management investigated the alleged conduct of the Merck official and took steps to ensure that it would not be repeated.[15]

Before Vioxx was launched, certain employees in the Marketing and Sales Departments sought to garner support for the drug among important clinicians who might prescribe the drug and thought leaders who might influence others about the benefits of Vioxx. Documents prepared in connection with their efforts refer to "neutralizing" physicians who were critical of Merck or Vioxx by offering grants or other incentives. As discussed later in the Report and more fully in Appendix K, we found no evidence that senior management endorsed such activities. In addition, in late 2001 Merck undertook, on its own initiative, a comprehensive review of sales and marketing practices throughout the Company. As a result, it implemented enhanced policies concerning compliance, known internally as the "Culture of Compliance." This initiative, which enforced and underscored Merck's commitment to its existing policies regarding promotional activities and physician education and training was not Vioxx-specific. It did, however, reinforce policies and procedures to enhance accountability and transparency and ensure that all interactions between representatives of Merck and physicians were appropriate.[16]

We also note that certain of the press releases that Merck issued concerning Vioxx – including the March 27, 2000 release (announcing the preliminary VIGOR Trial

---

[15]   See Appendix K.

[16]   See Appendix K.

M0DAA13752

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

results), the May 11, 2006 release (announcing preliminary results of a follow-up study on cardiovascular data from the APPROVe Trial) and the May 30, 2006 press release (correcting an error in the article published in the <u>New England Journal of Medicine</u> in February 2005 about the APPROVe Trial cardiovascular data) – did not provide as much context about the issues presented as might have been desirable, and the May 2006 press releases regarding the APPROVe Trial were not as clear as they could have been.[17]

Similarly, as we explain below and in Appendix G, a promotional aid called the Cardiovascular Card that was used by sales representatives with physicians after the VIGOR Trial cardiovascular data were unblinded did not, standing alone, provide all of the cardiovascular data on Vioxx.  Although used in response to questions from physicians about the cardiovascular safety of Vioxx, the Card did not include data from the VIGOR Trial.  The Company, however, separately provided a letter describing the VIGOR Trial data to physicians who asked questions about them.  Finally, the Card included data from prior clinical trials that were reflected in the label but that – like the VIGOR Trial – were not designed to assess cardiovascular risk.

The actions of Merck's employees with respect to the development and marketing of Vioxx must be evaluated with a recognition of three overarching facts:  (i) their belief that Vioxx was an important drug that conferred significant clinical benefits on patients by substantially reducing the risk of serious and sometimes fatal gastrointestinal

---

[17]    Shortly after issuing the May 11, 2006 press release, the Company posted on its website a 137-page report that it had submitted to the FDA containing data and detailed analyses from the follow-up study, as described below.

M00AA13753

Report of John S. Martin, Jr. to the Special Committee            September 5, 2006
of the Board of Directors of Merck & Co., Inc.               Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

complications associated with traditional NSAID therapy; (ii) their belief until the APPROVe Trial data were unblinded that Vioxx was not prothrombotic; and (iii) their decision to withdraw Vioxx based on their views that the APPROVe Trial cardiovascular data reflected an increased relative risk on Vioxx versus placebo. The convictions of Merck personnel concerning the safety of Vioxx are underscored in some instances by their personal use of the drug right up until the day that it was withdrawn. At the same time, MRL scientists understood that, given that the science was new and developing, it was impossible to know with certainty that Vioxx (or any selective Cox-2 inhibitor) posed no cardiovascular risk.

It is in this context that one must evaluate the interaction of MRL scientists with Vioxx's scientific critics and the FDA, and the Company's marketing practices. Whether these beliefs led certain Merck officials to overreact to criticism or to ignore prudent scientific or marketing practices may be the subject of legitimate debate. However, the extensive evidence we have reviewed has convinced us that, during the period that Vioxx was marketed, no member of Merck's senior management believed that Vioxx was prothrombotic and attempted to mislead the scientific or consuming communities.

M00AA13754

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

# VIII.

## REVIEW OF SPECIFIC CRITICISMS OF MERCK'S CONDUCT.

The allegations that have been made against the Company and its senior

management in connection with the development and marketing of Vioxx can be broadly

grouped into four categories:

- Merck's knowledge of the cardiovascular risk profile of Vioxx before Vioxx was approved by the FDA in May 1999;

- Merck's scientific response to cardiovascular data from the VIGOR Trial;

- Merck's marketing efforts; and

- Merck's analysis and reporting of cardiovascular data arising from the APPROVe Trial.

While we do not recite all of the allegations that have been made, we set forth

below each of the major criticisms within these categories followed by our findings and

conclusions with respect to each criticism.

## A.    Summary of Principal Criticisms and Findings Concerning Merck's Pre-approval Knowledge.

Central to the criticisms of Merck's conduct with respect to Vioxx is the

allegation that the Company knew, before Vioxx was approved by the FDA, that the drug

posed a serious cardiovascular risk to patients and deliberately failed to disclose that risk

to the public, the scientific community and the FDA.

Our findings regarding the allegations concerning Merck's alleged pre-approval

knowledge about the cardiovascular risks of Vioxx focus on the comprehensiveness of

- 27 -

M00AA13755

Report of John S. Martin, Jr. to the Special Committee                         September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Merck's pre-clinical and clinical testing of Vioxx and Merck's response to the FitzGerald

prostacyclin hypothesis.

### 1.   Allegation No. 1:  Merck Rushed Vioxx to Market Without Adequate Testing.

#### a.   Summary of Allegation.

The argument is made that "[i]n the late 1990s Merck was facing the loss of

patent protection on several top drugs and needed a big hit."[18]  According to Merck's

1996 profit plan, Merck needed to start marketing Vioxx by the fourth quarter of 1998,

after only four years of tests.  To meet that deadline, it is argued that Merck compressed

significantly the normal period for clinical trials and deliberately failed to test adequately

the cardiovascular safety of Vioxx.

#### b.   Our Findings and Conclusions.

While it is true that Merck lost patent protection on some of its major drugs in

2000 and 2001, we found no evidence to suggest that Merck propelled Vioxx to market

without conducting necessary testing in order to replace anticipated lost profits.

All new drugs at Merck (and in the pharmaceutical industry in general) undergo

rigorous testing, beginning with a series of tolerability studies in animals, that, if

successful, are followed by Phase I through III clinical testing in humans.  These test

results must be presented to the FDA, which must be satisfied that sufficient testing has

been performed to establish both the efficacy and the safety of the drug.  There is no basis

---

[18]   Anna Wilde Mathews* & Barbara Martinez*, Warning Signs:  E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

M00AA13756

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

to conclude that Merck attempted to shortcut the necessary testing or that the FDA did
not carefully review Merck's testing before permitting Merck to market Vioxx.

Merck's New Drug Application for Vioxx was one of the largest New Drug
Applications that Merck had ever filed – in terms of both the number of patients who
participated in Merck's clinical studies for Vioxx and the duration of their treatment with
Vioxx.[19] The application included data from numerous trials designed to test the efficacy
and gastrointestinal safety of Vioxx, which MRL scientists and regulatory liaisons
believed supported Merck's primary regulatory goal: to market Vioxx without the
standard NSAID-class gastrointestinal warning. The FDA approved Vioxx for sale in the
United States but did not agree that data included in the application supported removal of
the standard NSAID-class gastrointestinal warning.

Merck's New Drug Application also provided data about Vioxx's effects on other
body systems. The New Drug Application included analyses of (i) cardiovascular
adverse events that were "serious" (i.e., resulted in death or other serious clinical
outcome, such as hospitalization) in the Phase II/III osteoarthritis studies, and (ii) all
thromboembolic cardiovascular adverse events (including events pertaining to cardiac,
central nervous and peripheral systems) in the same group of studies. These analyses
showed that (i) the incidence rates of serious cardiovascular adverse events were not

---

[19]    In this regard, the application exceeded by far the requirements for a new drug application of the
International Conference on Harmonisation Guidances (developed by the FDA and regulators in
Japan and the European Union), as the FDA medical reviewer who reviewed Merck's New Drug
Application acknowledged. Transcript of 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis
Advisory Committee and the Drug Safety and Risk Management Advisory Committee, MRK-
AIU0185869, at 6106 (statement of M. L. Villalba*).

- 29 -

M00AA13757

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

statistically different between Vioxx, NSAID comparators and placebo, and (ii) the

incidence rates of all thromboembolic cardiovascular adverse experiences were similar

among the treatment groups.

The FDA medical reviewer who reviewed Merck's New Drug Application for

Vioxx has stated that she was aware of the FitzGerald prostacyclin hypothesis at the time

she reviewed the application but that there was no evidence that the hypothesis had any

clinical impact on cardiovascular risk (either from Vioxx or Celebrex, which the FDA

already had approved). The reviewer acknowledged that post-marketing data would

provide the only basis on which to answer any hypothetical question about the

cardiovascular safety of Vioxx. The FDA did not request that Merck furnish additional

data to support its application for approval to market Vioxx, which is something the FDA

presumably would have done had there been any doubt at that time about the

completeness of the application or the safety of Vioxx.

2.      **Allegation No. 2: Merck Knew in 1996
        that Vioxx Was Dangerous to the Heart.**

        a.      **Summary of Allegation.**

        Some have argued that Merck did not investigate fully during the clinical

development phase the serious cardiovascular problems that Vioxx could cause despite

the fact, it is argued, that the Musliner Memorandum mentioned above shows that by

M00AA13758

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

November 1996, MRL scientists were actively discussing Vioxx's potential

cardiovascular risks.[20]

### b.    Our Findings and Conclusions.

The Musliner Memorandum was generated in the context of discussions among

MRL scientists about the design of a large gastrointestinal clinical trial to test the primary

hypothesis that patients taking Vioxx would experience fewer gastrointestinal events than

patients taking traditional, non-selective NSAIDs.  Documents and interviews make clear

that MRL scientists confronted difficult design issues in planning that proposed trial,

including what drug or agent Vioxx should be tested against, but that they did not at any

point in the design process conclude that, or even consider whether, Vioxx was

prothombotic.  Rather, their entire discussion was predicated on the assumption –

expressly set forth in the Musliner Memorandum – that Vioxx was cardio-neutral.

