Report of John S. Martin, Jr. to the Special Committee                          September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                  Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

in its cardiovascular analysis submitted to the FDA in support of the supplemental New

Drug Application. By July 5, 2000, the cardiovascular events reported after the

February 10 reporting cut-off date had been adjudicated and analyzed, and included three

additional myocardial infarctions, all on Vioxx and all in patients not indicated for low-

dose aspirin cardiovascular prophylaxis (the "non-aspirin-indicated" subgroup).

Based on the additional data, the percentage of patients in the Vioxx arm who

experienced myocardial infarctions rose from 0.4% (17) to 0.5% (20) overall, whereas

the percentage of patients in the naproxen arm who experienced myocardial infarctions

remained the same. In addition, since all of the additional myocardial infarctions

occurred among Vioxx patients in the non-aspirin-indicated subgroup, the between-

treatment difference in myocardial infarctions in that subgroup increased from a two-fold

to a three-fold difference. Still, the article's statement that there was not a statistically

significant between-treatment difference in myocardial infarctions in the non-aspirin-

indicated subgroup remained accurate.

The authors of the VIGOR article sent their first revised manuscript back to the

New England Journal of Medicine on July 17, 2000 and continued revising the

manuscript in conjunction with the New England Journal of Medicine editors through

early October without, as indicated above, including the additional adjudicated data.

According to Dr. Alise Reicin, an MRL scientist and one of the two Merck

authors of the VIGOR article, the cardiovascular data reported and adjudicated after the

February 10 cut-off did not materially affect the conclusions stated in the article.

Because she believed that the post-February data did not make a material difference to

M00A113805

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

the conclusion, and because the set of data presented in the article was based on a reporting cut-off date that was established before data were unblinded, Dr. Reicin did not think it was necessary to advise the other authors of the updated data, and she did not do so.

Finally, we found no evidence to suggest that the authors' decision to delete a table of cardiovascular data before submitting the manuscript was made to mislead. A draft of the manuscript created prior to its submission to the <u>New England Journal of Medicine</u> had included a table of cardiovascular data that listed the raw numbers of total deaths, cardiovascular deaths, myocardial infarctions, and ischemic strokes that occurred in each treatment group, as well as the percentages of the total patients within each treatment group who experienced such events. This table was deleted from the draft manuscript on May 16, 2000, two days prior to its submission to the <u>New England Journal of Medicine</u>. Data on all of the individual endpoints from that table were included in the text of the article in percentage form (from which the raw numbers could be derived mathematically), and none of the underlying data were "hidden." The deleted table did not include data from after the February 10, 2000 reporting cut-off date.

Neither the anonymous peer reviewers nor the editors at the <u>New England Journal of Medicine</u> who received drafts of the manuscript presenting the data in percentages requested that the authors include the raw cardiovascular data or insert a cardiovascular data table. The <u>New England Journal of Medicine</u> editors required the authors to eliminate some of their other tables and figures to meet the <u>Journal</u>'s limit of five total tables and figures. One peer reviewer requested inclusion of the relative risk and

M0DAA113806

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

confidence interval for myocardial infarctions and these data were included in the revised manuscript and final article.

The non-Merck authors of the article collectively submitted a response on January 16, 2006 to the Journal editors' November 2005 editorial, which was published in the New England Journal of Medicine on March 16, 2006. The non-Merck authors stated that, while they had not been aware that additional adjudicated data were available before the article was published, they stood by the article as published:

> [W]e stand by our original article, which was written in line with basic clinical trial principles, specifying that data must be analyzed according to plans that are determined before unblinding. Thrombotic cardiovascular events were not deleted from the manuscript, and there is no material difference in the conclusion, that arise from the addition of the events reported after the predefined close-out date for cardiovascular events.[51]

It bears mention that had the three myocardial infarctions reported after February 10 been in the naproxen, and not the Vioxx, group, Merck quite likely would have been subject to criticism for altering the conclusions of the article to incorporate new data.

It is also worth noting that the press release that Merck issued on November 23, 2000, the same day as the article was published, did not mention the aspirin-indicated subgroup analysis. The release focused on the gastrointestinal results of the VIGOR Trial, but plainly stated that there were "significantly fewer heart attacks" in the naproxen

---

[51]  Bombardier* C, Laine* L, Burgos-Vargas* R, et al. Response to expression of concern regarding VIGOR study [letter]. N Engl J Med. 2006;354:1196-98, at 98.

M0DAA11380?

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

arm of the study than in the Vioxx arm, which, the release stated, was consistent with

naproxen's ability to block platelet aggregation due to its suppression of Cox-1.

### 10.   Allegation No. 10: Merck Recognized that Vioxx Was Prothrombotic, and Secretly Tried to Reformulate It.

#### a.   Summary of Allegation.

Merck's critics have argued that despite Merck's public statements that the

VIGOR Trial cardiovascular data were explained by the naproxen cardioprotection

hypothesis, Merck "privately sought to reformulate Vioxx in 2000 to reduce its

cardiovascular side effects."[52]  Critics have further alleged that, in fact, Merck submitted

a patent application for a reformulated drug while it was denying publicly that Vioxx

could cause heart attacks and strokes.[53]  According to the Philadelphia Inquirer, an

internal company document from 2000 regarding this patent application acknowledged

that "the way in which Vioxx reduces pain might also increase cardiovascular

problems."[54]  It is claimed that Merck executives thus understood the cardiovascular risks

of Vioxx and sought a patent "for a method of combining Vioxx with another agent to

lessen the risk."[55]

---

[52]   Documents Show Merck Researchers Knew Risks, Miami Herald, June 23, 2005, at 11A.

[53]   Thomas Ginsberg[*], Merck Sought to Trim Vioxx Risk, Phila. Inq., June 23, 2005, at A1.

[54]   Thomas Ginsberg[*], Merck Sought to Trim Vioxx Risk, Phila. Inq., June 23, 2005, at A1.

[55]   Thomas Ginsberg[*], Merck Sought to Trim Vioxx Risk, Phila. Inq., June 23, 2005, at A1.

M00AA113808

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### b.    Our Findings and Conclusions.

At various times from 1998 (before Vioxx was approved for sale) through September 2004, when it was withdrawn from the market, Merck, with input from external consultants including Drs. John Oates[*] and Garret FitzGerald[*], considered combining Vioxx with various antiplatelet agents.

Throughout this period, MRL scientists recognized the potential competitive advantage to be gained from combining Vioxx with an antiplatelet agent that would provide aspirin-style cardioprotection to high-risk patients without compromising the gastrointestinal-sparing effect of Vioxx. In addition, following the release of data from the VIGOR Trial, some MRL scientists recognized that, if in fact Vioxx inhibited prostacyclin in the vasculature, such inhibition might have an as-yet unproven clinical impact in certain high-risk patients who had a preexisting imbalance between prostacyclin and thromboxane. MRL scientists theorized that combining Vioxx and an antiplatelet agent into a single drug could potentially correct any preexisting imbalance and eliminate any theoretical cardiovascular risk of Vioxx in these patients.

The Company filed two patent applications – one in 1998 and one in 2000 – covering Vioxx combination therapies, but the Company did not actively pursue the development of either combination therapy option. Rather, beginning in 2002, the Company focused on the possibility of combining Vioxx with drugs that release nitric oxide, a gastroprotective agent. Such a combination, it was hypothesized, would enable patients to take a combination of nitric oxide and Vioxx concomitantly with low-dose aspirin without any gastrointestinal side effects. This combination, if proven to be

M0DA113809

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

effective at eliminating the gastrointestinal risk of concomitant administration of Vioxx plus aspirin, would have provided the Company with a competitive advantage in the market of Vioxx users who were also at high cardiovascular risk.

While the scientists who were involved in attempting to develop a combination therapy were aware of Dr. FitzGerald's[*] prostacyclin hypothesis and the debate surrounding the VIGOR Trial cardiovascular data, there is no evidence that MRL senior scientists' considerations of combination therapy options arose from an actual belief that Vioxx was prothrombotic. Indeed, an internal memorandum prepared by Dr. Mervyn Turner, the head of Merck's Worldwide Licensing and External Research Department, in September 2002 concerning a possible nitric oxide/Vioxx combination states: "We do not believe that the VIGOR study represents a true prothrombotic property of coxibs."[56]

The evidence establishes that the Merck scientists' objective in pursuing a combination therapy was to develop a new drug with properties superior to those of any other drug, including Vioxx, not to protect against a known prothrombotic effect of Vioxx.

**11.    Allegation No. 11:  Merck's Pooled Analyses Were Flawed.**

     **a.    Summary of Allegation.**

In an effort to show that the VIGOR Trial was an outlier and that other clinical data did not show that Vioxx presented a cardiovascular risk, Merck conducted a number of "pooled" or meta-analyses of its Vioxx trials. It has been argued that these pooled

---

[56]     9/12/02 email from M. Turner to J. Lasota, MRK-AEG0037638, at 38.

M00AA113810

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

analyses are flawed for at least two reasons.  First, it allegedly was improper to pool data

from Merck's Phase II/III osteoarthritis trials with the VIGOR Trial data because the

earlier trials involved different patient populations, involved fewer patients, and were of

shorter durations.[57]  Second, the composite endpoint that Merck used in its pooled

analyses did not focus, as it should have, on the differences in heart attack rates between

Vioxx and the comparator drugs or placebo.[58]  It is argued that had Merck not used a

composite endpoint, Vioxx would have been shown to be worse than the other

treatments.[59]

### b.    Our Findings and Conclusions.

As discussed above, after reviewing the FitzGerald prostacyclin hypothesis and

data from Merck's Vioxx clinical development program at its May 1998 meeting,

Merck's Board of Scientific Advisors recommended that, although Merck's clinical data

did not reveal any cardiovascular risk of Vioxx, Merck should establish a process to

monitor, on a program-wide basis, the cardiovascular profile of Vioxx.  The Board of

Scientific Advisors noted that individual trials of Vioxx would be too small and therefore

---

[57]   4/8/05 expert report of R. Kronmal*, at 15 (In re Vioxx Litig., No. 619, N.J. Super. Ct. Law Div.).

[58]   Juni* P, Nartey* L, Reichenbach* S, Sterchi* R, Dieppe* PA, Egger* M.  Risk of cardiovascular events
       and rofecoxib:  cumulative meta analysis.  Lancet.  2004;364:2021-2029, MRK-AJK0010752
       (11/4/04 online [in press] copy), at 5.

[59]   4/8/05 expert report of R. Kronmal*, at 17 (In re Vioxx Litig., No. 619, N.J. Super. Ct. Law Div.); see
       also Juni* P, Nartey* L, Reichenbach* S, Sterchi* R, Dieppe* PA, Egger* M.  Risk of cardiovascular
       events and rofecoxib:  cumulative meta analysis.  Lancet.  2004;364:2021-2029, MRK-AJK0010752
       (11/4/04 online [in press] copy), at 5.

M00AA113811

Report of John S. Martin, Jr. to the Special Committee                              September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

underpowered to detect any potential cardiovascular effect.[60]  The Board therefore

recommended that Merck plan to pool cardiovascular event data from several of its future

Vioxx trials to have sufficient power to assess the effect of Vioxx on cardiovascular risk.

The Board of Scientific Advisors further advised that Merck should create a uniform set

of criteria by which such events would be adjudicated so as to facilitate future pooling.

In accordance with these recommendations, MRL scientists devised the Cardiovascular

Adjudication Standard Operating Procedure, discussed above.

It was understood that the first pooled analysis would be performed when MRL

determined that there was a sufficiently large body of cardiovascular clinical trial data so

that such an analysis would be statistically meaningful.  In August 2000, after the VIGOR

Trial data and data from several other clinical trials of Vioxx had become available, MRL

scientists and biostatisticians discussed the logistics and methods for the first pooled

analysis.  To increase the data pool, MRL scientists determined that the pooled analysis

should also include the investigator-reported (unadjudicated) data from the trials that

pre-dated the Cardiovascular Adjudication SOP.  In the process of devising the plan for

the analysis, MRL scientists discussed how to define the endpoints of the analysis.

Two different composite endpoints were considered:  (i) the Antiplatelet Trialists'

Collaboration ("APTC") composite endpoint; and (ii) a composite endpoint consisting of

events enumerated under the Cardiovascular Adjudication SOP (the "confirmed

thrombotic endpoint").  The APTC composite endpoint consisted of cardiovascular death,

---

[60]     The concept of power is discussed in Exhibit 3 to the Report.

M0DAA13812

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

myocardial infarction, stroke (both ischemic and hemorrhagic), and death due to unknown cause or due to bleeding. The confirmed thrombotic endpoint included cardiac events (such as acute myocardial infarction), cerebrovascular events (such as ischemic cerebrovascular stroke), as well as peripheral vascular events (such as pulmonary embolism), but did not include unknown cause death.

MRL scientists noted that each endpoint had certain advantages and disadvantages. For example, they noted that the APTC composite endpoint had wide acceptance in the scientific community and consisted of events that had a high confirmation rate in the course of the adjudication process. The fact that it included "hard" endpoints such as myocardial infarction and stroke meant that investigators tended to diagnose these events correctly, which decreased the probability of including in the pooled analyses misdiagnosed events from the trials that pre-dated the Cardiovascular Adjudication SOP. At the same time, however, the APTC composite endpoint included non-thrombotic events, such as hemorrhagic strokes and unknown deaths, that, if included in the analysis, might dilute the power of the analysis to detect a difference in thrombotic events, or, in the case of hemorrhagic strokes, might bias the analysis in favor of Vioxx (which had no antiplatelet effect) as compared to traditional nonselective NSAIDs (which were known to increase bleeding time).

With regard to the confirmed thrombotic endpoint, MRL scientists noted that although it included only thrombotic events (thus directly addressing the issue of whether Vioxx was prothrombotic), it encompassed "soft" events that were misdiagnosed more

- 85 -

M0DAA13813

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

frequently by investigators (thus increasing the probability of including in the analysis misdiagnosed events from trials that pre-dated the Cardiovascular Adjudication SOP).

The evidence shows that MRL scientists discussed the pros and cons of each endpoint internally and with external experts. Dr. Carlo Patrono[*], an expert on antiplatelet agents and a member of the Antiplatelet Trialists' Collaboration, favored using the APTC composite endpoint. In addition, the APTC composite endpoint was the most commonly accepted endpoint used in trials evaluating antithrombotic agents. MRL scientists chose the APTC composite endpoint as the primary endpoint for the analysis and the confirmed thrombotic endpoint as the secondary endpoint.

MRL submitted the results of its first pooled analysis to the FDA on January 8, 2001. The results of the analysis were also published in an article co-authored by MRL scientists and Dr. Marvin Konstam[*], Chief of Cardiology at the New England Medical Center and an MRL consultant, in Circulation on November 6, 2001 (the "Konstam article"). The results of the pooled analysis showed, among other things, that patients on Vioxx had (i) a significantly increased risk of APTC composite endpoint events compared to patients on naproxen (relative risk 1.69; 95% confidence interval, 1.07 to 2.69), and (ii) a similar (and numerically decreased) risk of APTC composite endpoint events compared to patients on non-naproxen NSAIDs (relative risk 0.79; 95% confidence interval, 0.40 to 1.55) as well as to those on placebo (relative risk 0.84; 95% confidence interval 0.51 to 1.38).

Based on the results of the analysis, the Konstam article concluded that "[d]ata from >28,000 patients in 23 studies representing >14,000 patient-years at risk

M00AA13814

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

demonstrated that rofecoxib was not associated with excess CV thrombotic events compared with either placebo or non-naproxen NSAIDs." With regard to naproxen, the article stated that "[t]he data suggest[ed], but [were] insufficient to ascertain, the cardioprotective benefits of naproxen."[61]

The data submitted to the FDA and published in the Konstam article presented the overall results, the results by individual event type, as well as the results for the separate patient populations: patients with osteoarthritis, patients with rheumatoid arthritis and patients with Alzheimer's disease. In addition, Merck provided the data from each of the individual trials broken down by event-type to the FDA in Clinical Study Reports and periodic Safety Update Reports.

As subsequent trials of Vioxx ended and more cardiovascular adverse event data became available, MRL updated its pooled analysis and submitted updated results to the FDA, including on January 19, 2001 (this time, at the FDA's request, excluding from the pooled analysis all studies of fewer than six months), in July 2001, May 2002, and March 2004. Merck published the data from its July 2001 pooled analysis in a 2003 review article by Matthew Weir* et al. (including 1,783 patient-years in addition to the data included in the Konstam article) in The American Heart Journal.[62] The results of

---

[61]    Konstam* MA, Weir* MR, Reicin AR, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. Circulation. 2001;104:2280, at 87. MRK-ADY0002799.

[62]    Weir* MR, Sperling RS, Reicin A, Gertz BJ. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J. 2003;146:591-604. MRK-AHN0014891.

M00AA13815

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

these subsequent pooled analyses were consistent with the results of the original pooled analysis submitted to the FDA on January 8, 2001 and published in the Konstam article.

There is no evidence to suggest that the deliberative process that Merck scientists undertook internally and with their external consultants to select a composite endpoint for the analysis was designed to hide any risk. To the contrary, the record is clear that Merck's very purpose in conducting the pooled analyses was to investigate whether Vioxx presented any cardiovascular risk to patients that individual trials were unable to detect.

### 12.    Allegation No. 12:  Merck Intentionally Withheld from the FDA a Meta-Analysis of Myocardial Infarctions in the Vioxx Program.

#### a.    Summary of Allegation.

It has been argued that Merck intentionally withheld from the FDA data regarding the cardiovascular safety of Vioxx, including a meta-analysis of the myocardial infarction endpoint. Specifically, critics assert that Merck performed a meta-analysis in late 2000, which they allege demonstrated that Vioxx caused significantly more myocardial infarctions than NSAID comparators and placebo, but did not include it in the "Interim Cardiovascular Meta-analysis" submitted to the FDA on January 8, 2001. That submission, as discussed in response to Allegation No. 11, analyzed only the Antiplatelet Trialists' Collaboration ("APTC") composite cardiovascular endpoint, which allegedly produced more favorable results than the meta-analysis of the myocardial infarction endpoint.

M00AA13816

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### b.   Our Findings and Conclusions.

