UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
| | * | |
| STATE OF LOUISIANA, *ex rel.* JAMES D. CALDWELL, JR., Attorney General, | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
|     Plaintiff, | * | |
| | * | MAGISTRATE JUDGE |
| versus | * | KNOWLES |
| | * | |
| MERCK SHARP & DOHME CORP., | * | |
| | * | |
|     Defendant. | * | |
| | * | |
| Case No. 05-3700. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE* NO. 10, TO EXCLUDE EVIDENCE OR ARGUMENT ABOUT DR. DAVID J. GRAHAM'S "EXCESS EVENTS" CALCULATION**

Pursuant to Rules 702, 402, and 403 of the Federal Rules of Evidence, Defendant Merck Sharp & Dohme Corp. ("Merck") moves the Court to exclude any evidence about Dr. David J. Graham's conclusion that Vioxx caused between 88,000 and 144,000 excess cases of serious coronary events in the United States.[1]  In a paper published in *The Lancet* in January 2005, Dr. Graham opined that Vioxx had caused between 88,000 to 144,000 excess cases of serious coronary events in the United States and that 44 percent of these excess cases were fatal.[2]  Those figures, however, were unrelated to the findings of the study that Dr. Graham actually conducted.

---

[1] The State has designated two experts named David Graham.  This motion is directed toward certain testimony from Dr. David J. Graham, a Food and Drug Administration employee; the proposed testimony of David Y. Graham, the State's gastrointestinal expert, is the subject of separate *Daubert* and *in limine* motions.

[2] David J. Graham, et al., *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study*, LANCET 2005;365:475-81 (Jan. 25, 2005) ("Graham Study"), attached as Ex. A.

Instead, Dr. Graham derived his "excess events" estimate through a series of manipulative calculations based on data from four *entirely different* studies. As set forth below, Dr. Graham's calculation is inadmissible for multiple reasons.

*First*, because Dr. Graham's "excess events" calculation is inconsistent with – and in some cases contradicted by – the underlying data on which he relied, the calculation is unreliable and must be excluded under Rule 702 of the Federal Rules of Evidence.

*Second*, even if Dr. Graham's calculation were reliable (and it is not), his retrospective analysis – which was published several months after Vioxx was withdrawn from the market and has nothing to do with Merck's marketing of the drug – is irrelevant to Plaintiff's allegation that Merck's representations caused the State to pay for Vioxx when it otherwise would not have. Thus, while the Court declined to exclude Dr. Graham's "excess events" estimate in individual personal injury cases such as *Dedrick v. Merck*, whatever relevance his erroneous calculation had to those cases is absent here, because the State is asserting claims for economic loss – not personal injury.

*Finally*, Dr. Graham's calculation would be inadmissible even if it were relevant, because its tendency to waste time and cause undue delay would more than outweigh whatever probative value it has.

For all of these reasons, the Court should exclude any testimony or argument about Dr. Graham's "excess events" estimate.

## ARGUMENT

Dr. Graham cannot testify without limitation even if he is otherwise qualified as an expert. *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, 654 F. Supp. 2d 518, 520 (E.D. La. 2009) ("Sufficient qualifications to testify as an expert, however, do not automatically allow

testimony to be presented at trial."). Instead, the Court "has considerable discretion to admit or exclude expert testimony," and it should permit such testimony only if is reliable and will assist the trier of fact in determining a fact in issue. *Id.*; *see also* Fed. R. Evid. 702. Dr. Graham's "excess events" calculations is unreliable, irrelevant, and would cause undue delay, and it would be excluded for all of those reasons.

I.  **DR. GRAHAM'S "EXCESS EVENTS" ESTIMATE IS UNRELIABLE**

Dr. Graham's "excess events" estimate falls short of the central requirement that expert testimony must meet: reliability. Fed. R. Evid. 702*; Imperial Trading Co.,* 654 F. Supp. 2d at 522 (testimony must "be based on sufficient facts . . . the product of reliable principles and methods . . . and [those] principles and methods [must] be reliably applied to the facts of the case"). Where, as here, expert testimony is "speculative . . . [and] lacking any scientific validity," that testimony should be excluded as unreliable. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (en banc) (courts "are encouraged to exclude" expert testimony that is "speculative" and "lacking in scientific validity").

The methodology Dr. Graham used to derive his "excess events" calculation fails to meet that standard. Indeed, Dr. Graham conceded that his estimate was not intended to be an accurate number:

> And we put a number in our paper, and what we were more concerned with was the public health impact of Vioxx exposure than we were with what were the particular numbers, ***recognizing that the particular numbers could be different than the range that we gave****,* but that was our best estimate at what we thought was likely to be the case.

(May 9, 2006 Deposition of Dr. David J. Graham ("Graham Dep."), attached as Ex. B, at 430:6-15 (emphasis added).) This estimate is unreliable for multiple reasons.

