# EXHIBIT A

**CASE NO 05-3700**

| | |
|---|---|
| The State of Louisiana, ex rel | IN THE UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF LOUISIANA |
| James D. Caldwell, | |
| Attorney General, Plaintiff | |
| Vs. | |
| Merck & Co., Inc., Defendant | MDL NO. 1657 SECTION: L |

EXPERT REPORT OF

JERRY F. WELLS, BSPh, R.Ph.

**Qualifications and Background**

My formal education background is based in the pharmaceutical sciences, and I am registered to practice pharmacy in the State of Florida. I received a bachelor of sciences in pharmacy from the University of Florida in 1963 and was employed in retail pharmacy in both chain and independent pharmacy settings from 1963 to 1966 and from 1977 to 1984. In 1966 I joined Hoffmann-LaRoche, a pharmaceutical manufacturer, as a territory sales representative. During this employment in the pharmaceutical industry I had the opportunity to work as a medical school representative at Shands Teaching Hospital with the University of Florida in Gainesville and later to work as a Capital City Representative in the area of government affairs. While employed by Hoffmann-LaRoche in the area of government affairs I worked extensively with the development of Florida Medicaid's pharmaceutical benefit as well as state mental hospitals and other institutions. During this tenure I was appointed to Florida's State Pharmacy and Therapeutics Committee.

In 1984 I joined Florida's Medicaid program in the Department of Health and Rehabilitative Services as a Pharmacy Consultant, later promoted to Pharmacy Program Manager. I was recruited in about 1990 by the Florida Department of Health (DOH), also a state agency, to supervise the DOH State Central Pharmacy and the dispensing pharmacies located in various county public health centers. I served with the Department of Health until 1992 when I was asked to return to the state's Medicaid program as Pharmacy Bureau Chief. Florida's Medicaid program was transferred to the Agency for Health Care Administration when the Department of Health and Rehabilitative Services was reorganized to become the Department of Children and Families.

I worked with the Agency for Health Care Administration Medicaid Program in various capacities and retired from state government as the Bureau Chief for Medicaid Pharmacy Services in 2007. During my tenure with the Medicaid program I had the opportunity to serve on the Health

2

Care Financing Administration Pharmacy Technical Advisory Group (P-TAG), on the Medicare Pharmacy Technical Advisory Group, served as Chairman for the Southern Association of Medicaid Pharmacy Program Administrators and the American Association Medicaid Pharmacy Administrators.

Responsibilities during my tenure with the Medicaid program included development of administrative rules, pharmacy benefit design, the Medicaid Preferred Drug List, legislative bill analysis, budget forecasting, state rebate contracting with pharmaceutical manufacturers, development of disease management programs, supervision of the Drug Utilization Review (DUR) Board and the Pharmacy and Therapeutics (P&T) Committee, and I have been designated as an expert witness in the Medicaid prescription drug program.

As part of the management team for Medicaid I have been an expert witness on behalf of Medicaid in cases related to administrative rule challenges, Medicaid fraud and abuse litigation, manufacturer pricing, pharmacy reimbursement for dispensing fees and ingredient cost issues.

My resume is attachment A.  A list of my testimony in the past four years is attachment B.

**Compensation:**

I am compensated at the rate of $350 per hour for deposition and trial and $250 per hour for other work.

