# EXHIBIT B

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
 2
       STATE OF LOUISIANA, ex rel. )
 3     JAMES D. CALDWELL, ATTORNEY  )
       GENERAL,                     )
 4                                  )
          Plaintiff,                )
 5                                  )
       VS.                          ) CASE NO. 05-3700
 6                                  )
       MERCK SHARP & DOHME CORP.,   )
 7                                  )
          Defendant.                )
 8
 9
10     **************************************************
11                      ORAL DEPOSITION OF
12                         JERRY WELLS
13                      JANUARY 27, 2010
14     **************************************************
15
16            ORAL DEPOSITION of JERRY WELLS, produced as
17     a witness at the instance of the Plaintiff, and duly
18     sworn, was taken in the above-styled and numbered cause
19     on the 27th day of January, 2010, from 9:30 a.m. to
20     2:00 p.m., before Lisa D. Huneycutt, CSR in and for the
21     State of Texas, reported by machine shorthand, at the
22     offices of BAKER BOTTS, 910 Louisiana, Suite 3200,
23     Houston, Texas  77002, pursuant to the Louisiana Rules
24     of Civil Procedure, notice, and the provisions stated
25     on the record or attached hereto.
```

Page 8

1        MR. SALES: Objection to the extent that
2   you've asked him to summarize.
3        But his report is as he set forth, and
4   the bases for his opinions are set forth in the report.
5        So I object to the extent you are
6   recharacterizing or summarizing incorrectly the bases of
7   those opinions.
8        MR. DUGAN: I appreciate that. But,
9   Counsel, as you know, an expert report is not evidence.
10  So we're here today to take his deposition, and his
11  answers are what his answers are.
12       So we have it on the record that he's
13  holding himself out as an expert in the structure,
14  administration and operations of a State Medicaid
15  program.
16       Q.   (BY MR. DUGAN) Is that correct, sir?
17       MR. SALES: And I object to the extent
18  it misstates the prior testimony in which he referenced
19  that his opinions and the bases for his opinions are set
20  forth in his report.
21       MR. DUGAN: Okay.
22       Q.   (BY MR. DUGAN) So what qualifications do
23  you believe qualify you as an expert in this particular
24  area?
25       A.   Well, as I think I laid out in the report --

1  but I'll try and summarize it for you since you seem to
2  want it verbally -- I have about 24 years of experience
3  in managing a prescription drug benefit in the Florida
4  Medicaid Program.
5           I worked in the pharmaceutical industry in
6  territory sales and Government affairs in the early days
7  of the development of Medicaid programs, specifically in
8  Florida, and was quite familiar with how they initially
9  structured their program in Florida several years before
10 I ended up working with that program.
11          So I have some experience from the industry,
12 the pharmaceutical industry side of Medicaid.  I am a
13 pharmacist.  I have served as the chair of the Southern
14 Association of Medicaid Pharmacy Administrators on
15 multiple occasions, and on the National American
16 Medicaid Pharmacy Administrators Association on two
17 occasions.
18          I served on the HCFA -- or now CMS.  HCFA,
19 the Health Care Financing Administration -- it is now
20 the Center for Medicare and Medicaid Services -- the
21 pharmacy technical advisory group, for several years
22 during my tenure at Florida Medicaid.
23      Q.  And you just mentioned the Florida Medicaid
24 Program, sir.
25          Are you aware that the State of Florida has

```
 1    also filed a lawsuit in the Vioxx litigation?
 2        A.   I am.
 3        Q.   Are you intending on testifying against the
 4    State of Florida in that case?
 5        A.   If asked to do so.
 6        Q.   So you don't think there's a conflict of
 7    interests in testifying against your former employer?
 8        A.   Absolutely not.  I advised them not to file
 9    that suit when I was employed there under a previous
10    administration.
11        Q.   Okay.  And who did you -- who did you tell
12    that to?
13        A.   I don't recall the gentleman's name.  But I
14    was in my office, and someone actually came to the
15    office and met with me to ask me what I thought about
16    that.
17        Q.   And what was your response?
18        A.   I told them that I thought that that didn't
19    have any merit, that we ought not to do that.
20        Q.   And why would you say that?
21        A.   Because I didn't think the State of Florida
22    was damaged.
23        Q.   And obviously, they didn't follow your
24    recommendation?
25        A.   Well, they did until after I left.  There
```

