# Exhibit B

Transcript of the Testimony of

**Steven Wiggins**

**Date:** February 9, 2010

**Case:** STATE OF LOUISIANA v. MERCK SHARP & DOHME

**HOUSTON REPORTING SERVICE**
**1010 LAMAR, SUITE 1400**
**HOUSTON, TEXAS 77002**
Phone: 713-739-1400
Fax: 713-739-1410
Fax: 713-739-1421
Email: houstondepos@earthlink.net
cc: houstonproduction@gmail.com
Internet: www.houstoncourtreporting.com

```
 1    direction?
 2        Q.    (BY MR. PLYMALE)  Let's start with you
 3    personally.
 4        A.    It would have been sometime in the fall.  I
 5    can't -- I can't be more specific than that.
 6              And my people had gotten the data, had figured
 7    out how to put it up so you could see it, do simple
 8    things with it like figure out how many claims there
 9    were in a year and address various issues like that.
10    And I took a look at the data at that point.
11        Q.    And when you say your people, who are you
12    referring to?
13        A.    Rob Maness, M-A-N-E-S-S; Alex Knight,
14    K-N-I-G-H-T; Kris Buchan, K-R-I-S, B-U-C-H-A-N.  And
15    Brian Segers, S-E-G-E-R-S, was also involved to some
16    degree.
17        Q.    These four individuals are also consultants
18    with CRA?
19        A.    They're employees of CRA.  They have various
20    titles.
21        Q.    Do you recall those titles?
22        A.    Not very well.  Rob Maness is the more senior.
23    He's a Ph.D. in Economics, and I believe he is a vice
24    president.
25              The others are senior associates and have
```

```
 1   it's one of these checks that has two parts, the check
 2   itself and what it's for.  And it has numbers on it, and
 3   you actually have to go look up from your own records --
 4   my executive assistant goes and looks up and makes sure
 5   what the case number is and what period it's for and
 6   everything.
 7        Q.   Okay.  May I see those again?
 8        A.   Sure.
 9        Q.   Thanks.
10             If, at any time, you'd like to take a break,
11   just let me know.
12        A.   Five or ten minutes?
13             MR. PLYMALE:  Sure.  This is a good time.
14   Let's go off the record.
15                  (Brief recess taken.)
16        Q.   (BY MR. PLYMALE)  Dr. Wiggins, did you have a
17   chance to discuss your testimony during the break with
18   counsel?
19        A.   No.  We just chit-chatted.
20        Q.   What did you do to prepare for this
21   deposition?
22        A.   I read various documents, I read some
23   depositions, I reread my own report and Dr. Harris's
24   report.  I had -- I met with counsel for Merck
25   yesterday.
```

Page 61

```
 1        A.     I don't think so.
 2        Q.     When you -- after you received Dr. Harris's
 3   report, who first started typing the draft of your
 4   report?  Could you walk me through that process.
 5        A.     The process would be that there would be a
 6   discussion with Dr. Maness and myself, and I would often
 7   start drafting.
 8               I don't -- I'm trying to remember exactly how
 9   the drafting process started here.  I know there were
10   issues, and I typed up issues that became this -- well,
11   not this first part.  It would have been the background
12   and overview.
13               And then I would start drafting, and it would
14   get saved onto a common drive.  And then Rob Maness
15   would work on it, and I would work on it again.
16               But I would be the primary draftsman, and Rob
17   also would be doing some drafting and filling in things
18   that I felt needed to be filled in.
19        Q.     And prior to finalization, did you share a
20   draft of the report with counsel for Merck?
21        A.     They saw a WebEx version of the -- of the
22   draft.
23        Q.     When did you -- strike that.
24               When did they first see a draft of the report?
25        A.     It would have been in early January, a couple
```

```
 1    your question is a very general question, and I don't
 2    know -- I don't know who's on the list.
 3         Q.   Okay.
 4         A.   So have I ever spoken to a person -- anybody
 5    on a list?  I'd have to see the list.
 6         Q.   But without referring to a list, you're not
 7    aware of who are the other experts Merck has retained
 8    in this matter, correct?
 9         A.   I'm -- I'm not -- I could not name who the
10    other experts are, any of the other experts, without --
11    there may be some specific reference to an expert in my
12    report.  I don't think so.  I did not have discussions
13    with them in preparing my report or reaching the
14    conclusions that I reached.  But --
15         Q.   Did you ever meet with any of Merck's other
16    experts --
17         A.   Not in --
18         Q.   -- in this case, prior to today?
19         A.   No, not that I recall.
20         Q.   Okay.
21         A.   I don't believe I have.
22         Q.   Do you recognize the data fields listed in
23    Item 8 in this letter?
24         A.   No, I don't.  I don't recognize those.  I
25    recognize them as somehow being related to the data we
```

