# Exhibit C

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

    ************************************
 3

    IN RE:  VIOXX PRODUCTS              MDL No. 1657
 4  LIABILITY LITIGATION
                                         Section L
 5  This Document Relates To:
 6  STATE OF LOUISIANA, ex rel.
    JAMES D. CALDWELL, JR.,              Judge
 7  Attorney General,                    Eldon E. Fallon
                Plaintiffs,
 8
        v.                               Magistrate
 9                                       Judge Knowles
    MERCK SHARP & DOHME CORP.,
10              Defendant.               Case No. 05-3700
11  ************************************
12
13    DEPOSITION OF JEFFREY E. HARRIS, M.D., Ph.D.
14           Friday, January 29th, 2010
15                 10:08 a.m.
16
17
18                  Held At:
19       Hagens Berman Sobol Shapiro, LLP
20            55 Cambridge Parkway
21          Cambridge, Massachusetts
22
23  REPORTED BY:
24  Maureen O'Connor Pollard, RPR, CLR, CSR
```

Case 2:05-md-01657-EEF-DEK   Document 35730-3   Filed 03/01/10   Page 3 of 17
Jeffrey E. Harris, M.D., Ph.D.

Page 19

```
 1   after September of 2004, correct?
 2       A.   Correct.
 3       Q.   And so you have in column one "T
 4   month," then you've got summary of payment, and
 5   it goes out to month 70 with values in the mean
 6   summary of payment for that month?
 7       A.   Correct.
 8       Q.   And then month 70 corresponds to what
 9   calendar month?
10       A.   There's a line in the computer program
11   indicating that it is September, 2000 -- not in
12   the computer program but in the results which I
13   believe are on the last page, indicating that it
14   is September, 2004.
15       Q.   Did you check Dr. Wiggins's statement
16   that you have a mismatch between your
17   Bextra-Celebrex expenditures and calendar
18   months?
19       A.   I was not in a position to do so given
20   the time available and the limited materials
21   supplied to me.
22       Q.   Well, Dr. Wiggins went into your
23   backup materials and identified dates that don't
24   match the right calendar months; for example,
```

1   Bextra sales that occur well after Bextra was
2   withdrawn.  Did you do anything to confirm or
3   deny that Dr. Wiggins is correct that there was
4   a programming error in your Bextra-Celebrex
5   cohort?
6       A.   Given the limited time and given the
7   absence of a complete delivery of all relevant
8   files, I could not.
9       Q.   What do you mean "an absence of a
10  complete delivery of all relevant files"?
11      A.   To answer your question completely, I
12  would have to show you my list of what files I
13  received, and my comparison of the files that I
14  received with the files that Dr. Wiggins refers
15  to in his calculation.
16      Q.   Okay.  We'll do that in a minute.
17           How hard would it have been to go into
18  your own data and identify Bextra sales that
19  you say occurred but yet show up as being in
20  time periods well after the Bextra withdrawal?
21      A.   Given adequate time, it would not be
22  difficult at all.
23      Q.   What's the time commitment you think
24  would have been necessary for you to check your

1   own data?

2       A.      In an ideal world with no other
3   professional commitments and with an adequate
4   delivery of all intermediate files, it would
5   have taken an afternoon.

6       Q.      Okay.  So four hours?

7       A.      I don't think I can be any more
8   specific than that.

9       Q.      Right.  You've had enough time over
10  the last week or so to spend fifteen hours
11  preparing for your deposition, run some
12  calculations on Vioxx, speak with Plaintiff's
13  counsel, and you're saying you couldn't find an
14  afternoon to check to see whether Dr. Wiggins
15  was correct and you had a serious programming
16  error in your Bextra cohort?

17      A.      That is correct, sir.  And that is in
18  great part due to the lack of delivery of
19  sufficient material for me to make what I would
20  call a straightforward professional check.  In
21  particular, there were numerous data files that
22  I did not receive from defense counsel, or at
23  least were not forwarded to me, which would have
24  permitted me to do that calculation, and to

1   understand whether or not such an error was

2   present in a much more straightforward and

3   timely manner.

4       Q.    Why don't you just go to your own data

5   wherein the programming error is apparent and

6   see, "well, gee, is he right, did I really screw

7   this up and have expenditures assigned to the

8   wrong calendar date?" You could have done that

9   from your own data, couldn't you?

10      A.    In an ideal world with adequate time,

11  perhaps.

12      Q.    This is the afternoon we're talking

13  about again?

14      A.    The response of an afternoon is my

15  best estimate of how long it would take in an

16  attempt to be responsive to your question.

17      Q.    All right.

18      A.    However --

19      Q.    Go ahead.

20      A.    I don't know whether it's Professor

21  Wiggins, I don't know whether it's CRA

22  International, I don't know whether it's defense

23  counsel, so I will speak in the passive voice

24  and say in connection with this purported error,

