# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General,<br><br>Plaintiffs,<br><br>v.<br><br>MERCK SHARP & DOHME CORP.,<br><br>Defendants. | JUDGE ELDON E. FALLON<br><br>MAGISTRATE JUDGE KNOWLES<br><br>Case No. 05-3700 |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO MOTION TO EXCLUDE TESTIMONY OF JERRY AVORN, M.D.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................. 1

II.     LEGAL STANDARD............................................................................ 4

III.    THE QUALIFICATIONS OF JERRY AVORN, M. D. ....................... 5

IV.     DR. AVORN'S TESTIMONY ABOUT MERCK'S DISTORTION,
        SUPPRESSION, AND WITHHOLDING OF INFORMATION IS
        RELEVANT AND ADMISSIBLE........................................................ 5

        A.      This Court has Already Ruled that Dr. Avorn could Testify that
                Merck Suppressed, Distorted, and Withheld Data...................... 6

V.      DR. AVORN'S OFFERED EXPERTISE IS DERIVED FROM HIS
        SCIENTIFIC, TECHNICAL, OR OTHER SPECIALIZED
        KNOWLEDGE .................................................................................... 8

        A.      Dr. Avorn's Factual Knowledge With Respect To the Scientific
                Testing and Marketing of Vioxx Renders His Testimony
                Regarding Vioxx Proper ....................................................... 10

        B.      Dr. Avorn Properly Opines as to the Knowledge Generated By and
                Imparted to Merck About the Risks and Benefits of Vioxx Given
                the State of Science at Various Points in Time........................ 11

        C.      Dr. Avorn Provides Appropriate Testimony Concerning the FDA's
                Labeling Proposal and its Rebuke of Merck's Promotional
                Materials ................................................................................ 14

        D.      The Court Should Allow Dr. Avorn's Expert Testimony on All
                other Subjects to the Extent Allowed in Prior Vioxx Cases ............ 17

VI.     CONCLUSION.................................................................................... 18

## TABLE OF AUTHORITIES

Page

## CASES

*Allapattah Services, Inc. v. Exxon Corp.*,
    61 F. Supp. 2d 1335 (S.D. Fla. 1999) ...................................................................... 11

*Barnett v. Merck & Co., Inc.*,
    No. 06-0485 (E.D. La. July 25, 2006) ..................................................... 1, 5, 10, 11

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)........................................................................................................... 1

*Glaser v. Thompson Medical Co., Inc.*,
    32 F.3d 969 (6th Cir. 1994) ......................................................................................... 11

*In Re Diet Drug Product Liability Litigation*,
    No. MDL 1203, 2000 WL 8769000 (E.D. Pa. June 20, 2000) ................................. 4, 9, 10, 15

*In Re Phenylpropanolamine Product Liability Litigation*,
    99 F. Supp. 1230 (W.D. Wash. 2003)............................................................................ 4

*Smith v. Wyeth-Ayerst Labs. Co.*,
    278 F. Supp. 2d 684 (W.D.N.C. 2003) ..................................................................... 10, 12

859800.2

I.    **INTRODUCTION**

Plaintiff James D. Caldwell, by and through his undersigned counsel, urge this Court to deny Defendant, Merck Sharp & Dohme Corp. ("Merck") motion to exclude expert testimony of Jerry Avorn, M.D.  In *Barnett v. Merck & Co., Inc.*, Case No. 06-0485, defendant Merck filed a motion for an order excluding Dr. Avorn's testimony under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  This Court denied Merck's motion and permitted Dr. Avorn to testify.  *See Barnett*, No. 06-0485, slip op. at 2 (E.D. La. July 25, 2006) (hereinafter "*Barnett* Minute Entry").  Similarly, the Court denied Merck's motion again in *Smith v. Merck* (Case No. 05-cv-4379), in *Mason v. Merck* (Case No. 06-cv-810), and in *Dedrick v. Merck* (Case No. 05-cv-2524).  Merck makes the same shop-worn arguments here.  *See* Merck's Memorandum in Support of Motion of Merck to Exclude Testimony of Jerry Avorn, M.D., (hereinafter "Merck Mem.") at 1-3.

