# Exhibit 5

Jerry Avorn, M.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MDL DOCKET NUMBER:  1657
SECTION L

In re:  VIOXX PRODUCTS LIABILITY LITIGATION
GERALD BARNETT AND CORRINE BARNETT,

       Plaintiffs,

    VS.                  CIVIL ACTION NUMBER:
                         2:06cv485
MERCK & CO., INC.,

       Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JERRY AVORN, M.D.

June 15, 2006
8:36 a.m.

Sheraton Boston Hotel
39 Dalton Street
Boston, Massachusetts 02199

Susan A. Romano, Notary Public, Register Merit Reporter and Certified
Realtime Reporter within and for the Commonwealth of Massachusetts

Jerry Avorn, M.D.

Page 163

```
 1              A.    That's not fair to say.
 2              Q.    You believe, that even though
 3        you've never spoken with them, you know
 4        what particular doctors knew about the
 5        potential cardiovascular effects of Vioxx?
 6              A.    No.   What I said was that I'm
 7        aware of the information that was
 8        available to any doctor in America, and
 9        because -- because what is known to any
10        doctor is only going to come from what's
11        in the label, what's in the marketing
12        campaign, what's in the promotion, what's
13        in the literature and what's in the direct
14        consumer advertising, as well as perhaps
15        their own clinical experience.
16              There's no way that people can know
17        things apart from those channels.  And
18        I've done research on the influence of
19        different channels of communication to
20        doctors, whether it's promotional or
21        scientific, in shaping their knowledge and
22        their prescribing.
23              And so in the sense that I know
24        what Merck was saying about Vioxx or
```

Jerry Avorn, M.D.

1      wasn't saying and I know what was in the

2      literature the doctors might have read, I

3      can have a pretty good impression of what

4      doctors in general were aware of in

5      relation to Vioxx.

6      Q.    What did Dr. McCaffrey or Dr.

7      Mikola know about the potential risks of

8      cardiovascular -- Sorry. Withdrawn.

9           What did Dr. Mikola or Dr.

10     McCaffrey know about the potential

11     cardiovascular risks of Vioxx?

12               MR. TISI:  Objection.

13     A.    Only what was in the label or the

14     promotional materials or the literature.

15     That I can say with certainty.

16     Q.    Do you know whether Dr. Mikola or

17     Dr. McCaffrey read any of the promotional

18     materials for Vioxx?

19     A.    No.

20     Q.    Can you say, sir, under oath, that

21     you are aware of what the doctors who are

22     treating -- were treating the patients in

23     the Vioxx litigation knew, actually knew,

24     about the potential cardiovascular effects

Jerry Avorn, M.D.

Page 184

1          community, about what's inappropriate

2          action to take in relation to signals in

3          terms of further studies that need to be

4          done.

5                    And there's also general consensus

6          about fairness and accuracy and depiction

7          of information to patients and doctors.

8          Q.   Are you saying there's a standard

9          that you're actually applying when you are

10         assessing Merck's methods of dealing with

11         the cardiovascular risks?

12         A.   There's not a written down standard

13         that one can Xerox, but there is a

14         consensus, I think, within the medical

15         community about what's reasonable behavior.

16         Q.   What source can you point me to

17         that would show that there's a consensus

18         in the medical community about what would

19         constitute reasonable behavior by a drug

20         company?

21         A.   Well, in -- there is a document

22         called -- that I helped to write the first

23         version of.  Something like Guidelines for

24         Appropriate Pharmacoepidemiologic Practice.

Jerry Avorn, M.D.

Page 185

1         I -- I can't remember.  It's in my CV.

2         That was published by the International

3         Society for Pharmacoepidemiology, of which

4         I was president at one point, that sets

5         forth kind of good pharmacoepidemiologic

6         practice in working up and evaluating

7         risks.  So that's -- that's one piece.

8         And I believe it was -- it was revised in

9         the last year or two.

10             There are a variety of -- of

11        standards for appropriate -- Well, there

12        are standards that are not necessarily

13        written down, but they have to do with

14        fair and accurate communication.

15             There is actually legislation --

16        and I don't claim to be a regulatory

17        authority -- but there is legislation,

18        regulatory language in place about duty to

19        warn and so forth that is in FDA's

20        regulatory mandate as well.  So those

21        would be two kinds of examples of

22        standards.

23        Q.   Are drug companies subject to

24        strict FDA regulatory requirements?

Jerry Avorn, M.D.

Page 192

1           MR. TISI:  He identified

2      reasonable behavior; isn't that correct?

