UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: VIOXX PRODUCTS          *   MDL DOCKET NO. 1657
LIABILITY LITIGATION           *
                               *
                               *
THIS DOCUMENT RELATES TO       *   AUGUST 2, 2006, 8:30 A.M.
                               *
                               *
GERALD BARNETT V. MERCK        *   CASE NO. 06-CV-485-L
  & CO., INC.                  *
* * * * * * * * * * * * * * *  *


VOLUME III
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:            ROBINSON, CALCAGNIE & ROBINSON
                             BY:  MARK P. ROBINSON JR., ESQ.
                             620 NEWPORT CENTER DRIVE
                             NEWPORT BEACH, CALIFORNIA 92660


FOR THE PLAINTIFF:            BEASLEY ALLEN CROW METHVIN
                                PORTIS & MILES
                             BY:  ANDY D. BIRCHFELD, JR., ESQ.
                             234 COMMERCE STREET
                             POST OFFICE BOX 4160
                             MONTGOMERY, ALABAMA 36103


FOR THE DEFENDANT:            BARTLIT BECK HERMAN
                                PALENCHAR & SCOTT
                             BY:  PHILIP S. BECK, ESQ.
                                ANDREW L. GOLDMAN, ESQ.
                             54 W. HUBBARD STREET, SUITE 300
                             CHICAGO, ILLINOIS 60601

Page 455

1   OFFICIAL COURT REPORTERS:   CATHY PEPPER, CCR, RPR, CRR

2                TONI DOYLE TUSA, CCR, FCRR

                  500 POYDRAS STREET, ROOM HB-406

3                 NEW ORLEANS, LOUISIANA 70130

                 (504) 589-7778

4

5

6

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

7   PRODUCED BY COMPUTER.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 456

1          **I N D E X**

2               **PAGE**

3   GERALD AVORN (BY DEPOSITION)

      Cross-Examination          8

4      Redirect Examination     84

      Recross-Examination    119

5

6   CAROLYN CANNUSCIO (BY DEPOSITION)

      Direct Examination     124

7

8   EDWARD SCOLNICK (BY DEPOSITION)

      Direct Examination     137

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 457

1            MORNING SESSION

2           (AUGUST 2, 2006)

3     (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4   TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5   REPORTER.)

6     THE DEPUTY CLERK:  EVERYONE RISE.

7     THE COURT:  BE SEATED, PLEASE.  WHAT'S THE PROBLEM?

8   THE JURY IS OUTSIDE OF THE COURTROOM.  THE LAWYERS HAVE

9   SOMETHING?

10     MR. ROBINSON:  ON THE PLAINTIFF'S SIDE, YOUR HONOR.

11   WE WANT TO OFFER THE PLAINTIFFS' EXHIBITS ON DR. AVORN AND GET

12   THEM INTO THE RECORD.

13     THE COURT:  WHICH ONES ARE THEY?

14     MR. BECK:  WE JUST WANT A CHANCE TO LOOK THEM OVER

15   THIS MORNING, AND THEN AT A BREAK WE'LL FIGURE OUT IF WE'VE GOT

16   ANY OBJECTIONS TO ANY OF THEM.  WE KNOW WE HAVE SOME, BUT WE

17   CAN RAISE THAT, I THINK, OUT OF THE PRESENCE OF THE JURY.

18     THE COURT:  SURE.

19     MR. ROBINSON:  WE JUST WANT TO KEEP THINGS GOING.

20     MR. BECK:  RIGHT.  AND, JUDGE, I HAVE A REQUEST.  YOU

21   EXPLAINED TO THE JURY THE OTHER DAY WHAT DEPOSITIONS ARE USED

22   FOR, AND IT DAWNED ON ME DURING DR. AVORN'S DEPOSITION THAT

23   IT'S LIKE SHAKESPEARE.  WE HAVE A DEPOSITION WITHIN A

24   DEPOSITION.

25     THE COURT:  RIGHT.

Page 458

1     MR. BECK:  I WOULD APPRECIATE IT IF YOU WOULD EXPLAIN

2   TO THEM THAT HE HAD A DEPOSITION TAKEN A COUPLE OF WEEKS AGO

3   THAT WAS VIDEOTAPED TO PLAY AT TRIAL, AND SOMETIME BEFORE THAT,

4   HE HAD ALSO GIVEN A DEPOSITION, AND WHEN HE SEE THE TRANSCRIPT,

5   THAT'S WHAT'S THAT FROM.

6     MR. ROBINSON:  THE ONLY THING IT DOES IS HIGHLIGHT

7   THE IMPEACHMENT THING.

8     MR. BECK:  BUT, YOUR HONOR, AS IT IS, I THINK --

9     THE COURT:  I UNDERSTAND IT.  ANYTHING FURTHER?  WHAT

10   ARE WE DOING TODAY?

11     MR. ROBINSON:  WE'RE PLAYING DEPOS, YOUR HONOR.

12   AGAIN, UNFORTUNATELY.  WE GOT TO GET DR. SCOLNICK.  WE GOT TO

13   GET THESE OTHER DEPOS IN EVIDENCE.

14     THE COURT:  WHAT'S YOUR STANDPOINT ON THE TIME?

15     MR. ROBINSON:  WE CUT OUT A WITNESS, THOUGH.

16     MR. BIRCHFIELD:  WE CUT DOWN AN EXPERT.

17     MR. ROBINSON:  WE CUT OUT FARQUHAR, WHO WAS AN EPI

18   LIKE THIS GENTLEMAN.

19     MR. GOLDMAN:  JUST A COUPLE OF HOUSEKEEPING ISSUES,

20   JUDGE.  ON MOYE, WHO IS GOING TO BE, I THINK, THE NEXT LIVE

21   WITNESS -- OR THE FIRST LIVE WITNESS, WE NEED AN OFFICIAL

22   RULING ON THE DAUBERT MOTIONS.

23     THE COURT:  I HAVE THIS RIGHT HERE.

24     MR. GOLDMAN:  AND THEN ALSO, ON ZIPES, WE MOVED ON

25   ZIPES' SUPPLEMENTAL REPORT.  I THINK THAT'S AN OUTSTANDING

DAILY COPY

## Page 459

1   MOTION. AND THEN WE JUST HAVE -- AND MAYBE WE CAN DO THIS AT A
2   BREAK. BEFORE ONE OF THE DOCTORS TESTIFIES AT DEPOSITION,
3   DR. MIKOLA, WE HAVE A QUESTION ABOUT A PARTICULAR RULING THAT
4   YOU MADE ON THE DEPOSITION DESIGNATION. SO WE CAN DO THAT AT A
5   BREAK.
6           MR. ROBINSON: AND ON ZIPES' REPORT, YOUR HONOR, I
7   DON'T KNOW IF WE'RE ON THE RECORD OR NOT. ARE WE ON THE
8   RECORD? THERE IS, LIKE, THREE EXHIBITS THAT THE DEFENSE PUT
9   INTO DR. KARAVAN'S MOST RECENT DEPOSITION THAT SHOWED DR.
10  ZIPES, BECAUSE THEY CAME UP IN THE NEW DEPOSITION. SO WE
11  BELIEVE THAT THOSE ARE FAIR GAME. THERE ARE -- I'M JUST GOING
12  TO -- I THINK WE CAN TALK -- MR. GOLDMAN AND I CAN TALK ABOUT
13  THE OTHERS.
14          THE COURT: WHY DON'T Y'ALL TALK ABOUT IT, AND WE'LL
15  MEET AT THE BREAK AND TALK ABOUT IT.
16          MR. BECK: AND, JUDGE, MARK AND I HAVE BOTH BEEN
17  TALKING ABOUT WHETHER THE COURT IS GOING TO HAVE TRIAL ON
18  SATURDAY.
19          THE COURT: YEAH. THAT'S -- WHY DON'T Y'ALL COME UP.
20  LET'S TALK A LITTLE BIT ABOUT THAT.
21          (WHEREUPON, THERE WAS A BENCH CONFERENCE OUTSIDE OF
22  THE PRESENCE OF THE COURT REPORTER.)
23          THE COURT: LET'S BRING THE JURY IN, PLEASE.
24          THE MARSHAL: ALL RISE.
25          THE COURT: BE SEATED, PLEASE. JUST A COUPLE OF

## Page 460

1   COMMENTS ABOUT HOUSEKEEPING FOR MEMBERS OF THE JURY. I
2   MENTIONED TO YOU EARLY ON ABOUT DEPOSITIONS AND THE PURPOSE OF
3   USING DEPOSITIONS, AND I MENTIONED TO YOU THAT ONE OF THE
4   PURPOSES IS TO TAKE THE DEPOSITION AND THEN, IF A PERSON CAN'T
5   COME OR IS OUTSIDE OF THE SUBPOENA POWER, TO PLAY THE
6   DEPOSITION.
7           THE OTHER PURPOSE, OF COURSE, IS TO TAKE A
8   DEPOSITION PRIOR TO TRIAL -- EVERYBODY DOES IT -- TO FIND OUT
9   WHAT THAT WITNESS IS GOING TO SAY AND THEN, DURING TRIAL, YOU
10  UTILIZE THAT DEPOSITION TO EITHER IMPEACH OR BRING OUT THE FACT
11  THAT THE PERSON SAID SOMETHING AT A PRIOR TIME AND NOW HE'S
12  CHANGING HIS STORY, SO THAT YOU COULD TAKE THAT INTO
13  CONSIDERATION FOR WHATEVER REASON YOU FEEL NECESSARY.
14          NOW, YOU SAW BOTH USED IN THIS DEPOSITION. YOU
15  SAW THE DEPOSITION BEING PLAYED, AND THAT'S JUST AS IF THE
16  PERSON IS HERE. AND HE WAS ASKED QUESTIONS: "WELL, DIDN'T YOU
17  HAVE GIVE A DEPOSITION PREVIOUSLY?" AND HE DID. AND SO THAT
18  DEPOSITION WAS USED TO BRING OUT VARIOUS FACTS THAT HE SAID
19  BEFORE. SO IT'S SORT OF A PLAY WITHIN A PLAY. SO BOTH REASONS
20  FOR DEPOSITIONS YOU SAW IN THIS ONE.
21          THE PARTIES ARE TRYING THEIR BEST TO INTERSPERSE
22  THE DEPOSITIONS WITH LIVE TESTIMONY FOR YOU. UNFORTUNATELY, WE
23  DO HAVE MORE OF THE DEPOSITION TESTIMONY TODAY, AND THEN WE'LL
24  GET TO LIVE TESTIMONY SOMEWHERE IN -- EITHER IN BETWEEN OR AT
25  SOME TIME. THAT'S THE FIRST HOUSEKEEPING MATTER.

## Page 461

1           THE SECOND ONE IS: I TALKED TO THE LAWYERS, AND
2   THEY ARE DOING THEIR BEST TO TRY TO GET THE CASE TO YOU AS
3   QUICKLY AS POSSIBLE, BUT THEY FEEL AND THE COURT FEELS --
4   PRIMARILY THE COURT FEELS -- THAT IT WILL BE VERY HELPFUL TO
5   THEM, VERY HELPFUL TO THE PROCESS, IF YOU COULD WORK ON
6   SATURDAY. I'LL DO A HALF A DAY ON SATURDAY. I USUALLY GO FROM
7   8:00 TO 1:00, AND YOU WILL BREAK.
8           I'M SORRY TO INFRINGE UPON YOUR WEEKEND, BUT IN
9   THE LONG RUN, IT WILL BE BETTER BECAUSE WE'LL BE ABLE TO GET
10  THE CASE TO YOU MORE QUICKLY, HOPEFULLY. ANYTHING FURTHER?
11          ALL RIGHT. LET'S CALL THE WITNESS.
12          (WHEREUPON, GERALD AVORN, HAVING BEEN DULY SWORN,
13  TESTIFIED BY DEPOSITION AS FOLLOWS.)
14          CROSS-EXAMINATION
15  BY MR. BECK:
16  Q.  DOCTOR, I WOULD LIKE TO SPEND A FEW MINUTES ON THE STUDY
17  090.
18  A.  OKAY.
19  Q.  DO YOU REMEMBER DISCUSSING THAT SCHEDULE WITH MR. TISI
20  YESTERDAY?
21  A.  YES, I DO.
22  Q.  AND THAT WAS A CLINICAL TRIAL THAT WAS COMPLETED NOT LONG
23  AFTER THE COMPLETION OF VIGOR; IS THAT RIGHT?
24  A.  RIGHT.
25  Q.  SO THAT WOULD HAVE BEEN IN THE 2000 TIME FRAME?

## Page 462

1   A.  RIGHT.
2   Q.  DO YOU KNOW WHETHER MERCK PROVIDED THE RESULTS OF STUDY
3   090 TO THE FDA?
4   A.  I BELIEVE THEY DID.
5   Q.  AND, IN FACT, DID THE FDA THEN MAKE THE RESULTS OF STUDY
6   090 PUBLICLY AVAILABLE BY POSTING IT ON THE FDA WEBSITE?
7   A.  VIRTUALLY NO DOCTOR GOES TO THE FDA WEBSITE TO LOOK AT
8   STUDY RESULTS.
9   Q.  NO, MY -- WELL, RESEARCHERS DO, DO THEY NOT?
10  A.  SOMETIMES, YES.
11  Q.  AND MY QUESTION WASN'T WHAT PRESCRIBERS DO, BUT, RATHER,
12  DID THE FDA MAKE THE RESULTS OF STUDY 090 AVAILABLE BY
13  PUBLISHING IT ON ITS WEBSITE?
14  A.  THEY DID DISSEMINATE OR NOT DISSEMINATE, BUT THEY DID MAKE
15  AVAILABLE WHAT THEY HAD RECEIVED FROM MERCK, YES.
16  Q.  WAS STUDY 090 DISCUSSED BY DR. TARGUM IN HER MEMORANDUM
17  THAT APPEARED AROUND THE TIME OF THE FEBRUARY 2001 ADVISORY
18  COMMITTEE?
19  A.  YES.
20  Q.  YESTERDAY WHEN YOU WERE DISCUSSING STUDY 090, YOU
21  TESTIFIED THAT THERE WAS AN INCREASE IN NUMBERS OF
22  CARDIOVASCULAR EVENTS. DO YOU REMEMBER THAT?
23  A.  RIGHT.
24  Q.  YOU DID NOT TESTIFY YESTERDAY, DID YOU, THAT THERE WAS A
25  STATISTICALLY SIGNIFICANT INCREASE IN CARDIOVASCULAR EVENTS IN

DAILY COPY

## Page 463

1  STUDY 090?
2  A.  I DON'T BELIEVE THAT I SAID THAT.
3  Q.  SO WHEN VIOXX WAS COMPARED WITH PEOPLE WHO TOOK A SUGAR
4  PILL OR PLACEBO, THERE WAS NO STATISTICALLY SIGNIFICANT
5  DIFFERENCE IN CARDIOVASCULAR THROMBOTIC EVENTS; IS THAT
6  CORRECT?
7  A.  WHEN THE PLACEBO GROUP WAS -- WHEN BOTH OF THE REFERENT
8  GROUPS WERE COMBINED, I BELIEVE THERE WAS.  WHEN THE PLACEBO
9  GROUP, PER SE, WAS WHICH HALF AS LARGE AS THE OTHER STUDY
10  GROUPS, WAS BROKEN OUT, IT WAS NOT.
11  Q.  I WANT TO DISCUSS SOME MORE OF WHAT IT WAS THAT SCIENTISTS
12  WERE SAYING ABOUT THE POTENTIAL CARDIOPROTECTIVE EFFECT OF
13  NAPROXEN DURING THE 2000-THROUGH-2004 TIME FRAME.  AND FIRST I
14  WOULD LIKE TO LOOK AT AN ARTICLE THAT YOU WROTE, WHICH I
15  BELIEVE IS EXHIBIT 4.  IT WAS MARKED YESTERDAY.
16  A.  THEN THAT WOULD BE IN THAT BINDER.
17  Q.  THAT WOULD BE IN THE BINDER.
18  A.  OKAY.
19  Q.  I'VE PUT UP ON THE SCREEN EXHIBIT 4.  IS THIS AN ARTICLE
20  THAT YOU WERE AN AUTHOR OF?
21  A.  THAT'S RIGHT.
22  Q.  AND WHAT'S THE SUBJECT OF THE ARTICLE?
23  A.  NONSTEROIDAL ANTI-INFLAMMATORY DRUG USE AND HEART ATTACK.
24  Q.  WHAT JOURNAL WAS THIS PUBLISHED IN?
25  A.  ARCHIVES OF INTERNAL MEDICINE.

## Page 464

1  Q.  AND WHEN WAS IT PUBLISHED?
2  A.  IT WAS ACCEPTED FOR PUBLICATION IN JANUARY OF '02, AND IT
3  WAS PUBLISHED IN MAY OF '02.  SO IT WAS WRITTEN AT THE END OF
4  '01.
5  Q.  WAS THIS A STUDY THAT YOU AND SOME COLLEAGUES DID
6  CONCERNING POTENTIAL CARDIOPROTECTIVE EFFECTS OF NAPROXEN?
7  A.  YES.
8  Q.  DID YOU STUDY PATIENTS WHO HAD TAKEN NAPROXEN, IBUPROFEN,
9  AND OTHER TRADITIONAL NSAIDS?
10  A.  RIGHT.
11  Q.  WOULD YOU PLEASE TURN TO PAGE 1104, AND I'M GOING TO PUT
12  UP ON THE SCREEN THE SAME PARAGRAPH THAT MR. TISI PUT ON THE
13  SCREEN AND THE TWO OF YOU DISCUSSED YESTERDAY.
14  A.  RIGHT.
15  Q.  DO YOU REMEMBER THIS PARAGRAPH?
16  A.  YES.
17  Q.  AND IT STARTS OFF WITH, "IN THE STUDY BY BOMBARDIER, ET
18  AL."  AND THAT'S IN THE VIGOR PUBLICATION; CORRECT?
19  A.  CORRECT.
20  Q.  AND I THINK YOU WENT THROUGH THE FIRST TWO SENTENCES WHERE
21  IT SAID, "IN THE STUDY BY BOMBARDIER, ET AL." -- THAT MEANS "AND
22  OTHERS"; RIGHT?
23  A.  RIGHT.
24  Q.  -- "IN WHICH PATIENTS WITH RHEUMATOID ARTHRITIS WERE
25  RANDOMIZED TO RECEIVE ROFECOXIB OR NAPROXEN, THE RATES OF AM-

## Page 465

1  WERE FOURFOLD HIGHER IN PATIENTS TAKING ROFECOXIB."
2  ROFECOXIB, AS WE KNOW, IS VIOXX; RIGHT?
3  A.  RIGHT.
4  Q.  AND I THINK YOU ALSO DISCUSSED THE SENTENCE THAT SAID,
5  "THESE FINDINGS COULD HAVE RESULTED FROM A PROTECTIVE EFFECT OF
6  NAPROXEN, A RISK-ENHANCING EFFECT OF ROFECOXIB, OR BOTH";
7  RIGHT?
8  A.  RIGHT.
9  Q.  NOW, DID YOU GO ON TO SAY, "THE SELECTIVE COX-2 INHIBITORS
10  WERE NOT AVAILABLE DURING THE PERIOD THAT WE STUDIED"?
11  A.  RIGHT.
12  Q.  AND TO BE CLEAR, NOW YOU'RE TALKING ABOUT THE PAPER WE'RE
13  LOOKING AT RIGHT NOW, YOUR 2002 PUBLICATION?
14  A.  (NODS HEAD)
15  Q.  EVEN THOUGH VIOXX HAD BEEN ON THE MARKET SINCE MAY OF
16  1999, IN YOUR -- I THINK YOU MIGHT HAVE CALLED IT A "LOOK-BACK
17  STUDY" --
18  A.  IN OUR DATABASE.
19  Q.  -- YOU LOOKED AT A DATABASE --
20  A.  RIGHT.
21  Q.  -- THAT WENT BACK IN AN EARLIER PERIOD OF TIME WHEN
22  NEITHER CELEBREX NOR VIOXX WERE ON THE MARKET; RIGHT?
23  A.  OR WERE ON THE MARKET IN SUCH SMALL AMOUNTS.  NO,
24  ACTUALLY, YOU'RE CORRECT.  WE LOOKED AT DATA UP UNTIL THE END
25  OF 1995.  SO THERE WERE NO COX-2S ON THE MARKET IN THAT PERIOD.

## Page 466

1  Q.  OKAY.  SO JUST TO BE COMPLETELY CLEAR HERE, THE STUDY THAT
2  YOU DID WHEN FOCUSING ON WHETHER NAPROXEN HAD A
3  CARDIOPROTECTIVE EFFECT, THERE WAS NO LOOKING AT VIOXX AT ALL;
4  RIGHT?
5  A.  CORRECT.  NOT IN THIS STUDY.
6  Q.  OKAY.  AND BECAUSE OF THAT, DID YOU GO ON TO SAY IN YOUR
7  STUDY THAT THESE FINDINGS DO NOT CLARIFY --
8  A.  CAN YOU TELL ME WHERE YOU ARE LOOKING?
9  Q.  YES.  I'M HIGHLIGHTING IT ON THE SCREEN.
10  A.  RIGHT, RIGHT.
11  Q.  AND I'LL UNDERLINE IT.  THAT BASICALLY BECAUSE ROFECOXIB
12  OR VIOXX WASN'T EVEN ON THE MARKET DURING THE PERIOD THAT YOU
13  STUDIED, THE FINDINGS OF THIS PAPER DO NOT CLARIFY THE ROLE OF
14  VIOXX.  THAT'S WHAT YOU SAID; CORRECT?
15  A.  RIGHT.  WE DIDN'T STUDY VIOXX.
16  Q.  YOU WENT ON TO SAY THAT WHILE YOUR STUDY DID NOT CLARIFY
17  THE ROLE ABOUT ROFECOXIB, YOU SAID, "HOWEVER, THE DATA
18  PRESENTED HEREIN ARE CONSISTENT WITH A POSSIBLE PROTECTIVE
19  EFFECT OF NAPROXEN"; RIGHT?
20  A.  THAT'S RIGHT.  AND TO REALLY ROUND THAT OUT WE NEED TO
21  POINT OUT THAT THE NUMBER THAT REFERS TO WAS A 16 PERCENT
22  REDUCTION, NOT AN 80 PERCENT REDUCTION.
23  Q.  AND I THINK YESTERDAY YOU USED A PHRASE WHEN TALKING ABOUT
24  16 PERCENT -- I CAN'T REMEMBER.  WHAT WAS -- "WIMPY."  WAS THAT
25  A PHRASE YOU USED?

## Page 467

1  A.  IN EXPLAINING AN 80 PERCENT REDUCTION, YES.  IN THAT
2  CONTEXT, IT WAS WIMPY.
3  Q.  SO YESTERDAY YOU TESTIFIED THAT A 16 PERCENT INCREASE IN
4  CARDIOPROTECTIVE EFFECT WAS A WIMPY INCREASE?
5  A.  NO.  NO.  WHAT I SAID WAS, IN RELATION TO THE SUPPOSED 80
6  PERCENT EFFECT THAT MERCK WAS A ATTRIBUTING TO VIOXX, IT WAS
7  WIMPY --
8  Q.  OKAY.  I --
9  A.  I'M SORRY.  TO NAPROXEN.
10  Q.  IN ANY EVENT, WHAT YOU FOUND -- WITHOUT PUTTING AN
11  ADJECTIVE ON IT FOR THE TIME BEING, WHAT YOU DID FIND IN YOUR
12  2002 STUDY WAS THAT THE INFORMATION YOU COLLECTED WAS
13  CONSISTENT WITH A POSSIBLE PROTECTIVE EFFECT OF NAPROXEN;
14  RIGHT?
15  A.  RIGHT.  BUT TO BE FAIR, WE NEED TO READ THE REST OF THAT
16  SECTION, AND LINE 10 OF THE LAST PARAGRAPH.  PERHAPS YOU CAN
17  BRING THAT UP.  IT'S RIGHT BELOW WHERE YOU JUST CITED, IN WHICH
18  WE SAY TO PUT THIS IN PERSPECTIVE.  IT'S LINE 10 OF THE LAST
19  PARAGRAPH.
20  Q.  AND HOW MUCH DO YOU WANT ME TO BLOW UP THERE?
21  A.  I THINK JUST THE TWO SENTENCES BEGINNING WITH "TO PLACE
22  THE EFFECT OF NAPROXEN IN PERSPECTIVE."
23  Q.  LET ME SEE IF I CAN DO THAT.  HOW FAR DOWN?
24  A.  ENDING WITH THE LINE BEGINNING "BY ASPIRIN."
25  Q.  OKAY.

## Page 468

1  A.  OKAY.  ALL RIGHT.  THIS IS OUR SUMMARY THAT FOLLOWS THE
2  POINT THAT YOU HAD CITED ABOVE:  "TO PLACE THE EFFECT OF
3  NAPROXEN IN PERSPECTIVE, IN A LARGE RANDOMIZED TRIAL OF DAILY
4  ASPIRIN USE IN PRIMARY PREVENTION, PATIENTS IN THE INTERVENTION
5  ARM EXPERIENCED A 44 PERCENT REDUCTION IN THE RISK OF AMI.
6  THEREFORE, IT WOULD BE FALSE TO EQUATE THE MORE MODEST EFFECT
7  OF NAPROXEN SUGGESTED IN THIS STUDY WITH THE CARDIOPROTECTION
8  AFFORDED BY ASPIRIN."
9       AND THAT'S A KEY POINT IN OUR CONCLUDING PARAGRAPH.
10  Q.  NOW, LET'S TURN THE TO PAGE 1.
11  A.  OF THE PAPER?
12  Q.  OF THE PAPER.  AND THERE YOU HAVE THIS BUSINESS AT THE TOP
13  OF THE PAGE THAT'S SOMETIMES CALLED AN ABSTRACT; RIGHT?
14  A.  IT'S ALWAYS CALLED AN ABSTRACT.
15  Q.  OKAY.  IT'S ALWAYS CALLED AN ABSTRACT.  AND YOU SET FORTH
16  THE KEY INFORMATION IN THE ABSTRACT; IS THAT RIGHT?
17  A.  RIGHT.
18  Q.  AND THEN IN THE CONCLUSIONS IN THE ABSTRACT, I TAKE IT
19  THAT YOU SET FORTH THE KEY CONCLUSIONS IN THIS SECTION; RIGHT?
20  A.  RIGHT.
21  Q.  SO IF IT'S OKAY WITH Y'ALL, I'LL BLOW UP THE WHOLE THING
22  IN, THE CONCLUSIONS.
23  A.  SURE.
24  Q.  WAS YOUR KEY CONCLUSION THAT YOU PUT IN THE ABSTRACT,
25  "ALTHOUGH NSAIDS HAVE ANTI-INFLAMMATORY AND ANTI-PLATELET

## Page 469

1  EFFECTS SIMILAR TO THOSE OF ASPIRIN, WE DID NOT FIND THANK
2  THESE DRUGS CONFER A PROTECTIVE EFFECT AGAINST AMI," BEING
3  HEART ATTACKS; RIGHT?
4  A.  CORRECT.
5  Q.  "HOWEVER, USE OF ONE SPECIFIC NSAID, NAPROXEN, APPEARED TO
6  BE ASSOCIATED WITH A REDUCED RATE OF AMI," OR HEART ATTACK, "AN
7  EFFECT RECENTLY SUGGESTED BY A LARGE RANDOMIZED CONTROLLED
8  TRIAL AS WELL."  IS THAT RIGHT?
9  A.  CORRECT.
10  Q.  AND WHEN YOU SAID THAT THE USE OF NAPROXEN APPEARED TO BE
11  ASSOCIATED WITH A REDUCED RATE OF HEART ATTACK, THAT WAS FROM
12  YOUR OWN DATA; RIGHT?
13  A.  THAT WAS THE 16 PERCENT REDUCTION.
14  Q.  AND THEN YOU SAID THAT YOUR DATA -- THAT THIS SAME EFFECT
15  OF CARDIOPROTECTION FROM NAPROXEN WAS RECENTLY SUGGESTED BY A
16  LARGE RANDOMIZED CONTROLLED TRIAL.  THAT WAS THE VIGOR TRIAL?
17  A.  RIGHT.  I BELIEVE THEN AND I BELIEVE NOW THAT NAPROXEN
18  REDUCES THE RATE OF HEART ATTACK BY ABOUT 15 OR 16 PERCENT.
19  Q.  AND THE 16 PERCENT FIGURE COMES FROM THE VIGOR TRIAL;
20  RIGHT?
21  A.  NO.  THAT'S FROM OUR OWN RESEARCH.
22  Q.  I'M SORRY.  FROM YOUR OWN RESEARCH?
23  A.  RIGHT.  OTHERS HAVE FOUND SIMILAR THINGS.
24  Q.  WELL, IN FACT, OTHERS HAVE FOUND HIGHER RATES OF
25  CARDIOPROTECTION FROM NAPROXEN; RIGHT?

## Page 470

1  A.  SOME LOWER, SOME HIGHER.  BUT IF I THINK IF YOU WERE TO
2  PULL TOGETHER ALL THE DATA, THE MOST COMMON FINDING IS ABOUT
3  15 PERCENT.
4  Q.  AND IN VIGOR, YOU KNOW THAT THE PEOPLE -- IT WAS A
5  CONTROLLED STUDY WHERE THEY WERE USING 500 MILLIGRAMS TWICE A
6  DAY; RIGHT?
7  A.  RIGHT.
8  Q.  AND I THINK YOU SAID THE AVERAGE LENGTH OF TIME THAT
9  PEOPLE WERE IN THE STUDY WAS NINE MONTHS?
10  A.  THAT'S RIGHT.
11  Q.  AND YOUR STUDY WAS NOT A CONTROLLED STUDY WHERE EVERYBODY
12  TOOK THE SAME AMOUNT OF THE DRUG EVERY DAY FOR MANY MONTHS;
13  RIGHT?
14  A.  THAT'S CORRECT.
15  Q.  YOURS WAS LOOKING BACK AT MEDICAL RECORDS OF PEOPLE WHO
16  HAD PRESCRIPTIONS FOR NAPROXEN AND OTHER DRUGS; RIGHT?
17  A.  THAT'S RIGHT.
18  Q.  AND YOUR STUDY DID NOT TAKE INTO ACCOUNT WHETHER THE
19  PATIENTS WERE TAKING LOWER DOSES OF NAPROXEN THAN THEY WERE IN
20  THE VIGOR STUDY; RIGHT?
21  A.  WE LOOKED AT ALL DOSES.
22  Q.  WELL, MY QUESTION IS:  YOU DID THE STUDY.  YOU KNOW FROM
23  HAVING DONE THE STUDY, DON'T YOU, THAT LOTS OF THE PATIENTS
24  WERE TAKING LOWER DOSES THAN 500 MILLIGRAMS TWICE A DAY?
25  A.  WELL, LET ME FIND OUT WHERE I WANT TO BE FIRST.  I'M

## Page 471

1  LOOKING AT DOSAGE ON PAGE 1100.

2       OKAY.  ACTUALLY, YOU'RE INCORRECT.  IF YOU LOOK AT

3  TABLE 4 ON PAGE 1103, WE LOOKED AT THE VERY SMALL

4  CARDIOPROTECTIVE EFFECT OF NAPROXEN AS IT RELATED TO THE DOSE.

5  AND I'VE GOT A VERY BAD XEROX.  YOU MAY HAVE A BETTER COPY.

6  BUT THE LAST THREE LINES IN TABLE 4 LOOK AT THE ODDS RATIO OR

7  THE PROTECTION OF A NUMBER LESS THAN 1 IS PROTECTION AGAINST

8  HEART ATTACK.

9       AND WE LOOK AT THOSE THREE NUMBERS AS A FUNCTION OF

10  THE DOSE, WHICH WE EXPRESSED AS THE PERCENT OF THE MAXIMUM

11  ANTI-INFLAMMATORY DOSAGE.  SO, AGAIN -- IT'S HARD TO READ MY

12  XEROX, BUT I BELIEVE THE TOP LINE IS GREATER THAN 75 PERCENT OF

13  THE MAXIMUM ANTI-INFLAMMATORY DOSE, THE NEXT LINE IS 51 TO 75

14  PERCENT, AND THE LAST LINE IS 50 PERCENT OR LESS.  SO,

15  BASICALLY, IT'S THE HIGHEST DOSES?  THE MEDIUM DOSES, AND THE

16  SMALLEST DOSES.

17       AND LOOKING AT THOSE THREE NUMBERS, THERE IS NO

18  RELATIONSHIP TO THE CARDIOPROTECTIVE LEVEL OF ANY MEANINGFUL

19  KIND WITH DOSE.  THEY ARE BETWEEN 77 PERCENT AND 81 PERCENT.

20  SO I WOULD DISAGREE WITH YOU THAT OUR FINDINGS ARE EXPLAINED BY

21  THE FACT THAT THE PEOPLE TAKING NAPROXEN IN OUR STUDY WERE

22  TAKING IT AT A LOWER DOSE.

23  Q.  DO YOU KNOW WHETHER LOTS OF THE PEOPLE IN YOUR STUDY WERE

24  TAKING NAPROXEN AT DOSES LOWER THAN 500 MILLIGRAMS TWICE A DAY?

25  A.  WELL, IN EPIDEMIOLOGY, WE TRY TO AVOID TERMS LIKE "LOTS

## Page 472

1  OF," BUT I CAN TELL YOU THAT, REGARDLESS OF THE DOSE, PEOPLE --

2  LOTS OF PEOPLE WERE TAKING IT AT THE HIGH DOSE, THE MEDIUM

3  DOSE, AND THE LOW DOSE, AND THEY ALL HAD THE SAME EFFECT.

4  Q.  YOU COULD NOT CONTROL IN YOUR STUDY WHETHER THE PATIENTS

5  WERE TAKING NAPROXEN EVERY DAY AS THEY DID IN VIGOR; CORRECT?

6  A.  CORRECT.

7  Q.  DID YOU EVER STUDY A SUBGROUP OF PATIENTS WHO USED

8  500 MILLIGRAMS TWICE A DAY TO SEE WHAT THE CARDIOPROTECTIVE

9  EFFECT OF NAPROXEN WOULD BE AT THAT DOSE USED ON A REGULAR

10  BASIS TWICE A DAY?

11  A.  THAT GROUP -- THE CLOSEST TO THAT GROUP WOULD BE THIS

12  HIGHEST GREATER THAN 75 PERCENT OF THE MAXIMUM

13  ANTI-INFLAMMATORY DOSES.  THAT WOULD CALIBRATE WITH THE

14  POPULATION THAT YOU DESCRIBED AS BEST AS POSSIBLE.  AND THAT

15  GROUP WENT ALL THE WAY UP TO 19 PERCENT INSTEAD OF 16 PERCENT.

16  Q.  BUT YOU DON'T KNOW IF THEY USED THAT TWICE A DAY OR DAY

17  IN, DAY OUT, FOR NINE MONTHS; RIGHT?

18  A.  RIGHT.

19  Q.  HAVE OTHER SCIENTISTS FOUND, TO YOUR KNOWLEDGE, THAT FROM

20  A PHARMACOLOGIC MECHANISTIC PERSPECTIVE, THAT NAPROXEN AT

21  500 MILLIGRAMS TWICE A DAY MIMICS THE ANTI-PLATELET OF LOW-DOSE

22  ASPIRIN?

23  A.  I'M AWARE OF THE AREA OF RESEARCH YOU'RE DESCRIBING.  I

24  WOULDN'T USE THE WORD "MIMICS," BUT IT IS TRUE THAT PEOPLE HAVE

25  FOUND ANTI-PLATELET EFFECTS OF NAPROXEN.

## Page 473

1  Q.  WELL, MY QUESTION IS:  DO YOU KNOW WHETHER OTHER

2  SCIENTISTS HAVE FOUND NOT ONLY ANTI-PLATELET EFFECTS OF

3  NAPROXEN BUT THAT THEY MIMIC NOTICES THOSE OF LOW-DOSE ASPIRIN?

4  A.  I JUST CAN'T SPEAK TO THE WORD "MIMIC."

5  Q.  I'M HANDING YOU AN ARTICLE WE'VE MARKED AS EXHIBIT 49,

6  WHICH IS AN ARTICLE WRITTEN BY MARTA CAPONE AND OTHERS.

7  A.  RIGHT.

8  Q.  HAVE YOU EVER SEEN THIS BEFORE?

9  A.  I KNOW OF THE STUDIES.  I COULDN'T IDENTIFY IF IT'S THE

10  CAPONE STUDY IN WHICH PEOPLE HAVE FOUND AN ANTI-PLATELET EFFECT

11  OF NAPROXEN.

12  Q.  AND WHAT'S THE DATE OF THIS REPORT?

13  A.  2004.

14  Q.  WHAT PUBLICATION WAS IT?

15  A.  CIRCULATION.

16  Q.  AND LOOK AT THE CONCLUSION THAT'S SET FORTH IN THE

17  ABSTRACT.  DO YOU SEE WHERE DR. CAPONE AND HER COLLEAGUES SAID,

18  "THE REGULAR ADMINISTRATION OF NAPROXEN 500 MILLIGRAMS B.I.D.

19  CAN MIMIC THE ANTI-PLATELET" EFFECT -- "ANTI-PLATELET COX-1

20  EFFECT OF LOW-DOSE ASPIRIN?"

21  A.  RIGHT.

22  Q.  SO THIS IS ONE OF THE STUDIES THAT TALKS ABOUT HOW IT WORK

23  THE SAME WAY THAT ASPIRIN DOES?

24  A.  RIGHT.  THIS IS IN NINE SUBJECTS FOLLOWED FOR SIX DAYS

25  CORRECT.

## Page 474

1  Q.  HAVE OTHER SCIENTISTS FOUND THAT NAPROXEN EXERTS AN

2  ANTITHROMBOTIC EFFECT AT LEAST AS POTENT AS THAT OF ASPIRIN?

3  A.  I KNOW THAT THERE IS LITERATURE OUT THERE INDICATING THAT

4  THERE CAN, UNDER SOME CIRCUMSTANCES, BE AN ANTI-PLATELET EFFECT

5  OF ASPIRIN.

6  Q.  DO YOU REMEMBER DISCUSSING EXHIBIT 19 WITH MR. TISI

7  YESTERDAY?

8  A.  YES.

9  Q.  AND THIS WAS A SUBMISSION BY MERCK TO THE FDA IN NOVEMBER

10  OF 2001; CORRECT?

11  A.  RIGHT.

12  Q.  AND WOULD YOU PLEASE TURN TO PAGE 3.

13  A.  YES.

14  Q.  THERE IS LANGUAGE -- MOVE IT OVER.  HERE WE GO.  I THINK

15  THIS IS THE LANGUAGE THAT YOU FOCUSED ON, WHERE MERCK IS

16  WRITING TO THE FDA, AND MERCK SAID, "THE CONCEPT THAT THERE ARE

17  DIFFERENCES AMONG NSAIDS IS SUPPORTED BY EXTERNAL EPIDEMIOLOGIC

18  DATA FROM THREE SEPARATE STUDIES THAT UTILIZED DIFFERENT

19  CLINICAL DATABASES, INDICATING THAT THE USE OF NAPROXEN, BUT

20  NOT OTHER NSAIDS, IS CARDIOPROTECTIVE."  AND THEN THERE ARE

21  THREE CITATIONS, AND I THINK NUMBER 4 IS TO YOUR PAPER;

22  CORRECT?

23  A.  RIGHT.

24  Q.  AND THEN IT GOES ON TO SAY, "AMONG THESE STUDIES IS A U.S.

25  STUDY OF OVER 22,000 PATIENTS IN NEW JERSEY BY A BOSTON

## Page 475

1    ACADEMIC GROUP UNAFFILIATED WITH INDUSTRY."
2    A.  THAT'S RIGHT.
3    Q.  YESTERDAY YOU SAID THAT MERCK DISTORTED THE EFFECTS OF
4    YOUR STUDY.  DO YOU REMEMBER THAT?
5    A.  YES.
6    Q.  NOW, WHEN DESCRIBING YOUR STUDY AS ONE OF THREE -- WELL,
7    LET'S JUST GO THROUGH THE LANGUAGE HERE.
8        THE MERCK SUBMISSION SAYS, "THE CONCEPT THAT THERE
9    ARE DIFFERENCES AMONG NSAIDS IS SUPPORTED BY EXTERNAL
10   EPIDEMIOLOGICAL DATA FROM THREE SEPARATE STUDIES" -- NOW, JUST
11   LET ME JUST STOP THERE.  DOES YOUR STUDY SUPPORT THE CONCEPT
12   THAT THERE ARE DIFFERENCES AMONG NSAIDS?
13   A.  YES.
14   Q.  AND IT SAYS, "THAT USED DIFFERENT CLINICAL DATABASES."
15   AND YOUR STUDY OBVIOUSLY USED A DIFFERENT CLINICAL DATABASE
16   THAN THE OTHER ONES DID; RIGHT?
17   A.  RIGHT.
18   Q.  AND THEN IT GOES ON TO SAY THAT THREE SEPARATE STUDIES
19   INDICATE "A USE OF NAPROXEN, BUT NOT OTHER NSAIDS, IS
20   CARDIOPROTECTIVE."  DID YOUR STUDY INDICATE THAT THE USE OF
21   NAPROXEN, BUT NOT OTHER NSAIDS, IS CARDIOPROTECTIVE?
22   A.  YES.
23   Q.  AND THEN THE NEXT SENTENCE THAT SAYS, "AMONG THESE STUDIES
24   IS A U.S. STUDY OF OVER 22,000 PATIENTS IN NEW JERSEY."  AND
25   WAS YOUR STUDY OF OVER 22,000 PATIENTS IN NEW JERSEY?

## Page 476

1    A.  YES.
2    Q.  AND IT SAYS, "BY A BOSTON ACADEMIC GROUP."  THAT'S WHERE
3    YOU'RE FROM; RIGHT?
4    A.  RIGHT.
5    Q.  "UNAFFILIATED WITH INDUSTRY."  AND YOU ARE NOT AFFILIATED
6    WITH INDUSTRY; CORRECT?
7    A.  RIGHT.
8    Q.  YOU'VE TESTIFIED BOTH YESTERDAY AND TODAY -- YOU'VE
9    EMPHASIZED, I THINK IT'S FAIR TO SAY -- THAT THE
10   CARDIOPROTECTIVE EFFECT THAT YOU FOUND WAS 16 PERCENT; RIGHT?
11   A.  RIGHT.  ARE WE DONE WITH THIS DOCUMENT?
12   Q.  YES.
13   A.  BECAUSE I THINK, IN FAIRNESS, WE NEED TO POINT OUT THAT
14   THE REASON I FEEL THERE WAS A DISTORTION WAS THAT IT FOLLOWS A
15   PARAGRAPH IN WHICH MERCK WAS ARGUING TO THE FDA THAT THEY COULD
16   NOT TELL IF THE DIFFERENCE IN EFFECT FROM -- IN THE VIGOR STUDY
17   WAS BECAUSE IT WAS EXPLAINED AWAY BY NAPROXEN OR BY A
18   PROTHROMBOTIC OR CARDIOTOXIC EFFECT OF VIOXX.
19       AND THE DISTORTION PIECE HAS TO DO WITH THE FACT THAT
20   THE PARAGRAPH YOU JUST READ WAS A JUSTIFICATION FOR THEIR
21   SAYING WE DON'T KNOW WHETHER THIS WAS BECAUSE OF NAPROXEN OR
22   NOT AND LET'S JUST NOT ATTRIBUTE IT TO VIOXX BECAUSE WE CAN'T
23   TELL.  AND THAT WAS THE DISTORTION THAT I WAS REFERRING TO.
24   Q.  WELL, WHAT THEY SAID ABOUT YOUR STUDY WAS ACCURATE; RIGHT?
25   A.  NOT IN THE CONTEXT THAT THEY PRESENTED IT, NO.

## Page 477

1    Q.  WELL, THEY WERE MAKING THEIR POSITION TO THE FDA?
2    A.  AND USING MY DATA TO JUSTIFY IT.
3    Q.  BUT WHAT THEY SAID ABOUT YOUR DATA, EVERYTHING THEY SAID
4    ABOUT YOUR DATA WAS CORRECT; ISN'T THAT TRUE?
5    A.  WELL, CORRECT IN THE SENSE THAT THERE WAS ONE-FIFTH AS
6    MANY HEART ATTACKS IN THE NAPROXEN GROUP.  IT'S THE SPIN THAT I
7    THOUGHT WAS THE DISTORTION.
8    Q.  NOW, BACK TO MY QUESTION.  YOU'VE TALKED REPEATEDLY ABOUT
9    HOW THE EFFECT THAT YOU FOUND WAS 16 PERCENT.  AND I THINK
10   YOU'VE AGREED THAT YESTERDAY, AT LEAST IN ONE CONTEXT, YOU SAID
11   THAT THAT WAS WIMPY; RIGHT?
12   A.  LET ME BE VERY CLEAR.  LET ME BE VERY CLEAR ON THIS,
13   MR. BECK.  IT WAS WIMPY, TO USE THAT TERM, IN TRYING TO EXPLAIN
14   THE 80 PERCENT REDUCTION.
15   Q.  OKAY.  LET'S LOOK AT DEPOSITION EXHIBIT 4.  THAT'S YOUR
16   ARTICLE THAT WE WERE LOOKING AT A LITTLE WHILE AGO?
17   A.  YES.
18   Q.  AND WE'RE IN THAT SECTION CALLED THE ABSTRACT AT THE TOP.
19   AND UNDER "RESULTS" DO YOU SAY, "USE OF NAPROXEN WAS ASSOCIATED
20   WITH A SIGNIFICANT REDUCTION IN THE RISK OF AMI," OR HEART
21   ATTACKS, AND THEN YOU SET FORTH THE ACTUAL STATISTICS?
22   A.  I THINK YOU'RE CONFUSED ABOUT THE USE OF THE WORD
23   "SIGNIFICANT."  "SIGNIFICANT" REFERS HERE TO STATISTICALLY
24   SIGNIFICANT, AS WE DISCUSSED IT IN THE PAST.  IT DOES NOT MEAN
25   CLINICALLY SIGNIFICANT OR BIG-DEAL SIGNIFICANT.  AND THAT'S

## Page 478

1    ALWAYS THE WAY THIS WORD IS USED IN MEDICAL PAPERS, AND TO
2    SUGGEST THAT IT MEANS "CLINICALLY IMPORTANT" WOULD BE
3    INCORRECT.
4    Q.  SO "SIGNIFICANT" HERE REFERS TO THIS IS STATISTICALLY
5    SIGNIFICANT?
6    A.  CORRECT.
7    Q.  AND THAT CONCEPT IS ONE I THINK YOU DISCUSSED YESTERDAY.
8    WHAT THAT MEANS, CONVENTIONALLY, IS THAT THE RELATIVE RISK IS
9    ABOVE 1 AND YOU TALKED ABOUT -- I'M SORRY.  THE CONFIDENCE
10   INTERVALS WOULD NOT INCLUDE THE NUMBER 1; RIGHT?
11   A.  CORRECT.
12   Q.  AND THERE IS A P-VALUE THAT HAD TO BE -- WAS IT LOWER OR
13   HIGHER THAN .05?
14   A.  LOWER THAN .05.
15   Q.  LOWER THAN .05.  OKAY.  AND SO THAT'S WHAT'S MEANT IN YOUR
16   PAPER, IS THAT THERE IS A STATISTICALLY SIGNIFICANT
17   CARDIOPROTECTIVE EFFECT OF NAPROXEN; RIGHT?
18   A.  THAT'S RIGHT.
19   Q.  AND A 15 PERCENT REDUCTION, WOULD YOU CONSIDER THAT TO BE
20   CLINICALLY SIGNIFICANT?
21   A.  IT CAN BE.  IT DEPENDS WHAT YOU'RE LOOKING AT.
22   Q.  I'M HANDING YOU WHAT WE'VE MARKED AS EXHIBIT 52.  DO YOU
23   RECOGNIZE THAT PUBLICATION?
24   A.  YES.  IT IS WORTHY OF DISCUSSION SINCE I WAS A CO-AUTHOR
25   OF IT.  SORRY, IT'S LATE.

## Page 479

1   NO.  IN ALL SERIOUSNESS, IT'S ALSO IN A REAL JOURNAL
2   AND IT IS WRITTEN BY PEOPLE WHO HAVE ACTUALLY DONE RESEARCH IN
3   THIS AREA.
4   Q.  AS YOU INDICATED, YOU'RE ONE OF THE AUTHORS; RIGHT?
5   A.  RIGHT.
6   Q.  ALONG WITH YOUR COLLEAGUE, DR. SOLOMON, WHOM YOU
7   REFERENCED SEVERAL TIMES YESTERDAY?
8   A.  CORRECT.
9   Q.  AND WHAT'S THE DATE OF THIS STUDY?
10  A.  IT WAS PUBLISHED IN 2003.
11  Q.  AND WHAT PUBLICATION WAS IT IN?
12  A.  CURRENT OPINION IN RHEUMATOLOGY.
13  Q.  NOW, IS THIS AN ARTICLE WHERE YOU, AMONG OTHER THINGS,
14  REVIEW THE RESULTS OF STUDIES DONE BY OTHER PEOPLE AS WELL AS
15  YOURSELF?
16  A.  YES.
17  Q.  AND LET'S START ON PAGE 123.  SO THAT WOULD BE THE SECOND
18  PAGE OF YOUR ARTICLE.  I WANT TO FOCUS ON THE PARAGRAPH IN THE
19  FIRST COLUMN TOWARD THE BOTTOM.  ARE YOU WITH ME, DOCTOR?
20  A.  YES, I AM.  I AM.
21  Q.  OKAY.  AND YOU SAY, "FOUR STUDIES WERE PUBLISHED IN 2002
22  EXAMINING WHETHER NAPROXEN IS ASSOCIATED WITH A REDUCED RISK OF
23  ACUTE MYOCARDIAL INFARCTION."  AND THEN YOU CITE THOSE FOUR
24  STUDIES; RIGHT?
25  A.  RIGHT.

## Page 480

1   Q.  AND YOU SAY "ALL USED SIMILAR MEDICINES, ANALYZING VERY
2   LARGE CLAIMS DATABASES FROM A NUMBER OF DIFFERENT HEALTHCARE
3   SYSTEMS."  RIGHT?
4   A.  RIGHT.
5   Q.  THE RESULTS WERE QUITE CONSISTENT.  THREE FOUND IN PRIMARY
6   ANALYSES THAT NAPROXEN WAS ASSOCIATED WITH A 17 TO 39 PERCENT
7   REDUCTION IN ACUTE MYOCARDIAL INFARCTION COMPARED WITH OTHER
8   NONSELECTIVE NSAIDS; CORRECT?
9   A.  RIGHT.
10  Q.  IS IT CORRECT THAT THESE THREE OTHER STUDIES FOUND A
11  REDUCTION IN HEART ATTACKS, PEOPLE USING NAPROXEN COMPARED TO
12  OTHER NSAIDS OF 17 TO 39 PERCENT?
13  A.  YES.
14  Q.  AND LET ME ASK YOU BEFORE WE GO TO THE TABLE:  ARE YOU
15  TELLING ME THAT THAT NUMBER CAN'T REALLY BE COMPARED TO 16
16  PERCENT THAT YOU USED BECAUSE IT'S BEEN ADJUSTED IN SOME WAY?
17  A.  CORRECT.  AND YOU ALSO NEED TO POINT OUT, AS YOU DID, THAT
18  THE STUDY BY RAY, ET AL, INITIALLY FOUND A ZERO REDUCTION.  AND
19  IT WAS THE ADJUSTMENT THAT I WANTED TO TALK ABOUT THAT IS WHERE
20  YOU GET THE NUMBERS THAT YOU READ.
21  Q.  OKAY.  AND YOU WANT TO TALK ABOUT AN ADJUSTMENT?
22  A.  RIGHT.
23  Q.  DO YOU WANT ME TO SHOW TABLE 1?
24  A.  SURE.
25  Q.  OKAY.

## Page 481

1   A.  BECAUSE WHERE THESE NUMBERS COME FROM WAS, TO TRY AND MAKE
2   THE STUDIES COMPARABLE, WE TOOK THE PARENT FINDINGS, WHICH FOR
3   RAY, THAT FIRST LINE, WOULD HAVE BEEN NO REDUCTION.  AND WE
4   THEN, AS IT SAYS IN THE CAPTION, EXCLUDED PERSONS WITH A PRIOR
5   HEART ATTACK OR STROKE TO REDUCE CONFOUNDING BY UNMEASURED
6   ASPIRIN USE.
7       AND WHAT THAT MEANS IS THAT WE WANTED TO MAKE SURE
8   THAT THERE WERE NOT PEOPLE ON ASPIRIN IN THE STUDIES, AND SO WE
9   LOOKED AT A SUBSET OF THE RAY STUDY SO THAT, INSTEAD OF NO
10  EFFECT, THAT CAUSED A, I GUESS, 17 PERCENT REDUCTION.
11      AND THAT'S WHY OUR NUMBER IS 82 AND NOT 86, AS IT WAS
12  IN THE ORIGINAL PAPER.
13  Q.  OKAY.  SO LET ME ASK, THEN:  SO YOUR STUDY WAS ONE OF THE
14  THREE STUDIES THAT'S REFERENCED -- YOUR STUDY THAT WE TALKED
15  ABOUT AND WE WERE SAYING 16 PERCENT --
16  A.  RIGHT.
17  Q.  -- IS ONE OF THE THREE STUDIES THAT IS REFERENCED IN HERE
18  WHERE IT TALKS ABOUT 17 TO 39 PERCENT; RIGHT?
19  A.  RIGHT.
20  Q.  AND ADJUSTMENTS WERE MADE TO YOURS, AND SO WHICH ONE --
21  WHERE DOES YOUR FALL IN THE 17 TO 39 PERCENT?
22  A.  WELL, IT HAS TO DO WITH WHETHER YOU'RE LOOKING AT
23  EXCLUDING PEOPLE WHO HAD A HEART ATTACK OR STROKE.  AND THAT'S
24  WHAT THE NUMBERS IN THIS ARE.
25  Q.  RIGHT.

## Page 482

1   A.  WHEREAS, THE NUMBERS IN THE ORIGINAL PAPER ARE ALL COMERS,
2   EVERYBODY.
3   Q.  YEAH, I UNDERSTAND THAT.  AND WHEN WE LOOK AT THE 17 TO
4   39 PERCENT REDUCTION --
5   A.  RIGHT.
6   Q.  -- YOU'VE EXPLAINED, AND I APPRECIATE IT, THAT ONE OF THE
7   THREE STUDIES WAS ACTUALLY THE ONE THAT WE HAVE BEEN TALKING
8   ABOUT THAT YOU DID --
9   A.  RIGHT.
10  Q.  -- BEFORE, WE SAID 16 PERCENT, BUT AN ADJUSTMENT HAS BEEN
11  MADE?
12  A.  RIGHT.  IF YOU TAKE OUT EVERYONE WHO HAS HAD A HEART
13  ATTACK OR STROKE, IT GOES FROM 16 PERCENT TO 18 PERCENT.
14  Q.  18 PERCENT.  SO YOURS IS STILL ON THE LOW SIDE IN TERMS OF
15  WHAT THE THREE STUDIES FROM 2002 FOUND IN TERMS OF REDUCTION IN
16  HEART ATTACK RISK?
17  A.  NO.  I THINK 79, 82, 83 WOULD ALL BE CONSIDERED ABOUT THE
18  SAME NUMBER.
19  Q.  17 TO?
20  A.  I'M SORRY.  79.  I'M READING THE ACTUAL ADJUSTED RISK.  SO
21  IT'S -- IT'S 100 MINUS THOSE NUMBERS.
22      SO WHAT I'M SAYING IS, IF YOU HAVE A RELATIVE RISK OR
23  AN ODDS RATIO OF 82 PERCENT, 83 PERCENT, 79 PERCENT, WE WOULD
24  CONSIDER THOSE TO BE PRETTY CLOSE TO BEING THE SAME NUMBER.
25  Q.  WOULD YOU CONSIDER A 17 PERCENT REDUCTION IN HEART ATTACK

8  (Pages 479 to 482)

## Page 483

1  TO BE PRETTY CLOSE TO A 39 PERCENT REDUCTION IN HEART ATTACKS?
2  A.  NO, THAT -- THE 39 WAS SEEN IN A PAPER BY DR. WATSON, WHO
3  WORKS FOR MERCK.
4  Q.  AND YOURS, I GUESS, WOULD BE 18 ON THIS SCALE?
5  A.  CORRECT.
6  Q.  AND IS EXHIBIT 7 THE SAME DOCUMENT THAT I'M SHOWING UP ON
7  THE SCREEN?
8  A.  YES.
9  Q.  AND YOU JUST INDICATED THIS IS A CIRCULATION PAPER,
10  MEANING IT'S THE ONE PUBLISHED IN THE JOURNAL CIRCULATION?
11  A.  CORRECT.
12  Q.  AND WHAT YEAR WAS THIS ONE PUBLISHED IN?
13  A.  2004.
14  Q.  AND YOU DISCUSSED THIS ARTICLE WITH MR. TISI YESTERDAY.
15  REMEMBER THAT?
16  A.  TO THAT'S RIGHT.
17  Q.  AND IN PARTICULAR, YOU TALKED ABOUT THE FACT THAT
18  DR. CANNUSCIO DOES NOT APPEAR AS AN AUTHOR ON THIS ARTICLE AS
19  IT WAS EVENTUALLY PUBLISHED; CORRECT?
20  A.  THAT'S RIGHT.
21  Q.  AND I'LL COME BACK TO THAT SUBJECT IN A LITTLE BIT.
22  YESTERDAY WHEN YOU WERE TESTIFYING ABOUT THE FINDINGS IN THIS
23  ARTICLE, YOU INDICATED THAT YOU FOUND AN INCREASED RISK USING
24  VIOXX FOR 30 DAYS.  DO YOU REMEMBER THAT?
25  A.  FOR UP TO 30 DAYS.

## Page 484

1  Q.  UP TO 30 DAYS.  AND YOU ALSO SAID YESTERDAY THAT THERE WAS
2  AN INCREASED RISK THAT YOU FOUND USING VIOXX UP TO 90 DAYS.  DO
3  YOU REMEMBER THAT?
4  A.  THAT'S RIGHT.
5  Q.  YOU DID NOT TESTIFY YESTERDAY, DID YOU, ABOUT WHAT YOUR
6  PAPER FOUND CONCERNING PEOPLE WHO USED VIOXX FOR MORE THAN 90
7  DAYS?
8  A.  I DON'T REMEMBER IF WE COVERED IT, BUT WE CAN COVER IT
9  NOW.
10  Q.  WELL, IN FACT, WHAT YOU FOUND IN YOUR PAPER IS THAT THERE
11  WAS NO INCREASED RISK OF HEART ATTACK FOR PEOPLE WHO USED VIOXX
12  AFTER 90 DAYS; RIGHT?
13  A.  ALMOST RIGHT.  I THINK THE CORRECT WAY TO STATE IT IS WE
14  DID NOT FIND AN INCREASE IN RISK IN PEOPLE WHO USED IT OVER 90
15  DAYS.  THAT'S A LITTLE DIFFERENT FROM SAYING WE SHOWED THAT
16  THERE WAS NO RISK.
17  Q.  OKAY.  YOU DID NOT FIND ANY RISK WHATSOEVER IN HEART
18  ATTACKS FOR PEOPLE WHO USED VIOXX FOR 90 DAYS OR MORE?
19  A.  THAT'S CORRECT.
20  Q.  AND IN THE CONCLUSION SECTION OF THIS ARTICLE, IS THAT
21  WHAT IS INCLUDED IN THIS SENTENCE THAT I HIGHLIGHTED HERE THAT
22  SAYS, "THE RISK WAS ELEVATED IN THE FIRST 90 DAYS OF USE BUT
23  NOT THEREAFTER"?
24  A.  THAT'S CORRECT.  OUR BELIEF IS THAT PEOPLE WHO WERE HAVING
25  DIFFICULTY WITH THE DRUG IN THE FIRST 90 DAYS STOPPED TAKING

## Page 485

1  IT.
2  Q.  WELL, WHAT YOU FOUND WAS THAT THERE WAS NO ELEVATION IN
3  RISK AFTER 90 DAYS OF USE; RIGHT?
4  A.  RIGHT.
5  Q.  DID YOU SET FORTH THAT BELIEF IN YOUR ARTICLE?
6  A.  I CAN LOOK AND SEE, BUT I THINK EVEN MERCK AGREES THAT
7  THERE IS A RISK AFTER 90 DAYS.  SO I'M TRYING TO UNDERSTAND WHY
8  IT IS THAT WE FOUND NO RISK.
9      AND I THINK THAT, IN AN OBSERVATIONAL STUDY, AS YOU
10  SAID, WHERE WE DO NOT GIVE PEOPLE DRUGS IN A KIND OF CLINICAL
11  TRIAL SETTING, WE CAN'T MAKE PEOPLE STAY ON THE DRUG.  AND IF
12  SOMEBODY IS HAVING PROBLEMS WITH THE DRUG, WE OFTEN SEE IN AN
13  OBSERVATIONAL STUDY THAT PEOPLE WHO ARE HAVING DIFFICULTY WITH
14  THE DRUG STOP TAKING IT.
15      AND MY BELIEF, AS THE SENIOR AUTHOR OF THE PAPER, IS
16  THAT THAT IS PROBABLY WHY WE DID NOT SEE A RISK AFTER 90 DAYS.
17  Q.  WELL, THE KIND OF DIFFICULTIES THAT THEY HAVE ON A DRUG
18  LIKE THIS WOULD BE GASTROINTESTINAL DIFFICULTIES OR IT WASN'T
19  WORKING TO RELIEVE THEIR PAIN; RIGHT?
20  A.  NO.  THE DIFFERENCES THAT I'M THINKING OF IS PEOPLE WHOSE
21  BLOOD PRESSURE WENT UP, PEOPLE WHO DEVELOPED CHEST PAIN, PEOPLE
22  WHO DEVELOPED CONGESTIVE HEART FAILURE, ALL OF WHICH ARE KNOWN
23  SIDE EFFECTS OF VIOXX, MAY WELL HAVE DROPPED OUT OF TAKING THE
24  DRUGS SINCE THEY WERE JUST IN NORMAL CARE.  AND I BELIEVE THAT
25  IS WHY, AFTER 90 DAYS, WE DIDN'T SEE THE RISK.

## Page 486

1  Q.  WHY DON'T WE TAKE A BREAK AND I WOULD LIKE YOU TO READ
2  THROUGH YOUR ARTICLE, AND WHEN WE COME BACK FROM THE BREAK,
3  TELL ME WHETHER THERE IS ANYWHERE AT ALL IN YOUR ARTICLE WHERE
4  YOU SAY ANYTHING THAT WOULD SUPPORT YOUR LAST ANSWER.
5  A.  I CAN SAVE TIME AND TELL YOU RIGHT NOW THAT IT'S NOT THERE
6  BECAUSE IT'S MY CURRENT UNDERSTANDING OF WHAT OUR FINDINGS --
7  WHY OUR FINDINGS WERE AS THEY ARE IN LIGHT OF THE CONSENSUS
8  OPINION NOW THAT VIOXX DOES CAUSE HEART ATTACKS AFTER 90 DAYS,
9  BUT WE DID NOT ENGAGE IN THAT SPECULATION IN THE PAPER.
10  Q.  YOU COMPARED THE USE OF VIOXX TO THE USE OF CELEBREX, AS
11  WELL AS THE USE OF OTHER TRADITIONAL NSAIDS.  AND YOU ALSO
12  COMPARE IT TO PEOPLE WHO DIDN'T USE ANY NSAIDS AT ALL?
13  A.  RIGHT.
14  Q.  OKAY.  SO, FIRST, I WANT TO TALK ABOUT WHAT YOU FOUND WITH
15  VIOXX VERSUS CELEBREX DURING THIS FIRST 90 DAYS OF USE WHERE
16  YOU FOUND AN ELEVATED RISK.
17  A.  RIGHT.
18  Q.  OKAY.  WE'VE TALKED YESTERDAY AND TODAY ABOUT THE CONCEPT
19  OF STATISTICAL SIGNIFICANCE, AND YOU TALKED ABOUT P VALUES AND
20  CONFIDENCE INTERVALS.  REMEMBER THAT?
21  A.  RIGHT.
22  Q.  AND AM I CORRECT, DOCTOR, THAT THOSE THINGS, THE P VALUES
23  AND THE CONFIDENCE INTERVALS, ARE USED TO BASICALLY ESTIMATE
24  THE LIKELIHOOD THAT SOMETHING IS DUE TO CHANCE?
25  A.  EXACTLY.

Page 487

1  Q.  THERE'S ANOTHER STATISTICAL CONCEPT THAT RUNS THROUGHOUT
2  MANY OF THE ARTICLES WE'VE LOOKED AT CALLED RELATIVE RISK;
3  CORRECT?
4  A.  CORRECT.
5  Q.  AND SOMETIMES THAT'S ABBREVIATED AS RR; RIGHT?
6  A.  CORRECT.
7  Q.  AND THEN SOMETIMES I'VE SEEN IT REFERRED TO AS OR.  WHAT'S
8  THAT MEAN?
9  A.  THAT'S ODDS RATIO WHICH, FOR EVENTS THAT ARE NOT COMMON,
10 IS ABOUT THE SAME AS RELATIVE RISK.
11 Q.  OKAY.  NOW, THE STATISTICAL SIGNIFICANCE AND CONFIDENCE
12 INTERVALS, AS WE SAID, THAT'S, YOU KNOW, HOW LIKELY SOMETHING
13 IS THAT IT IS DUE TO CHANCE, BUT THEN RELATIVE RISK IS A
14 DIFFERENT CONCEPT.  AND AM I RIGHT THAT IT'S BASICALLY A
15 MEASUREMENT OF HOW MUCH HIGHER IS THE RISK?
16 A.  EXACTLY RIGHT.
17 Q.  OKAY.  SO THAT -- AND THE WAY THAT IT'S PRESENTED,
18 TYPICALLY, IN ONE OF THESE PAPERS IS THAT, IF THE RELATIVE RISK
19 IS 1 -- SAY IF YOU'RE COMPARING VIOXX TO NO USE OF MEDICINE AT
20 ALL, AND THERE WAS A RELATIVE RISK OF 1, THAT WOULD MEAN THAT
21 VIOXX WAS THE EQUIVALENT OF NOT USING ANY MEDICINE AT ALL;
22 RIGHT?
23 A.  CORRECT.
24 Q.  SO 1 IS KIND OF THE BASELINE; RIGHT?
25 A.  CORRECT.

Page 488

1  Q.  AND THEN, FOR EXAMPLE, IF IT WERE 2, 2.0, THAT WOULD MEAN
2  THAT THE RISK OF WHICHEVER THE DRUG WAS IS TWO TIMES GREATER
3  THAN THE OTHER ONE; RIGHT?
4  A.  WELL, THE RISK OF A GIVEN EVENT IF YOU TAKE THAT DRUG IS
5  TWICE, YES.
6  Q.  OKAY.  SO IF YOU WERE MEASURING HEART ATTACKS WITH DRUG A
7  AND DRUG B, AND DRUG A HAD A RELATIVE RISK OF 2, THEN YOU WOULD
8  BE SAYING THAT THE CHANCE OR RISK THAT THAT PERSON USING THAT
9  DRUG WOULD HAVE A HEART ATTACK TWICE AS HIGH AS SOMEBODY
10 USING THE OTHER DRUG?
11 A.  EXACTLY.
12 Q.  10 WOULD BE 10 TIMES AS HIGH.
13 A.  CORRECT.
14 Q.  SO LET'S GO BACK TO YOUR ARTICLE HERE.  TURN OVER TO
15 TABLE 2 ON PAGE 2071.
16 A.  GOT IT.
17 Q.  AND I'M GOING TO HIGHLIGHT THE FIRST HALF OR SO OF THAT SO
18 THAT IT'S JUST A LITTLE BIT MORE LEGIBLE.  AND I WANT TO TAKE A
19 FEW MINUTES AND WALK THROUGH THIS, IF YOU'LL BEAR WITH ME.  I
20 THINK IT MAY HELP THE JURY UNDERSTAND IT.
21 A.  OKAY.
22 Q.  THE TITLE IS "ADJUSTED ASSOCIATION BETWEEN COXIBS AND
23 ACUTE MYOCARDIAL INFARCTION."
24     NOW, THAT MEANS YOU'RE LOOKING AT THE RELATIVE RISK
25 COMPARING CERTAIN DRUGS TO OTHER DRUGS OR NO DRUGS AT ALL, AND

Page 489

1  WHAT YOU'RE DOING IS LOOKING AT THAT IN TERMS OF HEART ATTACKS;
2  RIGHT?
3  A.  CORRECT.
4  Q.  SO JUST LOOKING AT THE FIRST ONE, IT SAYS, "EXPOSURE" AND
5  THEN "REFERENCE GROUP." IN THE HEADING ON THE FIRST COLUMN.
6  YOU SEE THAT?
7  A.  RIGHT.
8  Q.  AND THEN WE HAVE THE "ADJUSTED ODDS RATIO," WHICH HAS TWO
9  COMPONENTS TO IT; RIGHT?
10 A.  (WITNESS NODS HEAD AFFIRMATIVELY.)
11 Q.  AND THE "P-VALUE" OVER HERE; IS THAT CORRECT?
12 A.  CORRECT.  RIGHT.
13 Q.  OKAY.  LET'S SEE IF WE CAN MAKE THAT A LITTLE MORE
14 CONCRETE BY -- WE'LL TAKE THE FIRST EXAMPLE.  SO THE EXPOSURE
15 THAT THE DRUG THAT YOU'RE MEASURING THE RISK OF IN THIS FIRST
16 ITEM IS ROFECOXIB, BEING VIOXX; RIGHT?
17 A.  CORRECT.
18 Q.  AND THE REFERENCE GROUP OR THE DRUG THAT YOU'RE COMPARING
19 IT TO IS CELECOXIB OR CELEBREX; IS THAT RIGHT?
20 A.  THAT'S RIGHT.
21 Q.  AND IS THIS FOR THIS 90-DAY PERIOD, OR IS THIS FOR --
22 A.  THIS IS, I BELIEVE, FOR ALL PERIODS STUDIED.
23 Q.  OKAY.  AND SO WHEN YOU COMPARE IT IN THIS FIRST ITEM,
24 VIOXX TO CELEBREX, WHAT YOU FOUND WAS A RELATIVE RISK OR ODDS
25 RATIO OF 1.24; RIGHT?

Page 490

1  A.  CORRECT.
2  Q.  SO HIGHER THAN EVEN BUT LESS THAN TWICE AS MUCH; CORRECT?
3  A.  CORRECT.
4  Q.  AND THEN THERE IS THIS CONFIDENCE INTERVAL THAT WE TALKED
5  ABOUT BEFORE, AND THAT BRACKET IS ABOVE 1.0.  AND THEREFORE,
6  TRADITIONALLY, IT WOULD BE CONSIDERED STATISTICALLY
7  SIGNIFICANT?
8  A.  CORRECT.
9  Q.  AND THEN THE P-VALUE, USING THE P-VALUE, WOULD THAT BE
10 STATISTICALLY SIGNIFICANT?
11 A.  CORRECT.
12 Q.  AND THAT'S BECAUSE IT'S ABOVE OR BELOW .05?
13 A.  LESS THAN .05.
14 Q.  LESS THAN .05.
15 A.  RIGHT.
16 Q.  WHERE ON THIS TABLE DOES IT INDICATE, OR DOES IT NOT, HOW
17 LONG THE USE IS FOR THIS COMPARISON OF VIOXX VERSUS CELEBREX?
18 A.  THIS IS EVERYBODY IN THE STUDY.  THIS TABLE INCLUDES ALL
19 THE DATA WE HAD.  SO IT'S ALL DURATIONS OF USE.
20 Q.  OKAY.  NOW, WE TALKED ABOUT THE RELATIVE RISK OR ODDS
21 RATIO, THIS NUMBER 1.24.  IS IT TRUE, DOCTOR, THAT
22 EPIDEMIOLOGISTS GENERALLY CONSIDER ASSOCIATION WITH A RELATIVE
23 RISK OF LESS THAN 2 TO BE A WEAK ASSOCIATION?
24 A.  NO.  THAT IS NOT A UNIVERSAL VIEW AT ALL.  SOME PEOPLE
25 BELIEVE THAT; OTHERS DON'T.

## Page 491

1  Q. ARE YOU FAMILIAR WITH DR. BRIAN STROM?
2  A. YES, I AM.
3  Q. AND HIS PUBLICATION, PHARMACOEPIDEMIOLOGY?
4  A. YOU MEAN HIS TEXTBOOK OR THE JOURNAL? I THINK YOU MEAN
5  THE TEXTBOOK.
6  Q. YES.
7  A. YES.
8  Q. IN, FACT, I'LL HAND YOU THE TEXT.
9  A. YES.
10  Q. YOU'RE FAMILIAR WITH HIS TEXTBOOK PHARMACOEPIDEMIOLOGY?
11  A. I AM, YES.
12  Q. AND I THINK YOU HAVE INDICATED BEFORE THAT YOU CONSIDER
13  DR. STROM'S TEXTBOOK, PHARMACOEPIDEMIOLOGY, TO BE ONE OF THE
14  THREE OR FOUR LEADING TEXTBOOKS IN THE FIELD. IS THAT A FAIR
15  STATEMENT?
16  A. YES. RIGHT.
17  Q. OKAY. I'LL JUST HAND YOU THE TEXTBOOK HERE.
18  A. GOT IT.
19  Q. SO EXHIBIT 53 IS AN EXCERPT FROM THIS BOOK.
20       DOCTOR, BEFORE WE TAKE A BREAK, WE HAD LOOKED AT A
21  TABLE FROM YOUR ARTICLE SHOWING A RELATIVE RISK OF VIOXX VERSUS
22  CELEBREX OF 1.24, AND THEN I ASKED YOU WHETHER A RELATIVE RISK
23  OF LESS THAN 2 WAS CONSIDERED BY EPIDEMIOLOGISTS TO BE A WEAK
24  ASSOCIATION. YOU HAD ANSWERED THAT QUESTION, AND THEN I HAD
25  GIVEN YOU THIS TEXTBOOK BY DR. STROM.

## Page 492

1       AND I THINK YOU ALREADY INDICATED THAT HE'S A LEADING
2  MAN IN THE FIELD AND HIS BOOK IS ONE OF THE THREE OR FOUR MOST
3  AUTHORITATIVE TEXTBOOKS IN THE FIELD OF PHARMACOEPIDEMIOLOGY;
4  RIGHT? I THINK YOU WERE NODDING YES. IS THAT RIGHT?
5  A. CORRECT.
6  Q. OKAY. AND WHEN I HANDED IT TO YOU AND I REFERRED YOU TO
7  PAGE 20, YOU ASKED TO SEE THE BOOK ITSELF, AND ONE OF THE
8  REASONS IS YOU WANTED TO SEE WHO ACTUALLY WROTE THE CHAPTER;
9  RIGHT?
10  A. RIGHT.
11  Q. BECAUSE IT'S ONE THING IF THE BOOK IS EDITED BY DR. STROM;
12  IT'S ANOTHER THING IF THE CHAPTER IS WRITTEN BY SOME GUY YOU'VE
13  NEVER HEARD OF. RIGHT?
14  A. CORRECT.
15  Q. WHO WROTE THE CHAPTER?
16  A. DR. STROM.
17  Q. OKAY. SO DR. STROM HIMSELF WROTE THE CHAPTER THAT PAGE 20
18  IS ON, AND ACCORDING TO DR. STROM --
19  A. I HAVE IT HERE.
20  Q. ACCORDING TO DR. STROM, DOES HE STATE HERE,
21  "CONVENTIONALLY, EPIDEMIOLOGISTS CONSIDER AN ASSOCIATION WITH
22  RELATIVE RISK OF LESS THAN 2 A WEAK ASSOCIATION"?
23  A. CORRECT. CORRECT THAT HE SAYS THAT. I DON'T AGREE WITH
24  THAT STATEMENT.
25  Q. YOU DISAGREE WITH DR. STROM ON THAT?

## Page 493

1  A. THAT'S RIGHT. AND IF I CAN EXPLAIN WHY I DISAGREE. I
2  THINK IF I WERE TO SAY TO A PATIENT "HERE IS DRUG X. IT
3  DOESN'T WORK ANY BETTER THAN DRUG Y IN YOUR CASE, BUT IT WILL
4  INCREASE YOUR RISK OF HEART ATTACK OR STROKE BY 90 PERCENT.
5  WOULD YOU LIKE THIS DRUG OR WOULD YOU LIKE THE OTHER DRUG?" IN
6  MY EXPERIENCE, PATIENTS WOULD SAY, "WHY WOULD I WANT A DRUG
7  THAT INCREASES MY RISK OF A HEART ATTACK OR STROKE BY 90
8  PERCENT?" AS, IN FACT, VIOXX DOES. AN INCREASE OF 90 PERCENT
9  WOULD BE A RELATIVE RISK OF LESS THAN 2.0. MOST OF US WOULD
10  NOT WANT TO INCUR A RISK OF 90 PERCENT INCREASE.
11  Q. WELL, OF COURSE, ONE OF THE THINGS THAT EPIDEMIOLOGISTS
12  AND STATISTICIANS DO IS THEY LOOK AT THE STRENGTH OF
13  ASSOCIATIONS TO SEE HOW LIKELY SOMETHING REALLY IS AND TO DRAW
14  JUDGMENTS THAT LAY PEOPLE MIGHT NOT BE IN A POSITION TO DRAW;
15  RIGHT?
16  A. RIGHT.
17  Q. IN ANY EVENT, THE ASSOCIATION THAT WE WERE LOOKING AT IN
18  YOUR ARTICLE ON VIOXX VERSUS CELEBREX -- I'LL PUT THAT BACK UP
19  ON THE SCREEN -- THAT WAS AN ASSOCIATION THAT WAS JUST 1.24;
20  RIGHT?
21  A. I WOULDN'T USE THE "JUST." THE ASSOCIATION WAS 1.24, OR
22  NEARLY 25 PERCENT INCREASE IN RISK.
23  Q. YOU TESTIFIED YESTERDAY THAT YOUR 2004 STUDY SHOWED AN
24  INCREASED RISK WITH A VARIETY OF COMPARISON DRUGS. DO YOU
25  REMEMBER THAT?

## Page 494

1  A. YES.
2  Q. LET'S LOOK HERE. ROFECOXIB, WHICH IS VIOXX -- I JUST WANT
3  TO LOOK HERE. WE'VE ALREADY LOOKED AT ROFECOXIB VERSUS
4  CELEBREX; RIGHT?
5  A. RIGHT.
6  Q. NOW, HERE IS ROFECOXIB OR VIOXX VERSUS NAPROXEN, AND THERE
7  THE RELATIVE RISK IS LOWER. IT'S 1.17; RIGHT?
8  A. RIGHT.
9  Q. AND ALSO, THERE THE CONFIDENCE INTERVAL GOES BELOW 1.0;
10  RIGHT?
11  A. RIGHT.
12  Q. AND UNDER CONVENTIONAL APPROACHES TO THIS SORT OF THING,
13  THAT WOULD NOT BE CONSIDERED STATISTICALLY SIGNIFICANT;
14  CORRECT?
15  A. RIGHT.
16  Q. AND THEN YOU ALSO -- SO JUST TO PUT THAT IN LAYMEN'S
17  TERMS, FROM A STATISTICAL POINT OF VIEW, WHEN YOU COMPARED
18  VIOXX TO NAPROXEN IN YOUR STUDY, THERE BASICALLY WAS NO
19  DIFFERENCE IN TERMS OF THE EFFECT, NO STATISTICALLY SIGNIFICANT
20  DIFFERENCE; RIGHT?
21  A. RIGHT.
22  Q. OKAY. AND SIMILARLY, WE HAVE VIOXX DOWN HERE VERSUS
23  IBUPROFEN. YOU SEE THAT?
24  A. RIGHT.
25  Q. THAT'S ANOTHER NSAID; RIGHT?

## Page 495

1   A.  RIGHT.
2   Q.  AND THERE THE RELATIVE RISK IS 1.21, CORRECT?
3   A.  RIGHT.
4   Q.  AND AGAIN, THE CONFIDENCE INTERVAL THAT WE TALK ABOUT
5   STARTS AT .92.  SO THAT'S BELOW 1.0; RIGHT?
6   A.  RIGHT.
7   Q.  SO AGAIN, THAT DIFFERENCE BETWEEN VIOXX AND IBUPROFEN IS
8   NOT STATISTICALLY SIGNIFICANT; CORRECT?
9   A.  THAT'S RIGHT.
10  Q.  YESTERDAY YOU ALSO TESTIFIED THAT YOUR 2004 STUDY SHOWED
11  AN INCREASED RISK OF HEART ATTACKS WITH LOWER DOSES OF VIOXX.
12  DO YOU REMEMBER THAT?
13  A.  RIGHT.
14  Q.  LET ME SHOW YOU -- I'M SORRY.  YOU ALREADY HAVE THIS
15  DOCUMENT IN YOUR STACK SOMEWHERE.  EXHIBIT 28 FROM YESTERDAY.
16  A.  CAN YOU TELL ME WHAT IT WAS?
17  Q.  IT WAS A COLLECTION OF THINGS THAT INCLUDED THE ABSTRACT
18  THAT YOU PUBLISHED?
19  A.  FROM THE AMERICAN COLLEGE OF RHEUMATOLOGY?
20  Q.  RIGHT.  THE ACR DOCUMENT.
21  A.  EXHIBIT 28.  IF THEY WERE IN ORDER, THEY ARE NOT IN ORDER
22  NOW.  GOT IT.
23  Q.  AND THE PAGES AREN'T NUMBERED, BUT IF YOU COUNT OUT 17, WE
24  FIGURED OUT YESTERDAY, 17 OR 18, YOU'LL FIND THE EXCERPT THAT
25  YOU TESTIFIED ABOUT.

## Page 496

1   A.  YOU MEAN OUR PAPER?  IS THAT WHAT YOU MEAN?
2   Q.  YES, YOUR ABSTRACT.
3   A.  GOT IT.
4   Q.  SO DO I HAVE UP ON THE SCREEN THE ABSTRACT THAT YOU
5   PUBLISHED CONCERNING IN EPIDEMIOLOGICAL STUDY WE HAVE BEEN
6   TALKING ABOUT?
7   A.  RIGHT.
8   Q.  OKAY.  YOU IDENTIFIED THIS YESTERDAY AS AN ABSTRACT THAT
9   WAS PRESENTED SOMEWHERE.
10  A.  RIGHT.  THE AMERICAN COLLEGE OF RHEUMATOLOGY.
11  Q.  AND YOU PRESENTED THIS ABSTRACT, AND THEN LATER ON YOU
12  TURNED THIS ABSTRACT INTO THE FULL-BLOWN ARTICLE THAT WE HAVE
13  BEEN LOOKING AT; RIGHT?
14  A.  THAT'S RIGHT.
15  Q.  AND I WANT TO JUST FOCUS ON THIS SUBJECT THAT I RAISED
16  BEFORE WE TURNED TO THIS DOCUMENT, AND THAT IS YOUR TESTIMONY
17  YESTERDAY THAT THE STUDY THAT RESULTED IN THIS ABSTRACT AND
18  YOUR ARTICLE, YOU SAID, SHOWED AN INCREASED RISK OF HEART
19  ATTACKS WITH LOWER DOSES OF VIOXX.  OKAY?
20  A.  RIGHT.
21  Q.  NOW, DOES THIS ABSTRACT BREAK DOWN THE RESULTS OF
22  INCREASED RISK BY DOSAGE FOR VIOXX?
23  A.  YES.
24  Q.  AND IS THAT IN THE "RESULTS" SECTION?
25  A.  YES.

## Page 497

1   Q.  LET ME BLOW UP THE "RESULTS" SECTION.  AND THERE IS A LOT
2   OF INFORMATION IN THE "RESULTS" SECTION, AND I WANT TO FOCUS ON
3   THE -- WHERE IN THE "RESULTS" SECTION YOU SHOW RESULTS WERE
4   25 MILLIGRAMS OR LESS OF VIOXX.
5   A.  OKAY.
6   Q.  OKAY?
7   A.  WOULD YOU LIKE ME TO IDENTIFY IT FOR YOU?
8   Q.  SURE.
9   A.  IF YOU GO TO THE THIRD LINE, WHICH IS WHERE IT SAYS "THE
10  ADJUSTED RELATIVE RISK OF AMI."
11  Q.  RIGHT.
12  A.  OKAY.  AND IT'S -- IT'S BASICALLY THAT LINE AND THE NEXT
13  LINE.
14  Q.  THE FIRST LINE IS ABOVE 25 MILLIGRAMS; RIGHT?
15  A.  RIGHT.  KEEP GOING.
16  Q.  OKAY.  AND ROFECOXIB IS IT HERE BELOW 25 MILLIGRAMS?
17  A.  CORRECT.  AND THEY BOTH ARE SIGNIFICANTLY INCREASED.
18  Q.  SO FOR COMPARING VIOXX BELOW 25 MILLIGRAMS TO CELEBREX,
19  YOU HAVE --
20  A.  IN THE LOW DOSE.  SO WE COMPARED HIGH DOSE OF VIOXX TO
21  HIGH DOSE OF CELEBREX --
22  Q.  YEAH.  I'M JUST FOCUSING ON THE LOW DOSE NOW.
23  A.  OKAY.
24  Q.  SO COMPARING LOW-DOSE VIOXX TO LOW-DOSE CELEBREX, YOU HAD
25  A RELATIVE RISK OR ODDS RATIO OF 1.21; CORRECT?

## Page 498

1   A.  RIGHT.
2   Q.  AND THEN YOU HAD A CONFIDENCE INTERVAL, WHICH STARTS JUST
3   ABOVE THE 1.0 MARK, WHICH IS THE TRADITIONAL MARK FOR
4   STATISTICAL SIGNIFICANCE.  RIGHT?
5   A.  RIGHT.
6   Q.  SO THAT'S THE COMPARISON OF VIOXX VERSUS CELEBREX?  AT LOW
7   DOSE.
8   A.  YES.
9   Q.  AND THEN DOES THE NEXT LINE TALK ABOUT DIFFERENT DOSES OF
10  VIOXX COMPARED TO PEOPLE WHO DID NOT USE ANY NSAID AT ALL?
11  A.  RIGHT.
12  Q.  AND AGAIN, FOCUSING ON THE LOWER DOSE, OR THE
13  25-MILLIGRAM -- THE 25 MILLIGRAM DOSE, THERE, WHEN YOU COMPARE
14  VIOXX 25-MILLIGRAM TO PEOPLE WHO DIDN'T USE ANY NSAID AT ALL,
15  THE RELATIVE RISK WAS JUST 1.11; CORRECT?
16  A.  RIGHT.
17  Q.  AND THERE THE CONFIDENCE INTERVAL ACTUALLY WAS SUCH WHERE
18  THE LOWER NUMBER FELL BELOW 1.0, SO IT MEANS IT'S NOT EVEN
19  STATISTICALLY SIGNIFICANT; RIGHT?
20  A.  YES.  BUT I NEED TO EXPLAIN THE ISSUE OF SIGNIFICANCE, AND
21  IT RELATES TO YOUR QUESTION EARLIER ABOUT THE STUDIES THAT
22  COMPARED VIOXX TO PLACEBO.
23       IF THE COMPARISON GROUP -- IF ANY GROUP IS OF SMALL
24  SIZE, IT IS MUCH LESS LIKELY THAT THE P-VALUE WILL BE
25  STATISTICALLY SIGNIFICANT.  AND THIS IS SORT OF FANCY

Page 499

1  STATISTICS, BUT IT IS UNIVERSALLY AGREED-UPON CONCEPT THAT THE
2  SMALLER THE GROUP OF PEOPLE THAT YOU'RE STUDYING AND/OR THE
3  SMALLER THE COMPARISON GROUP, THE MORE DIFFICULT IT IS TO SHOW
4  A STATISTICAL SIGNIFICANCE BECAUSE THAT REQUIRES -- IT'S REALLY
5  A COMBINATION OF TWO THINGS, THIS SIGNIFICANCE STUFF:  ONE IS
6  HOW BIG THE EFFECT IS AND THE OTHER IS THE SIZE OF THE
7  POPULATION THAT YOU'RE STUDYING.
8       SO, FOR EXAMPLE -- AND I'M SORRY TO GO INTO LENGTH
9  ABOUT THIS, BUT IT'S VERY IMPORTANT.  IF YOU WERE TO DO A STUDY
10  OF SMOKING AND LUNG CANCER, AND YOU ONLY STUDIED, LIKE, 20
11  PEOPLE, YOU MIGHT FIND NO STATISTICALLY SIGNIFICANT CONNECTION
12  BETWEEN SMOKING AND LUNG CANCER, NOT BECAUSE THE EFFECT ISN'T
13  THERE BUT BECAUSE THE SIZE OF THE GROUP THAT YOU'RE STUDYING
14  WAS TOO SMALL.
15       WHAT WE SEE HERE IS THAT THE NO-NSAID GROUP, AND IF
16  WE GO BACK TO ONE OF THE TABLES, WAS A GROUP THAT WAS SMALL IN
17  SIZE, IN TERMS OF -- IN OUR TERMS, WE TEND TO HAVE HUGE
18  POPULATIONS, BUT -- OR WAS THIS OTHER NSAIDS OR NO NSAIDS?
19  Q.  NO NSAIDS.
20  A.  NO NSAIDS.
21  Q.  WHAT ARE YOU LOOKING AT RIGHT NOW?
22  A.  OKAY.  I'M TRYING TO LOOK AT THE SIZES OF THE GROUP
23  BECAUSE WHAT I'M GOING BY, MR. BECK -- AND I THINK WHAT'S THE
24  RELEVANT AND MOST IMPORTANT DEPICTION OF THE DOSE IS WHAT
25  APPEARS IN THE FINAL PAPER, WHICH IS WHEN YOU TAKE ALL COMERS

Page 500

1  AND JUST NOT PICK SELECTIVELY WHICH COMPARISON GROUP YOU'RE
2  GOING TO LOOK AT, IN THE END OF RESULTS SECTION IN THE PAPER AS
3  IT WAS ACTUALLY PUBLISHED, WHAT WE SAY IS IF YOU LOOK AT
4  ROFECOXIB LESS THAN 25 MILLIGRAMS, OR 25 OR LESS, THE ODDS
5  RATIO IS 1.37 FOR EVERYBODY, WITH A P-VALUE OF .0004, WHICH IS
6  HIGHLY SIGNIFICANT, AND WAS COMPARABLE TO WHAT WE FOUND FOR
7  ROFECOXIB IN THE HIGH DOSE, WHICH WAS 1.38.
8       AND THE POINT ABOUT THE LOW DOSE IS THAT IT'S A
9  HIGHLY SIGNIFICANT ASSOCIATION, IF YOU TAKE ALL COMERS.  IF YOU
10  TAKE OTHER SMALLER COMPARISON GROUPS, YOU'RE LIKELY NOT TO SEE
11  SIGNIFICANCE?
12  Q.  I'M JUST FOCUSING ON THE ABSTRACT THAT YOU PRESENTED, AND
13  YOU DID INCLUDE THERE A BREAKDOWN SO THAT SOMEBODY COULD LOOK
14  AND SAY, OKAY, IF I'M INTERESTED IN VIOXX VERSUS SOMEBODY WHO
15  DIDN'T TAKE ANY PAIN MEDICATION AT ALL, AND PARTICULARLY THE
16  NORMAL DOSE OF VIOXX OF 25 MILLIGRAMS, THEN, ACCORDING TO YOUR
17  ABSTRACT HERE, THERE'S NO STATISTICALLY SIGNIFICANT DIFFERENCE
18  BETWEEN TAKING VIOXX IN 25 MILLIGRAMS AND NOT TAKING ANY
19  MEDICINE AT ALL; RIGHT?
20       AM I CORRECT, SIR, THAT ACCORDING TO THE ABSTRACT
21  WHERE YOU FIRST PRESENTED YOUR RESULTS, USING 25 MILLIGRAMS OF
22  VIOXX --
23  A.  OR LESS.
24  Q.  -- OR LESS, THERE WAS NO STATISTICALLY SIGNIFICANT
25  DIFFERENCE BETWEEN THAT AND NOT USING ANY NSAID AT ALL?

Page 501

1  A.  RIGHT.
2  Q.  WHEN YOU TURN THE ABSTRACT INTO THE ARTICLE THAT WE HAVE
3  TALKED ABOUT, DID YOU KEEP IN THE INFORMATION ABOUT HOW THERE
4  WAS NO STATISTICALLY SIGNIFICANT DIFFERENCE BETWEEN 25
5  MILLIGRAMS OF VIOXX AND THE USE OF NO NSAID AT ALL?
6  A.  WE EXPRESSED IT FOR THE WHOLE STUDY, INCLUDING ALL THE
7  STUDY PARTICIPANTS.  AS YOU KNOW, THERE'S A LIMIT TO HOW MANY
8  THINGS, HOW MUCH SPACE YOU ARE ALLOWED, IN AN ARTICLE.
9       I VIVIDLY REMEMBER THAT WE WENT BACK AND FORTH WITH
10  MERCK ABOUT THIS, AND THE LANGUAGE THAT WE ENDED UP WITH, WHICH
11  IS THE LANGUAGE THAT THE JOURNAL ACCEPTED, WAS TAKING ALL
12  COMERS, LOOKING AT THE DOSE OF ROFECOXIB/VIOXX COMPARED TO
13  NAPROXEN, COMPARED TO OTHER NONSTEROIDALS, COMPARED TO NO USE.
14  WE LOOKED AT THE ENTIRE POPULATION, AND THAT'S WHERE WE CAME UP
15  WITH THE DOSE ESTIMATE BECAUSE OF OUR BELIEF, WHICH THE JOURNAL
16  AGREED WITH, THAT THE BEST WAY OF LOOKING AT THE DOSE ISSUE WAS
17  TO LOOK AT IT ACROSS ALL COMERS FOR ALL COMPARISON GROUPS.
18  Q.  DID YOU OR DID YOU NOT INCLUDE IN THE PUBLISHED ARTICLE
19  THE INFORMATION THAT WE HAVE BEEN TALKING ABOUT IN THE ABSTRACT
20  THAT SHOWS THAT THERE IS NO STATISTICALLY SIGNIFICANT
21  DIFFERENCE BETWEEN USING 25 MILLIGRAMS OF VIOXX AND NOT TAKING
22  ANY NSAIDS AT ALL?
23  A.  NO, WE DID NOT.  BUT SIMILARLY, THERE IS NO PLACE WHERE WE
24  CAN LOOK AT SHORT DURATION OF LOW DOSE COMPARED TO NAPROXEN,
25  BECAUSE IF YOU CONSIDER HOW MANY DIFFERENT COMPARISONS GET

Page 502

1  MADE, THERE WOULD BE LITERALLY HUNDREDS OF COMPARISONS, AND
2  YOU'D NEED HUNDREDS OF POINTS IN YOUR TABLE, DATA POINTS, IN
3  YOUR TABLE.
4       AND SO IF YOU LOOK, FOR EXAMPLE, RIGHT NEXT TO TABLE,
5  WE WERE JUST LOOKING AT, THE MAIN DOSE ANALYSIS IS HIGH DOSE
6  VERSUS LOW DOSE, AND THAT WAS THE ONE THAT INDICATED A
7  SIGNIFICANT INCREASE FOR BOTH HIGH DOSE AND LOW DOSE.
8       YOU CAN'T PRESENT DOSE BY DURATION BY COMPARISON FOR
9  EVERY POSSIBLE COMBINATION.  AND THAT'S WHY THAT'S NOT THERE.
10  IT WAS NOT AN ATTEMPT TO HIDE ANY FINDINGS.
11  Q.  NOW, REGARDLESS OF WHETHER YOU THOUGHT THAT DR. CANNUSCIO
12  SHOULD HAVE BEEN INCLUDED AS AN AUTHOR, SETTING THAT ASIDE FOR
13  A SECOND, DO YOU AGREE THAT MERCK NEVER TOOK ANY OF THE GRANT
14  MONEY AWAY FROM YOU BECAUSE OF THE RESULTS OF YOUR STUDY?
15  A.  THAT'S CORRECT.
16  Q.  AND YOU DO AGREE THAT MERCK NEVER DID ANYTHING TO TRY TO
17  PERSUADE YOU NOT TO PUBLISH YOUR STUDY?
18  A.  THAT'S CORRECT.
19  Q.  AND DO YOU AGREE THAT MERCK NEVER TRIED TO INTIMIDATE YOU
20  IN ANY WAY BECAUSE OF THE RESULTS OF YOUR STUDY?
21  A.  I'D HAVE A HARD TIME SAYING YES TO THAT IN LIGHT OF
22  DR. REICIN'S VISIT TO OUR UNIT TO TELL US THAT OUR FINDINGS
23  DIDN'T FIT ANY OF THE OTHER FINDINGS THAT MERCK HAD AND THAT IT
24  WOULD BE AN EMBARRASSMENT TO US WHEN OUR FINDINGS WERE
25  PUBLISHED BECAUSE THEY WERE WRONG.

DAILY COPY

## Page 503

1  THAT WASN'T INTIMIDATION LIKE WITH A BASEBALL BATH,
2  BUT IT WAS A KIND OF SCARY STATEMENT.
3  Q.  PAGE 660 OF YOUR DEPOSITION, LINE 23:
4  "Q.  DID MERCK EVER TRY TO INTIMIDATE YOU BECAUSE OF
5  THE RESULTS OF YOUR STUDY?"
6  "A.  NO."
7  IS THAT YOUR SWORN TESTIMONY JUST A COUPLE WEEKS AGO?
8  A.  YES.
9  Q.  AND WOULD YOU AGREE, SIR, THAT MERCK NEVER TOOK ANY
10  INAPPROPRIATE ACTION AFTER YOU PUBLISHED YOUR STUDY?
11  A.  WELL, I CONSIDER THE ACTION IN RELATION TO DR. CANNUSCIO
12  INAPPROPRIATE.  I DON'T KNOW WHETHER YOU WOULD CALL THAT AFTER
13  OR DURING THE PUBLICATION OR BEFORE THE PUBLICATION, BUT I
14  THINK THAT WAS INAPPROPRIATE.
15  Q.  PAGE 661, LINE 5:
16  "Q.  DID MERCK EVER TAKE ANY INAPPROPRIATE ACTION
17  AFTER YOU PUBLISHED YOUR STUDY?"
18  "A.  NO."
19  WAS THAT YOUR SWORN TESTIMONY JUST A COUPLE OF WEEKS
20  AGO?
21  A.  YES.
22  Q.  SETTING ASIDE THE AUTHORSHIP ISSUE, DO YOU AGREE THAT
23  MERCK NEVER TOOK ANY INAPPROPRIATE ACTION AFTER YOU PUBLISHED
24  YOUR STUDY?
25  A.  I DO NOT AGREE WITH THAT STATEMENT.  I THINK THAT THEIR

## Page 504

1  PRESENTATION OF OUR STUDY TO THEIR SALES REPS, TO THE PUBLIC,
2  OF THE STATEMENTS THEY MADE WAS INAPPROPRIATE BECAUSE IT WAS
3  SCIENTIFICALLY WRONG.
4  Q.  ON PAGE 661, LINE 5 THROUGH LINE 8:
5  "Q.  DID MERCK EVER TAKE ANY INAPPROPRIATE ACTION
6  AFTER YOU PUBLISHED YOUR STUDY?"
7  "A.  NO."
8  THAT WAS YOUR SWORN TESTIMONY; CORRECT?
9  A.  I WANT TO SEE THAT ONE TIME.  661, LINE --
10  Q.  -- 5.
11  A.  OKAY.  I THINK WHAT WE NEED TO EXPLAIN HERE IS THAT --
12  Q.  FIRST OF ALL, WAS THAT YOUR SWORN TESTIMONY?
13  A.  TO THE QUESTIONS ABOUT WHAT MERCK DID TO US.  AND I THINK
14  IT'S VERY IMPORTANT AND ONLY FAIR TO POINT OUT THAT YOUR LINE
15  OF QUESTIONING A FEW WEEKS AGO WAS ABOUT THINGS THAT MERCK DID
16  TO US, AND I THINK IT'S A REAL BAIT-AND-SWITCH TO TRY AND MAKE
17  IT SEEM AS IF WE'RE TALKING ABOUT THE SAME THING.
18  WE'RE TALKING ABOUT DID THEY TAKE AWAY GRANT MONEY
19  FROM YOU?  DID THEY TRY TO INTIMIDATE YOU?  DID THEY TRY TO
20  PERSUADE YOU TO PUBLISH THE STUDY?  DID THEY TAKE ANY
21  INAPPROPRIATE ACTION?  AND IN THE CONTEXT OF DID THEY --
22  Q.  THOSE ARE EXACTLY THE SAME FOUR QUESTIONS I JUST ASKED?
23  A.  RIGHT.  AT SOME POINT, SOMEBODY ELSE WHO HAS MORE TIME CAN
24  LOOK AT THE WORDS OF THE QUESTIONS.  BUT WHAT IS ABSOLUTELY
25  CLEAR IN LOOKING AT THE DEPOSITION OF A COUPLE OF WEEKS AGO,

## Page 505

1  YOU WERE TALKING ABOUT THINGS THAT MERCK HAD OR HADN'T DONE TO
2  US TO INTIMIDATE US, AND IT WAS ALL IN THE CONTEXT OF:  DID
3  THEY TAKE AWAY GRANTS FROM YOU?  DID THEY TRY TO INTIMIDATE
4  YOU?  DID THEY EVER TRY TO PERSUADE YOU NOT TO PUBLISH YOUR
5  STUDY?
6  AND WHAT I'M RESPONDING TO NOW IS:  DID MERCK EVER
7  TAKE ANY INAPPROPRIATE ACTION?  WHEN YOU ASKED IT A COUPLE OF
8  WEEKS AGO, IT WAS ALL AROUND "DID MERCK EVER DO ANYTHING TO
9  YOU?"  AND I, QUITE APPROPRIATELY, RESPONDED TO THAT IN THE
10  CONTEXT THAT YOU ASKED IT:  "NO, MERCK NEVER DID ANYTHING
11  INAPPROPRIATE TO ME."
12  HOWEVER, IF YOU WERE TO TAKE THE QUESTION IN
13  ISOLATION, AS WE ARE NOW DOING, DID THEY EVER TAKE ANY
14  INAPPROPRIATE ACTION AT ALL IN RELATION TO YOUR STUDY, YES,
15  THEY DID IN THE WAY THEY PRESENTED OUR STUDY TO THE WORLD.
16  Q.  ARE YOU DONE?
17  A.  YES.
18  Q.  OKAY.  DID MERCK HAVE A RIGHT TO DISAGREE WITH SOME OF THE
19  CONCLUSIONS IN YOUR STUDY?
20  A.  YES.
21  Q.  AND WAS ONE OF THE CONCLUSIONS THAT MERCK DISAGREED
22  WITH -- LET'S LOOK AT YOUR STUDY NOW, EXHIBIT 7.  AND YOU
23  TALKED ABOUT THIS GENERALLY YESTERDAY; ALTHOUGH, I'M NOT SURE
24  THAT YOU FOCUSED ON THE SPECIFIC LANGUAGE IN THE METHODS AND
25  RESULTS SECTION.  BUT THERE WAS SOMETHING IN THE METHODS AND

## Page 506

1  RESULTS SECTION THAT MERCK AND YOU HAD A DISAGREEMENT ABOUT;
2  CORRECT?
3  A.  YES.
4  Q.  I'M HIGHLIGHTING SOME LANGUAGE IN THERE WHERE IT SAYS,
5  "CURRENT USE OF VIOXX WAS ASSOCIATED WITH AN ELEVATED RISK OF
6  AMI," OR HEART ATTACK, COMPARED WITH CELEBREX" -- AND IT GIVES
7  THE STATISTICS -- "AND WITH NO NSAID."  YOU SEE THAT?
8  A.  YES.
9  Q.  AND WAS THAT ONE OF THE AREAS WHERE YOU AND MERCK HAD
10  DISAGREEMENT ABOUT HOW THE DATA SHOULD BE PRESENTED?
11  A.  CORRECT.
12  Q.  AND WAS ONE OF THE POINTS THAT MERCK MADE TO YOU, THAT IF
13  YOU LOOKED AT NSAIDS, VIOXX VERSUS NSAID AT THE 25-MILLIGRAM
14  DOSE, THAT THERE WAS NO STATISTICALLY SIGNIFICANT DIFFERENCE?
15  A.  WAIT A MINUTE.  THAT'S NOT WHAT WE'RE TALKING ABOUT HERE.
16  THE -- THAT'S NOT WHAT THAT SAYS.
17  Q.  NO, I KNOW THAT'S NOT WHAT THAT SAYS.  WAS ONE OF THE
18  CONCERNS THAT MERCK ARTICULATED TO YOU WAS THAT IN THE ACTUAL
19  STUDY, AS WE SAW IN THE ABSTRACT, THAT WHEN YOU COMPARE A
20  25-MILLIGRAM VIOXX TO NO NSAID USE, THERE WAS NO STATISTICALLY
21  SIGNIFICANT DIFFERENCE; BUT THAT THEY COMBINED ALL THE
22  DOSES INSTEAD OF BREAKING IT DOWN 25 VERSUS 50 MILLIGRAMS?  WAS
23  THAT ONE ISSUE THAT THEY WERE CONCERNED ABOUT?
24  A.  THEY DIDN'T LIKE THE FACT THAT WE HAD THAT LINE THAT YOU
25  UNDERLINED, THAT SECTION, IN THE PAPER.  THEY WOULD PROBABLY

14  (Pages 503 to 506)

## Page 507

1  HAVE PREFERRED THAT WE FOCUSED ON THE NONSIGNIFICANT FINDING.

2      OUR RESPONSE WAS -- AND I THINK MOST EPIDEMIOLOGISTS

3  AND STATISTICIANS WOULD AGREE -- THAT THE MOST APPROPRIATE DATA

4  WAS TO TAKE THE LARGEST GROUP POSSIBLE AND NOT PRESENT

5  SUBGROUPS, ESPECIALLY BY DIVIDING THINGS INTO SUBGROUPS MAKES

6  THE SIGNIFICANCE GO AWAY.  THAT WOULD NOT SEEM TO ME AND, I

7  THINK, TO MOST PEOPLE TO BE THE FAIREST WAY TO LOOK AT DATA IN

8  THE ABSTRACT.

9  Q.  WAS ONE OF THE DISAGREEMENTS THAT MERCK HAD WITH YOU THAT

10  EVEN WHEN YOU COMBINE 25- AND 50-MILLIGRAM USE AND COMPARED IT

11  WITH NO NSAIDS, THAT THE DIFFERENCE THAT YOU SAW WAS NOT

12  STATISTICALLY SIGNIFICANT?

13  A.  THEIR POSITION WAS THAT A P .054 LEVEL OF SIGNIFICANCE

14  SHOULD BE CONSIDERED NOT IMPORTANT.  WE DIFFERED WITH THEM AND

15  FELT THAT .054, WHICH I THINK I EXPLAINED THE OTHER DAY WAS A

16  94.6 PERCENT CERTAINTY VERSUS A 95 PERCENT CERTAINTY, THAT IT

17  WAS IMPORTANT ENOUGH THAT WE FELT IT SHOULD REMAIN IN THE

18  PAPER.  THAT WAS A POINT OF DISAGREEMENT.

19  Q.  AND MERCK -- DID MERCK FEEL THAT IN THE ABSTRACT, THAT IT

20  SHOULD BE POINTED OUT THAT THIS WAS NOT STATISTICALLY

21  SIGNIFICANT?

22  A.  I BELIEVE THEY DID.

23  Q.  AND YOU DISAGREED WITH THAT?

24  A.  CORRECT.

25  Q.  OKAY.

## Page 508

1  A.  I BELIEVE THEY WANTED US TO SAY IN THE ABSTRACT THIS WAS

2  NOT STATISTICALLY SIGNIFICANT, WHICH WE INTERPRETED AS JUST AN

3  ATTEMPT TO MINIMIZE OR UNDER THE FINDING.

4  Q.  AND THAT WAS A BONE OF CONTENTION BETWEEN YOU AND MERCK?

5  A.  THAT WAS ONE, YES.

6  Q.  OKAY.  NOW, I THINK YOU MAY HAVE ALREADY AGREED WITH US,

7  BUT UNDER A CONVENTIONAL STATISTICAL APPROACH, A CONFIDENCE

8  INTERVAL THAT INCLUDES THE NUMBER 1 IS TRADITIONALLY NOT

9  CONSIDERED STATISTICALLY SIGNIFICANT; RIGHT?

10  A.  IT IS RIGHT ON THE BORDERLINE.

11  Q.  AND --

12  A.  AND REASONABLE PEOPLE WILL DISAGREE AS TO WHETHER IT FALLS

13  ON ONE SIDE OR THE OTHER.

14  Q.  AND SIMILARLY, THE .054, REASONABLE PEOPLE CAN DIFFER ON

15  THAT, WHETHER IT'S STATISTICALLY SIGNIFICANT; RIGHT?

16  A.  RIGHT.  SOME WOULD ROUND IT TO .05, WHICH IS THE WAY YOU

17  WOULD ROUND .054; AND SOME WOULD SAY, WELL, IT'S BIGGER THAN

18  .050, SO IT'S NOT.

19  Q.  AND THE CONVENTIONAL APPROACH IS, IF IT'S BIGGER THAN

20  .050, THEN IT'S NOT STATISTICALLY SIGNIFICANT; RIGHT?

21  A.  BUT ANOTHER CONVENTIONAL APPROACH IS IF THE ROUNDED .05 --

22  IF IT ROUNDS TO .05, THAT'S CLOSE.

23  Q.  SO, IN ANY EVENT, YOU DO AGREE THAT ON BOTH THE CONFIDENCE

24  INTERVAL AND WHETHER THIS SHOWS STATISTICALLY SIGNIFICANT OR

25  THE P-VALUE, WHETHER THAT SHOWS STATISTICALLY SIGNIFICANT,

## Page 509

1  REASONABLE PEOPLE CAN DISAGREE ABOUT THAT?

2  A.  RIGHT.  BUT MY RECOLLECTION WAS THAT THEY SAID TAKE IT OUT

3  OF THE ABSTRACT, AND WE FELT THAT THE CONCERN ABOUT THE

4  CONFIDENCE INTERVAL WAS PERFECTLY EXPRESSED BY JUST PUTTING THE

5  NUMBERS UP THERE.

6      WE PUT THE CONFIDENCE INTERVAL HAVING 1.0 IN IT.  WE

7  PUT THE P-VALUE OF .054, EVEN THOUGH, A LOT OF TIMES, PEOPLE

8  WILL ROUND P-VALUES TO JUST TWO NUMBERS.  AND OUR POSITION WAS

9  IF THERE'S A CONCERN ABOUT THAT, ALL THE DATA THAT YOU NEED TO

10  DEAL WITH THAT ARE IN THE ABSTRACT, AND I THINK THEIR POSITION

11  WAS TAKE IT OUT OF THE ABSTRACT.

12  Q.  OR PUT IN THE ABSTRACT THE STATEMENT THAT IT IS NOT

13  STATISTICALLY SIGNIFICANT; RIGHT?

14  A.  RIGHT.  AND I DON'T RECALL WHICH OPTION THEY FAVORED.

15  BUT, IN OUR VIEW, YOU DIDN'T NEED TO HIGHLIGHT IT BY SAYING

16  THIS IS NOT SIGNIFICANT BECAUSE ALL THE NUMBERS ARE THERE FOR

17  ANY READER TO JUDGE.

18  Q.  INCIDENTALLY, DO YOU DISAGREE THAT -- WITH MERCK THAT THIS

19  DIFFERENCE WAS NOT STATISTICALLY SIGNIFICANT?

20  A.  NO, I DO NOT AGREE.

21  Q.  LET'S GO TO PAGE 2071 OF YOUR ARTICLE, AT THE VERY BOTTOM

22  OF THE LEFT-HAND COLUMN AND THEN CONTINUING OVER TO THE TOP OF

23  THE RIGHT-HAND COLUMN.  LET'S SEE IF I CAN GET THESE THINGS

24  RIGHT-ALIGNED.  DID YOU SAY IN THE ACTUAL ARTICLE, "THE

25  ADJUSTED RELATIVE RISK OF AMI," OR HEART ATTACKS, WITH

## Page 510

1  ROFECOXIB WAS ELEVATED BUT DID NOT REACH STATISTICAL

2  SIGNIFICANCE COMPARED WITH NO CURRENT NSAID"?  IS THAT WHAT YOU

3  ACTUALLY SAID IN THE --

4  A.  RIGHT.

5  Q.  -- BODY OF THE ARTICLE?

6  A.  RIGHT.  AS I RECALL, THAT WAS A CONCESSION THAT WE MADE TO

7  MERCK BECAUSE THEY WERE SO UNHAPPY WITH THAT NUMBER.  I THINK

8  WHAT WE AGREED IN KIND OF A HORSE-TRADING WAY WAS WE'RE GOING

9  TO LEAVE IN IT THE ABSTRACT, BUT WE'RE WILLING TO POINT OUT IN

10  THE BODY THAT IT WAS NOT STATISTICALLY SIGNIFICANT.  I THINK

11  THAT WAS THE AGREEMENT WE MADE, BECAUSE WE REALLY WERE TRYING

12  TO COME TO AN AGREEMENT WITH THAT.

13  Q.  AND MERCK'S POSITION WAS IT'S MISLEADING TO HAVE THE

14  INFORMATION IN THE ABSTRACT BUT NOT THE OBSERVATION THAT

15  IT'S -- THESE NUMBERS ARE NOT STATISTICALLY SIGNIFICANT; RIGHT?

16  AND THIS BACK-AND-FORTH, THAT WAS A POSITION THAT YOU TOOK;

17  RIGHT?

18  A.  I'M JUST TRYING TO REMEMBER.  I'M NOT SURE HOW ANYONE

19  COULD SAY THAT THERE WAS ANYTHING IN THE ABSTRACT THAT DID NOT

20  GIVE THAT IMPRESSION, BECAUSE IT WAS ALL THERE WITH THE P-VALUE

21  AND THE CONFIDENCE INTERVAL.  SO IT'S NOT AS IF ANYBODY WOULD

22  HAVE MISSED THAT IN THE ABSTRACT.

23      BUT I THINK THAT, IN AN ATTEMPT TO COME TO SOME

24  AGREEMENT WITH THEM SO THAT THE PAPER COULD ACTUALLY GET

25  PUBLISHED, I THINK THEY WANTED US TO SAY SOMETHING LIKE IT WAS

DAILY COPY

## Page 511

1 NUMERICALLY ELEVATED BUT NOT SIGNIFICANT.  AND WE FELT THAT
2 THAT WAS A REAL -- AGAIN, THIS IS JUST MY RECOLLECTION OF THE
3 WORDS FROM SEVERAL YEARS AGO, AND WE FELT THAT THAT WAS NOT
4 ACCEPTABLE BECAUSE THAT SEEMS TO REALLY LOW-BALL THE
5 DIFFERENCE.
6        AND I THINK THIS IS WHAT WE NEGOTIATED WITH THEM AS
7 THE WORDING, AND WE PUT THAT IN IN AN ATTEMPT TO JUST GET TO
8 "YES" AND TO MOVE FORWARD.
9 Q.  YESTERDAY YOU TALKED ABOUT WHY YOU THOUGHT MERCK DECIDED
10 TO REMOVE DR. CANNUSCIO AS AN AUTHOR OF THE STUDY.  DO YOU
11 REMEMBER THAT?
12 A.  RIGHT.
13 Q.  NOW, THE TRUTH IS THAT, BASED ON YOUR PERSONAL
14 INTERACTIONS WITH MERCK, YOU DO NOT KNOW WHY MERCK DECIDED THAT
15 THEY DID NOT WANT DR. CANNUSCIO'S NAME TO APPEAR ON YOUR PAPER;
16 ISN'T THAT TRUE?
17 A.  TRUE.
18 Q.  IN FACT, YOU HAVE NEVER DISCUSSED THE ISSUE OF
19 DR. CANNUSCIO BEING AN AUTHOR WITH ANYBODY FROM MERCK; RIGHT?
20 A.  RIGHT.
21 Q.  YOU DID NOT HAVE ANY DIRECT DISCUSSIONS WITH
22 DR. SANTANELLO FROM MERCK ABOUT THE ISSUE ABOUT THE ISSUE OF
23 WHETHER DR. CANNUSCIO'S NAME WOULD REMAIN ON THE PAPER; IS THAT
24 RIGHT?
25 A.  RIGHT.  I JUST KNOW THE FACTS.

## Page 512

1 Q.  WELL, YOU'RE REPEATING WHAT SOMEBODY ELSE TOLD YOU; RIGHT?
2 A.  NO.  I --
3 Q.  YOU DID NOT --
4 A.  EXCUSE ME.  YOU JUST MADE A MISSTATEMENT THAT I NEED TO
5 CORRECT.  I KNOW THE FACT WAS THAT DR. CANNUSCIO INDICATED IN
6 CORRESPONDENCE WITH BOTH DR. SOLOMON AND ME THAT SHE WANTED TO
7 BE A CO-AUTHOR, AND WE COMMUNICATED BACK TO HER THAT WE AGREED
8 THAT SHE WAS TO BE A CO-AUTHOR?
9        AND THE OTHER FACTS THAT I KNOW IS THAT
10 DR. SANTANELLO TOLD DR. SOLOMON TO TAKE HER OFF THE PAPER AND
11 THAT I KNEW THAT THAT WAS NOT SOMETHING THAT SHE WAS KEEN TO
12 DO.
13 Q.  DID YOU NOT HAVE ANY DISCUSSIONS YOURSELF WITH
14 DR. CANNUSCIO ABOUT WHETHER HER NAME WOULD REMAIN ON THE PAPER;
15 CORRECT?
16 A.  THAT'S RIGHT.
17 Q.  NOW, IN YOUR TESTIMONY JUST A FEW MINUTES AGO, YOU SAID
18 THAT THE JOURNAL AGREED WITH YOU ON THE WAY THAT THE DATA
19 SHOULD BE PRESENTED IN THE ABSTRACT.  DO YOU REMEMBER THAT?
20 A.  RIGHT.  IN THE SENSE THAT THEY ACCEPTED IT AND PUBLISHED
21 IT.
22 Q.  AND THE JOURNAL THAT WE'RE TALKING ABOUT IS CIRCULATION;
23 RIGHT?
24 A.  RIGHT.
25 Q.  YESTERDAY YOU SAID THAT YOU HAD SUBMITTED YOUR PAPER FOR

## Page 513

1 PUBLICATION TO THE NEW ENGLAND JOURNAL OF MEDICINE.  DO YOU
2 REMEMBER THAT?
3 A.  RIGHT.
4 Q.  AND ALSO YOU SUBMITTED IT TO THE JOURNAL OF THE AMERICAN
5 MEDICAL ASSOCIATION; CORRECT?
6 A.  RIGHT.  RIGHT.
7 Q.  AND THE PHRASE THAT YOU USED WAS THAT THEY PASSED ON YOUR
8 PAPER; RIGHT?
9 A.  RIGHT.
10 Q.  IN FACT, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION
11 REJECTED YOUR ARTICLE AND REFUSED TO PUBLISH IT; CORRECT?
12 A.  WELL, I THINK THAT'S -- REJECTED AND REFUSED.  MOST
13 SUBMISSIONS TO BOTH OF THOSE JOURNALS DO NOT GET ACCEPTED.
14 THEY ACCEPT ONLY ABOUT 10 PERCENT OF SUBMISSIONS.  IT'S
15 SHOOTING VERY HIGH.  AND IT'S NO SHAME TO NOT HAVE A PAPER IN
16 THE NEW ENGLAND JOURNAL OR JAMA.
17 Q.  WELL, IN ANY EVENT, THE JOURNAL OF THE AMERICAN MEDICAL
18 ASSOCIATION REJECTED YOUR ARTICLE FOR PUBLICATION; IS THAT
19 TRUE?
20 A.  SURE.
21 Q.  AND THE NEW ENGLAND JOURNAL OF MEDICINE REJECTED YOUR
22 ARTICLE FOR PUBLICATION; IS THAT TRUE?
23 A.  SURE.
24 Q.  AND BOTH OF THESE JOURNALS PROVIDED YOU WITH INFORMATION
25 EXPLAINING THE CONCERNS THAT THEY HAD ABOUT THE WAY YOU

## Page 514

1 PRESENTED DATA IN YOUR ARTICLE, DIDN'T THEY?
2 A.  WELL, THEY EXPRESSED CONCERNS WITH -- YEAH, THAT'S WHAT
3 HAPPENS WHEN A JOURNAL DOESN'T TAKE YOUR PAPER.  I WRITE
4 LETTERS LIKE TO JOURNALS ALL THE TIME SAYING WHY THEY SHOULDN'T
5 ACCEPT A GIVEN PAPER.  THAT'S WHAT THE PEER-REVIEW PROCESS IS
6 ABOUT.
7 Q.  AND THE COMMENTS THAT YOU RECEIVED FROM BOTH THE JOURNAL
8 OF THE AMERICAN MEDICAL ASSOCIATION AS WELL AS THE NEW ENGLAND
9 JOURNAL OF MEDICINE ABOUT CONCERNS THAT THEY HAD ABOUT YOUR
10 PAPER WERE, IN SOME INSTANCES, EXACTLY THE SAME CONCERNS THAT
11 MERCK HAD EXPRESSED TO YOU ABOUT THE WAY THAT YOU WERE
12 PRESENTING INFORMATION IN YOUR PAPER; ISN'T THAT TRUE?
13 A.  I WOULD NEED TO LOOK AT THOSE REVIEWERS' COMMENTS BEFORE
14 ANSWERING THAT.
15        THE COURT:  WE'LL TAKE A BREAK AT THIS TIME.  LET'S
16 TAKE A 15-MINUTE BREAK.  THE COURT WILL STAND IN RECESS.
17        THE DEPUTY CLERK:  EVERYONE RISE.
18        (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
19        THE DEPUTY CLERK:  EVERYONE RISE.
20        THE COURT:  BE SEATED, PLEASE.  MEMBERS OF THE JURY,
21 JUST LOGISTICALLY AND A HOUSEKEEPING MATTER, I'M GOING TO TRY
22 TO GO TO 1:00 TODAY, IF I CAN, BECAUSE I HAVE MY SENTENCING --
23 I SENTENCE PEOPLE ON WEDNESDAY.  I HAVE A CRIMINAL DOCKET AS
24 WELL AS A CIVIL DOCKET.  SO I DO THAT AT 2:00, AND IT WILL TAKE
25 ME 45 MINUTES OR SO TO DO THAT.  SO IF WE TAKE A BREAK 1:00 OR

16  (Pages 511 to 514)

## Page 515

1    THEREABOUTS, WE CAN COME BACK AT ABOUT 2:45. ALL RIGHT.
2    BY MR. BECK:
3    Q.  DO YOU SEE THAT EXHIBIT 54? LET ME PUT IT UP ON THE
4    SCREEN. THIS IS FROM -- A FAX COVER SHEET FROM DR. SOLOMON TO
5    DR. CANNUSCIO; CORRECT?
6    A.  CORRECT.
7    Q.  AND THEN OVER ON THE NEXT PAGE, YOU SEE THAT HE'S
8    TRANSMITTING A LETTER FROM THE JOURNAL OF THE AMERICAN MEDICAL
9    ASSOCIATION DATED SEPTEMBER 30, 2003, AND IT'S ADDRESSED TO
10   HIM. YOU SEE THAT?
11   A.  YEP.
12   Q.  AND THE MIDDLE PARAGRAPH OF THE LETTER FROM JAMA TO
13   DR. SOLOMON SAYS, "BASED ON OUR IN-HOUSE EVALUATION OF THE
14   COMMENTS" -- I'M SORRY, "BASED ON OUR IN-HOUSE EVALUATION AND
15   THE COMMENTS OF EXTERNAL REVIEWERS, WE WILL NOT ACCEPT YOUR
16   ARTICLE FOR PUBLICATION. I AM ENCLOSING THE RELEVANT -- I AM
17   ENCLOSING THE REVIEWER'S COMMENTS, WHICH I HOPE YOU WILL FIND
18   HELPFUL." YOU SEE THAT?
19   A.  RIGHT. RIGHT. RIGHT AFTER THEY SAY THAT THEY ONLY --
20   THEY DON'T ACCEPT SEVEN-EIGHTHS OF THE PAPERS THAT ARE
21   SUBMITTED TO THEM.
22   Q.  INCIDENTALLY, YOU SAW THIS AT THE TIME; RIGHT?
23   A.  YES.
24   Q.  DR. SOLOMON SHARED IT WITH YOU; CORRECT?
25   A.  SURE.

## Page 516

1    Q.  INCLUDING THE REVIEWER'S COMMENTS?
2    A.  YES.
3    Q.  WILL YOU TURN OVER, PLEASE, TO -- ON THE FAX NUMBERING IS
4    PAGE 5 OF SEVEN?
5    A.  YES.
6    Q.  AND THIS IS -- THIS IS SOME OF THE COMMENTS FROM ONE OF
7    THE REVIEWERS; CORRECT?
8    A.  RIGHT.
9    Q.  THEN YOU LOOKED AT THESE AT THE TIME THEY WERE
10   TRANSMITTED?
11   A.  YES.
12   Q.  I'M GOING TO FOCUS ON TWO OF THE COMMENTS FROM THE
13   REVIEWER. COMMENT NO. 1 SAYS, "IN THE ABSTRACT, THE AUTHORS
14   REPORT A COMPARISON OF ROFECOXIB WITH NO NSAID AND AN ODDS
15   RATIO OF 1.14, 95 PERCENT CONFIDENCE INTERVAL EQUALS 1 TO 1.31
16   AS AN ELEVATED RISK. ONLY ON PAGE 11 DID THEY POINT OUT
17   STATISTICAL SIGNIFICANCE." DID YOU READ THAT REVIEWER'S
18   COMMENT AT THAT TIME?
19   A.  RIGHT. AND THAT'S WHY DR. SOLOMON WROTE IN AFTER THAT,
20   "INCLUDE P-VALUES IN ABSTRACT." AND THAT WAS OUR RESPONSE TO
21   THAT.
22   Q.  THIS WAS QUITE SIMILAR TO THE OBJECTION THAT MERCK MAKES
23   THAT YOU INDICATED AND ELEVATED RISK IN THE ABSTRACT, BUT ONLY
24   LATER IN THE ARTICLE DID YOU ACKNOWLEDGE THAT IT DID NOT REACH
25   STATISTICAL SIGNIFICANCE; RIGHT?

## Page 517

1    A.  RIGHT. AND OUR RESPONSE TO THAT WAS, IN THE SUBMISSION TO
2    CIRCULATION, TO INCLUDE P-VALUES IN THE ABSTRACT, AS HE
3    INDICATES.
4    Q.  AND THEN THE NEXT COMMENT SAYS, "THE AUTHORS DO NOT
5    PRESENT ACTUAL RESULTS, I.E. NO AMI'S IN EACH GROUP" -- OR
6    "NUMBER OF AMI'S IN EACH GROUP. THIS INFORMATION SHOULD BE
7    PRESENTED FOR ALL GROUPS AND SUBGROUPS ANALYZED IN THE TABLES."
8         WAS THIS ALSO ONE OF THE POINTS THAT MERCK RAISED
9    THAT THEY THOUGHT THAT YOU SHOULD HAVE THE INFORMATION FOR
10   SUBGROUPS SUCH AS 25 MILLIGRAMS OF VIOXX VERSUS NO NSAID USE?
11   A.  WHAT THE REVIEWER IS CLEARLY TALKING ABOUT IS THE -- WHAT
12   WE CALL THE "N," OR THE NUMBER OF PEOPLE WHO HAD AN MI. AND
13   WHAT THE REVIEWER ACTUALLY SAYS IS THE INFORMATION, THAT IS THE
14   NUMBER OF HEART ATTACKS, SHOULD BE PRESENTED FOR ALL THE GROUPS
15   AND SUBGROUPS ANALYZED IN THE TABLES.
16        AND SO WHAT THE REVIEWER IS REALLY ASKING FOR IS, IF
17   YOU HAVE A TABLE, YOU SHOULD PRESENT THE NUMBERS OF HEART
18   ATTACKS FOR THE PEOPLE THAT YOU DESCRIBE IN THE TABLE. AND
19   THAT IS WHAT WE ACTUALLY DID IN TABLE 2.
20        IN THE CAPTION OF THE TABLE AND A PART THAT YOU
21   DIDN'T SHOW, WE DO PRESENT THE NUMBERS OF HEART ATTACKS FOR THE
22   PEOPLE IN THE TABLE. WHAT THE REVIEWER DOES NOT SAY, AS YOU
23   IMPLY THAT HE DOES, IS THAT ANALYSIS SHOULD BE DONE ON ALL
24   GROUPS AND ALL SUBGROUPS. THAT'S NOT AT ALL WHAT IT SAYS HERE.
25        AND SINCE YOU CHARACTERIZED THIS, MR. BECK, AS THEY

## Page 518

1    REFUSED TO PUBLISH THE ARTICLE AND THEY REJECTED IT, I THINK,
2    IN FAIRNESS, IT'S IMPORTANT TO POINT OUT THAT THE REVIEWERS --
3    THE FIRST REVIEWER IN HIS OR HER MAIN COMMENT ABOUT OUR PAPER
4    SAID, "THIS MANUSCRIPT REPORTS A WELL-THOUGHT-OUT INVESTIGATION
5    AND IS WELL-WRITTEN AND CONCISE. THERE ARE A NUMBER OF
6    PROBABLY MINOR ISSUES AND ONE MAJOR ISSUE." THAT WAS THE FIRST
7    REVIEWER.
8         AND THEN THE OTHER REVIEWER SAID, THE ONE WHOSE
9    COMMENTS YOU'RE READING NOW, AT THE BEGINNING OF THE REVIEW, AS
10   THE SUMMARY STATEMENT, "THE AUTHORS HAVE CONDUCTED A
11   LARGE-SCALE STUDY WITH APPROPRIATE ANALYSIS.
12        AND THEN THIS -- I WILL JUST CONTINUE READING. THE
13   STRENGTH OF THE MANUSCRIPT IS THE CONSISTENCY OF FINDINGS FOR
14   DIFFERENT SUBGROUPS AND THE SENSITIVITY ANALYSIS. HOWEVER,
15   CONCLUSIONS MUST BE TEMPERED WITH CAVEATS REGARDING
16   RETROSPECTIVE DATA FROM A DATABASE RATHER THAN A PROSPECTIVE
17   RANDOMIZED CONTROL TRIAL."
18        SO I THINK IT'S IMPORTANT FOR THE JURY TO UNDERSTAND
19   THAT THESE WERE BOTH FAVORABLE REVIEWS. WE OFTEN RECEIVE
20   FAVORABLE REVIEWS. I OFTEN WRITE FAVORABLE REVIEWS IN WHICH I
21   SAY, "THIS IS AN PERFECTLY FINE STUDY."
22        I EVEN TELL THE EDITORS, IF I'M REVIEWING SOMETHING,
23   "I THINK YOU SHOULD PUBLISH IT." AND THEY THE EDITORS, SINCE
24   THEY END UP REJECTING BETWEEN 80 AND 90 PERCENT OF THEIR
25   SUBMISSIONS BECAUSE THEY CAN'T FIT ALL THE ARTICLES THAT GET

## Page 519

1 SUBMITTED, EVEN THE GOOD ONES, INTO A JOURNAL, THEY WILL TURN
2 IT DOWN.
3     BUT I THINK YOU GAVE THE MIS-IMPRESSION THAT "THEY
4 REJECTED YOUR PAPER AND REFUSED TO PUBLISH IT" AS IF IT HAD
5 GOTTEN REVIEWS THAT SAID IT WAS A BAD STUDY.  IN FACT, IF YOU
6 ARE FAIR ENOUGH TO READ THE SUMMARY STATEMENTS OF THE
7 REVIEWERS, THEY SAY, BOTH OF THEM, THIS WAS A VERY GOOD STUDY,
8 AND THEY MAKE A COUPLE OF SUGGESTIONS; ONE OF WHICH WE DEALT
9 WITH AND ONE OF WHICH YOU JUST MISCHARACTERIZED.
10 Q.  PLEASE LOOK AT EXHIBIT 14, WHICH IS IN YOUR BINDER.
11 A.  GOT IT.
12 Q.  AND IS EXHIBIT-14 ONE THAT MR. TISI ASKED YOU ABOUT
13 YESTERDAY?
14 A.  YES.
15 Q.  AND THIS IS AN ARTICLE WHERE THE FIRST LISTED AUTHOR IS
16 DR. RAY, AND THEN YOU ARE ALSO AN AUTHOR OF THIS DOCUMENT.  IS
17 THAT CORRECT?
18 A.  THAT'S RIGHT.
19 Q.  AND WHAT YEAR WAS THIS PUSHED IN?
20 A.  IT WAS PUBLISHED IN 2003.  ACTUALLY, IT WAS PUBLISHED
21 ONLINE, IT SAYS ON THE TOP, IN 2002.
22 Q.  SO LATE 2002, EARLY 2003?
23 A.  RIGHT.  SUMMARIZING A MEETING THAT HAPPENED IN AUGUST OF
24 2002.
25 Q.  AND WHAT PUBLICATION WAS THIS IN?

## Page 520

1 A.  PHARMACOEPIDEMIOLOGY AND DRUG SAFETY.
2 Q.  IF YOU GO OVER TO THE SECOND PAGE, THIS LANGUAGE -- WAS
3 THIS LANGUAGE THAT YOU AND MR. TISI DISCUSSED YESTERDAY, THAT
4 THESE STUDIES SUGGEST THAT --
5 A.  RIGHT.
6 Q.  -- ANY PROTECTIVE EFFECT OF NAPROXEN DOES NOT FULLY
7 ACCOUNT FOR THE FINDINGS IN THE VIGOR STUDY?
8 A.  CORRECT.
9 Q.  AND I THINK YOU INDICATED ALREADY THE VIGOR STUDY INVOLVED
10 THE USE OF 50 MILLIGRAMS OF VIOXX; RIGHT?
11 A.  CORRECT.
12 Q.  AND IN THIS STUDY WITH DR. RAY, DID YOU LOOK AT PEOPLE
13 WHO -- 20,000 PEOPLE OR SO, WHO USED 25 MILLIGRAMS OR LOWER OF
14 VIOXX?
15 A.  RIGHT.  YEAH, THIS WAS NOT THE REPORT OF A RESEARCH STUDY;
16 THIS WAS THE PROCEEDINGS OF A PANEL DISCUSSION THAT HAD
17 OCCURRED AT THE PHARMOCOEPI MEETINGS IN 2002.
18 Q.  AND DID YOU ATTEND THE PANEL DISCUSSIONS?
19 A.  I WAS PART OF IT, YES.
20 Q.  THEN LET'S JUST GO TO THE LAST PAGE.  IT SAYS HERE, IT
21 GOES, "THERE WAS NO EVIDENCE OF AN INCREASED RISK OF SERIOUS
22 CHD" -- WHAT IS CHD?
23 A.  CORONARY HEART DISEASE.
24 Q.  "THERE WAS NO EVIDENCE OF AN INCREASED RISK OF CORONARY
25 HEART DISEASE IN ALL INDIVIDUALS RECEIVING NAPROXEN, IBUPROFEN,

## Page 521

1 OR CELEBREX, COMPARED TO INDIVIDUALS WHO DID NOT RECEIVE AN
2 NSAID."  AND THEN IT SAYS, "THERE WAS ALSO NO EVIDENCE OF
3 INCREASED RISK FOR DOSES OF ROFECOXIB, 25 MILLIGRAMS OR BELOW";
4 CORRECT?
5 A.  YEAH.  I'M TRYING TO UNDERSTAND -- WHEN IT SAYS "THERE WAS
6 NO EVIDENCE," I NEED TO UNDERSTAND WHAT THIS PARAGRAPH IS
7 TALKING ABOUT.
8     WHAT THIS IS, THE LIST IS A REVIEW OF THE PAPER THAT
9 DR. RAY PUBLISHED THAT IS REFERENCE NUMBER 20 THAT WAS IN THE
10 LANCET.  SO THIS IS A DESCRIPTION OF THAT PAPER.
11 Q.  OKAY.  IN THE DESCRIPTION OF THAT PAPER, DOES THIS
12 COMMENTARY WHERE THEY TALK ABOUT A STUDY THAT, IN THAT
13 STUDY, HE DID FROM THE LANCET, THAT THERE WAS NO EVIDENCE OF
14 INCREASED RISK OF CORONARY HEART DISEASE FOR DOSES OF VIOXX AT
15 25 MILLIGRAMS OR BELOW?
16 A.  RIGHT.  THAT'S A STATEMENT OF DR. RAY'S FINDINGS.
17 Q.  WERE YOU PRESENT AT ANY GATHERINGS WHERE DR. RAY PRESENTED
18 HIS CONCLUSIONS FOLLOWING HIS -- OR BOTH BEFORE AND AFTER HIS
19 LANCET ARTICLE?
20 A.  I AM HAVING A HARD TIME REMEMBERING THAT.  IF I HAD BEEN
21 IT WOULD HAVE BEEN AT THESE ANNUAL PHARMOCOEPI MEETINGS, AND I
22 JUST DON'T REMEMBER WHETHER HE MADE A PRESENTATION THAT I
23 ATTENDED AT THESE MEETINGS.
24 Q.  DO YOU REMEMBER HEARING DR. RAY, IN LATE 2000 AND EARLY
25 2001, AFTER THE VIGOR RESULTS CAME OUT AND AFTER HE DID HIS

## Page 522

1 ANALYSIS, TELLING PEOPLE THAT, IN HIS JUDGMENT, 25-MILLIGRAM
2 VIOXX WAS SAFE?
3 A.  I KNOW THAT THAT WAS NOT THE PAPER WE JUST DISCUSSED
4 REPORTED, SO I WOULD EXPECT THAT HE WOULD HAVE BELIEVED THAT.
5 Q.  I'M HANDING YOU WHAT WE'VE MARKED AS EXHIBIT 56.
6 YESTERDAY YOU TALKED ABOUT ONE OF THE THINGS THAT YOU DO IS YOU
7 WORK WITH MEDICAL STUDENTS AND RESIDENTS ON HOW THEY OUGHT TO
8 GO ABOUT MAKING PRESCRIBING DECISIONS.  DO YOU REMEMBER THAT?
9 A.  RIGHT.
10 Q.  AND CAN YOU TELL US WHAT EXHIBIT 56 IS?
11 A.  SURE.  THIS IS AN EDUCATIONAL PIECE THAT DR. SOLOMON
12 PUBLISHED, ALONG WITH CHERLYN GRIFFIN AND KELLY CURTIS, WHO ARE
13 TWO -- WHO WERE TWO PHARMACISTS AT BRIGHAM ON -- THE TITLE IS,
14 "COX-2 INHIBITORS.  WHO REALLY NEEDS THEM?"
15 Q.  DOES YOUR NAME APPEAR ON EXHIBIT 56?
16 A.  RIGHT.  I WAS THE EDITOR OF THIS SERIES.
17 Q.  OKAY.  SO YOU -- YOU SAY THEY -- DR. SOLOMON, WHOM YOU'VE
18 TALKED ABOUT A LOT, WROTE THIS, BUT YOU WERE THE EDITOR OF THIS
19 WHOLE SERIES; IS THAT RIGHT?
20 A.  THAT'S CORRECT.
21 Q.  OKAY.  SO YOU SAW THIS AT THE TIME THAT IT WAS PREPARED
22 AND EDITED; RIGHT?
23 A.  THAT'S CORRECT.
24 Q.  I WOULD LIKE YOU TO LOOK, PLEASE, AT THE CRITERIA FOR USE.
25 AND LET ME PUT THIS UP ON THE SCREEN.  YOU SEE AT THE BOTTOM

## Page 523

1 THERE IS A HEADING "CRITERIA FOR USE"?
2 A. YES.
3 Q. YOU KNOW WHAT IT WAS USED WITH, DON'T YOU?
4 A. YES.
5 Q. OKAY. WHO?
6 A. THE MEDICAL STUDENTS AND INTERNS AND RESIDENTS AND FACULTY
7 AT THE BRIGHAM AND WOMEN'S HOSPITAL.
8 Q. OKAY. AND THIS IS WHAT DATE? I'M SORRY?
9 A. MARCH 2002.
10 Q. SO MARCH 2002, A COUPLE YEARS AFTER THE VIGOR RESULTS ARE
11 KNOWN; RIGHT?
12 A. RIGHT. YES, RIGHT.
13 Q. AND AFTER THE PERIOD WHERE YOU TESTIFIED EARLIER THAT YOU
14 HAD COME TO THE CONCLUSION THAT VIOXX POSED SERIOUS
15 CARDIOVASCULAR RISKS; CORRECT?
16 A. NO, I THINK YOU ARE ONCE AGAIN MISSTATING WHAT I HAD SAID.
17 Q. BY 2002, HAD YOU CONCLUDED THAT VIOXX POSED AN INCREASED
18 RISK OF CARDIOVASCULAR DISEASE?
19 A. I WOULD RATHER INDICATE WHAT I DID CONCLUDE AT THAT TIME,
20 WHICH IS THAT THERE WAS EVIDENCE OF AN ASSOCIATION BETWEEN
21 VIOXX AND CARDIOVASCULAR DISEASE.
22 Q. OKAY. SO 2002, "CRITERIA FOR USE" IN THE PUBLICATION USED
23 WITH THE HARVARD MEDICAL STUDENTS STATED: "BECAUSE OF THEIR
24 HIGH COST, COX-2 SELECTIVE INHIBITORS SHOULD BE RESERVED FOR
25 PATIENTS AT HIGH RISK OF BLEEDING WHO REQUIRE AN NSAID." AND

## Page 524

1 THEN THEY GO ON TO SPECIFY WHO THAT WOULD BE APPROPRIATE FOR.
2 DO YOU SEE THAT?
3 A. YES.
4 Q. IS THERE ANY STATEMENT IN HERE THAT THE USE OF COX-2
5 INHIBITORS SHOULD BE AVOIDED BECAUSE OF INCREASED -- BECAUSE OF
6 AN ASSOCIATION WITH CARDIOVASCULAR DISEASE?
7 A. YES. A FEW LINES JUST BELOW THAT, IT SAYS --
8 Q. ARE WE ON THE NEXT PAGE NOW?
9 A. YEAH.
10 Q. OKAY.
11 A. AT THE VERY TOP.
12 Q. OKAY.
13 A. "THE VIGOR TRIAL FOUND A FOURFOLD HIGHER RIGHT OF MI IN
14 RHEUMATOID ARTHRITIS PATIENTS RANDOMIZED TO ROFECOXIB COMPARED
15 TO RHEUMATOID ARTHRITIS PATIENTS RANDOMIZED TO NAPROXEN. WHILE
16 IT'S POSSIBLE THAT NAPROXEN CONFERS A PROTECTIVE EFFECT AGAINST
17 MI, IT ALSO MAY BE THE CASE THAT COX-2 SELECTIVE INHIBITORS ARE
18 ASSOCIATED WITH AN INCREASED RISK OF IM. THE POSSIBLE
19 MECHANISM FOR THIS ACTION MIGHT BE AN IMBALANCE IN THE ACTIVITY
20 OF COX-1 TO COX-2 ENZYMES PRODUCING A RELATIVE TENDENCY TO CLOT
21 OR OTHERWISE DAMAGING THE ENDOTHELIAL SURFACE," WHICH IS THE
22 SURFACE OF THE ARTERIES. "THIS IS AN ACTIVE AREA OF RESEARCH."
23 Q. AT THE TIME THIS WAS PRESENTED TO THE HARVARD MEDICAL
24 STUDENTS, IS THIS A FAIR SUMMARY OF YOUR VIEW OF THE EXISTING
25 STATE OF KNOWLEDGE?

## Page 525

1 A. I WOULD NOT. NO, I WOULD NOT -- IF THESE HAD BEEN MY
2 WORDS, AS OPPOSED TO MY HAVING PRESIDED OVER THE SERIES, I
3 WOULD HAVE SAID IT HAD BEEN SUGGESTED THAT NAPROXEN CONFERS A
4 PROTECTIVE EFFECT AGAINST MI, BUT IT IS LIKELY THAT COX-2
5 SELECTIVE INHIBITORS ARE ASSOCIATED WITH AN INCREASED RISK IN
6 MI. THAT WOULD HAVE -- I THINK THAT WAS WHAT I WAS WRITING
7 MYSELF, IN MY OWN VOICE, DURING THIS PERIOD.
8 Q. BUT WHAT DR. SOLOMON, YOUR COLLEAGUE, WAS WRITING --
9 A. AND THE TWO PHARMACISTS.
10 Q. -- AND PRESENTING TO THE HARVARD MEDICAL STUDENTS, WHILE
11 IT WAS POSSIBLE THAT NAPROXEN CONFERS A PROTECTIVE EFFECT
12 AGAINST MI, IT MAY ALSO BE THAT COX-2 SELECTIVE INHIBITORS ARE
13 ASSOCIATED WITH AN INCREASED RISK OF MI?
14 A. CORRECT.
15 Q. AND DID YOU -- I KNOW YOU WERE THE EDITOR OF THE SERIES.
16 DID YOU ACTUALLY LOOK AT THIS DOCUMENT BACK AT THE TIME?
17 A. YES.
18 Q. OKAY.
19 A. AND I STILL THINK THAT NAPROXEN DOES CONFER A VERY SMALL
20 PROTECTIVE EFFECT AGAINST MI.
21 Q. AND DOWN FURTHER ON THE PAGE, DO YOU SEE THAT THERE IS A
22 TABLE THAT -- WELL, FIRST THERE'S THIS HEADING, "CHOOSING
23 BETWEEN CELEBREX AND VIOXX IF A COX-2 AGENT IS REQUIRED."
24 A. RIGHT.
25 Q. AND THEN THERE IS A TABLE THAT -- AM I RIGHT? IT

## Page 526

1 BASICALLY SUMMARIZES THE PROS AND CONS OF CELEBREX VERSUS VIOXX
2 FOR DIFFERENT TYPES OF PATIENTS?
3 A. YES.
4 Q. IS THERE ANYWHERE IN THIS TRAINING PIECE FOR THE HARVARD
5 MEDICAL STUDENTS SAYING THAT, ALL THINGS BEING EQUAL, THEY
6 OUGHT TO USE CELEBREX VERSUS VIOXX BECAUSE OF AN INCREASED
7 ASSOCIATION IN CARDIOVASCULAR DISEASE?
8 A. NO.
9 Q. LET ME SHOW YOU WHAT --
10 A. I'M SORRY, MR. BECK. THERE'S JUST ONE THING I WANT TO
11 POINT OUT ABOUT THE AUTHORSHIP HERE. WHAT I NOTICE IS THAT --
12 IT ACTUALLY SAYS, "THIS REVIEW WAS PREPARED WITH THE HELP OF
13 CHERLYN GRIFFIN, R.PH. AND KELLY CURTIS, R.PH," THE TWO
14 PHARMACISTS, AND THEN IT SAYS, "FOR FURTHER INFORMATION,
15 CONTACT DAN SOLOMON VIA HOSPITAL E-MAIL."
16 SO I GUESS I CAN'T REALLY TESTIFY TO WHAT ROLE
17 DR. SOLOMON HAD IN THE WRITING OF THIS, JUST TO BE CLEAR.
18 Q. ALL YOU KNOW IS YOU REVIEWED IT BEFORE IT WAS USED WITH
19 THE HARVARD MEDICAL STUDENTS AND APPROVED IT; RIGHT?
20 A. RIGHT.
21 Q. EXHIBIT 57, IS THAT ANOTHER EDUCATIONAL PIECE THAT CAME
22 OUT IN THE SERIES THAT YOU EDITED?
23 A. YES. THIS IS BASICALLY THE SAME DOCUMENT ABOUT A YEAR
24 LATER.
25 Q. OKAY. AND WAS USED NOT JUST WITH MEDICAL STUDENTS BUT

DAILY COPY

## Page 527

1  WITH HARVARD FACULTY AND INTERNS AND OTHERS?
2  A. RIGHT.
3  Q. AND EXHIBIT -- BOTH 56 AND 57, YOU APPROVED THEIR USE WITH
4  THE MEDICAL STUDENTS, WITH THE RESIDENTS, AND WITH THE FACULTY;
5  CORRECT?
6  A. RIGHT.
7  Q. OKAY. SO, NOW, EXHIBIT 57, I THINK YOU INDICATED THAT
8  THIS WAS KIND OF AN UPDATED VERSION OF WHAT WE SAW BEFORE?
9  A. RIGHT.
10  Q. AND WHAT'S THE DATE OF THIS?
11  A. APRIL 2003.
12  Q. THERE'S A SECTION CALLED "SAFETY AND CARDIOVASCULAR
13  DISEASE" AT THE BOTTOM. DO YOU SEE THAT?
14  A. RIGHT.
15  Q. DOES THIS PIECE THAT YOU REVIEWED AND APPROVED STATE:
16  "THE VIGOR TRIAL FOUND A FOURFOLD HIGHER RATE OF MI IN
17  RHEUMATOID ARTHRITIS PATIENTS RANDOMIZED TO ROFECOXIB COMPARED
18  TO RHEUMATOID ARTHRITIS PATIENTS RANDOMIZED TO NAPROXEN"?
19  A. RIGHT.
20  Q. AND THEN DOES THE DOCUMENT SAY, "MORE RECENT RESEARCH
21  SUGGESTS AN INCREASED RISK OF MYOCARDIAL INFARCTIONS IN
22  PATIENTS TAKING ROFECOXIB AT DOSES GREATER THAN 25 MILLIGRAMS"?
23  A. RIGHT.
24  Q. THEN IT GOES ON TO TALK ABOUT THE POSSIBLE MECHANISM;
25  RIGHT?

## Page 528

1  A. RIGHT.
2  Q. AND IS THERE ANY STATEMENT IN HERE AT ALL SUGGESTING THAT
3  THERE IS ANY RISK OF HIGHER RATE OF HEART ATTACK FOR PEOPLE WHO
4  TAKE 25 MILLIGRAMS?
5  A. NO. WE WERE ONLY ABLE TO WORK FROM THE EVIDENCE THAT WE
6  HAD, AND WE WERE NOT AWARE OF A LOT OF THE EVIDENCE THAT WAS
7  AVAILABLE TO THE COMPANY DOCUMENTING THE HIGHER RISK THAT WAS
8  NOT AVAILABLE TO US IN THE MEDICAL LITERATURE.
9  Q. ON DIRECT EXAMINATION, YOU TALKED ABOUT HOW THE
10  ALZHEIMER'S TRIALS, YOU SAID, SHOWED AN INCREASE IN ALL-CAUSE
11  MORTALITY IN THE VIOXX ARM VERSUS THE PLACEBO ARM." YOU
12  REMEMBER THAT?
13  A. THAT'S RIGHT.
14  Q. AND "ALL-CAUSE MORTALITY" MEANS THAT PEOPLE DIED -- AND
15  REGARDLESS OF WHAT SOMEBODY THINKS ABOUT THE CAUSE OF THE
16  DEATH, MORE PEOPLE DIED IN THE VIOXX GROUP THAN IN THE PLACEBO
17  GROUP; RIGHT?
18  A. THAT'S CORRECT.
19  Q. WAS THERE ALSO INFORMATION DEVELOPED IN THE ALZHEIMER'S
20  TRIALS THAT COMPARED THE FREQUENCY OF HEART ATTACKS IN THE
21  VIOXX ARM VERSUS THE PLACEBO ARM?
22  A. YES.
23  Q. AS PART OF YOUR WORK IN THIS CASE, YOU TESTIFIED THAT YOU
24  REVIEWED SUBMISSIONS MADE BY MERCK TO THE FDA; CORRECT?
25  A. CORRECT.

## Page 529

1  Q. AND YOU REVIEWED FDA MEDICAL OFFICERS' EVALUATIONS OF THE
2  CLINICAL TRIALS; CORRECT?
3  A. CORRECT.
4  Q. CAN YOU ANSWER THIS QUESTION YES OR NO: DID YOU SEE, SIR,
5  IN THE MATERIALS THAT THE FDA BELIEVED THAT THERE WAS NO
6  STATISTICALLY SIGNIFICANT DIFFERENCE IN HEART ATTACKS IN THE
7  ALZHEIMER'S TRIALS? CAN YOU ANSWER THAT YES OR NO?
8  A. I WOULD BE PLEASED TO LOOK AT IT IF YOU WANT TO SHOW IT TO
9  ME. I HAVE SEEN REPORTS -- I DON'T REMEMBER IF IT WAS AN FDA
10  REPORT OR A MERCK REPORT OR AN ARTICLE -- INDICATING THAT THERE
11  WAS NOT A SIGNIFICANT DIFFERENCE.
12      AND IF YOU HAVE AN FDA REPORT YOU WOULD LIKE ME TO
13  LOOK AT, I WOULD BE HAPPY TO LOOK AT IT.
14  Q. FROM YOUR DEPOSITION, PAGE 502, LINE 20:
15  "Q. OKAY. DID YOU SEE, SIR, IN THE MATERIALS THAT
16  THE FDA BELIEVED THAT THERE WAS NO STATISTICALLY
17  SIGNIFICANT DIFFERENCE IN HEART ATTACKS IN THE ALZHEIMER'S
18  TRIALS?"
19      "A. YES."
20      WAS THAT YOUR SWORN TESTIMONY A COUPLE WEEKS AGO?
21  A. I GUESS.
22  Q. WELL, YEAH, YOU DISAGREED WITH THE FDA.
23  A. RIGHT, RIGHT.
24  Q. BUT THE QUESTION I HAD ASKED YOU BEFORE IS: DID THE FDA
25  CONCLUDE THAT THERE WAS NO STATISTICALLY SIGNIFICANT

## Page 530

1  DIFFERENCE? AND YOUR ANSWER IN YOUR DEPOSITION WAS "YES";
2  RIGHT? IS THAT CORRECT, SIR?
3  A. YES.
4  Q. ALL RIGHT. DID YOU ANALYZE ALL-CAUSE MORTALITY IN THE
5  VIOXX OSTEOARTHRITIS TRIALS?
6  A. I DON'T RECALL PERFORMING THOSE ANALYSES MYSELF, NO.
7  Q. DO YOU RECALL LOOKING AT ANY ANYBODY ELSE'S ANALYSIS OF
8  THAT?
9  A. YES. I DON'T RECALL HAVING -- I DO RECALL HAVING SEEN
10  OTHER PEOPLE'S ANALYSES OF THAT.
11  Q. HOW ABOUT FOR VIGOR, ADVANTAGE, AND APPROVE? DID YOU
12  CONDUCT ANY ALL-CAUSE MORTALITY ANALYSIS IN THOSE, CONCERNING
13  THOSE CLINICAL TRIALS?
14  A. WE HAVE TO GO BACK TO THE SAME POINT: I DIDN'T CONDUCT
15  ANALYSES OF THE TRIALS. I REVIEWED THE REPORTS OF THOSE WHO
16  HAD DONE SO.
17  Q. AND IN REVIEWING THE REPORTS OF THOSE WHO DID LOOK AT
18  ALL-CAUSE MORTALITY FOR THE OSTEOARTHRITIS TRIALS, VIGOR,
19  ADVANTAGE, AND APPROVE, IS IT TRUE THAT THE CONCLUSION WAS THAT
20  THERE WAS NO STATISTICALLY SIGNIFICANT DIFFERENCE IN MORTALITY
21  IN ANY ONE OF THOSE TRIALS?
22  A. I WOULD NEED TO GO BACK AND TAKE A LOOK AT THAT DATA
23  BEFORE JUST ANSWERING OFF THE TOP OF MY HEAD.
24  Q. DO YOU REMEMBER AS TO ANY ONE OF THOSE, ANY ANALYSES OF
25  ALL-CAUSE MORTALITY, SUGGESTING THAT THERE WAS A STATISTICALLY

## Page 531

1  SIGNIFICANT DIFFERENCE BETWEEN VIOXX AND EITHER PLACEBO OR ANY
2  COMPARATOR DRUG?
3  A.  SITTING HERE AT THE END OF A VERY LONG DAY, I CANNOT
4  IDENTIFY THAT.  BUT IF YOU WANT, I CAN GO BACK OVER THE
5  ANALYSES, WHICH WE HAVE HERE ON THE TABLE, AND TAKE A LOOK AT
6  THEM.
7  Q.  DOCTOR, I'M GOING TO HAND YOU WHAT I'VE MARKED AS
8  EXHIBIT 58.  DO YOU RECOGNIZE EXHIBIT 58?
9  A.  WELL, I'VE I CERTAINLY SEEN IT.  I DON'T REMEMBER IF IT
10  WAS AN EXHIBIT IN THE LAST DAY OR TWO, BUT I KNOW THE VILLALBA
11  REPORT.
12  Q.  AND YOU CALLED THIS THE VILLALBA REPORT?
13  A.  RIGHT.
14  Q.  WHAT DO YOU MEAN BY THAT?
15  A.  THE ONE OF DECEMBER '04 CALLED "INTERIM REVIEW."
16  Q.  SO WE HAVE HERE ON THE FIRST PAGE THAT DECEMBER 19 -- OR
17  2004 INTERIM REVIEW BY DR. VILLALBA; CORRECT?
18  A.  CORRECT.
19  Q.  AND LET'S LOOK OVER ON PAGE 7, PLEASE.  IS THERE SOMEWHERE
20  ON PAGE 7 THAT -- WHERE THE FDA INDICATES WHETHER THE -- HERE
21  WE GO.  WHAT'S INDICATED ON PARAGRAPH 2.1 OF THE VILLALBA
22  REVIEW?
23  A.  "THE CURRENT SUBMISSION DID NOT SUGGEST AN EXCESS IN THE
24  TOTAL NUMBER OF CV THROMBOTIC EVENTS FOR VIOXX AS COMPARED TO
25  PLACEBO."  SHALL I GO ON?

## Page 532

1  Q.  SURE.
2  A.  I THOUGHT WE WERE TALKING ABOUT DEATHS.
3  Q.  WELL, I'M NOW TALKING ABOUT CV EVENTS.
4  A.  ALL RIGHT.
5  Q.  ALL RIGHT.  IS THIS ONE OF THE DOCUMENTS THAT WAS PROVIDED
6  TO YOU BY THE LAWYERS THAT YOU'RE WORKING WITH SO THAT YOU
7  COULD HELP FORM YOUR OPINION AND TESTIFY YESTERDAY AND TODAY?
8  A.  YES.
9  Q.  DID YOU TAKE IT INTO ACCOUNT WHEN YOU REACHED YOUR
10  OPINIONS?
11  A.  YES, I DID.
12  Q.  DID YOU TAKE IT INTO ACCOUNT BEFORE YOU TESTIFIED
13  YESTERDAY ON DIRECT EXAMINATION?
14  A.  YES.
15  Q.  OKAY.  SO, FOCUSING ON CARDIOVASCULAR DEATHS, DOES THIS
16  INDICATE IN THE ALZHEIMER'S STUDIES THAT THERE WAS NO
17  DIFFERENCE BETWEEN VIOXX AND PLACEBO?
18  A.  THAT'S NOT WHAT THIS BOX THAT YOU'VE PUT UP TALKS ABOUT,
19  MR. BECK.
20  Q.  WELL, THEN, TELL ME WHAT IT SAYS.
21  A.  THIS IS FATAL AND NONFATAL EVENTS.
22  Q.  I'M SORRY.  SO CARDIOVASCULAR EVENTS, WHETHER THEY WERE
23  DEATHS OR NOT DEATHS, THERE WAS NO DIFFERENCE BETWEEN VIOXX AND
24  PLACEBO IN ALZHEIMER'S TRIALS; CORRECT?
25  A.  RIGHT.

## Page 533

1  Q.  YESTERDAY YOU REFERRED TO AN ARTICLE, WHICH IS EXHIBIT 9.
2  YOU DON'T HAVE TO PULL IT OUT, BUT IT WAS ABOUT CONFOUNDERS.
3  DO YOU REMEMBER THAT.
4  A.  YES.
5  Q.  AND I THINK YOU DESCRIBED THAT YOU WANTED TO MAKE THAT YOU
6  TOOK INTO ACCOUNT VARIABLES THAT MIGHT AFFECT HEART ATTACK
7  RATES OTHER THAN THE MEDICATIONS THAT WERE BEING EXAMINED;
8  RIGHT?
9  A.  RIGHT.
10  Q.  FOR EXAMPLE, THAT, FOR SOME REASON ONE GROUP HAD A LOT OF
11  SMOKERS IN IT AND THE OTHER DIDN'T, AND THAT COULD SKEW THE
12  RESULTS; RIGHT?
13  A.  CORRECT.
14  Q.  AND THAT'S BECAUSE YOU KNOW THAT SMOKERS ARE MORE LIKELY
15  TO HAVE HEART ATTACKS THAN NONSMOKERS; RIGHT?
16  A.  CORRECT.
17  Q.  AND THERE ARE OTHER CONFOUNDERS, SUCH AS PEOPLE WHO ARE
18  OVERWEIGHT OR HIGH CHOLESTEROL, THINGS LIKE THAT; RIGHT?
19  A.  CORRECT.
20  Q.  ALL OF THOSE WOULD BE CONSIDERED RISK FACTORS FOR SOMEONE
21  TO HAVE A HEART ATTACK; IS THAT RIGHT?
22  A.  CORRECT.
23  Q.  WHAT ABOUT -- THIS IS NOT SOMETHING YOU'VE MENTIONED, BUT
24  WOULD SOMEONE WHO WAS SUBJECTED TO YEARS AND YEARS OF
25  SECONDHAND SMOKE, WOULD THAT ALSO BE A CONFOUNDER?

## Page 534

1  A.  WELL, WE KNOW THAT SECONDHAND SMOKE IS A RISK FACTOR FOR
2  HEART DISEASE.
3  Q.  SO IF, FOR EXAMPLE, ONE SPOUSE HAD BEEN SMOKING FOR
4  DECADES, THE OTHER SPOUSE WOULD BE AT INCREASED RISK FROM THAT
5  ALONE OF HAVING A HEART ATTACK; IS THAT RIGHT?
6  A.  RIGHT.  SO IF VIOXX USERS HAD MORE SPOUSES WHO SMOKED THAN
7  CELEBREX USERS, THEN THAT WOULD BE SOMETHING THAT WAS NOT
8  MEASURED.
9  Q.  IN ANY EVENT, IF -- MY QUESTION IS SIMPLY:  IF SOMEBODY'S
10  SPOUSE HAS BEEN SMOKING FOR YEARS, THAT ALONE PUTS THEM AT
11  GREATER RISK FOR A HEART ATTACK RIGHT?
12  A.  YES.
13  Q.  ON THE QUESTION OF THE LABELS, WHERE YOU AND MR. TISI WENT
14  THROUGH THE 1999 AND 2002 LABELS YESTERDAY?  YOU REMEMBER THAT?
15  A.  YES.
16  Q.  AND YOU INDICATED THAT, IN THE 1999 LABEL, THERE WAS NO
17  BLACK-BOX WARNING, NO WARNING OR NO PRECAUTION CONCERNING
18  CARDIOVASCULAR RISK.  DO YOU REMEMBER THAT?
19  A.  RIGHT.
20  Q.  DO YOU KNOW WHETHER FOR THE LABEL THAT WAS IN EFFECT FOR
21  CELEBREX IN 1999, WAS THERE A BLACK-BOX WARNING CONCERNING
22  CARDIOVASCULAR RISK?
23  A.  NO.
24  Q.  WAS THERE A WARNING CONCERNING CARDIOVASCULAR RISK?
25  A.  I HAVE NOT REVIEWED THE CELEBREX LABEL IN THAT LEVEL OF

DAILY COPY

Page 535

1   DETAIL.

2   Q.  AND FOR OTHER PRESCRIPTION NSAIDS IN 1999, DID ANY OF THEM

3   HAVE A BLACK-BOX WARNING ABOUT CARDIOVASCULAR RISK?

4   A.  NOT TO MY KNOWLEDGE.

5   Q.  SO FOCUSING ON OTHER NSAIDS OTHER THAN VIOXX OR CELEBREX,

6   DID ANY OF THEM HAVE WARNINGS ABOUT CARDIOVASCULAR RISKS?

7   A.  IN 1999?

8   Q.  IN 1999.

9   A.  I DO NOT THINK SO.

10  Q.  THAT WOULD BE TRUE FOR FELDENE, FOR EXAMPLE; CORRECT?

11  A.  I HAVE NOT REVIEWED THE FELDENE LABEL IN PARTICULAR.

12  Q.  HOW ABOUT MOBIC?

13  A.  AGAIN, I HAVE NOT REVIEWED SPECIFIC ONES, BUT MY OVERALL

14  IMPRESSION IS THAT THEY DID NOT CARRY CARDIOVASCULAR RISK

15  WARNINGS OR BLACK BOXES.

16  Q.  AND IS IT YOUR UNDERSTANDING THAT THEY DID NOT HAVE

17  CARDIOVASCULAR RISK INFORMATION IN THE PRECAUTION SECTION AS

18  WELL?

19  A.  I CAN'T ANSWER THAT OFF THE TOP OF MY HEAD.

20  Q.  WE KNOW THAT VIOXX WAS WITHDRAWN FROM THE MARKET IN THE

21  FALL OF 2004; RIGHT?

22  A.  RIGHT.

23  Q.  AND THEN LATER, ALL OF THE NSAIDS, PRESCRIPTION NSAIDS,

24  ENDED UP WITH BLACK BOX WARNINGS; CORRECT?  WELL, IS THAT TRUE

25  OR NOT?  DO YOU KNOW?

Page 536

1   A.  WELL, I KNOW -- AND IT'S ACTUALLY A COMPLICATED ANSWER,

2   I'M AFRAID; AND THAT IS THAT THE FDA SEEMED TO ENCOURAGE THAT,

3   BUT IT IS NOT CLEAR THAT ALL OTHER NONSTEROIDAL MANUFACTURERS

4   HAVE ACTUALLY PUT THOSE INTO THEIR LABEL.

5   Q.  LET ME ASK YOU THIS:  NOW, AFTER VIOXX WAS WITHDRAWN FROM

6   THE MARKET AND THEN THERE WAS AN ADVISORY COMMITTEE MEETING IN

7   EARLY 2005, AS YOU INDICATED, DID THE FDA ENCOURAGE THE

8   MANUFACTURERS OF ALL PRESCRIPTION NSAIDS TO ADD A BLACK-BOX

9   WARNING?

10  A.  THEY ENCOURAGED THAT, BUT I DON'T THINK THAT MOST OF THE

11  COMPANIES DID SO.

12  Q.  DID CELEBREX ADD ONE?

13  A.  I BELIEVE IT DID.

14  Q.  DID FELDENE?

15  A.  I DON'T KNOW ABOUT THE FELDENE LABEL.

16  Q.  MOBIC?

17  A.  I DON'T KNOW ABOUT THE MOBIC LABEL.

18  Q.  DO YOU HAVE ANY INFORMATION ABOUT WHETHER

19  MR. GERALD BARNETT REVIEWED ANY DIRECT-TO-CONSUMER

20  ADVERTISEMENTS?

21  A.  NO.

22  Q.  DO YOU HAVE ANY INFORMATION ABOUT THE MATERIALS THAT WERE

23  CONSIDERED BY THE PHYSICIANS WHO PRESCRIBED VIOXX FOR

24  MR. BARNETT?

25  A.  NO.

Page 537

1   THE COURT:  DOES THAT END YOURS?

2   MR. BECK:  YES, YOUR HONOR, IT DOES.

3   MR. ROBINSON:  THIS IS NOW GOING TO BE OUR REDIRECT.

4   THE COURT:  OKAY.  NOW, WE HAVE A REDIRECT FROM THE

5   PLAINTIFFS.

6   REDIRECT EXAMINATION

7   BY MR. ROBINSON:

8   Q.  DOCTOR, YOU EXPRESSED A LOT OF OPINIONS IN YOUR

9   DIRECT-EXAMINATION, AND I'M GOING TO GO THROUGH SOME OF THOSE

10  OPINIONS AND SEE WHETHER YOU STILL HOLD THEM TO A REASONABLE

11  DEGREE OF MEDICAL AND SCIENTIFIC CERTAINTY.  OKAY?

12  A.  OKAY.

13  Q.  AND HE HAS INDEED SHOWN YOU QUITE A FEW DOCUMENTS;

14  CORRECT?

15  A.  CORRECT.

16  Q.  IS THERE ANY DOCUMENT THAT MR. BECK HAS SHOWN YOU THAT HAS

17  CHANGED THE OPINION YOU GAVE ON DIRECT-EXAMINATION THAT VIOXX

18  IS CAPABLE OF CAUSING HEART ATTACKS IN HUMAN BEINGS?

19  A.  I HAVE NOT CHANGED MY OPINION.

20  Q.  IS THERE ANY DOCUMENT THAT MR. BECK HAS SHOWN YOU IN

21  CROSS-EXAMINATION THAT CHANGES YOUR OPINION THAT VIOXX IS

22  CAPABLE OF CAUSING STROKES IN HUMAN BEINGS?

23  A.  I HAVE NOT CHANGED MY OPINION.

24  Q.  IS THERE ANY DOCUMENT THAT MR. BECK HAS SHOWN YOU IN

25  CROSS-EXAMINATION THAT CHANGES YOUR OPINION THAT THERE WAS A

Page 538

1   REASONABLE EVIDENCE OF ASSOCIATION BETWEEN HEART ATTACK AND

2   VIOXX WHEN VIGOR -- THE VIGOR RESULTS BECAME AVAILABLE TO MERCK

3   IN MARCH OF 2000?

4   A.  THAT IS STILL MY OPINION.

5   Q.  IS THERE ANYTHING THAT MR. BECK SHOWED YOU IN

6   CROSS-EXAMINATION THAT CHANGED YOUR OPINION THAT MERCK FAILED

7   TO EXPRESS THE -- IN A FAIR AND ACCURATE WAY, THE SCIENTIFIC

8   AND MEDICAL EVIDENCE OF VIOXX, AS THAT EVIDENCE WAS EMERGING,

9   AS YOU HAVE REVIEWED IT?

10  A.  NOTHING HE HAS SHOWN ME HAS CHANGED MY OPINION ABOUT THAT

11  MATTER.

12  Q.  IS THERE ANYTHING THAT MR. BECK HAS SHOWN YOU IN THE

13  COURSE OF THE PAST EIGHT HOURS OR SO THAT HAS CHANGED ANY OF

14  THE CORE OPINIONS THAT HAS -- THAT YOU HAVE GIVEN IN A

15  DIRECT-EXAMINATION IN THIS CASE?

16  A.  NOTHING.

17  Q.  DOCTOR, I HAVE PLACED TWO EXHIBITS BEFORE YOU --

18  A.  YES.

19  Q.  -- BEFORE YOU SAT DOWN THERE, AND THEY ARE EXHIBITS --

20  WOULD YOU TELL ME WHAT EXHIBITS THOSE ARE?

21  A.  YES.  41 AND 42.

22  Q.  OKAY.  YOU WERE ASKED SOME QUESTIONS ABOUT EXHIBIT 42, AND

23  THOSE BEING EIGHT -- THOSE EIGHT DOCUMENTS THAT WERE RELEVANT

24  TO MERCK'S DEFENSES.  DO YOU REMEMBER THAT, THOSE LINES OF

25  QUESTIONS?

22  (Pages 535 to 538)

## Page 539

1    A.  YES.
2    Q.  COULD YOU PLEASE TURN TO THE NEXT EXHIBIT, DOCUMENT 41?
3    A.  YES.
4    Q.  AND CAN YOU TELL ME HOW MANY REFERENCES ARE IN DOCUMENT --
5    COULD YOU TELL ME WHAT DOCUMENT 41 IS?
6    A.  YES.  IT IS THE RELIANCE MATERIALS OR THE MATERIALS THAT
7    WERE SENT TO ME BY PLAINTIFF'S COUNSEL IN FORMULATING MY
8    OPINION.
9    Q.  AND THE DOCUMENT THAT IS EXHIBIT 42 SAYS, "ADDITIONAL
10   MATERIALS PROVIDED"; CORRECT?
11   A.  CORRECT.
12   Q.  RELATED TO MERCK'S DEFENSES.
13   A.  CORRECT.
14   Q.  AND IT LISTS EIGHT ADDITIONAL PIECES OF INFORMATION;
15   CORRECT?
16   A.  CORRECT.
17   Q.  NOW, IF YOU'D TURN TO EXHIBIT 41, YOU'VE INDICATED THAT
18   THERE ARE ALMOST 200 REFERENCES IN THAT DOCUMENT.
19   A.  THAT'S RIGHT.
20   Q.  INCLUDED IN THOSE DOCUMENTS ARE DEPOSITIONS OF
21   DR. SCOLNICK, FOR EXAMPLE; CORRECT?
22   A.  RIGHT.
23   Q.  INCLUDED IN THOSE ARE PUBLISHED PEER-REVIEWED MEDICAL
24   JOURNAL ARTICLES PUBLISHED BY MERCK OFFICIALS, MERCK EMPLOYEES;
25   CORRECT?

## Page 540

1    A.  THAT'S RIGHT.
2    Q.  INCLUDED IN THAT WOULD BE FDA COMPILATIONS OF DATA THAT
3    YOU REVIEWED; IS THAT CORRECT?
4    A.  THAT'S RIGHT.
5    Q.  OKAY.  HAS ANY OF THAT LITERATURE THAT WAS PROVIDED TO YOU
6    BEEN GENERATED BY THE PLAINTIFF'S LAWYERS?  IN OTHER WORDS, ARE
7    THOSE OUR DOCUMENTS?
8    A.  NO.
9    Q.  OKAY.  SO, THOSE EITHER CAME FROM THE PUBLIC, THE PUBLIC
10   DOMAIN, FROM MERCK, OR FROM THE FDA; CORRECT?
11   A.  RIGHT.
12   Q.  DOCTOR, YOU WERE ASKED SOME QUESTIONS ABOUT THE
13   PREAPPROVAL SIGNALS.  DO YOU REMEMBER THAT?
14   A.  YES.
15   Q.  OKAY.  DO YOU REMEMBER WE TALKED A LITTLE BIT ABOUT --
16   LET'S TALK FIRST ABOUT TRIAL 17.  DO YOU REMEMBER THAT?
17   A.  YES.
18   Q.  FIRST OF ALL, WAS THAT A PLACEBO-CONTROLLED TRIAL?
19   A.  I BELIEVE IT WAS.
20   Q.  WAS IT BLINDED?
21   A.  I BELIEVE IT WAS.
22   Q.  AND YOU WERE ASKED A QUESTION BY MR. BECK WHETHER OR NOT
23   THE INVESTIGATOR IN THE CASE, IN THAT INDIVIDUAL CASE WHERE
24   THERE WAS A HEART ATTACK, ATTRIBUTED THE HEART ATTACK TO VIOXX.
25   DO YOU REMEMBER THAT QUESTION?

## Page 541

1    A.  I REMEMBER THE QUESTION.
2    Q.  IS THAT POSSIBLE TO DO IN A BLINDED PLACEBO-CONTROLLED
3    TRIAL?  DOES THE INVESTIGATOR KNOW WHETHER OR NOT THE PATIENT
4    IS ON THE EXPERIMENTAL DRUG OR THE SUGAR PILL?
5    A.  THE STUDY WOULD HAVE TO BE UNBLINDED FOR THEM TO KNOW
6    THAT.
7    Q.  AND TYPICALLY, THAT IS NOT THE CASE WITH AN INVESTIGATOR;
8    THEY DO NOT GET THAT INFORMATION?
9    A.  RIGHT.
10   Q.  AND WHERE DOES THE INVESTIGATOR IN A COMPANY-RUN TRIAL GET
11   INFORMATION ABOUT THE SIDE EFFECTS OF THE STUDY DRUG?
12   A.  WELL, IF -- ESPECIALLY IF IT'S A DRUG THAT IS NOT YET ON
13   THE MARKET, THE ONLY PLACE THEY COULD GET IT WOULD BE FROM THE
14   COMPANY.
15   Q.  COULD YOU PLEASE GO TO EXHIBIT 44 IN THE STACK OF
16   DOCUMENTS THAT YOU WERE GIVEN.  AND THAT -- THAT WOULD BE
17   DR. VILLALBA'S, JUST FOR THE RECORD, HER MEDICAL OFFICER
18   REPORT, PREAPPROVAL OF THE DRUG IN 1998; IS THAT CORRECT?
19   A.  1998 THROUGH 1999, YES.
20   Q.  OKAY.  WOULD YOU PLEASE GO TO THE PAGE -- WELL, THEY'RE
21   NOT REALLY PAGINATED HERE.
22   A.  TELL ME THE TABLE NUMBER.
23   Q.  TABLE 51 TO 52.
24   A.  GOT IT.
25   Q.  OKAY.  WOULD YOU READ THE PARAGRAPH STARTING, "EVALUATION

## Page 542

1    OF CV THROMBOEMBOLIC EVENTS."
2    A.  YES.  "EVALUATION OF CARDIOVASCULAR THROMBOEMBOLIC EVENTS,
3    REGARDLESS OF SERIOUSNESS, SHOWS A NUMERICALLY HIGHER INCIDENCE
4    OF ISCHEMIC/THROMBOEMBOLIC EVENTS (ANGINA, MYOCARDIAL
5    INFARCTION, CVA," WHICH IS STROKE, "TIA)" WHICH IS LIKE A
6    STROKE, "IN PATIENTS TAKING ROFECOXIB WHEN COMPARED WITH
7    PATIENTS TAKING PLACEBO, BUT THE EXPOSURE TO PLACEBO WAS LESS
8    THAN THE EXPOSURE TO ROFECOXIB."
9        "IN 6-WEEK STUDIES, THERE WAS ONE EVENT IN THE
10   PLACEBO GROUP," OR 2/10THS OF A PERCENT, "AND A TOTAL OF 12
11   EVENTS (APPROXIMATELY 1 PERCENT) IN THE ROFECOXIB GROUPS."
12       "IN 6-MONTH STUDIES, THERE WERE 3 EVENTS IN PLACEBO
13   (APPROXIMATELY 1 PERCENT) AND 23 (APPROXIMATELY 1 PERCENT) IN
14   THE TOTAL ROFECOXIB GROUP, EVEN THOUGH PLACEBO PATIENTS WERE
15   ONLY EXPOSED FOR UP TO 18 WEEKS.  THE DATA SEEMS TO SUGGEST
16   THAT, IN 6-WEEK STUDIES, THROMBOEMBOLIC EVENTS ARE MORE
17   FREQUENT IN PATIENTS RECEIVING ROFECOXIB THAN PLACEBO BUT DO
18   NOT SHOW A CLEAR DOSE-RESPONSE RELATIONSHIP WITH ROFECOXIB."
19   Q.  IS THAT CONSISTENT WITH WHAT YOU ULTIMATELY SAW IN YOUR
20   STUDY WHICH WAS PUBLISHED IN 2004?
21   A.  YES.  IT'S ALL THE SAME PATTERN OF A HIGHER RATE SEEN WITH
22   ROFECOXIB OR VIOXX COMPARED TO PLACEBO.
23   Q.  OKAY.  AND IS THAT WHAT YOU MEANT BY WAY OF A SIGNAL,
24   WHERE YOU LOOK AT -- YOU SEE A TREND AND IT RAISES A RED FLAG?
25   A.  THAT'S RIGHT.

23  (Pages 539 to 542)

## Page 543

1  Q.  WELL, LET ME ASK YOU, DOCTOR:  WHAT IS -- WHEN YOU USED
2  THE WORD "RED FLAG" IN YOUR DIRECT TESTIMONY, WHAT DID THAT
3  MEAN?
4  A.  A SIGNAL OR A RED FLAG IS EVIDENCE OF AN INCREASED
5  PREVALENCE OF A PROBLEM -- IN THIS CASE, IN ONE DRUG COMPARED
6  TO ANOTHER -- EVEN THOUGH, INITIALLY, THAT MAY NOT REACH THE
7  LEVEL OF STATISTICAL SIGNIFICANCE BECAUSE THERE'S NOT YET
8  ENOUGH EXPERIENCE WITH THE DRUG TO SEE THAT.
9       I TELL THEM THAT DEVELOPING A DRUG FROM THE BEGINNING
10  TO THE END OF THE PROCESS THROUGH POST-MARKETING SURVEILLANCE
11  REQUIRES THAT THEY MAKE ASSESSMENTS ON AN ONGOING BASIS AND
12  RESPOND TO NEW EVIDENCE AS IT COMES ALONG.  SOMETIMES THAT WILL
13  REQUIRE DOING STUDIES THAT WILL FOLLOW UP ON SIGNALS THAT MAY
14  NOT HAVE BEEN ANTICIPATED THAT COME UP IN THE EARLY STAGES OF
15  DRUG DEVELOPMENT.
16  Q.  YOU WERE ASKED SOME QUESTIONS ABOUT THE BOARD OF
17  SCIENTIFIC ADVISORS REPORT.  DO YOU REMEMBER THAT EARLIER?
18  A.  YES.
19  Q.  AND MR. BECK ASKED YOU QUESTIONS -- AND THIS IS JUST FOR
20  REFERENCE -- ABOUT SOME OF THE GOOD POTENTIAL -- I THINK WE CAN
21  FAIRLY CALL THEM COLLATERAL POTENTIAL BENEFITS AND POTENTIAL
22  SAFETY PROBLEMS.  DO YOU REMEMBER THE "GOOD AND THE BAD"
23  DISCUSSION THAT YOU HAD WITH MR. BECK?
24  A.  YES.
25  Q.  WELL, FIRST OF ALL, DO YOU KNOW WHETHER OR NOT VIOXX WAS

## Page 544

1  BEING INVESTIGATED FOR THE PURPOSE OF BEING A DRUG FOR
2  CARDIOPROTECTION?
3  A.  I DON'T KNOW OF ANY STUDIES THAT WERE CONDUCTED IN HUMANS
4  TO DEMONSTRATE THAT.
5  Q.  OKAY.  DO YOU KNOW WHETHER OR NOT THAT WAS THE PURPOSE FOR
6  DEVELOPING VIOXX?
7  A.  NO, IT WAS NOT, AS FAR AS I KNOW.
8  Q.  DO YOU KNOW -- DO YOU KNOW WHETHER OR NOT THEY FILED A NEW
9  DRUG APPLICATION, SUPPLEMENTAL NEW DRUG APPLICATION, OR
10  ANYTHING, TO INVESTIGATE WHETHER OR NOT VIOXX COULD BE CAPABLE
11  OF BEING A CARDIOPROTECTIVE DRUG?
12  A.  THAT WAS NEVER PART OF THE VIOXX HUMAN DEVELOPMENT PROGRAM
13  AS FAR AS I KNOW.
14  Q.  OKAY.  I'D LIKE YOU TO FIND, IF YOU COULD, THE BOARD OF
15  SCIENTIFIC ADVISORS NOTE OR REPORT.  IF YOU GO TO THE PAGE WITH
16  THE CARDIOVASCULAR ISSUES.
17  A.  YES.
18  Q.  NOW, YOU SEE THAT THEY IDENTIFY THREE DIFFERENT ISSUES.
19  A.  YES.
20  Q.  AND MR. BECK ASKED YOU, WELL, ISN'T IT TRUE THAT SOME OF
21  THESE COULD BE POTENTIALLY HELPFUL?
22  A.  RIGHT.
23  Q.  FIRST OF ALL, HE DIDN'T ASK YOU ABOUT NUMBER 3.  LET ME
24  ASK YOU ABOUT NUMBER 3.
25  A.  YEAH.  NUMBER 3 IS WHERE A LOT OF THE ACTION IS.  WE

## Page 545

1  DIDN'T GET TO TALK ABOUT THAT.
2  Q.  LET ME ASK YOU ABOUT NUMBER 3.  CAN IT EVER BE A GOOD
3  THING THAT THERE IS "THROMBOEMBOLIC OCCLUSION OF THE VESSEL AT
4  THE SITE OF PLAQUE RUPTURE WITH ENSUING CONSEQUENCES OF
5  ISCHEMIA"?
6  A.  NO.  THAT MEANS THAT THERE'S A BLOOD CLOT THAT FORMS AND
7  IT BLOCKS THE ARTERY, AND THE ISCHEMIA REFERS TO THE
8  DEPRIVATION OF THE TISSUE OF OXYGEN AND OFTEN RESULTS IN THE
9  DEATH OF THE TISSUE.
10  Q.  IS THERE EVER A CIRCUMSTANCE WHERE NUMBER 3 IS A GOOD
11  THING?
12  A.  WELL, I THINK IN FAIRNESS, WE NEED TO POINT OUT THAT, IF
13  YOU COULD PREVENT IT, IT WOULD BE A GOOD THING, AND THE 1, 2
14  AND 3 WERE ALL PHRASED BY THE BOARD AS "THE BAD THING."  AND IN
15  THE CASE OF 1, THEY SAID IT COULD BE BETTER OR IT COULD BE
16  WORSE.  IN THE CASE OF 2, MR. BECK POINTED OUT THAT THEIR
17  DISCUSSION WAS PRIMARILY OF PREVENTING THE BADNESS.  AND IN
18  NUMBER 3, IT'S PREDOMINANTLY ABOUT CAUSING THE BADNESS, BUT I
19  WOULD WANT TO SPEND A MOMENT --
20  Q.  SURE.
21  A.  -- IN FAIRNESS, JUST MAKING SURE THAT THEY WERE NOT
22  TALKING ABOUT PREVENTING THE BADNESS OF POINT NUMBER 3.
23  Q.  FEEL FREE TO TAKE A LOOK.
24  A.  OKAY.  I THINK A FAIR READING OF NUMBER 3 IS THAT IT IS
25  PRETTY MUCH EXCLUSIVELY LOOKING AT THE LIKELIHOOD OR THE THREAT

## Page 546

1  THAT A SELECTIVE COX-2 INHIBITOR LIKE VIOXX COULD JUST DO HARM.
2  THERE WAS NO GOOD NEWS IN THEIR PRESENTATION ABOUT TOPIC
3  NUMBER 3.
4  Q.  AND DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF
5  MEDICAL CERTAINTY AS TO WHETHER OR NOT A PHARMACEUTICAL COMPANY
6  PUTTING A DRUG ON THE MARKET HAS A RESPONSIBILITY TO
7  INVESTIGATE POTENTIAL BAD THINGS THAT IT MAY BECOME AWARE OF?
8  A.  I HAVE SUCH AN OPINION AND MY OPINION, WHICH IS COMPATIBLE
9  WITH WHAT I'VE WRITTEN IN MY BOOK AND TEACH TO CLASSES THAT
10  INCLUDE PHARMACEUTICAL EXECUTIVES, IS THAT IT'S NECESSARY TO DO
11  SO.
12      I'VE -- SINCE THE VIOXX WITHDRAWAL, I'VE EVEN MADE
13  THE ARGUMENT THAT IT'S A GOOD BUSINESS CASE TO DO SO BECAUSE
14  YOU CAN REALLY REGRET IT IF YOU DON'T.
15  Q.  DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF MEDICAL
16  AND SCIENTIFIC CERTAINTY, AS AN EXPERT IN DRUGS RISKS AND
17  BENEFITS, AND EVALUATING THEM, AS TO WHETHER OR NOT VIOXX IN,
18  THIS CASE, HAD ANY RESPONSIBILITY TO ACTUALLY --
19  A.  YOU MEAN MERCK HAD A RESPONSIBILITY?
20  Q.  -- MERCK HAD A RESPONSIBILITY, OR NOT, TO INVESTIGATE THE
21  POTENTIAL BAD EFFECT THAT'S IDENTIFIED HERE IN THE BOARD -- BY
22  THE BOARD OF SCIENTIFIC ADVISORS?
23  A.  I HAVE SUCH AN OPINION, AND THE OPINION IS THAT COMPANY
24  DID HAVE A RESPONSIBILITY TO FOLLOW UP THE ISSUES RAISED IN AN
25  EFFECTIVE MANNER BY THE SCIENTIFIC BOARD.

24  (Pages 543 to 546)

## Page 547

1  Q.  NOW, I WANT YOU TO PUT YOURSELF BACK IN 1998, WHEN THE

2  BOARD OF SCIENTIFIC ADVISORS COMMENTED ON THE POTENTIAL GOOD

3  AND THE POTENTIAL BAD, AS INDICATED HERE IN THIS DOCUMENT.

4  OKAY?

5  A.  OKAY.

6  Q.  COULD A RESPONSIBLE PHARMACEUTICAL COMPANY HAVE DESIGNED

7  AT THAT TIME A TRIAL TO INVESTIGATE WHETHER VIOXX WAS GOOD OR

8  BAD FOR THE HEART USING THE INFORMATION PROVIDED BY THE BOARD

9  OF SCIENTIFIC ADVISORS?

10  A.  YES, I BELIEVE SUCH A STUDY COULD HAVE BEEN INITIATED AT

11  THAT TIME.

12  Q.  OKAY.  AND DO YOU KNOW WHETHER OR NOT A STUDY -- OR WAS A

13  CARDIOVASCULAR OUTCOMES STUDY EVER DESIGNED IN 1998 TO LOOK AT

14  THE ISSUE IDENTIFIED BY THE BOARD OF SCIENTIFIC ADVISORS?

15  A.  I'M NOT AWARE THAT IN ANY YEAR A STUDY WAS DESIGNED AND

16  IMPLEMENTED TO TEST THE QUESTION OF THE CARDIOVASCULAR RISK OF

17  VIOXX IN PARTICULAR.

18  Q.  YOU WERE ASKED SOME QUESTIONS ABOUT ARM BLEEDS AND RAT

19  STUDIES AND ALL THOSE KINDS OF QUESTIONS.  DO YOU REMEMBER

20  THOSE QUESTIONS THAT YOU SPOKE TO EARLIER?

21  A.  YES.

22  Q.  BEYOND QUESTIONS OF LOOKING ABOUT WHETHER OR NOT THESE

23  STUDIES -- ANIMAL STUDIES, ET CETERA -- GENERALLY DEMONSTRATE

24  BIOLOGIC PLAUSIBILITY, WHAT RELEVANCE DO THOSE STUDIES HAVE IN

25  LIGHT OF CLINICAL TRIAL AND EPIDEMIOLOGIC EVIDENCE SHOWING AN

## Page 548

1  ASSOCIATION?

2  A.  THE ULTIMATE OUTCOME IS WHAT HAPPENS TO PATIENTS.  AND WE

3  TRY TO LEARN WHAT HAPPENS -- WHAT IS GOING TO HAPPEN TO

4  PATIENTS BASED ON ANIMAL STUDIES OR LAB MODELS OR OTHER KINDS

5  OF SCIENCE, WHICH CAN BE INTERESTING AND INFORMATIVE; BUT, AT

6  THE END OF THE DAY, WHAT MATTERS MOST IS THE GOOD AND THE BAD

7  EFFECTS AS THEY ARE RECORDED IN ACTUAL HUMAN BEINGS.

8  Q.  DO YOU REMEMBER WHEN MR. BECK ASKED YOU A SERIES OF

9  QUESTIONS ABOUT WHY YOU DID NOT MENTION THE GOOD ASPECTS OF THE

10  BOARD OF SCIENTIFIC ADVISORS?  DO YOU REMEMBER THAT?

11  A.  I RECALL WHAT YOU ARE TALKING ABOUT.

12  Q.  OKAY.  MR. BECK SHOWED YOU A COUPLE OF ARTICLES.  I THINK

13  HE SHOWED YOU THE BURLEIGH ARTICLE, AND I THINK HE SHOWED YOU

14  ANOTHER ARTICLE BY DR. --

15  A.  CIPOLLONE.

16  Q.  -- CIPOLLONE, AND -- BUT THERE WERE OTHER ARTICLES THAT

17  YOU ALSO CITED IN YOUR ARTICLE; CORRECT?

18  A.  RIGHT.

19  Q.  OKAY.  AND ULTIMATELY, AFTER REVIEWING THE LITERATURE ON

20  ALL SIDES OF THE ISSUE, INCLUDING THE ARTICLES THAT MR. BECK

21  HIGHLIGHTED FOR YOU AND ATTACHED, LOOKING AT ALL THE REFERENCES

22  AND DOING YOUR OWN STUDIES, WHAT DID YOU CONCLUDE?

23  A.  WELL, I CAN PROBABLY BEST ANSWER --

24  Q.  IN HUMANS.

25  A.  WELL, I THINK AN ANSWER THAT IS NOT GOING TO REPEAT

## Page 549

1  ANYTHING THAT WE'VE DONE TODAY IS THE PAPERS THAT MR. GOLDMAN

2  ASKED ME TO IDENTIFY FOR HIM AT THE FIRST DEPOSITION TWO WEEKS

3  AGO, BECAUSE I THINK WE'VE HEARD TODAY A RATHER SKEWED

4  PRESENTATION OF THE PHARMACOLOGY EVIDENCE THAT WAS IN PLACE

5  BEFORE THE DRUG WAS MARKETED.  AND TWO WEEKS AGO, MR. GOLDMAN

6  ASKED ME TO IDENTIFY ANIMAL STUDIES THAT I HAD RELIED UPON IN

7  FORMULATING MY OPINION.  AND WE HAVEN'T GOTTEN TO TALK ABOUT

8  THOSE, BUT SINCE WE ARE NOW TALKING ABOUT THE ANIMAL STUDIES

9  RELATED TO THE EFFECT OF VIOXX AND RELATED DRUGS, IT PROBABLY

10  WOULD BE APPROPRIATE TO JUST MENTION THEM SINCE THEY WERE

11  MATERIAL THAT MR. GOLDMAN HAD ASKED ABOUT.  AND THESE ARE THE

12  THREE PAPERS THAT I HAD IDENTIFIED FOR MERCK'S COUNSEL.

13       AND VERY BRIEF, BECAUSE THE HOUR IS LATE, BUT ONE IS

14  FROM 1997 IN NATURE.  AND IT'S A PAPER BY MURATA, AND I CAN

15  PROVIDE THE FULL REFERENCE LATER.  MR. GOLDMAN ACTUALLY HAS IT

16  ALREADY, AND I ASSUME HE SHARED THAT WITH MR. BECK.  AND

17  ESSENTIALLY WHAT IT SAYS IS THAT IF ONE DISRUPTS THE GENE FOR

18  PROSTACYCLIN, WHICH IS THE SUBSTANCE THAT VIOXX REDUCES THE

19  PRODUCTION OF, THE SUSCEPTIBILITY TO THROMBOSIS IS

20  INCREASED.

21       AND THEN THEY GO ON TO SAY, "OUR RESULTS ESTABLISH

22  THAT PROSTACYCLIN IS AN ANTI-THROMBOTIC AGENT IN VIVO."  AND

23  WHAT THAT MEANS, IN ENGLISH, IS THAT THE MATERIAL THAT VIOXX

24  REDUCES THE PRODUCTION OF PREVENTS CLOTTING, SO THAT BLOCKING

25  THAT WOULD INCREASE CLOTTING.  AND THAT WAS, AS I SAID, IN 1997

## Page 550

1  IN NATURE.

2       THE OTHER ONE MR. GOLDMAN ASKED ME ABOUT WAS A PAPER

3  THAT WAS IN THE JOURNAL OF BIOLOGICAL CHEMISTRY, WHICH IS THE

4  MAIN JOURNAL IN BIOCHEMISTRY, PUBLISHED IN 1999, AGAIN,

5  FEBRUARY OF 1999, BEFORE THE AVAILABILITY OF VIOXX ON THE

6  MARKET.

7       AND THIS WAS A STUDY IN WHICH THERE WAS AN

8  INVESTIGATION OF WHETHER HEART CELLS WERE INFLUENCED BY COX-2

9  THE ENZYME THAT VIOXX BLOCKS.  AND THEIR CONCLUSION ON THEIR

10  ABSTRACT IS THAT IN HEART CELLS THAT ARE INJURED IN A VARIETY

11  OF EXPERIMENTAL WAYS, PROSTACYCLIN, WHICH IS THE CHEMICAL THAT

12  VIOXX BLOCKS, PROTECTS THE HEART CELLS.  AND THEIR CONCLUSION

13  WAS THAT IF YOU BLOCK THAT PROSTACYCLIN CHEMICAL THAT PROTECTS

14  THE HEART CELLS, AS YOU WOULD DO WITH A COX-2 INHIBITOR SUCH AS

15  VIOXX, THAT WOULD BLOCK THE PROTECTION OF HEART CELLS IN AN

16  INJURED HEART.

17       AND THE THIRD PAPER, VERY BRIEFLY, THAT I WANT TO

18  TALK ABOUT, THAT PAPER WAS BY ADDERLEY AND FITZGERALD -- A

19  DIFFERENT FITZGERALD, BY THE WAY.

20       AND THE LAST ONE IS A PAPER BY SHINMURA.  AGAIN,

21  MR. GOLDMAN, AND I EXPECT MR. BECK, HAVE THE REFERENCE THAT I

22  PROVIDED TWO WEEKS AGO.  THIS WAS A STUDY ABOUT THE

23  CARDIOPROTECTIVE EFFECTS IN ANIMAL STUDIES WHEN THEY DAMAGE

24  ANIMAL HEARTS, AND IT SAYS -- THE TITLE IS "CYCLOOXYGENASE-2"

25  OR COX-2, "MEDIATES THE CARDIOPROTECTIVE EFFECTS OF" A BUNCH OF

25  (Pages 547 to 550)

## Page 551

1  OTHER THINGS HAVING TO DO WITH HEART DAMAGE.
2      AND, AGAIN, IN BRIEF, WHAT IT SAYS QUITE CLEARLY IN
3  THEIR ABSTRACT IS THAT THIS STUDY IDENTIFIES COX-2 AS A
4  CARDIOPROTECTIVE PROTEIN.  THEY GO ON TO SAY, "COX-2 MEDIATES
5  THE ANTI-INFARCT EFFECTS," WHICH MEANS COX-2, WHICH IS THE
6  ENZYME THAT IS BLOCKED BY VIOXX, MEDIATES OR HELPS TO PROMOTE
7  THE ANTI-HEART ATTACK EFFECTS IN THEIR MODEL.
8      SO, THESE WERE -- MR. GOLDMAN'S QUESTION TO ME TO
9  WHICH THESE WERE A RESPONSE WAS WHAT EVIDENCE WAS THERE BEFORE
10  VIOXX WAS MARKETED THAT INHIBITING COX-2 SELECTIVELY MIGHT BE
11  BAD FOR THE HEART.  AND I THINK THIS IS PRETTY CLEAR THAT,
12  GRANTED, THERE WAS EVIDENCE ON BOTH SIDES, BUT THERE WAS PRETTY
13  COMPELLING EVIDENCE ON THE DAMAGE SIDE ALREADY, EVEN BEFORE THE
14  DRUG HIT THE MARKET.
15  Q.  DOCTOR, LET ME GO BACK TO YOUR ARTICLE.  OKAY?  YOUR
16  ARTICLE, WHICH IS NUMBER 7 IN THE BOOK.
17  A.  IS THAT MY COPY OF THE BOOK?
18  Q.  YES.
19  A.  OKAY.
20  Q.  IN THAT ARTICLE, YOU REFER TO BOTH THE BURLEIGH AND THE --
21  A.  CIPOLLONE.
22  Q.  -- CIPOLLONE ARTICLES.
23  A.  RIGHT.
24  Q.  CORRECT?
25  A.  RIGHT.

## Page 552

1  Q.  SO --
2  A.  CIPOLLONE.
3  Q.  CIPOLLONE.  WHAT WERE YOU TRYING TO DO BY REFERRING THE
4  READERS TO ARTICLES LIKE THESE, AS WELL AS ARTICLES ON THE
5  OTHER SIDE OF THE ISSUE, THAT WERE ALSO CONTAINED IN YOUR
6  PAPER?
7  A.  WHAT THAT SECTION IS ABOUT WAS ESSENTIALLY SAYING THIS IS
8  A VERY ACTIVE AREA OF RESEARCH.  THERE'S A LOT OF NEW
9  INFORMATION THAT IS DEVELOPING ABOUT THE EFFECT OF THIS COX-2,
10  ENZYME WHICH HAD NOT BEEN FULLY STUDIED OVER THE YEARS BUT THAT
11  PEOPLE HAD BEGUN TO UNDERSTAND MAY HAVE AN IMPORTANT EFFECT
12  ON THE HEALTH OF THE VESSEL WALL; AS WELL AS ON THE ABILITY OF
13  BLOOD TO CLOT; AS WELL AS ON THE FUNCTION OF THE ARTERIES, AND
14  THAT THIS IS AN IMPORTANT AREA BECAUSE THERE'S A LOT OF VERY
15  EXCITING RESEARCH GOING ON, THAT COX-2 HAS A LOT TO DO WITH THE
16  ARTERIES.
17  Q.  NOW, AND WHEN YOU TOOK THOSE ISSUES AND YOU ACTUALLY
18  STUDIED THEM IN HUMAN BEINGS, WHAT DID YOU FIND?
19  A.  IN BRIEF, WE FOUND THAT, WHEN ALL IS SAID AND DONE, IF YOU
20  LOOK AT REAL TYPICAL PATIENTS OUT THERE IN THE COMMUNITY, THEY
21  WERE MORE LIKELY TO HAVE HEART ATTACKS IF THEY WERE TAKING
22  VIOXX.
23  Q.  IN YOUR ARTICLE THAT YOU WROTE, DID YOU ACKNOWLEDGE -- AND
24  WE WENT THROUGH SOME OF THE ARTICLES ON BOTH SIDES OF THE
25  ISSUE -- THAT PERHAPS VIOXX COULD HAVE A BENEFICIAL EFFECT AND

## Page 553

1  A BAD EFFECT IN TERMS OF THE ANIMAL MODELS THAT YOU IDENTIFIED?
2  A.  RIGHT.  THOSE ARE THE CITATIONS THAT MR. BECK ASKED ME
3  ABOUT.
4  Q.  IN THE ARTICLES THAT MERCK WROTE, DID THEY IDENTIFY ANY OF
5  THE POTENTIAL BAD ARTICLES THAT WOULD SUPPORT THE PROPOSITION
6  THAT VIOXX WAS PROTHROMBOTIC?
7  A.  IN FAIRNESS, I CAN'T SPEAK TO WHAT MERCK DID OR DIDN'T
8  SAY.  THIS IS AN ARTICLE WRITTEN BY MANY PEOPLE, AND THERE WILL
9  BE OTHER TESTIMONY ABOUT WHAT MERCK DID OR DIDN'T DO IN
10  RELATION TO THE PRESENTATION OF THE FINDINGS IN VIGOR.
11      SO, I CAN SPEAK JUST TO THE PAPER AS IT APPEARED IN
12  THE NEW ENGLAND JOURNAL THAT DR. BOMBARDIER AND COLLEAGUES
13  WROTE.  WE KNOW THERE WAS A LOT OF INTERACTION WITH MERCK, BUT
14  LET ME JUST SPEAK ABOUT THE PAPER.
15      THE PAPER IS REALLY PRESENTED IN A VERY ONE-SIDED
16  WAY.  IT WAS ALL ABOUT THE GOOD NEWS, AND THE BAD NEWS WAS
17  PRESENTED IN A WAY THAT MINIMIZED -- IN FACT, INVERTED IT -- SO
18  THAT IT WAS NOT EVEN PRESENTED AS BAD NEWS.
19  Q.  IN ANY OF THE MATERIALS THAT YOU'VE SEEN -- THE
20  EDUCATIONAL MATERIALS, THE LABEL, THE MEDICAL LITERATURE,
21  ANYTHING THAT CAME OUT OF MERCK -- WAS THERE EVER AN
22  ACKNOWLEDGMENT THAT AT LEAST A POTENTIAL MECHANISM OF ACTION
23  WAS THAT THIS DRUG WOULD BE PROTHROMBOTIC?
24      WELL, LET ME ASK YOU THE QUESTION:  WHAT, IF
25  ANYTHING, HAVE YOU EVER SEEN -- HAVE YOU SEEN IN ANY OF THE

## Page 554

1  MERCK LITERATURE THAT PRESENTED VIOXX AS HAVING ANY POTENTIAL
2  SIDE EFFECTS BEFORE APPROVE?
3  A.  THE VAST PREPONDERANCE OF THE MATERIAL THAT MERCK
4  PRODUCED, EITHER IN ARTICLES THAT IT HAD ITS STAFF OR
5  CONSULTANTS AUTHOR OR THE EDUCATIONAL SO-CALLED MATERIALS FOR
6  PHYSICIANS, THE VAST, VAST PREDOMINANCE OF IT WAS ALL THE GOOD
7  THINGS ABOUT VIOXX.
8      AND I CANNOT RECALL ANY MATERIALS THAT MERCK PRODUCED
9  THAT SAID THIS DRUG MAY INCREASE -- MAY BE PROTHROMBOTIC,
10  EXCEPT IN RECITING THE VIGOR DATA.
11  Q.  DOCTOR, DO YOU REMEMBER THE TULEJA ARTICLE THAT YOU WERE
12  ASKED ABOUT?  DO YOU REMEMBER WHETHER THESE MEN -- AND THIS WAS
13  THE --
14  A.  BLEEDING.
15  Q.  -- BLEEDING-TIME STUDY THAT WE TALKED ABOUT BEFORE.  DO
16  YOU REMEMBER WHETHER THESE WERE HEALTHY OR UNHEALTHY MEN?
17  A.  THEY WERE HEALTHY MEN, AS FAR AS I KNOW.
18  Q.  DO YOU KNOW WHETHER OR NOT THEY LOOKED AT -- WHAT KIND OF
19  VESSELS THEY LOOKED AT?  DID THEY LOOK AT CAPILLARIES, CORONARY
20  ARTERIES, ANYTHING LIKE THAT?
21  A.  I DON'T RECALL WHAT KIND OF VESSELS.
22  Q.  LET ME SHOW YOU THE -- LET ME SHOW YOU THE ARTICLE.  I'M
23  SHOWING YOU MY COPY.
24  A.  IT SAYS, "STANDARD MICROVASCULAR INJURY."
25  Q.  WHAT DOES THAT MEAN TO YOU?

DAILY COPY

## Page 555

1    A.  THAT IT'S AN EXPERIMENTAL TECHNIQUE IN WHICH THEY DAMAGE
2    THE SMALLEST VESSELS.
3    Q.  OKAY.  ARE THOSE THE SAME KIND OF VESSELS THAT CAUSE HEART
4    ATTACKS IN HUMAN BEINGS?
5    A.  NO.
6    Q.  OKAY.  DID THEY HAVE ATHEROSCLEROSIS?
7    A.  NO.  THEY WERE HEALTHY MEN.
8    Q.  AND CAN YOU TELL US WHO FUNDED THIS PARTICULAR STUDY?
9    A.  MERCK OF POLAND.
10   Q.  LET'S GO ON TO THE NEXT --
11   A.  AND IN FAIRNESS, THE POLISH STATE RESEARCH COUNCIL.
12   Q.  LET'S DISCUSS THE 2001 ADVISORY COMMITTEE FOR A MOMENT.
13   DO YOU HAVE THAT TRANSCRIPT THERE?  I BELIEVE IT'S THE BIG --
14   BIG ONE THERE.
15   A.  OKAY.
16   Q.  I'D LIKE TO TAKE YOU THROUGH SOME THINGS HERE.
17        FIRST OF ALL, I WOULD LIKE TO ORIENT THE JURY.  THIS
18   WAS AN ADVISORY COMMITTEE THAT WAS HELD IN FEBRUARY OF 2001 TO
19   DISCUSS THE VIGOR DATA?
20   A.  YES.
21   Q.  OKAY.  FIRST OF ALL, TELL US A LITTLE BIT ABOUT ADVISORY
22   COMMITTEES.  ARE THEY -- HOW MANY DRUGS DO THEY SEE OVER THE
23   COURSE OF SITTING AS AN ADVISORY COMMITTEE?
24   A.  IT WILL VARY.  SOMETIMES THEY WILL SEE A BUNCH AT ONE
25   SITTING. SOMETIMES THEY WILL FOCUS JUST ON ONE DRUG.

## Page 556

1    Q.  AND DO THEY TYPICALLY RECEIVE A PACKET OF INFORMATION
2    PRIOR TO GOING IN AND SITTING AND HEARING PRESENTATIONS?
3    A.  YEAH.  BUT SOMETIMES IT'S JUST LIKE THE DAY BEFORE.
4    Q.  AND HOW MUCH INFORMATION DO THEY ACTUALLY GET IF YOU'RE
5    TYPICALLY SPEAKING?
6    A.  WELL, AGAIN, IT VARIES.  SOMETIMES THEY GET A REAM THAT
7    COLLEAGUES OF MINE, WHO ARE ON THESE COMMITTEES, SAY THEY CAN'T
8    POSSIBLY GET THROUGH.  SOMETIMES THEY GET JUST A SMALL PACKET.
9    Q.  AND WHO TYPICALLY PRESENTS AT THESE ADVISORY COMMITTEES?
10   A.  THERE WILL OFTEN BE SOMEBODY FROM FDA PRESENTING, THERE
11   WILL OFTEN BE SOMEBODY FROM THE COMPANY PRESENTING, AND
12   SOMETIMES THEY EVEN HAVE PATIENTS PRESENTING.
13   Q.  NOW, LOOKING AT THE ADVISORY COMMITTEE OF 2001, THIS WOULD
14   HAVE BEEN APPROXIMATELY A YEAR AFTER MERCK BECAME AWARE OF THE
15   VIGOR RESULTS?
16   A.  RIGHT.
17   Q.  OKAY.  AND WOULD YOU GO TO THE TRANSCRIPT AT PAGE 5, IF
18   YOU COULD.  FIRST OF ALL, IT'S A PRESENTATION BY DR. GOLDMAN.
19   A.  OKAY.
20   Q.  AND DR. GOLDMAN, I'LL REPRESENT TO YOU, IS THE MERCK
21   REPRESENTATIVE.
22   A.  RIGHT.
23   Q.  DO YOU SEE WHERE IT SAYS, "WE BELIEVE THAT THE HIGHLY
24   SIGNIFICANT RESULTS FROM VIGOR MIRRORED A MODIFICATION OF THE
25   PRODUCT LABEL TO REFLECT A MORE APPROPRIATE PRESENTATION OF THE

## Page 557

1    DEMONSTRATED GI SAFETY BENEFITS THAT IS SPECIFIC TO VIOXX"?  DO
2    YOU SEE THAT; DO YOU HAVE ANY UNDERSTANDING READING THAT AS TO
3    WHAT THE PRIMARY PURPOSE OF THIS ADVISORY COMMITTEE WAS?
4    A.  WELL, SURE.  NOT JUST FROM THAT PARAGRAPH BUT FROM HAVING
5    REVIEWED THE TRANSCRIPT.  THE QUESTION -- AS WELL AS THE REST
6    OF THE HISTORY.  THE QUESTION WAS WHETHER THE OFFICIAL LABELING
7    OF VIOXX WAS GOING TO BE REVISED TO INCLUDE IN IT INFORMATION
8    ABOUT VIOXX HAVING A GREATER SAFETY ON THE GI TRACT COMPARED TO
9    OTHER DRUGS.
10   Q.  FIRST OF ALL, THIS IS AN INTERNAL E-MAIL FROM MERCK DATED
11   JANUARY 29TH, 2001; IS THAT CORRECT?
12   A.  THAT'S RIGHT.
13   Q.  AND IS THIS A -- IS THIS BEFORE THE FEBRUARY 8TH ADVISORY
14   COMMITTEE?
15   A.  ABOUT A WEEK BEFORE.
16   Q.  OKAY.  AND DO YOU SEE THE FIRST, THE E-MAIL FROM
17   DR. SHAPIRO TO, AMONG OTHER THINGS, ALISE REICIN?
18   A.  WHICH ONE IS THAT THAT YOU WANT ME TO LOOK AT?
19   Q.  THAT'S AT THE VERY TOP OF THE PAGE.
20   A.  THE TOP ONE?
21   Q.  UH-HUH.  DO YOU SEE THAT?
22   A.  FROM DR. SHAPIRO TO DR. REICIN, YES.
23
24   Q.  YES.  AND THAT'S THE SAME DR. REICIN THAT MADE THE
25   PRESENTATION TO THE ADVISORY COMMITTEE?

## Page 558

1    A.  RIGHT.
2    Q.  DO YOU SEE WHERE DR. REICIN, IN LOOKING AT THE LAST COUPLE
3    OF SENTENCES OF THE E-MAIL, SAYS THAT THERE IS A 30-TO-10
4    IMBALANCE IN DEATHS IN THE ALZHEIMER'S TRIALS?
5    A.  YES, 30 TO 10.
6    Q.  OKAY.  IS THAT THE KIND OF INFORMATION -- DO YOU KNOW
7    WHETHER THAT INFORMATION WAS EVER SHARED WITH THE MEMBERS OF
8    THE ADVISORY COMMITTEE?
9    A.  I DON'T BELIEVE IT WAS.  TO MY KNOWLEDGE, THAT INFORMATION
10   WAS NEVER SHARED WITH THE ADVISORY COMMITTEE AS IT WAS THINKING
11   ABOUT THE LABELING.
12   Q.  HAVE YOU REVIEWED WHAT HAS BEEN KNOWN AS THE SHAPIRO
13   META-ANALYSIS?
14   A.  YES.
15   Q.  OKAY.  COULD YOU TELL THE MEMBERS OF THE JURY WHAT THAT
16   WAS?
17   A.  SURE.  DR. DEBORAH SHAPIRO WAS A BIOSTATISTICIAN, I
18   BELIEVE, WHO WORKED FOR MERCK, AND SHE WAS ASKED TO PULL
19   TOGETHER AN OVERVIEW OF ALL OF THE STUDIES OF -- ALL THE
20   CLINICAL STUDIES OF VIOXX THAT WAS PRESENTED AT SOME MERCK
21   MANAGEMENT MEETING, AND I HAD OCCASION TO REVIEW THE DATA FROM
22   THAT REPORT.
23   Q.  AND WHAT DID THAT DATA SHOW YOU?  AND I'LL REPRESENT TO
24   YOU THAT THAT DATA WAS COMPILED AND SHARED WITHIN MERCK IN THE
25   FALL OF 2000, BEFORE THIS ADVISORY COMMITTEE.

27  (Pages 555 to 558)

Page 559

1  A.  MY RECOLLECTION WAS THAT THAT WAS AN ANALYSIS THAT WAS
2  DONE ONCE VIGOR AND ADVANTAGE AND 090 AND A NUMBER OF OTHER
3  STUDIES HAD BEEN COMPLETED.  AND IT WAS AN OVERVIEW OF THE
4  RELATIVE EVENTS IN VIOXX VERSUS THE VARIOUS COMPARATOR GROUPS.
5       AND THERE IS A SUMMARY SLIDE, THAT I'VE LOOKED AT
6  THAT IF YOU HAVE --
7  Q.  DOCTOR, FIRST OF ALL, WHAT IS THIS?
8  A.  THIS IS BATES NUMBER MRK-NJ0070364.  IT'S NOW MARKED AS
9  EXHIBIT 61, AND IT'S LABELED, "VIOXX PRELIMINARY CARDIOVASCULAR
10  META-ANALYSIS, DR. DEBORAH SHAPIRO, OCTOBER 18TH, 2000."
11  Q.  SO THAT WOULD HAVE BEEN BEFORE THE ADVISORY COMMITTEE
12  RAISED THEIR HANDS AND MADE ANY KIND OF RECOMMENDATIONS ON
13  LABELING CHANGES THAT MR. BECK ASKED YOU ABOUT?
14  A.  MONTHS BEFORE.
15  Q.  DID DR. SHAPIRO DO A META-ANALYSIS OF MI-ONLY EVENTS SEEN
16  IN THE VIOXX CLINICAL TRIALS?
17  A.  YES.
18  Q.  AND WHAT DID DR. SHAPIRO PRESENT WITHIN MERCK IN OCTOBER
19  OF 2000?
20  A.  THE MI ENDPOINT OF ROFECOXIB OR VIOXX VERSUS
21  NONSTEROIDALS.  AND THERE'S A SUMMARY OF A VARIETY OF THE
22  STUDIES WITH THE NUMBER OF PATIENTS IN THEM; THE NUMBER OF
23  PATIENTS WHO HAD EVENTS; THE RATES; AND THEN THE RELATIVE
24  RISKS, WHICH IS THE RISK OF THE EVENT IN VIOXX COMPARED TO THE
25  NONSTEROIDAL DRUG THAT IT WAS COMPARED TO.

Page 560

1  Q.  OKAY.  AND WHAT -- AND WHAT DOES IT INDICATE?
2  A.  THE FIRST ROW IS ALL PATIENTS, WHICH I ASSUME IS A SUMMARY
3  OF EVERYTHING ELSE ON THE SLIDE.  AND BASICALLY, IT SAYS
4  RELATIVE RISK 2.02, WITH A CONFIDENCE INTERVAL OF 1.44 TO 3.55;
5  WHICH BASICALLY MEANS A DOUBLING OF RISK OF HEART ATTACKS IN
6  THE OVERVIEW OF ALL THE STUDIES THAT DR. SHAPIRO OF MERCK
7  EVALUATED, WHICH, INTERESTINGLY, WAS ALMOST EXACTLY THE SAME
8  NUMBER AS THE APPROVE STUDY IN MANY YEARS WOULD FIND.  AND THEN
9  SHE SUBDIVIDES THAT INTO OTHER STUDIES, SPECIFIC STUDIES.
10      SO, VIGOR, AND SHE THEN HAS A FIVE-FOLD INCREASE IN
11  HEART ATTACKS LISTED FOR VIGOR.  ADVANTAGE, SHE HAS A 2.95 OR
12  ALMOST A THREE-FOLD INCREASE IN HEART ATTACKS IN THE ADVANTAGE
13  STUDY.  ONE CALLED RA HAS A RELATIVE RISK OF 1.82 OR ALMOST A
14  DOUBLING OF RISK.  I THINK THIS IS PROBABLY A SUMMARY OF THE --
15  ALL THE RA STUDIES, THAT IS, ALL THE RHEUMATOID ARTHRITIS
16  STUDIES.
17      AND THE NEXT LINE IS NON-RA, WHICH, I GUESS, IS THE
18  NON-RHEUMATOID ARTHRITIS STUDIES.  AND THAT HAS A RELATIVE RISK
19  OF 1.68, OR A 68 PERCENT INCREASE.
20      AND THEN THE LAST LINE IS 0A-069, AND THAT HAS A
21  LOWER NUMBER OF 0.55.
22  Q.  NOW, DOCTOR, LOOKING AT THE OVERALL -- OVERALL RESULTS, IS
23  THAT -- THAT GREATER THAN 2.0, IS THAT THE -- IS THAT THE LEVEL
24  THAT DR. STROM IN HIS BOOK, THAT MR. BECK PUT IN FRONT OF YOU,
25  IS HIGHLY SIGNIFICANT?

Page 561

1  A.  IT'S A DOUBLING OF RISK, AND THAT IS IN THE CATEGORY --
2  IT'S GREATER -- SLIGHTLY GREATER THAN A DOUBLING OF RISK, AND
3  THAT IS IN THE CATEGORY THAT, ACCORDING TO DR. STROM'S
4  TEXTBOOK, WOULD BE CATEGORIZED AS AN IMPORTANT BIG DEAL.
5  Q.  GOING BACK TO THE ADVISORY COMMITTEE, WHICH RAISED ITS
6  HAND AND MR. BECK ASKED YOU QUESTIONS ABOUT WHAT THEY
7  RECOMMENDED AND WHY THEY RECOMMENDED, THE BASIS OF THEIR
8  RECOMMENDATIONS, WAS DR. SHAPIRO'S ANALYSIS, TO YOUR KNOWLEDGE,
9  SHARED BY DR. REICIN BEFORE THE ADVISORY COMMITTEE WHEN THEY
10  RAISED THEIR HAND AND MADE THEIR VOTES?
11  A.  TO MY KNOWLEDGE, NONE OF THIS INFORMATION WAS SHARED WITH
12  THE ADVISORY COMMITTEE BY MERCK.
13  Q.  NOW, AS A RESULT OF THE ADVISORY COMMITTEE, THE FDA DID
14  MAKE A RECOMMENDATION TO MERCK, DID IT NOT?
15  A.  YES.
16  Q.  AND WHEN IT DID, DID IT ASK THAT A WARNING FOR
17  CARDIOVASCULAR EVENTS BE INCLUDED IN THE LABEL?
18  A.  YES, THEY DID.  THE DOCUMENTS I REVIEWED INDICATED THAT
19  WAS A REQUEST.
20  Q.  OKAY.  AND WAS THAT EVER DONE?  WAS IT EVER DONE?
21  A.  IT WAS NEVER DONE, TO MY KNOWLEDGE.
22  Q.  HE ASKED YOU -- OR MR. BECK ASKED YOU MANY QUESTIONS ABOUT
23  DR. TOPOL AND DR. NISSEN.
24  A.  RIGHT.
25  Q.  HAVE YOU READ DR. TOPOL AND DR. NISSEN'S PUBLIC ARTICLES

Page 562

1  CONCERNING VIOXX?
2  A.  SURE.
3  Q.  SINCE YOU WERE ASKED ON YOUR CROSS-EXAMINATION ABOUT
4  DR. NISSEN AND DR. TOPOL, I'M GOING TO ASK YOU THIS QUESTION:
5  HAVING READ -- HAVING READ THEIR SCHOLARSHIP ON -- AND THEIR
6  ARTICLES ON VIOXX --
7  A.  YES.
8  Q.  -- HOW WOULD YOU CHARACTERIZE THEIR SCHOLARSHIP IN TERMS
9  OF THE RISKS AND BENEFITS OF VIOXX?
10  A.  I THINK A FAIR SUMMARY OF WHAT THEY HAVE WRITTEN -- AND
11  THAT'S WHAT I DO, I SUMMARIZE THE LITERATURE AND LOOK AT WHAT
12  PARTICULAR PAPERS SAY VIEWED IN THE AGGREGATE -- IS THAT BOTH
13  OF THEM, FOR YEARS, HAVE EXPRESSED GRAVE CONCERNS ABOUT THE
14  SAFETY OF VIOXX.
15  Q.  TURNING TO YOUR STUDY:  FIRST OF ALL, IS THE CONCEPT THAT
16  YOU REFERRED TO, THE "DEPLETION OF THE SUSCEPTIBLES," A
17  GENERALLY ACCEPTED CONCEPT IN EPIDEMIOLOGY?
18  A.  YES.
19  Q.  WHAT WAS YOUR EXPLANATION OF WHY YOU DID NOT SEE A RISK
20  AFTER 90 DAYS WHEN YOU WERE ASKED THAT QUESTION BY MR. BECK?
21  A.  WHETHER OR NOT I USED THE TERM "DEPLETION OF
22  SUSCEPTIBLES," I CERTAINLY SAID TO MR. BECK THAT OUR
23  UNDERSTANDING OF THE FAILURE TO SEE AN EFFECT AFTER 90 DAYS WAS
24  THAT, IN AN OBSERVATIONAL STUDY WHERE WE'RE NOT CONTROLLING WHO
25  TAKES WHAT DRUG, PATIENTS WHO WERE GOING TO GET INTO TROUBLE

28  (Pages 559 to 562)

## Page 563

1  WITH VIOXX, MANY OF THEM HAD ALREADY DONE SO BY 90 DAYS OR HAD
2  HAD RELATED SIDE EFFECTS TO CAUSE THEM TO DROP OUT OF THE
3  STUDY.  AND THAT THAT -- THAT IS WHAT I BELIEVE EXPLAINS WHY WE
4  DID NOT SEE AN EFFECT AFTER 90 DAYS, EVEN THOUGH IT IS NOW WELL
5  KNOWN THAT THERE IS AN EFFECT AFTER 90 DAYS.
6  Q.  IS THERE A SCIENTIFIC OR EPIDEMIOLOGIC TERM FOR THAT
7  PHENOMENON --
8  A.  YES.
9  Q.  -- THAT YOU JUST DESCRIBED?
10  A.  IT IS CALLED "DEPLETION OF SUSCEPTIBLES."
11  Q.  AND IS THAT SOMETHING THAT IS GENERALLY RECOGNIZED IN THE
12  EPIDEMIOLOGIC COMMUNITY AS A PRINCIPLE OF WHEN YOU LOOK AT
13  EPIDEMIOLOGIC STUDIES LIKE THIS?
14  A.  YES.
15  Q.  YOU MENTIONED THAT -- IN RESPONSE TO MR. BECK'S QUESTION,
16  THAT ONE OF THE REASONS THAT IT MIGHT -- THAT PEOPLE MAY DROP
17  OUT IN THE FIRST 30 TO 90 DAYS WOULD BE THINGS LIKE
18  HYPERTENSION, CHF, THOSE KINDS OF THINGS THAT YOU -- JUST
19  REFERRING YOU TO TESTIMONY.  DO YOU REMEMBER THAT TESTIMONY?
20  A.  YES.
21  Q.  OKAY.  YOU HAVE DONE STUDIES INTO COMPARING CELECOXIB OR
22  VIOXX -- CELEBREX AND VIOXX ON THE ISSUE OF HYPERTENSION AND
23  CONGESTIVE HEART FAILURE.  HAVE YOU DONE THAT IN THOSE KINDS OF
24  STUDIES?
25  A.  THAT IS CORRECT.

## Page 564

1  Q.  OKAY.  WOULD THOSE BE THE SAME TWO COMPARATORS THAT WERE
2  INVOLVED IN YOUR MI STUDY THAT WE'RE REFERRING TO AS EXHIBIT 7?
3  A.  YES.
4  Q.  IS THERE A SCIENTIFIC BASIS, BASED UPON YOUR OWN STUDIES,
5  FOR YOUR CONCLUSION THAT PEOPLE, IN THE FIRST 30 TO 90 DAYS,
6  WOULD -- WOULD DROP OUT AT A GREATER RATE COMPARED TO -- TO
7  CELEBREX BECAUSE OF HYPERTENSION AND CONGESTIVE HEART FAILURE?
8  A.  YES.  OUR STUDIES OF HYPERTENSION IN VIOXX, AS WELL AS
9  THOSE OF OTHERS, SUCH AS DR. WHELTON, INDICATE A HIGHER RATE OF
10  PATIENTS BECOMING HYPERTENSIVE WHEN THEY TAKE VIOXX COMPARED TO
11  WHEN THEY TAKE CELEBREX.
12  Q.  COULD YOU PLEASE GO, DOCTOR, TO YOUR METHODS AND RESULTS
13  SECTION OF YOUR PAPER THAT'S UP ON THE SCREEN HERE?
14  A.  YES.
15  Q.  COULD YOU -- I THINK IT'S 4 -- WHERE IT SAYS .054, THE
16  P-VALUE THAT MR. BECK --
17  A.  YES.
18  Q.  -- WAS ASKING YOU ABOUT.  HOW MANY LINES UP IS IT?  MY
19  EYES ARE NOT SO GOOD.
20  A.  NO.  IT'S IN THE ABSTRACT.
21  Q.  IN THE ABSTRACT PORTION OF IT.
22  A.  IF YOU COULD JUST BLOW UP THE BOTTOM HALF OF THE METHODS
23  SECTION.
24  Q.  RIGHT THERE.  RIGHT THERE.
25  A.  YEAH, THAT'S GOOD.  OKAY.  IT'S ON LINES 2 AND 3.

## Page 565

1  Q.  DO YOU SEE THAT?
2  A.  YES.
3  Q.  YOU WERE ASKED SOME QUESTIONS ABOUT SOME SUGGESTIONS BY
4  THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, ABOUT
5  INCLUDING THE FACT -- INCLUDING INFORMATION ABOUT STATISTICAL
6  SIGNIFICANCE.  DO YOU REMEMBER THOSE QUESTIONS?
7  A.  YES.
8  Q.  DID YOU DO ANYTHING IN RESPONSE TO THAT PARTICULAR
9  SUGGESTION WHEN YOU RESUBMITTED THE PAPER TO CIRCULATION?
10  A.  YES.  AS DR. SOLOMON INDICATED ON HIS HANDWRITTEN NOTE
11  THAT MR. BECK PROJECTED, WE PUT THE P-VALUE INTO THE ABSTRACT,
12  AS YOU CAN SEE IT RIGHT THERE.
13  Q.  AND FOR ANYBODY WHO'S READING THIS ARTICLE, IS THE P-VALUE
14  PROMINENTLY DISPLAYED FOR THEM TO LOOK AT?
15  A.  SURE.  IT'S RIGHT THERE.  IT'S ON LINE -- OF THE BLOWUP,
16  IT'S LINE 3, JUST A COUPLE OF CHARACTERS IN.  IF YOU CAN
17  HIGHLIGHT THAT.  IT'S RIGHT THERE, P=.054.
18  Q.  NOW, IN YOUR ARTICLE IN THE JOURNAL OF THE -- COMMENTS OF
19  THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, WHICH I
20  BELIEVE WAS EXHIBIT 54, IF YOU CAN PULL THAT, PLEASE.  OVERALL
21  COMMENTS OF THE PEOPLE THAT INVESTIGATED -- WHO LOOKED AT THE
22  PAPER, THE PEER-REVIEWERS?
23  A.  YES.  DO YOU WANT TO --
24  Q.  PAGE 2.
25  A.  PAGE 2 OF WHAT?  PAGE 2 -- WELL, YEAH.  IT'S, I GUESS,

## Page 566

1  BATES NUMBER 3253 --
2  Q.  YES.
3  A.  -- IS PROBABLY THE BEST WAY TO REFER TO IT.
4  Q.  FIRST OF ALL, JUST SO EVERYBODY UNDERSTANDS, THESE ARE
5  ANONYMOUS PEER REVIEWERS WHO LOOK AT MANUSCRIPTS THAT ARE
6  SUBMITTED FOR PUBLICATION.  IS THAT FAIR?
7  A.  RIGHT.
8  Q.  SO, YOU DON'T KNOW WHO THESE PEOPLE ARE?
9  A.  RIGHT.
10  Q.  YOU DON'T KNOW WHETHER THEY -- WHO THEY WORK FOR, WHAT
11  THEIR ACADEMIC OR AFFILIATION IS, NOTHING?
12  A.  RIGHT.  JUST EXPERTS IN THE FIELD.
13  Q.  OKAY.  NOW, WHAT IS THE RESULT -- WHAT DOES THE FIRST
14  AUTHOR SAY ABOUT THE MANUSCRIPT AS A GENERAL MATTER?
15  A.  OKAY.  I THINK IN THE INTEREST OF TIME, I CAN JUST
16  INDICATE THAT REVIEWS ALWAYS START OUT WITH AN OVERVIEW, AND
17  THERE'S A LINE-AND-A-HALF OVERVIEW THAT IS THE REVIEWER'S
18  GENERAL IMPRESSION THAT I WILL JUST READ THE LINE-AND-A-HALF
19  OVERVIEW.
20      "THIS MANUSCRIPT REPORTS A WELL THOUGHT-OUT
21  INVESTIGATION AND IS WELL-WRITTEN AND CONCISE.  THERE ARE A
22  NUMBER OF PROBABLY MINOR ISSUES AND ONE MAJOR ISSUE."  THAT'S
23  THE GENERAL OVERVIEW AS STATED BY THE REVIEWER.
24  Q.  OKAY.  GOING TO THE NEXT COMMENT.
25  A.  THE NEXT REVIEWER, YOU MEAN?

29  (Pages 563 to 566)

## Page 567

1  Q.  YES.  COULD YOU PLEASE READ THE --
2  A.  OKAY.  YES.  THE AUTHOR -- AGAIN, THE OVERVIEW THAT THE
3  REVIEWER PRESENTS:  "THE AUTHORS HAVE CONDUCTED A LARGE-SCALE
4  STUDY WITH APPROPRIATE ANALYSIS."  DO YOU WANT ME TO --
5  Q.  KEEP GOING, PLEASE.
6  A.  OKAY.  THE STRENGTH OF THE MANUSCRIPT IS THE CONSISTENCY
7  OF FINDINGS FOR DIFFERENT SUBGROUPS AND THE SENSITIVITY
8  ANALYSIS.  HOWEVER, CONCLUSIONS MUST BE TEMPERED WITH CAVEATS
9  REGARDING RETROSPECTIVE DATA FROM A DATABASE, RATHER THAN A
10  PROSPECTIVE RANDOMIZED CONTROL TRIAL OR EVEN A COHORT
11  OBSERVATIONAL STUDY, WITH A PROPENSITY ANALYSIS OF THE
12  LIKELIHOOD OF RECEIVING A PARTICULAR TREATMENT.
13  Q.  OKAY.  NOW, IN YOUR STUDY THAT WAS PUBLISHED, DID YOU
14  ADDRESS THE LIMITATIONS OF OBSERVATIONAL ANALYSES?  DID YOU
15  ADDRESS THE POTENTIAL ISSUES OF THE STUDY THAT YOU CONDUCTED
16  WITH DR. SOLOMON?
17  A.  I BELIEVE WE DID THAT, YES.
18  Q.  GOING TO THE NEXT REVIEWER'S COMMENTS, I'D LIKE TO REFER
19  YOU TO THE GENERAL COMMENT THAT SAYS, "THE STUDY'S RESULTS ARE
20  INTERESTING..."
21  A.  YES.
22  Q.  OKAY.  "THE STUDY'S RESULTS ARE INTERESTING BUT NOT
23  NOVEL."
24  A.  RIGHT.
25  Q.  "PREVIOUS OBSERVATIONAL STUDIES AND META-ANALYSES HAVE

## Page 568

1  ALREADY SUGGESTED A DELETERIOUS EFFECT OF ROFECOXIB AND/OR A
2  PROTECTIVE EFFECT OF NAPROXEN."
3  A.  YES.
4  Q.  DO YOU SEE THAT?
5  A.  YES.
6  Q.  DID YOU HAVE THE INFORMATION THAT YOU HAVE BEEN MADE AWARE
7  OF DURING THE COURSE OF THIS LITIGATION ABOUT -- LET ME ASK
8  YOU:  TRIAL 090?  DID YOU KNOW THAT?
9  A.  NO, I DID NOT HAVE THAT INFORMATION.
10  Q.  DID YOU KNOW OF THE RESULTS OF THE ADVANTAGE TRIAL THAT
11  YOU NOW KNOW?
12  A.  I DID NOT HAVE THAT INFORMATION.
13  Q.  DID YOU KNOW OF THE RESULTS OF THE ALZHEIMER'S STUDY THAT
14  YOU NOW KNOW?
15  A.  RIGHT.  THERE WAS NO WAY I COULD HAVE SEEN THAT
16  INFORMATION.
17  Q.  DID YOU KNOW -- DID YOU KNOW THAT, IN THE ALZHEIMER'S
18  STUDY, THERE WAS AN IMBALANCE OF CARDIOVASCULAR DEATHS, 8 TO 2?
19  DID YOU KNOW THAT?
20  A.  THAT INFORMATION WAS NEVER MADE AVAILABLE.
21  Q.  IS THAT THE KIND OF INFORMATION THAT YOU, AS A DOCTOR
22  HELPING MAKE DECISIONS ABOUT WHAT GOES ON A PHARMACEUTICAL AND
23  THERAPEUTICS COMMITTEE AT THE BRIGHAM HOSPITAL, WOULD HAVE
24  WANTED TO KNOW WHEN YOU WERE MAKING DECISIONS ABOUT PATIENTS IN
25  YOUR HOSPITAL?

## Page 569

1  A.  IF A DRUG DOUBLES THE RISK OF DEATH, I WOULD WANT TO KNOW
2  THAT, AS A MEMBER OF THE PHARMACY AND THERAPEUTICS COMMITTEE,
3  BECAUSE I WOULD NOT BE COMFORTABLE HAVING THAT DRUG ON OUR
4  FORMULARY UNLESS IT HAD SOME INCREDIBLE BENEFICIAL PROPERTY
5  THAT WOULD OUTWEIGH THE DOUBLING OF THE RISK OF DEATH.
6  Q.  DOCTOR, YOU WROTE THIS IN THE 2002-2003 TIME FRAME, WHICH
7  WOULD HAVE BEEN ABOUT THE TIME YOU WERE WRITING THESE OR
8  EDITING THESE PARTICULAR THINGS FOR THE BRIGHAM?
9  A.  RIGHT.
10  Q.  WOULD YOU TELL US, SIR, WHAT YOU WROTE IN THAT TIME FRAME
11  ABOUT THE RISK OF HEART ATTACK BASED UPON YOUR UNDERSTANDING OF
12  THE EVIDENCE?
13  A.  YES.  THE FIRST FULL PARAGRAPH ON PAGE 202:  "AS FOR THE
14  PRODUCTS IN QUESTION:" WHICH IS THE COX-2 INHIBITORS, "YEARS OF
15  CLINICAL RESEARCH AND EXPERIENCE HAVE CONFIRMED THAT THE
16  COXIBS," OR COX-2 INHIBITORS, "ARE NO MORE EFFECTIVE THAN OLDER
17  DRUGS, DESPITE MASSIVE AD CAMPAIGNS THAT SUBTLY IMPLY
18  OTHERWISE.  AND WHILE THE COXIBS DO REDUCE GASTRIC BLEEDING
19  SOMEWHAT, THIS ADVANTAGE APPEARS TO BE MODEST.  THEN, OF
20  COURSE, CAME THE FINDINGS THAT THESE MEDICATIONS CAN INCREASE
21  THE RISK OF HEART ATTACK AND STROKE."
22  Q.  I THOUGHT THIS WAS --
23  A.  RIGHT, RIGHT.  NO.  THE PAPERBACK WAS PUBLISHED LATER.  SO
24  LET ME READ FROM PAGE 202 OF THE BOOK AS IT WAS -- CAME OUT IN
25  MID-'04, HAVING BEEN WRITTEN IN 2002-2003.

## Page 570

1  Q.  OKAY.
2  A.  OKAY.  TO READ:  "AS FOR THE PRODUCTS IN QUESTION, YEARS
3  OF CLINICAL RESEARCH AND EXPERIENCE HAVE CONFIRMED THAT THE
4  COXIBS ARE NO MORE EFFECTIVE THAN OLDER DRUGS, DESPITE MASSIVE
5  AD CAMPAIGNS THAT SUBTLY IMPLY OTHERWISE.  AND WHILE THE COXIBS
6  DO REDUCE GASTRIC BLEEDING SOMEWHAT, THIS ADVANTAGE APPEARS TO
7  BE MODEST.  CONCERNS HAVE ALSO EMERGED ABOUT OTHER SAFETY
8  PROBLEMS, PRIMARILY FOR MERCK'S VIOXX.  RESEARCH LED BY DR. DAN
9  SOLOMON IN MY DIVISION, AS WELL AS STUDIES FROM VANDERBILT
10  UNIVERSITY AND EVEN MERCK'S OWN CLINICAL TRIAL DATA, INDICATE
11  THAT VIOXX CAN INCREASE THE RISK OF HEART ATTACK AS WELL AS
12  CAUSE HIGH BLOOD PRESSURE.  NONETHELESS, EXTRAVAGANT MARKETING
13  AIMED AT PATIENTS AND DOCTORS HAVE MADE THESE AMONG THE MOST
14  PROFITABLE DRUGS EVER SOLD.  THOSE OF US WHO WORK AT
15  UNIVERSITIES MAY NOT BE VERY GOOD AT TURNING ORDINARY THINGS
16  INTO GOLD, BUT OTHERS CLEARLY ARE."
17  Q.  WOULD YOU PLEASE READ THE ONE SENTENCE THAT BEGINS WITH
18  THE WORD "RESEARCH."
19  A.  "RESEARCH LED BY DR. DAN SOLOMON IN MY DIVISION, AS WELL
20  AS STUDIES FROM VANDERBILT UNIVERSITY AND EVEN MERCK'S OWN
21  CLINICAL TRIAL DATA, INDICATE THAT VIOXX CAN INCREASE THE RISK
22  OF HEART ATTACK AS WELL AS CAUSE HIGH BLOOD PRESSURE."
23  Q.  IS THERE INFORMATION THAT YOU WERE NOT AWARE OF, THAT YOU
24  ARE NOW AWARE OF, THAT WOULD HAVE CHANGED IN ANY WAY YOUR
25  STATEMENT IN YOUR BOOK?

DAILY COPY

Page 571

1    A. THE INFORMATION THAT I HAVE BECOME AWARE OF SINCE THE
2    WITHDRAWAL OF THE DRUG WOULD HAVE JUST MADE THAT AN EVEN
3    STRONGER STATEMENT.
4    Q. IS THERE ANYTHING ABOUT THESE DOCUMENTS THAT MR. BECK
5    SHOWED YOU THAT IS -- THAT NEEDS TO BE CLARIFIED, SIR?
6    A. YES. THE -- IF THE QUESTION IS WHAT DID I BELIEVE ABOUT
7    THE RISKINESS OF VIOXX OR THE SAFETY OF VIOXX IN 2003, I THINK
8    PROBABLY THE MOST RELEVANT PIECE IS THE FACT THAT DR. SOLOMON
9    AND I ASKED OUR PHARMACY THERAPEUTICS COMMITTEE, WHICH WE BOTH
10   SIT ON, TO REMOVE HIGH-DOSE VIOXX FROM THE FORMULARY BECAUSE WE
11   FELT THAT IT WAS UNNECESSARILY SAFE (SIC); AND WE QUESTIONED
12   THE DECISION OF HAVING VIOXX BE THE COX-2 OF CHOICE AT OUR
13   HOSPITAL BECAUSE WE FELT THAT, AT ANY DOSE, IT WAS NOT AS SAFE
14   AS OTHER ALTERNATIVES, AND WE REQUESTED THE HOSPITAL COMPUTER
15   SYSTEM BE CHANGED TO REFLECT THAT.
16   Q. LET ME JUST ASK YOU ONE QUESTION. MR. BECK ASKED YOU
17   SEVERAL QUESTIONS ABOUT CELEBREX AND OTHER DRUGS THAT -- AND
18   THEIR CARDIOVASCULAR RISKS. DO YOU REMEMBER THOSE QUESTIONS?
19   A. YES.
20   Q. DO YOU HAVE AN OPINION THAT YOU HOLD TO A REASONABLE
21   DEGREE OF MEDICAL CERTAINTY AS TO WHETHER OR NOT CELEBREX
22   CARRIES THE SAME CARDIOVASCULAR RISKS AS VIOXX DOES?
23   A. YES, I DO. AND I DID AT THE TIME THAT WE PREPARED THE
24   DOCUMENT EDUCATING THE BRIGHAM DOCTORS THAT MR. BECK ASKED ME
25   ABOUT.

Page 572

1    Q. OKAY. AND WHAT WAS THAT OPINION?
2    A. AS OF 2002-2003, THERE WAS EVIDENCE IN PLACE IN THE
3    LITERATURE -- AND, WE NOW KNOW, BEYOND THAT -- THAT VIOXX
4    INCREASED THE RISK OF HEART ATTACK, AND THAT COMPARABLE
5    EVIDENCE OF A SIMILAR MAGNITUDE WAS NOT -- WAS NOT AVAILABLE
6    FOR CELEBREX, WHICH IS WHY, IN COMPARING THE TWO DRUGS, WE HAD
7    PETITIONED OUR PHARMACY AND THERAPEUTICS COMMITTEE TO NOT HAVE
8    VIOXX BE THE COX-2 OF CHOICE; TO NOT ALLOW USE OF THE HIGH-DOSE
9    DRUG AT ALL; AND TO ALLOW DOCTORS TO USE CELEBREX, RATHER THAN
10   VIOXX, IF THAT WAS THEIR PREFERENCE.
11   Q. AND, DOCTOR, DO YOU HAVE AN OPINION AS TO WHETHER OR NOT
12   VIOXX IS AN UNSAFE DRUG?
13   A. YES, I DO.
14   Q. AND WHAT IS THAT?
15   A. I HAVE SUCH AN OPINION, AND THE OPINION IS THAT VIOXX IS
16   AN UNSAFE DRUG.
17      MR. BECK: YOUR HONOR, THERE IS A FIVE-MINUTE
18   RE-RECROSS BY ME.
19      THE COURT: ON ISSUES THAT WERE JUST DEVELOPED IN
20   DIRECT, SO I'LL ALLOW IT.
21          RECROSS-EXAMINATION
22   BY MR. BECK:
23   Q. DOCTOR, I HAVE A FEW QUESTIONS ON ONE SUBJECT THAT
24   MR. TISI ASKED YOU ABOUT, AND THAT IS HYPERTENSION. DO YOU
25   REMEMBER TALKING WITH MR. TISI ABOUT THE QUESTION OF WHETHER

Page 573

1    VIOXX INCREASES THE RISK OF HYPERTENSION?
2    A. YES.
3    Q. WAS HYPERTENSION AND THE POSSIBILITY THAT IT COULD BE
4    CAUSED BY VIOXX SOMETHING THAT WAS IN THE VIOXX LABEL FROM DAY
5    ONE?
6    A. WELL, I HAVE THE LABELS HERE, AND LET ME JUST QUICKLY LOOK
7    AT THEM AND I CAN ANSWER THAT.
8    Q. WELL, DO YOU REMEMBER OFF THE TOP OF YOUR HEAD?
9    A. I KNOW THERE WAS A MENTION OF HYPERTENSION, BUT I CAN'T
10   TELL YOU WHETHER IT WAS FROM DAY ONE OR WHETHER THERE WAS THE
11   APRIL '02 LABEL OR THE 1999 LABEL, BUT I KNOW THEY'RE HERE AND
12   I CAN JUST FIND THEM.
13   Q. IF A PATIENT HAD MOSTLY NORMAL BLOOD PRESSURE READINGS
14   DURING THE TIME HE TOOK VIOXX BUT HAD SOME ELEVATED
15   BLOOD-PRESSURE SPIKES, WOULD YOU AGREE THAT THAT WOULD NOT BE
16   CONSIDERED HYPERTENSION?
17   A. I COULDN'T ANSWER THAT WITHOUT LOOKING AT THE PATIENT'S
18   CLINICAL RECORD.
19   Q. YOUR DEPOSITION, PAGE 330 -- 330, LINES 4 THROUGH 10:
20      "Q. WHAT IF THE PATIENT ACTUALLY HAD MOSTLY NORMAL
21      READINGS OF BLOOD PRESSURE DURING THE PERIOD OF TIME THAT
22      HE WAS ON VIOXX BUT HAD SOME ELEVATED BLOOD-PRESSURE
23      SPIKES? WOULD YOU CONSIDER THAT TO BE HYPERTENSION?"
24      "A. NO."
25      IS THAT YOUR SWORN TESTIMONY A COUPLE OF WEEKS AGO.

Page 574

1    WAS THAT YOUR SWORN TESTIMONY?
2    A. IT IS WHAT I SAID, BUT I DON'T THINK WHAT I SAID WAS
3    CORRECT.
4    Q. IS IT TRUE, SIR, THAT ALL NSAIDS CAN CAUSE HYPERTENSION?
5    A. VIRTUALLY ALL THE ONES THAT I KNOW ABOUT.
6    Q. IS IT TRUE THAT, LONG BEFORE VIOXX CAME ON THE MARKET, THE
7    MEDICAL COMMUNITY KNEW THAT NSAIDS COULD CAUSE HYPERTENSION?
8    A. YES, BUT SOME CAN DO IT MORE THAN OTHERS.
9    Q. AND, OF COURSE, IT WAS ALSO KNOWN THAT HYPERTENSION COULD
10   INCREASE THE RISK OF HEART ATTACK AND STROKE; CORRECT?
11   A. YES.
12   Q. BEFORE THE FDA APPROVED VIOXX, WAS THE FDA, TO YOUR
13   KNOWLEDGE, AWARE THAT VIOXX COULD CAUSE HYPERTENSION?
14   A. I BELIEVE IT DID.
15   Q. YOU JUST SAID A SECOND AGO THAT SOME NSAIDS -- I THINK YOU
16   SAID THAT ALL OR MOST NSAIDS CAN INCREASE BLOOD PRESSURE, AND
17   SOME DO IT MORE THAN OTHERS; RIGHT?
18   A. CORRECT.
19   Q. AND FROM YOUR REVIEW OF THE MATERIAL, IS IT TRUE, SIR,
20   THAT THE FDA WAS AWARE PRIOR TO APPROVAL OF VIOXX THAT, IN SOME
21   STUDIES, VIOXX INCREASED BLOOD PRESSURE AND HYPERTENSION MORE
22   THAN CERTAIN OTHER NSAIDS?
23   A. I CAN'T ANSWER THAT WITHOUT LOOKING AT ALL THE MATERIALS,
24   AND I DON'T THINK WE HAVE TIME FOR THAT.
25   Q. ON PAGE 331 OF YOUR DEPOSITION, GOING OVER TO 332,

DAILY COPY

## Page 575

1  STARTING AT LINE 24:

2  "Q. AND THE FDA WAS ALSO FULLY AWARE PRIOR TO

3  APPROVAL AND THEREAFTER THAT VIOXX, IN SOME STUDY,

4  INCREASED BLOOD PRESSURE AND HYPERTENSION MORE THAN

5  COMPARATOR NSAIDS; RIGHT?"

6  "A. I BELIEVE THEY WERE AWARE OF THAT."

7  WAS THAT YOUR TESTIMONY A COUPLE WEEKS AGO?

8  A. THAT IS WHAT IT SAYS.

9  Q. AND ALSO, YOU WERE AWARE, ARE YOU NOT, OF OTHER STUDIES

10  SHOWING THAT THERE IS NO DIFFERENCE IN THE RISK OF HYPERTENSION

11  BETWEEN VIOXX AND OTHER NSAIDS?

12  A. AND MY ANSWER NOW IS THE SAME AS MY ANSWER -- I'M SORRY

13  COULD -- AS MY ANSWER, THEN -- I'M SORRY. I REPEAT MY ANSWER,

14  THEN, THAT I WAS AWARE OF STUDIES AND AM AWARE OF STUDIES THAT

15  COME TO THE OPPOSITE CONCLUSION, INCLUDING OUR OWN. I CANNOT

16  CITE FOR YOU A STUDY THAT SHOWS NO DIFFERENCE.

17  BUT IF THERE IS ONE THAT YOU WANT ME TO REVIEW, I'D

18  BE HAPPY TO LOOK AT IT. I DON'T HAVE A CITATION IN MY HEAD

19  ABOUT THAT.

20  Q. BUT IT'S MIXED ON WHETHER VIOXX CAUSES MORE HYPERTENSION

21  OR DOESN'T CAUSE MORE HYPERTENSION?

22  A. THERE -- I KNOW THERE ARE SOME STUDIES THAT SHOW THAT IT

23  CAUSES MORE; I KNOW THERE'S SOME STUDIES THAT SHOW THAT IT

24  CAUSES A COMPARABLE AMOUNT; I CAN THINK OF NO STUDIES THAT I'M

25  AWARE OF, SITTING HERE AT THE END OF A LONG DAY, THAT SHOW THAT

## Page 576

1  IT CAUSES LESS.

2  THE COURT: IS THAT IT?

3  MR. BECK: THAT'S IT, YOUR HONOR.

4  MR. ROBINSON: YOUR HONOR, MAYBE THE JURY COULD --

5  THE COURT: LET ME SEE COUNSEL JUST LOGISTICALLY.

6  (WHEREUPON, THERE WAS A CONFERENCE AT THE BENCH

7  OUTSIDE THE PRESENCE OF THE COURT REPORTER.)

8  THE COURT: LET'S TAKE A SHORT TEN-MINUTE BREAK.

9  THE DEPUTY CLERK: EVERYONE RISE.

10  (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

11  THE DEPUTY CLERK: EVERYONE RISE.

12  THE COURT: BE SEATED, PLEASE. TELL US WHO THIS IS.

13  MR. ROBINSON: YOUR HONOR, BEFORE WE DO THAT, WE

14  WANTED JUST, IF WE COULD -- WE'VE GOT AGREEMENT WITH COUNSEL ON

15  THE FOLLOWING EXHIBITS.

16  THE COURT: OKAY.

17  MR. ROBINSON: WE WOULD LIKE TO OFFER THE EXHIBITS IN

18  FROM THE DEPOSITION OF DR. GERALD AVORN. I WENT OVER WITH

19  MR. GOLDMAN, AND WE'VE AGREED TO TAKE OUT ONE OF THE EXHIBITS,

20  AND I'M GOING TO SKIP THAT EXHIBIT. SO WE OFFER

21  EXHIBIT 1.0017, 1.0118, 1.0122, 1.0152, 1.0235, 1.0340, 1.0386,

22  1.0463, 1.0466, 1.1084. WE'RE GOING TO DROP OUT THE NEXT

23  EXHIBIT. THEN WE'RE OFFERING 1.1135, 1.1313, 1.1865, 1.1916,

24  1.2118, 5.0002, AVORN EXHIBIT 17, AVORN EXHIBIT 18, AVORN

25  EXHIBIT 27, AVORN EXHIBIT 28, AVORN EXHIBIT 29, AND AVORN

## Page 577

1  EXHIBIT 54.

2  THE COURT: ALL RIGHT. THOSE ARE OFFERED AND NO

3  OBJECTION. I'LL ADMIT THEM INTO EVIDENCE.

4  MR. ROBINSON: THANK YOU VERY MUCH, YOUR HONOR. FOR

5  OUR NEXT WITNESS, THE PLAINTIFF WILL CALL CAROLYN CANNUSCIO,

6  WHO WAS A MERCK EMPLOYEE.

7  (WHEREUPON, CAROLYN CANNUSCIO, HAVING BEEN DULY

8  SWORN, TESTIFIED BY DEPOSITION AS FOLLOWS.)

9  DIRECT EXAMINATION

10  BY MR. BECK:

11  Q. DR. CANNUSCIO, WOULD YOU STATE YOUR NAME, PLEASE.

12  A. CAROLYN CHRISTA CANNUSCIO.

13  Q. YOU'RE CURRENTLY EMPLOYED BY MERCK?

14  A. I AM.

15  Q. WHAT'S THE POSITION YOU HOLD TODAY?

16  A. I'M A SENIOR EPIDEMIOLOGIST. I'M CURRENTLY WORKING ONLY

17  ONE DAY A WEEK. I'VE ACTUALLY BEGUN A NEW JOB OUTSIDE OF

18  MERCK, AND I'M COMPLETING SOME OF MY TASKS AT MERCK.

19  Q. WHEN DID YOUR STATUS AS A FULL-TIME EMPLOYEE OF MERCK

20  CHANGE?

21  A. WELL, WHILE I WAS PREGNANT LAST SUMMER, SO A YEAR AGO, NOT

22  JUST THIS PAST SUMMER, I WENT DOWN TO PART-TIME STATUS. THEN I

23  WENT ON MATERNITY LEAVE AT THE END OF JANUARY. MY BABY WAS

24  BORN ON JANUARY 31. SO I WAS THEN ON MATERNITY LEAVE FOR ABOUT

25  SEVEN MONTHS AND THEN RETURNED JUST AFTER LABOR DAY.

## Page 578

1  Q. HOW MANY SENIOR EPIDEMIOLOGISTS WERE WORKING ON

2  VIOXX-RELATED PROJECTS AT THAT TIME?

3  A. HOW MANY SENIOR EPIDEMIOLOGISTS?

4  Q. YES.

5  A. I WAS THE PRIMARY ONE AND I MAY HAVE BEEN -- THERE MAY

6  HAVE BEEN OTHERS, BUT I DIDN'T INTERACT WITH ANY OTHER SENIOR

7  EPIDEMIOLOGISTS ON A REGULAR BASIS REGARDING VIOXX. THERE MAY

8  BE OTHER PEOPLE WHO HANDLED SPECIFIC TASKS. I'M NOT SURE.

9  Q. WHO WERE THE OUTSIDE CONSULTANTS THAT YOU GENERALLY

10  REFERRED VIOXX ISSUES TO WHILE YOU WERE SENIOR EPIDEMIOLOGIST

11  AT MERCK?

12  A. SO WHO DID I ASK FOR HELP, AS AN EPIDEMIOLOGIST OR WHO DID

13  MERCK ASK FOR HELP?

14  Q. WE'LL TAKE THEM ONE AT A TIME. WHO DID YOU ASK FOR HELP?

15  A. SO, IN THESE COLLABORATIONS I'VE TALKED TO YOU ABOUT, FOR

16  INSTANCE, THE INGENIX UNITED HEALTHCARE STUDY, DR. ALEC WALKER

17  WORKS FOR INGENIX AND IS AN EPIDEMIOLOGIST WHO I WOULD ASK FOR

18  HELP IN METHODOLOGICAL ISSUES, FOR INSTANCE.

19  I MENTIONED TO YOU DR. MARY CHESTER WASKO AND

20  DR. MARK GENOVESE, WHO ARE RHEUMATOLOGISTS. SO MOST OF THE

21  PEOPLE, IN THIS ROLE, WHO I WOULD RECOMMEND WOULD HAVE BEEN, YOU

22  KNOW, LIKE DR. ALEC WALKER, AN EPIDEMIOLOGIST, TO BRING METHODS

23  OR EXPERTISE OR A CLINICIAN -- BECAUSE I'M NOT A CLINICIAN --

24  TO PROVIDE THAT KIND OF PERSPECTIVE.

25  Q. FOLLOWING THE SOLOMON STUDY, DID YOU RECOMMEND THAT MERCK

DAILY COPY

## Page 579

1    WITHDRAW VIOXX FROM THE MARKET?

2    A.  FOLLOWING THE PUBLICATION OF THE SOLOMON STUDY IN

3    CIRCULATION?  NO, I DID NOT RECOMMEND THAT MERCK WITHDRAW VIOXX

4    FROM THE MARKET.

5    Q.  FOLLOWING THE COMPLETION OF THE STUDY -- I GUESS THAT'S

6    ABOUT FIVE MONTHS BEFORE ITS PUBLICATION OR SIX MONTHS -- DID

7    YOU RECOMMEND THAT MERCK WITHDRAW VIOXX FROM THE MARKET?

8    A.  AS I'VE SAID, NO, I DID NOT RECOMMEND TO THE CORPORATION

9    THAT VIOXX BE WITHDRAWN FROM THE MARKET.

10   Q.  DID DR. SOLOMON?

11   A.  TO ME?

12   Q.  TO MERCK.

13   A.  WELL, IN MY CONVERSATIONS, DR. SOLOMON DID NOT RECOMMEND

14   TO ME THAT MERCK REMOVE VIOXX FROM THE MARKET, NO.

15   Q.  DID ANY OTHER AUTHORS OF THE PAPER IN CIRCULATION

16   RECOMMEND TO MERCK THAT IT WITHDRAW VIOXX FROM THE MARKET AT

17   THAT TIME?

18   A.  I DON'T KNOW ABOUT ANY COMMUNICATIONS THE CO-AUTHORS MAY

19   HAVE HAD WITH OTHER PEOPLE AT MERCK.  IF THERE WERE ANY, I AM

20   NOT AWARE OF THEM.  BUT DR. SOLOMON, DR.  AVORN, THEY DID NOT

21   RECOMMEND TO ME, AS AN INDIVIDUAL, THAT VIOXX BE REMOVED FROM

22   THE MARKET, NOR DID THEY ASK ME TO TELL MERCK THAT VIOXX SHOULD

23   BE REMOVED FROM THE MARKET.

24   Q.  THEY CONCLUDED IT WAS DANGEROUS?

25   A.  I THINK THAT -- WELL, YOU'RE ASKING ME FOR THEIR

## Page 580

1    INTERPRETATION OF THE DATA.  THEY CAME TO RELATIVE RISKS THAT

2    WE COULD SPEAK ABOUT IN DETAIL IF YOU WANTED ME TO LOOK AT THE

3    PAPER WITH YOU, BUT TO MAKE A -- I, AS AN EPIDEMIOLOGIST, WAS

4    TRAINED THAT ONE EPIDEMIOLOGICAL STUDY DOES NOT PROVE ANYTHING;

5    THAT IT CAN ADD TO A DISCUSSION, THAT WE CAN MAKE OBSERVATIONS,

6    BUT THAT THERE'S NOT PROOF AS A RESULT OF AN OBSERVATIONAL

7    STUDY.  I DON'T KNOW WHAT THEIR CONCLUSION WAS OVERALL ABOUT

8    VIOXX, BUT THEY DEFINITELY DID NOT SAY TO ME MERCK SHOULD

9    REMOVE VIOXX FROM THE MARKET.  THEY DEFINITELY DID NOT.

10   Q.  IN NONE OF YOUR DISCUSSIONS WITH THEM, WORKING WITH THEM

11   ON THE PROJECT AND ANALYZING THE DATA, DID THEY SAY, "THIS DRUG

12   IS DANGEROUS.  IT'S A SAFETY PROBLEM"?

13   A.  THEY MAY HAVE SAID, "WE HAVE AN ELEVATED RELATIVE RISK."

14   THEY DID NOT SAY TO ME, THOUGH, YOU KNOW, DEFINITIVELY, "THIS

15   SOLVES IT.  THIS MEANS THAT THE DRUG IS DANGEROUS AND SHOULD BE

16   REMOVED FROM THE MARKET."  NO, THEY DID NOT.  DR. SOLOMON AND

17   DR. AVORN DID NOT SAY THAT TO ME.

18   Q.  AS A RESULT OF THE EXCESS MIS IN THE VIGOR STUDY, THERE

19   WAS A VERY REAL QUESTION AT MERCK AS TO WHETHER OR NOT IT WAS

20   THEIR DRUG THAT CAUSED THE DEATHS; RIGHT?

21   A.  FIRST OF ALL, I CANNOT REMEMBER IF IN THE VIGOR STUDY THE

22   OUTCOME WAS DEATHS FROM MI OR IF IT WAS NONFATAL MI'S, SO THAT

23   PART I CANNOT RECALL ABOUT THE VIGOR STUDY.  I CAN'T REMEMBER

24   WHAT OTHER ELEMENTS WERE IN THE ENDPOINT, TOO.  BUT THE

25   QUESTION WAS RAISED AND DISCUSSED AMONG SCIENTISTS; NOT JUST AT

## Page 581

1    MERCK, BUT IN THE BROADER SCIENTIFIC COMMUNITY, TOO.  THE

2    BROADER SCIENTIFIC COMMUNITY WAS ALSO ASKING THE QUESTION:  IS

3    NAPROXEN CARDIOPROTECTIVE?  IS VIOXX ASSOCIATED WITH INCREASED

4    RISK?  IS THERE SOME COMBINATION OF THOSE TWO THINGS, AND LET'S

5    INVEST IN TRYING TO GET TO THE BOTTOM OF THIS.  THAT WAS MY

6    JOB.  I WAS HIRED AND ASKED TO DEVOTE MYSELF TO PURSUING THAT

7    QUESTION.

8    Q.  AT THE SAME TIME YOU WERE PURSUING THAT QUESTION, VIOXX

9    WAS BEING PROMOTED AND STILL IS; CORRECT?

10   A.  CORRECT.

11   Q.  DO YOU KNOW HOW MANY VIOXX PRESCRIPTIONS, FOR EXAMPLE, HAD

12   BEEN FILLED BY THE END OF THE VIGOR STUDY?

13   A.  NO, I HAVE NO IDEA.  I HAVE NO IDEA.

14   Q.  YOU DON'T KNOW HOW MANY ADDITIONAL PRESCRIPTIONS WERE

15   FILLED AFTER THOSE RESULTS, BUT BEFORE IT WAS TAKEN OFF THE

16   MARKET, DO YOU?

17   A.  NO, I HAVE NO IDEA.

18   Q.  WHAT WE CAN AGREE ON HERE, PERHAPS, IS THAT IT SURELY

19   WASN'T KNOWN AT MERCK AT THAT TIME THAT VIOXX WASN'T WHAT

20   CAUSED THE HEART ATTACKS IN THE VIGOR STUDY?

21   A.  I THINK IT WAS AN OPEN QUESTION WHETHER VIOXX WAS A CAUSE

22   OF HEART ATTACKS IN PATIENTS TAKING IT, I THINK IT WAS.

23   Q.  WITH THAT OPEN QUESTION, DO YOU BELIEVE IT ETHICAL, AS AN

24   EPIDEMIOLOGIST, BASED ON YOUR TRAINING, FOR A COMPANY TO

25   CONTINUE TO SELL THE PRODUCT?

## Page 582

1    A.  I PERSONALLY, LISTENING TO THE SCIENTIFIC DISCUSSIONS THAT

2    WENT ON AND TALKING TO PEOPLE WHO WERE EXPERTS IN THE FIELD,

3    FOR INSTANCE, OF PHARMACOEPIDEMIOLOGY, FOR INSTANCE, TALKING TO

4    DR. ALEC WALKER, WHO USED TO BE THE CHAIR OF EPIDEMIOLOGY AT

5    HARVARD, WHO IS WILDLY RESPECTED IN THE FIELD -- HE ENGAGED IN

6    A STUDY WITH US TO TRY TO UNDERSTAND WHETHER OR NOT VIOXX WAS

7    ASSOCIATED WITH INCREASED CARDIOVASCULAR RISK.  I TRUST HIM SO

8    COMPLETELY.  I TRUSTED DR. GUESS AND STILL TRUST DR. GUESS AND

9    DR. SANTANELLO SO COMPLETELY TO DO THE RIGHT THING AND HAD FULL

10   CONFIDENCE THAT THESE PEOPLE WITH WHOM I WAS WORKING ALSO

11   BELIEVED IT TRULY TO BE AN OPEN QUESTION.

12        ALSO, YOU KNOW, INSTITUTIONAL REVIEW BOARDS,

13   REVIEWING CLINICAL TRIALS, AND THE FDA, I HAD TO TRUST THAT ALL

14   OF THESE SYSTEMS AND ALL OF THOSE PEOPLE WHO WERE LOOKING AT

15   ALL THE AVAILABLE EVIDENCE ALSO SHARED MY VIEW THAT IT WAS AN

16   OPEN QUESTION AND THAT IT WAS, IN FACT, APPROPRIATE TO CONTINUE

17   STUDIES OF THE MATTER.

18   Q.  IN YOUR VIEW, IT WAS MOST DEFINITELY AN OPEN QUESTION?

19   A.  I SAW IT AS AN OPEN QUESTION.

20   Q.  ARE YOU FAMILIAR WITH THE KAISER PERMANENTE AUGUST 25,

21   2004 STUDY?

22   A.  I SAW PRESS REPORTS OF THE GRAHAM STUDY I THINK YOU'RE

23   REFERRING TO --

24   Q.  YES.

25   A.  -- BUT I DON'T KNOW ABOUT IT IN DETAIL.  AGAIN, I WAS

## Page 583

1  STILL ON MATERNITY LEAVE WHEN THAT STUDY WAS PRESENTED.  I
2  DIDN'T ATTEND THE SCIENTIFIC MEETING WHERE IT WAS PRESENTED.
3  Q.  GENERALLY SPEAKING, YOU KNOW IT TO BE A LARGE NESTED CASE
4  CONTROLLED STUDY?
5  A.  I DON'T KNOW ANY OF THE DETAILS ABOUT THE STUDY; I JUST
6  KNOW THAT IT RECEIVED PRESS ATTENTION.
7  Q.  DO YOU KNOW THAT IT SHOWED A THREE-TIMES INCREASE IN THE
8  RATE OF AN ACUTE CARDIAC EVENT FOR PEOPLE ON 50 MILLIGRAMS OF
9  VIOXX?
10  A.  I DON'T KNOW ABOUT THE EXACT RESULTS OF THE GRAHAM STUDY,
11  AND I'M NOT FAMILIAR WITH THE DESIGN OF THE STUDY OR THE
12  POPULATION IN WHICH IT WAS DONE.
13  Q.  GIVEN YOUR INVOLVEMENT WITH VIOXX AND YOUR CONTINUED ROLE
14  AS A SENIOR EPIDEMIOLOGIST, YOU DIDN'T REVIEW EVEN THE
15  NEWSPAPER INFORMATION ABOUT THE KAISER PERMANENTE STUDY?
16  A.  I BRIEFLY READ REPORTS OF IT.  BUT, REMEMBER, I WAS ON
17  MATERNITY LEAVE WHEN IT CAME OUT AND I WAS ALSO PREPARING TO
18  BEGIN A NEW JOB, WHICH I HAVE BEGUN, AND TAKING CARE OF MY
19  CHILD, SO I WAS NOT THE PERSON RESPONSIBLE FOR FOLLOWING THAT.
20  IN MY ABSENCE, DR. WATSON WAS TAKING CARE OF MY
21  RESPONSIBILITIES IN THE EPIDEMIOLOGY DEPARTMENT.  MY
22  RESPONSIBILITIES AT HOME IN AUGUST WEREN'T ABOUT EPIDEMIOLOGY;
23  THEY WERE ABOUT BEING A MOTHER.
24  Q.  I UNDERSTAND.  DO YOU UNDERSTAND THAT THE AUTHORS IN THAT
25  STUDY CONCLUDED THAT VIOXX INCREASED THE RISK OF ACUTE

## Page 584

1  MYOCARDIAL INFARCTION AND SUDDEN CARDIAC DEATH AT DOSES GREATER
2  THAN 25 MILLIGRAMS?
3  A.  I DIDN'T KNOW ABOUT THE DOSE SPECIFIC FINDINGS FROM THAT
4  STUDY.  I AM NOT FAMILIAR WITH THE SPECIFIC DATA OR RESULTS
5  FROM THAT STUDY.  I AM JUST AWARE OF THE PRESS REPORTS THAT
6  THERE WAS AN OBSERVATION OF INCREASE IN RELATIVE RISK.
7  Q.  YOU KNEW AT EVERY JUNCTURE THAT, IF VIOXX WAS CAUSING
8  HEART ATTACKS, THE MORE PEOPLE THAT TOOK IT, THE MORE HEART
9  ATTACKS YOU'D SEE; RIGHT?
10  A.  IF IT WERE KNOWN TO BE CAUSAL, IT WOULD FOLLOW THAT THERE
11  WOULD BE ELEVATED RISK IN PEOPLE WHO WERE TAKING IT.
12  Q.  GIVEN THE STUDIES YOU'VE SEEN OVER YOUR FOUR YEARS AT
13  MERCK, YOU'LL AGREE THAT SOME OF THE ESTIMATED 20 MILLION
14  PERSONS WHO TOOK VIOXX HAVE SUFFERED HEART ATTACKS AS A RESULT?
15  A.  TODAY, USING THE DATA AVAILABLE TO US NOW --
16  Q.  YES.
17  A.  -- THAT'S PROBABLY TRUE.
18  Q.  YOU KNOW THAT IN MAY OF 2004 CIRCULATION PUBLISHED A STUDY
19  BY DR. DANIEL SOLOMON, DR. JERRY AVORN, AND OTHERS; CORRECT?
20  A.  I DO.
21  Q.  THAT WAS ABOUT FOUR MONTHS PRIOR TO THE RECALL OF VIOXX;
22  CORRECT?
23  A.  RIGHT, ABOUT FOUR MONTHS PRIOR TO THE RECALL.
24  Q.  DO YOU HAVE ANY IDEA OF THE NUMBER OF PEOPLE THAT TOOK
25  VIOXX BETWEEN MAY 2004 AND SEPTEMBER 30?

## Page 585

1  A.  AGAIN, I'M NOT FAMILIAR WITH PRESCRIPTION DATA, SO NO, I
2  DON'T KNOW THE NUMBERS.
3  Q.  AT LEAST INITIALLY YOU WERE IDENTIFIED AS AN AUTHOR ON
4  THAT STUDY; RIGHT?
5  A.  CORRECT.
6  Q.  MERCK'S SENIOR MANAGEMENT MADE A DECISION TO REMOVE YOU AS
7  AN AUTHOR OF THAT STUDY; RIGHT?
8  A.  I UNDERSTAND THAT MY SUPERVISOR, DR. SANTANELLO, MADE A
9  DECISION THAT IT WOULD BE APPROPRIATE FOR ME TO BE REMOVED AS
10  AN AUTHOR.
11  Q.  IS SHE MERCK SENIOR MANAGEMENT?
12  A.  I DON'T KNOW WHAT WAS INCLUDED IN THE FORMAL DEFINITION OF
13  THE TERM.  SHE'S SENIOR TO ME, CERTAINLY.
14  Q.  AS OF THE TIME YOU WENT ON MATERNITY LEAVE, YOU WERE TO BE
15  NAMED AS AN AUTHOR ON THE PAPER?
16  A.  THE DISCUSSION HAD COME UP BEFORE THAT AT VARIOUS POINTS
17  OF WHETHER OR NOT I SHOULD BE INCLUDED AS A CO-AUTHOR, BUT I
18  BELIEVE THAT WHEN I WENT OUT ON MATERNITY LEAVE -- WHEN I WENT
19  OUT ON MATERNITY LEAVE, I DON'T THINK I WAS THINKING ABOUT
20  WHETHER OR NOT I WAS GOING TO BE AN AUTHOR ON THE PAPER.  BUT
21  IF SOMEONE HAD ASKED ME, I WOULD HAVE PROBABLY THOUGHT THAT I
22  WOULD HAVE BEEN AN AUTHOR ON THE PAPER AT THAT TIME.
23  Q.  YOU HAD DONE A LOT OF WORK?
24  A.  I HAD DONE A LOT OF WORK.  I HAD REALLY DONE A LOT OF
25  WORK, YES.

## Page 586

1  Q.  WAS YOUR NAME ON THE ABSTRACT THAT WENT TO THE FDA?
2  A.  I DON'T KNOW IF THE AUTHORS' NAMES WERE INCLUDED ON THE
3  ABSTRACT THAT WENT TO THE FDA, BUT IT WAS INCLUDED ON THE
4  ABSTRACT THAT WAS PRESENTED AT THE AMERICAN COLLEGE OF
5  RHEUMATOLOGY MEETING.
6  Q.  WAS THERE A POSTER INVOLVED IN THAT, AS WELL?
7  A.  I'M SURE THERE -- WELL, IT MIGHT HAVE BEEN A PRESENTATION,
8  ACTUALLY, RATHER THAN A POSTER.
9  Q.  YOUR NAME WAS INCLUDED IN THAT?
10  A.  I WOULD ASSUME SO, I WOULD HOPE SO, BUT I DON'T KNOW -- I
11  HAVEN'T SEEN THE FRONT PAGE OF THAT, BUT MY NAME WAS DEFINITELY
12  ON THE ABSTRACT.  THAT'S USUALLY WHAT PEOPLE USE AS THE
13  REFERENCE FOR THESE MEETINGS.
14  Q.  IS IT FAIR TO SAY THE DECISION TO REMOVE YOU AS AN AUTHOR
15  WAS OVER YOUR OBJECTION?
16  A.  I WAS DISAPPOINTED IN THE DECISION AND HAD HOPED TO BE
17  INCLUDED AS AN AUTHOR ON THE PAPER.
18  Q.  WHAT WERE THE REASONS GIVEN TO YOU FOR REMOVING YOUR NAME
19  AS AN AUTHOR ON THE PAPER?
20  A.  IT WAS MY UNDERSTANDING THAT THE PAPER DIDN'T ADEQUATELY
21  DISCUSS THE LIMITATIONS IN THE DATA, FOR INSTANCE.
22  Q.  THAT WAS THE POSITION OF DRS. WATSON, GUESS, AND
23  MS. LANIER?
24  A.  I CAN'T SPEAK FOR ALL OF THEM, BUT DR. SANTANELLO HELD THE
25  VIEW -- AND I THINK STILL HOLDS THE VIEW -- THAT THE PAPER

DAILY COPY

## Page 587

1  DIDN'T ADEQUATELY DISCUSS OR ADDRESS THE LIMITATIONS OF THIS
2  STUDY.
3  Q.  THE FINAL VERSION OF THAT ARTICLE THAT DOESN'T HAVE YOUR
4  NAME ANYWHERE, IT IMPLIES THAT THERE'S NO CONTRIBUTION FROM ANY
5  MERCK EMPLOYEE IN STUDY DESIGN, STATISTICAL ANALYSIS, OR
6  PREPARATION OF THE MANUSCRIPT, DOESN'T IT?
7  A.  WELL, IRONICALLY MY NAME IS ACTUALLY IN THE MANUSCRIPT IN
8  A FOOTNOTE, SO IT ACTUALLY IS ON THE MANUSCRIPT.  SO THERE IS A
9  MENTION IN THERE THAT A MERCK EPIDEMIOLOGIST WAS INVOLVED.  I
10 DON'T KNOW IF IT SAYS THAT I'M AN EPIDEMIOLOGIST, BUT IT DOES
11 SAY IN A FOOTNOTE, "DR. CANNUSCIO, AN EMPLOYEE OF MERCK."
12 Q.  DID THAT FOOTNOTE REMAIN IN THE PUBLISHED ARTICLE?
13 A.  IT DID.
14 Q.  HAVE YOU SEEN THE PUBLISHED ARTICLE?
15 A.  I'VE SEEN PHOTOCOPIES OF THE PUBLISHED ARTICLE.
16 Q.  WHO TOLD YOU THAT THE FOOTNOTE WITH YOUR NAME IN IT
17 REMAINED ON THE FINAL PUBLISHED ARTICLE IN CIRCULATION?
18 A.  I HAVEN'T PICKED UP THE EDITION OF CIRCULATION, BUT I'VE
19 HAD EITHER PRINTED PDF FILES OR PHOTOCOPIES.  IN THE VERSIONS
20 I'VE SEEN, AT LEAST, MY NAME IS IN A FOOTNOTE.
21 Q.  WILL YOU CONFIRM WITH ME IN EXHIBIT 8 THAT YOUR NAME IS
22 NOT IN THE FOOTNOTE?
23 A.  THIS SENTENCE THAT SAYS, "OTHER THAN DR. CANNUSCIO, AN
24 EMPLOYEE OF MERCK, NO AUTHORS HAVE DIRECT PERSONAL FINANCIAL
25 RELATIONSHIP WITH ANY PHARMACEUTICAL COMPANY," AND THAT'S ON

## Page 588

1  THE VERSION IN EXHIBIT 7 WHERE I'M NOT LISTED AS AN AUTHOR.  SO
2  IT REFERS TO ME AS AN AUTHOR, ALTHOUGH I'M NOT LISTED AS AN
3  AUTHOR.  THEN IN THIS COPY THAT YOU'VE GIVEN ME, WHICH YOU SAID
4  YOU DOWNLOADED --
5  Q.  I DOWNLOADED EXHIBIT 7.
6  A.  -- AND THEN THIS ONE YOU --
7  Q.  IS THE PUBLISHED COPY.
8  A.  FROM THE JOURNAL ITSELF?
9  Q.  YES.
10 A.  OKAY.  SO IN THAT VERSION THE SENTENCE THAT I JUST READ IS
11 NO LONGER THERE, BUT I WASN'T AWARE THAT THAT'S THE WAY IT
12 LOOKS IN THE MAGAZINE, THE JOURNAL ITSELF.  I'VE ONLY SEEN THIS
13 VERSION PRIOR TO RIGHT NOW.
14 Q.  THE STATEMENT IN THE FINAL PUBLISHED ARTICLE THAT SAYS,
15 "NO AUTHORS HAVE DIRECT PERSONAL FINANCIAL RELATIONSHIPS WITH
16 ANY PHARMACEUTICAL COMPANY," IS SOMEWHAT MISLEADING, GIVEN
17 YOUR ROLE IN THIS WORK AND DRAFTING THIS ARTICLE, ISN'T IT?
18 IT'S CERTAINLY TRUE THAT, AT THE TIME YOU DID YOUR WORK ON THE
19 SOLOMON STUDY AND WORKED ON AUTHORING THE SOLOMON PAPER, YOU
20 HAD A FINANCIAL RELATIONSHIP WITH MERCK?
21 A.  RIGHT.  I WAS AN EMPLOYEE OF MERCK WHILE I WAS WORKING
22 WITH DR. SOLOMON, WHILE I WAS WORKING WITH HIM IN DOING THE
23 STUDY.
24 Q.  DID YOU PARTICIPATE ACTIVELY IN THE STUDY DESIGN OF THIS
25 SOLOMON STUDY?

## Page 589

1  A.  I DID.  I DID.  ABSOLUTELY.
2  Q.  YOU DID STATISTICAL ANALYSIS AND YOU INTERPRETED DATA,
3  DIDN'T YOU?
4  A.  I ASSISTED WITH THE STUDY DESIGN, THE DATA ANALYSIS,
5  INTERPRETATION, AND REVIEWS OF THE MANUSCRIPT.  I PARTICIPATED
6  IN ALL OF THOSE THINGS.  THERE'S NO QUESTION WHATSOEVER ABOUT
7  WHETHER OR NOT I PARTICIPATED IN THOSE THINGS.
8  Q.  THERE'S AN ACKNOWLEDGMENT ON THE LAST PAGE OF EXHIBIT 8
9  THAT SAYS, "WE WANT TO THANK AN EPIDEMIOLOGIST WHO PARTICIPATED
10 ACTIVELY IN THE STUDY DESIGN, STATISTICAL ANALYSIS, AND
11 INTERPRETATION OF THE DATA AND PREPARATION OF THE MANUSCRIPT."
12 ARE YOU THAT EPIDEMIOLOGIST?
13 A.  I WOULD SAY, "YOU'RE WELCOME."  I THINK THAT'S PROBABLY
14 ME.
15 Q.  WERE YOU THE SOLE MERCK EPIDEMIOLOGIST INVOLVED IN THE
16 SOLOMON STUDY?
17 A.  NO, BUT I WAS THE MAIN EPIDEMIOLOGIST INVOLVED IN THE
18 STUDY.
19 Q.  I TAKE IT DRS. SANTANELLO, GUESS, AND WATSON WOULD HAVE IN
20 SOME WAY HELPED YOU DESIGN THE STUDY?
21 A.  I CONSULTED THEM.
22 Q.  THAT STUDY SHOWED AN INCREASE OF HEART ATTACK AMONG VIOXX
23 USERS, CORRECT?
24 A.  THE RELATIVE RISKS FOR SOME OF THE COMPARISONS WERE
25 GREATER THAN 1.00.

## Page 590

1  MR. ROBINSON:  YOUR HONOR, THAT COMPLETES
2  DR. CANNUSCIO'S DEPOSITION.  NOW WE'RE GOING TO START THE
3  DEPOSITION OF DR. EDWARD SCOLNICK, WHO AT THE TIME VIOXX WAS ON
4  THE MARKET WAS THE PRESIDENT OF MERCK RESEARCH LABORATORIES
5  WE'RE STARTING AT A PORTION OF THE DEPO THAT DOESN'T
6  IDENTIFY --
7  THE COURT:  WAIT.  HOLD ON.  GO AHEAD.
8  MR. ROBINSON:  BUT HE WILL LATER, ABOUT 20 MINUTES
9  IN -- UNFORTUNATELY, THIS IS A CUT FROM AN EARLIER DEPOSITION,
10 YOUR HONOR, SO WE DO THAT FOR ABOUT 20 MINUTES, AND THEN HE
11 WILL GIVE WHO HE IS AND HIS BACKGROUND AFTER 20 MINUTES.
12 THE COURT:  WHO IS HE, SO WE KNOW?
13 MR. ROBINSON:  HE'S DR. EDWARD SCOLNICK.  HE WAS THE
14 PRESIDENT OF MERCK RESEARCH LABORATORIES DURING THE TIME THE
15 VIOXX WAS ON THE MARKET.
16 THE COURT:  THANK YOU.
17 (WHEREUPON, EDWARD SCOLNICK, HAVING BEEN DULY SWORN,
18 TESTIFIED AS FOLLOWS.)
19 DIRECT EXAMINATION
20 BY MR. ROBINSON:
21 Q.  MERCK RESEARCH LABS PUBLISHES THE MERCK MANUAL, DOES IT
22 NOT?
23 A.  THE MERCK MANUAL IS PUBLISHED BY A GROUP OF PEOPLE WHO
24 PUBLISH THE MERCK MANUALS, AND I'M NOT CERTAIN AT THIS POINT,
25 ORGANIZATIONALLY, WHERE THAT GROUP ACTUALLY SITS.

35 (Pages 587 to 590)

## Page 591

1  Q.  DOCTOR, I ASKED YOU BEFORE WE BROKE IF YOU WERE FAMILIAR
2  WITH THE MERCK MANUAL.
3  A.  YES, I AM.
4  Q.  ARE YOU FAMILIAR WITH DR. ROBERT BERKOW?
5  A.  I WAS FAMILIAR WITH DR. ROBERT BERKOW.
6  Q.  HAS DR. BERKOW PASSED WAY?
7  A.  I BELIEVE HE'S RETIRED.
8  Q.  HE'S RETIRED?
9  A.  MANY YEARS SINCE HE WAS HEAD OF THE MERCK MANUAL.  I DON'T
10 RECALL THE EXACT TIME, HOW MANY.
11 Q.  OKAY.  PRIOR TO HIS RETIREMENT, WHAT WAS DR. BERKOW'S
12 POSITION AT THE MERCK RESEARCH LABS?
13 A.  TO THE BEST OF MY RECOLLECTION, HE WAS IN CHARGE OF THE
14 PUBLICATION OF THE MERCK MANUAL AND THAT WAS HIS PRIMARY ROLE.
15 Q.  OKAY.  IN YOUR POSITION -- WELL, LET ME BACK UP.  DID HE
16 RETIRE FROM MERCK RESEARCH LABS AFTER YOU TOOK OVER AS
17 PRESIDENT OF MERCK RESEARCH LABS?
18 A.  YES, I BELIEVE SO.  YES.
19 Q.  HOW MUCH OVERLAP WAS THERE?  DO YOU KNOW WHEN HE RETIRED?
20 A.  I DON'T RECALL EXACTLY WHEN HE RETIRED.  THERE WERE
21 SEVERAL YEARS OF OVERLAP.
22 Q.  OKAY.  DID YOU HAVE INTERACTION WITH HIM WHILE HE WAS WITH
23 MERCK RESEARCH LABS?
24 A.  A FEW OCCASIONS.  VERY FEW.
25 Q.  AS PRESIDENT OF MERCK RESEARCH LABS, DID YOU HAVE ANY

## Page 592

1  OVERSIGHT ON THE MERCK MANUAL?
2  A.  NO, NONE WHATSOEVER.
3  Q.  DID YOU HAVE ANY INPUT AT ALL?
4  A.  NO, NOT TO THE BEST OF MY RECOLLECTION.
5  Q.  TO THE BEST OF YOUR RECOLLECTION, DID YOU AND DR. BERKOW
6  EVER SPEAK ABOUT ANYTHING AT MERCK, ANYTHING AT ANY TIME ABOUT
7  THE MERCK MANUAL OR THE PUBLICATION OR INCLUSION OF INFORMATION
8  IN THE MERCK MANUAL?
9  A.  I DON'T RECALL ANY CONVERSATIONS WITH DR. BERKOW ABOUT THE
10 CONTENT OF ANY SPECIFIC ITEM PUBLISHED IN THE MERCK MANUAL.
11 Q.  OKAY.  LET ME REVIEW WITH YOU THE FORWARD OF THAT BOOK,
12 AND I WANT TO ASK YOU JUST SOME GENERAL QUESTIONS ABOUT THE
13 MANUAL.  I WILL REPRESENT THAT EXHIBIT 3 IS A COPY OF THE FRONT
14 COVER OF THE BOOK, THE PUBLISHER'S PAGE, THE LIST OF
15 CONTRIBUTORS OF THE MERCK MANUAL, SIXTEENTH EDITION, PUBLISH
16 DATE 1992, LIBRARY OF CONGRESS CATALOG CARD NUMBER 1-31760, AND
17 THAT ALL PAGES THAT ARE STAPLED TOGETHER AS EXHIBIT 3, CAME
18 DIRECTLY FROM THE SIXTEENTH EDITION OF THE MERCK MANUAL.  LET
19 ME GO TO THE FORWARD WITH YOU, DOCTOR.
20 A.  YES.
21 Q.  FIRST OF ALL, HAVE YOU EVER USED THE MERCK MANUAL AS A
22 REFERENCE?
23 A.  I CAN'T SAY THAT I'VE NEVER USED IT, BUT IT'S BEEN RARE
24 THAT I'VE EVER LOOKED AT IT.
25 Q.  IT'S NOT DISPUTED THAT MERCK RESEARCH LABS AND MERCK &

## Page 593

1  CO., INC., PUTS THIS OUT FOR USE BY PHYSICIANS, NURSES OR BY
2  THE GENERAL PUBLIC?  IT'S SOLD TO THE GENERAL PUBLIC, IS IT
3  NOT?
4  A.  I BELIEVE IT'S SOLD TO THE GENERAL PUBLIC.
5  Q.  I WANT YOU TO FOLLOW DOWN WITH ME ABOUT FOUR LINES BEFORE
6  THE END OF THE FIRST PARAGRAPH, WHERE IT STARTS THE SENTENCE
7  "TODAY," AND TELL ME IF I READ THIS CORRECTLY.  "TODAY THE
8  MANUAL IS ONE OF THE MOST WIDELY USED MEDICAL TEXTS IN THE
9  WORLD."  TELL ME IF I READ THIS CORRECTLY.  "TODAY THE MANUAL
10 IS THE MOST WIDELY USED MEDICAL TEXT IN THE WORLD.  WHILE THE
11 BOOK HAS GROWN TO ABOUT 2,800 PAGES, ITS PRIMARY PURPOSE
12 REMAINS THE SAME, TO PROVIDE USEFUL CLINICAL INFORMATION TO
13 PRACTICING PHYSICIANS, MEDICAL STUDENTS, INTERNS, RESIDENTS,
14 AND OTHER HEALTHCARE PROFESSIONALS."
15 Q.  YOU'VE ACCURATELY READ IT.
16 Q.  AS THE PUBLICATION FROM THE COMPANY THAT YOU'RE WITH, CAN
17 I TAKE THIS TO BE A STATEMENT THE COMPANY THAT THIS IS WHAT
18 THEIR CLAIMING THIS BOOK TO BE?
19 A.  YOU'RE ASKING ABOUT THIS 1992 EDITION?
20 Q.  WELL, I'M GOING TO GO ON AND TALK ABOUT 1991 IN A BIT, BUT
21 THIS IS ALL WE'RE TALKING ABOUT RIGHT.
22 A.  WELL, THE GROUP THAT PUBLISHES THE MERCK MANUAL IS PART OF
23 MERCK & CO.  I CAN'T GO BEYOND THAT IN MY STATEMENT WITH REGARD
24 TO MERCK'S GUARANTEEING OR ENDORSING WHAT IS IN THE MERCK
25 MANUAL.  MERCK IS A COMPANY.

## Page 594

1  Q.  I'M NOT ASKING FOR ANY GUARANTEES, BUT YOU AS A FORMER
2  EXECUTIVE -- NOW YOU'RE THE PRESIDENT --
3  A.  EMERITUS.
4  Q.  -- EMERITUS OF MERCK RESEARCH LABS.  DO YOU STILL HAVE
5  YOUR BOARD POSITION WITH THEM?
6  A.  NO, I AM NO LONGER A BOARD MEMBER.
7  Q.  ARE YOU ANY LONGER AN EXECUTIVE VICE-PRESIDENT?
8  A.  NO.
9  Q.  YOU ARE NOW DEVOTING YOUR ENTIRE TIME TO THE RESEARCH AND
10 DEVELOPMENT OF DRUGS TO TREAT -- IS IT ALZHEIMER'S?
11 A.  NEUROPSYCHIATRIC ILLNESS.
12 Q.  OKAY.  THE MERCK MANUAL IS PRODUCED BY MERCK & CO. AND/OR
13 MERCK RESEARCH LABORATORIES AND PRESENTS ITSELF TO BE AN
14 AUTHORITATIVE TREATISE TO PRACTICING PHYSICIANS, MEDICAL
15 STUDENTS, INTERNS, RESIDENTS AND OTHER HEALTHCARE
16 PROFESSIONALS, DOESN'T IT?
17 A.  YES, I REALLY CAN'T ANSWER THE QUESTION THE WAY YOU'RE
18 PHRASING IT.  THE MERCK MANUAL IS PUBLISHED BY THE GROUP THAT
19 OVERSEAS ITS PUBLICATION.  IT HAS A EDITORIAL BOARD, WHICH IS
20 DESIGNATED ON THE FRONTAGE PAGE OF THE 1992 EDITION, WHICH
21 REVIEWS THE CHAPTERS IN THE MANUAL THAT ARE WRITTEN BY THE
22 PERSONS WHO ARE PART OF THE GROUP THAT PUBLISHES THE
23 MERCK MANUAL.  THAT REVIEW GROUP, INTERACTING WITH THE GROUP
24 WHO PUBLISHES THE MANUAL, ARE RESPONSIBLE FOR BEING ACCURATE IN
25 THE MANUAL.  THAT'S THE WAY I'VE ALWAYS VIEWED THIS MANUAL.

36  (Pages 591 to 594)

## Page 595

1  Q.  OKAY.  IN YOUR RESEARCH, HAVE YOU EVER HAD THE OPPORTUNITY
2  TO CONSULT THIS MANUAL?
3  A.  AS I SAID, I DON'T RECALL EVER HAVING CONSULTED THE
4  MANUAL.  IT'S POSSIBLE THAT I HAVE LOOKED AT IT ONCE OR TWICE
5  FOR SOMETHING, BUT I CERTAINLY DIDN'T USE IT AS A REFERENCE
6  BOOK.
7  Q.  I WANT TO GO TO THE SECOND PARAGRAPH.  I'M JUST GOING TO
8  READ THE FIRST SENTENCE.  TELL ME I READ THIS CORRECTLY.  I
9  WANT TO MAKE SURE I UNDERSTAND.  "FEWER PHYSICIANS NOW ATTEMPT
10 TO MANAGE THE WHOLE RANGE OF MEDICAL DISORDERS THAT CAN OCCUR
11 IN INFANTS, CHILDREN, AND ADULTS, BUT THOSE WHO DO MUST HAVE
12 AVAILABLE A BROAD SPECTRUM OF CURRENT AND ACCURATE
13 INFORMATION."  THE SECOND SENTENCE SAYS, "SPECIALISTS REQUIRE
14 PRECISE INFORMATION ABOUT SUBJECTS OUTSIDE THEIR AREAS OF
15 EXPERTISE."  THE LAST TWO LINES -- I KNOW THAT I'M SPLITTING A
16 SENTENCE HERE.  I'LL JUST READ THE LAST SENTENCE.  "KEEPING UP
17 WITH THE RAPID AND EXTRAORDINARY ADVANCES IN CELLULAR AND
18 MOLECULAR BIOLOGY, MOLECULAR GENETICS, AND MEDICAL TECHNOLOGY
19 IS MORE CHALLENGING THAN EVER, BUT THE MERCK MANUAL CONTINUES
20 TO TRY TO MEET THESE NEEDS, EXCLUDING ONLY DETAILS OF SURGICAL
21 PROCEDURES."
22 A.  THAT'S WHAT IT SAYS, YES.
23 Q.  OKAY.  LET ME GO TO THE SECOND PAGE OF THAT FORWARD.  I
24 WANT YOU TO READ THE FIRST FULL PARAGRAPH TO YOURSELF AND LET
25 ME KNOW WHEN YOU'RE DONE AND WE'LL WANT TO TALK TO YOU ABOUT A

## Page 596

1  FEW THINGS IN IT.
2  A.  I'VE READ THE FIRST PARAGRAPH.
3  Q.  OKAY.
4  A.  THE FIRST FULL PARAGRAPH.
5  Q.  RIGHT.  THE STATEMENT IN THIS PARAGRAPH -- I'M JUST GOING
6  TO PULL OUT A COUPLE OF KEY STATEMENTS THAT I SEE.  "SECTIONS
7  OF THAT BOOK WERE THEN SENT TO OUTSIDE EXPERTS, WHO HAD NOTHING
8  TO DO WITH ITS PREPARATION, TO SOLICIT THEIR MOST CANDID
9  CRITICISM."  THAT SOUNDS TO ME LIKE THE BEGINNING OF THE PEER
10 REVIEW PROCESS.  WOULD YOU AGREE WITH THAT?
11 A.  I THINK THAT IS A FORM OF PEER REVIEW.
12 Q.  OKAY.  DROPPING DOWN A FEW LINES, IT SAYS, "THEIR
13 MANUSCRIPTS WERE PAINSTAKINGLY EDITED BY OUR IN-HOUSE STAFF TO
14 OBTAIN EVERY VALUABLE MORSEL OF KNOWLEDGE, WHILE ELIMINATING
15 SOMETIMES ELEGANT, BUT UNNEEDED WORDS."
16 A.  I CAN READ WHAT YOU'RE READING.
17 Q.  SURE.  IS THAT, AGAIN, MORE OF THE DISTILLATION PROCESS OF
18 PEER-REVIEWING, TAKING THE MOST CANDID CRITICISMS AND
19 DISTILLING DOWN THOSE THINGS THAT ARE MOST NEEDED AND CUTTING
20 OUT THOSE THINGS THAT ARE -- I'M TRYING TO THINK HOW WE PUT
21 THAT -- "ELIMINATING SOMETIMES ELEGANT, BUT UNNEEDED WORDS"?
22 A.  THAT PART OF THE PROCESS IS THE EDITORIAL BOARD'S OPINION
23 ABOUT THE COMMENTS THEY'RE GETTING BACK FROM THE REVIEWERS,
24 YES.
25 Q.  THEN THE LAST TWO SENTENCES OR THREE SENTENCES, IT SAYS,

## Page 597

1  "THE AUTHORS THEN REWORK, MODIFY, AND POLISH THEIR MANUSCRIPTS.
2  ALMOST ALL OF THE MANUSCRIPTS WERE REVISED AT LEAST SIX TIMES.
3  15 TO 20 REVISIONS WERE NOT UNCOMMON.  WE BELIEVE THAT NO OTHER
4  MEDICAL TEXT UNDERGOES AS MANY REVIEWS AND REVISIONS AS THE
5  MERCK MANUAL DOES."  I READ THAT CORRECTLY, DIDN'T I?
6  A.  YES, DID.
7  Q.  THOSE SEGMENTS OF THAT PARAGRAPH THAT I'VE PULLED OUT
8  BASICALLY CHARACTERIZE AND DESCRIBE WHAT AT LEAST THE EDITORS
9  OF THIS BOOK, PUBLISHED BY THE COMPANY YOU WERE ALIGNED WITH OR
10 WORKED WITH, BELIEVED IT TO BE THE MOST PEER-REVIEWED AND
11 DISTILLED PIECE OF MEDICAL TEXT IN THE WORLD?
12 A.  YES.  I THINK THE PARAGRAPH SAYS THAT IS A HIGHLY
13 PEER-REVIEWED BOOK THAT TRIES TO BE CLEAR AND ACCURATE IN WHAT
14 IT REPRESENTS TO PEOPLE WHO WOULD READ IT.  I THINK THAT'S HOW
15 I UNDERSTAND THIS PARAGRAPH.
16 Q.  IT EXPLAINS THE MECHANISMS OF HOW THAT IS DONE BY SAYING
17 THAT SOMETIMES SIX REVISIONS, BUT EVEN AT TIMES 15 TO 20, IF
18 NECESSARY?
19 A.  THAT STATEMENT THAT YOU READ SAYS, "ALMOST ALL OF
20 MANUSCRIPTS WERE REVISED AT SIX TIMES.  15 TO 20 REVISIONS WERE
21 NOT UNCOMMON."
22 Q.  IN YOUR PROFESSIONAL EXPERIENCE, THE PURPOSE FOR DOING
23 THAT -- THOSE REVISIONS, THE SENDING IT BACK TO THE EDITOR, THE
24 REWRITING IT 10, 15 TIMES, MAYBE 20 -- IS SO THAT YOU CAN WEED
25 OUT EITHER BAD SCIENCE, IMPROPER OPINIONS, OR MAYBE SOMETHING

## Page 598

1  THAT'S BEEN DISPROVEN BY A RECENT SCIENTIFIC DISCOVERY?  I'M
2  NOT SAYING THAT'S THE REASON THAT IT IS DONE.  I'M JUST SAYING
3  THAT IS THE REASON THAT WE HAVE PEER REVIEW, SO THAT WE CAN
4  HAVE SOME, ALBEIT CONFIDENTIAL, DISCOURSE BETWEEN PROFESSIONALS
5  TO GET TO THE VERY HEART OF THE SCIENTIFIC ISSUES?
6  A.  I WOULD LIKE TO SEPARATE IN MY ANSWER PEER-REVIEW IN
7  GENERAL, WHICH YOU'RE DISCUSSING AND WE'VE DISCUSSED BEFORE,
8  THIS --
9  Q.  YES, SIR.
10 A.  -- AND AT LEAST MY UNDERSTANDING OF THE MERCK MANUAL'S
11 AIM.  AS YOU POINTED OUT, THE MERCK MANUAL IS READ WIDELY AND
12 IS EVEN AVAILABLE TO LAYPERSONS WITHOUT A SPECIAL MEDICAL
13 BACKGROUND.  I BELIEVE THAT THE MERCK MANUAL, IN ITS VARIOUS
14 REVISIONS AND REVIEWS, THAT A SIGNIFICANT PART OF THE PURPOSE
15 OF THOSE REVIEWS WAS TO TRY TO GET LANGUAGE AND EXPRESSION OF
16 THE WIDE VARIETY OF COMPLEX FIELDS THAT YOU'VE NOTED SO THAT IT
17 WAS CLEARLY WRITTEN AND UNDERSTANDABLE TO A WIDE AUDIENCE.
18 THAT'S A SLIGHTLY DIFFERENT PURPOSE THAN A TECHNICAL
19 PEER-REVIEW JOURNAL.
20 Q.  WELL, I UNDERSTAND.
21 A.  OKAY.
22 Q.  FOR THAT REASON, MERCK PUBLISHES ABOUT FOUR OR FIVE
23 DIFFERENT MERCK MANUALS, DON'T THEY?
24 A.  THEY PUBLISH FOUR OR FIVE DIFFERENT MERCK MANUALS BECAUSE
25 THE AUDIENCE AND THE CONTENT OF THOSE MANUALS IS SOMEWHAT

37 (Pages 595 to 598)

## Page 599

1   DIFFERENT, AND AT THIS POINT I CAN'T RECALL EXACTLY WHAT
2   MANUALS COVER WHAT.
3   Q.  OKAY.  BUT THERE IS AN MERCK MANUAL FOR DIAGNOSIS AND
4   THERAPY, WHICH IS WHAT WE HAVE IN FRONT OF YOU, A PORTION OF IT
5   IS IN FRONT OF YOU?
6   A.  I DON'T SEE THE REST OF THE TITLE, BUT I ASSUME YOU'RE
7   CORRECT.
8   Q.  IT'S ON THIS PAGE, DOCTOR.  IT SAYS "SIXTEENTH EDITION,
9   THE MERCK MANUAL OF DIAGNOSIS AND THERAPY."  THERE IS A MERCK
10   MANUAL FOR GERIATRICS?
11   A.  YES, I BELIEVE SO.
12   Q.  THERE IS A MERCK MANUAL FOR HOUSEHOLD USE, SO THAT WHEN
13   THEY'RE WRITING TO THE AUDIENCE OF PEOPLE LIKE MYSELF, WHO
14   DON'T HAVE MEDICAL TRAINING, WE CAN UNDERSTAND IT?
15   A.  THERE IS A MERCK MANUAL THAT'S WRITTEN FOR A BROADER
16   AUDIENCE, THAT'S CORRECT.
17   Q.  IF YOU COULD TURN TO THE COPY OF PAGE 2664 --
18   A.  YES.
19   Q.  -- UNDER THE SUBHEADING "HEMATOLOGIC EFFECTS."  THIS IS
20   FROM THE SECTION, I WILL REPRESENT TO YOU, IN THE BOOK.
21   A.  YES.
22   Q.  THERE'S PROSTAGLANDINS, THROMBOXANES AND -- I CAN'T
23   PRONOUNCE THAT LAST WORD -- LEUKOTRINES?
24   A.  "PROSTAGLANDINS, THROMBOXANES AND LEUKOTRINES."
25   Q.  LEUKOTRINES.  OKAY.  I'D LIKE TO GO BACK TO 2664.  WE'VE

## Page 600

1   ALREADY COVERED SOME OF THIS, BUT THERE'S A REASON FOR ME DOING
2   THIS IN THIS CONTEXT.  IF YOU LOOK AT THE LAST SENTENCE OF
3   THE -- WELL, IF YOU'LL JUST READ THE FIRST PARAGRAPH TO
4   YOURSELF, PLEASE.
5   A.  THE FIRST PARAGRAPH?  I'VE COMPLETED READING THAT
6   PARAGRAPH.
7   Q.  AND THAT PARAGRAPH ENDS WITH SOMETHING WE'VE ALREADY
8   DISCUSSED, AND THAT IS THAT PROSTAGLANDINS OR -- EXCUSE ME.
9   THROMBOXANE A2 IS A POTENT PLATELET AGGREGATOR AND
10   VASOCONSTRICTOR AND IS SYNTHESIZED PRIMARILY IN THE PLATELETS
11   OR BY THE PLATELET?
12   A.  THAT'S CORRECT.
13   Q.  OKAY.
14   A.  THAT'S WHAT THE PARAGRAPH SAYS.
15   Q.  AND THAT IS A CORRECT -- IT WOULD BE A CORRECT STATEMENT
16   TO SAY THROMBOXANE IS A POTENT PLATELET AGGREGATOR,
17   INDEPENDENTLY OF THE REST OF IT.  CORRECT?
18   A.  THAT WOULD BE CORRECT.
19   Q.  IT WOULD BE CORRECT TO SAY INDEPENDENTLY OF THIS STATEMENT
20   THAT THROMBOXANE A2 IS A POTENT VASOCONSTRICTOR, AS WELL.
21   CORRECT?
22   A.  I CAN'T ATTEST TO ITS POTENCY AS A VASOCONSTRICTOR.  IT IS
23   A VASOCONSTRICTOR.
24   Q.  OKAY.
25   A.  AND SINCE 1992, THERE ARE MANY OTHER VASOCONSTRICTORS AND

## Page 601

1   VASODILATORS, AND I DON'T KNOW, TODAY, WHETHER THROMBOXANE A2
2   WOULD BE CHARACTERIZED EXACTLY THAT WAY, SO --
3   Q.  WE'RE GOING TO GET TO THAT IN JUST A BIT.  AT THE BOTTOM
4   OF THE -- AT THE BOTTOM OF THE PAGE GOING ONE, TWO, THREE, FOUR
5   LINES UP, AND ONE WORD WITH THE SENTENCE THAT STARTS WITH
6   "THIS."  NOW, YOU CAN READ THE WHOLE SECTION IF YOU'D LIKE.  I
7   DON'T WANT TO TAKE THINGS OUT OF CONTEXT, BUT I DON'T WANT
8   TO --
9   A.  DO YOU WANT ME TO READ THAT?
10   Q.  YES.  YOU DON'T HAVE TO READ IT OUT LOUD, BUT I JUST WANT
11   YOU -- IF YOU WANT TO READ THE WHOLE "HEMATOLOGIC EFFECTS"
12   SECTION SO WE KNOW IN WHAT CONTEXT WE'RE TALKING ABOUT.
13   A.  OKAY.  I'VE READ IT.  THANK YOU.
14   Q.  OKAY.  WOULD IT BE FAIR TO SAY THAT THAT SHORT SECTION
15   DESCRIBES THE RELATIONSHIP THAT PROSTACYCLIN AND THROMBOXANE A2
16   PLAY IN BOTH PLATELET AGGREGATION AND IN VASOCONSTRICTION?
17   A.  THE PARAGRAPH DESCRIBES A RELATIONSHIP BETWEEN THROMBOXANE
18   A2 AND PROSTACYCLIN.
19   Q.  OKAY.  AND VASOCONSTRICTION AND PLATELET AGGREGATION?
20   A.  THAT'S WHAT THE PARAGRAPH DISCUSSES, YES.
21   Q.  IN LAY TERMS, WHAT IS PLATELET AGGREGATION?
22   A.  PLATELET AGGREGATION IS THE CLUMPING TOGETHER OF
23   PLATELETS, IN -- AN EARLY STEP IN THE FORMATION OF CLOTS.
24   Q.  OKAY.
25   A.  IT CAN BE REVERSIBLE.  IT CANNOT BE REVERSIBLE.

## Page 602

1   Q.  OKAY.  WHAT IS VASOCONSTRICTION IN LAY TERMS?
2   A.  VASOCONSTRICTION, IN LAY TERMS, IS NARROWING OF SMALL --
3   USUALLY, SMALL VESSELS IN THE ARTERIAL TREE.  THAT WOULD BE
4   GENERALLY WHAT VASOCONSTRICTION WOULD MEAN.  IT CAN ALSO APPLY
5   TO VEINS.
6   Q.  OKAY.  WHAT IS -- WELL, COULD THE -- AND THIS IS -- LET
7   ME -- THE RELATIONSHIP BETWEEN PLATELET AGGREGATION AND
8   VASOCONSTRICTION IS -- PLAYS AN IMPORTANT ROLE IN
9   HEMODYNAMIC -- IN HEMODYNAMIC INTEGRITY.  CORRECT?
10   A.  I'M NOT SURE I WOULD DESCRIBE IT EXACTLY THAT WAY, NO.
11   Q.  OKAY.  IF YOU HAVE PLATELET AGGREGATION COUPLED WITH
12   VASOCONSTRICTION, WOULD YOU AGREE WITH ME THAT THE LIKELIHOOD
13   OF AN OCCLUSIVE EVENT, BE IT A HEART ATTACK OR A STROKE, IS
14   GREATER?
15   A.  I WOULDN'T BE ABLE TO DRAW ANY CONCLUSION ABOUT WHAT WAS
16   GOING ON IN A GIVEN ANIMAL OR A PERSON'S VASCULAR TREE BASED ON
17   JUST THOSE TWO COMMENTS.  I THINK THAT'S TOO INCOMPLETE.
18   Q.  WELL, THERE ARE MANY FACTORS THAT CAN GO INTO WHETHER A
19   PERSON HAS A STROKE OR A HEART ATTACK, AND I UNDERSTAND THAT.
20   WHAT WE'RE TALKING ABOUT, WHEN WE TALK ABOUT PLATELET
21   AGGREGATION, WE'RE TALKING ABOUT THE BEGINNING OF PLATELETS
22   CLUMPING TOGETHER TO FORM A CLOT.  CORRECT?
23   A.  THAT'S CORRECT.
24   Q.  AND VASOCONSTRICTION IS THE INABILITY OF AN ARTERY OR A
25   VEIN TO EXPAND, BUT INSTEAD STAY CONSTRICTED OR BECOME SMALLER.

DAILY COPY

## Page 603

1   RIGHT?

2   A.  THAT IS ALSO CORRECT.

3   Q.  AND THERE ARE ENZYMES WITHIN OUR BODY THAT REGULATE THE

4   DILATION OR THE CONSTRICTION OF ARTERIES AND VEINS?

5   A.  THERE ARE MANY ENZYMES AND HORMONES THAT REGULATE THAT

6   PROCESS, IN ADDITION TO, INCLUDED IN THAT GROUP ARE THROMBOXANE

7   AND PROSTACYCLINS.  THERE ARE MANY OTHER FACTORS THAT AFFECT

8   THAT PROCESS.

9   Q.  THERE ARE, AND THAT'S NOT -- I'M NOT HERE TO ARGUE THAT

10  POINT WITH YOU.

11  A.  RIGHT.

12  Q.  BUT WE DO KNOW THAT THROMBOXANE A2 AND PROSTACYCLIN AFFECT

13  VASOCONSTRICTION AND PLATELET AGGREGATION?

14  A.  THAT'S CORRECT.

15  Q.  LET ME SHOW YOU WHAT I'M GOING TO MARK AS DEPOSITION

16  EXHIBIT 4, AND I'M GOING TO MAKE MY SAME REPRESENTATION.

17  THIS IS THE MERCK MANUAL, SEVENTEENTH EDITION, WHICH WAS

18  PUBLISHED, BY THE SECOND PAGE OF THAT EXHIBIT, IN 1999, AND YOU

19  CAN FLIP THROUGH AND REVIEW ALL OF THE PAGES IF YOU'D LIKE.  IT

20  HAS THE SAME GENERAL FOREWORD, ALTHOUGH SOMEWHAT CUT, BUT I

21  WANT TO DRAW YOUR -- ULTIMATELY DRAW YOUR ATTENTION TO THE LAST

22  PAGE OF THAT EXHIBIT.

23       IF YOU LOOK AT THAT INDEX AT PAGE 2818 WITH ME, AND

24  YOU MAY WANT TO, JUST FOR YOUR OWN BENEFIT, HAVE THE SIXTEENTH

25  EDITION AT HAND IF YOU'D LIKE.  BUT IF -- AND I'LL REPRESENT TO

## Page 604

1   YOU THAT THIS -- THAT I WENT BACK TO THE -- IF YOU LOOK AT THE

2   SIXTEENTH EDITION SIDE BY SIDE, THE LAST PAGE OF THE

3   DOCUMENT --

4   A.  THE VERY LAST PAGE THAT YOU'VE STAPLED TOGETHER?

5   Q.  YES.  THE INDEX.  ON THE SIXTEENTH EDITION, PAGE 2834,

6   BETWEEN THROMBOTIC, THROMBOCYTOPENIC PURPURA AND THRUSH IS

7   WHERE YOU FIND THROMBOXANE DISCUSSED.  CORRECT?

8   A.  YES, IT APPEARS IN THE ALPHABETICAL LISTING IN THE

9   INDEX --

10  Q.  OKAY.

11  A.  BETWEEN THROMBOTIC THROMBOCYTIC PURPURA AND THRUSH.

12  Q.  AND IN THE SEVENTEENTH EDITION, BETWEEN THROMBOTIC,

13  THROMBOCYTOPENIC PURPURA AND THRUSH, WHAT IS -- IS THERE AN

14  ENTRY FOR THROMBOXANES?

15  A.  THE INDEX IN THE SEVENTEENTH EDITION HAS THROMBOTIC

16  THROMBOCYTOPENIC PURPURA–HEMOLYTIC–UREMIC SYNDROME,

17  GLOMERULONEPHRITIS AND THEN THRUSH.  I SEE NO COMMENT ON THIS

18  PAGE ABOUT THROMBOXANE.

19  Q.  BETWEEN THE PUBLICATION OF THE SIXTEENTH EDITION IN 1992

20  AND THE PUBLICATION OF THE SEVENTEENTH EDITION IN 1999, WAS

21  THERE ANY GROUND-BREAKING RESEARCH THAT WAS DONE WITH REGARD TO

22  WHETHER OR NOT THROMBOXANE WAS A POTENT VASOCONSTRICTOR AND

23  VASODILATOR -- OR EXCUSE ME -- VASOCONSTRICTOR AND PLATELET

24  AGGREGATOR?

25  A.  I CAN'T ANSWER YOUR QUESTION.

## Page 605

1   Q.  ALL RIGHT.

2   A.  I DON'T KNOW.

3   Q.  IT'S MY UNDERSTANDING, CORRECT ME IF I'M WRONG, FROM THE

4   FDA REGS THAT GOVERN HOW PHARMACEUTICAL COMPANIES -- I'M NOT

5   TRYING TO MAKE A LEGAL STATEMENT HERE, BUT IT'S MY

6   UNDERSTANDING THAT IT'S THE OBLIGATION OF THE COMPANY TO KEEP

7   UP WITH THE MEDICAL LITERATURE THAT IMPACTS UPON THE DRUGS THAT

8   YOUR COMPANY MARKETS AND MANUFACTURES.  IS THAT A

9   GENERALIZATION?

10  A.  I CAN'T ANSWER YOUR QUESTION.  I WOULD -- I WOULD MAKE THE

11  COMMENT THAT THE PAGE IN THE SEVENTEENTH EDITION THAT IS NOT

12  HANDED OUT HERE BY YOU IS THE PAGE IN THE SIXTEENTH EDITION,

13  WHICH GOES THROUGH THE MANY EXTERNAL PEER REVIEWS THAT THE

14  SIXTEENTH EDITION WENT THROUGH.  TO THE BEST OF MY KNOWLEDGE,

15  THE MERCK MANUAL IS STILL PEER-REVIEWED BY MANY EXTERNAL

16  EXPERTS.

17  Q.  OH, I -- THAT WASN'T MY QUESTION.

18  A.  IT'S NOT SIMPLY PUBLISHED BY MERCK & CO.  IT'S REVIEWED BY

19  EXTERNAL EXPERTS, AS YOU SO NICELY POINTED OUT IN THE SIXTEENTH

20  EDITION.

21  Q.  CERTAINLY.  I'M TRYING TO POINT OUT THOUGH, AND I'M JUST

22  TRYING TO FIND OUT, THERE'S OBVIOUSLY A REASON WHY THE

23  PROSTACYCLIN THROMBOXANE SECTION WAS REMOVED BETWEEN 1992 AND

24  1999 -- WHAT I WANT TO KNOW IS, ARE YOU AWARE OF ANY -- OF ANY

25  RESEARCH, GROUND-BREAKING RESEARCH THAT WOULD CHANGE THE

## Page 606

1   CORRECTNESS OF WHAT IS STATED IN THE SIXTEENTH EDITION ABOUT

2   THROMBOXANES AND PROSTACYCLINS AND PROSTAGLANDINS?

3   A.  THE ONLY ANSWER THAT I CAN GIVE YOU TO THE GENERAL

4   QUESTION YOU'VE ASKED ABOUT, BUT NOT THE WAY YOU'VE PHRASED THE

5   QUESTION, IS THAT TO THE BEST OF MY RECOLLECTION, VERY, VERY

6   LITTLE RESEARCH OR ATTENTION IN THE MEDICAL LITERATURE HAS BEEN

7   PAID TO THROMBOXANE AND PROSTACYCLIN SINCE THE MID-'80S AND

8   EARLY '90S.  IN FACT, PROBABLY VERY -- I WOULD -- I DON'T KNOW

9   FOR CERTAIN, BUT I BELIEVE THAT THE TOPIC HAD RECEIVED VERY

10  LITTLE ATTENTION BETWEEN 1992 AND 1999 IN THE MEDICAL

11  LITERATURE.

12  Q.  OKAY.

13  A.  BECAUSE ITS IMPORTANCE WAS NOT CLEAR IN THE MEDICAL

14  LITERATURE.

15  Q.  OKAY.  AND WOULD YOU --

16  A.  IN YOUR TERMS, NO NEW DISCOVERIES HAD BEEN MADE WHICH GAVE

17  IT PROMINENCE.

18  Q.  RIGHT.  I UNDERSTAND.  DO YOU BELIEVE THAT THAT'S THE

19  REASON WHY IT WAS REMOVED FROM THE SIXTEENTH EDITION?

20  A.  I HAVE NO IDEA WHY IT WAS REMOVED FROM THE SEVENTEENTH

21  EDITION COMPARED TO THE SIXTEENTH EDITION INDEX.

22  Q.  OKAY.

23  A.  I HAVE NO IDEA WHY IT WAS REMOVED.

24  Q.  OKAY.

25  A.  I HAVE NEVER HEARD ANYTHING ABOUT WHY IT WAS REMOVED.

## Page 607

1  Q.  OKAY.  BUT YOU WOULD AGREE WITH THE ACCURACY OF THE

2  STATEMENTS OF WHAT THROMBOXANE AND PROSTACYCLIN ARE, AND WHAT

3  THEY DO IN OUR VASCULAR SYSTEM AS IT IS STATED BRIEFLY IN THE

4  SIXTEENTH EDITION?

5  A.  MY COMMENTS EARLIER ON THAT PARAGRAPH REMAIN ACCURATE.

6  Q.  I WANT YOU TO JUST REVIEW IT TO YOURSELF, AND I WANT TO

7  MAKE SURE THAT WE CAN AGREE THAT THE BOOK THAT'S PUBLISHED BY

8  MERCK & CO. THAT WE'RE LOOKING AT, OR THE PORTION THAT WE'RE

9  LOOKING AT, IS FACTUALLY AND SCIENTIFICALLY ACCURATE, ALTHOUGH

10  IT MAY BE BRIEF AND THERE MAY BE OTHER EXQUISITE POINTS THAT WE

11  HAVEN'T DISCUSSED, BUT WHAT IS STATED IS ACCURATE.

12  A.  WHAT I WOULD ANSWER TO YOUR QUESTION IS THE PARAGRAPH THAT

13  YOU AND I DISCUSSED TOGETHER BEGINNING WITH THE WORDS

14  "FOLLOWING" AND WHERE THE WORD "THROMBOXANE" AND "PGI" ARE

15  DISCUSSED IS A GENERALLY ACCURATE PARAGRAPH.

16  Q.  WHAT ABOUT THE PRECEDING PARAGRAPH THAT STARTS WITH "PGI

17  1"?  IS THAT A GENERALLY ACCURATE PARAGRAPH?

18  A.  THE PARAGRAPH BEFORE THAT BEGINS WITH "PGE-1"?

19  Q.  "PGE-1," THE FIRST PARAGRAPH BELOW "HEMATOLOGIC EFFECTS."

20  A.  YES.

21  Q.  IS THAT A GENERALLY ACCURATE PARAGRAPH?

22  A.  I THINK, IN 1992, THIS WAS GENERALLY TRUE.  I'M NOT SURE

23  EVERY WORD IN THE PARAGRAPH IS ACCURATE, BUT IT'S GENERALLY

24  TRUE.

25  Q.  OKAY.  AND, IN 1992, NAPROXEN WAS BEING USED -- WAS WIDELY

## Page 608

1  USED AS AN NSAID, WAS IT NOT?

2  A.  I THINK NAPROXEN WAS AVAILABLE.  I -- I DON'T KNOW EXACTLY

3  HOW WIDELY USED IT WAS.  IT WAS CERTAINLY USED AS AN NSAID.

4  Q.  FAIR ENOUGH.  IN THE BOTTOM OR THE LAST PARAGRAPH THREE

5  LINES UP STATES:  "LOW-DOSE ASPIRIN ADMINISTRATION, 81 TO 325

6  MILLIGRAMS, IS WIDELY USED FOR PREVENTIVE THERAPY IN PATIENTS

7  WITH ANGINA, POST-MYOCARDIAL INFARCTION OR STROKE AND IN

8  PATIENTS WITH INCIPIENT RISKS FOR THESE CATASTROPHES --"

9  A.  YES.

10  Q.  "-- ABNORMAL PLASMA, LIPID, SMOKERS, POSITIVE FAMILY

11  HISTORY," ET CETERA.  CORRECT?

12  A.  THAT IS CORRECT.

13  Q.  OKAY.  AND IN 1992, WHEN THE MERCK MANUAL WAS PUBLISHED,

14  IT DIDN'T WANT TO TELL ANYBODY -- IT DIDN'T PUBLISH TO THE

15  WORLD THAT ASPIRIN AND NAPROXEN ARE USED FOR THAT PROPHYLACTIC

16  PURPOSE?

17  A.  THERE'S NO COMMENTARY ABOUT NAPROXEN IN THIS PARAGRAPH IN

18  THE 1992 EDITION OF THE MERCK MANUAL.  THERE IS A COMMENTARY ON

19  ASPIRIN.

20      THE COURT:  WE'LL STOP HERE.  WE'LL STOP HERE AND

21  RESUME AT 2:45.  THE COURT WILL STAND IN RECESS.

22      THE DEPUTY CLERK:  EVERYONE RISE.

23          (LUNCHEON RECESS)

24          * * * * *

25

## Page 609

1          AFTERNOON SESSION

2          (AUGUST 2, 2006)

3      (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4  TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5  REPORTER.)

6      THE DEPUTY CLERK:  EVERYONE RISE.

7      THE COURT:  BE SEATED, PLEASE.  THIS IS THE

8  CONTINUATION OF THE WITNESS, WHOSE NAME IS SCOLNICK.

9      (WHEREUPON, EDWARD SCOLNICK, HAVING BEEN DULY SWORN,

10  TESTIFIED BY DEPOSITION AS FOLLOWS.)

11          DIRECT EXAMINATION

12  BY MR. ROBINSON:

13  Q.  ARE YOU DR. ED SCOLNICK?

14  A.  YES, I'M DR. EDWARD SCOLNICK.

15  Q.  ARE YOU THE EDWARD M. SCOLNICK, PRESIDENT OF MERCK

16  RESEARCH LABS AND THEN THE EXECUTIVE VICE PRESIDENT OF SCIENCE

17  AND TECHNOLOGY FOR MERCK & COMPANY?

18  A.  YES, I AM.

19  Q.  WELL, LET ME SUGGEST IT TO YOU, IF YOU'LL LOOK AT EXHIBIT

20  NUMBER 4.  I'LL BET YOU'VE SEEN THIS E-MAIL LATELY GETTING

21  READY FOR YOUR DEPOSITION, HAVEN'T YOU?

22  A.  I DON'T RECALL SEEING THIS E-MAIL BEFORE RIGHT NOW.

23  Q.  YOU DON'T RECALL SEEING THIS E-MAIL BEFORE?

24  A.  I DO NOT RECALL SEEING THIS E-MAIL BEFORE.

25  Q.  ALL RIGHT.  WELL, IF YOU'LL LOOK DOWN AT YOUR MESSAGE

## Page 610

1  DATED DECEMBER 5TH, 2001, IT'S ABOUT AN ANALYST WHO IS GOING TO

2  STAND UP IN PUBLIC AND SAY SOMETHING NEGATIVE ABOUT VIOXX.

3      AND YOU'RE THE FELLOW WHO WROTE, "DAVID IF HE SAYS

4  THIS, I WILL BOIL HIM IN OIL AT THE MEETING."  THAT'S WHAT YOU

5  SAID, ISN'T IT?

6  A.  THAT IS THE E-MAIL YOU'RE REFERRING TO, YES.

7  Q.  DOES THAT MEAN, YES, YOU SAID IT?

8  A.  THAT IS MY E-MAIL.

9  Q.  SO, YOU WERE SAYING YOU WERE GOING TO BOIL THIS FELLOW IN

10  OIL BECAUSE THIS WAS AN ANALYST WHO WAS GOING TO STAND UP AND

11  SUGGEST THAT MAYBE VIOXX CAUSES CV EVENTS, HEART ATTACKS,

12  STROKES, THINGS LIKE THAT; RIGHT?

13  A.  I DON'T RECALL THE DETAILS OF HIS REPORT.  I HAVE NOT SEEN

14  THIS E-MAIL, AND I DON'T RECALL THE DETAILS OF THIS AT ALL.

15  Q.  WELL, IF YOU'LL LOOK BEHIND, YOU'LL SEE WHAT IT IS THAT

16  UPSET YOU.  IT WAS THIS FELLOW NAMED -- SOMEBODY.  HANG ON.

17  HIS NAME IS AT THE END -- RICHARD STOVER, WHO PREPARED A

18  REANALYSIS OF MERCK'S META-ANALYSIS.  DO YOU SEE WHERE IT SAYS

19  THAT?

20  A.  THAT IS THE TITLE FOR THE ARTICLE THAT YOU'RE REFERRING

21  TO.

22  Q.  NOW, THOSE ARE A LOT OF BIG WORDS FOR NONSCIENTIST PEOPLE.

23  BUT JUST BETWEEN YOU AND ME, WHAT THIS REALLY IS IS IT'S A

24  STOCK ANALYST, SOMEONE WHO ADVISES THE INVESTMENT COMMUNITY ON

25  WHETHER TO BUY OR SELL STOCK.  AND HE'S BASICALLY EXAMINING

## Page 611

1    SOME OF WHAT YOU GUYS HAD BEEN TELLING PEOPLE ABOUT THE SAFETY
2    OF YOUR DRUG, ISN'T HE?
3    A. HE'S TALKING ABOUT THE VIGOR STUDY AND VIOXX, YES.
4    Q. OKAY. AND THAT'S WHY YOU SAID "DAVID, IF HE SAYS THIS, I
5    WILL BOIL HIM IN OIL AT THE MEETING." YOU DIDN'T WANT THAT
6    KIND OF TALK OUT THERE, DID YOU.
7    A. I DIDN'T WANT -- HAVING READ THIS MEMO, I DIDN'T WANT AN
8    INACCURATE STATISTICAL ANALYSIS OF OUR DATA.
9    Q. I WANT TO SHOW YOU SCOLNICK EXHIBIT NUMBER 7. DO YOU SEE
10   YOUR JUNE 1, 1998 E-MAIL?
11   A. YES, I DO.
12   Q. YOU DID THREATEN TO QUIT, DIDN'T YOU?
13   A. I WAS UPSET WITH A PARTICULAR MARKETING PERSON. I WAS --
14   AND THAT IS THE THRUST OF THIS E-MAIL.
15   Q. WELL, WHEN YOU SAID, "IF YOU LOSE, I WILL LEAVE BECAUSE I
16   WILL NOT BE ABLE TO HAVE ANY RESPECT FOR THIS COMPANY," THAT'S
17   THREATENING TO QUIT, ISN'T IT?
18   A. THE E-MAIL IS ACCURATE.
19   Q. NO. THAT WASN'T MY QUESTION. I SAID, WHEN YOU SAY IN
20   YOUR E-MAIL, IF YOU LOSE, I WILL LEAVE BECAUSE I WILL NOT BE
21   ABLE TO HAVE ANY RESPECT FOR THIS COMPANY, YOU'RE THREATENING
22   TO QUIT, AREN'T YOU?
23   A. I ACCEPT THAT INTERPRETATION, YES.
24   Q. YOU'RE SAYING "MERCK MARKETING, FOR ONCE, HAS TO COMPETE
25   AND WIN. IF YOU DO NOT BEAT PFIZER," WHICH IS WHO SEARLE WAS

## Page 612

1    AT THE TIME; RIGHT? IF YOU DON'T BEAT CELEBREX, THAT'S WHAT IT
2    MEANS; RIGHT?
3    A. YES, THAT'S CORRECT.
4    Q. "IF YOU DO NOT BEAT PFIZER TWO TO ONE, MERCK SHOULD THROW
5    IN THE TOWEL AND JUST GIVE UP AND HAND THE COMPANY OVER TO
6    SOMEONE ELSE. IF YOU," ALL CAPITALS, "LOSE, I WILL LEAVE,
7    BECAUSE I WILL NOT BE ABLE TO HAVE ANY RESPECT FOR THIS
8    COMPANY." YOU WERE PRETTY SET WITH THEM, WEREN'T YOU?
9    A. IT IS A POINTED E-MAIL.
10   Q. BECAUSE YOU WERE UPSET, WEREN'T YOU?
11   A. THAT IS CORRECT.
12   Q. YOU WERE UPSET ALSO BECAUSE OF SOME STUDY ISSUES, RESEARCH
13   ISSUES, WEREN'T YOU?
14   A. I DON'T -- I DON'T RECALL WHAT YOU'RE REFERRING TO.
15   Q. YOU -- LOOK AT WHAT IT SAYS AT THE START. YOU'RE SAYING
16   THAT THE REASON Y'ALL WERE THREE MONTHS BEHIND SEARLE, THE
17   REASON YOU WERE LOSING THE RACE, IS BECAUSE PEOPLE IN MARKETING
18   "DEMANDED A LABEL THAT SAID WE CAUSE NO ULCERS."
19        AND THEN THE BUDGETS WERE SO HIGH THAT NOBODY COULD
20   GET THE MONEY THAT THEY NEEDED FOR THE STUDY. AND THAT'S WHY
21   Y'ALL WERE BEHIND. THAT'S WHAT YOU SAY, ISN'T IT?
22   A. THAT IS WHAT THE MEMO SAYS, YES.
23   Q. BOTTOM LINE IS, YOU WERE SAYING MARKETING NEEDS TO STOP
24   THEIR DEMANDS AND JUST GET OUT THERE AND COMPETE AND WIN FOR
25   ONCE; RIGHT?

## Page 613

1    A. THAT'S WHAT MY MEMO INDICATES.
2    Q. SIR, Y'ALL WEREN'T READY TO GO TO MARKET WITH YOUR
3    PRODUCT, WITH VIOXX, WHEN CELEBREX HIT THE MARKET? Y'ALL GOT
4    BEAT; RIGHT?
5    A. CELEBREX GOT TO THE MARKET FIRST; THAT IS CORRECT.
6    Q. WELL, WE LOOKED AT AN EXHIBIT A FEW MINUTES AGO, THE 1998
7    ONE WHERE YOU SAID THAT Y'ALL WERE KILLING BASIC RESEARCH AGAIN
8    AT MERCK, ONCE AGAIN. THAT'S BECAUSE Y'ALL NEEDED MORE MONEY.
9    YOU DIDN'T HAVE ENOUGH MONEY IN THE BUDGET; RIGHT? SO, NOW
10   YOU'LL AGREE WITH ME IN 1998 Y'ALL DIDN'T HAVE ENOUGH MONEY IN
11   YOUR BUDGET TO DO ALL THE RESEARCH YOU WANTED TO DO; TRUE?
12   A. THAT IS TRUE. THAT IS ALWAYS TRUE OF ANY REALLY
13   PRODUCTIVE RESEARCH LABORATORY.
14   Q. WELL, SIR, YOU WEREN'T IN MARKETING YOURSELF, WERE YOU?
15   A. NO.
16   Q. WELL, WHY DID YOU KEEP DABBLING IN THE MARKETING END? WHY
17   WERE YOU SENDING BROADSIDE E-MAILS TO PEOPLE, BECAUSE Y'ALL
18   WERE TOO SLOW ON THE MARKETING?
19   A. I WAS COMPETITIVE, AND WE HAD A TERRIFIC DRUG, AND I
20   WANTED THE COMPANY TO PRESENT THAT DRUG WELL TO PHYSICIANS.
21   Q. SO YOU HAD ALL THE RESOURCES YOU NEEDED TO DO THE RIGHT
22   STUDIES, AND IF THE STUDIES WEREN'T DONE, IT WAS YOUR FAULT FOR
23   NOT DOING THEM BECAUSE YOU HAD THE MONEY. IS THAT WHAT YOU'RE
24   TELLING ME?
25   A. WE HAD SUFFICIENT RESOURCES TO STUDY VIOXX.

## Page 614

1    Q. AND IF YOU THOUGHT THAT THERE WAS AN ISSUE THAT NEEDED
2    DEBUNKING, YOU CERTAINLY KNEW HOW TO ORDER TO GET A STUDY
3    IMMEDIATELY TO DEBUNK THE ISSUE AND DESTROY CREDIBILITY, DIDN'T
4    YOU?
5    A. AND TO FIND OUT IF WE WERE WRONG.
6    Q. THAT WASN'T MY QUESTION, SIR. I SAID, YOU COULD HAVE DONE
7    A STUDY, AND YOU COULD HAVE ORDERED ONE TO BE DONE, WITH SPEED,
8    ON THE ISSUE OF CARDIOVASCULAR PROBLEMS, HEART ATTACKS AND
9    STROKES, COULDN'T YOU?
10   A. THERE WAS NO REASON TO DO SUCH A STUDY BEFORE VIOXX WENT
11   TO MARKET BASED ON ALL OF THE DATA, HUGE NDA, OVER 5,000
12   PATIENTS STUDIED.
13   Q. MY QUESTION IS SIMPLE. YOU CERTAINLY COULD HAVE ORDERED A
14   STUDY FOR RISKS OF HEART ATTACKS AND STROKES BEFORE YOU PUT THE
15   VIOXX DRUG ON THE MARKET, COULDN'T YOU?
16   A. IF THERE HAD BEEN A REASON TO DO THAT, I COULD HAVE DONE
17   THAT.
18   Q. AND BY THE SAME TOKEN, ANY DAY THAT VIOXX HAD BEEN ON THE
19   MARKET, THE SECOND IT OCCURRED TO YOU THAT THERE MIGHT BE A
20   PROBLEM WITH HEART ATTACKS AND STROKES, YOU COULD HAVE ORDERED
21   IMMEDIATELY A SPEED STUDY TO BE DONE; COULDN'T YOU?
22   A. I COULD HAVE ASKED OR ORDERED A STUDY TO BE DONE IF I HAD
23   THOUGHT THERE WAS A CARDIOVASCULAR RISK WITH VIOXX.
24   Q. I'M ASKING YOU, DID YOU EVER ORDER A SPECIFIC STUDY ABOUT
25   HEART ATTACKS AND STROKES?

## Page 615

1  A. I DID NOT ORDER A SPECIFIC STUDY. I URGED THE GROUP TO
2  COME UP WITH STUDY DESIGNS AFTER VIGOR TO FURTHER EXAMINE THE
3  QUESTION THAT WAS RAISED BY THE VIGOR STUDY.
4  Q. WELL, SIR, WHAT ABOUT VALOR? DID YOU HAVE ANYTHING TO DO
5  WITH TALK ABOUT DOING THE VALOR STUDY?
6  A. VALOR?
7  Q. YES, SIR.
8  A. I DON'T RECOGNIZE THE TERM. I'M SORRY.
9  Q. DID YOU KNOW THAT YOUR COMPANY AT ONE POINT CONTEMPLATED
10 AND ACTUALLY WENT PRETTY FAR IN DESIGNING THE IDEA OF DOING A
11 STUDY SPECIFICALLY TO LOOK AT HEART ATTACK, STROKES, CV RISKS?
12 A. YES. SEVERAL STUDY DESIGNS WERE CONSIDERED.
13 Q. AND ONE OF THEM HAD APPROVAL AND WAS ABOUT TO BE DONE WHEN
14 IT WAS CANCELLED. DID YOU KNOW THAT?
15 A. ONE OF THE STUDIES THAT I'M AWARE OF WAS NOT GIVEN FINAL
16 APPROVAL.
17 Q. WHY NOT?
18 A. BECAUSE WHEN THE STUDY WAS REVIEWED, SEVERAL PEOPLE
19 OBJECTED TO THE DESIGN OF THE STUDY, THAT IT WAS NOT A GOOD
20 SCIENTIFIC STUDY TO DO.
21 Q. SO, YOU HAD THE NEED FOR THE STUDY, YOU JUST DIDN'T DESIGN
22 A GOOD ONE. IS THAT FAIR TO SAY?
23 A. WE CONSIDERED MANY STUDY DESIGNS BEFORE THE APPROVED
24 DESIGN WAS CONCEPTUALIZED.
25 Q. WELL, THE TRUTH IS, THE ESSENTIAL STUDY THAT NEEDED TO BE

## Page 616

1  DONE FOR VIOXX WAS AN OUTCOMES STUDY FOR HEART ATTACKS AND
2  STROKES; RIGHT?
3  A. THE STUDY THAT WOULD MEASURE, AS A PREDEFINED ENDPOINT,
4  HEART ATTACKS AND STROKES WAS AN IMPORTANT STUDY FOR VIOXX.
5  Q. NOT AN IMPORTANT. IT WAS, AT LEAST IN THE WORLD OF THINGS
6  BACK IN 2001, THE ONLY ESSENTIAL STUDY FOR VIOXX, WASN'T IT?
7  A. IT WAS AN ESSENTIAL STUDY TO DO FOR VIOXX.
8  Q. THAT WASN'T MY QUESTION. THE ONLY ESSENTIAL STUDY; TRUE?
9  A. IT WASN'T THE ONLY ESSENTIAL STUDY TO DO. IT WAS --
10 Q. WELL, THAT'S WHAT YOU SAID.
11 A. IT WAS A VERY IMPORTANT STUDY.
12 Q. WELL, CERTAINLY BY THE YEAR 2000 YOU KNEW THAT THERE WAS
13 AN ISSUE ABOUT HEART ATTACKS AND STROKES, WEREN'T YOU?
14 A. THE VIGOR STUDY WAS AVAILABLE IN THE YEAR 2000.
15 Q. WE'RE MARKING THAT AS EXHIBIT NUMBER 13. IF YOU'LL LOOK
16 DOWN AT THE THIRD QUESTION, THAT'S THE ONE I WANT YOU TO LOOK
17 AT.
18 A. UH-HUH.
19 Q. WHY DID MERCK UNDERTAKE THE APPROVE TRIAL?
20 A. UH-HUH.
21 Q. MERCK PREPARED AN ANSWER TO THAT. NOWHERE IN THAT ANSWER
22 DOES IT SAY TO SEE IF PEOPLE ARE HAVING HEART ATTACKS AND
23 STROKES, DOES IT?
24 A. THE ANSWER TO THE QUESTION DOES NOT REFER TO THE
25 CARDIOVASCULAR OUTCOME PART OF THE STUDY.

## Page 617

1  Q. I'M SORRY. THAT'S A LONG ANSWER. ARE YOU JUST SAYING,
2  "YES, YOU'RE RIGHT, IT DOESN'T SAY HEART ATTACKS AND STROKES?"
3  A. THERE'S NOTHING ABOUT HEART ATTACKS AND STROKES IN THAT
4  ANSWER.
5  Q. YOU, DR. SCOLNICK, KNEW VIOXX WAS CAUSING HEART ATTACKS
6  AND STROKES BY THE TIME OF MARCH 2000; TRUE?
7  A. NOT TRUE.
8  Q. WELL, WE AT LEAST KNOW THAT YOU'RE GETTING REPORTS OF IT,
9  THAT YOU'RE HAVING SUMMARIZED OUT OF THOUSANDS OF REPORTS,
10 RIGHT, EXHIBIT 10?
11 A. AGAIN, I'VE TRIED TO EXPLAIN TO YOU THE FACT THAT, WHEN A
12 DRUG GOES ON THE MARKET, ADVERSE EXPERIENCE REPORTS ARE
13 REPORTED ON EVERY DRUG, INCLUDING VIOXX. AND THE CHALLENGE FOR
14 ANALYZING THOSE REPORTS IS TO TRY TO FIGURE OUT WHETHER THEY'RE
15 HAPPENING BY CHANCE ASSOCIATED WITH THE DRUG OR WHETHER THE
16 DRUG IS ACTUALLY CAUSING THE ADVERSE EXPERIENCES REPORTED IN
17 THE REPORTS. AND WE DID THIS -- WE DID THIS ROUTINELY AND
18 VERY, VERY CAREFULLY FOR EVERY DRUG WE EVER BROUGHT ON THE
19 MARKET.
20 Q. AS OF MARCH 2000, YOU, EDWARD SCOLNICK, KNEW THAT THE CV
21 EVENTS, THE HEART ATTACKS AND STROKES, WERE CLEARLY THERE, AND
22 YOU, EDWARD SCOLNICK, KNEW THAT THEY WERE MECHANISM-BASED WITH
23 VIOXX. TRUE?
24 A. THAT WAS MY VERY FIRST REACTION WHEN I SAW THE DATA FROM
25 THE VIGOR TRIAL.

## Page 618

1  Q. YOU KNEW IT FROM THE GET-GO. IT WAS YOUR FIRST REACTION;
2  RIGHT?
3  A. IT WAS MY FIRST REACTION BEFORE OTHER DATA WAS AVAILABLE.
4  Q. SIR, IT IS IN MARCH OF 2000; ISN'T IT?
5  A. YES, IT IS?
6  Q. AND YOU SAID TO EVERYBODY -- ALAN NIES, ALISE REICIN, AND
7  DEBORAH SHAPIRO -- CERTAIN THINGS, DIDN'T YOU.
8  A. I DID. IT SAYS, "I JUST RECEIVED AND WENT THROUGH THE
9  DATA."
10 Q. AND YOU DON'T STEP OUT AND SAY SOMETHING UNLESS YOU KNOW
11 IT'S TRUE AND RIGHT. DO YOU REMEMBER THAT?
12 A. I DON'T REMEMBER SAYING WHAT YOU'VE JUST QUOTED ME AS
13 SAYING.
14 Q. I THINK YOUR EXACT WORDS WERE YOU HOLD YOURSELF TO A VERY
15 HIGH STANDARD. DO YOU REMEMBER THAT?
16 A. YES, I DO REMEMBER THAT.
17 Q. AND SO YOU SENT THIS E-MAIL TO EVERYBODY, AND YOU SAID
18 THAT YOU RECEIVED AND YOU WENT THROUGH THE DATA; RIGHT?
19 A. UH-HUH. THAT'S WHAT IT SAYS.
20 Q. AND I'M SURE YOU DID THAT THOROUGHLY. YOU DIDN'T DO A
21 HALF-SLOP JOB, DID YOU?
22 A. I DON'T THINK SO. EXCUSE ME. IF I CAN JUST LOOK AT THE
23 MEMO FOR ONE SECOND. "PUBS", IN THIS CONTEXT, IS TALKING ABOUT
24 PERFORATIONS, ULCERS, AND BLEEDS ASSOCIATED WITH THE STUDY.
25 Q. OKAY. THANK YOU. "THERE IS NO DOUBT ABOUT THE"

## Page 619

1  PERFORATIONS, ULCERS AND BLEEDS DATA."
2      THEN LOOK AT YOUR NEXT SENTENCE:  "THE CV EVENTS
3  ARE" -- WHAT'S THAT WORD?
4  A.  THE SENTENCE READS:  "THE CARDIOVASCULAR EVENTS ARE
5  CLEARLY THERE."
6  Q.  THEY'RE CLEARLY THERE.  THAT'S YOUR CHOICE OF WORDS,
7  WEREN'T THEY -- WASN'T IT?
8  A.  THIS IS MY E-MAIL.  THAT IS CORRECT.
9  Q.  SO, AFTER YOU STUDIED THE DATA, YOU WENT THROUGH IT, YOU
10  SENT A MEMO OUT TO EVERYBODY, EVEN THOUGH YOU HOLD YOURSELF TO
11  A HIGH STANDARD, TELLING EVERYBODY THAT THE CV EVENTS ARE
12  CLEARLY THERE.
13      AND THAT WAS MARCH OF 2000, WASN'T IT.
14  A.  YES, IT IS?
15  Q.  AND YOU NEVER SENT OUT AN ORDER AT THAT POINT IN TIME FOR
16  A CV OUTCOMES STUDY, DID YOU?
17  A.  WE -- WE DID -- I DID NOT SEND OUT AN ORDER FOR A CV
18  OUTCOMES STUDY.  WE TOOK MANY IMMEDIATE ACTIONS TO TRY TO
19  UNDERSTAND THE CARDIOVASCULAR EVENTS SINCE WE COULDN'T CONCLUDE
20  WHAT WAS GOING ON IN THE TRIAL BECAUSE THERE WAS NO PLACEBO IN
21  THE TRIAL.
22  Q.  IN 1999, I WROTE, "PUSH VIOXX TO MARKET BY MAY 22ND OR
23  MERCK WILL BE A DIFFERENT COMPANY."  THAT'S WHAT YOU SAID IN
24  1999; RIGHT?
25  A.  IT ACCURATELY REFLECTS OUR EARLIER DISCUSSION.

## Page 620

1  Q.  AND THEN ALSO IN 1999, YOU SENT OUT THE E-MAIL THAT SAID
2  IF WE CAN'T BEAT CELEBREX TWO TO ONE, YOU'RE GOING TO QUIT OR
3  LEAVE THE COMPANY.  TRUE?
4  A.  YOU REFLECTED MY E-MAIL AND SOME OF MY SENTIMENTS IN THAT
5  E-MAIL.
6  Q.  THE DRUG VIOXX DID GO TO MARKET IN 1999, AND Y'ALL
7  MARKETED IT BEFORE THE VIGOR STUDY WAS FINISHED; TRUE?
8  A.  YES, THAT'S CORRECT.
9  Q.  COULDN'T AFFORD TO WAIT FOR THAT VIGOR STUDY TO GET DONE;
10  COULD YOU?
11  A.  NO, THAT'S NOT TRUE.  THAT WAS A STUDY THAT WAS PLANNED
12  FOR BEING DONE AFTER THE DRUG WAS APPROVED AND WAS GOING TO
13  PROVIDE ADDITIONAL DATA ABOUT GASTROINTESTINAL SAFETY FOR THE
14  DRUG.
15  Q.  BUT, SIR, IN THE VIGOR STUDY, YOU COULD NOT AFFORD TO WAIT
16  UNTIL IT WAS OVER TO MARKET YOUR DRUG BECAUSE, IF YOU WAITED,
17  MERCK WOULD BE A DIFFERENT COMPANY.  YOU NEVER WOULD HAVE MADE
18  MAY 22ND OF '99; RIGHT?
19  A.  THE VIGOR STUDY WAS NOT REQUIRED TO MARKET THE DRUG.
20  Q.  I'M NOT ASKING DID THE FDA REQUIRE IT.  I'M TALKING ABOUT:
21  DID YOU MARKET THE DRUG BEFORE YOU GOT THE VIGOR RESULTS IN?
22  A.  YES, WE DID.  THE VIGOR TRIAL WAS NEVER PLANNED AS PART OF
23  THE VERY LARGE NDA FOR THE INITIAL APPROVAL OF VIOXX.
24  Q.  THEN ALSO IN THE YEAR 2000, YOU NEVER ORDERED OR HAD DONE
25  A CV-SPECIFIC STUDY; TRUE?

## Page 621

1  A.  WE IMMEDIATELY, UPON HAVING THE VIGOR RESULTS, DID MANY
2  ADDITIONAL DATA ANALYSES ON STUDIES THAT WE HAD TO TRY TO
3  INTERPRET THE MEANING OF THE VIGOR RESULTS.  AND WE DID, IN THE
4  END, COME UP WITH A STUDY TO MEASURE CARDIOVASCULAR OUTCOMES.
5  Q.  I SAID -- IT'S A VERY SIMPLE QUESTION, SIR.  IT'S A SIMPLE
6  "NO."  2000, YOU NEVER DID A CV-SPECIFIC STUDY; TRUE?
7  A.  WE DID NOT DO A STUDY WHERE CARDIOVASCULAR OUTCOMES WERE A
8  PRIMARY ENDPOINT.  WE DID DO A STUDY WHERE CARDIOVASCULAR
9  OUTCOMES WERE A PREDEFINED ENDPOINT IN OUR STUDIES TO GATHER
10  ADDITIONAL CARDIOVASCULAR OUTCOMES DATA.
11  Q.  OKAY.  THAT'S MY POINT.  SO YOU NEVER DID -- NEVER -- ONE
12  SINGLE STUDY WHERE THE PRIMARY OUTCOME WAS:  DOES IT CAUSE
13  HEART ATTACKS OR STROKES?  RIGHT?
14  A.  YOU'RE CORRECT.
15  Q.  DID YOU CHANGE YOUR WARNING LABEL AND TELL PEOPLE ABOUT
16  THE VIGOR RESULTS IN THE YEAR 2000?  YES OR NO.
17  A.  WE TOLD PEOPLE ABOUT THE VIGOR RESULTS IMMEDIATELY AFTER
18  THEY BECAME AVAILABLE TO US, AND WE SUBMITTED AN NDA TO THE FDA
19  TO CHANGE OUR LABEL.
20  Q.  DO YOU HAVE EXHIBIT 18 IN FRONT OF YOU?
21  A.  YES, I DO.
22  Q.  IT'S THE DAY BEFORE YOUR "TO DO" LIST, ISN'T IT.  THE
23  13TH?
24  A.  YES.  IT'S THE DAY BEFORE THIS MEMO ON THE "TO DO" LIST.
25  Q.  AND FOUR DAYS AWAY FROM YOUR INITIAL CONCLUSION THAT VIOXX

## Page 622

1  WAS CAUSING HEART ATTACKS AND STROKES; RIGHT?
2  A.  FOUR DAYS FROM MY INITIAL MEMO WITH MY INITIAL CONCLUSION,
3  YES.
4  Q.  ALL RIGHT.  NOW, ALREADY YOU -- ABOUT FOUR DAYS LATER, YOU
5  HAVE GOT MS. REICIN SCOURING THE MEDICAL LITERATURE TRYING TO
6  FIND A STUDY SOMEWHERE THAT INDICATES THAT NSAIDS HELPED YOUR
7  HEART; RIGHT?
8  A.  THAT WAS ONE OF THE QUESTIONS THAT I ASKED THE TEAM WHEN
9  THEY SUGGESTED THAT NSAIDS COULD BE CARDIOPROTECTIVE.
10  Q.  AND THE ONLY STUDY SHE WAS ABLE TO FIND -- AND BY THE WAY,
11  IT IS SINGULAR -- THERE WAS ONLY ONE STUDY SHE COULD FIND;
12  TRUE?
13  A.  THAT'S WHAT THE E-MAIL SAYS, YES.
14  Q.  IN FACT, WHY DON'T YOU READ THAT SENTENCE WHERE I'VE
15  HIGHLIGHTED "ONLY STUDY."
16  A.  ALAN AND ED:  BELOW IS ATTACHED THE ABSTRACT FROM THE ONLY
17  STUDY I COULD FIND WHICH ASSESSED THE POTENTIAL
18  CARDIOPROTECTIVE EFFECTS OF AN NSAID.  ALISE."
19  Q.  I MEAN, DID IT OCCUR TO YOU THAT PEOPLE WERE TAKING THE
20  DRUG THAT COULD BE HAVING THESE HEART ATTACKS, OR IS THAT WHAT
21  YOU MEANT WHEN YOU SAID, "IT'S SAD OR IT'S A SHAME, BUT IT'S A
22  LOW INCIDENCE; YOU JUST DIDN'T FIGURE THERE WOULD BE THAT MANY
23  OF THEM"?
24  A.  AS I'VE STATED, MY INITIAL CONCLUSION WAS THAT VIOXX WAS
25  CAUSING HEART ATTACKS IN PATIENTS.  AFTER DISCUSSIONS OF THIS

## Page 623

1 ARTICLE AND EXTENSIVE OTHER DATA THAT WE HAD AVAILABLE TO
2 OURSELVES IN OUR OWN TRIALS, I CONCLUDED THAT I WAS NOT CORRECT
3 IN MY INITIAL CONCLUSION.
4 Q. WELL, I'M GOING TO HAND YOU A DOCUMENT MARKED EXHIBIT 19.
5 DO YOU HAVE IT IN FRONT OF YOU? ALL RIGHT. FIRST OF ALL, THIS
6 WELL-RESPECTED CARLO PATRONO SAID THAT HE DOES NOT THINK THAT
7 YOU CAN ATTRIBUTE THE INCREASE IN HEART ATTACKS AND STROKES TO
8 THE FACT THAT THE OTHER PEOPLE WERE TAKING NAPROXEN AND IT MUST
9 BE GOOD FOR YOUR HEART. FAIR TO SAY?
10 A. THAT'S WHAT HE WRITES, YES. THAT'S WHAT THE PERSON
11 REFLECTS ON HIS COMMENTS.
12 Q. AND THEN THERE ARE A NUMBER OF REASONS GIVEN WHY IT CAN'T
13 BE THAT NAPROXEN IS GOOD; RIGHT?
14 A. WHAT IT SAYS IS, HE QUESTIONS THE -- WHETHER THE MAGNITUDE
15 OF THE EFFECTS SEEN IN VIGOR IS CONSISTENT WITH NAPROXEN BEING
16 CARDIOPROTECTIVE.
17 Q. WELL, HE SAID FIRST OF ALL, "THERE IS A WEAK
18 PHARMACOLOGICAL BASIS." DO YOU SEE WHERE IT SAID THAT?
19 A. YES, I DO.
20 Q. AND WHAT THAT MEANS TO YOU AND ME AND FOLKS WHO READ THIS
21 STUFF MORE THAN WE PROBABLY SHOULD IS -- IS THAT THERE'S REALLY
22 NOT A GOOD MEDICAL SCIENCE PHARMACY REASON FOR SAYING IT'S
23 NAPROXEN. THAT'S WHAT THAT MEANS, DOESN'T IT.
24 A. IT REFERS TO THE PHARMACOLOGY OF THE DRUG, AND THAT'S HIS
25 INTERPRETATION.

## Page 624

1 Q. AND THEN IT SAYS, "NO EPIDEMIOLOGICAL EVIDENCE." DO YOU
2 SEE WHERE IT SAYS THAT?
3 A. YES, I DO.
4 Q. WELL, DO YOU SEE THE WORD "NO"?
5 A. I DO SEE THAT.
6 Q. HOW MANY ARE THERE. IF IT SAYS THERE'S NO EVIDENCE, HOW
7 MUCH EVIDENCE IS THERE?
8 A. I SEE HIS COMMENT. I DON'T KNOW THE DETAILS OF HIS REVIEW
9 THAT HE REFERS TO HERE.
10 Q. WELL, WHEN HE SAYS THERE'S NO EVIDENCE, DON'T YOU THINK
11 THAT MEANS ZERO?
12 A. I THINK THAT'S A PLAUSIBLE EXPLANATION, YES.
13 Q. OTHERWISE YOU THINK HE'D USE THE WORD "SOME" OR "A LITTLE"
14 OR "FEW" OR "LOTS"?
15 A. HE'S TALKING ABOUT CONVENTIONAL NONSTEROIDALS AS PART OF
16 HIS SENTENCE. AND WE ACTUALLY AGREE WITH THAT, EXCEPT FOR
17 NAPROXEN.
18 Q. SO, BUT YOU AGREE WITH THE STATEMENT EVEN FOR NAPROXEN,
19 THAT THERE'S NO EPIDEMIOLOGICAL EVIDENCE THAT NAPROXEN IS SAFE;
20 RIGHT? I MEAN, NOT SAFE, GOOD FOR THE HEART.
21 A. THERE HAD BEEN NO PRIOR DATA TO SUGGEST THAT NAPROXEN WAS
22 CARDIOPROTECTIVE.
23 Q. HE SAYS, "ADDITIONALLY" -- WHICH, I GUESS, MEANS ANOTHER
24 REASON, YET ANOTHER REASON; RIGHT?
25 A. YES.

## Page 625

1 Q. "ADDITIONALLY, THE MAGNITUDE OF THE EFFECT," IN OTHER
2 WORDS, HOW MANY MORE HEART ATTACKS YOU WERE CAUSING, "WOULD NOT
3 BE PLAUSIBLE EVEN IF YOU'D BEEN COMPARING IT TO ASPIRIN. HE
4 SAYS THAT, DOESN'T HE.
5 A. HE TALKS ABOUT THE ASPIRIN, YES, THE COMPARATOR TO
6 ASPIRIN.
7 Q. HE SAYS, "IN FACT, IN THREE DIFFERENT TRIALS, ASPIRIN HAS
8 SHOWN NO EFFECT ON THE PRIMARY PREVENTION OF STROKE, WHILE WE
9 HAVE SEEN A 50 PERCENT LOWER INCIDENCE OF STROKE IN THE
10 NAPROXEN ARM OF VIGOR"; RIGHT?
11 A. THAT'S WHAT HE SAYS.
12 Q. WELL, YOU WERE HOPING NAPROXEN HELPED THE HEART JUST LIKE
13 ASPIRIN DID; RIGHT?
14 A. WE WEREN'T HOPING ANYTHING. WE WERE CONCLUDING, BASED ON
15 THIS STUDY THAT YOU'VE REFERRED TO AND ALL THE OTHER ANALYSIS
16 VERSUS PLACEBO AND OTHER NSAIDS, THAT, EXCEPT FOR THIS NAPROXEN
17 STUDY, THERE WAS NO EVIDENCE FOR AN IMBALANCE OF CARDIOVASCULAR
18 EVENTS ATTRIBUTABLE TO VIOXX.
19 Q. SIR, WHAT Y'ALL WERE PUTTING FORTH THERE AS AN IDEA WAS
20 THAT NAPROXEN HELPS THE HEART JUST LIKE ASPIRIN DOES; RIGHT?
21 A. OR -- YES, THAT'S CORRECT.
22 Q. BUT THE TRUTH BE TOLD, EVEN ASPIRIN, IF YOU'D USED
23 ASPIRIN, EVEN ASPIRIN COULDN'T HELP THE HEART AS MUCH AS
24 NAPROXEN WOULD HAVE TO TO COME UP WITH THESE RESULTS; RIGHT?
25 A. ASPIRIN, TO MY KNOWLEDGE, HAD NEVER BEEN STUDIED IN THIS

## Page 626

1 KIND OF PATIENT POPULATION.
2 Q. THAT WASN'T MY QUESTION, SIR. MY POINT IS: Y'ALL HAD SO
3 MANY MORE HEART ATTACKS AND STROKES IN YOUR VIOXX GROUP THAN
4 THE NAPROXEN, THAT IF THE REAL REASON WHY IS BECAUSE NAPROXEN
5 WAS HELPFUL, THAT NAPROXEN WOULD HAVE TO BE TWO, THREE, FOUR
6 TIMES BETTER FOR YOU THAN EVEN ASPIRIN; RIGHT?
7 A. I CAN'T CONCLUDE THAT. ASPIRIN HAS NOT BEEN STUDIED IN
8 PATIENTS WITH RHEUMATOID ARTHRITIS IN THIS KIND OF TRIAL.
9 Q. SIR, IT --
10 A. THERE WAS NO WAY TO MAKE THAT QUANTITATIVE COMPARISON.
11 Q. WELL, NAPROXEN HADN'T BEEN STUDIED IN ANY OTHER TRIAL TO
12 SHOW THAT IT WAS CARDIOPROTECTIVE. IT NEVER HAD BEEN SHOWN
13 THAT IN ANY OF THE TESTING EVER DONE; TRUE?
14 A. THAT IS TRUE, AND I'VE TRIED TO EXPLAIN TO YOU WHY THAT
15 STUDY COULD NOT HAVE BEEN DONE.
16 Q. WELL, SIR, THAT STUDY IS GOING TO BE AN END RESULT OF
17 EVERY STUDY WITH NAPROXEN. YOU'RE ALWAYS GOING TO -- WHEN YOU
18 STUDY NAPROXEN, YOU'RE GOING TO COMPARE THE FAVORABLE OUTCOMES
19 ON A CARDIO BASIS WITH THOSE THAT DON'T; RIGHT?
20 A. NOT COMPARED TO PLACEBO TO REALLY BE ABLE TO ANSWER THAT
21 QUESTION.
22 Q. FINE. COMPARED TO OTHER NSAIDS; TRUE?
23 A. IF NAPROXEN HAD BEEN STUDIED THAT WAY, THEN SOME DAY IT
24 COULD HAVE BEEN ACHIEVED.
25 Q. JUST MAKE SURE WE'RE ON THE SAME PAGE. IF WE LOOK AT

Page 627

1  EXHIBIT 23, YOU EVEN SENT A MEMO TO THIS TO THE CEO AND TO THE
2  PRESIDENT OF MERCK BACK IN JANUARY OF 2001, DIDN'T YOU?
3  A.  YES.
4  Q.  YOU SAID YOU WANT TO POINT OUT TO ALL OF YOU AT ONE TIME
5  THAT, NUMBER ONE, THERE IS NO WAY TO PROVE THAT IN PATIENTS
6  WITH RHEUMATOID ARTHRITIS, THAT ALL OF THE DIFFERENCE BETWEEN
7  VIOXX AND NAPROXEN IS DUE TO THE BENEFIT OF NAPROXEN."  THAT'S
8  WHAT YOU SAID, ISN'T IT?
9  A.  THAT'S RIGHT.  AND "ALL" IS CAPITALIZED.
10 Q.  AND THEN YOU CAPITALIZE THIS WHOLE NEXT PHRASE:  "IT IS
11 IMPOSSIBLE TO PROVE THIS."  DIDN'T YOU.
12 A.  THAT'S WHAT THE E-MAIL SAYS.
13 Q.  THAT'S WHAT YOU SAID, ISN'T IT.
14 A.  YES, IT IS.  IT IS.
15 Q.  THEN YOU CAPITALIZE FOR EMPHASIS THIS NEXT SENTENCE:  "IT
16 IS IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."
17 A.  THAT'S EXACTLY WHAT I SAID.
18 Q.  YOU RETIRED FROM MERCK RESEARCH LABS IN 2003; CORRECT?
19 A.  THAT IS CORRECT.
20 Q.  IN THE LATE '80S AND EARLY '90S, YOU WERE ALSO THE
21 PRESIDENT OF MERCK RESEARCH LABS; RIGHT?
22 A.  YES.
23 Q.  AT THAT POINT IN TIME, YOU DID HAVE SOME CONCERNS ABOUT
24 WHAT THE PROSPECTS WOULD BE FOR MERCK IN THE LATE '90S AND 2000
25 AS SEVERAL DRUGS WERE COMING OFF PATENT; RIGHT?

Page 628

1  A.  I HAD CONCERNS.  IT WAS A WAY OFF, BUT, YES, I -- I
2  CERTAINLY REMEMBER VAGUE THOUGHTS ABOUT THAT.
3  Q.  YOU HAVE TO ANTICIPATE THAT DRUGS WOULD BE COMING OFF
4  PATENT MAYBE TEN YEARS DOWN THE ROAD AND SEEK TO HAVE NEW DRUGS
5  TO FILL THE DRUGS THAT WERE ONCE PROPRIETARY OF THE COMPANY?
6  A.  THAT IS CORRECT.
7  Q.  BECAUSE ONCE A DRUG BECOMES GENERIC OR GOES OFF PATENT,
8  THEN OTHER COMPETITORS CAN ENTER THE MARKET AND SEEK TO TAKE
9  MARKET SHARE; CORRECT?
10 A.  THAT'S CORRECT.
11 Q.  OKAY.  SO, IN THE EARLY '90S YOU KNEW THAT BEGINNING IN
12 2000 AND 2001, MERCK WOULD HAVE SEVERAL DRUGS GOING OFF PATENT;
13 CORRECT?
14 A.  THE ONE THAT COMES TO MIND IMMEDIATELY IS MEVACOR, BUT I
15 DON'T RECALL THE OTHER DRUGS AT THIS POINT.
16 Q.  OKAY.  ALL THESE DRUGS WERE SIGNIFICANT DRUGS FOR MERCK?
17 A.  YES.
18 Q.  SEVERAL OF THESE WERE BLOCKBUSTER DRUGS FOR MERCK; RIGHT?
19 A.  THEY WERE LARGE SELLING DRUGS, YES.
20 Q.  WELL, "BLOCKBUSTER" HAS A MEANING OR A CONNOTATION IN THE
21 INDUSTRY, DOESN'T IT?  "
22 A.  BLOCKBUSTER MEANS USUALLY A VERY LARGE DRUG, VERY LARGE
23 SALES DRUG.
24 Q.  TRADITIONALLY, IT MEANT MORE THAN A BILLION DOLLARS IN
25 SALES; TRUE?

Page 629

1  A.  THAT IS ONE INTERPRETATION GIVEN TO IT.
2  Q.  SO, SEVERAL OF THESE DRUGS WERE BLOCKBUSTER DRUGS.  YOU'D
3  AGREE WITH THAT?
4  A.  YES.
5  Q.  OKAY.  SEVERAL OF THESE DRUGS, EVEN IF YOU CAN'T REMEMBER
6  ALL OF THEM, WERE GOING OFF PATENT IN 2000, 2001, 2002;
7  CORRECT?
8  A.  I'M NOT SURE WHICH ONES, BUT SOME DRUGS WERE GOING OFF
9  PATENT AT THAT POINT.
10 Q.  WELL, YOU RECALL BEING CONCERNED ABOUT WHAT THE FUTURE
11 WILL HOLD IN 2000/2001 WHEN ALL THESE DRUGS WERE GOING OFF
12 PATENT; CORRECT?
13 A.  YES.
14 Q.  YOU WERE CONCERNED ABOUT THAT IN THE EARLY '90S?
15 A.  YES.
16 Q.  AND YOU WERE TRYING TO DESIGN NEW DRUGS TO FILL THE VOID
17 THAT WOULD BE LEFT BY THESE DRUGS WHEN THEY WENT OFF PATENT?
18 A.  WE WERE TRYING TO DEVELOP AND DISCOVER NEW DRUGS THAT
19 WOULD DO THAT.
20 Q.  ONE OF THE DRUGS THAT WAS GOING TO BE FILLING THE VOID
21 LEFT BY THESE OTHER DRUGS WHEN THEY WENT OFF PATENT WAS VIOXX;
22 TRUE?
23 A.  VIOXX WAS GOING TO FILL THE VOID.  BUT IN THE EARLY '90S,
24 VIOXX -- I BELIEVE VIOXX WAS NOT EVEN ON THE MERCK RADAR
25 SCREEN.  I DON'T EVEN THINK WE HAD THOUGHT OF THE PROJECT AT

Page 630

1  THAT POINT.  I DON'T -- I DON'T RECALL THE DATE WHEN THE VIOXX
2  PROJECT STARTED.
3  Q.  THERE'S A REFERENCE TO DR. PEPPI PRASIT.  DO YOU SEE THAT?
4  A.  DR. PEPPI PRASIT.
5  Q.  PRASIT.  HE WAS A SCIENTIST AT YOUR LABS IN MONTREAL;
6  CORRECT?
7  A.  YES, A CHEMIST.
8  Q.  YOU SEE THE DATE REFERENCED HERE.  IT'S JULY 1992;
9  CORRECT?
10 A.  YES, I DO.
11 Q.  DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN MERCK
12 STARTED CONSIDERING INVESTIGATING SELECTIVE NSAIDS?
13 A.  YES, IT DOES.  I HAD NOT RECALLED WE STARTED TO -- STARTED
14 THIS PROJECT THIS EARLY.
15 Q.  SO YOU PUT A LOT OF RESOURCES WITHIN MERCK RESEARCH LABS
16 ONTO THIS PARTICULAR PROJECT; CORRECT?
17 A.  YES, THAT IS CORRECT.
18 Q.  AND YOU ENCOURAGED DR. PRASIT AND HIS STAFF TO PURSUE THE
19 VIOXX PROJECT WITH ALL RESOURCES THAT WERE AVAILABLE AT MERCK
20 FROSST; TRUE?
21 A.  THAT IS CORRECT.
22 Q.  OKAY.  YOU KNEW HOW IMPORTANT THIS DRUG COULD BE FOR THE
23 COMPANY; RIGHT?
24 A.  I KNEW THAT THIS COULD BE A VERY IMPORTANT PROJECT, YES.
25 Q.  YOU WANTED TO BE THE FIRST TO MARKET WITH THIS SELECTIVE

## Page 631

1  COX-2 INHIBITOR; CORRECT?
2  A.  YES.
3  Q.  ALL RIGHT, SIR.  I WANT TO GET BACK TO SOMETHING.  I WANT
4  TO TURN BACK TO 1998.  I WANT TO TALK ABOUT THE PERIOD PRIOR TO
5  THE TIME WHEN MERCK HAD VIOXX APPROVED.  OKAY?  DO YOU REMEMBER
6  WHEN VIOXX WAS APPROVED?
7  A.  I BELIEVE IT WAS LATE 1999, MIDDLE OF 1999.
8  Q.  FOR THE RECORD, IT IS AN E-MAIL FROM YOU TO A SERIES OF
9  INDIVIDUALS:  ALAN NIES, BETH SEIDENBERG, TOM SIMON, ROBERT
10  SILVERMAN.
11      SIR, ARE ALL OF THOSE PEOPLE MERCK EMPLOYEES?
12  A.  YES, THEY HAVE -- THEY WERE.
13  Q.  SO WHAT YOU DID HERE WAS YOU SENT THESE FOLKS ON YOUR
14  VIOXX DEVELOPMENT TEAM AND SOME REGULATORY PERSONNEL AN ANALYST
15  REPORT; CORRECT?
16  A.  THAT APPEARS TO BE CORRECT.
17  Q.  OKAY.  YOU SENT IT WITH HIGH IMPORTANCE?
18  A.  THAT'S WHAT IT'S MARKED.
19  Q.  IT WAS REAL IMPORTANT THEY SAW THIS ANALYST REPORT?
20  A.  IT'S MARKED HIGH IMPORTANCE.
21  Q.  DO YOU MAKE IT A PRACTICE, SIR, TO SEND WALL STREET
22  ANALYST REPORTS TO EMPLOYEES WHO ARE ON PROJECTS WITHIN MERCK?
23  A.  I SENT A VARIETY OF INFORMATION TO THEM:  SOMETIMES
24  ANALYST REPORTS WHICH HAD RELEVANT INFORMATION, SOMETIMES
25  SCIENTIFIC ARTICLES.  I SEND A VARIETY OF THINGS TO MY

## Page 632

1  EMPLOYEES.
2  Q.  ALL RIGHT.  SO, IT IS, IN FACT, ACCURATE TO STATE THAT IN
3  1998 MERCK HAD DECLINING SALES IN SEVERAL OF ITS KEY
4  FRANCHISES; CORRECT?
5  A.  I'VE ANSWERED YOUR QUESTION.
6  Q.  I WOULD LIKE YOU TO ANSWER THAT QUESTION, PLEASE.
7  A.  SOME OF ITS FRANCHISES HAD DECLINING SALES.
8  Q.  OKAY.  AND THEY WERE KEY FRANCHISES?
9  A.  AND SOME OF THEM WERE KEY.
10  Q.  OKAY.  YOU ALSO HAD SEVERAL DRUGS GOING OFF PATENT IN THE
11  NEAR FUTURE; RIGHT?
12  A.  CORRECT.
13  Q.  WHEN YOU SENT THIS, WERE YOU SENDING IT AS A SCIENTIST,
14  SIR?
15  A.  YES, BECAUSE IT WAS IN MY CAPACITY AS HEAD OF THE RESEARCH
16  LABORATORIES TO THESE PEOPLE WHO REPORTED TO THE RESEARCH
17  LABORATORIES.
18  Q.  AND YOU THOUGHT IT WAS IMPORTANT TO TELL YOUR EMPLOYEES
19  THAT MERCK'S BASE BUSINESS WAS ERODING?
20  A.  YES.
21  Q.  YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT MERCK HAD
22  SEVERAL PRODUCTS GOING OFF PATENT?
23  A.  TO -- THEY KNEW THAT.  THIS WAS TO REEMPHASIZE THAT.
24  Q.  YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT SEVERAL OF
25  THE RECENTLY LAUNCHED PRODUCTS HAD NOT BEEN AS SUCCESSFUL AS

## Page 633

1  ANTICIPATED?
2  A.  I WANTED TO PROVIDE THEM THE INFORMATION IN THIS DOCUMENT,
3  YES, THAT'S CORRECT.
4  Q.  YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT SEVERAL OF
5  THE RECENTLY LAUNCHED PRODUCTS WEREN'T AS SUCCESSFUL AS YOU
6  ANTICIPATED THEY'D BE; RIGHT?
7  A.  THAT'S WHAT'S IN HERE, AND I WANTED TO PROVIDE THEM THAT
8  INFORMATION.
9  Q.  THEY ARE THE PEOPLE WHO YOU WOULD HOPE WOULD BE ABLE TO
10  FACILITATE A SPEEDY APPROVAL OF YOUR DRUG; CORRECT?
11  A.  THAT IS PART OF THEIR RESPONSIBILITY, PART OF THEIR JOBS,
12  YES.
13  Q.  AND THAT'S PART OF WHY YOU PROVIDED THIS E-MAIL TO THEM;
14  RIGHT?
15  A.  YES.
16  Q.  YOU WANTED THEM TO KNOW HOW IMPORTANT IT WAS THAT THIS
17  DRUG PROCEED QUICKLY THROUGH THE REGULATORY APPROVAL PROCESS;
18  RIGHT?
19  A.  YES.
20  Q.  IT WAS ESSENTIAL TO THE FINANCIAL SUCCESS OF THE FIRM;
21  RIGHT?
22  A.  IT WAS ESSENTIAL TO MERCK.  IT WAS IMPORTANT TO MERCK,
23  YES.
24  Q.  OKAY.  AND, IN FACT, IT WAS NOT ONLY ESSENTIAL, BUT
25  VIOXX'S SUCCESS WAS NECESSARY TO PRESERVE MERCK AND MERCK

## Page 634

1  RESEARCH LABS PERIOD; CORRECT?
2  A.  THAT IS WHAT I SAID IN MY E-MAIL.
3  Q.  THAT'S TRUE; RIGHT?
4  A.  I BELIEVE IT IS AN EXAGGERATION, BUT IT HAS SOME TRUTH.
5  Q.  WELL, AT THIS POINT IN TIME, OCTOBER 1998, WHAT DID YOU
6  KNOW ABOUT VIOXX'S POTENTIAL TO CAUSE CARDIOVASCULAR RISKS OR
7  CARDIOVASCULAR PROBLEMS?
8  A.  I DON'T RECALL EXACTLY WHAT WE KNEW AT THIS POINT.  BUT
9  THERE WAS NO EVIDENCE AT ALL IN THE VIOXX DEVELOPMENT PROGRAM
10  AT THIS POINT THAT VIOXX CAUSED CARDIOVASCULAR RISKS.
11  Q.  WHAT DO YOU MEAN BY THAT, "CAUSED CARDIOVASCULAR RISKS"?
12  A.  THERE WAS NO EVIDENCE TO SAY THAT VIOXX CAUSED A
13  CARDIOVASCULAR RISK.
14  Q.  WELL, YOU'RE NOT SAYING THAT IN INDIVIDUAL TRIALS
15  PREAPPROVAL THAT YOU DIDN'T SEE IMBALANCES BETWEEN
16  CARDIOVASCULAR RISKS IN VIOXX AND THE COMPARATOR DRUGS, ARE
17  YOU?
18  A.  BEFORE THE DRUG WAS APPROVED?
19  Q.  YES.
20  A.  I DON'T RECALL ANY SUCH DATA.  SO, IF IT WAS THERE, I
21  CERTAINLY DON'T RECALL IT.  NO.  ACTUALLY, THAT IS NOT THE
22  CONCLUSION THAT ANYONE DREW OR WAS CERTAIN OF.
23      THE QUESTION WAS RAISED AS TO WHAT THE SOURCE OF THAT
24  METABOLITE WAS IN THE SOURCE OF THE PROSTACYCLIN AND WHETHER IT
25  WAS SYSTEMIC OR WHETHER IT WAS NOT SYSTEMIC.

## Page 635

1  Q.  I SEE.  SO, IF IT WAS SYSTEMIC, THAT WOULD MEAN THAT
2  PROSTACYCLIN THAT WAS PRODUCED ORDINARILY IN THE VASCULATURE
3  WAS NOT -- WAS BEING SUPPRESSED BY VIOXX; TRUE?
4  A.  I DON'T THINK ANYONE HAD ANY EVIDENCE NOR FELT THAT
5  PROSTACYCLIN WAS PRODUCED IN THE VASCULATURE.  NO ONE REALLY
6  KNEW WHERE PROSTACYCLIN WAS PRODUCED EXACTLY, IN WHAT ORGANS,
7  AND THE RELATIONSHIP OF ANY OF THAT TO THE METABOLITE IN THE
8  URINE.  NONE OF THAT WAS KNOWN.
9  Q.  BUT YOU DID CONDUCT A CLINICAL TRIAL IN 1997 WITH AN
10  INDIVIDUAL NAMED GARRET FITZGERALD; CORRECT?
11  A.  YES.
12  Q.  AND HE RAN A CLINICAL TRIAL THAT SHOWED THAT VIOXX
13  SUPPRESSED THE URINARY METABOLITES OF PROSTACYCLIN; CORRECT?
14  A.  YES.
15  Q.  OKAY.  AND ONE OF THE CONCLUSIONS THAT WAS DRAWN BY YOUR
16  CONSULTANTS WAS THAT VIOXX WAS SUPPRESSING SYSTEMIC
17  PROSTACYCLIN; CORRECT?
18  A.  I DON'T BELIEVE THEY DREW THAT CONCLUSION.  I THINK THEY
19  RAISED THAT QUESTION.
20  Q.  AND IF THAT WAS HAPPENING, THERE WAS A RISK THAT VIOXX
21  COULD CAUSE THROMBOTIC EVENTS IN HUMANS; TRUE?
22  A.  THERE WAS A THEORY THAT THAT COULD OCCUR, WITH NO EVIDENCE
23  EVER GARNERED TO SUBSTANTIATE OR REFUTE THAT THEORY.
24  Q.  NOW, THAT THEORY WAS PUT FORTH AFTER THE DRUG WAS MARKETED
25  OR BEFORE THE DRUG WAS MARKETED?

## Page 636

1  A.  LONG BEFORE VIOXX EVER EXISTED.
2  Q.  YOU WEREN'T ALLOWED TO GO OUT AND TELL DOCTORS THROUGH
3  YOUR SALES REPRESENTATIVES THAT VIOXX REDUCED THE SERIOUS
4  CLINICAL SIDE EFFECTS ASSOCIATED WITH TRADITIONAL NSAIDS;
5  RIGHT?
6  A.  SERIOUS GASTROINTESTINAL SIDE EFFECTS?
7  Q.  YES.
8  A.  THAT IS CORRECT.
9  Q.  IF YOU HAD CONDUCTED A CV OUTCOMES TRIAL IN 1998, STARTED
10  IT IN 1998, THAT WOULD HAVE SLOWED DOWN THE APPROVAL PROCESS
11  FOR THE DRUG; TRUE?
12  A.  THAT IS TRUE.
13  Q.  IF YOU HAD TOLD THE FDA, "WE'RE CONCERNED.  WE MAY HAVE A
14  POTENTIAL CARDIOVASCULAR ISSUE WITH THE DRUG.  WE'D WANT TO DO
15  A CV SAFETY STUDY," THAT WOULD HAVE SLOWED DOWN THE APPROVAL
16  PROCESS?
17  A.  THAT WOULD HAVE.  WE GAVE THE FDA ALL OF THE DATA,
18  INCLUDING GARRET FITZGERALD'S DATA, IN THE NDA AND ALL THE
19  OTHER ANALYSES.  WE DID.  PREAPPROVAL.
20  Q.  YOU DIDN'T GIVE HIM THE RESULT OF A CV-OUTCOMES TRIAL
21  PREAPPROVAL; RIGHT?
22  A.  WE GAVE THEM AN ANALYSIS OF ALL THE CARDIOVASCULAR EVENTS
23  IN OUR NDA, WHICH SHOWED NO EVIDENCE THAT VIOXX CAUSED CV
24  EVENTS.
25  Q.  YOU DIDN'T GIVE THEM THE RESULTS FROM A CV OUTCOMES TRIAL

## Page 637

1  PREAPPROVAL, DID YOU?
2  A.  WE DID NOT DO A SEPARATE CV OUTCOMES TRIAL PREAPPROVAL.
3  Q.  SO YOU COULDN'T GIVE THEM THE DATA FROM SUCH A TRIAL?
4  A.  I'VE ANSWERED YOUR QUESTION.
5  Q.  YOU COULDN'T GIVE THEM THE DATA FROM SUCH A TRIAL?  COULD
6  YOU ANSWER THAT?
7  A.  YES.
8  Q.  THANK YOU.  NOW, WHAT'S THE DATA SAFETY MONITORING BOARD,
9  SIR?  IN GENERAL TERMS.
10  A.  IN GENERAL TERMS, IT'S AN EXTERNAL GROUP THAT MONITORS THE
11  SAFETY OF THE MERCK TRIALS, FOR ALL TRIALS OR MANY TRIALS.
12  Q.  AND YOU HAVE A DIFFERENT GROUP FOR EACH TRIAL OR THE SAME
13  GROUP FOR ALL TRIALS?
14  A.  I THINK IT'S A DIFFERENT GROUP FOR EACH TRIAL BECAUSE THE
15  CLINICAL EXPERTISE IS -- DIFFERENT CLINICAL TRIALS, DIFFERENT
16  CLINICAL EXPERTISE.
17  Q.  DID THE VIGOR TRIAL HAVE A DSMB?
18  A.  YES, IT DID.
19  Q.  TO BE CLEAR IN THE DSMB'S FUNCTION, THE DSMB HAS ACCESS TO
20  UNBLINDED DATA DURING THE CONDUCT OF CLINICAL TRIALS IF THEY
21  WANT IT; CORRECT?
22  A.  YES, I BELIEVE THAT'S TRUE.
23  Q.  BECAUSE THEIR FUNCTION IS TO ENSURE THE SAFETY OF PATIENTS
24  IN THOSE CLINICAL TRIALS, AT LEAST ONE OF THEIR FUNCTIONS;
25  TRUE?

## Page 638

1  A.  YES.
2  Q.  OKAY.  DO YOU RECALL THAT THE DSMB IN THE VIGOR TRIAL SENT
3  A LETTER TO MERCK STATING THAT THEY WANTED THE CARDIOVASCULAR
4  EVENTS IN THE VIGOR TRIAL SEPARATELY ANALYZED AS COMPARED TO
5  OTHER SAFETY ANALYSES THE COMPANY WAS DOING?
6  A.  I BECAME AWARE OF THAT MEMO LONG AFTER IT WAS SENT TO
7  PEOPLE AT MRL.
8  Q.  WHEN YOU SAW THAT LETTER FROM DR. WEINBLATT TO DR.
9  REICIN, DID THAT LETTER SUGGEST TO YOU THAT MERCK MAY HAVE A
10  CARDIOVASCULAR ISSUE WITH VIOXX?
11  A.  WHEN I SAW THAT LETTER, I WONDERED WHAT HAD BEEN IN DR.
12  WEINBLATT'S MIND WHEN HE SENT THE LETTER, AND THAT'S WHAT I
13  WONDERED.  I HADN'T SEEN THE LETTER.  I DON'T KNOW WHAT WAS IN
14  HIS MIND.
15  Q.  YOU'VE NEVER SPOKEN TO HIM?
16  A.  I DON'T RECALL SPEAKING TO DR. WEINBLATT.
17  Q.  NEVER CALLED HIM UP AFTER YOU GOT THE RESULTS OF THE VIGOR
18  TRIAL AND ASKED "WHAT CONCERNED YOU AND THE DATA YOU WERE
19  LOOKING AT DURING THE CONDUCT OF THE TRIAL?"
20  A.  NO, I NEVER CALLED DR. WEINBLATT.
21  Q.  NEVER ASKED DR. WEINBLATT WHY YOU ALLOWED THE TRIAL TO
22  CONTINUE IN THE FACE OF THE CARDIOVASCULAR EVENTS IN THE TRIAL?
23  A.  NO.  I DIDN'T.  I DIDN'T KNOW WHAT DATA HE HAD.  I NEVER
24  DEALT DIRECTLY WITH DSMBS.
25  Q.  BEFORE OUR BREAK, WE WERE TALKING ABOUT -- AT LEAST A FEW

## Page 639

1  MOMENTS BEFORE OUR BREAK, WE WERE TALKING ABOUT YOUR MARCH 9,
2  2000, E-MAIL.  DO YOU RECALL THAT TESTIMONY?
3  A.  YES, I DO.
4  Q.  THAT WAS THE E-MAIL WHERE YOU IDENTIFIED THAT THE CV
5  EVENTS WERE "CLEARLY THERE."  RIGHT?
6  A.  YES.
7  Q.  THAT IT APPEARED TO BE "MECHANISM BASED" AS YOU "WORRIED
8  IT WAS."  RIGHT?
9  A.  THAT'S WHAT THE E-MAIL SAYS, YES.
10  Q.  OKAY.  AND YOU SAID IT WAS ALSO "REAL."  RIGHT?
11  A.  YES.
12  Q.  OKAY.  THEN WE TALKED ABOUT WHAT MERCK AND YOU DID IN
13  RESPONSE TO YOUR INITIAL CONCERNS ABOUT THE CV ISSUES WITH
14  VIOXX; RIGHT?
15  A.  YES.
16  Q.  NOW, OVER A PERIOD OF WEEKS, YOU REACHED THE CONCLUSION,
17  CONTRARY TO YOUR MARCH 9TH E-MAIL, THAT IT WASN'T VIOXX THAT
18  WAS CAUSING THE PROBLEMS, IT WAS NAPROXEN THAT WAS PROTECTING
19  AGAINST THE PROBLEMS; IS THAT RIGHT?
20  A.  THAT'S CORRECT.
21  Q.  YOU REACHED THAT CONCLUSION IN, WHAT, 18 DAYS?
22  A.  WITHIN THAT PERIOD OF TIME.
23  Q.  WELL, MERCK ISSUED A PRESS RELEASE TO THE PUBLIC ON MARCH
24  27, 2000, LETTING THEM KNOW ABOUT THE CV EVENTS IN THE TRIAL,
25  AS WELL AS THE GI EVENTS IN THE TRIAL; CORRECT?

## Page 641

1  THE IMPLICATIONS TO THE PUBLIC COULD BE THAT WERE USING YOUR
2  DRUG IF YOUR DRUG REALLY WAS CARDIOTOXIC, AS YOU THOUGHT ON
3  MARCH 9?
4  A.  THE ANSWER TO YOUR QUESTION:  I DIDN'T MAKE THAT
5  CALCULATION.  I CONSIDERED PATIENT SAFETY, AS I ALWAYS HAVE.
6  AND ALL THE DATA SUPPORTED OUR HYPOTHESIS.
7  Q.  DID YOU CONSIDER THE IMPLICATIONS TO THE SALES OF THE DRUG
8  IF YOUR INITIAL CONCLUSION WAS THE FINAL CONCLUSION?
9  A.  OF COURSE.  AND THAT WAS NOT PART OF MY REASON FOR
10  REACHING MY CONCLUSION.
11  Q.  AND WHAT WAS THE IMPLICATION TO SALES OF THE DRUG IF YOUR
12  INITIAL CONCLUSION WAS, IN FACT, THE FINAL CONCLUSION?
13  A.  SALES OF THE DRUG WOULD BE SIGNIFICANTLY CURTAILED.  THE
14  SALES OF THE DRUG WOULD BE CURTAILED -- EVEN WITH THE PUBLICLY
15  AVAILABLE INFORMATION, SALES OF THE DRUG WOULD BE CURTAILED.
16  Q.  SO, YOU KNEW THAT --
17  A.  AND WE MADE ALL OF THE DATA AVAILABLE INSTANTLY ANYWAY.
18  Q.  DID YOU EVER TELL THE PUBLIC YOUR INITIAL CONCLUSION?
19  A.  I DID NOT BECAUSE I THOUGHT IT WAS AN ERROR.
20  Q.  DID YOU EVER SEND AN E-MAIL OUT TO THE PEOPLE ON THIS
21  E-MAIL LIST AND LET THEM KNOW, "GUYS, I THINK I MADE A MISTAKE?"
22  A.  SUBSTANTIAL PERIOD OF TIME LATER, WITH EVEN MORE ANALYSIS,
23  I -- TOLD THEM THAT I THOUGHT THEY HAD DONE A GREAT JOB AND
24  THAT I WAS CONFIDENT IN THE SAFETY OF THE DRUG.
25  Q.  DID YOU EVER SEND AN E-MAIL AT THE END OF MARCH 2000

## Page 640

1  A.  YES.
2  Q.  AND YOU STATED AT THAT POINT IN TIME THAT YOU BELIEVED
3  THAT THE EXPLANATION FOR THE DIFFERENCE BETWEEN THE TWO ARMS
4  WAS THE CARDIOPROTECTIVE EFFECT OF NAPROXEN; CORRECT?
5  A.  THE -- YES, THAT'S BASICALLY WHAT THE PRESS RELEASE SAID.
6  Q.  SO, WITHIN 18 DAYS, YOU HAD MADE A COMPLETE 180 IN YOUR
7  VIEW AS TO THE CAUSE OF THE CV EVENTS IN THE VIGOR TRIAL;
8  RIGHT?
9  A.  YES.  I THOUGHT THE EXPLANATION WHICH BEST EXPLAINED THE
10  RESULTS WAS NAPROXEN'S CARDIOPROTECTIVE ACTIVITY BASED ON DATA
11  ANALYSIS, LITERATURE ANALYSIS, AS I'VE STATED.
12  Q.  DID YOU BRING IN ANYBODY WHO WASN'T ON THE MERCK PAYROLL
13  TO LOOK AT THE DATA FROM THE VIGOR TRIAL BEFORE YOU REACHED THE
14  DECISION THAT NAPROXEN WAS CARDIOPROTECTIVE?
15  A.  AS I'VE STATED, I DIDN'T BRING IN AN OUTSIDE CONSULTANT.
16  I DO NOT KNOW WHO THE TEAM MIGHT HAVE CONSULTED AS OUTSIDE
17  INVESTIGATORS.
18  Q.  BUT YOU'RE PRETTY SURE, THOUGH, IF YOU HAD TOLD YOUR TEAM,
19  "I WANT TO GET THIS DATA LOOKED AT BY SOMEBODY INDEPENDENT OF
20  MERCK," THEY COULD HAVE DONE THAT; RIGHT?
21  A.  THEY COULD HAVE DONE IT.  I DON'T KNOW WHETHER -- I DON'T
22  THAT THEY DIDN'T DO IT.
23  Q.  BUT YOU DO KNOW YOU DIDN'T TELL THEM TO DO IT.
24  A.  I DID NOT.  I DID NOT, THAT IS CORRECT.
25  Q.  SIR, DID YOU EVER JUST DO A CALCULATION TO FIGURE OUT WHAT

## Page 642

1  SAYING, "BOY, I WAS WAY OFF ON THIS"?
2  A.  NO, I DID --
3  Q.  "I FEEL VERY COMFORTABLE WITH THE NOW"?
4  A.  I DID NOT SEND THAT IN AN E-MAIL LIKE THAT, NO.
5  Q.  IN FACT, AT THE END OF MARCH, YOU WERE STILL WORRIED,
6  WEREN'T YOU?
7  A.  YES, I WAS, EVEN THOUGH I HAD REACHED WHAT I THOUGHT WAS
8  THE RIGHT CONCLUSION.  I ALWAYS WORRIED ABOUT THE SAFETY OF OUR
9  DRUGS, AND I CONTINUED TO WORRY ABOUT IT.
10  Q.  BUT YOU WEREN'T SO WORRIED TO TELL THE FDA, WERE YOU?
11  A.  THE FDA HAD ALL THE DATA.  THE FDA HAS COMPETENT
12  SCIENTISTS AND CAN JUDGE THE DATA FOR THEMSELVES.  THEY KNEW
13  THAT THIS WAS A NEW FINDING POTENTIALLY FOR NAPROXEN.  THEY
14  COULD INTERPRET THE DATA FOR THEMSELVES, AND HAD THEY BEEN
15  CONCERNED, THEY WOULD HAVE EXPRESSED THAT TO US AND TOLD US, IF
16  THEY WERE THAT CONCERNED WITH THE AGGREGATE OF DATA, DO
17  SOMETHING DIFFERENTLY.
18  Q.  DID YOU TELL THE FDA YOU WERE WORRIED?
19  A.  I DIDN'T SPEAK TO THE FDA, AND I DON'T KNOW WHAT THE
20  REGULATORY AFFAIRS PEOPLE TOLD THE FDA.
21  Q.  YOU DON'T THINK THE FDA OR THE MEDICAL COMMUNITY WOULD
22  HAVE BEEN INTERESTED IN WHAT YOU, ED SCOLNICK, WERE WORRIED
23  ABOUT WITH RESPECT TO VIOXX?
24  A.  IF THE FDA HAD WANTED TO ASK ME, THEY WOULD HAVE ASKED ME.
25  AND I COMMUNICATED WITH MEMBERS OF THE MEDICAL COMMUNITY IN

48  (Pages 639 to 642)

## Page 643

1 CONSULTANTS' MEETINGS. I DON'T KNOW WHAT THE MEDICAL COMMUNITY
2 AS A WHOLE OR THE PUBLIC AS A WHOLE WOULD HAVE LIKED TO KNOW.
3 Q. SO YOU'RE SAYING THAT IF THE FDA HAD WANTED TO FIGURE OUT
4 WHAT YOU WERE THINKING IN TERMS OF CONCERNS ABOUT VIOXX, THEY
5 COULD HAVE ASKED YOU? IS THAT IT?
6 A. THE FDA COULD HAVE ASKED ME ANY TIME IF THEY WANTED TO.
7 THEY HAD ALL THE DATA AVAILABLE TO THEM.
8 Q. AND IF THEY ASKED YOU, YOU WOULD HAVE 237:237 TOLD THEM
9 YOU WERE WORRIED?
10 A. I WOULD HAVE TOLD THEM MY CONCERNS, WHAT WE DID, WHAT
11 CONCLUSIONS WE REACHED.
12 Q. WOULD YOU HAVE TOLD THEM YOU WERE WORRIED?
13 A. I WOULD HAVE TOLD THEM MY CONCERNS OR MY WORRIES AND WHAT
14 THE DATA WAS AND WHAT OUR CONCLUSIONS WERE AND HAD A DIALOGUE
15 WITH THEM, IF THEY HAD ASKED ME.
16       MY REGULATORY AFFAIRS PEOPLE ROUTINELY HAVE
17 DISCUSSIONS LIKE THAT WITH THE FDA. THEY ARE MY INSTRUMENT FOR
18 DEALING WITH THE FDA.
19 Q. WELL, ULTIMATELY THERE WAS AN ADVISORY COMMITTEE HELD IN
20 FEBRUARY 2001; RIGHT?
21 A. I THINK THAT DATE IS CORRECT.
22 Q. AND IT WAS TO CONSIDER CERTAIN OF THE CLINICAL TRIAL DATA
23 FROM VIGOR; RIGHT?
24 A. YES.
25 Q. AND IN PARTICULAR, GI SAFETY; RIGHT?

## Page 644

1 A. YES.
2 Q. AS WELL AS CV SAFETY; TRUE?
3 A. CORRECT.
4 Q. "GI" BEING GASTROINTESTINAL?
5 A. YES.
6 Q. "CV" BEING CARDIOVASCULAR?
7 A. CORRECT.
8 Q. YOU NEVER TOLD THE FDA AT ANY POINT IN TIME, TO THE BEST
9 OF YOUR KNOWLEDGE, THAT YOUR INITIAL CONCLUSION WAS THAT THE CV
10 EVENTS SEEN IN THE VIGOR TRIAL WERE MECHANISM-BASED AND
11 ATTRIBUTABLE TO VIOXX?
12 A. I NEVER TOLD THEM THAT.
13 Q. MERCK SUBMITTED A PROPOSED LABEL TO FDA SOMETIME IN 2000;
14 RIGHT?
15 A. YES. I BELIEVE WITHIN THREE MONTHS OF HAVING THE VIGOR
16 DATA.
17 Q. AND SO, AT THE END OF MARCH OF 2000, MERCK ISSUES A PRESS
18 RELEASE AND TELLS THE WORLD THE FAVORABLE PROPERTIES OF VIOXX
19 FOUND IN THE VIGOR TRIAL AS IT RELATES TO GI EFFECTS; CORRECT?
20 A. THAT IS CORRECT.
21 Q. ALSO DISCLOSES THAT THERE'S AN INCREASED NUMBER OF --
22 EXCUSE ME -- A DECREASED NUMBER OF CARDIOVASCULAR EFFECTS IN
23 THE NAPROXEN ARM OF THE VIGOR TRIAL; RIGHT?
24 A. THAT'S CORRECT.
25 Q. YOU DIDN'T TELL THE PUBLIC THAT THERE WAS AN INCREASED

## Page 645

1 NUMBER OF CARDIOVASCULAR EVENTS IN THE VIOXX ARM; RIGHT?
2 A. THE PRESS RELEASE WAS NOT WORDED THAT WAY, THAT IS
3 CORRECT.
4 Q. OKAY. BECAUSE THAT WOULD HAVE SUGGESTED THAT VIOXX HAD
5 ACTUALLY INCREASED THE RISK; RIGHT?
6 A. IT MIGHT HAVE SUGGESTED THAT, AND WE DIDN'T BELIEVE THAT.
7 Q. YOU WERE TRYING TO CONVEY TO PEOPLE THAT IT WAS, IN FACT,
8 NAPROXEN THAT WAS REDUCING THE RISK? THAT'S WHY YOU REPORTED
9 THE NUMBERS THAT WAY?
10 A. WE WERE -- HAD CONCLUDED THAT IT WAS NAPROXEN WHICH HAD
11 LOWERED THE RISK, AND THE PRESS RELEASE EXPRESSED OUR VIEW, AND
12 IT STATED THIS WAS A NEW FINDING FOR NAPROXEN.
13 Q. YOU WERE TRYING TO CONVEY TO PEOPLE THAT IT WAS, IN FACT,
14 NAPROXEN THAT WAS REDUCING THE RISK OF CARDIOVASCULAR EVENTS IN
15 THE VIGOR TRIAL; TRUE?
16 A. TRUE. THAT'S THE WAY THE PRESS RELEASE WAS WORDED, AS I
17 STATED BEFORE.
18 Q. DOCTOR, BEFORE WE GO ON: EVEN TWO WEEKS AFTER YOU ISSUED
19 THE PRESS RELEASE -- "YOU," MERCK -- ISSUED THE PRESS RELEASE
20 ANNOUNCING THE VIGOR RESULTS, DR. ED SCOLNICK WAS STILL
21 PERSONALLY WORRIED ABOUT WHAT THE RESULTS FROM VIGOR REALLY
22 MEANT; TRUE?
23 A. THAT'S CORRECT.
24 Q. AND YOU WERE WORRIED THAT VIOXX WAS ACTUALLY CAUSING
25 CARDIOVASCULAR EVENTS; TRUE?

## Page 646

1 A. I WAS WORRIED THAT WE COULDN'T EXCLUDE AN EFFECT OF VIOXX;
2 ALTHOUGH THE MAJOR EFFECT, I WAS CONVINCED, WAS DUE TO
3 NAPROXEN.
4 Q. AND YOU ACTUALLY TOLD YOUR STAFF THAT YOU PERSONALLY WERE
5 ACTUALLY IN MINOR AGONY OVER THE ISSUE; TRUE?
6 A. TRUE.
7 Q. AND YOU TOLD YOUR STAFF THAT "WE'RE NOT GOING TO KNOW THE
8 ANSWER UNTIL WE DO AN OUTCOMES TRIAL"; RIGHT?
9 A. THAT WE WERE NOT GOING TO KNOW -- WE WERE NOT GOING TO BE
10 ABLE TO EXCLUDE AN EFFECT OF VIOXX UNTIL WE DID AN OUTCOMES
11 TRIAL.
12 Q. YOU TOLD YOUR STAFF, YOUR PROJECT TEAM, "WE WILL NOT KNOW
13 FOR SURE WHAT IS GOING ON UNTIL WE DO AN OUTCOMES TRIAL"; TRUE?
14 A. TRUE.
15 Q. OKAY. AND YOU WANTED TO DO A BIG OUTCOMES TRIAL; RIGHT?
16 A. YES. THAT'S CORRECT.
17 Q. NOT SOME POOLED ANALYSIS; RIGHT?
18 A. THAT'S CORRECT.
19 Q. YOU WANTED TO DO A 10,000 PATIENT STUDY ON VIOXX, 10,000
20 PEOPLE ON A COMPARATOR AGENT; TRUE?
21 A. TRUE. THAT'S CORRECT.
22 Q. YOU WERE ADVOCATING USING TYLENOL AS THE COMPARATOR AGENT;
23 RIGHT?
24 A. THAT WAS MY IDEA, YES.
25 Q. YOU WANTED TO DO A 20,000 PERSON STUDY IN APRIL OF 2000 TO

DAILY COPY

## Page 647

1 EVALUATE THE CARDIOVASCULAR SAFETY OF VIOXX; RIGHT?
2 A. CORRECT.
3 Q. IT WAS GOING TO BE A HEAD-TO-HEAD TRIAL: TYLENOL ON ONE
4 ARM; VIOXX ON THE OTHER. RIGHT?
5 A. THAT'S CORRECT.
6 Q. AND WHEN DID YOU RUN THAT TRIAL?
7 A. THE PROJECT TEAM TOLD ME THAT WAS A TRIAL THAT COULD NOT
8 BE DONE BECAUSE PATIENTS COULDN'T BE KEPT ON TYLENOL WHO HAD
9 OSTEOARTHRITIS FOR THAT LONG A PERIOD OF TIME.
10 Q. IS THAT RIGHT? THAT'S WHAT -- YOU CAN'T --
11 A. TYLENOL IS NOT SUFFICIENT AS A PAINKILLER TO PATIENTS WITH
12 OSTEOARTHRITIS; AND, THEREFORE, THE TRIAL COULD NOT BE DONE.
13 AND I HAD TO ACCEPT THAT BECAUSE THEY FELT THAT WAY,
14 UNANIMOUSLY, VERY STRONGLY, THAT YOU COULDN'T DO THE TRIAL.
15     AND IF THE ALTERNATIVE WAS TO DO IT AGAINST ANOTHER
16 COMPARATOR NONSTEROIDAL, IT MIGHT NOT GIVE AS CLEAR AN ANSWER.
17 AND SO WE WERE IN A CONUNDRUM ABOUT WHAT TRIAL TO DO AT THAT
18 POINT.
19 Q. WELL, YOU WERE THE BOSS; RIGHT?
20 A. I NEVER ASKED THEM TO DO A TRIAL THAT THEY THOUGHT WAS
21 UNDOABLE.
22 Q. WELL, LET'S LOOK AT THIS E-MAIL, THEN, FROM APRIL 12, 2000
23 FROM YOU TO DR. REICIN. YOU WROTE THIS LATE AT NIGHT; RIGHT?
24 A. YES. IT'S DATED 10:42 P.M.
25 Q. YOU SENT IT WITH HIGH IMPORTANCE; TRUE?

## Page 648

1 A. TRUE.
2 Q. AND YOU WROTE: "HI ALISE. I HAVE BEEN TRADING E-MAILS
3 WITH DOUG GREENE IN REAL TIME." WHO IS DOUG GREENE?
4 A. DOUG GREENE AT THE TIME WAS HEAD OF THE CLINICAL,
5 REGULATORY, AND STATISTICS DEPARTMENT AT MERCK, WHICH IS
6 USUALLY REFERRED TO AS "DEVELOPMENT."
7 Q. WE ALL ARE ONLINE TOO LATE. I WILL TELL YOU, MY WORRY
8 QUOTIENT IS HIGH. I ACTUALLY AM IN MINOR AGONY." DO YOU SEE
9 THAT?
10 A. I DO.
11 Q. YOU WROTE THAT?
12 A. I DID.
13 Q. YOU MEANT IT?
14 A. I DID.
15 Q. "WHAT I REALLY WANT TO DO IS A 10,000 VERSUS 10,000
16 PATIENT STUDY IN MILD - MODERATE OA, TYLENOL VERSUS VIOXX, WITH
17 PRN" -- IS THAT PREVENTATIVE?
18 A. NO. IT MEANS USE IF YOU NEED.
19 Q. OKAY. "WITH PRN LOW-DOSE ASA." IS THAT ASPIRIN?
20 A. YES. "
21 Q. FOR THOSE JUDGED TO NEED IT." SIR, ARE YOU TELLING ME
22 THAT YOU COULDN'T DO A LONG-TERM STUDY IN PATIENTS WITH EVEN
23 MILD OSTEOARTHRITIS, TYLENOL VERSUS VIOXX?
24 A. THAT'S WHAT MY TEAM TOLD ME.
25 Q. YOU CONTINUE. "WE WILL NOT KNOW FOR SURE WHAT IS GOING ON

## Page 649

1 UNTIL WE DO THIS STUDY. PLEASE THINK HARD ABOUT THE DESIGN
2 BEFORE THE PAC MEETING." YOU WROTE THAT IN ALL CAPS; RIGHT?
3 A. I DID.
4 Q. WHEN DID YOU DO A CV OUTCOMES STUDY OF ANY DESIGN,
5 COMPARING VIOXX TO A COMPARATOR AGENT, WITH THE PRIMARY
6 ENDPOINT BEING CARDIOVASCULAR EVENTS?
7 A. AFTER DEBATING MANY PROTOCOLS, WE DECIDED THAT WE
8 WANTED -- THE ONLY WAY WE WOULD ANSWER ANY LINGERING DOUBT WAS
9 TO DO IT AGAINST PLACEBO AND FINALLY CAME UP WITH A PROTOCOL
10 FOR DOING THAT.
11 Q. RIGHT. YOU DIDN'T DESIGN A SPECIFIC TRIAL WITH A
12 PREDETERMINED ENDPOINT TO MONITOR CARDIOVASCULAR EVENTS,
13 THOUGH; DID YOU?
14 A. WE DID NOT DO THAT. WE AGGREGATED THREE LARGE TRIALS WITH
15 A PREDEFINED ENDPOINT TO BE CARDIOVASCULAR MORTALITY, WITH AN
16 AMPLE POWER TO LOOK FOR CARDIOVASCULAR EVENTS.
17 Q. SIR, I'M PASSING YOU OVER WHAT WE JUST MARKED AS
18 EXHIBIT -- I THINK IT'S 7 TO YOUR DEPOSITION. IT'S ENTITLED,
19 "VIOXX OUTCOMES STUDY POTENTIAL DESIGNS." FOR THE RECORD, IT
20 IS MRK-ABT0014818 TO 827. DO YOU RECOGNIZE THIS AS A SLIDE
21 SET, SIR?
22 A. THAT'S WHAT IT LOOKS LIKE IT IS.
23 Q. OKAY. IT'S ENTITLED, "VIOXX OUTCOMES STUDY POTENTIAL
24 DESIGNS." IT IS A POWERPOINT PRINTOUT. IS THAT WHAT IT LOOKS
25 LIKE TO YOU?

## Page 650

1 A. MORE OR LESS.
2 Q. THIS DOCUMENT SUMMARIZES SEVERAL DIFFERENT OUTCOMES
3 STUDIES CONCERNING CARDIOVASCULAR ISSUES THAT WERE BEING
4 CONSIDERED IN OR AROUND APRIL OF 2000; TRUE?
5 A. YES.
6 Q. ONE OF THE OUTCOMES STUDIES THAT WAS BEING CONSIDERED WAS
7 THE VIOXX-VERSUS-TYLENOL STUDY; TRUE?
8 A. YES.
9 Q. THERE'S SOME PROS AND CONS LISTED THERE; RIGHT?
10 A. YES.
11 Q. AND ONE OF THE PROS IS, "THIS STUDY DIRECTLY ADDRESSES THE
12 QUESTION OF THE CV SAFETY OF COX-2 INHIBITORS." DO YOU SEE
13 THAT?
14 A. YES.
15 Q. I READ THAT RIGHT; CORRECT?
16 A. YES.
17 Q. OKAY. THERE'S TWO CONS THAT ARE LISTED HERE; RIGHT?
18 A. YES.
19 Q. ONE IS, "DEMONSTRATION OF A CV DIFFERENCE WOULD LIKELY BE
20 DUE TO A COX-2 CLASS EFFECT BUT WOULD PUT VIOXX AT EXTREME
21 DISADVANTAGE TO CELEBREX AND NEGATE EXISTING OA AND ALZHEIMERS
22 DATA." DO YOU SEE THAT?
23 A. I DO.
24 Q. THE NEXT POINT WAS THERE WAS A POSSIBILITY THAT YOU DETECT
25 "SMALL DIFFERENCES FROM TYLENOL IN GI SAFETY," AND THAT WOULD

## Page 651

1  BE OF CONCERN; TRUE?

2  A.  THAT'S WHAT IT SAYS.

3  Q.  OKAY.  YOU WERE CONCERNED THAT IF YOU WENT HEAD-TO-HEAD

4  VIOXX VERSUS TYLENOL, YOU MIGHT HIGHLIGHT SOME FAVORABLE GI

5  SAFETY PROPERTIES OF TYLENOL; ISN'T THAT RIGHT?

6  A.  THAT'S WHAT THIS SAYS.  I WASN'T CONCERNED ABOUT THAT.

7  THAT'S WHAT THIS SAYS.

8  Q.  OKAY.  THERE WAS ALSO A POSSIBILITY THAT YOU MIGHT BE

9  WRONG, AND THE CARDIOVASCULAR EFFECTS SEEN IN VIGOR WAS REALLY

10  DUE TO VIOXX; RIGHT?

11  A.  THAT'S WHAT THIS SAYS AS A CON FOR THE STUDY.

12  Q.  SO IT WOULDN'T HAVE BEEN UNETHICAL TO DO A TRIAL OF VIOXX

13  VERSUS TYLENOL?

14  A.  WHAT I SAID IS IT WOULD BE UNDOABLE BASED ON OTHER INPUT

15  PEOPLE GAVE ME BECAUSE TYLENOL WOULD NOT RELIEVE PAIN ENOUGH TO

16  BE MONOTHERAPY IN SUCH A TRIAL.

17  Q.  SO IF SOMEONE WAS SPECULATING THAT IF YOU DID VIOXX VERSUS

18  TYLENOL, PEOPLE MAY FALL OUT OF THE TYLENOL ARM OVER TIME

19  BECAUSE IT WAS INEFFECTIVE; IS THAT RIGHT?

20  A.  NOT SPECULATING, BUT SAYING IT JUST AS IN -- THE SAME

21  MANNER AS ON THIS SLIDE, THAT WAS ANOTHER POINT BROUGHT UP MANY

22  TIMES DURING THE DISCUSSION.

23  Q.  WELL, THAT'S WHAT I'M WONDERING.  I DON'T SEE IT ON THIS

24  SLIDE.  DO YOU SEE THAT POINT RAISED ON THIS SLIDE, SIR?

25  A.  I DO NOT, BUT IT WAS SOMETHING PEOPLE TALKED ABOUT.  NOT

## Page 652

1  ALL POINTS OF MEETINGS ARE ON OUR SLIDES.

2  Q.  NOW, APART FROM JUST ASKING ABOUT YOUR INTERNAL FOLKS AND

3  THINKING ABOUT YOURSELF WHAT TYPE OF CV STUDY COULD BE DONE,

4  YOU ACTUALLY CONSULTED WITH SOME PEOPLE FROM OUTSIDE OF MERCK;

5  RIGHT?

6  A.  SEVERAL.

7  Q.  OKAY.  YOU ASKED THEM WHETHER A CV STUDY COULD BE DESIGNED

8  TO EVALUATE THE CARDIOVASCULAR SAFETY OF VIOXX, DIDN'T YOU?

9  A.  I ASKED THEM WHAT KIND OF STUDY COULD BE DESIGNED, YES.

10  Q.  YOU ACTUALLY SPOKE WITH A JOHN OATES ABOUT WHETHER A TRIAL

11  COULD BE DONE TO TEST THE CV SAFETY OF VIOXX; RIGHT?

12  A.  I DON'T REMEMBER ALL THE PEOPLE THAT OUR GROUP TALKED TO.

13  DR. OATES WAS ONE OF OUR CONSULTANTS ON OUR BOARD OF ADVISORS.

14  Q.  WASN'T IT DR. OATES' VIEW RIGHT AFTER THE VIGOR DATA WAS

15  RELEASED THAT YOU HAD TO DO ANOTHER TRIAL COMPARING VIOXX WITH

16  ASPIRIN AND NAPROXEN TO SEE WHETHER VIOXX WAS CARDIOTOXIC?

17  A.  I DON'T REMEMBER.  I REALLY DON'T REMEMBER.

18  Q.  DO YOU REMEMBER THAT STUDY DESIGN BEING PROPOSED?

19  A.  I REMEMBER THAT AMONG SEVERAL STUDY DESIGNS, YES.

20  Q.  DID YOU EVER DO THAT STUDY?

21  A.  THAT STUDY WAS NOT DONE.

22  Q.  YOU NEVER DID A STUDY LIKE THAT; RIGHT?

23  A.  THAT STUDY WAS NOT DONE.

24  Q.  DO YOU REMEMBER MERCK DEALING WITH DR. TOPOL IN 2001

25  CONCERNING THE DESIGN OF A CV OUTCOME TRIAL?

## Page 653

1  A.  I BELIEVE MERCK RESEARCH SCIENTISTS DEALT WITH DR. TOPOL,

2  YES.

3  Q.  YOU'D AGREE HE'S A RESPECTED CARDIOLOGIST?

4  A.  HE HAS A SIGNIFICANT REPUTATION IN CARDIOLOGY.

5  Q.  HE'S A RESPECTED CARDIOLOGIST, SIR?

6  A.  HE HAS A SIGNIFICANT REPUTATION.

7  Q.  DO YOU RESPECT DR. TOPOL?

8  A.  I THINK THERE ARE SOME THINGS HE'S DONE IN SCIENCE WHICH

9  HAVE NOT HELD UP TO BE TRUE.

10  Q.  DO YOU RESPECT DR. TOPOL?  YES OR NO.

11  A.  I THINK HE --

12  Q.  CAN YOU ANSWER MY QUESTION "YES" OR "NO," SIR?

13  A.  I HAVE MIXED THOUGHTS ABOUT HIS PUBLICATION RECORD, SO I

14  CAN'T ANSWER YOUR QUESTION.

15  Q.  DID YOU HAVE MIXED THOUGHTS ABOUT HIS PUBLICATION RECORD

16  BACK IN 2001?

17  A.  I CAN'T RECALL.

18  Q.  DID YOU ONLY HAVE A MIXED VIEW OF HIS PUBLICATION RECORD

19  AFTER HE STARTED TO PUBLISH ARTICLES NEGATIVE TO VIOXX?

20  A.  NO.  NO.

21  Q.  WELL, WHAT ARE YOU REFERRING TO, THEN, CONCERNING

22  DR. TOPOL'S MIXED PUBLICATION RECORD?

23  A.  I'M REFERRING, ONE, TO HIS META-ANALYSIS OF THE VIOXX

24  DATA, WHICH WAS -- I'VE BEEN TOLD BY STATISTICIANS I RESPECT

25  WAS A COMPLETELY FLAWED ANALYSIS, AND SOME OF HIS GENETICS WORK

## Page 654

1  WHICH HAS BEEN PROVEN TO BE WRONG.

2  Q.  OKAY.  SO ONE OF THE THINGS THAT YOU BASED YOUR MIXED VIEW

3  OF DR. TOPOL ON IS THE NEGATIVE STUDY HE PUBLISHED CONCERNING

4  VIOXX; CORRECT?

5  A.  BASE IT NOT ON THE NEGATIVE STUDY, BASE IT ON THE METHODS

6  WHICH HE USED TO DO THE METHODS -- THE NEGATIVE STUDY.

7  Q.  LET'S BE CLEAR ABOUT WHAT WE'RE TALKING ABOUT.  IN AUGUST

8  OF 2001, DR. TOPOL PUBLISHED A STUDY IN THE JOURNAL OF THE

9  AMERICAN MEDICAL ASSOCIATION; TRUE?

10  A.  TRUE.

11  Q.  THAT STUDY WAS RAISING CAUTION ABOUT THE POTENTIAL FOR

12  COX-2 INHIBITORS LIKE VIOXX AND CELEBREX TO CAUSE

13  CARDIOVASCULAR EVENTS; TRUE?

14  A.  THAT'S WHAT THAT STUDY CLAIMED TO HAVE SHOWN.

15  Q.  AND YOU'RE SAYING THAT YOU HAVE SPOKEN TO STATISTICIANS

16  THAT CHALLENGE THE WORK OF DR. TOPOL IN TERMS OF ITS

17  STATISTICAL RIGOR.  IS THAT WHAT YOU'RE SAYING?

18  A.  THAT'S EXACTLY WHAT I'M SAYING.

19  Q.  DID YOU TELL DR. TOPOL THAT?

20  A.  I'VE NEVER DISCUSSED ANYTHING DIRECTLY WITH DR. TOPOL.

21  Q.  WELL, DID YOU KNOW THAT SOME OF YOUR SCIENTISTS WENT OUT

22  TO TALK TO DR. TOPOL ABOUT THAT ARTICLE EVEN BEFORE IT WAS

23  PUBLISHED?

24  A.  I BELIEVE THAT DR. REICIN TOLD ME THAT SHE AND

25  DR. DEMOPOULOS, WHO WAS A CARDIOLOGIST BY TRAINING, WERE GOING

## Page 655

1  OUT TO SEE HIM TO DISCUSS THE ARTICLE.
2  Q.  AND THEY WENT OUT TO SEE HIM BEFORE THE ARTICLE IN THE
3  JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION WAS PUBLISHED;
4  RIGHT?
5  A.  I BELIEVE THEY DID.  I BELIEVE THAT'S WHAT DR.  REICIN
6  TOLD ME.
7  Q.  AND THE OBJECTIVE WAS THAT DR. TOPOL WOULD NOT PUBLISH THE
8  ARTICLE IN THE FORM IT CURRENTLY EXISTED BECAUSE THAT WAS
9  NEGATIVE TO VIOXX; TRUE?
10  A.  BECAUSE IT WAS INACCURATELY DONE STATISTICALLY.
11  Q.  WELL, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION HAS
12  EDITORS; RIGHT?
13  A.  YES, IT DOES.
14  Q.  I MEAN, DR. TOPOL JUST DIDN'T JUST PUBLISH THIS ARTICLE
15  IN JAMA BY HIMSELF; RIGHT?
16  A.  THAT IS CORRECT.
17  Q.  THERE WERE EDITORS AT JAMA WHO REVIEWED THE ARTICLE;
18  RIGHT?
19  A.  I DON'T KNOW WHO REVIEWED THE ARTICLE.
20  Q.  WELL, IN YOUR EXPERIENCE, SIR, IN THE PEER-REVIEWED
21  MEDICAL LITERATURE, THERE ARE EDITORS AT MEDICAL JOURNALS;
22  TRUE?
23  A.  THERE ARE, BUT I DON'T KNOW HOW THAT ARTICLE WAS REVIEWED
24  OR WHO REVIEWED IT.
25  Q.  YOU WOULD AGREE, SIR, THAT IT WOULD BE UNUSUAL FOR A

## Page 656

1  JOURNAL LIKE JAMA NOT TO HAVE AN ARTICLE LIKE THAT
2  PEER-REVIEWED?
3  A.  IT WOULD BE UNUSUAL, BUT I DON'T KNOW WHAT THEY DID.
4  Q.  IN FACT, MERCK ACTUALLY ISSUED A PRESS RELEASE
5  PREEMPTIVELY TO CHALLENGE THE RESULTS FROM THAT JAMA ARTICLE,
6  DIDN'T THEY?
7  A.  I DON'T RECALL AT ALL WHETHER THAT WAS DONE.
8  Q.  THE PEER-REVIEWED MEDICAL LITERATURE IS THE VEHICLE
9  THROUGH WHICH SCIENTIFIC OPINION IS EXCHANGED; TRUE?
10  A.  CORRECT.
11  Q.  AND THE STANDARD WAY OF RESPONDING TO SCIENTIFIC OPINION
12  EXPRESSED IN SCIENTIFIC LITERATURE IS TO RESPOND IN SCIENTIFIC
13  LITERATURE TO THAT PARTICULAR ISSUE RAISED; TRUE?
14  A.  TRUE.
15  Q.  IT IS NOT STANDARD PRACTICE TO RESPOND TO AN OPINION IN A
16  MEDICAL ARTICLE WITH A PRESS RELEASE DISPARAGING AN ARTICLE,
17  TRUE?
18  A.  NO, THAT'S NOT THE USUAL PRACTICE.  I DON'T RECALL WHAT
19  MERCK DID.
20  Q.  IS THAT A PRACTICE YOU ENDORSE?
21  A.  ABSOLUTELY NOT.
22  Q.  THE APPROPRIATE WAY TO RESPOND IS IN THE MEDICAL JOURNAL
23  ITSELF; TRUE?
24  A.  THAT IS AN APPROPRIATE WAY TO RESPOND.
25  Q.  YOU COULD WRITE A LETTER TO THE EDITOR?

## Page 657

1  A.  YES.  CORRECT.
2  Q.  YOU CAN SUBMIT YOUR OWN ARTICLE?
3  A.  CORRECT.
4  Q.  OR YOU CAN PUBLISH A COMPETING ARTICLE IN ANOTHER JOURNAL;
5  RIGHT?
6  A.  CORRECT.
7  Q.  BUT ONE OF THE THINGS THAT YOU THINK WOULD BE UNUSUAL IS
8  TO ISSUE A PRESS RELEASE TO RESPOND TO AN ARTICLE IN THE HAD
9  MEDICAL LITERATURE; TRUE?
10  A.  IT WOULD BE UNUSUAL.
11  Q.  AND JUST NOT RIGHT?
12  A.  IT WOULD BE -- IT'S NOT A STANDARD WAY OF DOING IT.
13  Q.  AND CERTAINLY NOTHING YOU'D ENDORSE?
14  A.  THAT IS CORRECT.
15  Q.  BUT MAY OF 2001, YOU WERE STILL INTERESTED IN A TRIAL TO
16  EVALUATE THE CV SAFETY OF VIOXX; TRUE?
17  A.  THAT IS TRUE.  I CONSTANTLY WANTED TO GARNER ADDITIONAL
18  DATA TO WHAT WE ALREADY HAD TO FURTHER PROVE WHAT WE HAD
19  CONCLUDED.
20  Q.  AND NOBODY HAD COME UP WITH A IDEA BY 2001 OF A CV STUDY
21  THAT COULD BE DONE TO EVALUATE THE CARDIOVASCULAR SAFETY OF
22  VIOXX? THAT'S YOUR TESTIMONY?
23  A.  AS THE DISCUSSIONS EVOLVED, WHAT EVERYBODY FOCUSED ON WAS
24  A STUDY VERSUS PLACEBO, AND NO PLACEBO-CONTROLLED TRIAL HAD YET
25  BE BROUGHT FORTH THAT PEOPLE WERE SATISFIED WITH THE DESIGN ON.

## Page 658

1  Q.  DO YOU REMEMBER THE VALOR TRIAL, SIR?
2  A.  I DON'T REMEMBER THAT NAME, NO.
3  Q.  DR. SCOLNICK, I JUST PASSED YOU OVER WHAT WE MARKED AS
4  EXHIBIT 10 TO YOUR DEPOSITION.  IT'S BATES-STAMPED MRK-ABA
5  0003490 TO 3491.  IT'S A LETTER FROM A CARLO PATRONO; CORRECT?
6  A.  YES, IT'S FROM DR. PATRONO.
7  Q.  HAVE YOU EVER SEEN THIS BEFORE?
8  A.  I DON'T RECALL.
9  Q.  WHO IS DR. BRAUNWALD?
10  A.  DR. BRAUNWALD IS A WELL-KNOWN CARDIOLOGIST AT BRIGHAM
11  HOSPITAL.
12  Q.  HERE IN MASSACHUSETTS?
13  A.  YES.
14  Q.  THAT'S AFFILIATED WITH HARVARD; IS THAT RIGHT?
15  A.  YES.
16  Q.  MERCK WAS SPEAKING TO DR. BRAUNWALD ABOUT RUNNING A VALOR
17  TRIAL; RIGHT?
18  A.  THAT'S WHAT THIS LETTER SUGGESTS.  I REMEMBER
19  DR. BRAUNWALD MAKING SUGGESTIONS, BUT I DON'T RECALL THE
20  DETAILS.
21  Q.  WELL, DO YOU RECALL AT THE END OF 2001 THERE WAS AN
22  INCREASED URGENCY TO DO A CARDIOVASCULAR STUDY; TRUE?
23  A.  THERE WAS, BECAUSE A NUMBER OF PEOPLE, SCIENTISTS AND
24  OTHERS, STILL WERE QUESTIONING WHETHER VIOXX HAD BEEN A
25  CONTRIBUTORY IN THE VIGOR TRIAL AS OPPOSED TO NAPROXEN BEING

DAILY COPY

## Page 659

1  BENEFICIAL.
2  Q.  PEOPLE WERE STILL WORRIED ABOUT WHETHER VIOXX WAS CAUSING
3  CARDIOVASCULAR EVENTS; TRUE?
4  A.  THERE WERE SOME PEOPLE WHO STILL WERE RAISING THAT
5  QUESTION.
6  Q.  I MAY HAVE ASKED YOU THIS, BUT DID YOU RUN THE VALOR
7  TRIAL?
8  A.  NO I DON'T THINK THE VALOR TRIAL WAS RUN.
9  Q.  WHY NOT?
10  A.  I DON'T REMEMBER WHY THE VALOR TRIAL WASN'T RUN.  THIS
11  SOUND LIKE A PRETTY COMPLICATED TRIAL TO ME, AND I DON'T
12  REMEMBER WHY IT WASN'T RUN.
13  Q.  WAS MONEY AN ISSUE?
14  A.  I DON'T REMEMBER WHY THE VALOR TRIAL WASN'T RUN.  AS I
15  SAID, THIS SEEMS LIKE A FAIRLY COMPLICATED PARAGRAPH HERE DR.
16  PATRONO TO DR. BRAUNWALD, SO I'M NOT ABLE TO FIGURE THIS OUT
17  QUICKLY.
18  Q.  DO YOU SEE THE THIRD PARAGRAPH?  IT READS:  "I HAVE
19  SERIOUS RESERVATIONS ABOUT THE ROLE OF THE SPONSOR."  THE
20  SPONSOR WOULD BE MERCK?
21  A.  IF THIS -- YEAH, PRESUMABLY.
22  Q.  "I HAVE SERIOUS RESERVATIONS ABOUT THE ROLE OF THE SPONSOR
23  IN MONITORING AND TERMINATION OF THE STUDY, AS WELL AS IN THE
24  STATISTICAL ANALYSIS OF THE RESULTS."  DO YOU SEE THAT?
25  A.  I DO.

## Page 660

1  Q.  FOLLOWING THE ADVISORY COMMITTEE IN 2001, A SERIES OF
2  NEGOTIATIONS TOOK PLACE WITH FDA CONCERNING THE LABEL FOR
3  VIOXX; RIGHT?
4  A.  YES, A VERY LONG TIME BEFORE WE ACTUALLY GOT A LABEL FROM
5  THEM.
6  Q.  I WANT TO PASS YOU OVER WHAT WE JUST MARKED AS EXHIBIT 11
7  TO YOUR DEPOSITION.  IT'S AN E-MAIL DATED JANUARY 31, 2001,
8  FROM YOU TO MR. GILMARTIN AND MR. ANSTICE.  THE SUBJECT IS
9  "MONDAY MC."  DO YOU SEE THAT?
10  A.  YES.
11  Q.  "MC" REFERS TO MANAGEMENT COMMITTEE?
12  A.  YES.
13  Q.  IT'S BATES-STAMPED MRK-ACR 0008985.  YOU WRITE -- I GUESS
14  IT'S THE SECOND SENTENCE OR SO -- "THE VIGOR MEETING IS NEXT
15  THURSDAY.  ON MONDAY, I WILL SHOW YOU THE ESSENCE, AN UPDATE OF
16  THE DATA, THAT SUPPORTS VIOXX IS SAFE IN THE CV SENSE.  BUT I
17  WANT TO POINT OUT TO ALL OF YOU AT ONE TIME THAT, ONE, THERE IS
18  NO WAY TO PROVE THAT, IN PATIENTS WITH RHEUMATOID ARTHRITIS
19  THAT" -- AND YOU PUT THIS IN ALL CAPS -- ALL OF THE DIFFERENCE
20  BETWEEN VIOXX AND NAPROXEN IS DUE TO THE BENEFIT OF NAPROXEN."
21  DO YOU SEE THAT?
22  A.  I DO.
23  Q.  THEN YOU CONTINUE:  "IT IS IMPOSSIBLE TO PROVE THIS."
24  THAT'S ALL CAPS; RIGHT?
25  A.  YES.

## Page 661

1  Q.  AND YOU CONTINUE FURTHER:  "IT IS IMPOSSIBLE TO KNOW THIS
2  WITH CERTAINTY."  THAT'S WHAT YOU WROTE; RIGHT?
3  A.  I DID.
4  Q.  AND THAT WAS YOUR -- THAT WAS YOUR FEELING AS OF
5  JANUARY 31, 2001?
6  A.  YES.  THAT'S JUST WHAT I'VE JUST TOLD YOU AGAIN.
7  Q.  A WEEK BEFORE THE ADVISORY COMMITTEE?
8  A.  YES.
9  Q.  YOU CONTINUE:  "KNOWING WHAT IS ABOUT TO HAPPEN, MANAGING
10  THE SHORT-TERM FALLOUT AND FACING AND MANAGING ANY LONGER-TERM
11  CONSEQUENCES."  "SHORT-TERM FALL," WHAT ARE YOU THINKING ABOUT
12  THERE?
13  A.  WHEN ALL OF THE DATA IS PRESENTED AGAIN, PEOPLE WILL RAISE
14  QUESTIONS WHETHER WE CAN PROVE THE NEGATIVE COMPLETELY; AND
15  THEREFORE, WE WILL QUESTION WHETHER THEY ARE SHOULD USE VIOXX
16  OR NOT.
17  Q.  "SHORT-TERM FALLOUT" ALSO REFERS TO POTENTIAL IMPACT ON
18  MERCK STOCK; RIGHT?
19  A.  I DON'T KNOW.  I THINK I HAD IN MIND JUST THE EFFECTS ON
20  VIOXX.
21  Q.  WELL, THE EFFECTS OF VIOXX WOULD INCLUDE DECREASED SALES
22  OF VIOXX; TRUE?
23  A.  YES.
24  Q.  WELL, DID YOU THINK THAT NEGATIVE LABELING FOR VIOXX WOULD
25  HAVE AN ADVERSE EFFECT ON VIOXX SALES?

## Page 662

1  A.  CERTAINLY.
2  Q.  DID YOU THINK THAT IF THERE WAS A CV WARNING FOR VIOXX,
3  THAT THAT WOULD HAVE A NEGATIVE EFFECT ON VIOXX SALES?
4  A.  CERTAINLY.  BUT I DIDN'T EXPECT A CV WARNING BASED ON THE
5  DATA.
6  Q.  DID YOU THINK THAT IF THERE WAS A CV WARNING ON VIOXX,
7  THAT WOULD ALSO HAVE AN EFFECT ON MERCK STOCK?
8  A.  CERTAINLY.  BUT AS I'VE SAID, I DID NOT EXPECT A CV
9  WARNING.
10  Q.  AND YOU REALLY THOUGHT IT WAS A CHALLENGE IN YOUR TEAM TO
11  CONVINCE THE FDA AND THE ADVISORY COMMITTEE THAT VIOXX DIDN'T
12  HAVE A CARDIOVASCULAR PROBLEM; TRUE?
13  A.  WE HAD ALL THE DATA WHICH SAID THAT WE DIDN'T HAVE A
14  PROBLEM, AND WE WANTED TO MAKE SURE WE COULD PRESENT ALL THAT
15  DATA, SURE.
16  Q.  BUT IT WASN'T JUST A CHALLENGE; IT WAS ALMOST IMPOSSIBLE;
17  RIGHT?
18  A.  IT WAS IMPOSSIBLE TO PROVE THE NEGATIVE, WHICH I POINTED
19  OUT IN MY E-MAIL NOTE.  IT WAS POSSIBLE TO PRESENT ALL THE DATA
20  WHICH SUPPORTED OUR POSITION.
21  Q.  WELL, THE ADVISORY COMMITTEE WENT WELL FROM YOUR
22  PERSPECTIVE; TRUE?
23  A.  YES.  QUITE WELL.
24  Q.  YOUR TEAM DID A FANTASTIC JOB; TRUE?
25  A.  YES.

## Page 663

1  Q.  AND THEY MADE THE FDA LOOK LIKE GRADE D HIGH SCHOOL
2  STUDENTS; ISN'T THAT WHAT YOU SAID?
3  A.  I DID IN AN E-MAIL NOTE, YES.  I REGRET THOSE WORDS, BUT
4  WE DID A GOOD JOB.
5  Q.  YOU MEANT THEM WHEN YOU WROTE IT?
6  A.  IT WAS -- I MEANT THEM.  IT WAS AN ALLUSION TO SOMETHING
7  THAT HAPPENED A FEW YEARS, BUT I DID WRITE THOSE WORDS.
8  Q.  THIS IS THE SAME FDA THAT YOU RESPECT?
9  A.  YES.
10  Q.  THIS IS THE SAME FDA THAT'S RESPONSIBLE FOR THE PUBLIC
11  SAFETY?
12  A.  THAT'S CORRECT.
13  Q.  THIS IS THE SAME FDA THAT'S RESPONSIBLE FOR EVALUATING THE
14  CARDIOVASCULAR DATA CONCERNING YOUR DRUG?
15  A.  YES.
16  Q.  AND YOU WERE PROUD THAT YOUR TEAM MADE THE FDA LOOK LIKE
17  GRADE D HIGH SCHOOL STUDENTS; TRUE?
18  A.  I WROTE THOSE WORDS.  I REGRET THE CHOICE OF WORDS.  I
19  WROTE THOSE WORDS.
20  Q.  LET'S MARK AS EXHIBIT 12, I THINK THE E-MAIL YOU WERE
21  REFERRING TO, SIR.
22  A.  YES.
23  Q.  DR. SCOLNICK, I JUST PASSED YOU OVER EXHIBIT 12 TO YOUR
24  DEPOSITION.  IT'S AN E-MAIL -- OR TWO E-MAILS, THE EARLIEST OF
25  WHICH IS AN E-MAIL FROM YOU TO SEVERAL FOLKS.  "SUBJECT:

## Page 664

1  TODAY."  IT'S BATES-STAMPED MRK-ACT 0018064.  IT'S DATED
2  THURSDAY, FEBRUARY 8, 2001, 9:10 P.M. IS THE TIME.  DO YOU SEE
3  THAT?
4  A.  YES, I DO.
5  Q.  YOU WROTE THIS THE DAY OF THE FEBRUARY 2001 ADVISORY
6  COMMITTEE?
7  A.  I DON'T REMEMBER THE DATE OF THE MEETING.
8  Q.  YOU WROTE:  "TO ALL." --
9  A.  IT LOOKS LIKE IT'S THE SAME DAY.
10  Q.  "TO ALL:  I BIT MY NAILS ALL DAY."  YOU'RE REFERRING TO
11  YOU LISTENING TO THE ADVISORY COMMITTEE?
12  A.  EITHER LISTENING OR BEING THERE.  I DON'T REMEMBER WHETHER
13  I WAS THERE OR I VIEWED IT.
14  Q.  IF YOU DIDN'T GO, YOU DID LISTEN?
15  A.  YES.
16  Q.  OKAY.  YOU SAID, "YOU WERE ALL FANTASTIC."  YOU WROTE THAT
17  IN ALL CAPS; RIGHT?
18  A.  YES.
19  Q.  YOU THEN WROTE THAT "YOU MADE THEM LOOK LIKE GRADE D HIGH
20  SCHOOL STUDENTS"; RIGHT?
21  A.  THAT'S WHAT THE MEMO SAYS.
22  Q.  YOU SAY, "AND YOU WON BIG, HUGE, AND COMPLETELY"; TRUE?
23  A.  THAT'S WHAT I SAID.
24  Q.  YOU WROTE THAT?
25  A.  YES.

## Page 665

1  Q.  YOU NOTE AT THE END OF THIS THAT YOUR TEAM "SHOULD ENJOY
2  AND BASK IN THE WARMTH OF HAVING DONE AN IMPOSSIBLE JOB
3  SUPERBLY"; IS THAT RIGHT?
4  A.  THAT'S WHAT I WROTE.
5  Q.  YOU AGREE IT'S NOT VERY FLATTERING TO REFER TO THE AGENCY
6  RESPONSIBLE FOR PROTECTING THE PUBLIC HEALTH, AS IT RELATES TO
7  DRUGS, AS GRADE D HIGH SCHOOL STUDENTS?
8  A.  NO, IT'S NOT FLATTERING.  AS I SAID, IT CAME FROM AN
9  ALLUSION TO AN EARLIER EVENT RELATED TO THE CRUX OF AN ADVISORY
10  MEETING, AND IT WAS INAPPROPRIATE IN THIS CONTEXT.
11  Q.  SO AFTER THE ADVISORY COMMITTEE MEETING IN FEBRUARY OF
12  2001, YOU GOT A LETTER FROM THE FDA SAYING THAT THEY WERE
13  CONDITIONALLY APPROVING MERCK'S SUPPLEMENTAL NEW DRUG
14  APPLICATION; RIGHT?
15  A.  AT SOME POINT WE GOT A LETTER BACK FROM THEM, YES.
16  Q.  YOU DIDN'T LIKE THE TONE OF THE LETTER, THOUGH, DID YOU?
17  A.  WE DIDN'T LIKE THE TONE, AND WE DIDN'T LIKE THE CONTENT.
18  AS I SAID EARLIER, THEY IGNORED ALL THE GI DATA.  THEY
19  COMPLETELY LEFT IT OUT.  THEY LEFT OUT THE ALZHEIMER'S DATA.
20  AND THEY HAD A WARNING DESPITE WHAT HAD HAPPENED AT THE
21  ADVISORY COMMITTEE WHERE NO WARNING WAS SUGGESTED, BASED ON ALL
22  THE DATA, OR VOTED FOR.
23       THE COURT:  WHEN YOU GET TO A BREAKING POINT.  I
24  DON'T KNOW WHETHER THIS IS IT.
25       MR. ROBINSON:  THIS IS PROBABLY A GOOD TIME,

## Page 666

1  YOUR HONOR.
2       THE COURT:  OKAY.  LET'S TAKE A 15-MINUTE BREAK AT
3  THIS TIME.  THE COURT WILL STAND IN RECESS.
4       THE DEPUTY CLERK:  EVERYONE RISE.
5       (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
6       THE DEPUTY CLERK:  EVERYONE RISE.
7       THE COURT:  BE SEATED, PLEASE.  OKAY.  MEMBERS OF THE
8  JURY, THIS IS THE LAST STRETCH.  WE'LL GO TO ABOUT A LITTLE
9  AFTER 5:00, 5:30.
10  BY MR. ROBINSON:
11  Q.  FOR THE RECORD, DR. SCOLNICK, I'VE JUST PASSED YOU WHAT
12  WE'VE MARKED AS EXHIBIT 13 TO YOUR DEPOSITION.  IT'S A TWO-PAGE
13  SERIES OF E-MAILS BATES-STAMPED MRK-ACR0009151 TO 9152.
14       DOCTOR, YOU ARE, IN FACT, AN AUTHOR AND RECIPIENT ON
15  SEVERAL OF THESE E-MAILS; TRUE?  YOU DIDN'T LIKE THE TONE OF
16  THE APPROVAL LETTER THAT YOU GOT FROM MERCK'S SUPPLEMENTAL NDA;
17  TRUE?
18  A.  THAT'S CORRECT.  I DON'T REMEMBER WHAT WAS IN IT AT THIS
19  POINT, SO IT'S VERY HARD TO RESPOND TO YOUR QUESTION.
20  Q.  I'LL JUST READ THE FIRST SENTENCE:  "TO ALL.  I AM SURE
21  YOU IMAGE MY REACTION TO THE TONE OF THE LETTER.  THE
22  OPEN-ENDED REQUEST FOR SAFETY UPDATES IS A FILIBUSTER.  DO YOU
23  SEE THAT?
24  A.  YES.
25  Q.  WHAT'S A FILIBUSTER?

DAILY COPY

## Page 667

1    A.  IT'S A DELAYING TACTIC.

2    Q.  SO YOU THOUGHT THE FDA WAS TRYING TO DELAY APPROVAL OF

3    YOUR SUPPLEMENTAL MGDA REQUEST TO GET SAFETY INFORMATION?

4    A.  THAT'S WHAT I WROTE.

5    Q.  YOU VIEWED THIS AS A DELAY TACTIC BY THE FDA; IS THAT YOUR

6    TESTIMONY?

7    A.  THAT'S WHAT I WAS WORRIED ABOUT.

8    Q.  OKAY.  THEN YOU STATE:  "WHEN WILL YOU FIND OUT WHAT THEY

9    HAVE DONE FOR OUR COMPETITOR?  IF BY ANY CHANCE THEY GET A

10   BETTER LABEL NOW AND WE ARE ASKED FOR THIS MUCH MORE DATA, I

11   WILL BE IN JANET'S OFFICE THE NEXT DAY."  DO YOU SEE THAT?

12   A.  YES.

13   Q.  YOUR COMPETITOR WOULD BE CELEBREX?

14   A.  YES.

15   Q.  THE MANUFACTURER OF CELEBREX?

16   A.  YES.

17   Q.  OKAY.  YOU WERE CONCERNED THAT THE MANUFACTURERS OF

18   CELEBREX WERE GOING TO GET AN APPROVED LABEL BEFORE VIOXX WAS

19   GOING TO GET AN APPROVED LABEL?

20   A.  FOR GI OUTCOMES, YES.  THAT'S WHAT I THINK I WAS CONCERNED

21   ABOUT.

22   Q.  AND, IF THAT HAPPENED, YOU WERE GOING TO GO DOWN THERE TO

23   THE FDA AND SEE JANET THE NEXT DAY; IS THAT RIGHT?

24   A.  THAT IS WHAT I SAID IN THE MEMO.

25   Q.  WHO IS JANET?

## Page 668

1    A.  JANET WAS JANET WOODCOCK, WHO WAS, I BELIEVE, THE HEAD OF

2    THE DRUG PART OF THE FDA.

3    Q.  SO YOU FELT YOU COULD GO DOWN THERE TO JANET'S OFFICE AND

4    YOU COULD TELL HER TO STRAIGHTEN THINGS OUT AND MAKE SURE THAT

5    MERCK'S LABEL GOT APPROVED ON THE TERMS YOU WANTED IT APPROVED

6    ON?

7    A.  I DON'T KNOW EXACTLY WHAT I WAS THINKING.  I CERTAINLY

8    WANTED TO ADVOCATE ON MERCK'S BEHALF IF THIS WERE TO HAPPEN.

9    THAT'S WHAT THIS MEMO SAYS.

10   Q.  SIR, IS THAT THE WAY IT'S SUPPOSED TO WORK:  WHEN YOU WANT

11   TO ADDRESS A LABELING REQUEST WITH THE FDA, YOU GO DOWN AND YOU

12   GO INTO JANET WOODCOCK'S OFFICE TO ADDRESS IT?

13   A.  THE HEAD OF THE DRUG OFFICE CAN BE INVOLVED IN THE LABEL

14   NEGOTIATIONS.

15   Q.  IS THIS WHO JANET WOODCOCK WAS?

16   A.  I BELIEVE AT THE TIME SHE WAS HEAD OF THE DRUG APPROVAL

17   PART OF THE FDA, AS OPPOSED TO VACCINES AND OTHER PARTS OF THE

18   FDA.  I BELIEVE, BUT I'M NOT CERTAIN.

19   Q.  SO, IN OTHER WORDS, IF THE FDA, PER CHANCE, DECIDED TO

20   GIVE THE CELEBREX MANUFACTURERS THE LABEL THEY HAD SOUGHT

21   BEFORE YOU GOT IT, YOU WERE GOING TO GO DOWN TO THE -- WHAT'S

22   THIS, THE HEAD OF DRUG APPROVAL AND COMPLAIN?  IS THAT YOUR

23   TESTIMONY?

24   A.  THAT WAS -- THAT'S WHAT THIS NOTE IMPLIES.

25   Q.  YOU SAID THAT YOU WEREN'T JUST GOING TO STOP WITH JANET;

## Page 669

1    RIGHT?

2    A.  THAT'S WHAT THIS SAYS.

3    Q.  YOU SAID YOU'D GO BEYOND, IF YOU NEEDED TO, WITH OTHER

4    CONTACTS YOU'D MADE IN HHS; RIGHT?

5    A.  THAT'S WHAT THIS SAYS.

6    Q.  SO YOU'D GO OVER JANET'S HEAD, IF YOU NEEDED TO?

7    A.  IN ORDER TO MAKE SCIENTIFIC POINTS WHICH I FELT STRONGLY

8    ABOUT.

9    Q.  I UNDERSTAND.  IF YOU FELT STRONGLY, AND JANET THE DIDN'T

10   GIVE YOU THE ANSWERS YOU WANTED, YOU WOULD GO ABOVE JANET'S

11   HEAD; RIGHT --

12   A.  BASED OUR -- PARTICULARLY, I THINK, TALKING ABOUT THE GI

13   LABELING OF THE DRUG.  WE HAD PRISTINE DATA ABOUT THE GI

14   SAFETY -- THE IMPROVED GI SAFETY OF VIOXX WHICH HAD NOT BEEN

15   ACKNOWLEDGED IN THE APPROVABLE LETTER, TO THE BEST OF MY

16   KNOWLEDGE.

17   Q.  I SEE THE LAST SENTENCE HERE, YOU SAY, "I'VE NEVER SEEN

18   BEING NICE TO THE FDA, EXCEPT ON RARE OCCASIONS, PAY OFF."  YOU

19   WROTE THAT?

20   A.  YES.

21   Q.  YOU MEANT IT?

22   A.  YES.

23   Q.  IT'S A TRUE STATEMENT?

24   A.  IT WAS MY FEELING.

25   Q.  A TRUE STATEMENT WHEN YOU WROTE IT, SIR?

## Page 670

1    A.  IT IS MY FEELING WHEN I WROTE IT.

2    Q.  OKAY.  THEN YOU SAY, ONE CANNOT DEAL WITH THEM IN A

3    RATIONAL WAY; RIGHT?

4    A.  THAT'S WHAT I SAID.

5    Q.  AND "RATIONAL WAY" WAS YOUR WAY; RIGHT?

6    A.  NO.  RATIONAL WAY WAS THE WAY WE HAD BEEN TRYING TO DEAL

7    WITH THEM WHEN WE SUBMITTED THE SUPPLEMENTAL NDA, WITH ALL OF

8    THE DATA THAT WAS SUPPORTED AT THE ADVISORY COMMITTEE MEETING.

9    Q.  RIGHT.  TO BE CLEAR, WHAT THE FDA WAS ASKING FOR WAS

10   ADDITIONAL SAFETY INFORMATION IN THEIR APPROVAL LETTER; TRUE?

11   A.  THAT'S WHAT THE MEMO IMPLIES.  I DO NOT KNOW NOR RECALL

12   WHAT WAS IN THAT REQUEST.

13   Q.  THE BOTTOM LINE IS THAT THE FDA, LOOKING FOR ADDITIONAL

14   DATA ON VIOXX, IN CONNECTION WITH YOUR SUPPLEMENTAL NDA

15   REQUEST, JEOPARDIZED YOUR ABILITY TO GET THE LABEL YOU WANTED

16   IN THE MARKETPLACE; TRUE?

17   A.  THEY WERE RETARDING THE PROCESS, IN MY OPINION.

18   Q.  AND YOU NEEDED THAT PROCESS TO MOVE QUICKLY; RIGHT?

19   A.  THAT WAS OUR GOAL.  WE WANTED IT TO MOVE QUICKLY.  WE HAD

20   SUBMITTED OUR APPLICATION VERY QUICKLY, AND IT STILL HAD BEEN

21   ALMOST A YEAR AFTER THE APPLICATION WAS SUBMITTED, AND WE

22   DIDN'T YET HAVE A LABEL BACK.

23   Q.  BECAUSE YOU WERE CONCERNED THAT, IN A COX-2 MARKET, THE

24   DRUG WITH THE BETTER LABEL WOULD SELL MORE DRUG; TRUE?

25   A.  WELL, WE HAD SUBSTANTIALLY BETTER GASTROINTESTINAL SAFETY

55  (Pages 667 to 670)

## Page 671

1 DATA THAN OUR COMPETITOR, AND I WANTED THAT TO BE REPRESENTED
2 IN OUR LABEL.
3 Q. YOU WERE CONCERNED THAT IN THE COX-2 MARKET, THE COMPANY
4 THAT HAD THE BETTER LABEL FOR ITS DRUG, WOULD SELL MORE OF THAT
5 DRUG; TRUE?
6 A. TRUE, IF THE DATA SUPPORTED THAT.
7 Q. YOU DID GET A LABEL AT SOME POINT IN TIME IN CONNECTION
8 WITH YOUR SUPPLEMENTAL NEW DRUG APPLICATION FOR VIOXX; TRUE?
9 A. YES.
10 Q. YOU GOT THAT IN THE FALL OF 2001?
11 A. I DON'T RECALL THE EXACT DATE. IT WAS AFTER -- CERTAINLY
12 AFTER THIS IN 2001.
13 Q. HAD A CV WARNING?
14 A. YES.
15 Q. "CV" MEANS CARDIOVASCULAR; RIGHT?
16 A. YES.
17 Q. OKAY. IN THE WARNINGS SECTION OF THE LABEL?
18 A. YES.
19 Q. AND THE LABEL YOU GOT FROM THE FDA HAD A CARDIOVASCULAR
20 WARNING IN THE WARNINGS SECTION; TRUE?
21 A. I BELIEVE SO.
22 Q. YOU THOUGHT IT WAS UGLY?
23 A. I DID.
24 Q. YOU THOUGHT IT WAS UGLY CUBED?
25 A. I DID.

## Page 672

1 Q. THAT'S UGLY TIMES UGLY TIMES UGLY; RIGHT?
2 A. "UGLY CUBED" IS EXACTLY WHAT YOU'VE STATED.
3 Q. AND UGLY IS THREE TIMES OVER; RIGHT?
4 A. RIGHT.
5 Q. SIR, I'M GOING TO PASS OVER WHAT WE'VE JUST MARKED AS
6 EXHIBIT 14 TO YOUR DEPOSITION. IT IS A SERIES OF E-MAILS,
7 THREE OF THEM IN PARTICULAR, FROM OCTOBER 2001. FOR THE
8 RECORD, IT IS BATES-STAMPED MRK-ABW0004799.
9     SIR, YOU'VE SEEN THIS DOCUMENT BEFORE; RIGHT?
10 A. YES, I HAVE.
11 Q. IT IS FROM OCTOBER 15, 2001?
12 A. YES.
13 Q. YOU SAID --
14 A. OCTOBER 16.
15 Q. YOU SAID, "DAVID." THAT'S DAVID ANSTICE; RIGHT?
16 A. YES.
17 Q. HE'S THE PRESIDENT OF THE U.S. HUMAN HEALTH?
18 A. YES.
19 Q. THAT WAS THE GROUP WITHIN MERCK RESPONSIBLE FOR ALL THE
20 MARKETING OF VIOXX?
21 A. THE DOMESTIC MARKETING OF VIOXX.
22 Q. YOU TOLD HIM, "BE ASSURED, WE WILL NOT ACCEPT THIS LABEL";
23 RIGHT?
24 A. THAT'S WHAT MY MEMO SAYS.
25 Q. OKAY. DAVID WAS CONCERNED ABOUT THIS LABEL; RIGHT?

## Page 673

1 A. YES.
2 Q. YOU THOUGHT IT PUT YOU AT A COMPETITIVE DISADVANTAGE;
3 RIGHT?
4 A. YES. AND IT DIDN'T ACCURATELY REFLECT OUR DATA.
5 Q. AND YOU WERE TELLING DAVID THAT "I'M GOING TO DO WHAT I
6 CAN TO MAKE SURE WE DON'T GET THAT LABEL"; RIGHT?
7 A. YES.
8 Q. I'M GOING TO DO WHAT I CAN TO MAKE SURE THERE'S NO CV
9 WARNING IN THE VIOXX LABEL; RIGHT?
10 A. THAT ISN'T WHAT THIS SAYS. IT SAYS, "WE WILL NOT ACCEPT
11 THIS LABEL, AND IF WE NEED TO, WE WILL GO TO AN ADVISORY
12 COMMITTEE MEETING TO GET THEM TO REVIEW WHAT OUR LABEL SHOULD
13 LOOK LIKE," A SCIENTIFIC PROCESS TO RESOLVE POTENTIAL -- A
14 POTENTIAL DISAGREEMENT BETWEEN THE FDA AND MERCK.
15 Q. SO YOU REJECTED THE LABEL YOU GOT FROM THE FDA THAT HAD
16 THE CV WARNING; TRUE?
17 A. TRUE. WE REJECTED THIS LABEL IN ITS TOTALITY. IT HAD A
18 CV WARNING, AND IT IGNORED THE GI DATA THAT WE HAD GARNERED IN
19 VIGOR.
20 Q. AND DAVID RESPONDED TO YOU, "WE KNEW IT WOULD BE UGLY, AND
21 IT IS." IS THAT RIGHT?
22 A. YES.
23 Q. HE ALSO SAID, "WE'LL FIGHT BACK AND SEE WHERE WE GET";
24 RIGHT?
25 A. YES, THAT'S WHAT HE SAID.

## Page 674

1 Q. AND HE AGAIN SAID, "WE'LL ASK FOR ADVISORY COMMITTEE IF WE
2 CAN'T MAKE HEADWAY WITH THE FDA"; RIGHT?
3 A. THAT'S WHAT HE SAID.
4 Q. YOU THEN SAY HERE IN THE FINAL ONE, YOUR FINAL E-MAIL FROM
5 OCTOBER 16, 2001, "IT'S UGLY CUBED." RIGHT?
6 A. YES.
7 Q. YOU SAY "THYE" -- THAT SHOULD BE "THEY"; RIGHT?
8 A. YES.
9 Q. "THEY ARE BASTARDS"; TRUE?
10 A. THAT'S WHAT THE E-MAIL SAYS.
11 Q. THAT'S WHAT YOU WROTE?
12 A. THAT'S WHAT I WROTE.
13 Q. YOU MEANT IT WHEN YOU WROTE IT?
14 A. I WAS VERY UPSET WHEN I WROTE THE E-MAIL.
15 Q. SO THIS PARTICULAR GROUP WITHIN THE FDA WAS DEVIOUS AND
16 ANTAGONISTIC; TRUE?
17 A. THAT'S WHAT I WROTE.
18 Q. THEY WERE BASTARDS?
19 A. THAT REFLECTED MY EMOTIONAL UNHAPPINESS WITH THEIR LABEL.
20 Q. THEY HAD THE ABILITY OF GRADE D HIGH SCHOOL STUDENTS;
21 TRUE?
22 A. THAT'S WHAT I WROTE.
23 Q. AND IF YOU WANTED TO GET ANYTHING DONE WITH THEM, YOU
24 COULDN'T TREAT THEM WITH RESPECT? TRUE?
25 A. I WROTE ALL OF THESE THINGS, AND I FELT THAT WE WERE NOT

DAILY COPY

## Page 675

1 GETTING A FAIR PROCESS FROM THIS DIVISION.
2 Q. THE FDA WAS PRETTY INSISTENT THIS DRUG NEEDED A CARDIAC
3 WARNING, WEREN'T THEY?
4 A. THEY PRESENTED THIS LABEL TO US, SO THEY MUST HAVE FELT
5 THAT WAY. THIS DIVISION FELT THAT WAY.
6 Q. YOU TOOK FROM THAT THAT THE FDA, AT LEAST, WAS CONCERNED
7 ABOUT THE POTENTIAL CARDIOVASCULAR IMPLICATIONS OF YOUR DRUG;
8 TRUE?
9 A. YES.
10 Q. AND THEY WANTED TO WARN THE AMERICAN PUBLIC ABOUT THE
11 POTENTIAL CARDIOVASCULAR IMPLICATIONS OF VIOXX; TRUE?
12 A. YES. DESPITE THE ADVISORY COMMITTEE MEETING WHICH HAD NOT
13 FELT THAT WAY.
14 Q. DR. SCOLNICK, I JUST PASSED YOU WHAT WE MARKED AS
15 EXHIBIT 15 TO YOUR DEPOSITION. IT'S A THREE E-MAIL SEQUENCE
16 FROM NOVEMBER 8, 2001. THE SUBJECT HERE SAYS, "HISTORY
17 LESSON." DO YOU SEE THAT?
18 A. UH-HUH. YES, I DO.
19 Q. IT'S A EXCHANGE BETWEEN -- INITIALLY FROM YOU TO DOUG
20 GREENE, AND BONNIE GOLDMAN; TRUE?
21 A. YES.
22 Q. YOU SAID, "DOUG AND BONNIE, TWICE IN MY LIFE I'VE HAD TO
23 SAY TO FDA, 'THAT LABEL IS UNACCEPTABLE. WE WILL, NOT UNDER
24 ANY CIRCUMSTANCES, ACCEPT IT.'" DO YOU SEE THAT?
25 A. YES, I DO.

## Page 676

1 Q. YOU CONTINUE THERE AND YOU SAY, "YOU WILL" -- IN ALL CAPS,
2 "WILL" -- "HAVE TO DO THAT ON THE CARDIAC WARNING FOR VIOXX. I
3 ASSURE YOU THAT YOU WILL." THAT'S WHAT YOU WROTE; RIGHT?
4 A. I DID.
5 Q. THE PARAGRAPH CONTINUES, WHERE I WAS BEFORE, "YOU WILL" --
6 IN ALL CAPS, "WILL" -- "HAVE TO DO THAT ON THE CARDIAC WARNING
7 FOR VIOXX. I ASSURE YOU THAT YOU WILL." DID I READ THAT
8 RIGHT?
9 A. YES, YOU DID.
10 Q. YOU PUT "WILL" IN EMPHASIS TO THESE PEOPLE; RIGHT?
11 A. YES, I DID.
12 Q. AND THESE WERE THE PEOPLE WHO WERE DEALING WITH THE FDA IN
13 CONNECTION WITH THE LABEL NEGOTIATIONS; RIGHT?
14 A. YES.
15 Q. YOU TOLD THEM, "AND I ASSURE YOU, I WILL NOT -- AND AGAIN,
16 IN ALL CAPS, "NOT" -- "SIGN OFF ON ANY LABEL THAT HAD A CARDIAC
17 WARNING"; TRUE?
18 A. THAT'S WHAT THE E-MAIL SAYS.
19 Q. SO YOU NEGOTIATED WITH THE FDA OVER THIS LABEL CONCERNING
20 CARDIAC AND GI WARNINGS FROM OCTOBER OF 2001 UNTIL APRIL OF
21 2002; TRUE?
22 A. THAT'S CORRECT. BECAUSE WE BELIEVED THAT THE DRUG DID NOT
23 JUSTIFY HAVING A CARDIAC WARNING BASED ON OUR DATA.
24 Q. DOES THE DRUG JUSTIFY A CARDIAC WARNING TODAY?
25 A. NO.

## Page 677

1 Q. IT DOESN'T?
2 A. IT DOES NOT JUSTIFY A CARDIAC WARNING BASED ON THIS DATA.
3 AND THE NEW DATA THAT YOU'RE REFERRING TO IS IN VERY
4 DIFFERENT CONTEXT AND COMPLETELY CONSISTENT WITH ALL THE DATA
5 WE HAD HERE. WE DIDN'T BELIEVE IT JUSTIFIED A WARNING.
6 Q. DOCTOR, I PASSED YOU OVER WHAT WE'VE MARKED AS EXHIBIT 16
7 TO YOUR DEPOSITION. IT IS A RELATIVELY BRIEF E-MAIL,
8 BATES-STAMPED MRK-ACR0009297, DATED FEBRUARY 25, 2002, FROM
9 YOU, AGAIN, TO THE SAME TEAM OF PEOPLE WORKING ON THE
10 NEGOTIATIONS OVER THE VIOXX LABEL; TRUE?
11 A. YES.
12 Q. AND YOU WROTE, "TO ALL: "IF YOU CAN GET THIS LABEL, IT
13 WILL BE AN AL MICHAELS QUOTE: "DO YOU BELIEVE IN MIRACLES?"
14 WHAT ARE YOU REFERRING TO THERE?
15 A. I'M REFERRING TO AL MICHAELS QUOTE WHEN THE U.S. OLYMPIC
16 PEOPLE BEAT THE RUSSIANS IN WHATEVER YEAR IT WAS IN ICE HOCKEY.
17 Q. THAT WAS AN IMPOSSIBLE TASK; RIGHT?
18 A. IT CERTAINLY APPEARED TO BE.
19 Q. SIR, PASSING OVER WHAT WE JUST MARKED AS EXHIBIT-18 TO
20 YOUR DEPOSITION. FOR THE RECORD, IT'S A JANUARY 28, 2001,
21 E-MAIL FROM YOURSELF TO EVE SLATER. OKAY. DO YOU SEE YOUR
22 E-MAIL AT THE TOP?
23 A. YES, I DO.
24 Q. THEN YOU CONTINUE: "THIS FRIES INCIDENT IS A DISASTER FOR
25 MERCK." DO YOU SEE THAT?

## Page 678

1 A. YES, I DO.
2 Q. YOU BELIEVED THAT AT THE TIME?
3 A. I DID.
4 Q. THEN YOU CONTINUED: "WORSE THAN VIGOR RESULTS
5 THEMSELVES." DO YOU SEE THAT?
6 A. YES.
7 Q. THE VIGOR RESULTS WERE ALSO A DISAPPOINTMENT FOR MERCK;
8 TRUE?
9 MR. ROBINSON: CAN WE BACK IT UP, THE LAST QUESTION?
10 (WHEREUPON, THERE WAS A CONFERENCE AT THE BENCH
11 OUTSIDE THE PRESENCE OF THE COURT REPORTER.)
12 THE COURT: OKAY. LET'S GO.
13 BY MR. ROBINSON:
14 Q. OKAY. DO YOU SEE YOUR E-MAIL AT THE TOP?
15 A. YES, I DO.
16 Q. THEN YOU CONTINUE: "THIS FRIES INCIDENT IS A DISASTER FOR
17 MERCK." DO YOU SEE THAT?
18 A. YES, I DO.
19 Q. YOU WROTE THAT?
20 A. I DID.
21 Q. YOU BELIEVED IT AT THE TIME?
22 A. I DID.
23 Q. THEN YOU CONTINUED: "WORSE THAN VIGOR RESULTS
24 THEMSELVES." DO YOU SEE THAT?
25 A. YES.

57 (Pages 675 to 678)

DAILY COPY

## Page 679

1  Q. THE VIGOR RESULTS WERE ALSO A DISAPPOINTMENT FOR MERCK;
2  TRUE?
3  A. SOME OF THEM WERE SURPRISING, AS YOU KNOW, AND SOME OF
4  THEM WERE EXCELLENT.
5  Q. OKAY. AND THE ONES THAT WERE SURPRISING WERE THE
6  CARDIOVASCULAR EFFECTS OF VIOXX; TRUE?
7  A. THE DIFFERENCE BETWEEN NAPROXEN AND VIOXX WAS SURPRISING
8  IN THE VIGOR RESULTS.
9  Q. WELL, YOU SAID, "WORSE THAN VIGOR RESULTS THEMSELVES."
10  THAT'S WHAT YOU WROTE; RIGHT, SIR?
11  A. I DID.
12  Q. YOU WERE IMPLYING THAT THE VIGOR RESULTS WERE
13  DISAPPOINTING IN SOME WAY; TRUE?
14  A. I WAS IMPLYING THAT THE DIFFERENCE BETWEEN THE VIOXX AND
15  NAPROXEN ARMS WERE SURPRISING AND CREATED AN ISSUE WHICH WE HAD
16  DEALT WITH AND CAME UP WITH WHAT WE THOUGHT WAS THE BEST
17  EXPLANATION BASED ON ALL OF THE OTHER DATA.
18  Q. WELL, SIR, YOU DIDN'T WRITE "MORE SURPRISING THAN THE
19  VIGOR RESULTS THEMSELVES" WHEN YOU WROTE THIS E-MAIL, DID YOU?
20  A. NO, I DID NOT.
21  Q. YOU WROTE "WORSE THAN VIGOR RESULTS"?
22  A. THAT'S WHAT I WROTE. IT'S A VERY SHORT E-MAIL. THAT'S
23  WHAT I WROTE.
24  Q. I UNDERSTAND. YOU'D AGREE WITH ME, SIR, WOULDN'T YOU,
25  THAT IF YOU WERE WRONG IN YOUR FINAL CONCLUSION ABOUT VIOXX,

## Page 680

1  AND THE PROBLEM WAS MECHANISM-BASED, THAT THERE COULD HAVE BEEN
2  HORRIBLE PUBLIC HEALTH CONSEQUENCES TO THE FOLKS WHO WERE
3  TAKING VIOXX IN THE GENERAL POPULATION; TRUE?
4  A. IF WE HAD BEEN WRONG, THERE WOULD HAVE BEEN NEGATIVE
5  CONSEQUENCES FOR PUBLIC HEALTH, YES.
6  Q. TENS OF THOUSANDS OF PEOPLE IN THE GENERAL POPULATION
7  TAKING VIOXX COULD HAVE SUFFERED HEART ATTACKS AS A RESULT OF
8  YOUR DRUG; TRUE?
9  A. IF WE HAD BEEN WRONG, THERE WOULD HAVE BEEN NEGATIVE
10  CONSEQUENCES FOR PUBLIC HEALTH. WE DID NOT BELIEVE WE WERE
11  WRONG. I'VE READ NEWSPAPER REPORTS OF THOSE. I DO NOT HAVE
12  ANY INDEPENDENT WAY OF ASSESSING THAT EVIDENCE OR THE VALIDITY
13  OF THOSE REPORTS.
14  Q. WELL, YOU'VE SEEN THE FDA REPORTS AS WELL; RIGHT?
15  A. I'VE SEEN NEWSPAPER REPORTS OF THE FDA, REPORTS OF
16  INCIDENCES IN TRIALS. I DON'T UNDERSTAND THE CALCULATIONS MADE
17  FROM THOSE BASED ON THE DATA I'VE SEEN.
18  Q. MERCK HAS THE SKILLED EMPLOYEES NECESSARY TO ESTIMATE WHAT
19  THE PUBLIC HEALTH CONSEQUENCES COULD BE OF A DRUG THAT IT MADE
20  THAT CAUSED CARDIOVASCULAR SIDE EFFECTS; TRUE?
21  A. MERCK CAN ESTIMATE WHAT THE CONSEQUENCES WOULD BE IF THE
22  DRUG WERE THOUGHT BY MERCK TO CAUSE CARDIOVASCULAR
23  CONSEQUENCES.
24  Q. AND IN MARCH OF 2000, NO SUCH ANALYSIS WAS DONE?
25  A. CORRECT. BECAUSE WE DIDN'T BELIEVE THE DRUG CAUSED THOSE

## Page 681

1  EVENTS.
2  Q. YOU AGREE WITH THE DECISION BY MERCK NOT TO ANALYZE THE
3  POTENTIAL PUBLIC HEALTH CONSEQUENCES, TO CONTINUING TO SELL
4  VIOXX IN MARCH OF 2000?
5  A. YES, I DO, BECAUSE WE BELIEVED THE DRUG WAS SAFE.
6  Q. SIR, I JUST PASSED YOU A DOCUMENT WE MARKED AS EXHIBIT 19
7  TO YOUR DEPOSITION. FOR THE RECORD, IT'S A DOCUMENT BY
8  DEBORAH SHAPIRO. WHO IS DEBORAH SHAPIRO?
9  A. DEBORAH SHAPIRO WAS A STATISTICIAN IN THE MERCK RESEARCH
10  LABORATORIES.
11  Q. SHE WAS THE UNBLINDED STATISTICIAN IN THE VIGOR TRIAL;
12  RIGHT?
13  A. YES, SHE WAS.
14  Q. SHE'S THE STATISTICIAN YOU CONTACTED TO GET AN EARLY LOOK
15  AT THE VIGOR DATA; RIGHT?
16  A. TO LOOK AT THE DATA FIRST WHEN THE TRIAL IS COMPLETED,
17  THAT IS CORRECT.
18  Q. FOR THE RECORD, THE DOCUMENT IS ENTITLED "VIOXX
19  PRELIMINARY CARDIOVASCULAR META-ANALYSIS," AND IT'S
20  BATES-STAMPED MRK-NJ0070364 THROUGH 397.
21      SO YOUR TESTIMONY IS THAT THE COMPANY CONDUCTED A
22  META-ANALYSIS PREAPPROVAL. THAT WAS THE FIRST TIME; RIGHT?
23  A. YES.
24  Q. IN MARCH OF 2000; RIGHT?
25  A. YES.

## Page 682

1  Q. AND THEN AGAIN IN OCTOBER OF 2000; CORRECT?
2  A. AS I SAID, I DON'T REMEMBER THE DATES OF ALL THE OTHER
3  META-ANALYSES.
4
5  Q. OKAY. I WOULD LIKE TO DIRECT YOUR ATTENTION TO PAGE
6  NJ0070394.
7  A. YES.
8  Q. THIS IS A "META-ANALYSIS" THAT DESCRIBES THE "RELATIVE
9  RISK OF MIS," THAT'S HEART ATTACKS?
10  A. YES.
11  Q. THE "MI ENDPOINT WITH 95% CI." WHAT'S "CI" MEAN?
12
13  A. CONFIDENCE INTERVAL.
14  Q. WHAT DOES CONFIDENCE INTERVAL REPRESENT, SIR?
15  A. IT'S A TERM THAT DESCRIBES THE BOUNDS IN WHICH TO ANALYZE
16  STATISTICAL SIGNIFICANCE.
17  Q. AND IF THE CONFIDENCE INTERVAL IS GREATER THAN 1 OR IF THE
18  CONFIDENCE -- IF THE CONFIDENCE INTERVAL DOESN'T ENCOMPASS 1,
19  IT INDICATES THAT THE FINDING IS STATISTICALLY SIGNIFICANT;
20  TRUE?
21  A. I BELIEVE THAT'S TRUE.
22  Q. WELL, IF YOU'D TURN TO THE LAST PAGE OF THE DOCUMENT, SIR,
23  IT'S BATES STAMPED ABI 0002128. DO YOU SEE THE PARAGRAPH
24  BEGINNING, "DAVID MENTIONED"?
25  A. LAST PAGE? OH, YES, I DO.

DAILY COPY

## Page 683

1  Q.  IN FACT, YOU OFFERED TO MR. ANSTICE TO ASSIST IN
2  DEVELOPING RESPONSES TO THE COMPETITIVE MESSAGES THAT WERE OUT
3  ON THE MARKET CONCERNING VIOXX AND CELEBREX; TRUE?
4  A.  THAT'S WHAT THE MEMO SAYS, YES.
5  Q.  IN PARTICULAR, YOU WERE GOING TO ASSIST IN RESPONDING TO
6  THE CARDIOVASCULAR ISSUES BEING ADDRESSED BY PFIZER AS IT
7  RELATED TO VIOXX; TRUE?
8  A.  THAT'S WHAT SHE REQUESTS AT THE BEGINNING OF THE FIRST
9  PAGE OF THE MEMO.
10  Q.  IF YOU'D LOOK AT THE THIRD NUMBERED PARAGRAPH ON PAGE 2 --
11  WELL, LET ME TAKE A STEP BACK.  THIS DOCUMENT IS DESCRIBING IN
12  PARTICULAR THE STEPS THAT ARE BEING TAKEN BY WENDY DIXON ON
13  BEHALF OF THE MARKETING DEPARTMENT OF MERCK TO RESPOND TO THE
14  COMPETITIVE CHALLENGES THAT ARE BEING RAISED BY PFIZER AGAINST
15  VIOXX; TRUE?
16  A.  THAT'S WHAT IT APPEARS TO BE.
17  Q.  SO, SHE'S TELLING YOU WHAT MATERIALS THE SALES FORCE HAS
18  TO RESPOND TO THE CARDIOVASCULAR ISSUES CONCERNING VIOXX;
19  RIGHT?
20  A.  YES.
21  Q.  THE THIRD ITEM THERE IS "A CARDIOVASCULAR CARD TO HANDLE
22  THE THROMBOEMBOLIC EVENTS ISSUE."  DO YOU SEE THAT?
23  A.  YES, I DO.
24  Q.  IT SAYS, "IT COMPARES CARDIOVASCULAR THROMBOEMBOLIC AES
25  FOR VIOXX COMPARATOR NSAIDS...AND PLACEBO."  DO YOU SEE THAT?

## Page 684

1  A.  YES.
2  Q.  AND THEN A BUNCH OF THE NSAIDS THAT ARE COMPARED ACROSS
3  THE NINE OSTEOARTHRITIS TRIALS ARE REFERENCED THERE; RIGHT?
4  A.  CORRECT.
5  Q.  YOU'VE SEEN THAT CARDIOVASCULAR CARD HAVEN'T YOU?
6  A.  I DON'T RECALL IT.
7  Q.  OKAY.  WELL, THE NEXT PARAGRAPH SAYS, "COPIES OF THE RENAL
8  CARD, CARDIOVASCULAR CARD, AND THE ROSSAT PAPER ARE ATTACHED."
9  DO YOU SEE THAT?
10  A.  I DO.  I STILL DON'T RECALL.
11  Q.  ANY REASON TO DOUBT THAT MS. DIXON WAS TELLING THE TRUTH
12  WHEN SHE SAID SHE WAS GIVING YOU THESE THINGS FOR YOUR REVIEW?
13  A.  SHE WAS GIVING THEM TO ME.  I DON'T THINK I WAS GIVEN THEM
14  FOR REVIEW.  I THINK SHE SAYS IN THE PARAGRAPH THAT THE
15  REPRESENTATIVES ALREADY HAVE THIS INFORMATION.
16      I DON'T RECALL THESE CARDS, AND I DON'T RECALL
17  DISCUSSING THE CARDS WITH HER AT ALL.
18  Q.  MORTALITY INFORMATION, TOTAL MORTALITY INFORMATION IS
19  IMPORTANT INFORMATION THAT SHOULD HAVE BEEN INCLUDED IN THE CV
20  CARD THAT WAS USED BY SALES REPRESENTATIVES TO RESPOND TO
21  PHYSICIAN INQUIRIES CONCERNING THE DRUG; TRUE?
22  A.  I THINK A CV CARD SHOULD HAVE CONTAINED ALL
23  CARDIOVASCULAR-RELATED INFORMATION FROM THE VARIETY OF DATA
24  SOURCES MERCK HAS, AND --
25  Q.  WOULD --

## Page 685

1  A.  -- IF THERE WAS MORTALITY DATA ASSOCIATED WITH THOSE
2  TRIALS, EACH OF THE TRIALS AND WHAT THE DATA WAS IN EACH OF THE
3  TRIALS.
4  Q.  OKAY.  I WANT TO START WITH YOU A SECTION ON THE LABELING
5  OF THE DRUG AND THE PROGRESSION OF THE LABELS OF THE DRUG.  YOU
6  WERE INTIMATELY INVOLVED IN THAT PROCESS; CORRECT, SIR?
7  A.  I CERTAINLY KNEW WHAT WAS GOING ON, YES.
8  Q.  WHEN THE DRUG WAS FIRST BROUGHT ON THE MARKET, IT HAD A
9  STANDARD NSAID GI WARNING; CORRECT?
10  A.  I BELIEVE THAT'S CORRECT.
11  Q.  NOW, HERE WE HAVE A LABEL WHICH APPEARS -- TO ME,
12  ANYWAY -- TO BE MERCK'S PROPOSAL TO THE FDA POST-VIGOR.  AM I
13  CORRECT THAT THAT'S WHAT THIS DOCUMENT REPRESENTS, EXHIBIT 39,
14  SIR?
15  A.  WHAT'S THE DATE OF THIS?
16  Q.  IT SAYS, "ORIGINAL LABEL SUBMISSION."  I'M WORKING WITH
17  DOCUMENTS THAT WERE PRODUCED BY MERCK, SO, I CAN TELL YOU BATES
18  NUMBERS AND I CAN TELL YOU WHAT IT SAYS, AND IT SAYS "ORIGINAL
19  LABEL SUBMISSION FOR VIGOR."
20  A.  WELL, IF THAT'S WHAT IT SAYS, I ASSUME IT IS THE ORIGINAL
21  SUBMISSION FOR VIGOR.  THE VIGOR STUDY IS REFERENCED IN THIS
22  LABEL, SO, THAT'S PROBABLY WHAT IT IS.
23  Q.  THERE'S NO CARDIOVASCULAR WARNING THAT'S GIVEN ON THE DRUG
24  RELATIVE TO RISKS OF CARDIOVASCULAR EVENTS OR INCREASE OF RISK
25  OF CARDIOVASCULAR EVENTS AS WAS PROVEN IN THE VIGOR STUDY;

## Page 686

1  CORRECT, SIR?
2  A.  THE VIGOR STUDY, AS I TOLD YOU, WE DID NOT BELIEVE
3  INDICATED VIOXX INCREASED CV EVENTS; AND THEREFORE, THERE WAS
4  NO WARNING IN THIS LABEL.  THAT IS CORRECT.
5  Q.  WHEN THE FDA GOT THIS PROPOSAL, WAS THAT THEIR VIEW OF THE
6  DATA?
7  A.  THE DATA WAS PRESENTED IN AN ADVISORY COMMITTEE.  THAT WAS
8  THEIR VIEW OF THE DATA.  IT WAS MERCK'S VIEW OF THE DATA.  AND
9  THE FDA CHOSE, I THINK IN THEIR FIRST RESUBMISSION TO US, TO
10  TAKE A DIFFERENT INTERPRETATION, YES.
11  Q.  THEY DID.  DID THEY SUGGEST THAT THERE BE A WARNING ON THE
12  DRUG, SIR, BASED ON THE VIGOR DATA?
13  A.  YES, THEY DID.
14  Q.  AND DID MERCK SAY, CERTAINLY WE'RE INTERESTED IN PUBLIC
15  SAFETY, AND A WARNING WOULD BE A GOOD IDEA ON A DRUG WHERE
16  THERE MIGHT BE A PROBLEM?  IS THAT WHAT MERCK SAID, SIR?
17  A.  MERCK DID NOT BELIEVE THERE WAS A CARDIOVASCULAR RISK
18  ASSOCIATED WITH VIOXX; AND AS THIS WARNING INDICATES, THERE IS
19  CARDIOVASCULAR RISK.  WE OBJECTED TO THAT LABEL.
20  Q.  WELL, DO YOU KNOW -- I CAN ONLY ASK YOU WHAT YOU KNOW
21  TODAY.  DO YOU KNOW OF ANY LABEL CHANGE THAT WAS MADE BETWEEN
22  MARCH OF 2000 AND APRIL OF 2002 REPORTING THE VIGOR RESULTS IN
23  A LABEL TO THE PRESCRIBING PHYSICIANS OF THIS COUNTRY AND
24  AROUND THE WORLD?
25  A.  NO, I DO NOT.

59  (Pages 683 to 686)

Page 687

1    Q.  SO PRESCRIBING PHYSICIANS WHO WERE GOING BY THE LABEL OF

2    YOUR DRUG BETWEEN MARCH OF 2000 AND APRIL OF 2002, THEY'RE JUST

3    LOOKING AT THE LABEL; THEY WOULDN'T KNOW ANYTHING ABOUT THE

4    VIGOR RESULTS; CORRECT?

5    A.  IF THEY WERE LOOKING ONLY AT THE LABEL?

6    Q.  YES.

7    A.  I DON'T KNOW WHAT THEY WOULD BE THINKING.  THE LABEL WAS

8    NOT CHANGED ON VIGOR UNTIL, AS YOU POINTED OUT, APRIL 2002.

9    Q.  THERE IS AN OBLIGATION BY A RESPONSIBLE PHARMACEUTICAL

10   COMPANY TO KEEP THE LABEL BOTH CLEAR AND ACCURATE AND TO TIMELY

11   UPDATE IT; CORRECT?

12   A.  YES.

13         THE COURT:  IS THAT IT?  OKAY.  WE'LL STOP HERE,

14   MEMBERS OF THE JURY, AND WE WILL START TOMORROW AT 8:30.

15   PLEASE REMEMBER NOT TO LISTEN TO ANY NEWS OR READ ANYTHING

16   ABOUT THIS CASE OR ANY OTHERS.  OKAY.  THANK YOU VERY MUCH.

17   ALL RISE AS THE JURY LEAVES, PLEASE.

18         (WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING.)

19              * * *

20

21

22

23

24

25

DAILY COPY