UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General,<br><br>Plaintiffs,<br><br>v.<br><br>MERCK SHARP & DOHME CORP.,<br><br>Defendants. | JUDGE ELDON E. FALLON<br><br>MAGISTRATE JUDGE KNOWLES<br><br>Case No. 05-3700 |

### PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF RICHARD KRONMAL, PH.D.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. LEGAL STANDARD ..................................................................................................... 3

III. DR. KRONMAL'S OPINIONS ABOUT MERCK'S ANALYSIS AND REPORTING OF CLINICAL TRIAL DATA ARE RELEVANT AND ADMISSIBLE .................................................................................................................. 3

IV. DR. KRONMAL'S OPINIONS ON CAUSATION ARE ADMISSIBLE ............ 5

V. DR. KRONMAL'S OPINIONS CONCERNING THE INADEQUATE DISCLOSURES IN THE VIOXX LABEL ARE ADMISSIBLE ......................... 7

VI. DR. KRONMAL'S OPINIONS ON CORPORATE CONDUCT ARE ADMISSIBLE TO SHOW VIOLATION OF THE STANDARD OF CARE ............................................................................................................................ 9

VII. CONCLUSION .............................................................................................................. 10

860093.2

## TABLE OF AUTHORITIES

Page

### CASES

*Black v. Food Lion*,
171 F. 3d 308 (5th Cir. 1999) .................................................................................................. 6

*Bouchard v. American Home Products Corporation*,
213 F. Supp. 2d 802 (N.D. Ohio 2002) .................................................................................... 5

*Brock v. Merrell Dow Pharms., Inc.*,
874 F.2d 307 (5th Cir. 1989) ................................................................................................... 6

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ................................................................................................................. 2

*In re Baycol Products Litigation*,
532 F. Supp. 2d 1029 (D.Minn. 2007) ........................................................................... 4, 5, 8, 9

*In re Diet Drugs*,
2000 WL 876900 (E.D. Pa. Jun. 20, 2000) .............................................................................. 8

*In re Vioxx Prods. Liab. Litig.*,
401 F. Supp. 2d 565 (E.D. La. 2005) .................................................................................... 1, 5

*Smith v. Wyeth-Ayerst Laboratories*,
278 F. Supp. 2d 684 (W.D.N.C. 2003) .................................................................................... 8

860093.2

I.  **INTRODUCTION**

Richard Kronmal, Ph.D., is a renowned biostatistician specializing in cardiovascular (CV) diseases. Dr. Kronmal's *curriculum vitae* shows extensive relevant experience in the field of CV disease and the safe conduct of clinical trials. He has served as a member and chairman of the Food and Drug Administration (FDA) Advisory Committee on Cardiovascular and Renal Diseases, 1979-1983, and as a consultant and committee member of the National Heart, Lung and Blood Institute (NHLBI), 1976-77 and 1982-84. He has also served as a statistical consultant and Data Safety and Monitoring Board (DSMB) chairman and member for a dozen long-term clinical trials involving stroke and coronary heart disease (CHD) prevention and other illnesses, between 1981 and the present. Dr. Kronmal's grant research includes work for the NHLBI; extensive work with the National Institutes of Health (NIH) on coronary heart disease and stroke between 1988 and 2005; cardiovascular biostatistics training with the NIH between 2001 and 2006; and studies of the epidemiology of vascular inflammation and atherosclerosis for the NIH between 2004 and 2009. Over 100 of Dr. Kronmal's 196 peer-reviewed publications concern CV disease and risk factors. (Kronmal *Curriculum Vitae* [Declaration of Donald C. Arbitblit, hereinafter, "DCA Decl.," Ex. 1].) This court has previously permitted another expert to rely on Dr. Kronmal's analyses of Vioxx's CV risk. *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 at 584-587 (E.D. La. 2005).

Dr. Kronmal is co-author of a published, peer-reviewed article in JAMA 2008 addressing Vioxx's CV risks in the Alzheimer's trials, one of the subjects of his expert opinions.
Dr. Kronmal has testified in Vioxx trials in the state courts of New Jersey and California.
Dr. Kronmal is clearly qualified to opine about the risks of Vioxx, and the disparity between what was known about those risks and what Merck disclosed about them.

