# EXHIBIT 5



29658702

Feb 19 2010
3:20PM

## I.     QUALIFICATIONS

My name is Richard A. Kronmal.  I am a Biostatistician, Professor of Biostatistics and Professor of Statistics at the University of Washington in Seattle, Washington.  I was previously the Chairman of the Biomathematics Group at the University of Washington in Seattle, Washington from 1973 to 1985.  As described in greater detail in my curriculum vitae, a true and accurate copy of which is attached hereto, my career has focused on the use of statistics in evaluating data gathered in clinical trials and epidemiological studies.

I earned my Ph.D. in Biostatistics from the University of California, Los Angeles in 1964.  During the course of my studies I was awarded a United States Public Health Fellowship (1961 to 1963).  I have received a Research Career Development Award, from the Public Health Service from 1968 to 1972.  In 1981, I was elected a Fellow of the American Statistical Association.  I am also a member of the Biometric Society.

I have been appointed to several Data Safety Monitoring Boards (DSMB).  The purpose of these boards is to ensure the safety of patients participating in clinical trials.  I am currently the Chair of the DSMB of two trials for the Corcept Corporation; one is a trial of a drug to treat psychotic depression and the other uses the same drug for the treatment of patients with Alzheimer's disease.  In addition, I am currently a member of the DSMB for an Aerogen Corporation study of a drug to prevent ventilator-associated pneumonia.  I was previously the Chair of the DSMB of the Genentec TPA in stroke studies, Chair of the DSMB of the Medtronic Physio-Control Biphasic Waveform for Internal Defibrillation Clinical Study, Chair of the Intrabiotics Corporation study of a drug to prevent Vanomycin resistant pneumonia and Chair of the DSMB for the Knoll Ancrod studies in the treatment of stroke.  I was a member of the DSMB of the Bristol Meyers Squibb OPERA Study and for the Syntex studies of a drug for the prevention and treatment of stroke.  I have also been a statistical consultant for numerous industry studies conducted by several corporations, including, but not limited to: Genentec, ICOS, DuPont, Knoll Pharmaceuticals, NeoRex, Bristol-Meyers Squibb, Wyeth Ayherst, HeartStream, Intrabiotics and AstraZenica.  I am currently a consultant to FoldRx, Northstar and Corcept.

M012013722

I was an Associate Editor and Member of the Editorial Advisory Board of the *Statistical Methods in Medical Research* journal. I was a member of Advisory Board of *Screening,* the official journal of the International Society for Neonatal Screening. I was previously an Associate Editor of the *Journal of Statistical Computation and Simulation* (1986-1989). I have reviewed medical research papers for many medical journals, including but not limited to the *Journal of the American Medical Association, The New England Journal of Medicine, Circulation,* and *Stroke.*

I have previously been a member of the Epidemiology and Disease Control Study Section of the National Institute of Health (NIH) (1984-1988). I was also a member of the Food and Drug Administration (FDA) Advisory Committee on Cardiovascular and Renal Diseases (1979 - 1983 (Chairman 1983)).

I have been the author or co-author of over 200 peer reviewed articles. These articles have been published in numerous medical journals including: *The New England Journal of Medicine,* the *Archives of Internal Medicine, Diabetes Care, Statistics in Medicine,* and the *Journal of the American Medical Association.* The complete list of my published materials, including the co-authors of the papers listed above, is included in my curriculum vitae attached hereto.

## II.   ASSIGNMENT AND GENERAL CONCLUSIONS

I was requested to review Merck's clinical trial data much in the same way that I would have done had I been asked to do so by Merck. In this regard, I was asked to use generally accepted statistical methods to determine whether there was statistical evidence of cardiovascular risk associated with rofecoxib, and if so, to assess the magnitude, character, and frequency of that risk. In this regard, I was asked to pay particular attention to the data collected for the following rofecoxib clinical trials:

- The Vioxx Gastrointestinal Outcomes Research (VIGOR) trial
- The meta-analysis of rofecoxib clinical trials conducted by Merck in 2001
- The Alzheimer's studies (Protocols 78 and 91)
- The APPROVe trial (prevention of recurrence of colon polyps)
- The VIP and VICTOR trials

M012013723

I was also asked to consider whether the results seen in the VIGOR trial were consistent from a statistical perspective with the data concerning any cardiovascular protective effects that naproxen may have.

Finally, I was asked to review and compare the overall statistical analysis of the Merck clinical trials contained in the rofecoxib label and render an opinion as to whether that information accurately reflected the totality of cardiovascular risk for rofecoxib as reflected in the clinical trial data files that I reviewed.

In presenting the analysis below, I reviewed the data files, analysis code, and data reports for the clinical trials at issue, and compared and validated my results with published and unpublished reports of the data. The Merck data files lacked documentation that, in my experience, ordinarily accompanies such data files and would have enabled me to quickly review the data. As I continue to review the data (or review newly provided data), I reserve the right to supplement and refine my report. I was also provided with and have reviewed other documents and information which bear upon and provide context to my findings and opinions, including peer-reviewed literature published in medical and scientific journals, documents obtained from FDA websites, internal Merck documents, and various depositions of Merck employees.

The basis for my conclusions and opinions expressed in this report is derived from my education, training, research, experience, expertise, review of internal Merck clinical data and documents, testimony of Merck researchers, FDA documents, and a review of relevant peer-reviewed medical and scientific literature.

As set forth more fully below, from a statistical standpoint, there was strong evidence—as early as the spring of 2000—that rofecoxib posed substantial risk to the heart and cardiovascular system. As demonstrated in the VIGOR trial, cardiovascular risk was apparent whether the endpoint was serious cardiovascular disease, or whether measured by myocardial infarctions (MI) or hypertension. Moreover, there was an unfavorable trend against the safety of rofecoxib for congestive heart failure and death. In analyzing the results of VIGOR, I have also considered whether these statistical results could have been reasonably explained by the data available concerning the effect of naproxen on these same cardiovascular endpoints. At the time the VIGOR results were

M012013724

revealed, there was no persuasive scientific evidence that the cardiovascular results seen in that trial could be reasonably attributed to a protective effect of naproxen.

I have also reviewed the original data for the clinical trial meta-analysis that was performed by Merck and presented to the FDA in February 2001, and which was ultimately published in the journal *Circulation* in October 2001. Using standard statistical methods, the data from the rofecoxib clinical trials did not disprove or undermine the evidence of cardiac risk seen in the VIGOR trial. Rather, my review of the meta-analysis data revealed that there was a statistically significant adverse cardiovascular risk for rofecoxib, particularly myocardial infarctions, in this combined analysis. Further, as I will show, analyses of the placebo controlled trials available at the time of the time of the Circulation publication would have revealed that rofecoxib significantly increased the risk of thrombotic events.

I have also reviewed the data from the completed Alzheimer's clinical trials. In this regard, I note that it was postulated that the result of these trials cast doubt on the evidence of cardiovascular risk seen in the VIGOR trial. From my review of the data, this is not accurate. The Alzheimer's data support the proposition that rofecoxib carries substantial increased cardiovascular risk, including myocardial infarction and sudden cardiac death. Further, when the incidence of death on rofecoxib is compared to placebo, there is a statistically significant and substantial increased risk of death on rofecoxib. The results of the Alzheimer's trials are far from reassuring as to the cardiovascular and overall safety of rofecoxib.

I have also reviewed the data files from the APPROVe study—the trial that ultimately led to withdrawal of the drug. As with the other clinical trial data that I reviewed, APPROVe demonstrated a serious increased cardiovascular risk with rofecoxib. Analysis of that data revealed no evidence that the cardiovascular risks of rofecoxib were confined to any period of time.

Finally, I have done two new meta-analyses of the data from the Merck clinical trials. The first uses the data from APPROVe, VIP and VICTOR with the endpoints of MI, hard CHD (MI and sudden cardiac death) and thrombotic events as defined in the Merck statistical analysis plan for this analysis. This analysis plan was proposed by Merck under the designation of Protocol 203, for the analyses of cardiovascular safety for

-4-

M012013725

the three aforementioned trials. The second meta-analysis uses the data from all of the studies for MI, thus supplementing the original Merck meta-analyses with the full data from the Alzheimer's studies and APPROVe, VIP and VICTOR. The results of both of these meta-analyses demonstrate conclusively that rofecoxib increases the risk of both MI and hard CHD by over two-fold.

Based on the rofecoxib clinical trial database, I have concluded that there was a strong, unambiguous and objective statistical evidence from at least early 2000 that rofecoxib was capable of causing a spectrum of serious cardiovascular diseases. This evidence was only strengthened by additional clinical trial evidence that accumulated thereafter. I have also concluded that the summary presentation of this data in the peer-reviewed literature and in the rofecoxib label was inconsistent with the overall clinical trial results that I observed in the clinical trial data files reviewed. Given this, Merck's representations about the clinical trials had the potential to mislead physicians about the frequency, character, severity, and spectrum of cardiovascular events associated with rofecoxib.

In connection with my work on this matter, I have been compensated at the rate of $500 per hour.

