# EXHIBIT 1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3   ***************************************************************

 4   IN RE:  VIOXX PRODUCTS
            LIABILITY LITIGATION
 5                                  MDL DOCKET NO. 1657
                                    NEW ORLEANS, LOUISIANA
 6                                  THURSDAY, JULY 6, 2006, 5:30 P.M.

 7   ***************************************************************

 8
                     TRANSCRIPT OF MOTIONS HEARING
 9          HEARD BEFORE THE HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES:

12
     FOR THE PLAINTIFF:        HERMAN HERMAN KATZ & COTLAR
13                             BY:  RUSS M. HERMAN, ESQUIRE
                               201 ST. CHARLES AVENUE, SUITE 4310
14                             NEW ORLEANS, LA 70170

15
                               BEASLEY ALLEN CROW METHVIN
16                             PORTIS & MILES
                               BY:  ANDY D. BIRCHFELD, JR., ESQUIRE
17                                  P. LEIGH O'DELL, ESQUIRE
                               234 COMMERCE STREET
18                             POST OFFICE BOX 4160
                               MONTGOMERY, ALABAMA 36103
19

20                             ROBINSON CALCAGNIE & ROBINSON
                               BY:  MARK P. ROBINSON, JR., ESQUIRE
21                             620 NEWPORT CENTER DRIVE, 7TH FLOOR
                               NEWPORT BEACH CA  92660
22

23                             LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                               BY:  DONALD C. ARBITBLIT, ESQUIRE
24                             EMBARCADERO CENTER WEST
                               275 BATTERY STREET, SUITE 3000
25                             SAN FRANCISCO, CA  94111-3339
```

```
 1                           GAINSBURGH BENJAMIN DAVID MEUNIER AND
                                 WARSHAUER, LLC
 2                         BY:  GERALD E. MEUNIER, ESQUIRE
                           2800 ENERGY CENTRE
 3                         1100 POYDRAS STREET, SUITE 2800
                           NEW ORLEANS, LOUISIANA  70163-2800
 4                         (504)522-2304

 5

 6   FOR THE DEFENDANT:    BARTLIT BECK HERMAN
                           PALENCHAR & SCOTT
 7                         BY:  PHILIP S. BECK, ESQUIRE
                                ANDREW GOLDMAN, ESQUIRE
 8                         54 W. HUBBARD STREET, SUITE 300
                           CHICAGO, ILLINOIS 60601
 9

10
     ALSO PRESENT:         JUSTIN WOODS, ESQUIRE
11                         JEAN PAUL OVERTON, ESQUIRE
                           DOUG MARVIN, ESQUIRE
12                         ADAM MORTARA, ESQUIRE

13
                           KEVIN CALCAGNE, ESQUIRE
14                         LEXI MYER, ESQUIRE
                           DAWN BARRIOS, ESQUIRE
15                         DREW RANIER, ESQUIRE

16
                           TOM KLINE, ESQUIRE
17                         LEONARD DAVIS, ESQUIRE
                           MONICA GANT MOTON, ESQUIRE
18                         HOLLY WHEELER, ESQUIRE
                           HAMILTON HILL, ESQUIRE
19

20

21   OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RPR, CRR
                                 500 POYDRAS STREET, ROOM B406
22                               NEW ORLEANS, LOUISIANA 70130
                                 (504) 589-7779
23

24   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.
25
```

1                          **P-R-O-C-E-E-D-I-N-G-S**

2                         THURSDAY, JULY 6, 2006

3                      M O R N I N G   S E S S I O N

4                      (COURT CALLED TO ORDER)

5           THE DEPUTY CLERK:  Everyone rise.

6           THE COURT:  Be seated please.  Call the case.

7           THE DEPUTY CLERK:  MDL Number 1657 In re:  Vioxx.

8           THE COURT:  Counsel make their appearance for the

9    record.

10          MR. HERMAN:  May it please the Court, Russ Herman of the

11   Plaintiffs' Steering Committee.  I'll argue the Graham motions.

12          THE COURT:  Okay.

13          MR. ROBINSON:  I'm Mark Robinson.  The entire steering

14   committee seems to be here but I won't announce them all.

15          MR. RANIER:  Good afternoon, Your Honor, Phil Beck,

16   Andy Goldman and Doug Marvin on behalf of Merck.  Mr. Goldman and

17   I will be addressing various of the motions.

18          THE COURT:  Okay.  Some of the motions I'll be able to

19   help you with.  Some of them I haven't studied with enough, I

20   just hadn't had enough time as you can see.  Unfortunately, we

21   also are in the middle of a trial today.  We had an attorney get

22   sick so we had to stop the trial, and so I'm going to have to

23   start it again on Saturday rather than Friday, so we'll see what

24   we can do.

25              Okay, I know we wanted to argue the Graham matter.

1    I've read most of the Graham deposition, but I haven't read it

2    all, so I'm not going to be able to rule from the bench with

3    Graham material.  I really do understand it, so you can just give

4    me the highlights of it.  I've read the briefs.  I understand the

5    briefs.

6         MR. BECK:  We have two Graham matters, Your Honor.  The

7    first one is our Motion in Limine.

8         THE COURT:  Sure.

9         MR. BECK:  Russ.

10         MR. HERMAN:  I thought we would, we had asked for

11    remedial relief first, but if you want to go first.

12         MR. BECK:  That's fine with me if Russ wants to go

13    first.

14         MR. HERMAN:  Good afternoon, Judge Fallon.  Russ Herman

15    for the Plaintiffs' Steering Committee.  This is a Rule 37

16    request for remedial relief.  Your Honor, I hope only to take 12

17    to 15 minutes in this argument.  I have some brief illustrations

18    that I will show at various points, but I promise to get to the

19    point.

20         Plaintiffs had a long fight to obtain Dr. Graham's

21    deposition.  It began in December 2005 with letters to the FDA.

22    Your Honor will recall the various motions, arguments, et cetera,

23    and eventually Your Honor ruled that Dr. Graham's deposition

24    would be taken, but it would be taken on a very restrictive issue

25    and confined to his public statements or published works.

1    And we understood in your ruling, in the colloquy and

2  the briefing that Your Honor was particularly concerned about

3  invasion of the FDA's deliberative process, and therefore the

4  restriction was only an examination as to the really public

5  pronouncements and writings.

6    Your Honor, it is Merck's position that the Court

7  imposed no bar on cross-examination in its March 13th order.

8  However, Your Honor, in your original order and opinion, dated

9  March 13th, ordering the FDA to produce Dr. Graham for his

10  deposition, and recognizing and I want to state for the record

11  that Dr. Graham was represented by the FDA as well as individual

12  lawyers, Your Honor ruled that this ruling, that is, your ruling

13  is not a blank check written to the PSC, Merck, or any other

14  litigant.  At a May 3rd hearing at line 24, at page 24, line 21,

15  23 of the transcript, you repeated the injunction to Counsel in

16  this matter.

17    "And as I also said, giving access to Dr. Graham by way

18  of a deposition is not a blank check to either side, either

19  plaintiffs or Merck or anyone else in this matter."

20    We bring before you this rule for corrective remedial

21  relief because we believe unfortunately Merck's position during

22  the deposition was contrary to your order, outside of its bounds,

23  and while not intended to obstruct the deposition, it certainly

24  probed the deliberative process of the FDA and probed Dr. Graham

25  on matters of which he knew nothing and which never were part of

1  the public body of knowledge that came from Dr. Graham.  I would

2  like to first turn to page 24, lines 8 to 18 of the deposition

3  and set the stage.

4       Mr. Beck acknowledges:  "The Judge has entered orders

5  when approving this deposition restricting the scope."

6       "MR. KLINE:  Yes."

7       "MR. BECK:  If, in fact, either side asks questions

8  outside the scope as approved by the Judge, as far as I'm

9  concerned, that's an appropriate area to raise an objection."

10       Go to page 29, excuse me, page 28, line 17.  There was

11  a colloquy among Counsel.  This is Mr. Kline speaking during the

12  deposition, Your Honor.

13       THE COURT:  Go ahead.

14      MR. HERMAN:  "And I understand," he's addressing

15  Mr. Beck and other Counsel.  "And I understand there are certain

16  things," to Mr. Beck, "you might do but my view of the order is

17  that the order means what it says.  So I will consider our

18  objections preserved as to those things, for example, that are

19  outside of the scope of public statements."

20       "For example, if you cross-examine on internal FDA

21  documents, putting aside the privilege issues that there might be

22  that the FDA might raise, I'm just going to take Judge Fallon's

23  order at its word and assume that those issues can just be raised

24  with the Judge later."

25       "For example, if you examine on hearsay documents that

1   were not within the ambit of Dr. Graham documents that he's never

2   seen before, which is clearly the way Judge Fallon rules that a

3   witness should not be shown those documents -- here's my point.

4   I assume that those are preserved under the rule because I, for

5   one, don't want to be interrupting you all the time."

6           "MR. BECK:  That's fine."

7           Now, that said with your rulings in context and with

8   the history, this interchange and the full interchange for the

9   benefit of Counsel, you can begin at page 23 and go through page

10  30, the portions of Merck's examination that are at issue here

11  involve nine public documents of the FDA, a nonparty, whose

12  discussions were to be protected by Judge Fallon's orders

13  restricting the scope of the examination.  The documents were

14  rank hearsay.  The documents Merck used during that deposition

15  not only violated Your Honor's order, but the intention is clear

16  that Merck intended to impugn the integrity of the witness by

17  confronting him with hearsay statements and internal gossip at

18  the FDA, many of which he had not seen before.

19          Let's look at clip number 3, for example.  Clip

20  number 3 is taken from Page 313, line 11.

21          (Start playback of Graham Deposition, Clip 3.)

22          "QUESTION:  Let me show you Exhibit 15.  I'm sorry.

23  Exhibit 15 is an e-mail string.  The last one appears to be dated

24  August 11, 2004, all around that time frame.  Do you see the

25  middle e-mail on page 1 is from Dr. Jenkins?"

1    "ANSWER:  Yes, I see it.  I've never seen this e-mail

2    before, the best I can recollect."

3         "QUESTION:  Let's go through what Dr. Jenkins said,

4    focusing on the second paragraph of his e-mail of August 11,

5    2004."

6         "MR. KLINE:  Objection only to the extent that I would

7    like the witness to be able to identify whether he has seen the

8    document before."

9         "MR. BECK:  He just testified that he had never --"

10        "MR. KLINE:  -- I apologize."

11        "MR. BECK:  He said that as best he could recall he

12   didn't remember seeing it."

13        "MR. KLINE:  I would just like to create a record as to

14   whether he's seen it or not for a ruling.  That's my only

15   reason --"

16        (Stop playback of Graham Deposition, Clip 3.)

17        MR. HERMAN:  I'm not going to play the examination,

18   which would take some time, from this document and a number of

19   e-mails that the witness said he didn't see that were from

20   internal FDA individuals to others making derogatory comments

21   either about, directly about Dr. Graham or his methods.  Because

22   it was outside of the scope of the order and because in addition

23   to that the witness had not seen the documents.  Your Honor, we

24   urge that we need corrective and remedial action.

25        This was not an isolated instance.  Could I see clip 4,

1  page 325, line 23, please.

2          (Start playback of Graham Deposition, Clip 4.)

3          "QUESTION:  I'm going to hand you what we've marked as

4  Exhibit 17."

5          "ANSWER:  This is actually 16."

6          "QUESTION:  Oh, I am sorry.  Have you seen Exhibit 17

7  before?"

8          "ANSWER:  No, I have never seen this before."

9          (Stop playback of Graham Deposition, Clip 4.)

10         MR. HERMAN:  Now, Your Honor, I point these out because

11  there are numerous e-mails.  These are not isolated examples, and

12  that the interrogation of the witness from these documents was

13  not only unfair but it was outside the specific directions that

14  you had given Counsel on both occasions and that Counsel

15  discussed in the deposition before the first question was asked.

16          The Court, as we understood it, the Court's intention

17  was to shield the FDA's internal deliberation from becoming

18  public.  Merck violated both the letter and the spirit of the

19  order.  The Court has said that it would not allow intrusion into

20  the FDA's internal processes.  That is one of the reasons why the

21  deposition was so limited.

22          In light of Your Honor's ruling, Merck could not get

23  these nonpublic, hearsay documents in, so it tried to get them in

24  through the back door.  And it would be very prejudicial having

25  played by the rules, if this material were allowed to go to the

1   jury or even to surface in some way which was never intended, and

2   which could not have been reasonably rebutted during the course

3   of the deposition, although on redirect there were attempts to

4   further elucidate how these documents violated the Court's order.

5         Of note, you can read the cross-examination of Mr. Beck

6   from numerous e-mails, and there is not one attack on the

7   ultimate substantive opinions of the witness.  What then was the

8   reason for going through this two-and-a-half-hour tedium of

9   internal documents that had never been made public?

10        Further, the internal deliberative gossip in the FDA,

11  when it directs its attention generally in an attack on

12  Dr. Graham, on one side of the scale, on the other side of the

13  scale is the fact that the substantive opinions of Dr. Graham

14  were peer-reviewed twice, not once, but twice in learned

15  treatises that reviewed his methodology, reviewed his

16  conclusions, and indeed, upon which his public pronouncements

17  were based.

18        Dr. David Graham, in an interview with News Talk,

19  Exhibit 25:  "In all the criticism I have received relating to

20  Vioxx and drug safety, they've never attacked the work of the

21  science I've done or the results I've come to.  What they've done

22  is call me names."

23        Would you please go to slide 5.

24        (Start playback of Graham Deposition, Clip 5.)

25        "QUESTION:  Please take a look at Exhibit 18.

1  Incidentally, how long has Dr. Trontell been at the FDA?"

2        "ANSWER:  Gee, I don't exactly know.  She's been with

3  the Office of Drug Safety for maybe 5 years.  She came from the

4  Office of New Drugs before that."

5        "MR. KLINE:  Can we just establish whether he's seen the

6  document or not?  That would help me later with the record.

7  That's all I ask."

8        "MR. BECK:  Sure."

9        "MR. KLINE:  On all of those."

10        "MR. BECK:  Yes."

11        "MR. KLINE:  Thanks."

12        "QUESTION:  Do you remember whether you've seen this

13  document before?"

14        "ANSWER:  No, I don't think that I have seen this

15  document before."

16        "QUESTION:  Do you see that Dr. Trontell is writing to

17  Dr. Seligman in the e-mail on the top?

18        "ANSWER:  Yes."

19        (Stop playback of Graham Deposition, Clip 5.)

20       MR. HERMAN:  And the questioning goes on and on about

21  that document the witness has never seen.  It's never been made

22  public.  It's an internal deliberative document or gossip

23  directed at Dr. Graham.

24        Let's go to, and that's at page 328, line 22.  Those

25  are three examples of just three of the e-mails and what went on,

1   and it summarized actually on redirect.

2           Would you go to slide 6, page 468, beginning at

3   line 24.

4           (Start playback of Graham Deposition, Clip 6.)

5           "QUESTION:  Next question.  Sir, we've seen a lot of

6   e-mails today which, first of all, did any of those e-mails that

7   you spent the better part of two and a half hours with Mr. Beck,

8   were any of those the subject of public testimony, sir?

9           "MR. BECK:  Object to the form."

10          "THE WITNESS:  No, they were not."

11          "QUESTION:  Were any of those -- any of that elaborate

12  examination that you were given by Merck's counsel part of any

13  public statements or public scientific meetings or testimony

14  before Congress?"

15          "ANSWER:  No -- "

16          "MR. BECK:  I object to the form.  Please wait, Doctor."

17          "THE WITNESS:  No, they weren't.  I really am trying.  I

18  apologize.

19          "MR. BECK:  I know you are.  Let me object and then you

20  answer.  I object to the form."

21          "QUESTION:  Let me try to clean it up.  Let me see if I

22  can ask it in a nonleading way.  The e-mails that you discussed

23  at length and all those internal documents -- let me ask it this

24  way:  Were those e-mails in the FDA, to your knowledge, ever made

25  public or put out in the public forum or talked about by you

```
 1   prior to today?"

