# EXHIBIT 3

1447
```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4
 5   IN RE: VIOXX PRODUCTS        *   MDL DOCKET NO. 1657
     LIABILITY LITIGATION         *
 6                                *
                                  *
 7                                *
     THIS DOCUMENT RELATES TO:    *   NOVEMBER 7, 2006, 8:30 A.M.
 8                                *
     CHARLES LARON MASON V. MERCK *   CASE NO. 06-CV-810-L
 9    & CO., INC.                 *
     * * * * * * * * * * * * * * * *
10
11
12                VOLUME VII
                JURY TRIAL BEFORE THE
13              HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE
14
15
     APPEARANCES:
16
17   FOR THE PLAINTIFF:       BLIZZARD, MCCARTHY & NABERS
                  BY:  EDWARD F. BLIZZARD, ESQ.
18                    J. SCOTT NABERS, ESQ.
                      REBECCA B. KING, ESQ.
19                 440 LOUISIANA STREET, SUITE 1710
                   HOUSTON, TEXAS 77002
20
21   FOR THE DEFENDANT:       BARTLIT BECK HERMAN
                  PALENCHAR & SCOTT
22                  BY:  PHILIP S. BECK, ESQ.
                     TAREK ISMAIL, ESQ.
23                    BRIAN P. O'DONOGHUE, ESQ.
                     SHAYNA S. COOK, ESQ.
24                 54 W. HUBBARD STREET, SUITE 300
                   CHICAGO, ILLINOIS 60601
25
```

1448

1  OFFICIAL COURT REPORTERS:   CATHY PEPPER, CCR, RPR, CRR
                        TONI DOYLE TUSA, CCR, FCRR
2                         500 POYDRAS STREET, ROOM HB-406
                        NEW ORLEANS, LOUISIANA 70130
3                          (504) 589-7778
4
5
   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
6  PRODUCED BY COMPUTER.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1449

1                         I N D E X

2                                     PAGE

3   CORNELIA PECHMANN

        VOIR DIRE                     1450

4       TRAVERSE                  1464

        DIRECT EXAMINATION                    1467

5       CROSS-EXAMINATION                     1520

        REDIRECT EXAMINATION                    1551

6

7   ERIC TOPOL (BY DEPOSITION)

        DIRECT EXAMINATION                    1562

8       CROSS-EXAMINATION                     1596

9

    BRIGGS MORRISON

10      DIRECT EXAMINATION                    1639

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1450

1              MORNING SESSION

2              (NOVEMBER 7, 2006)

3       THE DEPUTY CLERK:  ALL RISE.

4       THE COURT:  BE SEATED, PLEASE.  GOOD MORNING, LADIES

5  AND GENTLEMEN.

6        CALL YOUR WITNESS, PLEASE.

7       MR. BLIZZARD:  GOOD MORNING, YOUR HONOR.  THE

8  PLAINTIFFS CALL DR. CORNELIA PECHMANN.

9       THE COURT:  COME FORWARD.

10       THE DEPUTY CLERK:  DOCTOR, WOULD YOU RAISE YOUR RIGHT

11  HAND.

12       THE WITNESS:  YES.

13       (WHEREUPON, CORNELIA PECHMANN, HAVING BEEN DULY

14  SWORN, TESTIFIED AS FOLLOWS.)

15       THE DEPUTY CLERK:  PLEASE BE SEATED AND, USING THE

16  MICROPHONE THERE IN FRONT OF YOU, WHICH IS MOVABLE AND

17  ADJUSTABLE, WOULD YOU STATE YOUR NAME FOR THE RECORD.

18       THE WITNESS:  CORNELIA PECHMANN.

19       THE DEPUTY CLERK:  WOULD YOU SPELL THE LAST NAME.

20       THE WITNESS:  P-E-C-H-M-A-N-N.

21              VOIR DIRE

22  BY MR. BLIZZARD:

23  Q.  GOOD MORNING, LADIES AND GENTLEMEN.  GOOD MORNING,

24  DR. PECHMANN.

25  A.  GOOD MORNING.

1451

1  Q.  COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY.

2  A.  I'M DR. CORNELIA "CONNIE" PECHMANN FROM THE UNIVERSITY OF

3  CALIFORNIA, IRVINE BUSINESS SCHOOL.

4  Q.  ARE YOU A PROFESSOR?

5  A.  YES.

6  Q.  DO YOU HAVE YOUR RÉSUMÉ IN FRONT OF YOU?

7  A.  YES, I DO.

8  Q.  WE HAVE MARKED THAT AS EXHIBIT 4.5001.  COULD YOU TELL ME

9  WHAT THE RÉSUMÉ CONTAINS.

10  A.  IT CONTAINS MY TEACHING AND RESEARCH AFFILIATIONS, MY

11  AWARDS AND HONORS, COURSES THAT I'VE TAUGHT, MY EDUCATION,

12  GRANTS THAT I'VE RECEIVED, AND PUBLICATIONS AND MANUSCRIPTS I'M

13  WORKING ON.  IT CONTAINS MY PRESENTATIONS AT ACADEMIC

14  CONFERENCES, INVITED PRESENTATIONS AT UNIVERSITIES, MEDIA

15  COVERAGE OF MY RESEARCH, AND PROFESSIONAL ACTIVITIES, MOSTLY

16  SERVICE.

17  Q.  IS IT ACCURATE?

18  A.  YES.

19  Q.  IS IT REASONABLY UP-TO-DATE?

20  A.  YES.

21      MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER

22  DR. PECHMANN'S RÉSUMÉ.

23      MR. ISMAIL:  NO OBJECTION.

24      THE COURT:  LET IT BE ADMITTED.

25

1452

1  BY MR. BLIZZARD:

2  Q.  IF WE COULD PUT UP 4.5001.  IS THIS A COPY THE FIRST PAGE

3  OF YOUR RÉSUMÉ?

4  A.  YES, IT APPEARS TO BE.

5  Q.  IF YOU LOOK UNDER THE HEADING OF TEACHING OF RESEARCH

6  AFFILIATIONS, IT SAYS, UCI GRADUATE SCHOOL OF MANAGEMENT, FULL

7  PROFESSOR OF MARKETING NOVEMBER OR SUMMER OF 2003 TO PRESENT.

8  A.  CORRECT.

9  Q.  OKAY.  NOW, COULD YOU TELL US WHAT A FULL PROFESSOR OF

10  MARKETING DOES AT THE UCI GRADUATE SCHOOL OF MANAGEMENT.

11  A.  WELL, WE DO EXTENSIVE RESEARCH AND PUBLISH.  WE ALSO TEACH

12  CLASSES AND ARE INVOLVED IN SERVICE TO THE SCHOOL AND

13  UNIVERSITY AND NATIONAL LEVEL HEADING COMMITTEES PRIMARILY.

14  Q.  WHERE IS THE UNIVERSITY OF CALIFORNIA, IRVINE?

15  A.  IT IS IN SOUTHERN CALIFORNIA IN ORANGE COUNTY, SOUTH OF

16  LOS ANGELES.

17  Q.  AND HOW LONG HAVE YOU TAUGHT THERE?

18  A.  SINCE 1988.

19  Q.  WHAT DO YOU TEACH?

20  A.  I TEACH UNDERGRADUATES, MBA'S AND PH.D. STUDENTS, I TEACH

21  PRINCIPLES OF MARKETING, CONSUMER BEHAVIOR, A COURSE CALLED

22  MICROMARKETING, WHICH IS ABOUT RETAILING AND DIRECT MAIL, AND A

23  PH.D. COURSE IN STATISTICS THAT PEOPLE FROM ACROSS CAMPUS COME

24  TAKE.

25  Q.  AND WHO DO YOU TEACH THERE AT THE UNIVERSITY?  YOU MAY

1453

1  HAVE ALREADY TALKED ABOUT THAT.  DO YOU TEACH UNDERGRADS AND

2  GRADUATE STUDENTS?

3  A.  YES, ALTHOUGH I PRIMARILY TEACH GRADUATE STUDENTS.

4  Q.  WHAT IS YOUR EDUCATIONAL BACKGROUND THAT ALLOWED YOU TO

5  BECOME A FULL PROFESSOR OF MARKETING AT UC IRVINE.

6  A.  I HAVE A MASTER'S DEGREE IN PSYCHOLOGY FROM VANDERBILT

7  UNIVERSITY IN NASHVILLE, TENNESSEE; I HAVE A PH.D. IN MARKETING

8  FROM VANDERBILT; AND I HAVE AN MBA FROM VANDERBILT.

9  Q.  CAN WE SEE WHERE THAT'S SHOWN ON YOUR RÉSUMÉ, UNDER

10  EDUCATION?

11  A.  THAT'S IT.

12  Q.  SO WHAT YEAR DID YOU RECEIVE YOUR PH.D.?

13  A.  1988.

14  Q.  AND WHAT HAVE YOU BEEN DOING SINCE RECEIVING YOUR PH.D.?

15  A.  WORKING AT UC IRVINE.

16  Q.  HAVE YOU DONE RESEARCH IN THE AREA OF MARKETING?

17  A.  YES.

18  Q.  WHAT IS YOUR RESEARCH INTERESTS?

19  A.  INTEGRATED MARKETING COMMUNICATIONS.

20  Q.  AND WE'LL BE TALKING ABOUT THAT A LITTLE BIT LATER.

21  WHAT -- HAVE YOU PUBLISHED IN THIS FIELD?

22  A.  YES, I HAVE.

23  Q.  AND WHEN WE SAY "PUBLISHED," WHAT DOES THAT MEAN?

24  A.  I PUBLISHED IN ACADEMIC JOURNALS, PRIMARILY, BUT ALSO IN

25  CONFERENCE PROCEEDINGS OR BOOKS.

1454

1  Q.  ARE YOU ON THE EDITORIAL BOARDS OF ANY JOURNALS?

2  A.  YES.

3  Q.  COULD YOU JUST NAME A FEW?

4  A.  JOURNAL OF MARKETING, JOURNAL OF CONSUMER RESEARCH,

5  JOURNAL OF CONSUMER PSYCHOLOGY.

6  Q.  DO YOU -- HAVE YOU DONE PEER REVIEW FOR ANY MEDICAL

7  JOURNALS?

8  A.  YES.

9  Q.  WHICH MEDICAL JOURNALS?

10  A.  JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, JAMA.

11  Q.  AND IN WHAT CONNECTION HAVE YOU BEEN A PEER-REVIEWER FOR

12  JAMA?

13  A.  THEY SEND ME ARTICLES ON INTEGRATED MARKETING

14  COMMUNICATIONS THAT HAVE TO DO WITH MEDICAL ISSUES.

15  Q.  HAVE YOU WORKED ON LARGE INTEGRATED MARKETING CAMPAIGNS

16  YOURSELF?

17  A.  YES, I HAVE.

18  Q.  SO WE HAVE A RESEARCH SIDE OF YOUR WORK.  TELL US ABOUT

19  THE PRACTICAL SIDE OF YOUR WORK ON INTEGRATED COMMUNICATIONS

20  CAMPAIGNS.

21  A.  SURE.  FROM 1998 TO 2004, I WAS ONE OF A SIX-MEMBER EXPERT

22  PANEL THAT OVERSAW THE ANTIDRUG AD CAMPAIGN FOR THE OFFICE OF

23  NATIONAL DRUG CONTROL POLICY.

24  Q.  AND WHAT DID THAT CAMPAIGN INVOLVE?

25  A.  IT WAS A LARGE INTEGRATED MARKETING CAMPAIGN DESIGNED TO

1455

1  DISSUADE ADOLESCENTS FROM USING MARIJUANA AND ALSO PERSUADE

2  PARENTS TO INTERVENE AND TRY TO TALK TO THE KIDS ABOUT USING

3  DRUGS, SO IT WAS A LARGE CAMPAIGN.

4  Q.  AND HOW WERE YOU SELECTED?

5  A.  I WAS NOMINATED BY A STEERING COMMITTEE THAT WAS DESIGNED

6  TO SET UP THE CAMPAIGN.  THEN SENATOR BARBARA FEINSTEIN WROTE

7  ME A LETTER OF RECOMMENDATION -- SHE'S A SENATOR FROM

8  CALIFORNIA -- AND I WAS APPOINTED BY THE OFFICE OF NATIONAL

9  DRUG CONTROL POLICY, WHICH IS AN OFFICE UNDER THE PRESIDENT.

10  Q.  NOW, WHAT WAS YOUR RESPONSIBILITY ON THAT ANTIDRUG

11  CAMPAIGN?

12  A.  TO OVERSEE THE RESEARCH ON THE CAMPAIGN.

13  Q.  WHAT KIND OF RESEARCH WAS DONE ON THAT CAMPAIGN?

14  A.  WE DID BASIC RESEARCH WITH THE AUDIENCE TO FIGURE OUT WHAT

15  WERE THE ISSUES WERE, WITH ADOLESCENTS, WHY DID THEY WANT TO

16  USE MARIJUANA, WHY PARENTS WOULDN'T TALK TO THEIR KIDS; AND

17  THEN WE DEVISED A PLAN, AND CAME UP WITH DIFFERENT MESSAGES;

18  AND SO I OVERSAW THE RESEARCH TO CREATE THE MESSAGES AND TEST

19  THE MESSAGES.

20      THE MESSAGES WERE ALL TESTED BEFORE THEY WERE AIRED.

21  THEN WE DID ADDITIONAL RESEARCH TO TRACK THE MESSAGES AFTER

22  THEY WERE AIRED TO SEE THAT THEY WERE WORKING; AND IF THEY

23  WEREN'T WORKING, WE TRIED TO FIX THEM.

24  Q.  NOW, AS PART OF YOUR WORK FOR THE ANTIDRUG CAMPAIGN, DID

25  YOU WORK WITH OUTSIDE AGENCIES AD AGENCIES OR MARKETING

1456

1  RESEARCH FIRMS IN ORDER TO DO THE RESEARCH NECESSARY TO CONDUCT

2  THE CAMPAIGN?

3  A.  YES.

4  Q.  COULD YOU JUST TELL US A LITTLE BIT ABOUT WHO YOU WORKED

5  WITH AND WHY THAT'S IMPORTANT HERE.

6  A.  OKAY.  I WORKED WITH OGILVY AND MATHER ADVERTISING AGENCY.

7  THEY WERE THE ONES THAT DESIGNED THE MESSAGES AND AIRED THEM,

8  AND I WORKED WITH MILLWARD BROWN, WHO DID ALL OF THE RESEARCH

9  FOR US.  IT JUST SO HAPPENS THAT MERCK ALSO USED

10  MILLWARD BROWN, AND THEY USED OGILVY PR FIRM, WHICH A SISTER TO

11  THE AD AGENCY I WORK FOR.

12  Q.  WHEN YOU SAY "WORK FOR," DID YOU ACTUALLY WORK FOR OGILVY

13  ITSELF OR DID YOU WORK WITH THEM?

14  A.  I WORKED FOR THEM.  THE OFFICE OF NATIONAL DRUG CONTROL

15  POLICY ASKED THAT I BE HIRED AS A CONSULTANT; AND ON THEIR

16  BEHALF, I WAS HIRED BY OGILVY.

17  Q.  NOW, HAVE YOU WORKED ON ANY LARGE INTEGRATED

18  COMMUNICATIONS CAMPAIGNS THAT YOU CAN TALK TO THE JURY ABOUT?

19  A.  YES.  I ALSO WORKED ON THE U.S. CENSUS ADVERTISING

20  CAMPAIGN FROM 1998 TO 2002, AND I WAS CHOSEN BY THE AMERICAN

21  MARKETING ASSOCIATION TO REPRESENT MARKETERS, AND WE OVERSAW

22  THE 2000 CENSUS AD CAMPAIGN.

23  Q.  AND WHAT WAS THAT AD CAMPAIGN ABOUT?

24  A.  IT WAS DESIGNED TO GET PEOPLE TO FILL OUT THE CENSUS FORM.

25      THE COURT:  COUNSEL, WHY DON'T YOU GO INTO WHAT AN

1457

1  INTEGRATED MARKETER IS.

2        MR. BLIZZARD:  I HAD THAT ON MY OUTLINE, YOUR HONOR,

3  BUT THIS MAY BE A BETTER PLACE TO DO IT.

4  BY MR. BLIZZARD:

5  Q.  WHY DON'T YOU TELL THE JURY WHAT IS AN INTEGRATED

6  MARKETING CAMPAIGN?

7  A.  VERY SIMPLY, IT'S A HIGHLY SCIENTIFIC, SOPHISTICATED

8  APPROACH TO MARKETING COMMUNICATION THAT INVOLVES VERY

9  EXTENSIVE RESEARCH FROM BEGINNING TO END.  AND WITH THIS

10  RESEARCH YOU FIGURE OUT A NUMBER OF VERY SIMPLE MESSAGES THAT

11  YOU'RE GOING TO SURVEY TO YOUR AUDIENCE THAT ARE GOING TO

12  PROMOTE THE PRODUCT, AND THESE MESSAGES ARE INTERNALLY

13  CONSISTENT.

14        THEN YOU PUT THOSE MESSAGES IN VARIOUS DIFFERENT

15  TOOLS, AND THERE ARE FOUR TYPES OF TOOLS.  THAT'S WHY IT'S

16  CALLED "INTEGRATED" BECAUSE THE MESSAGES ARE IN ALL FOUR TYPES

17  OF TOOLS.  THE FOUR TYPES OF TOOLS ARE ADVERTISING, WHICH

18  PROBABLY YOU'RE MOST FAMILIAR WITH.

19  Q.  DR. PECHMANN, BEFORE YOU GO ON -- I HATE TO INTERRUPT

20  YOU -- BUT WOULD IT HELP, DO YOU THINK, MAYBE IF YOU WROTE SOME

21  OF THIS DOWN, WHAT THE STEPS ARE OF THE INTEGRATED MARKETING

22  CAMPAIGN AND WHAT THE TOOLS ARE?

23  A.  I THINK SO.

24        MR. BLIZZARD:  YOUR HONOR, COULD SHE DO THAT?

25        THE COURT:  SURE.

1458

1  BY MR. BLIZZARD:

2  Q.  IF YOU COULD PERHAPS STEP DOWN TO THE EASEL, AND WE

3  ACTUALLY HAVE SOME MARKERS HERE THAT YOU COULD USE.  YOU COULD

4  PICK YOUR OWN COLOR?

5  A.  SO THE FIRST STEP IS THAT YOU DO -- YOU DO RESEARCH TO

6  FIGURE OUT WHAT WOULD PROMOTE SALES OR PREVENT SALES, AND FROM

7  THAT, YOU DEVISE AN OVERALL PLAN.  SO YOU SAY, OKAY, YOU KNOW,

8  THESE ARE THE PROBLEMS WE FACE, THESE ARE THE OPPORTUNITIES;

9  SO, YOU KNOW, OVERALL, THIS IS OUR STRATEGY, THIS IS WHAT WE'RE

10  GOING TO TELL ME AND HOW MUCH WE EXPECT TO SELL AND THAT SORT

11  OF THING.

12       THEN THE SECOND THING YOU DO -- AGAIN, USING

13  EXTENSIVE RESEARCH -- IS YOU DEVELOP SPECIFIC MESSAGES; AND

14  THOSE ARE TO PROMOTE YOUR PRODUCT, TO SAY THINGS THAT WILL

15  PROMOTE YOUR PRODUCT, OR IF THERE IS SOMETHING THAT'S

16  PREVENTING SALES, YOU MAY CREATE A MESSAGE TO OVERCOME THAT

17  PROBLEM.

18       THEN YOU PUT THOSE MESSAGES IN THE TOOLS.  AND THESE

19  ARE VERY SIMPLE MESSAGES BECAUSE PEOPLE CANNOT COMPREHEND VERY

20  COMPLEX THINGS, SO IT'S "LISTERINE KILLS GERMS" KIND OF THING.

21  VERY SIMPLE.  AND THE TOOLS ARE ADVERTISING; PUBLIC RELATIONS,

22  WHICH MEANS PRESS RELEASES, SO BASICALLY IT GETS IN THE

23  NEWSPAPER, THAT SORT OF THING; SALES PROMOTION, SO IN THE CASE

24  OF A PHARMACEUTICAL DRUG THAT WOULD BE ALL THE MATERIALS THAT

25  THE SALES REP SHOWS TO THE DOCTOR, TALKS ABOUT WITH THE DOCTOR;

1459

1  AND DIRECT MAIL, SO THAT WOULD BE EITHER SOLICITED WHERE THE

2  DOCTOR SAYS, "I WANT SOME INFORMATION, MAIL IT TO ME," OR

3  UNSOLICITED, WHERE THEY JUST DO MASS MAILINGS.

4        SO YOU DO RESEARCH TO MAKE SURE THAT THESE TOOLS ARE

5  WORKING AND CONVEYING THE MESSAGE THAT YOU WANT BEFORE YOU EVER

6  USE THEM, BECAUSE YOU DON'T WANT TO SPEND THE MONEY PRINTING

7  THINGS AND RUNNING THAT AREN'T WORKING.

8        THEN THE THIRD STEP IS TRACKING.  SO WHAT YOU DO IS

9  YOU MONITOR YOUR TARGET GROUPS TO SEE ARE THEY UNDERSTANDING

10  THE MESSAGES?  AND IS IT AFFECTING THEIR BEHAVIOR?  AND IF THEY

11  EITHER AREN'T UNDERSTANDING THE MESSAGES OR IT'S AFFECTING

12  THEIR BEHAVIOR THE WRONG WAY, THEN YOU GO BACK AND FIGURE OUT

13  WHAT YOU DID WRONG HERE AND YOU FINE TUNE, SO BASICALLY YOU MAY

14  FINE TUNE.  THAT'S PRETTY MUCH IT; AND AS I SAID, THERE IS

15  EXTENSIVE RESEARCH AT EVERY PHASE.

16  Q.  SO DOES THAT, IN A SIMPLE WAY, EXPLAIN WHAT AN INTEGRATED

17  MARKETING CAMPAIGN IS ABOUT?

18  A.  YES.

19  Q.  OKAY.  I THINK YOU CAN RETURN TO YOUR SEAT NOW.  THANKS.

20        NOW, HAVE YOU WORKED, DR. PECHMANN, ON AN INTEGRATED

21  COMMUNICATIONS CAMPAIGN BEFORE FOR A PHARMACEUTICAL COMPANY?

22  A.  NO.

23  Q.  HAVE YOU BEEN ASKED TO WORK ON A CAMPAIGN FOR A

24  PHARMACEUTICAL COMPANY?

25  A.  YES.

1460

1  Q.  AND WHO HAVE YOU BEEN ASKED BY?

2  A.  I WAS CONTACTED A FEW MONTHS AGO BY A DOCTOR AT THE

3  UNIVERSITY OF CHICAGO WHO WANTED ME TO HELP WITH MERCK'S

4  INTEGRATED MARKETING CAMPAIGN FOR THEIR NEW CERVICAL CANCER

5  DRUG, AND I TOLD HIM THAT I WAS INVOLVED IN THIS CASE, SO I

6  COULDN'T DO IT.

7  Q.  SO IF YOU'VE NEVER WORKED ON AN INTEGRATED COMMUNICATIONS

8  CAMPAIGN THAT INVOLVED A PHARMACEUTICAL BEFORE, HOW CAN YOU

9  TESTIFY AS AN EXPERT IN THIS CASE THAT INVOLVES VIOXX?

10  A.  BECAUSE INTEGRATED MARKETING CAMPAIGNS ARE NOT INDUSTRY

11  SPECIFIC.  THE TECHNIQUES ARE THE SAME.  THE SAME MARKETING

12  RESEARCH FIRMS ARE USED.  THE SAME AD AGENCIES ARE USED.  IF

13  YOU LOOK AT ANY MBA PROGRAM, THEY DON'T SAY, YOU KNOW,

14  INTEGRATED MARKETING COMMUNICATIONS CAMPAIGN FOR

15  PHARMACEUTICALS AS A COURSE.  THEY SAY INTEGRATED MARKETING

16  COMMUNICATIONS CAMPAIGNS, AND THEY HAVE A BOOK LIKE THAT

17  (INDICATING).

18       IF I WERE TO TEACH A COURSE ON INTEGRATED MARKETING

19  CAMPAIGNS TO DOCTORS, I WOULD PROBABLY SPEND, OF TEN WEEKS,

20  NINE WEEKS ON THE BASICS AND ONE WEEK, LIKE, ON THE FDA, THE

21  SPECIFIC THINGS THAT HAVE TO DO WITH PHARMACEUTICALS; BUT THERE

22  IS JUST TREMENDOUS OVERLAP.

23  Q.  NOW, GOING BACK TO YOUR RÉSUMÉ FOR ONE MORE SECOND, HAVE

24  YOU RECEIVED AWARDS AS PART OF YOUR WORK IN MARKETING OVER THE

25  YEARS?

1461

1  A.  YES.  MY PAPER JUST WON THE BEST PAPER AWARD.

2  Q.  AND WHEN WAS THAT PUBLISHED?

3  A.  IT WAS PUBLISHED IN 2002, SO THEY WAIT TO SEE WHAT THE

4  REACTION IS.

5  Q.  AND WHAT WAS THE PAPER ABOUT?

6  A.  ADOLESCENTS' RESPONSE TO INTEGRATED CAMPAIGNS HAVING TO DO

7  WITH TOBACCO, EITHER ANTISMOKING OR CIGARETTE CAMPAIGNS.

8  Q.  AND WHAT -- HAVE YOU ALSO BEEN CITED AS ONE OF THE MOST

9  CITED SCHOLARS IN THE MARKETING FIELD?

10  A.  YES, I'M NOW IN THE TOP 50 MARKETING SCHOLAR LIST; AND

11  THAT ARTICLE THAT WON THE AWARD IS LISTED AS AN ESSENTIAL

12  READING IN MARKETING.

13  Q.  HAVE YOU -- IN THE AREA OF SERVICE, DO YOU SERVE ON ANY

14  COMMITTEES AT YOUR UNIVERSITY THAT DEAL WITH RESEARCH?

15  A.  YES.  I RECENTLY CHAIRED THE RESEARCH COMMITTEE FOR THE

16  ENTIRE UNIVERSITY, AND WE OVERSAW RESEARCH FROM EVERY

17  DEPARTMENT, CHEMISTRY, INCLUDING MEDICAL SCHOOL.  I ALSO WAS

18  VICE CHAIR OF THE COMMITTEE -- ON THE PROTECTION OF HUMAN

19  SUBJECTS WHERE WE ALSO REVIEWED MEDICAL PROTOCOLS TO MAKE SURE

20  THAT HUMANS WERE PROTECTED.

21  Q.  HAVE YOU BEEN RETAINED IN THIS CASE AND SEVERAL OTHERS TO

22  EXAMINE MERCK'S INTEGRATED COMMUNICATIONS CAMPAIGN WITH RESPECT

23  TO VIOXX?

24  A.  YES.

25  Q.  WHEN WERE YOU RETAINED?

1462

1  A.  DECEMBER OF LAST YEAR.

2  Q.  AND ABOUT HOW MANY HOURS HAVE YOU WORKED TO DATE IN

3  EXAMINING MERCK'S INTEGRATED COMMUNICATIONS CAMPAIGN?

4  A.  I DON'T KNOW THE HOURS, BUT IT WAS ABOUT 70 DAYS, SO ABOUT

5  THREE SOLID MONTHS.

6  Q.  DO YOU HAVE AN ESTIMATE OR MAYBE YOU KNOW THE EXACT

7  FIGURE, BUT CAN YOU TELL THE JURY AT LEAST AN ESTIMATE OF HOW

8  MUCH YOU HAVE BEEN PAID FOR YOUR WORK?

9  A.  I'M PAID $350 AN HOUR, AND IT'S ROUGHLY ABOUT 160,000.

10  Q.  AND HAS ALL OF THE WORK THAT YOU'VE DONE BEEN AT THE

11  REQUEST OF PLAINTIFF'S ATTORNEYS IN THE CASE?

12  A.  YES.

13  Q.  OKAY.  AND HAVE YOU GIVEN DEPOSITION TESTIMONY ON SEVERAL

14  OCCASIONS AND ANSWERED QUESTIONS FROM MERCK LAWYERS?

15  A.  YES.

16  Q.  OKAY.  NOW, IN ARRIVING AT YOUR OPINIONS IN THIS CASE,

17  WHAT WELL, FIRST OF ALL, WHAT DID YOU DO TO ARRIVE AT YOUR

18  OPINIONS?

19  A.  WELL, I WAS GIVEN SEVERAL BOXES OF MATERIALS INITIALLY

20  FROM THE LAWYER WHO RETAINED ME, AND THEN I WORKED WITH ANOTHER

21  LAWYER USING KEYWORD SEARCH TO FIND ANYTHING RELATED TO

22  MARKETING COMMUNICATIONS.

23      SO WE LOOKED UP TERMS TO DESCRIBE PLANS AND TOOLS AND

24  MESSAGES; AND WE LOOKED UP NAMES OF RESEARCH FIRMS; AND SO, WE

25  MANAGED TO GET BOXES AND BOXES AND BOXES OF DOCUMENTS THAT

1463

1  FILLED MY WHOLE OFFICE; AND I WENT THROUGH ALL OF THEM.

2  Q.  AND WHAT SORT OF METHODOLOGY DID YOU USE IN ORDER TO

3  ARRIVE AT YOUR OPINIONS?

4  A.  I USED A SCIENTIFIC METHOD.

5  Q.  AND COULD YOU DESCRIBE WHAT YOU DO.

6  A.  YES.  I FOCUSED ON THE RESEARCH, BECAUSE THAT'S ALWAYS

7  BEEN MY AREA OF EXPERTISE WITHIN INTEGRATED MARKETING

8  COMMUNICATIONS, SO I FOUND ALL THE RESEARCH AND REVIEWED THE

9  VALIDITY OF THE RESEARCH AND THE METHODS AND THE FINDINGS AND

10  REALLY FOCUSED ON THAT IN DEVELOPING MY OPINIONS.

11  Q.  OKAY.  AND WERE THE -- WAS THE RESEARCH THAT YOU REVIEWED

12  STANDARD RESEARCH IN YOUR FIELD?

13  A.  YES, IT WAS.

14  Q.  AND DID YOU FIND IT RELIABLE?

15  A.  YES, I DID.

16  Q.  AND DID YOU RELY UPON IT?

17  A.  YES, I DID.

18  Q.  OKAY.  AS A BASIS FOR YOUR OPINION THAT YOU'RE GOING TO

19  EXPRESS TODAY, HAVE YOU RELIED UPON CERTAIN DOCUMENTS.

20  A.  YES.

21  Q.  AND WHOSE DOCUMENTS ARE THEY?

22  A.  THEY ARE MERCK DOCUMENTS, MERCK RESEARCH DOCUMENTS, OR

23  MERCK MARKETING DOCUMENTS.

24  Q.  OKAY.  AND CAN YOU TELL US WHAT DOCUMENTS THEY ARE THAT

25  YOU RELY UPON BY CATEGORY.

1464

1  A.  OKAY.  SOME OF THEM WERE THE MARKETING PLANS.  SOME WAS

2  THE INITIAL MARKETING RESEARCH.  I ALSO LOOKED AT THE MESSAGES

3  AND THE TOOLS AND THE TRACKING RESEARCH.

4  Q.  SO PRETTY MUCH TRACKS THE OUTLINE OF THE INTEGRATED PLAN?

5  A.  EXACTLY.  EVERYTHING LISTED THERE I REVIEWED.

6       MR. BLIZZARD:  YOUR HONOR, AT THIS TIME WE WOULD

7  TENDER DR. PECHMANN AS AN EXPERT IN THE FIELD OF MARKETING AND

8  SPECIFICALLY INTEGRATED COMMUNICATIONS CAMPAIGNS.

9       THE COURT:  ANY QUESTIONS ON HER QUALIFICATION?

10       MR. ISMAIL:  YES, YOUR HONOR.

11              TRAVERSE

12  BY MR. ISMAIL:

13  Q.  GOOD MORNING, DR. PECHMANN.

14  A.  GOOD MORNING.

15  Q.  I WOULD LIKE TO JUST CLARIFY A FEW POINTS ABOUT YOUR

16  BACKGROUND, IF I COULD, BEFORE YOU PROCEED WITH MR. BLIZZARD.

17  A.  SURE.

18  Q.  MR. BLIZZARD AND I WILL BE ADDRESSING YOU AS

19  "DR. PECHMANN," AND THAT'S AS A RESULT OF YOU HAVING A PH.D. IN

20  BUSINESS; CORRECT?

21  A.  CORRECT.

22  Q.  BUT YOU'RE NOT A MEDICAL DOCTOR; IS THAT RIGHT?

23  A.  CORRECT.

24  Q.  AND YOUR TRAINING IS NOT IN MEDICINE OR THE MEDICAL

25  SCIENCES; IS THAT CORRECT?

1465

1  A.  CORRECT.

2  Q.  AND I THINK YOU INDICATED TO MR. BLIZZARD THAT THERE

3  WAS -- COINCIDENTALLY YOU HAD DONE SOME WORK WITH AN AGENCY

4  CALLED MILLWOOD BROWN, AND THAT MERCK ALSO USED THAT AGENCY,

5  MILLWOOD BROWN?

6  A.  MILLWARD BROWN; CORRECT.

7  Q.  JUST SO THERE IS NO CONFUSION, YOUR WORK WITH MILLWARD

8  BROWN HAD NOTHING TO DO WITH VIOXX; CORRECT?

9  A.  CORRECT.

10  Q.  AND SO, YOU MENTIONED THIS AGENCY OGILVY?

11  A.  CORRECT.

12  Q.  AND COINCIDENTALLY, MERCK HAD ALSO WORKED WITH THE SAME

13  AGENCY; IS THAT RIGHT?

14  A.  THEY WORKED WITH A PR FIRM OF THE AGENCY.  THEY ARE

15  SEPARATE AGENCIES BUT BOTH IN NEW YORK.  THEY ARE SISTER

16  AGENCIES, WPP.

17  Q.  AGAIN, JUST SO THERE IS NO CONFUSION, YOUR WORK WITH

18  OGILVY HAD NOTHING TO DO WITH VIOXX; CORRECT?

19  A.  CORRECT.

20  Q.   IN FACT, PRIOR TO BEING RETAINED BY THE PLAINTIFF LAWYERS

21  IN THIS CASE, YOU HAD NO EXPERIENCE WITH THE INTEGRATED

22  MARKETING CAMPAIGN FOR VIOXX; IS THAT RIGHT?

23  A.  CORRECT.

24  Q.  YOU HAD NOT WRITTEN ANY ARTICLES ABOUT VIOXX MARKETING?

25  A.  CORRECT.

1466

1  Q.  AND HAD YOU DONE ANY RESEARCH PRIOR TO BEING RETAINED BY

2  THE PLAINTIFF LAWYERS IN VIOXX MARKETING?

3  A.  NO, I HAD NOT.

4  Q.  SO, IS IT FAIR TO SAY THAT THE ONLY EXPERTISE YOU HAVE

5  WITH REGARD TO VIOXX IN PARTICULAR INTEGRATED MARKETING

6  CAMPAIGN IS THROUGH YOUR WORK WITH THE PLAINTIFF LAWYERS?

7  A.  YES, AND RELATE MATERIALS THAT I ACQUIRED THROUGH ACADEMIC

8  MEANS.

9  Q.  AS TO VIOXX'S MARKETING IN PARTICULAR, THE ONLY DOCUMENTS

10  YOU REVIEWED WERE THOSE THAT WERE PROVIDED TO YOU BY THE

11  PLAINTIFF LAWYERS; IS THAT FAIR TO SAY?

12  A.  NOT ENTIRELY BECAUSE, AS I SAID, I WENT AND OBTAINED

13  MARKETING MATERIALS THAT WERE -- ABOUT VIOXX THAT WERE IN THE

14  PUBLIC DOMAIN LIKE HARVARD BUSINESS CASES, THAT SORT OF THING.

15  Q.  WITH REGARD TO THESE MERCK DOCUMENTS THAT YOU TOLD THE

16  JURY ABOUT A MOMENT AGO, YOU RELIED ON THE PLAINTIFF LAWYERS TO

17  SELECT AND THEN PROVIDE TO YOU THOSE DOCUMENTS; CORRECT?

18  A.  NO, NOT REALLY.  I WORKED WITH THIS LAWYER; AND I GAVE HIM

19  KEYWORD SEARCHES; AND I INSISTED HE GIVE ME ANYTHING THAT CAME

20  OUT; SO IN THAT SENSE, I WAS GUIDING WHAT DOCUMENTS HE FOUND.

21  Q.  YOU TOLD THIS PLAINTIFF LAWYER THAT YOU WERE WORKING WITH

22  WHAT DOCUMENTS YOU WANTED TO REVIEW AND THEN RELIED ON HIM TO

23  GO SELECT THOSE DOCUMENTS; AND THEN THOSE WERE THE DOCUMENTS

24  YOU REVIEWED?

25  A.  WELL, I GAVE HIM KEYWORD SEARCHES, YES.

1467

1    Q.   AND THAT PLAINTIFF LAWYER PICKED THE DOCUMENTS AND GAVE

2    THEM TO YOU; RIGHT?

3    A.   THAT'S CORRECT.

4          MR. ISMAIL:  YOUR HONOR, WE DON'T OBJECT TO

5    DR. PECHMANN GIVING A GENERAL EXPLANATION OF THE INTEGRATED

6    MARKETING; BUT AS WE'VE DISCUSSED WITH THE COURT PREVIOUSLY, WE

7    DO HAVE OBJECTIONS TO SOME OF THE SCOPE OF HER TESTIMONY.

8          THE COURT:  OKAY.  THE COURT WILL ACCEPT HER AS

9    EXPERT IN THE FIELD OF INTEGRATED MARKETING.

10               DIRECT EXAMINATION

11   BY MR. BLIZZARD:

12   Q.   DOCTOR, BASED UPON YOUR REVIEW OF ALL OF THE MATERIALS

13   THAT YOU REVIEWED, AND BASED UPON YOUR EXPERIENCE AND TRAINING,

14   DO YOU HAVE AN OPINION ABOUT WHETHER THE INTEGRATED MARKETING

15   CAMPAIGN THAT MERCK HAD FOR VIOXX DEALT WITH THE ISSUE OF CV

16   RISKS?

17   A.   YES, IT DID.

18   Q.   OKAY.  BASED UPON YOUR REVIEW OF THE MATERIALS AND YOUR

19   EXPERIENCE, DO YOU HAVE AN OPINION ABOUT WHETHER THE MARKETING

20   CAMPAIGN EVER CLEARLY COMMUNICATED TO DOCTORS OR PATIENTS THAT

21   VIOXX COULD CAUSE HEART ATTACKS?

22          MR. ISMAIL:  OBJECTION, YOUR HONOR, BEYOND THE SCOPE

23   OF HER QUALIFICATIONS.

24          THE COURT:  I THINK THIS IS GENERAL ENOUGH.  I'LL

25   ALLOW IT AND OVERRULE THE OBJECTION.

1468

1      THE WITNESS:  YES, I HAVE AN OPINION.

2   BY MR. BLIZZARD:

3   Q.   AND WHAT IS THAT OPINION?

4   A.   THEY DID NOT CLEARLY STATE THE CARDIOVASCULAR RISKS.

5   Q.   AND WHAT IS YOUR OPINION ABOUT WHAT THEY DID COMMUNICATE

6   ABOUT CARDIOVASCULAR RISKS?

7        MR. ISMAIL:  OBJECTION, YOUR HONOR.  AGAIN, THIS IS

8   BEYOND THE SCOPE OF YOUR COURT'S PRIOR RULINGS ON HER

9   QUALIFICATIONS.

10        THE COURT:  MEMBERS OF THE JURY, THE AREA THAT I'M

11   DEALING WITH IS WHAT THE INTEGRATED MARKETING CAMPAIGN SAID OR

12   DELIVERED OR, AS SOME MARKETING PEOPLE SOMETIMES SAY,

13   "PITCHED," AS OPPOSED TO WHAT WAS CAUGHT BY THE PHYSICIANS

14   BECAUSE THE PHYSICIANS, OF COURSE, COME FROM ALL OTHER AREAS,

15   AND WHAT THEY KNEW AND HOW THEY KNEW IT AND THINGS OF THAT SORT

16   IS SPECIFIC TO THEM; BUT THIS WITNESS IS TALKING ABOUT WHAT WAS

17   DELIVERED, HOW IT WAS DELIVERED.  THAT IS APPROPRIATE, BUT

18   THAT'S THE AREA THAT I'M ALLOWING HER TO TESTIFY IN.

19        LET'S RESHAPE THE QUESTION, COUNSEL.

20   BY MR. BLIZZARD:

21   Q.   MY QUESTION REALLY IS:  YOU INDICATED THEY NEVER CLEARLY

22   COMMUNICATED THE RISK.  MY QUESTION IS:  DID THEY COMMUNICATE

23   THE OPPOSITE?

24   A.   THEIR MARKETING PLANS STATE THAT THEIR OBJECTIVE WAS TO

25   NEUTRALIZE CONCERNS ABOUT CARDIOVASCULAR RISKS AND TO IMPROVE

1469

1  PHYSICIANS PERCEPTIONS ABOUT VIOXX ON -- BECAUSE IT DOESN'T

2  CAUSE HEART ATTACKS.

3  Q.  OKAY.  IF YOU'LL TAKE A LOOK -- DO YOU HAVE IN FRONT OF

4  YOU OR UP THERE ALONGSIDE OF YOU P1.009?

5  A.  YES.

6  Q.  COULD YOU TELL ME WHAT THAT IS.  WITHOUT TALKING ABOUT THE

7  CONTENTS OF IT AT THIS POINT, JUST TELL US WHAT IT IS.

8  A.  IT'S A 2001 PROFIT PLAN FOR VIOXX, SO IT LAYS OUT THE

9  STRATEGY AND THEN TALKS ABOUT THE PROFIT IMPLICATIONS.

10  Q.  HOW DOES IT RELATE TO THE INTEGRATED MARKETING CAMPAIGN?

11  A.  IT'S THE FIRST STEP.

12  Q.  OKAY.  AND HOW SO?

13  A.  THEY DISCUSS THE FINDINGS OF THE RESEARCH REGARDING WHAT

14  WOULD PROMOTE OR PREVENT SALES, AND THEY TALK ABOUT THE

15  STRATEGY THAT THEY ARE GOING TO CARRY ON IN 2001.

16  Q.  IS THIS THE TYPE OF DOCUMENT THAT MARKETING PEOPLE

17  GENERALLY PREPARE?

18  A.  YES.

19  Q.  IS IT THE KIND OF DOCUMENT THAT EXPERTS LIKE YOURSELF

20  GENERALLY RELY UPON FOR THE WORK THAT YOU DO IN YOUR FIELD?

21  A.  YES.

22       MR. BLIZZARD:  YOUR HONOR, WE OFFER P1.009.

23       MR. ISMAIL:  NO OBJECTION, YOUR HONOR.

24       THE COURT:  LET IT BE ADMITTED.

25

1470

1  BY MR. BLIZZARD:

2  Q.  OKAY.  IF WE COULD GO TO PAGE 13, DOCTOR, OF THE 2001

3  PROFIT PLAN FOR VIOXX.  NOW, DO YOU HAVE -- FROM EXAMINING THIS

4  DOCUMENT, CAN YOU TELL US GENERALLY THE TIME FRAME THAT THIS

5  WAS PREPARED?

6  A.  IT WAS PREPARED IN THE FALL OF 2000.

7  Q.  SO IF YOU LOOK OVER AT THE PAGE 13 UNDER THE HEADING

8  OBJECTIVES, DOES THAT SET OUT -- OR WHAT DOES THAT SET OUT?

9  A.  IT STATES THE MARKETING OBJECTIVES FOR 2001 FOR THE ENTIRE

10  YEAR.

11  Q.  SO COULD YOU READ FOR US FIRST THE FIRST PARAGRAPH UNDER

12  OBJECTIVES.

13  A.  THE 2001 OBJECTIVES FOR VIOXX ARE DEFINED INTO TWO MAJOR

14  CATEGORIES:  MARKET PERFORMANCE AND STRATEGIC OBJECTIVES.  SO

15  BASICALLY HOW MUCH MONEY YOU'RE GOING TO MAKE AND HOW YOU'RE

16  GOING TO ACCOMPLISH IT.  THE MARKET PERFORMANCE OBJECTIVES ARE

17  FOCUSED ON SALES OF INCOME, WHILE THE STRATEGIC OBJECTIVES

18  ADDRESS THE IDENTIFIED KEY ISSUES.

19  Q.  AND HAVE YOU SEEN DOCUMENTS LIKE THIS BEFORE?

20  A.  YES.

21  Q.  UNDER THE MARKET PERFORMANCE OBJECTIVES, AGAIN, YOU

22  INDICATED THAT LIST OF PERFORMANCE OBJECTIVES, SALES

23  OBJECTIVES?

24  A.  EXACTLY.

25  Q.  AND WHAT WERE THE SALES OBJECTIVES THAT ARE LISTED HERE?

1471

1   A.   ACHIEVE THE SALES TARGET OF 2.5 BILLION.

2   Q.   IF YOU LOOK UNDER THE STRATEGIC OBJECTIVE OBJECTIVES, IS

3   THERE A STRATEGIC OBJECTIVES THERE THAT ADDRESSES HEART

4   ATTACKS?

5   A.   YES THERE, IS.

6   Q.   COULD YOU READ THAT FOR US?

7   A.   IT'S THE THIRD ONE DOWN.  NEUTRALIZE SAFETY CONCERNS

8   AROUND HYPERTENSION, EDEMA AND MI, THAT WOULD MEAN MYOCARDIAL

9   INFARCTION OR HEART ATTACK.

10  Q.   WHAT DOES THAT MEAN TO YOU AS A MARKETING PERSON, DOCTOR?

11  A.   THAT A MAJOR GOAL OF THEIR CAMPAIGN WAS TO ADDRESS SAFETY

12  CONCERNS AND NEUTRALIZE THEM.

13  Q.   DOES NEUTRALIZE HAVE A MEANING IN THE MARKETING FIELD?

14  A.   YES.

15  Q.   WHAT DOES IT MEAN?

16  A.   TO DISPEL, NULLIFY, GET RID OF, WEAKEN AS MUCH AS YOU

17  POSSIBLY CAN.

18  Q.   OKAY.  IF YOU LOOK OVER ON PAGE 18 OF THIS DOCUMENT, ON

19  PAGE 18, ARE THERE DESCRIPTIONS OF THE PROJECTED REACH OF THIS

20  CAMPAIGN?

21  A.   YES.

22  Q.   COULD YOU DIRECT US TO WHERE THOSE APPEAR.

23  A.   IN THE TOP BOX, THE SMALL BOX.

24  Q.   WHERE IT I SAYS "ELEMENT, REACH, FREQUENCY"?

25  A.   EXACTLY.

1472

1  Q.  COULD YOU EXPLAIN WHAT THOSE TERMS MEAN.

2  A.  SURE.  SO REACH IS THE PERCENTAGE OF THE TARGET AUDIENCE

3  THAT YOU EXPECT TO REACH, AND FREQUENCY IS HOW OFTEN YOU'RE

4  GOING TO REACH THEM.

5  Q.  AND SO, DO YOU UNDERSTAND WHAT SOME OF THESE ABBREVIATIONS

6  ARE FOR?

7  A.  YES.

8  Q.  COULD YOU TELL US ABOUT THAT.

9  A.  SO OBR IS OFFICE-BASED REPRESENTATIVES.  THAT'S THE SALES

10  REP CALLS.  SO THAT MEANS, BY "REACH, 95 PERCENT," THAT REPS

11  WERE SUPPOSED TO REACH 95 PERCENT OF TARGET PHYSICIANS.  THE

12  FREQUENCY OF 35 MEANS THEY -- THAT THEY MET WITH THE PHYSICIANS

13  ABOUT ONCE A WEEK; AND THEY WERE ABLE TO CONVEY A MARKETING

14  MESSAGE ABOUT 35 PERCENT OF THE TIME; SO LIKE ONCE A MONTH,

15  BECAUSE SOMETIMES A PHYSICIAN IS TOO BUSY.

16  Q.  HOW ABOUT THE NEXT ITEM WHICH IS "JOURNALS"?

17  A.  SO THE JOURNALS, THOSE ARE THE ADS THAT THEY PLACED IN

18  MEDICAL JOURNALS.  SO THEY WANTED TO REACH 93 PERCENT OF

19  DOCTORS THROUGH THOSE JOURNALS, SO THEY COULD SEE ABOUT FOUR

20  ADS A YEAR.

21  Q.  AND THEN HEL, DO YOU KNOW WHAT THAT REFERS TO?

22  A.  HEALTH, EDUCATION, LEARNING.

23  Q.  WHAT PART OF THE CAMPAIGN DOES THAT INVOLVE?

24  A.  THAT INVOLVES HAVING PRESENT EXPERTS COME AND PRESENT

25  INFORMATION ABOUT VIOXX TO DOCTORS IN SMALL GROUPS OR

1473

1  CONFERENCES.

2  Q.  AND THE REACH THERE --

3  A.  80 PERCENT BECAUSE THAT'S HARDER TO DO.  THEY WERE GOING

4  TO REACH 80 PERCENT OF THE DOCTORS WITH THESE VARIOUS EVENTS

5  WHERE THEY WOULD GET INDEPTH LEARNING FROM PAID EXPERTS.

6  Q.  AND FREQUENCY?

7  A.  THREE TIMES A YEAR.

8  Q.  AND THEN THE FINAL ONE IS DIRECT MAIL; CORRECT?  COULD YOU

9  EXPLAIN THAT.

10  A.  SO DIRECT MAIL ARE EITHER DEAR DOCTOR LETTERS THAT ARE

11  SENT -- USUALLY THOSE ARE UNSOLICITED.  THEY SEND ABOUT TWO A

12  YEAR.  AND THEN THE OTHERS ARE PIR'S.  THOSE ARE PROFESSIONAL

13  INFORMATION REQUEST LETTERS, WHERE THE DOCTORS ASKED FOR

14  INFORMATION.  THEY EXPECTED TO SEND SIX TOTAL, SO ROUGHLY FOUR

15  PIR'S AND TWO UNSOLICITED DEAR DOCTOR LETTERS.

16  Q.  NOW, WAS IT A PART OF THIS 2001 PROFIT PLAN TO ACTUALLY

17  CALCULATE IN DOLLARS THE POTENTIAL GAINS OR LOSSES IF SOME OF

18  THESE RESULTS WERE OR WERE NOT ACHIEVED?

19  A.  YES, THERE WAS.  THAT INFORMATION IS IN HERE.

20  Q.  OKAY.  IF YOU LOOK OVER ON PAGE 38, DO YOU SEE THE LAST

21  ASSUMPTION ON THAT PAGE, DOCTOR?

22  A.  YES.

23  Q.  AND WHAT IS THE LAST ASSUMPTION THERE?

24  A.  THE HEADING OF IT IS "POTENTIAL DOWNSIDE."

25  Q.  I SEE IN THE MIDDLE OF THE PAGE, THE TOP IT SAYS

1474

1  "POTENTIAL UPSIDE;" AND ABOUT MIDDLE WAY IT SAYS "POTENTIAL

2  DOWNSIDE;" RIGHT?

3  A.  RIGHT.  SO ONE POTENTIAL DOWNSIDE THAT THEY ASSUME COULD

4  HAPPEN WAS THAT VIOXX IS UNABLE TO NEUTRALIZE THE SAFETY

5  INTOLERABILITY ISSUES.

6  Q.  AND THE IMPACT ON THE FORECAST IS DOWNWARD; CORRECT?

7  A.  DOWNWARD.  WHERE IT HAS PARENTHESIS AROUND IT, IT MEANS

8  IT'S NEGATIVE.

9  Q.  AND WHAT WAS THE CALCULATION FOR THE AMOUNT OF MONEY THAT

10  WOULD BE LOST IF THIS ASSUMPTION DID NOT COME TO PASS?

11  A.  437 MILLION IN LOSS IN THAT ONE YEAR.

12  Q.  NOW, DID YOU ALSO LOOK AT THE 2002 MARKETING CAMPAIGN FOR

13  VIOXX?

14  A.  YES.

15  Q.  DO YOU HAVE IN FRONT OF YOU P1.2002?

16  A.  YES.

17  Q.  IF YOU -- AGAIN, SAME QUESTIONS WITH RESPECT TO THIS.  IS

18  THIS THE KIND OF DOCUMENT THAT MARKETING EXPERTS LIKE YOURSELF

19  TYPICALLY PREPARE?

20  A.  YES, IT IS.

21  Q.  AND IS IT THE KIND OF DOCUMENT THAT EXPERTS LIKE YOU AND

22  MARKET IN MARKETING TYPICALLY RELY UPON?

23  A.  YES, IT IS.

24  Q.  AND HAVE YOU RELIED UPON IT FOR YOUR OPINION IN THIS CASE?

25  A.  YES, IT.

1475

1       MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P1.2002.

2       THE COURT:   LET IT BE ADMITTED.

3   BY MR. BLIZZARD:

4   Q.  TAKE A LOOK, DOCTOR, OVER ON PAGE 7.

5   A.  OKAY.

6   Q.  FIRST ON THE -- UNDER THE HEADING OF "BEHAVIORAL

7   OBJECTIVES" -- FIRST OF ALL, COULD YOU TELL US HOW THIS PAGE IS

8   STRUCTURED AND WHAT THESE TERMS MEAN.

9   A.  YEAH, WELL, FIRST OF ALL, THIS WAS PREPARED IN THE FALL OF

10  2001 TO COVER FOR ALL OF 2002; AND THIS IS THE PROPOSED SUMMARY

11  PLAN TO ADDRESS THIS PROBLEM THAT THEY HAD DIAGNOSED THE YEAR

12  BEFORE AND ARE STILL DEALING WITH THIS YEAR, THAT THEY HAVE

13  PROBLEMS WITH PERCEPTIONS OF THE BRAND ON CV SAFETY AND ALSO

14  RENAL.

15  Q.  SO WHAT'S "BEHAVIORAL OBJECTIVES"?  WHAT DOES THAT MEAN?

16  A.  IT'S THE OBJECTIVE OF THE CAMPAIGN IN TERMS OF HOW -- WHAT

17  BEHAVIOR THEY EXPECT OF THE PHYSICIANS.

18  Q.  AND THEN THE "SUMMARY PLAN," WHAT IS THAT?

19  A.  THOSE ARE SOME OF THE MARKETING MATERIALS, NOT ALL OF

20  THEM, BUT SOME OF THE MARKETING MATERIALS THAT WILL HELP THEM

21  TO ATTAIN THOSE OBJECTIVES.

22  Q.  AND "SUCCESS MEASURES," WHAT ARE SUCCESS MEASURES?

23  A.  THAT'S THE RESEARCH, THE TRACKING RESEARCH, SO THAT

24  INDICATES, OKAY, THESE ARE THE QUESTIONS WE'RE GOING TO ASK AND

25  THIS IS THE RESULT WE WANT.

1476

1  Q.  OKAY.  SO IF YOU LOOK OVER UNDER "BEHAVIORAL OBJECTIVES,"

2  IS THERE ONE OF THEM THAT DEALS WITH CV RISKS?

3  A.  YES.

4  Q.  AND WHICH ONE IS IT?

5  A.  THE THIRD ONE DOWN.

6  Q.  OKAY.  AND WOULD YOU PLEASE READ THAT FOR US.

7  A.  IT STARTS AT THE TOP.  "PHYSICIANS -- SO THE OBJECTIVE IS

8  THAT PHYSICIANS PRESCRIBE VIOXX FOR ALL PATIENTS NEEDING PAIN

9  RELIEF, INDEPENDENT OF CV RISK FACTORS BECAUSE VIOXX DOES NOT

10  INCREASE THE RISK OF MI OR STROKE."

11  Q.  OKAY.  AND IF YOU LOOK UNDER THE "SUMMARY PLAN," WHERE IT

12  SAYS "CARDIOVASCULAR SLIDE KITS, PRINT MATERIALS,

13  CARDIOVASCULAR OBSTACLE HANDLER," ARE YOU FAMILIAR WITH THOSE?

14  A.  YES, I AM.

15  Q.  HOW WOULD THAT FIT WITHIN YOUR INTEGRATED MARKETING

16  COMMUNICATIONS CAMPAIGN THAT YOU DISCUSSED?

17  A.  THAT'S STEP TWO.  THE TOOLS.

18  Q.  AND THEN UNDER SUCCESS MEASURES, IS THERE ONE THAT DEALS

19  WITH HEART ATTACKS?

20  A.  YES.

21  Q.  AND WHICH ONE IS THAT?

22  A.  THE LAST ONE.

23  Q.  AND WHAT IS THE SUCCESS MEASURE THAT THEY ARE LOOKING AT?

24  A.  SO, STARTING AT THE TOP, "PHYSICIAN PERCEPTION OF VIOXX

25  VERSUS KEY COMPETITORS IMPROVES ON A QUARTERLY BASIS RELATIVE

1477

1  TO THE FOLLOWING PARAMETER," AND THE RESEARCH QUESTION IS,

2  "DOES NOT INCREASE THE RISK OF MI, MYOCARDIAL INFARCTION OR

3  STROKE."

4  Q.   OKAY.  AND HOW DOES THAT SUCCESS MEASURE FIT INTO YOUR

5  DESCRIPTION OF THE INTEGRATED MARKETING CAMPAIGN?

6  A.   THAT'S THE TRACKING.

7  Q.   OKAY.  SO IS THAT ITEM NUMBER 3?

8  A.   YES.

9  Q.   OKAY.  NOW, IF YOU'LL LOOK OVER TO PAGE 12 OF THIS

10  DOCUMENT.

11  A.   GOT IT.

12  Q.   NOW, AT THE TOP IT SAYS, "STRATEGY/POSITIONING METRICS,

13  ATTITUDINAL/PERCEPTUAL AND BEHAVIORAL."  COULD YOU DECODE THAT

14  FOR US.

15  A.   SO AGAIN, THIS IS -- THE METRICS IS THE RESEARCH; SO IT'S

16  ESSENTIALLY SAYING THESE ARE EITHER ATTITUDE OR BEHAVIORAL

17  MEASUREMENTS THAT WE'RE GOING TO TAKE TO MAKE SURE THE CAMPAIGN

18  IS WORKING.  BECAUSE IF SALES ARE GOING UP OR DOWN, YOU DON'T

19  KNOW WHY UNLESS YOU HAVE MEASUREMENTS OF THESE METRICS; SO A

20  KEY METRIC IS:  DOES THAT INCREASE THE RISK OF MYOCARDIAL

21  INFARCTION OR STROKE?

22  Q.   AND THAT'S THE SECOND FROM THE BOTTOM UNDER "LIST OF

23  STRATEGY POSITIONING METRICS"?

24  A.   CORRECT.  IT SAYS, "STRATEGY/POSITIONING METRIC" BECAUSE

25  IT'S A METRIC RELATED TO THE OVERALL STRATEGY OF THE CAMPAIGN.

1478

1  Q.  NOW, DOCTOR, LET US TALK NOW, IF WE CAN, NOW THAT WE

2  UNDERSTAND -- ACTUALLY, HAVE WE TALKED ABOUT ESSENTIALLY ITEM

3  NUMBER 1, THE PLAN -- ITEM NUMBER 1 ON YOUR INTEGRATED

4  MARKETING CAMPAIGN?

5  A.  YES, THERE IS SOMETHING IN THE -- IN THE PRIOR PLAN THAT

6  ACTUALLY STATES THE RESEARCH RESULTS; BUT OVERALL WE'VE PRETTY

7  MUCH COVERED THAT TOPIC.

8  Q.  NOW, WERE THERE MESSAGES THAT WERE DEVELOPED THAT DEALT OR

9  THAT WERE PART OF THIS PLAN?

10  A.  YES.

11  Q.  OKAY.  AND HAVE YOU BEEN ABLE TO IDENTIFY THE KEY MESSAGES

12  FOR THIS MARKETING CAMPAIGN OR THIS COMMUNICATIONS CAMPAIGN

13  THAT DEALT WITH CV RISKS OR HEART ATTACK RISKS?

14  A.  YES.

15  Q.  AND COULD YOU TELL US HOW IT WAS THAT YOU IDENTIFIED THE

16  KEY MESSAGES.

17  A.  I LOOKED AT THE TOOLS, ALL THE TOOLS IN WHICH THE MESSAGES

18  WOULD BE EMBEDDED; AND THESE WERE THE MESSAGES THAT WERE

19  REPEATED OVER AND OVER AND OVER AGAIN.

20  Q.  OKAY.  I THINK -- SO ARE THESE WHAT I THINK HIS HONOR

21  REFERRED TO AS THE "PITCH"?

22  A.  YES.

23  Q.  SO COULD YOU -- MAYBE IT WOULD BE HELPFUL IF YOU CAME AND

24  WROTE DOWN THE MESSAGES -- THE KEY MESSAGES THAT YOU'VE BEEN

25  ABLE TO IDENTIFY FROM A REVIEW OF THE DOCUMENT DOCUMENTS.

1479

1 WELL, MAYBE WE'LL START A NEW SHEET.

2 A.  I COULD PUT THEM HERE, OR NEW SHEET?

3 Q.  YES.  THAT WOULD BE EASIER TO READ.

4 A.  I HOPE IT'S OKAY THAT I'LL USE CV FOR CARDIOVASCULAR.

5 Q.  SURE.  I THINK WE'VE HEARD ENOUGH OF CV.

6 A.  AND MI IS OKAY TOO.  SO, THE FIRST MESSAGE IS BEHAVIORAL

7 THAT THEY WERE CONTINUALLY CONVEYING THE MESSAGE THAT VIOXX HAS

8 A FAVORABLE CARDIOVASCULAR SAFETY PROFILE; OR SOMETIMES THEY

9 WOULD SAY, "WE STAND BY THE OVERALL AND CARDIOVASCULAR SAFETY

10 OF VIOXX."

11 Q.  WHAT WOULD BE ANOTHER KEY MESSAGE THAT YOU WERE EXTRACTED

12 FROM -- HAVE EXTRACTED FROM THE DOCUMENTS?

13 A.  I NEED TO POINT OUT THAT THESE ARE SOPHISTICATED MESSAGES

14 BECAUSE THEY WERE AIMED FOR DOCTORS, SO THIS WOULD NOT WORK

15 WITH CONSUMERS, BUT A MAIN MESSAGE WAS VIOXX IS SAFE AS PLACEBO

16 IN TERMS OF CV EVENTS.

17 Q.  AND A THIRD MESSAGE?

18 A.  THIS ONE IS SOPHISTICATED, TOO; BUT THE STUDY HAD COME

19 OUT, THE VIGOR STUDY, IN EARLY 2000, SO TO EXPLAIN THOSE

20 RESULTS, WHERE THERE WAS A --

21      MR. ISMAIL:  OBJECTION, YOUR HONOR.

22      MR. BLIZZARD:  WITHOUT GETTING INTO THE VIGOR STUDY.

23      THE WITNESS:  OKAY.  OKAY.  SO TO EXPLAIN THE

24 DIFFERENCE IN THE HEART ATTACK RATE, THEY, IN THEIR MARKETING

25 TERMS, CONSISTENTLY SAYS THAT NAPROXEN EXPLAINS THE DIFFERENCE

1480

1  BECAUSE NAPROXEN WAS CARDIOPROTECTIVE.

2  BY MR. BLIZZARD:

3  Q.  AND IS THERE ANOTHER CV KEY MESSAGE THAT YOU WERE ABLE TO

4  EXTRACT FROM THE DOCUMENTS?

5  A.  YES.  SAFE FOR THE ELDERLY.  NOW, THAT'S NOT EXPLICIT

6  ABOUT CV, BUT THEIR RESEARCH SHOWED THAT IT WAS INTERPRETED TO

7  MEAN SAFE FROM A CV PERSPECTIVE?

8  Q.  SO WHEN YOU SAY THEIR RESEARCH SHOWED THAT, WHAT DO YOU

9  MEAN?

10  A.  WELL, THEY DID EXTENSIVE RESEARCH ON PHYSICIANS'

11  PERCEPTIONS; AND THAT RESEARCH SHOWED THAT THIS IS WHAT IT

12  MEANS.

13  Q.  SO -- AND AS A MARKETING PERSON, DO YOU HAVE AN OPINION

14  ABOUT WHETHER IT'S SAFE FOR THE ELDERLY IS A CONVEYANCE OF

15  OTHER MESSAGES THAT MIGHT IMPACT CV RISKS?

16       MR. ISMAIL:  OBJECTION, YOUR HONOR, BEYOND THE SCOPE.

17       MR. BLIZZARD:  I'LL WITHDRAW IT, YOUR HONOR.  WE'LL

18  STICK WITH THE RESEARCH.

19       THE WITNESS:  OKAY.

20  BY MR. BLIZZARD:

21  Q.  ALL RIGHT.  YOU CAN RESUME YOUR SEAT.

22       NOW, WITH RESPECT TO THESE KEY MESSAGES, HAVE YOU --

23  LET ME ASK YOU:  HOW MANY DOCUMENTS HAVE YOU REVIEWED THAT HAVE

24  THESE SORTS OF MESSAGES IN THEM?

25  A.  WELL, DOZENS, IF NOT MORE.

1481

1  Q.  OKAY.  NOW, WERE THERE -- LET'S TALK ABOUT THE TOOLS.

2  WERE THESE TOOLS THAT WERE USED TO CONVEY THESE MESSAGES, WERE

3  THEY ALL THE SAME KIND OF TOOLS?

4  A.  NO.  YOU SEE, THE WHOLE OBJECTIVE OF AN INTEGRATED

5  MARKETING COMMUNICATIONS CAMPAIGN IS TO HAVE THE MESSAGES

6  APPEAR IN THESE DIFFERENT TOOLS SO THAT YOUR TARGET GROUP

7  AUDIENCE MIGHT NOT PAY SO MUCH ATTENTION TO ONE TOOL THAN THEY

8  PAID ATTENTION TO ANOTHER ONE; SO ONE WAY OR ANOTHER YOU WOULD

9  CONVEY THIS MESSAGE TO THEM MULTIPLE TIMES OVER AN EXTENDED

10  PERIOD OF TIME SO THEY ALWAYS HAVE IT IN THEIR MEMORY THAT THIS

11  IS THE MESSAGE YOU'RE TRYING TO CONVEY.

12  Q.  YOU MENTIONED THE WORD "EMBEDDED" IN THE TOOLS.  WHAT DO

13  YOU MEAN BY EMBEDDED?

14  A.  WELL, BASICALLY SIMILAR WORDING WOULD BE "IN EACH TOOL."

15  SO WE HAVE GOT DIRECT MAIL, WE'VE GOT THE ADVERTISING, WE'VE

16  GOT THE SALES PROMOTIONS, WE'VE GOT THE PUBLIC RELATIONS, SO

17  THE PRESS RELEASES; AND ALL OF THOSE WOULD USE VERY SIMILAR

18  LANGUAGE SO THAT THE SAME INFORMATION WOULD BE CONVEYED FROM --

19  WITH ALL THOSE TOOLS.

20  Q.  AND HAVE YOU BROUGHT SOME EXAMPLES TO THE JURY, WITHOUT IT

21  BEING EXHAUSTIVE, BUT DO YOU HAVE SOME EXAMPLES THAT YOU CAN

22  SHOW TO THE JURY OF HOW THESE MESSAGES WERE EMBEDDED IN THESE

23  TOOLS AS A PART OF THE VIOXX CAMPAIGN?

24  A.  YES.

25  Q.  OKAY.  DO YOU HAVE UP THERE IN FRONT OF YOU P1.0581?

1482

1  A.  YES.

2  Q.  COULD YOU TELL US WHAT THAT IS.

3  A.  THIS IS A PRESS RELEASE.

4  Q.  AND WHAT IS THE DATE OF THE PRESS RELEASE?

5  A.  MARCH 27TH, 2000.

6  Q.  AGAIN, IS THIS THE KIND OF DOCUMENT THAT IS TYPICALLY

7  PREPARED BY PEOPLE WHO HAVE EXPERIENCE IN PUBLIC RELATIONS AND

8  MARKETING?

9  A.  YES.

10  Q.  AND DOES THIS -- IS THIS ACTUALLY A TOOL OF AN INTEGRATED

11  MARKETING CAMPAIGN?

12  A.  YES.

13  Q.  DO YOU RELY UPON IT FOR YOUR OPINION?

14  A.  YES.

15  Q.  DO PEOPLE WITHIN YOUR FIELD GENERALLY RELY UPON OR

16  TYPICALLY RELY UPON THESE KINDS OF DOCUMENTS TO REACH OPINIONS?

17  A.  YES.

18      MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P-1.0581.

19      THE COURT:  LET IT BE ADMITTED.

20  BY MR. BLIZZARD:

21  Q.  IF YOU WILL PUT THIS UP, THE TITLE OF THIS PRESS RELEASE

22  IS "MERCK INFORMS INVESTIGATORS OF PRELIMINARY RESULTS OF

23  GASTROINTESTINAL OUTCOMES STUDIES WITH VIOXX. "

24  A.  CORRECT.

25  Q.  I WANT TO POINT YOU TO, I GUESS, THE SECOND PARAGRAPH OR

1483

1  MAYBE YOU CAN TELL US, WHERE -- IS THERE ONE OF THESE MESSAGES

2  THAT IS EMBEDDED IN THIS DOCUMENT?

3  A.   THE NAPROXEN MESSAGE.

4  Q.   AND WHERE IS IT LOCATED?

5  A.   IN THE SECOND PARAGRAPH.

6  Q.   AND WHAT DOES IT SAY THERE?

7  A.   "IN ADDITION, SIGNIFICANTLY FEWER THROMBOEMBOLIC EVENTS

8  WERE OBSERVED IN PATIENTS TAKING NAPROXEN IN THIS GI OUTCOMES

9  STUDY, WHICH IS CONSISTENT WITH NAPROXEN'S ABILITY TO BLOCK

10  PLATELET AGGREGATION.  THIS EFFECT ON THESE EVENTS HAD NOT BEEN

11  OBSERVED PREVIOUSLY IN ANY CLINICAL STUDIES FOR NAPROXEN.

12  Q.   OKAY.  NOW, IF YOU'LL TAKE A LOOK AT ANOTHER DOCUMENT

13  THAT'S UP THERE, P1.0583.

14  A.   OKAY.

15  Q.   IS IT ALSO A PRESS RELEASE?

16  A.   YES.

17  Q.   WHAT IS THE DATE OF IT?

18  A.   APRIL 28, 2000.

19  Q.   DOES IT ALSO HAVE INFORMATION IN IT THAT IS PART OF THIS

20  MESSAGE THAT IS PART OF THE INTEGRATED MARKETING CAMPAIGN?

21  A.   THIS HAS THREE OF THE MESSAGES IN IT.

22      MR. BLIZZARD:  OKAY.  YOUR HONOR, WE WOULD OFFER

23  EXHIBIT P1.0583.

24      THE COURT:  I'LL ADMIT IT.

25

1484

1  BY MR. BLIZZARD:

2  Q.  OKAY.  THE TITLE OF THIS PRESS RELEASE IS WHAT?

3  A.  "MERCK CONFIRMS FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF

4  VIOXX."

5  Q.  IS THAT ONE OF THE MESSAGES?

6  A.  YES.

7  Q.  OKAY.  AND DOES THAT MESSAGE APPEAR IN THE BODY OF THIS

8  DOCUMENT AS WELL?

9  A.  YES.  ON THE SECOND LINE.

10  Q.  OKAY.  COULD YOU READ THAT, PLEASE.

11  A.  "IN RESPONSE TO SPECULATIVE NEWS REPORTS, MERCK & COMPANY,

12  INC., TODAY CONFIRMED THE FAVORABLE CARDIOVASCULAR SAFETY

13  PROFILE OF VIOXX."

14  Q.  AND THEN WHAT OTHER MESSAGES ARE CONTAINED WITHIN THIS

15  PRESS RELEASE?

16  A.  THE SECOND PARAGRAPH HAS THE SAFE AS A PLACEBO ON CV

17  EVENTS MESSAGE.

18  Q.  AND COULD YOU IDENTIFY OR READ THAT FOR THE JURY, PLEASE.

19  A.  "EXTENSIVE REVIEW OF DATA FROM THE COMPLETED

20  OSTEOARTHRITIS TRIALS AND ONGOING CLINICAL TRIALS WITH VIOXX,

21  AS WELL AS POST MARKETING EXPERIENCE WITH VIOXX, HAVE SHOWN NO

22  DIFFERENCE," UNDERLINED, "IN THE INCIDENCE OF CARDIOVASCULAR

23  EVENTS, SUCH AS HEART ATTACK, AMONG PATIENTS TAKING VIOXX,

24  OTHER NSAIDS, AND PLACEBO."

25  Q.  AND THEN DOES IT IDENTIFY THE NUMBER OF PRESCRIPTIONS THAT

1485

1   HAVE BEEN WRITTEN FOR VIOXX?

2   A.   YES, 10 MILLION.

3   Q.   WHAT OTHER MESSAGE APPEARS IN THIS PRESS RELEASE?

4   A.   THE NAPROXEN HYPOTHESIS.

5   Q.   AND WHERE DOES THAT APPEAR?

6   A.   IN THE THIRD PARAGRAPH.

7   Q.   COULD YOU IDENTIFY THAT LINE AND READ IT FOR US.

8   A.   "SIGNIFICANTLY FEWER HEART ATTACKS" -- IT STARTS ON THE

9   SECOND LINE, "SIGNIFICANTLY FEWER HEART ATTACKS WERE OBSERVED

10   IN PATIENTS TAKING NAPROXEN, 0.1 PERCENT, COMPARED TO PATIENTS

11   TAKING VIOXX, 0.5 PERCENT.  THIS RESULT IS CONSISTENT WITH

12   NAPROXEN'S ABILITY TO BLOCK PLATELET AGGREGATION.  THIS IS THE

13   FIRST TIME THIS EFFECT OF NAPROXEN TO REDUCE THESE EVENTS HAS

14   BEEN DEMONSTRATED IN A CLINICAL STUDY."

15   Q.   OKAY.  IS THERE A -- DO YOU ALSO HAVE UP THERE IN FRONT OF

16   YOU A PRESS RELEASE THAT'S P1.0152?

17   A.   YES.

18   Q.   AND WHAT IS THE DATE ON IT?

19   A.   MAY 22, 2001.  SO IT'S A YEAR LATER.

20   Q.   AND IS THIS SIMILAR TO THE PREVIOUS PRESS RELEASES IN THAT

21   IT CONTAINS SOME EMBEDDED MESSAGES?

22   A.   YES.

23        MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P1.0152.

24        THE COURT:  ADMITTED.

25

1486

1  BY MR. BLIZZARD:

2  Q.  WHAT MESSAGE DOES THIS PRESS RELEASE CONTAIN?

3  A.  IT CONTAINS A FAVORABLE CARDIOVASCULAR SAFETY PROFILE

4  MESSAGE AND THE SAFE AS A PLACEBO MESSAGE.

5  Q.  OKAY.  AT THE TOP, WHAT IS THE TITLE OF THIS PRESS

6  RELEASE?

7  A.  "MERCK CONFIRMS FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF

8  VIOXX."

9  Q.  IF YOU LOOK DOWN TO THE LAST PARAGRAPH ON THE PAGE.

10  A.  OH, YEAH, IT HAS NAPROXEN ALSO.

11  Q.  WHAT -- AGAIN, WHAT DOES THAT -- WHAT IS THE MESSAGE THERE

12  AT THE BOTTOM OF THE PAGE?

13  A.  "SIGNIFICANTLY FEWER HEART ATTACKS WERE OBSERVED IN

14  PATIENTS TAKING NAPROXEN, 0.1 PERCENT, COMPARED TO THE GROUP

15  TAKING VIOXX, 50 MILLIGRAMS, 0.5 PERCENT, IN THIS STUDY."

16  Q.  IF YOU LOOK OVER ON PAGE 2.

17  A.  YES.

18  Q.  IS THERE A MESSAGE THERE WITH RESPECT TO ONE OF THESE KEY

19  MESSAGES?

20  A.  YES.

21  Q.  AND WHAT --

22  A.  THE PLACEBO ONE.

23  Q.  COULD YOU IDENTIFY THAT FOR US.

24  A.  IN THE FIRST PARAGRAPH SHOWN ON THE SCREEN.  SO WHERE IT'S

25  UNDERLINED "NO DIFFERENCE."

1487

1   Q.   IN THE COMPLETED OSTEOARTHRITIS TRIALS?

2   A.   YES.  "THERE WAS NO DIFFERENCE IN THE INCIDENCE OF

3   CARDIOVASCULAR EVENTS, SUCH AS HEART ATTACKS, AMONG PATIENTS

4   TAKING VIOXX, OTHER NSAIDS AND PLACEBO."

5   Q.   OKAY.  NOW, AT THE NEXT -- IN THE NEXT PARAGRAPH, IS THERE

6   IS A MESSAGE IN THAT PARAGRAPH?

7   A.   YES.

8   Q.   AND WHAT IS IT?

9   A.   "THIS IS THE FIRST TIME THIS EFFECT OF NAPROXEN AND

10   CARDIOVASCULAR EVENTS HAS BEEN OBSERVED IN A CLINICAL STUDY."

11   AGAIN, IT SAYS THAT THE RESULTS ARE CONSISTENT WITH NAPROXEN'S

12   ABILITY TO BLOCK PLATELET AGGREGATION.

13          MR. ISMAIL:  FOR COMPLETENESS, YOUR HONOR, WE ASK

14   THAT THE SENTENCE FOLLOWING THAT BE READ.  "OTHER POTENTIAL

15   EXPLANATIONS WERE ADVANCED BY THE FDA REVIEWER AND WERE

16   DISCUSSED WITH THE ADVISORY COMMITTEE."  AND THEN GOING ON,

17   "THE COMMITTEE RECOMMENDED THAT THE DATA ON CARDIOVASCULAR

18   EVENTS IN VIGOR BE INCLUDED IN THE LABELING FOR VIOXX."

19          MR. BLIZZARD:  CORRECT.

20          THE WITNESS:  CORRECT.

21   BY MR. BLIZZARD:

22   Q.   DOES THAT SENTENCE SAY WHAT THE FDA REVIEWER SAID?

23   A.   NO.

24   Q.   I WOULD LIKE TO REFER YOU TO P1.2021.

25   A.   OKAY.

1488

1  Q.  DO YOU HAVE THAT IN FRONT OF YOU?

2  A.  YES.

3  Q.  COULD YOU TELL US WHAT THAT.

4  A.  THAT'S DIRECT MAIL PIECE TO DOCTORS THAT WAS UNSOLICITED.

5  Q.  YOU'RE LOOKING AT THE DEAR HEALTHCARE PROVIDER LETTER?

6  A.  YES.

7  Q.  I SKIPPED OVER THAT TO SAVE TIME.

8  A.  OH, I'M SORRY.  OKAY.  SO YOU'RE ON --

9  Q.  I'M ON P1.2021.

10  A.  OKAY.

11  Q.  AND COULD YOU IDENTIFY THAT DOCUMENT.

12  A.  OKAY.  IT'S DATED APRIL 11, 2002, AND IT WAS SENT TO ALL

13  FIELD PERSONNEL WITH RESPONSIBILITY FOR VIOXX; SO BASICALLY THE

14  SALES REPS AND THE MANAGERS, AND IT WAS AN ACTION REQUIRED

15  MEMO.

16  Q.  SO BEFORE WE TALK ABOUT THE ACTUAL CONTENTS, I'LL OFFER IT

17  INTO EVIDENCE; BUT BEFORE I DO THAT, WHERE DOES THIS FIT?  WHAT

18  TOOL IS THIS?

19  A.  SALES PROMOTION.

20  Q.  AND IS THIS PART OF AN INTEGRATED MARKETING CAMPAIGN?

21  A.  YES.

22  Q.  YOUR HONOR -- IS THIS TYPICALLY PREPARED BY MARKETING

23  PEOPLE LIKE YOURSELF WHO ARE EXPERTS IN THIS FIELD AND

24  TYPICALLY RELIED UPON AS EXPERTS LIKE YOURSELF IN THIS FIELD?

25  A.  YES.

1489

1 Q. AND DO YOU RELY UPON IT FOR YOUR OPINION?

2 A. YES.

3     MR. BLIZZARD: WE WOULD OFFER, YOUR HONOR, P1.1021.

4     THE COURT: I'LL ADMIT IT.

5 BY MR. BLIZZARD:

6 Q. IF YOU WOULD LOOK AT THE FIRST PAGE OF THIS DOCUMENT, DOES

7 THIS -- WHAT DOES IT SAY AT THE TOP?

8 A. "ACTION REQUIRED, LABEL CHANGE FOR VIOXX, GI OUTCOMES

9 RESEARCH STUDY AND RA INDICATION. OBSTACLE RESPONSES, SIDE BY

10 SIDE PI'S AND RA BACKGROUNDER."

11 Q. COULD YOU EXPLAIN WHAT THAT MEANS.

12 A. ESSENTIALLY THIS DIRECTS THE SALES REPS HOW TO ADDRESS ANY

13 OBSTACLE THAT THE PHYSICIANS MAY HAVE OR ANY CONCERN THE

14 PHYSICIAN MAY HAVE WITH RESPECT TO THIS STUDY.

15 Q. DOES IT ALSO DEAL WITH LABEL ISSUES?

16 A. YES. BECAUSE THE CONCERNS WOULD POSSIBLY ARISE WHEN

17 PHYSICIANS READ THE LABEL. THIS NEW LABEL.

18 Q. OKAY. AND UNDER THE INTRODUCTION, DOES IT TELL YOU THE

19 PURPOSE OF THE DOCUMENT?

20 A. "UPDATED INFORMATION TO RESPOND TO COMPETITIVE OBSTACLES

21 BASED ON THE RESULTS OF THE LABEL CHANGED."

22 Q. OKAY. AND UNDER ACTION REQUIRED, WHAT DOES THAT INDICATE?

23 A. "REVIEW AND BEGIN USING THE OBSTACLE RESPONSES IN RESPONSE

24 TO PHYSICIAN OR CUSTOMER QUESTIONS."

25 Q. UNDER "OBSTACLE RESPONSES," WHAT -- WHAT IS THE OBSTACLE

1490

1  THAT IS STATED HERE ON THIS DOCUMENT?

2  A.  "I HAVE HEARD THAT THE VIOXX GI OUTCOMES RESEARCH STUDY

3  SHOWED AN INCIDENCE OF CV EVENTS FOR VIOXX THAT WAS FIVE TIMES

4  THAT SEEN FOR NAPROXEN."  SO THAT WAS ON THE NEW LABEL.

5  Q.  SO IF YOU LOOK OVER TO THE LEFT-HAND SIDE -- WHERE IT HAS

6  THESE ONE, TWO, THREE, AND FOUR -- WHAT IS THAT PART OF THIS

7  DOCUMENT?

8  A.  THOSE ARE THE REQUIRED STEPS THAT THE SALES REPS HAVE TO

9  TAKE, BECAUSE THEY ARE PART OF THE INTEGRATED CAMPAIGN, TOO.

10  THEY ARE TO CONTROL WHAT MESSAGES THEY ARE SUPPOSED TO DELIVER.

11  Q.  SO IN THE FIRST ITEM UNDER "REVIEW THE LABEL," IT TELLS

12  THEM WHAT BULLET POINTS TO REVIEW IN THE LABEL INITIALLY;

13  CORRECT?

14  A.  CORRECT.  SO THAT THE STUFF THAT'S TABBED IN IS -- IS

15  VERBATIM FROM THE LABEL.

16  Q.  OKAY.  THEN -- SO IT INDICATES TO SAY "CARDIOVASCULAR

17  THROMBOEMBOLIC EVENT WERE 45 FOR VIOXX, 50 MILLIGRAMS, AS

18  COMPARED TO 19 FOR NAPROXEN.  MORTALITY DUE TO CARDIOVASCULAR

19  THROMBOTIC EVENTS, 7 VERSUS 6, VIOXX VERSUS NAPROXEN

20  RESPECTIVELY, WAS SIMILAR BETWEEN THE TREATMENT GROUPS;"

21  CORRECT?

22  A.  CORRECT.

23  Q.  THEN ON ITEM NUMBER 2 "REVIEW PRECAUTIONS SECTION OF LABEL

24  FOR PLACEBO-CONTROLLED TRIALS."  WHAT DOES THAT INDICATE THERE?

25  A.  WELL, HERE THEY ARE GOING TO DELIVER THE SAFEST PLACEBO

1491

1  MESSAGE.

2       MR. ISMAIL:  OBJECTION, YOUR HONOR.  THIS IS QUOTING

3  VERBATIM THE FDA APPROVED LABEL, AND IT'S BEYOND THE WITNESS'

4  QUALIFICATIONS TO CHARACTERIZE IT.

5       MR. BLIZZARD:  IT HAS THE LABEL INFORMATION IN IT,

6  YOUR HONOR; BUT WHAT THIS DOES IS GIVES THE PLAY-BY-PLAY ON HOW

7  YOU GO THROUGH THE LABEL; AND THAT'S WHAT SHE'S TALKING ABOUT.

8  I'LL LIMIT IT TO THAT.

9       THE COURT:  I'LL OVERRULE THE OBJECTION AND LET HER

10  TESTIFY.  WHAT DOES IT DO?

11       THE WITNESS:  IT GIVES THE PITCH.

12  BY MR. BLIZZARD:

13  Q.  WHAT IS THE -- WHAT DOES IT SAY WITH RESPECT TO -- LET ME

14  REPHRASE THAT.  WHAT'S ITEM NUMBER 2 DESIGNED TO DO?

15  A.  IT'S DESIGNED TO DELIVER THE SAFEST PLACEBO MESSAGE BY

16  REVIEWING THE PRECAUTION SECTION OF THE LABEL WHERE IT

17  DISCUSSES THE PLACEBO-CONTROLLED TRIALS.

18  Q.  OKAY.  THEN AT THE END OF -- ITEM NUMBER 3 IS SIGNIFICANCE

19  UNKNOWN.  AS A MARKETING PERSON, WHAT MESSAGE IS THAT INTENDED

20  TO DELIVER?

21       MR. ISMAIL:  OBJECTION, YOUR HONOR.  AGAIN, THIS IS

22  QUOTING VERBATIM THE LABEL.  IT'S IRRELEVANT WHAT A MARKETING

23  PERSON THINKS THE MESSAGE MEANS THAT CONVEYED TO DOCTORS.

24       THE COURT:  I UNDERSTAND THAT.  I'LL OVERRULE IT.

25       THE WITNESS:  WE HAVE RESEARCH AT THIS TIME PERIOD.

1492

1  BY MR. BLIZZARD:

2  Q.  WHAT DOES THE RESEARCH SHOW?

3  A.  IT SHOWS THAT DOCTORS FOUND THIS VERY CONFUSING AND THAT

4  IT DIDN'T CONVEY A CLEAR MESSAGE ABOUT CV RISKS, THAT VIOXX

5  MIGHT CAUSE A CV RISK.

6  Q.  AND IS THERE RESEARCH ABOUT THIS "SIGNIFICANCE UNKNOWN"

7  LANGUAGE?

8  A.  WELL, PEOPLE -- DOCTORS WERE ASKED TO REVIEW THIS

9  VERBATIM, AND SO WE GOT THEIR OVERALL IMPRESSION.

10      MR. ISMAIL:  OBJECTION TO THE HEARSAY, YOUR HONOR.

11  YOU DISCUSSED THESE TYPES OF SURVEYS BEFORE AND RULED THAT IT

12  WAS INADMISSIBLE THROUGH THIS WITNESS.

13      MR. BLIZZARD:  YOUR HONOR, WE'RE NOT GOING TO GO

14  THROUGH IT VERBATIM.

15      MR. ISMAIL:  YOUR HONOR, MAY WE APPROACH?

16      THE COURT:  SURE.

17      (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

18  THE BENCH.)

19      THE COURT:  IT'S DIFFICULT TO DEAL WITH FROM THE

20  STANDPOINT OF THE HEARSAY ISSUE IN THAT, NUMBER 1, IT'S NOT

21  GOING INTO WHETHER IT'S TRUTHFUL OR NOT; BUT HE'S USING IT AS

22  TO WHAT THEY SAID.  SECONDLY, IT'S A MERCK DOCUMENT, AND SO YOU

23  HAVE THE 801(D)(2) PROBLEM THAT YOU'RE FACED WITH.  THIS IS

24  WHAT MERCK HAS SAID IN THEIR OWN DOCUMENTS.

25      ALSO, WITH THIS SITUATION, THAT IS INFORMATION

1493

1  GIVEN TO NONDOCTORS, JUST LIKE SHE'S A NONDOCTOR.  THESE ARE

2  PEOPLE WHO ARE SALESMEN, AND THIS IS AN AREA THAT SHE WOULD

3  PARTICULARLY KNOW SOMETHING ABOUT.  I MEAN, SHE'S ALLEGEDLY A

4  SALES EXPERT.  SO THAT'S WHAT I'M TRYING TO DEAL WITH.  AT THE

5  SAME TIME, YOU KNOW, THERE IS SOME SUBSTANCE TO WHAT THE

6  OBJECTION FOCUSES ON.

7          MR. ISMAIL:  YOUR HONOR, IN THE BARNETT TRIAL, THERE

8  WAS AN EXTENDED DISCUSSION IN LIMINE ABOUT WHETHER DR. PECHMANN

9  CAN RELY ON THE SURVEYS OF DOCTORS WHICH WERE DONE BY THIRD

10  PARTIES, QUOTING THIRD-PARTY DOCTORS, AND THEN PROVIDED TO

11  MERCK.  THERE WAS DOUBLE AND TRIPLE HEARSAY IS WHAT YOUR HONOR

12  RULED AND THAT THIS WITNESS CAN'T BACK-DOOR A TRIPLE HEARSAY

13  DOCUMENT BY QUOTING IT IN HER OPINION, AND NOW SHE JUST WANTS

14  TO CHARACTERIZE IT WITHOUT PUTTING THE DOCUMENT UP.  IT'S AN

15  END RUN WITH REGARD TO YOUR PRIOR RULING WITH REGARD TO THE

16  HEARSAY.

17          MOREOVER, THIS IS WHAT WE -- WHAT WE SAW BEFORE

18  WITH THIS WITNESS AND WHAT I WAS WORRIED ABOUT THIS MORNING,

19  SHE WANTS TO CHARACTERIZE WHAT DOCTORS THINK ABOUT THESE

20  MESSAGES.  THIS IS QUOTING AN FDA APPROVED LABEL, AND SHE WANTS

21  TO SAY IT'S CONFUSING TO DOCTORS.

22          IT IS -- IT IS BEYOND HER PURVIEW, BOTH AS A

23  MATTER OF REGULATION, MERCK QUOTING THE LABEL, BY DEFINITION

24  CAN'T BE DEEMED MISLEADING OR ACTIONABLE IN THIS CASE UNDER

25  STATE TORT LAW; MOREOVER, IT IS BEYOND HER QUALIFICATIONS.

1494

1  SHE'S PUTTING HERSELF IN THE POSITION OF THE CATCHER THAT WANTS

2  TO CHARACTERIZE WHAT THE PITCH IS.

3      MR. BECK:  SINCE I ARGUED IT IN BARNETT IF I COULD

4  JUST ADD:  THE KEY POINT HERE IS THAT IT'S NOT A MERCK

5  DOCUMENT.  THESE WERE SURVEYS DONE BY THE THIRD PARTIES OF

6  FOURTH AND FIFTH PARTIES, SO IT IS AT LEAST TRIPLE HEARSAY, AND

7  SHE'S JUST BOOTSTRAPPING.  IT'S NOT THAT SHE TOOK IT INTO

8  ACCOUNT; SHE'S BOOTSTRAPPING TRIPLE AND QUADRUPLE HEARSAY.

9      MR. BLIZZARD:  YOUR HONOR, SHE'S NOT TESTIFYING -- AS

10  I UNDERSTOOD THE PROBLEM WITH BARNETT WAS THE ACTUAL VERBATIMS

11  FROM THE DOCTORS CONSTITUTE HEARSAY.  SHE'S QUOTING THE RESULTS

12  OF THE RESEARCH STUDY THAT WAS DONE FOR MERCK AND IS MERCK'S

13  RESEARCH THAT SHOWED THAT, IN FACT, DOCTORS WERE CONFUSED BY

14  THIS; AND THAT'S ALL SHE'S SAYING IS THAT THE RESEARCH SHOWED

15  THAT THIS -- WHEN THE LABEL WAS GONE OVER THIS WAY BY THESE

16  SALES REPS, THIS IS WHAT CONFUSED THE DOCTORS AND THAT MERCK

17  KNEW THAT BECAUSE OF THEIR RESEARCH RESULTS.

18      THE COURT:  AREN'T WE OVER THAT NOW?

19      MR. BLIZZARD:  YES, I AM.  I'M GOING TO THE LAST

20  POINT, BUT --

21      MR. BECK:  WHAT IS THE LAST POINT?

22      MR. BLIZZARD:  THE LAST POINT IS TO DEAL WITH THE

23  LAST THING, WHICH IS MERCK STANDS BEHIND THE OVERALL

24  CARDIOVASCULAR SAFETY, WHICH IS, AGAIN, ONE OF THE MESSAGES OF

25  THE CAMPAIGN WHICH IS ON THIS OBSTACLE HANDLER.  SO I'LL GET

1495

1  OFF THE RESEARCH.

2       THE COURT:  OKAY.  ALL RIGHT.  I SAID WHAT I SAID.

3  THANK YOU.

4       (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

5  OPEN COURT.)

6  BY MR. BLIZZARD:

7  Q.  DR. PECHMANN, IF WE GO TO THE LAST ITEM ON THIS PAGE OF

8  THIS DOCUMENT UNDER THE "OBSTACLE RESPONSE," IS ONE OF THE

9  MESSAGES THAT YOU'VE IDENTIFIED FROM THE INTEGRATED MARKETING

10  CAMPAIGN INCLUDED HERE?

11  A.  YES.

12  Q.  WHAT IS THAT MESSAGE?

13  A.  IT'S THE OVERALL REASSURANCE MESSAGE THAT MERCK STANDS

14  BEHIND THE OVERALL CV SAFETY OF VIOXX.

15  Q.  IF YOU COULD JUST AGAIN EXPLAIN WHO WAS THIS DOCUMENT

16  DIRECTED TO; THAT IS, WHO WAS SUPPOSED TO BE USING THIS

17  DOCUMENT?

18  A.  THE SALES REPRESENTATIVES, WHEN THEY MET WITH PHYSICIANS.

19  Q.  DOCTOR, I DIRECT YOUR ATTENTION TO P40 -- P4.5099.  DO YOU

20  HAVE THAT DOCUMENT IN FRONT OF YOU?

21  A.  YES.

22  Q.  COULD YOU IDENTIFY THAT DOCUMENT FOR US, PLEASE.

23  A.  THIS IS THE "OBSTACLE RESPONSE GUIDE FOR VIOXX, VICTORY IN

24  IT TO WIN IT."

25  Q.  COULD YOU TELL US HOW THAT FITS INTO THE INTEGRATED

1496

1  MARKETING CAMPAIGN.

2  A.  THIS IS ALSO RELATED TO SALES PROMOTIONS.  THIS WAS GIVEN

3  TO THE SALES REPS WITH EXPLICIT INSTRUCTIONS THAT WHEN ASKED

4  CERTAIN QUESTIONS, CERTAIN CONCERNS ARE RAISED, THEY SHOULD

5  RESPOND VERBATIM AS STATED IN THIS MANUAL.

6  Q.  OKAY.  THIS DOCUMENT, IS IT THE KIND OF DOCUMENT THAT IS

7  TYPICALLY PREPARED BY MARKETING PEOPLE, YOURSELF?

8  A.  YES.

9  Q.  AND/OR AT LEAST WITH THE ASSISTANCE OF MARKETING PEOPLE?

10  A.  YES.

11  Q.  IS THIS THE KIND OF DOCUMENT THAT IS TYPICALLY RELIED UPON

12  BY EXPERTS IN YOUR FIELD WHEN GIVING YOUR OPINIONS IN THIS KIND

13  OF MATTER?

14  A.  YES.

15  Q.  DO YOU RELY UPON IT FOR YOUR OPINION HERE?

16  A.  YES.

17      MR. BLIZZARD:  OKAY.  YOUR HONOR, WE WOULD OFFER

18  P4.5099.

19      MR. ISMAIL:  YOUR HONOR, JUST WITH RESPECT TO THIS

20  DOCUMENT, THERE IS VARIOUS ITERATIONS.  IF WE COULD CLARIFY

21  WHAT DATE THE PLAINTIFFS HAVE CHOSEN TO USE WITH THIS WITNESS.

22      MR. BLIZZARD:  WELL, YOUR HONOR, I CAN GIVE THE MERCK

23  BATES NUMBER.  IT'S ON THE DOCUMENT, IF THAT WOULD HELP.  IT'S

24  MRK-CAAD001695.

25      MR. ISMAIL:  PERHAPS WE COULD CLARIFY WITH

1497

1  MR. BLIZZARD AND THE WITNESS THAT THIS VERSION OF THE HANDLER

2  WAS BEFORE THE FDA APPROVED THE LABEL CHANGE FOR THE VIOXX --

3        THE WITNESS:  YES, THAT'S CORRECT.

4        MR. ISMAIL:  -- APPLICATION?  SO THIS IS THE

5  PRE-VIGOR LABEL; IS THAT CORRECT?

6        THE WITNESS:  CORRECT.

7        MR. ISMAIL:  THANK YOU, YOUR HONOR.

8  BY MR. BLIZZARD:

9  Q.  SO THIS WOULD HAVE BEEN USED PRIOR TO APRIL OF 2002; IS

10  THAT RIGHT, DOCTOR?

11  A.  CORRECT.

12  Q.  NOW, IF WE --

13        THE COURT:  I ADMITTED IT.

14        MR. BLIZZARD:  THANK YOU, YOUR HONOR.

15  BY MR. BLIZZARD:

16  Q.  IF WE GO TO THE FIRST PAGE OF THE DOCUMENT, IS THAT THE --

17  SORT OF THE COVER PAGE?

18  A.  WELL, THE FIRST PAGE IS ACTUALLY A MEMO SAYING HERE ARE

19  THE TOP TEN OBSTACLE HANDLERS AND THEN AFTER THAT IS THE COVER

20  OF THE ACTUAL MANUAL.  THAT'S WHAT YOU'VE GOT UP THERE.

21  Q.  AND IF WE GO TO PAGE 2.  I DON'T KNOW IF YOU HAVE THAT.

22  DOES THAT ACTUALLY LIST THE OBSTACLES THERE?

23  A.  YEAH.  ONLY ONE PAGE OF THEM, THOUGH, BECAUSE IT'S SEVERAL

24  PAGES.

25  Q.  THE NEXT PAGE ALSO HAS OBSTACLES ON IT?

1498

1   A.   YEP.

2   Q.   AND THERE IS A THIRD PAGE OF OBSTACLES AND A FOURTH PAGE;

3   CORRECT?

4   A.   YES.

5   Q.   OKAY.  IF YOU LOOK AT THE THIRD PAGE, NEAR THE BOTTOM,

6   OBSTACLE 32?

7   A.   YES.

8   Q.   WHAT IS THAT OBSTACLE THAT'S LISTED THERE?

9   A.   "PHYSICIAN WOULD SAY SOMETHING LIKE CELEBREX MUST BE A

10   SAFER AGENT.  UNLIKE VIOXX, CELEBREX OUTCOMES DATA DO NOT SHOW

11   ANY INCREASES IN MYOCARDIAL INFARCTIONS OR STROKE."

12   Q.   AND THEN IF YOU LOOK OVER ON -- I THINK IT'S 001750 IS THE

13   BATES NUMBER, IF THESE PAGES ARE NOT NUMBERED -- BUT ON THAT

14   PAGE, DOES THE VERBATIM RESPONSE APPEAR?

15   A.   YES, IT'S QUITE EXTENSIVE.  BUT THE SECOND PARAGRAPH MIGHT

16   BE THE MOST INFORMATIVE.

17   Q.   AND WHAT DOES THE SECOND PARAGRAPH CONVEY IN TERMS OF THE

18   INTEGRATED COMMUNICATIONS PLAN THAT YOU'VE DESCRIBED?

19   A.   IT'S THE "SAFE AS A PLACEBO" MESSAGE.

20   Q.   AND COULD YOU READ THAT FOR US.

21   A.   IN AN EXTENSIVE REVIEW OF ALL OF OUR PHASE III OA CLINICAL

22   TRIALS, VIOXX DID NOT," UNDERLINED, "SHOW AN INCREASE IN THE

23   INCIDENCE OF THROMBOEMBOLIC EVENTS COMPARED TO PLACEBO OR THE

24   COMPARATOR NSAIDS."

25   Q.   NOW, DOCTOR, I'M GOING TO SKIP OVER THE NEXT EXHIBIT FOR

1499

1  TIME PURPOSES AGAIN, AND GO TO P4.0510.

2  A.  OKAY.

3  Q.  I THINK THE JURY HAS ALREADY SEEN THIS DOCUMENT AND IT'S

4  IN EVIDENCE.  THIS IS THE -- WHAT HAS BEEN CALLED A "PIR

5  LETTER" DATED NOVEMBER 19, 2001, TO KAREN OLSON FROM MERCK.

6  A.  YES.

7  Q.  NOW, I'M NOT GOING TO ASK YOU HOW DR. OLSON INTERPRETED

8  THIS.  SHE WAS HERE AND HAS TESTIFIED ABOUT IT.

9  A.  OKAY.

10  Q.  I JUST WANT TO ASK YOU WHETHER THIS DOCUMENT CONTAINS

11  CERTAIN OF THE KEY MESSAGES THAT WERE PART OF THE INTEGRATED

12  COMMUNICATIONS CAMPAIGN?

13  A.  YES, IT CONTAINS TWO OF THEM.

14  Q.  COULD WE PUT UP P4.5010.  OKAY.  NOW, DOCTOR, WHAT IS THE

15  FIRST MESSAGE THAT IT CONTAINS?

16  A.  IT CONTAINS THE AS SAFE AS A PLACEBO MESSAGE AND I COUNTED

17  IT 12 TIMES.

18  Q.  WHY DON'T YOU JUST SHOW US THE FIRST PLACE WHERE IT

19  APPEARS.

20  A.  THE GRAPH THERE SHOW THE NUMBERS, AND ROFECOXIB IS VIOXX,

21  SO YOU CAN SEE PLACEBO IS 2.9, VIOXX IS 3.0, SO THAT'S THE

22  SAME.

23  Q.  AND INSTEAD OF GOING THROUGH ALL OF THE TIMES THAT'S

24  MENTIONED IN HERE, ARE THERE OTHER TIMES WHERE THE SAFE AS

25  PLACEBO MESSAGE IS DELIVERED IN THIS DOCUMENT?

1500

1  A.  YES, I COUNTED 12 TIMES.

2  Q.  AND HOW ABOUT THE NAPROXEN IS CARDIOPROTECTIVE MESSAGE; IS

3  THAT ALSO IN THIS DOCUMENT?

4  A.  YES, 12 TIMES.

5  Q.  IF YOU LOOK OVER ON PAGE 2, THE VIOXX GASTROINTESTINAL

6  OUTCOMES RESEARCH TRIAL.  NEAR THE BOTTOM.

7  A.  YES.

8  Q.  OKAY.  WHERE DO YOU SEE THE NAPROXEN IS CARDIOPROTECTIVE

9  MESSAGE?

10  A.  THE LAST PARAGRAPH ON THE PAGE.

11  Q.  OKAY.  AND WHAT DOES IT SAY?

12  A.  "THE LOWER INCIDENCE OF MI'S IN PATIENTS TREATED WITH

13  NAPROXEN COMPARED WITH PATIENTS TREATED WITH ROFECOXIB IS

14  CONSISTENT WITH NAPROXEN'S ABILITY TO BLOCK THROMBOXANE A-2

15  SYNTHESIS AND PLATELET AGGREGATION."

16  Q.  NOW, DR. PECHMANN, ARE YOU ALSO FAMILIAR WITH WHAT'S

17  CALLED THE CV CARD?

18  A.  YES.

19  Q.  WHAT IS THE CV CARD?

20  A.  IT WAS A COLORFUL SALES BROCHURE THAT THE SALES REPS WERE

21  INSTRUCTED TO USE FROM, ROUGHLY, MARCH 2000 TO THE LABEL CHANGE

22  IN APRIL 2002.

23  Q.  SO MARCH OF 2000 UNTIL APRIL 2002 WOULD HAVE BEEN THE TIME

24  FRAME WHEN IT WAS USED?

25  A.  RIGHT.

1501

1  Q.  AND WHO WAS IT USED BY?

2  A.  THE SALES REPS, WITH THE PHYSICIANS.

3  Q.  YOUR HONOR, I BELIEVE THIS IS ALREADY IN EVIDENCE, BUT I'M

4  NOT SURE, SO IT'S P1.266.  IS THIS A TOOL THAT IS PART OF THE

5  MARKETING -- INTEGRATED MARKETING PLAN, DR. PECHMANN?

6  A.  YES.

7  Q.  IS IT THE KIND OF THING THAT WAS PREPARED BY MARKETING

8  PEOPLE AND IS RELIED UPON BY YOU FOR YOUR OPINION?

9  A.  YES.

10  Q.  IS IT THE KIND OF THING THAT'S REASONABLY RELIED UPON BY

11  OTHER EXPERTS IN YOUR FIELD?

12  A.  YES.

13       MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P1.266

14  [SIC].

15       THE COURT:  I THINK IT'S ALREADY IN EVIDENCE, BUT IF

16  IT'S NOT, I'LL ADMIT IT.

17       THE WITNESS:  I'VE GOT TO FIND IT.

18       THE DEPUTY CLERK:  MR. BLIZZARD, COULD I HAVE THAT

19  NUMBER AGAIN.

20       MR. BLIZZARD:  YES, IT'S P1.2666.

21  BY MR. BLIZZARD:

22  Q.  DO YOU HAVE IT?

23  A.  GOT IT.

24  Q.  OKAY.  IF YOU LOOK OVER TO PAGE -- WELL, LET ME JUST ASK

25  YOU FOR THE SAKE OF TIME, WHERE IN THIS DOCUMENT DO ANY OF

1502

1   THESE KEY MESSAGES APPEAR?

2   A.  THE MAIN MESSAGE THROUGHOUT, AT LEAST THE FIRST THREE MAIN

3   PAGES AFTER THE COVER PAGE, SAFENESS OF PLACEBO ON CV EVENTS.

4   Q.  COULD YOU IDENTIFY SOME PLACES WHERE THAT APPEARS.

5   A.  THE THIRD PAGE, THE SECOND PAGE AFTER THE COVER, IT SHOWS

6   CARDIOVASCULAR THROMBOEMBOLIC ADVERSE EVENTS FOR PLACEBO AND

7   VIOXX; AND THE NUMBERS LOOK REALLY GOOD FOR VIOXX.  IT'S

8   ROUGHLY THE SAME OR EVEN BETTER THAN PLACEBO.

9   Q.  ARE THERE OTHER PLACES IN THIS DOCUMENT WHERE SIMILAR

10  MESSAGES ARE DELIVERED?

11  A.  YES.

12  Q.  TELL THE JURY, IF YOU CAN, WHAT GENERALLY OR HOW THIS WAS

13  SUPPOSED TO BE USED.

14  A.  IF A PHYSICIAN RAISED A CONCERN ABOUT CARDIOVASCULAR

15  RISKS, THE SALES REPRESENTATIVE WAS INSTRUCTED TO USE THE CV

16  CARD.  NOT IT WING IT BUT STATE VERBATIM AND SHOW THIS MATERIAL

17  TO THE DOCTORS.

18  Q.  NOW, DOCTOR, WE TALKED ABOUT THE VIGOR TRIAL; AND AGAIN,

19  I'M NOT ASKING YOU TO TALK ABOUT THE SCIENTIFIC RESULTS OF THE

20  VIGOR TRIAL; BUT WAS THE VIGOR PAPER ITSELF USED AS A MARKETING

21  PIECE?

22  A.  YES, IT WAS.

23  Q.  AND HOW DO YOU KNOW THAT?

24  A.  BECAUSE WE SAW THE ORDERS PLACED WITH THE JOURNAL.  MERCK

25  BOUGHT 500,000 COPIES OF THE NEW ENGLAND JOURNAL ARTICLE, AND

1503

1  THEN ALSO SENT OUT A BULLETIN TO THE SALES REPRESENTATIVES

2  SAYING THAT THEY SHOULD GIVE OUT THIS ARTICLE AND INSTRUCTING

3  THEM EXACTLY HOW TO DISCUSS IT.

4  Q.  AND INSTRUCTING THEM HOW TO DISCUSS IT IS THE NAPROXEN

5  THEORY, IS THE NAPROXEN IS CARDIOPROTECTIVE MESSAGE CONTAINED

6  WITHIN THE NEW ENGLAND JOURNAL OF MEDICINE ARTICLE?

7  A.  YES.

8  Q.  FINALLY, DOCTOR, WITH RESPECT TO THE EXAMPLES THAT WE HAVE

9  BEEN TALKING ABOUT, COULD YOU TAKE A LOOK AT P1.2004.  OKAY?

10  A.  OKAY.

11  Q.  COULD YOU TELL US WHAT THAT DOCUMENT IS.

12  A.  THIS IS A DETAIL PIECE, SO THESE COME UP QUARTERLY, AND

13  THEY WERE FANCY COLOR BROCHURES THAT THE SALES REPS SHOWED TO

14  THE PHYSICIANS WHEN THEY WERE MEETING WITH THEM.

15  Q.  WERE THESE THE KIND OF DOCUMENTS THAT WERE PREPARED BY

16  MARKETING PEOPLE AND WHICH YOU RELY UPON FOR YOUR OPINION?

17  A.  YES.

18  Q.  AND ARE THESE DOCUMENTS THAT ARE TYPICALLY RELIED UPON BY

19  PEOPLE IN YOUR FIELD?

20  A.  YES.

21       MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P1.2004.

22       MR. ISMAIL:  SAME ISSUE, YOUR HONOR, WITH RESPECT TO

23  THE TIMING.  IS THIS BEING OFFERED AS A MARKETING PIECE THAT

24  WAS USED PRIOR TO THE FDA APPROVED THE CHANGES TO THE VIOXX

25  LABEL ON APRIL 2002?

1504

1        THE WITNESS:  YES.

2        MR. ISMAIL:  WITH THAT UNDERSTANDING, YOUR HONOR.

3        THE COURT:  ALL RIGHT.  LET IT BE ADMITTED.

4   BY MR. BLIZZARD:

5   Q.   SO IF YOU GO OVER TO PAGE P0005069 [SIC].

6   A.   GOT IT.

7   Q.   OKAY.  AND WHAT KEY MESSAGES ARE MADE HERE?

8   A.   THIS IS THE SAFE IN THE ELDERLY MESSAGE, AND I FOUND IT IN

9   EVERY DETAIL PIECE THAT I LOOKED IN.  THEY LOOKED AT

10  CONSISTENTLY IN EVERY DETAIL PIECE EVERY QUARTER.

11  Q.   SO THIS IS JUST AN EXAMPLE?

12  A.   YES.

13  Q.   BUT THIS MESSAGE, WAS IT ISOLATED?

14  A.   NO.

15  Q.   NOW, DOCTOR, WHAT I WOULD LIKE TO NOW TALK TO YOU ABOUT IS

16  THE THIRD PART OF THE INTEGRATED MARKETING CAMPAIGN.

17  A.   THE TRACKING?

18  Q.   RIGHT.

19  A.   OKAY.

20  Q.   SO WE'VE TALKED ABOUT THE RESEARCH IN DEVELOPING A PLAN,

21  AND WE'VE TALKED ABOUT THE MESSAGES AND GIVEN SOME EXAMPLES OF

22  THE TOOLS THAT WERE USED TO CONVEY THE MESSAGES.  NOW, THE

23  THIRD PART OF THIS INTEGRATED MARKING CAMPAIGN IS WHAT?

24  A.   IS THE TRACKING OF THE CAMPAIGN ONCE IT'S OUT THERE TO SEE

25  IF IT'S WORKING, BECAUSE IF IT'S NOT WORKING, YOU'VE GOT TO FIX

1505

1  IT.

2  Q.  AND WHO -- HOW IS THIS MARKETING RESEARCH DONE?

3  A.  WELL, THEY CONDUCTED FOUR DIFFERENT TYPES OF TRACKING

4  STUDIES, AND THEY HIRED FOUR DIFFERENT MARKETING RESEARCH FIRMS

5  TO DO THEM, SO ONE FIRM PER STUDY BECAUSE THEY ARE DIFFERENT.

6  DO YOU WANT ME TO GO THROUGH ALL FOUR?

7  Q.  NOT AT THIS POINT.  LET ME FIRST ASK YOU, DO YOU HAVE IN

8  FRONT OF YOU P1.2032?

9  A.  YES.

10  Q.  AND IS THIS FROM YOUR REVIEW OF A MERCK DOCUMENT?

11  A.  YES.

12  Q.  OKAY.  WHAT IS THE COVER OF THE DOCUMENT DESCRIBED AS?

13  A.  "VIOXX MONTHLY EAR REVIEW, NOVEMBER 2001."

14  Q.  AND WHAT IS A MONTHLY EAR REVIEW, FROM YOUR REVIEW OF

15  THESE DOCUMENTS?

16  A.  THAT MEANS EARLY ASSESSMENT AND RESPONSE.  SO EVERY MONTH

17  THEY GOT NEW DATA.  THE BEGINNING OF THE NEXT MONTH THEY LOOKED

18  TO SEE ARE THINGS WORKING, EARLY ASSESSMENT; IF NO RESPONSE,

19  THEY FIGURED OUT WHAT TO DO.

20  Q.  SO WHAT CATEGORIES OF TRACKING WERE THESE STUDIES LOOKING

21  AT?

22  A.  THERE WAS A TRACKING OF WHAT PHYSICIANS RECALLED THE SALES

23  REPS SAYING, SO THAT WAS A DETAIL AUDIT.  THEN THERE WAS A

24  STUDY TO TRACK PHYSICIANS BELIEFS.  THAT WAS CALLED "THE

25  ATTRIBUTE TRACKING STUDY" TO SEE WHAT THEY WERE BELIEVING ABOUT

1506

1  VIOXX VERSUS THE COMPETITOR.  PRIMARY CELEBREX WAS WHAT THEY

2  WERE WORRIED ABOUT; BUT THE OTHER NSAIDS, TOO.

3        THEN THEY TRACKED ACTUAL SALES BY PHYSICIAN, BOTH NEW

4  PRESCRIPTIONS AND REFILLS.  SO THE NAME OF THE PRESCRIPTION --

5  THE NAME OF THE PHYSICIAN WAS KNOWN; BUT THE NAME OF THE

6  PATIENT, THANK GOD, WASN'T; AND THEN THEY TRACKED CONSUMER

7  BELIEFS AND ATTITUDES, VERY GENERAL THINGS.

8  Q.  AND HOW DID THEY DO THIS TRACKING?

9  A.  WELL, FIRMS WOULD CONTACT THESE TARGET MEMBERS IN VARIOUS

10  DIFFERENT WAYS -- ON THE PHONE, DEPENDING ON WHO IT WAS.  WITH

11  CONSUMERS, IT WAS ON THE PHONE.  WITH THE PHYSICIANS, IT WAS

12  INITIALLY PHONE AND FAX, AND THEN THEY WENT TO AN

13  INTERNET-BASED APPROACH.  AND WITH SALES, THEY JUST BOUGHT THE

14  DATA FROM THE PHARMACIES.

15  Q.  SO LET'S TAKE THESE ONE AT A TIME.  THE PHYSICIAN RECALL,

16  WHAT YOU CALL WHAT THE PHYSICIAN RECALLED THE SALES

17  REPRESENTATIVE SAYING TO THEM, HOW WAS THAT RESEARCH DONE?

18  A.  THEY HAD A PANEL OF PHYSICIANS THAT AGREED TO PARTICIPATE,

19  AND EVERY MONTH THEY HAD TO WRITE DOWN WHAT THE SALES REPS SAID

20  ABOUT VIOXX AND CELEBREX AND EVENTUALLY BEXTRA.

21  Q.  AND THEN DID THIS GET CONDENSED INTO A REPORT TO MERCK?

22  A.  YES.  SO THEY WROTE DOWN WORD FOR WORD WHAT THEY RECALLED;

23  AND THEN MERCK -- WELL, ACTUALLY THE RESEARCH FIRM -- CODED IT,

24  WHICH IS VERY STANDARD, TO SEE WHAT WERE THE MAIN MESSAGES AND

25  WHAT PERCENTAGE OF DOCTORS HEARD EACH MESSAGE.

1507

1  Q.  AND THEN THE SECOND THING YOU SAID WAS THAT THEY TRACKED

2  PHYSICIANS' ATTITUDES OR BELIEFS.  HOW DID THAT RELATE TO THE

3  PHYSICIAN RECALL OF WHAT THE SALES REP SAID, OR DOES IT -- ARE

4  THOSE TWO INTEGRATED?

5  A.  WELL, THEY SHOULD MATCH UP.  SO IF THE SALES REPS ARE

6  RECALLING -- I MEAN, IF THE PHYSICIANS ARE RECALLING A SALES

7  REP MAKING A STATEMENT, THEN THAT SHOULD CHANGE THEIR BELIEF;

8  SO THEY TRACK TO MAKE SURE, OKAY, ONCE IT'S BEEN DELIVERED, DID

9  THEY GET IT?

10  Q.  AND THEN THE THIRD PART WAS THEY TRACKED SALES ALONGSIDE

11  OF THAT?

12  A.  EXACTLY.  BECAUSE, YOU KNOW, THEN THEY COULD SEE, DID

13  THESE BELIEFS AFFECT SALES?

14  Q.  SO P1.2032, IS THAT THE KIND OF RESEARCH THAT YOU'RE

15  FAMILIAR WITH IN YOUR WORK AS A MARKETING EXPERT?

16  A.  VERY FAMILIAR.

17  Q.  IS THIS STANDARD AND RELIABLE RESEARCH?

18  A.  YES.

19  Q.  DOES IT HAVE A SCIENTIFIC BASIS TO IT?

20  A.  YES.

21  Q.  AND COULD YOU EXPLAIN THAT?

22  A.  WELL, IT'S A RANDOM SAMPLE OF PHYSICIANS OF CERTAIN

23  SUBSPECIALTIES; AND THEY -- THE WAY THEY WORD THE QUESTIONS

24  HAVE BEEN SHOWN TO BE RELIABLE AND VALID; AND THE WAY THEY

25  CODE, THEY HAVE TO VERIFY THAT THE CODING IS ACCURATE BY HAVING

1508

1  TWO DIFFERENT CODERS CODE THE SAME THING TO MAKE SURE THEY

2  AGREE; SO THEY FOLLOW STANDARD PROCEDURE THAT'S VERY

3  SCIENTIFIC.

4        MR. BLIZZARD:  OKAY.  YOUR HONOR, WE WOULD OFFER

5  P1.2032.

6        MR. ISMAIL:  OBJECTION TO HEARSAY, YOUR HONOR.

7        THE COURT:  I DON'T THINK IT'S HEARSAY.  I'LL

8  OVERRULE THE OBJECTION AND ALLOW IT.  I DON'T THINK IT'S

9  HEARSAY BECAUSE I DON'T THINK IT'S NECESSARILY OFFERED FOR THE

10  TRUTH OF WHAT IT'S BEING PRESENTED FOR, AND ALSO I THINK THAT

11  IT DOES COME WITHIN THE 801(D)(2) CONCEPT.

12  BY MR. BLIZZARD:

13  Q.  IF YOU WILL TAKE A LOOK AT BATES 6061 FROM THAT EXHIBIT.

14  FIRST OF ALL, IS THAT THE COVER PAGE THAT WE HAVE UP ON THE

15  SCREEN?

16  A.  YES, IT IS.

17  Q.  AND EAR AGAIN STANDS FOR?

18  A.  EARLY ASSESSMENT AND RESPONSE.  AND IT'S A MERCK REPORT

19  WHERE THEY LOOKED AT THE DATA THEY WERE GIVEN FROM THE RESEARCH

20  FIRM AND ANALYZED IT.

21  Q.  AND THE DATE IS JANUARY 7, 2001?

22  A.  NO.  IT'S A TYPO.  IT'S 2002.  IT'S FROM NOVEMBER AND THEY

23  FINALLY GOT IT AND LOOKED AT IT EARLY JANUARY.

24  Q.  SOMEBODY HASN'T CHANGED THEIR CALENDAR YET?

25  A.  CORRECT.

1509

1  Q.  SO IF WE GO OVER TO BATES 6061?

2  A.  I'VE GOT IT.

3  Q.  COULD YOU TELL US WHAT THIS PAGE SHOWS.

4  A.  IT'S THE CODING OF THE PERCENTAGE OF PHYSICIANS THAT

5  RECALLED EACH MESSAGE.

6  Q.  SO THE QUESTION IS:  WHICH OF THE PRODUCT FEATURES LISTED

7  BELOW WERE DISCUSSED BY THE SALES REPRESENTATIVE?

8  A.  RIGHT.

9  Q.  AND THEN HIGH COXIB PHYSICIANS ARE THE PEOPLE WHO RESPOND

10  TO THIS SURVEY?

11  A.  SO BASICALLY, THERE WERE TWO CLASSES OF PHYSICIANS.  HIGH

12  COXIBS WERE THE ONES THEY WERE MOST INTERESTED IN BECAUSE THEY

13  TEND TO DO PRESCRIBE COX-2'S.  AND THEN HIGH NSAIDS WERE THE

14  TOP GROUP TOO, BUT THEY ALSO TARGETED THEM BECAUSE THEY WERE

15  HOPING TO MAKE SOME INROADS THERE.  THEY USED THE TRADITIONAL

16  NSAIDS INSTEAD OF THE COX-2S.

17       SO, BASICALLY, THEY SHOWED DIFFERENT MONTHS OF DATA.

18  SO THEY ALWAYS SHOWED TWO MONTHS SIDE BY SIDE TO SEE WHETHER

19  THERE WAS A CHANGE.  HERE THEY COMBINED TWO MONTHS; SO

20  SEPTEMBER AND OCTOBER VERSUS NOVEMBER AND DECEMBER OF '01; AND

21  THEY SHOW WHAT THEY RECALLED ABOUT BOTH VIOXX AND CELEBREX, THE

22  SALES REPS.

23  Q.  AND IS THERE AN ITEM THERE THAT DEALS WITH RISK OF

24  MYOCARDIAL INFARCTION OR STROKE?

25  A.  YES.  IT'S THE ONE THAT'S HIGHLIGHTED SECOND TO THE BOTTOM

1510

1  IN THE FIRST TABLE.

2  Q.  AND --

3  A.  AND THE SECOND TABLE.

4  Q.  WHAT DO THE RESULTS SHOW YOU, OR WHAT ARE WE SHOWING THERE

5  WITH THOSE RESULTS?

6  A.  FOR EXAMPLE, 41.9 INDICATES THAT ALMOST 42 PERCENT OF

7  PHYSICIANS RECALLED THE SALES REPS DELIVERING THE MESSAGE THAT

8  VIOXX DOESN'T INCREASE THE RISK OF MYOCARDIAL INFARCTION OR

9  STROKE.  IN SEPTEMBER, OCTOBER '01.

10  Q.  AND FOR NOVEMBER, DECEMBER OF '01?

11  A.  IT WAS 46.7 PERCENT.

12  Q.  NOW, DO YOU HAVE IN FRONT OF YOU P1.2034?

13  A.  YES.

14  Q.  OKAY.  AND COULD YOU DESCRIBE WHAT THAT IS?

15  A.  SO THIS IS ANOTHER EAR REPORT FROM APRIL 2003.  IT'S A

16  MERCK DOCUMENT WHERE THEY REVIEWED THE RESEARCH.

17  Q.  IS IT A SIMILAR RESEARCH REPORT TO THE ONE THAT WE JUST

18  DESCRIBED AS P1.2032?

19  A.  I CAN'T VERIFY THE NUMBER; BUT, YES, IT'S THE SAME TYPE OF

20  REPORT AS THE LAST ONE.

21       MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P1.2034.

22       THE COURT:  WITH THE SAME OBJECTION, I'LL OVERRULE IT

23  AND LET IT BE ADMITTED.

24  BY MR. BLIZZARD:

25  Q.  IF YOU'LL GO TO BATES 2139.

1511

1   A.   OKAY.  DO YOU WANT ME TO DESCRIBE IT?

2   Q.   YES, PLEASE.

3   A.   SO THIS IS -- WHAT TIME PERIOD ARE WE TALKING -- THIS IS

4   2002 AND 2003.  SO MAY TO MAY.  SO KIND OF IN BETWEEN THOSE

5   TWO YEARS.  AND HERE IT TALKS -- IT GRAPHS THE PERCENTAGE OF

6   PHYSICIANS WHO RECALL THE SALES REP SAYING EACH MESSAGE WITH

7   RESPECT TO VIOXX.

8   AND THE HEADING SAYS, "EFFICACY, SAFETY AND TOLERABILITY

9   CONTINUE TO BE THE TOP VIOXX MESSAGES RECALLED;" AND THEN THE

10   SPECIFIC MESSAGE THAT'S RECALLED IS "SAFE FOR THE ELDERLY;" AND

11   THE GRAPHING HIGHLIGHTED IN YELLOW IS THE VIOXX LINE; AND IF

12   YOU SEE TO THE LEFT, THE SCALE, IT'S FROM 30 TO ALMOST

13   50 PERCENT OF THE SALES REPS RECALL OF THAT WAS SAID ABOUT

14   VIOXX.

15   Q.   AND FROM WHAT TIME PERIOD?

16   A.   MAY 2002 TO MAY 2003.

17   Q.   IT LOOKS LIKE FOR SOME PERIOD OF TIME, IT WAS DOWN AROUND

18   30 PERCENT, LOOKS LIKE AUGUST AND SEPTEMBER OF WHAT YEAR WOULD

19   THAT BE?

20   A.   2002.

21   Q.   AND THEN IT INCREASES THERE AFTER THAT?

22   A.   YEAH, BECAUSE THEY KIND OF HAVE -- THE WHOLE POINT IS

23   EMPHASIZE CERTAIN MESSAGES AND EMPHASIZE CERTAIN OTHER MESSAGES

24   SO PHYSICIANS AREN'T BORED.

25   Q.   LET'S GO TO THE OTHER ITEM SO WE'RE MORE BORED.  P1.2032,

1512

1  WHICH IS THE SAME DOCUMENT WE TALKED ABOUT PREVIOUSLY BUT NOW

2  BATES 6068.

3  A.  OKAY.

4  Q.  DO YOU HAVE THAT IN FRONT OF YOU?

5  A.  YES.

6  Q.  COULD YOU EXPLAIN THIS PAGE TO US, PLEASE.

7  A.  AGAIN, IT HAS THE TWO GROUPS OF PHYSICIANS:  THE HIGH

8  COXIBS THEY WERE MOST INTERESTED IN -- WE WOULD LIKE YOU TO

9  PRESCRIBE VIOXX -- AND THE HIGH NSAIDS.  IT TRACKS OVER TIME SO

10  THIS IS MOSTLY 2001 DATA.

11      IT'S A LITTLE CONFUSING BECAUSE IT'S A ROLLING MONTH

12  BUT BASICALLY SPRING THROUGH FALL, LATE FALL, NOVEMBER OF 2001.

13  IT TRACKS PHYSICIANS' RECALL OF THE MESSAGE DOES NOT INCREASE

14  THE RISK OF -- OH, ACTUALLY, I'M SORRY, IT TRACKS THEIR BELIEFS

15  ON DOES NOT INCREASE THE RISK OF MI STROKE; AND THIS IS THE

16  AVERAGE RATING, WITH TEN BEING ABSOLUTELY POSITIVELY DOES NOT,

17  AND ONE -- AND ZERO OR ONE MEANING MAYBE IT DOES.

18  Q.  SO THE FIRST TWO GRAPHS WE LOOKED AT ABOUT TRACKING

19  STUDIES WERE THOSE PHYSICIAN RECALLED WHAT THE SALES REPS SAID?

20  A.  CORRECT.

21  Q.  AND NOW THIS ONE IS WHAT?

22  A.  IS DID THEIR BELIEFS CHANGE?

23  Q.  AND SO WHAT DOES THIS SHOW WITH RESPECT TO THEIR BELIEFS

24  ABOUT VIOXX VERSUS CELEBREX WITH RESPECT TO RISK OF MI OR

25  STROKE?

1513

1   A.   WELL, IT SHOWS THAT IT WAS GETTING A PRETTY GOOD RATING

2   THROUGH 2001 UNTIL THE AUGUST JAMA ARTICLE HIT; AND THEN IT

3   DROPPED, THE RATING DROPPED A LITTLE BIT BECAUSE OF THAT

4   JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION ARTICLE ON MI; AND

5   THEN IT STARTED TO PICK BACK UP, WHICH THEY WERE VERY EXCITED

6   ABOUT.

7   Q.   AND HOW DO YOU KNOW THAT THEY WERE EXCITED ABOUT IT?  IS

8   THAT FROM THE MARKETING STUDIES THAT YOU READ?

9   A.   YES.

10   Q.   NOW, THERE ARE A COUPLE OF MORE OF THESE GRAPHS I WANT TO

11   GO THROUGH; AND THEN WE'LL BE FINISHED WITH THE GRAPH, WITH THE

12   TRACKING RESEARCH.  IF YOU'LL -- I HAVE ANOTHER MARKETING

13   STUDY, DOCUMENT P1.2164 THAT WE HAVEN'T INTRODUCED INTO

14   EVIDENCE YET.  IS IT ALSO A MARKETING -- IS IT ALSO MARKETING

15   RESEARCH THAT RELATES TO THE TRACKING OF A PHYSICIAN'S

16   ATTITUDES AND BELIEFS?

17   A.   IT'S A REVIEW OF A LOT OF RESEARCH INCLUDING THAT, YES.

18        MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P1.2164.

19        THE COURT:  I'LL ADMIT IT.

20   BY MR. BLIZZARD:

21   Q.   IF YOU'LL GO TO BATES 4869, AND COULD YOU TELL US WHAT

22   THIS GRAPH SHOWS.

23   A.   SO THIS SHOWS THE SAME QUESTION ON THE SURVEY BUT FOR

24   DIFFERENT TIME PERIOD.  IT SHOWS JANUARY '02 TO SEPTEMBER '03,

25   SO YOU'LL SEE THAT THE YELLOW LINE UP THERE SHOWS THE RATING OF

1514

1 VIOXX. THE VERY TOP LINE SHOWS THE IMPORTANCE OF THAT

2 ATTRIBUTE, WHICH IS UP ABOUT 9; AND YOU'LL SEE THAT VIOXX WAS

3 AT 7 AND THEN KIND OF GOT DOWN TO ABOUT 6.5 BUT STAYS PRETTY

4 STEADY THERE.

5 Q. AND WHAT OTHER LINES ARE REPRESENTED ON HERE BESIDES THE

6 VIOXX LINE?

7 A. CELEBREX, NAPROXEN, AND BEXTRA.

8 Q. OKAY. AND WHAT IS THE LINE IMMEDIATELY ABOVE OR IS THERE

9 MORE THAN ONE LINE IMMEDIATELY ABOVE THE VIOXX LINE?

10 A. THERE IS MORE THAN ONE.

11 Q. WOULD YOU TELL US IF THAT'S CELEBREX OR BEXTRA OR WHAT IT

12 IS?

13 A. LET'S SEE. IT'S HARD TO READ. I'M SURE ONE OF THOSE IS

14 CELEBREX. THE SQUARE IS CELEBREX. AND THE LIGHT SQUARE --

15 IT'S ALL KIND OF TOGETHER; AND THEN THE HIGHLIGHT IS THE

16 IMPORTANCE -- THE ONE THAT STICKS OUT WAY ON TOP, THAT'S THE

17 IMPORTANCE OF THE ATTRIBUTE.

18 Q. WHICH HAS THE TRIANGLE?

19 A. RIGHT.

20 Q. NOW, LET'S FINALLY GO TO CONSUMER RESEARCH. DID THEY --

21 DID MERCK ALSO HAVE SOME CONSUMER RESEARCH DONE ABOUT
CONSUMERS

22 ATTITUDES ABOUT VIOXX?

23 A. YES.

24 Q. AND COULD YOU TELL US WHAT -- FIRST OF ALL, P1.2008, IS

25 THAT A DOCUMENT THAT CONTAINS CONSUMER RESEARCH ABOUT VIOXX
AND

1515

1  CONSUMER ATTITUDES?

2  A.  YES.

3         MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P1.2008.

4         THE COURT:  I'LL ADMIT IT.

5         MR. ISMAIL:  HOLD ON, YOUR HONOR.  MAY I APPROACH?

6         THE COURT:  SURE.

7         MR. ISMAIL:  THIS DOCUMENT WAS NOT ON THE LIST

8  PROVIDED TO US, 2008.

9         MR. BLIZZARD:  JUDGE, IT MAY NOT HAVE BEEN; AND IN

10  WHICH CASE, I JUST WON'T GO INTO IT.

11         THE COURT:  LET'S TAKE A BREAK AT THIS TIME.  OKAY,

12  MEMBERS OF THE JURY, WE'LL TAKE A 15-MINUTE BREAK AT THIS TIME.

13  THE COURT WILL STAND IN RECESS.

14         THE DEPUTY CLERK:  EVERYONE RISE.

15         (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

16              * * *

17         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

18  TRANSCRIBED BY TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT

19  REPORTER.)

20         THE DEPUTY CLERK:  EVERYONE RISE.

21         THE COURT:  BE SEATED, PLEASE.  I UNDERSTAND THE LAST

22  DOCUMENT WAS WITHDRAWN, SO IT'S NOT ADMITTED.  THE RECORD

23  SHOULD REFLECT THAT.

24  BY MR. BLIZZARD:

25  Q.  DR. PECHMANN, IF YOU WILL LOOK AT P1.2031, DURING THE

1516

1  BREAK I HAVE SHOWN THAT TO COUNSEL FOR MERCK TO TRY TO SPEED

2  THINGS ALONG.  COULD YOU TELL US WHAT THAT DOCUMENT IS.

3  A.  THIS IS ANOTHER MERCK DOCUMENT.  IT'S AN OPERATIONS REVIEW

4  FOR VIOXX DATED JANUARY 31, 2003.

5  Q.  DOES IT CONTAIN MARKETING DATA IN IT SPECIFICALLY WITH

6  RESPECT TO TRACKING PRESCRIPTIONS OF VIOXX?

7  A.  YES.

8       MR. BLIZZARD:  YOUR HONOR, WE WOULD OFFER P1.2031.

9       THE COURT:  I'LL ADMIT IT.

10  BY MR. BLIZZARD:

11  Q.  IF YOU LOOK OVER ON PAGE 45 OF THIS DOCUMENT --

12  A.  OKAY.

13  Q.  -- IS THERE A CHART THERE THAT SHOWS THE TRACKING OF

14  PRESCRIPTIONS OF VIOXX OVER TIME?

15  A.  YES.  IT TRACKS NEW PRESCRIPTIONS.

16  Q.  HELP US GET ORIENTED TO THIS CHART.  THERE'S SOME ACTUAL

17  EVENTS THAT ARE DESCRIBED ON THIS CHART; CORRECT?

18  A.  YES.

19  Q.  SO WHAT IS THE BEGINNING DATE OF THIS CHART?

20  A.  IT LOOKS LIKE JUNE '01 --

21  Q.  OKAY.  THEN --

22  A.  -- AND IT GOES THROUGH DECEMBER '02.

23  Q.  NOW, THE FIRST EVENT THAT'S DESCRIBED THERE -- I THINK THE

24  LATER WITNESS WILL TALK ABOUT IT, SO I'M NOT GOING TO GET INTO

25  IT WITH YOU, BUT I WANT TO MAKE SURE THE JURY DOESN'T MISREAD

1517

1   THAT AS I DID.  THAT DOESN'T SAY "JAVA" THERE, DOES IT?

2   A.  NO.

3   Q.  WHAT'S IT SAY?

4   A.  JAMA, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION.

5   Q.  JUST BRIEFLY, FROM WHAT YOU KNOW, DOES THAT REFER TO AN

6   ARTICLE BEING PUBLISHED IN JAMA?

7   A.  YES.

8   Q.  THEN WE SEE A SALES DROP FOR THAT?

9   A.  CORRECT.  IT'S NEW PRESCRIPTIONS.

10  Q.  SO THIS TRACKS WHAT?

11  A.  NEW PRESCRIPTIONS.  IT'S MUCH MORE SENSITIVE TO EVENTS

12  BECAUSE EVEN THOUGH -- DOCTORS WON'T NECESSARILY SWITCH PEOPLE

13  OFF SOMETHING THEY ARE ALREADY ON, BUT THEY MAY START NEW

14  PEOPLE ON SOMETHING DIFFERENT.

15  Q.  SO AFTER THIS JAMA ARTICLE THERE IS AN EVENT DESCRIBED

16  "PROJECT OFFENSE"?

17  A.  CORRECT.

18  Q.  ARE YOU FAMILIAR WITH PROJECT OFFENSE?

19  A.  YES.

20  Q.  COULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT

21  PROJECT OFFENSE WAS.

22  A.  IT WAS MARKETING PROGRAM THAT MERCK DESIGNED WHEN THEY SAW

23  THIS DROP IN SALES.  IT HAD SEVERAL COMPONENTS, BUT BASICALLY,

24  IT WAS TO BE ON THE OFFENSE TO COMBAT THE JAMA ARTICLE.

25  Q.  DURING WHAT PERIOD OF TIME WAS THE PROJECT OFFENSE RUN,

1518

1  ACCORDING TO THAT GRAPH?

2  A.  FALL '01.

3  Q.  SO BEGINNING AROUND WHEN?

4  A.  SEPTEMBER TO DECEMBER.

5  Q.  NOW, YOU'RE FAMILIAR WITH THE DETAILING OR THE SALES

6  REPRESENTATIVES' VISITS TO NURSE OLSON BECAUSE YOU HAVE

7  REVIEWED THE CALL NOTES?

8  A.  CORRECT.

9  Q.  I'M NOT GOING TO ASK YOU TO INTERPRET ANY OF THOSE BECAUSE

10  SHE'S THE CATCHER AND SHE WAS HERE, BUT I DO WANT FOR YOU TO

11  TELL US WHETHER OR NOT YOU RECALL THAT THERE WERE SALES CALL

12  NOTES DURING THAT TIME PERIOD RELATING TO NURSE OLSON.

13  A.  YES.

14  Q.  DID PROJECT OFFENSE, AS PART OF IT, USE CERTAIN TOOLS TO

15  TALK THE DOCTORS?

16  A.  YES.

17  Q.  WHAT WERE THE TOOLS THAT WERE USED AS PART OF PRODUCT

18  OFFENSE?

19  A.  THE OBSTACLE HANDLER, THE CV OBSTACLE HANDLER, THE CV

20  CARD, AND THE PIR.

21  Q.  OKAY.  PIR, AN EXAMPLE OF THAT WOULD BE THE LETTER THAT

22  WAS SENT TO NURSE OLSON?

23  A.  YES.  SHE GOT OR SHE WAS SENT IN THIS TIME PERIOD.

24  Q.  NOW, OBVIOUSLY, IN THIS WHAT WE MIGHT CONSIDER A SHORT

25  PERIOD -- THE JURY MIGHT CONSIDER A LONG PERIOD -- WE HAVE

1519

1   COVERED A NUMBER OF DOCUMENTS, BUT ARE THERE OTHER DOCUMENTS

2   OUT THERE THAT YOU REVIEWED THAT WE HAVEN'T REALLY DISPLAYED

3   HERE?

4   A.  YES.

5   Q.  SPECIFICALLY, WAS THERE SOME CHANGE IN THE TOOLS THAT WERE

6   USED AFTER THE LABEL CHANGE?

7   A.  YES, THERE WERE SOME CHANGES.

8   Q.  COULD YOU DESCRIBE GENERALLY WHAT THE CHANGES WERE AFTER

9   THE LABEL CHANGE AS THEY APPLIED TO THESE TOOLS.

10  A.  THEY ADDED THE VIGOR STUDY RESULTS AS FAIR BALANCE IN THE

11  BROCHURES AND MATERIALS.

12  Q.  SOME OF THESE SAME MESSAGES THAT YOU TALKED ABOUT -- ABOUT

13  CV, FAVORABLE CV PROFILE, STAND BEHIND OVERALL SAFETY, AND

14  CARDIOVASCULAR SAFETY OF THE PRODUCT -- DID THEY CONTINUE TO BE

15  PART OF THE CAMPAIGN?

16  A.  ALL OF THEM DID.

17  Q.  OKAY.  HOW LARGE WAS THIS CAMPAIGN?

18  A.  IT WAS VERY LARGE.  VIOXX WAS THE NUMBER ONE ADVERTISED

19  PRESCRIPTION DRUG IN 2000.  THEIR BUDGET IN 2001 WAS

20  COMPARABLE, $160 MILLION, AND ANOTHER $240 MILLION TO

21  PHYSICIANS.

22  Q.  OKAY.

23  A.  IN ONE YEAR.

24  Q.  IN TERMS OF RESOURCES, IF MERCK HAD WANTED TO DEVISE AN

25  INTEGRATED COMMUNICATIONS CAMPAIGN TO COMMUNICATE THAT THERE

1520

1  WAS CV RISKS FOR VIOXX, DID THEY HAVE THE RESOURCES TO DO THAT?

2       MR. ISMAIL:  OBJECTION, BEYOND HER DESIGNATION AND

3  EXPERTISE.

4       THE COURT:  I'LL OVERRULE THE OBJECTION AND ALLOW IT.

5       THE WITNESS:  YES.

6       MR. BLIZZARD:  WE DON'T HAVE ANY ADDITIONAL QUESTIONS

7  AT THIS TIME.

8       THE COURT:  ANY CROSS?

9       MR. ISMAIL:  YES, SIR.

10           CROSS-EXAMINATION

11  BY MR. ISMAIL:

12  Q.  HELLO AGAIN, DOCTOR.

13  A.  HELLO.

14  Q.  YOU DISCUSSED WITH MR. BLIZZARD IN THE CONTEXT OF HIM

15  ASKING YOU WHETHER YOU HAD ANY DIRECT EXPERIENCE ADVISING

16  PHARMACEUTICAL COMPANIES ON MARKETING CAMPAIGNS OR AD AGENCIES

17  ADVISING PHARMACEUTICAL COMPANIES ON ADVERTISING CAMPAIGNS --

18  FIRST OF ALL, YOU SAID THAT WAS NOT PART OF YOUR EXPERIENCE

19  PRIOR TO THIS CASE; CORRECT?

20  A.  CORRECT.

21  Q.  I THINK YOU INDICATED, MORE OR LESS, THAT WITH RESPECT TO

22  YOUR OPINIONS THAT YOU OFFER TODAY, THAT THAT WAS SORT OF

23  BESIDE THE POINT BECAUSE, WHEN YOU'RE TALKING ABOUT INTEGRATED

24  MARKETING, THOSE CONCEPTS APPLY ACROSS INDUSTRIES; RIGHT?

25  A.  CORRECT.

1521

1  Q.  REALLY, INTEGRATED MARKETING CAMPAIGNS AS A CONCEPT ARE

2  USED BY A NUMBER OF DIFFERENT COMPANIES IN A NUMBER OF

3  DIFFERENT INDUSTRIES; IS THAT RIGHT?

4  A.  YES.

5  Q.  IN FACT, YOU TEACH STUDENTS THE IDEAS OF INTEGRATED

6  MARKETING CAMPAIGNS SO THEY CAN GO OUT IN THE WORLD AND APPLY

7  THAT WITH COMPANIES IN THEIR OWN WORK?

8  A.  YES.

9  Q.  REALLY, IT WOULD BE PART OF YOUR TEACHING THE STUDENTS

10  THAT IT'S GOOD PRACTICES FOR A COMPANY TO USE INTEGRATED

11  MARKETING CAMPAIGNS IF THEY ARE GOING TO DO ANY PROMOTIONAL

12  ACTIVITIES AT ALL?

13  A.  YES.

14  Q.  SO WITH RESPECT TO THE CONCEPTS OR THE STEPS THAT YOU

15  WALKED THROUGH WITH THE JURY TODAY, THOSE AREN'T CONCEPTS OR

16  STEPS THAT MERCK CAME UP WITH?

17  A.  CORRECT.

18  Q.  IN FACT, YOU WOULD EXPECT THAT ALL PHARMACEUTICAL

19  COMPANIES WOULD EMPLOY INTEGRATED MARKETING CAMPAIGNS

FOLLOWING

20  THE TRIED-AND-TRUE METHODS YOU TALKED ABOUT WITH THE JURY?

21  A.  YES.

22  Q.  WOULD YOU BELIEVE THAT THE COMPANY PFIZER, FOR EXAMPLE,

23  HAD AN INTEGRATED MARKETING CAMPAIGN FOR CELEBREX?

24  A.  YES.

25  Q.  WOULD YOU EXPECT THAT PFIZER'S CAMPAIGN FOR CELEBREX WOULD

1522

1  FOLLOW THE THREE-STEP PLAN THAT YOU DISCUSSED WITH THE JURY?

2  A.  I DON'T KNOW WHAT KIND OF RESEARCH THEY DID, BUT YES.

3  Q.  AS A CONCEPT BEHIND THE MARKETING, YOU WOULD EXPECT PFIZER

4  OR ANY OTHER COMPANY TO FOLLOW THE PRINCIPLES OF INTEGRATED

5  MARKETING?

6  A.  YES.

7  Q.  AM I RIGHT THAT, IN YOUR WORK IN CONNECTION WITH THIS

8  CASE, YOU HAVE NOT GONE BACK AND DONE A REVIEW OF PFIZER'S

9  INTEGRATED MARKETING CAMPAIGN FOR CELEBREX?

10  A.  I READ AVAILABLE CASES ON IT.

11  Q.  BUT NOT NEARLY TO THE EXTENT THAT YOU HAVE REVIEWED AND

12  DISCUSSED MERCK'S EFFORTS WITH REGARD TO VIOXX?

13  A.  CORRECT.

14  Q.  SO YOU ARE NOT PREPARED TO DISCUSS WITH THE JURY TODAY TO

15  THE SAME LEVEL OF DETAIL YOU DISCUSSED WITH VIOXX HOW PFIZER

16  WAS USING THE TOOLS OF INTEGRATED MARKETING FOR CELEBREX?

17  A.  CORRECT.

18  Q.  I GUESS THAT WOULD BE TRUE FOR ALL THE MANUFACTURERS OF

19  NSAIDS OR ANTI-INFLAMMATORY MEDICINES; YOU, SIMILARLY, HAVE NOT

20  GONE BACK AND DONE A REVIEW OF THEIR INTEGRATED MARKETING

21  CAMPAIGNS?

22  A.  I READ THE AVAILABLE CASES.

23  Q.  BUT, SIMILARLY, NOT TO THE EXTENT THAT YOU WOULD BE IN A

24  POSITION TO TALK ABOUT THAT WITH THE JURY TODAY?

25  A.  CORRECT.

1523

1  Q.  IN ADDITION TO THE FACT THAT MERCK DID NOT COME UP WITH

2  THE CONCEPT OF INTEGRATED MARKETING CAMPAIGNS, YOU CERTAINLY

3  DON'T MEAN TO IMPLY ANYTHING NEGATIVE WITH THE FACT THAT MERCK

4  HAD A CAMPAIGN FOR VIOXX; TRUE?

5  A.  CORRECT.

6  Q.  I'M GOING TO HAND YOU, DOCTOR -- JUST BECAUSE I WANT TO

7  TALK A LITTLE MORE DETAIL ABOUT JUST THE BASICS OF SUCH

8  CAMPAIGNS -- AN EXHIBIT WHICH IS MARKED FOR IDENTIFICATION ONLY

9  AS EXHIBIT 3679.

10  A.  OKAY.

11  Q.  DR. PECHMANN, DO YOU RECOGNIZE EXHIBIT 3679 AS A SLIDE

12  THAT YOU ACTUALLY PREPARED?

13  A.  YES.

14  Q.  SO I HAVE ON THE SCREEN NOW EXHIBIT 3679, WHICH IS A SLIDE

15  THAT YOU HAD DONE; RIGHT?

16  A.  CORRECT.

17  Q.  AM I CORRECT THAT THIS DOCUMENT HERE IS YOUR ATTEMPT TO

18  DESCRIBE IN A GENERAL SENSE WHAT AN INTEGRATED MARKETING

19  COMMUNICATIONS CAMPAIGN IS?

20  A.  YES.

21  Q.  YOUR SLIDE HERE THAT WE HAVE ON THE SCREEN IS NOT MERCK OR

22  VIOXX-SPECIFIC?

23  A.  CORRECT.

24  Q.  WE HAVE A COUPLE MORE STEPS THAN WHAT YOU COULD FIT ON

25  YOUR FLIP CHART HERE, BUT WOULD YOU AGREE THAT EXHIBIT 3679

1524

1   REFLECTS HOW YOU TEACH STUDENTS AND YOUR COLLEAGUES WHEN YOU

2   DISCUSS INTEGRATED MARKETING?  THIS DOCUMENT IS A REFLECTION OF

3   WHAT THAT KIND OF CONCEPTS ARE?

4   A.  YES.

5   Q.  BEFORE WE GO THROUGH THESE, I WANT TO TALK ABOUT SOME OF

6   THE TERMINOLOGY THAT'S USED HERE.  CERTAINLY, DOCTOR, IN YOUR

7   WORK YOU HAVE COME TO RECOGNIZE THAT DIFFERENT SPECIALTIES HAVE

8   DIFFERENT LINGO AS THEY GO ABOUT DOING THEIR WORK?

9   A.  YES.

10  Q.  I THINK THE JURY HAD A GOOD EXAMPLE OF THAT LAST FRIDAY.

11  WE HAD A WITNESS HERE AND THERE WAS A MEDICAL RECORD THAT SAID

12  THAT "THE PATIENT ADMITS."  THE WITNESS EXPLAINED THAT,

13  ALTHOUGH SOME OF US MAY THINK "ADMITS" IS LIKE A CONFESSION,

14  BUT WHEN DOCTORS AND NURSES WRITE THAT DOWN, THEY ARE JUST

15  SAYING THE PATIENT REPORTED THAT.  HAVE YOU HEARD OF THAT KIND

16  OF IDEA?

17  A.  YES.

18  Q.  SIMILARLY, IN THE MARKETING WORLD, THERE ARE TERMINOLOGIES

19  AND TERMS USED THAT HAVE A SPECIFIC MEANING TO MARKETERS THAT

20  MAY HAVE SORT OF A DIFFERENT MEANING TO FOLKS IN THEIR EVERYDAY

21  LIFE?

22  A.  YES.

23  Q.  SO LET'S TAKE A LOOK HERE IN THIS GENERAL DISCUSSION OF

24  WHAT AN INTEGRATED MARKETING CAMPAIGN IS.  THE FIRST STEP IS

25  "IDENTIFY OBSTACLES TO PRODUCT SALES."  DO YOU SEE THAT?

1525

1  A.  YES.

2  Q.  THE TERM "OBSTACLES," AS USED IN YOUR SLIDE AND AS YOU

3  DISCUSS IT WITH STUDENTS AND COLLEAGUES, DOES THAT JUST

4  GENERALLY MEAN ANY BARRIER TO SALES?

5  A.  YES.

6  Q.  SO IS "OBSTACLES" A TERM THAT MERCK CAME UP WITH?

7  A.  NO.

8  Q.  IS "OBSTACLES" A GENERIC TERM THAT MARKETING PROFESSIONALS

9  SUCH AS YOU USE EVERY DAY?

10  A.  IT'S ONE OF THE TERMS WE USE.

11  Q.  CERTAINLY YOU DON'T MEAN ANYTHING NEGATIVE OR WOULD NOT

12  SUGGEST TO THE JURY THAT THERE IS ANYTHING NEGATIVE THAT THE

13  MERCK MARKETERS USED THE TERM "OBSTACLES" IN ITS DOCUMENTS?

14  A.  CORRECT.

15  Q.  NOW, JUST TO GET A FURTHER UNDERSTANDING OF WHAT AN

16  OBSTACLE IS, DO YOU STILL HAVE THE -- I THINK THAT YOU CALLED

17  IT AN "OBSTACLE HANDLER GUIDE."  IT'S EXHIBIT 45099.

18  A.  YES.  I JUST HAVE TO LOOK FOR IT.

19  Q.  IF YOU'RE COMFORTABLE JUST FOLLOWING ON THE SCREEN, I CAN

20  GO ABOUT IT THAT WAY, AS WELL.

21  A.  YOU MAY HAVE TO.

22  Q.  ALL RIGHT.  IF AT ANY TIME YOU NEED A COPY OF THE

23  DOCUMENT, JUST TELL ME AND I'LL DIG IT OUT OF MY BOX HERE.

24  A.  OKAY.

25  Q.  HERE WE HAVE, JUST AS WE DISCUSSED, THIS IS A MERCK

1526

1  MARKETING DOCUMENT AND HERE'S THAT GENERIC MARKETING TERM

2  "OBSTACLE"; RIGHT?

3  A.  CORRECT.

4  Q.  AN OBSTACLE CAN MEAN ANY QUESTION THAT A PHYSICIAN HAS;

5  RIGHT?

6  A.  CORRECT.

7  Q.  AN OBSTACLE CAN BE A CONCERN A PHYSICIAN HAS LIKE "IS ONE

8  DRUG MORE EXPENSIVE THAN THE OTHER" OR "I DON'T UNDERSTAND THE

9  DOSING" AND THAT KIND OF THING.

10  A.  YES.

11  Q.  JUST IF WE USE A COUPLE OF EXAMPLES THAT YOU DIDN'T

12  DISCUSS WITH MR. BLIZZARD, CERTAINLY NOT ALL THE OBSTACLES THAT

13  MERCK MARKETERS WERE IDENTIFYING HAD TO DO WITH CARDIOVASCULAR

14  ISSUES; CORRECT?

15  A.  CORRECT.

16  Q.  HERE'S ONE THAT THE MARKETING FOLKS, IN DOING THEIR WORK,

17  SAID, "WELL, GEE, I THINK SOME PHYSICIANS HAVE THIS QUESTION

18  ABOUT WHETHER VIOXX CAN BE USED WITH THIS OTHER DRUG" THAT

19  NEITHER YOU NOR I ARE GOING TO TRY TO PRONOUNCE.

20  A.  CORRECT.

21  Q.  SO THIS WOULD BE AN EXAMPLE OF AN OBSTACLE THAT A

22  MARKETING PERSON WOULD WANT TO IDENTIFY?

23  A.  YES.

24  Q.  THEN, AS WE GO FORWARD, IF WE CAN GO BACK TO YOUR SLIDE

25  THAT AGAIN IS NOT MERCK OR VIOXX-SPECIFIC, I WANT TO TALK ABOUT

1527

1  STEP 2.  DO YOU SEE THAT?

2  A.  YES.

3  Q.  OKAY.  AGAIN, WE HAVE THIS TERM HERE THAT HAS KIND OF GOT

4  ITS OWN MEANING IN THE MARKETING BIZ, "NEUTRALIZE."

5  A.  YES.

6  Q.  I THINK YOU TOLD MR. BLIZZARD THAT "NEUTRALIZE" IS A TERM

7  THAT MARKETING FOLKS USE IN THEIR OWN WORK THAT MAY BE A LITTLE

8  BIT DIFFERENT THAN HOW OTHER PEOPLE USE THE TERM?

9  A.  YEAH.  I DON'T KNOW WHETHER WE USE IT DIFFERENTLY, BUT WE

10  USE IT.

11  Q.  WELL, IF WE WERE WATCHING, LIKE, THE SOPRANOS OR

12  SOMETHING, THE TERM "NEUTRALIZE" MAY MEAN TO PUT A HIT OUT ON

13  SOMEBODY; RIGHT?

14  A.  YEAH.  GOOD POINT.

15  Q.  BUT, TO A MARKETER, THAT'S CERTAINLY NOT HOW THE TERM

16  "NEUTRALIZE" IS MEANT.

17  A.  CORRECT.

18  Q.  YOU HAVE SEEN MANY EXAMPLES OUTSIDE OF MERCK'S DOCUMENTS

19  WHERE THE TERM "NEUTRALIZE" IS JUST PART OF THE EVERYDAY

20  MARKETING DISCUSSION?

21  A.  I'M NOT SURE I HAVE.

22  Q.  HAVE YOU SEEN YOUR OWN RESEARCH CITED WITH REGARD TO

23  DOCUMENTS USING THE WORD "NEUTRALIZE"?

24  A.  I DON'T KNOW; BUT IF NOT, IT WOULD BE A SYNONYM.

25  Q.  A SYNONYM, YOU SAID?

1528

1  A.  YES.

2  Q.  FOR WHAT?

3  A.  FOR "NEUTRALIZE."

4  Q.  CERTAINLY, THE WORD "NEUTRALIZE" IS NOT A TERM THAT MERCK

5  MARKETERS CAME UP WITH THEMSELF.

6  A.  CORRECT.

7  Q.  SO IT WOULD BE INACCURATE FOR -- IF THERE WAS A LAWYER ON

8  THE SCREEN ASKING A QUESTION OF A WITNESS YESTERDAY, "WHEN DID

9  MERCK COME UP WITH THE TERM 'NEUTRALIZE,'" THAT'S NOT REALLY A

10  FAIR QUESTION BECAUSE MERCK DID NOT INVENT THAT TERM?

11  A.  CORRECT.

12  Q.  "NEUTRALIZE" IN THE CONTEXT OF MARKETING MEANS -- LET ME

13  GO BACK ONE STEP.  WHEN WE WERE TALKING ABOUT THIS TERM

14  "OBSTACLE" UP HERE, YOU AND I TALKED ABOUT A NUMBER OF

15  DIFFERENT EXAMPLES ABOUT WHAT MAY CONSTITUTE AN OBSTACLE.  A

16  MISPERCEPTION OF A COMPANY'S PRODUCT CAN BE CONSIDERED AN

17  OBSTACLE?

18  A.  YES.

19  Q.  CERTAINLY YOU WOULD AGREE THAT A COMPANY CAN AND SHOULD

20  CORRECT ANY MISPERCEPTIONS ABOUT ITS PRODUCTS THAT ARE

21  OBSTACLES OUT IN THE FIELD?

22  A.  NOT NECESSARILY SHOULD, BUT WOULD CONSIDER IT.

23  Q.  THE TERM, THEN, IF WE ARE TALKING ABOUT THAT KIND OF

24  EXAMPLE OF AN OBSTACLE, ONE WAY TO NEUTRALIZE A MISPERCEPTION

25  ABOUT YOUR PRODUCT WOULD BE TO BRING THE CONSUMERS BACK TO A

1529

1  BALANCED OR NEUTRAL POSITION; RIGHT?

2  A.  CORRECT.

3  Q.  I THINK YOU DESCRIBED SOME WORK WITH MR. BLIZZARD YOU HAVE

4  DONE ON MARKETING CAMPAIGNS.  I THINK YOU USED THE ANTIDRUG OR

5  ANTISMOKING CAMPAIGN AS EXAMPLES.

6  A.  ANTIDRUG.

7  Q.  BUT YOU HAVE DONE WORK IN THE ANTISMOKING REALM, AS WELL?

8  A.  YES.

9  Q.  ONE OF YOUR EFFORTS HAS BEEN, YOU KNOW, TAKING, FOR

10  EXAMPLE, MOVIES, WHERE THEY SHOW GLAMOROUS MOVIE STARS SMOKING

11  AND THERE'S A WORRY THAT THAT WOULD UNFAIRLY INFLUENCE

12  ADOLESCENTS WITH REGARD TO SMOKING?

13  A.  CORRECT.

14  Q.  THAT WOULD BE AN OBSTACLE TO THOSE WHO HAVE AN ANTISMOKING

15  MESSAGE.

16  A.  YES.

17  Q.  CERTAINLY, FOR THOSE WHO ARE TRYING TO GET OUT THAT

18  MESSAGE, WE WOULD WANT TO NEUTRALIZE THE EFFECT OF SMOKING IN

19  THE MOVIES BY PRESENTING A MORE BALANCED PRESENTATION OF THE

20  DANGERS OF SMOKING?

21  A.  THAT WOULD BE ONE WAY.

22  Q.  YOU, FOR EXAMPLE, HAVE WRITTEN ARTICLES TALKING ABOUT

23  PUTTING MORE BALANCED INFORMATION IN THE FRONT OF A MOVIE SO

24  THE VIEWERS HAVE A MORE NEUTRAL OR BALANCED VIEW OF THE ISSUE;

25  CORRECT?

1530

1  A.  CORRECT.

2  Q.  YOU CERTAINLY DON'T IMPLY ANYTHING NEGATIVE WITH THE USE

3  OF THE WORD "NEUTRALIZE" IN AND OF ITSELF; RIGHT?

4  A.  CORRECT.

5  Q.  NOW, GOING TO YOUR CHART HERE, STEP 2 YOU DISCUSSED TOOLS;

6  CORRECT?

7  A.  (NODS HEAD).

8  Q.  THAT WAS WAYS THAT THE MARKETER CAN INTERACT WITH THE

9  FIELD ON PARTICULAR MESSAGES; CORRECT?

10  A.  WELL, IT'S THE WAY THEY DISSEMINATE THE MESSAGES TO THE

11  TARGET GROUPS.

12  Q.  NOW, WHEN WE ARE TALKING ABOUT A PHARMACEUTICAL MEDICINE

13  LIKE VIOXX, NO CONSUMER OUT THERE COULD EVER BUY A VIOXX

14  PRESCRIPTION WITHOUT A PHYSICIAN WRITING A PRESCRIPTION AND

15  MAKING THE DECISION THE MEDICINE WAS RIGHT FOR THAT PATIENT;

16  RIGHT?

17  A.  I HOPE THAT'S THE CASE.

18  Q.  WITH RESPECT TO PRESCRIPTION MEDICINES, DO DOCTORS AND

19  NURSES GET INFORMATION ABOUT THE RISK OF A PRODUCT FROM MEDICAL

20  ARTICLES?

21  A.  YES.

22  Q.  DO DOCTORS AND NURSES GET INFORMATION ABOUT RISKS FROM THE

23  PRODUCT LABEL?

24  A.  YES.

25  Q.  DO DOCTORS AND NURSES GET INFORMATION ABOUT THE RISKS OF A

1531

1 MEDICINE THROUGH MEDICAL CONFERENCES?

2 A. YES.

3 Q. DO DOCTORS AND NURSES GET INFORMATION ABOUT THE RISKS OF A

4 MEDICINE BY JUST TALKING WITH EACH OTHER ABOUT MEDICINES?

5 A. YES.

6 Q. DO DOCTORS AND NURSES GET INFORMATION JUST FROM THEIR OWN

7 CLINICAL EXPERIENCE WITH A MEDICINE?

8 A. YES.

9 Q. SO WITH RESPECT TO THE KNOWLEDGE DOCTORS AND NURSES HAVE

10 ABOUT RISKS OF A MEDICINE, IT'S NOT JUST WHAT IS DISSEMINATED

11 BY THE MANUFACTURER; IS THAT RIGHT?

12 A. CORRECT.

13 Q. NOW, YOU DISCUSSED SALES REPRESENTATIVES WITH THE JURY

14 THIS MORNING. JUST SO WE UNDERSTAND A LITTLE BIT MORE ABOUT

15 WHAT SALES REPRESENTATIVES DO, CERTAINLY, IT'S COMMONPLACE FOR

16 PHARMACEUTICAL COMPANIES TO HAVE SALES REPRESENTATIVES?

17 A. YES.

18 Q. ARE SALES REPRESENTATIVES TYPICALLY MEDICALLY TRAINED

19 DOCTORS AND NURSES?

20 A. NO.

21 Q. BUT THE SALES REPRESENTATIVES ARE TALKING TO DOCTORS AND

22 NURSES; RIGHT?

23 A. CORRECT.

24 Q. DOCTORS AND NURSES WHO KNOW A LOT MORE ABOUT MEDICINE THAN

25 THE SALES REPRESENTATIVES?

1532

1  A.  I WOULD THINK SO.

2  Q.  YOU WOULD THINK SO, ANYWAY?

3  A.  YES.

4  Q.  WITH RESPECT TO SALES REPRESENTATIVES, HAVE YOU HEARD OF

5  THIS CONCEPT CALLED "COUNTER DETAILING"?

6  A.  YES.

7  Q.  CAN YOU EXPLAIN TO THE JURY WHAT COUNTER DETAILING IS.

8  A.  A COMPETITOR TRIES TO DISCUSS THE COMPETING PRODUCT IN A

9  NEGATIVE WAY TO DISSEMINATE NEGATIVE INFORMATION ABOUT IT.

10  Q.  IN YOUR WORK IN THIS LITIGATION, HAVE YOU SEEN EXAMPLES

11  WHERE MERCK'S COMPETITORS USED THEIR SALES REPRESENTATIVES TO

12  DISSEMINATE INFORMATION ABOUT VIOXX?

13  A.  YES.

14  Q.  IN YOUR WORK ON THAT CASE, DID YOU LEARN THAT WHAT MERCK'S

15  COMPETITORS WERE DISSEMINATING ABOUT VIOXX, IN PART, DEALT WITH

16  CARDIOVASCULAR ISSUES?

17  A.  YES.

18  Q.  SO IF WE WERE GOING TO CREATE A COMPLETE LIST OF WAYS THAT

19  DOCTORS AND NURSES WOULD LEARN ABOUT MEDICINE -- WE TALKED

20  ABOUT ARTICLES AND CONFERENCES AND THE LABEL AND COLLEAGUES --

21  WE WOULD ALSO ADD WHAT COMPETITORS ARE TELLING THOSE SAME FOLKS

22  ABOUT YOUR PRODUCT?

23  A.  YES.

24  Q.  NOW, DO YOU UNDERSTAND THAT A SALES REPRESENTATIVE -- AT

25  LEAST LET'S TALK ABOUT THE MERCK SALES REPRESENTATIVES -- ARE

1533

1  REQUIRED TO DETAIL OR DISCUSS MERCK'S PRODUCTS ONLY IN A MANNER

2  CONSISTENT WITH THE FDA-APPROVED LABEL?

3  A.  YES.

4  Q.  THAT'S WHAT YOU UNDERSTAND IS MERCK POLICY?

5  A.  YES.

6  Q.  IS THAT ALSO FDA MANDATED?

7  A.  YES.

8  Q.  SO THE OBSTACLE RESPONSE GUIDE THAT YOU AND MR. BLIZZARD

9  DISCUSSED, THIS DOCUMENT HERE --

10  A.  YES.

11  Q.  -- THIS WAS A LIST OF A WHOLE HOST OF QUESTIONS THAT A

12  PHYSICIAN COULD ASK A MERCK SALES REPRESENTATIVE; RIGHT?

13  A.  YES.

14  Q.  THERE WERE SOME GUIDELINES FOR THE REPRESENTATIVES ON HOW

15  TO DEAL WITH THESE QUESTIONS AS THEY AROSE?

16  A.  YES.

17  Q.  THE SALES REPRESENTATIVES WERE TRAINED TO RESPOND IN THE

18  MANNER SET FORTH IN THE GUIDELINES SO IT'S CONSISTENT WITH THE

19  LABEL; RIGHT?

20  A.  THE SALES REPS WERE TRAINED TO MAKE PRESENTATIONS

21  CONSISTENT WITH THE LABEL.

22  Q.  BUT THIS DOCUMENT HERE -- IF YOU RECALL, I INTERJECTED IN

23  THE MIDDLE OF YOUR DIRECT EXAMINATION TO POINT OUT THIS

24  DOCUMENT WAS BEFORE THE FDA APPROVED A CHANGE TO THE VIOXX

25  LABEL TO ADD THE VIGOR HEART ATTACK INFORMATION; RIGHT?

1534

1  A.  YES.

2  Q.  SO THE QUESTION YOU WENT OVER WITH MR. BLIZZARD WAS AT A

3  TIME WHERE THE FDA HAD NOT YET APPROVED THE VIGOR INFORMATION

4  IN THE LABEL; RIGHT?

5  A.  YES.

6  Q.  IF WE WERE TO LOOK AT A OBSTACLE RESPONSE GUIDE OR UPDATE

7  THAT FOLLOWED THE FDA'S CHANGE TO THE VIOXX LABEL, YOU WOULD

8  SEE A DIFFERENT ANSWER; RIGHT?

9  A.  I NEVER SAW ONE SUBSEQUENT TO THE LABEL.

10  Q.  YOU UNDERSTAND THAT MERCK SALES REPRESENTATIVES WERE

11  INSTRUCTED TO DISCUSS THE LABEL CHANGE WITH PHYSICIANS?

12  A.  YES.

13  Q.  YOU USED -- I HOPE YOU STILL HAVE IT UP THERE -- DOCUMENT

14  1.2021?

15  A.  YES.

16  Q.  THIS WAS THE DOCUMENT THAT WAS DATED APRIL 11TH?

17  A.  THAT'S IT.

18  Q.  THIS WAS THE BULLETIN FOR FIELD PERSONNEL.  ARE FIELD

19  PERSONNEL THE PHARMACEUTICAL REPRESENTATIVES THAT WE HAVE

20  TALKED ABOUT TODAY?

21  A.  YES.

22  Q.  THERE'S A NUMBER OF INSTRUCTIONS FOR THE FIELD PERSONNEL

23  ON HOW TO INTERACT WITH PHYSICIANS NOW THAT THE FDA HAS CHANGED

24  THE VIOXX LABEL?

25  A.  YES.

1535

1  Q.  ONE OF THE PAGES YOU WENT OVER WITH MR. BLIZZARD WAS THIS

2  PAGE HERE; RIGHT?

3  A.  YES.

4  Q.  JUST IF YOU CAN CONFIRM WITH ME, DOCTOR, THAT THE SALES

5  REPRESENTATIVES WERE INSTRUCTED TO GO OVER THIS INFORMATION

6  WITH PHYSICIANS FOLLOWING THE LABEL CHANGE?

7  A.  YES.

8  Q.  I THINK, AS YOU INDICATED ON DIRECT, THESE MESSAGES, AS

9  YOU DISCUSSED THEM, WERE ACTUALLY VERBATIM FROM THE

10  FDA-APPROVED VIOXX LABEL?

11  A.  CORRECT.  IN THAT BLOCK, YES.

12  Q.  YOU WENT DOWN OVER HERE.  ALSO, THESE MESSAGES -- AND I

13  APOLOGIZE.  I'VE SKIPPED THE LEFT COLUMN HERE.  BUT SALES REPS

14  WERE INSTRUCTED:  "WE HAVE A LABEL CHANGE.  GO OUT AND TELL

15  YOUR DOCTORS ABOUT THE LABEL CHANGE"; RIGHT?

16  A.  CORRECT.

17  Q.  TELL THEM WHAT THE FDA HAS PUT IN THE LABEL?

18  A.  YES.

19  Q.  YOU'RE SUPPOSED TO REVIEW THE FDA PRECAUTION; RIGHT?

20  A.  YES.

21  Q.  WHEN YOU DO SO, GIVE THEM THE INFORMATION THE FDA HAS PUT

22  IN THE LABEL?

23  A.  WELL, NOT JUST THAT, BECAUSE THE BOTTOM PART ISN'T FROM

24  THE LABEL.

25  Q.  I'LL GET THERE.

1536

1  A.  OKAY.

2  Q.  AS TO WHERE I AM HERE, WHEN YOU'RE DISCUSSING THE

3  PRECAUTIONS SECTION, MAKE SURE YOU GIVE THEM THE VERBATIM

4  INFORMATION FROM THE LABEL; RIGHT?

5  A.  CORRECT.

6  Q.  HERE THERE WAS A SENTENCE THAT THE FDA PUT IN THE VIOXX

7  LABEL ON APRIL 2002 AFTER DISCUSSING A NUMBER OF DIFFERENT

8  CLINICAL STUDIES THAT THE SIGNIFICANCE WAS UNKNOWN.

9  A.  YES.

10  Q.  THAT'S ALSO INFORMATION THAT THE SALES REPS WERE GUIDED TO

11  TELL THEIR PHYSICIANS?

12  A.  THEY WERE SUPPOSED TO EMPHASIZE THAT.

13  Q.  GREAT.  THAT'S ALSO VERBATIM FROM THE LABEL; RIGHT?

14  A.  YES.

15  Q.  THEN YOU GO DOWN HERE, AND THIS WAS THE SENTENCE YOU

16  WANTED ME TO MAKE SURE I REFERENCED; RIGHT?

17  A.  WELL, I JUST WANTED TO POINT OUT THAT WASN'T ON THE LABEL.

18  Q.  AFTER GOING THROUGH ALL OF THE VERBATIM MESSAGES, THE

19  SALES REPRESENTATIVE REMINDS THE DOCTOR THAT MERCK STANDS

20  BEHIND THE OVERALL AND CARDIOVASCULAR SAFETY OF VIOXX; RIGHT?

21  A.  YES.

22  Q.  MAYBE I'M WRONG, BUT I THINK YOU WROTE THAT MESSAGE UP

23  HERE ON PAGE 2 OF THE FLIP CHART?

24  A.  YES, I DID.  SOMETHING SIMILAR.

25  Q.  OKAY.  "FAVORABLE CARDIOVASCULAR SAFETY PROFILE"?

1537

1  A.  (NODS HEAD)

2  Q.  ACTUALLY, THAT PHRASE GENERALLY WASN'T USED AFTER THE

3  LABEL CHANGE; RIGHT?

4  A.  THAT'S CORRECT.

5  Q.  AS OF THE LABELING CHANGE, MERCK SALES REPRESENTATIVES

6  USED THE PHRASE "STANDS BEHIND THE OVERALL AND CARDIOVASCULAR

7  SAFETY OF VIOXX"?

8  A.  CORRECT.

9  Q.  YOU HAVE SEEN, I GUESS IN YOUR WORK IN THIS CASE, LOTS OF

10  DIFFERENT PROMOTIONAL MATERIALS DISSEMINATED BY MERCK?

11  A.  YES.

12  Q.  ARE YOU FAMILIAR WITH THE FDA'S WATCHDOG GROUP CALLED

13  DDMAC?

14  A.  YES.

15  Q.  IS DDMAC THE AGENCY OR THE DIVISION OF FDA WHICH REGULATES

16  AND POLICES PHARMACEUTICAL MARKETING?

17  A.  YES.

18  Q.  IF DDMAC HAD CONCERNS WITH RESPECT TO MARKETING MATERIALS

19  OR PROMOTIONAL MATERIALS, THEY WOULD TELL THE MANUFACTURER OR

20  ASK THAT THEY BE CHANGED; RIGHT?

21  A.  ONLY IF THEY SAW THEM FIRST.

22  Q.  YOU HAVE NEVER SEEN ANY CRITICISM OF FDA DDMAC WITH

23  REGARDS TO THE PROMOTIONAL MESSAGE "MERCK STANDS BEHIND THE

24  OVERALL AND CARDIOVASCULAR SAFETY OF VIOXX"; ISN'T THAT TRUE?

25  A.  I SAW CRITICISM OF A SIMILAR MESSAGE, BUT NOT THAT EXACT

1538

1  ONE.

2  Q.  A DIFFERENT QUESTION, DOCTOR, AND THAT WAS WITH RESPECT TO

3  THIS SPECIFIC MATERIAL WHICH THE SALES REPS WERE INSTRUCTED TO

4  USE WITH THEIR DOCTORS.

5  A.  SO THE QUESTION --

6  Q.  IS IT TRUE THAT YOU HAVE NEVER SEEN ANY FDA CRITICISM OF

7  THE PROMOTIONAL MESSAGE "MERCK STANDS BEHIND THE OVERALL SAFETY

8  OF VIOXX"?

9  A.  CORRECT.

10  Q.  NOW, THERE WAS MORE INFORMATION, OR AT LEAST GUIDELINES,

11  PROVIDED TO SALES REPS ALONG WITH THE LABELING CHANGE; ISN'T

12  THAT RIGHT?

13  A.  YOU MEAN THERE WERE MORE PAGES IN THIS BULLETIN?  IS THAT

14  WHAT YOU'RE ASKING ME?

15  Q.  LET ME HAND UP WHAT'S BEEN MARKED AS EXHIBIT 3087.

16  DOCTOR, DO YOU RECOGNIZE EXHIBIT 3087?

17  A.  IT LOOKS SOMEWHAT FAMILIAR, BUT I HAVEN'T REVIEWED IT IN A

18  WHILE.

19  Q.  IS EXHIBIT 3087 THE TYPE OF INFORMATION THAT YOU ASKED THE

20  PLAINTIFF LAWYERS TO PROVIDE YOU IN YOUR REVIEW FOR THIS CASE?

21  A.  YES.

22  Q.  THIS IS ALSO DATED APRIL 11?

23  A.  YES.

24  Q.  DO YOU RECOGNIZE EXHIBIT 3087 AS A BULLETIN TO THE FIELD

25  ON THE NEW LABEL CHANGE FOR VIOXX?

1539

1  A.  YES.

2  Q.  THE SALES REPRESENTATIVES -- FIRST, JUST SO WE'RE CLEAR

3  HERE, WE HAVE THE FDA HAS MADE THE LABELING CHANGE TO INCLUDE

4  THE VIGOR HEART ATTACK INFORMATION; ISN'T THAT RIGHT?  ON

5  APRIL 11, 2002?

6  A.  YOU'RE ASKING ME IF THAT SAYS THAT?

7  Q.  I'M ASKING WHETHER YOU KNOW THAT ON APRIL 11, 2002, THE

8  FDA CHANGED THE VIOXX LABEL?

9  A.  THAT'S WHAT I BELIEVE IS THE DATE, CORRECT.

10  Q.  THEN WE HAVE "ACTION REQUIRED FOR THE SALES REPS," AND THE

11  SALES REPS ARE TOLD TO "DILIGENTLY FOLLOW ALL ACTIONS WITH

12  PHYSICIANS AND CUSTOMERS"; RIGHT?

13  A.  YES.

14  Q.  THEN DOWN BELOW WE HAVE THE "ACTIONS WITH PHYSICIANS AND

15  CUSTOMERS" OUTLINED?

16  A.  YES.

17  Q.  THIS MORE OR LESS RELATES TO THE PRIOR DOCUMENT YOU AND I

18  JUST TALKED ABOUT WHERE SALES REPRESENTATIVES WERE INSTRUCTED

19  TO GO OVER THE LABEL CHANGE WITH THEIR DOCTORS?

20  A.  YES.

21  Q.  THEN SALES REPS WERE TOLD "DO NOT PROVIDE PROMOTIONAL

22  MESSAGING UNTIL THE PACKAGE INSERT" -- THAT'S WHAT "PI" MEANS?

23  A.  YES.

24  Q.  THAT'S ANOTHER WORD FOR "LABEL"?

25  A.  YES.

1540

1  Q.  "DO NOT PROVIDE PROMOTIONAL MESSAGING UNTIL THE LABEL HAS

2  BEEN THOROUGHLY REVIEWED WITH THE PHYSICIAN OR CUSTOMER."

3  A.  CORRECT.

4  Q.  THAT WAS THE DIRECTIVE TO THE FIELD; CORRECT?

5  A.  YES.

6  Q.  NOW, I THINK YOU SHOWED THE JURY ONE PROMOTIONAL BROCHURE

7  THIS MORNING WITH REGARD TO VIOXX.

8  A.  A DETAILING PIECE.

9  Q.  DETAILING PIECE.  SORRY IF I MISUSED THE MARKETING LINGO

10  JUST THEN.  SO WE HAVE ONE PROMOTIONAL PIECE WE DISCUSSED THIS

11  MORNING.  BUT, MORE GENERALLY, IS IT THE CASE THAT MERCK

12  INCLUDED ALONG WITH THE DETAIL PIECES A COPY OF THE

13  FDA-APPROVED LABELING FOR VIOXX?

14  A.  YES.

15  Q.  THE PURPOSE OF THAT IS SO A DOCTOR WHO WANTS TO HAVE

16  ADDITIONAL INFORMATION CAN REFER TO THE PACKAGE INSERT; RIGHT?

17  A.  YES.

18  Q.  NOW, YOU USED P1.2004, THIS DOCUMENT HERE?

19  A.  THAT LOOKS CORRECT.

20  Q.  JUST SO WE ARE CLEAR, THIS -- LET ME BACK UP ONE STEP.  IS

21  IT THE CASE THAT DETAIL PIECES SUCH AS THE ONE YOU DISCUSSED

22  WITH THE JURY HAVE TO BE PREPARED CONSISTENT WITH THE LABEL?

23  A.  THAT'S THE POLICY, YES.

24  Q.  SO AT THIS POINT IN TIME -- THIS WAS IN 2001; IS THAT

25  RIGHT?  CAN WE AGREE IT'S BEFORE APRIL 2002?

1541

1  A.  CORRECT.

2  Q.  SO THIS PARTICULAR DETAIL PIECE WAS BEFORE THE FDA AMENDED

3  THE LABEL WITH REGARD TO VIGOR?

4  A.  YES.

5  Q.  SO --

6  A.  IT WAS 2001.

7  Q.  THANK YOU.  SO WERE DIFFERENT MATERIALS USED AFTER THE

8  LABEL WAS CHANGED IN APRIL 2002?

9  A.  SOME ASPECTS OF THE DETAIL PIECE CHANGED.

10  Q.  CERTAINLY, ONE ASPECT THAT CHANGED WAS THE DETAIL PIECE

11  INCLUDED THE UPDATED COPY OF THE FDA-APPROVED LABEL?

12  A.  YES.

13  Q.  NOW, ARE YOU AWARE THAT THIS PARTICULAR DOCUMENT THAT YOU

14  DISCUSSED WITH THE JURY WAS SENT TO THE FDA BY MERCK AND THE

15  DDMAC DIVISION?

16  A.  YES.

17  Q.  IN FACT, MANY OF THE DETAIL AIDS WERE SENT TO FDA;

18  CORRECT?

19  A.  THE QUARTERLY DETAIL PIECES WERE SENT, YES.

20  Q.  THIS WOULD BE AN EXAMPLE OF A QUARTERLY DETAIL PIECE THAT

21  WAS SENT TO FDA, AND SO THE FDA HAD A CHANCE TO LOOK AT IT AS

22  MERCK WAS USING IT WITH DOCTORS; RIGHT?

23  A.  CORRECT.

24  Q.  CERTAINLY, YOU HAVE NEVER SEEN ANY CRITICISM OF THE FDA

25  WATCHDOGS WITH REGARD TO THIS DOCUMENT; RIGHT?

1542

1  A.  CORRECT.

2  Q.  AFTER APRIL 2002, WHEN THE LABEL CHANGED, ALL THOSE

3  QUARTERLY PIECES WERE SENT THE FDA; CORRECT?

4  A.  YES.

5  Q.  YOU HAVE NEVER SEEN ANY CRITICISM BY THE FDA WATCHDOGS

6  WITH REGARD TO THE DETAIL PIECES USED AFTER THE LABEL CHANGE;

7  RIGHT?

8  A.  CORRECT.

9  Q.  NOW, YOU DISCUSSED THIS CV CARD WITH MR. BLIZZARD, AND I

10  THINK THAT'S EXHIBIT 1.2666.

11  A.  THAT LOOKS LIKE IT.

12  Q.  OKAY.  NOW, ARE YOU AWARE, DOCTOR, IN YOUR WORK IN THIS

13  CASE THAT MERCK PROVIDED TO THE FDA WATCHDOGS WHO OVERSEE

14  MARKETING A COPY OF THE CARDIOVASCULAR CARD?

15  A.  YES.

16  Q.  IS IT TRUE, DOCTOR, THAT THE FDA NEVER HAD ANY CRITICISMS

17  OF THE CARDIOVASCULAR --

18  A.  THEY NEVER VOICED ANY CRITICISMS TO MERCK.

19  Q.  YOU NEVER SAW ANY CRITICISMS FROM FDA IN THE REVIEW THAT

20  YOU HAVE DONE IN THIS CASE; CORRECT?

21  A.  CORRECT.

22  Q.  NOW, I THINK YOU WENT THROUGH THIS DOCUMENT WITH

23  MR. BLIZZARD IN PART AND HE ASKED YOU WHETHER YOU SAW --

24  THROUGH YOUR MARKETING HAT OR LENS, WHETHER YOU SAW ANY

25  MESSAGES IN THIS DOCUMENT.  DO YOU RECALL HAVING THAT

1543

1  DISCUSSION?

2  A.  YES.

3  Q.  ONE OF THE THINGS YOU SAID WAS THIS PLACEBO MESSAGE THAT

4  YOU TALKED ABOUT; CORRECT?

5  A.  YES.

6  Q.  I THINK YOU INDICATED -- MAYBE IT WASN'T THIS DOCUMENT OR

7  ANOTHER ONE -- YOU COUNTED HOW MANY TIMES YOU SAW, AS A

8  MARKETING PERSON, THIS MESSAGE; RIGHT?

9  A.  NOT IN THIS DOCUMENT, BUT ANOTHER ONE.

10  Q.  BUT YOU CERTAINLY COMMENTED, I THINK, THAT YOU SAW THROUGH

11  YOUR MARKETING PROFESSOR LENS THE PLACEBO MESSAGE MADE IN THIS

12  DOCUMENT.

13  A.  YES.

14  Q.  WHAT YOU WERE REFERRING TO, IF I UNDERSTOOD YOU CORRECTLY,

15  WAS THIS, AT LEAST IN PART, WAS TO THIS TABLE HERE?

16  A.  YES.

17  Q.  DO YOU UNDERSTAND, DOCTOR, THAT THIS INFORMATION ON VIOXX

18  AND PLACEBO AND OTHER ANTI-INFLAMMATORY MEDICINES COME FROM THE

19  CLINICAL TRIALS?

20      MR. BLIZZARD:  OBJECTION, YOUR HONOR.  THIS IS NOT

21  THE SCIENTIST TO TESTIFY ABOUT THAT, AND I ANTICIPATE THEY

22  WOULD BE CALLING SOME PEOPLE AND WE'LL HAVE A DISAGREEMENT

23  ABOUT IT.

24      THE COURT:  WELL, DO YOU KNOW THAT ONE WAY OR

25  ANOTHER, MA'AM?

1544

1       THE WITNESS:  NO.

2       THE COURT:  OKAY.

3   BY MR. ISMAIL:

4   Q.  ALL RIGHT.  WHEN YOU COMMENTED TO THE JURY THAT YOU SAW IN

5   THIS TABLE A -- FIRST OF ALL, THE CARDIOVASCULAR CARD WAS

6   INTENDED TO BE USED WITH PHYSICIANS TRAINED IN MEDICINE; RIGHT?

7   A.  CORRECT.

8   Q.  NOT WITH MARKETING PEOPLE; RIGHT?  IT WASN'T MEANT TO BE

9   USED WITH MARKETING PROFESSORS OR MARKETING STUDENTS; RIGHT?

10  A.  CORRECT.

11  Q.  WHEN YOU SAID TO THE JURY THAT YOU SAW IN THIS DOCUMENT,

12  THROUGH YOUR LENS AS A MARKETING PROFESSOR, THE PLACEBO

13  MESSAGE, YOU'RE REFERRING TO THE DATA THAT'S REFLECTED IN THE

14  DOCUMENT; CORRECT?

15  A.  ALSO THE SUMMARY AT THE BOTTOM.

16  Q.  SO THE SUMMARY OF THE DATA THAT'S IN THE DOCUMENT?

17  A.  CORRECT.

18  Q.  WOULD YOU AGREE WITH MR. BLIZZARD'S OBJECTION THAT YOU'RE

19  NOT THE PERSON THAT WE SHOULD BE ASKING AS TO WHETHER THIS DATA

20  IS ACCURATE OR NOT?

21  A.  CORRECT.

22  Q.  DOCTOR, DO YOU RECALL TELLING US IN YOUR DEPOSITION, WITH

23  REGARD TO THIS DOCUMENT, YOU AGREE THERE ARE NO FALSE

24  STATEMENTS MADE IN THE CARDIOVASCULAR CARD?

25      MR. BLIZZARD:  YOUR HONOR, MAY WE APPROACH?

1545

1       THE COURT:  OKAY.

2           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

3   THE BENCH.)

4           MR. BLIZZARD:  YOUR HONOR, I THINK HE IS NOW ABOUT TO

5   OPEN THE DOOR TO THIS WHOLE ISSUE OF WHETHER THESE STATEMENTS

6   ARE FALSE, WHICH I PURPOSELY STAYED OUT OF BASED UPON THE

7   COURT'S INSTRUCTION.  NOW HE WANTS TO USE THE REVERSE OF IT TO

8   SHOW SHE IS NOT SAYING ANY OF THESE SELECTED ITEMS HE IS

9   PICKING OUT ARE FALSE.

10          MR. ISMAIL:  YOU CAN'T OPEN THE DOOR TO AN

11  UNQUALIFIED OPINION.  SHE IS NOT IN A POSITION TO OPINE THE

12  MATERIAL IS MISLEADING.  IF YOUR HONOR WANTS ME TO WITHDRAW THE

13  QUESTION --

14          THE COURT:  YES.  LET'S WITHDRAW IT.  YOU CAN RESTATE

15  IT THE WAY YOU DID THE OTHER.  SOMEBODY ELSE IS BETTER

16  QUALIFIED.  I THINK THAT'S A LEGITIMATE OBJECTION.  SUSTAINED.

17          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

18  OPEN COURT.)

19  BY MR. ISMAIL:

20  Q.  TO REPHRASE MY QUESTION, MA'AM, WOULD YOU AGREE THAT YOU

21  ARE NOT THE PERSON WE SHOULD BE TALKING TO WITH REGARDS TO

22  WHETHER THE DATA CONTAINED IN THIS CARDIOVASCULAR CARD IS

23  ACCURATE?

24  A.  CORRECT.

25  Q.  NOW, YOU ALSO DISCUSSED, I THINK, A DOCUMENT SENT TO

1546

1  MS. OLSON, WHICH WAS THE NOVEMBER 2001 LETTER?

2  A.  CORRECT.

3  Q.  JUST LIKE MR. BLIZZARD, I'M NOT GOING TO BE ASKING YOU

4  WHAT YOU THINK MS. OLSON UNDERSTOOD AFTER READING THIS

5  DOCUMENT; I JUST WANT TO UNDERSTAND WHAT IT IS THAT YOU, IN

6  FACT, TOLD THE JURY THIS MORNING.  OKAY?

7  A.  OKAY.

8  Q.  NOW, THIS WAS THE DOCUMENT THAT YOU COUNTED UP THE NUMBER

9  OF TIMES -- LET ME BACK UP ONE SECOND.  THIS MORNING, WHEN YOU

10  WENT OVER THIS DOCUMENT, I THINK YOU TOLD US THAT, THROUGH YOUR

11  MARKETING PROFESSOR LENS, YOU SAW PROMOTIONAL MESSAGES IN HERE;

12  RIGHT?

13  A.  CORRECT.

14  Q.  YOU SAW, I THINK YOU TOLD US, THE PLACEBO MESSAGE; RIGHT?

15  A.  YES.

16  Q.  YOU GAVE THE JURY SOME NUMBER OF TIMES YOU SAW THE

17  MESSAGE?

18  A.  YES.

19  Q.  IN PART, WHAT YOU DID WHEN YOU MADE THAT TALLY WAS TO

20  COUNT THINGS LIKE THIS IN THE LETTER; RIGHT?

21  A.  YES.

22  Q.  SO WHAT I'VE SHOWN ON THE SCREEN HERE IS SOME OF THE DATA

23  THAT IS COMMUNICATED TO THE RECIPIENT OF THIS LETTER WITH

24  REGARD TO VIOXX AND PLACEBO AND OTHER ANTI-INFLAMMATORIES;

25  RIGHT?

1547

1  A.  YES.

2  Q.  YOU WENT THROUGH AND YOU SAID, WELL, THERE IS A TIME THAT

3  PLACEBO IS MENTIONED, SO YOU PUT A LITTLE TALLY MARK IN THAT

4  COLUMN.  THEN, AS YOU WALKED THROUGH THIS DOCUMENT, YOU FOUND,

5  FOR EXAMPLE, OTHER DATA THAT WAS SET FORTH BY MERCK IN THIS

6  LETTER TO MS. OLSON.  RIGHT?

7  A.  I TABULATED THE TIMES WHEN THEY SAID THAT THEY WERE

8  COMPARABLE.

9  Q.  RIGHT.  SO WHEN MERCK PUT FORTH THE DATA SHOWING THE

10  COMPARABILITY OF VIOXX TO PLACEBO, YOU COUNTED THAT AS A

11  MESSAGE?

12  A.  YES.

13  Q.  WOULD YOU AGREE, MA'AM, THAT YOU'RE NOT THE PERSON WE

14  SHOULD BE TALKING TO TO FIND OUT WHETHER THE DATA THAT MERCK

15  PUT IN THIS LETTER TO MS. OLSON WAS ACCURATE OR NOT?

16  A.  I AGREE.

17  Q.  NOW, I THINK YOU WENT OVER TWO GRAPHS WITH MR. BLIZZARD

18  THAT SORT OF TRACK PRESCRIPTIONS OR SALES -- I KIND OF LOST

19  TRACK, BUT AT LEAST SOME GRAPH OVER TIME, AND YOU STARTED IN

20  2001 AND YOU KIND OF ROLLED FORWARD.  DO YOU RECALL DOING THAT?

21  A.  THERE WAS ONE GRAPH ON SALES.

22  Q.  OKAY.  I THINK YOU AND MR. BLIZZARD HIGHLIGHTED THIS

23  DOWNWARD SPIKE THAT HAPPENED AFTER AUGUST OF 2001?

24  A.  I DON'T REMEMBER IF HE HIGHLIGHTED IT, BUT THERE WAS A

25  DOWNWARD SPIKE.

1548

1  Q.  DO YOU RECALL THAT, IN ONE OF THE TRACKING DOCUMENTS THAT

2  YOU AND HE DISCUSSED, THERE WAS SORT OF A CHANGE IN PERCEPTION

3  AFTER AUGUST OF 2001, AND MR. BLIZZARD MADE SOME COMMENT ABOUT

4  THE "JAVA" ARTICLE.  DO YOU RECALL HIM DOING THAT THIS MORNING?

5  IT WAS JOKINGLY REFERRED TO "JAVA," BUT IT'S THE JAMA ARTICLE.

6  A.  YES.

7  Q.  OKAY.  SO JUST SO WE'RE ORIENTED AGAIN ON THE TIME, THERE

8  WAS AN ARTICLE THAT CAME OUT IN AUGUST OF 2001 AND THAT ARTICLE

9  COMMUNICATED SOME INFORMATION ABOUT VIOXX THAT AFFECTED SALES

10  AND AFFECTED PEOPLE'S PERCEPTION OF THE PROBLEM?

11  A.  YES.  PHYSICIANS' BELIEFS OR PERCEPTIONS, YES.

12  Q.  GOING BACK TO THIS LETTER TO MS. OLSON, ON PAGE 3 OF THE

13  DOCUMENT THERE'S A REFERENCE TO AN ARTICLE BY MUKHERJEE.

14  A.  YES.

15  Q.  DO YOU RECOGNIZE THIS REFERENCE TO THE ARTICLE, THE JAMA

16  ARTICLE, THAT YOU TOLD THE JURY CHANGED PEOPLE'S PERCEPTIONS OF

17  VIOXX?

18  A.  YES.

19  Q.  IN THIS LETTER TO MS. OLSON, THERE'S A REFERENCE TO THIS

20  JAMA ARTICLE; CORRECT?

21  A.  YES.

22  Q.  THEN THERE'S A DISCUSSION OF THE CONCLUSIONS REACHED BY

23  THOSE AUTHORS; RIGHT?

24  A.  THAT'S PART OF WHAT'S SAID ABOUT IT.

25  Q.  INCLUDING THE AUTHOR'S CONCLUSION IN THE MUKHERJEE ARTICLE

1549

1  THAT VIOXX HAD A HIGHER RATE THAN BACKGROUND IN THEIR ANALYSIS;

2  RIGHT?

3  A.  YES.

4  Q.  NOW, WE HAVE TALKED A LOT ABOUT THIS WITH YOU TODAY AND

5  WITH OTHER WITNESSES, THIS CONCEPT OF THE LABEL.  BEFORE I GO

6  FURTHER ON THIS, JUST TO UNDERSTAND YOUR BACKGROUND, AM I

7  CORRECT THAT YOU HAVE NEVER DRAFTED A LABEL FOR A PRESCRIPTION

8  DRUG?

9  A.  CORRECT.

10  Q.  YOU DO NOT CONSIDER YOURSELF AN EXPERT IN THE WORDING FOR

11  PHARMACEUTICAL DRUG LABELS?

12  A.  CORRECT.

13  Q.  YOU UNDERSTAND IT'S NOT YOUR ROLE HERE TODAY TO

14  SECOND-GUESS THE FDA SCIENTISTS' DECISION TO IMPROVE THE

15  WORDING IN THE VIOXX LABEL?

16  A.  I AGREE.

17  Q.  SO I'M NOT GOING TO ASK YOU TO GO FURTHER IN YOUR

18  INTERPRETATION OF THE LABEL, BUT WOULD YOU AGREE JUST AS A

19  GENERAL MATTER THAT THE APRIL 2002 PACKAGE INSERT, THE LABEL

20  THAT WAS APPROVED BY THE FDA, WAS WIDELY DISTRIBUTED TO DOCTORS

21  IN THE UNITED STATES?

22  A.  THAT'S WHAT THE MARKETING MATERIALS INDICATE, YES.

23  Q.  YOU INDICATED TO MR. BLIZZARD WITH RESPECT TO THE CALL

24  NOTES THAT YOU REVIEWED IN THIS CASE SOME OF THE MATERIAL THAT

25  HE DISCUSSED WITH YOU.  MY QUESTION IS, MA'AM:  DO YOU RECALL

1550

1   SEEING REFERENCES IN THE CALL NOTES YOU REVIEWED WITH REGARD TO

2   MS. OLSON THAT MERCK'S SALES REPRESENTATIVES SHOWED MS. OLSON

3   THE REVISED VIOXX LABEL?

4   A.  I WOULD HAVE TO REVIEW THE CALL NOTES TO SEE EXACTLY WHAT

5   IT SAYS.  WOULD YOU LIKE ME TO DO THAT?

6   Q.  OR I COULD SHOW YOU YOUR DEPOSITION WHERE YOU ANSWERED

7   THAT QUESTION BEFORE.

8   A.  PROBABLY BECAUSE I WAS LOOKING AT THE CALL NOTES, BUT THEY

9   DEFINITELY -- THERE IS A MENTION OF THE LABEL IN HERE.

10  Q.  THERE IS A MENTION OF THE SALES REPRESENTATIVES

11  INTERACTING AND DISCUSSING WITH MS. OLSON AFTER APRIL 2002 THE

12  VIOXX LABEL CHANGE; RIGHT?

13       MR. BLIZZARD:  OBJECTION, YOUR HONOR.  I THINK, IF WE

14  SHOW THE CALL NOTE, IT DOESN'T SAY EXACTLY THAT, SO I WOULD

15  PREFER THAT WE SHOW THE CALL NOTE.

16       THE COURT:  OR YOU CAN USE THE DEPOSITION.

17  BY MR. ISMAIL:

18  Q.  LET ME ASK THE QUESTION THIS WAY:  WE WENT OVER THE

19  BULLETIN TO THE FIELD IN APRIL OF 2002, THE 11TH BULLETIN.  DO

20  YOU RECALL DOING THAT?

21  A.  YES.

22  Q.  YOU RECALL THAT INFORMATION WAS DISSEMINATED ABOUT THE

23  LABEL CHANGE THROUGH THE SALES REPRESENTATIVES THROUGH THAT

24  BULLETIN; CORRECT?

25  A.  YES.

1551

1  Q.  DO YOU RECALL INFORMATION WAS DISSEMINATED ABOUT THE LABEL

2  CHANGE THROUGH DEAR DOCTOR LETTERS TO PHYSICIANS?

3  A.  YES.

4  Q.  DO YOU RECALL THAT THE DEAR DOCTOR LETTER MERCK SENT OUT

5  WAS HIGHLIGHTED?  CORRECT?

6  A.  YES.

7  Q.  YOU AGREE FROM A MARKETING PROFESSIONAL'S POINT OF VIEW

8  THAT HIGHLIGHTING A LABEL TO NOTE THE CHANGES IS A GOOD WAY TO

9  DRAW ATTENTION TO IT?

10  A.  YES.

11       MR. ISMAIL:  ONE MINUTE, YOUR HONOR.  I MAY BE DONE.

12  THANK YOU, YOUR HONOR.  I DON'T HAVE ANY FURTHER QUESTIONS.

13       THE COURT:  ANY REDIRECT?

14       MR. BLIZZARD:  JUST A FEW, YOUR HONOR.

15             REDIRECT EXAMINATION

16  BY MR. BLIZZARD:

17  Q.  DO YOU HAVE THE CALL NOTE HANDY?

18  A.  YES, I DO.

19  Q.  CAN WE PUT UP THE SEVENTH PAGE OF THE CALL NOTE.  IF YOU

20  WILL READ THE CALL NOTE FOR 4-16-2002, PLEASE.

21  A.  "SHE DID NOT EXPRESS ANY CONCERNS REGARDING THE PI

22  CHANGES."

23  Q.  HOW IS THAT DESCRIBED TO THE LEFT OF THAT ITEM BY THE

24  SALES REP?

25  A.  "ACCOMPLISHMENTS."

1552

1 Q.  NOW, WITH RESPECT TO THE --

2        MR. ISMAIL:  YOUR HONOR, CAN WE ASK THAT THE WITNESS

3 ALSO READ THE APRIL 22 CALL NOTE WHICH DISCUSSES NEW VIOXX

4 PACKAGE INSERT?

5        THE COURT:  LET'S PUT IT BACK UP.

6        MR. ISMAIL:  IT'S ALSO NOTED THERE.  THANK YOU,

7 YOUR HONOR.

8 BY MR. BLIZZARD:

9 Q.  WHAT DOES THAT SAY?

10 A.  "RFM WITH ROBERT," AND "RFM" MEANS

11 REPRESENTATIVE-FACILITATED MEETING WITH ROBERT.  "NEW V" --

12 VIOXX -- "PI INSERT."  "PATIENT ASSISTANCE PROGRAM."  "ADDED

13 HER TO SAMPLE SIGNATURE FILE."

14 Q.  OKAY.

15 A.  "ACCOMPLISHMENT."

16 Q.  OKAY.  WE'LL GO TO THE PIR THAT WE HAVE BEEN DISCUSSING

17 FOR NURSE OLSON THAT'S IN EVIDENCE.

18 A.  OKAY.

19 Q.  I'LL JUST ASK YOU THIS.  THERE WAS SOME INFORMATION ABOUT

20 THE JAMA ARTICLE THAT WAS DISCUSSED WITH YOU.  DOES IT JUST

21 QUOTE FROM THE JAMA ARTICLE?

22 A.  NO.

23 Q.  WHAT ADDITIONAL INFORMATION IS INCLUDED THERE ABOUT THIS

24 ARTICLE THAT IS NOT JUST SIMPLY A QUOTE FROM THE JAMA ARTICLE?

25 A.  I WOULD HAVE TO FIND IT.

1553

1 Q. MAYBE WE CAN PUT IT UP ON THE SCREEN IN THE INTEREST OF

2 TIME, IF YOU'LL LOOK OVER ON THE THIRD PAGE, SECOND PARAGRAPH,

3 IN THE ARTICLE IN FRONT OF YOU, DOCTOR.

4 A. YES.

5 Q. "THE RECENT ARTICLE DISCUSSING THE CARDIOVASCULAR EFFECTS

6 OF COX-2 SELECTIVE INHIBITORS," MUKHERJEE, IS THAT THE ARTICLE?

7 A. YES.

8 Q. THEN IT DISCUSSES THE MUKHERJEE ARTICLE. IS THERE

9 ADDITIONAL INFORMATION THERE THAT'S NOT IN THE ARTICLE?

10 A. IN THE NEXT PARAGRAPH, THERE IS.

11 Q. OKAY. COULD YOU READ THAT FOR US, PLEASE.

12 A. WELL, IT'S THE ENTIRE PARAGRAPH, BUT I CAN READ THE

13 SUMMARY AT THE END.

14 Q. OKAY. SO ARE YOU TALKING ABOUT THE PARAGRAPH THAT BEGINS

15 "UNLIKE THE VIGOR TRIAL"?

16 A. YES.

17 Q. WHAT IS COMMUNICATED BY THAT SECOND PARAGRAPH BELOW THE

18 DESCRIPTION OF THE MUKHERJEE ARTICLE?

19      MR. ISMAIL: OBJECTION, YOUR HONOR. IT'S NOT

20 DISCUSSING THE MUKHERJEE.

21      THE COURT: WELL --

22      MR. ISMAIL: I DIDN'T ASK HER ABOUT OTHER SCIENTIFIC

23 ARTICLES --

24      THE WITNESS: YES, IT DOES. IT'S DISCUSSING --

25      MR. BLIZZARD: RIGHT. YOUR HONOR, IT SAYS, "UNLIKE

1554

1  THE VIGOR TRIAL, THE DATA USED IN THE META-ANALYSIS" --

2       THE COURT:  WHY DON'T YOU ASK HER WHAT PORTION OF

3  THAT DISCUSSES THE --

4  BY MR. BLIZZARD:

5  Q.  WHAT PORTION OF IT DISCUSSES THE --

6  A.  WELL, IF YOU SEE IN THAT FIRST PARAGRAPH THAT'S THE SQUARE

7  YOU'VE GOT THIS NAME -- OH, MY LORD -- SANMUGANATHAN, ET AL.

8  Q.  RIGHT.

9  A.  SO THAT'S THE DATA THAT THE JAMA ARTICLE USED AS THE

10  BASELINE TO THE MI RATE.

11  Q.  OKAY.

12  A.  IT'S THAT BASELINE DATA THAT IS THE BASIS FOR THE

13  CONCLUSION THAT IS CRITICIZING THE NEXT PARAGRAPH.

14  Q.  SO THE PARAGRAPH THAT STARTS "UNLIKE THE VIGOR TRIAL" IS A

15  CRITICISM OF THE BASELINE DATA FOR THE JAMA ARTICLE?

16       MR. ISMAIL:  OBJECTION, LEADING.

17       THE COURT:  RESTATE IT.

18  BY MR. BLIZZARD:

19  Q.  WHAT IS IT?

20  A.  THAT PARAGRAPH IS A CRITICISM OF THE BASELINE DATA USED IN

21  THE JAMA ARTICLE.

22  Q.  SO IS THIS -- WELL, WE'LL LEAVE IT THERE.  NOW, WITH

23  RESPECT TO A COUPLE OF OTHER ITEMS THAT WERE COVERED IN YOUR

24  CROSS-EXAMINATION, FIRST OF ALL, THERE WAS SOME DISCUSSION

25  ABOUT PRESCRIPTION MEDICATIONS AND WHERE DOCTORS GET THEIR

1555

1  INFORMATION.  OKAY?

2  A.  YES.

3  Q.  DO YOU KNOW WHETHER MERCK OR OTHER PHARMACEUTICAL

4  COMPANIES SOMETIMES HAS INFLUENCE ON WHAT IS PUBLISHED IN

5  MEDICAL JOURNALS?

6  A.  YES.

7  Q.  OKAY.  SO WHAT --

8       MR. ISMAIL:  YOUR HONOR, THIS IS OUTSIDE THE SCOPE OF

9  HER EXPERT DESIGNATION AND HER QUALIFICATIONS.

10      THE COURT:  YES.  I SUSTAIN THAT OBJECTION.

11  BY MR. BLIZZARD:

12  Q.  WELL, YOU TALKED EARLIER, I MEAN, ONE OF THE ISSUES THAT

13  WAS RAISED WAS MEDICAL CONFERENCES THAT PHYSICIANS ATTEND IS

14  ANOTHER SOURCE OF INFORMATION.  AS PART OF THE PLAN THAT YOU

15  TESTIFIED ABOUT, IS THERE INFORMATION IN THERE ABOUT MERCK

16  SPONSORING SOME OF THESE MEDICAL CONFERENCES?

17  A.  YES.

18  Q.  NOW, WITH RESPECT TO THIS OBSTACLE RESPONSE GUIDE THAT WE

19  PREVIOUSLY PUT ON THE SCREEN THAT DEALT WITH HOW TO HANDLE THE

20  LABEL WHERE THERE WAS "REVIEW LABEL," "REVIEW PRECAUTIONS

21  SECTION OF THE LABEL FOR PLACEBO-CONTROLLED TRIALS," AND THEN

22  UNDERNEATH THAT THERE WAS ITEM 4, "SIGNIFICANCE UNKNOWN," AND

23  THEN ITEM 5, "MERCK STANDS BEHIND THE OVERALL CV SAFETY OF

24  VIOXX --

25  A.  YES.

1556

1  Q.  -- IS THE SEQUENCING OF THAT DISCUSSION IMPORTANT IN

2  MARKETING?

3  A.  YES.

4  Q.  WHY?

5  A.  BECAUSE THE FINAL STATEMENT IS THE PITCH OR THE

6  CONCLUSION.

7  Q.  YOU WERE ASKED WHETHER OR NOT MERCK EVER WAS CRITICIZED BY

8  DDMAC FOR THE STATEMENT "STANDS BY THE OVERALL CARDIOVASCULAR

9  SAFETY OF VIOXX."  DO YOU REMEMBER THAT?

10  A.  YES.

11  Q.  DID DDMAC HAVE OTHER CRITICISMS OF MERCK FOR SIMILAR

12  WORDING?

13  A.  YES.

14  Q.  WHICH WORDING?

15  A.  THE FIRST WORDING THAT WE LISTED, "VIOXX HAS A FAVORABLE

16  CARDIOVASCULAR SAFETY PROFILE."

17  Q.  OKAY.  SO HOW IS THAT DIFFERENT FROM "MERCK STANDS BEHIND

18  THE OVERALL CARDIOVASCULAR SAFETY"?

19       MR. ISMAIL:  OBJECTION.  IT'S BEYOND HER EXPERT

20  QUALIFICATIONS TO PARSE THE INFORMATION THAT DOCTORS

21  UNDERSTAND.

22       THE COURT:  HE IS ASKING YOU NOT WHAT DOCTORS

23  UNDERSTAND, AS I UNDERSTAND, WHAT THEIR APPROACH WAS.

24  BY MR. BLIZZARD:

25  Q.  HOW IS THE MARKETING MESSAGE DIFFERENT?

1557

1   A.  IT ISN'T.

2   Q.  NOW, YOU WERE ALSO ASKED ABOUT OTHER DDMAC SCRUTINY OF

3   MERCK'S MARKETING MESSAGES.

4   A.  YES.

5   Q.  I'M NOT GOING TO GET INTO THE DETAILS OF THIS WITH YOU --

6   WE'LL COVER IT WITH OTHER WITNESSES -- BUT ARE YOU AWARE OF

7   DDMAC'S CRITICISM OF SPECIFIC MERCK MARKETING MESSAGES THAT

8   WERE PART OF THIS INTEGRATED CAMPAIGN?

9   A.  YES.

10       MR. BLIZZARD:  THOSE ARE THE ONLY QUESTIONS WE HAVE,

11   YOUR HONOR.

12       THE COURT:  WE WILL STOP HERE AND COME BACK AT 1:00.

13       THE DEPUTY CLERK:  EVERYONE RISE.

14       (WHEREUPON, THE JURY EXITED THE COURTROOM.)

15       THE COURT:  OKAY.

16       MS. CARTER:  WE HAVE A NUMBER OF MEDICAL RECORDS THAT

17   WERE ENTERED UNDER ZEBRACK, BUT WE WOULD LIKE FOR THEM ALSO TO

18   BE ENTERED UNDER SYMKOVIAK BECAUSE, WHEN THE JURORS GO BACK,

19   THEY'RE GOING TO HAVE THEM IN THE NOTEBOOK.  IF THEY ARE

20   LOOKING FOR SYMKOVIAK RECORDS, I WOULD LIKE THEM TO HAVE THEM

21   EASILY ACCESSIBLE.  OTHERWISE, I DON'T THINK WE HAVE ANY ISSUES

22   ON ZEBRACK BECAUSE THAT WAS ONLY 1.5028.

23       THE COURT:  ALL RIGHT.  I DON'T HAVE ANY PROBLEM WITH

24   THAT, BUT WHEN YOU DO YOUR EXHIBIT INDEX JUST MENTION THAT SO

25   THAT THE JURY IS NOT CONFUSED.

1558

1       MS. CARTER:  OKAY.  DO YOU WANT ME TO FORMALLY OFFER

2  THEM NOW OR DO YOU WANT US TO DO THAT IN FRONT OF THE JURY?

3       THE COURT:  SURE.

4       MS. CARTER:  PLAINTIFFS OFFER 1.5022, 1.5023, 1.5024,

5  1.5025, 1.5026, 1.5027, 1.5029, AND 1.5030.

6       MS. COOK:  NO OBJECTION.

7       THE COURT:  LET THEM BE ADMITTED.

8       MS. CARTER:  ON THE BAUMGARTNER EXHIBITS, I WILL JUST

9  CALL THEM OUT, AND DO YOU WANT TO DEAL WITH YOUR OBJECTIONS AS

10  WE GET TO THEM?

11       MS. COOK:  SURE.

12       MS. CARTER:  PLAINTIFFS OFFER 1.1711.

13       MS. COOK:  THIS IS MS. BAUMGARTNER'S EMPLOYEE

14  EVALUATION FOR THE YEAR 2001.  WE HAVE A RELEVANCE AND 403

15  OBJECTION JUST TO HAVING AN EMPLOYEE'S JOB EVALUATION IN FRONT

16  OF THE JURY.

17       THE COURT:  WHAT DO YOU NEED THAT FOR?

18       MS. CARTER:  YOUR HONOR, THE JOB EVALUATION, IT GOES

19  INTO WHAT HER RESPONSIBILITIES WERE AND IT'S RELEVANT TO HER

20  TESTIMONY.

21       THE COURT:  ALL RIGHT.  I'LL OVERRULE THE OBJECTION

22  AND RECEIVE IT.

23       MS. CARTER:  1.0415.

24       MS. COOK:  THIS IS ONE OF THE SEVERAL DOCUMENTS THAT

25  DEAL WITH THE PHYSICIANS TO NEUTRALIZE.  WE HAVE A STANDING

1559

1 OBJECTION TO THESE FOR 401, 402, 403.  ALSO, THERE'S A NUMBER

2 OF THEM, AS YOU WILL SEE, AND WE OBJECT TO THEM AS BEING

3 CUMULATIVE.

4      THE COURT:  I'LL OVERRULE THAT OBJECTION.  I THINK

5 THEY ARE RELEVANT.  I DON'T SEE IT'S PROBLEMATIC UNDER 403.

6      MS. CARTER:  THE NEXT ONE I THINK THAT FALLS IN THE

7 SAME CATEGORY IS 1.2612.

8      THE COURT:  PUT THEM ALL IN AND THEN I'LL RULE.

9      MS. CARTER:  1.0414, 1.0160, 1.0400, 1.1713, 1.1714,

10 1.0408, 1.1718, AND 1.0013.

11      THE COURT:  I UNDERSTAND THERE ARE OBJECTIONS OF

12 RELEVANCY AND OBJECTIONS OF BEING CUMULATIVE, 401 AND 403.

13 I'LL OVERRULE IT AND ALLOW IT.

14      MS. COOK:  IN ADDITION TO THOSE OBJECTIONS, THERE ARE

15 A COUPLE OF DOCUMENTS THAT WE HAVE ADDITIONAL OBJECTIONS.

16 1.0160, IT REFERENCES THE MATERIALS THAT DEAL WITH THE FRIES

17 LETTER INCIDENT, SO THAT FALLS INTO OUR OBJECTION TO THAT

18 GENERAL SUBJECT MATTER.

19      MS. CARTER:  WHICH HAS ALREADY BEEN ALLOWED IN.

20      THE COURT:  I OVERRULE THE OBJECTION.

21      MS. COOK:  1.0408 HAS AN E-MAIL THAT CONTAINS HEARSAY

22 STATEMENTS FROM THIRD-PARTY DOCTORS AND OTHER PEOPLE IN THE

23 FIELD.

24      THE COURT:  WHERE ARE YOU ON THAT?  IF IT IS HEARSAY,

25 IT OUGHT TO BE ABLE TO BE EXTRACTED.

1560

1      MS. CARTER:  IT'S REGARDING THE NEUTRALIZING OF

2  DOCTORS.

3      THE COURT:  WHAT DOES IT DO WITH THAT?  WHAT'S THE

4  HEARSAY?

5      MS. COOK:  "I HAVE HEARD THAT SIMON HAD BEEN MOSTLY

6  FAIRLY BALANCED" IS ONE EXAMPLE.  I CAN HAND IT UP IF YOU WANT

7  TO TAKE A QUICK LOOK AT IT.

8      THE COURT:  SURE.

9      MS. CARTER:  I WOULD POINT OUR, YOUR HONOR, THAT

10  THESE ARE STATEMENTS MADE BY MS. BAUMGARTNER AND SHE'S USING

11  THEM IN HER WORK TO NEUTRALIZE DOCTORS.

12      THE COURT:  I THINK THE THRUST OF IT REALLY GOES TO

13  HER ACTIONS RATHER THAN THE VALIDITY OF THE PARTIES.  I DON'T

14  SEE THIS AS BEING SIGNIFICANT.  I'LL OVERRULE THE OBJECTION.

15      MS. CARTER:  THAT'S ALL WE HAVE FOR NOW, YOUR HONOR.

16      MS. COOK:  ONE MORE.  1.0400 IS MS. BAUMGARTNER'S

17  CALENDAR FOR THE ENTIRE YEAR OF 2001.  IT SEEMS TO BE A

18  RELEVANCE ISSUE.  IF ANY OF IT IS GOING IN, WE WOULD LIKE THE

19  WHOLE CALENDAR GOING IN.

20      MS. CARTER:  YOUR HONOR, WE ARE ONLY OFFERING ONE

21  PAGE.

22      THE COURT:  WELL, IF YOU WANT THE WHOLE CALENDAR, YOU

23  CAN DO THAT.

24      MS. COOK:  OKAY.  WE'D LIKE THAT.

25      MS. CARTER:  WE'LL TAKE CARE OF THAT, THEN.

1561

1       THE COURT:  ANY OTHER EXHIBITS?

2       MS. COOK:  NO.

3       THE COURT:  THANK YOU VERY MUCH.  COURT WILL STAND IN

4   RECESS.

5       THE DEPUTY CLERK:  EVERYONE RISE.

6               (LUNCHEON RECESS)

7               * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1562

1           AFTERNOON SESSION

2           (NOVEMBER 7, 2006)

3      (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4  TRANSCRIBED BY TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT

5  REPORTER.)

6      THE DEPUTY CLERK:  EVERYONE RISE.

7      THE COURT:  BE SEATED, PLEASE.  CALL YOUR NEXT

8  WITNESS.

9      MR. BLIZZARD:  THE PLAINTIFF CALLS BY VIDEO

10  DEPOSITION ERIC TOPOL A CARDIOLOGIST IN CLEVELAND, OHIO.

11      (WHEREUPON, ERIC TOPOL, HAVING BEEN DULY SWORN,

12  TESTIFIED BY DEPOSITION AS FOLLOWS.)

13           DIRECT EXAMINATION

14  BY MR. BLIZZARD:

15  Q.  DR. TOPOL, GOOD MORNING.  NICE TO MEET YOU, SIR.

16  A.  GOOD MORNING.  I WANT TO REVIEW VERY BRIEFLY THE

17  HIGHLIGHTS OF YOUR BACKGROUND.  YOU HAVE A CURRICULUM VITAE.

18  I'M MARKING IT AS EXHIBIT 1 FOR THIS DEPOSITION.

19  Q.  THE VERSION THAT I HAVE IS WHAT I UNDERSTAND TO BE AN

20  ABRIDGED VERSION OF 127 PAGES.  SUFFICE IT TO SAY, YOU HAVE A

21  VERY SUBSTANTIAL CURRICULUM VITAE OUTLINING YOUR BACKGROUND
AND

22  EXPERIENCE; CORRECT?

23  A.  YES.

24  Q.  WHAT IS YOUR CURRENT POSITION, SIR?

25  A.  I'M PROVOST OF THE CLEVELAND CLINIC LERNER COLLEGE OF

1563

1  MEDICINE, CHIEF ACADEMIC OFFICER OF THE CLEVELAND CLINIC, AND

2  ALSO THE CHAIRMAN OF THE DEPARTMENT OF CARDIOVASCULAR MEDICINE

3  OF THE CLEVELAND CLINIC.

4  Q.  TAKE THEM ONE AT A TIME.  IDENTIFY EACH ONE OF THOSE

5  POSITIONS AND TELL ME VERY BRIEFLY WHAT THEY ENTAIL.

6  A.  THE PROVOST OF THE MEDICAL COLLEGE IS PROVIDING THE

7  OVERSIGHT OF THIS COLLEGE OF MEDICINE, WHICH HAD ITS BEGINNING

8  JUST THREE YEARS AGO, AND IT'S PART OF CASE WESTERN RESERVE

9  UNIVERSITY.  THE CHIEF ACADEMIC OFFICER RESPONSIBILITY IS

10  RESPONSIBLE FOR ALL RESEARCH AND EDUCATION HERE AT THIS

11  ACADEMIC MEDICAL CENTER, AND I'VE BEEN CHAIRMAN OF THE

12  DEPARTMENT OF CARDIOVASCULAR MEDICINE SINCE 1991, AND THIS IS A

13  LARGE DEPARTMENT, ONE OF THE LARGEST DEPARTMENTS IN

14  CARDIOVASCULAR MEDICINE IN THE COUNTRY.

15  Q.  MY UNDERSTANDING, SIR, THAT THIS -- AND YOU ARE A

16  CARDIOLOGIST; IS THAT CORRECT?

17  A.  THAT'S RIGHT.

18  Q.  TRAINED AS A CARDIOLOGIST; CORRECT?

19  A.  THAT'S EXACTLY RIGHT.

20  Q.  YOU DID YOUR UNDERGRADUATE DEGREE AT THE UNIVERSITY OF

21  VIRGINIA, YOUR MEDICAL SCHOOL AT THE UNIVERSITY OF ROCHESTER, A

22  RESIDENCY AT THE UNIVERSITY OF CALIFORNIA, SAN FRANCISCO, A

23  FELLOWSHIP AT JOHNS HOPKINS IN CARDIOLOGY, AND THEN YOU BECAME

24  BOARD-CERTIFIED IN INTERNAL MEDICINE AND IN CARDIOLOGY.  ALL

25  CORRECT?

1564

1  A.  THAT'S ALL CORRECT.

2  Q.  THEN YOU PRACTICED MEDICINE AND EVENTUALLY WORKED YOURSELF

3  UP TO BECOME THE TOP PERSON IN THE DEPARTMENT OF CARDIOVASCULAR

4  MEDICINE AT THE CLEVELAND CLINIC; CORRECT?

5  A.  THAT'S CORRECT, YES.  AS OF 1991, I CAME TO CLEVELAND

6  CLINIC.

7  Q.  WHEN DID YOU BECOME CHAIRMAN OF THE DEPARTMENT OF

8  CARDIOVASCULAR MEDICINE?

9  A.  ON MY ARRIVAL.

10  Q.  OH, RIGHT ON YOUR ARRIVAL?

11  A.  YES.  THAT WAS WHY I WAS RECRUITED HERE.

12  Q.  WHERE WERE YOU PREVIOUSLY?

13  A.  UNIVERSITY OF MICHIGAN, WHERE I DIRECTED THE

14  CARDIOCATHETERIZATION LABORATORY, AND I WAS A PROFESSOR OF

15  MEDICINE THERE.

16  Q.  YOU'VE SPENT YOUR ENTIRE CAREER AS A PRACTICING

17  CARDIOLOGIST, SIR?

18  A.  YES. I CONTINUE TO PRACTICE CARDIOLOGY WITH PATIENTS.

19  Q.  HOW MANY YEARS HAVE YOU BEEN A CARDIOLOGIST?

20  A.  20 YEARS.

21  Q.  IT MENTIONED THAT YOU'RE THE PROVOST OF THE CLEVELAND

22  CLINIC, AND THAT INVOLVES OVERSEEING THE ENTIRE MEDICAL

23  COLLEGE?

24  A.  THE MEDICAL COLLEGE, WHICH I FOUNDED WITH CASE WESTERN

25  RESERVE UNIVERSITY BACK IN 2001.

1565

1   Q.  IN ADDITION -- OH, AND I MIGHT ADD, THE CLEVELAND CLINIC,

2   SIR, GIVE US A SENTENCE OR TWO ON WHAT IS THE CLEVELAND CLINIC,

3   ESPECIALLY IN HEART MEDICINE.

4   A.  WELL, IN THE FIELD OF HEART MEDICINE, IT'S BEEN RANKED BY

5   THE U.S. NEWS & WORLD REPORT AS THE NUMBER ONE CENTER FOR THE

6   LAST 11 YEARS CONSECUTIVELY.

7   Q.  YOU HAVE BEEN A CLINICAL INVESTIGATOR ON MANY CLINICAL

8   STUDIES; IS THAT CORRECT?

9   A.  THAT'S RIGHT.

10  Q.  TELL US ABOUT IT BRIEFLY, A FEW SENTENCES.

11  A.  WELL, I'VE CHAIRED A NUMBER OF CLINICAL TRIALS OVER THE

12  PAST 20 YEARS. THE MOST WIDELY KNOWN ARE THE SO-CALLED GUSTO

13  TRIALS OF HEART ATTACK.  ALL THESE TRIALS HAD SOMETHING TO DO

14  WITH HEART ATTACK PREVENTION OR BETTER TREATMENT.  THE

15  CUMULATIVE 200,000 PATIENTS WERE ENROLLED, THE LARGEST HEART

16  ATTACK TRIALS EVER PERFORMED IN THE UNITED STATES, COORDINATED.

17  I'VE BEEN THE CHAIR OF ALL OF THOSE TRIALS.  THEY'VE BEEN

18  MULTINATIONAL TRIALS, INVOLVING 40 DIFFERENT COUNTRIES AROUND

19  THE WORLD, AND THESE TRIALS HAVE HAD, I THINK, A SUBSTANTIAL

20  IMPACT ON CLINICAL PRACTICE IN THE FIELD OF CARDIOLOGY AND FOR

21  PATIENTS.

22  Q.  YOU HAVE BEEN AN INVESTIGATOR, ACCORDING TO YOUR VITAE, ON

23  MANY NIH PROJECTS, NATIONAL INSTITUTES OF HEALTH.  BRIEFLY, A

24  FEW SENTENCES, TELL US ABOUT THAT.

25  A.  WELL, THE MAIN ONE IS AT A SPECIALIZED CENTER OF

1566

1  CLINICALLY-ORIENTED RESEARCH, WHICH IS THE FLAGSHIP GRANT OF

2  THE NIH, WHICH I WAS AWARDED A YEAR AGO. IT'S A FIVE-YEAR GRANT

3  FOR NEARLY $18 MILLION TO SUPPORT OUR WORK IN GENETICS AND

4  GENOMICS OF CORONARY ARTERY DISEASE AND HEART ATTACK, AND

5  THAT'S BEEN THE MAIN RESEARCH INTEREST THAT I'VE HAD OVER THE

6  PAST FIVE YEARS, HAS BEEN IN THE GENETICS AND GENOMICS OF HEART

7  ATTACK.

8  Q.  YOU'VE BEEN A MANUSCRIPT REVIEWER FOR A NUMBER OF

9  JOURNALS, PEER REVIEW, INCLUDING NATURE, SCIENCE, THE NEW

10  ENGLAND JOURNAL OF MEDICINE, JAMA, LANCET, AND MANY OTHER

11  PRESTIGIOUS JOURNALS; CORRECT?

12  A.  YES.

13  Q.  I HAVE BY COUNT -- AND I'M DOING ALL OF THIS, I MIGHT SAY,

14  JUST TO SAVE TIME, TO GET THROUGH ALL OF THIS.  YOU HAVE, BY MY

15  COUNT, 909 ORIGINAL PUBLICATIONS IN THE SCIENTIFIC LITERATURE.

16  DOES THAT SOUND ABOUT RIGHT?

17  A.  THAT'S ABOUT RIGHT.

18  Q.  AGAIN, BY MY COUNT, AN AUTHOR OR CO-AUTHOR ON 30 BOOKS?

19  A.  THAT'S CORRECT.

20  Q.  164 BOOK CHAPTERS?

21  A.  THAT'S CORRECT.

22  Q.  THESE ALL DEAL IN THE FIELD OF CARDIOLOGY, SIR?

23  A.  VIRTUALLY ALL ARE CARDIOLOGY PIECES OF WORK, YES.

24  Q.  THERE WAS A RECENT ARTICLE, AND I'D LIKE YOU TO TELL ME IF

25  THIS IS CORRECT, IT SORT OF PULLS SOME THINGS TOGETHER, ON

1567

1   NOVEMBER 11TH IN THE ASSOCIATED PRESS WHICH SAYS, "ONE MEDICAL

2   JOURNAL INDEX SERVICE RANKED TOPOL AS THE EIGHTH-MOST-CITED

3   MEDICAL RESEARCHER AMONG ITS INDEX PUBLICATIONS IN THE PAST TEN

4   YEARS WITH HIS 498 PAPERS CITED BY COLLEAGUES, 21,050 TIMES."

5   IS THAT ABOUT CORRECT?

6   A.   THAT'S CORRECT.  THE ISI RANKS MEDICAL RESEARCHERS, AND IN

7   THE LAST TEN YEARS, I'M RANKED NUMBER EIGHT OF THE MOST WIDELY

8   CITED MEDICAL RESEARCHERS IN THE WORLD.  SO THAT'S CORRECT.

9   Q.   LET ME ASK IT IN A DIFFERENT WAY JUST TO BE SURE.  WHAT IS

10   THE ISI, AND HOW DOES IT RANK YOU AS SOMEONE WHO IS CITED BY

11   OTHERS IN THE MEDICAL FIELD?

12   A.   THAT MEANS THAT IF YOU PUBLISH A PAPER AND THAT PAPER IS

13   CITED BY OTHERS, THAT'S THE CUMULATIVE TALLY OF CITATIONS OF

14   YOUR IMPACT IN THE MEDICAL LITERATURE, IN THE MEDICAL

15   COMMUNITY, AND SO THAT IS THE MOST HIGHLY REGARDED AUTHORITY

16   FOR COLLATING THAT DATA.  IN THE TEN-YEAR CUMULATIVE TALLY, AS

17   YOU MENTIONED, SOMEWHERE AROUND 500 MANUSCRIPTS WERE PUBLISHED,

18   AND THAT WAS THE EIGHTH LEADING, I BELIEVE, CITATION TALLY IN

19   THE RANKINGS.

20   Q.   SIR, AT SOME POINT IN TIME YOU BECAME INTERESTED IN THE

21   DRUG VIOXX; IS THAT CORRECT?

22   A.   YES.

23   Q.   THAT WOULD HAVE BEEN SOMETIME AROUND WHAT YEAR?

24   A.   WELL, IT WAS FEBRUARY 2001.

25   Q.   OKAY.  NOW, I WANT TO FAST-FORWARD BEFORE GOING TO

1568

1  FEBRUARY 2001, WHICH I'LL GO BACK.  BETWEEN FEBRUARY 2001 AND

2  TODAY, SITTING HERE TODAY, WHICH IS NOVEMBER 22, 2005, HAVE YOU

3  EXPRESSED CERTAIN OPINIONS PUBLICLY AND IN THE ACADEMIC

4  LITERATURE, AS WELL AS PRIVATELY IN E-MAILS AND WRITINGS,

5  RELATING TO YOUR BELIEFS AND OPINIONS REGARDING THE DRUG VIOXX?

6  A.  YES, CERTAINLY.

7  Q.  NOW, YOU ALSO FORMED OPINIONS RELATING TO THE CONDUCT OF

8  THE PHARMACEUTICAL COMPANY, MERCK, AND ITS CONDUCT OF RESEARCH

9  AND ITS MARKETING AND ITS MAKING AVAILABLE TO THE PUBLIC THE

10  DRUG VIOXX; IS THAT CORRECT?

11  A.  THAT'S CORRECT.

12  Q.  NOW, WHAT I'D LIKE TO DO IS TO SHOW YOU A DOCUMENT WHICH

13  IS FROM NOVEMBER 24, '04, MARKED AS EXHIBIT 2.  IT'S AN E-MAIL

14  FROM YOU TO DAVID GRAHAM.  WHO IS DAVID GRAHAM?

15  A.  DAVID GRAHAM IS A SAFETY OFFICER AT THE FOOD & DRUG

16  ADMINISTRATION.

17  Q.  DOES THIS E-MAIL REFLECT SOME OF THE OPINIONS AND

18  CONCLUSIONS THAT YOU REACHED RELATING TO MERCK'S CONDUCT OF ITS

19  SCIENTIFIC STUDIES AND ITS MARKETING OF THE DRUG VIOXX OVER THE

20  PAST FOUR YEARS SINCE YOU HAVE BECOME INVOLVED IN THE MATTER?

21  A.  YES.

22  Q.  SIR, I'M LOOKING AT THE PART WHERE YOU SAY, "I AM

23  BOTHERED." DO YOU SEE WHERE YOU SAY TO DAVID GRAHAM -- IS

24  GRAHAM A PHYSICIAN?

25  A.  YES.

1569

1  Q.  SO YOU'RE SAYING TO DR. GRAHAM, "I AM BOTHERED."  WOULD

2  YOU READ THAT FOR US, PLEASE?

3  A.  "I AM BOTHERED BY THE CONTINUED OUTRAGEOUS LIES OF MERCK

4  WITH THEIR FULL-PAGE MULTIPLE ADS THAT THEY PUBLISHED

5  EVERYTHING AND THAT THEY NEVER HAD A TRIAL WHICH SHOWED ANY

6  HARM OF VIOXX UNTIL APPROVE; WHEN, IN FACT, THERE WERE TWO BY

7  MAY 2000."

8  Q.  CONTINUE.

9  A.  "I AM ALSO UPSET THAT THE STORY OF THEIR SCIENTIFIC

10  MISCONDUCT FOR THE VIGOR PAPER IN THE NEW ENGLAND JOURNAL OF

11  MEDICINE, THAT'S "NEJM, WITH ERRORS OF OMISSION (DEATHS),

12  ERRONEOUS DATA (MI'S)," OR HEART ATTACKS, "AND INCOMPLETE DATA

13  (MORE THAN 1/2 OF THE THROMBOTIC EVENTS) HAS NOT RECEIVED ANY

14  ATTENTION WHATSOEVER."

15  Q.  LET ME SHOW YOU AN ARTICLE WHICH WAS IN THE CLEVELAND

16  CLINIC JOURNAL IN DECEMBER OF 2004.  DECEMBER OF 2004, THERE'S

17  AN ARTICLE WHICH WAS WRITTEN -- YOU'LL HAVE IT IN YOUR HANDS IN

18  A MOMENT -- CALLED "THE SAD STORY OF VIOXX AND WHAT WE SHOULD

19  LEARN FROM IT."  DID YOU CO-AUTHOR THAT ARTICLE?

20  A.  YES, I DID.

21  Q.  WHAT IS THE CLEVELAND CLINIC JOURNAL OF MEDICINE?

22  A.  THAT'S THE MEDICAL JOURNAL OF THIS INSTITUTION, WHICH IS

23  WIDELY CIRCULATED, HAS A CIRCULATION OF NEARLY 100,000

24  PHYSICIANS AND PARAPROFESSIONAL STAFF.

25  Q.  IS THIS A ROAD MAP TO THE SAGA OR THE STORY OF VIOXX, AS

1570

1  YOU SEE IT, AS A RESEARCHER AND PROMINENT PHYSICIAN IN

2  CARDIOLOGY?  PLEASE, SIR.

3  A.  I BELIEVE IT'S CERTAINLY PART OF TRYING TO GET THE FACTS

4  STRAIGHT ABOUT THIS VERY SAD STORY, YES.

5  Q.  OKAY.  TELL US THE STORY AS YOU UNDERSTAND IT, AS IT

6  HAPPENED IN 1999, BASED ON WHAT YOU KNOW, AND TELL US HOW YOU

7  KNEW IT AND WHAT YOU KNOW AND HOW THE STORY BEGAN.

8  A.  IN MAY THE FDA APPROVED VIOXX FOR COMMERCIAL USE, SO THAT

9  IS AN IMPORTANT TIME, TIME LINE.  THAT WAS ALSO AT THE TIME

10  WHEN THE FDA HAD A FORMAL REVIEW OF THE MEDICINE, WHERE THE

11  PRIMARY REVIEWER ALREADY HAD EXPRESSED IN HER DOCUMENT,

12  DR. VILLALBA, THAT THERE WAS A CONCERN REGARDING CLOTTING

13  EVENTS WITH VIOXX EVEN AT THE TIME OF APPROVAL IN MAY 1999.

14  Q.  YOU WRITE HERE THAT, "THE APPROVAL WAS BASED ON DATA FROM

15  TRIALS LASTING THREE TO SIX MONTHS AND INVOLVING PATIENTS AT

16  LOW RISK FOR CARDIOVASCULAR ILLNESS." DO YOU SEE THAT?

17  A.  THAT'S RIGHT.

18  Q.  WHAT IS THE SIGNIFICANCE OF THAT FACT?

19  A.  WELL, THIS IS ONE OF THE MOST SIGNIFICANT PARTS OF THE

20  WHOLE CLINICAL DEVELOPMENT OF THE VIOXX MEDICINE, AND THAT IS

21  THAT PATIENTS WITH HEART DISEASE WERE NOT TESTED IN ANY

22  MEANINGFUL WAY, AND WE KNOW FROM MULTIPLE DATABASES AND

SURVEYS

23  THAT AT LEAST 40 TO 50 PERCENT OF THE PATIENTS WHO ACTUALLY

24  TOOK THIS MEDICINE WHEN IT WAS IN CLINICAL USE ACTUALLY DID

25  HAVE KNOWN HEART DISEASE.

1571

1  Q.  WHY, AS YOU VIEW IT, IS THAT AN IMPORTANT FACT?

2  A.  WELL, IT'S IMPORTANT BECAUSE IF THE MEDICINE HAS A

3  CLOTTING RISK IN ARTERIES SUCH THAT IT COULD INDUCE HEART

4  ATTACKS, STROKES, OR DEATH, THE PATIENTS WHO ARE MOST LIABLE TO

5  SUFFER AS A CONSEQUENCE OF THAT WOULD BE PATIENTS WITH

6  PREEXISTING OR KNOWN ATHEROSCLEROTIC ARTERY DISEASE.

7  Q.  DID THIS MEDICINE OR DOES THIS MEDICINE, IN YOUR OPINION,

8  HAVE SUCH A RISK?

9  A.  THERE ISN'T ANY QUESTION ABOUT THE MEDICINE'S RISK IN THIS

10  REGARD.

11  Q.  WHEN YOU SAY THERE'S NO QUESTION, SIR, CAN YOU GIVE US

12  BROADLY, AND THEN I'LL GET INTO DETAILS WITH YOU LATER, BROADLY

13  WHY YOU SAY THAT?

14  A.  WELL, THE MEDICINE'S RISK, VIOXX'S RISK, HAS BEEN EVIDENT

15  SINCE TRIALS CONDUCTED IN 1999 AND ALL THE WAY THROUGH THE TIME

16  OF WITHDRAWAL IN SEPTEMBER 30, 2004.

17  Q.  HAVE THERE BEEN MULTIPLE TESTS AND MULTIPLE STUDIES THAT

18  HAVE, IN YOUR OPINION, PROVEN THAT FACT?

19  A.  THERE'S BEEN REPLICATION OF UNTOWARD SIGNIFICANT EXCESS OF

20  EVENTS OF HEART ATTACK, DEATH, AND STROKE IN MULTIPLE TRIALS.

21  THAT'S RIGHT.

22  Q.  I DIDN'T SAY IN THE BEGINNING OF THIS DEPOSITION.  YOU

23  WERE SUBPOENAED FOR THIS DEPOSITION; IS THAT CORRECT, SIR?

24  A.  THAT'S CORRECT.

25  Q.  YOU ARE NOT SERVING HERE AS AN EXPERT WITNESS FOR ANY

1572

1  PARTY; IS THAT CORRECT?

2  A.  NO, I'M NOT.

3  Q.  NOW, THERE WAS A STUDY CALLED VIGOR; IS THAT CORRECT?

4  A.  YES.

5  Q.  YOU EVENTUALLY BECAME FAMILIAR WITH THIS STUDY CALLED

6  VIGOR; CORRECT?

7  A.  YES.

8  Q.  DID YOU PARTICIPATE IN IT?

9  A.  NO, NOT AT ALL.

10  Q.  WHO DID THAT STUDY?

11  A.  THIS STUDY WAS DONE BY RHEUMATOLOGISTS, THE DOCTORS

12  LOOKING AFTER PATIENTS WITH RHEUMATOID ARTHRITIS.  IT WAS A

13  LARGE TRIAL BY A NETWORK OF RHEUMATOLOGISTS AND PATIENTS, ABOUT

14  8,000 PATIENTS WITH RHEUMATOID ARTHRITIS.

15  Q.  WHO FUNDED THE STUDY?

16  A.  MERCK.

17  Q.  WHO CONDUCTED THE STUDY?

18  A.  MERCK.

19  Q.  FOLLOWING OUR BROAD OUTLINE IN THE ARTICLE THAT YOU WROTE

20  IN THE CLEVELAND CLINIC JOURNAL OF MEDICINE IN DECEMBER OF

21  2004, YOU INDICATE THAT "VIGOR'S STRONG EVIDENCE THAT

22  ROFECOXIB" -- THAT'S THE NAME FOR VIOXX?

23  A.  YES.

24  Q.  -- "INCREASES THE RISK OF MI'S," AND IT CAME OUT OF THAT

25  STUDY; CORRECT?

1573

1  A.  THAT'S RIGHT.

2  Q.  WHAT DID THE VIGOR TRIAL SAY?  WHAT DID MERCK SAY THAT THE

3  VIGOR TRIAL SHOWED RELATING TO CARDIOVASCULAR RISKS?

4  A.  RIGHT.  WELL, I REMEMBER IT VERY WELL, BECAUSE THE DAY

5  THAT THAT PANEL HAD REVIEWED ALL THE DATA -- AND ONE OF THE

6  PANELISTS WAS MY COLLEAGUE, DR. STEVEN NISSEN -- I READ -- I

7  WAS ACTUALLY AT THE MEDICAL COLLEGE OF GEORGIA.  I WAS A

8  VISITING PROFESSOR.  I WAS READING THE USA TODAY THAT MORNING,

9  AND IT SAID THAT THIS WAS DUE TO NAPROXEN, THAT THE VIGOR

10  PROBLEMS OF HEART ATTACK WAS AN ISSUE OF NAPROXEN BEING

11  BENEFICIAL RATHER THAN VIOXX BEING DETRIMENTAL.

12        SO I WAS A LITTLE PUZZLED BY THAT, BUT I DIDN'T THINK

13  TOO MUCH OF IT UNTIL I GOT BACK TO CLEVELAND AND, THE NEXT DAY,

14  MET WITH DR. NISSEN AND DR. MUKHERJEE ABOUT THE FDA

15  PROCEEDINGS.  DR. NISSEN EXPLAINED HE DIDN'T THINK IT WAS JUST

16  SO SIMPLE AS THE NAPROXEN HYPOTHESIS, AS WE LATER TERMED IT,

17  AND WE STARTED TO DRILL DOWN ON THE DATA AND CONCLUDED THAT IT

18  WAS QUITE CONCERNING.

19  Q.  OKAY.  WHAT DID YOU FIND WAS CONCERNING ABOUT THE VIGOR

20  DATA?

21  A.  YES.  WELL, THERE WERE SEVERAL THINGS THAT WERE

22  PARTICULARLY BOTHERSOME:  NUMBER ONE, THAT IF NAPROXEN WAS

23  PROTECTIVE, IT HAD NOT EVER BEEN PROVEN; THAT IS, IT DIDN'T --

24  WE DIDN'T KNOW FOR SURE IT HAD AN ASPIRIN-LIKE EFFECT.

25        SO EVEN IF WE COULD GIVE -- ASSIGN NAPROXEN THE SAME

1574

1  MAGNITUDE OF PROTECTION AS ASPIRIN, THAT WOULD BE AT MAXIMUM A

2  25 PERCENT REDUCTION IN HEART ATTACKS, WHICH HAS BEEN VERY

3  CAREFULLY STUDIED FOR ASPIRIN.  SO IF NAPROXEN WAS AS GOOD AS

4  ASPIRIN, THAT COULD BE 25 PERCENT REDUCTION.  BUT ON THE OTHER

5  HAND, IN VIGOR, WE SAW A 500 PERCENT, THAT IS, A 20-FOLD

6  INCREASE IN HEART ATTACKS.  SO THE ORDER OF MAGNITUDE WAS

7  GREATLY IN EXCESS OF ANYTHING THAT ASPIRIN COULD DO.

8        FURTHERMORE, THE SECOND POINT, IN THAT, IF YOU HAVE A

9  RANDOMIZED TRIAL AND YOU HAVE AN EXPERIMENTAL ARM, WHICH IS A

10  NEW DRUG WHICH HASN'T BEEN STUDIED EXTENSIVELY, STILL A LOT OF

11  THINGS THAT NEED TO BE DISCOVERED ABOUT IT, AND YOU HAVE AN

12  ANCHOR DRUG, NAPROXEN, THAT HAD BEEN AVAILABLE FOR 20 YEARS,

13  AND IF YOU THEN DO A COMPARISON AND YOU SAY THERE'S MORE THAN

14  FIVEFOLD HEART ATTACKS AND TWOFOLD EXCESS OF CARDIOVASCULAR

15  SERIOUS EVENTS, HOW COULD YOU POSSIBLY CONCLUDE THAT IT WAS THE

16  NAPROXEN BEING BENEFICIAL?

17        THE ONLY APPROPRIATE CONCLUSION FROM THAT WOULD BE

18  THAT THERE'S A PROBLEM WITH THE EXPERIMENTAL DRUG VIOXX.

19  BEYOND THOSE CONCERNS WAS THAT THIS TRIAL WAS DONE IN PATIENTS

20  WITH RHEUMATOID ARTHRITIS WITHOUT HEART DISEASE, AND SO

21  WHATEVER WAS BEING SEEN IN THE VIGOR TRIAL COULD BE FAR WORSE

22  IN PATIENTS WITH HEART DISEASE.

23  Q.  NOW, WHAT YOU'VE DESCRIBED TO US IN THE PREVIOUS ANSWER,

24  IS THAT SOMETHING THAT -- IS THAT A CAPSULE OF WHAT YOU WERE

25  THINKING -- YOU AND YOUR COLLEAGUES WERE THINKING, BUT YOU IN

1575

1  PARTICULAR -- WHEN YOU SAW THE VIGOR TRIAL PUBLISHED IN THE

2  NEW ENGLAND JOURNAL?

3  A.  WELL, I DIDN'T EVEN TAKE NOTICE OF THE VIGOR TRIAL WHEN IT

4  WAS IN THE NEW ENGLAND JOURNAL.  IT WASN'T ON MY RADAR SCREEN,

5  AND IT DIDN'T REALLY CATCH, I BELIEVE, THE CARDIOLOGY COMMUNITY

6  BECAUSE THE HEART ATTACK PART OF THAT PUBLICATION WAS NOT -- IT

7  WAS NOT FEATURED.  IT WAS THE PROTECTION FROM THE

8  GASTROINTESTINAL SIDE EFFECTS THAT WAS THE MAIN CONCLUSION BUT

9  ONLY LOOKED BACK AT THAT PAPER AFTER THE FDA REVIEW OF THE

10  VIGOR DATA AND ALSO OF THE CELECOXIB DATA.  THERE WERE TWO DAYS

11  OF FDA REVIEWS:  ONE DAY WAS DEVOTED TO CELEBREX AND ONE DAY

12  WAS DEDICATED TO VIOXX.

13  Q.  IT WAS AFTER THE HEARINGS IN '01 WHERE THIS -- WOULD IT BE

14  FAIR TO SAY -- I HOPE THERE'S NOT AN OBJECTION -- GOT ON YOUR

15  RADAR SCREEN?

16  A.  YES.  IT WAS ONLY AFTER THE FDA HEARING AND DR. NISSEN

17  COMING BACK AND DR. MUKHERJEE GOING THROUGH THE DATA, GETTING

18  IT ALL COLLATED AND THREE OF US MEETING, DID THIS BECOME

19  SOMETHING OF AN AREA OF INTEREST.  IT CERTAINLY WAS NOTHING IN

20  MEDICINE THAT I HAD ANY INTEREST IN.  IT WASN'T IN MY FIELD OF

21  RESEARCH UP UNTIL THAT POINT IN TIME.

22  Q.  WAS IT SOMETHING THAT CONCERNED YOU?

23  A.  AS SOON AS WE LOOKED AT -- WELL, AS SOON AS I READ ABOUT

24  THE FDA PANEL, AS I SAID, THAT MORNING, IN THE NEWSPAPER, I WAS

25  CONCERNED.  BUT THAT CONCERN WAS MAGNIFIED AFTER STARTING TO

1576

1 REVIEW THE DATA WITH MY COLLEAGUES AT THE CLEVELAND CLINIC.

2 Q. OKAY. WERE YOU ALARMED?

3 A. I DON'T KNOW IF I WOULD USE THE WORD "ALARMED," BUT I WAS

4 SIGNIFICANTLY CONCERNED THAT THERE WAS A MEDICINE THAT WAS

5 GAINING INCREASED WIDE-SCALE USE. THERE ALREADY WAS, OF

6 COURSE, EXTENSIVE ADVERTISEMENTS AND POPULARITY OF THE MEDICINE

7 AND COULD SOMETHING BE WRONG. THAT WAS A CONCERN. I WOULD SAY

8 IT WAS A SIGNIFICANT CONCERN.

9 Q. OKAY. WHAT DID YOU DECIDE TO DO?

10 A. SO WE DECIDED WE WOULD PUT TOGETHER A MANUSCRIPT TO PULL

11 ALL THE DATA THAT WE COULD TOGETHER BECAUSE THERE HAD NOT YET

12 BEEN ONE. THERE HAD NOT YET BEEN A REGISTRATION IN THE MEDICAL

13 LITERATURE TO THE MEDICAL COMMUNITY THAT THIS WAS POTENTIALLY A

14 BIG DEAL.

15 Q. IS THAT THE KIND OF THING THAT YOU DO AS AN INDEPENDENT

16 ACADEMIC PHYSICIAN AND SCIENTIST?

17 A. THAT'S AN OBLIGATION THAT WE HAVE, IS TO PROCESS DATA

18 THAT'S OUT THERE, TRY TO MAKE IT AVAILABLE TO OUR COLLEAGUES IN

19 THE MEDICAL COMMUNITY AND IN THE INTEREST OF PATIENTS AND

20 CARING FOR PATIENTS IN THE OPTIMAL WAY. THIS IS THE SORT OF

21 THING THAT IS CRITICAL.

22 Q. DID YOU UNDERTAKE WHAT YOU DID WITH ANY AX TO GRIND

23 TOWARDS MERCK OR TOWARDS THE DRUG VIOXX?

24 A. I HAD ABSOLUTELY NO AX TO GRIND. I HAD AN EXCELLENT

25 RELATIONSHIP WITH MERCK. I HAD DONE CLINICAL TRIALS WITH

1577

1   MERCK.  IN FACT, I HAD JUST COMPLETED A VERY LARGE TRIAL CALLED

2   TARGET OF OVER 6,000 PATIENTS PUBLISHED IN THE NEW ENGLAND

3   JOURNAL OF MEDICINE. SO I ACTUALLY FOR MANY YEARS ENJOYED A

4   VERY GOOD RELATIONSHIP WITH MERCK.  SO I DO NOT BELIEVE THERE

5   WAS ANY AX TO GRIND WHATSOEVER.

6   Q.  TELL ME WHAT YOU DID THEN.  I MEAN, WHAT PROCESS DID YOU

7   FOLLOW?  BRIEFLY.

8   A.  WELL, WE CULLED ALL THE DATA TOGETHER, WHICH DID APPEAR IN

9   THE JAMA.  IT DIDN'T HAVE MUCH IN THE WAY OF CHANGES FROM OUR

10   INITIAL SUBMISSION TO THE ACTUAL PUBLICATION IN AUGUST.  BUT

11   THE ONE CONCERN THAT CAME UP ALONG THE WAY WAS THAT THE DATA

12   WERE DIFFERENT IN THE NEW ENGLAND JOURNAL OF MEDICINE PAPER

13   PUBLISHED IN NOVEMBER 2000 AND THE FDA DATABASE THAT WAS

14   AVAILABLE IN FEBRUARY 2001.

15        SO AT THAT POINT, WHILE WE WERE READY TO SUBMIT AND

16   DID SUBMIT THE PAPER TO JAMA FOR CONSIDERATION, I SENT THE

17   PAPER TO MERCK, MY COLLEAGUE, DR. LAURA DEMOPOULOS, WHO I HAD

18   WORKED ON THIS SO-CALLED TARGET TRIAL, TO SEE WHY THERE WERE

19   DISCREPANCIES IN THE DATA BETWEEN THE PUBLISHED PAPER AND THE

20   FDA DATABASE.

21   Q.  YOU ACTUALLY WENT THROUGH THE PROCESS OF GETTING THE

22   INFORMATION TOGETHER AND THEN DRAFTING THE PAPER; IS THAT

23   CORRECT?

24   A.  THAT'S CORRECT.

25   Q.  DID THE PAPERS REPRESENT LARGELY YOUR FINDINGS AND YOUR

1578

1  CONCLUSIONS?

2  A.  YES.

3  Q.  AND WERE THOSE FINDINGS AND CONCLUSIONS CRITICAL OF THE

4  VIGOR TRIAL AS WELL AS RAISING SOME CONCERNS RELATING TO THE

5  DRUG VIOXX?

6  A.  THERE IS NO QUESTION THEY WERE CRITICAL OF THE CONCERN

7  ABOUT THE SAFETY.  BUT I THINK THE MOST IMPORTANT STATEMENT

8  THAT WE MADE, WHICH APPEARS IN THE ARTICLE, WAS ABOUT HOW

9  THERE'S A MANDATE TO DO THE APPROPRIATE CLINICAL TRIALS WHICH

10  HAD NOT BEEN DONE AND WROTE:  "DEFINITIVE EVIDENCE OF SUCH AN

11  ADVERSE EFFECT WILL REQUIRE A PROSPECTIVE RANDOMIZED CLINICAL

12  TRIAL."  IT IS MANDATORY TO CONDUCT A TRIAL SPECIFICALLY

13  ASSESSING CARDIOVASCULAR RISK AND BENEFIT OF THESE AGENTS.

14  UNTIL THEN, WE URGE CAUTION IN PRESCRIBING THESE AGENTS TO

15  PATIENTS AT RISK FOR CARDIOVASCULAR MORBIDITY."

16  Q.  OKAY.  I'M GOING TO MARK A COPY OF YOUR JAMA ARTICLE AS

17  THE NEXT EXHIBIT NUMBER.  WHILE IT'S BEING MARKED, LET ME SAVE

18  TIME SO WE CAN KEEP THE BALL ROLLING.  I'LL MARK IT.

19       NOW, ALONG THE WAY, I WANT TO GO THROUGH WITH YOU A

20  COUPLE OF STEPS ALONG THE WAY.  I DON'T WANT TO SPEND A LOT OF

21  TIME ON IT, BUT I DO WANT TO GET THE PROCESS.  BEFORE YOU

22  PUBLISHED IT, YOU SAID TO ME -- AND I'M JUST RECAPPING -- THAT

23  YOU TALKED TO DR. DEMOPOULOS.

24  A.  YES.

25  Q.  YOU ACTUALLY -- AND I HAVE A COPY OF THIS.  YOU ACTUALLY

1579

1  SENT TO HER THE MANUSCRIPT; CORRECT?

2  A.  YES.

3  Q.  IN ADVANCE?

4  A.  YES.

5  Q.  WHAT WAS THE PURPOSE OF SENDING HER THE MANUSCRIPT, AS YOU

6  VIEWED IT?

7  A.  THE MAIN PURPOSE WAS TO RECONCILE THE DIFFERENCES IN DATA

8  THAT HAD BEEN PUBLISHED IN THE NEW ENGLAND JOURNAL OF MEDICINE

9  AND WHAT WAS APPEARING IN THE FDA DATABASE.  THERE WERE SOME

10  SIGNIFICANT DISCREPANCIES.

11  Q.  THE FDA DATABASE WAS MADE AVAILABLE AFTER THE FEBRUARY

12  2001 HEARING TO THE PUBLIC; IS THAT CORRECT?

13  A.  THAT'S RIGHT.

14  Q.  POSTED ON THE WEB SITE?

15  A.  POSTED ON THEIR WEB SITE.

16  Q.  AVAILABLE TO ANYONE TO SEE?

17  A.  ABSOLUTELY.

18  Q.  MERCK, DID YOU HAVE ACCESS TO THEIR INTERNAL DATA?

19  A.  NO, WE DID NOT.

20  Q.  DID YOU WANT TO GET IT?

21  A.  WELL, THAT'S ONE OF THE REASONS THAT I TRIED TO REACH OUT

22  TO DR. DEMOPOULOS.  SINCE I HAD WORKED WITH HER, WE HAD A VERY

23  GOOD RELATIONSHIP IN OUR OTHER TRIAL THAT WE HAD DONE.  I KNOW

24  SHE DID NOT DO RESEARCH IN THIS AREA OF COX-2 INHIBITORS, BUT I

25  THOUGHT SHE COULD BE HELPFUL TO GET THESE CONCERNS ABOUT DATA

1580

1  INCONSISTENCIES STRAIGHTENED OUT.

2  Q.  WAS THE DATA FORTHCOMING?

3  A.  WE NEVER RECEIVED ANY REVISIONS FROM ANYONE FROM MERCK.

4  THAT WAS NEVER SENT TO US, ANY SUGGESTIONS, CHANGES OF DATA.

5  THERE WAS NEVER ANYTHING SENT BACK TO ME OR TO MY COLLEAGUES.

6  Q.  I'M GOING TO SHOW YOU AN E-MAIL.  I WILL MARK IT AS THE

7  NEXT EXHIBIT NUMBER.  I'M GOING TO PUT IT IN THE RECORD.  IT'S

8  BRIEF, TO SAVE SOME -- YOU KNOW WHAT?  I CAN PUT IT RIGHT IN

9  FRONT OF YOU.  EXHIBIT 5.  NOW, IT'S A COPY OF -- I WOULD LIKE

10  YOU TO IDENTIFY IT, THE FRONT PAGE OF IT.  THERE'S AN E-MAIL

11  THAT SAYS IT'S FROM ALISE REICIN TO LAURA DEMOPOULOS. IT SAYS,

12  "DID THIS IN THE MIDDLE OF THE NIGHT.  NOT SURE IT MAKES

13  SENSE."  IT SAYS HERE IT BASICALLY TRANSMITS BACK ALISE

14  REICIN'S MARKUP, ELECTRONIC MARKUP, OF YOUR DOCUMENT.  ARE YOU

15  FAMILIAR WITH IT?

16  A.  I'VE NEVER SEEN THIS.

17  Q.  OKAY.  I WANT YOU TO TURN TO PAGE 8, SIR.  I WANT TO FIND

18  OUT IF THIS IS SOMETHING THAT WAS EVER SUGGESTED TO YOU.  IF

19  YOU'D LOOK AT THE FRONT PAGE, PLEASE, FIRST.  FRONT PAGE,

20  PLEASE.

21  A.  OH, YES.

22  Q.  SORRY.

23  A.  YES.

24  Q.  "SELECTIVE COX-2 INHIBITORS ARE ASSOCIATED WITH AN

25  INCREASED RISK OF CARDIOVASCULAR EVENTS."  DO YOU SEE IT?

1581

1  A.  YES.

2  Q.  OKAY.  THIS IS YOUR PAPER; CORRECT?

3  A.  YES.  WELL, I MEAN, THIS WAS THE ONE THAT APPARENTLY WAS

4  WORKED OVER.

5  Q.  CORRECT.

6  A.  THIS IS NOT OUR PAPER.

7  Q.  WERE YOU AWARE OF THE FACT THAT MERCK WAS WORKING OVER

8  YOUR PAPER?

9  A.  I HAD NO IDEA UNTIL THIS VERY MOMENT.

10  Q.  LOOK UNDER "RESULTS" ON PAGE 8.  DO YOU SEE -- I'D LIKE

11  YOU TO LOOK AT THE -- DON'T LOOK AT THE UNDERLINED SENTENCE

12  YET.  LOOK AT THE LAST -- THE SENTENCE THAT BEGINS:  "THE

13  RESULTS OF THE EVENT-FREE SURVIVAL ANALYSIS ON THE 66 CASES

14  SHOWED THAT THE RELATIVE RISK OF DEVELOPING A CARDIOVASCULAR

15  EVENT IN ROFECOXIB TREATMENT ARM WAS 2.37 PERCENT."

16      THAT'S SOMETHING YOU EVENTUALLY TOLD PEOPLE IN YOUR

17  JAMA PAPER; CORRECT?

18  A.  YES.

19  Q.  DID YOU KNOW OR DID THEY SUGGEST IT DIRECTLY TO YOU THAT,

20  ACCORDING TO DR. REICIN, "WE PREFER TO FLIP THE DATA AND SAY IT

21  WAS REDUCED ON NAPROXEN"?

22  A.  IT'S AMAZING.  YES, I SEE IT HERE, BUT IT'S AMAZING.  IT

23  CERTAINLY DIDN'T APPEAR IN OUR MANUSCRIPT.

24  Q.  SIR, YOUR JAMA ARTICLE, I THINK YOU READ TO ME THAT YOUR

25  CONCLUSION WAS TO CALL FOR A FULL LARGE-SCALE STUDY; CORRECT?

1582

1  A.  THAT'S RIGHT.

2  Q.  DID YOU WANT A PRIMARY CARDIOVASCULAR ENDPOINT STUDY

3  PERFORMED?

4  A.  NOT ONLY DID IT NEED TO HAVE CARDIOVASCULAR ENDPOINTS, BUT

5  IT HAD TO HAVE CARDIOVASCULAR PATIENTS.  PATIENTS HAD BEEN

6  EXCLUDED, ESSENTIALLY, FROM ALL OF THESE STUDIES.  SO THAT WAS

7  A PATIENT GROUP THAT WE WERE MOST WORRIED ABOUT BECAUSE THEY

8  WOULD HAVE THE HIGHEST PREDISPOSITION TO LIFE-THREATENING

9  EVENTS.

10  Q.  SO DID YOUR STUDY, WHAT YOU WERE PROPOSING, WAS IT TO

11  STUDY THE DRUG IN THOSE PEOPLE WHO WERE THE LOGICAL PEOPLE WHO

12  WERE GOING TO TAKE THE DRUG?

13  A.  YES.  THE ONLY WAY WE COULD GET TO THE ANSWER HERE, WAS IT

14  SAFE FOR PEOPLE WITH HEART DISEASE WHO HAVE ARTHRITIS TO TAKE

15  THE MEDICINE, WAS TO DO A TRIAL IN THESE PARTICULAR PATIENTS

16  WHO HAD BEEN COMPLETELY NEGLECTED IN THE DEVELOPMENT OF VIOXX.

17  Q.  LOOK AT PAGE 18.

18  A.  YES.

19  Q.  "UNTIL THEN" -- AND THIS ENDED UP IN YOUR PAPER -- "WE

20  URGE CAUTION IN PRESCRIBING THESE AGENTS TO PATIENTS AT RISK

21  FOR CARDIOVASCULAR MORBIDITY."  YOUR WORDS?

22  A.  THAT'S THE WORDS THAT'S HERE IN THE PAPER THAT ARE

23  PUBLISHED, YES.

24  Q.  THE UNDERLINED WORDS ARE DR. REICIN'S, ACCORDING TO HER

25  E-MAIL WHICH SHE WROTE.  DID YOU SEE WHAT SHE SAID?

1583

1  A.  YES.

2  Q.  "CONCLUSION NEEDS TO BE TONED DOWN."  WHEN SHE CAME TO SEE

3  YOU, SIR, DID YOU BELIEVE THAT ONE OF THE PURPOSES WAS TO

4  NEUTRALIZE YOU AND YOUR OPINION?

5  A.  WELL, CERTAINLY.  THE COMMENTS SHE MADE AT THAT MEETING

6  WOULD GO ALONG WITH THAT.  I MEAN, SHE BASICALLY SAID THAT -- I

7  REMEMBER THE CONVERSATION.  IT ACTUALLY WAS SUPPOSED TO BE

8  THREE PEOPLE COMING TO VISIT, WHICH WAS UNUSUAL, TO DISCUSS A

9  MANUSCRIPT; BUT BECAUSE OF OUR PRIOR RELATIONSHIP WITH MERCK

10  AND DR. DEMOPOULOS AND DR. DIBATTISTE, I HAD RELUCTANTLY AGREED

11  TO THIS MEETING.  BUT DR. DIBATTISTE DIDN'T SHOW UP.  IT WAS

12  SUPPOSED TO BE THE THREE OF THEM.  AND THE MEETING STARTED OUT

13  WITH THAT WE GOT IT WRONG; THAT WE WOULD BE EMBARRASSED.

14  Q.  "WE" MEANING?

15  A.  DR. NISSEN, DR. MUKHERJEE, AND I.

16  Q.  THREE PHYSICIANS AT THE CLEVELAND CLINIC?

17  A.  RIGHT.

18  Q.  GOT IT WRONG?

19  A.  GOT IT WRONG; THAT WE WOULD BE EMBARRASSED IF WE PUBLISHED

20  THIS PAPER.

21  Q.  HER WORD?

22  A.  THAT'S THE WORD.  THE WORD IS "EMBARRASSED."  I THOUGHT

23  THAT WAS HARSH.  SHE CAME ACROSS AS KIND OF ARROGANT, I

24  THOUGHT.  BUT WE TALKED IT THROUGH, AND I EXPLAINED TO HER

25  THAT, YOU KNOW, WE DON'T FEEL THAT WAY AT ALL AND WE WILL STAND

1584

1  BY OUR DATA.  WE ONLY WANTED THE INPUT ON INCONSISTENCIES OF

2  DATA.  WE DID NOT ASK FOR DR.  REICIN OR COLLEAGUES TO OPINE

3  ABOUT OUR PERSPECTIVE.

4          BUT THE DISCUSSION ENDED UP OKAY.  YOU KNOW, SHE CAME

5  ABOUT THE NAPROXEN HYPOTHESIS, WHICH I DISMISSED AS THE

6  EXPLANATION.  SHE CAME WITH THE RHEUMATOID ARTHRITIS -- THAT

7  "PATIENTS WITH RHEUMATOID ARTHRITIS, YOU KNOW, DR. TOPOL, HAVE

8  MUCH HIGHER RATES OF HEART ATTACK."  AND I SAID, "WELL, THAT

9  DOESN'T EXPLAIN IT BECAUSE ALL THE PATIENTS HAD RHEUMATOID

10  ARTHRITIS.  SO IF THERE'S A GRADIENT OF HEART ATTACK, IT CAN'T

11  JUST BE FROM THAT EXPLANATION."

12          SHE ALSO CAME WITH THE NOTION THAT THERE WERE LOTS OF

13  DATA THAT WE DIDN'T KNOW ABOUT -- DR. NISSEN, DR. MUKHERJEE,

14  AND I -- THAT WAS IN THE MERCK FILES, THAT THE FDA HAD, BUT WE

15  DIDN'T HAVE ACCESS.  I SAID, "WELL, WE CAN'T COMMENT ON DATA WE

16  DON'T HAVE ACCESS TO, AND I'M SORRY."  SO THE MEETING PROBABLY

17  WENT ON ABOUT AN HOUR AND A HALF.  IT ENDED CORDIALLY.  AT

18  TIMES SHE SAID THAT MERCK WAS CONSIDERING DOING A TRIAL IN

19  HEART PATIENTS, AND IF WE HAD ANY IDEAS, SHE WELCOMED US TO

20  FORWARD A PROPOSAL, PROTOCOL.

21          THAT SEEMED TO BE -- I GOT THE SENSE IT WAS A

22  GESTURE.  I DIDN'T REALLY THINK THAT DR. REICIN WAS SERIOUS

23  ABOUT IT; BUT NONETHELESS, I THOUGHT THAT WE PROBABLY SHOULD AT

24  LEAST SEND SOME TYPE OF PROTOCOL SKETCH IF THEY WOULD LIKE TO

25  SEE WHAT OUR IDEAS WERE FOR PURSUING THIS QUESTION.

1585

1  Q.  LET ME JUST BRIEFLY SHOW YOU ANOTHER DOCUMENT.  IT'S A

2  MERCK DOCUMENT.  VERY BRIEFLY.  AND, AGAIN, I DON'T HAVE THE

3  TIME TO HAVE YOU SIT AND READ THE WHOLE THING, BUT I WANT YOU

4  TO LOOK AT THE FRONT PAGE.  APPARENTLY THE MANUSCRIPT WAS

5  FURTHER WORKED ON INTERNALLY AT MERCK.  ARE YOU AWARE OF THAT

6  FACT?

7  A.  NO.  I HAD NO KNOWLEDGE OF THAT.

8  Q.  THERE'S AN E-MAIL FROM DR. DEMOPOULOS TO A NUMBER OF

9  PEOPLE, INCLUDING ALISE REICIN.  THEY TOOK A CRACK AT REVISING

10  IT.  IF YOU LOOK AT THE LAST SENTENCE OF THE E-MAIL:  "WE

11  RECOGNIZE THAT THE REVISED" TRANSCRIPT "DOES NOT COMPLETELY

12  NEUTRALIZE THE POTENTIAL NEGATIVE IMPACT OF THE PUBLICATION,

13  BUT IT IS SUBSTANTIALLY REMOVED FROM THE ORIGINAL.  WE FEEL

14  THAT REVISING IT FURTHER TO MORE COMPLETELY PRESENT A MERCK

15  PERSPECTIVE MIGHT ALIENATE THE AUTHORS AND THUS JEOPARDIZE OUR

16  OPPORTUNITY TO CONTRIBUTE AT ALL."  DID YOU KNOW THAT'S WHAT

17  WAS GOING ON?

18  A.  THIS IS REMARKABLE.  I DIDN'T KNOW THIS WAS GOING ON AT

19  ALL.

20  Q.  IS PART OF THE ACADEMIC PROCESS -- YOU'VE WORKED -- YOU'VE

21  DONE STUDIES FOR LARGE PHARMACEUTICAL COMPANIES:  MERCK?

22  A.  YES.

23  Q.  IS PART OF THE PROCESS TO GET THE SCIENTIFIC FACTS IN THE

24  MEDICAL LITERATURE, OR IS THE REAL OBJECTIVE OR IS PART OF THE

25  OBJECTIVE TO GET THE, QUOTE, DRUG COMPANY PERSPECTIVE?

1586

1  A.  WELL, YOU KNOW, I HAD BEEN TRYING TO HAVE AN

2  INTELLECTUALLY FULFILLING AND COLLABORATIVE RELATIONSHIP WITH

3  PEOPLE AT MERCK, AND THAT WAS SOMETHING THAT I THINK WE ENJOYED

4  UP UNTIL THIS SORT OF THING, WHICH IS OBVIOUSLY A DEPARTURE

5  FROM THAT, BUT --

6  Q.  IS IT --

7  A.  -- IT'S UNFORTUNATE.

8  Q.  IS IT A DEPARTURE FROM SOUND ACADEMIC AND SCIENTIFIC

9  PRACTICE TO ATTEMPT TO NEUTRALIZE PAPERS AND TRY TO INJECT A

10  PARTICULAR PERSPECTIVE RATHER THAN WHAT IS THE DOWN-THE-MIDDLE

11  TRUTH?

12  A.  YES.  I MEAN, I THINK THAT THE ROLE OF ACADEMIC MEDICINE

13  IS TO PUBLISH A HIGHLY OBJECTIVE INDEPENDENT PROCESSING OF DATA

14  AND PERSPECTIVE, AND ANYTHING TO TRY TO WARP THAT OR TWIST IT

15  IS UNACCEPTABLE.

16  Q.  NOW, LET'S TALK ABOUT VIGOR, BECAUSE THAT WAS SOME FOCUS

17  OF WHAT YOU WERE DOING WHEN YOU RETROSPECTIVELY LOOKED AT VIGOR

18  AND ALSO A NUMBER OF OTHER STUDIES, INCLUDING 090.

19  A.  YES.

20  Q.  OKAY.  YOU LOOKED AT, I THINK, A STUDY CALLED 085, 090,

21  VIGOR.  ANY OTHER?

22  A.  THOSE ARE THE PRINCIPAL ONES.  I THINK ALL THE STUDIES,

23  BUT THOSE ARE THE ONES THAT WE FOCUSED ON THE MOST.

24  Q.  YOU LOOKED AT THE VIGOR TRIAL, AND YOU MADE SOME

25  DETERMINATIONS THERE; CORRECT?

1587

1   A.  THAT'S RIGHT.

2   Q.  OKAY.  WHAT DID YOU -- I WOULD LIKE YOU TO LIST OUT

3   SEQUENTIALLY -- IF YOU'VE COVERED IT ALREADY, LIST IT SO WE

4   HAVE IT IN A LIST -- WHAT WERE YOUR MAJOR FINDINGS AS YOU

5   LOOKED INDEPENDENTLY BACK AT THE VIGOR TRIAL?

6   A.  I THINK THE MOST IMPORTANT FINDING IS SUMMARIZED IN

7   FIGURE 1 OF THAT PAPER, WHICH COMES RIGHT FROM THE FDA TARGUM

8   REPORT.  BASICALLY WHAT THAT FIGURE -- FIRST TIME NOW PUBLISHED

9   TO THE MEDICAL COMMUNITY, IT SHOWS THAT THERE'S A DIVERGENCE OF

10  THE HEART ATTACK AND SERIOUS EVENT CURVES.  THE EVENT CURVES IS

11  FIGURE 1, WHEREBY STARTING, AT FOUR TO SIX WEEKS AFTER THE

12  START OF THE MEDICINE, VIOXX, COMPARED TO NAPROXEN, THERE IS AN

13  OVER TWOFOLD RISK OF SERIOUS EVENTS.

14  Q.  THAT KAPLAN-MEIER CURVE, WHICH WILL BE MARKED -- WE DON'T

15  HAVE TO DISPLAY IT RIGHT NOW, BUT I WANT TO MARK IT SO THAT

16  IT'S PART OF AN EXHIBIT TO BE DISPLAYED AS PART OF THIS

17  TRANSCRIPT. WE WILL PUT A NUMBER "9" ON TABLE -- ON FIGURE 1 OF

18  THE TOPOL JAMA ARTICLE.  THAT FIGURE 1, WHICH IS THE

19  KAPLAN-MEIER CURVE SHOWING THE TIME TO CARDIOVASCULAR ADVERSE

20  EVENTS, THE LINE SEPARATED HOW MANY DAYS?

21  A.  BETWEEN FOUR AND SIX WEEKS, THESE CURVES DIVERGE.

22  Q.  IS THIS, BY THE WAY, SOMETHING THAT HAS BEEN REPLICATED IN

23  OTHER STUDIES?

24  A.  IT'S BEEN REPLICATED IN FOUR RANDOMIZED TRIALS.

25  Q.  THAT IT SEPARATES AT AN EARLY TIME?

1588

1   A.   THAT'S RIGHT.

2   Q.   OKAY.  WHAT ARE THOSE STUDIES?

3   A.   STUDY 090, WHICH WAS A SIX-WEEK TRIAL, WHICH HAD A 760

4   PERCENT EXCESS WITHIN THE SIX WEEKS.

5   Q.   YES.

6   A.   THE VIGOR TRIAL I JUST MENTIONED.

7   Q.   YES.

8   A.   THE ADVANTAGE TRIAL, WHICH WAS A 12-WEEK TRIAL THAT SHOWED

9   A SIGNIFICANT EXCESS IN THE 12-WEEK TIME FRAME; AND THE VICTOR

10   TRIAL, WHICH HAS NOT YET BEEN PUBLISHED, WHICH IS A COLON

11   CANCER TRIAL OF 2,300 PATIENTS COORDINATED OUT OF OXFORD, WHICH

12   HAS BEEN AT LEAST COMMENTED ON BY THE INVESTIGATORS HAVING

13   IMMEDIATE EXCESS IN HEART ATTACK RISK.

14   Q.   WHAT CONCLUSION HAVE YOU REACHED, DR. TOPOL, RELATING TO

15   THE INCREASED RISK OF CARDIOVASCULAR EVENTS, HEART ATTACKS, AND

16   STROKES RELATING TO SHORT-TERM USAGE OF THE DRUG?

17   A.   WELL, I SHOULD ALSO ADD THE FOUR RANDOMIZED TRIALS,

18   THERE'S THE CUMULATIVE ANALYSIS BY DR. JÜNI PUBLISHED IN THE

19   LANCET WHICH SHOWS NO RELATIONSHIP BETWEEN DURATION OF THERAPY

20   AND HEART ATTACK EXCESS.  BUT INTERESTINGLY, ALL FOUR OF THESE

21   TRIALS AND THE CUMULATIVE JÜNI ANALYSIS WAS ON PATIENTS WITHOUT

22   HEART DISEASE.  SO THE RISK OF IT BEING IMMEDIATE AND EARLY

23   COULD ACTUALLY BE MUCH MORE EXAGGERATED IN PATIENTS WITH HEART

24   DISEASE.

25   Q.   ANY DOUBT ABOUT IT IN YOUR MIND?

1589

1  A.  THERE ISN'T ANY QUESTION ABOUT THIS.  TO SEE IT REPLICATED

2  ACROSS FOUR TRIALS IN PATIENTS WHO DON'T EVEN HAVE HEART

3  DISEASE IS QUITE AN IMPORTANT FINDING.

4  Q.  IN THIS PARTICULAR KAPLAN-MEIER CURVE FOR THE VIGOR TRIAL,

5  THAT WAS NOT PUBLISHED IN THE NEW ENGLAND JOURNAL OF MEDICINE;

6  IS THAT CORRECT?

7  A.  NO.  AS I MENTIONED EARLIER, THE NEW ENGLAND JOURNAL OF

8  MEDICINE PAPER FEATURED THE GASTROINTESTINAL SIDE EFFECTS AND

9  BENEFIT, BUT IT DID NOT SHOW IN ANY GRAPHIC FORM -- AND THERE

10  ARE OTHER IRREGULARITIES OF THIS PAPER, BUT IT CERTAINLY DID

11  NOT HIGHLIGHT THE HEART ATTACK PROBLEMS.

12  Q.  YOU MENTIONED ALREADY THAT THERE WAS AN INCREASED RISK OF

13  CARDIOVASCULAR EVENTS STARTING AT THE SIX-WEEK PERIOD IN THIS

14  STUDY; CORRECT?

15  A.  YES.

16  Q.  REPLICATED BY OTHER STUDIES WE NOW KNOW LATER?

17  A.  THREE OTHER RANDOMIZED TRIALS?

18  Q.  YES.

19  A.  YES.

20  Q.  BY THE WAY, I'M GOING TO GET TO NAPROXEN.  ON THIS

21  NAPROXEN THEORY, HAS THERE EVER BEEN A RANDOMIZED CLINICAL

22  TRIAL DEMONSTRATING THAT NAPROXEN IS CARDIOPROTECTIVE?

23  A.  THERE IS NO -- THERE ARE NO DATA THAT I AM AWARE OF TO

24  SHOW THAT NAPROXEN IN ANY RANDOMIZED TRIAL IS CARDIOPROTECTIVE.

25  Q.  DO YOU THINK THAT, IF THERE WERE SUCH A STUDY, YOU WOULD

1590

1 KNOW ABOUT IT?

2 A. I WOULD THINK SO.

3 Q. SO WHAT DO YOU THINK OF THIS NAPROXEN HYPOTHESIS THAT WAS

4 PUT FORWARD BY MERCK TO JUSTIFY THE RESULTS IN VIGOR?

5 A. IT DOESN'T JUSTIFY -- I MEAN, AS I MENTIONED EARLIER, THE

6 PROBLEM IS YOU HAVE AN EXPERIMENTAL DRUG WHICH IS NOT FULLY

7 DEFINED, AND YOU COMPARE IT TO A DRUG THAT'S BEEN KNOWN FOR 20

8 YEARS. TO ALL OF A SUDDEN TO ASCRIBE SOME TYPE OF MAGICAL

9 PROTECTIVE EFFECT WITHOUT ANY BASIS IS NOT ACCEPTABLE.

10 Q. TELL ME, DR. TOPOL, AS YOU WROTE IT IN JAMA AND AS YOU

11 BELIEVED IT THEN AND TODAY, THE SIGNIFICANCE OF 090, THE STUDY

12 090. WHAT WAS THAT STUDY? WHEN WAS IT PERFORMED? JUST TELL

13 ME WHAT IT WAS AND WHAT ITS SIGNIFICANCE WAS TO YOU.

14 A. TO ME, THAT STUDY HAS BEEN OVERLOOKED. IT HAS, IN MANY

15 WAYS, EXTRAORDINARY SIGNIFICANCE IN THE CLINICAL DEVELOPMENT OF

16 VIOXX, AND THE REASON IS THAT THIS STUDY HAD 978 PATIENTS.

17 WITHIN THE 978 PATIENTS, THEY WERE RANDOMLY ASSIGNED -- THEY

18 HAD THE TYPICAL ARTHRITIS, "OSTEOARTHRITIS," SO-CALLED. THEY

19 WERE RANDOMLY ASSIGNED TO VIOXX; A MEDICINE CALLED NABUMETONE

20 OR KNOWN AS RELAFEN, WHICH ISN'T USED VERY MUCH; OR PLACEBO.

21 SO WHAT THEY HAD WERE THESE THREE ARMS TESTED WITH ONLY 12 AND

22 A HALF MILLIGRAMS OF VIOXX. SO IT'S A VERY LOW DOSE OF VIOXX

23 RELATIVE TO THESE OTHER TRIALS THAT WE'VE BEEN DISCUSSING.

24 Q. 090 BEING A 12.5 MILLIGRAM; AS OPPOSED TO VIGOR, WHICH WAS

25 50?

1591

1  A.  THAT'S RIGHT.

2  Q.  OKAY.

3  A.  WHAT IS SO STRIKING ABOUT THIS TRIAL IS THAT IT HAS, AT

4  THE END OF SIX WEEKS OF THERAPY, A STATISTICALLY SIGNIFICANT,

5  760 PERCENT, EXCESS OF HEART ATTACKS.

6      NOW, IT'S NOT QUITE 1,000-PATIENT TRIAL, BUT

7  CERTAINLY, THAT CAN'T BE MINIMIZED.  THE POINT BEING IS THAT,

8  IF YOU SEE THAT TRIAL IN REPLICATION WITH THE PROBLEMS WITH

9  VIGOR, YOU HAVE A VERY SERIOUS PROBLEM.  BUT, MOREOVER, WHAT IS

10  THE MISLEADING STATEMENTS THAT HAVE BEEN MADE IS THAT THERE

11  HAVE BEEN NO TRIALS EVER DONE WITH VIOXX, BEFORE APPROVE,

12  COMPARING THE DRUG EXCEPT FOR NAPROXEN, IN WHICH THERE WAS A

13  RISK.  IN FACT, THERE WAS STUDY 090, WHICH COMPARED TO PLACEBO

14  OR NABUMETONE, WHICH SHOWED A HIGHLY SIGNIFICANT EXCESS RISK.

15  Q.  AS OF AUGUST 22, 2001, ALL YOU WERE ASKING MERCK TO DO WAS

16  WHAT?

17  A.  TO DO AN APPROPRIATE TRIAL; TO ACKNOWLEDGE THAT THERE MAY

18  BE RISKS, AND THAT DIDN'T OCCUR, BUT TO ALSO DO AN APPROPRIATE

19  TRIAL IN PATIENTS WITH HEART DISEASE.

20  Q.  HAD ANYTHING THAT IS CALLED A PRESPECIFIED CARDIOVASCULAR

21  ENDPOINT STUDY, HAS IT EVER BEEN DONE BY MERCK?

22  A.  IT HAS NEVER BEEN DONE, IN MY MIND, TO THIS DAY.

23  Q.  DID IT NEED TO BE DONE?

24  A.  ABSOLUTELY, AND WE CALLED FOR IT INNUMERABLE TIMES.

25  Q.  THE WARNINGS ON THIS DRUG, WERE THERE ADEQUATE WARNINGS ON

1592

1 THIS DRUG, SIR, IN THE '99 AND 2002 LABELS AS TO CARDIOVASCULAR

2 RISKS?

3 A.  IN MY OPINION, BOTH THE ORIGINAL LABEL AND THEN THE

4 REVISION IN APRIL 2002 DID NOT SHOW ADEQUATE SAFETY CONCERNS

5 ABOUT HEART ATTACKS, STROKES, AND DEATH THAT COULD OCCUR FROM

6 THE MEDICINE.  SO IT WASN'T PRESENT AT ALL IN THE FIRST

7 ITERATION IN 1999, AND IT CERTAINLY WAS NOT ADEQUATELY FLAGGED

8 IN THE 2002 REVISION.

9 Q.  DID YOU OBSERVE ANY PATTERN OF CONDUCT BY MERCK EVERY TIME

10 OR ANY TIME AN INVESTIGATOR LIKE YOURSELF OR JÜNI DID A

11 CRITICAL ANALYSIS AND QUESTIONED THE SAFETY OF THE DRUG VIOXX?

12 A.  EACH TIME WE PUBLISHED A PAPER OR A STUDY WAS ALSO

13 PUBLISHED BY OTHER INVESTIGATORS QUESTIONING THE SAFETY OF

14 VIOXX, THERE WOULD BE IMMEDIATELY A PR ATTACK ON THE REPORT.

15 MERCK WOULD REFUTE THE FINDINGS AND/OR THEY WOULD HAVE

16 CONSULTANTS OF THEIRS REFUTE THE FINDINGS SO THERE WAS A

17 PUBLISHED AND THEN ANTI-FORCE THAT WOULD OCCUR WITHOUT ANY

18 QUESTION.

19 Q.  ONE THING THAT MERCK SAID FROM THE APPROVE STUDY WAS THAT

20 THERE WAS AN INCREASED RISK AFTER 18 MONTHS.  DO YOU RECALL

21 THAT CLAIM?

22 A.  YES.

23 Q.  HOW DID YOU SEE THAT IN THE CONTEXT OF THE FULL PICTURE OF

24 THE ARTICLES?

25 A.  THIS WAS ANOTHER EXTREMELY CONCERNING PART OF THAT

1593

1  DISSEMINATION ON THE DAY OF WITHDRAWAL, THAT IT TOOK 18 MONTHS

2  FOR THERE TO BE ANY RISK, BECAUSE THAT'S NOT TRUE.

3        IN FACT, AS I REVIEWED EARLIER IN THIS DEPOSITION,

4  THERE WERE FOUR TRIALS THAT SHOWED THAT THE TIME LINE FOR THAT

5  WAS CONSIDERABLY QUICKER.  IN VIGOR, WITH FOUR TO SIX WEEKS,

6  THERE WAS SEPARATION; IN ADVANTAGE, WITHIN 12 WEEKS; IN VICTOR,

7  THIS WAS IMMEDIATE; AND IN STUDY 090 WITHIN SIX WEEKS.  IN ALL

8  OF THESE TRIALS, THERE WERE NO HEART DISEASE PATIENTS.  SO IT

9  COULD HAVE BEEN MUCH WORSE THAN -- IN THE DAYS OR WEEKS.

10        BEYOND ALL THAT, THERE'S THE ISSUE OF A PROBLEM OF

11  STATISTICAL POWER; THAT IS, YOU HAVE TO DO A VERY LARGE TRIAL

12  IF YOU'RE NOT EXPECTING ADEQUATE NUMBER OF EVENTS, AND SO NONE

13  OF THE TRIALS WERE ADEQUATELY POWERED FROM A TIME PERSPECTIVE.

14  BUT GIVEN ALL THOSE THINGS, THAT IS, STATISTICAL POWER, LACK OF

15  CARDIOVASCULAR PATIENTS, AND FOUR RANDOMIZED TRIALS, IN

16  ADDITION TO THE JÜNI ANALYSIS, THERE'S A PRETTY STRONG CASE

17  THAT THE RISK OF VIOXX FOR HEART ATTACKS CAN OCCUR AT ANY TIME

18  AFTER THE INITIATION OF THE MEDICINE.

19  Q.  ALL RIGHT.  NOW, MY PURPOSE IS TO GO THROUGH YOUR

20  CRITICISMS OF THE VIGOR TRIAL AND WHAT YOU THINK MERCK DID THAT

21  CONSTITUTES SCIENTIFIC MISCONDUCT.  CAN YOU DO SO, SIR?

22  A.  YES.

23  Q.  PLEASE.

24  A.  OKAY.  SO WHAT I CITED HERE IN THIS CORRESPONDENCE IS HOW

25  THE ARTICLE IN THE NEW ENGLAND JOURNAL -- THIS GOES BACK TO

1594

1   WHAT WE DISCUSSED EARLIER TODAY, WHICH IS WHEN THE PAPER WAS

2   PUBLISHED IN NOVEMBER 2000 AS COMPARED TO THE FDA DOCUMENTS

3   THAT WE HAVE A CHANCE TO REVIEW IN FEBRUARY OF 2001, THERE

4   WAS -- THERE WERE GROSS DISCREPANCIES, WHICH IS WHY WE HAD

5   CONTACTED MERCK IN THE FIRST PLACE ABOUT THIS MANUSCRIPT.

6   THEN, FINALLY, WE HAD THE ABILITY TO WORK WITH THE NEW ENGLAND

7   JOURNAL OF MEDICINE EDITORS, DR. CURFMAN, DR. DRAZEN, AND TO

8   FIGURE OUT WHAT WAS GOING ON.

9        NOW, AS IT TURNS OUT, IN THE VIGOR MANUSCRIPT, IN THE

10  NEW ENGLAND JOURNAL IN 2000, IN THREE TIMES IN THE PAPER --

11  THIS IS FIRST AUTHORED BY BOMBARDIER -- AND THREE TIMES IT SAYS

12  THAT THE MORTALITY WAS THE SAME BETWEEN NAPROXEN AND VIOXX.

13       THAT WAS UNTRUE.  IN FACT, THERE WAS A 46 PERCENT

14  DIFFERENCE.  THERE WERE 22 DEATHS IN THE VIOXX ARM VERSUS 15

15  DEATHS IN THE NAPROXEN ARM SO INSTEAD OF PRESENTING THE DEATHS

16  AS THEY SHOULD, THE AUTHORS ONLY USED PERCENTAGES, ROUNDED THEM

17  OFF; BUT MOREOVER, THEY ASSERTED STRONGLY IN THREE DIFFERENT

18  PLACES THAT THE MORTALITY WAS THE SAME.  SO THAT'S ISSUE NUMBER

19  ONE.

20       THE SECOND ISSUE WAS THE FALSE DATA REGARDING HEART

21  ATTACKS.  SO INSTEAD OF A FIVEFOLD INCREASE, WHICH WE KNOW IS

22  TRUE AT THE BARE MINIMUM BECAUSE THERE WASN'T THE RIGHT

23  ADJUDICATION IN THIS TRIAL, AS WE LEARNED AND I REVIEWED

24  EARLIER FROM THE TARGUM REPORT, BUT NOW WE'RE TALKING ABOUT

25  THAT THE AUTHORS KNEW THE CORRECT NUMBER OF HEART ATTACKS.

1595

1  THEY COULD HAVE FIXED THE GALLEY PROOFS.

2      THIS IS TOLD TO ME BY THE EDITORS OF THE NEW ENGLAND

3  JOURNAL, BUT THEY DECIDED TO GIVE THE CORRECT NUMBERS IN THE

4  PUBLISHED NEW ENGLAND JOURNAL PAPER.  SO THEY HAD A FOURFOLD

5  INCREASE IN HEART ATTACKS RATHER THAN A FIVEFOLD INCREASE IN

6  HEART ATTACKS.  THAT IS ERRONEOUS, AND THAT APPEARS TO BE, BEST

7  I CAN RECONSTRUCT WITH THE NEW ENGLAND JOURNAL EDITORS, AN

8  ERROR OF COMMISSION.

9  Q.  AND THE THIRD?

10  A.  THE THIRD IS, RATHER THAN REPORT ANY OF THE OTHER CLOTTING

11  EVENTS, LIKE STROKES, LIKE TRANSIENT ISCHEMIC ATTACKS, LIKE

12  UNSTABLE ANGINA, LIKE PERIPHERAL ARTERIAL THROMBOSIS, LIKE

13  VENOUS THROMBOSIS, LIKE PULMONARY EMBOLISM, NONE OF THESE WERE

14  REPORTED IN THE NEW ENGLAND JOURNAL OF MEDICINE.

15      MR. BLIZZARD:  YOUR HONOR, THAT COMPLETES THE

16  PLAINTIFF'S TENDER FROM DR. TOPOL'S DEPOSITION.

17      THE COURT:  DO YOU WANT TO TAKE A BREAK?

18      MR. BECK:  YES.  THEN WE'LL PLAY OUR

19  CROSS-EXAMINATION.

20      THE COURT:  COURT WILL STAND IN RECESS FOR 15

21  MINUTES.

22      THE DEPUTY CLERK:  EVERYONE RISE.

23      (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

24      THE COURT:  BE SEATED PLEASE.  WE HAVE NOW

25  CROSS-EXAMINATION.

1596

1       MR. BECK:  YES.  OUR PARTNER, ANDY GOLDMAN, IS

2  CROSS-EXAMINING DR. TOPOL ON THE VIDEO.

3              CROSS-EXAMINATION

4  BY MR. BECK:

5  Q.  GOOD AFTERNOON, DR. TOPOL.

6  A.  GOOD AFTERNOON.

7  Q.  I WANT TO TALK FOR A FEW SECONDS ABOUT CARDIOVASCULAR

8  DISEASE.  IS IT THE LEADING CAUSE OF DEATH IN THE UNITED

9  STATES?

10  A.  YES, IT IS.

11  Q.  IS CARDIOVASCULAR DISEASE THE LEADING CAUSE OF DEATH BY

12  FAR?

13  A.  WELL, IT'S SIGNIFICANTLY GREATER THAN THE SECOND LEADING

14  CAUSE OF CANCER, SO YES.

15  Q.  IS CARDIOVASCULAR DISEASE THE NUMBER ONE KILLER IN THE

16  UNITED STATES AND HAS IT BEEN SINCE 1900?

17  A.  YES.

18  Q.  DO YOU KNOW THAT, APPROXIMATELY EVERY 34 SECONDS, SOMEBODY

19  DIES OF HEART DISEASE IN THIS COUNTRY?

20  A.  THAT'S, I THINK, FROM THE AMERICAN HEART ASSOCIATION; AND

21  I CAN'T VOUCH FOR THE CALCULATION, BUT THAT'S OUT THERE, YES.

22  Q.  IS IT TRUE, DR. TOPOL, THAT EVERY YEAR 400,000 -- 460,000

23  PEOPLE DIE OF HEART DISEASE IN THE EMERGENCY ROOM OR BEFORE

24  EVEN GETTING TO THE HOSPITAL?

25  A.  THAT NUMBER MAY BE ABOUT RIGHT.  THERE'S A LOT OF

1597

1 OUT-OF-HOSPITAL SUDDEN DEATH, YES.

2 Q. DID YOU TAKE VIOXX, DR. TOPOL?

3 A. YES, I TOOK VIOXX.

4 Q. YOU TOOK VIOXX FOR YEARS, DIDN'T YOU?

5 A. I TOOK IT OCCASIONALLY. I HAVE KNEE ARTHRITIS I'VE HAD

6 MULTIPLE KNEE SURGERIES. SO I WOULD TAKE IT ON DEMAND, YOU

7 KNOW, WHETHER IT BE EVERY -- ONCE, A COUPLE, EVERY FEW WEEKS,

8 THAT SORT OF THING.

9 Q. THE REASON YOU TOOK VIOXX IS BECAUSE YOU HAD SERIOUS KNEE

10 PAIN AND TRADITIONAL NSAIDS WERE BOTHERING YOUR STOMACH; IS

11 THAT TRUE?

12 A. I THINK THE MEDICINES THAT I HAD TAKEN ACTUALLY DIDN'T

13 BOTHER MY STOMACH. I HAVEN'T HAD ANY THINGS THAT REALLY

14 BOTHERED MY STOMACH VERY MUCH, BUT I CAN'T RECALL THAT SO MUCH

15 AS I THOUGHT I HAD BETTER RELIEF OF MY ARTHRITIS THAN BY TAKING

16 A MOTRIN OR SOME OTHER OVER-THE-COUNTER PREPARATION.

17 Q. VIOXX HELPED RELIEVE YOUR KNEE PAIN BETTER THAN THE

18 TRADITIONAL NSAIDS; IS THAT FAIR?

19 A. THE ONES THAT I HAD TRIED, YES.

20 Q. WAS THE VIGOR TRIAL PUBLISHED IN THE NEW ENGLAND JOURNAL

21 OF MEDICINE?

22 A. YES. AS I MENTIONED, THE NOVEMBER 22, 2000.

23 Q. IS THE NEW ENGLAND JOURNAL OF MEDICINE A TOP MEDICAL

24 JOURNAL?

25 A. IT'S THE LEADING IMPACT JOURNAL IN BIOMEDICINE TODAY.

1598

1  Q.  IS THE NEW ENGLAND JOURNAL OF MEDICINE A PEER-REVIEWED

2  JOURNAL?

3  A.  YES.

4  Q.  THAT MEANS THAT, BEFORE THE NEW ENGLAND JOURNAL OF

5  MEDICINE WILL PUBLISH AN ARTICLE, DOCTORS WHO ARE KNOWLEDGEABLE

6  IN THE FIELD THAT'S BEING DESCRIBED IN THE ARTICLE REVIEW THE

7  ARTICLE FOR ACCURACY?

8  A.  "PEER REVIEW" MEANS THAT THE DATA ARE REVIEWED AND

9  CERTAINLY THE CONCLUSIONS ARE -- YES, THAT'S WHAT PEER REVIEW

10  IS ALL ABOUT.

11  Q.  PEER-REVIEWED IS A STANDARD PROCESS THAT MEDICAL JOURNALS

12  USE TO ENSURE THE QUALITY OF THE ARTICLES THAT THEY PUBLISH;

13  CORRECT?

14  A.  CORRECT.

15  Q.  I WANT TO TALK BRIEFLY ABOUT HOW THE VIGOR TRIAL WAS

16  CONDUCTED, AND THEN WE'LL DISCUSS THE RESULTS.  OKAY?

17  A.  YES.

18  Q.  DO YOU KNOW THAT VIGOR TESTED WHETHER VIOXX WAS SAFE AT

19  TREATING PAIN SUFFERED BY PATIENTS WHO HAD RHEUMATOID

20  ARTHRITIS?

21  A.  YES.  I MENTIONED THAT EARLIER TODAY.

22  Q.  ONE OF THE THINGS THAT THE VIGOR TRIAL SOUGHT TO TEST WAS

23  WHETHER THE PATIENTS WHO HAD RHEUMATOID ARTHRITIS COULD HAVE

24  RELIEF FROM THEIR PAIN WITHOUT CAUSING THEM AS MANY STOMACH

25  PROBLEMS AS NAPROXEN; CORRECT?

1599

1   A.   THE PRIMARY, I THINK, ENDPOINT OF THE STUDY WAS THE RELIEF

2   OF GASTROINTESTINAL COMPLICATIONS.  THAT WAS, I THINK, WHY THE

3   SAMPLE SIZE AND THE POWER OF THE TRIAL WAS SET UP, TO DETECT

4   WHETHER OR NOT ROFECOXIB/VIOXX WOULD HAVE AN ADVANTAGE OVER

5   NAPROXEN IN THAT REGARD.

6   Q.   ARE PATIENTS WITH RHEUMATOID ARTHRITIS AT HIGHER RISK OF

7   HEART ATTACKS?

8   A.   AS I MENTIONED THIS MORNING, YES, PATIENTS WITH RA

9   (RHEUMATOID ARTHRITIS) DO HAVE HIGHER EVENT RATES FOR HEART

10   ATTACKS.

11   Q.   IN THE VIGOR TRIAL, PATIENTS WHO PARTICIPATED EITHER USED

12   VIOXX, 50 MILLIGRAMS ONCE A DAY, OR NAPROXEN, 500 MILLIGRAMS

13   TWICE PER DAY.  IS THAT RIGHT?

14   A.   THAT'S CORRECT.

15   Q.   YOU'RE NOT CRITICAL, DR. TOPOL, OF MERCK'S DECISION TO USE

16   NAPROXEN AS THE DRUG TO COMPARE VIOXX TO, ARE YOU, SIR?

17   A.   NO.  I THINK NAPROXEN, BEING A WIDELY USED NONSTEROIDAL

18   AGENT FOR ARTHRITIS, ALL TYPES OF ARTHRITIS, WAS A VERY

19   SUITABLE COMPARATOR.

20   Q.   NONE OF THE PATIENTS IN THE VIGOR TRIAL USED PLACEBO, DID

21   THEY?

22   A.   THE VIGOR TRIAL DID NOT TEST PLACEBO.  IT WAS A SO-CALLED

23   ACTIVE COMPARISON, THAT IS, COMPARING ONE ACTIVE

24   ANTI-INFLAMMATORY VERSUS ANOTHER.

25   Q.   A "PLACEBO" IS ANOTHER WORD FOR A SUGAR PILL; IS THAT

1600

1  RIGHT?

2  A.  THAT WOULD BE AN INACTIVE DRUG, YES.

3  Q.  WOULD IT BE ETHICAL, DR. TOPOL, IF HALF OF THE PATIENTS IN

4  THE VIGOR STUDY WHO HAD RHEUMATOID ARTHRITIS ONLY TOOK A

5  PLACEBO?

6  A.  IF THEY HAD NO OTHER RELIEF FOR THEIR RHEUMATOID ARTHRITIS

7  SYMPTOMS?

8  Q.  YES.

9  A.  NO, THAT WOULD NOT BE PROPER.

10  Q.  DO YOU AGREE, THEN, SIR, THAT VIOXX WORKED TO REDUCE PAIN

11  THAT RHEUMATOID ARTHRITIS PATIENTS WERE EXPERIENCING IN THE

12  VIGOR TRIAL?

13  A.  IT REDUCED PAIN, AS FAR AS I UNDERSTAND FROM THE DATA,

14  EQUALLY AS WELL AS NAPROXEN AT THE DOSES THAT WERE ADMINISTERED

15  WITH THE 50 MILLIGRAMS OF VIOXX, YES.

16  Q.  LET ME BACK UP, DR. TOPOL.  I THINK YOU SAID IN ONE OF

17  YOUR PREVIOUS ANSWERS THAT THERE WERE 20 HEART ATTACKS SEEN IN

18  THE VIOXX GROUP AND 4 HEART ATTACKS SEEN IN THE NAPROXEN GROUP;

19  RIGHT?

20  A.  THAT'S CORRECT.

21  Q.  THAT'S A FIVE-TIMES DIFFERENCE; RIGHT?

22  A.  THAT'S CORRECT.

23  Q.  WHAT PERCENTAGE OF THE PATIENTS IN THE VIOXX GROUP HAD

24  HEART ATTACKS?

25  A.  THAT WOULD BE 20 OF 4,047.  SO THAT WOULD BE

1601

1  APPROXIMATELY -- I DON'T HAVE A CALCULATOR, BUT IT WOULD BE

2  APPROXIMATELY .5 PERCENT.

3  Q.  ONE HALF OF 1 PERCENT?

4  A.  ONE HALF OF 1 PERCENT.

5  Q.  DO YOU KNOW WHAT THE PERCENTAGE OF HEART ATTACKS IN THE

6  NAPROXEN GROUP WAS?

7  A.  WELL, THAT WAS 4 OUT OF 4,029, WHICH IS LESS THAN .1

8  PERCENT.

9  Q.  OR LESS THAN ONE-TENTH OF 1 PERCENT?

10  A.  THAT'S CORRECT.

11  Q.  DID THE FOOD & DRUG ADMINISTRATION HOLD A SPECIAL ADVISORY

12  COMMITTEE MEETING IN FEBRUARY OF 2001 TO DISCUSS THE QUESTION

13  OF WHETHER COX-2 INHIBITORS CAUSE HEART PROBLEMS?

14  A.  YES.  THEY HAD, AS I MENTIONED THIS MORNING, A TWO-DAY

15  CONFERENCE, ONE FOR EACH OF THE DRUGS, CELEBREX AND VIOXX.

16  Q.  WHAT IS AN FDA ADVISORY COMMITTEE BRIEFLY, SIR?

17  A.  WELL, A PANEL OF EXPERTS ARE BROUGHT IN AND THE DATA ARE

18  REVIEWED, AND THERE'S RECOMMENDATIONS BY THE PANEL TO GIVE TO

19  THE FDA STAFF, AND THE FDA STAFF CAN EITHER ACCEPT OR REJECT

20  THOSE RECOMMENDATIONS.  BUT THIS IS A PANEL OF EXPERTS.  IN

21  THIS PARTICULAR CASE, IT WAS PREDOMINANTLY RHEUMATOLOGISTS.

22  THERE WERE ONLY TWO CARDIOLOGISTS WHO WERE INVITED TO THE PANEL

23  TO REVIEW VIOXX AND CELEBREX.

24  Q.  ONE OF THE CARDIOLOGISTS WHO WAS ON THE ADVISORY COMMITTEE

25  WAS YOUR COLLEAGUE, DR. STEVEN NISSEN; IS THAT RIGHT?

1602

1  A.  YES.

2  Q.  HE IS A WELL-RESPECTED CARDIOLOGIST; CORRECT, SIR?

3  A.  YES.

4  Q.  THE FDA ADVISORY COMMITTEE MEETINGS THAT ARE HELD, THOSE

5  ARE OPEN TO THE PUBLIC, AREN'T THEY, DR. TOPOL?

6  A.  YES.

7  Q.  DURING THE ADVISORY COMMITTEE MEETING THAT YOUR COLLEAGUE,

8  DR. NISSEN, ATTENDED, MERCK GAVE A PRESENTATION; RIGHT?

9  A.  MERCK GAVE A SUBSTANTIAL PRESENTATION, THAT'S RIGHT.

10  Q.  PFIZER GAVE A PRESENTATION ABOUT CELEBREX; CORRECT?

11  A.  THAT WAS ON A DIFFERENT DAY, YES.

12  Q.  THE FDA MADE A PRESENTATION AS WELL; CORRECT?

13  A.  YES.

14  Q.  THE FDA ALSO PREPARED BACKGROUND MATERIALS FOR THE

15  ADVISORY COMMITTEE, ANALYZING THE CLINICAL TRIALS THAT HAD BEEN

16  DONE ON VIOXX AND CELEBREX; CORRECT, SIR?

17  A.  THAT'S CORRECT.

18  Q.  LET ME SHOW YOU, SIR, AN EXCERPT FROM THE FDA ADVISORY

19  COMMITTEE MEETING.  DR. TOPOL, DOES DR. NISSEN MAKE THE

20  FOLLOWING STATEMENT TO THE ADVISORY COMMITTEE:  "BRIEFLY, I

21  THINK WHAT I WOULD SAY IN THE LABEL IS THAT THERE WAS AN EXCESS

22  OF CARDIOVASCULAR EVENTS IN COMPARISON TO NAPROXEN, THAT IT

23  REMAINS UNCERTAIN WHETHER THIS WAS DUE TO BENEFICIAL

24  CARDIOPROTECTIVE EFFECTS OF NAPROXEN OR PROTHROMBOTIC EFFECTS

25  OF THE AGENT, AND LEAVE IT AT THAT; THAT BASICALLY WE DON'T

1603

1   KNOW THE REASON"?  DO YOU SEE THAT?

2   A.   YEAH, I SEE IT, AND I UNDERSTAND THAT COMPLETELY.  AS OF

3   FEBRUARY 8, 2001, WHICH I BELIEVE WAS THE DATE OF THIS -- AND I

4   ALSO UNDERSTAND THAT THE CONSENSUS OF THE PANEL WAS LIKE THIS,

5   THAT THERE NEEDED TO BE A CHANGE IN THE LABEL ABOUT THE

6   CARDIOVASCULAR RISK.  SO THIS IS CONSISTENT WITH THAT.

7   Q.   DO YOU AGREE, DR. TOPOL, THAT ALL CLINICAL TRIALS MUST

8   OFFER POTENTIAL BENEFITS TO PATIENTS?

9   A.   ONE CAN NEVER DO A TRIAL WITH JUST TESTING THE SIDE

10   EFFECTS WITHOUT AT LEAST A PUTATIVE EQUAL OR BETTER BENEFIT.

11   Q.   DO ALL CLINICAL TRIALS HAVE TO HAVE SOME POTENTIAL BENEFIT

12   OFFERED TO PATIENTS?

13   A.   ALL CLINICAL TRIALS SHOULD HAVE A THERAPEUTIC POTENTIAL,

14   YES, A BENEFIT, YES.

15   Q.   DR. TOPOL --

16   A.   YES.

17   Q.   -- YOU CAN'T GIVE PATIENTS MEDICINE JUST TO SEE IF THEY

18   HAVE A HEART ATTACK OR DIE; CORRECT, SIR?

19   A.   I WOULD NEVER BE INVOLVED IN A CLINICAL TRIAL OR ADVOCATE

20   DOING A TRIAL WHERE THERE WAS JUST TESTING FOR HARM.  YOU HAVE

21   TO HAVE -- YOU DON'T PUT PATIENTS -- EXPERIMENT ON PATIENTS

22   UNLESS YOU'RE LOOKING AT BENEFIT AND ALSO, OF COURSE, ALWAYS

23   ASSAYING THE RISK AS WELL.

24   Q.   THE FIRST EXHIBIT, EXHIBIT 31 ON MAY 2, 2001 -- IS IT

25   DR. BHATT?

1604

1  A.  DR. BHATT, DEEPAK BHATT.

2  Q.  DR. BHATT IS SENDING AN E-MAIL TO DR. REICIN AND SAYS,

3  "HELLO.  AS DR. TOPOL PROMISED, HERE IS OUR PROTOCOL REGARDING

4  THE USE OF VIOXX IN ACUTE CORONARY SYNDROMES."  DO YOU SEE

5  THAT?

6  A.  I SEE THAT, AND I ALREADY DISCUSSED THAT THIS MORNING.

7  AND WHAT I SAID, IF I CAN GO BACK --

8  Q.  MY QUESTION WAS JUST:  DO YOU SEE THAT?

9  A.  I SEE THAT, YES.

10  Q.  THE PROTOCOL THAT DR. BHATT SENT TO MERCK IS EXHIBIT 32,

11  ISN'T IT?

12  A.  THAT'S WHAT YOU JUST GAVE ME, YES.

13  Q.  THE PROTOCOL FOR YOUR TRIAL -- BY "YOUR" I MEAN THE

14  CLEVELAND CLINIC.

15  A.  RIGHT.

16  Q.  -- INCLUDES DR. BHATT'S NAME AND YOUR NAME; CORRECT?

17  A.  HE PUT MY NAME ON IT, BUT THAT DOESN'T MEAN THAT I WAS

18  INVOLVED IN THIS.  THIS IS A PROTOCOL SKETCH, AND I GUESS HE

19  WAS LOOKING FOR FEEDBACK FROM MERCK.  BUT I DID NOT GO OVER

20  THIS IN TERMS OF DID I THINK THIS WAS THE APPROPRIATE DESIGN.

21       THIS WAS A BRIEF CONVERSATION I HAD WITH DR. BHATT,

22  AND I DON'T RECALL ALL THE DETAILS.  IT'S BACK FOUR YEARS AGO,

23  IN MAY 2001.  BUT I DID NOT AUTHOR THIS PROTOCOL, AND MY NAME

24  WAS LOOSELY ATTACHED TO IT.  I WAS NOT INTERESTED IN RUNNING A

25  TRIAL PERSONALLY ON THIS BECAUSE I DIDN'T FEEL THAT WAS

1605

1  APPROPRIATE.  I THOUGHT IT SHOULD BE DONE, BUT I SHOULD NOT

2  NECESSARILY BE INVOLVED WITH IT.

3  Q.  DR. TOPOL, DID THE CLEVELAND CLINIC SEND A PROTOCOL TO

4  MERCK OUTLINING WHAT THE CLEVELAND CLINIC BELIEVED WOULD BE AN

5  APPROPRIATE CARDIOVASCULAR OUTCOMES STUDY FOR VIOXX?

6  A.  DR. BHATT DID, YES.

7  Q.  DR. TOPOL, THE CONCEPT THAT HAS YOUR NAME AND DR. BHATT'S

8  NAME ON IT DESCRIBES THESE CRITERIA FOR INCLUSION, AND AS YOU

9  DESCRIBED ACUTE CORONARY SYNDROME, THE CONCEPT WAS THAT

10  PATIENTS WHO EITHER WERE THREATENED WITH A HEART ATTACK OR WHO

11  HAD A HEART ATTACK WOULD PARTICIPATE IN THE STUDY.  IS THAT

12  RIGHT?

13  A.  THAT'S CORRECT.  BUT YOU'RE LEAVING OUT ONE IMPORTANT

14  ELEMENT, AND AS IN THE TITLE OF THIS CONCEPT SHEET, "ELEVATED

15  MARKERS OF INFLAMMATION," AND IN THE INCLUSION CRITERIA ON

16  PAGE 6 THAT WE ARE NOW REVIEWING, YOU SEE ITEM 3.  IT SAYS,

17  "AND ITEM NUMBER 3, ELEVATED HIGH-SENSITIVITY C-REACTIVE

18  PROTEIN" KNOWN AS CRP, "GREATER THAN .2."

19      SO THEY HAD TO HAVE ARTERIAL INFLAMMATION; AND THAT

20  WAS THE WHOLE POINT OF THE CONCEPT, WAS THAT ROFECOXIB, AS WELL

21  AS CELECOXIB, HAVE BEEN SHOWN TO REDUCE INFLAMMATION.  SO, IN

22  FACT, IT COULD BE A BENEFIT TO THESE PATIENTS TO SUPPRESS

23  SUBSEQUENT HEART ATTACKS.

24  Q.  DO YOU SEE, SIR, THAT THE CONCEPT THAT YOU WERE PROPOSING

25  TO MERCK CALLS FOR THE STUDY TO LAST A MINIMUM OF ONE YEAR?

1606

1  A.  WHERE IS THAT?

2  Q.  IF YOU LOOK ON PAGE 5, UNDER "STUDY DESIGN" IT SAYS, "THIS

3  STUDY IS A MULTICENTER DOUBLE-BLIND RANDOMIZED" -- AND IT

4  CONTINUES -- "COMPARING THE EFFECTS OF VIOXX VERSUS PLACEBO

5  ADMINISTERED IN CONJUNCTION WITH STANDARD THERAPY (INCLUDING

6  ASPIRIN) FOR A MINIMUM OF ONE YEAR TO PATIENTS WHO HAVE

7  SUFFERED AN EPISODE OF AN ACUTE CORONARY SYNDROME," AND IT GOES

8  ON.

9  A.  AGAIN, THIS IS A CONCEPT SHEET.  THIS IS NOT A PROTOCOL.

10  THIS DOES NOT HAVE ANYTHING ABOUT EVENTS RATES THAT ARE

11  ANTICIPATED.  IT DOESN'T HAVE ANYTHING ABOUT SAMPLE SIZE.  IT

12  DOESN'T HAVE THE NUMBER OF TRIGGERED EVENTS TO STOP A TRIAL.

13  "ONE YEAR" IS JUST A VERY LOOSE TERM, THAT IT HAS TO HAVE SOME

14  LONG-TERM FOLLOW-UP.  SO, I SEE IT, BUT AGAIN IT REINFORCES HOW

15  SKETCHY -- THIS COULD NOT BE CALLED A PROTOCOL.  THIS IS A VERY

16  EARLY RUDIMENTARY DESIGN CONCEPT SHEET.

17  Q.  DR. TOPOL, THE CONCEPT SHEET THAT HAS YOUR NAME ON IT AND

18  DR. BHATT'S NAME ON IT CALLS FOR A STUDY THAT WOULD LAST A

19  MINIMUM OF ONE YEAR; CORRECT?

20  A.  VERY LOOSELY DEFINED, YES.

21  Q.  THE CONCEPT SHEET THAT HAS YOUR NAME ON IT AND DR. BHATT'S

22  NAME ON IT ALSO CALLS FOR PATIENTS TO BE FOLLOWED UP FOR A

23  MINIMUM OF ONE YEAR.  DO YOU SEE THAT, SIR?

24  A.  THAT'S WHAT IT SAYS.

25  Q.  THE CONCEPT SHEET ALSO REFERS ON PAGE 7, SIR, TO CERTAIN

1607

1  CRITERIA FOR EXCLUSION.  DO YOU SEE THAT?

2  A.  YES.

3  Q.  THIS IS ANOTHER WAY OF SAYING THESE ARE THE TYPE OF

4  PATIENTS WHO WILL NOT BE ALLOWED TO PARTICIPATE IN THE STUDY

5  ACCORDING TO THIS CONCEPT SHEET; CORRECT?

6  A.  THAT'S CORRECT.

7  Q.  IF YOU LOOK AT NUMBER 4, DO YOU SEE THAT THE CONCEPT THAT

8  DR. BHATT WAS PROPOSING TO MERCK SAYS THAT, UNDER 4, "ANY NEED

9  FOR COX-2 INHIBITORS."  SO IF A PATIENT WANTED TO PARTICIPATE

10  IN THIS STUDY, THEY COULDN'T DO SO IF THEY ACTUALLY NEEDED

11  COX-2 INHIBITORS; IS THAT RIGHT?

12  A.  YOU'LL HAVE TO ASK DR. BHATT ABOUT THIS SINCE HE WROTE IT,

13  BUT MY INTERPRETATION IS, IF THEY DIDN'T HAVE ANY OTHER RELIEF

14  OF THEIR PROBLEM WITHOUT A COX-2 INHIBITOR, THAT THEY COULDN'T

15  BE -- THAT IS, THEY WOULD HAVE TO BE WILLING TO BE RANDOMIZED.

16  SO, YES, IF THEY HAD TO TAKE A COX-2 INHIBITOR FOR SOME REASON,

17  THEY OBVIOUSLY WOULDN'T BE A SUITABLE CANDIDATE FOR THE TRIAL,

18  THE WAY HE'S WRITTEN THIS UP.

19  Q.  ON PAGE 2 OF THIS RUDIMENTARY CONCEPT, DO YOU SEE THE

20  FIRST SENTENCE UNDER THE INTRODUCTION:  "INFLAMMATORY CELLS

21  PLAY A SIGNIFICANT ROLE IN ATHEROSCLEROSIS"?

22  A.  I AGREE WITH THAT.  I SEE IT AND I AGREE WITH IT.

23  Q.  IN THE NEXT PARAGRAPH, THE CONCEPT SHEET SAYS, "ASPIRIN,

24  BY VIRTUE OF ITS PREFERENTIAL COX-1 INHIBITORY EFFECT, PROVIDES

25  MINIMAL ANTI-INFLAMMATORY ACTION."  DO YOU SEE THAT?

1608

1  A.  I SEE THAT.

2  Q.  THEN FURTHER DOWN IN THAT SECOND PARAGRAPH THE CONCEPT

3  SHEET SAYS, "THE ADMINISTRATION OF VIOXX MAY PROVIDE A DIRECT

4  APPROACH TO REDUCE CORONARY INFLAMMATION RESULTING IN FEWER

5  CARDIOVASCULAR RECURRENT ISCHEMIC EVENTS IN PATIENTS PRESENTING

6  WITH ACUTE CORONARY SYNDROMES."  DO YOU SEE THAT?

7  A.  YES.

8  Q.  CAN YOU EXPLAIN HOW IT IS THAT VIOXX COULD ACTUALLY

9  PREVENT RECURRENT ISCHEMIC EVENTS?

10  A.  RIGHT.  SO THERE HAVE BEEN SEVERAL STUDIES NOW WITH THE

11  DIFFERENT COX-2 INHIBITORS IN PATIENTS TO LOOK AT WHETHER

12  C-REACTIVE PROTEIN IS REDUCED, WHETHER ENDOTHELIAL FUNCTION,

13  WHICH IS THE LINING OF THE ARTERY CELLS, THAT WHETHER OR NOT

14  THAT CRITICAL LAYER OF THE ARTERY WALL FUNCTIONS BETTER AND

15  WHETHER THE INFLAMMATION IS REDUCED.  INDEED, THESE MECHANISTIC

16  STUDIES HAVE SUPPORTED THE CONCEPT THAT THERE COULD BE AN

17  IMPROVEMENT IN THIS PROCESS BY SUPPRESSING INFLAMMATION WITH

18  COX-2 INHIBITORS.

19  Q.  IN MAY OF 2001 YOU BELIEVED THAT VIOXX COULD ACTUALLY HELP

20  PREVENT HEART ATTACKS; CORRECT?

21  A.  I FELT THAT THAT WAS AN IMPORTANT MECHANISM, INFLAMMATION

22  OF THE ARTERY WALL, AND THIS IS A POTENT CLASS OF

23  ANTI-INFLAMMATORIES, AND CERTAINLY THERE WAS THAT POSSIBILITY.

24  OTHER STUDIES SUGGESTED THAT POTENTIAL.

25  Q.  AM I RIGHT, DR. TOPOL, THAT IN THE CONCEPT SHEET THAT

1609

1  DR. BHATT SENT TO MERCK IN MAY OF 2001, ANTICIPATED THAT VIOXX

2  WOULD ACTUALLY PREVENT HEART ATTACKS AND NOT CAUSE THEM?

3  A.  IN PATIENTS WHO HAD ACTIVE INFLAMMATORY CORONARY DISEASE.

4  Q.  DID YOU AGREE WITH DR. BHATT THAT, IN MAY OF 2001,

5  PATIENTS WHO HAD ACTIVE INFLAMMATORY CORONARY DISEASE MIGHT BE

6  BENEFITED BY TAKING VIOXX BECAUSE IT COULD HELP THEIR HEART?

7  A.  I ALREADY ANSWERED THAT QUESTION AFFIRMATIVELY.

8  Q.  OTHER SCIENTISTS SHARED THAT VIEW, DR. TOPOL, THAT COX-2

9  INHIBITORS COULD BE BENEFICIAL TO PATIENTS WHO HAVE

10  CARDIOVASCULAR DISEASE; IS THAT RIGHT?

11  A.  I ALREADY MENTIONED THAT THERE WERE SEVERAL STUDIES

12  PUBLISHED, AND I'VE CITED THEM IN MY WORK, THAT THAT INDEED WAS

13  A POTENTIAL BENEFIT OF COX-2 INHIBITORS IN PATIENTS WITH

14  ARTERIAL DISEASE.

15  Q.  THOSE WERE THE PATIENTS YOU WERE SUGGESTING BE STUDIED;

16  CORRECT?

17  A.  PATIENTS WITH INFLAMMATORY PROVEN ARTERY DISEASE, YES.

18  Q.  FROM MAY OF 2001 THROUGH THE TIME THAT VIOXX WAS WITHDRAWN

19  IN SEPTEMBER OF 2004, YOU BELIEVED THAT, IF A CARDIOVASCULAR

20  OUTCOMES STUDY WERE DONE, IT COULD SHOW THAT VIOXX AND CELEBREX

21  ACTUALLY HELPED PROTECT THE HEART; CORRECT?

22  A.  THAT'S ONE POSSIBILITY, YES.

23  Q.  I WANT TO TALK TO YOU, DR. TOPOL, ABOUT YOUR JAMA ARTICLE

24  THAT YOU PUBLISHED IN AUGUST OF 2001.  OKAY?

25  A.  SURE.

1610

1  Q.  YOU SAID ON DIRECT EXAMINATION THAT YOU SENT THE

2  MANUSCRIPT OR THE DRAFT OF THE JAMA ARTICLE TO MERCK TO SEE

3  WHERE THERE WERE DISCREPANCIES IN THE DATA BETWEEN THE

4  PUBLISHED PAPER THAT YOU WERE PUBLISHING AND THE FDA DATABASE.

5  DO YOU REMEMBER THAT?

6  A.  THAT'S CORRECT.  I SENT THE PAPER TO DR. DEMOPOULOS -- AND

7  WE ALREADY WENT THROUGH ABOUT, WHETHER IT WAS A PAPER VERSION.

8  THEN DR. REICIN REQUESTED AN ELECTRONIC VERSION.  WE WENT

9  THROUGH THAT THIS MORNING.

10  Q.  DR. TOPOL, YOU MET WITH MERCK EMPLOYEES IN APRIL OF 2001;

11  CORRECT?

12  A.  THAT WAS A MEETING I REFERRED TO WHEN THEY CAME TO

13  CLEVELAND.

14  Q.  IS THAT THE MEETING WHERE YOU SAID DR. REICIN CAME ON

15  QUITE STRONG AND THAT YOU WOULD CONSIDER HER COMMENTS TO BE

16  BRAZEN?

17  A.  I CONSIDERED HER REMARKS ABOUT HOW WE WOULD BE EMBARRASSED

18  IF WE PUBLISHED IT TO BE INAPPROPRIATE, YES.

19  Q.  DID DR. REICIN OR DR. DEMOPOULOS EVER EXERT ANY PRESSURE

20  OR INFLUENCE ON YOU DURING THAT MEETING?

21  A.  WELL, IT'S DR. DEMOPOULOS, AND AS I CONVEYED -- I MEAN, WE

22  SUMMARIZED THIS MORNING, BUT THERE WERE SOME DEFINITE DIFFICULT

23  ISSUES THAT WERE CONFRONTED, AND THERE WAS NO QUID PRO QUO IN

24  TERMS OF INTIMIDATION.  THEY DIDN'T SAY, IF YOU DON'T PULL THIS

25  PAPER OUT AND NOT TAKE IT OUT OF ITS SUBMISSION PHASE,

1611

1  SUCH-AND-SUCH WOULD HAPPEN.  BUT IT WAS NOT WHAT I WOULD

2  CONSIDER A PLEASANT DISCUSSION.

3  Q.  ACTUALLY, ISN'T IT TRUE, DR. TOPOL, THAT YOU ENJOYED

4  MEETING WITH DR. REICIN AND DR. DEMOPOULOS?

5  A.  DR. DEMOPOULOS AND I ARE COLLEAGUES AND WE WORKED ON A

6  TRIAL TOGETHER, AND I HAD NO PROBLEM WITH DR. DEMOPOULOS.  I

7  DID HAVE A PROBLEM WITH DR. REICIN, WHO I HAD NOT MET BEFORE,

8  WHO USED DR. DEMOPOULOS AS AN ACCESS POINT, WHO CAME TO VISIT

9  AND, AS I SAID, TOLD ME THAT WE WOULD REGRET PUBLISHING THE

10  PAPER BECAUSE WE DID NOT HAVE THE DATA THAT MERCK HAD; THAT WE

11  DIDN'T UNDERSTAND THAT RHEUMATOID ARTHRITIS PATIENTS HAD MORE

12  HEART ATTACKS AND THAT WE WOULD -- WE WERE MAKING A MISTAKE.

13  THOSE WERE COMMENTS THAT I DID NOT FIND ENJOYABLE WHATSOEVER.

14  Q.  DO YOU SEE EXHIBIT 5, SIR?

15  A.  YES.

16  Q.  THIS IS AN EXHIBIT THAT THE PLAINTIFFS USED AND DIDN'T ASK

17  YOU ABOUT THE E-MAIL DATED APRIL 20, 2001, FROM YOU TO

18  DR. REICIN.  DO YOU SEE THAT IN THE MIDDLE OF THE PAGE?

19  A.  YES, I DO.

20  Q.  DO YOU TELL DR. REICIN ON APRIL 20, "I ENJOYED THE MEETING

21  WITH YOU AND LAURA AND WILL HAVE MY ASSISTANT, DONNA BRESSAN,

22  FORWARD YOU AN ELECTRONIC COPY OF THE JAMA PAPER"?

23  A.  YES, I CERTAINLY SAID THAT.  I WAS TRYING TO BE

24  POLITICALLY CORRECT AND SMOOTH OVER THE DIFFICULTIES WE HAD

25  DURING THE MEETING.

1612

1  Q.  WAS IT TRUE WHAT YOU WROTE, DR. TOPOL, THAT YOU ENJOYED

2  THE MEETING WITH LAURA AND DR. DEMOPOULOS?

3  A.  TO BE EXACT, I DID NOT ENJOY SOME OF THE INTERACTIONS, BUT

4  I TRIED TO BE CORRECT ABOUT KEEPING THINGS ON AN UPBEAT.  WHEN

5  I WROTE THAT, IT WAS DEFINITELY TO CONVEY A SENSE OF LET'S NOT

6  HAVE ANY BAD FEELINGS, AND I TRIED TO CONVEY AN UPBEAT SENSE.

7  THAT'S WHAT THAT IS.

8  Q.  DR. TOPOL, YOU ACTUALLY THOUGHT THAT IT WOULD BE GREAT TO

9  GET MERCK'S INPUT ON THE JAMA ARTICLE; CORRECT?

10  A.  I DIDN'T THINK IT WOULD BE GREAT.  I THOUGHT IT WOULD

11  BE -- BECAUSE OF BEING COLLEAGUES WITH MERCK, BECAUSE OF HAVING

12  A RELATIONSHIP WITH DRS. DIBATTISTE AND DEMOPOULOS IN ANOTHER

13  TRIAL, I THOUGHT IT WAS APPROPRIATE THAT WE GIVE THEM AN

14  OPPORTUNITY TO REVIEW THE MANUSCRIPT AND THE DATA.

15  Q.  DR. TOPOL, I'VE HANDED YOU EXHIBIT 35, WHICH IS A SERIES

16  OF E-MAILS STARTING AT THE BOTTOM.  IT'S LAURA DEMOPOULOS IS

17  WRITING TO YOU, DR. TOPOL, ON APRIL 28, 2001.  DO YOU SEE THAT,

18  SIR?

19  A.  YES.

20  Q.  SHE WRITES TO YOU, "HI.  JUST WANTED TO LET YOU KNOW THAT

21  PETE AND I" -- THAT'S PETE DIBATTISTE -- "WILL BE WORKING WITH

22  ALISE TO TRY TO INCORPORATE SOME OF THE DATA WE DISCUSSED

23  DURING OUR VISIT INTO THE JAMA MANUSCRIPT."  DO YOU SEE THAT,

24  SIR?

25  A.  YES.  I SEE IT.  I CAN READ IT VERY WELL, YES.

1613

1  Q.  YOU WROTE BACK TO LAURA ON APRIL 28 AND YOU SAID, "HI,

2  LAURA.  THAT WILL BE GREAT TO GET YOUR INPUT."  DO YOU SEE

3  THAT, SIR?

4  A.  YES.  BUT DON'T CUT OFF THE SENTENCE:  "WE HAVEN'T HEARD

5  FROM JAMA YET"; THAT IS, THE PAPER WAS ALREADY UNDER REVIEW AT

6  JAMA.  OKAY?  SO THE INPUT WAS -- AND I TOLD THIS TO LAURA ON

7  THE PHONE, AND IT'S NOT CONVEYED IN THE E-MAIL.  THE INPUT WAS

8  ABOUT DATA ON THE MANUSCRIPT AND THE DISCREPANCIES THAT WE'RE

9  CONCERNED ABOUT.  I WANT TO BE, AGAIN, PERFECTLY CLEAR.  WE

10  NEVER RECEIVED ANY MANUSCRIPT RECOMMENDATIONS, DATA CHANGES

11  FROM MERCK, FROM DR. DEMOPOULOS, DR. DIBATTISTE, OR DR. REICIN.

12  Q.  DR. TOPOL, WAS IT TRUE WHAT YOU WROTE TO LAURA DEMOPOULOS,

13  THAT YOU THOUGHT IT WOULD BE GREAT TO GET HER INPUT ON YOUR

14  MANUSCRIPT?

15  A.  I WAS THE ONE WHO OFFERED THE MANUSCRIPT TO GET THE INPUT,

16  OF COURSE.

17  Q.  YOU ACTUALLY FOUND SOME OF MERCK'S COMMENTS TO BE

18  INSIGHTFUL AND YOU WANTED TO INCORPORATE THEM; ISN'T THAT

19  RIGHT, SIR?

20  A.  NO.  I DIDN'T GET ANY COMMENTS.  WE NEVER GOT ANY

21  COMMENTS.

22  Q.  DR. TOPOL, DID MERCK EVER PROVIDE COMMENTS TO YOU ON YOUR

23  JAMA PAPER THAT YOU SUBSEQUENTLY PUBLISHED IN AUGUST OF 2001?

24  A.  I'M NOT AWARE OF ANY COMMENTS.

25  Q.  LET ME HAND YOU WHAT I'VE MARKED --- THIS IS AN E-MAIL

1614

1  DATED JUNE 20, 2001, FROM PETE DIBATTISTE TO YOU, AND IT

2  ATTACHES YOUR MANUSCRIPT FOR THE JAMA PAPER, DOESN'T IT, SIR?

3  A.  YES.

4  Q.  DO YOU SEE THAT DR. DIBATTISTE IS SAYING THIS TO YOU IN

5  THIS E-MAIL:  "LAURA AND I HAVE HAD A CHANCE TO REVIEW THE MOST

6  RECENT VERSION OF THE COX-2 MANUSCRIPT.  THANKS FOR SHARING IT

7  WITH US.  WE'VE MADE A FEW COMMENTS EMBEDDED IN THE TEXT"?  DO

8  YOU SEE THAT, SIR?

9  A.  YES.

10  Q.  THEN, IF YOU FLIP THE PAGES, YOU CAN SEE THAT ON OCCASION,

11  MERCK MADE SOME SUGGESTIONS TO YOUR PAPER.  DO YOU SEE THAT,

12  SIR?

13  A.  YES.  THERE'S JUST LIMITED -- OKAY.  I SEE THEM NOW, YES.

14  Q.  THE E-MAIL WAS WRITTEN TO YOU, WASN'T IT, DR. TOPOL?

15  A.  THE E-MAIL'S WRITTEN TO ME, BUT I DON'T RECALL EVER HAVING

16  SEEN THIS DOCUMENT OR THE E-MAIL.

17  Q.  DO YOU HAVE ANY REASON TO DISPUTE THAT YOU ACTUALLY

18  RECEIVED AN E-MAIL FROM DR. DIBATTISTE ON JUNE 20, 2001?

19  A.  WELL, THIS LOOKS UNFAMILIAR TO ME.  I DON'T REMEMBER

20  SEEING IT BEFORE.  SO IT'S CERTAINLY SOMETHING THAT I'M NOT

21  FAMILIAR WITH.

22  Q.  MY QUESTION WAS:  DO YOU HAVE ANY REASON TO DISPUTE THAT

23  YOU ACTUALLY RECEIVED IT?

24  A.  MAYBE IT WAS SENT AND I NEVER GOT IT.  MAYBE THERE WAS A

25  PROBLEM.  I DON'T KNOW.  BUT I DON'T REMEMBER SEEING IT

1615

1  PREVIOUSLY.

2  Q.  DR. TOPOL, IF YOU'D TURN TO THE PAGE THAT ENDS WITH A

3  BATES NUMBER AT THE BOTTOM AND THEN SEVERAL ZEROS, 294?

4  A.  294.  YES.

5  Q.  DO YOU SEE THAT?

6  A.  SURE.

7  Q.  HERE MERCK IS PROVIDING SOME INPUT.  YOU SEE WHAT'S

8  UNDERLINED THERE ARE THEIR SUGGESTED COMMENTS?  DO YOU SEE

9  THAT?

10  A.  WHERE IT SAYS "THESE RESULTS"?

11  Q.  YES.

12  A.  OKAY.

13  Q.  IN THE SECTION ABOUT STUDY 085 AND 090 MERCK SAYS, "THESE

14  RESULTS THAT YOU DESCRIBE, WHILE IMPORTANT, ARE INCOMPLETE.

15  WOULD YOU CONSIDER SUBSTITUTING THE FOLLOWING SECTION TO

16  PROVIDE MORE ROBUST DATA?"  DO YOU SEE THAT, SIR?

17  A.  YES.

18  Q.  THAT'S A QUESTION THAT MERCK IS ASKING YOU ABOUT WHETHER

19  YOU THINK IT WOULD BE A GOOD IDEA TO INCLUDE THE LANGUAGE THAT

20  FOLLOWS; CORRECT?

21  A.  WELL, I ALSO WANT TO POINT OUT WE SENT THIS PAPER -- I

22  SENT IT TO LAURA IN MARCH, I BELIEVE, AND SUBMITTED IT TO THE

23  JAMA, AND THIS IS THE 20TH OF JUNE.  SO THIS IS MONTHS AFTER I

24  HAD SENT IT TO THEM.  BUT, ANYWAY, PLEASE.

25  Q.  ALL THAT MERCK IS DOING HERE, BY THE WAY, IS SAYING TO YOU

1616

1  WOULD YOU CONSIDER INCLUDING THIS LANGUAGE; CORRECT?

2  A.  WELL, YES, I GUESS THAT'S WHAT THEY'RE SAYING IN THIS.

3  BUT WE CERTAINLY DIDN'T INCLUDE, AND I DON'T REMEMBER EVER

4  SEEING THIS.

5  Q.  IF YOU REMEMBER, DR. TOPOL, YOU ACTUALLY FELT THAT MERCK'S

6  COMMENTS TO YOU WERE INSIGHTFUL ABOUT THE JAMA PAPER?

7  A.  NO, I DIDN'T SAY THAT.  OKAY?

8  Q.  THIS IS AN E-MAIL FROM YOU BACK TO DR. DIBATTISTE,

9  JUNE 22, 2001.  DO YOU SEE THAT, SIR, AT THE TOP.

10  A.  OKAY.  YES, I SEE THAT.

11  Q.  DO YOU SEE THAT YOU WROTE TO DR. DIBATTISTE, "THANKS.

12  YOUR COMMENTS ON THE PAPER CAME BACK AFTER IT WAS RESUBMITTED,

13  AND NOW WE HAVE FINAL ACCEPTANCE AND WILL TRY TO WEAVE SOME OF

14  THE INSIGHTFUL POINTS INTO THE GALLEYS." DO YOU SEE THAT, SIR?

15  A.  YES.  IT'S NICE TO HAVE THIS E-MAIL TO HELP REMEMBER THE

16  INTERACTION.  YES, I DO REMEMBER THIS.

17  Q.  SO YOU NOW REMEMBER GETTING COMMENTS AND REVIEWING THEM;

18  CORRECT, SIR?

19  A.  NO.  I'LL TELL YOU WHAT I REMEMBER EXACTLY.  THE

20  GALLEYS -- THE PAPER HAD BEEN ACCEPTED, THE GALLEYS HAD ALREADY

21  BEEN SENT BACK, AND THEN AFTER THE FACT WE GOT THIS -- YOU

22  KNOW, THREE MONTHS AFTER SUBMITTING IT TO MERCK, WE GOT THESE

23  COMMENTS.  I HAD BASICALLY DISREGARDED THEM BECAUSE THE PAPER

24  WAS COMPLETE, SO I REALLY NEVER WENT INTO IT.

25  Q.  DR. TOPOL, DID YOU WRITE TO DR. DIBATTISTE ON JUNE 22,

1617

1   2001, THAT YOU WOULD TRY TO WEAVE SOME OF THE INSIGHTFUL POINTS

2   INTO THE GALLEYS?

3   A.  IN A POLITE WAY, AFTER IT WAS ALREADY FINISHED, THAT WAS A

4   COMMUNICATION I APPARENTLY MADE TO DR. DIBATTISTE, WHO I

5   REGARDED AS A LONG-TERM COLLEAGUE, YES.

6   Q.  LET ME HAND YOU WHAT I'LL MARK AS EXHIBIT 38.  THIS IS

7   YOUR JAMA PAPER?

8   A.  UH-HUH.

9   Q.  THAT WAS PUBLISHED IN AUGUST OF 2001, ISN'T IT, SIR?

10   A.  YES.

11   Q.  JAMA IS A PEER-REVIEWED PUBLICATION, ISN'T IT?

12   A.  THAT'S CORRECT.

13   Q.  IT IS A TOP JOURNAL?

14   A.  ONE OF THE TOP JOURNALS.

15   Q.  IT'S WIDELY REVIEWED BY DOCTORS?

16   A.  THAT'S CORRECT.

17   Q.  WHEN YOU WROTE THIS ARTICLE IN JAMA, IT REFLECTED YOUR AND

18   DR. NISSEN'S BEST MEDICAL JUDGMENT ABOUT THE POTENTIAL

19   CARDIOVASCULAR RISKS ASSOCIATED WITH COX-2 INHIBITORS; CORRECT,

20   SIR?

21   A.  DR. MUKHERJEE AND THE INPUT OF THE REVIEWERS AND THE

22   EDITORS.

23   Q.  YOU BOTH HAD REVIEWED, DR. NISSEN AND YOU, LOTS OF DATA

24   CONCERNING COX-2 INHIBITORS BEFORE WRITING THIS PAPER; CORRECT,

25   SIR?

1618

1  A.  YES.

2  Q.  AMONG THE MATERIALS THAT YOU REVIEWED AND DR. NISSEN

3  REVIEWED ARE THE VIGOR STUDY, THE CLASS STUDY, STUDY 090,

4  STUDY 085, ASPIRIN TRIALS; CORRECT?

5  A.  YES.

6  Q.  AND VERY SCIENTIFIC LITERATURE; RIGHT, SIR?

7  A.  THAT'S CORRECT.

8  Q.  ISN'T IT TRUE, SIR, THAT WHEN YOU WROTE THIS PAPER, YOU

9  FOUND THAT THE DIFFERENCE IN CARDIOVASCULAR EVENTS SEEN IN

10  VIGOR WAS UNEXPECTED?

11  A.  WELL, I DON'T KNOW IF I WOULD QUALIFY IT LIKE THAT.  I

12  WOULD SAY THAT IT WAS SIGNIFICANTLY DIFFERENT AND THAT WE --

13  THERE WAS A BIOLOGIC MECHANISM.

14       SO I DON'T KNOW THAT YOU WOULD WANT TO SAY IT WAS

15  UNEXPECTED.  WE ALREADY KNEW THAT PROSTACYCLIN WAS SUPPRESSED,

16  A CRITICAL CONSTITUENT FOR BLOOD CLOTS AND NORMAL ARTERY

17  FUNCTION, AND SO I DON'T KNOW THAT YOU CAN SAY IT WAS

18  UNEXPECTED.  IT WASN'T EXPECTED BY THE TRIALIST PER SE, BUT IT

19  WOULDN'T BE AT ALL BIOLOGICALLY IMPLAUSIBLE.

20  Q.  IF YOU'D TURN TO THE PAGE IN YOUR PAPER, 958.

21  A.  YES.

22  Q.  SECOND COLUMN, LAST PARAGRAPH.  DO YOU WRITE IN YOUR PAPER

23  "OUR ANALYSIS HAS SEVERAL SIGNIFICANT LIMITATIONS.  THE

24  INCREASE IN CARDIOVASCULAR EVENTS IN THESE TRIALS WAS

25  UNEXPECTED."  IS THAT WHAT YOU WROTE?

1619

1   A.   THAT'S THE STATEMENT I'M TRYING TO PUT IN CONTEXT.

2   Q.   YOU SAY --

3   A.   IT SAYS, "AND EVALUATION OF THESE ENDPOINTS WAS NOT

4   PRESPECIFIED."  SO THAT'S PART OF -- IT'S INTERDEPENDENT.  IF

5   YOU DON'T ANTICIPATE THE ENDPOINTS AND SOME OF THE ISSUES ARE

6   UNEXPECTED, IT'S NOT A MATTER OF BIOLOGIC EXPECTATION; IT'S A

7   MATTER OF WHETHER THE TRIAL IS DESIGNED TO LOOK AT THIS

8   QUESTION.

9   Q.   YOU SAID ON DIRECT EXAMINATION THAT YOU FELT THERE WAS NO

10   BASIS FOR THE NAPROXEN HYPOTHESIS.  WAS THAT YOUR TESTIMONY?

11   A.   THAT ON THE COURSE OF HOW THIS PLAYED OUT FROM 2001 WHEN

12   THAT NAPROXEN HYPOTHESIS WAS FIRST TOUTED BY MERCK AND PUT IN

13   THE TARGUM REPORT TO THE PRESENT, OVER TIME IT WAS VERY CLEAR

14   THAT THAT COULD NOT BE TENABLE.

15   Q.   YOU SAID ON DIRECT EXAMINATION "THE ONLY APPROPRIATE

16   CONCLUSION WOULD BE THAT THERE'S A PROBLEM WITH THE

17   EXPERIMENTAL DRUG VIOXX."  RIGHT, SIR?  DO YOU REMEMBER

18   TESTIFYING TO THAT?

19   A.   I REMEMBER TESTIFYING; AND I REMEMBER THE STATEMENT IS

20   VERY CLEAR, COMPARING A WELL-ACCEPTED HISTORICAL ANCHOR,

21   NAPROXEN, VERSUS AN EXPERIMENTAL NEW DRUG, AND MAKING THE

22   CONCLUSION THAT THE ONLY REASONABLE CONCLUSION AS A CLINICAL

23   TRIALIST IS TO SAY THE EXPERIMENTAL ARM HAS A PROBLEM.  NONE OF

24   THESE WERE REPORTED IN THE NEW ENGLAND JOURNAL OF MEDICINE

25   PAPER.

1620

1

2

3  Q.  WELL, LET'S SEE WHAT CONCLUSION YOU REACHED WHEN YOU WROTE

4  THIS PAPER IN AUGUST OF 2001.  IF YOU'D TURN TO PAGE 957, THE

5  FIRST COLUMN, LAST PARAGRAPH, THE RESULTS OF THE VIGOR STUDY

6  CAN BE EXPLAINED BY EITHER A SIGNIFICANT PROTHROMBOTIC EFFECT

7  FROM VIOXX OR AN ANTITHROMBOTIC EFFECT FROM NAPROXEN (OR

8  CONCEIVABLY BOTH)."  DO YOU SEE THAT, SIR?

9  A.  NOT ONLY DO I SEE IT, BUT I ACKNOWLEDGED THIS SEVERAL

10  TIMES EARLIER TODAY, THAT THAT'S A POSSIBILITY.  WE WOULDN'T

11  JUST DISMISS WHAT MERCK PUT FORTH.  IT'S CERTAINLY A

12  POSSIBILITY, AND WE ACKNOWLEDGE IT.  I MENTIONED AT LEAST

13  TWICE, IF NOT THREE TIMES, IN THE PAPER.  I PUT THAT IN THE

14  DEPOSITION -- IN THE TESTIMONY EARLIER TODAY.

15  Q.  THE REASON THAT YOU FELT THAT NAPROXEN AND ITS

16  CARDIOPROTECTIVE EFFECTS COULD EXPLAIN THE RESULTS IN VIGOR IS

17  THAT NAPROXEN HAD SIGNIFICANT ANTICLOTTING EFFECTS, DOESN'T IT,

18  SIR?

19  A.  THAT'S WHAT MERCK WAS ADVANCING, THAT NOTION, BUT WHETHER

20  OR NOT THAT WAS CLINICALLY MEANINGFUL WAS NOT EVER DETERMINED.

21  Q.  IF YOU LOOK TWO SENTENCES DOWN, "NAPROXEN HAS SIGNIFICANT

22  ANTI-PLATELET EFFECTS," WHICH MEAN PLATELET -- "WITH MEAN

23  PLATELET AGGREGATION INHIBITION OF 93 PERCENT COMPARED WITH

24  PLATELET AGGREGATION INHIBITION OF 92 PERCENT FOR THOSE TAKING

25  ASPIRIN."  DO YOU SEE THAT, SIR?

1621

1  A.  YES.  WE REFERENCED WHERE THAT DATA CAME FROM.

2  Q.  YOU REFERENCED WHERE THAT DATA CAME FROM.  THAT WAS AN FDA

3  DOCUMENT; CORRECT, SIR?

4  A.  RIGHT.

5  Q.  DO YOU SEE IN THE SECOND COLUMN OF YOUR ARTICLE ON

6  PAGE 957 YOU ALSO SAY THAT "NAPROXEN, BUT NOT IBUPROFEN OR

7  DICLOFENAC, RESULTED IN A HIGH LEVEL OF PLATELET AGGREGATION

8  INHIBITION SIMILAR TO THAT ACHIEVED WITH ASPIRIN"?  DO YOU SEE

9  THAT, SIR?

10  A.  YES.

11  Q.  THEN YOU WRITE ABOUT FLURBIPROFEN, WHICH IS SOMETHING THAT

12  THE PLAINTIFF'S LAWYER ASKED YOU ABOUT; RIGHT?

13  A.  YES.

14  Q.  YOU WROTE IN JAMA:  "THERE IS CLINICAL EVIDENCE THAT

15  FLURBIPROFEN, 50 MILLIGRAMS TWICE DAILY FOR SIX MONTHS, REDUCED

16  THE INCIDENCE OF MI BY 70 PERCENT COMPARED WITH PLACEBO."

17  ISN'T THAT WHAT YOU WROTE, SIR?

18  A.  YES.

19  Q.  THEN YOU SAY, "INDOBUFEN, ANOTHER NSAID, WAS AS EFFECTIVE

20  AS ASPIRIN IN PREVENTING" -- AND THEN YOU CONTINUE; CORRECT,

21  SIR?

22  A.  YES.

23  Q.  THEN YOU SAY, "BECAUSE OF THE EVIDENCE FOR AN

24  ANTI-PLATELET EFFECT OF NAPROXEN, IT IS DIFFICULT TO ASSESS

25  WHETHER THE DIFFERENCE IN CARDIOVASCULAR EVENT RATES IN VIGOR

1622

1  WAS DUE TO A BENEFIT FROM NAPROXEN OR TO A PROTHROMBOTIC EFFECT

2  FROM VIOXX." DO YOU SEE THAT?

3  A.  AS I SAID, THIS WAS ACKNOWLEDGED AT LEAST TWO TO THREE

4  TIMES IN THE MANUSCRIPT, YES.

5  Q.  I WANT TO TALK ABOUT FIGURE 3 FOR JUST A MINUTE, PAGE 957,

6  FIGURE 3.

7  A.  JAMA ARTICLE?

8  Q.  YES.

9  A.  FIGURE 3?

10  Q.  DO YOU SEE THAT?

11  A.  YES.  I'M WITH YOU, YES.

12  Q.  LET ME SEE IF I UNDERSTAND THIS AND YOUR ANALYSIS HERE.

13  WHAT YOU DID IN YOUR PAPER WAS TO TAKE A PLACEBO GROUP AND THE

14  RATE, ANNUALIZED RATE OF MI'S OR HEART ATTACKS IN A PLACEBO

15  GROUP, AND YOU OBTAIN THOSE NUMBERS FROM FOUR DIFFERENT ASPIRIN

16  TRIALS; IS THAT RIGHT?

17  A.  NO.  ACTUALLY, THE TRIALS WERE PULLED TOGETHER BY A

18  BRITISH HEART JOURNAL PAPER; AND WE TOOK THAT, WHICH IS THE

19  LARGEST DATA SET WE COULD FIND, TO HAVE AS AN ANCHOR OR

20  REFERENCE TO THE COX-2 INHIBITOR TRIALS, YES.

21  Q.  THEN YOU COMPARED THE ANNUALIZED RATE OF MYOCARDIAL

22  INFARCTIONS IN THOSE FOUR TRIALS TO THE MI RATE IN VIGOR AND IN

23  CLASS, THE CELEBREX TRIAL; CORRECT, SIR?

24  A.  YES.

25  Q.  AND ACCORDING TO FIGURE 3, THIS SHOWS THAT CELEBREX HAS A

1623

1  HIGHER ANNUALIZED MYOCARDIAL INFARCTION RATE THAN VIGOR; IS

2  THAT RIGHT, SIR?

3  A.  THAT'S RIGHT, BUT THEY'RE VERY CLOSE.  THEY'RE BOTH .80,

4  .74, YES.

5  Q.  YOU NEVER RECOMMENDED THAT MERCK WITHDRAW VIOXX AT ANY

6  POINT WHILE IT WAS ON THE MARKET; CORRECT, SIR?

7  A.  I DID NOT RECOMMEND ITS WITHDRAWAL.

8  Q.  LOOK AT YOUR JAMA ARTICLE FOR ME, SIR.

9  A.  YES.  I KNOW EXACTLY WHAT'S GOING TO BE YOUR LINE OF

10  QUESTIONING HERE.

11  Q.  IF YOU'D TURN TO PAGE 956 --

12  A.  YES.

13  Q.  -- DO YOU SEE IN THE MIDDLE COLUMN YOU DEVOTE A WHOLE

14  SECTION TO STUDY 085 AND STUDY 090?  DO YOU SEE THAT, SIR?

15  A.  THAT'S RIGHT.

16  Q.  YES?

17  A.  YES.

18  Q.  YOU TALK ABOUT STUDY 090 AND 085 IN THIS ARTICLE, DON'T

19  YOU, IN AUGUST OF 2001?

20  A.  YES.

21  Q.  YOU OBTAINED INFORMATION ABOUT STUDY 090 FROM THE FDA'S

22  WEB SITE; CORRECT, SIR?

23  A.  YES, BUT NOT THOROUGHLY ENOUGH AT THIS TIME.

24  Q.  DO YOU SEE IN YOUR JAMA ARTICLE, WHEN YOU WERE WRITING TO

25  DOCTORS, YOU WROTE ABOUT STUDY 085 AND STUDY 090 TOGETHER;

1624

1  RIGHT?

2  A.  YES.

3  Q.  YOU DID THAT, SIR, IN JAMA BECAUSE STUDY 085 WAS A TWIN

4  STUDY, AN IDENTICAL STUDY TO STUDY 090; CORRECT?

5  A.  IT IS NOT A TWIN STUDY WHEN ONE TURNS OUT TO COME OUT

6  DIFFERENTLY THAN THE OTHER.

7  Q.  I'M TALKING ABOUT THE DESIGN, NOT THE RESULT.  IT WAS A

8  TWIN STUDY, WASN'T IT, SIR?

9  A.  NO.  THERE WERE SIGNIFICANT DIFFERENCES IN THE DESIGN AS

10  WELL.  THEY WERE BOTH IN OSTEOARTHRITIS, BUT STUDY 085 AND 090

11  HAD DIFFERENCES, FOR EXAMPLE, IN THE DOSE; AND THERE WAS

12  ASPIRIN USED.  THERE WERE DIFFERENT -- I DON'T REMEMBER ALL THE

13  DETAILS, BUT 085 AND 090 WERE NOT IDENTICAL.

14  Q.  LET'S LOOK AT WHAT YOU WROTE BACK AT THE TIME IN JAMA.  DO

15  YOU SEE THAT "STUDY 085," YOU SAY, "WAS A RANDOMIZED,

16  DOUBLE-BLIND PLACEBO-CONTROLLED TRIAL VERSUS" -- AND THAT'S THE

17  12.5-MILLIGRAM DOSE.  DO YOU SEE THAT?

18  A.  YES.

19  Q.  "VERSUS NABUMETONE, 1,000-MILLIGRAM DOSE.  DO YOU SEE

20  THAT, SIR?

21  A.  YES.

22  Q.  THAT'S THE IDENTICAL DOSE OF VIOXX AND NABUMETONE THAT WAS

23  USED IN STUDY 090; CORRECT?

24  A.  YES.  BUT AS IT TURNS OUT, THERE ARE DIFFERENCES, AND I

25  HAVE TO GO TO THE TARGUM REPORT.

1625

1  Q.  IS THIS WHAT YOU WROTE IN YOUR ARTICLE, SIR?

2  A.  THAT IS WHAT'S IN THE ARTICLE.  BUT YOU'RE ASKING ABOUT

3  WHETHER THEY ARE TWIN STUDIES AND THE SAME, AND THEY'RE NOT ALL

4  THE SAME, NO.

5  Q.  DO YOU SEE THAT STUDY 085 INVOLVED AN EVALUATION OF THE

6  TREATMENT OF VIOXX IN OSTEOARTHRITIS PATIENTS WHO HAD KNEE

7  PROBLEMS?  DO YOU SEE THAT?

8  A.  YES.

9  Q.  THAT'S THE SAME WITH 090; CORRECT?

10  A.  YES.  THE PATIENT COMPLAINT OF KNEE ARTHRITIS IS THE SAME.

11  Q.  THE DURATION OF THE TRIALS 085 AND 090 WERE ALSO THE SAME,

12  SIX WEEKS; CORRECT?

13  A.  THAT'S WHAT IT SAYS HERE.  I'D LIKE TO GO BACK TO THE

14  TARGUM REPORT TO VERIFY THAT.

15  Q.  DO YOU SEE THAT IN YOUR ARTICLE THAT YOU WROTE:  "PATIENTS

16  IN 085 WERE ALLOWED TO TAKE LOW-DOSE ASPIRIN FOR

17  CARDIOPROTECTION, AND FOR 090, ASPIRIN FOR CARDIOPROTECTION WAS

18  ALSO ALLOWED."  DO YOU SEE THAT, SIR?

19  A.  THAT'S WHAT IT SAYS IN THE ARTICLE.  AGAIN, WE HAD LIMITED

20  ACCESS TO 090.

21  Q.  WELL, THE ACCESS YOU HAD TO 090, SIR, IS REFERENCED ON THE

22  LAST PAGE OF YOUR ARTICLE IN FOOTNOTE 22; CORRECT?

23  A.  WHICH IS THE FDA WEB SITE.

24  Q.  YOU WENT TO THE FDA WEB SITE TO FIND INFORMATION FROM THE

25  FDA ABOUT STUDY 085 AND 090; CORRECT?

1626

1  A.  THAT'S RIGHT, BUT THAT'S NOT COMPLETE INFORMATION.  THAT'S

2  THE PROBLEM.

3  Q.  LET ME POINT OUT, SIR, THAT WHEN YOU WROTE YOUR ARTICLE AT

4  THE TIME, DO YOU SEE THAT YOU WROTE FOR STUDY 085 THAT THERE

5  WERE THREE TOTAL CARDIOVASCULAR EVENTS IN THE TRIAL:  ONE FOR

6  VIOXX, TWO FOR NABUMETONE, AND NONE FOR THE PLACEBO GROUP?  IS

7  THAT WHAT YOU WROTE IN YOUR JAMA ARTICLE?

8  A.  FOR STUDY 085.

9  Q.  DID YOU WRITE FOR STUDY 090 THAT THERE WERE 9

10  CARDIOVASCULAR EVENTS, FOR VIOXX, 2 FOR NABUMETONE, AND 1 FOR

11  PLACEBO?

12  A.  THAT'S WHAT IT SAYS IN THE ARTICLE.

13  Q.  IT WAS IMPORTANT TO PROVIDE INFORMATION ABOUT 085 AND 090

14  BECAUSE YOU WANTED TO GIVE THE PEOPLE WHO READ THIS ARTICLE

15  INFORMATION ABOUT BOTH STUDIES; CORRECT?

16  A.  WELL, WE CONCENTRATED MAINLY ON VIGOR, SO WE GAVE THE

17  OTHER TWO STUDIES, 085 AND 090, WHICH AT THAT TIME WE WEREN'T

18  AS CONCERNED.  WE DIDN'T MAKE MUCH OF THESE TWO STUDIES; THAT'S

19  TRUE.

20  Q.  YOU NEVER MENTIONED THE RESULTS OF STUDY 085 WHEN THE

21  PLAINTIFF'S LAWYERS WERE ASKING YOU QUESTIONS, DID YOU, SIR?

22  A.  I WASN'T ASKED ABOUT 085.

23  Q.  DR. TOPOL, I'M GOING TO SHOW YOU AT PAGE 958 IN THE FIRST

24  COLUMN, SECOND FULL PARAGRAPH, YOU SAY, SECOND SENTENCE:  "TWO

25  SMALLER STUDIES (STUDY 085 AND STUDY 090) OF VIOXX, THAT BOTH

1627

1  ALLOWED THE USE OF LOW-DOSE ASPIRIN AND DID NOT DEMONSTRATE THE

2  SIGNIFICANT INCREASE IN CARDIOVASCULAR EVENT RATE NOTED IN

3  VIGOR."  DID YOU WRITE THAT, SIR?

4  A.  THAT WAS IN OUR PAPER, AGAIN, FROM THE WRONG DATA THAT WE

5  DID NOT HAVE ACCESS TO.

6  Q.  I WANT TO KNOW WHAT DATA YOU HAD ACCESS TO AFTER THIS

7  POINT THAT YOU DIDN'T HAVE ACCESS TO IN --

8  A.  I'LL BE HAPPY TO GO OVER THAT IF YOU GIVE ME AN

9  OPPORTUNITY.

10  Q.  -- JAMA?

11  A.  PAGE 32 OF THE TARGUM REPORT.

12  Q.  THE TARGUM REPORT YOU SAW BACK IN FEBRUARY 2001, SIR?

13  A.  RIGHT.  BUT THEN WE HAD THE DETAILS OF THESE PATIENTS, FOR

14  EXAMPLE, PLACEBO, CORONARY OCCLUSION, AND WE COULD SAY HAD

15  NOTHING TO DO WITH A HEART ATTACK.

16  Q.  DR. TOPOL, THE TARGUM REPORT THAT YOU ARE RELYING ON NOW

17  FOR YOUR REVIEW THAT STUDY 090 WAS A SIGNAL --

18  A.  YES.

19  Q.  -- FOR CARDIOVASCULAR RISK IS THE SAME REPORT THAT YOU

20  CITE IN YOUR JAMA ARTICLE AND THAT YOU RELIED ON IN YOUR JAMA

21  ARTICLE; IS THAT TRUE?

22  A.  WE HAD THE DETAILS OF EACH OF THE PATIENTS.

23  Q.  YOU HAD THAT ALSO IN FEBRUARY 2001?

24  A.  I DID NOT HAVE ACCESS TO IT.

25  Q.  DR. TOPOL, DID YOU WRITE IN AUGUST OF 2001 THAT "TWO

1628

1  SMALLER STUDIES (STUDY 085 AND STUDY 090) DID NOT DEMONSTRATE

2  THE SIGNIFICANT INCREASE IN CARDIOVASCULAR EVENT RATE NOTED IN

3  VIGOR"?  DID YOU WRITE THAT?

4  A.  THAT'S CORRECT.

5  Q.  DID YOU ALSO SAY IN THE NEXT SENTENCE, "HOWEVER, THESE

6  STUDIES HAD SMALLER SAMPLE SIZES, USED ONLY 25% OF THE DOSE OF'

7  VIOXX USED IN VIGOR AND HAD FEW EVENTS FOR MEANINGFUL

8  COMPARISON"?  DID YOU WRITE THAT THEN, SIR?

9  A.  THAT'S RIGHT.

10  Q.  I WANT TO TRY TO KEEP TRACK OF THE NUMBERS THAT YOU'VE

11  USED OVER TIME FOR STUDY 090, AND SO I'M GOING TO GIVE YOU A

12  CHART AND ASK YOU TO CONFIRM THAT THIS IS CORRECT.  IN YOUR

13  AUGUST 2001 JAMA ARTICLE FOR STUDY 090, YOU SAID THAT THERE

14  WERE 6 CARDIOVASCULAR EVENTS IN THE VIOXX GROUP; CORRECT?

15  A.  RIGHT.

16  Q.  THIS IS AN E-MAIL AT THE BOTTOM THAT YOU WROTE TO MARLENE

17  GOORMASTIC ON OCTOBER 25, 2004; CORRECT?

18  A.  YES.

19  Q.  IS THAT YOUR STATISTICIAN?

20  A.  THAT'S THE STATISTICIAN, THAT'S RIGHT.

21  Q.  YOU'RE WRITING TO MS. GOORMASTIC ON OCTOBER 25 -- THIS IS

22  A MONTH AFTER WITHDRAWAL -- TO DO SOME STATISTICAL ANALYSIS;

23  CORRECT?

24  A.  YES.  THERE WAS SUBSEQUENT TO THIS, AS WELL, BUT THIS IS

25  ONE OF THE INTERACTIONS WE HAD.

1629

1  Q.  YOU ASK MARLENE AT THE BOTTOM:  I NEED TO DO A TEST

2  COMPARING THREE TREATMENT ARMS, VIOXX VERSUS NABUMETONE AND

3  THEN VIOXX VERSUS THE OTHER TWO COMBINED, MEANING NABUMETONE

4  AND PLACEBO.  HERE ARE THE DATA:  VIOXX, 7 OUT OF 390 EVENTS;

5  NABUMETONE, 1 OUT OF 392 EVENTS; PLACEBO, 1 OUT OF 196 EVENTS."

6  IS THAT WHAT YOU WROTE TO HER?

7  A.  THESE ARE EVENTS THAT ARE NOT DEATH, HEART ATTACK, OR

8  STROKE.  THESE ARE EVENTS REQUIRING CESSATION OF THE DRUG.

9  THIS IS A DIFFERENT PART OF THE TARGUM REPORT.  BUT, YES, THIS

10  IS ONE OF THE ANCILLARY ANALYSES THAT WAS PERFORMED.

11  Q.  THIS IS AN ANALYSIS ON STUDY 090; CORRECT?

12  A.  STUDY 090, BUT NOT ON DEATH, HEART ATTACK, AND STROKE.

13  Q.  THE NUMBERS THAT YOU'RE USING HERE ON OCTOBER 25 HAVE TO

14  DO WITH THE NUMBERS OF VIOXX PATIENTS WHO HAD TO BE

15  DISCONTINUED IN THE 090 STUDY; RIGHT?

16  A.  WITH SERIOUS CARDIOVASCULAR ADVERSE EVENTS, DIFFERENT THAN

17  DEATH, HEART ATTACK, AND STROKE.  THAT'S A DIFFERENT TABLE.

18  Q.  SO THE NUMBERS THAT YOU HAVE ARE 7, 1, AND 1.

19  A.  OKAY.

20  Q.  YOU ASK MS. GOORMASTIC AT THE BOTTOM:  CAN YOU OR SOMEONE

21  RUN THIS AND GET BACK TO ME, THE P-VALUES, RR, 95% CI?"  DO YOU

22  SEE THAT?

23  A.  YES.

24  Q.  WHAT YOU ARE ASKING HER TO DO -- A P-VALUE IS A TEST FOR

25  STATISTICAL SIGNIFICANCE; CORRECT?

1630

1  A.  YES.  YES.

2  Q.  RELATIVE RISK IS RR?

3  A.  YES.

4  Q.  CI IS CONFIDENCE INTERVAL, AND THAT'S ANOTHER TEST FOR

5  STATISTICAL SIGNIFICANCE; CORRECT?

6  A.  YES.

7  Q.  MS. GOORMASTIC WRITES BACK TO YOU THAT SAME DAY ABOVE AND

8  SAYS, "THE CHISQUARE" -- THAT'S A TYPE OF STATISTICAL TEST;

9  CORRECT? -- "INCLUDING ALL THREE GROUPS IS P EQUALS .06."  THEN

10  HERE'S THE ANSWER TO YOUR QUESTION: "FOR VIOXX VERSUS

11  NABUMETONE CHISQUARE P-VALUE IS .03."  DO YOU SEE THAT, SIR?

12  A.  YES.  I SEE THAT, BUT AGAIN IT'S NOT RELATED TO MY

13  PRINCIPAL INTEREST.

14  Q.  THE .03, JUST SO THE JURY CAN UNDERSTAND AND I CAN

15  UNDERSTAND, IF A P-VALUE IS LESS THAN .05, THAT MEANS THAT IT'S

16  STATISTICALLY SIGNIFICANT, THE RESULT; CORRECT?

17  A.  THAT'S RIGHT.

18  Q.  THE NEXT LINE SAYS "RELATIVE RISK."  DO YOU SEE YOU WROTE:

19  "RELATIVE RISK FOR VIOXX IS" -- I'M SORRY.  THIS IS WHAT

20  MS. GOORMASTIC WROTE -- "IS 7."  THEN YOU HAVE A CONFIDENCE

21  INTERVAL HERE THAT SHE WRITES:  ".9 - 56.9."  DO YOU SEE THAT

22  IN THE PARENTHESES?

23  A.  YES.

24  Q.  IF THE CONFIDENCE INTERVAL THAT IS DESCRIBED THERE

25  INCLUDES THE NUMBER 1, THAT IS, IF ONE FALLS WITHIN .9 TO 56,

1631

1  THAT MEANS THAT THE RESULT IS NOT STATISTICALLY SIGNIFICANT;

2  CORRECT, SIR?

3  A.  THAT'S CORRECT.

4  Q.  SO MS. GOORMASTIC WRITES:  "I WAS PUZZLED WHY THIS

5  CONFIDENCE INTERVAL COVERS 1 WHEN THE P-VALUE IS LESS THAN .05.

6  I THINK IT'S DUE TO THE SMALL NUMBER OF EVENTS USED."  DO YOU

7  SEE THAT?

8  A.  YES, I DO.

9  Q.  YOU HAD TALKED ABOUT THE SMALL NUMBER OF EVENTS IN YOUR

10  JAMA ARTICLE; RIGHT?

11  A.  THAT'S CORRECT.

12  Q.  THEN SHE SAYS, "WHEN I RAN A LOGISTIC REGRESSION MODEL" --

13  THAT'S ANOTHER WAY OF CALCULATING STATISTICAL SIGNIFICANCE;

14  RIGHT? -- "I GOT VERY SIMILAR RESULTS:  A RELATIVE RISK OF

15  7.1."  THEN THE CONFIDENCE INTERVAL THERE COVERS 1.  CORRECT,

16  SIR?

17  A.  THAT'S CORRECT.

18  Q.  WHEN YOU RECEIVED THIS E-MAIL FROM MS. GOORMASTIC, IT

19  WASN'T CLEAR TO YOU, SIR, WHETHER THERE WAS A STATISTICALLY

20  SIGNIFICANT DIFFERENCE OR NOT AS REFLECTED IN MS. GOORMASTIC'S

21  E-MAIL; CORRECT?

22  A.  THAT REALLY WAS NOT MY FOCUS.  I SEE WHAT YOU'RE SAYING

23  HERE, BUT THAT WAS NOT MY CONCERN.  THE EVENTS HERE FOR DEATH,

24  HEART ATTACK, AND STROKE WERE UNCLEAR.  THIS IS NOT WHAT THIS

25  REFERS TO.

1632

1  Q.  DR. TOPOL, I'VE HANDED YOU WHAT I'VE MARKED AS

2  EXHIBIT 43 --

3  A.  YES.

4  Q.  NOW, YOU WROTE "5 OUT OF 390" AND THEN YOU WROTE "1 OUT OF

5  588."  DO YOU SEE THAT IN YOUR E-MAIL?

6  A.  YES.  THAT'S EXACTLY THE SAME AS THE NEW ENGLAND JOURNAL

7  SUBSEQUENT CORRESPONDENCE.

8  Q.  THE 588, WHICH IS THE DENOMINATOR HERE, THAT IS CALCULATED

9  BY TAKING THE NUMBER OF PATIENTS IN THE NABUMETONE GROUP AND

10  ADDING THEM TO THE NUMBER OF PATIENTS IN THE PLACEBO GROUP;

11  CORRECT?

12  A.  THOSE ARE CONTROL GROUPS FOR THE TRIAL, THAT'S RIGHT.

13  THEY'RE NOT EXPERIMENTAL GROUPS.

14  Q.  SO WHAT YOU DID WAS YOU TOOK 5 EVENTS ON VIOXX AND YOU

15  COMPARED THEM TO 1 EVENT IN PLACEBO AND NABUMETONE COMBINED;

16  CORRECT?

17  A.  THAT IS HOW THIS ANALYSIS WAS PERFORMED WITH THE

18  APPROPRIATE CATEGORIZATION OF THE ENDPOINTS AND THE STATISTICS.

19  Q.  WHEN YOU WROTE YOUR JAMA ARTICLE AND THE EVENTS WERE 6, 2,

20  AND 1, YOU WROTE THAT THOSE NUMBERS WERE TOO SMALL FOR

21  MEANINGFUL COMPARISON; CORRECT?

22  A.  WITH THE ERRONEOUS DATA, THEY WERE NOT APPROPRIATE TO MAKE

23  A FINAL JUDGMENT.

24  Q.  THE NUMBERS 6, 2, AND 1 WERE SO SMALL THAT THEY COULDN'T

25  BE USED FOR MEANINGFUL COMPARISON; CORRECT?

1633

1   A.   I WOULDN'T USE THE TERM EXACTLY, NO.  THAT'S NOT THE TERM

2   THAT WE USE.

3   Q.   WELL, IF WE LOOK BACK AT YOUR JAMA ARTICLE, IT SAYS, "HAD

4   FEW EVENTS FOR MEANINGFUL COMPARISON.  FEW EVENTS."

5   A.   THAT'S RIGHT.

6   Q.   WHEN THE EVENTS WERE 6, 2, AND 1, AS YOU ANALYZED THEM IN

7   YOUR JAMA ARTICLE FOR VIOXX, NABUMETONE, AND PLACEBO, YOU

8   CONSIDERED THAT TO BE FEW EVENTS FOR MEANINGFUL COMPARISON;

9   CORRECT?

10   A.   WELL, THERE WAS NO SIGNIFICANT DIFFERENCE.  SO THAT MEANS

11   THERE'S NO MEANINGFUL DIFFERENCE, YES.

12   Q.   SO, NOW, IN NOVEMBER OF 2004, WHEN YOU SAY THE NUMBERS NOW

13   ARE 5 FOR VIOXX, 1 FOR NABUMETONE, AND 0 FOR PLACEBO, THERE'S

14   ACTUALLY FEWER EVENTS IN YOUR ANALYSIS FROM NOVEMBER OF 2004

15   THAN THERE WERE IN YOUR ANALYSIS IN JAMA; CORRECT?

16   A.   CORRECT.  BUT THE EVENTS ARE CORRECT NOW, AND THEY ARE THE

17   APPROPRIATE IRREVOCABLE ENDPOINTS OF DEATH, HEART ATTACK, AND

18   STROKE AND NOT ADMIXED WITH THINGS LIKE ATRIAL FIBRILLATION OR

19   A CHRONIC OCCLUSION THAT HAD NOTHING TO DO WITH A HEART ATTACK.

20          NOW, WE HAD A DIFFERENCE OF 1.3 VERSUS 0.2 PERCENT,

21   AND WHAT I SHOWED IN THE LETTER IN THE CORRESPONDENCE IN THE

22   NEW ENGLAND JOURNAL WITH THOSE NUMBERS IS THAT WITH THE EXACT

23   SAME VIOXX INCIDENT, 1.3 PERCENT WITH THOSE FIVE EVENTS THAT

24   YOU JUST CITED WAS EXACTLY THE SAME AS IN THE VIGOR TRIAL, 1.2

25   PERCENT FOR DEATH, HEART ATTACK, AND STROKE.  AND THERE WAS A

1634

1  7.6, THAT'S 760 PERCENT EXCESS COMPARED WITH THE CONTROLS,

2  WHETHER IT BE NAPROXEN IN VIGOR OR NABUMETONE AND PLACEBO IN

3  THE CURRENT STUDY 090 THAT WE'RE DISCUSSING.

4  Q.  DR. TOPOL, THE REASON YOU ASKED YOUR STATISTICIAN TO

5  COMPARE THE NUMBER OF EVENTS ON VIOXX TO THE NUMBER OF EVENTS

6  ON NABUMETONE AND PLACEBO COMBINED IS BECAUSE YOU KNOW THAT, IF

7  YOU COMPARE THE NUMBER OF EVENTS ON VIOXX TO JUST THE NUMBER OF

8  EVENTS ON NABUMETONE, THERE IS NO STATISTICALLY SIGNIFICANT

9  DIFFERENCE?

10  A.  THAT'S NOT THE APPROPRIATE COMPARISON.  WE ALREADY WENT

11  THROUGH THIS; THAT IS, WHEN YOU HAVE DRUGS THAT ARE A CONTROL

12  ARM THAT ARE WIDELY ACCEPTED AND HAVE BEEN AROUND FOR 10 OR 20

13  YEARS, AND YOU HAVE AN EXPERIMENTAL DRUG, IT IS APPROPRIATE,

14  JUST AS JÜNI DID IN HIS ANALYSIS IN THE LANCET AND JUST AS WE

15  DID HERE, TO COMPARE THE CONTROL ARMS WITH THE EXPERIMENTAL

16  ARM, WHICH IN THIS CASE, IS VIOXX.

17  Q.  YOU DIDN'T DO THAT IN YOUR JAMA ARTICLE, DID YOU, SIR?

18  A.  WE DIDN'T DO IT IN THE JAMA ARTICLE.  BUT WE DIDN'T HAVE

19  THE RIGHT DATA, SO OF COURSE WE COULDN'T DO IT IN THE JAMA

20  PAPER.  WE HAD ERRONEOUS CATEGORIZATION OF ENDPOINTS.

21  Q.  THE REASON THAT YOU COMBINED NABUMETONE AND PLACEBO AND

22  COMPARED THAT TO VIOXX IS BECAUSE YOU KNOW THAT, IF YOU COMPARE

23  THE NUMBER OF EVENTS ON VIOXX TO PLACEBO FOR STUDY 090, THERE

24  IS NO STATISTICALLY SIGNIFICANT DIFFERENCE; CORRECT?

25  A.  THAT IS NOT THE REASON WHY THAT ANALYSIS WAS PERFORMED

1635

1  THAT WAY.

2  Q.  AM I CORRECT, SIR, THAT IF YOU COMPARE 5 EVENTS ON VIOXX

3  TO 0 EVENTS ON PLACEBO, THERE'S NO STATISTICALLY SIGNIFICANT

4  DIFFERENCE?

5  A.  I DON'T KNOW.  WE'D HAVE TO RUN THE STATISTICS ON THAT.

6  Q.  YOU NEVER RAN THAT, DID YOU?

7  A.  I DON'T REMEMBER THAT WE RAN IT.  I DON'T HAVE IT AT HAND.

8  Q.  DR. TOPOL, I'VE HANDED YOU EXHIBIT 46, WHICH IS AN E-MAIL

9  EXCHANGE WITHIN THE FDA, AND I WANT TO POINT YOUR ATTENTION TO

10  NOVEMBER 1ST, 2004.  DO YOU KNOW WHO THE AUTHOR IS?

11  A.  DR. VILLALBA, YES, PRIMARY REVIEWER OF THIS APPLICATION.

12  Q.  DR. VILLALBA OF THE FDA WRITES:  "STUDY 090 WAS CONDUCTED

13  BETWEEN SEPTEMBER 1998 AND MAY 1999.  THIS ONE SHOWED MORE CV

14  THROMBOTIC EVENTS ON VIOXX THAN NABUMETONE OR PLACEBO.  TOPOL

15  WAS NOT INTERESTED IN STUDY 085 WHICH HAD IDENTICAL DESIGN AND

16  DURATION (6 WEEKS) AND APPROXIMATELY SAME SIZE, BUT SHOWED" --

17  AND HE UNDERLINES THIS -- "NO DIFFERENCES IN CV THROMBOTIC

18  EVENTS."  DO YOU SEE THAT, SIR?

19  A.  I SEE IT, AND I WANT TO POINT OUT THAT A CLINICAL TRIAL IS

20  FOR 20 YEARS.

21  Q.  DOCTOR --

22  A.  YOU LOOK FOR SIGNALS AND YOU DON'T DISREGARD CERTAIN

23  TRIALS AND LOOK AT CERTAIN TRIALS.

24  Q.  DR. TOPOL, YOU SEE THAT DR. VILLALBA OF THE FDA WRITES ON

25  NOVEMBER 8 OF 2004:  "MERCK MIGHT HAVE SUBMITTED STUDY 090

1636

1   RESULTS TO THE AGENCY SOMETIME EARLIER THAN JUNE 2000, BUT I DO

2   NOT THINK WE WOULD HAVE DONE ANYTHING WITH IT SINCE THE NUMBER

3   OF EVENTS WAS SMALL AND THERE WAS A TWIN STUDY (085) WITH

4   IDENTICAL SIZE AND DURATION CONDUCTED AT APPROXIMATELY THE SAME

5   TIME THAT SHOWED NO DIFFERENCE IN CV THROMBOTIC EVENTS AS

6   COMPARED TO PLACEBO AND NABUMETONE." DO YOU SEE THAT, SIR?

7   A.  I SEE THAT.

8   Q.  THIS WAS WRITTEN AFTER THE DRUG WAS WITHDRAWN; CORRECT?

9   A.  YES.  STILL, I WAS NOT INFORMED OF THESE DATES.

10  Q.  THE JÜNI ARTICLE SHOWS THAT THERE'S NO INCREASED RISK

11  ASSOCIATED WITH VIOXX AT THE 25-MILLIGRAM DOSE; CORRECT, SIR?

12  A.  NO.  NO.  THAT'S NOT AT ALL AN APPROPRIATE INTERPRETATION

13  OF THAT STUDY.

14  Q.  DO YOU ALSO SEE, DR. TOPOL, THAT IN TRIAL DURATION, DO YOU

15  SEE THAT, IN LESS THAN SIX MONTHS, THERE'S NO STATISTICALLY

16  SIGNIFICANT DIFFERENCE IN INCREASED CARDIOVASCULAR RISK IN THE

17  JÜNI STUDY?

18  A.  I'M AFRAID THE PROBLEM IS THAT YOU'RE NOT INTERPRETING

19  THESE DATA PROPERLY BECAUSE THE CONCEPT -- AND I CAN EXPLAIN IT

20  IF YOU'D LIKE -- ABOUT HETEROGENEITY AND INTERACTION.  WHAT

21  THIS TABLE SHOWS -- AND THE MOST IMPORTANT ASPECT OF THE TABLE

22  IS THIS COLUMN FOR P FOR INTERACTION.  WHAT THIS SHOWS IS THAT

23  THE DURATION, THERE'S NO DIFFERENCE:  217 PERCENT EXCESS FOR

24  LESS THAN SIX MONTHS; 233 PERCENT EXCESS FOR HEART ATTACK FOR

25  GREATER THAN SIX MONTHS.  THE SAME THING FOR DOSE.  ONLY IF

1637

1 THERE'S A P-VALUE FOR INTERACTION.

2      THE ONLY ONE THERE WAS, INTERESTINGLY, WAS ON THE

3 EXTERNAL ENDPOINT COMMITTEE, WHICH IS A TOPIC I WOULD HAVE

4 LOVED TO ADDRESS WITH YOU.  BUT THAT IS THE ONLY ONE THAT WAS

5 SIGNIFICANT, AND THAT'S THE ONLY THING YOU CAN SAY ABOUT THIS

6 TABLE.

7 Q.  LET ME ASK ONE MORE TIME.

8 A.  YES.

9 Q.  WITHOUT LOOKING AT THE P-VALUE THAT YOU JUST LOOKED AT, DO

10 YOU AGREE THAT TABLE 2 OF THE JÜNI STUDY SHOWS THAT THERE'S NO

11 STATISTICALLY SIGNIFICANT DIFFERENCE IN CARDIOVASCULAR RISK

12 ASSOCIATED WITH THE VIOXX 25-MILLIGRAM DOSE?

13 A.  IT DOES NOT SHOW THAT THERE IS NO STATISTICALLY

14 SIGNIFICANT DIFFERENCE, THAT THERE'S NO STATISTICALLY

15 SIGNIFICANT -- THERE'S NOTHING YOU CAN SAY ABOUT ANY OF THE

16 DOSES, HIGHER OR LOWER, BASED ON THIS ANALYSIS AND THE DATA.

17      MR. BECK:  YOUR HONOR, THAT'S IT FOR THE

18 CROSS-EXAMINATION.

19      MR. BLIZZARD:  YOUR HONOR, SUBJECT TO A REVIEW OF THE

20 DOCUMENTS THAT WE HAVE SUBMITTED -- AND WE WANT TO MAKE SURE WE

21 HAVE EVERYTHING OFFERED THAT WE PLAN TO OFFER -- THE PLAINTIFF

22 RESTS.

23      THE COURT:  OKAY.  MEMBERS OF THE JURY, AS I

24 MENTIONED TO YOU, THE WAY IT PROCEEDS IS THAT AFTER OPENING

25 STATEMENTS THE PLAINTIFF PUTS ON EVIDENCE, THEN AFTER THE

1638

1   PLAINTIFF PUTS ON EVIDENCE AND RESTS THE DEFENDANT MAY PUT ON

2   EVIDENCE.  WE ARE GOING TO TAKE A 10-MINUTE BREAK HERE AND THEN

3   START WITH THE DEFENDANT.  DO YOU HAVE A WITNESS?

4        MR. ISMAIL:  YES, YOUR HONOR.

5        THE COURT:  LET'S TAKE A 10-MINUTE BREAK AND LET THEM

6   SET UP.

7        THE DEPUTY CLERK:  EVERYONE RISE.

8        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

9        MR. BECK:  WE JUST NEED ON THE RECORD THAT WE --

10        THE COURT:  THE PLAINTIFF HAS RESTED SUBJECT TO

11   PUTTING ON THEIR EXHIBITS.  THE DEFENDANT HAS MOVED FOR THE

12   MOTIONS.

13        MR. BECK:  JMOL.  YOUR HONOR, WE HAVE A WRITTEN

14   MOTION, IF IT COULD BE DEEMED TENDERED RIGHT NOW.

15        THE COURT:  ANY PROBLEM WITH THAT?

16        MR. BLIZZARD:  NO, YOUR HONOR.

17        THE COURT:  THE COURT WILL ASSUME THAT THE MOTIONS

18   ARE PROPERLY FILED, TIMELY FILED, AND WILL BE SUPPLEMENTED

19   EITHER BY WRITING, ORALLY, OR BOTH AT A LATER TIME.

20        MR. BECK:  YES, YOUR HONOR.  WE WOULD LIKE TO MOVE ON

21   WITH DR. MORRISON RIGHT NOW, BUT TOMORROW MAYBE WHEN THE JURY

22   IS HAVING LUNCH, IF WE COULD HAVE FIVE MINUTES TO ADDRESS SOME

23   SPECIFIC POINTS THAT ARE IN THE WRITTEN MOTION -- EVERYBODY

24   WILL HAVE A CHANCE TO LOOK AT IT -- MAYBE WE CAN TRIM THE CASE

25   DOWN, GETTING RID OF SOME EXTRANEOUS CAUSES OF ACTION.

1639

1    THE COURT:  I THOUGHT YOU WERE GOING TO MEET TO TALK

2  ABOUT IT?

3    MR. BLIZZARD:  IF YOU'LL SEND IT TO US, WE CAN TALK

4  ABOUT IT.

5    MR. BECK:  WE'LL DO THAT.  WE HAVE COPIES FOR

6  EVERYBODY.  WE'LL BE HANDING THOSE UP TO THE COURT RIGHT NOW.

7    (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

8    THE DEPUTY CLERK:  EVERYONE RISE.

9    THE COURT:  BE SEATED, PLEASE.  MEMBERS OF THE JURY,

10  I'LL TRY TO GET YOU OUT A LITTLE EARLY TODAY SO YOU CAN GET

11  HOME, TAKE CARE OF THE KIDS, AND GO VOTE.  THAT'S THE REALLY

12  IMPORTANT THING.  I URGE EVERYBODY TO MAKE A SPECIAL EFFORT TO

13  DO IT.  LET'S CALL YOUR FIRST WITNESS, PLEASE.

14    MR. ISMAIL:  THANK YOU, YOUR HONOR.  MERCK CALLS AS

15  ITS FIRST WITNESS DR. BRIGGS MORRISON.

16    (WHEREUPON, BRIGGS MORRISON, HAVING BEEN DULY SWORN,

17  TESTIFIED AS FOLLOWS.)

18    THE DEPUTY CLERK:  PLEASE STATE YOUR FULL NAME AND

19  CORRECT SPELLING FOR THE RECORD.

20    THE WITNESS:  MY NAME IS BRIGGS, B-R-I-G-G-S,

21  WILLIAM, MORRISON, M-O-R-R-I-S-O-N.

22            DIRECT EXAMINATION

23  BY MR. ISMAIL:

24  Q.  GOOD AFTERNOON, DR. MORRISON.

25  A.  GOOD AFTERNOON.

1640

1  Q.  COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY AND TELL

2  THE FOLKS OF THE JURY A LITTLE BIT ABOUT YOURSELF.

3  A.  MY NAME IS BRIGGS MORRISON.  I'M A MEDICAL DOCTOR.  I WORK

4  FOR MERCK.

5  Q.  WHAT IS YOUR POSITION CURRENTLY AT MERCK?

6  A.  I'M A VICE PRESIDENT IN THE RESEARCH DIVISION OF THE

7  COMPANY.

8  Q.  IF YOU COULD JUST IN A FEW SENTENCES BRIEFLY DESCRIBE WHAT

9  YOUR DUTIES CURRENTLY ARE AS A VICE PRESIDENT AT MERCK.

10  A.  RIGHT NOW I OVERSEE A GROUP OF SCIENTISTS WHO ARE TRYING

11  TO INVENT AND DEVELOP NEW MEDICINES FOR THE TREATMENT OF

12  CANCER.

13  Q.  WHERE DO YOU CURRENTLY WORK AND LIVE, SIR?

14  A.  I LIVE IN SUMMIT, NEW JERSEY.  IT'S SORT OF A SUBURB OF

15  MANHATTAN.  I WORK IN NEW JERSEY AND PENNSYLVANIA.

16  Q.  DO YOU HAVE A FAMILY, DOCTOR?

17  A.  I DO.  I'M MARRIED AND I HAVE THREE KIDS, THREE BOYS AGES

18  13, 15, AND 17.

19  Q.  DOCTOR, COULD YOU JUST DESCRIBE FOR US THE EDUCATIONAL

20  BACKGROUND AND TRAINING YOU HAD BEFORE IT WAS THAT YOU ARRIVED

21  AT MERCK?

22  A.  SURE.  I WENT TO GEORGETOWN UNIVERSITY TO COLLEGE.  I WAS

23  A MAJOR IN BIOLOGY.  I WENT TO THE UNIVERSITY OF CONNECTICUT

24  FOR MEDICAL SCHOOL.  AFTER THAT I TRAINED AS AN INTERNIST AT --

25  IN BOSTON AT A HOSPITAL CALLED THE MASSACHUSETTS GENERAL

1641

1  HOSPITAL.  AFTER THAT I TRAINED, SPECIALTY TRAINING, AS A

2  CANCER DOCTOR, AN ONCOLOGIST.  THAT WAS AT THE CANCER CENTER IN

3  BOSTON.

4       THEN I DID BASIC RESEARCH -- I HAD DONE BASIC

5  RESEARCH WHEN I WAS IN MEDICAL SCHOOL, BUT DIDN'T -- ABOUT FOUR

6  OR FIVE YEARS OF BASIC RESEARCH AT HARVARD MEDICAL SCHOOL, I

7  WENT BACK TO THE CANCER CENTER AS A JUNIOR FACULTY PERSON FOR

8  ABOUT A YEAR OR SO, AND THEN I CAME TO MERCK.

9  Q.  HAVE YOU EVER HAD EXPERIENCE AS A TREATING PHYSICIAN, IN

10  YOUR EXPERIENCE, BEFORE COMING TO MERCK?

11  A.  YES.  I WAS A TREATING PHYSICIAN, ESSENTIALLY, AFTER I GOT

12  OUT OF MEDICAL SCHOOL.  SO AS PART OF INTERNSHIP AND RESIDENCY,

13  I TOOK CARE OF GENERAL INTERNAL MEDICINE PATIENTS.  THEN, AS

14  PART OF MY CANCER TRAINING, I TOOK CARE OF PATIENTS THERE.

15  AFTER I FINISHED MY RESIDENCY, I ALSO DID WHAT WE CALL

16  "MOONLIGHTING," WHERE I WORKED IN EMERGENCY ROOMS IN THE

17  GREATER BOSTON AREA, SEEING PATIENTS THERE AND COVERING OTHER

18  PHYSICIANS' PRACTICES.

19  Q.  HOW LONG IN TOTAL DID YOU HAVE IN TREATING PATIENTS BEFORE

20  YOU ARRIVED AT MERCK?

21  A.  ABOUT TEN YEARS.

22  Q.  WHEN WAS IT, DOCTOR, THAT YOU CAME TO MERCK?

23  A.  IT WAS ALMOST EXACTLY 11 YEARS AGO.  NOVEMBER -- I THINK

24  IT WAS NOVEMBER 5 OF 1995.

25  Q.  WHAT WAS YOUR POSITION AT MERCK WHEN YOU ARRIVED ALMOST

1642

1  EXACTLY 11 YEARS AGO?

2  A.  MY TITLE AT THE TIME WAS AN ASSOCIATE DIRECTOR.  I WAS

3  SORT OF AN ENTRY-LEVEL PHYSICIAN AT THE COMPANY.

4  Q.  WHY DID YOU LEAVE PRIVATE PRACTICE AND TREATING PATIENTS

5  AND COME TO MERCK?

6  A.  WHEN I CAME TO MERCK, I WAS DOING PRIMARILY BASIC RESEARCH

7  AND ALSO SEEING PATIENTS.  THE MAIN REASON I CAME TO MERCK WAS,

8  AS I SAID, I'M TRAINED AS A CANCER DOCTOR, AND IT WAS MY

9  FEELING THAT THE MEDICINES WE HAD FOR TREATING CANCER WERE NOT

10  VERY EFFECTIVE AND HAVE A LOT OF SIDE EFFECTS.  I THOUGHT,

11  GIVEN MY BASIC SCIENCE TRAINING AND MY CLINICAL TRAINING, IT

12  WOULD BE A REWARDING CAREER WORKING AND TRYING TO FIND NEW

13  MEDICINES THAT ARE MORE EFFECTIVE AND SAFER FOR TREATING

14  CANCER.

15  Q.  AT SOME POINT IN TIME, DOCTOR, DID YOU JOIN SOMETHING

16  KNOWN AS THE VIOXX PROJECT?

17  A.  YES.  WHEN I CAME --

18  Q.  WHEN WAS THAT?

19  A.  WHEN I CAME TO THE COMPANY IN '95, I JOINED -- IT WASN'T

20  CALLED VIOXX THEN.  IT STILL HAD, I THINK, AN L NUMBER.  BUT IT

21  WAS THE TEAM THAT BECAME THE VIOXX PROJECT TEAM.

22  Q.  JUST AS AN OVERVIEW, FOR WHAT PERIOD OF TIME DID YOU WORK

23  ON VIOXX AS A DEVELOPMENTAL DRUG AND THEN WORKING THROUGH THE

24  CLINICAL TRIALS OF THAT MEDICINE?

25  A.  I WAS ON THE PROJECT TEAM WHEN I CAME IN NOVEMBER OF 1995

1643

1   THROUGH THE TIME THAT THE DRUG GOT APPROVED, WHICH WAS MAY OF

2   '99.  THEN I WENT OFF THE PROJECT TEAM.  I STILL WAS AFFILIATED

3   WITH THEM -- WE'LL PROBABLY TALK A LITTLE BIT ABOUT SOME

4   STUDIES WE WERE DOING TO SEE IF VIOXX COULD TREAT CANCER, AND

5   SO I WAS HELPING SET UP THOSE STUDIES, BUT I WASN'T FORMALLY

6   PART OF THE PROJECT TEAM.

7         THEN, IN 2000, I THINK IT WAS, 2001, THERE WAS A

8   SHORT PERIOD WHERE I COVERED FOR ONE OF MY COLLEAGUES DOING

9   SOME WORK ON VIOXX.

10  Q.  CAN YOU EXPLAIN TO US GENERALLY WHAT A PROJECT TEAM IS AT

11   MERCK WITH REGARD TO THE DEVELOPMENT OF NEW MEDICINES.

12  A.  SURE.  THE PROJECT TEAM IS THE TEAM OF PEOPLE WHOSE JOB IT

13   IS TO DEVELOP A NEW PRODUCT, AND SO THERE -- IT'S PEOPLE WITH

14   DIFFERENT EXPERTISE IN DIFFERENT THINGS COME TOGETHER AS A

15   GROUP TO TRY TO DEVELOP A NEW PRODUCT.

16         SO THERE WILL BE CLINICAL SCIENTISTS LIKE MYSELF;

17   THERE WILL BE PEOPLE FROM THE REGULATORY GROUP WHO DEAL

18   PRIMARILY WITH INTERACTIONS WITH REGULATORY AGENCIES; THERE'S

19   PEOPLE FROM THE MANUFACTURING GROUP WHO HAVE TO ACTUALLY MAKE

20   THE DRUG AND MAKE THE PILLS; THERE'S FOLKS FROM THE MARKETING

21   ORGANIZATION; THERE'S PEOPLE WHO SPECIALIZE IN PHARMACOLOGY AND

22   ANIMAL PHARMACOLOGY.  SO ALL THE DIFFERENT SPECIALTIES THAT YOU

23   WOULD NEED TO DEVELOP THE DRUG COME TOGETHER AS PART OF THE

24   PROJECT TEAM.

25  Q.  WAS THERE A PROJECT TEAM FORMED ALREADY BY THE TIME THAT

1644

1  YOU ARRIVED AT MERCK IN 1995 WITH REGARD TO WHAT EVENTUALLY

2  BECAME VIOXX?

3  A.  YES, THERE WAS.

4  Q.  WAS THE PROJECT TEAM THAT YOU HAVE JUST DESCRIBED IN THE

5  GENERAL SENSE THE SAME TYPE OF TEAM THAT WAS IN PLACE FOR

6  VIOXX?

7  A.  YES.

8  Q.  APPROXIMATELY HOW MANY DOCTORS AND SCIENTISTS WORKED WITH

9  YOU ON THE VIOXX PROJECT TEAM THROUGH THE DEVELOPMENT OF THE

10  MEDICINE?

11  A.  WHEN I FIRST JOINED -- WE'LL GET INTO AN EXPLANATION OF

12  THE DIFFERENT PHASES OF DEVELOPMENT, BUT VIOXX WAS PRETTY EARLY

13  IN ITS DEVELOPMENT, SO I THINK THERE PROBABLY WEREN'T MORE THAN

14  MAYBE A DOZEN OR TWO PEOPLE ON THE PROJECT TEAM.  BY THE TIME

15  WE GOT TO THE APPROVAL, I WOULD SAY THERE WERE PROBABLY CLOSE

16  TO 100 PEOPLE WORKING ON THE PROJECT TEAM.

17  Q.  IN YOUR WORK ON THE VIOXX PROJECT TEAM, DOCTOR, DID YOU

18  COME TO REVIEW THE CLINICAL SCIENCE AND LABORATORY DATA THAT

19  HAD BEEN CONDUCTED BY THE OTHER MERCK SCIENTISTS AT THAT POINT

20  IN TIME?

21  A.  YES.

22  Q.  DO YOU HAVE AN UNDERSTANDING OF WHY IT WAS THAT THE MERCK

23  SCIENTISTS WERE WORKING TO DEVELOP A COX-2 INHIBITOR?

24  A.  YES, I DO.

25  Q.  CAN YOU PLEASE TELL US THE REASONS FOR THAT DEVELOPMENT?

1645

1  A.  VERY SIMPLY -- I THINK YOU'VE HEARD ABOUT THIS IN THE --

2  THROUGHOUT THE TRIAL -- THE PROMISE OF VIOXX WAS THAT THERE

3  WOULD BE A MEDICINE THAT COULD TREAT THE PAIN AND INFLAMMATION

4  THAT PATIENTS HAVE FROM VARIOUS FORMS OF ARTHRITIS WITHOUT

5  DAMAGING THE STOMACH AND WITHOUT THINNING THE BLOOD.  THOSE

6  WERE THE TWO SIDE EFFECTS OF TRADITIONAL NONSTEROIDALS THAT WE

7  THOUGHT VIOXX WOULD NOT HAVE.

8  Q.  PRIOR TO THE DEVELOPMENT OF COX-2 INHIBITORS LIKE VIOXX,

9  WHAT WAS THE STANDARD OF THERAPY WITH REGARD TO

10  ANTI-INFLAMMATORY MEDICATIONS?

11  A.  THE STANDARD WERE THESE SO-CALLED NONSTEROIDAL ANTIBIOTIC

12  INFLAMMATORIES YOU HEARD THEM TALK ABOUT, THE SORT OF

13  NONSELECTIVE ONES THAT INHIBIT BOTH COX-1 AND COX-2.

14  Q.  WHAT ARE SOME EXAMPLES OF THOSE TYPES OF MEDICINES?

15  A.  ONES THAT I THINK EVERYBODY WOULD KNOW ARE THINGS LIKE

16  IBUPROFEN, WHICH IS EITHER -- AN OVER-THE-COUNTER VERSION OF

17  THAT IS MOTRIN; NAPROXEN, THE OVER-THE-COUNTER VERSION OF THAT

18  IS ALEVE.  THERE ARE MANY OTHERS THAT ARE NOT OVER-THE-COUNTER;

19  THEY'RE PRESCRIPTION STRENGTH, THINGS LIKE DICLOFENAC AND

20  INDOMETHACIN.  THERE MUST BE ABOUT 20 OF THESE NONSTEROIDALS.

21  Q.  DOCTOR, CAN YOU -- AND MAYBE WE CAN USE A FLIP CHART TO DO

22  THIS -- EXPLAIN TO THE JURY WHAT WAS EVENTUALLY DISCOVERED AS

23  THIS PROBLEM WITH GASTROINTESTINAL SIDE EFFECTS THAT YOU HAVE

24  DISCUSSED WITH THE TRADITIONAL ANTI-INFLAMMATORY MEDICINES?

25        THE WITNESS:  IS IT OKAY IF I STEP DOWN?

1646

1       THE COURT:  SURE.

2       MR. BLIZZARD:  YOUR HONOR, CAN I COME AROUND WHERE I

3  CAN SEE?

4       THE COURT:  CERTAINLY.

5       THE WITNESS:  I'LL TRY TO EXPLAIN BRIEFLY THE SCIENCE

6  THAT I UNDERSTOOD AT THE TIME WHEN WE WERE WORKING ON VIOXX.

7           SO YOU HAVE HEARD, I THINK, THE TERM ENZYMES.

8  ENZYMES ARE ESSENTIALLY LITTLE FACTORIES THAT ARE IN YOUR BODY

9  THAT MAKE CHEMICALS, IN SIMPLE TERMS.  THERE ARE MANY, MANY

10 DIFFERENT KINDS OF FACTORIES.  SO IF YOU THINK ABOUT YOUR SKIN

11 VERSUS YOUR EYE VERSUS YOUR EAR, THEY DO DIFFERENT THINGS.  THE

12 WAY THE BODY ALLOWS THEM TO DO DIFFERENT THINGS IS THEY HAVE

13 DIFFERENT FACTORIES IN DIFFERENT PARTS OF THE BODY.

14          THE BODY ALSO HAS FACTORIES THAT AREN'T NORMALLY

15 AROUND BUT YET SORT OF ACTIVATED IF YOU NEED THEM.  SO IF YOU

16 CUT YOURSELF, YOU MIGHT NOT NEED YOUR BLOOD TO CLOT, BUT ONCE

17 YOU CUT YOURSELF, YOU DO.  SO THE FACTORIES THAT ARE INVOLVED

18 IN THAT WOULD GET TURNED ON.  IF YOU GOT A SPLINTER OR A

19 FISHHOOK IN YOUR FINGER OR SOMETHING, AND YOUR BODY MOBILIZED

20 SOME FACTORY TO TRY TO GET THIS OUT, THAT'S A DIFFERENT KIND OF

21 THING.  SO YOUR BODY CAN CONTROL WHERE THE FACTORIES ARE AND

22 WHEN THEY GET TURNED ON.

23          SO THERE'S TWO THAT ARE RELEVANT FOR THIS, AND I

24 KNOW YOU HAVE HEARD A LOT ABOUT IT, BUT I'LL GIVE YOU MY BRIEF

25 VERSION OF WHAT I UNDERSTOOD WHEN I STARTED WORKING ON VIOXX.

1647

1  THE FIRST ONE IS COX-1.  SO COX-1 IS ONE OF THE THESE FACTORIES

2  THAT'S ON IN YOUR BODY ALL THE TIME.  SO AS YOU SIT HERE AND I

3  STAND HERE, ALL OF US HAVE COX-1 FACTORIES OPERATING, MAKING

4  LITTLE CHEMICALS IN VARIOUS PARTS OF YOUR BODY.

5          THE TWO PARTS THAT WE WERE MOST INTERESTED IN

6  WERE THE STOMACH AND PLATELETS.  COX-1 WORKING IN YOUR STOMACH

7  MAKES THIS PROTECTIVE LINING.  SO YOUR STOMACH IS FILLED WITH

8  ACID.  IF WE TAKE THIS FOOD IN YOUR STOMACH AND PUT IT IN A

9  GLASS AND YOU STICK YOUR FINGER IN IT, YOU'LL GET A BURN

10  BECAUSE IT'S ACID, AND IT USES THAT ACID TO DIGEST YOUR FOOD.

11  BUT, AS YOU CAN IMAGINE, THAT ACID WOULD ALSO DIGEST YOUR

12  STOMACH.  SO THE COX-1 FACTORY IN YOUR STOMACH MAKES THIS

13  PROTECTIVE LINING SO YOUR STOMACH WON'T GET DIGESTED.

14          COX-1 IN PLATELETS ALLOWS YOUR BLOOD TO CLOT.

15  SO YOU'VE HEARD ABOUT PLATELETS, THESE LITTLE THINGS THAT FLOAT

16  AROUND IN YOUR BLOOD.  THEIR JOB IS BASICALLY TO PLUG HOLES.

17  SO IF THERE'S A BREAK IN THE BLOOD VESSEL, THE PLATELETS ALL

18  CLUMP UP, AND THEY BLOCK THE HOLE.  COX-1 IN THE PLATELETS

19  ALLOWS YOUR BLOOD TO CLOT.  SO IF YOU BLOCK COX-1 -- OR I THINK

20  THE PHRASE IF YOU DAMPEN DOWN, TURN THAT OFF, YOU'LL LOSE THE

21  PROTECTIVE LINING OF YOUR STOMACH.  THAT'S WHERE YOU GET THE

22  ULCERS, AND YOU'LL LOSE THE ABILITY OF YOUR BLOOD TO CLOT AND

23  YOU'LL BLEED.

24          SO IF YOU ARE TAKING ASPIRIN OR YOU ARE TAKING A

25  NONSTEROIDAL, YOUR DOCTOR WILL TELL YOU BE CAREFUL ABOUT

1648

1  BLEEDING.  IF YOU CUT YOURSELF, YOUR BLOOD IS NOT GOING TO CLOT

2  AS WELL.  THEY WILL TELL YOU TO WATCH OUT FOR BLOOD IN YOUR

3  STOOL.  THAT'S BECAUSE YOU HAVE DECREASED THE ABILITY OF YOUR

4  BLOOD TO CLOT AND YOU HAVE CAUSED DAMAGE TO THE PROTECTIVE

5  LINING.  SO THAT'S COX-1.

6          COX-2 IS NOT NORMALLY ON.  OUR UNDERSTANDING

7  WHEN WE DEVELOPED VIOXX IS THAT THE COX-2 FACTORY IS NOT ON AS

8  WE SIT HERE TODAY.  NORMAL, HEALTHY PEOPLE DON'T HAVE COX-2.

9  COX-2 GETS TURNED ON AS A WAY TO FIGHT INFECTIONS OR VIRUSES OR

10  FOREIGN BODIES, THINGS THAT SHOULDN'T BE THERE.  SO IF YOU GET

11  A SPLINTER, A FISHHOOK, DIRT IN A WOUND, ALL THAT, YOUR BODY

12  SAYS, "THAT DOESN'T BELONG HERE.  THAT'S FOREIGN.  I NEED TO

13  GET RID OF IT," AND IT TURNS ON THE COX-2 FACTORY TO GET RID OF

14  THAT.

15          SO WHAT COX-2 WILL LEAD TO IS PAIN,

16  INFLAMMATION, AND FEVER.  SO THAT'S ALL GOOD IF YOU HAVE A CUT

17  OR YOU HAVE A SPLINTER OR YOU HAVE AN INFECTION.  THERE'S A

18  REASON WHY YOUR BODY DOES THAT, AND THESE THINGS ARE PART OF

19  YOUR BODY'S MECHANISM TRYING TO GET RID OF THE FOREIGN -- THE

20  INFECTION OR THE FOREIGN BODY.  SO, NORMALLY, IT'S NOT ON, BUT

21  IT GETS TURNED ON WHEN YOU CUT YOURSELF OR YOU HAVE AN

22  INFECTION.

23          THE PROBLEM IS THAT, PEOPLE WHO HAVE ARTHRITIS,

24  IT STAYS ON ALL THE TIME.  SO, NORMALLY, IT GOES ON AND TURNS

25  OFF, BUT IN PEOPLE WHO HAVE ARTHRITIS, IT'S ON.  SO THEY

1649

1 CONSTANTLY HAVE PAIN, INFLAMMATION, AND FEVER. THEY DON'T FEEL

2 WELL. SO THE REASON THAT YOU'RE GIVING PEOPLE THESE

3 NONSTEROIDAL ANTI-INFLAMMATORY DRUGS IS TO TURN THIS OFF, AND

4 THAT WILL TAKE CARE OF THE PAIN, THE INFLAMMATION, AND THE

5 FEVER. THE PROBLEM IS IT WILL ALSO TURN OFF THIS, AND SO THEN

6 YOU LOSE THE PROTECTIVE LINING OF YOUR STOMACH AND YOUR BLOOD

7 DOESN'T CLOT.

8        SO, ONCE THIS WAS UNDERSTOOD, THE THEORY BEHIND

9 THIS, SCIENTISTS SAID MAYBE WE CAN MAKE SOMETHING THAT ONLY

10 TURNS THIS OFF, TREATS PAIN, INFLAMMATION, AND FEVER, BUT IT

11 WON'T THIN YOUR BLOOD AND IT WON'T DAMAGE YOUR STOMACH. SO

12 THAT'S WHAT WE KNEW AT THE TIME AND WHY WE DEVELOPED VIOXX, TO

13 TRY TO FIND A MEDICINE THAT WOULD ONLY AFFECT THIS AND NOT

14 AFFECT THIS.

15 BY MR. ISMAIL:

16 Q. THANK YOU, DOCTOR. PLEASE RETURN TO YOUR SEAT. NOW,

17 DR. MORRISON, DID SCIENTISTS ALWAYS UNDERSTAND THAT THERE WERE

18 TWO OF THESE COX ENZYMES, AS YOU JUST DESCRIBED IT TO THE JURY?

19 A. NO. WHEN I WAS IN MEDICAL SCHOOL AND I WAS IN RESIDENCY

20 TRAINING AS WELL, WE ALWAYS THOUGHT THERE WAS ONLY ONE. SO IT

21 WAS JUST GENERALLY ASSUMED THAT, IF YOU MAKE A MEDICINE THAT

22 TREATS PAIN, INFLAMMATION, AND FEVER, YOU'RE GOING TO GET THE

23 STOMACH PROBLEMS AND THE BLOOD THINNING. NOBODY KNEW HOW WE

24 COULD SEPARATE THOSE. SO PEOPLE USED TO MAKE DIFFERENT

25 NONSTEROIDALS AND TRY TO SEPARATE THESE, BUT THERE WAS NO

1650

1 UNDERSTANDING OF THE SCIENCE OF WHY.

2      SO IT WAS AROUND, I THINK, 1991 THAT THIS SECOND FORM

3 OF COX-2 WAS DISCOVERED AND THAT'S -- AS PEOPLE STARTED

4 FIGURING OUT WHERE THESE THINGS ARE, WHEN THE BODY TURNS THEM

5 ON, THAT'S WHERE THIS WHOLE IDEA CAME UP, ORIGINATED.  BUT

6 BEFORE THAT, NOBODY KNEW HOW TO SEPARATE THOSE TWO THINGS.

7 Q.  OKAY.  SO IN 1991 -- DO I HAVE IT RIGHT HERE ON THE TIME

8 LINE -- THAT SCIENTISTS -- WERE THESE SCIENTISTS OUTSIDE OF

9 MERCK?

10 A.  YES.

11 Q.  -- SCIENTISTS DISCOVERED THAT THERE WERE NOT JUST ONE COX

12 ENZYME BUT TWO?

13 A.  CORRECT.

14 Q.  YOU INDICATED THAT, BACK WHEN YOU WERE IN MEDICAL SCHOOL

15 AND IN PRACTICE, DOCTORS THOUGHT THIS WAS JUST ONE OF THE

16 CONSEQUENCES OF HAVING AN ANTI-INFLAMMATORY AGENT?

17 A.  CORRECT.

18 Q.  DID YOU EVER HAVE ANY CLINICAL EXPERIENCE AS A PHYSICIAN

19 WITH THE ADVERSE CONSEQUENCES TO PATIENTS KNOCKING OUT BOTH COX

20 ENZYMES?

21 A.  SURE.  THE SIDE EFFECT ON THE STOMACH, TAKING AWAY THAT

22 PROTECTIVE LINING, WHICH, AS I SAID, IF YOU LOSE THAT NOW, YOUR

23 ACID STARTS TO DIGEST YOUR STOMACH.  IF IT DIGESTS A LITTLE

24 BIT, YOU GET WHAT WE CALL AN ULCER.  THE TYPICAL SYMPTOMS FOR

25 AN ULCER, PEOPLE GET THIS TERRIBLE BURNING PAIN IN THEIR

1651

1  STOMACH.  IF THEY EAT, IT GOES AWAY; IF THEY TAKE AN ANTACID,

2  IT GOES AWAY.  SO THAT WAS A COMMON THING THAT I WOULD SEE IN

3  EMERGENCY ROOMS OR IN PATIENTS IN THE CLINICS.

4        IF IT DIGESTS FURTHER AND IT HITS A BLOOD VESSEL, NOW

5  YOU GET BLOOD POURING INTO YOUR STOMACH.  WHEN YOU GET BLOOD

6  POURING INTO YOUR STOMACH, WHAT A PATIENT EXPERIENCES IS

7  USUALLY THEY GET VERY NAUSEOUS BECAUSE THERE'S ALL THIS STUFF

8  IN THEIR STOMACH AND THEY VOMIT.  SO THEY WILL VOMIT UP BLOOD,

9  AND THAT'S NOT AN UNCOMMON, AND I, IN WORKING IN EMERGENCY

10  ROOMS, I HAD PEOPLE COMING INTO THE EMERGENCY ROOM AND VOMITING

11  UP BLOOD.  YOUR JOB IN THE EMERGENCY ROOM IS TO TRY TO STOP THE

12  BLEEDING AND GIVE THEM BACK BLOOD IF THEY'VE LOST A LOT.

13        THE THIRD THING IS IT CAN DIGEST RIGHT THROUGH THE

14  WALL OF THE STOMACH.  IF IT DOES THAT, THEN EVERYTHING, THE

15  ACID AND ALL, JUST POURS OUT INTO YOUR BELLY, AND THAT'S WHAT

16  IN MEDICINE CALL AN ACUTE BELLY.  THEIR BELLY IS ROCK HARD.  IF

17  THEY MOVE AT ALL, THEY GET HORRIBLE PAIN, SO THAT WHEN THEY

18  COME TO THE EMERGENCY ROOM THEY JUST DON'T WANT TO MOVE BECAUSE

19  THEIR ENTIRE BELLY IS FILLED WITH ACID.  I'VE SEEN CASES LIKE

20  THAT IN EMERGENCY ROOMS, AS WELL.

21  Q.  WHEN YOU CAME TO WORK ON DEVELOPING A COX-2 INHIBITOR, DID

22  YOU VIEW THE TRADITIONAL OR THE ADVERSE EFFECTS OF TRADITIONAL

23  ANTI-INFLAMMATORIES TO BE A SERIOUS PROBLEM WITH PATIENTS?

24  A.  I DID.  I WANT TO ALSO TALK ABOUT THE PLATELET PART OF

25  THIS.  SO THERE ARE CERTAIN PEOPLE WHO YOU CAN'T GIVE THE

1652

1  NONSTEROIDAL ANTI-INFLAMMATORY TO BECAUSE IT INHIBITS THEIR

2  PLATELETS.  SO IF YOU HAVE, FOR EXAMPLE, PEOPLE WHO ARE GOING

3  INTO SURGERY, I MEAN, IT'S VERY COMMON THE SURGEONS WILL ASK TO

4  HAVE THEM STOP THEIR NONSTEROIDALS, BECAUSE IF THEY ARE ON THAT

5  AT THE TIME OF SURGERY, THERE'S MORE LIKELY TO BE BLEEDING.

6       PEOPLE WHO HAVE LIVER FAILURE -- THE LIVER MAKES SOME

7  OF THE THINGS THAT YOUR BODY USES TO CLOT, SO IF THEY HAVE A

8  BAD LIVER, THEY ARE ALREADY NOT MAKING THOSE.  YOU DON'T GIVE

9  THEM AN NSAID.  PEOPLE WITH HEMOPHILIA, THEY BLEED, SO YOU

10  CAN'T GIVE THEM AN NSAID.  THEN THE PLACE WHERE I SAW IT MOST

11  COMMONLY IS PATIENTS WITH CANCER, THE THERAPIES THAT WE USE

12  ACTUALLY DECREASE THE NUMBER OF PLATELETS.  IT TURNS OFF THE

13  ABILITY OF THE BODY TO MAKE PLATELETS.  SO THEIR BLOOD IS

14  ALREADY THIN AND WE COULDN'T GIVE THEM NSAIDS.

15       SO I THINK BOTH THE STOMACH PROBLEMS AND THE PLATELET

16  PROBLEMS, MY -- I MEAN, PART OF THE REASON I CAME TO MERCK TO

17  WORK ON THIS, I ACTUALLY THOUGHT IT WAS A BIG MEDICAL PROBLEM,

18  AND IT WOULD BE VERY IMPORTANT TO HAVE A DRUG THAT WOULDN'T

19  HAVE THOSE SIDE EFFECTS.

20  Q.  FOLLOWING THE DISCOVERY THAT THERE WERE TWO, NOT ONE, COX

21  ENZYMES, DID THE SCIENTISTS AT MERCK BEGIN WORK ON INVENTING A

22  COX-2 INHIBITOR MEDICINE?

23  A.  YES, THEY DID.

24  Q.  WE HAVE IN THE TIME LINE HERE IN THE GREEN BARS -- AND

25  WE'LL GET TO EACH OF THESE PHASES WE PROGRESS -- BUT IF YOU

1653

1  COULD TELL THE JURY WHAT THE FIRST STAGE WAS IN THE DEVELOPMENT

2  OF A COX-2 INHIBITOR.

3  A.   SO ONCE THEY FIGURED OUT THAT THERE'S THESE TWO DIFFERENT

4  FACTORIES, COX-1, COX-2, THERE ARE CHEMISTS WHICH, IN THE

5  PHARMACEUTICAL INDUSTRY, ARE CALLED MEDICINAL CHEMISTS BECAUSE

6  THEY MAKE MEDICINES.  I'M NOT A CHEMIST, SO I FIND THIS PRETTY

7  FASCINATING.  THEY ARE ACTUALLY ABLE TO MAKE A DRUG THAT ONLY

8  TURNS OFF COX-2 BUT DOESN'T TURN OFF COX-1.  THERE'S WAYS THAT

9  THE MEDICINAL CHEMISTS CAN DO THIS, BUT THAT'S THE FIRST THING

10  THEY HAVE TO DO.  SO THEY MADE ACTUALLY A SERIES OF COMPOUNDS

11  THAT WOULD ONLY INHIBIT COX-2 BUT NOT INHIBIT COX-1.

12  Q.   WE HAVE UP ON THE TIME LINE, THAT FAR-LEFT BAR THERE,

13  "BASIC SCIENCE RESEARCH FROM 1991 TO 1992."  DOES THAT HAVE ANY

14  RELATION TO THE WORK YOU JUST DESCRIBED?

15  A.   YES.  SO THEY ARE TRYING TO SET UP EXPERIMENTS THAT THEY

16  CAN SCREEN THROUGH COMPOUNDS AND FIND ONE THAT CAN ONLY INHIBIT

17  THAT COX-2 BUT NOT COX-1.  SO THEY'RE DOING THAT.  I THINK IT

18  WAS AROUND 1992 THAT THEY ACTUALLY INVENTED THE MOLECULE THAT

19  BECAME KNOWN AS VIOXX, WHICH ONLY INHIBITS COX-2, BUT NOT

20  COX-1.

21  Q.   CAN YOU THEN TAKE US TO THE NEXT PHASE OF CLINICAL AND

22  LABORATORY DEVELOPMENT FOR WHICH EVENTUALLY BECAME VIOXX,

23  DOCTOR?

24  A.   SURE.  SO FINDING THE DRUG -- ESSENTIALLY, THEY DO THOSE

25  EXPERIMENTS IN TEST TUBES.  THEY CAN ESSENTIALLY MAKE PURIFIED

1654

1  VERSIONS OF THESE TWO FACTORIES, CREATE CHEMICALS, AND

2  DETERMINE AM I INHIBITING ONE OR THE OTHER.  ONCE YOU DO THAT,

3  THEN THE QUESTION IS -- THIS WAS A HYPOTHESIS.  PEOPLE CAME UP

4  WITH THIS IDEA -- DOES IT ACTUALLY WORK?

5       SO THEY GO INTO ANIMALS.  THEY HAVE ANIMAL MODELS OF

6  PAIN AND INFLAMMATION AND ANIMAL MODELS OF STOMACH DAMAGE, AND

7  THEY TREAT THE ANIMALS WITH THESE CHEMICALS THAT THEY HAVE NOW

8  MADE AND SAY DOES IT TREAT PAIN AND INFLAMMATION, WHICH IT

9  SHOULD AND IT DID; AND DOES IT NOT DAMAGE THE STOMACH, WHICH IT

10  SHOULDN'T AND IT DIDN'T.  SO THOSE ARE ANIMAL EXPERIMENTS WHERE

11  THEY ARE TRYING TO FIGURE OUT, IN ANIMALS, AT LEAST, DOES THIS

12  SEEM LIKE THIS HYPOTHESIS IS TRUE.

13  Q.  ARE YOU FAMILIAR WITH A REGULATORY CONCEPT CALLED AN

14  INVESTIGATIONAL NEW DRUG APPLICATION?

15  A.  YES.

16  Q.  IS THAT SOMETIMES REFERRED TO AS AN IND?

17  A.  YES.

18  Q.  CAN YOU PLEASE TELL THE JURY WHEN AN IND IS IN THE CONTEXT

19  OF DEVELOPING A NEW MEDICINE?

20  A.  WHAT AN IND IS -- YOU CAN'T ADMINISTER AN EXPERIMENTAL

21  DRUG TO PATIENTS OR EVEN NORMAL VOLUNTEERS IN THE UNITED STATES

22  WITHOUT FDA APPROVAL, SO THE IND IS WHERE THE COMPANY APPLIES

23  TO THE FDA AND ASKS FOR PERMISSION TO FINISH TESTING THEIR DRUG

24  IN PEOPLE.  SO IT'S A SUMMARY OF ALL OF THE EXPERIMENTS THAT

25  HAVE BEEN DONE UP TO THAT POINT IN ANIMALS.  WE SUMMARIZE THAT

1655

1   AND THEN ASK FOR THEIR PERMISSION TO NOW BE ABLE TO START

2   TESTING THIS IN PEOPLE.

3   Q.   WAS THERE AN IND FILED BY MERCK FOR THE MEDICINE THAT

4   BECAME VIOXX?

5   A.   YES.

6   Q.   WHEN WAS THAT?

7   A.   I THINK IT WAS 1994.

8   Q.   DID THE FDA THEREAFTER ALLOW MERCK TO PROCEED IN THE

9   CLINICAL TESTING OF VIOXX?

10  A.   YES.

11  Q.   ARE THERE DIFFERENT PHASES -- BY THE WAY, WHEN WE TALKED

12  ABOUT THESE PHASES OF DRUG DEVELOPMENT, ARE THESE SORT OF THE

13  STANDARD DEVELOPMENT WHEN IT COMES TO MEDICINE, OR IS THIS

14  SOMETHING SPECIFIC THAT WAS DONE FOR VIOXX?

15  A.   NO.   THE PHASES WE ARE GOING TO TALK ABOUT ARE STANDARD

16  PHASES OF ALL DRUG DEVELOPMENT.

17  Q.   WHAT IS THE FIRST PHASE, THEN, FOR CLINICAL TRIALS AFTER

18  THE FDA ALLOWS YOU TO TEST THE MEDICINE IN HUMAN BEINGS?

19  A.   LET ME GO BACK THE ONE OTHER THING WE DIDN'T TALK ABOUT

20  BEFORE WE GIVE IT TO HUMANS; AND THAT IS, AS PART OF THE IND,

21  WE SUMMARIZE EXPERIMENTS THAT WE DO IN ANIMALS THAT LOOK AT THE

22  SAFETY OF THE DRUG.   SO MOST OF THE ORGANS IN ANIMALS -- ONES

23  THAT ARE USUALLY USED ARE MICE RATS AND DOGS -- BEHAVE THE SAME

24  WAY AS HUMANS.   SO IF YOU GIVE A DOG A COMPOUND AND IT DAMAGES

25  THEIR LIVER, THEN YOU'RE HIGHLY SUSPICIOUS IT'S GOING TO DAMAGE

1656

1  A PERSON'S LIVER.  IF YOU GIVE IT TO A DOG AND IT DAMAGES THEIR

2  KIDNEY, YOU WORRY IT'S GOING TO DAMAGE A PERSON'S KIDNEY.

3       SO WE DO WHAT ARE CALLED TOXICOLOGY STUDIES IN

4  ANIMALS SO WE CAN, NUMBER ONE, KNOW WHAT WE SHOULD LOOK FOR IN

5  PEOPLE, BUT HOPEFULLY, IT DIDN'T CAUSE SIDE EFFECTS TO THE

6  ANIMALS, SO NOW YOU CAN GO INTO PEOPLE.

7       THE FIRST EXPERIMENT DONE IN PEOPLE, TYPICALLY, IS IN

8  NORMAL VOLUNTEERS.  SO THESE ARE NORMAL, YOUNG, HEALTHY MEN.

9  THE REASON IT'S MEN IS THAT THERE'S ANOTHER SET OF EXPERIMENTS

10  WE DO IN ANIMALS TO SEE WHETHER THE DRUG WILL DAMAGE THE

11  WOMEN'S REPRODUCTIVE ORGANS.  THAT OFTEN HASN'T BEEN DONE YET

12  BY THE TIME WE START IN PEOPLE, SO WE START WITH MEN.

13       SO THESE YOUNG, HEALTHY MEN WILL TAKE ONE PILL, AND

14  THAT'S THE BEGINNING OF PHASE I.  SO THEY TAKE ONE PILL OF THE

15  MEDICINE AND THEY ARE MONITORED VERY, VERY CAREFULLY, AND THEY

16  ARE BLOOD SAMPLES TAKEN AT VARIOUS TIMES AFTER THEY TAKE ONE

17  PILL TO FIND OUT WHETHER THE DRUG ACTUALLY GETS INTO THEIR

18  BODY.

19       SO THERE ARE MEDICINES THAT YOU GO THROUGH ALL THIS

20  AND YOU GIVE IT TO PEOPLE, AND IT BASICALLY GETS BROKE DOWN IN

21  THE STOMACH AND IT NEVER GETS INTO THE BLOODSTREAM.  SO THE

22  FIRST PART OF THIS IS, WHEN THEY TAKE THE PILL, WILL IT

23  ACTUALLY GET INTO THEIR BLOODSTREAM.  THAT'S THE BEGINNING OF

24  PHASE I DONE IN NORMAL, HEALTHY MEN.

25  Q.  WERE THOSE STUDIES DONE WITH VIOXX?

1657

1  A.  YES.

2  Q.  WHAT RANGE OF DOSES WERE TESTED WITH VIOXX IN THE STUDIES

3  THAT YOU HAVE JUST DESCRIBED?

4        MR. BLIZZARD:  YOUR HONOR, I JUST WANT SOME

5  CLARIFICATION.  IS THIS BEFORE DR. MORRISON CAME TO THE COMPANY

6  THAT WE ARE TALKING ABOUT HERE?

7        THE COURT:  WHY DON'T YOU CLEAR IT UP.

8        MR. ISMAIL:  I'LL BE HAPPY TO TALK IT THROUGH.

9  BY MR. ISMAIL:

10  Q.  YOU SAID YOU ARRIVED IN 1995; IS THAT CORRECT?

11  A.  CORRECT.

12  Q.  WHEN YOU ARRIVED AT MERCK AND BEGAN WORK ON THE VIOXX

13  PROJECT TEAM, WHAT DID YOU DO?

14  A.  WHEN I FIRST GOT TO MERCK, MY FIRST TWO MONTHS,

15  ESSENTIALLY, WERE REVIEWING ALL OF THE INFORMATION THAT MERCK

16  HAD ACCUMULATED ON ALL OF THE ANIMAL TESTING, TOXICOLOGY

17  TESTING, ANY TESTING DONE IN HUMANS.  I REVIEWED ALL OF THAT

18  DATA SO THAT I UNDERSTOOD WHERE MERCK WAS WITH THEIR TESTING

19  AND REVIEWED AS MUCH AS I COULD OF THE WORLD'S LITERATURE ON

20  COX-1 AND COX-2 SO THAT I HAD A FIRM UNDERSTANDING OF WHAT

21  MERCK HAD DONE AND WHAT THE STATE OF THE SCIENCE WAS.

22  Q.  SO, AT THIS POINT IN THE PHASE I DEVELOPMENT, BY THE TIME

23  YOU HAD ARRIVED AND THE LABORATORY DEVELOPED, HAD SOME OF THAT

24  ALREADY OCCURRED ON THE VIOXX DEVELOPMENT?

25  A.  YES.  SO THE IND HAD BEEN FILED BEFORE I CAME, THESE PHASE

1658

1 I STUDIES HAD BEEN DONE BEFORE I CAME, AND MY FIRST,

2 ESSENTIALLY, ASSIGNMENT WHEN I GOT THERE WAS TO LEARN ABOUT ALL

3 THIS STUFF SO I KNEW WHAT EVERYBODY ALREADY KNEW ABOUT THE

4 SCIENCE AND THE COMPOUND.

5 Q.  IN A VERY ABBREVIATED FASHION, IS THAT WHAT KNOWLEDGE THAT

6 YOU HAVE JUST TRIED TO DISCUSS WITH THE JURY OVER THE LAST 20

7 MINUTES REGARDING THE SCIENCE THAT HAD BEEN DEVELOPED BEFORE

8 YOU ARRIVED?

9 A.  YES, THAT'S CORRECT.

10 Q.  NOW, YOU WERE DISCUSSING WITH US THE PHASE I TESTING THAT

11 WAS DONE ON VIOXX, AND I THINK I JUST ASKED WHAT THE DOSES WERE

12 THAT WERE UNDER DEVELOPMENT IN THE PHASE I PROGRAM.

13 A.  RIGHT.  IN THE PHASE I PROGRAM, ON THE PHASE I DOSE, YOU

14 WANT TO SEE DOES THE DRUG GET INTO THEIR BLOODSTREAM AND THEN

15 DOES THE BODY BREAK IT DOWN.  AS PART OF THAT, WE GIVE

16 INCREASING DOSES.  SO THE HIGHEST DOSE, AS I RECALL, IN THE

17 NORMAL, HEALTHY VOLUNTEERS UP TO 1,000 MILLIGRAMS.

18       SO, REMEMBER, THE CLINICAL DOSE IS 25 MILLIGRAMS.  IT

19 TAKES A WHILE TO FIGURE OUT EXACTLY WHAT DOSE YOU SHOULD BE

20 USING.  SO, IN THESE FIRST ONES, WE JUST KEEP RAISING THE DOSE

21 TO SEE IF ANYBODY HAS -- IF THE DRUG IS BEING HANDLED BY THE

22 BODY AND IF THERE'S ANY SIDE EFFECTS FROM IT.  SO THEY WENT AS

23 HIGH AS 1,000 MILLIGRAMS IN THE SINGLE-DOSE STUDIES.

24 Q.  WHAT WAS THE NEXT PHASE IN THE VIOXX DEVELOPMENT PROGRAM

25 AT MERCK?

1659

1   A.  LET ME JUST FINISH A LITTLE BIT ABOUT PHASE I.  SO

2   PHASE I:  ONE DOSE; YOUNG, HEALTHY MEN.  THEN YOU DO USUALLY

3   ABOUT TWO WEEKS OF DOSING IN YOUNG, HEALTHY MEN.  YOU DO THE

4   SAME THING:  YOU LOOK AT HOW THE DRUG GETS INTO THEIR BODY AND

5   HOW IT GETS OUT OF THEIR BODY.

6        THE REASON YOU DO THE LONGER DOSING IS SOMETIMES A

7   MEDICINE CAN AFFECT THE BODY, AND IT AFFECTS THE WAY THE BODY

8   HANDLES IT.  SO ONE DOSE MAY GET IN AND HANDLE WELL, BUT, OVER

9   MULTIPLE DOSES, IT NOW STARTS TO ACCUMULATE OR SOMETHING ELSE

10  CHANGES.  SO THERE'S SINGLE DOSE AND MULTIPLE DOSE IN YOUNG

11  HEALTHY MEN, AND THERE'S SINGLE DOSE AND MULTIPLE DOSE IN OLDER

12  FOLKS, IN WHAT WE CALL ELDERLY.

13       THE REASON FOR THAT IS OLDER FOLKS, ALSO, THEIR BODY

14  CAN HANDLE DRUGS VERY DIFFERENTLY THAN YOUNG FOLKS.  SO YOU DO

15  THE SAME -- SINGLE DOSE, MULTIPLE DOSE -- IN THE ELDERLY TO SEE

16  HOW DO THEY HANDLE THE DRUG AND DOES THE DRUG GET IN, DOES THE

17  DRUG GET OUT.  ALL OF THAT IS DONE IN PHASE I.

18       THERE ARE OTHER STUDIES WHERE YOU LOOK AT WHAT EFFECT

19  DOES FOOD HAVE.  SO IF YOU TAKE THE PILL ON AN EMPTY STOMACH OR

20  YOU TAKE THE PILL AFTER YOU HAVE EATEN A NORMAL BREAKFAST, DOES

21  TAKE CHANGE THE WAY THE BODY HANDLES THE DRUG?  SO ALL THIS IS

22  DONE SO WE CAN FIGURE OUT HOW PEOPLE SHOULD TAKE IT.  THAT'S

23  ALL IN THE PHASE I PART.

24  Q.  THEN, PROGRESSING FURTHER IN THE DEVELOPMENT, WHAT WOULD

25  BE THE WORK THAT WAS DONE BY MERCK IN DEVELOPING VIOXX?

1660

1  A.  AFTER PHASE I COMES PHASE II.  PHASE II IS WHERE YOU --

2  WHAT WE CALL PROOF OF CONCEPT.  SO NOW WE ARE GOING TO ASK A

3  QUESTION:  OKAY.  THE DRUG GETS INTO YOUR SYSTEM, GETS OUT OF

4  YOUR SYSTEM, DOES IT TREAT PAIN, AND DOES IT NOT DAMAGE YOUR

5  STOMACH.  SO THERE WERE THREE DIFFERENT PHASE II STUDIES THAT

6  WERE DESIGNED TO ANSWER THOSE QUESTIONS:  DOES IT TREAT PAIN

7  AND DOES IT NOT DAMAGE YOUR STOMACH?

8  Q.  WHEN YOU SAY "PROOF OF CONCEPT," WHAT TYPE OF PAIN MODELS,

9  IF YOU WILL, WERE USED TO TEST THE MEDICINE?

10  A.  THE FIRST PAIN MODEL IS AN ORAL SURGERY MODEL.  SO, AGAIN,

11  YOUNG HEALTHY -- OTHERWISE HEALTHY, COLLEGE STUDENTS OFTEN HAVE

12  THEIR WISDOM TEETH TAKEN OUT.  WHEN THEY GOT THEIR WISDOM TEETH

13  TAKEN OUT, AFTER THE NOVOCAIN WEARS OFF, THEY DEVELOP PAIN

14  BECAUSE THEY JUST HAD SURGERY.  THEN THEY GET DOSED WITH AN

15  EXPERIMENTAL DRUG AND YOU FOLLOW THEM TO FIND OUT IF THEIR PAIN

16  GOT BETTER.

17       SO JUST ONE THING TO EXPLAIN ABOUT THESE WHAT WE CALL

18  CLINICAL TRIALS.  A BIG PART OF THESE CLINICAL TRIALS IS

19  THEY'RE WHAT WE CALL BLINDED.  SO YOU, I THINK, HEARD ABOUT THE

20  TERM PLACEBO.  SO SOME OF THE PATIENTS ARE TAKING A PLACEBO;

21  SOME OF THE PATIENTS ARE TAKING -- MAYBE TAKING VIOXX; SOME OF

22  THE PATIENTS MIGHT BE TAKING ANOTHER DRUG.  NOBODY IN THE

23  EXPERIMENT KNOWS WHAT THE PERSON IS TAKING.  THE PATIENT

24  DOESN'T KNOW, THE DOCTOR DOESN'T KNOW, AND WE AT MERCK DON'T

25  KNOW.  IT'S BLINDED.

1661

1  Q.  WHAT'S THE PURPOSE OF THE BLINDING?

2  A.  WELL, THERE'S TWO PURPOSES.  THE FIRST IS THAT,

3  PARTICULARLY FOR PAIN MEDICATIONS, THERE IS WHAT'S KNOWN AS THE

4  PLACEBO EFFECT.  ALL RIGHT?  SO IF IN THESE ORAL SURGERY

5  EXPERIMENTS, IF YOU TAKE SOMEBODY WHO HAS HAD THEIR WISDOM

6  TEETH TAKEN OUT, AND THE NOVOCAIN WEARS OFF AND THEY ARE IN

7  PRETTY BAD PAIN, AND YOU HAVE GIVEN THEM A PLACEBO, THERE ARE A

8  CERTAIN NUMBER OF PEOPLE WHO WILL SAY THE DRUG WORKED

9  WONDERFULLY AND IT TREATS THEIR PAIN.

10      SO YOU HAVE TO HAVE THAT AS WHAT WE CALL A CONTROL.

11  RIGHT?  YOU WANT TO KNOW, WELL, IF IT'S JUST A PLACEBO EFFECT,

12  YOUR DRUG IS NOT DOING ANYTHING.  SO PART OF THE PLACEBO IS TO

13  KNOW IS THE DRUG REALLY DOING IT OR IS IT A PLACEBO EFFECT.

14      THE SECOND PART IS THAT IT ALSO HELPS TO LOOK AT THE

15  SAFETY.  SO IF YOU SAY I GIVE, YOU KNOW, 20 PEOPLE A PLACEBO

16  AND 5 OF THEM DEVELOP A HEADACHE, WELL, IT HAS NOTHING TO DO

17  WITH THE DRUG; IT'S JUST PEOPLE GET HEADACHES.  SO BY HAVING A

18  PLACEBO ARM, WHEN YOU LOOK AT SAFETY, YOU CAN SAY 25 PEOPLE

19  DEVELOPED A HEADACHE IN THIS AND 5 HERE, THAT'S PROBABLY

20  RELATED TO THE DRUG.  YOU NEED THE PLACEBO ARM BOTH FOR SAFETY

21  AND TO KNOW WHETHER THE TREATMENT EFFECT IS FROM THE DRUG OR

22  THE PLACEBO EFFECT.

23  Q.  WERE THESE PHASE II STUDIES DONE ON VIOXX OF A LONGER

24  DURATION THAN THE PHASE I STUDIES THAT YOU HAVE TALKED ABOUT?

25  A.  THERE ARE THREE OF THEM.  THE FIRST ONE, THIS ORAL

1662

1  SURGERY, IS JUST ONE DAY.  THEY HAVE THEIR WISDOM TEETH TAKEN

2  OUT, THEY TAKE ONE DOSE OF MEDICINE, AND YOU FOLLOW THEM FOR 24

3  HOURS AND SEE IF THEIR PAIN GETS BETTER.

4       THE SECOND ONE, THE SECOND PAIN MODEL, WAS

5  OSTEOARTHRITIS, WHICH IS WHAT VIOXX WAS EVENTUALLY APPROVED

6  FOR.  SO OSTEOARTHRITIS IS THE WEAR-AND-TEAR ARTHRITIS THAT

7  PEOPLE TEND TO GET AS THEY GET OLDER.  SO THAT PHASE II STUDY

8  WAS A SIX-WEEK STUDY WHERE SOME PATIENTS GOT PLACEBO, SOME

9  PATIENTS GOT 25 MILLIGRAMS OF VIOXX, AND SOME PATIENTS GOT 125

10  MILLIGRAMS OF VIOXX FOR SIX WEEKS.  SAME THING YOU LOOK AT:

11  DOES IT TREAT THE PAIN OF OSTEOARTHRITIS, AND YOU LOOK AT THE

12  SAFETY OF THE PATIENTS WHO GOT THE MEDICINE.

13  Q.  YOU MENTIONED THAT, IN THESE PHASE II STUDIES, THERE ARE

14  SAFETY DATA COLLECTED?

15  A.  YES.

16  Q.  FIRST OF ALL, WHO IS ACTUALLY COLLECTING THE DATA WITH

17  RESPECT TO WHAT THE PATIENTS ARE REPORTING?

18  A.  SO, FOR ALL OF THESE CLINICAL TRIALS, THERE ARE PRACTICING

19  PHYSICIANS WHO DO ACTUALLY TREAT THE PATIENTS.  I'M A

20  PHYSICIAN.  I WORK IN NEWARK.  I ACTUALLY DON'T TREAT THE

21  PATIENTS IN THE CLINICAL TRIALS.  WE FIND PRACTICING

22  PHYSICIANS.

23       SO, IN THE PHASE I STUDIES, THERE ARE SPECIALLY

24  TRAINED PHYSICIANS WHO ARE EXPERT IN DOING PHASE I TRIALS.  SO

25  THEY ARE THE ONES WHO ACTUALLY DO -- GIVE THE MEDICINE TO THE

1663

1  PATIENT, TAKE THE BLOOD SAMPLES.  IF ANYTHING -- IF THEY HAVE

2  ANY SAFETY PROBLEMS, THEY ARE THE DOCTOR TAKING CARE OF THE

3  PATIENT.  IN THE PHASE II STUDIES, SIMILAR KIND OF THING.

4       SO THERE ARE TRAINED RESEARCH PHYSICIANS WHO DO THESE

5  ORAL SURGERY EXPERIMENTS AND THERE ARE TRAINED RESEARCH

6  PHYSICIANS WHO TAKE THEIR PATIENTS WITH OSTEOARTHRITIS AND PUT

7  THEM INTO THE CLINICAL TRIALS.  SO THEY ARE THE ONES SEEING THE

8  PATIENT, THEY ARE THE ONES DOING ALL THE MEASUREMENTS AND

9  RECORDING ALL THE INFORMATION, AND THEY ARE THE ONES ASSESSING

10  WHETHER THE PATIENTS HAVE HAD ANY ADVERSE EVENTS.

11  Q.  IN THE DEVELOPMENT THROUGH THE PHASE II PROGRAM, WERE

12  CARDIOVASCULAR EVENTS COLLECTED BY THE INVESTIGATORS OR

13  PHYSICIANS WHO WERE TREATING THESE PATIENTS IN THE STUDY?

14  A.  YES.  LET ME START.  SO, IN THE PHASE I, REMEMBER I SAID

15  THAT THE MAIN PURPOSE IS TO SEE DOES THE BLOOD GET INTO YOUR

16  SYSTEM; DOES IT GET OUT OF YOUR SYSTEM.  SO A LOT OF BLOOD

17  TESTS ARE TAKEN.  BUT THERE ARE ALSO BLOOD TESTS TAKEN TO LOOK

18  AT YOUR LIVER FUNCTION, TO LOOK AT YOUR KIDNEY FUNCTION.

19  THERE'S URINE TESTS TAKEN TO LOOK AT YOUR LIVER FUNCTION.

20  ELECTROCARDIOGRAMS ARE DONE TO LOOK AT WHAT EFFECT IT HAS ON

21  YOUR HEART RHYTHM.  SO ALL THAT -- AS I SAID, THESE ARE

22  PHYSICIANS WHO ARE EXPERTS IN DOING THESE PHASE I TRIALS.  THEY

23  ARE VERY CAREFULLY WATCHING THOSE PATIENTS TO SEE WHAT HAPPENS.

24       IN THE PHASE II TRIALS, SAME THING:  VERY WELL

25  TRAINED RESEARCH PHYSICIANS, DOING BLOOD TESTS, DOING

1664

1  ELECTROCARDIOGRAMS -- LET ME JUST MAKE SURE EVERYBODY

2  UNDERSTANDS.  THE WORD "ADVERSE EVENT" WHICH YOU HAVE HEARD,

3  THERE'S A VERY SPECIFIC DEFINITION OF WHAT THAT IS.  ANYTHING

4  AT ALL THAT HAPPENS TO SOMEBODY THAT YOU MIGHT CONSIDER BAD IN

5  A CLINICAL TRIAL IS AN ADVERSE EVENT.

6       SO IF YOU'RE IN THE STUDY AND YOU SPRAIN YOUR ANKLE,

7  THAT'S AN ADVERSE EVENT; IF YOU'RE IN THE STUDY AND YOU GET A

8  HEADACHE, THAT'S AN ADVERSE EVENT.  IF YOU ARE IN THE STUDY AND

9  YOU GET A RASH, THAT'S AN ADVERSE EVENT.  IF YOU ARE IN THE

10  STUDY AND YOU HAVE A SERIOUS PROBLEM -- YOU GET HOSPITALIZED,

11  YOU HAVE A HEART ATTACK, YOU HAVE A STROKE, YOU HAVE AN

12  INFECTION -- ALL OF THOSE THINGS ARE ADVERSE EVENTS.  THE

13  DOCTORS WHO ARE TAKING PART IN THESE TRIALS REPORT THAT TO US

14  ON A REGULAR BASIS, AND THAT'S THE INFORMATION THAT WE USE TO

15  DETERMINE WHETHER THE DRUG IS SAFE.

16  Q.  WHEN THESE SPECIALLY TRAINED INVESTIGATORS OR SCIENTISTS

17  WHO ARE PARTICIPATING IN OVERSEEING THE PATIENTS REPORT AN

18  ADVERSE EVENT, HAVE THEY NECESSARILY DETERMINED THAT THE STUDY

19  MEDICATION IS CAUSING THE EVENT IN THOSE PATIENTS?

20  A.  THEY ARE ASKED TO ASSESS WHETHER THEY THINK IT CAUSED IT.

21  SO, OBVIOUSLY, THEY ARE BLINDED.  THEY DON'T KNOW WHAT THE

22  PATIENT IS ON.  SO IF THEY -- YOU KNOW, IF THE PATIENT TRIPS

23  AND SPRAINS THEIR ANKLE, THE DOCTOR MAY SAY, "I DON'T THINK

24  THAT'S RELATED TO THE DRUG," BUT THEY ARE ASKED TO, BASED UPON

25  EVERYTHING THEY KNOW ABOUT THE PATIENT, TO ASSESS WHETHER THEY

1665

1  THOUGHT THAT ADVERSE EXPERIENCE WAS LIKELY DUE TO THE DRUG OR

2  NOT LIKELY DUE TO THE DRUG, ESSENTIALLY.

3       SO THERE MAY BE -- AGAIN, THESE DOCTORS ARE ALSO VERY

4  WELL INFORMED ABOUT EVERYTHING WE KNOW ABOUT THE DRUG.  SO THEY

5  GET WHAT WE CALL A CONFIDENTIAL INVESTIGATOR'S BROCHURE WHICH

6  SUMMARIZES BASICALLY EVERYTHING IN THE IND.  SO THEY SHOULD --

7  THEY DO KNOW A TREMENDOUS AMOUNT ABOUT THE DRUG AND WHAT
COULD

8  POTENTIALLY HAPPEN.  THEY KNOW ABOUT THE ANIMALS TOXICOLOGY

9  STUDIES AND THEY PUT THAT ALL INTO CONTEXT.

10      IF A PATIENT, FOR EXAMPLE, DEVELOPED HIGH BLOOD

11  PRESSURE IN ONE OF THESE TRIALS, THEY MIGHT SAY, "I THINK

12  THAT'S PROBABLY DUE TO THE DRUG.  I CAN'T SEE ANY OTHER REASON

13  WHY THE PATIENT WOULD HAVE DEVELOPED HIGH BLOOD PRESSURE.  SO

14  I'M GOING TO" -- SO THEY ATTRIBUTE CAUSALITY EVEN THOUGH THEY

15  ARE BLINDED, AND THEY DO THAT BASED UPON EVERYTHING THEY KNOW

16  ABOUT THE PATIENT AND THE MEDICINES.

17  Q.  LET'S SAY AN INVESTIGATOR DETERMINED THAT THERE WAS NO

18  LIKELY CONNECTION BETWEEN THE MEDICATION AND, SAY, THE SPRAINED

19  ANKLE.  DO THEY STILL HAVE TO REPORT THAT EVENT?

20  A.  YES.  THEY REPORT THE EVENT REGARDLESS OF WHETHER -- THEY

21  HAVE TO REPORT EVERY ADVERSE EVENT.  SO, AS I SAID, IF THE

22  PERSON HAS A HISTORY OF HEADACHES, BUT THEY GET A HEADACHE,

23  THEY STILL REPORT IT.  THEY HAVE TO REPORT EVERYTHING.  THEN --

24  REGARDLESS OF WHETHER THEY THINK IT WAS CAUSED BY THE DRUG, AND

25  THEN THEY TELL US WHETHER THEY THINK IT WAS OR WASN'T CAUSED BY

1666

1  THE DRUG.  BUT THEY HAVE TO REPORT THEM ALL.

2  Q.  WHEN MERCK COLLECTS THE DATA AND GATHERS IT TOGETHER AND

3  ANALYZES IT, DOES MERCK INCLUDE ALL THE EVENTS REGARDLESS OF

4  CAUSALITY?

5  A.  ABSOLUTELY.

6  Q.  WHAT WAS THE NEXT PHASE IN THE DEVELOPMENT OF VIOXX?

7  A.  THERE'S ONE MORE EXPERIMENT YOU FORGOT.  SO, IN

8  PHASE II --

9      MR. BLIZZARD:  YOUR HONOR, THIS HAS HAPPENED SEVERAL

10  TIMES.  I ASK THAT IT PROCEED BY QUESTION AND ANSWER.

11      THE COURT:  ALL RIGHT.

12  BY MR. ISMAIL:

13  Q.  I THINK ACTUALLY YOU'RE RIGHT.  YOU GOT TWO OF THE PAIN

14  MODELS AND I FORGOT TO ASK YOU ABOUT THE THIRD ONE.  I

15  INTERRUPTED THE ANSWER EARLIER, AND I APOLOGIZE.

16      THE COURT:  ASK A QUESTION FIRST.

17      THE WITNESS:  SO THE THIRD EXPERIMENT --

18      THE COURT:  WAIT.  ASK HIM A QUESTION FIRST.

19  BY MR. ISMAIL:

20  Q.  WHAT WAS THE THIRD PAIN MODEL THAT I INTERRUPTED YOU ON?

21  A.  IT WASN'T A PAIN MODEL.  IT WAS THE EXPERIMENT TO SEE IF

22  VIOXX DAMAGES THE STOMACH.

23  Q.  THANK YOU.  NOW, PLEASE PROCEED.

24  A.  OKAY.  REMEMBER, THE WHOLE THEORY HERE IS THE DRUG WILL

25  TREAT PAIN AND INFLAMMATION BUT NOT DAMAGE YOUR STOMACH.  THE

1667

1 ORAL SURGERY MODEL AND THE OSTEOARTHRITIS TRIALS BOTH SHOWED

2 THAT VIOXX DOES TREAT PAIN AND INFLAMMATION.  THEN THE QUESTION

3 IS:  WILL IT NOT DAMAGE YOUR STOMACH?

4       SO THE PHASE II STUDY FOR THAT WAS DONE IN NORMAL

5 VOLUNTEERS.  THE WAY THE EXPERIMENT IS DONE IS -- AND PEOPLE

6 VOLUNTEER FOR THESE STUDIES.  THE GASTROENTEROLOGIST HAS A TUBE

7 THEY CAN PASS INTO YOUR STOMACH AND LOOK AT YOUR STOMACH.  SO

8 THEY LOOK INTO THE STOMACH AND SEE IF THERE ARE ANY ULCERATIONS

9 OR LESIONS.  AS LONG AS THE STOMACH IS NORMAL, THEN THE PATIENT

10 IN THIS CASE GOT RANDOMLY ASSIGNED TO EITHER GET PLACEBO,

11 250 MILLIGRAMS OF VIOXX, OR IBUPROFEN OR ASPIRIN AT THE FULL

12 DOSE, THE DOSE THAT'S TAKEN FOR INFLAMMATION, NOT THE LOW DOSE.

13 THEY TAKE THAT FOR, I THINK IT WAS, 10 OR 14 DAYS.

14       THEN THE GASTROENTEROLOGIST LOOKS AT THE STOMACH

15 AGAIN AND SAYS, "ARE THERE ANY ULCERS, BLEEDS, ANYTHING NEW

16 THAT I DIDN'T SEE BEFORE THE EXPERIMENT STARTED?"  THEN ONCE

17 THAT'S ALL DONE, YOU UNBLIND IT AND YOU SEE WHAT HAPPENED.

18       WHAT WE SAW HAPPENED WAS THAT ASPIRIN AND IBUPROFEN

19 DAMAGED THE STOMACH THE WAY THAT WE ALL WOULD EXPECT THEM TO,

20 BUT VIOXX, IN THIS CASE AT 250 MILLIGRAMS, DIDN'T DAMAGE THE

21 STOMACH ANY DIFFERENT FROM PLACEBO.  SO NOW YOU HAVE IN

22 PEOPLE -- GRANTED, IT'S EARLY EVIDENCE, BUT IN PEOPLE YOU HAVE

23 EVIDENCE IT TREATS PAIN AND INFLAMMATION AND IT DOESN'T DAMAGE

24 THE STOMACH.  THOSE WERE THE PHASE II STUDIES.

25 Q.  WHAT DID THE PHASE II STUDIES SHOW ABOUT THE EFFECTIVENESS

1668

1  OF VIOXX WITH REGARD TO TREATING PAIN?

2  A.  IT WAS EFFECTIVE IN TREATING BOTH ORAL SURGERY PAIN AND

3  THE OSTEOARTHRITIS PAIN.

4  Q.  CONTINUING FORWARD, PHASE III STUDIES, CAN YOU DESCRIBE

5  GENERALLY FOR US WHAT A PHASE III STUDY IS?

6  A.  YES.  SO THE PHASE II STUDIES ARE PROOF OF CONCEPT:  IS

7  THERE ANY EVIDENCE AT ALL THAT THIS LOOKS LIKE IT'S TRUE IN

8  HUMANS?  PHASE III ARE NOW MUCH LARGER TRIALS DONE IN THE

9  PATIENT POPULATION THAT YOU ARE GOING TO EVENTUALLY MARKET THE

10  DRUG IN AND TYPICALLY WILL INCLUDE A COMPARATOR.

11       SO THE WHOLE IDEA HERE IS THIS IS GOING TO BE --

12  TREAT PAIN AND INFLAMMATION THE SAME AS THE TRADITIONAL NSAIDS

13  BUT NOT DAMAGE THE STOMACH.  SO THE PHASE III STUDIES ARE

14  PRIMARILY IN PATIENTS WITH OSTEOARTHRITIS ASKING DOES IT TREAT

15  PAIN AND INFLAMMATION AS WELL AS COMPARATOR AGENTS -- IBUPROFEN

16  WAS ONE AND DICLOFENAC THE OTHER -- AND DOES IT NOT DAMAGE THE

17  STOMACH, BUT NOW IN PATIENTS WHO HAVE OSTEOARTHRITIS, NOT IN

18  THE NORMAL, HEALTHY VOLUNTEERS.

19  Q.  LOOKING BACK IN THIS PERIOD, MOVING FROM PHASE II TO PHASE

20  III, DID MERCK INTERACT WITH THE FOOD & DRUG ADMINISTRATION ON

21  THE TYPE OF STUDIES THAT SHOULD BE DONE TO TEST THE SAFETY AN

22  EFFECTIVENESS OF VIOXX?

23  A.  YES, THEY DID.

24  Q.  CAN YOU DESCRIBE FOR US WHAT THAT INTERACTION WAS BETWEEN

25  MERCK AND THE FDA WITH REGARD TO THE DESIGN OF THE STUDIES?

1669

1      MR. BLIZZARD:  YOUR HONOR, TO THE EXTENT THAT HE HAS

2   PERSONAL KNOWLEDGE OF THIS, I HAVE NO OBJECTION TO HIS

3   TESTIMONY ABOUT IT, BUT I'M NOT SURE THAT THIS IS HIS AREA.

4      THE COURT:  ASK HIM.

5   BY MR. ISMAIL:

6   Q.  DOCTOR, CAN YOU TELL US WHAT YOUR OWN INVOLVEMENT WAS AS A

7   MEMBER OF THE VIOXX PROJECT TEAM WITH RESPECT TO WHETHER MERCK

8   WAS INTERACTING WITH THE FDA IN THE DESIGN OF THE STUDIES?

9   A.  YES.  SO, FROM MY OWN PERSONAL -- ON THE SPECIFIC STUDIES

10   THAT I DID, I WOULD WORK WITH OUR REGULATORY COLLEAGUES TO SEND

11   THOSE PROTOCOLS TO THE FDA.  BEFORE WE START THE EXPERIMENT,

12   THE PROTOCOL GOES TO THE FDA FOR THEM TO REVIEW IT AND

13   ESSENTIALLY ALLOW US TO PROCEED WITH THE EXPERIMENTS.

14      SO ALL THE ONES THAT I DID, I WOULD WORK WITH OUR

15   REGULATORY COLLEAGUES.  THOSE WOULD GET SENT BACK.  IF THERE

16   WERE COMMENTS, WE WOULD INTERACT WITH THEM ON THOSE.  THEN, AS

17   PART OF THE PROJECT TEAM, WE HAD REGULAR UPDATES, PART OF THE

18   STANDARD AGENDA OF ALL OF OUR INTERACTIONS WITH THE REGULATORY

19   AGENCIES.

20   Q.  WHEN IS AN END-OF-PHASE-II MEETING?

21   A.  AN END-OF-PHASE-II MEETING IS SORT OF WHAT IT SAYS:  YOU

22   FINISHED PHASE II.  NOW YOU WANT TO START YOUR PHASE III

23   TRIALS.  YOU GO TO THE FDA TO SAY, "HERE'S WHAT WE WOULD LIKE

24   TO DO FOR OUR PHASE III TRIALS AND HERE'S WHAT WE THINK THEY

25   ARE GOING TO SHOW.  YOU ESSENTIALLY ASK THEM, "IF THEY SHOW

1670

1  WHAT WE THINK THEY ARE GOING TO SHOW, IS THAT SUFFICIENT

2  EVIDENCE FOR YOU TO ALLOW US TO MARKET THE DRUG?"

3        SO, BEFORE YOU DO ALL THOSE EXPERIMENTS, YOU

4  ESSENTIALLY GO TO THEM AND SAY, "HERE'S WHAT WE ARE PLANNING ON

5  DOING.  HERE'S THE NUMBER OF PATIENTS.  HERE'S THE COMPARATOR

6  DRUG.  HERE'S HOW LONG WE ARE GOING TO DO THEM.  HERE'S THE

7  TESTS WE ARE GOING TO DO.  IF THEY ALL COME OUT THE WAY WE

8  THINK THEY WILL, IS THAT SUFFICIENT TO APPROVE THE DRUG?"  SO

9  YOU HAVE THE DIALOGUE WITH THEM BEFORE YOU START PHASE III.

10  Q.  THROUGH YOUR WORK ON THE PROJECT TEAM, DID YOU EVER COME

11  TO LEARN WHETHER OR NOT THERE WERE AN END-OF-PHASE-II MEETING

12  BETWEEN MERCK AND THE FDA WITH REGARD TO DEVELOPMENT OF VIOXX?

13  A.  IN THE PROJECT TEAM, THEY REVIEWED ALL OF THE SESSIONS

14  THAT WERE HANDLED, AND THERE WERE ACTUALLY A NUMBER OF

15  END-OF-PHASE-II MEETINGS.

16  Q.  TO YOUR KNOWLEDGE, SIR, DID THE FDA EVER CRITICIZE THE

17  SIZE OF THE STUDIES THAT WERE DONE BY MERCK IN THE DEVELOPMENT

18  OF THE MEDICINE?

19  A.  I'M JUST TO GO BACK TO THERE'S A -- THERE'S A DIALOGUE

20  BETWEEN THE FDA AND MERCK.  SO WHEN MERCK PUTS IN A PROPOSAL

21  AND SAYS WE ARE GOING TO DO THESE NUMBER OF PATIENTS, THEY MAY

22  COME BACK AND SAY, "WE THINK YOU SHOULD DO MORE."  "WE THINK

23  YOU SHOULD DO LONGER."  SO THERE IS A CONVERSATION THAT GOES ON

24  BETWEEN.

25        AT THE END OF THE DAY, THOUGH, THEY THEN AGREE

1671

1  THAT -- WHAT WE BOTH NOW AGREE:  "HERE'S THE PROGRAM WE THINK

2  YOU SHOULD BE ABLE TO DO.  IF IT COMES OUT THE WAY YOU THINK IT

3  WILL, THEN WE'LL BE ABLE TO APPROVE YOUR DRUG."

4  Q.  DO YOU HAVE EXHIBIT 15 BY YOU?

5  A.  YES, SIR.

6  Q.  DO YOU RECOGNIZE THIS DOCUMENT, SIR?

7  A.  I DO.

8  Q.  WHAT IS IT?

9  A.  THESE ARE THE MINUTES FROM THE END-OF-PHASE-II MEETINGS

10  WITH THE FDA.

11  Q.  DID YOU REVIEW THESE MINUTES AS PART OF YOUR WORK ON THE

12  PROJECT TEAM?

13  A.  YES.

14       MR. ISMAIL:  YOUR HONOR, WE MOVE THE ADMISSION OF

15  EXHIBIT 15.

16       MR. BLIZZARD:  YOUR HONOR, I OBJECT TO THE FOUNDATION

17  BECAUSE HE WASN'T INVOLVED IN THIS PART OF THE PROJECT FROM

18  WHAT I UNDERSTAND.

19       MR. ISMAIL:  YOUR HONOR, HE WAS PERSONALLY

20  INVOLVED --

21       THE COURT:  I UNDERSTAND.  I'LL OVERRULE THE

22  OBJECTION.

23       MR. ISMAIL:  THANK YOU, YOUR HONOR.

24  BY MR. ISMAIL:

25  Q.  WE HAVE ON THE SCREEN, DOCTOR, EXHIBIT 15, THAT YOU HAVE

1672

1  IN FRONT OF YOU; IS THAT CORRECT?

2  A.  YES.

3  Q.  YOU WERE DESCRIBING THESE END-OF-PHASE-II MEETINGS BETWEEN

4  MERCK AND THE FDA IN THE DEVELOPMENT OF THE MEDICINE; IS THAT

5  CORRECT?

6  A.  YES.

7  Q.  I WOULD ASK THAT YOU TURN TO PAGE -- WE HAVE THESE LITTLE

8  NUMBERS AT THE BOTTOM THAT END IN 955.  THIS IS AN

9  END-OF-PHASE-II MEETING THAT WAS IN MAY OF 1996; CORRECT?

10  A.  THESE ARE THE MINUTES OF THAT MEETING.

11  Q.  CORRECT.  YOU SAID THERE WAS A NUMBER OF PHASE II

12  MEETINGS.  OVER WHAT PERIOD OF TIME ARE WE TALKING ABOUT?

13  A.  OVER THE SERIES OF A FEW MONTHS, THERE WERE VARIOUS

14  MEETINGS WITH THE FDA.

15  Q.  NOW, TURNING BACK ONE PAGE, IS THIS THE EXECUTIVE SUMMARY

16  THE MINUTES OF THAT END-OF-PHASE-II MEETING?

17  A.  YES.

18  Q.  I JUST WANT TO SHOW TO THE JURY HERE -- CAN YOU READ THIS

19  SENTENCE RIGHT HERE INTO THE RECORD, PLEASE?

20  A.  IT SAYS, "THE AGENCY ACKNOWLEDGED THAT THE SUCCESSFUL

21  DEVELOPMENT OF A COX-2 SPECIFIC INHIBITOR HELD THE POTENTIAL TO

22  BE A VERY SIGNIFICANT THERAPEUTIC ADVANCE."

23  Q.  WHAT DID YOU UNDERSTAND THAT COMMENT THERE THROUGH THESE

24  MINUTES BETWEEN MERCK AND THE FDA MEANT WHEN YOU REVIEWED THEM

25  BACK AS PART OF THE PROJECT TEAM?

1673

1  A.  WELL, MY UNDERSTANDING IS THE AGENCY IS THE FDA, AND SO

2  THEY'RE ACKNOWLEDGING, AS WE TALKED ABOUT BEFORE, THAT IF THIS

3  HYPOTHESIS WERE TRUE, YOU COULD MAKE MEDICINE THAT TREATED PAIN

4  AND INFLAMMATION BUT DIDN'T DAMAGE THE STOMACH AND DIDN'T THIN

5  THE DRUG, THAT WOULD BE, FROM THEIR POINT OF VIEW, AN IMPORTANT

6  THERAPEUTIC ADVANCE.

7  Q.  THEN YOU INDICATED, I THINK, THAT THERE WAS A DIALOGUE

8  BETWEEN THE FDA AND MERCK REGARDING HOW TO DESIGN THE CLINICAL

9  TRIALS?

10  A.  CORRECT.

11  Q.  GOING FORWARD THREE PAGES, DOCTOR, IN THESE MINUTES, IT

12  SAYS:  "THE AGENCY CONCURRED WITH THE DURATION OF THE ACTIVE

13  COMPARATOR EFFICACY TRIALS."  DO YOU SEE THAT?

14  A.  I DO.

15  Q.  THEN WHEN WE SAY "THE AGENCY" HERE, WHO ARE WE REFERRING

16  TO?

17  A.  THAT'S THE FDA.

18  Q.  THEN OUT HERE WE HAVE "ACTIVE COMPARATOR EFFICACY TRIALS."

19  A.  RIGHT.

20  Q.  WHAT ARE THOSE?

21  A.  SO, REMEMBER, I SAID THE PHASE III STUDIES ARE WHERE

22  YOU'RE NOW GOING TO COMPARE YOUR DRUG TO THE STANDARD

23  MEDICINES.  SO THE "ACTIVE COMPARATOR" IS THEIR LANGUAGE FOR A

24  DRUG WE ALREADY KNOW WORKS.

25        SO THE TWO THAT ARE WERE DONE IN OUR TRIALS WERE

1674

1 EITHER IBUPROFEN AT ITS PRESCRIPTION STRENGTH, SO IT'S NOT

2 OVER-THE-COUNTER IBUPROFEN THAT YOU CAN GET IN THE DRUGSTORES,

3 THE STRENGTH THAT A PHYSICIAN CAN PRESCRIBE FOR YOU.  THOSE

4 STUDIES WERE SIX WEEKS.

5       THEN THERE WAS A COMPARISON AGAINST DICLOFENAC, WHICH

6 IS ANOTHER ONE OF THESE MEDICINES, AND THOSE STUDIES WERE FOR A

7 YEAR.  PATIENTS STAYED ON THE MEDICATION FOR A YEAR.

8 Q.  THEN, DOWN BELOW, FIRST WE COVERED DURATION AND WITH

9 RESPECT TO THE NUMBER OF PATIENTS TESTED.  I PUT ON THIS SCREEN

10 HERE THIS COMMENT IN THE MINUTES:  "THE AGENCY OFFERED NO

11 CONCERNS WITH THE PROPOSED TOTAL PATIENT EXPOSURE FOR THE

12 CLINICAL SAFETY DATABASE."  WHAT DOES THIS PHRASE MEAN,

13 "PROPOSED TOTAL PATIENT EXPOSURE"?

14 A.  ESSENTIALLY WHAT IT MEANS IS, OVERALL, HOW MANY PATIENTS

15 WILL HAVE TAKEN THE DRUG WHEN YOU SUBMIT THE DRUG, THE

16 APPLICATION.  SO WE TOLD THEM WE ARE GOING TO DO ALL THESE

17 VARIOUS STUDIES:  SOME FOR THIS PERIOD OF TIME; SOME FOR THAT

18 PERIOD OF TIME.  WHEN YOU ADD THAT ALL UP, HOW MANY PATIENTS

19 WILL HAVE TAKEN IT FOR VARIOUS PERIODS OF TIME THAT WE CAN THEN

20 USE TO SAY WHAT IS THE GENERAL SAFETY OF THIS DRUG.

21       SO WHAT THE AGENCY SAID WAS WHAT YOU PLAN ON DOING,

22 THE NUMBER OF PATIENTS, AND THE LENGTH OF TIME YOU'RE GOING TO

23 TREAT THEM IS OKAY WITH US.

24 Q.  DID YOU HELP DESIGN ANY OF THE CLINICAL TRIALS, WORK ON

25 ANY OF THE CLINICAL TRIALS, IN THIS PHASE OF THE DEVELOPMENT?

1675

1   A.   YES.

2   Q.   WHICH TRIALS, SIR?

3   A.   MY RESPONSIBILITY WAS FOR ALL OF THE ACUTE PAIN TRIALS AND

4   FOR ONE OF THE OSTEOARTHRITIS TRIALS.

5   Q.   WHAT DID THE PHASE III TRIALS SHOW WITH REGARD TO THE

6   EFFECTIVENESS OF VIOXX IN REDUCING PAIN AND INFLAMMATION?

7   A.   WHAT THEY SHOWED IS THAT -- AND THIS, AGAIN, WAS IN A LOT

8   OF DISCUSSIONS WITH THE FDA ABOUT HOW YOU CAN ACTUALLY SHOW

9   THIS.  THE HYPOTHESIS, WHAT WE THOUGHT WOULD HAPPEN, IS THAT

10  VIOXX WOULD BE AS EFFECTIVE AS TREATING PAIN AND INFLAMMATION

11  AS PRESCRIPTION-STRENGTH IBUPROFEN AND PRESCRIPTION-STRENGTH

12  DICLOFENAC.

13        WITHOUT GOING THROUGH ALL THE STATISTICS, THERE WAS

14  AN AGREEMENT ABOUT WHAT WE WOULD HAVE TO SHOW TO BE ABLE TO SAY

15  THEY'RE THE SAME.  IN THOSE TRIALS, WE MET ALL OF THOSE

16  ENDPOINTS AND WERE ABLE TO DEMONSTRATE SCIENTIFICALLY TO OUR

17  SATISFACTION AND TO THE SCIENTIFIC COMMUNITY'S SATISFACTION AND

18  TO THE FDA THAT THE EFFICACY, THE WAY YOU TREATED PAIN AND

19  INFLAMMATION, WAS AS GOOD AS PRESCRIPTION-STRENGTH IBUPROFEN

20  AND PRESCRIPTION-STRENGTH DICLOFENAC.

21  Q.   IN THESE PHASE III STUDIES, WERE THE MERCK SCIENTISTS ALSO

22  LOOKING AT THIS IDEA OF THE SAFETY OF THE MEDICINE ON THE

23  STOMACH?

24  A.   YES.

25  Q.   WHAT DID THOSE STUDIES SHOW WITH REGARD TO THE PROMISE OF

1676

1  THE MEDICINE THAT YOU DESCRIBED EARLIER THAT KICKED OFF THE

2  WHOLE DEVELOPMENT YEARS EARLIER?

3  A.  IT CONFIRMED WHAT THE -- I WOULD SAY, IT PRELIMINARILY

4  CONFIRMED WHAT WE THOUGHT WAS GOING TO HAPPEN; AND THAT IS,

5  THERE WERE STUDIES DONE IN OSTEOARTHRITIS PATIENTS WHERE,

6  AGAIN, THE GASTROENTEROLOGISTS PUT A TUBE DOWN THE STOMACH AND

7  LOOKED FOR ULCERS, AND THERE WERE SIGNIFICANTLY LESS ULCERS

8  WITH VIOXX THAN WITH IBUPROFEN.

9       IN ALL OF THE STUDIES, WE ALSO, AGAIN, WERE

10  COLLECTING THESE ADVERSE EVENTS.  SO IF, IN ANY ONE OF THESE

11  STUDIES A PATIENT REPORTS TO HIS DOCTOR AND SAYS, "I HAVE THIS

12  TERRIBLE BURNING PAIN," AND THEY DO AN EVALUATION AND FIND OUT

13  THEY HAD AN ULCER, WE COUNTED THOSE.  IF ANYBODY IN THESE

14  STUDIES PRESENTED TO AN EMERGENCY ROOM VOMITING UP BLOOD, WE

15  COUNTED THOSE.  IF ANYBODY PRESENTED WITH A PERFORATION.

16       SO WHEN YOU TAKE THE ENTIRE DATABASE AND PUT THAT ALL

17  TOGETHER, IT WAS FAIRLY CLEAR THAT THERE WERE LESS ULCERS,

18  BLEEDING ULCERS, OR PERFORATIONS ON VIOXX THAN ON THE

19  TRADITIONAL NSAID; IN THIS CASE, IBUPROFEN AND DICLOFENAC.

20  Q.  HAVE YOU HEARD OF A NEW DRUG APPLICATION, THAT CONCEPT?

21  A.  YES.

22  Q.  IS THAT SOMETIMES CALLED AN NDA?

23  A.  AN NDA, NEW DRUG APPLICATION.

24  Q.  WHAT IS AN NDA WITH REGARD TO THE DEVELOPMENT OF MEDICINE?

25  A.  SO THE NDA IS ESSENTIALLY YOU ARE NOW APPLYING TO THE FDA

1677

1  FOR PERMISSION TO SELL YOUR DUG.

2  Q.  WAS THERE AN NDA FILED WITH RESPECT TO VIOXX?

3  A.  YES.

4  Q.  DO YOU RECALL APPROXIMATELY WHEN THAT WAS?

5  A.  IT WAS IN THE FALL OF '98, I THINK OCTOBER OR NOVEMBER.

6  Q.  WHEN YOU SAY IT WAS THE APPLICATION TO SEEK PERMISSION TO

7  SELL THE DRUG, CAN YOU DESCRIBE WHAT GOES INTO AN NDA?

8  A.  YES.  THE NDA IS A SUMMARY OF EVERYTHING WE KNOW ABOUT THE

9  MEDICINE, EVERY EXPERIMENT WE HAVE EVER DONE.  FOR EVERY

10  CLINICAL TRIAL, THERE'S A REPORT THAT WE CALL A CLINICAL STUDY

11  REPORT.  SO THERE'S A REPORT FOR EVERY TRIAL WHICH SUMMARIZES

12  EXACTLY WHAT HAPPENED, PROVIDES ALL OF THE RAW DATA TO THE FDA.

13  SO THERE ARE INDIVIDUAL REPORTS OF EVERY EXPERIMENT, AND THEN

14  THERE IS SORT OF AN INTEGRATED SUMMARY OF THAT.

15        SO AFTER WE HAVE DONE ALL THESE, WE THEN WRITE AN

16  INTEGRATED SUMMARY OF, BASED UPON ALL OF THIS, THIS IS WHAT --

17  IF WE PUT IT ALL TOGETHER, IT TELLS US THIS, BOTH ABOUT HOW THE

18  DRUG TREATS PAIN AND INFLAMMATION AND ABOUT ITS SAFETY.  SO THE

19  NDA HAS A SUMMARY OF ESSENTIALLY EVERYTHING WE KNOW ABOUT THE

20  DRUG.

21  Q.  CAN YOU GIVE US A --

22        MR. BLIZZARD:  YOUR HONOR, CAN WE JUST APPROACH THE

23  BENCH BRIEFLY?

24        THE COURT:  SURE.

25        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

1678

1   THE BENCH.)

2        MR. BLIZZARD:  YOUR HONOR, IN THE PAST WHAT I'VE SEEN

3   IS THE WITNESS HAS REFUSED TO ANSWER ANY QUESTIONS ABOUT

4   COMMUNICATIONS OR E-MAILS HE HASN'T BEEN A PARTY TO, AND YET

5   HERE WE HAVE HIM TALKING ABOUT THE APPLICATION FOR AN NDA WHICH

6   WAS CLEARLY A REGULATORY ISSUE CLEARLY OUTSIDE OF HIS AREA

7   WITHIN THE COMPANY.  IF HE CONTINUES TO TESTIFY LIKE THIS, I

8   WILL BE FORCED TO TALK TO HIM ABOUT THE TARGUM MEMO AND OTHER

9   THINGS THAT RELATE TO FDA APPROVAL, SO I FAIL TO SEE WHY HE IS

10  THE WITNESS.  IF HE IS A CLINICAL SCIENTIST INVOLVED IN SOME OF

11  THE STUDIES AND IF HE IS GOING TO GO AND TALK ABOUT ALL OF THE

12  STUDIES OR EVEN FDA APPROVAL, THEN I THINK IT'S FAIR GAME FOR

13  ME TO BE ABLE TO CROSS HIM ON THAT.

14       THE COURT:  I THOUGHT HE WAS INVOLVED IN THAT.  ISN'T

15  HE?

16       MR. ISMAIL:  HE HELPED WRITE THE NDA.

17       THE COURT:  JUST GET THROUGH THAT.  LET'S MAKE SURE

18  BEFORE HE TESTIFIES TO SOMETHING HE HAS SOME KNOWLEDGE OF OR

19  HAS PARTICIPATED IN THE DRAFTING OF IT, CONSULTED WITH

20  SOMEBODY.

21       MR. ISMAIL:  YES, SIR.

22       (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

23  OPEN COURT.)

24  BY MR. ISMAIL:

25  Q.  DR. MORRISON, DID YOU PARTICIPATE IN THE PREPARATION OF

1679

1  THE VIOXX NDA?

2  A.  YES, I DID.

3  Q.  IN WHAT CAPACITY DID YOU PARTICIPATE IN THAT?

4  A.  I WROTE SOME OF THE CLINICAL STUDY REPORTS FOR THE

5  EXPERIMENTS THAT I DID AND I WROTE THE INTEGRATED SUMMARY OF

6  HOW THE DRUG WORKS FOR TREATING PAIN, AND I WROTE PART OF THE

7  CLINICAL SUMMARY OF THE SAFETY.

8       SO MY COLLEAGUE AND I SPLIT UP THE WRITING OF THE

9  SAFETY SECTION:  I WROTE PART, HE WROTE PART, AND THEN WE

10  WORKED TOGETHER AND SORT OF EDITED EACH OTHER.  SO,

11  ESSENTIALLY, THE WHOLE INTEGRATED SUMMARY OF SAFETY, I WAS

12  INVOLVED IN WRITING OR EDITING.

13  Q.  CAN YOU GIVE US THE SENSE OF A VOLUME OF WHAT A NEW DRUG

14  APPLICATION, AT LEAST THE ONE FOR VIOXX, IS WITH THE

15  INFORMATION SENT DOWN TO THE AGENCY?

16  A.  IT'S A LOT OF INFORMATION.  WHAT I WAS ALWAYS TOLD IS THEY

17  ACTUALLY HAVE A TRUCK THAT THEY LOAD ALL OF THE REPORTS ONTO,

18  AND THERE'S A TRUCK THAT DRIVES DOWN TO THE FDA.  SO IT'S A

19  LARGE AMOUNT OF INFORMATION.

20  Q.  SO, HERE WE ARE IN 1998, SEVEN YEARS AFTER THE DISCOVERY

21  OF COX-2, AND WE HAVE THESE VARIOUS PHASES OF CLINICAL TRIALS.

22  APPROXIMATELY HOW MANY CLINICAL TRIALS IN TOTAL, INCLUDING THE

23  PHASE I AND PHASE II AND PHASE III STUDIES, WERE PART OF THE

24  NDA SUBMISSION?

25  A.  IT'S IN THE FIFTIES.

1680

1 Q.  APPROXIMATELY, TO THE BEST OF YOUR RECOLLECTION, HOW MANY

2 PATIENTS ARE WE TALKING ABOUT HERE, CLINICAL TESTING PROGRAM

3 FOR VIOXX?

4 A.  THERE WERE ABOUT 10,000 PATIENTS IN THE TRIALS, AND AS I

5 RECALL, ABOUT 5,000 OF THEM WERE ON VIOXX; THE OTHER 5,000 WERE

6 EITHER ON A COMPARATOR DRUG OR ON PLACEBO.

7 Q.  YOU INDICATED EARLIER WHEN YOU WERE TALKING ABOUT PHASE II

8 STUDIES THAT ALL THE ADVERSE EVENTS WERE COLLECTED, INCLUDING

9 CARDIOVASCULAR EVENTS.  DO YOU RECALL SAYING THAT?

10 A.  YES.

11 Q.  WAS THAT TRUE IN THE PHASE III STUDIES, AS WELL?

12 A.  YES.

13 Q.  NOW, AT SOME POINT IN TIME, DID YOU LEARN THAT THERE WAS

14 ANOTHER COMPANY OUT THERE WHO WAS TRYING TO FIND A COX-2

15 INHIBITOR DRUG?

16 A.  YES.

17 Q.  WHAT COMPANY WAS THAT?

18 A.  IT WAS A COMPANY AT THE TIME CALLED SEARLE.  IN THIS

19 INDUSTRY, THERE'S SORT OF, YOU KNOW, MERGERS, AND SO SEARLE

20 ENDED UP BECOMING PART OF PHARMACIA, AND PHARMACIA ENDED UP

21 BECOMING PART OF PFIZER.  BUT AT THE TIME THAT WE WERE FIRST

22 DOING THIS, IT WAS SEARLE THAT HAD ANOTHER COX-2 INHIBITOR.

23 Q.  WAS MERCK INTERESTED IN BEING THE FIRST COMPANY TO COME

24 OUT WITH A COX-2 INHIBITOR?

25 A.  YES.

1681

1   Q.  DID MERCK SUCCEED IN BECOMING THE FIRST COMPANY TO COME

2   OUT WITH A COX-2 INHIBITOR?

3   A.  NO.

4   Q.  DID CELEBREX COME OUT BEFORE VIOXX?

5   A.  CELEBREX CAME OUT, I THINK, ABOUT SIX MONTHS BEFORE VIOXX.

6   Q.  JUST LOOKING WHERE WE ARE IN 1998, WHAT WAS YOUR BELIEF,

7   DOCTOR, AS A MEMBER OF THE PROJECT TEAM AND AS A SCIENTIST

8   WORKING ON THIS MEDICINE, WITH REGARD TO VIOXX'S POTENTIAL TO

9   BE AN EFFECTIVE PAIN-RELIEVER WITH REDUCED GASTROINTESTINAL

10  SIDE EFFECTS?

11  A.  I THOUGHT WE HAD VERY GOOD CLINICAL DATA FROM THE TRIALS

12  IN PEOPLE TO SHOW THAT THE DRUG WAS AN EFFECTIVE PAIN-RELIEVER

13  AND SAFER ON THE STOMACH AND ALSO DID NOT INHIBIT PLATELET

14  FUNCTION.

15  Q.  YOU MENTIONED THE INTEGRATED SUMMARY OF SAFETY IN 1998 YOU

16  HAD A HAND IN HELPING TO PREPARE; IS THAT CORRECT?

17  A.  RIGHT.  I WROTE HALF OF IT, AND THEN THE OTHER HALF I

18  EDITED WITH A COLLEAGUE OF MINE.

19  Q.  IS EXHIBIT 40 A COPY OF THE INTEGRATED SUMMARY OF SAFETY?

20  A.  IT'S PART OF IT.

21  Q.  PART OF IT.  DID MERCK SUMMARIZE IN THIS DOCUMENT SOME OF

22  THE CARDIOVASCULAR DATA THAT HAD BEEN DEVELOPED IN THE CLINICAL

23  TRIAL DEVELOPMENT FOR VIOXX?

24  A.  YES.

25  Q.  IF YOU TURN TO PAGE 328 OF THIS DOCUMENT?

1682

1    MR. ISMAIL:  FIRST OF ALL, YOUR HONOR, WE MOVE THE

2  ADMISSION OF EXHIBIT 40.

3    MR. BLIZZARD:  NO OBJECTION, YOUR HONOR.

4    THE COURT:  LET IT BE ADMITTED.

5  BY MR. ISMAIL:

6  Q.  DR. MORRISON, HAVE YOU TURNED TO PAGE 328?

7  A.  YES.

8  Q.  WE HAVE A SECTION HERE CALLED "THROMBOEMBOLIC

9  CARDIOVASCULAR ADVERSE EXPERIENCE"; IS THAT CORRECT?

10  A.  CORRECT.

11  Q.  WHAT ARE THROMBOEMBOLIC CARDIOVASCULAR ADVERSE

12  EXPERIENCES?

13  A.  SO ADVERSE EXPERIENCES, I EXPLAINED TO YOU.  THAT'S

14  ANYTHING THAT CHANGES TO SOMEBODY TAKING PART IN A TRIAL.  THE

15  CARDIOVASCULAR SYSTEM IS THE HEART AND BLOOD VESSELS, AND

16  THROMBOEMBOLIC ARE BLOOD CLOTS OR BLOOD CLOTS THAT TRAVEL

17  SOMEWHERE ELSE IN YOUR BODY.

18    SO SOMETIMES PEOPLE CAN GET A BLOOD CLOT IN THEIR LEG

19  BUT THEN BREAKS OFF AND GOES SOMEPLACE ELSE.  THAT'S CALLED AN

20  EMBOLIC EVENT.  SO THROMBOEMBOLIC ARE THESE CLOTTING EVENTS IN

21  THE BLOOD VESSELS.

22  Q.  SO WHAT IS SUMMARIZED HERE IN THIS SECTION?

23  A.  WHAT'S SUMMARIZED HERE IS THE DATA THAT CAME FROM ALL OF

24  THE CLINICAL TRIALS ON THESE SPECIFIC ADVERSE EXPERIENCES FROM

25  THE 10,000-PATIENT DATABASE.

1683

1  Q.  DOWN IN THE THIRD PARAGRAPH, DID MERCK SUMMARIZE THE

2  CLINICAL TRIALS THAT HAD BEEN DONE TO DATE AS "THE INCIDENCES

3  OF SERIOUS CARDIOVASCULAR ADVERSE EXPERIENCES WERE NOT

4  STATISTICALLY DIFFERENT AMONG TREATMENT GROUPS"?

5  A.  THAT'S CORRECT.

6  Q.  WHAT DOES THAT MEAN, DOCTOR?

7  A.  SO ONE OTHER WORD I WANT TO MAKE SURE EVERYBODY

8  UNDERSTANDS:  ADVERSE EVENT IS ANYTHING THAT HAPPENS.  A

9  SERIOUS ADVERSE EVENT HAS A SPECIFIC DEFINITION, AS WELL.

10  THAT'S IF YOU ARE HOSPITALIZED OR IF YOU DIE OR IF YOU HAVE A

11  PERMANENT DISABILITY.  SO IF SOMETHING BAD HAPPENS TO YOU AND

12  YOU GET HOSPITALIZED, YOU DIE, OR YOU HAVE A PERMANENT

13  DISABILITY, THOSE ARE THE SERIOUS ONES.  SO, IN THIS CASE, WHAT

14  WE ARE LOOKING AT ARE SERIOUS.  SO SOMEONE IS HOSPITALIZED OR

15  DIED OR HAD A DISABILITY, ADVERSE EXPERIENCES THAT ARE PART OF

16  THE CARDIOVASCULAR SYSTEM.

17        NOT ALL OF THOSE ARE THE CLOTTING ONES.  SO, FOR

18  EXAMPLE, IF YOU HAD AN IRREGULAR HEARTBEAT THAT LED YOU TO GET

19  HOSPITALIZED, THAT WOULD BE A SERIOUS CARDIOVASCULAR ADVERSE

20  EXPERIENCE THAT'S NOT RELATED TO CLOTTING.  SO THIS FIRST

21  ANALYSIS HERE IS ALL, EVERYTHING THAT WAS SERIOUS IN THE

22  CARDIOVASCULAR SYSTEM, AND WHAT IT SAYS IS THE LIKELIHOOD OF

23  THAT HAPPENING WAS THE SAME REGARDLESS OF WHETHER YOU WERE ON

24  PLACEBO, VIOXX, OR ONE OF THE COMPARATOR NSAIDS:  IBUPROFEN OR

25  DICLOFENAC.

1684

1   Q.  WAS THERE A SIMILAR SUMMARY WITH REGARD TO THESE

2   THROMBOEMBOLIC CARDIOVASCULAR ADVERSE EXPERIENCES?

3   A.  RIGHT.  SO THERE'S TWO THINGS:  ONE HERE IS ALL SERIOUS

4   THAT ARE RELATED TO THE HEART AND BLOOD VESSELS, AND THEN

5   SPECIFICALLY THE CLOTTING ONES THAT RELATE TO THE HEART AND

6   BLOOD VESSELS.  WE LOOKED AT HOW LIKELY THAT WAS IN PEOPLE ON

7   PLACEBO, VIOXX, OR THE COMPARATOR NSAIDS; AND IN THIS DATASET,

8   THEY WERE THE SAME.

9   Q.  WHEN YOU SAY "COMPARATOR NSAIDS," WERE THESE THE OLDER

10  NONSTEROIDALS THAT VIOXX WAS TESTED AGAINST IN THE CLINICAL

11  TRIALS?

12  A.  YES.  THE TWO THAT WERE PRIMARILY USED IN THE PHASE III

13  PROGRAM WERE IBUPROFEN AT ITS PRESCRIPTION STRENGTH AND

14  DICLOFENAC AT ITS PRESCRIPTION STRENGTH.

15  Q.  SO WHAT DID THE CLINICAL TRIALS SHOW AS OF THE TIME THAT

16  THE NEW DRUG APPLICATION WAS FILED WITH REGARD TO VIOXX'S

17  POTENTIAL TO INCREASE CARDIOVASCULAR THROMBOEMBOLIC RISKS?

18  A.  THE DATA AT THE TIME WE FILED THE DRUG WOULD SAY THAT THE

19  LIKELIHOOD OF THESE EVENTS HAPPENING ARE THE SAME ON VIOXX

20  VERSUS PLACEBO VERSUS TRADITIONAL MEDICINES.

21  Q.  TURNING NOW TO A NEW SUBJECT, WHEN IS AN FDA ADVISORY

22  COMMITTEE, DOCTOR?

23  A.  IT'S EXACTLY SORT OF WHAT IT DESCRIBES.  IT'S WHERE THE

24  FDA ASKS FOR ADVICE.  SO IF THEY GET AN APPLICATION AND THEY

25  HAVE TO MAKE -- THEY HAVE TO MAKE THE DECISION.  THEY ARE THE

1685

1 DECISION-MAKER OF DOES THE DRUG GET APPROVED OR NOT.  THEY MAY

2 ASK FOR ADVICE ON WHETHER IT SHOULD BE APPROVED; THEY MAY ASK

3 FOR ADVICE ON SPECIFIC THINGS THEY WANT TO PUT INTO THE PRODUCT

4 INFORMATION FOR DOCTORS; AND THEY ESSENTIALLY CALL IN ADVISORS

5 WHO ARE SCIENTISTS AND PHYSICIANS WHO DON'T WORK FOR THE FDA,

6 WHO GIVE THEM ADVICE.

7 Q.  WAS THERE AN ADVISORY COMMITTEE MEETING HELD TO DISCUSS

8 MERCK'S NEW DRUG APPLICATION FOR VIOXX?

9 A.  YES.

10 Q.  DID YOU PARTICIPATE IN HELPING DRAFT MERCK'S PRESENTATION?

11 A.  YES.

12 Q.  WHAT WAS THE OUTCOME OF THE ADVISORY COMMITTEE MEETING FOR

13 VIOXX?

14 A.  IT WAS ONE OF THOSE GOOD DAYS AT MERCK WHERE THE ADVISORY

15 COMMITTEE APPROVED -- THEY VOTED THAT THE FDA SHOULD APPROVE

16 THE DRUG.

17 Q.  DID THERE COME A TIME WHEN THE FDA DID APPROVE VIOXX?

18 A.  YES.

19 Q.  IF YOU TURN TO EXHIBIT 73 --

20     MR. ISMAIL:  YOUR HONOR, I BELIEVE THIS IS ALREADY IN

21 EVIDENCE.  IF NOT, I OFFER IT.

22     THE COURT:  IT'S ADMITTED.

23 BY MR. ISMAIL:

24 Q.  DOCTOR, CAN YOU TELL US WHAT EXHIBIT 73 IS?

25 A.  EXHIBIT 73 IS WHAT WE REFER TO AS THE APPROVAL LETTER.

1686

1  THE FDA SENDS A LETTER TO MERCK SAYING, "WE APPROVE YOUR DRUG."

2        MR. ISMAIL:  WE OFFER EXHIBIT 73, YOUR HONOR.

3        MR. BLIZZARD:  NO OBJECTION.

4        THE COURT:  LET IT BE ADMITTED.

5  BY MR. ISMAIL:

6  Q.  EXHIBIT 73, CAN YOU TELL US WHAT THE DATE OF IT IS,

7  DOCTOR?

8  A.  THE DATE STAMP IS MAY 20, 1999.

9  Q.  I WOULD ASK TO DIRECT YOUR ATTENTION DOWN HERE TO THIS

10  FOURTH -- BEFORE I DO THAT, I WANT TO ASK YOU ABOUT THIS

11  PARAGRAPH HERE.  WE HAVE ALL THESE SUBMISSIONS.  WE TALKED

12  ABOUT THIS NEW DRUG APPLICATION THAT WAS SUBMITTED BACK IN

13  1998.  WAS THAT THE LAST TIME THAT MERCK HAD ANY COMMUNICATIONS

14  WITH THE FDA REGARDING THE POTENTIAL APPROVAL OF VIOXX?

15  A.  ASK YOUR QUESTION AGAIN.

16  Q.  WE TALKED ABOUT HOW THE NEW DRUG APPLICATION WAS FILED IN

17  NOVEMBER OF 1998.  DID MERCK AND THE FDA CONTINUE TO DIALOGUE

18  AND INTERACT WITH REGARD TO THE APPROVAL OF VIOXX?

19  A.  YES.  AFTER THE APPLICATION GOES IN, AS THEY ARE REVIEWING

20  IT, THEY WILL SEND QUESTIONS TO US.  SO THEY ARE REVIEWING

21  THINGS, AND THEY'LL SAY EITHER WE CAN'T FIND SOMETHING OR WE

22  WOULD LIKE YOU TO DO ANOTHER ANALYSIS.  SO THERE IS CONTINUED

23  QUESTIONS FROM THEM AND ANSWERS BACK FROM US.

24  Q.  DOES THIS PARAGRAPH DESCRIBE SOME OF THAT INTERACTION?

25  A.  YES.

1687

1  Q.  NOW, GOING ON, THEN, TO THE FOURTH PARAGRAPH, CAN YOU GO

2  AHEAD, PLEASE, AND READ FOR THE JURY WHAT THE FDA WROTE TO

3  MERCK IN MAY OF 1999.

4  A.  "WE HAVE COMPLETED THE REVIEW OF THIS APPLICATION AS

5  AMENDED AND HAVE CONCLUDED THAT ADEQUATE INFORMATION HAS BEEN

6  PRESENTED TO DEMONSTRATE THAT THE DRUG PRODUCT IS SAFE AND

7  EFFECTIVE FOR USE AS RECOMMENDED IN THE ENCLOSED LABELING

8  TEXT."

9  Q.  THERE'S A SENTENCE OVER HERE, OR THIS PHRASE OVER HERE,

10  "ENCLOSED LABELING TEXT."  WHAT DOES THAT REFER TO?

11  A.  YOU KNOW, IT'S -- YOU'VE HEARD PEOPLE TALK ABOUT THE

12  LABEL.  IT'S ESSENTIALLY THE INFORMATION FOR PRESCRIBING

13  PHYSICIANS.

14      SO THERE IS A -- AND I WAS INVOLVED IN HELPING TO

15  DRAFT THE LABEL, AND THEN THE FDA WOULD SAY, "WELL, WE WOULD

16  LIKE THESE WORDS FOR THIS INITIAL LABEL."  YOU TALK ABOUT THAT,

17  BUT AT THE END OF THE DAY, THEY ENCLOSE HERE WHAT WE HAVE ALL

18  AGREED IS THE APPROVED LABEL.  THAT'S THE INFORMATION THAT'S

19  GOING TO GO OUT TO DOCTORS.  THEY ARE ESSENTIALLY SAYING IT'S

20  SAFE AND EFFECTIVE WHEN USED ACCORDING TO THE INSTRUCTIONS IN

21  THE LABEL.  THE LABEL, TO ME, IS ESSENTIALLY THE INSTRUCTIONS

22  FOR PHYSICIANS IN HOW TO USE THE DRUG.

23  Q.  SO WHEN THE FDA APPROVED VIOXX AS SAFE AND EFFECTIVE, DID

24  THE FDA APPROVE THE FINAL LANGUAGE FOR THE VIOXX LABEL?

25  A.  YES.

1688

1  Q.  LET'S UPDATE OUR TIME LINE HERE WITH THE FIRST FDA

2  APPROVAL IN MAY OF 1999.

3  A.  CORRECT.

4        MR. ISMAIL:  YOUR HONOR, HOW LATE DO YOU WANT TO GO

5  TODAY?

6        THE COURT:  WHAT'S YOUR SITUATION?

7        MR. ISMAIL:  I'M AT A BREAKING POINT AND I CAN START

8  A NEW DISCUSSION.  I WOULD DEFER TO THE COURT AND JURY AS TO

9  WHETHER YOU WOULD LIKE TO GO FURTHER THIS AFTERNOON OR NOT.

10        MR. BLIZZARD:  I'M READY TO QUIT.

11        THE COURT:  OKAY.  LET'S STOP AND GIVE YOU ALL AN

12  OPPORTUNITY TO GET HOME AND VOTE.  I'LL SEE YOU TOMORROW AT

13  8:30.  COURT WILL STAND IN RECESS UNTIL 8:30.

14        THE DEPUTY CLERK:  EVERYONE RISE.

15        (WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING.)

16                * * *

17

18

19

20

21

22

23

24

25