# EXHIBIT 4

Page 994

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: VIOXX PRODUCTS          *   MDL DOCKET NO. 1657
LIABILITY LITIGATION           *
                               *
* * * * * * * * * * * * * * *   *
                               *
THIS DOCUMENT RELATES TO:      *   DECEMBER 1, 2006, 8:30 A.M.
                               *
ANTHONY WAYNE DEDRICK V.       *   CASE NO. 05-CV-2524-L
   MERCK & CO., INC.           *
* * * * * * * * * * * * * * *   *



VOLUME V
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:             BEASLEY ALLEN CROW METHVIN
                                  PORTIS & MILES
                               BY:  ANDY D. BIRCHFIELD JR., ESQ.
                                    P. LEIGH O'DELL, ESQ.
                               234 COMMERCE STREET
                               MONTGOMERY, ALABAMA 36104


FOR THE DEFENDANT:             BARTLIT BECK HERMAN
                                  PALENCHAR & SCOTT
                               BY:  PHILIP S. BECK, ESQ.
                                    MARK OUWELEEN, ESQ.
                                    CARRIE A. JABLONSKI, ESQ.
                               54 W. HUBBARD STREET, SUITE 300
                               CHICAGO, ILLINOIS 60601


DAILY COPY

Page 995

```
 1   OFFICIAL COURT REPORTERS:    CATHY PEPPER, CCR, RPR, CRR
                                  TONI DOYLE TUSA, CCR, FCRR
 2                                500 POYDRAS STREET, ROOM HB-406
                                  NEW ORLEANS, LOUISIANA 70130
 3                                (504) 589-7778

 4

 5

 6
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
 7   PRODUCED BY COMPUTER.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 996

1                          I N D E X

2                                                    PAGE

3    DONNA ARNETT

4         DIRECT EXAMINATION                          997

5         CROSS-EXAMINATION                           1021

6         REDIRECT EXAMINATION                        1088

7

8    CORNELIA PECHMANN

9         VOIR DIRE                                   1101

10        DIRECT EXAMINATION                          1112

11        CROSS-EXAMINATION                           1150

12        REDIRECT EXAMINATION                        1182

13

14   EDWARD SCOLNICK (BY DEPOSITION)

15        DIRECT EXAMINATION                          1184

16

17

18

19

20

21

22

23

24

25

1                    MORNING SESSION

2                  (DECEMBER 1, 2006)

3            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4   TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5   REPORTER.)

6            THE DEPUTY CLERK:  EVERYONE RISE.

7            THE COURT:  BE SEATED, PLEASE.  GOOD MORNING, LADIES

8   AND GENTLEMEN.  MEMBERS OF THE JURY, AS THE STAFF MENTIONED TO

9   YOU, WE, UNFORTUNATELY, HAVE TO WORK TOMORROW, BUT I'LL BRING

10  THE DOUGHNUTS AND PASTRIES.  I UNDERSTAND YOU WANT TO COME AT

11  8:00 RATHER THAN 8:30, SO WE'LL GO FROM JUST 8:00 TO 1:00, AND

12  WE'LL TAKE A BREAK IN THE MORNING SO THAT YOU'RE NOT UNDULY

13  BURDENED.  I APPRECIATE THAT, THAT YOU'RE WILLING TO DO THAT,

14  AND I APPRECIATE ALL THE WORK THAT YOU'VE DONE SO FAR.  THE

15  ATTORNEYS ARE REALLY ALSO APPRECIATIVE OF THE ATTENTION THAT

16  YOU'VE GIVEN TO THE CASE AND YOUR TIMELINESS OF THE TRIAL AND

17  SO FORTH.  SO THANK YOU VERY MUCH.

18            YOU MAY CONTINUE.

19            MR. BIRCHFIELD:  THANK YOU, YOUR HONOR.

20            (WHEREUPON, DONNA ARNETT, HAVING BEEN DULY SWORN,

21  TESTIFIED AS FOLLOWS.)

22                    DIRECT EXAMINATION

23  BY MR. BIRCHFIELD:

24  Q.   GOOD MORNING, DR. ARNETT.

25  A.   GOOD MORNING.

1  Q.   YESTERDAY AFTERNOON, AS WE BROKE, WE WERE DISCUSSING YOUR

2  FIRST OPINION, THE OPINION NUMBER 2, VIOXX CAUSES HEART

3  ATTACKS; CORRECT?

4  A.   YES, WE WERE.

5  Q.   AND I ASKED YOU ABOUT ANY CLINICAL TRIALS THAT SUPPORTED

6  THAT OPINION, AND YOU HAD DESCRIBED THE APPROVE TRIAL FOR US;

7  CORRECT?

8  A.   CORRECT.

9  Q.   AND THEN I HAD ASKED YOU IF THERE WERE ANY OTHER TRIALS,

10  AND YOU HAD MENTIONED VIGOR.

11  A.   I HAD MENTIONED VIGOR.

12  Q.   WILL YOU DESCRIBE FOR US THE VIGOR STUDY, PLEASE, MA'AM.

13  A.   CERTAINLY.  VIGOR, SIMILARLY TO THE APPROVE STUDY, IS A

14  VERY LARGE CLINICAL TRIAL CONDUCTED IN RHEUMATOID ARTHRITIS

15  AGAIN, IT WAS A RANDOMIZED CLINICAL TRIAL WHERE PATIENTS WITH

16  RHEUMATOID ARTHRITIS WERE RANDOMIZED WITH EITHER VIOXX OR

17  NAPROXEN, ANOTHER NSAID, COMMONLY USED FOR RHEUMATOID

18  ARTHRITIS.  ABOUT 4,000 SUBJECTS WERE RECRUITED INTO EACH OF

19  THOSE TWO ARMS.

20  Q.   THE VIGOR STUDY, WAS IT ACTUALLY PUBLISHED?

21  A.   THE VIGOR STUDY WAS PUBLISHED IN THE NEW ENGLAND JOURNAL

22  OF MEDICINE.  AGAIN, THIS IS THE LEADING JOURNAL IN THE FIELD.

23  Q.   I WANT TO TAKE A LOOK AT THIS PUBLICATION, IF WE COULD.

24         MR. BIRCHFIELD:  WOULD YOU PUT UP 2.0183, PLEASE.

25

1    BY MR. BIRCHFIELD:

2    Q.    AND WE'RE LOOKING AT -- THIS IS THE ARTICLE THAT WAS

3    PUBLISHED; IS THAT CORRECT?

4    A.    THAT IS CORRECT.  THIS IS FROM THE NEW ENGLAND JOURNAL OF

5    MEDICINE.

6    Q.    AND THEN IF WE GO DOWN IN THE ABSTRACT SECTION AND WE LOOK

7    AT THE METHODS, TELL US WHAT THE METHODS SECTION IS AND WHAT'S

8    IT DESCRIBING HERE, PLEASE.

9    A.    WELL, FIRST OF ALL, AN ABSTRACT IS THE PART OF THE JOURNAL

10   ARTICLE THAT'S AVAILABLE FREELY TO ALL PEOPLE THROUGH ACCESS --

11   THROUGH THE NATIONAL LIBRARY OF MEDICINE, PUBMED.  SO THIS IS

12   THE PART THAT MOST OF US READ AS WE'RE SCANNING THE LITERATURE

13   TO UNDERSTAND THE IMPORTANCE OF STUDIES.

14           THE METHOD SECTION HERE DESCRIBED THE 8,000 PATIENTS

15   WHO WERE AT LEAST 15 YEARS OF AGE, AND THEY WERE, AS I'VE JUST

16   DESCRIBED, EITHER GIVEN ROFECOXIB, WHICH IS THE NAME OF VIOXX;

17   OR NAPROSYN TWICE A DAY.  THE PRIMARY GOAL OF THE STUDY WAS

18   NOT, AGAIN, CARDIOVASCULAR END POINTS; THE PRIMARY GOAL OF THE

19   STUDY WAS TO LOOK FOR CLINICAL UPPER GASTROINTESTINAL OR

20   STOMACH EVENTS.

21   Q.    AND WHAT WERE THE MAIN FINDINGS OF THIS STUDY, DR. ARNETT?

22   A.    THE MAIN FINDINGS FROM A CARDIOVASCULAR PERSPECTIVE WERE

23   THAT THERE WAS A MARKEDLY INCREASED HEART ATTACK RISK ON VIOXX

24   COMPARED TO NAPROSYN, ABOUT A 500 PERCENT INCREASE IN HEART

25   ATTACKS ON NAPROSYN -- ON VIOXX COMPARED TO NAPROSYN.

1    Q.   THE FDA MEDICAL REVIEW OFFICER, DID SHE DO A REPORT THAT

2    INCLUDED THE VIGOR DATA?

3    A.   SHE DID INDEED.  IN FACT, THE EXCESS RISK OF HEART ATTACKS

4    WAS MOST CLEARLY SEEN IN WHAT WAS SUBMITTED TO THE FOOD & DRUG

5    ADMINISTRATION AND WHAT'S AVAILABLE IN THE REPORT BY THE FOOD &

6    DRUG ADMINISTRATOR, DR. VILLALBA.  AND THERE IS A GRAPH.  I'M

7    NOT SURE IF I CAN SHOW IT OR NOT.

8    Q.   LET ME SHOW YOU WHAT'S MARKED AS PLAINTIFF'S

9    EXHIBIT 1.1246.  DR. ARNETT, IS THAT A COPY OF DR. VILLALBA'S

10   REPORT THAT YOU JUST REFERENCED?

11   A.   YES, IT IS.  IT'S THE SUPPLEMENTAL NDA THAT WAS SUBMITTED

12   TO THE FOOD & DRUG ADMINISTRATION.

13   Q.   AND DID YOU REVIEW THAT IN FORMING YOUR OPINIONS IN THIS

14   CASE?

15   A.   I DID.

16          MR. BIRCHFIELD:  YOUR HONOR, WE OFFER PLAINTIFF'S

17   EXHIBIT 1.1246.

18          MR. BECK:  NO OBJECTION, YOUR HONOR.

19          THE COURT:  LET IT BE ADMITTED.

20   BY MR. BIRCHFIELD:

21   Q.   DR. ARNETT, YOU SAID THAT THERE IS A SECTION IN HERE THAT

22   ILLUSTRATES THE VIGOR STUDY MORE CLEARLY.

23   A.   YES, THERE IS.  THERE IS A SECTION THAT EVALUATED THE

24   CARDIOVASCULAR RISKS, AND WITHIN THAT SECTION, THERE IS A PLOT.

25   THESE PLOTS ARE CALLED KAPLAN-MEIER CURVES.

1    Q.    AND IS THAT ON PAGE 30?

2    A.    YES, SIR.  IT'S ON PAGE 30.

3            MR. BECK:  MIKE, WILL YOU BLOW UP THE CHART FOR US

4    HERE, PLEASE.

5    BY MR. BIRCHFIELD:

6    Q.    DR. ARNETT, WILL YOU DESCRIBE FOR US WHAT WE SEE IN THIS

7    CHART.

8    A.    YES.  THIS IS AS I WAS DESCRIBING, WHAT'S CALLED A

9    KAPLAN-MEIER CURVE, AND EACH OF THESE LINES REPRESENTS EACH OF

10   THE TWO TREATMENTS.  ROFECOXIB IS VIOXX AND IT'S THE TOP LINE.

11   THE BOTTOM LINE REPRESENTS NAPROSYN.  EACH OF THOSE BUMPS IN

12   THE LINE, AS YOU MOVE OVER TIME ON THE BOTTOM AXIS WHERE YOU

13   HAVE MONTHS OF FOLLOW-UP, EXCUSE ME, AS YOU MOVE ACROSS TIME,

14   EACH OF THOSE BUMPS UP REPRESENTS A NEW CARDIOVASCULAR EVENT.

15   AND THIS WAS USING THE CONFIRMED THROMBOTIC CARDIOVASCULAR

16   SERIOUS ADVERSE EXPERIENCES IN THE VIGOR STUDY, WHICH INCLUDED

17   ALL KINDS OF CARDIOVASCULAR EVENTS.

18           THE DECISION TO FOLLOW UP CARDIOVASCULAR EVENTS

19   SPECIFIED THAT THE PRIMARY WAY THEY WOULD DO THAT IN THE

20   STUDIES THAT MERCK WAS CONDUCTING WAS TO USE SOMETHING CALLED

21   THE ANTI-PLATELET TRIALIST COLLABORATIVE DEFINITION, AND IT'S A

22   DEFINITION THAT INCLUDES ALL KINDS OF EVENTS:  HEART ATTACKS,

23   STROKES, AS WELL AS BLOOD CLOTS THAT HAPPEN IN THE ARTERIES OF

24   THE PERIPHERAL VASCULATURE.

25   Q.    AND SO WHAT DOES THIS TELL US ABOUT THE RELATIONSHIP

1    BETWEEN THE RISKS AND TIME?

2    A.   WHAT IT TELLS US IS THAT YOU START SEEING A SEPARATION OF

3    THE LINES, IN OTHER WORDS, THE RATE EARLY ON IN THE TREATMENT.

4    YOU SEE ABOUT ONE MONTH OR HALFWAY BETWEEN THE ZERO AND

5    TWO-MONTH PERIOD OF FOLLOW-UP A SEPARATION OF THE LINES, WHICH

6    INDICATES THAT VIOXX WAS CAUSING THE HEART ATTACK RISK EARLY.

7    Q.   IS THE INFORMATION IN THIS KAPLAN-MEIER PLOT, IS IT

8    PRESENTED IN THE VIGOR PUBLICATION?

9    A.   IT IS NOT.

10   Q.   IN REGARDS TO THE RESULTS, WHAT WERE THE CONCLUSIONS IN

11   THE VIGOR STUDY AS IT WAS ACTUALLY REPORTED IN THE PUBLICATION?

12   A.   IF WE LOOK WITHIN THE ABSTRACT OF THE PUBLICATION FROM

13   VIGOR.

14   Q.   OKAY.  LET'S GO BACK TO THAT --

15   A.   WE CAN COME BACK TO THAT.

16   Q.   -- PUBLICATION.  2.0183.  YOU WANT US TO LOOK AT THE

17   ABSTRACT?

18   A.   I WANT TO LOOK AT THE CONCLUSION OF THE ABSTRACT, BECAUSE

19   THIS IS THE CONCLUSION POINT OF THE PAPER.

20   Q.   OKAY.

21   A.   THE CONCLUSION OF THE PAPER IS, "IN PATIENTS WITH

22   RHEUMATOID ARTHRITIS, TREATMENT WITH VIOXX, A SELECTIVE

23   INHIBITOR OF CYCLOOXGENASE-2, IS ASSOCIATED WITH SIGNIFICANTLY

24   FEWER CLINICALLY IMPORTANT GASTROINTESTINAL EVENTS THAN

25   TREATMENT WITH NAPROXEN, A NONSELECTIVE INHIBITOR."

1   Q.   DR. ARNETT, IN THE VIGOR STUDY, IS THERE ANYTHING THAT

2   WOULD INDICATE WHETHER OR NOT THERE WAS AN INCREASED RISK FOR

3   PATIENTS THAT ARE AT RISK FOR HEART DISEASE?

4   A.   WELL, THE ONLY PLACE YOU CAN -- THERE ARE TWO PLACES IN

5   THIS PUBLICATION, THIS TEN-PAGE PUBLICATION, TWO LINES THAT

6   DESCRIBE HEART ATTACK RISKS, AND THEY ARE INCLUDED:  ONE IN THE

7   ABSTRACT, ONE STATEMENT; AND A SECOND STATEMENT IN THE PATIENT

8   SAFETY SECTION OF THE MANUSCRIPT, WHICH WAS ON THE FIFTH PAGE

9   OF THE PAPER.

10  Q.   OKAY.

11  A.   IF WE COULD GO TO THAT, I WOULD POINT IT OUT.

12             MR. BECK:  YOUR HONOR, MAY WE APPROACH?

13             THE COURT:  YES.

14             (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

15  THE BENCH.)

16             MR. BECK:  YOUR HONOR, WE ASKED HER IN HER

17  DEPOSITION, PAGE 208 TO 209, IF SHE WAS GOING TO OFFER ANY

18  OPINION AT ALL ABOUT WHETHER ANY SUBGROUP IS A GREATER OR

19  LESSER RISK BASED ON VIGOR.  SHE SAID NO.  NOW SHE'S DOING

20  EXACTLY WHAT SHE SAID SHE WAS NOT GOING TO DO.  IT'S NOT IN HER

21  REPORT, AND WE ASKED HER IN HER DEPOSITION IF SHE WAS GOING TO

22  DO IT AND SHE SAID NO.  WOULD YOU LIKE ME TO GET THE

23  TRANSCRIPT?

24             THE COURT:  NO.

25             MR. BIRCHFIELD:  WHAT SHE IS TESTIFYING HERE IS JUST

1   AN INDICATION ABOUT THE RISKS FOR AN AT-RISK POPULATION.  SHE'S

2   NOT REACHING ANY DEFINITE CONCLUSIONS.  IT'S NOT UP THERE ON

3   THE BOARD AS ONE OF HER MAIN OPINIONS.  SHE'S SAYING HERE IS

4   INFORMATION THAT WAS AVAILABLE THAT RAISES A CONCERN ABOUT THE

5   AT-RISK POPULATION.

6           MR. BECK:  SHE SAID SHE WASN'T GOING TO DO THAT IN

7   HER DEPOSITION.

8           MR. BIRCHFIELD:  YOUR HONOR, I MEAN, THAT'S A MATTER

9   OF CROSS-EXAMINATION.

10          MR. BECK:  IT IS NOT, YOUR HONOR.  IT'S A MATTER

11  OF -- SHE SAID SHE'S NOT GOING TO DO IT IN HER DEPOSITION.

12          THE COURT:  LET ME JUST HEAR ONE PERSON AT A TIME.

13          MR. BIRCHFIELD:  YOUR HONOR, WE FOLLOWED THE RULES IN

14  PROVIDING, YOU KNOW, THE BASIS OF HER OPINION AND THE REPORT

15  AND THEN WE PUT HER UP FOR DEPOSITION.  SHE'S LAID ALL OF THIS

16  OUT.  WE REALLY SHOULD NOT BE PUT IN A POSITION WHERE WE HAVE

17  TO GIVE A SCRIPT WORD FOR WORD FOR EVERYTHING THAT'S SHE'S

18  GOING TO SAY.  WE CAN'T DO THAT.

19          MR. BECK:  YOUR HONOR, THAT'S FALSE.  THE OPINION

20  DOES NOT HAVE ANYTHING WHATSOEVER TO DO WITH SUBGROUPS; AND

21  THEREFORE, WE ASKED HER IN HER DEPOSITION WHETHER SHE WAS GOING

22  TO DO ANYTHING WITH SUBGROUPS, HAD ANY OPINIONS BASED ON THAT,

23  AND SHE SAID NO.

24          THE COURT:  WHAT'S INVOLVED IN THIS, ANDY?  HOW MUCH

25  DO YOU PLAN TO GET INTO THIS?

1            MR. BIRCHFIELD:  I INTEND FOR HER TO SAY WHAT'S

2    REPORTED IN THE ARTICLE ABOUT THE AT-RISK POPULATION.  SHE'S

3    GOING TO SAY ABOUT THE ASPIRIN-INDICATED GROUP, AND THEN I'M

4    GOING TO ASK HER ABOUT DID APPROVE SHOW ANYTHING FOR THE PEOPLE

5    THAT WERE AT RISK.

6            MR. BECK:  SHE TESTIFIED THAT SHE WASN'T GOING TO DO

7    THAT FOR APPROVE EITHER.

8            THE COURT:  WHY DID WE GET INTO THIS POSITION?  YOU

9    GUYS BOTH HAVE -- WHY DO I HAVE TO KEEP MEETING WITH YOU?

10            MR. BECK:  YOUR HONOR, ALL WE CAN DO IS READ HER

11    OPINION AND ASK HER A QUESTION:  "ARE YOU GOING TO BE BASING

12    ANY OPINIONS ON SUBGROUPS?"  AND SHE SAID, "NO."  I CAN'T DO

13    ANYTHING ELSE.

14            MR. BIRCHFIELD:  YOUR HONOR, THOSE ARE THE OPINIONS

15    THAT SHE'S REACHED, BUT SHE'S -- I MEAN, SHE'S ENTITLED TO

16    DISCUSS THE MAIN CLINICAL TRIALS AND DISCUSS, YOU KNOW, THE

17    DIFFERENT ASPECTS OF THE TRIALS.  A PART OF THAT, THE MAIN

18    FINDING, IS WHAT SHE'S DESCRIBED:  IS THERE A DIFFERENCE IN THE

19    AN INCREASED RISK?  BUT THERE WASN'T.

20              ALSO REPORTED IN THERE THE -- THE INCREASED

21    RISKS.  ALTHOUGH, IT'S NOT -- IS NOT THE PRIMARILY ENDPOINT.

22    IT IS A -- IT'S A WARNING SIGNAL, LOOK, THERE IS AN INCREASED

23    RISK WITH AT-RISK POPULATION, AND SHE'S ENTITLED TO AT LEAST

24    DISCUSS THESE.  WE'VE GOT IT DOWN TO APPROVE AND VIGOR AND THE

25    MAJOR TRIALS, AND SHE OUGHT TO BE ABLE TO TESTIFY ABOUT THIS.

1          MR. BECK:  YOUR HONOR, IF SHE HAD DISCLOSED IT, THEN

2     THAT WOULD BE ONE THING, BUT WE ASKED HER POINT-BLANK AND SHE

3     SAID, "NO, I'M NOT GOING TO RELY ON THAT AT ALL."  I CAN'T DO

4     ANYTHING OTHER THAN ASK HER WHAT SHE'S GOING TO TESTIFY ABOUT,

5     AND SHE SAID SHE'S NOT GOING TO DO IT.

6          MR. BIRCHFIELD:  I MEAN, IT'S ONE THING TO SAY THAT

7     "I'M NOT RELYING ON THAT."  IT'S ANOTHER THING TO SAY, YOU

8     KNOW, "WHAT AM I INFORMED BY IN REVIEWING THESE."  IF YOU ASK

9     AN EXPERT, YOU KNOW, WHAT DID THEY RELY ON, YOU KNOW, THAT'S

10    ONE THING.  BUT THEY REVIEW A LOT OF THINGS AND INFORM THEIR

11    DECISIONS THAT WOULD NOT BE A FUNDAMENTAL BASIS OF RELIANCE ON.

12         THE COURT:  I'LL LET YOU GO.  I OVERRULE THE

13    OBJECTION.  LET'S GO.  LET'S SEE IF WE CAN GET THROUGH THIS AS

14    QUICKLY AS WE CAN.

15         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

16    OPEN COURT.)

17         MR. BIRCHFIELD:  GO TO PAGE 5 OF THE GENERAL SAFETY.

18    IF YOU WILL BLOW UP THAT SECTION, MIKE, THE GENERAL SAFETY

19    SECTION.

20    BY MR. BIRCHFIELD:

21    Q.   DR. ARNETT, WILL YOU TELL US HERE WHAT YOU SEE.

22    A.   IN THE FOURTH LINE OF THIS GENERAL SAFETY SECTION, YOU SEE

23    MI'S WERE LESS COMMON IN THE NAPROXEN GROUP THAN THE VIOXX

24    GROUP.  .1 PERCENT VERSUS .4 PERCENT, WITH A 95 PERCENT

25    CONFIDENCE INTERVAL FOR THE DIFFERENCE, AND THE RELATIVE RISK

1    IS EQUAL TO 0.2.

2    Q.   AND THEN WHAT ABOUT -- WELL, DOES THIS TELL YOU ANYTHING

3    ABOUT THE AT-RISK POPULATION?

4    A.   IT MAKES IT SOUND AS IF NAPROSYN IS PROTECTIVE AND VIOXX

5    IS NOT HARMFUL.

6          IF YOU GO ON BELOW THIS, IT TALKS ABOUT 4 PERCENT OF

7    THE STUDY SUBJECTS MEET THE CRITERION OF THE FDA'S REQUIREMENT

8    OR SUGGESTION FOR WHAT CAN BE CONSIDERED ASPIRIN-INDICATED

9    PATIENT FOR SECONDARY PREVENTION OF CARDIOVASCULAR DISEASE.

10   SECONDARY PREVENTION MEANS THE PEOPLE HAVE ALREADY HAD AN EVENT

11   AND WE'RE TRYING TO PREVENT A SECOND ONE, AND IN THOSE PATIENTS

12   THERE ARE ONLY 4 PERCENT OF THE STUDY SUBJECTS WHO WERE

13   CLASSIFIED AS HAVING THIS PRIMARY EVENT ALREADY.  OF THOSE,

14   THEY ACCOUNTED FOR 38 PERCENT OF THE PATIENTS WHO HAD

15   MYOCARDIAL INFARCTIONS IN THE VIGOR STUDY.

16   Q.   DR. ARNETT, IN THE APPROVE STUDY, WAS THERE ANY INDICATION

17   REGARDING THE RISKS FOR AN AT-RISK POPULATION?

18          MR. BECK:  YOUR HONOR, MAY I APPROACH ON THIS ONE?

19          THE COURT:  SURE.

20          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

21   THE BENCH.)

22          MR. BECK:  SHE TESTIFIED UNDER OATH AT PAGE 208 AND

23   209 OF HER DEPOSITION AS TO APPROVE.  SHE WOULD NOT OFFER ANY

24   OPINION THAT ANY SUBGROUP WAS AT GREATER OR LESSER RISK.  THERE

25   IS NOTHING IN HER DISCLOSURE THAT TALKED ABOUT DIFFERENT GROUPS

1    BEING AT DIFFERENT RISKS.  HER DISCLOSURE IS ALL ABOUT HOW

2    EVERYBODY IS AT THE SAME RISK, NO MATTER WHAT DOSE, NO MATTER

3    WHAT DURATION.

4              WE SOUGHT TO FIND OUT WHETHER SHE WAS GOING TO

5    TALK ABOUT SUBGROUPS BECAUSE THEN, OF COURSE, I COULD BE

6    PREPARED TO CROSS-EXAMINE HER ON IT, AND SHE SAID UNDER OATH

7    SHE WAS NOT GOING TO DO IT.

8              THE COURT:  DIDN'T SHE TESTIFY IN THE BEGINNING THAT

9    IT DOESN'T MATTER THE DOSAGE AND IT DOESN'T MATTER TIME?

10             MR. BECK:  THAT'S OPINION NUMBER 2 UP THERE.

11             MR. BIRCHFIELD:  THAT'S TRUE.  THAT'S CONSISTENT WITH

12   HER OPINION.  THE ONLY THING I'M ASKING HERE IS ABOUT THE

13   AT-RISK POPULATION.  BUT THAT'S FINE.

14             THE COURT:  LET'S GO TO SOMETHING ELSE.

15             (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

16   OPEN COURT.)

17   BY MR. BIRCHFIELD:

18   Q.   IN THE LAST SENTENCE HERE:  "THESE PATIENTS ACCOUNTED FOR

19   38 PERCENT OF THE PATIENTS IN THE STUDY WHO HAD MYOCARDIAL

20   INFARCTIONS."  IS THAT RIGHT?

21   A.   THAT'S CORRECT.

22   Q.   THAT'S SAYING THAT, IN THE VIGOR STUDY, THAT THE ONES WHO

23   HAD HEART ATTACKS WERE THOSE WHO WERE ASPIRIN-INDICATED OR

24   SHOULD HAVE BEEN ON ASPIRIN?

25   A.   THAT'S WHAT IT'S SAYING, THAT THE RISK APPEARED TO BE MUCH

1    GREATER IN THE TWO -- WERE INDICATED FOR ASPIRIN ACCORDING TO

2    THIS DEFINITION.

3    Q.    OKAY.   DR. ARNETT, WE TALKED ABOUT THE APPROVE STUDY AND

4    THE VIGOR STUDY.   WERE THERE ANY OTHER STUDIES THAT WERE

5    IMPORTANT TO YOUR OPINION THAT VIOXX CAUSES HEART ATTACKS?

6    A.    THERE ARE OTHER STUDIES, BUT IN PREFACE TO THAT, I HAVE TO

7    SAY THAT APPROVE WAS THE CADILLAC STUDY BECAUSE IT WAS LARGE

8    AND PLACEBO-CONTROLLED.   VIGOR SHOWED A 500 PERCENT INCREASE OF

9    HEART ATTACK.   ALSO A VERY LARGE STUDY WITH A DIFFERENT CONTROL

10   GROUP, NAPROSYN.   IN ADDITION TO THOSE TWO VERY LARGE AND VERY

11   COMPELLING STUDIES, THERE WERE OTHER STUDIES THAT HAD SHOWED

12   NUMERICAL INCREASES IN HEART ATTACK RISKS WITH VIOXX.

13   Q.    WHAT OTHER STUDIES?

14   A.    THE FIRST OF THESE IS CALLED THE ADVANTAGE STUDY, AND I

15   BELIEVE YOU HEARD ABOUT IT SOME YESTERDAY.   THE ADVANTAGE STUDY

16   WAS ANOTHER LARGE STUDY.   IT WAS CONDUCTED IN ABOUT 5600

17   PEOPLE.   ABOUT HALF OF THOSE WERE RANDOMIZED.   AGAIN, THIS IS A

18   RANDOMIZED TRIAL TO VIOXX AND THE OTHER HALF TO NAPROSYN, THE

19   SAME COMPARISON GROUP THAT WE JUST SAW IN THE VIGOR STUDY.

20   Q.    IN THE ADVANTAGE STUDY, WHAT ABOUT THE HEART ATTACKS?

21   WHAT DID YOU SEE?

22   A.    IN THE ADVANTAGE STUDY, ALMOST IDENTICAL TO WHAT WE SEE IN

23   THE VIGOR STUDY, THERE WERE SEVEN HEART ATTACKS OR SUDDEN

24   CARDIAC DEATHS IN THOSE WHO WERE RANDOMIZED TO VIOXX, BUT ONLY

25   ONE SUCH DEATH IN THOSE WHO WERE RANDOMIZED TO NAPROXEN.

1   Q.   THAT'S HEART ATTACKS PLUS SUDDEN CARDIAC DEATH?

2   A.   CORRECT.  SUDDEN CARDIAC DEATH IS OFTEN THE FIRST SIGN OF

3   A HEART ATTACK.

4   Q.   THEN WHAT ABOUT IF YOU LOOK JUST AT THE HEART ATTACKS IN

5   THE VIOXX GROUP VERSUS THE COMPARATOR GROUP?

6   A.   IN JUST THE HEART ATTACKS ALONE, THERE WERE FIVE SUCH

7   EVENTS IN THE VIOXX GROUP COMPARED TO ONE EVENT IN THE NAPROSYN

8   GROUP, WHICH YIELDS A RELATIVE RISK ESTIMATE THAT WOULD BE

9   EQUIVALENT TO WHAT WE FOUND IN VIGOR.

10           SO CONSISTENCY OF A FINDING IS ONE OF THE THINGS

11  THAT, AS AN EPIDEMIOLOGIST, I EVALUATE, AND IT WAS A CONSISTENT

12  FINDING BETWEEN VIGOR AND ADVANTAGE.

13  Q.   DR. ARNETT, DID YOU ALSO LOOK AT STUDIES 085 AND 090?

14  A.   I DID.  THESE ARE STUDIES THAT WERE CONDUCTED, AGAIN, IN

15  OSTEOARTHRITIS PATIENTS.  THEY WERE ALSO FAIRLY LARGE STUDIES,

16  NOT QUITE AS LARGE AS ADVANTAGE.  THEY WERE RANDOMIZING

17  PATIENTS WITH OSTEOARTHRITIS, EVERY SHORT-TERM STUDIES -- THIS

18  WAS A SIX-WEEK STUDY -- EITHER TO VIOXX -- 800 PATIENTS WERE

19  RANDOMIZED TO VIOXX, 800 WERE RANDOMIZED TO ANOTHER NSAID, AND

20  400 WERE RANDOMIZED TO PLACEBO.

21  Q.   WERE THOSE STUDIES, 085 AND 090, WERE THEY SIGNIFICANT IN

22  FORMING YOUR OPINION THAT VIOXX CAUSES HEART ATTACKS?

23  A.   THEY WERE SIGNIFICANT IN THAT THEY, IN ADDITION TO THESE

24  OTHER VERY LARGE AND VERY COMPELLING STUDIES, SHOWED NUMERICAL

25  EXCESS OF CARDIOVASCULAR EVENTS IN THOSE WHO WERE RANDOMIZED TO

1   VIOXX COMPARED TO PLACEBO.

2   Q.   WHAT IF YOU WERE LOOKING AT JUST THOSE STUDIES ALONE?

3   A.   IF I HAD ONLY THOSE STUDIES TO EVALUATE, WITHOUT THE

4   TOTALITY OF THESE CADILLAC STUDIES I REFERRED TO EARLIER,

5   APPROVE AND VIGOR, I PROBABLY WOULDN'T HAVE THOUGHT MUCH ABOUT

6   IT.  I WOULD HAVE THOUGHT:  THIS IS A RED FLAG.  WE'RE SEEING

7   ABOUT FOUR TIMES AS MANY EVENTS IN THOSE WHO HAVE VIOXX THAN

8   THOSE WHO HAVE PLACEBO OR THE OTHER NSAID.  BUT THAT, IN AND OF

9   ITSELF, IN THE ABSENCE OF ALL OF THE OTHER TOTALITY OF DATA,

10  SHOWING THE CARDIOVASCULAR RISKS FROM VIOXX, I PROBABLY WOULD

11  HAVE THOUGHT:  THIS IS INTERESTING.  I HAD BETTER KEEP AN EYE

12  ON IT.

13  Q.   I THINK YESTERDAY, WHEN YOU WERE DESCRIBING TOOLS, YOU

14  MENTIONED CONSISTENCY.  DOES 085 AND 090, DO THEY FIT INTO YOUR

15  CONSISTENCY TOOL HERE?

16  A.   THEY DO.  THEY SHOW THIS CONSISTENT HIGHER, NUMERICALLY

17  HIGHER, RATE OF CARDIOVASCULAR HEART ATTACK EVENTS IN THOSE

18  RANDOMIZED TO VIOXX VERSUS OTHER COMPARATORS.

19  Q.   DR. ARNETT, LET'S MOVE TO YOUR SECOND OPINION.  THE HEART

20  ATTACK RISK APPEARS AT ANY DOSE AND ANY DURATION OF USE.

21  A.   OKAY.

22  Q.   AND THAT'S AN OPINION YOU HOLD TO A REASONABLE DEGREE OF

23  SCIENTIFIC CERTAINTY?

24  A.   I DO.

25  Q.   WILL YOU TELL US, DR. ARNETT, WHAT STUDIES, WHAT CLINICAL

1    STUDIES, YOU RELY ON IN FORMING THAT OPINION?

2    A.   CERTAINLY.  THERE HAVE BEEN A NUMBER OF STUDIES I'VE JUST

3    DISCUSSED.  THE 085 AND 090 STUDIES WERE SIX-WEEK STUDIES; THE

4    VIGOR STUDY WAS ABOUT AN AVERAGE OF NINE MONTHS OF FOLLOW-UP;

5    THE ADVANTAGE STUDY WAS A 12-WEEK STUDY; AND THE APPROVE STUDY

6    THAT I FIRST DESCRIBED, WHICH WAS THE PLACEBO-CONTROLLED STUDY,

7    WAS A LONGER TERM FOLLOW-UP STUDY.  IN ALL OF THESE STUDIES,

8    YOU SEE THIS EXCESS OF CARDIOVASCULAR EVENTS, FROM SIX WEEKS TO

9    MUCH LONGER IN FOLLOW-UP TIME.

10   Q.   OKAY.  YOU MENTIONED 090.  HOW LONG WAS 090?

11   A.   THE 090 STUDY WAS SIX WEEKS IN DURATION.

12   Q.   WHAT WAS THE DOSAGE THAT WAS USED IN 090?

13   A.   THE DOSAGE IN 090 WAS 12.5 MILLIGRAMS, THE LOWEST DOSE

14   AVAILABLE FOR VIOXX.

15   Q.   AND IN THE VIGOR STUDIES, IT WAS -- YOU SAID IT WAS NINE

16   MONTHS; RIGHT?

17   A.   ABOUT NINE MONTHS OF FOLLOW-UP.

18   Q.   WHAT WAS THE DOSAGE THAT WAS USED IN VIGOR?

19   A.   50 MILLIGRAMS OF VIOXX.

20   Q.   ALL RIGHT.  AND THEN THE ADVANTAGE STUDY, HOW LONG DID YOU

21   SAY THE ADVANTAGE STUDY WAS?

22   A.   THE ADVANTAGE STUDY LASTED 12 WEEKS.

23   Q.   AND WHAT WAS THE DOSAGE WHAT WAS USED IN THE ADVANTAGE

24   STUDY?

25   A.   THE ADVANTAGE WAS 25 MILLIGRAMS.

1    Q.   DR. ARNETT, BASED ON THE APPROVE STUDY, WHAT WAS THE

2    RELATIVE RISK OF HAVING A HEART ATTACK IN THE FIRST SIX MONTHS?

3    A.   BECAUSE THE RELATIVE RISK WAS CONSTANT OVER TIME IN TERMS

4    OF ASSESSING THE -- WHAT WE CALL IN EPIDEMIOLOGY THE

5    PROPORTIONALITY ASSUMPTION, WHICH SAYS, ARE THOSE LINES

6    PROPORTIONAL OVER TIME, THAT TEST WAS NOT SIGNIFICANT, WHICH

7    MEANS THAT THE LINES WERE PROPORTIONAL.

8         SO THE NUMBER THAT I SHOWED YOU YESTERDAY WHEN WE PUT

9    UP THE HEART ATTACK RATES AND THOSE WHO WERE RANDOMIZED TO

10   VIOXX VERSUS THOSE WHO WERE RANDOMIZED TO PLACEBO, WE OBSERVED

11   A 2.8 RELATIVE RISK, WHICH TRANSLATES TO A 280 PERCENT INCREASE

12   IN HEART ATTACK RATES IN VIOXX VERSUS PLACEBO.  THAT MEANS --

13   SINCE WE FAILED TO REJECT THIS PROPORTIONALITY OVER TIME, THAT

14   MEANS THAT, FOR ALL PERIODS OF THAT STUDY, THE 2.8 NUMBER HOLDS

15   TRUE.

16   Q.   AND LET'S MOVE TO YOUR THIRD OPINION:  "MERCK STUDIES WERE

17   NOT DESIGNED WITH ADEQUATE POWER TO DETECT HEART ATTACK RISKS"?

18   A.   YES.

19   Q.   IS THAT AN OPINION THAT YOU HOLD TO A REASONABLE DEGREE OF

20   MEDICAL CERTAINTY?

21   A.   I DO.

22   Q.   AND, DR. ARNETT, DON'T SOME OF THE MERCK STUDIES FAIL TO

23   SHOW A STATISTICALLY SIGNIFICANT DIFFERENCE IN HEART ATTACKS?

24   A.   THEY DO.

25   Q.   AND IS THAT IMPORTANT, OR DOES THAT MEAN THAT THE HEART

1   ATTACK RISK IS UNCLEAR?

2   A.   GIVEN THE TOTALITY OF THE EVIDENCE AND THE MAGNITUDE AND

3   CONSISTENCY OF THE FINDINGS FROM THESE VERY LARGE RANDOMIZED

4   CLINICAL TRIALS -- APPROVE, VIGOR, ADVANTAGE -- THOSE THAT ARE

5   LARGER AND MORE POWERFUL STUDIES SHOW THIS CONSISTENT AND

6   STRONG EFFECT.

7            POWER IS A TERM THAT'S JUST THE OPPOSITE IN CONCEPT

8   TO WHAT WE LABEL AS STATISTICAL SIGNIFICANCE.  WHEN WE'RE

9   TESTING FOR STATISTICAL SIGNIFICANCE, OUR GOAL IS TO MAKE SURE

10  THAT THE FINDING THAT WE OBSERVE IS -- THAT FINDING OF A HIGH

11  RISK IS NOT JUST A FALSE OR RANDOM FINDING.

12           WITH POWER, THE QUESTION THAT WE'RE ASKING IS A

13  DIFFERENT QUESTION.  WE'RE ASKING OURSELVES, IS THERE -- IS

14  THERE REALLY AN EFFECT THERE THAT WE HAVE NOT DETECTED.  IS THE

15  RELATIVE RISK THAT WE'RE DETECTING OF 1.0, WHICH MEANS NO

16  EFFECT, REALLY NO EFFECT OR NOT?  IS THERE REALLY AN INCREASED

17  RISK THAT WE'RE MISSING?

18           IN OTHER WORDS, A WAY THAT I LIKE TO DESCRIBE IT TO

19  MY STUDENTS IS THAT WE CAST A NET, WE DESIGN OUR STUDIES, AS IF

20  WE'RE FISHING FOR THE REAL FINDING.  SO IF WE HAVE A SMALL NET,

21  AND WE CAST THAT NET AND GO FISHING.  WE MAY NOT CATCH A FISH.

22  IF WE CAST A LARGE NET, THOUGH, WE ARE MORE LIKELY TO CATCH A

23  FISH.

24           SIMILARLY, IF WE CAN'T GET A BIG NET, WE MAY

25  CONTINUALLY AND REPEATEDLY CAST THAT SMALL NET AND WE MAY

Page 1015

1    INCREASE OUR CHANCE OF FINDING A FISH OR CATCHING A FISH.  IF

2    WE REPEATEDLY INCREASE OUR FOLLOW-UP TIME IN OUR STUDIES, WE

3    MAY FIND SOMETHING THERE.

4           FINALLY, THERE ARE OTHER WAYS THAT WE CAN MAKE OUR

5    NET BIGGER BY TRYING TO COMBINE DIFFERENT NETS SO THAT WE MAKE

6    A BIGGER NET, AND THE WAY WE DO THAT IN EPIDEMIOLOGY IS

7    SOMETHING CALLED META-ANALYSES.

8    Q.   SO THE META-ANALYSES WOULD BE LIKE COMBINING A BUNCH OF

9    THE SMALLER NETS; IS THAT RIGHT?

10   A.   IT WOULD BE COMBINING A BUNCH OF THESE SMALLER NETS OR --

11   Q.   SMALLER STUDIES?

12   A.   -- SMALLER STUDIES TO TRY TO DETERMINE IF THERE IS A FISH

13   THAT WE CAN CATCH.

14          NOW, HOW THESE NETS FIT TOGETHER IS A BIG PROBLEM

15   WITH META-ANALYSIS STUDIES BECAUSE NOT ALL STUDIES ARE THE

16   SAME.  THEY MAY HAVE DIFFERENT FOLLOW-UP TIMES.  THEY MAY HAVE

17   DIFFERENT COMPARATORS.  SO THE NETS MAY NOT FIT TOGETHER ALL

18   THAT WELL.

19   Q.   ARE YOU AWARE OF STUDIES THAT MERCK HAS OFFERED TO SUGGEST

20   THAT THERE WAS NO CV RISK ASSOCIATED WITH VIOXX?

21   A.   I AM.

22   Q.   WHAT STUDIES HAVE THEY USED TO SUGGEST THAT?

23   A.   THERE ARE SEVERAL OF THESE META-ANALYSES THAT I JUST

24   DESCRIBED, THESE STUDIES THAT COMBINE OTHER STUDIES THAT HAVE

25   EVALUATED WHETHER OR NOT THERE WAS A CARDIOVASCULAR OR HEART

1   ATTACK RISK FROM VIOXX.

2   Q.   WELL, DO THESE STUDIES, DO THEY CALL INTO QUESTION YOUR

3   OPINION ABOUT THE HEART ATTACK RISK OF VIOXX?

4   A.   THEY DON'T AFFECT MY OPINION IN A NEGATIVE WAY BECAUSE OF

5   THE CONSISTENCY OF FINDINGS BETWEEN THE APPROVE STUDY, WHICH

6   WAS COMPARED TO PLACEBO IN A VERY LARGE STUDY; AND THE VIGOR

7   STUDY, WHICH WAS COMPARED TO NAPROSYN, BOTH OF WHICH SHOWED A

8   STATISTICALLY SIGNIFICANT AND MARKED INCREASE IN CARDIOVASCULAR

9   OR HEART ATTACK RISKS.

10  Q.   IN DOING YOUR INVESTIGATION REGARDING ANY HEART ATTACK

11  RISKS ASSOCIATED WITH VIOXX, DID YOU LOOK AT THE ALZHEIMER'S

12  STUDIES?

13  A.   I LOOKED AT BOTH THE ALZHEIMER'S STUDIES AND ANOTHER TYPE

14  OF STUDY FOR A TYPE OF META-ANALYSIS FOR OSTEOARTHRITIS.   I

15  LOOKED AT BOTH OF THOSE STUDIES.

16  Q.   IN LOOKING AT THE ALZHEIMER'S STUDY, DID THEY SHOW A

17  STATISTICALLY SIGNIFICANT INCREASED RISK IN HEART ATTACKS WITH

18  VIOXX?

19  A.   THE ALZHEIMER'S STUDIES DID NOT SHOW A STATISTICALLY

20  SIGNIFICANT INCREASED RISK, AND THERE ARE SOME REASONS THAT I

21  THINK THAT THEY PROBABLY DIDN'T.

22  Q.   OKAY.   WHAT ARE THOSE REASONS?

23  A.   THE FIRST IS THAT, EVEN THOUGH THEY SEEM LARGE, THEY

24  AREN'T ALL THAT LARGE.   THE VIGOR, THE APPROVE, AND THE

25  ADVANTAGE STUDIES TOGETHER CONTRIBUTED ABOUT 13,000 PATIENT

1   YEARS OF FOLLOW-UP.  IN AGGREGATE, THESE ALZHEIMER'S STUDIES

2   WERE MUCH SMALLER, AND THEY HAD ABOUT 2400 PATIENT YEARS OF

3   FOLLOW-UP.

4           SO, YOU KNOW, WE HAVE ABOUT SIX TIMES MORE PEOPLE

5   FOLLOW-UP TIME IN THE APPROVE, THE VIGOR, AND THE ADVANTAGE

6   STUDIES RELATIVE TO THE ALZHEIMER'S.  THERE WERE ALSO A LOT OF

7   METHODOLOGIC PROBLEMS WITH THE ALZHEIMER'S STUDIES THAT I WOULD

8   BE HAPPY TO DISCUSS.

9   Q.   WHEN ARE THOSE METHODOLOGICAL PROBLEMS?

10  A.   THE FIRST ONE IS THAT ABOUT 40 TO 45 PERCENT OF THE

11  PATIENTS STOPPED TAKING THEIR DRUG DURING THE COURSE OF THE

12  STUDY AND DROPPED OUT OF THE STUDY.  THE SECOND PROBLEM WITH

13  THE ALZHEIMER'S STUDY IS THAT THEY WERE IN PEOPLE WHO WERE AT

14  RISK OF DEVELOPING ALZHEIMER'S DISEASE, SO THEY HAD COGNITIVE

15  IMPAIRMENT ON ENROLLMENT.  SO HOW WELL THEY COULD DESCRIBE

16  HAVING A HEART ATTACK, TO ME, IS QUESTIONABLE AS AN

17  EPIDEMIOLOGIST.

18  Q.   AND THEN WHAT ABOUT THE OA STUDIES?  WAS THERE A

19  STATISTICALLY SIGNIFICANT FINDING IN AN OA STUDY?

20  A.   THERE WAS NOT A STATISTICALLY SIGNIFICANT FINDING IN THE

21  OSTEOARTHRITIS STUDIES COMBINED --

22  Q.   DOES THAT CAUSE YOU TO DOUBT YOUR OPINION THAT VIOXX

23  CAUSES HEART ATTACKS?

24  A.   NO.  AND FOR MANY OF THE SAME REASONS THAT I HAVE

25  PREVIOUSLY DESCRIBED:  THERE IS THE TOTALITY OF THE EVIDENCE

1   FROM THE CADILLAC STUDIES:  THE APPROVE AND THE VIGOR STUDIES.

2   IN ADDITION, SIMILARLY TO THE ALZHEIMER'S STUDIES, EVEN THOUGH

3   THEY SEEMED LARGE, THERE WERE ONLY ABOUT 2400 PATIENT YEARS OF

4   EXPERIENCE COMPARING VIOXX TO THE OTHER NSAIDS, AND 672

5   COMPARED TO PLACEBO.  SO EVEN THOUGH THEY SEEMED LARGE, THEY

6   ARE REALLY NOT CONTRIBUTING ALL THAT MUCH IN TERMS OF PATIENT

7   TIME BECAUSE THEY WERE VERY SHORT.

8            IN ADDITION, THESE STUDIES WERE CONDUCTED IN YOUNGER

9   WOMEN.  ABOUT 80 PERCENT OF THE RA STUDIES, RHEUMATOID

10  ARTHRITIS STUDIES, WERE IN WOMEN; ABOUT 70 PERCENT OF THOSE IN

11  THE OSTEOARTHRITIS STUDIES WERE IN WOMEN.  SO THESE WERE ALSO

12  YOUNGER WOMEN, IN THEIR 50'S AND 60'S, WHO AREN'T AT A VERY

13  HIGH RISK OF HEART DISEASE, HEART ATTACKS.

14  Q.   DR. ARNETT, DID YOU ACTUALLY DO POWER CALCULATIONS

15  REGARDING THESE STUDIES?

16  A.   I DID.  SO, AGAIN, YOU KNOW, POWER IS THIS WAY THAT WE

17  LOOK AT WHETHER OR NOT WE'RE -- THERE IS A REAL FINDING OUT

18  THERE, AND WE'RE JUST NOT SEEING IT BECAUSE OUR STUDY IS NOT

19  LARGE ENOUGH.  AND WHEN I DO THESE POWER CALCULATIONS, I FOUND

20  THAT THESE STUDIES WERE TERRIBLY UNDERPOWERED TO FIND THE

21  EXCESS RISK FROM VIOXX.

22  Q.   USING YOUR FISHING ANALOGY, WHEN YOU DID THE POWER

23  CALCULATION, YOU'RE TRYING TO SEE IF THE NET WAS DESIGNED TO BE

24  LARGE ENOUGH TO CATCH A FISH IF A FISH IS REALLY THERE; IS THAT

25  RIGHT?

1    A.    ASSUMING A FISH IS AT TRULY HIGH-RISK, THE POWER

2    CALCULATIONS ARE TELLING US JUST HOW BIG THAT NET IS TO CATCH

3    THAT FISH.

4    Q.   SO WHEN YOU DID THE POWER CALCULATIONS, YOU WERE LOOKING

5    TO SEE IF THOSE STUDIES WERE DESIGNED TO --

6              MR. BECK:  OBJECTION:  LEADING, YOUR HONOR.

7              THE COURT:  SUSTAINED.

8    BY MR. BIRCHFIELD:

9    Q.   WHEN YOU DID YOUR POWER CALCULATIONS, WHAT WERE YOU

10   LOOKING FOR?  WHAT WERE YOU DETERMINING THEN?

11             MR. BECK:  SHE'S ALSO COVERED IT ALREADY, YOUR HONOR,

12   A COUPLE OF TIMES.

13             THE COURT:  WE HAVE COVERED IT, COUNSEL.  LET MOVE ON

14   TO SOMETHING ELSE.

15   BY MR. BIRCHFIELD:

16   Q.   WHAT DID YOUR POWER CALCULATIONS SHOW IN REGARDS TO THE --

17             MR. BECK:  YOUR HONOR.

18             THE COURT:  SUSTAINED.

19   BY MR. BIRCHFIELD:

20   Q.   DR. ARNETT, DID YOU REVIEW ANY FDA MEDICAL OFFICER

21   REVIEWER COMMENTS ABOUT THE SIZE OF THE MERCK STUDIES?

22   A.   I DID.

23   Q.   WHAT DID YOU FIND IN THOSE COMMENTS?

24   A.    IN THE ORIGINAL NEW DRUG APPLICATION THAT WAS SUBMITTED TO

25   THE FDA, IN THE REVIEW OF CARDIOVASCULAR SAFETY, THERE WAS A

1  COMMENT THERE THAT THESE STUDIES WERE UNDERPOWERED.  THE SAMPLE

2  SIZE WAS NOT LARGE ENOUGH TO DETECT WITH CERTAINTY THE

3  CARDIOVASCULAR RISK, BUT THERE WAS CONCERN BECAUSE OF THIS

4  NUMERICAL EXCESS.

5  Q.   AND SO YOUR FINDINGS IN REGARDS TO THE POWER OF THESE

6  STUDIES, DID IT REINFORCE OR NOT YOUR OPINION THAT HEART ATTACK

7  RISK APPEARS AT ANY DOSE AND ANY DURATION OF USE?

8  A.   IT DID, BECAUSE THERE WAS -- THE ORIGINAL NDA SUBMISSION,

9  THE SUPPLEMENTAL NDA SUBMISSION WHERE I SHOWED THE GRAPH

10 EARLIER FOR THE VIGOR STUDY RESULT.  IN BOTH OF THOSE DOCUMENTS

11 THERE WERE CONCERNS EXPRESSED BY THE FDA ABOUT WHETHER THE

12 STUDIES WERE LARGE ENOUGH TO DETECT THE DIFFERENCE.

13 Q.   FINAL QUESTION:  THE HEART ATTACK RISKS APPEARS AT ANY

14 DOSE AND AT ANY DURATION OF USE.  IS THAT YOUR OPINION?

15 A.   THAT IS MY OPINION, BASED ON THE TOTALITY OF THE EVIDENCE,

16 WHEN WE COMBINE 090, WHICH IS A SIX-WEEK STUDY; ADVANTAGE, A

17 12-WEEK STUDY; APPROVE, A LONGER-TERM STUDY:  AT ALL DOSES, WE

18 SAW THE ELEVATED RISK.

19       MR. BIRCHFIELD:  OKAY.  THANK YOU, DR. ARNETT.  PASS

20 THE WITNESS.

21       THE COURT:  CROSS.

22       MR. BECK:  YOUR HONOR, COULD WE TAKE A BREAK SO WE

23 CAN MOVE OUR THINGS AROUND?

24       THE COURT:  OKAY.  WE'LL STAND IN RECESS FOR TEN

25 MINUTES.

1            THE DEPUTY CLERK:  EVERYONE RISE.

2            (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

3            THE DEPUTY CLERK:  EVERYONE RISE.

4            THE COURT:  BE SEATED, PLEASE.  YOU MAY

5    CROSS-EXAMINE, COUNSEL.  YOU'RE STILL UNDER OATH, MA'AM.

6                        CROSS-EXAMINATION

7    BY MR. BECK:

8    Q.   I WOULD LIKE TO SPEND JUST A COUPLE MINUTES ABOUT THE

9    CIRCUMSTANCES OF HOW YOU GOT INVOLVED IN THIS LITIGATION.  THIS

10   IS THE TRANSCRIPT FROM YESTERDAY.  MR. BIRCHFIELD ASKED YOU

11   WHAT DID YOU DO TO GET PREPARED.  YOU SAID, "WHEN I WAS AT

12   FIRST -- WHEN I WAS FIRST APPROACHED BY THE PLAINTIFF'S

13   ATTORNEYS, I, BEFORE MEETING WITH THEM OR AGREEING TO MEET WITH

14   THEM" YOU "REVIEWED THE LITERATURE."  SO THAT WAS BEFORE YOU

15   SAY YOU AGREED TO MEET WITH THE PLAINTIFF'S LAWYERS YOU

16   REVIEWED THE LITERATURE?

17   A.   THAT'S CORRECT.  I WANTED TO MAKE SURE THAT I HAD A FIRM

18   SCIENTIFIC FOUNDATION BEFORE I HAD AGREED TO WORK FOR ANY

19   ATTORNEY.

20   Q.   SO WHAT YOU TESTIFIED YESTERDAY AS WELL IS THAT YOU

21   EVALUATED THE EVIDENCE BEFORE YOU DECIDED TO GO FORWARD WITH

22   THE PLAINTIFF; RIGHT?

23   A.   THAT'S CORRECT.

24   Q.   IN FACT, WERE YOU APPROACHED BY THE PLAINTIFF'S ATTORNEYS,

25   OR WERE YOU HIRED BY A FIRM CALLED MED EXPERTISE, THAT IS AN

1  EXPERT BROKER?

2  A.   MY FIRST INTERACTION WAS WITH AN ATTORNEY IN BIRMINGHAM,

3  MR. LOU GARRISON, WHO FIRST CONTACTED ME.

4  Q.   DO YOU HAVE A CONTRACT WITH MED EXPERTISE?

5  A.   I DO.  AFTER I AGREED TO WORK WITH LOU, I WAS APPROACHED

6  BY MED EXPERTISE.

7  Q.   I'VE HANDED YOU WHAT WE WILL LATER MARK AS DEFENDANT'S

8  EXHIBIT 3700.  IS THAT YOUR CONTRACT OF MED EXPERTISE?

9  A.   IT IS.

10  Q.   AND THE LAWYER FROM BIRMINGHAM, IS THAT LAWYER IN

11  MR. BIRCHFIELD'S FIRM?

12  A.   NO, HE IS NOT.

13         MR. BECK:  WE OFFER DEFENDANT'S EXHIBIT 3700,

14  YOUR HONOR.

15         THE COURT:  LET IT BE ADMITTED.

16  BY MR. BECK:

17  Q.   IN THIS CONTRACT HERE, YOU SEE THEY THANK YOU FOR

18  "AGREEING TO WORK WITH MED EXPERTISE AND OUR ATTORNEY CLIENTS

19  ON THEIR CASES RELATING TO THE COX-2 INHIBITOR LITIGATION."  DO

20  YOU SEE THAT?

21  A.   I DO.

22  Q.   WHAT DOES THAT REFER TO, "THE COX-2 INHIBITOR LITIGATION"?

23  A.   I'M ASSUMING IT REFERS TO THE VIOXX LITIGATION SINCE

24  THAT'S WHAT I'VE BEEN WORKING ON.

25  Q.   WELL, DOES IT ALSO INCLUDE LITIGATION THAT THE SAME

1   LAWYERS HAVE BROUGHT AGAINST PFIZER FOR CELEBREX?

2   A.   I HAVE NO IDEA.   I'M ONLY WORKING ON THIS VIOXX

3   LITIGATION.

4   Q.   WELL, TURN OVER TO THE NEXT PAGE OF YOUR CONTRACT.   YOU

5   SEE WHERE IT SAYS THAT "MEL" -- THAT'S MEDICINE EXPERTISE;

6   CORRECT?

7   A.   CORRECT.

8   Q.   -- "WILL BE PROVIDING OPPORTUNITY FOR DONNA ARNETT, PH.D.,

9   TO SERVE AS AN EXPERT WITNESS IN THE COX-2 INHIBITOR

10  LITIGATION," AND THEY GO ON.   THEN THEY EXPLAIN THAT THEY'VE

11  BEEN RETAINED TO DO CASE EVALUATIONS INVOLVING COX-2, CELEBREX,

12  BEXTRA, AND/OR VIOXX; RIGHT?

13  A.   THAT'S WHAT THE AGREEMENT STATES.   THE KEY WORD IS

14  OPPORTUNITY.

15  Q.   THEN IF WE GO DOWN FURTHER IN YOUR CONTRACT:   "DONNA

16  ARNETT, PH.D., ACKNOWLEDGES THE IMPORTANCE OF PROVIDING

17  DEDICATED AND EXCLUSIVE SERVICES THROUGH MEL IN CONDUCTING

18  PATIENT AND CASE EVALUATIONS INVOLVING COX-2 INHIBITORS,

19  (CELEBREX, BEXTRA, AND/OR VIOXX)."   SO YOU ACKNOWLEDGE THAT;

20  RIGHT?

21  A.   I ACKNOWLEDGE IT SAYS THAT.   I HAVE NOT BEEN APPROACHED TO

22  DO ANY OTHER CASES EXCEPT VIOXX.

23  Q.   WELL, YOU SIGNED A CONTRACT, DID YOU NOT, ACKNOWLEDGING

24  THE IMPORTANCE OF YOU PROVIDING SERVICES IN CASES NOT JUST ON

25  VIOXX BUT ALSO CELEBREX AND BEXTRA?

1   A.   I WOULD BE GIVEN THE OPPORTUNITY TO PROVIDE SERVICES.

2   Q.   YOU ACKNOWLEDGE THE IMPORTANCE OF DOING SO, DIDN'T YOU?

3   "DEDICATED AND EXCLUSIVE SERVICES."

4   A.   THE EXCLUSIVE SERVICES ARE TO MED EXPERTISE.

5   Q.   YOU ALSO ACKNOWLEDGE THAT YOU'RE GOING TO -- LET'S SEE.

6   YOU "ACKNOWLEDGE THE IMPORTANCE OF PROVIDING DEDICATED AND

7   EXCLUSIVE SERVICES TO MED EXPERTISE IN SCREENING POTENTIAL

8   CASES FOR INDIVIDUAL PATIENTS WHO WERE SUPPOSED TO COX-2

9   INHIBITORS, INCLUDING CELEBREX, BEXTRA, AND/OR VIOXX; RIGHT?

10  A.   AGAIN, I'VE ONLY BEEN INVOLVED IN THE VIOXX CASE AS AN

11  EPIDEMIOLOGIST.  I HAVE NOT REVIEWED SPECIFIC CASES IN ANY

12  LITIGATION.

13  Q.   WELL, LET ME SEE IF I CAN SHORTCUT IT.  IN THE CONTRACT

14  THAT YOU SIGNED TO BE AN EXPERT IN, NOT ONLY VIOXX, BUT ALSO

15  CELEBREX AND BEXTRA, YOU SIGNED THAT CONTRACT WITHOUT REVIEWING

16  ANY MATERIALS WHATSOEVER CONCERNING CELEBREX OR BEXTRA; ISN'T

17  THAT TRUE, PROFESSOR?

18  A.   THAT'S TRUE BECAUSE -- AND THE KEY WORD, AGAIN, IS

19  OPPORTUNITY, AND IF I HAD THE OPPORTUNITY AND HAD REVIEWED THE

20  LITERATURE, THEN I MAY OR MAY NOT HAVE SIGNED ON.  BUT I'M ONLY

21  DOING THIS CASE -- AS I SAID, I HAVE A DAY JOB.

22  Q.   HOW MUCH DO YOU GET PAID FOR YOUR PART-TIME JOB?

23  A.   I WOULDN'T CALL THIS A PART-TIME JOB.  I SPENT 200 HOURS.

24  Q.   YOUR NIGHT JOB?  WHAT DO YOU WANT TO CALL IT?  YOU HAVE A

25  DAY JOB AT THE UNIVERSITY; RIGHT?

1    A.    I DO.

2    Q.    AND YOU'RE DOING THIS WORK UNDER THE CONTRACT; RIGHT?

3    A.    I AM.

4    Q.    HOW MUCH DO YOU GET PAID FOR THE WORK THAT YOU'RE DOING

5    UNDER THE CONTRACT?

6    A.    $400 AN HOUR.

7    Q.    DOES THAT GO TO THE UNIVERSITY WHERE YOU WORK, LIKE A

8    GRANT MONEY, OR DOES IT GO TO YOU PERSONALLY?

9    A.    I HAVEN'T RECEIVED ANY MONEY YET, AND I AM NOT SURE WHAT

10   I'M GOING TO DO WITH IT.  I'VE SET UP A SCHOLARSHIP ACCOUNT NOW

11   AT UAB --

12   Q.    YOU HAVEN'T BEEN PAID ANYTHING YET?

13   A.    NO.

14   Q.    YESTERDAY I THINK YOU SAID THAT YOU HAVE A TOTAL OF 200

15   HOURS IN; RIGHT?

16   A.    CORRECT.

17   Q.    AT $400 AN HOUR, THAT WOULD BE $80,000?

18   A.    CORRECT.

19   Q.    WHY HAVEN'T YOU BEEN PAID ANYTHING YET?

20   A.    I'M ASSUMING THE CHECK'S IN THE MAIL.

21   Q.    ARE YOU WAITING FOR THE OUTCOME OF THE CASE?

22   A.    I'M NOT HERE FOR THE OUTCOME OF THE CASE; I'M HERE AS AN

23   EXPERT.

24   Q.    WHEN WERE YOU FIRST APPROACHED BY THE LAWYER FROM

25   BIRMINGHAM?

1   A.    TIMING, I BELIEVE, WAS MARCH, EARLY MARCH.

2   Q.    SO A COUPLE WEEKS BEFORE YOU SIGNED THE CONTRACT?

3   A.    IT WAS DEFINITELY BEFORE I SIGNED THE CONTRACT.

4   Q.    AND ONE OF YOUR OPINIONS, OPINION NUMBER 2, THAT YOU'VE

5   EXPRESSED TODAY IS THAT THE HEART ATTACK RISK APPEARS AT ANY

6   DOSE AND AT ANY DURATION OF DOSE; RIGHT?

7   A.    THAT'S RIGHT.

8   Q.    BEFORE YOU SIGNED THE CONTRACT WITH MED EXPERTISE AND

9   SIGNED ON TO WORK WITH THE PLAINTIFF'S LAWYERS, HAVE YOU SAID

10  EXACTLY THE OPPOSITE OF THAT?

11  A.    NOT TO MY KNOWLEDGE.

12  Q.    DO YOU REMEMBER THAT MERCK VOLUNTARILY WITHDREW VIOXX FROM

13  THE MARKETPLACE IN SEPTEMBER OF 2004?

14  A.    I'M AWARE THAT AFTER THE APPROVE STUDY, WHICH SHOWED THE

15  HIGH RISK OF HEART ATTACKS --

16  Q.    WHY DON'T YOU TRY TO ANSWER MY QUESTION ABOUT WHAT MONTH

17  IT WAS INSTEAD OF REPEATING TESTIMONY THAT YOU GAVE TO

18  MR. BIRCHFIELD --

19          THE COURT:  WAIT, JUST A MOMENT.  LET'S SEE IF YOU

20  CAN BE RESPONSIVE TO THE QUESTION, MA'AM, BUT IF YOU WANT TO

21  EXPLAIN ANYTHING, I'LL LET YOU DO THAT.

22  BY MR. BECK:

23  Q.    IF YOU NEED TO EXPLAIN THIS ANSWER, GO AHEAD, BUT MY

24  QUESTION IS:  DO YOU RECALL THAT MERCK VOLUNTARILY WITHDREW

25  VIOXX FROM THE MARKET IN SEPTEMBER OF 2004?

Page 1027

1    A.    I DO.

2    Q.    DO YOU RECALL THAT THERE WAS AN ADVISORY COMMITTEE MEETING

3    OF THE FDA SCHEDULED FOR FEBRUARY OF 2005?

4    A.    YES.

5    Q.    DO YOU KNOW FROM YOUR REVIEW OF MATERIALS IN THE CASE THAT

6    MERCK PREPARED BACKGROUND INFORMATION THAT WAS SUBMITTED TO THE

7    ADVISORY COMMITTEE?

8    A.    I'M AWARE OF THAT.  IT WAS POSTED ON THEIR WEBSITE.

9    Q.    WELL, YOU'RE AWARE OF IT THROUGH OTHER MEANS AS WELL,

10   AREN'T YOU?

11   A.    I'M AWARE OF IT THROUGH THE WEBSITE.

12   Q.    WELL, DO YOU RECALL THAT, IN BETWEEN THOSE TWO DATES, THE

13   VOLUNTARY WITHDRAWAL IN SEPTEMBER OF 2004 AND THE ADVISORY

14   COMMITTEE IN FEBRUARY OF 2005, THAT MERCK APPROACHED YOU AND

15   ASKED YOU TO ACT AS A CONSULTANT FOR MERCK?

16   A.    I WAS ASKED AS AN EXPERT IN CARDIOVASCULAR EPIDEMIOLOGY TO

17   COME AND CONSULT WITH MERCK.  THE CONTENT OF THAT CONSULTATION

18   IS CONFIDENTIAL.  I'VE ASKED IF MERCK WANTED TO WAIVE THAT

19   CONFIDENTIALITY IN WRITING, BUT I HAVEN'T SEEN ANYTHING ABOUT

20   IT YET.

21   Q.    YESTERDAY, HOWEVER, YOU TESTIFIED ABOUT THIS AT PAGE 966

22   OF THE TRANSCRIPT.  MR. BIRCHFIELD ASKED YOU STARTING AT

23   LINE 2:

24          "Q.  HAVE YOU EVER DONE ANY WORK OR CONSULTING WORK

25       FOR A DRUG COMPANY?

1              "A.  I HAVE DONE ONE CONSULTING JOB FOR A DRUG

2         COMPANY.

3              "Q.  WHO WAS THAT?  WHICH DRUG COMPANY?

4              "A.  THAT WAS MERCK.

5              "Q.  AND THEN GENERALLY, WHAT TYPE OF WORK DID YOU

6         DO?

7              "A.  I WAS RETAINED AS A CARDIOVASCULAR

8         EPIDEMIOLOGIST."

9              THEN YOU TALK ABOUT YOUR CONFIDENTIALITY AGREEMENT.

10             THEN, AT THE BOTTOM OF THE PAGE AND GOING ON TO THE

11   NEXT PAGE, YOU AND MR. BIRCHFIELD HAD THIS EXCHANGE:

12             "Q.  WHEN YOU DID THIS WORK FOR MERCK, WERE THEY

13        CRITICAL IN ANY WAY OF THE SERVICES YOU PERFORMED OR THE

14        OPINIONS THAT YOU EXPRESSED?

15             "A.  NOT TO ME."

16             CORRECT?

17   A.   THAT'S CORRECT.

18   Q.   NOW, WHAT MERCK ASKED YOU TO DO BACK BETWEEN THE DATE OF

19   THE VOLUNTARY WITHDRAWAL AND THE ADVISORY COMMITTEE IS THEY

20   ASKED YOU TO REVIEW THE BACKGROUND PACKAGE THAT THEY WERE

21   PREPARING AND PROVIDING TO THE FDA SO THAT THE FDA COULD GIVE

22   IT TO THEIR ADVISORY COMMITTEE ON EXACTLY THE SUBJECTS OF THE

23   CARDIOVASCULAR SAFETY OF VIOXX; ISN'T THAT TRUE, PROFESSOR?

24   A.   I AM UNDER A CONFIDENTIALITY AGREEMENT.  MERCK HAS NOT

25   WAIVED THAT RIGHT IN WRITING, AND I WILL NOT DISCUSS ANY OF THE

1   WORK THAT WAS PERFORMED UNDER THAT AGREEMENT BECAUSE I SIGNED

2   AN AGREEMENT.

3   Q.   YOUR AGREEMENT SAID THAT YOU WOULD NOT DISCLOSE

4   CONFIDENTIAL INFORMATION THAT YOU GOT FROM MERCK; RIGHT?

5   A.   AND I'VE LIVED UP TO THAT AGREEMENT.

6   Q.   YES.  I'M NOT ASKING YOU ABOUT CONFIDENTIAL INFORMATION

7   THAT YOU GOT FROM MERCK; I'M ASKING YOU WHAT YOU WERE HIRED TO

8   DO.

9   A.   I'M NOT SURE -- YOU KNOW, I'M GOING TO GO ON THE SAFE SIDE

10  OF THIS BECAUSE I SIGNED AN AGREEMENT.

11  Q.   I SPEAK FOR MERCK; IT'S WAIVED.  WHAT WERE YOU ASKED TO

12  DO?

13          MR. BIRCHFIELD:  YOUR HONOR, IF WE HAVE A STIPULATION

14  THAT IT'S WAIVED, CAN SHE TESTIFY?

15          THE COURT:  MERCK HAS JUST WAIVED IT.

16  BY MR. BECK:

17  Q.   WHAT WERE YOU ASKED TO DO?

18  A.   I WAS ASKED TO REVIEW THE VIOXX DOCUMENTATION FOR THE

19  ADVISORY COMMITTEE.

20  Q.   YOU WERE ASKED TO GIVE YOUR STRAIGHTFORWARD PROFESSIONAL

21  OPINION AS TO THE ACCURACY, THOROUGHNESS, OF THE WORK THAT WAS

22  IN THE BACKGROUND PACKAGE; RIGHT?

23  A.   I CAN -- I WAS ASKED TO REVIEW AS A CARDIOVASCULAR

24  EPIDEMIOLOGIST THE PACKET.  I CAN'T ADDRESS THE THOROUGHNESS.

25  Q.   WERE YOU ASKED TO REVIEW THE CONCLUSIONS THAT WERE REACHED

1    BY THE MERCK PEOPLE WHO PUT TOGETHER THE PACKAGE?

2    A.    I WAS.

3    Q.    AND YOU UNDERSTOOD THAT MERCK WAS GOING TO BE PRESENTING

4    THIS PACKAGE TO THE FDA AND THEY WANTED TO GET IT RIGHT;

5    CORRECT?

6    A.    I CAN'T MAKE ANY OPINIONS ABOUT WHAT MERCK WANTED TO DO.

7    Q.    WELL, DIDN'T YOU UNDERSTAND THAT THEY WERE COMING TO YOU

8    AS A CARDIOVASCULAR EPIDEMIOLOGIST AND ASKING YOU TO REVIEW THE

9    WORK THEY HAD DONE AND TELL THEM WHETHER YOU THOUGHT THERE WERE

10   ANY FLAWS IN IT AND WHETHER YOU THOUGHT THEIR CONCLUSIONS WERE

11   CORRECT OR INCORRECT?

12   A.    I WAS ASKED TO REVIEW WHAT THEY PUT IN THAT DOCUMENT AT

13   THAT TIME FOR THE FDA.

14   Q.    WERE YOU ASKED TO REVIEW IT FOR PURPOSES OF DETERMINING

15   WHETHER THEIR ANALYSIS WAS SOUND AND THEIR CONCLUSIONS WERE

16   SOUND?

17   A.    WITH RESPECT TO THE EPIDEMIOLOGY PORTIONS, YES.

18   Q.    AND WHAT THAT WHOLE PACKAGE FOCUSED ON WAS THE

19   CARDIOVASCULAR SAFETY PROFILE OF VIOXX; CORRECT?

20   A.    IT WAS MORE THAN CARDIOVASCULAR SAFETY.

21   Q.    DO YOU REMEMBER THAT THAT WAS ONE OF THE PRINCIPAL FOCUSES

22   OF THE BACKGROUND PACKAGE AND INDEED THE ADVISORY COMMITTEE FOR

23   WHOM IT WAS PREPARED, THE CARDIOVASCULAR SAFETY PROFILE OF

24   VIOXX AND THE OTHER COX-2 INHIBITORS?

25   A.    THAT WAS ONE OF THE OBJECTIVES, BUT THERE WAS A LOT OF

1   DISCUSSION ABOUT THE OTHER CLINICAL INDICATIONS FOR VIOXX.

2   Q.   YOU FOCUSED ON YOUR ANALYSIS, AT LEAST IN PART, ON THE

3   CARDIOVASCULAR SAFETY PROFILE OF VIOXX, DIDN'T YOU?

4   A.   I CAN'T ADDRESS THE CARDIOVASCULAR SAFETY.   I LOOKED AT

5   THE DATA PROVIDED IN THAT RELATIVE TO THE VIGOR TRIAL AND THE

6   APPROVE TRIAL.

7   Q.   DID MERCK COMPENSATE YOU FOR YOUR TIME?

8   A.   THEY DID.

9   Q.   HOW MUCH WERE YOU PAID FOR THAT ASSIGNMENT?

10   A.   $10,000.

11   Q.   DID MERCK PROVIDE YOU WITH DOCUMENTS TO REVIEW?

12   A.   THEY DID.   THEY -- THEY DID.

13   Q.   YOU FELT THAT YOU HAD ALL THE MATERIAL YOU NEEDED TO

14   COMPLETE YOUR ASSIGNMENT, DIDN'T YOU.

15   A.   I DON'T KNOW ABOUT ALL THE MATERIAL.   THEY ASKED ME TO

16   REVIEW "A" DOCUMENT AND THEY ASKED ME TO DO IT OVER THE

17   CHRISTMAS HOLIDAYS, IN A VERY SHORT TIME PERIOD, AND I REVIEWED

18   THE DOCUMENT THAT THEY PROVIDED TO ME.

19   Q.   AND THAT'S NOT REALLY TRUE, IS IT?   DIDN'T YOU NOT ONLY

20   REVIEW -- WHEN WE TALK ABOUT "THE DOCUMENT," IT WAS THE

21   BACKGROUND PACKAGE OF SOME SIZE; CORRECT?

22   A.   CORRECT.

23   Q.   AND YOU DIDN'T JUST LIMIT YOURSELF TO THE BACKGROUND

24   PACKAGE THAT MERCK HAD PROVIDED YOU, DID YOU?

25   A.   I DON'T UNDERSTAND YOUR QUESTION.   THEY SENT ME A BOOK.   I

1   READ THROUGH IT.  IT WAS THE BACKGROUND PACKAGE THAT ULTIMATELY

2   IS ON THE WEB, UNCHANGED FROM WHAT I REVIEWED.

3   Q.   DID YOU DO YOUR OWN INDEPENDENT RESEARCH AND LITERATURE

4   REVIEWS ON VIOXX AND COX-2 INHIBITORS IN CONNECTION WITH THE

5   ASSIGNMENT THAT YOU PERFORMED FOR MERCK IN JANUARY OF 2005?

6   A.   I DID NOT.  IT WASN'T A PART OF MY ASSIGNED JOB.

7   Q.   I THINK YOU TESTIFED YESTERDAY YOU GAVE A SWORN

8   DEPOSITION IN SEPTEMBER OF THIS YEAR; CORRECT?

9   A.   THAT'S CORRECT.

10  Q.   AND WAS THIS YOUR SWORN TESTIMONY IN SEPTEMBER:

11        "Q.  AND IN THE COURSE OF ANY WORK YOU DID FOR MERCK,

12       DID YOU DO ANY INDEPENDENT RESEARCH ON VIOXX OF COX-2'S,

13       GOOGLE SEARCHES OR REVIEWS OF THE LITERATURE

14       INDEPENDENTLY?

15        "A.  I DID."

16        WAS THAT YOUR SWORN TESTIMONY A FEW MONTHS AGO?

17  A.   THAT IS -- YOU ASKED ME SPECIFICALLY EARLIER ABOUT

18  LITERATURE REVIEWS, BUT I DID DO GOOGLE SEARCHES AND LOOKED AT

19  THE FDA WEBSITE BEFORE I --

20  Q.   WELL --

21  A.   -- WHICH IS DIFFERENT THAN REVIEWING THE LITERATURE IN A

22  SYSTEMATIC WAY LIKE I DID IN PREPARATION FOR THIS TRIAL.

23  Q.   I ASKED YOU A MINUTE AGO, DID I NOT, PROFESSOR, DID YOU DO

24  ANY INDEPENDENT RESEARCH AND LITERATURE SEARCHES, AND YOU SAID

25  NO.  NOW, DID YOU OR NOT?

1  A.   AS I SAID, TO ME, A SCIENTIFIC LITERATURE SEARCH AND

2  GOOGLE SEARCHES ARE DIFFERENT, AND I DID LOOK INTO GOOGLE AND

3  THE FDA.

4  Q.   WELL, LET'S SEE WHAT ELSE --

5  A.   SO MY ANSWER WAS NOT INCORRECT OR UNTRUTHFUL IN ANY WAY.

6  Q.   HOW ABOUT THIS ANSWER:

7           "Q.   DID YOU DO A SEARCH OF THE PUBLISHED LITERATURE?

8           "A.   YES."

9           NOW, WHEN YOU WERE WORKING FOR MERCK IN 2005, DID YOU

10 DO A SEARCH OF THE PUBLISHED LITERATURE?

11 A.   IN BETWEEN WHEN THEY SENT ME THE PACKET AND WHEN I WENT TO

12 THE ACTUAL MEETING, I DID LOOK AT THE LITERATURE.

13 Q.   SO YOU DID DO A LITERATURE SEARCH AFTER ALL; RIGHT?

14 A.   A LITERATURE SEARCH TO ME IS DIFFERENT THAN LOOKING UP

15 ARTICLES ON THE WEB AND LOOKING AT ARTICLES IN PUBMED.  A

16 SYSTEMATIC SEARCH IS DIFFERENT.  SO I DID LOOK AT THE PUBLISHED

17 LITERATURE.

18 Q.   DID YOU SEARCH THE FDA WEBSITE IN CONNECTION WITH THE

19 ASSIGNMENT THAT YOU DID FOR MERCK IN JANUARY OF 2005?

20 A.   I HONESTLY DON'T REMEMBER NOW BECAUSE OF THE TIMING OF

21 WHEN I STARTED WORKING WITH MR. GARRISON AND --

22 Q.   WHO IS MR. GARRISON?

23 A.   THE ATTORNEY FOR THE DEPOSITION THAT YOU'RE REFERRING TO.

24 Q.   WELL, YOU MEAN THE PLAINTIFF'S ATTORNEY?

25 A.   UH-HUH (AFFIRMATIVE RESPONSE).

1    Q.    OKAY.  BUT THIS QUESTION HAD TO DO WITH WORK YOU WERE

2    DOING FOR MERCK BACK BEFORE YOU SIGNED ON WITH THE PLAINTIFFS,

3    AND DID YOU SEARCH THE FDA WEBSITE WHEN YOU WERE DOING THE WORK

4    FOR MERCK?

5    A.    AND I SAID YES.  AND, YOU KNOW, THIS WAS A VERY SHORT-TERM

6    PROJECT I DID WITH MERCK, VERY SHORT-TERM.

7    Q.    DID YOU FEEL THAT YOU HAD ALL THE MATERIALS THAT YOU

8    NEEDED IN ORDER TO COMPLETE YOUR ASSIGNMENT?

9    A.    THE ASSIGNMENT WAS TO REVIEW A DOCUMENT.  I REVIEWED THE

10   DOCUMENT.  SO, THEREFORE, I HAD WHAT I NEEDED TO REVIEW THE

11   DOCUMENT.  THAT WAS THE JOB.

12   Q.    DID YOU GATHER YOURSELF THE MAJOR CLINICAL TRIAL

13   PUBLICATIONS WHEN YOU WERE DOING THIS ASSIGNMENT FOR MERCK?

14   A.    I DON'T REMEMBER.

15   Q.    PAGE 106 OF YOUR DEPOSITION:

16          "Q.  CAN YOU GIVE ME ANY SENSE OF HOW MUCH LITERATURE

17       YOU GATHERED ON YOUR OWN?

18          "A.  THE MAJOR PUBLICATIONS AT THAT TIME FOR CLINICAL

19       TRIALS."

20   A.    UH-HUH (AFFIRMATIVE RESPONSE).

21   Q.    SO DO YOU NOW AGREE, THAT IN ADDITION TO THE BACKGROUND

22   MATERIAL THAT YOU GATHERED ON YOUR OWN, THE MAJOR CLINICAL

23   TRIAL PUBLICATIONS -- THE SAME CLINICAL TRIALS YOU TALKED ABOUT

24   TODAY; RIGHT?

25   A.    WELL, THE APPROVE STUDY WAS NOT PUBLISHED AT THAT POINT.

1    Q.   WAS THERE INFORMATION IN THE BACKGROUND PACKAGE ABOUT THE

2    APPROVE STUDY?

3    A.   YES.

4    Q.   OKAY.

5    A.   I BELIEVE SO.

6    Q.   VIGOR WAS PUBLISHED; RIGHT?

7    A.   VIGOR, AND THAT'S THE ONE I SPECIFICALLY REMEMBER GOING

8    AND --

9    Q.   ADVANTAGE?

10   A.   ADVANTAGE WAS NOT PUBLISHED IN A FORMAL WAY.  IT WAS

11   PUBLISHED AS A LETTER TO THE EDITOR IN 2005.  I DIDN'T PULL

12   THAT ONE UP.  I DON'T RECALL PULLING THAT ONE UP.

13   Q.   THE --

14   A.   I SPECIFICALLY RECALL, SO THAT MAYBE WE DON'T HAVE TO GO

15   FURTHER, THE -- PULLING UP THE VIGOR STUDY.

16   Q.   AFTER YOU REVIEWED THE MATERIALS THAT MERCK SENT YOU AND

17   THE MATERIALS YOU COLLECTED ON YOUR OWN, DID YOU PREPARE A

18   WRITTEN ANALYSIS?

19   A.   I DID.

20   Q.   DID THE WRITTEN ANALYSIS COMMENT ON THE CARDIOVASCULAR

21   SAFETY PROFILE OF VIOXX?

22   A.   IT DID.

23   Q.   AND NOW, AS I UNDERSTAND --

24   A.   BASED ON THAT PACKET THAT THEY SENT ME AND THE PUBLICATION

25   OF THE VIGOR RESULT.

1    Q.   DO I UNDERSTAND CORRECTLY THAT YOU HAVE THROWN AWAY ALL

2    THE DOCUMENTS THAT YOU RELIED ON THROUGH YOUR WORK ON BEHALF OF

3    MERCK?

4    A.   I WAS ASKED TO DESTROY THEM, AND I DID.

5    Q.   HOW ABOUT YOUR WRITTEN ANALYSIS?  WHAT DID YOU DO WITH

6    THAT?

7    A.   IT MAY STILL BE ON MY COMPUTER.  I HAVEN'T LOOKED AT IT

8    SINCE.

9    Q.   BUT AS FAR AS YOU KNOW, THEN, YOU DESTROYED YOUR WRITTEN

10   ANALYSIS AS WELL?

11   A.   I DON'T RECALL GOING IN AND INTENTIONALLY DELETING IT FROM

12   MY COMPUTER, BUT I HAVEN'T LOOKED AT IT SINCE.

13   Q.   DID YOU EVER SHARE YOUR WRITTEN ANALYSIS WITH ANYBODY FROM

14   THE COMPANY THAT YOU HAVE A CONTRACT WITH?

15   A.   NOT MY WRITTEN ANALYSIS, I DID NOT.

16   Q.   DID YOU TELL THEM ORALLY THE CONCLUSIONS THAT YOU HAD

17   REACHED?

18   A.   I DID NOT.

19   Q.   DID YOU TELL THEM ANYTHING ABOUT THE WORK THAT YOU HAD

20   DONE FOR MERCK?

21   A.   I TOLD THEM THAT I HAD BEEN RETAINED BY MERCK AND HAD

22   SIGNED CONFIDENTIALITY AGREEMENT.

23   Q.   BUT YOU DIDN'T TELL THEM ANYTHING AT ALL ABOUT ANY

24   CONCLUSIONS YOU HAD REACHED OR ANY COMMENTS THAT YOU MADE ABOUT

25   THE BACKGROUND PACKAGE THAT MERCK PREPARED AND GAVE TO THE FDA.

Page 1037

1   IS THAT YOUR TESTIMONY?

2   A.   THAT'S MY TESTIMONY.

3   Q.   DID YOU TELL THE PLAINTIFF'S LAWYERS ANYTHING ABOUT THAT

4   SUBJECT?

5   A.   I TOLD THEM THAT I HAD BEEN RETAINED BY MERCK.

6   Q.   SO THE ONLY THING THAT MR. BIRCHFIELD KNOWS IS THAT YOU

7   WERE RETAINED BY MERCK AND THAT YOU HAD A CONFIDENTIALITY

8   AGREEMENT; IS THAT RIGHT?

9   A.   THAT'S CORRECT.

10  Q.   HE DIDN'T KNOW THE SUBJECT MATTER OF THE WORK THAT YOU DID

11  FOR MERCK?

12  A.   NO.

13  Q.   AND THEN YOU DIDN'T KNOW --

14  A.   BUT IT WAS -- IT WAS -- THE TIMING WOULD MAKE IT

15  SUSPICIOUS.

16  Q.   WAS HE SUSPICIOUS?  DID HE ASK YOU QUESTIONS ABOUT IT?

17  A.   I CAN'T ATTEST TO MR. BIRCHFIELD'S --

18  Q.   DID HE ASK YOU ANY QUESTIONS ABOUT THE WORK THAT YOU DID

19  FOR MERCK?

20  A.   I WASN'T ALLOWED TO FINISH MY LAST ANSWER.

21  Q.   OKAY.  YOU WERE SAYING YOU CAN'T ATTEST TO WHAT

22  MR. BIRCHFIELD WAS SUSPICIOUS ABOUT.

23  A.   CORRECT.

24  Q.   ANYTHING ELSE YOU WANTED TO SAY?

25  A.   NO.  THAT WAS -- THAT WAS WHAT I WANTED TO SAY.

1   Q.   DID HE ASK YOU ANY QUESTIONS ABOUT THE WORK THAT YOU DID

2   FOR MERCK?

3   A.   ONCE I SAID I DIDN'T -- I HAD THIS CONFIDENTIALITY

4   AGREEMENT, WE DIDN'T DISCUSS IT.

5   Q.   DID HE ASK ANY QUESTIONS? WAS MY QUESTION.  DID HE?

6   A.   NO.

7   Q.   OKAY.  IS DEFENDANT'S EXHIBIT 3693 A COPY OF THE REPORT

8   THAT YOU SENT TO MERCK?

9   A.   YES.

10          MR. BECK:  WE OFFER DEFENDANT'S EXHIBIT 3693.

11          THE COURT:  ADMITTED.

12  BY MR. BECK:

13  Q.   SO THIS IS -- WE CAN SEE OVER ON -- TWO PAGES DOWN, THAT'S

14  YOUR SIGNATURE THERE?

15  A.   THAT'S CORRECT.

16  Q.   SO BACK ON THE FRONT AGAIN, IT'S JANUARY OF 2005; RIGHT?

17  THAT'S WHEN YOU WROTE THIS?

18  A.   YES, IT IS.

19  Q.   IT CONCERNED A REVIEW OF THE FDA ADVISORY COMMITTEE

20  BACKGROUND PACKAGE THAT MERCK WAS PREPARING; RIGHT?

21  A.   YES, IT DID.

22  Q.   AND THEN JUST GOING THROUGH THE FIRST COUPLE OF

23  PARAGRAPHS, YOU SAY, "I HAVE REVIEWED IN DETAIL THE FIRST

24  SECTION OF THE ABOVE-REFERENCED PACKAGE AND ENCLOSE COMMENTS

25  SPECIFICALLY RELATED TO THE SECTION THAT I REVIEWED, INCLUSIVE

1   OF ROFECOXIB PAGES 1 THROUGH 150."

2            DOES THAT MEAN THAT THE SECTION THAT YOU REVIEWED

3   INCLUDED 150 PAGES ON VIOXX?

4   A.   THAT'S CORRECT.  IT WAS THE FIRST -- MY FIRST EXPERIENCE

5   AT EVALUATING THE VIOXX.

6   Q.   AND THEN YOU SAY YOU HAVE NOT REVIEWED THE SECTION

7   REGARDING SOME OTHER DRUG; RIGHT?

8   A.   THAT'S CORRECT.

9   Q.   "FROM THE DETAILS PROVIDED, VIOXX HAS TWO PATHWAYS FROM

10  WHICH IT MAY INCREASE CARDIOVASCULAR RISK, HEMOSTATIC AND

11  RENOVASCULAR EFFECTS," AND THEN IT SAYS "EDEMA AND

12  HYPERTENSION."  AND THEN DID YOU SAY, "IT IS CLEAR THAT THE

13  POSSIBILITY OF AN INCREASED" -- WHAT DOES CVD RISK MEAN?  WHAT

14  DOES CVD MEAN?

15  A.   CARDIOVASCULAR DISEASE.

16  Q.   "IT IS CLEAR THAT THE POSSIBILITY OF AN INCREASED

17  CARDIOVASCULAR DISEASE RISK WITH ROFECOXIB WAS GIVEN ADEQUATE

18  ATTENTION IN ALL PHASES OF DRUG DEVELOPMENT."  WAS THAT ONE OF

19  THE CONCLUSIONS THAT YOU REACHED?

20  A.   IT WAS A CONCLUSION AND IT WAS BASED ON MY FIRST REVIEW OF

21  ANY VIOXX LITERATURE, AND IT WAS PURELY WHAT WAS GIVEN TO ME BY

22  THE COMPANY, MERCK.

23  Q.   AND WHAT DID YOU ALSO SAY, "I AM IN AGREEMENT WITH THE

24  CONCLUSIONS PROVIDED IN THE DOCUMENTATION"?

25  A.   AGAIN, IT WAS THE DOCUMENTATION PROVIDED TO ME BY MERCK.

1  Q.   AND YOU AGREED WITH THE CONCLUSIONS PROVIDED IN THAT

2  DOCUMENTATION; CORRECT, MA'AM?

3  A.   I HAD NO OTHER -- I AGREED WITH IT, BUT I HAD NO OTHER WAY

4  TO ASSESS THE VALIDITY OF WHAT WAS INCLUDED IN THE PACKET, AS A

5  SCIENTIST.  BUT I DID AGREE WITH WHAT WAS IN THE PACKET, THE

6  WAY IT WAS PRESENTED.

7  Q.   NOW, JUST A FEW MINUTES AGO, YOU WENT THROUGH THE VIGOR

8  PUBLICATION.  DO YOU RECALL THAT?

9  A.   I DO.

10 Q.   AND YOU HAD THE VIGOR PUBLICATION WHEN YOU WROTE THIS

11 LETTER; RIGHT?

12 A.   ACTUALLY, I ACTUALLY PULLED THE VIGOR PUBLICATION AFTER I

13 WROTE THIS LETTER.

14 Q.   WELL, DID YOU HAVE THE RESULTS CONCERNING THE VIGOR TRIAL

15 IN THE BACKGROUND PACKAGE?

16 A.   THERE WERE DESCRIPTIONS PROVIDED BY MERCK ABOUT VIGOR IN

17 THE BACKGROUND PACKAGE.

18 Q.   THE -- TODAY, WHEN YOU SAID THE VIGOR TRIAL WAS SOME SORT

19 OF CLEAR RED FLAG, AND I THINK YOU SAID THAT THINGS WEREN'T

20 STATED THE WAY THEY SHOULD HAVE BEEN STATED, DO YOU REMEMBER

21 THAT?

22 A.   I AGREE:  THE CARDIOVASCULAR HEART ATTACK RISK WAS NEVER

23 PRESENTED IN THE PAPER IN A WAY THAT, TO ME, WOULD BE PULLED

24 OUT.  IT WAS ON PAGE 5 IN THE SAFETY UPDATE.

25 Q.   BUT IN JANUARY, WHEN YOU WERE CONSULTING WITH MERCK RATHER

1  THAN BEING PAID BY THE PLAINTIFF'S LAWYERS, WHAT YOU SAID WAS

2  THAT "THE POSSIBILITY OF AN INCREASED CARDIOVASCULAR DISEASE

3  RISK WITH ROFECOXIB WAS GIVEN ADEQUATE ATTENTION IN ALL PHASES

4  OF DRUG DEVELOPMENT"; RIGHT?

5  A.   ONCE AGAIN, THESE WERE THE DATA THAT WERE PROVIDED TO ME

6  BY MERCK.  I'VE SUBSEQUENTLY NOW SPENT 200 MORE HOURS REVIEWING

7  THIS --

8  Q.   $80,000 WORTH; RIGHT?

9  A.   YES, SIR.

10  Q.   WELL, WHEN YOU PULLED UP THE VIGOR PUBLICATION, DID YOU

11  SAY, "OH, MY GOSH, MY CONCLUSIONS THAT I WROTE TO MERCK ARE

12  WRONG, AND SINCE I'M STILL WORKING FOR MERCK, AND THE ADVISORY

13  COMMITTEE MEETING HASN'T HAPPENED YET, I BETTER WRITE THEM

14  ANOTHER LETTER AND RETRACT THAT BECAUSE NOW I'VE READ THE VIGOR

15  PUBLICATION"?  DID YOU DO THAT?

16  A.   ACTUALLY, I DID NOT.  I WENT TO VISIT MERCK, AND AFTER

17  SPENDING THE DAY WITH THEM REVIEWING THEIR FDA PREPARATION,

18  LEFT, WENT AND PULLED THE VIGOR ARTICLE, AND WAS ASTOUNDED BY

19  THE FINDINGS.

20  Q.   DID YOU WRITE MERCK AND SAY, "I'M ASTOUNDED BY THE

21  FINDINGS.  I RETRACT MY CONCLUSIONS"?

22  A.   I DID NOT BECAUSE I NEVER WAS GIVEN ANY -- ANY RESPONSE TO

23  THE WORK I HAD DONE, AND I SPENT MY ENTIRE CHRISTMAS HOLIDAY

24  WORKING FOR MERCK TO DO THIS FOR THEM AS A FAVOR TO A FRIEND

25  AND NEVER HEARD BACK FROM THEM FOR THIS.

1   Q.   SO IS IT YOUR SWORN TESTIMONY, THEN, TODAY THAT YOU WROTE

2   MERCK THIS LETTER SAYING THAT THEY HAD ADEQUATELY REVIEWED AND

3   ASSESSED THE CARDIOVASCULAR RISKS THROUGHOUT AND THAT YOU HAD

4   AGREED WITH THEIR CONCLUSIONS AND THEN, WITHIN A WEEK OR SO,

5   YOU READ THE VIGOR ARTICLE AND WERE ASTOUNDED AND YOU DISAGREED

6   WITH EVERYTHING YOU HAD SAID IN THE LETTER?  IS THAT YOUR

7   TESTIMONY TODAY?

8   A.   MY TESTIMONY IS THAT I REVIEWED THIS DOCUMENTATION

9   PROVIDED TO ME BY MERCK.  IT WAS MY FIRST REVIEW OF THE VIOXX

10  AREA IN GENERAL, AND GIVEN THE DATA THAT THEY PROVIDED TO ME, I

11  AGREED WITH WHAT THEY PROVIDED TO ME.  IT DOESN'T REFLECT THE

12  SUM OF ALL OF THE WORK I HAVE NOW SPENT DOING.

13  Q.   INCIDENTALLY, SO THAT YOU KNOW WHAT I'VE GOT UP HERE FOR

14  THE JURY, JUST BECAUSE I'M GOING TO MOVE ON TO SOME OTHER

15  DOCUMENTS, I'VE GOT THIS SAME LANGUAGE HIGHLIGHTED.

16            IS DEFENDANT'S EXHIBIT 3692 THE BACKGROUND PACKAGE

17  THAT YOU REVIEWED FOR MERCK?

18  A.   I -- IT LOOKS THE SAME, BUT IT'S VERY THICK, AND I'M NOT

19  SURE IF EVERY PAGE IS IDENTICAL TO WHAT I REVIEWED.

20            MR. BECK:  WE OFFER 3692.

21            MR. BIRCHFIELD:  NO OBJECTION, YOUR HONOR.

22            THE COURT:  LET IT BE ADMITTED.

23  BY MR. BECK:

24  Q.   WE CAN SEE UP AT THE TOP, IT SAYS IT'S THE DRAFT OF THE

25  BACKGROUND PACKAGE THAT MERCK WAS GOING TO BE PRESENTING TO THE

1   FDA; CORRECT?

2   A.   THAT'S WHAT IT SAYS.   I HAD TO MOVE THE CLIP.

3   Q.   IN YOUR LETTER, YOU SAID YOU AGREED WITH THE CONCLUSIONS

4   PROVIDED IN THE DOCUMENTATION.   THE DOCUMENTATION IS THIS

5   BACKGROUND PACKAGE; RIGHT?

6   A.   CORRECT.

7   Q.   PLEASE TURN TO PAGE 141 OF THE BACKGROUND PACKAGE.   THESE

8   ARE THE CONCLUSIONS THAT WERE IN THE BACKGROUND PACKAGE;

9   CORRECT?

10  A.   THESE ARE THE CONCLUSIONS THAT WERE DRAWN BY MERCK IN

11  PREPARATION OF THIS DOCUMENT.

12  Q.   AND THESE ARE THE CONCLUSIONS THAT YOU SAID YOU WERE IN

13  AGREEMENT WITH; RIGHT?

14  A.   AT THE TIME, THE ONLY DOCUMENT I HAD READ WAS THIS

15  DOCUMENT.

16  Q.   PLUS THE THINGS THAT YOU GOT OFF THE WEB; RIGHT?

17  A.   CORRECT.   BUT --

18  Q.   PLUS THE THINGS THAT YOU LOOKED AT ON THE FDA WEBSITE;

19  CORRECT?

20  A.   I LOOKED AT THE VIGOR DOCUMENT PUBLICATION AFTER I READ

21  THIS AND WENT TO THE MEETING.

22  Q.   WELL, LET'S LOOK AT WHAT YOU SAID IN WRITING YOU AGREED

23  WITH.   FIRST OF ALL, AT THE CONCLUSION ABOUT GI BENEFITS, THE

24  CONCLUSION WAS THAT "VIOXX IS THE ONLY APPROVED COX-2 INHIBITOR

25  WITH A DEMONSTRATED ADVANTAGE OVER NONSELECTIVE NSAIDS IN

1  DECREASING THE RISK OF CLINICAL UPPER-GI EVENTS.  A BENEFIT

2  OVER NONSELECTIVE NSAIDS IN PATIENTS TAKING CONCOMITANT

3  LOW-DOSE ASPIRIN HAS BEEN SUGGESTED BUT NOT CONCLUSIVELY

4  ESTABLISHED."  YOU AGREE WITH THAT CONCLUSION; RIGHT?

5  A.   I DID NOT REVIEW THE -- AND I'M NOT A GI EXPERT, SO I

6  WASN'T ASKED TO CONCLUDE RELATIVE TO THE GI BENEFIT OR HARM.

7  Q.   BUT YOU ARE A CARDIOVASCULAR EPIDEMIOLOGIST; RIGHT?

8  A.   I AM.

9  Q.   SO LET'S LOOK AT THE THIRD BULLET, THE THIRD CONCLUSION

10  THAT YOU SAID YOU AGREED WITH.  IT IS:  "THE DATA FROM VIOXX

11  CLINICAL TRIALS SHOWS NO DIFFERENCE IN THE INCIDENCE OF

12  THROMBOTIC CARDIOVASCULAR EVENTS" -- DOES THAT INCLUDE A HEART

13  ATTACK?

14  A.   IT DOES.

15  Q.   -- "NO DIFFERENCE IN THE INCIDENCE OF THROMBOTIC

16  CARDIOVASCULAR EVENTS WITH ROFECOXIB 25 MILLIGRAMS VERSUS

17  PLACEBO OVER THE FIRST 18 MONTHS OF CONTINUOUS USAGE OR FROM

18  NON-NAPROXEN NSAIDS."  YOU SEE THAT?

19  A.   I SEE THAT.  BUT AGAIN, I WAS ONLY REVIEWING THE

20  LITERATURE PROVIDED TO ME IN THIS DOCUMENT, NOT THE SYSTEMATIC

21  REVIEW THAT I HAVE DONE SINCE.

22  Q.   SO WHEN YOU WERE WORKING FOR MERCK, BEFORE YOU SIGNED ON

23  WITH THE PLAINTIFF'S LAWYERS, BASED ON THE DOCUMENTATION YOU

24  REVIEWED, THE MATERIAL YOU LOOKED AT ON THE FDA WEBSITE, YOU

25  AGREED WITH THE CONCLUSION THEN THAT IS EXACTLY THE OPPOSITE OF

1   YOUR OPINION NUMBER 2 THAT YOU'RE GIVING FOR THE PLAINTIFF'S

2   LAWYERS; RIGHT?

3   A.   IT IS, ABSOLUTELY, BECAUSE OF THE EXTENSIVE SCIENTIFIC

4   WORK I HAVE DONE SINCE THAT TIME AND THE EVALUATION THAT I

5   PERFORMED SYSTEMATICALLY.

6   Q.   AND BACK WHEN YOU WERE PROVIDING SERVICES FOR MERCK,

7   COMMENTING ON A BACKGROUND PACKAGE THAT YOU KNEW THEY WERE

8   GOING TO BE PRESENTING TO THE FDA, YOU SAID THAT IT WAS NOT --

9   OR AGREED WITH THE CONCLUSION THAT IT WAS NOT UNTIL AFTER 18

10  MONTHS OF CONTINUOUS USE OF VIOXX THAT ANY CARDIOVASCULAR RISK

11  SHOWED UP; RIGHT?

12  A.   MAY I REVIEW THE LETTER THAT I SENT TO THEM --

13  Q.   CERTAINLY.

14  A.   -- QUICKLY?  BECAUSE I RECALL BEING VERY CONFUSED BY THAT

15  PARTICULAR FINDING.

16  Q.   GOOD.  BECAUSE WHEN YOU FIND IN YOUR LETTER WHERE YOU SAY

17  THAT YOU'RE CONFUSED BY THAT FINDING INSTEAD OF YOU AGREE WITH

18  THE FINDING, TELL ME SO THAT WE CAN LOOK AT THAT.  OKAY?  TAKE

19  A FEW MINUTES AND REVIEW THAT LETTER AND TELL ME WHERE YOU SAY

20  YOU'RE CONFUSED BY THIS CONCLUSION.

21  A.   I DIDN'T SEE IT IN THE LETTER ITSELF.  I KNOW THAT I WAS

22  CONFUSED BY THAT FINDING GIVEN WHAT WAS FOUND IN VIGOR, THE

23  OTHER STUDIES.

24  Q.   BUT WHAT YOU SAID IN WRITING WAS THAT YOU AGREED WITH THE

25  CONCLUSION; RIGHT?

1    A.   AT THE TIME, BASED ON THIS DOCUMENT THAT I WAS PROVIDED.

2    I HADN'T DONE POWER CALCULATIONS.   I HADN'T DONE EXTENSIVE

3    LITERATURE REVIEW AT THAT TIME.

4    Q.   THE VIGOR PUBLICATION, LET'S TAKE A LOOK AT THAT FOR A

5    MOMENT.   YOU WENT OVER THIS WITH MR. BIRCHFIELD; CORRECT?

6    A.   I DID.

7    Q.   I THINK THAT YOU FOCUSED ON THE ABSTRACT; RIGHT?

8    A.   I FOCUSED ON SEVERAL ASPECTS; THE ABSTRACT WAS ONE.

9    Q.   AND IN THE ABSTRACT, YOU FOCUSED ON THIS PARAGRAPH THAT

10   I'VE BLOWN UP, "CONCLUSIONS"; RIGHT?

11   A.   THAT WAS THE CONCLUDING STATEMENT OF THE ABSTRACT.

12   Q.   IS THAT WHAT YOU FOCUSED ON WITH MR. BIRCHFIELD?

13   A.   YES.

14   Q.   AND YOU AND MR. BIRCHFIELD TALKED ABOUT HOW CARDIOVASCULAR

15   RISKS WERE NOT DISCUSSED IN THESE -- ONE, TWO, THREE, FOUR --

16   FIVE LINES OF THE ABSTRACT; RIGHT?

17   A.   THAT IS INCORRECT.

18   Q.   DIDN'T YOU SAY THAT THE CARDIOVASCULAR RISKS DON'T APPEAR

19   IN THE CONCLUSIONS OF THE ABSTRACT?

20   A.   I DID SAY THAT.   THEY ARE NOT IN THE ABSTRACT

21   CONCLUSION --

22   Q.   WELL, THEY ARE IN THE ABSTRACT.

23   A.   THEY ARE.   IN FACT, I SAID THERE ARE TWO PLACES IN THE

24   VIGOR MANUSCRIPT THAT COMMENTED ON HEART ATTACKS.

25   Q.   YES.   AND, IN FACT, ONE OF THEM IS IN THE ABSTRACT; RIGHT?

1   IT'S JUST RIGHT ABOVE THIS PART, IN THE RESULTS SECTION; RIGHT?

2   A.   IN THE RESULTS SECTION OF THE ABSTRACT, IT STATES THAT

3   VIOXX WAS AN ASSOCIATED -- NAPROSYN WAS ASSOCIATED WITH A

4   PROTECTIVE EFFECT OF HEART ATTACKS.

5   Q.   DID THE RESULTS SECTION SAY THAT THERE WAS A DIFFERENCE IN

6   THE HEART ATTACK RATES BETWEEN VIOXX AND NAPROXEN?

7   A.   SPECIFICALLY, THE ABSTRACT SAID THERE WAS A MUCH LOWER

8   RATE OF MI WITH NAPROSYN THAN WITH VIOXX AND PRESENTED IT AS A

9   HIGHLY PROTECTIVE FINDING WITH A RELATIVE RISK OF 0.2.

10  Q.   SO A FIVEFOLD DIFFERENCE, IN THE ABSTRACT, DISCLOSED;

11  RIGHT?

12  A.   IN PROTECTIVE LANGUAGE FOR NAPROSYN.

13  Q.   INCIDENTALLY, THAT SAME SORT OF ANALYSIS WAS IN THE

14  BACKGROUND PACKAGE THAT YOU REVIEWED WHEN YOU SAID YOU AGREED

15  WITH THE CONCLUSIONS, WASN'T IT?

16  A.   AS I SAID, IT WAS MY FIRST --

17  Q.   I'M ASKING WHETHER IT WAS IN THERE.

18  A.   I DON'T RECALL. I KNOW THAT VIGOR WAS IN THIS. I DON'T

19  RECALL WHETHER IT WAS PRESENTED IN THE SAME WAY AS IT WAS IN

20  THE VIGOR STUDY.

21  Q.   YOU DON'T RECALL THAT, IN THE BACKGROUND PACKAGE ITSELF,

22  IT SAID HERE IS THE DIFFERENCE IN HEART ATTACKS THAT WE SAW IN

23  VIGOR AND WE THINK THE EXPLANATION IS THAT NAPROXEN IS

24  CARDIOPROTECTIVE?  YOU DON'T REMEMBER THAT?

25  A.   I REMEMBER REVIEWING THE VIGOR STUDY IN THIS FDA DOCUMENT

1    THAT WAS PRESENTED TO ME BY MERCK.

2    Q.   AND DO YOU REMEMBER BACK WHEN YOU SAID YOU AGREED WITH THE

3    CONCLUSIONS THAT THE DOCUMENTATION PROVIDED TO YOU BY MERCK

4    SAID HERE ARE THE DIFFERENCES BETWEEN VIOXX AND NAPROXEN IN

5    VIGOR, AND WE THINK THAT IT'S DUE TO A CARDIOPROTECTIVE EFFECT

6    OF NAPROXEN?

7    A.   I READ THAT THAT'S WHAT THEY STATED.

8    Q.   SO YOU KNEW THAT THAT WAS MERCK'S POSITION WHEN YOU AGREED

9    WITH THE CONCLUSIONS THAT WE JUST SAW; RIGHT?

10   A.   I WAS MOSTLY EVALUATING FROM A CARDIOVASCULAR

11   EPIDEMIOLOGIST POSITION WHETHER THE APPROVE STUDY, THE METHODS

12   THAT WERE DONE, WERE APPROPRIATE.  IT WAS THE TOTALITY OF THE

13   EVIDENCE IN THIS FDA DOCUMENT THAT I WAS REVIEWING.

14   Q.   SO, BASED ON THE TOTALITY OF THE EVIDENCE, INCLUDING THE

15   APPROVE DATA, AS WELL AS THE VIGOR DATA, AS WELL AS MERCK'S

16   EXPLANATION FOR WHAT THEY THOUGHT EXPLAINED THE VIGOR DATA,

17   BASED ON THE TOTALITY OF THAT, YOU AGREED WITH THIS CONCLUSION

18   THAT THE DATA FROM THE VIOXX CLINICAL TRIALS SHOW NO DIFFERENCE

19   IN THE INCIDENCE OF THROMBOTIC CARDIOVASCULAR EVENTS WITH

20   ROFECOXIB 25 MILLIGRAMS VERSUS PLACEBO OVER THE FIRST 18 MONTHS

21   OF CONTINUOUS USAGE OR FROM NON-NAPROXEN NSAIDS; RIGHT?

22   A.   IN MY WORK AT MERCK, AGAIN, IT WAS THE FIRST TIME I HAD

23   REVIEWED THE VIOXX LITERATURE.  I HAD THIS PACKET TO GO ON.

24   AND BASED ON WHAT I WAS PROVIDED THERE, I MADE A STATEMENT

25   ABOUT MY VIEWPOINT AS A CARDIOVASCULAR EPIDEMIOLOGIST.

1   Q.   AND YOUR VIEWPOINT WAS THAT YOU AGREED AS A CARDIOVASCULAR

2   EPIDEMIOLOGIST FROM ALL THE APPROVE DATA THAT WAS IN THAT

3   PACKAGE, ALL THE VIGOR DATA THAT WAS IN THAT PACKAGE, THE TWO

4   MAIN TRIALS THAT YOU TALKED ABOUT TODAY, APPROVE AND VIGOR,

5   THAT ALL THE DATA THAT WAS IN THAT PACKAGE BACK WHEN YOU WERE

6   CONSULTING WITH MERCK AS A CARDIOVASCULAR EPIDEMIOLOGIST, YOU

7   AGREED THAT THERE WAS NO INCREASED RISK IN SHORT-TERM USE,

8   DIDN'T YOU, PROFESSOR?

9   A.   I AGREED WITH THE CONCLUSIONS RELATIVE TO WHAT KNOWLEDGE I

10  HAD AT THAT TIME IN THIS VERY SPECIFIC PACKET THAT WAS PROVIDED

11  TO ME IN MY FIRST LOOK AT THE VIOXX AREA.   SUBSEQUENTLY, I'VE

12  DONE MUCH MORE EXTENSIVE WORK AND HAVE FORMED MY OPINION.   IT'S

13  AN IMPROVED AN OPINION.   I'VE PUT A LOT MORE TIME INTO IT NOW.

14  Q.   DID YOU PUT ALL THAT TIME IN BEFORE YOU SIGNED THE

15  CONTRACT TO WORK FOR THE PLAINTIFF'S LAWYERS?

16  A.   I PUT TIME IN TO EVALUATE THE LITERATURE BEFORE AGREEING

17  TO WORK WITH THE PLAINTIFF'S LAWYERS.

18  Q.   THE 200 HOURS THAT YOU'RE GOING TO GET PAID FOR, ALMOST

19  ALL OF THAT WAS DONE AFTER YOU HAD AGREED TO BE AN EXPERT;

20  RIGHT?

21  A.   I DIDN'T START BILLING UNTIL AFTER I AGREED TO BE AN

22  EXPERT, BUT I DID WORK BEFORE THAT, BEFORE I WOULD SIGN ON TO

23  WORK WITH THE PLAINTIFF.   I HAD WORKED WITH A DEFENSE ATTORNEY

24  BEFORE ON ANOTHER CASE, SO I WEIGH WHERE I WORK BY WHAT THE

25  SCIENCE TELLS ME.

1   Q.   WITH ONE OF THE THINGS THAT YOU LOOKED AT WITH

2   MR. BIRCHFIELD WHEN YOU WERE TALKING ABOUT VIGOR, DO YOU

3   REMEMBER THAT YOU SAID, THERE'S A -- IF YOU GO TO THE FDA

4   WEBSITE, YOU CAN FIND SOMETHING CALLED A KAPLAN-MEIER CURVE

5   THAT SHOWS WHEN NAPROXEN AND VIGOR, THE LINES SEPARATE?  DO YOU

6   REMEMBER THAT?

7   A.   I DON'T REMEMBER SAYING THAT THIS WAS FROM THE FDA

8   WEBSITE.  IT WAS IN THE FDA SUPPLEMENTAL REPORT IN THE MEMO

9   FROM DR. VILLALBA.

10  Q.   SO YOU WENT THROUGH THIS MEMO FROM DR. VILLALBA, AND IT

11  CONTAINED THIS GRAPH WHERE THE LINES SEPARATE; RIGHT?

12  A.   THAT'S CORRECT.

13  Q.   AND YOU SAID THAT WAS HIGHLY SIGNIFICANT TO YOUR

14  CONCLUSION NUMBER 2 THAT THE HEART ATTACK RISKS APPEAR AT ANY

15  DOSE AND AT ANY DURATION OF USE?

16  A.   YES.

17  Q.   AND YOU AND MR. BIRCHFIELD POINTED OUT THAT THAT

18  PARTICULAR GRAPH WAS NOT IN THE VIGOR PUBLICATION ITSELF;

19  RIGHT?

20  A.   THAT IS CORRECT.

21  Q.   IS THAT ONE OF THE THINGS THAT YOU FOUND ASTONISHING?

22  A.   YES.

23  Q.   LET'S LOOK AT PAGE 73 OF THE MATERIALS THAT MERCK PROVIDED

24  TO YOU.  THE GRAPH THAT YOU CLAIM WAS SO IMPORTANT TO OPINION

25  NUMBER 2, THE SHORT-TERM RISK OF VIOXX, THAT GRAPH WAS GIVEN TO

1   YOU BY MERCK BEFORE YOU AGREED THAT THERE WAS NO SHORT-TERM

2   RISK; RIGHT, PROFESSOR?

3   A.   I AGREED TO THE GENERAL CONCLUSIONS THAT WERE PROVIDED TO

4   ME IN THIS DOCUMENT.  WHEN THEY --

5   Q.   THE GRAPH -- I'M SORRY.  PLEASE COMPLETE YOUR ANSWER.

6   A.   WHEN I WROTE THIS MEMORANDUM TO MERCK, I WAS ASKED

7   SPECIFICALLY TO ADDRESS WHETHER THERE COULD BE SOME EXPLANATION

8   FOR THE APPROVE FINDING.  I FOCUSED MY WORK ON THE APPROVE

9   FINDINGS, SINCE THAT WAS THE POINT OF THE -- THE MAJOR POINT OF

10  THIS FDA MEETING.  I DIDN'T GO AND LOOK AT EACH OF THESE

11  CONCLUSIONS AND SAY "I AGREE WITH CONCLUSION 1 FOR THIS

12  REASON"; "I AGREE WITH CONCLUSION 2 FOR THIS REASON."

13  Q.   WELL, YOU CERTAINLY LOOKED AT THE CONCLUSIONS THAT HAD TO

14  DO WITH THE CARDIOVASCULAR SAFETY OF VIOXX BECAUSE THAT'S WHAT

15  THEY ASKED YOU TO LOOK AT AS A CARDIOVASCULAR EPIDEMIOLOGIST;

16  RIGHT?

17  A.   AND I RECALL THAT I REVIEWED THIS DOCUMENT, AND ONLY THIS

18  DOCUMENT, IN TERMS OF WRITING THIS LETTER THAT YOU'VE

19  HIGHLIGHTED.

20  Q.   I WANT TO MAKE SURE I UNDERSTAND.  YOU'RE NOT SAYING TODAY

21  THAT, WHEN YOU WROTE THE LETTER SAYING YOU AGREED WITH THE

22  CONCLUSIONS, YOU WERE NOT MEANING TO INCLUDE THE CONCLUSION

23  THAT SAID THAT VIOXX WAS SAFE IF YOU TOOK IT FOR LESS THAN 18

24  MONTHS.  YOU'RE NOT SAYING THAT NOW, ARE YOU?

25  A.   CAN YOU REPEAT YOUR QUESTION?

1    Q.    SURE.  YOU JUST TALKED ABOUT HOW, WELL, YOU DIDN'T LOOK AT

2    ALL THE CONCLUSIONS.  MY QUESTION IS:  WHEN YOU WROTE YOUR

3    LETTER AS A CARDIOVASCULAR EPIDEMIOLOGIST SAYING THAT YOU

4    AGREED WITH THE CONCLUSIONS, YOU CERTAINLY MEANT TO INCLUDE THE

5    SPECIFIC INCLUSIONS THAT I'VE HIGHLIGHTED THERE CONCERNING

6    CARDIOVASCULAR RISKS; RIGHT?

7    A.    WHAT I -- WHAT I BASED MY OPINION ON IN THIS LETTER WERE

8    ALL OF --

9    Q.    CAN YOU ANSWER THAT QUESTION AND THEN GIVE ANY EXPLANATION

10   YOU WANT?

11          WHEN YOU SAID YOU AGREED WITH THE CONCLUSIONS, DID

12   YOU INCLUDE CONCLUSION BULLET NUMBER 3 THAT SAYS "THE DATA FROM

13   VIOXX CLINICAL TRIALS SHOWS NO DIFFERENCE IN THE INCIDENCE OF

14   THROMBOTIC CARDIOVASCULAR EVENTS WITH ROFECOXIB 25 MILLIGRAMS

15   VERSUS PLACEBO OVER THE FIRST 18 MONTHS OF CONTINUOUS USAGE OR

16   FROM NON-NAPROXEN NSAIDS"?  WAS THAT A CONCLUSION THAT YOU, IN

17   FACT, AGREED WITH?

18   A.    IN JANUARY OF 2005, BASED ON THE DATA PROVIDED TO ME IN

19   THE DOCUMENT BY MERCK, HAVING NO OTHER DATA TO GO ON.

20   Q.    THEN YOU HAVE TO SAY YES OR NO AT THE END OF THAT.  DID

21   YOU OR DID YOU NOT, BASED ON THE DATA AVAILABLE TO YOU,

22   PROVIDED TO YOU BY MERCK, WITH NOTHING ELSE TO GO ON, ALL I'M

23   ASKING YOU IS WHETHER THAT HIGHLIGHTED CONCLUSION IS ONE OF

24   THEM THAT YOU AGREED WITH?

25   A.    I, AT THAT TIME REVIEWING WHAT THEY PROVIDED IN MY -- IN

Page 1053

1    MY LETTER, HERE, AGREED WITH WHAT THEY HAD PROVIDED TO ME.  I

2    HAVE SUBSEQUENTLY SPENT 200 HOURS LOOKING AT FDA DOCUMENTS,

3    PAPERS --

4              THE COURT:  NO.  WE'VE GOT THAT MA'AM.  I UNDERSTAND

5    IT.  HE'S ASKING YOU WHETHER YOU AGREED WITH IT AT THAT TIME.

6    THAT'S THE QUESTION.

7              THE WITNESS:  OH.

8    BY MR. BECK:

9    Q.   YES.  DID YOU AGREE, WHEN YOU WROTE YOUR LETTER WITH THAT

10   HIGHLIGHTED CONCLUSION --

11   A.   I WAS BASING MY CONCLUSIONS ON WHAT I --

12             THE COURT:  HE JUST WANTS TO KNOW YES OR NO, DID YOU

13   OR DIDN'T YOU?

14   A.   I STATED YES, BUT WHAT I WAS --

15             THE COURT:  ALL RIGHT.  THAT'S FINE.  YOU SAY "YES,"

16   AND THEN YOU WANT TO THE EXPLAIN IT.

17             THE WITNESS:  OKAY.

18   BY MR. BECK:

19   Q.   ALL I WANTED TO HEAR WAS THE YES OR NO.  I'VE HEARD THE

20   EXPLANATION SEVERAL TIMES NOW.  IS THE ANSWER YES?

21   A.   THE ANSWER FOR THAT, YES, IS "YES."  THE CONCLUSIONS,

22   HOWEVER, I WAS AGREEING WITH ARE DETAILED MORE IN MY LETTER.

23   Q.   NOW, BACK TO THE MATERIALS.  AS YOU SAID, YOU WERE BASING

24   YOUR CONCLUSION ON MATERIALS THAT MERCK SUPPLIED TO YOU, AND MY

25   QUESTION IS THAT:  AM I CORRECT THAT THE GRAPH THAT YOU AND

1   MR. BIRCHFIELD WENT OVER WHEN YOU WERE TALKING ABOUT YOUR

2   CONCLUSION NUMBER 2, YOU HAD THE SAME EXACT GRAPH, SAME EXACT

3   GRAPH WAS GIVEN TO YOU BY MERCK WHEN YOU AGREED WITH THE

4   OPPOSITE CONCLUSION.  IS THAT TRUE?

5   A.   THAT IS TRUE.  IT WAS MY FIRST EVALUATION OF THAT DATA,

6   AND I LOOKED AT WHAT THEY HAD PROVIDED.

7   Q.   DID YOU KNOW ABOUT STUDY 090 WHEN YOU WROTE YOUR LETTER?

8   A.   I DON'T RECALL.

9   Q.   DID YOU KNOW ABOUT STUDY 085 WHEN YOU WROTE YOUR LETTER

10  AGREEING WITH THE CONCLUSIONS?

11  A.   I DON'T RECALL THOSE TWO HAVING A MAJOR SUBCATEGORY WITHIN

12  THESE -- THIS LARGER DOCUMENT SO --

13  Q.   SO I'M NOT ASKING IF THEY HAVE A MAJOR SUBCATEGORY.  YOU

14  RELIED ON THOSE TWO STUDIES TODAY WHEN REACHING OPINION

15  NUMBER 2, SAYING THERE IS A SHORT-TERM RISK, AND MY QUESTION

16  IS:  DID YOU KNOW ABOUT THOSE STUDIES WHEN YOU WERE WORKING FOR

17  MERCK WHEN YOU SAID THERE WAS NO SHORT-TERM RISK?  DID YOU OR

18  DID YOU NOT KNOW ABOUT THOSE STUDIES?

19  A.   I DON'T RECALL.  I FOCUSED ON THE DOCUMENT THEY PROVIDED.

20  IF YOU WANT ME TO TAKE TIME TO GO THROUGH AND SEE IF THEY ARE

21  THERE, I'M HAPPY TO.

22  Q.   I'LL JUST ASK YOU A COUPLE OF QUESTIONS ABOUT WHAT YOU

23  SAID ABOUT 090 AND 085 TODAY.  I THINK YOU LUMPED THEM TOGETHER

24  AND SAID THAT THERE WERE, LIKE, FOUR ADVERSE EVENTS ON VIOXX

25  AND NONE ON PLACEBO; IS THAT RIGHT?

1    A.    NO.  I SAID IT WAS ABOUT FOURFOLD GREATER ON VIOXX.

2    Q.    WHAT WERE THE NUMBERS?

3    A.    THERE WERE SIX SERIOUS CARDIOVASCULAR EVENTS IN VIOXX,

4    THREE IN THE OTHER NSAID COMPARATORS, AND ONE IN PLACEBO.  SO

5    IT'S 6:1.

6    Q.    WELL, HOW MANY PEOPLE WERE TAKING VIOXX?

7    A.    ABOUT 800.

8    Q.    HOW MANY PEOPLE WERE TAKING PLACEBO?

9    A.    200.

10   Q.    SO AS FOURTH AS MANY PEOPLE TAKING PLACEBO?

11   A.    A FOURTH AS MANY.

12   Q.    WE HEARD THE OTHER DAY FROM DR. MOYÉ YOU'VE GOT TO KNOW

13   ABOUT THE DENOMINATORS.  DO YOU AGREE WITH DR. MOYÉ ON THAT?

14   A.    YOU DO HAVE TO KNOW ABOUT THE DENOMINATORS -- ACTUALLY,

15   THERE WERE 400 ON PLACEBO, PARDON MY -- I ERRED.  SO TWICE AS

16   MANY ON VIOXX THAN ON PLACEBO.

17   Q.    IN ANY EVENT, YOU DIDN'T SAY TO MERCK BACK IN 2005 THAT

18   THESE TINY NUMBERS IN 090 AND 085 GAVE YOU ANY KIND OF PAUSE

19   CONCERNING THE CARDIOVASCULAR PROFILE, DID YOU?

20   A.    I DON'T RECALL THEM BEING HIGHLIGHTED IN THIS DOCUMENT.

21   SO I DIDN'T COMMENT BECAUSE THEY WEREN'T HIGHLIGHTED.

22   Q.    ADVANTAGE, WHAT DID YOU SAY ABOUT THE PUBLICATION DATA OF

23   ADVANTAGE?

24   A.    IT WAS A LETTER TO THE EDITOR PUBLISHED IN 2005, AT LEAST

25   FIVE YEARS AFTER THE CONCLUSION OF THE STUDY.

1    Q.    SO IS IT YOUR TESTIMONY THAT IT WAS NOT AVAILABLE -- WHEN

2    YOU TALKED ABOUT HOW YOU PULLED TOGETHER THE PUBLISHED

3    LITERATURE ON CLINICAL TRIALS, YOU'RE SAYING THAT ADVANTAGE WAS

4    NOT PUBLISHED AS OF THE TIME YOU DID YOUR WORK?

5    A.    IN THE -- IN PULLING ABSTRACTS FROM THE PUBMED, AS I'VE

6    DESCRIBED, AS A STARTING POINT FOR DOING A SYSTEMATIC

7    LITERATURE SEARCH, LETTERS TO THE EDITOR DON'T APPEAR.  THEY

8    WOULD -- THERE IS NO ABSTRACT FOR THEM.  SO I DIDN'T --

9    Q.    WELL, THE LETTER TO THE EDITOR, YOU SAID, WAS IN 2005;

10   RIGHT?  THAT WOULD HAVE BEEN AFTER YOU DID YOUR WORK ANYWAY.

11   A.    THAT'S CORRECT.

12   Q.    AND MY QUESTION IS:  ISN'T IT TRUE THAT, BEFORE YOU DID

13   YOUR WORK, IN FACT, ADVANTAGE HAD BEEN PUBLISHED IN THE MEDICAL

14   LITERATURE AND IS ONE OF THE THINGS YOU LOOKED AT?

15   A.    CAN YOU CLARIFY THE TIME LINE?  ARE YOU SAYING BEFORE I

16   DID WORK FOR MERCK?

17   Q.    YES.  BEFORE -- WHEN YOU DID YOUR WORK FOR MERCK IN

18   JANUARY OF 2005, AND YOU DID -- AS YOU EXPLAIN, YOU PULLED UP

19   THE MAJOR CLINICAL TRIALS, YOU'VE GOT THE PUBLICATIONS FOR

20   THOSE, ADVANTAGE WAS ONE OF THE THINGS THAT HAD ALREADY HAD A

21   PUBLICATION ON IT WHEN YOU DID YOUR WORK IN 2005; ISN'T THAT

22   TRUE?

23   A.    I SPECIFICALLY STATED I PULLED THE VIGOR ARTICLE.  APPROVE

24   WAS NOT YET PUBLISHED, AND I DIDN'T RECALL ADVANTAGE BEING

25   MENTIONED IN ANY DETAIL IN THIS LARGE DOCUMENT.  IT COULD BE IN

1   THE FINE PRINT.

2   Q.   IS THE DOCUMENT THAT WE'VE MARKED AS EXHIBIT 657 A

3   PUBLICATION CONCERNING ADVANTAGE?

4   A.   THIS IS THE MAJOR PUBLICATION BY DR. LEESAY (SPELLED

5   PHONETICALLY) THAT DESCRIBES THE TOLERABILITY AND EFFECTIVENESS

6   FOR THE GI SYSTEM, THE GASTROINTESTINAL SYSTEM, FOR VIOXX

7   VERSUS NAPROSYN.

8   Q.   IS THIS THE ADVANTAGE STUDY OR NOT?

9   A.   IT'S THE GASTROINTESTINAL TOLERABILITY; THE ADVANTAGE

10  STUDY, YES.

11  Q.   AND THIS IS PUBLISHED WHEN?

12  A.   IN 2003, IF MEMORY SERVES ME.  YES, 2003.

13  Q.   SO TWO YEARS BEFORE YOU SIGNED ON TO WORK FOR MERCK AND

14  DID THE LITERATURE SEARCH FOR THE MAJOR CLINICAL TRIALS; RIGHT?

15  A.   THE LITERATURE SEARCH I DID FOR THE MAJOR CLINICAL TRIALS,

16  AS I SAID, WAS VIGOR.  THAT WAS THE ONE THAT WAS HIGHLIGHTED.

17  Q.   SO IS IT YOUR TESTIMONY THAT YOU DIDN'T LOOK AT ADVANTAGE

18  OR ANY OF THE DATA FROM ADVANTAGE WHEN YOU WROTE YOUR LETTER?

19  A.   THE MAJORITY --

20  Q.   IS THAT WHAT YOU SAID?

21  A.   THE MAJORITY OF THE WORK WAS REVIEWING THE APPROVE STUDY,

22  THE BACKGROUND FROM THE VIGOR STUDY, AND THAT'S WHERE I SPENT

23  MY TIME.

24  Q.   I KNOW YOU SAID THAT'S THE MAJORITY OF YOUR TIME.  AND THE

25  MAJORITY OF THE TIME THAT YOU SPENT WITH MR. BIRCHFIELD WAS ON

1    THOSE TWO THINGS, BUT YOU ALSO DISCUSSED ADVANTAGE WITH HIM.

2              MY QUESTION IS:  WHEN YOU REACH YOUR CONCLUSION, WHEN

3    YOU SAID YOU AGREED WITH THE CONCLUSION OF NO SHORT-TERM RISKS,

4    IN FACT, YOU HAD READ THE ADVANTAGE STUDY, HADN'T YOU?

5    A.   I HAD NOT.

6    Q.   SO YOU NEVER LOOKED AT IT?

7    A.   IN JANUARY OF 2005?

8    Q.   RIGHT.

9    A.   I CAN SAY WITH ASSURANCE I HAD NOT LOOKED AT THE ADVANTAGE

10   STUDY PUBLICATION.

11   Q.   YOU DIDN'T LOOK AT THE 2003 PUBLICATION THAT YOU HAVE IN

12   FRONT OF YOU?

13   A.   I DID NOT.

14   Q.   AND WAS THERE DATA FROM THE ADVANTAGE STUDY IN THE

15   BACKGROUND PACKAGE?

16   A.   AS I SAID, IT WASN'T A MAJOR SUBCATEGORY, TO MY MEMORY.  I

17   THREW THIS AWAY WHEN I LEFT, SO I HAVEN'T LOOKED AT IT SINCE

18   JANUARY OF 2005.

19   Q.   APPROVE, YOU SAID, WAS A MAJOR THING THAT YOU LOOKED AT

20   BACK THEN; RIGHT?

21   A.   WELL, IT WAS THE CAUSE OF THEM REMOVING VIOXX FROM THE

22   MARKET, SO IT WAS A MAJOR CONCERN.

23   Q.   AND THE 18 MONTHS COMES FROM THE DATA FROM APPROVE; RIGHT?

24   A.   I'M NOT SURE WHERE IT COMES FROM.

25   Q.   REALLY?  YOU MEAN, IN ALL THE WORK THAT YOU DID LOOKING AT

1   150 PAGES OF THE BACKGROUND MEMO, YOU DON'T KNOW THAT THIS

2   CONCLUSION ABOUT NO DIFFERENCE SHOWING UP UNTIL AFTER 18 MONTHS

3   COMES FROM THE APPROVE DATA?

4   A.   150 PAGES WAS WHAT I REVIEWED.

5   Q.   AND YOU DON'T KNOW THAT THE CONCLUSION THAT YOU SAID YOU

6   AGREED WITH OF NO INCREASED RISK UNTIL AFTER 18 MONTHS, YOU

7   DON'T KNOW THAT THAT COMES FROM THE DATA FROM APPROVE?

8   A.   SPECIFICALLY I WAS ASKED TO COMMENT AS A CARDIOVASCULAR

9   EPIDEMIOLOGIST ON WHAT COULD BE POSSIBLE EXPLANATIONS FOR THIS

10  LARGE INCREASED RISK IN HEART ATTACKS WITH APPROVE, AND THAT'S

11  WHAT I WAS TALKING ABOUT IN MY CONSULTING WORK WITH MERCK.

12  Q.   I DON'T MEAN TO PESTER YOU TOO MUCH, BUT I WOULD LIKE AN

13  ANSWER TO MY QUESTION.  SO WILL YOU PLEASE ANSWER IT?

14  A.   WOULD YOU RESTATE IT.

15  Q.   YES.  DIDN'T YOU KNOW WHEN YOU SAID YOU AGREED WITH THE

16  CONCLUSION THAT THERE WAS NO INCREASED RISK WITH USING VIOXX

17  MEDICAL AFTER 18 MONTHS, THAT THAT WAS BASED ON THE DATA FROM

18  THE APPROVE CLINICAL TRIAL?

19  A.   I WILL AGREE THAT IT WAS BASED ON DATA PROVIDED TO ME AT

20  THAT TIME, MY FIRST LOOK AT THE DATA, AND THAT I'VE

21  SUBSEQUENTLY REVIEWED THE LITERATURE AND HAVE A DIFFERENT

22  OPINION.

23  Q.   WELL, WE GOT HALFWAY THERE.  YOU SAID IT WAS BASED ON

24  DATA.  MY QUESTION IS:  DO YOU OR DO YOU NOT -- LET ME REPHRASE

25  IT.  DID YOU OR DID YOU NOT IN 2005 UNDERSTAND THAT THIS

1    CONCLUSION THAT YOU SAID YOU AGREED WITH ON NO SHORT-TERM RISK

2    CAME OUT OF THE APPROVE DATA?

3    A.    THERE WERE -- THERE WERE DATA FROM THE -- FROM -- THE

4    ANSWER TO YOUR QUESTION IS I DON'T REMEMBER.

5    Q.    FINE.  THE APPROVE DATA WAS DISCUSSED EXTENSIVELY IN THE

6    BACKGROUND MATERIALS; RIGHT?

7    A.    IT WAS DISCUSSED, BUT --

8    Q.    WELL, YOU HAVE A PROBLEM WITH EXTENSIVELY?  I THOUGHT THAT

9    YOU SAID YOUR WHOLE JOB WAS TO LOOK AT THE APPROVE STUDY.

10   A.    ACTUALLY, MY -- MY JOB WAS TO TRY TO HELP MERCK UNDERSTAND

11   WHY THERE WAS THIS EXCESS CARDIOVASCULAR RISK IN APPROVE, WERE

12   THERE ANY RISK FACTORS THAT PREDICTED WHO WOULD NOT BE HARMED

13   BY VIOXX.

14   Q.    WAS APPROVE A BIG PART OF THE BACKGROUND PACKAGE THAT YOU

15   REVIEWED?

16   A.    IT WAS IN THE BACKGROUND PACKAGE THAT I REVIEWED.

17   Q.    BUT YOU CAN'T SAY ONE WAY OR ANOTHER WHETHER IT WAS A

18   MAJOR PART OF IT?

19   A.    IT WAS ONE PART OF IT.

20   Q.    ARE THERE 16 PAGES TALKING ABOUT THE DATA IN THERE;

21   STARTING AT PAGE 140, FOR EXAMPLE?  I'M GOING TO WITHDRAW THAT

22   JUST TO SAVE TIME.

23         LET'S LOOK AT WHAT YOU LOOKED AT YESTERDAY WITH

24   MR. BIRCHFIELD.  HERE WE GO.  DO YOU RECOGNIZE THIS AS PART OF

25   THE -- IT'S THE APPROVE PUBLICATION THAT YOU WENT OVER WITH

1   MR. BIRCHFIELD.

2   A.   YES.

3   Q.   AND I CAN'T REMEMBER WHICH PAGE IT IS, BUT YOU AND

4   MR. BIRCHFIELD WENT OVER TABLE 2.  DO YOU REMEMBER?

5   A.   YES.  IT'S HARD TO READ ON THE SCREEN.

6   Q.   THIS DATA OR THIS TABLE YOU WENT OVER WITH MR. BIRCHFIELD,

7   YOU SAID THAT THIS WAS HIGHLY SIGNIFICANT TO YOUR CONCLUSIONS

8   IN THE CASE; RIGHT?

9   A.   YES.

10  Q.   AND YOU HIGHLIGHTED, I THINK, THE TOTAL NUMBERS HERE OF

11  ADJUDICATED THROMBOTIC ADVERSE EVENTS.  THAT'S THAT THING AT

12  THE TOP; RIGHT?

13  A.   CORRECT.  WELL, IT'S NOT THE APTC DEFINITION THAT MERCK

14  HAD SYSTEMATICALLY COLLECTED AS THEIR PRIMARY CARDIOVASCULAR

15  ENDPOINT, BUT IT IS THE ADJUDICATED THROMBOTIC EVENTS, AND

16  THERE IS A DIFFERENCE.

17  Q.   ALL I'M TRYING TO GET HERE IS THAT THESE ARE THE NUMBERS

18  THAT YOU WENT OVER WITH MR. BIRCHFIELD, AND YOU FOCUSED ON

19  CARDIAC EVENTS AND YOU FOCUSED ON MYOCARDIAL INFARCTION AND YOU

20  FOCUSED ON THESE NUMBERS THAT ARE UP THERE; RIGHT?

21  A.   I DID.  I ALSO, UNDER "CARDIAC EVENTS," YOU HAVE TO LOOK

22  AT THE COMPOSITE OF EVENTS.

23  Q.   OKAY.

24  A.   THERE IS MYOCARDIAL INFARCTION, FATAL MYOCARDIAL

25  INFARCTION.

Page 1062

1   Q.   THE OTHER NUMBERS YOU FOCUSED ON AS WELL.

2   A.   SUDDEN DEATH.

3   Q.   SO THIS TABLE FROM THE APPROVE STUDY, YOU SAID IT WAS

4   SIGNIFICANT TO YOU FOR THE OPINIONS YOU'RE GIVING TODAY.

5   A.   THAT'S CORRECT.

6   Q.   NOW, WOULD YOU TURN TO PAGE 131 IN THE MATERIALS THAT

7   MERCK GAVE YOU BACK IN EARLY 2005.  DO YOU HAVE THAT?

8   A.   I DO.

9   Q.   IT'S GOT THE SAME INFORMATION, DOESN'T IT?

10  A.   IT DOES FOR -- I'M JUST FOCUSING ON CARDIOVASCULAR EVENTS.

11  Q.   RIGHT.  THE INFORMATION THAT YOU FOUND MOST SIGNIFICANT

12  FROM THE APPROVE PUBLICATION THAT YOU AND MR. BIRCHFIELD WENT

13  OVER YESTERDAY WAS GIVEN TO YOU BY MERCK.  IT WAS IN THE

14  MATERIALS THAT YOU LOOKED AT WHEN YOU AGREED THERE WAS NO

15  SHORT-TERM RISK.  RIGHT?

16  A.   THAT'S CORRECT.  BUT WHAT I WROTE IN THIS ARTICLE AND

17  WHAT -- IN MY LETTER TO MERCK AND ALSO WHEN I WAS ASKED BY

18  DR. PASTERNAK TO COME AND COMMENT ON WAS WHETHER OR NOT RISK

19  FACTORS COULD BE EXPLAINING THE EXCESS CARDIOVASCULAR RISK

20  OBSERVED IN APPROVE.  SINCE THAT IS WHAT I REVIEWED, THE

21  CONCLUSIONS THAT THEY DREW RELATIVE TO RISK FACTORS IN THIS

22  LARGER PUBLICATION OF 150 PATIENTS WERE WHAT I WAS AGREEING TO.

23  Q.   AND YESTERDAY YOU SAID THAT ONE OF THE THINGS THAT YOU

24  FOUND DISTURBING IN THE APPROVE PUBLICATION THAT YOU AND

25  MR. BIRCHFIELD WENT OVER WAS THAT THERE WAS SOME SORT OF HIGHER

1    DROPOUT RATE FOR SOME PEOPLE VERSUS OTHER PEOPLE; RIGHT?

2    A.   YES.   A CONSISTENT FINDING OF THE VIOXX TRIALS IS THAT

3    THERE IS GREATER DROPOUT RATE BECAUSE OF HIGH BLOOD PRESSURE,

4    HYPERTENSION, AND EDEMA ACROSS ALL OF THEIR STUDIES.

5    Q.   TURN BACK JUST TO PAGE 130, ONE PAGE BACK FROM WHERE WE

6    ARE, IN MATERIALS THAT MERCK GAVE YOU WHEN YOU AGREED THERE WAS

7    NO SHORT-TERM RISK.   DOES THIS PAGE HAVE THE DROPOUT RATES?

8    A.   IT HAS THE PRESPECIFIED ADVERSE EXPERIENCES.

9    Q.   YESTERDAY YOU TALKED ABOUT THE DISTURBING NUMBER OF

10   DROPOUTS FOR HYPERTENSION AND EDEMA.   AND THE DROPOUT RATES FOR

11   THOSE THINGS, HYPERTENSION AND EDEMA, YOU FOUND SO SIGNIFICANT

12   YESTERDAY, THOSE WERE IN THE MATERIALS THAT MERCK GAVE YOU BACK

13   WHEN YOU AGREED THERE WAS NO INCREASED SHORT-TERM RISK; ISN'T

14   THAT TRUE, PROFESSOR?

15   A.   THAT'S NOT TRUE.   I AGREED TO WHAT I WAS ASKED TO COMMENT

16   ON FOR MERCK IN THIS 150-PAGE DOCUMENT WHICH WAS SPECIFICALLY

17   ADDRESSING CARDIOVASCULAR RISK FACTORS AND WHETHER OR NOT THEY

18   EXPLAINED THE EXCESS RISK OF HEART ATTACKS IN APPROVE.

19   Q.   DO YOU REMEMBER, ABOUT 10 OR 15 MINUTES AGO, WHEN THE

20   JUDGE ASKED YOU A QUESTION, AND THE JUDGE ASKED YOU, YOU KNOW,

21   "YOU CAN EXPLAIN IT ALL YOU WANT, BUT WHAT HE WANTS TO KNOW IS,

22   YES OR NO.   BACK IN 2005, DID YOU AGREE WITH THIS CONCLUSION?

23   AND YOU SAID," YES," YOU DID AGREE WITH THE CONCLUSION.   DO YOU

24   REMEMBER THAT, YOU AND THE JUDGE TALKING ABOUT THAT?

25   A.   I REMEMBER THE JUDGE TELLING ME I HAD TO ANSWER IN A "YES

Page 1064

1    OR NO" WAY.

2    Q.   AND DO YOU REMEMBER THAT WHEN THE JUDGE ASKED YOU, THE

3    ANSWER WAS YES; THAT BACK THEN, YOU AGREED WITH THAT CONCLUSION

4    AND NO SHORT-TERM RISKS?

5    A.   BUT I QUALIFIED IT BY SAYING THAT I DIDN'T GO THROUGH

6    POINT BY POINT AND PULL OUT EVERY CONCLUSION FROM THIS 150-PAGE

7    DOCUMENT AND SAY, "YES, I AGREE WITH THIS," AND, "NO, I DON'T

8    AGREE WITH THAT."

9         AND AGAIN, IN MY LETTER, THOSE CONCLUSIONS THAT I'M

10   REFERRING TO ARE ABOUT THE RISK FACTORS.

11   Q.   BACK TO APPROVE.  YOU LOOKED AT TABLE 2 WITH

12   MR. BIRCHFIELD.  WILL YOU PLEASE TURN TO TABLE 3.

13   A.   I'M MISSING TABLE 3 IN MY PAPER.

14   Q.   YOU'RE MISSING IT?

15   A.   THAT'S OKAY.  I CAN SEE IT ON THE SCREEN.

16        THE COURT:  YOU HAVE A SMALL SCREEN RIGHT THERE, TOO,

17   MA'AM, IF YOU NEED IT.

18   BY MR. BECK:

19   Q.   DOES TABLE 3 BREAK DOWN THE ADVERSE EVENTS, THE SERIOUS

20   THROMBOTIC EVENTS, APTC ENDPOINTS THAT YOU TALKED ABOUT, DOES

21   IT BREAK THEM DOWN BY HOW LONG PEOPLE HAVE USED VIOXX?

22   A.   IT DOES.

23   Q.   AND WE LOOKED BEFORE AT TABLE 2 HAD THIS OVERALL NUMBER

24   THAT WE SAW OF 46 ON VIOXX VERSUS 26 ON PLACEBO; RIGHT?

25   A.   THAT'S CORRECT.

1  Q.   THEN DO YOU SEE THAT, FOR THE FIRST 18 MONTHS, THERE WERE

2  ONLY 22 OF THESE ADVERSE EVENTS ON VIOXX COMPARED TO 20 ON

3  PLACEBO?

4  A.   I SEE THAT.  I SEE THAT.

5  Q.   AND THIS RELATIVE RISK THAT YOU TALKED ABOUT BEFORE, THAT

6  RELATIVE RISK IS ONLY 1.13; RIGHT?

7  A.   NO.  ACTUALLY, IT'S 1.18, TO BE PRECISE.

8  Q.   OKAY.  1.18.  BUT, IN ANY EVENT, IT'S NOT -- OH, IT'S OVER

9  HERE.  I'M SORRY.  1.18.  AND IT'S NOT STATISTICALLY

10 SIGNIFICANT; RIGHT?

11 A.   IT EXCLUDES THE NULL VALUE.  HOWEVER, THEY OVERALL TEST TO

12 DETERMINE WHETHER OR NOT THE ZERO TO 18 MONTH, 1.18 DIFFERS

13 FROM 4.45, THE LATER MONTHS.  IT IS NOT STATISTICALLY

14 SIGNIFICANT.  THERE IS NO EVIDENCE FROM THE MODEL THAT THESE

15 TWO NUMBERS DIFFER FROM ONE ANOTHER, ALTHOUGH NUMERICALLY THEY

16 LOOK DIFFERENT.

17 Q.   WELL --

18 A.   YOU'LL SEE THE CONFIDENCE INTERVALS OVERLAP BETWEEN THE

19 ZERO TO 18 AND THE 18 TO 36 MONTHS.

20 Q.   WE HEARD ABOUT CONFIDENCE INTERVALS AND IF -- IF THERE IS

21 A RELATIVE RISK OF 1.18 BETWEEN DRUG A AND PLACEBO, AND THE

22 CONFIDENCE INTERVAL GOES FROM BELOW 1, LIKE .64, TO ABOVE 1,

23 2.15, THEN, YOU KNOW, SETTING VIOXX ASIDE FOR A SECOND AND WHAT

24 YOU'RE TESTIFYING FOR FOR THE PLAINTIFFS, THAT MEANS THAT THERE

25 IS NOT A STATISTICALLY SIGNIFICANT DIFFERENCE BETWEEN THAT DRUG

1   AND PLACEBO; RIGHT?

2   A.   WELL, STATISTICAL SIGNIFICANCE WOULD ONLY BE RELEVANT HERE

3   IF THAT SUBGROUP WERE ADEQUATELY POWERED LARGE ENOUGH, HAD

4   ENOUGH EVENTS TO DETECT THAT.

5   Q.   CAN YOU ANSWER MY QUESTION WHETHER, IF YOU COMPARE ON

6   DRUG A TO PLACEBO, AND THERE IS A RELATIVE RISK OF ONLY 1.18,

7   AND THE CONFIDENCE INTERVAL OVERLAPS 1, WHICH IS THE PLACEBO --

8   SO IT COULD BE SOMEWHERE BELOW THE PLACEBO OR ABOVE THE

9   PLACEBO -- ISN'T THAT CLASSIC CASE OF THERE IS NO STATISTICALLY

10  SIGNIFICANT DIFFERENCE BETWEEN THE TWO?

11  A.   STATISTICAL SIGNIFICANCE, THE SIMPLE ANSWER TO HIS

12  QUESTION IS YES.  THE MORE THOROUGH ANSWER IS THAT, TO DO THESE

13  TYPE OF SUBGROUP ANALYSES AND TO MAKE A STATEMENT ABOUT ONE

14  SUBGROUP BEING DIFFERENT THAN ANOTHER SUBGROUP, WE WOULD HAVE

15  TO TEST THE SIGNIFICANCE OF THAT MOTIVATION.  AND IN THIS CASE,

16  WHEN THEY TESTED WHETHER OR NOT THESE TWO SUBGROUPS DIFFER BY

17  TIME, THE ANSWER TO THAT QUESTION IS NO.

18  Q.   WE LOOKED AT SOMETHING CALLED A KAPLAN-MEIER CURVE FROM

19  THE VIGOR STUDY.  DO YOU REMEMBER THAT?

20  A.   I DO.

21  Q.   AND A KAPLAN-MEIER CURVE IS WHERE IT SHOWS, YOU KNOW, THE

22  DIFFERENCE BETWEEN TWO THINGS, IN THAT CASE WAS VIOXX AND

23  NAPROXEN, OVER TIME, HEART ATTACKS.  AND THAT'S BASICALLY WHAT

24  THE KAPLAN-MEIER CURVE SHOWS; RIGHT?

25  A.   A KAPLAN-MEIER CURVE IS SHOWING A CUMULATIVE EVENT RATE.

1   Q.   WAS THERE A KAPLAN-MEIER CURVE THAT WAS IN THE APPROVE

2   STUDY BUT THAT YOU AND MR. BIRCHFIELD DID NOT SHOW THE JURY?

3   A.   IN THE PUBLICATION OF THE APPROVE STUDY OR IN THE APPROVE

4   STUDY OVERALL?

5   Q.   THE PUBLICATION OF THE APPROVE STUDY.

6   A.   IN THE PUBLICATION, THERE ARE TWO SUCH KAPLAN-MEIER

7   CURVES.

8   Q.   LET'S LOOK AT THE ONE ON PAGE 6.  I GUESS THEY ARE BOTH ON

9   PAGE 6.  THERE IS ONE THAT HAS TO DO WITH CONGESTIVE HEART

10  FAILURE, PULMONARY EDEMA, CARDIAC FAILURE BASED ON INVESTIGATOR

11  REPORTED RESULTS; RIGHT?

12  A.   CORRECT.

13  Q.   AND THEN THE ONE ON THE TOP IS THE ONES THAT HAVE BEEN

14  CONFIRMED THROUGH THE ADJUDICATION PROCESS THAT THEY HAD;

15  RIGHT?

16  A.   THIS WAS AN INTERESTING OBSERVATION IN THIS STUDY.  THIS

17  IS THE --

18  Q.   CAN YOU ANSWER THAT QUESTION BEFORE YOU TALK ABOUT WHAT

19  WAS INTERESTING IN THE STUDY?  CAN YOU ANSWER MY QUESTION

20  FIRST?

21  A.   WOULD YOU RESTATE IT.

22  Q.   IS THIS KAPLAN-MEIER CURVE REPORT OVER TIME THE INCIDENCE

23  OF CONFIRMED THROMBOTIC EVENTS ON VIOXX VERSUS PLACEBO AS THOSE

24  THINGS WERE CONFIRMED THROUGH THE ADJUDICATION PROCESS THAT WAS

25  SET UP FOR THE CLINICAL TRIAL?

1    A.   IT DOES REPORT THAT; BUT INTERESTING -- THE INTERESTING

2    PART IS THAT THIS ENDPOINT WAS NOT THE MERCK-SPECIFIED ENDPOINT

3    FOR THEIR CARDIOVASCULAR STANDARD OPERATING PROCEDURE.  IF YOU

4    LOOK AT A SIMILAR CURVE FOR THEIR PRIMARY DEFINITION OF A

5    CARDIOVASCULAR OUTCOME, THE APTC THAT I MENTIONED BEFORE, THESE

6    LINES LOOK MUCH DIFFERENT.  BUT IN THE PUBLICATION, THEY USE

7    THEIR SECONDARY OUTCOME MEASURE BECAUSE THE LINES OBVIOUSLY

8    DON'T LOOK VERY DIFFERENT IN THE BEGINNING.  ALTHOUGH,

9    STATISTICALLY THERE IS NO DIFFERENCE IN THOSE TWO LINES.

10   Q.   LET'S JUST LOOK.  IF WE HAVE ROFECOXIB IN BLUE, THE

11   LINES -- THE LINE THROUGH 18 MONTHS WOULD BASICALLY LOOK LIKE

12   I'VE GOT IT DRAWN THERE; RIGHT?  ALTHOUGH IT'S AN AWFULLY TINY

13   LINE.  CAN YOU SEE THAT?

14   A.   IT IS A TINY LINE, BUT...

15   Q.   YES, IT'S TOO TINY.  LET'S SKIP THE LINE.  OR THE COLORS,

16   ANYWAY.  YOU AGREE THAT THE LINES THEMSELVES FOR PLACEBO AND

17   VIOXX, GOING OUT, RECORDING THE NUMBER OF CONFIRMED THROMBOTIC

18   EVENTS -- THAT WOULD INCLUDE HEART ATTACK; RIGHT?

19   A.   CONFIRMED THROMBOTIC EVENTS DO INCLUDE HEART ATTACK.

20   Q.   -- THAT GOING OUT FOR 18 MONTHS, THAT THERE IS NO APPARENT

21   DIFFERENCE BETWEEN VIOXX AND A PLACEBO; CORRECT?

22   A.   I COMPLETELY DISAGREE WITH THAT STATEMENT.

23   Q.   WELL, DO YOU REMEMBER THAT THE NUMBER OF CONFIRMED EVENTS

24   WAS 22 FOR VIOXX AND 20 FOR PLACEBO?

25   A.   AS I HAVE STATED PREVIOUSLY, AS AN EPIDEMIOLOGIST, I

Page 1069

1   REQUIRE -- IN ORDER TO MAKE SUCH SUBGROUP ANALYSES, THAT I

2   WOULD REQUIRE THAT STATISTICAL TESTS THAT SAYS THAT THESE LINES

3   ARE DIFFERENT TO BE SIGNIFICANT BEFORE I WOULD BELIEVE THAT

4   THEY ARE DIFFERENT OR EVEN PUT INTO A PUBLICATION THAT THEY ARE

5   DIFFERENT, PARTICULARLY GIVEN THAT THIS WAS NOT THE PRIMARY

6   ENDPOINT SPECIFIED IN THE MERCK CARDIOVASCULAR STANDARD

7   OPERATING PROCEDURES.

8   Q.   AT SIX MONTHS, DO YOU AGREE THAT, LOOKING AT THIS CURVE,

9   THERE IS NO DIFFERENCE?

10  A.   AGAIN, STATISTICALLY, BECAUSE THERE IS NO DIFFERENCE IN

11  TIME, ACCORDING TO OUR STATISTICAL METHODS, THE RELATIVE RISK

12  OF 3, OR 300, OR 2.8 OR 280 PERCENT TO BE EXACT, IS CONSISTENT

13  OVER TIME.

14  Q.   ARE YOU SAYING THAT THIS GRAPH IS NOT HELPFUL TO YOU?

15  A.   IT'S NOT HELPFUL TO ME.

16  Q.   GOING BACK TO YOUR BACKGROUND PACKAGE, IF YOU LOOK AT

17  PAGE 133, BACK WHEN YOU AGREED WITH THE CONCLUSION THAT THERE

18  WAS NO DIFFERENCE IN THE CARDIOVASCULAR RISKS IN THE FIRST 18

19  MONTHS, DID YOU HAVE EXACTLY THE SAME GRAPH PROVIDED TO YOU BY

20  MERCK THAT YOU NOW SAY IS YOU KNOW HELPFUL?

21  A.   I BELIEVE THAT'S A COMPLETE MISREPRESENTATION OF WHAT I'VE

22  SAID TODAY.  WHAT I'VE SAID IS THAT, GIVEN THE DOCUMENTATION

23  PROVIDED TO ME, I WAS ASKED TO REVIEW AS A CARDIOVASCULAR

24  EPIDEMIOLOGIST WHETHER RISK FACTORS DETERMINED THE FINDINGS OF

25  APPROVE.  THOSE ARE THE CONCLUSIONS I AGREED WITH.

1   Q.   WHEN YOU TOLD THE JUDGE, "YES, IN 2005, I AGREED THAT

2   THERE WAS NO DIFFERENCE IN RISKS IN THE FIRST 18 MONTHS," WAS

3   PART OF THE MATERIAL THAT YOU HAD IN FRONT OF YOU BACK IN 2005

4   THE EXACT SAME GRAPH THAT TODAY YOU SAY IS UNHELPFUL?

5   A.   THAT IS NOT WHAT I SAID.  I SAID, "YES, BUT..."  I DID

6   NOT --

7   Q.   YES, WE HEARD THE "BUT."

8   A.   WELL, THE "BUT" IS IMPORTANT.

9   Q.   YEAH.  I THINK -- I THINK WE ALL GOT THAT IDEA.

10          MR. BIRCHFIELD:  YOUR HONOR.

11          THE COURT:  LET'S TAKE A 10-MINUTE BREAK AT THIS

12   TIME.  COURT WILL STAND IN RECESS.

13          THE DEPUTY CLERK:  EVERYONE RISE.

14          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

15          THE DEPUTY CLERK:  EVERYONE RISE.

16          THE COURT:  BE SEATED, PLEASE.

17          DOCTOR, I WANT YOU TO BE ABLE TO EXPRESS

18   YOURSELF AND GIVE YOUR OPINION, BUT LISTEN TO THE QUESTION

19   CLOSELY AND SEE IF YOU CAN ANSWER THE QUESTION.  WE'LL BE HERE

20   FOR DAYS IF YOU'RE NOT ANSWERING THE QUESTION, BECAUSE COUNSEL

21   WOULD CONSTANTLY PURSUE IT, AS HE HAS A RIGHT TO DO IT.  LISTEN

22   TO THE QUESTION AND THEN ANSWER IT.  PLAINTIFF COUNSEL HAS AN

23   OPPORTUNITY TO REDIRECT; AND IF HE FEELS HE HAS TO FLESH OUT

24   YOUR ANSWER, I'M SURE HE'LL DO THAT.  OKAY.

25          THE WITNESS:  OKAY, I'LL DO MY BEST.  THIS IS MY

Page 1071

1   FIRST TIME.

2              THE COURT:  THANK YOU.

3              THE DEPUTY CLERK:  EVERYONE RISE.

4              THE COURT:  BE SEATED, PLEASE.  YOU MAY PROCEED,

5   COUNSEL.

6   BY MR. BECK:

7   Q.   BEFORE WE RESUME, LET ME ASK:  DURING THE BREAK, DID YOU

8   TALK WITH ANY LAWYERS?

9   A.   I DID NOT.

10  Q.   NOW, I THINK ONE THING YOU WERE TALKING ABOUT WHEN WE WERE

11  LOOKING AT THE VIGOR PUBLICATION, WHICH HAS THIS SAME GRAPH;

12  RIGHT?

13  A.   IT HAS A K-M PLOT, A KAPLAN-MEIER CURVE LIKE THIS.

14  Q.   WELL, LET'S GO BACK TO THE VIGOR PUBLICATION.

15  A.   BUT IT IS FOR THE APTC ENDPOINT, NOT FOR THIS SERIOUS

16  ADVERSE EXPERIENCES ENDPOINT.

17  Q.   THE GRAPH THAT YOU AND I LOOKED AT A FEW MINUTES AGO, WHAT

18  WAS THAT FOR?

19  A.   THAT WAS FOR THE APTC.

20  Q.   THIS GRAPH HERE, YOU SAY THIS WAS APTC?

21  A.   NO.  THAT IS FOR CONFIRMED SERIOUS THROMBOTIC EVENTS IN

22  APPROVE.  I THOUGHT YOU WERE ASKING ME ABOUT VIGOR, AND THAT

23  WAS APTC.

24  Q.   I'M SORRY, IF I SAID VIGOR, I MISSPOKE.

25  A.   AND THE GRAPH FOR THE APTC ENDPOINT WAS MISSING FROM THIS

1   ARTICLE.

2   Q.   SO, NOW ARE WE BACK ON THE SAME PAGE.   THE ARTICLE HAS A

3   GRAPH FOR CUMULATIVE INCIDENTS OF CONFIRMED THROMBOTIC EVENTS;

4   RIGHT?

5   A.   IT DOES.

6   Q.   AND YOU SAID THAT IT WAS MISSING A GRAPH FOR APTC

7   ENDPOINTS; RIGHT?

8   A.   CORRECT.

9   Q.   AND DID YOU SAY THAT THE APTC ENDPOINTS WAS THE THING THAT

10  WAS PRESPECIFIED.   IS THAT WHAT YOU SAID?

11  A.   IN THE ORIGINAL MERCK MANUAL OF PROCEDURES, WHEN THEY

12  DECIDED TO START COLLECTING OUTCOME MEASURES, THEY AGREED ON

13  THE APTC AS THEIR PRIMARY ENDPOINT.

14  Q.   WELL, DO YOU REMEMBER THAT IN 1999 OR SO, IN THE LATE

15  '90S, THAT IN RESPONSE TO SUGGESTIONS FROM THE BOARD OF -- DO

16  YOU KNOW ANYTHING ABOUT THE BOARD OF SCIENTIFIC ADVISORS?

17  A.   WHICH BOARD?   I'M ASSUMING YOU'RE SPEAKING OF MERCK?

18  Q.   YES.

19  A.   I HAVE NEVER WORKED WITH DRUG COMPANIES BEFORE I DID THIS

20  ONE THING FOR MERCK.

21  Q.   MAYBE I CAN SHORT CIRCUIT THIS.   DO YOU KNOW THAT, IN

22  FACT, AT THE TIME THAT THE APPROVE STUDY WAS DONE THAT THE

23  PRIMARY PRESPECIFIED ENDPOINT THAT SHOWS UP ON THE GRAPH HERE

24  WAS, IN FACT, THE SERIOUS THROMBOTIC EVENTS RATHER THAN THAT

25  APTC THING YOU TALKED ABOUT?

Page 1073

1    A.    I WASN'T PART OF THAT COMMITTEE AND I HAVE NO IDEA; BUT IN

2    ALL OF THE DOCUMENTATION I REVIEWED FOR THE FDA, THE APTC WAS

3    THE ENDPOINT THAT WAS HIGHLIGHTED.

4    Q.    WELL, LOOK IN YOUR BACKGROUND PACKAGE.  WE WERE ON THAT

5    PAGE WITH THE GRAPH.  I THINK THAT WAS PAGE 67 OR 68.  OOPS, A

6    DIFFERENT GRAPH.  BUT TURN WITH ME TO PAGE 67, OKAY?

7    A.    I'M THERE.

8    Q.    AND DO YOU SEE IN THE BACKGROUND PACKAGE THAT WAS PROVIDED

9    TO YOU, THAT THEY EXPLAINED THE CARDIOVASCULAR ADJUDICATION

10   STANDARD OPERATING PROCEDURE.  DO YOU SEE THAT?

11   A.    YES.

12   Q.    AND THAT'S WHERE THEY EXPLAINED THEIR STANDARD OPERATING

13   PROCEDURE FOR WHAT THEY ARE GOING TO LOOK FOR IN THEIR CLINICAL

14   TRIALS WHEN IT COMES TO CARDIOVASCULAR EVENTS; RIGHT?

15   A.    I'M ASSUMING SO.  I WOULD IMAGINE THAT'S WHAT IT SAYS.

16   Q.    AND IN THE BACKGROUND MATERIALS THAT YOU HAD AVAILABLE TO

17   YOU, DO YOU SEE THAT MERCK TOLD YOU THAT IT HAD INITIATED AN

18   ADJUDICATION STANDARD OPERATING PROCEDURE -- HERE WE GO --

19   MERCK HAD INITIATED AN ADJUDICATION STANDARD OPERATING

20   PROCEDURE IN THE SECOND HALF OF 1998 TO SYSTEMATICALLY COLLECT

21   AND ADJUDICATE POTENTIAL CARDIOVASCULAR THROMBOTIC SERIOUS

22   ADVERSE EXPERIENCES FROM ALL FUTURE STUDIES WITH ITS SELECTIVE

23   COX-2 AGENTS.  DO YOU SEE THAT?

24   A.    THAT'S BECAUSE OF THE BIOLOGICAL REASON THAT THEY WERE

25   CONCERNED THAT THERE WOULD BE AN INCREASED RISK.

1  Q.    AND SO THEY PUT TOGETHER A STANDARD OPERATING PROCEDURE

2  AND SAID, "THIS IS THE PROCEDURE WE'RE GOING TO FOLLOW FOR ALL

3  OF OUR CLINICAL TRIALS, WHAT IT IS WE'RE GOING TO LOOK AT.  THE

4  PRIMARY PRESPECIFIED ENDPOINT"; RIGHT?

5  A.    RIGHT.

6  Q.    AND DO YOU SEE IN HERE THAT WHAT THEY SPECIFIED IS EXACTLY

7  WHAT WAS ON THE GRAPH IN THE APPROVE STUDY?

8  A.    CAN YOU SCROLL DOWN?

9  Q.    YOU NEED ME TO SCROLL DOWN?

10  A.    WHAT I READ IN THE FDA DOCUMENTATION, SO THE FDA

11  DOCUMENTATION MAY BE DIFFERENT THAN WHAT'S PRESENTED IN THE

12  PACKAGE THAT THEY PROVIDED, BUT THEY STATED IN THAT THAT THE

13  APTC WAS THEIR PRIMARY ENDPOINT.

14  Q.    DID YOU FIGURE OUT THAT WHAT HAPPENED WAS THAT APTC HAD

15  BEEN A PRIMARY ENDPOINT; AND THEN WHEN THEY STARTED TO -- THEY

16  SAID, "WE'RE GOING TO LOOK AT SYSTEMATICALLY ALL THE CLINICAL

17  TRIALS IN THE SAME WAY," THAT THAT'S WHEN THEY ADOPTED THE

18  ENDPOINT THAT WAS ON THE GRAPH THAT YOU CRITICIZED?

19  A.    I CAN'T COMMENT ON THE TIMING.  I KNOW DR. SHAPIRO, WHO IS

20  A MERCK EMPLOYEE WHO DID THE META-ANALYSIS, USED THE APTC

21  ENDPOINT WHEN SHE DID THE COMBINATION OF STUDIES.  I KNOW THAT

22  IN THE ORIGINAL DOCUMENT THAT I REVIEWED ON THE FDA WEBSITE

23  THAT THE APTC WAS THE PRIMARY MOTIVATOR FOR THE 203, AND IT'S

24  PARTICULARLY INTERESTING AND RELATIVE TO APPROVE BECAUSE THE

25  APTC ENDPOINT WAS SHOWING A VERY DIFFERENT CURVE.

1   Q.   CAN YOU TELL ME AND THE JURY WHETHER THIS PARAGRAPH THAT

2   YOU ASKED ME TO SCROLL DOWN TO SAYS THAT THE ENDPOINT THEY ARE

3   GOING TO BE LOOKING AT IS, IN FACT, THE ENDPOINT THAT WAS ON

4   THE GRAPH?  MAYBE I CAN HELP YOU.

5   A.   YES.  AND YOU'LL SEE IT INCLUDES -- THIS IS THE APTC

6   ENDPOINT, AND IT INCLUDES CARDIOVASCULAR EVENTS,

7   CEREBROVASCULAR EVENTS, AND PERIPHERAL VASCULAR EVENTS.  THAT'S

8   NOT WHAT IS ON THAT GRAPH.

9   Q.   SO YOU THINK THAT THIS MEANS APTC ENDPOINTS?

10  A.   YES.

11  Q.   OR WHATEVER.  SOMEONE ELSE WILL EXPLAIN THAT.

12       YOU TALKED ABOUT HOW THE LINES -- WHETHER THE

13  DIFFERENCE OVER TIME WAS STATISTICALLY SIGNIFICANT.  DO YOU

14  REMEMBER WHAT?

15  A.   I DO.  AND THEY WEREN'T.

16  Q.   AND ARE THERE DIFFERENT WAYS TO MEASURE WHETHER

17  DIFFERENCES THAT SHOW UP OVER TIME ARE STATISTICALLY

18  SIGNIFICANT?

19  A.   YOU HAVE TO USE THE WAY THAT'S APPROPRIATE FOR THE MODEL

20  THAT YOU SELECT.

21  Q.   ARE THERE -- IS ONE WAY TO MEASURE IT CALLED THE LOG TIME?

22  A.   THE LOG TIME WOULD BE THE WAY TO MEASURE IN A SURVIVAL

23  ANALYSIS, SUCH AS THE ONE THAT WAS CONDUCTED HERE.

24  Q.   AND IS ANOTHER WAY TO MEASURE IT LINEAR TIME?

25  A.   THAT'S ASSUMING A -- MAKING A VERY DIFFERENT ASSUMPTION.

1  THE LINEARITY ASSUMPTION IS ASSUMING THAT -- IT'S BASED ON A

2  LINEAR SCALE; WHEREAS, THE RELATIVE RISK ESTIMATE THAT WE

3  DERIVE FROM COX'S PROPORTIONAL HAZARDS MODEL ARE BASED ON A LOG

4  SCALE; SO, THEREFORE, THE LOG LINEAR TEST IS THE APPROPRIATE

5  TEST IN THE PROPORTIONAL HAZARDS MODEL, SUCH AS THE ONE IN

6  APPROVE.

7  Q.   I'M NOT GOING TO TRY TO SPEND THE TIME TO MAKE ALL OF THAT

8  PLAIN.  WHAT I WANT TO GET AT IT IS:  THERE ARE THESE TWO

9  DIFFERENT METHODS OF LOOKING AT WHETHER DIFFERENCES THAT SHOW

10  UP OVER TIME ARE STATISTICALLY SIGNIFICANT; RIGHT?

11  A.   YOU USE THE METHOD SPECIFIC FOR THE MODEL THAT YOU RUN.

12  TO USE ANOTHER METHOD WOULD BE INAPPROPRIATE.

13  Q.   AND I'M NOT -- YOU CAN TALK ABOUT APPROPRIATENESS WHEN WE

14  GET TO WHERE YOU KNOW I'M GOING IN A MINUTE, BUT I JUST WANT TO

15  FIND OUT WHETHER THERE ARE TWO METHODS?  ARE THERE?

16  A.   AS AN EPIDEMIOLOGIST, I WOULD ONLY RUN THE METHOD

17  APPROPRIATE FOR THE MODEL THAT I'M RUNNING.

18        THE COURT:  HIS QUESTION REALLY IS WHETHER THERE ARE

19  TWO METHODS, NOT WHETHER OR NOT YOU USED THE APPROPRIATE ONE.

20  ARE THERE MORE THAN TWO METHODS OR TWO METHODS?

21        THE WITNESS:  AS A STATUS -- IN MY EXPERIENCE AS A

22  BIOSTATISTICIAN RUNNING MODELS, I WOULD NOT USE BUT ONE METHOD

23  FOR THE PROPORTIONAL HAZARDS MODEL.

24        THE COURT:  SO THERE IS JUST ONE METHOD THEN.  THERE

25  IS NOT TWO METHODS?

1            THE WITNESS:  YES.

2    BY MR. BECK:

3    Q.   NOW, YOU KNOW THAT THERE WAS, AFTER THE VIGOR ARTICLE WAS

4    PUBLISHED, THEN THERE WAS A CORRECTION TO THE VIGOR -- APPROVE.

5    SORRY.  AFTER APPROVE WAS PUBLISHED, THEN THERE WAS A LATER

6    CORRECTION TO THE APPROVE ARTICLE; RIGHT?

7    A.   THERE WAS A CORRECTION AND A FOLLOW-UP OF THE APPROVE

8    COHORT.

9    Q.   THE CORRECTIONS, THE ONLY THING I'M ASKING ABOUT NOW, THAT

10   WAS BASICALLY A SITUATION WHERE THEY SAID, "ONE OF THESE TWO

11   METHODS HAD BEEN SPECIFIED FOR APPROVE, AND THE DATA HAD BEEN

12   ANALYZED UNDER THE OTHER ONE; AND THEREFORE, WE NEED TO MAKE

13   SOME CORRECTIONS USING THE PRESPECIFIED METHOD"; RIGHT?

14   A.   WELL, THERE WAS MUCH MORE TO THAT CORRECTION THAN JUST

15   THAT.  THAT WAS --

16   Q.   WAS THAT PART OF IT?

17   A.   THAT WAS PART OF IT.

18   Q.   OKAY.  AND THEN THEY SAID, "SO CERTAIN STATEMENTS --

19   A.   AND --

20   Q.   -- "SHOULD BE TAKEN OUT OF THE ARTICLE, AND CERTAIN THINGS

21   SHOULD BE STATED DIFFERENTLY"; RIGHT?

22   A.   COULD YOU REPEAT YOUR QUESTION.

23   Q.   YES.  THE CORRECTION THAT WAS LATER PUBLISHED SAID THAT,

24   YOU KNOW, USING THE LOG TIME METHOD INSTEAD OF THE LINEAR TIME

25   METHOD, WE NEED TO MAKE SOME CORRECTIONS; RIGHT?

1   A.   THEY WERE REQUIRED TO CORRECT THAT MANUSCRIPT BECAUSE THE

2   FINDINGS WERE NOT SIGNIFICANT USING THE CORRECT METHOD.

3   Q.   SO THEY CORRECTED THE MANUSCRIPT, AND CERTAIN STATEMENTS

4   WERE TAKEN OUT AND OTHER THINGS WERE RESTATED; RIGHT?

5   A.   SPECIFICALLY THEY HAD TO REMOVE THE STATEMENT ABOUT THE

6   18-MONTH PERIOD BEING STATISTICALLY DIFFERENT THAN THE 18 TO

7   36-MONTH PERIOD.

8   Q.   LET ME FOCUS.  I REMEMBER TABLE 3 THAT HAD THE ACTUAL DATA

9   WITH THE NUMBERS 22 VERSUS 20 FOR 18 MONTHS?  DO YOU REMEMBER

10  THAT TABLE?

11  A.   I REMEMBER THAT TABLE.

12  Q.   THAT TABLE STAYED IN THE ARTICLE AS CORRECTED; RIGHT?

13  A.   I CAN GO BACK AND CHECK.  I HAVEN'T ASKED MYSELF THAT

14  QUESTION, BECAUSE AS AN EPIDEMIOLOGIST, I WOULD NOT BE

15  SEPARATING THOSE TWO TIME PERIODS WITHOUT STATISTICAL REASONS

16  FOR DOING SO.

17  Q.   AND THE KAPLAN-MEIER CURVE THAT WE LOOKED AT, THAT -- FROM

18  THE ARTICLE, THAT STAYED IN THE ARTICLE AFTER THE CORRECTION

19  ALSO; CORRECT?

20  A.   THAT'S CORRECT.  BUT THE APTC ENDPOINT THAT WAS LATER

21  PUBLISHED SHOWS A MUCH DIFFERENT PICTURE.

22  Q.   I'M ASKING YOU ONLY ABOUT THE CORRECTION THAT WAS

23  PUBLISHED.

24  A.   OKAY.

25  Q.   NOW, I FEEL LIKE I'VE BEEN TAKING MY LIFE IN MY OWN HANDS

1   WHEN I ASK YOU ABOUT THE LOG TIME VERSUS LINEAR TIME, BUT I'M

2   GOING TO TRY IT ANYWAY.  COULD YOU STEP DOWN SO THAT YOU CAN

3   SEE WHAT I'M DRAWING AND THE JURY CAN SEE YOU.

4           SO WE SAW THE GRAPH WHERE THE LINES WERE ON TOP OF

5   EACH OTHER AND THEN SEPARATED AFTER 18 MONTHS.  THAT'S OUR

6   STARTING POINT; RIGHT?

7   A.   FOR THE -- NOT THE APTC BUT FOR THE SERIOUS ENDPOINTS.

8   Q.   RIGHT.  FOR THE SERIOUS ENDPOINTS.  AND THEN, THE QUESTION

9   IS, YOU KNOW, IS THERE A DIFFERENCE IN RISKS WHEN YOU MEASURE

10  IT OVER TIME; IS THAT RIGHT?

11  A.   SPECIFICALLY IT'S TESTING WHETHER THE HAZARD RATE RATIO,

12  THE PROPORTION OF THOSE TWO LINES, VARIES OVER TIME.

13  Q.   WELL, YOUR OPINION NUMBER 2 WAS THAT THE HEART ATTACK

14  RISKS APPEARS AT ANY DOSE AT ANY DURATION, RIGHT?

15  A.   CORRECT.

16  Q.   SO IS THE QUESTION THEN WHEN WE LOOK AT THAT GRAPH AND USE

17  WHICHEVER ANALYSIS IS APPROPRIATE, IS THE QUESTION WHETHER THE

18  HEART ATTACK DIFFERENCE CHANGES OVER TIME?  IS THAT A FAIR WAY

19  TO STATE IT?

20  A.   MY OPINION 2 IS BASED ON A TOTALITY OF THE STUDIES, NOT

21  JUST APPROVE.  APPROVE WAS NOT SUCH A STUDY.

22  Q.   I'M GOING TO WRITE DOWN A QUESTION AND SEE IF WE CAN TALK

23  ABOUT IT.  OKAY.  NOW, FOCUSING JUST ON APPROVE, RECOGNIZING

24  THAT YOU TALKED ABOUT OTHER THINGS AS WELL, BUT FOCUSING ON

25  APPROVE, FIRST LET ME ASK:  DID YOU AGREE IN 2005 THAT THE CV,

1   CARDIOVASCULAR RISKS DID CHANGE OVER TIME?

2   A.   AS I STATED BEFORE, WHEN I AGREED TO THE YES, THERE WAS A

3   BIG BUT; BUT I DIDN'T GO THROUGH EACH OF THESE OPINIONS; AND MY

4   ROLE WAS TO COMMENT ON RISK FACTORS FOR CARDIOVASCULAR AND

5   WHETHER THEY EXPLAINED APPROVE.

6   Q.   I CAN'T REMEMBER IF THERE WAS A YES OR NO IN THERE.   YOU

7   SAID WHEN YOU AGREED YES, THERE WAS A BIG BUT.   BUT TODAY YOU

8   SAY NO; RIGHT?

9   A.   I SAY THAT THE RATE RATIO SPECIFICALLY FOR VIOXX VERSUS

10  PLACEBO IS CONSTANT OVER THE PERIOD OF FOLLOW UP IN THE APPROVE

11  STUDY.

12  Q.   WELL, LET ME ASK -- I NEED MY NOTES TO KEEP STRAIGHT WHICH

13  TEST IS WHICH.   IN THE APPROVE STUDY AS IT WAS FIRST PUBLISHED

14  BEFORE THE CORRECTION, WHICH STATISTICAL TEST DID THEY USE TO

15  ADDRESS THIS QUESTION?   THE LINEAR TEST?

16  A.   ACTUALLY, THEY DIDN'T ADDRESS THIS QUESTION IN THAT TEST.

17  IN THE WRONG TEST.

18  Q.   WHAT QUESTION DID THEY ADDRESS?

19  A.   THEY ASKED WHETHER THE RELATIVE -- REMEMBER EPIDEMIOLOGY

20  IS ABOUT COMPARISON -- THE RELATIVE RISK IN VIOXX VERSUS

21  PLACEBO CHANGED OVER TIME, NOT THE CV RISK.   THE RELATIVE RISK.

22  Q.   IT IS THE RELATIVE CV RISK, THOUGH; RIGHT?   THAT'S WHAT

23  THEY'RE ASKING ABOUT?

24  A.   THAT'S WHAT I'M REFERRING TO.   THE RELATIVE RISK OR

25  SPECIFICALLY THE HAZARD RATE RATIO.

1    Q.    I'M SORRY, WHAT DID YOU SAY?

2    A.    SPECIFICALLY DID THE HAZARD RATE RATIO.

3    Q.    "DID THE RELATIVE RISK OF CV EVENTS --

4    A.    SPECIFICALLY THE ABSTRACTED DEFINITION.  NOT THE FULL APTC

5    ENDPOINT.

6    Q.    OKAY.  -- "CHANGE OVER TIME?"  RIGHT?

7          NOW, WOULD THEY -- AND IN THE ARTICLE, AS IT WAS

8    FIRST PUBLISHED, THEY USED LINEAR TEST TO ANSWER THAT QUESTION?

9    A.    CORRECT.  UH-HUH (AFFIRMATIVE RESPONSE).

10   Q.    AND THEN LATER IT WAS CORRECTED AND A LOG TEST WAS

11   APPLIED; RIGHT?

12   A.    THE LOG TEST WAS THE CORRECT TEST FOR THE MODEL THAT

13   ASSESSES THIS QUESTION IN THAT MORE SPECIFIC FORM OF THE HAZARD

14   RATE RATIO.

15   Q.    AND I'M GOING TO PUT A STAR NEXT TO THE LOG TEST TO

16   INDICATE THAT THAT'S THE ONE YOU TESTIFIED IS THE APPROPRIATE

17   ONE, OKAY?

18   A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

19   Q.    NOW, WHAT I WANT FROM YOU NOW IS JUST NUMBERS AND THEN YOU

20   CAN ANSWER WHAT YOU THINK IS IMPORTANT; BUT WHEN THEY LOOKED AT

21   THE -- WHEN THEY USED THE LINEAR TEST, WHICH YOU SAY WAS THE

22   WRONG TEST, DID THEY ANSWER THAT QUESTION, "YES, THE

23   DIFFERENCES OVER TIME ARE STATISTICALLY SIGNIFICANT"?

24   A.    THEY ANSWERED THE QUESTION, "YES, THEY WERE STATISTICALLY

25   SIGNIFICANT," USING THE WRONG TEST.

Page 1082

1   Q.   AND DID THEY COME UP WITH A P-VALUE OF 0.1?

2   A.   I WOULD HAVE TO REVIEW THE PAPER, BUT I'LL TAKE YOUR WORD

3   FOR IT.

4   Q.   OKAY.  I SAY ZERO.  IT'S 0.01, WHICH IS -- WE HEARD ABOUT

5   P-VALUES THE OTHER DAY FROM DR. MOY, AND WE MAY HAVE HEARD

6   ABOUT THEM YESTERDAY FROM YOU AS WELL; BUT RECOGNIZING THAT YOU

7   SAID THIS IS THE WRONG TEST, THAT WOULD BE STATISTICALLY

8   SIGNIFICANT BECAUSE IT'S LESS THAN .05; CORRECT?

9   A.   CORRECT.

10   Q.   AND THE CHANCE THAT IT'S JUST DUE TO RANDOM ERROR WOULD

11   BE, YOU WOULD BE -- IF THIS WERE THE RIGHT TEST -- YOU WOULD BE

12   BASICALLY 99 PERCENT SURE; RIGHT?

13   A.   THERE WOULD BE ONE CHANCE OUT OF A HUNDRED THAT THAT

14   OBSERVATION WAS DUE TO CHANCE.

15   Q.   OKAY.  SO, 99 PERCENT THAT IT'S NOT DUE TO CHANCE, THAT

16   IT'S THE RIGHT OBSERVATION?

17   A.   NO.  ACTUALLY, YOU DON'T KNOW FOR ANY GIVEN TEST.  SO IT

18   COULD BE OR IT COULDN'T BE.

19   Q.   NOW, FOR THE LOG TEST --

20   A.   ACTUALLY, I DIDN'T AGREE TO THE 99 PERCENT.

21   Q.   OKAY.  WELL, THEN WE'LL PUT A LITTLE ASTERISK DOWN, YOU

22   DISAGREE.

23        BUT WHEN A P-VALUE IS .01, DO YOU SAY THAT'S ONE OUT

24   OF A HUNDRED CHANCE -- ONE OUT OF A HUNDRED TIMES IT WOULD BE

25   DUE TO CHANCE; RIGHT?

1  A.   RIGHT.

2  Q.   99 TIMES OUT OF A HUNDRED, IT'S NOT DUE TO CHANCE; RIGHT?

3  A.   CORRECT.

4  Q.   THAT'S WHAT I MEAN BY 99 PERCENT.

5        WHAT WAS THE P-VALUE WHEN THEY CORRECTED IT AND USED

6  THE LOG APPROACH?

7  A.   FOR, AGAIN, SERIOUS CARDIOVASCULAR EVENTS, IT WAS

8  SOMETHING CLOSE TO .09.

9  Q.   ACTUALLY, IT WAS, DO YOU REMEMBER IT WAS .07?

10  A.   IT WAS BIGGER THAN .07.

11  Q.   IS THERE SOMETHING YOU COULD LOOK AT WHERE YOU COULD TELL

12  ME WHAT THE NUMBER IS.  HERE, I'LL TAKE THAT.

13  A.   THANK YOU.  IT'S .07.  I REMEMBER.076, BUT IT SAYS .07.

14  Q.   .07.  THANKS.

15        AND THAT, AS A TECHNICAL MATTER, FAILS THE

16  STATISTICALLY SIGNIFICANT TEST BECAUSE THE STATISTICALLY

17  SIGNIFICANT TEST MEANS YOU'VE GOT TO BE 95 PERCENT CERTAIN;

18  RIGHT?

19  A.   THAT'S THE GENERALLY ACCEPTED THRESHOLD.

20  Q.   AND THIS IS 93 TIMES OUT OF A HUNDRED IT'S THE RIGHT

21  ANSWER, BUT SEVEN TIMES OUT OF A HUNDRED IT COULD BE DUE TO

22  CHANCE; RIGHT?

23  A.   WHEN YOU'RE EVALUATING CAUSATION, WITH ONE ASPECT OF

24  EVALUATING CAUSATION, WHICH IS CHANCE, THAT ANSWER IS CORRECT.

25  BUT YOU HAVE TO LOOK AT THE TOTALITY OF ALL OF THE DATA --

Page 1084

1    Q.   I UNDERSTAND THAT YOU --

2    A.   -- IN MAKING THE DECISION.

3    Q.   I UNDERSTAND THAT YOU SAY THAT YOUR CONCLUSION IS BASED ON

4    MORE THAN APPROVE AND MORE THAN THAT GRAPH, BUT I'M JUST

5    ASKING --

6    A.   EVEN WITHIN APPROVE, THERE IS A DIFFERENCE IN THAT GRAPH

7    WHETHER OR NOT YOU USE THE APTC ENDPOINT, WHICH WAS THEIR

8    STANDARD OPERATING PROCEDURE FOR MEASURING EVENT.

9    Q.   WELL, WE'LL HEAR FROM MERCK PEOPLE ABOUT WHAT THE STANDARD

10   OPERATING PROCEDURE WAS.  HERE IS ALL I WANT:  DO YOU AGREE

11   WITH ME THAT THE GRAPH THAT THEY PUT IN APPROVE USING THE

12   ENDPOINT THAT THEY USED TO ANALYZE THE RESULTS OF APPROVE, THAT

13   WHEN THEY USED WHAT YOU CALLED THE WRONG TEST, THE STATISTICS

14   SAY THAT IT'S 99 TIMES OUT OF A HUNDRED THE ANSWER IS YES TO

15   THIS QUESTION; AND WHEN THEY USE THE TEST THAT YOU SAY IS

16   RIGHT, 93 TIMES OUT OF A HUNDRED THE ANSWER IS YES?

17   A.   I DISAGREE WITH THAT STATEMENT, FOR THE REASONS THAT THEY

18   NEVER CORRECTED FOR MULTIPLE TESTING AND THE MORE TESTS YOU

19   CONDUCT; SO THEY WERE LOOKING AT ALL OF THESE SUBGROUPS TO FIND

20   SOMETHING SIGNIFICANT; AND SURE ENOUGH, AFTER DOING HUNDREDS OF

21   TESTS, THEY FOUND ONE.

22           THE COURT:  ARE YOU FINISHED WITH THAT?

23           MR. BECK:  YES, YOU CAN RESUME YOUR SEAT.  AND I'LL

24   MOVE SO THAT PEOPLE CAN SEE ONE ANOTHER.

25

1  BY MR. BECK:

2  Q.   I THINK, DID YOU TALK IN YOUR DIRECT EXAMINATION ABOUT THE

3  STATEMENT MADE BY DR. VILLALBA OF THE FDA?  I THOUGHT YOU WENT

4  OVER A VILLALBA MEMO AND SAID THAT DR. VILLALBA HAD SOMETHING

5  TO SAY THAT YOU FOUND SIGNIFICANT?

6  A.   IN FORMING OPINION 3 ABOUT THEIR NOT BEING ADEQUATE

7  STUDIES CONDUCTED BY MERCK TO ASSESS THE CARDIOVASCULAR

8  RISKS -- IN FACT, THERE WAS NEVER A STUDY DESIGNED EXCLUSIVELY

9  TO DETECT CARDIOVASCULAR RISK -- THAT VILLALBA, WHO IS THE

10  MEDICAL OFFICER REVIEWER, HAD STATED ON TWO DIFFERENT OCCASIONS

11  THAT THE STUDIES WERE UNDERPOWERED TO EVALUATE THIS QUESTION

12  CONCLUSIVELY.

13  Q.   DO YOU KNOW THAT DR. VILLALBA ALSO SIGNED OFF ON THE

14  MEDICAL REVIEW AND ENDORSED THE APPROVAL OF VIOXX?

15  A.   WITH THIS CAVEAT IN HER NOTES ABOUT THE CARDIOVASCULAR

16  RISKS.

17  Q.   SO THE FDA KNEW WHAT YOU SAID WAS AN IMPORTANT THING; AND

18  KNOWING THAT, DR. VILLALBA HERSELF AGREED THAT VIOXX SHOULD BE

19  APPROVED AS SAFE AND EFFECTIVE WHEN USED ACCORDING TO THE

20  LABEL; CORRECT?

21  A.   I CAN'T SAY WHAT SHE WAS SAYING ACCORDING TO THE LABEL.  I

22  CAN SAY THAT WITH NEW DRUGS, WHEN YOU'RE EVALUATING SAFETY,

23  THAT SHE DID PUT IN A SAFETY CONCERN ABOUT HEART ATTACK AND

24  CARDIOVASCULAR EVENTS.

25  Q.   AND MY QUESTION, PROFESSOR, IS -- PLEASE FOCUS ON MY

1  QUESTION NOW -- HAVING EXPRESSED THAT, DID SHE THEN SAY SHE

2  AGREED THAT VIOXX SHOULD BE APPROVED AND BROUGHT TO THE MARKET?

3  A.   VIOXX WAS BROUGHT TO THE MARKET, BUT SHE DID POINT OUT

4  THAT LARGER DATA SETS WERE NEEDED TO CONCLUSIVELY ADDRESS THE

5  HEART DISEASE RISK WITH VIOXX.

6         MR. BECK:  YOUR HONOR, I THINK I NEED SOME HELP

7  GETTING AN ANSWER TO THE QUESTION.

8         THE COURT:  HIS QUESTION IS:  DID SHE OR DIDN'T SHE?

9         MR. BECK:  DID SHE OR DIDN'T SHE ENDORSE VIOXX BEING

10  APPROVED?

11         THE WITNESS:  I DON'T KNOW IF SHE'S THE FINAL

12  ARBITRATOR OF SUCH DECISIONS, BUT THE DRUG WAS APPROVED.

13         THE COURT:  BUT YOUR ANSWER THEN IS YOU DON'T KNOW?

14         THE WITNESS:  I DON'T KNOW.

15         THE COURT:  OKAY, THAT'S A FAIR ANSWER.

16         THE WITNESS:  OKAY.

17         THE COURT:  "YES," "NO," "I DON'T KNOW."  THOSE ARE

18  ALL FAIR ANSWERS.

19  BY MR. BECK:

20  Q.   I'M HANDING YOU WHAT WE'VE MARKED AS DEFENDANT'S

21  EXHIBIT 3070, WHICH IS AN FDA DOCUMENT FROM DECEMBER 18, 2004,

22  CALLED AN INTERIM REVIEW, AND DO YOU SEE THERE THAT THE

23  REVIEWER IS DR. VILLALBA?

24  A.   THERE WAS A CLINICAL TEAM LEADER, A REVIEWER BY

25  DR. VILLALBA, YES.

1          MR. BECK:  WE OFFER DEFENDANT'S EXHIBIT 3070,

2     YOUR HONOR.

3          MR. BIRCHFIELD:  NO OBJECTION.

4          THE COURT:   LET IT BE ADMITTED.

5     BY MR. BECK:

6     Q.   NOW, DID YOU REVIEW THIS DOCUMENT IN YOUR 200 HOURS THAT

7     YOU WORKED WITH THE PLAINTIFF'S LAWYERS?

8     A.   I REVIEWED THIS DOCUMENT.  IT'S LOVINGLY KNOWN AS THE

9     COVER-YOUR-ASS DOCUMENT.

10    Q.   SO THE CONCLUSION OF THIS DOCUMENT WHERE THE REVIEWER WAS

11    DR. VILLALBA IS, "BASED ON THIS INTERIM REVIEW OF AVAILABLE

12    DATA FROM PLACEBO-CONTROLLED STUDIES IN PATIENTS WITH EITHER

13    ESTABLISHED ALZHEIMER'S DISEASE OR MILD COGNITIVE IMPAIRMENT AS

14    SUBMITTED BY MERCK ON MARCH 30, 2004, IT APPEARS THAT, UP TO

15    THE TIME OF THE APPROVE STUDY, THE CARDIOVASCULAR SAFETY SIGNAL

16    WITH VIOXX DID NOT WARRANT A REGULATORY ACTION BY THE FDA."

17    YOU SAY THIS IS A JUST A COVER-YOUR-ASS MEMO?

18    A.   YES.  AND IN LIGHT THAT THE FDA HAD COME UNDER INTENSE

19    SCRUTINY AFTER THE APPROVE STUDY CAME OUT AND THERE WERE SENATE

20    HEARINGS THAT WERE SET UP, SO IT WAS A BIG AREA OF CONCERN FOR

21    THE FDA.

22    Q.   AND THIS WAS DECEMBER 18, 2004; RIGHT?

23    A.   RIGHT.

24    Q.   ABOUT THREE WEEKS BEFORE YOU WROTE THE LETTER SAYING YOU

25    AGREED THAT THERE WAS NO INCREASE IN SHORT-TERM RISKS USING

Page 1088

1   VIOXX; RIGHT?

2   A.   ONCE AGAIN, MY AGREEMENT WERE TO THE CONCLUSIONS RELATIVE

3   TO THE CARDIOVASCULAR SAFETY OF VIOXX AND RISK FACTOR LEVELS OF

4   THE PATIENTS.

5        MR. BECK:  THAT'S ALL I HAVE, JUDGE.

6        THE COURT:  ANY REDIRECT?

7        MR. BIRCHFIELD:  YES, YOUR HONOR.

8                    REDIRECT EXAMINATION

9   BY MR. BIRCHFIELD:

10  Q.   DR. ARNETT, I WANT TO TAKE A LOOK AT THE LETTER THAT YOU

11  SENT TO MERCK WHEN YOU WERE HIRED AS A CONSULTANT.  DO YOU HAVE

12  THAT IN FRONT OF YOU, DR. ARNETT?

13  A.   YES, I DO.

14  Q.   AND WE SEE IN YOUR LETTER TO THEM, YOU ASKED, "IN ADDITION

15  TO THE DATA THAT ARE PROVIDED, IT WOULD BE VERY HELPFUL TO HAVE

16  ADDITIONAL INFORMATION RELATED TO ANTICIPATED CVD" -- WHAT IS

17  CVD?

18  A.   CARDIOVASCULAR DISEASE.

19  Q.   -- "EFFECTS TO ASSIST IN THE EVALUATION OF THE CVD EFFECTS

20  OF ROFECOXIB, VIOXX, IN THE VARIOUS TRIALS LISTED BELOW";

21  CORRECT?

22  A.   THAT'S CORRECT.

23  Q.   AND THEN YOU LIST -- YOU HAVE SEVERAL BULLET POINTS HERE

24  WHERE YOU WERE ASKING MERCK TO PROVIDE YOU WITH THAT ADDITIONAL

25  INFORMATION; IS THAT CORRECT?

1  A.   THAT'S CORRECT.  I WAS PARTICULARLY CONCERNED ABOUT THE

2  BLOOD PRESSURE EFFECTS THAT WERE DETECTED CONSISTENTLY

3  THROUGHOUT ALL OF THEIR TRIALS THAT SHOWED MARKED INCREASES IN

4  BLOOD PRESSURE IN SOME PATIENTS ON VIOXX.

5  Q.   AND DID MERCK PROVIDE YOU THAT ADDITIONAL DATA?

6  A.   I RECEIVED NO FOLLOW-UP AT ALL TO THIS LETTER THAT I SENT.

7  Q.   AND THEN YOU ALSO SAY, "A SECOND AREA OF CONFUSION IN THE

8  CURRENT DOCUMENTATION IS THE DEFINITIONS OF CVD ENDPOINTS"; AND

9  YOU GO ON WITH A DESCRIPTION THERE OF THE AREA OF CONFUSION.

10  DID MERCK EVER RESPOND TO PROVIDE ANY CLARIFICATION ON THIS

11  ISSUE?

12  A.   NO, THEY DID NOT.

13  Q.   AND THEN YOU ASKED, OR YOU STATE, "THE TIMING OF THE CVD

14  EVENTS IN RELATION TO EXPOSURE TO ROFECOXIB DIFFERS ACROSS THE

15  STUDIES, SOME STUDIES SHOWING MORE RISK DURING EARLY

16  TREATMENT."  WHAT DID YOU MEAN BY THAT, DR. ARNETT?

17  A.   THE SHORT-TERM STUDIES THAT WE'VE DISCUSSED EARLIER TODAY,

18  YOU KNOW, SHOWED THE RISK HAPPENED EARLY.  IF YOU LOOK AT THE

19  KAPLAN-MEIER PLOTS, THERE WERE -- THEY -- THE RATES OF DISEASE

20  DIVERGED QUICKLY IN SOME STUDIES.

21  Q.   AND THEN YOU SAY -- YOU ASKED, YOU ASKED THE QUESTION, "DO

22  YOU HAVE A HYPOTHESES OTHER THAN RANDOM ERROR TO EXPLAIN THESE

23  DIFFERENT FINDINGS?"  DID YOU EVER GET AN ANSWER FROM MERCK

24  ABOUT WHETHER THEY HAD ANY HYPOTHESES TO EXPLAIN THESE

25  FINDINGS?

1  A.   I NEVER RECEIVED THEM; AND IT'S REALLY IMPORTANT BECAUSE

2  MY OPINION STILL HOLDS THAT THESE STUDIES WERE TERRIBLY

3  UNDERPOWERED TO DETECT THOSE RISKS; AND I EVEN POINTED OUT

4  HERE, IS THIS JUST RANDOM ERROR THAT'S ACCOUNTING FOR THESE

5  FINDINGS?

6  Q.   AND SO, WHEN YOU'RE ASKING DO YOU HAVE HYPOTHESES TO

7  EXPLAIN THESE DIFFERENT FINDINGS, WHAT ARE YOU TALKING ABOUT

8  THESE DIFFERENT FINDINGS?  WHAT ARE YOU ASKING THEM FOR?

9  A.   I WAS ASKING ABOUT WHY -- WHY THEY WOULD HAVE SOME STUDIES

10  THAT SHOWED THE RISK RIGHT AWAY, YOU KNOW, IN SIX WEEKS; AND

11  THEN, YOU KNOW, THERE WAS DIFFERENCES BETWEEN THOSE PLOTS

12  WHETHER OR NOT YOU USED ONE ENDPOINT OR ANOTHER ENDPOINT.  AND

13  THERE WASN'T CONSISTENCY OF THE INFORMATION IN THAT

14  DOCUMENTATION THAT LET ME, AS AN EPIDEMIOLOGIST, FEEL THAT IT

15  WASN'T A LARGE, IN SOME CASES, FISHING EXPEDITION.

16  Q.   AND THEN YOU GO ON TO SAY, "SPECIFIC TO THE APPROVE STUDY,

17  WERE EVENTS REPORTED IN AN ONGOING MANNER; OR WAS THERE A

18  STUDY- WIDE CALL FOR UPDATING SERIOUS ADVERSE EVENTS PRIOR TO

19  THE LANDMARK DATES," AND YOU GIVE THE DATES, 12 MONTHS,

20  18 MONTHS, ET CETERA.  WHAT ARE YOU ASKING ABOUT HERE?

21  A.   IN THE FIGURE THAT MR. BECK WAS REFERRING TO EARLIER, AND

22  THE P-VALUES THAT HE REFERRED TO HERE ON THE BOARD WHEN I CAME

23  DOWN, IS ALL ABOUT THAT ONE FIGURE THAT FORMS THE BASIS OF THAT

24  APPROVE ARTICLE.  AGAIN, IT'S NOT THE STANDARD OPERATING

25  PROCEDURE FOR HOW THEY WERE GOING TO DEFINE ENDPOINTS.

1        AND I WAS REALLY CONFUSED BY THAT FIGURE WHEN I WENT;

2   AND I WONDERED, WHEN YOU SEE, YOU KNOW, THE FLAT LINE AND THEN

3   ALL OF A SUDDEN AT 12 MONTHS THERE SEEMED TO BE A BIG BUMP AND

4   THEN AT 18 MONTHS ANOTHER BIG BUMP, HAVING WORKED ON CLINICAL

5   TRIALS FOR MANY YEARS, YOU KNOW, WE KNOW THAT AT CERTAIN TIMES

6   OF THE REPORTING OF CLINICAL TRIALS YOU SEND OUT -- YOU KNOW,

7   ASKING ME TO SEND YOU BACK INFORMATION ABOUT ENDPOINTS.  AND I

8   JUST WONDERED IF THAT COULD BE AN EXPLANATION.  IT JUST WAS A

9   VERY STRANGE OBSERVATION CHECK.

10  Q.   IN FACT, I THINK YOU POINT OUT IN YOUR LETTER HERE THAT

11  THIS EVENT PATTERN IS ODD; IS THAT CORRECT?

12  A.   THAT'S CORRECT.

13  Q.   AND AGAIN, NO RESPONSE FROM ANYONE AT MERCK TO PROVIDE

14  CLARIFICATION ON WHAT YOU WERE SEEING HERE OR THE QUESTIONS

15  THAT YOU HAD RAISED?

16  A.   THAT'S CORRECT.

17  Q.   DR. ARNETT, THE OPINIONS THAT YOU HAVE TODAY REGARDING

18  VIOXX, ARE THEY MORE INFORMED OPINIONS THAN YOU'VE HAD AFTER

19  THIS REVIEW AND RESPONSE?

20          MR. BECK:  I OBJECT.  LEADING, YOUR HONOR.

21          MR. BIRCHFIELD:  I ASKED WHETHER THEY ARE,

22  YOUR HONOR.  I'M NOT SUGGESTING AN ANSWER.

23          THE COURT:  I'LL ALLOW IT.  I'LL OVERRULE THE

24  OBJECTION.

25          THE WITNESS:  DO I GET TO ANSWER?

1          THE COURT:  YES.

2          THE WITNESS:  THEY ARE MUCH MORE INFORMED.  I SPENT

3    200 HOURS REVIEWING THIS DATA, GOING THROUGH NOT ONLY DATA

4    PROVIDED BY MERCK BUT OTHER PEOPLE WHO HAVE DONE INDEPENDENT

5    RESEARCH FROM MERCK AND LOOKED AT THE DATA, AS WELL AS

6    EXTENSIVELY REVIEWING THE FDA DOCUMENTATIONS; AND IT'S ON THE

7    BASIS OF THOSE OPINIONS, THOSE DOCUMENTS THAT I HAVE FORMED MY

8    OPINION.

9    BY MR. BIRCHFIELD:

10   Q.   DR. ARNETT, IN REGARDS TO THE WORK THAT YOU WERE DOING FOR

11   MERCK, MR. BECK ASKED YOU IF YOU REVIEWED THE VIGOR -- THE

12   VIGOR ARTICLE.  DO YOU RECALL THAT?

13   A.   I DO RECALL THAT.

14   Q.   AND SINCE THE -- SINCE THE PUBLICATION OF THE VIGOR

15   ARTICLE THAT WAS AVAILABLE IN 2005, HAS THERE BEEN -- HAS THERE

16   BEEN ANY --

17          MR. BECK:  YOUR HONOR, MAY WE APPROACH ON THIS?

18          THE COURT:  YES.

19          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

20   THE BENCH.)

21          THE COURT:  ANDY, I'M GOING TO HAVE TO STOP AT

22   12 O'CLOCK.  I'VE GOT A BIG CONFERENCE CALL AT THAT TIME.

23          MR. BIRCHFIELD:  YES, SIR.

24          MR. BECK:  YOUR HONOR, HE'S ABOUT TO ASK ABOUT THE

25   EXPRESSION OF CONCERN, WHICH WAS NOT REVIEWED BY HER AND NOT

1  RELIED ON BY HER; AND IT'S NOT LIKE I RAISED THE VIGOR ARTICLE

2  ON CROSS-EXAMINATION.  HE EXAMINED HER ON THE VIGOR ARTICLE,

3  AND I EXAMINED HER ON THE VIGOR ARTICLE, AND SHE NEVER HAD AS

4  HER MATERIALS REVIEWED OR ANY OPINIONS ON THE EXPRESSION OF

5  CONCERN.  I STAYED AWAY FROM THAT ALTOGETHER.  I EXAMINED HER

6  ON THE CORRECTION TO APPROVE BECAUSE THAT WAS REVEALED, BUT

7  SHE -- THEY SHOULDN'T BE ALLOWED TO SANDBAG BY BRINGING IN --

8          THE COURT:  I UNDERSTAND.

9          MR. BIRCHFIELD:  IT'S NOT A MATTER OF SANDBAGGING,

10 YOUR HONOR.  HE ASKED HER, HE CHALLENGED HER OPINIONS BASED ON

11 THE REVIEW OF THE VIGOR ARTICLE.  HE WENT INTO DETAIL ABOUT THE

12 VIGOR ARTICLE AND HER UNDERSTANDING BACK IN 2005.  SHE SHOULD

13 BE ABLE TO PUT THAT IN PROPER LIGHT BECAUSE IT WAS MISLEADING.

14 THAT'S THE --

15         THE COURT:  I UNDERSTAND.

16         MR. BECK:  I DIDN'T CHALLENGE HER ANYTHING ON THE

17 VIGOR ARTICLE.  WE LOOKED AT THE VIGOR ARTICLE, WHICH IS WHAT

18 HE SHOWED HER.

19         THE COURT:  I UNDERSTAND.  I'LL OVERRULE THE

20 OBJECTION.  AND DO IT QUICKLY, ANDY.

21         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

22 OPEN COURT.)

23 BY MR. BIRCHFIELD:

24 Q.   DR. ARNETT, ARE YOU FAMILIAR WITH AN EXPRESSION OF CONCERN

25 THAT WAS PUBLISHED IN THE NEW ENGLAND JOURNAL OF MEDICINE WITH

Page 1094

1    THE VIGOR ARTICLE AS IT WAS PUBLISHED?

2    A.   I AM, BECAUSE IT WAS A VERY UNUSUAL THING.  THEY DON'T

3    USUALLY PUBLISH -- I'VE NEVER SEEN ONE OTHER THAN THIS.

4              THE COURT:  LET HIM ASK THE QUESTIONS.

5              THE WITNESS:  OKAY, I'M SORRY.

6    BY MR. BIRCHFIELD:

7    Q.   I WOULD LIKE TO TAKE A LOOK AT THE EXPRESSION OF CONCERN,

8    EXHIBIT P2.0236.  CAN YOU PUT THAT UP FOR ME.

9              MR. BECK:  YOUR HONOR, I OBJECT.

10             THE COURT:  I SUSTAIN THE OBJECTION.  WE'LL HAVE TO

11   DO THIS WITH ANOTHER WITNESS.  SHE SAYS THAT SHE'S NOW AWARE OF

12   IT.

13   BY MR. BIRCHFIELD:

14   Q.   DR. ARNETT WOULD YOU EXPLAIN TO US WHAT WAS THE IMPORT OF

15   THE EXPRESSION OF CONCERN AS IT WAS PUBLISHED IN THE NEW

16   ENGLAND JOURNAL OF MEDICINE?

17             MR. BECK:  YOUR HONOR, I THOUGHT YOU JUST SUSTAINED

18   THE OBJECTION.

19             THE COURT:  I DID SUSTAIN IT.  LET'S REPHRASE THAT

20   QUESTION.  AS A RESULT OF THAT, DID YOU GET MORE INFORMATION?

21             THE WITNESS:  AS A RESULT OF THAT, I LEARNED THAT

22   THERE WERE THREE HEART ATTACK EVENTS THAT OCCURRED PRIOR TO AND

23   WERE KNOWN BY MERCK TWO WEEKS PRIOR TO THE ORIGINAL SUBMISSION

24   OF THE VIGOR PAPER THAT WERE NOT INCLUDED IN ANY OF THE

25   DOCUMENTATION SENT TO THE NEW ENGLAND JOURNAL OF MEDICINE.  SO

1  THERE WERE THREE MORE HEART ATTACKS THAT ALL HAPPENED IN THE

2  VIOXX GROUP, NOT IN THE NAPROSYN GROUP.

3  BY MR. BIRCHFIELD:

4  Q.   AND YOU TALKED TO MR. BECK ABOUT THE APPROVE CORRECTION

5  THAT WAS PUBLISHED IN THE NEW ENGLAND JOURNAL OF MEDICINE?

6  A.   I DID.

7  Q.   YOUR HONOR, MAY I PUBLISH THE CORRECTION?

8           MR. BECK:  NO, YOUR HONOR, I OBJECT TO THAT AS WELL.

9  THAT'S BEEN THE SUBJECT OF TESTIMONY, BUT NOT EVER BEEN --

10          MR. BIRCHFIELD:  IT'S IN A PEER-REVIEWED LITERATURE

11 YOUR HONOR.

12          MR. BECK:  NO, IT'S NOT.

13          MR. BIRCHFIELD:  IT'S PUBLISHED IN NEW ENGLAND

14 JOURNAL OF MEDICINE, WHICH IS A PEER-REVIEWED --

15          MR. BECK:  YOUR HONOR, WE'VE BEEN THROUGH IT BEFORE.

16 I OBJECT.

17          THE COURT:  OKAY.  I'LL OVERRULE THE OBJECTION.  I'LL

18 ALLOW IT.

19 BY MR. BIRCHFIELD:

20 Q.   MIKE, WOULD YOU PUT UP PLAINTIFF'S EXHIBIT 2.1726.

21          AND DR. ARNETT, IN THE CORRECTION THAT'S PUBLISHED IN

22 THE NEW ENGLAND JOURNAL OF MEDICINE REGARDING THE APPROVE

23 STUDY --

24 A.   THAT'S CORRECT.  IT WAS PUBLISHED IN JUNE 26, 2006.

25 Q.   OKAY.  AND WHAT WAS THE REASON FOR THE PUBLISHING OF THE

Page 1096

1   CORRECTION?

2   A.   THE REASON WAS THAT MUCH OF THE BASIS OF THE ARGUMENTS

3   ABOUT CARDIOVASCULAR RISKS PRESENTED IN AN ARTICLE ARE FOUNDED

4   ON THIS 18-MONTH PERIOD, WHERE THEY MAKE THE LINES APPEAR TO

5   LOOK LIKE THEY ARE NOT DIFFERENT AT 18 MONTHS FOR THAT ONE

6   ENDPOINT CALLED SERIOUS THROMBOTIC EVENTS.

7            AND WHEN THEY -- AND THE BASIS THAT FINDING IN THE

8   PAPER WAS PURELY ON THE USE OF THE WRONG TEST, THIS LINEAR

9   TEST, WHICH IS INAPPROPRIATE IN A PERSONAL HAZARDS MODEL, THE

10  ONE THAT MODELS THE RELATIVE RISK.

11  Q.   DR. ARNETT, IN THE CORRECTION THAT IS ON THE SCREEN NOW,

12  STATES THAT THE CARDIOVASCULAR EVENTS ASSOCIATED WITH ROFECOXIB

13  IN THE COLORECTAL ADENOMA CHEMO PREVENTION TRIAL, IS THAT THE

14  APPROVE TRIAL?

15  A.   THAT'S THE APPROVE TRIAL.

16  Q.   IN THE REPORTED RESULTS, THE TEST FOR PROPORTIONALITY OF

17  HAZARDS USED LINEAR TIME RATHER THAN THE LOGARITHM TIME THAT

18  WAS SPECIFIED IN THE METHODS SECTION.  TELL US WHAT THAT MEANS.

19  WHAT DO YOU MEAN BY THAT?

20            THE COURT:  COUNSEL, WE HAVE BEEN THROUGH THAT.  WE

21  REALLY HAVE BEEN THROUGH THAT.  WE UNDERSTAND LINEAR AND WE

22  UNDERSTAND LOG.

23  BY MR. BIRCHFIELD:

24  Q.   IN THE NEXT PARAGRAPH HERE, DR. ARNETT, IT SAYS -- THE

25  FIRST COMPLETE PARAGRAPH ON PAGE 1097, IS THAT REFERRING TO THE

1    APPROVE ARTICLE THAT WAS AS IT WAS ORIGINALLY PUBLISHED?

2    A.    THAT'S CORRECT.

3    Q.    SHOULD HAVE READ, "IN A POST HOC ASSESSMENT, VISUAL

4    INSPECTION OF FIGURE 2 SUGGESTED THAT THE KAPLAN-MEIER CURVE

5    SEPARATED 18 MONTHS AFTER RANDOMIZATION; CORRECT?

6    A.    THAT'S CORRECT.

7    Q.    HOWEVER, THE RESULTS OF AN OVERALL PROPORTIONAL HAZARDS

8    ASSUMPTION FOR TIME FOR THE ENTIRE 36-MONTH OBSERVATION PERIOD

9    DID NOT THE REACH STATISTICAL SIGNIFICANCE:   CORRECT?

10   A.    CORRECT.

11   Q.    AND SO, IN REGARDS TO APPLYING THE RELATIVE RISK IN THE

12   APPROVE TRIAL, WHAT DOES THIS MEAN?

13   A.    BECAUSE THE RELATIVE RISK IS NOT CHANGING OVER TIME, IT

14   MEANS THAT THE 2.8 FOLD EXCESS RISK, OR 280 PERCENT RISK OF

15   HEART ATTACKS, IS CONSTANT OVER TIME; SO NO MATTER WHETHER YOU

16   WERE AT ONE MONTH, THREE MONTHS, SIX MONTHS, TWELVE MONTHS,

17   EIGHTEEN MONTHS, THE RELATIVE RISK IS THE SAME.

18   Q.    IN REGARDS TO THE APPROVE TRIALS THAT WAS PUBLISHED, YOU

19   LOOKED AT TABLE 3 WITH MR. BECK.  DO YOU RECALL THAT?

20   A.    YES.

21   Q.    AND IN TABLE 3, HE ASKED YOU ABOUT APPLYING, YOU KNOW, THE

22   PERIOD JUST FOR THE 0 TO 18 MONTHS?

23   A.    CORRECT.

24   Q.    IS THAT AN APPROPRIATE -- IS THAT AN APPROPRIATE THING TO

25   DO WITH THAT TEST?

1  A.   IT WAS AN INAPPROPRIATE THING TO DO BECAUSE THERE WAS,

2  FIRST OF ALL, NO SIGNIFICANT EVIDENCE, NO STATISTICALLY

3  SIGNIFICANT EVIDENCE THAT THE RISK WAS CHANGING BETWEEN VIOXX

4  AND PLACEBO OVER TIME; SO IT APPEARED TO ME AS AN

5  EPIDEMIOLOGIST TO BE DATA DREDGING, TRYING TO COME UP WITH AN

6  EXPLANATION THAT WOULD LOWER THE MAGNITUDE OF THIS IMPACT.

7  Q.   AND DR. ARNETT, MR. BECK ASKED YOU ABOUT THE CONSULTING

8  WORK THAT YOU DID FOR MERCK; RIGHT?

9  A.   CORRECT.

10 Q.   AND THE BRIEFING DOCUMENT.  YOU WENT OVER THE BRIEFING

11 DOCUMENT IN DETAIL; IS THAT RIGHT?

12 A.   RIGHT.  WE DID.

13 Q.   AND THE BRIEFING DOCUMENT, WHAT WAS THAT BEING SUBMITTED

14 TO THE FDA FOR?

15 A.   IT WAS BEING SUBMITTED BECAUSE OF THE WITHDRAWAL OF VIOXX

16 FROM THE MARKET WHEN THEY REALIZED THAT IT WAS CARDIOTOXIC AND

17 CAUSING HEART ATTACKS.

18        MR. BECK:  YOUR HONOR, I OBJECT AND I MOVE TO STRIKE

19 AND ASK THAT THE JURY BE INSTRUCTED TO DISREGARD THAT.

20        THE COURT:  YES.  THAT'S A FAIR MOTION.  DISREGARD

21 THAT, MEMBERS OF THE JURY.  THAT'S UP FOR OTHER WITNESSES TO

22 TESTIFY.  IT'S SPECULATION.  I'LL GRANT THE REQUEST.

23 BY MR. BIRCHFIELD:

24 Q.   DR. ARNETT, THE BRIEFING DOCUMENT, WAS IT SUBMITTED TO THE

25 FDA FOR THE PURPOSE OF AN ADVISORY COMMITTEE MEETING?

Page 1099

1   A.   THAT'S TRUE.

2   Q.   AND WAS THE ADVISORY COMMITTEE MEETING HELD IN FEBRUARY OF

3   2005?

4   A.   IT WAS.

5   Q.   AND AT THAT ADVISORY COMMITTEE MEETING, DO YOU RECALL THAT

6   THERE WAS A VOTE ABOUT BY THE MEMBERS?

7            MR. BECK:  YOUR HONOR --

8            MR. BIRCHFIELD:  YOUR HONOR, THIS IS EXACTLY --

9            MR. BECK:  YOUR HONOR, NUMBER 1, IT'S REPETITIVE OF

10   HIS EARLIER WITNESSES; AND, NUMBER 2, IT IS BEYOND THE SCOPE.

11           THE COURT:   YOU'VE TOUCHED ON SOME OF THAT.  I'LL

12   OVERRULE THE OBJECTION AND ALLOW IT.  IS THIS THE LAST

13   QUESTION?

14           MR. BIRCHFIELD:  YES, SIR.  WELL, IT MAY BE A

15   TWO-PART QUESTION, BUT IT'S THE LAST AREA, YOUR HONOR.

16   BY MR. BIRCHFIELD:

17   Q.   DID THE ADVISORY COMMITTEE ADDRESS THE ISSUE, DID THEY

18   VOTE ON THE QUESTION OF WHETHER OR NOT VIOXX SIGNIFICANTLY

19   INCREASES THE RISK OF CARDIOVASCULAR EVENTS?

20   A.   THEY DID.

21   Q.   AND HOW DID THEY VOTE?

22   A.   THEY WERE UNANIMOUS.

23   Q.   IN WHICH WAY?

24   A.   IN SAYING THAT VIOXX CAUSES HEART ATTACK RISKS.

25           MR. BIRCHFIELD:  THANK YOU.

Page 1100

1            THE COURT:  WE'LL STOP HERE OF.

2            MR. BECK:  YOUR HONOR, CAN I APPROACH FOR A SECOND?

3            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

4   THE BENCH.)

5            MR. BECK:  YOUR HONOR, I WOULD ASK FOR A FEW MINUTES

6   TO ASK HER ABOUT THE EXPRESSION OF CONCERN JUST TO ESTABLISH,

7   NUMBER 1, SHE DIDN'T RELY ON IT IN HER ANALYSIS IN THIS CASE;

8   NUMBER 2, THE DATA THAT SHE HAD INCLUDED ALL OF THE HEART

9   ATTACKS; AND NUMBER 3, THE DATA THAT THE FDA HAD INCLUDED ALL

10  THE HEART ATTACKS.

11           MR. BIRCHFIELD:  YOUR HONOR, FIRST OF ALL, IT'S NOT

12  APPROPRIATE FOR HIM TO GO INTO ANY OF THAT.  THE REASON THAT I

13  WAS ALLOWED TO GO INTO THE EXPRESSION OF CONCERN IS BECAUSE OF

14  HIS PUTTING IT IN THE CONTEXT OF HER EVALUATION.

15           THE COURT:  I UNDERSTAND.  I'LL DENY THE REQUEST.

16  WE'LL STOP HERE AND COME BACK AT, LET'S SEE, AN HOUR AND

17  15 MINUTES, 1:15.

18           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

19  OPEN COURT.)

20           THE COURT:  THANK YOU VERY MUCH.  YOU'RE EXCUSED,

21  DOCTOR.  AND WE'LL COME BACK AT 1:15.  COURT WILL STAND IN

22  RECESS UNTIL THEN.

23           THE DEPUTY CLERK:  EVERYONE RISE.

24                    (LUNCHEON RECESS)

25                      * * * * *

Page 1101

1                    AFTERNOON SESSION

2                    (DECEMBER 1, 2006)

3          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4     TRANSCRIBED BY TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT

5     REPORTER.)

6              THE DEPUTY CLERK:  EVERYONE RISE.

7              THE COURT:  BE SEATED, PLEASE.  CALL YOUR NEXT

8     WITNESS.

9              MS. O'DELL:  YOUR HONOR, PLAINTIFFS CALL DR. CORNELIA

10    PECHMANN.

11         (WHEREUPON, CORNELIA PECHMANN, HAVING BEEN DULY

12    SWORN, TESTIFIED AS FOLLOWS.)

13             THE DEPUTY CLERK:  PLEASE STATE YOUR FULL NAME AND

14    CORRECT SPELLING FOR THE RECORD.

15             THE WITNESS:  CORNELIA PECHMANN, P-E-C-H-M-A-N-N.

16                    VOIR DIRE

17    BY MS. O'DELL:

18    Q.   GOOD AFTERNOON, DR. PECHMANN.

19    A.   GOOD AFTERNOON.

20    Q.   WOULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY.

21    A.   HI.  MY NAME IS CONNIE PECHMANN.

22    Q.   ARE YOU A PROFESSOR?

23    A.   YES, I AM.

24    Q.   DO YOU HAVE YOUR RÉSUMÉ WITH YOU TODAY?

25    A.   YES, I DO.

1   Q.   IS IT MARKED AS PLAINTIFF'S EXHIBIT 5.0022?

2   A.   YES.  I HAVE IT RIGHT HERE.

3   Q.   IS IT UPDATED?  IS IT REASONABLY UP-TO-DATE?

4   A.   YES.

5   Q.   IS IT ACCURATE?

6   A.   YES.

7            MS. O'DELL:  AT THIS TIME, YOUR HONOR, WE OFFER

8   PLAINTIFF'S EXHIBIT 5.0022.

9            MR. BECK:  NO OBJECTION.

10  BY MS. O'DELL:

11  Q.   DR. PECHMANN, TELL US A LITTLE BIT ABOUT YOUR ROLE AS A

12  PROFESSOR.

13  A.   I TEACH AT THE UNIVERSITY OF CALIFORNIA, IRVINE.  I TEACH

14  AT THE BUSINESS SCHOOL, SO I TEACH ABOUT FOUR CLASSES A YEAR.

15  I ALSO RUN SEVERAL COMMITTEES THAT HELP TO DEVELOP THE

16  CURRICULUM, KEEP IT UP-TO-DATE.

17           I ALSO DO RESEARCH.  WHAT I TYPICALLY DO WITH

18  RESEARCH IS THE GOVERNMENT WILL PUT OUT PROPOSALS, REQUESTS FOR

19  PROPOSALS, AND A LOT OF THEM WILL HAVE TO DO WITH, LIKE,

20  ADOLESCENTS AND SMOKING OR SOMETHING.  I HAVE EXPERTISE IN

21  INTEGRATED MARKETING COMMUNICATIONS, SO I WILL SUBMIT A

22  PROPOSAL SAYING LET'S LOOK AT HOW INTEGRATED MARKETING

23  COMMUNICATIONS COULD BE USED TO PREVENT KIDS FROM SMOKING.  SO

24  IT USUALLY HAS TO DO WITH A PUBLIC HEALTH ISSUE.  THEN, IF THEY

25  LIKE THE PROPOSAL, THEY FUND IT.  FOR TWO OR THREE YEARS, I

1  WORK ON THAT PROJECT, SUBMIT A REPORT, WRITE IT FOR

2  PUBLICATION, AND THEN GO AGAIN WITH ANOTHER PROPOSAL.

3  Q.   WELL, LET'S TAKE A LITTLE STEP BACK.  TELL US WHAT YOU

4  TEACH.

5  A.   I TEACH PRINCIPLES OF MARKETING, CONSUMER BEHAVIOR,

6  MICROMARKETING, DATABASE MARKETING.  VARIOUS COURSES IN

7  MARKETING.

8  Q.   WHAT TYPE OF STUDENTS DO YOU TEACH?

9  A.   I TEACH UNDERGRADUATES, M.B.A.'S, PH.D'S, AND EXECUTIVE

10 M.B.A.'S WHO COME AT NIGHT AND WEEKENDS.

11 Q.   WHERE DID YOU RECEIVE YOUR EDUCATION?

12 A.   I WENT TO VANDERBILT UNIVERSITY RIGHT HERE IN -- UP THE

13 ROAD IN NASHVILLE, TENNESSEE.  I GOT AN M.B.A. THERE AND A

14 PH.D., AND A MASTER'S IN PSYCHOLOGY.

15 Q.   WHAT IS YOUR PRIMARY AREA OF RESEARCH?

16 A.   INTEGRATED MARKETING COMMUNICATIONS.

17 Q.   HAVE YOU PUBLISHED IN THAT FIELD?

18 A.   YES, I HAVE.

19 Q.   HOW MANY ARTICLES?

20 A.   I COUNTED 57.

21 Q.   WHAT DOES IT MEAN TO PUBLISH IN THE FIELD OF MARKETING?

22 A.   WELL, YOU WRITE UP ABOUT A 50-PAGE PAPER DESCRIBING YOUR

23 RESEARCH METHODS AND FINDINGS AND THE IMPLICATIONS, YOU SEND IT

24 TO A JOURNAL.  IT'S PEER-REVIEWED, MEANING THAT PROFESSORS AT

25 OTHER TOP UNIVERSITIES REVIEW IT WITHOUT KNOWING YOUR NAME OR

1   YOU KNOWING THEIR NAME -- IT'S A BLIND REVIEW.  THEN THEY MAKE

2   COMMENTS.  YOU REVISE IT.  IF IT'S GOOD ENOUGH, ULTIMATELY, IT

3   GETS PUBLISHED IN ONE OF THE TOP MARKETING JOURNALS.

4   Q.   WE HAVE HEARD QUITE A BIT ABOUT SCIENTIFIC JOURNALS, BUT

5   ARE THERE ALSO MARKETING JOURNALS?

6   A.   OH, YES, THEY ARE.

7   Q.   TELL US ABOUT THOSE AND IF YOU SERVE ON ANY EDITORIAL

8   BOARDS.

9   A.   YES.  THERE'S JOURNAL OF MARKETING, JOURNAL OF MARKETING

10  RESEARCH, JOURNAL OF CONSUMER RESEARCH, JOURNAL OF CONSUMER

11  PSYCHOLOGY.  ALL OF THESE ARE RUN BY MARKETERS OR MARKETING

12  GROUPS.

13          WHAT WAS THE OTHER QUESTION?  OH, PEER REVIEW.  YEAH,

14  I'VE BEEN ON THE REVIEW BOARD OF THE TOP THREE MARKETING

15  JOURNALS, AND THAT MEANS THAT I HAVE MORE SAY OVER WHAT GETS

16  PUBLISHED.

17  Q.   HAVE YOU PEER-REVIEWED ARTICLES FOR THE JOURNAL OF THE

18  AMERICAN MEDICAL ASSOCIATION?

19  A.   YES, I HAVE.

20  Q.   HAVE YOU RECEIVED RESEARCH AND TEACHING AWARDS?

21  A.   YES, I HAVE.

22  Q.   TELL US ABOUT THOSE.

23  A.   WELL, I WAS NAMED IN THE TOP 50 OF MARKETING SCHOLARS FOR

24  MY RESEARCH IN THE CITATIONS.  SO, IN OTHER WORDS, HOW MANY

25  PEOPLE CITE MY WORK.  I WAS ALSO NAMED TO WHO'S WHO IN

1    ECONOMICS BECAUSE MY WORK INFLUENCES ECONOMICS.  ONE OF MY

2    PAPERS WON AN AWARD AND IS LISTED AS AN ESSENTIAL READING IN

3    MARKETING, AND I'VE WON SEVERAL TEACHING AWARDS TOO.

4    Q.   EXPLAIN TO US WHAT AN INTEGRATED MARKETING COMMUNICATIONS

5    PLAN IS.

6    A.   OKAY.  WELL, I WOULD SAY, FIRST OF ALL, THAT IT'S A VERY

7    SOPHISTICATED WAY TO RUN A COMMUNICATIONS CAMPAIGN THAT ONLY

8    BIG COMPANIES CAN REALLY DO AT THIS POINT.  ALTHOUGH, SMALLER

9    COMPANIES ARE TRYING TO LEARN HOW TO DO IT.

10        I THINK THE BEST WAY TO THINK ABOUT IT IS THAT IT'S

11   LIKE AN ORCHESTRA WITH A CONDUCTOR.  SO SOMEONE LIKE DAVID

12   ANSTICE, WHO YOU SAW YESTERDAY, WOULD BE THE CONDUCTOR, AND HE

13   HAS TO TELL THEM WHAT THE MARKETING MESSAGES ARE, AND THEN THE

14   ORCHESTRA HAS TO PLAY THAT MESSAGE OR GET THAT MESSAGE OUT, AND

15   SO THEY -- THE ORCHESTRA WOULD INCLUDE THE SALES REPS, THE AD

16   AGENCY, THE PUBLIC RELATIONS PEOPLE, THE DOCTORS WHO WRITE THE

17   DEAR DOCTOR LETTERS.  WHEN THE DOCTORS WANT INFORMATION, THERE

18   ARE DOCTORS AT MERCK WHO WRITE THESE LETTERS.

19        SO THIS ORCHESTRA IS ALL PLAYING BASICALLY THE SAME

20   MUSIC, WHICH IS THE MARKETING MESSAGE, JUST SLIGHTLY DIFFERENT

21   WAYS.  WHAT MAKES IT REALLY COMPLICATED IS THAT THIS ORCHESTRA

22   IS NOT GEOGRAPHICALLY IN ONE PLACE AND THEY ARE AREN'T ALL PART

23   OF MERCK.  SOME OF THEM ARE, YOU KNOW, SUBCONTRACTORS.

24   Q.   WELL, LET ME ASK YOU THIS.  JUST EXPLAIN FOR US, OUTSIDE

25   THE CONTEXT OF JUST, YOU KNOW, PHARMACEUTICAL COMPANY, WHAT ARE

1   TYPICAL TOOLS THAT ARE USED IN AN INTEGRATED MARKETING PLAN?

2   A.   SURE.   THE TYPICAL TOOLS ARE FOUR:   SO ADVERTISING; DIRECT

3   MAIL; SALES PROMOTION, WHICH IS SOMETHING LIKE A SALES

4   BROCHURE; AND -- WHAT'S THE FOURTH ONE -- OH, PUBLIC RELATIONS,

5   SO PRESS RELEASES.

6   Q.   HAVE YOU WORKED EXTENSIVELY IN LARGE INTEGRATED MARKETING

7   CAMPAIGNS?

8   A.   YES, I HAVE.

9   Q.   TELL US A LITTLE BIT ABOUT THOSE.

10  A.   WELL, I WORKED FOR SIX YEARS AS A CONSULTANT TO THE

11  ANTIDRUG AD CAMPAIGN THAT WAS RUN BY THE FEDERAL GOVERNMENT.

12  THERE WERE SIX ACADEMICS THAT WERE CHOSEN AS THE BEHAVIORAL

13  CHANGE EXPERT PANEL, AND WE OVERSAW THE CAMPAIGN THAT WAS RUN

14  BY THE OFFICE OF NATIONAL DRUG CONTROL POLICY, AND IT IS -- WAS

15  AND IS THE LARGEST GOVERNMENT INTEGRATED MARKETING CAMPAIGN

16  EVER.

17  Q.   WHAT WAS THE PURPOSE OF THAT CAMPAIGN?

18  A.   TO TRY TO DISSUADE ADOLESCENTS FROM SMOKING MARIJUANA.

19  Q.   JUST TO MAKE IT CLEAR, WHAT WERE YOUR RESPONSIBILITIES IN

20  RELATION TO THAT CAMPAIGN?

21  A.   WELL, I HELPED WITH THE RESEARCH.   WHAT I DIDN'T QUITE

22  MAKE CLEAR BEFORE IS THAT INTEGRATED MARKETING, IN ORDER TO

23  KNOW WHAT MESSAGE TO DELIVER, WHAT EVERYONE SHOULD BE

24  DELIVERING, YOU HAVE TO DO EXTENSIVE RESEARCH TO FIGURE OUT,

25  FIRST OF ALL, WHAT ARE PEOPLE THINKING?   LIKE WITH MARIJUANA:

1    WHY ARE KIDS USING MARIJUANA?  THEN YOU DEVELOP A MESSAGE AND

2    YOU PUT THE MESSAGES IN THESE DIFFERENT TOOLS, AND THEN YOU

3    TEST THE TOOLS TO MAKE SURE THEY'RE WORKING.

4           THEN, AFTER YOU RUN THE CAMPAIGN, YOU CONSTANTLY

5    MONITOR EVERY MONTH WHAT'S HAPPENING.  ARE PEOPLE SEEING THE

6    MESSAGES?  DO THEY BELIEVE THE MESSAGES?  HOW ARE THEY WORKING?

7    THEN YOU CAN FINE-TUNE THE CAMPAIGN.  SO I WAS RESPONSIBLE FOR

8    OVERSEEING ALL OF THAT RESEARCH AND MAKING SURE OUR CONDUCTOR

9    HAD THAT RESEARCH AND UNDERSTOOD THE RESEARCH AND UNDERSTOOD

10   HOW TO ADJUST THE CAMPAIGN.

11          I ALSO WAS RESPONSIBLE FOR WORKING WITH NIDA, THE

12   NATIONAL INSTITUTE OF DRUG ABUSE, SORT OF LIKE IN -- THEY WERE

13   KIND OF IN A ROLE LIKE AN FDA.  THEY OVERSAW OUR CAMPAIGN TO

14   MAKE SURE IT WAS SCIENTIFICALLY ACCURATE BECAUSE THEY DIDN'T

15   WANT US TO SAY ANYTHING THAT WASN'T TRUE ABOUT MARIJUANA.  SO,

16   BEFORE WE CREATED ADS, WE SENT THEM TO NIDA, AND THEY WOULD

17   SEND BACK COMMENTS.  AND BASED ON THE COMMENTS ON THE SCIENCE,

18   SOME OF THE ADS WOULD NOT BE CREATED BECAUSE THEY EXAGGERATED

19   THE RISKS OF MARIJUANA USE, AND WE DIDN'T WANT TO DO THAT.

20   Q.   WHEN YOU SAY -- YOU MENTION MESSAGES SEVERAL TIMES.  IS

21   MESSAGES IN MARKETING A TERM OF ART?

22   A.   YES, IT IS.

23   Q.   DEFINE THAT FOR US.

24   A.   MESSAGE IS A SHORT STATEMENT ABOUT WHY SOMEONE SHOULD --

25   TYPICALLY, WHY SOMEONE SHOULD BUY YOUR PRODUCT AND -- SO AN

1   EXAMPLE WOULD BE NIKE, JUST DO IT; OR LISTERINE KILLS GERMS,

2   THOSE SIMPLE STATEMENTS.

3            THE REASON THEY ARE SIMPLE IS MANY PEOPLE HAVE TO

4   CONVEY THE MESSAGES, LIKE YOUR SALES REPS AND SO ON, AND

5   CONSUMERS ARE VERY DISTRACTED.  THEY DON'T REALLY CARE ABOUT

6   MARKETING MESSAGES.  THEY SEE THOUSANDS OF THEM EVERY DAY.  SO

7   YOU HAVE TO DELIVER A VERY SIMPLE MESSAGE OVER A LONG PERIOD OF

8   TIME, USING ALL THESE DIFFERENT MEDIA, TO GET THE MESSAGE

9   ACROSS AND TO KEEP IT IN PEOPLE'S MINDS SO THAT THE BRAND

10  STANDS FOR SOMETHING AND PEOPLE WANT TO BUY IT.  NIKE, JUST DO

11  IT.  "I WANT NIKE."  SO THAT'S THE APPROACH.

12  Q.   AS A PART OF YOUR WORK WITH THE ANTIDRUG CAMPAIGN, HAVE

13  YOU WORKED WITH OUTSIDE MARKETING FIRMS?

14  A.   YES, I DID.

15  Q.   TELL US A LITTLE BIT ABOUT THAT.

16  A.   WELL, I WORKED WITH TWO FIRMS IN PARTICULAR:  OGILVY &

17  MATHER ADVERTISING IN NEW YORK, WHICH JUST HAPPENED TO BE

18  SISTER AGENCY TO OGILVY & MATHER PR THAT MERCK USED FOR THE

19  VIOXX CAMPAIGN; AND I ALSO USED A MAJOR MARKETING RESEARCH FIRM

20  CALLED MILLWARD BROWN FOR MUCH OF MY TRACKING, AND THAT'S THE

21  SAME -- AS IT TURNS OUT, THE SAME RESEARCH FIRM THAT MERCK USED

22  FOR VIOXX, BECAUSE IT'S A VERY GOOD FIRM.

23            BUT I NEVER WORKED ON THE VIOXX CAMPAIGN.  I NEVER

24  DISCUSSED THE VIOXX CAMPAIGN WITH ANYONE, WITH ANY OF THE

25  VENDORS.  IT'S JUST, AT THE SAME TIME I WAS DOING MY CAMPAIGN

1   FOR ANTIDRUG, THE VIOXX CAMPAIGN WAS GOING ON, AND WE HAPPENED

2   TO BE USING BASICALLY SIMILAR COMPANIES OR, IN ONE CASE, THE

3   SAME COMPANY.

4   Q.   YOU MENTIONED THE ANTIDRUG CAMPAIGN.  HAVE YOU WORKED ON

5   OTHER LARGE INTEGRATED MARKETING CAMPAIGNS?

6   A.   YES.  I ALSO WORKED ON THE 2000 U.S. CENSUS CAMPAIGN.

7   AGAIN, I WAS APPOINTED TO A GOVERNMENT PANEL BY THE AMERICAN

8   MARKETING ASSOCIATION, AND THAT'S THE SECOND LARGEST SOCIAL

9   MARKETING OR INTEGRATED MARKETING CAMPAIGN IN THE GOVERNMENT'S

10  HISTORY.

11  Q.   ARE YOU AN EXPERT IN INTEGRATED MARKETING?

12  A.   YES, I THINK SO.  NO, I'M POSITIVE.

13  Q.   YOU TEACH YOUR STUDENTS ABOUT INTEGRATED MARKETING

14  CAMPAIGNS?

15  A.   YES.

16  Q.   ALL RIGHT.  DO YOU CONSULT WITH ADVERTISING AND GOVERNMENT

17  AGENCIES ABOUT INTEGRATED MARKETING CAMPAIGNS?

18  A.   YES.

19  Q.   ARE YOU RECOGNIZED BY OTHERS IN MARKETING AS A LEADING

20  SCHOLAR?

21  A.   YES.

22  Q.   LET ME ASK YOU THIS:  ARE THE PRINCIPLES FOR INTEGRATED

23  MARKETING CAMPAIGNS THE SAME REGARDLESS OF THE PRODUCT?

24  A.   YES.

25  Q.   HAVE YOU BEEN ASKED TO CONSULT WITH PHARMACEUTICAL

1   COMPANIES ABOUT INTEGRATED MARKETING CAMPAIGNS?

2   A.   YES.

3   Q.   TELL US ABOUT THAT.

4   A.   WELL, A FEW MONTHS AGO, SOMEONE, ACTUALLY A DOCTOR AT THE

5   UNIVERSITY OF CHICAGO, CALLED AND ASKED IF I WOULD HELP WITH

6   THE MERCK INTEGRATED MARKETING CAMPAIGN FOR THEIR NEW CERVICAL

7   CANCER DRUG.  AND I COULDN'T DO IT BECAUSE I WAS BUSY AND I HAD

8   OTHER COMMITMENTS.

9   Q.   HAVE YOU BEEN RETAINED AS AN EXPERT IN THIS CASE --

10  A.   YES.

11  Q.   -- AS WELL AS OTHER CASES?

12  A.   YES.

13  Q.   WHEN WERE YOU RETAINED?

14  A.   DECEMBER OF LAST YEAR.

15  Q.   CAN YOU GIVE US AN ESTIMATE OF HOW MANY HOURS YOU'VE SPENT

16  STUDYING THE MERCK'S MARKETING CAMPAIGN FOR VIOXX?

17  A.   I ESTIMATE AT LEAST 560 HOURS, WHICH IS ABOUT 70 DAYS IN

18  8-HOUR DAYS.

19  Q.   HOW MUCH, APPROXIMATELY, HAVE YOU BEEN PAID?

20  A.   ABOUT $160,000.

21  Q.   WHAT DID YOU DO TO ARRIVE AT YOUR OPINIONS IN THIS CASE?

22  A.   I WAS GIVEN SEVERAL BOXES OF DOCUMENTS THAT RELATED TO THE

23  INTEGRATED MARKETING CAMPAIGN.  SO THE STRATEGIES AND THE

24  RESEARCH.  THEN I FOUND THAT THERE WERE GAPS, SO I DIRECTED A

25  LAWYER TO SEARCH, AND WE FOUND MANY, MANY MORE DOCUMENTS.

1   Q.   LET ME ASK THIS QUESTION:   WHOSE DOCUMENTS WERE THEY?

2   WERE THEY MERCK DOCUMENTS OR -- JUST TELL US A LITTLE BIT ABOUT

3   WHAT KIND OF DOCUMENTS --

4   A.   THEY WERE ALL MERCK DOCUMENTS, BUT SOME OF THEM HAD BEEN

5   PREPARED FOR MERCK BY THE VENDORS -- SO THE MARKETING RESEARCH

6   FIRM OR THE AD AGENCY OR THE PUBLIC RELATIONS FIRM -- AND THEY

7   HAD SUBMITTED THEM TO MERCK.   BUT THEY WERE ALL MERCK

8   DOCUMENTS.

9   Q.   WAS THE RESEARCH YOU'VE DONE TO PREPARE YOUR OPINIONS IN

10   THIS CASE STANDARD IN YOUR FIELD?

11   A.   YES.

12   Q.   WAS IT RELIABLE?

13   A.   YES.

14   Q.   LET ME ASK YOU THIS:   WILL YOU BASE YOUR OPINIONS TODAY ON

15   THE DOCUMENTS THAT YOU REVIEWED THAT YOU JUST DESCRIBED A FEW

16   MINUTES AGO?

17   A.   YES.   I'M BASING MY OPINIONS ON THESE MERCK DOCUMENTS.

18   Q.   AS WELL AS THE DOCUMENTS OF THE OTHER CONSULTANT FIRMS; IS

19   THAT RIGHT?

20   A.   YES.

21            MS. O'DELL:   AT THIS TIME, YOUR HONOR, WE TENDER

22   DR. PECHMANN AS AN EXPERT IN THE FIELD OF MARKETING, AND

23   SPECIFICALLY, INTEGRATED MARKETING CAMPAIGNS.

24            MR. BECK:   WE AGREE THAT SHE IS AN EXPERT IN THAT

25   FIELD, YOUR HONOR.

1          THE COURT:  THE COURT WILL ACCEPT HER IN THAT FIELD.

2                    DIRECT EXAMINATION

3    BY MS. O'DELL:

4    Q.   DOCTOR, BASED UPON YOUR REVIEW OF MERCK DOCUMENTS AND

5    OTHER MATERIALS THAT YOU HAVE REVIEWED AND TALKED TO US ABOUT

6    AND YOUR TRAINING AND EXPERIENCE, DO YOU HAVE AN OPINION ABOUT

7    WHETHER THE INTEGRATED MARKETING CAMPAIGN THAT MERCK HAD FOR

8    VIOXX DEALT WITH THE ISSUE OF CV RISKS?

9    A.   YES, IT DID.

10   Q.   WHEN WE SAY "CV RISKS," WE MEAN CARDIOVASCULAR RISKS.

11   A.   YES, WE DO.

12   Q.   WHAT'S YOUR OPINION?

13   A.   THE CAMPAIGN DEALT EXPLICITLY WITH CV RISKS.

14   Q.   SECONDLY, DOCTOR, BASED ON YOUR REVIEW OF THE DOCUMENTS

15   AND YOUR EXPERIENCE AND TRAINING, DO YOU HAVE AN OPINION ABOUT

16   WHETHER THE INTEGRATED MARKETING CAMPAIGN CLEARLY COMMUNICATED

17   TO DOCTORS AND PATIENTS THAT VIOXX INCREASED THE RISK OF HEART

18   ATTACK?

19   A.   YES, I HAVE AN OPINION.

20   Q.   WHAT'S YOUR OPINION?

21   A.    IT DID NOT DO THAT.  THE POINT OF THE CAMPAIGN WAS TO

22   PERSUADE DOCTORS AND THE GENERAL PUBLIC, PATIENTS, THAT IT WAS

23   A SAFE PRODUCT; IT DIDN'T POSE A CARDIOVASCULAR RISK; IT DIDN'T

24   CAUSE HEART ATTACKS.

25   Q.   DOCTOR, DO YOU HAVE IN YOUR BINDER TODAY PLAINTIFF'S

1    EXHIBIT 1.0009?

2    A.    YES.

3    Q.    WOULD YOU IDENTIFY THAT DOCUMENT FOR US, PLEASE.

4    A.    IT'S THE 2001 PROFIT PLAN FOR VIOXX PREPARED BY MERCK 1ST

5    OF SEPTEMBER 2000.  SO FALL OF 2000, AND IT WOULD COVER THE

6    WHOLE YEAR 2001.

7    Q.    GREAT.  HAVE YOU REVIEWED THIS DOCUMENT?

8    A.    YES, I HAVE.

9    Q.    IS IT ONE THAT'S TYPICALLY RELIED UPON BY A PERSON IN YOUR

10   FIELD?

11   A.    YES.

12   Q.    DID YOU RELY ON IT?

13   A.    YES.

14         MS. O'DELL:  YOUR HONOR, AT THIS TIME I OFFER

15   PLAINTIFF'S EXHIBIT 1.0009.

16         MR. BECK:  NO OBJECTION.

17         THE COURT:  LET IT BE ADMITTED.

18   BY MS. O'DELL:

19   Q.    DR. PECHMANN, TELL US THE DATE ON THIS DOCUMENT AGAIN.

20   A.    FIRST OF SEPTEMBER OF 2000.

21   Q.    DESCRIBE FOR US WHAT THIS DOCUMENT IS.

22   A.    IT'S A MARKETING PLAN THAT'S CREATED FOR 2001 THAT ALSO

23   INCLUDES REVENUE PROJECTIONS AND PROFIT PROJECTIONS.  IT'S A

24   VERY QUANTITATIVE PLAN.

25   Q.    DO MARKETING PEOPLE OR PROFESSIONALS TYPICALLY PREPARE A

Page 1114

1   DOCUMENT LIKE THIS?

2   A.   YES, THEY DO.

3   Q.   LET ME ASK YOU, DR. PECHMANN, TO TURN TO PAGE 13 OF THIS

4   DOCUMENT.

5   A.   OKAY.

6   Q.   YOU KNOW, PLEASE -- UNDER "OBJECTIVES," DO YOU SEE THERE

7   AT THE TOP OF THE PAGE?

8   A.   YES.

9   Q.   IF YOU WOULD FOR US, PLEASE, READ THE PARAGRAPH UNDER THE

10  TITLE "OBJECTIVES" AND EXPLAIN TO US WHAT OBJECTIVES ARE SET

11  OUT IN THIS DOCUMENT?

12  A.   OKAY.  SO THESE ARE THE MARKETING OBJECTIVES FOR THE

13  INTEGRATED MARKETING CAMPAIGN FOR 2001.  "THE 2001 OBJECTIVES

14  FOR VIOXX ARE DEFINED INTO TWO MAJOR CATEGORIES:  MARKET

15  PERFORMANCE AND STRATEGIC OBJECTIVES.  THE MARKET PERFORMANCE

16  OBJECTIVES ARE FOCUSED ON SALES AND INCOME" -- WHICH IS

17  REVENUE, PROFIT -- "WHILE THE STRATEGY [SIC] OBJECTIVES ADDRESS

18  THE CERTIFIED KEY ISSUES."

19  Q.   TELL US, IF YOU WOULDN'T MIND, SPECIFICALLY, WHAT ARE THE

20  SALES OBJECTIVES AND START WITH THE FIRST ONE, PLEASE.

21  A.   UNDER "MARKET PERFORMANCE OBJECTIVES," THE FIRST BULLET

22  POINT IS "ACHIEVE SALES TARGET OF 2.5 BILLION."

23  Q.   THAT'S DOLLARS; RIGHT?

24  A.   YES.

25  Q.   BELOW, YOU SEE IT SAYS "STRATEGIC OBJECTIVES"?

Page 1115

1   A.   YES.

2   Q.   PLEASE DESCRIBE WHAT A STRATEGIC OBJECTIVE WOULD BE IN

3   THIS CONTEXT.

4   A.   THOSE RELATE TO THE MESSAGES OF THE CAMPAIGNS.  SO WHAT'S

5   THE OVERALL STRATEGY OF HOW YOU'RE GOING TO COMMUNICATE TO

6   CONSUMERS AND PATIENTS --

7   Q.   IS THERE A STRATEGIC -- EXCUSE ME.  MA'AM, GO AHEAD.  I'M

8   SORRY.

9   A.   OH.  PHYSICIANS IS A MAJOR AUDIENCE.

10  Q.   RIGHT.  IS THERE A STRATEGIC OBJECTIVE THAT ADDRESSES

11  CARDIOVASCULAR RISKS?

12  A.   YES, THERE IS.

13  Q.   TELL US WHAT THAT IS.

14  A.   IT'S THE THIRD BULLET POINT.  "NEUTRALIZE SAFETY CONCERNS

15  AROUND HYPERTENSION, EDEMA, AND MI."  MI IS MYOCARDIAL

16  INFARCTION OR HEART ATTACK.

17  Q.   BASED ON YOUR REVIEW OF THIS DOCUMENT, WHAT PROBLEM HAS

18  BEEN DIAGNOSED BY THE MERCK MARKETING PEOPLE?

19  A.   WELL, I SAW THE RESEARCH.  THEY DID EXTENSIVE RESEARCH

20  WITH PHYSICIANS AND FOUND THAT SOME OF THEM WERE GETTING

21  CONCERNED ABOUT VIOXX POSSIBLY POSING A HEART ATTACK RISK, AND

22  THAT WAS AFFECTING THEIR PRESCRIBING.  THEY WEREN'T PRESCRIBING

23  IT.  AND, OF COURSE, THIS WAS BAD, SO THE OBJECTIVE HERE WAS TO

24  NEUTRALIZE THESE SAFETY CONCERNS.

25  Q.   IN THE CONTEXT OF THIS PLAN, I SEE THE WORD NEUTRALIZE.

Page 1116

1   WOULD YOU PLEASE DEFINE THAT FOR THE JURY, PLEASE.

2   A.   YES.   IN THE CONTEXT OF THIS PLAN, NEUTRALIZE MEANS GET

3   RID OF, YOU KNOW, DISPEL, PERSUADE, DOCTORS THAT VIOXX DOES NOT

4   CAUSE HEART ATTACKS.   IT DOESN'T MEAN BRING THEM BACK TO A

5   NEUTRAL POSITION WHERE MAYBE IT DOES; MAYBE IT DOESN'T.   SORT

6   OF NEUTRAL POSITION.   THIS WAS TO BASICALLY DISPEL SAFETY

7   CONCERNS.

8   Q.   HOW DOES THIS RELATE TO THE TERM OBSTACLES?   HAVE YOU

9   HEARD THAT BEFORE?

10   A.   YES.   AN MI CONCERN OR THE CARDIOVASCULAR CONCERN WAS AN

11   OBSTACLE.   AN OBSTACLE IS SOMETHING THAT WOULD PREVENT THE

12   DOCTOR OR HEALTHCARE PROVIDER FROM PRESCRIBING VIOXX.   SO THIS

13   WAS DESIGNED TO DISPEL THAT OBSTACLE.

14   Q.   HOW DO COMPANIES TYPICALLY ADDRESS OBSTACLES THAT THEY MAY

15   BE FACING WITH A MARKETING CAMPAIGN?

16   A.   WHENEVER I'VE SEEN A PLAN, WHAT WE DO WITH OBSTACLES IS WE

17   REFORMULATE THE PRODUCTS.   WE FIX THE PROBLEM.

18   Q.   IS THAT WHAT MERCK DID HERE?

19   A.   NO.

20   Q.   OKAY.   LET ME ASK YOU, DR. PECHMANN, IF YOU WOULD, PLEASE,

21   TO TURN TO PAGE 38 OF THIS DOCUMENT.

22   A.   OKAY.

23   Q.   IF YOU WOULD, PLEASE, IF YOU WOULD JUST TAKE THIS TABLE

24   FOR US AND GIVE US AN OVERVIEW OF WHAT'S BEING CONVEYED THROUGH

25   THIS TABLE.

1   A.   SO THIS IS THE FINANCIAL ANALYSIS OF, LIKE, A FORECAST FOR

2   2001 ABOUT REVENUE.   SO, ON THE LEFT, THEY LIST SOME OF THE

3   ASSUMPTIONS THAT THEY USED FOR THEIR BASE FORECASTS.   AND THEN

4   THEY TALK ABOUT IF SOME OF THOSE ASSUMPTIONS DIDN'T HOLD TRUE,

5   IF SOMETHING HAPPENED BAD OR GOOD.

6   Q.   RIGHT.   SO, IN THIS 2001 PROFIT PLAN, THE MARKETING TEAM

7   CALCULATED THE DOLLARS-AND-CENTS DIFFERENCE IT WOULD MAKE BASED

8   ON HOW THEY ADDRESSED THESE OBSTACLES OR HOW THEY WERE ABLE TO

9   NEUTRALIZE THE OBSTACLE?

10          MR. BECK:  (STANDING)

11          THE COURT:  I SUSTAIN THE OBJECTION TO LEADING.

12   REPHRASE THE QUESTION.

13          MS. O'DELL:  YES, YOUR HONOR.

14   BY MS. O'DELL:

15   Q.   DID THEY CALCULATE IN DOLLARS OR CENTS THE POTENTIAL GAINS

16   OR LOSSES IF THEIR OBJECTIVES FOR THE PLAN WERE MET?

17          MR. BECK:  THAT'S --

18          THE COURT:  WHAT ARE THEY DOING?

19          THE WITNESS:  YES, THAT IS WHAT THEY DO.  SO THEIR

20   PLAN HAD CERTAIN OBJECTIVES, AND THEY ARE ASSUMING THAT THEY

21   ARE GOING TO ACHIEVE THOSE OBJECTIVES.  IF THEY DON'T ACHIEVE

22   THE OBJECTIVE, THIS WOULD BE HOW MUCH MONEY THEY WOULD LOSE.

23   BY MS. O'DELL:

24   Q.   SO TELL US WHAT AN UPSIDE IS.

25   A.   SOMETHING GOOD THAT HAPPENED IN THE MARKETPLACE THAT WOULD

1   HELP SALES.

2   Q.   JUST EXPLAIN HOW THE UPSIDES, THE POTENTIAL UPSIDES, ARE

3   DISPLAYED IN THIS TABLE FOR US.

4   A.   SO THE FIRST UPSIDE IS "MARKET GROWTH CONTINUES TO ACHIEVE

5   DOUBLE-DIGIT GROWTH."  SO THAT'S THE ANALGESIC AND

6   ANTI-INFLAMMATORY MARKET.  THAT'S THE MARKET THEY WERE IN WITH

7   VIOXX.  THEY ESTIMATED THE PROBABILITY THAT IT KEPT AT DOUBLE

8   DIGIT GROWTH WITH MEDIUM.  IF THEY DID HAPPEN, THERE WOULD BE

9   AN INCREASE IN TOTAL PRESCRIPTIONS -- TRX IS TOTAL

10  PRESCRIPTIONS -- AND THAT WOULD IMPROVE REVENUES BY

11  $150 MILLION.

12  Q.   WHAT IS MEANT BY A DOWNSIDE?

13  A.   SOMETHING NEGATIVE THAT WOULD HAPPEN THAT WOULD REDUCE

14  REVENUE.

15  Q.   WHAT DO YOU MEAN BY REVENUE?

16  A.   SALES.  DOLLAR SALES.

17  Q.   TELL US, IN THE LOWER LEFT-HAND BOX THERE, WHAT'S THE

18  DOWNSIDE THAT'S LISTED?

19  A.   THEY CONSIDERED IT A POSSIBILITY THEY WERE UNABLE TO

20  NEUTRALIZE THE SAFETY ISSUES ABOUT CARDIOVASCULAR SAFETY AND

21  HEART ATTACKS.

22  Q.   WHAT WAS THE POTENTIAL DOWNSIDE IF THEY WERE UNABLE TO DO

23  THAT?

24  A.   THEY ESTIMATED THE PROBABILITY TO BE LOW THAT THEY WOULD

25  FAIL WITH THAT OBJECTIVE, BUT IF THEY DID FAIL, THEY ESTIMATED

1   THEY WOULD LOSE $437 MILLION, ALMOST HALF A BILLION IN SALES,

2   JUST IN THAT ONE YEAR.

3   Q.   DR. PECHMANN, IF YOU WOULD PLEASE TURN TO PLAINTIFF'S

4   EXHIBIT 1.2002.

5   A.   OKAY.

6   Q.   DID YOU REVIEW THIS DOCUMENT IN THE COURSE OF YOUR

7   RESEARCH?

8   A.   YES.

9   Q.   DID YOU RELY ON IT IN REACHING YOUR CONCLUSIONS?

10  A.   YES.

11          MS. O'DELL:  YOUR HONOR, AT THIS TIME --

12          THE COURT:  WHAT IS IT?

13          MS. O'DELL:  OH, YES, SIR.  THANK YOU.

14  BY MS. O'DELL:

15  Q.   PLEASE IDENTIFY THE DOCUMENT.

16  A.   IT'S THE ANNUAL MARKETING PLAN FOR VIOXX FOR 2002 FOR THE

17  SUBSEQUENT YEAR.

18  Q.   WHAT'S THE DATE ON THE PLAN?

19  A.   IT WAS PREPARED OCTOBER 9, 2001.  SO FALL OF 2001 FOR THE

20  SUBSEQUENT YEAR.

21          MS. O'DELL:  YOUR HONOR, AT THIS TIME WE MOVE TO

22  ADMIT 1.2002.

23          MR. BECK:  NO OBJECTION, YOUR HONOR.

24          THE COURT:  ADMITTED.

25

1   BY MS. O'DELL:

2   Q.   TURN TO PAGE 7, DR. PECHMANN.

3   A.   OKAY.

4   Q.   WHAT'S THE TITLE TO THIS TABLE?

5   A.   "PROPOSED SUMMARY PLAN FOR 2002.  ADDRESS CV, RENAL, OTHER

6   SAFETY ISSUES."

7   Q.   EXPLAIN FOR US WHAT THIS TABLE DESCRIBES.

8   A.   WELL, BASICALLY, THE RESEARCH CONTINUED TO SHOW IN 2001

9   THAT THE PHYSICIANS WERE STARTING TO GET A LITTLE CONCERNED

10  ABOUT WHETHER VIOXX MIGHT POSE A HEART ATTACK RISK, SO THEY

11  DEVISED A MARKETING PLAN TO NEUTRALIZE THAT CONCERN OR PERSUADE

12  DOCTORS THAT EVERYTHING WAS OKAY.

13  Q.   DEFINE FOR US, PLEASE, OR PLEASE EXPLAIN WHAT A SUCCESS

14  MEASURE IS.

15  A.   I INDICATED THAT INTEGRATED MARKETING CAMPAIGNS ARE BASED

16  ON RESEARCH.  THAT'S HOW YOU KNOW HOW TO ORCHESTRATE IT.  SO

17  THEY DID MONTHLY RESEARCH -- ACTUALLY, THEY HIRED A FIRM CALLED

18  DWT, WHO SURVEYED ABOUT 300 PHYSICIANS EVERY MONTH, AND IT

19  MEASURED THEIR PERCEPTIONS OF VIOXX AND CELEBREX, MAYBE A

20  COUPLE OTHER BRANDS, LIKE BEXTRA, SO THEY WERE ABLE TO TRACK,

21  GET THE MEAN PERCEPTION OR THE OVERALL BELIEF, THAT PEOPLE HAD

22  OF VIOXX EVERY MONTH, AND THEY COULD TRACK MONTHLY AS THEY ARE

23  RUNNING THEIR CAMPAIGN WHAT'S HAPPENING.

24        SO THEY STATED FOR 2002 THEY WANTED TO SEE A CHANGE

25  IN THAT -- IN PHYSICIANS' BELIEFS ABOUT VIOXX NOT INCREASING

1  THE RISK OF HEART ATTACK OR STROKE.  THEY WANTED PERCEPTIONS TO

2  IMPROVE.

3  Q.   IN THIS CONTEXT, WHAT DOES BEHAVIORAL OBJECTIVES MEAN?

4  A.   SO NOT ONLY DID THEY WANT PHYSICIANS' PERCEPTIONS TO

5  IMPROVE, BUT THEY WANTED THEM TO PRESCRIBE MORE VIOXX.  SO THE

6  BEHAVIORAL OBJECTIVE IS THE OBJECTIVE REGARDING PRESCRIPTIONS,

7  AND THAT ONE STATES PHYSICIANS -- THE OBJECTIVE IS THAT

8  "PHYSICIANS WILL PRESCRIBE VIOXX FOR ALL PATIENTS NEEDING PAIN

9  RELIEF INDEPENDENT OF" -- AND THE THIRD BULLET IS -- "CV RISK

10  FACTORS" BECAUSE VIOXX DOES NOT INCREASE THE RISK OF HEART

11  ATTACK, MI, OR STROKE."

12      SO HERE THEY WERE GOING TO TRACK SALES.  HOW DID THEY

13  TRACK SALES?  THEY PURCHASED THE DATA FROM PHARMACIES, SO THEY

14  KNOW FOR EVERY PHYSICIAN IN THE COUNTRY HOW MUCH THEY ARE

15  PRESCRIBING ON A MONTHLY BASIS OF VIOXX VERSUS CELEBREX.  AND

16  THEY AGGREGATED IT ALL TOGETHER, AND THEIR CAMPAIGN WAS TO

17  DISSEMINATE THIS MESSAGE IT DOESN'T CAUSE HEART ATTACKS, AND

18  THEY WANTED TO SEE AN IMPROVEMENT IN SALES.  SO THEY WANTED TO

19  SEE THAT THE MESSAGE WAS ACTUALLY WORKING AND IMPROVING SALES.

20  Q.   WHAT TOOLS DID THEY USE TO ACCOMPLISH THIS.

21  A.   THEY USED THE STANDARD TOOLS THAT ARE IN AN INTEGRATED

22  CAMPAIGN, SO THEY HAD ADVERTISING.  BUT THEY SPENT MOST OF

23  THEIR MONEY ON THE MERCK REPRESENTATIVES, AND THE MERCK

24  REPRESENTATIVES WOULD MEET WITH DOCTORS EVERY WEEK AND DELIVER

25  THESE MARKETING MESSAGES OR SALES PITCHES, AND THEN THE GOAL

Page 1122

1    WAS TO DELIVER ABOUT ONE MESSAGE A MONTH, ONE TO TWO A MONTH.

2             SO THAT WAS -- AND THEY HAD BROCHURES WHICH SHOW

3    PHYSICIANS AND MESSAGES THAT THEY WERE SUPPOSED TO STATE PRETTY

4    MUCH VERBATIM TO THE PHYSICIANS.  THEY ALSO DID DIRECT MAIL.

5    SO THEY WOULD SEND ABOUT SIX LETTERS TO THE DOCTORS A YEAR

6    UNSOLICITED.

7             IN ADDITION, IF THE DOCTOR SAID, "WELL, I'M CONCERNED

8    ABOUT HEART ATTACK" OR "I'M CONCERNED ABOUT THE VIGOR STUDY,"

9    THEY HAD A TEAM OF DOCTORS THAT WROTE RESPONSES, AND THAT WAS

10   PART OF THE MARKETING.  SO THEY WOULD WRITE THESE LETTERS BACK

11   TO THE DOCTORS.  THAT'S DIRECT MAIL.

12            THEN, OF COURSE, THERE'S A PUBLIC RELATIONS.  SO THEY

13   HAD OGILVY & MATHER DISSEMINATING PRESS RELEASES TO TRY TO

14   INFLUENCE NEWS COVERAGE.

15   Q.   WHAT TIME PERIOD DID THIS PARTICULAR MARKETING PLAN COVER?

16   A.   SO IT WAS COVERING 2002.

17   Q.   WAS THAT BEFORE THE VIGOR LABEL OR AFTER THE VIGOR LABEL?

18   A.   THIS WAS THE PLAN THAT THEY WERE PREPARING AS THEY WERE

19   NEGOTIATING THE CHANGE IN THE LABEL THAT WOULD INCLUDE THE

20   VIGOR FINDINGS, AND SO IT GOVERNED BEFORE AND AFTER THE LABEL

21   CHANGE.

22            SO MOSTLY AFTER, ACTUALLY, BECAUSE THE LABEL CHANGE

23   OCCURRED IN THE SPRING OF 2002.  SO THIS WAS THE PLAN FOR THE

24   ENTIRE 2002, AFTER THE LABEL CHANGED.

25   Q.   DOES THIS PLAN COVER THE PERIOD OF TIME -- WELL, LET ME

1   BACK UP.  WE HAVE HEARD SOME TESTIMONY ABOUT A WARNING LETTER,

2   AND DOES THIS PLAN COVER A TIME PERIOD AFTER SEPTEMBER OF 2001?

3   A.   YES.  THIS PLAN WAS PREPARED AFTER MERCK GOT THE WARNING

4   LETTER FROM THE FDA.

5   Q.   HOW WOULD THE MERCK MARKETING PEOPLE BE ABLE TO -- WERE

6   THEY ABLE TO TRACK WHETHER THEIR PLAN WAS SUCCESSFUL OR NOT?

7   A.   ABSOLUTELY.

8   Q.   HOW IS THAT?

9   A.   WELL, THEY SPENT HUNDREDS OF THOUSANDS, IF NOT MILLIONS,

10  OF DOLLARS PAYING RESEARCH FIRMS TO COLLECT THIS DATA OR PAYING

11  PHARMACIES TO GET THE DATA.

12  Q.   DR. PECHMANN, BASED ON YOUR REVIEW OF MARKETING PLANS LIKE

13  THIS AND THE PROFIT PLAN AND OTHER MARKETING PIECES OVER THE

14  COURSE OF YOUR RESEARCH AND INVESTIGATION, HAVE YOU IDENTIFIED

15  MARKETING MESSAGES THAT MERCK USED IN THE VIOXX MARKETING PLAN?

16  A.   YES.

17  Q.   CAN YOU TELL US WHAT THOSE ARE?

18        MS. O'DELL:  YOUR HONOR, IF SHE MAY, CAN SHE STEP

19  DOWN AND WRITE THOSE ON THE EASEL?

20        THE COURT:  YES.

21        THE WITNESS:  OKAY.  I IDENTIFIED THREE MAIN MESSAGES

22  THAT THEY USED TO CONVEY CARDIOVASCULAR SAFETY AND NO PROBLEM

23  WITH HEART ATTACKS, SO I'M GOING TO WRITE THOSE DOWN.

24        THE FIRST MARKETING MESSAGE THAT MERCK CREATED

25  OR PITCHED WAS:  "VIOXX HAS A FAVORABLE CARDIOVASCULAR SAFETY

1   PROFILE."  THEN THEY EVENTUALLY CHANGED THAT TO "WE STAND

2   BEHIND THE OVERALL AND CARDIOVASCULAR SAFETY PROFILE OF VIOXX."

3   SO IT WAS EITHER "WE STAND BEHIND THE SAFETY PROFILE" OR IT HAD

4   A FAVORABLE SAFETY PROFILE.  ONE OF THOSE TWO.

5   BY MS. O'DELL:

6   Q.   WHAT WAS THE SECOND MESSAGE?

7   A.   (WRITING ON BOARD)

8   Q.   WHAT WAS THE THIRD ONE?

9   A.   (WRITING ON BOARD)

10         SO THE SECOND MESSAGE WAS "VIOXX IS SAFE AS A SUGAR

11   PILL.  THERE'S NO DIFFERENCE BETWEEN VIOXX AND A SUGAR PILL OR

12   PLACEBO IN TERMS OF CV RISK OR HEART ATTACK RISK."

13         THE THIRD WAS "NAPROXEN IS CARDIOPROTECTIVE."  SO

14   THERE WAS A DIFFERENCE IN THE VIGOR STUDY BETWEEN NAPROXEN AND

15   VIOXX, AND THEY SAID IT WAS BECAUSE NAPROXEN PROTECTED THE

16   HEART LIKE ASPIRIN.

17   Q.   DR. PECHMANN, YOU MAY RESUME YOUR SEAT.  WERE THESE

18   MARKETING MESSAGES, DR. PECHMANN, INCLUDED IN THE VIOXX LABEL?

19   A.   NO.

20   Q.   WHO CONVEYED THESE MARKETING MESSAGES?

21   A.   ALL OF THOSE VEHICLES.  SO THE SALES REPRESENTATIVES,

22   THEIR BROCHURES, THE DEAR DOCTOR LETTERS, THE PRESS RELEASES.

23   Q.   WHO WAS THE PRIMARY TARGET AUDIENCE FOR THESE MESSAGES?

24   A.   PHYSICIANS, AND THEN ALSO THE GENERAL PUBLIC.  BUT

25   PRIMARILY PHYSICIANS.

Page 1125

1    Q.   JUST TO TAKE A LITTLE BIT OF A STEP BACK, HOW DID YOU

2    IDENTIFY THESE MESSAGES?

3    A.   I LOOKED AT THE MARKETING DOCUMENTS AND I ALSO LOOKED AT

4    THE TOOLS THEY USED.  SO I LOOKED AT ALL OF THEIR BROCHURES AND

5    THEIR PRESS RELEASES AND THEIR ADS AND THEIR DEAR DOCTOR

6    LETTERS AND THEIR PIR'S WHICH ARE THE LETTERS THE DOCTORS WRITE

7    WHEN OTHER DOCTORS ASK FOR INFORMATION, AND THESE ARE THE ONES

8    THAT APPEARED OVER AND OVER AND OVER.  SO THOSE ARE THE ONES

9    THAT WERE DECIDED WOULD BE THE SIMPLE MESSAGES THAT WOULD BE

10   THE CORE PART OF THE INTEGRATED MARKETING CAMPAIGN.

11   Q.   DR. PECHMANN, DO YOU HAVE PLAINTIFF'S EXHIBIT 1.006 IN

12   YOUR BINDER?

13   A.   YES, I DO.

14   Q.   WOULD YOU TURN TO THAT, PLEASE.

15   A.   YES.

16   Q.   ARE YOU FAMILIAR WITH THIS DOCUMENT?

17   A.   YES, I AM.

18   Q.   HAVE YOU REVIEWED IT PREVIOUSLY?

19   A.   YES, I HAVE.

20   Q.   DID YOU RELY ON IT IN FORMING YOUR OPINIONS THAT YOU'RE

21   REPRESENTING HERE TODAY?

22   A.   YES.

23   Q.   PLEASE IDENTIFY THE DOCUMENT FOR US.

24   A.   IT'S THE WARNING LETTER THAT THE FDA -- DDMAC, MARKETING

25   GROUP, SENT TO MARKET, TO THE CEO, GILMARTIN, ON SEPTEMBER 17,

Page 1126

1    2001.

2    Q.    WHAT IS DDMAC?

3              MR. BECK:   YOUR HONOR, MAY WE APPROACH ON THIS?

4              THE COURT:   SURE.

5              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

6    THE BENCH.)

7              MR. BECK:   HOW DOES THIS WITNESS KNOW THOSE THINGS

8    ABOUT DDMAC AND SHE'S AN ADVERTISING PERSON?   YOUR HONOR, WE

9    HAD SOME FDA EXPERTS HERE LIKE DR. MOYÉ AND NOW WE ARE GOING TO

10   HAVE AN ADVERTISING PERSON TALK ABOUT WARNING LETTERS.   I

11   OBJECT.   THIS IS WAY OUTSIDE HER EXPERTISE.

12             THE COURT:   I AGREE WITH THAT.

13             MS. O'DELL:   JUST FOR A SECOND.   DR. PECHMANN HAS

14   GONE THROUGH ALL THE MARKETING DOCUMENTS.   SHE HAS IDENTIFIED

15   THE MESSAGES, AND IN HER REPORT SHE IS EXPLICIT.   SHE CAN'T SAY

16   IT'S MISLEADING.   SHE IS NOT GIVING A SCIENTIFIC OPINION, BUT

17   SHE CAN SAY IT SEEMS THAT THE FDA CONCLUDED THAT CERTAIN

18   MESSAGES WERE MISLEADING OR SHE CAN TESTIFY TO WHAT THEY SAID

19   ABOUT THOSE PARTICULAR MESSAGES.

20                FOR EXAMPLE, THE MAY 22, 2001, PRESS RELEASE.   I

21   WOULD LIKE TO OFFER -- SHE HAS AN OPINION THAT HERE'S THE

22   MESSAGES THAT VIOXX WAS SAFE FROM A CARDIOVASCULAR STANDPOINT,

23   IT WAS AS SAFE AS A SUGAR PILL AND NAPROXEN WAS

24   CARDIOPROTECTIVE.   ALL THOSE ARE CONTAINED IN THAT PRESS

25   RELEASE, AND THAT'S THE PRESS RELEASE THAT THE FDA SAID IT WAS

1  SIMPLY INCOMPREHENSIBLE.  IN HER DEALINGS WITH THE

2  GOVERNMENT -- I WOULD BE GLAD TO LAY A BETTER FOUNDATION, BUT

3  SHE WAS RESPONSIBLE FOR COMPLYING WITH GOVERNMENT AGENCIES AND

4  THEIR OVERSIGHT OF MARKETING CAMPAIGNS.

5          MR. BECK:  YOUR HONOR, DO I NEED TO RESPOND?  THIS IS

6  WAY OUTSIDE HER EXPERTISE.  WE HAVE HAD PEOPLE WHO ARE

7  DESIGNATED AS EXPERTS IN THIS AREA, AND NOW WE HAVE A MARKETING

8  LADY WHO IS GOING TO SAY WHETHER SOMETHING IS OR IS NOT

9  CONSISTENT WITH THE FDA'S DIRECTIVES.  SO WE HAVE FDA EXPERTS

10 LIKE DR. MOYÉ, WHO DOESN'T SAY A WORD ABOUT IT, AND THEN WE

11 HAVE AN ADVERTISING PERSON WHO IS GOING TO COME IN AND SAY

12 HERE'S WHAT THE FDA SAID, AND THEN HERE ARE MESSAGES THAT ARE

13 INCONSISTENT WITH WHAT THE FDA SAID.

14          I CAN'T, OF COURSE, CROSS HER ON HOW THE FDA

15 GOES ABOUT MONITORING ALL THIS BECAUSE SHE DOESN'T KNOW.  IT'S

16 OUTSIDE HER AREA OF EXPERTISE IN TERMS OF THE SCIENCE.  SHE HAS

17 ALREADY GONE WELL BEYOND WHERE SHE WAS ALLOWED TO GO BEFORE.

18 I'VE BEEN POLITE BECAUSE I DON'T WANT TO BEAT UP ANOTHER WOMAN,

19 BUT THIS IS REALLY OUTSIDE THE AREA.

20          MR. BIRCHFIELD:  OVER AND OVER AGAIN, EVERY TIME WE

21 TRY TO OFFER THE WARNING LETTER, WE HEAR FROM MERCK, "THIS

22 ISN'T THE FDA.  THIS IS THE MARKETING AND ADVERTISING FOLKS."

23 SO WE GOT A MARKETING EXPERT ON --

24          THE COURT:  IS IT IN ALREADY?

25          MR. BIRCHFIELD:  IT'S IN EVIDENCE.

1    MR. BECK:  IT'S IN EVIDENCE.  IT'S BEEN BEAT TO

2    DEATH, BUT IT'S OUTSIDE HER EXPERTISE.

3    MR. BIRCHFIELD:  WE NEED TO CONNECT IT TO THEIR

4    MARKETING CAMPAIGN.  THAT'S THE POINT.

5    THE COURT:  LOOK, IT'S IN EVIDENCE.  THE THING THAT

6    MAY BE RELEVANT IS -- I DON'T WANT HER TO GET INTO THE FDA

7    THING.  IT'S IN EVIDENCE.  WHETHER SHE NOTED THAT THERE WAS ANY

8    CRITICISM OR SOMETHING ON THAT, I THINK THAT'S SOMETHING THAT

9    SHE MAY BE ABLE TO TESTIFY ABOUT.  I'M LEANING AWAY FROM THAT.

10   LEIGH, YOU CAN'T GO TOO FAR WITH SOMEBODY WHO IS

11   A MARKETING EXPERT TALKING ABOUT WHAT THE FDA DID.  MAYBE

12   ARGUMENT, ANDY.  YOU CAN USE THAT LEGITIMATELY IN SUMMATION,

13   BUT I THINK WE ARE GETTING AWAY FROM THIS PERSON'S EXPERTISE,

14   OTHER THAN THE FACT THAT --

15   MS. O'DELL:  YOUR HONOR, JUST TO HAVE A LITTLE

16   DIRECTION, BASED ON WHAT YOU HAVE JUST SAID, AS I GO THROUGH

17   THESE PRESS RELEASES, CAN I SAY "HAS THE FDA BEEN CRITICAL OF

18   THIS PRESS RELEASE?"  CAN SHE SAY "YES"?

19   MR. BECK:  WE GOT THIS FROM ANSTICE AND FOR HER --

20   I'M GOING TO CROSS-EXAMINE HER ON AND THEN THERE'S A RESPONSE

21   AND THE FDA TOOK NO ACTION.  THEY HAVE COVERED IT WITH ANSTICE.

22   THIS IS WAY OUTSIDE HER EXPERTISE.

23   THE COURT:  I'LL HAVE TO DEAL WITH THAT WHEN IT COMES

24   UP.  I'LL ALLOW IT FOR THAT.

25   MR. BECK:  THEY ARE GOING TO DO THE HOLT CONFERENCES

Page 1129

1   AND THAT KIND OF STUFF?  OH, IT HASN'T COME IN?  IT'S NOT IN

2   YET, JUDGE.

3             THE DEPUTY CLERK:  JUDGE, I JUST DON'T SEE WHERE IT

4   CAME IN YET IN THIS TRIAL, BUT TONI MAYBE COULD SEE.

5             MR. BECK:  I'M GOING TO OBJECT TO THE USE OF A

6   DOCUMENT THAT'S NOT IN EVIDENCE; THAT IS OUTSIDE OF HER AREA OF

7   EXPERTISE; THAT SHE CAN'T AUTHENTICATE.

8             MR. BIRCHFIELD:  WE CLEARLY COVERED IT, PUBLISHED IT

9   TO THE JURY WITH ANSTICE, AND I'M CERTAIN THAT IT WAS.

10            THE DEPUTY CLERK:  WE CAN FIND OUT IF WE CAN TAKE A

11  COUPLE MINUTES.

12            THE COURT:  I'M GOING TO HAVE TO STOP AT 3:00.  WE'LL

13  TAKE A 10-MINUTE BREAK.

14            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

15  OPEN COURT.)

16            THE COURT:  COURT WILL STAND IN RECESS FOR 10

17  MINUTES.

18            (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

19            THE DEPUTY CLERK:  EVERYONE RISE.

20            THE COURT:  BE SEATED, PLEASE.  THE WARNING LETTER

21  HAS BEEN INTRODUCED INTO EVIDENCE.  IT IS 1.0006 INSTEAD OF

22  1.0016.  SO THE "16" SHOULD BE CHANGED TO "06."

23            I'LL LET HER COMMENT ON IT FROM THE STANDPOINT

24  OF THE ADVERTISING.  MEMBERS OF THE JURY, THIS DOCUMENT IS INTO

25  EVIDENCE ALREADY.  THIS WITNESS, OF COURSE, IS NOT AN EXPERT IN

Page 1130

1  THE FDA AND INTERPRETING HOW THE WARNING LETTERS COME OUT AND

2  THINGS OF THAT SORT.  IT HAS SOME RELEVANCE FROM HER EXPERTISE,

3  THAT IS TO SAY, HER MARKETING EXPERTISE.  SO HER TESTIMONY IS

4  REALLY LIMITED TO THAT ASPECT OF THIS WARNING LETTER.

5           MS. O'DELL:  YOUR HONOR, SINCE THE DOCUMENT IS IN

6  EVIDENCE, MAY I PUBLISH IT TO THE JURY.

7           MR. BECK:  YOUR HONOR, I'M SORRY, BUT THIS WAS

8  DISALLOWED BEFORE.  CAN WE APPROACH ON THIS?

9           THE COURT:  THAT'S OKAY.  LET'S TRY TO DO IT WITHOUT

10 GOING THROUGH THAT AT THIS POINT.

11 BY MS. O'DELL:

12 Q.   DR. PECHMANN, LET ME ASK YOU IF YOU HAVE -- YOU ARE AWARE

13 THAT THERE WAS A WARNING LETTER SENT TO MERCK BY THE FDA;

14 CORRECT?

15 A.   RIGHT.  BY THE DDMAC DIVISION, THE MARKETING DIVISION.

16 Q.   BASED ON YOUR REVIEW OF THAT DOCUMENT, CAN YOU COMMENT ON

17 WHAT DDMAC'S -- LET ME JUST START THAT QUESTION OVER AGAIN.

18 BASED ON YOUR REVIEW OF THE WARNING LETTER, WHAT DID DDMAC SAY

19 ABOUT MERCK'S MESSAGE THAT YOU HAVE LISTED AS NUMBER 1 THERE?

20           MR. BECK:  YOUR HONOR, THIS IS REALLY OUTSIDE OF THE

21 SCOPE OF HER EXPERTISE, CALLING ON HER FOR REGULATORY MATTERS

22 WE HEARD FROM REGULATORY PEOPLE.

23           THE COURT:  THE ONLY THING IS THAT THIS IS THE

24 MARKETING ASPECT OF THE FDA.  SO SALES ASPECT OF THE FDA.  SO,

25 FROM THAT STANDPOINT, I WILL OVERRULE THE OBJECTION AND LET YOU

1  TELL US ABOUT IT.

2          THE WITNESS:  YES.  OKAY.  THE LETTER COMMENTS ON

3  THAT WORDING AND SAYS THAT IT MISREPRESENTS THE SAFETY PROFILE

4  OF VIOXX.

5  BY MS. O'DELL:

6  Q.   IN REGARD TO THE SECOND MERCK MESSAGE THAT YOU HAVE LISTED

7  ON THE BOARD THERE, WHAT WAS DDMAC'S EVALUATION OF THAT

8  MESSAGE?

9  A.   THE SECOND MESSAGE IS SAFE AS A SUGAR PILL, AND IT SAID

10  THAT IT MINIMIZES THE POTENTIALLY SERIOUS CARDIOVASCULAR

11  FINDINGS THAT WERE OBSERVED IN VIGOR.

12          MR. BECK:  YOUR HONOR, THIS IS NOT ANYTHING TO DO

13  WITH ADVERTISING.  I OBJECT TO THIS.

14          THE COURT:  OKAY.  WELL, LET'S MOVE ON TO SOMETHING

15  ELSE, PLEASE.

16          MS. O'DELL:  IF I COULD ASK ONE MORE QUESTION, YOUR

17  HONOR?  IT'S NOT ABOUT THE PARTICULAR MESSAGES, IF YOU GIVE ME

18  THAT LEEWAY.

19          THE COURT:  WELL, LET'S GO ON TO THE NEXT AREA.

20  LET'S LEAVE THE WARNING LETTER OUT AT THIS POINT.  YOU HAVE

21  MADE YOUR POINT.

22  BY MS. O'DELL:

23  Q.   DR. PECHMANN, IF I COULD PLEASE HAVE YOU TURN TO

24  PLAINTIFF'S EXHIBIT 1.0583.

25  A.   OKAY.

1    Q.    WOULD YOU PLEASE IDENTIFY THIS DOCUMENT.

2    A.    YES.   THIS IS A PRESS RELEASE, A MERCK PRESS RELEASE,

3    DATED APRIL 28, 2000.

4    Q.    DID YOU RELY ON IT IN FORMING YOUR OPINIONS THAT YOU'RE

5    EXPRESSING HERE TODAY?

6    A.    YES.

7             MS. O'DELL:  AT THIS TIME I OFFER PLAINTIFF'S EXHIBIT

8    1.0583.

9             MR. BECK:  NO OBJECTION.

10            THE COURT:  ADMITTED.

11   BY MS. O'DELL:

12   Q.    IF YOU WOULD, JUST TELL US WHAT THE DATE IS ON THIS PRESS

13   RELEASE.

14   A.    APRIL 28, 2000.

15   Q.    READ FOR US, IF YOU WOULD, PLEASE, THE HEADLINE OF THE

16   PRESS RELEASE.

17   A.    "MERCK CONFIRMS FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF

18   VIOXX."  THIS IS AFTER THE VIGOR RESULTS CAME OUT.

19   Q.    IF YOU WOULD, PLEASE, JUST GO THROUGH THE PRESS RELEASE

20   AND IDENTIFY THE MESSAGES THAT ARE CONTAINED IN THIS DOCUMENT.

21   A.    THE THREE MESSAGES I LISTED ON THE BOARD ARE CONTAINED IN

22   THAT ORDER RIGHT HERE.  SO THE HEADING TALKS ABOUT THE

23   FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF VIOXX, AND THE

24   SECOND SENTENCE OF THE ACTUAL RELEASE ITSELF SAYS THE SAME

25   THING.

1   Q.   OKAY.  PLEASE, IF YOU WOULD, PLEASE, READ THAT FOR US.

2   A.   SURE.  "IN RESPONSE TO SPECULATIVE NEWS REPORTS, MERCK &

3   COMPANY., INC., TODAY CONFIRMED THE FAVORABLE CARDIOVASCULAR

4   SAFETY PROFILE OF VIOXX."

5   Q.   IS THERE LANGUAGE IN THIS PRESS RELEASE THAT RELATES TO

6   MESSAGE NUMBER 2, WHICH IS VIOXX IS SAFE AS A SUGAR PILL?

7   A.   YES.  IN THE SECOND PARAGRAPH.

8   Q.   READ THAT FOR US, PLEASE.

9   A.   "EXTENSIVE REVIEW OF DATA FROM COMPLETED OSTEOARTHRITIS

10  TRIALS AND ONGOING CLINICAL TRIALS WITH VIOXX, AS WELL AS

11  POSTMARKETING EXPERIENCE WITH VIOXX, HAVE SHOWN NO DIFFERENCE

12  IN THE INCIDENCE OF CARDIOVASCULAR EVENTS SUCH AS HEART ATTACK

13  AMONG PATIENTS TAKING VIOXX, OTHER NSAIDS, AND PLACEBO."

14  Q.   DR. PECHMANN, IS THERE LANGUAGE IN THIS PRESS RELEASE THAT

15  RELATES TO MERCK'S MESSAGE THAT IT IS CARDIOPROTECTIVE?

16  A.   YES.  IN THE THIRD PARAGRAPH.

17  Q.   WOULD YOU IDENTIFY THAT FOR US, PLEASE.

18  A.   OKAY.  "IN PRELIMINARY FINDINGS FROM MERCK'S LARGE

19  GASTROINTESTINAL OUTCOMES STUDY THAT COMPARED VIOXX WITH

20  NAPROXEN IN PATIENTS WITH RHEUMATOID ARTHRITIS, SIGNIFICANTLY

21  FEWER HEART ATTACKS WERE OBSERVED IN PATIENTS TAKING NAPROXEN,

22  .1 PERCENT, COMPARED TO PATIENTS TAKING VIOXX, .5 PERCENT.

23  THIS RESULT IS CONSISTENT WITH NAPROXEN'S ABILITY TO BLOCK

24  PLATELET AGGREGATION."

25  Q.   IS A PRESS RELEASE LIKE THE ONE DISPLAYED ON THE SCREEN

Page 1134

1   ONE OF THE TOOLS USED TO CONVEY A MESSAGE IN A MARKETING

2   CAMPAIGN?

3   A.   YES.

4   Q.   LET ME JUST ASK:  IS THIS A DOCUMENT -- WELL, LET ME ASK

5   ANOTHER QUESTION.  THE DATE ON THIS DOCUMENT IS WHAT?

6   A.   APRIL 28, 2000.

7   Q.   IF YOU TURN FOR ME, PLEASE, TO PLAINTIFF'S EXHIBIT 1.152.

8   A.   1.0152.

9   Q.   YES.  THANKS.

10  A.   YES.

11  Q.   ARE YOU FAMILIAR WITH THIS DOCUMENT?

12  A.   YES.

13  Q.   DID YOU RELY ON IT IN FORMING YOUR OPINIONS?

14  A.   YES.

15               MS. O'DELL:  YOUR HONOR, AT THIS TIME WE OFFER

16  PLAINTIFF'S EXHIBIT 1.0152.

17               THE COURT:  WHAT IS IT?

18               THE WITNESS:  IT'S THE MAY 22, 2001 MERCK PRESS

19  RELEASE.

20               MR. BECK:  NO OBJECTION.

21               THE COURT:  LET IT BE ADMITTED.

22  BY MS. O'DELL:

23  Q.   DR. PECHMANN, WHAT'S THE DATE ON THIS DOCUMENT?

24  A.   MAY 22, 2001.

25  Q.   WOULD YOU PLEASE JUST IDENTIFY AND READ THE HEADLINE FOR

1   US.

2   A.   "MERCK CONFIRMS FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF

3   VIOXX."

4   Q.   IS EACH OF MERCK'S THREE MESSAGES THAT WE HAVE LISTED ON

5   THE BOARD THERE CONTAINED IN THIS DOCUMENT?

6   A.   YES.

7   Q.   WOULD YOU IDENTIFY -- JUST START AT THE BEGINNING.   IS

8   THERE LANGUAGE THAT RELATES TO MERCK'S NUMBER ONE MESSAGE,

9   WHICH IS CV SAFETY?

10  A.   RIGHT.   SO THERE'S THE HEADING:   "MERCK CONFIRMS FAVORABLE

11  CARDIOVASCULAR SAFETY OF VIOXX."   THAT TEXT IS REPEATED IN LINE

12  3:   "FAVORABLE CARDIOVASCULAR SAFETY PROFILE."

13  Q.   HOW ABOUT NAPROXEN?

14  A.   NAPROXEN IS -- WELL, ACTUALLY, ON THE TOP OF THE SECOND

15  PAGE, YOU GET THE NO DIFFERENCE MESSAGE, NO DIFFERENT FROM

16  PLACEBO; ACTUALLY, IN THE NEXT PARAGRAPH DOWN, AT THE END,

17  WHERE IT'S UNDERLINED, "NO DIFFERENCE.   "THERE WAS NO

18  DIFFERENCE IN THE INCIDENCE OF CARDIOVASCULAR EVENTS SUCH AS

19  HEART ATTACKS AMONG PATIENTS TAKING VIOXX, OTHER NSAIDS, AND

20  PLACEBO."   THEN IN THE NEXT PARAGRAPH IT TALKS ABOUT NAPROXEN'S

21  ABILITY TO BLOCK PLATELET AGGREGATION BY INHIBITING COX-1 LIKE

22  ASPIRIN.

23  Q.   DID THE FDA COMMENT ON THE MESSAGES CONTAINED IN THIS

24  PARTICULAR PRESS RELEASE?

25  A.   YES, THEY DID.

Page 1136

1   Q.    WHAT DID THEY SAY?

2              MR. BECK:  YOUR HONOR, I OBJECT AGAIN.   CAN I

3   APPROACH FOR A SECOND?

4              THE COURT:  YES.

5              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

6   THE BENCH.)

7              MR. BECK:  YOUR HONOR, WE HAVE BEEN TOLD SHE WAS

8   GOING TO DO THE SAME SCOPE SHE DID IN MASON, AND IN MASON THIS

9   WAS AS FAR AS SHE WAS ALLOWED TO GO:

10              "Q.  I'M NOT GOING TO GET INTO THE DETAILS OF THIS

11         WITH YOU.  WE'LL COVER IT WITH OTHER WITNESSES.  BUT ARE

12         YOU AWARE OF DDMAC'S CRITICISM OF SPECIFIC MERCK MARKETING

13         MESSAGES THAT WERE PART OF THE GRADUATED CAMPAIGN?

14         "A.  YES."

15              THAT WAS ALL SHE WAS ALLOWED TO DO.  I WAS TOLD THIS

16   WAS GOING TO BE A REPRISE OF THAT.  IN ANY EVENT, THE RULING

17   WAS CORRECT LAST TIME, AND I ASK FOR THE SAME RULING REGARDLESS

18   OF WHAT I WAS TOLD THEY WERE GOING TO DO.

19              MS. O'DELL:  YOUR HONOR, WE ARE GOING THROUGH THE

20   SAME PATTERN THAT WAS USED IN THE MASON CASE.

21              MR. BECK:  SHE IS CALLED UPON TO INTERPRET FDA AND

22   THEN INTERPRET --

23              THE COURT:  I UNDERSTAND.  LET'S TRY TO DO IT THE

24   SAME WAY YOU DID IT AT THAT POINT:  IS SHE AWARE OF THE

25   CRITICISM?  WERE THEY CRITICIZED FOR IT?  SOMETHING OF THAT

1  SORT, SO WE DON'T GET TOO FAR INTO DETAILS.  SHE'S JUST NOT

2  CAPABLE OF KNOWING ALL OF THE THINGS THE FDA MENTIONS, BUT I

3  THINK SHE SHOULD BE ABLE TO TESTIFY AS TO THE FACT THEY DID

4  CRITICIZE, THE FACT THEY DID DISAPPROVE OF IT, OR SOMETHING OF

5  THAT SORT.

6          MR. BIRCHFIELD:  JUDGE, IT'S ALSO VERY, VERY CRITICAL

7  FROM A TIMING STANDPOINT BECAUSE NOT ONLY -- IT'S NOT A

8  SITUATION WHERE THEY EMPLOYED THESE MESSAGES AND THEN THE FDA

9  SAYS, "WAIT A MINUTE.  THESE MESSAGES ARE FALSE AND MISLEADING

10 AND THEY MINIMIZE THE SERIOUS SAFETY CONCERNS WITH VIOXX," AND

11 THEN MERCK STOPS.  IT'S IMPORTANT TO PUT THAT IN CONTEXT.  FOR

12 A MARKETING EXPERT TO BE ABLE TO SAY ONCE THEY --

13         MR. BECK:  HERE'S THE PROBLEM.  AS WE HEARD FROM

14 MR. ANSTICE, THERE WERE TWO THINGS, THOSE HOLT CONFERENCES AND

15 WHATEVER THE OTHER THING WAS, THE PHARMACIST CONVENTIONS, WHERE

16 CORRECTIVE ACTION WAS TAKEN.  MR. ANSTICE TESTIFIED THAT, ON

17 THE PRESS RELEASE, THEY WENT BACK AND EXPLAINED OUR SIDE OF THE

18 STORY TO THE FDA AND THE FDA DIDN'T REQUIRE ANY FURTHER ACTION.

19 SO FOR A MARKETING LADY TO SAY, "GEE WHIZ, THE FDA THOUGHT THIS

20 WAS AWFUL AND THEY KEPT DOING IT ANYWAY," IS WAY OUTSIDE OF HER

21 EXPERTISE AND CONTRARY TO THE EVIDENCE.

22         MS. O'DELL:  THE POINT IS, JUDGE, THEY SAID THAT

23 SAYING THAT VIOXX HAS A FAVORABLE CARDIOVASCULAR PROFILE IS

24 MISLEADING AND THAT THE PRESS RELEASE WAS SIMPLY

25 INCOMPREHENSIBLE, BUT IF YOU GO THROUGH THE REMAINING DOCUMENTS

Page 1138

1   AFTER THIS DATE, IT'S THE SAME MESSAGE ALMOST WORD-FOR-WORD,

2   AND THAT'S THE POINT.

3          MR. BECK:  ONCE WE EXPLAINED WHAT WE WERE DOING TO

4   THE FDA, THEY SAID CASE CLOSED.

5          THE COURT:  YOU CAN COVER THAT ON CROSS.  I'LL ALLOW

6   IT TO THAT EXTENT.  I OVERRULE THE OBJECTION.

7          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

8   OPEN COURT.)

9   BY MS. O'DELL:

10  Q.   DR. PECHMANN, DID THE FDA CRITICIZE THIS PRESS RELEASE?

11  A.   YES, THEY DID.

12  Q.   WAS THERE ANY TYPE OF CORRECTION THAT WAS ISSUED BY MERCK?

13  A.   NO.  BECAUSE THEY WEREN'T SUPPOSED TO.

14  Q.   WHY IS THAT?

15  A.   BECAUSE --

16         MR. BECK:  YOUR HONOR --

17         THE COURT:  THAT GOES INTO WHAT THE FDA AND

18  INTERPRETING THE FDA.  LET'S MOVE ON, COUNSEL.

19  BY MS. O'DELL:

20  Q.   DR. PECHMANN, IF YOU WOULD TURN TO PLAINTIFF'S EXHIBIT

21  1.2011, PLEASE.

22  A.   GOT IT.

23  Q.   WOULD YOU IDENTIFY THAT FOR US.

24  A.   THIS IS MERCK'S DOCUMENT, A MARKETING DOCUMENT, CALLED THE

25  OBSTACLE RESPONSE GUIDE, VIOXX, VICTORY, IN IT TO WIN IT.

Page 1139

1           MR. BECK:  EXCUSE ME.  THIS WAS ONE THEY AGREED WOULD

2    NOT BE USED BECAUSE IT WASN'T DISCLOSED.

3           MS. O'DELL:  YES, YOUR HONOR.  I THINK THAT'S

4    MISTAKEN.  IT'S BEEN DISCLOSED IN THE PAST.

5           MR. BECK:  WELL, IT'S NOWHERE IN HER REPORT, NOWHERE

6    IN THE MATERIALS REVIEWED LIST.  IT'S ONE OF THE DOCUMENTS WE

7    IDENTIFIED THIS MORNING BEFORE SHE EVER TOOK THE STAND.

8           MS. O'DELL:  YOUR HONOR, I'LL BE GLAD TO MOVE ON.

9           THE COURT:  YES, LET'S MOVE ON.  MEMBERS OF THE JURY

10   WHAT WE ARE DEALING WITH HERE IS THAT, WHEN EXPERTS ARE CALLED

11   TO TESTIFY, THEY HAVE TO FIRST GIVE A REPORT, AND THE REPORT

12   HAS TO BE EXCHANGED BY AND BETWEEN COUNSEL.  IN ADDITION TO THE

13   REPORT, THEY MENTION THINGS THAT THEY -- THE DOCUMENTS THAT

14   THEY HAVE USED IN FORMULATING THEIR OPINIONS, AND THAT'S GIVEN

15   TO COUNSEL.  SO WE TRY TO KEEP IT TO THAT AREA.

16   BY MS. O'DELL:

17   Q.   DR. PECHMANN, WOULD YOU TURN TO PLAINTIFF'S EXHIBIT

18   1.2848, PLEASE.

19   A.   SURE.

20   Q.   DR. PECHMANN, WOULD YOU IDENTIFY THIS DOCUMENT, PLEASE.

21   A.   YES.  THIS WAS A DOCUMENT WRITTEN BY THE DOCTORS EMPLOYED

22   AT MERCK TO RESPOND WHEN A DOCTOR IN THE COMMUNITY HAD

23   QUESTIONS.  THIS IS CALLED THE PIR, PROFESSIONAL INFORMATION

24   REQUEST.

25   Q.   WHAT'S THE DATE ON THIS DOCUMENT?

Page 1140

1    A.    OCTOBER 2, 2001.

2              MS. O'DELL:  YOUR HONOR, AT THIS TIME I WOULD MOVE

3    INTO EVIDENCE 1.2848.

4              MR. BECK:  NO OBJECTION.

5              THE COURT:  LET IT BE ADMITTED.

6    BY MS. O'DELL:

7    Q.    DR. PECHMANN, I THINK YOU USED THE TERM PIR.  WOULD YOU

8    DEFINE THAT FOR US, PLEASE.

9    A.    YES.  IT'S A PROFESSIONAL INFORMATION REQUEST.

10   Q.    WHO'S AN INTENDED RECIPIENT OF A PIR, OR A PROFESSIONAL

11   INFORMATION REQUEST?

12   A.    YES.  HEALTHCARE PROFESSIONALS; MOST COMMONLY, A

13   PHYSICIAN.

14   Q.    WHAT DOES THIS PARTICULAR PIR LETTER ADDRESS?

15   A.    IT ADDRESSES VIGOR AND CARDIOVASCULAR ISSUES WITH RESPECT

16   TO VIOXX.

17   Q.    DR. PECHMANN, IF YOU WOULD, PLEASE, WOULD YOU IDENTIFY FOR

18   US, PLEASE, THE LOCATIONS IN THIS WHERE MERCK'S CV SAFETY

19   MESSAGE IS CONVEYED.

20   A.    SO UNDER "VIGOR TRIAL," THE SECOND PARAGRAPH, IT HAS THE

21   NAPROXEN IS CARDIOPROTECTIVE MESSAGE.

22   Q.    PLEASE JUST READ IT FOR US, IF YOU WOULD.

23   A.    SURE.  "THE LOWER INCIDENCE OF MI'S IN PATIENTS TREATED

24   WITH NAPROXEN COMPARED WITH PATIENTS TREATED WITH ROFECOXIB" --

25   WHICH IS VIOXX -- "IS CONSISTENT WITH NAPROXEN'S ABILITY TO

Page 1141

1    BLOCK THROMBOXANE A2 SYNTHESIS AND PLATELET AGGREGATION."

2    Q.    IS THIS PIR DATED AFTER THE WARNING LETTER?

3    A.    YES, IT IS.

4    Q.    WAS IT APPROVED BY THE FDA?

5    A.    NO, IT WAS NOT.

6    Q.    IF YOU WOULD, DR. PECHMANN, PLEASE TURN TO PAGE 2 OF THIS

7    DOCUMENT.

8    A.    YEAH.  IT HAS "SAFE AS PLACEBO" ON PAGE 2.

9    Q.    OKAY.  WOULD YOU READ THAT FOR US, THE LANGUAGE THAT

10   YOU'RE REFERRING TO.

11   A.    IT'S THE LAST -- THE SECOND-TO-THE-LAST SENTENCE, AT THE

12   BOTTOM.  "THE RESULTS OF THIS META-ANALYSIS DEMONSTRATE THAT

13   THE RISK OF SUSTAINING AN APTC EVENT" -- WHICH INCLUDES

14   CARDIOVASCULAR -- IT'S PRIMARILY CARDIOVASCULAR EVENTS -- "WAS

15   SIMILAR WHEN ROFECOXIB WAS COMPARED WITH PLACEBO AND WHEN

16   ROFECOXIB WAS COMPARED WITH NON-NAPROXEN NSAIDS (IBUPROFEN,

17   DICLOFENAC, NABUMETONE)."

18           MR. BECK:  I THINK SHE MIGHT BE OUTSIDE HER AREA OF

19   EXPERTISE.

20           THE COURT:  I TAKE THAT AS AN OBJECTION AND I

21   OVERRULE IT.

22   BY MS. O'DELL:

23   Q.    WAS THIS LETTER APPROVED BY THE FDA?

24   A.    NO.

25   Q.    DR. PECHMANN, IF YOU WOULD TURN TO PLAINTIFF'S EXHIBIT

Page 1142

1   1.2021, PLEASE.

2   A.   OKAY.  I HAVE IT.

3   Q.   WOULD YOU IDENTIFY THE DOCUMENT.

4   A.   YES.  THIS WAS A BULLETIN THAT MERCK MARKETING SENT OUT TO

5   MERCK REPRESENTATIVES ABOUT HOW TO TALK ABOUT THE LABEL CHANGE

6   OF APRIL 2002 WITH PHYSICIANS.

7   Q.   WOULD YOU IDENTIFY THIS DOCUMENT, PLEASE.  I MEAN, SORRY,

8   WOULD YOU TELL US THE DATE OF THE DOCUMENT.

9   A.   APRIL 11, 2002.

10  Q.   LET ME ASK:  WHO ARE BULLETINS SENT TO?

11  A.   THE MERCK REPRESENTATIVES IN THE FIELD.

12  Q.   WHERE DO THEY COME FROM?

13  A.   FROM MERCK'S MARKETING PEOPLE.

14  Q.   I SEE.  NOW, IF YOU WOULD TURN TO PAGE 2, IF YOU WOULDN'T

15  MIND.

16          THE COURT:  HAVE YOU ADMITTED THAT?

17          MS. O'DELL:  IT'S PLAINTIFF'S EXHIBIT 1.2021, AND WE

18  MOVE TO HAVE IT ADMITTED INTO EVIDENCE.

19          THE COURT:  LET IT BE ADMITTED.

20  BY MS. O'DELL:

21  Q.   DR. PECHMANN, DEFINE FOR US AGAIN, IF YOU WOULDN'T MIND,

22  WHAT AN OBSTACLE IS.

23  A.   IT'S SOMETHING THAT MIGHT PREVENT A PHYSICIAN FROM

24  PRESCRIBING VIOXX.

25  Q.   WHAT'S THE OBSTACLE THAT'S BEING DESCRIBED ON PAGE 2 OF

1    THIS DOCUMENT?

2    A.   THIS IS AN OBSTACLE RESPONSE GUIDE TO DIRECT THE MERCK

3    REPRESENTATIVES'S RESPONSES AN OBSTACLE SUCH AS THE PHYSICIAN

4    SAYING "I HEARD THAT THE VIOXX GI OUTCOMES STUDY," WHICH IS

5    VIGOR, "SHOWED AN INCIDENCE OF CV EVENTS FOR VIOXX THAT WAS

6    FIVE TIMES THAT SEEN FOR NAPROXEN."

7    Q.   OKAY.

8    A.   THAT WAS, OF COURSE, THE LABEL.

9    Q.   READ FOR US THE BOX IDENTIFIED AS NUMBER 4.

10   A.   YES.  SO THAT'S THE FINAL CONCLUSION.  HAVING GONE THROUGH

11   THE LABEL, THE FINAL CONCLUSION IS MERCK STANDS BEHIND THE

12   OVERALL/CV SAFETY OF VIOXX.

13   Q.   WHAT DID THIS BULLETIN DIRECT MERCK'S SALES

14   REPRESENTATIVES TO SAY TO DOCTORS WHEN THEY MET THIS OBSTACLE?

15   A.   WELL, THEY WERE SUPPOSED TO GO THROUGH THE LABEL BEFORE

16   THEY STATED THE PROMOTIONAL MESSAGE.  THE PROMOTIONAL MESSAGE

17   WAS NUMBER 4, AT THE BOTTOM, THAT THEY WERE SUPPOSED TO STATE

18   TO CONCLUDE MERCK STANDS BY THE OVERALL SAFETY OF VIOXX.

19   Q.   WAS THAT AFTER THE FDA WARNING LETTER?

20   A.   YES, MA'AM.

21   Q.   WAS THIS DOCUMENT CREATED AFTER THE LABEL CHANGE IN

22   APRIL 2002?

23   A.   YES.

24   Q.   WAS THIS DOCUMENT APPROVED BY THE FDA?

25   A.   NO.

1    Q.    WAS THE LANGUAGE THAT YOU READ IN THE BOX TO THE RIGHT

2    THERE BEGINNING "DOCTOR," WAS THAT CONTAINED IN THE VIOXX

3    LABEL?

4    A.    NO.

5    Q.    DR. PECHMANN, IF YOU WOULD TURN TO PLAINTIFF'S EXHIBIT

6    1.2032.

7    A.    OKAY.

8    Q.    IF YOU WOULD IDENTIFY THAT FOR US, PLEASE.

9    A.    THIS IS ANOTHER MERCK DOCUMENT, A MARKETING DOCUMENT.

10   IT'S THE MONTHLY EAR REVIEW.  EAR MEANS EARLY ASSESSMENT AND

11   RESPONSE.  IT'S DATED NOVEMBER -- I MEAN, 4 NOVEMBER 2001.

12   IT'S IMPROPERLY DATED BECAUSE IT WAS PREPARED JANUARY 2002, BUT

13   THEY FORGOT TO CHANGE THE YEAR.

14   Q.    WHAT IS THIS DOCUMENT?  WHAT'S THE PURPOSE OF THIS

15   DOCUMENT?

16   A.    TO PROVIDE THE TRACKING DATA TO THE MARKETING PEOPLE SO

17   THEY CAN SEE HOW THINGS ARE GOING OUT THERE IN THE MARKETPLACE:

18   ARE THEIR MESSAGES BEING DELIVERED, DO THE PHYSICIANS BELIEVE

19   THE MESSAGES, AND IS IT AFFECTING SALES.

20   Q.    HOW WOULD MERCK HAVE OBTAINED THIS DATA?  WHAT'S THE

21   TYPICAL . . .

22   A.    WELL, THEY OBTAIN THE DATA FROM THE DIFFERENT RESEARCH

23   FIRMS LIKE IMPACT RX, IMS, DWT.

24         MS. O'DELL:  I'M SORRY, YOUR HONOR.  I FORGOT TO MOVE

25   IT INTO EVIDENCE.  IT'S PLAINTIFF'S EXHIBIT 1.2032.

Page 1145

1          MR. BECK:  WE NEED TO APPROACH, JUDGE.

2          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

3     THE BENCH.)

4          MR. BECK:  THIS HAS BEEN THE SUBJECT OF REPEATED

5     RULINGS, INCLUDING AN IN LIMINE RULING, SO I'M A LITTLE

6     SURPRISED IT'S BEING BROUGHT UP AT TRIAL.  YOUR HONOR HAS RULED

7     SEVERAL TIMES THAT THESE TRACKING DOCUMENTS ARE TRIPLE AND

8     QUADRUPLE HEARSAY AND ARE NOT ADMISSIBLE AND THAT THIS WITNESS,

9     IN PARTICULAR, IS NOT ALLOWED TO BACK-DOOR INFORMATION IN

10    SAYING SHE RELIED ON IT.  THESE ARE THIRD-PARTY ENTITIES THAT

11    TRACK THINGS BY TALKING TO FOURTH AND FIFTH-PARTY ENTITIES

12    WHOSE NAMES AREN'T DISCLOSED.  THIS EXACT ISSUE CAME UP IN

13    MASON, AND WE OBJECTED AND YOUR HONOR SUSTAINED IT.

14         MS. O'DELL:  YOUR HONOR, IT'S SORT OF THE FOURTH ARM,

15    IF YOU WILL, OF AN INTEGRATED MARKETING CAMPAIGN IS TRACKING.

16    WE ARE NOT GOING TO OFFER THIS DOCUMENT TO TRY TO PUT INTO

17    EVIDENCE ANY HEARSAY STATEMENTS BY DOCTORS, BUT WE WOULD LIKE

18    TO SHOW GRAPHS, LIKE ED DID IN MASON, TO SHOW HOW THEY WERE

19    TRACKING THE DOCTORS' PRESCRIBING HABITS, HOW THEY UNDERSTOOD

20    THE MESSAGE, AND HOW THAT AFFECTED SALES.

21         MR. BECK:  SHE ALREADY TESTIFIED THEY DID THAT KIND

22    OF TRACKING, AND THAT'S WHAT YOUR HONOR HAS ALLOWED.  I DIDN'T

23    OBJECT THEN, AND NOW THEY ARE GETTING INTO THE CONTENT OF

24    HEARSAY.

25         THE COURT:  THE PROBLEM THAT I HAVE WITH THE DOCUMENT

1   IS I DON'T KNOW HOW I LET IT IN AND TELL THEM NOT TO READ IT OR

2   WHAT'S SAID ON IT IS NOT ACCURATE.  I DON'T KNOW WHETHER IT'S

3   ACCURATE BECAUSE THIS IS, AS I SAID IN MY RULING, TWO AND THREE

4   HEARSAY.  IT SEEMS TO ME THAT YOU CAN LOOK AT IT AND SAY

5   WHETHER OR NOT THEY TRACKED AND WHETHER OR NOT THE MESSAGE WAS

6   SUCCESSFUL BASED ON THEIR TRACKING, BUT THEN WE HAVE TO MOVE

7   ON.  IT'S NOT ADMISSIBLE INTO EVIDENCE.

8           MS. O'DELL:  YES, SIR.

9           THE COURT:  THE FACT OF THE TRACKING IS ADMISSIBLE.

10          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

11   OPEN COURT.)

12   BY MS. O'DELL:

13   Q.   DR. PECHMANN, DID MERCK TRACK THE PRESCRIBING HABITS OF

14   DOCTORS?

15   A.   YES, THEY DID.  THEY KNEW THE NAMES OF THE DOCTORS, THEY

16   TRACKED THE PRESCRIBING HABITS OF THE DOCTORS.

17   Q.   WHY DID THEY DO THAT?

18          MR. BECK:  YOUR HONOR, I OBJECT.  THIS GOES BEYOND

19   WHAT YOU SAID.

20          THE COURT:  WELL, I DON'T THINK IT DOES.  I'LL ALLOW

21   THAT.  WHY DID THEY DO IT?

22          THE WITNESS:  SO THAT THEY COULD MAKE SURE THAT THEIR

23   MARKETING MESSAGES WERE WORKING AND THAT IT WAS IMPROVING

24   SALES.

25          THE COURT:  SHE WANTS TO KNOW WHETHER OR NOT THE

Page 1147

1   TRACKING INDICATED THAT IT DID OR DID NOT.

2           THE WITNESS:  YES, IT DID.  THE TRACKING SHOWED THAT

3   MARKETING MESSAGES WERE WORKING.

4           THE COURT:  ALL RIGHT.

5   BY MS. O'DELL:

6   Q.  IF YOU TURN, DR. PECHMANN, TO 1.2031 IN YOUR BINDER,

7   PLEASE.

8   A.  OKAY.

9   Q.  WOULD YOU PLEASE IDENTIFY THIS DOCUMENT.

10  A.  THIS IS A MERCK MARKETING DOCUMENT CALLED OPERATIONS

11  REVIEW FOR VIOXX.

12  Q.  WHAT'S THE DATE ON THE DOCUMENT?

13  A.  JANUARY 31, 2003.

14  Q.  DID YOU RELY ON THIS DOCUMENT IN FORMULATING YOUR

15  OPINIONS?

16  A.  YES.

17          MS. O'DELL:  YOUR HONOR, AT THIS TIME I MOVE INTO

18  EVIDENCE 1.2031.

19          MR. BECK:  NO OBJECTION.

20  BY MS. O'DELL:

21  Q.  DR. PECHMANN, IF YOU WOULD TURN TO PAGE 45.

22  A.  I HAVE IT.

23  Q.  IF YOU WOULD TELL US WHAT THIS IS, DR. PECHMANN?

24  A.  SO MERCK IS REVIEWING THE EFFECTIVENESS OF ITS DIFFERENT

25  MARKETING PROGRAMS FROM 2001, JUNE 2001 THROUGH DECEMBER 2002.

1    THE LINE IS NEW PRESCRIPTIONS OF VIOXX AND NUMBER OF NEW

2    PRESCRIPTIONS.   THE VOLUME IS ON THE Y AXIS.

3    Q.   I SEE.   THERE ARE LITTLE BOXES THAT WE SEE WITH -- TELL US

4    WHAT THOSE ARE AND, YOU KNOW, WHAT THOSE SIGNIFY.

5    A.   SO THE BOXES AT THE TOP ARE EVENTS THAT OCCURRED

6    EXTERNALLY THAT COULD HAVE AFFECTED NEW PRESCRIBING.   THE BOXES

7    AT THE BOTTOM ARE ALL THE PROGRAMS THAT THEY LAUNCHED BECAUSE

8    THE WHOLE POINT OF THE INTEGRATED CAMPAIGN AND TRACKING IS THAT

9    IF YOU SEE SALES DROPPING, YOU LAUNCH A NEW PROGRAM WITH NEW

10   MESSAGES TO GET THOSE SALES BACK UP.

11            SO, FOR EXAMPLE, YOU SEE IN SUMMER OF 2001, YOU HAVE

12   GOT THE JAMA ARTICLE -- ACTUALLY, I THINK IT'S AUGUST -- THE

13   JAMA ARTICLE, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, THE

14   TOPOL ARTICLE, AND THAT TALKED ABOUT CV RISKS WITH COX-2'S LIKE

15   VIOXX.   SO SALES -- NEW PRESCRIPTIONS DROPPED.   PHYSICIANS

16   STOPPED GIVING OUT NEW PRESCRIPTIONS OF VIOXX.   SO THEY

17   LAUNCHED PROJECT OFFENSE, WHICH IS A MARKETING PROGRAM TO

18   IMPROVE SALES, AND THEN THEY ARE SHOWING HERE THAT IT WAS

19   HIGHLY EFFECTIVE.

20   Q.   JUST, IF YOU WOULD STEP BACK, ARE YOU FAMILIAR WITH

21   PROJECT OFFENSE?

22   A.   YES.

23   Q.   WOULD YOU DESCRIBE THAT, WHAT THAT PROJECT OFFENSE WAS?

24   A.   YES.   IT WAS GOING ON THE OFFENSE ABOUT THE CV RISKS AND

25   USING THE OBSTACLE-RESPONSE GUIDE AND THE CARDIOVASCULAR CARD

1    TO PERSUADE DOCTORS THAT THERE WAS NO CV RISK, NO HEART ATTACK

2    RISKS, AND THAT ALSO INCLUDED AND SENT THIS TO THE SALES REPS.

3    Q.    DID PROJECT OFFENSE ALSO INCLUDE PIR'S?

4    A.    YES, IT DID.

5    Q.    DEAR DOCTOR LETTERS?

6    A.    YES, IT DID.

7    Q.    DOES THE FDA REVIEW RESEARCH LIKE THIS?

8    A.    NO, THEY DO NOT.

9    Q.    WOULD YOU DESCRIBE THE VIOXX INTEGRATED MARKETING CAMPAIGN

10   AS LARGE?

11   A.    YES.  IT WAS VERY LARGE.

12   Q.    PLEASE EXPLAIN WHY.

13   A.    WELL, IN 2000, IT WAS THE NUMBER ONE PRESCRIPTION DRUG

14   ADVERTISED, AND IT WAS -- ITS BUDGET WAS LARGER THAN MANY OTHER

15   BUDGETS FOR OTHER CONSUMER PACKAGE GOODS.

16   Q.    WAS THE MARKETING PLAN WELL-IMPLEMENTED?

17   A.    EXTREMELY WELL-IMPLEMENTED.  THEY HAD VERY, VERY GOOD

18   CONTROL OVER THESE MESSAGES.

19   Q.    WAS IT EVER PART OF THE PLAN TO COMMUNICATE THAT VIOXX

20   INCREASED THE RISK OF A HEART ATTACK?

21   A.    NO, THAT WAS NOT PART OF THE PLAN.

22   Q.    IF MERCK HAD WANTED TO SEND THAT MESSAGE AND CONVEY THAT

23   MESSAGE, DID IT HAVE THE RESOURCES TO DO THAT?

24   A.    YES.

25             MR. BECK:  I OBJECT, YOUR HONOR.

1              THE COURT:  SUSTAINED.

2              MS. O'DELL:  I HAVE NOTHING FURTHER, YOUR HONOR.

3              THE COURT:  YOU MAY PROCEED, COUNSEL.

4              MR. BECK:  COULD WE TAKE A SHORT BREAK TO SET UP?

5              THE COURT:  WE'LL TAKE A SHORT BREAK.

6              THE DEPUTY CLERK:  EVERYONE RISE.

7              (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

8              THE DEPUTY CLERK:  EVERYONE RISE.

9              THE COURT:  BE SEATED, PLEASE.  YOU MAY

10    CROSS-EXAMINE, COUNSEL.

11                       CROSS-EXAMINATION

12    BY MR. BECK:

13    Q.   DR. PECHMANN, OTHER THAN YOUR WORK AS AN EXPERT FOR THE

14    PLAINTIFF LAWYERS, HAVE YOU EVER DONE ANY INDEPENDENT RESEARCH

15    ON THE INTEGRATED MARKETING CAMPAIGNS OF ANY PHARMACEUTICAL

16    COMPANY?

17    A.   NO, I HAVE NOT.

18    Q.   HAVE YOU EVER CONSULTED, ACTUALLY CONSULTED, WITH A

19    PHARMACEUTICAL COMPANY REGARDING AN INTEGRATED MARKETING

20    CAMPAIGN?

21    A.   NO, I HAVE NOT.

22    Q.   HAVE YOU EVER WORKED WITH AN AD AGENCY WHO HAD DEVELOPED

23    AN INTEGRATED MARKETING COMMUNICATIONS CAMPAIGN FOR A

24    PHARMACEUTICAL COMPANY?

25    A.   PROBABLY, BUT I DIDN'T WORK ON THAT ACCOUNT.

1   Q.   YOU WORKED ON SOMETHING ELSE.   YOU NEVER WORKED WITH AN AD

2   AGENCY ON AN INTEGRATED MARKETING CAMPAIGN FOR A PHARMACEUTICAL

3   COMPANY; RIGHT?

4   A.   CORRECT.

5   Q.   THEN I THINK YOU SAID THAT A DOCTOR FROM THE UNIVERSITY OF

6   CHICAGO WHO HAD SOME CONNECTION WITH MERCK, PRESUMABLY, ASKED

7   IF YOU WOULD BE INTERESTED IN GETTING INVOLVED IN AN INTEGRATED

8   MARKETING CAMPAIGN FOR ONE OF MERCK'S MEDICINES?

9   A.   CORRECT.

10  Q.   WHAT WAS THAT MEDICINE?

11  A.   THE CERVICAL CANCER DRUG.

12  Q.   WOULD IT BE A GOOD IDEA FOR A PHARMACEUTICAL COMPANY WHO

13  HAD A NEW CERVICAL CANCER MEDICINE TO HAVE AN INTEGRATED

14  MARKETING CAMPAIGN?

15  A.   BECAUSE IT'S A HIGHLY EFFECTIVE WAY TO COMMUNICATE ABOUT

16  YOUR PRODUCT.

17  Q.   IF SOMEBODY HAD A GOOD, NEW CERVICAL CANCER MEDICINE,

18  WOULD AN INTEGRATED MARKETING CAMPAIGN HELP EDUCATE DOCTORS TO

19  TREATMENTS THAT THEY MIGHT NOT OTHERWISE REALIZE WERE

20  AVAILABLE?

21  A.   YES, IT COULD.

22  Q.   COULD AN INTEGRATED MARKETING CAMPAIGN FOR SOMETHING LIKE

23  A CERVICAL CANCER MEDICINE ALSO EDUCATE PATIENTS SO THAT, WHEN

24  THEY WENT AND SAW THEIR DOCTOR, THEY MIGHT MENTION THIS AND

25  THEN GET BETTER MEDICAL CARE AS A RESULT?

1    A.    YES.

2    Q.    IS THAT TRUE ABOUT OTHER INTEGRATED MARKETING CAMPAIGNS

3    THAT YOU HAVE OBSERVED, FROM AFAR, AT LEAST, CONCERNING SOME

4    PRESCRIPTION MEDICINES?

5    A.    ALL OF THOSE QUESTIONS?

6    Q.    WELL, HAVE YOU SEEN ADS FOR STATINS?

7    A.    YES.

8    Q.    STATINS ARE DRUGS LIKE ZOCOR OR OTHERS THAT HELP LOWER

9    CHOLESTEROL; RIGHT?

10   A.    RIGHT.

11   Q.    HELP GUARD AGAINST HEART ATTACKS?

12   A.    YES.

13   Q.    HAVE YOU SEEN THAT THE DIFFERENT PHARMACEUTICAL COMPANIES

14   HAVE INTEGRATED MARKETING CAMPAIGNS TO EDUCATE THE PUBLIC ABOUT

15   STATINS, THESE ANTICHOLESTEROL MEDICINES?

16   A.    I HAVEN'T READ ABOUT THAT ONE IN PARTICULAR THAT I

17   REMEMBER, BUT THE BIG COMPANIES TEND TO USE INTEGRATED

18   MARKETING CAMPAIGNS.

19   Q.    FOR SOMETHING LIKE A STATIN THAT LOWERS HEART ATTACK RISKS

20   BY FIGHTING CHOLESTEROL, THAT WOULD BE A GOOD EFFECT OF AN

21   INTEGRATED MARKETING CAMPAIGN?

22   A.    WELL, THE RESEARCH IS CONTROVERSIAL BECAUSE IT SHOWS IT

23   CAN LEAD TO OVERPRESCRIBING BUT CAN ALSO CORRECT

24   UNDERPRESCRIBING.  SO IT KIND OF HAS A POSITIVE AND A NEGATIVE

25   EFFECT.

1    Q.    AS I UNDERSTAND IT, EVEN THOUGH YOU HAVE NOT BEEN INVOLVED

2    IN AN INTEGRATED MARKETING CAMPAIGN IN ANY CAPACITY FOR A

3    PHARMACEUTICAL COMPANY, YOUR EXPERTISE MORE GENERALLY APPLIES

4    REGARDLESS OF WHAT THE PARTICULAR INDUSTRY IS; IS THAT RIGHT?

5    A.    RIGHT.   THAT'S HOW IT'S COMMONLY BELIEVED TO BE THE CASE.

6    Q.    ARE INTEGRATED MARKETING CAMPAIGNS USED BY DIFFERENT

7    COMPANIES IN ALL SORTS OF DIFFERENT INDUSTRIES?

8    A.    YES.

9    Q.    IN FACT, DO YOU TEACH YOUR STUDENTS THE ELEMENTS OF AN

10   INTEGRATED MARKETING CAMPAIGN SO THAT THEY CAN GO OUT INTO THE

11   WORLD, WHETHER IT'S FOR THE PHARMACEUTICAL COMPANY OR SOMEBODY

12   ELSE, AND USE THOSE TOOLS EFFECTIVELY?

13   A.    YES.

14   Q.    AS PART OF YOUR TEACHING, DO YOU TELL YOUR STUDENTS THAT

15   IT'S A GOOD PRACTICE FOR A COMPANY TO USE AN INTEGRATED

16   MARKETING CAMPAIGN IF THEY'RE GOING TO BE DOING ANY SORT OF

17   PROMOTIONAL ACTIVITIES?

18   A.    YES.

19   Q.    YOU DESCRIBED THE DIFFERENT TOOLS -- I THINK YOU REFER TO

20   THEM AS INTEGRATED MARKETING CAMPAIGN -- LIKE RESEARCH AND

21   PUBLIC RELATIONS AND KEEPING TRACK OF RESULTS, THAT SORT OF

22   THING.

23   A.    YES.

24   Q.    NOW, OBVIOUSLY, MERCK DIDN'T INVENT THOSE TOOLS OR STEPS,

25   DID THEY?

Page 1154

1    A.    NO, THEY DID NOT.

2    Q.    WOULD YOU EXPECT ALL PHARMACEUTICAL COMPANIES TO EMPLOY

3    INTEGRATED MARKETING CAMPAIGNS, FOLLOWING THE TRIED-AND-TRUE

4    METHODS THAT YOU HAVE DESCRIBED TO THE JURY?

5    A.    THAT I CAN'T COMMENT ON WHETHER THEY DO THAT OR NOT.  THE

6    MAJOR ONES DO.

7    Q.    OKAY.  THE MAJOR ONES WOULD.  YOU WOULD EXPECT PFIZER, FOR

8    EXAMPLE, TO FOLLOW THE PRINCIPLES OF INTEGRATED MARKETING

9    CAMPAIGNS; RIGHT?

10   A.    YES.

11   Q.    IN FACT, DO YOU KNOW THAT THEY HAD SUCH A CAMPAIGN

12   INVOLVING CELEBREX?

13   A.    YES.

14   Q.    YOU TALKED ABOUT HOW MERCK, ONE OF THE THINGS THEY DID WAS

15   TRACKED PRESCRIPTIONS BY DOCTOR.  THAT KIND OF INFORMATION IS

16   AVAILABLE TO ALL PHARMACEUTICAL COMPANIES; CORRECT?

17   A.    YES.  IF THEY PAY FOR IT.

18   Q.    DO YOU KNOW WHETHER THE PHARMACEUTICAL COMPANIES THAT MADE

19   OTHER ANTI-INFLAMMATORIES, NOT JUST CELEBREX, ALSO USED

20   INTEGRATED MARKETING CAMPAIGNS?

21   A.    OTHER THAN CELEBREX?

22   Q.    YES.

23   A.    YES, THEY DID.

24   Q.    I'M HANDING YOU WHAT WE HAVE MARKED AS DEFENSE EXHIBIT

25   3679.  DO YOU RECOGNIZE THIS SLIDE, DOCTOR?

1   A.   YES, I DO.

2   Q.   WAS THIS SLIDE PREPARED BY YOU?

3   A.   YES, IT WAS.

4   Q.   IS IT A DOCUMENT THAT IS YOUR ATTEMPT TO DESCRIBE IN A

5   GENERAL SENSE WHAT A INTEGRATED MARKETING CAMPAIGN IS.

6   A.   YES.

7   Q.   IT'S NOT SPECIFIC TO VIOXX OR SPECIFIC TO MERCK; RIGHT?

8   A.   CORRECT.

9           MR. BECK:  WE OFFER DX-3679.

10          MS. O'DELL:  NO OBJECTION.

11          THE COURT:  LET IT BE ADMITTED.

12  BY MR. BECK:

13  Q.   DOES THIS SLIDE REFLECT HOW YOU AND COLLEAGUES WOULD TEACH

14  STUDENTS AND TRAIN THEM HOW TO GO OUT IN THE WORLD AND

15  IMPLEMENT AN INTEGRATED MARKETING CAMPAIGN?

16  A.   EXCEPT STEP 1.

17  Q.   WELL, FIRST, BEFORE WE GET TO THE INDIVIDUAL STEPS,

18  DIFFERENT INDUSTRIES THAT YOU HAVE WORKED IN, YOU HAVE LEARNED,

19  HAVE THEIR OWN KIND OF TERMINOLOGY; RIGHT?  THAT SORT OF THEIR

20  LITTLE WORDS AND PHRASES MEAN SOMETHING TO THEM.  IT MIGHT MEAN

21  SOMETHING ELSE TO SOMEONE WHO IS NOT IN THAT INDUSTRY.

22  A.   CORRECT.

23  Q.   THAT'S TRUE OF PEOPLE IN YOUR FIELD IN MARKETING; RIGHT?

24  A.   YES.

25  Q.   IN MARKETING THERE ARE TERMS OR WORDS THAT HAVE A SPECIFIC

1    MEANING TO MARKETERS THAT MAY HAVE A DIFFERENT MEANING TO

2    PEOPLE WHO ARE NOT IN YOUR PROFESSION; IS THAT RIGHT?

3    A.   YES.

4    Q.   SO STEP 1 ABOUT IDENTIFYING OBSTACLES TO PRODUCT SALES,

5    THE TERM OBSTACLES, AS YOU USED IT IN THIS DOCUMENT AND AS YOU

6    USE IT WITH YOUR STUDENTS AND YOUR COLLEAGUES, JUST GENERALLY

7    MEANS ANY BARRIER TO SALES; RIGHT?

8    A.   YES.

9    Q.   WE SAW THE WORD OBSTACLES IN SOME OF THE MERCK MARKETING

10   DOCUMENTS.  MERCK DIDN'T COME UP WITH THE TERM OBSTACLES WHEN

11   IT COMES TO INTEGRATED MARKETING CAMPAIGNS; RIGHT?

12   A.   CORRECT.

13   Q.   OBSTACLES IS A GENERIC TERM THAT MARKETING PROFESSIONALS

14   USE EVERY DAY; RIGHT?

15   A.   DEPENDING ON THE INDUSTRY, YES.

16   Q.   YOU DON'T MEAN ANYTHING NEGATIVE JUST BECAUSE THE MERCK

17   PEOPLE USE THE TERM OBSTACLES IN THEIR DOCUMENT; RIGHT?

18   A.   CORRECT.

19   Q.   YOU SAID THAT WHAT YOU DO WITH OBSTACLES IS YOU

20   REFORMULATE THE PRODUCT?

21   A.   YES.

22   Q.   WELL, OF COURSE, AN OBSTACLE CAN MEAN JUST A QUESTION THAT

23   SOMEBODY HAS THAT NEEDS TO BE ANSWERED; RIGHT?

24   A.   POSSIBLY.  BUT, GENERALLY, AN OBSTACLE IN THE CAMPAIGNS

25   THAT I HAVE REVIEWED HAS BEEN A PROBLEM WITH A PRODUCT.

Page 1157

1  Q.   WAS YOUR DEPOSITION TAKEN WHEN YOU WERE UNDER OATH ON

2  NOVEMBER 7, 2006?

3  A.   I WAS UNDER OATH WHEN I WAS DEPOSED, YES.

4  Q.   PAGE 1526:

5          "Q.  AN OBSTACLE CAN MEAN ANY QUESTION THAT A

6      PHYSICIAN HAS; RIGHT?

7          "A.  CORRECT."

8          WAS THAT YOUR SWORN TESTIMONY?

9  A.   YES.

10 Q.   AN EXAMPLE OF AN OBSTACLE IN THE VIOXX CONTEXT OR ANY DRUG

11 CONTEXT COULD BE A QUESTION LIKE IS ONE DRUG MORE EXPENSIVE

12 THAN ANOTHER ONE.  THAT WOULD BE AN OBSTACLE?

13 A.   YES.

14 Q.   AN OBSTACLE COULD BE SOMETHING LIKE "I DON'T UNDERSTAND

15 THE DOSING.  I DON'T KNOW WHETHER IT'S SUPPOSED TO GET

16 50 MILLIGRAMS OR 25 MILLIGRAMS"?  THAT COULD BE AN OBSTACLE?

17 A.   YES.

18 Q.   YOU KNOW FROM THE MATERIALS THAT YOU LOOKED AT, WHEN MERCK

19 USED THE TERM OBSTACLES IN ITS MARKETING MATERIALS, MERCK WAS

20 NOT ALWAYS REFERRING TO CARDIOVASCULAR ISSUES; CORRECT?

21 A.   CORRECT.

22 Q.   IN FACT, THERE WOULD BE THINGS LIKE AN OBSTACLE THAT WOULD

23 BE IDENTIFIED BY MERCK WOULD BE SOMETHING LIKE A PHYSICIAN

24 SAYING, "CAN I USE VIOXX WITH A PATIENT WHO'S USING SPECIFIC

25 OTHER MEDICATION?"  RIGHT?

Page 1158

1   A.   YES.  YOU'RE CORRECT.

2   Q.   THAT'S A QUESTION THAT A DOCTOR HAS ABOUT WHETHER IT'S

3   APPROPRIATE TO USE ONE MEDICINE WITH ANOTHER, AND UNTIL HE GETS

4   AN ANSWER TO THAT, THAT'S AN OBSTACLE; CORRECT?

5   A.   YES.

6   Q.   IN FACT, YOU HAVE SEEN THAT THERE ARE EVEN QUESTIONS LIKE

7   IS VIOXX AN ANTI-INFLAMMATORY DRUG, WHERE DOCTORS MIGHT BE

8   CONFUSED ABOUT WHETHER IT FIGHTS INFLAMMATION; RIGHT?

9   A.   YES.

10  Q.   IF A DOCTOR IS CONFUSED ABOUT WHETHER IT FIGHTS

11  INFLAMMATION, THAT, TOO, IS AN OBSTACLE, AS MERCK USED THE

12  TERM; RIGHT?

13  A.   YES.

14  Q.   THEN YOUR SLIDE ALSO SAYS THAT ANYBODY DOING AN INTEGRATED

15  MARKETING CAMPAIGN SHOULD DEVELOP A FEW SIMPLE KEY MESSAGES TO

16  COUNTER OR NEUTRALIZE THOSE OBSTACLES?

17  A.   YES.

18  Q.   AGAIN, THIS TERM NEUTRALIZE HAS ITS OWN MEANING IN THE

19  MARKETING PROFESSION; RIGHT?

20  A.   I THINK IT HAS A FAIRLY COMMON MEANING.

21  Q.   WELL, ISN'T NEUTRALIZE ONE OF THOSE TERMS LIKE OBSTACLE

22  THAT HAS KIND OF A SPECIALIZED MEANING WITHIN THE MARKETING

23  PROFESSION, VERSUS THE WAY THAT THE REST OF US MIGHT THINK OF

24  IT?

25  A.   POSSIBLY.

1  Q.   WELL, THE LAST TIME YOU WERE ASKED THAT QUESTION, YOU

2  DIDN'T HAVE ANY TROUBLE ANSWERING "YES," DID YOU?

3  A.   NO.  I SAID IT WAS SYNONYMOUS TO NULLIFY.  IT'S -- YOU

4  KNOW, SO THAT'S ONE OF THE WORDS WE USE.

5  Q.   WELL, NEUTRALIZE, THAT CAN MEAN OVERCOMING AN OBSTACLE,

6  SUCH AS A MISUNDERSTANDING BY THE PHYSICIAN, ABOUT WHETHER A

7  DRUG CAN BE USED WITH ANOTHER DRUG; RIGHT?

8  A.   YES.

9  Q.   SO IF WE WANT TO SUBSTITUTE NULLIFY, STILL WHAT WE ARE

10  TALKING ABOUT IS SOMEONE HAS A QUESTION, AND UNTIL THAT

11  QUESTION GETS ANSWERED, IT'S AN OBSTACLE; AND ONCE THE QUESTION

12  GETS ANSWERED SO THE PERSON HAS THE INFORMATION, THEN YOU'VE

13  NEUTRALIZED THE OBSTACLE THEN; RIGHT.

14  A.   YES.

15  Q.   CERTAINLY, IF THERE WERE MISPERCEPTIONS ABOUT A PARTICULAR

16  PRESCRIPTION DRUG, A DRUG COMPANY WOULD WANT TO NEUTRALIZE THAT

17  BY GIVING INFORMATION SO THAT PEOPLE UNDERSTOOD THE DRUG;

18  RIGHT?

19  A.   YES.

20  Q.   DO YOU AGREE THAT ONE WAY TO NEUTRALIZE A MISPERCEPTION

21  ABOUT A PRODUCT IS TO BRING THE CONSUMERS BACK TO A BALANCED OR

22  NEUTRAL POSITION?

23  A.   THAT'S NOT A COMMON INTERPRETATION OF THAT WORD.

24  Q.   DO YOU SEE HERE IN PRIOR TESTIMONY YOU WERE ASKED:

25          "Q.  NOW, THE TERM, THEN, IF WE ARE TALKING ABOUT

1          THAT KIND OF AN EXAMPLE OF AN OBSTACLE, ONE WAY TO

2          NEUTRALIZE A MISPERCEPTION ABOUT YOUR PRODUCT WOULD BE TO

3          BRING THE CONSUMERS BACK TO A BALANCED OR NEUTRAL

4          POSITION; RIGHT?

5               "A.  CORRECT."

6               CORRECT.

7     A.   YES.  I STILL BELIEVE THAT.  YOU ASKED ME A DIFFERENT

8     QUESTION THIS TIME.

9     Q.   I THINK YOU INDICATED YOU WORKED ON AN ANTISMOKING

10    CAMPAIGN.

11    A.   ANTIDRUG, YES.

12    Q.   ONE OF THE THINGS WHEN YOU WERE WORKING ON THE ANTISMOKING

13    PART OF IT WAS THAT, IN THE MOVIES, THERE WOULD BE MOVIE STARS

14    SMOKING CIGARETTES, AND YOUR CONCERN WAS THAT MIGHT INFLUENCE

15    YOUNG PEOPLE TO THINK THAT SMOKING WAS GLAMOROUS; CORRECT?

16    A.   CORRECT.

17    Q.   THE FACT THAT THERE WERE THESE MOVIE STARS MAKING SMOKING

18    LOOK GLAMOROUS, THAT WAS AN OBSTACLE TO THE MESSAGE THAT YOU

19    AND YOUR COLLEAGUES WERE TRYING TO DEVELOP; RIGHT?

20    A.   WELL, WE DIDN'T HAVE A MESSAGE IN THE MOVIE, BUT IT WAS AN

21    OBSTACLE TO . . .

22    Q.   IT WAS AN OBSTACLE TO THE ANTISMOKING CAMPAIGN?

23    A.   YES.

24    Q.   ONE WAY THAT YOU AND YOUR COLLEAGUES SUGGESTED OF GETTING

25    OUT THE ANTISMOKING MESSAGE WOULD BE TO NEUTRALIZE THE EFFECT

1  OF SMOKING IN THE MOVIES BY PRESENTING A MORE BALANCED

2  PRESENTATION CONCERNING THE RISKS OF SMOKING; RIGHT?

3  A.   RIGHT.

4  Q.   YOU TALKED ABOUT SOME SOURCES OF INFORMATION THAT DOCTORS

5  HAVE.  DO YOU REMEMBER THAT?

6  A.   IN PRIOR TESTIMONY OR AT DEPOSITIONS OR TODAY.

7  Q.   NO, NO.  TODAY, WHEN YOU WERE TALKING ABOUT -- YOU SAID

8  THAT THE DOCTORS WERE BASICALLY THE AUDIENCE THAT MERCK WAS

9  COMMUNICATING WITH AND THAT THERE WERE DIFFERENT WAYS DIFFERENT

10  SOURCES OF INFORMATION OR MEANS OF COMMUNICATION WHERE DOCTORS

11  WOULD GET THEIR INFORMATION ABOUT VIOXX.

12  A.   RIGHT.  DIFFERENT TOOLS, YEAH.

13  Q.   OBVIOUSLY, YOU UNDERSTAND THAT, WITH A PRESCRIPTION DRUG,

14  A CONSUMER CAN'T JUST GO AND BUY IT; IT NEEDS TO HAVE A

15  PRESCRIPTION WRITTEN BY A DOCTOR.  RIGHT?

16  A.   YES.

17  Q.   IN ADDITION TO THE TOOLS THAT YOU TALKED ABOUT AS A PART

18  OF MERCK'S INTEGRATED MARKETING CAMPAIGN ABOUT INFORMATION

19  CONCERNING VIOXX, DO DOCTORS HAVE A LOT OF OTHER SOURCES OF

20  INFORMATION CONCERNING THE BENEFITS, THE RISKS, THE SIDE

21  EFFECTS, ETC., ABOUT VIOXX?

22  A.   YES.

23  Q.   WOULD ONE SOURCE OF INFORMATION BE MEDICAL ARTICLES, LIKE

24  YOU REFERRED TO DR. TOPOL'S ARTICLE?

25  A.   YES.

Page 1162

1  Q.   OBVIOUSLY, DOCTORS ALSO GET INFORMATION FROM THE PRODUCT

2  LABEL ITSELF; RIGHT?

3  A.   YES.

4  Q.   DO DOCTORS GET INFORMATION ABOUT DIFFERENT DRUGS,

5  INCLUDING VIOXX, BY ATTENDING MEDICAL CONFERENCES?

6  A.   YES.

7  Q.   DO DOCTORS GET INFORMATION ABOUT VIOXX AND OTHER DRUGS

8  SIMPLY FROM TALKING TO ONE ANOTHER AND SHARING THEIR EXPERIENCE

9  WITH PATIENTS?

10 A.   YES.

11 Q.   YOU TALKED ABOUT SALES REPS AND HOW THEY WOULD GO OUT AND

12 TALK TO DOCTORS.  DO YOU RECALL THAT?

13 A.   YES.

14 Q.   YOU KNOW CLEARLY THAT MERCK IS NOT THE ONLY PHARMACEUTICAL

15 COMPANY THAT HAS SALES REPRESENTATIVES; RIGHT?

16 A.   CORRECT.

17 Q.   PFIZER HAS CERTAINLY GOT SALES REPS OUT THERE AS WELL?

18 A.   ABSOLUTELY.

19 Q.   I THINK YOU HEARD FROM DR. ANSTICE, BUT I'M SURE YOU KNEW

20 ALREADY THAT, TYPICALLY, SALES REPS ARE NOT PEOPLE WHO

21 GRADUATED FROM MEDICAL SCHOOL, OR EVEN NURSES; RIGHT?

22 A.   CORRECT.

23 Q.   THE DOCTORS WHO ARE LISTENING TO THE SALES REPS, THEY

24 UNDERSTAND THESE PEOPLE ARE NOT DOCTORS, NOT NURSES, BUT, IN

25 FACT, ARE SALES REPS; RIGHT?

Page 1163

1   A.   YES.

2   Q.   SOMETIMES, WHEN ONE COMPANY'S SALES REP CALLS ON A DOCTOR,

3   WILL THE SALES REP TALK ABOUT THE OTHER COMPANY'S MEDICINE?

4   A.   YES.

5   Q.   IS THAT CALLED COUNTER-DETAILING?

6   A.   YES.

7   Q.   THAT'S WHERE A SALES REP FROM ONE COMPANY DISCUSSES THE

8   COMPETITOR'S PRODUCT BUT PROBABLY IN A MORE NEGATIVE WAY;

9   RIGHT?

10   A.   YES.

11   Q.   IN YOUR WORK IN THIS CASE, DID YOU SEE EXAMPLES WHERE

12   MERCK'S COMPETITORS USED THEIR SALES FORCE TO DISSEMINATE

13   INFORMATION TO THE SAME DOCTORS CONCERNING VIOXX?

14   A.   YES.

15   Q.   WHEN THE COMPETITORS WERE USING THEIR SALES FORCE TO TALK

16   ABOUT VIOXX, THEIR SALES FORCE WAS TALKING ABOUT NEGATIVE

17   THINGS ABOUT VIOXX; RIGHT?

18   A.   THAT'S WHAT I READ ABOUT.

19   Q.   SO, IN ADDITION TO GETTING INFORMATION FROM MERCK ABOUT

20   VIOXX, ALL THESE SAME DOCTORS ARE BEING DETAILED BY THE PFIZER

21   REPS WHO ARE TRYING TO GET THEM TO PRESCRIBE CELEBREX INSTEAD;

22   RIGHT?

23   A.   YES.

24   Q.   THE PFIZER REPS CERTAINLY WERE NOT GOING TO BE SHY ABOUT

25   TALKING ABOUT THEIR PERCEPTION OF MERCK'S RISKS AND BENEFITS;

Page 1164

1   RIGHT?

2   A.   WELL, I DON'T HAVE ANY DATA SPECIFICALLY ON THAT, BUT I

3   HAVE READ OF INSTANCES WHERE THAT HAPPENED.

4   Q.   IN TERMS OF THE MERCK SALES REPS AND WHAT THEY CAN SAY

5   ABOUT VIOXX, DO YOU UNDERSTAND THAT MERCK'S SALES REPS ARE

6   REQUIRED TO DISCUSS MERCK'S PRODUCTS ONLY IN A MANNER THAT IS

7   CONSISTENT WITH THE FDA-APPROVED LABEL?

8   A.   YES.

9   Q.   DO YOU UNDERSTAND THAT THAT IS MERCK'S POLICY?

10  A.   YES.

11  Q.   DO YOU UNDERSTAND THAT THAT'S ALSO WHAT THE FDA WANTS

12  SALES REPS TO DO?

13  A.   YES.

14  Q.   THAT THE FDA WANTS SALES REPS TO CONFINE THEMSELVES WHEN

15  TALKING WITH THE DOCTORS TO INFORMATION THAT IS CONSISTENT WITH

16  WHAT THE FDA HAS APPROVED IN TERMS OF THE LANGUAGE OF THE

17  LABEL; CORRECT?

18  A.   YES.

19          THE COURT:  COUNSEL, I'M GOING TO HAVE TO TAKE A

20  BREAK AT THIS POINT.  ARE YOU ALMOST FINISHED?  LET'S TAKE A

21  BREAK, THEN.  I HAVE A CONFERENCE IN ANOTHER MATTER, MEMBERS OF

22  THE JURY.  I'LL BE 15 MINUTES.  COURT WILL STAND IN RECESS.

23  TAKE 15 MINUTES.

24          THE DEPUTY CLERK:  EVERYONE RISE.

25          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

 1              THE DEPUTY CLERK:  EVERYONE RISE.

 2              THE COURT:  BE SEATED, PLEASE.

 3   BY MR. BECK:

 4   Q.   DOCTOR, DO YOU STILL HAVE PLAINTIFF'S EXHIBIT 1.2021 UP

 5   THERE?

 6   A.   I'M SURE I DO.  CAN YOU DESCRIBE IT TO ME?

 7   Q.   IT'S AN APRIL 11 BULLETIN CONCERNING OBSTACLES.

 8   A.   WHAT'S THE NUMBER AGAIN?

 9   Q.   PLAINTIFF'S EXHIBIT 1.2021?

10   A.   GOT IT.

11   Q.   YOU WENT OVER THIS DOCUMENT, AT LEAST PART OF IT, WITH

12   MR. BIRCHFIELD.  DO YOU REMEMBER THAT?  I'M SORRY, WITH LEIGH.

13   A.   YES.

14   Q.   YOU SAID THAT IT WAS NOT APPROVED BY THE FDA.  ARE

15   BULLETINS LIKE THIS THAT ARE SENT BY THE HOME OFFICE OUT TO THE

16   SALES FORCE EVER APPROVED BY THE FDA?

17   A.   NO.

18   Q.   ARE THEY EVER SUBMITTED TO THE FDA FOR APPROVAL?

19   A.   NO.

20   Q.   DOES THE FDA EVEN WANT TO GET BULLETINS THAT THE HOME

21   OFFICE SENDS TO THE SALES FORCE?

22   A.   I DON'T KNOW.

23   Q.   WHENEVER YOU ANSWERED A QUESTION ABOUT ONE OF THESE

24   BULLETINS NOT BEING APPROVED BY THE FDA, THE FDA HAS NO PROCESS

25   IN PLACE WHERE THEY ASK TO SEE THEM; RIGHT?

1   A.   THAT'S NOT TRUE.  ALL I CAN SAY IS MERCK DID NOT SEND

2   THESE TO THE FDA.  I DON'T KNOW ABOUT OTHER COMPANIES.

3   Q.   YOU DON'T KNOW ANYTHING ABOUT WHETHER THE FDA WANTS THEM

4   OR NOT; RIGHT?

5   A.   I DON'T KNOW.

6   Q.   THE ACTION REQUIRED HERE, THIS BULLETIN, WAS ON THE DAY OF

7   THE LABEL CHANGE; RIGHT?

8   A.   YES, I BELIEVE SO.

9   Q.   YOU CAN SEE THE DATE?

10  A.   YEAH.  APRIL 11, 2002.

11  Q.   ALL RIGHT.  ON THE ACTION REQUIRED HERE, "LABEL CHANGE FOR

12  VIOXX GI OUTCOMES RESEARCH STUDY AND RA," DO YOU KNOW WHAT THAT

13  MEANS?

14  A.   YES.

15  Q.   RHEUMATOID ARTHRITIS?

16  A.   RIGHT.

17  Q.   THEN IT'S "OBSTACLE RESPONSES.  SIDE-BY-SIDE PIS."  WHAT

18  DOES THAT MEAN?

19  A.   THE PATIENT, THE LABELS.

20  Q.   THEN "RHEUMATOID ARTHRITIS BACKGROUND"?

21  A.   RIGHT.

22  Q.   DOWN IN "ACTION REQUIRED," IT SAYS, "REVIEW AND BEGIN

23  USING THE OBSTACLE RESPONSES IN RESPONSE TO PHYSICIAN OR

24  CUSTOMER QUESTIONS"; RIGHT?

25  A.   YES.

1   Q.   IF YOU TURN OVER TO THE NEXT PAGE, I THINK YOU MAY HAVE

2   FOCUSED ON PARTS OF IT, BUT LET'S GO THROUGH IT A LITTLE MORE

3   DELIBERATELY.  UP HERE IT SAYS "OBSTACLE RESPONSES"; RIGHT?

4   A.   RIGHT.

5   Q.   IT'S REFERRING TO UPDATED OBSTACLES; RIGHT?

6   A.   YES.

7   Q.   AN UPDATED OBSTACLE MEANS NEW QUESTIONS THAT ARE LIKELY TO

8   BE ASKED BECAUSE THERE'S A NEW LABEL; RIGHT?

9   A.   OR IT COULD BE NEW ANSWERS BECAUSE THERE'S A NEW LABEL.

10  Q.   WELL, THE OBSTACLE IS THE QUESTION, AND THEN THE ANSWER IS

11  HOW YOU ADDRESS THE OBSTACLE; RIGHT?

12  A.   WELL, I DON'T KNOW IF BY OBSTACLE THEY MEAN THE OBSTACLE

13  RESPONSE OR THE ACTUAL OBSTACLE, SO I'M NOT QUITE SURE.

14  Q.   OKAY.  BUT, IN ANY EVENT, WE HAVE A NEW LABEL AND THEY ARE

15  TALKING ABOUT UPDATED OBSTACLES NOW THAT WE HAVE A NEW LABEL;

16  RIGHT?

17  A.   YES.

18  Q.   THERE IS A QUESTION POSED HERE IN THE BLUE BOX; RIGHT?

19  A.   RIGHT.

20  Q.   THE QUESTION POSED THERE IS:  "I HAVE HEARD THAT THE VIOXX

21  GI OUTCOMES RESEARCH STUDY" -- THAT WOULD BE VIGOR; RIGHT?

22  A.   YES.

23  Q.   -- "SHOWED AN INCIDENCE OF CARDIOVASCULAR EVENTS FOR VIOXX

24  THAT WAS FIVE TIMES THAT SEEN FOR NAPROXEN"; RIGHT?

25  A.   RIGHT.

1    Q.   SO HERE THEY ARE SAYING TO THE SALES FORCE HERE'S HOW TO

2    DEAL WITH A QUESTION THAT COMES FROM A DOCTOR SAYING "I'VE

3    HEARD ABOUT FIVEFOLD DIFFERENCE IN HEART ATTACKS FROM VIOXX AND

4    NAPROXEN AND VIGOR"; CORRECT?

5    A.   YES.

6    Q.   I THINK YOU INDICATED, OF COURSE, THAT THIS INFORMATION

7    ABOUT THE FIVEFOLD INCREASE WAS ITSELF IN THE LABEL; RIGHT?

8    A.   YES, IT WAS.

9    Q.   I DON'T THINK THAT YOU WENT OVER STEPS 1, 2, OR 3.

10   STEP 1, WHAT IS THE SALES REP TOLD TO DO WHEN ASKED ABOUT

11   CARDIOVASCULAR QUESTIONS?

12   A.   TO REVIEW THE LABEL.

13   Q.   SO IT GIVES THE SALES REP A LITTLE SCRIPT WHERE THE SALES

14   REP SAYS, "DOCTOR, LET ME REVIEW THE DATA WITH YOU."  THEN

15   THERE'S THESE THREE SENTENCES WITH LITTLE DASHES INDENTED

16   THERE.  DO YOU KNOW WHERE THEY COME FROM?

17   A.   THE LABEL.

18   Q.   SO IS THE SALES REPRESENTATIVE BEING INSTRUCTED HERE, WHEN

19   ASKED ABOUT CARDIOVASCULAR EVENTS SEEN IN THE VIGOR TRIAL, TO

20   GO THROUGH EXACTLY WHAT'S IN THE LABEL?

21   A.   TO GO THROUGH PARTS OF THE LABEL.

22   Q.   THE PARTS THAT HAVE TO DO WITH THE VIGOR CARDIOVASCULAR

23   EVENTS; RIGHT?

24   A.   SOME OF WHAT HAS TO DO WITH THAT, YES.

25   Q.   EACH ONE OF THESE LITTLE ITEMS NEXT TO "REVIEW THE LABEL,"

1    YOU'VE ACTUALLY CHECKED AND YOU KNOW IT'S WORD-FOR-WORD WHAT'S

2    IN THE LABEL; RIGHT?

3    A.    I DID THE BEST I COULD TO CHECK, YES.

4    Q.    THEN STEP 2 IS TO REVIEW THE PRECAUTIONS SECTION FOR THE

5    PLACEBO-CONTROLLED TRIALS; RIGHT?

6    A.    YES.

7    Q.    YOU REMEMBER GENERALLY IN THE LABEL, WHEN DISCUSSING

8    CARDIOVASCULAR EVENTS, THERE'S A DISCUSSION OF THE VIGOR TRIAL;

9    RIGHT?

10   A.    YES.

11   Q.    THEN, UNDERNEATH THAT, THERE'S A DISCUSSION OF THE

12   PLACEBO-CONTROLLED TRIALS AND THE ALZHEIMER'S TRIALS; RIGHT?

13   A.    THE PLACEBO-CONTROLLED, YEAH.

14   Q.    DO YOU KNOW THAT THEY ARE THE ELDERLY PATIENTS?

15   A.    THAT, I HAVEN'T CHECKED RECENTLY, BUT --

16   Q.    OKAY.  WELL, THE JURY HAS SEEN THE LABEL.

17   A.    OKAY.

18   Q.    UNDERNEATH THE VIGOR RESULTS, THERE'S PLACEBO-CONTROLLED

19   TRIALS THAT ARE DISCUSSED; CORRECT?

20   A.    CORRECT.

21   Q.    THEN THE SALES REP IS INSTRUCTED TO SAY, "DOCTOR, ALSO

22   CONTAINED IN THE CARDIOVASCULAR EFFECTS SECTION OF THE LABEL IS

23   DATE FROM PLACEBO-CONTROLLED TRIALS.  LET ME REVIEW THAT DATA

24   WITH YOU."  THIS DATA, OR THESE LITTLE SUBPOINTS HERE, WHERE DO

25   THEY COME FROM?

1    A.    THE LABEL.

2    Q.    YOU CHECKED TO SEE WHETHER THEY COME WORD-FOR-WORD FROM

3    THE LABEL?

4    A.    YES.

5    Q.    HERE WERE THE SALES REPS SPECIFICALLY INSTRUCTED THAT WHEN

6    TALKING ABOUT THE PLACEBO-CONTROLLED TRIALS, THAT THEY NOT ONLY

7    SHOULD SAY THAT THE OVERALL OUTCOMES WERE 21 TO 35 ACTUALLY IN

8    VIOXX'S FAVOR, BUT TOLD TO TAKE THE NEXT STEP AND SAY, HOWEVER,

9    ON THE MORTALITY, THE DEATHS THAT OCCURRED, IT'S ACTUALLY 8 TO

10   3 AGAINST VIOXX?   WERE THEY TOLD TO GIVE THAT INFORMATION

11   WHENEVER THEY WERE ASKED ABOUT CARDIOVASCULAR EVENTS?

12   A.    RIGHT.   THEY PROVIDED IT UP THERE, TOO, FOR VIGOR.

13   Q.    SO THEY PROVIDED THE OVERALL CARDIOVASCULAR EVENTS AS WELL

14   AS THE MORTALITY EVENTS, CARDIOVASCULAR EVENTS, FOR BOTH VIGOR

15   AND FOR THE PLACEBO-CONTROLLED TRIALS; RIGHT?

16   A.    CORRECT.

17   Q.    NOW, I THINK YOU MENTIONED UP HERE 7 VERSUS 6, I GUESS IT

18   IS, THE DEATHS IN THE VIGOR TRIAL; IS THAT RIGHT?

19   A.    RIGHT.

20   Q.    NOW, I WON'T ASK YOU TO TRY TO INTERPRET IT.   THEN, DOWN

21   HERE, STEP 3, WHAT'S STEP 3?

22   A.    "SIGNIFICANCE UNKNOWN."

23   Q.    IT SAYS HERE "AS STATED IN THE LABEL" -- AND IT GOES ON TO

24   SAY THE SIGNIFICANCE OF THE CARDIOVASCULAR FINDINGS FROM THESE

25   THREE STUDIES -- THE THREE STUDIES WOULD BE VIGOR AND THE TWO

Page 1171

1    PLACEBO STUDIES; RIGHT?

2    A.   YES.

3    Q.   THOSE ARE THE THREE STUDIES IN THE FDA-APPROVED LABEL?

4    A.   YES.

5    Q.   THE SALES REPS ARE INSTRUCTED TO SAY, "THE SIGNIFICANCE OF

6    THE CV FINDINGS FROM THESE STUDIES IS UNKNOWN AND PROSPECTIVE

7    STUDIES SPECIFICALLY DESIGNED TO COMPARE THE INCIDENCE OF

8    SERIOUS CV EVENTS IN PATIENTS TAKING VIOXX VERSUS NSAID

9    COMPARATORS OR PLACEBO HAVE NOT BEEN PERFORMED."

10   A.   RIGHT.

11   Q.   WHERE DOES THAT LANGUAGE COME FROM?

12   A.   THE LABEL.

13   Q.   SO, IN TERMS OF THE MESSAGES THAT WERE BEING IMPLEMENTED

14   AS SOON AS THE LABEL WAS CHANGED, FIRST OF ALL, THE SALES REPS

15   WERE INSTRUCTED, WERE THEY NOT, TO SAY THAT, WHEN IT CAME TO

16   VIGOR AND THE DIFFERENCES, AS WELL AS THE OTHER CV DATA FROM

17   THE CLINICAL TRIALS, THAT THE SIGNIFICANCE IS NOT KNOWN?

18   A.   UNKNOWN, YES.

19   Q.   THEN, UNDERNEATH, I THINK YOU DID FOCUS ON THIS, THAT THE

20   MESSAGE WAS MERCK FIRMLY STANDS BEHIND THE OVERALL

21   EFFECTIVENESS AND CARDIOVASCULAR SAFETY OF VIOXX?

22   A.   RIGHT.   THAT'S THE MARKETING MESSAGE.

23   Q.   INCIDENTALLY, WHEN YOU GO OVER TO THE NEXT PAGE ON THIS --

24   SO YOU SAY THAT'S THE MARKETING MESSAGE.   EVERYTHING BEFORE

25   THAT -- STEP 1, 2, AND 3 -- IS GIVING INFORMATION THAT COMES

Page 1172

1  FROM THE FDA-APPROVED LABEL, AND THEN THE MARKETING MESSAGE IS

2  WE STAND BEHIND OUR PRODUCT; RIGHT?

3  A.   RIGHT.  WE FIRMLY STAND BEHIND.

4  Q.   FIRMLY STAND BEHIND.

5  A.   FIRMLY STAND.

6  Q.   OKAY.  THEN, OVER ON THE NEXT PAGE, DO YOU SEE THAT, ONCE

7  THE LABEL HAS BEEN APPROVED BY THE FDA, INSTRUCTIONS GO TO THE

8  SALES FORCE ABOUT WHAT TO SAY IF THE DOCTOR SAYS, "WHY IS THERE

9  THIS DIFFERENCE BETWEEN NAPROXEN AND VIOXX?"  DO YOU SEE THAT?

10  A.   YES.

11  Q.   ON YOUR THREE MESSAGES, YOU HAVE NAPROXEN IS

12  CARDIOPROTECTIVE; RIGHT?

13  A.   RIGHT.

14  Q.   NOW, WHAT THE SALES REPS WERE INSTRUCTED TO SAY ONCE THE

15  LABEL HAD BEEN APPROVED BY THE FDA, THEY WERE SUPPOSED TO GO

16  THROUGH -- I GUESS THERE ARE SIX STEPS ON THIS ONE; RIGHT?

17  A.   YES.

18  Q.   THE FIRST STEP THEY'RE SUPPOSED TO DO IF SOMEBODY ASKED

19  ABOUT WHY IS THERE A DIFFERENCE BETWEEN NAPROXEN AND VIOXX IS

20  WHAT?

21  A.   THE SAME AS THE LAST PAGE:  TO GO THROUGH THE

22  CARDIOVASCULAR EVENTS AND CARDIOVASCULAR AND MORTALITY IN THE

23  VIGOR STUDY.

24  Q.   TO GO THROUGH AND TO POINT OUT THAT, IN THE VIGOR STUDY,

25  THERE WERE 45 CARDIOVASCULAR THROMBOTIC EVENTS ON VIOXX

Page 1173

1    COMPARED TO 19 FOR NAPROXEN; CORRECT?

2    A.    CORRECT.

3    Q.    AND TO ALSO DO THE MORTALITY DATA; CORRECT?

4    A.    YES.

5    Q.    THEN WAS THE NEXT STEP THE SAME AS BEFORE, TO REVIEW THE

6    PLACEBO-CONTROLLED TRIALS?

7    A.    YES.

8    Q.    AGAIN, THAT COMES RIGHT OUT OF THE LABEL?

9    A.    YES.  THE BULLET POINTS DO.

10   Q.    I'M SORRY?

11   A.    THE BULLET POINTS DO.

12   Q.    YES.  THEN THE NEXT STEP IS -- WELL, THAT WAS TO REVIEW

13   THE PLACEBO-CONTROLLED.  NOW, STEP 3, WHEN ANSWERING THE

14   QUESTION ABOUT NAPROXEN VERSUS VIOXX ONCE WE HAD THE NEW LABEL,

15   WERE THE SALES REPS INSTRUCTED TO EXPLAIN THE SIGNIFICANCE IS

16   UNKNOWN?

17   A.    YES.

18   Q.    WERE THEY TOLD TO GO ON AND SAY THAT VIOXX IS NOT A

19   REPLACEMENT FOR ASPIRIN?

20   A.    YES.

21   Q.    DOES THAT ALSO COME STRAIGHT OUT OF THE LABEL?

22   A.    YES.

23   Q.    THEN HERE COMES, I GUESS, THE MARKETING MESSAGE; RIGHT?

24   A.    YES.

25   Q.    THAT WE FIRMLY STAND BEHIND OUR PRODUCT?

1    A.    RIGHT.  AND 6 IS MARKETING, TOO.

2    Q.    6 IS THAT IF THEY HAVE FURTHER QUESTIONS THAT A SALES REP

3    IS NOT TRAINED AND CAPABLE OF ANSWERING, THAT THAT SHOULD GET

4    REFERRED TO THE DOCTORS AT MERCK SO THAT THEY CAN WRITE A

5    RESPONSE DIRECTLY TO THAT DOCTOR; IS THAT RIGHT?

6    A.    RIGHT.

7    Q.    WHEN YOU WROTE YOUR MERCK MESSAGES UP THERE, YOU SAID THE

8    FIRST MESSAGE WAS VIOXX HAS A FAVORABLE CV SAFETY PROFILE.

9    A.    CORRECT.

10   Q.    THAT WAS A PHRASE THAT YOU SHOWED THAT WAS IN SOME PRESS

11   RELEASES FROM THE 2001 TIME FRAME.

12   A.    IN 2000, 2001, YES.

13   Q.    THEN ONCE THE LABEL CHANGE TOOK PLACE IN APRIL 2002 AND WE

14   HAD THE FDA-APPROVED LABEL, WAS IT TRUE THAT THE PHRASE YOU

15   WROTE UP THERE AS MERCK'S FIRST MESSAGE GENERALLY WAS NOT USED

16   BY MERCK ANY LONGER?

17   A.    CORRECT.  THEY USED A SYNONYMOUS MESSAGE.

18   Q.    WHAT THEY USED WAS, "DOCTOR, BASED ON THESE DATA, MERCK

19   FIRMLY STANDS BEHIND THE OVERALL EFFECTIVENESS AND CV SAFETY OF

20   VIOXX."  RIGHT?

21   A.    YES, SOMETHING ALONG THOSE LINES.

22   Q.    FROM ALL THE THINGS YOU HAVE LOOKED AT AFTER THE LABEL

23   CHANGE AND MERCK FORMULATED ITS MESSAGE IN THIS WAY, THE FDA,

24   AS FAR AS YOU KNOW, NEVER CRITICIZED THE USE OF THAT PHRASE OR

25   THAT MESSAGE, DID THEY?

Page 1175

1   A.   WELL, THEY DIDN'T SEE IT.

2   Q.   WELL, YOU DON'T KNOW WHAT THEY SAW, DO YOU?

3   A.   YES.

4   Q.   YOU KNOW EVERYTHING THEY SAW?

5   A.   WELL, I SAW EVERYTHING THAT WAS SUBMITTED TO THEM, SO THEY

6   HAD THE POTENTIAL TO SEE.

7   Q.   DID THE FDA EVER CRITICIZE THE USE OF THAT PHRASE AFTER

8   THE LABEL WAS CHANGED?

9   A.   NO, THEY DID NOT.

10  Q.   YOU HAD AN EXHIBIT THAT I THINK WAS 2031.  DO YOU RECALL

11  THAT ONE?

12  A.   YES.

13  Q.   SO THAT'S PLAINTIFF'S EXHIBIT 1.2031.  THIS WAS THE

14  JANUARY 31, 2003, OPERATIONS REVIEW?

15  A.   RIGHT.

16  Q.   YOU LOOKED AT A GRAPH ON PAGE 45?

17  A.   YES.

18  Q.   YOU SAID THAT THE JAMA -- THAT'S THE JOURNAL OF THE

19  AMERICAN MEDICAL ASSOCIATION ARTICLE; RIGHT?

20  A.   YES.

21  Q.   THE ARTICLE CAME OUT AND THAT RAISED QUESTIONS ABOUT

22  CARDIOVASCULAR SAFETY OF VIOXX; CORRECT?

23  A.   YES.

24  Q.   THAT WAS ONE OF THE SOURCES OF INFORMATION DOCTORS HAD?

25  A.   YES.

1    Q.    YOU SAID THAT AFFECTED PRESCRIBING BEHAVIOR?

2    A.    YES, NEW PRESCRIPTIONS.

3    Q.    I THINK YOU ALSO WENT OVER ONE OF THOSE PIR LETTERS,

4    EXHIBIT 1.2848.  DO YOU HAVE THAT?

5    A.    I'M SURE I DO SOMEWHERE.   2848.  LET'S SEE -- YES.

6    Q.    I TAKE IT YOU PICKED THIS AS AN EXAMPLE OF THE KIND OF

7    LETTERS THAT WERE SENT OUT; RIGHT?

8    A.    THAT WERE SENT OUT AFTER THE WARNING LETTER.

9    Q.    IN THIS LETTER HERE, IT REFLECTS THAT THE SALES REP WHO

10   CALLED ON THIS DOCTOR -- REFER REQUEST REGARDING VIOXX, AND THE

11   INQUIRY FROM THIS DOCTOR CONCERNED A RECENT ARTICLE PERTAINING

12   TO THE CARDIOVASCULAR EVENTS OF COX-2 SELECTIVE INHIBITORS;

13   RIGHT?

14   A.    YES.

15   Q.    DO YOU SEE WHAT MERCK THEN GOES ON TO DESCRIBE AS

16   SOMETHING CALLED THE MUKHERJEE ARTICLE?  I'LL HIGHLIGHT THE

17   NAME OVER HERE, "MUKHERJEE."  DO YOU SEE THAT?

18   A.    YES.

19   Q.    THAT'S THE SAME THING AS THE TOPOL ARTICLE; RIGHT?

20   A.    I BELIEVE SO, YES.

21   Q.    SO, IN THIS SAME TIME FRAME, WE ARE ACTUALLY COMMUNICATING

22   TO DOCTORS ABOUT THE TOPOL ARTICLE; IS THAT RIGHT?

23   A.    THEY PROVIDED SOME INFORMATION.

24   Q.    I THINK YOU SAID IN CONNECTION WITH THIS DOCUMENT THAT

25   THIS WAS NEVER APPROVED BY THE FDA.  DO YOU REMEMBER THAT?

1    A.   YES.

2    Q.   DO YOU HAVE THE SLIGHTEST IDEA WHETHER PIR LETTERS ARE

3    SUPPOSED TO BE EVEN SUBMITTED FOR APPROVAL BY THE FDA?

4    A.   I KNOW THAT MERCK DID NOT SUBMIT THEM, SO I'M ASSUMING

5    THAT THEY DIDN'T HAVE TO.  THEY COULD HAVE, BUT THEY CHOSE NOT

6    TO.

7    Q.   YOU'RE ASSUMING THEY COULD HAVE.  YOU DON'T HAVE THE

8    SLIGHTEST IDEA WHETHER THE FDA WANTS TO SEE THESE DO YOU?

9    A.   I DO KNOW THAT THEY COULD HAVE SUBMITTED THEM.

10   Q.   DO YOU HAVE THE SLIGHTEST IDEA WHETHER THE FDA WANTS TO

11   SEE THESE?

12   A.   NO, I DO NOT.

13   Q.   I'M HANDING YOU WHAT WE HAVE MARKED AS DEFENSE EXHIBIT

14   3087.

15        MR. BECK:  GAYLYN, THIS MAY HAVE BEEN RECEIVED IN

16   EVIDENCE ALREADY WITH MR. ANSTICE.

17   BY MR. BECK:

18   Q.   DO YOU RECOGNIZE THIS AS ANOTHER BULLETIN FROM APRIL 11,

19   2002, FROM THE MERCK HOME OFFICE TO THE PEOPLE IN THE FIELD?

20   A.   YES.

21   Q.   DID YOU TAKE THIS INTO CONSIDERATION WHEN YOU FORMULATED

22   YOUR OPINIONS IN THIS CASE?

23   A.   YES.

24        MR. BECK:  WE OFFER DEFENSE EXHIBIT 3087.

25        MS. O'DELL:  NO OBJECTION.

1           THE COURT:  LET IT BE ADMITTED.

2    BY MR. BECK:

3    Q.   DO YOU REMEMBER THE LAST BULLETIN WE LOOKED AT WAS ALSO

4    FROM APRIL 11?  RIGHT?

5    A.   I BELIEVE SO, YES.

6    Q.   THAT ONE WAS SPECIFICALLY, YOU KNOW, ABOUT OBSTACLES.

7    WHETHER THAT MEANS QUESTIONS OR WHETHER IT MEANS ANSWERS TO

8    QUESTIONS, BUT IT HAD TO DO WITH WHAT HAPPENS IF QUESTIONS ARE

9    ASKED NOW THAT WE HAVE A NEW LABEL; RIGHT?

10   A.   RIGHT.

11   Q.   THIS PARTICULAR BULLETIN, INSTEAD OF JUST TALKING ABOUT

12   WHAT HAPPENS IF A DOCTOR ASKS QUESTIONS, DOES THIS BULLETIN

13   ACTUALLY TELL THE SALES FORCE WHAT IT IS THEY ARE SUPPOSED TO

14   GO OUT THERE AND DO NOW THAT WE HAVE GOT THE NEW LABEL?

15   A.   YES.

16   Q.   THAT'S THE ACTION REQUIRED, LABEL CHANGE, ETC., SAME KIND

17   OF LANGUAGE WE SAW BEFORE; RIGHT?

18   A.   VERY SIMILAR.

19   Q.   THEN DOES IT SAY THAT THE PURPOSE OF THIS BULLETIN IS TO

20   PROVIDE YOU WITH IMPORTANT UPDATED INFORMATION BASED ON THE

21   RESULTS OF THE LABEL CHANGE AND IMMEDIATE ACTIONS REQUIRED BY

22   THE FOLKS OUT IN THE FIELD?

23   A.   YES.

24   Q.   DO YOU SEE HERE, UNDER "ACTIONS REQUIRED," THEY ARE TOLD

25   TO "DILIGENTLY FOLLOW ALL ACTIONS WITH PHYSICIANS AND

Page 1179

1   CUSTOMER."  THAT REFERS DOWN TO THIS HEADING; CORRECT?

2   A.   YES.

3   Q.   THEN THEY ARE ALSO TOLD, ARE THEY NOT, THAT ONE OF THE

4   THINGS THAT IS REQUIRED OF THEM IS TO REVIEW THE NEW LABEL AND

5   DISTRIBUTE THE NEW LABEL TO PHYSICIANS?

6   A.   YES.

7   Q.   THEN UNDER THE ACTIONS WITH PHYSICIANS AND CUSTOMERS, WERE

8   THEY TOLD TO PROACTIVELY REVIEW ALL CHANGES TO THE LABEL WITH

9   THE PHYSICIANS?

10  A.   YES.

11  Q.   INCLUDED IN THE FOUR PARTICULAR POINTS, THEY WERE TOLD --

12  PROACTIVELY MEANS GO OUT THERE ON YOUR OWN AND DO IT WHETHER

13  THE FELLOW ASKS YOU A QUESTION OR NOT; RIGHT?

14  A.   CORRECT.

15  Q.   THEY WERE TOLD TO GO OVER THE CARDIOVASCULAR PRECAUTION

16  WITH THE DOCTORS; CORRECT?

17  A.   YES.

18  Q.   WERE THEY TOLD THAT THEY SHOULD NOT PROVIDE ANY

19  PROMOTIONAL MESSAGING UNTIL THE PI -- BEING THE LABEL -- WAS

20  THOROUGHLY REVIEWED WITH THE DOCTOR?

21  A.   YES.

22  Q.   WE TALKED BEFORE ABOUT DETAILING AND COUNTER-DETAILING,

23  AND WE SAW THERE A REFERENCE TO PROMOTIONAL EFFORTS.  ARE

24  PROMOTIONAL MATERIALS ALSO REFERRED TO AS DETAILING PIECES?

25  A.   YES.  SOME OF THEM ARE.

1   Q.   GENERALLY, WAS IT THE CASE THAT MERCK INCLUDED WITH ITS

2   DETAILING PIECES A COPY OF THE FDA-APPROVED LABEL WHENEVER A

3   DETAILING PIECE WAS HANDED OUT TO A DOCTOR?

4   A.   YES.

5   Q.   THE PURPOSE OF THIS WAS, IN ADDITION TO ANY PROMOTIONAL

6   PIECE, THE DOCTOR ALSO HAD THE LABEL ITSELF THAT HE OR SHE

7   COULD LOOK AT TO GET ADDITIONAL INFORMATION; CORRECT?

8   A.   YES.

9   Q.   AND TO LOOK TO SEE WHAT THE FDA HAD APPROVED IN TERMS OF

10  THE LABEL CHANGE?

11  A.   YES.

12  Q.   I TAKE IT THAT YOU HAVE NEVER ACTUALLY PARTICIPATED IN

13  DRAFTING A LABEL FOR A PRESCRIPTION MEDICINE; IS THAT RIGHT?

14  A.   CORRECT.

15  Q.   YOU DON'T HOLD YOURSELF OUT AS AN EXPERT IN THE WORDING OF

16  PHARMACEUTICAL DRUG LABELS; IS THAT RIGHT?

17  A.   CORRECT.

18  Q.   YOU'RE NOT HERE TO SECOND-GUESS THE FDA'S SCIENTISTS'

19  DECISION TO IMPROVE THE WORDING IN THE VIOXX LABEL, ARE YOU?

20  A.   CORRECT.

21  Q.   DO YOU KNOW THAT THE LABEL WAS WIDELY DISTRIBUTED TO

22  DOCTORS THROUGHOUT THE UNITED STATES, THE NEW 2002 LABEL?

23  A.   YES, I DO KNOW THAT.

24  Q.   IT WAS DISSEMINATED, WAS IT NOT, THROUGH DEAR DOCTOR

25  LETTERS THAT WERE SENT OUT TO PHYSICIANS?

Page 1181

1   A.   YES.  I'VE SEEN THOSE.

2   Q.   WITH THE BIG BLUE BOXES SAYING "IMPORTANT PRESCRIBING

3   INFORMATION"?

4   A.   I NEVER GOT IT IN COLOR, BUT I'LL BELIEVE YOU IT WAS BLUE.

5   Q.   DID YOU LEARN THAT MERCK SENT IT OUT TO UPWARDS OF 300,000

6   PHYSICIANS AND OTHER HEALTHCARE PROVIDERS?

7   A.   YES.  THAT'S WHAT THEIR RECORDS INDICATE.

8   Q.   WHEN THEY SENT OUT THE NEW LABEL WITH THE BIG BLUE BOX

9   WITH IMPORTANT PRESCRIBING INFORMATION, DID THEY INCLUDE A COPY

10  OF THE LABEL THAT HAD ALL OF THE INFORMATION HIGHLIGHTED IN

11  YELLOW?

12  A.   YES, THEY DID.

13  Q.   INCLUDING THE CARDIOVASCULAR INFORMATION FROM VIGOR; IS

14  THAT RIGHT?

15  A.   YES.

16  Q.   FROM A MARKETING PROFESSIONAL'S POINT OF VIEW, WAS

17  HIGHLIGHTING THE LABEL LIKE THAT IN YELLOW A GOOD WAY TO DRAW

18  ATTENTION TO THE CARDIOVASCULAR INFORMATION THAT WAS IN THE

19  LABEL?

20  A.   YES.

21          MR. BECK:  THAT'S ALL I HAVE, JUDGE.

22          THE COURT:  ANY REDIRECT?

23          MS. O'DELL:  YES.

24

25

DAILY COPY

1                          REDIRECT EXAMINATION

2    BY MS. O'DELL:

3    Q.   DR. PECHMANN, ARE INTEGRATED MARKETING CAMPAIGNS

4    INHERENTLY BAD?

5    A.   NO, THEY ARE NOT.

6    Q.   SO YOUR CRITICISMS TODAY ARE NOT ABOUT INTEGRATED MARKETS

7    CAMPAIGNS IN GENERAL, ARE THEY?

8    A.   CORRECT.

9    Q.   IS IT IMPORTANT THAT A MESSAGE IN AN INTEGRATED MARKETING

10   CAMPAIGN BE TRUE?

11   A.   YES.

12   Q.   LET ME JUST ASK YOU:  WHAT WAS THE PRIMARY OBSTACLE THAT

13   MERCK WAS ADDRESSING FROM MARCH 2000, AT LEAST, UNTIL VIOXX WAS

14   WITHDRAWN FROM THE MARKET?

15             THE COURT:  WAIT JUST A MOMENT.

16             MR. BECK:  OBJECTION, YOUR HONOR.  IT IS A REPEAT OF

17   DIRECT EXAMINATION.  OUTSIDE THE SCOPE.  I NEVER ASKED HER

18   ABOUT WHAT THE PRIMARY OBSTACLE WAS.

19             THE COURT:  I THOUGHT WE HAD ALREADY COVERED THAT.

20   BY MS. O'DELL:

21   Q.   HOW DID MERCK ATTEMPT TO NEUTRALIZE CV CONCERNS IN THE

22   MARKETPLACE?

23             MR. BECK:  YOUR HONOR, THAT WAS THE ENTIRE DIRECT

24   EXAMINATION.

25             THE COURT:  WE REALLY HAVE BEEN COVERING THIS.  WE

Page 1183

1    HAVE TO MOVE ON.  I'LL ALLOW IT.  LET'S GO ON.  LET'S NOT

2    REHASH DIRECT.

3              MS. O'DELL:  CAN SHE ANSWER THE QUESTION?

4              THE COURT:  YES, YOU CAN ANSWER.

5              THE WITNESS:  DO YOU WANT TO REPEAT THE QUESTION?

6    BY MS. O'DELL:

7    Q.   PLEASE.  HOW WAS MERCK ATTEMPTING TO NEUTRALIZE THE CV

8    CONCERNS IN THE MARKETPLACE?

9    A.   THEY DEVELOPED MESSAGES BASED ON RESEARCH THAT WOULD

10   PERSUADE DOCTORS THAT VIOXX WAS SAFE FROM A CARDIOVASCULAR

11   STANDPOINT AND THAT IT DIDN'T CAUSE HEART ATTACKS.  THEN THEY

12   DISSEMINATED THOSE MESSAGES THROUGH DIFFERENT TOOLS AND THEY

13   CONDUCTED RESEARCH TO MAKE SURE -- WELL, FIRST THAT THE SALES

14   REPS WERE DELIVERING THE MESSAGE, IF THAT WAS THE PERSON WHO

15   HAD TO DELIVER IT, AND THAT THE MESSAGES WERE BELIEVED AND THAT

16   THEY POSITIVELY IMPACTED SALES.

17   Q.   WAS THIS ATTEMPT TO NEUTRALIZE THAT OBSTACLE THE SAME

18   AFTER THE APRIL 2002 LABEL CHANGE?

19   A.   YES.

20   Q.   BY ATTEMPTING TO NEUTRALIZE THE CV SAFETY CONCERN WITH

21   DOCTORS, WERE PATIENTS PUT AT RISK FOR HEART ATTACK?

22             MR. BECK:  YOUR HONOR, THAT IS SO FAR OUTSIDE THE

23   SCOPE OF THE ADVERTISING LADY'S EXPERTISE.

24             THE COURT:  I SUSTAIN IT.

25             MS. O'DELL:  NO FURTHER QUESTIONS.

Page 1184

1            THE COURT:  ALL RIGHT.  YOU'RE EXCUSED.  THANK YOU

2    VERY MUCH.  LET ME SEE COUNSEL ON LOGISTICS, PLEASE.

3            (WHEREUPON, THERE WAS A CONFERENCE AT THE BENCH

4    OUTSIDE THE PRESENCE OF THE COURT REPORTER.)

5            THE COURT:  LET'S CALL YOUR NEXT WITNESS, PLEASE.

6            MR. BIRCHFIELD:  YOUR HONOR, AT THIS TIME WE WILL

7    RESUME THE DEPOSITION OF DR. ED SCOLNICK.  YOU WILL RECALL THAT

8    DR. SCOLNICK WAS THE PRESIDENT OF MERCK RESEARCH LABS.  WE JUST

9    WANT TO RESUME HIS TESTIMONY.  WE'RE GOING TO BACK IT UP JUST A

10   FEW MINUTES TO GET TO THE PLACE WHERE WE STARTED WITH

11   DISCUSSING A PARTICULAR DOCUMENT TO REORIENT THE JURY.

12           MR. BECK:  I THINK WE ARE STILL IN, AS I RECALL, THE

13   PLAINTIFF'S QUESTIONING OF DR. SCOLNICK.  THEN, AFTER A WHILE,

14   WE GET TO QUESTIONING BY THE DEFENSE COUNSEL.

15           THE COURT:  OKAY.

16           (WHEREUPON, EDWARD SCOLNICK, HAVING BEEN DULY SWORN,

17   TESTIFIED BY DEPOSITION AS FOLLOWS.)

18                      DIRECT EXAMINATION

19   BY MR. BIRCHFIELD:

20   Q.   SIR, I JUST PASSED YOU A DOCUMENT.  WE MARKED IT AS

21   EXHIBIT 19 TO YOUR DEPOSITION.  FOR THE RECORD, IT'S A DOCUMENT

22   BY DEBORAH SHAPIRO.  WHO IS DEBORAH SHAPIRO?

23   A.   DEBORAH SHAPIRO WAS A STATISTICIAN IN THE MERCK RESEARCH

24   LABORATORIES.

25   Q.   SHE WAS THE UNBLINDED STATISTICIAN IN THE VIGOR TRIAL;

Page 1185

1    RIGHT?

2    A.   YES, SHE WAS.

3    Q.   SHE'S THE STATISTICIAN YOU CONTACTED TO GET AN EARLY LOOK

4    AT THE VIGOR DATA; RIGHT?

5    A.   TO LOOK AT THE DATA FIRST WHEN THE TRIAL IS COMPLETED,

6    THAT IS CORRECT.

7    Q.   FOR THE RECORD, THE DOCUMENT IS ENTITLED "VIOXX

8    PRELIMINARY CARDIOVASCULAR META-ANALYSIS," AND IT IS

9    BATES-STAMPED MRK-NJ0070364 THROUGH 397.  SO YOUR TESTIMONY IS

10   THAT THE COMPANY CONDUCTED A META-ANALYSIS PRE-APPROVAL.  THAT

11   WAS THE FIRST TIME; RIGHT?

12   A.   YES.

13   Q.   IN MARCH OF 2000; RIGHT?

14   A.   YES.

15   Q.   AND THEN AGAIN IN OCTOBER OF 2000; CORRECT?

16   A.   AS I SAID, I DON'T REMEMBER THE DATES OF ALL THE OTHER

17   META-ANALYSES.

18   Q.   OKAY.  I'D LIKE TO DIRECT YOUR ATTENTION TO PAGE

19   NJ0070394.

20   A.   YES.

21   Q.   THIS IS A META-ANALYSIS THAT DESCRIBES THE RELATIVE RISK

22   OF MI.  THAT'S HEART ATTACKS?

23   A.   YES.

24   Q.   THE "MI ENDPOINT WITH 95 PERCENT CI."  WHAT'S CI MEAN?

25   A.   CONFIDENCE INTERVAL.

1    Q.   WHAT DOES CONFIDENCE INTERVAL REPRESENT, SIR?

2    A.   IT'S A TERM THAT DESCRIBES THE BOUNDS IN WHICH TO ANALYZE

3    STATISTICAL SIGNIFICANCE.

4    Q.   IF THE CONFIDENCE INTERVAL IS GREATER THAN 1 OR IF THE

5    CONFIDENCE -- IF THE CONFIDENCE INTERVAL DOESN'T ENCOMPASS 1,

6    IT INDICATES THAT THE FINDING IS STATISTICALLY SIGNIFICANT;

7    TRUE?

8    A.   I BELIEVE THAT'S TRUE.

9    Q.   AT THE BOTTOM OF THE PAGE, IT SAYS "TOTAL COHORT."  DO YOU

10   SEE THAT?

11   A.   YES, I DO.

12   Q.   WHAT'S A COHORT?

13   A.   A COHORT IS A GROUP OF PATIENTS THAT'S BEEN STUDIED IN

14   THIS META-ANALYSIS.

15   Q.   THEN TO THE RIGHT, IT SAYS "2.02."  DO YOU SEE THAT?

16   A.   UH-HUH.

17   Q.   THAT'S THE RELATIVE RISK --

18   A.   YES, I DO.  I'M SORRY.

19   Q.   THAT'S THE RELATIVE RISK OF HEART ATTACKS AMONG ALL

20   STUDIES FOR NSAIDS VERSUS VIOXX; TRUE?

21   A.   THAT IS, I THINK, WHAT THIS PLOTS, NON-NAPROXEN AND

22   NAPROXEN NSAIDS.

23   Q.   THAT'S RIGHT.  AND THE CONFIDENCE INTERVAL, AGAIN, IS

24   WHAT, SIR?

25   A.   THE CONFIDENCE INTERVAL FOR 2.0?

1   Q.   FOR THE 2.02.

2   A.   IS 1.14 TO 3.55.

3   Q.   THE FACT THAT THE CONFIDENCE INTERVAL DOES NOT GO BELOW 1

4   INDICATES THAT THE 2.02 RELATIVE RISK IS STATISTICALLY

5   SIGNIFICANT; TRUE?

6   A.   YES.   THIS, I BELIEVE, AGGREGATES BOTH NAPROXEN AND

7   NON-NAPROXEN NSAIDS.

8   Q.   WHAT DOES STATISTICAL SIGNIFICANCE REFER TO, SIR?

9   A.   THAT, 95 TIMES OUT OF 100, THAT THE RESULT IS AN ACCURATE

10  ONE AND NOT BY CHANCE.   THERE'S ONLY 5 PERCENT CHANCE -- A 5

11  PERCENT CHANCE THAT THE RESULT IS A FLUKE.

12  Q.   OKAY.   AND A RELATIVE RISK OF 2.02 IN THIS TOTAL COHORT

13  INDICATES A DOUBLING OF THE RISK OF HEART ATTACKS AMONG ALL OF

14  MERCK'S STUDIES --

15  A.   WHAT YOU --

16  Q.   -- COMPARING NSAIDS TO VIOXX; TRUE?

17  A.   COMPARING ALL NSAIDS, INCLUDING NAPROXEN, TO VIOXX.

18  THAT'S WHAT THIS PLOTS, YES.

19  Q.   IF YOU'D TURN THE PAGE, SIR, YOU SEE AN ADDITIONAL CHART.

20  AGAIN, "MI ENDPOINT," THAT'S HEART ATTACK ENDPOINT; RIGHT?

21  A.   YES.

22  Q.   IT SAYS, "ROFECOXIB VERSUS NSAIDS."   VIOXX IS ROFECOXIB;

23  RIGHT?

24  A.   YES.

25  Q.   AGAIN REFLECTS 2.02 BEING THE RELATIVE RISK FOR ALL

1    PATIENTS COMPARED ROFECOXIB TO NSAIDS; TRUE?

2    A.   TO ALL NSAIDS, AS I'VE SAID, NAPROXEN AND NON-NAPROXEN.

3    Q.   WELL, SIR, WOULD YOU ENDORSE A DECISION NOT TO GIVE AN

4    MI-ONLY META-ANALYSIS TO THE FDA?

5    A.   THAT SHOULD BE PART OF ANY SUBMISSION.

6    Q.   YOU WOULDN'T ENDORSE A DECISION NOT TO GIVE UNFAVORABLE

7    SAFETY DATA TO THE FDA, WOULD YOU?

8    A.   I WOULD ENDORSE THAT ALL OF THE DATA BE SUBMITTED TO THE

9    FDA.

10   Q.   DID YOU BECOME AWARE OF THE RESULTS OF MERCK'S

11   META-ANALYSIS?

12   A.   I WAS SHOWN SUMMARIES OF META-ANALYSES, YES, BUT I DON'T

13   RECALL THE DETAILS OF WHAT WAS IN THOSE SUMMARIES AT THIS

14   POINT.

15   Q.   OKAY.  SIR, LET ME PASS OVER TO YOU WHAT WE JUST MARKED AS

16   EXHIBIT 20 TO YOUR DEPOSITION.  FOR THE RECORD, SIR, I JUST

17   PASSED YOU WHAT WE'VE MARKED AS EXHIBIT 20 TO YOUR DEPOSITION.

18   IT'S A JANUARY 8, 2001, LETTER FROM A ROBERT SILVERMAN, SENIOR

19   DIRECTOR OF REGULATORY AFFAIRS, TO SOMEBODY AT THE FDA; IS THAT

20   RIGHT, SIR?

21   A.   YES, CORRECT.

22   Q.   IT'S A TRANSMITTAL OF INFORMATION TO THE FDA?

23   A.   YES, IT IS.

24   Q.   TRANSMITTAL OF INFORMATION TO THE FDA CONCERNING VIOXX?

25   A.   YES.

1    Q.    TRANSMITTAL OF THE "INTERIM CARDIOVASCULAR META-ANALYSIS"

2    FOR VIOXX; TRUE?

3    A.    YES.  YES, THAT'S CORRECT.

4    Q.    IS THERE AN MI META-ANALYSIS IN THE SUBMISSION TO THE FDA?

5    A.    THE META-ANALYSIS DONE IN THIS DOCUMENT, I DO NOT SEE IN

6    THIS DOCUMENT.  I DO SEE, AND IT IS IMPORTANT TO POINT OUT, ALL

7    OF THE DATA ON THE FOUR PAGES I CITED TO YOU.

8    Q.    WHAT YOU'RE TRYING TO HIGHLIGHT, SIR, IS THAT CERTAIN MI

9    INFORMATION WAS ENCOMPASSED WITHIN THE APTC ENDPOINT; RIGHT?

10   A.    THAT IS WHAT I'M TRYING TO POINT OUT, YES.

11   Q.    BUT MERCK DID A SPECIFIC ANALYSIS LOOKING AT THE INCIDENCE

12   OF HEART ATTACKS ACROSS ALL OF ITS TRIALS; TRUE?

13   A.    THAT IS INDICATED IN THIS DOCUMENT, IN THE FIRST DOCUMENT

14   THAT YOU SHOWED ME IN THIS DISCUSSION.

15   Q.    THAT DOCUMENT IS EXHIBIT 19; RIGHT?

16   A.    YES, IT IS.

17   Q.    MERCK DID AN MI META-ANALYSIS IN OCTOBER 2000; TRUE?

18   A.    YES, THAT'S TRUE.

19   Q.    AND DIDN'T GIVE IT TO THE FDA IN JANUARY 2001; TRUE?

20   A.    THE SPECIFIC FIGURES ARE NOT INCLUDED IN THE SUBMISSION TO

21   THE FDA.  THE DATA IS INCLUDED.

22   Q.    WELL, NOT ONLY THE FIGURES, SIR, THE MI META-ANALYSIS IS

23   NOT IN THAT SUBMISSION TO THE FDA; CORRECT?

24   A.    THAT IS CORRECT.

25   Q.    THERE MIGHT BE SOME HEART ATTACK DATA IN THAT SUBMISSION

1  TO THE FDA; RIGHT?

2  A.   THERE IS HEART ATTACK DATA IN THIS SUBMISSION.

3  Q.   BUT THERE'S NOT AN MI META-ANALYSIS IN EXHIBIT 20; RIGHT?

4  A.   NOT THAT I COULD FIND, NO.  IT DOES NOT -- IT'S NOT THERE.

5  Q.   IS IT YOUR TESTIMONY THAT YOU WERE NEVER CONSULTED BY

6  REGULATORY WITHIN MERCK RESEARCH LABS AS TO WHETHER TO GIVE THE

7  MI META-ANALYSIS OR NOT TO GIVE IT TO THE FDA?

8  A.   THAT IS MY TESTIMONY.  I WAS NEVER CONSULTED ON THAT

9  POINT.

10  Q.   DO YOU ENDORSE THE DECISION NOT TO GIVE THAT MI

11  META-ANALYSIS TO THE FDA IN JANUARY 2001?

12  A.   I WOULD HAVE HAD NO OBJECTION TO THEIR SUBMITTING ALL OF

13  THE META-ANALYSES.

14  Q.   SIR, SHOULD THE MI META-ANALYSIS HAVE BEEN GIVEN TO THE

15  FDA IN JANUARY 2001?

16  A.   I WOULD HAVE GIVEN IT TO THEM.  IT IS PERFECTLY REASONABLE

17  TO GIVE IT THEM.  THERE IS AN ABUNDANCE OF DATA IN THIS

18  DOCUMENT WHICH WE HAVEN'T COVERED.  YES, IT SHOULD HAVE BEEN

19  GIVEN, INCLUDING ALL THE DATA IN THIS DOCUMENT.

20  Q.   YOU WERE THE BOSS?

21  A.   I WAS NOT CONSULTED IN THIS MATTER.

22  Q.   SO IF YOUR GROUP DIDN'T CONSULT -- IF YOUR GROUP DIDN'T

23  SUBMIT THIS INFORMATION TO THE FDA, THEY DISREGARDED YOUR

24  STANDARD OPERATING PROCEDURE?

25  A.   THE STANDARD OPERATING PROCEDURE IN THE LABS IS TO SUBMIT

1  ALL DATA TO THE FDA.  ALL THE DATA IS IN HERE.  THE SPECIFIC

2  META-ANALYSIS IS NOT INCLUDED IN THIS DOCUMENT.

3  Q.   YOU SAY ALL THE DATA IS IN THERE, SIR, BUT THERE'S NOT AN

4  MI META-ANALYSIS IN THAT DOCUMENT; RIGHT?

5  A.   THAT IS CORRECT.

6  Q.   YEAH, BUT THE ONE THING WE CAN AGREE IS, THERE'S NOT AN MI

7  META-ANALYSIS REFLECTED IN THAT PARTICULAR DOCUMENT, THE

8  JANUARY 2001 SUBMISSION TO THE FDA; RIGHT?

9  A.   THERE'S NO MI META-ANALYSIS THAT I CAN FIND IN THE JANUARY

10  8 DOCUMENT.

11  Q.   YOU DIDN'T GIVE IT TO THE ADVISORY COMMITTEE IN FEBRUARY

12  2001 EITHER, DID YOU?

13  A.   I DON'T RECALL WHAT WAS IN THE PRESENTATION.  I DON'T

14  RECALL EVER HAVING SEEN THIS FIRST DOCUMENT, EXHIBIT 19, AND I

15  DON'T RECALL EVER HAVING SEEN THE SECOND DOCUMENT WHICH WAS

16  SUBMITTED.  I HAD AN EXCELLENT GROUP, AND THEY HANDLED THE

17  SUBMISSIONS TO THE FDA AND THE PREPARATION FOR THE ADVISORY

18  COMMITTEES.

19  Q.   THE COMPANY ULTIMATELY PUBLISHED A META-ANALYSIS

20  CONCERNING CARDIOVASCULAR EVENTS IN THE PEER-REVIEWED

21  LITERATURE, DIDN'T IT?

22  A.   YES.  I BELIEVE IT DID IN CIRCULATION OR ANOTHER

23  CARDIOVASCULAR JOURNAL.

24  Q.   FALL OF 2001.  DOES THAT SOUND RIGHT?

25  A.   SOUNDS APPROXIMATELY RIGHT.  I DON'T REMEMBER THE DATE.

1

2    Q.   DR. SCOLNICK, I JUST PASSED YOU OVER WHAT WE MARKED AS

3    EXHIBIT 21 TO YOUR DEPOSITION.  IS THIS THE PUBLICATION OF THE

4    META-ANALYSIS YOU WERE JUST REFERRING TO?

5    A.   I THINK IT WAS THE ONE YOU WERE JUST REFERRING TO.  IT IS

6    ONE OF THE ONES I RECALL.  IT IS ONE I RECALL.  I DON'T RECALL

7    WHETHER OTHERS WERE PUBLISHED.

8    Q.   TO BE CLEAR, THIS IS AN OCTOBER 2001 ARTICLE PUBLISHED IN

9    THE JOURNAL CIRCULATION; CORRECT?

10   A.   YES.  CORRECT.

11   Q.   SO YOU WERE TESTING THE DRUG IN ALZHEIMER'S PATIENTS;

12   RIGHT?

13   A.   YES.

14   Q.   WHEN YOUR TEAM WAS BEFORE THE ADVISORY COMMITTEE THAT WAS

15   CONVENED TO EVALUATE THE SAFETY OF VIOXX IN FEBRUARY 2001, THAT

16   TEAM CITED THE ALZHEIMER'S DATA AS DATA THAT WAS REASSURING ON

17   THE SAFETY OF THE DRUG; TRUE?

18   A.   YES.  THE ADVISORY COMMITTEE WAS CONVENED TO GO OVER THE

19   GASTROINTESTINAL DATA AND, AS PART OF THAT, ALL OF THE DATA ON

20   VIOXX.

21   Q.   SIR, I'M PASSING YOU OVER WHAT WE JUST MARKED AS

22   EXHIBIT 22 TO YOUR DEPOSITION.  FOR THE RECORD, IT'S

23   BATES-STAMPED MRK-ABP016650.  IT RUNS THROUGH PAGE 677.  IT'S A

24   DOCUMENT ENTITLED VIOXX AD PROGRAM.  DO YOU SEE THAT HEADING,

25   SIR?

1   A.   YES, I DO.

2   Q.   AD IS ALZHEIMER'S DISEASE?

3   A.   YES.

4   Q.   OKAY.  NOW, IF THE COMPANY HAD A DRUG THAT WOULD PREVENT

5   THE ONSET OF ALZHEIMER'S DISEASE, THAT WOULD BE A SIGNIFICANT

6   MEDICAL DISCOVERY; YOU'D AGREE WITH THAT?

7   A.   YES, IT WOULD.

8   Q.   A SIGNIFICANT REVENUE OPPORTUNITY FOR THE COMPANY;

9   CORRECT?

10  A.   THEY WOULD GO TOGETHER.  IT WOULD BE A MAGNIFICENT

11  DISCOVERY FOR MEDICAL AND FOR PATIENTS.

12  Q.   OKAY.  THAT'S THE APPROVE TRIAL THAT'S BEING REFERENCED

13  THERE, ISN'T IT?

14  A.   YES, I BELIEVE SO.

15  Q.   YOU'D AGREE WITH ME, SIR, THAT THOSE THREE PARAGRAPHS

16  DON'T SAY ANYTHING ABOUT THAT TRIAL BEING CONDUCTED TO TEST THE

17  CARDIOVASCULAR SAFETY OF VIOXX?

18  A.   YES, I'D AGREE WITH THAT.

19  Q.   SIR, THE PAGE CONTINUES AND IT DISCUSSES THE ALZHEIMER'S

20  DISEASE TRIALS; TRUE?

21  A.   YES.

22  Q.   OKAY.  MERCK IS TELLING ITS SHAREHOLDERS HERE THAT IT IS

23  IN THE PROCESS OF TESTING VIOXX IN ALZHEIMER'S PATIENTS; TRUE?

24  A.   YES.  IT REALLY DOESN'T STATE WHETHER IT WILL OR WON'T

25  WORK.

Page 1194

1    Q.    OKAY.   JUST GETTING BACK NOW TO WHERE WE WERE, A TREATMENT

2    FOR ALZHEIMER'S DISEASE PRESENTED A SIGNIFICANT REVENUE

3    OPPORTUNITY FOR MERCK IF VIOXX WAS ABLE TO DEMONSTRATE A

4    REDUCTION IN THE INCIDENCE OF ALZHEIMER'S DISEASE; TRUE.

5    A.    YES.   AS WE SAID, AN IMPORTANT MEDICAL FINDING.

6    Q.    OKAY.   LET'S TAKE A STEP FORWARD AND UNDERSTAND THE DEATH

7    DATA IN THE ALZHEIMER'S TRIALS.   SIR, I'M PASSING OVER WHAT WE

8    JUST MARKED AS EXHIBIT 24 TO YOUR DEPOSITION.   IT'S A

9    MULTI-PAGE MEMO TO YOU FROM A DR. GILBERT BLOCK.   FOR THE

10   RECORD, IT IS BATES-STAMPED MRK-NJ0333225 TO 35.   I DON'T KNOW

11   IF I INDICATED THIS, BUT IT IS DATED MARCH 21, 2001.   DOCTOR,

12   HAVE YOU SEEN THIS BEFORE?

13   A.    I DON'T RECALL SEEING IT.   IT IS ADDRESSED TO ME.

14   Q.    I THINK WHAT WE'RE LOOKING AT HERE, SIR, RIGHT, IS THAT 14

15   PEOPLE DIED ON VIOXX, 3 DIED IN PLACEBO IN THIS TRIAL; TRUE?

16   A.    YES, THAT'S TRUE.

17   Q.     95 TIMES OUT OF 100, WHEN YOU RAN THIS TRIAL, YOU'D GET

18   THE SAME RESULT; RIGHT?

19   A.    THAT'S WHAT STATISTICAL SIGNIFICANCE IMPLIES, YES.

20   Q.    SO, 95 OUT OF 100 TIMES, IF YOU RERAN THIS TRIAL, 14 WOULD

21   DIE ON VIOXX, 3 WOULD DIE ON PLACEBO.   SO, IN THIS PARTICULAR

22   TRIAL, 11 PEOPLE DIED ON VIOXX MORE THAN DIED ON PLACEBO; TRUE?

23   A.    YES, THAT'S CORRECT.

24   Q.    DID YOU TELL OLD PEOPLE AROUND THE COUNTRY WHO WERE TAKING

25   THIS DRUG, "WE HAVE THIS TRIAL.   11 EXCESS DEATHS WERE FOUND IN

Page 1195

1   THIS TRIAL," SIR?

2   A.   I DON'T RECALL WHAT INFORMATION WAS DISSEMINATED ON THE

3   TRIAL.

4   Q.   SO THE 11 PATIENTS WHO DIED UNNECESSARILY IN PROTOCOL 091

5   AS COMPARED TO THE PLACEBO ARM, DIED AND THEY GOT NO BENEFIT

6   FROM VIOXX IN THIS TRIAL; TRUE?

7   A.   THERE WERE 11 PATIENTS WHO DIED IN THE TRIAL MORE THAN IN

8   PLACEBO.  THE AGGREGATE GROUP DID NOT BENEFIT FROM VIOXX BASED

9   ON THE STATISTICAL EFFICACY OF THE TRIAL.

10  Q.   APART FROM THE 091 TRIAL, WE ALSO KNOW THERE WAS A SECOND

11  PROGRESSION TRIAL.  THAT'S THE 126 TRIAL.  WE ESTABLISHED THAT

12  THIS MORNING; RIGHT?

13  A.   YES.

14  Q.   OKAY.  THERE WAS ALSO AN ALZHEIMER'S DISEASE PREVENTION

15  TRIAL; TRUE?

16  A.   YES.

17  Q.   OKAY.  THE FOLKS IN MERCK RESEARCH LABS LOOKED AT THE

18  INCIDENCE OF DEATH IN THAT TRIAL, TOO, DIDN'T THEY?

19  A.   I DON'T RECALL THE CATEGORIES THEY LOOKED AT.  DEATH WOULD

20  BE COLLECTED IN ANY TRIAL.

21  Q.   WELL, YOU SEE IN THE MEMO WE WERE JUST LOOKING AT FROM

22  DR. BLOCK, IT SAYS, "ALL DEATHS IN THE ONGOING PREVENTION

23  TRIAL ...AND THE TERMINATED SECOND PROGRESSION TRIAL...WILL BE

24  UNBLINDED AND EVALUATED."  DO YOU SEE THAT?

25  A.   YES, I DO.

1    Q.    OKAY.  SO IT'S YOUR UNDERSTANDING THAT THE DEATHS IN THE

2    OTHER TRIALS WERE ALSO LOOKED AT; TRUE?

3    A.    THAT'S WHAT THIS IMPLIES.

4    Q.    SIR, I'VE JUST PASSED YOU OVER WHAT WE HAVE MARKED AS

5    EXHIBIT 25 TO YOUR DEPOSITION.  DO YOU AGREE WITH ME, SIR, THAT

6    THIS DOCUMENT IS A COMBINED INTENTION TO TREAT AND ON-DRUG

7    ANALYSIS OF THE DEATH DATA IN BOTH PROTOCOL 091 AND PROTOCOL

8    078?

9    A.    YES, THAT'S WHAT THE SUMMARY DOCUMENT -- THE SUMMARY PAGE

10   ON THE FRONT PAGE STATES, YES.

11   Q.    OKAY.  IF YOU'D TURN TO THE NEXT PAGE, SIR, IT IDENTIFIES

12   THE MORTALITY ANALYSIS, OR THE DEATH ANALYSIS, FOR THE 091 AND

13   078 TRIALS ON AN INTENT-TO-TREAT BASIS.  DO YOU SEE THAT AT THE

14   BOTTOM OF THE FIRST PAGE?

15   A.    IT DOES IT FOR BOTH PROTOCOLS, YES.

16   Q.    NUMBER OF DEATHS ON VIOXX, 13. DO YOU SEE THAT?

17   A.    YES.

18   Q.    NUMBER OF DEATHS ON PLACEBO, 3?

19   A.    YES.  THAT'S THE TRIAL WE WERE LOOKING AT.

20   Q.    OKAY.  IT'S ABOUT WHAT, FOUR TIMES AS HIGH, A LITTLE MORE

21   THAN FOUR?

22   A.    YES.

23   Q.    OKAY.  GO DOWN TO THE ITT ANALYSIS FOR PROTOCOL 078.  DO

24   YOU SEE THAT BELOW IT?

25   A.    YES.

1   Q.   OKAY.  NUMBER OF DEATHS ON VIOXX, 21; RIGHT?

2   A.   YES.

3   Q.   NUMBER OF DEATHS ON PLACEBO, 9; RIGHT?

4   A.   YES.

5   Q.   THERE'S A RATE NEXT TO EACH OF THOSE NUMBERS; RIGHT?

6   A.   THERE IS.

7   Q.    THE RATE FOR VIOXX IS WHAT, A LITTLE UNDER TWO AND A HALF

8   TIMES GREATER THAN THE RATE FOR PLACEBO?

9   A.   YES.

10  Q.   WHAT THAT MEANS IS THAT TWO AND A HALF TIMES AS MANY

11  PEOPLE DIED TAKING VIOXX IN THE 078 TRIAL AS OF THIS POINT IN

12  TIME AS COMPARED TO PLACEBO; TRUE?

13  A.   YES.

14  Q.   OKAY.  IF YOU'D TURN TO PAGE 755, INTERNAL NUMBERING 4,

15  BATES NUMBER 755.

16  A.   JUST A MOMENT, PLEASE.

17  Q.   FEEL FREE.

18  A.   OKAY.  THANK YOU.  WHERE DO YOU WANT ME TO TURN, 755?

19  Q.   I'M SORRY.  756.

20  A.   EXCUSE ME, I WANT TO LOOK AT ONE OTHER THING.

21  Q.   THERE'S CALCULATIONS OF SOMETHING CALLED A HAZARD RATIO.

22  DO YOU SEE THAT?

23  A.   JUST A MOMENT.  756?

24  Q.   YEAH.  THERE'S A PARAGRAPH IN BETWEEN THE CHARTS.  IT

25  SAYS, "FROM THE MORTALITY FREQUENCY AND INCIDENT RATE CHARTS

1    FOR PROTOCOL 091."  DO YOU SEE THAT?

2    A.    YES, YES.

3    Q.    THERE'S A HAZARD RATIO CALCULATION IN THE LAST SENTENCE

4    FOR THE 091 TRIAL.  DO YOU SEE THAT?

5    A.    I'M SORRY.  YES, I DO.

6    Q.    4.43 WOULD BE THE RELATIVE INCREASED RISK OF DEATH ON

7    VIOXX COMPARED TO PLACEBO; TRUE?

8    A.    THE RELATIVE INCREASE IN RISK, YES.

9    Q.    OKAY.  SO FOLKS ON VIOXX IN THE 091 TRIAL WERE 4.4 TIMES

10   MORE LIKELY TO DIE COMPARED TO THOSE ON PLACEBO; TRUE?

11   A.    IT'S A HAZARD RATIO.  I THINK THAT'S TRUE.

12   Q.    OKAY.  IF YOU'D TURN THE PAGE, SIR, IF YOU LOOK AT THE

13   RESULTS FOR THE 078 TRIAL, PARAGRAPH BEGINNING, "FROM THE

14   MORTALITY FREQUENCY AND INCIDENT RATE CHARTS FOR PROTOCOL 078."

15   DO YOU SEE THAT?

16   A.    YES.

17   Q.    THEN IT SAYS AT THE END, "AFTER ADJUSTING FOR AGE AND

18   GENDER, THE HAZARD RATIO BETWEEN" VIOXX "AND PLACEBO WAS 2.55."

19   DO YOU SEE THAT SENTENCE?

20   A.    YES.

21   Q.    THAT INDICATES THAT FOLKS ON VIOXX WERE 2.55 TIMES MORE

22   LIKELY TO DIE THAN PATIENTS ON PLACEBO; TRUE?

23   A.    YES.

24   Q.    OKAY.  SO LET ME UNDERSTAND, SIR.  AS OF THIS POINT IN

25   TIME, APRIL 8, 2001, THE COMPANY HAS TWO INDEPENDENT

Page 1199

1    PLACEBO-CONTROLLED TRIALS DEMONSTRATING A STATISTICALLY

2    SIGNIFICANT INCREASE IN THE RISK OF DEATH; TRUE?

3    A.   YES.

4    Q.   OKAY.  IN THE ONE TRIAL, 091, THERE WAS A FOUR TIMES

5    GREATER RISK OF DEATH ON VIOXX COMPARED TO PLACEBO; TRUE?

6    A.   YES.

7    Q.   OKAY, SIR.  WELL, YOU'D AGREE THAT MORTALITY DATA IS

8    IMPORTANT; RIGHT?

9    A.   YES, IT IS.

10   Q.   THAT'S THE KIND OF DATA THAT A PHYSICIAN SHOULD KNOW;

11   RIGHT?

12   A.   YES, THEY SHOULD.

13   Q.   ANY DOUBT IN YOUR MIND THAT PHYSICIANS WOULD LIKE TO KNOW

14   WHETHER YOUR DRUG, MERCK'S DRUG, INCREASED THE RISK OF DEATH?

15   A.   IT'S DATA THAT SHOULD HAVE -- A PHYSICIAN SHOULD KNOW.

16   Q.   ANY DOUBT THAT THE FDA WOULD HAVE WANTED TO KNOW RIGHT

17   AFTER YOU KNEW THIS THAT VIOXX INCREASED THE RISK OF DEATH?

18   A.   I DON'T KNOW WHEN -- I DON'T KNOW THAT THIS DATA WAS NOT

19   SUBMITTED TO THE FDA.  I DON'T KNOW WHAT WAS DONE WITH THIS

20   DATA.

21   Q.   THE CONCLUSIONS THAT WERE REACHED WITHIN MERCK CONCERNING

22   THE STATISTICALLY SIGNIFICANT INCREASED RISK OF DEATH SHOULD

23   HAVE BEEN SHARED WITH FDA NO LATER THAN 15 DAYS AFTER THIS

24   ANALYSIS; RIGHT?

25   A.   THAT'S THE USUAL REPORTING TIME FOR DATA LIKE THIS.

1   Q.   DID MERCK SEND OUT A DEAR DOCTOR LETTER TELLING PHYSICIANS

2   AROUND THE COUNTRY THAT WE'VE GOT THESE TWO TRIALS, AND WE'VE

3   GOT A STATISTICALLY SIGNIFICANT INCREASED RISK OF DEATH?

4   A.   I DON'T RECALL THEM SENDING OUT A DEAR DOCTOR LETTER, NO.

5   Q.   DID MERCK ISSUE A PRESS RELEASE TELLING DOCTORS THE SAME

6   INFORMATION?

7   A.   I DON'T RECALL A PRESS RELEASE.

8   Q.   DID MERCK PUBLISH A LETTER IN THE NEW ENGLAND JOURNAL OF

9   MEDICINE TELLING PHYSICIANS ABOUT THE FINDINGS FROM THESE TWO

10  TRIALS?

11  A.   I DON'T RECALL SUCH A LETTER.

12  Q.   PUBLISH A LETTER ANYWHERE IN THE MEDICAL LITERATURE TO GET

13  WORD OUT PROMPTLY THAT OLD PEOPLE ARE AT A SUBSTANTIALLY

14  INCREASED RISK OF DEATH ON THE DRUG?

15  A.   I DON'T RECALL A LETTER BEING WRITTEN ABOUT THESE TRIALS

16  IN THE WAY YOU'RE ASKING THE QUESTION.

17  Q.   THIS WAS ALL ON YOUR WATCH; RIGHT?

18  A.   THIS OCCURRED WHILE I WAS PRESIDENT OF RESEARCH, YES.

19  Q.   RIGHT.  AND THE RESPONSIBILITY FOR COMMUNICATING THE

20  SCIENTIFIC MESSAGES LEARNED FROM CLINICAL TRIALS IN MERCK

21  RESEARCH LABS WAS ULTIMATELY YOURS; TRUE?

22  A.   YES.  I WAS NOT SHOWN THIS DATA.

23  Q.   IS THAT YOUR POSITION NOW, YOU WERE NOT SHOWN THIS DATA?

24  A.   I DON'T RECALL HAVING SEEN THIS DATA.

25  Q.   ARE YOU DISAVOWING YOU HAD ANY KNOWLEDGE OF THE

Page 1201

1    STATISTICALLY SIGNIFICANT INCREASED RISK IN DEATH IN THE 078

2    AND 091 TRIALS IN APRIL OF 2001?

3    A.   I DON'T RECALL ANYTHING ABOUT 078.  WHAT I'VE TOLD YOU I

4    RECALL ABOUT 091 IS WHAT I'VE SAID:  THAT THERE WAS AN

5    IMBALANCE OF EVENTS AND THAT THEY WEREN'T DUE TO

6    CARDIOVASCULAR -- AN EXCESS OF CARDIOVASCULAR EVENTS.  THAT IS

7    ALL I RECALL ABOUT THE ALZHEIMER'S DATA.

8    Q.   WELL, THE ONE THING WE DO KNOW, AND YOU KNOW NOW LOOKING

9    AT THIS MEMO, IS THAT THERE WERE STATISTICALLY SIGNIFICANT

10   INCREASED NUMBERS OF DEATHS ON VIOXX COMPARED TO PLACEBO AS OF

11   APRIL 2001; TRUE?

12   A.   THE ANALYSES THAT ARE HERE INDICATE THAT, YES.

13   Q.   YOU DON'T THINK THAT WAS DUE TO CHANCE?

14   A.   IT WAS STATISTICALLY SIGNIFICANT.

15   Q.   YOU DON'T THINK THAT WAS DUE TO CHANCE?

16   A.   THEREFORE, IT WAS NOT LIKELY DUE TO CHANCE.

17   Q.   SIR, I'M PASSING YOU OVER WHAT WE JUST MARKED AS EXHIBIT

18   26 TO YOUR DEPOSITION. IT'S AN E-MAIL, A SERIES OF E-MAILS

19   BEGINNING WITH AN E-MAIL TO YOU FROM DR. GILBERT BLOCK.  DO YOU

20   SEE THAT?

21   A.   WHERE ARE WE?  WE ARE STARTING AT THE BOTTOM.

22   Q.   STARTING AT THE BOTTOM.  THAT WOULD BE THE

23   EARLIEST-IN-TIME E-MAIL; CORRECT?

24   A.   YES.

25   Q.   YOU WROTE, "DOUG, WHEN I READ THIS NOTE ABOUT 30 MINUTES

1    AGO, I TRIED TO CALL YOU AT HOME."  DO YOU SEE THAT?

2    A.    I DO.

3    Q.    YOU WERE UPSET THAT DR. BLOCK SHARED THIS INFORMATION

4    BEFORE A COMMITTEE MEETING BEFORE HE SHARED IT WITH YOU; ISN'T

5    THAT RIGHT?

6    A.    I DON'T REMEMBER WHAT I WAS UPSET ABOUT.

7    Q.    YOU THEN GET A RESPONSE FROM DR. GREENE; RIGHT?

8    A.    YES.

9    Q.    HE NOTES IN THE MIDDLE OF HIS RESPONSE THAT YOU'RE GOING

10   TO BE BEFORE THE FDA ON APRIL 11 TO DISCUSS LABELING ISSUES;

11   RIGHT?

12   A.    YES.

13   Q.    HE THEN NOTES, "I EXPECT THAT WE WILL NEED TO INFORM THEM

14   OF THIS IN SOME WAY SINCE WE HAVE INCLUDED THE CV EVENTS FROM

15   THE AD TRIALS."  DO YOU SEE THAT?

16   A.    YES.

17   Q.    "CV EVENTS" ARE CARDIOVASCULAR EVENTS?

18   A.    YES.

19   Q.    THE "AD TRIALS," THAT'S ALZHEIMER'S DISEASE AGAIN; RIGHT?

20   A.    YES.

21   Q.    WHAT HE'S SAYING IS YOU'RE GOING TO HAVE TO TALK TO THE

22   FDA ABOUT THE MORTALITY DATA; RIGHT?

23   A.    HE SAYS CARDIOVASCULAR EVENTS, YES.

24   Q.    WELL, SIR, IS IT YOUR TESTIMONY THAT THE FOLKS IN

25   REGULATORY WHO WENT DOWN TO TALK TO THE FDA ON APRIL 11 ABOUT

1   LABELING ISSUES WOULD NOT HAVE CHECKED WITH YOU BEFORE GOING TO

2   DETERMINE WHAT MESSAGE SHOULD BE COMMUNICATED ABOUT ALZHEIMER'S

3   DATA?

4   A.   YES.  THEY WOULDN'T NECESSARILY HAVE DISCUSSED WITH ME THE

5   DETAILS OF WHAT THEY TALKED TO WITH FDA.

6   Q.   SO IF THE FOLKS FROM MERCK WHO WENT DOWN AND TALKED TO FDA

7   ON LABELING ISSUES ON APRIL 11 DIDN'T DISCLOSE ANY OF THE

8   MORTALITY DATA; THAT WAS THEIR DECISION AND NOT YOURS.  THAT'S

9   WHAT YOU'RE SAYING?

10  A.   I DON'T KNOW WHAT THEY DISCLOSED, BUT I DID NOT GIVE THEM

11  ANY INSTRUCTIONS, TO THE BEST OF MY RECOLLECTION, ON WHAT TO

12  DISCLOSE OR NOT TO DISCLOSE TO THE FDA, AND THE -- I THINK MOST

13  OF THE CONTENT OF THIS E-MAIL INDICATES THAT.

14  Q.   SIR, I'M GOING TO PASS YOU OVER WHAT WE'RE MARKING AS

15  EXHIBIT 27 TO YOUR DEPOSITION.  FOR THE RECORD, IT'S A DOCUMENT

16  TITLED, "FDA - MRL MEETING."  "MRL," THAT'S MERCK RESEARCH

17  LABS?

18  A.   YES.

19  Q.   OKAY.  THEN IT'S GOT AN NDA NUMBER.  THAT'S THE NDA NUMBER

20  FOR VIGOR?

21  A.   THAT'S WHAT IT SEEMS TO INDICATE.

22  Q.   OKAY.  APRIL 11, 2001.  DO YOU SEE THAT?

23  A.   YES, I DO.

24  Q.   THAT'S THE DATE DOUG GREENE WAS STATING THAT YOU WERE

25  GOING TO BE -- EXCUSE ME, MERCK WAS GOING TO BE BEFORE THE FDA

Page 1204

1    TO DISCUSS LABELING ISSUES; RIGHT?

2    A.    YES.

3    Q.    TAKE A QUICK LOOK AT THE DOCUMENT, SIR.  DO YOU SEE ANY

4    REFERENCE TO TWO TRIALS DEMONSTRATING STATISTICALLY SIGNIFICANT

5    INCREASED RATES OF DEATH IN THE REPORT OF THIS PARTICULAR

6    MEETING?

7    A.    I DON'T SEE A COMMENT ABOUT THAT IN THIS SUMMARY.

8    Q.    SO FOLKS FROM MERCK RESEARCH LABS AND THE REGULATORY GROUP

9    WITHIN MERCK WENT DOWN TO THE FDA ON APRIL 11, 2001, TO TALK

10   ABOUT LABELING FOR VIOXX; TRUE?

11   A.    THERE WAS A MEETING ON LABELING OF VIOXX ON APRIL 11, YES.

12   Q.    THAT WAS THE MEETING WHERE DOUG GREENE SUGGESTED WE SHOULD

13   REPORT THIS ALZHEIMER'S DEATH DATA FROM THE 091 TRIAL; RIGHT?

14   A.    I HAVEN'T HAD A CHANCE TO READ HIS E-MAIL TO ME, SO... HE

15   SAYS IN THE E-MAIL, "I EXPECT THAT WE WILL NEED TO INFORM THEM

16   OF THIS IN SOME WAY SINCE WE HAVE INCLUDED THE CV EVENTS FROM

17   THE AD TRIALS."  YES, I THINK HE IS SUGGESTING THAT.

18   Q.    WELL, DID YOU TELL HIM NOT TO DO THAT?

19   A.    ABSOLUTELY NOT.

20   Q.    DO YOU ENDORSE THE DECISION NOT TO DISCLOSE TWO TRIALS

21   THAT HAVE STATISTICALLY SIGNIFICANT DOUBLING IN THE RATES OF

22   DEATH TO THE FDA?

23   A.    I DO NOT ENDORSE THAT DECISION.

24   Q.    DR. SCOLNICK, WE'RE GOING TO SHIFT GEARS A LITTLE BIT. I

25   WANT TO TALK ABOUT YOUR ROLE IN THE MARKETING OF VIOXX.  OKAY?

Page 1205

1    A.    UH-HUH.

2    Q.    YOU DID HAVE A ROLE IN THE MARKETING OF VIOXX; CORRECT,

3    SIR?

4    A.    NOT A DIRECT ROLE, NO.

5    Q.    YOU ASSISTED THE MARKETING FUNCTION WITHIN MERCK IN

6    CONNECTION WITH THE MARKETING OF VIOXX; TRUE?

7    A.    ONLY IN THE INITIAL DATA DISCUSSIONS WITH MARKETING ABOUT

8    WHAT THE DATA WAS IN THE FILE.  I DID NOT PREPARE MARKETING

9    INFORMATION.

10   Q.    WELL, SIR --

11   A.    -- OR APPROVE IT OR SEE IT BEFORE IT WAS USED.

12   Q.    WELL, THE DOCUMENT I JUST PASSED YOU AND WE MARKED AS

13   EXHIBIT 30 TO YOUR DEPOSITION IS A MEMO FROM WENDY DIXON TO YOU

14   DATED MAY 8, 2000; RIGHT?

15   A.    YES.

16   Q.    BATES-STAMPED MRK-ABI0002126 TO 2128.  I TAKE IT YOU'VE

17   SEEN THIS BEFORE, SIR?

18   A.    I DON'T REMEMBER.  PERHAPS.  I DON'T SPECIFICALLY RECALL

19   IT.

20   Q.    WELL, SIR, DO YOU HAVE ANY REASON TO DOUBT THAT YOU

21   RECEIVED THE MEMO FROM WENDY DIXON FROM MAY OF 2000 THAT WAS

22   SENT TO YOUR ATTENTION AND YOUR ATTENTION ALONE?

23   A.    NO, I DON'T HAVE ANY REASON TO DOUBT IT, BUT I DON'T

24   RECALL AT THE MOMENT, EXCEPT I'M READING IT NOW.

25   Q.    THE SUBJECT LINE OF THIS PARTICULAR MEMO IS "RENAL AND

1   CARDIOVASCULAR ISSUES FOR VIOXX." TRUE?

2   A.   YES.

3   Q.   OKAY.  IN FACT, WENDY DIXON WAS IN CHARGE OF THE MARKETING

4   EFFORT FOR VIOXX; TRUE?

5   A.   YES, I BELIEVE THAT'S TRUE.

6   Q.   WELL, IF YOU'D TURN TO THE LAST PAGE OF THE DOCUMENT, SIR,

7   IT'S BATES-STAMPED ABI 0002128.  DO YOU SEE THE PARAGRAPH

8   BEGINNING, "DAVID MENTIONED..."?

9   A.   LAST PAGE?  OH, YES, I DO.

10  Q.   IN FACT, YOU OFFERED TO MR. ANSTICE TO ASSIST IN

11  DEVELOPING RESPONSES TO THE COMPETITIVE MESSAGES THAT WERE OUT

12  ON THE MARKET CONCERNING VIOXX AND CELEBREX; TRUE?

13  A.   THAT'S WHAT THE MEMO SAYS, YES.

14  Q.   OKAY.  IN PARTICULAR, YOU WERE GOING TO ASSIST IN

15  RESPONDING TO THE CARDIOVASCULAR ISSUES BEING ADDRESSED BY

16  PFIZER AS IT RELATED TO VIOXX; TRUE?

17  A.   THAT'S WHAT SHE REQUESTS AT THE BEGINNING OF THE FIRST

18  PAGE OF THE MEMO.

19  Q.   IF YOU'D LOOK AT THE THIRD NUMBERED PARAGRAPH ON PAGE 2 --

20  WELL, LET ME TAKE A STEP BACK.  THIS DOCUMENT IS DESCRIBING IN

21  PARTICULAR THE STEPS THAT ARE BEING TAKEN BY WENDY DIXON ON

22  BEHALF OF THE MARKETING DEPARTMENT OF MERCK TO RESPOND TO THE

23  COMPETITIVE CHALLENGES THAT ARE BEING RAISED BY PFIZER AGAINST

24  VIOXX; TRUE?

25  A.   THAT'S WHAT IT APPEARS TO BE.

1    Q.    SO SHE'S TELLING YOU WHAT MATERIALS THE SALES FORCE HAS TO

2    RESPOND TO THE CARDIOVASCULAR ISSUES CONCERNING VIOXX; RIGHT?

3    A.    YES.

4    Q.    THE THIRD ITEM THERE IS "A CARDIOVASCULAR CARD TO HANDLE

5    THE THROMBOEMBOLIC EVENTS ISSUES."  DO YOU SEE THAT?

6    A.    YES, I DO.

7    Q.    IT SAYS, "IT COMPARES CARDIOVASCULAR THROMBOEMBOLIC AES

8    FOR VIOXX COMPARATOR NSAIDS...AND PLACEBO."  DO YOU SEE THAT?

9    A.    YES.

10   Q.    THEN A BUNCH OF THE NSAIDS THAT ARE COMPARED ACROSS THE

11   NINE OSTEOARTHRITIS TRIALS ARE REFERENCED THERE; RIGHT?

12   A.    CORRECT.

13   Q.    YOU'VE SEEN THAT CARDIOVASCULAR CARD, HAVEN'T YOU?

14   A.    I DON'T RECALL.

15   Q.    OKAY.  WELL, THE NEXT PARAGRAPH SAYS, "COPIES OF THE RENAL

16   CARD, CARDIOVASCULAR CARD, AND THE ROSSAT PAPER ARE ATTACHED."

17   DO YOU SEE THAT?

18   A.    I DO.  I STILL DON'T RECALL.

19   Q.    ANY REASON TO DOUBT THAT MS. DIXON WAS TELLING THE TRUTH

20   WHEN SHE SAID SHE WAS GIVING YOU THESE THINGS FOR YOUR REVIEW?

21   A.    SHE WAS GIVING THEM TO ME.  I DON'T THINK -- I DON'T THINK

22   I WAS GIVEN THEM FOR REVIEW.  I THINK SHE SAYS IN THE PARAGRAPH

23   THAT THE REPRESENTATIVES ALREADY HAVE THIS INFORMATION.  I

24   DON'T RECALL THESE CARDS AND I DON'T RECALL DISCUSSING THE

25   CARDS WITH HER AT ALL.

1   Q.   MORTALITY INFORMATION, TOTAL MORTALITY INFORMATION, IS

2   IMPORTANT INFORMATION THAT SHOULD HAVE BEEN INCLUDED IN THE CV

3   CARD THAT WAS USED BY SALES REPRESENTATIVES TO RESPOND TO

4   PHYSICIAN INQUIRIES CONCERNING THE DRUG; TRUE?

5   A.   I THINK A CV CARD SHOULD HAVE CONTAINED ALL

6   CARDIOVASCULAR-RELATED INFORMATION FROM THE VARIETY OF DATA

7   SOURCES MERCK HAS, AND --

8   Q.   WOULD --

9   A.   -- AND IF THERE WAS MORTALITY DATA ASSOCIATED WITH THOSE

10  TRIALS, EACH OF THE TRIALS AND WHAT THE DATA WAS IN EACH OF THE

11  TRIALS.

12  Q.   MY QUESTION, SIR, WAS WHETHER THE CV CARD SHOULD HAVE

13  INCLUDED ALL THE MORTALITY DATA THE COMPANY HAD IN ITS

14  POSSESSION AND HAD ANALYZED AT THE POINT IN TIME WHEN IT

15  RELEASED THE CV CARD?

16  A.   I THINK AN IDEAL CARD WOULD HAVE HAD CV DATA, CV

17  MORTALITY, TOTAL MORTALITY, FOR ALL THE STUDIES AVAILABLE.

18  Q.   OKAY. I WANT TO START WITH YOU A SECTION ON THE LABELING

19  OF THE DRUG AND THE PROGRESSION OF THE LABELS OF THE DRUG.  YOU

20  WERE INTIMATELY INVOLVED IN THAT PROCESS; CORRECT, SIR?

21  A.   I CERTAINLY KNEW WHAT WAS GOING ON, YES.

22  Q.   WHEN THE DRUG WAS FIRST BROUGHT ON THE MARKET, IT HAD A

23  STANDARD NSAID GI WARNING; CORRECT?

24  A.   I BELIEVE THAT'S CORRECT.

25  Q.   NOW, HERE WE HAVE A LABEL WHICH APPEARS -- TO ME,

1    ANYWAY -- TO BE MERCK'S PROPOSAL TO THE FDA POST-VIGOR.  AM I

2    CORRECT THAT THAT'S WHAT THIS DOCUMENT REPRESENTS, EXHIBIT 39,

3    SIR?

4    A.   WHAT'S THE DATE OF THIS?

5    Q.   IT SAYS "ORIGINAL LABEL SUBMISSION."  I'M WORKING WITH

6    DOCUMENTS WHICH WERE PRODUCED BY MERCK.  SO I CAN TELL YOU

7    BATES NUMBERS AND I CAN TELL YOU WHAT IT SAYS.  IT SAYS

8    "ORIGINAL LABEL SUBMISSION FOR VIGOR."

9    A.   THE VIGOR STUDY IS REFERENCED IN THIS LABEL, SO THAT'S

10   PROBABLY WHAT IT IS.

11   Q.   THERE'S NO CARDIOVASCULAR WARNING THAT'S GIVEN ON THE DRUG

12   RELATIVE TO RISKS OF CARDIOVASCULAR EVENTS OR INCREASE OF RISK

13   OF CARDIOVASCULAR EVENTS AS WAS PROVEN IN THE VIGOR STUDY;

14   CORRECT, SIR?

15   A.   THE VIGOR STUDY, AS I TOLD YOU, WE DID NOT BELIEVE

16   INDICATED VIOXX INCREASED CV EVENTS AND, THEREFORE, THERE WAS

17   NO WARNING IN THIS LABEL.  THAT IS CORRECT.

18   Q.   WHEN THE FDA GOT THIS PROPOSAL, WAS THAT THEIR VIEW OF THE

19   DATA?

20   A.   THE DATA WAS PRESENTED IN AN ADVISORY COMMITTEE.  THAT WAS

21   THEIR VIEW OF THE DATA. IT WAS MERCK'S VIEW OF THE DATA.  AND

22   THE FDA CHOSE, I THINK IN THEIR FIRST RESUBMISSION TO US, TO

23   TAKE A DIFFERENT INTERPRETATION, YES.

24   Q.   THEY DID.  DID THEY SUGGEST THAT THERE BE A WARNING ON THE

25   DRUG, SIR, BASED ON THE VIGOR DATA?

1   A.   YES, THEY DID.

2   Q.   DID MERCK SAY, CERTAINLY WE'RE INTERESTED IN PUBLIC

3   SAFETY, AND A WARNING WOULD BE A GOOD IDEA ON A DRUG WHERE

4   THERE MIGHT BE A PROBLEM?  IS THAT WHAT MERCK SAID, SIR?

5   A.   MERCK DID NOT BELIEVE THERE WAS A CARDIOVASCULAR RISK

6   ASSOCIATED WITH VIOXX, AND AS THIS WARNING INDICATES, THERE IS

7   CARDIOVASCULAR RISK, WE OBJECTED TO THAT LABEL.

8   Q.   WELL, DO YOU KNOW -- I CAN ONLY ASK YOU WHAT YOU KNOW

9   TODAY.  DO YOU KNOW OF ANY LABEL CHANGE THAT WAS MADE BETWEEN

10  MARCH OF 2000 AND APRIL OF 2002 REPORTING THE VIGOR RESULTS IN

11  A LABEL TO THE PRESCRIBING PHYSICIANS OF THIS COUNTRY AND

12  AROUND THE WORLD?

13  A.   NO, I DO NOT.

14  Q.   SO PRESCRIBING PHYSICIANS WHO WERE GOING BY THE LABEL OF

15  YOUR DRUG BETWEEN MARCH OF 2000 AND APRIL OF 2002, THEY'RE JUST

16  LOOKING AT THE LABEL, THEY WOULDN'T KNOW ANYTHING ABOUT THE

17  VIGOR RESULTS; CORRECT?

18  A.   IF THEY WERE ONLY LOOKING AT THE LABEL?

19  Q.   YES.

20  A.   I DON'T KNOW WHAT THEY WOULD BE THINKING.  THE LABEL WAS

21  NOT CHANGED ON VIGOR UNTIL, AS YOU POINTED OUT, APRIL 2002.

22  Q.   THERE IS AN OBLIGATION BY A RESPONSIBLE PHARMACEUTICAL

23  COMPANY TO KEEP THE LABEL BOTH CLEAR AND ACCURATE AND TO TIMELY

24  UPDATE IT; CORRECT?

25  A.   YES.

Page 1211

1            MR. BECK:  YOUR HONOR, AT THIS POINT THE EXAMINATION

2    BEGINS BY DEFENSE COUNSEL.

3            THE COURT:  WHY DON'T WE TAKE A 10-MINUTE BREAK AT

4    THIS TIME.

5            MR. BIRCHFIELD:  I THINK WE ARE STILL ON THE

6    PLAINTIFF'S CASE.

7            MR. BECK:  OH.  WELL, WE NEED A BREAK TO FIGURE OUT

8    WHERE WE ARE, YOUR HONOR.

9            THE COURT:  WE'LL TAKE A 10-MINUTE BREAK.

10            THE DEPUTY CLERK:  EVERYONE RISE.

11            (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

12            THE DEPUTY CLERK:  EVERYONE RISE.

13            THE COURT:  BE SEATED, PLEASE.  MEMBERS OF THE JURY,

14    I EXPLAINED TO THE ATTORNEYS THE PERSONAL PROBLEMS, AND THEY

15    ARE BOTH HAPPY TO ACCOMMODATE YOU AND UNDERSTAND AND APPRECIATE

16    THE WORK THAT YOU ALL ARE DOING ON THE CASE AND THE ATTENTION

17    THAT YOU ARE GIVING TO THE CASE.  YOU NEED TO KNOW THE COURT IS

18    VERY APPRECIATIVE, TOO.  WE ARE GOING TO STOP HERE AND START

19    TOMORROW AT 8:00.  I HATE TO WORK ON SATURDAY, FOLKS, BUT WE

20    HAVE TO GET THIS MATTER WRAPPED UP.  OKAY.  YOU HAVE A GOOD

21    NIGHT, AND I HOPE THE MOVERS AND EVERYTHING WORKED OUT.  COURT

22    WILL STAND IN RECESS.

23            THE DEPUTY CLERK:  EVERYONE RISE.

24            (WHEREUPON, THE JURY EXITED THE COURTROOM.)

25            THE COURT:  WE'LL RESUME TOMORROW.  WE NEED TO TAKE

DAILY COPY

Page 1212

1    THAT MATTER UP TOMORROW, MR. BIRCHFIELD, UNLESS YOU WANT TO

2    TALK ABOUT IT NOW.

3            MR. BIRCHFIELD:  YOU TOLD ME I HAVE TO MAKE A

4    DECISION BY THE END OF THE DAY AND THAT'S THE ISSUE.

5            THE COURT:  LET'S HAVE A SEAT.  WHAT'S THE PROBLEM?

6            MR. BIRCHFIELD:  IN MAKING A DECISION BETWEEN

7    DR. FOSSLIEN OR DR. FUNK, DR. FOSSLIEN IS IN CHICAGO, AND RIGHT

8    NOW HE IS SNOWED IN.  I DON'T KNOW IF HE CAN GET HERE.  IT'S A

9    PROBLEM FOR ME.  IF I LOOK AT MY CASE AND SAY DR. FOSSLIEN

10   WOULD BE THE BEST FIT HERE AND THEN HE CAN'T GET HERE, THEN I'M

11   REALLY IN A BIND.  I'M JUST CONCERNED ABOUT THE ATTRITION HERE,

12   YOUR HONOR.  THESE ARE NOT JUST EXPENDABLE EXPERTS WE HAVE

13   LINED UP.  THESE ARE WORLD-CLASS EXPERTS.  I MAY JUST LOSE THEM

14   THROUGH THE FRUSTRATION OF GETTING READY FOR TRIAL AND THEN

15   BEING FORCED TO SAY, "YOU CAN'T TESTIFY."

16           DR. COLIN FUNK IS A PRIME EXAMPLE.  HE STUDIED

17   WITH GARRETT FITZGERALD.  HE IS WORKING ON PROJECTS RIGHT NOW

18   WITH GARRETT FITZGERALD.  HE IS ONE OF THE LEADING AUTHORITIES

19   IN THIS AREA, AND FOR ME TO MAKE THAT CALL AT THE LAST-MINUTE

20   AND SAY, "I CAN'T CALL YOU," I'M FACING A VERY DIFFICULT

21   CIRCUMSTANCE.  I'VE BEEN IN COURT ALL DAY.  TO MAKE THAT

22   DECISION IN THE MIDST OF THIS TRIAL, WHILE THE TRIAL IS GOING

23   ON, AND NOT BEING ABLE TO COMMUNICATE WITH THE EXPERTS PUTS ME

24   IN A VERY DIFFICULT SPOT.

25           THE COURT:  TAKE THAT UP WITH THEM TONIGHT AND WE'LL

1    TALK ABOUT IT IN THE MORNING.  I'LL EXTEND THAT PERIOD OF TIME

2   SO THAT WE CAN REGROUP.

3            MR. BIRCHFIELD:  THANK YOU, YOUR HONOR.

4            THE COURT:  COURT WILL STAND IN RECESS.

5            THE DEPUTY CLERK:  EVERYONE RISE.

6            (WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING.)

7                         *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25