UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
|     STATE OF LOUISIANA, ex rel JAMES D. | * | JUDGE FALLON |
|     CALDWELL, JR. Attorney General, | * | |
|                   Plaintiff, | * | MAG. JUDGE KNOWLES |
| | * | |
|     versus | * | |
| | * | |
|     MERCK & CO., INC., | * | |
|                   Defendant | * | |
| **CASE NO. 05-3700** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO EXCLUDE THE TESTIMONY OF JOHN DAVID ABRAMSON, M.D.</u>

## TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    DR. ABRAMSON IS NOT MERELY A "CHEERLEADER" OF PLAINTIFFS' POSITION . . . . . . . . 5

II.   MERCK HAS MIS-CHARACTERIZED THE NATURE AND SUBSTANCE OF
      DR. ABRAMSON'S TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  TO THE EXTENT DR. ABRAMSON CITES TO THE OPINIONS OR WRITINGS OF OTHER EXPERTS,
      SUCH REFERENCES ARE APPROPRIATE AND PERMISSIBLE UNDER RULE 703 . . . . . . . . . . . 9

      A.    Dr. Abramson's reference to Dr. Pechmann's opinions is permissible . . . . . . . . 10

      B.    Dr. Abramson's reliance upon a straightforward statistical analysis
            in support of his independent conclusion that Merck improperly reported
            the VIGOR study GI findings was appropriate . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.    Dr. Abramson's reference to the "Expression of Concern" in support
            of his opinion that Merck concealed CV risks arising in Merck-sponsored
            studies is permissible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      D.    Dr. Abramson's citation to a quotation by the purported "author" of
            the Merck-sponsored ADVANTAGE study in a New York Times
            article is proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.   DR. ABRAMSON IS QUALIFIED TO TESTIFY TO MECHANISMS WHEREBY VIOXX HAS
      THE POTENTIAL TO INCREASE CV RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.    TO THE EXTENT THIS COURT FINDS THAT THE SUITABILITY OF CELEBREX AS AN
      ALTERNATIVE TO VIOXX IS RELEVANT, THEN DR. ABRAMSON IS QUALIFIED TO
      OFFER EXPERT TESTIMONY ON THIS SUBJECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

## TABLE OF AUTHORITIES

PAGE

### CASES

*In re Neurontin Marketing and Sales Practice Litigation,*
    – F.Supp. 2d – 2010 WL 53568, p. 5 (D. Mass. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Zyprexa Prods. Liab. Litig.,*
    493 F. Supp. 2d 571, 580 (E.D.N.Y.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*In re Zyprexa Products Liability Litigation,*
    253 F.R.D. 69, 154 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Tricor Indict Purchaser Antitrust Litigation*
    C.A. No. 05-360 (U.S.D.C District of Delaware 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Charles Foti, Attorney Genereal ex rel, State of Louisiana v. Janseen Pharmaceuticals*
    27th JDC No. 04-C-3967-D, St. Landry Parish, LA (January 7, 2010). . . . . . . . . . . . . . . . 1

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig,*
    2007 WL 1964337, at *7 (D. Minn. Jun. 29, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Welding Fume Prods. Liab. Litig.,*
    2005 WL 1868046, at *17 (N.D. Ohio Aug. 8,2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Rezulin Prods. Liab. Litig.*
    309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Polythane Systems, Inc. v. Marina Ventures Intern, Ltd.,*
    993 F.2d 1201, 1207 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

### RULES

Federal Rules of Evidence
    702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6
    703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11, 13

## INTRODUCTION

A respected physician, academician and published author, Dr. John Abramson brings together a number of expertise that are necessary to understanding the complex and varied ways in which Merck manipulated the scientific information upon which physicians, including members of LDHH's P&T Committee, relied in making decisions about Vioxx. Applying his expertise in the fields of primary care, statistics, epidemiology and medical communication, Dr. Abramson offers expert testimony which is essential to understanding both the means by which Merck has distorted the medical literature regarding Vioxx and the ways in which physicians utilized such distorted scientific information in their decisions about Vioxx. Dr. Abramson's opinions in this regard have repeatedly been accepted by courts in pharmaceutical litigation, and should be accepted here.[1]

