Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

- - -

| | | |
|---|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | : | MDL NO. 1657 |
| | : | |
| | : | SECTION L |
| This Document Relates to: | : | |
| | : | JUDGE ELDON |
| STATE OF LOUISIANA, ex rel. | : | E. FALLON |
| JAMES D. CALDWELL, JR., | : | |
| Attorney General, | : | MAGISTRATE |
| Plaintiff, | : | JUDGE KNOWLES |
| | : | |
| versus | : | |
| | : | |
| MERCK & CO., INC., | : | |
| Defendant. | : | NO. 05-3700 |

- - -

Monday, December 14, 2009

- - -

Deposition of MELWYN WENDT, PHARM.D., held at LOUISIANA DEPARTMENT OF HEALTH & HOSPITALS, 628 North 4th Street, Baton Rouge, Louisiana, commencing at approximately 9:24 a.m., before Cheryl Sletta, Certified Court Reporter, Registered Professional Reporter.

Melwyn Wendt, Pharm.D.

Page 110

1  A  Correct.
2  Q  And how is it that the board came up with this
3     criteria, do you remember?
4  A  We would have looked at utilization. We would
5     have probably gotten together with -- would have
6     asked for input from our consultant, from ULM.
7  Q  Do you remember that happening, or you're just
8     saying that's probably how it happened?
9  A  That's usually how it happens, so I -- I don't
10    specifically remember all the details.
11 Q  Do you remember this meeting in particular about
12    how it happened, how this information was
13    presented?
14 A  I remember the meeting.
15 Q  Tell me what you remember about the meeting
16    January 26th, 2005.
17 A  Well, I remember that Dr. Townsend was there. She
18    was the medical director for Medicaid. And I
19    think she might have presented some issues on --
20    she may have discussed the COX-2s also. I don't
21    specifically remember every little detail, how the
22    parameters came about, but like I said, we usually
23    worked in conjunction with ULM.
24 Q  Anything else you remember about the meeting
25    January of 2005?

Page 111

1  A  Not specifically.
2  Q  Do you remember whether anybody at the DUR Board
3     was at all critical of Merck?
4  A  I don't recall anybody being critical of Merck.
5  Q  Do you see it says, "Criteria Parámetros" on page
6     4, "Use of Celebrex or valdecoxib"?
7  A  "Criteria parameters," page 4 -- I'm sorry, I'm
8     just not --
9  Q  It's under "Retrospective Criteria Proposal."
10 A  No, I'm sorry. I just -- on page 4, right?
11 Q  Page 4.
12 A  Okay.
13 Q  "Retrospective Criteria Proposal."
14 A  Okay.
15 Q  "Consider non-selective NSAID in place of COX-2
16    inhibitor if no GI risk factor or treatment
17    failure."
18       Do you see that?
19 A  Yes, I'm sorry. I got you.
20 Q  And then it has a number of criteria parameters?
21 A  Right.
22 Q  Including "use of Celebrex or valdecoxib," right?
23 A  Right.
24 Q  Not "60 years or older," right?
25 A  Right.

Page 112

1  Q  And then it goes on?
2  A  Right.
3  Q  Do you know who developed those criteria
4     parameters?
5  A  That would have been -- that would have been
6     recommendations from ULM, and we probably would
7     have brought it through the medical director here,
8     Dr. Townsend, just for -- and she may have had
9     some input into yes or no. Since it's just these
10    two, these two COX-2s, then Vioxx was already off
11    the market would be why that wouldn't be included
12    here.
13 Q  Do you know who at ULM was involved in developing
14    these criteria parameters?
15 A  Don't -- I'm not positive, no.
16 Q  And then it says, under "Prospective Deny Edit
17    Proposal" -- do you see that?
18 A  Yes, I do.
19 Q  So is this a proposal by ULM?
20 A  Well, it's a proposal by -- it's a proposal to the
21    DUR Board, which would have been done in
22    conjunction with ULM and Unisys and DHH. It's not
23    like an individual, necessarily.
24 Q  Were you involved in deciding what the --
25 A  I would have been involved in this discussion,

Page 113

1     yes.
2  Q  What do you remember about how the prospective
3     deny edit proposal here on page 4 was conceived?
4  A  What do I remember about how it was conceived?
5  Q  How did it happen?
6  A  Can you -- can you ask me some other way? I don't
7     know how to answer you.
8  Q  Sure. How is it that you all came up with these
9     criteria to include as the prospective deny edit
10    proposal?
11 A  Well, it was considered that if a patient were
12    sick -- I don't know if this is what you're asking
13    me. But if a patient were older than 60, they
14    could be more at risk to have a GI issue. If they
15    were -- if they were on a PPI or an H2 antagonist,
16    they could have a GI issue. That's why they're on
17    these, so that it would look like appropriate use.
18    And if they were on a chronic corticosteroid or
19    warfarin that there would be some value in using a
20    COX-2.
21       And then they -- so you were going to deny
22    unless -- in other words, if one of these issues
23    happened, then the initial claim would not deny.
24 Q  So if patients were older than 60 years old, then
25    they would be able to have their prescriptions for

29 (Pages 110 to 113)

Melwyn Wendt, Pharm.D.

