## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General,<br><br>Plaintiffs,<br><br>v.<br><br>MERCK SHARP & DOHME CORP.,<br><br>Defendants. | JUDGE ELDON E. FALLON<br><br>MAGISTRATE JUDGE KNOWLES<br><br>Case No. 05-3700 |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
### TO MOTION TO EXCLUDE TESTIMONY OF NEIL JULIE, M.D.

859604.2

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. LEGAL STANDARD ......................................................................................... 2

III. DEFENDANT'S MOTION DOES NOT CHALLENGE THE BASIS
FOR DR. JULIE'S OPINIONS THAT VIOXX IS GASTROTOXIC ................. 2

IV. DEFENDANT'S MOTION DOES NOT MENTION OR CHALLENGE
DR. JULIE'S OPINIONS REGARDING LOW RISK OF COMMONLY
USED NSAID DOSES, NOR RISKS OF VIGOR WITH ASPIRIN, NOR
MISREPRESENTATION OF NSAID-RELATED MORTALITY ...................... 3

V. DR. JULIE INDEPENDENTLY REVIEWED THE "COMPLICATED GI
EVENT" DATA FROM THE VIGOR TRIAL, AND HIS LIMITED
RELIANCE ON A BIOSTATISTICIANS' STATISTICAL TEST WAS
APPROPRIATE UNDER RULE 703 ................................................................. 4

    A. Dr. Julie's Opinions Concerning The VIGOR Study Are Based
Upon His Own Review Of The Data ....................................................... 5

    B. Dr. Julie Had Sufficient Basis To Reasonably Rely On The Head
Of Biostatistics At A Major University To Perform A
Straightforward  Statistical Test On Defendant's Own
Undisputedly Accurate Data. .................................................................. 8

VI. DR. JULIE'S OPINIONS ARE BASED ON RELIABLE
METHODOLOGY AND SUPPORTED BY PEER REVIEWED
LITERATURE THAT THE DEFENSE MEMORANDUM FAILS TO
MENTION ......................................................................................................... 10

VII. DR. JULIE'S TESTIMONY CONCERNING THE MARKETING AND
PROMOTION OF VIOXX IS ADMISSIBLE EXPERT TESTIMONY ........... 11

    A. Dr. Julie's Marketing Opinion Is Appropriate Expert Testimony .......... 11

    B. Dr. Julie's Testimony Is Based On His Expertise And Experience ......... 14

VIII. CONCLUSION .................................................................................................. 15

859604.2

# TABLE OF AUTHORITIES

**Page**

## CASES

*Daubert v. Merrell Dow Pharmaceuticals,*
509 U.S. 579 (1993)................................................................... 9

*In re Diet Drugs Prods. Liab. Litig.,*
2000 WL 876900, 2000 U.S. Dist. LEXIS 9037
(E.D. Pa. June 20, 2000) ........................................................... 15

*In re Prempro Prods. Liab. Litig.,*
554 F. Supp. 2d 871 (E.D. Ark. 2008)............................... 13, 14

*In re Prempro Prods. Liab. Litig.,*
586 F.3d 547 (8th Cir. 2009) ...................................................... 14

*In re Rezulin Prods. Liab. Litig.,*
309 F. Supp. 2d 531 (S.D.N.Y. 2004) .............................. 12, 13

*In re Seroquel Prods. Liab. Litig.,*
Slip Copy, 2009 WL 3806436 (M.D. Fla. 2009)............. 12, 13, 15

*In re Vioxx Products Liability Litigation,*
401 F. Supp. 2d 565 (E.D. La. 2005)......................... 7, 9, 10

*Pfizer v. Teva Pharms. USA,*
461 F. Supp. 2d 271 (D.N.J. 2006) ................................. 12, 15

## OTHER AUTHORITIES

Claire Bombardier, et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and
Naproxen in Patients with Rheumatoid Arthritis,"
*N Engl J Med* 2000; 343:1520–8 .................................................. 5

## RULES

Federal Rules of Evidence
Rule 702................................................................................ 11
Rule 703 ................................................................................. 7

