# Exhibit 5

Neil Julie, M.D.

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re:  VIOXX Products         :MDL   1657

Liability Litigation           :

This Document Relates to       :

STATE OF LOUISIANA et rel.     :Section L

JAMES D. CALDWELL, Attorney:

General,                       :Honorable Eldon E. Fallon

       Plaintiff          :Magistrate Judge Knowles

v.                             :

MERCK SHARP & DOHME CORP.,     :Case No.:   05-3700

       Defendant          :

-----------

Deposition of NEIL JULIE, M.D.

Bethesda, Maryland

Wednesday, January 13, 2010

9:08 a.m.

Pages:  1 - 328

Reported By:  Dawn M. Hart, Notary Public, RPR/RMR

1      Q     Now, on your Exhibit B materials reviewed
2   list for Exhibit 7, I didn't see any documents on here
3   from Herb.  Do you know who I'm talking about, Herb?
4      A     Doctor Baum.
5      Q     Yes.  Doctor Baum, Doctor Herb Baum.  I
6   didn't see any documents on here related to Doctor
7   Herb Baum.
8      A     I didn't rely on the data that he provided.
9      Q     Why not?
10     A     You know, we provided him with the SAS
11  spreadsheets and I told him what my questions were.
12  He came back with data which was very complex and hard
13  for me to understand, and on a couple of occasions the
14  calculations that were done didn't address what I
15  needed in the questions that I was asking, which
16  ultimately was the interactive P value between steroid
17  users and non-users in regards to Vioxx and naproxen.
18          So once the Court agreed to an extension, I
19  just figured that it was, you know, it was too
20  convoluted and that I would just kind of stop things
21  there, and I asked Mr. Arbitblit if he knew a
22  statistician that could do these calculations the way
23  they needed to be done.
24     Q     And again, what time frame is that?

1    A    I think probably the last contact with
2    Doctor Baum was probably right around -- last contact
3    I had was probably late July. I think there's an
4    E-mail in there from August 1st. And then after that
5    things pretty much completely stopped. And later
6    Doctor Jewell, who is the head of biostatistics or
7    statistics at Berkeley, picked up the ball.
8    Q    And just so I'm clear, you're not relying on
9    Doctor Herb Baum for any of your opinions in this
10   case?
11   A    Correct.
12   Q    You told me that Doctor Jewell is a -- who
13   is he again?
14   A    I can look it up. Let me see. He is in
15   Berkeley, and he is a statistician, and I'll tell you
16   more when I just get to the right page.
17        (Reviewing.)
18        He's a professor of biostatistics and
19   statistics at UC Berkeley.
20   Q    You in your report rely on an analysis of
21   the VIGOR study performed by Doctor Jewell, correct?
22   A    Correct.
23   Q    Have you ever relied on Doctor Jewell in
24   your clinical practice for treating patients?

Neil Julie, M.D.

Page 127

1   that background.

2       Q    Is he a medical doctor?

3       A    I don't know.

4       Q    Did you demand to see his CV?

5       A    No.  I took his credentials of being
6   Professor of Biostatistics and Statistics as having
7   been vetted well enough.

8       Q    By Doctor Arb -- by Mr. Arbitblit.  Let me
9   ask -- you took his credentials as being vetted by Mr.
10  Arbitblit?

11           MR. ARBITBLIT:  Object to form.

12      A    Not really.  I mean I think that it was
13  really based on his title.  You know, I mean I know
14  Berkeley.  I know UC Berkeley.  I was out in
15  California, in the Bay area for four years.  I know
16  what a fine institution it is.  I know the head of the
17  Department of Economics in Berkeley.  So, you know,
18  that in itself qualified him in my mind.

19      Q    But you didn't go to the internet and Google
20  him or anything like that?

21      A    No.

22      Q    And you say that you were the one who asked
23  him to do a specific analysis for this case, correct?

24           MR. ARBITBLIT:  Object to form.

Neil Julie, M.D.

Page 128

1   A   Well, I had the specific analysis design in
2   my mind as a non-degree-carrying, you know,
3   statistician, but I knew the question that needed to
4   be answered and I passed that along to Mr. Arbitblit
5   who then passed it on to Doctor Jewell.
6   Q   And tell me the -- tell me the exact
7   question that you asked Mr. Arbitblit to pass on to
8   Doctor Jewell.
9   A   The question is based on going back to the
10  source data, if you look at two groups, those who are
11  steroid users as defined in the study versus
12  non-steroid users, and then you look at those who are
13  on Vioxx versus those who are on naproxen, and look in
14  the confirmed and complicated PUB group at the
15  incident rate ratios of those two groups, so that
16  you're now looking at a particular subgroup analysis
17  to see if that particular subgroup defines a
18  significant risk factor, what the numbers show; is
19  there a statistically significant interaction P value
20  that shows that steroid use versus non-steroid use is
21  a major determinant of risk.
22  Q   Is that the only analysis that you asked him
23  to provide?
24  A   I also asked him to look at the Alzheimer's

Neil Julie, M.D.

