**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, | JUDGE ELDON E. FALLON |
| Plaintiffs, | MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., | Case No. 05-3700 |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO MOTION TO EXCLUDE TESTIMONY OF JOHN MACGREGOR, M.D.**

**TABLE OF CONTENTS**

                                                                          **Page**

I.      INTRODUCTION .................................................................................. 1

II.     LEGAL STANDARD.............................................................................. 2

III.    DR. MACGREGOR'S OPINIONS CONCERNING CAUSATION ARE
        ADMISSIBLE AND DIRECTLY RELEVANT TO THIS CASE....................... 3

        A.      Evidence of Causation Is Relevant to the Degree of Risk and the
                Inadequacy of the Warnings .................................................... 3

        B.      Evidence that Vioxx Caused Worse Hypertension Than Other
                Drugs in its Class Is Relevant to the Inadequacy of The Warning ............ 5

        C.      Dr. MacGregor's Opinions Regarding CV Risk in the Alzheimer's
                Trials Are Relevant, Admissible, and Internally Consistent..................... 6

IV.     DR. MACGREGOR MAY TESTIFY TO DISCREPANCIES BETWEEN
        KNOWN OR KNOWABLE CARDIOVASCULAR RISKS AND
        MERCK'S REPRESENTATIONS OF RISK, BASED ON HIS
        SCIENTIFIC AND MEDICAL KNOWLEDGE AND EXPERIENCE .............. 8

V.      THE ZYPREXA DECISION IS INAPPLICABLE TO VIOXX ......................... 9

        A.      Zyprexa Does Not Apply Where The Evidence Shows that the
                Drug in Question Should Never Have Been Marketed............................ 9

        B.      *Zyprexa* Did Not Preclude Claims Based on the Difference
                Between Price Paid and Value Received ................................................ 10

        C.      *Zyprexa* Should Be Limited To Its Facts, Which Involved a
                Beneficial Drug that Remains on the Market ......................................... 11

        D.      The *Zyprexa* Decision Is Not Applicable to the Specific Louisiana
                Statutes that Give Rise to Claims for Relief........................................... 11

VI.     DR. MACGREGOR MAY RELY ON THE REBUTTAL REPORT OF
        DR. JEWELL, CONSISTENT WITH PRIOR RULINGS OF THE
        COURT ....................................................................................................... 15

        A.      Dr. MacGregor Did His Own Statistical Analysis of the
                Osteoarthritis (OA) Data, and No Reliance on Dr. Jewell's Report
                Is Necessary ........................................................................................ 15

        B.      The Court Has Permitted Testifying Experts To Rely On
                Biostatistical Consultants' Analyses In Previous Vioxx Cases.............. 15

        C.      Merck's Argument Concerning Alleged Variance From the
                Protocol 203 Data Analysis Plan Is Inaccurate......................................... 16

VII.    CONCLUSION.......................................................................................... 18

# TABLE OF AUTHORITIES

Page

## CASES

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993).....................................................................................2, 3

*Gen. Elec. Co v. Joiner*,
522 U.S. 136 (1997)...........................................................................................3

*Huss v. Gayden*,
571 F.3d 442 (5th Cir. 2009) .......................................................................2, 3

*In Re Diet Drug Product Liability Litigation*,
No. MDL 1203 2000 WL 8769000 (E.D. Pa. June 20, 2000) ...................... 9

*In re Zyprexa Prods. Liab. Litig.*,
No. 07-cv-65 --- F. Supp. 2d--- 2009 WL 4260857 (E.D.N.Y. Dec. 1, 2009) ........ 9, 10, 11, 12

*Knight v. Kirby Inland Marine, Inc.*,
482 F.3d 347 (5th Cir. 2007) ...........................................................................3

*Moore v. Ashland Chem., Inc.*,
151 F.3d 269 (5th Cir. 1998) ...........................................................................2

*Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*,
401 F. Supp. 2d 565 (E.D. La. 2005)..................................................... 2, 15, 16

*Smith v. Wyeth-Ayerst Labs. Co.*,
278 F. Supp. 2d 684  (W.D.N.C. 2003) ...........................................................9

## STATUTES

La. Rev. Stat. Ann.
§ 51:1408 ........................................................................................................ 13

## OTHER AUTHORITIES

12/17/03 P&T Committee Meeting Minutes LaAG-Vioxx-002720-760, at p. 13 ...................... 14

*Journal of the American Medical Association* (Psaty, JAMA 2008)........................................... 4, 7

## RULES

Federal Rules of Evidence
702 ................................................................................................................... 2
703 ................................................................................................................. 15

859521.1

## I.      **INTRODUCTION**

John MacGregor, M.D., Ph.D., is an expert cardiologist who has provided admissible

testimony concerning cardiovascular risks of Vioxx in the state courts of New Jersey and

California.  Dr. MacGregor is also a Ph. D. biochemist, Professor of Medicine at University of

California San Francisco (UCSF), Director of the UCSF Cardiac Catheterization Laboratory and

Interventional Cardiology, and author of 40 peer-reviewed articles. (MacGregor Curriculum

Vitae [Declaration of Donald C. Arbitblit, (hereinafter, "DCA Decl.") Ex. 24.])

