# Exhibit 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  VIOXX                          )
Products Liability Litigation          )
                                       )
This Document Relates to:              )
                                       )
    STATE OF LOUISIANA, ex rel.        )
    JAMES D. CALDWELL,                 )
    ATTORNEY GENERAL                   )
                                       )
              Plaintiff,               )
                                       )
    vs.                                )
                                       )
    MERCK SHARP & DOHME CORP.,         )
                                       )
              Defendant.               )

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF COOK       )

        The deposition of DAVID J. SALES, M.D.,

called by the Plaintiffs for examination, taken

pursuant to notice and pursuant to the Federal Rules

of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Kelly A. Siska, Certified Shorthand Reporter

and Notary Public, at One North Franklin Street,

Suite 625, Chicago, Illinois, commencing at 9:30 a.m.

on the 26th day of January, A.D., 2010.

1   BY THE WITNESS:

2       A.      Not to my knowledge.

3       Q.      Do you know whether Merck performed any

4   tests of interaction -- Withdraw that.

5               What is the extent of your statistical

6   training?

7       A.      I took a course in statistics from Dr. Paul

8   Meier of the Kaplan-Meier plots at the University of

9   Chicago that was specifically designed to medical

10  scientists as part of my training program at the

11  University of Chicago.  And I have significant

12  training in higher mathematics as an undergraduate at

13  the Massachusetts Institute of Technology.  And as

14  part of my training for my Ph.D. I received training

15  in statistical analysis and interpretation of

16  scientific literature.

17      Q.      Do you consider yourself a biostatistician?

18      A.      No.  But I have above average knowledge of

19  biostatistics as a medical scientist.

20      Q.      And in the clinical trials that you've been

21  involved in, have you done your own statistical

22  analyses?

23      A.      No, sir.

24      Q.      And do you hold yourself out as an

1    Q.    And did you find anything referring to

2   that?

3    A.    No, I did not.

4    Q.    Doctor, when the issue arose about the

5   steroid versus nonsteroid subgroups after you reviewed

6   that Dr. Graham and Julie reports, did you ask Merck's

7   counsel for documents on that subject?

8    A.    I asked for the numbers.  Yes, I did.

9    Q.    And the document marked as Exhibit 6 with

10  the confirmed PUBs tables and the last one being the

11  confirmed complicated PUBs for study location

12  interaction, is that something that you've received in

13  response to your inquiry after the plaintiff's reports

14  were provided to you?

15   A.    Yes.

16   Q.    Did you have a discussion with Merck's

17  counsel about whether the analysis for the confirmed

18  complicated PUBs endpoint had ever been performed by

19  Merck for the steroid versus nonsteroid subgroup?

20   A.    Not that I recall.

21   Q.    When you say you asked them for the

22  numbers, what numbers did you ask them for?

23   A.    I asked them for the number of confirmed

24  complicated PUBs that had occurred in patients who had

1  received both VIOXX or naproxen and had or not

2  received steroids.

3      Q.    What did they tell you?

4      A.    They gave me the numbers.

5      Q.    Did you write them down?

6      A.    Somewhere.

7      Q.    Are they in your file?

8      A.    I believe they are, but I'm having

9  difficulty finding them right now.

10     Q.    Did they tell you that in the nonsteroid

11 users there were nine complicated PUBs in the VIOXX

12 group and ten in the naproxen group?

13     MR. BAUM:  Objection.

14 BY THE WITNESS:

15     A.    Yes.

16     Q.    Did they tell you that in the steroid at

17 baseline group that there were seven complicated

18 confirmed PUBs in the VIOXX group and 27 in the

19 naproxen group?

20     MR. BAUM:  Objection.

21 BY THE WITNESS:

22     A.    Say that again, please.

23     Q.    Did Merck's counsel tell you that for the

24 steroid users at baseline in the VIGOR study there

1  were seven confirmed complicated PUBs in the VIOXX

2  group and 27 in the naproxen group?

3      MR. BAUM:  Same objection.

4  BY THE WITNESS:

5      A.    Sounds about right, but I can't tell you

6  that that's exactly the number they gave me.

7      Q.    Did Merck's counsel tell you that Merck had

8  performed an analysis of the confirmed complicated

9  PUBs for the steroid versus nonsteroid at baseline

10  subgroups in the VIOXX versus naproxen treatment

11  groups at some point in the past?

