# Exhibit 4
# Part 4

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)     **1551**

Product: MK-0966
Protocol/Amendment No.: 088-04                                                47

## A. LABELING, PACKAGING, STORAGE, AND RETURN OF CLINICAL SUPPLIES (CONT.)

Table 9

Contents by Treatment Group

| Treatment Group | Bottle A | Bottle B |
|---|---|---|
| MK-0966 50 mg Naproxen 1000 mg | MK-0966 50 mg MK-0966 placebo | Naproxen placebo Naproxen 500 mg |

Table 10 outlines the approximate number of bottles that will be dispensed per visit.

Table 10

Number of Bottles Dispensed

| Visit Number | Bottle A | Bottle B |
|---|---|---|
| 1 | -- | -- |
| 2 | 1 | 2 |
| 3[†] | -- | -- |
| 4 | 1 | 2 |
| 5 | 1 | 2 |
| 6 | 1 | 2 |
| 7 | 1 | 2 |
| 8 | 1 | 2 |
| 9 | 1 | 2 |

[†] Due to the 135-tablet fill per bottle, new medication bottles will not be dispensed at Visit 3, Visit 2 bottles will be re-dispensed at this visit.

## B. BIOLOGICAL SPECIMENS

Ten-milliliter (10-mL) and 5-mL samples of blood will be obtained at Visits 2.0, 4.0, 6.0, 8.0, end-of-study, and discontinuation. Plasma should be separated from blood as soon as possible and shielded from direct light exposure until plasma separation. Serum and plasma samples should be stored at -20°C until shipment.

/MK-0966/CP/RP2317.DOC * APPROVED
U.S. (U.S. IND)                                                              03-Sep-1999

Confidential - Subject To Protective Order                          MRK-AFV0130201

Product: MK-0966
Protocol/Amendment No.: 088-04                                      48

## B. BIOLOGICAL SPECIMENS (CONT.)

Samples will be archived for possible future assay of *Helicobactor pylori* antibodies, MK-0966 concentration, or markers of cartilage metabolism or inflammatory/immune mediators.

The laboratory that is analyzing any clinical samples should be blinded to the treatment.

It is the responsibility of the primary investigator to ensure that all staff personnel who will be handling, packaging, and/or shipping clinical specimens act in conformance with International Air Transport Association (IATA) regulations relating to the handling and shipping of hazardous goods.

## C. CLINICAL AND LABORATORY DATA COLLECTION

### Method of Data Collection

Workbooklets/worksheets will be provided by the SPONSOR to record data in the clinic. Data on workbooklets worksheets may be handwritten. For all other protocol required information that is originally recorded elsewhere (e.g., X-ray, lab results, diary cards), either a copy will be sent to the SPONSOR directly, or hand transcribed onto worksheets (as directed by the study procedures). In this instance, the actual date of an examination (e.g., Xray, phlebotomy) should be reported on the worksheets; this may be different from that of the office or clinic visit. Whenever possible, all information requested on a worksheet should be completed. If information is not available, it should be documented as such (e.g., temporarily or permanently missing).

Periodically, a representative of the SPONSOR will review study documents (see Protocol Section II.D., Study Documentation and Records Retention) to verify compliance with the protocol. The SPONSOR representative will also review the accuracy of the data compared to source documents.

After preliminary review of these worksheets by the Investigator/study staff, the worksheets are entered into a laptop computer by SPONSOR personnel. Original worksheets will remain at the site as source/support documents.

During the SPONSOR data review and entry, corrections may be discussed with and documented by the site personnel.

Discrepancies or questions concerning the data will be sent to the Investigator. The discrepancy reports should be resolved by the Investigator/study staff, signed and dated, and a copy returned to the SPONSOR. The original discrepancy report must be retained in the subject/patient binder as a record of changes or acknowledgment of the receipt of queries on the data.

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                                49

## C. CLINICAL AND LABORATORY DATA COLLECTION (CONT.)

At the end of the study when all data has been reviewed and all discrepancies have been addressed, final computer-generated case report forms (CRFs) will be printed by the SPONSOR and sent along with the signature page to the Investigator. The CRF will serve as the site's record of the final study data and will be retained at the site along with the source documents and workbooks. Any data corrections or changes applied to the CRFs must be signed, initialed and dated as per Good Clinical Practice (GCP) standards. The original signed and dated signature page and label page, along with copies of any annotated final CRF pages that had changes/corrections following Investigator's signature must be sent to the SPONSOR at the specified address on the SPONSOR Contact page of the Protocol. A photocopy of the signature page and label page is retained at the site. No other CRFs will be sent to the SPONSOR (unless specifically requested by the SPONSOR).

