# Exhibit 4
# Part 9

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)      **1664**

**Product:** MK-0966
**Protocol/Amendment No.:** 089-04                                            63

## I.  INTRODUCTION

This appendix provides the definitions of the Primary Endpoint: upper-GI perforations, ulcers, and bleeds (hereafter referred to as "PUBs"). It also describes the requirements for endpoint clinical documentation, and the adjudication of potential endpoints. A MRL internal standard operating procedure (SOP) describing the details for the processing and the adjudication of endpoints is found under separate cover.

## II.  DEFINITIONS

### A.  Terminology

The following definitions apply to the terms used:

- Potential Endpoint  - An unadjudicated endpoint that has been proposed based on available documentation.

- Endpoint Classification – The specific categorization or diagnosis of an adjudicated end point.

- Adjudication - The process of classifying a clinical endpoint, or assessing its level of certainty, through the application of predefined rules and classification criteria by the Case Review Committee (see IV. Below) prior to unblinding of treatment assignments. The outcome of adjudication is typically either "yes" (positively adjudicated end point), "no" (negatively adjudicated end point) or "reclassification" (a change in the endpoint type, date, or time).

### B.  Definition of Upper-Gastrointestinal PUBs

PUBs are defined as follows:

- An upper-GI perforation is defined as a newly developed perforation of the stomach or duodenum. Those occurring distal to the duodenum are not included.

- An upper-GI ulcer is defined as a newly developed ulcer in the stomach or duodenum. Those occurring distal to the duodenum are not included.

- An upper-GI hemorrhage is defined as newly documented bleeding whose source is from the esophagus, stomach, or duodenum. Those occurring distal to the duodenum are not included.

/MK-0966/CP/RP2318.DOC * APPROVED                                    08-Sep-1999
Non-U.S. (Non-U.S. IND)

Confidential - Subject To Protective Order                          MRK-AFV0130314

**Product: MK-0966**
**Protocol/Amendment No.: 089-04**                                                 64

### C. Endpoint Date

For purposes of internal MRL documentation and analysis, an endpoint (diagnosis) date is defined as follows:

- The event date is the date of the first (inpatient or outpatient) diagnostic procedure (radiological test, endoscopy, surgery, and autopsy) used for purposes of judging whether the potential event meets confirmatory criteria. In situations where hospitalization records do not indicate the date of the procedure, the hospital admission date is recorded as the event date. If no diagnostic procedure is performed (e.g., a GI bleed is suspected based on an observation of documented melena [distinguished from other cause of dark stool] or laboratory evidence of GI bleeding) then the date of the observation or specimen draw is used.

### D. Other Definitions

Other pertinent definitions are as follows:

- Melena—passage of dark-colored, tarry stools, due to the presence of blood altered by the intestinal juices, and distinguished from other dark stool, e.g. that due to bismuth salts;

- Hematemesis—vomiting of blood, distinguished from blood tinged or streaked emesis;

- Healthcare provider witnessed—directly observed by the investigator or witnessed by a physician or other healthcare professional judged by the investigator to be fully credible; and

## III.   DOCUMENTATION OF POTENTIAL ENDPOINTS

All potential endpoints occurring in the study will be identified, documented and submitted for adjudication. Information about endpoints obtained by the investigator, study nurse coordinator, External Coordinating Center or MRL personnel through telephone/oral conversations with nonstudy physicians will be documented in writing. The documentation will include the information obtained and the name and title of the reporter. The person obtaining the information will sign and date the document.

/MK-0966/CP/RP2318.DOC * APPROVED
Non-U.S. (Non-U.S. IND)

08-Sep-1999
R 20-Dec-1999

Confidential - Subject To Protective Order                                    MRK-AFV0130315

**Product:** MK-0966
**Protocol/Amendment No.:** 089-04                                                    65

It is the responsibility of the investigator to determine if a case qualifies as a potential endpoint . <u>A properly completed significant GI Event Form (GICL), and a concise but complete clinical narrative of the case, both signed by the investigator, are required for a potential endpoint to be submitted for adjudication.</u> The GICL worksheet has been designed for purposes of investigator documentation of a potential endpoint . Instructions for the completion of the GICL will be given to all investigators.

The investigator is to assemble the following for each potential endpoint :

1. A copy of the completed GICL worksheet, <u>signed by the investigator.</u>

2. A concise summary clinical narrative about the endpoint, its evaluation, and treatment, <u>signed by the Investigator.</u>

3. A copy of the standard NSAE/SAE report form.

4. Clean, readable copies of source documents including:

   - Hospital admission and discharge reports;
   - Endoscopy, surgical and radiographic reports;
   - Emergency room reports;
   - Laboratory and pathology reports;
   - H. pylori test results; and
   - Physician notes.

All investigators will be given, as part of the field procedures manual, instructions as to how to collect documentation for and report potential endpoints, and store records related to them.  Confidentiality of patient identifying information will be maintained.

All patients who discontinue early from the GI Outcomes study will be followed via telephone for the occurrence of an endpoint.  These telephone contacts will occur at 14 and 45 days post-discontinuation, and at study completion.  The informed consent in the primary protocol covers the data proposed for patient follow-up.  It is required that medical records be obtained for any endpoint reported during follow-up of a discontinued patient. If a serious adverse event other than an endpoint is identified during the follow-up, it will be reported into WAES*NET only.  This data will not be included in the primary clinical database.

The Discontinued Patient Follow-up (DPF) Form will be used to collect data regarding endpoints occurring after the usual 14-day post-discontinuation follow-up for safety.  Important ancillary data, including concomitant medications, excessive alcohol use, and other relevant data will be collected on the DPF as well.

Confidential - Subject To Protective Order                                    MRK-AFV0130316

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)                    **1667**

Product: MK-0966
Protocol/Amendment No.: 089-04                                      66

## IV.   THE CASE REVIEW COMMITTEE

The CRC will have full responsibility for final blinded adjudication of all potential endpoints. The CRC will be composed of three voting clinicians (at least two of whom are gastroenterologists) with expertise in the diagnosis of endpoints and in the conduct of clinical trials. The voting members may not include employees of Merck. No member of the CRC may be an investigator for this study, or be directly involved in any way in the conduct of the study. The CRC will be assisted by blinded Merck personnel.

## V.   ENDPOINT ADJUDICATION CRITERIA

Endpoint adjudication criteria are shown in **Attachment A**. Criteria are given for confirmation of the diagnosis, and for determination as to whether the endpoint is clinically complicated. The CRC will adjudicate each endpoint with respect to the confirmatory criteria first, followed by adjudication with respect to the clinically complicated criteria. Potential endpoints judged to meet the confirmation criteria by a majority of the CRC (2 of 3) are adjudicated as "confirmed." Endpoints not meeting confirmation criteria will be judged "unconfirmed." Similarly, an endpoint judged to meet the clinically complicated criteria by a majority of the CRC are adjudicated as "complicated," and one not meeting the criteria will be judged "uncomplicated." Thus, there will be four classes of end points (confirmed and complicated, confirmed and uncomplicated, unconfirmed and complicated, and unconfirmed and uncomplicated). The CRC may adjudicate an event as being "not an upper-GI event", if by majority opinion the potential endpoint did not involve the upper-GI tract as defined. In addition, the CRC may reclassify a potential endpoint if there is sufficient evidence to do so. All adjudications by the committee are final.

## VI.   ADJUDICATION PROCEDURES

A Case Review Committee (CRC), consisting of 3 independent consultants, will review and adjudicate all endpoints in a blinded manner. Each CRC member will independently make a preliminary adjudication of the end point. The full CRC will convene to jointly review the preliminary judgments and form a joint, final blinded adjudication for each case. In the event of disagreement, a majority ruling on confirmation status will be made (confirmed vs. unconfirmed) following which a majority ruling will be made as to whether the case was clinically complicated (complicated vs. uncomplicated). All adjudications by the CRC will be final. Final adjudication for a given case will occur prior to any analysis (interim or final) that includes the end point, and before unblinding of the database. A SOP detailing the internal MRL procedures related to these activities is found under separate cover.

/MK-0966/CP/RP2318.DOC * APPROVED                              08-Sep-1999
Non-U.S. (Non-U.S. IND)

Confidential - Subject To Protective Order                          MRK-AFV0130317

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1668**

**Product:** MK-0966
**Protocol/Amendment No.:** 089-04                                          67

### VII.  MAINTENANCE OF TREATMENT BLIND

Requests for waivers for reporting endpoints (i.e., PUBs) which meet the 15-day
reporting criteria (serious, unexpected, and related to use of the drug) will be
made to the appropriate agencies for all sites participating in the study, such that
these endpoints are not reported to a regulatory agency nor unblinded until the
end of the study.

In the event these waivers are not obtained, or in the event of inadvertent
unblinding, additional procedures to maintain the treatment blind to the Merck
personnel involved in processing the endpoint documentation, and to the CRC
members have been established. These are described in the internal Merck SOP
detailing such procedures.

Confidential - Subject To Protective Order                         MRK-AFV0130318

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)   **1669**

68

Product: MK-0966
Protocol/Amendment No.: 089-04

# ATTACHMENT A

## VIGOR Endpoint Adjudication Criteria

| EVENT | CRITERIA FOR CONFIRMED* EVENT | CRITERIA FOR CONFIRMED COMPLICATED EVENTS |
|---|---|---|
| Gastric or Duodenal Perforation due to Active Gastric Ulcer (GU) or Duodenal Ulcer (DU) | Report of gastric or duodenal perforation (excluding perforation caused by a malignant ulcer) confirmed by one or more of the following:<br><br>1.  Endoscopy<br>2.  Surgery<br>3.  Unequivocal radiographic results consistent with free intraperitoneal air or extravasation of contrast media<br>4.  Autopsy | All gastric or duodenal perforations are classified as complicated. |
| Obstruction due to Active Gastric Ulcer (GU) or Duodenal Ulcer (DU) | Postprandial nausea and vomiting lasting for at least 24 hours AND evidence of narrowing of the distal stomach, pylorus, or duodenum due to a non-malignant ulcer documented by:<br><br>1.  Endoscopy<br>2.  Surgery<br>3.  Radiography<br>4.  Autopsy | All obstructions are classified as complicated |
| Development of Active Gastric Ulcer (GU) or Duodenal Ulcer (DU) | Report of GU or DU confirmed by one or more of the following:<br><br>1.  Endoscopy<br>2.  Surgery<br>3.  Unequivocal radiological evidence of active GU or DU on upper-GI series with contrast<br>4.  Autopsy | GU or DU associated with a confirmed upper-GI hemorrhage as defined under Development of Upper-GI Hemorrhage, criteria 1, 2, or 3. |

