# Exhibit 4
# Part 11

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1706**

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

## Appendix G

## Vascular Event Adjudication Worksheets

Confidential Property of Merck & Co., Inc.
E:\PROGRA~ N$pdbAkAN\S0PRH~1.DOC                                      26

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)                **1707**

C-2SI Vascular Events Monitoring and Adjudication SOP                         30-Aug-1999

## ADJUDICATION WORKSHEET
## COX-2 VASCULAR EVENT SAE MONITORING PROJECT
### CARDIOLOGY SUBCOMMITTEE

VEC Case No.          |__|__|__|__|

Reported Event        _____

Standard Description  _____

EVENT ONSET:          |__|__|/|__|__|/|__|__|__|__|

HOSPITAL ADMISSION DATE:   |__|__|/|__|__|/|__|__|__|__|          ☐ No Hospital Admission
                           DAY / Mnth   / Year

---

**Adjudication Instructions:** Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment. If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria. Justify your decision on the Adjudication Worksheet.

---

1. **Did the patient die?**
   - ☐ Yes     **If Yes,** continue to question 2.
   - ☐ No      **If No,** skip to question 3

2. **IF A FATAL EVENT: Indicate the cause of death for which criteria are met. For each event, include comments as to the criteria most relevant to your decision. If no event criteria are met, skip to question 4.**

   ☐  **Acute Myocardial Infarction**
      Major STRESSOR RELATIONSHIP   (CHECK ONE BOX):
         Complication of a cardiac revascularization procedure
         Related (major stressor antecedent to the MI)
         NOT Related (MI occurred spontaneously)
         Uncertain relationship

   Criteria/comments:_____
   _____
   _____
   _____

   ☐  **Sudden and/or Unexplained Death**
   Criteria/comments:_____
   _____
   _____
   _____

3. **IF A NON-FATAL EVENT: Indicate the event(s) for which criteria are met. For each event, include comments as to the criteria most relevant to your decision. If no event criteria are met, skip to question 4.**

   ☐  **Acute Myocardial Infarction**
      Major STRESSOR RELATIONSHIP   (CHECK ONE BOX):
         Complication of a cardiac revascularization procedure
         Related (major stressor antecedent to the MI)
         NOT Related (MI occurred spontaneously)
         Uncertain relationship

   Criteria/comments:_____
   _____
   _____

   ☐  **Unstable Angina Pectoris**
   Criteria/comments:_____
   _____
   _____
   _____

[Continued on p.2]
Confidential Property of Merck & Co., Inc.                                      27
E:\PK0096A\PK0\P088C\PK0\P096\DIFFIN-1.DOC

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1708**

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

**ADJUDICATION WORKSHEET**
**COX-2 VASCULAR EVENT SAE MONITORING PROJECT**
**CARDIOLOGY SUBCOMMITTEE**

**3.  NON-FATAL EVENT (cont.)**

☐ **Cardiac (atrial or ventricular) thrombus**
Criteria/comments:_____
_____
_____
_____

☐ **Resuscitated Cardiac arrest (without identified cause listed elsewhere)**
Criteria/comments:_____
_____
_____
_____

**4.  If no event criteria are met, indicate the reason:**
☐  Not a Thromboembolic event (e.g. pneumonia, cancer)
☐  Insufficient data
☐  Requires adjudication by other subcommittee
    ☐  Cerebrovascular
    ☐  Peripheral vascular
☐  Other (Specify):_____

**NOTES:** (Including additional documentation required for adjudication)
_____
_____
_____

**SIGNATURE:** _____     **DATE:** _____

For questions - contact:
Linda Nelsen
tel: (610) 397-3412
fax: (610) 397-2992
email: linda_nelsen@merck.com

Confidential Property of Merck & Co., Inc.
E:\PROGRA~1\Ept\Public\MSOFFD4~1.DOC

28

Confidential - Subject To Protective Order                    MRK-AFV0130358

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)                    **1709**

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

## ADJUDICATION WORKSHEET
## COX-2 VASCULAR EVENT SAE MONITORING PROJECT
## PERIPHERAL VASCULAR SUBCOMMITTEE

VEC Case No.          __

Reported Event        _____

Standard Description  _____

EVENT ONSET: |__|__|/|__|__|/|__|__|__|__|

HOSPITAL ADMISSION DATE:    |__|__|/|__|__|/|__|__|__|__|          ☐ No Hospital Admission
                            DAY / Mnth   / Year

**Adjudication Instructions**: Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment. If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria. Justify your decision on the Adjudication Worksheet.

**1.  Did the patient die?**

      ☐ Yes          **If Yes**, continue to item 2.

      ☐ No           **If No**, skip to item 3

**2.  IF A FATAL EVENT:  Indicate the cause of death for which criteria are met.  For each event, include comments as to the criteria most relevant to your decision.  If no event criteria are met, skip to question 4.**

      ☐   **Pulmonary Embolism**
          Major STRESSOR RELATIONSHIP  (CHECK ONE BOX):
          ☐    Spontaneous (PE occurred spontaneously)
          ☐    Secondary to antecedent stressor (Related to surgery, trauma or underlying malignancy)
          ☐    Uncertain relationship
      Criteria/comments:_____
      _____
      _____
      _____

      ☐   **Peripheral Arterial Thrombosis/Thromboembolism**  (e.g. mesenteric thrombus/embolus)
      Criteria/comments:_____
      _____
      _____
      _____

**3.  IF A NON-FATAL EVENT:  Indicate the event(s) for which criteria are met. For each event, include comments as to the criteria most relevant to your decision. If no event criteria are met, skip to question 4.**

      ☐   **Pulmonary Embolism**
          Major STRESSOR RELATIONSHIP  (CHECK ONE BOX):
          ☐    Spontaneous (PE occurred spontaneously)
          ☐    Secondary to antecedent stressor (Related to surgery, trauma or underlying malignancy)
          ☐    Uncertain relationship
      Criteria/comments:_____
      _____
      _____
      _____

      ☐   **Peripheral Venous Thrombosis**  (e.g. mesenteric thrombus/embolus)
          Major STRESSOR RELATIONSHIP  (CHECK ONE BOX):
          ☐    Spontaneous (Thrombosis occurred spontaneously)
          ☐    Secondary to antecedent stressor (Related to surgery, trauma or underlying malignancy)
          ☐    Uncertain relationship
      Criteria/comments:_____
      _____
      _____
      _____

**Non-fatal events (continued on p.2)**

Confidential Property of Merck & Co., Inc.                              29
E:\FROUGA~1\0tg\Vsbir\SNXOFFIN~1.DOC

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)　　　**1710**

C-2SI Vascular Events Monitoring and Adjudication SOP　　　　　30-Aug-1999

**ADJUDICATION WORKSHEET**
**COX-2 VASCULAR EVENT SAE MONITORING PROJECT**
**PERIPHERAL VASCULAR SUBCOMMITTEE**

3. **NON-FATAL EVENTS (cont.)**

　☐　**Peripheral Arterial Thrombosis/Thromboembolism**
　Criteria/comments:_____
　_____
　_____
　_____

4. **REASON THAT NO EVENT CRITERIA ARE MET:**
　☐　Not a thromboembolic event  (e.g. pneumonia, cancer)
　☐　Insufficient data
　☐　Requires adjudication by other subcommittee
　　　☐　Cardiovascular
　　　☐　Cerebrovascular
　☐　Other (Specify):_____

