# EXHIBIT A

*State of Louisiana, ex rel. James D. Caldwell, Attorney General, v. Merck Sharpe*

*& Dohme Corp., U.S. District Court, Eastern District of Louisiana, Case No. 05-3700*

**EXPERT REPORT OF JEFFREY E. HARRIS, M.D. Ph.D.**

December 22, 2009

**Qualifications**

1. I am a Professor of Economics at the Massachusetts Institute of Technology (MIT). I have held the rank of tenured full professor since 1998 [1]. (Numbers in brackets refer to end notes.) In my capacity as a faculty member at MIT, I have regularly taught courses in health economics, microeconomics and a freshman seminar on AIDS, and from time to time I have offered courses in industrial organization, government regulation, and probability and statistics. In my courses, I have taught students about many aspects of the economics of the pharmaceutical industry, including the demand for pharmaceuticals, competition among pharmaceutical manufacturers, and the effects of government regulation of the pharmaceutical industry.

2. From 1977 through April 2006, I practiced medicine as a primary care physician at the Massachusetts General Hospital in Boston, Massachusetts. In that capacity, I wrote thousands of prescriptions for a wide variety of branded and generic drugs, including non-steroidal anti-inflammatory drugs and COX-2 inhibitors. In February 2006, I began work as a consulting physician to the Providence Community Health Centers in Providence, Rhode Island. Since February 2008, I have been serving as a practicing internist at Blackstone Valley Community Health Care in Pawtucket, Rhode Island, where I care for disadvantaged patients who quite often have no health insurance coverage and cannot speak English.

3. In my capacity as an economist and physician, I have written scholarly articles in peer-reviewed journals, advised numerous government agencies, given invited testimony before U.S. Congressional committees, and served as an invited member of

2

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

committees of the National Academy of Sciences and Institute of Medicine. A complete

listing is given in my Curriculum Vitae, which is attached to this Report.

4. I have served as an expert witness and given expert testimony at trial. A

complete listing of expert reports, deposition and trial testimony within the past five years

is included in my Curriculum Vitae. In 2004, I testified on the economics of competition

and collusion in the cigarette industry in United States v. Philip Morris [2]. In 2006, I

served as a consultant and named expert witness on pharmaceutical economics on behalf

of the Internal Revenue Service on a tax matter involving the pharmaceutical industry [3].

In March 2008, I testified in a class certification hearing in In re: Zyprexa Products

Liability Litigation, UFCW Local 1776 v. Ely Lilly [4].

**Hourly Rate**

5. My hourly rate is $600 for both preparation and testimony.

**Opinions Subject to Revision**

6. I may revise my opinions in the event that I receive additional relevant

information.

**Questions Addressed**

7. Counsel for Plaintiff has asked me to address the following questions:

(a) What were the total expenditures on Vioxx, net of rebates, by the Louisiana

Department of Health and Hospitals (DHH)?

(b) If Vioxx had been withdrawn from the U.S. market in March 2000, what

would have been the reduction in total expenditures on Vioxx, net of rebates, by the

Louisiana DHH?

(c) What was the impact of the decision by the Louisiana Medicaid Pharmaceutical and Therapeutics Committee (PTC) to exclude Vioxx from its Preferred Drug List (PDL) from June 10, 2002 through July 13, 2003 on Louisiana DHH expenditures on Vioxx?

(d) What was the impact of Louisiana's Drug Utilization Review (DUR) program, instituted on March 15, 2005, on Louisiana DHH expenditures on the two COX-2 inhibitors Bextra and Celebrex?

(e) Did the withdrawal of Vioxx from the U.S. market by Merck & Co. on September 30, 2004 result in a compensating increase in expenditures by the Louisiana DHH on non-steroidal anti-inflammatory drugs (NSAIDs) or on the other two COX-2 inhibitors (Bextra and Celebrex) that remained on the market?

I understand that these questions are addressed in connection with alternative legal approaches to the calculation of damages in the present litigation.

**Principal Conclusions**

8.  In response to the forgoing questions, I have reached the following principal conclusions:

(a) The Louisiana Department of Health and Hospitals expended a total of $20,663,672, net of manufacturer's rebates, on Vioxx during 1999–2005.  In presenting this conclusion, I make no correction for inflation.  Nor do I compute interest due in the event that Defendant Merck is required to pay a judgment in this amount.

(b) If Vioxx had been withdrawn from the U.S. market by the end of March 2000, total expenditures on Vioxx, net of rebates, by the Louisiana DHH would have been

4

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

reduced by $18,316,860.  Again, this computation makes no correction for inflation or

interest.

(c) The decision by the Louisiana Medicaid Pharmaceutical and Therapeutics

Committee (PTC) to exclude Vioxx from its Preferred Drug List (PDL) from June 10,

2002 through July 13, 2003 markedly reduced expenditures by Louisiana DHH on Vioxx.

Based upon a cohort analysis of Medicaid recipients who had been prescribed Vioxx, I

estimate that if Vioxx had not been excluded from the PDL, then Louisiana DHH

expenditures on Vioxx, net of rebates, would have been approximately $4,200,000

greater.  Based on an aggregate linear trend model, I estimate that if Vioxx had remained

off the PDL from July 14, 2003 until its withdrawal from the U.S. market on September

30, 2004, then Louisiana DHH expenditures, net of rebates, would have declined by

approximately $2,000,000.

(d) Louisiana's Drug Utilization Review (DUR) program, instituted on March 15,

2005, significantly reduced expenditures by the Department of Health and Hospitals on

the two COX-2 inhibitors Bextra and Celebrex.  Based on a cohort analysis of Medicaid

recipients who had been prescribed either Bextra or Celebrex, I estimate that the DUR

program reduced average monthly expenditures on these two drugs by 34 percent and 11

percent, respectively.  In a separate analysis of the prescribing habits of a panel of

Louisiana physicians, I find that the DUR program was associated with a 33 percent

declined in total monthly Bextra prescriptions and a 31 percent decline in total monthly

Celebrex prescriptions.

(e) The withdrawal of Vioxx from the U.S. market by Merck on September 30,

2004 did indeed result in a compensating increase in expenditures by the Louisiana DHH.

5

Based upon a cohort analysis of Medicaid recipients who had been prescribed Vioxx, I estimate that the withdrawal of Vioxx was associated with a monthly decrease in Vioxx expenditures of $28.74. Concurrently, combined monthly expenditures on NSAIDs and other COX-2 inhibitors increased by $16.35. Put differently, for each $1.00 decline in expenditures on Vioxx, I estimate that combined expenditures on NSAIDs and the other two COX-2 inhibitors increased by $0.57.

**Overview of Reliance Materials**

9. In addition to my knowledge, expertise and experience in the field, I relied upon four sources of evidence.

(a) I have reviewed a number of public documents, including corporate press releases, notices of formal action by the U.S. Food and Drug Administration (FDA), minutes of meetings of the Louisiana Medicaid Pharmaceutical and Therapeutics Committee (PTC), and letters sent by the Louisiana DHH to the state's healthcare providers. Copies of all such documents are contained in an electronic folder entitled *Harris Vioxx Report References*.

(b) I analyzed data on individual claims by Louisiana Medicaid recipients for Vioxx, Bextra, Celebrex, NSAIDs and proton pump inhibitors (PPIs) during 1998 – November 2009 (the "Louisiana Medicaid Data"). The database, which was delivered to me in its final form on December 15, 2009, contained over 7.9 million individual transactions. Each transaction record included the date of the original prescription, the date of processing by the pharmacy, the date that the claim was paid by Louisiana DHH, the generic name, dosage and quantity of the prescribed drug, the amount paid, a unique numerical identifier for each Louisiana Medicaid recipient, and other details. The total

number of transactions by calendar year is shown in Appendix Table A. (All text and appendix tables appear at the end of this Report.) I understand that Defendant Merck & Co. has received a copy of the same database. All of my analyses of this database are contained in an electronic folder entitled *Louisiana Medicaid Data Analysis*.

