# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


*********************************

IN RE:  VIOXX PRODUCTS          MDL No. 1657
LIABILITY LITIGATION
                                Section L

This Document Relates To:
STATE OF LOUISIANA, ex rel.
JAMES D. CALDWELL, JR.,          Judge
Attorney General,               Eldon E. Fallon
              Plaintiffs,


     v.                          Magistrate
                                 Judge Knowles

MERCK SHARP & DOHME CORP.,
              Defendant.         Case No. 05-3700
*********************************


DEPOSITION OF JEFFREY E. HARRIS, M.D., Ph.D.
         Friday, January 29th, 2010
              10:08 a.m.



                  Held At:
    Hagens Berman Sobol Shapiro, LLP
         55 Cambridge Parkway
        Cambridge, Massachusetts


REPORTED BY:
Maureen O'Connor Pollard, RPR, CLR, CSR

Jeffrey E. Harris, M.D., Ph.D.

Page 14

1   or check a statement made by Professor Wiggins

2   in his report.

3           And fourth, I had several

4   conversations with counsel after receipt of

5   Professor Wiggins's report up until today.

6       Q.    How much time would you estimate

7   you've spent preparing for the deposition in

8   those four categories you just described?

9       A.    Fifteen or twenty hours.

10      Q.    What was the calculation of

11  Dr. Wiggins you attempted to check or refute?

12      A.    I can respond either by describing it

13  qualitatively or showing you the calculation,

14  because I brought a paper copy with me.

15      Q.    Why don't you describe it

16  qualitatively.

17      A.    On a specific page of Professor

18  Wiggins's report, he makes an assertion that I

19  had made a programming error in connection with

20  a specific calculation, and as further evidence

21  of the programming error my calculation produces

22  a data file in which Vioxx appears implausibly

23  and incorrectly to continue to be sold after it

24  was withdrawn from the market in September,

Jeffrey E. Harris, M.D., Ph.D.

Page 15

1    2004.

2            I loaded on the computer the very same

3    file which contained the purported programming

4    error and which I had submitted in connection

5    with my report, and ran a tabulation of Vioxx

6    sales with respect to the month of service, and

7    determined that there were no Vioxx sales after

8    September, 2004.

9        Q.   Is this the issue relating to the

10   infinity date programming error that was

11   described?

12       A.   I'm not sure I would characterize it

13   as an error, because at this point given the

14   available time I've had, given the limited

15   information I've been given, and given the

16   results that I've obtained independently, I'm

17   not sure there is an error.  And although I

18   understand in programming what infinity date

19   means, I don't think I can be any more

20   responsive.

21       Q.   But just so I'm clear, the error that

22   you think Dr. Wiggins ascribed to your analyses

23   related to the Vioxx cohort, correct, as opposed

24   to your Bextra-Celebrex cohort?

Jeffrey E. Harris, M.D., Ph.D.

Page 16

1       A.      No.   The error that Dr. Wiggins

2    referred to was with respect to the

3    Bextra-Celebrex cohort.

4       Q.      Dr. Wiggins didn't actually charge in

5    his report that you made the same error in your

6    Vioxx cohort, correct?

7       A.      No, he did not.

8       Q.      Did you check to see whether

9    Dr. Wiggins was correct, that, in fact, you did

10   have an error in your Bextra-Celebrex cohort?

11      A.      That's exactly the answer I gave in

12   the previous question.

13      Q.      Actually you said Vioxx sales.

14      A.      Then I was incorrect.

15              But no, in order to answer fully I

16   would have to show you the --

17      Q.      Then let's do that.

18      A.      -- the calculation and the sentence in

19   Professor Wiggins's report.

20      Q.      Why don't you get out what you did.

21      A.      Since this isn't on videotape, I have

22   a folder of copies of various materials that I'm

23   opening, and in particular I'm looking at the

24   expert report of Steven Wiggins which I printed

Jeffrey E. Harris, M.D., Ph.D.

Page 18

1    "Further evidence of this error can be

2    demonstrated by observing Vioxx expenditures

3    long after Vioxx was withdrawn in September,

4    2004."

5              It is the latter sentence that I

6    checked, or its accuracy is what I checked by

7    running a program that I just described.

8              BY MR. ISMAIL:

9    Q.    All right.  Let's go ahead and mark

10   your copy of the report as Exhibit 2.

11             (Whereupon, Harris Exhibit Number 2

12             was marked for identification.)

13             MR. ISMAIL:  And let's mark whatever

14   tabulation you ran as Exhibit 3.

15             (Whereupon, Harris Exhibit Number 3

16             was marked for identification.)

17             BY MR. ISMAIL:

18   Q.    You only have one copy of it?

19   A.    Yes.

20   Q.    Let me take a look.

21             So Exhibit 3 is the tabulation,

22   printout of the tabulation that you ran to check

23   the statement of Paragraph 96 of Dr. Wiggins's

24   report that Vioxx expenditures can be observed

Jeffrey E. Harris, M.D., Ph.D.

Page 19

1    after September of 2004, correct?

2         A.    Correct.

3         Q.    And so you have in column one "T

4    month," then you've got summary of payment, and

5    it goes out to month 70 with values in the mean

6    summary of payment for that month?

7         A.    Correct.

8         Q.    And then month 70 corresponds to what

9    calendar month?

10        A.    There's a line in the computer program

11   indicating that it is September, 2000 -- not in

12   the computer program but in the results which I

13   believe are on the last page, indicating that it

14   is September, 2004.

