# EXHIBIT E

1  A.  No.  I haven't -- as I'm looking at this -- I
2  haven't looked at this in a while.  This obviously
3  hasn't been updated quite as much as it probably should
4  have been.
5  Q.  Okay.  "Workshop Presentations."  There are
6  none listed since 1996.
7      Have you had any workshop presentations since
8  1996?
9  A.  Yes, I have.  And that's not been updated.
10 Q.  How frequently have you given workshop
11 presentations since 1996?
12 A.  Only a few times.
13 Q.  Any in the last ten years?
14 A.  Yes.
15 Q.  Your Ph.D. was in Economics, right?
16 A.  That's correct.
17 Q.  Do you have any medical training?
18 A.  No.  In the sense of being a doctor or going
19 to medical school or anything like that, no.
20 Q.  You didn't start an M.D. program and change
21 at some point --
22 A.  No.
23 Q.  -- or anything like that?
24 A.  No.  I am an economist.  I have regularly read
25 the medical literature for a long time, but that is as

```
 1    an economist with the training of an economist, looking
 2    at economic issues.  I'm only an economist.
 3         Q.   Do you have any legal training?
 4         A.   Not that I would have the opinion that it
 5    creates any legal expertise on my part.  I'm an
 6    economist.  I have taken some law courses, and I am a
 7    student of the economics of contracting, but it is
 8    strictly from an economic point of view.
 9              I'm an economist looking at, at times, legal
10    issues, and I work in an area and do publish papers in
11    an area called law and economics.  But my perspective is
12    from an economist's point of view, and I have no legal
13    expertise as a lawyer.
14         Q.   You never went to law school?
15         A.   I never went to law school.
16         Q.   You're not licensed to practice law anywhere?
17         A.   I am not.
18         Q.   Do you intend to offer any legal opinions in
19    this case?
20         A.   I do not.
21         Q.   Do you intend to offer any medical opinions in
22    this case?
23         A.   I do not.
24         Q.   Do you consider yourself an expert in
25    marketing?
```

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
    STATE OF LOUISIANA, ex rel. )
 3  JAMES D. CALDWELL, ATTORNEY  )
    GENERAL,                     )
 4                               )
       Plaintiff,                )
 5                               )
    VS.                          ) CASE NO. 05-3700
 6                               )
    MERCK SHARP & DOHME CORP.,   )
 7                               )
       Defendant.                )
 8

 9

10       *********************************************

11                     ORAL DEPOSITION OF

12                    STEVEN WIGGINS, Ph.D.

13                      FEBRUARY 9, 2010

14       *********************************************

15

16         ORAL DEPOSITION of STEVEN WIGGINS, Ph.D.,

17  produced as a witness at the instance of the Plaintiff,

18  and duly sworn, was taken in the above-styled and

19  numbered cause on the 9th day of February, 2010, from

20  10:00 a.m. to 3:20 p.m., before Lisa D. Huneycutt, CSR

21  in and for the State of Texas, reported by machine

22  shorthand, at the offices of BAKER BOTTS, 910 Louisiana,

23  Suite 3200, Houston, Texas  77002, pursuant to the

24  Louisiana Rules of Civil Procedure, notice, and the

25  provisions stated on the record or attached hereto.
```

1  report as the next exhibit.
2             (Exhibit No. 8 was marked for
3                identification.)
4      Q.   (BY MR. PLYMALE)  And you've reviewed
5  Dr. Harris's report, correct?
6      A.   That's correct.
7      Q.   And you've also reviewed his deposition
8  testimony, correct?
9      A.   That's correct.
10     Q.   And in both his report and his deposition
11 testimony, Dr. Harris set forth his opinion regarding
12 the medical basis for certain data exclusions, right?
13            MR. SALES:  Objection to form.
14     A.   I would not agree with that characterization.
15 He certainly discussed the issue.
16     Q.   (BY MR. PLYMALE)  So in the data exclusions
17 that you consider arbitrary in the cohort analyses that
18 Dr. Harris performed, for example, limiting the data
19 to twelve months from the first Vioxx prescription,
20 Dr. Harris didn't offer an opinion that his clinical
21 and medical judgment was a basis for that data
22 exclusion?
23            MR. SALES:  Objection to the form.
24     A.   I mean, he said what he said.  In his -- here,
25 on Page 26 -- Paragraph 26, he says, "Based upon my

1    clinical experience as a physician, I suggested a
2    one-year follow-up as a compromise between the acute
3    indications for an antiinflammatory drug such as Vioxx
4    (e.g. two to three weeks of pain from neck whiplash
5    injury after an automobile accident) and the chronic
6    indications (e.g. months to years of persistent pain
7    from progressive osteoarthritis of the hip)."
8              Then he goes on to talk about while some drug
9    prescriptions are valid for as long as one year, most
10   have a shorter duration.
11             This is not about how long prescriptions last.
12   It's whether or not patients use the drug Vioxx and over
13   what period of time they use them.
14             He doesn't talk about that.  He doesn't talk
15   about the fact that two-thirds of all prescriptions
16   written for Vioxx, in fact, happen after one year, and
17   he doesn't -- in his deposition, when this subject came
18   up, what he said was that he wanted to follow a given
19   group of patients and make sure that he had it right
20   for those patients.
21             But that's not the question at hand.  The
22   question at hand regards LADHH expenditures.  And so he
23   doesn't offer a reason for why it is better to measure
24   LADHH expenditures using a limited group.  He never
25   does say that.

1  reimbursements for their prescriptions.
2           MR. PLYMALE:  Objection to the
3  responsiveness.
4      Q.   (BY MR. PLYMALE)  Do you have any medical
5  basis to disagree with Dr. Harris's clinical opinions
6  in this case?
7           MR. SALES:  Objection; asked and
8  answered.
9      A.   I am not familiar with any medical opinions
10 that Dr. Harris has offered in this case.  These appear
11 to be economic questions that he's addressing.
12     Q.   (BY MR. PLYMALE)  Fair enough.
13          And your criticism of Dr. Harris's opinions
14 here are based on economics, and not on medicine,
15 correct?
16          MR. SALES:  Objection to the extent that
17 Dr. Harris is proffered on economics, and not on medical
18 issues.  So I'm not understanding what the form of the
19 question is.
20          THE WITNESS:  Could you please reread
21 the question.
22          (The material referred to was read by
23           the reporter.)
24          THE WITNESS:  My criticism of his
25 analysis is an economic criticism to the economic

```
 1    opinions that he has offered, and I'm not aware of any
 2    other opinions that he's offered.
 3         Q.    (BY MR. PLYMALE)  Okay.  In Paragraph 103, the
 4    second sentence --
 5         A.    Of my report?
 6         Q.    Of your report.  Excuse me.
 7               You're addressing spillover from Medicaid to
 8    the rest of the State of Louisiana, and you state,
 9    "There is no a priori reason to expect that the placing
10    of Vioxx on NPDL status within the Medicaid system would
11    have a substantial effect on the prescribing behavior
12    of physicians treating patients covered by other
13    payers."
14               Did I read that right?
15         A.    Yes, you did.
16         Q.    In general, isn't the Medicaid system one of
17    the largest third-party payors for prescription drugs
18    in a state?
19         A.    Yes.
20         Q.    And isn't the formulary status of a drug on a
21    State's Medicaid formulary or preferred drug list, as is
22    the case in Louisiana, of interest to pharmaceutical
23    manufacturers?
24               MR. SALES:  Objection to the form.
25         A.    Yes.  And to clarify, I think this sentence
```