**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION** | **MDL No.  1657** |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General,<br><br>Plaintiffs,<br><br>v.<br><br>MERCK SHARP & DOHME CORP.,<br><br>Defendants. | JUDGE ELDON E.  FALLON<br><br>MAGISTRATE JUDGE KNOWLES<br><br>Case No.  05-3700 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO MOTION TO EXCLUDE TESTIMONY OF TERRY D. LEACH**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     LEGAL STANDARD................................................................................. 2

III.    THE QUALIFICATIONS OF DR. LEACH. ........................................... 4

IV.     DR. LEACH'S OPINIONS ARE RELEVANT TO THIS CASE AND
        WILL ASSIST THE TRIER OF FACT...................................................... 5

        A.      Provider Synergies and the P&T Committee Relied on Merck's
                Information about Vioxx......................................................... 5

        B.      Clinical Information Trumps Financial Considerations in
                Formulary Decisionmaking. ..................................................... 8

V.      CONCLUSION......................................................................................... 10

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993) ................................................................................................. 2, 3

*Gen. Elec. Co v. Joiner*,
  522 U.S. 136 (1997) .................................................................................................. 3

*Huss v. Gayden*,
  571 F.3d 442 (5th Cir. 2009) ................................................................................... 2, 3

*Knight v. Kirby Inland Marine, Inc.*,
  482 F.3d 347 (5th Cir.  2007) .................................................................................. 3

*Moore v. Ashland Chem., Inc.*,
  151 F.3d 269 (5th Cir. 1998) ................................................................................... 2

*Plunkett v. Merck & Co. (In re Vioxx Prods.  Liab.  Litig.)*,
  401 F. Supp. 2d 565 (E.D. La. 2005) ...................................................................... 2

**RULES**

Federal Rules of Evidence
  702 ............................................................................................................................ 2

## I.       **INTRODUCTION**

Terry D. Leach, Pharm.D. is an expert on P&T Committees and Pharmacy Benefits

Management who has provided admissible testimony concerning those same topics in Federal

Court in the *Zyprexa* litigation.  Dr. Leach's testimony meets standards of admissibility and

relevance in all respects, and there is no reasonable basis to exclude his testimony here[1].

Dr. Leach offers opinions about the role of the Pharmacy Benefit Manager (PBM) and

Pharmacy and Therapeutics Committee ("P&T Committee") in the development of drug

formularies and the importance of complete, accurate information provided by drug companies

in making sound drug formulary decisions.  The implications of Vioxx are discussed in Dr.

Leach's Declaration, which suggests that safer formularies and better patient care may have

resulted had cardiovascular safety information at issue in this litigation been made available.

Having issued his expert witness Declaration and been deposed prior to the discovery

cut-off imposed by the Court, Plaintiff intends to also submit an affidavit by Dr. Leach in support

of our opposition to Defendant's Motion for Summary Judgment which will address significant

case-specific issues raised by Merck's Motion.  Merck will have the opportunity to challenge Dr.

Leach's affidavit at that time.

For now, Merck seeks to exclude Dr. Leach's opinions regarding how formulary

decisions are made as abstraction and contrary to the facts of this case, suggesting that the

evidence is undisputed that Plaintiff's PBM did not rely on drug manufacturers in making its

recommendations to Plaintiff's P&T Committee.  The evidence shows, however, that Provider

Synergies, Plaintiff's PBM did indeed rely on drug manufacturers' information about Vioxx and

---

[1] Dr. Leach holds the degree of Pharm.D., a Doctor of Pharmacy, and as such is entitled the salutation and title of Dr.  Throughout Merck's memorandum, Dr. Leach is inappropriately referred to as Mr. Leach.  Conveniently, in the same memorandum, Defendants attempt to support their arguments with testimony from Dr.Valerie Taylor, also a Pharm.D, selectively referring to her as Dr. Taylor.

other drugs in its class in making their recommendations to the P&T Committee.

Merck also challenges Dr. Leach's suggestion that the industry standard is that formulary decisions are based on clinical effectiveness of drugs, claiming that the evidence is undisputed that formulary decisions made by Plaintiff's P&T Committee were motivated primarily by cost, rather than safety.  Such a claim is convenient, but far from uncontroverted.  In fact, the weight of the evidence suggests that clinical issues were of primary concern to the P&T Committee and were at the foundation of Provider Synergies' review and recommendations to the P&T Committee.

