UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  VIOXX | ) | MDL No. 1657 |
| Products Liability Litigation | ) | |
| | ) | SECTION:  L |
| This Document Relates to: | ) | |
| | ) | HON. ELDON E. |
| STATE OF LOUISIANA, ex rel. | ) | FALLON |
| JAMES D. CALDWELL, | ) | |
| ATTORNEY GENERAL | ) | MAG. JUDGE |
| Plaintiff | ) | KNOWLES |
| | ) | |
| versus | ) | |
| | ) | |
| MERCK SHARP & DOHME CORP. | ) | |
| | ) | |
| Cause No. 05-3700 | ) | |

---

HIGHLY CONFIDENTIAL
ORAL DEPOSITION OF
FRAN KAISER, M.D.
JANUARY 29, 2010

---

ORAL DEPOSITION of FRAN KAISER, M.D., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 29th day of January, 2010, from 9:38 a.m. to 6:27 p.m., before Therese J. Casterline, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Baker Botts, LLP, 2001 Ross Avenue, Suite 700, in the City of Dallas, County of Dallas, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

CONTINENTAL COURT REPORTERS, INC.
214-742-4949

```
 1              THE WITNESS:  One of which is a blank, by
 2   the way.
 3              MR. GOLDMAN:  The last one.
 4              MR. ARBITBLIT:  Yes.  But it has a Bates
 5   number on it, so for completion, we are including the
 6   blank page.
 7        Q.  So if you go to the page -- the last page that
 8   has printing on it, you'll see a message from you to
 9   Holly Jacques on August 8th, 2002.  Do you see that?
10        A.  Yes.
11        Q.  Did you attend a meeting with Holly Jacques
12   and Dr. Culotta of the Louisiana P&T committee in the
13   time frame leading up to August 8th, 2002?
14        A.  Yes.
15        Q.  Where did that meeting take place?
16        A.  I don't recall.
17        Q.  Was anyone else present?
18        A.  Holly, myself, but I -- and Dr. Culotta.  I
19   don't recall if there was anyone else there.
20        Q.  Do you recall if you went to lunch or had a
21   meeting at his office?
22        A.  (Shakes head.)
23        Q.  Had -- you have to say out loud.
24        A.  I'm sorry.  No, I don't.
25        Q.  Had you ever met Dr. Culotta before?
```

Timestamps: 13:12:56 (line 8), 13:13:29 (line 13), 13:13:59 (line 24)

```
            1        A.   I had seen Dr. Culotta and -- and knew him to
            2   be the head of the P&T committee.  Did I meet with him?
            3   I -- I don't know.
            4        Q.   And was the purpose of this meeting to --
            5   well, withdraw that.
            6             Your e-mail says, as always, it is great
13:14:30    7   to work with you.
            8             You are really amazing.  We never would
            9   have achieved any measure of success with the Louisiana
           10   P&T committee if it had not been for your knowledge of
           11   Louisiana issues as well as the relationship you have
           12   with Dr. Culotta.  I am sure there is no one else from
           13   Pharma that he would have even been willing to have a
           14   meeting with, such as the one held yesterday.  The fact
           15   he is even willing to entertain consideration of Zocor,
13:14:55   16   Vioxx, and Cozaar speaks volumes to the regard he has
           17   for Merck, and that would not happen without you.
           18             Thanks for all you do.
           19             Did I read that correctly?
           20        A.   Yes.
           21        Q.   And what led you to say, I am sure there is no
           22   one else from Pharma that he would have even been
           23   willing to have a meeting with, such as the one held
           24   yesterday?
13:15:27   25        A.   Holly has such presence, credibility, and
```

|   |   |
|---|---|
| 1 | professionalism that even people on P&T committees who |
| 2 | normally do not see Pharma people will see Holly. |
| 3 | Q.  And by Pharma people, you're talking about |
| 4 | representatives from pharmaceutical companies? |
| 5 | A.  I'm talking about Holly and even myself.  We |
| 6 | don't always get access to individuals. |
| 13:15:59  7 | Q.  The general word Pharma, with a capital P, are |
| 8 | you referring to employees of pharmaceutical companies? |
| 9 | A.  I think I was just referring to us.  We are -- |
| 10 | I mean, we represent a pharmaceutical company, and so |
| 11 | we sometimes call ourselves Pharma, not -- not the |
| 12 | trade association. |
| 13 | Q.  And the next sentence, the fact he is even |
| 14 | willing to entertain consideration of Zocor, Vioxx, and |
| 13:16:26  15 | Cozaar -- was it your understanding that the result of |
| 16 | the August 8th, 2000 -- or the meeting that -- I'll |
| 17 | withdraw that.  It's now a mess. |
| 18 | Is it your understanding that as a result |
| 19 | of the meeting you attended with Holly Jacques and |
| 20 | Dr. Culotta that he was willing to entertain |
| 21 | consideration of Zocor, Vioxx, and Cozaar? |
| 22 | MR. GOLDMAN:  Objection, lacks foundation, |
| 23 | calls for speculation. |
| 13:16:57  24 | A.  Consideration may -- again, I'd be |
| 25 | speculating.  It may have just been the clinical |

1  information that we presented to him.

2  Q. Does your e-mail here mean that there was
3  discussion with Dr. Culotta, at which point he
4  indicated willingness to reconsider on Vioxx?

13:17:29  5  A. It looks like, if we track this, he had
6  requested information, clinical information, on a heart
7  protection study, which is Zocor, GI outcomes data, and
8  Renaal -- the Renaal -- R -- two As -- Renaal study,
9  which was with ARBs. We would have reviewed the
13:17:59  10  information, and on Vioxx certainly, again, the label.

11  And, again, just ensured that his
12  questions had received an answer. That was the
13  practice that we had if somebody had questions, to
14  ensure that their questions were answered, did they
15  have further questions.

13:18:28  16  Q. I notice on the second page of the document,
17  it says that Dr. Fran Kaiser, John Fevurly, and I --
18  meaning Holly Jacques, who wrote it -- are scheduled to
19  meet with him -- meaning Dr. Culotta -- next Wednesday,
20  August 7th, at 10:30 a.m.

21  Did John Fevurly also attend the meeting?
22  A. I don't recall if he was there.
23  Q. What was his position?
24  A. He was also an account executive.
25  Q. A national account executive?

```
14:31:30   1              MR. GOLDMAN:  Object to the form, vague.
           2         A.  I don't recall if Chuck was with me with the
           3    meeting with the P&T chair.  We may have had an
           4    additional meeting in New Orleans.
           5         Q.  When you say additional, you mean in addition
           6    to the meeting you attended with Holly Jacques and
           7    Dr. Culotta?
           8         A.  Yes.
           9         Q.  And what recent data on Vioxx did you present
          10    at that meeting?
14:32:00  11              MR. GOLDMAN:  Objection, lacks foundation,
          12    calls for speculation.
          13         A.  We would have presented the label update.
14:32:30  14         Q.  The label update did not include the
          15    Alzheimer's data we discussed from the Psaty and
          16    Kronmal article and the Chen memo, right?
          17              MR. GOLDMAN:  Hold on a second.
          18         A.  Psaty and Kronmal came out --
          19              MR. GOLDMAN:  I'm sorry.  One second.  Let
          20    me just get my objection.
          21              Objection, lacks foundation.
          22         A.  Psaty and Kronmal came out in 2008.
          23         Q.  Did you read Psaty and Kronmal's text as to
14:32:58  24    when the data were known to Merck?
          25              MR. GOLDMAN:  How would they know that?
```