# EXHIBIT 1

Jeffrey E. Harris, M.D., Ph.D.

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

        **********************************
 3

     IN RE:  VIOXX PRODUCTS          MDL No. 1657
 4   LIABILITY LITIGATION
                                     Section L
 5   This Document Relates To:
 6   STATE OF LOUISIANA, ex rel.
     JAMES D. CALDWELL, JR.,         Judge
 7   Attorney General,              Eldon E. Fallon
                  Plaintiffs,
 8
        v.                           Magistrate
 9                                   Judge Knowles
     MERCK SHARP & DOHME CORP.,
10              Defendant.     Case No. 05-3700
11      **********************************
12
13    DEPOSITION OF JEFFREY E. HARRIS, M.D., Ph.D.
14          Friday, January 29th, 2010
15                 10:08 a.m.
16
17
18                 Held At:
19       Hagens Berman Sobol Shapiro, LLP
20            55 Cambridge Parkway
21          Cambridge, Massachusetts
22
23   REPORTED BY:
24   Maureen O'Connor Pollard, RPR, CLR, CSR
```

Jeffrey E. Harris, M.D., Ph.D.

Page 14

1   or check a statement made by Professor Wiggins

2   in his report.

3           And fourth, I had several

4   conversations with counsel after receipt of

5   Professor Wiggins's report up until today.

6       Q.    How much time would you estimate

7   you've spent preparing for the deposition in

8   those four categories you just described?

9       A.    Fifteen or twenty hours.

10      Q.    What was the calculation of

11  Dr. Wiggins you attempted to check or refute?

12      A.    I can respond either by describing it

13  qualitatively or showing you the calculation,

14  because I brought a paper copy with me.

15      Q.    Why don't you describe it

16  qualitatively.

17      A.    On a specific page of Professor

18  Wiggins's report, he makes an assertion that I

19  had made a programming error in connection with

20  a specific calculation, and as further evidence

21  of the programming error my calculation produces

22  a data file in which Vioxx appears implausibly

23  and incorrectly to continue to be sold after it

24  was withdrawn from the market in September,

Jeffrey E. Harris, M.D., Ph.D.

Page 15

1    2004.

2            I loaded on the computer the very same

3    file which contained the purported programming

4    error and which I had submitted in connection

5    with my report, and ran a tabulation of Vioxx

6    sales with respect to the month of service, and

7    determined that there were no Vioxx sales after

8    September, 2004.

9        Q.    Is this the issue relating to the

10   infinity date programming error that was

11   described?

12       A.    I'm not sure I would characterize it

13   as an error, because at this point given the

14   available time I've had, given the limited

15   information I've been given, and given the

16   results that I've obtained independently, I'm

17   not sure there is an error.  And although I

18   understand in programming what infinity date

19   means, I don't think I can be any more

20   responsive.

21       Q.    But just so I'm clear, the error that

22   you think Dr. Wiggins ascribed to your analyses

23   related to the Vioxx cohort, correct, as opposed

24   to your Bextra-Celebrex cohort?

Jeffrey E. Harris, M.D., Ph.D.

Page 16

1      A.     No.   The error that Dr. Wiggins

2    referred to was with respect to the

3    Bextra-Celebrex cohort.

4      Q.     Dr. Wiggins didn't actually charge in

5    his report that you made the same error in your

6    Vioxx cohort, correct?

7      A.     No, he did not.

8      Q.     Did you check to see whether

9    Dr. Wiggins was correct, that, in fact, you did

10   have an error in your Bextra-Celebrex cohort?

11     A.     That's exactly the answer I gave in

12   the previous question.

13     Q.     Actually you said Vioxx sales.

14     A.     Then I was incorrect.

15            But no, in order to answer fully I

16   would have to show you the --

17     Q.     Then let's do that.

18     A.     -- the calculation and the sentence in

19   Professor Wiggins's report.

20     Q.     Why don't you get out what you did.

21     A.     Since this isn't on videotape, I have

22   a folder of copies of various materials that I'm

23   opening, and in particular I'm looking at the

24   expert report of Steven Wiggins which I printed

