# EXHIBIT 1

Neil Julie, M.D.

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3   In Re:  VIOXX Products      :MDL  1657
 4   Liability Litigation        :
 5   This Document Relates to    :
 6   STATE OF LOUISIANA et rel.  :Section L
 7   JAMES D. CALDWELL, Attorney :
 8   General,                    :Honorable Eldon E. Fallon
 9             Plaintiff         :Magistrate Judge Knowles
10   v.                          :
11   MERCK SHARP & DOHME CORP.,  :Case No.:  05-3700
12             Defendant         :
13                      -----------
14             Deposition of NEIL JULIE, M.D.
15                  Bethesda, Maryland
16              Wednesday, January 13, 2010
17                      9:08 a.m.
18
19   Pages:  1 - 328
20   Reported By:  Dawn M. Hart, Notary Public, RPR/RMR
21
22
23
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Neil Julie, M.D.

Page 50

```
 1     A     Yes.
 2     Q     Do you hold yourself out to the medical
 3   community as a cardiologist?
 4     A     No.
 5     Q     Do you hold yourself out to the medical
 6   community as an epidemiologist?
 7     A     No.
 8     Q     Do you hold yourself out to the medical
 9   community as a biostatistician?
10     A     No, but to all three of those categories I
11   do have extensive knowledge and familiarity with
12   cardiology, with epidemiology, with biostatistics
13   based in my general training as an intern and resident
14   at UCSF, plus additional knowledge I've gleaned in
15   residency and a year of Emergency Room medicine.  Also
16   in biostatistics, from working at the Environmental
17   Science Lab with Irving Selikoff.  And I've had an
18   opportunity to learn many things about those areas,
19   but I do not have degrees or certifications in
20   cardiology, epidemiology or biostatistics.
21     Q     Do you hold yourself out to the medical
22   community as an orthopedist?
23     A     No.
24     Q     Do you hold yourself out to the medical
```

```
 1   knew as little professionally about Doctor Baum as I
 2   did about Doctor Jewell, except that Doctor Jewell is
 3   a Professor of biostatistics at Berkeley.  So I just
 4   decided that if it needed to be done right that we
 5   should start over.
 6        Q    Okay.  And again, before you were engaged in
 7   this case related to the State of Louisiana, you'd
 8   never met Doctor Jewell, correct?
 9        A    Right.
10        Q    Did you ever speak with him for this
11   particular case?
12        A    No.
13        Q    Did you ever meet with Doctor Jewell for
14   this particular case?
15        A    No.
16        Q    Do you know where his office is?
17        A    I know it's in Berkeley California.
18        Q    Do you know where in Berkeley?
19        A    No.
20        Q    Do you know what, or if he has any medical
21   background?
22        A    I have suspicions, but I don't know -- I
23   mean in terms of medical background I think that
24   biostatistics is a medical field, so yeah, he's got
```

Neil Julie, M.D.

1   that background.
2       Q    Is he a medical doctor?
3       A    I don't know.
4       Q    Did you demand to see his CV?
5       A    No.  I took his credentials of being
6   Professor of Biostatistics and Statistics as having
7   been vetted well enough.
8       Q    By Doctor Arb -- by Mr. Arbitblit.  Let me
9   ask -- you took his credentials as being vetted by Mr.
10  Arbitblit?
11           MR. ARBITBLIT:  Object to form.
12      A    Not really.  I mean I think that it was
13  really based on his title.  You know, I mean I know
14  Berkeley.  I know UC Berkeley.  I was out in
15  California, in the Bay area for four years.  I know
16  what a fine institution it is.  I know the head of the
17  Department of Economics in Berkeley.  So, you know,
18  that in itself qualified him in my mind.
19      Q    But you didn't go to the internet and Google
20  him or anything like that?
21      A    No.
22      Q    And you say that you were the one who asked
23  him to do a specific analysis for this case, correct?
24           MR. ARBITBLIT:  Object to form.

Neil Julie, M.D.

