# EXHIBIT 1

David Y. Graham, M.D.

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
    In re:  VIOXX                   §  MDL No. 1657
 3  Products Liability              §
    Litigation                      §  SECTION L
 4  _____  §
                                    §
 5  STATE OF LOUISIANA,             §
    ex rel. JAMES D. CALDWELL,      §  JUDGE ELDON E.
 6  JR., Attorney General,          §  FALLON
                                    §
 7          Plaintiff,              §
                                    §
 8  v.                              §  MAGISTRATE
                                    §  JUDGE KNOWLES
 9  MERCK SHARP & DOHME CORP.,      §
                                    §
10          Defendant.              §  Case No.
                                    §  05-3700
11                                  §
12
13           FRIDAY, JANUARY 15, 2010
14                   - - -
15          Oral deposition of DAVID Y.
16  GRAHAM, M.D., held in the offices of
17  Matthews & Associates, 2905 Sackett Street,
18  Houston, Texas 77098, Houston, Texas
19  commencing at 9:30 a.m., on the above date,
20  before Minnie Cadena-Meche, Registered Merit
21  Reporter.
22                   - - -
23          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

David Y. Graham, M.D.

Page 27

1   name were, obviously, not sent to you by the
2   plaintiff's attorneys. Would that be a fair
3   statement?
4       A.   Yes.
5       Q.   All right. So which reports in
6   Exhibit 6 do you recall were actually sent to
7   you by the plaintiff's attorneys, if you
8   recall?
9       A.   In which of the publications?
10      Q.   Publications, I'm sorry.
11      A.   He sent me Langman. Of course,
12  I had seen it before; but he did send it to
13  me.
14      Q.   Okay.
15      A.   He sent me the APPROVe study
16  which also I had seen before. He sent me the
17  VIGOR study.
18      Q.   I assumed you had seen that
19  before?
20      A.   Of course. It's easier to get
21  his copies than to go through my file.
22      Q.   All right.
23      A.   I've got, of course,
24  Dr. Jewell's report.

David Y. Graham, M.D.

```
 1        Q.    Is that a two-page report?
 2        A.    Two-page report.
 3        Q.    All right.  Let me ask you
 4   about doctor -- is this Dr. Nicholas Jewell
 5   who is referred to in page 14 of your report?
 6        A.    Yes.
 7        Q.    Had you worked with Dr. Jewell
 8   before?
 9        A.    Never.
10        Q.    Had you met Dr. Jewell?
11        A.    Never.
12        Q.    Had you spoken with Dr. Jewell?
13        A.    Never.
14        Q.    Do you know anything about
15   Dr. Jewell's qualifications from personal
16   knowledge?
17        A.    Well, only that he's a
18   professor at Berkeley.
19        Q.    Okay.  But he hasn't done any
20   work with you before, correct?
21        A.    No.
22        Q.    Was the report that -- this
23   two-page report that Dr. Jewell sent you from
24   a medical journal, or was it just two pieces
```

1   of paper?
2           MR. ARBITBLIT:  Objection,
3       form.
4       A.   Best I can tell, it was his own
5   analysis of the data.
6   BY MR. JOSEPHSON:
7       Q.   Okay.  Do you know if Dr. --
8   were you ever informed whether Dr. Jewell had
9   served as an expert for Don in this or other
10  litigation?
11      A.   We never discussed Dr. Jewell's
12  previous works.
13      Q.   Okay.  So is it fair to say
14  that in terms of your own personal knowledge,
15  you've never worked with him, talked to him
16  or had any hand in the preparation of his
17  report?
18      A.   I had nothing to do with the
19  preparation of his report.
20      Q.   Okay.  And is it fair to say
21  that you rely upon Dr. Jewell's two-page
22  report?
23      A.   Oh, yes.
24      Q.   Okay.  And we'll come -- we're

David Y. Graham, M.D.

Page 70

```
 1        Q.    Okay.  And did you have -- has
 2   Dr. Jewell's work ever been published, to
 3   your knowledge?
 4        A.    Well, I understand it's under
 5   restraining order; and I hope that will be
 6   released so that it can be published.
 7        Q.    And who told you that it would
 8   be impossible for someone to do an analysis
 9   in a peer-reviewed medical journal about the
10   data in the VIGOR trial and what it meant?
11        A.    No one told me that at all.
12        Q.    So when you say it's under a
13   restraining order and it would be impossible
14   for someone to do analysis of the VIGOR
15   trial --
16        A.    I didn't say that.  I said my
17   understanding of his report right now was
18   under a restraining order and that I hoped
19   that that would be released so that we -- or
20   someone could publish it.
21        Q.    And who told you that his
22   report -- the two-page report that you
23   read -- or one-and-a-half-page report that
24   you read was under a restraining order?
```