UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: VIOXX | ) | MDL NO. 1657 |
|     Products Liability Litigation | ) | |
| | ) | SECTION: L |
| This Document Relates to: | ) | |
| | ) | HON. ELDON E. FALLON |
|     STATE OF LOUISIANA, ex rel. | ) | |
|     JAMES D. CALDWELL, | ) | MAG. JUDGE KNOWLES |
|     ATTORNEY GENERAL | ) | |
|         Plaintiff | ) | |
| | ) | |
|     versus | ) | |
| | ) | |
| MERCK SHARP & DOHME CORP. | ) | |
| | ) | |
|     Case No. 05-3700 | ) | |
| | ) | |

**<u>REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
CERTAIN OPINION TESTIMONY AND STATEMENTS OF MERCK'S EXPERTS
CONCERNING THE SAFETY AND EFFICACY OF VIOXX BASED ON "PERSONAL
EXPERIENCE"</u>**

860713.1

## I.   Introduction

Defendant's Memorandum in Opposition to Plaintiff's Motion to Exclude Opinion Testimony Based on "Personal Experience" concedes the following points, which are undisputed:

> 1.   Not a single study is cited to support a claim that Vioxx provided more effective pain relief than ibuprofen or naproxen, the most commonly used NSAIDs and those used by defense experts themselves.

> 2.   Merck cites a study to show Vioxx provided better pain relief than Relafen (nabumetone) at 1000 mg/day, but Merck's own study showed that Vioxx did not provide better pain relief than Relafen at 1500 mg/day, and Relafen was safer than Vioxx for GI side effects even at the higher dose.

> 3.   Merck cites a study to show Vioxx provided better pain relief than Celebrex, but the company suppressed a study that showed the opposite—that Celebrex—provided better pain relief than Vioxx, and Merck's expert did not know that study existed.

In short, the defense experts' "personal experience" testimony is inadmissible because it is contradicted, rather than supported by, the gold standard clinical trial data.

## II.   Merck's Experts' "Personal Experience" Is Contradicted By RCT Evidence

### A.   Drs. Curtis and Parnell Cite Studies that Do Not Support their "Clinical Experience" Regarding the Efficacy of Vioxx

Merck claims that Drs. Curtis and Parnell are not planning to testify on the basis of personal experience alone because each "identified literature supporting the notion that Vioxx provided superior pain relief to some alternatives, including Celebrex." (Merck Opp. at 5-6.) However, their cited studies (to the extent they specify any) do not support that argument.

Dr. Parnell does not, in fact, rely on any literature to support his claim that Vioxx "tended

- 1 -

to be more effective than Celebrex in decreasing pain and inflammation and in increasing function." (Parnell Rep. at 3 [SRL Decl. Ex. 1].)  Instead, he relies on "clinical experience" alone. (*Id.*)  Moreover, as Merck points out, Dr. Parnell states that "medical literature," "in general," supports "the fact that the Cox 2 selective inhibitors had similar efficacy to prescription dose traditional NSAIDS." (Merck Mem. at 5; Parnell Rep. at 3.)  Dr. Parnell's general reference to "studies" comparing Vioxx to traditional NSAIDs does not adequately support his clinical experience regarding Vioxx's "superior efficacy" to Celebrex, a non-traditional NSAID.

The literature that Dr. Curtis cites does not support his opinions for several reasons. First, some cited studies actually contradict his claims of "superior efficacy."  For example, Dr. Curtis cites articles that show *no difference in efficacy* between Vioxx and naproxen 1000 mg (Lisse) and nabumetone 1500 mg (Truitt).  (Curtis Rep. at 10 [SRL Decl. Ex. 2]; Truitt, K.E., et al., 2001 [SRL Decl. Ex. 3]; Lisse, A., et al., 2003 [SRL Decl. Ex. 4].)

Second, Dr. Curtis cites two Merck studies included for "promotion" that compared Vioxx with a low dose of nabumetone 1000 (Weaver, Kivitz) despite Merck's prior knowledge that nabumetone 1500 mg was as effective as Vioxx and had zero GI events (Truitt).  (Curtis Rep. at 10; Weaver, A., et al., 2006 [SRL Decl. Ex. 5]; Kivitz, A., et al., 2004 [SRL Decl. Ex. 6].)  So Merck's "success" in showing better pain relief than a low dose of nabumetone does not support Dr. Curtis' blanket statement that Vioxx is superior to other NSAIDs in treating osteoarthritis.

