# EXHIBIT 23
# Part 1 of 2

Product: MK-0966
Protocol/Amendment No.: 150-00

**THIS PROTOCOL AND ALL OF THE INFORMATION RELATING TO IT ARE
CONFIDENTIAL AND PROPRIETARY PROPERTY OF MERCK & CO., INC.,
WHITEHOUSE STATION, NJ, U.S.A.**

## SPONSOR:

Merck & Co., Inc. (hereafter referred to as the **SPONSOR**)
One Merck Drive
P.O. Box 100
Whitehouse Station, NJ, 08889-0100, U.S.A.

## TITLE:

A Randomized, Parallel-Group Double-Blind Study to Evaluate the Safety and Efficacy
of Celecoxib 200 mg, Acetaminophen 4000 mg, Rofecoxib 12.5 mg, and Rofecoxib 25
mg in Patients with Osteoarthritis of the Knee

## INVESTIGATOR(S):

PRIMARY:
SECONDARY/SUBINVESTIGATOR:

## SITE:

## INSTITUTIONAL REVIEW BOARD/ETHICAL REVIEW COMMITTEE:

MK-0966 Document2
U.S. (U.S. IND) APPROVED

22-Feb-2001

MRK-I8940066500

**Product:** MK-0966
**Protocol/Amendment No.:** 150-00

# TABLE OF CONTENTS

PAGE

PROTOCOL SYNOPSIS ........................................................................................5

STUDY FLOW CHART ........................................................................................9

SPONSOR CONTACT INFORMATION................................................................10

I.  CLINICAL SECTIONS.................................................................................12

    A. BACKGROUND AND RATIONALE............................................................12
        1.  Introduction...........................................................................................12
        2.  Clinical Investigator's Brochure............................................................13
        3.  Prior Clinical Experience: Rofecoxib ....................................................13
        4.  Prior Clinical Experience: Celecoxib .....................................................14
        6.  Rationale for the Study .........................................................................15
        7.  Rationale for Dose Selection .................................................................16
    B. OBJECTIVES.............................................................................................16
    C. HYPOTHESES...........................................................................................17
    D. PATIENT DEFINITION ............................................................................17
        1.  Inclusion Criteria .................................................................................17
        2.  Exclusion Criteria ................................................................................19
    E. STUDY DESIGN .......................................................................................22
        1.  Summary of Study Design.....................................................................22
        2.  Treatment.............................................................................................23
            a.  Treatment Plan...........................................................................23
            b.  Prior and Concomitant
                Medication(s)/Treatment(s) ........................................................25
            c.  Diet/Activity/Other....................................................................25
        3.  Study Procedures .................................................................................26
            Visit 1-Screening ...................................................................................26
            Visit 2--Flare/Confirmation ...................................................................29
            Visits 3, 4 and 5--Treatment Weeks 2, and 4 and 6................................31
    F.  EFFICACY MEASUREMENTS ...................................................................35
    G. SAFETY MEASUREMENTS.......................................................................37
        1.  Evaluating and Recording Adverse Experiences....................................37
        2.  Immediate Reporting of Adverse Experiences to the
            SPONSOR ...........................................................................................41

**Product:** MK-0966
**Protocol/Amendment No.:** 150-00

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | a. | Serious Adverse Experiences | 41 |
|  |  | b. | Selected Nonserious Adverse Experiences | 42 |
|  | 3. | Safety Measurements |  | 43 |
| H. | STUDY DURATION AND SUBMISSION OF DATA |  |  | 44 |
| I. | DATA ANALYSIS |  |  | 44 |
|  | 1. | Responsibility for Analyses/In-House Blinding |  | 44 |
|  | 2. | Hypotheses and Objectives |  | 44 |
|  |  | a. | Primary Hypothesis | 44 |
|  |  | b. | Secondary Hypothesis | 44 |
|  |  | c. | Secondary Objective | 44 |
|  |  | d. | Exploratory Objectives | 44 |
|  | 3. | Variables/Time Points of Interest |  | 45 |
|  |  | a. | Efficacy Variables | 45 |
|  |  | b. | Safety Variables | 46 |
|  |  | c. | Compliance | 47 |
|  | 4. | Approaches to Analyses |  | 47 |
|  | 5. | Statistical Methods |  | 47 |
|  |  | a. | Efficacy Analysis | 47 |
|  |  | b. | Safety Analysis | 47 |
|  | 6. | Multiplicity |  | 47 |
|  | 7. | Sample Size and Power |  | 48 |
|  | 8. | Subgroup Analyses |  | 48 |
|  | 9. | Interim Analyses |  | 48 |
|  | 10. | Data Analysis Plan |  | 48 |

| | | |
|---|---|---|
| II. | ADMINISTRATIVE AND REGULATORY SECTIONS | 49 |
| A. | LABELING, PACKAGING, STORAGE, AND RETURN OF CLINICAL SUPPLIES | 49 |
| B. | BIOLOGICAL SPECIMENS | 52 |
| C. | CLINICAL AND LABORATORY DATA COLLECTION | 52 |
|  | 1. Worksheets and Case Report Forms | 52 |
| C. | CLINICAL AND LABORATORY DATA COLLECTION (CONT.) | 53 |
|  | 2. Laboratory Results | 53 |
| D. | STUDY DOCUMENTATION AND RECORDS RETENTION | 53 |
| E. | INFORMED CONSENT | 54 |
| F. | INSTITUTIONAL REVIEW BOARD (IRB)/INDEPENDENT ETHICS COMMITTEE (IEC) | 56 |

MRK-I8940066502

**Product: MK-0966**
**Protocol/Amendment No.: 150-00**

G. CONFIDENTIALITY ....................................................................56
   1. Confidentiality of Data ...........................................................56
   2. Confidentiality of Patient Records...........................................57
   3. Confidentiality of Investigator Information..............................57
H. COMPLIANCE WITH LAW, AUDIT, AND
   DEBARMENT.........................................................................57
I. COMPLIANCE WITH FINANCIAL DISCLOSURE
   REQUIREMENTS....................................................................58
J. QUALITY CONTROL AND QUALITY ASSURANCE...........................58
K. PUBLICATIONS......................................................................59

III. SIGNATURES...........................................................................60

A. SPONSOR'S REPRESENTATIVE ....................................................60
B. INVESTIGATOR(S) ....................................................................60

LIST OF REFERENCES.......................................................................61

ATTACHMENTS................................................................................63

APPENDICES ....................................................................................73

APPENDIX 1.......................................................................75
APPENDIX 2.......................................................................76
APPENDIX 3.......................................................................77
APPENDIX 4.......................................................................81
APPENDIX 5.......................................................................82
APPENDIX 6.......................................................................83
APPENDIX 7.......................................................................84
APPENDIX 8.......................................................................85
APPENDIX 9.......................................................................86
APPENDIX 10.....................................................................87
APPENDIX 11.....................................................................88
APPENDIX 12.....................................................................89
APPENDIX 13.....................................................................94

MRK-I8940066503

**Product:** MK-0966
**Protocol/Amendment No.:** 150-00

# PROTOCOL SYNOPSIS

PRODUCT:    MK-0966

PROTOCOL TITLE:  A Randomized, Parallel-Group Double-Blind Study to Evaluate the Safety and Efficacy of Celecoxib 200 mg, Acetaminophen 4000 mg, Rofecoxib 12.5 mg, and Rofecoxib 25 mg in Patients with Osteoarthritis of the Knee

PROTOCOL/AMENDMENT NO.:  XXX-XX / Multicenter

U.S. IND NO.: 46,894                    CLINICAL PHASE: IV

PRIMARY OBJECTIVE:  To demonstrate superior efficacy of rofecoxib 25 mg qd compared to celecoxib 200 mg qd in the treatment of osteoarthritis of the knee as measured by the Patient Global Assessment of Response to Therapy (PGART) over 6 weeks of treatment.

SECONDARY OBJECTIVES:

1. To demonstrate superior efficacy of rofecoxib 25 mg qd to acetaminophen 1000 mg qid in the treatment of osteoarthritis of the knee as measured by Patient Global Assessment of Response to Therapy over 6 weeks of treatment.

2. To investigate the overall safety and tolerability of rofecoxib 12.5 mg qd, rofecoxib 25 mg qd, celecoxib 200 mg qd, and acetaminophen 1000 mg q.i.d. during a six week treatment period.

Exploratory Objectives

1. To compare onset of efficacy of rofecoxib 25 mg qd and celecoxib 200 mg qd as measured by the time to first good or excellent response to therapy (PGART) during the first six days of therapy.

2. To compare onset of efficacy of rofecoxib 25 mg qd and acetaminophen 1000 mg qid as measured by the time to first good or excellent response to therapy (PGART) during the first six days of therapy.

3. To compare onset of efficacy (Days 1-6) of rofecoxib 12.5 mg qd, rofecoxib 25 mg qd, and celecoxib 200 mg qd in terms of pain on walking (WOMAC Question 1,) pain at night (WOMAC Question 3), pain at rest (WOMAC Question 4), and morning stiffness (WOMAC Question 6).

4. To compare the efficacy of rofecoxib 25 mg qd to celecoxib 200 mg qd as measured by the WOMAC Pain Subscale score over 6 weeks of treatment.

5. To compare the efficacy of rofecoxib 25 mg qd to acetaminophen 1000 mg qid as measured by the WOMAC Pain Subscale score over 6 weeks of treatment.

MRK-I8940066504

**Product:** MK-0966
**Protocol/Amendment No.:** 150-00

6. To compare efficacy of rofecoxib 12.5 mg qd and acetaminophen 1000 mg qid as measured by the Patient Global Assessment of Response to Therapy (PGART) over 6 weeks of treatment.

PRIMARY HYPOTHESIS: Rofecoxib 25 mg qd will be superior to celecoxib 200 mg qd in terms of patients with a good or excellent response to therapy as assessed by the Patient Global Assessment of Response to Therapy after six weeks of treatment.

SECONDARY HYPOTHESIS: Rofecoxib 25 mg qd will be superior to acetaminophen 1000 mg qid in terms of patients with good to excellent response to therapy as assessed by Patient Global Assessment of Response to Therapy after six weeks of treatment.

STUDY DESIGN AND DURATION: This randomized, double-blind (under in-house blinding conditions), study will evaluate the safety and efficacy of celecoxib 200 mg, acetaminophen 4000 mg, rofecoxib 12.5 mg, and rofecoxib 25 mg over six weeks of treatment for osteoarthritis of the knee. Eligible patients will be randomized in a 1:2:2:1 allocation ratio to one of four treatment groups and will receive either rofecoxib 12.5 mg qd (N=260), rofecoxib 25 mg qd (N=520), celecoxib 200 mg qd (N=520), or acetaminophen 1000 mg q.i.d. (N=260) for six weeks. Tylenol® (acetaminophen) rescue therapy will be available to all NSAID or coxib user patients for intractable pain (on an "as needed" basis) during the washout phase only after discontinuation of previous osteoarthritis therapy. Clinical efficacy and safety data will be collected at 2, 4, and 6 weeks of therapy. In addition, efficacy data will be collected on Days 1-6 of therapy

PATIENT SAMPLE: Two types of patients will be studied: 1) patients with a history of response to a common NSAID or coxib whose symptoms worsen with discontinuation of the drug; and 2) patients who regularly use acetaminophen instead of NSAID/coxib for the treatment of OA of the study joint. Those patients taking NSAID or coxib therapy (at therapeutic dose) must have been regular users for at least 30 days prior to study enrollment and subsequently must exhibit a flare of osteoarthritis symptoms during an NSAID or coxib washout period. Those patients taking acetaminophen (at therapeutic dose) must have been using this on a regular basis for at least 30 days prior to study enrollment and must not have used NSAIDs or coxibs for the treatment of osteoarthritis for the 30 days prior to study enrollment. These patients must obtain a minimum score for pain on walking at baseline and at Visit 2 (no washout or flare criteria). Allocation to treatment groups will be stratified by previous osteoarthritis medication use {acetaminophen, NSAID or coxib}. At least 390 previous acetaminophen users will be enrolled.

DOSAGE/DOSAGE FORM, ROUTE, AND DOSE REGIMEN:   Patients will take daily celecoxib 200 mg, acetaminophen 4000 mg, rofecoxib 12.5 mg, or rofecoxib 25 mg in a blinded fashion in the following manner:

MRK-I8940066505

**Product:** MK-0966
**Protocol/Amendment No.:** 150-00

*First Dose per day:*
One tablet of rofecoxib 12.5 mg, one tablet of placebo to match rofecoxib 25 mg, one capsule of placebo to match celecoxib 200 mg, and two placebo tablets to match acetaminophen 500 mg
*or*
One tablet of rofecoxib 25 mg, one tablet of placebo to match rofecoxib 12.5 mg, one capsule of placebo to match celecoxib 200 mg, and two placebo tablets to match acetaminophen 500 mg
*or*
One capsule of celecoxib 200 mg, one tablet of placebo to match rofecoxib 12.5 mg, one tablet of placebo to match rofecoxib 25 mg, and two placebo tablets to match acetaminophen 500 mg
*or*
Two tablets of acetaminophen 500 mg, one tablet of placebo to match rofecoxib 12.5 mg, one tablet of placebo to match rofecoxib 25 mg, and one capsule of placebo to match celecoxib 200 mg

*Second, Third and Fourth Dose per day:*
Two tablets of acetaminophen 500 mg
*or*
Two tablets of placebo to match acetaminophen 500 mg


**EFFICACY MEASUREMENTS:** Efficacy endpoints include: Patient Global Assessment of Response to Therapy (Likert scale), pain on walking (WOMAC Question 1), pain at night (WOMAC Question 3) pain at rest (WOMAC Question 4), morning stiffness (WOMAC Question 6), Investigator Global Assessment of Response to Therapy, physician-assessed joint tenderness, discontinuations due to lack of efficacy, quality of life as assessed by the MOS 36-Item Short-Form Health Survey (SF-36) questionnaire, WOMAC VA 3.0.


**SAFETY MEASUREMENTS:** Spontaneously reported adverse events, percent of patients that discontinue prematurely from the study due to drug-related adverse events; physical examination, vital signs (blood pressure, heart rate, respiratory rate, pulse); body weight; laboratory evaluations.


**DATA ANALYSIS:** A logistic regression model with factors for treatment group, previous OA treatment strata (Acetaminophen, NSAID), and baseline Investigator Global Assessment of Disease Status (IGADS) will be used to compare treatment groups in terms of the number of patients with a Good or Excellent response to PGART at Week 6. With 520 patients per arm there is 90% power to detect a difference between the percent of patients with a Good or Excellent response to therapy (PGART) for rofecoxib 25 mg and celecoxib 200 mg, assuming the true difference is at least 10 percentage points (50% vs. 60%).

MK-0966 Document2                                                                    22-Feb-2001
U.S. (U.S. IND) APPROVED

MRK-I8940066506

**Product:** MK-0966
**Protocol/Amendment No.:** 150-00

*ANY SERIOUS ADVERSE EXPERIENCE, INCLUDING DEATH DUE TO ANY CAUSE, WHICH OCCURS TO ANY PATIENT ENTERED INTO TREATMENT IN THIS STUDY OR WITHIN 14 DAYS FOLLOWING CESSATION OF TREATMENT, WHETHER OR NOT RELATED TO THE INVESTIGATIONAL PRODUCT, MUST BE REPORTED WITHIN 24 HOURS TO ONE OF THE INDIVIDUAL(S) LISTED ON THE CONTACT INFORMATION PAGE. ALL PATIENTS WITH SERIOUS ADVERSE EXPERIENCES MUST BE FOLLOWED UP FOR OUTCOME.*

MRK-I8940066507

**Product:** MK-0966
**Protocol/Amendment No.:** 150-00

# STUDY FLOW CHART

| | Screen | Flare/ Confirm | Treatment Days* | Treatment Weeks | | | |
|---|---|---|---|---|---|---|---|
| | Visit | Visit | 1-6 | 2 | 4 | 6 | Early |
| Clinic Visit I.D.: | 1 | 2 | | 3 | 4 | 5 | Discontinuation |
| Informed Consent | X | | | | | | |
| Review of Entry Criteria | X | X | | | | | |
| Medical History | X | | | | | | |
| Monitor for Adverse Experiences | | X | X | X | X | X | X |
| Vital Signs | X | X | | X | X | X | X |
| Weight | X | | | | | X | X |
| Height | X | | | | | | |
| Physical Examination | X | | | | | X | X |
| Study Joint Examination | X | X | | X | X | X | X |
| CBC, serum chemistry, UA | X | | | | | | |
| Urine β-HCG⁺ | X | X | | | | | |
| 12-lead ECG# | X | | | | | | |
| Dispense Rescue Medication (acetaminophen) | X | | | | | | |
| Dispense Study Medication | | X | | X | X | | |
| Dispense Patient Take Home Forms | | X | | | | | |
| WOMAC Questionnaire | X | X | X** | X | X | X | X |
| Investigator Global Assessment of Disease Status | X | X | | | | | |
| Patient Global Assessment of Response to Therapy | | | X | X | X | X | X |
| Investigator Global Assessment of Resp. to Therapy | | | | X | X | X | X |
| Health Survey (SF-36) | | X | | | | X | X |
| Collect Pt. Take Home Forms | | | | X | | | |
| Collect Study Medication | | X | | X | X | X | X |

⁺Urine β-HCG samples to be obtained from women of childbearing potential only.  Urine β-HCG may be repeated anytime pregnancy is suspected.  Please see I.G.2.b concerning pregnancy reporting.

# ECGs performed within 6 months prior to Visit 1 may be used.  A copy of ECGs must be kept with the patient's study file.

* Patient is to complete assessment of Pain at Night and Morning Stiffness (Questions 3 and 6: WOMAC Osteoarthritis Index Version VA 3.0) immediately before the morning dose of study medication is taken and Pain on Walking, Pain at Rest (Questions 1 and 4: WOMAC Osteoarthritis Index Version VA 3.0), and Patient Global Assessment of Response to Therapy at bedtime on patient take home forms on Days 1-6.  At all visits the entire WOMAC Questionnaire and Patient Global Assessment of Response to Therapy will be completed at the clinic.

