UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: VIOXX | ) | MDL NO. 1657 |
|     Products Liability Litigation | ) | |
| | ) | SECTION: L |
| This Document Relates to: | ) | |
| | ) | HON. ELDON E. FALLON |
|     STATE OF LOUISIANA, ex rel. | ) | |
|     JAMES D. CALDWELL, | ) | MAG. JUDGE KNOWLES |
|     ATTORNEY GENERAL | ) | |
|         Plaintiff | ) | |
| | ) | |
|   versus | ) | |
| | ) | |
| MERCK SHARP & DOHME CORP. | ) | |
| | ) | |
| Case No. 05-3700 | ) | |

### PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY OF MERCK'S EXPERTS CONCERNING THE RELATIVE SAFETY AND EFFICACY OF VIOXX COMPARED TO OTHER MEDICATIONS

861035.4

I.  **Introduction**

Plaintiffs do not merely "critique" Merck's clinical trials or attack their experts' conclusions, as Merck suggests.[1] Nor is this a case of reading the same studies in different ways. The simple fact is that the clinical trials reviewed by both sides' experts are reliable, and that they can only be read one way: Vioxx was associated with fewer gastrointestinal (GI) side effects than the particular drugs tested, and at the particular doses tested. They do not and cannot show GI safety as to lower, undisputedly safer doses of those drugs. Accordingly, Merck's experts' unsupported opinions that Vioxx is safer for the GI tract than other non-steroidal anti-inflammatory drugs (NSAIDs), without regard to dose, are inadmissible under *Daubert*.

II. **Plaintiffs Establish that Merck's Experts' Employ Unscientific Methodologies**

Merck did not and cannot cite legal authority in support of their experts' methodologies. Conversely, Plaintiffs demonstrate that Merck's experts' methodologies are unreliable and their opinions concerning relative GI safety should be excluded on three independent, legally supported grounds: (1) Failure to account for the dose-response relationship; (2) Extrapolation from high doses to low doses; and (3) Reliance on studies that are not clinically relevant to practicing physicians. Ultimately, "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co v. Joiner*, 522 U.S. 136, 146 (1997).

A.  **Merck's Experts Offer Unlimited Opinions that Vioxx is Safer for the GI Tract than Traditional NSAIDS**

Merck claims that their experts "appropriately" and "carefully" address Vioxx's comparative GI safety over traditional NSAIDs. (*See* Merck Opp. at 3, 17.) To the contrary, each of Merck's challenged experts offers broad, general opinions that extend the data beyond their

---

[1] (*See* Merck Opposition to Plaintiffs' Motion to Exclude Certain Opinion Testimony of Merck's Experts Concerning the Relative Safety of Vioxx Compared to Other Medications (Merck Opp.) at 7.)

861035.4

inherent limitations by claiming that Vioxx has a lower GI risk than drugs against which it was not tested and at doses against which it was not tested.[2]

Nor is it true that "*both* Merck's and Plaintiffs' experts have testified to the superior gastrointestinal profile of Vioxx" (Merck Opp. at 7), and Merck mischaracterizes Plaintiffs' expert Dr. Avorn's testimony in an attempt to support that argument.[3] (*Id.* at 7 n.8.) Thus, Dr. Avorn's testimony is consistent with Plaintiffs' experts' opinions and with the universally accepted principle that toxicity must be considered in relation to a particular dose and drug.

Plaintiffs would not object to defense experts' opinions that compare Vioxx to other NSAIDs with respect GI safety, if such testimony specified the comparator drug and the dosage tested. However, Merck's experts offer unlimited statements that Vioxx is safer than other NSAIDs. Since there is no evidence to support these opinions, this Court should exclude them.

### B. Plaintiffs Established that Merck's Experts' Opinions are the Product of Unreliable Methods Because they Fail to Account for the Dose-Response Relationship, Even Though they Acknowledge a Dose Effect

Merck does not dispute that the dose-response relationship is "the hallmark of basic toxicology," or that "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *McClain v. Metabolife Int'l, Inc.*, 401

---

[2] (Curtis Rep. at 19 ("It had superior GI safety to traditional NSAIDS as demonstrated in RCTs ...") [SRL Decl. Ex. 1]; *see also id.* at 20; Sales Rep. at 7 ("Treatment with VIOXX produces relief of pain and inflammation equivalent to that provided by conventional NSAIDs with reduced risk for their sometimes severe upper gastrointestinal complications. This benefit extends to the lower gastrointestinal tract as well.") [SRL Decl. Ex. 2]; Parnell Rep. at 3 ("With respect to GI safety, Vioxx has demonstrated to be associated with fewer GI perforations, ulcers, and bleeds compared to traditional non-selective NSAIDS.") [SRL Decl. Ex. 3]; Silvers Rep. at 6 ("current data...suggests a lower gastrointestinal risk compared to traditional NSAIDS") [SRL Decl. Ex. 4].)

