# EXHIBIT 16

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   In Re:                            )
                                       )
 5        Products Liability Litigation )
                                       ) MDL NO. 1657
 6   This Document Relates to:         )
     _____)
 7                                     )
                                       )
 8   STATE OF LOUISIANA, ex rel., JAMES )
     D. CALDWELL, ATTORNEY GENERAL,    )
 9                                     )
                   Plaintiff,          )
10                                     ) Case No.:
     vs.                               )
11                                     ) 05-3700
     MERCK SHARP & DOHME CORP.,        )
12                                     )
                   Defendant(s).       )
13   _____)

14

15         DEPOSITION OF DAVID L. CURTIS, M.D.,

16                 Expert Witness

17             Held at O'Melveny & Myers

18         Two Embarcadero Center, 28th Floor

19             San Francisco, California

20              Monday, January 18, 2010

21             9:34 a.m. - 5:31 p.m.

22

23

24

25   REPORTED BY:  James Beasley, CSR No. 12807
```

David L. Curtis, M.D., Expert

BARKLEY
Court Reporters

1    BY MR. ARBITBLIT:

2         Q.    Doctor, with respect to the use of Motrin

3    or any other brand of ibuprofen, do you see the

4    reference under dosage and administration that says:

5              "The smallest dose of Motrin that

6              yields acceptable control should be

7              employed"?

8         A.    I do.

9         Q.    Is that the practice that you followed in

10   prescribing ibuprofen?

11        A.    Yes.

12        Q.    Is that the practice you followed in

13   prescribing any nonsteroidal anti-inflammatory drug?

14        A.    Yes.

15        Q.    Do you see the language that says:

16             "The dose should be tailored to each

17             patient, and may be lowered or

18             raised depending on the severity of

19             symptoms either at the time of

20             initiating drug therapy or as the

21             patient responds or fails to

22             respond"?

23             Did I read that correctly?

24        A.    Yes, you read it correctly.

25        Q.    Is that also the practice that you followed

108

BARKLEY
Court Reporters

1    with ibuprofen?

2         A.    Yes.

3         Q.    And with other nonsteroidals as well?

4         A.    Yes.

5         Q.    The line after that says:

6                   "In general, patients with rheumatoid

7                    arthritis seem to require higher

8                    doses of Motrin than do patients

9                    with osteoarthritis."

10                Did I read that correctly?

11        A.    You did.

12        Q.    Do you agree with that statement?

13        A.    Yes.

14        Q.    In your practice, did you generally start

15   with a lower dose of ibuprofen for patients who you

16   considered to have mild osteoarthritis than patients

17   who had moderate or severe arthritis?

18                MR. TOMASELLI:   Object to form.

19                THE WITNESS:   I would choose the smallest

20   dose that I thought would be appropriate for that

21   individual patient.

22                And that decision might be based on the

23   patient symptoms, the patient's age, the patient's

24   comorbidity, other medical problems they would have,

25   the patient's GI history.

David L. Curtis, M.D., Expert

BARKLEY
Court Reporters

```
 1   range.  But if you want me to describe how I would

 2   interpret mild, moderate and severe in dosage

 3   range --

 4   BY MR. ARBITBLIT:

 5       Q.   Yes.

 6       A.   So all things being equal in a patient who

 7   has no particular risk factors, I would explain to

 8   the patient that a dose of 200 milligrams as needed,

 9   which might be two or three times a day, would be

10   for the mild case and would also be for the moderate

11   case.

12            Again, it's a patient interpretation of

13   relief of their symptoms.  So my interpretation of

14   their symptoms and the relief that's going to be

15   required, I would try to use the lowest dose that

16   relieves their symptoms.

17            And then I would explain about the dose

18   range, and in current time, we have prescription

19   strength, so I would potentially go up to 1,800,

20   2,400, 3,200 milligrams, depending, again, on the

21   patient and risk factors for side effects.

22            And I would make that decision.  But

23   following what the PDR says, it would be an

24   assessment of the patient in a response, either on

25   the telephone or in another visit in the office,
```

David L. Curtis, M.D., Expert

BARKLEY
Court Reporters

1    taking the blood pressure, taking a blood test, all

2    of those go into selecting that dose range.

3        Q.   On the occasions when you would go as high

4    as 3,200, is that your understanding of the top end

5    that's permitted under the indications for

6    ibuprofen?

7        A.   Correct.

8        Q.   And would that commonly be for a severe

9    flare-up of rheumatoid arthritis?

10           MR. TOMASELLI:  Object to form.

11           THE WITNESS:  Again, the higher doses would

12   be typically more effective for severe pain and for

13   severe inflammation.  So if I had to use that dose,

14   it would be typically under those indication.

15   BY MR. ARBITBLIT:

16       Q.   Would it be your practice to back off of

17   3,200 as soon as the flare-up was controlled?

18           MR. TOMASELLI:  Object to form.

19           THE WITNESS:  I missed --

20   BY MR. ARBITBLIT:

21       Q.   Would it be your practice to back down,

22   titrate down from 3,200 as soon as possible when the

23   patient's condition permitted?

24       A.   Again, individual patients, if the goal is

25   pain control, it is to use the smallest dose as

                          118

BARKLEY
Court Reporters

