# EXHIBIT 24 Part 1

CONSULTANTS MEETING
MK-0966 (COX-2 INHIBITOR)
PHASE III MONITORING OF GI
CLINICAL EVENTS
SEPTEMBER 28, 1996
BACKGROUND PACKAGE

EXHIBIT NO. 24
Sales

Kelly A. Siska

Confidential - Subject To Protective Order

AGENDA

Confidential – Subject To Protective Order

MRK-NJ0231925

*September 20, 1996*

# MK-0966 (COX-2 INHIBITOR) CONSULTANTS MEETING
## PHASE III MONITORING OF GI CLINICAL EVENTS

## AGENDA

| *Time* | *Topic* | *Presenter* |
|---|---|---|
| 8:15-9:00 | Continental Breakfast | |
| 9:00-9:05 | Welcome and Introductions | Dr. D. Watson |
| 9:05-9:10 | Objectives of the Meeting | Dr. D. Watson |
| 9:10-9:20 | Clinical Background on MK-0966 | Dr. B. Daniels |
| 9:25-9:30 | NSAID Class Warning | Dr. B. Daniels |
| 9:30-9:45 | Phase III GI Clinical Event Monitoring Plan | Dr. D. Watson |
| 9:45-10:30 | Questions for Consultants and Discussion | |
| 10:30-10:45 | Morning Break | |
| 10:45-12:00 | Discussion (cont.) | |
| 12:30-1:00 | Lunch | |
| 1:00-1:30 | GI Outcomes Mega-trial | Dr. T. Musliner |
| 1:30-2:35 | Questions for Consultants and Discussion | |
| 2:35-2:45 | Afternoon Break | |
| 2:45-3:45 | Discussion (cont.) | |
| 3:45-4:00 | Wrap-up | Dr. D. Watson |

Confidential - Property of Merck and Co., Inc.

Confidential - Subject To Protective Order

MRK-NJ0231926

OBJECTIVES

Confidential - Subject To Protective Order

MRK-NJ0231927

*September 20, 1996*

# MK-0966 (COX-2 INHIBITOR) CONSULTANTS MEETING
# PHASE III MONITORING OF GI CLINICAL EVENTS

## OBJECTIVES

1.  To review and discuss the design and implementation of a plan to monitor the incidence of clinically important GI events in phase III trials of MK-0966

2.  To review and discuss issues related to the design and implementation of a large, randomized, clinical trial to demonstrate a low incidence of clinically important GI events with MK-0966.

Confidential - Property of Merck and Co., Inc.

Confidential - Subject To Protective Order

MINUTES

Confidential - Subject To Protective Order

MRK-NJ0231929

*Cox-2*
*Outcomes Study*

## MK-0966 (COX-2 INHIBITOR) CONSULTANTS' MEETING
### PHASE III MONITORING OF GI CLINICAL EVENTS
### and DESIGN OF A GI OUTCOMES MEGA-TRIAL

### September 28, 1996

### MEETING MINUTES

The morning session of the meeting covered the Phase III Monitoring of GI Clinical Events; the afternoon session covered the Design of a GI Outcomes Mega-Trial. A list of the consultants is provided in Attachment 1 and a list of other attendees is provided in Attachment 2. Attachment 3 contains a copy of the agenda for the meeting.

## PHASE III MONITORING OF GI CLINICAL EVENTS

Dr. Watson made opening remarks and provided an overview of the objectives (Attachment 4) of the meeting. Dr. Daniels presented the clinical background for the COX-2 program including the ongoing and planned clinical trials (overheads in Attachment 5) and facilitated discussion of the NSAID class label warning. Dr. Watson then presented the MK-0966 Phase III GI Clinical Event Monitoring Plan (overheads in Attachment 6). Productive discussion from the meeting is summarized below.

### Clinically Significant NSAID-Related Events (Perforations, Ulcers, UGI Bleeding)

The consultants agreed that the basis for the primary hypothesis should be the collection of perforations, ulcers and bleeding (PUBs) from upper-GI sources. They approved of the criteria set forth to establish the "certainty" of these events, but suggested that the need for transfusion be added as a criterion for severity of bleeding. The consultants suggested that Clinically Significant Upper GI Bleeding should be defined according to "severity" in addition to "certainty" criteria. They also suggested that a sub-analysis of ulcers be performed related to severity (e.g., bleeding ulcers as a subset of all ulcers). Discussion of monitoring for esophageal and lower GI events pointed out that, while adding power to the analysis, this practice would also add to the misclassification of events leading to "noise" in the data. It was decided that these events would not be included in the PUB events. Similar discussion led to agreement that ulcer with obstruction would not be counted as a distinct event since these are expected to be rare and would be counted as an ulcer.

