# EXHIBIT 24 Part 2

# Questions (cont.)

## With respect to Class I events:

3.  Are the criteria for indefinite events (especially that for UGI bleed) appropriate?

    If not, what other/additional criteria should be considered?

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231981

# Questions (cont.)

With respect to Class II events:

1.  We have proposed that this class of events be composed of a pre-specified set of GI symptoms which are typically associated with NSAIDs. The symptoms (dyspepsia, heartburn, epigastric pain, nausea) are being collected as spontaneously reported adverse events.

    Do you agree with this plan?

    Are the included symptoms appropriate?

C:\WINDOWS\CONMIN1.DOC

Confidential – Subject To Protective Order

MRK-NJ0231982

# Questions (cont.)

## With respect to hypotheses and analysis:

1. Our primary hypotheses is that the incidence of definite Class I events (GI perforation, ulcer or bleed) will be less with MK-0966 than with active comparators.

   Is this hypothesis appropriate?

C:\WINDOWS\CONMIN\.DOC

Confidential - Subject To Protective Order

MRK-NJ0231983

# Questions (cont.)

With respect to hypotheses and analysis:

2.  With respect to the analysis approach:

    a.  We plan to analyze the number of patients having one or more Class I events.

        Do you agree with this proposal?

        Should we also analyze the types of Class I events separately?

        If so, what hierarchy of Class I events would you use?

C:\WINDOWS\CONM\N1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231984

# Questions (cont.)

**With respect to hypotheses and analysis:**

2.   With respect to the analysis approach:

b.   It is possible that an analysis of the different types of Class I events would yield discrepant results.

From a clinical perspective, which type of event do you consider to be of greatest importance?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231985

# Questions (cont.)

## With respect to hypotheses and analysis:

2.  With respect to the analysis approach:

    c.  We are considering an analysis that combines patients having either a Class I or Class II event.

        Would you recommend doing so?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231986

# Questions (cont.)

With respect to hypotheses and analysis:

3. Our preliminary power calculations show that we have approximately 50% power to show a difference in the Class I event rate that is typical of non-NSAID versus NSAID users. Therefore, it is likely that an analysis of the Class I events would show a statistically non-significant result in favor of MK-0966.

   In your opinion, would we be doing ourselves more harm than good by carrying out such an analysis?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231987

# Questions (cont.)

With respect to hypotheses and analysis:

4.  Two of the phase III trials have scheduled endoscopies, while four of them do not. We plan to include all six studies in the pooled analysis. However, we would exclude from the pooled analysis ulcers discovered solely during protocol-scheduled endoscopy and classified as a study endpoint.

Do you think that we can reliably and validly distinguish between these ulcers and those discovered during an evaluation for cause (ie. because of symptoms or clinical signs, independent of scheduled endoscopy)?

C:\WINDOWS\CONM.INI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231988

# Questions (cont.)

## With respect to Procedures:

1. We plan to use an external board to perform blinded reviews of investigator narratives, adverse event reports, case report forms, and supporting documentation of Class I events.

   Do you agree with this plan?

C:\WINDOWS\CONM\INI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231989

# Questions (cont.)

## With respect to Procedures:

1. Are the procedures for event documentation appropriate and sufficiently rigorous?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231990

**ATTACHMENT 7**

Confidential – Subject To Protective Order

MRK-NJ0231991

# MK-0966
# GI Outcomes Study

Confidential - Subject To Protective Order

MRK-NJ0231992

# GI Outcomes Study

- Purpose

  - To provide clinical corroboration of endoscopic evidence for a reduced/absent potential for GI ulceration with MK-966

  - To demonstrate a meaningful reduction in the incidence of significant GI complications compared to marketed NSAIDs

  - To demonstrate cost advantages of MK-966 vs. NSAID comparators

  Secondary

- Design Conception: MK-966 vs. one or more active comparators in an OA population; duration at least 1 yr

- Primary Endpoint: Serious upper GI complications -- perforations, ulcers, bleeds ("PUBs")

  Peptic ulcer

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0231993

# Incidence of PUBs

- **Smalley et al., 1995** - elderly Medicaid recipients ≥ 65; 209,066 person-years of follow-up, 1984-86:

  |                    | Annual Hosp Rates (%) |
  | ------------------ | --------------------- |
  | NSAID nonusers     | 0.42                  |
  | Current NSAID users| 1.67                  |

- Other estimates of PUBs incidence:

  - Lanza et al., 1995 - current NSAID users 20-64 yrs    - 0.42%
  - Schorr et al., 1993 - current NSAID users ≥65 yrs     - 0.83%*
  - Fries et al., 1991 - RA pts on NSAIDS                 - 1.58%*
                         RA pts not on NSAIDs             - 0.28%*
  - Ohmann et al., 1992 - Dusseldorf, PU bleeds           - 0.05%*
                          age 60-79                       - 0.13%*
                          age ≥80                         - 0.26%*
  - Longstreth, 1994 - Kaiser, UGI bleeds                 - 0.10%*

    *hospitalizations only

Confidential - Subject To Protective Order

C:\WINDOWS\CONMIN1.DOC

MRK-NJ0231994

# PUBs as Endpoints

- Variability in PUB rates -- dependent on definitions, characteristics of the population, detection methods

- Factors tending to increase PUB rates:
  - higher risk population (age, prior history, use of other drugs)
  - broader definition of events
  - more aggressive approach to detection

- Factors tending to reduce PUB rates:
  - use of antiulcer drugs

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231995

# PUBs as Endpoints (cont)

- Options for increasing detection of GI clinical endpoints
  - endoscopy/UGI in patients who discontinue due to pre-specified upper GI AEs   } — they do not like this one
  - screening for heme positive stools → work-up   } — maybe
  - screening for fall in hgb → work-up — yes
    (downside: potential interference with PUB rates & other outcomes measures)

- Option of broadening the definition of the primary endpoint (e.g. including a specified fall in hgb as a primary endpoint event)   — No fun 0966   Goo

