# EXHIBIT 4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
* * * * * * * * * * * * * * *
                              *
In Re:  VIOXX                 *  MDL NO.: 1657
Products Liability Litigation *
                              *  SECTION: L
This Document Relates to:     *
                              *  HON. ELDON E.
     STATE OF LOUISIANA, ex rel.*      FALLON
     JAMES D. CALDWELL,        *
     ATTORNEY GENERAL          *  MAG. JUDGE
          Plaintiff            *  KNOWLES
                              *
     versus                    *
                              *
     MERCK SHARP & DOHME CORP. *
                              *
      Case No. 05-3700         *
                              *
                              *
* * * * * * * * * * * * * * *
```

Deposition of CLEMENT C. EISWIRTH,

JR, MD, FACC, FASE, taken on Friday, January

22, 2010, commencing at 9:32 a.m., in the law

offices of Stone Pigman Walther Wittmann, 546

Carondelet Street, New Orleans, Louisiana,

70130.

1    your expert's CV.

2    EXAMINATION BY MS. GROSS:

3        Q    Doctor, why don't we begin, if you'd

4    like to describe your --

5        A    Can I just interrupt you?  This may

6    be -- this says July 2005.  I thought we had

7    given one for December.  It's basically the

8    same, to be honest, but I just didn't want

9    to -- I think there was one dated

10   December 2009 with the report.

11       Q    Yeah, July 2005 seems a little bit

12   like it's probably out of date by now.

13       A    Well, right.  I'm not in academic

14   medicine so the publications stuff would be

15   the same, but like I noticed the UR chairman

16   thing.  That's what drew my attention to it,

17   chairman 2/03 to the present.  I'm co-chair

18   now, I'm no longer the chairman; things like

19   that, you know, but that would be about the

20   only change, I believe.

21       Q    Are you still on the Board of

22   Directors of East Jefferson Hospital?

23       A    No, ma'am.  That was a one-year

24   appointment I believe, maybe a little over a

25   year.  I completed the term in another

1   research for beta blockers, for instance, for

2   heart failure, ace inhibitors for heart

3   failure, and so we were involved with that;

4   and there would be members from other

5   universities at some of these meetings, and we

6   would talk about study designs and what we

7   were going to do.

8      Q    Those were two big trials?

9      A    There weren't just single trials.

10  There were multiple studies, but yes, those

11  were two big areas in cardiology.

12     Q    Have you ever been responsible for

13  the design of a study of any drug?

14     A    No, ma'am.

15     Q    What percentage of your time is spent

16  on managerial activities, as compared to

17  treating patients?

18     A    I would say less than one percent, as

19  long as we don't count teaching the house

20  office staff as managerial.

21     Q    You're still a member of the American

22  Heart Association?

23     A    Yes, ma'am, I am.  Yes.

24     Q    And still a fellow of the American

25  College of Cardiology?

1      A    I am.

2      Q    I'm turning now to, on Page 3, a

3  subsection on clinical research

4  accomplishments.

5      A    Yes, ma'am.

6      Q    Have you had a paper that you have

7  written published since 1994?

8      A    No, ma'am.

9      Q    You were first author on this first

10  paper?

11     A    Yes, ma'am.

12     Q    My father had a heart transplant, so

13  I was looking at it.  I'm very appreciative of

14  surgeons that do heart transplants.  You've

15  served as an expert witness prior to this

16  litigation?

17     A    Yes, ma'am.

18     Q    How many times?

19     A    In court?

20     Q    How many times have you had an

21  agreement with an attorney to either write an

22  expert report, provide a deposition, or

23  testify in courts?  How many case have you

24  been involved in one of those three ways?

25     A    Over one year?  What timeframe?

1      Q      What was the opinion that your --

2    what opinion did you present in this case?

3      A      My cases involved looking at patient

4    records and determining whether I thought they

5    had suffered any injury, and as a result we

6    read a lot of echocardiograms, et cetera, and

7    that dispensed with several because there was

8    no injury, no significant insufficiency, and

9    my reports or comments would be to that

10   measure, and I didn't have to write many

11   reports.  My deposition as I recall got more

12   involved, not just in the patient injury

13   issue, but also the literature involved and my

14   feelings about that.

15     Q      Did you offer an opinion on the

16   safety of the drug?

17            MR. TOMASELLI:

18            Object to form; overly broad.

19            THE WITNESS:

20            My opinion was I would be asked

21   specific questions about what this patient's

22   pulmonary hypertension may be due to, or what

23   this patient's mitral insufficiency might be

24   due to.  I know and I should tell you, to

25   expound on that, that I'm sure in the

Page 28

1   depositions that I was asked my opinion about

2   the literature in terms about injury, and may

3   have made comments on that as well.

4   EXAMINATION BY MS. GROSS:

5       Q    Okay.  Approximately when did you

6   become involved in this litigation?

7       A    That would have been last summer.

8       Q    2009?

9       A    That's correct.  I think, I want to

10  say May or June 2009.

11      Q    Were you involved in any

12  Vioxx-related cases prior to this summer?

13      A    Yes.

14      Q    Could you please list them, describe

15  them?  You don't need to recite the name of

16  them.

17          MR. TOMASELLI:

18          Dr. Eiswirth, I counsel you only to

19  mention the ones where you know that you were

20  designated as an expert and were not a

21  consulting expert.

22  EXAMINATION BY MS. GROSS:

23      Q    Understood.

24      A    Those, I honestly don't know because

25  I never gave a deposition or testimony at

1   trial, so I don't know where I was in the

2   pecking order, so to speak.

3       Q    Did you write an expert report to be

4   submitted to the court?

5            MR. TOMASELLI:

6            Object to form.  Again, Dr. Eiswirth,

7   I have to counsel you to answer if you wrote

8   an expert report if you know it was served in

9   litigation.

10           THE WITNESS:

11           And I don't know that.

12   EXAMINATION BY MS. GROSS:

13       Q    You don't know.  How did you become

14   involved in this particular case?

15       A    I received a phone call from Joe

16   asking me if I would be willing to talk to him

17   about a case that involved the Louisiana

18   Attorney General suit, or pursuing a suit

19   against Merck.

20       Q    Did you know Joe before that phone

21   call?

22       A    I did.

23       Q    Had you worked with him as an expert

24   before that phone call?

25       A    Superficially, with my prior Vioxx

1   experience.  He was not one of my lead

2   contacts, but I did have contact with him.

3          (Off-the-record discussion.)

4   EXAMINATION BY MS. GROSS:

5      Q    And you can maybe just describe how

6   you assessed whether you wanted to become

7   involved in this litigation?

8      A    Well, it was literally on the phone.

9   I was loading up a U-haul truck to take my son

10  up to his residency at Barnes, and so I just

11  told him we'd have to talk when I got back in

12  town, but that I had kept my Vioxx literature

13  and I felt comfortable that there would not be

14  an issue that I could not help the defense on

15  because I don't believe that Vioxx has ever

16  caused somebody to have a heart attack, and so

17  I told him I'd be happy to look at it and see,

18  and he mentioned it had to do with the

19  Medicaid dollars, and that's about the extent

