UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No.  1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, Plaintiffs | JUDGE ELDON E.  FALLON |
| | MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., Defendants | Case No.  05-3700 |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Merck's knew and concealed critical information regarding
           the risks and benefits of Vioxx. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Marketing to LDHH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    Impact of Merck's marketing of Vioxx on LDHH medicaid
           reimbursements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    Awareness of "cardiovascular concerns" does not preclude plaintiffs' claims. . . . . . . . . 11

II.    Merck is not entitled to summary judgment on the grounds that the state
    purportedly cannot demonstrate a direct causal link between Merck's
    misconduct and the state's payments for Vioxx. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    Individualized proof of causation is not required under Louisiana's
           unique statutory scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

           1.    Redhibition does not require any showing of causation beyond
                    an objective inquiry into the nature of the product. . . . . . . . . . . . . . . . . . 14

           2.    Restitution under §1408 does not require any showing of
                    actual causation, only that defendant *may* have obtained funds
                    through its unlawful conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

           3.    Merck's reliance on the *Zyprexa* line of cases is misplaced. . . . . . . . . . . 18

    B.    LDHH could have restricted reimbursements for prescriptions of Vioxx,
           but did not do so because of Merck's fraudulent concealment. . . . . . . . . . . . . . . 22

III.    LDHH can assert a claim in redhibition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    A.    The state has standing to sue in redhibition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.      Merck cannot meet its burden for summary judgment on the State's redhibition claim on the grounds that the State is relegated to a reduction in purchase price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      1.      Under Article 2532, when the thing sold has been destroyed, plaintiff can still obtain a full refund of the purchase price. . . . . . . . . . . 36

      2.      Under article 2545, the state is entitled to a full refund of the purchase price, subject to a credit for the value conferred on the State, the value of which credit it is Merck's burden to prove. . . . . . 38

      3.      The holding in *Smith v. Gen. Motors* is not controlling in the situation presented here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      4.      There is ample evidence from which this Court could determine an appropriate reduction in price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III.    The facts presented support a claim for restitution under LUTPA §1408 on behalf of LDHH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

      A.      Restitution under §1408 is not barred by the LPLA. . . . . . . . . . . . . . . . . . . . . . . 42

      B.      The Attorney General is expressly empowered to bring restitution claims on behalf of the State. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      C.      The State can prove entitlement to a remedy under LUTPA §1408. . . . . . . . . . 47

      1.      Grounds for restitution differ from those for redhibition. . . . . . . . . . . . . 48

      2.      Whether the State would have purchased other equally costly drugs is irrelevant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## TABLE OF AUTHORITIES

**PAGE**

**FEDERAL CASES**

*Delta Truck & Tractor, Inc. v. J.I. Case Co.*,
  975 F.2d 1192 (5th Cir. 1192)...................................................... 46

*Desiano v. Warner-Lambert Co.*,
  326 F.3d 339 (2nd Cir. 2003)...................................................... 35

*Edmonds v. Levine*,
  417 F.Supp.2d 1323, 1238 (S.D. Fla. 2006)................................... 26, 27, 28

*Harper v. Harris County, Tex.*,
  21 F.3d 597, 600 (5th Cir. 1994). .................................................. 11

*In re Actimmune Mktg. Litig.*,
  614 F.Supp.2d 1037 (N.D. Cal. 2009)....................................... 18, 20, 21

*In re Rezulin Prods. Liab. Litig.*,
  392 F.Supp.2d 597 (S.D.N.Y. 2005) ("*Rezulin I*").................................. 34

*In re Rezulin Prods. Litig.*,
  524 F.Supp.2d 436 (S.D.N.Y. 2007) ("*Rezulin II*"). .......................... 24, 26, 27

*In re Zyprexa Prod. Liab. Litig.*,
  –F.Supp.2d – 2009 WL 4260857 (E.D.N.Y. 2009)....................... 18, 19, 20, 21

*Ironworkers' Local Union No. 68 v. AstraZeneca Pharms. LP*,
  585 F.Supp.2d 1339 (M.D.Fla. 2008). ....................................... 18, 20

*Laborers Health & Welfare Fund v. Bayer Corp.*,
  655 F.SUpp. 2d 1270 (S.D. Fla. 2009). ........................................... 18

*Orthopedic & Sports Injury Clinic v. Wang Labs. Inc*,
  922 F.2d 220 (5th Cir. 1991)...................................................... 47

*Pharmaceutical Research and Mfrs. of America v. Meadows*,
  304 F.3d 1197, 1202 (11th Cir. 2002)......................................... 25, 26

*Southeast Labor Fund v. Bayer Corp.*,
  655 F.Supp.2d 1270 (S.D. Fla. 2009)............................................ 20

*Wyatt v. Hunt Plywood Corp.*,
297 F.3d 405, 408-409 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## STATE CASES

*Aucoin v. Southern Quality Homes, LLC*,
2007-1014 (La. 2/26/08), 984 So.2d 685. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Austin's of Monroe, Inc. v. Brown*,
474 So.2d 1383 (La.App. 2d Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Brown v. Duplantier*,
La. 1823, 1 Mart.N.S. 312.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Buck v. Adams*,
446 So.2d 895 (La. App. 1st Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Cloud v. Huffman Motor Co.*,
416 So.2d 266 (La.App. 3d Cir.1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Davis v. Davis*,
353 So.2d 1060 (La.App. 2d Cir.1977), *writ denied*,
355 So.2d 549 (La.1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Ditcharo v. Stepanek*,
538 So.2d 309, 312-13 (La.App. 5th Cir.), *writ denied*
541 So.2d 858 (La. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Holloway v. Gulf Motors*,
588 So.2d 1322 (La. App. 2d Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Landaiche v. Supreme Chevrolet*,
602 So.2d 1127, 1131 (La. App. 1st Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Leonard v. Daigle Pontiac-Buick-GMC, Inc.*,
413 So.2d 577 (La.App. 1st Cir.1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Magee v. Brown*,
2003-0600 (La.App. 4th Cir. 10/1/03),
859 So.2d 720, 724, *writ denied*, 2003-3016 (La. 1/30/04), 865 So.2d 68.. . . . . . . . . . . . . 38

*Mire v. EatelCorp, Inc.*,
   2002-1705 (La.App.1st Cir. 5/9/03), 849 So.2d 608, 614 *writ denied*,
   2003-1590 (La. 10/3/03), 855 So.2d 317. .............................. 14, 15, 19, 41

*Smith v. Gen. Motors Acceptance Corp.*,
   542 So.2d 831 (La. App. 3d Cir. 1989)............................................. 39

*State ex. rel. Guste v. General Motors Corp.*,
   354 So.2d 770 (La.App. 4th Cir.1978),
   *aff'd and remanded* 370 So.2d 477 (La.1979). .................................. 17, 43

*State ex rel. Guste v. Orkin Exterminating Co., Inc.*,
   528 So.2d 198, 204 (La. App. 4th Cir. 1988), *writ denied*
   533 So.2d 18 (La. 1988)...................................................... 17, 49

*State ex rel. Ieyoub v. Classic Soft Trim, Inc.*,
   95-804 (La.App. 5 Cir. 10/20/95), 663 So.2d 835, *writ denied*,
   95-2604 (La. 1/26/96), 666 So.2d................................................. 45

## FEDERAL STATUTES AND REGULATIONS

42 USCA §1396r-8............................................... 3, 23, 24, 25, 26

42 U.S.C.A. §1396r-8(d)(1)(B)(iv)...................................................... 25

42 U.S.C.A. §1396r-8(d)(4)(C)................................................ 25, 27, 29, 39

42 U.S.C.A. §1396r-8(d)(5)............................................................ 27

## STATE STATUTES AND REGULATIONS

LSA-C.C. art. 2439.................................................................. 33

LSA-C.C. art. 2520........................................................ 2, 14, 16, 36, 39

LSA-C.C. art. 2522.................................................................. 36

LSA-C.C. art. 2532.......................................................... 2, 36, 40, 48

LSA-C.C. art. 2533.................................................................. 40

LSA-C.C. art. 2536.................................................................. 40

LSA-C.C. art. 2545. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15, 36

La. R.S. 9:2800.52. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

La. R.S. 9:2800.53(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

LSA-R.S. 46:446. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 34, 35, 47

LSA-R.S. 46:153.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 26, 27, 29, 30

LSA-R.S. 46:153.3 B(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

LSA-R.S. 46:153.3 B(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

LSA-R.S. 46:143.3 (B)(2) (pre-2001 version). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

LSA-R.S. 46:153.3(B)(4)(a) (pre-2001 version). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

LSA-R.S. 46:153.3(B)(3)(a) (post 2001 version). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

LSA-R.S. 51:1404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

LSA-R.S. 51:1407. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

LSA-R.S. 51:1408. . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 16, 17, 18, 19, 20, 42, 43, 44, 45, 46, 47, 48
(Louisiana Unfair Trade Practices Act (LUTPA))

LSA-R.S. 51:1409. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 46, 47

## OTHER

California Business and Professions Code, §17200 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

California Business and Professions Code,  §17203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Mississippi Consumers Protection Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

MAY IT PLEASE THE COURT:

Through this lawsuit, the Louisiana Attorney General, on behalf of the State of Louisiana and the Louisiana Department of Health and Hospitals (LDHH) is seeking to recover the more than $20,000,000 it paid in reimbursements for Vioxx prescriptions, a drug for which the risks so outweighed its benefits, that it never should have been approved for use. (See Plaintiff's Statement of Contested Facts (PSS) ¶¶2, 185.) Under the facts presented, Louisiana law affords a number of remedies whereby the State can recover these funds from Merck, Sharp & Dohme Corp. (Merck), the manufacturer of the drug who knowingly concealed and misrepresented its true risk and benefit profile.

While LDHH can demonstrate direct reliance on Merck's fraudulent omissions and manipulation of the published literature, this case hinges on Louisiana's unique statutory scheme, which allows for recovery without the need to consider individualized questions of reliance. Neither redhibition, which focuses on the inherent quality of the thing sold as opposed to the subjective reliance of the buyer, nor restitution under the Attorney General's unique powers provided by LSA-R.S.51:1408, has a requirement of actual reliance. Hence these causes of action do not necessitate the individualized inquiries into prescribing physicians' decision making process that have caused some courts, considering entirely different laws unique to other states, to conclude that third party payers could not pursue certain claims arising from drug manufacturers' unlawful marketing practices. What Merck has described as an impermissible "price-inflation" theory of loss is actually expressly provided for in the redhibition articles of the Louisiana Civil Code.[1] Redhibition affords

---

[1] Interestingly, this so-called impermissible "price-inflation" theory of loss was embraced by the *Zyprexa* court upon which Merck has relied so heavily in support of its assertion that the need for individualized inquiry into doctor's prescribing decisions precludes claims that require

LDHH a right to rescission of the sale of Vioxx, in that the risks so outweighed the benefits as to render the drug useless. LSA-C.C. art. 2520. Additionally, as a bad faith seller, who omitted to declare what it knew about Vioxx and represented that Vioxx had qualities which it knew Vioxx did not have, Merck is liable for a return of the purchase price plus interest and damages. LSA-C.C. art. 2545. The fact that LDHH cannot return the Vioxx does not limit the State to a reduction in price, since the destruction by consumption was a result Merck's conduct and not the fault of the state. LSA-C.C. art. 2532. Moreover, because Merck was in bad faith, the burden is on Merck to show the benefit, if any, which the state received from Vioxx, in order to get a credit against refund of the full purchase price. LSA-C.C. art. 2545. In any event, the State has adduced ample evidence from which the Court could determine an appropriate reduction in price should the Court deem it appropriate to limit the State to a reduction in price.

The State has standing to bring a redhibition claim. The State is the "buyer" for purposes of redhibition. Indeed, the state is the sole payer for the price of Vioxx Medicaid prescriptions. If the state is not the buyer, then no one is, because the Medicaid patients who took Vioxx did not pay for it. Moreover, even assuming *arguendo* that the Medicaid patients are the "buyer," the state is nevertheless able to assert the medicaid patients' redhibition claims, because by statute, that State can directly assert any claims that the Medicaid patients could assert. LSA-R.S. 46:446.

