UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No.  1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, <br>                               Plaintiffs <br><br>                    v. <br><br> MERCK SHARP & DOHME CORP., <br>                               Defendants | JUDGE ELDON E.  FALLON <br><br> MAGISTRATE JUDGE KNOWLES <br><br><br> Case No.  05-3700 |

**PLAINTIFFS' STATEMENT OF CONTESTED FACTS**

## I.   MERCK MISREPRESENTED AND FAILED TO DISCLOSE KNOWN RISKS OF VIOXX AND RISKS THAT SHOULD HAVE BEEN KNOWN

### A.   Vioxx Was Not Safe and Effective for Its Intended Use When It Was Approved By the FDA on May 20, 1999, Due to Known Risks of Vioxx to the Cardiovascular System

1.     Merck submitted a New Drug Application for Vioxx on November 23, 1998, which was approved on May 20, 1999.  The approval letter said that FDA concluded that adequate information had been presented that the drug was safe and effective for its recommended use. (Letter, FDA to Silverman, 5/20/99, previously marked as Kessler Ex. 5 Declaration of Stephen B. Murray, Jr., hereinafter "SBM Decl." Ex. 1.)

2.     As of May 1999, adequate information had not been presented to demonstrate that Vioxx was safe and effective for its recommended use, and Vioxx was not shown to be safe and effective.  (Kessler Dep. 132:8-134:14; SBM Decl. Ex. 2.)

3.     Merck knew, before the company submitted its new drug application to the FDA, that Vioxx posed a risk of thrombotic events (blood clotting that can lead to heart attacks or strokes). (Kessler Report  18; SBM Decl. Ex. 3.)

4.     On October 10, 1996, in a research management committee update evaluating a. placebo-controlled high-dose study of Vioxx in Rheumatoid Arthritis (Clinical Trial Protocol 017) [hereinafter referred to as "Protocol 017], Merck officials wrote, "Adverse events of most concern were in the cardiovascular system (e.g. MI, unstable angina. . ..)" MRK-ABC0048699 at 8706. A table listing patients with non-fatal, serious clinical adverse experiences in Protocol 017 submitted to the FDA (Table E-152 of Merck's Integrated Safety Summary dated October 26, 1998) showed three thrombotic events (heart attack, unstable angina, and pulmonary blood clot) in Vioxx-treated

-2-

patients and no thrombotic events in placebo-treated patients. MRK-ABS0067368. While the dosage in this study involved a higher daily dose than was recommended in the drug's labeling, adverse events at a higher dose may portend safety signals at lower doses.  (Kessler Report  19.)

5.     During May 1996 through January 1997, Merck carried out Protocol 023, a double-blind, placebo-controlled safety and pharmacokinetic study of Vioxx. In that study, a decrease was noted in the urinary excretion of PGI-M, which "likely reflects . . . to some undefinable extent a decrease in PGI-2 synthesis.  PGI-2 is synthesized ubiquitously in blood vessel walls. . . . It is the most potent of all platelet inhibitors of platelet aggregation, and has vascular dilatory properties as well." (Kessler Report  19; Watson, Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials, 12/30/97 MRK-ABS0037036 at 7039; previously marked as Watson Ex. 8; SBM Decl. Ex. 4.)  Merck also knew that Vioxx "had no effect on systemic thromboxane," which is involved in promoting platelet aggregation and clotting MRK-ABC0009947 at 949. Internally, Merck knew that "[t]hese findings raised a concern about the potential for VIOXX to cause cardiovascular problems." MRK-ABC0009947 at 949.  To FDA Merck officials wrote "The clinical implications of partially inhibiting the production of PGI 2 without inhibiting thromboxane generation systemically are unknown but any untoward effects should be revealed by the long term safety and efficacy trials with [Vioxx]." MRK-ABK0025697 at 25793.  (Kessler Report  20.)

6.     On December 30, 1997, Merck scientist Douglas Watson, discussing the results of Protocol 023 described in the preceding , wrote:  "These findings raised concern about the potential for Vioxx to predispose to cardiovascular (CVD) thrombotic events. . ." MRK-ABS-0037036 at 37039-40.  (Kessler Report  21.)

-3-

7.      On February 2, 1998, Merck scientist Watson reported a statistically significant relative risk of 2.16 [95%CI 1.14,3.94] for thrombotic cardiovascular serious adverse events in women based on patients in the pooled Vioxx -comparator-placebo osteoarthritis trials versus pooled Fosamax-placebo study patients [hereinafter referred to as "Watson analysis"]. MRK-NJ006804 at 819. Watson stated, "The overall incidence for women was elevated compared to Fosamax placebo controlled patients." The value of comparing the incidence in pooled Vioxx-comparator-placebo osteoarthritis trials to pooled Fosamax-placebo study patients resided in the large number of "person years at risk," which according to Watson was over 14,500 person years at risk. MRK-NJ0066804 at 819. Watson dismissed the elevated relative risk by suggesting that the Fosamax pooled population had an atypically low risk of cardiovascular disease. MRK-NJ0066804 at 805.  However, two months earlier, on December 3, 1997, a Cardiovascular Task Force Agenda listed discussion about whether the Fosamax patients were "appropriate" controls for the Watson analysis; no concerns are mentioned in the document, and Merck proceeded with the study. (MRK-ABY0199809; SBM Decl. Ex. 5; Kessler Report  22.)

8.      Watson's February 2, 1998 report also included a comparison of CV event incidence in the pooled Vioxx-comparator-placebo osteoarthritis trials versus data from the Cardiovascular Health Study (CHS).   MRK-NJ0066804 at 805. The "Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials" did not include comparison to, nor reference to, the CHS.  MRK-AB50037036, 048.  This comparison was undertaken as a post hoc analysis.

9.      Watson had cited the CHS in a Memorandum dated 11/21/96, which listed 15 different sources for "Estimates of Cardiovascular Disease Incidence for Planning GI Outcomes

Mega-trial." (MRK-ABS0210824; Musliner Ex. 8; SBM Decl. Ex. 6.) Watson's Memorandum noted several "caveats," which included: "Rates vary greatly by study population, gender, race and age," and rates "increase sharply with each successive decade in age." (Id., at 10825, emphasis in original.) The CHS was dissimilar to the Vioxx studies in that: (a) the CHS population, on average, was 11 years older than the Vioxx clinical trial subjects; (b) the CHS population included community members with poor health and a wide range of cardiac risk factors, while the Vioxx trials were a healthier group. (Watson Dep. 118:22-120:13, 2/9/05; SBM Decl. Ex. 7). (Kessler Report  22.)

10.     Federal Food Drug and Cosmetic Act 21 U.S.C. § 355(b)(1)(A) and 21 CFR § 314.50 (d)(5)(iv) state that a New Drug Application is required to include "analysis of any other data or information relevant to an evaluation of the safety and effectiveness of the drug product . . . derived from clinical investigations . . . ."(emphasis added). The Watson analysis, described above, was "derived from clinical investigations." There is no evidence that the Watson analysis was submitted to the FDA as part of the Merck's New Drug Application dated November 23, 1998. (Kessler Report 23.)

11.     On April 13, 1998, Merck scientist Dr. Alan Nies, in preparation for Merck's Scientific Advisory Board (SAB), prepared a Write-up for the meeting that would be held the next month. Nies wrote, "the finding of an effect of COX-2 inhibition on the excretion of PGIM was entirely unexpected. . .To assess the potential implication of these biochemical findings on cardiovascular health, the clinical team and epidemiology have analyzed the blinded VIOXX database for serious cardiovascular events. The analysis does not suggest a concern. An initial look at the unblinded safety data from the Phase III comparison study vs. diclofenac (approximately 1300 patients followed for 6 months) also does not indicate an excess of cardiovascular events in patients

treated with VIOXX™. Additional analyses will be performed on unblinded data when available." MRK-AIR0041448 at 457-58. Nies' write-up did not present to the SAB that the relative risk in women was 2.16 in Watson's analysis. (Kessler Report 24.)

12.     On May 3-6, 1998, Merck's SAB noted that Vioxx may remove an inhibitor of platelet aggregation. The SAB commented to Merck that this possibility could increase the risk of cardiovascular disease. The SAB stated, "By removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation is enhanced. More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality." MRK-AEI0002734 at 2738. The SAB stated, "It is therefore proposed that coronary events be predetermined endpoints in all future controlled trials with Vioxx. . .. It is proposed that these endpoints be assessed by a uniform set of criteria so that meta analysis of coronary and cerebral vascular events from all these can be performed." MRK-AEI0002739. (Kessler Report 25.)

13.     Merck's Scientific Advisory Board stated that possible risk of adverse cardiovascular events should be "addressed in parallel with the conclusion of the process of acquisition and analysis of the data that will place the drug in the hands of patients." MRKAEI0002742. (Kessler Report 26.)

14.     Data submitted by Merck to the FDA in October 1998, in the Integrated Safety Summary (ISS) of the NDA, revealed that the incidence of thromboembolic cardiovascular adverse experiences in osteoarthritis (OA) patients in six-week studies was 0.2 percent in placebo treated patients versus 0.8 percent in 25 mg Vioxx treated patients and 0.7 in 12.5 mg  Vioxx treated patients. MRK-OS42014072 at 401-02. In six-month studies of OA patients, the incidence of

thromboembolic events was 0.8 percent in placebo versus 1.0 in 25 mg treated patients and 1.2 in 12.5 mg treated patients.  (Kessler Report  27.)

15.     Based on this data, the FDA medical reviewer stated, "With the available data it is impossible to answer with complete certainty whether the risk of cardiovascular and thromboembolic events is increased in patients on [Vioxx]].  A larger database will be needed to answer this and other safety comparison questions." MRK-ADI0005375 at 5479.  (Kessler Report  28.)  Under FDA regulations, the manufacturer has to show that the drug is safe and effective.  However, the medical officer applied an inverted test, i.e., the lack of complete certainty that the risk was increased. (Kessler Dep. 132:8-134:14.)

16.     There is no evidence that Merck resolved the risk of thrombotic events prior to submitting its New Drug Application [hereinafter "NDA"] to the FDA on November 23, 1998. (Kessler Report  30.)  There is no evidence that Merck resolved the risk of thrombotic events prior to extensive marketing and promotion of Vioxx beginning May 1999.  (Kessler Report  31.)

17.     Despite the SAB recommendation in 1998 that possible risk of adverse cardiovascular events should be "addressed in parallel with the conclusion of the process of acquisition and analysis of the data that will place the drug in the hands of patients," MRK-AEI00007742, as late as January 12, 2000 Merck's plan was not to do formal statistical analyses of cardiovascular risk, and the "descriptive analyses" that were contemplated would not be done "for another year yet." MRK-NJ0120258 at 0265.  (Kessler Report  32.)

18.     The long term studies (ranging from 26-86 weeks) that Merck conducted on Vioxx prior to submission of its NDA did not resolve the potential risk of thrombotic events because 1) such long term studies were designed without a placebo arm, 2) the numbers of adverse

cardiovascular events were too small to determine whether there was a cardiovascular risk of VIOXX and 3) patients at highest risk for cardiovascular events were excluded. See, generally MRK-ADI0005375 at 478-479.  (Kessler Report  33.)

19.     Merck's intended use of Vioxx included its use for "relief of the signs and symptoms of osteoarthritis. . ." MRK-99420021411.  Excess weight contributes to the development of osteoarthritis. This is a population that is especially prone to the cardiovascular disease that is associated with the metabolic consequences of adiposity.  (Kessler Report  34.)

20.     Merck's marketing and promotion launch was unprecedented in Merck's history. David W. Anstice, Merck president of Human Health for the Americas, called Vioxx's introduction the company's "biggest, fastest, and best prescription drug launch ever." MRK-ACZ0000907. (Kessler Report  35.)

21.     Merck engaged in widespread direct to consumer marketing which "activated 1MM consumers," with an investment of "$65MM." MRK-AB10008139 at 99.  (Kessler Report  37.)

22.     Having decided to market the drug, Merck did not warn patients with cardiovascular risk, (persons who were excluded from Vioxx osteoarthritis clinical trials, patients with angina, congestive heart failure, myocardial infarction within the prior year, uncontrolled hypertension or history of stroke or transient ischemic attack within the prior two years) in the drug's label against use of the drug.  (Kessler Report  39.)

23.     Merck's Integrated Safety Summary (ISS) submitted as part of the New Drug Application (NDA) stated: "The basic safety of any new drug is defined by comparing it to placebo. For this reason, the primary, pre-specified comparison is between MK-0966 [Vioxx] (12.5 and 25 mg) and placebo in the 6-week studies.  These studies have placebo controls for their entire duration.

By contrast, the only other studies with placebo controls were the U.S. and Multinational Endoscopy OA Studies (Protocols 044 and 045); however, placebo exposure in these studies was approximately one-third less than exposure to active drug.  The remainder of the Phase II/III OA studies did not use placebo controls."  (Vioxx ISS, MRK-ABS0066396 at 6781; SBM Decl. Ex. 8.)

24.     The ISS showed that, in the Vioxx pre-market 6-week OA clinical trials, there was a statistically significant excess risk of "Clinical Adverse Experiences" (AE's) of the "Cardiovascular System."  The incidence of such AE's was 7.6% for Vioxx 25 mg, 7.6% for Vioxx 12.5 mg, and 3.4% for placebo, p=0.004.  (Id.; ISS, MRK-ABS0066396 at 6793-94.)  (Watson Dep. 2/9/05, at 64:18-65:15; 68;21-69:14.)  The excess risk of "Cardiovascular System" AE's, which included myocardial infarction, stroke, transient ischemic attack, and congestive heart failure, was not disclosed by Merck in the Vioxx label nor any publication, and this excess risk did not appear in the monographs prepared by Provider Synergies, upon which Plaintiff relied in selecting Vioxx for the Preferred Drug List (PDL).

25.     The 6-week OA studies reported in the ISS also showed statistically significant excess risks of digestive system AE's (23.4% for Vioxx, 25 mg compared to 14.1% for placebo) and respiratory system (4.1%, 2.8%, 0.7% for Vioxx 25 mg, Vioxx 12.5 mg, and placebo, respectively).  (ISS at 6793-94.)  The significant excess risk of digestive and respiratory system AE's were not disclosed by Merck in the Vioxx label nor any publications, and these excess risks did not appear in the monographs prepared by Provider Synergies, upon which Plaintiffs relied.

