UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No.  1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, Plaintiffs | JUDGE ELDON E.  FALLON MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., Defendants | Case No.  05-3700 |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.2, Plaintiff, the State of Louisiana ex re James D. Caldwell,

Jr., Attorney General respectfully submits this response to defendant's statement of material facts.

## I. THE STATE OF LOUISIANA'S MEDICAID PROGRAM

### A. Overview Of The Louisiana Medicaid Program

1.  The Louisiana Department of Health and Hospitals ("LDHH") administers the State's

Medicaid program. All Louisiana Medicaid recipients have the costs of their

prescriptions paid directly by the Medicaid Program. (Dep. of Charles Castille

("Castille Dep.") 33:8-24, Dec. 10, 2009;  attached as Ex. 1.) *See also* Louisiana's

-1-

Medicaid Program, *available at* http://www.dhh.louisiana.gov/offices/publications/pubs-92/Flyet.1020Medical%20Programs%2010-04.pdf (last visited Feb. 18, 2010).

**RESPONSE:** Undisputed

2.     Medicaid, an entitlement program created in 1965 by Title IX of the Social Security Act, is jointly funded by state and federal governments to provide healthcare coverage to low income families with dependent children and to elderly, blind or disabled individuals. 42 U.S.C. § 1396-1; 42 U.S.C. § 1396a(a)(10)(A)-(C). States create and administer their own programs, which must comply with certain federal guidelines. *See* 42 U.S.C. §1396(a).

**RESPONSE**: Undisputed

3.     Under federal law, state Medicaid programs are required to cover certain "mandatory" health benefits, such as physician and hospital services. States are permitted, but not required, to offer prescription drug benefits to Medicaid-eligible citizens. 42 U.S.C. § 1396a(a)(IO); *see also* 42 U.S.C. § 1396d(a)(12). Louisiana has chosen to offer prescription drug benefits in its Medicaid program. *See* Medicaid Pharmacy Benefits Management, Bureau of Health Services Financing, *available at* http://www.dhh.1ouisiana.gov/offices/?ID=340  (last visited Feb. 18, 2010).

**RESPONSE**: Undisputed

4.     States that decide to provide a pharmacy benefit receive both federal funding and rebates from pharmaceutical companies under the Medicaid Drug Rebate Program. 42 U.S.C. §1396r-8(a), (b); *see also* U.S. Dep't of Health & Human Servs., Centers

for Medicare and Medicaid Services, Medicaid Drug Rebate Program, Overview, *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram (last visited Feb.18.2010). This rebate program - created by the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90") - requires a drug manufacturer to enter into a national rebate agreement with the Secretary of the Department of Health & Human Services ("HHS") in order for states to receive federal funding for coverage of its drug products for Medicaid patients. *Id.* At all relevant times, Vioxx was subject to a rebate agreement between the Secretary of HHS and Merck. *(See* Supp'l Rebate Agreement (attached as Ex. 2).)

RESPONSE: Plaintiff contests the inference that the matters asserted in this paragraph are applicable to Vioxx on the grounds that Vioxx was not safe and effective when it was approved on May 20, 1999; that there was a pre-approval signal of cardiovascular risk that was neither disclosed to plaintiff nor adequately investigated prior to marketing; that adequate pre-market investigation would have confirmed the drug was cardiotoxic; that Vioxx would not have been approved had Merck adequately investigated the signal of CV risk; that Vioxx would not have been subject to a rebate agreement had it not been approved. (See Deposition of David Kessler (Kessler Depo) at 132:8-134:14; 164:3-12, SBM Dec. Ex. 2; Affidavit of David Hood (Hood Affidavit), SBM Dec. Ex. 77). Plaintiff incorporates by reference this response into its response to each and every paragraph of Defendant's Statement of Uncontested Fact.

5.     States may negotiate with pharmaceutical companies for supplemental rebates in addition to those provided under the federal rebate program. *See* Safe and Effective Approaches to Lowering State Prescription Drug Costs: Best Practices Among State

Medicaid Drug Programs (Sept. 9,2004), *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram (last visited Feb. 18, 2010). *(See also* Dep. of Mary Julia Terrebonne ("Terrebonne Dep.") 81:19-82:20, 146:3-7, Nov. 9,2009 (attached as Ex. 3).)

RESPONSE: Undisputed

6.   States that elect to provide a prescription drug benefit must provide reimbursement for all "covered outpatient drugs" that are subject to a rebate agreement. "Covered outpatient drugs" means prescription drugs that are approved for safety and effectiveness under the federal Food, Drug, and Cosmetic Act. 42 U.S.C. § 1396r-8(a)(1), (d)(I)(b), (k)(2)(A) & (k)(6).

RESPONSE:  Plaintiff objects to this purported "Statement of Fact" insofar as it is nothing more than a conclusion of law.  To the extent that a response to this conclusion of law is called for, Plaintiff notes that states are not required to reimburse "covered outpatient drugs" that are subject to a rebate agreement per the exceptions recognized in 42 U.S.C. §§ 1396r-8(d)(I), (2), (4), which plaintiff contends are applicable to the Louisiana medicaid program and in particular to Louisiana's reimbursement of Vioxx.  (See generally, Opposition to Motion for Summary Judgment). Additionally, at all times Vioxx was on the market, the State of Louisiana was able to restrict reimbursement of prescriptions for safety reasons by use of Drug Utilization Review prospective deny edits.  (See Deposition of Melwyn Wendt (Wendt Depo) at 178:20-25, 180:17-19; 189:7-15,SBM Dec. Ex. 78)  Moreover, plaintiff contests the inference that the matters asserted in this paragraph are applicable to Vioxx on the grounds that Vioxx was not safe and effective when it was approved on May 20, 1999; that there was a pre-approval signal of cardiovascular risk that

was neither disclosed to plaintiff nor adequately investigated prior to marketing; that adequate pre-market investigation would have confirmed the drug was cardiotoxic; that Vioxx would not have been approved had Merck adequately investigated the signal of CV risk; that Vioxx would not have been subject to a rebate agreement had it not been approved. (See Kessler Depo at.132:8-134:14; 164:3-12; Hood Affidavit).

7.     There are four exceptions to the mandatory reimbursement requirement. Specifically, coverage may be denied where: (1) a prescription is not made for a "medically accepted indication"; (2) a prescription involves certain specified categories of drugs *(e.g.,* anorexics, fertility drugs, cough and cold medicine, minor tranquilizers, and cosmetic drugs) or certain specified indications (such as smoking cessation); (3) a state has executed a special rebate agreement with the manufacturer, approved by the Secretary of HHS, specifically restricting coverage of the prescription; or (4) a state has excluded coverage of the drug from its formulary by following the requirements set forth in the federal Medicaid statute (including making specified findings in writing, amending state law to authorize the restriction, and securing approval from the Secretary of HHS). 42 U.S.C. §§ 1396r-8(d)(I), (2), (4). *(See also* Report of Jerry F. Wells ("Wells Rep.") 9 (attached as Ex. 4).)

**RESPONSE**: Plaintiff objects to this purported "Statement of Fact" insofar as it is nothing more than a conclusion of law.  To the extent that a response to this conclusion of law is called for, please see Response to Statement of Uncontested Fact No. 6, *supra*.

8.     The federal Medicaid statute defines "medically accepted indications" as all uses approved by the Food & Drug Administration ("FDA"), as well as any non-approved

uses supported by the compendia listed in the statute: the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information, or the DRUGDEX Information System. 42 U.S.C. §§ 1396r-8(k)(6), (g)(l)(B)(I).

RESPONSE:  Plaintiff objects to this purported "Statement of Fact" insofar as it is nothing more than a conclusion of law.  To the extent that a response to this conclusion of law is called for, please see Response to Statement of Uncontested Fact No. 6, *supra*.

9.   States are permitted to subject any covered outpatient drug to "prior authorization," so long as the prior authorization program complies with certain requirements. 42 U.S.C. § 1396r-8(d)(1)(A). The state must first have a prior authorization program in place. To adopt a prior authorization program, a state must obtain approval of a plan from the Center for Medicare and Medicaid Services and enact enabling legislation. 42 C.F.R. § 430.12(C). If a prior authorization process is in place for a particular drug, state approval is required before that drug can be dispensed to a Medicaid patient. 42 U.S.C. § 1396r-8(d)(5). To comply with federal law, the state's approval system must: (1) provide a response by telephone or other telecommunication device within 24 hours of the request for authorization; and (2) permit a 72-hour supply of a covered outpatient drug to be dispensed in an emergency situation (as defined by the Secretary of HHS). 42 U.S.C. §§ 1396r-8(d)(1)(A), (d)(2), (d)(5). *(See also* Wells Rep. 9.)

