# EXHIBIT C

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA


In Re:  VIOXX

Products Liability Litigation

STATE OF LOUISIANA, ex rel.
JAMES D. CALDWELL,         MDL NO. 1657
ATTORNEY GENERAL              SECTION L
   Plaintiff
                              Case No.
   versus                     05-3700

MERCK & CO., INC.,
   Defendant
```

                HIGHLY CONFIDENTIAL

        Oral deposition of WARREN

J. LAMBERT, taken at the law offices

of DECHERT, LLP, Cira Centre, 2929

Arch Street, Philadelphia,

Pennsylvania, on Friday, December 18,

2009, commencing at 8:02 a.m., before

Dianna R. Pugliese, a Registered

Merit Reporter, Certified Realtime

Reporter, Certified Shorthand

Reporter (NJ & DE), and Notary

Public, pursuant to notice.

1   marketing?

2       A.   No, sir.

3       Q.   And by "regular interface,"

4   I'm referring to a weekly or biweekly

5   interface as opposed to, you know,

6   every once in a blue moon.

7            MR. SALES:  Asked and

8   answered.

9            THE WITNESS:  No, sir.

10  BY MR. MURRAY:

11      Q.   How about promotional

12  materials that the sales force used;

13  where would those materials come

14  from?  Were they generated by

15  headquarters?

16      A.   Yes, sir.

17      Q.   Okay.  And am I correct in

18  my understanding that they wouldn't

19  have had the authority to make their

20  own promotional tools; correct?

21      A.   Yes, sir.

22      Q.   And did you have any

23  responsibility for furnishing those

24  promotional materials to the sales

ORAL DEPOSITION OF WARREN J. LAMBERT, 12/18/2009

Page 96

1      Q.   Okay.  Do you recall
2  whether there was a strategy in place
3  to convey messages regarding renal
4  and cardiovascular issues using the
5  tools that are listed here?
6      A.   I can't recall
7  specifically, but as a matter of
8  normal course, whatever the sales
9  force receives from headquarters, any
10 approved information, if that was the
11 message or background information at
12 the time, that's what they would have
13 communicated.
14     Q.   Okay.  Do you recall a
15 renal card?
16     A.   I don't.
17     Q.   Okay.  Do you recall a CV
18 card?
19     A.   I don't, sir.
20     Q.   Okay.  Do you know what
21 it's referring to where it says the
22 PIR available from MEDSA?
23     A.   Again, I don't know what
24 specifically that was, but,

Page 101

1  It says, Consistent Messaging.
2          If you look at the bullet
3  point, it says, Core Messages will
4  remain focused on efficacy and
5  safety.
6          Do you recall whether that
7  was a core message that your sales
8  force was delivering in the time --
9  with respect to Vioxx in the time
10 frame July of 2001?
11         MR. SALES:  Objection.
12 Misstates the document.
13         THE WITNESS:  I don't
14 recall the Core Messages at that
15 time.  But, typically, reps would
16 communicate what's in the package
17 insert.
18 BY MR. MURRAY:
19    Q.   Okay.  In terms of
20 determining what would be a message
21 to be delivered by the sales force,
22 does that come from marketing or
23 sales?
24    A.   It comes from the

ORAL DEPOSITION OF WARREN J. LAMBERT, 12/18/2009

Page 102

1  headquarters team.
2      Q.  Okay.  So would you believe
3  that this, if this was a -- if there
4  was a message, a core message to be
5  delivered, that would have come from
6  headquarters?
7          MR. SALES:  Objection to
8  form.
9          THE WITNESS:  Again, I'm
10 not familiar with this document.
11 BY MR. MURRAY:
12     Q.  Okay.  Based on the type of
13 document it is, the subject matter,
14 et cetera, and based on your
15 experience as a senior region
16 director in 1999 to 2004, do you
17 believe this document would have been
18 generated by headquarters?
19         MR. SALES:  Objection.
20 Calls for speculation.
21         THE WITNESS:  I don't know.
22 BY MR. MURRAY:
23     Q.  Let me turn you to the page
24 ending in Bates number 200 under the