# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, | JUDGE ELDON E. FALLON |
| Plaintiffs, | MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., | Case No. 05-3700 |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* NO. 9 TO EXCLUDE EVIDENCE OF AND REFERENCE TO POST-MARKETING ADVERSE EVENT REPORTS**

862033.1

I.  **INTRODUCTION**

Defendants' Motion *In Limine* No. 9 seeks to exclude evidence of post-marketing adverse event reports. The Court has previously denied motions to exclude this type of evidence. (Order, *Dedrick v. Merck and Co.* at *(In re Vioxx Products Liability Litigation)*, MDL 1657, November 22, 2006 (denying, in part, Merck's Motion *in Limine* to Exclude Evidence And Testimony Addressed in Motions Previously Considered/Granted by the Court) [Declaration of Donald C. Arbitblit (hereinafter "DCA Decl.") Ex. 1].) The same ruling should control the outcome of the present motion, which should be denied.

Adverse Event Reports (AERs) are relevant for numerous purposes. AERs have been found relevant to issues of causation, knowledge, notice, and duty to warn. Merck itself commonly relied upon post-market reports and analyses to support its public posture on cardiovascular (CV) safety, and the same type of evidence is relevant when it tends to rebut Merck's position. Moreover, AERs are admissible under the Federal Rules of Evidence, as this court has already ruled. Thus, the Court should deny Merck's Motion *in Limine* number nine.

II.  **AERs ARE RELEVANT TO SHOW NOTICE THAT CLAIMS OF GREATER GASTROINTESTINAL SAFETY BASED ON CLINICAL TRIALS WERE CONTRADICTED BY VIOXX'S ADVERSE EFFECTS AMONG ACTUAL USERS**

AERs are admissible to prove notice or knowledge of product defects. *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 687 (11th Cir. 1984) (affirming a district court's ruling to admit reports prepared by doctors and the company's field representatives showing a design defect with a contraceptive device). Merck cites no authority to indicate otherwise. In this case, thousands of gastrointestinal (GI) adverse events associated with Vioxx undermine Merck's claims of Vioxx purported GI safety and the adequacy of its warnings.

Merck employees and consultants published literature concerning clinical trials which

served as the basis for the claim that "ulcer rates were comparable to placebo." (Laine, L., et al., 1999 [DCA Decl. Ex. 2].) A summary of this article appeared in each of the three monographs prepared by Provider Synergies, Inc., the pharmacy benefit manager upon which the State of Louisiana Department of Health and Hospitals (LDHH) relied in deciding to approve Vioxx for the Preferred Drug List (PDL). (Kaiser Exs. 30, 36, 40 [DCA Decl. 3, 4, and 5].) However, beginning in 1999 even before that article was published, and continuing until Vioxx was withdrawn on September 30, 2004, Merck received a continuous stream of AERs that contradicted this claim. The Merck Worldwide Adverse Event System (WAES) database, which compiled the accumulated AERs for Merck products, was provided to Plaintiffs' Counsel during discovery in this matter. A search of the database using the adverse event terms "perforations, ulcers and hemorrhages/bleeds" of the GI system resulted in over 3,800 AERs reported in association with Vioxx. (*See* Screen Shot of WAES database [DCA Decl. Ex. 15].) Among these were approximately 250 fatalities; in 75 reports of fatal GI events, the individual reporting the event stated that it was "related," "probably related," or "definitely related" to the decedents' use of Vioxx. Citing an earlier set of AER data, an FDA medical officer review stated that, despite the results in the VIGOR clinical trial setting, the GI safety profile of Vioxx was similar to NSAIDs, and that there had been 37 unduplicated reports of fatal GI events among patients using Vioxx between its approval in May 1999 and the close of the review period in October 2000. ([DCA Decl. Exs. 6, 7, and 8].)

It is well known that only a fraction of adverse events are reported, and this fact is commonly mentioned as a caution in attempting to determine the true rate of such events based on AERs. (*See, e.g.* Bengt-Erik Wilholm, *Spontaneous Reporting Systems Outside the United*

*States, in* Pharmacoepidemiology 119, 126 (Brian L. Strom ed., 1989) [DCA Decl. Ex. 9].)[1]

Therefore, Merck knew that the reports of fatal GI events among patients using Vioxx represented only a fraction of the actual number of such events. Furthermore, it is relevant to the issue of notice and duty to warn that physicians in completing the AERs stated their belief that the drug was related, probably related, or definitely related to fatal GI bleeds, and that the FDA reviewer said the post-market profile was similar to that of NSAIDs, when Vioxx was introduced as a supposedly safer alternative to those products.

Thus, the AERs provide supportive and consistent evidence to the other facts cited in Plaintiffs' Statement of Contested Facts, showing that Vioxx is toxic to the GI system, that it is not comparable to placebo, and that the rate of serious, complicated GI events was as high as, or higher than, the rate of such events among the population in the traditional NSAIDs groups in Merck's clinical trials. (*See* Plaintiffs' Statement of Contested Facts, ¶¶ 80-93.) Accordingly, the receipt of thousands of AERs describing perforations, ulcers and bleeds is relevant to whether Merck acted reasonably in failing to inform Plaintiffs or the medical community of the known risks.

