*EXHIBIT 9*

# Pharmacoepidemiology

Edited by

## Brian L. Strom, M.D., M.P.H.

Associate Professor of Medicine and
  Pharmacology and
Co-Director
Clinical Epidemiology Unit
Section of General Internal Medicine
Department of Medicine
University of Pennsylvania School of Medicine
Attending Physician
Hospital of the University of Pennsylvania
Philadelphia, Pennsylvania



CHURCHILL LIVINGSTONE
New York, Edinburgh, London, Melbourne

**Library of Congress Cataloging-in-Publication Data**

Pharmacoepidemiology/edited by Brian L. Strom.
    p.  cm.
  Includes bibliographies and index.
  ISBN 0-443-08675-3
  1. Drugs—Side effects.  2. Epidemiology—Research—Methodology.
I. Strom, Brian L.
  [DNLM: 1. Drug therapy—adverse effects.  2. Epidemiologic
Methods.  QZ 42 P536]
RM302.5.P53   1989
615'.704—dc20                                                         89-17300
DNLM/DLC                                                          CIP
for Library of Congress

© Brian L. Strom, M.D., M.P.H. 1989

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior permission of the copyright holder (Brian L. Strom, M.D., University of Pennsylvania School of Medicine, Philadelphia, PA 19104-6095).

Published and distributed in the United States by Churchill Livingstone Inc., 1560 Broadway, New York, NY 10036. Distributed in the United Kingdom by Churchill Livingstone, Robert Stevenson House, 1–3 Baxter's Place, Leith Walk, Edinburgh EH1 3AF, and by associated companies, branches, and representatives throughout the world.

Accurate indications, adverse reactions, and dosage schedules for drugs are provided in this book, but it is possible that they may change. The reader is urged to review the package information data of the manufacturers of the medications mentioned.

Acquisitions Editor: *Robert A. Hurley*
Copy Editor: *Bridgett Dickinson*
Production Designer: *Patricia M<sup>c</sup>Fadden*
Production Supervisor: *Jocelyn Eckstein*

Printed in the United States of America
First published in 1989

# 10

# Spontaneous Reporting Systems Outside the United States

Bengt-Erik Wiholm
Sten Olsson

The awareness that modern drugs could carry unexpected hazards was triggered by a letter to the editor of the *Lancet* published on 16 December 1961.[1] In this historical document of 15 lines, Dr. McBride from Australia reported that he had noted an increased frequency of limb malformations among babies and that a common denominator seemed to be the intake of a new hypnotic drug, thalidomide, by their mothers.

In the wake of the public health disaster that then was unravelled, the governments in many countries arranged procedures for a systematic collection of information about adverse drug reactions (ADRs). These systems were based on the spontaneous reporting of suspected ADRs by physicians and were first organized in Australia, Italy, the Netherlands, New Zealand, Sweden, the United Kingdom, the United States, and the Federal Republic of Germany. Each of these was initiated between 1961 and 1965. Similar systems now operate in about 30 countries.

In 1968, 10 countries from Australasia, Europe, and North America agreed to pool all reports that had been provided to their national monitoring centers in a World Health Organization (WHO)-sponsored international drug-monitoring project. The reason for pooling the data was a wish to identify even very rare but serious reactions as early as possible. The WHO scheme was first set up as a feasibility study in Alexandria, VA, and moved to WHO headquarters in Geneva in 1970. Owing to financial problems, the economic and operative responsibilities of the WHO center were transferred to Sweden in 1978. The formal responsibility for and the coordination of the program, however, still rests with WHO headquarters in Geneva. Today 27 countries participate in the program (Table 10-1).

Spontaneous reporting systems are primarily designed to detect new ADRs: they generate signals about possible ADRs, creating hypotheses for subsequent studies. The next steps are to prove or refute these hypotheses; to estimate the incidence, relative, and excess risk of the ADRs; to explore the mechanisms involved; and to identify special risk groups. Under certain selected circumstances, spontaneous reporting can be used to provide valuable information for these latter tasks, as well.

In this chapter, we describe the organization, operation, and results of sponta-

Table 10-1. Countries Participating in the WHO International Drug Monitoring Program and Year When They Entered the Program

| Country | Year |
|---|---|
| Australia | 1968 |
| Canada | 1968 |
| Czechoslovakia | 1968 |
| Germany, Federal Republic of | 1968 |
| Ireland | 1968 |
| Netherlands | 1968 |
| New Zealand | 1968 |
| Sweden | 1968 |
| United Kingdom | 1968 |
| United States | 1968 |
| Denmark | 1971 |
| Norway | 1971 |
| Japan | 1972 |
| Poland | 1972 |
| Israel | 1973 |
| Finland | 1974 |
| Yugoslavia | 1974 |
| Bulgaria | 1975 |
| France | 1975 |
| Indonesia | 1975 |
| Italy | 1975 |
| Romania | 1976 |
| Belgium | 1977 |
| Spain | 1984 |
| Thailand | 1984 |
| Germany, Democratic Republic of | 1987 |
| Turkey | 1987 |

neous reporting schemes outside of the United States, with the goal of increasing the readers' understanding about the advantages and limitations of this pharmacoepidemiologic approach.

## DESCRIPTION

ADR reporting schemes differ in a number of different dimensions. First, there are in essence two parallel global systems. One is the medical literature: many journals publish case reports of patients who experienced possible ADRs. The other is the collection of different national systems, systems whose data are coordinated and pooled by the WHO Collaborating Center. The focus of this chapter is on the second system rather than the first, although literature case reports are included to some degree in some of the national systems.

