*EXHIBIT 11*



7418991

Nov 11 2005
11:41PM

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to** | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| **Evelyn Irvin Plunkett v. Merck & Co, Inc.** | * | **CASE NO. 02:05CV4046** |

---

### Plaintiff's Memorandum in Opposition to
### Defendant's Motions in Limine to Scientifically Unreliable and Irrelevant Medical and Scientific Evidence, David Graham Estimates, and Adverse Event Data

*(Plaintiff's Opposition to Defendant's Motions in Limine No. 6, 8, 11)*

---

Plaintiff Evelyn Irvin Plunkett, Personal Representative of the Estate of Richard Irvin, Jr., hereby opposes defendant Merck & Co. Motions in Limine No. 6, 8 and 11 to Exclude all Evidence of and Reference to (1) Statistically Insignificant Data; (2) David Graham Estimates; (3) Toxicological Data from Animal Studies; (4) Adverse Event Reports ("AERs"); (5) Investigator-Reported Data; and (6) Alzheimer's Disease Clinical Trial Mortality Data. The evidence at issue is highly relevant and admissible under well-established Federal law. For the reasons described herein as well as for the reasons asserted by the Plaintiff in his response to defendant's *Daubert* motions, this Court should deny Defendant's motion to exclude this evidence.

## ARGUMENT

**I.     MOTIONS IN LIMINE ARE INAPPROPRIATE WHEN USED TO USURP THE
JURY'S DUTY TO MAKE DETERMINATIONS ON QUESTIONS OF FACT**

At the outset, Plaintiff notes that Merck's scattershot attempt to exclude broad categories

of evidence in this case is entirely misplaced and inappropriate.  Basically Merck has requested

that the Court improperly exclude any and all relevant yet remotely harmful evidence remotely to

the story it wishes to present at trial.  This is not the purpose of the *in limine* motion. *See United*

*States v. Posner,* 594 F.Supp. 923, 927-28 (S.D. Fla. 1984) (denying motion in limine as

premature where court could not make a determination as to the admissibility of the evidence

prior to knowing whether the witness would testify at trial); *Violette v. Armonk Assocs., L.P.,* 849

F. Supp. 923, 930-31 (S.D.N.Y.1994) (denying plaintiff's *in limine* motion without prejudice to

its renewal on the ground that the circumstances under which such evidence would be introduced

were unknown); *United States v. Feola,* 651 F. Supp. 1068, 1129 (S.D.N.Y.1987) ("It would be

improper for this Court to speculate as to the circumstances that might surround the introduction

of this evidence at trial, specifically, the adequacy of the foundation . . . , the probative value

weighed against the potential prejudicial impact in light of the evidence presented, and the

purpose for which such a statement will be introduced at the time."), *aff'd,* 875 F.2d 857 (2d

Cir.1989).

The Fifth Circuit has noted: "[w]hen evidence is challenged solely on the ground that it is

irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401--it must be without

probative value as to *any* fact of consequence to the determination of the action. If it is relevant

as to any issue, it is relevant to the action and is not inadmissible under Rule 402". *See Chrysler*

*Credit Corp. v. Whitney Nat'l Bank,* 824 F.Supp. 587, 599 (E.D.La.1993)(quoting *Lubbock Feed*

*Lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250, 267 (5th Cir.1980)(emphasis in original).  A movant *in limine* has the burden of establishing that the evidence sought to be excluded on relevancy grounds is *not* relevant to *any* issue in the case.  It is not enough to establish that the evidence *is* relevant to an issue which is *not* part of the case.  *See Chrysler Credit Corp. v. Whitney Nat'l Bank,* 824 F.Supp. 587, 599 (E.D.La.1993).

## II.   TESTIMONY REGARDING THE STUDIES AND DATA AT ISSUE SHOULD NOT BE PRECLUDED; PARTICULARLY WHERE PLAINTIFFS' EXPERTS HAVE RELIED ON SUCH STUDIES IN FORMING THEIR OPINIONS

Although the substantive aspects of this case are governed by Florida law, the Federal Rules of Evidence control the admission of expert testimony.  *Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 459 (5th Cir.1996).  Federal Rule of Evidence 702 governs the admission of expert testimony and provides that  "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or  otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed.R.Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *Bocanegra v. Vicmar Services, Inc.,* 320 F.3d 581 (5th Cir 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591-92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* At 584.

