*EXHIBIT 12*

Confidential - Subject to Protective Order

Page 222

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - ATLANTIC COUNTY

- - -

IN RE:   VIOXX LITIGATION : CASE NO. 619

- - -

CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

- - -

July 29, 2005

- - -

Continued videotape deposition of THOMAS BOLD, M.D., held in the offices of Morgan Lewis, 1701 Market Street, Philadelphia, Pennsylvania 19103, commencing at 9:07 a.m., on the above date, before Linda L. Golkow, a Federally-Approved Registered Diplomate Reporter and Certified Shorthand Reporter.

- - -

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

Confidential - Subject to Protective Order

Page 279

1  safety surveillance of spontaneous reports.
2  BY MR. ARBITBLIT:
3       Q.    Were you the highest ranking person
4  at Merck who was assigned to review adverse
5  experience reports concerning Vioxx on a regular
6  basis?
7       A.    Highest ranked person, you mean with
8  regard to spontaneous reports?
9       Q.    Yes.
10      A.    On a regular basis, continuous
11 monitoring, I am the person who was responsible and
12 is still responsible of safety monitoring of
13 spontaneous reports.
14      Q.    And it was your job to identify
15 issues that may have implications for the safety
16 information sections for the assigned products with
17 regard to labeling?
18      A.    Well, it is my job, as I said, to
19 continuously monitor the safety of spontaneous
20 reports and to identify signals using the procedures
21 we have in place and, therefore, informing upper
22 management about any potential findings.
23           MR. ARBITBLIT:  Let's get this one
24 marked, please.
25                - - -

Confidential - Subject to Protective Order

Page 280

```
 1                    (Whereupon, Deposition Exhibit Bold-27,
 2               "Report Evaluation and Safety
 3               Surveillance Standard Operating
 4               Procedure Merck & Co., Inc. Title:  RESS
 5               Physician Medical Review, SOP No. 210,"
 6               MRK-GAR0014164 - MRK-GAR0014169, was
 7               marked for identification.)
 8                          - - -
 9     BY MR. ARBITBLIT:
10          Q.     27 is a document previously marked as
11     Exhibit 6 in a different deposition.  It's SOP
12     Number 210, title "RESS Physician Medical Review."
13     And that refers to your job at the time; correct?
14          A.     That is correct.
15          Q.     And you were the RESS physician, and
16     this describes your job duties at that time.
17          A.     That is correct.
18          Q.     At Page 5 of the document, the RESS
19     physician is in the left-hand column under section 2
20     heading "Label/Product Circular Review (Marketed
21     Products)," and it reads:  "In collaboration with
22     other AERT (Adverse Experience Review Team) members,
23     identify issues that may have implications for the
24     safety information sections for assigned products."
25     Do you see that?
```

Confidential - Subject to Protective Order

Page 281

1    A.    I see that.
2    Q.    So, it was your job with the other
3    members of the AERT to do what it says here, right,
4    "identify issues that may have implications for the
5    safety information sections for assigned products"?
6    A.    That is correct.
7    Q.    What they're talking about is the
8    labeling that goes with the product that includes
9    information about adverse events, whether it's
10   warnings, precautions, adverse reactions, the entire
11   spectrum; correct?
12   A.    I'm not sure I understand "the entire
13   spectrum."
14   Q.    Well, there are various levels of
15   information that a company can include on a label,
16   correct, going from rare events regardless of
17   causality all the way up to a black box warning?
18   A.    There are various levels, that is
19   correct.
20   Q.    Your job was to identify issues that
21   may have implications for the safety information
22   sections of this, and when they say "safety
23   information sections," they are referring to
24   labeling; right?  Safety information sections of the
25   label?

Page 447

1    Q.    Look at Tab 3.  "The reporting
2  physician felt that edema and myocardial infarction
3  was related to therapy with rofecoxib."
4    A.    I see that, but I don't see the
5  statement that the doctor says that edema led to the
6  myocardial infarction.  Isn't this what you implied
7  in your question?  I don't see that statement.
8    Q.    I think I said reported associated
9  with it.
10         But regardless, have you ever looked
11  at edema in association with myocardial infarction
12  before today?  Have you ever looked at reports where
13  both of those occurred in the same patient?
14    A.    Yes.  We have reports where, I mean,
15  as you can see here, where the patient presented
16  with edema and with myocardial infarction.  We know
17  that.  But it seems to me that you are implying
18  something more about that.  It seems to me that you
19  are implying that there's a relationship between the
20  development of edema and the myocardial infarction,
21  and I don't see that in these reports.  That is my
22  confusion.
23    Q.    Okay.
24         Let's look at Number 21, which is a
25  report that appears to have a Post-it on it and it

