UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, | JUDGE ELDON E. FALLON |
| Plaintiffs, | MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., | Case No. 05-3700 |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTIONS *IN LIMINE* NUMBERS 1 AND 13 (TO EXCLUDE EVIDENCE OR ARGUMENT CRITICIZING THE FOOD AND DRUG ADMINISTRATION OR ITS APPROVAL OF VIOXX, AND THAT MERCK MISLED THE FDA)**

861690.3

## I.  INTRODUCTION

The Court has previously denied Merck's motion to exclude the testimony of David J. Graham, a current FDA official. Dr. Graham's testimony addressed the interaction between Merck and the FDA, as well as the flaws in Merck's defense based upon FDA approvals. (Order, *Mason v. Merck,* October 16, 2006, MIL #2 [Declaration of Donald C. Arbitblit (hereinafter ("DCA Decl." Ex. 1].) The same ruling should apply in this case.

David Kessler, M.D., the former Commissioner of the Food and Drug Administration (FDA) is eminently qualified to testify concerning all aspects of the case as to which he has offered opinions, including the actions of Merck in development and marketing of Vioxx; the actions of the FDA in approving the drug and its conduct after approval; and the interaction between Merck and the FDA. Dr. Kessler applied a reliable methodology by considering relevant documents as to the history of what Merck knew about cardiovascular risk, what Merck told or failed to tell the FDA, and how the FDA applied or misapplied the regulations concerning new drug approval and post-marketing warnings. Dr. Kessler's opinions are relevant to establish violation of the standard of care for a pharmaceutical company and to address Merck's recurring defense based on FDA approvals of its conduct. *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) is not applicable to this case, because Plaintiff alleges a claim based on fraudulent misrepresentation and concealment as to the State of Louisiana, not as to the FDA, and evidence of Merck's interactions with the FDA is relevant to that claim.

## II.  DR. KESSLER'S OPINIONS ARE RELEVANT AND ADMISSIBLE

The Food, Drug and Cosmetic Act requires the sponsor of a new drug to demonstrate safety and efficacy to gain FDA approval. 21 U.S.C. § 355(b). In the absence of such approval, a new drug may not be introduced into interstate commerce. 21 U.S. § 355(a). Dr. Kessler testified at his deposition, in response to a question from defense counsel, that he disagreed with

the FDA's determination that adequate information had been provided to conclude that Vioxx was safe and effective when it was approved for use in May 1999. (Kessler Dep. 132:8-134:14 January 21, 2010 [Declaration of Don C. Arbitblit (hereinafter "DCA Decl.") Ex. 2].) Merck now seeks to exclude that opinion, but there is no legitimate basis to do so. As the former head of the FDA, the agency charged with interpretation and application of FDA regulations, Dr. Kessler is certainly well-qualified to offer an opinion about whether the laws were applied correctly, and his opinion falls squarely within the scope of admissibility under the prior rulings of the Court in this case.

In *In re Vioxx Products Liab. Litigation,* 401 F. Supp. 2d 565 (E.D. La. 2005), the Court ruled that the testimony of a plaintiffs' expert who was a former FDA employee "will help the jury understand the applicable FDA regulations and Merck's responses. . . . [H]is testimony should focus on the significance of certain documents and how these documents fit into the FDA's regulatory scheme." *Id.* at 595. Further, the Court stated, "*Buckman Company v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001), would not bar a qualified expert from testifying as to their opinion on whether the FDA correctly balanced the benefits and risks of a drug from a regulatory standpoint." *Id.* at 587. This ruling is applicable here. Dr. Kessler reviewed the documents relevant to Merck's knowledge of CV risk, including those that Merck provided to the FDA and those that were not provided. (Kessler Rep. ¶¶ 18-29 [DCA Decl. Ex. 3].) Based upon that review and his experience as FDA Commissioner, Dr. Kessler offered opinions concerning the documents and their relationship to the FDA's regulatory scheme, and his testimony is relevant and admissible.

The defense memorandum presents snippets of Dr. Kessler's deposition testimony that do not fairly portray his experience, expertise or methodology. For example, Defendant incorrectly

asserts that Dr. Kessler "based his conclusion that the FDA should not have approved Vioxx solely on a review of summary of a medical review officer's evaluation." (Def.'s Mem. in Supp. at 6.) However, it is evident from Dr. Kessler's Report that he considered many other documents in forming his opinion, including those that showed higher incidence of thromboembolic events on Vioxx compared to placebo in the clinical trials; pharmacology studies that demonstrated a prostacycline-thromboxane imbalance in Vioxx users; Merck's undisclosed "concern" over whether that imbalance could promote a pro-thrombotic state; the internal "Watson" analysis derived from clinical data showing a higher incidence of thromboembolic events among the pooled Vioxx trial population than a placebo group selected for comparison by Merck from another drug trial; and the recommendations of Merck's Scientific Advisory Board to investigate the CV risk issues in parallel with the steps taken to commercialize the drug. (Kessler Rep. at ¶¶ 18-29.) None of these documents are referenced in the Defense Memorandum, which paints an inaccurate picture of expert reliance on a single document.

