*EXHIBIT 1*

## EXPERT REPORT

## DAVID A. KESSLER

### QUALIFICATIONS

1. My name is David A. Kessler, M.D. I received my M.D. degree from Harvard Medical School in 1979 and my J.D. degree from the University of Chicago Law School in 1978. I did my pediatrics training at Johns Hopkins Hospital.

2. I was appointed in 1990 by President George H. W. Bush as Commissioner of the United States Food and Drug Administration and confirmed by the United States Senate. I served in that position also under President William Jefferson Clinton until February 1997.

3. I have taught food and drug law at Columbia University Law School. I have testified many times before the United States Congress on food, drug, and consumer protection issues under federal and state law. I have published numerous articles in legal, medical, and scientific journals on the federal regulation of food, drugs, and medical devices over the last thirty years. I have had special training in pharmacoepidemiology at Johns Hopkins Hospital. My resume, including a list of my published books and articles, and address is included in Appendix A. Cases in which I have appeared as a witness in the last four years, and expert witness fee are attached in Appendix B.

4. As Commissioner, I had ultimate responsibility for implementing and enforcing the United States Food, Drug and Cosmetic Act. I was responsible for overseeing five Centers within FDA. They included, among others, the Center for Drug Evaluation and Research and the Center for Biologics Evaluation and Research. In addition to those duties, I placed high priority on getting promising therapies for serious and life-threatening diseases to patients as quickly as possible. I introduced changes in the device approval process to ensure that it meets high standards. During my tenure as Commissioner, the FDA announced a number of new programs, including: the regulation of the marketing and sale of tobacco products to

-1-



children; nutrition labeling for food; user fees for drugs and biologics; preventive controls to improve food safety; measures to strengthen the nation's blood supply; and the MEDWatch program for reporting adverse events and product problems. I created an Office of Criminal Investigation within the agency.

5.   I have served in numerous academic medical positions including Professor of Epidemiology and Biostatistics and Pediatrics.

6.   I have reviewed the documents provided to me in Appendix C to this report. Based on a review of those documents, and my training and experience, I have a number of opinions that are detailed below.

**FDA PRODUCT APPROVAL AND STATE TORT LIABILITY USUALLY OPERATE INDEPENDENTLY, EACH PROVIDING A SIGNIFICANT YET DISTINCT LAYER OF CONSUMER PROTECTION.**

7.   It is the purveyor of a drug that has responsibility to assure that its products meet both state consumer protection and FDA laws and regulations. It is the purveyor of a drug that is responsible for the safety of its product.

8.   FDA regulation of a drug cannot anticipate and protect against all safety risks to individual consumers. Even the most thorough regulation of a product may fail to identify potential problems presented by the product.

9.   It was my opinion while Commissioner of FDA, and remains to this day, that the two systems of state consumer protection and federal food and drug regulation should and do operate in a complementary but independent manner.

10. As I have written and testified before the United States Congress, the Federal Food Drug and Cosmetic Act (FDCA) grants FDA substantial authority over the approval, labeling, and promotion of pharmaceutical products. But, nothing in the FDCA, or in FDA's implementing regulations, relieves a manufacturer of its duty to act according to the company's internal knowledge about a product and its potential risks.

11. A fundamental problem FDA faces is that, by necessity, drugs are approved on the basis of less-than-perfect knowledge.  Risks that are rare, or appear as common illnesses, have long latency periods, result from drug interactions, or have adverse impacts on subpopulations, often go undetected in clinical testing.  If a drug company has reason to know that the risks of a drug may result in adverse events, it has a responsibility to inform physicians and health care providers.

12. A drug company has a responsibility, independent of what FDA directs it to do, to alert physicians and patients to risks that were unknown to or poorly understood by the FDA, but were evident to the company.  This duty predates by decades the advent of federal regulation of drugs. *See, e.g., Thomas v. Winchester*, 6 N.Y. 397 (1852).

13. FDA's regulations make clear that a drug company has a duty to warn and modify labeling without delay when hazards emerge with one of its drugs. The regulations expressly authorize the company to make labeling changes, and take other steps to inform physicians and patients of emerging risks, without advance approval from the agency.  Such responsibility complements, not undercuts, FDA's job of protecting consumers from dangerous drugs.

14. Drug companies have an obligation to revise a label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship have not been definitely established." 21 CFR. § 201.57(c)(6).

15. Manufacturers have superior resources that are or should be committed to overseeing the safety of the drugs they market. As a result, manufacturers invariably get safety information before the FDA does and have access to information that is not available to the FDA. Company scientists and physicians also develop impressions and understanding of a drug's potential safety profile that may be more informed than the FDA's.

16. Thus, what a drug company knows about a drug and what the FDA knows may be  different.

17. The duties of a pharmaceutical company are based not only on FDA laws and regulations, but also on the risks presented by a drug about which the company knew, should have known, or should have investigated. Merck's responsibility for the safety of its product and the adequacy of its warnings exists regardless of what FDA did or did not do.