The record makes clear that MRL scientists did not believe that it was ethical or

feasible to deny pain relief to patients with osteoarthritis for a lengthy period (the trial

was being planned to last approximately twelve months), so a trial testing Vioxx versus a

placebo was not an option.  In addition, a number of MRL scientists believed that, as

stated in the Musliner Memorandum, testing Vioxx against a traditional non-selective

NSAID comparator had the potential to yield a between-treatment differential in

cardiovascular events favoring the comparator because non-selective NSAIDs had

antiplatelet effects and could, by virtue of those effects, provide cardioprotection to

---

[20]    Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's
Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

- 31 -

M00AA13759

Report of John S. Martin, Jr. to the Special Committee                          September 5, 2006
of the Board of Directors of Merck & Co., Inc.                          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

patients in the NSAID arm of the trial.  Thus, these scientists expressed concern that

testing Vioxx against a traditional NSAID comparator created the theoretical risk that

patients in the NSAID arm would experience fewer cardiovascular events than those in

the Vioxx arm, a result that they speculated might be misconstrued to suggest that Vioxx

had caused a higher number of cardiovascular events.

     MRL scientists also discussed internally and with external experts whether or not

patients in the trial should be permitted to take low-dose aspirin.  The evidence reflects

that those involved in the discussions carefully weighed competing design considerations.

The benefits of allowing low-dose aspirin use in both the NSAID and Vioxx arms would

be (i) that it would permit usage by a broad spectrum of patients, including those

requiring the use of low-dose aspirin for cardiovascular prophylaxis, and thus would have

reflected "real world" usage of Vioxx, and (ii) that allowing all patients who might

require cardiovascular prophylaxis to receive it would lessen the likelihood that patients

taking Vioxx would have a higher incidence of cardiovascular events as compared to

those taking a non-selective NSAID.  The problem with allowing patients to take

low-dose aspirin, however, was that aspirin was known to cause gastrointestinal

problems, which would confound the study results and potentially prevent MRL from

proving its primary hypothesis that selective Cox-2 inhibitors do not cause

gastrointestinal injury.

     Ultimately, MRL settled on a trial design in which 25 mg of Vioxx would be

tested against two non-selective NSAIDs, diclofenac and ibuprofen, in patients with

osteoarthritis, and in which low-dose aspirin use would not be allowed.  Merck cancelled

- 32 -

M00AA113760

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

the proposed trial in August 1997, before the first patient was enrolled. As discussed more fully below at pages 47 and 48 in response to the assertion that MRL cancelled the trial anticipating negative cardiovascular data, the cancellation was based on a number of factors, none of which reflected a concern about cardiovascular risk. Indeed, the evidence concerning the development and design of the gastrointestinal outcomes trial reflects no concern whatsoever that Vioxx might be prothrombotic.

In sum, the evidence cited by Merck's critics to support the claim that MRL scientists believed in 1996 that Vioxx was prothrombotic is based on statements that, taken in context, evidence a belief not that Vioxx would cause heart attacks but rather that a comparator NSAID might reduce the number of heart attacks through its inhibition of Cox-1. Hindsight has demonstrated that the MRL scientists involved in the discussion were prescient in that Merck's critics have construed the VIGOR Trial data exactly as MRL scientists anticipated they might.

### 3.   Allegation No. 3: Merck Ignored Advice From Outside Experts Concerning Possible Prothrombotic Risks of Vioxx.

#### a.   Summary of Allegation.

Merck also has been criticized for allegedly failing to heed the advice of at least two of its outside consultants, Dr. Garret FitzGerald[*] of the University of Pennsylvania and Dr. John Oates[*] of Vanderbilt University, both of whom independently urged the Company to investigate further the potential cardiovascular risks of Vioxx even before it was approved by the FDA.

- 33 -

M0DAA13761

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The consultants' recommendations were prompted by the findings of a study,
called Protocol 023, sponsored by Merck and conducted by Dr. FitzGerald[*] in 1996 and
1997. The study showed that Vioxx, like non-selective NSAIDs, suppressed urinary
excretion of a metabolite of prostacyclin – a substance in the body that dilates blood
vessels and helps to prevent blood clots by inhibiting platelet aggregation. The study
further showed that Vioxx, unlike traditional non-selective NSAIDs, did not suppress
urinary excretion of a metabolite of thromboxane, a substance in the body that constricts
blood vessels and promotes blood clots. Although very little was known at the time
about what role, if any, Cox-2 played in the production of prostacyclin in the
bloodstream, Dr. FitzGerald[*] hypothesized that the reduction in prostacyclin metabolite
in the urine meant that Vioxx decreased prostacyclin in the bloodstream and that doing so
without also decreasing thromboxane could theoretically place patients in a
prothrombotic state.

Critics argue that although the study did not prove that patients taking Vioxx
would necessarily experience an increase in the number of cardiovascular events due to a
decrease of prostacyclin in their blood, the "FitzGerald prostacyclin hypothesis" was, at
the very least, cause for immediate concern and follow-up. Critics charge that Merck
failed in 1997 to follow up on the implications raised by the study and did not adequately
investigate the cardiovascular risks of Vioxx.

It is further alleged that after Merck presented the Fitzgerald prostacyclin
hypothesis to its Board of Scientific Advisors in May 1998, the Board examined the
hypothesis and advised MRL to conduct further tests on the potential cardiovascular risks

M00AA13762

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

of the drug.  The allegation is made that just as Merck had ignored its outside consultants when they suggested additional cardiovascular studies in 1997, Merck ignored the advice of its Board of Scientific Advisors in 1998 and failed to conduct any of the studies suggested by that body of experts for fear that such studies would demonstrate that Vioxx created or enhanced cardiovascular risk.

    **b.**    **Our Findings and Conclusions.**

    **(1)**    **Protocol 023 Data and Genesis of the FitzGerald Prostacyclin Hypothesis**

Protocol 023 was funded by Merck and designed to test the renal (or kidney-related) effects of Vioxx as compared to indomethacin (a non-selective NSAID) in a small, 36-subject trial.  Drs. Garret FitzGerald[*] and Francesca Catella-Lawson[*] of the University of Pennsylvania conducted the study, which showed, among other things, that Vioxx reduced prostacyclin metabolite (PGI-M) in urine but did not decrease thromboxane metabolite in the urine.  From this finding, Dr. FitzGerald[*] hypothesized (i) that selective Cox-2 inhibition resulted in reduced levels of prostacyclin in the vasculature (although the source of prostacyclin metabolite in urine was not known with any certainty), and therefore (ii) that the selective inhibition of Cox-2, which has no effect on thromboxane, might upset the balance between prostacyclin and thromboxane in the vasculature, which (iii) could put patients in a prothrombotic state.

M0DAA13763

Report of John S. Martin, Jr. to the Special Committee          September 5, 2006
of the Board of Directors of Merck & Co., Inc.          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

### (2)      MRL Reaction to the FitzGerald Prostacyclin Hypothesis

Our investigation revealed that MRL scientists, including senior management, learned the findings of Protocol 023 -- and Dr. FitzGerald's[*] related hypothesis -- in October 1997, and had two immediate reactions.

First, they questioned Dr. FitzGerald's[*] premise that the suppression of the urinary metabolite necessarily signaled a reduction in vascular prostacyclin. If there were no reduction in vascular prostacyclin, MRL scientists believed, there would be no effect on the thromboxane/prostacyclin balance in the vasculature and thus no prothrombotic effect.

Second, they believed that the Fitzgerald prostacyclin hypothesis was undermined by evidence suggesting that Tylenol, a widely used over-the-counter drug with a long clinical history that had been shown to suppress the same prostacyclin metabolite in urine, had never been shown to be prothrombotic.

### (3)      Merck's Pre-approval Investigation of the Hypothesis

Despite what the evidence suggests were genuine questions within MRL about the premises of Dr. FitzGerald's[*] hypothesis, Merck took several affirmative steps to investigate the hypothesis before Vioxx was approved for sale, and, in our view, concluded in good faith that Vioxx posed no cardiovascular risk.

First, in response to the Protocol 023 data, Dr. Douglas Watson, an MRL epidemiologist, was tasked in November 1997 with reviewing data from Merck clinical trials to determine if there was any signal that patients on Vioxx experienced more

- 36 -

M00AA13764

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

thrombotic events than those on placebo.  Because many of the clinical trials still were

blinded at that time and because there were limited data testing Vioxx against placebo,

Dr. Watson's analysis compared the overall incidence of cardiovascular events as of

December 1997 in the Vioxx clinical program (in the Vioxx and comparator groups

combined) against the incidence of cardiovascular events in the placebo arms of clinical

trials for two other Merck drugs.  This blinded comparison did not signal to MRL

scientists that there was an increased cardiovascular risk in the studies that included

Vioxx.

After the data from Vioxx trials that were ongoing at the time of Dr. Watson's

analysis were unblinded, MRL scientists analyzed the incidence of cardiovascular events

on Vioxx versus comparators in the Vioxx development program and found that the

cardiovascular incidence rate for Vioxx was similar to the incidence rate for the

comparators (non-selective NSAIDs and placebo) in the Vioxx clinical trials to date.  On

that basis, MRL management believed that there likely was no clinical significance to

Dr. FitzGerald's[*] belief that Vioxx suppressed vascular prostacyclin, even if correct.

Although MRL's analysis was not statistically powered to detect a small difference in

cardiovascular events between Vioxx and the comparators, MRL scientists were

comforted by the results.

Second, Merck Frosst, Merck's basic research facility in Montreal, Canada,

conducted an animal study to evaluate the contribution of Cox-2 to prostacyclin

production by the aortic tissue, and found that Cox-2 did not play a major role in

prostacyclin production in the rabbit aorta.  Although this did not rule out the possibility

M00A413765

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

that Cox-2 might be responsible for the production of prostacyclin elsewhere in the
vasculature or in humans, in the minds of MRL scientists it made one of the premises of
the FitzGerald prostacyclin hypothesis more doubtful.