The evidence shows that early internal drafts of the first Vioxx cardiovascular meta-analysis that Merck planned to submit to the FDA had included a section reviewing a meta-analysis of the myocardial infarction endpoint.  Neither this section nor any reference to a meta-analysis of myocardial infarctions, however, was included in the "Interim Cardiovascular Meta-analysis" provided to the FDA on January 8, 2001.  As discussed above, that meta-analysis included only an analysis of the widely accepted APTC composite endpoint, which included a number of thrombotic and other cardiovascular events.

Both the APTC composite endpoint meta-analysis and the myocardial infarction meta-analysis included analyses of event rates for Vioxx as compared to (i) non-naproxen NSAIDs and placebo combined and (ii) all comparators combined (i.e., any nonselective NSAID, including naproxen, and placebo).  With respect to the first comparison, neither the APTC meta-analysis nor the myocardial infarction meta-analysis showed a statistically significant difference in the event rates between Vioxx and the combined comparators, and in fact both meta-analyses showed a small numerical decrease in the event rate on Vioxx.

With respect to the second comparison, however – which included naproxen – the meta-analysis of myocardial infarctions showed a statistically significantly higher event rate on Vioxx, which did not emerge in the APTC composite cardiovascular endpoint analysis that Merck submitted to the FDA.  This second comparison (between Vioxx and all comparators combined) was driven to a large extent by the Vioxx-naproxen

M0DAA13817

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

component.  In addition, according to MRL scientists, the validity of this comparison was subject to question because there was not sufficient homogeneity between the blocks of data from the studies included in the comparison, meaning that they were sufficiently different that it was not appropriate to group naproxen together with all other comparators for meta-analysis purposes.  This fact was noted in Merck's FDA submission of the APTC composite endpoint meta-analysis.

We have found no evidence suggesting that MRL scientists failed to include the meta-analysis of myocardial infarctions for the purpose of hiding or misrepresenting data.  Rather, the "Interim Cardiovascular Meta-analysis" submitted to the FDA included data broken out by individual events for each pooled comparison (including the number of myocardial infarction events and relevant patient years), which FDA statisticians could have used to conduct a meta-analysis of myocardial infarctions.  Although the FDA responded to Merck's meta-analysis of APTC composite endpoint events by asking for several additional analyses, it did not request that Merck provide a meta-analysis of myocardial infarctions.

In addition, after January 2001, Merck provided the FDA with updated meta-analyses and submitted periodic Safety Update Reports with cardiovascular (including myocardial infarction) event data.  We are not aware of any evidence that Merck attempted to conceal any cardiovascular data from the FDA.

M00AA113818

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### 13.  Allegation No. 13:  Merck Confirmed the Cardiovascular Safety of Vioxx Through Misleading Promotion.

#### a.  Summary of Allegation.

Throughout 2000 and 2001, it is claimed that "'Merck issued a relentless series of publications reconfirming the drug's safety"[63] and continued to "confirm the safety profile of Vioxx" in press releases[64] and at medical conferences so that the public and physicians prescribing Vioxx would erroneously believe that it was safe.  Critics rely on the fact that the FDA's Division of Drug Marketing, Advertising, and Communications (known as DDMAC) sent Merck a Warning Letter in September 2001 criticizing the Company's promotion of Vioxx as misleading and stating that it was "simply incomprehensible" that Merck would claim that Vioxx posed no cardiovascular risk.[65]  In addition, DDMAC stated that the "naproxen benefit hypothesis was hypothetical and was not the only reasonable explanation for the VIGOR results."[66]

#### b.  Our Findings and Conclusions.

The September 17, 2001 Warning Letter focused on three sets of events:  (i) six promotional audio conferences presented on Merck's behalf by an outside speaker who

---

[63]  Sharon Kirkey\*, Vioxx-maker Valued Sales Over Safety, The Gazette (Montreal), Oct. 7, 2004, at A12 (quoting Dr. Eric Topol\*).

[64]  See, e.g., 4/28/00 Merck press release, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx®," MRK-ABI0002231-32; 5/22/01 Merck press release, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx®," MRK-ABI0003228-30.

[65]  Barbara Martinez\*, Vioxx Lawsuits May Focus on FDA Warning in 2001, Wall St. J., Oct. 15, 2004, at B1.

[66]  Barbara Martinez\*, Vioxx Lawsuits May Focus on FDA Warning in 2001, Wall St. J., Oct. 15, 2004, at B1.

M0DA113819

Report of John S. Martin, Jr. to the Special Committee                         September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

allegedly misrepresented the safety profile of Vioxx; (ii) allegedly misleading oral

representations by two sales representatives to FDA officials at two pharmacists'

conferences; and (iii) a press release issued on May 22, 2001 that claimed that Vioxx had

a "favorable cardiovascular profile."

Specifically, in the September 2001 Warning Letter, DDMAC asserted:

> You have engaged in a promotional campaign for Vioxx
> that minimized the potentially serious cardiovascular
> findings that were observed in the Vioxx Gastrointestinal
> Outcomes Research (VIGOR) study, and thus,
> misrepresents the safety profile for Vioxx.  Specifically,
> your promotional campaign discounts the fact that in the
> VIGOR study, patients on Vioxx were observed to have a
> four to five fold increase in myocardial infarctions (MIs)
> compared to patients on the comparator non-steroidal anti-
> inflammatory drug (NSAID), Naprosyn (naproxen).[67]

DDMAC further alleged that Merck's promotional campaign failed "to disclose that [the

naproxen cardioprotection hypothesis was] hypothetical, [had] not been demonstrated by

substantial evidence, and that there [was] another reasonable explanation, that Vioxx may

have pro-thrombotic properties."[68]

As discussed more fully in Appendix G, Merck conducted an investigation of the

issues identified in DDMAC's Warning Letter and, on October 1, 2001, Mr. David

Anstice, President, Human Health – The Americas, sent DDMAC a written response.[69]

Mr. Anstice's letter stated that Merck strongly disagreed with DDMAC's assertion that

---

[67]   9/17/01 FDA Warning Letter from T. Abrams* to R. Gilmartin, MRK-AAF0007777, at 77.

[68]   9/17/01 FDA Warning Letter from T. Abrams* to R. Gilmartin, MRK-AAF0007777, at 77.

[69]   10/1/01 letter from D. Anstice to T. Abrams*, MRK-AFT0007691-99.

M00AA13820

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Merck had "engaged in a promotional campaign for Vioxx that minimized the potentially serious cardiovascular findings that were observed" in the VIGOR Trial and its assertion that Merck's May 22, 2001 press release was false or misleading.

With regard to the six promotional audio conferences discussed in the Warning Letter, Mr. Anstice's response explained that Merck had strict policies, designed to enforce federal regulations, concerning the promotion of its products. He informed DDMAC that all outside speakers were required to sign a contract with Merck in which they agreed that they would not make any off-label claims in their presentations and would provide fair balance. Mr. Anstice acknowledged that the outside speaker cited in the Warning Letter had violated Merck's policies at these audio conferences and informed DDMAC that Merck had discontinued using the speaker.

With respect to the second issue raised in the Warning Letter – Merck's May 22, 2001 press release – Merck's response letter explained that the May 22 press release was issued "in response to media and analyst activity and was not proactively issued to promote the cardiovascular safety profile of Vioxx."[70] As explained in the letter, Merck issued the press release in response to two events: (i) an April 27, 2001 analyst's report by Richard Stover[*] of Arnhold & S. Bleichroeder, Inc., entitled "Cox-2 Inhibitor Outlook: Cardiovascular Safety Issues Raised in FDA Advisory Committee Meetings," which concluded, in part, that naproxen did not show a cardioprotective effect in the VIGOR Trial, and (ii) a May 22, 2001 article in The New York Times, entitled "Doubts

---

[70]     10/1/01 letter from D. Anstice to T. Abrams[*], MRK-AFT0007691, at 94.

M0DAA11382I

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

are Raised on the Safety of 2 Popular Arthritis Drugs," which cited Mr. Stover's[*] report

questioning the cardiovascular safety of both Vioxx and Celebrex and which had been

picked up by the television media.[71]

Merck's press release, entitled "Merck Confirms Favorable Cardiovascular Safety

Profile of Vioxx," stated that Vioxx had a "favorable cardiovascular safety profile."[72]

Mr. Anstice further stated:

> . . . the [Warning] Letter appears to create an affirmative
> obligation to disclose alternative explanations for data in a
> communication whose very purpose is to respond to and
> debate those same alternative explanations. . . [and] does
> not acknowledge the fact that substantial balance, including
> the existence of alternative hypotheses, was included in that
> press release.[73]

Merck argued that "The First Amendment protects Merck's right to respond under these

circumstances with information that is truthful and not misleading, as well as the public's

right to hear both sides of the story."[74] Merck's subsequent releases regarding Vioxx and

the VIGOR Trial, however, were more explicit regarding alternative explanations for the

VIGOR Trial results.

With respect to the third issue raised in the Warning Letter – oral representations

made by sales representatives at two pharmacists' conferences regarding the

---

[71]   10/1/01 letter from D. Anstice to T. Abrams[*] attaching documents, MRK-AFT0007691, at 700-40.

[72]   5/22/01 Merck press release, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx®," MRK-ABI0003228, at 28.

[73]   10/1/01 letter from D. Anstice to T. Abrams[*], MRK-AFT0007691, at 94-95.

[74]   10/1/01 letter from D. Anstice to T. Abrams[*], MRK-AFT0007691, at 95.

M00AA11382Z

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

cardiovascular safety profile of Vioxx -- Mr. Anstice advised DDMAC that if Merck's investigation of the allegations revealed that sales representatives acted contrary to the "long-standing written policies that govern the activities of all field-based personnel," Merck would take appropriate disciplinary action.

After consultation with DDMAC, including teleconferences and a meeting in late October of 2001, Merck sent two DDMAC-approved "Dear Healthcare Provider" letters on November 19, 2001 to attendees of the audio and pharmacists' conferences who could have been exposed to the explanations for the VIGOR Trial cardiovascular rates that focused solely on the naproxen cardioprotection hypothesis. The letters stated that DDMAC objected to claims "that the FDA asserts were misleading about the significant cardiovascular findings in the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study."[75] The letters further stated:

> Alternative interpretation[s] have been proposed for the difference in the rates of myocardial infarctions (MI) in the Vioxx treatment group in comparison with the naproxen treatment group. Possible explanations include that Vioxx increased the MI rate or naproxen decreased the MI rate. The underlying reason for the difference has not been established in prospectively designed clinical studies.[76]

---

[75]   11/19/01 letter from T. Casola to T. Abrams attaching Dear Healthcare Provider letters, MRK-AAF0007880, at 82, 89.

[76]   11/19/01 letter from T. Casola to T. Abrams attaching Dear Healthcare Provider letters, MRK-AAF0007880, at 82, 89.

M00AA11823

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

On January 2, 2002, DDMAC sent Merck a letter stating that based on these corrective actions, it considered the matter "satisfactorily resolved" and "closed."[77] DDMAC did not require Merck to take any corrective action concerning the press release. Merck did not receive any additional warning letters from DDMAC alleging that Merck's promotion of Vioxx was improper. In addition, as discussed at pages 116 and 117 and 120 through 121 below, in late 2001, Merck introduced a Company-wide campaign to underscore the importance of compliance, in part to ensure that Merck product promotion complied with federal regulations as well as Merck policies.

### 14. Allegation No. 14: Other Merck Studies Showed that Vioxx Was Dangerous, But Merck Ignored or Hid the Results.

#### a. Summary of Allegation.

It is alleged that cardiovascular data from the VIGOR Trial were not the only data that revealed Vioxx's cardiovascular risk. According to critics, data from other Merck clinical trials – available long before the APPROVe Trial data were unblinded – raised a red flag about the cardiovascular safety of Vioxx, but Merck chose to ignore them. A related criticism is that Merck selectively determined not to publish negative data from these trials.

First, it is argued that two twin studies conducted before Vioxx was approved for sale, Protocol 090 and Protocol 085, revealed an excess incidence of heart attacks in the Vioxx arm, but that Merck discounted the data because the studies were short.

---

[77]   1/2/02 letter from L. Governale* to T. Casola, MRK-AAF0007894, at 94.

- 96 -

M00A11824

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Second, it has been claimed that Merck's ADVANTAGE Trial likewise revealed an increased cardiovascular risk of Vioxx and that MRL scientist Dr. Alise Reicin tried to minimize these results by asking another MRL scientist, Dr. Eliav Barr, to alter the results to reflect that a certain death in that trial was not a heart attack.[78]  In their email exchange, Dr. Reicin is alleged to have "repeatedly urged the researcher to change his views about the death 'so that we don't raise concerns.'"[79]

Third, it is claimed that although two placebo-controlled trials testing the efficacy of Vioxx both in treating and in preventing Alzheimer's disease did not indicate a difference in the incidence of cardiovascular events between the Vioxx and placebo arms, they showed that elderly people taking Vioxx were 4½ times "more likely to die than those in a placebo group."[80]  According to Dr. Gurkirpal Singh[*], director of the post-marketing drug surveillance program at Stanford University, the reason more patients on Vioxx were dying even though the rate of heart attacks and strokes was not higher was that "[t]hey were dying before they got a heart attack or stroke. . . ."[81]  The argument continues that although interim data from the Alzheimer's trials did not reflect a

---

[78]   Alex Berenson[*], Evidence in Vioxx Suits Shows Intervention by Merck Officials, N.Y. Times, April 24, 2005; 11/8/00 email from A. Reicin to E. Barr, MRK-NJ0124427, at 27-28.

[79]   Alex Berenson[*], Evidence in Vioxx Suits Shows Intervention by Merck Officials, N.Y. Times, April 24, 2005.

[80]   Judith Graham[*], FDA Knew in 2002 that Vioxx Posed Risk; Agency Chose Not to Warn Doctors, Chicago Trib., February 10, 2005, at C1; see also 9/14/05 transcript of Humeston v. Merck & Co., ATL-L-2272-03 MT, N.J. Super. Ct. Law Div., at 39-40, 70.

[81]   Judith Graham[*], FDA Knew in 2002 that Vioxx Posed Risk; Agency Chose Not to Warn Doctors, Chicago Trib., February 10, 2005, at C1.

M00AA11382S

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

cardiovascular risk, the studies revealed an increased incidence of cardiovascular events
after 18 months, a fact that MRL scientists attributed – without support – to chance.

### b.      Our Findings and Conclusions.

The evidence shows that all relevant data with respect to the studies discussed
above were submitted on a timely basis to the FDA and that Merck did not "ignore" or
try to "hide" allegedly negative data.

Merck's Protocols 090 and 085 were twin 6-week trials that tested the
comparative efficacy of Vioxx, placebo and nabumetone (a non-selective NSAID) in
relieving the pain and inflammation associated with osteoarthritis. Merck submitted the
trial data from these studies – including the cardiovascular data – to the FDA on June 29,
2000 with the supplemental New Drug Application for Vioxx. In the application, Merck
highlighted the fact that these trials had included low-dose aspirin to support a claim that
Vioxx could be administered concomitantly with aspirin. The trials each included
approximately 1,000 patients, randomized among the three arms of the study.

In Protocol 090, of the 978 patients enrolled, investigators reported that 6 patients
in the Vioxx arm experienced a serious cardiovascular event (including heart attacks),
versus 1 in the placebo group and 2 in the nabumetone group. The difference in the
incidence of serious cardiovascular events between treatment groups in Protocol 090 was
not statistically significant and MRL scientists believed that the numbers were too small
to be meaningful. (After these events were adjudicated, there were 5 serious
cardiovascular events in the Vioxx arm, 0 in the placebo arm, and 1 in the nabumetone
arm.)

- 98 -

M00AA13826

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                           Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Protocol 085 (the twin study), did not show any imbalance in serious

cardiovascular events:  there were 2 investigator-reported cardiovascular events in the

Vioxx arm, 2 in the nabumetone arm, and 0 in the placebo arm.  Dr. Maria Lourdes

Villalba[*], a medical reviewer at the FDA who reviewed data from Protocols 090 and 085

as well as other Vioxx trials following the VIGOR Trial, did not view these results as

significant.  In an internal FDA email, she stated:

> the number of events [in Protocol 090] was small and there
> was a twin study (085) with identical size and duration,
> conducted at approximately the same time, that showed no
> difference in CV thrombotic events as compared to placebo
> and nabumetone.[82]

These cardiovascular data were included in Merck's cardiovascular pooled

analysis, which was published in Circulation in 2001.  The data also were discussed in an

article written by Dr. Eric Topol[*] of the Cleveland Clinic and published in JAMA in

2001.  The efficacy and tolerability data from Protocol 090 (but not the cardiovascular

data) were presented on a poster at the American Geriatric Society Conference in May

2001.  An article including all of the Protocol 090 data, including cardiovascular data,

was published in the Journal of Clinical Rheumatology in February 2006.

Data from the ADVANTAGE Trial (a 12-week trial of Vioxx versus naproxen in

osteoarthritis patients that ended in April 2000) were likewise submitted to the FDA in

support of Merck's supplemental New Drug Application.  Dr. Barr subsequently

reviewed all deaths that occurred in the course of the ADVANTAGE Trial to determine

---

[82]    11/8/04 email from M. Villalba[*] to L. Lemley[*] and J. Woodcock[*], FDACDER 023057.

M00AA13827

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

which ones fell within the APTC composite cardiovascular endpoint and should therefore
be included in the cardiovascular meta-analysis soon to be submitted to the FDA. Both
Dr. Barr and Dr. Reicin agreed that the death at issue should be counted in the meta-
analysis. Their disagreement was over whether Dr. Barr should retrospectively
characterize a certain death as a heart attack, which, according to Dr. Reicin, would have
raised concerns about process because all heart attacks were supposed to have been
adjudicated but this event had not been adjudicated since it had not been reported by the
investigator as a heart attack. The data were blinded and there is no evidence that either
Dr. Barr or Dr. Reicin knew which treatment, Vioxx or naproxen, this patient was taking.

In the end, this death was counted in Merck's cardiovascular meta-analysis and
was listed as an "unknown cause of death" in Merck's submission to the FDA. In an
article about the ADVANTAGE Trial published in the Annals of Internal Medicine in
2003, the death was included in one composite grouping of cardiovascular events (the
APTC composite endpoint analysis), but not in another.[83]

With respect to critics' claims about Merck's lack of transparency with data from
the long-term Alzheimer's trials, while Merck had reviewed blinded, and then unblinded,
cardiovascular data during the pendency of those trials, it was not until the spring of 2001
that mortality data from Protocol 091, the first of the Alzheimer's trials to end, were
examined. The data showed that there was a mortality imbalance between the Vioxx and

---

[83]  Lisse JR, Perlman* M, Johannson* G, et al. Gastrointestinal tolerability and effectiveness of
rofecoxib versus naproxen in the treatment of osteoarthritis: A randomized, controlled trial. Ann
Intern Med. 2003;139:539-46.