*First*, Dr. Graham's "excess events" estimate is inconsistent with the data he relies on. Dr. Graham manufactured his estimate through a series of misleading calculations that involved

3

multiplying the relative risk of heart attacks among Vioxx users as reported in the VIGOR[3] and APPROVe[4] studies by the rate of heart attacks in patients receiving other therapies, which he derived from data reported in the CLASS Study[5] and a 2002 observational study performed by Professor Wayne A. Ray.[6]  He then applied an overall fatality rate associated with heart attacks in the general population.  (Graham Dep. 152:21-154:1, 402:20-405:11, 419:12-422:11; Graham Study at 6.)  His estimate is thus derived from a calculation of numbers from four different studies, only two of which involved patients taking Vioxx:  VIGOR and APPROVe.  The APPROVe study, however, did not find *any* increased risk of adverse cardiovascular events associated with less than eleven months of continuous use of Vioxx at the 25 milligram dose.[7]  Moreover, neither VIGOR or APPROVe demonstrated an increased risk of death.[8]

*Second*, Dr. Graham's estimate is contradicted by the underlying data.  As the chart below demonstrates, the actual rate of heart attacks among Vioxx users in the VIGOR and APPROVe studies from which he derived the multipliers for his calculation was *lower* than the rate of heart attacks reported for the patients in the CLASS and Ray studies, which provided the baseline for his computation.  (Graham Dep. 428:13-19, 432:22-433:1 ("**Q:**  And, again, the real

---

[3]     Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis* (hereinafter "Bombardier"), N. ENGL. J. MED. 2000;343:1520-8, attached as Ex. C.

[4]     Bresalier et al., *Cardiovascular Events Associated with Rofecoxib in Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED. 2005;352:1092 ("Bresalier"), attached as Ex. D.

[5]     The CLASS study compared Celebrex to ibuprofen and diclofenac, two traditional NSAIDs.  *See* F.E. Silverstein et al., *Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study – a randomized controlled study* (hereinafter the "Class Study"), JAMA 2000, 284: 1247-55, attached as Ex. E.

[6]     The Ray study compared Vioxx to other NSAIDs.  *See* W.A. Ray et al., *COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease* (hereinafter the "Ray Study"), LANCET 2002; 360:1071-73, attached as Ex. F.

[7]     Bresalier at 1092.  In addition, because VIGOR compared Vioxx against naproxen rather than placebo, it cannot be determined whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (i) a cardiovascular risk associated with high-dose Vioxx; (ii) a cardio-protective effect associated with naproxen; or (iii) chance, either in whole or in part.

[8]     Bresalier at 1092; Bombardier at 1523.

life heart attack rate in both VIGOR and APPROVe was lower than what you say is the normal background rate for people who are not taking any medicine at all, right?  **A:**  That's correct. . . . **Q:** . . . VIGOR and APPROVe both had lower rates than your background rates, correct?  **A:** Yes.").)

| Comparison of Heart Attack Rates In Studies Relied on by Dr. Graham | | |
|---|---|---|
| Study | Rate (per thousand patient years) | Patient Group |
| VIGOR | 7.4[9] | 50mg Vioxx users |
| APPROVe | 6.9[10] | 25mg Vioxx users |
| CLASS | 7.9[11] | Ibuprofen/diclofenac users |
| Ray | 12.4[12] | NSAID users & non-users |

In other words, while Dr. Graham purports to find an excess number of heart attacks associated with Vioxx use, the underlying data that he relies on for this proposition show the exact *opposite* – namely, that Vioxx users had *fewer* heart attacks than users of other NSAIDs. Given this data, Dr. Graham has no legitimate scientific basis for his opinion that Vioxx caused between 88,000 to 140,000 "excess events" in the general population.  The Court can and should exclude any evidence or argument based on this opinion.  *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another. . . .  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) ("A court may rightfully exclude expert testimony where a court finds that an expert

---

[9]   (Graham Dep. 421:5-18.)

[10]  (*Id.* 423:17-424:24.)

[11]  CLASS Study at 1247.

[12]  Ray Study at 1072.

5

has extrapolated data, and there is too great an analytical gap between the data and the opinion proffered.") (internal quotation marks omitted); *see also Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997) ("[A]n expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology.").

*Finally*, Dr. Graham's "excess events" estimate is not supported by his findings from the Kaiser Permanente data that he analyzed and published in *The Lancet*.[13] Dr. Graham conceded that the Kaiser Permanente data demonstrated *no* statistically significant increased risk of heart attacks or deaths associated with the use of Vioxx at the 25 milligram dose. (Graham Study at 4, Table 3.) His calculation is thus at odds with the Kaiser Permanente data, which was the basis for his published article.

Because Dr. Graham's estimate is scientifically unreliable and simply wrong, the Court should exclude it and any reference to it.[14] *See Moore,* 151 F.3d at 279 (en banc) (courts "are encouraged to exclude" expert testimony that is "speculative" and "lacking in scientific validity").