**Materials Reviewed:**

1. Second Amended Complaint

2. Declaration of Terry D. Leach, Pharm.D. dated November 6, 2009 including references

3. Report of John S. MacGregor, M.D., Ph.D. dated November 6, 2009

4. Expert report of David A. Kesslor, M.D., J.D. dated November 5, 2009

5. Report of Neil L. Julie, M.D. dated November 4, 2009

6. Report of David Y. Graham, M.D. dated November 6, 2009

7. Pretrial order #13 (Stipulation and Protective Order Regarding Confidential Information)

8. Transcript and exhibits of the October 28, 2009 videotaped deposition of Gina C. Biglane, Pharm.D.

9. Transcript and exhibits of the November 9, 2009 videotaped deposition of M.J. Terrebonne

10. Report of John David Abramson, M.D. dated November 5, 2009

11. Transcript of the oral deposition of Holly Jacques Turner dated October 22, 2009

12. Transcript of the oral deposition of John Fevurly dated November 12, 2009

13. Transcript and exhibits of the videotaped deposition of Ben Bearden, dated October 12, 2009

14. FDA Memorandum dated April 6, 2005.

15. Agenda, minutes and transcripts of Pharmacy & Therapeutics Committee meetings from 2001 through 2005.

16. Minutes and presentations from Drug Utilization Review Board meetings from 1999 through 2005.

17. LADUR annual reports 1999-2004

18. LARS 46:153.3 (2000)

19. LARS 46:153.3 (2002)

20. Provider Synergies' contract with the Louisiana DHH effective March 19, 2002 LaAG-VIOXX-002838

21. Provider Synergies' monographs presented to the Louisiana P&T Committee referencing NSAIDs, including Vioxx.

22. Bombardier, Claire et al. "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis." NEJM 2003, 343:1520-8

23. May 1999 Vioxx Package Insert

24. Vioxx Package Insert - April 2002, MRK-01A0003097-3111 and M00A30218-2131

25. Important Prescribing Information - Dear Healthcare Professional Letter, April 2002, MRK-JF0008774-8778

26. Mortin, Ibuprofen Tablets, USP Package Insert and Etodolac Package Insert

27. Ibuprofen Tablet Package Insert #111494-04, May 2008

28. September 25, 2001, The Wall Street Journal/Chris Adams, "FDA Warns Merck for Misrepresenting Its Blockbuster Arthritis Drug Vioxx."

29. October 9, 2001 New York Times/Gina Kolata, "The Doctor's World; For Pain Reliever, Questions of Risk Remain Unresolved."

30. September 25, 2001, AP Online, "FDA Says Merck Misleading on Vioxx."

31. September 25, 2001, USA Today - Health and Science/Rita Rubin, "FDA sends warning letter to Vioxx maker."

32. September 24, 2001, CBS Market Watch/Lisa Richwine, "Merck Vioxx promotions said misleading on safety." MFK-JAT0000667-670

33. 2009 Louisiana Medicaid Preferred Drug List

**Medicaid Program Background and History**

Medicaid was created by the United States Congress in July, 1965 as a part of negotiations between the Johnson administration and congress over funding for the Medicare program. These programs are the Title XVIII (Medicare) and Title XIX (Medicaid) amendments to the Social Security Act. Medicare is managed and funded by the federal government while Medicaid is managed and funded jointly by the federal and individual state governments. The managing federal agency, originally designated the Health Care Financing Administration (HCFA) is now designated the Center for Medicare and Medicaid Services (CMS) while the managing state agencies are uniquely designated by each state. In Florida the current managing agency is the Agency for Health Care Administration (AHCA) and in Louisiana the current managing agency is the Louisiana Department of Health and Hospitals.

Federal financial participation (FFP) for state Medicaid programs is set by federal statute at a minimum of fifty percent (50%) for most service costs and is increased above this level using a formula based on each state's per-capita income. Federal funding for most administrative costs is set at 50% but there are numerous exceptions where FFP is higher than 50%; these include professional staff salaries at 75% for pharmacists, nurses and physicians. Family planning services receive a 90% federal matching rate, and some temporary developmental FFP grants are as high as 90% and 100%. Florida Medicaid received approximately 58% and Louisiana received slightly above 70% federal matching rates for most services in the early 2000's. States with higher average income receive the minimum 50% federal matching rate while some lower income state rates approach 80%.

Medicaid reimburses pharmacy providers for prescription drug services at rates prescribed by each states' administrative rule or statute but must follow maximum limits established in the

7

Code of Federal Regulations (CFR) established by CMS.  States establish a dispensing fee based on cost surveys or other sources of information and establish ingredient cost reimbursement rates based on pricing information provided by manufacturers and other sources adjusted by administrative rule or state statute.  Most states use a commercial database marketed as First DataBank but there are other sources that provide manufacturer pricing information. Unlike hospitalization and physician services coverage which is mandatory under Medicaid programs, the prescription drug program is an optional benefit but all states currently provide a prescription drug benefit.

Prior to 1990 most state Medicaid programs reimbursed pharmacies using a formula based on the reported average wholesale price (AWP) or wholesaler acquisition cost (WAC) plus the dispensing fee established by the state agency.  As the pharmacy benefit became an increasing factor in the Medicaid budget, state legislatures have used a variety of initiatives to manage prescription drug programs such as formularies or preferred drug lists, manufacturer rebates, quantity limits, ingredient cost limitations, Prior Authorization (PA) and Drug Utilization Review programs (DUR).