```
 1    were differences of opinion.
 2         Q.   I understand.
 3              Okay.  So anything else in reference to your
 4    qualifications to be an expert in this area?
 5         A.   Well, I've rambled on quite a bit more than I
 6    would have thought I should.
 7         Q.   Right.
 8         A.   Let me refer back to my report, I guess.  I
 9    don't want to leave something out that I've got in my
10    report that I didn't think of during that little
11    soliloquy there.
12         Q.   I understand, sir.
13              But I need to -- I need to caution you that
14    I'm here to ask you questions.  And while it's okay to
15    refer back to the report, it's going to -- it's based
16    on your personal knowledge and your understanding and
17    what you can recall as you sit here today.
18              It's going to go a lot smoother, because if
19    you tell me you need to go back to the report, then
20    we're going to go back to the report and just kind of
21    go through it.
22              Do you understand, sir?
23              MR. SALES:  Objection --
24         A.   Okay.
25              MR. SALES:  Objection to the extent -- I
```

Page 16

1  as a program manager when the agency downsized, and then
2  again as a bureau chief later.
3       Q.  Okay.  Can you give me some of your job duties
4  as bureau chief.
5       A.  Not an all-inclusive list because I don't
6  guess you ever can get everything down.
7       Q.  Right.
8       A.  But I was responsible for day-to-day
9  operations of program policy, claims administration.
10 We had a fiscal agent, but anything that didn't work
11 correctly in claims processing through our fiscal agent
12 landed in my unit, and I had responsibility either
13 directly or indirectly for getting that resolved.
14          Budget projections, budget preparation for
15 what we thought we'd be spending in the coming year,
16 management of the drug utilization review program and
17 committee, the P&T committee, the preferred drug list.
18          The provider manuals were produced by my
19 staff for pharmacy providers to use.  Legislative bill
20 analysis for prospective legislative ideas that various
21 staffers and legislators would come up with.
22          That certainly wasn't all of it, but that was
23 a lot of what we did --
24      Q.  Okay.
25      A.  -- and what I was responsible for.

Page 35

1           That's the only one that I can recall.
2       Q.  And I don't need to know the inner details of
3   what that case was about.
4           But was it in your capacity as a consultant,
5   or because of your prior knowledge from your employment
6   at the Florida Medicaid office?
7       A.  That was because of prior knowledge.
8       Q.  Prior knowledge.  Okay.
9           I'm just talking about now in your private
10  consulting practice.  How many times have you been hired
11  to give expert testimony?
12      A.  If you count Texas and Louisiana separately,
13  that would be two.
14          I was hired as an expert in some provider
15  litigation by a law firm in Florida, and I've been hired
16  as an expert in some AWP litigation by a law firm in
17  California.
18      Q.  Some AWP litigation?
19      A.  Correct.
20      Q.  Okay.  So to the best of your knowledge,
21  that's -- I count four times.
22      A.  Since I retired.
23      Q.  Is that accurate?
24      A.  That would be accurate.
25      Q.  Okay.  And so in the State of Texas case, you

Electronically signed by Lisa Huneycutt (601-374-636-5257)                    4ec43540-a27f-47e5-921c-1780b54aa166

```
1    all I was doing was reading and reviewing, and there may
2    have been some time that I was just writing and not
3    doing any reading and reviewing.
4             But I didn't break that up, so I don't know
5    what it would be.
6        Q.   So out of the 28 hours, can you guesstimate
7    for me?
8        A.   I'd prefer not to do that.
9        Q.   You'd prefer not to guesstimate?
10       A.   (No verbal response.)
11       Q.   So your testimony is that out of the 28 hours,
12   you probably spent more time reviewing documents for
13   your report than actually writing the report?
14       A.   That's a fair statement.
15       Q.   Okay.
16                (Exhibit No. 6 was marked for
17                 identification.)
18       Q.   (BY MR. DUGAN)  Mr. Wells, I'm showing you
19   what's been marked as Wells No. 6, which is the expert
20   report that you have submitted in this case.
21            The document in front of you, is that the
22   document that you've submitted in this case?
23       A.   Yes, sir.
24       Q.   Mr. Wells, why was Vioxx taken off the market?
25       A.   It was voluntarily removed by the
```

```
 1   manufacturer.
 2        Q.   Why?
 3        A.   I was not privy to all of their internal
 4   discussions, so I don't know the full reasons.  I know
 5   that there was a press release related to the reporting
 6   of cardiovascular events, but I'm not sure that I know
 7   their internal reasoning for doing that.
 8        Q.   Okay.  So your testimony is that you're not
 9   sure why it was taken off the market?
10             MR. SALES:  Objection; misstates the
11   prior testimony.
12        A.   I know that it was taken off the market
13   voluntarily by Merck.  It was withdrawn.
14        Q.   (BY MR. DUGAN)  But you're not sure exactly
15   why?
16        A.   I'm not -- they don't have to state the reason
17   that they did that, and I'm not sure that it was ever
18   stated.  It may have been.
19        Q.   Okay.  Mr. Wells, I had mentioned to you
20   earlier Provider Synergies.
21             Do you remember me referencing Provider
22   Synergies?
23        A.   I remember you asked a question if I had ever
24   done any work for them.
25        Q.   That's correct.
```