1   But -- so I wouldn't think that that would be me.
2           I do not recall a conversation with Ms. Bjork
3   about this data set and these kinds of issues during
4   this time, or anytime, actually.  These kinds of issues,
5   I don't recall ever -- ever dealing with.
6       Q.   (BY MR. PLYMALE)  Do you recall a
7   teleconference on October 13th, 2009 --
8       A.   I --
9       Q.   -- with myself, a representative from Unisys,
10  Ms. Sullivan, who I will represent is an attorney
11  in-house in the Louisiana Department of Health and
12  Hospitals, and Merck's counsel?
13      A.   I do not recall such a conversation.
14      Q.   Could the experts referred to here possibly
15  be the other CRA team members on this Vioxx project?
16      A.   Well, to the best of my knowledge, these
17  people are not anybody that I was working with at CRA.
18           I don't -- this is -- I do not believe work
19  had begun on this project, so I don't know what experts
20  are being referred to here.  And I do not personally
21  recall a conversation of this type.
22      Q.   What data sets did you review from the
23  Louisiana Medicaid claims data?
24      A.   I believe we had some data.  The data that
25  was actually analyzed to reach the conclusions that were

Page 74

1   reached in my report all came from Dr. Harris.
2           I believe -- I believe that we had some data
3   before that, and it was my understanding that it was
4   basically the same kind of data that Dr. Harris was
5   looking at.
6           But the ones that actually were analyzed to
7   reach the conclusions in this report are ones that came
8   from Dr. Harris.
9       Q.  Were any analyses done by you or the other
10  CRA members on the prior data sets, as you referenced
11  them?
12          MR. SALES:  Objection; vague and
13  ambiguous.
14      A.  I believe that we had some data that we
15  looked at, but I would describe it as looking at the
16  data, trying to see what -- what was there.  There was
17  nothing -- and that's done in Stata on the screen.  You
18  tell it to count the number of observations.
19          So there was no -- there was no formal
20  analysis, no regressions, nothing of that sort done
21  until we received Dr. Harris's data, and then the real
22  analysis took place on that data set.
23      Q.  (BY MR. PLYMALE)  In Exhibit 7, Ms. Bjork
24  requests, in the third paragraph, a new production of
25  claims data.

```
 1          So you can look at the log file and back out.
 2   At least in Stata, which is the program that we used,
 3   you can figure out exactly what each command was
 4   executed -- as it was executed by the program, and you
 5   can verify that a log file and a program are identical.
 6          Q.   You reviewed Dr. Harris's deposition testimony
 7   where he testifies that there were missing files in the
 8   material that was supplied to him, correct?
 9          A.   He said there was -- that intermediate files
10   were not provided, which isn't actually quite a fair
11   characterization, since all the programs necessary to
12   create the intermediate files were supplied, and all you
13   have to do is say, "Do," and put that file name there,
14   and anything you want, you've got.
15          That's what -- that's what we did, actually,
16   to create Dr. Harris's intermediate files, to recreate
17   them.
18          Q.   Did you supply those intermediate files to
19   Merck's counsel?
20          A.   No.  The intermediate files were not supplied,
21   but the code necessary to generate them was supplied.
22          Q.   And the starting point of the calculations
23   was the data set you received along with Dr. Harris's
24   report, right?
25          A.   Yes.
```

```
 1        Q.   And the programs were all based on
 2   Dr. Harris's programs that he supplied with his report,
 3   right?
 4        A.   Yes.
 5        Q.   Were there any other programs that you or the
 6   CRA team created for the data analysis?
 7        A.   No.  There were very minor modifications, as
 8   explained in my report, adding a few lines of code here
 9   or there.
10             That is the analysis that was undertaken,
11   and that's part of why it's so easy to recreate these
12   intermediate data sets.
13             Dr. Harris is familiar with the code, and all
14   he has to do is just say, "Do it," and he's got it.
15             MR. PLYMALE:  Dr. Wiggins, I have no
16   further questions for you today.
17             But, Counsel, due to the lack of
18   production of a complete set of responsive invoices
19   and the lack of production of complete underlying
20   reliance materials for his report, I'll leave this
21   deposition open on the record.
22             MR. SALES:  We obviously totally object
23   to that.  Dr. Wiggins has been here.  He's ready to
24   answer any questions.
25             We will supplementally produce any
```