```
 1    I received one computer file in which two lines
 2    were marked.
 3         Q.    You're missing my question.
 4         A.    I'm not done with my answer.
 5         Q.    Because you're not answering my
 6    question.  My question doesn't relate to what
 7    data files you received from the defense.
 8               My question related to; you have in
 9    your possession your own data and the analyses
10    you ran for the Bextra-Celebrex cohort,
11    correct?
12         A.    Correct.
13         Q.    Did you take the time to go into your
14    own data to see whether Dr. Wiggins was correct
15    and you had a programming error in your data?
16         A.    To the extent that I could, yes.  And
17    in particular, to the extent that Dr. Wiggins
18    described the error, it was my understanding
19    that the error predicted the sentence at the top
20    on Page 39.  Since Dr. Wiggins did not provide
21    the original program but rather a log file,
22    since Dr. Wiggins or whoever it was did not
23    produce the corrected data file, and furthermore
24    since Dr. Wiggins did not produce the underlying
```

```
 1    difficult for me to give a deposition during the
 2    semester which starts next week.
 3         Q.    Great.  So --
 4         A.    And I offered to give a deposition
 5    today.
 6         Q.    Okay.  So we moved up the deposition
 7    at your request.  And you seem to have enough
 8    data in your possession to check the statement
 9    that there were Vioxx expenditures that occurred
10    after the withdrawal of the drug.  Similarly,
11    you have enough data in your possession to
12    confirm or deny whether your program assigned
13    Bextra expenditures after that drug was
14    withdrawn.  You could have done that work,
15    correct?
16         A.    Yes, I could have.
17         Q.    And you didn't, correct?
18         A.    That is correct.
19         Q.    Now, what other documents do you have
20    there in that folder of yours?
21         A.    I have an index that I prepared
22    entitled "Documents Received" which, strictly
23    speaking, is not one of the documents, it's
24    rather just a summary.
```

1  called me or arranged a call and had one
2  question, which I answered on the phone.
3        Beyond that, I don't recall any
4  comments, and there were certainly no edits.
5    Q.    What was the question?
6    A.    On my own I had made one substantive
7  change between the draft and the final version,
8  and that refers to a computation of the
9  percentage decline in Celebrex and Bextra
10 prescriptions associated with the Drug
11 Utilization Review Program. I revised those in
12 the final draft so that the base prescription
13 rate reflected the most recent prescription
14 activity rather than the overall average for the
15 last five or more years.
16       Mr. Murray identified the change on
17 his own, and asked me why the change had been
18 made, and my response was exactly what I just
19 testified to.
20   Q.    Did anyone assist you in doing the
21 programming or computations that underlie your
22 report?
23   A.    Once I had the data in hand, no.
24   Q.    Are you excluding something when --

Jeffrey E. Harris, M.D., Ph.D.

Page 52

```
 1   what do you mean by "once you had the data in
 2   hand"?
 3       A.   Mr. -- or pardon me, Dr. Plymale
 4   delivered a series of files which I assume were
 5   organized by Unisys, but once I received those
 6   files, copies of which are in my work materials,
 7   all computations including programming are my
 8   own and no one else's.
 9       Q.   If you turn to Paragraph 9 of your
10   report, please, subsection A.  You describe
11   there the documents that you have reviewed for
12   the purposes of providing your opinions in this
13   case?
14       A.   Yes.
15       Q.   And you have an electronic folder in
16   the materials that were provided to the defense
17   that's entitled "Harris Vioxx Report
18   References"?
19       A.   Correct.
20       Q.   Are there any documents that you are
21   relying upon for your opinions in this case
22   other than those that are included in the
23   electronic file "Harris Vioxx Report
24   References"?
```

Jeffrey E. Harris, M.D., Ph.D.

Page 54

```
 1     A.     Correct.
 2     Q.     Is your understanding that Merck
 3  received the same database that you did?
 4     A.     Yes.
 5     Q.     Are you aware of any data set that you
 6  were provided in this case that was not provided
 7  to Merck?
 8     A.     I don't know.  I can only enumerate
 9  everything that I received, which is exactly
10  what I wrote in Paragraph 9.  As to whether
11  Merck received it, I do not know.
12            In the case of the Louisiana Medicaid
13  data, it was my understanding that Merck
14  actually requested it initially.
15     Q.     Did you receive any other data sets
16  from the Plaintiff other than the Louisiana
17  Medicaid data set?
18     A.     Yes.
19     Q.     What?
20     A.     I received the data enumerated in
21  Paragraph C on Page 7 from Plaintiff's counsel.
22  D really isn't a data set, it's another
23  tabulation or a document produced by Merck.
24     Q.     All right.  C relates to the IMS data?
```

```
 1      A.     Correct.
 2      Q.     You received it from Plaintiff's
 3   counsel, but your understanding is that data set
 4   did not originate with the Plaintiff, correct,
 5   Louisiana --
 6      A.     Correct.
 7      Q.     So other than the Medicaid data set,
 8   is there any data that you received from -- that
 9   you understood was in the possession of the
10   Louisiana Department of Health & Hospitals?
11      A.     I don't understand the question.
12      Q.     Other than the Louisiana Medicaid
13   data, is there any other data that you received
14   that you understood originated with Louisiana
15   DHH?
16      A.     In terms of computerized data, no.
17      Q.     Is there something else?
18      A.     If data includes minutes of meetings
19   of pharmacy review committees, correspondence,
20   announcements to medical professionals, it's my
21   understanding that clearly originated from the
22   Louisiana Department of Health & Hospitals.  But
23   computerized data, nothing else above and beyond
24   that described in Paragraph A.
```