In its motion, Merck challenges Dr. Avorn's proposed testimony on the grounds that his opinions are either "irrelevant," "outside the scope of his area of expertise," or "were not disclosed in his expert report."  *Id.*  Merck goes on to request that this Court exclude his testimony with respect to four specific areas.  *First*, Merck challenges Dr. Avorn's opinions about Merck's suppression, distortion, and withholding of data.  *Second*, Merck objects to Dr. Avorn's "recounting of the Vioxx story."  *Third*, Merck challenges Dr. Avorn's testimony as to what Merck knew or should have known.  *Fourth*, Merck challenges Dr. Avorn's qualifications to offer opinions regarding Merck's negotiations with the FDA over Vioxx labeling and promotion.  Additionally, Merck objects to Dr. Avorn's testimony on the following topics: standard of care, direct to consumer advertising, the APPROVe "correction," mortality data, and "all major publications" concerning Vioxx.  None of Merck's challenges withstand scrutiny under *Daubert*, as this Court has already recognized.

Merck acknowledges that this Court has allowed Dr. Avorn to testify via video deposition in the Vioxx personal injury actions. *Id.* Merck fails to mention, however, that this Court has already allowed Dr. Avorn to offer *all* the opinions that they challenge in the present case. (*See Barnett* Trial Tr. vol. 2, August 1, 2006 ("8/1/2006 Trial Tr.") [Sarah R. London Declaration in Support of Plaintiff's Opposition to Motion to Exclude Expert Testimony of Jerry Avorn, M.D. ("SRL Decl.") Ex. 1].) Indeed, Merck's arguments that certain opinions fall "outside the scope of Dr. Avorn's area of expertise," have all been fully briefed and litigated—there is nothing new about these arguments. This Court already considered and rejected the same arguments in the Court's July 25, 2006 Order. *See Barnett* Minute Entry. Since Merck has given the Court no reason to reconsider its past ruling, this court should deny Merck's motion to exclude Dr. Avorn's opinions concerning (1) what Merck knew or should have known; (2) the "recounting of the Vioxx story," and (3) Merck's negotiations with the FDA over Vioxx labeling and promotion.

The only new issue before this court is whether Dr. Avorn's testimony that Merck suppressed, withheld, and distorted data is relevant to this case involving the State of Louisiana. Plaintiff incorporates by reference the Louisiana-specific responses set forth in the Memorandum in Opposition to Motion to Exclude Testimony of John MacGregor, M.D., filed contemporaneously. As noted therein, and as acknowledged in Defendant's pleadings, its arguments on this subject are more appropriately within the scope of its summary judgment motion, and the Court should defer ruling on this aspect of the *Daubert* motions until the summary judgment briefing has been completed. For the purposes of the present motion, Plaintiff submits that Dr. Avorn's testimony concerning Merck's failure to truthfully represent what was known about cardiovascular risks of Vioxx is centrally relevant to the case. As set

859800.2

forth in the MacGregor opposition, Plaintiff relied upon information submitted by Provider Synergies, in deciding to add Vioxx to the Louisiana Preferred Drug List (LPDL); Provider Synergies, in turn, relied upon the peer reviewed literature to arrive at its recommendations. Thus, Merck's suppression of a wide range of cardiovascular risk information and its failure to include that data in the peer reviewed publications deprived Provider Synergies of the essential information needed to make an informed recommendation upon which the Plaintiff could reasonably rely.

As noted in the Vioxx personal injury cases, Dr. Avorn is a widely published Professor of Medicine at Harvard University, and is Chief of the Division of Pharmacoepidemiology and Pharmacoeconomics at the Brigham and Women's Hospital in Boston Massachusetts. (*See Curriculum Vitae* of Jerome L. Avorn, M.D. ("Avorn CV") [SRL Decl. at Ex. 2].) Dr. Avorn is considered one of the world's leading authorities on: (1) epidemiology;
(2) pharmacoepidemiology (the study of the risks and benefits of drugs); and (3) how physicians evaluate the benefits and risks of medications in making prescribing decisions. *Id.* He has published over 200 original articles, book chapters, editorials on these and other topics in the peer-reviewed medical journals, including *Circulation, The New England Journal of Medicine, The Journal of the American Medical Association,* and *Hypertension. Id.* Additionally, Dr. Avorn has advised the United States Congress, the President of the Unites States and the Food and Drug Administration ("FDA") on drug utilization issues, and has been at the forefront on implementing evidence-based educational programs for physicians. *Id.*

Dr. Avorn has conducted original research on the cardiovascular safety and other risks and benefits of NSAIDs, naproxen and cyclooxygenase-2 ("Cox-2") inhibitors, including Vioxx (rofecoxib). All of this original research occurred long before Dr. Avorn ever agreed to be an

- 3 -

expert in Vioxx litigation, as reflected in his expert report, *curriculum vitae*, and deposition testimony on June 15-16, 2006. Indeed, Dr. Avorn was even funded by Merck itself, who hired him to perform a cardiovascular study on Vioxx. That research was published in the eminent cardiovascular journal, *Circulation*, before Vioxx was withdrawn. (*See* Solomon, DH, Avorn, JL, et al., *The Relationship Between Selective Cox-2 Inhibitors and Acute Myocardial Infarction in Older Adults, Circulation* 2004; 109:2068 – 2073 [SRL Decl. Ex. 3].)