3           BY MR. GOLDMAN:

4      Q.   Is there a test, sir, that you're

5      applying to determine whether Merck's

6      conduct concerning Vioxx was reasonable?

7      A.   Okay.  There is no one test the

8      way you would do a Chi-square on a

9      clinical trial.  "The test," in quotes, is

10     whether that behavior meets reasonable

11     standards of experts in the field.

12          And there's also a common sense

13     test of, I think, whether any individual

14     layperson or a juror would expect that a

15     reasonable company would do X, Y, Z given

16     a given piece of data.

17     Q.   Do you believe that jurors are

18     capable of evaluating Merck's conduct in

19     coming to a conclusion about whether

20     Merck's conduct was reasonable or

21     unreasonable?

22     A.   In some ways yes and in some ways

23     no, and let me explain.  They would not

24     be able to understand what acceptable

Jerry Avorn, M.D.

Page 193

1           standards of behavior in the medical

2           community are because they're not doctors,

3           or about interpreting the meaning of

4           certain findings because they're not

5           pharmacoepidemiologists.  So there are some

6           important technical things which a juror,

7           on his or her own, could not be able to

8           interpret.

9                And then there are other things

10          which any person with common sense can

11          interpret, as in if you saw a particular

12          signal of a problem what would a

13          reasonable company do.  So there's --

14          There's the two kinds.

15               And the latter I think a juror

16          could handle on their own.  The former, I

17          think, requires some expert interpretation.

18          Q.  So as I understand it, you believe

19          that expertise is required to be able to

20          explain the standards that you believe are

21          acceptable for a pharmaceutical company's

22          conduct, but whether or not Merck violated

23          those standards a juror could determine on

24          its own?

Jerry Avorn, M.D.

1      A.    That's a total distortion of what I

2      said.

3                    MR. TISI:   I would also

4      add, Counsel, you know, that is clearly a

5      ruling that a judge has to make.

6            Asking an expert witness to sit in

7      the -- to put judicial robes on and decide

8      where his appropriate expert testimony was

9      not appropriate expert testimony is

10     absolutely inappropriate.

11           And I will abide by Judge Fallon's

12     ruling about not, you know, stating

13     speaking objections; however, those kinds

14     of things are so ridiculous that if you

15     really feel like you're compelled to ask

16     this witness to sit as a judge, I will

17     feel that perhaps maybe we should call

18     Judge Fallon on that.

19                    MR. GOLDMAN:   Fine.

20                    MR. TISI:   So let's --

21     let's -- let's -- let's stick to medical

22     opinions, and not judicial opinions.

23           BY MR. GOLDMAN:

24     Q.    Are you an expert, Dr. Avorn, in

Jerry Avorn, M.D.

1    FDA regulations?

2       A.   To the extent that my expertise

3    about drug risks and benefits relate very

4    closely to FDA decisions, yes. Am I a

5    regulatory attorney?  No.

6       Q.   But you believe you are an expert

7    in FDA guidelines concerning drug labeling?

8       A.   We -- We have written on that

9    topic, and I, again, to the extent a great

10   deal of that is about pharmacoepidemiology

11   and data on risks and benefits, yes.

12      Q.   We'll talk more about the FDA in a

13   minute.

14           When did you form your opinion that

15   Vioxx increased cardiovascular risk?

16      A.   I think it began to form when the

17   VIGOR study was published in November of

18   2000.

19      Q.   When did you form your opinion that

20   Merck's conduct in responding to the

21   potential cardiovascular risks of Vioxx was

22   unreasonable?

23      A.   It took form over time.  I think

24   it began, actually, in early 2001, in a

Jerry Avorn, M.D.

Page 413

1          were actually 20 heart attacks in the

2          Vioxx arm and not 17.

3              A.   No.

4              Q.   Were you aware, prior to

5          withdrawal, that there was a five times

6          difference in heart attacks between the

7          Vioxx arm and the Naproxen arm?

8              A.   I think in the publication itself,

9          the relative risk of .2 would be a

10         fivefold difference.

11             Q.   You reference Dr. Scolnick's March

12         9th, 2000, e-mail --

13             A.   Yes.

14             Q.   -- on Page .12.  Why do you

15         reference that, sir?

16             A.   Because the company has taken the

17         position that it was unaware that the drug

18         imposed cardiovascular risk, and that the

19         findings from VIGOR, and later from

20         APPROVe, were surprising to them in that

21         they did not believe that their drug was

22         dangerous to the heart.