Defendant raises numerous arguments to keep Dr. Kronmal from offering his opinions at

860093.2

trial. Some of these mirror the contentions that Defendant has made as to plaintiff's expert Dr. MacGregor, and as to those arguments Plaintiff incorporates by reference the responses in the Opposition to Dr. MacGregor's testimony. Such arguments include the claim that Dr. Kronmal's opinion about misrepresentations do not prove causation of economic loss, on the theory that Provider Synergies, the company that recommended approval of Vioxx to the State of Louisiana, informed the State about the CV risk of Vioxx. As Plaintiff responded to the MacGregor motion, Merck's argument fails because Provider Synergies could not possibly have known about nor adequately informed the State of data or information that Defendant suppressed. Dr. Kronmal's opinions on this issue are particularly germane, since the nondisclosure of Vioxx CV risk data is the subject of both Dr. Kronmal's peer-reviewed work and considerable importance in Vioxx litigation.

As in its opposition to Dr. MacGregor's testimony, Defendant claims that Dr. Kronmal may not testify to Vioxx CV risks based on data that became available after the September 30, 2004 date of product withdrawal. However, as Plaintiff responded in that context, such data is relevant because: (1) the data supports the conclusion that Vioxx causes CV thrombotic events; (2) Vioxx was not safe and effective when it was approved in 1999; (3) there was a signal of CV risk that imposed on obligation to conduct adequate testing before marketing; and (4) adequate testing prior to May 1999 would likely have shown the same excess risk as was revealed by the subsequent trials that Dr. Kronmal analyzed, thus making it more likely than not that Vioxx would not have been marketed in the first place.

Defendant argues that Dr. Kronmal's opinions regarding nondisclosure of CV risk to the FDA are pre-empted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). However, Plaintiff does not allege a claim for relief based on a "fraud on the FDA" theory, and

*Buckman* is therefore inapplicable. Instead, just as Defendant relies on the history of its interactions with FDA to prove that it acted reasonably, Plaintiff may introduce contrary evidence of improper interactions with the FDA to support an inference of negligence.

Defendant further contends that Dr. Kronmal should be precluded from offering opinions regarding matters that it characterizes as involving "ethics," "motive," and "state of mind." Of note, in support of its argument, Defendant cites examples of testimony that Dr. Kronmal was <u>permitted</u> to give in a previous Vioxx trial (Def. Mem. at 22). Dr. Kronmal's testimony addresses the relevant standard of care applicable to a pharmaceutical company. The publication of Dr. Kronmal's views on Defendant's corporate conduct in JAMA, a prestigious, mainstream, peer-reviewed journal tends to refute the claim that his opinions are irrelevant or inflammatory. Instead, they are relevant and admissible.

## II. LEGAL STANDARD

Plaintiff incorporates by reference Section II of the Memorandum in Opposition to Defendant's Motion to Exclude Testimony of John MacGregor, M.D.

## III. DR. KRONMAL'S OPINIONS ABOUT MERCK'S ANALYSIS AND REPORTING OF CLINICAL TRIAL DATA ARE RELEVANT AND ADMISSIBLE

Plaintiff incorporates by reference Section III of the Memorandum in Opposition to the Motion to Exclude Testimony of John MacGregor, M.D. In summary, there is ample evidence that Defendant acted according to a "publish if positive" strategy in which Merck's "Scientific Communication Plan" used the peer-reviewed literature in conjunction with the marketing department to promote messages of CV safety by retaining favored authors who consistently presented Merck's point of view. (*See, e.g.*, Kessler Rep. at ¶¶ 40-80 [DCA Decl. Ex. 2].) Several of Plaintiff's experts have opined and testified to various important omissions from Merck-sponsored publications regarding both CV risk (as well as claims of GI benefit). Provider

Synergies could not present the State with a fair and reliable knowledge base to decide whether to place Vioxx on the PDL, when Defendant published only positive analyses and suppressed negative data from appearing in the literature upon which Provider Synergies relied. When Valerie Taylor of Provider Synergies summarized the literature in the monographs provided to the Louisiana P&T Committee (Def. Mem. at 6), she was necessarily stymied by lack of knowledge of what Merck chose not to make public. Dr. Kronmal has opined about a range of relevant unpublished information, including the matters in his peer-reviewed publication on the Alzheimer's trials.