## III.    REVIEW OF ROFECOXIB CLINICAL TRIAL DATA

### VIOXX Gastrointestinal Outcomes Research Study (VIGOR)

VIGOR was a randomized clinical trial in patients with rheumatoid arthritis conducted under two identical protocols in the United States and abroad. A total of 8076 patients were randomized to either rofecoxib 50 mg daily or naproxen 1000 mg daily. The median follow-up time for the trial was 9 months (maximum = 13 months). The primary endpoint of the trial was confirmed upper gastrointestinal events adjudicated by a blinded panel. Patient visits were at 6 weeks, 4 months, and every 4 months until study termination. The last patient exited the trial in early 2000, and the data was unblinded shortly thereafter, on or about March 9, 2000. Adverse events were reported spontaneously to investigators; certain cardiovascular events were also adjudicated by a blinded panel.

M01213726

The data were collected by the investigators on case report forms which Merck translated into a series of SAS data files. Individual patients were identified by protocol, site, and allocation number. Data made available for analysis included separate data tables with demographic information about the patients, adverse events, gastrointestinal events, vital statistics, efficacy data, and laboratory test findings. The data files were analyzed for this report using the STATA program and generally accepted statistical procedures for analyzing clinical trial data of this kind.

The most striking result in the VIGOR trial was the substantial excess of MIs in the rofecoxib group compared to the naproxen group. There were 20 MIs (0.494%) in the rofecoxib group and only 4 (0.099%) in the placebo group. Figure 1 shows the cumulative MI rate curves comparing rofecoxib to naproxen. The relative risk from a Cox proportional hazards model is 5.0 (p<0.005, 95% CI=1.7 - 14.6). Thus, it is unlikely that this is a chance finding. The rates per 1000 person years are 7.4 for rofecoxib and 1.5 for naproxen.

**Figure 1.**



-6-

M012D13727

The incidence of death in VIGOR was 22/4047 (0.54%) and 15/4209 (0.37%), for rofecoxib and naproxen respectively. The difference was not statistically significant but in light of the MI results should have been concerning. The cumulative mortality over time are shown in Figure 2.

**Figure 2.**



In addition, excess cases of congestive heart failure were also seen among patients taking rofecoxib. Congestive heart failure is a serious medical condition that results in considerable limitation of activities, frequent hospitalization, and has a median survival of about 5 years. In VIGOR, there were 19 cases of CHF in the rofecoxib group compared to 9 in the naproxen group. This corresponds to a relative risk of >2.0. While the p-value is slightly above the 0.05 level that is used to judge statistical significance, the p=0.065 observed is a strong signal of an association between rofecoxib and CHF risk. In addition, 15 of the 28 reported CHF cases were judged to be serious adverse events. Of these, 12 were in the rofecoxib group and 3 in the naproxen group (p<0.025), a statistically significant increased risk. Further, 6 patients discontinued therapy due to CHF in the rofecoxib group compared to 0 patients in the naproxen group.

-7-

M012I13728

The incidence of hypertensive adverse events in the rofecoxib arm of VIGOR was also striking. In VIGOR, a hypertensive adverse event was loosely defined as "Hypertension-related adverse experiences reported in this study included the terms: blood pressure increased, borderline hypertension, diastolic hypertension, hypertension, hypertension uncontrolled with medication, hypertensive crisis, labile hypertension, systolic hypertension, and uncontrolled hypertension." (taken from the sponsor's FDA briefing document). This is a "loose" definition because the term does not distinguish between a new hypertensive event and the exacerbation of preexisting hypertension. In the later case, an increase in blood pressure would likely require either an increase in the dose of the blood pressure lowering medication that the patient is taking, or the addition or substitution of a new drug. For the patient who is free of hypertension, an increase in blood pressure might be sufficient to require instituting blood pressure lowering therapy.

Figures 3 and 4 show the cumulative rates over time of a hypertensive adverse event for the two treatment groups for the patients without and with hypertension at baseline, respectively. In both figures rapid rise of the event curve near 12 months is a result of very few patients still be under observation at the that time so that the few events that occur cause a large and misleading increase in the event rates.

M012D13729

**Figure 3.**



Cumulative Hypertensive Adverse Event by Treatment in VIGOR
No Baseline Hypertension

**Figure 4.**



Cumulative Hypertensive Adverse Event by Treatment in VIGOR
Baseline Hypertension

M012D13730

Importantly, the rate of hypertension adverse events is 35/1000 person years greater in the rofecoxib treatment patients without hypertension at baseline (p.<0.0003) and 92/1000 greater in those with hypertension at baseline (p.< 0.00001) than for naproxen treated patients. That is for every 1000 patients taking rofecoxib for one year it is estimated that there would be an additional 35 non-hypertensive patients with a hypertensive adverse event, and among the patients with hypertension, 92 <u>additional</u> hypertensive adverse events than would have occurred in these patients had they been taking naproxen.

The results of the VIGOR trial provide convincing, statistically significant evidence that rofecoxib was responsible for an increased risk for myocardial infarction and hypertension. The data also suggest the strong possibility that rofecoxib might increase the risk for congestive heart failure and death. These data were all the more striking because—as a result of Merck's exclusion criteria—the majority of the patient population in VIGOR (like many of the rofecoxib clinical trials) were not considered to be at high risk of suffering a cardiovascular event.

The presentation of the VIGOR results in The New England Journal of Medicine (Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000;343:1520-8) was misleading. The significant excess risk of MI on rofecoxib was reported as follows: "Myocardial infarctions were less common in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent; ... relative risk, 0.2; . . ." The reported incidence rates are inaccurate; the actual rates for naproxen and rofecoxib were 0.1 percent and 0.5 percent respectively. Second, the reporting of the relative risk as 0.2 is counter-intuitive and highly unusual when compared to how the relative risk for an adverse event is typically reported. The relative risk for an adverse event should be presented as the risk for the experimental agent (rofecoxib) compared to the risk for the comparator agent (naproxen), which would be a relative risk of 5.0 in this case. Moreover, at a minimum, the method by which relative risks for adverse events are computed in the presentation of trial data should be done consistently across adverse events. In the reporting of the VIGOR results, the authors changed the method used depending on the adverse event being reported.

-10-

M012013731

The statistically significant increased risk of hypertensive adverse events seen in VIGOR with rofecoxib is similarly concerning. Hypertension is a serious health concern. It is a disease and an established risk factor for myocardial infarction, CHF, and stroke. From my review of the data, the incidence of hypertensive adverse events in the rofecoxib arm of the VIGOR trial posed an unacceptable risk. The increase in hypertensive adverse events for rofecoxib users compared to naproxen users in the VIGOR trial is beyond that reported in the medical literature for other NSAIDs and Cox 2 inhibitors. Yet, there is only limited discussion of the magnitude or importance of this increase in the reports to the FDA. Further, in *The New England Journal of Medicine* publication, there is no mention of the rates and character of this adverse event.

In addition, the findings for CHF in this study should have resulted in a review of the other clinical trial experience with rofecoxib by Merck and in an increased vigilance on its part in future clinical trials for this event. At a minimum, those results should have been published in the VIGOR paper published in *The New England Journal of Medicine*. This was not done.

The incidence of death in VIGOR was 22/4047 (0.54%) and 15/4209 (0.37%), for rofecoxib and naproxen respectively. This corresponds to a relative risk of 1.46 (non-significant). Contrary to the way other adverse events were reported in *The New England Journal of Medicine*, Merck did not report the relative risk for mortality. Rather, Merck reported the frequency of deaths as 0.5 and 0.4, for rofecoxib and naproxen respectively. In so doing, Merck rounded down the death rate for rofecoxib and rounded up the death rate for naproxen, a technique that reduced the apparent difference in deaths and understated the relative risk among treatments in the trial.

Merck's response to the cardiovascular findings in VIGOR was to assure the medical community that instead of rofecoxib causing the increased risk of cardiovascular events seen in VIGOR; it was naproxen that was reducing them. The foundation of that argument was the hypothesis that users of naproxen would experience a cardioprotective benefit similar to that seen with the use of aspirin. At the time the VIGOR results were released, there was no clinical trial or epidemiological evidence supporting this assertion. This statement also raises an important statistical question: *if it were true* that naproxen

-11-

M012D13732

has anti-platelet effects similar to aspirin, would this effect be sufficient to explain the excess risk seen for rofecoxib in VIGOR?

Substantial clinical trial data on the protective effect of aspirin for myocardial infarction exists. As described below, Merck, in re-analyzing the cardiovascular events seen in its rofecoxib trials, used a combined endpoint employed by the Antiplatelet Trialists' Collaboration (APTC) when analyzing cardiovascular events suffered by those taking anti-platelet regimens. The APTC reported that "Among low risk recipients of 'primary prevention' a significant reduction of one third in non-fatal myocardial infarction was, however, accompanied by a non-significant increase in stroke. Furthermore, the absolute reduction in vascular events was much smaller than for high risk patients despite a much longer treatment period (4.4% antiplatelet therapy vs. 4.8% control; five year benefit only about four per 1000 patients treated) and was not significant (P=0.09)." [Prevention of death, myocardial infarction, and stroke by prolonged antiplatelet therapy in various categories of patients. (Antiplatelet Trialists' Collaboration) (Collaborative Overview of Randomized Trials of Antiplatelet Therapy, part 1). British Medical Journal, Jan 8, 1994 v308 n6921 p81(26)] While there are differing estimates of the cardioprotective effect of aspirin, the APTC estimate does not include recent studies reflecting smaller effect. However, even if one accepted the Company's hypothesis and naproxen was *as effective as* aspirin at preventing myocardial infarction as reported by the APTC, we would expect that rofecoxib would have a relative risk of 1.33 compared to naproxen. The observed relative risk of 5.0 for MIs is statistically significantly different from 1.33 (p=0.01). Thus, we have strong evidence that a protective effect of naproxen was an unlikely explanation for the dramatically increased incidence of myocardial infarctions in the VIGOR trial.