 2              "ANSWER:  No."

 3              (Stop playback of Graham Deposition, Clip 5.)

 4              MR. HERMAN:  Now, Your Honor, my esteemed Counsel

 5   opposite is an excellent advocate, a member of the bar with great

 6   experience.  There were ways that Dr. Graham could have been

 7   cross-examined on his public pronouncements without resorting to

 8   violating your order.  And without resort to rank hearsay within

 9   hearsay, without resort to lack of foundation, without resort to

10   violating the rule of completeness.  There were a number of ways

11   that Mr. Beck could have legitimately cross-examined.  After all,

12   he's called witness after witness in trials who are experts.  He

13   has available to him journal articles that are in public domain.

14   He had available many, many opportunities to cross-examine this

15   witness without resort to the internal deliberative and

16   nondeliberative hearsay of FDA principles.  It would be no more

17   valid had plaintiffs known that that deposition would proceed in

18   the way in which Mr. Beck orchestrated it.

19              It would not have been legitimate even had plaintiffs

20   known that that's the way the deposition was going to be

21   conducted, for us to produce the internal documents of the FDA

22   extolling Dr. Graham, extolling the virtue of his public

23   pronouncements, extolling the virtue of the work which he had

24   really done in fulfilling the FDA's supposed watchdog in the

25   public interest.
```

1          Because the plaintiffs still would have adhered to

2     Your Honor's pronouncement restricting the examination of the

3     witness.

4          And I thank Your Honor for the opportunity to argue

5     this matter before you on behalf of the PSC.

6          THE COURT:  Rebuttal.

7          MR. BECK:  As to the suggestion that I intimidated

8     Dr. Graham, I would invite Your Honor to watch the video and see

9     whether there is even a glimmer of intimidation on Dr. Graham's

10    face.

11         It's interesting that the FDA was represented and of

12    course would have an interest if I had gone outside the proper

13    scope of the examination, and the FDA lawyers never once objected

14    to anything as being outside the scope and intruding into the

15    deliberative process of the FDA, not once, for me, for Mr. Kline

16    may object and said that he was getting into areas that intruded

17    into their deliberative process but they didn't object to a

18    single question that I asked.

19         And Dr. Graham was represented, incidentally,

20    Mr. Herman was incorrect, he was not represented by the FDA

21    lawyers.  They made that very clear.  He was represented by his

22    own counsel, and we squabbled early on about the whole business

23    about his e-mails, but when it came to the substance of the

24    testimony, they never objected to the scope as well.

25         It's certainly true that Mr. Kline objected to the

1    scope, and I understood that he was objecting at various times,

2    and we agreed to go forward subject to any arguments that we

3    would make to Your Honor, but the fact that I understood that

4    Mr. Kline was objecting is hardly proof that I was going beyond

5    the scope.

6          We have a fundamental difference about the meaning of

7    Your Honor's ruling concerning what the appropriate scope of

8    Dr. Graham's deposition would be.  When you read plaintiffs'

9    brief and when you listen to Mr. Herman, it rings true that they

10   perceived this as an opportunity to go and to have Dr. Graham

11   repeat the things that he said publicly, but repeat them under

12   oath and, therefore, render them admissible at trial.  And that's

13   certainly one of the purposes of the deposition, but Your Honor

14   did not limit it to his prior statements.  What Your Honor's

15   order said, and we quoted in our brief, was that the deposition

16   was limited to the matters on which he had publicly spoken, to

17   the subject matters on which he had spoken.

18         And in our view, we were entitled to cross-examine him

19   on these matters, on these subject matters.  And we're entitled

20   to cross-examine him not just to ask him what he said to Congress

21   or what he said when he gave a speech or what he said on

22   "60 Minutes" or the other TV programs that he frequented, we were

23   entitled to confront him with evidence showing two things:

24   Number 1, that what he said was false, and number 2, that he is

25   biased in what he said.  And we're entitled to do that when we

1  cross-examine any witness.  It's inconceivable to me that there
2  would be a deposition where the sole inquiry is, What did you say
3  publicly critical of Merck and we're not allowed to cross-examine
4  him to show that what he said was without basis or was the
5  product of bias.  So that's what the cross-examination focused
6  on.
7      And it's also very important in this regard,
8  Your Honor, that he testified as an expert.  The plaintiffs say
9  in their briefs, whether it's on their Rule 37 motion or in
10  response to our motion, they say that he was just a fact witness.
11  He was not an expert witness.  But in fact, almost everything he
12  testified about was expert opinion testimony.  And I'll just give
13  you a couple of indications of that.
14      This is page 60 of his deposition, lines 10 through 13.
15  This is by Mr. Kline.  We'll go on, beyond 13.  Early in the
16  deposition he's qualifying him as an expert.
17      "I would ask you, sir, do you consider yourself an
18  expert in drug safety?"
19      "Yes, I do."
20      "QUESTION:  Do you consider yourself an expert in the
21  workings of the Food & Drug Administration insofar as
22  understanding the structure, the culture, the background, the
23  personnel?"
24      "ANSWER:  Yes, I consider myself an expert on the
25  culture, structure, organization, et cetera, of FDA having lived

1    through it for 22 years."

2              And then continuing on page 61, beginning at line 6.

3              "In what areas of FDA do you consider yourself an

4    expert?"

5              And then he goes on to list all the areas where he's an

6    expert.

7              "I'm an expert in post-market drug safety.  I'm an

8    expert in the area of interaction between the reviewing

9    divisions, the preapproval side of the FDA and the post-approval

10   side of FDA.  I'm an expert on the culture of the FDA.  The way

11   that science is used within the FDA or as it relates to drug

12   safety in particular but also as it relates to efficacy.  I'm an

13   expert in the personnel practices of the FDA, in the ways that it

14   treats its medical officers.  And there is probably a host of

15   other areas that relate to life working within the FDA that I'm

16   an expert in."

17             And, Your Honor, they didn't just qualify him as an

18   expert, they went on to elicit from him expert testimony on these

19   subjects that they just touched upon.  For example, over on, and

20   I'm only going to do some of these for illustrative purposes.

21             On page 63, down at line 23.

22             "Do you believe Vioxx is an unsafe drug, sir?"  Nothing

23   could be more of an opinion testimony.

24             "Yes, I do."

25             And then he goes on on page 64.  I'll just read the

1    next couple questions and answers.

2         "Do you believe that Merck was correct in taking it off

3    the market?"  Again asking for an expert opinion.

4         "Yes, I do."

5         "Should it ever have been placed on the market in the

6    first place?"

7         They are not asking him, incidentally, What did you say

8    on "Nightline"?  They are asking him his expert opinion about

9    whether Merck should have taken it off the market, whether it

10   ever should have been on the market in the first place.  They are

11   eliciting straight expert opinion on those subjects.

12        So he goes on to say, you know, "It is my professional

13   opinion," and we're not talking about fact testimony here.  His

14   answer:  "It is my professional opinion, based on the evidence

15   that I've looked at that Vioxx should not have been approved at

16   the time that it was approved and that there were substantial

17   areas of concern related to cardiovascular safety that should

18   have been explored more fully and more thoroughly prior to

19   consideration of approval."

20        Over on 65, I'm sorry, I've got the wrong page.  Well,

21   Your Honor gets the idea.  Here is one other one I'll show you

22   just on the subjects that he testified on.

23        Line 5, on page 141:  "Was Vioxx indeed a public health

24   catastrophe?"  I objected to the form because Mr. Kline was

25   leading him.  In any event, he said, "Yes."

1           "Why is that, sir?"

2           "Well, in my opinion, it was a public health catastrophe

3    because, A, it was a toxic drug and he goes on to give a speech

4    about why it was a public health catastrophe.

5           And on page 144, lines 10 through 18:  "Tell us why the

6    88,000 to 140,000 excess cases of serious coronary heart disease

7    probably occurred in the United States over the market life of

8    Vioxx."

9           "ANSWER:  It occurred because Vioxx is unsafe at any

10   dose.  In other words, all the doses of Vioxx can cause increased

11   heart attack risk."

12          He goes on and on.  So lots and lots of opinion

13   testimony.  Why do I emphasize that so much, Your Honor?  The

14   reason is that when they elicit from him expert testimony,

15   whether or not it was also the subject of public pronouncements

16   that he made, some of these were and some of them were not, but

17   whether they were or not, we're entitled to cross-examine him on

18   those matters, like Your Honor's order said, just like we're

19   entitled to cross-examine any other expert.

20           And if there are e-mails, as there are, that he was on,

21   that he received, they didn't show you any of those, but a lot of

22   the e-mails that I showed him were e-mails to and from him that

23   contradict the opinions that they elicited from him.  Because he

24   would say that it's, that all they ever did was call me names,

25   and they never addressed the science.  That's his justification

1    all the time publicly, and that's what Mr. Herman read to

2    Your Honor this afternoon.  Well, we showed him e-mails that he

3    was on, where they said, You know what, Dr. Graham, you're wrong.

4    When you give those estimates about excess deaths, that's lousy

5    science.  There is no basis in science for that.  Take it out of

6    the article.

7            And I cross-examined him and I said, The people who

8    wrote that e-mail to you, who picked them to be the reviewers,

9    within the EPA, of your article?  And he said, I did.  And I

10   said, Did you consider those people who wrote that e-mail to you

11   to be the most authoritative and honest epidemiologists in the

12   entire FDA?  And he said, Yes, I did.  That's why I picked them.

13           And so we use documents from the people that he picked

14   to review his article who said that his article had lousy, junk

15   science in it.  And it was taken out during the FDA review of his

16   article and then he submits it to *Lancet*, and lo and behold the

17   numbers come back in and then he gooses them up by a factor of

18   three or four.

19           Now, that's fair game on cross-examination for somebody

20   whose opinions are elicited.  And we certainly did use some

21   documents that he had not seen before.  But again, if he were

22   only a fact witness, and the question is what did you do and this

23   sort of thing, then there might be a fair objection to that,

24   there might not.  We would have to take it up.  But he was not a

25   fact witness.  He was an expert witness through and through.  And

1    an expert witness can be confronted with all kinds of materials

2    that contradict his opinions, whether he's seen them before or

3    not.   That happens with every expert we have in these cases and

4    it happens in every courtroom around the country and especially

5    when they elicit from him statements such as, Every time they

6    criticize me, there is no science behind it.   They are just

7    calling me names.   And when he says that publicly to defend the

8    statements that he made concerning Vioxx.

9          And we are entitled to put in front of him and confront

10   him with documents from the FDA, that were produced by the FDA in

11   response to a subpoena by the plaintiffs' lawyers that showed

12   that the FDA scientists were taking it very seriously as a matter

13   of science and that they disagreed with Dr. Graham on the merits

14   and said that his science was junk science on the merits and not

15   because of personality conflicts.

16          So, Your Honor, that's the sum and substance of our

17   response to this.   You know, I'm sure we'll have to go slogging

18   through, you know, question and answer by question and answer,

19   but in terms of some blanket assertion that we were handcuffed in

20   this deposition and were only allowed to ask him to repeat what

21   he said publicly rather than to test what he said publicly, and

22   to impeach him on what he said publicly, and to show his bias on

23   what he said publicly, and to show that he's wrong when he says

24   publicly that the other FDA people had no scientific basis to

25   disagree with him and it was just a conspiracy to smear his name

 1 | which was testimony that Mr. Kline elicited on direct
 2 | examination, I'm entitled to show that the testimony that
 3 | Mr. Kline elicited, that he was the victim of a conspiracy that
 4 | went to the highest levels of the FDA, I'm entitled to show that
 5 | that's false.
 6 |         THE COURT:  Okay.  I do understand.
 7 |         MR. HERMAN:  I'm going to, if Your Honor would permit, a
 8 | very brief rebuttal.
 9 |         THE COURT:  Very brief.  Because I do get it.
10 |         MR. HERMAN:  I'll respond on the expert issue when we
11 | argue the next motion.
12 |         Would you put up slide number 8.  You see, Your Honor,
13 | in the motion that we brought that I argued, Mr. Beck, as he's
14 | argued here says, "There was no public statements limitation on
15 | Dr. Graham's deposition.  The applicable order cannot be read so
16 | narrowly."
17 |         But when he brings his Motion in Limine, he says, "The
18 | Court should enforce its March 13, 2006, order.  When this Court
19 | granted the PSC's Motion to Compel Dr. Graham's deposition, it
20 | did so with clear instructions to allow plaintiff to present
21 | testimony from Dr. Graham.  Going beyond this limitation would be
22 | extremely prejudicial to Merck."
23 |         And I think the entire tenor for the motion you will
24 | hear next is the reverse of the position Mr. Beck took here.
25 | Yes, you can cross-examine an expert, but you can't do it from

1    documents without foundation that have rank hearsay in them, that

2    are part of a deliberative process that were never supposed to be

3    disclosed.  There are other ways to do it.  And there are better

4    ways to do it, without violating an order of the Court.

5              Thank you, Your Honor.

6              THE COURT:  Okay.  You have the flip side of this.  Do

7    you want to move this?

8              MR. BECK:  Yes, Your Honor.  And if we could just leave

9    this up.  I love ellipses.  They are one of my favorite things.

10   So when he puts that up, I automatically turn to the brief and

11   this relates to our motion, so I'm not just responding there.

12   What we said was, this was the, I guess the second paragraph on

13   page 2.  We said, "First, there was no public statements

14   limitation on Dr. Graham's deposition," then the ellipses start

15   and we continue, "at least insofar as PSC defines that term in

16   its motion."

17             We could keep continuing.  In the PSC's view, the sole

18   purpose of the Court's March 13, 2006, order authorizing