## BACKGROUND

Dr. John Abramson is a medical doctor licensed to practice in Massachusetts since 1982. A *cum laude* graduate of Harvard College, he attended Dartmouth Medical School and graduated with a degree in Medicine from Brown Medical School in 1976. He completed his internship at the University of North Carolina, and his residency at Case Western Reserve University from 1979 to 1981. He earned a Robert Wood Johnson Fellowship in Family Medicine at Case Western, and a Master of Science in Family Practice degree. His Fellowship included the study of epidemiology,

---

[1] *See e.g. In re Neurontin Marketing and Sales Practice Litigation,* – F.Supp. 2d – 2010 WL 53568, p. 5 (D. Mass. 2010); *In re Zyprexa Prods. Liab. Litig.,* 493 F. Supp. 2d 571, 580 (E.D.N.Y.2007) *In re Zyprexa Products Liability Litigation,* 253 F.R.D. 69, 154 (E.D.N.Y. 2008). *In re Tricor Indict Purchaser Antitrust Litigation,* C.A No. 05-360 (SLR) USDC District of Delaware (2009) . *In re Charles Foti, Attorney General ex rel, State of Louisiana,* 27th Judicial District Court, No. 04-C-3967-D, St. Landry Parish, LA (January 7, 2010) See Exhibit 3.

statistics, research design, health policy and interpretation of scientific data. He served as Chair of the Department of Family practice at Lahey Clinic in Burlington Massachusetts from 1994 to 2001 and has been a clinical instructor at Harvard Medical School since 1997. *(See* Expert Report of John Abramson, MD ("Report") at 4.) As a member of the faculty at Harvard Medical School, he has taught medical students how to critically interpret medical literature and data into a risk/benefit analysis for prescribing drugs to patients. (Report at 6-7.)

Dr. Abramson has 28 years of practice as a physician in multiple arenas. As a treating physician, he has been responsible for the evaluation, care, and treatment of numerous patients for primary care, as well as disease diagnosis, treatment, and management. He has firsthand experience of the type and content of information physicians need to make informed prescribing decisions, perform risk benefit analysis and evaluate safety and efficacy of drugs for their patients. He carefully reads medical journals both as part of his responsibilities as a practicing physician and as a researcher evaluating the quality of the scientific evidence presented in these journals. (Report at 6.)

Since 2003, Dr. Abramson has published widely on health policy and commercial bias in the scientific evidence that doctors rely on to guide their clinical practice, including several articles in peer-reviewed medical journals and a book published by Harper Collins in 2004. (Report at 7; Exhibit 1 to Report.) He is a highly sought after speaker on these subjects at medical schools, hospital grand rounds, and health insurers. In an opinion admitting his testimony in the Zyprexa litigation in 2007, Judge Weinstein called Dr. Abramson "a distinguished scientist whose expertise probably will be helpful in deciding relevant scientific and economic issues." *In re Zyprexa Prods. Liab. Litig.,* 493 F. Supp. 2d 571, 580 (E.D.N.Y. 2007).

Moreover, before Vioxx was ever taken off the market, and long before he was ever involved in any litigation about Vioxx, Dr. Abramson spent literally hundreds of hours researching the safety and efficacy of Cyclooxygenase-2 (COX-2) inhibitors, including Vioxx and Celebrex. (Report, at 5). He conducted extensive research into the omission of key aspects of the results of manufacturer-sponsored studies of both Vioxx and Celebrex in medical journals and completed a book chapter about the safety and efficacy of these products. (*Id.*) Since becoming involved with this litigation, Dr. Abramson has reviewed thousand pages of Merck's internal documents and deposition testimony regarding Merck's own knowledge of the risks and relative benefits associated with Vioxx and Merck's efforts to downplay those risks while exaggerating the benefits both in scientific literature and in its communications with physicians. (See Abramson Rep., Ex. 2). Additionally, since he wrote his initial report, discovery into Merck's communications with physicians in Louisiana, and particularly Merck's sales calls on members of the LDHH P&T Committee members and communications with LDHH's Pharmacy Benefit Manager, Provider Synergies, has confirmed Dr. Abramson's understanding that the national strategy for communicating with physicians was followed in Louisiana as well.[2]