Page 114

1    Celebrex or Bextra reimbursed by the State?
2  A  Without a denial. Without an initial denial, yes.
3  Q  And if patients were on a PPI or an H2 antagonist,
4     then they'd be able to get --
5  A  That's right.
6  Q  -- their COX-2 inhibitors reimbursed?
7  A  Right.
8  Q  And then there's a statement that says, "Override
9     provision available with an appropriate diagnosis
10    code/reason supplied by the prescriber."
11 A  Right.
12 Q  "GI diagnosis, treatment failure."
13    What does that mean?
14 A  That would mean if -- if a patient -- if a
15    prescriber wrote a prescription for one of these
16    two COX-2s and we didn't know that there was a GI
17    diagnosis, it wasn't apparent or whatever, and if
18    they said there is a gastrointestinal diagnosis
19    and they supplied a diagnosis code, then they
20    could -- the pharmacist could override the claim.
21    So the denial would then be null and void as such.
22    The same thing if they had said they had treatment
23    failure with other nonsteroidals.
24 Q  Okay. Do you see in the next sentence down, it
25    says -- is it -- how do you --

Page 115

1  A  Soileau.
2  Q  "Soileau asked about the relative cost associated
3     with the addition of a proton pump inhibitor to a
4     NSAID versus COX-2 inhibitor use."
5  A  Yeah, I see that.
6  Q  Do you see that? And then in the next paragraph,
7     it says, "Terrebonne stated the P&T Committee
8     addresses clinical and monetary issues. There are
9     clinical issues to address here."
10    Do you see that?
11 A  Yes.
12 Q  What did Ms. Terrebonne mean, if you know, by
13    that?
14 A  I think she was just trying to get the DUR Board
15    to focus on the clinical issues that were at hand.
16 Q  Do you know whether this prospective deny edit was
17    then used after January 2005?
18 A  It was implemented, yes.
19 Q  Do you know whether the DUR Board considered the
20    FDA's recommendations on treatment guidelines for
21    the use of COX-2 inhibitors after they came out
22    with their advisory in determining what the
23    parameters should be for DUR going forward for
24    COX-2 inhibitors?
25 A  What I recall is the FDA advisory coming out, and

Page 116

1     I thought that that was taken into consideration
2     at this board meeting.
3  Q  Do you know whether, in fact, the criteria that
4     was used was among the issues that the FDA
5     mentioned in their advisory e-mail?
6  A  I don't remember specifically, but I do believe it
7     had a big role in this -- this criteria being
8     developed.
9  Q  And that's because the DUR Board defers to the
10    judgment of the FDA, right?
11    MR. PLYMALE:
12    Objection.
13    Go ahead.
14    THE WITNESS:
15    The DUR Board defers to the judgment of
16    the FDA -- I don't know that I would say
17    the DUR Board would defer to anything.
18    Maybe the State does, but I wouldn't say
19    that the DUR Board itself does.
20 BY MR. GOLDMAN:
21 Q  All right. Fair.
22 A  They're -- they're practicing physicians and
23    pharmacists and, you know...
24 Q  Do you know whether the DUR Board ever discussed
25    any potential cardiovascular issues with COX-2

Page 117

1     inhibitors prior to January 2005?
2  A  I don't remember anything prior to this meeting.
3  Q  Do you know that the Provider Synergies monographs
4     had discussed potential cardiovascular risks with
5     all COX-2 inhibitors, including Vioxx, for years
6     before January 2005?
7  A  I don't -- I don't recall that. I wouldn't have
8     really probably seen those either.
9  Q  Would it surprise you to learn that the P&T
10    Committee was aware of potential cardiovascular
11    concerns with Vioxx for the entire time that Vioxx
12    was on the PDL?
13    MR. PLYMALE:
14    Objection.
15    THE WITNESS:
16    I would --
17 BY MR. GOLDMAN:
18 Q  But the DUR Board never addressed any issues
19    relating to cardiovascular concerns?
20    MR. PLYMALE:
21    Objection.
22    Go ahead.
23    THE WITNESS:
24    The DUR Board operates independently of
25    P&T. So the DUR Board would not

30 (Pages 114 to 117)