## I.      INTRODUCTION

Neil Julie, M.D., is a board-certified gastroenterologist with 30 years experience treating patients suffering gastro-intestinal (GI) illnesses.  Dr. Julie has extensively studied non-steroidal anti-inflammatory drug (NSAID)-related GI disease and NSAID risk factors, pathophysiology, and mechanisms of injury, as part of his fellowship training and ongoing medical education.  He has devoted hundreds of hours to reading the scientific literature regarding NSAID-related GI lesions, served as lead investigator in a clinical trial of a medication used to reduce NSAID-related GI side effects, and has conducted a "Grand Rounds" medical educational seminar addressed to GI risks of NSAIDs, Vioxx and other COX-2 inhibitors.  Report of Neil Julie, M.D., pp. 1-3; Declaration ("DCA Decl."), Exh. 1.  Dr. Julie's qualifications are not challenged by Merck.

There is a remarkable disparity between the opinions actually expressed by Dr. Julie, and those that Defendant attempts to exclude by its motion.  Defendant seeks to exclude all of Dr. Julie's opinions expressed in a lengthy report, despite the fact that Defendant's Memorandum in support of the motion omits mention of most of Dr. Julie's opinions.  Defendant's Memorandum also incorrectly asserts that Dr. Julie's opinion that Vioxx is gastrotoxic was based on another expert's analysis of the VIGOR clinical trial, when in fact, Dr. Julie's opinions concerning the GI toxicity of Vioxx were based upon several specifically identified clinical trials of Vioxx compared to placebo, which were unrelated to the VIGOR trial of Vioxx compared to naproxen.  As to the VIGOR trial, Dr. Julie performed his own review of the data and formed his own opinion; his limited reliance upon a test of statistical significance performed by a biostatistician was permissible under Rule 703 and prior rulings of the Court in similar circumstances.

Dr. Julie is not offered as a marketing expert.  To the extent that he comments upon a few

of Merck's internal documents, such opinions and documents are relevant to explain his own past practice of prescribing Vioxx without knowing what defendant had not disclosed about the GI risk of Vioxx, and to show consistency between the corporate strategy and the sales efforts to which Dr. Julie was exposed.  Applicable precedent permits Dr. Julie to testify that the marketing and labeling did not conform to what was known or knowable about the drug.

## II.     LEGAL STANDARD

Plaintiff incorporates by reference § II of the Memorandum in Opposition to Motion to Exclude Testimony of John MacGregor, M.D.

## III.    DEFENDANT'S MOTION DOES NOT CHALLENGE THE BASIS FOR DR. JULIE'S OPINIONS THAT VIOXX IS GASTROTOXIC

Dr. Julie's expert report of November 4, 2009 provides a Summary of Opinions which states as follows: "11.  Merck's clinical trials (Protocol 069, Alzheimer's, and APPROVe) demonstrate that Vioxx is harmful to the GI tract."  (Julie Rep. at 3; DCA Decl., Exh. 1.)  Dr. Julie's opinions on the subject of Vioxx's GI toxicity are then set forth at length, beginning at page 4, paragraph 15, and concluding at page 9, paragraph 27.  (*Id.*)  Over the course of these pages, Dr. Julie makes reference to the statistically significant four-fold excess risk of GI side effects of Vioxx compared to placebo in the APPROVe study and the Alzheimer's Protocol 078 trial, as well as the excess of GI adverse experiences compared to placebo in the pooled, pre-market osteoarthritis (OA) trials identified by Merck as "Protocol 069."  (*Id.*)  Dr. Julie's opinion that Vioxx is gastrotoxic did not mention nor rely on the VIGOR study or any information from any other expert.  (*Id.*)

Despite the fact that Dr. Julie's opinions regarding Vioxx GI toxicity are based upon the specific clinical trials he identified, and despite his lack of any reliance upon VIGOR or other experts for such opinions, Defendant's Memorandum seeks to exclude Dr. Julie's opinions

- 2 -

regarding Vioxx GI toxicity by erroneously arguing that such opinions were based on the VIGOR trial and Dr. Jewell's statistical analysis.  (Def. Mem. at 1.)  This argument fails because its premise is demonstrably incorrect.