1  data and to help to calculate the relative risk data
2  from that study.
3      Q    Did you ask him to do these analyses because
4  you're not qualified to do them yourself?
5           MR. ARBITBLIT:  Object to form.
6      A    That is -- I don't have the knowledge of
7  statistical calculations to do it myself.  I can ask
8  the questions, but I need a computer or a statistician
9  to give me the answers.
10     Q    If you could have done them yourself, you
11 would have?
12          MR. ARBITBLIT:  Object to form.
13     A    Well, I think that I did my own on a
14 calculator calculation of the, what he covers in the
15 bottom of his second page where, you know, you take
16 the 10 cases and you do the numerator/denominator, and
17 you calculate what the incident rate ratios are.  And
18 so if you go to my report, I think I probably cover
19 that.
20          On my report on Page 6, I put in those
21 numbers from my own calculations there, which if you
22 compare it to his calculations you can see he leaves
23 out some of the decimal points for Protocol 78, and
24 his numbers on incident risk ratio, he's got 3.83

Neil Julie, M.D.

Page 135

1  differential in subgroups where the risk in the, in
2  the steroid users is 27 patients versus seven
3  patients, and in the non-steroid users the difference
4  is 10 to nine, then you know, you need to, you need to
5  address that data.
6       And in addition there were questions that
7  were raised by the editorial reviewers of the New
8  England Journal and Reviewer B raised specific
9  questions about steroids, and Merck was dissembling
10 about the importance of that.  So those numbers should
11 have been reviewed.
12     Q    Do you remember my question?
13     A    Yes.
14     Q    Okay.  My question was were subgroup
15 analyses prespecified in VIGOR off of the POB
16 endpoint, the complicated endpoint?
17     A    I'd have to check that document, but I think
18 they probably were not.
19     Q    Okay.  Was -- you obviously rely on Doctor
20 Jewell's analysis of this steroid issue off of the
21 complicated endpoint, correct?
22     A    Well, I mean I did the data count in terms
23 of numbers, you know, 27 versus seven, 10 versus nine.
24 I verified that by looking at the SAS sheets myself,

Neil Julie, M.D.

Page 136

1  but the statistics --

2    Q   I'm sorry.

3    A   The statistics, I'm sure he then went and did his own counts. But the statistics that he calculated on the basis of that, I rely on him on.

6    Q   And obviously his statistical analysis is an integral part of your report?

8    MR. ARBITBLIT: Object to form.

9    A   It is a part of my report, but it is basically, for a good statistician, a fairly straightforward numerical calculation.

12    Q   And why didn't you attach Doctor Jewell's report to your report?

14    A   Why? I have it listed in my bibliography.

15    Q   Did you instruct the Plaintiff's lawyers to make sure that they provided the Jewell report when they served your report?

18    A   Well, you know, this is kind of where the line between being a doctor and being a lawyer, you know, can create an obstacle. I didn't feel any sense of obligation to tell somebody to provide you with a document that I thought you might have had.

23    Q   When did you -- let see. When did you --

24    MR. TOMASELLI: Let's mark this. Hold on.

Neil Julie, M.D.

Page 139

1        MR. ARBITBLIT: Object to form.

2    A   I think the law firm.

3    Q   How much does he make an hour?

4    A   I have no idea.

5    Q   How much has he been paid from Plaintiffs
6    lawyers suing manufacturers of Cox-2 selective
7    inhibitors?

8    A   I have no idea.

9    Q   Would that matter to you?

10   A   It would be of curiosity. I don't really
11   want to know. I don't care.

12   Q   You wouldn't want to know if Doctor Jewell's
13   made hundreds of thousands of dollars from Plaintiff's
14   law firms or even tens of thousands of dollars from
15   Plaintiff's law firms suing manufacturer of Cox-2
16   selective inhibitors?

17       MR. ARBITBLIT: Object to form.

18   A   Well, it would be of marginal interest.

19       I mean the thing is, though, I want to say
20   about this report is he is applying simple
21   statistical/biostatistical analytic tools. So the
22   numbers should not really lie. So I don't really
23   think that I'm not really asking him for -- I'm not
24   really relying on his opinions, I'm relying on his

Neil Julie, M.D.

Page 140

1  numbers. And, you know, I don't think that he is --
2  you know, I don't suspect that there's anything wrong
3  here.
4  Q    Do you know if Doctor Jewell has done any
5  other analyses of Vioxx data --
6  A    Don't know.
7  Q    -- regarding GI risks or cardiovascular
8  risks or anything?
9  A    Don't know.
10 Q    Don't know. And if Doctor Jewell had done
11 analyses of Vioxx data and had used different methods
12 than the ones you told him to use, would expect him --
13 would you have expected him to tell you that?
14      MR. ARBITBLIT:  Object to form.
15 A    It would be useful information.
16 Q    So if for example he used prespecified
17 Merck, Merck -- withdrawn.
18      If he used Merck-prespecified statistical
19 analyses for some of his other analyses and then used
20 different analyses for the analyses that you asked him
21 to do, would you expect him to tell you that?
22      MR. ARBITBLIT:  Object to form.
23 A    It would be useful information.
24 Q    Back to your report, Exhibit 8, the first