Dr. MacGregor's testimony meets standards of admissibility and relevance in all respects, and

there is no basis to exclude his opinions.

Merck seeks to exclude Dr. MacGregor's testimony that Vioxx causes heart attacks,

claiming such opinions are irrelevant.  According to Merck, the only relevant issue is whether

Merck misrepresented the known cardiovascular (CV) risks of Vioxx.  However, causation and

risk are inextricably intertwined.  The fact that Vioxx causes heart attacks is the central CV risk

that Plaintiffs allege Merck knew and failed to adequately disclose.  Evidence of causation and

knowledge of risk are both relevant and mutually supportive.

Merck challenges Dr. MacGregor's comments regarding labeling on the grounds that he

is not an expert on FDA regulations, but the same argument has been regularly rejected by the

courts.  Experts may testify that known or knowable risks are different from those described on a

drug label, based upon medical expertise and familiarity with the scientific evidence, and such

testimony does not depend on FDA regulatory or labeling experience.

Merck argues that Dr. MacGregor may not rely upon opinions stated in a rebuttal report

of Dr. Jewell, but the Court has previously ruled that testifying experts may rely on the analyses

of non-testifying biostatistical consultants, and the same result should apply here.

Finally, Merck contends that Dr. MacGregor's opinions are not relevant under the recent

*Zyprexa* ruling.  For the several reasons set forth in section V of this memorandum, *Zyprexa* is not applicable to Plaintiffs' claims for relief in this case, nor does it bar the testimony of Dr. MacGregor or Plaintiff's experts generally.

## II.    LEGAL STANDARD

The Federal Rules of Evidence govern the admissibility of expert testimony.  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  Under Federal Rule of Evidence 702, expert testimony is admissible if:  (1) the expert is qualified through knowledge, skill, experience, training, or education;  (2) the testimony is based upon sufficient facts or data;  (3) the testimony is the product of reliable principles and methods;  and (4) the witness has applied the principles and methods reliably to the facts of the case.

The trial court acts as a "gatekeeper" to ensure that expert testimony is "reliable" and "relevant."  *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993).  The focus is on the experts' qualifications and methodology, rather than results or conclusions.  *Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565, 574 (E.D. La. 2005) (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998)).

Scientific testimony is reliable if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known.  *Daubert*, 509 U.S. at 592-93.  In *Daubert*, the Supreme Court set forth the following non-exclusive list of factors to consider in determining the scientific reliability of expert testimony; (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community.  *Id.* at 593-95.  The "reliability analysis applies to all aspects of an expert's

- 2 -

testimony; the methodology, the facts underlying the expert's opinion, the link between the facts

and the conclusion." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

Scientific testimony is relevant if the expert's "reasoning or methodology properly can be

applied to the facts in issue," meaning that there is an appropriate fit between the scientific

testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is

irrelevant when "there is simply too great an analytical gap between the data and the opinion

proffered." *Gen. Elec. Co v. Joiner*, 522 U.S. 136, 146 (1997).

To satisfy its gatekeeping responsibility, the trial court must make a "preliminary

assessment of whether the reasoning or methodology underlying the testimony is scientifically

valid and whether the reasoning or methodology properly can be applied to the facts in issue."

*Huss*, 571 F.3d at 452 (quoting *Daubert*, 509 U.S. at 592-93).

## III.     DR. MACGREGOR'S OPINIONS CONCERNING CAUSATION ARE ADMISSIBLE AND DIRECTLY RELEVANT TO THIS CASE

### A.     Evidence of Causation Is Relevant to the Degree of Risk and the Inadequacy of the Warnings

Defendant's argument seeks to separate "cardiovascular (CV) risk" from the

manifestations of that risk, that is, an excess of heart attacks, strokes, thrombotic events, and

hypertension. Under Merck's theory of the case, only evidence of "risk" would be admissible,

while evidence of harm would be excluded. However, risk and outcome are logically and legally

interrelated. The greater the defendant's knowledge that the risk was actual rather than

theoretical, the higher the duty to warn and to act to prevent harm. Furthermore, the adequacy of

the warning is itself determined, in large part, by the evidence that the risk was real. There is

abundant evidence, set forth in the Second Amended Complaint ("SAC") and Plaintiff's expert

reports, that Merck had actual knowledge of a true excess of thrombotic events among Vioxx

patients.[1]  No Vioxx label or Merck-sponsored publication ever disclosed or warned of a true

excess of thrombotic events; instead, the risks were downplayed or described as having

"unknown" significance.  (*See, e.g.*, 2002 Vioxx Package Insert, previously marked as Kessler

Ex. 11 [DCA Decl. Ex. 1].)  The trier of fact should hear and consider evidence that the risk of

heart attacks and other adverse events was real, rather than hypothetical, in determining whether

defendant adequately warned of the risk.