12      MR. BAUM:  Objection, asked and answered.

13  BY THE WITNESS:

14      A.    I'm sorry repeat that again.  These are

15  complicated questions.

16      Q.    Sure.  Can you explain as best you can what

17  it is you are looking for in your file that you have a

18  recollection of seeing previously on the subject of

19  the steroid versus nonsteroid subgroups for the

20  confirmed complicated PUBs in the VIGOR study?

21      A.    I had reviewed the numbers that you had

22  just mentioned to me, and I was looking for the source

23  document that listed those numbers.

24      Q.    Do you have Dr. Julie's report?

1       A.      Yes, I do.

2       Q.      Can you get that out, please?

3       A.      (Tenders.)

4                       (Deposition Exhibit No. 9 was so

5                       marked.)

6   BY MR. ARBITBLIT:

7       Q.      Doctor, the court reporter has marked as

8   Exhibit No. 9 the report of Neil Julie and there's

9   handwriting on this document.  In particular at

10  page 34, there's a reference to the confirmed

11  complicated PUBs endpoint.  Does this appear to be the

12  document that you've seen prior to today that sets

13  forth the numbers of confirmed complicated PUBs in

14  this steroid versus nonsteroid users for the VIOXX

15  versus naproxen treatment groups in the VIGOR study?

16      A.      Yes.

17      MR. BAUM:  I'm just going to point out it's

18  page 11, paragraph 34.

19      MR. ARBITBLIT:  Page 11, paragraph 34.  Thank

20  you, Counsel.

21  BY MR. ARBITBLIT:

22      Q.      I don't know if the court reporter heard

23  your answer, sir?

24      A.      Yes.

1    Q.    Is that -- now that you've seen the

2  document, does that refresh your recollection that

3  that is the only document that you've seen that sets

4  forth the numbers of confirmed complicated PUBs in the

5  steroid versus nonsteroid at baseline subgroups for

6  the VIOXX versus naproxen treatment groups in the

7  significant study?

8    MR. BAUM:  Objection.

9  BY THE WITNESS:

10    A.    No.

11    Q.    You think there's another document?

12    A.    I think there is, but I don't know.  I

13  can't find it right now.

14    Q.    You agree that it's not in Exhibit 6 which

15  is an excerpt from the MK-0966 or VIOXX -- I'll

16  withdraw the question.

17        Do you know what MK-0966 is?

18    A.    I think that's VIOXX.

19    Q.    And do you know what protocol No. 088/089

20  is?

21    A.    It's VIGOR.

22    Q.    And Exhibit 6 is a June 20, 2000, dated

23  document setting forth analyses of data from the VIGOR

24  trial; right?

1        A.      Yes.

2        Q.      We've confirmed that all of those apply

3   only to the confirmed PUB endpoint except for the last

4   one which is confirmed complicated PUBs analysis of

5   treatment by study region interaction; correct?

6        A.      Correct.

7        Q.      So there's nothing about the steroid user

8   confirmed complicated PUBs in this document that Merck

9   prepared; is there?

10       A.      That's correct.

11       Q.      And there's nothing about the confirmed

12  complicated PUBs by steroid use endpoint in the

13  submission to the FDA that you looked at previously

14  which was marked --

15       MR. BAUM:   Exhibit 8.

16  BY MR. ARBITBLIT:

17       Q.      -- as Exhibit 8; correct?

18       A.      Correct.

19       Q.      And it's correct also, Doctor, that the

20  VIGOR study itself did not mention the data for the

21  confirmed complicated endpoint by steroid versus

22  nonsteroid use; did it?

23       MR. BAUM:   Objection, vague.   You mean the

24  publication?

1      MR. ARBITBLIT:   Withdrawn.

2  BY MR. ARBITBLIT:

3      Q.     It's correct, Doctor, that the published

4  article by Bombardier, Reicin, et al. in November,

5  2000, did not provide the reader with the data for the

6  confirmed complicated endpoint broken out by steroid

7  versus nonsteroid use; right?

8      A.     Correct.

9      Q.     And before you saw Dr. Julie's report, you

10  had never seen that data; correct?

11      A.     I don't believe I had.

12      Q.     So after you saw Dr. Julie's report, you

13  asked counsel for Merck for information about that

14  data; right?