## D. STUDY DOCUMENTATION AND RECORDS RETENTION

Study documentation includes all case report forms, data correction forms, workbooks, source documents, monitoring logs and appointment schedules, SPONSOR-investigator correspondence and regulatory documents (e.g., signed protocol and amendments, Ethics or Institutional Review Committee correspondence and approval, approved and signed patient consent forms, Statement of Investigator form, and clinical supplies receipts and distribution records).

Source documents include all recordings of observations or notations of clinical activities and all reports and records necessary for the evaluation and reconstruction of the clinical research study. Accordingly, source documents include, but are not limited to, laboratory reports, ECG tracings, X rays, radiologist reports, patient diaries, biopsy reports, ultrasound photographs, patient progress notes, hospital charts or pharmacy records and any other similar reports or records of any procedure performed in accordance with the protocol.

Source documents may also include SPONSOR workbooks, CRFs, or electronic devices when information is recorded directly onto such forms or devices. The investigator should identify to the SPONSOR which data will be directly recorded onto workbooks, CRFs, or electronic devices. A form will be supplied by the SPONSOR for this identification. This source document identification form should be maintained in the site's Regulatory Binder. In the event that the workbook or CRF is used as a source document the workbook/CRF must be signed and dated be the individual making the entry. The signature and date are also required if the entry is made by an individual not identified as a primary investigator or secondary/subinvestigator in the protocol (e.g., ophthalmologist) or not under the direct supervision of the primary investigator.

/MK-0966/CP/RP2317.DOC * APPROVED                                    03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order                                    MRK-AFV0130203

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                              50

## D. <u>STUDY DOCUMENTATION AND RECORDS RETENTION</u> (CONT.)

Whenever possible, the original recording of an observation should be retained as the source document; however, a photocopy is acceptable provided that it is a clear, legible, and exact duplication of the original document.

Government agency regulations and directives require that all study documentation pertaining to the conduct of a clinical trial must be retained by the investigator. They shall be retained until at least 2 years after the last approval of a marketing application in an International Conference on Harmonisation (ICH) region. The SPONSOR will notify the investigator in writing when retention is no longer necessary.

### 1. <u>Steering Committee</u>

#### <u>Responsibility</u>

Steering Committee consists of specialists in the field of epidemiology, rheumatology, gastroenterology, internal medicine, and biostatistics. The Steering Committee provides the overall scientific and operational direction for the trial through consideration of recommendations from its working committees. The Steering Committee is responsible for the conduct of the trial according to the highest scientific and ethical standards, as well as approving revisions and amendments to the protocol. In addition, the Steering Committee will receive and decide on any recommendations made by the Data and Safety Monitoring Board (DSMB) regarding early stopping of the study. The Steering Committee will remain blinded to results during the course of the study. However, during the course of the study, the DSMB may elect to unblind some members of the Steering Committee to certain aspects of the data (see Section II.D.3. Advisory Committee). The Steering Committee must approve all scientific reports concerning the main findings of the trial. The Steering Committee will meet at least once per year or more frequently if this is in the interest of the study. Subcommittees of the Steering Committee will include: Executive, Publications, and Advisory.

### 2. <u>Executive Committee</u>

#### <u>Responsibility</u>

The executive committee decides on practical issues during the conduct of the trial and reports and advises the Steering Committee. Any action by the Executive Committee that deviates from the basic protocol of the trial needs approval by the Steering Committee. The Executive Committee will have regular meetings at intervals of at least once per quarter. The committee schedules periodic and ad hoc meetings of the Steering Committee.

/MK-0966/CP/RP2317.DOC * APPROVED                                   03-Sep-1999
U.S. (U.S. IND)

Confidential – Subject To Protective Order                          MRK-AFV0130204

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04          51

## D. STUDY DOCUMENTATION AND RECORDS RETENTION (CONT.)

Membership of the executive committee is composed of the Steering Committee Chairman and Co-Chairman, two to three clinical center principal investigators, and a MRL Clinical Monitor and Statistician.