/MK-0966/C9/REP2318.DOC * APPROVED -08-Sep-1999
Non-U.S. (Non-U.S. IND)

MRK-AFV0130319

Product: MK-0966
Protocol/Amendment No.: 089-04

## ATTACHMENT A (CONT.)

### VIGOR Endpoint Adjudication Criteria

69

| EVENT | CRITERIA FOR CONFIRMED EVENT | CRITERIA FOR CONFIRMED COMPLICATED EVENT |
|---|---|---|
| Development of Upper-GI (esophageal, gastric, or duodenal) Hemorrhage | Report of upper-GI hemorrhage fulfilling one or more of the following:<br>1. Healthcare provider witnessed frank hematemesis (distinguished from blood tinged or streaked emesis), including coffee-grounds vomitus, OR healthcare provider-witnessed frank blood or coffee grounds by gastric aspiration or lavage (distinguished from scant coffee-grounds that clear rapidly)<br>2. Healthcare provider witnessed frank melena (distinguished from other dark stool e.g., that due to bismuth salts).<br>3. Active upper-GI bleeding documented by endoscopy, angiography, or surgery.<br>4. Heme-positive stool associated with a documented upper-GI lesion judged by the healthcare provider to be the source of the bleeding AND associated with either of the following:<br>a) Significant bleeding/volume loss<br>b) Stigmata of recent bleeding (visible vessel, pigmented spot or clot on ulcer base) on endoscopy | 1. Upper-GI hemorrhage associated with significant bleeding/volume loss (1). |

/MK-0966/CP/RP2318.DOC * APPROVED--08-Sep-1999
Non-U.S. (Non-U.S. IND)

Confidential – Subject To Protective Order

Product: MK-0966
Protocol/Amendment No.: 089-04

70

## ATTACHMENT A (CONT.)

### VIGOR Endpoint Adjudication Criteria

| EVENT | CRITERIA FOR CONFIRMED EVENT | CRITERIA FOR CONFIRMED COMPLICATED EVENT |
|---|---|---|
| Development of Upper-GI (esophageal, gastric, or duodenal) Hemorrhage (cont.) | 5. Patient reported hematemesis or melena associated with a documented upper-GI lesion judged by the healthcare provider to be the source of the bleeding AND associated with one or more of the following:<br><br>a)  Significant bleeding/volume loss<br>b)  Stigmata of recent bleeding (visible vessel, pigmented spot or clot on ulcer base) on endoscopy | 1.  Upper-GI hemorrhage associated with significant bleeding/volume loss (1). |

(1)  Criteria for significant bleeding/volume loss:  One or more of the following (a, b, c, or d)is temporally related to the event:
   a.   Decrease in hemoglobin >=2 gm/dL (or >=6% drop in hematocrit if hemoglobin not available)
   b.   Evidence of orthostatic (sitting to standing, or lying to sitting) changes; one or more of:  i) pulse rate increase of >20 BPM, ii) decrease in SBP >20 mm Hg, iii) decrease in DBP >10 mm Hg
   c.   Other evidence of significantly reduced circulatory volume (e.g., significant hypotension corrected by volume replacement).
   d.   Transfusion of blood or packed red blood cells

/MK-0966C9/RP2318.DOC * APPROVED–08-Sep-1999
Non-U.S. (Non-U.S. IND)

Confidential - Subject To Protective Order

MRK-AFV0130321

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)                    **1672**

**Product:** MK-0966
**Protocol/Amendment No.:** 089-04                    71

APPENDIX 5

Naproxen Product Circular

Confidential - Subject To Protective Order                    MRK-AFV0130322

**2458/ROCHE LABORATORIES**                                    **PHYSICIANS' DESK REFERENCE®**

## Cytovene—Cont.

Health and Human Services, National Institutes of Health, Bethesda, MD, September, 1991 NIH Publication No. 92-2631. 9. American Society of Hospital Pharmacists technical assistance bulletin on handling cytotoxic and hazardous drugs. *Am J Hosp Pharm.* 1990; 47:1033-1049. 10. Controlling Occupational Exposure to Hazardous Drugs. US Department of Labor. Occupational Health and Safety Administration. OSHA Technical Manual. Section V - Chapter 3, September 22, 1995.

CYTOVENE-IV for intravenous infusion manufactured by Fujisawa USA, Division of Warner-Lambert Company, Morris Plains, NJ 07960 and CYTOVENE Capsules for oral administration manufactured by Syntex Puerto Rico, Inc., Humacao, Puerto Rico 00791 for:

Roche Laboratories
A Member of the Roche Group
Roche Laboratories Inc.
340 Kingsland Street
Nutley, New Jersey 07110-1199
Revised: December 1996
*Shown in Product Identification Guide, page 353*

**EC-NAPROSYN®**                                                  R
[nā' pro-sin]
(naproxen) Delayed-Release Tablets

**NAPROSYN®**                                                     R
(naproxen) Tablets

**ANAPROX®/ANAPROX® DS**                                          R
[an' ă-prox]
(naproxen sodium) Tablets

**NAPROSYN®**                                                     R
(naproxen) Suspension

## DESCRIPTION

Naproxen is a member of the arylacetic acid group of non-steroidal anti-inflammatory drugs. The chemical names for naproxen and naproxen sodium are (S)-6-methoxy-α-methyl-2-naphthaleneacetic acid and (S)-6-methoxy-α-methyl-2-naphthaleneacetic acid, sodium salt, respectively.

Naproxen is an odorless, white to off-white crystalline substance. It is lipid-soluble, practically insoluble in water at low pH and freely soluble in water at high pH. The octanol/water partition coefficient of naproxen at pH 7.4 is 1.6 to 1.8. Naproxen sodium is a white to creamy white, crystalline solid, freely soluble in water at neutral pH.

NAPROSYN (naproxen) Tablets contain 250 mg, 375 mg or 500 mg of naproxen and croscarmellose sodium, iron oxides, povidone and magnesium stearate.

EC-NAPROSYN (naproxen) Delayed-Release Tablets are enteric-coated tablets containing 375 mg or 500 mg of naproxen and croscarmellose sodium, povidone and magnesium stearate. The enteric coating dispersion contains methacrylic acid copolymer, talc, triethyl citrate, sodium hydroxide and purified water. The dispersion may also contain simethicone emulsion. The dissolution of this enteric-coated naproxen tablet is pH dependent with rapid dissolution above pH 6. There is no dissolution below pH 4. Each ANAPROX 275 mg and ANAPROX DS 550 mg tablet contains naproxen sodium, the active ingredient, with magnesium stearate, microcrystalline cellulose, povidone and talc. The coating suspension for the ANAPROX 275 mg tablet may contain hydroxypropyl methylcellulose 2910, Opadry K-1-4210A, polyethylene glycol 8000 or Opadry YS-1-4215. The coating suspension for the ANAPROX DS 550 mg tablet may contain hydroxypropyl methylcellulose 2910, Opaspray K-1-4227, polyethylene glycol 8000 or Opadry YS-1-4216.

NAPROSYN (naproxen) Suspension for oral administration contains 125 mg/5 mL of naproxen in a vehicle containing sucrose, magnesium aluminum silicate, sorbitol solution and sodium chloride (30 mg/5 mL, 1.5 mEq), methylparaben, fumaric acid, FD&C Yellow No. 6, imitation pineapple flavor, imitation orange flavor and purified water. The pH of the suspension ranges from 2.2 to 3.7.

## CLINICAL PHARMACOLOGY

Naproxen is a nonsteroidal anti-inflammatory drug (NSAID) with analgesic and antipyretic properties. The sodium salt of naproxen has been developed as a more rapidly absorbed formulation of naproxen for use as an analgesic. The naproxen anion inhibits prostaglandin synthesis but beyond this its mode of action is unknown.

**Pharmacokinetics:** Naproxen itself is rapidly and completely absorbed from the gastrointestinal tract with an in vivo bioavailability of 95%. The different dosage forms of NAPROSYN are bioequivalent in terms of extent of absorption (AUC) and peak concentration ($C_{max}$); however, the products do differ in their pattern of absorption. These differences between naproxen products are related to both the chemical form of naproxen used and its formulation. Even with the observed differences in pattern of absorption, the elimination half-life of naproxen is unchanged across products ranging from 12 to 17 hours. Steady-state levels of naproxen are reached in 4 to 5 days, and the degree of naproxen accumulation is consistent with this half-life. This suggests that the differences in pattern of release play only a negligible role in the attainment of steady-state plasma levels.

*Absorption:*

*Immediate Release:* After administration of NAPROSYN tablets, peak plasma levels are attained in 2 to 4 hours. After oral administration of ANAPROX, peak plasma levels are attained in 1 to 2 hours. The difference in rates between the two products is due to the increased aqueous solubility of the sodium salt of naproxen used in ANAPROX. Peak plasma levels of naproxen given as NAPROSYN Suspension are attained in 1 to 4 hours.

*Delayed Release:* EC-NAPROSYN is designed with a pH-sensitive coating to provide a barrier to disintegration in the acidic environment of the stomach and to lose integrity in the more neutral environment of the small intestine. This enteric polymer coating selected for EC-NAPROSYN dissolves above pH 6. When EC-NAPROSYN was given to fasted subjects, peak plasma levels were attained about 4 to 6 hours following the first dose (range: 2 to 12 hours). As in vivo study in man using radiolabeled EC-NAPROSYN tablets demonstrated that EC-NAPROSYN dissolves primarily in the small intestine rather than the stomach, so the absorption of the drug is delayed until the stomach is emptied. When EC-NAPROSYN and NAPROSYN were given to fasted subjects (n=24) in a crossover study following 1 week of dosing, differences in time to peak plasma levels ($T_{max}$) were observed, but there were no differences in total absorption as measured by $C_{max}$ and AUC:

| | EC-NAPROSYN* 1000 mg bid | NAPROSYN* 500 mg bid |
|---|---|---|
| $C_{max}$ (μg/ml) | 94.9 (19%) | 97.4 (13%) |
| $T_{max}$ (hours) | 4 (39%) | 1.9 (61%) |
| $AUC_{0-12h}$ (μg·hr/mL) | 845 (20%) | 757 (16%) |

*Mean value (coefficient of variation)

*Antacid Effects:* When EC-NAPROSYN was given as a single dose with antacid (64 mEq buffering capacity), the peak plasma levels of naproxen were unchanged, but the time to peak was reduced (mean $T_{max}$ fasted 5.6 hours, mean $T_{max}$ with antacid 5 hours), although not significantly.