**NOTES:** (Including additional documentation required for adjudication)
_____
_____
_____

**SIGNATURE:** _____　　**DATE:** _____

For questions - contact:
Linda Nelsen
tel: (610) 397-3412
fax: (610) 397-2992
email: linda_nelsen@merck.com

Confidential Property of Merck & Co., Inc.
E:\PROGRA~1\Repl\bbb\n\SCFFIN~1.DOC　　　　　30

Confidential - Subject To Protective Order　　　　　MRK-AFV0130360

C-2S1 Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

## ADJUDICATION WORKSHEET
## COX-2 VASCULAR EVENT SAE MONITORING PROJECT
## CEREBROVASCULAR SUBCOMMITTEE

VEC Member: _____

Reported Event _____  Standard Term _____

EVENT ONSET: |___|/|___|___|/|___|___|___|___|    DATE OF HOSPITALIZATION |___|/|___|___|/|___|___|___|___|  ☐ No Hospital Admission

For questions contact:

Linda Nelsen

(610) 397-3412
linda_nelsen@merck.com

**Adjudication Instructions:** Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment. If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria. Justify your decision in the space provided.

At each level of the chart below, indicate if there is adequate documentation to support the classification listed. If the final decision with sufficient data is at decision 3, 4 and 5, include comments as to the criteria or clinical features most relevant to your decision. For specified events, indicate if the event was fatal.

| Decision | | Event | | Initials |
|---|---|---|---|---|
| 1. Neurologic Event | ☐ Insufficient data | ☐ Neurologic | ☐ Not Neurologic | _____ |
| 2. Vascular Event | ☐ Insufficient data | ☐ Vascular | ☐ Not vascular | _____ |
| 3. Stroke or TIA | ☐ Insufficient data | ☐ Stroke | ☐ Transient Ischemic | _____ |
| 4. Ischemic or Hemorrhagic | ☐ Insufficient data | ☐ Ischemic stroke | ☐ Venous Thrombosis    ☐ Hemorrhagic Stroke | _____ |
| 5. Subtype of Ischemic stroke | ☐ Insufficient data | ☐ Large Artery | ☐ Cardioembolism    ☐ Lacune    ☐ Other etiology | _____ |

If the event is adjudicated to be one of the following events, indicate if it is fatal or non-fatal:

Ischemic cerebrovascular stroke:          ☐ Fatal    ☐ Non-fatal
Hemorrhagic cerebrovascular stroke        ☐ Fatal    ☐ Non-fatal
Cerebrovascular Venous Thrombosis:        ☐ Fatal    ☐ Non-fatal

Criteria/Comments: _____

_____

_____

_____

Confidential Property of Merck & Co., Inc.
MRK0966-17ApVMonWSMRH1.DOC

31

Confidential - Subject To Protective Order                    MRK-AFV0130361

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1712**

Confidential - Subject To Protective Order

MRK-AFV0130362

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1713**

C-2S1 Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

**Appendix H**

Adjudication Guidelines For Cardiac Events

(CARDIOLOGY COMMITTEE)

Confidential Property of Merck & Co., Inc.          33

Confidential – Subject To Protective Order                              MRK-AFV0130363

C-2S1 Vascular Events Monitoring and Adjudication SOP                          30-Aug-1999

## Appendix H
## Adjudication Guidelines For Cardiac Events

**Adjudication Instructions**:  Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment.  If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria. Justify your decision on the Adjudication Worksheet.

### NON-FATAL EVENTS

### Acute myocardial infarction

Acute MI (in patients not undergoing invasive cardiac revascularization procedures) is defined as:

1.     New pathological Q waves (>0.03 sec wide) in two contiguous leads, *OR*

2.     Symptoms consistent with ischemia (see note below) *OR* new ischemic ST-T-wave changes (ST depression or ST elevation or T-Wave inversion) in two or more contiguous leads *AND* one or more of the following abnormal enzyme profiles:

    a)     A rise in serum creatine kinase MB (CK-MB) to >2 times the upper limit of normal when measured in mass units *OR*

    b)     A rise in serum creatine kinase (CK) to >2 times the upper limit of normal, and abnormal CK-MB when measured in activity units *OR*

    c)     A rise in serum CK of >2 times the upper limit of normal when CK-MB unavailable, and no other cause of elevated CK is present *OR*

    d)     A rise in serum CK of >2 times the upper limit of normal when CK-MB unavailable, and cardiac troponin I or T >2 times the upper limit of normal.

    (Note: An acceptable equivalent of typical chest pain would be clinical evidence of hemodynamic instability manifested as pulmonary edema, evidence of hypoxemia or hypotension [systolic blood pressure <90 mm Hg, not related to antianginal therapy or need for fluid volume or pressor therapy], if associated with ECG evidence of ischemia.)

In patients undergoing invasive cardiac revascularization procedures, a new acute MI is defined by the following guidelines:

1.     In patients following PTCA, atherectomy, or stent:

    a)     CK-MB >3 times the upper limit of normal within 24 to 36 hours after the PTCA, *OR*

Confidential Property of Merck & Co., Inc.     34
E:\PROGRA~1\Rep\Public\MSOFFIN~1.DOC

Confidential – Subject To Protective Order                                                          MRK-AFV0130364

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1715**

C-2SI Vascular Events Monitoring and Adjudication SOP                    6/14/00

## Appendix H

### Adjudication Guidelines For Cardiac Events

**(continued)**

   b) In the absence of CK-MB data, CK of >3 times the upper limit of normal, *OR*

   c) Cardiac troponin I or T >5 times the upper limit of normal.

  2. In patients following CABG:

   a) The development of new pathologic Q-waves (>0.03 sec in 2 contiguous leads) on the ECG within 48 hours post-CABG.

   b) After 48 hours post-CABG, a new MI can be diagnosed as for patients not undergoing cardiac revascularization procedures.

For acute MI, the adjudicator is asked to make a determination as to any possible association between the MI and antecedent "major stressors", specifically cardiac revascularization procedures (i.e. PTCA, atherectomy, stent, or CABG), GI bleeds, or major surgery. The following guidelines should be used in making these determinations:

  1. Complication of an cardiac revascularization procedure: an MI that, in the clinical judgment of the adjudicator, occurred coincident with (or within 72 hours following) and was probably a complication of an antecedent cardiac revascularization procedure.

  2. Other major-stressor-related (excludes cardiac revascularization procedures): an MI that, in the clinical judgment of the adjudicator, occurred coincident with (or within 48 hours following) and was probably a complication of an antecedent major stressor such as GI bleed or major surgery.

  3. Not major-stressor-related: an MI that, in the clinical judgment of the adjudicator, occurred spontaneously and was not associated with an antecedent major stressor.

  4. Unclear major-stressor-relationship: an MI that, in the clinical judgment of the adjudicator, was of uncertain temporal relationship to a major stressor.

#### Unstable angina pectoris

UAP is defined as new or accelerating symptoms of myocardial ischemia (prolonged and/or repetitive anginal-like chest discomfort, anginal pain at rest, or ischemia-mediated hemodynamic instability) accompanied by new ischemic ST-T-wave changes (ST depression or ST elevation or T-wave inversion). In addition, such an event does not qualify as a myocardial infarction as defined above.