(c) I analyzed proprietary data, provided by IMS Health Incorporated [5, 6], on prescriptions for Vioxx, Bextra, Celebrex and other anti-arthritis drugs written by a panel of 16,751 participating Louisiana-based physicians who were queried during 1998–2007 (the "IMS Xponent Louisiana Data"). The IMS Xponent Louisiana Data, which contained over 395,000 individual records, was delivered to me on December 5, 2009. The prescriptions enumerated in this database were not necessarily written for Louisiana Medicaid patients. The database was organized in two-year waves. The numbers of physicians participating in each two-year wave is shown in Appendix Table B. Each prescribing physician record in each wave included physician identifiers, location of practice, and specialty. Each record also included the number of new prescriptions and the total number of prescriptions for each of the 24 months in the two-year wave, as well as the corresponding quantities prescribed, for each drug prescribed. All of my analyses of this database are contained in an electronic folder entitled *Louisiana Xponent Data Analysis*.

(d) I analyzed data on rebates to the State of Louisiana for Vioxx by calendar quarter during 1999–2004, which were produced by Merck in connection with the present litigation [7].

10. In addition to the Louisiana Medicaid Data and the IMS Xponent Louisiana Data, I received other databases from IMS Health that were nationwide in scope.

Because these additional databases were not specific to the state of Louisiana, I did not analyze them in connection with this Report. I may include analyses of these additional data in a supplementary report if they subsequent prove to be relevant [8].

**Timeline of Critical Events**

11.  Table 1 below summarizes the critical events at both the state and national levels. Vioxx was approved by the FDA on May 20, 1999 and was marketed in the U.S. shortly thereafter. In May 2002, the Louisiana Medicaid Pharmaceutical and Therapeutics Committee (PTC) decided to exclude Vioxx from its Preferred Drug List (PDL) while Bextra and Celebrex remained on the PDL. This decision formally went into effect in June 2002. In May 2003, the Louisiana Medicaid PTC decided to include Vioxx and Bextra on the PDL, but exclude Celebrex. This decision formally went into effect in July 2003. In August 2004, the Louisiana Medicaid PTC decided to place all three COX-2 inhibitors on its PDL.

12.  On September 30, 2004, Merck withdrew Vioxx from the U.S. market, citing the results of a controlled clinical trial that showed an increased risk of cardiovascular events. In December 2004, the FDA issued additional advisories concerning the cardiovascular risks of Bextra and Celebrex. In March 2005, the Louisiana DHH Drug Utilization Review program instituted a "prospective deny audit," in which prescriptions for Bextra and Celebrex would be denied unless the patient met specific diagnostic criteria or the physician documented treatment failure or a history of gastrointestinal bleeding.

13.  On April 7, 2005, the FDA asked Pfizer to withdraw Bextra from the U.S. market based upon multiple concerns, including the drug's increased cardiovascular risks.

At the same time, the FDA asked Pfizer to place a "black box" warning on the label for Celebrex that would highlight the drug's cardiovascular risks.  The warning went into effect in September 2005.

14.  On August 29, 2005, Hurricane Katrina struck southeast Louisiana, resulting in the massive displacement of patients, doctors and pharmacies in New Orleans and the surrounding parishes.  In August 2007, Celebrex was back on the PDL, but the drug was still subject to the Drug Utilization Program's "prospective deny audit."

**Trends in Prescriptions and Expenditures on Vioxx**

15.  Text Figure 1 graphs Vioxx prescriptions covered by Louisiana Medicaid during each month from June 1999 through October 2004.  The horizontal axis represents the date that the initial prescription was written, rather than the date that the pharmacy may have processed a refill or the date that the Louisiana DHH actually paid the pharmacy invoice.  Text Figure 2 graphs gross expenditures on Vioxx by the Louisiana DHH during the same time period as Figure 1.  The vertical axis represents payments to pharmacies and does not exclude rebates directly from the manufacturer Merck.

16.  Figure 1 shows a decline in Vioxx prescriptions from 6,250 in May 2002 to 1,816 in June 2002, to 455 in July 2002. Vioxx prescriptions remained depressed, with only a slight upward trend, until July 2003, when prescriptions reach 2,281, and August 2003, when prescriptions reach 3,653.  The period June 2002 through July 2003 corresponds to the time period when Vioxx was excluded from the Louisiana Medicaid Preferred Drug List.  After September 2004, Vioxx prescriptions were negligible or zero, inasmuch as the drug had been withdrawn from the U.S. market.

9

17. Text Table 2 shows expenditures by the Louisiana DHH on Vioxx by year of payment. Both the gross payments to pharmacies and the net payments after subtraction of rebates are shown. In this table, in contrast to Figure 2, Vioxx expenditures are classified according to the date when the Louisiana DHH paid the pharmacy invoice or received a rebate. Total expenditures on Vioxx, net of rebates, were $20,663,672.

**Net Expenditures on Vioxx through March 2000**

18. Text Table 3 partitions Louisiana DHH expenditures on Vioxx into two time periods: June 1999 through the end of March 2000, and April 2000 through the end of September 2004. To calculate gross expenditures on Vioxx in each time period, I used the date that the pharmacy processed the prescription or refill, rather than the date of the initial prescription or the date that the Louisiana DHH ultimately paid the pharmacy. If Vioxx had been withdrawn from the U.S. market by the end of March 2000, Table 3 shows that total Vioxx expenditures, net of rebates, would have been reduced by $18,316,860.

**Exclusion of Vioxx from the Louisiana Medicaid Preferred Drug List (PDL):**
**Aggregate Linear Trend Analyses**

19. Text Figures 3 and 4, respectively, show the results of two aggregate linear trend models of gross expenditures on Vioxx. In Figure 3, a linear trend model is employed to predict gross expenditures if Vioxx had continued to be excluded from the Louisiana Medicaid PDL from July 14, 2003 onward. In Figure 4, a linear trend model is employed to predict gross expenditures if Vioxx had not been excluded from the PDL during June 10, 2002 to July 13, 2003.

10

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

20.  In Figure 3, I have fit the monthly data points to a straight line during the period when Vioxx had been excluded from the PDL, and then projected the trend line forward.  The cumulative difference between observed and projected expenditures represents the predicted reduction in gross expenditures on Vioxx if the exclusion from the PDL had remained in place.  Adjusting the reduction in gross expenditures by the prevailing rebate rates, I estimated that continuation of Vioxx on the Non-Preferred Drug List (NPDL) would have reduced Louisiana's net expenditures on Vioxx by $2.011 million.  The details are given in the file *Projected LA Medicaid Vioxx Payments under Continued NPDL.log*.

21.  In Figure 4, I have fit the monthly data points to a straight line during the periods before and after the exclusion of Vioxx from the Louisiana Medicaid PDL, and then projected the trend line during the intervening period. The cumulative difference between observed and projected expenditures represents the predicted reduction in gross expenditures on Vioxx as a consequence of its exclusion from the PDL.  Adjusting the reduction in gross expenditures by the prevailing rebate rates, I estimated that placement of Vioxx on the Non-Preferred Drug List (NPDL) reduced Louisiana's net expenditures on Vioxx by $4.261 million.  The details are given in the file *Projected LA Medicaid Vioxx Savings during NPDL.log*.