15        Q.    Did you check Dr. Wiggins's statement

16   that you have a mismatch between your

17   Bextra-Celebrex expenditures and calendar

18   months?

19        A.    I was not in a position to do so given

20   the time available and the limited materials

21   supplied to me.

22        Q.    Well, Dr. Wiggins went into your

23   backup materials and identified dates that don't

24   match the right calendar months; for example,

Jeffrey E. Harris, M.D., Ph.D.

Page 39

1   where I was a consultant to a pharmaceutical

2   company that to my knowledge had no legal

3   connection, no case was pending, and I certainly

4   wasn't asked to testify.

5       Q.    So over the last ten years, you've

6   averaged between 150 and $250,000 per year on

7   legal cases, and the vast majority of that

8   income derives from retention by Plaintiff

9   lawyers, correct?

10      A.    Yes, those are the gross amounts, that

11  is correct.

12      Q.    What percentage of your professional

13  time do you spend doing legal work?

14      A.    Somewhere between five and ten

15  percent.

16      Q.    What percentage of your professional

17  income is derived from legal work?

18      A.    Can the question be repeated?

19      Q.    What percentage of your annual income

20  is derived from doing legal work?

21      A.    Less than twenty percent.

22      Q.    If I understand, are you still a

23  practicing physician?

24      A.    That's correct.

Jeffrey E. Harris, M.D., Ph.D.

Page 108

1      A.    Correct.

2      Q.    Would this patient be in your cohort

3   or not?

4      A.    Yes, the patient would be, the patient

5   would be followed from August of 2003 until

6   August of 2004, and would be regarded as a

7   control patient, that is somebody whose one year

8   clinical follow-up ended before the withdrawal

9   of Vioxx.

10      Q.    I don't think I understand your

11   description of a control.  I'm not sure you

12   described it that way in your report.  So can

13   you explain to me how just by methodology you

14   set up this construct of -- let me withdraw that

15   for a second.

16            Let me say what I understood so far,

17   and you can tell me if I missed the boat

18   already, okay?

19            You were attempting to define a group

20   of patients who you believe were active Vioxx

21   users as of the date of the withdrawal, correct?

22   Am I right so far?

23      A.    Correct.

24      Q.    For whom you had reason to believe

Jeffrey E. Harris, M.D., Ph.D.

Page 109

1   they were Medicaid eligible?

2       A.      Correct.

3       Q.      And you looked to see, okay, when

4   those patients switched off Vioxx, how much did

5   the compensating expenditures go up for the

6   state?

7       A.      If at all, yes.

8       Q.      And so if that's your focus, how did

9   you use patients who were not active Vioxx

10  patients as of the date of the withdrawal in

11  your analysis?

12      A.      The large fraction of individuals who

13  received their first Vioxx prescription may have

14  come back for a couple of refills but actually

15  never had another prescription.  If,

16  accordingly, we simply compared Vioxx use of

17  that active abuser in the immediate month or two

18  before the withdrawal and the immediate month or

19  two after, our analysis would suffer from the

20  criticism that many individuals simply don't

21  come back for Vioxx.  Accordingly, we couldn't

22  compare that individual with somebody else in

23  the same month who was not subject to the Vioxx

24  withdrawal.

Jeffrey E. Harris, M.D., Ph.D.

1            If we have somebody who started Vioxx,

2    for example, in June of 2004, and was by my

3    definition still an active Vioxx patient by the

4    end of 2004, the first effect is to compare

5    Vioxx use and other medication use in that

6    patient in month three, that's September, and

7    month four, that's October, of Vioxx use, with

8    the trend in Vioxx or other drug use in months

9    three and four of a patient not subject to the

10   withdrawal.

11           In econometric terms, a comparison of

12   use immediately before and after a withdrawal is

13   sometimes called a natural experiment, sometimes

14   it's called a regression discontinuity design.

15           When we compare the difference in

16   Vioxx use in that one patient between the

17   pre-withdrawal period and the post-withdrawal

18   period, it's called a difference analysis.  When

19   we compare that difference with a patient who

20   was taking Vioxx and did not have to face a

21   withdrawal, that's called a difference in

22   differences analysis.  All of these are terms of

23   art that are standard in any university in the

24   world.

Jeffrey E. Harris, M.D., Ph.D.

Page 111

1              In essence, my regression design
2     computes a difference in differences analysis in
3     the period immediately before and after the
4     Vioxx withdrawal for those patients who in my
5     professional judgment are most likely to be
6     active Vioxx patients.
7          Q.    Okay.  So can you tell me where --
8     just so I'm clear, when you report, say, in --
9     turn to table, I think it's F, your Vioxx
10    cohort.
11             The table F are tabular results of
12    your regression estimates on your Vioxx one year
13    follow-up cohort, correct?
14         A.    Correct.
15         Q.    So when you show a coefficient of
16    minus 28.74 in the Vioxx withdrawn from US
17    market, you are attempting to identify a
18    coefficient just on people you believe were
19    still on Vioxx as of the date of withdrawal?
20         A.    They were individuals who were most
21    likely to be either on Vioxx or to have a
22    clinical condition that would warrant the use of
23    Vioxx.
24         Q.    Why do you say that?  How did you make

Jeffrey E. Harris, M.D., Ph.D.

Page 112

1    that happen in your cohort?

2         A.    As I said in my report, a great many

3    people have Vioxx for one prescription and don't

4    come back, but there are still others who use

5    the drug on a longer term basis.  In those cases

6    most prescriptions are renewable either at six

7    months or a year, and therefore a one year

8    follow-up would be sufficient to capture those

9    individuals who decided to go back for the drug

10   or whose physicians made that decision for them.