Finally, Merck argues that several of Dr. Leach's opinions should be excluded as speculative, outside of his experience, and within the province of the jury.  Dr. Leach has a broad base of knowledge and experience about the matters to which he offers his testimony and has reviewed sufficient materials in order to offer reliable opinions that are relevant to this case and that will assist the trier of fact.  Dr. Leach's testimony should not be excluded.

## II.    LEGAL STANDARD

The Federal Rules of Evidence govern the admissibility of expert testimony.  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  Under Federal Rule of Evidence 702, expert testimony is admissible if: (1) the expert is qualified through knowledge, skill, experience, training, or education; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case.

The trial court acts as a "gatekeeper" to ensure that expert testimony unless is "reliable" and "relevant."  *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993).  The focus is on the experts' qualifications and methodology, rather than results or conclusions.  *Plunkett v. Merck & Co.  (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565, 574 (E.D. La. 2005) (citing

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998)).

Scientific testimony is reliable if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court set forth the following non-exclusive list of factors to consider in determining the scientific reliability of expert testimony; (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id*. at 593-95. The "reliability analysis applies to all aspects of an expert's testimony; the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

Scientific testimony is relevant if the expert's "reasoning or methodology properly can be applied to the facts in issue," meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is irrelevant when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co v. Joiner*, 522 US. 136,146 (1997).

To satisfy its gatekeeping responsibility, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue." *Huss*, 571 F.3d at 452 (quoting *Daubert*, 509 U.S. at 592-93). In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147.

## III.     THE QUALIFICATIONS OF MR. LEACH

Terry D. Leach, Pharm.D., earned a Bachelor of Science degree in pharmacy and a

Doctor of Pharmacy degree from Ohio Northern University in Ada, Ohio.  In addition, he completed an accredited residency program in hospital pharmacy at Riverside Methodist Hospitals in Columbus, Ohio. Serving the health care industry in numerous capacities, Dr. Leach has been involved in such diverse areas as hospital pharmacy, oncology pharmacy, home health care, home infusion, managed care and marketing communications.  Throughout his career, he has had key roles in formulary management and P&T Committees.  For the past 15 years, Dr. Leach has held senior management positions in managed care pharmacy, including Fidelis Care of New York, Horizon BlueCross and BlueShield of New Jersey, Mid-Atlantic Medical Services Inc. (MAMSI), and general marketing consulting assignments.  Spanning his managed care career, he has served as a P&T Committee chair, vice chairman and secretary, developed and presented drug monographs to P&T Committees, created formulary kits and dossiers on behalf of various pharmaceutical companies, and attended four major PBM P&T meetings.  Dr. Leach is an active member of the Academy of Managed Care Pharmacy (AMCP).  He has delivered numerous scientific presentations and has authored publications in his field of expertise.

Dr. Leach has testified before in complex pharmaceutical Third-Party Payor litigation, namely the *Zyprexa* litigation, in which his testimony regarding PBMs and P&T Committees was accepted by the Court.

Dr. Leach's qualifications as an expert witness are imparted by his work in the domains of academia, consulting for pharmaceutical companies, and managed care companies, all of which draws upon his scholarship and real-life experience in the health-care industry as scientist, researcher, author and manager.

IV.    **DR. LEACH'S OPINIONS ARE RELEVANT TO THIS CASE AND WILL ASSIST THE TRIER OF FACT.**

   A.    **Provider Synergies and the P&T Committee Relied on Merck's Information about Vioxx.**

   Merck seeks to exclude Dr. Leach's opinions regarding how formulary decisions are made as abstraction and contrary to the facts of this case, suggesting that the evidence is undisputed that Plaintiff's PBM did not rely on drug manufacturers in making its recommendations to Plaintiff's P&T Committee.  The evidence shows, however, that Provider Synergies, Plaintiff's PBM did indeed rely on drug manufacturers' information about Vioxx and other drugs in its class in making their recommendations to the P&T Committee, which in turn relied on Merck's information.  This information flowed from the foundation of Merck controlled and disseminated data that was the basis of the body of publicly available literature, as well as the various versions of Merck's own label and package inserts for Vioxx, as well as materials that Merck provided to Provider Synergies during in-person clinical discussions and in written responses to requests for information by the PBM.

   1.    **Dr. Leach's Refers to Materials Beyond Merck's Narrow Assertion.**

   Defendant's challenge of Dr. Leach takes his comments out of context, suggesting that his opinion is based on an assumption that the limited materials provided by manufacturers directly to PBMs are a key source of information in making recommendations to P&T Committees.  Dr. Leach's report and his deposition read as a whole make clear that he is generally referring to the broader body of information available to the public that is influenced by, manufactured by, or founded upon drug manufacturer information.