Jeffrey E. Harris, M.D., Ph.D.

1    out as I received it, including the appendix or

2    exhibits.

3         Q.    Why don't we do this.  Let's mark, so

4    we're all looking at the same thing, mark this

5    as Exhibit 1.

6              (Whereupon, Harris Exhibit Number 1

7              was marked for identification.)

8         A.    The document that you've handed to me

9    is not the complete report, if that's what

10   you're asking me to identify.

11             BY MR. ISMAIL:

12        Q.    I didn't ask you that.

13             So what's the statement of Dr. Wiggins

14   that you believe --

15        A.    Well, let me refer then to my copy.

16             (Witness reviewing document.)

17        A.    I'm referring to a statement on

18   Page 39 of my copy of his report which is part

19   of Paragraph 96.  The last sentence of that

20   paragraph continues on Page 39.  These

21   paragraphs are part of a section whose major

22   heading, as it appears on Page 35, refers to

23   "Prospective DUR edits on Bextra and Celebrex."

24             The statement at the top of Page 39 is

Jeffrey E. Harris, M.D., Ph.D.

Page 18

1    "Further evidence of this error can be

2    demonstrated by observing Vioxx expenditures

3    long after Vioxx was withdrawn in September,

4    2004."

5              It is the latter sentence that I

6    checked, or its accuracy is what I checked by

7    running a program that I just described.

8              BY MR. ISMAIL:

9         Q.   All right.  Let's go ahead and mark

10   your copy of the report as Exhibit 2.

11             (Whereupon, Harris Exhibit Number 2

12             was marked for identification.)

13             MR. ISMAIL:  And let's mark whatever

14   tabulation you ran as Exhibit 3.

15             (Whereupon, Harris Exhibit Number 3

16             was marked for identification.)

17             BY MR. ISMAIL:

18        Q.   You only have one copy of it?

19        A.   Yes.

20        Q.   Let me take a look.

21             So Exhibit 3 is the tabulation,

22   printout of the tabulation that you ran to check

23   the statement of Paragraph 96 of Dr. Wiggins's

24   report that Vioxx expenditures can be observed

Jeffrey E. Harris, M.D., Ph.D.

1    after September of 2004, correct?

2        A.    Correct.

3        Q.    And so you have in column one "T

4    month," then you've got summary of payment, and

5    it goes out to month 70 with values in the mean

6    summary of payment for that month?

7        A.    Correct.

8        Q.    And then month 70 corresponds to what

9    calendar month?

10       A.    There's a line in the computer program

11   indicating that it is September, 2000 -- not in

12   the computer program but in the results which I

13   believe are on the last page, indicating that it

14   is September, 2004.

15       Q.    Did you check Dr. Wiggins's statement

16   that you have a mismatch between your

17   Bextra-Celebrex expenditures and calendar

18   months?

19       A.    I was not in a position to do so given

20   the time available and the limited materials

21   supplied to me.

22       Q.    Well, Dr. Wiggins went into your

23   backup materials and identified dates that don't

24   match the right calendar months; for example,

Page 24

1    computer runs that underlie figure one and the

2    alternative calculations on Page 97, my task was

3    at minimum made much more difficult.

4         Q.    All right.  You --

5         A.    Given six days from the day in which I

6    received all the materials as well as this

7    report, as well as my other professional

8    calculations, I made a decision about which

9    portions of the report I should focus on.  And

10   given that I could not verify the statement at

11   the top of Page 6 -- or 39, I decided to

12   continue with other work.

13            Had there been more time and had I

14   received all the materials that I would normally

15   expect in the course of professional

16   communication, it could have been different.

17        Q.    All right.  First of all, the

18   deposition was moved up at your request, right?

19        A.    I don't know that one way or another.

20        Q.    Did you tell Plaintiff's counsel that

21   you needed to have the deposition moved from

22   next week because school started and we had to