Page 129

1  data and to help to calculate the relative risk data
2  from that study.
3      Q   Did you ask him to do these analyses because
4  you're not qualified to do them yourself?
5          MR. ARBITBLIT:  Object to form.
6      A   That is -- I don't have the knowledge of
7  statistical calculations to do it myself.  I can ask
8  the questions, but I need a computer or a statistician
9  to give me the answers.
10     Q   If you could have done them yourself, you
11 would have?
12         MR. ARBITBLIT:  Object to form.
13     A   Well, I think that I did my own on a
14 calculator calculation of the, what he covers in the
15 bottom of his second page where, you know, you take
16 the 10 cases and you do the numerator/denominator, and
17 you calculate what the incident rate ratios are.  And
18 so if you go to my report, I think I probably cover
19 that.
20         On my report on Page 6, I put in those
21 numbers from my own calculations there, which if you
22 compare it to his calculations you can see he leaves
23 out some of the decimal points for Protocol 78, and
24 his numbers on incident risk ratio, he's got 3.83

Neil Julie, M.D.

Page 131

```
 1   statistical tests that were prespecified by Merck in
 2   analyzing subgroups?
 3        A    I did not.
 4        Q    Do you know if Doctor Jewell used the
 5   prespecified subgroups, the prespecified statistical
 6   tests that Merck prespecified, or whether he just did
 7   what you asked him to do?
 8        A    I don't know whether he did or he didn't.
 9        Q    And was -- when you say that you asked him
10   to look at the subgroups of steroids, you asked him to
11   look at the subgroup of steroids with respect to
12   complicated events, correct?
13        A    Yes, that's right, confirmed complicated
14   events.
15        Q    And complicated events are also called POBs,
16   have you seen that?
17        A    I've seen that.  There's a lot of kind of --
18   you know, there's different terms used at different
19   times, and it's quite confusing.  But yeah, I do know
20   what you mean.
21        Q    And complicated events are a subset of
22   perforations, ulcers and bleeds, or PUBs, correct?
23        A    Right.
24        Q    And the complicated events were a secondary
```

Neil Julie, M.D.

Page 283

1   there are statistical concerns that have to be
2   factored in.
3       Q   Did Doctor Jewell, when he did his analysis,
4   did he use the Cox model when analyzing the subgroups?
5       A   Let me look that up.
6           (Reviewing.)
7           There's no comments to that effect, so I'm
8   not really sure if he did or not.
9       Q   If the Cox model was prespecified as the
10  model to use for these types of analyses, do you think
11  Doctor Jewell should have used that model?
12          MR. ARBITBLIT:  Object to form.
13          (Exhibit 16 was marked for identification
14  and was attached to the transcript.)
15      A   That's a statistician's question that I
16  cannot really address.
17      Q   Makes sense, though, if you prespecify the
18  Cox model that Doctor Jewell should use the Cox model,
19  right?
20          MR. ARBITBLIT:  Object to form.
21      A   It's really a question of the basis for
22  choosing that model.  I don't really know whether that
23  model -- what the relative pros and cons of that
24  models as opposed to his model are.

1     Q    So you don't know what model he used,
2  correct?
3          MR. ARBITBLIT:  Objection.  Asked and
4  answered.
5     A    You know, I think that he mentions the exact
6  tests in one of his calculations of P values, but I
7  don't know what model he used for multivariable
8  analysis.
9     Q    Okay.  I'm going to hand you Julie Exhibit
10 16, I think.  Is that right?  I lost it there.  Did I
11 put 16 on there?
12    A    Yeah, you put 16 on there.
13    Q    Okay.  And that's a memo that you referred
14 to in your report, correct?
15    A    Right.
16    Q    And that's a memo regarding this Watson
17 analysis, correct?
18    A    Correct.
19    Q    And the Watson analysis is an analysis
20 related to PUBs and complicated events for all of the
21 clinical trials other than VIGOR, correct?
22    A    That's correct.
23    Q    And turn with me to Table 16 of that memo,
24 please.

Page 315

1  combination therapy, then that's all they got to work
2  with.
3      Q    I'm not necessarily asking about Merck
4  studies.
5      A    Right.
6      Q    Is it valid in your opinion to say that one
7  drug is clinically equivalent to another drug simply
8  based on scheduled endoscopy studies?
9           MR. ARBITBLIT:  Object to form.  Asked and
10 answered.
11     A    You know, endoscopic findings based on
12 scheduled endoscopies are not a good surrogate for
13 clinically significant ulcerative disease.
14     Q    Is Ibuprofen cardio protective?
15          MR. ARBITBLIT:  Object to form.
16     A    It has, you know, been subject to
17 met-analysis, I think by Kearney, and I think that it
18 is, you know, essentially neutral or maybe slight and
19 I'm not sure if this rises to statistical
20 significance, slight increase in risk.
21          So I think there's a slight increase in
22 risk, but I don't know if it's reached statistically
23 significance.
24     Q    For patients who need cardio protection