Dr. Curtis also relies on two articles by Merck consultants and employees, purporting to show greater efficacy than Celebrex.  (Curtis Rep. at 10-11; Schnitzer, T., et al., 2005 [SRL Decl. Ex. 7]; Geba, G., et al., 2002 [SRL Decl. Ex. 8].)  Yet Dr. Curtis does not mention the design factors that Merck built into the study to favor Vioxx, in particular, the dosing regimen,

- 2 -

timing of efficacy assessment, and study endpoints were all selected to maximize the difference in half-life between Celebrex.[1]

Vioxx has a half-life of 17 hours, while the Celebrex half-life is 11.2 hours. (PDR Celebrex, 2002 & 2005 [SRL Decl. Ex. 9 & 10]; PDR Vioxx, 2002 & 2005 [SRL Decl. Ex. 11 & 12].) Because of its 11 hour half-life, the Celebrex dosing instructions allow the 200 mg daily dose to be divided into two doses of 100 mg each for the treatment of OA. (PDR Celebrex, 2002) The Schnitzer and Geba studies not only specified a single Celebrex dose of 200 mg, but also required that the dose be given between 7 and 10 a.m. (Schnitzer, T., et al., 2005; Geba, G., et al., 2002.) Subjects were instructed to evaluate efficacy on two occasions when the morning dose of Celebrex was either at low ebb ("at bedtime") or even lower in the morning, "*immediately before*" taking the next day's dose (Protocol 150, 2/22/01, MRK-I8940066500 at 6628-641 [SRL Decl. 23]). To round out the strategy, major study endpoints included "pain at night" and pre-dose "morning stiffness" (*Id.*), when the previous day's medication had diminished by over 2 half-lives.

Schnitzer's article acknowledges that the VACT result could be attributable to Celebrex's shorter half-life (Schnitzer, T., et al., 2005 at 1103), but at no time does it acknowledge that the study design capitalized on that difference, nor does it mention that Celebrex can be administered in two daily doses to minimize such differences rather than maximize them. Merck

---

[1] Merck touted this fact in its marketing materials: "Let me tell you why VIOXX should be your first choice, over Celebrex, for appropriate OA and acute pain patients. First, Vioxx provides ONCE DAILY POWER in chronic OA. Vioxx 12.5 and 25 mg, once daily, provides relief which lasts all day, all night, and into the next morning." (Memo from MIT for Vioxx to All RBG VPs and Senior Business Directors, Attachment A, MRK-H.H5STM003573 [SRL Decl. Ex. 14].)

860713.1

had planned all of its previous trials for multiple daily doses of the comparator drugs,[2] and even

the VACT study design called for acetaminophen to be spread out over 4 daily doses, so the

decision to give only a single dose of Celebrex in the morning, and then to test its efficacy 12

and 24 hours later, can only be interpreted as a conscious choice to favor Vioxx and disfavor

Celebrex. (*See also* Julie Rebuttal at 3 ¶ 6 (quoting Prescrire International 2000, 9:166-169

(stating that Vioxx clinical trials were designed to "favour rofecoxib" compared to other

medications)) [SRL Decl. Ex. 24].)[3]

In summary, the studies cited by Merck's experts do not support the opinions that Vioxx

is more effective than other NSAIDs.  Dr. Curtis cites studies that contradict his opinion by

showing only comparable efficacy.  He cites no studies showing greater efficacy than ibuprofen

or naproxen, and only cites two marketing studies showing greater efficacy than nabumetone

despite a prior Merck study showing comparable efficacy and safety to a higher dose of

nabumetone.  Despite plans to include labeling statements of superiority, the nabumetone studies

were never included on the Vioxx label.  (See Vioxx Label 2002 [SRL Decl. Ex. 16].)