** WOMAC Osteoarthritis Index Version VA 3.0 Questions 1, 3, 4, and 6 only.

MK-0966 Document2
U.S. (U.S. IND) APPROVED

22-Feb-2001

MRK-I8940066508

Product: MK-0966
Protocol/Amendment No.: 150-00

# SPONSOR CONTACT INFORMATION

## *REPORTING OF SERIOUS ADVERSE EXPERIENCES*

*ANY SERIOUS[†] ADVERSE EXPERIENCE, INCLUDING DEATH DUE TO ANY CAUSE, WHICH OCCURS TO ANY PATIENT ENTERED INTO TREATMENT IN THIS STUDY OR WITHIN 14 DAYS FOLLOWING CESSATION OF TREATMENT, WHETHER OR NOT RELATED TO THE INVESTIGATIONAL PRODUCT, MUST BE REPORTED WITHIN 24 HOURS TO ONE OF THE INDIVIDUAL(S) LISTED BELOW. ALL PATIENTS WITH SERIOUS ADVERSE EXPERIENCES MUST BE FOLLOWED UP FOR OUTCOME.*

| Gregory P. Geba, M.D. | or | Denise Rue |
|---|---|---|
| Director | | Manager |
| Merck & Co., Inc. | | Merck & Co., Inc. |
| Clinical Development | | Clinical Development |
| P.O. Box 4 HM-202 | | P.O. Box 4 HM-202 |
| West Point, PA 19486 | | West Point, PA 19486 |

| Telephone – Office: | PRIVACY – Redacted privacy | | Telephone – Office: | PRIVACY – Redacted – privacy |
|---|---|---|---|---|
| FAX No.: | | | FAX No.: | |
| Telephone – Home: | | | Telephone – Home: | |
| or | | | | |

| Deborah Matzura-Wolfe | or | Christine Mullen |
|---|---|---|
| Medical Program Coordinator | | Assistant Medical Program Coordinator |
| Merck & Co., Inc. | | Merck & Co., Inc. |
| Clinical Development | | Clinical Development |
| P.O. Box 4 HM-202 | | P.O. Box 4 HM-202 |
| West Point, PA 19486 | | West Point, PA 19486 |

| Telephone – Office: | PRIVACY – Redacted – privacy | | Telephone – Office: | PRIVACY – Redacted – privacy |
|---|---|---|---|---|
| FAX No.: | | | FAX No.: | |
| Telephone – Home: | | | Telephone – Home: | |

† See Protocol Section I.G., Safety Measurements, for definitions of serious adverse experiences.

MK-0966 Document2
U.S. (U.S. IND) APPROVED

22-Feb-2001

Product: MK-0966
Protocol/Amendment No.: 150-00

11

# SPONSOR CONTACT INFORMATION (CONT.)

**RETURN ALL CLINICAL SUPPLIES WITH INVENTORY DOCUMENTATION TO:**
See Protocol Section II.A., Labeling, Packaging, Storage, and Return of Clinical Supplies.

| |
|---|
| Clinical Preparation, WP 78 A-DOCK |
| Merck Research Laboratories |
| West Point, PA  19486 |

**SHIP BIOLOGICAL SPECIMENS TO:**
See Protocol Section II.B., Biological Specimens.

| | |
|---|---|
| Quest Diagnostics Incorporated | |
| 7600 Tyrone Avenue | |
| Van Nuys, CA 91405-1449 | |
| | |
| | |
| | |
| Telephone – Office: PRIVACY – Redacted – | |
| FAX No.: 818-374-4655 | |

**THE INVESTIGATOR WILL FORWARD THE ORIGINAL SIGNED SIGNATURE FORM(S) AND LABEL PAGES TO:**
See Protocol Section II.C., Clinical and Laboratory Data Collection.

| |
|---|
| Clinical Development |
| Deborah Matzura-Wolfe |
| 1 Walnut Grove Drive |
| HM-202 |
| Horsham, PA 19044 |
| |
| |

MK-0966 Document2
U.S. (U.S. IND) APPROVED

22-Feb-2001

## A.    BACKGROUND AND RATIONALE (CONT.)

significantly contribute to the symptoms or pathogenesis of acute and chronic inflammation, then a COX-2 specific inhibitor, free of dose limiting COX-1 associated toxicity, may demonstrate comparable or possibly greater clinical efficacy than existing NSAID for a variety of clinical disorders including osteoarthritis.

### 2.  Clinical Investigator's Brochure

Each investigator will be supplied with the VIOXX® (rofecoxib) Confidential Investigator's Brochure (CIB).  A summary of all animal pharmacology, metabolism, and toxicity related to rofecoxib are contained in the CIB. Summaries of efficacy and safety studies for rofecoxib that have been completed are also included.

### 3.  Prior Clinical Experience: Rofecoxib

Over 10,000 individuals have received rofecoxib as part of a clinical trial. Clinical studies have included single and multiple-dose safety studies in healthy young male volunteers; a single and multiple-dose safety study in healthy elderly men and women; studies of clinical efficacy in the treatment of postoperative dental pain and dysmenorrhea; studies of clinical safety and efficacy in subjects with OA of the knee and hip; a pilot study of clinical efficacy in patients with rheumatoid arthritis; an ADME (absorption, distribution, metabolism, excretion) study using radiolabeled rofecoxib; upper GI safety studies monitored by endoscopy; and safety studies in patients with hypertension, renal insufficiency and hepatic insufficiency.  Drug interaction studies have investigated concurrent administration of rofecoxib and digoxin, corticosteroids preparations, oral contraceptives, cimetidine, warfarin, antacid, and low dose methotrexate in rheumatoid patients. Using *ex vivo* assays of COX-1 and COX-2 activity (serum TXB2, LPS-induced PGE2, respectively), selective inhibition of COX-2 by rofecoxib in humans has been confirmed.  Bleeding time is unaffected by treatment with rofecoxib.

In acute analgesic models of postoperative dental pain, post-orthopedic surgical pain and primary dysmenorrhea, rofecoxib was effective for moderate and severe pain.  The analgesic effect of a single 50 mg dose of rofecoxib was generally similar to naproxen sodium 550 mg or ibuprofen 400 mg.  In single-dose postoperative dental pain studies, the onset of analgesia with a single 50 mg dose of rofecoxib occurred within 45 minutes.  Furthermore, in a multiple dose study of post-orthopedic surgical pain in which patients received rofecoxib or placebo for up to 5 days, rofecoxib 25 mg and 50 mg once daily was effective in reducing pain.  Patients on rofecoxib also consumed a significantly smaller amount of additional analgesic medication than patients treated with placebo.

MRK-I8940066511

## A.   BACKGROUND AND RATIONALE (CONT.)

In a clinical trial comparing rofecoxib to celecoxib and acetaminophen in osteoarthritis, rofecoxib 25 mg qd provided superior relief of pain and other related symptoms of OA compared to celecoxib and acetaminophen [10].

Overall, rofecoxib has been generally well tolerated.  In nine controlled studies of osteoarthritis patients using doses of 12.5 mg and 25 mg, the most common adverse experiences regardless of drug relationship include: abdominal pain, asthenia/fatigue, dizziness, influenza-like disease, edema (lower extremity), URI, hypertension, diarrhea, dyspepsia, epigastric discomfort, heartburn, nausea, sinusitis, back pain, headache, bronchitis, and UTI.

The osteoarthritis clinical data demonstrates that once-daily administration of 12.5 and 25 mg rofecoxib results in clinically important improvements in the signs and symptoms of OA including pain, physical disability, joint stiffness and tenderness, health-related quality of life, and global improvement (physician and patient).

For additional safety and efficacy information, see Appendix 1 (package circular for rofecoxib).

### 4.   Prior Clinical Experience: Celecoxib

Celebrex®(celecoxib) is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of celecoxib is to inhibit prostaglandin synthesis primarily via inhibition of COX-2.

In clinical studies in osteoarthritis, treatment with celecoxib 200 mg (either 100 mg b.i.d. or 200 mg qd) showed improvement in pain, stiffness, and functional components of the WOMAC osteoarthritis index.  In addition, celecoxib was similar in effectiveness to naproxen 500 mg b.i.d.

The most common adverse experiences regardless of drug relationship are: abdominal pain, diarrhea, dyspepsia, flatulence, nausea, back pain, peripheral edema, headache, dizziness, insomnia, pharyngitis, sinusitis, rhinitis, URI, and rash.

For additional safety and efficacy information, see Appendix 2 (package circular for celecoxib).

## A.   BACKGROUND AND RATIONALE (CONT.)

### 5.   Prior Clinical Experience: Acetaminophen

Acetaminophen is a clinically proven analgesic and antipyretic that is equal in efficacy to aspirin and unlikely to produce side effects associated with aspirin use (package insert, Appendix 3).   Adverse effects of therapeutic doses of acetaminophen are generally believed to be mild [11].

Acetaminophen has also been compared to dual COX1/COX2 inhibitors [12,13]. Results from a short term study comparing acetaminophen (4000 mg/day) to either naproxen 1200 mg/day (analgesic dose) or naproxen 2400 mg/day (anti-inflammatory dose) demonstrated that acetaminophen has comparable efficacy to both doses of naproxen, a dual COX1/COX2, in the treatment of overall pain for osteoarthritis of the knee [13].

For additional safety and efficacy information on acetaminophen, please refer to the Appendix 3, the Tylenol® (acetaminophen) package circular.

### 6.   Rationale for the Study

In aggregate, NSAID gastropathy represents the most common serious drug adverse event in the industrialized world.  A clinically effective anti-inflammatory /analgesic agent with a reduced incidence of GI toxicity represents a significant therapeutic advance.   Administration of rofecoxib or celecoxib, both COX-2 selective inhibitors, may produce therapeutically beneficial effects to patients with osteoarthritis, rheumatoid arthritis, pain and other inflammatory diseases with a significant reduction in the incidence of toxicity that is associated with NSAIDs which are dual COX-1/COX-2 inhibitors.

In a double-blind acute pain study (post-surgical dental pain) comparing two COX–2 selective inhibitors which involved 272 patients, rofecoxib 50 mg demonstrated significantly greater efficacy compared to celecoxib 200 mg for overall analgesic effect, total pain relief (TOPAR8), time to onset of pain relief, peak effect, and duration of pain relief. Onset of pain relief was achieved within 30 minutes for rofecoxib compared to 1 hour for celecoxib. The duration of pain relief following a single oral dose of rofecoxib 50 mg was more than four times that observed with celecoxib 200 mg (24 hours vs. 5 hours respectively).[14]

Additionally, the effective half-life of rofecoxib is approximately 17 hours compared to approximately 11 hours for celecoxib.

Similar results may be seen in other pain models where both rofecoxib and celecoxib are indicated for pain treatment. Patients may experience a difference

## A.   BACKGROUND AND RATIONALE (CONT.)

in overall analgesic effect, time to onset of pain relief, time to peak effect or duration of relief when taking either rofecoxib or celecoxib.

The primary purpose of this study is to compare the efficacy and safety of celecoxib, a COX-2 inhibitor, and acetaminophen in the treatment of osteoarthritis of the knee, relative to rofecoxib over a 6-week period.

### 7.   Rationale for Dose Selection

According to the package circular for rofecoxib, the recommended daily dose is either 12.5 mg or 25 mg once daily for the treatment of osteoarthritis. For celecoxib, 200 mg is the recommended dose for once a day treatment of osteoarthritis. Celecoxib 200 mg qd demonstrated similar efficacy and safety as celecoxib 100 mg bid in the treatment of osteoarthritis in a six-week randomized, controlled trial [15].

Both the package circular and the ACR recommend doses of up to 4000 mg/day of acetaminophen for the treatment of osteoarthritis.

## B. OBJECTIVES

### Primary Objective

To demonstrate superior efficacy of rofecoxib 25 mg qd compared to celecoxib 200 mg qd in the treatment of osteoarthritis of the knee as measured by the Patient Global Assessment of Response to Therapy (PGART) over 6 weeks of treatment.

### Secondary Objectives

1. To demonstrate superior efficacy of rofecoxib 25 mg qd to acetaminophen 1000 mg qid in the treatment of osteoarthritis of the knee as measured by Patient Global Assessment of Response to Therapy over 6 weeks of treatment.

2. To investigate the overall safety and tolerability of rofecoxib 12.5 mg qd, rofecoxib 25 mg qd, celecoxib 200 mg qd, and acetaminophen 1000 mg q.i.d. during a six week treatment period.

### Exploratory Objectives

1 To compare onset of efficacy of rofecoxib 25 mg qd and celecoxib 200 mg qd as measured by the time to first good or excellent response to therapy (PGART) during the first six days of therapy.

MRK-I8940066514

## B  OBJECTIVES (CONT.)

2. To compare onset of efficacy of rofecoxib 25 mg qd and acetaminophen 1000 mg qid as measured by the time to first good or excellent response to therapy (PGART) during the first six days of therapy.

3. To compare onset of efficacy (Days 1-6) of rofecoxib 12.5 mg qd, rofecoxib 25 mg qd, and celecoxib 200 mg qd in terms of pain on walking (WOMAC Question 1,) pain at night (WOMAC Question 3), pain at rest (WOMAC Question 4), and morning stiffness (WOMAC Question 6).

4. To compare the efficacy of rofecoxib 25 mg qd to celecoxib 200 mg qd as measured by the WOMAC Pain Subscale score over 6 weeks of treatment.

5. To compare the efficacy of rofecoxib 25 mg qd to acetaminophen 1000 mg qid as measured by the WOMAC Pain Subscale score over 6 weeks of treatment.

6. To compare efficacy of rofecoxib 12.5 mg qd and acetaminophen 1000 mg qid as measured by the Patient Global Assessment of Response to Therapy (PGART) over 6 weeks of treatment.

## C.  HYPOTHESES

### Primary Hypothesis

Rofecoxib 25 mg qd will be superior to celecoxib 200 mg qd in terms of patients with good or excellent response to therapy as assessed by Patient Global Assessment of Response to Therapy after six weeks of treatment.

### Secondary Hypothesis

Rofecoxib 25 mg qd will be superior to acetaminophen 1000 mg qid in terms of patients with good to excellent response to therapy as assessed by Patient Global Assessment of Response to Therapy after six weeks of treatment.

## D.  PATIENT DEFINITION

### 1.  Inclusion Criteria

#### Inclusion Criteria That Apply to Both Groups

a  Patient is male or female, is at least 40 years of age, and has diagnosis of osteoarthritis of the knee (tibio-femoral joint) for greater than 6 months based on clinical criteria specified in Appendix 4.  If newly diagnosed, patients must have clinical symptoms consistent with osteoarthritis of the study joint for at least 6 months.  They must also fulfill the criteria specified in Appendix 4.

MRK-I8940066515

## D. PATIENT DEFINITION (CONT.)

b   Patient is diagnosed as American Rheumatology Association (ARA) functional Class I, II, or III (see Appendix 5).

c   The knee to be designated as the "study joint", must be the patient's primary source of pain/disability in the lower extremity.

d   Female patients of childbearing potential must demonstrate a urine β-hCG level consistent with a nongravid state at the Screening and baseline visits (visits 1 and 2) and agree to use adequate oral or barrier contraception or abstain from sexual contact at least 7 days prior to treatment and continuing through the treatment period or a discontinuation visit.  Oral contraceptives, hormone implants, and injections are only considered effective if used properly and started at least 1 month before study start and continued for 1 month after the study ends.  Women who are postmenopausal, or surgically sterile status post-hysterectomy or who have had bilateral tubal ligation are exempt from this requirement.  Postmenopausal status is defined as no menses for the previous 6 months.

e   Patient is willing to limit alcohol intake to no more than 14 drinks a week (no more than 2 in a day) and to avoid unaccustomed strenuous physical activity (e.g., unaccustomed weight lifting, initiation of physical therapy) for the duration of the study.

f   Excepting osteoarthritis, patient is judged to be in otherwise general good health based on medical history, physical examination, and routine laboratory tests (see Appendix 6).

g   Patient is able to understand and complete study questionnaires including questions requiring a visual analog scale.

h   Patient understands the study procedures and agrees to participate in the study by giving written informed consent.

### Chronic NSAID Use Patients

i   Patient must report a history of positive therapeutic benefit in osteoarthritis of the knee with NSAID in the past.  In addition, patients must be taking a single NSAID on a regular basis and at a prescription strength (see Appendix 8) for at least 30 days prior to study enrollment ("regular basis" is defined as greater than 25 of the previous 30 days) for treatment of symptoms of osteoarthritis.

MRK-I8940066516

## D. PATIENT DEFINITION (CONT.)

j    Patient assessment of pain on walking on a flat surface (extracted from the WOMAC Osteoarthritis Index Version VA 3.0, question one) at the Screening visit will be less than 80 mm on the 100 mm VAS scale.

k    Prior to randomization, and following discontinuation of prior NSAID therapy during the washout period specified in Appendix 8, patient must satisfy all of the following flare criteria at Visit 2 ("flare visit"):

- Minimum 40 mm on patient assessed pain on walking on a flat surface on a 100 mm VAS scale

- Increase 15 mm on patient assessed pain on walking on a flat surface compared to screening result recorded at Visit 1; and

- A worsening in Investigator Global Assessment of Disease Status of at least 1 point on a 5-point Likert scale compared to screening assessment recorded at Visit 1.