[3] Dr. Avorn acknowledged only that Vioxx did "significantly reduce serious gastrointestinal problems" and "the incidence of [PUBs]," in response to specific questions about the VIGOR trial, and the answers quoted in the defense memorandum directly followed his description of the specific drug, naproxen, and the specific dose, 1000 mg/day, used in that trial. (*Mason v. Merck* 10/31/06 Trial Tr. at 340:20-341:15 (testimony of Dr. Jerry Avorn) [SRL Decl. Ex. 5].)

F.3d 1233, 1242 (11th Cir. 2005). Nor does Merck dispute that the Fifth Circuit has reaffirmed the importance of the dose-response relationship in pharmaceutical and toxic tort cases. *See, e.g., Burleson v. Texas Dep't of Crim. Justice*, 393 F.3d 577, 586-587 (5th Cir. 2004).

Merck incorrectly argues that these principles do not apply to their experts' opinions. (Merck Opp. at 16-17.) The dose-response relationship is a scientific principle of general applicability. Merck's experts attempt to distinguish precedent on the grounds that the cases cited by Plaintiff involved medical causation, but the same principle clearly applies to randomized clinical trials ("RCTs"). Each trial presents a collection of individual GI adverse events that is subjected to statistical analysis to assess the likelihood that an excess risk was caused by the drug tested, at the dose tested. Merck and its experts rely on such studies to support opinions that NSAIDs cause GI events, and that Vioxx causes fewer of them. Therefore, the question of causation is at the heart of the matter, and the doses at which each drug has been tested are just as relevant in this case as in any other toxic tort or pharmaceutical case.

Finally, Merck does not dispute that their experts acknowledge that a dose-response relationship exists between NSAIDs and higher incidence of adverse GI effects.[4] Moreover, Merck cites no authority for their claim that low dose NSAIDs cause GI harm, aside from Dr. Avorn who testified only that there "can be" problems with NSAIDs, when he was not even asked questions about dose (Merck Opp. at 17; *Mason* 10/31/06 Trial Tr. 225:25-226:2 ("Q: Is that a serious problem associated with non-steroidal anti-inflammatories A. Yes, it can be.") Conversely, Plaintiffs' experts cited peer-reviewed studies showing that ibuprofen, at doses lower than 2400 mg/day, is indistinguishable from placebo or background. (*See* Julie Rep. at 9-

---

[4] (*E.g.*, Silvers Dep. 247:24-248:2 ("Q; In patients taking NSAIDS, is dose a risk factor for GI complications? A; Yes. The higher doses are more risky than low doses.") [SRL Decl. Ex. 9]; Sales Dep. 100:6-12 [SRL Decl. Ex. 10].)

10; Julie Rebuttal at 4-5; Graham Rep. at 7 [SRL Decl. Exs. 6, 7, and 8].)

Thus, the record before the Court shows beyond dispute that NSAID GI toxicity is dependent on dose; that Merck only tested one dose of ibuprofen, 2400 mg/day; and that the lower doses that Merck failed to test are safer. Merck's experts may not extend their opinions beyond what the data will support, and therefore their opinions are inadmissible.

### C. Plaintiffs Established that Merck's Experts' Unjustifiably Extrapolate from High Doses to Infer that Low Doses would Produce the Same Results

Merck does not address or even attempt to differentiate the present case from *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*, 524 F. Supp. 2d 1166, 1180 (N.D. Cal. 2007). Plaintiffs demonstrated, however, that *Bextra/Celebrex* is directly on point. (Pl. Mot. at 17.) Just like the experts in *Bextra/Celebrex*, Merck's experts improperly extrapolate from high dose studies of non-selective NSAIDs to infer that Vioxx would be safer than those medications administered at lower doses. *See Bextra/Celebrex*, 524 F. Supp at 1180. This Court should likewise exclude or limit such testimony because the "analytical gap" between the experts' opinion and the data is "simply too great." *See id.* at 1181; *Joiner*, 522 U.S. at 147.