```
 1              MR. BAUM:  Whatever your pleasure.
 2              MR. ARBITBLIT:  Let's take a short break.
 3         (Recess taken at 4:45 p.m.)
 4   BY MR. ARBITBLIT:
 5       Q.   Doctor, if you had a clinical trial of,
 6   say, 450 or 500 osteoarthritis Class I patients and
 7   you wanted to see what an efficacious dose of
 8   ibuprofen was for those patients, what doses would
 9   you look at?
10              MR. TOMASELLI:  Object to form.  Incomplete
11   hypothetical.  Go ahead and answer.
12              THE WITNESS:  Well, a Class I
13   osteoarthritis patient, you're not going to have a
14   trial about that because those people are so barely
15   symptomatic that you're not going to get a very
16   robust answer.
17              It would be a waste of time, basically.
18              Going back to your article that you
19   referenced in the Goodman and Gilman, you want to do
20   a clinically important study that has a clinically
21   important answer, and Class I osteoarthritis is not
22   an important question.
23   BY MR. ARBITBLIT:
24       Q.   If you gave 450 Class I osteoarthritis
25   patients 2,400 milligrams a day of Vioxx for 6 to 12
```

245

BARKLEY
Court Reporters

1    weeks, would you potentially be causing them

2    gastrointestinal harm unnecessarily?

3           MR. TOMASELLI:  Object to form.

4           THE WITNESS:  Well, I guess you started out

5    by saying if I gave 450 patients with osteoarthritis

6    Vioxx 25, did I rephrase it correctly?

7       Q.   No, I don't think so.  I think I said --

8    2,400 milligrams of Vioxx?

9           MR. ARBITBLIT:  2,400 milligrams of Vioxx,

10   that would be a lot.  Sorry, I spoke wrong there.

11          MR. TOMASELLI:  Some of my objections

12   actually make sense, you'll find.

13          MR. ARBITBLIT:  I will start over.

14      Q.   If you had a clinical trial in which you

15   gave 450 Class I osteoarthritis patients

16   2,400 milligrams a day of ibuprofen for 12 weeks,

17   would you be risking causing gastrointestinal events

18   among patients who did not need that degree of

19   medication?

20          MR. TOMASELLI:  Object to form.  Incomplete

21   hypothetical.

22          Go ahead.

23          THE WITNESS:  I can rephrase the question?

24   BY MR. ARBITBLIT:

25      Q.   Please.

David L. Curtis, M.D., Expert

BARKLEY
Court Reporters

1      A.    If someone were to design a trial with 450

2  patients and they wanted to use 1,200 milligrams of

3  ibuprofen, you might have trouble getting that

4  through an IRB because it would not be considered

5  clinically important.

6           Whatever risk you subjected those subjects

7  to would not be justified by the potential outcome

8  data, so it would probably get stopped very quickly.

9           So it's not either an important question or

10  it's not a question that would justify that kind of

11  money and that kind of potential risk to the

12  subjects.

13  BY MR. ARBITBLIT:

14      Q.    Same question as to Class II, what would

15  your thoughts be about that?

16           MR. TOMASELLI:   Same objection.

17           THE WITNESS:   The same kind of analysis

18  would go on, do you have enough justification in a

19  symptomatic population to justify a study, and then

20  you'd ask what -- what is the results that would

21  make it an important study.

22           If you're looking at GI events and side

23  effects, that might be a justifiable study.   But,

24  again, you'd have an IRB problem of saying you've

25  got mild osteoarthritis no doubt in people who have

247

BARKLEY
Court Reporters

1    minimum symptoms.

2              You'd probably have trouble running the

3    study, enrolling patients in the study, getting

4    patients to take a dose of ibuprofen three times a

5    day.

6              I mean, that's my answer to your question.

7    I don't know if that does answer your question.

8    BY MR. ARBITBLIT:

9        Q.    And what dose were you assuming in your

10   previous answer?

11       A.    If I had mild osteoarthritis, Class I,

12   Class II, those patients are at this particular time

13   going to get over-the-counter ibuprofen or have

14   already tried over-the-counter ibuprofen, and it

15   either helps them or gives them side effects.

16       Q.    And by over-the-counter ibuprofen do you

17   mean 200 milligrams per pill with a maximum of

18   1,200 milligrams per day?

19       A.    That may be what patients are doing on

20   their own, and that may be what I would do.  If I

21   had an individual patient, I might suggest that they

22   try up to that amount of medication on they're own

23   to see if that would help them.

24       Q.    I was trying to determine what you meant by

25   your reference to over-the-counter ibuprofen in

David L. Curtis, M.D., Expert

BARKLEY
Court Reporters

1    terms of dosing in your previous answer?

2        A.    200 milligrams is the over-the-counter

3    dose, as needed.

4        Q.    Up to a maximum of what?

5        A.    Again, in the individual patients, we're

6    talking about a study -- we're talking about

7    individual patients.  I let the patients take it up

8    to six, eight, 2400 milligrams a day with my

9    approval with all the due warnings of side effects.

10           MR. ARBITBLIT:   Thank you, Doctor.   No

11   further questions.

12           MR. TOMASELLI:  Dr. Curtis, I have a couple

13   of questions today.

14                    - - - -

15                 EXAMINATION

16   BY MR. TOMASELLI:

17       Q.    You talked with Mr. Arbitblit some today

18   regarding association and even sometimes causation

19   regarding Vioxx and cardiovascular risk and you

20   talked about those terms, do you remember that?

21       A.    I do.

22       Q.    And do you remember that much of the

23   discussion today has been had regarding potential

24   cardiovascular risk of Vioxx versus a placebo,

25   right?

David L. Curtis, M.D., Expert

BARKLEY
Court Reporters