Dr. Spector suggested an additional category of reproducible hematocrit drops of ≥6 percentage points to broaden the collection of bleeding events. Since hematology testing is routine in all Phase III studies, the data would be readily available, and comparison to screening (pretreatment) values would be possible. Dr. Daniels noted that the protocols do have procedures for re-evaluation of hematocrit values triggered by a drop of 5 percentage points, and include the suggestion to perform stool guaiac testing. While the

1

Confidential - Subject To Protective Order

MRK-NJ0231930

Phase III Monitoring of GI Clinical Events
September 28, 1996

consultants agreed to the additional category, they emphasized that it should be considered separately from the PUB categories because attribution of these events to NSAIDs will be less certain, and because they represent a different set of GI bleeding events than upper GI bleeding as defined in the plan. The consultants felt that the strongest evidence of a class difference for MK-0966 will be obtained using the PUB category for the primary analysis.

<u>UGI NSAID-Related Symptoms</u>

In considering the second category of events in the plan, pre-selected NSAID-related GI events, the consultants suggested that symptoms should be collected actively by using a checklist rather than passively by mapping spontaneously reported events into several defined categories. The consultants thought that a checklist would be viewed as a more rigorous method of collecting these types of events, providing hard evidence that the patient was asked about the symptom(s). Prof. Langman also felt that regulators might view the data more favorably if efforts were made to use a defined symptom checklist. Discussion noted that a checklist was likely to increase the incidence of the named events which could be detrimental to the ultimate label language. Prof. Langman pointed out that definitions of symptoms are not internationally uniform and are subjectively determined by individuals. Dr. Spector pointed out that attempts had been made to validate GI symptom questionnaires in a pilot fashion in the 7-day endoscopy study, and in an ibuprofen study, with negative results. The former study produced an inconsistent result for the questionnaire; the latter study barely distinguished ibuprofen from placebo. It is known that there is no consistent relationship between symptoms and structural lesions. In the absence of a validated GI symptom checklist, MRL felt that the usual open-ended method of collection of spontaneous events would be best. Dr. Simon also noted that the decision to collect spontaneously reported information on a selected set of symptoms was prompted by the methods used in the nabumetone and meloxicam clinical trials. Since it is not expected that there will be a significant difference demonstrated for MK-0966 versus comparators based on analysis of symptoms, it was decided that no hypothesis related to symptoms would be stated, but a descriptive analysis would be performed. The consultants suggested that perhaps several more terms could be added to the pre-specified list of symptoms.

Dr. Griffin questioned whether the use of $H_2$-receptor antagonists or antisecretory drugs would be allowed during the study. The patients will not be allowed to use concomitant $H_2$-receptor antagonists, except as prescribed for an adverse event. The consultants sought clarification on the medical history of eligible patients and were advised that the enrollment will be stratified for prior history of GI complications. The exclusion from enrollment of patients with a history of the use of antisecretory medications will be at the discretion of the investigators.

2

Confidential - Subject To Protective Order                                    MRK-NJ0231931

Phase III Monitoring of GI Clinical Events
September 28, 1996

## Data Analysis

The consultants agreed to the proposal to analyze the number of patients having events rather that the numbers of events. The primary analysis will analyze PUBs together since the total number is expected to be small. Consensus was reached that the PUBs and UGI symptom events would not be combined because the expected small number of PUBs would be overwhelmed by the much larger number of symptoms. The consultants agreed that there was no need to analyze the population of patients who discontinued due to significant GI events because they would all be represented in the other analyses.

The power of the primary analysis of PUBs was acknowledged to be small (there is about 50% power to detect the amount of difference in the expected event rates between an NSAID and placebo at a two-sided alpha level of 0.05). However, such an analysis will need to be done for regulatory purposes. The consultants agreed that to commit to many sub-analyses within the PUB category would most likely present many negative results due to small numbers which would then have to be qualified. Discussions concerning the analysis methods confirmed that what was implied by a "pooled analysis" was in fact a "meta-analysis" , and that the analysis would include a factor accounting for "study".