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0231996

# Published Large Comparator Studies/Data

- "Misoprostol Reduces Serious Gastrointestinal Complications in Patients with RA Receiving NSAIDs"
  - *Ann Intern Med, 1995*

- "Safety Experience with Nabumetone vs. Diclofenac, Naproxen, Ibuprofen, and Piroxicam in OA and RA"
  - *Am J Med, 1993*

- "Review of Clinical Trials and Benefit/Risk Ratio of Meloxicam"
  - *Scand J Rheum, 1996*

Confidential – Subject To Protective Order

MRK-NJ0231997

C:\WINDOWS\CONMIN1.DOC

# Misoprostol Megatrial: Design

- 6-month, randomized, placebo-controlled, double-blind trial of misoprostol vs. placebo in 8843 patients with RA on continuous therapy with ≥ 1 of 10 pre-specified NSAIDs at predefined minimum doses

- 664 study sites, US & Canada

- Antacids but not other antiulcer drugs allowed

- Primary endpoint:  Serious clinical upper GI complications

- Blinded External Review Committee -- "suspicious" events reported by investigators were assigned to specified "definite" and "probable" categories; cases with probable non-NSAID causes were excluded (~60%)

Confidential - Subject To Protective Order

MRK-NJ0231998

C:\WINDOWS\CONMIN1.DOC

# Misoprostol Megatrial: Results

- Dropout rate = 39% over 6 mo ( 42% misoprostol vs. 36% placebo; excess attributable to misoprostol side effects)

- Definite serious upper GI complications: 25 of 4404 patients (0.57%) on misoprostol vs. 42 of 4439 on placebo (0.95%)

  projected annual rates: NSAIDs + misoprostol    1.1% ⎫
                          NSAIDs alone             1.9% ⎭

- If "probable" events and "uncomplicated" ulcers included: projected annual rates: NSAIDs + misoprostol   2.0% ⎫
                          NSAIDs alone             3.9% ⎭

Confidential - Subject To Protective Order

C:\WINDOWS\CONMIN1.DOC

# Nabumetone vs. NSAIDs: Study Design

- 12-week randomized, open-label trial

- 4411 patients with RA or OA (448 sites)

- Patients randomized in a 3:1 ratio - nabumetone:comparator NSAID; 5 treatment groups: nabumetone (1-2,000 mg/d), diclofenac (1-200 mg/d), naproxen (500-1,500 mg/d), piroxicam (10-20 mg/d), ibuprofen (1,200-3,200 mg/d); dose titrated as needed

- H2 blockers, misoprostol, omeprazole permitted
  - 3-4% usage at entry
  - 18-20% usage during study

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0232000

## Meloxicam Data - PUB Rates in Double-blind Studies (RA and OA)

| | Meloxicam 7.5 mg n=881 | Meloxicam 15 mg n=1590 | Piroxicam 20 mg n=699 | Diclofenac 100 mg SR n=324 | Naproxen 750-1000 mg n=243 |
|---|---|---|---|---|---|
| PUBs: % (n) | 0.1 (1) | 0.2 (3) | 1.2 (8)**# | 0.6 (2) | 2.1 (5)**# |
| Projected* PUB annual incidence (%) | 0.42 | 0.70 | 4.3 | 2.3 | 7.7 |

* crude extrapolation from quoted mean meloxicam exposure of 98 days, with assumption that exposure was the same for all drugs at all doses

**p < 0.05 compared with meloxicam 7.5 mg; # p < 0.05 compared with meloxicam 15 mg

Confidential - Subject To Protective Order

C:\WINDOWS\CONMINI.DOC

MRK-NJ0232001

# Nabumetone vs. Comparator NSAIDs: Published Results

## Occurrence of PUBs

| | | |
|---|---|---|
| nabumetone | (n=3315) | 1 (0.03) |
| Comb. NSAIDs | (n=1096) | 6* (0.5) |
| naproxen | (n=279) | 2** (0.7) |
| ibuprofen | (n=279) | 2** (0.9) |
| diclofenac | (n=279) | 1 (0.3) |
| piroxicam | (n=279) | 1 (0.3) |

*p=0.001 vs. nabumetone, **p<0.02 vs. nabumetone

- 25-32% of patients withdrew (any reason) within 3 mo

C:\WINDOWS\CONM1N1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232002

# Megatrial Design Scenarios

Confidential - Subject To Protective Order

MRK-NJ0232003

C:\WINDOWS\CONMIN1.DOC



consider disproportionate allocation of tx groups

disallow - Ethical

# Megatrial Design Scenario - 1

OA patients currently taking
or in need of NSAIDs

Randomized
to
MK-966

n ~5,500**

Randomized
to NSAID
Comparators*

n ~5,500**

* ? naproxen, ibuprofen, diclofenac?
** sample size estimate for 95% power to detect a 50% lower event rate;
assumes PUB rate of 1.5% in NSAID group and does not take dropouts
into consideration. It may need to be 2-3 fold higher

Possible variants – open label study, disproportionate allocation to
treatment groups; allow or disallow use of antiulcer drugs.