20  of the conversation then on the phone.

21     Q    Okay.  So is that your opinion in

22  this case, that you don't believe that Vioxx

23  has ever caused anyone to have a heart attack?

24     A    I think there is an association of

25  Vioxx and cardiovascular events, but it's very

1  difficult to say that there's a cause and

2  effect.

3      Q     Can you describe for me your training

4  in epidemiology?

5      A     I have no training in epidemiology,

6  but I do have training both in my residency

7  and fellowship and my practice how to read

8  literature, and to make medical decisions

9  based upon the literature.

10     Q     Okay.  Can you describe for me any

11  training that you have in biostatistics?

12     A     I have no training in biostatistics,

13  but similarly have been taught how to read the

14  literature and what to look for, what it all

15  means and how to decipher it, so I feel pretty

16  confident with that capability.

17     Q     Okay.  So after you came back from

18  bringing your son where you brought him, how

19  did you become involved with Joe again?

20     A     I believe I asked Joe for a copy of

21  the suit so I could read it, and he had sent

22  that to me so I'd make sure I knew what it was

23  all about, and then I spoke with him and told

24  him that I'd be happy to assist him with the

25  defense.

1      Q     Do you know that's perfectly fine?

2           MR. TOMASELLI:

3           Object to form.

4           THE WITNESS:

5           I've reviewed the list.

6    EXAMINATION BY MS. GROSS:

7      Q     Okay.  So here in your report on Page

8    2 you stated, "The literature and materials I

9    have reviewed and relied upon in forming my

10   opinions for this report is attached," and

11   that would be the initial list, that I have no

12   idea what we marked.

13          MR. TOMASELLI:

14          Exhibit 1.

15   EXAMINATION BY MS. GROSS:

16     Q     Exhibit 1.  If you'd like to take a

17   brief look again at this list of selected

18   materials, and will you confirm to me that

19   none of the materials that have been added to

20   the amended list were materials that you

21   relied on in forming your opinion in your

22   expert report?

23     A     I cannot do that for you, and that's

24   why we have the amended list; because this,

25   there are articles in here that are referenced

Page 39

1    in my report, and again, there's so much.

2    It's such a voluminous amount of material, to

3    avoid any miscommunication here today I wanted

4    to make certain that you had access to

5    everything that I may have even just read an

6    abstract on, and so I had asked and made

7    copies of the first page of everything I have

8    looked at, so that would you would not be put

9    at a disadvantage, and asked the attorneys to

10   send it to you.  I did not make, personally

11   make either of these two lists.  The attorneys

12   did it on my behalf.

13       Q    Okay.  Did you review the list that

14   they --

15       A    Just to make my answer complete, to

16   have all of the literature that's available

17   for my report, as well as all of the things

18   that subsequently came out and were given to

19   me, you would combine this additional

20   information with my original list you were

21   supplied, and you would have everything.

22       Q    Okay.  So this statement in the

23   report is incorrect, that the literature and

24   materials that you've reviewed and relied upon

25   in forming your opinions for the report is

1   attached?

2            MR. TOMASELLI:

3            Object to form; misstates facts,

4   misstates his testimony.

5   EXAMINATION BY MS. GROSS:

6      Q    Why don't you explain how you can

7   reconcile this statement with not all the

8   materials that you have reviewed and relied

9   upon in writing your report being in the

10  original list?

11           MR. TOMASELLI:

12           Object to the form; misstates facts.

13           THE WITNESS:

14           I thought I had addressed that with

15  you when I reviewed my report, the list that

16  they supplied to you.  In my meetings with the

17  attorneys, I pointed out that there were

18  additional materials that were not on that

19  list.  I then gave them everything, the first

20  page of everything I looked at, and I had them

21  reconcile the two to get it prepared for this

22  deposition.

23           I did not make the original list, and

24  I did not make the second list.  My

25  contribution to the literature reviewed is

1   this binder, which has the first page of

2   everything I've touched in the peer-reviewed

3   literature or medical literature, not

4   necessarily the first page of any Merck

5   document or anything like that.

6   EXAMINATION BY MS. GROSS:

7       Q     Right, I understand.  When did you

8   inform them that the list that was attached to

9   your expert report was not complete?

10      A     I believe that would have been last

11  week, that I supplied that information to

12  them.

13      Q     When did you first see the list that

14  was compiled for you as the initial list of

15  materials reviewed?

16      A     I don't recall.

17      Q     Well, I'm sorry that we're going to

18  have to do this, but unfortunately we're going

19  to have to go through this list of 56

20  documents, so that you can let me know which

21  ones you relied upon in writing your initial

22  report and which ones you have since come

23  across, recently been exposed to, that you did

24  not rely upon at the time that you wrote your

25  report.  So let's start with --

1          MR. TOMASELLI:

2          Object to form.  You mentioned the

3     list of 56, Exhibit 5.  Maybe I have the wrong

4     exhibit, but there's a list of 43.

5     EXAMINATION BY MS. GROSS:

6       Q    Oh, you're right.  I'm sorry.  Let me

7     apologize for that.  This is just a list of

8     the peer-reviewed medical articles, and there

9     is a bunch of other documents that are not

10    peer-reviewed medical articles, but let's

11    start with the peer-reviewed medical articles.

12      A    Okay.

13      Q    Okay, Adami.  Is that a document that

14    you relied upon in writing your expert report?

15      A    No, ma'am.  That was one supplemental

16    to it.

17      Q    How did you come across the Adami

18    article after writing your expert report?

19      A    I did a search on the Internet one

20    night and Googled it and got some additional

21    literature, and that was one of them.

22      Q    Approximately when was that?

23      A    Sometime within, say, the last two to

24    four weeks.

25      Q    Okay.  Awtry?

1      A    I did rely on that one.

2      Q    Belton?

3      A    I did rely on that one.  It was about

4   a mouse model, so I think I just referred to

5   animal studies in my report, and that was the

6   extent that that one shows up.

7      Q    Bogaty?  I'm not sure I pronounced it

8   correctly.

9      A    You did, and I didn't rely on that

10  one.

11     Q    APPROVe correction?

12     A    I did not have that one when I did my

13  expert report.

14     Q    I'm going to start calling them by

15  Number 6, Number 7, to save us time, if that's

16  okay?

17     A    Yes, that would be.

18     Q    That way you don't have to hear me

19  mangle people's names and such.  Number 6?

20     A    I had that for my expert report.

21     Q    Seven?

22     A    I believe I had that one for my

23  expert report.  That's not germane directly to

24  this.  It just talks about the premature

25  release of data, but I honestly don't know.

1      Q      Eight?

2      A      I don't recall that one.  Let me look

3  at the cover sheet.  I think I got that one

4  after my report was completed.

5      Q      Is that one you found on your Medline

6  search?

7      A      Yes, ma'am, I believe so.  Actually I