Additionally, the Attorney General is empowered to seek restitution on behalf of LDHH under the broad equitable remedy of restitution, which allows the Court to return any property which *may* have been obtained through unlawful business practices such as those engaged in by Merck in the marketing of Vioxx. LSA-R.S. 51:1408. To award restitution, the Court need not determine

---

proof of proximate cause.

actual reliance on the part of LDHH or the individual prescribing doctors, but need only determine that Merck's unlawful practices *may* have resulted in Merck's sales of Vioxx to Louisiana Medicaid.

Contrary to Merck's assertion, the Attorney General can bring claims for restitution on behalf of LDHH.  The Attorney General's claim for restitution is *not* subject to LPLA exclusivity, because the damages under restitution are precisely those types of damages which the Louisiana legislature exempted from the LPLA's exclusivity provisions.  Additionally, it matters not that LDHH is not a "consumer" or "business competitor," because §1408 expressly authorizes the attorney general to assert claims for restitution on behalf of anyone who may have been affected by an unlawful trade practice.[2]

Finally, even assuming *arguendo* that the state had to prove its own reliance on Merck's fraudulent practices and resultant damages, such as is necessary to prevail under traditional tort remedies, the state can do so.  At all times that Vioxx was on the market, LDHH had the authority to restrict reimbursements for Vioxx in accordance with published clinical data. 42 USCA §1396r-8; LSA-R.S. 46:153.3.  As the Secretary of LDHH and the chairs of the Medicaid P&T Committee have all sworn, had the Merck-sponsored published clinical data accurately disclosed information about the risks and benefits of Vioxx, LDHH would have exercised its power to restrict reimbursements of Vioxx, and thus would have avoided paying to Merck a quantifiable portion, if not all, of the over $20,000,000 in prescription reimbursements it paid for Vioxx. (See PSS ¶¶108, 148.)

---

[2]  In any event, LDHH is authorized by statute to stand in the shoes of the medicaid patients, who undoubtedly are consumers of Vioxx.  LSA-R.S. 46:446.

-3-

## STATEMENT OF FACTS

_____Throughout its marketing of Vioxx, Merck manipulated the published literature upon which doctors and, in this case, the Louisiana Medicaid program, rely in making decisions about prescription drugs, and concealed key information in order to exaggerate the benefits of Vioxx while understating its risks.  Through such deceptive practices Merck caused LDHH to pay millions of dollars in prescription reimbursements for a drug the risks of which so outweighed its benefits that it was unfit for its intended use.

### A.     Merck's knew and concealed critical information regarding the risks and benefits of Vioxx

Plaintiff notes at the outset that the jury in the *Barnett* case tried before this Court, considering the very evidence of Merck's knowledge and concealment of critical information regarding the risks and benefits of Vioxx presented here, found by clear and convincing evidence, that Merck "knowingly misrepresented or failed to disclose a material fact to plaintiffs' treating physicians" and "that plaintiffs' treating physicians were entitled to rely and did in fact rely on that misrepresentation or non-disclosure." (August 30, 2006 Order & Reasons, attached hereto at Tab A). This Court found that the Barnett jury's findings on liability, which hinged on "the safety risks of Vioxx, what Merck knew about any such risks, when Merck knew this information, and what Merck should have done about it" were reasonable. (*Id.*)

Before Merck ever brought Vioxx to the market, Merck was aware the potential for Vioxx to cause cardiovascular events.  In its pre-marketing studies submitted to the FDA, Merck inadequately investigated this known risk, and failed to disclose to the FDA key analyses regarding the data submitted.  As a result, the FDA approval was based on inadequate information, and Vioxx

never should have been approved for use. (Plaintiff's Separate Statement of Contested Facts (PSS ¶¶1-13).

Merck continued to fail to adequately investigate cardiovascular risks after it obtained approval for Vioxx. Merck designed its post-market studies to avoid adequate investigation of the cardiovascular risks. (PSS ¶¶43, 52-55, 65). All the while, in both its label, which did not include a warning for cardiovascular risks, and its marketing materials, Merck downplayed the significance of cardiovascular risks. (PSS ¶¶135-137) In spite of its avoidance of an adequate investigation of cardiovascular risks, by March, 2000, results of Merck's VIGOR study confirmed that the cardiovascular risk outweighed any GI benefit conferred by Vioxx. (PSS ¶¶ 31, 34, 38) Publications of the Merck-sponsored VIGOR study in peer-reviewed literature touted the GI benefits while failing to disclose that those benefits were outweighed by cardiovascular side effects. (PSS ¶¶31-42, 45-46) Similarly, Vioxx's label, which was changed in 2002 to reflect the VIGOR study results exaggerated GI benefit while failing to include a warning of cardiovascular risks, and stating that significance of cardiovascular findings in studies cited was "unknown." (PSS ¶¶160-161, 169)

Throughout the time Vioxx was on the market, both in published studies of Merck-sponsored research and its labeling and marketing, Merck greatly exaggerated the GI benefits of Vioxx, examples of which include:

* By April 2003, Merck's data showed that Vioxx had about a four times greater risk of GI harm compared to placebo, although the Laine study stated that the Vioxx ulcer rate was "comparable to placebo" (PSS ¶¶92-93, 159);

* Vioxx was only tested to show GI benefit against high doses of ibuprofen and other NSAIDs that are not taken by 90% of the NSAID users, while people who used lower doses (the vast majority) got no benefit (PSS ¶160) ;

\*      Although the VIGOR study publication concluded Vioxx showed a statistically significant benefit over Naproxen for the most serious GI events, the VIGOR study results only showed such a benefit for patients taking steroids, which comprise only a small percentage of Vioxx patients (PSS ¶161);

\*      By February 27, 2003, Merck knew that the rate of the most serious GI events in the osteoarthritis studies was higher on Vioxx than on the traditional NSAIDs such as ibuprofen by the end of the study (PSS ¶¶91-92, 162).

Similarly, Merck manipulated published literature to conceal the cardiovascular risks of

Vioxx, examples of which include:

\*      The VIGOR study publication did not include complete cardiovascular (CV) data that was pre-specified for analysis, which would have shown excess CV risk to all patients, not just the ones who were "Aspirin-indicated" (i.e., had prior CV event) (PSS ¶163) ;

\*      The VIGOR study publication did not include the "Overall safety" results showing that Vioxx patients had 21% more serious adverse events than naproxen patients, when all types of harm were considered, which demonstrated that any GI benefit was outweighed by CV harm (PSS ¶¶42, 164);

\*      By 2001, Merck knew that Merck-sponsored Alzheimer's studies showed an excess risk of mortality among Vioxx patients versus placebo, and the same data showed an excess of cardiovascular mortality (PSS ¶165);

\*      Although by April 2002, Merck's OA data showed a statistically significant 3-fold risk of thrombotic CV events compared to placebo, a 2002 Merck-sponsored study publication only addressed pre-market OA studies and stated that there was no difference between Vioxx and placebo (PSS ¶¶65, 166).

\*      The VIGOR study showed a statistically significant 27% greater rate of hospitalizations for Vioxx patients as opposed to Naproxen. Although there were 20 fewer hospitalizations for gastrointestinal problems, there were 41 more cardiovascular hospitalizations among people taking Vioxx. This data, which would have demonstrated that treatment with Vioxx presented a significant economic disadvantage to treatment with Naproxen was never published (PSS ¶¶42, 167).

Despite all of the foregoing information, which demonstrated that the risks of Vioxx far

outweighed its benefits, Merck kept Vioxx on the market until September 30, 2004, touting its

purported GI benefits while insisting that the extent of cardiovascular risks, if any, was unknown. In September 30, 2004, after it was forced to discontinue its APPROVe study when patients taking Vioxx were shown to have a two-fold increase in confirmed cardiovascular events, Merck finally withdrew Vioxx from the market. (PSS ¶¶123, 129)

### B.    Marketing to LDHH

Louisiana's Medicaid program has been described by Merck's own sales force as one of "very high control," which is to say, LDHH exercises a great deal of control over reimbursement of prescription drugs. (PSS ¶175.   Since well before Vioxx came on the market, LDHH restricted reimbursements for prescriptions for safety reasons through implementation of Drug Utilization Review (DUR) Board prospective deny edits. (PSS ¶176).   Prospective deny edits were implemented at the pharmacy through an automated system, and could deny prescriptions based on objective criteria.   LDHH maintained the power to restrict reimbursements for safety reasons through use of DUR prospect deny edits throughout the entire time Vioxx was on the market. (*Id.*)

Additionally, on June 13, 2001, the Louisiana legislature authorized LDHH to restrict reimbursements for prescription drugs in accordance with federal law, to establish a "closed formulary" and to empanel a Medicaid Pharmaceutical & Therapeutical (P&T) Committee to develop that formulary based on review of clinical information. LSA-R.S. 46:153.3 (revised June 13, 2001).   This Act granted LDHH even greater authority to exclude reimbursements of prescriptions consistent with clinical indications.   In March of 2001, LDHH contracted with pharmacy benefit manager, Provider Synergies, Inc. to perform clinical evaluations of drugs considered for Louisiana's formulary or "Preferred Drug List" (PDL) (Defendant's Statement of Undisputed Material Facts ("DS"), No. 22).   Provider Synergies, Inc. prepared clinical monographs

-7-

summarizing available published literature for consideration by P&T Committee members in determining whether to restrict reimbursements of prescription drugs, including Vioxx. (DS No. 30).

Merck's own documents demonstrate that throughout the time that Vioxx was on the market, Merck employed a strategy of communicating its distorted clinical message to ensure that LDHH did not implement these controls over reimbursements of Vioxx.  Merck made a practice of targeting Louisiana's Drug Utilization Review Board and Medicaid Pharmaceutical & Therapeutics (P&T) Committee members, as well as LDHH's pharmacy benefit manager, Provider Synergies (PS) with favorable messages about Vioxx. (PSS ¶¶ 138-139, 141-148)  A 2002 Merck "Customer Profile for the State of Louisiana" described "Merck Strategy & Tactics":

> \*  Continue to work with the State of Louisiana and the DHH through
>     Provider Synergies to ensure unrestricted access to Merck products.
>
> \*  Maximize share for Merck products on the PDL.
>
> \*  Continue to develop product advocates with Medicaid P&T and DUR
>     members. (PSS ¶138)

In connection with this effort, the Merck sales force aggressively targeted P&T Committee members, both before and after P&T Committee meetings to deliver Merck's pro-Vioxx message. (PSS ¶143) Merck personnel, including regional medical director Fran Kaiser and National Account Executive Mary Ogle, repeatedly met personally with P&T Committee Chair Dr. Vincent Culotta and DUR Board members to deliver Merck's pro-Vioxx message. (PSS ¶¶139, 141-142).  The messages delivered through these contacts were developed by Merck's headquarters, and were consistent with Merck's national marketing strategy for Vioxx. (PSS ¶¶149-157). Included among these messages would have been Vioxx's core messages of efficacy and safety of Vioxx, particularly emphasis of GI benefits and downplaying of cardiovascular risks. (PSS ¶¶149-151, 153).

-8-

Merck implemented a similar strategy with respect to LDHH's consultant, Provider Synergies.  A Merck document outlines "Merck's Strategy" for dealing with Provider Synergies, stating, "The primary approach will be to communicate strong clinical differentiation messages in an effort to establish agreement on a premium price threshold that Provider Synergies can recommend to the State." (PSS ¶145)  In furtherance of this strategy, Merck regional medical directors met with Provider Synergies at least twice a year to deliver clinical messages developed by the team at Merck headquarters. (PSS ¶¶147, 155) Tellingly, the Provider Synergies monographs on Vioxx all concluded, consistent with Merck's marketing message, that Vioxx delivered considerable GI benefits over traditional NSAIDs and that any "cardiovascular concerns" were based on meta-analyses and that caution should be used in interpreting meta-analyses. (PSS ¶158).  The Provider Synergies Monographs upon which LDHH relied on making decisions about Vioxx cited primarily to distorted and incomplete Merck-sponsored studies, such as the NEJM VIGOR article, the Reicin study and the Laine study (see above) and provided inadequate information about the safety profile of Vioxx. (PSS ¶¶158-159).