26.     One of Merck's pre-market OA trials was Protocol 045, a study of Vioxx 25 mg and 50 mg compared to ibuprofen 2400 mg/day and placebo.  This study showed a statistically significant excess risk of "chest pain" for Vioxx 50 mg compared to placebo (3.6% v 0%, p=0.012)

(MRK-OS420085469-464, 469, Table 44; SBM Decl. Ex. 9.)   Systolic hypertension events exceeding "Predefined Limits of Change" (PDLOC; >20 mm increase and value >140 mm) were also statistically significantly increased in Protocol 045, for both the 25 mg and 50 mg Vioxx doses compared to placebo, but the ibuprofen group did not show a significant increase compared to placebo. (Id., MRK-OS420085570, Table 59.)

27.     Protocol 045 was the subject of a published article authored by Merck consultants Hawkey and Laine, along with several Merck employee authors.  (Hawkey, et al., Arthritis and Rheumatism 2000; 43:370-377; SBM Decl. Ex. 10.)  The published article did not disclose the statistically significant excess incidence of chest pain or hypertension events among Vioxx patients compared to placebo.  Instead, the article reported no significant differences for other endpoints ("overall rates," "rates of discontinuation" and "serious clinical adverse experiences").  (Id., at 374.) The gastrointestinal event rates of Protocol 045 were included in the Vioxx label, but the excess risk of chest pain and hypertension in that trial were not disclosed in the label, nor in the monographs prepared by Provider Synergies, upon which Plaintiff relied.  (MRK-99420021411 at 419-20; Kessler Ex. 5.)

28.     In the Vioxx 6-month OA pre-market trials, there were 38 chest pain AE's among Vioxx patients compared to zero chest pain AE's in the placebo group.  Statistical analyses was not presented.  These data were not disclosed in the Vioxx label nor any publication, nor in the Provider Synergies monographs.  (MRK-ABS0066871.)

29.     Food and drug regulations state that drug companies have an obligation to revise a label "to include a warning about a clinically significant hazard as soon as there is reasonable

evidence of a causal association with a drug; a causal relationship have not been definitely established." 21 CFR. § 201.57(c)(6).  (Kessler Report  14.)

30.     Prior to the initial marketing date of May 20, 1999, the ISS and data derived from clinical trials of Vioxx showed reasonable associations with clinically significant hazards, including significant excess risk of AE's of the cardiovascular system, digestive system, and respiratory systems, and numerically increased incidence of thrombotic cardiovascular events. The Vioxx label did not include a warning as to these hazards.

**B.     The CV Adverse Event Results of the VIGOR Trial Were Misrepresented and Concealed from Plaintiff and Provider Synergies, the Pharmacy Benefit Manager Upon Whom Plaintiff Relied for Information About Risks of Vioxx**

31.     The VIGOR clinical trial studied approximately 8000 RA patients who took either Vioxx 50 mg or naproxen 1000 mg/day for about nine months.  The trial results showed a statistically significant five-fold higher risk of MI, and a 2.37 times higher rate of the pre-specified thrombotic event "endpoint"; which included cardiac, cerebrovascular and peripheral events. (Abramson Report  61; SBM Decl. Ex. 11.)  The published article reported a lower rate in the naproxen group for a different endpoint, MI, stating that the rate was 0.4% on Vioxx and 0.1% for naproxen.  (Bombardier, NEJM 2000; SBM Decl. Ex. 12.)

32.     In public statements and in a published New England Journal of Medicine paper dated November 23, 2000, Merck argued that the difference in the incidence of heart attacks in the naproxen and Vioxx treated arms of the study were likely due to the possibility that naproxen is cardioprotective.  (Kessler Report 40.)  Merck did not disclose to the public that it had been advised by its SAB that Vioxx may be causing excess thrombotic events. In the NEJM article, physicians and

the public were never told there was a reason to believe that Vioxx itself was possibly causing harm. (Kessler Report 41.)

33.     In its Standard Operating Procedure (SOP) for all Vioxx trials beginning in 1998, there was a prespecified endpoint comprised of a combination of prespecified thrombotic events cardiac, cerebral, and peripheral. Vascular events monitoring and adjudication SOP. August 30 1999 /revised January 21 2000 MRK-I8940077810 at 813; "The purpose of this SOP is to provide standardized data for pooled analyses of the incidence of vascular events of patients treated with COX-2 inhibitors." (Kessler Report 42.)

34.     In publishing the partial results of the VIGOR study, Merck did not disclose that there was a predetermined endpoint and what the results of the analysis were for that endpoint. As of April 2000, as documented in a presentation to the SAB (the "April 2000 presentation"), Merck knew that there were 41 confirmed serious thromboembolic events in the Vioxx treated group and 18 in the naproxen group. MRK-NJ408967 at 97; MRK-NJ0189526. On July 5, 2000, based on continued reporting of adverse events, and as documented in a memo from Deborah Shapiro to Dr. Alise Reicin (the "July 5, 2000 memo"), Merck knew that there were 45 confirmed thromboembolic events in the Vioxx treated group and 19 in the naproxen treated group. MRK-NJ0071320 at 322. As of April 16, 2000, a draft of the VIGOR manuscript had reference to pre-specified analyses which included thromboembolic events. MRK-NJ0346560 at 574 and 589. These references to the prespecified thromboembolic endpoint were not submitted in the final manuscript or disclosed in the NEJM paper. (Kessler Report 43.)

35.     In publishing the partial results of the VIGOR study, Merck did not disclose data that revealed an increasing incidence of serious thromboembolic cardiovascular events in rheumatoid

arthritis patients over time compared to naproxen. In the "April 2000 presentation" and in the "July 5, 2000 memo," Merck included Kaplan-Meier data plots which revealed an increased incidence beginning before two months and continuing to increase over the rest of the study. The Kaplan-Meier data plots showing increased risk of CV events were never provided to the NEJM nor included in the November 23, 2000 VIGOR article, despite Merck's providing a similar plot to NEJM showing reduced risk of GI events on Vioxx. MRK-NJ408967 at 998, MRK-NJ0071320 at 323.  (Kessler Report  44; Abramson Report at 48-49.)

36.    In publishing its NEJM paper, Merck did not report the results of serious thrombotic events in selected subgroups as shown in Table 4 of the "July 5, 2000" memo which documents a significant excess of thrombotic events in both aspirin indicated and aspirin non indicated subgroups. (Kessler Report  46; Abramson Report at 66.)

37.    Merck submitted the NEJM paper on May 18, 2000, then submitted an extensive revision of the manuscript of July 17, 2000 NEMJ 000028.  Further correspondence about the paper occurred over the next months before the paper was accepted for publication on September 13, 2000. 2000 NEMJ 000054. The April and July 2000 data, cited above, was not provided to the NEJM during the exchanges of correspondence between May 2000 and the November 2000 publication. (Kessler Report  48.)

38.    The pre-specified analyses in the VIGOR trial also included overall serious adverse experiences, discontinuation due to hypertension and edema, and congestive heart failure adverse events.  None of the results for these events appeared in the submitted manuscript or the published article.  On May 17, 2000, the day before the VIGOR manuscript was sent to NEJM, an internal Merck presentation showed those results.  For the serious adverse experience endpoint, there was

a statistically significant excess risk in the Vioxx group (9.3 percent versus 7.8 percent, p=0.013). Discontinuations due to hypertension were statistically significantly worse in the Vioxx group (28 versus 6, p<0.001), and discontinuations due to edema were numerically elevated and borderline statistically significant (25 versus 13, p=0.057).  Congestive heart failure adverse events were numerically elevated and borderline statistically significant (19 versus 9, p=0.065).  (Kaiser Dep. 178:21-190:2; Kaiser Ex. 39, SBM Decl. Exhs. 13, 14.)  Fran Kaiser, the Merck Regional Medical Director (RMD) responsible for peer-to-peer communication with representatives of the State of Louisiana Pharmaceuticals and Therapeutics ("P&T") Committee about risks and benefits of Merck products, including Vioxx, did not know that the overall serious adverse experiences in the Vioxx group were statistically significantly greater than those in the naproxen group in the VIGOR study. (Kaiser Dep. 184:4-8, 184:12.)  She did not recall whether she ever knew about the congestive heart failure or hypertension discontinuation data from the VIGOR study.  (Kaiser Dep. at 188:10-190:2.) The data showing statistically significant excess risk of serious adverse experiences in the Vioxx group compared to naproxen are not found in the summary of the VIGOR study in the Provider Synergies' monograph relied upon by Plaintiff in deciding to add Vioxx to the Preferred Drug List; the hypertension discontinuation data and congestive heart failure data are also absent from the monograph.  (Kaiser Dep. 182:18-24, 183:9; Kaiser Ex. 39.)

39.     Instead of the prespecified analyses of edema, hypertension, serious cardiovascular events including thromboembolic and congestive heart failure events, the VIGOR authors presented a post-hoc outcome measure of myocardial infarction (MI).  The authors stated that the significantly higher risk of MI did not extend to people for whom aspirin was not indicated.  Had the article presented the prespecified cardiovascular outcome measure of serious thrombotic events, a

significantly increased risk would have been demonstrated for those both with and without a previous history of CV disease. (Abramson Report  50-53; Kessler Report  46, 48.)

40.     The VIGOR article stated that cardiovascular events were assessed for a future meta-analysis for the following reason:  "Because highly selective cyclooxygenase-2 inhibitors do not inhibit platelet aggregation, which is mediated by cyclooxygenase-1, there was a possibility that the incidence of thrombotic cardiovascular events would be lower among patients treated with nonselective cyclooxygenase inhibitors than among those treated with cyclooxygenase-2 selective inhibitors." (Bombardier, NEJM 2000 at 1521.) However, the Vioxx Project Team Minutes for May 12, 1998, which summarized the May 19998 Board of Scientific Advisors meeting, included a reference to the SAB's advice to systematically collect and analyze data on CV events.  One of the two reasons stated for this process was:  "Based upon data on PGI metabolism data obtained for Vioxx, it is conceivable that Vioxx could disturb the [endothelium-platelet] interaction to favor platelet aggregation."  (Project Team Minutes, May 12, 1998, MRK-ABS0214762 at 4768, previously marked as Daniels Ex. 6; SBM Decl. Ex. 15 (emphasis added).)  Neither the published article nor the Provider Synergies monograph disclosed that the thrombotic events in VIGOR had been analyzed because of a concern that had existed since prior to marketing of Vioxx that the drug could disturb normal metabolic conditions to "favor platelet aggregation."

41.     The April 2000 draft of the VIGOR article showed that 101 patients would need to be treated with naproxen for one year to avoid one serious Vioxx-associated thromboembolic event, while 125 patients would need to be treated with Vioxx for one year to avoid one serious naproxen-associated GI event.  This calculation, showing greater risk of serious adverse events on

Vioxx, was deleted from the manuscript and did not appear in the published article, Vioxx label, or Provider Synergies monographs.  (Abramson Report  58, 59.)

42.     FDA Medical Review Office Villalba documented that there were 27% more hospitalizations in patients taking Vioxx than in those taking Naproxen in the VIGOR study (relative risk = 1.27, p=0.002).  While there were 20 fewer hospitalizations for GI events in the Vioxx group, there were 41 more hospitalizations for CV events in the Vioxx group.  (Abramson Report  62.)  The statistically significant excess in hospitalizations in the Vioxx group was not disclosed in the published VIGOR article, nor in the Vioxx label, nor in the Provider Synergies Monographs relied upon by Plaintiff.

### C.     Merck Attempted to "Neutralize" Perception of CV Risk Following the VIGOR Study

43.     Merck's research agenda "in order to maximize growth" was based on developing strategies to… "[d]emonstrate that COX-2 inhibitors have a similar cardiovascular profile compared with placebo and non-naproxen NSAIDs"  MRK-ABT0078672 at 695-96.  (Kessler Report  52.)

44.     Merck minimized Vioxx's risk of myocardial infarctions. As noted by the Food and Drug Administration's Division Director of the Division of Drug, Marketing, Advertising and Communications 'Dr. Thomas Abrams, on September 17, 2001. MRK-ABA0003277 ("DDMAC letter") to Merck's President and CEO Raymond V. Gilmartin, "You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial

infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)." FDA was "aware of six promotional audio conferences, presented on behalf of Merck" that were in "violation of the Act." MRK-ABA0003277 at 79.  (Kessler Report 53.)

45.     Merck advanced unproven theories concerning regarding Vioxx's safety. As noted by the Food and Drug Administration in the DDMAC letter, Merck's "promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." MRK-ABA0003277. According to FDA, "there are no adequate and well controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmocodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs.  (Kessler Report  55.)

46.     As noted by the Food and Drug Administration in the DDMAC letter, Merck's minimizing "potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile." MRK-ABA0003283.  (Kessler Report  57.)

47.     Merck's presentation of cardiovascular risk data in its promotional "Cardiovascular Card" omitted contrary data from the VIGOR study.  In a bulletin to all field personnel with

-17-

responsibility for Vioxx, Merck announced on April 28, 2000 the availability of a tri-fold pamphlet containing data that would ensure that its field "would be well prepared to respond to questions about the cardiovascular effects of Vioxx." MRK-AAR0007383. As summarized by staff of the U.S. House of Representatives Committee on Government Reform, according to the Cardiovascular Card, patients on Vioxx were 11 times less likely to die and 8 times less likely to die from heart attacks and strokes than patients on standard anti-inflammatory drugs. In addition, the risk of MIs was less than half of that for patients taking placebo and identical to that of patients receiving anti-inflammatory drugs. The Cardiovascular Card did not present the cardiovascular rkk data from the VIGOR study which, as FDA noted in its DDMAC letter, observed a four to five fold increase in MI's compared to patients on another non-steroidal. MRK-AAR0019055-60. (Kessler Report 58.)

48.     Merck's Cardiovascular Card was also omitted contrary data regarding cardiovascular risk from Merck's other more recent clinical trials. Merck's Cardiovascular Card was announced on April 28, 2000. MRK-AAR0038843. Data from Clinical Protocols 085 and 090 were known to Merck by February 2000. Data from Clinical Protocol 083 were known to Merck in September 2000. MRK-ABP0015346 at 363 and 368. Merck did not include the results of clinical protocols 083, 085 and 090 in discussing the risk of thromboembolic events in the Cardiovascular Card. The omission of these three studies resulted in an incomplete picture of cardiovascular risk in Merck's OA trials. Had these studies been included the relative risk of serious thrombotic cardiovascular events in osteoarthritis trials would have been 1.80 compared with Merck's reported relative risk of .94 in published studies. MRK-ACD0122214 at 39 and American Journal of Cardiology Vol. 89, January 15, 2002 (Table 4b) at 207. (Kessler Report 59; Abramson Report 97-103.)