RESPONSE:  Plaintiff objects to this purported "Statement of Fact" insofar as it is nothing more than a conclusion of law.  To the extent that a response to this conclusion of law is called for, please see Response to Statement of Uncontested Fact No. 6, *supra*.

**B.    Overview Of Louisiana Medicaid's Preferred Drug List And Prior Authorization Program**

10.    Under federal law, a "formulary" is a list of prescription drugs, both brand-name and generic, which are pre-approved for reimbursement under a state's Medicaid plan. 42 U.S.C. § 1396r-8(d)(1)(iv). Federal law does not require states to create a formulary, but if they do, it must meet the requirements set forth in the federal statute. 42 U.S.C. § 1396r-8(d)(4).

RESPONSE:  Plaintiff objects to this "Statement of Fact"as it is simply a conclusion of law.

11.    Prior to 2001, Louisiana did not have a formulary or Preferred Drug List ("PDL"). Instead, Louisiana required Medicaid reimbursement of all FDA-approved drugs, subject only to the few exceptions discussed in paragraph 7, *supra.* La Rev. Stat. Ann. § 46: 153.3(B) (1999).  *(See also* Pl.'s Resp. to Def.'s Second Interrog. No.3 (responses to interrogatories are attached collectively as Ex. 5) (prior to creation of a PDL, "DHH had an open formulary and DHH paid for drugs in which the drug manufacturer participated in the Federal Drug Rebate Program, the drug was not in one of the drug categories listed in the OBRA 90 excluded list as a category that does not have mandatory coverage by the state and the drug was not a DESI drug"); Dep. of Ben Bearden ("Bearden Dep.") 49:19-50:10, Oct. 12,2009 (attached as Ex. 6); Castille Dep. 27:16*28: 4; id.* 35:5-23 (**Q:** "[A]s the undersecretary, you understood

-7-

that Louisiana Medicaid could not legally restrict payments for any FDA-approved product; is that right?" **A:** "That is my understanding, yes, that is correct." **Q:** "And never tried to do so, to your knowledge?" **A:** "Not to my knowledge." **Q:** "And it would be strictly relying upon, again, the FDA's determination that a product has been approved for use by a prescribing doctor to a patient?" **A:** "That is correct, that's my understanding."); Report of Steven N. Wiggins ("Wiggins Rep.") ¶ 11 (attached as Ex. 7).)

**RESPONSE**:  Plaintiff objects to this purported "Statement of Fact" to the extent that it contains conclusions of law. The state does not contest that prior to 2001, Louisiana did not have a preferred drug list.  However, at all times Vioxx was on the market, including prior to the adoption of the PDL in 2001, the State of Louisiana was able to restrict reimbursement of prescriptions for safety reasons by use of Drug Utilization Review prospective deny edits.  Prior to 2001, LDHH had mechanisms, including DUR, to limit or legally restrict the reimbursement of FDA-approved drugs as far back as 1991 (See Wendt Depo at 34:12-17, 195:12-14, 36:10-14).  DUR prospective edits went electronic at the point of sale on July 1, 1996 (See Wendt Depo at 37:18-22).  Prior to 2001, LDHH did in fact implement DUR edits to restrict reimbursement of FDA-approved drugs (See Wendt Depo at 178:20-25, 180:17-19).  Most of the DUR edits have a safety issue component. (See Wendt Depo at 189:7-15).  For example, DUR Board limited the use of Tylenol because of liver toxicity (Wendt Depo at 185:10-25), and limited the use of the NSAID ketorolac, brand name Toradol, for its potential side effect of causing bleeding (See Wendt Depo at 189:19-24).  In fact, the DUR board implemented a prospective DUR deny edit for NSAIDs in June, 2001 which was effectively a prior authorization program in that prescriptions for therapeutic duplicates of NSAIDs

were payable only after discussion with and approval from the prescriber (See LDHH DUR Annual Report 10-1-00 thru 9-30-01 Vioxx-LaAG-004653-004966, SBM Dec. Ex. 79).  After a black box warning was added to the package insert for Celebrex, LDHH added a prospective deny edit to address cardiovascular concerns presented by that Cox-2 inhibitor.  (See Wendt Depo at 111:5-116:8)  Moreover, plaintiff contests the inference that the matters asserted in this paragraph are applicable to Vioxx on the grounds that Vioxx was not safe and effective when it was approved on May 20, 1999; that there was a pre-approval signal of cardiovascular risk that was neither disclosed to plaintiff nor adequately investigated prior to marketing; that adequate pre-market investigation would have confirmed the drug was cardiotoxic; that Vioxx would not have been approved had Merck adequately investigated the signal of CV risk; that Vioxx would not have been subject to a rebate agreement had it not been approved. (See Kessler Depo at 132:8-134:14; 164:3-12; Hood Affidavit). Plaintiff incorporates by reference this response into its response to each and every paragraph of Defendant's Statement of Uncontested Fact.

12.     Prior to 2001, Louisiana law also did not allow for the establishment of prior authorization requirements in the Medicaid pharmacy program. (Dep. of Gina Biglane ("Biglane Dep.") 25:2-27:7, Oct. 28, 2009 (attached as Ex. 8); *id.* 91:2-92:4; Terrebonne Dep. 144:7-12; Wells Rep. 9, 12.)

**RESPONSE**:  Plaintiff objects to this purported "Statement of Fact" insofar as it is nothing more than a conclusion of law. To the extent a response is required, plaintiff contests the inference that LDHH could not take steps to restrict the reimbursement of prescriptions for safety reasons.  For instance,  all times Vioxx was on the market, including prior to the adoption of the PDL in 2001, the State of Louisiana was able to and did in fact restrict reimbursement of prescriptions for safety

reasons by use of Drug Utilization Review prospective deny edits.  See Response to Statement No. 11, *supra*.

13.     In June 2001, the Louisiana legislature passed a law allowing LDHH to implement a PDL and prior authorization program. 2001 La. Act 395, *amending* La. Rev. Stat. Ann. § *46:153.3. (See also* Terrebonne Dep. 32:7-18; Wells Rep. 11-12; Wiggins Rep. ¶ 15.)

RESPONSE:  Plaintiff objects to this purported "Statement of Fact" insofar as it is nothing more than a conclusion of law. To the extent a response is required, Plaintiff contests the inference that the amendment to La. Rev. Stat. Ann. § 46:153.3 only allowed for the implementation of a prior authorization program.  In addition to allowing for the implementation of a prior authorization program, La. Rev. Stat. Ann. § 46:153.2 empowered the LDHH to "limit reimbursement for multi-source prescription drugs in accordance with state and federal law...." and "establish a drug formulary that utilizes a prior approval process *or any other process or combination of processes that prove to be cost-effective in the medical assistance program*." La.-R.S. §46:153.3 (emphasis added).

14.     On June 10, 2002, LDHH implemented that legislation. (Letter from B. Bearden to Prescribing Practitioners and Pharmacy Providers, May 24,2002 (LaAG-VIOXX-002294002304) (attached as Ex. 9); Biglane Dep. 91:2-22; Terrebonne Dep. 109:10-110:6; Wells Rep. 12.)

RESPONSE:  Plaintiff disputes the inference that LDHH did nothing to implement La.-R.S. §46-153.3 until June 10, 2002.  LDHH began to take steps to implement La.-R.S. §46:153.3 immediately upon its passage.  The preferred drug list and the prior authorization process were

finalized in April, 2002 and by a phased in process were implemented on June 10, 2002. (Deposition of Gina Biglane (Biglane Depo) at  91:11-22, SBM Dec. Ex. 92).