The relevance and admissibility of the AERs evidence is not negated by the labeled warning of the risk of GI adverse events. Instead, where the label included reference to the misleading clinical trial data claiming that Vioxx ulcer rates were comparable to placebo (Kessler Ex. 5, MRK-99420021411 at 419-20) [DCA Decl. Ex. 10]), the AER evidence is relevant to show the inadequacy and inaccuracy of the warning in light of contradictory data.

### III. ADVERSE EVENT REPORTS ARE RELEVANT AND RELIABLE EVIDENCE THAT VIOXX IS GASTROTOXIC AND CAUSES HEART ATTACKS.

Courts have allowed expert testimony relying on AERs, as they provide additional

---

[1] Dr. Wiholm was head of pharmacoepidemiology at Merck until his untimely death in 2005.

support to establish causation. *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 185, 200 (S.D.N.Y. 2009) (denying, in relevant part, Merck's motion to exclude expert testimony on general causation in a pharmaceutical products liability multi-district litigation case); *In re Neurontin Litig*, 612 F. Supp. 2d 116, 153 (D. Mass 2009) (denying Pfizer's motion to exclude expert testimony on general causation); *In re Phenylpropanolamine (PPA) Litigation*, 289 F. Supp. 2d 1230 at 1242, 1246 (W.D. Wash. 2003) (denying defendant's motion to exclude expert testimony as to an association between PPA and hemorrhagic or ischemic stroke).

Courts have also found AERs to be admissible to support plaintiffs' theories of causation. *In re Neurontin*, 612 F. Supp. 2d at 157 (finding that pre- and post-marketing AERs were relevant to plaintiffs' theory that Neurontin caused suicide and suicide-related injuries.) Alternatively, some trial courts have delayed ruling on the admissibility of adverse event data until trial, since such decisions depends on context. *See, e.g., In re Fosamax*, 645 F. Supp. 2d at 200 ("Whether the AERs may be disclosed at trial depends on whether they are otherwise admissible or whether "their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. Fed. R. Evid. 703. Both questions may depend on case-specific circumstances.").

A large number of case reports adds "greater weight" to the reliability of an opinion on causation. *In re Fosamax*, 645 F.Supp 2d. at 184 (finding that 1400 adverse event reports were a "large number" adding to the "reliability" of plaintiffs' experts' opinions on causation); *In re PPA*, 289 F. Supp. 2d at 1242 (finding "significant the sheer volume of case reports, case series and spontaneous reports associating PPA with hemorrhagic stroke to women"); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (stating in dicta that reliable evidence on causality includes, inter alia, "a very large number of case reports.").

Plaintiffs agree that AERs are not as reliable as controlled studies. *See In re Baycol Prods. Litig.*, 532 F.Supp.2d 1029, 1039-40 (D.Minn. 2007) (noting that the "FDA has published certain caveats" as to the proper use of adverse event reports and citing multiple court opinions addressing the reliability of AERs). However, "[case] studies may be carefully considered in light of other information available." *In re Fosamax*, 645 F. Supp. 2d at 184 (citing Mary Sue Henifin, et al., *Reference Guide on Medical Testimony*, *in* Ref. Manual on Scientific Evid, at 633-34.) Indeed, epidemiologists consider case reports relevant to the "totality" of the data when assessing causation. *See Ambrosini v. Labarraque*, 101 F.3d 129, 136 (D.C. Cir. 1996). Thus, taken in context with controlled studies and other evidence, AERs are admissible to show consistency in the data and to support an opinion on causation.

Thus, the Court should deny Merck's motion to exclude all evidence of and reference to postmarketing AERs and to bar expert testimony based on such reports, with respect to causation and notice issues.

## IV.  AERs ARE ADMISSIBLE UNDER THE FEDERAL RULES OF EVIDENCE AND ARE NOT BARRED BY THE HEARSAY RULE

As plaintiffs argued in previous Vioxx cases, and as set forth in section III, *supra*, AERs do not fall within the definition of hearsay under Rule 801 to the extent that they are not being offered to prove the truth of the matter asserted. (*See* Pl.'s Opp. to Mot. to Exclude Adverse Event Data, *Irvin v. Merck*, November 11, 2005, incorporated herein [DCA Decl. Ex. 11].) Even if this Court finds that AERs are hearsay, they are admissible under the business records exception to the hearsay rule, or as admissions.

Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Testimony offered to prove that the party had knowledge or notice is not

hearsay. *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 687 (11th Cir. 1984). *See Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 483 (5th Cir. 2009) ("[T]he value of the statement does not rest upon the declarant's credibility and, therefore, is not subject to attack as hearsay.") (quoting *Alexander v. Conveyors & Dumpers, Inc.*, 731 F.2d 1221, 1230 (5th Cir. 1984). *See also Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1090 (5th Cir. 1988) (holding that a statement does not fall under the hearsay rule if it was offered to prove that certain statements were made to defendant corporation).