Second, the national systems themselves are organized in many different ways. Most are centralized, but a few are decentralized. For most of the national systems the reporting of ADRs is voluntary, but for some it is mandatory. Most national systems receive their reports directly from health practitioners. Some, however, receive most of their reports from health practitioners via the pharmaceutical manufacturers, including the largest national system, that of the United States (see Ch. 9). Most centers review each report on an individual basis by using a clinical pharmacology approach, often making judgements about each case as to how likely it is that the drug caused the adverse event (see also Ch. 21). However, others use mainly an aggregate or epidemiologic approach to the analysis of the reports. Finally, the national centers differ dramatically in how they interact with reporters. Some treat their reporters anonymously, providing feedback only in the form of regulatory actions or occasional published papers. Others provide very direct feedback—verbal, written, or published—to maximize the dialogue between the reporters and the center.

## Organization and Affiliation of National Monitoring Centers

In most countries, the monitoring center is part of the drug regulatory authority. Some countries have designated a university to carry out the functions of a national center, although its coverage may be restricted to one or two regions. This is the case in Spain and until recently, in Italy. In Indonesia and New Zealand, the functions are carried out jointly by the drug control authority and a university institution. In Switzerland, there is a drug-monitoring center cosponsored by the national regulatory authority and a consortium of pharmaceutical industries. In the Federal Republic of Germany, the ADR monitoring program

was originally (in 1958) organized by the Drug Commission of the German medical profession, but it did not go into full operation until 1962. Since 1978 the new drug law transferred the responsibility for the evaluation of drug-induced risks to the National Institute of Health (Bundesgesundheitsamt). The Drug Commission still collects and evaluates ADR reports from physicians, pharmacists, and manufacturers, which then are relayed to the health authorities.

In France, the situation is unique, in that the Ministry of Health serves as a coordinating and executive body for a network of 30 regional centers connected to major regional hospitals. Each center is responsible for ADR monitoring in its region. The evaluated reports are fed into a central data base. The regional centers are cosponsored by the Ministry of Health, the hospitals, and the universities. Other public or even private sources of support can be used as well, provided they are ethical, reported to the Ministry of Health and agreed to by the Ministry. Italy, Spain, and Thailand are developing systems similar to that of France. For a few years in the United Kingdom, there have been selected regional centers connected to university hospitals, which have a special responsibility for stimulating ADR reporting in their particular areas. In Japan, a total of 1,001 hospitals have been designated as "monitoring hospitals" by the Ministry of Health. Clinicians in these hospitals are particularly encouraged to report on ADRs observed. There are also 2,477 "monitoring pharmacies," designated to report on adverse reactions to over-the-counter medicines.

Regionalized systems have the advantage that good communication and personal relationships may be established between the staff of the monitoring center and the reporting professionals. They are, however, demanding in the number of staff needed and, unless the reports are fed directly into a central data base, result in delays in the flow of information.

Finally, in Canada and New Zealand the national centers also function as poison information centers. These may serve as useful models for other countries, since intoxications and adverse reactions are often related. The regional centers in France also have responsibility for a general drug information activity, providing pharmacologic advice for specific patients. This may further add to the value of a center, as the local physicians then feel that they not only feed in reports of ADRs, but in return receive clinically relevant information from the center.

## Reporting Requirements

The greatest need for information on undesirable and unexpected drug effects relates to drugs that are newly marketed. Thus, most countries emphasize the need to report even trivial reactions to new drugs, while for established medicines only serious reactions are usually requested. Some countries have clearly identified which new drugs they want observed most closely. In the United Kingdom, such drugs are marked with a black triangle in the British National Formulary. In Denmark, a list of drugs of special interest is published in the national medical journal. In New Zealand and Ireland, some selected new drugs are put in an intensive reporting program. Most countries have, however, issued rather general recommendations as to what type of reactions should be reported to the National Center.

In a majority of countries, submission of reports on suspected ADRs is voluntary. However, a few countries have instituted legal obligations for certain groups to report. In France, Norway, and Sweden it is compulsory for physicians and dentists to report cases of suspected serious adverse reactions to the regulatory authority. In France, the Federal Republic of Germany, Italy, Japan, the United Kingdom, and the

United States it is obligatory for drug manufacturers to submit to the regulatory authority cases of suspected adverse experiences that have become known to them. In many countries of the second group, the institution of legal requirements has resulted in a dramatic increase in the number of reports received at the national center. it is not certain, however, that the quality of the reports has increased or that this had led to an earlier recognition of new reactions. In our opinion, it is preferable that a reporting system be based on direct communication between clinicians and professionals at the monitoring center. If this is possible, a legal obligation to report seems to be less important than frequent and relevant feedback from the system.

## Sources of Reports

The regulatory status and the organization of a national drug-monitoring program also determines the sources and the type of information that will be received. Three main groups of countries can be identified:

Countries obtaining a substantial contribution of reports directly from physicians in hospitals and in outpatient care, such as Australia, Ireland, the Netherlands, New Zealand, the Nordic Countries, and the United Kingdom.
Countries receiving a vast majority of their information in secondary form, via the pharmaceutical industry, such as the Federal Republic of Germany, Italy, and the United States.
Countries mainly dependent on information from hospital physicians only, such as Japan, Romania, and Yugoslavia.

The contribution from dentists is generally small. Some countries accept reports from pharmacists, nurses, and even consumers.

## Handling of Reports

When a report reaches a national center, it is normally read by a physician or a pharmacist, who makes a judgement about whether the information provided is sufficient as a basis for an opinion about the correctness of the diagnosis and causality, or whether more data should be requested. In some countries, the national center is staffed by pharmacists who have access to medical consultants. In a majority of countries participating in the WHO scheme, the medical officer makes an assessment of each case with regard to the probability of a causal relationship between the clinical event and the drug(s) administered. In many countries, the national center is aided in making the final assessment of causality and the evaluation of the clinical importance of the aggregate reports by an advisory committee of experienced clinical experts.