The Supreme Court has provided five, non-exclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are "(1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community." *Id.* at 584-85 (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *Mathis v. Exxon Corp,* 302 F.3d 448 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 275 (5th Cir.1998) (en banc).

As the *Bocanegra* court stated, "the test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue." *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct. *Id.* at 585.

The Fifth Circuit has noted that "the *Daubert* analysis should not supplant trial on the merits." *Mathis,* 302 F.3d at 461 (quoting *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir.2002)) . "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786).

In addition, "whether an expert's testimony is reliable is a fact-specific inquiry." *See Burleson v. Texas Dep't of Criminal Justice,* 393 F.3d 577, 583-584 (5th Cir.2004)(citing *Skidmore v. Precision Printing & Pkg., Inc.,* 188 F.3d 606, 617-18 (5th Cir.1999)).  The broad

4

generalization made by Merck in the motions in limine make such required factual inquiry impossible until trial, where the context and facts related to the evidence sought to be introduced may be analyzed by the Court.

The types of material that Merck seeks to exclude, published studies, clinical study data, and adverse event reports, are of the type that is regularly relied upon by experts and clearly admissible under Federal law. *See id.* Plaintiffs submit that the Court should permit their experts to testify and consider, in the overall context of their testimony, whether they have established that any text, article, clinical data or adverse event report that they rely on is "reliable." Without testimony establishing whether the evidence at issue is representative of that which experts in the field typically rely on, a ruling on whether this, or any other evidence should be excluded is premature.

## III.   EVIDENCE OF AND REFERENCE TO DR. GRAHAM'S ESTIMATES ARE RELEVANT AND SHOULD BE ALLOWED

Merck seeks to exclude evidence relating to or referencing findings from a retrospective nested case-control study conducted by Dr. David Graham, an FDA scientist, and others (hereinafter "Graham Study"), in which Dr. Graham found an increased risk of heart attacks and sudden death associated with the use of Vioxx as compared to Celebrex, even where such evidence has been relied upon by Plaintiff's experts, including Dr. Wayne Ray and Dr. Benedict R. Luchesi. *See* P. 2.0050 (Ex. A). This study was published in a peer-reviewed, medical journal. *See id.* Using the relative risks from randomized clinical trials and the background rates seen in NSAID risk studies, Dr. Graham suggests that an estimated 88,000 – 140,000 excess cases of serious coronary heart disease occurred over the market-life of Vioxx. *See id.* Dr. Graham observes that the United States national estimate of case-fatality rate (fatal acute

myocardial infarction plus sudden cardiac death) was 44%, and extrapolates from this that many

of the above mentioned excess cases attributable to Vioxx use were fatal. *See id.* at 6.

   **A.    Dr. Graham's Estimates of Excess Heart Attacks and Sudden
          Cardiac Deaths are Admissible to Show Notice, Causation,
          Merck's Failure to Warn, and Its Disregard for Consumers**

        Merck has asked this Court to exclude all testimony and evidence related to Dr.

Graham's estimates of excess heart attacks and sudden cardiac death ("Graham's Estimates),

because Merck claims that such evidence relies on clinically insignificant data.  Such a request is

improperly overbroad because Dr. Graham's study, in its entirety, has its own independent basis

for admissibility.  Additionally, information as early November 1999 suggested that there was an

increased risk of serious cardiovascular events occurring in patients taking Vioxx compared to

naproxen.  The Graham Estimates bring forward the result of Merck's failure to properly warn

against the adverse reactions attributable to the ingestion of Vioxx.   The Graham Estimates are

derived from sound, well-founded methodology and, as indicated by the defendants in their

motion, supported by several experts in the field that have relied to some extent on his findings.

Thus, the Graham Study is sufficiently reliable under Federal law and is admissible.

        Merck suggests that the Graham Estimates are irrelevant because Merck claims that the

Graham study did not show a statistically significant association  between 25 mg Vioxx and the

risk of serious coronary heart disease. This narrow-viewed approach to the important data found

in Dr. Graham's study is a perfect example of the myopic view taken by Merck in analyzing all

study data related to Vioxx and cardiovascular risk.  The Graham study data exemplify the total

potential impact of Merck's failure to warn, which denied Mr. Irvin of his right to give informed

consent.  Also, the data is relevant to Merck's duty, level of conscious disregard for the safety of

the consumer, and the unreasonableness of Merck's conduct when presented with such data.