Confidential - Subject to Protective Order

Page 448

1  says "Copy for Thomas."  Is that a copy for you?
2       A.      That is a copy for me, yes.
3       Q.      And this is a "28 year old female
4  smoker" who "had no cardiovascular risk factor
5  except tobacco use and regular intake of
6  contraceptive pill."  And "The reporting physician
7  felt that coronary thrombosis and consequent
8  myocardial infarction in this young smoker female
9  patient was related to therapy with rofecoxib and
10 contraceptive pill."  What did you do with this copy
11 that was provided to you?
12      A.      Well, these copies are provided to me
13 by my associates, so, they ensure that I see all
14 those reports.  So, they are just being brought to
15 my attention.
16      Q.      Now then, look at Number 22.  You've
17 got a physician telling you that he had eight
18 patients who were placed on therapy with rofecoxib
19 25 milligram tablets who experienced myocardial
20 infarctions and stated that "some of the patients
21 'should never have been started on rofecoxib,'" and
22 that "The reporting physician felt that the
23 myocardial infarctions were related to therapy with
24 rofecoxib.  Additional information has been
25 requested."

Confidential - Subject to Protective Order

Page 449

1                    Did you recall any follow-up about
2    those eight patients with heart attacks referred by
3    a single doctor for your consideration?
4         A.     Well, again, I mean, I cannot recall
5    any specific actions undertaken trying to obtain
6    more information, but it also says that "The
7    physician did not remember the specific patients,"
8    which seems to be very odd in my opinion at least.
9    I mean, if a doctor reports on eight patients, makes
10   certain statements without providing any detailed
11   information and then saying he did not remember the
12   specific patients, I mean, one has to be careful.  I
13   mean, I read these reports, of course.  I mean, I'm
14   not saying those patients never existed.  I would
15   never do that.  But what information can you take
16   out of a report such as that?
17        Q.     Well, you could get additional
18   information.  Do you see any evidence that that was
19   done?
20        A.     And, again, I cannot speak what
21   attempts were made with regard to the specific
22   reports.  I'm sure there's a record, and that could
23   be found out.  But it is also telling to a certain
24   extent when the original report, I assume that this
25   is the original report, said that the physician did

Confidential - Subject to Protective Order

Page 450

1  not remember the specific patients.
2              So, that is -- when you look at the
3  back sides, that is information which was provided
4  through a company representative.  So, this is most
5  likely that the company representative visited the
6  office and the doctor told the representative about
7  something, but he would not remember the specific
8  patients.
9       Q.     So, in other words --
10      A.     Which I find -- I mean, if you have
11 eight patients, as a doctor, who all had a
12 myocardial infarction as stated here, I would think,
13 as a doctor, if I report about my patients, that I'm
14 able to identify those patients and give this
15 information to a company representative.
16      Q.     Do you have patients?
17      A.     I don't treat patients.
18      Q.     And this doctor did, and he felt that
19 eight of his patients got a heart attack because of
20 Merck's drug.  That's what he says.
21             MR. VAN KIRK:  Object to the form.
22 BY MR. ARBITBLIT:
23      Q.     Right?
24      A.     Well, that may be so, but whether or
25 not these were his patients or whether or not he

1  heard about that, I'm not so sure.  I mean, what
2  clearly is striking, if these are his patients, that
3  he would not remember the specific patients.
4        Q.      It's more striking to you that he
5  doesn't remember the specific patients, according to
6  whoever entered this data, than that eight people
7  had myocardial infarctions that this doctor
8  attributed to your drug?  Is that what's most
9  striking to you about this document, Doctor?
10       A.      I recognize that somebody reports --
11  no specific information with regard to any of those
12  patients, but there is a report telling the sales
13  representatives, at least that's the way it appears,
14  that there are eight patients who were placed on
15  therapy with rofecoxib and experienced myocardial
16  infarctions.  This I will not deny.  I'm not saying
17  this never happened.  I recognize that.
18              But I also recognize the additional
19  information.  I mean, these cannot be unrecognized
20  either.  And the fact is that the physician did not
21  remember the specific patients.  So, if the
22  physician doesn't remember specific patients, it is
23  very difficult to obtain follow-up information to be
24  able to assess these reports.  That's all I'm
25  saying.