In his interpretation of the FDA regulations, Dr. Kessler stated that the manufacturer has the burden of showing that the drug is safe and effective, and he explained that the medical officer applied "the wrong standard" by permitting the approval process to go forward where it could not be stated with "complete certainty" whether the risk was increased—the obverse of the correct standard. (Kessler Dep. 132:8-134:14.) Dr. Kessler also opined that Merck's pre-market "Watson" analysis met the regulatory definition of data "derived from clinical investigations," and that it therefore should have been submitted as part of the New Drug Application. (Kessler Rep. ¶ 23.) Testimony on these issues would assist the finder of fact in understanding the applicable standards for new drug approval; whether Merck misled the FDA by not disclosing the Watson analysis; and "whether the FDA correctly balanced the benefits and risks of the drug

861690.3                                                      - 3 -

from a regulatory standpoint." *In re Vioxx Litig.*, 401 F. Supp. 2d at 587.

Dr. Kessler's experience as Commissioner of the FDA for seven years under two Presidents substantially exceeds the level of expertise of other FDA employees who have been permitted to testify about FDA regulations, pharmaceutical companies' behavior, and the interaction between the two, in this case and elsewhere. Dr. Kessler has also testified before Congress concerning the preemption doctrine and co-authored an *amicus* brief relied upon by the United States Supreme Court in *Wyeth v. Levine*, 555 U.S. ___ (2009), which held that the preemption doctrine did not relieve a pharmaceutical company of its duty to warn of hazards of its product.

Finally, Merck misinterprets Dr. Kessler's statements about his review of the FDA's conduct, implausibly interpreting his comments as evidence of lack of knowledge or expertise, when in fact these statements merely reflect that *Merck's* conduct was the focus of his opinions; interactions with FDA are inherently a part of that assessment. Paragraph 7 of Dr. Kessler's report makes clear that his opinions are focused on the conduct of "the purveyor" of the drug, i.e., Merck: "the purveyor" of a drug has the responsibility for its safety; "the purveyor" of the drug is responsible to assure that its products meet both FDA laws and regulations and state consumer protection law. (Kessler Rep. at ¶ 7.) Plaintiff has alleged claims against Merck, not against the FDA, and in that regard, Dr. Kessler did not take on the assignment of expressing opinions about whether the FDA acted properly or improperly, despite the fact that the interaction between Merck and the FDA is necessarily a part of the inquiry. One cannot reasonably infer that Dr. Kessler is somehow unqualified to opine about the agency that he directed or how FDA interacted with Merck. He clearly has sufficient qualifications, and his testimony "will help the [finder of fact] to understand the applicable FDA regulations and

Merck's responses." *In re Vioxx Litigation, supra*, 401 F. Supp. 2d at 595.

### III. ADMISSIBILITY OF DR. KESSLER'S TESTIMONY IN *NEURONTIN* SUPPORTS ADMISSIBILITY IN THIS CASE

Dr. Kessler recently testified in the *In re Neurontin Litigation* MDL trial in United States District Court in Massachusetts, addressing analogous issues of FDA regulations, corporate conduct, and the interaction between the agency and the company. Here, as in that case, Dr. Kessler's testimony is relevant and admissible, based upon his review of the documents and his expertise in the field.

### IV. PLAINTIFF DOES NOT ALLEGE CLAIMS AGAINST FDA, AND *BUCKMAN* IS INAPPLICABLE

In deciding that Plaintiff's expert could testify as to FDA interaction with Merck, the Court stated that the holding in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), is "completely inapplicable to the issues at hand." *In re Vioxx Litig.*, 401 F. Supp. 2d at 587. Where Plaintiff alleges fraud committed as to the state of Louisiana, evidence of Merck's conduct in relation to FDA is relevant, admissible, and not barred by *Buckman*.

### V. CONCLUSION

The testimony of Dr. Kessler and Dr. Graham is relevant and admissible to assist the finder of fact in understanding Merck's conduct in relation to FDA regulations, the standard of care, and Merck's failure to submit to the FDA all the data derived from clinical investigations of Vioxx. Merck's motion should be denied.

Respectfully submitted, this 12th day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Plaintiffs' Memorandum In Opposition To Defendant's Motion in Limine Numbers 1 and 13 (To Exclude Evidence Or argument Criticizing The Food and Drug Administration or Its Approval of Vioxx, And That Merck Mislead The FDA) has this day been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to pretrial order No. 8B, on this the 12th day of March, 2010.

/s/ James R. Dugan