## WHAT MERCK KNEW ABOUT VIOXX (ROFECOXIB) CARDIOVASCULAR RISKS BEFORE MERCK FILED ITS APPLICATION WITH THE FDA

18. Merck knew, before the company submitted its new drug application to the FDA, that Vioxx posed a risk of thrombotic events (blood clotting that can lead to heart attacks or strokes).

19. On October 10, 1996, in a research management committee update evaluating a placebo-controlled high-dose study of Vioxx in Rheumatoid Arthritis (Clinical Trial Protocol 017)[hereinafter referred to as "Protocol 017"], Merck officials wrote, "Adverse events of most concern were in the cardiovascular system (e.g. MI, unstable angina….)" MRK-ABC0048699 at 8706. A table listing patients with non-fatal, serious clinical adverse experiences in Protocol 017 submitted to the FDA (Table E-152 of Merck's Integrated Safety Summary dated October 26, 1998) showed three thrombotic events (heart attack, unstable angina, and pulmonary blood clot) in Vioxx-treated patients and no thrombotic events in placebo-treated patients. MRK-ABS-0067368. While the dosage in this study involved a higher daily dose than was recommended in the drug's labeling, adverse events at a higher dose may portend safety signals at lower doses.

20. During May 1996 through January 1997, Merck carried out Protocol 023, a double-blind, placebo-controlled safety and pharmacokinetic study of Vioxx. In that study, a decrease was noted in the production of $PGI_2$, which is involved in inhibiting platelet aggregation. Merck also knew that Vioxx "had no effect on systemic thromboxane," which is involved in promoting platelet aggregation and clotting MRK-ABC0009947 at 949. Internally, Merck knew that "[t]hese findings raised a concern about the potential for VIOXX to cause cardiovascular problems." MRK-ABC0009947 at 949. To FDA Merck officials wrote "The clinical implications of partially inhibiting the production of $PGI_2$ without inhibiting

-4-

thromboxane generation systemically are unknown but any untoward effects should be revealed by the long term safety and efficacy trials with [Vioxx]."   MRK-ABK0025697 at 25793.

21. On December 30, 1997, Merck scientist Douglas Watson, discussing Protocol 023, wrote, "These findings raised concern about the potential for Vioxx to predispose to cardiovascular (CVD) thrombotic events…" MRK-ABS-0037036 at 37039-40.

22. On February 2, 1998, Merck scientist Watson reported a statistically significant relative risk of 2.16 [95%CI 1.14,3.94] for thrombotic cardiovascular serious adverse events in women based on patients in the pooled Vioxx -comparator-placebo osteoarthritis trials versus pooled Fosamax-placebo study patients [hereinafter referred to as "Watson analysis"]. MRK-NJ0066804 at 819. Watson stated, "The overall incidence for women was elevated compared to Fosamax placebo controlled patients." The value of comparing the incidence in pooled Vioxx-comparator-placebo osteoarthritis trials to pooled Fosamax-placebo study patients resided in the large number of "person years at risk," which according to Watson was over 14,500 person years at risk. MRK-NJ0066804 at 819. Watson dismissed the elevated relative risk by suggesting that the Fosamax pooled population had an atypically low risk of cardiovascular disease. MRK-NJ0066804 at 805. No document that I have reviewed suggested *a priori* that Merck had concluded that Fosamax pooled study patients were not an appropriate control. In fact, two months earlier, on December 3, 1997, Merck's Cardiovascular Task Force discussed whether the Fosamax pooled study patients were appropriate controls for the "Watson analysis" and proceeded with the study. MRK-ABY0199809. Watson's report also included a comparison of the pooled Vioxx-comparator-placebo osteoarthritis trials versus data from the Cardiovascular Health Study. MRK-NJ0066804 at 805. The "Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials" did not include comparison to, nor reference to, the Cardiovascular Health Study. MRK-ABS0037036, 048. This comparison was undertaken as a post hoc analysis.

-5-

23. Based on my reading of the Federal Food Drug and Cosmetic Act 21 U.S.C. §355(b)(1)(A) and 21 CFR § 314.50 (d)(5)(iv) the "Watson analysis" having been an "analysis of any other data or information relevant to an evaluation of the safety and effectiveness of the drug product...derived from clinical investigations..." should have been submitted to the Food and Drug Administration as part of the Merck's New Drug Application dated November 23, 1998.