Third, Dr. Alan Nies, head of Clinical Pharmacology at MRL, presented the
FitzGerald prostacyclin hypothesis at a meeting of Merck's Board of Scientific Advisors
in May 1998. This Board of approximately twenty-five outside consultants convened
annually to review and discuss with MRL scientists and Merck senior management
Merck's clinical drug program. The evidence reflects that the Board of outside experts,
which included Dr. John Oates[*], a world-renowned expert on platelets and prostanoids
(including prostacyclin and thromboxane), took the FitzGerald prostacyclin hypothesis
seriously, but did not believe that it should prevent or delay the commercial distribution
of Vioxx given that Merck's unblinded clinical data did not reveal any cardiovascular
risk. In its written report, the Board of Scientific Advisors, which had considered the
"hypothetical adverse effects" of Vioxx, concluded:

> The gain in safety achieved by the elimination of serious
> and fatal gastrointestinal toxicity will free patients from one
> of the most serious adverse effects in current drug therapy.
> Thus, there is a strong mandate for introduction of Vioxx
> into medical practice as soon as is feasible.[21]

In light of the FitzGerald prostacyclin hypothesis, and, to a lesser extent, an
alternative hypothesis endorsed by some members of the Board of Scientific Advisors
that Vioxx's anti-inflammatory properties might provide a cardiovascular benefit to

---

[21]   5/98 "Programmatic Review: Vioxx Program," MRK-AEI0002734, at 742.

M00AA13766

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                           Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

certain patients, the Board of Scientific Advisors recommended that Merck develop a

uniform set of criteria to collect and evaluate cardiovascular events for future analysis. In

response, MRL implemented a Cardiovascular Adjudication Standard Operating

Procedure (the "Cardiovascular Adjudication SOP") requiring that all cardiovascular

events occurring in the Vioxx clinical program be collected in a uniform manner and

assessed for a second time by an independent, blinded expert committee to ensure

consistency across diagnoses.

Merck took several additional steps to investigate the FitzGerald prostacyclin

hypothesis after Vioxx had been approved by the FDA. When Dr. Peter Kim, now

President of MRL, joined Merck in early 2001, he established a "Coxib Task Force" to

focus on important issues in the Vioxx and Arcoxia programs.[22] After hearing about

Dr. FitzGerald's[*] prostacyclin hypothesis and reviewing the research that Merck had

conducted in response to it, Dr. Kim directed Merck scientists to research what Dr. Kim

identified as the basic unconfirmed assumption in the prostacyclin hypothesis: whether

prostacyclin formation is catalyzed by Cox-2 in the vasculature. From Dr. Kim's

perspective, and that of other senior MRL scientists, a finding that prostacyclin exists

side-by-side (or is co-localized) with Cox-2 within cells in the vasculature would lend

credence to that assumption and would support Dr. FitzGerald's[*] hypothesis that

inhibition of Cox-2 could create a prothrombotic state by creating an imbalance between

---

[22]   Arcoxia is Merck's second-generation selective Cox-2 inhibitor. It has been marketed outside of the
       United States, but as of the date of this Report, is not being marketing in the United States. Arcoxia is
       discussed further in Appendix O.

M00AA13767

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

thromboxane and prostacyclin.  On the other hand, a finding that Cox-2 is not co-localized with prostacyclin in the vasculature would cast doubt on Dr. FitzGerald's[*] assumption that Cox-2 catalyzed production of prostacylin in the vasculature, suggesting that suppression of Cox-2 would not alter the balance between prostacyclin and thromboxane in the vasculature and thus that Vioxx should have no prothrombotic effect.

In 2002, Merck conducted an animal study to investigate this question and found that Cox–1 was co-localized with prostacyclin synthase in the vasculature to a greater extent than Cox-2.  This suggested to MRL scientists that inhibition of Cox-2 alone would not increase the risk of thrombotic events through the mechanism proposed in the FitzGerald prostacyclin hypothesis.  It also underscored – as we were reminded repeatedly by prominent outside experts we interviewed as well as by MRL scientists – that Cox enzyme-related science was new and evolving during the time period covered by our investigation.

The record makes clear that given the state of the science, Merck's clinical trial data and the various assumptions underlying the FitzGerald prostacyclin hypothesis, it was not unreasonable for MRL to conclude, after considering that hypothesis, that selective inhibition of Cox-2 would not have, or was not likely to have, any clinical cardiovascular implication.  It is worth noting that even Dr. FitzGerald[*], who believed that his hypothesis applied to all selective Cox-2 inhibitors, including Celebrex, did not believe that FDA approval of selective Cox-2 inhibitors should be delayed on the basis of his hypothesis.  A 1999 <u>Philadelphia Inquirer</u> article quoted Dr. FitzGerald[*] as saying:

M00AA13768

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

"The likelihood is, if this is a risk, it will be a small one because our experience to date does not reveal an excess of cardiovascular events."[23]

### (4)    Studies That Merck Did Not Conduct

The fact that MRL scientists decided not to conduct certain studies proposed by Drs. FitzGerald[*] and Oates[*] does not in our view suggest that Merck scientists did not take reasonable steps to test the validity of Dr. FitzGerald's[*] hypothesis. The evidence shows that MRL scientists concluded that the studies proposed by Drs. FitzGerald[*] and Oates[*] would not answer directly or conclusively the fundamental questions posed by the findings of Protocol 023 – whether Vioxx suppressed prostacyclin production in human vasculature, and, if so, whether Vioxx increased the risk of cardiovascular events in humans – and that the way to answer those questions was by collecting clinical trial data. Moreover, as discussed above, MRL did conduct a number of studies to explore the FitzGerald prostacyclin hypothesis, a fact that cuts against the allegation that MRL failed to conduct certain studies proposed by its outside experts out of fear of what the results would reveal.

---

[23]    Stacey Burling[*], Penn Study Hints at Risks with Cox-2 Painkillers/The New Drugs May Increase a Patient's Chances of Getting a Stroke or a Heart Attack, Phila. Inq., Feb. 1, 1999 (quoting Dr. FitzGerald[*] as stating that he would "fully endorse [the FDA's] decision not to allow [the FitzGerald prostacyclin hypothesis] to retard their approval of Celebrex").

M00A13769

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### 4.   Allegation No. 4:  Merck Did Not Publish The FitzGerald Prostacyclin Hypothesis in a Timely Manner and Did Not Disclose it to the FDA.

#### a.   Summary of Allegation.

The results of Protocol 023 – including the data reflecting a decrease in urinary prostacyclin metabolites in patients taking Vioxx – were made available to Merck and its consultants in late 1997 but were not published until May 1999.  It is asserted that Merck did not want the FDA to know about the FitzGerald prostacyclin hypothesis at least until Vioxx was approved for sale and was concerned that publication of the article might delay approval.  For this reason, it is asserted, Merck also did not address the FitzGerald prostacyclin hypothesis in the New Drug Application it submitted for Vioxx.

#### b.   Our Findings and Conclusions.

We have discovered no evidence to suggest that any members of Merck management sought to conceal the FitzGerald prostacyclin hypothesis from the scientific community or the FDA.  Although the New Drug Application, submitted to the FDA on November 23, 1998, did not expressly refer to Dr. FitzGerald's[*] hypothesis, Merck submitted the data from Protocol 023 on which it was based, including the PGI-M (urinary metabolite) data.  The application also stated that the clinical effects of Vioxx's potential suppression of prostacyclin without a counterbalancing inhibition of thromboxane might require further study.

The New Drug Application set forth the view held by MRL scientists about the cardiovascular safety profile of Vioxx, namely, that Vioxx had no effect on platelet

M00AA13770

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

function and that therefore, as compared to non-selective NSAIDs which inhibited

platelets, there could be a relatively increased rate of cardiovascular events on Vioxx.

In addition, Merck's Background Package submitted to the FDA for the

April 20, 1999 meeting of the FDA Arthritis Advisory Committee stated:

> It had been suggested that specific COX-2 inhibition might
> increase the risk for cardiovascular events due to the lack of
> platelet function inhibition. It is clear that rofecoxib does
> not inhibit platelet aggregation and would not, therefore,
> convey the cardioprotective properties attributed to
> low-dose aspirin. While this benefit is not offered by
> rofecoxib, there is no evidence, preclinically or clinically,
> to suggest that rofecoxib carries any increased risk for
> cardiovascular events.[24]

Dr. Maria Lourdes Villalba[*], the FDA medical reviewer who evaluated Merck's

New Drug Application, has stated that when she reviewed the Vioxx application in 1998,

"[t]here were theoretical concerns regarding that inhibition of prostacyclin could induce

prothrombotic events" but that "based on these data [in the application], there was not

much to say about it." Dr. Villalba[*] further noted that "Celebrex had recently been

approved, in December '98, and Celebrex had not shown anything either."[25] As Dr.

Villalba[*] noted, at the time that the Vioxx New Drug Application was under

consideration, the FDA already had reviewed data in support of the Celebrex New Drug

---

[24]   MRL Background Package for 4/20/99 FDA Arthritis Advisory Committee meeting,
MRK-ACD0064939, at 5109.

[25]   Transcript of 2/16/05 Joint Meeting of the FDA Arthritis Advisory Committee and the Drug Safety
and Risk Management Advisory Committee, MRK-AIU0185869, at 6108.

M00A413771

Report of John S. Martin, Jr. to the Special Committee                         September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Application, including data from the McAdam study (a study similar to Protocol 023 that

Dr. FitzGerald[*] conducted with Celebrex).

      With respect to the article about Protocol 023, the evidence shows that

Dr. FitzGerald[*] and Dr. Catella-Lawson[*] submitted a draft of the article manuscript for

MRL's review in January 1998, as was the protocol for Merck-funded studies.  MRL

scientists Dr. Barry Gertz and Dr. Briggs Morrison engaged in lengthy discussions with

Drs. FitzGerald[*] and Catella-Lawson[*] over the meaning of the data and the manner in

which it should be presented in the published article.  The MRL scientists believed that

the article should focus on the primary objective of the trial – assessing the renal effects

of Vioxx – and the data relevant to that objective, while Dr. FitzGerald[*] and his team

wanted to feature prominently the FitzGerald prostacyclin hypothesis and its potential

implications for selective Cox-2 inhibitors.