M00AA11828

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

placebo arms of the trial. The record establishes that based on these data, Merck unblinded mortality data from Protocols 078 and 126 and performed a combined analysis that showed 41 deaths in the Vioxx group and 24 deaths in the placebo group for the three Alzheimer's trials combined.

MRL scientists conducted analyses to investigate the data and determine whether there was a relationship between mortality and cardiovascular adverse events. These analyses showed that (i) there was a relatively equal distribution of cardiovascular events between the Vioxx and placebo groups and (ii) the mortalities were due to numerous causes. Because there was no discernable pattern to the mortalities, MRL scientists concluded that there was no causal nexus between Vioxx and the mortalities. The evidence shows that on July 12, 2001, Merck submitted a periodic Safety Update Report to the FDA, which provided safety data, including mortality data, from Protocols 078, 091 and 126. These data were incorporated into the revised Vioxx product labeling in 2002. Based on the evidence we reviewed, Merck did not hide or prevent dissemination of data from these trials.

The evidence further shows that at the time that final cardiovascular data from the Alzheimer's trials became available, MRL scientists did not believe that there was any significance to the apparent increase in the hazard rate after 18 months because, for the first 18 months, the incidence of cardiovascular events had been lower in the Vioxx group than in the placebo group. The rate of accumulating cardiovascular events in the Vioxx group began to exceed that of the placebo group after 18 months. Throughout the Alzheimer's trials, the difference in the cardiovascular event rate between the two arms

M00AA113829

Report of John S. Martin, Jr. to the Special Committee                                        September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                             Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

was not statistically significant, and the total incidence of cardiovascular events between

Vioxx and placebo was almost exactly even.  Therefore, MRL scientists and statisticians

viewed the changes in the event rates as simply "noise" around the mean.

        In addition to investigating publication of data from these trials specifically, we

also reviewed Merck's policy on publishing the results of its clinical studies.  The

evidence showed that it had always been Merck's policy, as a general matter, to endeavor

to publish the results of all Merck-sponsored clinical studies, regardless of outcome, with

the exception of hypothesis-generating studies that Merck viewed as proprietary

information.  This guiding principle, while part of Merck's culture, was formally codified

in 1999 and 2000, when Merck drafted and adopted its Code of Conduct for Clinical

Trials.[84]  This was precipitated by a discussion in the pharmaceutical industry about

proper publication practices that arose because of a series of high profile events in the

1990s in which pharmaceutical companies other than Merck had been accused of

attempting to block the publication of unfavorable data.[85]  The Code of Conduct was a

---

[84]   See 9/12/01 slide presentation of L. Hirsch, H. Guess, and D. Thompson to CCRC, MRK-NJ0206001,
       at 06-07 (discussing Merck Clinical Trial Code of Conduct).  At around the same time, Merck
       approved a new guidance on publication practices, which was the product of a joint effort by
       representatives from Merck, Glaxo Wellcom, AstraZeneca, and Eli Lilly.  See id.; 12/99 Guidance
       Document, "Good Publication Practices:  Guidelines for Pharmaceutical Companies,"
       MRK-AGV0043414-18.

[85]   See 9/12/01 slide presentation of L. Hirsch, H. Guess, and D. Thompson to CCRC, MRK-NJ0206001,
       at 05 (mentioning, among others, dispute between Knoll Pharmaceuticals and the University of
       California, San Francisco regarding synthroid and dispute between Apotex Pharmaceuticals and
       Dr. Nancy Oliveri regarding deferipone).  The Code of Conduct was also a reaction to a series of two
       articles published in The New York Times in May 1999 that raised questions about the practice of
       Merck and other pharmaceutical companies paying large sums to clinical investigators and about
       fraud among the clinical investigators.  Kurt Eichenwald* and Gina Kolata*, Drug Trials Hide
       Conflicts for Doctors, N.Y. Times, May 16, 1999, MRK-ABS0399414-31; Kurt Eichenwald* and

M00AA11830

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

one-page list of key principles governing the ethical and scientific conduct of Merck-sponsored studies that was appended to the back of every study protocol.[86]

In the spring of 2001, a new department – the Medical Communications Department – was created to oversee all publication efforts. A more detailed publication policy, entitled "Merck Guidelines for Publication of Clinical Trials and Related Works," was adopted in September 2003.[87] The 2003 publication guidelines cover not only clinical trials, but also "related works," which include observational studies. The guidelines include detailed guidance on what studies should be published, what data should be included, what constitutes publication, and when studies should be published.[88]

---

Gina Kolata[*], A Doctor's Drug Studies Turn Into Fraud, N.Y. Times, May 16, 1999, MRK-ABS0399398-412.

[86] See, e.g., Merck Code of Conduct for Clinical Trials attached to APPROVe Trial Protocol, MRK-ABS0326111, at 185, 197.

[87] 9/23/03 "Merck Guidelines for Publication of Clinical Trials and Related Works," MRK-AGE0000593-600.

[88] Recently, the pharmaceutical industry as a whole has tried to address the problem of selective publication of clinical studies. The National Institute of Health ("NIH") has established a national registry of clinical trials (http://www.clinicaltrials.gov) and the Pharmaceutical Research and Manufacturers of America ("PhRMA") has developed a database where the results of clinical trials can be posted and publicly viewed (http://www.clinicalstudyresults.org). Merck currently registers on the NIH registry all Phase II, III, and post-marketing trials in which treatment has been assigned and has begun posting the results of its hypothesis-testing studies on the PhRMA database as well. Merck Perspective, "Clinical Trials Registries and the Publication of Clinical Trial Results," http://www.merck.com (last updated September 2005).

- 103 -

M00A11831

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### 15.    Allegation No. 15:  Merck Kept the Cardiovascular Safety Information Out of the Product Label.

#### a.    Summary of Allegation.

Although the VIGOR Trial data were available in March 2000, the Vioxx label was not changed to reflect those data until April 11, 2002.  Critics claim that Merck deliberately prolonged negotiations with the FDA over how the VIGOR Trial and ADVANTAGE Trial cardiovascular data should be reported in the label in an effort to forestall disclosure of those data.[89]  When the new label finally was approved in April 2002, the cardiovascular risk information was not reported in the "Warning" section of the label but was mentioned only in the "Precaution" section.  In addition, it has been argued that Merck, on its own initiative, could have effected a change to the label to make clear the cardiovascular risks of Vioxx.

#### b.    Our Findings and Conclusions.

None of the evidence we have reviewed supports a conclusion that Merck intentionally sought to delay the label negotiations.  To the contrary, the record reflects that Merck sought expedited review of its supplemental New Drug Application, which was submitted on June 29, 2000, so that the FDA would approve a label with the VIGOR Trial gastrointestinal data as quickly as possible.  The FDA, however, denied expedited review and set an Advisory Committee meeting for February 8, 2001 to review Merck's application.

---

[89]    Anna Wilde Mathews*, Did FDA Staff Minimize Vioxx's Red Flags?, Wall St. J., November 10, 2004, at B1; Gardiner Harris*, F.D.A. Official Admits 'Lapses' on Vioxx, N.Y. Times, March 2, 2005, at A15.

- 104 -

M0DAA13832

Report of John S. Martin, Jr. to the Special Committee                                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Negotiations as to how the VIGOR Trial results would be characterized in the label, and where within the label they would be reported, did not begin in earnest until some months after the February 2001 FDA Advisory Committee meeting. On May 21, 2001, Merck submitted its third proposed label to the FDA. The FDA, however, did not counter-propose a label until almost five months later, on October 15, 2001. After this substantial time delay, for which there is no evidence that Merck was responsible, negotiations moved relatively quickly, with each side responding in a timely manner to the other party's proposal. From June 29, 2000 through April 11, 2002, Merck submitted a total of 12 draft label proposals to the FDA. The FDA submitted four counterproposals to Merck.

Importantly, the record reflects that the label negotiations were focused on much more than the presentation of cardiovascular data. Also of great significance to Merck was changing the standard NSAID-class gastrointestinal warning to reflect the positive results of the VIGOR Trial. To be sure, Merck and the FDA negotiated over the presentation of cardiovascular data and where within the label it should be included. MRL scientists and regulatory personnel did not believe that the Vioxx cardiovascular data supported a warning, which Merck believed should be reserved for known adverse effects. MRL scientists took the position that the VIGOR Trial cardiovascular data were explained by the naproxen cardioprotection hypothesis and not by any prothrombotic effect of the drug. The record reflects that MRL scientists, including regulatory personnel, believed that cardiovascular data from the VIGOR Trial and other Vioxx trials should be presented so that physicians could make their own risk/benefit analysis.

M00AA113833

Report of John S. Martin, Jr. to the Special Committee                              September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

The FDA's October 15 counterproposal label with its suggested cardiovascular

warning led Dr. Scolnick to write:

> twice in my life i have had to say to the FDA "That label is
> unacceptable. We will not under any circumstances accept
> it." . . . You WILL have to do that on the cardiac warning
> for Vioxx. . . . And i assure you i will NOT sign off on any
> lable (sic) that had a cardiac warning. the data review
> yesterday convinces me that we do not have an unsafe drug
> and i am willing if needed to spend several hours one on
> one with anyone at the FDA going through the data until
> they in fact get it[90]

Merck's next proposal, which the FDA accepted, moved the cardiovascular data to the

Precautions section of the label, where it remained through the final version of the label.

There is some question whether it would have been possible for Merck to add the

cardiovascular data from the VIGOR Trial to the Vioxx label prior to FDA approval in

April 2002 through a "changes being effected" supplement. The regulations indicate that

unilateral changes may be made at the election of the drug sponsor to add important

known risk information to the label in certain situations. However, in the fall of 1999,

the FDA denied Merck's use of the "changes being effected" process to add language to

the Vioxx label based on post-marketing adverse experience data regarding concurrent

administration of Vioxx and the blood-thinning drug warfarin. Moreover, MRL scientists

did not believe that Vioxx posed a known cardiovascular risk because their review of the

available data persuaded them that the cardiovascular effects seen in the VIGOR Trial

were the result of the cardioprotective effect of naproxen.

---

[90]    11/8/01 email from E. Scolnick to D. Greene, A. Nies and B. Goldmann, MRK-ACR0009287.

M00AA113834

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

In hindsight, it may well be that the unilateral addition of a cardiovascular warning to the Vioxx label would have been beneficial to Merck in terms of defending against the numerous failure-to-warn products liability cases pending, but there is no basis on which to conclude that pursuing the standard FDA-approved label modification process rather than making changes unilaterally was unreasonable.

### 16.   Allegation No. 16:  Merck Announced – Then Cancelled – a Cardiovascular Outcomes Trial to Avoid Revealing That Vioxx Was Prothrombotic.

#### a.   Summary of Allegation.

At the end of 2001, approximately 21 months after the VIGOR Trial data were unblinded, Merck announced that it would conduct a cardiovascular outcomes trial.  In early 2002, Merck finally settled on a trial design, which it called the VALOR Trial. Merck established an outside Steering Committee for the VALOR Trial and began to line up investigators and sites at which patients would receive treatment.  Then, on the eve of its start in March 2002, the VALOR Trial was cancelled abruptly, and without explanation.  The VALOR Trial "was scheduled to produce data by March 2004 but may have provided answers about Vioxx's risks even earlier if patients had shown ill effects."[91]

It is argued that the Company's 21-month delay in scheduling the trial was inexcusable given the known risks of the drug, and that Merck only compounded the problem when it cancelled the study it had committed to conduct.

---

[91]   Barry Meier*, Merck Canceled an Early Study of Vioxx, N.Y. Times, Feb. 8, 2005, at C1.

- 107 -

M00A11B635

Report of John S. Martin, Jr. to the Special Committee                                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                           Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

### b.     Our Findings and Conclusions.

The criticism that MRL scientists knew or feared that Vioxx was prothrombotic and canceled the planned cardiovascular outcomes trial to avoid exposing that fact is not supported by the extensive evidence we have reviewed.

The evidence reveals that Merck made a series of efforts to design a cardiovascular outcomes trial that would answer the fundamental question of whether Vioxx was prothrombotic. Following the release of the VIGOR Trial data, MRL scientists immediately began to consider designing and implementing a cardiovascular outcomes trial to answer this question. By May 2000, however, MRL scientists had strengthened their view on the basis of all of the available clinical evidence that Vioxx did not pose a cardiovascular safety problem and had come to see that it would be difficult to design an ethical and feasible cardiovascular outcomes trial. In addition, members of the Marketing Department, who subsequently supported such a trial, had concluded at the time that it was not necessary. Accordingly, MRL decided not to embark on a lengthy and expensive outcomes trial at that time.

In 2001, however, competitors and critics intensified their claims that selective Cox-2 inhibitors in general, and Vioxx in particular, put patients at increased cardiovascular risk. These claims prompted MRL scientists to reconsider conducting a cardiovascular outcomes trial in the hopes that a successful trial would quell critics and prove to the public what MRL scientists already believed to be true: that Vioxx was not prothrombotic. In a September 13, 2001 email, Dr. Scolnick described MRL's

M00AA13836

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                       Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

prioritization of clinical studies for the following year: "For Vioxx: Only the Cv

outcome study. ONLY ESSENTIAL STUDY!"[92]

By that time, MRL scientists had already begun designing such a trial, and

diligent attempts to do so continued throughout the fall of 2001 and early spring of 2002.

MRL scientists well understood that the cleanest way to prove that Vioxx was not

prothrombotic would be to test it against placebo. FDA policy, however, provides that a

placebo-controlled trial must be designed to demonstrate some benefit of the test drug

(i.e., a "superiority" hypothesis), rather than that no difference exists between the test

drug and the comparator (i.e., a "non-inferiority" hypothesis). Additionally, the FDA

generally disfavored placebo-controlled trials testing a non-inferiority hypothesis

regarding cardiovascular safety, and enrolling patients in such a trial would not be

feasible. Thus, a simple Vioxx versus placebo trial, focused on cardiovascular outcomes,

was precluded by FDA guidelines.

MRL scientists and outside consultants developed several other design options

involving an active comparator, but the inclusion of another drug in the study design

would make it difficult to determine unambiguously whether Vioxx itself was

prothrombotic because any differential seen in the results could – like the VIGOR Trial

results – be interpreted to have been caused either by Vioxx or by the active comparator.

The evidence shows that around January 2002, Merck decided to conduct the

VALOR Trial, which was a slightly more complex version of a placebo-controlled trial,

---

[92]     9/13/01 email from E. Scolnick to D. Anstice et al., MRK-ABW0005624.

M00A11337

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

administering Vioxx or placebo in a population of high-cardiovascular risk patients, all of whom would take low-dose aspirin.  The primary hypothesis was a superiority hypothesis predicated on the notion that, because atherosclerosis was believed to be an inflammatory disease, the anti-inflammatory properties of Vioxx would confer a cardiovascular benefit to patients in the Vioxx arm.  The VALOR Trial was set to begin in the second quarter of 2002.

While MRL was still developing the final protocol for the VALOR Trial, Dr. Robert Silverman from MRL Regulatory Affairs met informally with Dr. Lawrence Goldkind[*], Deputy Division Director at the FDA's Division of Anti-Inflammatory, Analgesics & Ophthalmic Drug Products, and discussed the proposed trial.  Dr. Goldkind[*] expressed discomfort with the design and objective of the study and noted that any anti-inflammatory benefit Vioxx might provide was speculative and would be outweighed by greater risks.  Dr. Silverman communicated Dr. Goldkind's[*] views to the VALOR Trial team, which prompted further internal discussion of the viability and ethics of such a design.

Dr. Peter Kim, then Executive Vice President for Research and Development at MRL, cancelled the trial in March 2002 for a variety of reasons, including the fact that the superiority claim of the study – that Vioxx might be beneficial to high-cardiovascular risk patients – was not strong enough in his view to justify, ethically, conducting the study.  In addition, the inclusion of aspirin in the study would not produce a result that clearly answered the question of whether Vioxx alone had negative cardiovascular effects as compared to non-selective NSAIDs alone or placebo.

M00AA13838

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

By October 2002 Merck had determined that it would combine placebo-controlled data from three long-term cancer prevention studies testing the efficacy of Vioxx in reducing the risk of certain cancers and use these pooled data to further evaluate the cardiovascular profile of Vioxx.  This study, called Protocol 203, was viewed by MRL scientists as equivalent to a prospectively designed cardiovascular outcomes trial, and would provide a clean answer to the question of whether Vioxx was prothrombotic, without implicating the ethical concerns raised in the VALOR Trial.

In sum, while the process of designing a cardiovascular outcomes trial was painstaking, there is no evidence that MRL intentionally delayed the process to avoid the results.

### 17.   Allegation No. 17:  Merck Ignored Mounting Epidemiological Evidence That Vioxx Was Prothrombotic.

#### a.   Summary of Allegation.

Critics assert that from 2002 until the time that Vioxx was withdrawn from the market, there were numerous epidemiological studies that demonstrated that Vioxx caused increased cardiovascular risk to patients based on data other than from Merck's various clinical trials.

For example, it is alleged that an October 2002 study by Dr. Wayne Ray[*], an epidemiologist at Vanderbilt University, found that "Medicaid patients in Tennessee who

- 111 -

M0DAA113839

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

were taking high doses of Vioxx . . . had significantly more heart attacks and strokes than similar patients who were not taking high doses."[93]

It also is alleged that even a Merck-sponsored study conducted in 2003 by Dr. Daniel Solomon* of Harvard University "found Vioxx was associated with an elevated relative risk of heart attacks compared to use of Pfizer's Celebrex or no similar painkiller."[94] When Dr. Solomon* refused to change the study's conclusion, Merck removed from the article the name of one of its scientists who had collaborated on the study.[95]

In addition, nearly a year before Merck received the APPROVe Trial results, it received "preliminary results" from a separate, Merck-sponsored epidemiological study – the Ingenix Study – that, according to critics, "apparently indicated that the drug posed cardiovascular risks."[96]

### b.    Our Findings and Conclusions.

Our review of the record as detailed in Appendix P demonstrates that the epidemiological evidence was by no means clear-cut: some studies found that there was no difference in the incidence rate of cardiovascular events between selective Cox-2

---

[93]    Alex Berenson* et al., Despite Warnings, Drug Giant Took Long Path to Vioxx Recall, N.Y. Times, Nov. 14, 2004, at A1.