---

[13]   Nor is Dr. Graham's calculation admissible simply because this statement is found in a published article. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316 (11th Cir. 1999) ("[S]crutiny by one's peers does not insure admissibility. Again, it is well established that '[p]ublication . . . is not a *sine qua non* of admissibility.'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993)); *Jones v. United States*, 933 F. Supp. 894, 899 n.8 (N.D. Cal. 1996) (rejecting expert's reliance on statistically insignificant data to prove causation notwithstanding that articles reporting such data were published in peer-reviewed journals). Rather, Federal Rule of Evidence 702 requires the Court to determine that the opinion is "based upon sufficient facts or data" and is "the product of reliable principles and methods." Fed. R. Evid. 702.

[14]   For similar reasons, the Court should exclude any evidence of or reference to any other "excess event" estimates regarding Vioxx. In his deposition, for example, Dr. Graham testified that his estimate is lower than the estimates of "some other folks." (Graham Dep. 463:5-10.) Dr. Graham could not identify who these "other folks" were or how they derived their estimates.

## II. DR. GRAHAM'S "EXCESS EVENTS" CALCULATION IS IRRELEVANT TO THE STATE'S CLAIMS AND WOULD CAUSE UNDUE DELAY IF ADMITTED

Even if Dr. Graham's opinion that Vioxx caused a certain number of "excess events" in the general population were reliable (and it is not), it should still be excluded because it is irrelevant to the fraud-based claims that the State of Louisiana has asserted and would cause undue delay. Fed. R. Evid. 702 (reliable expert testimony admissible if it would "assist the trier of fact . . . to determine a fact in issue"); Fed. R. Evid. 402; Fed. R. Evid. 403.

Louisiana has asserted claims for damages stemming from the purchase of Vioxx – not claims for personal injury premised on a theory that Vioxx was defective or that Merck acted negligently. The gravamen of the State's complaint is that Merck's alleged misrepresentations caused the State and Louisiana citizens to pay for Vioxx when they otherwise would not have. (*See, e.g.*, Compl. ¶¶ 170, 184, 192.) The facts relevant to the State's claims, therefore, include the content of alleged representations to Provider Synergies, the Louisiana Department of Health and Hospitals, and the State's Pharmaceutical and Therapeutics Committee; whether those representations caused the State to pay for Vioxx or Louisiana physicians to inappropriately prescribe it; and how much money the State of Louisiana and its citizens would have saved (if any) in the absence of the challenged representations. Even if reliable, Dr. Graham's "excess events" estimate – a retrospective analysis published after the withdrawal of Vioxx and which has nothing to do with Merck's marketing of the drug – would do nothing to help determine these facts in issue.

In any event, even if Dr. Graham's "excess events" calculation did have some relevance to the State's claims, the Court should still exclude it because whatever minimally probative value the calculation has would be more than outweighed by its tendency to cause undue delay and waste time. Fed. R. Evid. 403; *see also Imperial Trading Co.*, 654 F. Supp. 2d at 520 (even

if reliable and relevant, expert testimony "may always be excluded based on considerations of undue delay, waste of time, or needless presentation of cumulative evidence") (internal quotation marks omitted).  Permitting Dr. Graham to opine about his "excess events" calculation would require Merck to cross-examine him about his methodology – and to call its own witnesses to show why Dr. Graham's calculation is unsubstantiated and unreliable.  This process would waste substantial time on matters that are at best collateral to the State's claims here, and Dr. Graham's "excess events" calculation should be excluded for this reason too.  *See Weiss v. Allstate Ins. Co.*, 512 F. Supp. 2d 463, 472 (E.D. La. 2007) (excluding evidence under Rule 403 where it would lead to "time-wasting on collateral issues").

Because evidence of or reference to Dr. Graham's "excess events" estimate would not assist the trier of fact to decide any issue that is relevant to this case – and would serve only to cause undue delay – the Court should exclude any evidence of or argument about the calculation.

## CONCLUSION

For the foregoing reasons, Merck respectfully requests that the Court grant its motion in its entirety.

Dated: February 26, 2010

Respectfully submitted,

/s/ Dorothy H. Wimberly
Phillip A. Wittman, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
  WITTMANN LLC
546 Carondelet Street
New Orleans, LA 70130
Phone: (504) 581-3200
Fax:    (504) 581-3361

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Memorandum In Support of Motion to Exclude Evidence or Argument About Dr. David J. Graham's "Excess Events" Calculation has been served on Liaison Counsel by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Plaintiff, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 26th day of February, 2010.

    /s/ Dorothy H. Wimberly
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, Louisiana  70130
    Phone:  504-581-3200
    Fax:     504-581-3361
    dwimberly@stonepigman.com

    Defendants' Liaison Counsel

1009104v.1