Quantity limitations were effective in eliminating abuse by doctors or patients in requesting excessively large quantities.  DUR programs prior to 1992 were retrospective, typically looking back over a six to twelve month period to analyze and make recommendations regarding prescribing patterns.  Rebates started to appear in Medicaid prescription programs in 1989 when two manufacturers, Merck and Glaxo, voluntarily entered into rebate agreements with a few state Medicaid programs.

The federal legislature took action to control the rising cost of Medicaid prescription drug programs with the omnibus budget reconciliation act of 1990 (OBRA 90) through the section 1927 amendment to Title XIX of the social security act specifying mandatory rebates from drug

manufacturers to state Medicaid programs.  This amendment provided for a minimum of 15.1%
for branded drugs and 11% for generic or multi-source drugs based on the average
manufacturer price (AMP).  The generic rebate is straight forward and relatively simple to
calculate while the brand drug rebate is much more complex.  Rebates for brand name drugs
include adjustments for "best price", price increases above the consumer price index (urban)
and other factors which result in rebates for brand name drugs generally above the 15.1%
minimum.

This legislation also included provisions mandating that state Medicaid programs cover all FDA
approved drugs marketed by manufacturers who signed a national rebate agreement with CMS
unless those drugs were specifically exempted in the statute.  OBRA 90 allowed states to
exclude or restrict coverage for certain drugs or categories of drugs, such as benzodiazepines,
weight loss drugs, fertility drugs, drugs used for cosmetic purposes, among others.  These
specified exemptions from automatic coverage did not include NSAIDs.

OBRA 90 allowed states to enact state plans to permit prior authorization of all other FDA
approved drugs only if such state plan, approved by CMS, provided for a response by telephone
or other telecommunications device within 24 hours of a request and provided for the dispensing
of at least a 72 hour supply of a covered outpatient prescription drug in an emergency situation.
However, before the advent of Preferred Drug Lists or PDLs, states rarely had approved state
plans permitting these prior authorizations for drugs not subject to restriction as specified by
OBRA 90.  Louisiana Medicaid did not have an approved state plan that permitted prior
authorizations for FDA approved covered outpatient drugs prior to enactment of the Louisiana
Preferred Drug List legislation in 2001, which was implemented in 2002.

OBRA 90 also codified requirements for retrospective and prospective Drug Utilization Review
programs.  Most states already had functioning retrospective DUR programs but technical

capabilities to conduct prospective (real-time) DUR along with claim editing prior to dispensing were just emerging in conjunction with automated claims processing.

Development of Prospective DUR (Pro-DUR) editing as a component of a point-of-sale claim transaction is much like the credit card transaction most of us experience on a daily basis. A merchant transmits credit card and transaction information to a switch vendor who routes that information to the appropriate bank or financial institution where verification of status, available credit, reasonableness of the purchase are checked and a confirmation of payment is returned to the merchant in a matter of a few seconds. In the case of a Medicaid prescription, the pharmacy provider transmits patient identification, Medicaid plan information and prescription information to a switch vendor who then routes that claim information to a fiscal agent or pharmacy benefits manager for the Medicaid program who then confirms eligibility of the patient and pharmacy provider, checks for potential drug therapy conflicts, age and sex conflicts, drug to diagnosis conflicts and possibly others. The system then calculates an allowable payment and returns this information to the pharmacy.

Modifications to the language regarding formulary restrictions in section 1927 of Title XIX now permitted states more flexibility in managing their Medicaid prescription benefit program through a "Preferred Drug List" as opposed to a "Restricted Formulary". However, most states including Louisiana continued to have open formularies. To explain the differences, an Open Formulary allows for any covered drug to be prescribed and reimbursed without restriction. A Restricted Formulary on the other hand prohibits an unlisted drug from ever being prescribed and reimbursed.

In 2001 Florida adopted a mandatory PDL and required minimum rebate levels for drugs to be included on the PDL. The minimum rebate could be achieved through the federal rebate if high enough, or through a state supplemental rebate if needed. Florida engaged the services of

10

Provider Synergies, a consultant contractor based in Ohio, to assist with development of supplemental rebate contracts and negotiation with manufacturers.  This company also provided support to the legislatively mandated Pharmacy and Therapeutics (P&T) committee by developing therapeutic category background information as well as individual drug monographs used by the committee in determining their recommendations for the PDL.  Florida had previously engaged the services of Heritage Information Systems (Heritage) as a consultant contractor to assist with pharmacy auditing and support of the Drug Utilization Review board to develop both retrospective and prospective DUR intervention criteria.