```
 1      Q.    All right.  If you go to Paragraph 10
 2  of your report.  In addition to the IMS data
 3  specific to the State of Louisiana, you received
 4  IMS data that were nationwide in scope, correct?
 5      A.    Correct.
 6      Q.    At the time that you submitted your
 7  report, you had not analyzed the nationwide IMS
 8  data referred to in Paragraph 10, correct?
 9      A.    Correct.
10      Q.    And as you sit here today, have you
11  still not analyzed the nationwide IMS data
12  referred to in Paragraph 10?
13      A.    That is correct.
14      Q.    Was this data set something you
15  requested?
16      A.    Yes.
17      Q.    Why did you request it?
18      A.    I had worked with IMS data before, and
19  during the formulation of my initial analysis
20  plan and my conversations with counsel I thought
21  that it might be relevant to the calculations
22  that Plaintiff's counsel had asked me to make
23  for the State of Louisiana.
24      Q.    At some point you decided it wouldn't
```

```
 1   have been relevant?
 2        A.    I believe that it is always and has
 3   been relevant, but in this case not sufficiently
 4   specific.
 5        Q.    Okay.  As you sit here today, you have
 6   no plan to analyze the nationwide IMS data
 7   referred to in Paragraph 10, correct?
 8        A.    With respect to this case, no.
 9        Q.    Am I correct?  You had a double
10   negative in there.  Was my statement correct?
11        A.    Could the statement be repeated?  It
12   is my fault for answering too quickly.
13        Q.    I'll restate it.
14              You have no plans to analyze the
15   nationwide IMS data referred to in Paragraph 10
16   in your report for the purposes of this case,
17   correct?
18        A.    That is correct.
19        Q.    Thank you.
20              If you turn to Page 3 of your report,
21   you have a section entitled "Questions
22   Addressed"?
23        A.    Yes.
24        Q.    And there follows five questions that
```

```
 1    I did do by way of sensitivity a nine month,
 2    twelve month and eighteen month analysis.
 3         Q.    And you found that your model was
 4    sensitive to the period of follow-up that you
 5    employed, correct?
 6         A.    To some degree, yes.
 7         Q.    And in fact, what you found, the
 8    direction the sensitivity pointed was that the
 9    longer the follow-up period, the higher the
10    compensating expenditures became, correct?
11         A.    I'd have to refer to the work papers.
12    I don't have them all in my head in front of me,
13    or in front of me.
14         Q.    Did you see that Dr. Wiggins looked at
15    your work papers and described those nine,
16    twelve and eighteen month analyses that you did?
17         A.    I think he has that in one of his
18    appendices, yes.
19         Q.    Did you check to see whether he
20    accurately reported the analyses that you did?
21         A.    No, I didn't have time to do so.
22         Q.    How long would that have taken you?
23         A.    Well, let's look at what he did.
24         Q.    He went into your file and he pulled
```

1   Vioxx user who can be followed accurately for
2   twelve months, then my analysis identifies
3   approximately three-quarters of the individuals.
4   There are a remaining one-quarter who had a
5   Vioxx prescription but are not analyzed in the
6   statistical sample.
7        Q.    In column D, Dr. Wiggins reports that
8   your twelve month cohort excludes 80 percent of
9   the observations from the database?
10       A.    That's not what column D says.
11       Q.    Okay.  Tell me what column D says to
12  you.
13       A.    It says "percent of all non-missing
14  observations in sample," and here I believe
15  Professor Wiggins has incorrectly characterized
16  any zero expenditure as missing, and therefore I
17  do not know what the meaning of this calculation
18  is.
19       Q.    Then let's go to column H.  "Percent
20  of cohort member observations excluded from
21  analysis."  In the twelve month cohort line,
22  Dr. Wiggins reports that 73.8 percent of the
23  observations from the patients you included in
24  the cohort were not subject to your analysis.

Page 164

```
 1    Do you know whether that is an accurate number?
 2         A.    I have not had time to verify it, but
 3    I believe what he is saying is that there are
 4    individuals whom I identified in the twelve
 5    month cohort who continue to have observations
 6    past twelve months whom I did not include in the
 7    analysis.  As to whether that percentage is
 8    correct or not, I do not know.
 9         Q.    Okay.  So if you go back to Paragraph
10    27 in your report, there are 67,899 individuals
11    in the database who have at least one Vioxx
12    prescription, correct?
13         A.    I see where you're reading.  Yes.
14         Q.    And then your analysis, your cohort
15    includes 49,324 of them, right?
16         A.    Yes.
17         Q.    And so do you believe the other 18,000
18    patients whom you excluded lost Medicaid
19    eligibility?
20         A.    They could have.  I don't know.
21         Q.    Does that strike you as an
22    inordinately high percentage?
23         A.    Offhand I don't know, but there is
24    substantial turn-around on Medicaid, there is
```