Contrary to Merck's assertions in its memorandum, Dr. Avorn is clearly qualified to testify to: (1) factors that affect physicians' prescribing practices; (2) the reasonableness of Merck's response to the scientific and medical information concerning Vioxx; (3) the reasonableness of the steps taken by Merck to study the cardiovascular effects of Vioxx; and (4) the medical and scientific accuracy of the label and other promotional information disseminated by Merck. Not only has this Court allowed Dr. Avorn to testify on these subjects, but he has previously been found qualified to render the kinds of opinions that Defendants challenge. *See In Re Diet Drug Product Liability Litigation*, No. MDL 1203, 2000 WL 8769000, at *9-10 (E.D. Pa. June 20, 2000) ("Dr. Avorn [is] qualified to render an opinion as to the label's accuracy and, it follows from that, the extent to which inaccuracies and omissions could either deprive a reader or mislead a reader are or were at the time the labeling was published."); *see also In Re Phenylpropanolamine Product Liability Litigation*, 99 F. Supp. 1230 (W.D. Wash. 2003) (approving the testimony of Jerry Avorn using *Daubert* standard).

## II.   **LEGAL STANDARD**

The legal standard for admission of expert testimony in federal court is set forth in the Opposition to Motion to Exclude Expert Testimony of John S. MacGregor, M.D., Ph.D., filed concurrently herewith and incorporated herein by reference.

- 4 -

## III.    THE QUALIFICATIONS OF JERRY AVORN, M. D.

This Court has already considered Dr. Avorn's qualifications in the Vioxx personal injury cases and admitted his testimony on all subjects that Merck challenges in this case. *See Barnett* Minute Entry at 2. (*See also* 8/1/2006 Trial Tr.)

By way of summary, Dr. Avorn is among a small handful of an international authorities in the fields of pharmacoepidemiology, NSAIDs, and Cox-2 inhibitors, and the prescribing practices of physicians. (*See* Avorn CV.) Dr. Avorn's qualifications as an expert witness are imparted by his work in the domains of academia, scientific consulting for pharmaceutical companies, including Merck, and scientific consulting to the PSC in the present litigation, all of which draws upon his scholarship as a scientist, researcher, author and medical clinician. *Id.*

Merck's challenge to Dr. Avorn's focuses primarily on his conclusions, not his qualifications or his methodology. The fact that his qualifications are unassailable most likely accounts for Merck's failure to even mention his background, his research or even the fact that Merck itself sought Dr. Avorn's expertise in designing and carrying out studies on the cardiovascular risks of Vioxx. In any event, as this Court has recognized, Dr. Avorn is more than qualified to offer the opinions at issue in this case.

## IV.    DR. AVORN'S TESTIMONY ABOUT MERCK'S DISTORTION, SUPPRESSION, AND WITHHOLDING OF INFORMATION IS RELEVANT AND ADMISSIBLE

Dr. Avorn's testimony concerning Merck's distortion, suppression, and withholding of data from the public, the FDA, and physicians should be admitted to the same extent as in the Vioxx personal injury cases. This testimony has already been deemed admissible as both relevant and reliable. *See, e.g., Barnett* Minute Entry at 2. As in the prior Vioxx cases, what Merck knew, when they knew it, and what they did with that information is critical to this case. Merck's misrepresentations and omissions are relevant here because key decision makers, such

as the state Pharmaceuticals & Therapeutics Committee ("P&T Committee") and Louisiana

physicians, relied on Merck's published studies in making decisions about whether Vioxx was a

safe and effective drug.  Indeed, by their own admission, Merck used published studies as

marketing materials to influence state decision makers, physicians and the public.  Moreover,

had Merck adequately disclosed and investigated the CV risk of Vioxx before marketing, Vioxx

never would have been approved—and the state of Louisiana could not have put it on their

preferred drug list.  Accordingly, Dr. Avorn's opinions concerning Merck's suppression,

distortion and withholding of data is admissible.

> **A.    This Court has Already Ruled that Dr. Avorn could Testify that Merck
> Suppressed, Distorted, and Withheld Data**

This Court has already allowed *all* of Dr. Avorn's challenged testimony concerning

suppressed, distorted and withheld data in prior Vioxx cases.  (*See, e.g.*, 8/1/2006 Trial Tr.)