23                 And it seemed relevant that Dr.

24         Scolnick, as early as March of 2000, wrote

Jerry Avorn, M.D.

Page 414

1          the cardiovascular events are clearly

2          there, this is real, and it is

3          mechanism-based as we worried it was,

4          which conveys a concern that the company

5          had had about the cardiovascular risk of

6          the drug even before the VIGOR study was

7          completed.

8                And then going on about Oates and

9          Allen and Barry who write about the

10         metabolite meanings, that is, indicating

11         that the prostaglandin findings were

12         important to the riskiness of the drug.

13         Q.   Is it your position, sir, that it's

14         obvious from the March 9, 2000, e-mail

15         from Dr. Scolnick, that he believed that

16         Vioxx caused heart attacks, and that he

17         and others at Merck were worried that that

18         would happen?

19         A.   Okay.

20               MR. TISI:  At that point in

21         time?  Are you asking what his state of

22         mind is now, or what his state of mind

23         was then?

24               MR. GOLDMAN:  Then.

Jerry Avorn, M.D.

Page 415

1          A.    Okay.   This is an important point

2          that has come up a number of times, and

3          I'll try to explain it again.

4                 Whether or not Dr. Scolnick and the

5          others at Merck believed that more

6          patients given Vioxx in VIGOR would have

7          heart attacks than patients in VIGOR given

8          other drugs, does not require that they

9          have believed that their drug caused heart

10         attacks or whether they believed that the

11         reason was that other drugs prevented

12         heart attacks.

13                The important point is, that if the

14         company was going to go on and spend a

15         hundred million dollars a year to convince

16         patients to take Vioxx, and many millions

17         of dollars more to convince doctors to

18         prescribe Vioxx, instead of Naproxen or

19         other drugs, that the clear result of that

20         would be that patients who were switched

21         to Vioxx, even if they just believed that

22         Naproxen was preventing heart attacks, that

23         they knew that use of Vioxx would result

24         in a net increase in the number of heart

Jerry Avorn, M.D.

Page 416

1          attacks in patients taking Vioxx instead

2          of taking another drug.

3               And it does not matter as much

4          whether they attributed that to a

5          prothrombotic effect of Vioxx or even if

6          they believed there was an antithrombotic

7          effect of Naproxen.  The net result would

8          obviously be that people who were taking

9          Naproxen and were then persuaded by Merck

10         to take Vioxx or their doctors were

11         persuaded to prescribe Vioxx, would have

12         more heart attacks as a result of that

13         switch.

14         Q.   Did you just say that -- to try to

15         summarize -- that you believe Merck

16         expected there to be more heart attacks if

17         they switched or attempted to switch

18         patients from Naproxen to Vioxx?

19         A.   In clinical practice, yes.

20         Q.   Do you know that the patients who

21         are at risk of heart attacks were

22         encouraged to be on aspirin?

23         A.   By whom?

24         Q.   By their doctors.

Jerry Avorn, M.D.

Page 421

1    that Pfizer had, certainly in 2000, the

2    level of compelling clinical evidence about

3    Celebrex causing heart attacks comparable

4    to the data that Merck had and was

5    published in 2000 about Vioxx and heart

6    attacks.  So mechanism is less important

7    to me than actual results from a

8    randomized clinical trial.

9         And I feel that the burden of the

10   VIGOR data that Merck had was dramatically

11   different from whatever mechanistic worries

12   one might have had about Celebrex or

13   Bextra.

14    Q.   So your personal opinion is that

15   Merck's effort to market Vioxx was more

16   problematic than Pfizer's efforts to market

17   Celebrex?

18             MR. TISI:  Objection to the

19   personal opinion part.

20    A.   I would say my expert opinion,

21   given the risk data available to both

22   companies, indicates that Merck was

23   marketing a drug with a strong burden of

24   risk evidence from clinical trials that

Jerry Avorn, M.D.

Page 422

1          was not the case with Celebrex, and still

2          is not, and the data on Bextra did not

3          emerge for years later.

4              Q.    You refer in your report, sir, to

5          another e-mail from Dr. Scolnick where he

6          calls the FDA --

7              A.    Bastards.

8              Q.    Yes.  Do you remember that?

9              A.    Yes.

10             Q.    Why did you refer to that in your

11         report?

12             A.    Okay.  Why don't we go to where it

13         is.  Remind me what page it's on.  It was

14         in the Negotiations about the Label

15         section.

16             Q.    Twenty-three.  It's at 23, top

17         paragraph, the last sentence.