Nor are Dr. Kronmal's opinions about misleading the FDA pre-empted under *Buckman*. (Def. Mem. at 10-12.) Plaintiff states no claim for relief arising from fraud on the FDA. Throughout the Vioxx cases, Merck has sought shelter behind its claims that it told the FDA all the risks, and that FDA nevertheless signed off on Vioxx's safety, as evidence of its reasonable and prudent conduct. Evidence of Merck's misrepresentations, omissions and distortions of the evidence in its communications to the FDA must therefore be equally relevant to show the opposite: that Merck did not act reasonably or prudently. Plaintiff would introduce evidence of misrepresentation to the FDA in support of the claims in the Second Amended Complaint (SAC), and not to prove a fraud on the FDA theory of liability.

Defendant cites *In re Baycol Products Litigation*, 532 F. Supp. 2d 1029 (D.Minn. 2007), in support of its argument that Dr. Kronmal's opinions that Merck mislead the FDA are preempted. (Def. Mem. at 10-11.) However, the *Baycol* case correctly ruled that expert testimony would be excluded if it were offered *only* to show that the FDA was misled, but that such testimony *would* be admissible "to the extent it is offered to support a claim that the medical community, treating physicians or patients were misled by [defendant's] alleged failure

860093.2

to submit information to the FDA." *In re Baycol*, 532 F. Supp. 2d at 1053. The *Baycol* court also cited *Bouchard v. American Home Products Corporation*, 213 F. Supp. 2d 802 (N.D. Ohio 2002), another case erroneously relied upon by Defendant here. In *Bouchard*, the court held that, based on the *Buckman* decision, any evidence offered *only* to show that the FDA was misled or that evidence was intentionally concealed from the FDA would be excluded. *Id.* at 812 (emphasis added). However, where a claim was based on direct fraud against the plaintiff and her physician, rather than the FDA, "then evidence as to what was or was not provided to the FDA may be relevant." *In re Baycol*, 532 F. Supp. 2d at 1053, citing *Bouchard, supra*.

In this case, Plaintiff has alleged no claim for relief arising from a fraud on the agency theory. Instead, Plaintiff's claims are based upon fraudulent misrepresentations and omissions as to Plaintiff, under state law. Therefore, as in the *Baycol* and *Bouchard* cases cited above, evidence of Defendant's nondisclosures or misrepresentations to the FDA is admissible.

Finally, the Court has previously permitted Dr. Avorn to testify to similar evidence that Defendant misrepresented CV risk evidence to the FDA, and Dr. Kronmal may do so as well, for comparable purposes. (*See* Plaintiff's Memorandum in Opposition to Motion to Exclude Testimony of Jerry Avorn, M.D., filed contemporaneously.)

### IV.   DR. KRONMAL'S OPINIONS ON CAUSATION ARE ADMISSIBLE

Defendant argues that Dr. Kronmal may not testify that Vioxx causes CV harm because he is a biostatistician, not a medical doctor. However, Dr. Kronmal's opinions that Vioxx increases the risk of CV events is comparable to the testimony of another non-medical expert permitted to testify on the same issues by this Court. *In re Vioxx Products Liab. Litig., supra*, 401 F. Supp. 2d at 584-587 (permitting a non-medical professor, Wayne Ray to testify to increased CV risk of Vioxx based in part on Professor Ray's reliance on Dr. Kronmal's analyses). Dr. Kronmal's background and decades of experience in CV risk trials and studies

make him particularly well-qualified to offer the opinions he has provided in this case.

Defendant cites inapposite cases in support of its argument to exclude Dr. Kronmal's causation testimony. For example, in *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307 (5th Cir. 1989), the Court of Appeals excluded expert testimony where it found that there were *no* studies showing a statistically significant increased risk of birth defects associated with Bendectin. *Id.* at 312-13. In contrast, there is abundant evidence of statistically significant CV risk of Vioxx, cited by Dr. Kronmal and others, including a 5-fold risk of myocardial infarction (MI) in VIGOR; greater than 2-fold excess MI and thrombotic event risk in APPROVe; and the 3.84 Relative Risk of CV mortality in the Alzheimer's trials. (Psaty and Kronmal, JAMA 2008; referenced at Kronmal Report at 41, marked as Kaiser Ex. 22 [DCA Decl. Ex. 3].)

Defendant also cites numerous cases regarding the various factors supporting a causal inference, sometimes called the "Bradford Hill" criteria. Yet no case holds that all the evidence on all of the factors must come from a single expert. Thus, while Dr. Kronmal is not an expert on biological mechanisms, Dr. MacGregor is a cardiologist and biochemist who does have that expertise, and the biostatistical and medical expert opinions are complementary parts of the evidentiary proof of causation.