More recently Juni, et al reported in *Lancet* the results of a meta-analysis of myocardial infarction risk for rofecoxib in randomized clinical trials in patients with musculoskeletal disorders. [Risk of cardiovascular events and rofecoxib: a cumulative meta-analysis. (Juni, P, Nartely L, Reichenbach S, et al.). Lancet, Nov 5, 2004 v364,p2021] Juni also conducted a meta-analysis of the pharmacoepidemiological studies of naproxen that address the issue of a possible protective effect of naproxen. The results

-12-

M012D13733

of Juni's analyses show a small and marginally significant relative risk of MI on
naproxen of 0.86, clearly inconsistent with the observed 0.20 relative risk from VIGOR.

In short, it was unreasonable for Merck to presume that the VIGOR trial brought a
previously unseen cardioprotective effect of naproxen, rather than the more obvious and
rational conclusion that rofecoxib significantly increased the risk of myocardial
infarctions.

On December 8, 2005, the New England Journal of Medicine published an
"Expression of Concern" (Expression of Concern: Bombardier et al., "Comparison of
Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid
Arthritis," N Engl J Med 2000;343:1520-8) regarding the accuracy and completeness of
the original VIGOR publication in the NEJM in 2000. This was a very serious action
taken by NEJM, that was based on some of the omissions of results that I reported on
above. Generally, an "Expression of Concern" is issued by a medical journal when
"allegations of scientific misconduct or breach of publication ethics" have been made. I
have only been able to locate 4 other times such an action was taken over the last five
years: The non-Merck and Merck authors of the VIGOR paper responded to the
Expression of Concern with a defense based on the fact that inaccuracies in the reporting
of events didn't change any conclusions and that the data on the MI events that were not
reported were reported to Merck 6 days after the date that they had specified as the cutoff
date for analyses for the paper. This defense is wrong on both counts. First, as is clearly
pointed out by the NEJM, the additional events do in fact change the results in a
meaningful way because there is a difference in the magnitude of the relative risk, its
statistical significance and the interpretation of the subgroup (aspirin indicated or not) in
which the events occurred. Second, there was ample time for Merck to make the changes
to the paper required to fully and accurately report the results. It is immaterial whether or
not in the author's opinion the inclusion of these results would change the interpretation.
The reported data should be accurate and complete. The cut-off date for analyses is not
inviolate and accuracy and completeness always takes precedence. The NEJM rejected
the response of Merck and the non-Merck authors and reaffirmed their Expression of
Concern. As I described above, the omissions of critical serious side effect data was

-13-

M012D13734

much more widespread than even the NEJM is aware. The omission of the hypertension and CHF results was as serious as the omission of the MI and other CVD data.

### Pooled-Analysis of OA, RA, Alzheimer's and Low Back Pain Trials

In 2001, Merck published in the journal *Circulation* the result of a pooled analysis of cardiovascular thrombotic events in 23 separate clinical trials in rofecoxib and a variety of comparator agents, including placebo, naproxen, diclofenac, nabumetone, and ibuprofen. The analysis included rofecoxib doses of 12.5, 25 and 50 mg per day and a wide range of durations of 4 weeks or greater. The principal endpoint was an aggregate of cardiovascular, hemorrhagic and sudden/unknown death together with non-fatal myocardial infarction and non-fatal stroke, known as the Anti-Platelet Trialists' Collaboration endpoint (ATPC). Some of the underlying adverse events were adjudicated by a blinded panel and some were not. Only events that occurred within 14 days of stopping the study agent were included in the Merck meta-analysis.

As set forth above, the VIGOR trial presented strong scientific evidence that rofecoxib was capable of causing a spectrum of cardiovascular events—primarily, myocardial infarctions. In that context, it was appropriate and expected that Merck review its other rofecoxib clinical trials to determine whether these findings were seen across trials. However, Merck's meta-analysis, as published in the journal *Circulation* in October 2001 (and presented to the FDA Advisory Committee in February 2001), suffers from considerable shortcomings.

In particular, given the strong signal for an increased risk of MI seen in the VIGOR trial, MI would have been a natural endpoint to use for any meta-analysis of the cardiovascular safety of rofecoxib. Such a meta-analysis was done by Merck in October 2000, showing a statistically significant doubling of risk of MI in the rofecoxib users in the NSAID comparator trials (MRK-NJOO70395). This result was not published in the October 2001 *Circulation* article or presented to the FDA in February 2001. Based on my review of the pertinent data files, the authors of the *Circulation* article had access to the data that I used for the analyses presented above and in fact had specific files identified for analyses of MIs alone.

-14-

M012013735

Merck's meta-analyses relied on the APTC composite endpoint to assess cardiovascular risk. The use of composite endpoints like the APTC endpoint—which was designed to measure efficacy and risks in a very different setting—has the effect of diminishing the apparent relative risk if some of the outcomes are unrelated to rofecoxib use. In the "View and Reviews" section of the journal Neurology, Albers presents a discussion of the use of composite endpoints for the evaluation of anti-platelet therapies [*Neurology* 2000;54:1022-1028]. He points out that "In fact, the use of a combined endpoint may lead to an underestimate of therapeutic benefits when patients at high risk for one particular endpoint are studied." While his discussion is about the evaluation of the benefits of treatment, the same principle holds for the evaluation of the detrimental effects of a therapy. In a search of the medical literature using PubMed and Google Scholar, I was able to find only one paper (other than those from the APTC group and Merck) that used the APTC endpoint, and that was a paper published in 2005 describing the cardiovascular safety results for another Cox 2 inhibitor, lumiracoxib.

The meta-analysis also could not detect excess risk that is not present until after long term exposure to the drug (referred to by the FDA statistical reviewer as non-constant risk ratio).[1] This consideration is particularly important with respect to the published meta-analysis because much of the data relied upon in the analysis came from short-term studies that would have little ability (in statistical terms, "power") to detect the excess risk for rofecoxib. Thus, in the present context, the initial diluting effect of relying on APTC endpoints for a cardiovascular safety analysis is further increased by the inclusion of data from underpowered short studies.

Merck produced the data files used for the meta-analysis published in *Circulation*, and the production included two data files containing adjudicated and unadjudicated data for the myocardial infarction and APTC events. For the meta-analysis presented here, all of the trials were combined for the purpose of estimating the rate of myocardial infarction in rofecoxib versus all of the control therapies used in various trials. As is typical for meta-analyses, this analysis estimates the relative risk of myocardial infarction for all of

---

[1]    The event rate curves for VIGOR are suggestive of an increasing relative risk with increasing exposure to rofecoxib. Thus, studies with short follow-up times would have little ability to detect the excess risk for rofecoxib.

M012D13736

the studies combined.  A test for heterogeneity of the relative risk between study groups was carried out.

Table 1 below shows the relative risk of myocardial infarction for rofecoxib versus the control agent by the disease group studied (Arthritis and non-Arthritis).  For the arthritis study grouping the RR for rofecoxib is 2.24, p<0.003 level.  For the non-arthritis grouping the RR= 1.27 which is not statistically significant.  It should be noted that the confidence intervals for the two disease groups overlap considerably, suggesting that any apparent differences between study populations could be a result of chance.  A test for differences in the effect of rofecoxib in the two disease groups is non-significant (p=0.23).  An analysis done by dose also shows no statistically significant evidence of a dose effect.  Thus, with respect to this analysis, there is no statistically compelling evidence that the effect of rofecoxib varies by dose or medical condition of the patient population.  However, the lack of significance does not rule out that there are important differences; it simply indicates that the data are not sufficient to conclude that such effects exist.  It is worth noting that the follow-up time was very short for most of the studies (median of 3.4 and 11.9 months for the arthritis and non-arthritis groups, respectively) which has the effect of making it impossible for these studies to estimate any long term effects of rofecoxib on the risk of MI.

M012D13737

| Table 1. Relative Risk of Myocardial Infarction by Study Population | | | | |
|---|---|---|---|---|
| Study Population | Relative Risk | 95% Confidence Interval | | p-value* |
| Arthritis Patients | 2.24 | 1.31 | 3.84 | 0.003 |
| Non-Arthritis | 1.27 | 0.57 | 2.84 | |
| **Overall Estimate (stratified)** | **1.89** | **1.22** | **2.94** | **0.004** |

*Blank entry indicates non-significant

Figure 5 (limited to 12 months of follow-up because of small number of patients followed beyond that time point) shows the unadjusted cumulative MI rates for rofecoxib and control. There was no statistically significant deviation from the Cox proportional hazards assumption. This indicates as is shown in Figure 5, that the relative risk is fairly constant over time. The lack of statistical significance of these tests does not rule out either heterogeneity of risk or non-proportional hazards, but these data do not support a conclusion that these exist.

-17-

M012D13738

**Figure 5.**



        Merck's meta-analysis also suffered from several more general methodological

limitations.  In particular, the meta-analyses pooled (i) studies of different lengths (4-86

weeks), with most patients being exposed under 6 months, (ii) different doses (12.5, 25,

and 50mg), (iii) multiple comparators—both placebo and active agents, and (iv) different

patient disease states.    With respect to an earlier version of the meta-analysis that was

prepared by Merck for the February 2001 FDA Advisory Committee, the FDA expressed

many of the same criticisms.