19   Dr. Graham's deposition was to, "allow the parties to this

20   litigation to depose Dr. Graham on," and then we're in italics,

21   "his public statements and his public writings," end italics, "so

22   that those statements and writings would be admissible at trial."

23   And then we say, "But the applicable order cannot be read so

24   narrowly."

25             So it's the ellipses where the substance of the

1   argument is, Your Honor.  And it is exactly what I said this

2   afternoon.  And that is that Dr. Graham, his deposition was

3   limited not to the statements that he made but to matters on

4   which he's made public statements.  And that was our

5   cross-examination.

6           Now, in terms of our motion to limit his testimony, we

7   have four categories, and, Your Honor, are you pretty much up to

8   speed on this motion, too?

9           THE COURT:  Yes, I am, but what I really need to do,

10  I've read three hundred and, let's see, I just ran out of time on

11  this, I read 318 pages of it.

12          MR. BECK:  Are you in my part or Mister --

13          THE COURT:  I'm in your part.

14          MR. BECK:  Well, keep going then, Your Honor.  You can

15  stop when you get to the redirect, Your Honor.  And Tom, when you

16  read the redirect, you'll discover that notwithstanding what

17  Mr. Herman said today, Mr. Kline was not surprised at the

18  questions that I asked because he had a whole satchel full of

19  documents that he was ready to lower the boom with on redirect

20  because he knew exactly what I was going to do.

21          Anyway, the categories --

22          THE COURT:  Let me just say to both of you-all at this

23  point, my gut on the first period, parts that I read, I think I'm

24  not going to exclude the whole deposition.  I don't see it coming

25  out that way.  I do see that there are certain areas that I've

1  got to look at and deal with.  But that's really where it's at,

2  so I don't see excluding the deposition.

3         MR. BECK:  Your Honor, if I could just identify the

4  areas where we would ask you to pay particular attention, you

5  know, we have lots of objections but there are ones that we ask

6  Your Honor to take rifle aim with rather than a hip-shooting sort

7  of thing.

8         One are, there are some opinions that he gave on topics

9  that he has not addressed before his deposition.  We think that

10  there are also matters that were irrelevant and prejudicial in

11  this case, even though he has talked about them before.  We don't

12  think that his testimony in this case ought to be a forum for his

13  criticisms of how the FDA works or how Congress has chosen to

14  regulate the drug industry, and we also have a major problem with

15  the testimony concerning the estimate of deaths caused by Vioxx.

16         And I want to be very brief on the first three and then

17  spend a little bit more time on the fourth.

18         There were matters on which Dr. Graham has never spoken

19  before publicly, at least that we could find out.  And so we

20  identified those in our motion inviting the plaintiffs to tell us

21  and the Court where he's identified, or where he's talked about

22  them before.  And they didn't ever identify any such thing.

23         So, the first one is dragging, he said, in response to

24  questions from Mr. Kline, that Merck dragged its feet in

25  implementing the post VIOXX label change.  And he's never said

1  that before.  And when we point that out, so that's an area that

2  they are not entitled to get into, subject matter about whether

3  Merck dragged its feet in the label change.  We pointed that out

4  and then they come back, and the only thing they quote in their

5  brief are statements where he's criticizing the FDA for being too

6  slow in implementing the label change, that the FDA should have

7  acted more expeditiously.  But if you look at what they quote,

8  it's no criticism of Merck.  So, they've got all of these public

9  statements.  They can't find a single one that criticizes Merck

10  for dragging its feet on the label change.

11         He also said that the FDA medical examiner, Dr. Targum,

12  you'll remember the Targum memorandum, he said, My gosh, I just

13  saw for the first time the other day when getting ready for the

14  deposition that she recommended that Vioxx contain a

15  cardiovascular warning.  He himself testified that it was just in

16  getting ready for this deposition, the first time he noticed

17  that.  So clearly, the fact, and they made a big deal about the

18  fact that Dr. Targum recommended a CV warning in February of

19  whatever year it was, and but the point is that he has never

20  spoken out on that at all.  This was brand-new, as he said.  And

21  they don't, they can't come up with anything in their response to

22  contradict that.

23         The third category was that he said that Merck should

24  have done a big CV outcome study after VIGOR.  He said this at

25  his deposition.  But he never has said that publicly, and what,

1   again, we invited them to show us that we're wrong, and in their

2   response, all they have is a general criticism of the process

3   that the FDA follows in terms of outcome study, but nothing at

4   all saying that Merck should have done a CV outcome study in

5   light of the VIGOR analysis.

6          Now, those are opinions that other people have

7   expressed, like Dr. Topol and that have come into evidence in the

8   case, but Dr. Graham has never spoken out on that.  He's been

9   critical of the FDA's overall process, but he never made that

10  criticism about what Merck should have done.  Again, they don't

11  cite anything to the contrary.

12         And then last week, the opinion which I showed you,

13  that Vioxx never should have been approved.  The, again, that's

14  not one that he spoke out on publicly.  He had a lot of

15  criticisms of Merck and of the FDA, but he never said that Vioxx

16  should not have been approved.

17         And what they quote, what it is is a complaint to

18  Congress about how the FDA should use a fundamentally different

19  approach to drug safety.  And he says, he takes the confidence

20  interval or whatever it is, the level of confidence, 95 percent,

21  and he has an analogy of how that's 95 bullets out of 100

22  chambers.  And he says the FDA has a lousy approach.  The FDA

23  says, you know, there is only 95 bullets out of 100 in the

24  chambers, then it's okay to approve the drug.  They should have a

25  different approach for Vioxx, for example.  But, you know, he's

1   not saying, he mentions Vioxx in passing, he's not saying that
2   under the FDA regulations that exist, that Vioxx should not have
3   been approved or that or because information wasn't available.
4   What he's saying is he doesn't like the FDA regulations and that
5   they should be different, and if they were different, Vioxx and a
6   lot of other drugs, he says, would not have been approved.  So
7   that's not, so that's we think an impermissible area.

8          Then there are, so those are areas where he hasn't
9   addressed before.  Then we move to a different subject, which is
10  matters that we consider to be irrelevant and prejudicial.

11         Now, these are matters where the Plaintiffs' Steering
12  Committee comes backs and says, Well, he's talked about them
13  before publicly.  We agree he's talked about them before publicly
14  but that doesn't make them relevant to this case.  One example is
15  his opinions about PPA, which is another drug.  He goes on a
16  rant, basically, about PPA and how the FDA dealt with PPA.  Now,
17  why should we have to defend PPA?  Whatever his views are on PPA,
18  while he's expressed them a lot in public, it doesn't have
19  anything to do with this case, and we shouldn't have to rebut his
20  testimony on how the FDA handled PPA.

21         He also doesn't like a statute that Congress enacted,
22  the Prescription Drug User Fee Act.  And he says that one of the
23  unintended consequences of the Prescription Drug User Fee Act is
24  that, well, drug companies pay a fee that goes to the FDA, you
25  know, when they file their applications for new drugs, so the

1   guys in the FDA want to move those applications along so that the

2   FDA gets a lot of money.

3          Now, it's improper testimony concerning other people's

4   state of mind.  You know, the state of mind of the people who are

5   in the drug approval side of things.  It's hearsay because he

6   says that, how do I know this?  Sixteen or seventeen people have

7   told me this, you know, on the sly because they don't want their

8   names known.  So we can't cross-examine any of them.

9          And the whole subject, we believe, of his disagreement

10  with Congress and the Food and Drug Administration is an

11  interesting and important one, but not one to submit to a jury in

12  an individual personal injury case.

13         Similarly, I talk about the analogy to the loaded gun.

14  That kind of hyperbole, you know, what it reminded me of is when

15  one of their doctors, I think in response to one of their

16  questions said that the left anterior descending artery is a

17  widow maker.  And they moved, as they did in the *Irvin* case, to

18  preclude any reference to widow maker because it was inflammatory

19  and over-the-top hyperbole and these matters ought to be

20  discussed in a dispassionate scientific way rather than through

21  these inflammatory analogies.  And Your Honor granted that motion

22  in *Irvin* and Your Honor granted that motion in this case, so

23  we're going to have to go clip out the reference that the doctor

24  made in response to their questions about a widow maker.

25         Well, this thing is just, you know, 95 bullets in a

1  100-chamber gun is just as inflammatory and just as hyperbolic,
2  and it ought, we ought to be talking about confidence intervals,
3  not playing Russian roulette because that's not what statistical
4  standards are all about.

5      Their basic response to all of this is Graham has said
6  it before and our reply is, sure he has but that doesn't make it
7  admissible this the case.  I mean, Your Honor said we could
8  inquire into things that he said before, it doesn't mean that
9  everything he's ever said is relevant and is admissible.

10     Now, the one area that's more in the nature of a
11 *Daubert* challenge goes to an estimate of his that we saw on the
12 screen of 68,000 to something like 139,000 excess deaths occurred
13 on Vioxx.  And this is a statement that appears in an article
14 that he and Dr. Ray, who you will remember, they authored, it was
15 published in *Lancet*, I think, in 2004.

16     And on this one, Your Honor, this is opinion testimony
17 that has to meet the *Daubert* standard before it comes in.  And in
18 fact, we filed a Motion in Limine last time around in *Irvin*
19 saying that this should stay out, and Your Honor said, well, it's
20 premature to rule on it in advance of trial, but it's not coming
21 in unless somebody can establish under *Daubert* its reliability,
22 that it meets the threshold test.  That was Your Honor's ruling
23 on that statement.

24     So then they tried to get it in through Dr. Ray, who is
25 one of the authors, and in fact the one who did the number

1    crunching.  And I objected because they hadn't laid the

2    foundation for reliability, and Your Honor sustained it.  So even

3    though they had an author of this article testify twice, they

4    never tried to lay the foundation of the reliability of that

5    estimate in the *Lancet*.

6           And so then they bring in Dr. Graham, and they have

7    Dr. Graham say, This is what I said in the *Lancet*.  And our

8    objection to that, Your Honor, is that he never laid the

9    foundation for the reliability.  And their response is, Well,

10   he's a fact witness, not an expert witness.  And they do not

11   contest in their papers the *Daubert* issue.  What they say in

12   their papers is *Daubert* doesn't apply because Dr. Graham is not

13   an expert, he's a fact witness.  And they make no claim, no

14   argument that it meets the *Daubert* standard.  And its their

15   burden, of course, to show that it does meet the *Daubert*

16   standard.  And as I said before, Your Honor, he's not just a fact

17   witness.  He's a witness who is giving expert opinions where they

18   qualified him as an expert, they elicited expert opinions from

19   him.  And the fact that he gave one of his expert opinions

20   previously doesn't mean that it's insulated from a *Daubert*

21   challenge, that simply because he's repeating something he said

22   before doesn't mean that it doesn't have to meet *Daubert*.  It

23   does.  Or else Dr. Ray could say the same thing.

24           Now, why doesn't it meet *Daubert*?  Well, as I said,

25   it's their obligation to establish that it does and they haven't

1   even tried.

2          But here is why it doesn't.  He started out,

3   Your Honor, and this is in the deposition.  I don't know if it's

4   before page 333 or after page 333, but Your Honor will recognize

5   it when you see it because I asked him some questions about this,

6   even though they didn't make any effort at all to lay a

7   foundation for how he came up with these numbers.

8          So he starts off in the draft that he's writing and

9   submitting for FDA review with an estimate of excess deaths of

10  27,000.  And so he submits it for FDA peer review to the two

11  people that he handpicked as the best guys in all of the FDA, the

12  most honest and smartest pharmacoepidemiologists , and they said,

13  This is bad science.  There is no scientific basis for this

14  estimate, and so he took it out.  And that's established in

15  e-mails that he was on.  And then after he takes it out, he

16  submits it to *Lancet*, and according to Dr. Graham, *Lancet* says to

17  him, Gee whiz, we like it when you give those estimates of the

18  excess deaths like you have on "60 Minutes" and stuff like that.

19  Can you put that back in?  And so he obliges and he ups it from

20  27,000 to 37,000.  And then, and we saw a draft of that that's in

21  the deposition.  And then he decides to change it from 37,000 to

22  68,000 to 139,000.

23         How does he do that?  We don't know because he never

24  explained it.  But we do know a couple of very important things.

25  Number 1 is, I asked, Is this estimate based on the data that's

1   set forth in the rest of your article, the epidemiological study

2   that you did that showed that 25 milligrams of Vioxx did not

3   increase cardiovascular risk compared to no use of NSAIDs?

4           And he said, No, that estimate is not based on any of

5   the data that's in my article.  And I said, Well, how do you come

6   up with this number.  And he said, Well, we take, we take, you

7   know, a number that comes out of VIGOR, and we take a number that

8   comes out of APPROVe, and so we have VIGOR compared to Naproxen,

9   VIGOR at 50 milligrams.  Then we have APPROVe, which is compared

10  to a placebo, different dose, different time period.

11          And then we compare that to a so-called class study

12  where Vioxx isn't even involved, but it's an analysis, I think

13  it's Celebrex compared to other NSAIDs, and then we compare that

14  to some numbers that came out of one of Dr. Ray's analyses.  And

15  if we pull four numbers out of four different studies that

16  related to four different drugs at different doses for different

17  duration, then I'm able to derive this estimate.  And he never

18  did explain how he derived the estimate, let alone establish its

19  reliability.

20          And we set forth in our brief, Your Honor, a chart that

21  shows how preposterous the whole thing is because the CV rate

22  that came out of VIGOR, the people who, you know, the rate of CV

23  events from VIGOR and from APPROVe, the people who took Vioxx,

24  was lower than the CV event rates that he used from the class

25  study and from Dr. Ray's report for people who never took any