In his expert report, Dr. Abramson discusses the sources of information about prescription drugs that are available to and relied upon by doctors, and assesses whether Merck "minimized the risks associated with Vioxx and overstated benefits in both the medical articles it funded and in its communications to physicians." (Abramson rep. ¶13) To do this, Dr. Abramson has drawn on his unique mixture of specialized knowledge in patient care and how pharmaceutical company-

---

[2] Dr. Abramson will be supplementing his report to discuss Louisiana-specific information gleaned through discovery subsequent to his draft of his initial report.

sponsored research and marketing affect doctors' decisions.   This task requires Dr. Abramson's understanding not only of the information physicians rely upon, but also, among other things, the design of clinical trials, the technical and often subtle ways in which bias can be introduced into those trials and the results affected, and what information those trials provide to a pharmaceutical company. He is then able to compare that raw information with what Merck allowed to be presented and actually packaged and presented to physicians and to the public.

## ARGUMENT

Dr. Abramson offers valuable expert opinion into the ways in which information about pharmaceutical products are communicated to physicians, the means by which manufacturers can and have distorted the information upon which physicians rely, and the manner in which doctors have received an interpreted this misinformation.  Dr. Abramson's expert testimony on this subject is based on his vast experience in the field, in which he has not only published and taught, but also has been recognized as a preeminent expert.  In an effort to exclude this expert testimony which is critical to understanding key aspects of the case, Merck attempts to mis-characterize the nature of his testimony, suggesting that he is merely a "cheerleader" of plaintiffs' case.

The legal standard for admission of expert testimony in federal court is set forth in the Opposition to Motion to Exclude Expert Testimony of John S. MacGregor, M.D., PhD., filed concurrently herewith and incorporated herein by reference.  Dr. Abramson's testimony more than satisfies the legal standard for admissibility of expert testimony.

Dr. Abramson's testimony is based on sound methodology and requires expertise. Dr. Abramson's expertise is in critically analyzing the production and dissemination of scientific, and specifically, medical knowledge.   This is a well-developed field whose leaders, such as Dr.

-4-

Abramson, routinely publish works in mainstream peer-reviewed journals.[3]  Here, Dr. Abramson set out to analyze clinical trials from both a medical and statistical point of view to determine what the pre-specified outcomes showed, to track the publication (or lack thereof) of the findings, and then to analyze whether the published findings were consistent with research protocols and the study data to determine whether physicians, patients, and payors had the best information available to them to make prescribing decisions. This requires the application of several intersecting forms of expertise, including epidemiology, statistics, research design, pharmacology, scientific publication processes, primary care, health policy, and medical communications. Dr. Abramson's training and expertise allow him to understand and explain the complex nexus of clinical research and dissemination of information to doctors in creating false impressions with respect to the comparative safety and efficacy of Vioxx.

## I.    DR. ABRAMSON IS NOT MERELY A "CHEERLEADER" OF PLAINTIFFS' POSITION.

The synthesis that Dr. Abramson's testimony offers - just as to sources of medical knowledge and Defendants' manipulation of those sources - will assist the trier of fact in digesting the extensive factual record in this case. Further, Dr. Abramson's horizontal expertise, reaching across primary care to epidemiology and statistics, makes him uniquely qualified to provide that assistance.  Far more than merely providing a "narrative," Dr. Abramson painstakingly details the steps Merck took to manipulate the scientific information about Vioxx, and then explains the impact of those actions on

---

[3]Illustrative examples of scholarship examining the role of commercial bias in scientific research include Stryer D, Bero LA, "Characteristics of Materials Distributed by Drug Companies: An Evaluation of Appropriateness," *Journal of General Internal Medicine*, 1996:11:575-583, cited at footnote 93 of Dr. Abramson's report; as well as Dr. Abramson's own journal article, "The Effect of Conflict of Interest on Biomedical Research and Clinical Practice Guidelines: Can we Trust the Evidence in Evidence-Based Medicine?," *Journal of the American Board of Family Practice*, 2005:18:414-418.

the medical literature and the decision-making processes of physicians, such as members of the

LDHH P&T Committee, who were directly and vigorously targeted by Merck's office-based sales

representatives.[4]

    Dr. Abramson's testimony is thus no mere "narrative" of the events in this case.[5]   As one

court has pointed out, in distinguishing the *Rezulin* opinion heavily relied on by Merck, an expert's

synthesis of a complicated factual record can help the trier of fact. It is only when, as in *In re*