Notably, Defendant's Memorandum does not even mention the specific clinical trials that Dr. Julie actually relied on to form his opinion that Vioxx is gastrotoxic (APPROVe, 078 and 069).  Nor does Defendant's Memorandum mention or refute Dr. Julie's opinions concerning the results of these trials.  Therefore, Dr. Julie's opinion that Vioxx is gastrotoxic, based upon defendant's own clinical trials, is unchallenged and admissible.[1]

## IV.   DEFENDANT'S MOTION DOES NOT MENTION OR CHALLENGE DR. JULIE'S OPINIONS REGARDING LOW RISK OF COMMONLY USED NSAID DOSES, NOR RISKS OF VIGOR WITH ASPIRIN, NOR MISREPRESENTATION OF NSAID-RELATED MORTALITY

Defendant's Memorandum fails to challenge Dr. Julie's opinion that "the most commonly used doses of tNSAIDs conferred little GI risk."  (Julie Report ¶¶ 28-30.)  Dr. Julie's Report cites two peer-reviewed studies showing that real-world osteoarthritis patients, who predominantly use ibuprofen intermittently at doses of 1200 mg or less per day, have rates of GI adverse effects that are not distinguishable from placebo or background rates, while defendant's osteoarthritis clinical trials tested Vioxx against only the constant, prolonged high dose of 2400 mg per day. Thus, Vioxx would not have reduced risk for patients on lower, safer doses of ibuprofen that defendant never tested, because those lower doses did not impose an excess risk in the first place. (Id.) Defendant's Memorandum does not mention or challenge these opinions.

---

[1] Defendant's expert gastroenterologist, David Sales, M.D. had been unaware of Vioxx Alzheimer's clinical trial data showing 11 discontinuations for GI hemorrhages and ulcers on Vioxx, compared to zero on placebo.  Dr. Sales agreed that the studies cited by Dr. Julie showed statistically significant 4-fold excess of GI perforations, ulcers and bleeds compared to placebo, and that randomized clinical trials provide the "strongest evidence" of a drug's risks and benefits.  (Sales Tr. at 82:8-96:10; DCA Decl., Exh. 2.)

859604.2

Defendant's Memorandum does not mention or challenge Dr. Julie's opinion that co-administration of low-aspirin with Vioxx eliminated any GI benefit compared to ibuprofen; that this information was known to Merck by 2001 but not published until August 2004, only one month before Vioxx was withdrawn from the market; that widespread use of aspirin among OA patients is well-known due to cardiovascular co-morbidities among arthritis patients; and that this "clinical insight demonstrating a loss of GI benefit with Vioxx plus ASA should not have been denied to the community of practicing clinicians but should have been published for the benefit of our patients before 2003." (*Id.* ¶¶ 37–41, pat 12–13.)

Defendant's Memorandum does not challenge Dr. Julie's opinions that Merck's consultant/VIGOR co-author, Loren Laine, M.D., knowingly relied on "bogus" estimates of the number of deaths attributable to NSAID related GI events to justify the introduction of Vioxx to the market place; that the incidence of GI side effects had been substantially reduced by the increased used of proton pump inhibitors (PPIs) to protect against NSAID-induced GI adverse, events prior to the introduction of Vioxx to the marketplace in 1999; and that "much of the problem that Vioxx had been designed to address had already been effectively addressed by other therapies and modifications in tNSAID use." (*Id.* at ¶¶ 51-53, pat 16-17.)

Therefore, these opinions are unchallenged and admissible.

## V. DR. JULIE INDEPENDENTLY REVIEWED THE "COMPLICATED GI EVENT" DATA FROM THE VIGOR TRIAL, AND HIS LIMITED RELIANCE ON A BIOSTATISTICIANS' STATISTICAL TEST WAS APPROPRIATE UNDER RULE 703

Defendant's Memorandum provides a factually erroneous challenge to Dr. Julie's opinions concerning the VIGOR study. Dr. Julie's opinions and data review were performed independently, and he reached his own conclusions; he did not "blindly parrot" another expert's opinions. Dr. Julie relied upon the biostatistician report for the limited and reasonable purpose

of testing the statistical significance of the VIGOR data that Dr. Julie reviewed.  The statistical test itself is non-controversial and was not challenged by the defense gastroenterologist nor any other defense expert.  Defendant also erroneously interprets Dr. Julie's report to deny that the VIGOR study showed a gastrointestinal benefit, when in fact Dr. Julie's opinion acknowledges a benefit and demonstrates that the reduction in complicated GI events was shown only among the patients who also used steroids for treatment of rheumatoid arthritis (RA), a known potent risk factor for higher incidents of such events.  Finally, defendant's claim that Dr. Julie's opinion regarding VIGOR is not "generally accepted" arises from its own erroneous assertion that Dr. Julie denied a GI benefit, when his opinion actually confirms the benefit while explaining which patients received it.  To the extent that Dr. Julie's opinion differs from prior publications, the explanation is that Merck failed to make the data public for the complicated GI events stratified by steroid use, thereby precluding others from publishing it.