        Defendant claims that Dr. MacGregor's testimony is irrelevant because Provider

Synergies, the company that provided information about risk to the Louisiana Pharmaceuticals

and Therapeutics ("P&T") Committee, included a section summarizing published information

about CV risk in the monographs submitted to the Committee.  (Def. Mem. at 14.)  However,

Valerie Taylor, Provider Synergies' lead author of the Vioxx monograph submitted to the State,

acknowledged that her submission was based on the peer-reviewed literature, and she did not

have or rely upon  Merck's internal documents.  (Taylor Dep. at 19:8-14, January 15, 2010

[DCA Decl. Ex. 2].)  Plaintiff's experts, including Dr. MacGregor, have opined that the

published literature was itself an insufficient and misleading basis upon which to adequately

assess the risks and benefits of Vioxx, because Defendant consistently published only the

analyses that were "positive" for the drug, while suppressing negative data.  (*See, e.g.*,

MacGregor Rep. at 1-2, 10-11; Kessler Rep. at ¶¶ 60-82, ¶¶ 14-19); Psaty, JAMA 2008 [DCA

Decl. Exs. 3, 4, and 5].)

---

[1] *See, e.g.*, testimony of Jerry Avorn, M.D., excerpted and referenced in Plaintiff's Opposition to
Motion to Exclude Dr. Avorn's testimony, filed contemporaneously.  Dr. Avorn testified
forcefully that the hypothesis of naproxen being cardio-protective did not explain the VIGOR
excess heart attacks, and that he told Merck officials the most likely explanation was that Vioxx
was causing more CV events.  Merck thus had knowledge of actual risk of harm, provided by its
own consultant, and such knowledge is clearly relevant to the misrepresentations and
downplaying of CV risk in Merck's labels, and company-sponsored literature.

Merck argues that Dr. MacGregor should not be permitted to testify to the results of clinical trials that became known at or after the date when Vioxx was withdrawn from the market on September 30, 2004. (Def. Mem. at 3.)  This argument does not take into account a central basis for Plaintiffs' claims for relief, i.e., Defendant's ongoing failure to adequately investigate the risk of CV harm from the pre-market phase until market withdrawal.  Thus, for example, Plaintiffs' expert David Kessler, M.D., former head of the United States Food and Drug Administration (FDA), testified that Vioxx was not safe and effective on the date that it was approved in May 1999, and that there was sufficient evidence of cardiovascular risk prior to marketing to require additional testing to be done.  (Kessler Dep. 132:8-134:14 [DCA Decl. Ex. 6]; Kessler Rep. at 4-9 ¶¶ 18-39.)  Dr. Kessler and others have testified or opined that Defendant knew a CV outcomes study was needed to determine the extent of the risk, yet decided not to do that study.  (Kessler Dep. 164:3-12; Kessler Rep. at 4-9 ¶¶ 18-39.)  Plaintiff should be permitted to show that the ultimate result of Merck's clinical trials was to demonstrate cardiotoxicity and excess heart attacks and strokes (Baron, et al., 2008, marked as Curtis Ex. 31; Curtis Dep. 236:17-22, January 18, 2010 ("Q.  With that understanding, do you agree that for the entire period, the study showed that rofecoxib increased the risk of the combined APTC endpoint of myocardial infarction, stroke, and vascular death?  A.  I do.") [DCA Decl. Exs. 7 and 8]), and a finder of fact should be permitted to make the reasonable inference that Merck could and should have carried out the studies to discover that Vioxx was harmful *before* placing it on the market, rather than after millions of patients had taken the drug.

### B. Evidence that Vioxx Caused Worse Hypertension Than Other Drugs in its Class Is Relevant to the Inadequacy of The Warning

Defendant argues that Dr. MacGregor should be precluded from testifying that Vioxx causes hypertension, and that hypertension in turn is a risk factor for cardiovascular events, on

859521.1

the grounds that hypertension was referenced in the Vioxx label.  (Def. Mem. at 4.)  However, Dr. MacGregor's report provides reliable evidence that Vioxx caused more hypertension than other drugs in its class, and that Merck's labeling and peer-reviewed publications on this subject were incomplete and inaccurate.  (MacGregor Rep. at 6-10.)  Accordingly, Dr. MacGregor's testimony regarding excess risk of hypertension and its relation to greater heart attack risk is relevant and admissible.

### C.   Dr. MacGregor's Opinions Regarding CV Risk in the Alzheimer's Trials Are Relevant, Admissible, and Internally Consistent

Defendant contends that Dr. MacGregor takes inconsistent positions with regard to the CV risk evidence provided by the Alzheimer's studies.  (Def. Mem. at 4-6.)  But Defendant's brief does not mention that the Alzheimer's trials gave rise to two different data sets, one based upon only the "on drug" events and the other based upon Merck's analysis of all events, both on and off drug.  Merck described the Alzheimer's trials as "true ITT [Intention to Treat]," which meant that "data were captured long after discon[tinuation]."  (Email from Shapiro to Barr, Reicin, et al., 1/29/01; 1P0278 [DCA Decl. Ex. 9].)  In contrast, Merck "only use[d] up to 14 days" after discontinuation for the APTC endpoint.  *Id.*  Thus, the Alzheimer's studies gave rise to two different data sets with very different results.  Dr. MacGregor's opinions regarding these two data sets are internally consistent, supported by scientific principles, relevant and admissible.