15      A.     Yes, I did.

16      Q.     And they never told you that Dr. Julie's

17  numbers were wrong; did they?

18      A.     No.

19      Q.     Did you do any statistical analyses of

20  these numbers yourself?

21      A.     I looked at the number of events and the

22  number of patient years and did a calculation of the

23  number of events per patient year.  I did no further

24  statistical analysis beyond that.

1        Q.      Did you use the patient years to determine

2    the rate of events in each subgroup?

3        A.      Yes, I did.

4        Q.      Did you do that on a calculator or

5    computer?

6        A.      On a calculator.

7        Q.      Did the calculator print out the results?

8        MR. BAUM:   Objection, vague.

9        MR. ARBITBLIT:   Withdrawn.

10   BY MR. ARBITBLIT:

11       Q.      Did you print out the results?

12       A.      I wrote them down.

13       Q.      Where are they?

14       A.      I can't find them.   I think they're at

15   home.

16       Q.      They're part of your file in this case,

17   sir; aren't they?

18       A.      They weren't in any of these documents that

19   were here.   I wrote it down on a piece of paper.

20       Q.      Can you find that piece of paper?

21   Withdrawn.

22       A.      It's not with me today.

23       Q.      Right.   I understand.   Do you have a file

24   at home where you keep documents relating to your

1    retention on VIOXX that is not with you here today?

2        A.    No.

3        Q.    Where at home is the piece of paper where

4    you wrote down the rates of events in the complicated

5    confirmed PUBs by steroid versus nonsteroid use?

6        MR. BAUM:   Objection, lack of foundation.

7    BY THE WITNESS:

8        A.    I don't know where it was.  I thought I had

9    brought everything here today.

10       Q.    But do you have a recollection as you sit

11   here today that you wrote it on a piece of paper?

12       A.    Yes.

13       Q.    And what you wrote was for steroid users in

14   the VIOXX group seven over the number of patient years

15   versus 27 over the number of patient years?

16       A.    Yes.

17       Q.    And did you use Table 12.3-6 to get the

18   number of patient years to get the steroid versus

19   nonsteroid patients?

20       A.    Yes, I did.

21       Q.    What are those?

22       A.    Shall I read them?

23       Q.    Yes, please.

24       A.    For patients who had no baseline steroid

1    use, the VIOXX patients were 1,184 patient years.  The

2    naproxen they were 1,178 patient years.  For baseline

3    for steroid use they were 1,513 patient years.  And

4    for naproxen 1,516 patient years.

5         Q.    Doctor, I'd like you to perform the

6    calculation with the data that you performed at home

7    on the piece of paper that you don't have with you?

8         A.    Okay.

9                        (Witness performing calculation.)

10   BY THE WITNESS:

11        A.    This is very similar to what I calculated.

12        MR. ARBITBLIT:  Can we get that marked, please.

13                        (Deposition Exhibit No. 10 was so

14                         marked.)

15   BY MR. ARBITBLIT:

16        Q.    Can you explain what Exhibit 10 is, Doctor?

17        A.    Yes.  It's a table that separates out

18   patients who had or not received steroids along with

19   these medicines.  I wrote down POB's which are

20   complicated PUBs.  I divided by the number of patient

21   years and then multiplied by either 100 or 1,000 to

22   get the number of PUBs per 100 or 1,000 patient years.

23        Q.    What are the results?

24        A.    The results are for patients without

1  baseline steroid use VIOXX patients had a POB rate of

2  7.6.  Naproxen was a rate of 8.4.  For patients with

3  baseline steroid use VIOXX yielded a POB of 4.6 per

4  1,000 patient years and naproxen 17.8 per 1,000

5  patient years.

6       Q.    When did you do the similar calculation at

7  home -- I'll withdraw that.

8             When did you do the similar calculation

9  that's represented on that piece of paper that you

10 have at home?

11      A.    After I received Dr. Julie's report.

12      Q.    Did you do it sometime before you completed

13 your own report?

14      A.    I did it -- yes.

15      Q.    You did not include it in your own report;

16 did you?

17      A.    No, I did not.

18      Q.    Did you in your mind perform a rough

19 calculation of what the relative risks were in the two

20 subgroups, steroid and nonsteroid at baseline, after

21 you had done the calculations on Exhibit 10?