### 3. Advisory Committee

This committee meets with the DSMB to discuss any recommendation for the discontinuation of the study or modification of the protocol, and reports these recommendations to the Steering Committee. The advisory committee therefore avoids having the entire Steering Committee unblinded when the DSMB needs to present unblinded information to justify their recommendation.

### 4. End Point Classification Committee

#### Responsibility

The End Point Classification Committee will be responsible for the definition of PUBs during the study period as described in the protocol. Medical records, endoscopy, and radiographic reports will be evaluated by experts on the End Point Classification Committee. The committee will prepare reports on each possible event without information on drug allocation that might identify the participant's study treatment.

### 5. Data and Safety Monitoring Board

The Data and Safety Monitoring Board (DSMB) assesses the effects of study treatment during the trial and may give advise to the Steering Committee. With the exception of a non-voting Merck statistician, the members of the committee are independent of Merck Research Laboratories and clinical investigators participating in this trial, and will not have any other involvement in the study, nor will they have any relation to study participants. The board monitors the trial for evidence of beneficial or adverse effects of the study treatments using the guidelines proposed by the protocol. The board may recommend any steps to ensure the safety and integrity of the trial. Furthermore, it may recommend that the trial be terminated or that specific high-risk patient groups be withdrawn from the study, if any subgroup manifests serious or widespread side effects. To guarantee the unrestricted performance of its task, the board receives the individual study morbidity and mortality data from a designated MRL statistician. The DSMB has the ability to unblind the data if there appears to be clinically significant differences.

/MK-0966/CP/RP2317.DOC * APPROVED          03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order          MRK-AFV0130205

**Product: MK-0966**
**Protocol/Amendment No.: 088-04**                                              52

## D. STUDY DOCUMENTATION AND RECORDS RETENTION (CONT.)

Reports of all serious adverse experiences in this study from the MRL Worldwide
Adverse Experience database and the clinical database will be presented to the
committee.

The interim monitoring guidelines that the DSMB will follow will be described in
the Data Analysis Plan, which will be completed before the first interim analysis.
The DSMB minutes will summarize the actions and deliberations of the DSMB
and will be made available to Merck and the Steering Committee at the
conclusion of the trial.

## E. INFORMED CONSENT

The investigator must obtain documented consent from each potential patient in
biomedical research or when an investigational drug is administered to patients in a
clinical study. If a Patient Package Insert (PPI) exists for any product being used in
the study within the indication and dosage of the prescribing information, the consent
form will reference the PPI and the investigator shall provide a copy of it to the
patient for his/her review before the patient signs the Informed Consent Form. If the
study is outside of the indication or dosage, the consent form shall include all relevant
information from the PPI but the patient will not be given a copy of the PPI.

Consent must be documented by the patient's dated signature on a Consent Form
along with the dated signature of the person conducting the consent discussion. If
local law does not allow written consent, then oral consent, attested to by the dated
signature of an impartial witness (someone not involved with the conduct of the
study), is the required alternative.

If the patient is illiterate, an impartial witness should be present during the entire
informed consent reading and discussion. Afterward, the patient should sign and date
the informed consent, if capable. The impartial witness should also sign and date the
informed consent along with the individual who read and discussed the informed
consent (i.e., study staff personnel).

If the patient is legally incompetent (i.e., a minor or mentally incapacitated), the
written consent of a parent, legal guardian or legal representative must be obtained.
Depending on local law or review committee requirements such consent may also
need to be signed by an impartial witness.

A copy of the signed and dated consent form (along with the PPI if appropriate)
should be given to the patient before participation in the trial.

Confidential - Subject To Protective Order                            MRK-AFV0130206

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                                   53

## E. INFORMED CONSENT (CONT.)

The initial informed consent form and any subsequent revised written informed consent form, and written information must receive the IRB/IEC's approval/favorable opinion in advance of use. The patient or his/her legally acceptable representative should be informed in a timely manner if new information becomes available that may be relevant to the patient's willingness to continue participation in the trial. The communication of this information should be documented.

A copy of the FDA Regulations Regarding Informed Consent and a sample consent form are attached to this protocol.