*Food Effects:* When EC-NAPROSYN was given as a single dose with food, peak plasma levels in most subjects were achieved in about 12 hours (range: 4 to 24 hours). Residence time in the small intestine until disintegration was independent of food intake. The presence of food prolonged the time the tablets remained in the stomach, time to first detectable serum naproxen levels, and time to maximal naproxen levels ($T_{max}$), but did not affect peak naproxen levels ($C_{max}$).

*Distribution:*

Naproxen has a volume of distribution of 0.16 L/kg. At therapeutic levels naproxen is greater than 99% albumin-bound. At doses of naproxen greater than 500 mg/day there is less than proportional increase in plasma levels due to an increase in clearance caused by saturation of plasma protein binding at higher doses (average trough $C_{ss}$ 36.5, 49.2 and 56.4 mg/L with 500, 1000 and 1500 mg daily doses of naproxen). However, the concentration of unbound naproxen continues to increase proportionally to dose.

*Metabolism:*

Naproxen is extensively metabolized to 6-0-desmethyl naproxen, and both parent and metabolites do not induce metabolizing enzymes.

*Elimination:*

The clearance of naproxen is 0.13 mL/min/kg. Approximately 95% of the naproxen from any dose is excreted in the urine, primarily as naproxen (less than 1%), 6-0-desmethyl naproxen (less than 1%) or their conjugates (66% to 92%). The plasma half-life of the naproxen anion in humans ranges from 12 to 17 hours. The corresponding half-lives of both naproxen's metabolites and conjugates are shorter than 12 hours, and their rates of excretion have been closely with the rate of naproxen disappearance from the plasma. In patients with renal failure metabolites may accumulate.

*Special Populations:*

*Pediatric Patients:* In pediatric patients aged 5 to 16 years with arthritis, plasma naproxen levels following a 5 mg/kg single dose of naproxen suspension (see DOSAGE AND ADMINISTRATION) were found to be similar to those found in normal adults following a 500 mg dose. The terminal half-life appears to be similar in pediatric and adult patients. Pharmacokinetic studies of naproxen were not performed in pediatric patients younger than 5 years of age. Pharmacokinetic parameters appear to be similar following administration of naproxen suspension or tablets in pediatric patients. EC-NAPROSYN has not been studied in subjects under the age of 18.

*Renal Insufficiency:* Naproxen pharmacokinetics has not been determined in subjects with renal insufficiency. Given that naproxen, its metabolites and conjugates are primarily excreted by the kidney, the potential exists for naproxen metabolites to accumulate in the presence of renal insufficiency.

## CLINICAL STUDIES

*General Information:* Naproxen has been studied in patients with rheumatoid arthritis, osteoarthritis, juvenile arthritis, ankylosing spondylitis, tendinitis and bursitis, and acute gout. Improvement in patients treated for rheumatoid arthritis was demonstrated by a reduction in joint swelling, a reduction in duration of morning stiffness, a reduction in disease activity as assessed by both the investigator and patient, and by increased mobility as demonstrated by a reduction in walking time. Generally, response to naproxen has not been found to be dependent on age, sex, severity or duration of rheumatoid arthritis.

In patients with osteoarthritis, the therapeutic action of naproxen has been shown by a reduction in joint pain or tenderness, an increase in range of motion in knee joints, increased mobility as demonstrated by a reduction in walking time, and improvement in capacity to perform activities of daily living impaired by the disease.

In a clinical trial comparing standard formulations of naproxen 375 mg bid (750 mg a day) vs 750 mg bid (1500 mg/day), 9 patients in the 750 mg group terminated prematurely because of adverse events. Nineteen patients in the 1500 mg group terminated prematurely because of adverse events. Most of these adverse events were gastrointestinal events.

In clinical studies in patients with rheumatoid arthritis, osteoarthritis and juvenile arthritis, naproxen has been shown to be comparable to aspirin and indomethacin in controlling the aforementioned measures of disease activity, but the frequency and severity of the milder gastrointestinal adverse effects (nausea, dyspepsia, heartburn) and severe adverse effects (tinnitus, dizziness, lightheadedness) were less in naproxen-treated patients than in those treated with aspirin or indomethacin.

In patients with ankylosing spondylitis, naproxen has been shown to decrease night pain, morning stiffness and pain at rest. In double-blind studies the drug was shown to be as effective as aspirin, but with fewer side effects.

In patients with acute gout, a favorable response to naproxen was shown by significant clearing of inflammatory changes (eg, decrease in swelling, heat) within 24 to 48 hours, as well as by relief of pain and tenderness.

Naproxen has been studied in patients with mild to moderate pain secondary to postoperative, orthopedic, postpartum episiotomy and uterine contraction pain and dysmenorrhea. Onset of pain relief can begin within 1 hour in patients taking naproxen and within 30 minutes in patients taking naproxen sodium. Analgesic effect was shown by such measures as reduction of pain intensity scores, increase in pain relief scores, decrease in numbers of patients requiring additional analgesic medication, and delay in time to remedication. The analgesic effect has been found to last for up to 12 hours.

[Naproxen may be used safely in combination with gold salts and/or corticosteroids; however, in controlled clinical trials, when added to the regimen of patients receiving corticosteroids, it did not appear to cause greater improvement over that seen with corticosteroids alone. Whether naproxen has a "steroid-sparing" effect has not been adequately studied. When added to the regimen of patients receiving gold salts, naproxen did result in greater improvement. But use in combination with salicylates is not recommended because there is evidence that aspirin increases the rate of excretion of naproxen and data are inadequate to demonstrate that naproxen and aspirin produce greater improvement over that achieved with aspirin alone. In addition, as with other NSAIDs, the combination may result in higher frequency of adverse events than demonstrated for either product alone.

In [1]C blood loss and gastroscopy studies with normal volunteers, daily administration of 1000 mg of naproxen as 1000 mg of NAPROSYN (naproxen) or 1100 mg of ANAPROX (naproxen sodium) has been demonstrated to cause statistically significantly less gastric bleeding and erosion than 3250 mg of aspirin.

Three 3-week, double-blind, multicenter studies with EC-NAPROSYN (naproxen) (375 or 500 mg bid, n=585) and NAPROSYN (375 or 500 mg bid, n=576) were conducted comparing EC-NAPROSYN with NAPROSYN, including 335 rheumatoid arthritis and osteoarthritis patients who had a recent history of NSAID-related GI symptoms. These studies indicated that EC-NAPROSYN showed no significant differences in efficacy or safety and had similar prevalence of minor GI complaints. Individual patients, however, may find one formulation preferable to the other.

Five hundred and fifty-three patients received EC-NAPROSYN during long-term open label trials (mean length of treatment was 159 days). The rates for clinically]

*Information will be superseded by supplements and subsequent editions*

**PRODUCT INFORMATION**                                                  ROCHE LABORATORIES/2459

diagnosed peptic ulcers and GI bleeds were similar to what has been historically reported for long-term NSAID use.[1]

**INDIVIDUALIZATION OF DOSAGE**

Although NAPROSYN, NAPROSYN Suspension, EC-NAPROSYN, ANAPROX and ANAPROX DS all circulate in the plasma as naproxen, they have pharmacokinetic differences that may affect onset of action. Onset of pain relief can begin within 30 minutes in patients taking naproxen sodium and within 1 hour in patients taking naproxen. Because EC-NAPROSYN dissolves in the small intestine rather than in the stomach, the absorption of the drug is delayed compared to the other naproxen formulations (see CLINICAL PHARMACOLOGY).

The recommended strategy for initiating therapy is to choose a formulation and a starting dose likely to be effective for the patient and then adjust the dosage based on observation of benefit and/or adverse events. A lower dose should be considered in patients with renal or hepatic impairment or in elderly patients (see PRECAUTIONS).

**Analgesia/Dysmenorrhea/Bursitis and Tendinitis**

Because the sodium salt of naproxen is more rapidly absorbed, ANAPROX/ANAPROX DS is recommended for the management of acute painful conditions when prompt onset of pain relief is desired. The recommended starting dose is 550 mg followed by 550 mg every 12 hours or 275 mg every 6 to 8 hours, as required. The initial total daily dose should not exceed 1375 mg of naproxen sodium. Thereafter, the total daily dose should not exceed 1100 mg of naproxen sodium. NAPROSYN may also be used for treatment of acute pain and dysmenorrhea. EC-NAPROSYN is not recommended for initial treatment of acute pain because absorption of naproxen is delayed compared to other naproxen-containing products (see CLINICAL PHARMACOLOGY and INDICATIONS and USAGE).

**Acute Gout:** The recommended starting dose is 750 mg of NAPROSYN followed by 250 mg every 8 hours until the attack has subsided. ANAPROX may also be used as a starting dose of 825 mg followed by 275 mg every 8 hours as needed. EC-NAPROSYN is not recommended because of the delay in absorption (see CLINICAL PHARMACOLOGY).

**Osteoarthritis/Rheumatoid Arthritis/Ankylosing Spondylitis:** The recommended dose of naproxen is NAPROSYN or NAPROSYN Suspension 250 mg, 375 mg or 500 mg tablet twice daily (morning and evening) or EC-NAPROSYN 375 mg or 500 mg taken twice daily. Naproxen sodium may also be used (see DOSAGE AND ADMINISTRATION).

During long-term administration the dose of naproxen may be adjusted up or down depending on the clinical response of the patient. A lower daily dose may suffice for long-term administration. In patients who tolerate lower doses well, the dose may be increased to 1600 mg per day when a higher level of anti-inflammatory/analgesic activity is required. When treating patients with naproxen 1500 mg/day (as NAPROSYN or 1650 mg of ANAPROX), the physician should observe sufficient increased clinical benefit to offset the potential increased risk. The morning and evening doses do not have to be equal in size and administration of the drug more frequently than twice daily does not generally make a difference in response (see CLINICAL PHARMACOLOGY).

**Juvenile Arthritis:** The use of NAPROSYN Suspension allows for more flexible dose titration. In children, doses of 5 mg/kg/day produced plasma levels of naproxen similar to those seen in adults taking 500 mg of naproxen (see CLINICAL PHARMACOLOGY).

The recommended total daily dose is approximately 10 mg/kg given in two divided doses (in, 5 mg/kg given twice a day) (see DOSAGE AND ADMINISTRATION).

**INDICATIONS AND USAGE**

Naproxen as NAPROSYN, EC-NAPROSYN, ANAPROX, ANAPROX DS or NAPROSYN Suspension are indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis and juvenile arthritis.

Naproxen as NAPROSYN Suspension is recommended for juvenile rheumatoid arthritis in order to obtain the maximum dosage flexibility based on the patient's weight.

Naproxen as NAPROSYN, ANAPROX, ANAPROX DS and NAPROSYN Suspension are also indicated for the treatment of tendinitis, bursitis, acute gout, and for the management of pain and primary dysmenorrhea. EC-NAPROSYN is not recommended for initial treatment of acute pain because the absorption of naproxen is delayed compared to absorption from other naproxen-containing products (see CLINICAL PHARMACOLOGY and DOSAGE AND ADMINISTRATION).