Confidential Property of Merck & Co., Inc.      35
E:\PROGRA~1\R.q\PMSG\MSOP7IN~1.DOC

Confidential – Subject To Protective Order             MRK-AFV0130365

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1716**

C-2SI Vascular Events Monitoring and Adjudication SOP                    6/14/00

## Appendix H

## Adjudication Guidelines For Cardiac Events

### (continued)

Available ECGs include ST-T wave changes as follows:

a)   New persistent or transient ST-segment depression >0.5 mm (0.08 seconds after the J-point) in two contiguous leads, *OR*

b)   New persistent or transient T-wave inversion (>1 mm) in two contiguous leads, or pseudonormalization, *OR*

c)   Transient ST segment elevation >1 mm in two contiguous leads

### Cardiac (atrial or ventricular) thrombus

The diagnosis of cardiac thrombosis must be made on the basis of confirmatory evidence by echocardiography, MRI, CT scan, or ventriculography or autopsy.

### Resuscitated cardiac arrest

A resuscitated cardiac arrest is defined as the occurrence of verified hemodynamic collapse of cardiac origin (i.e. tachyarrhythmia, bradyarrhythmia, electromechanical dissociation) in which criteria for non-fatal acute MI, or PE are not met, and following which the patient survives for at least 24 hours as a result of cardioversion and/or electrical or pharmacologic CPR.

### FATAL EVENTS

### Fatal MI

A fatal MI is one as defined above and that is documented to directly result in death within 30 days of the onset of the signs or symptoms of the event, or a death with an autopsy report of findings consistent with an acute MI.

### Sudden Death and/or Unexplained Death

Sudden and/or unexplained death is defined as witnessed instantaneous or near-instantaneous death that occurs without warning or within-in one hour of non-diagnostic symptoms, or as an unwitnessed, unexpected death in which criteria for a fatal coronary or cerebrovascular event are not met.

Confidential Property of Merck & Co., Inc.     36
S:\PROGRA~1\SopPublic\IN6SOPFIN~1.DOC

Confidential - Subject To Protective Order                    MRK-AFV0130366

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.) **1717**

C-2SI Vascular Events Monitoring and Adjudication SOP                     30-Aug-1999

# Appendix I

## Adjudication Guidelines For Peripheral Vascular Events
### (PERIPHERAL VASCULAR SUBCOMMITTEE)

Confidential - Subject To Protective Order                     MRK-AFV0130367

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1718**

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

## Appendix I

## Adjudication Guidelines For Peripheral Vascular Events

**Adjudication Instructions:**  Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment.  If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria. Justify your decision on the Adjudication Worksheet.

**NOTE:** For purposes of this classification, peripheral is defined as arterial and venous vascular beds other than cardiac or cerebrovascular, as defined herein.  These include central vascular beds supplying the lungs, intraperitoneal and retroperitoneal organs (e.g., renal, hepatic, mesenteric vein), the pelvic organs, and the extremities.

### NONFATAL EVENTS

### Pulmonary embolism

An event which consists of documented signs and symptoms of pulmonary embolism confirmed by objective laboratory evidence.  Clinical signs and symptoms should include one or more of the following:

- Presence of venous thrombus *OR* the predisposition for venous thrombosis
- Dyspnea
- Tachypnea
- Chest pain
- Tachycardia
- Hypotension or syncope
- Cyanosis
- Cor pulmonale (jugular venous distention, an S3 gallop, right ventricular heave, tachypnea, tachycardia).

Other diseases which manifest similar clinical signs and symptoms should be excluded (including pneumonia, pneumothorax, myocardial infarction, ventricular septal rupture, aortic dissection, and pericardial tamponade).

Supportive laboratory documentation must include at least one of the following:
- Ventilation-perfusion (V-Q) lung scan suggesting (1) high probability for pulmonary embolism *OR* (2) abnormal scan only in the presence of peripheral venous thrombosis
- Spiral (ultrafast) CT
- Pulmonary angiography
- Autopsy evidence

Confidential Property of Merck & Co., Inc.     38
B:\PROGRA~1\RepPub\x\0MSO99#-1.DOC

Confidential - Subject To Protective Order                    MRK-AFV0130368

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1719**

C-2SI Vascular Events Monitoring and Adjudication SOP                     6/14/00

## Appendix I:

## Adjudication Guidelines For Peripheral Vascular Events

### (continued)

For pulmonary embolism the adjudicator is asked to make a determination as to any possible association between the pulmonary embolism and antecedent "major stressors, e.g. surgery, trauma, or underlying malignancy. The following guidelines should be used in making these decisions:

1.  <u>Major-stressor-related</u>: a pulmonary embolism, that , in the clinical judgment of the adjudicator, occurred coincident with (or within 1 month following) a major stressor.

2.  <u>Not major-stressor-related</u>: a pulmonary embolism that, in the clinical judgment of the adjudicator, occurred spontaneously and was not associated with an antecedent major stressor.

3.  <u>Unclear major-stressor-relationship</u>: a pulmonary embolism that, in the clinical judgment of the adjudicator, was of uncertain temporal relationship to a major stressor.

### Peripheral deep venous thrombosis

An event which consists of documented signs and symptoms of peripheral or central venous occlusion supported by objective laboratory evidence. In symptomatic cases, signs and symptoms of pain, tenderness, swelling, discoloration, venous distention, prominence of superficial veins, and/or the presence of palpable cord may be present. In asymptomatic patients, a positive venogram is strongly recommended to make the diagnosis. For events in veins supplying central structures and extremities, objective laboratory evidence includes venography or duplex doppler ultrasound, or CT scan, or magnetic resonance imaging or pathological specimens, or autopsy findings.

For peripheral venous thrombosis, the adjudicator is asked to make a determination as to any possible association between the pulmonary embolism and antecedent "major stressors:, e.g. surgery, trauma, or underlying malignancy. The following guidelines should be used in making these decisions:

1.  Major-stressor-related: a peripheral venous thrombosis that  in the clinical judgment of the adjudicator, occurred coincident with (or within 1 month following) a major stressor.

2.  Not major-stressor-related: a peripheral venous thrombosis that, in the clinical judgment of the adjudicator, occurred spontaneously and was not associated with an antecedent major stressor.

3.  Unclear major-stressor-relationship: an peripheral venous thrombosis that, in the clinical judgment of the adjudicator, was of uncertain temporal relationship to a major stressor.

Confidential Property of Merck & Co., Inc.      39
E:\PROGRA~1\XspPA88C\MKSOFPBN-1.DOC

Confidential - Subject To Protective Order                                    MRK-AFV0130369

C-2SI Vascular Events Monitoring and Adjudication SOP                                    6/14/00

## Appendix I:

## Adjudication Guidelines For Peripheral Vascular Events

### (continued)

### Peripheral arterial thrombosis/thromboembolism

Hospitalization for documented signs and symptoms of new onset or accelerating arterial occlusion in a peripheral artery, supported by objective laboratory or surgical evidence.

For events in arteries supplying the extremities, there should a new onset or accelerating pain with physical findings of ischemia (involving at least one of the following: absent pulse, cool temperature, neurologic deficit, cyanosis or pallor). For events in arteries supplying central structures and extremities, objective laboratory abnormalities include ankle/brachial pressure index or toe/brachial pressure index or duplex doppler ultrasound or arteriography, CT scan, or magnetic resonance imaging or pathological specimens, or autopsy findings.