22.  My analysis in Figure 4 is consistent with an internal analyses performed by Merck [9-11].  One internal document estimated losses over six months of 2002 equal to $3.570 million [10].  Another internal document estimated a loss of $1.53 million in the fee-for-service portion of Louisiana Medicaid over six months of 2002, but noted that the "National Medicaid PDL Model" predicted losses 2–3 times larger [11].  This document

11

also commented, "The data that we have does not measure the spillover effect of the Medicaid PDL." [11]

**Cohort Analyses of the Louisiana Medicaid Data**

23.  The aggregate linear trend models of the previous section do not take advantage of the individual-level transactions contained in the Louisiana Medicaid data. Nor do they consider the possible influence of other regulatory events at the state and national level, as displayed in the timeline of Table 1.  To address these potential limitations, I performed a series of cohort analyses of the Louisiana Medicaid data.

24.  Each transaction in the database, including the original prescription and refills, contains a unique patient identifier that permits an analyst to follow the same Medicaid recipient over time.  An illustrative listing of all transactions for a single Louisiana Medicaid recipient, enumerated in Appendix Table C, shows how the patient repeatedly refilled prescriptions for Bextra (valdecoxib) from November 2002 through July 2003, and then switched to Vioxx (rofecoxib) on August 28, 2003, after the latter drug had been placed on the Louisiana Medicaid PDL.  The patient filled the Vioxx prescription four times, incurring total gross expenditures on Vioxx for the Louisiana DHH of $\$83.97 \times 4 = \$335.88$.  While this Medicaid recipient obtained no Vioxx prescriptions after March 18, 2004, the subsequent transactions for meloxicam (an NSAID) and pantoprazole (a proton-pump inhibitor or "PPI") permit the analyst to conclude that the individual remained a Medicaid recipient until at least September 8, 2004, that is, more than one year from the first Vioxx prescription on August 28, 2003.

25. Unfortunately, the database did not provide information on the duration of an individual recipient's eligibility for Medicaid.  Accordingly, if a recipient obtained a

single Vioxx prescription and had no other recorded transactions for any drug (NSAIDs,

COX-2 inhibitors or PPIs), the analyst cannot determine whether or not that individual

remained on Medicaid.

     26. I constructed a longitudinal cohort that consisted of each individual in the

Louisiana Medicaid database who had received at least one Vioxx prescription and who,

on the basis of the available transaction data, was known to be a Medicaid recipient for

one year from the date of the first Vioxx prescription.  Based upon my clinical experience

as a physician, I selected a one-year follow-up as a compromise between the acute

indications for an anti-inflammatory drug such as Vioxx (e.g., 2-3 weeks of pain from

neck whiplash injury after an automobile accident) and the chronic indications (e.g.,

months to years of persistent pain from progressive osteoarthritis of the hip).  While some

drug prescriptions are valid for as long as one year, most have a shorter duration, and thus

the one-year follow-up period permits the analyst to observe whether or not the patient

obtained a repeat prescription.  In sensitivity analyses, I varied the follow-up from 9 to 18

months.

     27. A total of 67,899 individuals in the Louisiana Medicaid data received at least

one Vioxx prescription.  Given the available transaction data, the median duration of

follow-up was 37 months from the date of the first Vioxx prescription.  A total of 49,324

individuals (or 72.6 percent of the total) could be followed for 12 months after the month

of the first Vioxx prescription.  (See *LA Medicaid Vioxx Cohort.log*.)  This subset of

individuals (the "Vioxx one-year follow-up cohort") served as my primary analytic

database.  Collapsing the time axis into one-month intervals, each member of the cohort

thus had 13 observations (from month 0 to month 12) for each of five medication classes:

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

NSAIDs, Vioxx, Celebrex, Bextra, and PPIs.  The balanced database, including zeros

when there were no transactions for a given medication class in a given month, had a

total of $49,324 \times 5 \times 13 = 3,206,060$ observations.  For each of the five medication

classes, there were $49,324 \times 13 = 641,212$ observations.  The mean number of

prescriptions and mean expenditures per month on each of the five medication classes are

shown in Appendix Table D.

28.  I estimated regression models on payments for each medication class, for

combined payments on all medication classes, and for combined payments on all

medications except PPIs (that is, NSAIDs, Vioxx, Celebrex and Bextra).  In each

regression model, I specified fixed effects for each individual and for each month of

follow-up (from 1 to 12).  In addition, I specified indicator variables to capture the

calendar time periods during which each of the relevant regulatory interventions was in

effect.  A listing of all such regulatory intervention variables is shown in Appendix Table

E.  In one important case, the regulatory interventions overlapped in time.  An indicator

variable that corresponded to the time period from September 2005 onward could be

capturing the removal of Celebrex from the Louisiana PDL, the FDA's imposition of a

black box warning on Celebrex, or the massive displacement effects of Hurricane

Katrina.

29.  In essence, those individuals whose first Vioxx prescription was filled early

on (especially during 1999–2001) serve as a control group to assess the effect of later

regulatory intervention of those individuals whose first prescription was filled later on

(especially during 2002–2004).  The fact that various regulatory interventions were in

14

effect at different times permits the analyst to identify the separate effects of each regulation.

30.   In addition to constructing a Vioxx follow-up cohort, I also constructed an analogous Bextra-Celebrex follow-up cohort.  A total of 133,660 individuals in the Louisiana Medicaid data had at least one prescription for either Bextra or Celebrex. Among these Medicaid recipients, I identified 90,573 individuals (67.8 percent) who could be followed for 12 months after the month of the first prescription.  For these individuals, I constructed a similar balanced panel of observations on Bextra and Celebrex payments, and then ran the same regression models with fixed effects for each individual and month of follow up, as well as indicator variables for regulatory interventions.

**Results for the Vioxx One-Year Follow-Up Cohort**

31.   Appendix Table F shows the principal results for the Vioxx one-year follow-up cohort.  The complete results are shown in the electronic document *LA Medicaid Vioxx Cohort Regression Models.log*.  Additional results with a shorter or longer duration of follow-up are given in *LA Medicaid Vioxx Cohort 9-Month Follow-Up.log* and *LA Medicaid Vioxx Cohort 18-Month Follow-Up.log*. The electronic documents also show the results for total expenditures inclusive of proton pump inhibitors.  In general, such results were not significantly different from the principal findings reported below.

32.   To interpret the results, consider the estimated effect of removal of Vioxx from the Louisiana Medicaid PDL for one year starting in July 2002.  The estimated coefficient is −8.56, which means that the regulatory intervention reduced expenditures on Vioxx by $8.56 per month.  If I make the conservative assumption that the effects of

15

this regulatory intervention can be projected only onto the 49,324 individuals in the one-

year follow-up cohort (and not the complete cohort of 67,899 Medicaid recipients who

ever had a Vioxx prescription), then the 12-month effect of the intervention is

$12 \times 49{,}324 \times \$8.56 = \$5.07$ million. Adjusting this estimate for an average 16.1-percent

rebate rate, I obtain an estimated effect of $\$5.07 \times (100\% - 16.1\%) = \$4.25$ million. This

estimate is quite close to that obtained from the aggregate linear trend model based on

Figure 4.

33. Appendix Table F also shows a smaller estimated effect (−1.13) of the

removal of Vioxx from the Louisiana PDL on expenditures for four medication classes.

That is, the estimated monthly decline in Vioxx expenditures of $8.56 was

counterbalanced by a $7.43 increase in expenditures for the other medications

$(8.56 - 1.13 = 7.43)$. In fact, the principal cause of the compensating increase was a rise

in expenditures on Bextra, which was still on the U.S. market at the time.