11              To go beyond one year is, in my

12   judgment and experience, to run the serious risk

13   that the patient no longer has the Vioxx

14   indication, and that the sample is contaminated

15   with individuals who just weren't Vioxx patients

16   anymore.

17        Q.    But that concern actually is not borne

18   out by your analysis, is it, Doctor?  You did a

19   nine month, twelve month and eighteen month

20   analysis, correct?

21        A.    The answer to your first question is I

22   don't know of anything that contradicts the

23   conclusion I just stated.

24              The answer to your second question is

Jeffrey E. Harris, M.D., Ph.D.

Page 121

1              You will take the thirteen

2    observations of Medicaid expenditures for that

3    patient?

4         A.    Yes.

5         Q.    And you would take no expenditures

6    when that patient switched to naproxen, correct?

7         A.    If that person switched to naproxen

8    outside the one year period of follow-up, that

9    would not be counted in my cohort analysis as I

10   have reported it here, at least in the principal

11   analysis.

12        Q.    So for the stated purpose of what you

13   were trying to do, which is to see what was the

14   effect of the withdrawal on compensating

15   expenditures, that patient should have been

16   included conceptually, correct?

17        A.    No.

18        Q.    Why?

19        A.    Because the follow-up past one year is

20   not in my opinion a reliable indicator that that

21   person was still an active Vioxx patient.

22        Q.    But the patient was continuously on

23   Vioxx and then switched to naproxen, why doesn't

24   that signal to you that they are indicated for

Jeffrey E. Harris, M.D., Ph.D.

Page 122

1    some sort of NSAID therapy?

2         A.    In that particular hypothetical case,

3    the person is on Vioxx therapy, but since I

4    cannot make that analysis for every one of the

5    patients, and since I have to treat them in a

6    standardized manner, I have to set a cutoff for

7    when the typical person is a Vioxx patient.

8         Q.    Okay.  I'll get to your analyses in

9    the aggregate, but I want to understand if your

10   purpose was to understand what did active Vioxx

11   users do as of the withdrawal, and did the state

12   have to have compensating expenditures for those

13   patients.  Somebody who took Vioxx for two years

14   and then switched to naproxen should be someone

15   you'd want to analyze, right?

16        A.    Yes.

17        Q.    So when you have this twelve month

18   follow-up limit the way you did, any patient as

19   of the date of the withdrawal who was taking

20   Vioxx for more than one year and had some switch

21   to another NSAID, you never considered the

22   expenditures post-withdrawal on the other

23   NSAIDs; true?

24        A.    If an individual began a twelve month

Jeffrey E. Harris, M.D., Ph.D.

Page 123

1    follow-up period more than a year before the

2    removal of Vioxx from the market, and then

3    continued to take Vioxx up to the date of

4    withdrawal and then switched, then that

5    individual would only be followed for one year,

6    and would only be included as a control

7    individual, that is somebody not subject to

8    withdrawal of the drug, who took Vioxx

9    continuously for one year.  But my procedure

10   would indeed exclude his continued use of Vioxx

11   after that year of follow-up and under the

12   hypothetical his switch to another drug.

13        Q.    Okay.  So if your real focus was to

14   understand what happened to current Vioxx users

15   as a result of the withdrawal, you did not

16   analyze anyone who was actually taking Vioxx for

17   more than a year before the withdrawal, correct?

18        A.    Correct.

19        Q.    And if you wanted to understand the

20   impact of the withdrawal on compensating

21   expenditures in the State of Louisiana, you

22   would want to include everyone who was currently

23   a Vioxx user as of the date of the withdrawal

24   and follow them to see what their switching

Jeffrey E. Harris, M.D., Ph.D.

Page 124

1    behavior was, and that would include people who

2    were taking the medicine for more than a year;

3    that's what you would have wanted to do, right?

4         A.    I thought about alternative designs

5    that would capture the effect that you're

6    referring to.  Alternative designs, for example,

7    might consider defining an active Vioxx user as

8    somebody who had a Vioxx prescription the month

9    before the withdrawal, which would definitely

10   include anybody who was taking it for five years

11   up until that time.  I decided that those

12   alternative designs were much more likely to be

13   subject to bias, and that the right way to

14   design the cohort was to take the first Vioxx

15   prescription as time zero and then follow the

16   patient for what clinically would be a

17   reasonable amount of time.

18            It could indeed exclude individuals

19   who were long-term users, but a design which

20   attempted to go after long-term use had the

21   serious disadvantage that it might be picking up

22   an association between the withdrawal of Vioxx

23   and subsequent NSAID use rather than a true

24   causal effect.

Jeffrey E. Harris, M.D., Ph.D.

Page 125

1          What's more, if I were to, say, take

2     this individual, and he had a Vioxx prescription

3     one month right before the withdrawal, then I

4     had to decide how about two months and three

5     months.  In that case I'm getting into problems

6     of retrospective design which I thought were

7     inappropriate.

8          The correct design, in my opinion, is

9     what analysts call a prospective design, that is

10    we start on the day of treatment.  It most

11    closely mimics a clinical trial.

12    Q.    I appreciate that answer, but that's

13    not really what I asked.

14         If your stated objective for your

15    analysis was to see what was the effect of the

16    withdrawal on expenditures for the State of

17    Louisiana, that analysis should include patients

18    who were taking Vioxx for more than one year

19    before the withdrawal and then switched to

20    another medicine, correct?