   Although Provider Synergies performed an independent review of Vioxx, the body of literature which was available to the clinical reviewers was itself subject to Merck's misrepresentations and omissions.  Dr. Leach opines in his report that in general, PBMs rely on

- 5 -

"publicly available clinical information [which] is derived from drug manufacturers, who are the

only other parties other than the FDA that have access to these data." See, Leach Report at p.6;

Declaration of Justin Bloom, hereinafter "JB Decl.," Exh. A).   Merck controlled the data from

which the information available to the medical community was derived and from which

conclusions about the safety and efficacy of the drug were made.   Dr. Leach further states that:

> P&T Committees do not conduct clinical research, relying instead o[n] the clinical
> pharmacy departments of PBMs to present the most up-to- date information
> available to the public. This information is obtained through conclusions available
> in such resources as published peer-reviewed articles, information provided by
> drug manufacturers, Food and Drug Administration (FDA) approved
> documentation, proceedings from medical conferences, and scientific textbooks."

(Leach Report at p. 2; JB Decl., Exh. A)

The evidence at trial will show that through its omissions and misrepresentations, Merck

polluted the well of publicly available information from which Provider Synergies drew in order

to make its recommendations to the P&T Committee.  Dr. Leach opines that "[i]n the absence of

complete and/or accurate information provided by the d[r]ug manufacturers to the PBM and then

relayed to the P&T, the P&T committees are unable to exercise their responsibilities to make

sound formulary drug determinations." (Leach Report at p. 3; JB Decl., Exh. A).  Later in his

report, Dr. Leach further states that:

> The information that is use by the clinical pharmacy staff in the development of
> such a document is limited to the clinical evidence available within the public
> domain, including journal articles, abstracts from professional meetings and the
> product's label or manufacturer's package insert. The clinical evidence that is
> available in the public domain must be statistically significant and without bias to
> render useful recommendations and decisions.
>
> It is important to reiterate that, PBMs do not have access to any information not in
> the public domain, including internal or external clinical or study data.

(Leach Report at p. 3; JB Decl., Exh. A.)

## 2.    Provider Synergies and the P&T Committee Relied on Various Sources of Information Provided by Merck.

In fact, beyond the polluted well of peer-reviewed literature discussed above, the record demonstrates that Provider Synergies relied on the Vioxx label and package insert as an important source of information and that they did rely on additional supporting information that was provided by Merck directly to Provider Synergies via numerous in-person meetings by Merck Medical Directors and in the form of materials sent directly to Provider Synergies in response to information requests.  Additionally, Merck directly provided information to the Chair of the P&T Committee, Dr. Culotta.

 In her deposition, Dr. Taylor, the Clinical Director for Provider Synergies acknowledges that she relied on the 2002 Vioxx Label in developing the monograph and in making the PBM's ultimate recommendation to the P&T Committee[2].  See, Taylor Tr. at p. 113:16-20; JB Decl, Exh. B.

Dr. Kerry Edwards, a Merck Medical Director, routinely called on Provider Synergies and presented Merck-prepared "slide decks," a fact that will be discussed in Dr. Leach's affidavit in support of Plaintiffs Opposition to the Motion for Summary Judgment.  In August of 2002, prior to the key vote to place Vioxx on the Preferred Drug List, Dr. Fran Kaiser, also a Merck Medical Director, held discussions directly with Dr. Culotta, the Chair of the P&T Committee, in which she reviewed clinical information and discussed safety and efficacy issues relating to Vioxx.  See, Kaiser Tr. at pp. 101-104, p. 130; JB Decl, Exh. C.

Dr. Taylor also acknowledged in her deposition that Provider Synergies took into consideration supporting information provided by Merck in response to requests for information

---

[2] The 2002 Label for Vioxx contained numerous omissions and misrepresentations, including conclusions from the VIGOR trial which Dr. Taylor interpreted in her deposition as stating that Vioxx had a lower rate of GI toxicity than other drugs in its class for patients regardless of concomitant steroid use.  See, Taylor Tr. at p. 112:1 - 113:20; JB Decl, Exh. B.

made by Provider Synergies staff.  Merck sent numerous informational packets addressing

specific topics raised in communications with Provider Synergies, which were reviewed and

considered.  In one such request, after the Wall Street Journal published an article critical of

Vioxx, Dr. Taylor specifically requested information about a study, beyond what had been

published about the study, asking:

> Provider Synergies would be interested in hearing about Merck's take on the
> latest information published in the Wall Street Journal about Vioxx.  We would
> like to hear how the study was conducted and how that affects the results.  We are
> also interested in any information you can provide us that is not published about
> the study.  Do you have any in-house data that would refute this study's results?
>
> How can we continue to recommend Vioxx as a preferred drug in light of this
> information?  Especially how can we recommend it as the only Cox II?
>
> Any other information that we can use with our states to refute the claims in WSJ
> would be helpful…."