23   do it today?

24        A.    I did tell counsel that it would be

Jeffrey E. Harris, M.D., Ph.D.

1    difficult for me to give a deposition during the

2    semester which starts next week.

3        Q.    Great.  So --

4        A.    And I offered to give a deposition

5    today.

6        Q.    Okay.  So we moved up the deposition

7    at your request.  And you seem to have enough

8    data in your possession to check the statement

9    that there were Vioxx expenditures that occurred

10   after the withdrawal of the drug.  Similarly,

11   you have enough data in your possession to

12   confirm or deny whether your program assigned

13   Bextra expenditures after that drug was

14   withdrawn.  You could have done that work,

15   correct?

16       A.    Yes, I could have.

17       Q.    And you didn't, correct?

18       A.    That is correct.

19       Q.    Now, what other documents do you have

20   there in that folder of yours?

21       A.    I have an index that I prepared

22   entitled "Documents Received" which, strictly

23   speaking, is not one of the documents, it's

24   rather just a summary.

Jeffrey E. Harris, M.D., Ph.D.

Page 207

1    Bextra withdrawal in table G, correct?

2         A.    Correct.

3         Q.    Do you believe your methodology that

4    you employed was able to single out the causal

5    effect of the deny edit on Bextra-Celebrex and

6    other expenditures from the Bextra withdrawal

7    effect?

8         A.    Although the window in which the

9    prospective deny edit was in effect and the

10   Bextra was still on the market is only one

11   month, yes.

12        Q.    Now, with respect to the prospective

13   deny edit, has counsel asked you to make an

14   estimate of what the compensating expenditures

15   would be as a result of a prospective deny edit

16   at any time prior to March, 2005?

17        A.    No.

18        Q.    The compensating expenditures that the

19   State of Louisiana would have to incur as a

20   result of a prospective deny edit would depend

21   upon the mix of information that patients and

22   doctors had about the alternative therapies,

23   right?

24        A.    Correct.

Jeffrey E. Harris, M.D., Ph.D.

Page 208

1      Q.     And in March of 2005, there was a

2   great deal of information about NSAIDs that was

3   not available during the time Vioxx was on the

4   market, correct?

5      A.     Yes, correct.

6      Q.     There was an FDA Advisory Committee

7   that took place in 2005 that discussed the

8   entire class of NSAIDs that received a great

9   deal of publicity, right?

10     A.     I don't know.

11     Q.     You have made no effort to determine

12   what the impact was of the information that

13   existed about NSAIDs after September of 2004

14   that would have impacted expenditures per month

15   for the four medication class, correct?

16     A.     Above and beyond the specific events

17   taken into account in my analysis, no.

18     Q.     So to the extent there were new

19   studies reported, announcements by FDA, Advisory

20   Committees, widespread media publicity about

21   NSAIDs, to the extent those events influenced

22   the prescribing decisions within Medicaid, those

23   are not separately accounted for in table G,

24   correct?

Jeffrey E. Harris, M.D., Ph.D.

Page 217

```
 1        A.    I believe so.

 2        Q.    And you didn't do that, right?

 3        A.    No, I did not.

 4        Q.    So as you sit here today, do you know

 5   one way or another whether your Bextra-Celebrex

 6   cohort assigns Bextra expenditures to a

 7   calendar period that occurred after the Bextra

 8   withdrawal?

 9        A.    No, I do not.

10        Q.    When was Celebrex excluded from the

11   Louisiana PDL?

12              (Witness reviewing documents.)

13        A.    At various times.  Actually twice as

14   reflected in table one of my report.

15              BY MR. ISMAIL:

16        Q.    First time was June of 2002, and the

17   second time was when?

18        A.    In September of 2005.

19        Q.    In table G, which Celebrex PDL

20   exclusion event are you referencing there?

21        A.    The exclusion in 2003.

22        Q.    You mean 2002?  Or 2003, sorry,

23   correct.

24              That coincides with Vioxx's inclusion
```