Dr. Parnell does not cite any specific studies, but merely references general scientific literature

that does not, in fact, support his claim that Vioxx is superior in effectiveness to Celebrex.  Thus,

Merck's experts' opinions concerning superior efficacy are based on clinical experience, not

---

[2] Ibuprofen, 3x 800 mg; naproxen, 2x 500 mg; diclofenac, 2x 75 mg; nabumetone 3x 500 mg.

[3] The Court may also consider that all the studies cited by Dr. Curtis were written by Merck employees or favored consultants.  For example, authors Weaver and Schnitzer were both on Merck's Advisory Board.  (Laine Dep. at 238:14-240:2, 242:8-246:19, February 2, 2010 [SRL Decl. Ex. 13].)  Members of this board received $5,000 per day each to go to meetings where they advised Merck on marketing and competitive strategies.  (*Id.* at 27:7-11, 238:14-240:2, 242:8-246:19; Laine Exhibit 2 [SRL Decl. Ex. 15].)  According to internal Merck documents, both doctors are considered to be Merck's "strong advocates." *Id.*  The authors' financial connections to Merck further undermine the studies' reliability, as do the dates of publication of the Schnitzer and Weaver articles in 2005 and 2006—after Vioxx was off the market, when providing information to prescribers could not have been the motivation.

860713.1

supported by reliable scientific data, and should be excluded under *Daubert*. *See In Re Neurontin Marketing and Sales Practices Litigation*, No. 04-10981, slip op. at 2 (D. Mass. February 12, 2010); *Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565 (E.D. La. 2005) (No. 05-4046).

### B.   The Scientific Literature Contradicts Merck's Experts' Opinions

Merck downplays the extensive scientific evidence that contradicts their experts' claims regarding superior efficacy, suggesting that Plaintiffs seek to exclude testimony that is "inconsistent with some clinical data." (Merck Opp. at 5.)  Dr. Curtis acknowledges that the majority of studies show only comparable (rather than superior) efficacy for Vioxx. (*Id.* at 6. *See, e.g.*, Bombardier, C., et al, 2000 [SRL Decl. Ex. 17]; Laine L, et al., 1999 [SRL Decl. Ex. 18]; Saag, K., et al., 2000 [SRL Decl. Ex. 19].)  Indeed, Merck has never claimed superior efficacy, either on the label or in marketing materials. (Nies Dep. 647:25-648:3, 650:16-19 [SRL Decl. Ex. 20]; Vioxx Label, 1999 [SRL Decl. Ex. 21].)

Under *Daubert*, this Court has the gate keeping responsibility to ensure that Merck's experts offer opinions that are based on reliable methods.  Here, Drs. Curtis and Parnell seek to offer expert testimony contradicting the great weight of scientific evidence, on the basis of personal experience and studies that contradict their opinions, are otherwise unreliable, or do not support their broad conclusions.  Consequently, this Court should exclude Merck's experts' testimony that Vioxx is more effective than other NSAIDs.

### C.   Merck Experts Used an Unreliable Methodology Where They Were Unaware of Data Contradicting Their Opinions Because Merck Suppressed the Data

Merck fails to respond to Plaintiffs' argument that Drs. Curtis and Parnell's testimony must be excluded because they did not rely on sufficient data—namely the clinical data that Merck suppressed. (See Pls.' Motion at 8-10.)  Federal Rule of Evidence 702 provides that a

party seeking to introduce expert testimony must show that "the testimony is based upon sufficient facts or data."  The Fifth Circuit has excluded expert testimony on the basis of incomplete or inaccurate data. *See, e.g., Black v. Food Lion, Inc.,* 171 F.3d 308, 313 (5th Cir. 1999); *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 275-79 (5th Cir. 1998)).

According to Merck, "Dr. Curtis and Dr. Parnell considered all of the available information on Vioxx" (Merck Mem. at 6), but the facts belie that claim.  Drs. Curtis and Parnell did not and could not rely on all information concerning Vioxx's efficacy because Merck suppressed data from Protocol 906, an RCT showing that Vioxx was actually *less* effective than Celebrex for pain relief.  (*See* Plaintiffs' Motion to Exclude Certain Opinion Testimony and Statements of Merck's Experts Concerning the Safety and Efficacy of Vioxx Based on Personal Experience at 7-10.)  Merck does not even address the suppressed data in its Opposition, and thereby fails to explain how their experts could have relied on sufficient data to form their opinions concerning efficacy.[4]

Thus, Merck's experts' opinions that Vioxx is more effective than Celebrex are based on unreliable methodology and should be excluded.