### Acetaminophen Use Patients

l    Patient is a regular user of acetaminophen and not NSAID for the treatment of symptomatic osteoarthritis of the knee. Patient total daily dose may vary, but must be in the range of 1200 to 4000 mg. Regular use is defined as 25 of the last 30 days. No NSAID use for the treatment of osteoarthritis is permitted for 30 days prior to study entry.

m    At both Visit 1 and Visit 2, patient satisfies all of the following criteria:

- Minimum 40 mm on patient assessed pain on walking on a flat surface on a 100 mm VAS scale;

- A score of 2, 3, or 4 (Fair, Poor, Very Poor) on the Investigator Global Assessment of Disease Status (5-point Likert scale)

### 2. Exclusion Criteria

Patient has a concurrent medical/arthritic disease that could confound or interfere with evaluation of efficacy including, but not limited to:

a    Inflammatory arthritis (e.g., rheumatoid arthritis (controlled or uncontrolled), systemic lupus, spondyloarthropathy, polymyalgia rheumatica), gout, episodes of acute monoarticular arthritis clinically consistent with pseudogout,

MRK-I8940066517

Paget's disease affecting the study joint, a history of septic arthritis or intra-articular fracture of the study joint, osteochondritis desiccans or osteonecrosis

## D. PATIENT DEFINITION (CONT.)

of the study joint, Wilson's disease, hemochromatosis, ochronosis, or primary osteochondromatosis.

b   Patient with chondrocalcinosis, except those with incidental chondrocalcinosis, which is distinguished from pseudogout by 1) age of ≥65 years, 2) no polyarthritis, 3) no prior diagnosis of pseudogout, and 4) no concern by physician that pseudogout exists in the patient.

c   Patient with isolated patellofemoral disease manifested by primarily anterior knee pain.

d   History of acute ligamentous or meniscal injury of the study joint within the previous 2 years or arthroscopy of the affected knee within 6 months prior to study entry.

e   Patient is a candidate for imminent joint replacement.

### Other Concurrent/Previous Medical Conditions:

f   Patient is, in the opinion of the investigator, mentally, or legally incapacitated preventing informed consent from being obtained, or cannot read or comprehend written material.

g   Patient has a history of gastric malabsorption.

h   Patient has clinical or laboratory evidence of significant renal, gastrointestinal, pulmonary, hepatic, endocrine, neurological (apart from migraine), or other systemic disease that in the opinion of the investigator contraindicates a 6-week course of therapy with NSAID or acetaminophen.

i   Patient's serum creatinine is greater than 2.0 mg/dL.

j   Patient has angina or congestive heart failure with symptoms that occur at rest or minimal activity. [Note: patients with a history of myocardial infarction or coronary artery bypass grafting more than 1 year prior to the start of the study may participate.]

MRK-I8940066518

k   Patient has uncontrolled hypertension.   [Note: patients with medically controlled hypertension (diastolic blood pressure ≤ 95, systolic blood pressure ≤ 165) may participate.]

l   Patient has a recent history of stroke or transient ischemic attack (within the previous 1 year)

## D. PATIENT DEFINITION (CONT.)

m   Patient is currently a user (including "recreational use") of any illicit drugs, or has a history of drug or alcohol abuse within the past 5 years.

n   Patient is allergic (NSAID induced asthma, urticaria, or other allergic type reactions) to acetaminophen, or has hypersensitivity (e.g., bronchoconstriction in association with nasal polyps) to aspirin, ibuprofen, nabumetone, other NSAID, or sulfa drugs.   [Note:   Patients with a history of a potential idiosyncratic allergic reaction (e.g., rash) to a single NSAID in the past but who tolerate at least two other NSAID without hypersensitivity reactions may participate.]

o   Patient has a history of any illness that, in the opinion of the investigator, might confound the results of the study or pose additional risk to the patient (e.g. severe obesity with complications, fibromyalgia).

**Concurrent/Previous Medication**

p   Patient has taken the following medications in the interval specified below:

- Patient has been administered intravenous, intramuscular, or oral corticosteroids within 1 month of study entry.

- Patient has been taking glucosamine and/or chondroitin sulfate for <6 months prior to study start. If patient has been taking glucosamine and/or chondroitin sulfate for ≥6 months, the physician must consider the patient stable (i.e., patient has reached potential maximum efficacy benefit and must be taking a stable dose of glucosamine and/or chondroitin sulfate throughout the study). If a patient has taken glucosamine and/or chondroitin sulfate but has recently discontinued treatment, the minimum allowable time from discontinuation is 3 months.

- Patient has been administered intra-articular steroids, Hyalgan® (sodium hyaluronate), or Synvisc® (hylan G-F 20) to the study knee within 3 months of entry into the study or intra-articular steroids, Hyalgan®, or Synvisc® to any other joint within 1 month of study entry.

- Patient has taken misoprostol or sucralfate within the past 14 days.

- Topical, oral or systemic analgesic medications within 2 weeks of study entry and for the duration of the study (except current OA therapy and study therapy).

## D. PATIENT DEFINITION (CONT.)

q   Patient is excluded from the study if the following concomitant medications are required during the study: warfarin, ticlopidine, and high dose aspirin. Patients taking low-dose aspirin (81 mg or less, once daily or less frequently) for cardio-protective benefit WILL BE ALLOWED to participate in this trial. If clinically indicated, patients on 325 mg per day of aspirin may be placed on 81 mg per day in order to participate in the trial.

r   Patient is excluded from the study if using appetite suppressants such as phentermine, fenfluramine, sibutramine or derivatives. [Note: Patients using over the counter appetite suppressants (e.g., Dexatrim®) may participate]

### Other

s   Patient has clinically significant abnormalities on screening (Visit 1) clinical examination or laboratory safety tests.   Patients with baseline serum transaminases exceeding 1.5x the upper limit of normal must be discussed with the medical monitor before enrolling. For patients aged 40-64, hemoglobin values must be greater than 11.5 g/dl for women and greater than 12.5 g/dl for men. For patients >65 years of age, hemoglobin values must be greater than 10.6 g/dl for women and greater than 11.6 g/dl for men.

t   Patient has participated in and received active treatment in an investigational trial within 30 days prior to Visit 1.

## E. STUDY DESIGN

### 1. Summary of Study Design

This is a randomized, double-blind (under in-house blinding conditions) study to evaluate safety and efficacy of rofecoxib, celecoxib, and acetaminophen, over six weeks of treatment for osteoarthritis of the knee. Osteoarthritis will be diagnosed with standardized clinical criteria.   Two types of patients will be studied: 1) patients with a history of response to NSAID or coxib whose symptoms worsen with discontinuation of the drug; and 2) patients who regularly use acetaminophen instead of NSAID or coxib for the treatment of OA of the study joint.   Eligible patients will be randomized to one of four treatment groups and will receive either rofecoxib 12.5 mg qd, rofecoxib 25 mg qd, celecoxib 200 mg qd, or acetaminophen 1000 mg q.i.d.,   **Allocation will be stratified by previous**

MRK-I8940066520

acetaminophen use or NSAID/coxib use. Patients who are acetaminophen users will be assigned the lowest available allocation number. Patients who are previous NSAID or coxib users will be assigned the highest available allocation number. At least 390 acetaminophen users are to be randomized. Approximately 2000 patients will be screened at approximately 100 study sites. This will ensure 1560 total patients are allocated at Visit 2. Clinical safety and

## E. STUDY DESIGN (CONT.)

efficacy data will be collected at 2, 4 and 6 weeks of therapy.  In addition, efficacy data will be collected on Days 1-6 of therapy.

Patients who are NSAID or coxib users are allowed to use acetaminophen 325 mg tablets during the washout phase as rescue analgesia for pain.  Patients are requested to use as little acetaminophen as possible for relief of study joint pain only.  Use will be recorded by tablet count.  Patients will discontinue use at least 12 hours before Visit 2.

The efficacy endpoints are: WOMAC VA 3.0., Patient Global Assessment of Response to Therapy, Investigator Global Assessment of Response to Therapy, physician-assessed joint tenderness, discontinuations due to lack of efficacy, quality of life as assessed by the MOS 36-Item Short-Form Health Survey (SF-36) questionnaire.

Additional efficacy data will be collected in the form of patient take home forms which patients will complete on Days 1 through 6. Day 1 is considered the first day study medication is taken in the randomized portion of the study.

Safety will be monitored by repeat clinical and laboratory assessments and patient reported adverse events. Patients will be monitored for adverse events over the same period of time

### 2.  Treatment

#### a.  Treatment Plan

Eligible patients will be randomized in a 1:2:2:1 ratio, stratifying by previous osteoarthritis therapy use (acetaminophen, NSAID) to one of four treatment groups and will receive either rofecoxib 12.5 mg P.O. qd, rofecoxib 25 mg P.O. qd, celecoxib 200 mg P.O. qd, or acetaminophen 1000 mg P.O. q.i.d., respectively, following a flare/confirmation period. Rofecoxib 12.5 mg tablets or matching placebo, rofecoxib 25 mg tablets or matching placebo, celecoxib 200 mg capsule or matching placebo, and acetaminophen 500 mg tablets or matching placebo will be used for 6 weeks.  All medications will be taken daily according to the dosing schedule below:

MRK-I8940066521

## E. STUDY DESIGN (CONT.)

| Treatment Group | Treatment Composition |
|---|---|
| Rofecoxib 12.5 mg | 1 tablet rofecoxib 12.5 mg qd<br>1 tablet placebo to match rofecoxib 25 mg qd<br>1 capsule placebo to match celecoxib 200 mg qd<br>2 tablets placebo to match acetaminophen 500 mg q.i.d. |
| Rofecoxib 25 mg | 1 tablet rofecoxib 25 mg qd<br>1 tablet placebo to match rofecoxib 12.5 mg qd<br>1 capsule placebo to match celecoxib 200 mg qd<br>2 tablets placebo to match acetaminophen 500 mg q.i.d. |
| Celecoxib 200 mg | 1 tablet placebo to match rofecoxib 12.5 mg qd<br>1 tablet placebo to match rofecoxib 25 mg qd<br>1 capsule of celecoxib 200 mg qd<br>2 tablets placebo to match acetaminophen 500 mg q.i.d. |
| Acetaminophen 4000 mg | 1 tablet placebo to match rofecoxib 12.5 mg qd<br>1 tablet placebo to match rofecoxib 25 mg qd<br>1 capsule placebo to match celecoxib 200 mg qd<br>2 tablets acetaminophen 500 mg q.i.d. |

Study therapy will total 1 capsule/day of celecoxib or matching placebo, 1 tablet/day of rofecoxib 12.5 mg or matching placebo, 1 tablet/day of rofecoxib 25 mg or matching placebo, and 8 tablets/day of acetaminophen or matching placebo (11 tablets total/day).

Patients who are washing out of NSAID or coxib will be supplied with 1-2 bottles of acetaminophen 325 mg tablets during the washout phase as rescue analgesia for osteoarthritis pain. Patients are requested to use as little acetaminophen as possible for relief of study joint pain only. Use will be recorded by tablet count. Patients will discontinue use at least 12 hours before Visit 2. THE STUDY COORDINATOR WILL TELEPHONE THE PATIENTS THE DAY BEFORE VISIT 2 TO REMIND THEM OF THIS RESTRICTION. The maximum daily dose of acetaminophen is not to exceed 2600 mg (8 tablets)/day.

MRK-I8940066522

**Product:** MRK-0966
Protocol/Amendment No.: 150-00

### E. STUDY DESIGN (CONT.)

**b. Prior and Concomitant Medication(s)/Treatment(s)**

Concomitant use of the following medications is prohibited during the entire study: other NSAIDs, oral or systemic analgesic medications, warfarin, ticlopidine, high dose aspirin, intravenous, intramuscular, oral corticosteroids, or intra-articular steroids to the study knee, misoprostol, sucralfate, appetite suppressants such as phentermine, fenfluramine sibutramine or derivatives.

Use of low-dose aspirin (81 mg or less, once daily or less frequently) is permitted.

Topical (dermal), inhaled, or intra vaginal corticosteroids are permitted during the study.

Use of all prior and concurrent medications will be collected at each visit on case report forms.

No rescue therapy for osteoarthritis is allowed in this study, except for acetaminophen 325 mg during the washout period for NSAID or coxib users only. Acetaminophen rescue medication is not allowed at any time during the blinded portion of the study.

**c. Diet/Activity/Other**

No more than 14 alcoholic drinks (beer 8 ounces, wine 4 ounces, liquor 1 ounce) may be consumed per week during the course of the study. No more than 2 alcoholic drinks may be consumed in a single day.

Unusual or unaccustomed strenuous physical exercise or activity should be avoided throughout the duration of the study. As much as possible, patients should maintain their usual level of activity.

Patients must maintain adequate compliance with the study medication regimen based upon tablet counts. If a patient misses three or more doses between at any visit, the site staff should re-instruct the patient on the dosing regimen.

MRK-I8940066523

**Product: MK-0966**
**Protocol/Amendment No.: 150-00**

26

## E. STUDY DESIGN (CONT.)

### 3. Study Procedures

#### Visit 1-Screening

| List of Procedures |
|---|
| Informed consent |
| WOMAC |
| Review of entry criteria |
| Medical history including ulcer disease |
| Vital signs (BP, HR, RR), temp., weight, height |
| Physical examination |
| CBC, serum chemistry, UA |
| Urine β-hCG |
| ECG 12 lead |
| Study joint examination |
| Investigator global assessment of disease status |
| Emergency card distributed |
| Dispense Acetaminophen to NSAID users |

Written informed consent will be obtained.

A sequential baseline number will be assigned.

The patient will complete the WOMAC questionnaire.

**For patients on NSAIDs or coxibs:** The patient's assessment of pain on walking on a flat surface (WOMAC Section A., Question 1.) will be recorded on a visual analog scale (VAS) and must be less than 80 mm. Following completion of this question, the clinical research coordinator will review the patient response and if less than 80 mm, the patient will be instructed to continue with the Visit 1 procedures. **For patients on acetaminophen:** No acetaminophen use for 12 hours prior to the visit is allowed. Extended-release acetaminophen is not to be used for 24 hours prior to the visit. The patient's assessment of pain on walking on a flat surface (WOMAC Section A., Question 1.) will be recorded on a visual analog scale (VAS) and must be a minimum of 40 mm. Following completion of this question, the clinical research coordinator will review the patient response and if at least 40 mm, the patient will be instructed to continue with the Visit 1 procedures.

Potential patients will be evaluated to determine whether they fulfill the entry requirements listed in Section I.C. This will include a review of medical history and confirmation of the diagnosis of osteoarthritis of the knee based on clinical criteria as detailed in 4. In addition, patients must be ACR functional Class I, II, or III (Appendix 5) and have a history of therapeutic benefit from NSAIDs or be a regular user of acetaminophen.

## E. STUDY DESIGN (CONT.)

If both knees are affected, the most painful joint will be selected for evaluation and clinical response. Joints affected by osteoarthritis, in addition to the study joint (e.g., spine, inter-phalangeal joints, thumb carpal-metacarpal joint) will be recorded. A medical history including episodes of ulcer, GI bleeding and other GI side effects will be obtained.

Female patients of childbearing potential must agree to use oral or barrier contraception or abstain from sexual contact beginning at least 7 days prior to treatment and continuing through the treatment period or a discontinuation visit.

It is preferred that all clinical assessments be performed in the morning. If morning assessments are not possible, clinical assessments will be performed at approximately the same time of day throughout the study for an individual patient. The time of day selected and the investigator performing assessments will be kept constant for an individual patient throughout the study.

Vital signs (blood pressure, heart rate, respiratory rate, temperature) will be obtained with patient in a sitting position after a 10-minute rest.

Mean blood pressure readings are to be obtained by taking 3 consecutive blood pressure readings at least one minute apart. Individual blood pressure readings must be within $\pm$ 5 mmHg of the mean of the three readings. If not, consecutive readings must be taken until this criteria is met for the last 3 readings.

Patients will be weighed in street clothing with jacket/coat and shoes removed. A complete physical examination will be performed. Height will be recorded in inches with the patients shoes removed.

Blood will be obtained for CBC, serum chemistry, and urine for urinalysis.

A urine sample for urine $\beta$-hCG level will be obtained from all women of childbearing potential. The sample must confirm nongravid state prior to randomization.

A 12-lead electrocardiogram (ECG) will be performed. (If a 12 lead ECG was performed within the past 6 months is available and the patient has experienced no symptoms that would warrant a repeat ECG; it will not be necessary to perform a new ECG at Visit 1.0.). A copy of all ECGs must be kept with the patients' study files.

An examination of the study joint will be performed and recorded. An Investigator Global Assessment of Disease Status will be recorded.

MK-0966 Document2                                                         22-Feb-2001
U.S. (U.S. IND) APPROVED

MRK-I8940066525

## E. STUDY DESIGN (CONT.)

**For Patients on NSAIDs or coxibs:** Patients will be given 1-2 bottles containing 24 acetaminophen, 325-mg tablets at the screening visit. Acetaminophen should only be used after the patient has been instructed to initiate NSAID/coxib washout. Written instructions for use of acetaminophen during NSAID/coxib washout will be provided as follows: "You will be permitted to use acetaminophen on an as needed basis (every 4-6 hours) for intolerable arthritis pain that occurs after you stop taking your NSAID. No more than 8 tablets may be taken during a 24-hour period". The study coordinator will telephone the patients the day prior to Visit 2 to remind them that acetaminophen should not be used within 12 hours preceding return to the study clinic for the "flare" visit.

Patients will be given a card to carry at all times during the study identifying that they are participants in an investigational drug study and listing emergency telephone contact numbers.

### NSAID Washout—NSAID or Coxib User Patients

After screening laboratories have been verified to be within defined limits, patients that fulfill all entry criteria and have signed an informed consent will be contacted by telephone and instructed to discontinue their current NSAID or coxib regimen. The duration of washout depends upon the NSAID or coxib being discontinued and is specified in Appendix 8.

Patients will be instructed to return to the clinical research center for repeat evaluation upon worsening of pain and other symptoms of their osteoarthritis, i.e., "flare."

Patients will be contacted by the clinical research coordinator before the last day of the maximum washout period if they have not yet returned for Visit 2.0.

### Acetaminophen Patients

Patients will be given an appointment for a confirmation visit in 3 to 7 days. Note: Patients are eligible to continue in the study if screening laboratories have been verified to be within defined limits and patients fulfill all entry criteria.

Patient will be contacted on the day prior to their visit. The study coordinator will remind them that acetaminophen should not be used for 12 hours prior to returning for the confirmation visit. Extended-release acetaminophen should not be used for 24 hours prior to the confirmation visit.