Plaintiffs agrees that RCTs are the gold standard for scientific evidence.[5] RCTs are reliable, in large part, because they test particular doses of particular drugs while controlling for other factors. It is not proper scientific method, however, to extrapolate data from a high dose RCT to conclude that the same result would occur at lower doses that have not been tested. Merck's experts do precisely that, and Merck offers no legal or scientific support for such methodology. Thus, this Court should exclude the challenged opinions on the ground that Merck's experts' opinions unjustifiably extrapolate from RCTs with high dose comparators to

---

[5] (*See* Plaintiffs' Motion to Exclude Certain Opinion Testimony and Statements of Merck's Experts Concerning the Safety and Efficacy of Vioxx Based on Personal Experience, filed on February 19, 2010 and incorporated herein.)

- 4 -

861035.4

infer that Vioxx would be safer than NSAIDs at lower doses.

### D. Plaintiffs Demonstrated that Merck's Experts Rely on Studies that Have No Clinical Relevance to Prescribing Physicians

Merck's experts cite studies that are not relevant to physicians who treat patients with osteoarthritis (OA), by far the largest patient population to whom Vioxx was marketed, since the clinical trial conditions bear little or no relation to the standard of care or the treatment of the disease in the real world. However, a litigation expert cannot employ a research methodology that would not be followed by real-world scientists in the same field. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Defense experts should not be permitted to offer opinions about the GI safety of Vioxx under artificial clinical trial conditions, without limitations that would distinguish the basis for those opinions from the conditions that apply to actual patients.

#### 1. Plaintiffs Established that Merck's Experts Rely on Studies that Used Higher Doses of Comparator Drugs than Doctors Prescribe in Real World Osteoarthritis Treatment

Plaintiffs established that the doses of NSAID comparator drugs in Merck's OA trials were higher than normally prescribed for treatment of osteoarthritis. For example, it is undisputed that ibuprofen at 2400 mg per day is not for chronic use.[6] (Busson, M., et al., 1986 [SRL Decl. Ex. 11]; Parnell Dep. 199:19-200:5 [SRL Decl. Ex. 12]; Sales Dep. 200:10-14.) As noted in a Memo dated August 19, 1998, Merck's consultants told them specifically that "Patients with OA are only rarely treated with high dose chronic NSAIDS." (MRK-GUE0051686 at 687 [SRL Decl. Ex. 13] (emphasis added).)[7] Indeed, Merck's Regional Medical Director, Dr. Kaiser, agreed that the lowest effective dose should be used, and that if a higher

---

[6] Similarly, it is undisputed that 150 mg diclofenac is the maximum dose. (Email from Brian Daniels to Thomas Simon, 2/26/07, MRK-NJ0315892 [SRL Decl. Ex. 14].)

[7] For the same reason, Merck's consultants advised that the GI outcome study (VIGOR) be conducted with *RA* patients, because RA *is* treated with chronic high dose NSAIDs. *Id.*

dose is needed for an acute episode she would "back off" as soon as possible. (Kaiser Dep. 201:9-20 [SRL Dec. Ex. 15].) Even if physicians, including Merck's experts, do on occasion prescribe brief courses of a high dose of ibuprofen to treat an acute flare of the disease, no defense expert or medical witness testified that he or she would administer 2400 or 3200 mg of ibuprofen every day for 16 weeks, and defense witnesses agreed that the standard of care required titrating the dose downward after the acute flare had passed. (Merck Opp. at 12-13; *See* Curtis Dep. 108:2-11, 109:14-21, 117:6-21 [SRL Decl. Ex. 16]; Kaiser Dep. 199:8-201:20.)

Merck emphasizes that Vioxx was tested at "twice the maximum chronic dose," in the VIGOR study, but such emphasis is misplaced and only supports Plaintiffs' position that dose is a critical factor in assessing toxicity. (Merck Opp. at 5.) Merck's documents show that 25 mg/day was ultimately chosen as the maximum RA dose because Merck's RA studies showed that 12.5 mg was not effective; that there was no greater pain relief at 50 mg than at 25 mg Vioxx; and that the higher doses had higher adverse event rates. (CRRC Meeting, 4/3/01, MRK-ABP0016915 at 7069 [SRL Decl. Ex. 17]; 2002 Vioxx label [SRL Decl. Ex. 18].) Thus, while higher doses of a drug are more toxic, they are not necessarily more effective after a therapeutic plateau has been reached, as in the Vioxx RA studies. Having proved this for Vioxx, Merck cannot credibly deny that the same is true for other NSAIDs that it failed to test at a range of doses.