Consensus was reached that the endoscopy studies should be included in the monitoring plan and the meta-analysis, but information from protocol-scheduled endoscopies would be excluded. The plan as presented would have asked the endoscopist to identify whether a performed endoscopy was medically necessary. Various other methods of having investigators account for the timing of endoscopies relative to symptom onset and findings were discussed and found to be unreliable and operationally difficult. Since the likelihood of a significant clinical event being discovered on a scheduled endoscopy visit is low, and that a small number of such events would have little influence on the outcome of the analysis, it was agreed that a window of time around scheduled endoscopies would be defined and events occurring or discovered inside the window would be excluded from the meta-analysis.

## Study Procedures

The consultants agreed to the plan to use an external review board to evaluate the investigator narratives, case report forms, adverse event reports and supporting documentation for PUB events. The review board will conduct these evaluations blinded to treatment. There was agreement that it would be important that the review board agree with the criteria set forth for PUBs in the monitoring plan. MRL must provide operating procedures for the functions of the review board. The board must be completely informed of the guidance given to investigators in the protocols, procedure manuals, and investigator meetings regarding medical evaluations of patients having significant GI events. The consultants agreed that it would be impossible to mandate standard work-ups by investigators, but that guidelines are desirable. The operational procedures for the external review board will also be added to the Phase III GI Event Monitoring Plan.

3

Confidential - Subject To Protective Order

Phase III Monitoring of GI Clinical Events
September 28, 1996

<u>Discussion of Innovative NSAID-Induced Symptom Study Design</u>

MRL raised the topic of how NSAID-related symptoms could be better studied.  Drs.
Bombardier and Strom were in agreement that it should be possible to plan a study of
NSAID symptoms using a series of "N of one" studies.  Under such a plan, patients with
prior NSAID-related GI side effects, and the NSAID with which they experience the
problem, would be identified for study.  The subjects would then be randomized to a
series of treatments including acetaminophen, the NSAID causing trouble previously,
another active non-selective NSAID, and a Merck selective COX-2 inhibitor.  Patients
would be treated for approximately 2 weeks on each medication with adequate washouts
(drug dependent) between treatments.  Data regarding GI symptoms and treatment
preferences would be gathered.  The statistical analysis would be based on comparisons
of the COX-2 selective agent vs. each of the other treatments, on an individual basis.
This trial design is called an "n of 1" study because one is randomly allocating the drugs
within the individual as opposed to randomly allocating drugs within groups of people.
This type of design is ideally suited to the study of drug side-effects.  Dr. Bombardier noted
that some trials have been published using similar designs.  Dr. Strom said that it has
been found that 20-30% of patients report consistent GI symptoms on a given NSAID.
Dr. Silverman's suggestion that as a more conservative approach the paradigm could be
piloted without Merck study drug followed by a definitive study was favorably received.

4

Confidential - Subject To Protective Order                    MRK-NJ0231933

Design of a GI Outcomes Mega-Trial
September 28, 1996

## DESIGN OF A GI OUTCOMES MEGA-TRIAL

Dr. Musliner opened the afternoon session for discussion of a GI outcomes mega-trial. The overheads are in Attachment 7.

### Overall Design

A variety of design options were discussed. Drs. Strom and Bombardier strongly favored an observational type study, approximating a more "real world" situation, to demonstrate the effect of MK-0966 on clinically important outcomes (e.g., hospitalization for GI bleed). Dr. Strom was concerned that in the absence of such a study, Merck might be susceptible to criticism for not testing the drug as it will be used in an uncontrolled setting. Dr. Strom suggested a double-blind, MK-0966 versus comparator design, where patients are given study medication then questioned at the end of a year as to whether they were hospitalized. Although Prof. Langman noted that the rate of hospitalizations would be very low, Dr. Strom thought that it represented the most important outcome and if we could not differentiate MK-0966 from NSAIDs in terms of hospitalization for bleeding, then other distinctions made would be less important. Dr. Bombardier agreed in general but noted that the cost of working-up GI symptoms were very important in the overall outcome of OA and RA and suggested collecting data to this effect. While many agreed that this sort of study had certain attractions, it was highly unlikely that a study with very limited monitoring would be allowable since MK-0966 is not an approved drug. Dr. Spector agreed that we could not conduct this type of a study during this phase (IIIb) of development and stated that we needed to gain interim data, including clinically important data on PUBs, in a more controlled study. While Dr. Strom argued that we would get the intermediate data from the endoscopy and Phase III trials, Dr. Spector reminded the attendees that this was not a *fait accompli* and the GI Outcomes Study would provide a safety net in the event that data were not definitive. Dr. Spector further commented that the purpose of the GI Outcomes Study was to obtain scientific and medical data to establish MK-0966 as much safer than NSAIDs. He noted that the health economic outcome data, would be secondary to the clinical safety data collected.