Confidential - Subject To Protective Order

C:\WINDOWS\CONMIN1.DOC

MRK-NJ0232004

# Scenario 1

- <u>Pros</u>
  - High likelihood of a positive, strong result for MK-0966 vs. the combined NSAID group
  - OA population
  - Direct resource utilization data and MK-966 incidence rates for comparison to NSAIDs currently in common use

C:\WINDOWS\CONMINI.DOC

Confidential – Subject To Protective Order

MRK-NJ0232005

# Scenario 1

- Cons
  - Background PUB rate will remain unknown
  - No comparative data to those NSAIDs with real or perceived lower GI toxicity
  - Risk of observing PUB rates in the MK-966 group which exceed those published for nabumetone or other agents
  - Liability & ethical issues if antiulcer agents prohibited; confounding of results if they are allowed
  - High dropout rate -- implications

Confidential – Subject To Protective Order

C:\WINDOWS\CONMIN1.DOC

MRK-NJ0232006



Confidential – Subject To Protective Order

MRK-NJ0232007

# Scenario 2

- **Pros**

  - Potential to demonstrate superior GI safety and cost advantages compared to newer NSAIDs with lower GI toxicity

- **Cons**

  - Extremely large study would be needed if the goal were to show a GI safety advantage for MK-0966 specifically over nabumetone; it is possible that no safety advantage exists

  - Background PUB rate will remain unknown
  - Dilemma of use of anti-ulcer agents remains
  - Problem of high dropout rate in OA population remains

C:\WINDOWS\CONMINI.DOC

Confidential - Subject To Protective Order

MRK-NJ0232008

# Megatrial Design Scenario - 3

**Study Population: Elderly Subjects (≥70?) or Elderly Subjects at Increased Risk for Alzheimer's Disease**

Taking or anticipated to require NSAIDs

Not taking and not anticipated to require NSAIDs

?

**Observational Arm – Osteoarthritic Elderly Patients Taking NSAIDs**

**Non-NSAID-Requiring Elderly, Randomized to MK-966**

Double-Blind MK-966

**Non-NSAID-Requiring Elderly, Randomized to Placebo**

Double-Blind Placebo

**Co-Primary Hypotheses:**
- Serious GI complications – MK-966 = Placebo
- Cognitive fn/memory measures: MK-966 better than Pbo

**Secondary Hypothesis:**
- PUBs incidence – MK-966 < NSAIDs

Confidential – Subject To Protective Order



Megatrial Design Scenario – 4

OA patients currently taking
or in need of NSAIDs

Randomized
to
MK-966

n ~ ?

Randomized
to
Acetaminophen

n ~ ?

Randomized
to Other
NSAIDs

n ~ ?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232010

# Scenario 4

- Pros
  - Opportunity to demonstrate equivalency for GI safety relative to a "quasi-placebo" in an OA population
  - Potential to concurrently demonstrate safety superiority and cost advantages compared to "standard" NSAIDs

- Cons
  - Very large study would be required
  - Will the FDA accept equivalency to acetaminophen as a surrogate for equivalency to placebo?
  - High drop-out rate, due to OA population plus presumed lower efficacy of acetaminophen
  - Dilemma of use of anti-ulcer agents remains

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232011

## Questions

1. Merck favors an active comparator design for this study (i.e. scenario 1, 2 or 4 not scenario 3). Which comparator design would best support the goals of the program?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232012

# Questions, cont.

a.  Should there be one or several comparator agents (e.g., naproxen, ibuprofen, diclofenac)? Should nabumetone be included?

b.  Should the study be open-label or double-blind?

c.  Should antiulcer agents (e.g., misoprostol, H2 blockers, proton pump inhibitors, sucralfate) be allowed?

d.  Should "rescue" medication (e.g., acetaminophen) be incorporated into the study design to foster patient retention? Similarly, should switching of NSAID comparator agents be permitted for individual patients?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232013

## Questions, cont.

e.  What would be the estimated drop-out rate for a 1-year trial?

f.  How should the potential bias resulting from better compliance in the MK-0966 group vs. b.i.d. or t.i.d. comparator NSAIDs be handled?

g.  Is a comparator study likely to provide data of the type and strength needed to support elimination of the NSAID GI warning?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232014

## Questions, cont.

2. We are considering including a broader range of GI events as endpoints. This may increase the number of observed GI events and potentially decrease the sample size. For example:

  - all patients who discontinue due to dyspepsia could be asked to undergo endoscopy

  - all patients screened and detected to have a fall in hct of >6 points or heme-positive stool could be asked to undergo work-up (including endoscopy).

  - a fall in hct of >6 points could itself be included as an event category within the primary endpoint

Which, if any, of these approaches would be advisable? Might they compromise the clinical relevance of the findings and/or outcomes analyses?

Confidential - Subject To Protective Order

C:\WINDOWS\CONMIN1.DOC

MRK-NJ0232015

## Questions, cont.

3. What additional outcomes data would be most useful to collect (e.g. health care utilization/cost data, OA efficacy, quality of life)?

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232016

DR. ELLIOT EHRICH

JAN 27 1997

# THE DOMINION GROUP, INC.

January 24, 1997

Mr. David Ortlieb
Merck Human Health Division
Mail Stop WP37 A-212
P.O. Box 4
West Point, PA 19486

Dear David:

The information below summarizes our findings regarding COX-2 inhibitors since
our last update memo of January 20, 1997.

1.    Celecoxib by Searle

As noted previously, celecoxib entered Phase III trials in late August/early
September of 1996. We have identified over 100 sites participating sites in the US
and 7 sites participating in Canada. Most of the sites are clinical research centers
of CROs and only recently began recruiting patients. The CRO coordinating this
large multi-center study is Kendle, located in Cincinnati, OH.

Searle is conducting several celecoxib Phase III protocols in both rheumatoid
arthritis and osteoarthritis (both hip and knee protocols). A study nurse at the New
Smyrna Beach, FL, site reported that celecoxib appears to be helping inflammation
through the entire body rather than just the site targeted in the protocol. In the hip
and knee osteoarthritis protocols, length of treatment is three months. Enrollment
criteria require no replacements of the joints targeted. For example, a patient with
knee replacements would not be eligible for the knee protocol but would be eligible
to enroll in the hip protocol.

Once enrolled in the trial, patients are eligible to participate in a two year open-label
study. The hip and knee OA protocols are designed with three arms as follows: (1)
celecoxib; or (2) placebo; or (3) an unidentified NSAID. If randomized to the
celecoxib arm, patients are randomized to one dosage level throughout the three
treatment month period. The celecoxib arm randomizes each patient to one of five
different dosage levels. This source declined to identify each celecoxib dosage
level.