8  did JAMA, so it was probably one I came across

9  and had just thrown in the box, and found it

10  later.

11     Q      Number 9?

12     A      I had that one before I did my expert

13  report.

14     Q      Ten?

15     A      I had that one before I did my expert

16  report.

17     Q      Eleven?

18     A      Just to avoid confusion, I'm going to

19  look.  I had that one before.

20     Q      Twelve?

21     A      I had this one before I did my expert

22  report.

23     Q      Thirteen?

24     A      I'm pretty sure I had this one before

25  I did my expert report.  I think I may have

1   even quoted that one by name in the report,

2   but I'm not sure.

3       Q    Do you know that that is a document

4   that was published in 2009?  That may help you

5   or not help you recollect.

6       A    Yeah, I'm actually looking at the

7   front page where I have some scribble-scatch

8   to try to help me, but it's very difficult,

9   obviously.  I'll do the very best I can.

10      Q    That was one I guessed was probably a

11  brand new one too, but what do I know?

12      A    Yeah, I'm not sure that it was.

13      Q    Fourteen?

14      A    Oh, this is a dog study.  I had this

15  one before I did my report.  Yes, I had that

16  one.

17      Q    Fifteen?

18      A    I had that one.

19      Q    Sixteen?

20      A    We're on 15, or 16?

21      Q    Sixteen.

22      A    This was a letter that he wrote, and

23  I did not have that before.  I believe that's

24  what that's referring to, is a letter.

25      Q    Okay.  So before we go to the next

1    page, you've named four that are new that you

2    received or came across since writing the

3    report.  That would leave 12 that you had

4    already obtained before you wrote your report,

5    so I just want to clarify.  You've been

6    answering with respect to whether you had the

7    material, and I'd like to know if there's any

8    of these that you did not rely on in writing

9    your report.

10          MR. TOMASELLI:

11          Object to the form.  In addition to

12    what he's already stated?  Like for example,

13    you asked him about Number 1, and he said he

14    didn't rely on it.

15    EXAMINATION BY MS. GROSS:

16      Q    Right.  Well, he said Number 1 is

17    brand new, he didn't have it.  So I said with

18    exception to the ones he didn't have, I'm

19    wondering of the ones he had, are there any

20    that you didn't necessarily rely on?  When I

21    do research I have things that are in my pile.

22    I look at it, I say that's not relevant, and I

23    don't use it.  I'm wondering, did you rely on

24    all of these documents, or are there some in

25    here that you did not rely on?

1          MR. TOMASELLI:

2          Object to the form.

3    EXAMINATION BY MS. GROSS:

4     Q    Do you understand the question?

5     A    I understand the point of your

6    question.  I think I answered that earlier by

7    saying it's very difficult to know what you

8    may have used, because it's in your general

9    gestalt, or knowledge base.  That's why it's

10   important I think to share with you everything

11   I looked at, which is what I attempted to do

12   before today and previous to this deposition.

13   I can't tell you, won't be able to tell you,

14   unless my paper specifically makes reference

15   to an article, whether I used that particular

16   article in forming any particular line of the

17   report.

18    Q    Okay.  As you were writing your

19   report, did you make a list of footnotes?

20    A    I did not.

21    Q    Did you keep a list yourself of

22   materials that you were using as you were

23   writing your report?

24    A    Typically if I was thinking of

25   putting in something, I might put the first

1    author or paper, a little note to myself to

2    pull that paper to make sure I looked at it

3    because I was trying to figure out how to

4    organize it, but once I did the report then

5    that was all eliminated from the body, except

6    if you look -- actually I found out last night

7    when I was reading I had not eliminated,

8    there's one reference to a trial that we used

9    with other nonsteroidals.  They have an

10   anti-platelet factor, and I have the two

11   authors listed in parentheses.  It would be

12   those kind of internal notes to myself that I

13   didn't keep afterwards.

14        Q    Okay, fair enough; next page.  So as

15   we go, you'll tell me again whether it is a

16   document that you had before or whether you

17   had obtained it since your report, and at the

18   same time if you recall if it's a document

19   that you did rely on or if you recall that you

20   did not rely on it, you'll make a note to me

21   of that at the same time as we go through

22   them.  Is that okay with you?

23        A    Sure, that will be good.

24        Q    Okay.  Seventeen?

25        A    Seventeen I got after I did my

1    report, and I did not rely on it.  Well, it's

2    kind of silly to tell you that.  Obviously I

3    didn't rely on it.

4        Q     Eighteen?

5        A     I'm really not sure when I got this

6    report.  I honestly don't know.

7        Q     Okay.  19?

8        A     This was before my report, but I did

9    not rely on it in my report.

10       Q     Twenty?

11       A     I had this, and I'm sure I used some

12   of the information in my report, at least in

13   my general knowledge base.

14       Q     Twenty-one?

15       A     I do not believe -- I do not recall,

16   but I do not believe I used this one in my

17   report.  I got it after, I believe.

18       Q     Oh, this is a new one?

19       A     I think it was, but it's hard to

20   remember.

21       Q     I won't ask you how you got it, then.

22       A     I wouldn't be able to tell you,

23   because --

24       Q     You wouldn't know.  I understand.

25   22?

1      A     Oh, I had 22.  I had it at home.

2    I'll double-check that for you, but I'm pretty

3    sure.  Yes, I had that, and I did use that.

4      Q     Twenty-three?

5      A     I had this, and I definitely used

6    some of this in my report.

7      Q     Twenty-four?

8      A     I had this, and again, it was an

9    animal study so it was just in general terms,

10   it was referenced in my report.

11     Q     Yes, I recognize that place in your

12   report where you discussed the animal studies.

13   That was 24 we just did, right?

14     A     Yes, ma'am.

15     Q     Twenty-five?

16     A     I had this.  I can't tell that I used

17   it in the basis of my report, but just the

18   general knowledge base about the aspirin, it's

19   a pretty old study.

20     Q     Twenty-six?

21     A     I had that report previously, and I

22   did use that in my report.

23     Q     Twenty-seven?

24     A     I had this Reicin article.  Oh, wait.

25   I'm sorry.  That's a response to -- I had that

1   before I did my report, yes.  That's the

2   response to the data.  I was looking at the

3   wrong thing in here, but yes, but I also had

4   that one too.

5        Q     Twenty-eight?

6        A     Let's see.  I had that, and I used

7   that in my report.  I think it was

8   specifically referenced too, if I remember

9   right, in my report.

10       Q     Twenty-nine?

11       A     I had this.  I don't believe I

12   actually used it in my report, but maybe in

13   just some general terms, but I had that.

14       Q     Thirty?

15       A     I told you something wrong.  Excuse

16   me, ma'am.  Saito had more than one article in

17   my binder.

18       Q     Yes, there's two of them.

19       A     Let me go to the other one here.  I

20   did have this report and I did use it, but

21   just in general terms in the report.  The

22   other Saito, the experimental MI, I had it but

23   just in general terms was that used in the

24   report.

25       Q     Oh, okay.