LDHH and Provider Synergies were both highly concerned about cardiovascular risks and considered those risks in determining whether to include Vioxx on the LDHH Medicaid formulary. P&T Committee and Provider Synergies both frequently raised questions regarding cardiovascular safety. (PSS ¶¶168-170). By stressing the supposed GI benefits and de-emphasizing the cardiovascular issues, Merck successfully quelled those concerns and prevented LDHH from implementing contemplated controls on reimbursements of Vioxx. (PSS ¶¶171-173, 178, 180-183) In spite of repeated inquiries from both LDHH and Provider Synergies about cardiovascular concerns, at no time, did anyone from Merck ever reveal any of the concealed facts set forth above,

-9-

and LDHH personnel, including the chairs of the P&T Committee and the Secretary of LDHH ultimately responsible for approval of reimbursements, remained unaware of material information about the risk/benefit profile of Vioxx. (PSS ¶¶171-173).

### C.    Impact of Merck's marketing of Vioxx on LDHH medicaid reimbursements.

Merck's misleading marketing blitz on Louisiana Medicaid achieved Merck's desired effect. At no time during the entire time that Vioxx was on the market did LDHH implement any restriction on reimbursements of Vioxx, other than requiring a prior authorization for Vioxx for about a year. By meeting directly with key LDHH personnel to deliver Merck's clinical message, Merck's sales force succeeded in reversing even that limited restriction.  Indeed, Merck internal documents boast of Merck's success in maintaining unrestricted access to Vioxx. (PSS ¶184).

This Court need not take Merck's word for it that its efforts were successful.  LDHH P&T Committee members and the Secretary of LDHH have provided sworn affidavits that the Merck-sponsored clinical research and Merck direct marketing efforts convinced them that the risks associated with Vioxx were of acceptable levels for a prescription drug of wide-spread analgesic use and that its benefits outweighed its risks. (PSS ¶¶171-173).  Had the LDHH personnel responsible for deciding whether to restrict reimbursement of Vioxx known facts not disclosed in the Merck-sponsored published studies, they would have opposed unrestricted access to Vioxx in order to protect Louisiana Medicaid patients from exposure to this dangerous drug. (PSS ¶¶180-83)

With no restrictions on reimbursements of Vioxx throughout most of the five years that Vioxx was on the market, and a permissive prior authorization in place for only one of those years, Merck was able to collect $20,663,672.00 in Vioxx reimbursements, net of rebates, from LDHH. (PSS ¶189).  By representing in its labeling, its marketing, and Merck-controlled published literature

-10-

that Vioxx had benefits which Merck knew it did not possess, and by concealing its knowledge of the cardiovascular risks of Vioxx and its failure to adequately investigate same, Merck collected millions of dollars in prescription reimbursements from the State of Louisiana.

## ARGUMENT

A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact. *Wyatt v. Hunt Plywood Corp.*, 297 F.3d 405, 408-409 (5th Cir. 2002). An issue is material if its resolution could affect the outcome of the action. *Id.* In order to determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain the material factual issues. *Harper v. Harris County, Tex.*, 21 F.3d 597, 600 (5th Cir. 1994). In deciding whether a fact issue has been created, the Court must view the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party. *Wyatt,* 297 F.3d at 409. The Court must review all of the evidence in the record but make no credibility determinations or weigh any evidence. *Id.* In reviewing the evidence, the Court must disregard everything favorable to the moving party that the finder of fact is not required to believe, and should give credence to the evidence favoring the nonmoving party. *Id.* Plaintiffs have adduced ample evidence which gives rise to genuine issues of material fact as to any of the claims under Louisiana law asserted in this lawsuit.

## I.  Awareness of "cardiovascular concerns" does not preclude plaintiffs' claims.

Throughout its brief, Merck suggests that plaintiffs cannot assert any claims based on Merck's misrepresentations of the safety and efficacy of Vioxx, because purportedly the state was made aware of cardiovascular concerns through the Vioxx labeling and the clinical monographs prepared by Provider Synergies. Awareness of some "cardiac concerns" is not the same as knowing

what Merck knew about the true cardiac risks of Vioxx, to say nothing of Merck's overstatement of the GI benefits of Vioxx. The record is replete with evidence that statements of cardiovascular concern in the Vioxx labeling and Provider Synergies monographs were inadequate to apprise LDHH of the true hazards of Vioxx, and that Merck failed to disclose key information about Vioxx, which unlike the labeling and Provider Synergies monographs, would have demonstrated that the risks of Vioxx far outweighed its purported benefits. (PSS ¶¶159-167). Indeed, the record demonstrates that Vioxx should not have been prescribed to *anyone*.

The state's mere awareness of some level of risk does not preclude the state from asserting that it lacked adequate information about Vioxx. The instant case is analogous to that of *Buck v. Adams*, 446 So.2d 895 (La. App. 1st Cir. 1984). In *Buck*, a case involving the sale of a boat, the seller disclosed that the wooden boat had worm holes in its bottom. After the sale, the buyer discovered that the worm holes were so severe as to render the vessel unseaworthy. The *Buck* court found that the defendant had failed to disclose a redhibitory defect, even though the seller had disclosed the existence of the worm holes, because the seller had not put the buyer on notice that the worm holes were of such a severity as to render the vessel unseaworthy.

This case presents a similar situation. While LDHH may have been aware of certain "cardiovascular concerns," LDHH was not aware that the cardiovascular risks were of such a degree as to render the drug unfit for use in patients. That is to say nothing of Merck's exaggeration of the GI benefits of Vioxx. The State has introduced ample evidence from which the finder of fact could conclude that the State was inadequately apprised of the risks and benefits of Vioxx, even though the Merck label and Provider Synergies monographs put the state on notice of certain "cardiovascular concerns."

-12-

Whether a buyer was adequately informed or had knowledge of a defect in the object of the sale is a factual question. See *Landaiche v. Supreme Chevrolet,* 602 So.2d 1127, 1131 (La. App. 1st Cir. 1992); *Ditcharo v. Stepanek,* 538 So.2d 309, 312-13 (La.App. 5th Cir.), *writ denied* 541 So.2d 858 (La. 1989).  Hence, the question of whether LDHH was adequately informed of the risks and benefits of Vioxx is a question of disputed material fact which precludes the entry of summary judgment.  As Merck's motion for summary hinges on its assertion that the State was aware of cardiovascular concerns with Vioxx, this Court must deny Merck's motion for this reason alone.

II.    **Merck is not entitled to summary judgment on the grounds that the state purportedly cannot demonstrate a direct causal link between Merck's misconduct and the state's payments for Vioxx.**

Merck contends that summary judgment is appropriate because purportedly the State cannot demonstrate a direct causal link between Merck's misconduct and LDHH's decisions to reimburse prescriptions of Vioxx.  Whether LDHH can demonstrate a direct causal link between Merck's unlawful conduct and the state's decisions to expend millions of dollars in Vioxx reimbursements is absolutely immaterial to the unique Louisiana state law claims of redhibition and restitution asserted herein.  Nevertheless, plaintiff can demonstrate that Merck's fraudulent conduct caused LDHH to refrain from taking actions which would have avoided the expenditure of millions of dollars in medicaid reimbursements for Vioxx**.**

A.    **Individualized proof of causation is not required under Louisiana's unique statutory scheme.**

Merck argues that the State must prove a direct causal link between Merck's conduct and the State's expenditures on Vioxx, either through evidence that the State itself or the thousands of doctors who wrote Vioxx prescriptions relied Merck's omissions and misrepresentations.  Merck's

argument ignores the unique nature of the redhibition and restitution claims asserted by the State, neither of which requires such an inquiry.  Indeed, Merck's argument on this point not only fails to mention the governing Louisiana case-law regarding these two causes of action, but even omits key language from the statutory provisions themselves.

      **1.**    **Redhibition does not require any showing of causation beyond an objective inquiry into the nature of the product.**

Contrary to Merck's selective and incomplete quotation from the Civil Code provision governing redhibition, to prevail under redhibition, a plaintiff most certainly does not have to demonstrate that "the plaintiff 'would not have bought the thing had he known of the defect.'" (See Merck Brief, at p. 18, selectively quoting from LSA-C.C. art. 2520).  As the plain language of Article 2520 provides and Louisiana courts have recognized, the unique remedy of redhibition requires no such proof.  LSA-C.C. art. 2520; *Mire v. Eatel Corp., Inc.*, 2002-1705 (La.App.1st Cir. 5/9/03), 849 So.2d 608, 614 *writ denied*, 2003-1590 (La. 10/3/03), 855 So.2d 317.  Rather the inquiry for purposes of redhibition is on the nature of the thing sold, and not on any actual reliance on the part of the buyer. *Id.*

The Louisiana Civil Code article setting forth the cause of action of redhibition, provides:

> A defect is redhibitory when it renders the thing useless, or its use so inconvenient that **it must be presumed** that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale. A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that **it must be presumed** that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.

LSA-C.C. art. 2520 (emphasis added)

-14-

Under the plain language of the statute, the plaintiff's own reliance is immaterial. Rather, the focus of the inquiry is on the nature of defect in the thing sold, and whether the defect is such that it could be *presumed* that a buyer would not have bought the thing or would have bought it for a lesser price. As one Louisiana court explained:

> [T]he inquiry under a redhibition claim does not involve the buyer's subjective knowledge or reliance, but rather is an objective inquiry into the deficiency and whether it diminishes the product's value or renders it so inconvenient that the reasonable buyer would not have purchased it had he known of the deficiency.

*Mire* 849 So.2d at 614.

Hence, contrary to Merck's unsupported assertion, in order to prevail in redhibition, the State need not show that LDHH would not have bought Vioxx but for Merck's misrepresentations and omissions, or that thousands of doctors would not have written Vioxx prescriptions but for Merck's misconduct, but rather the State must merely show that due to the defect in Vioxx, it must be presumed that a *reasonable buyer* would not have bought it or would have paid less for it. The State has certainly adduced ample evidence from which a finder of fact could reach such a conclusion. Indeed, Merck itself reached that very conclusion when it withdrew Vioxx from the market.

Additionally, the redhibition article addressing bad faith sellers likewise is devoid of any requirement of reliance on the part of the buyer. Rather, the focus of the inquiry is on the seller's statements or omissions about the nature of the thing sold. Civil Code article 2545 provides:

> A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have

-15-

> yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.  A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.

As with article 2520, there is no requirement that the plaintiff show reliance.  Rather, the focus of the inquiry is again on the nature of the thing sold, and in the case of a bad faith seller, whether the seller has knowingly misrepresented or concealed the nature of the thing sold.

There is ample evidence that Merck knowingly misrepresented and concealed the true risks of Vioxx, and as such Merck is not entitled to summary judgment on the claim of redhibition, regardless of whether plaintiff can demonstrate that the State or prescribing physicians relied on Merck's misrepresentation.  In fact, under the law of redhibition, plaintiff need not even adduce proof of Merck's bad faith, since a manufacturer is presumed to know of the existence of a redhibitory defect.

### 2. Restitution under §1408 does not require any showing of actual causation, only that defendant *may* have obtained funds through its unlawful conduct.

As with its selective citation to the redhibition article, Merck has conveniently omitted key language from its citation to the restitution provision of the Louisiana Unfair Trade Practices Act (LUTPA).  In this case, Merck's omission is small, but glaring: the elimination of the single word "may."  LUTPA authorizes the Attorney General to seek restitution on behalf of "any aggrieved person" whose property "*may* have been acquired by means of" a deceptive trade practice.  La.-R.S. 51:1408.  This broad restitution remedy, which gives courts flexibility to fashion equitable remedies to redress unfair trade practices, does not require the Attorney General to demonstrate reliance on the part of any aggrieved person.  It does not even require the Attorney General to show causation for any injury.  By it's very language, the restitution provision merely requires the Attorney General

to demonstrate that victims' property "*may* have been acquired by means of a deceptive trade practice." *Id.*

Louisiana courts have recognized that La.R.S. 51:1408 authorizes the Attorney General to seek a broad remedy of restitution to provide redress to anyone who may have been affected by an unfair or deceptive trade practice. *State ex. rel. Guste v. General Motors Corp.*, 354 So.2d 770 (La.App. 4th Cir.1978), *aff'd and remanded* 370 So.2d 477 (La.1979); *State ex rel. Guste v. Orkin Exterminating Co., Inc.*, 528 So.2d 198, 204 (La. App. 4th Cir. 1988), *writ denied* 533 So.2d 18 (La. 1988). The court in *Orkin* held:

> Initially, we note that where injunctive actions are brought by the state, Louisiana's Unfair Trade Practices and Consumer Protection Law, La.R.S. 51:1408 allows the court to issue additional orders or render judgments against any party, as may be necessary to compensate any aggrieved person for any property, movable or immovable, corporeal or incorporeal, which *may* have been acquired from such person by means of any method act or practice declared unlawful by La.R.S. 51:1405...Under this section, restitution, as compensation to an aggrieved party, may be sought in deceptive trade practice cases. *State ex. rel. Guste v. General Motors Corp.*, 354 So.2d 770 (La.App. 4th Cir.1978), aff'd and remanded 370 So.2d 477 (La.1979).