-18-

49.    Soon after the VIGOR results were known to the company, on April 14, 2000 Merck had identified as "Marketing needs:...Rapid publication and communication at opinion leader events' of phase III OA results demonstrating comparable incidence of thromboembolic events with VIOXX, placebo and NSAID comparators." MRK-AB10002269 at 307.  (Kessler Report  60.)

50.    Merck also identified as a need to "[e]stablish that Vioxx /Coxib do not increase the risk of thromboembolic events due to their unique [mechanisms of action]..." MRK-ABI0002269 at 308. (Kessler Report  61.)

51.    On January 8, 2001, approximately one month after publication of VIGOR results, at a WHHM Competitive Assessment Task Force, Merck officials in a slide presentation stated that one of its objectives was to "[c]ontinue to neutralize any perceived safety (hypertension/edema, CV) concerns." MRK-AHY0263589, 90; MRK-AHY0263592. That strategy to neutralize the "perceived CV Safety Concerns" involved the publication of articles by the company's scientists and outside consultants.  (Kessler Report  62.)

52.    Merck's strategy to "neutralize" perceptions of cardiovascular risk included the publication of several papers, a letter to the editor, abstract submissions and meta-analyses regarding cardiovascular risk . MRK-AHY026359-97.  (Kessler Report  63.)

53.    Merck's scientific communications strategy included "plans for abstracts, presentations, and peer reviewed publications" that focused on key safety messages, including the key message that "VIOXX does not increase the thromboembolic risk of patients compared to non-naproxen, non-selective NSAIDS." MRK-AAD0106697 at 791.  (Kessler Report  64.)

54.    The first paper that Merck intended to publish was to be based on "CV safety (069 database)." MRK-AHY0263596 . The first paper that was published based on CV safety (069)

appeared in the American Journal of Cardiology Vol. 89, January 15, 2002 ("AJC paper"). It was received by the journal editors on July 2, 2001. (Kessler Report ¶ 65.)

55.     The AJC paper did not include the results of clinical protocols 083, 085 and 090, for which data analyses were all completed by September, 2000. MRK-ABP0015346 at 363 and 368. (Kessler Report ¶ 66.)

56.     As of December 19, 2000, a cardiovascular safety in phase III studies manuscript was under development. MRK-ABP0015346 at 352. (Kessler Report ¶ 67.)

57.     As of December 19, 2000, Merck's plan was also to "[c]onduct a meta-analysis of CV events from all PH III studies..., VIGOR, ADVANTAGE, and all other studies for which data will be available." Merck officials stated that "[i]f results are positive, then publish." MRK-ABP0015346. (Kessler Report ¶ 68.)

58.     As of January 30, 2001, Merck plans to publish cardiovascular phase III OA studies had been terminated. MRK-ABP0016015 at 021. Instead of publishing the phase III OA studies, the "Team will focus on submitting the Meta-analysis of CV safety that was prepared to support the VIGOR advisory committee." MRK-ABP0016015, 6021. (Kessler Report ¶¶ 69, 70.)

59.     Published meta-analyses included papers listing Dr. Marvin Konstam and Dr. Matthew Weir as first authors. Both papers included names of several Merck scientists including Dr. Alise Reicin. These published meta-analyses by Merck scientists and outside consultants included data from Alzheimer's studies in addition to OA and RA studies. MRK-ABA0004431- 440; MRK-ADY0006153-166. From Table 3 in Konstam article, the conclusion of whether VIOXX resulted in increased Antiplatelet Trialists Collaboration (APTC) endpoints hinged on whether Alzheimer's results were included in the meta-analyses. According to Merck's SOP for pooled

analysis of vascular events dated August 30, 1999 and revised January 2000, Alzheimer's studies were placed in a separate "study block," which was not to be analyzed until late 2003. MRK-I8940077810 at 827. In addition, as of the publication date of Dr. Marvin Konstam's meta-analysis article, the Alzheimer studies were not complete. Had Konstam, Reicin et al. analyzed the two blocks of studies that had been planned to be complete and available for analysis at the time of submission of the article, the TCVSAE results would have revealed a relative risk of 2.4 for Vioxx compared to placebo, borderline statistically significant (p = 0.06). Compliance and dropout rates were increased in the Alzheimer's cohort. MRK-I2690007833 at 857 and 951. As Merck scientist Alan Nies wrote in the major pharmacology text, The Pharmacological Basis of Therapeutics by Goodman and Gilman, "[N]oncompliance, even if randomly distributed between both groups, may cause falsely low estimates of the true potential benefits or toxicity of a particular treatment." 9th edition, 1996 at 45. (Abramson Report  113-114; Kessler Report  71.)

60.     The Konstam article also omitted data showing a statistically significant excess risk of mortality in the Alzheimer's studies, which was known to Merck by April 8, 2001, about six months before the Konstam article was submitted for peer review.  The submitted draft did not mention the mortality data.  (Kessler Report  77; see D, below.)

61.     On April 17, 2001, Merck officials and scientists attended a presentation where slides read "establish favorable safety profile for and within class." The slide also read, "Maximize exposure of Alzheimer's Disease/Mild Cognitive Impairment placebo-controlled, CV safety data." MRK-AADO0226839 at 846.  (Kessler Report  72.)  In 2002, Merck issued a press release describing cardiovascular event rates in the Alzheimer's trials, which did not mention the statistically

significant excess risk of mortality in the Vioxx patients in those trials. (Kaiser Dep. 116:1-126:2, Kaiser Exs. 18, 19, 21; SBM Decl. Exs. 16, 17, & 18.)

62.     In its Scientific Communication Plan for Vioxx dated March 27, 2001, Merck noted that all the cardiologists "listed have been engaged" by Merck and "have demonstrated a clear understanding of Merck's point of view on cardiovascular and renal issues." It added, "[t]hose cardiologists marked with an asterisk represent certified national speakers who consistently communicate Merck's point of view on these issues in presentations to their colleagues." (MRK-ABO0000257 at 263; Kessler Report  73; SBM Decl. Ex. 19.)

63.     After Merck scientists wrote the first draft of one of the meta-analysis papers, Merck contacted scientists who were on Merck's "consistently communicate list" to work with them on publication of the manuscript. MRK-ABK0436556-57.  One such scientist, Dr. Marvin Konstam, ended up being first author on one of the papers that concluded that there was "no evidence for an excess of CV events" for Vioxx. MRK-ABA0004431-440.  (Kessler Report  74.)

64.     The paper published by Dr. Marvin Konstam, Dr. Matthew Weir and Merck scientists and physicians was published in the journal Circulation. The paper was originally rejected after being submitted through the express route to the Journal of the American Medical Association. After receiving the rejection Merck officials, in an email titled, "Urgent decision needed about CV meta-analysis journal," recommended submitting the manuscript to Circulation because Dr. Konstam, the lead author, was on the editorial board of Circulation. They noted that the editor would let them know within a week whether the article would be accepted and would be fast tracked. MRK-ABW0010182. Peer review of journal articles normally takes weeks to months. At the time

Merck was trying to rush the publication of favorable data, Merck recognized that "key events [were] negatively impact[ing] NRx volume for Vioxx." MRK-ABI0008139 at 182.  (Kessler Report  75.)

65.     The paper published by Dr. Matthew R. Weir et al in the American Heart Journal, Volume 140, page 591, October 2003, did not include CV event data from Protocols 136 and 010, which had been completed before the manuscript was submitted for peer-review. (MRK-ABSO415816 [protocol 136]; MRK-0S420045791 [protocol 010]; Gertz, BJ et al. Curr. Med. Res. and Op. 2002; 18:82-91 at 83-84; and MRK-I8940080062 at 095.) In addition, the Weir paper employed an APTC endpoint that revealed fewer adverse events in the Vioxx treated arm than would have been reported had Merck employed the previously specified thrombotic cardiovascular serious-adverse events endpoint (TCVSAE). The conclusion of the Weir paper was that a "review of the phase IIB/III OA program revealed no adverse CV safety signals..." If Merck had reported all completed OA trials utilizing the TCVSAE endpoint, a statistically significant three-fold excess of such events would have been apparent.  (Kessler Report  76; MacGregor Report at 5; SBM Decl. Ex. 20.)

## D.     Merck Misrepresented and Concealed Data From the Alzheimer's Trials Showing Significant Excess Risk of Mortality and Heart Disease Mortality

66.     As of April 8, 2001, and documented in a memo by Merck scientist Joshua Chen, Merck knew that patients taking Vioxx in Protocol 091 , had a statistically significant "greater chance to die across all of the four age and gender categories..." employing an intention to treat analysis. Chen also reported that in Protocol 078, "males aged 75 or older had the highest risk of death... Age, Gender and Treatment were all statistically significant...," and "the hazard ratio between [Vioxx] and placebo was 2.55." Merck also knew that the combined ITT analysis "indicated that

survival was worse for patients receiving Vioxx." MRK-AAX0000752 at 56, 57 and 59. From Kaplan-Meier plots, the increase risk of death was noted after six months follow-up since treatment. MRK-AAX0000752 at 59. None of these "all cause mortality" intent to treat analyses was included in the papers published by Dr. Reicin, Konstam or Weir. (Kessler Report ¶ 77.)

67.     The Alzheimer's trials data also showed a statistically significant excess risk of heart disease mortality, Relative Risk = 3.84, $p < 0.005$. Psaty and Kronmal, JAMA 2008; 299:1813-1817 at 1815; Kaiser Ex. 22. Dr. Psaty, the lead author, has not been involved in any litigation involving Vioxx on behalf of any party. Dr. Kronmal, the co-author, is a retained expert for Plaintiff who obtained the data from the Alzheimer's trials through discovery in the litigation. Dr. Kaiser, Merck's RMD, recognized JAMA as a reputable journal. She saw the article in the normal course of reviewing journals when it came out in 2008. Dr. Kaiser has not seen any rebuttal by Merck to the accuracy of the numbers of heart disease related deaths in the Alzheimer's studies since the article was published. The p value of $< 0.005$ means there is less than a one-in-100 likelihood that the heart disease mortality result was due to chance. (Kaiser Dep. 126:4-129:12; Psaty article, Kaiser Ex. 22; SBM Decl. Ex. 21.)

68.     Dr. Kaiser was not aware of a statistically significant excess risk of mortality in the Alzheimer's trials before her deposition on January 29, 2010. When Dr. Kaiser met with Dr. Culotta, Chairman of the Louisiana P&T Committee on August 6-7, 2002, she presented the 2002 label update. The significant excess risk of mortality and heart disease mortality did not appear in the label. Dr. Kaiser stated, "If it wasn't in the label, it wasn't discussed." (Kaiser Dep. 124:3-10; 129:14-131:19.)

69.     Merck did not publish the data showing a statistically significant excess risk of mortality and heart disease mortality in the Alzheimer's trials at any time.  Provider Synergies, which relied on the peer reviewed literature and the label, would not have had the unpublished data, and these results do not appear in the monographs prepared by Provider Synergies, upon which Plaintiff relied.

### E.     Merck Concealed and Misrepresented Data Concerning Hypertensive Effects of Vioxx

70.     On January 8, 2001 in a WHHM Competitive Assessment Task Force document, Merck officials stated, "Neutralize perceived renal safety concerns," and cited a list of papers to be authored and published in medical journals. MRK-AHY0263589, 98. In that document, one of the messages that Merck planned to communicate-was, "Rates of hypertension and edema with Vioxx and Celebrex are low and consistent with incidences of these adverse events with non-selective NSAIDs," MRK-AHY0263589 at 95.  (Kessler Report  83.)

71.     Merck was aware, as of January 9, 2001, that approximately 10.5% of patients in protocol 112 on 25mg Vioxx exceeded predefined limits of change for systolic blood pressure (an absolute value of more than 140 with an increase in baseline more than 20 mm) in contrast to 5.3% for Celebrex and 4.8% placebo. At the 12.5 mg dose 10% of patients exceeded predefined limits of change for systolic blood pressure in contrast to 5.3% for Celebrex and 4.8% placebo. The differences between Vioxx and placebo and Celebrex were statistically significant. MRK-AIN0001235 at 1281 and 1419.  (Kessler Report  84.)

72.     On March 12, 2001, Merck official Thomas R. Cannell wrote internally in an email, "...I'll also say that I eventually think we should step up to the fact that we probably do cause a little

more HTN/edema particularly in the marketplace where V25...are the most common doses." MRK-AD00040808.  (Kessler Report  85.)

73.     Merck's intent had been to publish Protocol 112. MRK-ABI0002269 at 291. In an article published in 2002, Merck scientists did not disclose the results of Protocol 112. Gertz, BJ et al. Curr. Med. Res. and Op. 2002; 18:82-91 at 89 and 90. The Gertz article states that studies have shown that celecoxib also tends to increase blood pressure but does not report the results of Merck's study showing significantly greater hypertensive effects on Vioxx compared to Celebrex in Protocol 112. (Kessler Report  86.)

### F.     Merck Delayed Issuing a Stronger Warning on Vioxx's Label, and the 2002 Label Did Not Adequately Disclose Risks of Vioxx

74.     On June 29, 2000, approximately two months after learning the VIGOR trial results, Merck submitted a revised label to FDA which attributed the difference in cardiovascular adverse events in the VIGOR trial to the "known anti-platelet effects of naproxen." On March 2, 2001 Merck submitted a proposed revised label stating that "naproxen may decrease platelet aggregation." MRK-0042008017 at 8038 and MRK-AAD0106697 at 6832. (Kessler Report 88.) Merck's proposed labeling changes to FDA on June 29, 2000 and March 2, 2001 continued to rely on the unproven theory that naproxen was cardioprotective, which FDA criticized in the DDMAC letter of September 17, 2001 (see  44-46, above). (Kessler Report  89.)

75.     On October 15, 2001, following Merck's proposed labeling, FDA proposed that Merck include in the Warning section of Vioxx's label the statement that "VIOXX should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with

a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure." MRK-NJ0439283 at 309.  (Kessler Report  90.)

76.     In testimony before the United States Senate Committee on Health, Education, Labor and Pensions on March 1, 2005, FDA official Dr. Sandra Kweder, discussing the results from the VIGOR trial, testified "the lapse from my perspective was the delay that it took to get that information into the labeling-it took over a year-as well as once it was in the labeling, the failure of that information somehow to be in the forefront of the consciousness of the prescribing physician." (Kessler Report  91.)