15.     If a drug appears on a state Medicaid program's PDL, then the cost of the prescription will be paid by that program without the need for any prior authorization. 42 U.S.C. § 1396r8(d)(1)(iv). *(See also* Terrebonne Dep. 33:18-34:13.) The LDHH Medicaid Pharmacy & Therapeutics ("P&T") Committee is responsible for recommending which drugs should be included on the Louisiana PDL and which drugs should require prior authorization. La. Rev. Stat. Ann. § 46:153.3(D). *(See also* Bearden Dep. 46:8-15.) Representatives of pharmaceutical companies play no role in discussions among P&T Committee members. *(See* Terrebonne Dep. 48:10-13.) At no point has a member of the pharmaceutical industry served on the LDHH P&T Committee. *(See id.* 57: 11-17.)

**RESPONSE**:  Plaintiff contests the inference that all prescriptions will be paid if a drug appears on the PDL insofar as it fails to recognize that even if a drug appears on the PDL, LDHH can restrict reimbursements for safety reasons through the implementation of Drug Utilization Review prospective deny edits.  See Response to Statement No. 9, *supra*.

Plaintiff disputes that representatives of pharmaceutical companies "play no role in discussions among P&T committee members."  Merck sales personnel targeted P&T committee members with the intention of delivering Merck's pro-Vioxx message to the P&T committee. (See e.g. MRK-EBES0031269-70, "The office-based team should contact P&T Committee Member to make sure that they are fully aware of the benefits and features of those products up for review," SBM Dec. Ex. 50; MRK-AGLAAD0010034, "have our representatives touch base with member of

-11-

the [P&T] Committee to ensure that they have the latest and greatest information on... Vioxx," SBM Dec. Ex. 51; MRK-AGLAAD0020006, "regularly call on chief of P&T and Pharmacy Director... to ensure that they fully understand the value that our product portfolio provides...," SBM Dec. Ex. 52; MRK-AGLAAD0001024, "Louisiana Medicaid Tactical Plan... Call on P&T Committee members...," SBM Dec. Ex. 53; MRK-AGLAAD0020750-52, "messaging with targeted P&T members prior to and immediately following P&T Meetings," SBM Dec. Ex. 48; MRK-AGLAAD0000706-712 "Customer Profile, State of Louisiana... Merck Strategy & Tactics... continue to develop product advocates with Medicaid P&T and DUR committee members," SBM Dec. Ex. 45; Affidavit of P&T Committee member Dr. Brobson Lutz (Lutz Affidavit), SBM Dec. Ex. 60). Representatives of Merck routinely met with and provided clinical information to Provider Synergies, Inc., the company retained by LDHH to make clinical presentations at P&T Committee meetings. (See Deposition of Kerry Edwards (Edwards Depo) at 62:1-13; 65:14-66:11, 81:4-82:5, SBM Dec. Ex. 66). Pharmaceutical company representatives were allowed to attend and offer comments at meetings of the LDHH P&T Committee ((Minutes and Tr. of May 8, 2002 P&T Committee meeting (Ex. 23 to Defendant's Statement of Undisputed Material Facts).

16.    The Secretary of LDHH has final approval authority and decides whether to accept the P&T Committee's recommendations regarding which drugs to place on the PDL. (Bearden Dep.152:20-l53:l2.)

**RESPONSE**: Undisputed.

## II. THE DEVELOPMENT AND FDA APPROVAL OF VIOXX

17.    Vioxx (rofexicob) is a prescription drug previously manufactured by Merck and approved by the FDA for use in the treatment of osteoarthritis, acute pain,

dysmenorrhea, rheumatoid arthritis, and migraine headaches. (Pl.'s Second Am. Compl. ("SAC") ¶ 60.) Vioxx belongs to a class of pain relievers known as non-steroidal anti-inflammatory drugs ("NSAIDs"). *(Id.* ¶ 10.)

RESPONSE:  Plaintiff does not contest that Vioxx was approved by the FDA on May 20, 1999; however, Plaintiff contests the inference that such approval was proper, and further contests the inference that adequate information had been provided to the FDA to demonstrate that Vioxx was safe and effective. (See Kessler Depo at 132:8-132:14).

18.    The FDA approved Vioxx for sale on May 20, 1999. *(Id.* ¶ 9; *see also* Letter from R. DeLap to R. Silverman at 1, May 20, 1999 (MRK-9942002l4ll) (attached as Ex. 10) ("We ... have concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the enclosed labeling text.").) Vioxx was thereafter sold in the United States until Merck voluntarily withdrew it from the market on September 30, 2004.

RESPONSE:  Plaintiff incorporates by reference the response to Paragraph 17, above. Plaintiff further contests the assertion that the removal of Vioxx from the market was voluntary, in that such withdrawal was necessary due to the admission by Merck that the APPROVe study demonstrated an excess of heart attacks and strokes among patients taking Vioxx. (See Merck Press Release, September 30, 2004, JAB 00221-JAB–00222, SBM Dec. Ex. 86).

19.    Traditional NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that promotes pain and inflammation, and have been a mainstay for treating pain from arthritis and other chronic inflammatory conditions. (Report of David R. Silvers, M.D. ("Silvers Rep.") 2 (attached as Ex. 11); Report of David L. Curtis, M.D.

("Curtis Rep.") 1 (attached as Ex. 12).) But like most drugs, traditional NSAIDs also

have potentially serious side effects.· (Silvers Rep. 2.) In particular, chronic use of

traditional NSAIDs - which inhibit both the COX-l and COX-2 enzymes -

significantly increases the risk of gastrointestinal problems, including perforations,

ulcers and bleeds that cause thousands of deaths and many thousands of

hospitalizations every year. *(Id; see also* Curtis Rep. 3, 7; Report of David J. Sales,

M.D. ("Sales Rep.") 2-3 (attached as Ex. 13).)

RESPONSE:  Plaintiff disputes that the COX -2 hypothesis was true and further disputes the

assertion and/or inference that Vioxx was less gastrotoxic than traditional NSAIDs under conditions

of actual dosage and use of such NSAIDs by the large majority of users. Plaintiff incorporates by

reference the matters asserted in his Separate Statement of Contested Fact, paragraphs 80-93).

20.     Vioxx was developed in order to provide a pain-relief medication for patients with

chronic pain that would reduce the risk of those serious gastrointestinal injuries by

selectively inhibiting only the COX-2 enzyme and sparing the COX-l enzyme, which

protects the stomach lining. (Silvers Rep. 3; Report of Douglas E. Vaughan, M.D. ¶

9 (attached as Ex. 14).)

RESPONSE: Plaintiff incorporates by reference the response to paragraph 19, above, and

further responds that the assertion in paragraph 20 of the defendant's Statement is not evidentiary

under Rule 56 and may not be considered by the Court.

21.     During the five years Vioxx was on the market, a number of clinical studies were

conducted that yielded information relevant to new potential therapeutic uses for the

drug, as well as potential risks, including cardiovascular risks. (Report of Lisa

-14-

Rarick. M.D. ("Rarick Rep.") 16-17 (attached as Ex. 15).) These studies led to broad

debate about the benefits and risks of Vioxx and other COX-2 drugs. (Wells Rep. 15;

Report of Melvin L. Parnell, Jr., M.D. ("Parnell Rep.") 3-4 (attached as Ex. 16).) The

FDA approved changes to the Vioxx package insert to include additional information

about the drug's potential cardiovascular risks in April 2002. (Rarick Rep. 14-15.)

RESPONSE:  Plaintiff disputes the inference that the "broad debate" was an informed debate,

and further asserts that Plaintiff was inadequately informed of the risks of Vioxx because of Merck's

concealment, deceit, misrepresentations in, and material omissions from, the peer-reviewed literature

upon which Plaintiff relied, and upon which those who advised Plaintiff also relied. (See Kessler

Depo at 132:8-134:14; 164:3-12 ; Hood Affidavit; Affidavit of John D. Abramson, M.D. (Abramson

Affidavit), SBM Dec. Ex. 11).

## III.    LDHH COULD NOT - AND DID NOT - RESTRICT REIMBURSEMENT OF VIOXX FOR MEDICAID PATIENTS.

RESPONSE:  Plaintiffs object to this heading and the unsupported inference it is intended to

draw from the undisputed facts set forth within this section.

### A.    LDHH Was Required To Cover Vioxx Prescriptions In Its Medicaid Program Both Before And After Establishment Of The PDL And Prior Authorization.

RESPONSE:  Plaintiffs object to this heading and the unsupported inference it is intended to

draw from the undisputed facts set forth within this section.