Primarily, Plaintiffs intend to offer AERs and to prove notice and Merck's failure to warn or properly investigate, evaluate, and resolve cardiovascular and GI safety risk. As such, these reports are not offered primarily to prove the truth of what they assert—that Vioxx caused serious GI or CV events—but rather that Merck knew or had notice of these events and failed to warn doctors, patients, and the public.

Moreover, the AERs kept by Merck are also admissible under the business records exception to the hearsay rule, or as admissions. *See Chism v. Ethicon Endo-Surgery, Inc.*, No. 4:08-00341, 2009 U.S. Dist. LEXIS 94141, at *5-6 (E.D. Ark. Sept. 23, 2009) (denying medical device manufacturer's motion to exclude adverse event reports, holding that the reports fall under the business record exception to the hearsay rule). *See generally Murtinlcovic v. Bangash*, No. 84-9568, 1987 WL 28400 (N.D. Ill. December 18, 1987) (explaining that receipt of adverse event reports and records maintained of them are admissible against defendants as either records of regularly conducted business under Fed. R. Evid. 803(6) or as Defendant's admissions under Fed. R. Evid. 801(d)(2)).

Rule 803(6) reads, in part:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near

> the time by, or from information transmitted by, a person with
> knowledge, if kept in the course of a regularly conducted business
> activity, and if it was the regular practice of that business activity
> to make the memorandum, report, record or data compilation . . . .

Like the medical device reports in *Chism*, the AERs in this case were made during the course of a regularly conducted business activity, required under federal regulations. *See* 21 C.F.R. § 314.80; 2009 U.S. Dist. LEXIS 94141, at *5-6. Merck collected AERs and maintained the WAES database, pursuant to written procedures, for the specific purpose of identifying signals of risks due to the use of their products, and to determine whether such signals warranted revisions of the safety sections of the labels of such products. (Deposition of Thomas Bold, M.D. 279:3-281:6, July 29, 2005 [DCA Decl. Ex. 13]). Contrary to Merck's assertion, nothing in the pleadings shows circumstances that indicate a lack of trustworthiness of such documents for the purposes for which they are admissible.

This Court has already denied Merck's request to exclude AERs, and should do so again in this case. AERs not hearsay when offered to prove notice, knowledge or Merck's failure to follow the standard of care. To the extent Plaintiff's experts rely on AERs to inform their opinion that Vioxx is gastrotoxic, or plaintiffs offer them to prove as much, the AERs fall under exceptions to the hearsay rule and are admissible.

### V. MERCK HAS RELIED ON ADVERSE EVENT REPORTS TO SUPPORT PURPORTED ABSENCE OF RISK OF CV HARM, AND PLAINTIFF'S AER EVIDENCE IS ADMISSIBLE TO PROVE NOTICE OF INCREASED RISK.

Merck's motion seeks to exclude the same type of AER evidence that it has relied upon in the past to justify the safety of its product. In the very first public statement following the VIGOR trial, on March 27, 2000, Merck stated that it had reviewed its "post-marketing experience" and found no evidence of CV risk of Vioxx. (March 27, 2000 Press Release at 2 [DCA Decl. Ex. 12].) Similarly, in the Background Information document submitted by Merck

to the FDA Advisory Committee on January 2, 2001, Merck included a section on its review of post-marketing reports, again to justify the alleged lack of a signal of CV risk. (Background Information, 1/2/01, at 97-98 [DCA Decl. Ex. 14].) These assertions permit Plaintiff to introduce relevant contrary evidence arising from Merck's AERs showing that doctors reported hundreds of MIs associated with Vioxx, and that many of them told the company that Vioxx was the cause of the MI. (Bold Dep. 447:21-453:22 [examples of doctors reporting MI "related" to Vioxx], 464:1-465:19 [473 MI reports with Vioxx in Merck's database as of 12/13/03].) Dr. Bold also testified that MI "should have been considered" for label review by the Adverse Effect Report Team [AERT] based on the receipt of more than seven MI reports in any six-month period (Bold Dep. 463:25-464:21), making 58 such reports in the six months ending November 2001. This evidence is relevant to notice and failure to warn.

Thus, the finder of fact may infer that Merck's internal knowledge of such reports was as relevant as Merck's earlier analysis claiming not to show such a signal, and an inference of negligence or concealment may be made on the basis of Merck's public statements about the exonerating analysis while failing to make known the reports suggesting excess risk.

## VI.   CONCLUSION

For the foregoing reasons, Merck's motions to exclude all evidence of and reference to adverse event reports should be denied.

Respectfully submitted, this 12th day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Plaintiffs' Memorandum In Opposition To Defendant's Motion in Limine No. 9 To Exclude Evidence Of And Reference to Post Marking Adverse Event Reports has this day been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to pretrial order No. 8B, on this the 12th day of March, 2010.

/s/ James R. Dugan