No common standard for the assessment of causality has been agreed on internationally. Most experts are able to agree about which factors should be taken into account in the assessment, but how much weight should be given to each of the factors is the subject of an ongoing scientific debate. During the last ten years, a number of more or less complicated and comprehensive algorithms for the assessment of causality have been constructed.[2,3] When tested by their inventors, these algorithms have, in general, been found to decrease inter-rater variability.[4–6] This has not, however, always been the case when the algorithms have been tested by independent groups.[7,8] Moreover, it has not been possible to test whether the assessments reached by the use of the algorithms have been more valid than those reached without them. No algorithm has yet been constructed that can cope with the wide varieties of exposure-event categories seen by a national center and yet is simple enough to be used when evaluating a large number of cases on a routine basis.

The only country that today is using an

algorithm on a routine basis for the assessment of causality in ADR reports is France, where the existence of 30 different regional centers necessitates some standardization.[9] The use of this algorithm is also mandatory for the pharmaceutical industry. In contrast, some national centers, for example, that in Canada, are of the opinion that causality rating of each single case as submitted introduces bias and that it is an unacceptable allocation of resources. Methods for assessing causality in case reports are discussed in more detail in Chapter 21.

## Feedback to Reporters

Some form of feedback from the national center has to be arranged for clinicians to be involved in two-way communication. In many countries, such as Australia, Japan, the Nordic countries, Yugoslavia, and Turkey, each reporter receives a personal acknowledgment, often including a preliminary evaluation of the case. In the Netherlands and the United Kingdom, many reports are followed up by a telephone call, a personal visit from a medical officer at the center, or a visit from a specially assigned physician.

Adverse reaction bulletins are produced regularly in many countries and then distributed to the medical profession. Sometimes the information is included in a local medical journal or a drug information bulletin, as in Belgium, Denmark, Sweden, and the United States. Signals of hitherto unknown but potential adverse reactions are increasingly reported to the WHO collaborating center. Each quarter, about 1,000 new potential drug-event combinations are received. During recent years, several such signals have been published, based on single or few cases that appeared in two or more countries and where the material was pooled to generate a signal of better quality (Table 10-2). Compilations of all ADRs reported to a drug or a drug class are also published in medical journals or books.[24–26]

## Rate of Reporting

Griffin and Weber[27] have calculated 1982 reporting rates in 15 different countries. Denmark, Ireland, New Zealand, Norway,

Table 10-2. Examples of Publications on New ADRs During the 1980s[a]

| Reaction | Drug | Year of Publication | Country | Reference |
|---|---|---|---|---|
| Agranulocytosis | Mebhydrolin | 1982 | Australia | 10 |
| Diplopia | β-Blockers | 1982 | United Kingdom | 11 |
| Testicular pain | Mazindol | 1983 | Australia, the Netherlands | 12 |
| Drug interaction | Oral contraceptive and griseofulvin | 1984 | The Netherlands, United Kingdom | 13 |
| Fibrosis | Ergotamine | 1984 | Belgium | 14 |
| Photosensitivity | Azapropazone | 1985 | 6 countries | 15 |
| Acute hypersensitivity | Paracetamol | 1985 | 10 countries | 16 |
| Agranulocytosis | Indalpine | 1985 | France | 17 |
| Extrapyramidal disorders | Flunarizine, cinnarizine | 1986 | Spain | 18 |
| Skin reactions | Terfenadine | 1986 | 5 countries | 19 |
| Esophageal obstruction | Glucomannan | 1986 | Australia | 20 |
| Pulmonary infiltrates | Tolfenamic acid | 1987 | Finland | 21 |
| Angioedema | Enalapril | 1987 | United Kingdom | 22 |
| Urticaria | Captopril | 1988 | The Netherlands | 23 |

[a] These are examples of new ADRs that were discovered through spontaneous reports or for which spontaneous reports reinforced previous suspicions.

124 • *Pharmacoepidemiology*

Sweden, and the United Kingdom were in the group of countries having the highest reporting rates, whether this was counted relative to their total population (more than 200 reports per million inhabitants) or their number of practicing physicians (more than 100 reports per 1,000 physicians). Figure 10-1 depicts the number of reports received by the WHO center from each of the different participating countries in 1987. In most countries, reporting has gradually increased over time (Fig. 10-2). It usually takes some 5 to 10 years of operation before reporting reaches a stable level. The number of reports has, however, increased substantially in Australia, Spain, and the United Kingdom. The number of reports relayed to the WHO center is often less than that received in the country, for various technical reasons. Also, reports evaluated as unclassifiable or reactions caused by overdoses are omitted from some but not all countries. The U.S. situation is special in this regard and is described separately (see Ch. 9). Usually about 40,000 reports are relayed annually, which corresponds to about 170 reports per million inhabitants.

## ADVANTAGES

A spontaneous reporting system can be relatively inexpensive to operate. One physician, one pharmacist, and a secretary can usually manage between 1,000 and 3,000 reports a year, depending on the amount of scrutiny, follow-up, feedback, and other activities that are part of the program. The



**Fig. 10-1.** Number of case reports per million inhabitants submitted to the WHO Collaborating Center from various countries in 1987. Countries submitting less than 10 reports per million inhabitants are not shown. *More reports than usual because of a backlog. **Fewer reports than usual because of technical problems.