Merck had a continuing duty to warn about all adverse events, including death.  If the true extent of the risks had been disclosed, doctors would not have continued to prescribe these drugs in such rapid numbers and Mr. Irvin would have had knowledge of his increased risk for myocardial infarction or death.  Moreover, if Merck had disclosed its knowledge sooner, the Graham Study would not have been supplied with the data sufficient to generate the damning estimates Merck now seeks to avoid.  Finally, listings of death suggest the fact that Merck was inaccurate in its measurement of the rate of MI with Vioxx.

Merck argues that the Graham Estimates are flatly inconsistent with the findings of APPROVe and VIGOR, and, therefore, are irrelevant.  This assumption is incorrect.  First, Dr. Graham clearly relies on additional data and studies in reaching his conclusion.  As stated on page six of his study, his estimates evolved from the total estimated number of Vioxx prescriptions dispensed in the USA, indicated by IMS Health, combined with the use of relative risks generated in the APPROVe and VIGOR clinical trials, together with the background rates seen in NSAID risk studies.

Merck argues that the Graham Study found no statistically significant increased risk of heart attacks or deaths associated with Vioxx use at the 25 mg dose.  From this, Merck alleges that the Graham study data is inconsistent and pure chance.  To support its argument, Merck cites the fact that some Texas courts have held that epidemiological data must demonstrate an odds ratio of 2.0 or greater to be reliable.  Merck is incorrect in its assertion that this Court is bound by or should even find persuasive Texas substantive law on the question of reliability.  To the extent that the matter is one of substantive, rather than procedural law, Florida law should apply.  In Florida and in federal courts throughout the country epidemiological evidence involving odds ratios below 2.0 is admissible and consistent with a plaintiff's recovery at trial. *See Berry v. CSX*

7

*Transp. Inc.*, 709 So. 2d 552, 569 (Fla. 1st DCA 1998).  The Second Circuit has held that a

"qualified expert may view the epidemiological studies and factor out other known risks . . .

which might enhance the remaining recognized risks, even though the risk in the study fell short

of the 2.0 correlation."  *In re Joint E. & S. District Asbestos Litig.,* 964 F.2d 92, 97 (2d Cir.

1992).  Where plaintiff's experts use epidemiological studies as one basis for an expert opinion

but do not rely solely on epidemiological evidence, epidemiological evidence of a certain

magnitude need not be provided because the expert does not rely on those studies alone.  *Id.*;

*Berry,* 709 So. 2d at 568-70.  As stated above, Dr. Graham considers several bases for his

estimates and any suggestion by Merck that his estimates are inconsistent with his data should

not be determinative for the admissibility of this evidence. The Graham Study is supported by

sound methodology and expert support, and admissible under Federal law.

It is well settled that there are at least 10 kinds of evidence that can support a causal

connection between a drug and its adverse reactions.  These lines of evidence include, but are not

limited to, case reports in series, adverse event reports, animal studies, case reports that are

published in peer reviewed medical literature, chemical structure, studies based on

pharmacological classes similar to the drug at issue, textbooks, and literature on similar drugs of

the same class that have the same mechanisms of action.  *See In Re: Phenylpropanolamine*

*(PPA),* 2003 WL 22417238 *26 (N.J. Super. 2003)  For this reason, and all those stated above,

Defendant's final argument to exclude the Graham study data is also unpersuasive.

This evidence is relevant to Plaintiff's claims that Merck had notice of the adverse risks

associated with Vioxx and failed to adequately study and test the drug before selling it on the

market.  If Merck had responded appropriately to earlier findings, and had taken into

consideration the material analyzed by Dr. Graham, the vast injuries suffered by many people,

8

including Mr. Irvin, could have been avoided.  Instead, Merck delayed and postponed studies until the true consequences of the ingestion of this drug could no longer be concealed.