Confidential - Subject to Protective Order

Page 452

1    Q.    Okay.  Take a look at Number 32,
2    which is information received from a physician via
3    the German agency concerning a 70-year-old male
4    patient with quite a bit of detail.  And the
5    statement at the bottom of the second page, page
6    MRK-ACO0058987 had:  "The reporting physician felt
7    that angina pectoris, posterior myocardial
8    infarction and coronary single vessel disease were
9    related to therapy with rofecoxib.  He stated that
10   classical NSAIDs like diclofenac and ibuprofen had
11   been well tolerated by the patient in former years."
12              Now, do you have a basis to disagree
13   with this reporting physician's interpretation that
14   Vioxx caused the heart attack?
15   A.    Again, I'm not -- I mean, the
16   physician is entitled to his opinion.  What I would
17   say, what we know now is that -- and there are two
18   findings really which were not necessarily apparent
19   in April of 2004.  We know that basically all
20   NSAIDs, selective, nonselective NSAIDs, are
21   recognized as drugs which potentially can increase
22   the risk of myocardial infarctions, and that would
23   include diclofenac and ibuprofen.
24              I would also point out that the
25   patient has been on therapy for a very short period

1  of time, a matter of several weeks.  In the APPROVe
2  trial, I mean, we did not see any separation of an
3  increased risk for 18 months.  And then again, even
4  if there's an increased risk, that doesn't mean
5  causality between use of a specific drug and the AE
6  itself.
7              So, I'm also looking at the patient
8  situation.  I see this is a Type II diabetes
9  mellitus, the patient has hypertension, the patient
10 has hypercholesterolemia.  I mean, all this
11 information has been taken into account in looking
12 at those reports.
13      Q.      And it has been taken into account by
14 the treating doctor as well, and he knew his patient
15 and concluded that Vioxx was the cause of the event;
16 is that right?  Yes or no?
17              MR. VAN KIRK:  Object to the form.
18              THE WITNESS:  It is correct that
19 there is a statement by the reporting physician that
20 he felt that the angina, the posterior MI, coronary
21 single vessel disease was "related to therapy with
22 rofecoxib."  That is correct.
23 BY MR. ARBITBLIT:
24      Q.      Doctor, your statement about NSAIDs
25 having risk of myocardial infarction including

Page 463

1    what does that mean in terms of whether there had
2    been reports of MI, silent MI and age indeterminate
3    MI in the database?
4         A.    That is correct.  So, when you see a
5    term, then that means that we would have a report of
6    that term in the database.  So, basically this
7    indicates -- I mean, the -- I can leave it at that.
8         Q.    Okay.
9               Now, going back to the 13 MIs, 12
10   serious, that we talked about as of January 31st,
11   2000, how does this period correspond to the time
12   periods for the rule of seven triggering a review of
13   that term?
14        A.    That period is more than six months,
15   so, that is basically a year.  Am I correct?
16        Q.    Well, yes, although I was wondering
17   how that related to the -- how the February 1st,
18   1999 would have been the international birthdate as
19   opposed to when it was marketed in the U.S.  Are
20   these all reports from around the world, or do you
21   know?
22        A.    Well, it is a cumulative summary
23   tabulation, so, that would mean that it is not
24   limited to U.S. reports.  It would be worldwide.
25        Q.    In the stack here, if you could look

1  for the adverse event summary from June 2001 to
2  November 2001.  It is in your stack of documents.
3  That's Exhibit 31.  If you could look at page 16 of
4  the document, which is 30024 on the Bates page.  Do
5  you see that?
6         A.      I see that.
7         Q.      Do you see under myocardial
8  infarction reports this period, there are 58 serious
9  reports?
10        A.      I see that.
11        Q.      And that's far more than seven under
12 your rule of seven should have been considered for
13 AERT review at that time; correct?
14        A.      The rule of seven indicated it should
15 have been considered for AERT review.
16        Q.      All the way over in the cumulative
17 reports, you see "143"?
18        A.      Yes, I see that.
19        Q.      So, that would have been the total
20 since marketing began?
21        A.      That is correct.
22                MR. ARBITBLIT:  Can I have that
23 marked next.
24                        - - -
25                (Whereupon, Deposition Exhibit Bold-57,

Confidential - Subject to Protective Order

Page 465

1                E-mail 12-3-03 with attachment,
2                MRK-ACO0107709 - MRK-ACO0107723, was
3                marked for identification.)
4                      - - -
5    BY MR. ARBITBLIT:
6         Q.     Does that have the 12/3/03 review?
7    Is that what you're looking at?  That's Exhibit 57.
8         A.     Yes.
9         Q.     Again, it's excerpted.  If you'll
10   look at Page 7 of the document which has last Bates
11   digits 7717.
12        A.     Yes.
13        Q.     You see under myocardial infarction,
14   there were 81 reports and 1 positive rechallenge
15   during the reporting period?
16        A.     I see that.
17        Q.     And the cumulative report total was
18   473.  Do you see that?
19        A.     I see that.
20        Q.     This November 2003 end date was after
21   the AERT review for events exceeding seven that
22   became mandatory; correct?
23        A.     I believe so.
24        Q.     And you did have MI terms in the
25   December AERT document that we just looked at;

ESQUIRE DEPOSITION SERVICES