24. On April 13, 1998, Merck scientist Dr. Alan Nies, in preparation for Merck's Scientific Advisory Board (SAB), prepared a write-up for the meeting that would be held the next month. Nies wrote, "the finding of an effect of COX-2 inhibition on the excretion of PGIM was entirely unexpected...To assess the potential implication of these biochemical findings on cardiovascular health, the clinical team and epidemiology have analyzed the blinded VIOXX database for serious cardiovascular events. The analysis does not suggest a concern. An initial look at the unblinded safety data from the Phase III comparison study vs. diclofenac (approximately 1300 patients followed for 6 months) also does not indicate an excess of cardiovascular events in patients treated with VIOXX™. Additional analyses will be performed on unblinded data when available." MRK-AIR0041448 at 457-58. Nies' write-up did not present to the SAB that the relative risk in women was 2.16 in Watson's analysis.

25. On May 3-6, 1998, Merck's SAB noted that Vioxx may remove an inhibitor of platelet aggregation. The SAB commented to Merck that this possibility could increase the risk of cardiovascular disease. The SAB stated, "By removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation is enhanced. More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality." MRK-AEI0002734 at 2738. The SAB stated, "It is therefore proposed that coronary events be predetermined endpoints in all future controlled trials with Vioxx.... It is proposed that these endpoints be assessed by a uniform set of criteria so that meta analysis of coronary and cerebral vascular events from all these can be performed." MRK-AEI0002739.

26. Merck's Scientific Advisory Board stated that possible risk of adverse cardiovascular events should be "addressed in parallel with the conclusion of the process of acquisition and analysis of the data that will place the drug in the hands of patients." MRKAEI0002742.

27. Data submitted by Merck to the FDA in October 1998, revealed that the incidence of thromboembolic cardiovascular adverse experiences in osteoarthritis patients in six-week studies was 0.2 percent in placebo treated patients versus 0.8 percent in 25mg qd Vioxx treated patents and 0.7 in 12.5 mg qd Vioxx treated patients. MRK-OS42014072 at 401-02. In six-month studies of osteoarthritis patients, the incidence of thromboembolic events was 0.8 percent in placebo versus 1.0 in 25 mg qd treated patients and 1.2 in 12.5 mg qd treated patients.

28. Based on this data, the FDA medical reviewer stated, "With the available data it is impossible to answer with complete certainty whether the risk of cardiovascular and thromboembolic events is increased in patients on [Vioxx]]. A larger database will be needed to answer this and other safety comparison questions." MRK-ADI0005375 at 5479.

29. Based on the evidence in Merck's possession, it is my opinion that Merck should have recognized before marketing that there was a "safety signal" for adverse thrombotic events and that should have resulted in a more thorough investigation of VIOXX's cardiovascular risk before marketing.

**MERCK SHOULD HAVE RESOLVED THE RISK OF THROMBOTIC EVENTS BEFORE MARKETING VIOXX.**

30. There is no evidence that Merck resolved the risk of thrombotic events prior to submitting its New Drug Application [hereinafter "NDA"] to the FDA on November 23, 1998.

31. There is no evidence that Merck resolved the risk of thrombotic events prior to extensive marketing and promotion of Vioxx beginning May 1999.

32. Despite the SAB recommendation in 1998 that possible risk of adverse cardiovascular events should be "addressed in parallel with the conclusion of the process of acquisition

and analysis of the data that will place the drug in the hands of patients," MRK-AEI0002742, as late as January 12, 2000 Merck's plan was not to do formal statistical analyses of cardiovascular risk, and the "descriptive analyses" that were contemplated would not be done "for another year yet." MRK-NJ0120258 at 0265.

33. The long term studies (ranging from 26-86 weeks) that Merck conducted on Vioxx prior to submission of its NDA did not resolve the potential risk of thrombotic events because 1) such long term studies were designed without a placebo arm, 2) the numbers of adverse cardiovascular events were too small to determine whether there was a cardiovascular risk of VIOXX and 3) patients at highest risk for cardiovascular events were excluded. *See*, generally MRK-ADI0005375 at 478-479.

34. Merck's intended use of Vioxx included its use for "relief of the signs and symptoms of osteoarthritis..."MRK-99420021411. It well established that excess weight contributes to the development of osteoarthritis. This is a population that is especially prone to the cardiovascular disease that is associated with the metabolic consequences of adiposity.

35. Merck's marketing and promotion launch was unprecedented in Merck's history. David W. Anstice, Merck president of human health for the Americas, called Vioxx's introduction the company's "biggest, fastest, and best prescription drug launch ever." MRK-ACZ0009097.

36. It is my opinion that Merck had a responsibility to investigate and resolve the question of cardiovascular safety prior to the widespread introduction of the drug to the market.

37. Merck engaged in widespread direct to consumer marketing. Based on "celebrity, morning, and music" and "created for 'It's a Beautiful Morning' " Merck "activated 1MM consumers," with an investment of "$65MM." MRK-ABI0008139 at 99.

38. It is my opinion that Merck had a responsibility to investigate and resolve the question of cardiovascular safety prior to marketing Vioxx. This responsibility was heightened by the extent of Merck's direct-to-consumer marketing and promotion practices.