      As described in detail in Appendix A, although the evidence shows that there

were sharp differences in the opinions of the MRL scientists and the outside authors and

that, as a result, the negotiations were difficult and at times heated, there is no evidence

that Drs. Gertz and Morrison were motivated by a desire to hide data or prevent the

dissemination of a hypothesis that they viewed as evidence of an increased cardiovascular

risk on Vioxx.  MRL signed off on the draft manuscript, which included the prostacyclin

hypothesis, in April 1998.  The publishing delay was not caused by Merck:  the first

journal to which the article was submitted, the New England Journal of Medicine,

declined to publish the article, and it was thereafter submitted to Journal of Pharmacology

M00AA13772

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

and Experimental Therapeutics in October 1998, accepted in January 1999, and published

in May 1999.  The published article included the FitzGerald prostacyclin hypothesis.

As discussed above, the FitzGerald prostacyclin hypothesis was the main impetus

for the Cardiovascular Adjudication SOP, although the hypotheses that traditional non-

selective NSAIDs and/or Vioxx might be cardioprotective influenced the decision as

well.  Merck submissions to the FDA varied in the extent to which they identified the

FitzGerald prostacyclin hypothesis as a primary motivation for the SOP.  For instance,

Merck's June 2000 submission to the FDA stated that the Cardiovascular Adjudication

SOP was developed to "determine whether there [was] a difference in the degree of

cardiovascular protection conferred by . . . COX-2 selective inhibitors versus

nonselective COX-1/COX-2 inhibitors or placebo."[26]  Merck's Background Package for

the February 8, 2001 meeting of the FDA Arthritis Advisory Committee, however, stated

that the SOP had been established to investigate the hypotheses that Vioxx might be

pro-thrombotic or that traditional non-selective NSAIDs might be cardioprotective.[27]

There is no evidence that Merck withheld from the FDA any evidence regarding

the metabolite findings of Protocol 023 or the incidence of thrombotic events in Vioxx

trials or that anyone at Merck purposefully attempted to mislead the FDA or the public

about the reasons for the adjudication procedure.  Indeed, Merck notified the FDA in

December of 1998 about its intent to adjudicate cardiovascular adverse events in Vioxx

---

[26]    6/29/00 sNDA Cardiovascular Events Analysis, MRK-00420018004, at 015.

[27]    MRL Background Package for 2/8/01 FDA Arthritis Advisory Committee Meeting,
        MRK-ABK0456845, at 859.

M00AA13773

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

trials and submitted a copy of the Cardiovascular Adjudication SOP (which expressly

referred to the FitzGerald prostacyclin hypothesis) to the FDA in May 1999.

### 5. Allegation No. 5: Merck Cancelled a Gastrointestinal Outcomes Trial in 1997 Because MRL Scientists Feared that the Cardiovascular Results Would Be Unfavorable.

#### a. Summary of Allegation.

In 1997, as part of Merck's strategy of accelerating FDA approval and the

commercial introduction of Vioxx, MRL scientists designed a gastrointestinal outcomes

trial to prove that Vioxx caused less gastrointestinal injury than traditional non-selective

NSAIDs. Such proof, the Company hoped, would convince the FDA that Vioxx should

be marketed without the standard gastrointestinal warning on the label of all traditional

non-selective NSAIDs, which in turn would put Vioxx at a marketing advantage over

traditional non-selective NSAIDs.

Critics claim, however, that in trying to design that trial MRL scientists

recognized that Merck was in a "no win situation" because the study would likely reveal

increased cardiovascular events in patients who took Vioxx versus those in the study who

took a non-selective NSAID comparator.[28] Critics further allege that MRL scientists

tried to design the gastrointestinal outcomes study around this problem by excluding high

risk patients from the study in the hope that Vioxx's cardiovascular risks "would not be

evident."

---

[28] Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

M00AA13774

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                           Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

According to critics, Merck cancelled the planned gastrointestinal trial for fear

that it would highlight the cardiovascular risks of Vioxx and, as MRL's Dr. Briggs

Morrison stated in an email to Dr. Alise Reicin, "kill [the] drug."[29]  Critics further assert

that Vioxx likely would not have been approved by the FDA if the study had been

conducted.

### b.    Our Findings and Conclusions.

As discussed above, internal documents from 1996 and 1997 regarding the design

of a gastrointestinal outcomes trial do not reflect a belief that Vioxx was, or even might

be shown to be, prothrombotic.  When read in full and in context, the documents reflect a

concern that the results of a trial against a non-selective NSAID with cardioprotective

properties might be misinterpreted.  We are aware of no evidence indicating that the trial

was cancelled in response to a belief that Vioxx might be prothrombotic.  The internal

correspondence about the trial documents a thoughtful exchange among MRL scientists

focused on whether to allow people in the trial to take low-dose aspirin.  Read in context,

the now-famous "kill the drug" email makes clear that an important consideration in

designing the trial was that, because Vioxx did not inhibit Cox-1 as did non-selective

NSAIDs, patients in the Vioxx arm would be likely to experience more thrombotic events

than the patients who were receiving a non-selective NSAID comparator.[30]

---

[29]  Anna Wilde Mathews[*] & Barbara Martinez[*], Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

[30]  As described in Appendix A, in early 1997, MRL scientists Drs. Briggs Morrison, Alise Reicin and Brian Daniels engaged in email correspondence about the design of a gastrointestinal outcomes trial and whether such a trial should exclude low-dose aspirin.  Dr. Morrison wrote:  I know this has been

M00AA13775

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The evidence indicates that Merck decided to cancel the trial in August 1997 after FDA representatives suggested to MRL scientists and regulatory officials that even if data from the planned trial were favorable the FDA was unlikely to approve a label for Vioxx without the standard NSAID-class gastrointestinal warning.

## B.   Summary of Principal Criticisms and Findings Concerning Merck's Scientific Response to VIGOR Trial Cardiovascular Data.

Based on further discussion with the FDA as well as the news that Searle/Pfizer was planning a gastrointestinal outcomes trial for Celebrex, Merck subsequently revisited the decision to conduct a gastrointestinal outcomes trial and planned the VIGOR Trial. The VIGOR Trial was a gastrointestinal outcomes trial designed to prove the Cox-2 hypothesis. Data from the trial were unblinded on March 9, 2000. Although the gastrointestinal results were favorable, the unadjudicated data available at that time showed that among the 4,046 patients in the Vioxx group of the trial, there were 92 serious cardiovascular events, 21 of which were reported as myocardial infarctions (heart attacks) and 15 of which were reported as strokes, and that among the 4,029 patients in the naproxen group, there were 46 serious cardiovascular events, including 9 reported myocardial infarctions and 7 reported strokes. (After the data were adjudicated, there were 20 confirmed myocardial infarctions in patients who took Vioxx, and 4 confirmed

---

discussed to death, but real world is everyone is on [low-dose aspirin], so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug." 2/25/97 email from B. Morrison to T. Simon, B. Daniels, E. Ehrich, and A. Reicin, MRK-LEH0058311, at 12. Dr. Reicin responded: "Low Dose Aspirin – I HEAR YOU!  This is a no win situation! . . . . What about the idea of excluding high risk CV patients- ie those that have already had an MI, CABG, or PTCA?  This may decrease the CV event rate so that a difference between the two groups would not be evident. . . ." 2/25/97 email from A. Reicin to T. Simon, B. Daniels, E. Ehrich, and B. Morrison, MRL-LEH0058311, at 11.

M00DA13776

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

myocardial infarctions in patients who took naproxen.)  The manner in which MRL scientists came to consensus about the meaning of these cardiovascular data and the follow-up investigations they conducted have been criticized extensively.

Our conclusions with respect to these criticisms are based on our finding that, after analyzing the VIGOR Trial data, MRL scientists developed the view that the between-treatment difference in cardiovascular events most likely was due to the cardioprotective effects of naproxen.  Extensive documentary evidence, which is set forth in detail in Appendices E and F, traces the evolution of their beliefs regarding what caused the between-treatment difference as well as the manner in which they continued to investigate the data.  While MRL scientists recognized that it was impossible to prove a negative, i.e., that Vioxx posed no cardiovascular risk, the dialogue in many of these internal documents reflects a firm belief in the safety of Vioxx and an equally firm belief that the cardioprotective effects of naproxen best explained the between-treatment difference in the incidence of cardiovascular events in the VIGOR Trial.

6. **Allegation No. 6:  Merck Tried to Design the VIGOR Trial in the First Instance to Avoid Creating Negative Cardiovascular Data.**

a. **Summary of Allegation.**

It is alleged that Merck attempted to design the VIGOR Trial to avoid generating cardiovascular results that were "statistically significant" by (i) excluding from the study patients over 55 who were more likely to have a heart attack, (ii) including more women who are less heart attack-prone than men, (iii) eliminating from the study anyone with a

M00AA13777

Report of John S. Martin, Jr. to the Special Committee                                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                       Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

prior heart problem, and (iv) eliminating any aspirin users.  Critics allege that the VIGOR

Trial exposed the danger of Vioxx despite these efforts at concealment.[31]

### b.      Our Findings and Conclusions.

Based on our review of the record, it is clear that because no one at Merck

believed that Vioxx was prothrombotic at the time that the VIGOR Trial was planned,

scientists involved in the trial design were not concerned that a large clinical trial would

unmask a cardiovascular risk.

The evidence shows that certain design decisions dictated to a large extent the

VIGOR Trial's patient population.  For example, the FDA recommended that Merck test

Vioxx's gastrointestinal effects at a high dose because if the gastrointestinal outcomes

data were favorable at a high dose, they were likely to be even more favorable at the

more frequently prescribed lower dosages.  The FDA also recommended testing Vioxx at

a higher-than-recommended dose out of a concern that patients experiencing pain would

take higher-than-recommended doses in an effort to alleviate their pain more quickly and

fully – a phenomenon known as dosage creep.