[94]    Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

[95]    Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

[96]    Barry Meier*, Earlier Merck Study Indicated Risks of Vioxx, N.Y. Times, Nov. 18, 2004, at C1.

M00AA13840

Report of John S. Martin, Jr. to the Special Committee                     September 5, 2006
of the Board of Directors of Merck & Co., Inc.                       Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

inhibitors and non-naproxen NSAIDs; others found that selective Cox-2 inhibitors were

associated with a higher rate of cardiovascular events; some studies found that naproxen

conferred cardioprotection; other studies found that it did not.  In addition, the studies

employed widely differing methodologies, some of which were the subject of debate and

controversy within the scientific community.

 Internal Company documents reflect Merck's view – which is widely held in the

scientific community – that controlled clinical trials are the gold standard for studying the

efficacy and safety of a drug.  Epidemiological studies may be useful to identify a

possible safety signal but are by no means definitive.  Merck conducted and funded

epidemiological studies, some of which produced results in support of naproxen

cardioprotection and Vioxx's cardio-neutrality, and some of which did not.  In addition,

the record underscores that the science was evolving and that the limitations of

epidemiological studies were widely recognized.  We found no evidence to suggest that

anyone at Merck disregarded a signal that he believed to be a reliable indicator that

Vioxx was prothrombotic.

 **18.** **Allegation No. 18:  Merck Withdrew its Application
   Seeking Approval to Market Arcoxia Because MRL
   Scientists Knew That it Was Not Safe and Would Invite
   <u>Further Scrutiny of Vioxx's Cardiovascular Profile.</u>**

  **a.** **Summary of Allegation.**

 It has been asserted that Merck withdrew its New Drug Application for Arcoxia,

its second-generation selective Cox-2 inhibitor, in 2002 based on negative clinical data

M00AA113841

Report of John S. Martin, Jr. to the Special Committee                               September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

about its cardiovascular safety.[97]  According to critics, Merck did not want the FDA

scrutinizing these data at an upcoming Advisory Committee meeting because it feared

that the Arcoxia data might prompt the Agency to take a harder look at Vioxx's

cardiovascular safety and the Company did not want to jeopardize its existing

blockbuster.[98]

b.    **Our Findings and Conclusions.**

Although our investigation focused on Vioxx, we also investigated whether

Merck's decision to withdraw the Arcoxia New Drug Application was motivated by

cardiovascular safety issues with the drug.  We did not find any evidence that Merck

withdrew the Arcoxia application based on a belief that Arcoxia was prothrombotic or a

concern that the Arcoxia application might jeopardize Vioxx.

Merck originally submitted the New Drug Application for Arcoxia in late 2001.

By March 2002, there were already three entrants into the domestic selective Cox-2

inhibitor market – Celebrex, Vioxx, and Pfizer's second selective Cox-2 inhibitor,

Bextra.  According to the Company's March 15, 2002 press release, Merck withdrew the

application in order to better position Arcoxia in the marketplace:

> Last month, Merck announced plans to submit an expanded
> New Drug Application (NDA) for ARCOXIA (etoricoxib)
> to the FDA to include new efficacy data for ankylosing
> spondylitis [a rare, but chronically painful, disease of the
> spine] that will better position the product to compete
> successfully in the coxib class, where there already are

---

[97]    See Geoff Dyer*, "Merck Revival Hopes Dented," Financial Times (London), March 16, 2002, at 17.

[98]    Complaint in Kaufman v. Gilmartin, No. 04-5566, D.N.J., at ¶¶ 67-68.

M00AA113842

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

> three entrants. Accordingly Merck announced the
> withdrawal of the original U.S. NDA for the investigational
> medicine. Merck believes the new data, along with the data
> previously submitted, will provide a fuller picture of the
> product's efficacy and safety and will position it more
> favorably for approval in the United States.[99]

At the same time, the Company was engaged in discussions with the FDA concerning the

safety profile of Arcoxia, which led to the Company's announcement on June 11, 2002

that the FDA had requested "additional cardiovascular safety data for ARCOXIA versus

comparators other than naproxen."[100]

Merck resubmitted the Arcoxia New Drug Application on December 30, 2003 and

received an approvable letter from the FDA on October 29, 2004, which stated that the

application would be approved upon the submission of additional data, including

cardiovascular safety data. Merck recently completed a pooled analysis of cardiovascular

data from three large clinical trials that tested Arcoxia against diclofenac, a widely used

non-selective NSAID. The combined data from all three trials demonstrated similar rates

of cardiovascular events among those patients treated with Arcoxia and those treated with

diclofenac. The Company has submitted this data to the FDA and has announced its

intention to use this data to respond to the FDA's October 2004 approvable letter.[101]

---

[99]   4/18/02 Merck press release, "Merck Announces First-Quarter 2002 Earnings Per Share of 71 Cents,"
MRK-PRL0000251, at 54.

[100]  6/11/02 Merck press release, "Merck Plans to Refile U.S. New Drug Application for ARCOXIA™ in
Second Half of 2003," MRK-ADW0081756, at 56.

[101]  8/23/06 Merck press release, "Merck Provides Preliminary Analyses of the Completed MEDAL
Program for ARCOXIA™ (Etoricoxib)," MRK-I4640003746-48.

M0DAA113843

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Although the Arcoxia New Drug Application is still pending in the United States,

the drug has been approved and is marketed in over 40 foreign countries.

### C.    Summary of Principal Criticisms and Findings Concerning Merck's Marketing of Vioxx.

Claims that Merck disseminated false information concerning the safety of Vioxx

stem from the premise that MRL scientists and Company senior management understood,

or at least suspected, that Vioxx caused cardiovascular events.  The Company also is

criticized for giving the Marketing Department an inappropriate level of influence in the

setting of Merck's scientific agenda and for engaging in other improper conduct to

"neutralize" Merck's critics.

Our findings regarding claims about Merck's marketing and promotion derive for

the most part from our finding that MRL scientists believed that Vioxx was a safe drug.

To the extent that such claims focus on the aggressiveness of some in Merck's Marketing

Department, we are persuaded that senior management did not condone such conduct and

that Senior Management adopted the Culture of Compliance to reinforce Merck's

commitment to high ethical standards.  Consistent with our mandate, we did not

investigate allegations of misconduct by individuals in the Marketing Department who

were separated from the Company or who were not part of senior management.

This is not to say that we endorse all of the sales and marketing practices that we

reviewed.  The evidence establishes that certain individuals within the Marketing and

Sales Departments engaged in practices that were inconsistent with Merck's policies and

at times proposed neutralizing critics through means that senior management viewed as

M00AA13844

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

unacceptable. Such unacceptable conduct, however, was addressed Company-wide in late 2001 when senior management put in place an enhanced "Culture of Compliance." Although the initiative was not designed to address specifically any of the marketing practices discussed in this Report, the Company's renewed emphasis on compliance and training has curbed promotional activities that Merck deems unacceptable.

### 19. Allegation No. 19: Merck Attempted to Improve Vioxx's Competitive Position by "Neutralizing" Physicians Who Supported Celebrex or Were Critical of Vioxx.

#### a. Summary of Allegation.

Merck filed for FDA approval to market Vioxx in the United States on November 23, 1998, knowing that Vioxx's principal competitor, Searle/Pfizer's Celebrex, would be available beginning in early 1999. Even with the fast-track approval Merck hoped it would receive from the FDA, this meant that Merck would have to "play[] [a] game of catch-up" to reduce Celebrex's market lead and to garner support for Vioxx.[102] Critics allege that Merck therefore set out even before Vioxx was approved to "neutralize" a list of "problem" physicians who were pro-Celebrex by "offer[ing] them carrots like clinical trials, posts as consultants or [] grants."[103] Despite Merck's insistence that such activities were "educational," the "standardized form requesting payments to doctors . . . read 'Expected Outcome/Return on Investment,'" which, it is

---

[102] Barry Meier* & Stephanie Saul*, Marketing of Vioxx: How Merck Played Game of Catch-Up, N.Y. Times, Feb. 11, 2005, at A1.

[103] Barry Meier* & Stephanie Saul*, Marketing of Vioxx: How Merck Played Game of Catch-Up, N.Y. Times, Feb. 11, 2005, at A1.

M0DA113845

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

asserted, revealed an inappropriate marketing-oriented, rather than educational,
purpose.[104]

### b.    Our Findings and Conclusions.

Our review of the evidence shows that the market competition between
Searle/Pfizer and Merck, even before either of their selective Cox-2 inhibitors was
approved by the FDA, was intense and that both companies invested tremendous
resources in launching their respective drugs.

When Celebrex was introduced to the market in early 1999, Vioxx was still five
months away from FDA approval.  During this pre-approval period, Merck's Marketing
Department worked to help introduce physicians to Vioxx and to develop physicians as
advocates for the product.  Up until the end of 2001, some of the ways in which Merck
developed advocates included:  advisory board meetings and consultants' meetings at
which various topics concerning Vioxx and the NSAID market generally would be
discussed in a focus-group setting; a Merck-sponsored speaker program in which outside
speakers would make presentations to a safety monitoring board about Vioxx; a Medical
School Grant Program through which physicians could apply for grants to study Vioxx;
and sponsorship of Continuing Medical Education programs.  The Company also sought
to develop advocates by employing physicians as clinical investigators in post-marketing
Vioxx trials.

---

[104]   Barry Meier* & Stephanie Saul*, <u>Marketing of Vioxx:  How Merck Played Game of Catch-Up</u>, N.Y.
Times, Feb. 11, 2005, at A1.

M00AA113846

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Merck field sales representatives whose job it was to discuss the anticipated market entry of Vioxx with physicians identified certain physicians whom the field representatives believed were anti-Vioxx (based on their understanding of Vioxx's product profile) or anti-Merck. A member of the Marketing Department compiled these physicians' names in a list of "36 Physicians to Neutralize."[105] Critics point to a column on the "36 Physicians to Neutralize" chart that includes comments regarding the means by which the physician might be converted to an advocate. Included in the column are "show me the money," "continue to support with clinical studies," "Weekend Consultants' meeting in an elegant location (New York, Hawaii) or a 5-day international meeting," and "offer medical school grant." While we do not condone such practices, we found no evidence that anyone in senior management encouraged or condoned them. Nor did we review evidence that the sales representatives' recommendations for developing the physician into an advocate were followed.

Despite the provocative sound of the word "neutralize," senior management of the Marketing Department reported that they understood the effort to "neutralize" physicians to be one in which Merck scientists would educate these targeted physicians about Vioxx, often through one of the programs mentioned above. Evidence shows that Merck management believed that if physicians were educated about the benefits of selective Cox-2 inhibitors and about Vioxx in particular, they would no longer be "anti-Vioxx" and would be more likely to become proponents of the drug. It is important to note that

---

[105]   List of Physicians to Neutralize, MRK-AFI0004750-96 (attached to 7/23/99 email from
S. Baumgartner to S. Johnson, MRK-AFI00044569).

M00AA113847

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

throughout the period that Vioxx was marketed, Merck expected all Company representatives to adhere to Merck's policies and procedures, which were designed to ensure compliance with federal regulations and which also, in many instances, went beyond what the law required.

All of the members of senior management in the Marketing Department whom we interviewed were unequivocal that the only travel or entertainment for doctors that was permissible had to be premised on education or market research. Merck policy – both before the Culture of Compliance and after – strictly prohibited offering weekend trips or medical school grants without a bona fide scientific or market research purpose.

Many of the programs discussed above in connection with advocate development and/or neutralizing physicians were revised in connection with the Culture of Compliance. For example, since late 2001, Merck policy has been that advisory boards and consultants' meetings may only be convened when the information sought is not available through other means. In addition, the Marketing and Sales Departments no longer have a voice in determining which physicians should participate in a clinical trial, or which physicians Merck should support through Merck's Medical School Grant Program. In addition, Merck has centralized the education programs, which makes oversight easier.

The Culture of Compliance was initiated proactively by the Company in late 2001 to ensure that all Company employees understood the policies governing marketing and sales practices and to enhance accountability. As part of the broad-based initiative, Mr. David Anstice, President, Human Health – The Americas, established an Office of

M00AA113848

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Compliance. That office, under the leadership of Ms. Lucine Beauchard, undertook a comprehensive review of all existing Merck Marketing and Sales programs, winnowed down the number of programs (to simplify oversight and compliance and ensure that all programs furthered Merck's legitimate business purposes), clarified the written policies for each approved program, and made structural changes that further separated marketing and selling from medical and scientific activities.

The evidence shows that the initiative was aimed at the marketing and sale of all Merck products and was not specific to Vioxx. In addition, the fact that a program was discontinued or changed pursuant to the initiative did not mean that it was determined to have been abused. Rather, the focus was to underscore Merck's strong commitment to ethical business practices. Notably, the Culture of Compliance was voluntarily initiated in response to internal concerns at Merck and was not in response to any federal or state investigation of sales practices at Merck or in the pharmaceutical industry. While no set of policies can completely eliminate the risk of rogue sales representatives or other sales and marketing personnel engaging in conduct that violates Company policy, the Culture of Compliance reflected a strong desire on the part of the Company to aggressively address any such conduct and to promote high standards of ethical behavior.

M0DAA113849

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

20.     **Allegation No. 20:  Merck's Marketing Department
Unduly Influenced the Scientific Research Agenda.**

a.     **Summary of Allegation.**

It is argued that after the VIGOR Trial data were unblinded, "Merck allowed

marketing to trump its scientists"[106] and to determine what Vioxx trials should be

conducted.  For example, Marketing executives purportedly "rejected pursuing a study

focused on Vioxx's cardiovascular risks apparently because [they] feared it could send

the wrong signal about the company's . . . confidence in Vioxx. . . ."[107]  An internal

Marketing presentation to senior executives states:  "At present, there is no compelling

marketing need for such a study . . . .  Data would not be available during the critical

period.  The implied message is not favorable."[108]  It is argued that this emphasis on

marketing over science underscored Merck's desire to put profits above patient safety.

b.     **Our Findings and Conclusions.**

The criticism that Merck's Marketing Department dictated the scientific research

agenda is not supported by the evidence.  To the contrary, documentary and other

evidence underscores that all research decisions were made by MRL senior management.

When Mr. Gilmartin joined the Company in 1994, he created a number of cross-

disciplinary teams, including the Human Health Product Approval Committee.

---

[106]   Christopher Bowe* & Simon London*, The Company's Chief Executive Faces a US Senate Hearing Today, Financial Times (London), Nov. 18, 2004, at 19.

[107]   Alex Berenson* et al., Despite Warnings, Drug Giant Took Long Path to Vioxx Recall, N.Y. Times, Nov. 14, 2004, at 1.

[108]   Alex Berenson* et al., Despite Warnings, Drug Giant Took Long Path to Vioxx Recall, N.Y. Times, Nov. 14, 2004, at 1.

M00AA13850

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                         Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Mr. Gilmartin believed that in a company the size of Merck, interaction between various

departments was critical to ensure that the Marketing, Public Affairs and other

Departments understood the scientific product profiles so that they would be better

positioned to address questions and engage in strategic planning.  In addition, the Human

Health Product Approval Committee allowed MRL scientists to hear from members of

the Marketing Department about what doctors in the field were looking for in a drug.

Critics point to a slide presentation from a May 2000 Human Health Product

Approval Committee meeting which reflects that the Marketing Department sought

approval of a decision not to proceed with a cardiovascular outcomes trial as evidence

that the Marketing Department directed the scientific agenda.  The record shows that in

the immediate aftermath of the VIGOR Trial unblinding, MRL scientists discussed

conducting an outcomes trial.  As discussed above in response to Allegation No. 8,

however, they had concluded by May 2000, based on their review and analysis of

cardiovascular data from the Vioxx clinical program, that the difference in the incidence

of cardiovascular events between the Vioxx and naproxen groups in the VIGOR Trial

most likely was caused by the cardioprotective effect of naproxen and that Vioxx was

cardio-neutral.  While members of the Marketing Department were invited to express

their views, it was MRL that determined that a cardiovascular outcomes trial was not

necessary.  Members of senior management in both MRL and the Marketing Department

were unequivocal that if MRL had believed that it was necessary to conduct an outcomes

trial, the views of the Marketing Department would have been irrelevant.

M00AA113851

Report of John S. Martin, Jr. to the Special Committee          September 5, 2006
of the Board of Directors of Merck & Co., Inc.               Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

While it is true that at one point in time some people in the Marketing Department thought that announcing a cardiovascular risk study of Vioxx would send a wrong message, at another time Marketing personnel thought that such a study was necessary to put to rest the competition's clam that the VIGOR Trial showed that Vioxx was prothrombotic. In the end it was the MRL scientists who determined what studies should be conducted, and when.

### 21.   Allegation No. 21: Merck Went on the Offensive Against Doctors and Academics who Questioned Vioxx's Cardiovascular Safety.

#### a.   Summary of Allegation.

It is alleged that when academic researchers raised questions about Vioxx's cardiovascular safety, Merck "struck back hard."[109] Merck's approach was first to try and persuade critics to change their views. If that did not work, a Merck executive would threaten and try to discredit critics. A letter to Mr. Gilmartin, Merck's Chairman and Chief Executive Officer, from Dr. James Fries*, a Stanford University Medical School doctor, sums up Merck's tactics in this regard. As explained by Dr. Fries*, Merck's Dr. Louis Sherwood met with academics and threatened them with consequences, financial and reputational, if they were not more favorable to Merck.[110] Dr. Fries'* letter

---

[109]   Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

[110]   Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1. 2004, at A1.; Thomas Ginsberg*, Threats to Critics of Vioxx Alleged, Phila. Inq., June 5, 2005, at A1.

M00A13852

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

identified eight academic physicians he alleged were threatened or retaliated against by

Dr. Sherwood or other Merck employees.

### b.   Our Findings and Conclusions.

The complete record we reviewed reflects that Dr. Louis Sherwood, a former

academic Chairman and former head of the Medical and Scientific Affairs division of

U.S. Human Health, was the most senior U.S. Human Health representative to meet with

physicians who were identified as anti-Vioxx to educate them about Vioxx.  His scientific

and academic background made him, it was believed, well-suited to the job.  While one

can legitimately question some of the conduct attributed to Dr. Sherwood, it is clear that

when complaints came to the attention of Mr. Gilmartin, he responded appropriately.