Similarly, in 2001 Louisiana enacted legislation providing for a PDL and supplemental manufacturer rebates.  Louisiana Medicaid originally employed the services of the University of Louisiana Monroe (ULM) College of Pharmacy to provide support for their DUR program and to develop the PDL process, including reviewing drug classes and making recommendations to the Pharmacy and Therapeutics Committee.  Louisiana's DHH, the state agency charged with administering the Louisiana Medicaid program, elected in 2002 to contract with Provider Synergies to replace the ULM College of Pharmacy in performing drug class reviews, PDL recommendations, and manufacturer rebate negotiations on behalf of the State.  From my review of materials in this case, the ULM College of Pharmacy did not present any materials related to the NSAID or COX II drug classes to the Pharmacy and Therapeutics committee.  Provider Synergies, in Louisiana as in Florida, contracted to and represented that they would conduct independent reviews of managed drug classes based on published, peer-reviewed clinical data, FDA approved labeling, and rebate status, and thereafter make recommendations to the Pharmacy and Therapeutics Committee regarding inclusion or exclusion from the Preferred Drug List.

**Discussion**

In 1999, Vioxx was reviewed, determined to be both safe and effective, and approved for marketing in the United States by the federal Food and Drug Administration (FDA).  Louisiana Medicaid, like Florida Medicaid, correctly relies upon the FDA to serve as the approval authority for the safety and effectiveness for drugs marketed in the United States.  Since Louisiana had an open formulary, Louisiana Medicaid appropriately and as required added Vioxx to its drug database as a reimbursable product.

The 2001 Louisiana legislature, for the first time, authorized and directed the DHH Medicaid program to implement a Preferred Drug List (PDL) using a legislatively mandated Pharmacy and Therapeutics (P&T) Committee.  The legislation also permitted Louisiana Medicaid to seek supplemental rebates from manufacturers as consideration for inclusion of products on the PDL.  Prior to this legislation Louisiana Medicaid was prohibited from implementing a prior authorization program and was required to provide reimbursement for any drug prescribed by a physician that the physician considered appropriate.

Initially the Louisiana DHH employed the services of the ULM to develop drug monographs for the P&T committee.  As mentioned above, in March of 2002 Provider Synergies replaced ULM as the contracting expert responsible for PDL recommendations.

No drugs were subject to prior authorization under Louisiana Medicaid prior to the June 10, 2002 implementation of the PDL.  All FDA approved drugs including Vioxx and other COX II drugs were reimbursable without restrictions prior to June 10, 2002.

The first time the COX II class was reviewed by the P&T Committee was May 8, 2002.  Prior to the May 8, 2002 review of COX IIs, Provider Synergies conducted its independent clinical review of each of the drugs in the class and requested supplemental rebates from the manufacturers.  Merck, at that time, declined to participate in providing supplemental rebates to

Louisiana Medicaid for its products.  Provider Synergies prepared and submitted a monograph of the COX II class as well as a cost analysis.  The monograph appropriately discussed potential cardiovascular concerns with the COX II's and specifically with Vioxx along with potential gastrointestinal benefits.  The VIGOR trial was referenced and discussed in the monograph.

Based upon the minutes and transcript from the May 8, 2002 P&T meeting as well as testimony of the witnesses, it is abundantly clear that the P&T committee and Louisiana Medicaid, as we were in Florida, were well aware of the potential cardiovascular risks of Vioxx and other COX IIs when making their decision regarding the PDL status of COX IIs.  It is also clear that Provider Synergies recommended and the P&T committee accepted that Vioxx should be non-preferred at that time because Merck did not agree to a supplemental rebate for Vioxx.  Additional Merck products were also left off the PDL in 2002 for the same reason.  Celebrex and Bextra were included on the initial PDL, as Pfizer had agreed to a supplemental rebate.

As noted above, Louisiana Medicaid could not have restricted Vioxx reimbursement before June of 2002.  Placement of Vioxx on the non-preferred drug list, prior authorization required, in June 2002 was the most restrictive action that could have been taken against Vioxx by Louisiana Medicaid.  Even so, Louisiana DHH personnel have testified that the Louisiana Medicaid prior authorization system was "soft" and requests for authorization were routinely approved.