In the Vioxx personal injury cases, this Court permitted Dr. Avorn to testify at trial

concerning Merck's distortion of information.  (*See, e.g.*, 8/1/2006 Trial Tr. at 399:16-20 ("I

have never known a collection of papers on any one topic in which there has been such a

constellation of skewed and distorted presentation of data in any drug studies that I have ever

looked at."); 402:19-21 ("There was a pattern of what I would characterized as systematic

distortion that rose almost to the level of grotesque.").)

This Court also admitted Dr. Avorn's challenged testimony regarding his service on a

P&T Committee at Brigham and Women's Hospital in Boston.  (*See Barnett* Trial Tr. vol. 3,

August 2, 2006 ("8/2/2006 Trial Tr.") at 570:23-571:15; 568:17-569:5 [SRL Decl. Ex. 6]) ("if a

drug doubles the risk of death, I would want to know that, as a member of the pharmacy and

therapeutics committee, because I would not be comfortable having that drug on our

formulary…").)

859800.2

Further, this court has already ruled that Dr. Avorn could testify that Merck's misrepresentations influenced physicians' prescribing decisions:

> Q.  Do you have an opinion as to whether or not Merck acted reasonably and prudently in communicating the risks of Vioxx to physicians?
>
> A.  As someone who has conducted years of research on how physicians make prescribing decisions in relation to what evidence is available to them, I have conducted studies and actual interventions to improve physicians' use of drugs, which have been published in the New England Journal of Medicine and other peer-reviewed journals.  I think a lot about how physicians use information that they have available to them in making prescribing decisions, and my clear impression is that doctors did not have adequate information presented to them by Merck to make a fair and reasonable evidence-based decision about Vioxx.

(8/1/2006 Trial Tr. at 290:2-15.)

Additionally, this court has admitted testimony from Dr. Avorn that Merck misled the FDA:

> Q.  Do you have an opinion that you hold to a reasonable degree of medical certainty as to whether or not Merck accurately conveyed through all of its activities -- publications, detailing, direct-to-consumer advertising, labeling, "dear doctor" letters, et cetera – effectively communicated the risks and benefits so doctors can make evidence-based prescribing decisions?
>
> A.  Yes, I have such an opinion.
>
> Q.  Okay.  And what is that opinion?
>
> A.  That Merck's conduct of its research program and analysis of its data and communication of those data to physicians, to patients, even to FDA, was inadequate in that it failed to truthfully represent what was known to Merck at the time about the risks of its drug in relation to the cardiovascular symptoms.

(*Id.* at 289:12-290:1.)  In particular, Dr. Avorn testified that Merck distorted the results of his study on naproxen to downplay the cardiovascular risks associated with Vioxx:

> Q.  Is this a letter that was sent to the Food & Drug --appear to be a letter sent to the Food & Drug Administration, in part referring to your study results on the naproxen study?

- 7 -

859800.2

A.   Yes.  It was sent by Merck by Dr. Silverman, I believe.

\*\*\*

Q.   Doctor, were you aware at the time that Merck was using your study results
that were presented to Dr. Guess in August of 2001 to suggest that the results
of VIGOR were a result of the cardioprotective effect of naproxen?

A.   No, I was not aware of that at the time.

Q.   If you had been -- if you had been aware of that, what would your reaction
have been?

A.   Well, I can tell you what my reaction is right now, which is I'm indignant
that they took a finding of ours that was very clearly communicated, that is,
the very modest effect of protection of the hearts that we found with
naproxen, which we explicitly said was not enough to explain the increase in
heart attacks in the naproxen/Vioxx comparison in VIGOR, that Dr. Guess
was in the room when we presented that and, I now understand, even wrote
down, that we hypothesized that what really was probably going on was an
increased risk in the selective Cox-2, or Vioxx, as a explanation of the
VIGOR study.  I am upset right now, and I was the first time I saw this, to
know that they were essentially distorting our scientific findings to justify
exactly the opposite position from what we have said both in writing and in
public.

Q.   Do you -- in looking at that document, is that a fair and accurate
representation of the science that you presented to Dr. Guess at the ISPE
meeting in August of 2001?

A.   No.  It's a distortion of what was presented.

(8/1/2006 Trial Tr. at 318:14-321:4.)

Thus, all of Dr. Avorn's challenged testimony concerning suppression, distortion and

withholding of information has already been deemed reliable and relevant to the Vioxx cases.

This court should allow Dr. Avorn to testify on these subjects to the extent he was allowed to do

so in the personal injury cases.