18             A.    (Witness viewing document).  Right.

19         Yes.  Because -- I think this is very

20         relevant to an assessment of the company's

21         willingness or unwillingness to depict the

22         cardiovascular risk of its drug in a fair

23         and accurate manner in the labeling.

24                  And my reading of what FDA was

Jerry Avorn, M.D.

Page 423

1           proposing that Dr. Scolnick was responding

2           to, was that it was a fair and accurate

3           and helpful depiction of the true

4           cardiovascular risk of Vioxx, and Dr.

5           Scolnick's statement, and not just him

6           calling them bastards, but I think --

7           which is just bad manners -- but I think

8           more relevant, depicting that proposed

9           label as ugly cubed, and descriptions by

10          him and Mr. Anstice about fighting back

11          and the other materials that I cite, are

12          relevant because they depict a clear

13          pattern of resistance on the part of Merck

14          to the accurate depiction of the

15          cardiovascular risk of their drug in its

16          official FDA labeling.

17              Q.   You think that Dr. Scolnick's

18          reference to the FDA as bastards suggests

19          that he didn't want to accurately convey

20          the cardiovascular risks of Vioxx?

21              A.   As I said a minute ago, what is

22          more telling is not his bad language, but

23          the other quotations which I cite, in

24          which he and his colleagues depict the

Jerry Avorn, M.D.

Page 424

1        FDA's labeling, which in my view, fairly

2        describes the cardiovascular risk as ugly

3        and we will not accept this.

4            I think that's more relevant than

5        the bastards piece, which just indicates

6        the magnitude of his vehemence about this.

7        Q.   Do you know why Dr. Scolnick was

8        frustrated with the FDA over the label

9        negotiations?

10       A.   Part of it was that the company

11       wanted to win a label change that would

12       depict gastroprotection, and as I

13       understand it, FDA would not agree to that

14       until they were satisfied that there was a

15       more accurate depiction of the

16       cardiovascular risk.

17           And my understanding is that Merck

18       preferred to get the label changed to

19       reflect the favorable gastrointestinal

20       effects of the drug, but was not willing

21       to accept FDA's concurrent change of the

22       label to depict the cardiovascular risk

23       component.

24       Q.   What is your basis for saying that,

Jerry Avorn, M.D.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MDL DOCKET NUMBER:  1657
SECTION L

In re:  VIOXX PRODUCTS LIABILITY LITIGATION
GERALD BARNETT AND CORRINE BARNETT,

       Plaintiffs,

    VS                      CIVIL ACTION NUMBER:
                                2:06cv485

MERCK & CO., INC.,

       Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CONTINUING DEPOSITION OF

JERRY AVORN, M.D.

VOLUME II

June 16, 2006
8:38 a.m.

Sheraton Boston Hotel
39 Dalton Street
Boston, Massachusetts

  Laurie J. Driggers, Notary Public, Certified Shorthand Reporter, Realtime
Professional Reporter
  and Certified Realtime Reporter within and for the Commonwealth of
Massachusetts

Jerry Avorn, M.D.

Page 438

1           studies and others of the osteoarthritis

2           and RA studies.  And I apologize for not

3           having done so, because I misunderstood

4           the question.

5               Q.   What I'm going to do is mark as

6           the next exhibit, then, 11, a blank

7           document.

8               A.   Mm-hmm.

9               Q.   And if you could, after this

10          deposition, find any studies that you

11          think show an increased risk of stroke --

12              A.   Okay.

13              Q.   -- while Vioxx was on the market,

14          and then if you could just please let Mr.

15          Tisi know --

16              A.   Right.

17              Q.   -- and then we will make sure that

18          your list --

19                   MR. TISI:  I've never seen

20          this quite done this way, but I will --

21          Let's -- That's fine.

22                   MR. GOLDMAN:  -- put it on

23          Exhibit 11.

24                   THE WITNESS:  That's fine.

Jerry Avorn, M.D.

Page 439

1           MR. TISI:  I'll take Exhibit
2      11 and we'll --
3           And were we successful in getting
4      all those materials that were photocopied
5      back?
6           MR. GOLDMAN:  Yes.
7           MR. TISI:  Okay.  Good.  So
8      I'll be able to take those back or get
9      them back to you.
10          (Exhibit-11, Studies That
11     Show An Increased Risk of Stroke,
12     Published During The Time Vioxx Was On The
13     Market, marked for identification).
14          MR. GOLDMAN:  I'm going to
15     label Exhibit 11 Studies That Show An
16     Increased Cardio -- sorry -- An Increased
17     Risk of Stroke Published During the Time
18     Vioxx Was on the Market.
19          MR. TISI:  And just to be
20     clear, I'm not -- I am not agreeing to
21     produce an exhibit this way.  I will think
22     about it, because I've never seen it done
23     this way, whether I would just provide it
24     as a supplement or have an exhibit made

Jerry Avorn, M.D.