Another relevant aspect of the causation evidence that Defendant does not mention is the 2005 FDA Advisory Committee vote of 32 to 0 that Vioxx significantly increases the risk of CV events (Curtis Tr. 236:17-22 [DCA Decl. Ex. 4].) This consensus of acknowledged experts appointed by the FDA invalidates Defendant's reliance on authorities such as *Black v. Food Lion*, 171 F. 3d 308 (5th Cir. 1999), which involved a claim of fibromyalgia due to trauma. The Court of Appeals noted a consensus that there was "no scientific evidence" that trauma causes fibromyalgia—just the opposite of the scientific consensus in this case that Vioxx is cardiotoxic

860093.2

and does increase the risk of the type of harm alleged.

There is no merit to Defendant's claim that Dr. Kronmal's opinions should be barred because he cites some results that are not statistically significant, for example the congestive heart failure results from VIGOR (19 v. 9 for Vioxx and naproxen, respectively, p=0.065).[1] (Kronmal Rep. at 7 [DCA Decl. Ex. 5].) Several data analyses upon which Dr. Kronmal based his opinion are consistent, statistically significant and show strong associations, thus meeting three of the most important of the Hill "causation" criteria, including the VIGOR MI data (*Id.* at 5-6); VIGOR hypertension data (*Id.* at 8-11); Alzheimer's mortality/CV mortality data (*Id.* at 23-42); APPROVe MI data (*Id.* at 42-46); and the Protocol 203 analyses (*Id.* at 46-49).

Merck's claim that it would be prejudiced by evidence that Vioxx caused CV harm, as opposed to merely risk, is unpersuasive. The stronger the evidence that the risk was real, rather than theoretical, the higher the Defendant's duty to warn, and to act, to prevent the harm. Plaintiff must be entitled to present evidence that the risk was real, and that Defendant knew it or should have known it.

V.      **DR. KRONMAL'S OPINIONS CONCERNING THE INADEQUATE DISCLOSURES IN THE VIOXX LABEL ARE ADMISSIBLE**

Plaintiff incorporates by reference Section IV of the Memorandum in Opposition to Motion to Exclude Testimony of John MacGregor, M.D. Dr. Kronmal is qualified to testify to the discrepancy between the known or knowable evidence of CV risk and the risk as described in the Vioxx label, on the basis of his scientific training and familiarity with the evidence.

---

[1] Defendant's employees and consultants themselves have published results of data analysis showing p values greater than 0.05, describing such results as evidence of a "trend," or "borderline" significance. (*See, e.g.*, Bombardier, NEJM 2000; 343:1520 at 1526, describing a p value of 0.09 as evidence of a "trend toward a decrease in the primary endpoint;" [DCA Decl. Ex. 6].) Merck's "hard line" against any consideration of results >0.05 is only drawn when the data is adverse to the Defendant.

In *In re Diet Drugs*, 2000 WL 876900 (E.D. Pa. Jun. 20, 2000), the court held that plaintiffs' experts "are qualified to render an opinion as to the label's completeness, accuracy, and—it follows from that—the extent to which any inaccuracies or omissions could either deprive a reader or mislead a reader of what the risks and benefits of the diet drugs in issue are or were at the time the labeling was published." *Id.* at *11. This ruling was subsequently adopted after remand, *Smith v. Wyeth-Ayerst Laboratories*, 278 F. Supp. 2d 684, 702 (W.D.N.C. 2003), and cited with approval by the court in *In re Baycol Products Litigation*, 532 F. Supp. 2d 1029 (D.Minn. 2007), upon which Defendant relies. In particular, the court held that plaintiff's expert was "qualified to render an opinion regarding the completeness of the Baycol label based on his knowledge of the risks of Baycol and his own clinical experience."[2] Dr. Kronmal is similarly permitted to testify to the accuracy and completeness of the label on the basis of his scientific expertise and knowledge.

Dr. Kronmal's report also sets forth the text of 21 CFR Section 201.57(e), which states that pharmaceutical labels "shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug: a causal relationship need not have been proved." (Kronmal Rep. at 50 [DCA Decl. Ex. 5].) Dr. Kronmal then summarizes the "reasonable evidence of an association between rofecoxib and the development of a spectrum of a cardiovascular disease, including MI, hard LHD, CHF, and hypertension," (*Id.*) all of which are addressed at length in his Report. Dr. Kronmal also states that the phrase "'reasonable evidence

---

[2] The *Baycol* court excluded only opinions as to whether the Baycol label complied with FDA regulations, where the expert did not claim experience with such regulations. *Id.* Here, Dr. Kronmal does have expertise to address "reasonable evidence of an association" of Vioxx with CV risks, having spent his career studying and writing about such associations.