        My re-analysis of Merck's meta-analysis necessarily suffers from the same

limitations as Merck's analysis because it is based on the same data with the exception

that I did not use the APTC endpoint. By using MI as the endpoint, my analysis is not

subject to the dilution effect due to including in the composite endpoint, events that were

not associated with rofecoxib use. Thus, while the limitations apparent in Merck's APTC

meta-analysis are also present in my myocardial infarction analysis, the latter analysis

still provides the relevant evidence as to whether rofecoxib increases the risk of

myocardial infarction.

M012D13739

In another meta-analysis authored by Juni, et al. (investigators who were not connected to Merck) and published in *Lancet*, the authors reached similar results to those reported here based on summary data available from the FDA and peer-reviewed literature for the Merck rofecoxib studies in patients with chronic musculoskeletal disorders (arthritis). They describe their results and conclusions as follows: "By the end of 2000 (52 myocardial infarctions, 20 742 patients) the relative risk from randomized controlled trials was 2·30 (95% CI 1·22–4·33, p=0·010), and 1 year later (64 events, 21 432 patients) it was 2·24 (1·24–4·02, p=0·007). There was little evidence that the relative risk differed depending on the control group (placebo, non-naproxen NSAID, or naproxen; p=0·41) or trial duration (p=0·82)." As seen in table 1, my analyses verify Juni's results for the arthritis studies included in Juni's report.

Finally, while the emphasis of my report is on the results for MI, Merck reported meta-analysis results for the combined endpoint of thrombotic cardiovascular events and conclude that the findings for this endpoint supports their contention that rofecoxib use doesn't result in an increased risk. For this reason I have also included here analyses for thrombotic events in the Merck placebo controlled arthritis trials based on a Merck document entitled Rofecoxib Cardiovascular Combined-Analysis Update in 2003 (MRK-AGT0018960) and the data files from which this report was generated. I have also done this analysis for the MI endpoint based on this same collection of files comparing placebo to rofecoxib. I carried out a Cox proportional hazards analysis to estimate the relative risks (RR).

For Merck's placebo-controlled arthritis studies, the RR for thrombotic cardiovascular events is 3.04 (95% confidence interval of 1.16-7.95, p=0.023) for rofecoxib compared to placebo. Thus, well before the results for APPROVe were known, Merck had in its possession placebo-controlled studies that showed that rofecoxib increased the risk of thrombotic cardiovascular events. Further, as is shown in figures 6 and 7 below (7 is a blowup of the first 60 days of figure 6) showing the cumulative event rates for rofecoxib versus placebo, contrary to Merck's assertion that the increased risk only occurs after 18 months of taking rofecoxib, the excess risk is seen within days of starting the medication. In the first 60 days of follow-up in these studies, there were 22

-19-

M012D13740

thrombotic events in the rofecoxib users compared to only 2 in the placebo patients.  For the first 60 days of exposure, the RR is 6.35, with a p-value of 0.012.

The results are quite similar for MI, where the RR is 2.82 (p-value=0.18).  There were 12 MI events in these trials.  In the first 60 days of use, the RR is 5.76 (p-value 0.09).  Figure 8 shows the cumulative MI event rate for the first 60 days.  Because of the small number of MI's in these trials, the p-values do not reach statistical significance, but the estimates of the RR are nonetheless similar to those for the thrombotic CV events.  From this analysis, it is apparent that the increased risk for MI seen in the placebo-controlled arthritis trials begins within days of starting on rofecoxib.

Figure 6.  Rofecoxib versus Placebo Cumulative Cardiovascular Event rates for Merck Arthritis Studies.



-20-

M012D13741

Figure 7.  Rofecoxib versus Placebo Cumulative Cardiovascular Event rates for Merck Arthritis Studies restricted to the first 60 days of follow-up.



-21-

M012013742

Figure 8. Rofecoxib versus Placebo Cumulative MI rates for Merck Arthritis Studies restricted to the first 60 days of follow-up.



In conclusion, the meta-analyses reported by Merck are extremely limited in their ability to either support or refute the finding from VIGOR. However, when the analyses use myocardial infarction as the endpoint—the logical choice for a primary endpoint in light of the VIGOR results—rofecoxib demonstrates a statistically significant and clinically important increased risk for myocardial infarction across all trials. Further, analyses of the placebo controlled arthritis trials showed a significant increase in risk for thrombotic cardiovascular events in the Rofecoxib group. As will be shown later in this report, the trials that were completed after the Merck meta-analyses show almost identical excess MI risks associated with rofecoxib use.

### Alzheimer's Studies (Protocols 078 and 091)

Merck conducted three clinical trials to assess the effects of rofecoxib on Alzheimer's disease. (Protocols 126 and 78 were terminated prior to completion.)

-22-

Protocol 078 enrolled 1457 patients over age 65 with mild cognitive impairment and randomized them to blinded treatment with rofecoxib 25 mg or placebo.  The planned duration of the study was 48 months, but only 13.6% of the subjects completed the study while taking the agent to which they were randomized. The primary endpoint was conversion to Alzheimer's disease. Merck reported that significantly more patients taking rofecoxib were diagnosed with new onset Alzheimer's disease than those taking a placebo.

Protocol 091 involved 692 patients over age 50 diagnosed with possible or probable Alzheimer's and randomized them to blinded treatment with rofecoxib 25 mg or placebo. The planned duration of the study was 12 months. The primary endpoint was reduction in cognitive decline measured by the Alzheimer's Disease Assessment Scale. The company reported no difference between treatment groups upon completion. In both trials the company collected investigator-reported adverse events and adjudicated certain cardiovascular events and all deaths.  Merck also conducted in early 2001 an interim analysis of cardiovascular endpoints for inclusion in the meta-analysis prepared by the company.

My analysis relied on the raw data files the company produced that included data files with the pertinent patient demographic, concomitant medication, adverse event, vital signs, efficacy measurements, and laboratory test results. As with previously examined trials, the data were in the form of SAS data files, tables, program code, value, and variable labels. The data differed from that available from the earlier Merck trials in that adverse event information was available not only for the on-drug period but for off-drug follow-up on some patients.   With the exception of the APPROVe trial, only the Alzheimers trials followed patients off drug in the study.

The focus of my analyses will be on CHD events and mortality. For study 078, I will also briefly describe the results for the primary endpoint of progression to Alzheimer's Dementia (AD).

Before showing the results of my analyses, I will present the results from an analysis reported in April of 2001 by a Merck statistician, Joshua Chen PhD in a memo (MRK-ACR004) to Raymond Bain, PhD, also a Merck employee.  At the time of the

M012D13744

Chen memo, study 091 had finished.  The title of the Chen memo was MRK-0966
Combined Mortality Analyses Protocol 091 + Protocol 078.

Chen's analyses were directed to the question of whether there was evidence of an
effect of rofecoxib on mortality. The tables below (tables 1.2a and 1.2b), extracted from
the Chen memo, shows the mortality data from both studies. The data shown are for an
intent-to-treat (ITT) analysis that includes all deaths within the study period of 12 months
+14 days in study 091 (median follow-up of 1 year) and in study 078 up to last follow-up
+ 14 days (median follow-up 1.7 years). As shown in the tables, in study 091 there were
13 deaths in the rofecoxib and 3 in the placebo subjects; for study 078 there were 21
deaths in the rofecoxib and 9 in the placebo subjects.

### Table 1.2a 0-12 Month ITT Analysis For Protocol 091

|  | MK-0966 (N=346) | Placebo (N=346) |
|---|---|---|
| Number of Deaths (%) | 13 (3.8) | 3 (0.9) |
| Number of Discon* (%) | 77 (22.3) | 70 (20.2) |
| Number still in Study (%) | 256 (74.0) | 273 (78.9) |
| * Discontinuation of study before 12-month AND alive 14 days after discontinuation | | |

### Table 1.2b ITT Analysis For Protocol 078

|  | MK-0966 (N=723) | Placebo (N=732) |
|---|---|---|
| Number of Deaths (%) | 21 (2.9) | 9 (1.2) |
| Number of Discon* (%) | 290 (40.1) | 259 (35.4) |
| Number still in Study (%) | 412 (57.0) | 464 (63.4) |
| * Discontinuation of study AND alive 14 days after discontinuation | | |

Chen then carried out analyses that accounted for the exposure time of the
subjects in the two treatment arms and estimated the hazard ratio (referred to hereafter as
the relative risk, RR) using the Cox proportional hazards model. He did a separate
analysis for each study as well as an analysis for the two studies combined.

Chen reported in study 091 that after adjustment for age and gender, the RR of
death for a rofecoxib subject compared to a placebo subject was 4.43 (95% confidence
interval of 1.26-15.53), which is statistically significant at the p<0.01. In study 078 he
reported that after adjustment for age and gender, the RR of death for a rofecoxib subject
compared to a placebo subject was 2.55 (95% confidence interval 1.17-5.56, p-value

M012D13745

<0.02). He also reported on analyses that supported combining the two groups for a pooled analysis.

The table below (reproduced from the Chen memo) shows mortality from the pooled analysis. There are 34 deaths in the rofecoxib group and 12 in the placebo group.