1  medicine.  So, but somehow he manipulated those numbers in a way

2  that's never been explained to come up with this estimate.  Now,

3  Dr. Ray, who was one of the number crunchers, testified at two

4  trials, and they didn't even try with Dr. Ray to lay the

5  foundation for the reliability of that number.  And then they use

6  Dr. Graham and they don't even try to lay the foundation for the

7  reliability of him either.  And their only defense is, Well, he's

8  not an expert, so it doesn't have to meet *Daubert*.

9          THE COURT:  All right.

10         MR. HERMAN:  May it please the Court, there is one issue

11  with which I agree and the Court should not have to determine,

12  and that is, it is true that during the deposition Dr. Graham

13  said that he had recently read the deposition of medical officer

14  Targum, and Targum said that such and such about there should

15  have been a CV warning.  And certainly that's not something that

16  was a public pronouncement or a published pronouncement of

17  Graham, and I don't think that really is at issue here, that one

18  statement should come out.

19         As to Merck dragging its feet, *News Target* and the

20  Senate testimony, *News Target* reporting on August 30, '05,

21  indicated that Dr. Graham had spoken to Congress and in the media

22  on numerous occasions about the delay in implementing the

23  post-VIGOR change.

24         Dr. Graham had also spoken at length about the

25  relationship between the drug companies and the FDA and how the

1  FDA viewed the industry as a client.  In fact, it's sort of like

2  the Goddess Janice, who January is named for, you could look in

3  both directions but it's still one person.  And one of the

4  essential questions here is, is a jury entitled to know the

5  relationship between FDA and Merck?  And we believe it is because

6  if the jury is to be given a full picture, if the jury is to

7  understand that FDA approval of a warning at some point is not

8  the shield behind which Merck can continue to try these cases,

9  then evidence of the relationship of Merck and the FDA is an

10  appropriate, relevant, evidentiary matter which must be brought

11  to a jury in order to balance the field.  Otherwise, the jury is

12  told the FDA is there to protect you.  The FDA is a consumer

13  watchdog.  And how is a jury then to balance Merck's

14  pronouncements against the reality?

15        Counsel is upset because Dr. Graham said Merck should

16  and could have done a really huge CV outcomes trial.  But

17  Exhibit 25 indicates, "There was no incentive to do things right.

18  The clinical trials that are done are too small and as a result

19  it's very unusual to find a serious safety problem in these

20  clinical trials."

21        And another quote from Exhibit 18, "Those studies,"

22  meaning the Merck studies, "would have to be much larger and take

23  much longer than current trials.  And then the industry wouldn't

24  be able to get those blockbusters to market quickly."

25        That is a legitimate complaint from an observer within

1    the observed agency of government about Merck's activities and

2    the activities of the pharmacy industry.

3           To deny a jury that information because he used the

4    word "huge" instead of "large" or "great," we believe is

5    untoward.

6           Vioxx should have never been approved by the FDA as

7    safe and effective, and the complaint's made that he's never said

8    that, but he was a safety officer.  He repeatedly stated that the

9    structure and cultural issues of the FDA lead to a system that's

10   biased toward approving drugs, stated that the FDA uses to

11   evaluate safety with a loaded-gun analogy, and what's wrong with

12   that analogy?  It's not pejorative.

13          In law, the burden of proof is what's more probable

14   than not.  But the FDA, not by regulation, not by mandate of

15   Congress, but by fiat says, Well, once we determine that a drug

16   may be efficacious, then somebody else has got to prove it's

17   95 percent unsafe by a 95 percent degree.

18          Well, how do you explain that to a jury?  Do you say to

19   a jury with -- what the FDA requires, according to Merck is for

20   some consumer group to come inside the FDA or some outside folks,

21   point a loaded revolver that's got 90 charges out of 100 in it

22   and say, Well, there is no proof that it's unsafe.  Why isn't he

23   in the best position to draw that analogy?  Certainly a lawyer

24   could draw it.  A lawyer could argue it.  Why not someone inside

25   the FDA?

1        Sure, he's a whistle blower.  I'm certain he's not

2   comfortable about it.  He fought his deposition from being taken.

3   Let's look at Exhibit 3 on screen, PowerPoint 7.0 and let's look

4   what he did.

5        Now, this is a public forum.  This is a forum in 2005

6   at a professional group, the International Society of

7   pharmacoepidemiology, and I agree, he's an expert.  I don't think

8   he was a fact, just a fact witness.  I think he's an expert.  I

9   think that's intellectually honest.  Indeed, Mr. Beck qualified

10  him as an epidemiologist.  And now he's speaking to an

11  International Society of Pharmacoepidemiologists in 2005 in

12  Nashville.

13       Let's go to the next page that we show up there.  I

14  think it's page 6.  And he's talking as, ignorance bias or

15  irresponsibility?  You decide, group.  It's got nothing to do

16  with anything but Vioxx.

17       Go to the next slide.  If there is any doubt about it,

18  there is the VIGOR study.  Now, Mr. Beck says, Well, there was no

19  support for the opinion about how many people would be injured

20  except in the deposition in which Dr. Graham explained exactly

21  what he did as an epidemiologist.  And Mr. Beck is not an

22  epidemiologist.  He's not competent to stand up and say that that

23  methodology is wrong and try and create a *Daubert* hearing out of

24  something that's not a *Daubert* hearing.

25       I don't understand how it is that someone could say

1  that Dr. Graham never, ever spoke on this issue and wasn't

2  competent to say so and to do so.

3        Now, let's talk about Merck's reliance on a defense

4  that the FDA is some sort of consumer protection agency.  I

5  recall very well when we were in Houston at the first *Irvin* trial

6  the cross-examination of plaintiffs' expert.  How much were you

7  paid?  When were you paid?  How many times have you testified?

8  Why?  Because it is a legitimate form of inquiry to indicate

9  bias.

10       And what Dr. Graham has said is that when a consumer

11  agency that's supposed to be a watchdog is paid by the industry

12  it's supposed to watch, there is some internal conflict there.

13  Why isn't someone inside the FDA who has received numerous

14  awards, whose qualifications to testify have never been

15  challenged, whose opinions have been peer-reviewed on two

16  occasions, when there is evidence that the FDA tried to stop him

17  from publishing at all, why isn't he entitled to say, You know,

18  folks, I'm there.  Well, I think a jury using its common sense at

19  least has the right to know what the relationship is between the

20  FDA and the drug company, Merck, in deciding what the truth is.

21       This isn't a question of the FDA being charged with

22  fraud or with Merck committing a fraud on the FDA as was done in

23  *Buckman*.  It's an evidentiary matter, and the jury should be

24  allowed to weigh it in that context.

25       Now, I want to get more specific about the estimate of

1    the number of heart attacks and deaths.  Sure, there are ways

2    that you can deal with that.  But you can't deal with it in this

3    context.  Dr. Graham is relating a conclusion, an estimate based

4    on an epidemiologic analysis he performed contemporaneously at

5    the time.  Learned Counsel says, Well, you know, this is a

6    25-milligram case.  So it doesn't apply here.  That's what he

7    says in the brief, but one of the studies from which Graham

8    produced his results isn't limited to 50 milligrams.  It has

9    other dosages.

10          Whether he's a percipient fact witness, and frankly,

11   Your Honor, I disagree with that.  I can't stand up here and

12   argue something I don't intellectually believe.  I don't believe

13   that.  He's an expert.  And he has opinions acknowledged by

14   Mr. Beck as an epidemiologist at page 228 of the deposition.

15          This is nothing more than Merck's attempt to challenge

16   a witness's observations, fact findings and methods without any

17   expert support attacking that methodology.

18          The studies that Merck performed excluded all high-risk

19   patients.  Therefore, Graham's estimate, which is based on

20   numbers from Merck's own studies, is an underestimate.  And I

21   think Your Honor has heard enough testimony and seen enough rules

22   and read enough articles to know that if you exclude high-risk

23   patients from a study involving Vioxx, in fact what you're dealt

24   with is a half truth, because this drug was designed to relieve

25   pain in high-risk patients.  And of course, if you exclude them

1    from your studies, you're going to get a skewed finding.  And to

2    say that he's exaggerated is a false conclusion.  And most

3    respectfully, Your Honor, his analysis is based on epi data,

4    Merck's own data which included all dosages.

5         THE COURT:  Okay, let me just say this, folks, we've got

6    about 11 or 12 or 13 motions.  We're not going to be able to take

7    an hour, hour and a half for each motion.  We're just not going

8    to be able to do that.  So we're going to have to do some

9    prioritizing.

10        The ones that I'm going to take are the motions on

11   Cornelia Pechmann, the Lemuel Moye, the Nicholas Jewell, and the

12   Curtis Bryan.  I'm going to reserve Topol and as I say, I'm not

13   going to rule on Graham or Topol tonight but I'll hear from you

14   on those motions.

15        I'm going to take about a 15-minute, maybe 20-minute

16   break.  I've got some other things to do.  And I'll come back and

17   we'll do that.

18        MR. BECK:  Your Honor, am I right then that we're going

19   to do those four and then the other things you'll take on the

20   papers?

21        THE COURT:  Yes, I may have to take them on the papers,

22   after that I'm going to have to meet with you-all on a pretrial

23   motion.  What's your schedules tomorrow from the standpoint of

24   people from out of town?  The reason I mention that, I was

25   supposed to be in trial tomorrow, in the criminal trial, but as I

1    say, we've got a lawyer now that had to go to the hospital so we

2    have to take off.  I told the jury to come back on Saturday

3    instead of in the morning.

4            MR. BECK:  We're all scheduled to go back at 9:00 a.m.

5            THE COURT:  Everybody is leaving at 9:00 a.m.?

6            MR. ROBINSON:  I'm not.  I'm taking a deposition in this

7    case at noon.

8            THE COURT:  Well, let's see where we go with it.  I do

9    need to meet with you-all on the pretrial order so we can talk

10   about that.

11           MR. HERMAN:  May I approach for a minute on a matter

12   that doesn't deal with this case?

13           MR. BECK:  If it doesn't deal with the case, I don't

14   need to step up.

15           (Off-the-record discussion.)

16           THE COURT:  We stand at recess for 20 minutes.

17           THE COURT DEPUTY:  Everyone rise.

18                         (Recess.)

19           THE COURT:  Be seated, please.

20           MR. BECK:  Your Honor, for planning purposes, we on the

21   defense side have rearranged our schedule so that we can leave

22   later in the day tomorrow.  And I understand that there is a

23   deposition that Mr. Robinson is going to be involved in, starting

24   at 11:00, so whatever Your Honor wants to handle tomorrow, I'll

25   hang around.  And from our side, Andy and I will be here and we

1    would like to get it done by 11:00 in fairness to Mr. Robinson.

2            THE COURT:  Start at nine, is that okay with you?

3            MR. ROBINSON:  That would be fine, Your Honor.

4            THE COURT:  Give me some input.  I don't need this on

5    the record.

6            (Off-the-record discussion.)

7            THE COURT:  Let's start with Cornelia Pechmann.

8            MR. BECK:  Yes, Pechmann.

9            THE COURT:  I've read the briefs.  If you can just give

10   me a thumbnail.

11           MR. BECK:  I'll try to be shorter on this than I was on

12   the other one.

13           Two fundamental flaws that we see in her opinion and

14   her report.  The first one is that she opines on subjects that

15   she's not qualified to speak to.  Science and medicine, for

16   example.  She gives opinions concerning the cardiovascular risks

17   of Vioxx as revealed in VIGOR, and she even gives opinions as to

18   subgroups, so that, for example, in her report in paragraph 9F,

19   and I'm going to save time by not putting everything up on the

20   screen, Your Honor.

21           THE COURT:  Okay.

22           MR. BECK:  But in her report, paragraph 9F, at the very

23   end, she talks about how there were, how Vioxx was especially

24   dangerous for elderly patients with preexisting cardiovascular

25   problems.  And, Your Honor, that's an interesting observation but

1    she's a marketing professor.  So, she's unqualified to speak to

2    that.  She's not a scientist or a doctor.  And in fact, as we

3    point out in our brief, she gives, she purports to give expert

4    testimony on how Vioxx is prothrombotic, and that the Naprosyn

5    hypothesis is invalid.  And she admitted in her deposition that

6    she had to go to the dictionary and look up prothrombotic because

7    she didn't know what it meant.  So she shouldn't be giving

8    science and medicine testimony.

9         The second area where she's unqualified to speak is on

10   what Merck should have known or knew and what Merck intended.

11   And, Your Honor, this is something that I thought we laid to rest

12   in *Irvin* I.  You gave the parties guidance where on some, like

13   Luchessi and some of the other experts that they had identified,

14   I think, Dr. Ray, you said, I'm not going to let somebody get up

15   there and say, I've read the documents and this shows what Merck

16   understood and this shows what Merck's intention was.  And state

17   of mind.  But that is almost all of her opinion is what Merck

18   knew or should have known.

19        And then, Your Honor, there are areas that are within

20   her expertise and in a sense that she's a marketing person and

21   she talks about Merck's marketing.  But this is, I think, the one

22   subtle point, if there is one, to our motion.  And that is that

23   as to the marketing issues, she does not anywhere in her report

24   describe any kind of methodology that she's employing to reach

25   her conclusions.  And all she does, and I really would invite

1    Your Honor to read her report.  It's tedious, it's --

2              THE COURT:  I have read it.

3              MR. BECK:  All she does is compile the documents and the

4    testimony that the plaintiffs' lawyers like best and then attach

5    labels and say that Merck's conduct was false and misleading.

6              These are not the kind of subjects that are, expert

7    testimony is necessary for or helpful to the jury.

8              Would you just turn this off.

9              How sick of this are you, Judge?  Do you want me to go

10   through and give you examples of this or are you familiar enough?

11             THE COURT:  I really am.  I've got it.  I've read her

12   stuff, and I've read the memorandum.  I do understand the issues.

13             MR. BECK:  Your Honor, what I urge you to do is, you

14   know, if you take a look at paragraph, the only thing I'm going

15   to show is paragraph 18.  I say that, but then maybe I'll get

16   carried away.  Here is paragraph, here is paragraph 18 of her

17   report, which is at page 10.  Here we go.