*Rezulin,* the expert provides "purely' a repetition of the factual allegations in plaintiffs' complaint,'

involving 'nothing technical or scientific,' that a court might find the expert testimony unhelpful,

because the expert is providing only 'simple inferences drawn from uncomplicated facts.'" *In re*

*Welding Fume Prods. Liab. Litig.,* 2005 WL 1868046, at *17 (N.D. Ohio Aug. 8, 2005) (quoting *In*

*re Rezulin Prods. Liab. Litig.,* 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004)). In allowing the proposed

expert testimony, the *Welding Fume* court went to state, in terms wholly applicable here:

---

   [4]  See e.g. MRK-EBES0031269-70 ("The office-based team should contact P&T
Committee Member to make sure that they are fully aware of the benefits and features of those
products up for review."); MRK-AGLAAD0010034 ("have our representatives touch base with
members of the [P&T] Committee to ensure that they have the latest and greatest information
on... Vioxx."); MRK-AGLAAD0020006 ("regularly call on chief of P&T and Pharmacy
Director... to ensure that they fully understand the value that our product portfolio provides...");
MRK-AGLAAD0001024 ("Louisiana Medicaid Tactical Plan... Call on P&T Committee
members..."); MRK-AGLAAD0020750-52 ("messaging with targeted P&T members prior to
and immediately following P&T Meetings"), attached hereto as *in globo* Exhibit #1.

   [5]  To the extent Abramson recites voluminous facts in his report, it is to provide adequate
support for his opinions. *Daubert* and Rule 702 require experts to have considered all pertinent
evidence before rendering their opinions, yet Defendants fault Dr. Abramson for having reviewed
*too* much material. There is no authority for such an argument. Dr. Abramson will help the
factfinder understand a very technical and complicated record. See *In re Guidant Corp.*
*Implantable Defibrillators Prods. Liab. Litig,* 2007 WL 1964337, at *7 (D. Minn. Jun. 29, 2007)
(expert's testimony "would assist the trier of fact to understand the evidence or to determine fact
issues given the allegations by the Plaintiffs, the purported defenses of the Defendants, *and the*
*overall factual record in the case.")* (emphasis added).

> In this case, the great majority of the documents and articles that Dr. Levy is reviewing and comparing are complicated, and the inferences those documents may or may not support are not at all simple. It is through the application of his expertise that Dr. Levy may allow the trier of fact to better understand what the documents do (and don't) mean, and, thus, what the defendants did (or didn't) know. It is not the case that "the untrained layman [is] qualified to determine intelligently and to the best possible degree the[se] particular issue[s] without enlightenment" from experts.

*Id.* (quoting Fed. R. Evid. 702 (Advisory Committee Notes to 1972 Proposed Rule)) (emphasis added).

The *Rezulin* opinion is further distinguishable. In *Rezulin,* the plaintiffs designated one expert witness to testify about suppression of internal studies, and only one part of the court's opinion addressed that expert. 309 F. Supp. 2d at 553-54. The *Rezulin* court, which performed a separate analysis for each expert, described the type of scientific suppression at issue there as "non-technical," such as emails showing that in-house scientists' access to computer servers was being blocked. *Id.* at 554. As Dr. Abramson repeatedly shows in his detailed assessments of Defendant's conduct with respect to multiple studies, publications, and promotional materials, the suppression here was not through such brute methods as that, but through the complicated and nuanced manipulation of science upon which physicians rely in conducting "evidence-based" evaluations of prescription drugs.

The narrative excluded in *Rezulin,* called a "history of *Rezulin"* in the opinion, was, unlike Dr. Abramson's testimony, merely a recitation of "selected regulatory events concerning Rezulin, including Advisory Committee meetings, labeling changes, 'Dear Doctor' letters, and approval and withdrawal decisions by regulators in the United States and abroad." *In re Rezulin Prods. Liab. Litig.,* 309 F. Supp. at 551 (S.D.N.Y. 2004). Whether or not it was true, as the *Rezulin* court held,

-7-

that a lay juror was "equally capable" of constructing a narrative of the case, it is not true here that a juror can construct a narrative of Defendants' years-long, multifaceted conduct, much less understand the impact that such activities would have on the medical literature or the decision-making processes of doctors who rely on that literature. Dr. Abramson's testimony will undoubtedly be of help to the trier of fact.