### A.    Dr. Julie's Opinions Concerning The VIGOR Study Are Based Upon His Own Review Of The Data

The VIGOR clinical trial resulted in an article published in *The New England Journal of Medicine* in November 2000 (Claire Bombardier, et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," *N Engl J Med* 2000; 343:1520–8; DCA Decl. Exh. 3).  The study was designed to test whether Vioxx 50 mg. would be associated with a lower rate of GI adverse events than naproxen 1000 mg. per day in RA patients.  The primary pre-specified endpoint was "confirmed perforations, ulcers and bleeds (PUBs);" a secondary endpoint was defined as "confirmed complicated PUBs," a subset of the primary endpoint consisting of only the most serious GI events.  (*Id.*)  Fifty-six percent (56%) of the VIGOR patients took steroids, a well-established risk factor for NSAID-related GI side effects.  The study plan called for a "subgroup analysis" of the primary endpoint according to

whether subjects were steroid users or non-steroid users; the plan also provided that subgroup

analyses could be done as to secondary endpoints, and Merck did conduct subgroup analyses of

the "complicated" PUBs for 3 of the 6 pre-specified subgroups.[2]  (VIGOR Data Analysis Plan;

DCA Decl., Exh. 4.)

Dr. Julie's report did not express any opinions about the overall VIGOR result or the

primary endpoint analysis.  Instead, Dr. Julie's report addressed only the secondary VIGOR

endpoint of confirmed, complicated PUBs.  As noted in paragraph 34 at page 11:

> Based upon my review of the Merck data files for the VIGOR
> study, among steroid users there were 27 confirmed complicated
> PUBs in the naproxen group compared with 7 in the Vioxx group,
> approximately a four-fold excess risk with concurrent steroid use
> (which is comparable to the increase RR of the Piper study,
> above).  However, with patients who did not use steroids, there
> were 10 confirmed complicated events on naproxen versus 9 on
> Vioxx.

(*Id.*; DCA Decl., Exh. 1.)  Thus, on the face of the report, Dr. Julie confirms that he personally

reviewed the data files and concluded that there was a four-fold excess risk among steroid users

compared to a difference of only 10 versus 9 among non-steroid users.  This opinion does not

deny any risk reduction in the Vioxx group, as defendant argues, but instead applies defendant's

own, previously unpublished data to clarify that the benefit occurred disproportionately among

the steroid users. Dr. Julie testified that he reached this conclusion independently, without

consultation or reliance on any other expert:

> . . . I did the data count in terms of numbers, you know, 27 versus
> seven, 10 versus nine.  I verified that by looking at the SAS
> [statistical] sheets myself . . .

(Julie Tr. at 135:22-24; DCA Decl., Exh. 5.)

---

[2] Complicated PUBs were analyzed for the subgroups of age (> 65 or < 65 years), prior history
of a PUB, and study location.  (Sales Tr. at 55:2–21; DCA Decl., Exh. 2.)

Paragraph 34 of Dr. Julie's report includes a reference to the results of a biostatistician's analysis showing the incidence rate ratio among steroid users (3.85) and among non-steroid users (1.12), along with the interaction P value of 0.047 as to the difference in those ratios. The statistically significance of the result indicates that the difference in rates is not likely due to chance (*Id.*) As noted above, Dr. Julie himself specified in advance the test that he wanted, and his reliance on a biostatistician to perform such a calculation is reasonable, permissible under Federal Rules of Evidence 703, and within the bounds of similar expert practice and evidentiary rulings by the Court in prior Vioxx cases.