Under the ITT analysis of the Alzheimer's trials, defendant knew that there was a 30 to 10 excess risk of mortality by January 2001.  *Id.*  Shortly thereafter, Merck conducted a formal, statistical ITT analysis of mortality in the Alzheimer's trials in April 2001, which showed a statistically significant excess risk of all-cause mortality.  (Chen Memo to Bain, April 8, 2001, marked as Kaiser Ex. 19 [DCA Decl. Ex. 10].)  The same Merck data sets have been analyzed by

859521.1

an expert retained by Plaintiff (Richard Kronmal, Ph.D.) and an independent expert affiliated

with no party to the litigation (Bruce Psaty, M.D.).  The Psaty/Kronmal analysis confirmed the

excess of all-cause mortality and also showed a statistically significant, 3.84 excess risk of

cardiovascular mortality in the Alzheimer's trials.  This analysis resulted in a peer-reviewed

article in the *Journal of the American Medical Association* (Psaty, JAMA 2008).[2]  Defendant

never published these data, and thus they were unknown to Merck's own Regional Medical

Director responsible for providing "peer-to-peer" information about risks and benefits to the

State of Louisiana, nor were they referenced in the monograph prepared by Provider Synergies

as the basis for the State's decision to add Vioxx to the Preferred Drug List (PDL) in 2003.

(Kaiser Dep. 124:3-10, January 29, 2010; 2003 Monograph, marked as Taylor Ex. 15; [DCA

Decl. Exs. 11 and 12].)  It is clear that Dr. MacGregor may testify to relevant, statistically

significant excess risks of mortality and cardiovascular mortality that passed the test of peer

review in one of the nation's leading medical journals (MacGregor Rep. at 4), and which were

not disclosed to Plaintiff while Vioxx was on the market.

Dr. MacGregor's report does not refer to the "on drug only" analysis of thrombotic

events in the Alzheimer's trials, but he testified about that analysis at the deposition cited in the

defense memorandum (at pp. 5-6).  The largest Alzheimer study was Protocol 078, a trial in

which "thirty-nine percent didn't take their pills," an extraordinarily high level of non-

compliance that removes "statistical power." (MacGregor Dep. 109:5-111:3, March 22, 2007

[DCA Decl. at Ex. 13].)  In contrast, in the VIGOR study, only 0.6% failed to meet the frequency

---

[2] Defendant argues that Dr. MacGregor may not testify about the Alzheimer's data because the results were not statistically significant. (Def. Mem. at 5.)  However, Defendant's own analysis and the peer-reviewed article confirm that the ITT analysis results were statistically significant, and thus Defendant's argument is contrary to the evidence.

859521.1

of ingestion protocol—a 60-fold difference in the compliance level in the two trials. (VIGOR

Clinical Study Report, MRK-AFV0451455 at 1560 [DCA Decl. Ex. 14].)  Merck's own Director

of Clinical Therapeutics, Alan Nies, M.D., wrote in an authoritative textbook that non-

compliance in a clinical trial "may cause falsely low estimates of the true potential benefits or

toxicity of a particular treatment." (Nies, Goodman and Gilman (1996) at 45 [DCA Decl. Ex.

15].)  Thus, Dr. MacGregor's criticism of the Alzheimer's trial is supported by the opinions of

Merck's own senior scientist in a non-litigation setting.[3]  If Defendant believes that

Dr. MacGregor's opinions are inconsistent, they may cross-examine on that basis.  However, the

opinions are based on reliable methodology and admissible.

Defendant also argues that the results of the Alzheimer's trials are irrelevant because

those trials were not mentioned in the Provider Synergies monographs submitted to the P&T

Committee. (Def. Mem. at 14-15.)  This argument is unpersuasive, because (a) the company's

failure to publish negative data showing the danger of the drug is precisely the basis for its

liability, and (b) the same failure to publish such data precluded Provider Synergies from

knowing or informing the P&T Committee about it.