22      A.    I don't understand your question.

23      Q.    Did you see that the incident rate ratios

24 for the steroid group and nonsteroid group were shown

1    in Dr. Julie's report as 3.85 for the steroid users

2    and 1.12 for the nonsteroid users?

3         A.    Yes, I did.

4         Q.    And did you see in your own calculations

5    that those appeared to square with the data that you

6    calculated?

7         A.    They were approximately the same, yes.

8         Q.    Did you write the text alongside

9    paragraph 34 that says, What is an interaction fee

10   value?

11        A.    Yes, I did.

12        Q.    Had you ever heard of an interaction P

13   value before?

14        A.    Yes.

15        Q.    And why did you write that text?

16        A.    I wanted to remind myself to review it.

17        Q.    What did you do to review it?

18        A.    I actually asked my son who's a statistics

19   graduate student.

20        Q.    What did your son tell you?

21        A.    I can't remember exactly what he told me.

22        Q.    Generally what did he tell you?

23        A.    He told me that it's a measure, as you had

24   asked me earlier if it's significant, to show that

1    there are differences between two populations.

2        Q.    Did he tell you something along the lines

3    that if the P value for interaction is statistically

4    significant, then that provides evidence that there is

5    a real difference between the populations according to

6    the risk factor to which they're exposed?

7        MR. BAUM:  Objection, vague.

8    BY THE WITNESS:

9        A.    No, he did not.

10        Q.    What did he tell you more specifically?

11        A.    He told me that it was a method of looking

12    at different populations and that the P value is a

13    measure of whether or not, if these studies were done

14    repeatedly what the chance was that you would get the

15    similar results.

16        Q.    And did he tell you -- Withdraw that.

17        In your own experience, is a P value of

18    less then 0.05 statistically significant?

19        A.    Yes, it is.

20        Q.    Did you discuss with your son the P Value

21    of 0.047 for the comparison of the steroid versus

22    nonsteroid users at baseline in the confirmed

23    complicated PUBs endpoint?

24        A.    No, I did not.

1      Q.      Did you recognize the 0.047 P value as

2  statistically significant at the less than .05 level?

3      A.      .047 is less than .05.  Yes, it is.

4      Q.      And did you ask -- did you provide any of

5  the data to your son to perform an interaction test?

6      A.      No, I did not.

7      Q.      Did you provide the data to any

8  statistician to perform an interactive test?

9      A.      No, I did not.

10      Q.      Did you discuss with Merck's counsel

11  whether to perform an interaction test on the data?

12      A.      No.

13      Q.      Did you have any reason to challenge the

14  validity of the P value for interaction set forth in

15  paragraph 34 of Dr. Julie's report?

16      A.      No.

17      Q.      At the end of paragraph 34, did you ask to

18  see the statistical report of Dr. Julie?

19      A.      Yes, I did.

20      Q.      And did counsel provide it to you?

21      A.      Yes.  Last week.

22      Q.      When did you first ask them if they could

23  get it for you?

24      A.      Shortly after I received Dr. Julie's

1    opinion.

2         Q.    So over two months ago?

3         A.    I don't recall exactly.

4         Q.    Did you -- well, you served your report, or

5    you signed your report on December -- undated.  Do you

6    recall that your expert opinion has a date of 11-09 on

7    it?

8         A.    Yes, I do.

9         Q.    Is that when you wrote it?

10        A.    I believe.  The final version was finished

11   in December.  May have been -- it may have been

12   November.

13        Q.    There's a dark line on your invoice after

14   November 24, 2009, and then no further entries until

15   December 22nd.  Is it correct that the work on your

16   report was completed by November 24, 2009?

17        A.    There's a dark line because I needed to

18   extend the line on the invoice and I'm not very good

19   with spreadsheets.  So that has to do with my

20   ineptitude on the computer.  I can't tell you for

21   certain when I finished it.

22        Q.    Did you ask Merck's counsel to try to get

23   Dr. Julie's report for you?

24        A.    Yes, I did.

1    reads, Reference P088C, a double-blind, randomized,

2    stratified parallel-group study to assess the

3    incidence of PUBs during chronic treatment of event

4    MK-0966 or naproxen in patients with rheumatoid

5    arthritis, Protocol 088/089.  And I have a copy for

6    counsel.  The last page of this document ends in 1779.