## F. INSTITUTIONAL REVIEW BOARD (IRB)/INDEPENDENT ETHICS COMMITTEE (IEC)

The IRB will comply with all federal, state, and local laws. Particular attention is drawn to the Food and Drug Administration Regulations for Institutional Review Boards (21 CFR, Part 56), and the International Conference on Harmonisation (ICH) Guidelines for Good Clinical Practices for IRB/IEC Committees. Copies of relevant information derived from these guidelines are attached to this protocol. The investigator is responsible for obtaining initial and continuing review (at intervals not less than once per year) of the study by an IRB. Written approval from the IRB must be forwarded to the SPONSOR before clinical supplies will be shipped. For continuing studies, written approval from the IRB must be sent to the SPONSOR at intervals not to exceed 1 year.

The investigator shall also obtain from the IRB and submit to the SPONSOR, a signed statement indicating that it complies with Good Clinical Practices. A sample IRB Compliance letter is attached to this protocol.

The SPONSOR will promptly be advised of any regulatory inspection (relating to this study), of either the institution or the IRB. The investigator will promptly provide the SPONSOR with a copy of any inspection report.

## G. CONFIDENTIALITY

### 1. Confidentiality of Data

Particular attention is drawn to the regulations promulgated by the Food and Drug Administration under the Freedom of Information Act providing, in part, that information furnished to clinical investigators and Institutional Review Boards will be kept confidential by the Food and Drug Administration only if maintained in confidence by the clinical investigator and Institutional Review Board.

/MK-0966/CP/RP2317.DOC * APPROVED                                    03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order                                    MRK-AFV0130207

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)                **1558**

Product: MK-0966
Protocol/Amendment No.: 088-04                                                          54

## G. CONFIDENTIALITY (CONT.)

By signing this protocol, the investigator affirms to the SPONSOR that information furnished to the investigator by the SPONSOR will be maintained in confidence and such information will be divulged to the Institutional Review Board, Ethical Review Committee, or similar or expert committee; affiliated institution; and employees only under an appropriate understanding of confidentiality with such board or committee, affiliated institution and employees. Data generated by this study will be considered confidential by the investigator, except to the extent that it is included in a publication as provided in Protocol Section II.K., Publications.

### 2. Confidentiality of Patient Records

By signing this protocol, the investigator agrees that the SPONSOR (or SPONSOR representative), Institutional Review Board/Independent Ethics Committee (IRB/IEC) or Regulatory Agency representatives may consult and/or copy study documents (see Protocol Section II.D., Study Documentation and Records Retention) in order to verify case report form data. By signing the consent form, the patient agrees to this process. If study documents will be photocopied during the process of verifying case report form information, the patient will be identified by unique code only; full names/initials will be masked.

### 3. Confidentiality of Investigator Information

By signing this protocol, the investigator recognizes that certain personal identifying information (e.g., name, hospital or clinic address, curriculum vitae) may be made part of a regulatory submission and may be transmitted (either in hardcopy or electronically) to all Merck subsidiaries/agents worldwide for internal study management purposes or as required by individual regulatory agencies. Additionally, the investigator's name, hospital/clinic address/phone number may be included when reporting certain serious adverse events to regulatory agencies or to other investigators.

## H. COMPLIANCE WITH LAW, AUDIT, AND DEBARMENT

By signing this protocol, the investigator agrees to conduct the study in an efficient and diligent manner and in conformance with this protocol; generally accepted standards of Good Clinical Practice; and all applicable federal, state, and local laws, rules and regulations relating to the conduct of the clinical study.

The investigator also agrees to allow monitoring, audits, Institutional Review Board/Independent Ethics Committee review and regulatory agency inspection of trial-related documents and procedures and provide for direct access to all study-related source data and documents.

/MK-0966/CP/RP2317.DOC * APPROVED                                    03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                          55

## H. COMPLIANCE WITH LAW, AUDIT, AND DEBARMENT (CONT.)

The investigator agrees not to seek reimbursement from patients, their insurance providers, or from government programs for procedures included as part of the study reimbursed to the investigator by the SPONSOR.

The investigator shall prepare and maintain complete and accurate study documentation in compliance with Good Clinical Practice standards and applicable federal, state, and local laws, rules and regulations; and, for each patient participating in the study, provide all data, and upon completion or termination of the clinical study submit any other reports to the SPONSOR as required by this protocol or as otherwise required pursuant to any agreement with the SPONSOR.

Study documentation (see Protocol Section II.D., Study Documentation and Records Retention) will be promptly and fully disclosed to the SPONSOR by the investigator upon request and also shall be made available at the investigator's site upon request for inspection, copying, review and audit at reasonable times by representatives of the SPONSOR or any regulatory agencies. The investigator agrees to promptly take any reasonable steps that are requested by the SPONSOR as a result of an audit to cure deficiencies in the study documentation and case report forms.