**CONTRAINDICATIONS**

All naproxen products are contraindicated in patients who have had allergic reactions to prescription as well as to over-the-counter products containing naproxen. It is also contraindicated in patients in whom aspirin or other nonsteroidal anti-inflammatory/analgesic drugs induce the syndrome of asthma, rhinitis and nasal polyps. Both types of reactions have the potential of being fatal. Anaphylactoid reactions to naproxen, whether of the true allergic type or the pharma-

cologic idiosyncratic (eg, aspirin hypersensitivity syndrome) type, usually but not always occur in patients with a known history of such reactions. Therefore, careful questioning of patients for such things as asthma, nasal polyps, urticaria and hypotension associated with nonsteroidal anti-inflammatory drugs before starting therapy is important. In addition, if such symptoms occur during therapy, treatment should be discontinued.

**WARNINGS**

*Risk of GI Ulceration, Bleeding and Perforation with NSAID Therapy:* Serious gastrointestinal toxicity such as bleeding, ulceration and perforation can occur at any time, with or without warning symptoms, in patients treated chronically with NSAID therapy. Although minor upper gastrointestinal problems, such as dyspepsia, are common, usually developing early in therapy, physicians should remain alert for ulceration and bleeding in patients treated chronically with NSAIDs even in the absence of previous GI tract symptoms. In patients observed in clinical trials of several months to 2 years' duration, symptomatic upper GI ulcers, gross bleeding or perforation appear to occur in approximately 1% of patients treated for 3 to 6 months and in about 2% to 4% of patients treated for 1 year.

Physicians should inform patients about the signs and/or symptoms of serious GI toxicity and what steps to take if they occur.

Studies to date with all naproxen products have not identified any subset of patients not at risk of developing peptic ulceration and bleeding or any differences between different naproxen products in their propensity to cause peptic ulceration and bleeding. Except for a prior history of serious GI events and other risk factors known to be associated with peptic ulcer disease, such as alcoholism, smoking, etc., no risk factors (eg, age, sex) have been associated with increased risk. Elderly or debilitated patients seem to tolerate ulceration or bleeding less well than other individuals and most spontaneous reports of fatal GI events are in this population. Studies to date are inconclusive concerning the relative risk of various NSAIDs in causing such reactions. High doses of any NSAID probably carry a greater risk of these reactions, although controlled clinical trials showing this do not exist in most cases. In considering the use of relatively large doses (within the recommended dosage range), sufficient benefit should be anticipated to offset the potential increased risk of GI toxicity.

**PRECAUTIONS**

*General:* NAPROXEN-CONTAINING PRODUCTS SUCH AS NAPROSYN, EC-NAPROSYN, ANAPROX, ANAPROX DS, NAPROSYN SUSPENSION, ALEVE, AND OTHER NAPROXEN PRODUCTS SHOULD NOT BE USED CONCOMITANTLY SINCE THEY ALL CIRCULATE IN THE PLASMA AS THE NAPROXEN ANION.

If the steroid dose is reduced or eliminated during therapy, the steroid dosage should be reduced slowly and the patients should be observed closely for any evidence of adverse effects, including adrenal insufficiency and exacerbation of symptoms of arthritis.

Patients with initial hemoglobin values of 10 grams or less who are to receive long-term therapy should have hemoglobin values determined periodically.

The antipyretic and anti-inflammatory activities of the drug may reduce fever and inflammation, thus diminishing their utility as diagnostic signs in detecting complications of presumed noninfectious, noninflammatory painful conditions. Because of adverse eye findings in animal studies with drugs of this class, it is recommended that ophthalmic studies be carried out if any change or disturbance in vision occurs.

*Renal Effects:* As with other nonsteroidal anti-inflammatory drugs, long-term administration of naproxen to animals has resulted in renal papillary necrosis and other abnormal renal pathology. In humans, there have been reports of acute interstitial nephritis, hematuria, proteinuria and occasionally nephrotic syndrome associated with naproxen-containing products and other NSAIDs since they have been marketed.

A second form of renal toxicity has been seen in patients taking naproxen as well as other nonsteroidal anti-inflammatory drugs. In patients with prerenal conditions leading to a reduction in renal blood flow or blood volume, where the renal prostaglandins have a supportive role in the maintenance of renal perfusion, administration of a nonsteroidal anti-inflammatory drug may cause a dose-dependent reduction in prostaglandin formation and precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and the elderly. Discontinuation of nonsteroidal anti-inflammatory therapy is typically followed by recovery to the pretreatment state. Naproxen and its metabolites are eliminated primarily by the kidneys; therefore, the drug should be used with caution in patients with significantly impaired renal function, and the monitoring of serum creatinine and/or creatinine clearance is advised in these patients. Caution should be used if

the drug is given to patients with creatinine clearance of less than 30 mL/minute because accumulation of naproxen metabolites has been seen in such patients.

Chronic alcoholic liver disease and probably other diseases with decreased or abnormal plasma proteins (albumin) reduce the total plasma concentration of naproxen, but the plasma concentration of unbound naproxen is increased. Caution is advised when high doses are required and some adjustment of dosage may be required in these patients. It is prudent to use the lowest effective dose.

Studies indicate that although total plasma concentration of naproxen is unchanged, the unbound plasma fraction of naproxen is increased in the elderly. Caution is advised when high doses are required and some adjustment of dosage may be required in elderly patients. As with other drugs used in the elderly, it is prudent to use the lowest effective dose.

*Hepatic Function:* As with other nonsteroidal anti-inflammatory drugs, borderline elevations of one or more liver tests may occur in up to 15% of patients. These abnormalities may progress, may remain essentially unchanged, or may be transient with continued therapy. The SGPT (ALT) test is probably the most sensitive indicator of liver dysfunction. Meaningful (3 times the upper limit of normal) elevations of SGPT or SGOT (AST) occurred in controlled clinical trials in less than 1% of patients. A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be evaluated for evidence of the development of more severe hepatic reaction while on therapy with naproxen. Severe hepatic reactions, including jaundice and cases of fatal hepatitis, have been reported with naproxen as with other nonsteroidal anti-inflammatory drugs. Although such reactions are rare, if abnormal liver tests persist or worsen, if clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (eg, eosinophilia, rash, etc.), naproxen should be discontinued.

*Fluid Retention and Edema:* Peripheral edema has been observed in some patients receiving naproxen. Since each ANAPROX or ANAPROX tablet contains 25 mg or 50 mg of sodium (about 1 mEq per each 250 mg of naproxen), and each teaspoonful of NAPROSYN Suspension contains 39 mg (about 1.6 mEq per each 125 mg of naproxen) of sodium, this should be considered in patients whose overall intake of sodium must be severely restricted. For these reasons, ANAPROX, ANAPROX DS and NAPROSYN Suspension should be used with caution in patients with fluid retention, hypertension or heart failure.

*Information for Patients:* Naproxen, in NAPROSYN, EC-NAPROSYN, ANAPROX, ANAPROX DS and NAPROSYN Suspension, like other drugs of this class, is not free of side effects. The side effects of these formulations of naproxen can cause discomfort and, rarely, there are more serious side effects, such as gastrointestinal bleeding, which may result in hospitalization and even fatal outcomes.

NSAIDs (Nonsteroidal Anti-inflammatory Drugs) are often essential agents in the management of arthritis and have a major role in the treatment of pain, but they also may be commonly employed for conditions that are less serious. Physicians may wish to discuss with their patients the potential risks (see WARNINGS, PRECAUTIONS and ADVERSE REACTIONS) and likely benefits of naproxen treatment, particularly when it is used for less serious conditions where treatment without NSAIDs may represent an acceptable alternative to both the patient and physician. Caution should be exercised by patients whose activities require alertness if they experience drowsiness, dizziness, vertigo or depression during therapy with naproxen.

*Laboratory Tests:* Because serious GI tract ulceration and bleeding can occur without warning symptoms, physicians should follow patients chronically treated with naproxen for signs and symptoms of ulceration and bleeding and should inform them of the importance of this follow-up and what they should do if certain signs and symptoms do appear (see WARNINGS: *Risk of GI Ulceration, Bleeding and Perforation with NSAID Therapy*).

*Drug Interactions:* The use of NSAIDs in patients who are receiving ACE inhibitor may potentiate renal disease states (see PRECAUTIONS: *Renal Effects*).

In vitro studies have shown that naproxen anion, because of its affinity for protein, may displace from their binding sites other drugs that are also albumin-bound (see CLINICAL PHARMACOLOGY: *Pharmacokinetics*).

Theoretically, the naproxen anion itself could likewise be displaced. The naproxen anion itself could likewise be displaced. Short-term controlled studies failed to show that taking the drug significantly affects prothrombin times when administered to individuals on coumarin-type anticoagulants. Caution is advised nonetheless, since interactions have been seen with other nonsteroidal agents of this class. Similarly, patients receiving the drug and a hydantoin, sulfonamide or sulfonylurea should be observed for signs of toxicity to these drugs (see CLINICAL STUDIES: *General Information*).

*Continued on next page*

Consult 1998 PDR® supplements and future editions for revisions

Confidential - Subject To Protective Order                                                    MRK-AFV0130324

**2460/ROCHE LABORATORIES**

**PHYSICIANS' DESK REFERENCE®**

## EC-Naprosyn/Anaprox—Cont.

Concomitant administration of naproxen and aspirin is not recommended because naproxen is displaced from its binding sites during the concomitant administration of aspirin, resulting in lower plasma concentrations and peak plasma levels.

The antitumoric effect of furosemide has been reported to be inhibited by some drugs of this class. Inhibition of renal lithium clearance leading to increases in plasma lithium concentrations has also been reported. Naprosyn and other nonsteroidal anti-inflammatory drugs can reduce the antihypertensive effect of propranolol and other beta-blockers. Probenecid given concurrently increases naproxen anion plasma levels and extends its plasma half-life significantly. Caution should be used if naproxen is administered concomitantly with methotrexate. Naproxen, naproxen sodium and other nonsteroidal anti-inflammatory drugs have been reported to reduce the tubular secretion of methotrexate in an animal model, possibly increasing the toxicity of methotrexate.

Due to the gastric pH elevating effects of H2-blockers, sucralfate and intensive antacid therapy, concomitant administration of EC-NAPROSYN is not recommended.

**Drug/Laboratory Test Interactions:** Naproxen may decrease platelet aggregation and prolong bleeding time. This effect should be kept in mind when bleeding times are determined.