## FATAL EVENTS

### Pulmonary embolism

A fatal PE is one as defined above and that is documented to directly result in death.

### Peripheral arterial thrombosis/thromboembolism

A fatal peripheral arterial thrombosis/thromboembolism is an event as defined above and that is documented to directly result in death.

Confidential Property of Merck & Co., Inc.    40
E:\PROGRA~1\ep\PubSub\SOPFIN~1.DOC

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1721**

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

**Appendix J**

Adjudication Guidelines For Cerebrovascular Events

**(NEUROLOGY SUBCOMMITTEE)**

Confidential Property of Merck & Co., Inc.     41
ENPRCORA~P(eq4N466(VN6DPFIN-1.DOC

Confidential - Subject To Protective Order                                   MRK-AFV0130371

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)                    **1722**

C-2SI Vascular Events Monitoring and Adjudication SOP                    R29-Dec-1999

## Appendix J
## Adjudication Guidelines For Cerebrovascular Events
### (NEUROLOGY SUBCOMMITTEE)

**Adjudication Instructions**:  Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment.  If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria. Justify your decision on the Adjudication Worksheet.

### NON-FATAL EVENTS

### ~~Ischemic Cerebrovascular~~ Stroke with adequate documentation to subclassify etiology as follows

An cerebrovascular stroke is defined as  focal neurological disturbance of the central nervous system affecting higher integrated functioning, cranial nerves, motor, sensory, brainstem, cerebellar or spinal cord, alone or in combination in the absence of witnessed epileptic seizure or known history of migraine.  Signs and symptoms persist longer than 24 hours.

### Ischemic vs. Hemorrhagic Stroke

A diagnosis of ischemic stroke can be made provided brain imaging done within 48 hours discloses no sign of hemorrhage.

### Etiology of ischemic cerebrovascular stroke

Subtypes of ischemic cerebrovascular stroke are as follows:

1. **Ischemic Cerebrovascular Stroke due to large-artery atherosclerosis**

These patients will have clinical and brain imaging findings consistent with stenosis or occlusion of a major brain artery or branch cortical artery, presumably due to atherosclerosis.

2. **Ischemic Cerebrovascular Stroke due to cardioembolism**

This category includes patients with arterial occlusions *AND* at least one cardiac source for an embolus.  (Table 1)

**Table 1.**      **Sources of Cardioembolism**

| |
|---|
| Mechanical prosthetic valve |
| Mitral stenosis |
| Atrial fibrillation |
| Left atrial/atrial appendage thrombus |
| Sick sinus syndrome |
| Myocardial infarction ( <6 months) |
| Left ventricular thrombus |
| Dilated cardiomyopathy |
| Akinetic left ventricular segment |
| Atrial myxoma |
| Infective endocarditis |
| Mitral valve prolapse |
| Mitral annulus calcification |
| Atrial septal aneurysm |
| Patent foramen ovale |
| Left atrial |

Confidential Property of Merck & Co., Inc.      42
E:\PRO\RA~\RepAbia\N\60FEN~1.DOC

Confidential - Subject To Protective Order                    MRK-AFV0130372

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1723**

C-2SI Vascular Events Monitoring and Adjudication SOP                    R29-Dec-1999

Bioprosthetic cardiac valve
Nonbacterial thrombotic endocarditis
Congestive heart failure
Hypokinetic left ventricular segment

Confidential Property of Merck & Co., Inc.     43
E:\PROGRA~1\Expe\Nelle\IN\EOPPBN~1.DOC

Confidential – Subject To Protective Order

MRK-AFV0130373

C-2SI Vascular Events Monitoring and Adjudication SOP                     30-Aug-1999

## Appendix J

### Adjudication Guidelines For Cerebrovascular Events

#### (Continued)

3.      Small-artery occlusion (lacune)

This category includes patients whose cerebrovascular strokes exhibit one of the
traditional syndromes:

- Pure motor hemiplegia: hemiplegia with or without dysarthria;  CT or MRI usually
  reveals a lesion in  the territory of the lenticulostriate artery (i.e. internal capsule,
  corona radiata).

- Pure sensory lacune: a pure sensory lacune will exhibit hemisensory deficit with
  usual CT or MRI evidence of a lacune in the lateral thalamus or parietal white
  matter.

- Dysarthria/clumsy hand syndrome:  severe dysarthria, central facial weakness and
  associated dysarthria and clumsiness of the affected hand.  The CT or MRI usually
  shows a lacune in the contralateral pons.

- Ataxic Hemiparesis: characterized by ataxia and weakness of the leg more than in
  the arm.  The degree of ataxia is out of proportion to the weakness.  The lesion is
  located in the corona radiate near the internal capsule or the ventral pons

4.      Ischemic Cerebrovascular Stroke of other determined etiology

This category includes patients lacking evidence of other major ischemic stroke
categories and lacking evidence of non-atherosclerotic vasculopathies, hypercoagulable
states or hematologic disorders.

**Ischemic Cerebrovascular Stroke without Adequate Documentation to subclassify etiology**

The subtype cause of ischemic stroke cannot be classified based on existing
documentation.

**Cerebrovascular venous thrombosis**

An event which consists of documented signs and symptoms of occlusion of an
intracranial vein or venous sinus, supported by CT, MRI or angiography.

**Transient Ischemic Attack**

An event which consists of documented focal neurologic deficit which resolves
completely within 24 hours without residua and is not associated with a new abnormality
on brain imaging.

**Hemorrhagic Cerebrovascular Stroke or Hemorrhagic Change**

An event with a focal neurologic deficit with documented evidence of intracranial blood
products on imaging studies or spinal fluid analysis.

Confidential Property of Merck & Co., Inc.      44
E:\PROGRA~1\Rsp0\Jdx\DASOPPEN~1.DOC

Confidential - Subject To Protective Order                     MRK-AFV0130374

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

## Appendix J

### Adjudication Guidelines For Cerebrovascular Events

**(Continued)**

#### FATAL EVENTS

#### Ischemic Cerebrovascular Stroke with adequate documentation to subclassify etiology

A fatality due to any type of ischemic stroke as defined above that in best clinical judgment is the most likely cause of death.

#### Ischemic Cerebrovascular Stroke without adequate documentation to subclassify etiology

A fatality due to an ischemic stroke as defined above that in best clinical judgment is the most likely cause of death.

#### Cerebrovascular Venous Thrombosis

A fatal cerebrovascular venous thrombosis as defined above that in best clinical judgment is the most likely cause of death.

#### Hemorrhagic cerebrovascular stroke or hemorrhagic change

A hemorrhagic cerebrovascular stroke or hemorrhagic change as defined above that in best clinical judgment is the most likely cause of death.

Confidential - Subject To Protective Order                    MRK-AFV0130375

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)                    **1726**

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

# Appendix K

## Vascular Events Final Adjudication Form

Confidential Property of Merck & Co., Inc.      46

Confidential - Subject To Protective Order                    MRK-AFV0130376

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1727**

*C-2SI Vascular Events Monitoring and Adjudication SOP*          30-Aug-1999

## COX-2 VASCULAR EVENTS MONITORING
## FINAL ADJUDICATION FORM

VEC Case No. |___|___|___|___|

Reported Event          _____

Standard Description   _____

EVENT ONSET:          |___|___|/|___|___|/|___|___|___|___|

HOSPITAL ADMISSION DATE:   |___|___|/|___|___|/|___|___|___|___|          ☐ No Hospital Admission
                            MO / DAY / YR

1. **Did the patient die?**

   ☐ Yes          **If Yes**, continue to item 2.
   ☐ No           **If No**, skip to item 3.