34. Appendix F likewise shows the effect of the withdrawal of Vioxx from the

U.S. market at the end of September 2004. There is an estimated monthly decline $28.74

in Vioxx expenditures, while monthly expenditures on the four medication classes

declined by $12.42. Hence, there was a counterbalancing increase in expenditures for the

other medications of $28.74 - 12.42 = 16.35$ dollar per month. Put differently, for every

$1.00 decline in Vioxx expenditures, there was a compensating increase in expenditures

of NSAIDs and other COX-2 agents of $0.57. (That is, $16.35 / 28.74 = 0.57$.)

35. The results of an internal analysis of the short-term impacts of the withdrawal

of Vioxx, performed by the Louisiana Department of Health and Hospitals [12], are

generally consistent with my findings here.

**Results for the Bextra-Celebrex One-Year Follow-Up Cohort**

36. Appendix Table G shows the principal results for the Bextra-Celebrex one-year follow-up cohort. The complete results are shown in the electronic document *LA Medicaid Bextra-Celebrex Cohort Regression Models.log*. The imposition by the Louisiana Drug Utilization Review program of a system of "prospective deny edits" was associated with a decline in monthly Bextra expenditures of $7.96 and a decline in monthly Celebrex expenditures of $1.85. The estimated combined monthly decline, based on the sum of these two parameter estimates, is $9.81. The rightmost column of the table shows that the estimated decline for the four medication classes combined was $6.96. Since Vioxx had already been withdrawn from the U.S. market when the DUR prospective deny edit system was initiated, the latter finding implies a compensatory increase of $2.85 in NSAID prescriptions. A separate regression model on NSAID prescriptions yielded an estimated monthly expenditure increase of $1.79 in NSAID prescriptions.

37. During the one-year period prior to the institution of the DUR program, mean monthly expenditures in the Bextra-Celebrex cohort were $23.02 for Bextra and $17.29 for Celebrex, respectively. (See: *LA Medicaid Bextra-Celebrex Cohort Regression Models.log*.) Accordingly, in percentage terms, the DUR program was associated with a $7.96/23.02 = 34\%$ decline in monthly Bextra expenditures and a $1.85/17.29 = 11\%$ decline in monthly Celebrex expenditures.

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

**Cohort Analyses of the IMS Xponent Louisiana Data**

38. I constructed a longitudinal cohort of prescribing physicians from the IMS Xponent Louisiana data, employing unique identifiers to link the participating doctors across the four 2-year waves of the database.  In contrast to my analysis of the Louisiana Medicaid cohort data, there was no ambiguity as to whether a given physician was located in Louisiana and followed in the Xponent panel during any given wave. Accordingly, I included the entire history of the physician's prescribing practices in my regression model.  As in my analysis of the Medicaid data, I specified a fixed effect for each cohort member, who in this case was a prescribing physician.  The two principal endpoints were the monthly number of new prescriptions and the monthly number of total prescriptions (that is, both new and renewal).  No prices or expenditures were provided in the IMS Xponent database.  As noted earlier, the panel measured prescriptions to all patients, and not just Medicaid patients.

39. Appendix Table H shows the estimated effects of the same regulatory interventions and key events on the monthly total number of prescriptions in the Louisiana IMS Xponent panel.  The complete results are given in the electronic document *Xponent Cohort Analysis.log*.  The parameter estimates show a compensating increase in Bextra prescriptions, but a decline in NSAID prescriptions, in relation to the withdrawal of Vioxx from the U.S. market.  The NSAID medication class in the IMS Xponent database, however, was much broader than in the Louisiana Medicaid database.

40. Appendix Table H shows estimated declines in monthly total prescriptions of 1.52 and 1.74 for Celebrex and Bextra, respectively. During the one-year period prior to the institution of the DUR program, mean monthly total prescriptions in the Xponent

18

cohort were 4.97 for Celebrex and 5.23 for Bextra, respectively. (See: *Xponent Cohort Analysis.log*.) Accordingly, in percentage terms, the DUR program was associated with a $1.52/4.97 = 31\%$ decline in monthly Celebrex prescriptions and a $1.71/5.23 = 33\%$ decline in monthly Bextra prescriptions.

**Comment**

41. Counsel for Plaintiff specifically asked me to compute the reduction in Louisiana DHH expenditures, net of rebates, if Vioxx had been withdrawn from the U.S. market in March 2000. If requested, I can use the Louisiana Medicaid data to compute the corresponding reduction in expenditures for any other cutoff date.

42. I used the Louisiana Medicaid data to estimate the compensating increase in expenditures on NSAIDs and other COX-2 inhibitors after the withdrawal of Vioxx from the U.S. market at the end of September 2004. As noted in my timeline (Table 1), the withdrawal of Vioxx was followed by the removal of Bextra in April 2005, as well as other FDA actions concerning the cardiovascular risks of Celebrex. The extent of the compensating increase in NSAID and other COX-2 inhibitor expenditures might have been different if Vioxx had been withdrawn from the U.S. market earlier.

43. In making adjustments for rebates, I relied upon historical rebate percentages. When I estimated the reduction in Louisiana DHH net expenditures on Vioxx if the drug had been withdrawn from the market in March 2000, this reliance on historical rebate percentages required no additional assumptions. In my analysis of the impact on net expenditures on Vioxx if the drug had remained on the Non-Preferred Drug List, the reliance on historical rebate percentages entailed the additional assumption that such percentages would have remained unchanged.

19

44.  The aggregate trend analyses in this report did not take advantage of the individual-level detail in the Louisiana Medicaid data.  Nor did they consider other possible concurrent regulatory influences on Vioxx expenditures.  However, such analyses do have the important advantage of simplicity and transparency.

45.  The precision of my cohort analyses of the Louisiana Medicaid data would be improved if I had information on the exact time period during which each individual was an eligible Medicaid participant.

46.  The IMS Xponent data measured prescriptions for all patients, not just Medicaid patients.  Nonetheless, the "prospective deny edit" system instituted by the Louisiana Drug Utilization program for Medicaid patients was associated with significant declines in Bextra and Celebrex use in the Xponent panel.  This finding suggests that the regulatory actions taken by Louisiana DHH on behalf of its Medicaid clients may indeed have had spillover effects on other non-Medicaid patients.

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

**Text Tables**

Table 1. Timeline of Critical Events

| Date | Description |
|---|---|
| 20-May-1999 | FDA approves Vioxx "for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea." [13] |
| 8-May-2002 | Louisiana Medicaid Pharmaceutical and Therapeutics Committee (PTC) recommends Vioxx be placed on its Non-preferred Drug List (NPDL), while Bextra and Celebrex be placed on its Preferred Drug List (PDL). Prior authorization will be required for Vioxx prescriptions [14]. |
| 10-Jun-2002 | Louisiana Medicaid's placement of Vioxx on the NPDL and Bextra and Celebrex on PDL formally goes into effect [15, 16]. |
| May-2003 | Louisiana Medicaid PTC recommends elimination of prior authorization requirement for Vioxx, placing the drug on its PDL along with Bextra, while Celebrex is recommended for the NPDL [16]. |
| 14-Jul-2003 | Louisiana Medicaid's placement of Vioxx on its PDL formally goes into effect.  Bextra remains on the PDL, while Celebrex is moved to the NPDL [17]. |
| 5-May-2004 | Louisiana Medicaid PTC recommends leaving Vioxx and Bextra on its PDL, while Celebrex is to remain on its NPDL [18, 19]. |
| 11-Aug-2004 | Louisiana Medicaid PTC recommends placing Vioxx, Bextra and Celebrex on its PDL [20]. |
| 30-Sep-2004 | Merck announces voluntary withdrawal of Vioxx from worldwide markets, citing data from a study of the prevention of recurrence of colorectal polyps, in which "there was an increased relative risk for confirmed cardiovascular events, such as heart attack and stroke, beginning after 18 months of treatment in the patients taking VIOXX compared to those taking placebo" [21]. FDA confirms Merck's withdrawal of Vioxx (rofecoxib) "due to safety concerns" [22, 23]. |
| 9-Dec-2004 | FDA approves a new label for Bextra (valdecoxib) that adds "a new warning about possible heart and blood clotting problems, particularly in patients who have just had coronary artery bypass graft surgery" [24]. |
| 17-Dec-2004 | FDA announces the halting of a clinical trial of Celebrex (celecoxib) "because of an increased risk of cardiovascular (CV) events…" [25]. |
| 26-Jan-2005 | Louisiana Drug Utilization Review Board approves "prospective deny edit" on prescriptions for Cox-2 inhibitors that do not satisfy specific criteria [26]. |
| 15-Mar-2005 | Louisiana Drug Utilization Review "prospective deny edit" goes into effect [27]. |
| 07-Apr-2005 | FDA asks Pfizer to withdraw Bextra (valdecoxib) from the market "because the overall risk versus benefit profile for the drug is unfavorable" [28]. Pfizer agrees to suspend sales of Bextra [29]. |