21    A.    Ideally, yes.

22    Q.    And for any patient who was in your

23    cohort in this twelve month follow-up who was

24    taking Vioxx on the day the medicine was

Jeffrey E. Harris, M.D., Ph.D.

Page 126

1   withdrawn in September, 2004, if that patient

2   was taking Vioxx any longer than six months, by

3   the way you designed the study, by definition

4   there was going to be more Vioxx expenditures in

5   your model than compensating NSAID expenditures;

6   true?

7        A.    No.

8        Q.    Why not?

9        A.    Number one, the dependent variable or

10  endpoint is not the number of prescriptions, but

11  the dollar expenditure.

12            Number two, the end point is

13  prescriptions per month and not prescriptions

14  over the year.  So, for example, I had nine

15  months of Vioxx prescriptions as of September

16  30th, and I spent $2 a month hypothetically for

17  each of the nine months, on September 30th my

18  doctor switched me to naproxen and for the

19  subsequent three months I spent $1 per month.

20  Since the endpoint is prescription expenditures

21  per month, then my pre-withdrawal expenditure

22  will be $2 and my post-withdrawal expenditure

23  will be $1, and the compensating effect is $2

24  minus $1.

Jeffrey E. Harris, M.D., Ph.D.

Page 139

1    other study that I personally have done.

2         Q.    And the research papers that you

3    described on Zantac and Tagamet, are those on

4    aggregate data or individual claims data?

5         A.    Some are on aggregate data, and some

6    are on cohort data, and some refer to panels of

7    doctors that have been constructed by surveyors

8    which have then been used in cohort analysis.

9         Q.    In Paragraph 26 you describe this one

10   month follow-up and your rationale for it.

11   Would you turn there, please?

12        A.    (Witness complies).  You mean the one

13   year follow-up?

14        Q.    Did I say one month?  I apologize, one

15   year.

16             Are you at Paragraph 26?

17        A.    Yes, I am.

18        Q.    So four lines down you write "Based

19   upon my clinical experience as a physician, I

20   selected a one year follow-up as a compromise

21   between the acute indications for

22   anti-inflammatory drugs such as Vioxx (two to

23   three weeks of pain from neck whiplash injury

24   after an automobile accident) and the chronic

Jeffrey E. Harris, M.D., Ph.D.

Page 140

1    indications (for example, months to years of

2    persistent pain from progressive osteoarthritis

3    of the hip."

4           Why did you think it was necessary to

5    impose a compromise on your cohort between acute

6    and chronic conditions?

7           A.    I wanted to make the period of

8    follow-up long enough so as to capture some

9    patients who took Vioxx more than just one time,

10   such as for an acute injury.  The problem was

11   that as you extend the period of follow-up in a

12   uniform manner for every patient, given the

13   limitations I was faced, you lose people.

14          Q.    What do you mean "the limitations you

15   were faced"?

16          A.    If I wanted to follow every patient

17   for two years, since I don't have the full data

18   on Medicaid eligibility, I will have to exclude

19   anyone who I don't know for a fact had

20   transactions for two years.  So my cohort in

21   that case would have a longer follow-up, but

22   would have fewer people, and the gains from a

23   longer follow-up in my opinion are way

24   outweighed by the loss of observations.

Jeffrey E. Harris, M.D., Ph.D.

Page 141

1     Q.    But the one year follow-up that you

2   employed results in a cohort that does not

3   actually reflect the real life balance between

4   acute and chronic in Louisiana Medicaid,

5   correct?

6     A.    I don't know what you mean by a "real

7   life balance."

8     Q.    Well, you decided I was going to

9   exclude observations more than twelve months

10  out, right?

11    A.    For the one year cohort analysis,

12  that's correct.

13    Q.    And so for patients who were long-term

14  chronic users of Vioxx before the regulatory

15  events you were analyzing, their switching

16  behavior is not analyzed in your cohort, right?

17    A.    Only their first year of Vioxx use is

18  analyzed in the cohort.  If hypothetically an

19  individual had one Vioxx prescription per month

20  from 1999 until 2004, my analysis would only

21  take into account the first year of that

22  hypothetical individual's prescription.

23          The problem is an a priori or uniform

24  rule to follow individuals that long would

Jeffrey E. Harris, M.D., Ph.D.

Page 142

1    exclude thousands of people for whom I didn't

2    have data from 1999 to 2004.

3         Q.    Okay.

4         A.    What's more, in real life people don't

5    do that.  They take Vioxx, they don't show up

6    every month for a prescription, sometimes the

7    prescriptions are written for six months and

8    they don't show up for that entire time.  Other

9    people drop Vioxx or any other drug and then go

10   back to it.  Still others do polypharmacy to the

11   extent that it's permitted by a Medicaid agency

12   and try multiple drugs at the same time.  The

13   idea of a continuous long-term Vioxx user is, in

14   fact, the exception.

15        Q.    Are you done?  I didn't want to

16   interrupt.

17        A.    Yes.

18        Q.    Okay.  The mix of observations you

19   included in your cohort reflects your one year

20   proxy for Medicaid eligibility and your one year

21   of follow-up, and does not necessarily reflect

22   the entire group of Vioxx patients in Louisiana

23   Medicaid; true?

24        A.    True.

Jeffrey E. Harris, M.D., Ph.D.