See, Taylor Deposition Plaintiff's Exhibit 1, JB Decl, Exh. D.

In her deposition, in the course of discussing the above exhibit, Dr. Taylor stated that

asking for information beyond published studies was part of Provider Synergies' normal process.

See, Taylor Tr. at p. 109:7-10; JB Decl, Exh. B.

Shortly after the request for additional information was made, Vioxx was withdrawn from the

market.

**B.      Clinical Information Trumps Financial Considerations in Formulary
Decisionmaking.**

Merck also challenges Dr. Leach's suggestion that the industry standard is that formulary

decisions are based on clinical effectiveness of drugs, claiming that the evidence is undisputed

that formulary decisions made by Plaintiff's P&T Committee were motivated primarily by cost,

rather than safety.  Such a claim is convenient, but far from uncontroverted.  In fact, the weight

of the evidence suggests that clinical issues were of primary concern to the P&T Committee and

were at the foundation of Provider Synergies' review and recommendations to the P&T

Committee.  Merck has understood this to be the case all along, but creates a fiction through

exaggeration and selective testimony for purposes of this litigation.  Plaintiff's opposition to

Defendant's Motion for Summary Judgment and supporting affidavits from Dr. Leach and

members of the P&T Committee at the time in which Vioxx was under consideration will

provide further evidence of this.

Merck's own Customer Profile document for the State of Louisiana DHH account clearly

describes Provider Synergies' process, stating that a drug is first reviewed by Provider Synergies

on its clinical merits, and then after clinical review, Provider Synergies performs a financial

analysis.  When asked in his deposition about this, Mr. John Fevurly, Merck's National Account

Representative for Provider Synergies, agreed that the document accurately described the

Provider Synergies review process and that it "generally outlines the guidelines that Provider

Synergies provided to Michael [Davis] and I on how the process worked for the State of

Louisiana." See, Fevurly Tr. pp. 45:6 - 46:3, referring to deposition Exhibit 6, JB Decl, Exh. E,F.

In his deposition, Mr. Michael Davis, the other another NAE responsible for Provider

Synergies, referred to above in Mr. Fevurly's deposition, stated that Provider Synergies put

together a clinical monograph, after which Merck would provide pricing per the PBM's request,

following which, a financial analysis was performed.  See, Davis Tr., 147:16 - 148:18, JB Decl,

Exh. G.  These examples support Dr. Leach's opinion in his declaration that when a PBM

presents materials to a P&T Committee "[t]he two primary areas of discussion are the safety and

efficacy of the agent compared with other drugs in the same therapeutic class and what

constitutes the current standard for therapy" and his deposition testimony that it is the industry

standard that PBMs and P&T Committees consider clinical attributes of a drug first, and cost

considerations second and his specific opinion offered in deposition that cost would be considered by the P&T Committee's in their decision of making a drug preferred versus non-preferred "only after the safety and efficacy have been established." Leach Report at p.4; Leach Tr. at 110: 5-23; JB Decl, Exh. A, H.

After safety and efficacy have been established, Dr. Leach entertained that cost would be a significant factor in the P&T Committee's decisions where drugs in the same class were considered equivalent in the areas of safety and efficacy.  Leach Tr. at 120:18 -121:8, JB Decl, Exh. H.  Merck goes too far in stating that the P&T Committee's decisions were motivated primarily by cost.  Dr. Leach's opinions on this matter are reliable and relevant and will assist the trier of fact.

## V.     CONCLUSION

For the reasons stated above, Dr. Leach's opinions are relevant and admissible.  The motion to exclude testimony should be denied.

Dated March 1, 2010                              Respectfully submitted,


 /s/ *Justin Bloom*
Justin Bloom
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA  70130
Telephone; (504) 648-0180
Facsimile; (504) 648-0181
Email; jbloom@dugan-lawfirm.com

Counsel for Plaintiff