### D.   Merck's Experts Did Not Give "Due Deference" to the Weight of the Literature, Where the Literature Contradicts Their Views

Merck asks this Court to allow unreliable opinions merely because the expert "acknowledges" that the majority of scientific studies contradicts their opinion, relying on *Cantrell v. GAF Corp.,* 999 F.2d 1007, 1014 (6th Cir. 1993). (Merck Opp. at 6-7.)  The opinions at issue are not, as Merck suggests, "precisely like the testimony the Sixth Circuit approved in

---

[4] (*See also* Email from Anne Altmeyer to Andreas Moan, et. al., dated 9/20/01 (saying that neither Protocol 906 nor 907 looks very good for Vioxx) [SRL Decl. Ex. 25].  Neither study was ever published.

- 6 -

*Cantrell.*" First, in *Cantrell*, both parties agreed that the expert's testimony was supported by reliable scientific evidence. 999 F.2d at 1014. Here, the parties agree on just the opposite—that the majority of scientific evidence contradicts Merck's expert testimony of superior efficacy. Second, the Court in *Cantrell* allowed the expert to testify to "*confirmatory* data, gained through his own clinical experience." *Id.* (emphasis added). Here, Merck's experts' opinions concerning superior efficacy are not "confirmatory," but *contradictory* to the undisputed great weight of scientific evidence.

Thus, the mere fact that Dr. Curtis claims to have given "due deference" to contradictory studies does not resuscitate his testimony. Rather, his admission that the majority of studies contradict him serves as a sign that his methodology is unreliable, and his opinion should be excluded.

## III. Drs. Curtis and Parnell's Testimony Concerning their Clinical Experience is Irrelevant to Causation

Merck argues that their experts' clinical experience is relevant to "causation," insofar as their testimony shows that doctors would not have changed their prescribing behavior if more information had been known about Vioxx. (Merck Opp. at 7.) This argument misses the mark. The admissibility of defense experts' "greater efficacy" opinion must stand or fall on its own merits. The opinion is either based on a reliable methodology or it isn't, and such testimony cannot be bootstrapped into the case by tagging along with another issue that has no bearing on whether Vioxx provides better pain relief.

Second, Merck's "causation" argument puts the cart before the horse by *assuming* that Vioxx had greater efficacy, and that such greater efficacy influenced prescribers' behavior, rather than using a reliable methodology to support the premise that Vioxx provided better pain relief. Further, even if prescribers believed that to be the case, the basis for their belief is not the subject

- 7 -

of the pending motion.  Instead, the defense experts' methodology is at issue, and non-witness

prescribers' beliefs are not a factor in the *Daubert* analysis.

As Dr. Curtis acknowledges, doctors give the greatest weight to clinical trials in making

prescribing decisions.  (Curtis Dep. at 66:14-18; 67:1-3 [SRL Decl. Ex. 22].)  Indeed, Dr. Curtis

states that RCTs "provide the best evidence for making clinical decisions."  (Curtis Rep. at 12.)

Better pain relief of a particular drug for a particular patient, as a result of patient-specific

factors, is not equivalent to proof of greater efficacy; that is why clinical trials are done.

Thus, Merck's experts challenged testimony based on their clinical experience is

irrelevant to causation and should be excluded.

## IV.   CONCLUSION

For the reasons stated herein, defense experts used an unreliable methodology to opine

that Vioxx provided better pain relief than NSAIDs, by citing studies that contradicted their

claim, ignoring the weight of the evidence, and remaining unaware of contrary clinical trial data

that Merck kept from them.  Plaintiff respectfully requests that the Court issue an order

precluding testimony from Merck's experts on the matters set forth above, and for such other and

further relief to which Plaintiff may be entitled.

Respectfully submitted, this 9th day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

860713.1

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

860713.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum In Support Of Plaintiff's Motion To Exclude Certain Opinion Testimony And Statements Of Merck's Experts Concerning The Safety And Efficacy Of Vioxx Based On "Personal Experience" has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United State District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 9th day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

- 10 -

860713.1