MRK-I8940066526

**Product: MK-0966**
Protocol/Amendment No.: 150-00                                          29

## E. STUDY DESIGN (CONT.)

*If a patient has signed an informed consent form but is not randomized, the investigator must submit the following case report forms to the sponsor for the patient: demographics/medical history, INC/EXC, NSAE/SAE, and status forms. Unless otherwise directed, no other data need be submitted for these patients.*

### Visit 2.-Flare/Confirmation

| List of Procedures |
|---|
| Investigator global assessment of disease status |
| WOMAC |
| Review of Entry Criteria |
| Monitor for adverse experiences |
| Health Survey (SF-36) |
| Vital signs (BP, HR, RR) |
| Urine β-hCG |
| Study joint examination |
| Dispense study medication |
| Dispense Take Home Forms |
| Collect acetaminophen from NSAID users |

### Chronic NSAID or Coxib User Patients

- Within the NSAID or coxib washout period specified in Appendix 8, patients will return to the clinical research center to determine if they meet flare criteria. Patients will complete the WOMAC questionnaire. An Investigator Global Assessment of Disease Status will also be recorded. Patients will be eligible for randomization if they fulfill all the following criteria (Appendix 9):

- Minimum of 40 mm on patient assessed pain on walking on a flat surface.

- Increase 15 mm on patient assessed pain on walking on flat surface compared to Visit 1.

- A worsening in Investigator Global Assessment of Disease Status of at least 1 point on a 5-point Likert scale compared to Visit 1.0.

Patients who do not fulfill flare criteria upon return for Visit 2.0 may return to the clinical research center for re-evaluation on one additional occasion within the duration of the washout period specified in Appendix 8.

The acetaminophen bottle will be returned, a tablet count performed and recorded.

MRK-I8940066527

## E. STUDY DESIGN (CONT.)

### Acetaminophen Patients

Patients will return for a confirmation visit as scheduled on Visit 1. Patients who fail to return will be contacted by phone. Patients will complete the WOMAC questionnaire. An Investigator Global Assessment of Disease Status will also be recorded. Patients will be eligible for randomization if they fulfill both of the following criteria (Appendix 9):

- Minimum of 40 mm on patient assessed pain walking on a flat surface.

- A score of 2, 3, or 4 (Fair, Poor, Very Poor) on the Investigator Global Assessment of Disease Status (0 to 4 point Likert scale)

### Both NSAID/Coxib Patients and Acetaminophen Patients

**The following procedures will be performed with patients from both groups who fulfill their respective entry criteria:**

Question patient for adverse events since the last visit.

Vital signs (blood pressure, heart rate, respiratory rate) will be obtained with patient in a sitting position after a 10-minute rest. During the rest period patient will complete the   Health Survey (SF-36). Mean blood pressure readings are to be obtained by taking 3 consecutive blood pressure readings at least one minute apart. Individual blood pressure readings must be within ± 5 mmHg of the mean of the three readings. If not, consecutive readings must be taken until this criteria is met for the last 3 readings.

A urine sample for urine β-hCG level will be obtained from all women of childbearing potential. The sample must confirm nongravid state prior to randomization.

An examination of the study joint will be performed and recorded.

Patients will be assigned an allocation number. **Patients who are acetaminophen users will be assigned the lowest available allocation number. Patients who are previous NSAID users will be assigned the highest available allocation number. The goal is to enroll patients into the trial until at least 390 acetaminophen users are randomized. When the desired number of acetaminophen users for the study is reached, sites will be notified.**

Patients will be given Take Home Forms (Appendix 11; Days 1-6) to complete between clinic visits 2 and 3. They will complete Question 3 (pain at night), and Question 6 (morning stiffness) of the WOMAC questionnaire prior

MRK-I8940066528

**Product: MK-0966**
**Protocol/Amendment No.: 150-00**                                                       31

### E. STUDY DESIGN (CONT.)

to the morning dose on Days 2 through 6. Question 1 (pain on walking), Question 4 (pain at rest), and Patient Global Assessment of Response to Therapy will be completed at bedtime on the day that they were randomized (Day 1) and Days 2-6. Patients will be instructed to record the date of assessments, the dates and times of dosing and to bring the take home forms with them to their next regularly scheduled visit.

The patient will be provided four bottles of study medication. Patients will be instructed to take 1 tablet from Bottle A, 1 tablet from Bottle B, 1 capsule from Bottle C and 2 tablets from Bottle D as the initial dose per day, then 2 tablets from Bottle D every 4-6 hours for a total of 8 tablets from Bottle D in a 24-hour period. On the day of randomization (Day 1), the initial dose of study medication (5 tablets/capsules) will be administered by the study coordinator with 8 ounces of water. The remaining doses (Bottle D) will be taken every 4-6 hours for a total of 8 tablets on Day 1.

An appointment for Visit 3 will be made for 2 weeks time (±3 days).

**No rescue therapy for osteoarthritis, including acetaminophen, is allowed during the blinded portion of the study.**

**Visits 3, 4 and 5--Treatment Weeks 2, and 4 and 6**

|  | Treatment Weeks: | | |
|---|---|---|---|
|  | 2 | 4 | 6 |
| Clinic Visit ID: | 3.0 | 4.0 | 5.0 |
|  |  |  |  |
| Adverse experiences | X | X | X |
| Health Survey (SF-36) |  |  | X |
| WOMAC | X | X | X |
| Patient global assessment of response to therapy | X | X | X |
| Vital signs (BP, HR, RR) | X | X | X |
| Weight |  |  | X |
| Physical examination |  |  | X |
| Study joint examination | X | X | X |
| Investigator global assessment of response to therapy | X | X | X |
| Dispense study medication | X | X |  |
| Study medication tablet count | X | X | X |
| Collect Take Home Forms | X |  |  |

Question patient for adverse events since the last visit.

MK-0966 Document2
U.S. (U.S. IND) APPROVED                                                    22-Feb-2001

MRK-I8940066529

## E. STUDY DESIGN (CONT.)

At VISIT 3 only (Treatment week 2): collect the Take Home Forms from the patient and review the forms while the patient is in the office to assess accuracy of dates and times. Record any adverse experiences that may have occurred during completion of the Take Home Forms. Any changes if necessary, must be made only by the patient, who will initial and date the Take Home Form. Visual analog scales on the forms will be measured and values will be recorded.

Visits 3, 4 and 5
Vital signs (blood pressure, heart rate, respiratory rate) will be obtained with patient in a sitting position after a 10-minute rest. Mean blood pressure readings are to be obtained by taking 3 consecutive blood pressure readings at least one minute apart. Individual blood pressure readings must be within ± 5 mmHg of the mean of the three readings. If not, consecutive readings must be taken until this criteria is met for the last 3 readings. During the rest period patients will complete the WOMAC questionnaire and will record a Global Assessment of Response to Therapy.

The investigator will perform and record an examination of the study joint and an Investigator Global Assessment of Response to Therapy will be recorded.

The bottles of study medicine will be collected and a tablet count performed. At Visits 3 and 4 patients will be given four new bottles of study medicine. Patients will be instructed to take 1 tablet from Bottle A, 1 tablet from Bottle B, 1 capsule from Bottle C and 2 tablets from Bottle D as the initial dose per day, then 2 tablets from Bottle D for a total of 8 tablets from Bottle D in a 24-hour period.

Following each Visit, patients will be scheduled for their next clinic visit (2 weeks ± 3 days). Patients who do not return for a visit will be contacted. If patients are unable to continue participating in the study, discontinuation visit procedures (see below) will be performed.

**At Visit 5.0 only (Treatment Week 6):** in addition to the aforementioned procedures a physical examination will be performed (including weight) and patients will complete the Health Survey (SF 36).

Patients can resume taking an NSAID or acetaminophen the day after Visit 5 as deemed appropriate by the investigator or their physician.

MRK-I8940066530

## E. STUDY DESIGN (CONT.)

### Discontinuation Visit

For randomized patients unable to complete the 6-week treatment course for any reason, a discontinuation visit is required. This visit will be scheduled within 48 hours of a patient discontinuing from the study. The reason for discontinuation will be noted (e.g., lack of efficacy, adverse event, inability to comply with study protocol visits or other).

Patients may withdraw at any time or be dropped from the study at the discretion of the investigator should any untoward effects occur. In addition, a patient may be withdrawn by the investigator or the SPONSOR if he/she violates the study plan or for administrative and/or other safety reasons. The investigator or study coordinator must notify the SPONSOR immediately when a patient has been discontinued/withdrawn due to an adverse experience (telephone or FAX). When a patient discontinues/withdraws prior to study completion, all applicable activities scheduled for the final study visit should be performed at the time of discontinuation. Any adverse experiences which are present at the time of discontinuation/withdrawal should be followed in accordance with the safety requirements outlined in Sections I.G.2.a. and b.

A single patient cannot be assigned more than one allocation number.

Procedures to be performed at the Discontinuation visit are:

Vital signs (blood pressure, heart rate, respiratory rate) will be obtained with patient in a sitting position after a 10-minute rest. Mean blood pressure readings are to be obtained by taking 3 consecutive blood pressure readings at least one minute apart. Individual blood pressure readings must be within ± 5 mmHg of the mean of the three readings. If not, consecutive readings must be taken until this criteria is met. During the rest period, the patient will complete the Global Assessment of Response to Therapy and the Health Survey (SF-36). The *primary* reason for discontinuation, i.e., lack of efficacy, serious adverse event, noncompliance, or other (with explanation) will be recorded by the investigator.

A physical examination will be performed (including weight).

Tablet counts (study medication) will be performed.

The investigator will perform and record an examination of the study joint and an Investigator Global Assessment of Response to Therapy will be recorded.

Patients will complete the WOMAC questionnaire.

Question patient for adverse events since the last visit.

## E. STUDY DESIGN (CONT.)

Note: Baseline and/or allocation numbers for patients who discontinue or withdraw may not be reassigned.

### Unblinding Procedure

This study is a double blind (under in-house blinding conditions) clinical trial. Neither the patient nor the investigator nor the SPONSOR will be aware to which treatment group the patient has been assigned. The unblinding envelopes should remain sealed and should be opened by the investigator only in cases where the treatment of an adverse experience or clinical condition is dependent upon knowledge of the drug administered. The trial patient's welfare will always take priority over any other consideration in determining when a treatment code should be revealed. The investigator should not unblind a patient's treatment without the Clinical Monitor's approval. If unblinding of the investigational product(s) for an investigator's patient should occur (e.g., accidental unblinding, emergency unblinding for an adverse experience), the investigator must promptly notify the Clinical Monitor.

### Scheduling of Clinic Visits

- Patients who are chronic NSAID users will return for Visit 2 within the interval specified in Appendix 8. If patient fails to meet flare criteria on their first Flare Visit, an additional flare visit is allowed. This second attempt must also occur within the washout interval.

- The interval between subsequent visits will be 2 weeks ±3 days for patients.

- It is preferred that all clinical assessments be performed in the morning. If morning assessments are not possible, clinical assessments will be performed at approximately the same time of day throughout the study for an individual patient.

### Noncompliance with Medication

Patients who miss more than 20% of scheduled doses are considered noncompliant. Noncompliant patients should **not** be discontinued from the study. Their compliance should be monitored and recorded. Their compliance with the study regimen should be encouraged. They should be further instructed in the proper use of the study medication.

MRK-I8940066532

## F. EFFICACY MEASUREMENTS

### WOMAC VA 3.0

The WOMAC VA 3.0 will be administered at all visits. Questions 1, 3, 4, and 6 only (pain on walking, night pain, and pain at rest, morning stiffness) will be given to patients on the Take Home Forms (Days 1-6). The WOMAC questionnaire will be provided to each study center.

### Investigator Global Assessment of Disease Status

An Investigator Global Assessment of Disease Status on a Likert scale will be recorded at Visits 1 and 2 using the following scale:

0 = Very Well
1 = Well
2 = Fair
3 = Poor
4 = Very Poor

### Patient Global Assessment of Response to Therapy

At Days 1 through 6 (Day 1 is considered the first day study medication is taken in the randomized portion of the study) and at Visits 3, 4, 5, and the Discontinuation Visit (if patient discontinues prematurely), the patient will be asked to rate their overall response of their arthritis to the study medication.

0 = None--no good at all-ineffective drug
1 = Poor--some effect, but unsatisfactory
2 = Fair--reasonable effect, but could be better
3 = Good--satisfactory effect with occasional episodes of pain and/or stiffness
4 = Excellent--ideal response, virtually pain free

### Investigator Global Assessment of Response to Therapy

At Visits 3, 4, and 5 and the Discontinuation Visit (if patient discontinues prematurely), the investigator will evaluate the Patient's Global Response to Therapy according to the following scale:

0 = None--No response, absence of drug effect
1 = Poor--Minimal response; unacceptable
2 = Fair--Definite response, but could be better
3 = Good--Good response, but less than the best possible anticipated response
4 = Excellent--Best possible anticipated response, considering the severity and stage of disease

## F. EFFICACY MEASUREMENTS (CONT.)

### Study Joint Examination

The investigator will examine the study joint for tenderness at all visits.   The investigator will use the following guidelines.

#### Joint Tenderness

Examination of study knee for tenderness (pain in response to passive motion or pressure) will be performed with the patient supine.   Pain on palpation or during passive range of motion will be graded according to the following scale:

0 = No pain
1 = Patient states there is pain
2 = Patient states there is pain and winces
3 = Patient states there is pain, winces, and withdraws

During the assessment of pain on passive motion, no concurrent pressure will be applied to the knee joint margin.   During pain on passive motion testing, the joint will be moved through the full available range in order to detect any end range pain.

Knee joint line pain in response to pressure is tested in the neutral position, palpation being conducted around the medial and lateral joint lines.

The maneuver that produces the greatest pain (passive motion or joint line pressure) will be used to determine the final knee tenderness score.

### MOS 36-Item Short-Form Health Survey (SF-36)

At Visits 2, 5 and the Discontinuation Visit (if the patient discontinues prematurely) patients will complete the (SF-36; Appendix 10).

### Completing Patient Questionnaires

Site personnel will read instructions for completing the questionnaire to each patient. Patients are allowed to hear the instructions as frequently as needed.   Study coordinators are not to assist patients in answering any questions.   Patients are to respond based on the instructions given, then record their responses on the appropriate section of the case report form.   Study coordinators are responsible for verifying that all questions are answered.

*Product:* MK-0966
Protocol/Amendment No.: 150-00

37

## F. EFFICACY MEASUREMENTS (CONT.)

### Completing Patient Take Home Forms

Patients will be instructed about how to complete the Take Home Forms. The study coordinator will be responsible for entering the patient's identification (initials, baseline number and/or allocation number) on the forms prior to providing them to the patient. When the forms are returned, the study coordinator will verify the accuracy of the information, measure the visual analog scales, and record the values on the forms (Appendix 11).

**No rescue therapy for osteoarthritis, including acetaminophen, is allowed during the blinded portion of the study.**

## G. SAFETY MEASUREMENTS

### 1. Evaluating and Recording Adverse Experiences

Adverse experiences may occur in the course of the use of a Merck product in clinical studies or within the follow-up period specified by the protocol, or prescribed in clinical practice, from overdose (whether accidental or intentional), from abuse, and from withdrawal.

Adverse experiences may also occur in screened patients during any preallocation baseline period as a result of a protocol-specified intervention including washout or discontinuation of usual therapy, diet, placebo treatment, or a procedure.

Such events will be recorded at each examination on the Adverse Experience Case Report Forms.

An adverse experience is defined as any unfavorable and unintended change in the structure, function, or chemistry of the body temporally associated with the use of the SPONSOR'S product, whether or not considered related to the use of the product. Any worsening (i.e., any clinically significant adverse change in frequency and/or intensity) of a preexisting condition which is temporally associated with the use of the SPONSOR'S product, is also an adverse experience.

Changes resulting from normal growth and development which do not vary significantly in frequency or severity from expected levels are not to be considered adverse experiences. Examples of this may include, but are not limited to, teething, typical crying in infants and children, and onset of menses or menopause occurring at a physiologically appropriate time.

The investigator will evaluate all adverse experiences as to:

MK-0966 Document2
U.S. (U.S. IND) APPROVED

22-Feb-2001

MRK-I8940066535

## G. SAFETY MEASUREMENTS (CONT.)

- Maximum intensity:

  — Mild (awareness of sign or symptom, but easily tolerated);

  — Moderate (discomfort enough to cause interference with usual activity);

  — Severe (incapacitating with inability to work or do usual activity).

- Seriousness:

  A serious adverse experience is any adverse experience occurring at any dose that:

  —†Results in death; or

  —†Is life threatening (places the patient, in the view of the investigator, at immediate risk of death from the experience as it occurred [Note: This does not include an adverse experience that, had it occurred in a more severe form, might have caused death.]); or

  —†Results in a persistent or significant disability/incapacity (substantial disruption of one's ability to conduct normal life functions); or

  —†Results in or prolongs an existing inpatient hospitalization (hospitalization is defined as an inpatient admission, regardless of length of stay, even if the hospitalization is a precautionary measure for continued observation) (Note: Hospitalization [including hospitalization for an elective procedure] for a preexisting condition which has not worsened does not constitute a serious adverse experience.); or

  —†Is a congenital anomaly/birth defect (in offspring of patient taking the product regardless of time to diagnosis); or

  — Is a cancer; or

  — Is the result of an overdose (whether accidental or intentional).

  **ALSO:**

  Other important medical events that may not result in death, not be life threatening, or not require hospitalization may be considered a serious adverse experience when, based upon appropriate medical judgment, the event may jeopardize the patient and may require medical or surgical intervention to prevent one of the outcomes listed previously (designated above by a †).

MRK-I8940066536

## G. SAFETY MEASUREMENTS (CONT.)

- Duration:

  Record the start and stop dates of the adverse experience. If less than 1 day, indicate the appropriate length of time and units.

- Action taken (Did the adverse experience cause the test drug to be discontinued?); and

- Relationship to test drug (Did the test drug cause the adverse experience?):

  The determination of the likelihood that the test drug caused the adverse experience will be provided by the investigator. The investigator's signed/dated initials on the source document or worksheet, that supports the causality noted on the AE form, ensures that a medically qualified assessment of causality was done. This initialed document must be retained for the required regulatory time frame. The criteria below are intended as reference guidelines to assist the investigator in assessing the likelihood of a relationship between the test drug and the adverse experience based upon the available information.