Merck's argument that Vioxx was tested at double the chronic doses in the VIGOR trial to provide a "rigorous testing of the GI safety of rofecoxib" is also contradicted by the VIGOR protocol, which shows that the RA dose of Vioxx had not been established when the VIGOR study was designed in 1998. Vioxx had not yet been approved at any dose, nor for any indication. The maximum OA dose was "anticipated to be 25 mg," and Merck expected the RA

861035.4

dose to be "somewhat higher," due to the greater severity of the disease. The previous trial of Vioxx in RA had started at 175 mg per day, but "in mid-study, the dose was lowered to 125 mg. ... Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure)." The dose was lowered again to 75 mg in the extension of the study. (MRK-ABC0048699 at 8706; MRK-ABS0067365-368 [SRL Decl. Exs. 19 and 20].) Thus, the 50 mg dose in VIGOR could not have been chosen as "twice the maximum" dose for RA, since the RA dose had not been established; instead, the 50 mg dose represented an effort to balance toxicity and pain relief based on prior studies.[8]

Merck's experts rely on reviews and meta-analyses of the same Merck studies, which compared Vioxx at an average dose of approximately 27 mg (just above the standard dose) against maximum/near maximum doses of other NSAIDs. (*See* Rostom, et al., 2007 [SRL Decl. Ex. 21]; Watson D.J. et al., 2004, marked as Sales Ex. 38 [SRL Decl. Ex. 22].) These articles add no new data, but instead confirm that there is no evidence to support Vioxx' claimed GI safety relative to lower doses of non-selective NSAIDs.

Merck's claim that comparing Vioxx with "prescription strength" NSAIDs is "directly relevant" is also off target. (*See* Merck Opp. at 18.) "Prescription strength" ibuprofen does not mean 2400 mg; it means the dose that a doctor prescribes in conformity with the label, which is the lowest effective dose. For example, Drs. Curtis and Kaiser both testified that they would prescribe 200 to 400 mg ibuprofen three times a day, i.e. 600 to 1200 mg. (Curtis Dep. 117:6-118:2; Kaiser Dep. 200:15-24.) Also, since over-the counter ibuprofen is 1200 mg or less (Curtis

---

[8] Merck tested Vioxx at doses of 12.5 mg to 175 mg in RA patients—a twelve-fold differential—before settling on a dose that was 1/7 the originally tested amount. Yet Merck never tested ibuprofen at any other dose than 2400 mg/day in OA. (CRRC Meeting, *supra* at 7069; ABC0048699 at 8706.)

Dep. 248:17-23) any ibuprofen dose above 1200 mg per day is necessarily "prescription strength," yet Merck did not compare Vioxx with 1200 mg or even 1600 mg, the dose shown safe and effective in the Henry meta-analysis. (Henry D, et al., 1996 ("Henry Article"), marked as Curtis Ex. 16 [SRL Decl. Ex. 23].) Thus, "prescription-strength" is simply a catch phrase that offers no support to Merck's position, since the term inherently includes a wide range of lower, safer NSAID doses that Merck failed to test, and as to which its experts have no evidence to compare GI safety.

Merck further asserts, without proof, that their clinical trials were designed to test "equally potent" doses of NSAIDs (Merck Opp. at 12), but that assumption is precisely where the data gap lies: without testing, as Merck Consultant Dr. Griffin told the company before Vioxx was marketed: "Equipotent doses are not necessarily known." (1996 Consultant Meeting [SRL Decl. Ex. 24].) It is only by conducting the tests that one learns the answers. Plaintiffs have established that Merck did not conduct trials comparing Vioxx with lower doses. (See Pl.'s Mem. at § II.D.) As a result, there is too great an analytical gap between the data and their opinions, as well as between the real world and the courtroom, and their opinions should be excluded or subject to limitations that would make explicit the bounds beyond which the data cannot be stretched.