When the consultants were questioned whether a comparator design would best support the goals of the program, Prof. Langman replied that he would not be fully confident MK-0966 were safe [enough to eliminate the NSAID class warning] solely on the basis of a comparative trial. Dr. Nies reiterated that data from the Outcomes Study would be used in combination with the endoscopy and Phase III studies to distinguish MK-0966 from NSAIDs and support elimination of the class warning label. Prof. Langman agreed that if all data were favorable, the argument would be stronger.

### Number/Type of Comparative Agents

Dr. Strom suggested that MK-0966 be compared against drugs perceived to be the safest (e.g., acetaminophen and ibuprofen). Prof. Langman noted that we could not state that MK-0966 is as safe as placebo if we do not have a comparison study to placebo. Noting the difficulties with such a design in an OA population, Prof. Langman was of the opinion that data showing superior safety against several comparators would be stronger

5

MRK-NJ0231934

Design of a GI Outcomes Mega-Trial
September 28, 1996

than data versus only one comparative agent. The consultants favored an acetaminophen arm in the study as a method for obtaining surrogate background safety endpoint rates. It was agreed that although the dropout rate would be high, dropouts due to lack of efficacy would be an important endpoint. The use of rescue therapy such as tramadol and other local measures (e.g., exercise) were recommended to enhance retention. Acetaminophen use as rescue therapy in a study of this design, was not recommended because of the potential for toxicity (due to high doses) in the acetaminophen arm. Dr. Silverman and Mr. Khanna questioned the advisability of an acetaminophen arm, because the findings could highlight favorable properties of acetaminophen.

Mr. Khanna noted that in the U.S., naproxen, ibuprofen and diclofenac currently hold 50 % of the NSAID market share and estimated this to be a constant over the next several years. Internationally, diclofenac holds the largest market share. Everyone agreed not to include nabumetone since off-label doses may be required to reach equivalent efficacy and an extremely large trial might be needed. The consultants' preference was for a single NSAID comparator to be studied in parallel with acetaminophen. It was, however, concluded that ibuprofen (due to it's perceived favorable safety profile) and diclofenac (because of its common use internationally) could be included in the NSAID comparator arm. A definitive conclusion concerning the acetaminophen arm was not reached. Everyone agreed that the study should be double-blind and that switching of NSAIDs during the study should not be allowed.

When questioned about doses of the comparator agents, the consultants suggested that dose titration be considered in order to closer approximate real world OA treatment practices and guidelines. However, the majority of Merck attendees felt that MK-0966, 25 mg, should be compared to fixed, equi-potent doses of the comparator agents. Dr. Griffin argued that equally efficacious doses are not necessarily known. She also questioned whether it would be ethical if titration were not allowed, as this is considered standard of care. Placing patients on near maximal doses of drug would not be consistent with current treatment guidelines that recommend progressing from low to high doses of an NSAID on an as needed basis.

Duration

Prof. Langman questioned why the study was being considered with a one year duration. Drs. Spector and Nies replied that the duration was mainly to show long-term data for regulatory purposes. In addition, it was noted that in animal studies, very large doses of MK-0966 appeared to be safe at three months but induced intestinal ulcerations at six and 12 months, even at lower doses. The reasons for this effect over time are not completely understood.

The drop out rate for the one year study was estimated by the consultants to be 40-70% even with the "typical" Merck efforts for increasing patient retention. They noted that drop outs would mainly be due to lack of efficacy.