This source reported that there have been absolutely no problems with stomach
irritation. Approximately two patients out of 60 have had to drop out of the study
due to unidentified side effects of itching. The studies do require endoscopic
evaluation.

8229 Boone Blvd., Suite 710          Vienna, Virginia 22182          PH    (703) 848-4233
                                                                      FX    (703) 848-9469

Confidential - Subject To Protective Order                                         MRK-NJ0232017

**ATTACHMENT 8**

Confidential - Subject To Protective Order

Executive Summary of MK-0966 Consultants' Meeting
Critical Evaluation of Phase III Monitoring of GI Clinical Events and
Design of a GI Outcomes Mega-trial
September 28, 1996; Elizabeth, NJ

Distribution List:

Mr. James Bolognese
Dr. Christine Cioffe
Dr. Brian Daniels
Dr. Elliot Ehrich
Dr. Beth Friedman
Mr. Bill Gerth
Dr. Barry Gertz
Dr. Bonnie Goldmann
Dr. Peter Gruer
Dr. Harry Guess
Mr. Deepak Khanna
Dr. Stephanie Larouche
Dr. Briggs Morrison
Dr. Jim Murray
Dr. Tom Musliner
Dr. Alan Nies
Dr. William Powell
Ms. Suzanne Pryor-Tillotson
Dr. Hui Quan
Dr. Nancy Santanello
Dr. Robert Silverman
Dr. Thomas Simon
Ms. Sandy Simpson
Dr. Reynold Spector
Dr. Ulrich Taglieber
Dr. George Williams

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232019

October 16, 1996

**Executive Summary of MK-0966 Consultants' Meeting:**
**Critical Evaluation of Phase III Monitoring of GI Clinical Events**
**and Design of a GI Outcomes Mega-trial**

A consultants' meeting was held on Saturday, September 28, 1996, at the Hilton Airport Hotel in Elizabeth, NJ.  The purpose of the meeting was to receive critical evaluation of (1) the plan for monitoring  upper gastrointestinal (UGI) events during MK-0966 phase III clinical trials and (2) initial plans for the GI mega-trial.  The consultants present were Claire Bombardier, MD, Marie Griffin, MD, Professor Michael Langman, and Brian Strom, MD.

This memo is a summary of the consultants' opinions regarding the questions asked of them. Publication of complete minutes of the meeting will follow.

## Phase III Monitoring of GI Clinical Events

### Clinically Significant NSAID-Related Events (Perforations, Ulcers, UGI Bleeding)

The consultants agreed that the events chosen for evaluation are appropriate.  They made a number of suggestions for the definitions of and criteria for events.  These included recommendations that ulcers should be subcategorized according to whether bleeding occurred, that these events would be better defined by "severity" as well as "certainty" criteria, and that the need for transfusion be added as an indication of UGI bleeding severity.  They agreed to the MRL suggestion of adding a separate category of a reproducible $\geq 6$ percentage point drop in hematocrit, relative to baseline or previous on-study value, regardless of whether the drop is within or outside the "normal range", as long as the drop in hematocrit is judged by the investigator to be due to GI bleeding not explained by identifiable factors such as cancer, surgery, or trauma).  The consensus was that this new type of event would not be put into the same class of events as perforations, ulcers, and bleeding.  With respect to questions about the inclusion of esophageal and/or lower GI events in the definition of significant clinical events, the consensus was that although this would increase the power of the analysis it would also increase the misclassification of events.  Therefore, it was concluded that esophageal and lower-GI events would not be included.

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232020

UGI NSAID-Related Symptoms

The consultants suggested that UGI symptoms should be collected actively (e.g., by symptom check list) rather than passively by mapping spontaneously reported GI adverse events into several pre-defined categories. The MRL attendees noted that following this suggestion would artificially elevate the reported incidence of GI adverse events in the trial in a way that could place the product at a competitive disadvantage in the product labeling.  MRL also indicated that a validated checklist is not currently available.  There was general agreement that the passive collection method would be maintained.  However, the decision was made that no hypotheses regarding the symptoms would be stated.  The symptoms would be the subject of descriptive analyses only.

Data Analysis

The consultants agreed to the proposal for an analysis based on the number of patients experiencing events (as opposed to the number of events).  It was also agreed that the primary analysis would combine PUBs because of the small number of expected events.  It was acknowledged that the analysis is underpowered, but it needs to be done for regulatory purposes. Consensus was reached that PUBs and UGI symptoms would not be combined for analysis since the few expected PUBs would be overwhelmed by the larger numbers of symptoms. Similarly, the consultants advised that no analysis of discontinuations due to UGI symptoms is necessary, since this analysis would be redundant to that of GI symptoms.  The consultants agreed that the endoscopy studies should be included in the monitoring plan and meta-analysis; however, they agreed that the information obtained from protocol-scheduled endoscopies should not be included in the meta-analysis.  It was suggested that clinically significant events (ulcers or bleeds) discovered during scheduled endoscopy would be identified and excluded from the meta-analysis by defining a period of time around scheduled visits.

Study Procedures

The consultants concurred with the idea of an external review board, as proposed by MRL.  The board will be given written guidance on how to classify clinically significant NSAID-related perforations, ulcers, and UGI bleeding events.  The event narratives requested of and written by investigators can be unstructured in format.  The investigators should be given general guidelines for the expected evaluation of UGI events, but rigorous enforcement of these clinical evaluation procedures will not be done.  The consultants concurred that an examination of the relationship of UGI symptoms with MK-0966 and other drugs should be explored by doing a series of within-patient studies ("n-of-1" studies) in patients with a history of NSAID side-effects.