```
 1      A     So my answer for 29 is actually my

 2   answer for 30.

 3      Q     Got you.  So 29 you used generally,

 4   30 you don't think you used?

 5      A     Correct.

 6      Q     Thirty-one?

 7      A     Thirty-one, I had it and I used it.

 8      Q     Thirty-two?

 9      A     I had, I believe I did have this

10   report, but I don't think I referenced it in

11   my report.  I had this article, I should say,

12   but I don't think I used it in my report.

13      Q     Thirty-three?

14      A     I got that after my report.

15      Q     Do you recall how you came across

16   that?

17      A     Yes.  I think I asked about it in

18   response to one of the expert reports, or

19   rebuttals.

20      Q     Thirty-four?

21      A     Let me just make sure I have the

22   right one.  I had this one and I used it in my

23   report, or at least generally.

24      Q     Thirty-five?

25      A     I believe this is one I pulled off
```

Page 53

1   the Internet after my report.  I'm not

2   positive, but I'm pretty sure it is.

3        Q     Okay.  36?

4        A     I had that, and I commented on that

5   in my report.

6        Q     Thirty-seven?

7        A     I had this one before, and I think I

8   referred to it generally in my report.

9        Q     Thirty-eight?  Are you still looking

10  at that one?  I don't mean to rush you.

11       A     I was, but that's okay.

12       Q     If you want to change your --

13       A     I know I've answered to the best of

14  my knowledge.  I'm pretty sure that's correct.

15       Q     Okay.

16       A     I had this title.  I'm not sure it's

17  the same one.  Yes, I had this one, and I

18  again, generally, at least in my report.

19       Q     Thirty-nine?

20       A     I definitely had this one.  I don't

21  think I used it in my report.  I think this is

22  just a general knowledge.

23       Q     Forty?

24       A     Yes, I had this one, and I referenced

25  it in my report.

1     Q     Forty-one?

2     A     I do have a note on here that I

3  didn't think it was particularly important in

4  the Vioxx case, but I think I referenced it,

5  for whatever reason.

6     Q     Okay.  I'll make a note of that.

7     A     This Warner article, I did have it.

8  Actually, no, I did not.  I think I had this

9  after my report.  I think this was after my

10  report, and that was from my Internet search.

11    Q     Forty-two?

12    A     I had that one, and I used that one.

13    Q     Forty-three?

14    A     That one I got after my report, and

15  that was also from my Internet search.  I

16  recognize the title.

17          MS. GROSS:

18          I'm just going take a quick second,

19  and just do a fast count.  It should not take

20  very long.

21          Okay, I'm just going to make a brief

22  statement for the record.  Of 43 new medical

23  journal articles added yesterday to the

24  materials reviewed list, the doctor testified

25  that ten of them he had received since

1    drafting his report.  One of them he couldn't

2    recall, 32 he had before drafting his report.

3    Of that 32, four of them he believes he did

4    not rely on in writing his report, and 28 he

5    either generally incorporated the knowledge or

6    specifically cited the article in the report.

7    For that reason, we're going to renew our

8    objection to the presentation -- first, we

9    renew the objection to closing this deposition

10   today.  We're going to ask that it remain

11   open, and also we object to the presentation

12   of an expert report without the required list

13   of materials reviewed and relied on.

14            MR. TOMASELLI:

15            Again, we completely disagree with

16   the characterization of counsel.  We'll be

17   happy to bring it up later.

18   EXAMINATION BY MS. GROSS:

19       Q    Doctor, just to finish up quickly

20   with the materials reviewed list set of

21   questions, in your prior experience drafting

22   expert reports, were you asked to compile a

23   list of materials that you reviewed or relied

24   upon in forming your opinion?

25            MR. TOMASELLI:

Page 56

1          Object to the form.

2    EXAMINATION BY MS. GROSS:

3        Q    Do you understand my question?

4        A    I do.  Yes, and generally they also

5    when they -- like for instance, a large

6    voluminous amount of material like Baycol, et

7    cetera, I didn't make my own bibliography.

8    Typically the lawyers presented it.

9        Q    You didn't type it yourself?

10       A    I didn't type it myself.

11       Q    Did you provide all of the materials

12   to the attorneys to type up --

13            MR. TOMASELLI:

14            Object to form.

15            MS. GROSS:

16            -- before the submission of your

17   report?

18            MR. TOMASELLI:

19            Object to the form.

20            THE WITNESS:

21            For this report?

22   EXAMINATION BY MS. GROSS:

23       Q    No, no, in previous.  I know you

24   didn't in this report, but in previous

25   instances?

1              MR. TOMASELLI:

2              Object to the form; lawyer

3    testifying.

4              THE WITNESS:

5              I don't recall there ever being an

6    issue with the other ones, you know, in

7    attorney depositions.

8    EXAMINATION BY MS. GROSS:

9       Q    Okay.  Do you recall when you first

10   saw the materials reviewed and relied on list

11   that was initially submitted with your report?

12             MR. TOMASELLI:

13             Object to form; asked and answered.

14   He said he couldn't recall.

15             THE WITNESS:

16             I don't recall.

17   EXAMINATION BY MS. GROSS:

18      Q    Sometimes I don't remember everything

19   that I asked, so sorry.  Okay, quickly if we

20   could return to the amended materials reviewed

21   and relied on list, we just have a few

22   non-journal documents to look at.

23             MR. TOMASELLI:

24             Are we looking at Exhibit 2?

25   EXAMINATION BY MS. GROSS:

```
 1      Q     That's correct.  If you want to turn

 2   to Page 4, please, looking at Item Number 62,

 3   do you recall how you obtained that document?