> *Id.,* 528 So.2d at 204 (emphasis added).

The causation element of §1408's restitution provision is featherweight at most. The statute grants courts broad powers to "compensate *any* aggrieved person for any property... which *may* have been acquired by means of " any deceptive trade practice. This flexible language provides "broad powers of restitution, adapted to give relief when due, yet narrowly drawn so as to be equitable." *Id.* Noting that the restitution remedy is broad and equitable in nature, the *Orkin* court affirmed a trial court's order requiring the defendant to reinstate all cancelled exterminating contracts, even

-17-

though the Attorney General had made no showing that all of the clients whose contracts were cancelled had relied on the deceptive trade practice at issue.  Rather than require any specific showing of reliance, the statute provides the court broad, equitable powers to compensate those subjected to deceptive trade practices such as those complained of herein.

Nowhere in the language of §1408 is there any requirement of direct reliance on the part of the aggrieved party.  The purpose of the restitution provision is to give courts the ability to fashion a broad yet equitable remedy to redress deceptive trade practices where proof of causation may be difficult.  The Court can award restitution if the Attorney General shows that the defendant may have acquired property through a deceptive trade practice.  The record is replete with evidence that Merck fraudulently prevented the State from restricting reimbursements for medicaid prescriptions of Vioxx, resulting in the expenditure of millions of dollars in prescription costs.  These facts more than satisfy any causation requirement under §1408's broad restitution remedy.

### 3.    Merck's reliance on the *Zyprexa* line of cases is misplaced.

Relying on a handful of cases that hold that the "individualized proof rule" precludes a finding for a third party payer plaintiff on any claim that depends upon a showing that individual doctors wrote prescriptions as a result of a drug manufacturers' fraudulent conduct, Merck suggests that this Court must grant summary judgment on all of the State's claims.[3]  Merck's reliance on these cases is misplaced.  First, the state can and will demonstrate that Merck's misconduct caused the State itself to reimburse Vioxx prescriptions, regardless of whether individual prescribing doctors

---

[3] *In re Zyprexa Prod. Liab. Litig.*, –F.Supp.2d – 2009 WL 4260857 (E.D.N.Y. 2009); *In re Actimmune Mktg. Litig.*, 614 F.Supp.2d 1037 (N.D. Cal. 2009); *Ironworkers' Local Union No. 68 v. AstraZeneca Pharms. LP*, 585 F.Supp.2d 1339 (M.D.Fla. 2008); *Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F.SUpp. 2d 1270 (S.D. Fla. 2009).

-18-

would have prescribed the drug.  In none of the cases on which Merck relies was there any allegation that the defendant drug manufacturers' misconduct caused the payor plaintiffs themselves to take actions which resulted in reimbursements of prescriptions.  Second, under the unique Louisiana causes of action asserted here, none of which were addressed by any of the extra-jurisdictional district court decisions upon which Merck relies, the state need not demonstrate reliance on the part of anyone, much less individualized proof as to the prescribing decisions of thousands of physicians.

The holdings in *Zyprexa* and all of the other cases cited by Merck all dealt with theories of liability which required the Court to inquire into the prescribing decisions of doctors who wrote prescriptions.  As is discussed, *supra*, neither the cause of action of redhibition nor §1408 restitution requires any inquiry into the prescribing decisions of doctors.  Rather, redhibition focuses on the inherent nature of the product and as such requires no inquiry into the subjective knowledge or reliance of the buyer.  *Mire, supra*.  Similarly, the focus of the restitution claim is on the defendant's misconduct and whether the defendant "may" have obtained funds through an unlawful trade practice.  LSA-R.S. 51:1408.  The claims at issue herein do not require the type of proof which prompted certain courts like the Eastern District of New York in *Zyprexa* to grant summary judgment.

In determining that consideration of the State of Mississippi's claims would require individualized proof of causation as to each prescription, the *Zyprexa* court focused on the specific causation requirement of the Mississippi statute at issue in that case.  Finding individualized proof of reliance necessary to claims under Mississippi's Consumer Protection Act (CPA), Judge Weinstein cited to Mississippi's rigid causation element.  Judge Weinstein noted the specific causation element of the Mississippi CPA:

> Violators of the CPA are subject to liability in damages for "any ascertainable loss of money or property, real or personal, *as a result of* ... a [prohibited] method, act or practice."

> In re *Zyprexa,* 2009 WL 4260857 at 60. (Emphasis added).

It was this specific causation requirement – that ascertainable loss of money or property occur "as a result of" an unfair trade practice – that led Judge Weinstein to conclude that the need for individualized proof of reliance precluded the Mississippi Attorney General from proving its CPA claim through generalized proof.[4]

By contrast, the section of the Louisiana Unfair Trade Practices Act which expressly empowers the Louisiana Attorney General to seek an equitable remedy of restitution has no such specific causation requirement.  Instead, the Louisiana legislature has empowered the Louisiana Attorney General to seek restitution to "compensate *any* aggrieved person for any property... which *may* have been acquired by means of " any deceptive trade practice. LSA-R.S. 51:1408 (emphasis added).  In order to assert the claim for restitution on behalf of LDHH, the Attorney General need not demonstrate that prescriptions were written "as a result" of Merck's deceptive practices.  Rather, the Attorney General need only demonstrate that such prescriptions "*may* have been" the result of a deceptive trade practice.

The holding in *In re Actimmune Mktg. Litig.*, 614 F.Supp.2d 1037 (N.D. Cal. 2009), cited by Merck, recognizes a distinction between claims that require proof of causation and those based

---

[4]  Other cases cited by Merck likewise involved a requirement to show direct causation between the alleged misrepresentation and the plaintiff's expenditures.  *Southeast Labor Fund v. Bayer Corp.*, 655 F.Supp.2d 1270 (S.D. Fla. 2009)(requiring plaintiff must show "ascertainable loss" due to defendants' misrepresentation to prevail under New Jersey Consumer Protection Act); *Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP*, 585 F.Supp. 2d 1339 (M.D. Fla. 2008) (same).

-20-

on a consumer protection statute that does not require proof of actual causation. While the *Actimmune* court dismissed plaintiffs' RICO claims on the grounds that the need to consider individual prescribing decisions of doctors precluded plaintiff from meeting RICO's more stringent proximate cause requirement, it granted plaintiffs leave to amend their California consumer protection claims to allege that defendants' conduct had a tendency to mislead doctors. Although the *Actimmune* court found that plaintiffs could not rely on a fraud-on-the-market theory to support their California consumer protection claims, recognizing the relaxed causation standard under California's consumer protection law (California Business and Professions Code, §17200 et seq.), the Court nevertheless granted the plaintiffs leave to amend their complaint to allege specific facts that the defendants' misrepresentations would have had a tendency to mislead doctors. *Actimmune*, 614 F.Supp.2d at 1054-1056.

The language of California's consumer protection statute is nearly identical to Louisiana's, allowing for restitution of moneys "which *may* have been acquired by such means of unfair competition." Cal. Bus. & Prof. Code §17203 (emphasis added). Recognizing that to prevail under California's consumer protection law, the plaintiff need only demonstrate a tendency to mislead rather than actual causation, the *Actimmune* court allowed the plaintiffs to proceed with those claims, even though the court found that the plaintiffs could not present aggregate proof of the prescribing decisions of doctors. The same rationale applies here. Since actual causation is not necessary to prevail under §1408, the inability of the plaintiffs to present aggregate proof of the prescribing decisions of individual doctors does not warrant dismissal of plaintiffs' claims.

Finally, Merck glosses over the aspect of the *Zyprexa* court's denial of summary judgment with respect to claims based on a theory that plaintiff paid too much for the drug. In a footnote,

-21-

Merck suggests that this Court should ignore that aspect of the *Zyprexa* holding because supposedly no price inflation theory has been pled in this case and other authority has rejected the price-inflation theory in drug cases.  Louisiana's law of redhibition, which plaintiffs most definitely have pled, is a codification of a price-inflation theory, and allows for recovery of the difference between the purchase price and what a reasonable buyer would have paid had the defect been known (See discussion of redhibition claim, at Section III, *infra*).  Regardless of whether the *Zyprexa* court was correct that a price inflation theory is permissible under common law theories of liability, that court's holding that such a claim is not subject to summary judgment on the grounds that it does not require inquiry into the prescribing decisions of individual doctors is applicable to the State's claim for redhibition.

  **B.** **LDHH could have restricted reimbursements for prescriptions of Vioxx, but did not do so because of Merck's fraudulent concealment.**

  Merck is not entitled to summary judgment on the question of causation.  There remain substantial disputed questions of material fact as to whether Merck's conduct caused the state to pay for Vioxx prescriptions.  Merck's key assertion on this issue, that the state was precluded by law from restricting reimbursements for Vioxx, is legally and factually wrong.

  Merck suggests that the State cannot prove causation, even though Merck marketed Vioxx directly to LDHH, because purportedly LDHH was not allowed to refuse to pay for prescriptions of Vioxx, a drug subject to a rebate agreement with the Secretary of Health and Human Services.  Merck's entire argument in this regard pre-supposes that Vioxx was properly approved for use by the FDA.  Had Vioxx not been approved by the FDA – and there is ample evidence in the record to demonstrate it would not have been but for Merck's misconduct – then none of the federal or state

limitations on a state's ability to restrict medicaid prescription reimbursements would have been applicable, as these provisions only apply to FDA-approved drugs.  Nevertheless, even if the drug was properly approved for use by the FDA, at all times that Vioxx was on the market, LDHH had the authority under both state and federal law to restrict prescriptions of Vioxx.

Since before Vioxx was placed on the market, and continuing to the present day, LDHH has had the statutory authority (indeed, the statutory duty) to restrict reimbursements of prescription drugs to ensure that prescriptions are "not likely to result in adverse medical results" through the implementation of its Drug Utilization Review prospective edits.  42 U.S.C. §1396r-8(g); LSA-R.S. 46:153.3(B)(4)(a) (pre-2001 version); LSA-R.S. 46:153.3(B)(3)(a) (post 2001 version).  LDHH has routinely used prospective edits to deny filling of medicaid prescriptions at the pharmacy for safety reasons.  Indeed, when the FDA issued an advisory of cardiovascular risks in Cox-2 inhibitors in December 2004, LDHH issued a prospective deny edit with respect to Bextra and Celebrex which resulted in a significant numbers of denials of prescriptions for those drugs.  (PSS ¶176)  Even with Vioxx approved by the FDA, had sufficient information about the risks and benefits of Vioxx been disclosed, LDHH could have, at the very least, implemented a prospective deny edit as restrictive as that imposed for Cox-2's in December 2004, resulting in a quantifiable drop in the number of Vioxx prescriptions reimbursed by LDHH (PSS ¶¶176-178).