77.     Rather than changing the label in accordance with FDA's proposal when FDA suggested changes, Merck engaged in repeated negotiations regarding Vioxx labeling from November 2001 to April 2002. Merck officials privately stated "We knew it would be UGLY and it is. We'll fight back and see where we get"; "Be assured we will not accept this label. if we need to we will ask to go to an advisory committee meeting" and "it is ugly cubed, thye [sic] are bastards." MRK-ABW004799.  (Kessler Report  92.)

78.     Based on Merck's U.S. Long Range Operating Plan Franchise: Analgesic & Anti-Inflammatory Products: Vioxx, Etoricoxib July 2001, Merck was aware of the effect of various labeling changes on its sales forecast. MRK-ABI0008659 at 674.  (Kessler Report  93.)

79.     The 2002 revised label did not accurately or completely describe the risks of Vioxx. The label did not disclose the three-fold, statistically significant excess risk of TCVSAEs in the OA trials, despite including information from the Alzheimer's trials.  The data from the Alzheimer's trials was incomplete in that the statistically significant excess risk of mortality and heart disease mortality did not appear in the label.  The information concerning VIGOR did not disclose the statistically

significant excess risk of pre-specified adverse event analyses, including overall serious adverse experiences and discontinuations due to hypertension.  The numerical excess risk of congestive heart failure (19 v. 9, p=0.065) was not disclosed.   The statistically significant excess risk of hospitalizations in the Vioxx group compared to the naproxen group did not appear in the label. Merck refused to accept the FDA position that the higher incidence of thrombotic events in the VIGOR study should appear in the warning section of the label, and instead there was only a precaution concerning use of Vioxx in patients with a previous history of ischemic heart disease. The latter precaution was misleading in that it suggested the risk only existed for patients with such a prior history, when in fact the VIGOR data showed increase risk to patients with and without a previous history of ischemic heart disease.  In 2002, the year of the label change, Merck purchased 549,500 reprints of the NEJM VIGOR article, virtually one for ever prescribing physician in the United States.  These reprints carried forward claims of benefit and safety that differed from the information in the April 2002 label.  Merck conducted research to determine the impact of its efforts to neutralize perceptions of CV risk which demonstrated that "physicians do not know how to interpret the information regarding the CV data."  (Abramson Report 62, 94; 2002 Vioxx Package Insert, previously marked as Kessler Ex. 11; SBM Decl. Ex. 22.)

## II.  THE 2002 VIOXX LABEL OMITTED AND MISREPRESENTED MATERIAL INFORMATION REGARDING CV RISKS AND GI BENEFITS

### A.  The 2002 Vioxx Label Omitted and Misrepresented CV Risk (to be provided).

## III.  MERCK MISREPRESENTED AND CONCEALED MATERIAL INFORMATION REGARDING THE GI RISK OF VIOXX

A. **Merck's Data Showed that Vioxx Was Gastrotoxic, and that Complicated GI Adverse Events on Vioxx Occurred at Rates Comparable to Traditional NSAIDs**.

80.     Randomized Clinical Trials (RCTs) against placebo are the gold standard for determining the safety of a drug. Repeated similar results in multiple RCTs provide the highest level of reliability of the data. Three separate trials of the standard dose of Vioxx 25 mg versus placebo both showed approximately a 4 to 5-fold excess risk of Merck's specified gastrointestinal (GI) adverse event endpoint of perforations, ulcers and bleeds (PUBs) on Vioxx compared with placebo. In each trial there was a similarly elevated risk of Vioxx for the most important category, "complicated PUBs." This is the most clinically significant endpoint because it conveys the risk for major morbidity or mortality. (Julie Report  15; Graham Report  16-21; Sales Dep. at 82-96, SBM Decl. Exs. 23, 24, & 25.)

81.     In a medical review before Vioxx was marketed, the FDA officer  recognized that "...rofecoxib [Vioxx] was not the same as placebo. There was evidence of a dose-response for endoscopic ulcers with rofecoxib." Merck attempted to persuade the FDA to eliminate the standard GI warning for the NSAID class from the Vioxx label. However, the FDA refused to alter the class warning because Merck's clinical trials failed to show the absence of risk.  (Julie Report  16, 17.)

82.     The APPROVe study compared Vioxx 25 mg to placebo for 3 years among patients with colon polyps. This long-term study found that the relative risk of Vioxx 25 mg compared to placebo for PUBs was 4.90 (p<0.001). For complicated PUBs, there was a similarly elevated relative risk (RR) for Vioxx of 3.79 (NS).  (Julie Report  18; Graham Report  20; Sales Dep. at 86:5-87:19.)

83.     GI toxicity of Vioxx was seen in the data found in Table 63 of the Clinical Study Report for Protocol 078, clinical trial that compared Vioxx 25 mg and placebo among patients with

mild cognitive impairment over the course of a 4-year study. The data show a statistically significant approximately 4-fold excess risk of both PUBs and complicated PUBs on Vioxx compared to placebo. Protocol 078 was completed by April 23, 2003, but the data showing excess GI toxicity was not published until 2005, after Vioxx had been removed from the market, and this information was not available to Plaintiff, authors of medical literature regarding GI toxicity of Vioxx, or practicing physicians. (Julie Report 19, 21; Graham Report 19; Sales Dep. 80:11-85:6.)

84. The ViP clinical trial compared Vioxx 25 mg to placebo among patients with prostate cancer. The Clinical Study Report for ViP showed a 5-fold excess of PUBs, and a 4-fold excess of complicated PUBs in the Vioxx group. (Sales Dep. 94:19-96:3 (Note an error in the transcript at 94:20-VIGOR should be ViP).)

85. FDA prepared a review on December 18, 2004, showing the combined data for discontinuations for GI adverse events in two combined Vioxx trials of Alzheimer's, 078 and 091, which were both completed by April 2003. The FDA review showed 11 discontinuations for GI ulcers and hemorrhages in the Vioxx subjects, compared to zero in the placebo subjects. This data was never published or available to Plaintiff or practicing physicians while Vioxx was on the market. (Sales Dep. 89:13-92:8.)

86. The relative risks of PUBs and complicated PUBs of between 3.8 and 5.0, as seen in the APPROVe, ViP and 078 Vioxx studies, falls within the mid-range of that stated historically for nonselective tNSAIDs. Merck's consultant, Loren Laine, wrote, "A variety of epidemiologic studies (cohort and case control) show a significant increase in clinical upper GI events with NSAID use (aspirin and nonaspirin NSAIDs) with most reports suggesting a 2 to 6-fold increase over the incidence in people not taking NSAIDs." (Julie Report 20.)

87.     In the new drug application (NDA)- for Vioxx, Merck submitted data for Protocol 069, which consisted of a pooled analysis of eight studies of Vioxx compared to traditional NSAIDs (tNSAIDs)and placebo among patients with osteoarthritis (OA). The Protocol evaluated the endpoints of PUBs and complicated PUBs. The definition of a PUB could be met by endoscopic criteria alone, regardless of clinical significance of the findings.  (Julie Report  22.)

88.     The FDA medical review of Vioxx in 1999 stated "that many endoscopic ulcerations are asymptomatic and may come and go without complication." It has been noted that "...there is no convincing evidence that endoscopic ulcers are a reasonable surrogate for clinical ulcer disease or for ulcer complications."  (Julie Report  23; Graham Report  28.)

89.     While Merck reported a statistically significant lower incidence of PUBs on Vioxx compared to the tNSAID comparator group, this endpoint included the endoscopically determined ulcers. In contrast, the incidence of confirmed complicated PUBs was similar between Vioxx and non-selective NSAIDs by 12 months. This is the most clinically hazardous category since all other PUB (uncomplicated) events are readily treatable by endoscopic and medical means and are life-threatening minimally, if at all, in the modern era. In other words, for the most important end point Vioxx did not show a benefit compared with tNSAIDs.  (Julie Report  24.)

90.     Further evidence of Vioxx's GI toxicity is also found in the serious adverse experience reports submitted by Merck to the FDA with the NDA in 1998. These experiences occurred during the same eight clinical trials of OA patients that comprised "Protocol 069," plus an additional 6-week OA study known as Protocol 010 that had been excluded from the Protocol 069 group. These adverse experiences (AExps) arose spontaneously during the Vioxx studies; they were clinically apparent and identified serious by the study doctors. Therefore, these serious adverse experience listings did

not include the type of endoscopically determined erosions described above, which are not a "reasonable surrogate" for clinical ulcer disease.  (Julie Report  26.) These data show that the incidence of serious GI AExps in the Vioxx group was slightly higher than the incidence of serious GI AExps in the group of other NSAIDs. (Julie Report  27.)

91.    A follow-up analysis of Protocol 069 conducted by Merck in February 2003 included a Kaplan-Meier curve of cumulative incidence rates which showed that the incidence of complicated PUBs was greater among Vioxx patients than patients in the tNSAID groups. In 2004, Merck employee authors published an article about the follow-up analysis which omitted the above-mentioned figure and provide a different Kaplan-Meier graph of only the uncomplicated PUBs, for which a lower rate on Vioxx was asserted. (Sales Dep. 190:9-196:21; Yu Memo, 2/27/03, SBM Decl. Ex. 26.)

92.    The clinical trial data referenced above, including results known to Merck between 1998 and April 2003, show that Vioxx causes GI PUBs and complicated PUBs at a rate of 4 to 5 times above placebo, and that the incidence of complicated PUBs among Vioxx patients was comparable to or greater than the incidence of complicated PUBs among tNSAID users.

93.    A Monograph prepared by Provider Synergies, upon which Plaintiff relied for information used to decide to add Vioxx to the Preferred Drug List (PDL) in May 2003, included a reference to a study by Merck consultant Loren Laine and Merck employee co-authors, which stated that Vioxx ulcer rates were "comparable to placebo" and significantly lower than the rates for ibuprofen. This study, known as Protocol 044, employed the endoscopically detected "ulcer" endpoint that was questioned by the FDA medical reviewer. The endoscopic detection method yielded unreliable event rates in the ibuprofen group that were approximately 100 times greater than

the rate of clinically relevant GI events. The unpublished data summarized in the preceding paragraphs, which was unavailable to Plaintiff or to Provider Synergies, show that Vioxx was not "comparable to placebo," that it caused 4 to 5-fold increases of PUBs and complicated PUBs compared to placebo, and that the rates of complicated PUBs were similar to, or higher in the Vioxx group than among tNSAID users.

### B. Merck's Clinical Trials Did Not  Conform to Realistic Dosages or Frequency of Use of tNSAIDs among The Large Majority of Osteoarthritis Patients.

94.    Of the comparators used by Merck in the Vioxx premarketing clinical trials known as 069, ibuprofen was far more commonly used in the general population. In actual medical practice, the majority of patients use ibuprofen under conditions which differ substantially from those created in Merck's clinical trials.  (Julie Report  28; Julie Rebuttal at 2; Graham Report  31; Curtis Dep. 245:5-249:10; SBM Decl. Ex. 27; Kaiser Dep. 201:9-20.)

95.    OA patients differ from RA patients in that they have a less severe degree of inflammatory disease. As a result, OA patients use lower doses of NSAIDs and use them more intermittently than RA patients. These factors substantially reduce the frequency of GI complications among OA patients compared to RA patients. At commonly used doses and frequencies of ibuprofen use, the GI adverse event rate cannot be distinguished from placebo or background rates. (Julie Report  29; VIGOR Protocol, MRK-AFV013042, SBM Decl. Ex. 28.)

96.    The Merck OA trials utilized a 2400 mg ibuprofen comparator dose (thus yielding a higher PUB rate) that was not consistent with that used by the majority of OA patients in the real world situation. Merck's own consultant, Christopher Hawkey, co-authored a major meta-analysis of tNSAID use in 1996, before Vioxx was marketed, demonstrating a low risk of GI adverse events

among patients who used ibuprofen at doses of 1600 mg /day or less; showing that such doses conformed to the practice of doctors in treating the large majority of OA patients; and documenting that the safety advantage of ibuprofen did not persist at doses above 1600 mg/ day. Laine, who co-authored the 044/045 studies with Hawkey, testified that no one would dispute the fact that the 2400 mg dose imposes a greater risk of GI adverse events than lower doses. ( Henry, 1996; Hawkey, 2000; Laine, 1999; Laine Dep. 270:6-12; 272:15-17; SBM Decl. Exs. 29, 30, 31.)

97.     The studies described above show that the GI event rates among tNSAID subjects in the Vioxx clinical trials were undoubtedly higher than the rates that such patients would have experienced had they used lower or intermittent doses of such medications as would have occurred under conditions that adhered to actual medical practices and standards of care.   The ibuprofen label states that the lowest effective dose should be used; that the dose should be tailored to the individual patient; and that the dose should be titrated upward or downward depending upon the patient's response. Defense expert Dr. Curtis and Merck Regional Medical Director Fran Kaiser agreed that, in their own medical practices, patients in the mild to moderate categories of OA would generally be prescribed 200 to 400 mg of ibuprofen, 3 times per day, for a total daily dose of 600 to 1200 mg. If a higher dose was needed for an acute episode, Drs. Curtis and Kaiser agreed that they would reduce the dose as soon as possible. (Curtis Dep. 111:13-18; Kaiser Dep. 199:8-21.)

98.     Merck consultant Marie Griffin advised the company in 1996 that the standard of care for arthritis treatment required NSAID dose titration, and that starting at a high dose, without attempting a lower dose first, might not be ethical. Merck representatives replied that the company wanted to use fixed, equipotent doses of Vioxx and NSAID comparators, to which Dr. Griffin replied that equipotent doses were not necessarily known. A second consultant, Dr. Brandt, advised

-34-

Merck that the 2400 mg ibuprofen dose was too high, and that such a dose did not conform to what doctors actually used. A 1998 survey by Merck consultants and employees, published in 2002 confirmed that there was little available information on the subject of equal effective doses of NSAIDs. Merck's OA trials administered Vioxx doses that ranged from 12.5 mg to 25 mg to 50 mg per day-three different doses covering a fourfold range. However, NSAID comparators were tested in the premarket clinical trials only at unvaried daily dosage levels-- 2400 mg ibuprofen; 150 mg diclofenac (the maximum permissible prescribed dose for OA); and 1500 mg nabumetone. Merck did not conduct any Vioxx trials that titrated NSAID doses. Merck's OA clinical trials "favoured rofecoxib" by using maximal or near maximal doses of the comparator NSAIDs. (Merck, Consultants Meeting, 10-24-1996; Minutes for the MK-0966 Consultants Meeting to Discuss the Design of the GI Clinical Outcomes Megatrial ("Consultants Meeting"), marked as Sales Ex. 24; Langman, M.J., et al., 1999 ("Langman study"), marked as Sales Ex. 31; Emery, P., et al., 2002, marked as Sales Ex. 40; Sales Dep. 131:14-17, 207:8-15; Prescrire International, 2001; SBM Decl. Exs. 32, 33, 34, 35.)