22.    LDHH is required to cover all FDA-approved drugs manufactured by companies that

have entered into rebate agreements with HHS. (Dep. of Me1wyn Wendt ("Wendt

Depo") 30:3-17, Dec. 14, 2009 (attached as Ex. 17).)

-15-

RESPONSE:  Plaintiff objects to this purported "Statement of Fact" insofar as it is nothing more than a conclusion of law. To the extent a response is required, Plaintiff contests that LDHH is required to reimburse all FDA-approved drugs manufactured by companies that have entered into rebate agreements with HHS without limitation.  Throughout the time Vioxx was on the market, LDHH had the ability to restrict reimbursements for prescriptions through a number of means. Plaintiff incorporates by reference the matters set forth in his Separate Statement of Contested Fact, paragraphs 174-184).  Moreover, plaintiff contests the inference that the matters asserted in this paragraph are applicable to Vioxx on the grounds that Vioxx was not safe and effective when it was approved on May 20, 1999; that there was a pre-approval signal of cardiovascular risk that was neither disclosed to plaintiff nor adequately investigated prior to marketing; that adequate pre-market investigation would have confirmed the drug was cardiotoxic; that Vioxx would not have been approved had Merck adequately investigated the signal of CV risk; that Vioxx would not have been subject to a rebate agreement had it not been approved. (See Kessler Depo at 132:8-134:14; 164:3-12; Hood Affidavit).

23.    Until June 2002, when Vioxx was removed from the PDL, Vioxx prescriptions were automatically reimbursable without any prior authorization requirement. (Terrebonne Dep. 110:7-11; Bearden Dep. 185:10-14.)

RESPONSE: Plaintiff contests the inference that the matters asserted in this paragraph are applicable to Vioxx on the grounds that Vioxx was not safe and effective when it was approved on May 20, 1999; that there was a pre-approval signal of cardiovascular risk that was neither disclosed to plaintiff nor adequately investigated prior to marketing; that adequate pre-market investigation would have confirmed the drug was cardiotoxic; that Vioxx would not have been approved had

Merck adequately investigated the signal of CV risk; that Vioxx would not have been subject to a rebate agreement had it not been approved. (See Kessler Depo at 132:8-134:14; 164:3-12; Hood Affidavit).

24.     LDHH was also required to pay for Vioxx prescriptions after Louisiana adopted a prior authorization program and PDL, even during the time that Vioxx was not on the PDL. (Bearden Dep. 78:14-19 (testifying that Louisiana's prior authorization process was not "a hard PA process" because "if a prescriber wanted to prescribe that drug, we would approve it, but we used that opportunity as an education to discuss the drug ... and other drugs that were on the PDL"); Biglane Dep. 93:18-94:7; Dep. of Valerie E. Taylor ("Taylor Dep.") 51:21-52:11, Jan. 15,2010 (attached as Ex. 18).) *See* also 28 La. Reg. 1639, 1640 (July 2002) ("Those drug products subject to mandatory coverage as a result of a rebate agreement with the federal government will be covered until written notice is received from the Centers for Medicare and Medicaid Services that coverage will be terminated.").

RESPONSE:  Plaintiff objects to this purported "Statement of Fact" insofar as it is nothing more than a conclusion of law. To the extent a response is required, plaintiff contests that LDHH was "required" to reimburse prescriptions for Vioxx.  La. Rev. Stat. Ann. § 46:153.2 empowered the LDHH to "limit reimbursement for multi-source prescription drugs in accordance with state and federal law...." and "establish a drug formulary that utilizes a prior approval process *or any other process or combination of processes that prove to be cost-effective in the medical assistance program*." La.-R.S. §46:153.3 (emphasis added).  Additionally, LDHH could have restricted reimbursements for Vioxx for safety reasons through the implementation of Drug Utilization Review

prospective deny edits.  (See Response to Statement No. 9, *supra*).  Moreover, plaintiff contests that requirements for reimbursement of FDA-approved drugs apply to Vioxx on the grounds that Vioxx was not safe and effective when it was approved on May 20, 1999; that there was a pre-approval signal of cardiovascular risk that was neither disclosed to plaintiff nor adequately investigated prior to marketing; that adequate pre-market investigation would have confirmed the drug was cardiotoxic; that Vioxx would not have been approved had Merck adequately investigated the signal of CV risk; that Vioxx would not have been subject to a rebate agreement had it not been approved.  (See Kessler Depo at 132:8-134:14; 164:3-12; Hood Affidavit).  Plaintiff incorporates by reference this response into its response to each and every paragraph of Defendant's Statement of Uncontested Fact.

### B.   LDHH's P&T Committee Was Aware Of The Risks And Benefits Of Vioxx When It Made PDL Recommendations To LDHH.

RESPONSE: Plaintiffs object to this heading and the unsupported inference it is intended to draw from the undisputed facts set forth within this section.

### 1.   LDHH contracted with knowledgeable third parties to advise the P&T Committee on PDL decisions based on economic and independent medical analyses of drug classes.

RESPONSE: Plaintiffs object to this heading and the unsupported inference it is intended to draw from the undisputed facts set forth within this section.

25.   Beginning in 2001, LDHH contracted with the University of Louisiana at Monroe ("ULM") Pharmacy School to prepare and administer a PDL and prior authorization program for the Medicaid program. (Biglane Dep. 23:2-23; *id.* 42:18-43:44-10; Terrebonne Dep. 35:21-24.)

RESPONSE: Undisputed.

-18-

26.     Although ULM also played a consulting role to the P&T Committee early on, the Committee replaced ULM with Provider Synergies on March 6, 2002, before the prior authorization program was up and running. (Castille Dep. 49:14-51:6.)

**RESPONSE**:  Plaintiff contests the inference that ULM no longer played a role in consulting with LDHH about prescription drugs after LDHH contracted with Provider Synergies on March 6, 2002.  University of Louisiana at Monroe has continued to act in an advisory capacity to LDHH for drug utilization review since its inception in 1991 (See Wendt Depo at 62:12-22).

27.     Since that time, LDHH has contracted with Provider Synergies, LLC to negotiate supplemental rebates with prescription drug manufacturers and to perform clinical and economic analysis of prescription drug data for the P&T Committee, which uses that information to make PDL recommendations. (Castille Dep. 49:8-51:6; Bearden Dep. 135:4-13 (confirming that Provider Synergies provided an "independent assessment of the clinical evidence of benefits" of prescription drugs); *id.* 142:5-20 (Provider Synergies briefed the P&T Committee on the clinical strengths and weaknesses of prescription drugs); *id.* 151:13-152:8; *see also* Pl.'s Resp. to Def.'s Second Interrog. No. 13 (since supplemental rebates were instituted, Provider Synergies has negotiated those rebates on behalf of Louisiana Medicaid); Pl. 's Resp. to Def.'s Second Interrog. No. 8 (Provider Synergies has analyzed clinical risks and benefits of drugs since 2002 for the P&T Committee); Taylor Dep. 25:20-26:20 (scope of work under Provider Synergies' contract with LDHH included development, implementation and operation of the LDHH Medicaid Pharmacy Program's preferred drug list and supplemental rebate programs).)

RESPONSE: Plaintiff contests the assertion that Provider Synergies was an "independent reviewer," and further asserts that Provider Synergies depended upon the accuracy and fair disclosure of risks and benefits by Defendant in the labeling and peer reviewed literature that Provider Synergies used as the basis for its recommendations to the Louisiana Pharmaceuticals and Therapeutics (P&T) Committee. Representatives of Merck routinely met with and provided clinical information to Provider Synergies, Inc. (See Edwards Depo at 62:1-13; 65:14-66:11, 81:4-82:5; MRK-AGLAB0000399-400 "Customer Profile, Provider Synergies, L.L.C.... Merck's Strategy... The primary approach will be to communicate strong clinical differentiation messages in an effort to establish agreement on a premium price threshold that Provider Synergies can recommend to the State," SBM Dec. Ex. 55). Furthermore, Plaintiff affirmatively asserts that neither LDHH nor Provider Synergies was adequately informed by Defendant of the true risks and benefits of Vioxx, and Plaintiff incorporates by reference his response to paragraph 21, above, and the Separate Statement of Contested Facts.