Fig. 10-2. Number of case reports submitted to the WHO Collaborating Center each year.

basic technical equipment needed is also a relatively minor investment. Together with other properties (Table 10-3), some of which are unique, this makes a spontaneous reporting system one of the basic ingredients in a comprehensive system for the postmarketing surveillance of drug-induced risks.

A spontaneous reporting system has the potential to cover the total patient population. It is not restricted to either hospitalized patients or those treated as outpatients, and does not exclude patients treated for other concomitant diseases, etc. Moreover, the surveillance can start as soon as a drug is approved for marketing and has no inherent time limit. Thus, it is potentially the most cost-effective system for the detection of new ADRs which occur rarely, mostly in special subgroups, like the elderly, or in combination with other drugs.

In an analysis of how important ADRs were first suspected and then verified, Venning[28] found that 13 of 18 reactions were first signalled by an anecdotal report

Table 10-3. Advantages and Disadvantages of Spontaneous Reporting Systems

**Advantages**
 Inexpensive and simple to operate
 Covers all drugs during their whole life cycle
 Covers the whole patient population, including special subgroups, such as the elderly
 Does not interfere with prescribing habits
 Can be used for follow-up studies of patients with severe ADRs, to study mechanisms

**Disadvantages**
 Amount of clinical information available is often too limited to permit a thorough case evaluation
 Underreporting decreases sensitivity and makes the systems sensitive to selective reporting
 Reporting rate is seldom stable over time
 No direct information on incidence

Case 2:05-md-01657-EEF-DEK   Document 37040-10   Filed 03/12/10   Page 11 of 19

made by a physician with an open and critical mind. The fact that these reports were published in medical journals led Venning to conclude that spontaneous reporting systems were of little value in the signalling process. However, the majority of these reactions actually were detected before most spontaneous reporting systems were operational. In a recent analysis of where the first suspicion that a new drug could cause agranulocytosis appeared, it was found that, for 13 of 20 drugs, the first report appeared in the WHO data base more than 6 months before it was published. The opposite situation was found only in two cases.[29] Some of these signals were published. Table 10-2 presents these and some other examples of situations in which a drug problem has been "discovered" or in which a previous signal has been reinforced by the use of spontaneous reports. In most cases, however, a spontaneous reporting system needs to be supplemented by other sources of information.

## DISADVANTAGES

Spontaneous reporting systems are mainly intended to produce signals about potential new ADRs. To fulfill this function properly, one must recognize that a number of false signals will be produced; therefore, each signal must be scrutinized and verified before it can be accepted. Preferably, a signal should be followed up by an analytic epidemiologic study design and one or more of the data resources described in Chapters 11 to 19.

A more serious disadvantage is that all reactions are not reported and that the proportion which is reported in any specific situation is hard to estimate. A basic requirement for the generation of a report is that a physician suspect that the signs or symptoms of the patient may be caused by a drug. This is relatively easy when the reaction can be predicted by the inherent pharmacologic actions or chemical properties of the drug. There are also some diseases that are considered as "typical" drug-induced reactions, such as agranulocytosis and severe skin reactions, so that the basic level of suspicion is high. It is, however, very hard to make the mental connection between a drug and a medical event if the event stimulates a spontaneously occurring disease or other untoward event that has never previously been described as drug induced. It is also difficult to make the mental connection between a drug and a medical event if there is a time lag between exposure and disease.

Even if the physician suspects the signs and symptoms of the patient to be drug induced, there are a number of more or less irrational reasons for not reporting this suspicion. Dr. Inman, the founder of the British "yellow card" system, has designated the most common reasons as "the seven deadly sins" (Table 10-4).[30]

Besides delaying the detection of new ADRs, underreporting creates two other important problems. First, it will result in an underestimate of the frequency of the ADR and, thereby, an underestimate of the importance of the problem. This may not be so serious as long as one recognizes that

**Table 10-4.** Reasons for Not Reporting Adverse Drug Reactions

| |
|---|
| Complacency—the mistaken belief that only safe drugs are allowed on the market |
| Fear of involvement in litigation |
| Guilt—because harm to patient has been caused by the treatment the doctor has prescribed |
| Ambition to collect and publish a personal series of cases |
| Ignorance of the requirements for reporting |
| Diffidence about reporting mere suspicions which might perhaps lead to ridicule |
| Lethargy—an amalgam of procrastination, lack of interest or time, inability to find a report form, etc. |

(From Inman,[30] with permission.)

the reported frequency is a minimum level. More important is that underreporting may not be random but selective, which may introduce serious bias. The effect of selective reporting becomes potentially disastrous if the number of reports of an ADR for different drugs is compared in an uncritical way. For example, in Sweden, as in many other countries, there was a surge of reports of gastrointestinal ulcers and bleeding suspected to have been caused by piroxicam soon after its introduction. If the number of ulcers and bleeding reported for piroxicam is compared with that reported for indomethacin or aspirin, one may be led to believe that the new drug is much more ulcerogenic than the old ones. However, there are many other possible reasons for the apparent differences. The rate of reporting is often higher during the first years a new drug is on the market. The reporting rate has increased in general, as well. Finally, a drug that is claimed to be very safe may first be tried on patients who have sensitive stomachs and who do not tolerate aspirin and indomethacin.

## PARTICULAR APPLICATIONS

### Without the Addition of Other Data

A spontaneous reporting system can, in its basic form, be regarded as an incomplete (and at worst biased) collection of case reports, without any information on the size or characteristics of the population exposed to the drug. In this basic form, it is rarely possible to use spontaneous reports to establish a causal connection between an adverse event and a drug, unless (1) there is at least one patient with a positive rechallenge and some other supportive patients who do not have known confounding drugs or diseases, or (2) there is a cluster of exposed cases reported, the background incidence of the adverse event is close to zero, and there is no confounding.