      **B.**    **Estimates Of Excess Number Of Heart Attack Or Death Has Substantial Probative Value Which Is Not Substantially Outweighed By Any Potential Prejudice To Merck, Nor Will Such Evidence Confuse Or Mislead The Jury**

The probative value of the Graham study data is clearly shown in the previous section. Any prejudicial effect felt by Merck hardly reaches the level of "unfair."  "Direct proof of a claim does not create the *unfair* prejudice that Rule 403 intended to avoid. The touchstone for excluding evidence under Rule 403 is not prejudice, but *unfair* prejudice, which must substantially outweigh the probative value of the evidence. This Court does not view Rule 403 as a tool designed to permit the trial court to "even out" the weight of the evidence.  "Instead, there is a place in the courtroom where the skill and acumen of professional trial lawyers should be brought to bear. Indeed, the motion practice presaging the subject jury trial admits that the trial lawyers in this case are keenly aware of the points of contest, and quite capable of fairly evening-out the score at trial on the merits and paring down any inaccuracy or exaggeration, such that it more closely comports with the truth." *Soll v. Provident Life & Acc. Ins. Co.*, 2002 WL 1461891 at 6 (E.D.La. July 5, 2002)

The Fifth Circuit in *United States v. Pace,* 10 F.3d 1106 (5th Cir.1993), *cert. denied,* 511 U.S. 1149, 114 S.Ct. 2180, 128 L.Ed.2d 899 (1994) observed that the exclusion of evidence under Rule 403 should occur only sparingly.  *Id.*  Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. "Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403

9

must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.* "As to such, Rule 403 is meant to relax the iron rule of relevance. It is not designed to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none ." *Id.* at 1115-16 (quoting *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)).

Relevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by the risk of undue prejudice. *United States v. Adair,* 2005 WL 2990586 (5th Cir. 2005). Once evidence has been established as being relevant, the burden is on the party urging exclusion of evidence to convince the court that Rule 403 considerations should control. *State v. Jones,* 891 So. 2d 760, 767 (La. App. 4 Cir. 2004). It should be emphasized, however, that exclusion of relevant evidence pursuant to Rule 403 "is an extraordinary measure that should be used sparingly." *Campbell v. Keystone Aerial Surveys, Inc.,* 138 F.3d 996, 1004 (5th Cir.1998).

The evidence Merck seeks to exclude exemplifies the impact that Merck's failure to warn had on its consumers—failure to warn of knowledge possessed by Merck since at least 1999. Further, limiting instructions are available to reduce any possibility of jury confusion.

## IV. EVIDENCE AND TESTIMONY RELATED TO DATA UNDERLYING ANY STUDIES RELIED ON BY PLAINTIFF'S EXPERTS SHOULD BE ALLOWED

Plaintiffs' experts use epidemiological studies as one basis for opinions but will not rely solely on epidemiological evidence; thus, plaintiff does not need to provide epidemiological evidence of a certain magnitude for the evidence to be sufficiently reliable. *See In Re Joint E. & S.,* 964 F. 2d at 97.

Though most of these arguments will likely be resolved during the Court's *Daubert* hearings, Merck argues that to be statistically significant, an epidemiology study must be reach the 95% confidence level.  Merck improperly relies on the case of *Cado v Everest Minerals Corp.*, 362 F.Supp.2d 814, 821 (W.D. Tex. 2005), where the Court based its opinion not on the procedural Federal Rules of Evidence, or any of the progeny of cases applying Rule 702, but instead on the substantive law of Texas, as announced by the Texas Supreme Court in the infamous *Havner* decision.  *Cado*, 362 F.Supp.2d at 814 (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 723-24 (Tex 1997)).

Even if this Court were to adopt the determination that substantive law, not procedural, governed the admissibility of epidemiological evidence, it is certain that in the present case this Court would not look to Texas law, but rather to Florida law.  Under Florida law as under federal standards, such evidence would be admissible and not properly excluded under any evidentiary grounds.  *See Castillo v. E.I. Dupont De Nemours & Co., Inc.*, 854 So. 2d 1264 , 1270 (Fla. 2003) (epidemiology studies not necessary for party to meet its burden of showing causal connection).

In light of the forgoing facts and law in this Circuit, Plaintiffs' experts should not be precluded from testifying as to their opinions, which may or may not involve data deemed by the defendant to be insignificant.

### V.   ALL EVIDENCE OF AND TESTIMONY RELATED TO TOXICOLOGICAL DATA FROM ANIMAL STUDIES SHOULD BE ALLOWED

Similarly, Merck claims that "animal studies are not a sufficient basis for establishing causation"and that "the probative value of such studies is…outweighed by the potential prejudice…likelihood of confusing the issues and misleading the jury".  However, Plaintiff's

experts, including Dr. Lucchesi, *do not rely on animal studies alone*; rather, they rely on both human and animal reactions. Cases cited by Merck do not hold that evidence from animal studies cannot be considered along with other types of evidence to prove causation, but rather, that animal studies alone cannot prove causation in humans. Federal Rule of Evidence 703 allows an expert to testify "if facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.. R. Evid. 703.