39. Having decided to market the drug, Merck should have warned patients with cardiovascular risk, (persons who were excluded from Vioxx osteoarthritis clinical trials, patients with angina, congestive heart failure, myocardial infarction within the prior year, uncontrolled hypertension or history of stroke or transient ischemic attack within the prior two years) in the drug's label against use of the drug.

**MERCK FAILED TO WARN OF THROMBOTIC RISK IN THE VIGOR STUDY.**

40. In public statements and in a published *New England Journal of Medicine* paper dated November 23, 2000, Merck argued that the difference in the incidence of heart attacks in the naproxen and Vioxx treated arms of the studied were likely due to the possibility that naproxen is cardioprotective.

41. Merck did not disclose to the public what the SAB had noted -- that Vioxx may be causing the thrombotic events. In the *NEJM* article, physicians and the public were never told there was a reason to believe that Vioxx itself was possibly causing harm.

42. In its Standard Operating Procedure (SOP) for all Vioxx trials beginning in 1998, there was a prespecified endpoint comprised of a combination of prespecified thrombotic events — cardiac, cerebral, and peripheral. Vascular events monitoring and adjudication SOP. August 30 1999 /revised January 21 2000 MRK-I8940077810 at 813; "The purpose of this SOP is to provide standardized data for pooled analyses of the incidence of vascular events of patients treated with COX-2 inhibitors."

43. In publishing the partial results of the VIGOR study, Merck failed to disclose that there was a predetermined endpoint and what the results of the analysis were for that endpoint. As of April 2000, as documented in a presentation to the Scientific Advisory Board [hereinafter referred to as "April 2000 presentation"], based on results from the Vigor gastrointestinal safety study, Merck knew that there were 41 confirmed serious thromboembolic events in the Vioxx treated group and 18 in the naproxen group. MRK-NJ408967 at 97; MRK-NJ0189526. In July 5, 2000, based on continued reporting of adverse events, and as documented in a memo from Dr. Deborah Shapiro to Dr. Alise Reicin [hereinafter referred

to as "July 5, 2000 memo"], Merck knew that there were 45 confirmed thromboembolic events in the Vioxx treated group and 19 in the naproxen treated group. MRK-NJ0071320 at 322. As of April 16, 2000, a draft of the VIGOR manuscript had reference to pre-specified analyses which included thromboembolic events. MRK-NJ0346560 at 574 and 589. These references to the prespecified thromboembolic endpoint were not submitted in the final manuscript or disclosed in the *NEJM* paper.

44. Further, in publishing the partial results of the VIGOR study, Merck failed to disclose data that revealed an increasing incidence of serious thromboembolic cardiovascular events in rheumatoid arthritis patients over time compared to naproxen. In the "April 2000 presentation" and in the "July 5, 2000 memo," Merck included Kaplan-Meier data plots which revealed an increased incidence beginning before two months and continuing to increase over the rest of the study. The Kaplan-Meier data plots were never provided to the *NEJM* nor included in the November 23, 2000 VIGOR article. MRK-NJ408967 at 998, MRK-NJ0071320 at 323.

45. In my opinion, had these results been disclosed, a different conclusion from what was reported in the paper would have followed -- that the risk of serious thrombotic adverse events outweighed the benefits of preventing serious GI events.

46. In publishing its *NEJM* paper, Merck failed to report the results of serious thrombotic events in selected subgroups as shown in Table 4 of the "July 5, 2000" memo which documents a significant excess of thrombotic events in both aspirin indicated and aspirin non indicated subgroups.

47. In my opinion, had these results been disclosed, a different conclusion from what was reported in the paper would have followed — that Vioxx itself posed a significant risk of thrombotic events.

48. While Merck submitted the *NEJM* paper on May 18, 2000, it submitted an extensive revision of the manuscript on July 17, 2000 NEMJ 000028. Further correspondence about the paper occurred over the next months before the paper was accepted for publication on

September 13, 2000.  2000 NEMJ 000054.  The April and July 2000 data, cited above, should have been provided to the *NEJM* because they were relevant to a full understanding of the risks and benefits of the drug.

49. The company had a responsibility once it had the data to inform the public not only in its published papers but in the drug's label.

50. FDA's regulations permit a drug's sponsor to add or strengthen warnings to a drug's label to improve drug safety without prior FDA approval. 21 CFR §§314.70(c)(6)(iii)(A), (C).

51. As noted earlier, it is my opinion that Merck should not have engaged in marketing without resolving the risk of thrombotic events.   However, having decided to market the product, it is my opinion that , by mid-2000, Merck should have strengthened Vioxx's drug labeling to reflect the increased thrombotic risk.

**MERCK'S MARKETING AND PROMOTION PRESENTED A SELECTIVE PICTURE OF VIOXX WHICH MISREPRESENTED THE DRUG'S SAFETY.**

52. Merck's research agenda "in order to maximize growth" was based, on "developing strategies to...[d]emonstrate that COX-2 inhibitors have a similar cardiovascular profile compared with placebo and non-naproxen NSAIDs." MRK-ABT0078672 at 695-96.