The recommended doses for osteoarthritis, the principal target market for Vioxx,

were 12.5 mg and 25 mg.[32]  The record reflects that MRL scientists did not think that it

would have been ethical to test a higher-than-recommended or necessary dose of Vioxx

---

[31]   7/11/05 transcript of Ernst v. Merck & Co., No. 19961*BH02, Tex. Dist. Ct., at 72-73.

[32]   After the VIGOR Trial was planned and commenced, Vioxx was in fact approved for the treatment
and signs of osteoarthritis.  The FDA-approved label for Vioxx stated that the recommended starting
dose was 12.5 mg once daily and that "[s]ome [osteoarthritis] patients may receive additional benefit
by increasing the dose to 25 mg once daily."

M00AA13778

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

in that population. In addition, MRL scientists believed (although the FDA was not convinced) that it already had proved the Cox-2 hypothesis in osteoarthritis patients.

Merck planned to seek a future indication for rheumatoid arthritis patients, and MRL scientists and external consultants agreed that it made sense to conduct the trial in such patients. The dosage for such patients had not been determined at the time the trial was being designed but was thought to be at least 25 mg, so conducting the trial with a 50 mg dose of Vioxx did not present an ethical concern.

According to Dr. Alise Reicin, the MRL scientist who drafted the VIGOR Trial protocol, the decision made in 1997 to exclude low-dose aspirin from the trial so that the anticipated positive gastrointestinal results would not be confounded, was equally valid for the VIGOR Trial, which was a gastrointestinal outcomes trial. MRL scientists also decided to exclude from the trial patients with a recent history of cardiovascular disease (e.g., stroke within the past two years, coronary artery surgery or heart attack within the past year, or uncontrolled hypertension) because such patients, under FDA guidelines, should take low-dose aspirin for cardiovascular prophylaxis.

### 7.   Allegation No. 7: The Head of MRL Acknowledged the Cardiovascular Danger of Vioxx.

#### a.   Summary of Allegation.

To support their claim that MRL scientists knew that the VIGOR Trial cardiovascular data proved that Vioxx was prothrombotic, Merck's critics point to an email that Dr. Edward Scolnick, the head of MRL, sent shortly after he received the VIGOR Trial data in which he stated: "the [cardiovascular] events are clearly there. . . .

- 51 -

M00AA13779

Report of John S. Martin, Jr. to the Special Committee          September 5, 2006
of the Board of Directors of Merck & Co., Inc.          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

it is a shame, but it is a low incidence and it is mechanism-based as we worried it was."[33]

Dr. Scolnick's March 9, 2000 email has been interpreted in the Vioxx tort litigation as

reflecting his understanding that the "mechanism-based" effect in the VIGOR Trial had

confirmed the FitzGerald prostacyclin hypothesis, which is why he told other MRL

scientists that he wanted to make "clear to the world" that this was an effect of the entire

class of selective Cox-2 inhibitors, not just Vioxx.[34]

### b.  Our Findings and Conclusions.

The most compelling evidence as to whether Dr. Scolnick believed that Vioxx

was prothrombotic are his own words, written after MRL scientists had analyzed the

VIGOR Trial data and after cardiovascular data from the placebo-controlled Alzheimer's

trials were unblinded.  Although Dr. Scolnick has testified that his first reaction to the

VIGOR Trial data – as reflected in his March 9, 2000 email – was that Vioxx was

prothrombotic,[35] the internal emails quoted above at pages 21 and 22 reflect that Dr.

Scolnick quickly came to the view that the totality of the data did not support that

---

[33]    3/9/00 email from E. Scolnick to D. Shapiro, A. Reicin, and A. Nies, MRK-ABH0016220 (quoted in Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1); see also 9/14/05 transcript of Humeston v. Merck & Co., ATL-L-2272-03 MT, N.J. Super. Ct. Law Div., at 42-43.

[34]    3/9/00 email from E. Scolnick to D. Shapiro, A. Reicin, and A. Nies, MRK-ABH0016220 (quoted in Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1).

[35]    It should be noted that Dr. Scolnick was not among the MRL scientists to whom the Musliner Memorandum was circulated.

M0DAA13780

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

conclusion.  In a late 2001 internal email, he was emphatic that the data did not support a

cardiovascular warning for Vioxx because Vioxx was not unsafe.[36]

In addition to contemporaneous documents, we also reviewed numerous

transcripts of Dr. Scolnick's deposition testimony and interviewed Dr. Scolnick for

approximately ten hours.  On the basis of this substantial body of information, we are

persuaded that Dr. Scolnick concluded shortly after the VIGOR Trial unblinding that the

most likely explanation for the cardiovascular results was that naproxen had provided

cardioprotection.  We also interviewed numerous MRL scientists who worked with

Dr. Scolnick.  While many of them indicated that Dr. Scolnick was highly demanding

and sometimes difficult to work with, they were unanimous in the view that he was "data

driven."  Not a single MRL witness expressed any doubt about Dr. Scolnick's conviction

that Vioxx was safe; indeed, not a single MRL witness believed that Vioxx was

prothrombotic before the APPROVe Trial cardiovascular data were unblinded, which led

to the withdrawal of Vioxx.

---

[36]   11/8/01 email from E. Scolnick to D. Greene, A. Nies, and B. Goldmann, MRK-ACR0009287.

M00AA13781

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

**8.      Allegation No. 8:  Merck's Naproxen Cardioprotection Hypothesis
Was an Implausible Explanation for the VIGOR Trial
Cardiovascular Data that the Scientific Community -- and Even
Some MRL Scientists – Recognized Did Not Explain the
<u>Between-Treatment Difference in Cardiovascular Events.</u>**

**a.      Summary of Allegation.**

Merck did not acknowledge that Vioxx caused the cardiovascular events in the

Vioxx arm of the VIGOR Trial and instead publicly stated that the most likely

explanation for the between-treatment difference in the incidence of cardiovascular

events was that the other agent in the study, naproxen, was cardioprotective.  It has been

argued that this "naproxen cardioprotection hypothesis" was not a plausible scientific

explanation and that MRL should not have propounded the theory in the first instance or

continued to adhere to it after its own data disproved it.  The following reasons have been

offered in support of such criticisms:

<u>First</u>, critics claim that there was no hard clinical evidence to support the

naproxen cardioprotection hypothesis.

<u>Second</u>, critics allege that MRL's outside consultants told MRL senior

management that the VIGOR Trial cardiovascular data also could be explained by

Vioxx's prothrombotic properties, or by chance, and that "[m]any scientists outside the

company found [Merck's naproxen cardioprotection] theory implausible. . . ."[37]

---

[37]      Alex Berenson\*, Gardiner Harris\*, Barry Meier\* & Andrew Pollack\*, <u>Despite Warnings, Drug Giant
Took Long Path to Vioxx Recall</u>, N.Y. Times, Nov. 14, 2004, at A1; <u>see also</u> 7/14/05 transcript of
<u>Ernst v. Merck & Co.</u>, No. 19961*BH02, Tex. Dist. Ct., at 76-78.

M00AA13782

Report of John S. Martin, Jr. to the Special Committee                September 5, 2006
of the Board of Directors of Merck & Co., Inc.                        Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Third, it is argued that the makers of naproxen never touted any alleged

cardioprotective effects of the drug, which is something they surely would have done had

it been true.[38]

Fourth, it is alleged that even scientists at MRL conceded that the alleged

cardioprotective effect of naproxen could not account for the magnitude of the difference

in the incidence of cardiovascular events between the naproxen and Vioxx arms of the

study:  the difference was even greater than would have been anticipated had the patients

in the naproxen arm been taking low-dose aspirin for cardiovascular prophylaxis, which

is the recognized gold standard for preventing blood clots.

Fifth, critics argue that a post-hoc subgroup analysis that Merck scientists

performed to support the naproxen cardioprotection hypothesis was of questionable

validity and allegedly failed to support the hypothesis.  Based on a review that they

conducted in mid-April 2000, MRL scientists determined that 4% of the patients enrolled

in the VIGOR Trial should have been taking low-dose aspirin for cardiovascular

prophylaxis based on FDA-approved criteria.  Critics allege that separating out these

patients conveyed the false impression that the between-treatment difference in the

incidence of cardiovascular events in the VIGOR Trial was limited to patients in the 4%

subgroup who needed cardiovascular protection and that those patients had received the

needed cardioprotection from naproxen.  In addition, it is alleged that when all the data

were available, the between-treatment difference in cardiovascular events was not

---

[38]     7/14/05 transcript of Ernst v. Merck & Co., No. 19961*BH02, Tex. Dist. Ct., at 75.

- 55 -

M0DAA13783

Report of John S. Martin, Jr. to the Special Committee                                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

confined to this sub-group, so Merck's reliance on the analysis was misplaced and misleading.

Sixth, critics assert that, as noted above, Dr. Scolnick recognized that the cardiovascular events were "mechanism-based," that is, that they were caused by Vioxx's selective blocking of the Cox-2 enzyme and prostacyclin. Thus, there was not a "lower" incidence of cardiovascular events in the naproxen arm of the trial, but a "higher" incidence in the Vioxx arm.

Finally, it is alleged that given the uncertainty about the cause of the difference in event rates, the press release that Merck issued on March 27, 2000 announcing the results of the VIGOR Trial should have identified other possibilities for the findings – including the possibility that Vioxx was prothrombotic – and should not have focused exclusively on Merck's naproxen cardioprotection hypothesis.

### b.    Our Findings and Conclusions.

As explained in the Introduction, the focus of our investigation was whether senior management acted in bad faith, intentionally failed to investigate the cardiovascular risks of Vioxx, or otherwise intentionally sought to mislead the scientific community and general public with regard to the cardiovascular risks of Vioxx. Thus, it is not our role to opine on whether the naproxen cardioprotection hypothesis was, or was not, the best hypothesis to explain the VIGOR Trial cardiovascular results.

We investigated how MRL scientists analyzed the VIGOR Trial data, how they arrived at (and maintained their belief in) the naproxen cardioprotection hypothesis, and whether they did so in good faith. Based on the considerable evidence we reviewed, we

M00AA13784

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

believe MRL scientists and management genuinely believed that the naproxen cardioprotection hypothesis was the most likely explanation for the VIGOR Trial cardiovascular results.