After Mr. Gilmartin received the letter from Dr. Fries[*] accusing Dr. Sherwood of

intimidating and threatening professors and physicians who questioned the safety of

Vioxx, Mr. Gilmartin directed Mr. Anstice, President, Human Health – The Americas, to

investigate the allegations, which he did.  Mr. Anstice asked Dr. Sherwood to write a

memorandum responding to Dr. Fries'[*] allegations.

Dr. Sherwood's four-page, single-spaced memorandum reflects his belief, in each

instance, that he was completely justified in the manner in which he contacted physicians

and discussed data with them to correct their misapprehensions.  Dr. Sherwood did not

think that it was appropriate for academic physicians to "go out and say anything and do

anything one pleases" and he stated that he intervened on an "ad hoc basis" when such

individuals did not present data in a balanced manner.

- 125 -

M00AA13853

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Senior Merck management, including Messrs. Gilmartin and Anstice, took steps to investigate the allegations and to ensure that any behavior by Dr. Sherwood that might have been interpreted as intimidating or threatening would not be repeated.  The evidence does not suggest that Dr. Sherwood's conduct was part of an orchestrated campaign by senior management to suppress scientific discourse about Vioxx.  Since Dr. Sherwood retired in 2002, we saw no need to attempt to resolve the factual disputes arising from his response to the Fries letter.

### 22.   Allegation No. 22:  Merck Sales Representatives Used Misleading Promotional Aids to Sell More Vioxx and Were Trained to Dodge Questions About Cardiovascular Risks.

#### a.   Summary of Allegation.

According to critics, internal Company documents reveal that as soon as the VIGOR Trial results were released in March 2000, Merck "trained an army of employees visiting doctors' offices to avoid discussing negative studies about Vioxx . . ."[111] and to "dodge" questions about the cardiovascular safety of Vioxx.  Sales representatives were trained using a sales aid called "Dodge Ball Vioxx."  It is claimed that, to win, sales representatives had to successfully dodge 12 pages of questions – called obstacles – such as, "I am concerned about the cardiovascular effects of Vioxx."[112]

---

[111]   Deidra Henderson*, Merck Told Sellers to Avoid Talk of Vioxx Heart Risks, Boston Globe, May 6, 2005, at C1.

[112]   Anna Wilde Mathews* & Barbara Martinez*, Warning Signs:  E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1 (quoting document).

M0DAA113854

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

In addition, Merck's sales representatives used a promotional piece written by the

Marketing Department called a "Cardiovascular Card" to attempt to allay physicians'

concerns about Vioxx's safety profile.[113]  It is argued that the Cardiovascular Card was

misleading in that it used old data – not the data from the VIGOR Trial, or the

ADVANTAGE Trial, or Protocol 090 – to try and show that Vioxx was safe.  It is further

argued that the Card misleadingly stated that Vioxx was eight times safer than other

NSAIDs in terms of cardiovascular mortality.[114]

In addition, during the two-year period after the VIGOR Trial but before the label

change, it is alleged that Merck sought to downplay the VIGOR Trial cardiovascular

results by preventing sales representatives from discussing them with physicians – even

in response to physician concerns or questions.

### b.   Our Findings and Conclusions.

The Sales Department employed an array of sales training materials to train sales

representatives regarding what the Company deemed appropriate – and inappropriate –

communications with physicians, including written instructions or roadmaps, Bulletins

and voicemail messages.  In addition, to reinforce Company-approved responses to

questions that a physician might ask, Merck also developed training games.  Critics have

highlighted one such training game in particular, Dodge Ball Vioxx, in support of their

---

[113]   Bernadette Tansey[*], How Marketing Drives the Pharmaceutical Industry, S. F. Chronicle,
May 6, 2005, at A1.

[114]   Deidra Henderson[*], Merck Told Sellers to Avoid Talk of Vioxx Heart Risks, Boston Globe, May 6,
2005, at C1; see generally 5/5/05 memorandum from H. Waxman[*] to Democratic Members of the
Government Reform Committee, MRK-ALE0009615-43.

M00AА13855

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

claim that Merck hid product safety information from physicians by teaching sales

representatives to "dodge" physician questions, particularly about cardiovascular data.

The record is clear that representatives were not instructed to "dodge" questions

or hide data.  Rather, Merck policy, which was designed to reinforce FDA regulations,

was that representatives could only discuss with physicians data referenced in the label

and were prohibited from discussing the VIGOR Trial data until the product label was

changed in April 2002.

There is evidence that Merck's competitors were informing physicians of the

VIGOR Trial results and arguing that the VIGOR Trial proved that Vioxx was

prothrombotic.  Since, as noted above, Merck sales representatives were not to address

issues not on the product label, Merck's Marketing and Medical and Scientific Affairs

Departments produced a number of different materials that could be given to or shared

with physicians who inquired about the cardiovascular safety of Vioxx.

First, representatives were provided with a promotional aid called a

"Cardiovascular Card" that presented data from the Vioxx clinical program that were

included in the product label.  In response to questions about Vioxx's cardiovascular

safety profile, sales representatives could show the Card, which presented cardiovascular

data from the trials that were referred to in the label.  The purpose of the Card appears to

have been to reinforce that Vioxx was safe at the dosages (12.5 mg and 25 mg) and

indication (osteoarthritis) for which it was most commonly prescribed.  We note that the

Cardiovascular Card was approved internally by the Vioxx Medical/Legal Review Board

to ensure its accuracy before it was released to the field, and was submitted to the FDA's

M00AA113856

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Division of Drug Marketing, Advertising, and Communications. There is no evidence that either this review board, comprising an attorney and two physicians, or DDMAC believed that the Card depicted cardiovascular data from the Phase IIb/III osteoarthritis trials anything other than accurately.

Second, if a physician asked a question about the VIGOR Trial data specifically, the sales representative could request, through a physician information request (or "PIR"), that Merck send the physician a written response letter. Merck's Medical and Scientific Affairs Department would then send these physicians letters that did refer to the VIGOR Trial results.

Third, after the article about the VIGOR Trial was published in the New England Journal of Medicine, Merck's Medical and Scientific Affairs Department provided reprints of the article to physicians who requested information on the VIGOR Trial. Starting on February 28, 2001, these reprints were accompanied by a cover letter that explained that the cardiovascular data in the article were based on a reporting cut-off date of February 10, 2000 and that provided the additional adjudicated data.

Thus, while the Cardiovascular Card standing alone did not present all the available cardiovascular data concerning Vioxx, there is no reason to believe that any responsible Merck official considered the Cardiovascular Card to be misleading in the context in which it was to be used.

M00AA13857

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

**D.   Summary of Principal Criticisms and Findings Concerning
Merck's Post-withdrawal Analysis and Reporting of
Cardiovascular Data Arising From The APPROVe Trial.**

The press release that Merck issued on September 30, 2004 stated that Merck

decided to withdraw Vioxx from the market based on data from the APPROVe Trial that

demonstrated "an increased relative risk for confirmed cardiovascular events, such as

heart attack and stroke, beginning after 18 months of treatment in the patients taking

VIOXX compared to those taking placebo."  According to the release, "[t]he results for

the first 18 months of the APPROVe study did not show any increased risk of confirmed

cardiovascular events on VIOXX. . . ."[115]  The article about the APPROVe Trial

cardiovascular results that was subsequently published in the <u>New England Journal of

Medicine</u> likewise stated:  "the event rates [in the Vioxx and placebo groups] were

similar for the first 18 months."[116]  Merck has characterized the data in this way in

numerous public statements throughout the post-withdrawal period.

The principal criticisms of Merck's post-withdrawal analysis and reporting of

APPROVe Trial cardiovascular data arise from this 18-month claim.

<u>First</u>, critics allege that the claim that the risk emerged only after 18 months of

continuous use is not supported by the data from the APPROVe Trial, either singly or in

combination with other data from the Vioxx development program.

---

[115]   9/30/04 Merck press release, "Merck Announces Voluntary Worldwide Withdrawal of Vioxx,"
MRK-AFF0000040, at 40.

[116]   Bresalier RS, Sandler RS, Quan H, et al.  Cardiovascular events associated with rofecoxib in a
colorectal adenoma chemoprevention trial.  N Engl J Med.  2005;352:1092-102, at 1092.

M00AA113858

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                       Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Second, Merck announced on May 30, 2006 that it had made an error in an article
about the APPROVe Trial cardiovascular data published in the New England Journal of
Medicine (the "APPROVe article") in identifying the test used to determine whether the
cardiovascular hazard ratio was constant over time or whether it increased over time.
Critics claim that the error casts doubt on Merck's claim that the cardiovascular event
rates on Vioxx and placebo were similar for the first 18 months of the trial and diverged
thereafter.

Third, following the termination of the APPROVe Trial, in which data were
collected on adverse events that occurred while patients were on treatment or within
14-days after discontinuing treatment, Merck undertook to collect follow-up data on
patients originally enrolled in that trial to determine whether and to what extent the
increased cardiovascular relative risk seen in the APPROVe Trial resolved 15 or more
days after patients stopped taking Vioxx.  It is alleged that the results of this follow-up
study establish that the hazard ratio on Vioxx increased with respect to placebo not at the
18-month mark as Merck has claimed, but rather at approximately 4 months.  These
allegations and our findings with respect to each are discussed more fully below.

23.   **Allegation No. 23: Merck's Claim that the Increased Risk of
      Cardiovascular Events on Vioxx Has Been Observed Only After
      18 Months of Continuous Treatment Is Not Supported by the Data.**

   a.   **Summary of Allegation.**

Critics allege that Merck's claim based on post-hoc analyses that the increased
relative risk of cardiovascular events on Vioxx relative to placebo in the APPROVe Trial
emerged after 18 months of continuous treatment is not supported by the data.  Critics

- 131 -

M0DAA113859

Report of John S. Martin, Jr. to the Special Committee        September 5, 2006
of the Board of Directors of Merck & Co., Inc.        Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

further claim that, even when the APPROVe Trial cardiovascular data are considered together with other cardiovascular data from Merck's clinical trials of Vioxx, the data are still not sufficient to rule out the possibility of an increased risk significantly earlier than 18 months into the course of treatment.

### b.    Our Findings and Conclusions.

Merck scientists developed the view that the APPROVe Trial cardiovascular data showed an increased relative risk beginning at 18 months based on a number of post-hoc statistical analyses that Merck scientists conducted on the base study data. These analyses included use of a Kaplan-Meier plot, also called a time-to-event plot, which creates curves reflecting the cumulative rate of events in each treatment group over time. As shown in the figure below, the vertical axis quantifies the cumulative rate of cardiovascular events with continuous use of each treatment (Vioxx and placebo) as measured in days along the horizontal axis. The plot that MRL scientists reviewed in September 2004 (reproduced below) appears to show that there was an increase over time in the risk of confirmed thrombotic events, and that the separation between Vioxx and placebo became apparent after approximately 18 months.[117]

---

[117]  9/13/04 Pre-Meeting Report from H. Quan to APPROVe ESMB, MRK-AEO0029517, Figure 2a at 37.

- 132 -

M0DAA13860

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP



APPROVe Trial – Kaplan-Meier Plot for Confirmed Thrombotic Events
(August 2004 Data)

Using the preliminary APPROVe Trial cardiovascular data that were available in

the summer of 2004, an MRL statistician conducted a statistical test designed to

determine whether the hazard rates were proportional over time (i.e., whether the risk of

an event on Vioxx relative to placebo remained constant over the course of the trial). As

fully explained in Appendix R, a common method for testing the proportionality of the

hazard rates is to use a Cox proportional hazards model fitted with a covariate for the

assigned treatment (here, Vioxx or placebo) and either (i) a covariate for the interaction

between treatment and the "logarithm of time" (the "Logarithm of Time Test") or (ii) a

covariate for the interaction between treatment and "linear time" (the "Linear Time

Test"). The relevant outcome of these proportional hazards tests is a p-value of between

0 and 1.0 that indicates whether sufficient evidence exists to reject the assumption built

into the Cox proportional hazards model that the hazard rates are proportional over time.

M00AA113861

Report of John S. Martin, Jr. to the Special Committee                                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                      Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

As discussed in detail in Appendix R, many biostatisticians using a Cox proportional hazards model to test the constancy of the hazard ratio would deem results as high as p=0.10, in conjunction with graphical analysis, to be sufficient evidence to reject the assumption of proportional hazards because such tests have low power. However, Merck statisticians frequently use a p-value of 0.05 as a conventional cut-off. As explained more fully below, an MRL statistician ran both the Logarithm of Time Test and the Linear Time Test and determined that there was sufficient evidence to reject the assumption that the hazard ratio was constant over time.

Finally, another important statistical analysis of the APPROVe Trial data that Merck scientists performed before withdrawing Vioxx involved reviewing the hazard ratio between Vioxx and placebo over time broken down into 6-month increments. A table reflecting the results of this analysis is reproduced below. This analysis similarly indicated "a trend for the treatment differences for major [cardiovascular] outcomes to increase over time."[118] As illustrated below, this analysis, which was based on relatively few events in each six-month segment, indicated that there was a greater number of confirmed thrombotic events on Vioxx ("Treatment B") versus placebo ("Treatment A") in every six-month increment except for the second, and that this difference was markedly greater after the 18-month mark (540 days) than it was during the first 18 months. The results for the APTC composite cardiovascular endpoint, also reproduced below, likewise showed a marked increase in hazard ratios after the 18-month mark.

_____

[118]   Minutes of 9/17/04 APPROVe ESMB meeting, MRK-AFF0000124, at 24.

- 134 -

M0DA13862

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

APPROVe Trial (August 2004 Data)
Confirmed Thrombotic Events in 6-Month Intervals

| Relday | Treatment A | | Treatment B | | |
|--------|-------------|---|-------------|---|---|
| | Number of Events | Hazard (SE) | Number of Events | Hazard (SE) | Hazard Ratio |
| 0 - 180 | 5 | 0.0040( 0.0018) | 7 | 0.0058( 0.0022) | 1.4459 |
| 181 - 360 | 7 | 0.0060( 0.0023) | 4 | 0.0037( 0.0018) | 0.6147 |
| 361 - 540 | 7 | 0.0063( 0.0024) | 8 | 0.0078( 0.0028) | 1.2490 |
| 541 - 720 | 4 | 0.0038( 0.0019) | 8 | 0.0083( 0.0029) | 2.2000 |
| 721 - 900 | 2 | 0.0020( 0.0014) | 7 | 0.0076( 0.0029) | 3.8938 |
| > 900 | 0 | 0(0) | 11 | 0.0245( 0.0074) | . |

APPROVe Trial (August 2004 Data)
APTC Events in 6-Month Intervals

| Relday | Treatment A | | Treatment B | | |
|--------|-------------|---|-------------|---|---|
| | Number of Events | Hazard (SE) | Number of Events | Hazard (SE) | Hazard Ratio |
| 0 - 180 | 3 | 0.0024( 0.0014) | 6 | 0.0050( 0.0020) | 2.0672 |
| 181 - 360 | 4 | 0.0034( 0.0017) | 2 | 0.0018( 0.0013) | 0.5385 |
| 361 - 540 | 5 | 0.0045( 0.0020) | 3 | 0.0029( 0.0017) | 0.6553 |
| 541 - 720 | 2 | 0.0019( 0.0013) | 7 | 0.0072( 0.0027) | 3.8372 |
| 721 - 900 | 2 | 0.0020( 0.0014) | 6 | 0.0065( 0.0026) | 3.3241 |
| > 900 | 0 | 0(0) | 9 | 0.0199( 0.0066) | . |

        In assessing the APPROVe Trial cardiovascular data, MRL scientists and outside

consultants also reviewed the Kaplan-Meier plots that had been prepared in connection

with analyses of cardiovascular data from two placebo-controlled trials that tested the

efficacy of Vioxx in preventing or slowing the progression of Alzheimer's disease.

These plots similarly reflected an apparent change in the hazard ratio at approximately

the 18-month mark, but because the hazard rate on Vioxx was lower than that on placebo

for the first 18 months and averaged out so that the hazard rates of both treatments were

similar over a 36-month period, it previously had not been possible to draw any

conclusion from the change that appeared after approximately 18 months.

M00AA113863

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

These analyses support the claims that the APPROVe Trial cardiovascular data from the base study provided reasonably strong evidence of a non-constant hazard ratio, and that the cardiovascular event rates between the two arms of the study appeared similar during the first 18 months and then diverged. We are aware of no evidence conclusively demonstrating that the divergence in hazard rates in the APPROVe Trial began before the 18-month mark, but the data cannot be characterized as providing definitive evidence that the risk of experiencing a cardiovascular adverse event was in fact equal between the Vioxx and placebo arms for the first 18 months. As Dr. Scott Zeger[*], Chair of the Department of Biostatistics at Johns Hopkins University and a member of Merck's Board of Scientific Advisors, cautioned in an email to senior Merck statisticians preparing for the post-withdrawal February 2005 FDA Advisory Committee Meeting, Merck should not "conclude that the [APPROVe] data prove there is no elevated risk until 18 months," because the "confidence intervals can not rule out [an increased relative risk of ] 1.5-2.0 as early as 6 months." Dr. Zeger[*] agreed that "there is reasonably compelling evidence that the relative risk is not constant across all time."[119]

Merck has made many public statements concerning the first 18 months of the APPROVe Trial and generally has used characterizations – such as "[t]he two curves appeared to be similar"[120] or "the event rates were similar in the two groups"[121] or "[t]he

---

[119]   1/31/05 email from S. Zeger[*] to J. Bolognese, MRK-AGO0069292.

[120]   3/15/05 APPROVe Trial abbreviated Clinical Study Report, Cardiovascular Safety Report, MRK-I8940100962, at 82.

M00AA113864

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

increased relative risk became apparent after 18 months of treatment"[122] – that are

consistent with, and do not overstate the import of, the underlying APPROVe Trial

cardiovascular data.  The Company has on occasion, however, made statements about its

analyses of the hazard ratio that could be misconstrued to suggest that those data prove

that there is no elevated risk during the first 18 months.  For example, its September 30,

2004 press release announcing the withdrawal of Vioxx stated:

> In this study, there was an increased relative risk for
> confirmed cardiovascular events . . . beginning after 18
> months of treatment in the patients taking VIOXX
> compared to those taking placebo.  The results for the first
> 18 months of the APPROVe study did not show any
> increased risk of confirmed cardiovascular events on
> VIOXX. . . .[123]

Similarly, Merck's January 21, 2005 submission to the FDA concerning the

APPROVe Trial cardiovascular data stated that "in the APPROVe study, an increased

risk of CV events . . . was first seen beginning after 18 months of chronic treatment"[124]

and "[data] from the APPROVe study confirm the findings of our other clinical trial

databases that there is no evidence for an increase in the relative risk of sustaining a

---

[121]   Bresalier RS, Sandler RS, Quan H, et al.  Cardiovascular events associated with rofecoxib in a
colorectal adenoma chemoprevention trial.  N Engl J Med.  2005;352:1092-102, at 1092.