Subsequent to the May 2002 recommendations, Merck agreed to provide supplemental rebates to Louisiana Medicaid.  The Louisiana Medicaid P&T Committee performs an annual review of managed drug classes. The COX II class was again reviewed at the May 21, 2003 P&T committee meeting.  Provider Synergies again performed an independent clinical review and cost analysis for the COX II class.  Provider Synergies prepared an updated COX II monograph which again discussed the risks and benefits of the COX II agents.  The monograph specifically

13

referenced the April 2002 Vioxx label which contained the FDA approved language discussing the VIGOR trial and cautioned against use of Vioxx in patients with ischemic heart disease. The monograph also referenced numerous published peer reviewed clinical data. At this May, 2003 P&T committee meeting Provider Synergies and the committee recommended that Vioxx and Bextra be included on the LA Medicaid PDL and that Celebrex be removed.

It is again clear from the minutes and transcript of the May 21, 2003 P&T committee meeting that the P&T committee and Louisiana Medicaid were well aware that Vioxx had a potential increased cardiovascular risk, but in light of the cost analysis and the overall risk/benefit analysis provided by Provider Synergies for the COX II class, Vioxx was appropriately recommended for inclusion on the 2003 Louisiana PDL.

Cardiovascular risk of Vioxx and other COX IIs were again reviewed and discussed at the December 17, 2003 P&T committee meeting as well as at the May 5, 2004 P&T committee meeting. As a result of the May 5, 2004 P&T committee meeting Vioxx and Bextra were recommended to be retained on the PDL and Celebrex was recommended for return to the Louisiana PDL.

The State's allegation that Louisiana Medicaid, providers or beneficiaries were mislead or had insufficient information related to potential cardiovascular risks of Vioxx is simply not valid. It is clear from the P&T Committee meetings transcripts and minutes, deposition testimony, and news media reports, that Louisiana Medicaid was well aware of the debate about potential cardiovascular risk of COX-II inhibitors and more specifically of Vioxx. It is also clear that the recommendations and decisions regarding COX II agents inclusion or exclusion on the PDL was largely driven by whether the manufacturer agreed to a sufficient supplemental rebate. This is comparable to the sequence of events in Florida where we also used the services of Provider Synergies.

14

The discussion regarding Vioxx possibly contributing to increased cardiovascular risk and the hypothesis that increased COX-II specificity resulted in increased risk of a cardiovascular event was widely discussed and debated from 2000 and continues to the present.  In my opinion the Provider Synergies monographs conveyed the risks and benefits associated with Vioxx and other COX II agents to the Louisiana P&T committee.  Louisiana Medicaid and the P&T committee had information and expert assistance to make an informed decision as to formulary treatment of Vioxx and other NSAIDs.

The fact that there are both risks and benefits associated with all drug therapies is well known to all health care professionals and is one of the first principles taught in pharmacology.  This is further reinforced by the FDA requirement that all drug labeling include, in addition to indications and use, sections on contraindications, warnings, precautions and adverse reactions.  Both the risks and benefits are considered when making a decision to add a drug to a formulary and when making a decision to prescribe that drug for a patient.

After the voluntary withdrawal of Vioxx in September of 2004, the FDA issued findings in April of 2005 that found all NSAIDs have similar cardiovascular risk profiles.  As a result of the FDA findings, a boxed warning regarding potential cardiovascular risk was required for all selective and non-selective NSAIDs.  However, a large number of drugs in this class remain on the Louisiana PDL without restriction.  In 2004 and today, in multiple therapeutic classes there are numerous drugs with boxed warnings, many specific to increased cardiovascular risk, on the Louisiana PDL without prior authorization. Given these facts, any allegation that Louisiana Medicaid would have not placed Vioxx on the PDL in June 2003 until it was voluntarily withdrawn in September 2004 but for lack of awareness of the cardiovascular risks is not supportable.

In the State's expert reports, there are numerous references to marketing activity, recruitment of thought leaders as speakers, direct to consumer advertising, and targeting of Medicaid and other specific markets.  All of these activities are commonplace in pharmaceutical marketing, are engaged in by most manufacturers and are legal promotional practices.  None of these activities impacted in any way the decision of Louisiana Medicaid to add Vioxx to its open formulary in 1999, or subsequent P&T committee recommendations in June 2002 and thereafter.  As with my experience in Florida with Provider Synergies, marketing information and activities by manufacturers were not considered for or used in recommendations to the P&T Committee.  Further, Provider Synergies and the Louisiana P&T committee were aware of and considered the potential increased cardiovascular risks and potential gastrointestinal benefits of Vioxx and other COX IIs, and made informed decisions, largely based on willingness of manufacturers to provide supplemental rebates, regarding the PDL status of the COX-II agents.

I reserve the right to amend this report and the opinions contained in the report should additional information become available to me.