## V.   DR. AVORN'S OFFERED EXPERTISE IS DERIVED FROM HIS SCIENTIFIC, TECHNICAL, OR OTHER SPECIALIZED KNOWLEDGE

Notwithstanding this Court's Order that Dr. Avorn's expert testimony is proper, and this

Court's previous decision to allow *all* the subjects that Merck challenges, Merck again

859800.2

categorizes Dr. Avorn's expert conclusions as uninformed, "personal" opinions on "non-scientific" issues.  In spite of Merck's best efforts, Dr. Avorn is precisely the kind of expert who is qualified under Rule 702 and *Daubert* to speak regarding the scientific and medical issues for which his testimony is offered.

Importantly, prior Courts have rejected the very arguments that Merck raises here.  In the *Diet Drug Litigation*, Dr. Avorn was identified as an expert.  *In re Diet Drug*, 2000 WL 8769000.  In *Diet Drugs*, the PSC identified Dr. Avorn to testify on several issues, including his opinions about the accuracy of the diet drug labels in communicating the risk.  There, unlike here, Dr. Avorn did not have personal knowledge of the issues in the case and was a "pure" expert witness.  Nevertheless, the parties and the Court agreed that Dr. Avorn was "fully qualified within [his] discipline and [can] testify concerning the risks and benefits of the diet drugs at issue." *Id.* at *11.  Despite this expertise, the defendant contended that Dr. Avorn should not have been permitted to "recount" plaintiff's documents and he should not have been able to comment on the accuracy of the manufacturer's label and its explanation of the risks and benefits.  The Court properly rejected both arguments.

In rejecting the manufacturer's so-called "*Daubert* challenge" on the use of documents, the Court said that Dr. Avorn's use of *facts and documents* was likely permissible. *Id.* at 8 (emphasis added) ("If a document that is being read or paraphrased is in fact admitted into evidence (i.e., if it is relevant and admissible and there is no Rule 403 balancing reason to preclude it) presumably the trial judge will allow [the expert to] speak to it.").  Further, the Court allowed Dr. Avorn to testify to the medical and scientific accuracy of the label and its effectiveness in communicating the risk:

> Dr. Avorn [is] fully qualified to opine on the medical facts and science regarding
> the risks and benefits of the diet drugs in question and to compare that knowledge

with what was provided in the text of labeling and warnings on the diet drugs in question. ***In other words, Dr. [] Avorn, [is] qualified to render an opinion as to the label's accuracy and, it follows from that, the extent to which inaccuracies and omissions could either deprive a reader or mislead a reader are or were at the time the labeling was published.***

*In re Diet Drug*, 2000 WL 8769000, at *11 (emphasis added); *see also Smith v. Wyeth-Ayerst Labs. Co*, 278 F. Supp. 2d 684, 701-702 (W.D.N.C. 2003) (allowing plaintiff's biostatistics expert, Lemuel Moye, M. D. to testify about the applicable standard of care for pharmaceutical companies and the medical and scientific accuracy of product labels).

Dr. Avorn should likewise be permitted to offer similar testimony with regard to Vioxx.

### A.   Dr. Avorn's Factual Knowledge With Respect To the Scientific Testing and Marketing of Vioxx Renders His Testimony Regarding Vioxx Proper

This Court has already considered this issue and allowed Dr. Avorn to testify concerning the Vioxx "story." *See, e.g.*, *Barnett* Minute Entry.  Merck has provided no new arguments for why this testimony should be excluded in this case.  This court should allow Dr. Avorn's testimony to be admitted on these subjects to the extent it has already been deemed admissible.

Nevertheless, Merck again incorrectly asserts in its brief that "[t]here is no evidence that Dr. Avorn has any personal knowledge of any of the facts he has included in his narrative of the case, other than knowledge acquired from his review of the documents given to him by plaintiff's counsel in anticipation of this litigation." (Merck Mem. at 18.)  Defendant simply ignores the statement in his expert report that states that "I will also present evidence concerning the experience of my research team in its work with our Merck funded epidemiologic study of the relationship between Vioxx and heart attack that was ultimately published in the cardiology journal *Circulation* in 2004." (Avorn Rep. at 2 [SRL Decl. Ex. 4].)

Dr. Avorn has been intimately involved as a contributor to the "Vioxx Story."  Dr. Avorn conducted research, funded by Merck and presented to Merck, on the risk of acute myocardial

infarction in patients taking Cox-2 inhibitors and conventional NSAIDs.  In that research, funded by Merck, Dr. Avorn tested the effects of Vioxx.  "These studies, together with [expert's] extensive experience and work in this area, provide sufficient, reliable scientific data upon which [expert] may base his conclusions. . . ."  *See Glaser v. Thompson Medical Co., Inc.*, 32 F.3d 969, 975 (6th Cir. 1994).