Page 440

```
 1        like this.  But I -- I accept that you

 2        can mark any exhibit you want.

 3             BY MR. GOLDMAN:

 4        Q.   And to be clear, Dr. Avorn, I don't

 5        want the plaintiffs' lawyers to go search

 6        the planet to try to find --

 7        A.   Of course.

 8        Q.   -- a study.  I want it based on

 9        the work you've done in formulating your

10        opinions and testifying that you believe

11        there's an increased risk of stroke.  I

12        would appreciate if you could do that,

13        okay?

14                  MR. TISI:  And I will agree

15        that that's the way it's to be done.

16             BY MR. GOLDMAN:

17        Q.   Do you know of any clinical trial

18        that showed a doubling of the risk of

19        cardiovascular events from Vioxx before the

20        APPROVe study?

21        A.   Yes.  And that is derived also from

22        Dr. Pelayo's, P-E-L-A-Y-O, 1999 review of

23        the new drug application for Vioxx.  There

24        is a table in it which I can pull right
```

Jerry Avorn, M.D.

```
 1          now.
 2                  (Witness viewing documents).
 3                       MR. TISI:  And would that
 4          have been the preapproval or post?  I
 5          don't remember what your question was.
 6          I'm sorry.
 7                       MR. GOLDMAN:  At any point
 8          Vioxx was on the market.
 9                       MR. TISI:  Any point Vioxx
10          was on the market.
11            A.    Okay.  Then was I, because it was
12          a long day, just mishearing that as at any
13          time prior to approval as well, and I
14          misheard it?  Because you apparently
15          didn't say that yesterday.  Is that --
16            Q.    Okay.  Let me ask it both ways.
17            A.    Maybe we can just go back and look
18          at what the wording was.
19                       MR. TISI:  I think you
20          testified, Jerry.  I mean, I don't want --
21                  BY MR. GOLDMAN:
22            Q.    Let's start with preapproval
23          then --
24            A.    Right.
```

Jerry Avorn, M.D.

Page 460

1          your report?

2          A.   Yes.

3          Q.   Okay.

4          A.   So it looks as if this was not

5     materials sent to me after my report but

6     material they had failed to list earlier.

7                    MR. TISI:  And I can

8     represent, just so that there's clarity of

9     the record, all of these were provided to

10    him before.  It was our initial omission,

11    which we caught when we were preparing.

12         The only documents that were not

13    were obviously the supplemental APPROVe

14    data, which wasn't available at the time

15    of his report.

16                    MR. GOLDMAN:  I'm just going

17    to mark for the record the expert report

18    of Dr. Ray that you had in your file,

19    sir.  It's dated January 11th of 2006, and

20    was submitted in the Plunkett case.

21                    (Exhibit-12, Expert Report

22    of Dr. Ray dated January 11, 2006, marked

23    for identification).

24         ///

Jerry Avorn, M.D.

Page 461

1          BY MR. GOLDMAN:

2      Q.   My only question about this, sir,

3   has to do with a reference on one of Dr.

4   Ray's references.  It really has nothing

5   to do with his report, okay?

6      A.   Okay.

7      Q.   You wrote the word zodiac?

8      A.   I wrote?  Oh, okay.  You mean my

9   notes -- My notes, right.

10     Q.   There's an indication on the last

11  page of the report where you're just

12  listing references, and you wrote the

13  reference to zodiac next to Reference 83,

14  which is an article in JAMA from 1991

15  called Analysis and Interpretation of

16  Treatment Effects in Subgroups of Patients

17  in Randomized Clinical Trials.

18     A.   Yes.

19     Q.   Can you tell me, number one, what

20  that issue is about, and number two, why

21  you wrote zodiac?

22     A.   Sure.  Let me take a look.

23          (Witness viewing document).  Sure.

24  That's a very interesting paper that I

Jerry Avorn, M.D.

Page 462

1              think I flagged just because it's one of

2              my favorite papers and I wanted to make a

3              note of its relevance to this case.