860093.2

of an association' is a statistical concept that is well within my area of expertise." *Id.*[3] Thus, Dr. Kronmal may testify to the lack of a labeled warning of an association between Vioxx and cardiovascular diseases after reasonable evidence of such an association existed, based on the scientific evidence and his expertise in the field.

### VI. DR. KRONMAL'S OPINIONS ON CORPORATE CONDUCT ARE ADMISSIBLE TO SHOW VIOLATION OF THE STANDARD OF CARE

Defendant seeks to exclude Dr. Kronmal's opinions concerning its conduct of Protocol 078, in particular the continuation of that trial after significant risks had been demonstrated. (Def. Mem. at 19-22.) The courts have held that experts may testify as to the standard of care and its violation, and the characterization of the testimony as either "ethical violation" or "standard of care violation" is not clear cut. *See, e.g., In re Baycol, supra*, 532 F. Supp. 2d at 1054. Dr. Kronmal's Report shows that he has substantial experience in the monitoring of clinical trials, and he has served as chair or member of several Data Safety and Monitoring Boards (DSMBs) charged with responsibility "to ensure the safety of patients participating in clinical trials" of medications intended to treat CV disease and other illnesses. (Kronmal Rep. at 1.) Thus, his opinions about Merck's conduct are based on direct experience with the standard of care and its application, rather than mere "personal beliefs" as the Defendant contends. (Def. Mem. at 21.)[4]

---

[3] Defendant's memorandum claims that Dr. Kronmal may not rely on "associations" to prove "causation." (Def. Mem. at 15.) As noted elsewhere, the evidence of causation is strong, consistent and admissible, and all of the Vioxx trials in this Court have permitted such evidence. However, it should be emphasized that the statutory warning is required upon reasonable evidence of an *association* between the drug and the hazard, and Dr. Kronmal's biostatistical expertise makes him well-qualified to testify to that issue.

[4] In this regard, Defendant's reference to the *Rezulin* ruling is inapposite, since that decision concerned presentation of data in a New Drug Application; it did not concern Defendant's conduct of clinical trials or their continuation after evidence of significant excess risk had been

- 9 -

Dr. Kronmal has previously testified in the New Jersey Court that Defendant permitted the Alzheimer's clinical trial 078 to continue for two years after knowing of statistically significant excess risk of mortality and progression to Alzheimer's disease in the Vioxx arm of the trial. (Def. Mem. at 20-22.) The same opinion has now been published in Dr. Kronmal's JAMA 2008 article (DCA Decl., Ex. 3.) Yet Defendant argues that Dr. Kronmal should not be permitted to offer similar testimony in this case. Plaintiff submits that Dr. Kronmal's opinions concerning the Alzheimer's trial have met the standards of peer review and judicial admissibility, and that such opinions are admissible because they are relevant to the standard of care, and to Defendant's pattern and practice of disregard for the well-being of patients exposed to Vioxx. *See* Order and Reasons, *Barnett v. Merck*, at 3-4, August 30, 2006 (holding that the jury's findings for Plaintiff on claims of negligent failure to warn and deceit by concealment were "reasonable," where jury found "by clear and convincing evidence that Merck's conduct was willful, wanton, or in reckless disregard of the Plaintiff's rights"). Alternatively, Plaintiff submits that the Court may reserve decision on this aspect of Dr. Kronmal's opinions until the time of trial, when the evidence will provide a context for the ruling.

## VII.  CONCLUSION

For the reasons set forth above, Dr. Kronmal's opinions are relevant, based on reliable methodology, and admissible. Defendant's motion should be denied.

---

known, 309 F. Supp. at 543 n.27, an area where Dr. Kronmal has substantial experience beyond mere personal views.

860093.2

Respectfully submitted, this 1st day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

860093.2

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Plaintiff's Memorandum In Opposition To Motion To Exclude Testimony Of Richard Kronmal has this day been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to pretrial order No. 8B, on this the 1st day of March, 2010.

/s/ James R. Dugan

860093.2