**Table 1.2.2 Mortality Frequency (Combined ITT Analysis)**

| Number of Deaths (%) | MK-0966 (N=1069) | Placebo (N=1078) |
|---|---|---|
| Total * | 34 (3.2) | 12 (1.1) |
| Protocol 091 (AD) ** | 13 (38.2%) | 3 (25%) |
| Protocol 078 ** | 21 (61.8%) | 9 (75%) |

* total number of deaths in each treatment arm (% number of patients in the treatment arm)
** number of deaths from individual protocol (% total deaths in the treatment arm)

After adjustment for age, gender and protocol, the Cox model gives, a RR for death comparing rofecoxib to placebo of 2.99 (95% confidence interval of 1.55 to 5.77). This RR is significant at the $p<0.001$ level. Thus the data from the two Alzheimer's studies provide strong evidence of a major mortality excess associated with taking rofecoxib – a startling three-fold increase in the risk of death.

When I first saw the Chen memo, I assumed that Merck must have immediately notified the study Data Safety Monitoring Board (DSMB) and the FDA of this finding. However, neither of these actions was taken. The original protocol for Protocol 078 indicated that the study was to be monitored by a DSMB. However, soon after the study was started Merck filed a protocol amendment with the FDA (and I presume the Institution Review Boards of the study centers) that removed the DSMB. Thus, there was no one external to Merck who was monitoring the trial to protect the welfare of the trial participants.

The FDA has a role in the protection of the welfare of the participants, but this role is dependent on the company providing the necessary data for them to evaluate. The submission of individual adverse event reports by the company over time is insufficient to enable active trial monitoring. FDA depends on the company and/or the DSMB (if there is one) to alert them if there is evidence of a possible harmful effect of the drug under study. Merck did not notify the FDA of the results of Chen's analyses. Further, the IRBs of the participating study sites should have been alerted to the possible detrimental

M012D13746

effect of rofecoxib on mortality, as the IRBs are entrusted with protection of the welfare of people from their center who are in the trial. Merck did not notify the IRBs about the findings in the Chen memo. Study 078 continued for about 2 years; during that time there were approximately 8 additional excess deaths in the rofecoxib treated patients compared to placebo (20 rofecoxib versus 12 placebo, based on the difference in the numbers in the Chen report compared to the final totals from study 078).

In my opinion, Merck's failure to notify the appropriate organizations of the possible excess risk of death from taking rofecoxib sharply deviates from accepted clinical practice and constitutes gross scientific misconduct.

In July 2001, Merck filed with the FDA, a SUR (MRK-01420145856) for rofecoxib. At that time they reported data on the mortality findings from study 091 and 078. Their report of the mortality results lacked clarity and effectively hid the magnitude of the mortality difference seen so clearly in the Chen memo. In the FDA review of the data presented in the SUR the following table is shown that summarizes the mortality data from the Alzheimer's studies.

FDA Table 22.  Deaths in Alzheimer's studies

| Study # | Rofecoxib 25 mg N= 1448 | | | Placebo N= 1451 | | |
|---|---|---|---|---|---|---|
| | n/Pt Years of exposure | | | n/Pt Years of exposure | | |
| 091 | 15/301 | | | 8/366 | | |
| 078 | 14/996 | | | 8/1098 | | |
| 126 | 4/165 | | | 3/169 | | |
| | n | (%) | | n | (%) | |
| Total* | 33 | (2.3) | | 20 | (1.4) | |
| CVT[1] | 8 | (0.6) | | 4 | (0.3) | |
| Other[2] | 24 | (1.7) | | 16 | (1.1) | |

Both the results in the SUR and in Chen's memo were based on a data files prepared in March of 2001. Thus, the results from both analyses should be very similar. A comparison of this table 22 with table 1.2.2 from the Chen memo shows considerable disagreement. However, in checking the data files from the two Alzheimer's studies I have been able to largely resolve these discrepancies. For both study 091 and 078, Chen produced tables based on the ITT population. Thus, all deaths were included, even those

-26-

M012013747

that occurred when the subject wasn't taking the drug, as long as the study was ongoing. For study 091, Chen limited his analyses to the 12 months (+ 14 days) of the study when it was still a parallel design study, e.g. patients were randomly allocated to rofecoxib and placebo.

After the 12 month period, 90% of the rofecoxib group was switched to placebo, with the remainder staying on rofecoxib with three months of additional follow-up. In table 22 above, Merck included deaths that occurred during or after the extra 3-month period. Thus, for study 091, Merck effectively reported an ITT analysis by including all deaths. However, for study 078, Merck did not include all of the deaths; rather they only included deaths that occurred within 14 days from the last dose of drug taken by the patient. Had this rule been applied for study 091, the reported deaths would have been distributed as 9 rofecoxib versus 2 placebo.

However one looks at it, the presentation of the data as summarized in Table 22 is a serious misrepresentation of the mortality data from the two studies. An unbiased, clear presentation of the results would have shown the ITT findings along the lines done by Chen. Clearly, had the results been presented as was done by Chen, the level of concern in the FDA and the broader medical community would have been far greater. In my view, the serious mortality concerns identified in these trials was cause to stop trial 078.

Merck scientists claimed in the medical literature and in reports to the FDA that the Alzheimer's studies were reassuring with respect to cardiovascular safety of rofecoxib. Even as late as January 2005, Kim and Reicin (Merck employees) in a letter to the editor of Lancet criticized the report by Juni on the excess risk of MI associated with rofecoxib. They state in reference to the Alzheimer's studies that, "The results of these trials show no difference between rofecoxib (Vioxx) and placebo" [The Lancet, Vol 365, Jan 1, 2005].

My analyses (below) of the data show that Merck again failed to accurately report the significant adverse data from these studies to the medical community and the FDA. Table 2 shows the results of my analyses. The relative risk of myocardial infarction on rofecoxib was 1.52 compared to placebo (p = 0.21). However, this analysis underestimates the true risk for MI because many of the events recorded as sudden deaths were likely concurrent with or preceded by an MI, but classified as a sudden death. This

-27-

is because most sudden deaths occur unobserved, so there is inadequate documentation available to determine if an MI or arrhythmia or both was the cause of the death. As a result, those MIs were not counted in Merck's analyses as MIs. Thus a better indication of the risk of a heart disease event is the broader category of "hard" CHD defined as MI plus sudden death. This endpoint is widely used in cardiovascular studies. It was used in the Merck-sponsored trial of Zocor (Scandinavian Simvastatin Survival Study Group: Randomized trial of cholesterol lowering in 4444 patients with coronary heart disease: the Scandinavian Simvastatin Survival Study (4S). *Lancet* 344:1383–1389, 1994).

In my analyses, I have also included as a hard CHD and heart disease death endpoint, three subjects who were recorded as having unknown (or 'insufficient data') as the cause of death and had an adverse event of MI noted for the hospitalization at which the death occurred. In addition, I have classified as heart disease deaths, one death coded as cardiac failure and another as hypertension. Merck did not count these events in any of their analyses as cardiac events. The relative risk of hard CHD was 1.89 (p < 0.05). The relative risk for fatal heart disease was 3.84 (p < 0.005). These findings cannot be interpreted as being "reassuring" with respect to the CHD risk associated with rofecoxib.

| Table 2. Relative Risks for Alzheimer's Studies | | | |
|---|---|---|---|
| Endpoint | Relative Risk | Confidence Interval | p-value |
| MI | 1.52 | 0.78   2.94 | 0.21 |
| Hard CHD (MI + Sudden Cardiac Death) | 1.89 | 1.08   3.33 | <0.05 |
| Heart Disease Mortality | 3.84 | 1.54   9.51 | <0.005 |
| All Cause Mortality | 2.13 | 1.36   3.33 | <0.001 |

In addition, treatment with rofecoxib was associated with statistically significant excess total mortality in the rofecoxib group, indicating that treatment shortened life in this patient population. For deaths from all causes, the relative risk of death for rofecoxib treatment was 2.13 (p < 0.001). In January 2001, in an email addressed to other Merck scientists, Shapiro (a Merck statistician) discusses the possibility of doing an ITT analysis of mortality for all of the rofecoxib studies. In the memo she states about the Alzheimer's deaths that, "But the count not excluding late deaths was 30 rofe to 10 placebo."

-28-

M012D13749

The time-to-event curves, Figures 9, 10 and 11, show the cumulative event rates for hard CHD, heart disease deaths, and total mortality, respectively. The over four-fold excess risk for CHD death and two-fold excess risk of total mortality in those taking rofecoxib compared to those on placebo was striking and the finding robust.

M012D13750

Figure 9.



Figure 10.



M012D1375I

Figure 11.



In a search of the files provided by Merck I was able to locate a file that included mortality data from all of the studies included in the published meta-analyses. This file was among the files in a folder entitled "meta-analysis." I did an analysis of all-cause mortality (information on the cause of death was not included in the file). There were 56 deaths in subjects taking rofecoxib and 26 in subjects taking the comparator agents, giving a RR = 1.73 (p<0.025). The Alzheimer's studies deaths agreed with what was presented in the Shapiro email.

In addition, in March 1, 2001 a report was written that presented a cataloging of the causes of the deaths in the Alzheimer's studies by three Merck physicians, Dr. Chodakewitz, Dr. Beck and Dr. Barr (MRK-AAX000696- MRK-AAX000705). The table 2 below is reproduced from this report. Note that there are 8 rofecoxib and 2 placebo cardiovascular deaths, a four fold difference. In addition, among the deaths classified in the table as other/unknown, 7 rofecoxib and 3 placebo deaths were listed with cardiovascular causes in appendix 2 of the document.