18             THE COURT:  I have it.

19             MR. BECK:  And this is bold type.  That's her bold type.

20   And so we're taking her overall summary.  "My overall opinion in

21   this case can be summarized as follows.  In a study called VIGOR

22   completed in March, Merck learned that 5 out of every 1,000

23   patients on Vioxx had a heart attack as compared to 1 patient out

24   of every 1,000 on Naproxen.  In other words, in the VIGOR study,"

25   she goes on to do the math.

1        "Yet Merck sold about $9.5 billion worth of Vioxx,
2   primarily in the U.S. but also worldwide, from March 2000 until
3   September 2004.  It was the eighth best selling drug."
4        And then she says, "How did Merck sell so much given
5   Vioxx's significant cardiovascular risk potential?  Merck devised
6   and implemented an unprecedented integrated marketing
7   communications campaign for Vioxx.  It was sophisticated,
8   coordinated and well funded."
9        It talks about how much money we spent.  And it says
10  that -- I skipped over the most important part.
11       "Merck's integrated marketing communications campaign
12  for Vioxx was perfect, except on the most important dimension of
13  all:  The campaign was misleading.  Instead of acknowledging
14  Vioxx's cardiovascular risk potential, the campaign was expressly
15  designed to neutralize concerns about Vioxx's cardiovascular risk
16  potential.  As a result, they made a lot of money."
17       And then she's goes on.  And then the whole report is,
18  there is no methodology, no kind of expert analysis.  It is
19  nothing but one paragraph after another saying, Here is this
20  document, here is this testimony from Mr. Anstice.  Merck was
21  misleading.  Here is this document, here is this testimony.
22  Merck's conduct was misleading.  It is 100 percent an evidentiary
23  discussion, an advocate's piece.
24       I said that I was only going to show you one thing but
25  I'm not, I'm going to show you two things and then I'll sit down.

1    The other one is at page 8, paragraph 15.

2            And this is what she claims to be doing.  She said, "In

3    addition, I used my expertise in identifying misleading

4    advertising to formulate my opinions regarding Merck's integrated

5    marketing communications campaign for Vioxx.  She says there is a

6    substantial body of literature and substantial published research

7    on what constitutes misleading advertising, and marketing experts

8    are frequently used to help identify misleading advertising in

9    legal cases because, 'What is truth?'  That simple, age-old

10   question may elicit a simple answer from some people.  But in the

11   real world of complex communications, truth has many levels and

12   involves a number of issues."

13           So we have an expert, a marketing professor who is

14   going to answer the question, What is truth?

15           THE COURT:  She's a philosopher.

16           MR. BECK:  And I don't think we need her help on what is

17   truth, Your Honor.  But if she comes, I'm going to ask her

18   whether God exists and what's the meaning of life so we can wrap

19   all those important things up at once.

20           I'm being facetious but that's what her report, once

21   you get past the gobbledygook about how I'm an expert and there

22   is a lot of books out there on advertising, she doesn't refer to

23   any of the books, any methodology, any statistics.  It is nothing

24   but a closing argument, and that ought to be made by Mr. Robinson

25   or Mr. Birchfield, not by this person.

 1          THE COURT:  Okay.

 2          MR. ROBINSON:  Thank you, Your Honor, but I'm not going

 3   to give it tonight.  First of all, Your Honor, I think it's

 4   important that she's a very qualified expert.  She's got --

 5          THE COURT:  You don't need to convince me on that.

 6   She's very qualified.

 7          MR. ROBINSON:  Next.  These are her, you know, the

 8   foundation for her opinions, Your Honor.  At page 68, "Merck's

 9   market research shows that if Merck failed to neutralize safety

10   concerns about Vioxx's cardiovascular risk, Vioxx sales would

11   drop dramatically."

12          Number 2, in the report at page 25, "Merck performed an

13   integrated marketing communications campaign for Vioxx to address

14   the issue of cardiovascular risk."

15          At page 24 and 25 of her report, she talks about "the

16   strategic and behavioral objective of Merck's integrated

17   marketing campaign to neutralize safety concerns."

18          And at page 28 and page 53 through 61 of her report she

19   talks about the marketing communication campaign.

20          Go on.  We're not going to have her testify,

21   Your Honor, to the medical causation issue.  So Mr. Beck can be

22   satisfied there.  However -- go to the next -- she can't, she can

23   basically, with her background and experience, look at all of the

24   Merck data that Merck has given us.  She worked for Ogilvy, one

25   of the divisions of Ogilvy from '99 through 2004, and so she, she

1   knows exactly how Ogilvy tracked.

2           She also worked with Millward Brown.  She was working,

3   for Ogilvy they were working with Millward Brown.  She

4   understands what they were doing.  DDB is the other company that

5   was involved in tracking.  Basically, what she is going to

6   testify to, Your Honor, is that Merck realized that they had an

7   issue regarding CV risks and decided to neutralize that risk.

8   And they did that by marketing.  And they then they tracked very,

9   in a very sophisticated way, with all these, these companies,

10  they track the message, and one of the documents that they gave

11  you today that they want to try to keep out because they are

12  concerned about it is one of their tracking documents where they

13  are actually going and actually asking the doctors what they were

14  told by sales reps, and they tried to track the message to see

15  if, in fact, the doctors believed that Vioxx causes heart

16  attacks, does Vioxx cause CV events, does Vioxx cause strokes.

17  And that's what they did.  And the answer was, Hey, our message

18  is clear, Vioxx does not cause heart attacks and does not cause

19  CV risks.  And they did it with a billion contacts a year, or

20  actual impressions a year, and Your Honor, this is a very

21  sophisticated marketing campaign.

22          Now, I'm not going to go beyond what the rules of

23  evidence are in putting her on.  And basically, I will stay

24  within the methodology that she used.

25          Go on here.  Go on.

1          These are their documents basically that she's relying
2     on to conclude what their goals were.
3          And go further here.  Warning letters, she relies upon.
4     Stop there.
5          This is Merck's strategic marketing objective.  This is
6     a Merck document, Your Honor, and they lay out their marketing
7     plan and basically, under "Strategic Objective" they say, Our
8     strategic objective is to neutralize the safety concerns about
9     hypertension, edema and MI.  That's what they were trying to do.
10          And then there is the other document, I think you saw
11     it in the *Irvin* case, where they basically were saying, We can do
12     that.  That realizes 437 million a year.  So, this was a very big
13     ticket item for them to do.
14          Let's move on.
15          Her expertise is in integrated marketing campaigns.
16     That's what this was.  One of the defense arguments is, Well, a
17     jury can understand this.  Some of the documents they can.  But
18     to understand how they put this whole plan together, how they got
19     the 3,800 sales reps, the 560 advocates, the, all of the, the
20     various free samples they gave out, the $160 million in direct
21     consumer advertising, it went on and on.  The sales reps,
22     repeated contacts and, Your Honor, it applies in this case.
23     Clearly applies in the case.
24          And I'll just say in a nutshell this:  If there was
25     ever a case where Merck's campaign worked, it was in this case.

1   They, actually part of their game plan was to embrace the doctors

2   so that when prescribing the drugs, they'll continue to prescribe

3   the drugs.  And in fact, with Dr. Mikola and Dr. McCaffrey, they

4   did just that.  They signed contracts with McCaffrey for eight

5   years to be one of their thought leaders.  He was their biggest

6   earner in that area.  Mikola was married to a sales rep.

7           This case was clearly a case where their marketing

8   campaign worked.  They actually connected with the actual doctors

9   that were prescribing to Mr. Barnett.

10          Go on.

11          The results of the campaign:  And they target, this is

12  a Merck document.  And they are targeting what effect the

13  perceptions were regarding the *New York Times* article, the *JAMA*

14  article, the warning letter, the 9/17 warning letter, they are

15  actually targeting and analyzing and tracking this information.

16          This is their document.  "Merck research indicates

17  campaign neutralized CV risks."  That's their own documents.  So

18  her methodology is Merck's methodology.  She understands their

19  methodology.  She understands the integrated marketing campaign.

20          Go on.

21          Her expertise allows her to explain to the jury Merck's

22  integrated marketing communications campaign for Vioxx and how

23  Merck achieved their strategic objective of neutralizing CV

24  safety concerns through that campaign.

25          I'm going to try and put this on appropriately, with

1  her as a witness talking about science.  There is a science of

2  marketing and, you know, I could go on, Your Honor.  I have a

3  longer PowerPoint, but I know it's late, but if the Court has any

4  questions, I would be happy --

5        THE COURT:  No, I don't.  Let me, I'm going to try to

6  write something on it to give you some benefit of my thinking,

7  but let me just tell you the way I see this particular matter:

8  As I understand it, plaintiffs propose to call Dr. Cornelia

9  Pechmann as an expert witness to analyze and explain Merck's

10  integrated marketing communication campaign.  The defendant, of

11  course, moves to exclude on 702 and *Daubert* standards.  I look

12  first of all, to her qualifications.  And she seems to me to be a

13  qualified person in the area of marketing.  She has a Ph.D. in

14  marketing management, master's in business administration,

15  Master's in psychology, bachelor's degrees in psychology and

16  Spanish.  I don't know where the Spanish is significant but

17  psychology is of course part of the marketing aspect, so I think

18  that's of help.  So her practical experience, present position as

19  I noted from the documents that both of you presented to me,

20  she's a professor of marketing at the University of California,

21  Irvine.  She's written about 50 publications dealing with

22  integrated marketing communications, she's been retained by

23  government agencies, businesses to work and advise them on the

24  integrated marketing campaigns.  Her specialty seems to be

25  integrated marketing communication.  She's published articles on

1    the same technique she says that's used by Merck in its

2    integrated marketing program and campaign.  Also, I noted that

3    she considers herself, or published articles in any event, on

4    identifying and preventing misleading advertising.

5           As I understand her methodology, she says that she's

6    reviewed, she says, thousands, if not tens of thousands of papers

7    and documents, including depositions, exhibits, custodial files,

8    associated with Merck's marketing sales, public relations people,

9    she's interviewed and she's interviewed or discussed with various

10   sales representatives from Merck, she says she's applied her

11   knowledge and experience with marketing constructs, marketing

12   research tools, marketing and advertising, metrics and

13   pharmacological marketing metrics to formulate her opinion.

14          My focus, of course, is not on her conclusion, which

15   Counsel mentions at the page that he read to me, which I noted

16   also.  My focus under *Daubert* is on 702 and also on *Daubert*, and

17   it's not to question the conclusion but to focus on whether or

18   not the individual is qualified, whether or not it will be

19   helpful to the jury, and whether or not the conclusions are based

20   on proper methodology.

21          The marketing aspect of our society has gotten more and

22   more complicated.  With technology comes marketing, and with

23   various different types of technology, marketing becomes more and

24   more specialized and also more and more complex.  So I do think

25   that the jury would be benefited by somebody who is talking about

the integrated marketing approach.  That really, just that whole
concept has come around not too long ago.  When we were starting
to talk about integrated marketing, it used to go without saying,
without even description, somebody coined that phrase and
everybody has been rallying behind it, but I think it's helpful
to have somebody put this in hopefully shirt-sleeve English so
the jury can understand it.  So, I do think it will be helpful
and I do think the party is qualified to testify and I do think
her methodology is appropriate.

But there are some problematic areas.  I think the
defense Counsel raises one.  She says in her conclusion that
Dr. Barnett, I am sorry, Dr. McCaffrey and Dr. Mikola is
Mr. Barnett's physicians.  She says that they were not given
adequate warnings that Vioxx posed cardiovascular risks.  That's
a real pregnant word, a real complicated word, adequate.  I think
for a nonmedical person to say that a medical person was not
given adequate warnings, I think that's a reach.  I don't think
she's able to testify about that.

What Merck knew and when they knew it in a general
sense, that's, to me, also is getting inside of someone else's
head.  However, the witness can, in order to discern what the
integrated marketing approach is, has to understand what the
problems, what will proceed that the integrated marketing was
devised to deal with.  And without exquisite detail, I think the
witness can explain or postulate or conclude that because of

1   VIGOR or whatever it is that there was some information that

2   cardiovascular risks existed for taking Vioxx.  And then she

3   concludes that, as I read it, that Merck saw this as an obstacle

4   or a challenge and devised a marketing technique to neutralize

5   physicians and the public concerns about Vioxx and its potential

6   risks.

7           And discuss what that marketing technique was and

8   explain it and how they went about it and what they did and how

9   they did it.

10          I think those are fair game, but when she gets into

11  explaining what doctors knew or what warnings should have been

12  given or whether or not they were adequate, even exquisite

13  understanding of the various studies, I don't see her explaining

14  the study; that's out of her field.  So there are some minds that

15  have to be navigated around that testimony, and I'll be receptive

16  to objections if they get too close to that but the general

17  subject matter of marketing it seems to me is a fair aspect.  And

18  I'll try to put this in a more cogent process.  I'm just telling

19  you in my 20th hour.

20          Let's see.  The next one is --

21          MR. BECK:  Your Honor, could I ask a question or at

22  least ask you to address it in your written opinion?

23          THE COURT:  Sure.

24          MR. BECK:  I have listened to Your Honor and I can

25  imagine testimony that says, here was the problem identified by

1   Merck of potential risks, here was a program they devised in

2   order to address that.  But what she goes on to say is that the

3   program was a pack of lies and it was intended and did in fact

4   deceive.

5           So if you look, for example, at paragraph 19 of her

6   opinion, which is, gives her more specifics, it's got a whole

7   bunch of subparagraphs, but basically every one of them starts,