## II.   MERCK HAS MIS-CHARACTERIZED THE NATURE AND SUBSTANCE OF DR. ABRAMSON'S TESTIMONY.

In its effort to exclude Dr. Abramson's valuable expert testimony, Merck repeatedly misstates both the expertise offered by Dr. Abramson and the substance of the opinions he intends to offer. Two glaring examples of such mis-characterizations are Merck's suggestion that Dr. Abramson has been offered as an expert in marketing and the contention that Dr. Abramson offers opinions regarding Merck's intent and state of mind.  Both of these suggestions are readily belied by the record in this case.

Ignoring Dr. Abramson's extensive expertise in the subject of how doctors undertake risk benefit analysis in making prescription decisions, Merck suggests that Dr. Abramson is being offered as an expert in marketing.  Neither the State nor Dr. Abramson has ever suggested that he is an expert in marketing.  Rather, Dr. Abramson summarizes the expertise which would assist the trier of fact in this matter as follows:

> Based on my education, training and experience in medicine, epidemiology, statistics and research design, I believe I am qualified to testify regarding the risks and benefits of drugs (including Vioxx), and the design and analysis of data in clinical studies pertaining to Vioxx and other anti-inflammatory drugs.  I am further qualified to testify regarding the type and form of delivery of information physicians need and expect regarding the efficacy and safety profiles

of drugs (including Vioxx) to make informed decisions about prescribing and impact on patient care.

(Abramson rep., ¶ 1).

Nowhere does Dr. Abramson suggest that he has expertise in marketing. Rather he states, as his impressive C.V. confirms, that he has expertise in the evaluation of efficacy and safety of prescription drugs by physicians, the materials upon which doctors rely in making those decisions, and the manner in which those materials can and are manipulated by drug companies.

Merck also falsely suggests that Dr. Abramson intends to offer opinions about Merck's intent. Dr. Abramson does nothing of the sort. Taking out of context two isolated remarks from two paragraphs of Abramson's 102 page report, Merck suggests that Abramson offers opinions with respect to Merck's intent. The supposed comments about Merck's intent in Abramson's report are based not on any opinion of Dr. Abramson, but on remarks in Merck's own documents, which Abramson has cited for the authors' statements about their own state of knowledge regarding cardiovascular risks. Abramson cites these statements as further support for his conclusion, based on his review of Merck-sponsored studies, that the studies avoided inquiry into the true cardiovascular risks posed by Vioxx. While he quotes Merck's employees' statements about their own knowledge, he most certainly does not offer any expert opinion as to Merck's state of mind or intent.

III.   **TO THE EXTENT DR. ABRAMSON CITES TO THE OPINIONS OR WRITINGS OF OTHER EXPERTS, SUCH REFERENCES ARE APPROPRIATE AND PERMISSIBLE UNDER RULE 703.**

Much of Merck's attack on Dr. Abramson's testimony centers around his purported "piggy-backing" onto the opinions of other experts and published articles. In each such instance, Merck has taken Dr. Abramson's references to these materials out of context, ignoring Dr. Abramson's own

supported expert analysis in order to suggest that Abramson merely "regurgitates" the opinions of other experts. In truth, in each instance cited by Merck, Abramson's reference to other experts and/or articles are merely supportive of his own expert analysis and conclusions, which go beyond the opinions expressed by the materials cited. Such references to other experts and writings in support of an expert's opinions are entirely appropriate and permissible under Rule 703.

### A.     Dr. Abramson's reference to Dr. Pechmann's opinions is permissible.

Merck criticizes Dr. Abramson for purportedly "parroting" the conclusions of Dr. Cornelia Pechmann's report. Much of Merck's rebuke of Dr. Abramson's citation to Dr. Pechmann is based on Merck's contention, largely rejected by this Court in previous cases, that Dr. Pechmann's testimony itself is inadmissible. As has been set forth in Plaintiffs' Memorandum in Opposition to Motion to Exclude Testimony of Cornelia Pechmann, M.D., incorporated by reference, Dr. Pechmann's testimony is admissible. Moreover, Dr. Abramson's limited reliance on Dr. Pechmann's report in support of his own independent analysis is entirely permissible under Rule 703.