For example, in *In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565 (E.D. La. 2005) Merck moved to exclude testimony by plaintiffs' expert Wayne Ray on the issue of whether short term of use of Vioxx increases cardiovascular risk, based in part upon the position that Professor Ray had reached his opinion by relying upon a biostatistician's reanalysis of Merck's clinical trial data. Just as it does in this case, Merck claimed that the statistician's analysis was unreliable because it was conducted for purposes of the litigation, had not been published, and had not been subject to peer review. 401 F. Supp. 2d at 584-585. The Court denied Merck's motion to exclude Professor Ray's opinion that short term use of Vioxx can cause adverse cardiovascular effects, despite his reliance upon the biostatistician's analysis of clinical trial data. *Id.* at 586. Also, on July 6, 2006, in an unpublished decision, the Court permitted another plaintiff's expert in the *Barnett v. Merck* case to rely upon the report of a biostatistician (Dr. Jewell) under Rule 703 (July 6, 2006 Hearing Tr. at 82:22-83:2; DCA Decl., Exh. 6). As in these prior circumstances, Dr. Julie's reliance upon the statistician's calculation of relative risks and statistical significance was reasonable and permissible.[3]

---

[3] Even if the Court were to disallow reliance upon the statistical report, Dr. Julie would

**B.      Dr. Julie Had Sufficient Basis To Reasonably Rely On The Head Of Biostatistics At A Major University To Perform A Straightforward Statistical Test On Defendant's Own Undisputedly Accurate Data.**

Defendant's Memorandum provides selective excerpts of Dr. Julie's deposition transcript of January 13, 2010, which exaggerate Dr. Julie's reliance upon Dr. Jewell's work while underestimating Dr. Julie's own knowledge.  For example, defendant cites only a part of a sentence involving Dr. Julie's initial consultation with Herb Baum, another biostatistician, omitting the text that states that Dr. Baum's calculations "didn't address what I needed in the questions that I was asking, which ultimately was the interactive P value between steroid users and non-users in regards to Vioxx and naproxen." (Julie Tr. 123:10–17; DCA Decl., Exh. 5.) The text of the deposition shows that Dr. Julie was an active director of the process, knew the precise question to be answered and the test that would answer it, and determined that Dr. Baum had not adequately addressed it.

Dr. Julie also knew that Dr. Jewell is "the head of biostatistics or statistics at Berkeley" (*id.* at 124:6–7), and his confidence in Dr. Jewell was not solely "based on his title," as the defense memo suggests (Def. Mem. at 3).  Instead, Dr. Julie testified, "I know U.C. Berkeley.  I was out in California, in the Bay Area for four years.  I know what a fine institution it is.  . . . So, you know, that in itself qualified him in my mind." (*Id.* at 127:13–18.)  As for the calculation itself, Dr. Julie testified that he asked counsel to pass on to Dr. Jewell the question, "Is there a statistically significant interaction P value that shows that steroid use versus non-steroid use is a major determinant of risk." (*Id.* at 128:6–21.)  Dr. Julie performed his own calculations of the incidence rate ratios, stated at page 6 of his report, and his calculations were comparable to those done by Dr. Jewell. (*Id.* at 129:13–130:4.)  Dr. Julie testified that

---

nevertheless be entitled to testify to the opinions that he reached independently on the basis of his own review of the data.

Dr. Jewell's statistical analysis "is a part of my report, but it is basically, for a good statistician, a fairly straightforward numerical calculation." (*Id.* at 136:9–11.) "I mean the thing is, though, I want to say about this report is he is applying simple statistical/biostatistical analytic tools. So the numbers should not really lie. . . . I'm not really relying on his opinions, I'm relying on his numbers. And, you know, I don't think that he is--you know, I don't suspect that there's anything wrong here." (*Id.* at 139:19–140:3.)

At his deposition on January 26, 2010, defense expert David Sales, M.D., confirmed Dr. Julie's view that there is no controversy as to the data or the accuracy of the statistical analysis. Dr. Sales testified that after receiving Dr. Julie's November 2009 report, he asked defense counsel about the number of complicated PUBs in the steroid versus non-steroid users in VIGOR; that defense counsel told him the figures used by Dr. Julie were accurate; that he conducted his own calculation that confirmed the accuracy of the incidence rate comparisons; and that he had no basis to challenge the validity of either the raw data or the statistical calculation. (Sales Tr. 35:4-37:6; 38:7-41:24; 44:1-48:16; DCA Decl., Exh. 2.) These admissions support the conclusion that there is no true controversy over the statistical analysis.[4]

As this Court has held, where both sides' experts rely on the same clinical trials but reach different conclusions, the methods are reliable and the opinions are admissible under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *In re Vioxx Litigation*, *supra*, 401 F. Supp. at 599.