IV.   **DR. MACGREGOR MAY TESTIFY TO DISCREPANCIES BETWEEN KNOWN OR KNOWABLE CARDIOVASCULAR RISKS AND MERCK'S REPRESENTATIONS OF RISK, BASED ON HIS SCIENTIFIC AND MEDICAL KNOWLEDGE AND EXPERIENCE**

Merck argues that Dr. MacGregor's opinions concerning the inadequacies of the

information about CV risk are inadmissible because he is not an expert on FDA regulations or

labeling. (Def. Mem. at 7-10.)  However, the courts have appropriately rejected this hyper-

---

[3] The inconclusive result for the on-drug analysis does not negate or diminish the importance of the statistically significant excess risk in the intention to treat population; since low power reduces the ability to detect an effect, the statistical interpretation of the ITT analysis is that the difference would have been even larger if compliance had been greater.

technical approach to admissibility of expert testimony.  In *In Re Diet Drug Product Liability Litigation*, No. MDL 1203, 2000 WL 8769000 (E.D. Pa. June 20, 2000), Judge Bechtle rejected a similar challenge to plaintiffs' expert pulmonologists who offered testimony that the fenfluramine label did not adequately warn of the risk of primary pulmonary hypertension (PPH).  The MDL court held that plaintiffs' experts were permitted to testify to the known or knowable risks of the drug, and to further testify that the label did not accurately reflect such risks.  Such testimony was permitted on the basis of expertise in the relevant medical and scientific disciplines, and lack of FDA regulatory/labeling experience was explicitly rejected as a basis for excluding the testimony.  *See also Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 702 (W.D.N.C. 2003) ("The Court intends to follow the MDL Court's ruling.").

The same rule is applicable here.  Dr. MacGregor is well-qualified to evaluate the evidence of CV risk of Vioxx.  He is equally well-qualified to offer the opinion that the Vioxx label and company-sponsored publications did not accurately convey that risk.

## V.    THE ZYPREXA DECISION IS INAPPLICABLE TO VIOXX

Defendant relies heavily upon the *In re Zyprexa Prods. Liab. Litig.*, No. 07-cv-65, --- F. Supp. 2d---, 2009 WL 4260857 (E.D.N.Y. Dec. 1, 2009), to support its position that Dr. MacGregor's opinions are inadmissible.  Plaintiff maintains that this issue should be deferred until the summary judgment briefing is completed, since Defendant acknowledges that its motion for summary judgment provides the legal framework upon which it relies.  For the purpose of the present motions, Plaintiff provides the preliminary response set forth below.

### A.    Zyprexa Does Not Apply Where The Evidence Shows that the Drug in Question Should Never Have Been Marketed

The central, recurring theme in the *Zyprexa* decision was that a number of plaintiff's claims were barred by the "Individualized Proof Rule," which precluded plaintiff from using

aggregated data to prove damages. *Id.* at *98-107. In this case, the evidence negates application of the Individualized Proof Rule.

Unlike the *Zyprexa* case, Plaintiff's evidence here includes testimony from former FDA Director David Kessler, M.D., that Vioxx was not safe and effective at the time it was approved for marketing; that the FDA medical officer applied the "wrong standard" in recommending approval despite substantial unresolved concerns over CV risk that required a "larger database" to answer; and that additional testing to resolve the CV risk issue should have been done before marketing. (Kessler Dep. 132:8-134:14, 164:3-12; Kessler Rep. at 4-9 ¶¶ 18-39.) Sufficient testing prior to May 20, 1999 would have revealed the same excess risk that was demonstrated later, and the drug would never have been marketed if adequate pre-market testing had been done. Thus, the facts here present a basis for causation and damages that includes the entire period during which Vioxx was sold, and which does not depend on the Individualized Proof Rule relied upon in *Zyprexa*. Put simply, if the drug had never been approved, no doctors would have prescribed it for any patients, and the State of Louisiana would not have spent any money to reimburse for Vioxx purchases.[4]

**B.** **_Zyprexa_ Did Not Preclude Claims Based on the Difference Between Price Paid and Value Received**

The *Zyprexa* decision held that claims for fraud and negligence remained viable "insofar as they seek to recover the difference between the value received by Zyprexa patients and the market price of Zyprexa reimbursed by the State." *Id.* at *96. Plaintiffs' have a right to recover under this theory: the medical evidence supports a conclusion that Vioxx was not worth more than a traditional NSAID such as ibuprofen or naproxen, because (a) the touted GI benefits were

---

[4] Defendant agrees that without FDA approval "the drug could not have been prescribed." Def. Mem. in Support of Motion to Exclude Testimony of Richard A. Kronmal, Ph.D., at 10.

859521.1

only demonstrated in high-dose clinical trial comparisons that were not relevant to actual

patients, 90% of whom used lower, safer dosages; (b) Vioxx itself caused GI harm that cannot be

distinguished from that of traditional NSAIDs in real-world conditions of use; and (c) to the

extent Vioxx showed a benefit for serious GI events compared to high-dose naproxen, that

benefit was restricted to patients who take steroids to treat rheumatoid arthritis (RA)—only about

2% of Vioxx users.  (*See generally*, Reports of Doctors Julie, Graham, and Abramson [DCA

Decl. Exs. 16, 17, and 18].)