7            First question, Doctor, have you seen this

8    document before?

9        A.    No.

10       Q.    Doctor, you may recognize some portions of

11   this document that you have seen before.  For example,

12   if you turn to the page ending in 1737 at the bottom

13   right page with the heading, Subgroup analyses

14   continued at the Table 12.3-6, confirmed PUBs analysis

15   of treatment by baseline steroid use interaction?

16       A.    Yes.

17       Q.    And does this appear to be another version

18   of the same table that you looked at in the materials

19   in the Exhibit 6 that Merck's counsel provided to you?

20       A.    Yes.

21       Q.    If you turn to page 1584, do you see that

22   the page refers to section 7.5 subgroup analyses

23   interaction and associations with the primary

24   endpoint?

1      Q.    But at no time that you're aware of has

2   Merck ever published the data for the confirmed

3   complicated PUB endpoint for the use of systemic

4   corticosteroids at baseline?

5      MR. BAUM:  Objection.

6   BY THE WITNESS:

7      A.    To my knowledge they have not published

8   that data.

9      MR. ARBITBLIT:  Off the record.

10                    (Discussion off the record.)

11                    (Deposition Exhibit No. 14 was so

12                     marked.)

13   BY MR. ARBITBLIT:

14      Q.    Doctor, Exhibit No. 14 is an excerpt from

15   the VIGOR statistical data analysis plan bearing a

16   date of 15 March 2000.  Have you seen this document

17   before?

18      A.    No, sir.

19      Q.    If you look at the page marked 4543 in the

20   lower right, you'll see that there is another

21   reference to the same list of subgroup analyses that

22   we've seen before in the other document; correct?

23      A.    Yes.  As pointed out, it was a primary

24   endpoint, yes.

1       Q.      And on the next page, 4544, in the middle

2   of the page, do you see the paragraph that starts with

3   the phrase, Summary statistics?

4       A.      Yes, I do.

5       Q.      Do you see that the last sentence of that

6   reads, Subgroup analysis may also be performed for

7   more numerous at the secondary endpoints, i.e.,

8   confirmed plus unconfirmed PUBs?

9       A.      Yes, I do.

10      Q.      Do you see that in the prespecified data

11  analysis plan the Merck scientists mentioned that they

12  may do additional subgroup analysis of secondary

13  endpoints?

14      MR. BAUM:   Objection.

15  BY THE WITNESS:

16      A.      Where is that?

17      Q.      Is it correct that in the sentence I just

18  read from the data analysis plan, the Merck

19  scientists who wrote the data analysis plan said that

20  they may also do subgroup analyses for secondary

21  endpoints?

22      A.      Yes.

23      MR. BAUM:   Objection to incomplete reading of the

24  sentence.

1    Q.    Was the 95 percent confidence interval 1.98

2    to 14.5 for those data?

3    A.    Yes, it was.

4    Q.    Is that a statistically significant result

5    based on the lower end of the confidence interval

6    being greater than 1.0?

7    A.    Yes.

8    Q.    Did the authors report that the risks of

9    duodenal ulcers and gastric ulcers was increased in

10   the rofecoxib group although the increase seemed

11   greater for the former?

12   A.    Yes.

13   Q.    And they refer to Figure 2 which shows that

14   data?

15   A.    That's correct.

16   Q.    Do the authors also report that for

17   confirmed complicated PUBs the rate was .23 versus .06

18   events per 100 patient years?

19   A.    Yes.

20                    (Deposition Exhibit No. 18 was so

21                    marked.)

22   BY MR. ARBITBLIT:

23   Q.    Exhibit No. 18 is a December 18, 2004

24   interim review by Villalba, V I L L A L B A,

1   concerning update of cardiovascular thrombotic events

2   and Ahlzeimer's study 078 and 091.  Have you seen that

3   one before?

4        A.    I don't believe I have.

5        Q.    Doctor, in your clinical trials have you

6   kept track of discontinuations from treatment?

7        A.    The trial organizers keep track of

8   discontinuation, yes.

9        Q.    Are discontinuations sometimes thought of

10  as a particularly relevant adverse endpoint because

11  they are serious enough to have the patient leave the

12  trial?

13       MR. BAUM:  Objection, form.

14  BY THE WITNESS:

15       A.    That depends on the reason for the

16  discontinuation.