Persons debarred from conducting or working on clinical studies by any court or regulatory agency will not be allowed to conduct or work on this SPONSOR's studies. The investigator will immediately disclose in writing to the SPONSOR if any person who is involved in conducting the study is debarred, or if any proceeding for debarment is pending or, to the best of the investigator's knowledge, threatened.

In the event the SPONSOR prematurely terminates a particular trial site, the SPONSOR will promptly notify that site's IRB/IEC.

## I. COMPLIANCE WITH FINANCIAL DISCLOSURE REQUIREMENTS

By signing this protocol, the investigator agrees to provide to the SPONSOR accurate financial information to allow the SPONSOR to submit complete and accurate certification and disclosure statements as required by U.S. Food and Drug Administration regulations (21 CFR Part 54). This requirement also extends to subinvestigators.

## J. QUALITY CONTROL AND QUALITY ASSURANCE

By signing this protocol, the SPONSOR agrees to be responsible for implementing and maintaining quality control and quality assurance systems with written SOPs to

Confidential - Subject To Protective Order                              MRK-AFV0130209

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1560**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                         56

## J.   QUALITY CONTROL AND QUALITY ASSURANCE (CONT.)

ensure that trials are conducted and data are generated, documented, and reported in compliance with the protocol, accepted standards of Good Clinical Practice, and all applicable federal, state, and local laws, rules and regulations relating to the conduct of the clinical study.

## K.   PUBLICATIONS

As this study is part of a multicenter trial, publications derived from this study should include input from the principal investigator, his or her colleagues, the other investigators in this trial, and SPONSOR personnel. Such input should be reflected in publication authorship, and whenever possible, preliminary agreement regarding the strategy for order of authors' names should be established before conducting the study. Subsequent to the multicenter publication, or 24 months after completion of the study, whichever comes first, an investigator and/or his/her colleagues may publish the results for their study site independently.

The SPONSOR must have the opportunity to review all proposed abstracts, manuscripts, or presentations regarding this study 60 days prior to submission for publication/presentation. Any information identified by the SPONSOR as confidential must be deleted prior to submission, it being understood that the results of this study are not to be considered confidential. SPONSOR review can be expedited to meet publication guidelines.

/MK-0966/CP/RP2317.DOC * APPROVED                              03-Sep-1999
U.S. (U.S. IND)

Confidential – Subject To Protective Order                    MRK-AFV0130210

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)  **1561**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                             57

## III.  SIGNATURES

### A. <u>SPONSOR'S REPRESENTATIVE</u>

<u>TYPED NAME</u>                    <u>SIGNATURE</u>                    <u>DATE</u>

_____   _____   _____

### B. <u>INVESTIGATOR(S)</u>

I agree to conduct this clinical study in accordance with the design and specific provisions of this protocol; deviations from the protocol are acceptable only with a mutually agreed upon protocol amendment.  I also agree to report all information or data in accordance with the protocol and, in particular, I agree to report any serious adverse experiences as defined in Section I.G. of this protocol.  I also agree to handle all clinical supplies provided by the SPONSOR and collect and handle all clinical specimens in accordance with the protocol.

<u>TYPED NAME(S)</u>                    <u>SIGNATURE</u>                    <u>DATE</u>

_____   _____   _____
Primary Investigator(s)

_____   _____   _____
Secondary/Subinvestigator(s)

_____   _____   _____
Secondary/Subinvestigator(s)

_____   _____   _____
Secondary/Subinvestigator(s)

_____   _____   _____
Secondary/Subinvestigator(s)

/MK-0966/CP/RP2317.DOC * APPROVED                                    R 23-Sep-1999
U.S. (U.S. IND)                                                      R 20-Dec-1999
                                          03-Sep-1999               R 01-Feb-2000

Confidential - Subject To Protective Order                    MRK-AFV0130211

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1562**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                          58

## LIST OF REFERENCES

1.  Brooks P. NSAIDs in Rheumatology. ed. JH Klippel, Paul Dieppe. 1998.

2.  FDC reports. November 29, 1987:8-9.

3.  Lee SH, Soyoola E, Chanmugam P, et al. Selective expression of mitogen-inducible cyclooxygenase in macrophages stimulated with lipopolysaccharide. J Biol Chem 1992;267:25934-8.