The administration of naproxen may result in increased urinary values for 17-ketogenic steroids because of an interaction between the drug and/or its metabolites with m-dinitrobenzene used in this assay. Although 17-hydroxy-corticosteroid measurements (Porter-Silber test) do not appear to be artifactually altered, it is suggested that therapy with naproxen be temporarily discontinued 72 hours before adrenal function tests are performed if the Porter-Silber test is to be used.

Naproxen may interfere with some urinary assays of 5-hydroxy indoleacetic acid (5HIAA).

**Carcinogenesis:** A 2-year study was performed in rats to evaluate the carcinogenic potential of naproxen at rat doses of 8, 16 and 24 mg/kg/day (40, 100 and 150 mg/m2). The maximum dose used was 0.28 times the systemic exposure to humans at the recommended dose. No evidence of tumorigenicity was found.

**Pregnancy: Teratogenic Effects: Pregnancy Category B.** Reproduction studies have been performed in rats at 20 mg/kg/day (125 mg/m2/day, 0.28 times the human systemic exposure), rabbits at 20 mg/kg/day (220 mg/m2/day, 0.27 times the human systemic exposure), and mice at 170 mg/kg/day (510 mg/m2/day, 0.28 times the human systemic exposure) with no evidence of impaired fertility or harm to the fetus due to the drug. There are no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, naproxen should not be used during pregnancy unless clearly needed.

**Nonteratogenic Effects:** There is some evidence to suggest that when inhibitors of prostaglandin synthesis are used to delay preterm labor there is an increased risk of neonatal complications such as necrotizing enterocolitis, patent ductus arteriosus and intracranial hemorrhage. Naproxen treatment given in late pregnancy to delay parturition has been associated with persistent pulmonary hypertension, renal dysfunction and abnormal prostaglandin E levels in preterm infants. Because of the known effect of drugs of this class on the human fetal cardiovascular system (closure of ductus arteriosus), use during third trimester should be avoided.

**Nursing Mothers:** The naproxen anion has been found in the milk of lactating women at a concentration of approximately 1% of that found in plasma. Because of the possible adverse effects of prostaglandin-inhibiting drugs on neonates, use in nursing mothers should be avoided.

**Pediatric Use:** Safety and effectiveness in pediatric patients below the age of 2 years have not been established. Pediatric dosing recommendations for juvenile arthritis are based on well-controlled studies (see DOSAGE AND ADMINISTRATION). There are no adequate effectiveness or dose-response data for other pediatric conditions, but the experience in juvenile arthritis and other use experience have established that single doses of 2.5 to 5 mg/kg (as naproxen suspension, see DOSAGE AND ADMINISTRATION), with total daily dose not exceeding 15 mg/kg/day, are well tolerated in pediatric patients over 2 years of age.

## ADVERSE REACTIONS

The following adverse reactions are divided into three parts based on frequency and whether or not the possibility exists of a causal relationship between naproxen and those adverse events. In those reactions listed as "Probable Causal Relationship" there is at least 1 case for each adverse reaction where there is evidence to suggest that there is a causal relationship between drug usage and the reported event. Adverse reactions reported in controlled clinical trials in 960 patients treated for rheumatoid arthritis or osteoarthri-

tis are treated below. In general, reactions in patients treated chronically were reported 2 to 10 times more frequently than they were in short-term studies in the 960 patients treated for mild to moderate pain or for dysmenorrhea. The most frequent complaints reported related to the gastrointestinal tract.

A clinical study found gastrointestinal reactions to be more frequent and more severe in rheumatoid arthritis patients taking daily doses of 1500 mg naproxen compared to those taking 750 mg naproxen (see CLINICAL PHARMACOLOGY).

In controlled clinical trials with about 80 pediatric patients and in well-monitored, open-label studies with about 400 pediatric patients with juvenile arthritis treated with naproxen, the incidence of rash and prolonged bleeding times were increased, the incidence of gastrointestinal and central nervous system reactions were about the same, and the incidence of other reactions were lower in pediatric patients than in adults.

The following adverse reactions are divided into three parts based on frequency and causal relationship. Incidence greater than 1% (Probable Causal Relationship):

**Gastrointestinal:** constipation,* heartburn,* abdominal pain,* nausea,* dyspepsia, diarrhea, stomatitis

**Central Nervous System:** headache,* dizziness,* drowsiness,* lightheadedness, vertigo

**Dermatologic:** itching (pruritus)*, skin eruptions*, ecchymoses*, sweating, purpura

**Special Senses:** tinnitus*; hearing disturbances, visual disturbances

**Cardiovascular:** edema,* dyspnea,* palpitations

**General:** thirst

*Incidence of reported reactions between 3% and 9%. Those reactions occurring in less than 3% of the patients are unmarked. Incidence less than 1% (Probable Causal Relationship):

The following adverse reactions were reported less frequently than 1% during controlled, clinical trials and through voluntary reports since marketing. These mentions observed through voluntary reporting since marketing are italicized.

**Gastrointestinal:** abnormal liver function tests, colitis, gastrointestinal bleeding and/or perforation, hematemesis, jaundice, pancreatitis, melena, vomiting

**Renal:** glomerular nephritis, hematuria, hyperkalemia, interstitial nephritis, nephrotic syndrome, renal disease, renal failure, renal papillary necrosis

**Hematologic:** agranulocytosis, eosinophilia, granulocytopenia, leukopenia, thrombocytopenia

**Central Nervous System:** depression, dream abnormalities, inability to concentrate; insomnia, malaise, myalgia, muscle weakness

**Dermatologic:** alopecia, photosensitive dermatitis, urticaria, skin rashes, photosensitivity reactions resembling porphyria cutanea tarda, epidermolysis bullosa

**Special Senses:** hearing impairment

**Cardiovascular:** congestive heart failure

**Respiratory:** eosinophilic pneumonitis

**General:** anaphylactoid reactions, angioneurotic edema, menstrual disorders, pyrexia (chills and fever)

Incidence less than 1% Causal Relationship Unknown):

These observations are being listed to serve as alerting information to the physician.

**Hematologic:** aplastic anemia, hemolytic anemia

**Central Nervous System:** aseptic meningitis, cognitive dysfunction

**Dermatologic:** epidermal necrolysis, erythema multiforme, Stevens-Johnson syndrome

**Gastrointestinal:** nonpeptic gastrointestinal ulceration, ulcerative stomatitis

**Cardiovascular:** vasculitis

**General:** hyperglycemia, hypoglycemia

## OVERDOSAGE

Significant naproxen overdosage may be characterized by drowsiness, heartburn, indigestion, nausea or vomiting. Because naproxen sodium may be rapidly absorbed, high and early blood levels should be anticipated. A few patients have experienced seizures, but it is not clear whether or not these were drug-related. It is not known what dose of the drug

would be life-threatening. The oral LD50 of the drug is 543 mg/kg in rats, 1234 mg/kg in mice, 4110 mg/kg in hamsters, and greater than 1000 mg/kg in dogs.

Should a patient ingest a large number of tablets or a large volume of suspension, accidentally or purposefully, the stomach may be emptied and usual supportive measures employed. In animals 0.5 g/kg of activated charcoal was effective in reducing plasma levels of naproxen. Hemodialysis does not decrease the plasma concentration of naproxen because of the high degree of its protein binding.

## DOSAGE AND ADMINISTRATION

**Rheumatoid Arthritis, Osteoarthritis, and Ankylosing Spondylitis**

(See table at bottom of page)

To maintain the integrity of the enteric coating, the EC-NAPROSYN tablet should not be broken, crushed or chewed during ingestion.

During long-term administration, the dose of naproxen may be adjusted up or down depending on the clinical response of the patient. A lower daily dose may suffice for long-term administration. The morning and evening doses do not have to be equal in size and the administration of the drug more frequently than twice daily is not necessary.

In patients who tolerate lower doses well, the dose may be increased to naproxen 1500 mg per day for limited periods when a higher level of anti-inflammatory/analgesic activity is required. When treating such patients with naproxen 1500 mg/day, the physician should observe sufficient increased clinical benefits to offset the potential increased risk (see CLINICAL PHARMACOLOGY and INDIVIDUALIZATION OF DOSAGE).

**Juvenile Arthritis:** The recommended total daily dose of naproxen is approximately 10 mg/kg given in 2 divided doses (ie, 5 mg/kg given twice a day). A measuring cup marked in 1/4 teaspoon and 2.5 milliliter increments is provided with the NAPROSYN Suspension. The following table may be used as a guide for dosing of NAPROSYN Suspension:

| Patient's Weight | Dose | Administered as |
|---|---|---|
| 13 kg (29 lb) | 62.5 mg bid | 2.5 mL (1/2 tsp) twice daily |
| 25 kg (55 lb) | 125 mg bid | 5.0 mL (1 tsp) twice daily |
| 38 kg (84 lb) | 187.5 mg bid | 7.5 mL (1 1/2 tsp) twice daily |

**Management of Pain; Primary Dysmenorrhea and Acute Tendinitis and Bursitis:** The recommended starting dose is 550 mg of naproxen sodium as ANAPROX/ANAPROX DS followed by 550 mg every 12 hours or 275 mg every 6 to 8 hours as required. The initial total daily dose should not exceed 1375 mg of naproxen sodium. Thereafter, the total daily dose should not exceed 1100 mg of naproxen sodium. NAPROSYN may also be used but EC-NAPROSYN is not recommended for initial treatment of acute pain because absorption of naproxen is delayed compared to other naproxen-containing products (see CLINICAL PHARMACOLOGY, INDICATIONS AND USAGE and INDIVIDUALIZATION OF DOSAGE).

**Acute Gout:** The recommended starting dose is 750 mg of NAPROSYN followed by 250 mg every 8 hours until the attack has subsided. ANAPROX may also be used at a starting dose of 825 mg followed by 275 mg every 8 hours. EC-NAPROSYN is not recommended because of the delay in absorption (see CLINICAL PHARMACOLOGY).

## HOW SUPPLIED

NAPROSYN Tablets: 250 mg: yellow, round-shaped, biconvex, debossed with NAPROSYN on one side and 250 on the other. Packaged in light-resistant bottles of 100 and 500.

100's (bottle): NDC 18393-373-42; 500's (bottle): NDC 18393-373-62.

375 mg: peach, capsule-shaped, debossed with NAPROSYN on one side and 375 on the other. Packaged in light-resistant bottles of 100 and 500.

100's (bottle): NDC 18393-373-12; 500's (bottle): NDC 18393-372-62.

500 mg: yellow, capsule-shaped, debossed with NAPROSYN on one side and 500 on the other. Packaged in light-resistant bottles of 100 and 500.