2. **IF A FATAL EVENT:** Indicate the cause of death for which criteria are met.  If unable to indicate a cause of death, skip to item 4.

| | Confirmed by criteria | Based on clinical judgment |
|---|:---:|:---:|
| **CARDIAC EVENTS** | | |
| ☐ Acute Myocardial Infarction | ☐ | ☐ |
| MI STRESSOR RELATIONSHIP  (CHECK ONE BOX): | | |
| ☐  Complication of PTCA/revascularization procedure | | |
| ☐  Related (major stressor antecedent to the MI) | | |
| ☐  NOT Related (MI occurred spontaneously) | | |
| ☐  Uncertain relationship | | |
| ☐ Sudden and/or Unexplained Death | | |
| **PERIPHERAL VASCULAR EVENTS** | | |
| ☐ Pulmonary Embolism | ☐ | ☐ |
| Major STRESSOR RELATIONSHIP  (CHECK ONE BOX): | | |
| ☐  Spontaneous (PE occurred spontaneously) | | |
| ☐  Secondary to antecedent stressor | | |
| ☐  Uncertain relationship | | |
| ☐ Peripheral Arterial Thrombosis/Thromboembolism | ☐ | ☐ |
| **NEUROLOGY EVENTS** | | |
| ☐ Ischemic Cerebrovascular Stroke with adequate documentation to subclassify | ☐ | ☐ |
| Indicate the subtype of Ischemic CVA | | |
| ☐  Due to large-artery atherosclerosis | | |
| ☐  Due to cardioembolism | | |
| ☐  Small artery occlusion (Lacune) | | |
| ☐  Other determined etiology | | |
| ☐ Ischemic Cerebrovascular Stroke without adequate documentation to subclassify | ☐ | ☐ |
| ☐ Hemorrhagic cerebrovascular stroke or hemorrhagic change | ☐ | ☐ |
| ☐ Cerebrovascular Venous Thrombosis | ☐ | ☐ |
| **NON THROMBOTIC EVENT** | | |
| ☐ Death unrelated to thrombotic/ thromboembolic conditions (e.g. pneumonia, cancer, subarachnoid hemorrhage from aneurysm or trauma) | ☐ | ☐ |

Continued on pg. 2

Confidential Property of Merck & Co., Inc.          47
E:\PROGRA~1\Eg\htdocs\IM\SOP\FIN~1.DOC

Confidential – Subject To Protective Order          MRK-AFV0130377

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)   **1728**

*C-2SI Vascular Events Monitoring and Adjudication SOP*                    30-Aug-1999
## COX-2 VASCULAR EVENTS MONITORING
## FINAL ADJUDICATION FORM

3. **IF A NON-FATAL EVENT: Indicate the event for which criteria are met.** If unable to specify, skip to item 4.

**CARDIAC EVENTS**
- ☐ Acute Myocardial Infarction   ☐   ☐
  - MI STRESSOR RELATIONSHIP.  (CHECK ONE BOX):
    - ☐ Complication of PTCA/revascularization procedure
    - ☐ Related (major stressor antecedent to the MI)
    - ☐ NOT Related (MI occurred spontaneously)
    - ☐ Uncertain relationship
- ☐ Unstable Angina Pectoris   ☐   ☐
- ☐ Cardiac (atrial or ventricular) thrombus   ☐   ☐
- ☐ Resuscitated Cardiac arrest   ☐   ☐
  - (without identified cause listed elsewhere)

**PERIPHERAL VASCULAR EVENTS**
- ☐ Pulmonary Embolism   ☐   ☐
  - Major STRESSOR RELATIONSHIP.  (CHECK ONE BOX):
    - ☐ Spontaneous (PE occurred spontaneously)
    - ☐ Secondary to antecedent stressor
    - ☐ Uncertain relationship
- ☐ Peripheral Venous Thrombosis   ☐   ☐
  - MAJOR STRESSOR RELATIONSHIP  (CHECK ONE BOX):
    - ☐ NOT Related (occurred spontaneously)
    - ☐ Related (related to surgery or trauma)
    - ☐ Uncertain relationship
- ☐ Acute Peripheral Arterial thrombosis/thromboembolism   ☐   ☐

**NEUROLOGY EVENTS**
- ☐ Ischemic Cerebrovascular Stroke with adequate documentation   ☐   ☐
  - to subclassify
  - Indicate the subtype of Ischemic CVA
    - ☐ Due to large-artery atherosclerosis
    - ☐ Due to cardioembolism
    - ☐ Small artery occlusion (Lacune)
    - ☐ Other determined etiology
- ☐ Ischemic Cerebrovascular Stroke without adequate   ☐   ☐
  - documentation to subclassify
- ☐ Hemorrhagic cerebrovascular stroke or hemorrhagic change   ☐   ☐
- ☐ Transient Ischemic Attack   ☐   ☐
- ☐ Cerebrovascular venous thrombosis   ☐   ☐

**NON THROMBOTIC EVENTS**
- ☐ Event unrelated to thrombotic/ thromboembolic conditions   ☐   ☐

4. **If Unable to adjudicate, indicate so:**

**UNABLE TO ADJUDICATE:**
- ☐ Insufficient data
- ☐ Other: (specify): _____

**NOTES:** _____

VEC Chair: _____          DATE: _____
[Name]          **Signature**

Confidential Property of Merck & Co., Inc.     48
E:\PROGRA~1\qx4wh\x\0A6OPP)M~1.DOC

Confidential - Subject To Protective Order                    MRK-AFV0130378

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)          **1729**

**Product:** MK-0966
**Protocol/Amendment No.:** 089-04          73

# **ATTACHMENTS**

/MK-0966/CP/RP2318.DOC * APPROVED          08-Sep-1999
Non-U.S. (Non-U.S. IND)

Confidential – Subject To Protective Order          MRK-AFV0130379

## DRUG CONSENT FORM

You are invited to be in a research study. You need to decide whether you want to participate or not. Please take your time to make your decision. Carefully read the following and ask the study doctor any questions which you may have. The study is being conducted for Merck & Co., Inc., the Sponsor.

**Why is the study being done?**
The purpose of this study is to test the safety of the research study drug, [insert name of drug]. Another purpose is to see if [insert name of drug] has any effect on your [insert "disease" or "condition"].

**Who should not be in the study?**
[Insert exclusion criteria that the patient can assess in simple language].

**What will I be asked to do? What are my requirements?**
The study doctor or staff will ask you about your medical history and will examine you. You will be assigned to either receive [insert name of drug] or a pill that looks the same as [insert name of drug] that has no active ingredient (or you may receive [insert name of active comparator, if any]). You have a _____ in ___ chance of receiving the active study drug. You and your study doctor will not know whether you are receiving the real drug or the inactive look-alike pill. You will be required to visit the study doctor about [insert number of times]. At each visit the study doctor or staff may do any or all of the following [insert a summary of study procedures in simple language (e.g., a bulleted list, a simplified table, a check list of procedures)].