21

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

| Date | Description |
|------|-------------|
| 07-Apr-2005 | FDA asks Pfizer to include a boxed warning in the Celebrex (celecoxib) label "highlighting the potential for increased risk of cardiovascular (CV) events and gastrointestinal (GI) bleeding." Manufacturers of all other prescription and over-the-counter NSAIDs are asked to revise their labels to help make patients "aware of the potential for CV and GI adverse events associated with this class of drugs" [28, 30, 31]. |
| 15-Jun-2005 | FDA issues supplemental labeling request letters for over-the-counter (OTC) NSAIDs [32]. |
| 18-Jul-2005 | FDA issues revised supplemental labeling request letters for over-the-counter (OTC) NSAIDs [33]. |
| 17-Aug-2005 | Louisiana Medicaid PDL contained only NSAIDs [34, 35]. |
| 29-Aug-2005 | Hurricane Katrina strikes southeast Louisiana, resulting in massive displacement of patients, healthcare providers and pharmacies in New Orleans and neighboring parishes. |
| 1-Nov-2005 | Louisiana Medicaid PDL contained only NSAIDs. Celebrex excluded [36]. |
| 8-Aug-2007 | Louisiana Medicaid PTC includes Celebrex on PDL along with NSAIDS [34, 37]. |
| 20-Sep-2007 | Celebrex included in Louisiana PDL but subject to Drug Utilization Review [38]. |

Table 2. Gross Payments, Rebates, and Net Payments for Vioxx by the Louisiana Department of Health and Hospitals, 1999–2005

| Year [a] | Gross Payments [b] | Federal Rebates | State Suppl. Rebates | Total Rebates [c] | Net Payments [d] |
|------|------|------|------|------|------|
| 1999 | 1,418,479 | 194,250 | | 194,250 | 1,224,229 |
| 2000 | 5,390,293 | 798,671 | | 798,671 | 4,591,622 |
| 2001 | 8,266,675 | 1,119,871 | | 1,119,871 | 7,146,805 |
| 2002 | 4,254,852 | 677,629 | | 677,629 | 3,577,223 |
| 2003 | 2,031,241 | 346,273 | 100,661 | 446,934 | 1,584,308 |
| 2004 | 3,273,796 | 585,232 | 150,688 | 735,920 | 2,537,876 |
| 2005 | 1,793 | 183 | | 183 | 1,610 |
| Total | 24,637,131 | 3,722,109 | 251,349 | 3,973,458 | 20,663,672 |

Source: *LA Medicaid Vioxx Net Payments 1999-2005.log*

a. Year of payment.
b. Computation of gross payments takes into account all debit and credit adjustments and voided transactions.
c. Total rebates equal federal rebates plus state supplemental rebates.
d. Net payments equal gross payments minus total rebates.

22

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Table 3. Gross Payments, Rebates, and Net Payments for Vioxx by the Louisiana
Department of Health and Hospitals:  June 1999 – March 2000, and April 2000 –
September 2004

| Time Period [a] | Gross Payments [b] | Total Rebates [c] | Net Payments [d] |
|---|---|---|---|
| Jun 1999 – Mar 2000 | 2,698,328 | 351,516 | 2,346,812 |
| Apr 2000 – Sep 2004 | 21,938,803 | 3,621,942 | 18,316,860 |
| Jun 1999 – Sep 2004 | 24,637,131 | 3,973,458 | 20,663,672 |

Source: *LA Medicaid Vioxx Expenditures through Mar-2000.log*

a. The time period for Gross Payments is partitioned according to the date of
   processing by the pharmacy.
b. Computation of gross payments takes into account all debit and credit adjustments
   and voided transactions.
c. Total rebates equal federal rebates plus state supplemental rebates.
d. Net payments equal gross payments minus total rebates.  The row corresponding
   to April 2000 – September 2004 shows an apparent discrepancy in subtraction due
   to round off.

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

**Text Figures**

Figure 1. Vioxx Prescriptions per Month, Louisiana Medicaid, 1999–2004 [a,b]



Source: *LA Medicaid Voixx Prescription Trends.log*

a.  The data points directly above the tick mark correspond to January of each year.
    The horizontal axis corresponds to the date that the initial prescription was written,
    and not the date that the pharmacy processed the prescription or any refills.
b.  All voided transactions, in which a payment by the Louisiana DHH is subsequently
    reversed, have been eliminated.

24

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Figure 2. Gross Payments for Vioxx per Month, Louisiana Medicaid, 1999–2004 [a,b,c]



Source: *LA Medicaid Voixx Prescription Trends.log*

a. The data points directly above the tick mark correspond to January of each year. The horizontal axis corresponds to the date that the initial prescription was written, and not the date that the pharmacy processed the prescription or any refills.
b. All voided transactions, in which a payment by the Louisiana DHH is subsequently reversed, have been eliminated.
c. Gross payments do not take into account rebates.

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Figure 3. Projected Gross Payments for Vioxx per Month, Louisiana Medicaid, if Vioxx
had Continued on the Non-Preferred Drug List (NPDL) after July 13, 2003 [a,b,c,d]



Source: *Projected LA Medicaid Vioxx Payments under Continued NPDL.log*

   a.   The data points directly above the tick mark correspond to January of each year.
       The horizontal axis corresponds to the date that the initial prescription was written,
       and not the date that the pharmacy processed the prescription or any refills.
   b.   All voided transactions, in which a payment by the Louisiana DHH is
       subsequently reversed, have been eliminated.
   c.   Gross payments do not take into account rebates.
   d.   The solid least squares regression line, fit to the data points from July 2002 – June
       2003, has an estimated slope of $4,080/month. The dashed line represents the
       predicted values during July 2003 – August 2004.

26

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Figure 4. Projected Gross Payments for Vioxx per Month, Louisiana Medicaid, if Vioxx
Had Been on the Preferred Drug List (PDL) from June 10, 2002 – July 13, 2003 [a,b,c,d]



Source: *Projected LA Medicaid Vioxx Savings during NPDL.log*

    a.   The data points directly above the tick mark correspond to January of each year.
        The horizontal axis corresponds to the date that the initial prescription was written,
        and not the date that the pharmacy processed the prescription or any refills.
    b.   All voided transactions, in which a payment by the Louisiana DHH is
        subsequently reversed, have been eliminated.
    c.   Gross payments do not take into account rebates.
    d.   The solid least squares regression line, fit to the points from April 2001 –
        May 2002 and July 2003 – July 2004, has an estimated slope of –$10,434/month.
        The dashed line represents the predicted values during June 2002 – June 2003.