Page 143

1      Q.    So the reason or the compromise that
2  you decided upon you said was "based upon my
3  clinical experience as a physician," right?
4      A.    Correct.
5      Q.    Okay.  Well, we talked about your
6  clinical experience as a physician earlier, but
7  just to review; you were a very infrequent
8  prescriber of Vioxx, correct?
9      A.    Correct.
10      Q.    And five years later you express some
11  difficulty remembering the frequency with which
12  you prescribed Vioxx, right?
13      A.    Vioxx specifically, that's correct.
14      Q.    And you have done no research into the
15  mix between chronic and acute users of Vioxx,
16  correct?
17      A.    The answer is yes, I have, and it's
18  contained within my analysis here above and
19  beyond my own clinical experience with the use
20  of anti-inflammatory drugs in general.
21      Q.    What specific analysis -- let me back
22  up one second.
23            What percentage of the Vioxx patients
24  who have at least one Vioxx prescription in

Jeffrey E. Harris, M.D., Ph.D.

Page 144

1  Louisiana Medicaid use the drug chronically more

2  than a year?

3       A.    A relatively small percentage.

4       Q.    Okay.  And that conclusion comes from

5  what?

6       A.    Although I don't have the documents in

7  front of me, my analysis has an indicator

8  variable for each month from the first

9  prescription out through one year.  Immediately

10  after the first prescription, the indicator

11  variable for average Vioxx expenditures drops by

12  a substantial amount.  It then continues to drop

13  for a few months to a level substantially below

14  that, and never recovers.

15           The fact that the time indicator

16  variables where the time measures the time from

17  the first prescription fall, level off and never

18  recover is a measure of the extent to which an

19  individual who had one Vioxx prescription came

20  back for more, and if I had the output in front

21  of me, I do not think that it is in any -- even

22  an example is in any of the materials from

23  Professor Wiggins, but let me look.

24           (Witness reviewing document.)

Jeffrey E. Harris, M.D., Ph.D.

Page 145

1      A.     Well, I shouldn't use his regressions
2    because without the full delivery I don't know
3    what they mean.
4           Even in the ones I'm looking at, which
5    is in Exhibit 11, it's clear that the month
6    dummy variables, D-U-M-M-Y, drop immediately
7    after the first prescription and then never
8    recover.
9      Q.     So what is a relatively small
10   percentage?
11     A.     Without actually looking at my own
12   results, I can't tell you whether it's in the
13   order of ten percent or twenty percent or
14   something a little bit bigger, but it's much
15   less than half.
16     Q.     Okay.  Well, do you think it's even
17   possibly below ten percent?
18     A.     It could be.
19     Q.     Whatever the percentage is, those
20   patients' compensating other NSAID expenditures
21   per month would not be included in your
22   analysis, right?
23     A.     If out of 100 Vioxx patients, ten were
24   still Vioxx patients three years later, and if

Jeffrey E. Harris, M.D., Ph.D.

Page 146

1   Vioxx were abruptly withdrawn at that time,

2   those individuals' responses would not be part

3   of my cohort analysis.

4            The problem is finding those

5   individuals, that is finding a rule that the

6   investigator can apply systematically.  We are

7   not in the business of doing an after the fact

8   investigation of each and every person's record

9   to make a judgment as to who was a Vioxx user

10  and who wasn't given the available data.

11      Q.    What do you mean that "we are not in

12  the business of"?  Who is "we"?

13      A.    An investigator who is attempting to

14  assess in an unbiased and accurate manner the

15  causal effect of an interruption of Vioxx

16  availability among active Vioxx users needs to

17  come up with a design that can be applied before

18  the fact, that is before seeing the results in a

19  uniform manner to what amounted to tens of

20  thousands of patients and millions of

21  observations.

22      Q.    By limiting the cohort and the

23  observations in which you do, does your

24  resulting model reflect a composition of Vioxx

Jeffrey E. Harris, M.D., Ph.D.

Page 147

1    users that are skewed more towards the acute

2    than might have been the case in real life in

3    the Medicaid database?

4         A.    It is entirely possible that the

5    design excludes longer term Vioxx users who, in

6    fact, reacted or their physicians reacted to the

7    withdrawal of Vioxx.  It includes only their

8    experience in the first year.  But whether there

9    is a better design that can identify these

10   people, my judgment was no.  Extending the

11   cohort well beyond one year not only resulted in

12   a loss of observations, but ran the risk that

13   what changes in NSAID use were observed were

14   purely coincidental rather than causal.

15        Q.    Okay.  I understand your point that

16   you think you got the right model, but one of

17   the jobs of an analyst is to identify biases

18   that exist in the model they chose, right?

19   That's often times pointed out in research

20   papers?

21        A.    Correct.

22        Q.    Okay.  So let's identify the biases in

23   your model.

24             The model you chose in the cohort

Jeffrey E. Harris, M.D., Ph.D.

Page 148

1    analysis was biased against long-term chronic

2    users of Vioxx, correct?

3        A.    Possibly.

4        Q.    Putting on your clinician hat for a

5    moment, folks who are using Vioxx long-term and

6    chronically are patients who are more likely in

7    need of alternative therapy than short-term

8    acute users, correct?

9        A.    Not necessarily.

10       Q.    Nothing is necessarily always true,

11   but the question is about whether a patient who

12   is taking Vioxx for two years is more likely to

13   need some alternative therapy than a patient who

14   took Vioxx for two weeks; will you agree with

15   that logic?

16       A.    I'll take two patients, and although

17   I'll give them names to protect the

18   confidentiality, these are typical.