  The following components are to be used to assess this relationship; the greater the correlation with the components and their respective elements (in number and/or intensity), the more likely the test drug caused the adverse experience (AE):

  --- Exposure:
    Is there evidence that the patient was actually exposed to the test drug such as: reliable history, acceptable compliance assessment (pill count, diary, etc.), expected pharmacologic effect, or measurement of drug/metabolite in bodily specimen?

  --- Time Course:
    Did the AE follow in a reasonable temporal sequence from administration of the test drug?

    Is the time of onset of the AE compatible with a drug-induced effect?

  --- Likely Cause:
    Is the AE not reasonably explained by another etiology such as underlying disease, other drug(s), or other host or environmental factors?

  --- Dechallenge:
    Was the dose of test drug discontinued or reduced?
        If yes, did the AE resolve or improve?
            If yes, this is a positive dechallenge.

MRK-I8940066537

## G. SAFETY MEASUREMENTS (CONT.)

If no, this is a negative dechallenge.

(Note: This criterion is not applicable if: (1) the AE resulted in death or permanent disability; (2) the AE resolved/improved despite continuation of the test drug; or (3) the study is a single-dose drug study or a vaccine study.)

— Rechallenge:
Was the patient reexposed to the test drug in this study?
If yes, did the AE recur or worsen?
If yes, this is a positive rechallenge.
If no, this is a negative rechallenge.

(Note: This criterion is not applicable if: (1) the initial AE resulted in death or permanent disability, or (2) the study is a single-dose drug study or a single-dose vaccine study.)

NOTE: IF A RECHALLENGE IS PLANNED FOR AN ADVERSE EVENT WHICH WAS SERIOUS AND WHICH MAY HAVE BEEN CAUSED BY THE TEST DRUG, OR IF REEXPOSURE TO THE TEST DRUG POSES ADDITIONAL POTENTIAL SIGNIFICANT RISK TO THE PATIENT, THEN THE RECHALLENGE MUST BE APPROVED IN ADVANCE BY THE U.S. CLINICAL MONITOR AND THE INSTITUTIONAL REVIEW BOARD.

— Consistency With Test Study Drug Profile:
Is the clinical/pathological presentation of the AE consistent with previous knowledge regarding the test drug or drug class pharmacology or toxicology?

The assessment of relationship will be reported on the case report forms by the investigator according to his/her best clinical judgment, including consideration of the above elements. Use the following scale of criteria as guidance (not all criteria must be present to be indicative of a drug relationship).

— Definitely related to test drug:
There is evidence of exposure to the test drug.
The temporal sequence of the AE onset relative to administration of the test drug is reasonable.
The AE is more likely explained by the test drug than by another cause.
Dechallenge is positive.
Rechallenge (if feasible) is positive.

MRK-I8940066538

**Product: MK-0966**
**Protocol/Amendment No.: 150-00**

41

## G. SAFETY MEASUREMENTS (CONT.)

· The AE shows a pattern consistent with previous knowledge of the test
drug or test drug class.

— Probably related to test drug:
There is evidence of exposure to the test drug.
The temporal sequence of the AE onset relative to administration of the
·test drug is reasonable.
The AE is more likely explained by the test drug than by another cause.
. Dechallenge (if performed) is positive.

— Possibly related to test drug:
There is evidence of exposure to the test drug.
The temporal sequence of the AE onset relative to administration of the
test drug is reasonable.
The AE could have been due to another equally likely cause.
Dechallenge (if performed) is positive.

— Probably not related to test drug:
There is evidence of exposure to the test drug.
There is another more likely cause of the AE.
Dechallenge (if performed) is negative or ambiguous.
Rechallenge (if performed) is negative or ambiguous.

— Definitely not related to test drug:
The patient did not receive the test drug.

**OR**

Temporal sequence of the AE onset relative to administration of the test
drug is not reasonable.

**OR**

There is another obvious cause of the AE.

2.  **Immediate Reporting of Adverse Experiences to the SPONSOR**

a.  **Serious Adverse Experiences**

ANY SERIOUS ADVERSE EXPERIENCE, INCLUDING DEATH DUE TO
ANY CAUSE, WHICH OCCURS TO ANY PATIENT ENTERED INTO
TREATMENT IN THIS STUDY OR WITHIN 14 DAYS FOLLOWING
CESSATION OF TREATMENT, WHETHER OR NOT RELATED TO THE
INVESTIGATIONAL PRODUCT, MUST BE REPORTED WITHIN
24 HOURS TO ONE OF THE INDIVIDUAL(S) LISTED ON THE

**Product: MK-0966**
**Protocol/Amendment No.: 150-00**

42

## G. SAFETY MEASUREMENTS (CONT.)

SPONSOR CONTACT INFORMATION PAGE. ALL PATIENTS WITH SERIOUS ADVERSE EXPERIENCES MUST BE FOLLOWED UP FOR OUTCOME.

**b. Selected Nonserious Adverse Experiences**

Although not considered an adverse experience, it is the responsibility of investigators or their designees to report any pregnancy in a patient (spontaneously reported to them) which occurs during the study or within 14 days of completing the study. All patients who become pregnant must be followed to the completion/termination of the pregnancy. If the pregnancy continues to term, the outcome (health of infant) must also be reported to one of the individuals listed on the SPONSOR Contact Information page.

Special procedures are required for reporting and documenting certain types of gastrointestinal and vascular adverse events. These procedures are described in the following Standard Operating Procedures (SOPs):

- Standard Operating Procedure for the Surveillance, Monitoring, and Adjudication of Upper-GI Perforations, Ulcers, and Bleeds in Clinical Trials of COX-2 Specific Inhibitors

- Standard Operating Procedure for the Surveillance, Monitoring, and Adjudication of Acute Thrombotic/Embolic Vascular Events in Clinical Trials of COX-2 Specific Inhibitors

The clinical events covered by these SOPs include complicated or uncomplicated peptic ulcers, upper-GI obstructions, upper-GI perforations, and upper-GI (esophageal, gastric, or duodenal) hemorrhages; and serious acute thrombotic or embolic vascular (arterial or venous) events in any vascular bed. The SOPs for these events require some or all of the following, depending on the type of event:

- Completion of standard Non-serious or Serious Adverse Event Forms (if applicable to group doing study)

- Completion of special case report form worksheets

- Submitting copies of standard and special case report form worksheets to your local Clinical or Local Medical Monitor

- Submitting copies of source documents (including in some cases complete hospitalization records) to your local Clinical or Local Medical Monitor

- Submitting an investigator narrative summarizing the event

**Protocol/Amendment No.: 150-00**

## G. SAFETY MEASUREMENTS (CONT.)

An independent, blinded committee will use the above documentation to adjudicate the events according to prespecified criteria.

Specific instructions are given in Appendices 12 and 13.

### 3. Safety Measurements

#### Physical Examination, Vital Signs, and Body Weight

A complete physical examination including vital signs (heart rate, blood pressure, and respiration rate) will be performed during the Screening Visit, Visit 5 or if patient discontinues. (Note that breast, rectum, and urogenital exams are not required as part of the physical examination for this protocol). Blood pressure, pulse, and respirations will be obtained at all visits. Temperature and height will be obtained at Visit 1 (screening) only.

Blood pressure will be performed in the same arm and by the same study coordinator for each patient throughout the study. A large cuff should be used as needed.

Mean blood pressure readings are to be obtained by taking 3 consecutive blood pressure readings at least one minute apart. Individual blood pressure readings must be within ± 5 mmHg of the mean of the three readings. If not, consecutive readings must be taken until this criteria is met.

Patients will be weighed in street clothing with jacket/coat and shoes removed at the Screening Visit, Visit 5, and the Discontinuation Visit (if the patient discontinues prematurely).

#### Laboratory Safety Studies--Serum Chemistry, CBC, Urinalysis

A CBC, serum chemistry panel, and urinalysis (see Appendix 6) will be obtained at Visit 1.

#### Urine Beta-Human Chorionic Gonadotropin (β-hCG)

For female patients of childbearing potential, a urine β-hCG level must be consistent with a non-gravid state at Visits 1 and 2. A urine β-hCG should be repeated anytime pregnancy is suspected. Please refer to section G.2.b for complete instructions.

## H. STUDY DURATION AND SUBMISSION OF DATA

The study will take approximately 8 weeks for an individual patient to complete. The study will be carried out over a 9-month period with a planned enrollment period of about 7 months.

## I. DATA ANALYSIS

### 1. Responsibility for Analyses/In-House Blinding

The statistical analysis of the data obtained from this study will be the responsibility of the biostatistics group in Clinical Development, USHH, Merck & Co., Inc. This study will be conducted using in-house blinding procedures.

### 2. Hypotheses and Objectives

#### a. Primary Hypothesis

Rofecoxib 25 mg qd will be superior to Celecoxib 200 qd mg in terms of the percent of patients with a good or excellent response to therapy as assessed by Patient Global Assessment of Response to Therapy after six weeks of treatment.

#### b. Secondary Hypothesis

Rofecoxib 25 mg qd will be superior to acetaminophen 1000 mg qid in terms of patients with good to excellent response to therapy as assessed by Patient Global Assessment of Response to Therapy after six weeks of treatment.

#### c. Secondary Objective

To investigate the overall safety and tolerability of rofecoxib 12.5 mg qd, rofecoxib 25 mg qd, celecoxib 200 mg qd, and acetaminophen 1000 mg q.i.d. during a six week treatment period.

#### d. Exploratory Objectives

1. To compare the efficacy of rofecoxib 25 mg qd to celecoxib 200 mg qd as measured by the WOMAC Pain Subscale score over 6 weeks of treatment.

2. To compare onset of efficacy of rofecoxib 25 mg qd and celecoxib 200 mg qd as measured by the time to first good or excellent response to therapy (PGART) during the first six days of therapy.

3. To compare the efficacy of rofecoxib 25 mg qd to acetaminophen 1000 mg qid as measured by the WOMAC Pain Subscale score over 6 weeks of treatment.

## I. DATA ANALYSIS (CONT.)

4.  To compare onset of efficacy of rofecoxib 25 mg·qd and acetaminophen 1000 mg qid as measured by the time to first good or excellent response to therapy (PGART) during the first six days of therapy.

5.  To compare onset of efficacy (Days 1-6) of rofecoxib 12.5 mg qd, rofecoxib 25 mg qd, and celecoxib 200 mg qd in terms of pain on walking (WOMAC Question 1,) pain at night (WOMAC Question 3), pain at rest (WOMAC Question 4), and morning stiffness (WOMAC Question 6).

6.  To compare efficacy of rofecoxib 12.5 mg qd and acetaminophen 1000 mg qid as measured by the Patient Global Assessment of Response to Therapy (PGART) over 6 weeks of treatment.

### 3.  Variables/Time Points of Interest

#### a.  Efficacy Variables

1)  Patient Global Assessment of Response to therapy (PGART) is measured on a 5-point Likert scale--0 (None), 1 (Poor), 2 (Fair), 3 (Good), 4 (Excellent).  Analysis of this variable will be based upon the number of patients with a Good or Excellent response.

- Primary Endpoint: Comparison between the rofecoxib 25 mg group and the celecoxib 200 mg group in terms of the percent of patients with a Good or Excellent response at Week 6.

- Secondary Endpoint: Comparison between the rofecoxib 25 mg group and the acetaminophen 4000 mg group in terms of the percent of patients with a Good or Excellent response at Week 6.

- Exploratory Endpoint: Comparison between the rofecoxib 25 mg group and the celecoxib 200 mg group in terms of the time to the first Good or Excellent response during the first six days of treatment.

- Exploratory Endpoint: Comparison between the rofecoxib 25 mg group and the acetaminophen 4000 mg group in terms of the time to the first Good or Excellent response during the first six days of treatment.

- Exploratory Endpoint: Comparison between the rofecoxib 12.5 mg group and the acetaminophen 4000 mg group in terms of the percent of patients with a Good or Excellent response at Week 6.

**Product: MK-0966**
**Protocol/Amendment No.: 150-00**

46

## I. DATA ANALYSIS (CONT.)

2) <u>Pain Subscale (WOMAC)</u> is composed of the first 5 questions of the WOMAC and measured on a visual analog scale (VAS). The scale ranges from 0 to 100 mm, where 0 represents No Pain and 100 Extreme Pain.

Analysis of this variable will be based upon the average change (over Weeks 2, 4, and 6) from the Flare Visit.

- Exploratory Endpoint: Comparison between the rofecoxib 25 mg group and the celecoxib 200 mg group in terms of the average change.

- Exploratory Endpoint: Comparison between the rofecoxib 25 mg group and the acetaminophen 4000 mg group in terms of the average change.

3) <u>Pain on Walking</u> is question 1 of the WOMAC. Analysis of this variable will be based upon the average change (over Days 1-6) from the Flare Visit.

- Exploratory Endpoint: Comparison among the rofecoxib 12.5 mg, 25 mg, and celecoxib 200 mg groups in terms of the average change.

4) <u>Pain at Night</u> is question 3 of the WOMAC. Analysis of this variable will be based upon the average change (over Days 1-6) from the Flare Visit.

- Exploratory Endpoint: Comparison among the rofecoxib 12.5 mg, 25 mg, and celecoxib 200 mg groups in terms of the average change.

5) <u>Pain at Rest</u> is question 4 of the WOMAC. Analysis of this variable will be based upon the average change (over Days 1-6) from the Flare Visit.

- Exploratory Endpoint: Comparison among the rofecoxib 12.5 mg, 25 mg, and celecoxib 200 mg groups in terms of the average change.

6) <u>Morning Stiffness</u> is question 6 of the WOMAC. Analysis of this variable will be based upon the average change (over Days 1-6) from the Flare Visit.

- Exploratory Endpoint: Comparison among the rofecoxib 12.5 mg, 25 mg , and celecoxib 200 mg groups in terms of the average change.

### b. <u>Safety Variables</u>

The incidence of any serious adverse experiences (AEs), drug related AEs, AEs which cause discontinuation, edema-related events which cause discontinuation, hypertension-related events which cause discontinuation,

MRK-I8940066544

## I.  DATA ANALYSIS (CONT.)

CHF, and GI AEs will be of primary interest in the evaluation of tolerability and safety.  These endpoints will be more specifically defined within the data analysis plan for this study.

### c.  Compliance

Compliance with study medication will be calculated for each randomized patient who takes at least one dose of study medication.  Compliance will be based upon the data collected on the RX (Prime therapy) case report form.

### 4.  Approaches to Analyses

An All-Patients-Treated approach will be employed for all efficacy and safety data.  The details of this approach will be specified in the data analysis plan for this study.  If there are sufficient number of protocol violators to warrant a per-protocol analysis will be performed on the primary and secondary endpoints.

### 5.  Statistical Methods

#### a.  Efficacy Analysis

A logistic regression model with factors for treatment group, previous OA treatment strata {Acetaminophen, NSAID}, and baseline Investigator Global Assessment of Disease Status (IGADS) will be used to compare treatment groups in terms of the number of patients with a Good or Excellent response to PGART at Week 6.  The Wilcoxon rank test for survival data will be used to compare treatment groups in terms of the time to the first Good or Excellent response during the first week of treatment.  An ANOVA model with factors for treatment group, previous OA treatment strata, and baseline covariate will be used to estimate treatment group mean changes, and test the significance of the difference in treatment means for the Pain Subscale (WOMAC) pain on walking, pain at night, pain at rest, and morning stiffness.

#### b.  Safety Analysis

Fisher's exact test will be used to compare the treatment groups in terms of the incidence of the prespecified events stated within the Safety Variables section.  All other safety data will be summarized by descriptive statistics only.

### 6.  Multiplicity

No multiplicity adjustment is needed since there is a single primary hypothesis which involves a single treatment comparison of a single variable and time point.

## I. DATA ANALYSIS (CONT.)

### 7. Sample Size and Power

With 520 patients per arm there is 90% power to detect a difference between the percent of patients with a Good or Excellent response to therapy (PGART) for rofecoxib 25 mg and celecoxib 200 mg, assuming the true difference is at least 10 percentage points (50% vs. 60%). This calculation assumes a 2-sided test and an $\alpha$-level of 0.05. An observed difference of as small as 6 percentage points in this trial would be statistically significant. Estimates of the percent of patients with a Good or Excellent response come from previous Merck trials (Protocols 106, 112, and 116).

### 8. Subgroup Analyses

The key efficacy variables will be summarized by patient type (NSAID use patient, acetaminophen use patient).

### 9. Interim Analyses

There are no plans to perform interim analyses of the data from this study.

### 10. Data Analysis Plan

For the purpose of the final analysis, the official clinical database will not be unblinded until medical/scientific review has been completed, protocol violators have been identified, and data have been declared clean. If after the study has begun amendments are made to the statistical analysis specified in this section, then these amendments to the plan will be listed, along with an explanation as to why they occurred, in the Data Analysis Plan. The Data Analysis Plan will also specify, in further detail, the analysis methodology of secondary safety and efficacy endpoints, subgroup analyses, and data rules, and will be prepared and placed on file at Merck prior to unblinding the study.

MRK-I8940066546

## II.   ADMINISTRATIVE AND REGULATORY SECTIONS

## A. <u>LABELING,   PACKAGING,   STORAGE,   AND   RETURN   OF CLINICAL SUPPLIES</u>

Investigational clinical supplies must be received by a designated person at the study site, handled and stored safely and properly, and kept in a secured location to which only the investigator and designated assistants have access.  Clinical supplies are to be dispensed only in accordance with the protocol.  The investigator is responsible for keeping accurate records of the clinical supplies received from the SPONSOR, the amount dispensed to and returned by the patients, and the amount remaining at the conclusion of the study.  In accordance with Good Pharmacy Practices, gloves should always be worn by study personnel if directly handling tablets or capsules that are returned (i.e., when counting returns).  The Clinical Monitor should be contacted with any questions concerning investigational products where special or protective handling is indicated.  At the end of the study, all clinical supplies including partial and empty containers must be returned as indicated on the Contact Information page(s).  U.S. sites should follow instructions for the Clinical Supplies Return Form (R464) and contact your SPONSOR representative for review of shipment and form before shipping.  Sites outside of the United States should check with local country Merck personnel for appropriate documentation that needs to be completed for drug accountability.