    2.    **<u>Merck's Reliance on FDA Approval and Peer-Reviewed Publications is Misplaced</u>**

Merck claims support from the FDA for its position, but, in fact, the FDA-approved label took the same approach advocated by Plaintiffs: claims of lower GI risk were limited to the specific comparator dose of the specific comparator drug. The label provides data from the Vioxx trial against ibuprofen 2400 mg/day and against naproxen 1000 mg/day, and the FDA directly refused Merck's attempt to include the results of Protocol 069, a pooled analysis of

861035.4

multiple NSAIDs, in the label. (*See* Julie Rep. ¶17.) There is no evidence that Merck ever sought FDA approval for a label claim that Vioxx was safer than NSAIDs generally and at any dose, but it is clear from the history as to Protocol 069 that such an effort would have been rejected.

Similarly, each peer reviewed article states a particular drug and dose. For example, Merck admits that the Langman study used constant doses (2400 mg/day ibuprofen, 150 mg/day diclofenac, 1500/day nabumetone). (Merck Opp. at 4; Langman, M.J., et al., 1999 [SRL Decl. Ex. 25].) These doses were included in the study's "results" and "methodology," further illustrating the importance of the dose-relationship in drawing conclusions about drug efficacy. (Langman, M.J., et al., 1999.)

Thus, the FDA-approved label and published studies reinforce Plaintiffs' position: proper scientific methodology requires that opinions regarding Vioxx's relative efficacy must be accompanied by the specific drug and dose against which Vioxx was tested. Merck's experts do not limit their testimony to such drug/dose specific opinions, and therefore fail under *Daubert*.

### 3. Merck's Unethical Conduct Is Relevant to the Inapplicability of the Clinical Trials to Actual Patients in the Real World

Ethics and standard of care are not red herrings, as Merck suggests. (Merck Opp. at 14-15.) Rather, these issues are directly relevant to the disconnect between the studies Merck carried out and the claims made for the drug by the company and its experts. (See section I.D.2, *supra*.) The standard of care in the real world requires use of the lowest effective dose, and titration down from high doses as soon as possible. (*See* Pl.'s Mem. at II.B.) Yet, Merck never tested Vioxx against NSAIDs as they are actually prescribed by doctors and used by the vast majority of patients. This lack of conformity to the standard of care highlights the gap between the data comparing Vioxx to only the prolonged and constant use of high dose NSAIDs, and the actual use of lower, varying doses on an intermittent basis as prescribed by Merck's own witnesses.

- 9 -

Merck does not benefit from the claim that the studies must have been proper, else why would so many have participated or approved them. Even defense witness Dr. Curtis admitted that a study would have trouble getting past an IRB if one were to propose administering 2400 mg/day ibuprofen for 16 weeks to patients with mild or moderate OA, because they do not need such intense doses and the risks would be greater than any possible benefits. (Curtis Dep. 245:5-249:10.) Yet the evidence shows that Merck's trials did include a majority of such patients (*E.g.*, Cannon, G., et al., 2000 [SRL Decl. Ex. 26].) Merck's informed consent forms for the OA trials informed patients of the general risks of ibuprofen, but did not mention the *critical* fact that the dosage to be administered was higher and more constant than necessary for most patients, thus exposing them to an undisputedly greater risk. (Protocol 045 Patient Consent Form at 4, 5 [SRL Decl. Ex. 27].) Nor is there any evidence that Merck told the IRBs of the specific, mild to moderate range of patient levels of OA in these trials, and an IRB cannot be expected to guess that information in approving the protocols.

### III.   CONCLUSION

Experts on both sides rely on the same studies comparing Vioxx to constant high dose NSAIDs. Those studies cannot support defense opinions that Vioxx has lower GI risk than NSAIDs without regard to dose or intermittent use. Plaintiffs request that the Court issue an order precluding such testimony, or at minimum requiring that any such opinions be accompanied by a limiting statements that Vioxx's GI risk has not been tested, nor has its claim of relative risk been proved, against lower, safer doses of NSAIDs.

Respectfully submitted, this 9th day of March, 2010.

861035.4

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum In Support Of Plaintiffs' Motion To Exclude Certain Opinion Testimony And Statements Of Merck's Experts Concerning The Relative Safety And Efficacy Of Vioxx Compared to Other Medications has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United State District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this the 9th day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130