6

Confidential - Subject To Protective Order

Design of a GI Outcomes Mega-Trial
September 28, 1996

<u>Use of Antiulcer Agents</u>

Everyone agreed that patients regularly taking antiulcer agents (e.g., misoprostol, H$_2$ blockers, proton pump inhibitors, etc.) at baseline should be excluded from the study. It was agreed that the use of such medications during the study could not be disallowed and the need for these agents should be considered a secondary endpoint. Prof. Langman cautioned that indiscriminate use, especially of over the counter antiulcer medications, would need to be minimized. There was also a question as to how patients who start on antiulcer medications for preventive measures (i.e., without cause) would be analyzed. Dr. Guess was concerned that use of such agents during the study could compromise the primary outcome (PUBs).

<u>Intention-to-Treat (ITT) vs. Per-Protocol Analysis</u>

Whether patients should be followed in the study after discontinuing therapy was discussed (ITT approach). Dr. Griffin was a proponent for this approach stating that a per-protocol analysis (only analyzing data on patients while they are in the study on treatment) would be biased due to the likely high dropout rate and potential for an endpoint to occur shortly after discontinuation of treatment. Dr. Spector suggested following patients for four weeks after discontinuing therapy. Dr. Guess noted that regulatory agencies prefer an ITT approach. A final consensus was not reached.

<u>Endpoint Definition</u>

There was discussion as how the endpoint definition might be broadened. Dr. Spector suggested inclusion of hematocrit decreases of six percentage points or more as an endpoint as this could be considered a clinically important change. Prof. Langman was concerned that this would dilute the PUB endpoints as the event rate for hematocrit decreases would be far greater than that for PUBs. Dr. Strom was concerned that depending on the timing for monitoring blood counts in relation to observation of the cause for the decrease (e.g., a patient may have a decreased hematocrit due to a bleeding ulcer but the lesion may no longer be apparent by the time the lab result is obtained).

Dr. Musliner raised the possibility of endoscoping patients who discontinue therapy for GI symptoms as a method for increasing detection of symptomatic ulcers. The consultants were not in favor of required endoscopies stating that in practice, symptomatic patients are first instructed to discontinue therapy to see if symptoms disappear before other invasive tests are considered. In addition, enrollment might be hindered if patients had to consent to endoscopy once they experienced GI symptoms that required therapy discontinuation.

As a compromise, the consultants agreed that decreases in hematocrit would be a better endpoint than required endoscopy findings. It was reasoned that a decrease of six percentage points from baseline or previous visit, confirmed by repeat analysis, could be considered a presumed bleed after obvious non-GI causes were ruled out (e.g., trauma, blood donation, other anemias, etc.). It was recommended that the same definitions and criteria should be used in the Phase III pooled monitoring of GI clinical events.

7

Design of a GI Outcomes Mega-Trial
September 28, 1996

### Additional Outcomes Measures

The extent of capturing efficacy data was discussed.  Dr. Griffin felt that efficacy data needed to be collected as there was not an agreement as to what fixed dose is considered efficacious.  Some Merck attendees argued to minimize efficacy measurements since the trial would not be appropriately designed to study efficacy rigorously and would have the risk of not being able to demonstrate clear superiority to acetaminophen.  Dr. Gruer suggested that collection of minimal efficacy data may be inconclusive and either no efficacy data be collected or more rigorous measures be employed.

### Closing

Dr. Watson thanked the consultants and all participants for their informed contributions to the discussion.

### Post-Meeting

An Executive Summary of the meeting (Attachment 8) was distributed to all invitees on October 16, 1996.  A written transcript of the meeting will be distributed by the Epidemiology department.

8

Confidential - Subject To Protective Order

MRK-NJ0231937

**ATTACHMENT 1**

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231938

**ATTACHMENT 1**

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231939

# MK-0966 (COX-2 INHIBITOR) CONSULTANTS' MEETING
## PHASE III MONITORING OF GI CLINICAL EVENTS

## CONSULTANTS

Claire Bombardier, MD
Director, Clinical Epidemiology Division, Wellsley Hospital Research Institute
Director, Clinical Epidemiology Unit, University of Toronto
Scientist, Coordinator of Clinical Research, Institute for Work and Health
Toronto, Ontario
Canada