# GI Outcomes Mega-trial

Design and Endpoint Issues:

The consultants and Merck attendees discussed a variety of design options and settled on the proposal of a one year, double-blind, randomized study in OA patients, with MK-0966, and comparator NSAID treatment arms, and possibly an acetaminophen arm.  The acetaminophen arm would provide a method for obtaining surrogate background safety endpoint rates, given that it is not feasible to retain OA patients on placebo for one year.  The consultants suggested that ibuprofen alone be used as the comparator NSAID, since it is perceived as relatively safe. Merck attendees felt that diclofenac would also need to be included because of its wide use and status as a reference NSAID internationally. The consultants suggested that dose titration be considered in order to more closely approximate real-world OA treatment practices and guidelines.  However,

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

the majority of Merck attendees felt that MK-0966 should be compared to fixed, equi-potent doses of the comparator agents.

Use of rescue therapy such as tramadol was recommended to enhance retention; switching of comparator NSAIDs was deemed inadvisable. The consultants estimated that the drop-out rate in a one year study would be in the range of 40-60% due primarily to incomplete control of OA symptoms. There was a consensus that patients requiring antiulcer medications at baseline should be excluded, but use of such agents during the study must be allowed and should be considered a secondary endpoint.

Some of the consultants argued that for the event-rate comparison between MK-0966 and NSAIDs an intention-to-treat analysis may be required by regulatory agencies and would protect against biases associated with different drop-out rates in the treatment groups. The Merck attendees were divided on the approach to the primary analysis.

The option of expanding the primary endpoint to include PUBs plus decreases in hematocrit of ≥6 percentage points was discussed. Proponents argued that this magnitude of decrease is clinically significant and should be presumed to reflect GI bleeding in the absence of an alternative explanation. Its inclusion would substantially decrease the numbers of patients required to demonstrate superior safety for MK-0966 relative to comparators and probably for equivalency to acetaminophen. Others were concerned whether regulatory agencies would accept inclusion of hematocrit changes and pointed out that this would change the focus of the study from incidence of clinically significant PUBs to a study of hematocrit decreases, which has not been the main focus of any published NSAID trial to date.

Issues for which definite conclusions were not reached included the following: advisability of incorporating an acetaminophen arm, use of fixed doses vs. dose titration, scope of patient follow-up after therapy discontinuation, inclusion of hematocrit decreases in the primary endpoint definition, and collection of efficacy data. A follow-up consultants meeting to further address these and other issues pertaining to the GI outcomes study is planned.

C:\WINDOWS\CONMIN1.DOC

Confidential - Subject To Protective Order

MRK-NJ0232022

Dr. Eversmeyer Presentation Oct. 4, 1996     *File*     *COX-2:*

*Prospective Outcome study*

**Highlights of Presentation by Dr. Walter Eversmeyer, M.D., FACR
Browne McHardy Clinic, Section of Rheumatology, Metairie, LA
October 4, 1996**

*"Problems and Successes Encountered in a Multicenter Megatrial on the Safety and Efficacy
of Nabumetone"*

<u>Nabumetone Trial</u>

Several features of this trial which were not obvious from the papers were clarified. It was apparently initiated in 1991 more as a seeding ("pre-marketing") trial than as a trial to address pre-specified safety or efficacy questions. There were apparently no a priori hypotheses. It was only at the end of the trial that Dr. Eversmeyer was approached by the sponsor to assess the data. He indicated that they took the approach of looking to see what statistically significant results could be documented.

Investigational sites were restricted to entering no more than 12 patients. Investigators were "polled" as to their "favorite" NSAID, and within the group of four comparators ultimately chosen, the patients at a given site were randomized at a 3:1 ratio to either nabumetone or the single "preferred" NSAID selected from the four options by the investigator. All patients entered were required to have previously been treated with NSAIDs, although the paper indicates that only 70% of all patients were taking NSAIDs at the time of entry.

Although the paper states that the study was "open-label," Dr. Eversmeyer indicates that patients and investigators were double-blind to which of the two medications used at a particular site a given patient was receiving. Double-dummy images were used. All patients were started on the lowest dose, but dose could be titrated at the physician's discretion, in which case both the active tablets and placebo were doubled. Dose titration was only allowed at the four week scheduled visit. He could not provide a good explanation why the ibuprofen group seemed not to have required titration to doses that would usually be considered equipotent to the doses to which the other NSAIDs were titrated. (In practice, Dr. Eversmeyer noted that he generally starts patients on the highest dose of NSAID because by the time they are referred to him, they generally have been taking lower doses unsuccessfully)

The allocation of relatively small numbers of patients to comparator NSAIDs was seen by Dr. Eversmeyer as a weakness of the study, reflecting its initiation as a pre-marketing type study. In his view a design in which the numbers of patients in the nabumetone and comparator arms were equal would have been preferred. He also saw allowing the use of antiulcer agents as a weakness of the study, perhaps contributing to the very low PUBs event rates observed. He could not tell us how the use of antiulcer drugs compared between the different treatment groups as this was never analyzed. If use of these drugs is allowed in similar studies, he felt it should be a pre-specified endpoint. He nevertheless felt that the finding of greater GI safety for nabumetone was real. Use of analgesics was left to the discretion of the investigators (agents as strong as Tylenol #3), as was use of steroid joint injections, both of which he felt confounded the efficacy results. He agreed that some "rescue" therapy was needed, but it should be tracked and analyzed as an endpoint. Finally, he argued that the absence of a washout period also limited the efficacy data,

1

Confidential - Subject To Protective Order

Dr. Eversmeyer Presentation Oct. 4, 1996

because it is generally easier to maintain a patient who is in remission on an NSAID than it is to treat a patient who has flared.

There was no systematic means for specifically reporting PUBs. These were reported as AEs and details with sometimes obtained retrospectively.

The study used a VAS GI distress instrument, which he felt was not very sensitive for detecting potential differences in GI tolerability for the drugs used in the context of this study, given the use of H2 blockers, proton-pump inhibitors, sucralfate, etc. He did not know if this instrument had been validated in any formal manner.