 4      A     That would have been forwarded by

 5   counsel at some point in my review, either for

 6   this case or the prior case.

 7      Q     Did you have that material before you

 8   completed your expert report?

 9           MR. TOMASELLI:

10           Object to form.  If you want to show

11   him what it is, so he can answer it better --

12           THE WITNESS:

13           I don't recall from just reading the

14   title of it.  Is it on my --

15           MS. GROSS:

16           I don't have it, since it wasn't on

17   the initial list and I just got this list

18   yesterday, so...

19           MR. TOMASELLI:

20           I'll make a representation for the

21   record that it's used by McGregor in his

22   report, and that Dr. Eiswirth asked me for it

23   when he got his rebuttal report and I sent him

24   the table, so if it helps you out any --

25   EXAMINATION BY MS. GROSS:
```

Page 59

1       Q     Okay.  Number 63, the Cardiovascular

2   Safety Database, the Targum Report?

3       A     I don't know when I reviewed it.

4       Q     You don't know when you reviewed it?

5       A     I'll say some of these reports

6   were -- I think I testified to that earlier,

7   that I asked for many things after reading

8   McGregor's report and his rebuttal report.

9       Q     Okay.  Let's turn to Page 5 of your

10  report.  Did you review any materials relating

11  to the VIGOR study, other than the Bombardier

12  article that you cite?

13      A     I'm sure in some of the Merck

14  documents, either before or after I had access

15  to, either in response to questions in the

16  report I saw, but I relied on the

17  peer-reviewed data for the formation of my

18  report for the VIGOR that I've discussed here.

19      Q     Okay.  Did you review a protocol for

20  the VIGOR study?

21      A     The protocol was described in the

22  report of the VIGOR trial.

23            MS. GROSS:

24            Okay.  So only to the extent that the

25  protocol is described in the Bombardier

1    article, which we marked as Exhibit 6?

2              MR. TOMASELLI:

3              Object to form; vague as to protocol.

4    EXAMINATION BY MS. GROSS:

5        Q    By protocol I mean the document

6    setting forth the study design and, you know,

7    data analysis plan.  Are you familiar with the

8    term protocol as relating to clinical studies?

9        A    Yeah, I am, and as I've testified to

10   if you pull the VIGOR article -- and we can

11   pull it -- it will talk about the method, and

12   I assume that's what you're referring to by

13   protocol, is the method of the trial.

14             I'm going to refer to mine, in my

15   book, if that's okay.

16       Q    That's perfectly fine, Doctor.  About

17   five lines down, in the sentence beginning

18   with "Patients in this trial were at least 50

19   years of age and had a history of rheumatoid

20   arthritis, or at least 40 years of age and on

21   chronic prednisone therapy for rheumatoid

22   arthritis," why did you find it important to

23   note the characteristics of the subjects in

24   the study?

25             MR. TOMASELLI:

1  with what you use it for.

2  EXAMINATION BY MS. GROSS:

3      Q      Right.   What about prospective

4  observational studies?

5            MR. TOMASELLI:

6            Object to form; vague.

7  EXAMINATION BY MS. GROSS:

8      Q      Do you have concerns about those?

9      A      What's an observational study?

10     Q      An observational study -- well, a

11  retrospective study I was referring to is one

12  where you're not random.   You have a set

13  database, right, and you're using data that

14  already happened, you go back and look, and

15  you described it as trolling for data, but for

16  example in the Physicians Health Study where

17  they enrolled people many, many years ago, and

18  did questionnaires and formed hypothesis and

19  intended to test them, but they didn't

20  randomize the people for, you're going to eat

21  vegetables and you're not.   That would be a

22  prospective observational study.

23     A      Okay.

24     Q      In that situation, because you state

25  your hypothesis before your data accrues,

1   conclude that you only have the median

2   exposure of three months, and again, in a

3   retrospective analysis as a practical

4   clinician, there's not a lot you can

5   extrapolate.  This is more for people to do

6   the next study, what's important, what it

7   looks like.

8           What I said it's reassuring for is

9   that the VIGOR trial had just been published,

10  and one of the speculations was this imbalance

11  theory of FitzGerald.  FitzGerald is one of

12  the people who believed in that at the time.

13  This article, if that was true, you would

14  think well, you might see a difference even in

15  here, and you didn't.  So in a way, it was

16  reassuring to the medical community at that

17  point in time.

18      Q    In the report, let's jump to Page 13.

19  In the last paragraph you state, "The above

20  data reflects the totality of the randomized

21  clinical trial data concerning Vioxx as of

22  2004, prior to reporting of the APPROVe trial

23  results in 2004."  How did you verify the

24  truth of that statement?

25      A    Well, this was the only -- these were

1   the only articles that I could find that were

2   published on that, so that's what I meant by

3   the totality.   Perhaps I should have said the

4   totality of the peer-reviewed data available.

5        Q     So if Merck had done studies and had

6   not written articles and had them published in

7   peer-reviewed journals, you wouldn't have

8   known about that, correct?

9             MR. TOMASELLI:

10            Object to form.

11            THE WITNESS:

12            That is correct.   I did not -- I

13  don't know how to answer that, because I know