The record supports an inference that had Merck adequately represented the risks and benefits of Vioxx, LDHH could have implemented any of a number of DUR prospective edits based on clinical information which would have had a significant, quantifiable  impact on the volume of Vioxx prescriptions that LDHH reimbursed.  One such example would have been a prospective deny edit limiting Vioxx prescriptions to patients who were also on steroids.  Such a prospective deny edit

-23-

would have drastically reduced the number of Vioxx prescriptions reimbursed by LDHH.  Drs. Abramson, Julie and Graham, have all opined that Vioxx was only shown to have a positive impact on serious GI events on Vioxx patients who were also taking steroids, which comprised at most 7-8% of Vioxx users.  Had this information been disclosed, and had the full risk of CV events been disclosed, LDHH could have implemented a DUR prospective edit, based on clinical data, which only allowed prescriptions of Vioxx to patients who were also on steroids.  Such a measure would have reduced LDHH's reimbursements for Vioxx by a minimum of 92-93%.[5]

Hence, at all times Vioxx was on the market, LDHH could have significantly restricted its reimbursements for Vioxx through implementation of Drug Utilization Review prospective deny edits, but did not do so because of Merck's misrepresentations and concealment as to the risks and benefits of Vioxx.  This ability to restrict Vioxx prescriptions existed even before the Louisiana legislature adopted the implementation of a closed formulary in July of 2001.  The *Rezulin II* court, which Merck cites for the proposition that the state cannot assert a claim where the state is precluded by law from refusing to reimburse medicaid prescriptions, was not presented with evidence of and did not consider the state's ability to restrict reimbursements through DUR prospective deny edits. See *In re Rezulin Prods. Litig.*, 524 F.Supp.2d 436 (S.D.N.Y. 2007) ("*Rezulin II*")

After June of 2001, when the Louisiana legislature approved a "closed formulary" system consistent with 42 USC §1396r-8, LDHH's ability to restrict and even refuse reimbursements for Vioxx became much broader.  The federal statute cited by Merck expressly authorized LDHH to "exclude or restrict" payments for prescriptions of drug's on the basis of clinical reasons of safety

---

[5]  With LDHH's total expenditures for Vioxx at $20,663,672.00 (See PSS ¶198), the implementation of such a DUR throughout the time Vioxx was on the market would have resulted in a savings to the state of approximately $19,010,000 to $19,217,000.

-24-

and efficacy.   42 U.S.C.A. §1396r-8(d)(1)(B)(iv).   The statute empowers states to exclude reimbursements for any drug which, per its labeling, does not have a significant advantage over other drugs included in the formulary.   42 U.S.C.A. §1396r-8(d)(4)(C). The record is replete with evidence that Vioxx did not demonstrate any significant advantage over traditional NSAIDs, and in fact posed considerably greater risk while offering no greater efficacy (PSS ¶186). Hence, pursuant to the very federal statutes cited by Merck, LDHH had the authority to refuse reimbursements for Vioxx by excluding it from a formulary.

Section (d)(4)(C) of the Medicaid statute cited by Merck provides that states can exclude covered drugs under circumstances present here.   Section (d)(4)(C) provides:

> A covered outpatient drug may be excluded with respect to the treatment of a specific disease or condition for an identified population (if any) only if, based on the drug's labeling... the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion.

> (42 U.S.C.A. 1396r-8(d)(4)(C) (portion pertaining to drugs not covered by Food, Drug and Cosmetics Act omitted).

Hence, 42 U.S.C.A. 1396r-8 specifically authorizes a state to refuse to pay for Vioxx.  Had Merck properly labeled Vioxx, it would have had to disclose a considerable disadvantage of Vioxx as compared to other NSAIDs, and the State would then have been authorized by federal statute to refuse reimbursement for the drug.

Courts interpreting section (d)(4)(C) have construed it to mean that a state can lawfully refuse payment for a Medicaid eligible drug by excluding the drug from a formulary, as long as the decision is based on issues of clinical safety and effectiveness. *Pharmaceutical Research and Mfrs. of*

*America v. Meadows*, 304 F.3d 1197, 1202 (11th Cir. 2002); *Edmonds v. Levine*, 417 F.Supp.2d 1323, 1238 (S.D. Fla. 2006).  The record demonstrates that LDHH would have refused to pay for Vioxx had Merck not misrepresented the safety and efficacy of the drug.  Hence, LDHH can assert that it could have legally refused payment for Vioxx had it known the truth about Merck's misrepresentations.

Ignoring this key provision of §1396r-8, Merck cites to a lone district court decision which held that the purported inability of LDHH to exclude coverage for drugs subject to a rebate agreement was fatal to LDHH's fraudulent marketing claims.  See *In re Rezulin Prods. Liab. Litig.*, 524 F.Supp.2d 436 (S.D.N.Y. 2007) ("*Rezulin II*").  Merck's reliance on *Rezulin II* is misplaced.  Indeed, the *Rezulin II* court held that in the situation presented here, where a drug was on the market after June 13, 2001, the state of Louisiana was *not* barred from refusing payment for drugs subject to a rebate agreement.

While the *Rezulin II* court noted the general rule that §1396r-8 requires states to cover drugs subject to a rebate agreement, that decision turned on the fact that La.-R.S. 46:153.3, as it was written when Rezulin was on the market, precluded the LDHH from adopting a closed formulary, and required that LDHH "shall provide reimbursement for any drug prescribed by a physician that, in his professional judgment and within the lawful scope of his practice, he considers appropriate for the diagnosis and treatment of the patient." LSA-R.S. 46:143.3 (B)(2) (pre-2001 version).[6]  Since Louisiana law at the time barred LDHH from adopting a restrictive formulary, the *Rezulin II* court

---

[6]  Note that the pre-2001 version of LSA-R.S. 46:153.3 provided an exception for the DUR prospective edit procedure.

-26-

held that the exception established under 42 U.S.C.A. §1396(d)(4)(C) did not apply.  *Id.*, 524 F.Supp. at 440.

However, the *Rezulin II* court noted, effective June 13, 2001, La.-R.S.46:153.3 was amended to remove the ban on a restrictive formulary.  The provision of 46:153.3 (B)(2) requiring that LDHH reimburse any drug prescribed by a physician was eliminated in its entirety.  The *Rezulin II* court found that since Rezulin had been removed from the market in March of 2001, prior to the Louisiana legislature's repeal of its ban on a closed formulary, Louisiana could not avail itself of the exception provided in §1396r-8(d)(4)(C).  Nevertheless, the *Rezulin II* court acknowledged that had Rezulin still been on the market after June 13, 2001, the defendant's causation/reliance argument would have failed.  *Id.*, 524 F.Supp.2d at 440, n. 17.  In the instant case, Vioxx remained on the market until September 30, 2004.  Thus, even under the *Rezulin II* holding cited by Merck, LDHH would have been able to refuse reimbursement of Vioxx from June 13, 2001 through the drug's removal from the market on September 30, 2004.

The only other authority Merck offers for its suggestion that LDHH was banned by federal law from excluding Vioxx from its formulary is a Florida district court case regarding the use of prior authorizations under 42 U.S.C.A. §1396r-8(d)(5). *Edmonds v. Levine*, 417 F.Supp. 2d 1323 (S.D.Fla. 2006).  As with the *Rezulin II* decision, that holding actually supports Plaintiff's assertion that LDHH could have excluded Vioxx.  Merck cites the *Edmonds* holding for the proposition that a state may not use its prior authorization procedure to deny payments for a covered drug.[7]  However,

_____

[7] It should be noted that the *Edmonds* holding did not deal with a state restricting reimbursements on the basis of patient safety.  The *Edmonds* court may well have reached a different conclusion about the state's right to refuse reimbursement through a prior authorization program if the state's reason for doing so was to save patients' lives.

Merck utterly ignores the *Edmonds* court's observation that a state *can* choose to exclude reimbursement based on clinical factors.  The *Edmonds* court held, "the state may not exclude that drug from coverage *except through its formulary committee based solely on clinical factors*." *Edmond*, 417 F.Supp. 2d at 330 (emphasis added).

In *Edmonds*, the state of Florida attempted to refuse payment for the prescription drug Neurontin through a prior authorization program, rather than excluding it from a formulary based on clinical factors of safety and efficacy.  The *Edmonds* court held that since Florida had not excluded reimbursement based on clinical safety and efficacy, it could not avail itself of the exception to the rule applicable to covered drugs excluded on the basis of clinical safety and efficacy. The *Edmond* court held that the state could not use a prior authorization process to exclude coverage, holding that the only permissible way to exclude a drug was to exclude it based on clinical considerations.

While the *Edmonds* court held that a state could not use prior authorizations to deny reimbursements for a covered drug, the *Edmonds* court also held that a state *could* deny coverage for a drug for reasons of clinical safety and efficacy.  The *Edmonds* court held:

> The Medicaid Act permits a state (through its formulary committee) to remove a Medicaid-eligible drug from the formulary, with the result that the drug will no longer be covered for reimbursement, if the drug that "does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome" over other drugs included in the formulary. §1396r-8(d)(4)(C). The committee's decision to exclude a drug from the formulary is generally limited to issues of clinical safety and effectiveness. *Id*.; *see Meadows*, 304 F.3d at 1202. The committee must provide a written explanation, available to the public, of the basis for excluding a drug from the formulary. §1396r-8(d)(4)(C). As the *Meadows* court explained, **the exclusion of a drug from a state**

-28-

> formulary **"has the effect of actually denying coverage of, or payment for, certain Medicaid-eligible drugs."** 304 F.3d at 1207.
>
> *Id.*, 417 F.Supp.2d at 1328 (emphasis added).

The lynchpin of Merck's argument is a fallacy. As the *Rezulin II* court noted, after June 13, 2001, LDHH was empowered to create a closed formulary and could have excluded coverage for Vioxx based on considerations of safety and efficacy. The statute cited by Merck specifically empowers the state to do so. 42 U.S.C.A. §1396r-8(d)(4)(C). If there is any doubt on that score, this Court need look no further than the cases cited by Merck, both of which hold that when a state, like Louisiana after June13, 2001, is empowered to adopt a closed formulary, the state can exclude reimbursements for reasons of safety and efficacy.

Before June 13, 2001, LDHH could have restricted reimbursements for Vioxx through its DUR prospective audits, expressly authorized, nay mandated, by federal law. After June 13, 2001, when the Louisiana authorized a closed formulary process, LDHH could have refused payment for all prescriptions for Vioxx altogether.

Merck has suggested that after the June 2001 amendments to LSA-R.S. §46:153.3, LDHH only had a prior authorization program, and did not have the ability to refuse reimbursements through its formulary program. While it is true that during the time that Vioxx was on the market, LDHH had only used its formulary program to implement a prior authorization system, the legislature had granted LDHH the power to restrict reimbursements to the full extent allowable under federal law, so LDHH could have utilized its formulary to refuse to reimburse Vioxx altogether. The June 2001 revision to §153.3 gave LDHH unlimited authority to "limit reimbursement for

-29-

multi-source prescription drugs in accordance with state and federal law." LSA-R.S. 46:153.3 B(1).[8]

Hence, had Merck not manipulated the science to overstate the benefits and understate the risks of

Vioxx, LDHH could have refused to reimburse Vioxx, in accordance with 42 USC 1396r-8(d)(4)(C).

Finally, even assuming for the sake of argument that the only means available to the state to

restrict reimbursements of Vioxx was through the prior authorization program, the state can still

show individualized reliance and resultant economic harm.  In June of 2002, for purely economic

reasons (the state being under the impression that all Cox-2 inhibitors were essentially equivalent

in terms of efficacy and safety), the state of Louisiana excluded Vioxx from its first Preferred Drug

List.  In the words of Merck's own documents, when Louisiana did so, Vioxx sales "plummeted"

(PSS ¶199).  In 2003, unaware of Merck's misrepresentations and omissions as to the risks and

benefits of Vioxx, LDHH placed Vioxx on its PDL, resulting in a significant increase in Vioxx

reimbursements, estimated by economist Jeffrey Harris to be approximately $2,000,000 in additional

payments for Vioxx.  Hence, the state can demonstrate through reliable economic analysis that the

state's own decisions with respect to prior authorizations of Vioxx resulted in quantifiable economic

harm to the state.