99.     Merck used the American College of Rheumatology (ACR) 1992 classification system to categorize and screen participants in its Vioxx arthritis trials according to severity of disease. There are four ACR categories: Class I (no impairment of activities of daily living, vocation or avocation); Class II (impairment of avocation activities only); Class III (impairment of vocation and avocation activities); and Class IV (impairment of all 3 fields). Merck's trials excluded Class IV patients. Published studies show that approximately 75% of the subjects were in Classes I and II, which roughly correspond to mild to moderate OA. (Hochberg, M., et al., 1992, marked as Curtis

Ex. 13; Saag, K., et al., 2000, marked as Sales Ex. 39; Sales Dep. 198:2-199:3; Curtis Dep. 103:5-104:1; Parnell Dep. 186:3-8, 187:7-188:6; SBM Decl. Exs. 36, 37, 38.)

100.    Defense and Plaintiff's experts agree that patients with Class I or II / mild to moderate OA do not need constant dosing of 2400 mg/day of ibuprofen for extended periods to relieve pain. (Curtis Dep. 108:2-11; 245:5-249:10; Graham Rebuttal at 1; SBM Decl. Ex. 39.)

101.    The literature and Merck documents support the conclusion that the Vioxx OA trials did in fact "favour rofecoxib" by administering higher / more constant doses of comparator NSAIDs than typically used in practice and higher / more constant doses than a majority of the patients needed to treat their condition.

### C.    Merck Did Not Disclose Data from the VIGOR Trial Showing that All but One of the Excess Complicated GI Events in the Naproxen Group Occurred among Subjects Who Used Steroids to Treat RA.

102.    Most patients who use Vioxx or NSAIDs in the general population did not use concurrent steroids. Concurrent use of steroids and NSAIDs by RA patients confers greater GI risk than use of NSAIDs alone. For example, Fries reports that among RA patients there is a "marked effect of corticosteroid therapy that is not observed in OA patients, where such concurrent treatment is less common." (Julie Report 31; Graham Report at 37; Graham Rebuttal at 5.) The enhanced risk of concurrent steroid use with NSAIDs had been known for many years before Vioxx was developed or marketed. In 1991, Piper showed a relative risk of 4.4 for ulcer or ulcer complication in users of NSAIDs plus steroids compared to users of NSAIDs without steroids. (Julie Report 32.)

103.    The VIGOR trial compared GI adverse event rates among RA patients taking Vioxx 50 mg per day compared to naproxen 1000 mg per day. The primary endpoint consisted of confirmed, non-complicated PUBs, including ulcers that could be confirmed by endoscopy without

any requirement as to the minimum size of ulcer that would qualify. A secondary endpoint consisted of confirmed, complicated PUBs, comprised of serious perforations, obstructions and bleeds. Fifty-six percent of the VIGOR subjects used steroids at baseline.  The VIGOR data analysis plan pre-specified several subgroups for analysis as to the primary PUB endpoint, including baseline steroid use.  The plan also permitted subgroup analysis for secondary endpoints, and Merck did in fact report the results for the secondary endpoint of confirmed, complicated PUBs in the pre-specified subgroups according to prior history of a PUB or absence of such history; age, over or under 65 years; and study site location. Merck authors also volunteered two post hoc (not pre-specified) subgroup analyses to the peer reviewers of the manuscript, based on use of GI protective medication and a composite of "low-risk" factors. However, Merck did not report or disclose the VIGOR subgroup analysis of the complicated PUBs according to steroid use or non-steroid use. Instead, Merck published only the overall result of the complicated PUB comparison, reporting a statistically significant reduction of complicated PUBs in the Vioxx group. (Bombardier, NEJM 2000; Julie Report  33; Graham Report  33-37; VIGOR Data Analysis Plan excerpt; Curtis Dep. 161:13-162:12; Sales Dep.38:6-41:11; Laine Dep. 93:17-107:1, 110:18-119:21; SBM Decl. Exs. 40.)

104.    The Merck data files for the VIGOR study showed that, among steroid users there were 27 confirmed complicated PUBs in the naproxen group compared with 7 in the Vioxx group, approximately a 4-fold excess risk with concurrent steroid use (which is comparable to the increased RR of the Piper study, above). However, with patients who did not use steroids, there were 10 confirmed complicated events on naproxen versus 9 on Vioxx. After discussion of these figures with

Merck's counsel, Merck's expert witness Dr. Sales agreed that counsel confirmed the numbers of events were accurate.  (Julie Report  34; Sales Dep. 34:11-36:15.)

105.    Defense expert Dr. Sales testified that interaction tests are done on clinical trial data to determine whether there is a difference in two groups according to a risk factor, and that investigators want to know if an interaction exists because it "might change their conclusions" about what the data mean.  (Sales Dep. 24:3-25:10.)

106.    Statistical analysis of the complicated PUBs in VIGOR showed that the patients on baseline steroids had an Incidence Rate Ratio (IRR) of 3.85 while the patients without baseline steroid use had an IRR of 1.12. The (interaction) p-value was 0.047, indicating that the difference in ratios is unlikely to be due to chance. Defense expert Dr. Sales stated that the result was statistically significant, and that he did not challenge the validity of the statistical analysis.  (Julie Report  34; Sales Dep. 45:18-46:7.)

107.    The complicated PUB results of the VIGOR trial for RA patients using steroids cannot be generalized to OA patients, who rarely use steroids, and who constitute a much larger segment of the population for whom Vioxx was prescribed. There are about 25 million adults diagnosed with OA in the United States, compared to about 1.3 million diagnosed with RA, a ratio of about 20 to 1.

108.    The statistical analysis demonstrating that only steroid users had a lower incidence of confirmed complicated PUBs in the VIGOR trial was not published or otherwise made known to Plaintiff or the medical community at any time while Vioxx was on the market.  (Julie Report  35; Hood Affidavit; P&T Committee member affidavits.)

109.    The Vioxx 2002 label stated that the risk reduction of approximately 50% was maintained for the complicated PUB endpoint among patients with and without steroid use. That statement was contrary to the undisputed data showing only a 12% difference in the rate of complicated PUBs between the Vioxx and naproxen groups for non-steroid users, compared to an approximate 4-fold higher risk in the naproxen group among the steroid users. The Monographs prepared for Plaintiff by Provider Synergies, and upon which Plaintiff relied, were based on the label and the peer-reviewed literature, neither of which disclosed the true data for the complicated PUB endpoint. (Taylor Dep. at 19:8-14, January 15, 2010; 2003 Monograph, marked as Taylor Ex. 15; 2004 Monograph, marked as Kaiser Ex. 36; 2002 Vioxx Package Insert, previously marked as Kessler Ex. 11; SBM Decl. Ex. 41, 42, 43; Hood Affidavit.)

**D.    Merck Knew by November 2001 that Taking Vioxx Plus Aspirin for Cardio-Protection Eliminated the Difference in Endoscopic Ulcer Rates between Vioxx and Ibuprofen, but That Information Ws not Published Until August 2004.**

110.    Merck knew by 2001 that Vioxx taken with low dose aspirin ("ASA")  conferred no significant GI benefit compared with the non-selective NSAID ibuprofen. Merck had planned Protocol 136 with the goal of demonstrating superior GI safety of Vioxx plus ASA compared with ibuprofen, and to publish that data and include it in labeling . However, the study failed to show superiority of Vioxx plus ASA, and the publication of this data was delayed until August, 2004, only one month before Vioxx was withdrawn from the market.   (Julie Report  37; Laine Dep. 129:9-136:22.)

111.    The lack of superior GI safety of Vioxx plus ASA, as demonstrated in Protocol 136, was first reflected in a modification to the Vioxx package insert issued in August, 2003. However,

this new language and mention of Protocol 136 did not appear in the Physician's Desk Reference (PDR) until it was added to PDR 2004 Supplement A, published in July, 2004. The statement regarding Protocol 136 did not appear in either the 2003 or 2004 main volumes of the PDR.  (Julie Report  38.)

112.    Use of ASA in the OA population is common, due to the cardiovascular co-morbidities seen in the general arthritis population, especially among the elderly. As early as November, 1998, FDA representatives had "raised a concern about the exclusion of patients on low dose aspirin" from the pre-approval clinical trials. Merck informed the FDA that "the current VIOXX clinical database contained experience in some patients with concomitant low dose ASA use." However, patients on concurrent ASA were excluded by design from most, of the trials submitted in the NDA. (Julie Report  39.)

113.    It was subsequently shown "that nearly half of long-term Cox-2 users take concomitant aspirin for cardioprotection." Thus, patients who used ASA for cardioprotection plus Vioxx had a comparable risk of GI toxicity to patients who used ibuprofen alone.  (Julie Report  40.)

114.    Because of Merck's delay in publication from November 2001 to August 2004, Plaintiff and the doctors and patients of Louisiana were unaware of the data showing that Vioxx plus low-dose aspirin resulted in as many endoscopically-detected ulcers as high dose ibuprofen at 2400 mg/ day.

**E.      Merck Had a Goal to Maximize Its Share of the Market by Selling Vioxx to Patients at Low Risk of a GI Event.**

115.    Merck Regional Medical Director (RMD) Fran Kaiser stated that Merck's marketing goals included continuing to "work with the State of Louisiana and the Department of Health and

Hospitals (DHH) through Provider Synergies to ensure unrestricted access for key Merck products," and to try to maximize market share for Merck products on the PDL. (Kaiser Dep. 134:10-136:4). Merck was aware of that some payors wanted to limit the prescribing of Vioxx for patients in low risk groups, and the company sought to combat such "limitation." (Julie Report 44.)

116.    Direct to consumer advertising (DTCA) was one method used to promote Vioxx use. Merck's Operation Review for Vioxx, dated January 21, 2003, shows that the company invested $65 million in DTCA in 2002; that the resultant annual gross sales influenced by DTCA amounted to $176 million; and that physicians honor 90% of patient requests for Vioxx. (Julie Report 45.) Dr. Julie experienced both patient requests for Vioxx and company representative sales visits encouraging use Vioxx for all his patients regardless of their underlying risk. Merck's documents also describe "physician promotion" efforts to persuade doctors to prescribe Vioxx based on "superior GI safety" regardless of underlying risk and without disclosing results of clinical trials showing Vioxx's GI toxicity compared with placebo or the similarity of Vioxx and tNSAIDs for complicated GI events. Dr. Julie experienced such physician promotion efforts that did not reveal the data described above. (Julie Report 47.)

117.    Marketing to third-party payors was included in Merck's approach. Merck's documents disclose a "mitigation strategy" to "convince payors of the benefits of using Vioxx over NSAIDs (nonselective NSAIDs)" that would "emphasize GI safety advantage in both "low risk" and "high risk" patients. (Julie Report 48.)

118.    Dr. Julie's personal experiences with Vioxx detailing by Merck sales representatives were consistent with the Merck strategies outlined above. During those encounters, GI safety was

touted, even for low and very low risk patients, and results from clinical trials showing GI toxicity with Vioxx were not mentioned.  (Julie Report  50.)

## IV.   VIOXX CAUSES INCREASED RISK OF MYOCARDIAL INFARCTION, HYPERTENSION AND OTHER CV ADVERSE EVENTS

### A.   Vioxx Upsets the Balance between PGI-2 and Thromboxane A2.

119.   Vioxx acts by inhibiting the action of an enzyme called cyclooxygenase-2 (COX-2) in the endothelial cells of blood vessels. Inhibition of this enzyme suppresses the formation of PGI-2 from arachidonic acid. PGI-2 has been shown to inhibit platelet aggregation, cause vasodilation and prevent the proliferation of vascular smooth-muscle cells. In platelets, arachidonic acid is metabolized by an enzyme called cyclooxygenase-1 (COX-1) into thromboxane A2, a compound that causes vasoconstriction and platelet aggregation and the promotion of thrombus formation. (MacGregor Report at 2-3.)

120.   Balance between the opposing effects of PGI-2 and thromboxane A2, is important in cardiovascular disease. Selective suppression of PGI-2 production caused by the inhibition of cyclooxygenase-2 by Vioxx, which has essentially no effect on cyclooxygenase-1 and thromboxane A2 production, is believed to upset the balance between these compounds in a way that increases the concentration of thromboxane A2 relative to PGI-2. It has been proposed that this creates a prothrombotic environment which is the likely explanation for the observed increase in thrombotic complications, including myocardial infarction and stroke, seen in patients taking Vioxx in clinical trials. It is plausible that  reduction of PGI-2 formation elevates blood pressure and accelerates atherogenesis, based on its effects on vasodilation and vascular smooth-muscle cell proliferation. Hypertension was a common side effect of Vioxx therapy in the clinical trials. These additional

effects would further explain the deleterious cardiovascular effects observed in patients taking Vioxx. (MacGregor Report at 3.)

**B.    RCT Evidence Shows Excess Risk of CV Thrombotic Adverse Events.**

**VIGOR**

121.    In the VIGOR trial, 8076 patients with rheumatoid arthritis were randomized to receive either 50 mg of Vioxx per day or 500 mg of naproxen twice a day. The median follow up period was nine months. There was a statistically significant four-fold increase in the incidence of myocardial infarction in the patients receiving Vioxx compared to patients taking naproxen, as reported in the article describing the results of the VIGOR trial that appeared in the New England Journal of Medicine on November 23, 2000. The article proposed that naproxen might have a protective cardiovascular effect. This explanation was not supported by any direct evidence from RCTs. Even if naproxen provided a cardioprotective effect equal to aspirin, it would not account for the increased risk seen in patients taking Vioxx in the VIGOR trial.