28.     The P&T Committee relies on the "independent assessment of the clinical evidence of benefits" of prescription drugs provided by Provider Synergies. *(See* Bearden Dep. 135:4-13 (answering question about Provider Synergies' analyses in the affirmative).) Provider Synergies in turn relies "on independent peer-reviewed published clinical data and FDA labeling and findings as [the] primary source of information for [its] reviews." (Taylor Dep. 19:10-13,44:2245: 12,81:16-17.)

RESPONSE: Plaintiff incorporates by reference his response to paragraph 27, above, and the Separate Statement of Contested Facts.

29.     Provider Synergies did not rely on marketing materials, internal emails, or formulary

dossiers from pharmaceutical companies, though it did request clinical study information from manufacturers from time to time. (Taylor Dep. 42:4-13, 44:22-45:8,80:12-81:18.)

**RESPONSE**: Plaintiff disputes that Provider Synergies did not rely on marketing materials or formulary dossiers. Merck provided formulary dossiers to Provider Synergies (See MRK-MEH0013314-17, SBM Dec. Ex. 56). Representatives of Merck routinely met with and provided clinical information to Provider Synergies, Inc. (See Edwards Depo at 62:1-13; 65:14-66:11, 81:4-82:5; MRK-AGLAAB0000398-400, "Provider Synergies Customer Profile... Merck's Strategy... The primary approach will be to communicate strong clinical differentiation messages in an effort to establish agreement on a premium price threshold that Provider Synergies can recommend to the State,"). Further, Plaintiff incorporates by reference the response to paragraph 27, above, and the Separate Statement of Contested Facts.

30.     Provider Synergies briefed the P&T Committee on the clinical strengths and weaknesses of the drugs the Committee considered for placement on the PDL. *(See id. 15:8-18.)* As part of the briefing process, Provider Synergies supplied the P&T Committee with monographs, which included cost analyses of prescription drugs, as well as recommendations based on peer-reviewed clinical published data and FDA labeling. *(See* Castille Dep. 54:6-11 (**Q.** "Do you recall the process being that they were going to look at peer-reviewed clinical published data and FDA labeling as a primary source of what their recommendations were going to be, other than the cost side?" **A.** "Yes, that was my understanding."); Bearden Dep. 142:12*20; see also, e.g.,* Exs. 19-21 (Vioxx monographs).)

RESPONSE:  Plaintiff incorporates by reference the response to paragraph 27, above, and the Separate Statement of Contested Facts.

31.     Apart from providing the P&T Committee with clinical data regarding a drug's efficacy, Provider Synergies also played a critical role in reducing prescription drug costs to LDHH by securing supplemental rebate agreements from drug manufacturers. *(See* Bearden Dep. 130:2-8 (testifying that Provider Synergies made recommendations "[t]o lower the expenditures by ... getting supplemental rebates").) These agreements in turn played a role in the recommendations Provider Synergies would make to the P&T Committee. A pharmaceutical company's unwillingness to provide a supplemental rebate for its drugs would adversely affect the chances that its products would be placed on the PDL. *(See* Castille Dep. 56:19-24 (agreeing that a company's failure to provide a supplemental rebate was considered a negative factor by the P&T Committee).)

RESPONSE: Plaintiff incorporates by reference his response to paragraph 27, above, and further asserts that patient safety was the primary factor in decisions concerning drug reimbursement, and that cost considerations were only applicable where there were competing drugs that were believed to be of comparable risk and benefit. (See Hood Affidavit; Lutz Affidavit).  Plaintiff further asserts that the true risks and benefits of Vioxx were not disclosed, as set forth above.

32.     Representatives of pharmaceutical companies played no role in discussions among P&T Committee members. *(See* Terrebonne Dep. 48:10-13.) At no point has a member of the pharmaceutical industry served on the P&T Committee. *(See id* 57:11-17.) Further, the P&T committee did not rely on materials prepared by

pharmaceutical companies as part of its decision-making process regarding the PDL.

*(See* Bearden Dep. 193:13-16.)

RESPONSE:  Plaintiff contests the assertion that drug companies played no role in the decisions of the P&T Committee.  Merck sales personnel targeted P&T committee members with the intention of delivering Merck's pro-Vioxx message to the P&T committee. (See e.g. MRK-EBES0031269-70, "The office-based team should contact P&T Committee Member to make sure that they are fully aware of the benefits and features of those products up for review,.; MRK-AGLAAD0010034, "have our representatives touch base with member of the [P&T] Committee to ensure that they have the latest and greatest information on... Vioxx."; MRK-AGLAAD0020006, "regularly call on chief of P&T and Pharmacy Director... to ensure that they fully understand the value that our product portfolio provides..."; MRK-AGLAAD0001024, "Louisiana Medicaid Tactical Plan... Call on P&T Committee members..."; MRK-AGLAAD0020750-52, "messaging with targeted P&T members prior to and immediately following P&T Meetings"; MRK-AGLAAD0000706-712 "Customer Profile, State of Louisiana... Merck Strategy & Tactics... continue to develop product advocates with Medicaid P&T and DUR committee members,"). Representatives of Merck routinely met with and provided clinical information to Provider Synergies, Inc., the company retained by LDHH to make clinical presentations at P&T Committee meetings. (See Edwards Depo at 62:1-13; 65:14-66:11, 81:4-82:5; MRK-AGLAAB0000398-400 "Customer Profile, Provider Synergies, L.L.C.... Merck's Strategy... The primary approach will be to communicate strong clinical differentiation messages in an effort to establish agreement on a premium price threshold that Provider Synergies can recommend to the State.").  Pharmaceutical company representatives were allowed to attend and offer comments at meetings of the LDHH P&T

-23-

Committee. (Minutes and Tr. of May 8, 2002 P&T Committee meeting (Ex. 23 to Defendant's Statement of Undisputed Material Facts).   Moreover, Merck controlled the data that it misrepresented, omitted or failed to publish in the peer-reviewed literature upon which the P&T Committee and its adviser, Provider Synergies, relied. Plaintiff incorporates by reference the response to paragraph 27, above, and the Separate Statement of Contested Facts.

33.     In particular, the P&T Committee did not rely on any representations by Merck regarding Vioxx before making any recommendations pertaining to the PDL. *(See id. 241:14*18; 242: 1-2 (testifying that he did not rely on any verbal or written representations from Merck before deciding whether to put a Merck product on the PDL); *see also* Terrebonne Dep; 115:8-14 (testifying that she did not see any information about marketing efforts by pharmaceutical companies in the materials prepared by Provider Synergies).)

RESPONSE:   Disputed. Plaintiff incorporates by reference the response to paragraph 32, above, and the Separate Statement of Contested Facts.

34.     The information Provider Synergies presented to the P&T Committee about scientific knowledge about the cardiovascular risks of Vioxx and other NSAIDs was adequate to inform the Committee about those risks. (Report of Clement C. Eiswirth, Jr., M.D. 21 (attached as Ex. 22).)

RESPONSE:  Plaintiff contests that the information provided by Merck was adequate to warn of the true CV risk of Vioxx (See Abramson Affidavit).   Plaintiff  incorporates by reference the response to paragraph 27, above. Plaintiff further responds that paragraph 34 of Defendant's Statement is not evidentiary under Rule 56 and may not be considered by the Court.

-24-

35.     No one at LDHH was aware of any misrepresentation ever made by Merck to Provider Synergies or LDHH about Vioxx. (Bearden Dep. 39:2-7; Castille Dep. 105:19-106:19; Terrebonne Dep. 152:16-22; Wendt Depo 175:9-177:5.)

**RESPONSE**: Plaintiff does not dispute that no one at LDHH was aware of Merck's misrepresentations, and further asserts that had LDHH personnel been aware of those misrepresentations, they would not have reimbursed Vioxx prescriptions, would have implemented DUR prospective deny edits with respect to Vioxx, and/or would not have approved Vioxx for inclusion on the Preferred Drug List.  (See Hood Affidavit; Lutz Affidavit; Culotta Affidavit SBM Dec. Ex. 58; Doskey Affidavit SBM Dec. Ex. 59)

## 2.     LDHH's PDL decisions were based on cost, not safety.

**RESPONSE**: Plaintiff objects to this heading and the unsupported inference it is intended to draw from the undisputed facts set forth within this section.