Although the reappearance of an adverse event when a drug is given again is certainly no proof of causality,[31] in practice one is rather reassured that there is strong evidence for a causal connection if one has a cluster of cases with good clinical information, in which the same event has reappeared with repeat exposure at least once in each patient. Of course, this is only possible if the medical event in question is of a type that would diminish or disappear after withdrawal of the drug and not reappear spontaneously. Thus, the observation of five cases of aseptic meningitis that reappeared within hours after readministration of the antibiotic trimethoprim for urinary tract infections[32] will convince most clinicians (and lawyers, if not philosophers) that this drug did and can cause such a reaction. For typical "hit-and-run" effects like thromboembolic diseases and for diseases that can be cyclic, information on rechallenge, however, can be misleading.

However, information on rechallenges is relatively uncommon in most spontaneous reporting systems. In a study designed to compare the information in and the evaluation of spontaneous reports from the Nordic countries, it was found that there was information on a positive reexposure in only 13% of 200 consecutive nonfatal cases (unpublished data).

An example meeting the second criterion occurred with the cardiovascular drug aprindine. Four to five cases of agranulocytosis were reported in the Netherlands during the first two years the drug was marketed. As the background incidence of agranulocytosis is only five to eight per million inhabitants per year,[33] this made a strong case for a causal relationship.[34] In contrast, it is much more difficult to judge whether the very commonly used analgesic and antipyretic drug dipyrone causes agranulocytosis or is used to treat symptoms caused by agranulocytosis.

## With the Addition of Denominator Data

Today, many drug regulatory authorities and pharmaceutical manufacturers have access to information that can be used to estimate both the size and the characteristics of the exposed population and the background incidence of diseases. The sources available in Sweden are shown in Table 10-5. In Sweden, all pharmacies belong to one state-owned corporation, and the total amount of drugs delivered to different pharmacies since 1972 (and hospitals since 1976) is computerized and stored. The amounts sold can easily be calculated as number of packs, tablets, or so-called defined daily doses (DDD)[35] (see Ch. 20).

In addition, since 1974 a random sample of 1 of every 288 prescriptions has been selected and made available in more detail. Information about the age and sex of the patient and the name, amount, and daily prescribed dose of the drug is coded and computerized. Since 1983, this sample has been increased to 1 of every 25 prescriptions.

As another example, since 1978 the Diagnosis and Therapy Survey has been conducted, as a collaborative effort between the pharmaceutical industry, the National Corporation of Pharmacies, the Medical Association, and the National Board of Health. In this survey, a random sample of physicians each week register the indication for all drugs prescribed.

All this information is maintained on an aggregate basis. There is also a small individual prescription register in the county of Jämtland, where drug purchases for one-seventh of the population have been continuously recorded since 1970. Information from all these sources is published annually in a book entitled Swedish Drug Statistics.[36]

Finally, morbidity and mortality registers function in much the same way as those in other countries. While the information in the cancer register, the malformation register, and the medical birth record register is of high quality, it is slow, with a backlog of 1 to 3 years. The information in the mortality register and hospital diagnosis register is produced more quickly but is less accurate.

## With the Addition of Numerator Data

If the rate of reporting is known, the estimate of the numerator can become more accurate. From studies of registers of hospital discharge diagnoses, it has been possible to calculate reporting rates for some areas, ADRs, and periods of time. Considering serious reactions such as blood dyscrasias, thromboembolic disease, and Stevens-Johnson syndrome, in general between 20 and 40% of the patients discharged with these diagnoses have been found to be reported.[37] By identifying all positive *Mycobacterium bovis* BCG cultures in bacteriology laboratories, it was found that almost 80% of all children who developed an osteitis after BCG vaccination had been reported.[38] However, reporting rates probably cannot be generalized. The magnitude of underreporting is important to

Table 10-5. Complementary Sources of Information for the Evaluation of ADRs Available in Sweden

| Source of Information | Year of Introduction |
|---|---|
| **Adverse drug reaction oriented** | |
| Spontaneous reporting system | 1965 |
| Intensive hospital monitoring | 1979 |
| **Drug utilization oriented** | |
| Total sales register | 1972 |
| Prescription sample 1:288 | 1974 |
| Diagnosis and therapy survey | 1978 |
| County of Jämtland survey | 1970 |
| Community of Tierp survey | 1971 |
| **Morbidity oriented** | |
| Mortality register | 1911 |
| Cancer register | 1959 |
| Malformation register | 1965 |
| Medical birth register | 1973 |
| Patient register | 1968 |

know when evaluating the data but should not be used to correct for underreporting in the calculations.

## Using Spontaneous Reports to Estimate Risk

If information from an efficient spontaneous reporting system can be combined with information on drug sales and prescription statistics, it is often possible to derive a rough estimate of the frequency or incidence rate of an ADR. Such estimates can, of course, never reach the accuracy of those derived from clinical trials or formal epidemiologic postmarketing surveillance studies. However, they can serve as a first indicator of the size of a potential problem. For very rare reactions, they may actually be the only conceivable measure.