### A.   Animal Toxicity Studies Are Relevant and Should be Allowed

Merck argues that animal studies are at the bottom of the scientific hierarchy and therefore should not be considered in determining whether there is a causal link between a drug and its effect in humans.[1] This is a very interesting argument in light of Merck's recent reliance on a study involving rabbits. See *Humeston v. Merck & Co.,* Testimony of Dr. Briggs Morrison, Transcript at 3266-3267 (Ex. B).

However, the authority cited by Merck rejects animal studies only when offered to controvert overwhelming epidemiological evidence. Here, no such overwhelming evidence exists. Furthermore, there is no support for Merck's argument that animal studies should be completely excluded where, in their opinion, "more reliable human data" is available. (p. 15). To disregard relevant toxicological animal data based solely on Merck's unsupported opinion is improper. Animal studies are admissible along with other evidence to prove causation. *See Lopez v. Wyeth-Ayerst*, 139 F.3d 905 (9th Cir. 1998) ("animal studies can contribute to an expert's scientific conclusions as to causation...") (citations omitted). *See also* Reference Manual on Scientific Evidence at 405 (2d ed. Federal Judicial Center 2000) ("Toxicological research often involves exposing animals... to chemicals, monitoring the outcomes, and

---

[1] Of interest, Merck has identified countless animal studies in its lists of exhibits it intends to offer into evidence at trial. No doubt, Merck intends to do what it attempts to convince this Court is contrary to law—rely on animal studies to support its expert's opinions.

comparing the outcome with those from unexposed control groups."). *See In re:*
*Phenylpropanolamine* (PPA), 2003 WL 22417238 (N.J. Super. July 21, 2003) (the court
allowed expert testimony that it considered of the type that experts in the medical and
toxicological communities generally use, including case reports, operations, retrospective
reviews, perspective studies, clinical studies, and **animal studies**, realizing that humans are
not rats or mice, but that "there is some relationship and if there is a problem in rats or mice,
there may be a similar problem in humans".  Further, the court allowed the expert to
"extrapolate from one subpopulation to another so long as he has an objective basis for doing
so and that such expert testimony of causation be admitted because it supports and
complements other scientific knowledge, e.g., animal studies, case reports."); *In re Paoli R.R.*
*Yard PCB Litigation*, 35 F.3d 717 (3rd Cir. 1994) (The district court abused its discretion in
excluding expert testimony regarding "animal studies that, although their 'fit' to proof of
causation in humans was in dispute, all experts acknowledged that the studies were of some
use at least in eliminating those chemicals not likely to cause disease in humans.").

**B.**      **Rule 403 Does Not Bar Evidence Of And**
         **Testimony Related to Toxicological Data From Animal Studies**

Merck argues that animal studies have no probative value because large-scale blinded
clinical trials of humans already exist.  However, as stated above, animal studies are not
excluded simply because human studies or trials exist, rather, animal studies may be relied on
in addition to such evidence. *See In re Paoli R.R Yard PCB Litigation*, 35 F.3d at 781 (it was
an abuse of discretion for the district court to conclude that the "probative value of the animal
studies was substantially outweighed by unfair prejudice and waste of time...there was
significant evidence in the record from other sources that the evidence was probative".  Thus,

13

the lower court's decision to choose between opinions was rejected and the animal studies were allowed as one source by which plaintiffs could prove their case.).[2]

**VI.    EVIDENCE OF AND REFERENCE TO ADVERSE EVENT REPORTS INVESTIGATOR REPORTED DATA, AND ALL-CAUSE MORTALITY FIGURES FROM ALZHEIMER'S CLINICAL TRIALS ARE HIGHLY RELEVANT AND HAVE PROBATIVE VALUE THAT FAR <u>OUTWEIGHS THEIR PREJUDICIAL VALUE</u>**

Merck also argues that adverse event reports ("AERs") including data reported by clinical investigators, as well as mortality data from certain Alzheimer's clinical trials, be excluded on the basis of relevancy, hearsay, and Federal Rule of Evidence 403.  This contention may be attacked on many of the same grounds as that of the previous section.