53. Merck minimized Vioxx's risk of myocardial infarctions.  As noted by the Food and Drug Administration's Division Director of the Division of Drug, Marketing, Advertising and Communications Dr. Thomas Abrams, on September 17, 2001.  MRK-ABA0003277 [hereinafter referred to as "DDMAC letter"] to Merck's President and CEO Raymond V. Gilmartin, "You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID),

Naprosyn (naproxen)."   FDA was "aware of six promotional audio conferences, presented on behalf of Merck" that were in "violation of the Act." MRK-ABA0003277 at 79.

54. As noted by the Food and Drug Administration in the DDMAC letter, Merck minimized the rate of MIs in the "VIGOR study by your comparison of this rate to the rate of MIs observed for Celebrex (celecoxib) in the Celebrex Long Term Arthritis Safety Study (CLASS)."  Such comparison was inappropriate because the VIGOR study excluded certain groups of patients who had cardiovascular disease, in contrast to the Celebrex study. MRK-ABA0003277 at 80.

55. Merck advanced unproven theories concerning regarding Vioxx's safety.  As noted by the Food and Drug Administration in the DDMAC letter, Merck's "promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin.  That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties."  MRK-ABA0003277. According to FDA,  "there are no adequate and well controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmocodynamically comparable to aspirin or clinically effective in decreasing the risk of MI's."

56. Merck made unsubstantiated superiority claims.  As noted by the Food and Drug Administration in the DDMAC letter, Merck 's suggestion that "COX-2 inhibitors, including Vioxx, have an overall safety profile that is superior to other NSAIDs is misleading because such an advantage has not been demonstrated….Furthermore, your claim that the VIGOR and CLASS trials 'show once again that they are safer than non-steroidals' is also misleading because it implies that the results of the VIGOR trial….can be applied to the entire class of NSAIDs." MRK-ABA0003281.

57. As noted by the Food and Drug Administration in the DDMAC letter, Merck's minimizing "potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile." MRK-ABA0003283.

58. Merck's presentation of cardiovascular risk data in its promotional "Cardiovascular Card" was misleading. In a bulletin to all field personnel with responsibility for Vioxx, Merck announced on April 28, 2000 the availability of a tri-fold pamphlet containing data that would ensure that its field "would be well prepared to respond to questions about the cardiovascular effects of Vioxx." MRK-AAR0007383. As summarized by staff of the U.S. House of Representatives Committee on Government Reform, according to the Cardiovascular Card, patients on Vioxx were 11 times less likely to die and 8 times less likely to die from heart attacks and strokes than patients on standard anti-inflammatory drugs. In addition, the risk of MIs was less than half of that for patients taking placebo and identical to that of patients receiving anti-inflammatory drugs. The Cardiovascular Card did not present the cardiovascular risk data from the VIGOR study which, as FDA noted in its DDMAC letter, observed a four to five fold increase in MI's compared to patients on another non-steroidal. MRK-AAR0019055-60.

59. Merck's Cardiovascular Card was also misleading because it failed to recognize cardiovascular risk from Merck's other more recent clinical trials. Merck's Cardiovascular Card was announced on April 28, 2000. MRK-AAR0038843. Data from Clinical Protocol 085 were known to Merck in 1999. Data from Clinical Protocol 090 were known to Merck in February 2000. Data from Clinical Protocol 083 were known to Merck in September 2000. MRK-ABP0015346 at 363 and 368. Merck did not include the results of clinical protocols 083, 085 and 090 in discussing the risk of thromboembolic events in the Cardiovascular Card. The failure to include these three studies resulted in an incomplete picture of cardiovascular risk. Had these studies been included the relative risk of serious thrombotic

-13-

cardiovascular events in osteoarthritis trials would have been 1.80 compared with Merck's reported relative risk of .94 in published studies. MRK-ACD0122214 at 39 and *American Journal of Cardiology* Vol. 89, January 15, 2002 (Table 4b) at 207.

60. Soon after the VIGOR results were known to the company, on April 14, 2000 Merck had identified as "Marketing needs:...Rapid publication and communication at opinion leader events of phase III OA results demonstrating comparable incidence of thromboembolic events with VIOXX, placebo and NSAID comparators." MRK-AB10002269 at 307.

61. Merck also identified as a need to "[e]stablish that Vioxx /Coxib do not increase the risk of thromboembolic events due to their unique [mechanisms of action]..." MRK-ABI0002269 at 308.

62. On January 8, 2001, approximately one month after publication of VIGOR results, at a WHHM Competitive Assessment Task Force, Merck officials in a slide presentation stated that one of its objectives was to "[c]ontinue to neutralize any perceived safety (hypertension/edema, CV) concerns." MRK-AHY0263589, 90; MRK-AHY0263592. That strategy to neutralize the "perceived CV Safety Concerns" involved the publication of articles by the company's scientists and outside consultants. The use of the word "neutralize" suggests, in my opinion, that Merck's interest was in countering perceptions of cardiovascular risk.