**(1)  Overview of Post-VIGOR Analyses That Led MRL Scientists to Conclude That Naproxen Cardioprotection Was the Most Likely Explanation for the VIGOR Trial Results**

Between March 9, 2000, when the VIGOR Trial data were first unblinded, and March 27, 2000, when Merck issued a press release about the VIGOR Trial and the cardiovascular results and publicly put forth the naproxen cardioprotection hypothesis, MRL scientists performed numerous analyses to investigate the meaning of the data. During this period, MRL's team of unblinded scientists gathered information relating to the potential cardiovascular implications of the three central components of the VIGOR Trial: (i) Vioxx generally and the 50 mg dosage used in the VIGOR Trial, in particular; (ii) the study population -- rheumatoid arthritis patients; and (iii) the comparator drug -- naproxen.

**(a)  Review of Vioxx Cardiovascular Data**

With respect to the first component, the unblinded MRL scientists examined cardiovascular data from other clinical trials that had included Vioxx, including the Phase IIb/III osteoarthritis trials and two trials conducted to test the efficacy of Vioxx in preventing or slowing the progression of Alzheimer's disease.

- 57 -

M00AA13785

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### (i)  Review of unblinded data from osteoarthritis trials

After the VIGOR Trial unblinding, MRL scientists re-analyzed the then-unblinded data from the Phase IIb/III osteoarthritis trials, which reflected no statistically significant difference (and very little numerical difference) in the rate of serious cardiovascular thrombotic events between Vioxx (all doses) and the comparator non-selective NSAIDs as a group.  The unblinded team also noted that "the absolute rate of serious thromboembolic events was similar in patients treated with rofecoxib in both the Phase III OA combined analyses [2.05/100 PYR] and VIGOR [2.12/100 PYR]," while the rate of serious thrombotic events for patients on naproxen in the VIGOR Trial was much lower (1.13/100 PYR).[39]  These data suggested to MRL scientists "that the difference between rofecoxib and naproxen in VIGOR was driven by a reduction in events in the naproxen group."[40]

### (ii)  Review of placebo-controlled data from Alzheimer's trials

Merck's Protocol 078 tested the efficacy of Vioxx in preventing the conversion of mild cognitive impairment into Alzheimer's disease, and Protocol 091 tested the efficacy of Vioxx in slowing the progression of the symptoms of Alzheimer's disease.  These

---

[39]  3/23/00 preliminary VIGOR report to FDA, MRK-ABK0460838, at 47, 51, 63.  ("PYR" means patient years at risk.)  Some Merck documents refer to certain cardiovascular events as "thrombotic" and other Merck documents refer to these same events as "thromboembolic."  Although there is a clinical difference, witnesses and Merck internal documents used these terms interchangeably to refer to cardiovascular events caused by a clot, such as a myocardial infarction or stroke.  We use the term "thrombotic" throughout this Report.

[40]  3/23/00 preliminary VIGOR report to FDA, MRK-ABK0460838, at 63.

M00AA13786

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

trials (collectively, the "Alzheimer's trials"), which were still blinded in March 2000, contained a large number of patients (over 2000) who had been on either Vioxx 25 mg or placebo for, at that point, an average of nine months.[41]

After the VIGOR Trial unblinding, the decision quickly was made to partially unblind the serious cardiovascular event data from these two ongoing trials into "Treatment Group A" and "Treatment Group B" (without disclosure of treatment type) in order to obtain placebo-controlled data on the cardiovascular effects of Vioxx. Then, if an imbalance were found between the treatment groups, Merck would totally unblind the data and see if there was evidence against placebo that Vioxx was prothrombotic.

There were 26 patients with serious thrombotic cardiovascular events in group A versus 32 patients with such events in group B, approximately a 20% difference, though not a statistically significant one. However, the number of events characterized by investigators as either "myocardial infarctions" or "acute myocardial infarctions" was equal between the two groups (eight in each arm) as was the number of events investigators labeled "cerebrovascular accidents," i.e., strokes (five in each arm).[42] As a result, Dr. Scolnick felt comfortable that the data did not show an overall imbalance between the two groups or a prothrombotic effect in one arm, and he did not ask for the

---

[41]   Cardiovascular events from these trials were being collected pursuant to normal procedures for reporting and collecting all adverse events and, under the Cardiovascular Adjudication SOP discussed above, were being sent to an external adjudication committee.

[42]   3/23/00 preliminary VIGOR report to FDA, MRK-ABK0460838, at 55.

M00AA13787

Report of John S. Martin, Jr. to the Special Committee                                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

data to be fully unblinded to reveal which group was which.[43]  Unblinding as to treatment

group would have revealed that the group with the lower total number of patients with

events, group A, was the Vioxx treatment group.

The cardiovascular data from the Alzheimer's trials were extremely important to

MRL's understanding of the VIGOR Trial cardiovascular data.  Several MRL scientists,

including Dr. Scolnick, recalled that it convinced them that the cardiovascular event

differential in the VIGOR Trial was caused by naproxen's cardioprotective effects and

not any prothrombotic effect of Vioxx.

### (iii)    Dr. Barr's analysis

Dr. Eliav Barr, an MRL antiplatelet expert working in the Vaccines division who

was tapped by Dr. Scolnick to help investigate the VIGOR Trial cardiovascular data,

requested additional information so that he could begin an in-depth review of the

cardiovascular events in the VIGOR Trial that had been reported as of March 9, 2000.

He requested adjudication packages for the adjudicated cardiovascular events and reports

from the Worldwide Adverse Event System for all reported cardiovascular adverse events

in the VIGOR Trial (including, but not limited to, those that had been or were to be

adjudicated).  He also requested background patient demographic data.  Dr. Barr

examined adverse event data on epistaxis (nose bleeds), a common side effect of

antiplatelet treatment, and found significantly more nose bleeds in the naproxen arm (27)

---

[43]    3/21/05 Open Letter from E. Scolnick, "Vioxx: Scientific Review," MRK-AFO0288987, at 993-94.
The decision not to fully unblind the data was influenced by the fact that once a trial is unblinded, the
trial may be considered compromised.  For that reason, during the pendency of a clinical trial, every
effort is made to keep the data blinded.

M00AA113788

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

than in the Vioxx arm (7).[44] He found these data particularly compelling because they suggested that the antiplatelet properties of naproxen had a clinical effect in the VIGOR Trial patients, rendering them more susceptible to bleeding, as would a low-dose aspirin regimen.

Dr. Barr also requested subgroup analyses of the VIGOR Trial cardiovascular data based on patient demographics and cardiovascular risk factors, such as age, gender, history of cardiovascular disease, smoking habits and hormone replacement therapy. These analyses showed that, regardless of treatment group, patients with more cardiovascular risk factors experienced more cardiovascular events. These analyses left open the issue of whether it was Vioxx that was increasing the risk, naproxen that was decreasing it, chance, or some combination of the three.

### (iv)    Review of post-marketing data

Merck's Worldwide Product Safety and Epidemiology Department tracks adverse event reports for Merck drugs – both adverse event reports from clinical trials and those spontaneously submitted by doctors or patients "post-marketing" (i.e., after a drug has been released onto the market). Soon after unblinding, senior members of the Worldwide Product Safety and Epidemiology Department provided the team of unblinded scientists who were analyzing the VIGOR Trial data with a list and descriptions of all spontaneously reported post-marketing cardiovascular adverse experiences with Vioxx

---

[44]    6/29/00 sNDA Cardiovascular Events Analysis, MRK-00420018004, at 43-44.

M00AA13789

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

and attempted to evaluate whether the absolute incidence of such reported events
indicated a safety signal.

Spontaneously reported post-marketing adverse experience data are difficult to
interpret, because there are so many potentially confounding unidentifiable background
variables and there is no way accurately to determine the "denominator" (that is, the total
number of patients on Vioxx during the relevant period). These issues create especially
substantial problems in the case of relatively common adverse experiences (such as
myocardial infarctions), because it is difficult to differentiate a drug effect from the
normal background incidence of such events in the patient population, especially given
uneven rates of spontaneous reporting of adverse events. Based on an examination of the
total numbers of spontaneously reported cardiovascular adverse events on Vioxx, MRL
scientists concluded that the numbers were not "disproportionate to the numbers reported
with other products which have no known associated cardiovascular risks and are
indicated for treatment populations with similar age structures as VIOXX."[45]

### (b)    Naproxen Cardioprotection

With regard to the second component of the VIGOR Trial that MRL scientists
investigated – whether naproxen conferred cardioprotection to patients in the naproxen
arm of the trial – MRL scientists came to believe, after reviewing the relevant literature
and existing clinical data on aspirin and certain other non-selective NSAIDs as well as
pharmacological data on naproxen, that a cardioprotective effect of naproxen was the

---

[45]    3/13/00 memorandum from P. Gruer to A. Reicin, MRK-00420018281, at 83.

M00AA13790

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

most likely cause of the difference in the incidence of cardiovascular events in the

VIGOR Trial.

First, as discussed above, MRL scientists knew that aspirin, a traditional

non-selective NSAID, was cardioprotective.  MRL scientists also knew that aspirin was

the only traditional non-selective NSAID conclusively proven to be cardioprotective.

MRL scientists were aware, however, that, in several small clinical trials, use of two

non-aspirin non-selective NSAIDs (indobufen and flurbiprofen) was associated with a

decreased risk of cardiovascular events, suggesting that non-aspirin, non-selective

NSAIDs also might be cardioprotective.

Second, MRL scientists were aware that the mechanism for aspirin's

cardioprotective effect was its suppression of the Cox-1 enzyme and its irreversible

inhibition of platelet aggregation (or blood clotting) throughout the life of a platelet.

MRL scientists also were aware that non-aspirin, non-selective NSAIDs (such as

naproxen) inhibited Cox-1 and platelet aggregation, but did so reversibly, meaning that

the effect ceased once the drug wore off.  MRL scientists thus noted that there was a

mechanistic basis for the hypothesis that non-aspirin NSAIDs might be cardioprotective

if taken often and regularly enough to sustain their effects.  (MRL scientists also knew

that Vioxx, on the other hand, had no effect on Cox-1 and platelet aggregation and

therefore would not be expected to confer a cardioprotective effect through such a

mechanism.)