[122]   Bresalier RS, Sandler RS, Quan H, et al.  Cardiovascular events associated with rofecoxib in a
colorectal adenoma chemoprevention trial.  N Engl J Med.  2005;352:1092-102, at 1092.

[123]   9/30/04 Merck press release, "Merck Announces Voluntary Worldwide Withdrawal of Vioxx,"
MRK-AFF0000040, at 40.

[124]   MRL Background Package for 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis Advisory
Committee and the Drug Safety and Risk Management Advisory Committee, MRK-S0420050740,
at 774.

M00AA113865

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

thrombotic CV event for the rofecoxib group versus placebo over the first 18 months of

treatment."[125]  However, this same submission to the FDA also contained statements such

as "Although the frequency of [cardiovascular] events were low and did not appear to be

elevated compared to placebo during the first 18 months of use, a decision was made to

voluntarily withdraw rofecoxib from the marketplace"[126] and "Prior to 18 months there

was no apparent difference in the cumulative incidence of these [cardiovascular] events

in the two groups as evidenced by the overlapping [Kaplan-Meier] plots."[127]

We find that MRL scientists were reasonable in concluding, on the basis of all

available data from the base study and the results of post-hoc analyses, that there was

reasonably strong evidence that the hazard ratio in the APPROVe Trial was not constant

over time and that an increase in the hazard ratio appeared to begin after approximately

18 months of continuous use of Vioxx.  In addition, although Merck has in some

instances described the APPROVe Trial cardiovascular data in a manner that could be

misinterpreted to suggest that those data preclude the possibility of an elevated risk in the

first 18 months, Merck's communications concerning the 18-month issue, when

considered in the aggregate, lead us to conclude that the Company only intended to assert

---

[125]   MRL Background Package for 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis Advisory
Committee and the Drug Safety and Risk Management Advisory Committee, MRK-S0420050740,
at 778.

[126]   MRL Background Package for 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis Advisory
Committee and the Drug Safety and Risk Management Advisory Committee, MRK-S0420050740,
at 757.

[127]   MRL Background Package for 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis Advisory
Committee and the Drug Safety and Risk Management Advisory Committee, MRK-S0420050740,
at 773.

M0DA11386

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

that the APPROVe Trial data provided no evidence of an increased relative risk during

the first 18 months.

> 24. **Allegation No. 24: The Article in the New England Journal of Medicine About the APPROVe Trial Cardiovascular Results and Merck's Corrective Statements Were Purposefully Misleading.**

>> a. **Summary of Allegation.**

In February 2005, an article concerning the APPROVe Trial cardiovascular data

that was co-authored by MRL scientists and a group of outside authors was published in

the New England Journal of Medicine (the "APPROVe article"). The APPROVe article

stated that, in the APPROVe Trial, the cardiovascular event rates for the Vioxx and

placebo groups were similar for the first 18 months of the trial and diverged thereafter

and that "[t]he changing pattern of the treatment effect over time was confirmed by a

failed test for proportionality of hazards (P=0.01)."[128] According to the article, the test

"evaluat[ed] the interaction between the logarithm of time and the assigned treatment"

(i.e., was the Logarithm of Time Test).[129]

On May 30, 2006, Merck issued a press release announcing that it had recently

discovered an error in the published APPROVe article and, as a result, was "correcting its

---

[128]   Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1097.

[129]   Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1095.

M00AA1138657

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

prior description of one of the statistical methods used to analyze certain data."[130]

Specifically, the release stated:

> The reference to logarithm of time in the description of
> methods published in the NEJM and submitted to
> regulatory agencies was in error.  The reported result
> (p-value = 0.01) came from a statistical model using linear
> time, not logarithm of time.  Recent tests show that the
> result using logarithm of time has a p-value = 0.07.[131]

The release stated that the error did not change any of the conclusions about the data set

forth in the APPROVe article.

In addition, the release stated that "The VIOXX cardiovascular data analysis plan

called for numerous statistical and graphical methods to be used to assess whether the

relative risk of VIOXX compared to placebo was constant over time or if it changed over

time. . . " and that "the use of the variable, logarithm of time, was an element in the

primary method specified."  The Company attached to the release an excerpt from the

Statistical Data Analysis Plan for Protocol 203 – its planned pooled analysis of

cardiovascular data from three placebo-controlled trials, one of which was the APPROVe

Trial – that pertained to proportionality testing.

These events give rise to several allegations pertaining to the APPROVe article

and Merck's public statements regarding the error:

---

[130]   5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe
Study," MRK-AFN0110064, at 64.

[131]   5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe
Study," MRK-AFN0110064, at 64.

M00AA11386B

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

First, it is argued that Merck purposefully reported in the APPROVe article the proportionality p-value based on the Linear Time Test (rather than the Logarithm of Time Test as indicated) because that method yielded a statistically significant result that allowed Merck to make the claim that the hazard ratio in the APPROVe Trial changed over time, whereas the Logarithm of Time Test yielded a result that was not statistically significant. According to critics, had the APPROVe article reported the non-significant p-value resulting from the Logarithm of Time Test, Merck would have been precluded from claiming that the assumption of the Cox proportional hazards model – that the hazard ratio is constant – did not hold. It follows, critics claim, that Merck would have been precluded from claiming that the cardiovascular event rates in the APPROVe Trial were similar for the first 18 months and diverged thereafter.

Second, the APPROVe article stated that "[a] test of the proportional-hazards assumption was specified in the cardiovascular analysis plan."[132] It is argued that this language was intended to give the impression that the method for testing the proportionality of hazards was pre-specified in the APPROVe Trial Data Analysis Plan when, in fact, the referenced "cardiovascular analysis plan" was for a separate study – Protocol 203 (the Company's planned pooled analysis of cardiovascular data from three placebo-controlled studies, one of which was the APPROVe Trial) – and did not govern the analysis of APPROVe Trial cardiovascular data standing alone. It is further argued that the authors of the APPROVe article deliberately mischaracterized the method for

---

[132]   Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1095.

M00AA13869

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

testing the proportional hazards assumption as pre-specified so as to lend credibility to
what was really a post-hoc analysis not entitled to much weight.

Third, it is similarly argued that Merck's public statements regarding the error
gave the erroneous impression that the Company's analysis of the proportionality of the
hazard rates in the APPROVe Trial was pre-specified so as to lend credibility to that
analysis and bolster the Company's claim that the hazard ratio in the APPROVe Trial
changed over time. Critics point to language in the May 30, 2006 press release
describing analyses specified in the Statistical Data Analysis Plan for Protocol 203 for
testing whether the hazards ratio in the APPROVe Trial changed over time and stating
that Merck conducted such analyses "[a]s specified in the analysis plan."[133] Although a
subsequent section of the release states that "[t]here was no Statistical Analysis Plan . . .
for the cardiovascular data from APPROVe alone,"[134] critics contend that the release
conveys the impression that the Statistical Data Analysis Plan for Protocol 203 governed
the APPROVe Trial analyses.

Critics also contend that an Open Letter from Dr. Peter Kim, President of MRL,
that was posted on Merck's website on June 26, 2006, gives the impression that the
proportionality testing conducted on the APPROVe Trial cardiovascular data was pre-
specified (although the Open Letter attached an "Assessment" regarding Merck's view of

---

[133]   5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe
Study," MRK-AFN0110064, at 64.

[134]   5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe
Study," MRK-AFN0110064, at 65.

M0DAA113870

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                           Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

the error that concedes that there was no specific plan for the analysis of the

cardiovascular event hazard rate over time in the APPROVe Trial).[135]

Fourth, it is argued that, if in fact the analyses set forth in the Statistical Data

Analysis Plan for Protocol 203 governed the APPROVe Trial standing alone, then

Merck's May 30, 2006 press release was misleading because it stated that the error in the

article could be corrected by substituting "linear time" for "logarithm of time" in the

description of the analysis performed.

The very purpose of pre-specification is to avoid bias in analyzing the results of a

clinical trial by stating in advance what statistical methods will be used to analyze the

data and how the results will be interpreted.  When a test is pre-specified in a statistical

analysis plan, it is argued, those analyzing the data must conduct that test and accept its

outcome.

The Statistical Data Analysis Plan for Protocol 203 stated that the "primary

method for testing the proportional hazards assumption" was the Logarithm of Time Test

and that a p-value greater than 0.05 resulting from that test "is not inconsistent with

proportionality, i.e., constancy of treatment effect over time."[136]  According to critics,

because the p-value resulting from the Logarithm of Time Test was greater than p=0.05,

the error can only be corrected by reporting the p-value for the specified Logarithm of

Time Test and accepting the conclusion it requires – that the assumption of proportional

---

[135]   6/26/06 letter from P. Kim, "An Open Letter from Merck," MRK-AFO0300152, at 54.

[136]   Protocol 203 Statistical Data Analysis Plan, MRK-AAD0200169, at 94.

M00AA13871

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

hazards cannot be rejected.  Merck's claim in its May 30, 2006 press release that "the linear test is an appropriate method to assess changes in relative risk over time"[137] is beside the point since the Logarithm of Time Test, and not the Linear Time Test, was the specified test.

Finally, the cardiovascular analysis plan referenced in the article specified analyses of two separate composite cardiovascular endpoints – confirmed thrombotic events and APTC composite cardiovascular endpoint events.  It is argued that the results for the APTC composite cardiovascular endpoint were markedly less favorable to Vioxx and less supportive of the 18-month claim than those for the confirmed thrombotic endpoint but were not reported in detail and that the article incorrectly stated that the results for the two were "similar" so as to avoid disclosing unfavorable results.

### b.   Our Findings and Conclusions.

There is no evidence to support the contention that Merck purposefully misidentified the covariate used in the Cox proportional hazards model as the Logarithm of Time Test rather than the Linear Time Test in the APPROVe article.  We find that the misidentification occurred because the MRL statisticians involved in drafting and reviewing the article assumed that the Logarithm of Time Test had in fact been performed and that it was that test that generated the p-value of 0.01 that was reported in the APPROVe article.  The error that led to the misreporting (both in the article and in the submission to the FDA about the APPROVe Trial cardiovascular results) was made

---

[137]   5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064, at 64-65.

M0DAA13872

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

months before work on the article began when the MRL statistician analyzing the data on
behalf of the APPROVe Trial External Safety Monitoring Board switched the relevant
statistical program from the Logarithm of Time Test to the Linear Time Test, did not
document that switch, and later failed to recall that the switch had been made.  In
addition, given the totality of the data available at that time, we do not believe that the
error in the APPROVe article materially affects any of the conclusions reached, and we
find that the data and MRL scientists' post-hoc analyses supported the view that the
hazard ratio in the APPROVe Trial changed over time.

As discussed below, however, we also find that Merck's public disclosures about
the error lacked clarity and necessary context.  The published APPROVe article stated
that the analysis performed to test the assumption that the hazard ratio was constant was
"specified" in the cardiovascular data analysis plan.[138]  The evidence shows that the
analysis performed was post-hoc and was not pre-specified.  The APPROVe article and
Merck's subsequent disclosures about the error – including Merck's May 30, 2006 and
June 26, 2006 press releases – should, in our view, have made clear that the data analysis
conducted, while consistent with good statistical practice, was not pre-specified for the
APPROVe Trial alone.  Alternatively, MRL statisticians could have drafted a statistical
analysis plan to govern their analyses of the APPROVe Trial cardiovascular data.

---

[138]   Bresalier* RS, Sandler* RS, Quan H, et al.  Cardiovascular events associated with rofecoxib in a
colorectal adenoma chemoprevention trial.  N Engl J Med.  2005;352:1092-102, at 1099.

M00A11.3873

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                         Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx


### (1)    Source of the Error

Throughout the summer and early fall of 2004, Dr. Hui Quan, the MRL

statistician who worked for the APPROVe Trial External Safety Monitoring Board

during the pendency of the trial, conducted numerous analyses of the APPROVe Trial

cardiovascular data in preparation for the September 17, 2004 meeting of the External

Safety Monitoring Board.  In the course of this work, Dr. Quan noted, based on the

Kaplan-Meier plots he prepared for both the confirmed thrombotic and APTC composite

cardiovascular endpoints, that the hazard ratio did not appear constant but instead

appeared to change at around the 18-month mark.

Dr. Quan believed that, if in fact the hazard ratio was not constant over time but

instead was increasing, the External Safety Monitoring Board should be informed so that

it could evaluate whether any action was appropriate.[139]  To test whether the hazard ratio

was non-constant, Dr. Quan's usual practice (consistent with Merck's convention) was to

use the Logarithm of Time Test.  Although no contemporaneous record of Dr. Quan's

work exists, Dr. Quan's recollection was that the Logarithm of Time Test as applied to

the data then available to him yielded a p-value above 0.05.  This result struck Dr. Quan

as inconsistent with other analyses he had performed, most notably the Kaplan-Meier

plot, which seemed clearly to indicate a change in the hazard ratio.

---

[139]    6/8/06 email from H. Quan to J. Bolognese et al., MRK-ARQ0007271 (stating that Dr. Quan switched
the covariate in the relevant computer program from Logarithm of Time to Linear Time "in order not
to hide any thing [sic] from ESMB").

M00AA13874

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Dr. Quan then ran the Linear Time Test, which (like the Logarithm of Time Test) is a standard means of testing the constancy of the hazard ratio. According to Dr. Quan, based on the data available at the time, the Linear Time Test yielded a p-value that was smaller than that generated by the Logarithm of Time Test and therefore more consistent with Dr. Quan's prior analyses (such as the Kaplan-Meier plots).

Based on Dr. Quan's review of the p-values generated by the two tests, as well as "fit statistics" included in the outputs from the tests, he concluded that the Linear Time Test covariates fit the data better than the Logarithm of Time Test covariates. (As explained in Appendix R, Dr. Jennifer Ng, another MRL statistician, was tasked later in the fall of 2004 with conducting various statistical analyses of the APPROVe Trial cardiovascular data independently of the work that Dr. Quan was doing. Dr. Ng's Memorandum about the analyses also supported the conclusion that the Linear Time Test "fit" the APPROVe Trial data better than the Logarithm of Time Test.)

In preparing the September 13, 2004 report to the APPROVe Trial External Safety Monitoring Board, Dr. Quan used the program he had modified previously. The report stated that the proportionality p-value for the confirmed thrombotic endpoint was 0.006 – a statistically significant deviation from the proportional hazards assumption, meaning that there was sufficient evidence to reject the assumption of a constant hazard ratio over time.

Dr. Quan's September 13, 2004 report to the External Safety Monitoring Board did not state whether he had obtained the p=0.006 result using the Logarithm of Time Test or the Linear Time Test. According to Dr. Quan, the switch from the Logarithm of

M0DAA13875

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Time Test to the Linear Time Test was never documented outside the program itself,

which reflects which covariate (logarithm of time or linear time) was used in the Cox

proportional hazards analysis.

### (2)    Duplication of the Error

Work began on the article about the APPROVe Trial cardiovascular data in late

October 2004. The article, which was published in the <u>New England Journal of Medicine</u>

in February 2005, was authored by seven external scientists and five MRL scientists. The

statistical analyses on which the article was based were performed by Dr. Quan as an

extension of the work he had done as the unblinded statistician for the APPROVe Trial

External Safety Monitoring Board. The published article used final data that became

available in December 2004. The APPROVe article stated that a "test of the

proportional-hazards assumption . . . was accomplished by evaluating the interaction

between the logarithm of time and the assigned treatment . . ."[140] and stated further that

"[t]he changing pattern of the treatment effect over time was confirmed by a failed test

for proportionality of hazards (P=0.01)."[141] This p-value, as noted above, was the result

based on final data using the Linear Time Test, not the Logarithm of Time Test. The

result for the Logarithm of Time Test, which was not reported in the article, was p=0.07.

---

[140]   Bresalier RS, Sandler RS, Quan H, <u>et al.</u> Cardiovascular events associated with rofecoxib in a
colorectal adenoma chemoprevention trial. <u>N Engl J Med.</u> 2005;352:1092-102, at 1095.

[141]   Bresalier RS, Sandler RS, Quan H, <u>et al.</u> Cardiovascular events associated with rofecoxib in a
colorectal adenoma chemoprevention trial. <u>N Engl J Med.</u> 2005;352:1092-102, at 1097.

M0DAA11876

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Based on the extensive record we reviewed, including numerous drafts of and correspondence about the article, we find that the error in the article with respect to the proportional hazard testing was inadvertent. A proportionality p-value was first inserted in the draft in November 2004, although there was no description of the method used to achieve this result. At that time, the p-value reported was p=0.006 based on August 2004 data analyzed by Dr. Quan. When final data became available in December 2004, the p-value of 0.01 (rounded down from p=0.014) was included instead. Both of these p-values were generated using the Linear Time Test. According to Dr. Quan and Mr. Bolognese, the two MRL statisticians who were co-authors of the article, once the program was changed to linear time at Dr. Quan's direction in the summer of 2004, it continued to generate results, including the p-value, using the Linear Time Test, although Dr. Quan did not recall that he had made the switch.

A description of the method used to test the proportional hazards assumption was first added to the draft manuscript on January 11, 2005 and subsequently changed on February 13, 2005, after reviewers at the New England Journal of Medicine asked the authors whether the test was described correctly. It is not clear whether Dr. Quan or Mr. Bolognese added the language about the statistical test, although each agreed that the language was added by one of them. At around the same time that the description of the method was revised, the authors added that the Logarithm of Time Test was "specified" in the "cardiovascular-analysis plan." Handwritten notes on galley proofs reflect that an editor thought that the February 13 description was confusing. The language that appears in the February 15 published article was then substituted.