Jerry F. Wells

Date  12/3/2009

Attachment A

Jerry F. Wells

Post Secondary Education:
University of Florida 1958-1963
        Associates in Science
        Bachelors in Pharmacy
Virginia Commonwealth University 1999
        Fellowship in Health Care Management

Licensure: Florida Board of Pharmacy

My collegiate degree is in pharmacy with an emphasis on pharmacology and chemistry.
Following the required internship, board examination and licensure I was employed in
both chain and independent pharmacies during my early career but my interests were in
pharmaceutical marketing. In pursuit of that goal I accepted a position with Hoffmann-
LaRoche, a pharmaceutical manufacturer, as a territory sales representative in 1967. I
was fortunate during my eleven year tenure with this company, in addition to regular
territory sales, to have the opportunity to work with the Shands Medical School, two
Veterans Administration Hospitals, two state mental hospitals, and eventually to be
assigned responsibility for state government affairs in Florida.

This last assignment resulted from new federal and state legislation creating the Medicare
and Medicaid health plans. The contacts and background from these years and the
experience from the VA and state mental hospitals provided unique experience for the
latter part of my career managing the pharmacy benefit for the Florida Medicaid program.

It was also during this period that the federal government was developing the Controlled
Substances Act and I had the opportunity to work with both state and federal legislators
as well as with the recently created Drug Enforcement Administration (DEA).

My advocacy for changes in the Medicaid benefit structure resulted in an invitation to
work with the Florida Medicaid program which I accepted in 1984. Significant changes
were imminent in the design of Medicaid's prescription drug benefit and I was privileged
to participate in a number of these;

- I worked with development of the initial Federal Maximum Allowable Cost
  pricing for multi-source drugs (FMAC).
- I proposed and convinced the Health Care Financing Administration (now the
  Center for Medicare and Medicaid Services or CMS) that Wholesaler Acquisition
  Cost (WAC) based pricing was a valid alternative to discounted Average
  Wholesale Price (AWP) based pricing.
- Introduction of the first computerized cost effectiveness studies for Florida
  Medicaid was used to justify inclusion of contraceptive drugs and devices as a
  covered service in the prescription drug program.
- I was invited to serve on the federal advisory board with the Health Care
  Financing Administration ( CMS) for the first, unsuccessful Medicare prescription

drug benefit. This advisory board objected to the design and predicted the public's rejection of this original plan.

- Prior to implementation of the federal Medicaid rebate statutes in 1990, I participated in numerous advisory boards and work groups with various pharmaceutical manufacturers in developing proposals for rebates to Medicaid programs in order to avoid restrictive formularies.

- Because the federal Maximum Allowable Cost (FMAC) program chose not to address pricing for injectable products Florida Medicaid developed the first state level upper limit pricing for injectable drugs; primarily hemophilia factor products and injectable antibiotics.

- Florida's introduction of Point of Sale claims processing for Medicaid was one of the first in the nation. This resulted in significant cost savings for the state and providers as well as allowing development of procedures to credit Medicaid for unused medications in long term care facilities.

- Budget constraints eventually resulted in legislation requiring Florida Medicaid to institute a Preferred Drug List or PDL and state supplemental rebates. Florida's Medicaid Pharmacy and Therapeutics committee is regarded as one of the nation's most efficient and even handed P&T committees and is widely imitated by other state programs.

- Development of Prior Authorization processes is a part of managing an effective PDL and while this is viewed with concern and objected to by manufacturers, Florida Medicaid has been able to incorporate efficiencies through transparent criteria and eventually developed automated PA criterion based on diagnostic history from medical claims and/or inferred diagnoses from historic drug therapy to remove any requirements for provider intervention in many cases.

- Most recently, I worked with development of the Medicaid Reform Plan in Florida which uses risk adjusted capitation to more appropriately reimburse health plans prospectively for their patient population.

---

Associations and Organizations

Florida Pharmacy Association
Southern Association of Medicaid Pharmacy Administrators –
    Chairman 1987, 1988, 1997, 1998
Upjohn Pharmacy Consultant Panel 1998-1999
American Medicaid Pharmacy Administrators Association
    Chair 1987, 1995
CMS Pharmacy Technical Advisory Group (P-TAG) 1987-1989 and 1993-2007

Attachment B

**Jerry Wells - Prior Testimony**

Kindred Hospitals East LLC., et. al v. State of Florida

Ven-a-Care litigation

State of Texas v. Merck & Co., Inc.

Mr. Wells may have testified in one or two other matters for the State of Florida, but after a diligent search, was unable to identify the case names.