Moreover, Dr. Avorn's use of his and Merck's own testing to form the bases for his opinions regarding Merck's conduct is admissible, as "reliability is further established when his opinions are viewed in the context with [defendant's] own documents."  *See Allapattah Services, Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1353 (S.D. Fla. 1999).  In light of Dr. Avorn's experience as a fact witness with first-hand knowledge of the scientific findings from Merck's pharmaceutical test results, Dr. Avorn's opinions regarding the "Vioxx Story" are admissible.

**B.      Dr. Avorn Properly Opines as to the Knowledge Generated By and Imparted to Merck About the Risks and Benefits of Vioxx Given the State of Science at Various Points in Time**

This Court has already considered this issue and allowed Dr. Avorn to testify concerning what Merck "knew or should have known."  *See, e.g.*, *Barnett* Minute Entry.  Merck has provided no new arguments for why this testimony should be excluded in this case.  This court should allow Dr. Avorn's testimony to be admitted on these subjects to the extent it has already been deemed admissible.

Once again, Merck proposes to straitjacket Dr. Avorn by suggesting that he cannot testify to what Merck "knew or should have known" about the risks of Vioxx.  (Merck Mem. at 18.)  Nor does Merck want to allow Dr. Avorn to recount facts in evidence that relate to the body of data that was available between 1996 and 2004.  *Id.* at 16.  Defendant terms such evidence impermissible evidence on "corporate intent."  Quite simply, this argument flies in the face of law and common sense.  Dr. Avorn has personal knowledge of the body of data available at

- 11 -

various points in time regarding the effects of Cox-2 inhibitors, NSAIDs, and Vioxx, by way of his own contributions to that body of work.  He is a prime candidate for explaining the multiple and sometimes inconsistent pieces of information available to Merck, as well as what Merck chose to ignore.

Expert testimony about what a defendant should have done with reasonable prudence is qualitatively dissimilar to testimony that attempts to characterize corporate intent.  Indeed, it is necessary for an expert to explain what was known or knowable at particular points in time and what a reasonable and prudent response to that knowledge would be.  That is classic standard of care testimony that is central to cases like this.  In order to provide such testimony, it is proper for an expert to not only review the public literature but also non-public documents like FDA medical officer reviews of Vioxx, FDA Advisory Committee hearing transcripts, non-public Clinical Study Reports prepared by Merck, internal statistical analyses prepared by Merck and internal e-mails from Merck scientists.  As the court explained in the *Smith v. Wyeth* case, when a similar objection was made:

> Defendant's criticism of Dr. Moye's preparation is curious.  Dr. Moye has reviewed the FDA Advisory Committee Hearings for Redux as well as the majority of the medical literature in forming his opinion.  The Court takes judicial notice that this process is not unusual, but rather how experts go about developing an opinion within their discipline.  Given Dr. Moye's educational background, as well as his experience as a clinical trial investigator and consultant, his qualifications in this area are beyond question.

278 F. Supp. at 701.

Indeed, Dr. Avorn uses documents to further support his pre-litigation objective opinion that Merck reacted to the VIGOR results (and other evidence) in an unreasonable and untimely manner.  For example, he relies on the FDA medical officer review of Dr. Targum to support his view that it was unreasonable to believe that the alleged cardioprotective properties of naproxen explained the results of VIGOR.  (*See* Avorn Rep. at 11.)  Similarly, he cites the FDA's

- 12 -

proposed warning language to demonstrate his opinion that the watered-down precaution given by Merck in the 2002 label was medically and scientifically incomplete and misleading. (*See* Avorn Dep. at 421-423, June 15-16 2006 ("Discovery Dep.") [SRL Decl. Ex. 5].) He uses Merck's own statistical analyses of the mortality seen in its Alzheimer's studies to demonstrate that Merck knew of serious problems with Vioxx and did not communicate them. *Id.* at 500-504. By way of a final example, Dr. Avorn uses Merck's own marketing analysis of the effect of adding a warning to convey increased risk of cardiovascular events to support his view that a warning would have had a meaningful effect of changing prescribing choices of doctors. *Id.* at 460-463. In all of these instances, he properly uses Merck's evidence to support his views without ever attempting to impute motive for Merck's failures.

In an apparent attempt to bolster its motion to strike portions of Dr. Avorn's testimony, Merck repeatedly attempted to goad Dr. Avorn into stating that his opinions were not objective, but that he was interpreting issues of Merck's so-called "corporate intent" and "motive." In no instance did Dr. Avorn take Merck's bait. For example:

> Q.   Do you consider yourself to be an expert in determining a pharmaceutical company's intent?
>
> A.   I think no one – Its difficult to know intent. One can only know about behaviors.