4                    As I recall that paper, it looked

5              at the use of subgroup analysis, and

6              pointed out that in one very big clinical

7              trial, if one were to do a post hoc

8              subgroup analysis -- if this is the

9              correct paper I'm thinking of -- if one

10             were to do a subgroup post hoc analysis,

11             you could demonstrate that the given

12             treatment was very much more effective in

13             some patient groups and very much less

14             effective in other patient groups, and

15             that that group -- that grouping turned

16             out to be their zodiac sign, like Aquarius

17             or Capricorn.

18                   And again, if this is the paper I'm

19             thinking of, the authors pointed out that

20             that was a limitation of post hoc subgroup

21             analyses, because clearly a patient's

22             zodiac sign was not going to be

23             meaningfully predictive of outcome.

24                Q.   Is it your opinion, then, that post

Jerry Avorn, M.D.

Page 463

1          hoc analyses are limited in what they can

2          establish, or is it your view that post

3          hoc analyses are compelling?

4             A.    Given that this is a topic that

5          people have written long papers about, let

6          me try to give a very brief answer.

7                  Post hoc subgroup analyses can be

8          -- Well, subgroup analyses can be

9          meaningful if they have been predetermined

10         as subgroups and are not come up with --

11         are not designated after the fact.  And we

12         do that all the time.  We -- The research

13         community.

14                 They can also be informative if

15         after a study is completed it turns out

16         that there may be a patient group that is

17         particularly either susceptible to a side

18         effect or likely to benefit or unlikely to

19         benefit.

20            Q.    Mm-hmm.

21            A.    And often that kind of analysis can

22         be very informative if it has -- Well, if

23         it has the following properties:  A, it is

24         not data dredging, either by an academic

Jerry Avorn, M.D.

Page 500

1          Alzheimer's trials, okay?

2          A.   Okay.

3          Q.   Do you agree that there was no

4     statistically significant difference in

5     heart attacks in the Alzheimer's trials

6     between Vioxx and placebo?

7          A.   (Witness viewing document).  No.

8          Q.   What's your basis for that?

9          A.   That the ascertainment, as I

10    indicated in my report, of heart attack in

11    elderly people, particularly elderly people

12    with dementia, is very difficult.

13          Even in elderly people without

14    dementia, we know that about a quarter of

15    heart attacks are not symptomatic.  So any

16    conclusions about the rate of heart

17    attacks that is not based on a fairly

18    active surveillance mechanism, but rely on

19    kind of spontaneous report of heart

20    attacks but do not have a component of the

21    study designed to determine who had a

22    heart attack and who didn't proactively,

23    is of minimal reliability.

24          Q.   Have you described your bases for

Jerry Avorn, M.D.

Page 501

```
1              saying that there is a statistically

2              significant difference in heart attacks in

3              the Alzheimer's trials between Vioxx and

4              placebo?

5          A.   I didn't say that there was.

6          Q.   Yes, you did.

7          A.   Can you read back the question?

8          Q.   My question was:  Do you agree that

9              there was no statistically significant

10             difference in heart attacks in the

11             Alzheimer's trials been Vioxx and placebo?

12         A.   Right.  And the reason that I said

13             I didn't agree is that I don't know from

14             the data available whether there was or

15             wasn't a difference in heart attack rates.

16         Q.   Do you know that the peer reviewed

17             published article on the Alzheimer's trial

18             -- let's start with 078 -- demonstrated no

19             statistically significant difference in

20             heart attacks?

21         A.   As I was recall, there was some

22             very major methodological problems with

23             that article.  And the fact that something

24             makes it into a peer review journal is not
```

Jerry Avorn, M.D.

Page 502

1          in and of itself a guarantee that they got

2          it right.

3               There was problems, as I recall,

4          with the analysis in terms of whether it

5          was intentioned to treat or not in the

6          follow-up of patients.  And we could go

7          over that paper in particular.

8               So they did not -- and as I also

9          recalled, there was a paper that was

10         written either mostly or predominantly by

11         Merck scientists, and it did not seem to

12         me to be a compelling representation of

13         the findings in that study.

14         Q.   Do you think because there were

15         Merck scientists on a paper about

16         Alzheimer's that that calls into question,

17         in your mind, the reliability of the study

18         and the way it's presented?

19         A.   Not in and of itself.

20         Q.   Okay.  Did you see, sir, in the

21         materials that the FDA believed that there

22         was no statistically significant difference

23         in heart attacks in the Alzheimer's

24         trials?

Jerry Avorn, M.D.