-31-

M012D13752

Table 2: Deaths on drug (including 14 days after discontinuation of drug) in MK-0966 studies 078, 091 and 126 based on secondary categorization

| Category of Death | Study | MK-0966 | Placebo |
|---|---|---|---|
| Cardiovascular[1] | 078 | 3 | 0 |
| | 091 | 3 | 1 |
| | 126 | 2 | 1 |
| | Total | 8 | 2 |
| Respiratory[1,2] | 078 | 1 | 0 |
| | 091 | 4 | 0 |
| | 126 | 0 | 0 |
| | Total | 5 | 0 |
| Cancer | 078 | 1 | 4 |
| | 091 | 0 | 0 |
| | 126 | 0 | 1 |
| | Total | 1 | 5 |
| Other/Unknown | 078 | 8 | 3 |
| | 091 | 2 | 1 |
| | 126 | 1 | 1 |
| | Total | 11 | 5 |
| | Overall Total | 25 | 12 |

Deaths listed for study 091 occurred during month 0-12,
study 078 is ongoing, study 126 is currently being discontinued, deaths listed for both
studies are as of 3/01
[1] based on blinded assessment by Eliav Barr, MD
[2] based on blinded assessment of deaths due to pneumonia Jeff Chodakewitz, MD

Thus, as early as January of 2001, Merck scientists were aware of the excess mortality associated with rofecoxib across all of their studies and that much of this excess was due to cardiovascular causes. These results were not presented in any of the published meta-analyses nor were they presented to the FDA. On the contrary, in the July 2001 SUR (page 101), it is stated that, "Therefore, review of the deaths does not identify a specific increased risk with rofecoxib." This statement is false.

Merck submitted a Clinical Safety Report (CSR) to the FDA in November 2003 on the results from study 078 (MRK-12690007833). In addition, Merck summarizes the mortality and cardiovascular risk results from the Alzheimer's studies in their background document for the FDA Advisory Committee in February 2005. Finally, Merck and the investigators for studies 078 and 091 present the Alzheimer's results in

-32-

M012013753

journal articles (Reines et al., Neurology 2004 and Thal et al., Neuropsychopharmacology 2005). The publication of the results of this trial, however, was incomplete and inaccurate.

In Merck's summary document for the 2003 CSR (MRK-AHP0085928) the following statement is made concerning the results of study 078: "There were no unexpected safety results in this study compared to what is in the current label ..." This statement is selective and misleading. This pattern of basing statements about the safety of rofecoxib on the on-drug data and not mentioning the full ITT results is repeated in all of Merck's presentations and publications. In the CSR (page 212), Merck states that "All deaths were adjudicated, whether they occurred on or off of study medication, ... . Statistical analyses of all-cause mortality and thrombotic cardiovascular mortality were performed only for patients on-drug ... ." Even when Merck does statistical analyses for the on-drug period they fail to present the survival curves or the Cox model RR's and associated statistical tests. Instead they present incidence rates and confidence intervals but not the statistical tests for differences in the rates (page 187). The one time that they do a statistical test for the on-drug death rates, they state it is not statistically significant (page 127). They come to this conclusion by computing the test based on the proportion of patients in each group who died rather than on the incidence rates (which accounts for exposure time). This is not the correct test to use for data of this type. .

On page 130 of the CSR, Merck presents the proportion of patients who died for the ITT population; however they don't present the incidence rates, survival curves, or RRs. They do a test of the proportions and do indicate that it is statistically significant but otherwise ignore this finding. In the final section of the CSR, Merck states that "Rofecoxib 25mg was generally well tolerated in patients with MCI."

The Company's submissions and presentations in connection with the 2005 Advisory Committee concerning the data from these trials did not reflect the substantial CHD and all-cause mortality risk associated with rofecoxib as determined by the trials. Once again Merck failed to present an ITT analysis. In Table 25 of Merck's Advisory Committee Briefing Document (page 117, MRK-AFK 02235712), the cardiovascular and mortality risk of rofecoxib is understated by omitting the events that occurred off-treatment. Table 3 shows the results for the ITT data compared to the results in Table 25

-33-

M012D13754

of the 2005 FDA report. In spite of the results from the ITT mortality and CHD events analyses, Merck continued to assert that the Alzheimer's studies demonstrate the cardiovascular safety of rofecoxib.

| Table 3. Comparison of Results from Alzheimer's Data File to Results in FDA Presentation | | | | |
|---|---|---|---|---|
| Adjudicated Event Category | ITT Results from Data File | | Results Presented to FDA | |
| | Placebo | rofecoxib | Placebo | rofecoxib |
| Acute myocardial infarction | 14 | 15* | 14 | 14 |
| Fatal acute myocardial infarction | 1 | 6 | 1 | 2 |
| Sudden cardiac death | 4** | 12* | 4 | 8 |
| Total Hard CHD Events | 19 | 32 | 19 | 24 |

*One acute myocardial infarction occurred on the same day as a sudden cardiac death and is included in both rows (but only once in the total hard CHD row).
**Two of the sudden cardiac deaths included here are deaths that the adjudication committee listed as 'respiratory arrest'. In my analyses in table 2, I did not include them as CHD events.

The results of study 091 were published in Neurology in 2004. Seven of the eight authors of the paper were Merck employees (the non-employee was a Merck paid consultant). The only mortality data presented were the number of deaths while on-drug, 9 on rofecoxib and 2 on placebo. No statistical tests were done. In the Chen memo based on the same on-drug data reported in Neurology, Chen reports that the RR for rofecoxib was 4.68, p<0.05. Further, the ITT analyses produced by Chen showed a RR for rofecoxib of 4.43 (p<0.01). The failure of the authors to include these analyses in the paper is consistent with Merck's failure to include essential information in the publication of its earlier VIGOR trial.

The paper describing the results of study 078, published in Neuropsychopharmacology in 2005, for which 8 of the 11 authors were employees of Merck, is very troubling in its presentation. The authors interpreted the results for the primary endpoint of the study, which is the progression from mild cognitive impairment (MCI) to Alzheimer's, in a very troubling manner. The RR for the progression to Alzheimer's for rofecoxib compared to placebo was 1.46, p=0.011. The study was planned so that a RR of 0.7 in favor of rofecoxib would be detectable (i.e., in planning the trial, the investigators believed that a 30% or greater reduction in the risk of Alzheimer's due to the use of rofecoxib would be an important medical difference). Had Merck observed a RR of 0.7 for the primary endpoint, it would have strongly supported

-34-

Merck's hypothesis that rofecoxib delayed the onset of Alzheimer's disease. One would think that having observed a RR of 1.46 (a forty-six percent *increase* in conversion to Alzheimers), Merck would have concluded that it was likely (although not certain) that the use of rofecoxib increased the progression from MCI to Alzheimer's. Instead, Merck concluded that, "The results from this MCI study did not support the hypothesis that rofecoxib would delay a diagnosis of Alzheimer's Disease. . ."

In the discussion section of the paper they state that, "The possibility that rofecoxib might be inferior to placebo was also not supported by data from two large previous AD treatment studies... and found that rofecoxib had no significant effect on progression of cognitive or functional decline (Aisen et al, 2003; Raines et al, 2004)." This statement is not correct. The Aisen paper (JAMA; 289, 21, 2003) shows a statistically significant difference between rofecoxib and placebo (p=0.044), favoring placebo. That is, in this study, the decline in intellectual functioning in the rofecoxib patients was statistically significantly greater than in the placebo group. The authors of the paper interpreted this difference as non-significant because they made an adjustment for the fact that they were also testing the hypothesis that naproxen was equal to placebo. However, for the purposes of whether or not the results of this study supported a possible harmful effect on progression of cognitive decline, the more appropriate p-value to use is the unadjusted one.

The FDA in their December 5, 2001 memo to Merck asked whether it was appropriate to continue study 078, given the statistically significant excess mortality and lack of efficacy seen in study 091. Merck replied that one of the reasons that the study should continue was the importance of learning if rofecoxib prevents dementia in people with mild cognitive impairment. However, as demonstrated below, had a DSMB examined the findings for the onset of Alzheimer's in study 078 they would have found that as early as Sept. 15, 2000, it was clear that there was statistical evidence that not only didn't rofecoxib prevent Alzheimer's disease, it might actually cause it. Thus, the argument given by Merck that rofecoxib might prevent Alzheimer's disease was contradicted by the actual results from study 078 and didn't provide a valid reason to continue the trial. The safety concerns raised by both the excess mortality and the excess risk of Alzheimer's disease made it imperative that the trial be terminated to protect the

-35-

M012D13756

welfare of the trial participants and to alert the medical community of the adverse safety
profile of rofecoxib. In my experience, a reasonable DSMB would have strongly
recommended termination of the study and a reasonable pharmaceutical firm would have
accepted the recommendation.