8   you know, plaintiff Barnett's physician, Dr. McCaffrey, was

9   misled by Merck.  Barnett's physician, Mikola, was misled by

10  Merck.

11          THE COURT:  I think that's problematic.

12          MR. BECK:  And all of this stuff about how everything

13  they said was misleading because that's what every single one of

14  the subheadings has, Merck's misleading integrated marketing

15  campaign falsely stated so and so.  So it's one thing if she

16  says, here were the pieces of campaign, they had

17  direct-to-consumer marketing, they had this, they had that, they

18  had the other thing, they kept track.  It's another thing for her

19  to draw the conclusion about what was true and what was false.

20          THE COURT:  I basically agree with that.  I think that

21  that may be admissible from the standpoint of other witnesses.

22  But as to whether or not they were told whether or not they were

23  adequately advised, I think those doctors have to say they

24  weren't adequately advised.  And if they had been adequately

25  advised, they would have done something or other.  I'm not

1    comfortable with her saying this doctor was not adequately

2    advised.  And I'm not sure about whether she could say this is,

3    this is misleading or not misleading.  She seems to be an expert

4    in misleading advertising, but I don't know whether that, I'm

5    having difficulty taking it out of context and giving you some

6    guidance on it, because it may well be significant in a certain

7    context and not significant in another context.

8              MR. ROBINSON:  Maybe when we call her as a witness, Your

9    Honor, before you and Mr. Beck, what area that I want to get into

10   with misleading.  There are some areas but I don't want to do it

11   now.  We have three more motions.  But I will before putting her

12   on make sure we're all in agreement as to, I understand what the

13   Court is saying.  She can't, you don't want her to get into a

14   state of mind of Dr. Mikola or McCaffery but I do think there is

15   some, she needs to explain to the jury, you know, why this is

16   misleading marketing.  So I think that there is a balance.

17             THE COURT:  I'll be heads up on the misleading part.  I

18   think I understand what the problem is and I'll focus on it.

19   It's going to be hard for me to address that in writing because I

20   do see it as more of a contextual.

21             MR. BECK:  I don't need it Your Honor, as long as you're

22   alert to it, we don't need it.

23             THE COURT:  I will focus on it and I will be conscious

24   of it.  I have flagged that.

25             Let's talk about what is it, Moye?

1          MR. GOLDMAN:  Dr. Moye, Judge.  Good evening, Judge.

2          THE COURT:  Good evening.

3          MR. GOLDMAN:  Dr. Moye, I assume you've read the papers,

4    is a professor of biostatistics and epidemiologist at the

5    University of Texas.  He is very experienced in designing and

6    conducting clinical trials, and Merck does not object to Dr. Moye

7    testifying about those subjects, doesn't object to Dr. Moye

8    testifying about relevant risk issues or statistical issues but

9    we do object to four specific areas, maybe five.  If you indulge

10   me, Judge, let me just cover the issues specifically.

11         THE COURT:  Sure.

12         MR. GOLDMAN:  The first is Dr. Moye is unqualified and

13   didn't apply any methodology at all in forming his opinion in

14   paragraph 24 of his report that there are two alleged mechanisms

15   by which Vioxx increases cardiovascular risks.  So in paragraph

16   24, he talks about the imbalance theory, which Your Honor knows

17   about, the clotting theory, and he talks about hypertension and

18   how that can lead to atherosclerosis.  Those are his two proposed

19   mechanisms for how Vioxx allegedly increases cardiovascular

20   risks.

21             In his deposition, Your Honor, Dr. Moye admitted first

22   he's not a pharmacologist so he is not familiar with how

23   mechanisms work.  He also admitted more importantly I think for

24   purposes of *Daubert* that he did not apply scientifically reliable

25   methodology.  And I'll show you why that's so if I can just pull

1   up page 331 of his deposition.

2             This is page 331 of Dr. Moye's deposition.  Here he's

3   being asked about what studies he's reviewed around the area of

4   prostacyclin, which Your Honor is knows is part of this imbalance

5   theory.  And on line 7, he's first asked, "Is prostacyclin a

6   prostacyclin?"  And he's looking in his report and he doesn't

7   even see a mention of prostacyclin.

8             And my question of line 18 is, my question is, "Is

9   prostacyclin a prostaglandin?"

10            "It's related to it.  I don't know the chemical

11  composition of it, so I don't know if it meets the chemist's

12  definition of being a prostaglandin or not."

13            And Your Honor knows from two trials already that

14  prostacyclin is a type of prostaglandin.  And then the question

15  is, "Is that outside of your area of expertise whether

16  prostacyclin is a prostaglandin?"

17            "Yes."

18            Then if we go to, Judge, page 376, here is the part

19  about the methodology.  Line 21, at the bottom.  I'll call it out

20  to make it a little easier to read.

21            "Dr. Moye, is there any specific study that you're

22  relying on for your opinion that Vioxx causes an imbalance

23  between prostacyclin and thromboxane?"

24            "No, it was my understanding of the biochemistry of it,

25  but I haven't reviewed the basic biochemical studies, no."

1          So he hadn't even read the basic biochemical studies on

2     prostacyclin to know whether COX-2 inhibition could create an

3     imbalance in the human body.

4          And then the question is, "Do you know whether the

5     studies measure prostacyclin directly or whether they measure a

6     metabolite of it?"

7          And you know from the Fitzgerald study that's the urine

8     metabolite.

9          And then he says, "I don't know that."

10         And then he's asked another specific question about

11    prostacyclin.  So this is not a witness as a biostatistician and

12    epidemiologist who is qualified or took the time to review the

13    studies necessary to apply a reliable methodology in forming his

14    opinion.  So the first area, Judge, is that Dr. Moye can talk

15    about statistics all he wants but should not be allowed to talk

16    about mechanism.

17         The second area, Judge, is about Merck's intent and

18    state of mind.  And this may not be an issue because in the

19    plaintiffs' response brief, I believe they say, quote, that they

20    do not intend to solicit testimony from Dr. Moye regarding the

21    motive and intent behind Merck's actions or inactions at page 17

22    of their response brief.

23         So, we moved in part because he said in his deposition

24    and in his report that he plans on testifying about Merck's

25    intent.  I think they took that out of the area of examination,

1  but if they don't stand by that, Judge, I think an order from you

2  is appropriate in that regard because it is inappropriate subject

3  matter for an expert witness.

4       THE COURT:  The problem I had with this one is that both

5  of you-all took a different view of what he's going to testify

6  to.  I almost had the feeling a boat was coming crest, you know,

7  crossing.

8            You said he was going to testify to certain things and

9  they said he was going to testify to other things.  And so I

10  don't know what he's going to testify to is what I'm saying.  So

11  that's my problem.  You need to alert me to the difficulties that

12  I should be aware of, but I don't know whether I'm in a position

13  now to say he can or he can't because you say he's going to do

14  something and they say he's going to do something else, and I

15  don't exactly know what he's going to do.

16       MR. GOLDMAN:  Our basis for saying what he's going to do

17  is based on what is in his report and what he says.  So for

18  example, on paragraph 87 and 190 of his report, he says that,

19  "Merck engaged in a deliberate attempt to confuse the medical

20  community."

21            A deliberate attempt.  That's intent, so we interpret

22  that to mean he's going to testify about intent.  And then he

23  said other things in his deposition in that regard.  But you're

24  right, Your Honor, it looks like it's ships passing in the night

25  because they are not apparently going to ask him questions about

1   the subject matter in his report.

2           THE COURT:  He seems to me to be a very well-qualified

3   statistician epidemiologist.  I think that that's the

4   statistician slash epidemiologist, I guess.  He's published over

5   120 articles.  He's authored over six books.  He's on the FDA's

6   cardiovascular renal drug advisory committee.  He serves as a

7   statistical consultant for the FDA and recently completed a

8   two-year term on the FDA pharmacy science committee.  So he seems

9   to me to be qualified and seems to be capable of dealing with

10  statistics and to the extent he's an epidemiologist, I assume

11  he's qualified there, too, but I don't know what he's going to be

12  testifying to.  I don't see him testifying to some of the things

13  that you say that he's, you assumed he was going to testify to,

14  unless the plaintiffs withdraw or had withdrawn it now because

15  he's just not qualified in certain areas.  The fact that he's a

16  good biostatistics person involved in design, execution and

17  analysis of clinical trials and he's been doing that for nearly

18  20 years now doesn't mean that he's an internist or knows a lot

19  about Vioxx.

20          MR. GOLDMAN:  Right, Judge, that's exactly our point.

21  And there are two areas that I do know they say in their response

22  brief they do plan to elicit testimony about so maybe we could

23  explore those because we agree that those are areas that they are

24  going to try to elicit testimony about, and we think it's

25  improper under Rule 702 in *Daubert*.

1    The first is about the VIGOR *New England Journal of*
2  *Medicine* publication.  In his report, Dr. Moye says that Merck's
3  failure to include the three additional heart attacks that were
4  learned about after the cutoff date constitutes a critical
5  ethical omission.  That's one thing we think is improper for
6  experts to talk about.

7    But then, while they say in the response brief they
8  won't talk about the ethical issue, they say they do intend to
9  elicit testimony from Dr. Moye and say that he is qualified to
10 testify that the three additional heart attacks should have been
11 included in the VIGOR manuscript prior to publication.  And
12 that's on page 8 of their response brief, and our problem with
13 that testimony, Judge, is it's for the same reason you precluded
14 Dr. Fletcher from testifying in the *Plunkett* case, it's improper
15 for Dr. Moye to come in and basically cheerlead for Dr. Curfman.
16 And Dr. Curfman can speak all he wants about how he thinks Merck
17 should have included these three additional heart attacks.  And
18 he has a deposition in this case.  But the jury doesn't need to
19 hear from a biostatistician about how he thinks Merck should have
20 included that information in the *New England Journal of Medicine*
21 article as well.  So for the same reasons you excluded
22 Dr. Fletcher, we think those apply here too, Judge.

23   Finally, another area I think they agree they are going
24 to ask him questions about, that has to do with class and effect.
25 And this is important because in his deposition, Dr. Moye says,

1    "Vioxx is the worst of the COX-2 inhibitors."

2            And then in plaintiffs' response brief, they say that,

3    "Dr. Moye will testify that Vioxx poses a greater cardiovascular

4    risk as compared to other NSAIDs as a whole."

5            The problem with that is that Dr. Moye has done nothing

6    whatsoever to analyze any risks that the other NSAIDs and other

7    COX-2 inhibitors may cause.  So in order for an expert to come up

8    and say, Vioxx is the worst of all the other NSAIDs in terms of

9    cardiovascular risks, he needs to look at other NSAIDs, analyze

10   the studies of other NSAIDs, know what cardiovascular risks those

11   NSAIDs pose and then say, there are other studies that show that

12   Vioxx's risk is higher.

13           And so let me just show you this one point, Judge, and

14   then I'll sit down.  On page -- it's actually on page 368, of

15   Dr. Moye's deposition, line 22, the question is, "Do you disagree

16   that the FDA also found that data from long-term controlled

17   clinical trials that have included a comparison of COX-2

18   selective and nonselective NSAIDs do not clearly demonstrate that

19   the COX-2 selective agents confer a greater risk of serious

20   adverse cardiovascular events than nonselective NSAIDs?"  And

21   here, we're talking about the FDA's conclusion, right?

22           And he says, "If you ask me do I disagree with the fact

23   that they said that, of course not."

24           And then he goes on and he says he does disagree with

25   the ultimate conclusion.  And if we continue on, I'm sorry that

1    this takes a few pages, Judge, but it's important.  He says, the

2    question is, "But you haven't done a scientific review of the

3    literature on the cardiovascular effects of other NSAIDs, have

4    you?"

5              "ANSWER:  That's true."

6              That alone precludes Dr. Moye from testifying about how

7    Vioxx compares to other NSAIDs when it comes to cardiovascular

8    effects because he hasn't even looked at the literature on the

9    topic.

10             And there are other areas that we've cited in our

11   brief, too, I don't need to cover on this subject, Judge.

12             THE COURT:  Do I have a copy of his whole deposition?

13   Do you know?

14             MR. BIRCHFIELD:  Yes, Your Honor.  We submitted it as an

15   attachment to our brief, Your Honor.

16             THE COURT:  I didn't know whether it was full or

17   complete.

18             MR. BIRCHFIELD:  Yes, Your Honor, on the plaintiffs'

19   side.

20             MR. GOLDMAN:  So, Judge, there are other areas that we

21   raised in our brief that we think Dr. Moye should be precluded

22   from testifying about, but those are the areas that I wanted to

23   cover in my remarks tonight.

24             THE COURT:  Thank you.

25             MR. BIRCHFIELD:  Good evening, Your Honor.

1  Andy Birchfield on behalf of Mr. Barnett.  Let me go briefly

2  through the issues that are raised in his brief.  First, they

3  raised the issue as to marketing and they say that Dr. Moye

4  admits that he's not an expert on marketing.  We do not intend to

5  offer Dr. Moye to testify about an integrated marketing campaign.

6  However, he has, he is a doctor, he's a medical doctor, he has

7  published, as you noted, over 120 articles.  One thing that, and

8  you listed a number of his qualifications there, but in addition

9  to that, he has spent an excess of 250 hours reviewing the

10 relevant medical literature as well as Merck documents.  He has

11 spent an enormous amount of time and gained that experience.

12 While we do not intend for him to offer an opinion about the

13 integrating marketing campaign as a marketing expert, he is

14 qualified to render opinions about the label for Vioxx and how

15 that label was inadequate to provide an adequate warning about

16 this cardiovascular risk associated to Vioxx.  That's the area

17 where we intend for him to offer an opinion, not on the

18 integrated market campaign.

19        Merck says he admits that he is not an expert and they

20 say that he never met with a Merck sales rep.  The fact that he

21 never met with a Merck sales rep on Vioxx does not negate his

22 qualifications to render an opinion about what is included in the

23 Vioxx label compared to the known cardiovascular risks of Vioxx.