Rule 703 allows an expert to cite to the work of other experts, even non-testifying experts, in support of the expert's opinions. Fed. Rule. Evid. 703; *Polythane Systems, Inc. v. Marina Ventures Intern, Ltd.*, 993 F.2d 1201, 1207 (5th Cir. 1993). Moreover, concerns about the admission of hearsay testimony of non-testifying experts are not present when, as here, the expert upon whom Dr. Abramson relied, Dr. Pechmann, is herself available for cross-examination.

Moreover, Dr. Abramson does not merely "parrot" Dr. Pechmann's opinion. Rather, he relies on Dr. Pechmann's marketing analysis in support of his independent conclusion – based on his own extensive research and expertise in the field of how doctors understand and utilize published studies

-10-

in evaluating risks and benefits of prescription drugs – that the reprints of the NEJM VIGOR article were misleading to physicians and "detracted from the impact of inclusion of some of the CV data from the VIGOR trial in the April 2002 label change and Dear Healthcare Provider letter." (Abramson rep., ¶94).  Such reliance on another testifying expert's opinions in support of his own independent opinions is entirely appropriate and permissible under Rule 703.

**B.**   **Dr. Abramson's reliance upon a straightforward statistical analysis in support of his independent conclusion that Merck improperly reported the VIGOR study GI findings was appropriate.**

Merck suggests that Dr. Abramson's entire opinion regarding gastrointestinal (GI) results of the VIGOR study is inadmissible because he purportedly based the opinion on the statistical analysis of non-testifying expert biostatistician, Dr. Jewell.  The appropriateness of an experts' reliance on Dr. Jewell's straightforward statistical analysis has been addressed in Plaintiffs' Memorandum in Opposition to Motion to Exclude Testimony of Neil Julie, M.D., which is incorporated herein by reference.

Moreover, Dr. Abramson relies on Dr. Jewell's straightforward statistical analysis solely for the purpose of demonstrating the effect of Merck's failure to differentiate the sub-group of patients who were on steroids in assessing GI events.  Dr. Abramson opines, based on his own expertise and analysis, that it was inappropriate to lump non-steroid users in with steroid users when assessing the serious GI impact to patients taking Vioxx in the VIGOR trial.  (Abramson rep., ¶¶78-80).  Dr. Abramson merely relies on Dr. Jewell's straightforward statistical analysis, the substance of which Merck has not challenged, to *quantify* the effect of the improper lumping of these two sub-groups together on the GI findings of the VIGOR study.  Dr. Abramson's reference to Dr. Jewell's statistical analysis for this limited purpose is entirely in keeping with Rule 703 and most certainly does not

render Abramson's testimony regarding the inappropriateness of Merck's reporting of GI findings in the VIGOR study unreliable.

### C. Dr. Abramson's reference to the "Expression of Concern" in support of his opinion that Merck concealed CV risks arising in Merck-sponsored studies is permissible.

Merck argues that this Court should exclude Dr. Abramson's testimony about the "Expressions of Concern" in the New England Journal of Medicine, on the grounds that Dr. Abramson purportedly does nothing more than "cheerlead" the conclusions of the authors of that article. Dr. Abramson's reference to the "Expression of Concern" is not mere cheerleading or bolstering the conclusions of that article. Rather, Dr. Abramson cites to facts presented in that article as yet another example of the manipulation of scientific literature by Merck in support of his own expert conclusion that Merck corrupted the scientific data upon which doctors rely in making decisions about the comparative efficacy and safety of Vioxx.

Notably, Dr. Abramson's citation to the "Expression of Concern" constitutes but a few lines of a five page analysis of the significance of Merck's omission of important thrombotic events in the November 2003 NEJM article. (See Abramson rep., Sec. VI.D. at pp. 37-41). Before he even makes reference to the "Expression of Concern," he conducts his own analysis of the omission of these events based on Merck documents and deposition testimony and reaches his own opinions about the significance of these omissions. Only after he has engaged in this independent analysis and reached his own expert opinions does Dr. Abramson cite to the "Expression of Concern" as further support for his own conclusions.

Merck's suggestion that citation to an article like the "Expression of Concern," published in a peer-reviewed journal, to support an expert's own opinion constitutes impermissible

"cheerleading" would mean that no expert could ever cite to published literature in support of an opinion. Dr. Abramson's citation to the "Expression of Concern" in support of his own independent expert analysis is entirely appropriate and falls well within the realm of proper expert testimony.