---

[4] Plaintiff incorporates by reference § IV.D of the Memorandum in Opposition to Motion to Exclude Testimony of David Y. Graham, M.D., which recounts the history of Defendant's economically motivated aversion to admitting that the benefit of Vioxx is limited to steroid users.

## VI. DR. JULIE'S OPINIONS ARE BASED ON RELIABLE METHODOLOGY AND SUPPORTED BY PEER REVIEWED LITERATURE THAT THE DEFENSE MEMORANDUM FAILS TO MENTION

Defendant argues that Dr. Julie's views about Vioxx GI toxicity are "in direct disagreement with the published views of other gastroenterology researchers and experts." (Def. Mem. at 3–4.)  However, Dr. Julie's views are consistent with and supported by those of scientists and peer reviewed authors that the defense memorandum omits.  For example, Dr. Julie's rebuttal report cites the peer reviewed study by Castellsague (2009) which found that "current rofecoxib and naproxen users had the highest risk for upper GI complications with adjusted ORs of 3.6 (95% CI 2.2–5.7) and 3.4 (95% CI 1.8–6.7) respectively." (Rebuttal Rep. at 1–2; DCA Decl., Exh. 7.)  Thus, peer-reviewed literature reports Vioxx having GI toxicity similar to naproxen under real-world conditions.

Other literature cited by Dr. Julie noted that the clinical trials relied upon by defendant were biased in favor of Vioxx by their use of maximal doses of compared NSAIDs.  (*Id.* at ¶ 6, at 2.)  Another recent study, erroneously cited by defense expert Dr. Sales for the proposition that COX-2 inhibitors caused fewer upper GI complications than traditional NSAIDs, actually showed that there was a lower relative risk for ibuprofen than for Vioxx for upper GI adverse events.  (*Id.* at ¶ 10, at 4.)

Defendant also relies heavily upon review articles that provide no new data.  The first such review cited by defendant was actually authored by a paid consultant and expert witness for Merck (Lanza).  *See In re Vioxx Litigation*, *supra*, 401 F. Supp. 2d at 579, discussing Lanza's opinions offered for Merck.  Dr. Julie's rebuttal also points out that the American Gastroenterological Association (AGA) Institute recommendations were written without benefit of the data that Merck failed to publish:  the VIGOR study showed that "the benefit in regards to the most clinically important events were confined to the population of steroid users;" the

reviews did not mention the excess risk of complicated PUBs and PUBs in the Alzheimer's

Protocol 078 and APPROVe studies; and many of the authors of the review were industry

consultants who had written company sponsored articles about the benefits of COX-2 inhibitors.

Finally, none of the reviewers could have known that Merck failed to publish the data showing

that two of the traditional NSAID tested in the Vioxx clinical trials actually resulted in no PUBs

and were thus safer than Vioxx.  (*Id.* at ¶¶ 15–17, pat 6–7.)

In short, Dr. Julie has applied a reliable methodology by reviewing the same studies that

defense experts have read, plus additional unpublished clinical trial data from Merck's files that

were unknown to either defense experts or the authors of the review articles upon which they

relied.  Dr. Julie applied a reliable methodology to arrive at admissible opinions as to the GI

toxicity of Vioxx.

**VII.    DR. JULIE'S TESTIMONY CONCERNING THE MARKETING AND
PROMOTION OF VIOXX IS ADMISSIBLE EXPERT TESTIMONY**

**A.    Dr. Julie's Marketing Opinion Is Appropriate Expert Testimony**

Dr. Julie cites three internal Merck documents, for the purpose of comparing the medical

content of Merck's marketing to medical evidence, particularly his own analysis of the

gastrointestinal safety of Vioxx.  Yet Merck argues that "Dr. Julie's marketing testimony is not

an expert opinion at all - rather, it consists of reviewing and commenting on internal Merck

documents."  (Def. Mem. at 12.)  This statement bears no resemblance to Dr. Julie's "marketing

testimony."