### C.      *Zyprexa* Should Be Limited To Its Facts, Which Involved a Beneficial Drug that Remains on the Market

Judge Weinstein took pains to clarify that Zyprexa was a uniquely beneficial drug with

"social value"; that doctors continued to use it even after full knowledge of its associated risks

had been disclosed; and that the drug saved substantial sums that the State of Mississippi was not

required to spend on hospitalizations or other treatment of patients because Zyprexa had been

administered.  *Id.* at 113-114.  In this case, the facts are opposite:  Vioxx is not on the market and

has not been for over 5 years; it was removed because it causes excess CV events; such events

necessarily cost money to the State that it would otherwise not have spent; and Defendant has

been unable or unwilling to pursue its failed attempt to return the product to the market that it

began in the Spring of 2005.  (Curtis Dep. 268:17-272:6.)

Therefore, the *Zyprexa* decision is not controlling, and Dr. MacGregor's opinions are

directly relevant to the CV effects of Vioxx that should have kept it from being sold to Louisiana

residents.

### D.      The *Zyprexa* Decision Is Not Applicable to the Specific Louisiana Statutes that Give Rise to Claims for Relief

Merck asserts that Dr. McGregor's opinions about Merck's distortions in the scientific

literature and the misstatements in the Vioxx label cannot be relevant to plaintiffs' claim,

859521.1

because LDHH purportedly did not rely on these materials in reaching its decisions with regard to reimbursements of Vioxx.  Relying on the *Zyprexa* decision, Merck asserts that unless LDHH itself relied on the Vioxx label, the tendency of the label and Merck's distortions of the scientific literature to mislead doctors who wrote Vioxx prescriptions reimbursed by Louisiana Medicaid is irrelevant.  Setting aside the fact that the record contains ample evidence that such materials played a significant role in LDHH's decisions with respect to reimbursement of Vioxx prescriptions, Merck's reliance on *In re Zyprexa* is misplaced.

Merck asserts that under the Eastern District of New York's holding in *Zyprexa*, misrepresentations to individual doctors who wrote Medicaid prescriptions for Vioxx are irrelevant, because consideration of misrepresentations to such doctors would require individualized proof with respect to whether the misrepresentation caused each doctor to write each prescription for each patient.  However, the *Zyprexa* decision was based on Mississippi law, which has a specific causation requirement that the Louisiana's Unfair Trade Practices Act at issue here does not.

In determining that consideration of the State of Mississippi's claims would require individualized proof of causation as to each prescription, the *Zyprexa* court focused on the specific causation requirement of the Mississippi statute at issue in that case.  Finding individualized proof of reliance necessary to claims under Mississippi's Consumer Protection Act (CPA), Judge Weinstein cited to Mississippi's rigid causation element.  Judge Weinstein noted the specific causation element of the Mississippi CPA:

> Violators of the CPA are subject to liability in damages for "any ascertainable loss of money or property, real or personal, *as a result of* . . . a [prohibited] method, act or practice."

*In re Zyprexa*, 2009 WL 4260857 at 60. (Emphasis added).

It was this specific causation requirement – that ascertainable loss of money or property

- 12 -

occur "as a result of" an unfair trade practice – that led Judge Weinstein to conclude that the need for individualized proof of reliance precluded the Mississippi Attorney General from proving its CPA claim through generalized proof.

By contrast, the section of the Louisiana Unfair Trade Practices Act which expressly empowers the Louisiana Attorney General to seek an equitable remedy of restitution has no such specific causation requirement.  Instead, the Louisiana legislature has empowered the Louisiana Attorney General to seek restitution to "compensate *any* aggrieved person for any property... which *may* have been acquired by means of " any deceptive trade practice.  La. Rev. Stat. Ann. § 51:1408 (emphasis added).  In order to assert the claim for restitution on behalf of LDHH, the Attorney General need not demonstrate that prescriptions were written "as a result" of Merck's deceptive practices.  Rather, the Attorney General need only demonstrate that such prescriptions "*may* have been" the result of a deceptive trade practice.  Dr. McGregor's testimony that the representations of cardiovascular risks of Vioxx in Merck's label were misleading and understated the actual risks and that Merck distorted the available scientific literature is directly relevant to meeting the Attorney General's burden to show that LDHH's reimbursements of Vioxx prescriptions "*may* have been acquired by means of" a deceptive trade practice.

Moreover, there is ample evidence in the record to prove that LDHH relied on understatements of cardiovascular risks both in the Vioxx label and in Merck's manipulation of the scientific literature in reaching its decision to include Vioxx on the PDL.  As Merck itself points out, LDHH's P&T committee considered cardiovascular concerns associated with Vioxx in deciding whether to include Vioxx on the PDL.  Members of the P&T committee and the P&T committee's consulting firm, Provider Synergies, both considered the published scientific literature and the Vioxx label, as well as marketing materials provided by the manufacturer in

859521.1

assessing that risk.  Therefore, Merck's omissions from the published literature necessarily affected Provider Synergies' ability to give complete and accurate risk information to the P&T Committee.