17       Q.    Assuming that the discontinuation is as a

18  result of an adverse event, would those adverse events

19  be considered more meaningful than adverse events that

20  did not require discontinuation?

21       MR. BAUM:  Objection, form.

22  BY THE WITNESS:

23       A.    Not necessarily.

24       Q.    Under some circumstances, would you

1   consider discontinuation to be significant for adverse

2   events?

3           MR. BAUM:   Objection, form.

4   BY THE WITNESS:

5           A.    Again, it depends on the particular adverse

6   event and the particular discontinuation, but studies

7   do indeed track those reasons.

8           Q.    Take a look at page 26 of the exhibit

9   you're holding and look at the Appendix 2.   Patients

10  with discontinuation due to adverse events in studies

11  078 and 091.

12          A.    Yes.

13          Q.    First of all, are you aware that 091 is

14  another Ahlzeimer's trial that was completed at some

15  time prior to 078?

16          A.    I don't know when it was completed.   I

17  believe it the Ahlzeimer's trial.

18          Q.    Do you agree that duodenal ulcer resulting

19  in discontinuation is a relevant event in considering

20  the gastrointestinal effects of the drug?

21          MR. BAUM:   Objection, form.

22  BY THE WITNESS:

23          A.    Yes, I do.

24          Q.    Do you agree that gastric ulcer is a

1   relevant event in considering the gastrointestinal

2   effects of a drug?

3        MR. BAUM:  Objection, form.

4   BY THE WITNESS:

5        A.    Yes, I do.

6        Q.    Same question as to gastrointestinal

7   hemorrhage?

8        A.    Yes.

9        MR. BAUM:  Same objection.

10  BY THE WITNESS:

11       A.    Yes.  All these would be factors that are

12  considerations.

13       Q.    Would gastrointestinal hemorrhage -- I'll

14  withdraw that.

15            Do you see that for gastrointestinal

16  disorders, generally, there were 45 in the VIOXX arm

17  at the rate of 4.21 per 100 patient years versus 28 in

18  the placebo arm for a rate of 2.61 per 100 patient

19  years?

20       A.    I agree with the numbers that you're

21  reading from the study that they had recalculated the

22  rate where a patient years at risk were calculated

23  based on the overall endpoint.

24       Q.    For the categories duodenal ulcer, gastric

1   ulcer, gastrointestinal hemorrhage, NOS -- or not

2   otherwise specified -- and upper gastrointestinal

3   hemorrhage, do you see the totals are 11 in the VIOXX

4   arm and zero in placebo. Do you want to take them one

5   at a time?

6        A.   Yes. List them again, please.

7        Q.   Is duodenal ulcer, VIOXX two, placebo

8   nothing. Do you see that line, sir?

9        A.   Yes, I do.

10        Q.   The question is: For duodenal ulcer, is it

11   VIOXX two, placebo nothing?

12        A.   Yes.

13        Q.   Going down two lines to gastric ulcer, is

14   it VIOXX four, placebo nothing?

15        A.   Yes.

16        Q.   Going down two lines further, is it three

17   for VIOXX and none for placebo for gastrointestinal

18   hemorrhage NOS?

19        A.   Yes.

20        Q.   And going down four lines from there for

21   upper gastrointestinal hemorrhage, is it VIOXX two,

22   placebo nothing?

23        A.   Yes, it is.

24        Q.   So if you add those up, is it 11 to

Page 92

1   nothing, VIOXX versus placebo?

2       A.      Yes, it is.

3       Q.      And that's data that you haven't seen

4   before today?

5       A.      That's correct.

6       Q.      And you hadn't seen it when you wrote your

7   report?

8       A.      That's correct.

9       Q.      Doctor, in your clinical trials, have you

10  had occasion to try to calculate relative risk when

11  there are zero events in one arm?

12      MR. BAUM:  Objection.

13  BY THE WITNESS:

14      A.      No.

15      Q.      Is that just not done because you can't

16  calculate a rate with zero in the enumerator?

17      A.      It's because I don't do the relative risk

18  calculations.

19      Q.      Are you aware of any trials where you have

20  been a participant where someone on the team has

21  calculated a relative risk using some mathematical

22  substitute for zero and an enumerator where there have

23  been no events in that treatment arm?

24      MR. BAUM:  Objection.