4.  Lyons-Giordano BL, Pratta MA, Galbraith W, Davis GL, Arner EC. Interleukin-1 differentially modulates chondrocyte expression of cyclooxygenase-2 and phospholipase $A_2$. Exp Cell Res 1993;206:58-62.

5.  Masferrer JL, Zweifel BS, Manning PT, et al. Selective inhibition of inducible cyclooxygenase-2 in vivo is anti-inflammatory and nonulcerogenic. Proc Natl Acad Sci U.S.A. 1994;91:3228-32.

6.  Meade EA, Smith WL, DeWitt DL. Differential inhibition of prostaglandin endoperoxide synthase (cyclooxygenase) isozymes by aspirin and other nonsteroidal anti-inflammatory drugs. J Biol Chem 1993;268:6610-4.

7.  Mitchel JA, Akarasereenont P, Thiemermann C, Flower RJ, Vane JR. Selectivity of nonsteroidal anti-inflammatory drugs as inhibitors of constitutive and inducible cyclooxygenase. Proc Natl Acad Sci U.S.A. 1994;90:11693-7.

8.  Pritchard KA, O'Banion MK, Miano JM, et al. Induction of cyclooxygenase-2 in rat vascular smooth muscle cells in vitro and in vivo. J Biol Chem 1994;269:8504-9.

9.  Yamagata K, Andreasson KI, Kaufman WE, Barnes CA, Worley PF. Expression of a mitogen-inducible cyclooxygenase in brain neurons: regulation by synaptic activity and glucocorticoids. Neuron 1993;11:371-86.

10. Crofford LJ, Wilder RL, Ristimaki AP, et al. Cyclooxygenase-1 and -2 expression in rheumatoid synovial tissues. J Clin Invest 1994;93:1095-101.

11. Hirschowitz BI. Nonsteroidal anti-inflammatory drugs and the gastrointestinal tract. Gastroenterology 1994;2:207-23.

12. Silverman FE, Graham DY, Senior JR, et al. Misoprostol reduces serious gastrointestinal complications in patients with rheumatoid arthritis receiving nonsteroidal anti-inflammatory drugs. Annals of Internal Medicine 1995;123:241-9.

13. Singh G, Ramey DR. NSAID-induced gastrointestinal complications: The ARAMIS Perspective—1997. The Journal of Rheumatology. 1998;25Suppl 51:8-16.

/MK-0966/CP/RP2317.DOC * APPROVED                              03-Sep-1999
U.S. (U.S. IND)

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)                **1563**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                    59

### LIST OF REFERENCES (CONT.)

14. Collett D. Modeling survival data in medical research. Chapman & Hall 1994; 254-60.

15. Lachin JM, Foulkes, MA.  Evaluation of sample size and power for analyses of survival with allowance for nonuniform patient entry, losses to follow-up, noncompliance, and stratification. Biometrics 1986;42:507-19.

16. Hwang IK, Shih WJ, DeCani JS.  Group sequential designs using a family of Type I error probability spending functions.  Stat Med 1990;9:1439-45.

17. O'Brien PC, Fleming TR.  A multiple testing procedure for clinical trials.  Biometrics 1979;35:549-56.

/MK-0966/CP/RP2317.DOC * APPROVED                          03-Sep-1999
U.S. (U.S. IND)

Confidential – Subject To Protective Order                    MRK-AFV0130213

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1564**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                        60

## APPENDICES

1. Laboratory Safety Analyses

2. Algorithm for Assessing Out-of-Range Laboratory Values

3. Total Blood Drawn

4. End Point Definitions and Adjudication Procedures

5. Naproxen Product Circular

6. Standard Operating Procedure for the Surveillance, Monitoring, and Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials of COX-2-Specific Inhibitors

/MK-0966/CP/RP2317.DOC * APPROVED                    03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order                    MRK-AFV0130214

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.) **1565**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                          61

### APPENDIX 1

Laboratory Safety Analyses

#### Hematology

Hemoglobin
Hematocrit
WBC (total and differential)
Platelet count

#### Complete Blood Chemistry

Sodium
Potassium
Calcium
Total protein
Albumin
SGOT (AST)
SGPT (ALT)
Alkaline phosphatase[‡]
Total bilirubin[†]
Blood urea nitrogen (BUN)
Creatinine
Glucose
Uric acid

#### Urinalysis

Protein, sugar, pH, RBCs, WBCs (Chemstrip 9 Boehringer-Mannheim or equivalent) and at Visit 1.0.