100's (bottle): NDC 18393-277-42; 500's (bottle): NDC 18393-277-62.

| | | |
|---|---|---|
| NAPROSYN | 250 mg<br>or 375 mg<br>or 500 mg | twice daily<br>twice daily<br>twice daily |
| ANAPROX | 275 mg<br>(naproxen 250 mg with 25 mg sodium) | twice daily |
| ANAPROX DS | 550 mg<br>(naproxen 500 mg with 50 mg sodium) | twice daily |
| NAPROSYN Suspension | 250 mg (10 mL/2 tsp)<br>or 375 mg (15 mL/3 tsp)<br>or 500 mg (20 mL/4 tsp) | twice daily<br>twice daily<br>twice daily |
| EC-NAPROSYN | 375 mg<br>or 500 mg | twice daily<br>twice daily |

Information will be superseded by supplements and subsequent editions

**PRODUCT INFORMATION**                                    **ROCHE LABORATORIES/2461**

Store at 15° to 30°C (59° to 86°F) in well-closed containers; dispense in light-resistant containers.
NAPROSYN Suspension: 125 mg/5 mL (contains 39 mg sodium, about 1.5 mEq/teaspoon). Available in 1 pint (473 mL) light-resistant bottles (NDC 0004-0258-26). Measuring cups are provided so that one can be dispensed with each prescription.
Store at 15° to 30°C (59° to 86°F); avoid excessive heat, above 40°C (104°F). Dispense in light-resistant containers.
EC-NAPROSYN Delayed-Release Tablets: 375 mg white, oval-shaped, imprinted with EC-NAPROSYN on one side and 375 on the other, in light-resistant containers of 100.
100's (bottle): NDC 18393-256-42.
500 mg: white, capsule-shaped, imprinted with EC-NAPROSYN on one side and 500 on the other, in light-resistant bottles of 100.
100's (bottle): NDC 18393-256-42.
Store at 15° to 30°C (59° to 86°F) in well-closed containers; dispense in light-resistant containers.
ANAPROX Tablets: Naproxen sodium 275 mg: light blue, oval-shaped, film-coated, debossed with ROCHE on one side and ANAPROX on the other. Packaged in bottles of 100 and 500.
100's (bottle): NDC 18393-274-42; 500's (bottle): NDC 18393-274-62.
Store at 15° to 30°C (59° to 86°F) in well-closed containers.
ANAPROX DS Tablets: Naproxen sodium 550 mg: dark blue, capsule-shaped, film-coated, debossed with ROCHE on one side and ANAPROX DS on the other. Packaged in bottles of 100 and 500.
100's (bottle): NDC 18393-276-42; 500's (bottle): NDC 18393-276-62.
Store at 15° to 30°C (59° to 86°F) in well-closed containers.
"Manufactured by Patheon Inc., Mississauga, Ontario L5N 3X4. Distributed by Roche Laboratories Inc., Nutley, N.J.
Manufactured by Syntex Puerto Rico, Inc.
Humacao, PR 00791
Revised: January 1997
Shown in Product Identification Guide, page 333

**EFUDEX ®**                                                        ℞
[ef'u-dex ]
brand of fluorouracil
**TOPICAL SOLUTIONS AND CREAM**

*The following text is complete prescribing information based on official labeling in effect June 1997.*

**DESCRIPTION**
Efudex Solutions and Cream are topical preparations containing the fluorinated pyrimidine 5-fluorouracil, an antineoplastic antimetabolite.
Efudex Solution consists of 2% or 5% fluorouracil on a weight/weight basis, compounded with propylene glycol, tris(hydroxymethyl)aminomethane, hydroxypropyl cellulose, parabens (methyl and propyl) and disodium edetate.
Efudex Cream contains 5% fluorouracil in a vanishing cream base consisting of white petrolatum, stearyl alcohol, propylene glycol, polysorbate 60 and parabens (methyl and propyl).
Chemically, fluorouracil is 5-fluoro-2,4(1H,3H)-pyrimidinedione. It is a white to practically white, crystalline powder which is sparingly soluble in water and slightly soluble in alcohol. One gram of fluorouracil is soluble in 100 mL of propylene glycol. The molecular weight of 5-fluorouracil is 130.08.

**CLINICAL PHARMACOLOGY**
There is evidence that the metabolism of fluorouracil in the anabolic pathway blocks the methylation reaction of deoxyuridylic acid to thymidylic acid. In this manner fluorouracil interferes with the synthesis of deoxyribonucleic acid (DNA) and to a lesser extent inhibits the formation of ribonucleic acid (RNA). Since DNA and RNA are essential for cell division and growth, the effect of fluorouracil may be to create a thymine deficiency which provokes unbalanced growth and death of the cell. The effects of DNA and RNA deprivation are most marked on those cells which grow more rapidly and take up fluorouracil at a more rapid rate. The catabolic metabolism of fluorouracil results in degradation products (eg, CO₂, urea, α-fluoro-β-alanine) which are inactive. Systemic absorption studies of topically applied fluorouracil have been performed on patients with actinic keratoses using trace amounts of ¹⁴C-labeled fluorouracil added to a 5% preparation. All patients had been receiving unlabeled fluorouracil until the peak of the inflammatory reaction occurred (10 to 3 weeks), ensuring that the time of maximum absorption was used for measurement. One gram of labeled preparation was applied to the entire face and neck and left in place for 12 hours. Urine samples were collected. At the end of 3 days, the total recovery ranged between 0.48% and 0.94% with an average of 0.76%, indicating that approximately 5.98% of the topical dose was absorbed systemically. If applied twice daily, this would indicate systemic absorption of topical fluorouracil to be in the range of 5 to 6 mg per

daily dose of 100 mg. In an additional study negligible amounts of labeled material were found in plasma, urine and expired CO₂ after 8 days of treatment with topically applied ¹⁴C-labeled fluorouracil.

**INDICATIONS AND USAGE**
Efudex is recommended for the topical treatment of multiple actinic or solar keratoses. In the 5% strength it is also useful in the treatment of superficial basal cell carcinomas when conventional methods are impractical, as with multiple lesions or difficult treatment sites. Safety and efficacy in other indications have not been established.
The diagnosis should be established prior to treatment, since this method has not been proven effective in other types of basal cell carcinomas. With isolated, easily accessible basal cell carcinomas, surgery is preferred since success with such lesions is almost 100%. The success rate with Efudex Cream and Solution is approximately 93%, based on 113 lesions in 54 patients. Twenty-five lesions treated with the solution produced 1 failure and 62 lesions treated with the cream produced 7 failures.

**CONTRAINDICATIONS**
Efudex may cause fetal harm when administered to a pregnant woman.
There are no adequate and well-controlled studies in pregnant women with either the topical or the parenteral forms of fluorouracil. One birth defect (cleft lip and palate) has been reported in the newborn of a patient using Efudex as recommended. One birth defect (ventricular septal defect) and cases of miscarriage have been reported when Efudex was applied to mucous membrane areas. Multiple birth defects have been reported in a fetus of a patient treated with intravenous fluorouracil.
Animal reproduction studies have not been conducted with Efudex. Fluorouracil administered parenterally has been shown to be teratogenic in mice, rats, and hamsters when given at doses equivalent to the usual human intravenous dose; however, the amount of fluorouracil absorbed systemically after topical administration to actinic keratoses is minimal (see CLINICAL PHARMACOLOGY). Fluorouracil exhibited maximum teratogenicity when given to mice as single intraperitoneal injections of 10 to 40 mg/kg on Day 10 or 12 of gestation. Similarly, intraperitoneal doses of 12 to 37 mg/kg given to rats between Days 9 and 12 of gestation and intramuscular doses of 3 to 9 mg/kg given to hamsters between Days 8 and 11 of gestation were teratogenic. Doses higher than 40 mg/kg resulted in abortion.
Efudex is contraindicated in women who are or may become pregnant during therapy. If this drug is used during pregnancy, or if the patient becomes pregnant while using this drug, the patient should be apprised of the potential hazard to the fetus.
Efudex is also contraindicated in patients with known hypersensitivity to any of its components.

**WARNINGS**
Application to mucous membranes should be avoided due to the possibility of local inflammation and ulceration. Additionally, cases of miscarriage and a birth defect (ventricular septal defect) have been reported when Efudex was applied to mucous membrane areas during pregnancy.
Occlusion of the skin with nonclusive hydration has been shown to increase percutaneous penetration of several topical preparations. If any occlusive dressing is used in treatment of basal cell carcinomas, there may be an increase in the severity of inflammatory reactions in the adjacent normal skin. A porous gauze dressing may be applied for cosmetic reasons without increase in reaction.
Exposure to ultraviolet rays should be minimized during and immediately following treatment with Efudex because the intensity of the reaction may be increased.

**PRECAUTIONS**
General: There is a possibility of increased absorption through ulcerated or inflamed skin.
Information for Patients: Patients should be forewarned that the reaction in the treated areas may be unsightly during therapy and, usually, for several weeks following cessation of therapy. Patients should be instructed to avoid exposure to ultraviolet rays during and immediately following treatment with Efudex because the intensity of the reaction may be increased. If Efudex is applied with the fingers, the hands should be washed immediately afterward. Efudex should not be applied on the eyelids or directly into the eyes, nose or mouth because irritation may occur.
Laboratory Tests: Solar keratoses which do not respond should be biopsied to confirm the diagnosis. Follow-up biopsies should be performed as indicated in the management of superficial basal cell carcinoma.
Carcinogenesis, Mutagenesis, Impairment of Fertility: Adequate long-term studies in animals to evaluate carcinogenic potential have not been conducted with fluorouracil.