**What is known about this (these) drug(s)?**
This is the first time that the drug has been used in man. OR
The drug has been used in [insert approximate number of subjects (worldwide) who have taken the drug].

**How long will I be in the study?**
You will be in the study about [insert number of weeks, months, or years].

**How many other people will be participating in the study?**
About [insert number of participants at all sites] people will be participating in the study.

**Will I be paid?  [include section only if applicable.]**
You will be paid as follows: [insert payment information]

**What adverse (bad) effects can happen to me by participating in the study?**
The following adverse effects have been reported by people taking [insert name of drug] in previous studies or seen in animal experiments: [insert any foreseeable risks or discomforts as bullets or summary]. The study doctor or staff will discuss these with you. There can be other adverse effects that are not presently known about [insert name of drug]. It is not known how the study drug(s) may affect an unborn baby.

**If I have an adverse effect, who will pay the doctor and hospital bills?**
If you are injured or become sick directly from the Merck study drug, Merck & Co., Inc., the Sponsor of the study, will pay for the reasonable costs of medical treatment to the extent such costs are not covered by your medical or hospital insurance or third-party or governmental programs providing such coverage. No other form of compensation is available.

**What benefit can I expect?**
If the drug works, you may have some benefit. On the other hand, it may not work and there may be no benefit. Also, you may be on a look-alike pill that does not contain any drug and will not provide any benefit.

**Are there any other drugs that I may be able to take or things that I can do for my condition/disease if I don't want to participate in the study?**
The following other drugs or procedures are available as alternatives to [insert name of drug]:
[insert other drugs and/or procedures].

**Who will be able to see my records and know that I am in the study?**
If you agree to become part of this study, your name will be held in confidence. Unless required by law, only the study doctor and staff, sponsor representatives involved in this study, independent ethics committees and inspectors from government regulatory agencies will have direct access to your medical records to check the study information.

**Will I be told if new information about the drug is discovered during the study?**
You will be told in a timely manner of any significant new information that may affect your willingness to stay in this study.

**Who do I call if I have questions?**
For questions about the study or if you have a study-related injury, call the study doctor _____[insert name] at _____[insert telephone number].
For questions about your rights as a participant in the study, call _____[insert name] at _____[insert telephone number].

**Can I refuse to be in the study and can I be asked to leave the study?**
Your participation in this study is voluntary. You can choose not to take part in the study, or you can quit at any time. You will not lose any benefits to which you are otherwise entitled. If you quit the study, you can receive the standard treatment for this condition. You will not be prevented from participating in future studies.

You may be asked to leave the study by the study doctor or Merck & Co., Inc., without your consent if you need other treatment, if you do not follow the study plan, if you have a study-related injury or for any other reason. If you leave the study, the doctor may ask to examine you and do some final tests.

You will receive a signed copy of this consent form.

I have read and understand this consent form. All my questions have been answered. I volunteer to take part in this study.

Signature of Volunteer_____ Date_____
Signature of Person Conducting Review of Consent_____ Date_____

Confidential – Subject To Protective Order

### ICH HARMONISED TRIPARTITE GUIDELINE

### GUIDELINE FOR GOOD CLINICAL PRACTICE

**Section 3:        INSTITUTIONAL REVIEW BOARD/INDEPENDENT ETHICS COMMITTEE (IRB/IEC)**

**3.1 Responsibilities**

3.1.1    An IRB/IEC should safeguard the rights, safety, and well-being of all trial subjects.  Special attention should be paid to trials that may include vulnerable subjects.

3.1.2    The IRB/IEC should obtain the following documents:

trial protocol(s)/amendments(s), written informed consent form(s) and consent form updates that the investigator proposes for use in the trial, subject recruitment procedures (e.g. advertisements), written information to be provided to subjects, Investigator's Brochure (IB), available safety information, information about payments and compensation available to subjects, the investigator's current curriculum vitae and/or other documentation evidencing qualifications, and any other documents that the IRB/IEC may need to fulfill its responsibilities.

The IRB/IEC should review a proposed clinical trial within a reasonable time and document its views in writing, clearly identifying the trial, the documents reviewed and the dates for the following:

-approval/favourable opinion;

-modifications required prior to its approval/favourable opinion;

-disapproval/negative opinion; and

-termination/suspension of any prior approval/favourable opinion.

3.1.3    The IRB/IEC should consider the qualifications of the investigator for the proposed trial, as documented by a current curriculum vitae and/or by any other relevant documentation the IRB/IEC requests.

3.1.4    The IRB/IEC should conduct continuing review of each ongoing trial at intervals appropriate to the degree of risk to human subjects, but a least once per year.

3.1.5    The IRB/IEC may request more information than is outlined in paragraph 4.8.10 be given to subjects when, in the judgment of the IRB/IEC, the additional information would add meaningfully to the protection of the rights, safety and/or well-being of the subjects.

3.1.6    When a non-therapeutic trail is to be carried out with the consent of the subject's legally acceptable representative (see 4.8.12, 4.8.14), the IRB/IEC should determine that the proposed protocol and/or other document(s) adequately addresses relevant ethical concerns and meets applicable regulatory requirements for such trials.

3.1.7    Where the protocol indicates that prior consent of the trial subject or the subject's legally acceptable representative is not possible (see 4.8.15), the IRB/IEC should determine that the proposed protocol and/or other documents adequately addresses relevant ethical concerns and meets applicable regulatory requirements for such trials (i.e. in emergency situations).

3.1.8    The IRB/IEC should review both the amount and method of payment to subjects to assure that neither presents problems of coercion or undue influence on the trial subjects.  Payments to a subject should be prorated and not wholly contingent on completion of the trial by the subject.

3.1.9    The IRB/IEC should ensure that information regarding payment to subjects, including the methods, amounts, and schedule of payment to trial subjects, is set forth in the written informed consent form and any other written information to be provided to subjects.  The way payment will be prorated should be specified.

**3.2 Composition, Functions and Operations**

3.2.1    The IRB/IEC should consist of a reasonable number of members, who collectively have the qualifications and experience to review and evaluate the science, medical aspects, and ethics of the proposed trial.  It is recommended that the IRB/IEC should include:

(a)        At least five members.

(b)        At least one member whose primary area of interest is in a nonscientific area.

(c)        At least one member who is independent of the institution/trial site.

Only those IRB/IEC members who are independent of the investigator and the sponsor of the trial should vote/provide opinion on a trial-related matter.

A list of IRB/IEC members and their qualifications should be maintained.

Confidential – Subject To Protective Order

3.2.2    The IRB/IEC should perform its functions according to written operating procedures, should maintain written records of its activities and minutes of its meetings, and should comply with GCP and with the applicable regulatory requirement(s).

3.2.3    An IRB/IEC should make its decisions at announced meetings at which at least a quorum, as stipulated in its written operating procedures, is present.

3.2.4    Only members who participate in the IRB/IEC review and discussion should vote/provide their opinion and/or advise.

3.2.5    The investigator may provide information on any aspect of the trial, but should not participate in the deliberations of the IRB/IEC or in the vote/opinion of the IRB/IEC.