27

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

## Appendix Tables

Appendix Table A.  Number of Transactions in Louisiana Medicaid Data, 1998–2009

| Year | Number of Transactions |
|---|---|
| 1998 | 313,391 |
| 1999 | 500,001 |
| 2000 | 1,119,608 |
| 2001 | 797,882 |
| 2002 | 791,778 |
| 2003 | 820,281 |
| 2004 | 890,141 |
| 2005 | 813,731 |
| 2006 | 436,699 |
| 2007 | 453,718 |
| 2008 | 483,953 |
| 2009 | 493,788 |
| Total | 7,914,971 |

Appendix Table B.  Number of Prescribers Participating in Each Two-Year Wave of the IMS Xponent Louisiana Data, 1998–2007

| Two-Year Wave | Continuing Prescribers from Previous Wave | New Prescribers Entering Current Wave [a] | Total Participating Prescribers [b] |
|---|---|---|---|
| 1998-1999 | 0 | 10,755 | 10,755 |
| 2000-2001 | 9,485 | 1,471 | 10,956 |
| 2002-2003 | 9,139 | 1,911 | 11,050 |
| 2004-2005 | 9,427 | 1,989 | 11,416 |
| 2006-2007 | 9,442 | 1,968 | 11,410 |

a. The new prescribers did not participate in the previous wave, but some (1,343) had participated in earlier waves.  Therefore, the total number of new prescribers (18,094) exceeds the number of unique participating prescribers (16,751) in the panel.
b. Some prescribing physicians who did not continue to the next wave may have moved from Louisiana but continued to participate in the nationwide Xponent panel maintained by IMS Health.  The analysis did not include the prescribing practices of such physicians when they were out of state.

28

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Appendix Table C.  All Transactions for Louisiana Medicaid Recipient
"000210954998972520" for NSAIDs, COX-2 Inhibitors, or Proton Pump Inhibitors

| Prescription Date | Date of Service [a] | NDC Description [b] | Payment [c] |
|---|---|---|---|
| 26-Nov-02 | 26-Nov-02 | VALDECOXIB | 84.89 |
| 26-Nov-02 | 19-Dec-02 | VALDECOXIB | 84.89 |
| 26-Nov-02 | 6-Jan-03 | VALDECOXIB | 84.89 |
| 26-Nov-02 | 29-Jan-03 | VALDECOXIB | 84.89 |
| 26-Nov-02 | 21-Feb-03 | VALDECOXIB | 84.89 |
| 26-Nov-02 | 22-Mar-03 | VALDECOXIB | 84.89 |
| 7-Apr-03 | 5-May-03 | VALDECOXIB | 84.89 |
| 7-Apr-03 | 29-Jul-03 | VALDECOXIB | 87.27 |
| 28-Aug-03 | 28-Aug-03 | ROFECOXIB | 83.97 |
| 28-Aug-03 | 29-Sep-03 | ROFECOXIB | 83.97 |
| 28-Aug-03 | 21-Oct-03 | ROFECOXIB | 83.97 |
| 18-Mar-04 | 18-Mar-04 | ROFECOXIB | 83.97 |
| 19-Mar-04 | 19-Mar-04 | MELOXICAM | 80.36 |
| 5-Apr-04 | 5-Apr-04 | MELOXICAM | 80.36 |
| 12-Apr-04 | 12-Apr-04 | PANTOPRAZOLE SODIUM | 71.94 |
| 22-Apr-04 | 22-Apr-04 | PANTOPRAZOLE SODIUM | 204.29 |
| 22-Apr-04 | 19-May-04 | PANTOPRAZOLE SODIUM | 204.29 |
| 22-Apr-04 | 16-Jun-04 | PANTOPRAZOLE SODIUM | 204.29 |
| 5-Apr-04 | 2-Jul-04 | MELOXICAM | 84.83 |
| 22-Apr-04 | 15-Jul-04 | PANTOPRAZOLE SODIUM | 204.29 |
| 5-Apr-04 | 16-Jul-04 | MELOXICAM | 84.83 |
| 5-Apr-04 | 29-Jul-04 | MELOXICAM | 84.83 |
| 5-Apr-04 | 12-Aug-04 | MELOXICAM | 84.83 |
| 22-Apr-04 | 13-Aug-04 | PANTOPRAZOLE SODIUM | 204.29 |
| 5-Apr-04 | 26-Aug-04 | MELOXICAM | 84.83 |
| 22-Apr-04 | 8-Sep-04 | PANTOPRAZOLE SODIUM | 210.78 |

Source: *Appendix Table C.log*

a. The date of service represents the date that the pharmacy processed the prescription or refill.
b. NDC = National Drug Classification
c. Payment represents the amount that Louisiana DHH paid the pharmacy, irrespective of any copayment made by the Medicaid recipient.  See *Nov09.rerun.CLAIMS.EXT.DED and COUNTs.xls.*

29

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Appendix Table D.  Mean Payment per Month for Five Medication Classes in the Vioxx 12-Month Follow-up Cohort[a]

| Medication Class | Mean (SD) Number of Prescriptions per Month | Mean (SD) Expenditure per Month ($) |
|---|---|---|
| NSAID | 0.042 (0.201) | 1.71 (11.82) |
| Vioxx | 0.271 (0.445) | 21.93 (39.97) |
| Celebrex | 0.059 (0.235) | 5.40 (23.91) |
| Bextra | 0.016 (0.126) | 1.54 (13.05) |
| PPIs | 0.168 (0.374) | 21.84 (53.39) |

Source: *Regression Models Sample Means.log*

a. Each member of the cohort had 13 observations, ranging from month 0 to month 13.  Hence, the mean number of Vioxx prescriptions per cohort member would be $13 \times 0.271 = 3.52$, while the mean gross expenditure on Vioxx per cohort member would be $13 \times \$21.93 = \$285.09$.

Appendix Table E.  Indicator Variables for Key Regulatory Events in the Cohort Regression Models[a]

| Regulatory Intervention or Event | Starting Month | Ending Month[a] |
|---|---|---|
| Vioxx withdrawn from U.S. market | Oct-2004 | – |
| Vioxx excluded from Louisiana PDL | Jul-2002 | Jun-2003 |
| Bextra withdrawn from U.S. market | Apr-2005 | – |
| DUR "prospective deny edit" is in effect | Mar-2005 | – |
| Celebrex black box warning is in effect[b] | Sep-2005 | – |
| Hurricane Katrina causes displacement[b] | Sep-2005 | |
| Celebrex excluded from Louisiana PDL | Jul-2003 | Sep-2004 |
| Celebrex excluded from Louisiana PDL[b] | Sep-2005 | Sep-2007 |

Source: *LA Medicaid Vioxx Cohort Regression Models.log*

a. When a regulatory intervention remains in effect permanently (or, in the case of Hurricane Katrina, where the displacement effect is thought to be long-lasting), the indicator variable is set to 1 from the starting month until the final month.  For the Vioxx cohort, the final month is Oct-2005.  For the Bextra-Celebrex cohort, the final month is Nov-2009.
b. These events are overlapping.  Hence, a single indicator variable, set equal to 1 from Sep-2005 onward, captured all three events.