19            Jeff lifted a heavy box at work and

20   pulled his back out.  His doctor prescribed a

21   COX-2 inhibitor, but then for one reason or

22   another he could not cash the prescription.

23   Jeff has to work, his economic livelihood and

24   his family depends on it, he will try whatever

Jeffrey E. Harris, M.D., Ph.D.

Page 149

1    means to find pain relief.  It may not be an

2    NSAID, it might be a drug containing Tylenol or

3    an opiate narcotic, that is a short-term use

4    because many of the individuals like Jeff will

5    get better and go back to work.

6              Tarek, on the other hand, has

7    long-term aches and pains from rheumatoid

8    arthritis, and his doctor says why don't you

9    take a COX-2 inhibitor, and he doesn't really

10   think it works, and when the COX-2 inhibitor is

11   removed he just says "oh, well, I don't need

12   anything, or maybe I'll try an aspirin," and

13   those things occur all the time.

14             Given that they occur all the time, I

15   don't think I could agree with the proposition

16   that a long-term user necessarily needs more

17   compensation than a short-term user, and it

18   could be just the opposite.

19        Q.   So given that inability to derive any

20   conclusion from who is an acute or chronic user,

21   why did you attempt to compromise?  What were

22   you thinking you were compromising by your

23   analysis?

24        A.   Once again, the compromise is between

Jeffrey E. Harris, M.D., Ph.D.

Page 150

1   the duration of follow-up and the sample cohort

2   size.   When I extend the duration of

3   follow-up --

4        Q.    That's not what you wrote, sir.   You

5   didn't say "I was compromising."  I understand

6   the tension in your -- you set out an analysis,

7   and I understand the tension, you think you need

8   to identify who is Medicaid eligible, and you

9   use this proxy of twelve months of some

10  prescription, and you're worried that if you go

11  out beyond that you are going to be excluding

12  patients from the cohort, and you're worried if

13  you go smaller than that you're going to be

14  excluding observations from the patients who are

15  in.   I understand the tension you've described.

16           But that's not the compromise you

17  wrote in your report.   The compromise you wrote

18  in your report is between acute indications and

19  chronic indications, right?

20       A.    Am I answering the page and a half of

21  transcript you just articulated, or the last

22  sentence?

23       Q.    Why don't you just answer the last

24  sentence.

Jeffrey E. Harris, M.D., Ph.D.

Page 151

1      A.      Indeed if I reduce the follow-up
2   period to three months, I might be able to
3   capture nearly all the individuals in the
4   database, but there may indeed be individuals
5   who are genuine Vioxx users beyond three months.
6              As I wrote in the report and I
7   testified today, to capture chronic use it is my
8   experience that individuals in that category
9   will review -- or rather renew a prescription
10  either at six months or one year, but the
11  compromise between acute use and chronic use
12  does not require that I assume one group has any
13  more or less compensation than another, but
14  rather is an attempt to capture both.
15     Q.      Going back to the bases you give for
16  this compromise, your clinical experience, you
17  had very few Vioxx prescriptions in your
18  experience, and you generally gave out Celebrex
19  samples rather than write prescriptions, right?
20     A.      Well, the way it works is you start
21  with the samples, and then if the patient is
22  interested in continuing, then you write -- and
23  can afford it and is covered by insurance, you
24  continue.  As to what the exact mix of samples

Page 160

1    The fundamental problem is that Professor

2    Wiggins's analysis takes every month in which a

3    patient had no prescriptions for a drug and

4    describes it as missing, and that's clearly not

5    true.

6         Q.    Okay.

7         A.    If we were to call this anything, it

8    is a number, whose significance I'm not sure of,

9    of those months in the entire cohort in which

10   some positive expenditure was recorded.

11        Q.    If you look at the first part of the

12   table and you look at the twelve month cohort

13   line, that was your principal cohort analysis

14   for your report?

15        A.    Correct.

16        Q.    Why did you do the nine and eighteen

17   month cohorts?

18        A.    Because I thought it was only

19   appropriate to see how much of a variation from

20   twelve months, how much that variation would

21   affect the results.  And even though I decided

22   that the cohort for twelve months was going to

23   be my principal case, I thought it appropriate

24   to report at least in my work papers what the

Jeffrey E. Harris, M.D., Ph.D.

Page 161

1    variation was.

2         Q.    Did you decide on twelve months before

3    you did the nine and eighteen month analyses?

4         A.    Yes, I did.

5         Q.    Is that reflected anywhere?  Any way

6    we can confirm that you decided twelve month was

7    the right cohort before you ran the eighteen

8    month cohort, for example?

9         A.    Absolutely.

10        Q.    Do tell.

11        A.    If you look at my work papers you will

12   see a date and timestamp for every program that

13   I ran.  Those will be external in the sense that

14   the files in the operating system will report

15   them at a certain date and time, and they will

16   be internal in the sense that the log files

17   which memorialize what passed on the screen will

18   record the date and time that the program was

19   executed, and you will see that the twelve

20   months were always done first, and that the nine

21   and eighteen months were done later.  And what

22   is more, every output has a time later than

23   every input.

24        Q.    I think you said earlier you don't

Jeffrey E. Harris, M.D., Ph.D.

Page 182

1      A.    A fair estimate and my best estimate

2  of the causal effect of both short-term and

3  long-term, in fact all active Vioxx users.

4      Q.    The withdrawal number that you came

5  to, 2,874, negative 2,874 and negative 1,242,

6  table F?

7      A.    I see that, yes.

8      Q.    I believe you did that percentage in

9  your report, and it's 57 percent net?