Note: The investigator or designated assistant should not open individual clinical supply containers and count tablets/capsules, etc., before dispensing to the patients.  Any deviation from this must be discussed with the Clinical Monitor.

The study medication will be dispensed in bottles at Visits 2, 3 and 4.  Each bottle will contain a 17-day supply of study medication.  Each days dosage will consist of 10 tablets and 1 capsule to be taken in the following manner: patients will take 1 tablet from Bottle A, 1 tablet from Bottle B, 1 capsule from Bottle C and 2 tablets from Bottle D in the morning and then 2 tablets from Bottle D every 4-6 hours, for a total of 8 tablets in a 24-hour period from Bottle D.

MRK-I8940066547

## A. LABELING, PACKAGING, STORAGE, AND RETURN OF CLINICAL SUPPLIES (CONT.)

The label for Bottle A will appear as follows:

| Patient Number | | Packaging ID # |
|---|---|---|
| 17 Tablets | | Visit  (#) |
| | Bottle A | |
| Take 1 tablet in the morning | | |

The label for Bottle B will appear as follows:

| Patient Number | | Packaging ID # |
|---|---|---|
| 17 Tablets | | Visit  (#) |
| | Bottle B | |
| Take 1 tablet in the morning | | |

The label for Bottle C will appear as follows:

| Patient Number | | Packaging ID # |
|---|---|---|
| 17 Capsules | | Visit  (#) |
| | Bottle C | |
| Take 1 capsule in the morning | | |

The label for Bottle D will appear as follows:

| Patient Number | | Packaging ID # |
|---|---|---|
| 136 Tablets | | Visit  (#) |
| | Bottle D | |
| Take 2 tablets every 4-6 hours for a total of 8 tablets/day. | | |

Each patient will receive 3 kits (1 kit box at Visit 2, Visit 3, and Visit 4);  each box containing one Bottle A, one Bottle B, one Bottle C and one Bottle D.  Each kit box will be labeled with protocol #, allocation number, packaging ID No., Visit Nos. Bottle A, Bottle B, Bottle C and Bottle D.  The treatment groups will be as follows:

MRK-I8940066548

Product: MK-0966
Protocol/Amendment No.: 150-00

51

## A. LABELING, PACKAGING, STORAGE, AND RETURN OF CLINICAL SUPPLIES (CONT.)

| Group | Bottle A | Bottle B | Bottle C | Bottle D |
|-------|----------|----------|----------|----------|
| Rofecoxib 12.5 mg | Rofecoxib 12.5 mg tablets | Placebo matching rofecoxib 25 mg tablets | Placebo matching celecoxib 200 mg capsule | Placebo matching acetaminophen 500 mg tablets |
| Rofecoxib 25 mg | Placebo matching rofecoxib 12.5 mg tablets | Rofecoxib 25 mg tablets | Placebo matching celecoxib 200 mg capsule | Placebo matching acetaminophen 500 mg tablets |
| Celecoxib | Placebo matching rofecoxib 12.5 mg tablets | Placebo matching rofecoxib 25 mg tablets | Celecoxib 200 mg capsule | Placebo matching acetaminophen 500 mg tablets |
| Acetaminophen | Placebo matching rofecoxib 12.5 mg tablets | Placebo matching rofecoxib 25 mg tablets | Placebo matching celecoxib 200 mg capsule | Acetaminophen 500 mg tablets |

Standard one-panel labels will be affixed to each bottle. In addition a separate sealed envelope containing study drug identification will be supplied to the investigator for their patients. Envelopes must be stored in a secured and centralized area. The cover sheet of the envelope contains the packaging identification number and the patient allocation number. The middle sheet contains the same information plus drug identification. The back sheet is shaded to prevent the contents from being revealed. Drug identification information is to be unmasked ONLY if necessary for the welfare of the patient. Prior to the unblinding, the investigator will attempt to contact the clinical monitor. All unblinding must be properly documented on the unblinding log sheets. The envelopes must be retrieved from the investigator and reviewed by the Clinical Monitor for any unblinding that may have occurred. Envelopes must be returned to the Sponsor at the completion of the study.

The Tylenol® (acetaminophen) bottles will be supplied as open-label product. The single panel label on the bottle will appear as similar as follows:

| Patient Number | | Packaging ID |
|----------------|--|--------------|
| 24 tablets | Acetaminophen 325 mg | Visit __ |
| Take no more than 8 tablets in 24 hours | | |

The patient number and visit number will be entered on the label when dispensed per protocol. All patients who will be washing out of NSAID will receive 1-2 bottles of 24 X 325 mg tablets at Visits 1.0.

## B. BIOLOGICAL SPECIMENS

All biological specimens will be processed by a central laboratory according to its instructions. Laboratory supplies and instructions for the labeling, packaging and shipment of biological specimens will be provided by the central laboratory.

The Central laboratory will provide each investigational site with specimen collection materials in pre-identified visit-specific kits. Each kit will be appropriately labeled identifying the sponsor, protocol number, investigator (name and/or number), and study visit. Instructions will be provided and followed to ensure that each specimen is appropriately associated with the correct patient. Specimens and requisition forms will be completed including patient study identification numbers and patient initials, date of birth, sex, and date and time of specimen collection as applicable. The laboratory that is analyzing any clinical samples should be blinded to the patient's treatment.

It is the responsibility of the primary investigator to ensure that all staff personnel who will be handling, packaging, and/or shipping clinical specimens act in conformance with International Air Transport Association (IATA) regulations relating to the handling and shipping of hazardous goods.

## C. CLINICAL AND LABORATORY DATA COLLECTION

### 1. Worksheets and Case Report Forms

Workbooklets/worksheets similar to the case report forms may be provided by the SPONSOR to record data in the clinic. Data on workbooklets/worksheets, are to be transferred to case report forms which may be handwritten or computer generated. All handwritten worksheets or case report forms must be completed legibly in ink (preferably black), pressing firmly with ballpoint pen to ensure clear, legible copies.

Two-part NCR case report forms will be provided to record the data in the clinic. In studies using CRFs as source documents, original data will be handwritten directly on these forms. If original data is recorded directly on the case report form, a certified (certification verifies the authenticity and quality of CRFs copied) photocopy will be retained at the study site. If thought necessary by the study site, data initially can be recorded on progress notes and transcribed to the case report forms. It is important to remember that all handwritten data must be legible and complete.

Periodically, a representative of the SPONSOR will review study documents (see Protocol Section II.D., Study Documentation and Records Retention) to verify

MRK-I8940066550

## C. CLINICAL AND LABORATORY DATA COLLECTION (CONT.)

compliance with the protocol and accuracy of the data. The actual date of an examination (e.g., X ray, phlebotomy) should be reported on the workbooks and case report forms; this may be different from that of the office or clinic visit. Whenever possible, all information requested on a workbook should be completed. If information is not available, it should be documented as such. All corrections or changes made to any study data (e.g., source documents, workbooks, case report forms) must be appropriately initialed and dated, as per good research practice standards.

Case report forms must be reviewed and a Signature page signed by an investigator who signed the protocol.

A Signature Form is to be signed and dated by the investigator and included with each batch of case report forms. The original signed case report forms are returned to the SPONSOR by a representative of the SPONSOR, and a complete set is given to the investigator. As a result of the SPONSOR data review process, corrections or changes to case report forms may be required. Any such changes must be signed and dated by the investigator

### 2. Laboratory Results

Laboratory specimens will be processed by a central laboratory. Results will be transferred via hard copy to the Investigator and hard copy reports will be retained in the patients study record. The Investigator will review each clinical laboratory report to determine patient eligibility at entry and to review and respond to clinically significant findings. The Investigator will receive telephone alerts as appropriate based on laboratory findings. Laboratory specifications will be provided by the central laboratory.

## D. STUDY DOCUMENTATION AND RECORDS RETENTION

Study documentation includes all case report forms, data correction forms, workbooks, source documents, monitoring logs and appointment schedules, SPONSOR-investigator correspondence and regulatory documents (e.g., signed protocol and amendments, Independent Ethics or Institutional Review Committee correspondence and approval, approved and signed patient consent forms, Statement of Investigator form, clinical supplies receipts, and distribution records).

Source documents include all recordings of observations or notations of clinical activities and all reports and records necessary for the evaluation and reconstruction of the clinical research study. Accordingly, source documents include, but are not

MRK-I8940066551

## D. STUDY DOCUMENTATION AND RECORDS RETENTION (CONT.)

limited to, laboratory reports, ECG tracings, x-rays, radiologist reports, patient diaries, biopsy reports, ultrasound photographs, patient progress notes, hospital charts or pharmacy records and any other similar reports or records of any procedure performed in accordance with the protocol.

Source documents may also include SPONSOR workbooks, CRFs, or electronic devices when information is recorded directly onto such forms or devices. The investigator should identify to the SPONSOR which data will be directly recorded onto workbooks, CRFs, or electronic devices. A form will be supplied by the SPONSOR for this identification. This source document identification form should be maintained in the site's Regulatory Binder. Any document which serves as a source document (e.g., workbooklet, handwritten CRF, hospital chart, diary, questionnaire) should be signed or initialed and dated by the individual making the observation/recording. Counter signatures or initials may be appropriate in certain cases where medical assessments/observations are made by one individual but dictated to a third party for recording.

In the event that the workbook or CRF is used as a source document, the workbook/CRF must be signed and dated by the individual making the entry. The signature and date are also required if the entry is made by an individual not identified as a primary investigator or secondary/subinvestigator in the protocol (e.g., ophthalmologist) or not under the direct supervision of the primary investigator.

Patient questionnaires and Patient Global Assessments are to be completed by the patient only. At all visits the questionnaires will be reviewed by the study coordinator in the presence of the patient to check for completeness.Whenever possible, the original recording of an observation should be retained as the source document; however, a photocopy is acceptable provided that it is a clear, legible, and exact duplication of the original document.

Government agency regulations and directives require that all study documentation pertaining to the conduct of a clinical trial must be retained by the investigator. They shall be retained until at least 2 years after the last approval of a marketing application in an International Conference on Harmonisation (ICH) region. The SPONSOR will notify the investigator in writing when retention is no longer necessary.

## E. INFORMED CONSENT

The investigator must obtain documented consent from each potential patient in biomedical research or when an investigational drug is administered to patients in a clinical study. If a Patient Package Insert (PPI) exists for any product being used in the study within the indication and dosage of the prescribing information, the consent

MRK-I8940066552

## E. INFORMED CONSENT (CONT.)

form will reference the PPI and the investigator shall provide a copy of it to the patient for his/her review before the patient signs the Informed Consent Form. If the study is outside of the indication or dosage, the consent form shall include all relevant information from the PPI but the patient will not be given a copy of the PPI.

Consent must be documented by the patient's dated signature on a Consent Form along with the dated signature of the person conducting the consent discussion. If local law does not allow written consent, then oral consent, attested to by the dated signature of an impartial witness (someone not involved with the conduct of the study), is the required alternative.

If the patient is illiterate, an impartial witness should be present during the entire informed consent reading and discussion. Afterward, the patient should sign and date the informed consent, if capable. The impartial witness should also sign and date the informed consent along with the individual who read and discussed the informed consent (i.e., study staff personnel).

If the patient is legally incompetent (i.e., a minor or mentally incapacitated), the written consent of a parent, legal guardian or legal representative must be obtained. Depending on local law or review committee requirements such consent may also need to be signed by an impartial witness.

The information from the consent form should be translated and communicated to the subject in language understandable to the subject. When the study subject population includes non-English speaking people, an accurately translated consent form should be provided with a written statement by the translator (whether the translator is the investigator, the Clinical Monitor, or a professional translator), indicating that the consent form is an accurate translation of the accompanying English version.

A copy of the signed and dated consent form (along with the PPI if appropriate) should be given to the patient before participation in the trial.

The initial informed consent form and any subsequent revised written informed consent form, and written information must receive the IRB/IEC's approval/favorable opinion in advance of use. The patient or his/her legally acceptable representative should be informed in a timely manner if new information becomes available that may be relevant to the patient's willingness to continue participation in the trial. The communication of this information should be documented.

A copy of the FDA Regulations Regarding Informed Consent and a sample consent form are attached to this protocol.

MRK-I8940066553

## F. INSTITUTIONAL REVIEW BOARD (IRB)/INDEPENDENT ETHICS COMMITTEE (IEC)

The investigator is responsible for obtaining Review Board approval of the protocol, as well as approval of all subsequent major changes, in compliance with local law. Copies of these approvals must be forwarded to the SPONSOR. The IRB will comply with all federal, state, and local laws. Particular attention is drawn to the Food and Drug Administration Regulations for Institutional Review Boards (21 CFR, Part 56), and the International Conference on Harmonisation (ICH) Guidelines for Good Clinical Practices for IRB/IEC Committees. Copies of relevant information derived from these guidelines are attached to this protocol. The investigator is responsible for obtaining initial and continuing review (at intervals not less than once per year) of the study by an IRB. Written approval from the IRB must be forwarded to the SPONSOR before clinical supplies will be shipped. For continuing studies, written approval from the IRB must be sent to the SPONSOR at intervals not to exceed 1 year.

The investigator shall also obtain from the IRB and submit to the SPONSOR, a signed statement indicating that it complies with Good Clinical Practices. A sample IRB Compliance letter is attached to this protocol.

The SPONSOR will promptly be advised of any regulatory inspection (relating to this study), of either the institution or the IRB. The investigator will promptly provide the SPONSOR with a copy of any inspection report.

## G. CONFIDENTIALITY

### 1. Confidentiality of Data

Particular attention is drawn to the regulations promulgated by the Food and Drug Administration under the Freedom of Information Act providing, in part, that information furnished to clinical investigators and Institutional Review Boards will be kept confidential by the Food and Drug Administration only if maintained in confidence by the clinical investigator and Institutional Review Board.

By signing this protocol, the investigator affirms to the SPONSOR that information furnished to the investigator by the SPONSOR will be maintained in confidence and such information will be divulged to the Institutional Review Board, Ethical Review Committee, or similar or expert committee; affiliated institution; and employees only under an appropriate understanding of confidentiality with such board or committee, affiliated institution and employees. Data generated by this study will be considered confidential by the investigator,

MRK-I8940066554

### G. CONFIDENTIALITY (CONT.)

except to the extent that it is included in a publication as provided in Section II.K., Publications.

#### 2. Confidentiality of Patient Records

By signing this protocol, the investigator agrees that the SPONSOR (or SPONSOR representative), Institutional Review Board/Independent Ethics Committee (IRB/IEC) or Regulatory Agency representatives may consult and/or copy study documents (see Protocol Section II.D., Study Documentation and Records Retention) in order to verify case report form data. By signing the consent form, the patient agrees to this process. If study documents will be photocopied during the process of verifying case report form information, the patient will be identified by unique code only; full names/initials will be masked.

#### 3. Confidentiality of Investigator Information

By signing this protocol, the investigator recognizes that certain personal identifying information (e.g., name, hospital or clinic address, curriculum vitae) may be made part of a regulatory submission and may be transmitted (either in hard copy or electronically) to all Merck subsidiaries/agents worldwide for internal study management purposes or as required by individual regulatory agencies. Additionally, the investigator's name, hospital/clinic address/phone number may be included when reporting certain serious adverse events to regulatory agencies or to other investigators.

## H. COMPLIANCE WITH LAW, AUDIT, AND DEBARMENT

By signing this protocol, the investigator agrees to conduct the study in an efficient and diligent manner and in conformance with this protocol; generally accepted standards of Good Clinical Practice; and all applicable federal, state, and local laws, rules and regulations relating to the conduct of the clinical study.

The Code of Conduct, a collection of goals and considerations that govern the ethical and scientific conduct of clinical investigations sponsored by Merck & Co., Inc., is attached.

The investigator also agrees to allow monitoring, audits, Institutional Review Board/Independent Ethics Committee review and regulatory agency inspection of trial-related documents and procedures and provide for direct access to all study-related source data and documents.

The investigator agrees not to seek reimbursement from patients, their insurance providers, or from government programs for procedures included as part of the study reimbursed to the investigator by the SPONSOR.

MRK-I8940066555

## H. COMPLIANCE WITH LAW, AUDIT, AND DEBARMENT (CONT.)

The investigator shall prepare and maintain complete and accurate study documentation in compliance with Good Clinical Practice standards and applicable federal, state, and local laws, rules and regulations; and, for each patient participating in the study, provide all data, and upon completion or termination of the clinical study submit any other reports to the SPONSOR as required by this protocol or as otherwise required pursuant to any agreement with the SPONSOR.

Study documentation (see Protocol Section II.D., Study Documentation and Records Retention) will be promptly and fully disclosed to the SPONSOR by the investigator upon request and also shall be made available at the investigator's site upon request for inspection, copying, review and audit at reasonable times by representatives of the SPONSOR or any regulatory agencies. The investigator agrees to promptly take any reasonable steps that are requested by the SPONSOR as a result of an audit to cure deficiencies in the study documentation and case report forms.

Persons debarred from conducting or working on clinical studies by any court or regulatory agency will not be allowed to conduct or work on this SPONSOR's studies. The investigator will immediately disclose in writing to the SPONSOR if any person who is involved in conducting the study is debarred, or if any proceeding for debarment is pending or, to the best of the investigator's knowledge, threatened.

In the event the SPONSOR prematurely terminates a particular trial site, the SPONSOR will promptly notify that site's IRB/IEC.

## I. COMPLIANCE WITH FINANCIAL DISCLOSURE REQUIREMENTS

By signing this protocol, the investigator agrees to provide to the SPONSOR accurate financial information to allow the SPONSOR to submit complete and accurate certification and disclosure statements as required by U.S. Food and Drug Administration regulations (21 CFR Part 54). This requirement also extends to subinvestigators.

## J. QUALITY CONTROL AND QUALITY ASSURANCE

By signing this protocol, the SPONSOR agrees to be responsible for implementing and maintaining quality control and quality assurance systems with written SOPs to ensure that trials are conducted and data are generated, documented, and reported in compliance with the protocol, accepted standards of Good Clinical Practice, and all applicable federal, state, and local laws, rules and regulations relating to the conduct of the clinical study.