Marie R. Griffin, MD
Professor, Department of Preventive Medicine
Professor, Department Medicine
Vanderbilt University School of Medicine
Nashville, TN
USA

Professor Michael Langman
Dean, Faculty Medicine and Dentistry
University of Birmingham
Queen Elizabeth Hospital
Birmingham,
United Kingdom

Brian L. Strom, MD
Chair, Department of Biostatistics and Epidemiology
Director, Center for Clinical Epidemiology and Biostatistics
University of Pennsylvania School of Medicine
Philadelphia, PA
USA

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231940

**ATTACHMENT 2**

C:\WINDOWS\CONMIN1.DOC

Confidential – Subject To Protective Order

MRK-NJ0231941

# MK-0966 (COX-2 INHIBITOR) CONSULTANTS' MEETING
## PHASE III MONITORING OF GI CLINICAL EVENTS

### MERCK INVITEES

Mr. James Bolognese
Dr. Christine Cioffe
Dr. Brian Daniels
Dr. Elliot Ehrich
Dr. Beth Friedman
Mr. Bill Gerth
Ms. Monica Hoover
Dr. Barry Gertz
Dr. Bonnie Goldmann
Dr. Peter Gruer
Dr. Harry Guess
Mr. Deepak Khanna
Dr. Stephanie Larouche
Dr. Briggs Morrison
Dr. Jim Murray
Dr., Tom Musliner
Dr. Alan Nies
Dr. William Powell
Ms. Suzanne Pryor-Tillotson
Dr. Hui Quan
Dr. Nancy Santanello
Dr. Robert Silverman
Dr. Thomas Simon
Ms. Sandy Simpson
Dr. Reynold Spector
Dr. Ulrich Taglieber
Dr. Douglas Watson
Dr. George Williams

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231942

**ATTACHMENT 3**

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231943

# MK-0966 (COX-2 INHIBITOR) CONSULTANTS' MEETING
## PHASE III MONITORING OF GI CLINICAL EVENTS

### AGENDA

| Time | Topic | Presenter |
|------|-------|-----------|
| 8:15-9:00 | Continental Breakfast | |
| 9:00-9:05 | Welcome and Introductions | Dr. D. Watson |
| 9:05-9:10 | Objectives of the Meeting | Dr. D. Watson |
| 9:10-9:20 | Clinical Background on MK-0966 | Dr. B. Daniels |
| 9:25-9:30 | NSAID Class Warning | Dr. B. Daniels |
| 9:30-9:45 | Phase III GI Clinical Event Monitoring Plan | Dr. D. Watson |
| 9:45-10:30 | Questions for Consultants and Discussion | |
| 10:30-10:45 | Morning Break | |
| 10:45-12:00 | Discussion (cont.) | |
| 12:30-1:00 | Lunch | |
| 1:00-1:30 | GI Outcomes Mega-trial | Dr. T. Musliner |
| 1:30-2:35 | Questions for Consultants and Discussion | |
| 2:35-2:45 | Afternoon Break | |
| 2:45-3:45 | Discussion (cont.) | |
| 3:45-4:00 | Wrap-up | Dr. D. Watson |

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231944

**ATTACHMENT 4**

C:\WINDOWS\CONMIN1.DOC

Confidential – Subject To Protective Order

MRK-NJ0231945

# OBJECTIVES

1. To review and discuss the design and implementation of a plan to monitor the incidence of clinically important GI events in phase III trials of MK-0966

2. To review and discuss issues related to the design and implementation of a large, randomized, clinical trial to demonstrate a low incidence of clinically important GI events with MK-0966.

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231946

**ATTACHMENT 5**

Confidential - Subject To Protective Order

MRK-NJ0231947

# Outline

- Program Hypothesis
- Clinical Results
- Design of the phase III trials

Confidential - Subject To Protective Order

# Biology of COX

- Prostaglandins are Synthesized by Two Homologous Cyclooxygenase (COX) Enzymes: COX-1 and COX-2

- COX-1: Constitutive - Widely Distributed Including Platelets, GI tract

- COX-2: Inducible - Present in Monocytes, Neural Tissue, Placenta

- Marketed NSAID are Dual COX-1/COX-2 Inhibitors

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231949

# GI Complications of NSAID

- 2 to 4 % yearly incidence of perforation, ulcer or bleeding with chronic therapy
- In the United States
  - ➤ 76,000 Hospitalizations/Year
  - ➤ 7,600 Deaths/Year

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231950

## NSAID GI Warning

**Risk of GI ulceration, bleeding and perforation with NSAID:** Serious GI toxicity such as bleeding, ulceration, and perforation, can occur at any time, with or without warning symptoms, in patients treated chronically with NSAID...In patients observed in clinical trials of several months to two year's duration, symptomatic upper GI ulcers, gross bleeding or perforation appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. Physicians should warn patients about signs and or symptoms of serious GI toxicity...