Although the paper states that all analyses were "intention to treat," safety events (AEs) were counted only through the last visit. No attempt was made to obtain or include safety endpoint data for patients who discontinued the study or study drug. Investigators, were asked to report any problems that they learned of through three months following completion of the study, however, there does not seem to have been a formal study visit for this. The paper tabulates PUBs reported for patients within 3 months following completion, however, these were not included in the analysis. In all cases, patients went on to receive unblinded NSAID or steroid therapy which may have contributed to these events.

The analysis of fall in hemoglobin was entirely post-hoc. The choice of 1.5 g/dL was made because it gave a statistically significant result. Other cut-offs were apparently looked at and yielded less impressive differences between nabumetone and the comparator agents. The published comparison was between baseline hemoglobin and the last measured hemoglobin; decreases of 1.5 g/dL that fell within the normal range were included.

General Remarks on NSAIDs

In Dr. Eversmeyer's view, NSAIDs are "optional" drugs in that there are always alternatives that can be substituted (e.g. analgesics to control pain in OA; alternative agents for RA). For RA patients, NSAIDs are primarily useful to treat interim symptoms while waiting for more definitive therapy (e.g. methotrexate) to take effect.

Dr. Eversmeyer commented that he has no favorites and considers all NSAIDs to be similar at appropriate doses for efficacy. He commented that in general, some NSAIDs may have reduced GI safety risk, but none are risk free, including nabumetone. He also noted that there is a definite lack of predictability as to which NSAID will work best in any particular patient and that ~15% of patients in his practice cannot tolerate any NSAID because of GI symptoms. He felt that this population would be an interesting one in which to study a drug like MK-966.

Based on his experience and that of rheumatologists with whom he is associated, he does not feel that nabumetone at appropriate doses is less efficacious than other NSAIDs, except perhaps for indomethacin which he feels has superior efficacy to the other available NSAIDs.

2

Confidential - Subject To Protective Order

MRK-NJ0232024

Dr. Eversmeyer Presentation  Oct. 4, 1996

In his clinical experience, acetaminophen at full dose (4 gm/day) is not very effective in OA and most often will not provide adequate control. Very high dropout rates are to be expected if this is used as primary therapy in a comparator arm.

He would accept demonstration of GI safety in populations other than OA patients as extrapolable to OA and all NSAID requiring patients.


Comments on MRL preliminary design plans

Dr. Eversmeyer predicted that the drop-out rate for a 1-year study could be limited to 30-40% even though this was the rate observed over the 3 months of the nabumetone trial. Most dropouts are observed early and are generally due to lack of efficacy.

He noted that an acetaminophen comparator arm would be difficult; high dropouts for lack of efficacy should be expected. He would personally accept strong endoscopy data together with better safety demonstrated in an NSAID comparator trial as strong incentive for physicians to use MK-966 over other NSAIDs if efficacy were similar. However, he thought that regulatory agencies would require clinical demonstration of equivalency to either placebo or acetaminophen before they would allow total removal of the NSAID GI warning for this drug. 

In general he argued that falls in hematocrit should not be pooled with PUBs in the primary endpoint for a study such as ours. His reasoning appeared to be that falls in hematocrit of the magnitude examined in the nabumetone trial occur in large numbers of patients taking NSAIDs chronically, and the reason for this and the relationship to clinically significant events is uncertain. Examination of larger falls in hematocrit in the nabumetone trial apparently did not show statistically significant differences. In his clinical practice (and by implication, that of most rheumatologists) hematocrit or blood counts are not routinely followed, but only measured if there is suspicion of a bleed or other problem warranting this measurement.

3

Confidential - Subject To Protective Order

MRK-NJ0232025

ATTENDEES

Confidential – Subject To Protective Order

MRK-NJ0232026

*September 20, 1996*

## MK-0966 (COX-2 INHIBITOR) CONSULTANTS MEETING
## PHASE III MONITORING OF GI CLINICAL EVENTS

### CONSULTANTS

Claire Bombardier, MD
Director, Clinical Epidemiology Division, Wellsley Hospital Research Institute
Director, Clinical Epidemiology Unit, University of Toronto
Senior Scientist, Coordinator of Clinical Research, Institute for Work and Health
Toronto, Ontario
Canada

Marie R. Griffin, MD
Professor, Department of Preventive Medicine
Professor, Department Medicine
Vanderbilt University School of Medicine
Nashville, TN
USA

Professor Michael Langman
Dean, Faculty of Medicine and Dentistry
University of Birmingham
Queen Elizabeth Hospital
Birmingham,
United Kingdom

Brian L. Strom, MD
Chair, Department of Biostatistics and Epidemiology
Director, Center for Clinical Epidemiology and Biostatistics
University of Pennsylvania School of Medicine
Philadelphia, PA
USA

Confidential - Property of Merck and Co., Inc.

*September 20, 1996*

# MK-0966 (COX-2 INHIBITOR) CONSULTANTS MEETING
## PHASE III MONITORING OF GI CLINICAL EVENTS

### MERCK ATTENDEES

Mr. James Bolognese
Dr. Christine Cioffe
Dr. Brian Daniels
Dr. Elliot Ehrich
Dr. Beth Friedman
Mr. Bill Gerth
Ms. Monica Hoover
Dr. Barry Gertz
Dr. Bonnie Goldmann
Dr. Peter Gruer
Dr. Harry Guess
Mr. Deepak Khanna
Dr. Stephanie Larouche
Dr. Briggs Morrison
Dr. Jim Murray
Dr., Tom Musliner
Dr. Alan Nies
Dr. William Powell
Ms. Suzanne Pryor-Tillotson
Dr. Hui Quan
Dr. Nancy Santanello
Dr. Robert Silverman
Dr. Thomas Simon
Ms. Sandy Simpson
Dr. Reynold Spector
Dr. Ulrich Taglieber
Dr. Douglas Watson
Dr. George Williams

Confidential - Property of Merck and Co., Inc.