14  I saw some internal Merck documents, so I may

15  have known something.   They may have had

16  protocol numbers.   I'm not too good with that,

17  so I don't want to mislead you.

18  EXAMINATION BY MS. GROSS:

19       Q    That's okay.

20       A    But for purposes of this report, I

21  only relied on the published data.

22       Q    Okay.   Before we go to lunch let's do

23  something easy, because my head's starting to

24  spin.   Did you bring your invoices today?

25       A    Yes, ma'am.

1      Q     Okay, so you've handed me two

2   invoices.  Are these the only invoices that

3   you have billed to counsel in this case?

4      A     Yes, ma'am.

5      Q     And they report 26.5 hours on one and

6   nine hours and ten minutes on the other, so is

7   the totality of time that you've spent on this

8   case since you were engaged over the summer,

9   34 hours, approximately 34 or 35 hours?

10          MR. TOMASELLI:

11          Object to form.

12          THE WITNESS:

13          No, that's not correct.

14   EXAMINATION BY MS. GROSS:

15      Q     Okay.  Can you explain it?

16      A     That's correct since the last billing

17   statement.

18      Q     Okay.  Since November 24th, how much

19   time have you spent approximately since

20   November 24th?

21      A     It's probably approaching 100 hours,

22   close to 100 hours additional.  I haven't

23   totaled it up yet.

24      Q     So it took 34 hours to do the report,

25   and now a hundred hours since the report?

1      A     The report, when I did the report I

2   had my review of materials from the earlier

3   Vioxx cases or litigation, so I had already

4   done a lot of the literature review.  My

5   preparation obviously for this deposition

6   which, as I shared with you before, a lot of

7   times in cases you do, you do an extra report

8   and then it gets put on the back burner and

9   nothing happens for a long time, so I didn't

10  go through a read-and-review of the intense

11  literature as I prepared the report that I did

12  subsequent to it.  I just had looked at things

13  and I had some information available, some old

14  data that I had used on my earlier stuff, so I

15  didn't have to go through quite the intensive

16  review that I did to prepare for this report

17  or this deposition.

18      Q     Did you directly incorporate any

19  portions of a prior report into this report?

20      A     I know I had, some of my prior

21  reports I had some information, but I didn't

22  use it, just as a basis of the report.  I

23  mean, there are certainly some shared data

24  elements.

25      Q     You didn't cut and paste some of the

1   that the actual rate is the rate over the

2   entire 36 months, and the chance error is in

3   the distribution over the first 18 months

4   versus the second 18 months.  I mean, those

5   are our three possibilities, right?

6           MR. TOMASELLI:

7           Object to form.

8           THE WITNESS:

9           Yeah, I think that's correct.

10  Mathematically, the way you'd align the

11  curves, any of those three sounds like that

12  would be reasonable.  Again we're talking,

13  obviously this is all conjecture on our part.

14  I'll follow your assumptions for a while here,

15  and see where they lead.

16  EXAMINATION BY MS. GROSS:

17      Q    So if we were to look at the entire

18  set, we would have -- how should I say this?

19  Well, let me ask you; what do you think is the

20  most likely of those three possibilities?  I

21  know that you're just an expert giving your

22  opinion, but what do you think the most likely

23  is, of those three possibilities?

24          MR. TOMASELLI:

25          Objection to the form; to the extent

1    it's been asked and answered.

2          THE WITNESS:

3          Well, I've told you what I think it

4    was, which is that the placebo group had an

5    inexplicable drop in the end, and I was just

6    doublechecking my math to make sure I didn't

7    misspeak, but that is correct, at the 18

8    months.

9    EXAMINATION BY MS. GROSS:

10   Q    Okay, so I just didn't understand

11   what you meant by -- I mean, I did hear you

12   say that you thought it was an inexplicable

13   drop, so what you're saying is that you think

14   the placebo rate should have been what it was

15   in the first 18 months, and that the second 18

16   months was just very, very different from

17   where the curve is supposed to be?

18         MR. TOMASELLI:

19         Object to form; asked and answered.

20         THE WITNESS:

21         Yes.

22   EXAMINATION BY MS. GROSS:

23   Q    You think that it is more likely than

24   not that the actual rate of the events on

25   placebo is the rate over the entire 36-month

1    period, and that the chance error is in the

2    distribution over the first 18 months versus

3    the second 18 months?

4        A     No, I think that the first 18 months

5    event rate, not the overall event rate, is the

6    correct rate for the placebo group.  The

7    overall rate is diluted by the last 18 months,

8    when the inexplicable drop in the placebo

9    group occurred, so I would not accept the

10   premise that the placebo over the 36-month

11   event rate is the correct rate, because it was

12   driven downward by the last 18 months.  I

13   think your study, the first 18 months had a

14   reasonable expected event rate in that

15   population, and you just saw a drop in your

16   placebo group.

17       Q     Why?

18             MR. TOMASELLI:

19             Object to form; asked and answered.

20   EXAMINATION BY MS. GROSS:

21       Q     No, I asked you before what of the

22   three options do you think it was, and now I'm

23   asking you what your basis is.  Why do you

24   think that it's the rate in that first 18

25   months that is the correct rate, and not the