Merck suggests that to the extent the State could only restrict reimbursements of prescriptions

of Vioxx, as opposed to refusing to pay them altogether, determination of the State's claims would

hinge upon an inquiry into the prescribing decisions of thousands of physicians.  This assertion is

simply incorrect. Determination of the State's claim under those circumstance would only hinge

---

[8]  The provisions of LSA-R.S. 46:153.3 allowing for the creation of a prior authorization program appear at LSA-R.S. 46:153.3 B(2).  LSA-R.S. 46:153.3 B(1), which empowers the board to limit reimbursements in accordance with state and federal law without further restriction is a separate section from the prior authorization provision and is not limited to prior authorizations.

upon an inquiry into the decisions of a single entity, LDHH.  Once the Court has determined that LDHH would have taken certain measures to restrict reimbursements, quantifying the impact of those measures would necessitate nothing more than review of the State's own prescription reimbursement data.  For instance, with respect to prior authorizations of Vioxx, the State's prescription history demonstrates the impact of the State's decision to remove the prior authorization requirement for Vioxx.  Indeed, Merck's own documents track the impact of the State's prior authorization decisions on sales, noting a precipitous decline immediately after Vioxx was initially excluded from the PDL, and a dramatic increase in sales immediately after it was announced that Vioxx would be placed on the PDL.

Applying essentially the same methodology utilized by Merck in measuring this impact, plaintiff's expert Jeffrey Harris determined that the decision to put Vioxx on the PDL cost the state approximately $2 million.  Tellingly, Merck itself routinely uses similar economic analyses to project the impact of various market events on sales of its products, and considers such analyses to be based on sound reliable economic methodologies and sufficiently accurate upon which to base its business decisions. (PSS ¶200).

Similarly, with respect to the use of DUR prospective deny edits, which would turn on objective prescribing criteria, the Court could determine the impact of whatever DUR edits the State might have imposed by reference to Unisys LDHH prescription reimbursement data, which would show the number of Vioxx patients who would meet whatever objective criteria were set by a clinically prescribed DUR prospective edit.  For example, plaintiff's expert, Jeffrey Harris utilized this data to determine the impact of the relatively permissive DUR prospective deny edit the DUR Board  implemented with respect to Cox-2 inhibitors in December of 2004.  (PSS ¶176).

Evidence that the State expended money for Vioxx prescription reimbursements because Merck's omissions and representations to the State induced the state to take or not to take certain actions to restrict reimbursement of Vioxx prescriptions is more than adequate to meet the causation requirement of any theory of recovery. Given that the causation requirement for restitution under §1408 is featherweight, only requiring that Merck's unlawful business practice "may" have caused such expenditures, such evidence more than satisfies the State's burden of proof.

While not required to do so under Louisiana law of redhibition and restitution, the State has brought forth ample evidence that it could and in fact did rely on Merck's misrepresentations and omissions to its considerable detriment. Merck cannot meet its burden for summary judgment on this question.

**III.    LDHH can assert a claim in redhibition.**

The facts support a cause of action for plaintiff under Louisiana's unique statutory regime of redhibition, a cause of action which does not require any inquiry into the buyer's subjective knowledge or reliance.

**A.    The state has standing to sue in redhibition.**

Without citing a single Louisiana or Fifth Circuit authority, Merck asserts that the state of Louisiana does not have a cause of action in redhibition, because the state is not a "buyer" of Vioxx. Merck contends that because the state merely paid for the drug, but did not personally take possession of the drug, it cannot be considered a "buyer" entitled to redhibition. Not only is this argument entirely without support in Louisiana statutory law or jurisprudence, but it also ignores the nature of the Medicaid transaction, and effectively removes the claim of redhibition from any Medicaid purchase of pharmaceuticals.

-32-

Even though LDHH paid the entire purchase price for Vioxx prescribed to Medicaid beneficiaries, Merck contends that LDHH is not the "buyer" of Vioxx, because LDHH never acquired possession of Vioxx. No Louisiana court has ever embraced this restrictive definition of "buyer" and Merck's proposed definition finds no support in the statutes governing sale. The term "buyer" is not even defined anywhere in the Louisiana Civil Code articles governing sales. However, sale is defined as the transfer "of ownership of a thing to another for a price in money." LSA-C.C. art. 2439. Here, there is no disputing that LDHH is the one who paid the price in money for the transfer of ownership, even assuming that "ownership" did not transfer to LDHH.

There is nothing in the Civil Code that says that the buyer is the person who acquires ownership in a thing, as opposed to the person who pays the price in money. Of course, in most situations, the person to whom ownership is transferred and the person who pays the price for that transfer of ownership are one and the same. However, in the unique situation presented under Medicaid, arguably the one who pays the price and the one to whom ownership is transferred are two different entities.[9] In that unique situation, it would stand to reason that the one who paid the price is the "buyer" for purposes of redhibition. To hold otherwise would be to find drug manufacturers effectively immune from redhibition with respect to Medicaid prescriptions.

Because of the unique situation presented by Medicaid prescriptions, Merck's position would result in a sale without a buyer for purposes of redhibition. In redhibition, the buyer is entitled to a refund of the purchase price or the difference between what the buyer paid and what a buyer would have paid. However, in Medicaid, the person prescribed the drug, who Merck suggests is the only

---

[9] Arguably, the state acquires "ownership" of the prescription drug, which right of ownership it confers on the Medicaid beneficiary.

"buyer," would have no remedy, because that person did not pay anything for the drug. Under Merck's reasoning, the state, who has suffered the harm of purchasing the drug with the redhibitory defect, would have no claim in redhibition, because, according to Merck, the state is not the "buyer." This Catch-22 scenario finds no support in either the Civil Code articles on redhibition or controlling jurisprudence.

Merck's sole support for its novel theory that the state cannot pursue a claim in redhibition, even though the state is the *only* party who pays for Medicaid prescriptions, is a lone New York district case, *In re Rezulin Prods. Liab. Litig.*, 392 F.Supp.2d 597 (S.D.N.Y. 2005) ("*Rezulin I*"), which is not only distinguishable, but which also has never been followed by any court in Louisiana or the Fifth Circuit, and is in direct conflict with the United States Second Circuit's earlier decision *in the same case*.

*Rezulin I* is easily distinguished, in that *Rezulin I* did not address the unique situation presented by Medicaid prescriptions. Rather, *Rezulin I* dealt with prescription reimbursements by health benefit providers (i.e. private health plans) who reimburse a portion of their clients' medical expenses. *Rezulin I* did not address the question of whether the state, who pays the whole of a prescription cost, is the purchaser of a drug prescribed to a Medicaid beneficiary. More importantly, with respect to claims by the State for Medicaid prescriptions, as opposed to claims by private third party payers, the question of who is the buyer, the State or the patient, is immaterial, since the State is expressly empowered by statute to assert any claim that the medicaid patient would have. LSA-R.S. 46:446.

More importantly, the validity of the *Rezulin I* holding is particularly questionable, since it is in direct conflict with the United States Second Circuit's earlier decision *in the same case*. See

-34-

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2nd Cir. 2003). In *Desiano*, overruling the *Rezulin I* court's grant of a motion to dismiss on the grounds that third party payors were not purchasers, the Second Circuit held:

> The district court characterized Plaintiffs as "essentially financial intermediaries," rather than direct purchasers of Rezulin. Although this court has not to date held that insurance companies are, in all instances, the "purchasers" of the drugs for which they reimburse pharmacies, we, like several other courts, have indicated that in a variety of contexts **they are the buyers**.

> *Id.*, 326 So.2d at 350 (emphasis added).

The Second Circuit has not been called upon to review the lower court's apparent disregard for its holding that third party payors are "buyers," but there can be no reconciling the *Rezulin I* decision with the earlier ruling of the Second Circuit.

Even assuming that LDHH is not the buyer for purposes of the redhibition statute, Louisiana law broadly empowers LDHH to stand in the shoes of persons on whose behalf it paid Medicaid benefits to collect the amounts paid in benefits. LSA-R.S. 46:446. Under LSA-R.S. 46:446, LDHH has the right to proceed directly against the third party liable to the person on whose behalf LDHH has paid benefits. Hence, assuming, as Merck contends, the Medicaid beneficiary to whom Vioxx was prescribed is the purchaser for purposes of redhibition, LDHH is authorized by statute to assert the redhibition claim of that beneficiary to recover the moneys that LDHH expended for Vioxx.

**B.      Merck cannot meet its burden for summary judgment on the State's redhibition claim on the grounds that the State is relegated to a reduction in purchase price.**

Merck suggests that summary judgment is appropriate as to the State's redhibition claim because the state is only entitled to a reduction in price for Vioxx, and the State cannot produce competent evidence as to an appropriate reduction in price. Whether the state is entitled to a full

refund or a merely a reduction in price turns on a host of contested factual questions which cannot be resolved by summary judgment.   The finding that a redhibitory defect warrants rescission or merely reduction is a factual matter in which the trial court has great discretion. *Davis v. Davis*, 353 So.2d 1060 (La.App. 2d Cir.1977), *writ denied*, 355 So.2d 549 (La.1978); *Cloud v. Huffman Motor Co.*, 416 So.2d 266 (La.App. 3d Cir.1982).  Moreover, even assuming that the state's remedy under redhibition were limited to a reduction in price, there is ample evidence from which the Court could determine the appropriate reduction in price.

The State has offered ample evidence that the value of Vioxx was nil, that the product was not of merchantable quality, and that Merck misrepresented and/or concealed known redhibitory defects.  Under these circumstances, the state is entitled to a return of the full purchase price.  LSA-C.C. 2520; LSA-C.C. 2545.  Nevertheless, Merck suggests that because the State cannot return the product, because the product was consumed by medicaid patients, the State can only assert a claim for a reduction in price.  Merck's argument ignores multiple provisions of the redhibition articles which address the very situation presented here, and under which, the plaintiff is entitled to a full return of the purchase price even though the plaintiff cannot return the thing sold.

1.     **Under Article 2532, when the thing sold has been destroyed, plaintiff can still obtain a full refund of the purchase price.**

Louisiana Civil Code article 2532 expressly provides for the situation where the plaintiff is unable to return the thing because it has been destroyed, and holds that under the circumstances presented here, the plaintiff is still entitled to a full refund even though the plaintiff cannot return the thing sold.  LSA-C.C. art. 2532.  Article 2532 provides:

> If the redhibitory defect has caused the destruction of the thing the
> loss is borne by the seller, and the buyer may bring his action even

after the destruction has occurred.

LSA-C.C. art. 2532.

Here, the redhibitory defect is that Vioxx was not fit for consumption. Vioxx was intended by Merck to be consumed, and was consumed by Medicaid patients even though it was not fit for consumption. The consumption was not due to any fault on the part of LDHH or the patients who consumed the Vioxx, but due to the redhibitory defect and Merck's misrepresentations and omissions as to the nature of Vioxx. Hence, the loss occasioned by the State's inability to return the Vioxx is borne by Merck, and the state is entitled to a full refund of the purchase price even though the State cannot return the Vioxx taken by its medicaid patients.

Even assuming that the consumption of the Vioxx was not due to the redhibitory defect, but was instead a fortuitous event, Merck is nevertheless responsible for the return of the full purchase price even though the Vioxx has been destroyed and cannot be returned. Article 2532 provides that in the event that the thing has been destroyed by fortuitous event, after the seller has been given the notice required for rescission of the sale, the loss of the thing is borne by the seller. LSA-C.C. art. 2532. In the instant case, the State was not required to give notice, because the seller had actual knowledge of the existence of the redhibitory defect. LSA-C.C. art. 2522.[10] Even if this Court were to find that the consumption of Vioxx was fortuitous, and not due to Merck's fault, the state would nevertheless be entitled to a full refund of the purchase price, because the loss of the thing is borne by the seller, Merck.

---

[10] Note that article 2545 provides that a manufacturer is deemed to know that the thing sold has a redhibitory defect. LSA-C.C. art. 2545.

-37-

Merck is not entitled to summary judgment on the grounds that plaintiff is only entitled to a reduction in price, because under the clear provisions of the redhibition articles, under the facts presented, there is a material question of disputed fact as to whether the State is entitled to a full refund of the purchase price.

### 2.  Under article 2545, the state is entitled to a full refund of the purchase price, subject to a credit for the value conferred on the State, the value of which credit it is Merck's burden to prove.