122.    It was subsequently reported that three additional patients in the Vioxx group of the VIGOR trial had experienced myocardial infarctions. A total of 20 patients who were randomized to receive Vioxx experienced myocardial infarction, compared to four patients with myocardial infarction in the naproxen group. When these additional patients were included in the analysis, patients randomized to receive Vioxx were five times more likely to have a myocardial infarction than patients randomized to receive naproxen. In the VIGOR trial, 80% of the total myocardial infarctions were attributable to taking Vioxx. There was early separation of the time to serious thrombotic cardiovascular event curves, with separation noted after only 4 to 6 weeks of treatment with Vioxx. Significantly more patients in the Vioxx group developed hypertension that caused them

to drop out of the study: 28 in the Vioxx group v. 6 in the naproxen group (RR 4.67, p<0.001).) (MacGregor Report at 3-4.)

**APPROVE**

123.    In the Adenomatous Polyp Prevention on Vioxx Trial (APPROVe), 2586 patients with a history of colorectal adenomas were randomized to receive either 25 mg per day of Vioxx or placebo. This trial was stopped early by the data safety monitoring committee because of a significant increase in cardiovascular events, including myocardial infarction and stroke, for patients taking Vioxx compared to those on placebo. The published results of APPROVe show that the risk of cardiac events, defined as MI (fatal or non-fatal), sudden cardiac death, or unstable angina significantly increased with a relative risk of 2.80 (1.44-5.45). The risk of myocardial infarction was 2.3 times greater for patients taking Vioxx compared to patients taking placebo.  (MacGregor Report at 4, 7.)

**OA Trials**

124.    Study 090 was a randomized, placebo-controlled, double-blind trial comparing the efficacy and safety of 12.5 mg per day of Vioxx to 1000 mg per day of nabumetone and to placebo over a 6 week period, in treating osteoarthritis of the knee. Low dose aspirin for cardioprotection was allowed. There was a trend toward increased serious adverse cardiovascular events in the Vioxx group compared to the other two groups, even at this lower dose of Vioxx, and even with the short period of treatment. Out of a total of nine serious adverse cardiovascular events in study 090, six were in the Vioxx group.  (MacGregor Report at 4.)

125.    A summary of OA trials of Vioxx is included in a Merck document submitted to the FDA titled, "Rofecoxib Cardiovascular Combined-Analysis Update with Data through June 2003."

-44-

Table 13 of this document presents the thrombotic cardiovascular serious adverse experiences (TCVSAE) for a number of studies, including OA trials, and calculates the relative risk and 95% confidence interval for each study and for studies within a category. The Merck analysis of the combined osteoarthritis studies calculated a relative risk of 2.84 (increased risk with Vioxx), with a 95% confidence limit of 0.97 to 8.38 using the Cox model if the number of cases is at least 11, otherwise the relative risk was calculated using a ratio of rates. Using the ratio of rates method, the relative risk of thrombotic events in the OA trials in Table 13 was 3.03, and the result was statistically significant. In addition, TCVSAEs from another OA study, Protocol 010, were not included in the Table 13 analysis. When study 010 is included, a statistically significant relative risk of greater than 3 is obtained. (MacGregor Report at 5).

**Alzheimer's Trials**

126.    Three randomized, placebo-controlled clinical trials in patients with either Alzheimer's Disease (Protocols 091 and 126) or mild cognitive impairment (Protocol 078) were conducted to test whether Vioxx would slow the progression of Alzheimer's Disease, or in the case of patients with mild cognitive impairment, whether Vioxx would prevent Alzheimer's Disease from developing. Major problems with these trials included high drop out rates and low rates of compliance with taking the study medications. A review of the data from the 078 and 091 trials showed a statistically significant increase in the relative risk for all-cause mortality and the combined outcome of MI and sudden cardiac death compared to the placebo group. (MacGregor Report at 4.)

**PROTOCOL 203**

127.    Protocol 203 was Merck's combined analysis of the following three placebo-controlled trials of Vioxx (rofecoxib): 1. APPROVe, or Protocol 122; 2. ViP, or Protocol

201; and 3. VICTOR, or Protocol 145. In general, Protocol 203 was an attempt to take three efficacy

trials and combine them to also look at safety. Protocol 203 was the only protocol designed and

powered to look at CV safety of Vioxx. It did not have an efficacy end point.  (MacGregor Report

at 5.)

128.    Per Protocol 203's Executive Summary, all three studies were to allow use of

low-dose aspirin (75 to 100 mg/day) in patients with past CV history (CVA, TIA, MI, angina,

CABG, PTCA). Patients included in Protocol 203 were comparable in age to patients with

osteoarthritis or rheumatoid arthritis, "allowing generalization of the results of this analysis to other

populations, including those with osteoarthritis or rheumatoid arthritis."  (MacGregor Report at 5.)

Protocol 203 demonstrated a highly statistically significant increased risk of cardiac events on Vioxx

compared to placebo, with early separation of the incidence curves.  (MacGregor Report at 5-6.)

129.    The VICTOR trial was designed to explore the value of Vioxx in reducing the

chances of colorectal cancer recurrence following conventional adjuvant therapy. Overall study data

from VICTOR was monitored by a separate ESMB than that of ViP and APPROVe, the other two

studies contributing to Protocol 203. In VICTOR, 7000 patients were to be randomized equally

between 25 mg of Vioxx daily and placebo, with half receiving Vioxx for two years, the other half

for five years.  The VICTOR trial was not initially designed to examine CV data, but later was

amended to do so in light of the VIGOR data. While 2434 patients were recruited between April

2002 and September 2004, at 151 United Kingdom clinical centers, recruitment stopped and the trial

was unblinded on September 30, 2004, when Merck withdrew Vioxx from the worldwide market.

The VICTOR article published in July 2007, showed a statistically significant increased risk of

cardiovascular thrombotic events on Vioxx at a dose of 25 mg, compared to placebo, RR = 2.66, p= 0.04.  (MacGregor Report at 6.)

### C.    RCTs Show That Vioxx Increases the Risk of Hypertension to a Greater Degree than traditional NSAIDs or Celebrex.

130.    The peer-reviewed published literature and Merck internal documents show that Vioxx has hypertensive effects greater than that of other NSAIDs. Hypertension is an established risk factor for thrombotic CV events, due to both chronic effects on development of atherosclerosis and acute effects on increasing shear stress on plaques (MacGregor Report at 6.)

131.    The APPROVe trial reported a mean increase in systolic blood pressure of $3.4 \pm 0.4$ mmHg and diastolic blood pressure of $0.9 \pm 0.2$ mmHg, compared to a reduction of $0.5 \pm 0.2$ and $0.8 \pm 0.3$ mmHg in the placebo group (p<0.01), which represents an average change in 1287 subjects. Some patients experienced much higher increases in blood pressure, further increasing their risk of a cardiac event.  There was a statistically significant doubling of risk of hypertension on Vioxx 25 mg compared to placebo in the APPROVe study.  (MacGregor Report at 7.)

132.    In the VIGOR study, patients taking Vioxx 50 mg were at a significantly increased risk of experiencing hypertension when compared to those subjects taking naproxen. In the FDA Advisory Committee Briefing Document for NDA 21-042, s007 for VIOXX Gastrointestinal Safety dated February 8, 2001, the discontinuations due to hypertension-related AEs were 28 on Vioxx 50 mg vs. 6 on naproxen. The relative risk estimate is 4.67 (1.93, 11.28), p<0.0001. (MacGregor Report at 8.)

133.    In Protocol 112, Merck studied the effects of Vioxx 12.5 mg and Vioxx 25 mg on hypertension compared to Celebrex 200 mg and placebo. It was a 6-week controlled study of 1,521

patients. The Merck Statistical Report of January 9, 2001 indicates that the effects of Vioxx on hypertension were approximately twice those of Celebrex and placebo on hypertension (on Vioxx 25 mg and 12.5 mg, approximately 10% of patients had increased systolic blood pressure greater than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to 5.3% on Celebrex and 4.8% on placebo). The increased hypertension on Vioxx 25 mg versus Celebrex 200 mg and placebo was statistically significant, at p = 0.004 and p = 0.0046, respectively. (MacGregor Report at 8.)

134.    On March 14, 2005, a meta-analysis of the blood pressure data from the published RCTs was published in the Archives of Internal Medicine. This meta-analysis showed a greater effect of Vioxx on blood pressure than other NSAIDs. The investigators included a table listing the 19 trials meeting inclusion criteria (see Figure 3 below). The authors reached their results despite the fact that two key studies were not included in the meta-analysis - 1) Protocol 112, which was completed by January 2001, and showed a statistically significant doubling of the risk for Vioxx versus Celebrex and placebo; Merck did not publish this study and 2) APPROVe, published after the cutoff for publications to be included in the meta-analysis. (MacGregor Report at page 9.) The results of the meta-analysis show that coxibs caused an increase in the weighted mean difference (WMD) for systolic blood pressure compared with placebo (3.85/1.06 mm Hg) and nonselective NSAIDs (2.83/1.34 mm Hg). Further, the authors found that Vioxx appeared to confer a higher risk of developing hypertension and clinically important systolic elevation compared with Celebrex. As the authors note, "elevated systolic BP is closely associated with increased cardiovascular events including heart failure, myocardial infarction and death." (MacGregor Report at 9.)

V.     **MERCK MISREPRESENTED AND OMITTED MATERIAL INFORMATION REGARDING CV RISK FROM THE LABEL AND PEER-REVIEWED LITERATURE AUTHORED BY ITS EMPLOYEES AND CONSULTANTS**

A.     **Knowledge of Risk Prior to Marketing Was Misrepresented or Not Disclosed.**

135.    Merck began to market Vioxx on May 20, 1999. The label that accompanied the product did not disclose that:

a.     "concern" existed within the company that Vioxx could pre-dispose to thrombotic events;

b.     Merck's pre-specified "primary safety analysis" of the 6-week OA studies showed a 3 to 4 fold higher incidence of thromboembolic cardiovascular adverse experiences;

c.     Merck was aware of an imbalance between thromboxane and prostacycline that its Scientific Advisory Board (SAB) advised could be a mechanism that promotes thrombotic events and atherosclerosis;

d.     high-risk patients, such as those with CHF, uncontrolled hypertension, recent MI or stroke, were excluded from the trials that assessed risk;

e.     the internal Watson analysis showed a statistically significant doubling of risk of thromboembolic events among women in the pooled Vioxx OA trials compared to the Fosamax placebo group that Merck chose as an appropriate comparison population;

f.     the SAB recommended evaluation of CV risk issues "in parallel" with the steps taken to place the product in the hands of patients, but the product was placed in the hands of patients without having conducted any additional trials to resolve the question; and

g.      the FDA Medical Officer Review stated that a larger database would be needed to answer the question of whether there was an increased risk of thrombotic events with Vioxx, while at the same time Merck did not have access to a larger database nor any RCT planned to address that question.  (Kessler Report  18-39; Kessler Ex. 5.)

136.    The label that accompanied the product described hypertension with Vioxx as similar to hypertension with traditional NSAIDs, but it did not disclose RCT results showing greater hypertensive effects among Vioxx patients compared to traditional NSAID patients, including:

a.      Results of Protocol 045, completed prior to October 1998, showing that the incidence of "hypertension-type adverse experiences" was 10.5 % on Vioxx 25 mg, 20.6 % on Vioxx 50 mg, and 3.9 % on ibuprofen, or three to five times higher on Vioxx than ibuprofen; in comparison, the label showed rates of 3.5% for Vioxx and 3.0% on ibuprofen, identifying the data only for the "hypertension" endpoint (Kessler Ex. 5; Kaiser Dep. 164:7-167:11); and

b.      Results of Protocol 034, dated September 16, 1998, showing a statistically significant excess risk of exceeding the "Predefined Limits of Change" (PDLOC) for systolic blood pressure on Vioxx compared to diclofenac. (16, 17 and 8% in the 12.5 mg Vioxx, 25 mg Vioxx. and 150 mg diclofenac groups, respectively); (Kaiser Dep. 169:12-173:8).

**B.      Knowledge of Risk Arising from the VIGOR Study Was Misrepresented or Not Disclosed.**

137.    Results of the VIGOR study of Vioxx 50 mg compared to naproxen 1000 mg / day were unblinded on March 9, 2000. The preliminary analysis showed 17 MI's in the Vioxx group compared to 4 in the naproxen group. Complete data showed that there were 20 MI's on Vioxx compared to 4 on naproxen. On March 27, 2000, Merck issued a press release that attributed the

difference in MI rates to a cardioprotective effect of naproxen. The press release also said there was

no difference in the rate of thrombotic events in the Vioxx OA trials or in an interim analysis of data

from two trials of Vioxx in Alzheimer's patients.  (MacGregor Report at 10-11; Kessler Report at

9-19.)

## VI.   MERCK FRAUDULENT MARKETING SCHEME WAS DIRECTED AT DECISION MAKERS WITHIN LDHH

### A.   Targeting of LDHH

138.   Merck employed a strategy of directly calling on key decision makers within LDHH

in order to ensure unrestricted access to Merck products.  A 2002 Merck "Customer Profile for the

State of Louisiana" (MRK-AGLAAB0000287-MRK-AGLAAB0000295, SBM Decl. Ex. 44)

described "Merck Strategy & Tactics":

> \*        Continue to work with the State of Louisiana and the DHH
>          through Provider Synergies to ensure unrestricted access to
>          Merck products.
>
> \*        Maximize share for Merck products on the PDL.
>
> \*        Continue to develop product advocates with   Medicaid P&T
>          and DUR members.

The 2003 Customer Profile espoused the same strategy ( MRK-AGLAAD0000706-712, SBM Decl.

Ex. 45)

139.   Regional Medical Director Fran Kaiser repeatedly met with P&T chair Dr. Vincent

Culotta to deliver Merck's clinical message (Kaiser Depo at 101:11-105:21; 130:2-13);  (MRK-

MEH0016615-618, SBM Decl. Ex. 46);

140.     Merck responded to specific requests by LDHH P&T Committee Chair Dr. Vincent Culotta for clinical information about Vioxx's CV and GI profiles with Merck-sponsored studies. (MRK-MEH0016615-618)

141.     Merck National Account Executive Mary Ogle "regularly call[ed] on the chief of P&T and Pharmacy Director... to ensure that they fully understand the value that ou product portfolio provides to the appropriate patient populations vs. the competition."   ( May 28, 2005 Memo from Mary Ogle to Marc Dervishian re Push-Through and Pull-Through tactical plans for LA Medicaid MRK-AGLAAD0020006, SBM Decl. Ex. 47); Mary Ogle's 2003 Updated Tactical Plan for the Louisiana Medicaid Market stated that Government Affairs would, "conduct along with NAE [National Account Executive] and RMD [Regional Medical Director] quarterly dinner meetings with P&T chair." (MRK-AGLAAD0020750-752, SBM Decl. Ex. 48).