36.     LDHH's motive for establishing a PDL and prior authorization process was to save money. When a particular drug manufacturer had not given the State a supplemental rebate offer, the P&T Committee would ask Provider Synergies to go back to the company to negotiate for one, and, in the meantime, the P&T Committee would not put that company's drugs on the PDL. (Bearden Dep. 63:11-64:2; *id.* 130:2-8 (Provider Synergies made recommendations "[t]o lower the expenditures by ... getting supplemental rebates"); Wiggins Rep. ¶¶ 18,22.) Thus, a pharmaceutical company's unwillingness to provide a supplemental rebate for its drugs would adversely affect the company's chances that its products would be placed on the PDL. *(See* Castille Dep. 56:19-24 (agreeing that a company's failure to provide a

supplemental rebate was considered a negative factor by the P&T Committee).)

RESPONSE:  Plaintiff objects to the inference that the sole motive for establishing a PDL and prior authorization program was to save money.  The statute which provides for, *inter alia*, the establishment of a formulary identifies "improving the quality of patient care" as a key reason for the measure.  LSA-R.S. § 46:153.3  While cost was certainly a significant factor in determining whether to include drugs on the Preferred Drug List, the P&T Committee's primary concern was with clinical aspects of safety and efficacy of drugs.  Cost considerations were only applicable where there were competing drugs that were believed to be of comparable risk and benefit. (See Hood Affidavit).

37.    On May 8, 2002, following a discussion of Vioxx, Celebrex, and Bextra (including whether their manufacturers had agreed to provide supplemental rebate payments to the State), the P&T Committee decided to recommend listing Celebrex, Bextra, and all traditional NSAIDs - but not Vioxx - on the PDL. (Bearden Dep. 172:17-173:15; Taylor Dep. 56:7-14; Bearden Dep. Exs. 13 & 14 (Minutes and Tr. of May 8, 2002 P&T Committee meeting (Exs. 13 & 14 to Def.'s Req. for Admis.) (attached collectively as Ex. 23)); PI.'s Resp. to Def.'s Req. for Admis. Nos. 13 & 14 (attached collectively as Ex. 24); Wells Rep. 13.) This was the first time that the P&T Committee considered these drugs for the PDL since the enactment of the prior authorization statute. (Castille Dep. 64: 11-15.)

RESPONSE: Undisputed

38.    By April 2002, the P&T Committee was well aware both of the debate surrounding the potential cardiovascular risks of Vioxx and the label change that occurred as a

-26-

result of new clinical data. (Taylor Dep. 45:16-49:8 (February 2002 Provider Synergies monograph on COX2s provided to the P&T Committee described the cardiovascular and gastrointestinal risks of COX-2s); *id.* 60:5-61:15 (Provider Synergies considered the 2002 Vioxx label in making its annual recommendation to the P&T Committee); Bearden Dep. 175:23-178:7 (testifying that P&T Committee members would have read about Vioxx's potential CV risks in Provider Synergies' February 2002 monograph, which contained a section entitled "Cardiovascular Concerns" and a subsection entitled "Cardiovascular Events" based on published research); *id.* 176:4-177:24 (the monograph included a discussion of the potential need for further clinical trials to evaluate the risk of cardiovascular events associated with COX-2 agents and specifically referenced a Journal of the American Medical Association article that discussed the cardiovascular issue); Wells Rep. 13.)

**RESPONSE**: Plaintiff disputes the inference that Provider Synergies was truthfully and fairly informed of the risks and benefits of Vioxx and further responds that the monograph provided to the P&T Committee did not accurately disclose the true risks and benefits of Vioxx because of Merck's concealment, deceit, misrepresentations in, and omissions from, the peer-reviewed literature upon which Provider Synergies based its monographs. Plaintiff incorporates by reference the response to paragraph 27, above, and the Separate Statement of Contested Facts.

39.     Dr. Valerie Taylor of Provider Synergies presented this information to the P&T Committee at its May 8, 2002 meeting, stating that there was research on the cardiovascular risks of those drugs but "no real conclusions at this point." (Bearden Dep. 178:16-179:7; *see also* Taylor Dep. 53:6-54:14 (testifying that she explained to

the P&T Committee that the February 2002 monograph provided the "latest information in this [COX-2] class" regarding cardiovascular concerns and that there was a lot of discussion of those concerns and gastrointestinal issues).) Still, Provider Synergies recommended placing Celebrex and Bextra on the PDL for the COX-2 class during that meeting because they were less expensive in light of supplemental rebates. (Bearden Dep. 179:8-180:24; Taylor Dep. 55:25-57: 10; Terrebonne Dep. 106:12-25.)

**RESPONSE**:  Plaintiff disputes the inference that any such discussion was based on adequate disclosure of risk and benefit information, and Plaintiff incorporates by reference the response to paragraphs 21 and 38, above, and the Separate Statement of Contested Facts.

40.    Merck had not entered into a supplemental rebate with the State of Louisiana by May 2002. (Castille Dep. 68:2-10.) Merck's initial refusal to provide supplemental rebates to Louisiana was "generally the reason" that Merck's products were not included on the PDL in 2002. (Castille Dep. 56:19-57:9; *see also* Bearden Dep. 55:2-22; *id.* 58:3-9 (**Q**: "So do I understand correctly that the principal motivation for moving from an open formulary to a closed formulary for the State was to save money within the Medicaid program?" **A:** "Absolutely, I mean, that was the motivating factor."); Wells Rep. 13 (opining that Vioxx was initially left off the PDL "because Merck did not agree to a supplemental rebate for Vioxx").)

**RESPONSE**:  Disputed.  Plaintiff incorporates by reference the response to paragraph 31, above, and the Separate Statement of Contested Facts.

41.    After the P&T Committee issued its recommendations regarding placement of the

-28-

COX-2 drugs on the PDL, the Secretary of LDHH approved its recommendations, which became effective on June 10,2002. (Bearden Dep. 183:6-11; *id. 183:18-184:3.)*

**RESPONSE**: Undisputed

42.     The April 2003 Provider Synergies monograph that was provided to the P&T Committee for its annual consideration of NSAIDs also discussed potential cardiovascular concerns about the NSAID class. ("Nonsteroidal Anti-Inflammatories (NSAIDs)" (LaAGVIOXX- 03338-3352) (Ex. 17 to Def.'s Req. for Admis.; Pl.'s Resp. to Def.'s Req. for Admis. No. 17) (attached as Ex. 25).) The monograph explained the cardiovascular risks of the class of COX-2s in general and Vioxx specifically and "would have been reviewed and discussed" by the P&T Committee. (Bearden Dep. 195:3-5; Terrebonne Dep. 116:20-117:1; *see also* Castille Dep. 76: 19-77:7 ("in terms of the presentation, the written presentation made to the P&T Committee, there was extensive review of' cardiovascular clinical and labeling information).) Provider Synergies specifically highlighted potential cardiovascular risk implications of the VIGOR study: "The VIGOR study raised some questions about the cardiovascular safety of Vioxx." (Terrebonne Dep. 116:3-12.)

**RESPONSE**:  Disputed. Plaintiff incorporates by reference the response to paragraphs 21 and 38, above, and the Separate Statement of Contested Facts.

43.     At the P&T Committee's May 21,2003 meeting, Dr. Taylor of Provider Synergies discussed the VIGOR study and other data Merck submitted to the FDA about the cardiovascular risks of Vioxx. (Taylor Dep. 64:12-19 (testifying that there is "no

doubt" that she alerted the P&T Committee to the cardiovascular and gastrointestinal results in the VIGOR study); Bearden Dep. 194:4-195:5.) She did not discuss the theory that the VIGOR results could be explained by the fact that Naproxen is cardioprotective. (Taylor Dep. 144:18-145:11.) Provider Synergies recommended at that meeting that Ce1ebrex be taken off the PDL and Vioxx put on the PDL. (Bearden Dep. 196:23-197:5; Taylor Dep. 66:10-67:10.) Dr. Adams, a member of the Committee, suggested that a stepped therapy approach be considered for COX-2 drugs, but his proposal was not adopted. (Bearden Dep. 197:15-199:2.) For the most part, however, Committee members' questions and comments centered on pricing. *(See id. 201:21-202:21.)*

RESPONSE:  Plaintiff incorporates by reference the response to paragraphs 21 and 38, above, and the Separate Statement of Contested Facts.