Specifically, with knowledge of the number of DDDs sold and the average prescribed daily dose (PDD), it is possible to get a rough estimate of the total person-time of exposure for a particular drug. The number of cases reported per patient exposure-time will then be a rough estimate of the incidence. For example, the yearly "incidence" of reported thromboembolic complications fell drastically, from 26 to 7 per 100,000 users, in parallel with the introduction of low-estrogen oral contraceptives in Sweden in the mid-1970s.[39] If prescription statistics are available, the number of prescriptions may actually be a better estimate of drug use among outpatients than the number of treatment weeks calculated from sales data, especially for antibiotics, for which drug use is mostly short-term and doses and treatment times may vary with patient age and indication. As an example, the frequency of reports of serum-sickness-like reactions and erythema multiforme was 17 and 4 per 10,000 prescriptions, respectively, among children aged 0 to 9 years prescribed a solution of cefaclor (a cephalosporin antibiotic). No such reactions were reported among adults using tablets (data on file). These results could suggest that there is something in the solution apart from the active substance that causes the reactions. However, other possible explanations are age-dependent differences in reporting or in actual immunologic reactivity, and one must always be extremely careful in the interpretation of such data.

If the background incidence of a disease is known or can be estimated from other sources, it is sometimes also possible to calculate rough estimates of relative risks and excess risks from spontaneously reported data on ADRs plus sales and prescription statistics. For example, single cases of aplastic anemia in patients taking acetazolamide (a carbonic anhydrase-inhibiting diuretic that is used mainly for the treatment of glaucoma) have been reported since the drug was introduced in the mid-1950s.[40] There are no quantitative measurements of the incidence of this reaction, but it was certainly very rare. It was thought to be more rare than aplastic anemia occurring after the use of chloramphenicol. However, between 1972 and 1985, 10 cases were reported to have occurred in Sweden alone.[41] Based on sales and prescription data, it could be estimated that the total exposure time was 180,000 patient-years during the same period of time, giving an incidence of about 1 reported case per 20,000 exposed patients, or 50 per million patient-years. From a population-based case-control study of aplastic anemia in which Sweden participated,[42] it could be estimated that the total yearly incidence of aplastic anemia in the relevant age groups was about 6 per million. In the case-control study, it was not possible to estimate the relative risk for the association between acetazolamide and aplastic anemia because there were no exposed controls. However, if the spontaneously reported incidence of aplastic anemia among people exposed to acetazolamide is compared with the total incidence of aplastic anemia from the case-

control study, the relative risk could be estimated to be around 8. Obviously the true incidence is probably higher than the incidence of reported cases. The true relative risk is something greater than 8, therefore.

Several potential sources of errors in this study must be considered. The degree of underreporting in this example is unknown. However, in one study the reporting rate for aplastic anemia was found to be 30%,[43] and since then reporting in general has doubled. There is no known association between glaucoma and aplastic anemia that could act as a confounder, but some of the reported patients had taken other drugs during the 6 months before the detection of their aplastic anemia. In fact, there were only two patients who had been treated with drugs which, on clinical pharmacologic grounds, seem to be reasonable alternatives. However, it is a clear limitation that multiple drug exposures cannot be corrected for in a rough analysis such as this.

As another example, in March 1982 a new antidepressant drug, zimelidine, was introduced in Sweden. Zimelidine was a new chemical entity that blocked the uptake of serotonin in the neurons, instead of blocking the uptake of epinephrine or norepinephrine, as did its predecessors. As of the time of drug marketing, this antidepressant drug appeared to be less toxic than tricyclic antidepressants, with fewer of the ADRs usually associated with the use of antidepressants. A hypersensitivity reaction that mimicked influenza, with fever, myalgia, arthralgia, and sometimes a slight rash or elevation of the liver transaminases, seemed to be the only characteristic new ADR associated with the use of this new compound.

However, during the first 16 months of the marketing of zimelidine, approximately 50 patients were reported to have developed various neurologic complications during treatment with the drug. Eight of these patients fulfilled the criteria for suffering from Guillain-Barré syndrome.[44] All these patients developed a "flulike" hypersensitivity reaction within the first month of treatment. The neurologic complication developed in close connection to the hypersensitivity reaction. By using sales and prescription statistics, it could then be estimated that a maximum of 60,000 individuals could have been treated with zimelidine, with a total exposure time of about 14,000 patient-years. From Sweden's hospital statistics we could estimate the yearly incidence of Guillain-Barré syndrome to be 2.5 per 100,000 inhabitants. The reported frequency of the Guillain-Barré syndrome among patients exposed to zimelidine could then be estimated to be at least about 1 in 6,000, the incidence rate 0.6 per 1,000 treatment-years, the relative risk 24, and the excess risk 0.58 per 1,000 treatment-years.

In this situation no relevant confounding factors could be identified. All reported cases fulfilled strict criteria for the disease, so misclassification of the cases could be ruled out. Complete ascertainment of all cases (complete reporting) could not be guaranteed; this would lead to an underestimate of the risk estimates. Moreover, the population at risk (the denominator) might have been grossly overestimated. All patients who developed the Guillain-Barré syndrome did so between day 11 and day 30 of treatment. Thus, the risk did not seem to be independent of time. However, the denominator was calculated from the estimate of the total patient exposure-time, which included patients who stopped treatment within the first week as well as those treated for several months. Moreover, all cases of Guillain-Barré syndrome developed among patients who first experienced a hypersensitivity reaction, and these reactions were seen on average in only 1 to 2% of the patients during the clinical trials program. Thus, the true population at risk might be only the 1 to 2% of all patients who developed hypersensitivity reactions to the drug. Of course, this too would lead to our estimate being an underestimate of the real risks.

## Using Spontaneous Reporting Data to Identify Mechanisms and Risk Groups

As soon as it has been established that a drug could induce a certain adverse reaction, it becomes very important to look for the mechanisms that could be involved and to try to identify whether any group of patients is at a particularly increased risk or if any measures could be taken at the patient or the population level to reduce the risk. Usually a multitude of different methods must be applied, both in the laboratory and at a population level. A good spontaneous reporting system can be of value in this work in certain circumstances, if the data can be compared with sales and prescription data or if the patients can be subjected to special investigations.