Two primary issues in this case are Merck's notice of adverse events associated with Vioxx and, in light of its knowledge, Merck's failure to properly warn about the dangerous side effects associated with Vioxx.  The role of AER, including reports made by clinical investigators, are central to the issues in this case, namely, notice to the company of adverse events and Merck's continuing duty to monitor and warn about these events.  Clinical trial adverse event investigation and post-marketing surveillance are critical components of all pharmaceutical companies' duties in maintaining a safety profile of a specific drug for meeting the company's responsibilities to physicians and patients as well as reporting to the FDA.

**A.    <u>Evidence of Adverse Event Reports are Admissible</u>**

AERs and clinical trial investigator reports do not fall within the definition of hearsay under Rule 801 to the extent that they are not being offered to prove the truth of the matter asserted.  Primarily, Plaintiffs intend to offer AERs and investigator data reports to prove

_____

notice and Merck's failure to warn or properly investigate, evaluate, and resolve cardiovascular safety risk.

Merck's suggestion that the FDA has cautioned about the reliability of AERs and other anecdotal reports does not negate the fact that Merck had knowledge of such AERs, similar to the injury suffered by Mr. Irvin which resulted in his death, and failed to exercise its duty to investigate such claims. Furthermore, Merck's assertion that AERs or investigator data are scientifically unreliable and inadmissible, and that opinion testimony based on such reports should also be inadmissible, is unfounded. Merck proceeds in its motion to string cite cases that ostensibly stand for this proposition. However, its effort, as with the animal studies, is dubious at best.

In the cases cited by Merck, AERs or case reports were excluded as evidence where the AERs or case reports were scant in number or were the sole support for the expert's testimony. Neither situation is at issue in the present case because there are countless AERs and/or case reports on point. Case reports have long-standing use as evidenced by publication of such reports in peer-reviewed scientific journals. *Reference Manual on Scientific Evidence,* supra, at 469. See also *Caraker v. Sandoz Pharmaceuticals Corp.,* 172 F. Supp. 2d 1046, 1050 (S.D. Ill. 2001) (where the court declined to allow an expert to rely solely on a scant number of case reports, but acknowledged that an overwhelming amount of case reports, [without additional support] showing a temporal proximity between a very specific drug and a very specific adverse event might be enough to make a general causation conclusion sufficiently reliable).

Moreover, the AERs and Clinical Investigator data kept by Merck are also admissible under the business records exception to the hearsay rule and as admissions by a party. See

generally *Martinkovic v. Bangash,* 1987 WL 28400 (explaining that receipt of adverse event reports and records maintained of them are admissible against defendants as either records of regularly conducted business under Fed.R. Evid. 803(6) or as Defendant's admissions under Fed. R. Evid. 801(d)(2)).  For purposes of notice, the reports in Merck's database are sufficiently trustworthy to fall within the exceptions to the hearsay rule.

Additionally, AERs are admissible as an exception to the hearsay rule for statements made for purposes of medical diagnosis or treatment, because an important purpose of the AER program or  clinical investigator reports is to identify whether the cause of an adverse reaction is due to the ingestion of a drug.  Rule 803(4).

### B.   Adverse Event Reports are Admissible When They Involve Incidents Sufficiently Similar to Place Defendant on Notice of Danger.

The requirement of similarity of circumstances is relaxed where evidence, such as AERs or clinical investigator reports, is offered to show that a defendant had notice of a danger rather than where the prior incidents are directed at proving actual negligence.  *Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613, 626 (8th Cir. 1983) (explaining how it is up to the jury to decide what weight to give complaints from other customers).  Further, "[u]nder Fed. R. Evid. 401, evidence of similar occurrences 'might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, [or] the standard of care, and causation.'" *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338-39 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112 (1981)).  To the extent experts rely on the numbers of AERs, the defendants will have ample opportunity to counter this evidence and explain dissimilarities.