63. Merck's strategy to "neutralize" perceptions of cardiovascular risk included the publication of several papers, a letter to the editor, abstract submissions and meta-analyses regarding cardiovascular risk . MRK-AHY0263596-97

64. Merck's scientific communications strategy included "plans for abstracts, presentations, and peer reviewed publications" that focused on key safety messages, including the key message that "VIOXX does not increase the thromboembolic risk of patients compared to non-naproxen, non-selective NSAIDS." MRK-AAD0106697 at 791.

65. The first paper that Merck intended to publish was to be based on "CV safety (069 database)." MRK-AHY0263596 . The first paper that was published based on CV safety (069) appeared in the *American Journal of Cardiology* Vol. 89, January 15, 2002 [hereinafter referred to as "AJC paper"]. It was received by the journal editors on July 2, 2001.

66. The AJC paper did not include the results of clinical protocols 083, 085 and 090,  for which data analyses were all completed by September, 2000.  MRK-ABP0015346 at 363 and 368.

67. As of December 19, 2000, a cardiovascular safety in phase III OA studies manuscript was under development.  MRK-ABP0015346 at 352.

68. As of December 19, 2000, Merck's plan was also to "[c]onduct a meta-analysis of CV events from all PH III studies…, VIGOR, ADVANTAGE, and all other studies for which data will be available." Merck officials stated that "[i]f results are positive, then publish."  MRK-ABP0015346.

69. As of January 30, 2001, Merck plans to publish cardiovascular phase III OA studies had been terminated.  MRK-ABP0016015 at 021.

70. Instead of publishing the phase III OA studies, the "Team will focus on submitting the Meta-analysis of CV safety that was prepared to support the VIGOR advisory committee."  MRK-ABP0016021.

71. Published meta-analyses included papers listing  Dr. Marvin Konstam and  Dr. Matthew Weir as first authors.  Both papers included names of several Merck scientists including Dr. Alise Reicin.  These published meta-analyses by Merck scientists and outside consultants included data from Alzheimer's studies in addition to OA and RA studies. MRK-ABA0004431-440;  MRK-ADY0006153-166.  From Table 3 in Konstam article, the conclusion of whether VIOXX resulted in increased Antiplatelet Trialists Collaboration (APTC) endpoints hinged on whether Alzheimer's results were included in the meta-analyses.  There are arguments for and against why Alzheimer safety data should be included. One of the reasons arguing against such inclusion is that according to Merck's SOP for pooled analysis of vascular

-15-

events dated August 30, 1999 and revised January 2000, Alzheimer's studies were placed in a separate "study block." MRK-I8940077810 at 827. In addition, as of the publication date of Dr. Marvin Konstam's meta-analysis article, the Alzheimer studies were not complete. Another argument against inclusion of the Alzheimer's studies is that compliance and dropout rates were increased in the Alzheimer's cohort. MRK-I2690007833 at 857 and 951. As Merck scientist Alan Nies wrote in the major pharmacology text, *The Pharmacological Basis of Therapeutics* by Goodman and Gilman, "[N]oncompliance, even if randomly distributed between both groups, may cause falsely low estimates of the true potential benefits or toxicity of a particular treatment." 9th edition, 1996 at 45. Arguing for the inclusion of the Alzheimer's studies is the goal of presenting all the available data. In my opinion, to present a nonselective, unbiased analysis, Merck should have included the results with and without the Alzheimer's data and discussed the compliance and drop out data.

72. On April 17, 2001, Merck officials and scientists attended a presentation where slides read "establish favorable safety profile for and within class." The slide also read, "Maximize exposure of Alzheimer's Disease/Mild Cognitive Impairment placebo-controlled, CV safety data." MRK-AAD00226839 at 846.

73. In its scientific communication plan for Vioxx dated March 27, 2001, Merck noted that all the cardiologists "listed have been engaged" by Merck and "have demonstrated a clear understanding of Merck's point of view on cardiovascular and renal issues." It added, "[t]hose cardiologists marked with an asterisk represent certified national speakers who consistently communicate Merck's point of view on these issues in presentations to their colleagues." [hereinafter "consistently communicate list" MRK-ABO0000257 at 263. In my opinion, the use of speakers who understood or "consistently communicate" Merck's position resulted in a less than objective presentation of the data.

74. After Merck scientists wrote the first draft of one of the meta-analysis papers, Merck contacted scientists who were on Merck's "consistently communicate list" to work with them on publication of the manuscript. MRK-ABK0436556-57. One such scientist, Dr.

-16-

Marvin Konstam, ended up being first author on one of the papers that concluded that there was "no evidence for an excess of CV events" for Vioxx.    MRK-ABA0004431-440.