One of the questions MRL scientists asked was why, if traditional non-selective

NSAIDs were cardioprotective by virtue of Cox-1 inhibition, such an effect was not

M00A13791

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

evident in the pre-New Drug Application osteoarthritis studies that tested Vioxx against the non-selective NSAIDs ibuprofen, diclofenac, and nabumetone.  In reviewing the results of a pre-New Drug Application pharmacological study assessing the effect of several NSAIDs (including diclofenac, ibuprofen and naproxen) on Cox-1 and platelet aggregation, MRL scientists noted that naproxen was the only tested non-aspirin NSAID that inhibited platelet aggregation to a relatively high degree throughout its dosing interval.  This observation suggested to them that, if taken regularly at the recommended dosing interval, naproxen (but not diclofenac and ibuprofen) would sustain its antiplatelet effect and might mimic aspirin's irreversible inhibition of platelet aggregation and therefore its cardioprotective effect.

### (c)    Rheumatoid Arthritis Patient Population

MRL scientists also investigated the extent to which the patient population might have influenced the cardiovascular results in the VIGOR Trial.  Their research revealed that rheumatoid arthritis patients are at increased risk for cardiovascular events generally and have preexisting high levels of thromboxane.  Thus, rheumatoid arthritis patients could be more susceptible to the potential cardioprotective effects of naproxen's inhibition of thromboxane and platelet aggregation.  However, to the extent that Vioxx caused a decrease in prostacyclin in the vasculature, such patients might be more susceptible to a prothrombotic effect caused by an imbalance between thromboxane and prostacyclin.

M00AA13792

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### (2)    Summary of Our Findings and Conclusions

Following are our findings with respect to the arguments that have been made to

support the claim that the naproxen cardioprotection hypothesis cannot explain the data,

and therefore, that MRL scientists must have adopted it in bad faith.

First, although it is true that naproxen's cardioprotective qualities had not been

directly tested in any large clinical outcomes trial, there was pharmacological evidence

that naproxen inhibited platelet aggregation to a relatively high degree throughout its

dosing interval as well as limited clinical evidence for the more general proposition that

non-selective NSAIDs other than aspirin may provide cardioprotection, as described

above.  While MRL scientists recognized that these data standing alone did not

definitively establish that naproxen was cardioprotective, MRL scientists believed that

they provided a reasonable basis for the naproxen cardioprotection hypothesis and, given

the absence of any significant between-treatment cardiovascular differential in Merck's

other Vioxx trials, that naproxen cardioprotection was the most likely explanation for the

VIGOR Trial results.

Second, critics rely on the reaction of Dr. Carlo Patrono[*], a prostaglandin expert

and external consultant to MRL, to support their claim that outside scientists did not

agree with the naproxen cardioprotection hypothesis.  The evidence demonstrates that

Dr. Patrono[*] initially believed, and so advised Merck, that the cardiovascular results of

the VIGOR Trial were due to chance:  He did not believe that the data supported the

conclusion that Vioxx was prothrombotic or that naproxen had a cardioprotective effect.

Dr. Patrono[*], however, later changed his view regarding naproxen cardioprotection (and

M0DAA13793

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

its role in the VIGOR Trial) after conducting his own clinical pharmacological study that showed that 500 mg of naproxen given twice daily could mirror the antiplatelet effect of aspirin.

In addition, MRL convened three meetings in the fall of 2000 with outside consultants – one with cardiologists, one with prostaglandin experts and one with a mixed group of experts, including rheumatologists, statisticians and nephrologists – at which cardiovascular data from the VIGOR Trial were discussed. Although external consultants recognized that without a placebo arm it was impossible to determine the cause of the disparity in the incidence of cardiovascular events between the two arms of the study, most agreed that naproxen cardioprotection was a plausible cause. They were influenced in particular, as MRL scientists had been, by the fact that there was no difference in the incidence of cardiovascular events between Vioxx and placebo or non-naproxen NSAIDs in prior and ongoing clinical trials.

Because MRL scientists and the VIGOR Trial investigators were blinded to the data throughout the trial, the trial had been monitored by a Data Safety and Monitoring Board – an external board of scientists who periodically reviewed safety data, including cardiovascular data, from the trial on a partially or fully unblinded basis – to protect patient safety. It is noteworthy that the Data Safety and Monitoring Board recognized even as data were accruing that "there is no ability in this trial to distinguish between a potentially harmful effect of Treatment A [Vioxx] and a cardiovascular protective effect

M00AA13794

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

of Treatment B [naproxen] due to its antiplatelet effects."[46]  The Monitoring Board

members thus believed that the naproxen cardioprotection hypothesis was plausible, even

though they did not have the benefit of reviewing cardiovascular data from the VIGOR

Trial in the context of data from other trials.

Third, the fact that the naproxen label makes no claim that naproxen is

cardioprotective is not surprising given the lack of economic incentive for the makers of

naproxen to pursue such a claim and reflects nothing one way or the other about whether

naproxen may provide cardioprotection.  There are several factors that may explain why

no large outcomes study had been conducted to test the cardioprotective effects of

naproxen:  (i) it would have been very costly to conduct a clinical trial of the size

necessary to produce data to support a claim of cardioprotection in the naproxen label;

(ii) aspirin, which was available in inexpensive generic formulations, had long been

believed to provide cardioprotection and was proven to do so in the early 1990s, shortly

before naproxen's patent was set to expire; (iii) aspirin was known to be the only non-

selective NSAID that irreversibly inhibited Cox-1 throughout the life of the platelet,

whereas any cardioprotective effect of naproxen would require regular dosing and a high

degree of patient compliance; (iv) naproxen is known to cause gastrointestinal injury to a

greater extent than low-dose aspirin, making patient retention in a clinical trial more

difficult and making naproxen compare unfavorably to low-dose aspirin as a theoretical

---

[46]     Minutes of 11/17/99 Data Safety and Monitoring Board meeting, MRK-AFL0000891, at 91-92.

M0DAA13796

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

source of cardioprotection; and (v) as a result, there was no economic incentive for the makers of naproxen to sponsor a costly trial.

Fourth, with respect to the argument that MRL scientists recognized that naproxen cardioprotection could not account for the magnitude of the difference in the incidence of cardiovascular events between the Vioxx and naproxen treatment arms in the VIGOR Trial, the record reflects that MRL scientists investigated (and discussed with the external consultants) potential reasons for the magnitude of the difference. The evidence shows that they recognized that the differential might be explained by chance or by characteristics of the rheumatoid arthritis patient population tested in the VIGOR Trial that may have made them more susceptible to the cardioprotective effects of naproxen. All of the relevant data were given to the FDA.

Fifth, even after MRL scientists had concluded that naproxen cardioprotection best explained the between-treatment difference in the incidence of cardiovascular events and Merck issued a press release about the study, MRL scientists continued to analyze the data. In April 2000, MRL scientists determined that based on FDA-approved criteria (as reflected in the aspirin product circular[47]), 4% of the patient population enrolled in the VIGOR Trial should have been taking low-dose aspirin for cardiovascular prophylaxis, and thus should not have been enrolled in the trial because it was designed to exclude

---

[47]   The United States product circular for aspirin states that aspirin is indicated for patients with a history of ischemic stroke, transient ischemic attack, myocardial infarction, unstable angina, and chronic stable angina. Physicians' Desk Reference. 60th ed. Montvale, NJ: Thomson PDR; 2006:1627-29 (entry for ECOTRIN®: enteric-coated aspirin); see also 6/29/00 sNDA Cardiovascular Events Analysis, MRK-00420018004, at 022 (citing U.S. product circular for aspirin).

M00AA13796

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

patients taking (or who should be taking) low-dose aspirin for cardiovascular
prophylaxis.

An analysis conducted on April 14, 2000 with all cardiovascular event data that
had been adjudicated to date revealed that 31% of the cardiovascular events (including
38% of the heart attacks) observed in the VIGOR Trial occurred in these 4% of patients.
When these "aspirin-indicated" patients were excluded from the analysis, the difference
in the incidence of cardiovascular events between the remainder of the Vioxx and
naproxen groups was not statistically significant. In the 4% of patients who were aspirin-
indicated, on the other hand, the incidence of cardiovascular events was significantly
higher in patients taking Vioxx than in those taking naproxen. MRL scientists felt that
this analysis supported the hypothesis that, in the VIGOR Trial, naproxen had acted like
aspirin and conferred cardioprotection to those patients who should have been on aspirin,
while Vioxx had simply not provided such protection.

This analysis was reassuring to MRL scientists, and to Dr. Scolnick in particular.
However, the analysis was repeated on April 21 and again on July 5 as additional
cardiovascular events were adjudicated, and, with the addition of new data, became less
compelling. After the July 5, 2000 iteration, there was a statistically significant between-
treatment difference in overall cardiovascular events and a nearly significant difference in
myocardial infarctions in the non-aspirin-indicated patients. As discussed in
Appendix N, based on these additional data, Merck opposed inclusion of references to the
aspirin-indicated subgroup analysis in its negotiations with the FDA concerning the
contents of the post-VIGOR label.

M0DAA13797

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Still, even with the additional data, the aspirin-indicated subgroup analysis was not in conflict with the hypothesis that naproxen cardioprotection accounted for the cardiovascular event differential in the VIGOR Trial. It remained the case that of the eight myocardial infarctions that occurred in the aspirin-indicated 4% subgroup, none were experienced by patients taking naproxen.

Sixth, we already have addressed the argument that has been made that MRL scientists, including Dr. Scolnick, did not believe the naproxen cardioprotection hypothesis. As indicated above, Dr. Scolnick believed in the cardiovascular safety of the drug and we found no senior Merck scientist who disagreed with this view. In fact, immediately upon seeing the cardiovascular data from the VIGOR Trial, Dr. Eliav Barr remarked that MRL had just successfully completed a placebo-controlled trial that demonstrated the cardioprotective effects of naproxen. Dr. Barr believed that because Vioxx had no antiplatelet effect, it was cardio-neutral, and that the other agent in the study, naproxen, which he believed had a potent antiplatelet effect, was the cause of the reduction in thrombotic events.