- 149 -

M0DAA13877

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                         Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

According to Dr. Quan and Mr. Bolognese, they assumed when the article was

being drafted that the Logarithm of Time Test had been used because it is a widely

accepted method to test the Cox proportional hazards assumption, is the conventional

starting method at Merck, and is the method typically used by Dr. Quan.  Neither

Dr. Quan nor Mr. Bolognese checked the program prior to publication to confirm that

assumption.  In addition, both Dr. Quan and Mr. Bolognese, as well as numerous

witnesses including external authors, stated that the issue of which test had been used to

confirm that the assumption of proportional hazards did not hold was not an issue on

which people were focused during the manuscript review process because they accepted

that the hazard ratio was not constant based on the totality of the statistical analyses

performed.

Based on our review of the record, we find that the erroneous description of the

model used to test the proportional hazards assumption (which also was duplicated in

Merck's submission to the FDA of an abbreviated Clinical Study Report, dated

March 15, 2005) was inadvertent and was not made with any intent to mislead.

The error was discovered by Mr. Thomas Cook, a Merck statistician working on

analyzing cardiovascular data from the APPROVe Trial follow-up study discussed

below.  In the course of his work, Mr. Cook ran numerous statistical tests, some of which

previously had been conducted on the data from the base study, including the Logarithm

of Time Test.  That test, however, yielded a p-value of 0.07, not 0.01, when Mr. Cook ran

it for confirmed thrombotic events.  This caused him to check the covariate used in

testing the proportional hazards assumption for purposes of the APPROVe article, which

- 150 -

M00AA13878

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

led to the discovery that the p-value of 0.01 reported in the APPROVe article and in the abbreviated Clinical Study Report was generated by the Linear Time Test.

### (3)    Import of the Error

Based on the final APPROVe cardiovascular data, the Logarithm of Time Test for confirmed thrombotic events reflects a p-value of 0.07 while the Linear Time Test, as reported in the <u>New England Journal of Medicine</u>, reflects a p-value of 0.01 for the same endpoint. According to critics, because the p-value generated by the Logarithm of Time Test is greater than 0.05, Merck had no basis for stating that the hazard rate changed. In fact, it is argued, Merck's own Statistical Data Analysis Plan for Protocol 203 provided that a p-value greater than 0.05 "is not inconsistent with proportionality, i.e., constancy of treatment effect over time," in other words, is not sufficient to support rejection of the proportional hazards assumption.[142]

As a general matter, tests for proportional hazards have low statistical power, especially if they are not based on a significant number of events. In the APPROVe Trial, only 72 patients experienced cardiovascular events over the course of the 3-year study: of the 1287 patients in the Vioxx arm of the study, 46 patients experienced a confirmed thrombotic event compared to 26 of the 1299 patients in the placebo group. As discussed above, under these circumstances, many biostatisticians using a Cox proportional hazards model to evaluate the constancy of the hazard ratio would deem results as high as p=0.10, in conjunction with graphical analysis, to be sufficient evidence

---

[142]    Protocol 203 Statistical Data Analysis Plan, MRK-AAD0200169, at 94.

M0DAA13879

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

to reject the assumption of proportional hazards and would see no meaningful difference between a p-value of 0.01 and 0.07. If the Statistical Data Analysis Plan for Protocol 203, which specified the Logarithm of Time Test as the "primary method" and set a significance level at p=0.05, were binding on this analysis of APPROVe Trial cardiovascular data, then the authors of the APPROVe article would have been required to report that the result of the Logarithm of Time Test was p=0.07 and that this result was not inconsistent with a finding that the hazard ratio is proportional over time. As discussed below, however, we find that the Protocol 203 Statistical Data Analysis Plan was not required to be followed in analyzing cardiovascular data from the APPROVe Trial alone. As a result, there is no meaningful difference in the conclusion with respect to confirmed thrombotic events.

In addition, while the test of the proportional hazards assumption is the most formal means of evaluating whether there is a change in the hazard ratio over time, other analyses may also be considered. As explained above, the Kaplan-Meier curves of the APPROVe Trial cardiovascular data appeared to reflect a clear change in the hazard rate at around the 18-month mark, as did the analysis of events in 6-month time intervals. These are all post-hoc analyses and therefore are not entitled to the same weight that would have been accorded to pre-specified analyses, but taken together, they provide reasonably strong evidence of a changing hazard ratio.

### (4)     APTC Endpoint Events

In addition to analyzing confirmed thrombotic events, MRL scientists also analyzed cardiovascular events in the APPROVe Trial using the Antiplatelet Trialists'

M0DAA13880

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Collaboration ("APTC") composite cardiovascular endpoint. As discussed above at pages 84 and 85, this endpoint consisted of cardiovascular death, myocardial infarction, stroke (both ischemic and hemorrhagic), and death due to unknown cause or due to bleeding. With respect both to the confirmed thrombotic and the APTC composite cardiovascular endpoints, the APPROVe article concluded, as discussed above, that the difference between the placebo and Vioxx groups was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months. The APPROVe article stated that "[t]he changing pattern of the treatment effect over time [for the confirmed thrombotic endpoint] was confirmed by a failed test for proportionality of hazards (P=0.01)" and that "[f]indings for the APTC end point were similar."[143]

The evidence reflects that MRL scientists concluded based on the Kaplan-Meier curves and 18-month segment analyses that the hazard rate for APTC events appeared to change at approximately 18 months, like the changing hazard rate for confirmed thrombotic events. The p-value for APTC composite endpoint events based on the Linear Time Test, however, was p=0.119, a result that is not statistically significant as measured against the conventional p-value of 0.05 to measure significance, or even against the more generous p-value of 0.10 used by many biostatisticians for testing the assumption of proportional hazards.

MRL scientists believed that given the small numbers of events, the fact that the p-value was 0.119 for such events using the Linear Time Test was not particularly

---

[143]   Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1097.

M0DAA113881

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

meaningful, especially when viewed in the context of the totality of the cardiovascular data from the APPROVe Trial. We found no evidence that the Logarithm of Time Test was conducted on the final data for the APTC endpoint before the APPROVe article was written. It would no doubt have been better if the authors had included in the APPROVe article the proportionality p-value for APTC composite cardiovascular endpoint events as well as for confirmed thrombotic events.

### (5)    Pre-specification of Data Analyses Conducted

The evidence shows that the MRL scientists' analyses of the cardiovascular events in the APPROVe Trial were post-hoc – i.e., were not dictated by any pre-specified plan. The APPROVe Trial Data Analysis Plan did not address statistical analyses of cardiovascular data in great detail and instead referred to the Cardiovascular Adjudication SOP generally, as well as to the combined analysis that would be performed pursuant to the Statistical Data Analysis Plan for Protocol 203. The Statistical Data Analysis Plan for Protocol 203 set forth analyses to be performed once the APPROVe, ViP and VICTOR Trials were completed and data from the three trials were pooled. Thus, there was not any plan in place that specified in detail how the cardiovascular data from the prematurely terminated APPROVe Trial should be analyzed on a stand-alone basis.

With respect to checking the assumption that the hazard ratio was constant, the Statistical Data Analysis Plan for Protocol 203 stated:

> Analytical and graphical methods will be employed to verify the proportional hazards assumption. The primary method for testing the proportional hazards assumption will be by including the factor treatment*log(time) in the model; nonsignificance ($p > 0.050$) of this factor is not

- 154 -

M0DAl13882

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

> inconsistent with proportionality, i.e., constancy of
> treatment effect over time.[144]

The two MRL statisticians independently analyzing the APPROVe Trial

cardiovascular data, Dr. Quan and Dr. Ng, did not rely on the Statistical Data Analysis

Plan for Protocol 203 in conducting their analyses. Dr. Quan, for example, in conducting

analyses for the External Safety Monitoring Board, was guided by his experience as well

as by requests from the External Safety Monitoring Board members. Dr. Ng similarly

was not governed by a formal analysis plan and ran a series of tests and analyses

suggested during brainstorming sessions with senior MRL statisticians.

The published APPROVe article stated that "[a] test of the proportional hazards

assumption was specified in the cardiovascular-analysis plan."[145] It did not indicate that,

in light of the premature termination of the APPROVe Trial, there was no data analysis

plan that governed how the APPROVe Trial cardiovascular data standing alone should be

analyzed. In our view, it would have been preferable to have included in the article a

statement to the effect that, due to the unanticipated circumstances, there was no data

analysis plan that dictated the analyses to be conducted on the APPROVe Trial

cardiovascular data alone. The article could have reached the same conclusions and

simply stated that Merck followed best statistical practices and conventions in analyzing

the APPROVe Trial cardiovascular data and that those analyses were generally consistent

---

[144]   Protocol 203 Statistical Data Analysis Plan, MRK-AAD0200169, at 94.

[145]   Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a
colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1095.

M0DAA113883

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

with the pre-specified analyses set forth in the Protocol 203 Statistical Data Analysis

Plan.

We did not find evidence as to why the authors of the APPROVe article did not

include this additional context. Although analysis of the proportionality of hazards was

identified in the article as having been specified, the authors, based on recommendations

from New England Journal of Medicine peer reviewers, also stated that other analyses

conducted, including the analysis of when the hazard ratio appeared to change, were

post-hoc:

> In a post hoc analysis, the difference between the two
> groups in the incidence of thrombotic events was evident in
> the second 18 months of the study, whereas the event rates
> were similar for the first 18 months. . . . The changing
> pattern of the treatment effect over time was confirmed by
> a failed test for proportionality of hazards (P=0.01).[146]

The press release that Merck issued on May 30, 2006 correcting the description of

the statistical method used to test the proportional hazards assumption, and the follow-up

release that Merck issued on June 26, 2006, refer several times to "specified" analyses,[147]

and the May 30 release attaches an excerpt from Protocol 203 regarding the "Check of

[proportional hazards] Model Assumptions."[148] As indicated above, the May 30, 2006

---

[146]   Bresalier RS, Sandler RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1097.

[147]   5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064, at 64; 6/26/06 Merck press release, "Merck Stands Behind Original APPROVe Study Results," MRK-ASW0005632, at 33.

[148]   Excerpt of Protocol 203 Statistical Data Analysis Plan, "Check of Model Assumptions," MRK-AFN0110067 (attached to 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064).

M00AA13884

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

press release stated in a separate section that "[t]here was no Statistical Analysis Plan . . . for the cardiovascular data from APPROVe alone."[149]  Both releases nevertheless create the erroneous impression that the testing performed on the APPROVe Trial cardiovascular data was pre-specified.

A number of MRL employees involved in drafting and reviewing these press releases (the June 26 release repeats nearly verbatim three of the paragraphs from the May 30 release) stated that the intent of the drafters was to convey that Merck had a plan in place to analyze cardiovascular data and that the post-hoc analyses of the APPROVe Trial cardiovascular data were conducted in a manner that was consistent with that plan. This additional context was included in an assessment about the APPROVe Trial cardiovascular data analysis that accompanied an Open Letter from Dr. Peter Kim dated June 26, 2006:

> In the absence of a specific plan for the analysis of CV event HR [hazard rate] over time in APPROVe alone, the analysis of the proportional hazards assumption for the APPROVe CV data proceeded in a manner consistent with good statistical practice and consistent with the DAP for Protocol 203.[150]

While the releases are not as clear as they could have been, we find no basis to believe that anyone at Merck intended them to mislead the public regarding the APPROVe Trial cardiovascular data analysis.  It also must be noted that whether or not

---

[149]   5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in the APPROVe Study," MRK-AFN0110064, at 65.

[150]   6/26/06 letter from P. Kim, "An Open Letter from Merck," MRK-AFO0300152, at 54.

M00A11386S

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

analyses were pre-specified, Merck withdrew Vioxx on the basis of Merck scientists'
view that the APPROVe Trial cardiovascular data reflected a higher relative risk for
patients using Vioxx than for those using placebo.

25. **Allegation No. 25:  New Data Collected from Patients Who
Were Enrolled in the APPROVe Trial Indicate that the Relative
Risk of a Cardiovascular Event on Vioxx Increases Almost
Immediately – Not After 18 Months as Merck Has Claimed.**

a. **Summary of Allegation.**

Vioxx was withdrawn from the market on September 30, 2004 on the basis of
cardiovascular data from the APPROVe Trial consisting of cardiovascular adverse events
that occurred while patients were on treatment (Vioxx or placebo) or within 14 days of
having discontinued treatment.  After the APPROVe Trial was terminated, the Protocol
was amended to collect and analyze follow-up data on cardiovascular events that
occurred more than 14 days after patients discontinued therapy in an effort to evaluate
whether the increased relative risk of cardiovascular adverse events on Vioxx seen during
the course of the base study would return to normal after patients stopped using the drug.
MRL scientists and members of the APPROVe Trial Administrative Committee began
discussing these protocol amendments less than a week after Vioxx was withdrawn from
the market and finalized them in August 2005.  Merck first submitted results of this
follow-up study to the FDA and described them in a press release on May 11, 2006.

Critics have argued that these follow-up data, when combined with data from the
base study, demonstrate that the increased risk of cardiovascular adverse events on Vioxx
as compared to placebo in the APPROVe Trial emerged after only a few months of use –

M00AA113886

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

not after 18 months of continuous use as Merck has argued publicly. Critics further allege that Merck deliberately presented these data in a confusing and incomplete manner in its May 11 press release to avoid undermining the Company's claim that there was no increased relative risk during the first 18 months of the APPROVe Trial.

Finally, critics have questioned whether Merck had these data prior to the publication of the 2005 APPROVe article and have alleged that these data were intentionally withheld from that article so as not to undermine the 18-month claim.

### b.    Our Findings and Conclusions.

The APPROVe Trial Protocol specified, as was standard in all Merck trials, that data would be collected on serious adverse events, including cardiovascular events, that occurred while patients were on treatment or within 14 days after discontinuation of treatment. After Vioxx was withdrawn from the market in September 2004, MRL scientists, members of the APPROVe Trial Administrative Committee, and representatives of the FDA recognized that an important open question remained: whether patients who took Vioxx in the APPROVe Trial would continue to experience increased rates of thrombotic events compared to placebo more than 14 days after stopping use of the drug.

To answer this question, MRL scientists, in consultation with the APPROVe Trial Administrative Committee and the FDA, instituted two amendments to the APPROVe Trial Protocol in August 2005. The amendments provided for the collection and adjudication of all cardiovascular events experienced by any patient originally enrolled in the base study at any time within four years of having enrolled – i.e., within the

M0DAA13887

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

three-year duration of the base study or a fourth follow-up year – regardless of whether

that patient was still enrolled in the study or on therapy at the time of the event.  Data on

cardiovascular events that occurred more than 14 days after discontinuation of the study

drug had been only sporadically reported during the base study and therefore had not

provided an adequate basis for meaningful analysis.

The Statistical Data Analysis Plan for the follow-up study specified two different

analyses:  (i) an analysis of cardiovascular events that occurred either during treatment or

after the discontinuation of treatment among all patients randomized in the base study

who had taken at least one study dose (the "Intention-to-Treat Analysis"); and (ii) an

analysis of cardiovascular events occurring among these same patients fifteen days or

more after the discontinuation of treatment (the "Off-Drug Analysis").  Both analyses

included all relevant events that occurred during the three-year term of the base study

plus a fourth follow-up year.  The specified primary and secondary endpoints for both

analyses, respectively, confirmed thrombotic events and APTC composite endpoint

events, were the same cardiovascular endpoints analyzed following termination of the

APPROVe Trial base study.  Critics base their claim on the results of the

Intention-to-Treat analysis, which is the focus of discussion below.

### (1)  Results

On May 11, 2006, Merck reported preliminary analyses of these data to the FDA

and issued a press release that set forth Merck's conclusions about the results' impact on

the Company's prior analyses of cardiovascular data from the base study.  The results

may be summarized as follows:

M0DAA113888

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

- For the Intention-to-Treat Analysis (including both on-drug and off-drug data), there was a statistically significant increased relative risk of both confirmed thrombotic events and APTC composite cardiovascular endpoint events on Vioxx versus placebo over the course of the four-year study period, and there was insufficient evidence to reject the assumption of proportional hazards.[151]

- For the Off-Drug Analysis, there were more cardiovascular events in the Vioxx arm than in the placebo arm – 28 versus 16 confirmed thrombotic events, and 21 versus 12 APTC events, on Vioxx versus placebo – but the difference was not statistically significant.

The Statistical Data Analysis Plan for the follow-up study specified the use of Kaplan-Meier time-to-event plots and a test of the proportionality of the hazard rates over time. Critics claim that the follow-up data refute Merck's 18-month claim based on the appearance of the Kaplan-Meier plots and the statistically non-significant result of the proportional hazards test. With respect to the proportional hazards test, MRL statisticians ran both the Logarithm of Time Test and the Linear Time Test for both endpoints (confirmed thrombotic events and APTC composite endpoint events) in the Intention-to-Treat Analysis. All four tests resulted in p-values greater than p=0.05, meaning that there was not sufficient evidence in the Intention-to-Treat Analysis to reject the assumption

---

[151] In the Intention-to-Treat Analysis in the follow-up study, the relative risk for confirmed thrombotic events on Vioxx versus placebo was 1.74 (95% confidence interval, 1.19 to 2.55), and the relative risk for APTC composite cardiovascular endpoint events on Vioxx versus placebo was 1.86 (95% confidence interval, 1.19 to 2.90). 5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, at 217, 228.

M00AA113889

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

that the hazard ratio was proportional throughout the trial.[152]  The Kaplan-Meier time-to-

event plots for the two endpoints in the Intention-to-Treat Analysis are set forth below:



APPROVe Extension – Intention-to-Treat Analysis
Kaplan-Meier Plot – Confirmed Thrombotic Events[153]

| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1221 | 1187 | 1152 | 1131 | 1117 | 1092 | 1032 | 989 |
| Placebo | 1300 | 1247 | 1224 | 1189 | 1173 | 1157 | 1133 | 1071 | 1027 |

---

[152]   For the confirmed thrombotic endpoint in the Intention-to-Treat Analysis, the p-values were p=0.345
for the Linear Time Test and p=0.306 for the Logarithm of Time Test.  5/26/06 APPROVe Extension
Statistical Package, MRK-S0420112195, Figure B2 at 220-21.  For the APTC endpoint, the
corresponding p-values were p=0.748 and p=0.687, respectively.  Id. Figure B6 at 231.

[153]   5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, Figure B1 at 219.