Dr. Avorn refused to engage in any speculation regarding Merck's internal decision-making or motives, and testified that his opinions were objective and based on what was reasonable and prudent under the circumstances. (*See, e.g.*, Discovery Dep. at 184-185; 414-415; and 438-441.) Furthermore, Dr. Avorn explained how his testimony regarding this topic would be informative for a jury. *Id.* at 192-193. As such, Dr. Avorn's testimony regarding "what Merck knew or should have known" is appropriate.

859800.2

**C.**     **Dr. Avorn Provides Appropriate Testimony Concerning the FDA's Labeling Proposal and its Rebuke of Merck's Promotional Materials**

This Court has already considered this issue and allowed Dr. Avorn to testify concerning the FDA's labeling proposal and its rebuke of Merck's promotional materials. (*See, e.g.*, 8/1/2006 Trial Tr. at 390:24-391:7.) Merck has provided no new arguments for why this testimony should be excluded in this case. This court should allow Dr. Avorn's testimony to be admitted on these subjects to the extent it has already been deemed admissible.

Nevertheless, Merck again takes issue with Dr. Avorn's opinions that the information provided by Merck to the FDA about Vioxx, and the format in which it was provided, were inadequate and misleading, and that Merck possessed important information regarding cardiovascular risk that it did not reveal in a complete and timely manner to the FDA, nor to prescribing physicians of Vioxx, nor to the consuming public at large. (Merck Mem. at 20.) Merck contends Dr. Avorn's opinions regarding its negotiations with FDA and its labeling of Vioxx is inadmissible under *Daubert*. However, *Daubert* does not preclude evidence of misrepresentations to and concealment from the FDA. Further, *Daubert* does not preclude evidence of misrepresentations to and concealment from doctors and consumers of the drug, particularly where an expert is qualified to testify regarding the effects of such misrepresentations on the prescribing practices of physicians, as well as the effects of such misrepresentations on Vioxx's profitability.

Merck also argues that Dr. Avorn's opinions are based not on an interpretation of the regulations that govern submission of information to the FDA, but on his own personal views. However, the actual testimony cited, *infra*, shows that Dr. Avorn was not attempting to interpret the regulations, nor was he challenging them. Rather, he is critical of the manner in which Merck responded to evidence of cardiovascular risk associated with Vioxx in the clinical trials.

859800.2

There is nothing speculative regarding the opinions stated by Dr. Avorn.  (*See* Discovery Dep. at 413-416; 421-422.)

Merck further seeks to exclude Dr. Avorn's opinions as to "whether the Vioxx label provided adequate information to health professionals," and whether the risk information provided on a prescription drug label "can heavily influence a drug's sales."  However, it is precisely these kinds of scientific and non-scientific influences that Dr. Avorn has studied in relationship to physician prescribing habits.  As evidenced by Dr. Avorn's report, he is critical of the labeling content that accompanied Vioxx, specifically the fact that the label did not clearly and explicitly inform physicians that the drug was contraindicated for individuals with preexisting cardiovascular conditions.  (*See* Avorn Rep. at 19; Discovery Dep. at 163-164.)  As set forth by Judge Bechtle in *In Re Diet Drugs*, this is a scientific opinion that he is qualified to give.  Dr. Avorn also opines that the label misrepresented the severity of reported adverse effects and it failed to present an accurate representation of the risk of cardiovascular effects, such as acute myocardial infarction, caused by the drug.  (Avorn Rep. at 22-23; Discovery Dep. at 424.)  This testimony is entirely proper.  The Court in *In Re Diet Drugs* did not preclude "generalizations about the thoughts, habits and considerations of physicians, patients and regulators."  *In re Diet Drugs,* 2000 WL 8769000, at *11.  The experts were precluded from testifying "as to what doctors think," but not from testifying as to the "label's completeness" and "accuracy," and the "extent to which any inaccuracies or omissions could deprive or mislead a reader."  *Id.* at *11.

It is also inappropriate to preclude Dr. Avorn from giving testimony that touches upon FDA issues where they overlap with pharmacoepidemiologic principles.  Since Merck is raising such issues in its defense to this case, it is likely to raise issues regarding its interactions with

- 15 -

FDA in examining Dr. Avorn.  Moreover, while Dr. Avorn, having not worked at FDA, is not a

technical "regulatory" expert, there are areas where his expertise in pharmacoepidemiology

necessarily and inextricably overlaps with regulatory issues pertaining to drugs.  In his

deposition, he explained:

> Q.   Are you an expert, Dr. Avorn, in FDA regulations?
>
> A.   To the extent that my expertise about drug risks and benefits relate very closely to FDA decisions, yes.  Am I a regulatory attorney?  No.
>
> Q.   But you believe that you are an expert in FDA guidelines concerning drug labeling?
>
> A.   We – We have written on that topic, and I, again, to the extent that is about pharmacoepidemiology and data on risks and benefits, yes.