Page 503

```
 1          A.    Yes.
 2          Q.    And you take issue with the FDA's
 3    judgment on that?
 4          A.    Well, I think FDA -- saying that a
 5    study failed to find a difference does not
 6    mean to -- does not mean the same thing
 7    as there was no -- there was no
 8    difference.
 9          Q.    Do you dispute the FDA's conclusion
10    that there was no difference in -- in
11    heart attacks in the Alzheimer's trials
12    between Vioxx and placebo?
13          A.    Yes, I do, for the following
14    reason.
15          Q.    Actually, just say yes, you do.
16    Okay?
17          A.    Yes, I do.
18          Q.    Do you believe that there was a
19    statistically significant difference for
20    heart attacks and strokes combined in the
21    Alzheimer's trials between Vioxx and
22    placebo?
23          A.    What I believe is that there was a
24    doubling of mortality and that that raises
```

Jerry Avorn, M.D.

Page 504

```
 1            the likelihood that there was an important
 2            risk in one group and not in the other.
 3                 I can't speak to what that risk
 4            was, whether it was stroke or heart attack
 5            or both.
 6             Q.   Before you were retained as an
 7            expert witness, sir, did you ever say
 8            anywhere that you thought that the
 9            mortality question in Alzheimer's raised a
10            question about whether Vioxx caused
11            cardiovascular events in the Alzheimer's
12            trials?
13             A.   I'd never seen data on mortality.
14             Q.   And the data that you're relying on
15            is data from Dr. Ray, who is quoting Dr.
16            Kronmal?
17             A.   No.  I believe that there also are
18            other sources of data on the eventually
19            reported mortality difference in that --
20            in those studies.
21             Q.   What are you relying on for your
22            opinion that there was an increase in
23            mortality between Vioxx and placebo in the
24            Alzheimer's trials, sir?
```

Jerry Avorn, M.D.

Page 674

1        Celebrex?

2        A.   I've seen studies that showed the

3        opposite, certainly.  And I don't recall

4        right now sitting here studies that showed

5        the same result.  But I would be happy to

6        look at one if you have it.

7        Q.   What FDA regulatory experience,

8        sir, have you had in the last two years?

9        A.   Can you define what you mean by FDA

10       regulatory experience?

11       Q.   Your experience interpreting FDA

12       regulations for the FDA.

13                   MR. TISI:  Objection.

14       A.   I think one can have regulatory

15       experience without working for the FDA.

16             I've written an article in the New

17       England Journal about the FDA's approval

18       standards.  I've written an article, a

19       separate article in the New England

20       Journal about FDA's depiction of risks in

21       its labels.

22             I've been invited to sit on an FDA

23       advisory committee to evaluate adverse

24       effects associated with a drug it was

Jerry Avorn, M.D.

Page 675

1    considering.  I've written extensively in

2    my book and elsewhere about the relation

3    between FDA's legal obligation and

4    mandating legislation and what is or isn't

5    done by the agency and by companies in

6    relation to the duty to warn.

7         I teach about that in -- at Harvard

8    Medical School and the Harvard School of

9    Public Health.  I'm writing a chapter that

10   will be in the standard Harvard

11   pharmacology textbook on regulatory policy

12   and the affect on ascertainment of drug

13   side effects.

14        I have another paper that I'm

15   completing with a colleague in my division

16   who's a lawyer and a physician on the

17   relationship between 21 CFR and the

18   obligations that it imposes on FDA and on

19   companies about duty to warn.

20        Should I go on?

21   Q.   You can stop.

22   A.   Okay.

23   Q.   Are you holding yourself out as an

24   expert in FDA regulations for labeling,

Jerry Avorn, M.D.

Page 676

1        sir?

2          A.    I'm holding myself out as an expert

3        in the ascertainment of drug risks and in

4        the responsibilities of companies and,

5        frankly, of the federal government to take

6        those risks and that epidemiology and

7        translate that into communications.

8          Q.    As to labeling, sir, you're not

9        holding yourself out as an expert in the

10       FDA regulations for drug labeling, true?

11         A.    To the extent that those labels

12       require content, and that content is about

13       pharmacoepidemiology, I have expertise

14       about that content and what needs to be

15       communicated in that -- in those labels.

16         Q.    In terms of what needs to be

17       communicated outside of pharmacology

18       within --

19              MR. TISI:

20       Pharmacoepidemiology.

21              MR. GOLDMAN:  I'm sorry.

22       Withdrawn.

23              BY MR. GOLDMAN:

24         Q.    Do you agree, sir, that you don't

Jerry Avorn, M.D.

Page 677

1          hold yourself out as an expert on FDA's

2          regulations concerning the labeling of drug

3          -- prescription drug products?