I have carried out analyses for study 078 of both the mortality and Alzheimer's
endpoints for follow-up through two separate dates – Sept 15, 2000 and March 23, 2001.
The former date corresponds to when unblinded cardiovascular and mortality results for
the Alzheimer's studies were made available to a Merck statistician to provide data for
the FDA Arthritis Advisory Committee Background Information report for the Feb. 8,
2001 Advisory Committee meeting. It was at this time that Merck employees had access
to the mortality findings from the Alzheimer's studies. Further, this is at a point where
the number of Alzheimer's events (93) was sufficient to justify an interim analysis by a
DSMB had one existed. The second date corresponds to the follow-up date that the
Merck statistician Joshua Chen indicates was covered in his analysis of the mortality
data. Early in April of 2001, Chen's report alerted Merck scientists and management
about the excess mortality seen in the Alzheimer's studies. Table 4 below summarizes
the result of these analyses.

| Table 4. Relative Risks for Alzheimer's Study 078 for the Mortality and Alzheimer's Endpoints. | | | | |
|---|---|---|---|---|
| For Follow-up Through Sept. 15, 2000 | Relative Risk | 95% Confidence Interval | | p-value |
| Alzheimer's | 1.58 | 1.04 | 2.39 | 0.03 |
| Mortality | 3.22 | 1.17 | 8.87 | 0.02 |
| For Follow-up Through March 23, 2001 | | | | |
| Alzheimer's | 1.64 | 1.12 | 2.39 | 0.01 |
| Mortality | 2.41 | 1.14 | 5.10 | 0.02 |

Had a DSMB reviewed these results based on the Sept. 15, 2000 follow-up cutoff
date they would have seen a statistically significant 58% increased risk for Alzheimer's
disease and a tripling of the risk of death, both statistically significant (p=0.03 and
p=0.02, respectively). Figures 12 and 13 show the cumulative event rate curves for
Alzheimer's and mortality, respectively. Note that for both endpoints the curves begin

-36-

M012D13757

to separate during the first 6 months and there is a continuing separation over time that is not diminishing with increasing follow-up time. A statistical test for proportional hazards is non-significant, indicating no evidence for differing relative risks at different time points.

Similarly, had a reasonable DSMB reviewed the results for follow-up through March 23, 2001, the continued statistically significant difference for both mortality and Alzheimer's would have resulted in a recommendation to stop the study 078. Figures 14 and 15 show the cumulative event rate curves for Alzheimer's and mortality, respectively. Again, the test for proportional hazards is non-significant.

In my over 40 years of reviewing results from clinical trials, I have never seen or read of a clinical trial that was allowed to continue that had such a marked and statistically significant difference for both a serious adverse event (mortality in this instance) and the primary study endpoint (Alzheimer's dementia). The statistical evidence for 078 reveals that by allowing the study to continue, Merck likely caused additional trial subjects to die prematurely and others to have Alzheimer's dementia. Merck failed in its obligation to protect the welfare of the trial subjects and in so doing violated the provisions of the DECLARATION OF HELSINKI.

M012D13758

**Figure 12.  Alzheimer's Dementia Cumulative Event Rate Curves for Study 078 for a Sept. 15, 2000 Follow-up Cutoff Date.**



**Figure 13.  Mortality Cumulative Event Rate Curves for Study 078 for a Sept. 15, 2000 Follow-up Cutoff Date.**



-38-

M012D13759

**Figure 14. Alzheimer's Dementia Cumulative Event Rate Curves for Study 078 for a March 23, 2001 Follow-up Cutoff Date.**



**Figure 15. Mortality Cumulative Event Rate Curves for Study 078 for a March 23, 2001 Follow-up Cutoff Date.**



-39-

M012D13760

The inaccurate and misleading reporting of trial results in the medical literature is again present in the reporting and discussion of the mortality findings. The 091 publication first reports the proportion of patients who died on-treatment in the two arms of the study. It does not report the incidence rates, RR's, or any tests of significance. In this respect, the approach taken is identical to that in the FDA 078 CSR report. While Merck does list in this report the deaths that occur in the off-drug period, they provide no analyses concerning the difference in the RR for total mortality or for heart disease mortality. This pattern of misleading reporting is continued in the published article describing the results from 078 (Thal et al.):

> "The total number of deaths and causes of death on–drug were consistent
> with expectation for an elderly population, and there was no specific pattern as to
> cause of death in either treatment group. The off-drug mortality data are difficult
> to assess since follow-up information was available for less than half of the
> patients, there was an imbalance in the extent of follow-up between the two
> groups, and the majority of the deaths occurred more than 48 weeks after the
> treatment had been discontinued."

This statement is both inaccurate and invites a misunderstanding of the importance of the mortality findings. Below are the critical facts:

- There was a statistically significant excess of mortality during the on-drug period, which continued into the off-drug period.
- An ITT analysis that includes all of the deaths is likely to be biased towards a reduced difference between the treatments. This is due to the fact that with longer follow-up deaths will occur due to "natural causes" - that is, deaths that are not related to the treatments used in the trials. Thus, the observation of a statistically significant difference for the ITT population should have been of great concern.
- The difference in the extent of follow-up was due to the higher rate of Alzheimers and of discontinuation due to side effects in rofecoxib patients than in placebo patients. Both of these would likely bias the results towards a

M012D13761

smaller RR rather than a larger one, because Alzheimer's disease and side effects are themselves risk factors for subsequent mortality.

- Rather than there being "... no specific pattern as to cause of death in either treatment group," the majority of the difference in the risk of death was due to heart disease deaths. The number of cancer deaths, for example, was identical in the rofecoxib patients and placebo patients. There were also 5 deaths in the rofecoxib patients that were classified as accidental deaths (there were none in placebo patients). For several of these the adjudications could not rule out that the accidents that resulted in the death of the patient might have been due to a heart attack or stroke. If some of these 'accidents' were heart attacks, then the observed RR for rofecoxib underestimated the true risk.

- Study 091 also observed an excess of mortality both on-drug and ITT.

An accurate and complete discussion of the findings of this study would have made the points I've outlined above and reported that there was a highly statistically significant excess of mortality associated with the use of rofecoxib.

In conclusion, as early as January of 2001, when Shapiro reported that there were 30 deaths in the rofecoxib patients and 10 in placebo patients in the Alzheimer's studies, Merck was aware that there might be a serious mortality risk in the elderly associated with taking rofecoxib. That information should have been presented to FDA and its Advisory Committee at that point in time. The report in March 2001 and the April 2001 analyses by Chen further supported this mortality concern. At that point in time, study 078 should have been halted and the data should have been disclosed to the medical community. This was not done. The findings after the completion of study 078 provided further compelling evidence that rofecoxib was unsafe for use in the elderly. It also showed that rofecoxib might increase the deterioration of mental functioning in the elderly. Much of this information was unknown to the scientific and medical communities until a 2008 publication in the Journal of the American Medical Association [Psaty BM; Kronmal RA. Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment: A Case Study Based on Documents From Rofecoxib Litigation. JAMA, April 16, 2008; 299: 1813 - 1817.]. This paper, which I coauthored, summarized the Alzheimer's findings that appear in this report. Also,

-41-

appearing in the same issue of JAMA [Ross JS; Hill KP; Egilman DS; Krumholz HM. Guest Authorship and ghostwriting in Publications Related to Rofecoxib: A Case Study of Industry Documents From Rofecoxib Litigation. JAMA. 2008;299(15):1800-1812.] was an article that showed that the scientific publications on the 091 and 078 studies were written by Merck employees and contractors and the non-Merck authors listed, including the first authors of both papers, had little or no role in the writing of the papers (e.g. were 'ghost' authors).

### Protocol 122 Colon Polyps Study (APPROVe)

Protocol 122 enrolled 2586 patients with recently-removed colorectal adenomas to receive 25 mg of rofecoxib or placebo. They completed approximately 3 years of treatment before the trial was halted for safety reasons by the external data safety monitoring board. The study's intended endpoint was the recurrence of colorectal adenomas, but in addition it was among a group of clinical trials included in a plan established in 2003 to monitor and adjudicate certain cardiovascular endpoints. As in the Alzheimer's studies, follow up was continued in some patients after completion or discontinuation of drug treatment.

The SAS data files, tables, program code, variable and value labels provided by the company and used in this analysis were similar to those described in previous sections. The relative risks of an MI and CHD were calculated with a Cox proportional hazard model using the same event definitions as in the Alzheimer's protocols.

The relative risk of rofecoxib for an MI was 2.07 (p=0.05, 95% CI=(1.00, 4.29)). The relative risk of hard CHD was 2.17 (p<0.025, 95% CI=(1.12, 4.23)). The excess risk of MI or CHD with rofecoxib was statistically significant and consistent with those observed in the previous three analyses. A test of the hypothesis of a constant hazard ratio (no differences in relative risk over time) found no statistically significant evidence of either increased or decreased risk over time. The time-to-event curves for MI and CHD are shown below in Figures 16 and 17.

M012D13763

**Figure 16.**



**Figure 17.**



M012D13764

The withdrawal of rofecoxib in September 2004 was publicly attributed to the results of the APPROVe trial. With respect to the APPROVe data, Merck has stated that the data demonstrated "an increased cardiovascular risk in patients using rofecoxib beginning after 18 months of continuous use . . ." The statement above is misleading because—as Merck did in its presentation of its meta-analysis and Alzheimer's data—it has failed to provide a separate analysis of the previously signaled cardiovascular events; particularly MI events and hard CHD. Further, the CSR for the APPROVe trial reveals that the investigator reported cardiovascular events, which were a secondary endpoint in the trial, separated early and remained separate over the duration of the trial: "The curve of the rofecoxib treatment group was above the curve of the placebo treatment group during the entire study." The publication of the APPROVe trial failed to reveal this information, which was contrary to the Company's public position. This was not proper.