24        The next issue that they raised is the ethical omission

25 of the three heart attacks.  And first of all, Dr. Moye, in

1  addition to having 120 articles published in peer-reviewed

2  journals, he also serves as a peer reviewer for a number of

3  medical journals, including the *New England Journal of Medicine*.

4  He has the qualifications to testify about what could have and

5  what should have been published in the literature.  Merck objects

6  to this testimony in essence because it would be cumulative.

7  That's one of the bases.  And they say, Dr. Curfman already

8  testifies to that effect.  That's not a *Daubert* issue.  That is a

9  trial management issue.  And if the Court, if we choose to have

10  Dr. Moye provide that testimony and you exclude Dr. Curfman's

11  testimony on that, that's a trial management issue.  But we

12  should not be forced to, you know, say, This is the way you're

13  going to offer this testimony.  If it's cumulative, you can

14  address that as a trial management issue but it's not a *Daubert*

15  issue.

16          And they also assert that that is improper character

17  testimony because it deals with ethics, and they assert ethics

18  doesn't have anything to do with it.  We're not talking about

19  Dr. Moye saying that Merck is an unethical company.  We're not

20  offering that type of character evidence but what we are offering

21  evidence on is a standard, an objective standard.  What would a

22  reasonable pharmaceutical company do?  And that is guided by

23  ethical principles.  And when you are talking in terms of what

24  should a company provide to a medical journal, that is an area

25  that needs expert testimony.  A lay person would not know.  They

1  could not really discern.  Is a prespecified cutoff, does that

2  free you from the obligation to publish it?  We need to be able

3  to present expert testimony to rebut Merck's position here.  A

4  jury needs to understand, what are the normal workings, what are

5  the guidelines that apply to pharmaceutical companies here.  It

6  is not improper testimony.

7          And Merck argues that Dr. Moye is not qualified to

8  render causation opinions.  That's their position.  And they say

9  that he, first, he's not, he's not qualified because he has not

10  had any personal experience with Vioxx.  That was not a position

11  that they argued today, but that is a matter that they set out in

12  their brief.  Dr. Moye, the Court has listed his convictions.  He

13  has spent the time reviewing the medical literature.  He

14  understands Vioxx and the issues there.  He is certainly entitled

15  to render opinions.  And the fact that he did not prescribe Vioxx

16  is not a valid argument that he should be precluded from offering

17  that testimony.  And I'll be glad to go further.

18          THE COURT:  No, I agree with that.  I think some of the

19  issues that I'm grappling with or some of the things is that some

20  of the material that the defendants are concerned about and some

21  that you're concerned about in other areas seem to me to be

22  legitimate areas.  It's a question of whether or not it's a

23  *Daubert* issue or whether it's a cross-examination issue or an

24  impeachment issue.  And that's where it's at.  A lot of what's

25  being expressed is a legitimate concern.  The question is whether

1  or not it's such that it taints the entire testimony.  That's

2  where I'm having some difficulty.

3        MR. BIRCHFIELD:  Your Honor, in regards to the

4  qualifications on general causation, are you satisfied with what

5  you've seen there?  I won't go into any other issues on that.

6        THE COURT:  No, I'm okay with that.  I understand that.

7  What about the class effect that he's concerned about?

8        MR. BIRCHFIELD:  Your Honor, what they are asking, have

9  you reviewed all of the literature?  Can you do a rank order of

10  the NSAIDs?  And he says, No.  The FDA says that they could not

11  do a rank order of the NSAIDs.  And in that memo, they state why

12  they can't.  And that is because there is no adequate testing

13  there.  So can Dr. Moye come in and provide to the jury a rank

14  order of all of the COX-2 inhibitors, put this one is number 1,

15  this one is number 2, this one is number 3, through all tens and

16  hundreds of the NSAIDs?  No, he cannot do that.  But what he has

17  done is he has reviewed the relevant literature involving Vioxx,

18  which includes comparisons to other NSAIDs, it includes

19  comparisons to Celebrex, the other COX-2 inhibitors, and he has

20  looked and his report sets out the basis for that, about the

21  selectivity, you know, that's the key there.  That's what he

22  looks at, the selectivity that correlates to the worst effect

23  here.  And he's reviewed the study and sets out in his report

24  about how Vioxx was the most selective COX-2 inhibitor did not

25  inhibit the COX-1 as Celebrex does.  So he is in a position to

1  say that Vioxx the worst of the NSAIDs, even though he cannot do
2  a rank order.

3          If you look at the FDA memo itself, and what they say
4  is that there is a class effect, and that's what we've heard
5  about in both of these trials.  And so Merck has taken the
6  position, Well, the FDA has said that they cannot do, that there
7  is a class effect; you cannot rank orders.  So, all NSAIDs are
8  equal.  All the NSAIDs, therefore, are equal in their
9  cardiovascular risks.  But you look at what the FDA did in its
10 memo.  In that memo, they look at, they look at Bextra.  And they
11 say, Pfizer, take it off the market.  They urged Pfizer to take
12 Bextra off the market.  They looked at Celebrex, and they say,
13 No, we're not going to urge you to take it off the market but put
14 a black-box warning.  They look at the other NSAIDs and say,
15 There is not enough study here, so provide a warning.

16         So the FDA does itself does distinguish between the
17 degree of risk in the COX-2 inhibitors and in the NSAIDs.  So
18 it's improper to take the FDA's statement in this memo, which is,
19 and that memo is replete with references to a lack of studies.
20 We don't know, we don't have any long-term studies, there is not
21 enough data here.  But it's improper to look that memo and say,
22 The FDA has reached a be-all, end-all conclusion that all NSAIDs
23 are equal in cardiovascular risks.  And that's, Dr. Moye has
24 reviewed the relevant studies and has established his basis for
25 saying that Vioxx is the worst of these COX-2 inhibitors.

1      And, Your Honor, in reference to the statement about or

2    state of mind or what Merck knew and when they knew it, and you

3    indicated that there is some concerns there about when we're

4    really crossing the line of impeachment and what's the area

5    there, previously in both *Irvin* I and *Irvin* II, you know, the

6    Court ruled that that really needs to be in context, and you

7    think that that's not a *Daubert* issue.  That's something that

8    needs to be brought up at trial so that you can look at the

9    context.  I mean, is he looking at a Merck, you know, a Merck

10    memo among scientists in explaining, you know, what they are

11    saying there and how that indicates, you know, Merck's knowledge.

12    You know, that's different.  I mean, and that would apply, you

13    know, on a case-by-case, document by document, issue by issue,

14    you know, basis and needs to be reserved for trial as you did in

15    both *Irvin* I and *Irvin* II.

16         Your Honor, in regards to the lack of scientific

17    support, and Mr. Goldman showed you a couple of deposition clips

18    there, and the only thing that he established in regards to the

19    prostacyclin and thromboxane is Dr. Moye could not give an

20    opinion as to whether or not they were a prostaglandin or not.

21    That does not, that does not negate his qualifications and his

22    understanding.  If you read his report, if you read his

23    deposition testimony, and it's clear that he has an understanding

24    of the mechanisms and he has an understanding of the studies

25    here.

1           THE COURT:  I must say, though, I was surprised at that

2     when I read it.  I was just really surprised that somebody who

3     has 120 articles, six books, I mean, it's really a species.

4           MR. BIRCHFIELD:  Sure, Your Honor, and that's something

5     they can have fun with on cross-examination.  But what's at issue

6     here, I mean, what Dr. Moye points out is that there is a

7     chemical structure here and it deals with the carbon molecule and

8     there is a large number of chemicals that would be considered

9     prostaglandins and others that would not, based on the chemical

10    structure.  And he says, I haven't looked at the chemical

11    structure and I can't say.

12          The same issue, Your Honor, was raised with regards to,

13    in regards to Dr. Ray, where they said that his opinions lacked

14    scientific support.  The Court reviewed all of the literature,

15    the literature that he relied on and said that there is an

16    abundance of support in the scientific community for those

17    opinions.  His opinions do not lack scientific support.  Whether

18    he can say the prostaglandin, they list prostaglandins or not is

19    not determined for whether or not he is, he has scientific

20    support for his opinions.

21          And then the last issue they raise, I think you've

22    addressed a number of times is whether or not it's preempted by

23    *Buckman,* and we did not have a fraud on the FDA claim here.

24          MR. GOLDMAN:  Andy, you had something.  It wasn't just

25    that Dr. Moye didn't know that a prostacyclin was a

1   prostaglandin.  It's also that he didn't look at any of the basic

2   studies on prostacyclin at all to know whether COX-2 inhibition

3   has any type of effect on prostacyclin in the vasculature.  And

4   not be familiar with the basic studies, he did not apply an

5   appropriate methodology.  If Dr. Moye as Mr. Birchfield said

6   cannot rank the order of NSAIDs when it comes to cardiovascular

7   risks, then he can't say that Vioxx is the worst when it comes to

8   cardiovascular risks relative to other NSAIDs.

9           And this issue is not about what does the FDA say in

10  its memo.  The issue is, has Dr. Moye done the work necessary,

11  does he have a reliable scientific methodology to support his

12  opinion that he somehow knows that Vioxx is the worst of all the

13  NSAIDs when he's unable to rank them?  So I think that proves the

14  point that he has not done the work to be able to reach that

15  conclusion under *Daubert*.

16          In terms of the VIGOR *New England Journal of Medicine*

17  issue.  It's not just a cumulative question.  And *Daubert*, the

18  whole issue about *Daubert* is a trial management question.  And

19  one of the questions when you analyze whether an expert is

20  supposed to be able to testify is whether he satisfies Rule 702

21  and will it assist the jury in determining an issue of fact.  It

22  won't assist the jury if there is another witness like

23  Dr. Curfman who is in a better position to say whatever he thinks

24  about the three heart attacks.  So it is a trial management issue

25  but that doesn't mean it's not a *Daubert* issue.

1    And the fact, this is my final point, Judge.  The fact

2 that Dr. Moye has published 120 articles and has himself been a

3 peer reviewer is no different than Dr. Fletcher.  I don't know

4 how many articles he published but he certainly held himself out

5 as somebody who was a peer reviewer and thought he was an expert

6 to be able to say what work should have been done with respect to

7 the *New England Journal of Medicine* publication.  So the fact

8 that he's been a peer reviewer doesn't make it any more helpful

9 to the jury to understand whether those three heart attacks

10 should have been included in the VIGOR article or not.

11    THE COURT:  Okay.  Let me look at that, particularly

12 those areas that you've focused me on.

13    Moye is going to testify, it's a question of the areas

14 of his testimony that I have to deal with.  And again, when I get

15 to areas, it's hard for me to -- it's so contextual that I can

16 deal with some of it, and I am going to be able to deal with some

17 of it.  But I'm not going to able to deal with all of it because

18 it's a contextual aspect.  And how you approach it with the

19 leaving out the articles for the heart attacks, for example, if

20 they approach that from the standpoint if you were a peer

21 reviewer of an article and the author did this, that may be one

22 thing.  Whether or not it's a violation of ethics, that may be

23 another issue.  Based on experience, whether or not you can

24 impeach him on that is one thing, but it's not necessarily, it

25 would not be admissible.  One may not be admissible, the other

1  might well be admissible.  So I just have to focus on that a

2  little bit.  I'm not able to give you any guidance tonight.

3           Talk to me about the plaintiffs' move to designate an

4  additional expert, Nicholas Jewell, Ph.D., and biostatistician

5  and professor at the University of California.

6           MR. BECK:  Yes, Your Honor.  We move to exclude

7  Dr. Jewell.  And just by way of background, they have a

8  Dr. Farquhar, who is a cardiologist and an epidemiologist, and

9  he's going to be an expert.  And he was timely designated by them

10  as an expert.

11           THE COURT:  Yes.  I've got your argument.  Let me hear

12  from the plaintiffs.

13           MR. ROBINSON:  Your Honor, can I speak first of all --

14           THE COURT:  There is no question that it comes too late.

15  There is no question that it's going to prejudice because it

16  comes too late.  That, to me, seems to be the, if it comes too

17  late, it's prejudicial.  It seems to me almost the same thing.

18  You can't take the position that a rebuttal expert, I understand

19  an expert that you properly designated and timely designated can

20  testify rebutting something.  I mean, you put him on and he says

21  something, then they put the other expert on and he says

22  something else, and it raises an issue that you hadn't focused

23  on.  Conceivably you might be able to use that expert to rebut

24  what the other expert said, but not to bring in a rebuttal expert

25  at the 11th hour.  I don't see that.  So help me --

1      MR. ROBINSON:  I'm going to let Mr. Arbitblit get the

2   factual setting on it.  As I look at the Code, the Code says that

3   from the date of the filing of the report, so that would have

4   been May 22nd.  We would then have 30 days to file a rebuttal,

5   like a rebuttal expert.  And so I think that's what we did.  And

6   I think that if Mr. Arbitblit is going to explain why.  He took

7   the deposition of their expert.  We were surprised with some of

8   the things they said, and so that's why.

9          THE COURT:  Okay, I'll hear from you.

10         MR. ARBITBLIT:  Thank you, Your Honor.  May it please

11  the Court.  I'll certainly try my best to respond to Your Honor's

12  comments.  I submitted a declaration stating the background on

13  this matter as to the past practice with Dr. Farquhar and the

14  fact that his reliance on biostatistical consultants was part of

15  his pattern of practice, that we saw no need to identify

16  Dr. Jewell as a testifying expert.  We weren't even notified that

17  there was an interest in taking Dr. Jewell's discovery or

18  deposition until May 28th, which was after the May 22nd deadline

19  and the Court's order.

20         THE COURT:  They take the position that you had

21  designated as a nontestifying expert and as such successfully

22  refused to allow the defendants to depose him.  That was on

23  June 14th when you advised the defendants of your decision to

24  convert him from a nontestifying to a testifying expert, and you

25  furnished a report on June 21st that you then said, Okay, take

1  his deposition.

2         MR. ARBITBLIT:  Your Honor, if I could, there is a point