**D.** **Dr. Abramson's citation to a quotation by the purported "author" of the Merck-sponsored ADVANTAGE study in a New York Times article is proper.**

As with Merck's misrepresentation of Dr. Abramson's reference to the "Expression of Concern," Merck's attack on Dr. Abramson's passing reference to a New York Times article is a gross mis-characterization of his opinion testimony. Dr. Abramson most certainly does not attempt to lend his expert credence to a New York Times article. Rather, in a seven page section discussing distortions in the Merck-sponsored ADVANTAGE study, Dr. Abramson makes a single reference to the New York Times article, and only insofar as it quotes the statement of the "author" of the ADVANTAGE study that the article was in fact written by Merck. Aside from the direct quotation from the identified "author" of the study, Dr. Abramson makes no other reference to the New York Times article or any of its statements or conclusions.

Dr. Abramson's citation to the New York Times' report of a statement by the identified "author" of the study was not offered to give credence to the New York Times article, but rather as the basis for his independent opinion that ghost-writing such an article violates standards of International Committee of Medical Journal Editors (ICMJE). (See Abramson rep., ¶89). Dr. Abramson's reference to the New York Times article is exactly the sort of reference to reliance materials permitted under Rule 703.

**IV.  DR. ABRAMSON IS QUALIFIED TO TESTIFY TO MECHANISMS WHEREBY VIOXX HAS THE POTENTIAL TO INCREASE CV RISKS.**

-13-

Relying on this Court's opinion with respect to the testimony of Dr. Michael Alan Graham, Merck suggests that Dr. Abramson should not be allowed to testify to the mechanisms by which Vioxx poses the potential for CV risks. Dr. Abramson's situation is easily distinguished from that of Dr. Graham. Whereas this Court held that Dr. Graham should not be allowed to testify to the causative mechanism, because Dr. Graham "had never done any research on NSAIDs or COX-2 inhibitors prior to becoming an expert for the plaintiffs," Dr. Abramson spent "hundreds of hours researching the safety and efficacy of... Cox-2 inhibitors, including Vioxx and Celebrex.... and had completed a book chapter about the safety and efficacy or Vioxx and Celebrex" before ever being retained as an expert in any Vioxx litigation." (Abramson rep., ¶2). That experience of extensive study of Vioxx safety literature renders Dr. Abramson more than qualified to offer the opinion as to the mechanisms whereby Vioxx has the potential to increase CV risks.

Moreover, both the substance of Dr. Abramson's testimony and the purpose for which it is being offered differ significantly from that of Dr. Graham. Dr. Graham intended to opine as to whether Vioxx *causes* heart attacks and whether Vioxx *caused* the plaintiffs' heart attack in that case. Here, Dr. Abramson is merely offering testimony, based on his extensive review of the literature, of the mechanisms by which Vioxx has the *potential to increase CV risks*. (Abramson rep., ¶22). Dr. Abramson is not offering opinions with respect to general or specific causation, but rather with respect to the state of the literature viz a vis potential mechanisms of increased risk. Dr. Abramson is more than qualified to offer such an opinion.

V.    **TO THE EXTENT THIS COURT FINDS THAT THE SUITABILITY OF CELEBREX AS AN ALTERNATIVE TO VIOXX IS RELEVANT, THEN DR. ABRAMSON IS QUALIFIED TO OFFER EXPERT TESTIMONY ON THIS SUBJECT.**

-14-

Finally, Merck contends that Dr. Abramson should not be allowed to offer opinions as to whether Celebrex was a viable alternative to Vioxx. Merck's reasons for excluding Dr. Abramson's Celebrex opinion have nothing to do with his expertise or methodology. Rather, Merck's attack is based on two premises: 1) that the suitability of Celebrex as a substitute for Vioxx has no place in this lawsuit; and 2) that Dr. Abramson's opinions are contradicted by the factual record. With respect to the former contention, the State and Merck are in agreement; whether Celebrex is a reasonable alternative to Vioxx is irrelevant to the claims asserted herein. As for the latter, Merck is simply wrong; there is ample evidence to support Dr. Abramson's contention that Celebrex sales were the result of the manufacturer's misrepresentations of the relative risks and benefits of the drug.