Appropriate expert testimony consists of reliable "scientific, technical, or other

specialized knowledge [that] "will assist the trier of fact to understand the evidence or to

determine a fact in issue[.]"  Fed. R. Evid. 702.  Merck apparently assumes that the internal

documents cited by Dr. Julie merely discuss "lay matters" easily understood by the lay person,

but the documents clearly scientific and technical content.  (Def. Mem at 12–13.)  Thus,

Dr. Julie's testimony would be admissible to explain the documents, and "assist the trier of fact

to understand the evidence," even if Dr. Julie merely summarized and explained the medical

content.  "Drug marketing materials aimed at physicians may be technical in nature and, for that

reason, expert testimony may be necessary to explain those materials."  *In re Seroquel Prods.*

*Liab. Litig.*, Slip Copy, 2009 WL 3806436, *8 (M.D. Fla. 2009) (allowing epidemiologist to

explain scientific information in marketing materials and compare that information to the other

materials).

      Dr. Julie does not merely summarize internal Merck documents, however.  Nor does he

merely assists the trier of fact to understand the scientific content of complex documents – which

would, in itself, be admissible.  Dr. Julie's testimony explains the relevance of the documents in

the context of his expert opinion – specifically, that Vioxx had a gastrotoxicity profile similar to

other NSAIDs under conditions of real world use for the majority of patients, which was contrary

to the representations of GI benefit for all patients in the Merck marketing materials. The

"marketing testimony," as Merck calls it, incorporates the three marketing documents into that

opinion, and forms the basis of his further opinion that the information was available to Merck,

and that Vioxx marketing materials were inconsistent with that information.  (Julie Report ¶¶ 42–

44; DCA Decl. Exh. 1.)  *Pfizer v. Teva Pharms. USA*, 461 F. Supp. 2d 271, 278-79 (D.N.J. 2006)

(expert opinion including overview of the marketing and regulation of Celebrex and quotations

from regulatory documents is admissible, rejecting argument that expert "does not offer any

opinions and merely recites the text of FDA documents").

      Merck cites *In re Rezulin Prods. Liab. Litig.*, in support of the proposition that experts

may not opine on internal company documents, but Rezulin involved expert testimony pertaining

to "lay matters which a jury is capable of understanding . . . and is no more than arguments and conclusory statements." 309 F. Supp. 2d 531, 554 (S.D.N.Y. 2004). The *Rezulin* court did not exclude expert testimony because it opined on internal company documents. The court excluded the testimony because it opined on documents that a lay person would understand. The fact that they were internal company documents was irrelevant – it was the complexity (or lack of complexity) of the documents at issue, not their source. 309 F. Supp. 2d at 554 (excluding expert testimony summarizing, *inter alia*, "an internal email that purports to discuss changes in employee access to computer servers. All of [the] proposed testimony . . . follows this format."). *See also In re Seroquel*, 2009 WL 3806436, *4 (holding three experts may rely on and discuss internal corporate documents to show, *inter alia*, the distinctions between information available to the defendants and information communicated to prescribing healthcare providers, because "[to] rule otherwise would unduly restrict Plaintiffs' experts from explaining the bases of their opinions").

Merck cites *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008). *In re Prempro* actually *supports* the admission of expert testimony that summarizes corporate documents, to provide the jury with the necessary tools to interpret the documents in the context of the case. Prior to trial, the *In re Prempro* court denied a motion to exclude the testimony of a regulatory expert that would provide "'a purely factual recitation of the history of Provera, and its progression as a drug . . . to show the environment in which [Defendants] operated.' The purpose for allowing such testimony was efficiency, and the summary of the documents was to be 'purely factual.'" 554 F. Supp. 2d at 886, *quoting* the Court's pretrial ruling. After trial, the court ruled that the testimony was not helpful to the finder of fact — not because the testimony summarized corporate documents, but because there was no summary —

859604.2

the expert "simply read the document to the jury," "without further comment." *Id.* The court

concluded that the expert testimony "did not 'give the jury the tools they need to look at those

documents, [to] understand them in the context of a regulatory background," therefore, the

testimony did not assist the finder of fact. *Id. See also In re Prempro Prods. Liab. Litig.*, 586

F.3d 547, 571 (8th Cir. 2009) (noting on appeal that the expert "simply read the contents of

exhibits thus undermining the asserted basis for expert testimony" although the court instructed

counsel "to relate the testimony" to FDA guidelines).