LDHH director of Medicaid Ben Bearden testified that P&T committee members considered marketing materials from pharmaceutical companies in connection with the PDL review.  (Ben Bearden Dep. at 196:5-10, October 12, 2009 [Declaration of Stephen Murray, Jr. (hereinafter "SMJR Decl.") at ¶ 3].)  P&T Committee members also discussed the packet inserts at P&T Committee Meetings.  (*See, e.g.*, 12/17/03 P&T Committee Meeting Minutes LaAG-Vioxx-002720-760, at 13.)  Additionally, there is ample evidence that Merck sales personnel targeted P&T committee members with the intention of delivering Merck's pro-Vioxx message to the P&T committee.[5]  Valerie Taylor of Provider Synergies testified that she considered the entire body of published literature (including studies manipulated by Merck) and the Vioxx label in preparing Provider Synergies recommendations to the State of Louisiana with respect to PDL status.  (Valerie Taylor Dep. at 19:8-14, 36:15-22, 42:4-25; 102:10-21, 116:6-16, January 15, 2010 [SMJR Decl. ¶ 3].)  Indeed, Provider Synergies's discussion of cardiovascular risks consistently concluded, consistent with Merck's labeling, that further study of cardiovascular risks was necessary and that results of meta-analysis should be viewed "with caution."  (*See*

_____

[5] (*See, e.g.*, MRK-EBES0031269-70 ("The office-based team should contact P&T Committee Member to make sure that they are fully aware of the benefits and features of those products up for review.") [SMJR Decl. ¶ 3]; MRK-AGLAAD0010034 ("have our representatives touch base with member of the [P&T] Committee to ensure that they have the latest and greatest information on... Vioxx.") [SMJR Decl. ¶ 3]; MRK-AGLAAD0020006 ("regularly call on chief of P&T and Pharmacy Director... to ensure that they fully understand the value that our product portfolio provides...") [SMJR Decl. ¶ 3]; MRK-AGLAAD0001024 ("Louisiana Medicaid Tactical Plan... Call on P&T Committee members..."); MRK-AGLAAD0020750-52 ("messaging with targeted P&T members prior to and immediately following P&T Meetings") [SMJR Decl. ¶ 3].)

- 14 -

Provider Synergies Monographs, Exhibits J-M of Defendant's Motion to Exclude Testimony of

Dr. MacGregor.)  Such statements neutralized the cardiovascular concerns raised by members of

the P&T committee.  Dr. McGregor's testimony regarding the actual cardiovascular risks

associated with Vioxx is critical to understanding the misleading nature of the discussion of

cardiovascular risks in the Vioxx label as well as Merck's manipulation and distortion of the

published scientific literature.

**VI.     DR. MACGREGOR MAY RELY ON THE REBUTTAL REPORT OF DR. JEWELL, CONSISTENT WITH PRIOR RULINGS OF THE COURT**

Defendant argues that Dr. MacGregor may not rely on a rebuttal report of Nicholas

Jewell, Ph.D., which was initially served in the *Barnett v. Merck* case.  Plaintiff submits that such

reliance is limited, reasonable, and permitted under Federal Rule of Evidence 703 as determined

in the *Barnett* case in 2006.

**A.     Dr. MacGregor Did His Own Statistical Analysis of the Osteoarthritis (OA) Data, and No Reliance on Dr. Jewell's Report Is Necessary**

Dr. MacGregor's report includes reference to Defendant's OA trials, which showed a

statistically significant three-fold excess risk of thrombotic events by April 2002.  (MacGregor

Rep. at 4-5.)  Merck challenges Dr. MacGregor's opinion on the grounds that it relied on

Dr. Jewell's report.  However, Dr. MacGregor's report states that he personally calculated the

relative risks from the OA trials to reach this conclusion.  *Id.*  Therefore, Dr. MacGregor may

offer opinions about the relative risk of Vioxx compared to placebo based on the OA data,

regardless of Dr. Jewell's report.

**B.     The Court Has Permitted Testifying Experts To Rely On Biostatistical Consultants' Analyses In Previous Vioxx Cases**

In *In re Vioxx Litigation*, *supra*, defendant moved to exclude the testimony of plaintiff's

expert Wayne Ray, Ph.D., based in part on the argument that Professor Ray had relied on the

859521.1

biostatistical report of a nontestifying consultant, Richard Kronmal, as to issues of whether the Vioxx data supported increased CV risk with short-term use.  The court denied defendant's motion and permitted Professor Ray to testify on that issue.  *In re Vioxx Litigation*, 401 F. Supp. 2d at 585-586.

Also, on July 6, 2006, this Court heard argument regarding a number of expert-related issues in *Barnett v. Merck*, including the rebuttal report of Dr. Jewell, an expert whose analysis had been relied upon by a timely disclosed expert, Dr. Farquhar.  The Court denied a motion to designate Dr. Jewell as an additional expert because the designation came too late, but stated that "[Rule] 703 will allow Dr. Farquhar to explain that situation and deal with it." (*Barnett v. Merck*, Hearing Tr. 82:22-83:2, July 6, 2006 [DCA Decl. Ex. 19].)  Defendant argues that the Jewell report does not meet the Rule 703 standards as the type of matter upon which another expert may reasonably rely; however, the Court's determination of July 6, 2006 decided that Dr. Jewell's report was suitable for another expert to rely upon and thus came within the scope of that Rule.[6]

The same considerations support the conclusion that Dr. MacGregor may rely upon the Dr. Jewell's report.