Microscopy and other appropriate studies (protein/creatinine ratio) will be performed if the Chemstrip 9 (or equivalent) indicates the presence of any significant abnormality such as 1 to 3+ plus proteinuria.

#### Other

Stool hemoccult (prestudy only)

---

[†]  Bilirubin will be fractionated (direct/indirect) if elevated.
[‡]  GGTP will be performed of alkaline phosphatase is elevated.

/MK-0966/CP/RP2317.DOC * APPROVED                              03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order
                                                              MRK-AFV0130215

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1566**

Product: MK-0966
Protocol/Amendment No.: 088-04                                          62

## APPENDIX 2

### Algorithm for Assessing Out-of-Range Laboratory Values

For all laboratory values obtained at prestudy evaluation:

A.  If all values are normal, the subject may enter the study.

B.  If ≥1 value is outside the normal range, the following choices are available:

    1.  The subject may be excluded from study;

    2.  The abnormal test may be repeated.

    3.  The value may be considered to be of not clinical significance and the patient may be entered into the study without repeating the test.

C.  If the repeat test value is within the normal range, the subject may enter the study.

D.  If the repeat test value is still abnormal, the investigator will evaluate the potential subject with a complete history and physical examination, looking especially for diseases that could result in an abnormality in the laboratory value in question. If such diseases can be excluded, and if the investigator feels that the abnormal laboratory value is not clinically relevant, then the subject may enter the study. The Merck clinical monitor will be included in the decision of whether or not to enroll the subject in the study.

E.  If there is any clinical uncertainty regarding the significance of an abnormal value, the subject will be excluded from study.

F.  Because patients with rheumatoid arthritis often have an anemia of chronic disease, low hemoglobin are not unexpected in this patient population. Patients with a history of anemia of chronic disease may enter the study, however, patients without a documented history or with a hemoglobin less than or equal to 10 g/dL should have a repeat test to ascertain that the baseline is stable prior to randomization.

/MK-0966/CP/RP2317.DOC * APPROVED                                    03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order                          MRK-AFV0130216

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1567**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04          63

## APPENDIX 3

Total Blood Drawn

| | Screening | Treatment Periods | End-of-Study or Discontinuation | Total Samples | mL Blood per Test | Total Blood |
|---|---|---|---|---|---|---|
| CBC | 1 | 3 | 1 | 5 | 5 | 25 |
| Hemoglobin, hematocrit | | 4 | 0 | 4 | 3 | 12 |
| Serum chemistry | 1 | 3 | 1 | 5 | 10 | 50 |
| Serum for archive | 0 | 4 | 1 | 5 | 5 | 25 |
| Plasma for archive | 0 | 4 | 1 | 5 | 5 | 25 |
| | | | | | Grand Total: | 137 mL |

/MK-0966/CP/RP2317.DOC * APPROVED
U.S. (U.S. IND)                                      03-Sep-1999

Confidential – Subject To Protective Order          MRK-AFV0130217

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1568**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                            64

## APPENDIX 4

Endpoint Definitions and Adjudication Procedures

/MK-0966/CP/RP2317.DOC * APPROVED                          03-Sep-1999
U.S. (U.S. IND)

Confidential – Subject To Protective Order                          MRK-AFV0130218

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1569**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                    65

## I.  INTRODUCTION

This appendix provides the definitions of the Primary Endpoint: upper-GI perforations, ulcers, and bleeds (hereafter referred to as "PUBs"). It also describes the requirements for endpoint clinical documentation, and the adjudication of potential endpoints. A MRL internal standard operating procedure (SOP) describing the details for the processing  and the adjudication of endpoints is found under separate cover.

## II.  DEFINITIONS

### A.  Terminology

The following definitions apply to the terms used:

- Potential Endpoint  - An unadjudicated endpoint that has been proposed based on available documentation.

- Endpoint Classification – The specific categorization or diagnosis of an adjudicated end point.

- Adjudication - The process of classifying a clinical endpoint, or assessing its level of certainty, through the application of predefined rules and classification criteria by the Case Review Committee (see IV. Below) prior to unblinding of treatment assignments. The outcome of adjudication is typically either "yes" (positively adjudicated end point), "no" (negatively adjudicated end point) or "reclassification" (a change in the endpoint type, date, or time).