Studies with the active ingredient of Efudex, 5-fluorouracil, have shown positive effects in in vitro tests for mutagenicity and on impairment of fertility.
5-Fluorouracil was positive in three in vitro cell neoplastic transformation assays. In the C3H/10T½ clone 8 mouse embryo cell system, the resulting morphologically transformed cells formed tumors when inoculated into immunosuppressed syngeneic mice.
While no evidence for mutagenic activity was observed in the Ames test (3 studies), fluorouracil has been shown to be mutagenic in the survival count recessy with Bacillus subtilis and in the Drosophila wing-hair spot test. Fluorouracil produced petite mutations in Saccharomyces cerevisiae and was positive in the micronucleus test (bone marrow cells of male mice).
Fluorouracil was clastogenic in vitro (ie, chromatid gaps, breaks and exchanges) in Chinese hamster fibroblasts at concentrations of 1.0 and 2.0 μg/mL and has been shown to increase sister chromatid exchanges in human lymphocytes. In addition, 5-fluorouracil has been reported to produce an increase in numerical and structural chromosome aberrations in peripheral lymphocytes of patients treated with this product.
Doses of 125 to 250 mg/kg, administered intraperitoneally, have been shown to induce chromosomal aberrations and changes in chromosome organization of spermatogonia in rats. Spermatogonial differentiation was also inhibited by fluorouracil, resulting in transient infertility. However, in studies with a strain of mouse which is sensitive to the induction of sperm head abnormalities after exposure to a range of chemical mutagens and carcinogens, fluorouracil was inactive at oral doses of 5 to 50 mg/kg/day. In female rats, fluorouracil administered intraperitoneally at doses of 25 and 50 mg/kg during the preovulatory phase of oogenesis significantly reduced the incidence of fertile matings, delayed the development of preimplantation and postimplantation embryos, increased the incidence of preimplantation lethality and induced chromosomal anomalies in these embryos. Single dose intravenous and intraperitoneal injections of 5-fluorouracil have been reported to kill differentiated spermatogonia and spermatocytes (at 500 mg/kg) and to produce abnormalities in spermatids (at 50 mg/kg) in mice.
Pregnancy: Teratogenic Effects: Pregnancy Category X: See CONTRAINDICATIONS section.
Nursing Mothers: It is not known whether Efudex is excreted in human milk. Because there is some systemic absorption of fluorouracil after topical application (see CLINICAL PHARMACOLOGY), because many drugs are excreted in human milk, and because of the potential for serious adverse reactions in nursing infants, a decision should be made whether to discontinue nursing or to discontinue use of the drug, taking into account the importance of the drug to the mother.
Pediatric Use: Safety and effectiveness in children have not been established.

**ADVERSE REACTIONS**
The most frequent adverse reactions to Efudex occur locally and are often related to an extension of the pharmacological activity of the drug. These include burning, crusting, allergic contact dermatitis, erosions, erythema, hyperpigmentation, irritation, pain, photosensitivity, pruritus, scarring, rash, soreness and ulceration. Ulcerations, other local reactions, cases of miscarriage and a birth defect (ventricular septal defect) have been reported when Efudex was applied to mucous membrane areas. Leukocytosis is the most frequent hematological side effect.
Although a causal relationship is remote, other adverse reactions which have been reported infrequently are:
Central Nervous System: Emotional upset, insomnia, irritability.
Gastrointestinal: Medicinal taste, stomatitis.
Hematological: Eosinophilia, thrombocytopenia, toxic granulation.
Integumentary: Alopecia, blistering, bullous pemphigoid, discomfort, ichthyosis, scaling, suppuration, swelling, telangiectasia, tenderness, urticaria, skin rash.
Special Senses: Conjunctival reaction, corneal reaction, lacrimation, nasal irritation.
Miscellaneous: Herpes simplex.

**OVERDOSAGE**
There have been no reports of overdosage with Efudex.
The oral LD₅₀ for the 5% topical cream was 234 mg/kg in rats and 50 mg/kg in dogs. These doses represented 11.7 and 1.95 mg/kg of fluorouracil, respectively. Studies with a 5% topical solution yielded an oral LD₅₀ of 274 mg/kg in rats and 35.5 mg/kg in dogs, corresponding to 10.7 and 1.43 mg/kg of fluorouracil, respectively. The topical application of the 5% cream to rats yielded an LD₅₀ of greater than 500 mg/kg.

**DOSAGE AND ADMINISTRATION**
When Efudex is applied to a lesion, a response occurs with the following sequence: erythema, usually followed by vesiculation, desquamation, erosion and reepithelialization.

Continued on next page

Consult 1998 PDR® supplements and future editions for revisions

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1677**

**Product:** MK-0966
**Protocol/Amendment No.:** 089-04                                    72

APPENDIX 6

Instructions to Investigator Sites for Documentation of Serious Vascular Adverse Events
in Clinical Trials of Cox-2-Specific Inhibitors

/MK-0966/CP/RP2318.DOC * APPROVED                      08-Sep-1999
Non-U.S. (Non-U.S. IND)                                      R 01-Feb-2000

Confidential - Subject To Protective Order                                    MRK-AFV0130327

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1678**

Standard Operating Procedure for the Surveillance, Monitoring, and
Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials
of COX-2 Specific Inhibitors

Confidential – Subject To Protective Order                              MRK-AFV0130328

C-2SI Vascular Events Monitoring and Adjudication SOP                              30-Aug-1999

# Table of Contents

EXECUTIVE SUMMARY ....................................................................................................................... 1

I.      INTRODUCTION AND PURPOSE ............................................................................................ 2

II.     BACKGROUND ...................................................................................................................... 2

III.    ADMINISTRATION ................................................................................................................ 2
A.      MEMBERSHIP AND ROLE OF THE VASCULAR EVENT COMMITTEE .......................................... 2
B.      THE MRL VASCULAR EVENT COORDINATING CENTER ........................................................ 3
C.      CLINICAL TRIALS COVERED BY THE STANDARD OPERATING PROCEDURES ........................... 4

IV      METHODS .............................................................................................................................. 4
A.      OVERVIEW OF APPROACH TO SURVEILLANCE, MONITORING, AND ADJUDICATION OF EVENTS ......... 4
B.      VASCULAR SERIOUS ADVERSE EVENT SURVEILLANCE ......................................................... 5
C.      VASCULAR EVENT MONITORING ........................................................................................... 5
D.      SUBMISSION OF DATA TO THE MRL COORDINATING CENTER ............................................... 6
E.      DATA REQUIRED FOR CLINICAL EVENT EVALUATION ........................................................... 6
F.      RECEIPT OF DATA / DOCUMENTATION BY THE MRL VEC COORDINATING CENTER ............... 6
G.      LOGGING THE VASCULAR EVENT DATA ................................................................................ 6
H.      THE VASCULAR EVENT DATABASE ....................................................................................... 6
I.      MRL COORDINATING CENTER ASSEMBLY AND REVIEW OF THE VASCULAR EVENT DATA PACKAGE 6
J.      SHIPMENT OF THE VASCULAR EVENT DATA PACKAGES ......................................................... 7
K.      CLASSIFICATION OF EVENTS AND ADJUDICATION CRITERIA .................................................. 8
L.      DEFINITION OF VASCULAR EVENT DATE ................................................................................ 9
M.      MULTIPLE EVENTS IN ONE PATIENT ...................................................................................... 9
N.      PRELIMINARY VASCULAR EVENT ADJUDICATION ................................................................... 9
O.      FINAL VASCULAR EVENT ADJUDICATION .............................................................................. 10
P.      BLINDING ............................................................................................................................. 10
Q.      QUALITY CONTROL OF THE VASCULAR EVENT DATA BASE ................................................... 11
R.      QUALITY ASSURANCE ........................................................................................................... 11
S.      VASCULAR EVENTS FOR ANALYSIS ....................................................................................... 11

REFERENCES.................................................................................................................................. 12

APPENDIX A................................................................................................................................... 13

VASCULAR EVENTS COMMITTEE MEMBERSHIP ................................................................................ 13

APPENDIX B................................................................................................................................... 15

VASCULAR SAE TERMS (CRISP BROADER TERM) ........................................................................... 15

APPENDIX C................................................................................................................................... 17

SUGGESTED FLOW OF REQUESTS FOR DATA/DOCUMENTATION ........................................................ 17

APPENDIX D................................................................................................................................... 20

CASE REPORT FORM WORKSHEETS AND SOURCE DOCUMENTS ......................................................... 20

APPENDIX E................................................................................................................................... 22

CLINICAL TEAM VASCULAR EVENT FORM....................................................................................... 22

APPENDIX F ................................................................................................................................... 24

VASCULAR EVENT ADJUDICATION PACKAGE COVER ....................................................................... 24

Confidential Property of Merck & Co., Inc.                                                          1
E:\PROGRA~1\Ilep\PublishNDS\DPTN~1.DOC

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)            **1680**

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

APPENDIX G.............................................................................................................................. 26
VASCULAR EVENT ADJUDICATION WORKSHEETS.................................................................... 26
APPENDIX H.............................................................................................................................. 33
ADJUDICATION GUIDELINES FOR CARDIAC EVENTS .............................................................. 33
APPENDIX I................................................................................................................................ 37
ADJUDICATION GUIDELINES FOR PERIPHERAL VASCULAR EVENTS ...................................... 37
APPENDIX J............................................................................................................................... 41
ADJUDICATION GUIDELINES FOR CEREBROVASCULAR EVENTS............................................. 41
APPENDIX K.............................................................................................................................. 46
VASCULAR EVENTS FINAL ADJUDICATION FORM ................................................................... 46

Confidential Property of Merck & Co., Inc.
P\PROGRA~1\top\M&c\0966\0966~1.DOC

2

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)        **1681**

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

## EXECUTIVE SUMMARY

This document describes a standard operating procedure (SOP) for surveillance, monitoring, and adjudication of potential acute Thromboembolic vascular (cardiac, cerebrovascular, and peripheral vascular) events (hereafter referred to as vascular events) among patients in cyclooxygenase-2-specific inhibitor (C-2SI: MK-0966, MK-0663, and future compounds) trials and their extensions. It contains standard procedures to be used in all eligible trials for event surveillance, monitoring, documentation, and adjudication by a blinded, external, Vascular Event Committee (VEC). The purpose of this SOP is to provide standardized data for pooled analyses of the incidence of vascular events in patients treated with a C-2SI compound, compared with that of patients treated with one or more comparator agents. These procedures apply to all trials of MK-0966, MK-0663, and future C-2SI compounds which are of ≥4 weeks duration, and include all events occurring on treatment or within 14 days following the discontinuation of treatment. These include trials and trial extensions conducted by MRL, CDP, and CDSP. Trials which are done in normal, healthy volunteers, regardless of duration of the study, are excluded. This SOP is not restricted to specific indications.

The Vascular Event Committee is composed of three separate subspecialty committees: one each for cardiac events, cerebrovascular events, and peripheral (pulmonary, abdominal/pelvic and extremities) vascular events. The members of the three committees are, respectively, cardiologists, neurologists, and vascular specialists who are expert in the treatment of ischemic syndromes as well as the medical aspects of clinical trials. Each subspecialty committee contains three active members. Adjudications are performed in a blinded manner using prespecified event definitions and adjudication guidelines.