3.2.6    An IRB/IEC may invite non-members with expertise in special areas for assistance.

**3.3 Procedures**

The IRB/IEC should establish, document in writing, and follow its procedures, which should include:

3.3.1    Determining its composition (names and qualifications of the members) and the authority under which it is established.

3.3.2    Scheduling, notifying its members of, and conducting its meetings.

3.3.3    Conducting initial and continuing review of trials.

3.3.4    Determining the frequency of continuing review, as appropriate.

3.3.5    Providing, according to the applicable regulatory requirements, expedited review and approval/favourable opinion of minor change(s) in ongoing trials that have the approval/favourable opinion of the IRB/IEC.

3.3.6    Specifying that no subject should be admitted to a trial before the IRB/IEC issues its written approval/favourable opinion of the trial.

3.3.7    Specifying that no deviations from, or changes of, the protocol should be initiated without prior written IRB/IEC approval/favourable opinion of an appropriate amendment, except when necessary to eliminate immediate hazards to the subjects or when the change(s) involves only logistical or administrative aspects of the trial (e.g., change of monitor(s), telephone number(s) (see 4.5.2).

3.3.8    Specifying that the investigator should promptly report to the IRB/IEC:

    (a)    Deviations from, or changes of the protocol to eliminate immediate hazards to the trial subjects (see 3.3.7, 4.5.2, 4.5.4).

    (b)    Changes increasing the risk to subjects and/or affecting significantly the conduct of the trial (see 4.10.2)

    (c)    All adverse drug reactions (ADRs that are both serious and unexpected.)

    (d)    New information that may affect adversely the safety of the subjects of the conduct of the trial.

3.3.9    Ensuring that the IRB/IEC promptly notify in writing the investigator/institution concerning:

    (a)    Its trial-related decisions/opinions.

    (b)    The reasons for its decisions/opinions.

    (c)    Procedures for appeal of its decisions/opinions.

**3.4**    **Records**

The IRB/IEC should retain all relevant records (e.g., write procedures, membership lists, lists of occupations/affiliations of members, submitted documents, minutes of meetings, and correspondence) for a period of at least 3 years after completion of the trial and make them available upon request from the regulatory authority(ies).

The IRB/IEC may be asked by investigators, sponsors or regulatory authorities to provide its written procedures and membership lists.

Confidential – Subject To Protective Order

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)    **1733**

Date:_____

(insert Primary Investigator's name and address below)

_____

_____

_____

RE:  Insert title of protocol and protocol number

Dear Dr. _____(insert name of Primary Investigator):

My signature below verifies that the IRB/IEC listed below operates in accordance with applicable national/local and institutional regulations and guidelines which govern IRB/ERC operations.

_____        _____

Printed Name, IRB/IEC Chairperson of        Signature, IRB/IEC Chairperson

Date  (insert name and address of IRB/IEC here)

_____

_____

_____

_____

IRB's Federal Assurance number is:_____ (optional for U.S. IRBs)

Confidential – Subject To Protective Order        MRK-AFV0130383

## WORLD MEDICAL ASSOCIATION DECLARATION OF HELSINKI

Recommendations Guiding Medical Physicians in Biomedical
Research Involving Human Subjects

Adopted by the 18th World Medical Assembly Helsinki, Finland, June 1964 and amended by the 29th World Medical Assembly Tokyo, Japan, October 1975, 35th World Medical Assembly Venice, Italy, October 1983, and the 41st World Medical Assembly Hong Kong, September 1989 and the 48th General Assembly, Somerset West, Republic of South Africa, October 1996.

**INTRODUCTION**

It is the mission of the physician to safeguard the health of the people. His or her knowledge and conscience are dedicated to the fulfilment of this mission.

The Declaration of Geneva of the World Medical Association binds the physician with the words, "The health of my patient will be my first consideration," and the International Code of Medical Ethics declares that, "A physician shall act only in the patient's interest when providing medical care which might have the effect of weakening the physical and mental condition of the patient."

The purpose of biomedical research involving human subjects must be to improve diagnostic, therapeutic and prophylactic procedures and the understanding of the etiology and pathogenesis of disease.

In current medical practice most diagnostic, therapeutic or prophylactic procedures involve hazards. This applies especially to biomedical research.

Medical progress is based on research which ultimately must rest in part on experimentation involving human subjects.

In the field of biomedical research a fundamental distinction must be recognized between medical research in which the aim is essentially diagnostic or therapeutic for a patient, and medical research, the essential object of which is purely scientific and without implying direct diagnostic or therapeutic value to the person subjected to the research.

Special caution must be exercised in the conduct of research which may affect the environment, and the welfare of animals used for research must be respected.

Because it is essential that the results of laboratory experiments be applied to human beings to further scientific knowledge and to help suffering humanity, the World Medical Association has prepared the following recommendations as a guide to every physician in biomedical research involving human subjects. They should be kept under review in the future. It must be stressed that the standards as drafted are only a guide to physicians all over the world. Physicians are not relieved from criminal, civil and ethical responsibilities under the laws of their own countries.

I.    **BASIC PRINCIPLES**

1.   Biomedical research involving human subjects must conform to generally accepted scientific principles and should be based on adequately performed laboratory and animal experimentation and on a thorough knowledge of the scientific literature.

2.   The design and performance of each experimental procedure involving human subjects should be clearly formulated in an experimental protocol which should be transmitted for consideration, comment and guidance to a specially appointed committee independent of the investigator and the sponsor provided that this independent committee is in conformity with the laws and regulations of the country in which the research experiment is performed.

3.   Biomedical research involving human subjects should be conducted only by scientifically qualified persons and under the supervision of a clinically competent medical person. The responsibility for the human subject must always rest with a medically qualified person and never rest on the subject of the research, even though the subject has given his or her consent.

4.   Biomedical research involving human subjects cannot legitimately be carried out unless the importance of the objective is in proportion to the inherent risk to the subject.

5.   Every biomedical research project involving human subjects should be preceded by careful assessment of predictable risks in comparison with foreseeable benefits to the subject or to others. Concern for the interests of the subject must always prevail over the interests of science and society.

6.   The right of the research subject to safeguard his or her integrity must always be respected. Every precaution should be taken to respect the privacy of the subject and to minimize the impact of the study on the subject's physical and mental integrity and on the personality of the subject.

    MRK-AFV0130384

MK-0966, Reference P088C, Appendix 3.2.1 (Cont.)   **1735**

I.   **BASIC PRINCIPLES (CONT.)**

7.   Physicians should abstain from engaging in research projects involving human subjects unless they are satisfied that the hazards involved are believed to be predictable.  Physicians should cease any investigation if the hazards are found to outweigh the potential benefits.

8.   In publication of the results of his or her research, the physician is obliged to preserve the accuracy of the results.  Reports of experimentation not in accordance with the principles laid down in this Declaration should not be accepted for publication.

9.   In any research on human beings, each potential subject must be adequately informed of the aims, methods, anticipated benefits and potential hazards of the study and the discomfort it may entail.  He or she should be informed that he or she is at liberty to abstain from participation in the study and that he or she is free to withdraw his or her consent to participation at any time.  The physician should then obtain the subject's freely-given informed consent, preferably in writing.

10.  When obtaining informed consent for the research project the physician should be particularly cautious if the subject is in a dependent relationship to him or her or may consent under duress.  In that case the informed consent should be obtained by a physician who is not engaged in the investigation and who is completely independent of this official relationship.