30

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Appendix Table F.  Regression Estimates for the Vioxx One-Year Follow-Up Cohort[a]

| Regulatory Intervention or Event | Monthly Vioxx Payments ($)[b] | Monthly Four-Medication Class Payments ($)[c] |
|---|---|---|
| Vioxx withdrawn from U.S. market | −28.74 (0.82) | −12.42 (1.01) |
| Vioxx excluded from Louisiana PDL | −8.56 (0.20) | −1.13 (0.25) |
| Bextra withdrawn from U.S. market | | −1.92 (0.81) |
| DUR "prospective deny edit" is in effect | | −2.99 (0.73) |
| Celebrex black box / Hurricane Katrina [d] | | 0.75 (2.15) |
| Celebrex excluded from Louisiana PDL | −11.29 (0.76) | −3.37 (0.94) |

Source: *LA Medicaid Vioxx Cohort Regression Models.log*

  a.  Standard errors are in parentheses below each parameter estimate.
  b.  Effects of Bextra withdrawal, the DUR prospective audit and the Celebrex black-box/Katrina could not be estimated for Vioxx alone, as they became effective after Vioxx was withdrawn on September 30, 2004.
  c.  Four-medication class includes NSAIDs, Vioxx, Celebrex and Bextra.
  d.  These two events combined.  See Appendix Table E.

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Appendix Table G.  Regression Estimates for the Bextra-Celebrex One-Year Follow-Up Cohort[a]

| Regulatory Intervention or Event | Monthly Bextra Payments ($)[b] | Monthly Celebrex Payments ($) | Monthly Four-Medication Class Payments ($)[c] |
|---|---|---|---|
| Vioxx withdrawn from U.S. market | −14.93 (0.26) | −2.68 (0.33) | −14.49 (0.49) |
| Vioxx excluded from Louisiana PDL | 2.04 (0.18) | −3.22 (0.19) | −1.19 (0.32) |
| Bextra withdrawn from U.S. market | −4.34 (0.31) | −0.04 (0.53) | −6.96 (0.60) |
| DUR "prospective deny edit" is in effect | −7.96 (0.31) | −1.85 (0.50) | −6.96 (0.57) |
| Celebrex black box / Hurricane Katrina[d] | | −16.43 (0.39) | 0.50 (0.44) |
| Celebrex excluded from Louisiana PDL | −0.64 (0.22) | −8.45 (0.25) | −3.93 (0.40) |

Source: *LA Medicaid Bextra-Celebrex Cohort Regression Models.log*

    a.  Standard errors are in parentheses below each parameter estimate.
    b.  Effects of Bextra withdrawal, the DUR prospective audit and the Celebrex black-box/Katrina could not be estimated for Bextra alone, as they became effective after Bextra was withdrawn on April 7, 2005.
    c.  Four-medication class includes NSAIDs, Vioxx, Celebrex and Bextra.
    d.  These two events combined.  See Appendix Table E.

32

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

Appendix Table H.  Regression Estimates of the Effects of Regulatory Interventions and Key Events on Total Monthly Prescriptions in the Louisiana IMS Xponent Cohort [a]

| Regulatory Intervention or Event | NSAID [b] | Vioxx [c] | Celebrex | Bextra |
|---|---|---|---|---|
| Vioxx withdrawn from U.S. market | −3.17 (0.05) | −4.41 (0.03) | −0.69 (0.04) | 3.27 (0.5) |
| Vioxx excluded from Louisiana PDL | −5.10 (0.04) | 0.06 (0.03) | 1.03 (0.03) | 3.09 (0.04) |
| Bextra withdrawn from U.S. market | 0.13 (0.13) | | 0.08 (0.09) | −2.43 (0.08) |
| DUR "prospective deny edit" is in effect | 1.16 (0.12) | | −1.52 (0.09) | −1.74 (0.08) |
| Celebrex black box / Hurricane Katrina [d] | 0.04 (0.06) | | 0.05 (0.04) | |
| Celebrex excluded from Louisiana PDL | −5.26 (0.02) | −0.01 (0.02) | 0.38 (0.03) | 4.66 (0.04) |

Source: *Xponent Cohort Analysis.log*

a.  Standard errors are in parentheses below each parameter estimate.
b.  The complete list of drugs in this class is given in the Stata data file *Arthritis Classification.dta*
c.  Effects of Bextra withdrawal, the DUR prospective audit and the Celebrex black-box/Katrina could not be estimated for Bextra alone, as they became effective after Bextra was withdrawn on April 7, 2005.
d.  These two events combined.  See Appendix Table E.

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

**Signature Page**

Jeffrey E. Harris          12/22/2009

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

**Notes and References**

1.      The opinions expressed in this report are the author's sole responsibility, and do not necessarily represent those of the Massachusetts Institute of Technology or any other organization.

2.      Harris, J.E., *Trial Testimony*, in *United States of America v. Philip Morris Incorporated et al.* 2004, Civil Action No. 99-2496(GSK), United States District Court for the District of Columbia, October 14-21, 2004.

3.      The matter was settled before trial.  My compliance with a protective order in that case requires that I not disclose the details of my work.

4.      Weinstein, J.B., *Memorandum & Order. Motion for Class Certification.* 2008, United States District Court, Eastern District of New York: In re: Zyprexa Products Liability Litigation (04-MD-1596), UFCW Local 1776 v. Ely Lilly (05-CV-4115), Opinion issued September 5, 2008.

5.      IMS Health Incorporated, *Order Confirmation and Agreement for Litigation Requests between IMS Health Incorporated ("IMS") and Murray Law Firm, dated as of the Effective Date ("Agreement").* 2009, November 23.

6.      IMS Health Incorporated, *Anti-Arthritic IMS Rx data 1999 through 2007: Documentation.* 2009: ARTH USA 1999 to 2007 Documentation.pdf.

7.      Merck & Co. Inc., *LA Vioxx Rebates.MRK-ZEZ0000001.xls (Electronic Spreadsheet).* 2009: November 25.

8.      I received Xponent data for the entire nationwide panel of prescribers maintained by IMS Health, representing all states other than Louisiana, for the time period 1998–2007.  This database was over 19 gigabytes in size and contained

35

approximately 25 million individual records.  I also received summary electronic

spreadsheets on nationwide prescriptions for anti-arthritis and anti-ulcer drugs by

month from 1999–2007 (derived from the National Disease and Therapeutic

Index or "NDTI"), as well as nationwide promotional efforts by sales

representatives in physicians' offices for anti-arthritis and anti-ulcer drugs by

month from 1997–2007 (derived from Integrated Promotional Services or "IPS").

Finally, I received the underlying raw data from the nationwide NDTI database

for 1999–2007, along with a copy of Dataview 4.0, the proprietary software

package licensed by IMS Health to read the raw NDTI data.

9.  Harrington, J.P., *Louisiana Medicaid (Memorandum attaching LA Analysis - Slide.ppt and Louisiana Medicaid.ppt)*. 2002: Merck & Co. Inc. MRK-AGLLAAD0009918, October 16.

10. Geweniger, J.R., *PDL Gross Sales Analysis. Louisiana Medicaid (Slide Presentation)*. 2002, Dallas TX: Merck & Co. Inc., MRK-AGLAAD0009919 PDL Analysis.pdf, October 15.

11. Lambert, W., *State of Louisiana: Medicaid (Slide Presentation)*. 2002, Dallas TX: Merck & Co. Inc., MRK-AGLAAD0009920 PDL Analysis.pdf, October 15.

12. Greene, T., *Memorandum to M.J. Terrebonne. Subject: NSAID 2005_04_28.xls*. 2005, Baton Rouge LA: Louisiana Drug Utilization Review Board, May 2.

13. U.S. Food and Drug Administration, *Approval Letter for Vioxx: Attention Robert E. Silverman, Merck Research Laboratories*. 1999, Rockville MD: http://www.accessdata.fda.gov/drugsatfda_docs/appletter/1999/21042ltr.pdf, May 20.