10     A.    Net compensation, yes.

11     Q.    So a 43 percent savings?

12     A.    Well, again it's a 43 percent, I'm not

13  sure I would use the word savings.

14     Q.    Then let's not.

15          If you go to Paragraph 42 of your

16  report.  So you're talking here about your Vioxx

17  twelve month cohort and your analysis of the

18  causal effect, as you describe it, of the

19  withdrawal?

20     A.    Yes.

21     Q.    You write in the last sentence of that

22  paragraph, quote, "The extent of the

23  compensating increase in NSAID and other COX-2

24  inhibitor expenditures might have been different

Jeffrey E. Harris, M.D., Ph.D.

Page 183

1  if Vioxx had been withdrawn from the US market

2  earlier," close quote.

3          What do you mean by that?

4      A.     While I attempted to take into account

5  the most important contemporaneous events, in

6  particular regulatory events, it is nonetheless

7  the case from my point of view as an economist

8  that the projection of the compensating increase

9  to any other point in time needs to be done with

10  care.

11      Q.     How would you do it if you wanted to

12  be careful?

13      A.     While it is outside the scope of my

14  testimony, I understand that Plaintiff will

15  propose as facts that Defendant Merck could have

16  and should have disclosed certain cardiovascular

17  risks earlier as a result of data it knew

18  internally in a clinical trial; for example, in

19  March of 2000 in the VIGOR Trial.

20          If Plaintiff proposes that the buyer,

21  namely Louisiana Medicaid, could have taken

22  certain regulatory reactions in response to that

23  information, then normally it would be

24  appropriate for Plaintiff to establish the facts

Jeffrey E. Harris, M.D., Ph.D.

Page 184

1   that Louisiana's action at that time are not

2   materially different from the actions that it

3   took a few years later.  I'm not in a position

4   to make that evaluation.

5          It might, for example, include what

6   would have been the consequences to the

7   scientific community and to government

8   regulation in general, not only about Vioxx but

9   other drugs in the class had the alleged

10  concealment not occurred.

11     Q.   The decisions of the patients and the

12  doctors in September of 2004 and thereafter for

13  current Vioxx patients reflects the information

14  and state of knowledge that had been generated

15  by that date, correct?

16     A.   Correct.

17     Q.   Though if we wanted to look at earlier

18  time periods, necessarily the information and

19  knowledge was different than it was in September

20  of 2004; true?

21     A.   I don't have an expert opinion on

22  that, but that's my general understanding.

23     Q.   So if you want to go all the way back

24  to March of 2000, there certainly were studies

Jeffrey E. Harris, M.D., Ph.D.

Page 186

1    compensating expenditures as a result of the

2    Vioxx withdrawal in September of 2004 can

3    validly be applied to any data?

4        A.    Having given my best estimate of the

5    causal effect of withdrawal in September, 2004

6    and the compensating increase, I satisfied what

7    I understood to be my assignment with respect to

8    that aspect of Plaintiff's counsel's request.

9              In the event that that estimate were

10   to be applied to an earlier time period, it is

11   my own economic, not necessarily legal opinion

12   that counsel will have to develop the necessary

13   facts to ensure that the projection to an

14   earlier time period is valid, but I did not do

15   that in my report.

16       Q.    The events that took place after

17   September of 2004 include a December, 2004

18   health advisory from the FDA, correct?  I

19   believe it's on 21 of your report.

20             (Witness reviewing document.)

21       A.    There were two FDA actions in my

22   chronology in December, 2004 listed in table one

23   of my report, yes.

24             BY MR. ISMAIL:

Jeffrey E. Harris, M.D., Ph.D.

Page 187

1     Q.    One of which relates to Bextra, one

2  of which relates to Celebrex, correct?

3     A.    Correct.

4     Q.    And you did not separately analyze the

5  impact of those two regulatory events on NSAID

6  expenditures in the State of Louisiana, correct?

7     A.    No, I did not include those as

8  indicator variables.

9     Q.    Do you believe it is reasonable that

10  the information that was disclosed in December

11  of 2004 about Bextra and Celebrex could have

12  had an effect on your analysis of the causal

13  effect of the Vioxx withdrawal in September of

14  2004?

15     A.    It's possible, but I did not think

16  those events were as important as those that I

17  specifically and explicitly took into account.

18     Q.    Did you look to see to what extent

19  patients who were on Vioxx in September of 2004

20  elected to not go on any alternative NSAID or

21  COX-2 inhibitor thereafter?

22     A.    Above and beyond what I've presented

23  in my report, in my work materials, no.

24     Q.    So to the extent that there was a

Jeffrey E. Harris, M.D., Ph.D.

Page 191

1    A.    Okay.

2          (Witness reviewing document.)

3    A.    Okay, I'll focus on Paragraph 70.

4          BY MR. ISMAIL:

5    Q.    It also is discussed at 80, 81, 82.

6    A.    Okay.  I'm going to take the liberty

7    of reading two sentences from Paragraph 70 of

8    Dr. Wiggins's report so as to ensure that I

9    understand your question.  "Exhibit E shows that

10   after removing the inappropriate zero

11   observations from Dr. Harris's model, the

12   compensating increase in other expenditures

13   increases to $0.76 for every dollar decline in

14   Vioxx expenditures.  These results demonstrate

15   that Dr. Harris's cohort regression results are

16   highly sensitive to his treatment of the missing

17   observations, and that the results reflect

18   class-wide NSAID information."