MRK-I8940066556

**Product: MK-0966**
**Protocol/Amendment No.: 150-00**                                           59

## K. PUBLICATIONS

As this study is part of a multicenter trial, publications derived from this study should include input from the principal investigator, his/her colleagues, the other investigators in this trial, and SPONSOR personnel. Such input should be reflected in publication authorship, and whenever possible, preliminary agreement regarding the strategy for order of authors' names should be established before conducting the study. Subsequent to the multicenter publication, or 24 months after completion of the study, whichever comes first, an investigator and/or his/her colleagues may publish the results for their study site independently.

The SPONSOR must have the opportunity to review all proposed abstracts, manuscripts, or presentations regarding this study 60 days prior to submission for publication/presentation. Any information identified by the SPONSOR as confidential must be deleted prior to submission, it being understood that the results of this study are not to be considered confidential.

MRK-I8940066557

## III. SIGNATURES

## A. SPONSOR'S REPRESENTATIVE

| TYPED NAME | SIGNATURE | DATE |
|---|---|---|
| Gregory P. Geba, M.D. | | 2/22/01 |

## B. INVESTIGATOR(S)

I agree to conduct this clinical study in accordance with the design and specific provisions of this protocol; deviations from the protocol are acceptable only with a mutually agreed upon protocol amendment. I also agree to report all information or data in accordance with the protocol and, in particular, I agree to report any serious adverse experiences as defined in Section I.G. of this protocol. I also agree to handle all clinical supplies provided by the SPONSOR and collect and handle all clinical specimens in accordance with the protocol.

| TYPED NAME(S) | SIGNATURE | DATE |
|---|---|---|
| Primary Investigator(s) | | |
| Secondary/Subinvestigator(s) | | |
| Secondary/Subinvestigator(s) | | |
| Secondary/Subinvestigator(s) | | |
| Secondary/Subinvestigator(s) | | |

## LIST OF REFERENCES

1.  Felson DT.  The course of osteoarthritis and factors that affect it.  Rheumatic Disease Clinics of North America 1993;19:607-15.

2.  Lee SH, Soyoola E, Chanmugam P, Hart S, Sun W, Zhong H, Liou S, Simmons D, Hwanag D.   Selective expression of mitogen-inducible cyclooxygenase in macrophages stimulated with lipopolysaccharide. J Biol Chem 1992;267:25934-8.

3.  Lyons-Giordano BL, Pratta MA, Galbraith W, Davis GL, Arner EC.  Interleukin-1 Differentially modulates chondrocyte expression of cyclooxygenase-2 and phospholipase A2. Exp Cell Res 1993;206:58-62.

4.  Yamagata K, Andreasson KI, Kaufman WE, Barnes CA, Worley PF.  Expression of a mitogen-inducible cyclooxygenase in brain neurons: regulation by synaptic activity and glucocorticoids. Neuron 1993;11:371-86.

5.  Pritchard KA, O'Banion MK, Miano JM, Vlasic N, Bhatia UG, Young DA, Stemerman, MB.  Induction of cyclooxygenase-2 in rat vascular smooth muscle cells in vitro and in vivo. J Biol Chem 1994;269:8504-9.

6.  Crofford LJ, Wilder RL, Ristimaki AP, Sano H, Remmers EF, Epps HR, Hla T. Cyclooxygenase-1 and -2 expression in rheumatoid synovial tissues.  J Clin Invest 1994;93:1095-101.

7.  Masferrer JL, Zweifel BS, Manning PT, Hauser SD, Leahy KM, Smith WG, Isakson PC, Seibert K.  Selective inhibition of inducible cyclooxygenase 2 in vivo is anti-inflammatory and nonulcerogenic. Proc Natl Acad Sci U.S.A. 1994;91:3228-32.

8.  Meade EA, Smith WL, DeWitt DL.   Differential inhibition of prostaglandin endoperoxide synthase (cyclooxygenase) isozymes by aspirin and other nonsteroidal anti-inflammatory drugs. J Biol Chem 1993;268:6610-4.

9.  Mitchel JA, Akarasereenont P, Thiemermann C, Flower RJ, Vane JR.  Selectivity of nonsteroidal anti-inflammatory drugs as inhibitors of constitutive and inducible cyclooxygenase. Proc Natl Acad Sci U.S.A. 1994;90:11693-7..

10. Geba GP, Weaver AL, Polis AB, Dixon ME, Schnitzer TJ.   The Efficacy of Rofecoxib compared to Celecoxib and Acetaminophen in Osteoarthritis of the Knee: The VIOXX- Acetaminophen- Celecoxib Trial (VACT).  Manuscript submitted to JAMA, 2001: publication pending: data on file.

11. Batchlor EE and Paulus HE.  Principles of Drug Therapy. 495-492.

MRK-I8940066559

12. Williams HJ, Ward JR, Egger MJ, Neuner R, Brooks RH, Clegg DO et al. Comparison of Naproxen and Acetaminophen in a Two-Year Study of Treatment of Osteoarthritis of the Knee. Arthritis & Rheumatism 1993, 36: 1196-1206

13. Bradley JD, Brandt KD, Katz BP, Kalasinski LA, Ryan SI.   Comparison of an Antiinflammatory Dose of Ibuprofen and Acetaminophen in the Treatment of Patients with Osteoarthritis of the Knee.  N Engl J Med 1991, 325: 87-91.

14. Malmstrom K, Kotey P, Friedman AF, Seidenberg BC. Rofecoxib and Celecoxib- A comparison of two specific Cox-2 inhibitors: A randomized, placebo- and active comparator controlled clinical trial. Abstract submitted to American College of Rheumatology, 1999: publication pending: data on file.

15. Williams GW, Ettlinger R, Ruderman EM, Hubbard RC, Lonien ME, Yu SS, Zhao W, and Geis S.  Treatment of Osteoarthritis with a Once-Daily Dosing Regimen of Celecoxib: A Randomized, Controlled Trial. J Clin Rheumatol 2000; 6: 65-74.

MRK-I8940066560

**ATTACHMENTS**

MRK-I8940066561

Merck & Co., Inc
**Code of Conduct for Clinical Trials**

## I. Introduction

### A. *Purpose*

Merck & Co., Inc. ("Merck") conducts clinical trials worldwide to evaluate the safety and effectiveness of our products. As such, we are committed to designing, implementing, conducting, analyzing and reporting these studies in compliance with the highest ethical and scientific standards. Protection of patient safety is the overriding concern in the design of clinical trials. In all cases, Merck clinical studies will be consistent with standards established by the Declaration of Helsinki and in compliance with all local and/or national regulations and directives.

### B. Scope

Such standards shall be endorsed for all clinical interventional investigations sponsored by Merck irrespective of the party (parties) employed for their execution (e.g., contract research organizations, collaborative research efforts). This Code is not intended to apply to studies which are observational in nature, or which are retrospective. Further, this Code does not apply to investigator-initiated studies (e.g., Medical School Grant Program), which are not under the control of Merck.

## II. Scientific Issues

### A. Study Conduct

#### 1. Study Design

Except for pilot or estimation studies, clinical trial protocols will be hypothesis-driven to assess safety, efficacy and/or pharmacokinetic or pharmacodynamic indices of Merck or comparator products. Alternatively, Merck may conduct outcomes research trials, studies to assess or validate various endpoint measures, or studies to determine patient preferences, etc.

The design and conduct of a study (i.e., patient population, duration, statistical power) must be adequate to address the specific purpose of the study. Research subjects must meet protocol entry criteria to be enrolled in the study, unless specifically exempted by the Merck study monitor.

#### 2. Site Selection

Merck selects investigative sites based on medical expertise, access to appropriate patients, adequacy of facilities and staff, previous performance in Merck studies, as well as budgetary considerations. Prior to study initiation, sites are evaluated by Merck personnel to assess the ability to successfully conduct the trial.

#### 3. Site Monitoring/Scientific Integrity

Study sites are monitored to assess compliance with the study protocol and general principles of Good Clinical Practice. Merck reviews clinical data for accuracy, completeness and consistency: data are verified versus source documentation according to standard operating procedures. Per Merck policies and procedures, if fraud and/or misconduct are suspected, the issue is investigated: when necessary, the clinical site will be closed and, if appropriate, the responsible regulatory authorities and ethics review committees notified.

### B. Publication and Authorship

To the extent scientifically appropriate, Merck seeks to publish the results of studies it conducts. Some early phase or pilot studies are intended to be hypothesis-generating rather than hypothesis testing. In such cases, publication of results may not be appropriate since the trial may be underpowered and the analyses complicated by statistical issues of multiplicity.

Merck's policy on authorship is consistent with the requirements outlined in the ICH-Good Clinical Practice guidelines. In summary, authorship should reflect significant contribution to the design and conduct of the study, performance or interpretation of the analysis, and/or writing of the manuscript. All named authors must be able to defend the study results and conclusions. Merck funding of a study will be acknowledged in publications.

## III. Patient Protection

### A. IRB/ERC Review

All clinical trials will be reviewed and approved by an independent IRB/ERC before being initiated at each site. Significant changes or revisions to the protocol will be approved by the IRB/ERC prior to implementation, except that changes required urgently to protect patient safety and well-being may be enacted in anticipation of IRB/ERC approval. For each site, the IRB/ERC and Merck's Consent Form Review department (U.S. studies) or local medical director (non-U.S. studies) will approve the patient informed consent form.

### B. Safety

The guiding principle in decision-making in clinical trials is that patient welfare is of primary importance. Potential patients will be informed of the risks and benefits of, as well as alternatives to, study participation. At a minimum, study designs will take into account the local standard of care. Patients are never denied access to appropriate medical care based on participation in a Merck clinical study.

All participation in Merck clinical trials is voluntary. Patients are enrolled only after providing informed consent for participation. Patients may withdraw from a Merck study at any time, without any influence on their access to, or receipt of, medical care that may otherwise be available to them.

### C. Confidentiality

Merck is committed to safeguarding patient confidentiality, to the greatest extent possible. Unless required by law, only the investigator, sponsor (or representative) and/or regulatory authorities will have access to confidential medical records that might identify the research subject by name.

### D. DNA Research

Genetic research such as analysis of DNA sequences will only be performed with the specific informed consent of the subject. Use of archival specimens collected as part of a study is subject to the same restriction. With IRB approval, an exception to this restriction may be possible if specimens are de-identified and are not referable to a specific subject.

## IV. Financial Considerations

### A. Payments to Investigators

Clinical trials are time- and labor-intensive. It is Merck's policy to compensate investigators (or the sponsoring institution) in a fair manner for the work performed in support of Merck studies. Merck will only pay reasonable incentives to enroll patients in its trials. However, when enrollment is particularly challenging, additional payments may be made to compensate for the time spent in extra recruiting efforts.

Merck does not pay for patient referrals. However, Merck may compensate referring physicians for time spent on chart review to identify potentially eligible patients.

### B. Clinical Research Funding

Informed consent forms will disclose that the trial is sponsored by Merck, and that the investigator or sponsoring institution is being paid or provided a grant for performing the study. However, the local IRB/ERC may wish to alter the wording of the disclosure statement to be consistent with financial practices at that institution. As noted above, publications resulting from Merck studies will indicate Merck as a source of funding.

### C. Funding for Travel and Other Requests

Funding of travel by investigators and support staff (e.g., to scientific meetings, investigator meetings, etc.) will be consistent with local guidelines and practices including, in the United States, those established by the American Medical Association (AMA).

## V. Investigator Commitment

Investigators will be expected to review Merck's Code of Conduct as an attachment to the study protocol, and in signing the protocol, agree to support these ethical and scientific standards.

MRK-I8940066562

## INSTRUCTIONS FOR DRUG ADVERSE EXPERIENCE (AE) FORM

### GENERAL INSTRUCTIONS

An Adverse Experience Report Form must be completed for each workbooklet even if no adverse experiences were present.

### ADVERSE EXPERIENCE DEFINITION

Adverse experiences means any unfavorable and unintended change in the structure (signs), function (symptoms), or chemistry (laboratory data) of the body, or worsening of a pre-existing condition temporally associated with any use of a Merck product whether or not considered related to the use of the product. Changes resulting from normal growth and development which do not vary significantly in frequency or severity from expected levels are not to be considered adverse experiences. Examples of this may include, but not limited to, teething, typical crying in infants and children, and onset of menses or menopause occurring at a physiologically appropriate time.

Adverse experiences may occur in the course of the use of a Merck product in clinical studies or within the follow-up period specified by the protocol, or prescribed clinical practice, from overdose (whether accidental or intentional), from abuse, or a procedure.

Adverse experiences may also occur in screened patients during any preallocation baseline period as a result of a protocol-specified intervention including washout or discontinuation of usual therapy, diet, placebo treatment, or a procedure.

### SPECIFIC INSTRUCTIONS AND DEFINITIONS

#### A. "LATEST INFORMATION" DATE

Enter the date that the information, provided on the AE form, was last updated. This date is the last date of the reporting period covered by the AE form.

#### B. CLINICAL ADVERSE EXPERIENCE

List all clinical AE's that occurred. Record discrete episodes of the same experience separately.

**NOTE: Do not list death as an adverse experience. Death may be considered an outcome of an adverse experience.**

Indicate the following for each clinical adverse experience:

**DATE AE STARTED:** Enter the date that the patient or subject first experienced the AE or symptoms related to the AE

**TIME AE STARTED:** If a column is provided for time, enter the time (military time) that the AE was first noted by the patient.

**DATE AE STOPPED:** Enter the date that the AE or symptoms relating to the AE stopped. If the AE is still present on the "latest information" date entered at the top right of the form, indicate that the AE is continuing rather than entering a stop date.

**DURATION IF LESS THAN 24 HOURS:** If the AE lasted less than 24 hours, indicate the number of hours or minutes that the AE was continuously present.

**MAXIMUM INTENSITY: FOR ADULTS OR OLDER CHILDREN**

1 = MILD — Awareness of sign or symptom, but easily tolerated.

2 = MODERATE — Discomfort enough to cause interference with usual activity.

3 = SEVERE — Incapacitating with inability to work or do usual activity.

**DID AE RESULT IN:** Indicate for each adverse experience all of the conditions that are met in this question.

D = Death

P = Persistent or significant disability/incapacity

H = Hospitalization or prolongation

N = None of the above

If one or more of the choices (other than NONE) are indicated, *IMMEDIATELY notify the Merck Clinical Monitor (U.S.) or Local Medical Director (ex-U.S.) by telephone.*

**IS THE AE:** Indicate for each adverse experience all of the conditions that are met in this question.

A = Congenital anomaly/birth defect

C = Cancer

O = Due to overdose

L = Life-threatening

M = Other important medical event

N = None of the above

If one or more of the choices (other than NONE) are indicated, *IMMEDIATELY notify the Merck Clinical Monitor (U.S.) or Local Medical Director (ex-U.S.) by telephone.*

**DID THE AE CAUSE THE TEST DRUG TO BE DISCONTINUED?** Indicate, for each adverse experience, whether that particular AE resulted in the Test Drug being discontinued from the study.

**DID THE TEST DRUG CAUSE THE ADVERSE EXPERIENCE?**

1 = DEFINITELY NOT — No relationship

2 = PROBABLY NOT — Relationship is not likely

3 = POSSIBLY — Relationship may exist

4 = PROBABLY — Relationship is likely

5 = DEFINITELY — Unquestionable relationship

#### C. OTHER ADVERSE EXPERIENCE

List all other adverse experiences identified from the Laboratory Report Form (LAB) or other special safety forms (e.g., ECG, X-RAY, etc.).

**DATE LAB SPECIMEN OBTAINED OR SPECIAL SAFETY EXAM PERFORMED:** Enter the date of the laboratory exam or special safety exam on which the adverse experience was noted.

Follow the instructions listed for "CLINICAL ADVERSE EXPERIENCE" in Section B above to complete the four questions listed below for each "OTHER ADVERSE EXPERIENCE" noted:

**DID AE RESULT IN:**

**IS THE AE:**

**DID THE AE CAUSE THE TEST DRUG TO BE DISCONTINUED?**

**DID THE TEST DRUG CAUSE THE ADVERSE EXPERIENCE?**

#### D. DID PATIENT/SUBJECT DIE?

If the patient died for any reason, *IMMEDIATELY notify Merck Clinical Monitor (U.S.) or Local Medical Director (ex-U.S.) by telephone the* and complete the following questions:

**DATE DIED:**

**PROBABLE CAUSE OF DEATH:**

**DID THE TEST DRUG CAUSE THE ADVERSE EXPERIENCE?**

MRK-I8940066563

Date:_____

(insert Primary Investigator's name and address below)

_____

_____

_____

RE:  Insert title of protocol and protocol number

Dear Dr. _____(insert name of Primary Investigator):

My signature below verifies that the IRB/IEC listed below operates in accordance with applicable national/local and institutional regulations and guidelines which govern IRB/IEC operations.

_____     _____     _____

Printed Name, IRB/IEC Chairperson     Signature, IRB/IEC Chairperson     Date

(insert name and address of IRB/IEC here)

_____

_____

_____

IRB's Federal Assurance number is:_____ (optional for U.S. IRBs)

MRK-I8940066564

ICH HARMONISED TRIPARTITE GUIDELINE

GUIDELINE FOR GOOD CLINICAL PRACTICE

**Section 3:** **INSTITUTIONAL REVIEW BOARD/INDEPENDENT ETHICS COMMITTEE (IRB/IEC)**

**3.1 Responsibilities**

3.1.1  An IRB/IEC should safeguard the rights, safety, and well-being of all trial subjects. Special attention should be paid to trials that may include vulnerable subjects.

3.1.2  The IRB/IEC should obtain the following documents:

trial protocol(s)/amendments(s), written informed consent form(s) and consent form updates that the investigator proposes for use in the trial, subject recruitment procedures (e.g. advertisements), written information to be provided to subjects, Investigator's Brochure (IB), available safety information, information about payments and compensation available to subjects, the investigator's current curriculum vitae and/or other documentation evidencing qualifications, and any other documents that the IRB/IEC may need to fulfill its responsibilities.