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231951

# COX-2 Hypothesis

A COX-2 selective inhibitor will be an effective anti-inflammatory and analgesic medication with substantially reduced GI toxicity.

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231952

# Pharmacology of MK-0966

- *in vitro*

  ➤ COX-2 $IC_{50}$ (20 nM)
  ➤ COX-1 $IC_{50}$ (100 μM)

- *ex vivo* data confirms COX-2 selectivity

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231953

## Objective

Avoid the standard NSAID GI warning
label through serial endoscopy studies
in combination with a low incidence of
PUB in clinical trials

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231954

# Endoscopy Study

- One Week Study in Normal Volunteers
- MK-0966 250 mg daily
  Ibuprofen 800 mg three times a day
  Aspirin  650 four times a day
  Placebo
- Endoscopy at baseline and after 7 days of study drug administration

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231955

# MK-0966 Erosion Score Similar to Placebo



% of patients with Erosion Score > 1
After 7 Days of Administration

Confidential - Subject To Protective Order

MRK-NJ0231956

# Pilot Osteoarthritis Study

- OA of the Knee
- Regular Users of NSAID who 'flare' with discontinuation
- MK-0966 25 mg and 125 mg

  Placebo
- Patient assessment of their Osteoarthritis using WOMAC and Global Questions

C:\WINDOWS\CONMINI.DOC

Confidential – Subject To Protective Order

MRK-NJ0231957

## Phase III OA Trials



- Pair of one-year trials of NК-0966 vs.

## MK-0966 Effective in OA Pain



MK-0966 Vs. Diclofenac

MK-0966 12.5 mg/day — 200 Subjects

MK-0966 25 mg/day — 200 Subjects

Diclofenac 150 mg/day — 200 Subjects

Efficacy Endpoints — 12   26   52

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231959



MK-0966 Vs. Ibuprofen

MK-0966 12.5 mg/day — 200 Subjects

MK-0966 25 mg/day — 200 Subjects

Ibuprofen 2.4 gm/day — 200 Subjects

Study Week    2/4    4/8    6/12

Only one MK-0966 arm in the Nabumetone study

C:\WINDOWS\CONMINI.DOC

MRK-NJ023196

Confidential - Subject To Protective Order

# Endoscopy Trial Design



|  |  |  |  |  |
| --- | --- | --- | --- | --- |
| MK-0966 50 mg | 150 Patients |  |  |  |
| MK-0966 25 mg | 150 Patients |  |  |  |
| Ibuprofen 2.4 gm | 150 Patients |  |  |  |
| Placebo | 150 Patients |  |  |  |

| Endoscopy | Entry | 6 Weeks | 3 Months | 6 Months |

Confidential - Subject To Protective Order

MRK-NJ0231961

# Extension to Dose Confirmation Trial

- Long term safety extension to a placebo controlled six week dose confirmation trial
- Four treatment arms
  - ➤ MK-0966 12.5, 25, and 50 mg-80%
  - ➤ Diclofenac 150 mg-20%

C:\WINDOWS\CONMIN1.DOC

MRK-NJ023

Confidential - Subject To Protective Order

## Cumulative Exposure

- MK-0966-1250 patient years
  - ➤ 12.5 mg to 50 mg range
- Diclofenac-420 patient years
- Ibuprofen-160 patient years
- Placebo-60 patient years
- Nabumetone-12 patient years
- per protocol exposure

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231963

**ATTACHMENT 6**

Confidential - Subject To Protective Order

MRK-NJ0231964

# MK-0966 Phase III
# GI Clinical Event Monitoring Plan

Confidential - Subject To Protective Order

MRK-NJ0231965

# Classification of GI Events

Class I:   Upper GI perforations, ulcers or bleeds

Class II:   Pre-specified NSAID-related GI symptoms

Class III:   Treatment D/C due to Class I or II events

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231966

# Class I Events
## (Significant NSAID-related UGI Complications)

1. Upper-GI Perforation confirmed by any one or more of the following:

   a) Endoscopy
   b) Surgery
   c) Autopsy
   d) Unequivocal radiographic results consistent with free intraperitoneal air or extravasation of contrast media on UGI series.