LETTER

Confidential - Subject To Protective Order

MRK-NJ0232029

*September 20, 1996*

DATE

Letter sent to the following consultants

Claire Bombardier, MD
Marie R. Griffin, MD
Professor Michael Langman
Brian L. Strom, MD

Dear Dr./Prof.

Thank you for agreeing to participate in , our meeting on September 28, 1996 at the Newark Hilton Hotel, Elizabeth, NJ.  The purpose of the meeting is to review and discuss with you important components of our Phase III program for MK-0966, a selective inhibitor of COX-2 for the treatment of arthritis and pain.  As previously indicated, we expect that this agent will have equal or better efficacy, and better GI tolerability, than dual COX-1/COX-2-inhibitor NSAIDs.  The topics for discussion at this meeting are two components of our overall strategy to demonstrate the improved GI tolerability of MK-0966.  They are:

1. A plan to monitor our Phase III trials for the occurrence of clinically important GI events and to document and classify such events for purposes of a pooled analysis.

2. Preliminary plans to design and conduct a mega-trial to demonstrate a low incidence of clinically important GI events with MK-0966.

Details of the available clinical information on MK-0966 and other materials relevant to these issues are found in this package, the contents of which are:

- Agenda
- Objectives
- List of Participants
- Introduction
- GI Clinical Event Monitoring Plan
- Questions for Consultants
- Preliminary GI Outcomes Mega-trial Design Plan
- Questions for Consultants
- Clinical sections of Confidential Investigator's Brochure (Attachment 1)
- Relevant Literature (Attachment 2)

Confidential - Property of Merck and Co., Inc.

MRK-NJ0232030

*September 20, 1996*

We look forward to a productive and interesting meeting.  Please do not hesitate to
contact me if you have any questions.

Sincerely,


Douglas J. Watson, Ph.D.

Confidential - Property of Merck and Co., Inc.

Confidential - Subject To Protective Order

MRK-NJ0232031

INTRODUCTION

Confidential - Subject To Protective Order

MRK-NJ0232032

*September 20, 1996*

# MK-0966 (COX-2 INHIBITOR) CONSULTANTS MEETING
## PHASE III MONITORING OF GI CLINICAL EVENTS

## INTRODUCTION

MK-0966, highly selective COX-2 inhibitor, is being developed for the treatment of osteoarthritis (OA), rheumatoid arthritis (RA), and pain. It is hypothesized that MK-0966, because of its selective inhibition of COX-2, will exhibit beneficial anti-inflammatory and analgesic effects with less GI toxicity and greater GI tolerability than is associated with currently available nonsteroidal anti-inflammatory drugs (NSAIDs).

Cyclooxygenase 1 and 2 (COX-1, COX-2) are two isoforms of a ubiquitous enzyme known to catalyze the synthesis of prostaglandins. COX-1 is constitutively expressed, and is believed to be the enzyme responsible for the synthesis of prostanoids associated with physiological functions, such as gastric mucosal protection and vascular homeostasis. COX-2 is an inducible enzyme thought to be primarily responsible for the synthesis of prostanoids that mediate responses to pathological processes, such as the propagation of inflammation and fever.

Currently available NSAIDs inhibit both COX-1 and COX-2 and are associated with gastroduodenal injury, in part resulting from inhibition of prostaglandin synthesis and consequent reduced mucosal defenses. Minor side effects such as nausea, dyspepsia and abdominal pain may affect 10 to 60% of patients taking NSAIDs. The most serious NSAID-related GI adverse events are peptic ulcers, ulcer-related perforations and upper GI bleeds ("PUBs"). Such events are believed to occur in ~2-4% of patients taking NSAIDs for a year and represent a significant source of morbidity and mortality. Risk for such events commonly limits or contraindicates the use of NSAIDs in patients who would otherwise benefit from their therapeutic effects.

MK-0966 is a highly selective COX-2 inhibitor. If it is correct that COX-1-derived prostanoids do not substantially contribute to the symptoms or pathogenesis of acute and chronic inflammation, and that COX-1 inhibition is primarily responsible for "standard" NSAID-induced GI toxicity, then a selective COX-2 inhibitor may manifest a more favorable GI safety profile and clinical efficacy as great as NSAIDs in current usage.

In preclinical studies, MK-0966 has been shown to have significant anti-inflammatory, analgesic, and antipyretic activity, as well as a reduced potential for GI toxicity. These findings have been confirmed in Phase I and II clinical studies, in which MK-0966 has been shown to be effective in the treatment of post-operative dental pain and symptomatic osteoarthritis. It has also shown reduced potential to acutely damage the gastric mucosa in a small endoscopy trial.

Confidential - Property of Merck and Co., Inc.

Confidential - Subject To Protective Order

*September 20, 1996*

A three-part strategy to demonstrate MK-0966's superior GI safety and tolerability versus comparators has been adopted.  The components of this strategy are:

1. Studies to assess mucosal damage by endoscopy and mucosal permeability
2. A focused assessment of reported "pre-specified GI clinical events" occurring in all phase III trials.
3. A large outcome study (Phase IIIb) to assess GI complications, costs, and healthcare resource utilization.

This meeting will cover topics related to Strategies 2 and 3, above.

Confidential - Property of Merck and Co., Inc.

Confidential - Subject To Protective Order

MRK-NJ0232034

GI EVENT PLAN

Confidential - Subject To Protective Order

MRK-NJ0232035

# MK-0966 (COX-2 Selective Inhibitor)
## Phase III Gastrointestinal Clinical Event Monitoring Plan

### Executive Summary

This document describes the background, rationale, and plan for the Gastrointestinal (GI) Clinical Event Monitoring Plan for the Phase III trials of MK-0966 (a selective COX-2 inhibitor). The trials covered by this plan include MK-0966 protocols 033, 034, 035, 040, and the two Phase III Endoscopy Trials in OA patients. This plan is one component of a three-part Phase III strategy to demonstrate the superior GI tolerability of MK-0966.