```
 1   rate in the second 18 months, or the rate over

 2   the whole 36-month period?

 3             MR. TOMASELLI:

 4             Object to form; asked and answered.

 5             THE WITNESS:

 6             I don't know how I could answer that

 7   any differently.  I've explained to you that

 8   the event rate in the first 18 months is

 9   reasonable for what you'd expect to see.  If

10   the event rate was -- let me look at my

11   numbers here -- in the control group was 1.13

12   events per patient year per 100 patient years,

13   and for the next 18 months it suddenly

14   dropped, I just don't have an explanation in a

15   group this age why you'd expect to see a drop

16   in your placebo group.  Again, as a practicing

17   cardiologist when patients come to me I never

18   tell them, "Hey, look.  As you get older, your

19   heart attack rate is going to go down for the

20   next two years."  It just doesn't happen.

21   EXAMINATION BY MS. GROSS:

22      Q    Okay.  So is it your testimony then

23   that over 36 months, an event rate of 0.78 for

24   this population is not unreasonable or --

25             MR. TOMASELLI:
```

1          Object to form.

2    EXAMINATION BY MS. GROSS:

3      Q    -- not reasonable?  You chose not the

4    0.78, which is what you would see over the

5    whole 36-month period, but you chose the 1.13

6    as what you think is the most reasonable rate.

7    Is 0.78 an unreasonable, surprising rate of

8    events over a 36-month period for this

9    population?

10          MR. TOMASELLI:

11          Object to form; compound, vague, and

12   asked and answered.

13   EXAMINATION BY MS. GROSS:

14     Q    Okay.  Let me withdraw it, and phrase

15   it really nice and tight so that he'll be

16   really pleased with it.  Is an event rate of a

17   36-month period of 0.78 for this population

18   unreasonable?

19     A    I wouldn't say that the 0.78 is

20   unreasonable, but that's -- again, it's not

21   unreasonable if you're based on rates 1.0.  So

22   but again, the 0.78, the reason I think it's

23   unreasonable to use that event rate in this

24   case, which is what you're trying to get me to

25   agree that I'll do, and I told you before that

1    I won't -- the reason is because the 0.78 is

2    being derived from the combination of the

3    expected event rate, which I think is much

4    more plausible for the first 18 months of

5    1.13, and it's being diluted by an extremely

6    low event rate that makes no sense of 0.38.

7              So out of the three choices, which

8    one do I think is the bast rate?  The best

9    rate for a placebo would be the 1.13 rate.

10   The 0.78, again, is a mathematical for this

11   particular study that was derived by using a

12   ridiculously low placebo group event rate and

13   using it as if it was correct, and I don't

14   think it was, for the reasons I've testified

15   to.

16   EXAMINATION BY MS. GROSS:

17       Q    I understand.  Can you name to me any

18   published articles that agree with your

19   opinion that APPROVe, because of -- well,

20   let's just say any articles, any published

21   articles that agree with your opinion that

22   APPROVe does not establish an increased risk

23   of cerebrovascular or cardiovascular events on

24   rofecoxib?

25              MR. TOMASELLI:

1   that means that Vioxx becomes cardioprotective

2   later on.

3            MS. GROSS:

4            I didn't think you were saying that,

5   but I am going to just make a motion that the

6   part of the answer that wasn't responsive to

7   the question is struck.

8   EXAMINATION BY MS. GROSS:

9       Q    The point that I was trying to make

10  is that when we were looking at the confidence

11  interval for the hazard ratio for only the

12  time after treatment, the number remaining in

13  the study at that time was very small.

14           MR. TOMASELLI:

15           Object to form.

16           THE WITNESS:

17           Which timeframe?  Are you asking me

18  if it's very small at 48 months?

19  EXAMINATION BY MS. GROSS:

20      Q    Thirty-six months.  Let's start at 36

21  months, which is --

22      A    You only have 177 patients in the

23  Vioxx group and 114 in placebo, and clearly

24  that's a small number, but I mean, just so

25  that -- I think you might be misunderstanding

1  requirements on here.

2      Q    Just so that we can be a little bit

3  more concrete, I'm looking at your paragraph

4  on retrospective studies on Page 20, and the

5  first sentence says, "There have been a number

6  of retrospective reviews to assess the

7  cardiovascular risks associated with the use

8  of Vioxx and other NSAIDs.  Retrospective

9  reviews do not control for differences in the

10  populations studied and hence, must be

11  interpreted with caution."  Some have reported

12  increased cardiovascular risk, while others

13  have found no increased risks in patients

14  receiving Vioxx.  Multiple studies have found

15  no increased risk with Vioxx at the

16  25 milligram dose, the maximum recommended

17  daily dose.  What retrospective studies are

18  you referring to here?  Because there's no

19  references to any author or any publication,

20  and I don't know what retrospective studies

21  you looked at.

22      A    Right.  Basically the totality.

23  Reicin we talked about, Konstam we talked

24  about, Mukherjee.  Ross you asked me about,

25  but obviously wasn't available to me when this

1    I've got to see my family once this month.

2          MS. GROSS:

3          We can mark that the next exhibit,

4    Exhibit 21.

5    EXAMINATION BY MS. GROSS:

6      Q    Doctor, have you seen that document

7    before?

8      A    I honestly don't recall.  Let me look

9    in my binder, and I'll be able it tell you.

10   Now I don't know what I did with the thing you

11   gave to me.

12         I don't believe I've seen this, but I

13   don't know.  Is it on my record of submission

14   to you?

15     Q    That's a good question.

16     A    I've just got to find it.

17     Q    It is.  It's new, the one that's on

18   your list that you --

19     A    Then I just need to find it in here,

20   so we'll be okay.  Who do I have it listed

21   under?

22     Q    You don't, actually.  It just says

23   "APPROVe correction".  It has no cite or

24   author or anything.  It's Number 28 on your

25   amended list, if that helps in any way.

1      A     No, I didn't file them in that way.

2      Q     Well, it would be Bresalier,

3   probably.  I mean, Bresalier is the author of

4   the article that it corrects.

5      A     Let me see if I have it in there; and

6   you're right, that's where it is, under

7   Bresalier.

8      Q     Okay.  So according to our

9   conversation this morning, when we went

10  through the documents that you had received

11  and that you had added to your list today, and

12  we went through to see which of those you had

13  before and which of those you received since

14  writing your report, at that time you said

15  this was new, that you had received it after

16  writing your report.  Did I mark that right?

17     A     I think you did.

18     Q     Okay.

19     A     I'd have to refer to my report to see

20  if I quoted that or not, because I don't

21  recall it.  Since I had not deleted that

22  sentence, this would not have been included in

23  my report, because I didn't have it scratched

24  off.  I'm scratching it off now to avoid that

25  confusion.  It's like reading the healthcare

Page 262

1    bill when you change something.  I can't tell

2    the pages from here to which one's Page 1100,

3    for the other correction to look at.  Do you

4    have the paper?

5        Q    Yeah, let me see.  Are you still

6    making your edits there, Doctor?

7        A    I can't find that page number, so I'm

8    trying to find the paragraph that that might

9    be correcting.

10       Q    Okay.  I'm looking for my copy so I

11   can give you a hand, but it just doesn't want

12   to be found.

13            Okay.  So you're looking for the, "In

14   Addition," the first full paragraph on Page

15   1100?

16       A    Yes, ma'am.

17       Q    Okay, so we need the APPROVe study.

18            (Off-the-record discussion.)

19   EXAMINATION BY MS. GROSS:

20       Q    So Doctor, you've read the

21   correction, and what were you doing for the

22   past few minutes?

23       A    Reading the correction.

24       Q    Reading?

25       A    Trying to find it.

1      Q      Did you mark the article with the

2   changes from the correction?

3      A      I did.  I'm going to have to mark it

4   better, when I get where I can do it in a

5   little better handwriting, to complete the

6   whole correction.

7      Q      What is a proportional hazards test;

8   if you know?

9      A      I really don't know.

10     Q      After having made the corrections set

11  forth in the correction to your actual copy of