Additionally, article 2545, which governs redhibition in the case of a seller such as Merck who is presumed to know of the defect, provides for a full refund of the purchase price, together with damages , interest and reasonable attorneys' fees. LSA-C.C. art. 2545.  Article 2545 further provides that to the extent that the thing was of some use to the buyer, then the seller can get a credit against these remedies for the value of the use of the thing.  *Id.*  However, the burden to show the value conferred rests with the seller.  *Magee v. Brown*, 2003-0600 (La.App. 4th Cir. 10/1/03), 859 So.2d 720, 724, *writ denied*, 2003-3016 (La. 1/30/04), 865 So.2d 68; *Holloway v. Gulf Motors*, 588 So.2d 1322 (La. App. 2d Cir.).  The *Holloway* court held:

> [T]he seller has the burden of proving the value of the use of the defective product. *Alexander v. Burroughs Corp.*, 350 So.2d 988 (La.App. 2d Cir.1977), amended and aff'd, 359 So.2d 607 (1978); *Alleman v. Hanks Pontiac-GMC, Inc., supra*. On this record there is no such evidence and the trial court did not err in declining to reduce Mrs. Holloway's award.

> *Holloway*, 588 So.2d at 1328.

The burden to show that the State is entitled to less than a full refund of the purchase price because the Vioxx consumed was of some value to the plaintiff, and the burden to show what that value might have been, rest with the defendant, Merck.  Merck has presented no evidence of the

-38-

amount of value conferred on plaintiff through consumption of Vioxx, and Merck is not entitled to summary judgment on the grounds that plaintiff has produced no such evidence, when it is Merck who bears the burden of demonstrating the value conferred.  In any event, although not required to do so, plaintiff has adduced ample evidence that the value of the Vioxx to LDHH was nil or *de minimus*.

### 3.    The holding in *Smith v. Gen. Motors* is not controlling in the situation presented here.

The sole case cited by Merck for the proposition that the State is relegated to a reduction in price because the state cannot return the thing sold did not involve a situation where the thing was destroyed, much less one where the thing was destroyed by virtue of the redhibitory defect. See *Smith v. Gen. Motors Acceptance Corp.*, 542 So.2d 831 (La. App. 3d Cir. 1989).  Nor did that case involve a seller who was in bad faith and hence bears the burden of demonstrating the value, if any, conferred on the plaintiff.   Rather, the *Smith* case involved alleged redhibitory defects in a vehicle, which the plaintiff could not return because the plaintiff vehicle had been repossessed.

Notably, the *Smith* decision distinguished the very situation presented here.  The *Smith* court explained:

> Return of price is the result of redhibition; C.C. 2531 and 2545. But because redhibition is the 'avoidance of a sale', C.C. 2520, it entails obliging the buyer to return the thing **unless the thing 'has perished through the badness of its quality', C.C. 2532, or its 'loss was not occasioned by the fault of the purchaser', C.C. 2536. Here the thing has neither perished nor been lost; it has been sold or exchanged. A buyer who has resold the thing cannot demand return, but only reduction, of the price**, *Brown v. Duplantier*, La. 1823, 1 Mart.N.S. 312. Accordingly, plaintiff's only remedy is for 'a reduction of the price', C.C. 2541 and 2543, an action 'subject to the same rules ... as the redhibitory action', C.C. 2544.

*Smith*, 542 So.2d at 832 (emphasis added).[11]

As the *Smith* court noted, its holding that a plaintiff who cannot return the thing is relegated to a reduction in price has no bearing on situations where the thing has been destroyed through the redhibitory defect or the fault of the seller.

> **4.     There is ample evidence from which this Court could determine an appropriate reduction in price.**

Even assuming that the State were required to demonstrate the amount of an appropriate reduction in price, summary judgment would nevertheless be inappropriate as there is ample evidence from which this Court can determine the proper amount of such a reduction.  Whether a reduction in price as opposed to a full refund of the purchase price is appropriate, and if so the proper amount of such a discount, are disputed questions of material fact as to which summary judgment is inappropriate.  The proper amount of a reduction in price is a factual question as to which the trial court has great discretion to determine based upon **all facts and circumstances**. *Leonard v. Daigle Pontiac-Buick-GMC, Inc*., 413 So.2d 577 (La.App. 1st Cir.1982); *Austin's of Monroe, Inc. v. Brown*, 474 So.2d 1383 (La.App. 2d Cir.1985).

Plaintiff's expert John Abramson, M.D., has opined that Vioxx was not a suitable alternative to other safer, equally effective and far less expensive NSAID agents on the market and that but for Merck's misrepresentations and omissions regarding Vioxx, the drug "would not have commanded a premium price because it was no more effective and was less safe than other far less expensive alternatives."  (See Declaration of Stephen B. Murray, Jr. (SBM Dec) Ex. 11, ¶10).  From this

---

[11]  Note that the Smith case cites to LSA-C.C. art. 2536, which has since been repealed, but the substance of which was incorporated into LSA-C.C. art. 2532.  See "Revision Comments – 1993" LSA-C.C. art. 2532. ([Art. 2532] combines the substance of Article 2532, 2533, and 2536.)

testimony, the Court could conclude that a reasonable reduction in price for Vioxx would be the difference in price between Vioxx and something less than the prescription costs of the safer equally effective and far less expensive traditional NSAID agents.  All of the data necessary for the Court to make such a calculation is contained in the database of Louisiana medicaid claims, which shows not only the amounts expended in Vioxx reimbursements, but also the amounts expended in reimbursements for all other NSAIDs, including dosage, quantity, and amount paid for each prescription. (PSS ¶192).[12]

The lynchpin of Merck's argument that plaintiff cannot demonstrate a reduction in price is Merck's suggestion that plaintiffs cannot demonstrate a price reduction because the state purportedly was required by law to pay a set price for Vioxx.  This contention fails for a number of reasons.  First and foremost among these reasons is that Merck's basic premise is factually and legally inaccurate. The federal government does *not* mandate that states pay a set price for Vioxx.  The states remain free to negotiate their own price for prescription drugs covered by a federal medicaid rebate agreement, and the state of Louisiana has routinely negotiated a lower price than the price negotiated by the federal government through supplemental rebates for drugs, including Vioxx. (PSS ¶192).

Additionally, whether the state was precluded from paying a different price for Vioxx is immaterial, since the focus of the inquiry for purposes of redhibition is not on the plaintiff's own subjective reliance, but on an objective inquiry into the nature of the thing sold and whether a reasonable buyer would have paid less.  *Mire, supra*.  Even assuming that the state were required by federal law to pay a fixed price for Vioxx – which it most definitely is not – the Court could

_____

[12]  The State included a representative from Unisys, the company that maintains Louisiana's Medicaid claims data on its witness list.  Merck did not object to this designation or seek to depose a representative from Unisys.

nevertheless conclude that a reduction in price under redhibition would be appropriate because a reasonable purchaser of Vioxx would have refused to pay a premium for a drug that was no more effective and less safe than much cheaper traditional NSAIDs.

Merck is not entitled to summary judgment on plaintiff's redhibition claims on the grounds that the state cannot demonstrate a reduction in price, because there exist material questions of disputed fact as to whether the state is relegated to a reduction in price, and even if the state were limited to a reduction in price, the state has adduced ample evidence from which this Court, exercising its broad discretion to consider all the facts and circumstances, could determine what a reasonable reduction in price would be.

### III. The facts presented support a claim for restitution under LUTPA §1408 on behalf of LDHH.

Merck suggests that it is entitled to summary judgment on the State's LUTPA claims on the grounds that: 1) the exclusivity provision of the Louisiana Products Liability Act (LPLA) bars any claim under LUTPA; 2) the State, as neither a consumer nor a business competitor does not have standing to bring a LUTPA claim; and 3) the State cannot demonstrate entitlement to restitution because purportedly the State cannot demonstrate any loss as a result of Merck's misconduct.  Merck is wrong on all counts: LPLA exclusivity does not apply to restitution under LUTPA, which does not constitute "damages" for purposes of LPLA exclusivity; the Attorney General is expressly empowered to bring §1408 restitution claims on behalf of the State; and the state need only demonstrate that Merck may have obtained money by means of an unfair trade practice, not any "loss" on the part of the state.

### A. Restitution under §1408 is not barred by the LPLA.

Restitution under La.-R.S. 51:1408 is not a claim for damage as to which the LPLA's exclusivity provision would apply. The exclusivity provision of the LPLA provides that the LPLA provides the exclusive theories of liability "for manufacturers for *damage* caused by their products." La.-R.S. 9:2800.52 (emphasis added). Restitution under 51:1408 is not "damages." *State ex. rel. Guste v. General Motors*, 354 So.2d 770, 755 (La.App. 4th Cir.1978), *aff'd and remanded* 370 So.2d 477 (La.1979). The court in *Guste v. General Motors* held that restitution was not "damages," finding "damages... mean relief other than refund of the purchase price and the return to the status quo that constitute restitution." *Id.*

As the Louisiana Fourth Circuit held in *Guste*, the only case to consider the question of whether restitution constitutes "damages", restitution is *not* "damages." Rather, it is an equitable remedy asserted exclusively by the Louisiana Attorney General which, as is discussed *supra*, is awarded not as damages for harm caused by a product, but as redress for funds which "may have been acquired by means of a deceptive trade practice.

While a handful of courts – all in cases involving claims of bodily injury caused by a defective product – have held that claims for "damages" under the private right of action afforded by LSA-R.S. 51:1409 are barred by the exclusivity provision of the LPLA, no court has held that the LPLA bars an Attorney General action for restitution under §1408 of LUTPA. Notably, the *Guste v. General Motors* court held that "actual damages" under §1409 were not "restitution" under LSA-R.S. 51:1408. *Id.* at 755.

Moreover, the *Guste* court held that restitution under §1408 was the equivalent of the remedy under redhibition. *Id.* Indeed, Merck itself has argued that the remedy of restitution under §1408 is the equivalent of the remedy available under redhibition. (See Merck Brief, at p. 39). The Louisiana

-43-

Supreme Court has held that the restitution remedy under redhibition is not "damage" for purposes

of the LPLA. *Aucoin v. Southern Quality Homes, LLC*, 2007-1014 (La. 2/26/08), 984 So.2d 685.

The Louisiana Supreme Court held:

> The LPLA defines 'damage' by explicitly excluding amounts
> recoverable under redhibition for damage to the product and
> economic loss arising from a deficiency in or loss of use of the
> product. La. R.S. 9:2800.53(5). Thus, while the LPLA is the
> exclusive remedy against manufacturers for damages resulting from
> a defective product, a manufacturer can still be liable for damages in
> redhibition.
>
> *Id.*, 984 So.2d at 691 n. 8.

Since damages under redhibition are the equivalent of restitution under LSA-R.S. 51:1408, the

LPLA's exclusivity provision does not act to bar actions for restitution by the Louisiana AG under

§1408.

Additionally, the exclusivity provision of LPLA requires that the "damage" be "caused by

a product." The claim for restitution not only is not "damage" but it also is not "caused by a

product." Rather, the restitution remedy arises because funds were acquired by means of a deceptive

trade practice.

**B.     The Attorney General is expressly empowered to bring restitution claims on
behalf of the State.**

Citing to a handful of cases that involve claims by private individuals for damages under

LUPTA §1409, Merck suggests that the State cannot assert claims under LUTPA, because the state

is neither a consumer nor a business competitor. Whether the State is a consumer or business

competitor has absolutely no bearing on the claims brought by the Attorney General on behalf of the

state under §1408, which expressly empowers the Attorney General to bring restitution claims on

behalf of "anyone" who has been subjected to an unfair trade practice.

Regardless of whether LDHH is a consumer, the Attorney General is expressly empowered under LSA-R.S. 51:1407 and 1408 to seek injunctive relief and restitution on behalf of the state against anyone who utilized unfair and deceptive trade practices.  LSA-R.S. 51:1407; LSA-R.S. 51:1408; *State ex rel. Ieyoub v. Classic Soft Trim, Inc.*, 95-804 (La.App. 5 Cir. 10/20/95), 663 So.2d 835, *writ denied*, 95-2604 (La. 1/26/96), 666 So.2d 669.   The *Classic Soft* court held:

> the legislature has enacted certain regulations concerning commerce in this state and has **directly empowered the Attorney General to** enforce those laws both criminally and civilly, and to **seek redress against violators on behalf of** both **the state** and private parties.

> *Id.*, 663 So.2d at 837 (emphasis added).

Regardless of whether LDHH is a consumer, the Attorney General has been "directly empowered... to seek redress against violators on behalf of... the state."