142.     Regional Medical Direct Fran Kaiser met with members of the DUR Board to deliver Merck's clinical message re Vioxx. (MRK-MEH0016700-701, SBM Decl. Ex. 49)

143.     Merck's office based sales force targeted P&T committee members to deliver Merck's clinical message about Vioxx.  (MRK-EBES0031269-70: "The office-based team should contact P&T Committee Member to make sure that they are fully aware of the benefits and feautres of thsoe products up for review," SBM Decl. Ex. 50;   MRK-AGLAAD0010034, "have our representatives touch base with member of the [P&T] Committee to ensure that they have the latest and greatest information on... Vioxx," SBM Decl. Ex. 51; MRK-AGLAAD0020006: "regularly call on chief of P&T and Pharmacy Director... to ensure that they fully understand the the value that our product portfolio provides...," SBM Decl. Ex. 52; MRK-AGLAAD0001024: "Louisiana Medicaid

-52-

Tactical Plan... Call on P&T Committee members...," SBM Decl. Ex. 53; MRK-AGLAAD0020750-52: "messaging with targeted P&T members prior to and immediately following P&T Meetings").

144.    Merck's sale representatives called on doctors who would become members of the P&T committee, delivering Merck's pro-Vioxx message, including CV and GI issues, throughout the time Vioxx was on the market, even before the P&T Committee was empaneled. (Spreadsheet of P&T Sales rep. contacts with P&T Committee members, SBM Decl. Ex. 54; Declaration of David Franco).

145.    Merck employed a strategy of directly calling on LDHH's consultant Provider Synergies in order to ensure unrestricted access to Merck products.  An October 9, 2002 Customer Profile for Provider Synergies, L.L.C. describes "Merck's Strategy":  Merck will promote the full product line emphasizing the scientific/clinical and financial value so that Medicaid patients will have unrestricted access to Merck products.  The primary approach will be to communicate strong clinical differentiation messages in an effort to establish agreement on a premium price threshold that Provider Synergies can recommend to the State." (MRK-AGLAB0000399-400, SBM Decl. Ex. 55).

146.    In keeping with this strategy, Merck provided clinical dossiers to Provider Synergies. (MRK-MEH0013314-17, SBM Decl. Ex. 56)

147.    In furtherance of this strategy, a Merck regional medical director met with Provider Synergies twice a year to deliver clinical information about Vioxx. (Deposition of Kerry Edwards (Edwards Depo) at 81:4-82:5, SBM Decl. Ex. 57).

148.    P&T Directors and Members have confirmed that they were repeatedly detailed by Merck's sales force regarding Vioxx.  (Affidavit of P&T Committee Chair Dr. Vincent Culotta,

M.D., SBM Decl. Ex. 58; Affidavit of P&T Committee Chair Dr. Richard Doskey, M.D., SBM Decl.

Ex. 59, and Affidavit of P&T Committee member Dr. Brobson Lutz, M.D., SBM Decl. Ex. 60.)

**B.   Marketing to LDHH  was consistent with the national scheme outlined hereinabove, which exaggerated the comparative GI benefits of Vioxx while downplaying cardiovascular risks.**

149.   A "National Cross-Functional Team Meeting for Vioxx" attended by Warren

Lambert, the sales manager responsible for directing sales call on P&T members repeatedly stressed

the need for "National consistency around messaging, stated that "core messages will remain focused

on EFFICACY and safety," including "GI safety" and instructed Merck sales teams how to "handle

obstacles" surrounding CV issues. (MRK-EBES0000190-MRK-EBES0000207, SBM Decl. Ex. 61).

150.   The 2001 "Tactical Plan for Vioxx ARKLATEX Region", which was provided to the

sales team that called on Louisiana Medicaid physicians and P&T committee members instructed

these sale representatives to "Completely resolve physician concerns regarding renal and

cardiovascular issues (including high blood pressure and edema) using the renal card, the CV card,

the PIR available from MEDSA and the Canon Reprint." (MRK-EBES0000023-28, at 26, SBM

Decl. Ex. 62).

151.   The 2002 "Tactical Plan for Vioxx ARKLATEX Region", which was provided to the

sales team that called on Louisiana Medicaid physicians and P&T committee members instructed

these sale representatives to "Deliver efficacy message first which differentiates [sic] Vioxx and

drive market share in the Coxib Class....Provide balanced response to physician CV and Renal

obstacles and return to the core messages for Vioxx.... Use annotated product circular to provide core

messages for Vioxx following expected label revisions for RA and VIGOR.... [and] Utilize approved

launch pieces upon receipt following expected label revisions for RA and VIGOR." (MRK-EBES000001-11, at 7-8, SBM Decl. Ex. 63).

152.    A January 24, 2004 memo from sales manager Warren Lambert to his team of office-based sales representatives re "Louisiana Medicaid – Action Required," stated:

> There is a formulary meeting in March where decisions will be made on which products are preferred on the "pharmacopoeia". The office-based team should contact each P&T Committtee member to make sure that they are fully aware of the benefits and features of those products up for review.... The team in Upper Gwynned (Merck national headquarters) has created an outstanding clincial package."

(MRK-EBES0031269-MRK-EBES0031270)

153.    Sales personnel calling on P&T committee members were told to provide "approved messages on the CV data." They were further told, "we need to have a sense of urgency as we call on our Medicaid flagged physicians and the P&T Committee Members and follow through on our Mediciaid Action plan... We have the right team in place so make sure we make every effort to insure Vioxx wins this formulary decision for the right reasons.  Good luck and good selling."(July 28, 2004 memo re Updated P& Related Activities Presentation," MRK-AGLAAF0002000-2001, SBM Decl. Ex. 64).

154.    The Vioxx product messages delivered by sales representatives to Medicaid P&T committee members were all developed by Merck national headquarters.  (Lambert Depo at 68:15-71:19, SBM Decl. Ex. 65).

155.    The clinical messages delivered by regional medical director Kerry Edwards to Provider Synergies at his twice-annual meetings were all developed and approved by Merck national headquarters.  (Edwards Depo at 55:1-23; 109:6-110:15, SBM Decl. Ex. 66).

Case 2:05-md-01657-EEF-DEK   Document 36600   Filed 03/10/10   Page 56 of 69

156.    The Merck National Account Executive responsible for calling on Provider Synergies confirmed that all information he provided to Provider Synergies re Vioxx would have been developed and approved by Merck corporate headquarters. (Steven Shearer Depo at 24:23-26:8, SBM Decl. Ex. 67)

157.    Merck National Account Executive for the Louisiana Medicaid account, Mary Ogle, testified that any product message would have come from Merck corporate headquarters. (Mary Ogle Depo at 330:11-332:14, SBM Decl. Ex.68).

## VII.    INFORMATION PROVIDED TO LDHH WAS INCOMPLETE, MISLEADING, AND FAILED TO DISCLOSE CRITICAL INFORMATION KNOWN BY MERCK ABOUT THE TRUE RISK AND BENEFIT PROFILE OF VIOXX.

158.    Information provided in Provider Synergies monographs was compiled entirely on information from Merck's label and published literature.  (Taylor Depo at 19:10-13,44:2245:12, 81:16-17.)  Provider Synergies monographs provided information largely consistent with Merck's clinical messages, and as such failed to adequately apprise LDHH of cardiovascular risks while overstating GI benefits.  (Abramson Affidavit at ¶¶6, 7).

159.    Neither the Provider Synergies Monographs (Provider Synergies Monographs, Ex. ???), the direct communications from Merck to LDHH, nor the publications of Merck-sponsored clinical trials revealed that by April 2003, Merck's data showed that Vioxx had about a four times greater risk of GI harm compared to placebo, although the Laine study stated that the Vioxx ulcer rate was "comparable to placebo" (See PSS No. 83, supra; see also 2002 -04 monographs, SBM Decl. Ex. 69, Kaiser Exs. 30, 36 and 40, SBM Decl. Exs. 70, 71 and 72 respectively, and her deposition testimony at pp. 197:10-198:24, 204:22-207:5, 207:12-208:5, and 220:12-211:17.)

160.     Neither the Provider Synergies Monographs, the direct communications from Merck to LDHH, nor the publications of Merck-sponsored clinical trials revealed that Vioxx was only tested to show GI benefit against high doses of ibuprofen and other NSAIDs that are not taken by 90% of the NSAID users, while people who used lower doses (the vast majority) got no benefit (See PSS No. 94-100, supra; Response of Neil Julie, ¶4, SBM Decl. Ex. 73; see also 2002 -04 monographs, Kaiser Exs. 30, 36 and 40, and her deposition testimony at pp. 197:10-198:24, 204:22-207:5, 207:12-208:5, and 220:12-211:17.)

161.     Neither the Provider Synergies Monographs, the direct communications from Merck to LDHH, nor the publications of Merck-sponsored clinical trials revealed that although the VIGOR study publication concluded Vioxx showed a statistically significant benefit over Naproxen for the most serious GI events, the VIGOR study results only showed such a benefit for patients taking steroids, which comprise only a small percentage of Vioxx patients. (Abramson affidavit, ¶26; see also 2002-04 monographs, Kaiser Ex. 30, 36 and 40), and her deposition testimony at pp. 197:10-198:24, 204:22-207:5, 207:12-208:5, and 220:12-211:17.)

162.     Neither the Provider Synergies Monographs, the direct communications from Merck to LDHH, nor the publications of Merck-sponsored clinical trials revealed that by February 27, 2003, Merck knew that the rate of the most serious GI events in the osteoarthritis studies was higher on Vioxx than on the traditional NSAIDs such as ibuprofen by the end of the study. (See PSS No. 91, supra; Sales Depo at 190:9-196:21; Yu Memo, 2/27/03; see also 2002 -04 monographs, Kaiser Exs. 30, 36 and 40, and her deposition testimony at pp. 197:10-198:24, 204:22-207:5, 207:12-208:5, and 220:12-211:17).

163.    Neither the Provider Synergies Monographs, the direct communications from Merck to LDHH, nor the publications of Merck-sponsored clinical trials revealed that The VIGOR study publication did not include complete cardiovascular (CV) data that was pre-specified for analysis, which would have shown excess CV risk to all patients, not just the ones who were "Aspirin-indicated" (ie, had prior CV event). (See PSS 39, supra; see also 2002 -04 monographs, Kaiser Exs. 30, 36 and 40, and her deposition testimony at pp. 197:10-198:24, 204:22-207:5, 207:12-208:5, and 220:12-211:17)

164.    Neither the Provider Synergies Monographs (Provider Synergies Monographs, the direct communications from Merck to LDHH (Kaiser Depo at 131:13-20 "If it wasn't in the label, it wasn't discussed), nor the publications of Merck-sponsored clinical trials revealed that The VIGOR study publication did not include the "Overall safety" results showing that Vioxx patients had 21% more serious adverse events than naproxen patients, when all types of harm were considered, which demonstrated that any GI benefit was outweighed by CV harm (Abramson affidavit, ¶12).

165.    Neither the Provider Synergies Monographs (Provider Synergies Monographs, the direct communications from Merck to LDHH (Kaiser Depo at 131:13-20 "If it wasn't in the label, it wasn't discussed), nor the publications of Merck-sponsored clinical trials revealed that by 2001, Merck knew that Merck-sponsored Alzheimer's studies showed an excess risk of mortality among Vioxx patients versus placebo, and the same data showed an excess of cardiovascular mortality (Abramson affidavit, ¶31).

166.    Neither the Provider Synergies Monographs (Provider Synergies Monographs, the direct communications from Merck to LDHH (Fran Kaiser Depo at 131:13-20 "If it wasn't in the

label, it wasn't discussed), nor the publications of Merck-sponsored clinical trials revealed that although by April 2002, Merck's OA data showed a statistically significant 3-fold risk of thrombotic CV events compared to placebo, a 2002 Merck-sponsored study publication only addressed pre-market OA studies and stated that there was no difference between Vioxx and placebo. (Abramson affidavit, ¶22).

167.    Neither the Provider Synergies Monographs (Provider Synergies Monographs, the direct communications from Merck to LDHH (Kaiser Depo at 131:13-20 "If it wasn't in the label, it wasn't discussed), nor the publications of Merck-sponsored clinical trials revealed that the VIGOR study showed a statistically significant 27% greater rate of hospitalizations for Vioxx patients as opposed to Naproxen.  Although there were 20 fewer hospitalizations for gastrointestinal problems, there were 41 more cardiovascular hospitalizations among people taking Vioxx.  This data, which would have demonstrated that treatment with Vioxx presented a significant economic disadvantage to treatment with Naproxen was never published. (Abramson affidavit, ¶32).

## VIII.   DECISION MAKERS WITHIN LDHH RELIED ON MERCK'S OMISSIONS AND REPRESENTATIONS WITH RESPECT TO VIOXX

### A.    In spite of frequently raising concerns about the safety and efficacy of Vioxx, key LDHH and Provider Synergies were unaware of facts misrepresented and concealed by Merck.

168.    LDHH was concerned about cardiovascular issues, and considered those issues in determinating whether to restrict access to Vioxx.  The P&T Committee frequently raised questions about cardiovascular concerns surrounding Vioxx in its deliberations about whether to include Vioxx on the PDL.  (Minutes and Transcript of May 8, 2002 P&T Committee Meeting (Previously marked s Ex. 23 to Defendant's Statement of Undisputed Material Facts, SBM Decl. Ex. 74; (Transcript of

Dec. 17, 2003 P&T Committee meeting (LaAG-VIOXX-00460-536, SBM Decl. Ex. 75). Merck had personnel present at P&T Committee meetings where these concerns were raised, including regional medical directors Fran Kaiser and Kerry Edwards. (*Id.*) Yet at no time did anyone from Merck disclose any information regarding the cardiovascular risks beyond that contained in the Merck label. (Kaiser Depo at 131:13-20 "If it wasn't in the label, it wasn't discussed; Kerry Edwards Depo at 110:2-15)

169.    LDHH consultant Provider Synergies likewise raised cardiovascular concerns about Vioxx in each one of its meetings with Merck regional medical director Kerry Edwards. (Edwards Depo at 81:4-82:5). Kerry Edwards never provided any information beyond that which was provided in the label in response to these frequent inquiries. (Edwards Depo at 110:2-15). Even after the Vioxx label was changed to incorporate VIGOR data, it stated the significance of the cardiovascular finding in the studies cited was "unknown." (2002 Vioxx label)

170.    At one point, Taylor directly asked Merck RMD Kerry Edwards whether Merck had any information about cardiovascular risks that was not available in the published literature. (MRK-AHN0050573-74, SBM Decl. Ex. 76). Taylor even posed the question, "How can we continue to recommend Vioxx as a preferred drug in light of this information?" (*Id.*). Edwards forwarded this request on the corporate headquarters in the form of a P.I.R. (*Id.*) Still Merck failed to disclose its knowledge of the true cardiovascular risks of Vioxx. (See e.g. Contested Facts 159-167, supra).