44.     At the May 21,2003 meeting, the P&T Committee voted to recommend that Vioxx be placed on the PDL and Ce1ebrex removed. (Terrebonne Dep. 113:11-18; Wells Rep. 14.)  The decision was made because Merck's supplemental rebate offer made Vioxx more cost effective to the State than Celebrex. (Bearden Dep. 201:10-203:11, 205:9-12.)

RESPONSE:  Plaintiff contests the inference that the members of the P&T Committee were sufficiently informed in making the decision to recommend approval Vioxx for the PDL, and further asserts that the P&T Committee was not sufficiently informed, on the basis of the concealment, deceit, misrepresentations and omissions referenced above. Plaintiff incorporates by reference the response to paragraphs 21 and 38, above, and the Separate Statement of Contested Facts.

-30-

45.      Shortly thereafter, the Secretary of LDHH approved the P&T Committee's recommendations, and Vioxx was placed on the PDL for the first time on July 14, 2003. (Castille Dep. 87:11-18, 89:17-21.)

**RESPONSE**: Plaintiff contests the inference that the Secretary was sufficiently informed in making the decision to approve Vioxx for the PDL, and further asserts that the Secretary was not sufficiently informed, on the basis of the concealment, deceit, misrepresentations and omissions referenced above. (See Hood Affidavit). Plaintiff incorporates by reference the response to paragraphs 21 and 38, above, and the Separate Statement of Contested Facts.

46.      During the December 17, 2003 P&T Committee meeting, Dr. Weather, a member of the Committee, stated that he thought the COX-2 drugs and particularly Vioxx should be revisited because of cardiovascular concerns discussed in the package inserts and an increase in heart attacks seen in patients taking Vioxx. (Tr. of Dec. 17, 2003 P&T Committee meeting (LaAG-VIOXX-00460-536) (Ex. 41 to Defo's Req. for Admis.; P1o's Resp. to Defo's Req. for Admis. No. 41) (attached as Ex. 26).) Dr. Vince Culotta, chair of the P&T Committee, agreed to work with Terry Taylor of Provider Synergies to discuss whether it would be possible to renegotiate one type of drug in the NSAID class, instead of waiting until the next annual class review. *(Id.;* Bearden Dep. 207: 12-209:6.) Although the P&T Committee did not make any recommendations regarding the PDL at the December 2003 meeting, it recommended negotiations with Pfizer about the price of Celebrex so that the drug could be added to the PDL in the future. (Terrebonne Dep. 131:19-23.)

**RESPONSE**: Plaintiff incorporates by reference the response to paragraph 39, above, and the

Separate Statement of Contested Facts.

47. The April 2004 Provider Synergies monograph provided to the P&T Committee again discussed potential cardiovascular concerns associated with COX-2 drugs. ("Nonsteroidal Anti-Inflammatories (NSAIDs) Review" (LaAG-VIOXX-003353-3369) (Ex. 21 to Def.'s Req. for Admis.; Pl's. Resp. to Def.'s Req. for Admis. No. 21) (attached as Ex. 27); *see also* Taylor Dep. 75:14-77:9; Bearden Dep. 213:5-19.)

**RESPONSE**: Disputed. Plaintiff incorporates by reference the response to paragraph 39, above, and the Separate Statement of Contested Facts.

48. At the May 5, 2004 P&T Committee meeting, Provider Synergies reported that the manufacturer of Celebrex had offered an additional rebate, but that it was not sufficient to warrant putting the drug back on the PDL. (Taylor Dep. 77:23-78: 12; *see also* Tr. of May 5, 2004 P&T Committee meeting (LaAG-VIOXX-00537-00639) (Ex. 42 to Defo's Req. for Admis.; Pl's. Resp. to Def's Req. for Admis. No. 42) (attached as Ex. 28); Bearden Dep. 216:9-217:1.)

**RESPONSE**: Undisputed

49. The issue of the Vioxx package insert was once again discussed by the P&T Committee at the May 5, 2004 meeting. (Castille Dep. 96:20-97:3.) Despite discussion in the P&T Committee about the CV risks of Vioxx, and despite a re-review of the clinical information about the COX-2 class and the pricing for those drugs, the committee decided to keep Vioxx on the PDL. (Bearden Dep. 219:3-11; Terrebonne Dep. 138:20-139:23; Wells Rep. 14.)

**RESPONSE**:  Disputed.  Plaintiff incorporates by reference the response to paragraph 39, above, and the Separate Statement of Contested Facts.

50.     At the August 11, 2004 meeting of the P&T Committee, the Committee voted to follow Provider Synergies' recommendation that all three COX-2 drugs (Vioxx, Celebrex and Bextra) be placed on the PDL. (Tr. of August 11, 2004 P&T Committee meeting (Ex. 24 to Defo's Req. for Admis.; PI's. Resp. to Defo's Req. for Admis. No. 24) (attached as Ex. 29); Bearden Dep. 223:3-225:1.) By this time, Provider Synergies and Pfizer had reached an agreement regarding an adequate supplemental rebate. (Castille Dep. 102:16-21.) The decision to place Celebrex back on the PDL was made to save the State money; at the meeting, there was no discussion of any clinical reasons for doing so. (Bearden Dep. 226: 12-227:5.)

**RESPONSE**:  Disputed.  Plaintiff incorporates by reference the response to paragraph 39, above, and the Separate Statement of Contested Facts.  Additionally, plaintiff contests that there was no discussion of clinical factors.  The presentation by Provider Synergies to the LDHH P&T Committee at its August 11, 2004 meeting solely concerned published new comparative clinical trials and did not cover any cost or economic analyses, and Provider Synergies recommended all of the Cox-2 inhibitors be placed on the PDL for clinical reasons.  (See Deposition of Ben Bearden (Bearden Depo) at 200:19-202:15, SBM Dec. Ex. 93).  The economic savings resulting from the recommendation at this P&T Committee meeting did not result from adding Celebrex to the PDL, but rather were from the resulting mix of having nineteen of twenty NSAIDS, and all three Cox-2 drugs on the PDL.  (See Bearden Depo at 203:6-19).

51.     Vioxx remained on the Louisiana Medicaid PDL until September 30, 2004, when Merck voluntarily withdrew it from the market. (Terrebonne Dep. 148:4-22; *see also* SAC ¶ 159.)

**RESPONSE**:  Plaintiff incorporates by reference the response to paragraphs 18, 21 and 38 above, and the Separate Statement of Contested Facts.

### C.     Louisiana's Medicaid P&T Committee Kept NSAIDs With "Black Box" Warnings On Its PDL Even After The Withdrawal Of Vioxx.

52.     In April 2005, the FDA required manufacturers of NSAIDs - including COX-2 inhibitors like Celebrex - to place a "black box" warning on the drugs' labeling due to concerns about their cardiovascular risks. (Taylor Dep. 89:25-90:20; Wells Rep. 15; Curtis Rep. 4.)

**RESPONSE**:  Disputed.  The black box warning for Celebrex was actually approved on July 29, 2005 and implemented on August 1, 2005. (See http://www.accessdata.fda.gov/drugsatfda_docs/label/2005/020998s018,019lbl.pdf (last visited 3/5/10) SBM Dec. 94.)  Additionally, Plaintiff disputes the inference that the black box warning for Celebrex supports a claim that Vioxx and Celebrex had equivalent cardiovascular risk. Plaintiff further asserts that Vioxx has significantly greater CV risk than Celebrex, See Separate Statement of Contested Facts Paragraph 133.

53.     The Louisiana Medicaid Program continued to list Celebrex on its PDL until November 1, 2005, notwithstanding the addition of this label and well-publicized concerns about cardiovascular risks. *See* Louisiana's Medicaid Program, *available at* http://www.lamedicaid.com/provwebl/pharmacy/preferredoct05.htm (last visited Feb.

19, 2010). Celebrex remained off the PDL until October 1, 2007. *See* Louisiana's

Medicaid Program, *available at*

http://www.lamedicaid.com/provwebllpharmacy/preferredoctober07.htm (last visited Feb. 19, 2010).

In October 2007, it was put back on the PDL and remained there until October 2009. *See* Louisiana's

Medicaid Program, *available at* http://www.lamedicaid.com/provwebl/pharmacy/preferred_list.htm

(last visited Feb. 19, 2010).  *(See also* Pl.'s Resp. to Def.'s Req. for Admis. No. 48 (admitting that

Celebrex was on the PDL during part or all of 2008) (attached as Ex. 30).)