For example, in one study of the characteristics of patients developing hypoglycemia during treatment with glyburide (an oral antidiabetic drug), the distribution of prescribed daily doses was similar in patients with episodes of severe hypoglycemic episodes and in the general population. However, patients hospitalized because of severe hypoglycemia were older and were more likely to have had a previous episode of cerebrovascular disease.[45]

As another example, in one of the first follow-up studies published on oral contraceptives and thromboembolic disease, it was found that women who were reported to have developed deep vein thrombosis while taking oral contraceptives were of the blood group O more often than would have been expected from the distribution of blood groups in the population.[46]

A similar study[47] studied patients reported to have developed lupoid reactions while taking hydralazine for hypertension. A much higher percentage were slow acetylators than the 40% that would be expected from the distribution of this phenotype in the population at large.

Finally, in a more sophisticated study, Strom et al.[48] recently used spontaneously reported cases of the suprofen-induced "acute flank pain syndrome" in a case-control study designed to identify patient-specific risk factors for the development of the syndrome. Patients who were reported to have developed the syndrome were compared with a random sample of patients who had taken the drug without problems.

## THE FUTURE

At least in the Western countries, the population is growing progressively older, and thus, we can expect a steady increase in the chronic use of medications. Even if the drugs to be used are more sophisticated and "targeted," they are also likely to more powerful and hence more difficult to use. With the continued development of clinical trial methodology, adverse reactions that are caused by pharmacologic mechanisms will probably be better known as to type and incidence when new medicines are approved. However, there will still be the classical idiosyncratic reactions, which cannot be predicted and which are too rare to be detected in the clinical premarketing trials programs. Moreover, it would be naive to assume that we will not be confronted with totally new and unexpected types of ADRs in the years to come. Thus, the importance of postmarketing surveillance will not diminish; we must continuously develop our total armamentarium of methods for this task. Spontaneous reporting of new and unexpected reactions is likely to remain one of the basic methods for pharmacoepidemiology for many years.

The role of spontaneous reporting in the future will be even more central if it can be developed further. The basic requisite for its enhanced effectiveness is an increased flow of information, both in quantitative and qualitative terms. For example, to increase the reporting of classical, rare ADRs such as blood dyscrasias, toxic epidermal

necrolysis, and liver and kidney damage, the automatic collection of information about all patients who have been hospitalized with these conditions could be instituted. This could be accomplished through manual retrieval of case summaries, providing high-quality information, or alternatively through automated transfer of computerized hospital discharge diagnoses.

However, the detection of the totally unexpected will most probably continue to rely on the capacity of the alert human mind for the foreseeable future. Therefore, it is mandatory to enhance the practicing clinician's awareness of and cooperation with ADR reporting. Here a regionalized system with mutual benefits, like the French system, seems promising.

Finally, it is not enough to increase the reporting signalling function only quantitatively. To gain new knowledge and to guarantee drug safety, it is necessary to increase the qualitative aspects of the information. The number of signals of possible new adverse events that are reported (1,000 per quarter to WHO) calls for a more efficient procedure for scrutinization and evaluation than can be accomplished with the present resources in the WHO program. We must therefore set up a system in which these signals can be analyzed and evaluated more effectively. This can only be accomplished through increased resources for and a more effective collaboration among national monitoring centers, university institutions, and pharmaceutical manufacturers.

## REFERENCES

1. McBride WG: Thalidomide and congenital abnormalities. Lancet II:1358, 1961
2. Venulet J, Berneker GC, Ciucci AG (eds): Assessing causes of adverse drug reactions. Academic Press, London, 1982
3. Herman RL (ed): Drug-event association: perspectives, methods, and uses. Drug Info J 18:195, 1984
4. Karch FE, Lasagna L: Toward the operational identification of adverse drug reactions. Clin Pharmacol Ther 21:2247, 1977
5. Kramer MS, Leventhal JM, Hutchinson TA et al: An algorithm for the operational assessment of adverse drug reactions. JAMA 242:623, 1979
6. Naranjo C, Busto EM, Seller P: A method for estimating the probability of adverse drug reactions. Clin Pharmacol Ther 30:239, 1981
7. Louik C, Lacouture PG, Mitchell AA et al: A study of adverse reaction algorithms in a drug surveillance program. Clin Pharmacol Ther 38:183, 1985
8. Pere JC, Begaud B, Haramburu F et al: Computerized comparison of six adverse drug reaction assessment procedures. Clin Pharmacol Ther 40:451, 1986
9. Moore N: Adverse drug reaction monitoring: doing it the French way. Lancet II:1056, 1985
10. McEwen J, Strickland WJ: Mebhydrolin napadisylate. A possible cause of reversible agranulocytosis and neutropenia. Med J Aus 2:583, 1982
11. Weber JCP: Beta-adrenoreceptor antagonists and diplopia. Lancet II:826, 1982
12. McEwen J, Meyboom RHB: Testicular pain caused by mazindol. Br Med J 287:1763, 1983
13. van Dijke CPH, Weber JCP: Interaction between oral contraceptives and griseofulvin. Br Med J 288:1126, 1984
14. Rober H, Derbandrenghien JP, Blampain JP et al: Fibrotic process associated with long term ergotamine therapy. N Engl J Med 311:601, 1984
15. Olsson S, Biriell C, Boman G: Photosensitivity during treatment with azapropazone. Br Med J 291:939, 1985
16. Stricker BHC, Meyboom RHB, Lindquist M: Acute hypersensitivity reactions to paracetamol. Br Med J 291:938, 1985
17. Castot A, Efthymiou ML: Atteintes hématologiques associées a la prise d'indalpine. Therapie 40:337, 1985
18. Laporte JR, Capella D: Useless drugs are not placebos: lessons from flunarizine and cinnarizine. Lancet II:853, 1986