C.      **Adverse Event Reports Are More Probative than Prejudicial**

Given the fact that the AERs including investigator reports are being presented by

plaintiffs as admissible non-hearsay, as well as hearsay that falls within the exceptions above,

AERs are relevant evidence a jury should be permitted to consider in determining the issue of

notice.  Merck is free to offer testimony regarding the importance and underlying procedure

involved with AERs or with their self-proclaimed "adjudication process" begun in 1998.  *See*

*Bendi v. McNeil-P.P.C., Inc.,* 6 F.3d 1378, 1385 (4th Cir. 1995) (explaining how the probative

value of these reports was not outweighed by the danger of unfair prejudice, because the

reports were highly probative on the issue of notice and the Defendant was free to offer

testimony rebutting their significance).   Similarly, Plaintiffs will be able to show that the 1998

adjudication program, was not a method for assessing causation, but instead was part of

Merck's pattern of ignoring its duty to properly investigate cardiovascular risk, and burying

any such evidence.  That Merck would now seek to hide behind this self-preservation

adjudication process as a basis for excluding evidence of the actual cardiovascular adverse

event reports during the clinical trials is not surprising, but it should not be countenanced.

Specifically, such evidence is directly relevant and admissible to support Plaintiff's challenge

of Merck's adjudication process and how it handled these early signals of the cardiovascular

risk.

Merck argues that a jury may accord more weight to AERs simply because they are

collected by a federal agency and might confuse the jury by placing Merck in a bad light.  As

noted above, there is a relaxed standard for admitting AERs and other anecdotal evidence,

including testimony based on such evidence when used to show notice on behalf of the

defendant rather than to prove negligence.  To the extent the evidence may be considered by

17

the jury for one purpose but not another, the issuance of a limiting instruction at trial can resolve any potential concern of prejudice or confusion. *See O.L. Maudlin v. Upjohn Co.*, 697 F.2d 644, 648 (5th Cir. 1983) (explaining how a limiting instruction by the Court as to the use of AERs in determining notice, prevented possible jury confusion and/or prejudice with regard to AERs which report injuries other than the one at issue). Further, the time and testimony that would be necessary for Merck to deny notice of voluminous AERs would be minimal, at best, and not meet the level of undue delay under Rule 403. The fact that Merck received and kept records of investigator reports and AERs relating to the ingestion of Vioxx goes directly to the issue of awareness of the dangerous propensities of its prescription drug.

> **D.   All AERs , Investigator Reports, and Mortality Data from Clinical Trials Are Relevant To Show Merck's Course of Conduct and Conscious Disregard for the Safety Of The Consumer**

This Court should allow AERs and Investigator data received by Merck into evidence, at least up to the date of Mr. Irvin's death. Events up to this date show Merck's awareness and continuing failure to warn doctors and consumers about the injuries suffered by Mr. Irvin, including his death. AERs not only serve as a monitoring function for the pharmaceutical manufacturer, but proper notation and forwarding of the information found in the AERs serves as a tool for doctors in determining when to prescribe and how to monitor the prescription drug in question. The fact that all of the AERs do not relate to Mr. Irvin's death does not negate the fact that every AER, especially those related to cardiovascular injuries and stroke, could and would be used in a doctor's analysis as related to the prescribing and monitoring of those ingesting the drug. And the investigator data is relevant to many issues including Merck's duty to investigate, Merck's duty to warn in its initial product labeling, and Merck's motive to manipulate other trials. Further, the Alzheimer's disease clinical trial data related to

mortality is highly relevant to issues of notice, a duty to investigate, a duty to warn, and the unreasonableness of Merck's conduct in marketing and selling the drug.

Furthermore, AERs relating to Vioxx are relevant to Merck's course of conduct and conscious disregard of the safety of the consumer. Where punitive damages are sought, evidence of events occurring subsequent to the incident in question is highly probative on the issue of conscious disregard for the safety of others. Despite the fact that a defendant's conduct may not have had a possible effect on the particular plaintiff, evidence of related conduct by the defendant, which amounted to a conscious disregard for the safety of others is entirely relevant to the issue of punitive damages.

## CONCLUSION

For the foregoing reasons, Merck's motions to exclude all Evidence of and Reference to (1) Dr. Graham's Estimates and Statistically Insignificant Data; (2) Toxicological Data from Animal Studies; and (3) Adverse Event Reports, Investigator Reports, and Alzheimer's disease clinical trials mortality data should be denied.

Respectfully submitted,

By: _P. Leigh O'Dell_

**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750
**PLAINTIFFS' LIAISONCOUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)
**PLAINTIFF'S STEERING COMMITTEE**

Christopher A. Seeger, Esquire
 SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **11th** day of November, 2005.