75. The paper published by Dr. Marvin Konstam, Dr. Matthew Weir and Merck scientists and physicians was published in the journal *Circulation*.  It was received by the Journal on October 2, 2001 and accepted for publication the next day.  The paper was originally rejected after being submitted through the express route to the Journal of the American Medical Association.  After receiving the rejection Merck officials, in an email titled, "Urgent decision needed about CV meta-analysis journal," recommended submitting the manuscript to *Circulation* because Dr. Konstam, the lead author, was on the editorial board of Circulation. They noted that the editor would let them know within a week whether the article would be accepted and would be fast tracked. MRK-ABW0010182. Peer review of journal articles normally takes weeks to months.  At the time Merck was trying to rush the publication of favorable data, Merck recognized that "key events [were] negatively impact[ing] NRx volume for Vioxx." MRK-ABI0008139 at 182.

76. The paper published by Dr. Matthew R. Weir et al in the *American Heart Journal* , Volume 140,  page 591,  October 2003,  does not appear to  include all the osteoarthritis studies that Merck had completed by the time the Weir manuscript was published.  (see MRK-ABSO415816 [protocol 136]; MRK-0S420045791 [protocol 010]; Gertz, BJ et al. *Curr. Med. Res. and Op.* 2002; 18:82-91 at 83-84; and MRK-I8940080062 at 095) In addition, the Weir paper employed an APTC endpoint that revealed fewer adverse events in the Vioxx treated arm than would have been reported had Merck employed the previously specified thrombotic cardiovascular serious adverse events endpoint (TCVSAE).  The conclusion of the Weir paper was that a "review of the phase IIB/III OA program revealed no adverse CV safety signals..." As pointed out in the statistical analysis conducted by Dr. John S. MacGregor on June 15, 2007, had Merck reported all completed OA trials utilizing the thrombotic cardiovascular serious adverse events endpoint, a statistically significant safety risk would have been apparent (page 8).

77. As of April 8, 2001, and documented in a memo by Merck scientist Joshua Chen, Merck
knew that patients taking Vioxx in Protocol 091 , had a statistically significant "greater
chance to die across all of the four age and gender categories..." employing an intention to
treat analysis.  Chen also reported that in Protocol 078, "males aged 75 or older had the
highest risk of death... *Age, Gender and Treatment* were all statistically significant...," and
"the hazard ratio between [Vioxx] and placebo was 2.55."  Merck also knew that the
combined ITT analysis "indicated that survival was worse for patients receiving Vioxx."
MRK-AAX0000752 at 56, 57 and 59.  From Kaplan-Meier plots, the increase risk of death
was noted after six months follow-up since treatment. MRK-AAX0000752 at 59.  None of
these "all cause mortality" intent to treat analyses was included in the papers published by
Dr. Reicin, Konstam or Weir.

78. In my opinion, Merck had an obligation to look for and uncover evidence of adverse
cardiovascular events.  The evaluation of adverse events may differ based on which studies
are included and which endpoints are utilized in the analysis.  Because it is difficult to assess
the causal nature of serious common adverse events once a drug is on the market, it is the
responsibility of a pharmaceutical problem to scrutinize clinical data for evidence of
potential problems and to present a full range of potential analyses.

79. As represented in Powerpoint slides prepared for a Merck Princeton Annual meeting in
2001, Merck had a plan in response to "market issues"  to "[e]stablish favorable safety
profile for and within the class" with specific reference to Vioxx's cardiovascular profile.
That strategy included publication plans for Phase IIb/III OA studies, and meta-analysis. It
also included the objective to "maximize exposure" of Alzheimer's cardiovascular safety
data.  MRK-AAD0226839 at 42-47.

80. Merck's objectives included "combating imposed limitations on use" including combating
attempts to limit use to low risk CV patients or patients at risk for GI events. MRK-
AAD0226839 at 42.

81. In my opinion, Merck's conduct was consistent with its documented strategy to defend Vioxx against any association with cardiovascular risk.

82. In my opinion, Merck had an obligation, when it promoted and marketed Vioxx, to present to physicians and health care providers the data in a non selective, unbiased fashion, which Merck did not do.  Merck's focus on "neutralizing" the perceived cardiovascular risk resulted in selective presentation of favorable data.

**MERCK FAILED TO ADEQUATELY WARN PHYSICIANS AND HEALTHCARE PROVIDERS OF INCREASED BLOOD PRESSURE RISK.**

83. On January 8, 2001 in a WHHM Competitive Assessment Task Force document, Merck officials stated, "Neutralize perceived renal safety concerns," and cited a list of papers to be authored and published in medical journals. MRK-AHY0263589, 98. In that document, one of the messages that Merck planned to communicate was, "Rates of hypertension and edema with Vioxx and Celebrex are low and consistent with incidences of these adverse events with non-selective NSAIDs."  MRK-AHY0263589 at 95.