Finally, as explained above, although MRL scientists could not definitively rule out other reasons for the between-treatment event rate differential, over the course of a few weeks they became comfortable that naproxen's anti-platelet effects had conferred cardioprotection to patients in the naproxen arm of the VIGOR Trial. While it might have been desirable to have included in the release other possible explanations for the difference – including, for example, that the population studied may have been more susceptible to either a prothrombotic effect of Vioxx or a cardioprotective effect of

M00AA13798

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

naproxen – the press release that was issued on March 27, 2000 set forth the consensus view within MRL: the observed effect likely was caused by naproxen's antiplatelet effects.

For all of these reasons, we have concluded that MRL scientists genuinely believed that the naproxen cardioprotection hypothesis was the best explanation for the between-treatment difference in the incidence of cardiovascular events in the VIGOR Trial.

### 9.    Allegation No. 9:  The Published VIGOR Trial Results Intentionally Omitted Important Cardiovascular Risk Information.

#### a.    Summary of Allegation.

The allegation is made that the authors of the VIGOR Trial article that was published in the New England Journal of Medicine in November 2000 intentionally excluded important data in an effort to minimize or misrepresent the cardiovascular risk exposed by the VIGOR Trial.  It is argued that the article included all gastrointestinal adverse events that occurred through the end of the trial on March 9, 2000 but included only cardiovascular adverse events reported by February 10, 2000, and that the article concealed this discrepancy.

It is further argued that, before the article was published, Merck had obtained updated cardiovascular data including all cardiovascular adverse events that occurred through March 9, 2000 but purposefully did not include them in the article.  Instead, Merck relied on cardiovascular data available only through February 10, 2000, and on the basis of those incomplete data, conducted a sub-group analysis of the incidence of

M00AA13799

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

myocardial infarctions among the 4% of VIGOR Trial patients who should have been taking low-dose aspirin for cardiovascular prophylaxis.  Merck then included this sub-group analysis in the article, allegedly to convey the impression that "the patients who suffered heart attacks were at high risk of heart disease to begin with,"[48] and thus to make Vioxx appear to be safe in patients not indicated for low-dose aspirin use.  Had Merck included the updated data, the argument goes, this "aspirin-indicated" subgroup analysis and the article's discussion of the VIGOR Trial cardiovascular results would have been materially altered.

Finally, it is argued that, before submitting the manuscript for publication, the authors deleted a table that contained relevant cardiovascular data to conceal those data from publication.

In November 2005, the editors of the New England Journal of Medicine published an editorial about the VIGOR Trial article that raised three principal criticisms:  (i) the article did not include the updated cardiovascular data, specifically, three heart attacks that occurred in the Vioxx group of non-aspirin-indicated patients; (ii) as a result, calculations in the article (i.e., the incidence of heart attacks overall and in the non-aspirin-indicated subgroup) were incorrect and presented a misleading view of the difference in risk between Vioxx and naproxen; and (iii) cardiovascular data were deleted from the article before submission.  The editors renewed their criticisms in an "Expression of Concern Reaffirmed," which the New England Journal of Medicine

---

[48]    Roni Rabin[*], Vioxx Was Long Under Research Microscope, Newsday, Oct. 12, 2004, at B47.

M00A13800

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

published in March 2006.  The same March edition also carried a "Response to Expression of Concern Regarding VIGOR Study" by the non-Merck authors of the VIGOR Trial article.

In sum, according to critics, the VIGOR Trial article did not present a scientifically honest view of the cardiovascular data, or the risks of Vioxx.

### b.   Our Findings and Conclusions.

The article on the VIGOR Trial, which was authored by 11 non-Merck members of the VIGOR Trial Steering Committee and two MRL scientists, Dr. Alise Reicin and Dr. Deborah Shapiro, was published in the New England Journal of Medicine in November 2000.  The lead author of the article was Dr. Claire Bombardier[*], a rheumatologist at the University Health Network in Toronto, Canada.  Dr. Loren Laine[*], a gastroenterologist from the University of Southern California School of Medicine in Los Angeles, California, also assumed a principal role in drafting the article, along with Dr. Reicin.  The article, entitled "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," focused on the gastrointestinal results of the VIGOR Trial, which was designed to focus on gastrointestinal outcomes, not on cardiovascular risks.

With respect to cardiovascular data, the article included percentages of patients in each group who experienced cardiovascular events, including myocardial infarctions, and set forth the 4% aspirin-indicated subgroup analysis:

> The rate of death from cardiovascular causes was 0.2 percent in both groups.  Ischemic cerebrovascular events occurred in 0.2 percent of the patients in each group.

- 73 -

M00AA11380I

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

> Myocardial infarctions were less common in the naproxen
> group than in the rofecoxib group (0.1 percent vs. 0.4
> percent, 95 percent confidence interval for the difference,
> 0.1 to 0.6 percent; relative risk, 0.2, 95 percent confidence
> interval, 0.1 to 0.7).  Four percent of the study subjects met
> the criteria of the Food and Drug Administration (FDA) for
> the use of aspirin for secondary cardiovascular prophylaxis
> (presence of a history of myocardial infarction, angina,
> cerebrovascular accidence, transient ischemic attack,
> angioplasty, or coronary bypass) but were not taking low-
> dose aspirin therapy.  These patients accounted for 38
> percent of the patients in the study who had myocardial
> infarctions.  In the other patients the difference in the rate
> of myocardial infarction between groups was not
> significant (0.2 percent in the rofecoxib group and 0.1
> percent in the naproxen group).  When the data showing a
> reduction in the rate of myocardial infarction in the
> naproxen group became available after the completion of
> this trial, Merck, the manufacturer of rofecoxib, notified all
> investigators in ongoing studies of a change in the
> exclusion criteria to allow patients to use low-dose aspirin.
> There was no association between hypertension and
> myocardial infarction; only a single patient (in the
> rofecoxib group) had both hypertension and a myocardial
> infarction as adverse events.[49]

The article also stated:

> The rate of myocardial infarction was significantly lower in
> the naproxen group than in the rofecoxib group (0.1 percent
> vs. 0.4 percent).  This difference was primarily accounted
> for by the high rate of myocardial infarction among the 4
> percent of the study population with the highest risk of a
> myocardial infarction, for whom low-dose aspirin is
> indicated.  The difference in the rates of myocardial
> infarction between the rofecoxib and naproxen groups was
> not significant among the patients without indications for
> aspirin therapy as secondary prophylaxis.

---

[49]   Bombardier C, Laine L, Reicin A, et al.  Comparison of upper gastrointestinal toxicity of rofecoxib
and naproxen in patients with rheumatoid arthritis.  N Engl J Med.  2000;343:1520-28, at 1523.

M00AA13802

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

\*                    \*                    \*

> [O]ur results are consistent with the theory that naproxen
> has a coronary protective effect and highlight the fact that
> rofecoxib does not provide this type of protection owing to
> its selective inhibition of [Cox-2] at its therapeutic dose and
> at higher doses.  The finding that naproxen therapy was
> associated with a lower rate of myocardial infarction needs
> further confirmation in larger studies.[50]

The percentages included in the article reflected data reported before February 10,

2000 – a cut-off date that MRL scientists had set before the VIGOR Trial data were

unblinded.  The Merck authors of the VIGOR article did not discuss with the non-Merck

authors of the article or with the New England Journal of Medicine editors the fact that

the cardiovascular data presented in the article were based on a pre-specified reporting

cut-off date of February 10, 2000 while the pre-specified reporting cut-off date for

gastrointestinal events was March 9, 2000.  While it may have been prudent to state that

fact in the article, we have found no evidence that the failure to do so was motivated by

an intent to deceive.  In addition, the facts that (i) the article as published reported a

statistically significant difference in the incidence of cardiovascular events between

Vioxx and naproxen, and (ii) beginning in February 2001, Merck circulated reprints of

the article with a cover letter disclosing the post-cut-off data, indicate to us that the

presentation of the cardiovascular data in the VIGOR article was not intended to mislead.

The documentary evidence provides a rationale for why and how the February 10

reporting cut-off date for cardiovascular events was selected and demonstrates that it was

---

[50]   Bombardier* C, Laine* L, Reicin A, et al.  Comparison of upper gastrointestinal toxicity of rofecoxib
and naproxen in patients with rheumatoid arthritis.  N Engl J Med.  2000;343:1520-28, at 1526-27.

M0DAA113803

Report of John S. Martin, Jr. to the Special Committee                        September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

chosen before anyone at Merck had been unblinded to the VIGOR Trial results. In brief,

MRL scientists fixed the February 10 cut-off date after the Data Safety and Monitoring

Board for the VIGOR Trial (a group of five external scientists) asked Merck to create and

implement a plan specifically to analyze the cardiovascular data from the VIGOR Trial

(in addition to analyzing them as part of a future pooled analysis of Vioxx cardiovascular

data from several studies). Although all adverse event data were routinely analyzed in

clinical trials, pre-specified detailed analysis plans for specific adverse events were not

the norm. Because the VIGOR Trial was a gastrointestinal safety trial, the VIGOR Trial

Data Analysis Plan pre-specified an analysis plan for gastrointestinal events but there was

no pre-specified plan for analyzing cardiovascular data, nor were adjudications of

cardiovascular events proceeding at the same pace as adjudications of gastrointestinal

events. In order to satisfy the Data Safety and Monitoring Board's request and still meet

the internal deadline that Merck had set for submitting to the FDA the supplemental New

Drug Application in support of its request for a label change, Merck set a reporting cut-

off of February 10, 2000 for cardiovascular adverse events. This meant that all

cardiovascular events reported by the cut-off would be adjudicated, analyzed, and

included in the FDA submission, set for June 2000. Merck would still adjudicate and

report to the FDA in periodic Safety Update Reports any cardiovascular adverse events

reported after the cut-off.

When the authors of the VIGOR article first submitted a manuscript to the New

England Journal of Medicine on May 18, 2000, they used the cardiovascular data

reported prior to the February 10, 2000 cut-off date – the same data that Merck had used

M0DAA113804