M00A11389O

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP





APPROVe Extension – Intention-to-Treat Analysis
Kaplan-Meier Plot – APTC Events[154]

| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1220 | 1188 | 1158 | 1140 | 1125 | 1102 | 1042 | 1002 |
| Placebo | 1300 | 1249 | 1228 | 1196 | 1181 | 1165 | 1140 | 1079 | 1036 |

Finally, the Company conducted a post-hoc analysis of cardiovascular events among patients who had completed the three-year base APPROVe Trial and for whom fourth-year follow-up data had been collected. There were numerically more confirmed thrombotic events among patients assigned to the Vioxx arm (15) than among those assigned to the placebo arm (9), but this difference was not statistically significant.

### (2) Import of Follow-up Data

Analyses based on extended follow-up data such as the Intention-to-Treat Analysis have potential benefits and potential drawbacks, as discussed more fully in Appendix R. Proponents of such analyses contend that collecting data only on adverse

---

[154] 5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, Figure B5 at 230.

M00AA113891

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

events that occur while patients are on therapy or within 14 days of discontinuing therapy may exclude drug-related events that take place more than 14 days after termination of treatment, thereby potentially introducing bias into the analyses – especially if patients discontinue due to other adverse events such as hypertension and remain at risk for subsequent cardiovascular adverse events.

Others, including Merck witnesses whom we interviewed, contend that a 14-day follow-up period is reasonably designed to capture events that are drug-related and that a longer period of follow up may tend to dilute a safety signal. Merck witnesses took the position that the Intention-to-Treat Analyses specified for the follow-up study were significantly less meaningful than the on-drug analyses arising from the base study and should be heavily discounted if not disregarded entirely because they (i) mixed data on on-drug and off-drug events and (ii) incorporated events that may have occurred, in the case of early drop-outs, long after the patient discontinued therapy, thereby potentially diluting an on-drug safety signal by the addition of events that occur in similar numbers in both arms of the study in the off-drug period.

While it is beyond our mandate to attempt to resolve this scientific debate, we note that the Intention-to-Treat Analyses – like all analyses conducted on the APPROVe Trial cardiovascular data – were secondary analyses designed and conducted on a limited number of events after the base study had already been unblinded. The Intention-to-Treat Analyses may form a useful component of scientists' overall understanding of the cardiovascular safety profile of Vioxx, and they raise the possibility that an increased relative risk of cardiovascular events on Vioxx versus placebo may appear before the

M0DAA13892

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

18-month mark.  Like any post-hoc analyses, however, they do not, standing alone,

provide the basis for any firm conclusions.  While the Company's position with respect to

these data may be overly categorical, the known data in totality neither prove nor

disprove the existence of an increased cardiovascular risk on Vioxx before 18 months of

continuous treatment.  (The fact that a result cannot be ruled out or disproved cannot be

interpreted as signaling that the opposite is true or has been proved.)

### (3)      May 11, 2006 Press Release Regarding Follow-up Study

On May 11, 2006, Merck issued a press release announcing the results of the

preliminary analyses of the APPROVe Trial follow-up study.  The first paragraph of that

press release stated as follows:

> In the off-drug follow-up period for patients in the
> APPROVe study, there was not a statistically significant
> difference in the risk of confirmed thrombotic
> cardiovascular events in patients who had previously taken
> VIOXX compared to those who had previously taken
> placebo, according to preliminary analyses announced
> today by the study sponsor, Merck & Co., Inc.  This
> prespecified analysis included patients regardless of when
> they discontinued study therapy.  Furthermore, in the one-
> year off-drug follow-up period for patients who completed
> approximately three years of therapy in the APPROVe
> study, there was not a statistically significant difference in
> the risk of confirmed thrombotic events in patients who had
> previously taken VIOXX compared to those who had
> previously taken placebo.  In these analyses, the data were
> insufficient to conclude that there was an increased relative
> risk of confirmed thrombotic cardiovascular events
> following discontinuation of therapy.  In the prespecified
> primary analysis of each patient's four-year data (that
> combined data from the on-drug period and the off-drug
> period regardless of when patients discontinued study
> therapy) the difference in the risk of confirmed thrombotic
> cardiovascular events between groups initially observed in

M00A11393

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

the on-drug period of the study remained statistically significant.[155]

Attached to the press release was a four-page summary of the results of the follow-up study that Merck had included in its May 11 report to the FDA. The summary set forth four "Conclusions" to be drawn from the follow-up data, the first two of which resulted from a post-hoc analysis that divided the Intention-to-Treat data set into pre- and post-18 month segments and compared them to the corresponding segments in the base study as follows:

- For the first 18 months, the relative risk of confirmed thrombotic cardiovascular events for rofecoxib compared to use of placebo in the ITT analysis was similar to that observed in the on-drug base study.

- Beyond 18 months, the relative risk of confirmed thrombotic cardiovascular events for rofecoxib compared to use of placebo in the ITT analysis was approximately half of that observed in the on-drug base study. This lowering of the relative risk was mostly due to the off-drug follow-up data observed during the period beyond month 36 and to the off-drug follow-up data in patients who prematurely discontinued study therapy.[156]

Neither the press release nor the four-page summary mentioned the results of the pre-specified Kaplan-Meier plots and analyses of the proportionality of hazards for the four-year data that critics have argued establish an increased relative risk of cardiovascular events on Vioxx well before the 18-month mark. In addition, neither the press release nor the four-page summary mentioned the results for the secondary APTC

---

[155]   5/11/06 Merck press release, "Merck Announces Preliminary Analyses of Off-Drug Extension of APPROVe Study," MRK-S0420112019, at 19.

[156]   5/11/06 APPROVe Off-Drug Extension Preliminary Analyses of Thrombotic Cardiovascular Safety, MRK-ARQ0002293, at 96.

M00A113894

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

composite events endpoint, which were generally less favorable to Vioxx and less supportive of the 18-month claim than the reported results for the confirmed thrombotic events endpoint. Notably, the post-hoc analysis of the off-drug data showed that during the first six months after discontinuation of therapy, there was a statistically significant increase in the risk of APTC events among those patients that had previously taken Vioxx.[157]

While the press release quoted above is difficult to understand and it can be argued that other information should have been included, the fact that Merck shortly thereafter posted on its website the entire 137-page report it submitted to the FDA suggests that there was no intention to mislead.

In addition, the plots themselves, as well as the views of Drs. Furberg[*] and Nissen[*], the Company, and the authors of the published APPROVe article about the meaning of those data, have recently been fully aired in the New England Journal of Medicine and in responsive Merck-issued press releases. As a result, while it may have been preferable to set forth the results of those pre-specified analyses in the original press release for the benefit of the scientific community, any arguable lack of full and clear disclosure as of May 11 was quickly remedied.

---

[157] The relative risk for Vioxx versus placebo for this period was 3.74 (95% confidence interval, 1.04 to 13.42). 5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, Table B14 at 233. While more confirmed thrombotic events occurred among patients who had previously taken Vioxx than among those who had previously taken placebo (12 versus 5, respectively), the difference was not statistically significant (relative risk 2.44; 95% confidence interval, 0.86 to 6.94). Id. Table B7 at 233.

M00AA13895

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### E.   Summary of Principal Criticisms and Findings Concerning Financial Interests of Merck Senior Management.

Each of the criticisms discussed in this Report rests on a common premise: that Merck personnel engaged in alleged misconduct with respect to the development, testing and/or marketing of Vioxx because they were financially motivated to conceal the drug's risks so as to ensure its success in the marketplace. These allegations take on two forms: (i) allegations that sales of Vioxx had an undue influence in Merck's compensation structure; and (ii) allegations that Merck senior management sought to enrich themselves by trading Merck common stock on the basis of material nonpublic information.

Our conclusions with respect to these allegations are based on our finding that compensation for executive officers and non-executive employees at Merck was driven by formulas based on multiple operational and strategic factors. While sales of Vioxx, like those of other products, played a role in the Company's overall success, they did not have an unwarranted impact on compensation. In addition, as discussed below, we found no evidence to support the allegation that Merck's senior management traded on the basis of material nonpublic information pertaining to Vioxx's cardiovascular safety.

### 26.   Allegation No. 26:  Merck Senior Managers Turned a Blind Eye to the Cardiovascular Risks of Vioxx so as not to Jeopardize Their Compensation.

#### a.   Summary of Allegation.

Critics argue that Merck senior management was financially motivated to downplay or ignore the cardiovascular risks of Vioxx, both before the drug was approved by the FDA and while it was on the market. Prior to approval, it is argued, the Company

M00AA13896

Report of John S. Martin, Jr. to the Special Committee                September 5, 2006
of the Board of Directors of Merck & Co., Inc.                          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

needed a major drug to replace lost profits from other drugs that were going off patent. In addition, Merck's future depended on its keeping pace with other drug manufacturers like Searle/Pfizer, which had a selective Cox-2 inhibitor in the pipeline. For these reasons, critics allege that senior management did not heed the signals that Vioxx posed a cardiovascular danger.

After Vioxx was approved for sale in the United States, it is alleged that Merck senior management continued to downplay or ignore mounting data concerning the cardiovascular risks of Vioxx and put patients at risk so as not to jeopardize their compensation and the value of their equity holdings.

### b.    Our Findings and Conclusions.

As discussed in other parts of this Report, we found no evidence that Merck rushed Vioxx to market prematurely or before adequate safety testing was conducted. In addition, we found that MRL scientists seriously investigated the FitzGerald prostacyclin hypothesis, repeatedly pooled and analyzed cardiovascular data from Vioxx clinical trials, and believed in good faith that Vioxx was not prothrombotic. Thus, one could argue on the basis of these two findings that there was no need for us to investigate further any alleged ill motives for Merck's seeking FDA approval for Vioxx or for marketing the drug.

Critics have also alleged, however, that financial motivation played a role in Merck senior management's decision to keep Vioxx on the market in the face of alleged signals that it posed a serious cardiovascular risk. We therefore investigated the manner

- 169 -

M0DAA13897

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

in which Merck senior management was compensated and the effect that the profitability

of the Vioxx franchise may have had on compensation.[158]

Throughout the relevant period, compensation decisions for executive officers and

non-executive employees were guided by the Company's compensation philosophy.  This

philosophy set compensation based on Merck's performance vis-à-vis peer companies as

well as individual performance.  The Company sought to retain key employees by

compensating them at competitive levels and to align employees' interests with those of

shareholders interests through the use of long-term incentives (e.g., stock option grants).

To this end, the Company utilized three forms of compensation for executives: (i) base

salary; (ii) annual bonus; and (iii) equity in the form of stock option grants, and later,

performance and restricted share units.

As discussed more fully in Appendix S, although the Compensation and Benefits

Committee of the Board of Directors and the Chief Executive Officer had some

discretion in setting executive compensation at Merck, the process was largely a

formulaic one, driven by numeric calculations derived from various Company-wide and

departmental performance assessments as well as personal performance and the

marketplace.  For example, the salary component of executive compensation was set

based on the marketplace for comparable positions as well as the executive's personal

performance.  Similarly, the annual bonus was determined based on (i) a "Company

Performance Grid" score, a multi-factor assessment of the Company's performance with

---

[158]   We discuss below in the Report the specific allegations made concerning post-approval evidence of a
safety problem, and our findings with respect to each such allegation.

M00AA13898

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

reference to various financial and strategic measures, and (ii) a "Division Performance

Grid" score, an even more granular assessment of each division's annual objectives and

achievements.  Finally, the equity award component was set in light of the market but

also took into account various components of the Company Performance Grid as well as

the executive's personal performance.

While sales of Vioxx, like those of all of the Company's key franchise products,

impacted executive bonuses insofar as they affected scores on the Company Performance

Grid, we did not find that the impact was disproportionate or determinative of

compensation rates.  As discussed in Appendix S, the Company Performance Grid score

depended upon several operational metrics (including, but not limited to, earnings per

share growth versus other leading health care companies, sales growth versus other

leading health companies, and return on investment in operating assets) and several

strategic metrics (such as manufacturing productivity, research and development, and

Human Resources initiatives).  Each of the above metrics was assigned a point value that

contributed to the Company's ultimate score.  Earnings per share was the most significant

metric in the Grid and was assigned 30 points (from 2003 on, 35 points) out of a possible

100 plan points, while sales growth, return on investment in operating assets,

manufacturing productivity, and Human Resource initiatives were each assigned 10

points.

Although Vioxx played a role in the earnings per share and sales growth metrics

in the Company Performance Grid, we determined, for the reasons set forth below and

discussed more fully in Appendix S, that executive compensation was not

M00AA113899

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

disproportionately influenced or dictated by Vioxx.  First, while the Company has

acknowledged the importance of Vioxx in its product portfolio, its earnings per share and

sales growth assessments relied on four or five other key franchise products, including

Zocor, Prinivil, and several other products.  Second, the earnings per share and sales

growth metrics were only two components of a multi-factor assessment and both were

assessed in relation to the activities of Merck's peer healthcare companies.  Third, the

earnings per share metric is not driven solely by top-line growth in the form of sales, but

rather measures the Company's structural efficiency and reflects Company expenses and

costs.  Fourth, based on the point values assigned to the metrics in the Grid, sales growth,

return on investment in operating assets, manufacturing productivity, and Human

Resource initiatives were given equal weight and therefore had an equal effect on

compensation.  Furthermore, several of the above mentioned metrics not directly linked

to sales – i.e., return on investment in operating assets, manufacturing productivity, and

Human Resource initiatives – were given in the aggregate the same or comparable weight

to the earnings per share metric.

In conclusion, there is no question that senior management at Merck quite

appropriately had a financial interest in the Company's success.  It is also clear, however,

that Vioxx was but one of several key franchises upon which Company profitability

depended.  In light of the multi-tiered level of review over compensation decisions, the

formulaic method used to calculate compensation for executive officers and non-

executive employees, and the Company's diversified product portfolio, Vioxx sales were

M00AA13900

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                           Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

merely a factor in the Company's overall financial success and did not have an

unwarranted impact on awards for executive officers or non-executive employees.

### 27.    Allegation No. 27: Merck Senior Executives Traded on Material, Nonpublic Information Concerning Vioxx.

#### a.    Summary of Allegation.

Various complaints filed against Merck have made broad allegations that Merck

insiders traded the Company's securities on the open market based on material non-

public information about Vioxx and its cardiovascular risk profile in violation of the

federal securities laws.[159]

#### b.    Our Findings and Conclusions.

As explained more fully in Appendix S, federal law prohibits corporate insiders

from trading on the basis of material nonpublic information.[160]  Most of the Company's

officers and directors are subject to additional regulations that require them to report most

of their transactions involving Merck stock and prohibit them from selling the

Company's stock within six months of a purchase, or vice versa ("short-swing

transactions").[161]  Our investigation examined the Company's policies with respect to the

---

[159]   See, e.g., Consolidated and Third Amended Class Action Complaint, Pringle v. Merck & Co., No. 03-3125, E.D. La., at ¶278 ("During the Class Period, a number of Defendants and other Merck insiders sold substantial amounts of Merck common stock from their personal holdings while in possession of adverse non-public information about the risks of VIOXX."). In addition, the Company's Board of Directors has received letters making similar allegations. See, e.g., 12/10/04 demand letter from J. Abraham to C. Colbert.

[160]   See 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5 (prohibiting the use of a fraudulent device in connection with securities transactions); Dirks v. SEC, 463 U.S. 646, 654 (1983) ("[A]n insider will be liable under Rule 10b-5 for inside trading only where he fails to disclose material nonpublic information before trading on it and thus makes "secret profits."") (citations omitted).

[161]   15 U.S.C. § 78p.

M00AA11390I

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

securities regulations as well as the trading activity of individual corporate officers and directors.

The evidence shows that the Company adopted a restrictive trading window policy, which limited the times when its senior officers and directors could trade in Merck securities to four pre-established periods each year. We find this policy to be reasonably well designed to promote compliance with the governing law. The Company opened its trading windows several days after its quarterly and annual earnings releases,[162] when a great deal of previously nonpublic material information would have been widely disseminated. Thus, the policy minimized the possibility that senior managers could profitably trade on the basis of nonpublic material information.

In addition to implementing this trading window policy, the Company regularly issued trading restriction memoranda, which advised the recipients that they were in possession of nonpublic information that could potentially be viewed as material and requested that they not trade Merck securities. Senior corporate officers and directors frequently received such memoranda, which prohibited them from trading even during window periods. The evidence shows that information relating to Vioxx was from time to time the subject of such memoranda or verbal instructions not to trade.

As part of our investigation, we reviewed the trading records of the Company's most senior officers and directors between May 1999 and December 2004. It appears that, with one inadvertent exception, all directors and senior managers complied with the

---

[162]   3/5/99 memorandum from M. McDonald to Section 16 Officers, MK-STK0000500.

M0DAA13902

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Company's internal insider trading policies.[163]  Furthermore, consistent with the

Company's guidance, it appears that senior management held rather than sold the

Company's equity securities granted to them.

We find no basis to support the allegation that senior managers traded on the basis

of material nonpublic information concerning Vioxx's cardiovascular safety.  As stated

throughout this Report, there is no evidence that anyone in senior management at Merck

believed that Vioxx presented an increased cardiovascular risk to patients before the

APPROVe Trial cardiovascular data were unblinded in September 2004.  The data were

unblinded between two trading windows and promptly disclosed.  According to Merck

policy, corporate officers and directors could not trade in Merck stock for almost a full

month after disclosure of the APPROVe Trial cardiovascular data and the decision to

withdraw Vioxx.[164]  Our review of senior managers' trading records indicate that no

officers or directors traded prior to the public release of the APPROVe Trial results.

---

[163]  As explained in Appendix S, we did identify one transaction that appears to have violated the Company's policies.  This transaction was a small open-market acquisition of fewer than 90 shares by one of the Company's directors.  According to Ms. Celia Colbert, Secretary of the Company, this trade occurred at the beginning of the director's tenure and was executed, without his knowledge, by one of his financial advisors.  There is no evidence that the director traded on the basis of material nonpublic information.

[164]  As explained in Appendix Q, the External Safety Monitoring Board recommended stopping the APPROVe Trial on September 17, 2004.  This announcement followed a trading window period that ended on August 9, 2004.  MK-STK0000470.  Merck announced the results of the APPROVe Trial and its decision to voluntarily withdraw Vioxx from the market on September 30, 2004.  9/30/04 Merck press release, "Merck Announces Voluntary Worldwide Withdrawal of VIOXX," MRK-AFJ0008607, at 07.  The next trading window did not open until October 26, 2004.  10/21/04 memorandum from N. Van Allen to Directors and Officers Subject to Section 16(b), MK-STK0000469.

M00AA13903