(Discovery Dep. at 194-195; *see also id.* at 674-678.)  Later in his deposition, he gave a concrete

example where his expertise overlapped with FDA regulation:

> Q.   Okay, Doctor, I am going to hand this to you (Exhibit 23 – Food and Drug Administration, Section 201.57).
>
> A.   (Deponent reviewing exhibit.).
>
> Q.   First of all there is a highlighted section there. Could you read it into the record please?
>
> A.   Sure.  This is the Food – it is labeled Food and Drug Administration, HHS, Section 201.57.
>
> Q.   Okay.
>
> A.   And –
>
> Q.   The section is highlighted?
>
> A.   Yes, and under heading (e) warnings, "The label shall be revised to include a warning as long as there is a reasonable evidence of an association between a hazard with a drug, semicolon, causation need not be proved, period."
>
> Q.   Okay.  Just taking that language alone, okay, if that language appears in any other context other than in a regulation, just taking the language, if it appeared in an article, if it appeared in a textbook, if it appeared in a presentation you had, would that language be something you would be

familiar with?

A.   Yes.  I have seen that language many times.

Q.   Okay.  Is this language that is a pharmacoepidemiologic concept: a reasonable evidence of an association?

A.   Yes, I think that pharmacoepidemiology is all about reasonable evidence, determining associations, serious hazards and causal relationships. That is the substance of [pharmacoepidemiology].

Q.   Are you – Do you consider yourself an expert in interpreting the scientific and medical concepts embodied in that language?

A.   Yes.  In fact, that language cannot be operational without having mastery of concepts such as reasonable evidence, serious hazards and causal relationship.

Q.   And is that something that, in your experience, the average layperson understands those concepts without guidance from people such as yourself?

A.   They cannot.

(Discovery Dep. at 723-725.)

Without any explanation, Merck also proposes that Dr. Avorn cannot comment on the FDA's rebuke of Merck's promotional material, which relies on the so-called naproxen hypothesis.  Surely, Dr. Avorn can rely on such a statement to support his opinion that the naproxen hypothesis was never a rational explanation for VIGOR.

Finally, Merck argues that Dr. Avorn is not permitted to testify regarding the effects of drug labels, and changes thereto, on the prescribing practices of doctors, all of which contribute to the sales of a drug.  As discussed extensively in prior Vioxx cases, Dr. Avorn is an international expert in this domain.  Thus, Dr. Avorn's testimony regarding FDA's labeling proposal and its rebuke of Merck's promotional materials is admissible.

**D.    The Court Should Allow Dr. Avorn's Expert Testimony on All other Subjects to the Extent Allowed in Prior Vioxx Cases**

This Court allowed Dr. Avorn to testify concerning all the other subjects that Merck

challenges as "outside the scope" of his expert report, including:  (1) "standard of care"

(8/1/2006 Trial Tr. at 301:22-302:15; (2) "direct to consumer advertising" (*Id.* at 399:21-401:14);

(3) "the APPROVe correction" (*Id.* at 354:9-355:6); (4) "mortality data" (*Id.* at 390:13-23); and

(5) "all major publications" (*Id.* at 399:3-20).

     Moreover, these statements were all within the scope of Dr. Avron's report, which Merck

acknowledges includes "the question of whether rofecoxib (Vioxx) increases the risk of

cardiovascular disease" and "the methods by which Merck evaluated and managed this issue

throughout the development and marketing of Vioxx."  (Avron Rep. at 1; Merck Mem. at 1.)

     Given that this Court has already admitted this challenged testimony and that these

subjects are all within the scope of Dr. Avorn's expert report, Merck's objections to these

"outside the scope" opinions should be denied.

## VI.    CONCLUSION

     For the reasons stated above, Dr. Avorn's challenged opinions are relevant and

admissible.  The motion to exclude testimony should be denied.

     Respectfully submitted, this 1st day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

- 18 -

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

859800.2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Plaintiffs' Memorandum In Opposition to Motion to Exclude Expert Testimony of Jerry Avron, M.D. has this day been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to pretrial order No. 8B, on this the 1st day of March, 2010.

/s/ James R. Dugan

859800.2