4                    MR. TISI:  Objection.

5          A.    I don't think I can agree to that.

6          I think that while we all know that I'm

7          not an attorney, I think I have

8          considerable expertise in the ascertainment

9          of drug risk and in the quantification of

10         that risk, and in the communication of

11         that risk, which happens to be done

12         primarily through a drug label.

13         Q.    In terms of what the FDA requires

14         of drug companies for labeling drug

15         products, you don't consider yourself an

16         expert in that; is that fair to say?

17         A.    I didn't say that.  I have a

18         fairly good understanding and expertise

19         related to what the legislation of the

20         Code of Federal Regulation requires of

21         companies and requires of FDA in relation

22         to depiction of drug risks.

23         Q.    And you think your fairly good

24         understanding of the FDA regulations makes

Jerry Avorn, M.D.

1          you an expert in FDA labeling?

2                    MR. TISI:  Objection.

3          A.   I think that's something the judge

4          will probably decide.

5          Q.   Have you ever approved a label as

6          an FDA employee, sir?

7          A.   No.

8          Q.   Have you ever prepared a label as

9          an employee of a pharmaceutical company?

10         A.   No.   Thank goodness.

11         Q.   Do you agree, sir, that the FDA

12         advisory committee, before Vioxx was ever

13         brought to the market, approved of the

14         content of the Vioxx label before Vioxx

15         was brought to market?

16                   MR. TISI:  Objection.

17         A.   The FDA advisory committee?

18         Q.   Mm-hmm.

19                   MR. TISI:  Objection.

20                   BY MR. GOLDMAN:

21         Q.   Or don't you know?

22                   MR. TISI:  Objection.

23         A.   I'm not aware that the detailed

24         wording of labels is brought to the

Jerry Avorn, M.D.

Page 723

1        A.   Yes.  And under heading (e)

2    Warnings, "The labeling shall be revised

3    to include a warning as soon as there is

4    reasonable evidence of an association of a

5    serious hazard with a drug;" semicolon, "a

6    causal relationship need not have been

7    proved."  Period.

8        Q.   Okay.  Just taking that language

9    alone, okay, if that language appeared in

10    any other context other than in a

11    regulation, just taking that language, if

12    it appeared in an article, if it appeared

13    in a textbook, if it appeared in a

14    presentation, would that language be

15    language that you are familiar with?

16        A.   Yes.  I've seen it in many of

17    those contexts.

18        Q.   Okay.  Is this language that is a

19    pharmacoepidemiologic concept, a reasonable

20    evidence of association and causation?

21        A.   Yes.  I think pharmacoepidemiology

22    is all about reasonable evidence,

23    determining associations, serious hazards

24    and causal relationships.  That's the

Jerry Avorn, M.D.

Page 724

```
1        substance of pharmacopeia.
2          Q.   Are you -- Do you consider yourself
3        an expert in interpreting the scientific
4        and medical concepts embodied in that
5        language?
6          A.   Yes.  In fact, that language cannot
7        be operationalized without having mastery
8        of concepts such as reasonable evidence,
9        serious hazard, and causal relationship.
10         Q.   And is that something that, in your
11       experience, the average lay person
12       understands those concepts without guidance
13       from people such as yourself?
14         A.   They cannot.
15         Q.   Yesterday you were asked -- Stay
16       with that for a moment.  You were asked
17       about written standards that deal with
18       managing risks, and I think you referred
19       to a pharmacoepidemiologic paper or
20       whatever.  Would this be another example
21       of the kind of standards that -- talk
22       about managing risk, this regulation you
23       just referred to?
24                   MR. GOLDMAN:  Object to the
```

Jerry Avorn, M.D.

Page 725

1              form.
2              A.   Yes.  It is a standard for managing
3         risk.
4              Q.   Okay.  So this would be another
5         kind of source that you might look at?
6              A.   Right.
7                   MR. GOLDMAN:  Object to the
8         form.
9                   BY MR. TISI:
10             Q.   Oh.  Yeah.  Let me go to this.
11                  If you go to Page .12 of your
12        report, sir.
13             A.   (Witness complied).  Yes.
14             Q.   If you look at -- It quotes -- and
15        we can go back to the original document --
16        But it quotes Dr. Scolnick's e-mail about
17        his March 2000 e-mail.  Do you see that?
18             A.   (Witness viewing document).  Yes.
19             Q.   We've referred to that before.  And
20        you were asked, you know, do you know Dr.
21        Scolnick's intent, you can get into his
22        mind and figure out what he was really
23        thinking what he wrote that.  Do you
24        remember that line of questioning?