As noted above, the relative risk for MI from a Cox model is 2.07 ($p=0.05$, 95% CI=(1.00, 4.29)). For CHD (MI & sudden cardiac death), the relative risk is 2.17 ($p<0.025$, 95% CI=(1.12, 4.23)). Both of these are consistent with the risks observed in my previous analyses for VIGOR, Alzheimer's, and the meta-analysis. It is also worth noting that, as is shown in Figures 16 and 17, the cumulative event rate curves appear to separate early and thus do not show the same degree of early similar risk and later increasing risk of rofecoxib compared to placebo shown for the APTC endpoint. Such findings are contrary to Merck's public assertions that in the APPROVe trial, an increased risk of cardiovascular events was not evident until after 18 months of continuous use.

The analysis below describes the findings from the one year extension of follow-up of the APPROVe study requested of MERCK by the FDA. It is important to note that the extension did more than add additional follow-up time and events; it also made an intent-to-treat (ITT) analysis for CV events possible for APPROVe. The extended follow-up included all trial participants who the investigators were able to contact and who agreed to the follow-up. This comprised 84% of the originally randomized participants.

M012D13765

For the analyses presented below I have included all available events and follow-up through 210 weeks from each study participant's entry date. This corresponds to the primary analysis specified in the Merck statistical analysis plan for the extension. I present below the results for MI and hard CHD (MI + sudden cardiac death).

For MI, the RR comparing rofecoxib to placebo is 2.11 (p=0.018, CI=1.14-3.90). This is a small increase in relative risk compared to the result for the "on-drug" analysis (RR= 2.07). The MI event rate curves are shown in Figure 18. Note that there is no evidence from the curves that the excess risk of MI starts after 18 months. Rather, it is clear that the curves separate within the first 6 months of follow-up. Merck's contention, founded on its post hoc analysis, that there is no excess risk for CV events until after 18 months of continuous use is not supported by these data. A statistical test for equality of RR across time is not rejected (proportional hazards p=0.43) and thus there is no statistical support for the Merck 18 month argument.

The results for hard CHD shows a small decrease in the RR compared to the on-treatment analyses reported earlier. The RR is 1.84 (p=0.02, CI=1.08-3.14) compared to the on-drug RR of 2.17. The test for equality of RR across time is not rejected (proportional hazards p=0.47). Again, there is no evidence in support of Merck's contention that the risk associated with rofecoxib use is only manifest after 18 months of continuous use.

As I have discussed, Merck has based many of its arguments about the safety of rofecoxib on results using the APTC and thrombotic endpoints. Specifically, the Company's contention that the increased risk is only for patients who use rofecoxib for 18 months is based on an analysis of these endpoints. In the APPROVe report in the New England Journal of Medicine (NEJM), Merck supports this claim by presenting the event rate curves for the thrombotic endpoint and by doing a test for proportional hazards for the thrombotic endpoint. They report that this test was significant at the p=0.01 level. Subsequent to the release of the APPROVe follow-up data, Merck revealed that the p-value for the proportional hazards test Merck reported in the NEJM APPROVe report was, in fact incorrect, and not statistically significant; thus, even the on treatment

-45-

APPROVe data lacked statistical evidence supporting the 18 month hypothesis articulated by the Company. The NEJM subsequently issued a correction to the APPROVe report confirming the absence of statistical evidence supporting that hypothesis.

The follow-up data from the APPROVe extension provides overwhelmingly convincing evidence that the 18 month hypothesis is not supportable even based on the APPROVe data. The additional follow-up not only tallied events that occurred during the one year extension, it also ascertained events that occurred during the first three years of the study in participants who Merck did not follow for the entire period because they dropped out due to side effects or for other reasons. Thus, for the first three years of the study, the data now reflects more closely the ITT analyses that are the scientific standard for clinical trial results. Merck provided these analyses to the FDA in May of 2006 (MRK-S04020112023).

One of the striking findings shown in Merck's report to the FDA is that even for the thrombotic and APTC endpoint, the appearance of no increased RR for the first 18 months is no longer present and the test for proportional hazards is no longer near significant. This is shown in the two figures (B1, page 15 and B5, page 24 of the FDA submission) below for the thrombotic and APTC endpoint. Merck reports that the p-values of the test of proportional hazards are 0.75 for both the thrombotic and APTC endpoints. These p-values show that there is no statistical support for any deviation from a constant RR over the follow-up time, e.g., the Merck 18 month hypothesis is not supported by the APPROVe extension data.

**Protocol 203 Pooled Analyses**

In January of 2004, Merck produced a document entitled "Statistical Data Analysis Plan – A Combined Analysis of Thrombotic Cardiovascular Events in 3 Placebo-Controlled Studies of Rofecoxib (Study 203)." The Statistical Data Analysis Plan ("DAP") was authored by members of the Merck Clinical Biostatistics unit. The DAP sets forth the analysis plan for an analysis of CV events based on the data from

-46-

MO12D13767

pooling the data from three studies of rofecoxib—APPROVe, VIP, and VICTOR. The planned analyses would be presented on a periodic basis to an unblinded independent DSMB referred to by Merck as the External Safety Monitoring Board (ESMB). The thrombotic endpoint is defined as a confirmed acute MI, unstable angina pectoris, sudden and/or unexplained death, resuscitated cardiac arrest, cardiac thrombus, pulmonary embolism, ischemic cerebrovascular stroke, cerebrovascular venous thrombosis and transient ischemic attack. The detailed sequential analysis plan described in the DAP was never implemented. Thus, ESMB review focused on the APPROVe trial which was recommended for termination by them in September of 2004 based on the excess CV events in the rofecoxib group compared to the placebo group.

I have received data files from all three studies which I have combined for the pooled analyses reported here. Below are the results for the analysis of the two primary endpoints I have examined: MI, and hard CHD. I have also included the thrombotic endpoint for purposes of comparison.

The results for the three endpoints are shown in Table 5. Note that there is a highly statistically and medically significant excess risk associated with rofecoxib use compared to placebo for each endpoint. For MI, the RR is 2.26; for hard CHD, the RR is 2.18; and for the thrombotic endpoint, the RR is 1.73 (p-value<0.007 for all of the endpoints).

| Table 5. Relative risks for Protocol 203 pooled analyses | | | |
|---|---|---|---|
| Endpoint | Relative Risk | 95% Confidence Interval | p-value |
| MI | 2.26 | 1.25   4.09 | 0.007 |
| Hard CHD (MI + Sudden Cardiac Death) | 2.18 | 1.26   3.78 | 0.005 |
| Thrombotic Events | 1.73 | 1.21   2.48 | 0.003 |

Figures 18, 19 and 20 show the cumulative event curves for MI, hard CHD, and thrombotic events, respectively. The curves for MI, hard CHD, and thrombotic events on rofecoxib are above the placebo curves during the entire period analyzed.

M012D13768

Figure 18.



-48-

M012D13769

**Figure 19.**



**Figure 20.**



M012D13770

**Cardiovascular Data in Rofecoxib Product Label**

It is my understanding that pharmaceutical labels "shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug: a causal relationship need not have been proved." US FDA 21 CFR Section 201.57(e). The phrase "reasonable evidence of an association" is a statistical concept that is well within my area of expertise.

As expressed in this report, by early 2000, there was reasonable evidence of an association between rofecoxib and the development of a spectrum of cardiovascular disease, including MI, hard CHD, CHF, and hypertension. Similarly, the Alzheimer's trials provided reasonable evidence of an association between rofecoxib and total mortality, cardiovascular mortality, and the conversion to Alzheimer's disease. The clinical trials provided evidence of the frequency, character, and severity of these serious hazards. It is my opinion that the 2000 and 2002 labels for rofecoxib failed to accurately portray the statistical data that reflected these serious health risks.

In particular, prior to 2002, the rofecoxib label did not contain any reference to the statistical evidence of the marked increased risk of myocardial infarction that should have been evident to Merck at least as early as the spring of 2000. It is my opinion that without this clinical trial data, the label was inaccurate and incomplete. In 2002, the label was amended to include references to *select* VIGOR data. As presented in the label, this statistical information misstates the consistent findings seen across clinical trials concerning the frequency, character, severity, and spectrum of cardiovascular adverse events seen in the rofecoxib clinical trials. It also refers to the meta-analysis and Alzheimer's data, even though there were many methodological and substantive flaws in that analysis and presentation. Finally, the label failed to disclose the strong evidence of an association of rofecoxib with increased mortality and progression to Alzheimer's disease seen in the Alzheimer's studies. These omissions and distortions subvert the spirit and letter of the regulations governing the required warnings that should be included in the drug label.

M012D13771

## IV.    CONCLUSION

In conclusion, I have reviewed and analyzed Merck clinical trials data files that were sufficient in number to provide a comprehensive overview of the scientific evidence available to the Company about the cardiac and cardiovascular risks of rofecoxib. The significant risks of rofecoxib to the heart and cardiovascular system were apparent in the spring of 2000 and confirmed and reinforced by data that became available in succeeding years. In addition, the evidence of significant mortality risk seen in the Alzheimer's trials should have been reported to the medical community. In my opinion, Merck did not accurately present the adverse effects of rofecoxib seen in these data in published articles, presentations to the FDA, and the product labeling.

*Richard A. Kronmal*
Richard A. Kronmal

M012013772