3  in the defense opposition memorandum that suggests that we had

4  taken some position opposing discovery of Dr. Jewell for some

5  period of months, which is simply incorrect.  Dr. Jewell's report

6  on protocol 203, which was the combined analysis of Merck's three

7  studies of Vioxx had been provided to other experts in January,

8  but he was never designated as anything.  His report was given to

9  other experts as something that was part of their reliance

10 materials that they reviewed, and we never heard from Merck about

11 Dr. Jewell, not one word between January and May.  Then we get to

12 our May 22nd deadline, and we hadn't taken any position on what

13 Jewell was, other than someone that was cited in Dr. Farquhar's

14 report as a biostatistics consultant, just as he had relied on

15 Dr. Lavorie (spelled phonetically) and Dr. Ahn (spelled

16 phonetically) in his September 26, 2005, report to which Merck

17 did not seek a deposition or further discovery.  And we

18 voluntarily provided the reliance materials that Dr. Farquhar

19 reviewed.

20        It was only after the deadline passed on May 22nd that

21 we first heard from Merck asking for discovery from Dr. Jewell on

22 May 28th.  And that's Exhibit 3 to my declaration, and that was

23 after the deadline had already past.  Then we got a June 1st

24 report of Dr. Kim who was specifically a biostatistician

25 designated by Merck who included in his report several concepts

1    that are specifically biostatistical in nature.  And that, in

2    the, I think that there is a fairly well-established tradition in

3    the law, certainly that I've seen, that it's fair to have the

4    ability to respond like for like.  If the defense identifies a

5    biostatistician who starts talking about a concept of power, for

6    example, it's a very important concept in the whole defense that

7    Merck has now created for whether the results of studies of polyp

8    patients like the APPROVe study can be generalized to people with

9    osteoarthritis.

10           Well, the basic point that they are trying to make is

11   that there is an inconsistency between the APPROVe data showing

12   increased risk and the Alzheimer's data that doesn't show

13   increased risk.  Now, the very key concept for that is the idea

14   that Merck raised for the first time on June 1st through a

15   biostatistician that the Alzheimer's trials were adequately

16   powered to detect the difference.  Now, that's never been argued

17   to my knowledge, certainly not brought to my attention in these

18   cases, which I've been trying to follow pretty closely.  But they

19   did it through a biostatistician for a reason.  Power

20   calculations are designed to tell whether a study has an adequate

21   size and magnitude of effect to detect a difference.  The

22   reference manual on scientific evidence, which we've cited, is

23   clear on the point, and Dr. Kim agreed with this at his

24   deposition, that if a study is not adequately powered, then the

25   results are best characterized as inconclusive, not inconsistent

1  because the power is low, the proof is weak.  The point is that

2  this is specifically something that Dr. Jewell is qualified to

3  respond to as a biostatistician to say, Dr. Kim, you got it

4  wrong.  You didn't take into account poor compliance, 39 percent

5  didn't take their Vioxx so you can't judge that.  You can't do a

6  power calculation without including that.

7          So there is a specific point beyond the normal

8  epidemiologic analysis for which they've used a biostatistician.

9  They've also used a biostatistician to try to make the point that

10  for the same reason, based on the Alzheimer's studies and the

11  brand-new study in the British medical journal that was raised,

12  brought into a direct examination by Merck at the deposition of

13  its own expert that I took on June 12th, they used that as an

14  opportunity to elicit affirmative testimony that this brand-new

15  study supported the position that Alzheimer's and polyp patients

16  were different and that supported the inconsistency, which in

17  turn is the foundation for the argument that you can't generalize

18  the data from APPROVe or the polyp studies.

19          THE COURT:  You're talking about whether or not it's

20  legitimate expert material.  It may well be, but the problem that

21  I'm dealing with, really, is that it comes too late.  I mean,

22  look, how, on June 21st, on June 14th, you tell them, for a case

23  that's going to be tried in three weeks or a month afterwards.

24  It's the 21st before they get a report.  And they are going to

25  have to try a case in three weeks.  How is that fair to them?

1          MR. ARBITBLIT:  Well, Your Honor, I think that the point

2     with Dr. Jewell's testimony, a lot of this was raised, I would

3     say, tactically.

4          First of all, I would like to go back to Mr. Robinson's

5     point that the Court certainly is, there is no one in this room

6     who could interpret this Court's order other than the Court.  We

7     acknowledge that.  That's part of the law.  We acknowledge that.

8     However, as I understand from Mr. Robinson, the scheduling order

9     was negotiated between Counsel, and it was silent on the issue of

10    a rebuttal.  And it would be our position that it would be

11    inappropriate to assume or presume a waiver of a Rule 26 right of

12    rebuttal, which we presumed we would have.  I certainly presumed

13    in all good faith that rebuttal reports would be permitted, and

14    Mr. Robinson assured me that there had been no discussion nor

15    waiver of rebuttal rights under the rule.  So it's not too late.

16    It's timely under Rule 26.

17         THE COURT:  Your understanding of Rule 26 is that you

18    bring in a new expert?

19         MR. ARBITBLIT:  That's my understanding, Your Honor,

20    that a rebuttal expert can be brought in within 30 days to

21    address, it doesn't, the rule is not specific that it has to be a

22    formerly named expert who addresses the issues raised by the

23    defense.  If the defense raises the issues, and I've tried to lay

24    out in our pleadings and declaration specifically where it was

25    that the defense raised issues to which Dr. Jewell was responding

1   that are biostatistical in nature or that they used their

2   biostatistician to address, Rule 26 does not say that it has to

3   be a previously named expert that addresses those issues.  It

4   says that rebuttal is permitted within 30 days unless otherwise

5   directed by the Court.  We don't, the Court did not otherwise

6   direct, other than to set a scheduling order that was negotiated

7   by the parties.  And in all good faith we assumed that rebuttal

8   would be permitted.  And certainly Mr. Goldman's e-mails saying

9   that the testimony of Dr. Jewell is vital, acknowledging the

10  importance of it.  Even in the *Chorus* (spelled phonetically) case

11  that we've cited where a report was considered not timely, the

12  Court was permitted to, I think the Court permitted the parties

13  to add the expert where there was time to depose before trial.

14  Now, we're in a window where expert depositions are still going

15  on.  Personally, I was given 11 days to take the deposition of

16  Dr. Kim, the defense expert, when Merck did not adhere to the

17  scheduling order, which said depositions will be done by

18  June 8th.  They unilaterally set that on June 12th and told me to

19  come take the deposition then, after having the report for

20  11 days and showed up with a box of his materials on the spot.

21          Now, as far as prejudice, most of Dr. Jewell's opinions

22  that are at issue as far as what Dr. Farquhar relied on, it's all

23  Merck data, Your Honor.  They are not prejudiced in the

24  slightest.  They've had the data throughout.  They've had the

25  biostatisticians who could have analyzed it throughout.  I was

1    thinking of arguing in November about protocol 203, over 7 months
2    ago.  And Merck said, Well, protocol 203, we don't have it.
3           At Dr. Kim's deposition, I asked him whether he planned
4    to do it; the answer was, No.  They've got the data.  They don't
5    want to do the analysis because they don't like what it shows,
6    which is an early and persistent risk of Vioxx compared to
7    placebo.  And then they come in and challenge without evidence,
8    they say, Well, Dr. Jewell, only Dr. Jewell can tell us whether
9    he relied on adequate data, isn't that right, Dr. Farquhar?
10          So, they made a tactical strike to try to undermine
11   Dr. Farquhar's testimony and reliance on the protocol 203
12   analysis without any evidence to support the claim that
13   Dr. Jewell relied on something improper.  And they've got the
14   data, and they've got the biostatisticians, and I think when they
15   invite Dr. Jewell to testify by having their Counsel state, Is
16   Dr. Jewell the only person who could tell us whether that data
17   was sufficient to analyze, is Dr. Jewell the only one who can
18   explain what's the proper p-value for statistical interactions,
19   it would be prejudicial to the plaintiffs to not allow a response
20   that's timely under Rule 26, where the parties never agreed to
21   waive their right to rebuttal.  And I would be happy to answer
22   any specific questions.
23          THE COURT:  No, I understand.  I'll give you an
24   opportunity.
25          MR. BECK:  Your Honor, I think the last few things that

1   Mr. Arbitblit said were really critically important and show why

2   this would be improper as rebuttal testimony.  Here is what they

3   are worried about.  Rebuttal testimony is supposed to rebut

4   something that our expert is saying.  What they are worried about

5   is rebutting our cross-examination of their expert.  But what

6   they said is when we cross-examine Dr. Farquhar and we said,

7   Dr. Farquhar, you're relying on Dr. Jewell, but you haven't

8   checked his work, they want a rebuttal expert to come in, not to

9   rebut something that our expert said, but to rebut a gap that

10  they had in their other expert.  And rule, the federal rule on

11  rebuttal experts, 26(a)(2)(C), says that rebuttal reports contain

12  information, "intended solely to contradict or rebut evidence on

13  the same subject matter identified by another party under

14  paragraph 2 as," and then it goes on as expert testimony.

15          So, this isn't even real life rebuttal.  And it is

16  prejudicial that late in the game, having declined our invitation

17  to let us take Jewell's deposition, they then try to turn him

18  into a testifying expert.  And we are prejudiced by that,

19  Your Honor.  It is untimely.  And the notion that, well, the

20  order can be read to contemplate brand-new rebuttal experts, that

21  just doesn't make any sense in terms of the real-life schedule.

22          THE COURT:  I understand the issue.  I'm going to deny

23  the motion to designate an additional expert, Nicholas Jewell, as

24  a biostatistician and professor at the University of California

25  at Berkeley.  I think it comes too late.  It's prejudicial.  And

1    I do think it's, I think that the 703 will allow Dr. Farquhar to

2    explain that situation and deal with it.  I don't see this even

3    as a rebuttal expert.  In any event, I feel it comes too late.

4            Okay, what's the next motion we have to deal with?  I

5    understand that Bryan, that's been worked out.

6            MR. BECK:  That we submitted on papers, Your Honor.

7            THE COURT:  I thought that was agreed on.

8            MR. GOLDMAN:  Flavahan was agreed upon.  We withdraw

9    drew our motion on Farquhar.  They withdrew theirs on Flavahan.

10   I think the only *Daubert* motion left is Bryan.

11           THE COURT:  I have before me the plaintiffs' proposal to

12   call by deposition Dr. Curtis Bryan, the surgeon who performed

13   heart surgery on Gerald Barnett.  The plaintiff took his

14   deposition and the defendant cross-examined the doctor.  The

15   plaintiff seeks to exclude certain portions of Dr. Bryan's

16   deposition on the grounds that the defendant seeks to use

17   Dr. Bryan as an expert and they have not been given a report.

18   And two, Dr. Bryan cannot satisfy *Daubert* as to certain areas

19   covered by the defendant.  Basically what the motions --

20           MR. ROBINSON:  Your Honor, maybe if the Court, maybe if

21   you haven't really read my reply brief, the most recent brief --

22           THE COURT:  I didn't.

23           MR. ROBINSON:  I really think maybe we should put this

24   off until tomorrow because I think that that says, if you haven't

25   had a chance to read it, then maybe we could do that tomorrow.

 1           THE COURT:  All right.  We'll do that.

 2           MR. BECK:  Then, I think, Your Honor --

 3           MR. GOLDMAN:  I'm sorry, I don't think there was a reply

 4    brief in the Bryan motion.

 5           MR. ROBINSON:  Yeah, I filed a reply brief.

 6           THE COURT:  Did you get it?

 7           MR. GOLDMAN:  No, no.  Judge, I think there is a

 8    misunderstanding.  The Bryan motion was fully briefed.  The brief

 9    that you filed last night has to do with treating physicians in

10    general.  That's not the Bryan *Daubert* motion.

11           MR. ROBINSON:  No, there is a Bryan reply brief.

12           MR. GOLDMAN:  All right.  I'll look for it.

13           MR. ROBINSON:  I wasn't sure whether the Judge had a

14    chance to see it.

15           THE COURT:  I haven't seen it.

16           MR. BECK:  Could you, did you e-mail us a copy, too.

17           MR. GOLDMAN:  Well, Andy doesn't think he does.

18            Would you send it to us so we can argue it tomorrow,

19    Judge.

20           THE COURT:  What else do we have for tonight?

21           MR. BECK:  I think that's it for tonight, Your Honor.

22           MR. ROBINSON:  Your Honor, it's 8:30.

23           MR. BECK:  So we'll be here at 9:00 a.m.

24           THE COURT:  Yes.  And at 9:00 a.m., we'll talk about

25    your pretrial order and I've got some documents.  Do you need to

1   argue the documents or not?

2         MR. GOLDMAN:  Judge, the documents, I think there is

3   only five.  And I think if Your Honor gave us guidance on those,

4   that would help us with respect to other --

5         THE COURT:  I'll do that.  I really don't need any

6   argument on these.  I understand them.

7         MR. ROBINSON:  Your Honor, one thing.  One thing, I

8   mean, I didn't respond or anything to that.  I thought I was

9   going to be orally responding to the documents.

10        THE COURT:  That's fine.

11        MR. ROBINSON:  Your Honor, one other thing, we can do

12  this tomorrow, well, we can do it as part of the pretrial.  I've

13  started, I have some, quote, admissible documents.  We hope they

14  are admissible.  And I gave Andy a list and I sent the Court a

15  list and I brought a set of the documents and I Fed-Ex'd a set to

16  Mr. Goldman.  But we don't expect --

17        THE COURT:  Okay.

18        MR. BECK:  We all thank you, Judge.

19        MR. ROBINSON:  Thank you.

20        THE COURT:  See you tomorrow.  Court will stand in

21  recess.

22        THE DEPUTY CLERK:  Everyone rise.

23        (Whereupon, at 8:34 p.m. court was adjourned.)

24                          *    *

25

1                          REPORTER'S CERTIFICATE

2

3      I, Cathy Pepper, Certified Realtime Reporter, Registered

4  Professional Reporter, Certified Court Reporter, Official Court

5  Reporter, United States District Court, Eastern District of

6  Louisiana, do hereby certify that the foregoing is a true and

7  correct transcript, to the best of my ability and understanding,

8  from the record of the proceedings in the above-entitled and

9  numbered matter.

10

11

12                              _____

13                              Cathy Pepper, CCR, RPR, CRR

14                              Official Court Reporter

15                              United States District Court

16

17

18

19

20

21

22

23

24

25