Merck contends that the suitability of Celebrex as a substitute for Vioxx has no place in this litigation. Plaintiffs could not agree more. Under the claims asserted by the State, redhibition and restitution under LSA-R.S. 51:1408, the inquiry is whether the plaintiff paid too much for Vioxx given *Vioxx's* inherent properties, not what other products the State might have paid for had it not paid for Vioxx.[6] However, Merck has suggested, without any jurisprudential support, that consideration of the price of Celebrex and Bextra is necessary to determining plaintiffs' damages as a result of Merck's unlawful marketing of Vioxx. If Merck is permitted to make this argument, which has no basis in the law of either redhibition or restitution, and finds no support in Louisiana's jurisprudence, then plaintiffs must be permitted to present evidence as to whether Celebrex is in fact a reasonable alternative.

Dr. Abramson, who has devoted nearly as much time to researching the literature regarding

---

[6] The State intends to provide complete briefing on this issue in its opposition to Merck's Motion for Summary Judgment.

Celebrex as he has that surrounding Vioxx, has concluded that Celebrex shares many of the same risks as Vioxx and is not a reasonable substitute for Vioxx. Additionally, Dr. Abramson opines that like Vioxx, the volume of sales of Celebrex is attributable to manipulation of the scientific literature by the manufacturer. Merck suggests that Dr. Abramson should not be allowed to offer this opinion, because purportedly the facts do not support it. Whether there are facts that contradict Dr. Abramson's opinion is a matter for cross-examination, not grounds for exclusion of his testimony. Nevertheless, contrary to Merck's contention, there are ample facts to support Dr. Abramson's testimony.

Merck contends that Dr. Abramson cannot assert that Celebrex is not a suitable alternative to Vioxx because, even after a black box warning was added to the Celebrex label, doctors continued to prescribe Celebrex and LDHH continued to reimburse Celebrex prescriptions. While these facts may tend to undermine Dr. Abramson's opinion, and will no doubt be raised by Merck on cross-examination, they do not negate his opinion. What Merck fails to mention is that after Celebrex received its black box warning, sales of Celebrex dropped considerably, in spite of the fact that it was at that point the only COX-2 inhibitor on the market. More importantly, as more information about the risks of Celebrex became available, LDHH implemented extensive controls over prescriptions of Celebrex, only allowing its use in patients who had failed on traditional NSAIDs. (See Deposition of Melwyn Wendt, 111:5-116:8, excerpts attached hereto as Exhibit #2). Hence, although Celebrex continues to be prescribed to a discreet group of patients under limited circumstances, there is ample support for Dr. Abramson's contention that Celebrex is not a suitable alternative for Vioxx, which was prescribed for wide-spread use as a superior alternative to

traditional NSAIDs.

## CONCLUSION

As courts have repeatedly held, Dr. Abramson's unique expertise in the area of pharmaceutical research and literature, how doctors utilize that literature in making decisions about the relative risks and benefits of prescription drugs, and how manufacturers influence that literature in order to minimize the risks and overstate the benefits of their products, is of particular assistance to the finder of fact in evaluating pharmaceutical marketing claims such as those at issue in this lawsuit. Merck's arguments for excluding Dr. Abramson's testimony are straw men, based on gross mis-characterizations of both his expertise and his testimony. Dr. Abramson's expert testimony will assist this Court in understanding the complex and varied means by which Merck distorted the scientific literature to induce doctors, such as those members of the P&T committee targeted by Merck's sales force, to underestimate the risks and overestimate the benefits of Vioxx.

Respectfully submitted, this 1st day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale (La Bar No. 28409)
Stephen B. Murray, Jr. (La Bar No. 23877)
Stephen B. Murray, Sr. (La Bar No. 9858)
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan Mcminn
L. Christopher Styron
Assistant Attorney General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street, 6th Floor
Baton Rouge, Louisiana 70802
Telephone (225) 326-6020
Facsimile (225) 326-6096

Francisco H. Perz
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone (225) 342-1188
Facsimile (225) 342-2232

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Plaintiffs' Memorandum In Opposition to Exclude The Testimony of John David Abramson, M.D. has this day been served on Liaison counsel, Phillip A. Wittman and Russ Herman, U.S. Mail and e-mail or by hand delivery and emial and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to Pre-Trial Order No. 8B, on this 1st day of March, 2010.