*In re Prempro* is simply inapposite. Dr. Julie cites a small number of marketing

documents to show that the presentation of the gastrointestinal profile of Vioxx in those

materials in inconsistent with the results of his expert review of data regarding the drug's profile,

and to show that the drug's actual risk was known or knowable to Merck. He does not merely

summarize Vioxx marketing materials, and even if he did, such testimony would be admissible

to assist the trier of fact in understanding unfamiliar scientific content. For both of these reasons,

his testimony is appropriate expert opinion.

### B.   Dr. Julie's Testimony Is Based On His Expertise And Experience

Merck further argues that Dr. Julie is unqualified to "summariz[e] Merck's internal

marketing documents" because he is not a marketing expert. (Def Mem. at 13.) First, as noted

above, Dr. Julie does not attempt to "summarize" Merck's marketing documents. He does not

offer expert testimony about FDA regulations, marketing ethics, or the business aspects of

marketing. Dr. Julie cites internal Merck documents for the purpose of comparing the content of

the marketing materials to what his analysis shows about the drug. It is well-established that

testimony of this type is within the province of a medical expert – indeed, Merck's own cited

cases say so. The court in *In re Diet Drugs* clearly held that medical experts "are fully qualified

to opine of the medical facts and science regarding the risks and benefits of the diet drugs in

question and to compare that knowledge with what was provided in the text of labeling and warnings[.]" *In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 876900, *11, 2000 U.S. Dist. LEXIS 9037 (E.D. Pa. June 20, 2000).  Comparing the medical content of a label to conflicting medical content does not require an expertise in federal regulatory requirements.  Nor does comparing the medical content of Merck's marketing materials to the expert's medical opinion require a marketing degree. *Pfizer v. Teva Pharms. USA*, 461 F. Supp. 2d at 277 ("an expert in rheumatology, [the doctor] may render an opinion on the accuracy of Celebrex's marketing materials . . . [Rheumatologist] is 'fully qualified to opine on the medical facts and science of Celebrex and compare that knowledge with what was provided in the text of the marketing materials'"). *See also In re Seroquel*, 2009 WL 3806436 at *8 (medical experts qualified "to explain and compare information in Seroquel marketing materials to other evidence").

Merck does not cite a single case that holds that a medical expert is not qualified to opine on the accuracy of marketing materials.  Merck can only attempt to argue that Dr. Julie is unqualified to opine on the marketing documents by mischaracterizing his opinion, and citing authority that is only applicable to statements Dr. Julie never made.  (Def. Mem. at 14.)  Dr. Julie does not express an opinion on Merck's "'state of mind' or 'the manner in which corporations and the pharmaceutical marketplace react, behave or think[.]'"  (Def. Mem. at 14, quoting *In re Diet Drugs*, 2000 WL 876900 at *8–9.)  He makes no statement about FDA regulations, ethics, or intent.  Dr. Julie's merely opines on the accuracy of the medical content of Merck's marketing materials, an opinion that is clearly within the bounds of his medical expertise.

## VIII.  <u>CONCLUSION</u>

Dr. Julie is a well-qualified gastroenterologist whose credentials are not challenged.  He applied a reliable methodology by reviewing the same published clinical trials that Merck's experts reviewed.  Dr. Julie went beyond the required level of inquiry by evaluating important

unpublished data from those and other trials, of which defense experts were unaware. As this

Court has previously ruled, the Daubert test is based on reliability of the methodology, not the

conclusions reached thereby, and Dr. Julie's application of reliable methods supports

admissibility of his opinions.  To the limited extent that Dr. Julie cites internal Merck documents

other than the clinical trials themselves, his opinions thereon are admissible to explain scientific

issues relating to the disparity between defendant's knowledge and what it disclosed to the

medical community.

       Respectfully submitted, this 1st day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

859604.2

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Plaintiff's Memorandum In Opposition To Motion To Exclude Testimony Of Neil Julie has this day been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to pretrial order No. 8B, on this the 1st day of March, 2010.

/s/ James R. Dugan

859604.2