   **C.**   **Merck's Argument Concerning Alleged Variance From the Protocol 203 Data Analysis Plan Is Inaccurate**

Protocol 203 was defendant's pre-specified pooled analysis of CV thrombotic event data from three clinical trial of Vioxx 25 mg versus placebo (APPROVe, ViP and VICTOR).

---

[6] The rebuttal report itself includes sufficient indicia of reliability to support that conclusion, including Dr. Jewell's credentials as a biostatistician, professor, department head, winner of merit-based awards in his field, and author of recognized, authoritative textbooks, as well as his use of the same data that Merck itself used for analysis of CV risk and provided to plaintiffs during litigation discovery.

(MacGregor Rep. at 5-6.)  Defendant argues that Dr. MacGregor's reliance on the Jewell analysis is unreliable because Dr. Jewell allegedly varied from the Protocol 203 protocol by performing a statistical analysis before the trial reached the number of adverse events (611) that would have occurred if the trials had gone on for several more years toward completion.  (Def. Mem. at 21-23.)  This argument is wrong for several reasons.

First, the Protocol 203 Data Analysis Plan (DAP) directs that interim analyses were to be conducted while the trials were ongoing, beginning as early as May 2004.  (Data Analysis Plan, MRK-AFL0015451 at 468-69 [DCA Decl. Ex. 20].)  Thus, the DAP clearly permits analysis of data accumulated as of a later date, after the trials had been terminated.

Second, Merck itself performed and presented an analysis of Protocol 203 to the FDA Advisory Committee in February 2005, which showed a statistically significant excess risk of 1.67 (95% C.I.  1.15, 2.43) for the pre-specified endpoint of "confirmed Thrombotic Events" (Braunstein Slide 53 [DCA Decl. Ex. 21].)  Defendant's own presentation of the Protocol 203 results at a public regulatory committee meeting undermines the claim that plaintiffs' experts have erred by analyzing the same data sets.

Third, the plan to analyze after 611 events was based on an incorrect prediction that there would be only a 12% difference in the event rate for Vioxx versus placebo, thereby requiring a large number of events to have sufficient power to detect a statistically significant difference.  (DAP, MRK-AFL0015451 at 455-456.)  Instead, a much greater difference was demonstrated, thereby reducing the number of events needed to reach statistical significance.

Fourth, defense experts purport to rely on data from each of the three pooled studies, (Curtis Rep. at 15; Eiswirth Rep. at 14-17 [DCA Decl. Exs. 22 and 23]), yet their reports fail to acknowledge the pre-specified plan to combine the three studies, nor to report the results of that

859521.1

pooled analysis. Plaintiffs experts should be permitted to offer the data analysis that was pre-specified, rather than allowing defense experts to offer unchallenged opinions about the individual studies that were not intended for separate analysis of CV events. In this regard, it is relevant that defendant's own plan for Protocol 203 stated that the "combined analysis" would "provide increased precision," and that the 3 studies "are being combined because of the rarity of these events." (DAP at MRK-AFL0015454.) Defendant now attempts to abandon its own plan by splintering the data into separate pieces that are less reliable than the whole data set intended for analysis.

Finally, neither the particulars of data analysis plans nor lack of completion of clinical trials can provide an acceptable basis to fail to conduct safety analyses for the protection of both clinical trial subjects and the public at large. Indeed, the APPROVe trial itself had no prespecified CV analysis, and that trial was stopped prior to completion. Yet, the safety analysis of APPROVe was the admitted basis for removal of Vioxx from the market, and the peer-reviewed literature confirms that the APPROVe trial demonstrated the cardiotoxicity of the drug, showing increased risk of heart attack, stroke and cardiovascular death. (Baron, et al., 2008; Curtis Dep. 236:17-22; MacGregor Rep. at 2-6.) Dr. MacGregor should be permitted to testify that the pooled analysis planned by defendant confirmed the excess CV risk of Vioxx and that the excess risk was evident very early after exposure began.

## VII.   CONCLUSION

For the reasons stated above, Dr. MacGregor's opinions are relevant and admissible to show the CV toxicity of Vioxx and the discrepancies between the known or knowable risks and those disclosed by defendant in its labels and company-sponsored articles. The motion to exclude testimony should be denied.

Respectfully submitted, this 1st day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

- 19 -

859521.1

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Plaintiffs' Memorandum In Opposition To Motion To Exclude Testimony Of John Macgregor, M.D. has this day been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to pretrial order No. 8B, on this the 1st day of March, 2010.

/s/ James R. Dugan

859521.1