### B.  Definition of Upper-Gastrointestinal PUBs

PUBs are defined as follows:

- An upper-GI perforation is defined as a newly developed perforation of the stomach or duodenum. Those occurring distal to the duodenum are not included.

- An upper-GI ulcer is defined as a newly developed ulcer in the stomach or duodenum. Those occurring distal to the duodenum are not included.

- An upper-GI hemorrhage is defined as newly documented bleeding whose source is from the esophagus, stomach, or duodenum. Those occurring distal to the duodenum are not included.

/MK-0966/CP/RP2317.DOC * APPROVED                                    03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order                          MRK-AFV0130219

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1570**

**Product:** MK-0966
**Protocol/Amendment No.:** 088-04                                               66

### C. Endpoint Date

For purposes of internal MRL documentation and analysis, an endpoint (diagnosis) date is defined as follows:

- The event date is the date of the first (inpatient or outpatient) diagnostic procedure (radiological test, endoscopy, surgery, and autopsy) used for purposes of judging whether the potential event meets confirmatory criteria. In situations where hospitalization records do not indicate the date of the procedure, the hospital admission date is recorded as the event date. If no diagnostic procedure is performed (e.g., a GI bleed is suspected based on an observation of documented melena [distinguished from other cause of dark stool] or laboratory evidence of GI bleeding) then the date of the observation or specimen draw is used.

### D. Other Definitions

Other pertinent definitions are as follows:

- Melena—passage of dark-colored, tarry stools, due to the presence of blood altered by the intestinal juices, and distinguished from other dark stool, e.g. that due to bismuth salts;

- Hematemesis—vomiting of blood, distinguished from blood tinged or streaked emesis;

- Healthcare provider witnessed—directly observed by the investigator or witnessed by a physician or other healthcare professional judged by the investigator to be fully credible; and

### III.  DOCUMENTATION OF POTENTIAL ENDPOINTS

All potential endpoints occurring in the study will be identified, documented and submitted for adjudication. Information about endpoints obtained by the investigator, study nurse coordinator, External Coordinating Center or MRL personnel through telephone/oral conversations with nonstudy physicians will be documented in writing. The documentation will include the information obtained and the name and title of the reporter. The person obtaining the information will sign and date the document.

Confidential - Subject To Protective Order                          MRK-AFV0130220

**Product: MK-0966**
**Protocol/Amendment No.: 088-04**                                               67

It is the responsibility of the investigator to determine if a case qualifies as a potential endpoint . A properly completed significant GI Event Form (GICL), and a concise but complete clinical narrative of the case, both signed by the investigator, are required for a potential endpoint to be submitted for adjudication. The GICL worksheet has been designed for purposes of investigator documentation of a potential endpoint . Instructions for the completion of the GICL will be given to all investigators.

The investigator is to assemble the following for each potential endpoint :

1. A copy of the completed GICL worksheet, signed by the investigator.

2. A concise summary clinical narrative about the endpoint, its evaluation, and treatment, signed by the Investigator.

3. A copy of the standard NSAE/SAE report form.

4. Clean, readable copies of source documents including:

   - Hospital admission and discharge reports;

   - Endoscopy, surgical and radiographic reports;

   - Emergency room reports;

   - Laboratory and pathology reports;

   - H. pylori test results; and

   - Physician notes.

All investigators will be given, as part of the field procedures manual, instructions as to how to collect documentation for and report potential endpoints, and store records related to them. Confidentiality of patient identifying information will be maintained .

All patients who discontinue early from the GI Outcomes study will be followed via telephone for the occurrence of an endpoint. These telephone contacts will occur at 14 and 45 days post-discontinuation, and at study completion. The informed consent in the primary protocol covers the data proposed for patient follow-up. It is required that medical records be obtained for any endpoint reported during follow-up of a discontinued patient. If a serious adverse event other than an endpoint is identified during the follow-up, it will be reported into WAES*NET only. This data will not be included in the primary clinical database.

The Discontinued Patient Follow-up (DPF) Form will be used to collect data regarding endpoints occurring after the usual 14-day post-discontinuation follow-up for safety. Important ancillary data, including concomitant medications, excessive alcohol use, and other relevant data will be collected on the DPF as well.

/MK-0966/CP/RP2317.DOC * APPROVED                                  03-Sep-1999
U.S. (U.S. IND)

Confidential - Subject To Protective Order                                    MRK-AFV0130221