The MRL Vascular Event Coordinating Center, within the Department of Epidemiology, is responsible for the overall administration of the SOP, using the following methods. Surveillance for vascular clinical events is performed by continuous active review, by personnel within Worldwide Product Safety and Epidemiology, of the Worldwide Adverse Experience System (WAES) database of all serious cardiovascular SAE reports for all eligible trials. WAES reports using prespecified CRISP preferred AE terms are identified and listed for the VEC Liaison. The Coordinating Center logs the event into the Vascular Event Database, and a sequential case number is assigned. The Clinical Monitor or other assigned member of the clinical team responsible for the trial is notified that the event is eligible for adjudication. The Clinical Monitor brings the event to the attention of field personnel who request data and documentation from the investigator. The investigator completes the appropriate case report form worksheets, and assembles supporting source documentation. The forms and documents are sent to the responsible clinical team member in MRL, CDP or CDSP who reviews the package for completeness and consistency and sends it to the Clinical Monitor, who again reviews the documentation package. New information for an SAE obtained through this process is summarized and submitted to WPS&E following standard procedures (MAPP 13) for SAE reporting. Following clinical review, the documentation is sent to the Coordinating Center. The Coordinating Center logs the receipt of the documentation, masks all patient and protocol identifiers, assembles a standard Vascular Event Data Package, and sends the package to the appropriate subspecialty committee for preliminary adjudication. The VEC members independently perform the preliminary adjudication. Final adjudication of each case is reached by majority vote in cases where the preliminary adjudications are not unanimous. The Coordinating Center enters the preliminary and final adjudications in a secure database, and maintains backup files and paper records in secure locations. The Coordinating Center is also responsible for quality control of the database and for providing data files for analysis. MRL Clinical Quality Assurance is responsible for quality assurance of the database.

Analyses will be performed on blocks of studies grouped according to study design, indication and the timing of their completion. The objective of the statistical analysis is to estimate the incidence of vascular events in patients treated with a specific COX-2 compound and that of patients treated with comparator NSAIDs. No formal comparisons among treatment group rates will be performed.

Confidential Property of Merck & Co., Inc.
E:\PROGRA~1\Pkp\PubMED\VOPFIN~1.DOC

I

Confidential - Subject To Protective Order                                MRK-AFV0130331

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP                    30-Aug-1999

**I.    INTRODUCTION AND PURPOSE**

This document describes a standard operating procedure (SOP) for the prospective surveillance, monitoring, and blinded adjudication of potential acute thromboembolic vascular (cardiovascular, cerebrovascular, and peripheral vascular) events (vascular events) among patients in cyclooxygenase-2-specific inhibitor (C-2SI: MK-0966, MK-0663, and future compounds) trials and their extensions. It contains standard procedures to be used in all eligible trials. The purpose of this procedure is to provide standardized data for pooled analyses of the incidence of vascular events in patients treated with a COX-2 compound, compared with that of patients treated with one or more comparator agents.

**II.    BACKGROUND**

Merck's COX-2 specific agents efficiently suppress COX-2 activity, as measured in ex vivo assays of lipopolysaccharide (LPS)-induced leukocyte prostaglandin E2 production. In contrast to nonsteroidal anti-inflammatory drugs (NSAIDs), which are dual COX-1/COX-2 inhibitors, COX-2 specific inhibitors do not suppress serum levels of thromboxane B2 , a product of platelet-derived COX-1, and thus do not prolong platelet aggregation, as measured by bleeding time.

In MK-0966 Protocol 023 (A Double-Blind, Placebo-Controlled, Parallel-Group Study to Evaluate and Compare the Effects of L-748,731 [MK-0966], Indomethacin, and Placebo on Urinary Sodium Excretion and Other Parameters of Renal Function in Subjects Consuming a 200 mEq Sodium Diet), MK-0966 (50 mg daily), and indomethacin (50 mg 3 times daily) were both found to significantly reduce the urinary excretion of PGI-M compared to placebo. However, MK-0966 had no effect on systemic thromboxane production (largely platelet derived) as assessed by measurements of serum thromboxane B2 and the urinary metabolite, 11-dehydro-thromboxane B2. It was felt that the reduction in urinary PGI-M likely reflects both a reduction in renal PGI2 generation, as supported by an observed decrease in urinary 6-keto PFGI$\alpha$, and, to some undefinable extent, a decrease in systemic PGI2 synthesis.[1]  PGI2 is synthesized ubiquitously in blood vessel walls from arachidonate derived from either the vessel wall or the platelet. It is the most potent of all inhibitors of platelet aggregation, and has vascular dilatory properties as well. Conversely, thromboxane A2, a potent platelet aggregator and vasoconstrictor, is synthesized primarily by the platelet.[2]  The clinical implications of partially inhibiting the production of PGI2 without inhibiting thromboxane generation systemically are unknown. In general, oral administration of VIOXX has been safe and well-tolerated to date, and no clinical important difference between VIOXX and comparator NSAIDs in the incidence of serious vascular adverse events have been observed.

**III.    ADMINISTRATION**

   ***A.    Membership and Role of the Vascular Event Committee***

   The Vascular Event Committee (VEC) is composed of three separate subspecialty committees: one each for cardiac events, cerebrovascular events, and peripheral vascular events. The members of the three subspecialty committees are, respectively, cardiologists, neurologists. and peripheral vascular specialists who are expert in the treatment of ischemic syndromes as well as the medical aspects of clinical trials. The members of the VEC may not be employees of Merck & Co., Inc. No member of the VEC may be an investigator for any of the clinical trials covered by this SOP or involved in the conducting of the studies in any capacity. The current membership of the VEC is listed in **Appendix A.**

Confidential Property of Merck & Co., Inc.
E:\PRIVIRA∼1\Lap\Pablise\0\SGP\FIN∼1.DOC                    2

Confidential - Subject To Protective Order                    MRK-AFV0130332

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP                30-Aug-1999

The total VEC membership consists of a minimum of nine members at all times, three for each subspecialty. Membership may change over time. One of the three members from each subspecialty is designated Chair for that subspecialty committee.

The VEC members are responsible for:

- Reading and understanding the contents of the current version of this SOP
- Understanding and accepting the current clinical event definitions and adjudication guidelines contained in the SOP
- Completion of the "Adjudication SOP Review and Acknowledgment Form"
- Identification of an assistant to facilitate communications with MRL
- Thorough review of all Vascular Event Data Packages in a timely manner (or communication that review will be delayed)
- Completion and return of the Preliminary Adjudication worksheet in a timely manner (or communication that preliminary adjudication will be delayed)
- Attendance at regularly scheduled teleconferences or meetings for the final adjudication of events and the conduct of committee business, as needed

In addition to the VEC Member responsibilities listed above, the VEC subspecialty chair is responsible for:

- The overall scientific integrity of the clinical event adjudication process (with assistance from the MRL Vascular Event Coordinating Center)
- The orderly conduct of teleconferences and meetings (with assistance from the MRL Vascular Event Coordinating Center)
- Mediation of disputes among members of the subspecialty committee concerning the evidence for a clinical event
- Signing the completed Final Clinical Event Adjudication Form, as representative for the subspecialty committee

### B.    *The MRL Vascular Event Coordinating Center*

The MRL Vascular Event Coordinating Center (hereafter referred to as the Coordinating Center), within the Department of Epidemiology, is responsible for the overall administration of the SOP. These responsibilities include:

- Participation in surveillance for vascular SAEs
- Receipt, logging, handling, and copying of clinical event documentation
- Preparation, distribution and tracking of event documentation
- Receipt and logging of preliminary and final adjudication data
- Scheduling and conduct of final adjudication meetings
- Creation and maintenance of a database with the results of the preliminary and final adjudications for each case
- Communications with the VEC Chairs and Members
- Communications with members of the COX-2 Project Team(s) on matters relating to the conduct of the SOP

An MRL Epidemiologist serves as director of the Coordinating Center and Liaison to the VEC (hereafter referred to as the VEC Liaison). This person has overall responsibility for the

Confidential Property of Merck & Co., Inc.                                                          3
E:\PROPRA~1\Fq\PMvbc9N8DPPM~1.DOC

C-2S1 VASCULAR EVENTS MONITORING AND ADJUDICATION SOP                    30-Aug-1999

functioning of the Coordinating Center. An Epidemiology Program Coordinator (hereafter referred to as the VEC Coordinator) assists the VEC Liaison and is responsible for the management of the administrative details of the procedures and the maintenance of the Vascular Events database. The VEC Coordinator also schedules, provides documentation for, and prepares minutes of all meetings.

Members of MRL Cardiovascular Clinical Research and Clinical Neurosciences serve as internal consultants to the Coordinating Center on an as needed basis.

### C.    Clinical Trials Covered by the Standard Operating Procedures

These procedures apply to all trials of MK-0966, MK-0663, and future COX-2 compounds which are of ≥4 weeks duration, and which began during 2Q98 or later. These include trials and trial extensions conducted by MRL, CDP, and CDSP. Included trials are not restricted to specific indications. Trials which are done in normal, healthy volunteers, regardless of duration of the study, are excluded. The determination as to which studies are pooled for analysis, and the timing of those analyses, will be addressed in a Data Analysis Plan (found under separate cover) and through future amendments/revisions to the SOP.

### IV    METHODS

### A.    Overview of Approach to Surveillance, Monitoring, and Adjudication of Events

This section provides an overview of the approach to the surveillance, monitoring, and adjudication of events. The sections that follow provide the specifics of the process.

Surveillance for vascular events is performed by continuous active review of the WAES database for all serious vascular SAE reports from eligible trials. This review is performed by personnel within Worldwide Product Safety and Epidemiology (WPS&E). Completed reports of events using prespecified CRISP preferred AE terms are forwarded to the VEC Liaison. WAES reports are printed and patient and treatment identifiers masked by an Epidemiology staff member who has no responsibility to the VEC or for adjudication procedures. The event is logged into the vascular event database and a sequential case number is assigned. The VEC Liaison notifies the Clinical Monitor (MRL & CDP or designee of the Clinical Monitor) or Medical Affairs Director (CDSP, hereafter referred to under the term Clinical Monitor) responsible for the trial that the event qualifies for adjudication. The monitor requests data and documentation from the investigator or brings it to the attention of a member of the field team who makes the request of the investigator. The investigator completes the appropriate case report form worksheets and assembles the supporting source documentation. The forms and documents are sent to the Clinical Monitor (U.S. sites) or Local Medical Director (non-U.S. subsidiaries). For events at non-U.S. subsidiaries, the Local Medical Director arranges for translation of pertinent documents as necessary and sends completed documentation to the Clinical Monitor for review. The Clinical Monitor reviews the completed documentation for consistency and completeness, completes and signs the VE Inventory and sends the VE data package to the Coordinating Center.

The Coordinating Center logs the receipt of the documentation, masks all patient, treatment and trial identifiers, and assembles a standard Vascular Event Data Package (VEDP). On a periodic basis, the VEDPs are sent for preliminary adjudication by the appropriate subcommittee. The VEC members independently perform the preliminary adjudications and return the completed adjudication forms to the Coordinating Center by overnight courier. Final adjudication of each

Confidential - Subject To Protective Order                    MRK-AFV0130334