11.  In case of legal incompetence, the informed consent should be obtained from the legal guardian in accordance with the national legislation.  Where physical or mental incapacity makes it impossible to obtain informed consent, or when the subject is a minor, permission from the responsible relative replaces that of the subject in accordance with national legislation.

Whenever the minor is in fact able to give a consent, the minor's consent must be obtained in addition to the consent of the minor's legal guardian.

12.  The research protocol should always contain a statement of the ethical considerations involved and should indicate that the principals enunciated in the present Declaration are complied with.

II.  **MEDICAL RESEARCH COMBINED WITH PROFESSIONAL CARE (CLINICAL RESEARCH)**

1.   In the treatment of the sick person, the physician must be free to use a new diagnostic and therapeutic measure, if in his or her judgment it offers hope of saving life, reestablishing health or alleviating suffering.

2.   The potential benefits, hazards and discomfort of a new method should be weighed against the advantages of the best current diagnostic and therapeutic method.

3.   In any medical study, every patient (including those of a control group, if any) should be assured of the best proven diagnostic and therapeutic method.  This does not exclude the use of inert placebo in studies where no proven diagnostic or therapeutic method exists.

4.   The refusal of the patient to participate in a study must never interfere with the physician-patient relationship.

5.   If the physician considers it essential not to obtain informed consent, the specific reasons for this proposal should be stated in the experimental protocol for transmission to the independent committee (1,2).

6.   The physician can combine medical research with professional care, the objective being the acquisition of new medical knowledge, only to the extent that the medical research is justified by its potential diagnostic or therapeutic value for the patient.

III. **NONTHERAPEUTIC BIOMEDICAL RESEARCH INVOLVING HUMAN SUBJECTS (NONCLINICAL BIOMEDICAL RESEARCH)**

1.   In the purely scientific application of medical research carried out on a human being, it is the duty of the physician to remain the protector of the life and health of that person on whom biomedical research is being carried out.

2.   The subjects should be volunteers; either healthy persons or patients for whom the experimental design is not related to the patient's illness.

3.   The investigator or the investigating team should discontinue the research if in his/her or their judgment it may, if continued, be harmful to the individual.

4.   The research on man, the interest of science and society should never take precedence over considerations related to the well being of the subject.

Confidential - Subject To Protective Order

## INSTRUCTIONS FOR DRUG ADVERSE EXPERIENCE (AE) FORM

### GENERAL INSTRUCTIONS

An Adverse Experience Report Form must be completed for each workbooklet even if no adverse experiences were present.

### ADVERSE EXPERIENCE DEFINITION

Adverse experiences means any unfavorable and unintended change in the structure (signs), function (symptoms), or chemistry (laboratory data) of the body, or worsening of a pre-existing condition temporally associated with any use of a Merck product whether or not considered related to the use of the product. Changes resulting from normal growth and development which do not vary significantly in frequency or severity from expected levels are not to be considered adverse experiences. Examples of this may include, but not limited to, teething, typical crying in infants and children, and onset of menses or menopause occurring at a physiologically appropriate time.

Adverse experiences may occur in the course of the use of a Merck product in clinical studies or within the follow-up period specified by the protocol, or prescribed clinical practice, from overdose (whether accidental or intentional), from abuse, or a procedure.

Adverse experiences may also occur in screened patients during any preallocation baseline period as a result of a protocol-specified intervention including washout or discontinuation of usual therapy, diet, placebo treatment, or a procedure.

### SPECIFIC INSTRUCTIONS AND DEFINITIONS

**A. "LATEST INFORMATION" DATE**

Enter the date that the information, provided on the AE form, was last updated. This date is the last date of the reporting period covered by the AE form.

**B. CLINICAL ADVERSE EXPERIENCE**

List all clinical AE's that occurred. Record discrete episodes of the same experience separately.

**NOTE: Do not list death as an adverse experience. Death may be considered an outcome of an adverse experience.**

Indicate the following for each clinical adverse experience:

**DATE AE STARTED:** Enter the date that the patient or subject first experienced the AE or symptoms related to the AE

**TIME AE STARTED:** If a column is provided for time, enter the time (military time) that the AE was first noted by the patient.

**DATE AE STOPPED:** Enter the date that the AE or symptoms relating to the AE stopped. If the AE is still present on the "latest information" date entered at the top right of the form, indicate that the AE is continuing rather than entering a stop date.

**DURATION IF LESS THAN 24 HOURS:** If the AE lasted less than 24 hours, indicate the number of hours or minutes that the AE was continuously present.

**MAXIMUM INTENSITY: FOR ADULTS OR OLDER CHILDREN**

1 = MILD — Awareness of sign or symptom, but easily tolerated.
2 = MODERATE — Discomfort enough to cause interference with usual activity.
3 = SEVERE — Incapacitating with inability to work or do usual activity.

**DID AE RESULT IN:** Indicate for each adverse experience all of the conditions that are met in this question.

D = Death
P = Persistent or significant disability/incapacity
H = Hospitalization or prolongation
N = None of the above

If one or more of the choices (other than NONE) are indicated, *IMMEDIATELY notify the Merck Clinical Monitor (U.S.) or Local Medical Director (ex-U.S.) by telephone.*

**IS THE AE:** Indicate for each adverse experience all of the conditions that are met in this question.

A = Congenital anomaly/birth defect
C = Cancer
O = Due to overdose
L = Life-threatening
M = Other important medical event
N = None of the above

If one or more of the choices (other than NONE) are indicated, *IMMEDIATELY notify the Merck Clinical Monitor (U.S.) or Local Medical Director (ex-U.S.) by telephone.*

**DID THE AE CAUSE THE TEST DRUG TO BE DISCONTINUED?** Indicate, for each adverse experience, whether that particular AE resulted in the Test Drug being discontinued from the study.

**DID THE TEST DRUG CAUSE THE ADVERSE EXPERIENCE?**

1 = DEFINITELY NOT — No relationship
2 = PROBABLY NOT — Relationship is not likely
3 = POSSIBLY — Relationship may exist
4 = PROBABLY — Relationship is likely
5 = DEFINITELY — Unquestionable relationship

**C. OTHER ADVERSE EXPERIENCE**

List all other adverse experiences identified from the Laboratory Report Form (LAB) or other special safety forms (e.g., ECG, X-RAY, etc.).

**DATE LAB SPECIMEN OBTAINED OR SPECIAL SAFETY EXAM PERFORMED:** Enter the date of the laboratory exam or special safety exam on which the adverse experience was noted.

Follow the instructions listed for "CLINICAL ADVERSE EXPERIENCE" in Section B above to complete the four questions listed below for each "OTHER ADVERSE EXPERIENCE" noted:

DID AE RESULT IN:

IS THE AE:

DID THE AE CAUSE THE TEST DRUG TO BE DISCONTINUED?

DID THE TEST DRUG CAUSE THE ADVERSE EXPERIENCE?

**D. DID PATIENT/SUBJECT DIE?**

If the patient died for any reason, *IMMEDIATELY notify Merck Clinical Monitor (U.S.) or Local Medical Director (ex-U.S.) by telephone* the and complete the following questions:

DATE DIED:

PROBABLE CAUSE OF DEATH:

DID THE TEST DRUG CAUSE THE ADVERSE EXPERIENCE?

Confidential - Subject To Protective Order