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

14.     Louisiana Department of Health and Hospitals, *Medicaid Pharmaceutical and Therapeutics Committee Meeting: Minutes*. 2002, Baton Rouge LA: (Castile Deposition Exhibit 13), May 8.

15.     Louisiana Department of Health and Hospitals, *Dear Prescribing Practitioners and Pharmacy Providers (Letter)*. 2002, Baton Rouge LA: (Castille Deposition Exhibit 15), May 24.

16.     Provider Synergies L.L.C., *Louisiana Medicaid PDL Program Overview & Results*. 2004, Cincinnati OH: http://www.dhh.louisiana.gov/offices/publications/pubs-134/050504ATTACHMENT8.pdf, March 18.

17.     Louisiana Department of Health and Hospitals, *Dear Prescribing Practitioners and Pharmacy Providers (Letter)*. 2003, Baton Rouge LA: (Castille Deposition Exhibit 22), July 14.

18.     Terrebonne, M.J., *Memorandum to Frederick P. Cerise. Subject: P&T Committee May 5, 2004 Recommendations*. 2004, Baton Rouge LA: (Castille Deposition Exhibit 30) Louisiana Department of Health and Hospitals, May 12.

19.     Louisiana Department of Health and Hospitals, *Medicaid Pharmaceutical and Therapeutics Committee Meeting: Minutes*. 2004, Baton Rouge LA: (Castile Deposition Exhibit 27), May 5.

20.     Louisiana Dept. of Health and Hospitals, *Medicaid Pharmaceutical and Therapeutics Committee Meeting: Minutes*. 2004, Baton Rouge LA: http://www.dhh.louisiana.gov/offices/publications/pubs-134/8-11-04%20P%20&%20T%20Minutes%20Approved%203-9-05_1.pdf, August 11.

37

21.     Merck & Co. Inc., *Merck Announces Voluntary Worldwide Withdrawal of
        VIOXX®*. 2004, Whitehouse Station NJ:
        http://www.merck.com/newsroom/vioxx/pdf/vioxx_press_release_final.pdf,
        September 30.

22.     U.S. Food and Drug Administration, *FDA Public Health Advisory: Safety of
        Vioxx*. 2004, Rockville MD:
        http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatie
        ntsandProviders/ucm106274.htm, September 30.

23.     U.S. Food and Drug Administration, *Vioxx (rofecoxib) Questions and Answers*.
        2004, Rockville MD:
        http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatie
        ntsandProviders/ucm106290.htm, September 30.

24.     U.S. Food and Drug Administration, *Questions and Answers: Strengthened
        Warnings on Bextra*. 2004, Rockville MD:
        http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatie
        ntsandProviders/ucm106255.htm, December 9.

25.     U.S. Food and Drug Administration, *FDA Statement on the Halting of a Clinical
        Trial of the Cox-2 Inhibitor Celebrex*. 2004, Rockville MD:
        http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2004/ucm1083
        84.htm, December 17.

26.     Louisiana Drug Utilization Review Board, *Chronic pain disorders: Appropriate
        use of COX2 inhibitors (pp. 4-5)*, in *Louisiana Drug Utilization Review Board*

*Meeting Minutes (Terrebonne Deposition Exhibit 25), January 26*. 2005: Baton Rouge LA.

27.    Louisiana Dept. of Health and Hospitals, *Dear Prescribing Physician (Letter concerning COX-2 Drug Utilization Review)*. 2005, Baton Rouge LA: (Wendt Deposition, Exhibit 14), March 1.

28.    U.S. Food and Drug Administration, *FDA Announces Series of Changes to the Class of Marketed Non-Steroidal Anti-Inflammatory Drugs (NSAIDs) (News Release)*. 2005, Rockville MD: http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2005/ucm1084 27.htm, April 7.

29.    Pfizer Inc., *New FDA Labeling for Pfizer's Celebrex and All Other NSAIDs to Reflect Similar Cardiovascular Profile.  Pfizer Separately Agrees to Suspend Sales of Bextra Due to FDA Evaluation of Risks of Rare But Serious Skin Reactions*. 2005: http://www.pfizer.com/news/press_releases/pfizer_press_releases.jsp?rssUrl=http: //home.businesswire.com/portal/site/pfizer/index.jsp?ndmViewId=news_view&n dmConfigId=1006553&newsId=20070309005275&newsLang=en, April 7.

30.    U.S. Food and Drug Administration, *Public Health Advisory - FDA Announces Important Changes and Additional Warnings for COX-2 Selective and Non-Selective Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)*. 2005, Rockville MD: http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatie ntsandProviders/ucm150314.htm, April 7.

39

Harris, J.E. Expert Report          *State of Louisiana v. Merck*          December 22, 2009

31.    U.S. Food and Drug Administration, *Alert for Healthcare Professionals:*

       *Celecoxib (marketed as Celebrex)*. 2005, Rockville MD:

       http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformat

       ionforPatientsandProviders/ucm124654.pdf, April 7.

32.    U.S. Food and Drug Administration, *Supplemental Labeling Request Letter and*

       *Labeling Template (OTC NSAID Products)*. 2005, Rockville MD:

       http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformat

       ionforPatientsandProviders/ucm106252.pdf, June 15.

33.    U.S. Food and Drug Administration, *Supplemental Labeling Request*. 2005,

       Rockville MD:

       http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformat

       ionforPatientsandProviders/ucm106249.pdf, July 18.

34.    Provider Synergies LLC, *Louisiana Medicaid PDL Program Overview and*

       *Results*. 2009, Cincinnati OH:

       http://www.dhh.louisiana.gov/offices/publications/pubs-

       103/Memo%20Response%20to%20SXC%2041309.pdf, February 13.

35.    Louisiana Department of Health and Hospitals, *Medicaid Pharmaceutical and*

       *Therapeutics Committee Meeting: Minutes*. 2005, Baton Rouge LA:

       http://www.dhh.louisiana.gov/offices/publications/pubs-

       134/7056.17.05%20P%20&%20T%20Approved%20Minutes.pdf, August 17.

36.    Louisiana Dept. of Health and Hospitals, *Prior Authorization PDL*

       *Implementation Schedule*. 2005, Baton Rouge LA: November 1.

37.    Louisiana Dept. of Health and Hospitals, *Medicaid Pharmaceutical and Therapeutics Committee Meeting: Minutes*. 2007, Baton Rouge LA: August 8.

38.    Louisiana Dept. of Health and Hospitals, *Dear Pharmacy Provider (RE: PDL #07-02)*. 2007, Baton Rouge LA: September 20.

December 22, 2009

# JEFFREY E. HARRIS
## Curriculum Vitae

- Residence:       56 John Street
  Providence, Rhode Island 02906-2034

- MIT Office:      Department of Economics E52-252F,
  Massachusetts Institute of Technology,
  Cambridge MA 02139
  Voice 617-253-2677; Fax 617-253-6915
  Email *jeffrey@mit.edu*

## Current Employment

Professor, Department of Economics, Massachusetts Institute of Technology,
since July 1, 1998.

## Education

- Ph.D. in Economics, 1975, University of Pennsylvania.
- M.D., 1974, University of Pennsylvania.
- A.B. (*summa cum laude*), 1969, Harvard University.
- Resident & Clinical Fellow, Medical Services, Massachusetts General Hospital, 1974–1977.

## Past and Present Medical Practice

Primary Care Physician, Internal Medicine Associates, Massachusetts General Hospital, Boston, Massachusetts, 1977–2006.

Internist, Blackstone Valley Community Health Care, Pawtucket, Rhode Island, 2008–.

Consulting Physician, Providence Community Health Centers, Providence, Rhode Island, 2006–.

Currently active medical licenses:  Massachusetts #38219; Rhode Island #MD11997.