19   Q.    Do you understand what Dr. Wiggins is

20   saying there?

21   A.    I think I understand what he's

22   intending to say, yes.

23   Q.    That the information that existed in

24   the marketplace for physicians and patients in

Jeffrey E. Harris, M.D., Ph.D.

Page 192

1    the fourth quarter of 2004 was different than it

2    was in earlier time periods as evidenced by the

3    fact that there was a class-wide movement to get

4    away from NSAIDs.  Do you agree or disagree with

5    that conclusion?

6         A.    That's not what Dr. -- that's a

7    two-part question.

8              The first answer is that's not what

9    Dr. Wiggins says or I interpret him to say.  In

10   fact, I don't think his analysis has anything to

11   do whatsoever with a classified effect.  In this

12   particular case, Dr. Wiggins's exclusion of

13   months in which there were zero expenditures as

14   somehow missing data is not a question of

15   methodology, it is just plain wrong and invalid,

16   and any conclusions that he draws therefrom,

17   whether they be in Exhibit E or elsewhere, are

18   in my opinion not reliable and cannot be used to

19   demonstrate either a class-wide effect or the

20   relevance of an analysis of 2004 to any other

21   period.

22        Q.    Tell me why.

23        A.    James was spending $1 per month on

24   Vioxx for six months prior to its withdrawal.

Jeffrey E. Harris, M.D., Ph.D.

Page 193

1    After its withdrawal, James had only one
2    expenditure on the sixth month after withdrawal
3    for $1 for another drug.  In the six months
4    prior to the withdrawal, James's average
5    expenditure on Vioxx was $1 per month, $1 each
6    month, in fact.  In the six months afterward,
7    his average expenditure was $0.16 per month, or
8    sixteen and two-thirds cents per month because
9    he did not go to the pharmacy and pick up any
10   medication at all.
11           Now, let's say that Professor Wiggins
12   eliminates those first five months after Vioxx
13   withdrawal where James's doctor and James did
14   not go to the pharmacy or order any medicines
15   and excludes them as so-called missing
16   observations, then we only have one month, the
17   sixth month in which James spent $1, we will
18   reach the false and entirely erroneous
19   conclusion that James spent $1 per month on
20   Vioxx prior to the withdrawal, and $1 per month
21   on the other drug post-withdrawal.
22        Q.    Okay.
23        A.    That is an example stripped down of
24   why the exclusion of zeros in the database isn't

Jeffrey E. Harris, M.D., Ph.D.

Page 194

1    even a question of methodology, it's just plain

2    wrong, and any inference drawn from it cannot be

3    right.  People do not go to the pharmacy every

4    month.  And if the database shows zero

5    expenditures for that month, it is not missing,

6    it is a genuine zero, and to call it missing is

7    not a methodological issue, it's just a plain

8    error.

9        Q.   One of the statements Dr. Wiggins

10   makes in his report is that prior -- the

11   percentage of time that a patient had no

12   expenditures on NSAIDs was much greater in the

13   period after the Vioxx withdrawal than before.

14   Do you have any reason to --

15       A.   I don't know one way or another if

16   that's true.

17       Q.   One of the inferences from that data,

18   if you assume it to be true, is that there was a

19   class-wide movement away from NSAIDs in the

20   fourth quarter of 2004, or a greater reluctance

21   to use NSAIDs in the fourth quarter of 2004.  Is

22   that a fair inference from that data?

23       A.   There may have been a class-wide

24   effect, and that class-wide effect is taken into

Jeffrey E. Harris, M.D., Ph.D.

Page 195

1    account in my analysis.

2        Q.    You assigned the class-wide effect,

3    all of that effect, to the Vioxx withdrawal,

4    right?

5        A.    Yes.  If Merck hypothetically had

6    announced, as Plaintiff alleges, that Vioxx had

7    certain cardiovascular side effects and

8    withdrawn Vioxx as Plaintiff, I think, claims

9    Merck should have done, then that might have

10   indeed had a ripple effect on other drugs in the

11   same therapeutic class.  But that would have

12   been a consequence of Merck's action whether it

13   took place in 2004 or any other time period, and

14   I don't see it as dissociable or detachable from

15   Merck actions.

16            Had Merck disclosed the cardiovascular

17   side effect, there may very well have been less

18   of a compensation because of the overall concern

19   that the newly disclosed information affected

20   all drugs in the class.

21       Q.    You assigned 100 percent of the

22   class-wide reluctance to use NSAIDs as a causal

23   result of the Vioxx withdrawal, correct?

24       A.    No.

Jeffrey E. Harris, M.D., Ph.D.

Page 196

1      Q.    In what way no?

2            (Witness reviewing documents.)

3      A.    Any reductions or changes in

4   medication use after March, 2005 were assigned

5   in my analysis to other regulatory events.

6            BY MR. ISMAIL:

7      Q.    Let me rephrase my question.

8            Any class-wide movement away from

9   NSAIDs that occurred after September, 2004 and

10  before March of 2005, you assigned 100 percent

11  of that impact to the Vioxx withdrawal; true?

12           MR. DUGAN:  Objection.  Asked and

13  answered.

14           BY MR. ISMAIL:

15     Q.    Go ahead.

16     A.    I think the correct way of stating it

17  is if the withdrawal of Vioxx during the narrow

18  time period you're referring to resulted in a

19  class-wide --

20     Q.    That's not what I asked, sir.

21     A.    Well, then, I don't have anything else

22  to add to my previous answer.

23     Q.    Well, how about an answer to my

24  previous question.