The IRB/IEC should review a proposed clinical trial within a reasonable time and document its views in writing, clearly identifying the trial, the documents reviewed and the dates for the following:

-approval/favourable opinion;

-modifications required prior to its approval/favourable opinion;

-disapproval/negative opinion; and

-termination/suspension of any prior approval/favourable opinion.

3.1.3  The IRB/IEC should consider the qualifications of the investigator for the proposed trial, as documented by a current curriculum vitae and/or by any other relevant documentation the IRB/IEC requests.

3.1.4  The IRB/IEC should conduct continuing review of each ongoing trial at intervals appropriate to the degree of risk to human subjects, but a least once per year.

3.1.5  The IRB/IEC may request more information than is outlined in paragraph 4.8.10 be given to subjects when, in the judgment of the IRB/IEC, the additional information would add meaningfully to the protection of the rights, safety and/or well-being of the subjects.

3.1.6  When a non-therapeutic trail is to be carried out with the consent of the subject's legally acceptable representative (see 4.8.12, 4.8.14), the IRB/IEC should determine that the proposed protocol and/or other document(s) adequately addresses relevant ethical concerns and meets applicable regulatory requirements for such trials.

3.1.7  Where the protocol indicates that prior consent of the trial subject or the subject's legally acceptable representative is not possible (see 4.8.15), the IRB/IEC should determine that the proposed protocol and/or other documents) adequately addresses relevant ethical concerns and meets applicable regulatory requirements for such trials (i.e. in emergency situations).

3.1.8  The IRB/IEC should review both the amount and method of payment to subjects to assure that neither presents problems of coercion or undue influence on the trial subjects. Payments to a subject should be prorated and not wholly contingent on completion of the trial by the subject.

3.1.9  The IRB/IEC should ensure that information regarding payment to subjects, including the methods, amounts, and schedule of payment to trial subjects, is set forth in the written informed consent form and any other written information to be provided to subjects. The way payment will be prorated should be specified.

**3.2 Composition, Functions and Operations**

3.2.1  The IRB/IEC should consist of a reasonable number of members, who collectively have the qualifications and experience to review and evaluate the science, medical aspects, and ethics of the proposed trial. It is recommended that the IRB/IEC should include:

(a)  At least five members.

(b)  At least one member whose primary area of interest is in a nonscientific area.

(c)  At least one member who is independent of the institution/trial site.

Only those IRB/IEC members who are independent of the investigator and the sponsor of the trial should vote/provide opinion on a trial-related matter.

A list of IRB/IEC members and their qualifications should be maintained.

3.2.2    The IRB/IEC should perform its functions according to written operating procedures, should maintain written records of its activities and minutes of its meetings, and should comply with GCP and with the applicable regulatory requirement(s).

3.2.3    An IRB/IEC should make its decisions at announced meetings at which at least a quorum, as stipulated in its written operating procedures, is present.

3.2.4    Only members who participate in the IRB/IEC review and discussion should vote/provide their opinion and/or advise.

3.2.5    The investigator may provide information on any aspect of the trial, but should not participate in the deliberations of the IRB/IEC or in the vote/opinion of the IRB/IEC.

3.2.6    An IRB/IEC may invite non-members with expertise in special areas for assistance.

**3.3 Procedures**

The IRB/IEC should establish, document in writing, and follow its procedures, which should include:

3.3.1    Determining its composition (names and qualifications of the members) and the authority under which it is established.

3.3.2    Scheduling, notifying its members of, and conducting its meetings.

3.3.3    Conducting initial and continuing review of trials.

3.3.4    Determining the frequency of continuing review, as appropriate.

3.3.5    Providing, according to the applicable regulatory requirements, expedited review and approval/favourable opinion of minor change(s) in ongoing trials that have the approval/favourable opinion of the IRB/IEC.

3.3.6    Specifying that no subject should be admitted to a trial before the IRB/IEC issues its written approval/favourable opinion of the trial.

3.3.7    Specifying that no deviations from, or changes of, the protocol should be initiated without prior written IRB/IEC approval/favourable opinion of an appropriate amendment, except when necessary to eliminate immediate hazards to the subjects or when the change(s) involves only logistical or administrative aspects of the trial (e.g., change of monitor(s), telephone number(s) (see 4.5.2).

3.3.8    Specifying that the investigator should promptly report to the IRB/IEC:

    (a)    Deviations from, or changes of the protocol to eliminate immediate hazards to the trial subjects (see 3.3.7, 4.5.2, 4.5.4).

    (b)    Changes increasing the risk to subjects and/or affecting significantly the conduct of the trial (see 4.10.2)

    (c)    All adverse drug reactions (ADRs that are both serious and unexpected.)

    (d)    New information that may affect adversely the safety of the subjects of the conduct of the trial.

3.3.9    Ensuring that the IRB/IEC promptly notify in writing the investigator/institution concerning:

    (a)    Its trial-related decisions/opinions.

    (b)    The reasons for its decisions/opinions.

    (c)    Procedures for appeal of its decisions/opinions.

**3.4    Records**

The IRB/IEC should retain all relevant records (e.g., write procedures, membership lists, lists of occupations/affiliations of members, submitted documents, minutes of meetings, and correspondence) for a period of at least 3 years after completion of the trial and make them available upon request from the regulatory authority(ies).

The IRB/IEC may be asked by investigators, sponsors or regulatory authorities to provide its written procedures and membership lists.

MRK-I8940066566

FOOD AND DRUG ADMINISTRATION REGULATIONS FOR INSTITUTIONAL REVIEW BOARDS (CODE OF FEDERAL REGULATIONS, TITLE 21, PART 56)

## Subpart B — Organization and Personnel

### 56.107 IRB Membership

a. Each IRB shall have at least five members, with varying backgrounds to promote complete and adequate review of research activities commonly conducted by the institution. The IRB shall be sufficiently qualified through the experience and expertise of its members, and the diversity of the members, including consideration of race, gender, cultural backgrounds, and sensitivity to such issues as community attitudes, to promote respect for its advice and counsel in safeguarding the rights and welfare of human subjects. In addition to possessing the professional competence necessary to review the specific research activities, the IRB shall be able to ascertain the acceptability of proposed research in terms of institutional commitments and regulations, applicable law, and standards of professional conduct and practice. The IRB shall therefore include persons knowledgeable in these areas. If an IRB regularly reviews research that involves a vulnerable category of subjects, such as children, prisoners, pregnant women, or handicapped or mentally disabled persons, consideration shall be given to the inclusion of one or more individuals who are knowledgeable about and experienced in working with those subjects.

b. Every nondiscriminatory effort will be made to ensure that no IRB consists entirely of men or entirely of women, including the institution's consideration of qualified persons of both sexes, so long as no selection is made to the IRB on the basis of gender. No IRB may consist entirely of members of one profession.

c. Each IRB shall include at least one member whose primary concerns are in the scientific area and at least one member whose primary concerns are in nonscientific areas.

d. Each IRB shall include at least one member who is not otherwise affiliated with the institution and who is not part of the immediate family of a person who is affiliated with the institution.

e. No IRB may have a member participate in the IRB's initial or continuing review of any project in which the member has a conflicting interest, except to provide information requested by the IRB.

f. An IRB may, in its discretion, invite individuals with competence in special areas to assist in the review of complex issues which require expertise beyond or in addition to that available on the IRB. These individuals may not vote with the IRB.

## Subpart C — IRB Functions and Operations

### 56.108 IRB Functions and Operations

In order to fulfill the requirements of these regulations, each IRB shall:

a. Follow written procedures: (1) For conducting its initial and continuing review of research and for reporting its findings and actions to the investigator and the institution; (2) for determining which projects require review more often than annually and which projects need verification from sources other than the investigator that no material changes have occurred since previous IRB review; (3) for ensuring prompt reporting to the IRB of changes in research activity, and (4) for ensuring that changes in approved research, during the period for which IRB approval has already been given, may not be initiated without IRB review and approval except where necessary to eliminate apparent immediate hazards to the human subjects.

b. Follow written procedures for ensuring prompt reporting to the IRB, appropriate institutional officials, and the Food and Drug Administration of: (1) Any unanticipated problems involving risks to human subjects or others; (2) any instance of serious or continuing noncompliance with these regulations or the requirements or determinations of the IRB; or (3) any suspension or termination of IRB approval.

c. Except when an expedited review procedure is used (see § 56.110), review proposed research at convened meetings at which a majority of the members of the IRB are present, including at least one member whose primary concerns are in nonscientific areas. In order for the research to be approved, it shall receive the approval of a majority of those members present at the meeting.

### 56.109 IRB Review of Research

a. An IRB shall review and have authority to approve, require modifications in (to secure approval), or disapprove all research activities covered by these regulations.

b. An IRB shall require that information given to subjects as part of informed consent is in accordance with § 50.25. The IRB may require that information, in addition to that specifically mentioned in § 50.25, be given to the subjects when in the IRB's judgment the information would meaningfully add to the protection of the rights and welfare of subjects.

c. An IRB shall require documentation of informed consent in accordance with § 50.27, except that the IRB may, for some or all subjects, waive the requirement that the subject or the subject's legally authorized representative sign a written consent form if it finds that the research presents no more than minimal risk of harm to subjects and involves no procedures for which written consent is normally required outside the research context. In cases where the documentation requirement is waived, the IRB may require the investigator to provide subjects with a written statement regarding the research.

d. An IRB shall notify investigators and the institution in writing of its decision to approve or disapprove the proposed research activity, or of modifications required to secure IRB approval of the research activity. If the IRB decides to disapprove a research activity, it shall include in its written notification a statement of the reasons for its decision and give the investigator an opportunity to respond in person or in writing.

e. An IRB shall conduct continuing review of research covered by these regulations at intervals appropriate to the degree of risk, but not less than once per year, and shall have authority to observe or have a third party observe the consent process and the research.

## DRUG CONSENT FORM

You are invited to be in a research study. You need to decide whether you want to participate or not. Please take your time to make your decision. Carefully read the following and ask the study doctor any questions which you may have. The study is being conducted for Merck & Co., Inc., the Sponsor.

**Why is the study being done?**
The purpose of this study is to test the safety of the research study drug, [insert name of drug]. Another purpose is to see if [insert name of drug] has any effect on your [insert "disease" or "condition"].

**Who should not be in the study?**
[Insert exclusion criteria that the patient can assess in simple language].

**What will I be asked to do? What are my requirements?**
The study doctor or staff will ask you about your medical history and will examine you. You will be assigned to either receive [insert name of drug] or a pill that looks the same as [insert name of drug] that has no active ingredient (or you may receive [insert name of active comparator, if any]). You have a _____ in ___ chance of receiving the active study drug. You and your study doctor will not know whether you are receiving the real drug or the inactive look-alike pill. You will be required to visit the study doctor about [insert number of times]. At each visit the study doctor or staff may do any or all of the following [insert a summary of study procedures in simple language (e.g., a bulleted list, a simplified table, a check list of procedures)].

**What is known about this (these) drug(s)?**
This is the first time that the drug has been used in man. **OR**
The drug has been used in [insert approximate number of subjects (worldwide) who have taken the drug].

**How long will I be in the study?**
You will be in the study about [insert number of weeks, months, or years].

**How many other people will be participating in the study?**
About [insert number of participants at all sites] people will be participating in the study.

**Will I be paid? [Include section only if applicable.]**
You will be paid as follows: [insert payment information]

**What adverse (bad) effects can happen to me by participating in the study?**
The following adverse effects have been reported by people taking [insert name of drug] in previous studies or seen in animal experiments: [insert any foreseeable risks or discomforts as bullets or summary]. **The study doctor or staff will discuss these with you.** There can be other adverse effects that are not presently known about [insert name of drug]. It is not known how the study drug(s) may affect an unborn baby.

**If I have an adverse effect, who will pay the doctor and hospital bills?**
If you are injured or become sick directly from the Merck study drug, Merck & Co., Inc., the Sponsor of the study, will pay for the reasonable costs of medical treatment to the extent such costs are not covered by your medical or hospital insurance or third-party or governmental programs providing such coverage. No other form of compensation is available.

**What benefit can I expect?**
If the drug works, you may have some benefit. On the other hand, it may not work and there may be no benefit. Also, you may be on a look-alike pill that does not contain any drug and will not provide any benefit.

**Are there any other drugs that I may be able to take or things that I can do for my condition/disease if I don't want to participate in the study?**
The following other drugs or procedures are available as alternatives to [insert name of drug]:
[insert other drugs and/or procedures].

**Who will be able to see my records and know that I am in the study?**
If you agree to become part of this study, your name will be held in confidence. Unless required by law, only the study doctor and staff, sponsor representatives involved in this study, independent ethics committees and inspectors from government regulatory agencies will have direct access to your medical records to check the study information.

**Will I be told if new information about the drug is discovered during the study?**
You will be told in a timely manner of any significant new information that may affect your willingness to stay in this study.

**Who do I call if I have questions?**
For questions about the study or if you have a study-related injury, call the study doctor _____[insert name] at _____[insert telephone number].
For questions about your rights as a participant in the study, call _____[insert name] at _____[insert telephone number].

**Can I refuse to be in the study and can I be asked to leave the study?**
Your participation in this study is voluntary. You can choose not to take part in the study, or you can quit at any time. You will not lose any benefits to which you are otherwise entitled. If you quit the study, you can receive the standard treatment for this condition. You will not be prevented from participating in future studies.

You may be asked to leave the study by the study doctor or Merck & Co., Inc., without your consent if you need other treatment, if you do not follow the study plan, if you have a study-related injury for any other reason. If you leave the study, the doctor may ask to examine you and do some final tests.

You will receive a signed copy of this consent form.

I have read and understand this consent form. All my questions have been answered. I volunteer to take part in this study.

Signature of Volunteer_____   Date_____

Signature of Person Conducting Review of Consent_____   Date_____

## FDA REGULATIONS REGARDING INFORMED CONSENT
## (CODE OF FEDERAL REGULATIONS, TITLE 21, PART 50)

**50.20  General Requirements for Informed Consent**

Except as provided in 50.23, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative.  An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence.  The information that is given to the subject or the representative shall be in language understandable to the subject or the representative.  No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive or appear to waive any of the subject's legal rights, or releases or appears to release the investigator, the sponsor, the institution, or its agents from liability for negligence.

**50.25  Elements of Informed Consent**

(a) Basic elements of informed consent.  In seeking informed consent, the following information shall be provided to each subject:
   (1) A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and identification of any procedures which are experimental.
   (2) A description of any reasonably foreseeable risks or discomforts to the subject.
   (3) A description of any benefits to the subject or to others which may reasonably be expected from the research.
   (4) A disclosure of appropriate alternative procedures or courses of treatment, if any, that might be advantageous to the subject.
   (5) A statement describing the extent, if any, to which confidentiality of records identifying the subject will be maintained and that notes the possibility that the Food and Drug Administration may inspect the records.
   (6) For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs and, if so, what they consist of, or where further information may be obtained.
   (7) An explanation of whom to contact for answers to pertinent questions about the research and research subjects' rights, and whom to contact in the event of a research-related injury to the subject.
   (8) A statement that participation is voluntary, that refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and that the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled.
(b) Additional elements of informed consent.  When appropriate, one or more of the following elements of information shall also be provided to each subject:
   (1) A statement that the particular treatment or procedure may involve risks to the subject (or to the embryo or fetus, if the subject is or may become pregnant) which are currently unforeseeable.
   (2) Anticipated circumstances under which the subject's participation may be terminated by the investigator without regard to the subject's consent.
   (3) Any additional costs to the subject that may result from participation in the research.
   (4) The consequences of a subject's decision to withdraw from the research and procedures for orderly termination of participation by the subject.
   (5) A statement that significant new findings developed during the course of the research which may relate to the subject's willingness to continue participation will be provided to the subject.
   (6) The approximate number of subjects involved in the study.
(c) The informed consent requirements in these regulations are not intended to preempt any applicable Federal, State, or local laws which require additional information to be disclosed for informed consent to be legally effective.
(d) Nothing in these regulations is intended to limit the authority of a physician to provide emergency medical care to the extent the physician is permitted to do so under applicable Federal, State, or local law.

**50.27  Documentation of Informed Consent**

(a) Except as provided in §56.109(c), informed consent shall be documented by the use of a written consent form approved by the IRB and signed by the subject or the subject's legally authorized representative.  A copy shall be given to the person signing the form.
(b) Except as provided in §56.109(c), the consent form may be either of the following:
   (1) A written consent document that embodies the elements of informed consent required by § 50.25.  This form may be read to the subject or the subject's legally authorized representative but, in any event, the investigator shall give either the subject or the representative adequate opportunity to read it before it is signed.
   (2) A "short form" written consent document stating that the elements of informed consent required by § 50.25 have been presented orally to the subject or the subject's legally authorized representative.  When this method is used, there shall be a witness to the oral presentation.  Also, the IRB shall approve a written summary of what is to be said to the subject or the representative.  Only the short form itself is to be signed by the subject or the representative.  However, the witness shall sign both the short form and a copy of the summary, and the person

MRK-I8940066569

actually obtaining the consent shall sign a copy of the summary.  A copy of the summary shall be given to the subject or the representative in addition to a copy of the short form.

MRK-I8940066570

# APPENDICES

MRK-I8940066571

1. VIOXX® Package Circular/Patient Product Information
2. Celebrex® (celecoxib) Package Circular
3. Regular Strength Tylenol® (acetaminophen) Package Circular
4. Osteoarthritis Clinical Criteria for Eligibility
5. ARA Functional Class
6. Laboratory Safety Analyses
7. Algorithm for Assessing Out-of-Range Laboratory Values
8. Therapeutic Dose Range of NSAID--Washout Period
9. Flare Criteria
10. MOS 36-Item Short-Form Health Survey (SF-36)
11. Patient Take Home Forms
12. Instructions To Investigator Sites For Reporting Upper-Gi Clinical Events
13. Cardiovascular Event Monitoring

# APPENDIX 1

VIOXX® Package Circular

MRK-I8940066573