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231967

## Class I Events (cont)

2. Development of Active Gastric or Duodenal Ulcer confirmed by any one or more of the following

   a) Endoscopy
   b) Surgery
   c) Unequivocal radiological evidence of gastric or duodenal ulcer on upper-GI series with contrast

   d) Autopsy

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231968

# Class I Events (cont)

3. Development of Clinically Significant Upper-GI
   Bleeding - defined as one or more of the following:

   a) Physician-documented hematemesis
   b) Physician-documented melena
   c) Heme-positive stool proven to be from upper GI
      source and evidence of significant blood loss*
   d) Patient report of hematemesis or melena, and
      evidence of significant blood loss*

   * (see next slide)

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231969

# Purpose

## Criteria for Significant Blood Loss

One or more of the following which is temporally related to
"heme-positive stool proven to be from upper GI source", or
"patient report of hematemesis or melena" (previous slide):

a) Decrease in hematocrit $\geq$ 5 %.
b) Evidence of orthostatic pressure changes (one or more of):
   i.  pulse rate increased (sitting to standing) of $\geq$ 20 BPM
   ii.  decrease in SBP $\geq$ 20 mm Hg
   iii. decrease in DBP $\geq$ 10 mm Hg
c) Other evidence of significantly reduced circulatory volume
   (e.g. shock, or significant hypotension corrected by volume

Confidential – Subject To Protective Order

MRK-NJ0231970

# Class II Events
## (NSAID-related GI Symptoms)

Spontaneously reported AEs mapped (blinded to treatment and in an automated manner) to one of the following Merck AE dictionary terms:

1. Dyspepsia
2. Heartburn
3. Epigastric pain
4. Nausea

C:\WINDOWS\CONM\INI.DOC

Confidential – Subject To Protective Order

MRK-NJ0231971

# Class III Events
## (Discontinuations due to Class I or II Event)

Discontinuation due to Class I or II event, documented on Case Report Form

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231972

# Procedures

Data Collection:
- Standard CRF (AE, Patient Status)
- Significant GI Clinical Event Form

Documentation:
- Class I: Standard CRF, supported by source documents and investigator narratives
- Class II: CRF (AE report form)
- Class III: CRF (Patient Status form)

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231973

# Investigator Narratives

Proposal:

- Investigators given standard guidelines

- Narrative is unstructured, written description of Class
  1 case with supporting documentation

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231974

# External Review Board

Board will perform blinded review of the CRF, investigator narrative, and supporting documentation for all Class I events

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231975

# Analysis

Objective:  to compare the incidence of significant GI complications in Phase III trials

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231976

# Analysis

Primary Hypothesis:

- The incidence of Class I events (Upper GI perforation, ulcer or bleed) will be less with MK-0966 than with all active comparators combined

C:\WINDOWS\CONMIN1.DOC

Confidential – Subject To Protective Order

MRK-NJ0231977

# Analysis (cont)

Secondary Hypotheses:

- The incidence of Class II events (NSAID-related GI symptoms) will be less with MK-0966 than with all active comparators combined

- The incidence of treatment discontinuations due to
    a) Class I Events alone
    b) Class II Events alone
    c) Both Class I and II Events combined will each be less with MK-0966 than with all active comparators combined

C:\WINDOWS\CONMIN.DOC

Confidential - Subject To Protective Order

MRK-NJ0231978

# Questions

With respect to Class I events:

1. Are the included events and the criteria for definitiveness appropriate?

   If not, what other/additional events or criteria should be considered?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231979

# Questions (cont.)

## With respect to Class I events:

2. The misoprostol study (Silverstein et al), included a category for ulcer with obstruction (distinct from ulcer with bleed) which occurred less often with misoprostol than placebo.

We do not plan to include this type of event in our Class I category.  Should we?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231980