The objective of the GI Clinical Event Monitoring Plan is to provide for a standardized means of collecting relevant information about clinically significant GI events during Phase III trials of MK-0966. The data collected under this plan will be used for a pooled analysis, the primary objective of which will be to assess the comparative incidence of significant GI events and complications in all Phase III trials.

Events of interest are categorized as Class I-III. Class I events are GI PUBs (perforations, ulcers or bleeds), Class II events are pre-specified NSAID-related GI symptoms (dyspepsia, heartburn, epigastric pain, nausea), and Class III events are treatment discontinuations due to Class I or II events. For Class I events, definitive diagnostic criteria have been developed.

Procedures for data collection, monitoring, auditing, and site documentation of events are specified. Documentation of GI clinical events covered under this plan (regardless of class) does not replace the documentation required on the standard MRL data collection tools. Wherever possible, the same documentation will serve both purposes of AE reporting and categorization of events for pooled analysis. Standard MRL data collection tools will document Class II and III events for purposes of this plan. Appendix A shows the categories and definitions of events covered under this plan. Appendix B details the instructions given to clinical sites regarding the procedures to be followed. Appendix C shows the data collection form used to record Class I events.

An external review board, consisting of one or more independent consultants, will review the classification and supporting documentation for all Class I events. This review will be performed for each patient before unblinding of the study containing that patient.

A detailed data analysis plan will be developed at a future time. However, several important analytic issues are briefly addressed.

Confidential - Subject To Protective Order

*August 30, 1996*

## MK-0966 (COX-2 Selective Inhibitor)
## Phase III Gastrointestinal Clinical Event Monitoring Plan

### I.   Introduction

This document describes the background, rationale, and plan for the Gastrointestinal (GI) Clinical Event Monitoring Plan for the Phase III trials of MK-0966 (a selective COX-2 inhibitor). The trials covered by this plan include MK-0966 protocols 033, 034, 035, 040, and the two Phase III Endoscopy Trials in OA patients.

MK-0966 is being developed for the treatment of osteoarthritis (OA), rheumatoid arthritis (RA), and pain. It is hypothesized that MK-0966, because of its selective inhibition of COX-2, will exhibit beneficial anti-inflammatory and analgesic effects with less GI toxicity and greater GI tolerability than is associated with currently available nonsteroidal anti-inflammatory drugs (NSAIDs). A three-part strategy is being used to Phase III trials of MK-966 to demonstrate its superior GI safety and tolerability vs. comparators. The components of this strategy are:

1.   Studies to assess mucosal damage by endoscopy and mucosal permeability
2.   A focused assessment of reported "pre-specified GI clinical events" occurring in all phase III trials.
3.   An large outcome study ( Phase IIIb) to assess GI complications, costs, and healthcare resource utilization

This plan describes item 2 of this strategy.

The goal of the GI Clinical Event Monitoring Plan is to provide corroborating evidence for an exemption from the class warning regarding the risk of GI toxicity with NSAIDs. The plan does so by providing standardized methods for the collection of relevant information about clinically significant GI complications of MK-0966 and comparators across several trials for purposes of a pooled analysis of clinically important GI clinical events. A pooled analysis is required because of the rarity of the more serious of such events (see Section III).

The Gastrointestinal Clinical Event Monitoring Plan was developed by the GI AE subcommittee to the MK-0966 Project Team. The Subcommittee members consisted of representatives from Clinical Research (GI, Immunology/ Rheumatology, and Endocrine/Metabolism), Worldwide Product Safety and Epidemiology, and BARDS Epidemiology.

2

Confidential - Subject To Protective Order

MRK-NJ0232037

MK-0966 GI Clinical Event Monitoring Plan                                    August 30, 1996

II.      **Objectives and Hypotheses**

         Objective:

         • To assess the comparative incidence of significant GI complications in Phase III trials.

         Primary Hypothesis:

         • The incidence of Class I events (GI perforation, ulcer or bleed) will be less with MK-0966 than with active comparators.

         Secondary Hypotheses

         • The incidence of Class II events (NSAID-related GI symptoms) will be less with MK-0966 than with comparators.
         • The incidence of treatment discontinuations due to:
             - Class I Events alone
             - Class II Events alone
             - both Class I and II Events combined
             will each be less with MK-0966 than with active comparators.

III.     **Background and Rationale**

         A.   Mechanism of NSAID-related GI Toxicity

              NSAIDs act to inhibit the synthesis of prostaglandins, which are known to affect almost all known components of gastrointestinal (GI) mucosal defense.(Blower 1993, Levi 1993)  It is currently understood that prostaglandin synthesis in humans is catalyzed by at least two forms of cyclooxygenase: cyclooxygenase-1 (COX-1, prostaglandin endoperoxide synthase-1, PGHS-1) and cyclooxygenase-2 (COX-2, prostaglandin endoperoxide synthase-2, PGHS-2).  COX-1 is constitutively expressed and enzymatically active in a variety of tissues including the stomach, intestine, kidneys and platelets.  COX-1 may therefore be the isoform responsible for the physiological functions of prostanoids including gastric mucosal protection and normal platelet function.

              In contrast to COX-1, COX-2 is not constitutively expressed but rather is induced by mediators such as serum growth factors, cytokines, and mitogens.(Lee 1992, Lyons-Giordano 1993)  Given the localization and pattern of induction, COX-2 is hypothesized to be primarily responsible for the synthesis of prostanoids that mediate responses to pathological processes such as the propagation of inflammation, pain and fever.  A specific COX-2 inhibitor would therefore have the potential to suppress the response to pathological insults that are mediated by prostanoids (e.g., inflammation) without toxicity allegedly associated with inhibition of COX-1.  If COX-1 derived prostanoids do not significantly contribute to the symptoms or pathogenesis of acute and chronic inflammation, then a COX-2 specific

                                                                                                3

Confidential - Subject To Protective Order                                    MRK-NJ0232038