12  the document, are there places in the article

13  that still suggest an increase, or that the

14  difference in the rate of events between Vioxx

15  and placebo does not occur until 18 months?

16     A      My paper talks about the number of

17  events, and it doesn't look like it changed

18  that, so I don't think that part's changed.  I

19  think they're talking about the appearance of

20  the Kaplan-Meier curve, it looks like.

21     Q      Well, what does the Kaplan-Meier

22  curve portray?

23     A      It's not just the number of events,

24  but it's just a projection, a statistical

25  projection.

Page 264

1      Q     Can you identify in your copy of the

2    article for me where the article still

3    suggests that there is a difference in the

4    rates of events after 18 months?

5      A     I don't think so.  The article's

6    making that conclusion, but the absolute

7    numbers that I gave you have not been changed

8    by this correction.  The event rates we

9    discussed and spent all at that time on, there

10   was no correction as to that data.  The

11   correction looks like it just pertains to that

12   curve and some of the conclusions that they

13   drew in the abstract, they changed the

14   verbiage of.

15     Q     What do you understand this

16   correction to mean?

17           MR. TOMASELLI:

18           Object to form.

19           THE WITNESS:

20           I mean, all I can do is read what it

21   says.  I don't know what the meaning is.

22   They're just pointing out that there's no

23   statistically significant difference in that

24   curve.  We already knew that, because the

25   points crossed anyway.  We were just talking

1    about where the separation appeared to begin,

2    so I don't think the event rate's at the 18

3    months that the original article suggested.

4    Those actual event rates, though, from my

5    reading of this correction did not change.

6    They just changed the verbiage in the article

7    as to what they wanted to say about the

8    change.

9    EXAMINATION BY MS. GROSS:

10       Q    What's the dates on this correction?

11       A    July 13th, 2006.

12       Q    How long after the publication of the

13   original APPROVe article was the publication

14   published?

15       A    Well, let's see.  The original

16   APPROVe was 2004, wasn't it?  2005.

17       Q    About what month?

18       A    It was right before Vioxx was pulled.

19   I can't remember the data.  Maybe August; I

20   don't remember.

21       Q    Well, Vioxx was pulled in 2004.  The

22   article took a little longer to actually get

23   out.

24       A    Oh, that's true.  The article got

25   published after that.  I can't tell the month

1   conversation about what happened here without

2   your having to know what a proportional hazard

3   is.

4          MR. TOMASELLI:

5          Object to form; lawyer testifying.

6   EXAMINATION BY MS. GROSS:

7      Q    Have you ever heard the term

8   proportional hazard before?

9      A    Yes.

10     Q    Do you recall in what sitting?

11     A    Just the literature that I've read.

12     Q    Can you recall any of the literature

13  that you read that?

14     A    No, just come across the term.

15     Q    When you review a study in a journal

16  like the New England Journal of Medicine, do

17  you take an interest in the statistical

18  methods that are applied in the study?

19     A    I would say that that's hard to

20  answer yes or no to.  Of course you look at

21  it, but you trust the peer-review process.

22  They went through the statistical analysis,

23  those experts on the panel, and said this is

24  appropriate, this is good.  I look more at the

25  numbers, the event rates in the different

1    groups.  That type of information means more

2    to me in how I apply it clinically.

3         Q    Okay.  So essentially you assume that

4    the people that wrote the article did not

5    leave out any information that would be

6    important to you?

7              MR. TOMASELLI:

8              Object to form; vague.

9              THE WITNESS:

10             That is correct, and that the

11   reviewers who review the article would have

12   caught any discrepancy, in terms of the

13   statistical analysis used.

14   EXAMINATION BY MS. GROSS:

15        Q    There is a difference between a

16   discrepancy and an omission, isn't there?

17             MR. TOMASELLI:

18             Object to the form.

19             THE WITNESS:

20             I would say so.  I can qualify that.

21   EXAMINATION BY MS. GROSS:

22        Q    You don't have to qualify that.  Did

23   you ever see an earlier draft of the APPROVe

24   article?

25        A    No, ma'am.

1    was marked as Exhibit 15.  Do you remember

2    discussing a couple of tables with respect to

3    that analysis?

4        A    I do.

5        Q    Do you remember discussing whether a

6    Study 010 was included in this analysis?

7        A    I do.

8        Q    Do you remember that you discussed

9    with counsel that 010, based on Exhibit 16,

10   was a Phase IIa osteoarthritis study?

11       A    I did point that out.

12       Q    And regardless of the difference

13   between a Phase IIa and IIb study,

14   Dr. Eiswirth, if you can read the first line

15   of this exhibit, and tell me whether a Phase

16   IIa study would have been included in this

17   analysis?

18       A    It would not.  It specifically states

19   in all Phase IIB to Phase V clinical trials,

20   of at least four weeks or more in duration --

21       Q    Sorry to interrupt.  Is it surprising

22   in any way that a Phase IIa study would be

23   left out of a protocol that did not include

24   Phase IIa studies?

25       A    No, it wouldn't.

1      Q    Dr. Eiswirth, one small area of

2    questioning and then hopefully we'll get you

3    out of here, but can you find your expert

4    report and turn to Page 20, and tell me when

5    you're there?

6      A    I'm there.

7      Q    Do you see the section of your report

8    on Page 20 under the title "Retrospective

9    Studies"?

10     A    I do.

11     Q    Do you remember discussing with

12   counsel this portion of your report, as well

13   as a couple of articles that I may butcher,

14   but that I think were the Reicin, the STROBE

15   publication, and a publication of Concato.  Do

16   you remember that?

17     A    I do.

18     Q    Can you tell me in your report under

19   Retrospective Studies what you're discussing

20   here in a general way?

21     A    On this section I'm just reading the

22   first two lines, "There have been a number of

23   retrospective reviews to assess the

24   cardiovascular risks associated with the use

25   of Vioxx and other NSAIDs.  Retrospective

1    reviews do not control for differences in the

2    population studied and hence, must be

3    interpreted with caution," so what this is

4    referring to are retrospective reviews of

5    noncontrolled studies.

6        Q    And in that section of your report,

7    did you mean to discuss the results of

8    randomized control trials in that section of

9    your report?

10       A    No.  I'm sorry, no, not in this

11   report.  Not in this section of the report,

12   no.  This was all just retrospective views of

13   non-randomized data.

14       Q    And are there other sections of your

15   report that discuss at length the various

16   randomized clinical trial data with respect to

17   Vioxx?

18       A    Yes, sir.

19       Q    And can you give me an example of a

20   type of retrospective uncontrolled trial that

21   you just discussed, or that you were

22   attempting to discuss in the retrospective

23   studies section, just so the record is clear

24   as to what type of study that would be?

25       A    Sure, the trials that had to do with

1    like the Kaiser Permanente database, the

2    Medicaid trial database.  Some of the stuff

3    out of yours just looked at patients who had

4    received prescriptions, for instance.  That's

5    what this was meant to be.  That's partly why

6    I was confused with apples and oranges, I kept

7    saying, and she was showing me the other data

8    versus this.  This would not be included in

9    the reviews of what she was asking me.

10       Q    Okay, and again, did you mean to

11   include any randomized clinical trial data or

12   analyses of randomized clinical trial data in

13   this section of your report?

14       A    No.  This section clearly doesn't

15   refer to that.

16            MR. TOMASELLI:

17            Okay.  Dr. Eiswirth, I think I'm just

18   going to let you go home, and reserve the rest

19   of my questions until the time of trial.

20   Thank you for your time today.

21            MS. GROSS:

22            I'm just going to briefly state for

23   the record that, due to the large number of

24   documents that were not disclosed until

25   yesterday, we still move that we keep this