The Attorney General's powers to act under LUTPA are not confined to "consumer transactions" or actions on behalf of "consumers" as those terms are defined under LUTPA, but extend to all "consumer interests."  LSA-R.S. 51:1404.  "Consumer Interests" are broadly defined as "those acts, practices, or methods that *affect* the economic welfare of a consumer." LSA-R.S. 51:1404 (emphasis added).  Consumer is broadly defined as "any person who uses, purchases or leases goods or services."  Undoubtedly, the marketing of Vioxx, including the marketing of Vioxx to LDHH, is a matter of "consumer interest", i.e., a matter that "affects" consumers, as to which the Attorney General has been expressly and broadly empowered to act.

Included among the Attorney General's broad powers to act under LUTPA is the power to seek redress on behalf of "any aggrieved person."  LSA-R.S. 51:1408.  Tellingly, the legislature did

-45-

not limit the persons on behalf of whom the Attorney General could seek redress.  No court has ever

limited the Attorney General's authority to seek retribution to "consumers" or "business

competitors" or "consumer transactions."  Nevertheless citing no authority, Merck states "aggrieved

persons" under 51:1408 "means consumers and business competitors." (Merck Brief, p. 38).  Section

1408 says absolutely nothing of the sort, and no court has ever held that claims for restitution

asserted by the Attorney General are so limited.  The broad power to seek restitution is encompassed

within the Attorney General's mandate to regulate all practices that affect consumers and is not

subject to the limitations that Merck suggests.

In support of its assertion that the Attorney General cannot assert LUTPA claims on behalf

of LDHH, Merck has cited to a handful of cases which deal with private rights of action under LSA-

R.S. 51:1409.  None of those cases even address, much less attempt to limit, the Louisiana Attorney

General's broad powers of restitution under LUTPA §1408.

Merck relies heavily on decision of a New York district court in *Rezulin I*, *supra*.  No

Louisiana or Fifth Circuit court has followed *Rezulin I* for the proposition that claims involving

reimbursement of prescription costs do not fall within the ambit of LUTPA.  More significant,

however, is the fact that *Rezulin I* did not involve restitution claims asserted by the Attorney General

on behalf of the state which the Attorney General is expressly empowered to bring under §1408.

*Rezulin I* is not controlling.  Rather, those Louisiana holdings that have recognized that the Attorney

General is expressly empowered to seek restitution on behalf of the State are.

The Fifth Circuit cases cited by Merck not only do not involve §1408 claims brought by the

Attorney General on behalf of the state, but also deal with situations which, unlike the instant case,

clearly did not involve any consumer interest.  *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 975 F.2d

-46-

1192 (5th Cir. 1192) involved a claim by a farm implement franchise dealer against the manufacturer

of farm implement equipment for wrongful termination of its franchise agreement, which in no way

involved a consumer transaction.  *Orthopedic & Sports Injury Clinic v. Wang Labs. Inc*, 922 F.2d

220 (5th Cir. 1991) involved claims by an orthopedic clinic arising out of the purchase of specialized

business computer software, and hence the subject of the transaction was not "primarily intended for

personal, family or household use."  The Fifth Circuit held that such a claim in no way involved a

"consumer transaction" and rejected the LUTPA claims.  These cases, which do not involve Attorney

General restitution claims under §1408, and do not involve questions of consumer interest, do not

support Merck's assertion that, contrary to the express language of §1408 and controlling Louisiana

jurisprudence, the Attorney General cannot assert restitution claims on behalf of the State.

Additionally, even assuming for the sake of argument that the party on whose behalf the

Attorney General is seeking restitution need be a consumer, LSA-R.S. 46:446 expressly empowers

LDHH to step in the shoes of medicaid patients, who most definitely are consumers.  Hence, since

the Attorney General has asserted restitution claims on behalf of LDHH, which stands in the shoes

of consumers, the "aggrieved person" on whose behalf the Attorney General has brought the

restitution claim is a consumer.

**C.      The State can prove entitlement to a remedy under LUTPA §1408.**

Merck suggests that it is entitled to summary judgment on the State's LUTPA claims,

because the state cannot demonstrate a "loss" as a result of defendant's conduct and as such is not

entitled to a remedy under LUTPA.  For purposes of restitution under §1408, as with redhibition, the

state need not establish a "loss" as a result of the defendant's conduct.[13]  Rather, the state need only

show that Merck *may* have acquired the state's property by means of a deceptive trade practice.  The

focus in on Merck's conduct, and funds which *Merck* may have obtained through its unlawful

conduct.  In this case, the funds which Merck may have obtained through unlawful conduct are the

approximately $20,000,000 in prescription reimbursements which the State paid for Vioxx, a drug

which Merck marketed through a well-orchestrated scheme of concealment, misrepresentation and

deception.

### 1.    Grounds for restitution differ from those for redhibition.

Merck suggests that the State's claims for restitution must necessarily fail for the same

reasons that it contends the state's claims for redhibition must fail, because purportedly the State

cannot return the Vioxx and the State cannot meet its burden to show an appropriate reduction in

price.  As is discussed above, the State can meet its burden for redhibition, but regardless of whether

the state can meet its burden for redhibition, the State still has a claim for restitution.  While

Louisiana courts have noted the similarity between the remedies afforded by redhibition and

restitution, there is a considerable difference in the showings necessary for recovery under these two

theories.  First, while by the terms of LSA-C.C. art. 2532, redhibition requires return of the thing

purchased (under certain circumstances not applicable here), there is no such provision in §1408.

Second, while redhibition focuses on what a reasonable buyer would have done, restitution focuses

---

[13] Much of Merck's argument in this regard focuses on the elements of a private citizen's claim for damages under §1409.  Any requirement of showing actual damages under §1409 is utterly immaterial to the State's claim for restitution under §1408.

on the defendant's conduct, *i.e.* whether the defendant engaged in an unlawful activity and whether the defendant "may" have obtained funds through such practices.  LSA-R.S. 51:1408.

Any purported inability on the part of the state to show an appropriate reduction in price for redhibition purposes would not defeat the State's ability to assert a claim for restitution.  The State's right to restitution is not based on a showing as to the difference in value between the thing purchased and the thing received, but on the funds obtained by Merck.  Most importantly, the burden to show that the defendant obtained funds through an unlawful practice is considerably different from the burden to show a price differential for purposes of redhibition, since for purposes of restitution, the Attorney General need only show that the funds "may" have been obtained because of the unfair trade practice.

Moreover, while redhibition may require return of the thing purchased (under circumstances not presented here), the broad and equitable remedy of restitution has no such requirement.  The remedy of restitution has been drafted broadly, so as to give the Court the flexibility to fashion appropriate equitable remedies.  *See e.g. Guste v. Orkin*, 528 So.2d at 204.  Under the unique circumstances presented in this case, the Court has, through the broad equitable nature of §1408 restitution, the ability to fashion an appropriate remedy even though the State cannot return the Vioxx for which it paid, and even if the state cannot demonstrate with the specificity necessary to a claim in redhibition the price differential between what it paid and what a reasonable buyer would have paid but for the redhibitory defect.

> **2.    Whether the State would have purchased other equally costly drugs is irrelevant**.

-49-

In a novel argument, Merck suggests that it is immune from the State's claims because had the State not been duped into paying for Vioxx, a drug that did not have the properties it was purported to have, the State would have paid for Celebrex, another, equally expensive drug that purportedly did have the properties Vioxx lacked. Merck's novel suggestion is not only utterly without support in either the statutory provisions or jurisprudence governing redhibition or restitution, but also patently absurd.

Nowhere in either the codal or statutory provisions governing redhibition and restitution is there any suggestion that the court should consider what a plaintiff would have spent his money on had he not been duped into paying money to the defendant.  The inquiry under these theories of recovery focuses on the intrinsic value of the thing plaintiff purchased and the money received by the defendant, not on whether plaintiff would have purchased something else of comparable price that possessed the qualities that defendant's product lacked.

Under Merck's novel theory, a purveyor of seafood could knowingly pass off artificial crab as premium Louisiana jumbo lump crabmeat, inducing plaintiff to pay the premium due for real crabmeat.  Then, when the plaintiff learns of the fraud and demands a refund (or at least the difference in value in between the premium price for jumbo lump crabmeat and the value of the artificial crabmeat), the seafood vendor could argue that the buyer is not damaged because if the plaintiff had not bought the defendant's fake crabmeat, the plaintiff would have paid a premium price for real crabmeat from an honest vendor.  Not surprisingly, such a ridiculous proposition finds no support in the Louisiana jurisprudence.

Moreover, even assuming that this Court were to apply Merck's ridiculous assertion that it should consider what the State would have spent on other products had it not paid an unjustified

price for Merck's defective product, there would still remain disputed questions of material fact as to whether plaintiff has suffered harm, even in light of the fact that alternative products that purportedly possessed the qualities that Vioxx lacked were comparably priced to Vioxx.  First, Dr. John Abramson has opined that Celebrex was not a suitable alternative for Vioxx, in that it suffered from similar defects as Vioxx.  (See SBM Dec. Ex. 11, ¶¶156-167).  This evidence gives rise to a disputed question of material fact as to whether plaintiff would have paid for Celebrex had it not bought Vioxx, assuming such an inquiry were even appropriate.

Additionally, plaintiffs have offered evidence that, even accounting for expenditures for Celebrex and Bextra, the state still suffered a loss paying for Vioxx.  Dr. Jeffrey Harris demonstrates through sound economic analysis of Louisiana Medicaid prescription history immediately following withdrawal of Vioxx from the market, that many of the prescriptions which had been written for Vioxx would have been written not for Celebrex or Bextra, but for less expensive traditional NSAIDs.  Dr. Harris estimates that withdrawal of Vioxx resulted in a monthly decrease of average expenditures of  $28.74, but that the resultant increase in expenditures for all other NSAIDs and Cox-2 inhibitors combined was only $16.35, or put another way, for each $1.00 that LDHH did not pay for Vioxx, it would only have paid $0.57 for other replacement prescriptions. (PSS 198, ¶8(e)).  Thus, the record demonstrates that even accounting for what other prescriptions the state would have reimbursed had it not paid for Vioxx, an analysis that is utterly irrelevant to the claims asserted herein, the state nonetheless suffered a loss of 43% of its prescription costs for Vioxx.  Merck is not entitled to summary judgment, even if this Court were to adopt its novel and unsupported theory that the Court should consider how the state would have spent its money had it not overpaid for Merck's defective product.

## CONCLUSION

The myriad disputed questions of material fact pertinent to the State's right to recover under the unique statutory regimes of redhibition and restitution preclude the entry of Summary Judgment. The State has adduced ample evidence from which this Court could find for the State under traditional theories of tort liability, as well as the unique remedies of redhibition and restitution. Merck's Motion for Summary Judgment should be denied.

Respectfully submitted, this 9th day of March, 2010.

> /s/ Stephen B. Murray, Jr.
> James R. Dugan, II (La. Bar No. 24785)
> Douglas R. Plymale. (La. Bar No. 28409)
> Stephen B. Murray, Jr. (La. Bar No. 23877)
> Stephen B. Murray, Sr. (La. Bar No. 9858)
> Justin Bloom
> MURRAY LAW FIRM
> 650 Poydras Street, Suite 2150
> New Orleans, LA 70130
> Telephone: (504) 525-8100
>
> James D. Caldwell, Attorney General
> Trey Phillips
> Bryan McMinn
> L. Christopher Styron
> Assistant Attorneys General
> LOUISIANA DEPARTMENT OF JUSTICE
> 885 North Third Street - 6th Floor
> Baton Rouge, Louisiana 70802
> Telephone: (225) 326-6020
>
> Francisco H. Perez
> Kim Sullivan
> General Counsel
> Louisiana Department of Health and Hospitals
> P.O. Box 3836
> Baton Rouge, Louisiana 70821
> Telephone: (225) 342-1188
>
> COUNSEL FOR PLAINTIFF

-52-

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Plaintiff's Memorandum  In Opposition To Defendant's Motion For Summary Judgment has this day been served on Liaison Counsel, Phillip A. Wittmann and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to Pretrial Order No. 8B, on this the 9th  day of March, 2010.

*/s/ Stephen B. Murray, Jr.*