171.    In spite of frequent inquiries regarding cardiovascular risks, Merck never disclosed any of the following to P&T Director Dr. Vincent Culotta, P&T Director Richard Doskey, or LDHH Secretary David Hood:

\*      That Vioxx was not safe and effective when approved in 1999 due to the signal of CV harm that was not adequately investigated.

\*      That Merck, the manufacturer of Vioxx, was aware that Vioxx had the potential to induce cardiovascular side effects and failed to adequately investigate that question.

\*      That Merck manipulated published literature to greatly exaggerate the gastrointestinal (GI) benefits of Vioxx, including:

     A.      By April 2003, Merck's data showed that Vioxx had about a four times greater risk of GI harm compared to placebo, although the Laine study cited in Provider Synergies' Monographs provided to the P&T Committee stated that the Vioxx ulcer rate was "comparable to placebo";

     B.      Vioxx was only tested to show GI benefit against high doses of ibuprofen and other NSAIDs that are not taken by 90% of the NSAID users, while people who used lower doses (the vast majority) got no benefit;

     C.      Although the VIGOR study publication cited in the Provider Synergies monographs concluded Vioxx showed a statistically significant benefit over Naproxen for the most serious GI events, the VIGOR study results only showed such a benefit for patients taking steroids, which comprise only small percentage of Vioxx patients.

     D.      By February 27, 2003, Merck knew that the rate of the most serious GI events in the osteoarthritis studies was higher on Vioxx than on the traditional NSAIDs such as ibuprofen by the end of the study period, but this information was not disclosed in any of the Monographs

\*      That Vioxx significantly increased the risk of serious cardiovascular harm whether or not a patient had a previous history of cardiovascular disease (i.e., was "aspirin-indicated"), that Merck's evidence showed that this risk was not mitigated by concomitant treatment with low-dose aspirin, and that Merck manipulated published literature from its sponsored research to minimize the cardiovascular risks of Vioxx, including:

     A.      The VIGOR study publication referenced in the Provider Synergies Monographs did not include complete cardiovascular (CV) data that was pre-specified for analysis, which would have shown excess CV risk to all patients, not just the ones who were "Aspirin-indicated" (ie, had prior CV event);

B.  The VIGOR study publication did not include the "Overall safety" results showing that Vioxx patients had 21% more serious adverse events than naproxen patients, when all types of harm were considered, which demonstrated that any GI benefit was outweighed by CV harm;

C.  By 2001, Merck knew that Merck-sponsored Alzheimer's studies showed an excess risk of mortality among Vioxx patients versus placebo, and the same data showed an excess of cardiovascular mortality;

D.  Although by April 2002, Merck's OA data showed a statistically significant 3-fold risk of thrombotic CV events compared to placebo, a 2002 Merck-sponsored study publication cited in the Provider Synergies Monographs provided to the P&T Committee only addressed pre-market OA studies and stated that there was no difference between Vioxx and placebo.

*  That while Merck-published studies cited in the Provider Synergies monographs concluded that further study was necessary to determine whether Vioxx posed a cardiovascular risk, Merck's internal documents recognized that Vioxx did pose a cardiovascular risk and Merck consciously steered its sponsored research away from investigating that risk.

*  That Vioxx was significantly less safe and no more effective than so-called traditional NSAIDs such as Ibuprofen and Naproxen, drugs which cost a fraction of the price of Vioxx.

(See Hood Affidavit, SBM Decl. Ex. 7; Culotta Affidavit; Doskey Affidavit)

172.  LDHH Secretary Hood, P&T Committee Chair Dr. Vincent Culotta, and P&T Committee Chair Richard Doskey were unaware of any of the information which Merck failed to disclose set forth at No. 171, supra.   (See Hood Affidavit, Culotta Affidavit, Doskey Affidavit)

173.  LDHH Secretary David Hood, P&T Committee Chairman Dr. Vincent Culotta and P&T Committee Chairman Dr. Richard Doskey all believed that while there were various risks associated with the use of Vioxx, the risks were of acceptable levels for a prescription drug of widespread analgesic use such as Vioxx and that those risks were outweighed by the benefits provided by the drug   (See Hood Affidavit, Culotta Affidavit, Doskey Affidavit)

**B.      LDHH had the ability to restrict or deny reimbursements of Vioxx prescriptions, but failed to do so as the result of its reliance on misrepresentations, concealment and omissions of material facts by Merck.**

174.     LDHH not required to reimburse and would not have reimbursed drugs not approved by the FDA. (See Hood Affidavit)

175.     Louisiana's Medicaid program has been described by Merck's own sales force as one of "very high control," which is to say, LDHH exercises a great deal of control over reimbursement of prescription drugs. (MRK-ALGAAB0000398-400).

176.     At all times Vioxx was on the market, including prior to the adoption of the PDL in 2001, the state of Louisiana was able to restrict reimbursement of prescriptions for safety reasons by use of Drug Utilization Review prospective deny edits.  Prior to 2001, LDHH had mechanisms, including DUR, to limit or legally restrict the reimbursement of FDA-approved drugs as far back as 1991 (Wendt Depo at 34:12-17, 195:12-14, 36:10-14, SBM Decl. Ex. 78).  DUR prospective edits went electronic at the point of sale on July 1, 1996 (Wendt Depo at 37:18-22).  Prior to 2001, LDHH did in fact implement DUR edits to restrict reimbursement of FDA-approved drugs (Wendt Depo at 178:20-25, 180:17-19).  Most of the DUR edits have a safety issue component. (Wendt Depo at 189:7-15).  For example, DUR Board limited the use of Tylenol because of liver toxicity (Wendt Depo at 185:10-25), and limited the use of the NSAID ketorolac, brand name Toradol, for its potential side effect of causing bleeding (Wendt Depo at 189:19-24).  In fact, the DUR board implemented a prospective DUR deny edit for NSAIDs in June, 2001 which was effectively a prior authorization program in that prescriptions for therapeutic duplicates of NSAIDs were payable only after discussion with and approval from the prescriber (LDHH DUR Annual Report 10-1-00 thru 9-30-01 Vioxx-LaAG-004653-004966, SBM Decl. Ex. 79).  After the FDA issued an advisory about

cardiovascular risks in Cox-2's in December of 2004, LDHH added a prospective deny edit to address cardiovascular concerns presented by Cox-2 inhibitors. (See Wendt Depo at 111:5-116:8**.** The propsective deny edit for Cox-2's reduced reimbursements for Cox-2's significantly, according to one measure by more than 30 percent (Harris report, ¶8(d); SBM Decl. Ex. 80).

177.   Had adequate information about Vioxx been disclosed, a reasonably prudent DUR Board would have implemented DUR prospective deny edits in conformity with clinical information to prevent the use of Vioxx in patients in whom it was not indicated. (Affidavit of Terry Leach, ¶19).

178.   Had LDHH Secretary Hood been aware of concealed material facts about Vioxx and had the Drug Utilization Review Board (DURB) recommended prospective edits to prevent the use of Vioxx in patients for whom Vioxx was not indicated, he would have approved the use of such edits to promote the safety of Medicaid patients. (See Hood Affidavit).

179.   After the Louisiana legislature approved the creation of a closed formulary, LDHH established a P&T Committee to review critical information about pharmaceutical products and make recommendations to the Secretary regarding drugs to be included on a preferred drug list, and the Secretary had responsibility for approving drugs for inclusion on the preferred drug list. (See Hood Affidavit)

180.   Had they been made aware of the facts not disclosed to them (as set forth in No. 171, supra), P&T Committee Chairs Dr. Vincent Culotta and Dr. Richard Doskey would not have recommended inclusion of Vioxx on the preferred drug list. (See Doskey Affidavit, Culotta Affidavit);

181.    Had he been made aware of the facts not disclosed to him (as set forth in No. 171, supra), Secretary Hood would not have approved the recommendations of the P&T Committee that Vioxx be included on the preferred drug list.

182.    Had he been made aware of the facts not disclosed to him (as set forth in No. 171, supra), Secretary Hood would not have been willing to reimburse Vioxx prescriptions, and in no event would have been willing to be reimburse prescriptions of Vioxx at a cost greater than traditional NSAIDs such as ibuprofen and naproxen, which were both available as low cost generics both by prescription and over the counter. (Hood Affidavit)

183.    Had he been made aware of the facts not disclosed to him (as set forth in No. 171, supra), Secretary Hood would have done everything within his power as Secretary to ensure that LDHH neither bore the cost of reimbursing prescriptions of Vioxx nor exposed Louisiana residents to the increased risk of serious cardiovascular harm from Vioxx. (Hood Affidavit)

184.    Merck internal documents boast of Merck's success in maintaining unrestricted access to Vioxx. (MRK-AGLAAF0001609-MRK-AGLAA0001610, SBM Decl. Ex. 82; MRK-MEH0016617-MRK-MEH0016618, SBM Decl. Ex. 83; MRK-EBE0027930, SBM Decl. Ex. 84; MRK-AGLAAD0012178, SBM Decl. Ex. 85.)

## IX.    EVIDENCE OF LDHH'S ENTITLEMENT TO RECOVERY

### A.    REDHIBITION

185.    Vioxx had a redhibitory defect in that the risks associated with its use so outweighed its benefit that it was suitable for use in patients.  (Sept. 30, 2004 Press Release by Merck re withdrawal from the market JAB00221-222, SBM Decl. Ex. 86; Kessler Depo at 132:8-134:14; 164:3-12; Abramson Affidavit, ¶15)

-65-

186.     Rational buyers knowing the full truth about Vioxx would not have purchased the drug. (Report of Dr. John Abramson, ¶15; Affidavit of David Hood; see also facts regarding concealment of risk of Vioxx, supra, particularly Nos. 159-167)

187.     Vioxx would not have commanded a premium price because it was no more effective and far less safe than other less expensive NSAIDs on the market. (Report of Dr. John Abramson, ¶15)

188.     In no event would LDHH have been willing to be reimburse prescriptions of Vioxx at a cost greater than traditional NSAIDs such as ibuprofen and naproxen, which were both available as low cost generics both by prescription and over the counter. (Affidavit of David Hood).

189.     The total amount expended by LDHH for Vioxx, net of rebates, was $20,663,672.00 (Report of Dr. Jeffrey Harris, ¶8(a)

190.     LDHH cannot return the Vioxx for which it paid, because the Vioxx has been destroyed by consumption by Medicaid patients.

191.     Because the cost of hospitalizations associated with Vioxx use are greater than those with traditional NSAIDs (See No. 167, supra), the value conferred on LDHH by Vioxx is negative.

192.     Evidence of the price differential between what LDHH paid for Vioxx and what Vioxx would have paid for less expensive, equally effective and safer traditional NSAIDs is contained in the Unisys data to which Unisys corporate representative Jeff Raymond is prepared to testify (See Affidavit of Jeff Raymond, SBM Decl. Ex. 87).

**B.     RESTITUTION**

193.     The total amount expended by LDHH for Vioxx as a result of Merck's unfair trade practice is $20,663,672.00. (Report of Jeffrey Harris, ¶8(a)

194.    Assuming arguendo that Merck lacked adequate information to justify removal of Vioxx from the market until March of 2000 (when the final VIGOR results were available to Merck), LDHH"s expenditures for Vioxx from March 2000 through its removal from the market, net of rebates, were $18,316,860.

195.    The total amount of LDHH's expenditures for Vioxx as a result of LDHH's decision to eliminate a prior authorization for Vioxx is $2,000,000. (Harris report, ¶8(C)

196.    The amount that LDHH would have expended for Vioxx reimbursement assuming certain reasonable prospective deny edits based on objective criteria can be obtained from the Unisys prescribing data, which contains all of the data necessary to calculate amounts spent in reimbursements for any drug, including, but not limited to data on date of service, date of payment, prescriber, drug name, drug NDC, dosage, quantity, days supply, dispensing fees, diagnosis codes, prior authorization requests, patient identity and total amount paid for each prescription. (See Affidavit of Jeff Raymond)

C.    ACTUAL LOSSES BY LDHH

197.    Whatever this Court's factual findings are regarding what steps LDHH would have taken had it known of material concealed information about Vioxx, LDHH's actual losses as a result of any such decisions can be determined by reference to the Unisys data, which contains all of the data necessary to calculate amounts spent in reimbursements for any drug, including, but not limited to data on date of service, date of payment, prescriber, drug name, drug NDC, dosage, quantity, days supply, dispensing fees, diagnosis codes, prior authorization requests, patient identity and total amount paid for each prescription. (See Affidavit of Jeff Raymond)

198.    LDHH's actual losses as a result of the decision to remove a prior authorization are $2,000,000 (expert report of Jeffrey Harris)

199.    Merck itself calculated the effect of implementation of prior authorizations on Vioxx.(*See e.g.* MRK-AGLAAD0009918-MRK-AGLAAD000942; MRK-AGLAAF0001588-MRK-AGLAAF0001597).  Having calculated the effect of a prior authorization on Louisiana Medicaid for Vioxx sales, National Accounte Executive Mary Ogle remarked that because of the prior authorization requirement, Merck's sales "plummet[ed]." MRK-AGLAAD0021844).

200.  Merck itself routinely uses economic analyses to project the impact of various market events on sales of its products, and considers such analyses to be based on sound reliable economic methodologies and sufficiently accurate upon which to base its business decisions. (Deposition of Wendy Lepore, pp. 21-31).

Respectfully submitted, this 9th day of March, 2010.

/s/ Stephen B. Murray, Jr.
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
Justin Bloom
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100

James D. Caldwell, Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020

-68-

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Plaintiff's Memorandum In Opposition To Motion To Exclude Testimony Of John David Abramson, M.D. has this day been served on Liaison Counsel, Phillip A. Wittmann and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to Pretrial Order No. 8B, on this the 9th day of March, 2010.

*/s/ Stephen B. Murray, Jr.*