RESPONSE:  Plaintiff disputes that Celebrex had a black box warning as of April 2005 and

further asserts that the Celebrex black box was not added to the label until August 2005, and that

Plaintiff removed Celebrex from the PDL promptly thereafter.  On August 17, 2005, at the very next

LDHH P&T committee meeting after the Celebrex black box warning went into effect, the LDHH

P&T committee recommended to remove Celebrex from the PDL. (*See*

www.dhh.louisiana.gov/offices/publications/pubs-134/8.17.05%20P%20&%20T%20Approved

%20Minutes.pdf (last visited 3/5/10), SBM Dec. Ex. 95).  *Id.*  Plaintiff further asserts that Celebrex

was subsequently restored to the PDL on the basis of the consensus that Celebrex poses less CV risk

than Vioxx.  Plaintiff also further asserts that due to cardiovascular concerns surrounding Celebrex,

the LDHH Drug Utilization Review Board implemented a prospective deny edit to restrict

prescriptions of Celebrex.  (*See* Wendt Depo at 111:5-116:8)   Had the full cardiovascular risks of

Vioxx been disclosed, LDHH would have, at the very least, implemented prospective deny edits for

Vioxx that were as restrictive if not more restrictive than those adopted with respect to Celebrex.

(See Hood Affidavit, Leach Affidavit SBM Dec. Ex. 81).

**D.   Louisiana's Drug Utilization Review Board Did Not Prospectively Deny Claims For COX-2 Drugs Including Vioxx.**

54.     The role of the Louisiana Drug Utilization Review Board ("DURB") was to review prescribing patterns to determine whether there was misuse or abuse of drugs by prescribers and Medicaid patients. (Bearden Dep. 34:2-15; Wiggins Rep. ¶¶ 12-13.)

RESPONSE:  Plaintiff contests the inference that identification of misuse or abuse of drugs by prescribers was the only role of the DUR board.  The DUR Board implemented prospective deny edits for safety reasons.  (See Response to Statement No. 9, supra).  The focus of DUR edits is on clinical outcomes and on the clinical appropriateness of therapy.  (*See* Wendt Depo at 118:11-21).

55.     One of the tools at the DURB's disposal was a "prospective deny edit." A prospective deny edit would result in an initial denial of a claim for some or all Medicaid beneficiaries. *(See* Wendt Depo 113:8-23.) An initial denial could be overridden if the beneficiary or the beneficiary's physician satisfied certain pre-specified prescribing criteria. *(See id. 114:13-23.)*

RESPONSE: Undisputed

56.     No DURB prospective deny edit was ever applied to any NSAID or COX-2 drug for side effects while Vioxx was on the market. (Bearden Dep. 248:16-249:17; Biglane Dep. 38:12-40:14.)

RESPONSE:  Plaintiff disputes the inference that the DURB was adequately informed of the risks and benefits of Vioxx when decisions concerning the use of the "deny edit" procedure were made. Plaintiff incorporates by reference the response to paragraphs 21 and 38, above, and the Separate Statement of Contested Facts. Moreover, the DUR Board operated independently from the

Medicaid P&T Committee, so the DUR Board did not receive any of the Provider Synergies monographs and discussions of "CV concerns." (*See* Wendt Depo at 117:9-118:3). Plaintiff further contests the inference that no DURB prospective deny edit was appropriate for Vioxx while Vioxx was on the market. If the cardiovascular concerns with Vioxx in 2003 would have been brought to the DUR Board, it would have been taken and addressed as a serious concern. (*See* Wendt Depo at 133:13-133:18). Notably, the DUR Board implemented a prospective deny edit for Cox-2 inhibitors in response to the FDA's December 2004 advisory (See Wendt Depo at 98:15-20, 115:19-116:8). Had LDHH been fully advised of the risks and benefits of Vioxx, LDHH would have, at the very least, implemented a DURB prospective deny edit for Vioxx. (*See* Wendt Affidavit, Hood Affidavit).

### E.     ULM Does Not Appear To Have Ever Rejected A Request For Prior Authorization.

57.     Under Louisiana's prior authorization program, a request for prior authorization can be submitted to the ULM Prior Authorization Unit by phone, facsimile or mail, and the unit will respond within 24 hours from the date and time the request was received. *See* Louisiana Medicaid Pharmacy Benefits Management Prior Authorization Program Effective June 10, 2002, *available at* http://www.lamedicaid.com/provwebl/forms/forms.htm#rxpa (last visited Feb. 18, 2010). Authorization can be requested retroactively for prescriptions that have already been filled, but such requests must be sent by mail to the Bureau of Health Services Financing for special handling. *Id.* Based on the deference accorded to prescribing physicians, ULM does not appear to have ever rejected a request for prior authorization. (Terrebonne Dep. 36:20-24.)

RESPONSE:  Plaintiff disputes the inference that ULM was adequately informed of the risks and benefits of Vioxx when prior authorizations were approved. Plaintiff incorporates by reference the responses to paragraphs 21 and 38, above, and the Separate Statement of Contested Facts.

## IV.   LOUISIANA PHYSICIANS' KNOWLEDGE, EXPERIENCE AND PRESCRIBING PATTERNS VARY.

58.   Physicians make prescribing decisions based on a variety of factors, including their own experience using NSAIDs, the experience of each individual patient, medical literature, consultation with colleagues, medical school training, continuing medical education, professional meetings, guidelines, algorithms and the FDA, as well as information provided by drug manufacturers. (Parnell Rep. 3-4.)

RESPONSE: Plaintiff disputes the inference that individual physicians could have made informed decisions about prescribing Vioxx and further asserts that such decisions were not adequately informed due to Merck's concealment, deceit, misrepresentations and omissions about such risks and benefits. Plaintiff incorporates by reference the Separate Statement of Contested Facts. Plaintiff further asserts that the matters set forth in this Paragraph are non-evidentiary under Rule 56 and may not be considered by the Court.

59.   A physician's selection of appropriate medication for patients needing relief from chronic or acute pain is a highly individualized process involving the application of clinical judgment to each patient's particular circumstances. (Curtis Rep. 20.) Relevant considerations include the nature of the pain, risks and benefits of the proposed therapy, the anticipated dose and duration of use, the patient's medical history (including gastrointestinal problems, drug reactions or allergies), possible

adverse interactions with other medications, anticipated patient compliance, cost and

insurance coverage, and other patient concerns. (Wells Rep. 15; Curtis Rep. 20.)

RESPONSE:  Plaintiff incorporates by reference the response to paragraphs 58 above.

60.   An NSAID that effectively relieves pain for one patient may not do so for another.
(Curtis Rep. 4; Parnell Rep. 3,4; Sales Rep. 2.) Likewise, individual patients may
tolerate some NSAIDs better than others. (Silver Rep. 5; Curtis Rep. 20.) In
particular, traditional NSAIDs like naproxen, ibuprofen, and dic10fenac often
produce gastrointestinal complications ranging from simple dyspepsia (stomach
upset) - the most common reason that patients cannot tolerate chronic NSAID therapy
- to life-threatening perforations, ulcers and bleeds. (Curtis Rep. 6-7; Silver Rep. 3-
4.) COX-2 inhibitors like Vioxx reduced these side effects, improving compliance
rates and providing, for some patients, the only viable treatment option. (Curtis Rep.
20.)

RESPONSE:  Plaintiff incorporates by reference the response to paragraphs 58 above.

61.   Physicians receive information regarding the risks and side effects associated with
particular drugs from a number of sources, including the drug label, medical
literature, scientific meetings, personal experience, and consultations with colleagues.
(Parnell Rep. 3-4.)

RESPONSE:  Plaintiff incorporates by reference the response to paragraphs 58 above.


SIGNATURE BLOCK ON NEXT PAGE


-39-

Respectfully submitted, this 9th day of March, 2010.

/s/ Stephen B. Murray, Jr.
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
Justin Bloom
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100

James D. Caldwell, Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188

Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Plaintiff's Response to Defendant's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment has this day been served on Liaison Counsel, Phillip A. Wittmann and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to Pretrial Order No. 8B, on this the 9th day of March, 2010.

/s/ Stephen B. Murray, Jr.