Case 2:05-md-01657-EEF-DEK   Document 37040-10   Filed 03/12/10   Page 18 of 19

19. Stricker BHC, van Dijke CPH, Isaacs AJ et al: Skin reactions to terfenadine. Br Med J 293:536, 1986
20. Henry D, Mitchell A, Aylward J et al: Glucomannan and risk of oesophagel obstruction. Br Med J 292:591, 1986
21. Strömberg C, Palva E, Alhava E et al: Pulmonary infiltrations induced by tolfenamic acid. Lancet II:685, 1987
22. Wood S, Mann B, Rawlins M: Angio-oedema and urticaria associated with angiotensin converting enzyme inhibitors. Br Med J 294:91, 1987
23. Markusse HM, Meyboom RHB: Gynecomastia associated with captopril. Br Med J 296:1262, 1988
24. Holmberg L, Boman G, Bottiger LE et al: Adverse reactions to nitrofurantoin. Analysis of 921 reports. Am J Med 69:733, 1980
25. Weber JCP: Epidemiology in the United Kingdom of adverse drug reactions from nonsteroidal anti-inflammatory drugs. p. 27. In Rainsford KD and Velo GP (eds): Side Effects of Anti-Inflammatory Drugs. Part I. MTP Press, Lancaster, England, 1986
26. Wiholm B-E, Myrhed M, Ekman E: Trends and patterns in adverse drug reactions to nonsteroidal anti-inflammatory drugs reported in Sweden. p. 55. In Rainsford KD and Velo GP (eds): Side Effects of Anti-Inflammatory Drugs. Part I. MTP Press, Lancaster, England, 1986
27. Griffin JP, Weber JCP: Voluntary systems of adverse reaction reporting. Adverse Drug React Acute Poisoning Rev 1:23, 1986
28. Venning GR: Identifications of adverse reactions to new drugs. II. How were 18 important adverse reactions discovered and with what delay? Br Med J 286:289, 1983
29. Wiholm B-E, Lindquist M: The detection and evaluation of drug induced agranulocytosis by spontaneous reports. IIIrd World Conference on Clinical Pharmacology and Therapeutics, Stockholm, 1986
30. Inman WHW (ed): Monitoring for Drug Safety. 2nd Ed. p. 37. MTP Press, Lancaster, England, 1986
31. Rothman KJ (ed): Causal inference in epidemiology. p. 7. In Modern epidemiology. Little, Brown, Boston, 1986
32. Carlson J, Wiholm B-E: Trimethoprim associated aseptic meningitis. Scand J Infect Dis 19:687, 1987
33. The International Agranulocytosis and Aplastic Anemia Study: Risk of agranulocytosis and aplastic anemia. A first report of their relation to drugs with special reference to analgesics. JAMA 256:1749, 1986
34. van Leeuwen R, Meyboom RHB: Agranulocytosis and aprinidine. Lancet II:1137, 1976
35. Nordic Council on Medicines: Nordic Statistics on Medicines 1975–1977. Part II. Nordic Council on Medicines, Uppsala, Sweden
36. National Corporation of Swedish Pharmacies: Statistisk sammanställning 1979–88 (Swedish Drug Statistics). (Introduction and codes in English). National Corporation of Swedish Pharmacies, Stockholm
37. Wiholm B-E: Spontaneous reporting of ADR. p. 12. In Boström H, Ljungstedt N (eds): Detection and Prevention of Adverse Drug Reactions. Skandia International Symposia. Almqvist & Wiksell, Stockholm, 1983
38. Böttiger M, Romanus V, de Verdier C et al: Osteitis and other complications caused by generalized BCG-itis. Experiences in Sweden. Acta Paediatr Scand 71:471, 1982
39. Böttiger LE, Boman G, Eklund G et al: Oral contraceptives and thromboembolic disease. Effects of lowering oestrogen content. Lancet I:1097, 1980
40. Fraunfelder FT, Meyer MS, Bagby GC Jr et al: Hematologic reactions to carbonic anhydrase inhibitors. Am J Ophthamol 100:79, 1985
41. Mortimer O, Wiholm B-E: Acetazolamide-pancytopenia. Bulletin from the Swedish Adverse Drug Reactions Advisory Committee 46, 1985
42. The International Agranulocytosis and Aplastic Anemia Study: Incidence of aplastic anemia. The relevance of diagnostic criteria. Blood 70:1718, 1987
43. Böttiger LE, Westerholm B: Drug-induced blood dyscrasias in Sweden. Br Med J 3:339, 1973
44. Fagius J, Osterman PO, Siden A et al: Guillain-Barré syndrome following zimelidine treatment. J Neurol Neurosurg Psychiatry 48:65, 1985

45. Asplund K, Wiholm B-E: Glibenclamide-associated hypoglycemia, a report on 57 cases. Diabetologia 24:412, 1983
46. Jick H, Slone D, Westerholm B et al: Venous thromboembolic disease and ABO blood type. Lancet I:539, 1969
47. Strandberg I, Boman G, Hassler L et al: Acetylator phenotype in patients with hydralazine-induced lupoid syndrome. Acta Med Scand 200:267, 1976
48. Strom BL, West SL, Sim E, Carson JL: The epidemiology of the acute flank pain syndrome from suprofen. (Submitted for publication.)