84. Merck was aware, as of January 9, 2001, that approximately 10.5% of patients in protocol 112 on 25mg Vioxx exceeded predefined limits of change for systolic blood pressure (an absolute value of more than 140  with an increase in baseline more than  20 mm) in contrast to 5.3% for Celebrex and 4.8% placebo. At the 12.5mg dose 10% of patients exceeded predefined limits of change for systolic blood pressure in contrast to 5.3% for Celebrex and 4.8% placebo. The differences between Vioxx and placebo and Celebrex were statistically significant. MRK-AIN0001235 at 1281 and 1419.

85. On March 12, 2001, Merck official Thomas R. Cannell wrote internally in an email, "...I'll also say that I eventually think we should step up to the fact that we probably do cause a little more HTN/edema particularly in the marketplace  where V25...are the most common doses." MRK-ADO0040808.

86. Merck's intent had been to publish Protocol 112. MRK-ABI0002269 at 291. In an article published in 2002,  Merck scientists did not disclose the results of Protocol 112. Gertz, BJ et al. *Curr. Med. Res. and Op.* 2002; 18:82-91 at 89 and 90.  Moreover, the Merck authors

imply that Vioxx's effect on blood pressure was less than what was reported in Protocol 112 and similar to Celebrex other non-selective NSAIDS .

87. In my opinion, Merck should have made known to United States physicians and health care providers the results of protocol 112.

**MERCK DELAYED ISSUING STRONGER WARNING ON VIOXX'S LABEL.**

88. On June 29, 2000, approximately two months after learning the VIGOR trial results, Merck submitted a revised label to FDA which attributed the difference in cardiovascular adverse events in the VIGOR trial to the "known anti-platelet effects of naproxen." On March 2, 2001 Merck submitted a proposed revised label stating that "naproxen may decrease platelet aggregation." MRK-0042008017 at 8038 and MRK-AAD0106697 at 6832.

89. Merck's proposed labeling changes to FDA on June 29, 2000 and March 2, 2001, were inadequate attempts to explain Vioxx's cardiovascular risk. Merck continued to rely on an unproven theory that Naproxen was cardioprotective.

90. On October 15, 2001, following Merck's proposed labeling, FDA proposed that Merck include in the Warning section of Vioxx's label the statement that "VIOXX should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure." MRK-NJ0439283 at 309.

91. In testimony before the United States Senate Committee on Health, Education, Labor and Pensions on March 1, 2005, FDA official Dr. Sandra Kweder, discussing the results from the VIGOR trial, testified "the lapse from my perspective was the delay that it took to get that information into the labeling—it took over a year—as well as once it was in the labeling, the failure of that information somehow to be in the forefront of the consciousness of the prescribing physician."

92. Rather than changing the label in accordance with FDA's proposed changes when FDA suggested changes, Merck engaged in repeated negotiations regarding Vioxx labeling from

November 2001 to April 2002. Merck officials privately stated "We knew it would be UGLY and it is. We'll fight back and see where we get"; "Be assured we will not accept this label. if we need to we will ask to go to an advisory committee meeting" and "it is ugly cubed, thye [sic] are bastards." MRK-ABW004799.

93. Based on Merck's U. S Long Range Operating Plan Franchise: Analgesic & Anti-Inflammatory Products: Vioxx, Etoricoxib July 2001, Merck was aware of the effect of various labeling changes on its sales forecast.   MRK-ABI0008659 at 674.

94. In my opinion, Merck's conduct as to the drug's labeling was consistent with the company's objective to "neutralize" the cardiovascular risks that were associated with Vioxx. *See* eg. MRK-ABW0004799,  MRK-AAD0106697 at 6727-28,  MRK-ABI00008674, MRKAHY0263589 at 592.

95. It is the responsibility of the purveyor of a drug to expeditiously assure that a drug's label adequately informs physicians and health care providers.  Merck failed to do that.

## CONCLUSION

The duties of a pharmaceutical company are based not only on FDA laws and regulations, but also on the risks presented by a drug about which the company knew, should have known, or should have investigated.

Based on the evidence in Merck's possession prior to its decision to market Vioxx, Merck should have recognized that there was a "safety signal" for adverse thrombotic events and that should have resulted in a more thorough investigation and resolution of Vioxx's cardiovascular risk before marketing.

Post marketing, Merck failed to warn physicians, health care providers and patients that it had in its possession data that revealed an increased incidence of serious thromboembolic cardiovascular events in osteoarthritis patients compared to placebo. Merck also failed to disclose to physicians, health care providers and patients the full risk data of the VIGOR trial which revealed that the drug's serious thrombotic adverse events outweighed its benefits and indicated that Vioxx itself posed a significant risk of cardiovascular thrombotic events.

Merck's marketing and promotion of Vioxx presented a selective picture of Viox which misrepresented the drug's safety.

November 5, 2009

David A. Kessler, M.D.