# EXHIBIT 8

# Report of

# John David Abramson, M.D.

# Table of Contents

I.     Introduction ........................................................................................... 4

II.    Qualifications ........................................................................................ 4

III.   Summary of Opinions ........................................................................... 8

IV.    Background ........................................................................................... 10

V.     Merck Designed Its Clinical Trials of Vioxx to Minimize Risk and
       Maximize Appearance of Benefit .......................................................... 12

       A.     Early Evidence of Potential CV Risk Associated with Selective
              COX-2 Inhibition ......................................................................... 12

       B.     Merck's Clinical Trials - Including VIGOR - Hid Suspected
              CV Risks and Maximized Appearance of GI Benefit .................... 17

              Figure 1 ...................................................................................... 19

VI.    Results of Merck's VIGOR Trial ............................................................ 21

       A.     Prior to Completion of the Trial .................................................... 21

       B.     Publication of the Results of the VIGOR Trial in the *NEJM* .......... 24

       C.     The Complete and Unbiased Results from the VIGOR Trial:
              What Merck Knew and When They Knew It ................................. 27

              Figure 2 ...................................................................................... 28

              Figure 3 ...................................................................................... 29

              Figure 4 ...................................................................................... 30

              Figure 5 ...................................................................................... 36

       D.     Merck Omitted Important Thrombotic Cardiovascular Events
              Including Three Myocardial Infarctions that Occurred in the
              VIGOR Trial from the *NEJM* Article ............................................. 37

       E.     VIGOR Showed that Vioxx Did Not Reduce the Risk of
              Complicated GI Events for Those Not Taking Steroids ................ 41

       F.     Other Merck-Sponsored Clinical Trials of Vioxx .......................... 46

VII.   Marketing, Detailing, and Public Relations ........................................... 52

       A.     Misrepresentation of the CV Risk of Vioxx .................................. 53

       B.     Merck Used the Cardiovascular Card to Mislead Physicians ........ 55

2

C.     Merck-Sponsored Publications Misled About CV Risk/Safety
       of Vioxx ................................................................................ 61

       Figure 6 ................................................................................ 64

D.     PIRs Misled Physicians ........................................................ 71

E.     Medical Journal Advertising ................................................. 75

F.     Press Releases ..................................................................... 75

G.     Direct to Consumer Advertising............................................ 82

VIII.  Marketing in Louisiana Reflected Merck's National Marketing
       Strategy ................................................................................. 82

A.     Tutorials ................................................................................ 83

B.     Call Notes.............................................................................. 84

       Figure 7 ................................................................................ 87

       Figure 8 ................................................................................ 88

C.     Louisiana Department of Health and Hospitals ................... 89

IX.    Celebrex Was Not a Reasonable Alternative to Vioxx ................ 91

       Figure 9 ................................................................................ 93

       Figure 10 .............................................................................. 94

X.     Formulary Dossier and Cost-Effectiveness Articles ................... 96

A.     Formulary Dossier ................................................................ 96

B.     Cost-Effectiveness Reports.................................................. 98

XI.    Conclusion .................................................................................. 102

On November ___, 2009, I, John David Abramson, M.D., of 39 Spring Street, Ipswich, Massachusetts, state as follows:

## I.  Introduction

1.     Based on my education, training and experience in medicine, epidemiology, statistics and research design, I believe I am qualified to testify regarding the risks and benefits of drugs (including Vioxx), and the design and analysis of data in clinical studies pertaining to Vioxx and other anti-inflammatory drugs.  I am further qualified to testify regarding the type and form of delivery of information physicians need and expect regarding the efficacy and safety profiles of drugs (including Vioxx) to make informed decisions about prescribing and impact on patient care.

## II.  Qualifications

2.     I am a medical doctor licensed to practice medicine in the State of Massachusetts since 1982.  I have been Board Certified in Family Medicine and a Diplomate of the American Board of Family Practice since 1982.  I graduated cum laude from Harvard College in 1970 with a Degree in Social Relations.  I attended Dartmouth Medical School and graduated with a Degree in Medicine from Brown Medical School in 1976.  I performed my internship at the University of North Carolina from 1976 to 1977.  I then served as a primary care physician in the National Health Service Corps of the U.S. Public Service in Monroe County, West Virginia (1977 to 1979).  I completed my residency at Case Western Reserve University from 1979 to 1981.  I also completed a Robert Wood Johnson Fellowship in Family Medicine at Case Western University from 1980 to 1982, earning a Master of Science in Family Practice Degree.  During this two-year fellowship, which included study of epidemiology, statistics, research design and health policy, I received training in the interpretation of scientific data.  Additionally,

4

I was a Senior Research Associate on the Faculty of the Institute for Health Policy, Heller School, Brandeis University from 1992 to 1993, during which I participated in a project that explored local control of healthcare resources to optimize allocation and health outcomes. I served as Chair of the Department of Family Practice at Lahey Clinic in Burlington, Massachusetts, from 1994 to 2001. I have been a clinical instructor at Harvard Medical School since 1997. In recent years, I have published on health policy and the growing commercial bias in the scientific evidence that doctors rely on to guide their clinical practice. Before Vioxx was removed from the market and before I was consulted in any litigation involving Vioxx, I had spent hundreds of hours researching the safety and efficacy of cyclooxygenase-2 (COX-2) inhibitors, including Vioxx and Celebrex, as well as the omission of key aspects of the results of manufacturer-sponsored studies of both these drugs in our most trusted medical journals, and had completed a book chapter about the safety and efficacy of Vioxx and Celebrex.

3.      Throughout my 26 years as a physician, I have had firsthand experience in multiple practice arenas that further qualifies me to render opinions in this litigation. My first experience as a primary care doctor was in a rural health clinic in Appalachia with the National Health Service Corps, then a part of the U. S. Public Health Service. From 1982 to 2002, I practiced family medicine in Hamilton, Massachusetts. As a treating physician, I was responsible for the evaluation, care and treatment of numerous patients for both wellness care and disease diagnosis, and treatment and management. I have prescribed many different drugs, including Vioxx and other non-steroidal anti-inflammatory drugs (NSAIDs), in the scope of my clinical practice for over two decades and have firsthand experience regarding the type and content of information a

physician needs to make informed decisions about prescribing drugs to a patient (including Vioxx and other NSAIDS), including performing risk/benefit analyses and evaluating safety and efficacy of drugs for a given patient. I carefully read medical journals both as a practicing physician - to keep up-to-date on the latest developments that would impact the care and treatment of my patients, and as a researcher - to evaluate the quality of the scientific evidence presented therein.

4.     I also have experience with the healthcare industry. From 1986 to 1993, I served as Associate Medical Director of Pru-Care of Massachusetts. I am currently the Executive Director of Health Management for Wells Fargo Complete Health Solutions. In that role, I participate in designing health benefits for self-insured companies that reflect the best scientific evidence about effective healthcare: integrating the best of medical science, predictive health modeling, and the largely untapped health benefits of helping people to adopt healthier lifestyles.

5.     Teaching has also been an important lens through which I have observed and experienced the changes in medicine that have taken place throughout my career. I have taught both medical students and postgraduate students and also lectured extensively as an invited speaker regarding the growing challenge to clinicians trying to make informed decisions about optimal pharmacotherapy for their patients. My academic appointments include serving as a clinical instructor in ambulatory care and prevention at Harvard Medical School since 1997. From 1993 to 1995, I was the Chair of the Graduate Medical Education Committee (Family Practice Residency) at Beverly Hospital. I have also served as a mentor for first year medical students in the Primary Care Mentorship Program at Harvard Medical School and also as a Preceptor in the Primary Care Clerkship Program at Harvard Medical School. I continue to serve as a

tutor in the Primary Care Clerkship Program there.   In these roles, I have taught students how to critically interpret and integrate medical literature and data into a risk/benefit analysis for prescribing drugs to patients.

6.     The issue of public health and health policy and how doctors process information from various sources has been of importance and interest to me throughout my career as a physician.  Because of the changes that I was observing in American medicine and experiencing in my own practice, I left clinical practice to devote full-time to research this topic, specifically in regard to the pharmaceutical industry and its impact on public health, public safety, and the quality of American healthcare.   Since the beginning of 2002, I have been researching, writing, lecturing, and teaching about how the information and misinformation about drugs and other medical products available to practicing physicians impacts their medical decisions and the overall quality, effectiveness, and cost of American healthcare.

7.     As noted in my curriculum vitae, I have been invited to lecture at medical schools, hospital Grand Rounds and health insurers about the growing commercial influence on the production and dissemination of medical information available to physicians, the public, and health policymakers.

8.     Thus, based on my education, training, two decades of clinical practice and my independent research, I am qualified to testify regarding how pharmaceutical company-sponsored research and marketing affects doctors' clinical decisions, patients' expectations and the overall quality and effectiveness of medical care, and as to whether Merck's marketing of Vioxx was likely to deceive physicians.  Prior to being consulted in this litigation, I published articles and a book on this subject as listed in my curriculum vitae.  A true and correct copy of my curriculum vitae, further outlining my

education, training, publications, and experience, as well as my hourly rate is attached as *Exhibit 1.*

9. The opinions expressed in this declaration are my own and are based on my education, training, research and experience, my review of the peer-reviewed medical literature, and on corporate documents and depositions produced in this litigation by Merck. A list of the articles, depositions and documents upon which I relied in forming my opinions is attached as *Exhibit 2* and are incorporated into my opinions stated below. My opinions as stated in this declaration are stated to a reasonable degree of medical probability.

10. A list of testimony I have given within the past 4 years as an expert either at deposition or at trial is attached as *Exhibit 3.*

### III. Summary of Opinions

11. It is my opinion, based on my education, training, experience and review of the literature and documents listed in *Exhibit 2*, that Merck failed to communicate to physicians, healthcare providers, and consumers in a fair, balanced, and reasonably complete manner the true overall and cardiovascular (CV) risks associated with Vioxx that were known to them. In addition, Merck exaggerated the relative gastrointestinal (GI) safety of Vioxx. Merck's actions thus deprived patients of the right to make informed decisions about their healthcare and exposed them unnecessarily to excess risk of serious harm and injury, including heart attack and death. It is my opinion that the true risks of Vioxx far outweighed the benefits and there were safer and equally effective alternatives on the market, such as naproxen and ibuprofen.

12. It is my opinion that Merck's sponsorship of medical studies and journal articles, detailing of physicians by its sales force, medical journal advertisements, and

issuance of press releases provided the physicians who prescribed Vioxx, the consumers who ingested Vioxx, and the purchasers who paid for Vioxx with material misrepresentations and omissions regarding the true safety profile of Vioxx.

13.   Although Merck's own VIGOR trial showed that Vioxx was significantly less safe overall than the older, far less expensive, and no less effective NSAID, naproxen, Merck systematically minimized the risks associated with Vioxx and overstated its benefits in both the medical articles it funded and in its communications to physicians, other healthcare providers and consumers, thus depriving them of the right to make educated, informed decisions about the true risks and benefits of Vioxx. Physicians, consumers, and purchasers had both a right and a need for Merck to be forthright and thorough in communicating the clinical risks of Vioxx, as well as the benefits.   Having reviewed corporate depositions, documents, congressional and governmental hearing briefs and materials, and underlying clinical trial data, it is my opinion that there was much information that Merck had that was critical to physician decision-making, but was withheld from doctors.   Instead, the information that was reported to physicians was incomplete and at times without scientific basis.

14.   With specific reference to Louisiana, Merck documents show that the national strategy to maximize Vioxx sales by minimizing the risks and exaggerating the benefits of Vioxx took place in Louisiana.   Specifically, Merck's sales activities in Louisiana included (but were not limited to): using drug representatives to carry the national sales messages into doctors' offices, developing "qualified experts" to present the advantages of Vioxx, paying doctors to participate in so-called tutorials with drug representatives, providing financial incentives to drug representatives to increase Vioxx sales, and conducting "Consultants' Meetings" designed to increase Vioxx use.

9

15.    Finally, it is my opinion that had full and accurate information been reasonably provided to physicians, patients, and purchasers about the risks and benefits of Vioxx, not only would it have been prescribed extremely rarely if at all, as there were other alternative non-steroidal anti-inflammatory (NSAID) agents on the market that were as effective, safer, and far less expensive, but it would not have commanded a premium price because it was no more effective and was less safe than other far less expensive alternatives.  Rational buyers knowing the full truth about the safety of Vioxx would not have purchased the drug, or at most would have made it available to only a small subset of patients being treated with steroids who absolutely required NSAID therapy, had tried and failed on other NSAIDs (especially ibuprofen) at low doses, did not have a previous history of CV disease, and were at high risk of serious GI complications.

## IV. Background

16.    Vioxx, a selective COX-2 inhibitor, was approved by the Food and Drug Administration (FDA) in 1999 for the treatment of arthritis, acute pain, and primary dysmenorrhea.  When Vioxx was approved, I was engaged in active clinical practice of family medicine and had patients diagnosed with these conditions.

17.    In response to the intense advertising to consumers, many of my patients came to me requesting prescriptions for Vioxx.  This led me to engage in further research of these drugs.  The results of a Merck-sponsored study, VIGOR (Vioxx Gastrointestinal Outcomes Research), which compared the safety of Vioxx and naproxen, another NSAID, were published in the November 23, 2000, issue of the *New England Journal of Medicine (NEJM)*.  Though this article reported more myocardial infarctions in the patients exposed to Vioxx, the authors (all 13 of whom were either

10

employees of or had financial ties to Merck) concluded that this finding was due to the cardioprotective properties of naproxen, that Vioxx did not significantly increase the risk for heart attack in people without a previous history of CV disease, and that Vioxx offered the advantage of causing significantly fewer GI complications than naproxen.

18.   In 2001, I began more in-depth research regarding this finding and discovered the data from the VIGOR study that Merck had submitted to the FDA, which demonstrated significantly more serious CV complications in the people taking Vioxx - whether or not they had a previous history of CV disease - and that Merck's argument that it was not Vioxx that increased the risk of heart attacks but naproxen that decreased the risk of heart attack, was without reasonable scientific basis and clinically misleading.  This prompted me to engage in yet more research on this issue.  My long-term personal interest in public health and safety and a concern about the growing misrepresentation of research by drug and other medical industries and its negative impact on American healthcare led me to spend hundreds of hours over the next three years researching this issue in general and Vioxx specifically.

19.   A practicing physician (not engaged in such research) could not reasonably have been expected to spend so much time reviewing and evaluating primary data, rather he or she would have relied on information provided by Merck or would have taken the *NEJM* article at face value.  Even the most disciplined practicing physicians rarely have the time and often do not have the training to do independent critical analysis of scientific evidence presented in their most trusted sources of information.

11

# V. Merck Designed Its Clinical Trials of Vioxx to Minimize Risk and Maximize Appearance of Benefit

## A. Early Evidence of Potential CV Risk Associated with Selective COX-2 Inhibition

20.   As early as 1996, Merck officials were aware that selective COX-2 inhibition by Vioxx could potentially increase the risk of thrombotic CV events – a risk that might be mitigated by allowing people at high risk of developing CV problems to take prophylactic aspirin.  Yet corporate documents reveal that in 1996 Merck officials also understood that in order to accentuate the primary theoretical GI advantage of Vioxx, patients in clinical trials should not be allowed to take aspirin.  (Aspirin, it was surmised, would increase the risk of adverse GI events, such as bleeding and ulcers, more in patients taking Vioxx than in patients taking other NSAIDs.)  A 1996 memo discussed Merck's dilemma: in trials disallowing the use of aspirin, "there is a substantial chance that significantly higher rates" of CV problems would manifest in the Vioxx group.[1]  Merck was thus aware of the potential risk of increased thrombotic CV events and was strategizing to design trials that would minimize this risk and maximize the potential GI advantage of Vioxx even during its pre-approval development phase.

21.   While the potential risk of increased CV complications with Vioxx compared to non-selective NSAIDs in the memo described above was based on the possible anti-platelet activity in non-selective NSAIDs, Merck's plan to evaluate the incidence of CV serious adverse events in the Phase IIb/III osteoarthritis clinical trials, dated December 30, 1997, revealed the concern that Vioxx would exert a pro-thrombotic effect:

---

[1] MRK-AAX0002413 to 2420.

> The clinical implications of partially inhibiting the production of PGI2 without inhibiting thromboxane generation systemically are unknown. These findings raised concern about the potential for Vioxx to predispose to CV thrombotic events; however, there has not been any evidence of an increased incidence of such events in clinical trials of Vioxx to date. [2]

22. Thus, Merck was aware that replacing a non-selective NSAID with Vioxx had the potential to increase CV risk by two separate mechanisms: 1) removing potential (though undocumented) anti-platelet clinical effect; and 2) creating a pro-thrombotic environment by selectively inhibiting prostacyclin without offsetting inhibition of thromboxane.

23. The potential for Vioxx to exert a pro-thrombotic effect and thus increase thrombotic CV complications was specifically addressed in the Vioxx Project Team meeting minutes of January 12, 1998.[3] Merck's Study 023 had shown that both Vioxx and indomethacin significantly reduce urinary excretion of PGI-M (a metabolite of prostacyclin), suggesting a reduction in prostacyclin biosynthesis. Indomethacin also inhibited thromboxane, but because of its COX-2 selectivity, Vioxx had no effect on thromboxane. The minutes reflect concern about the potential effect of these findings:

> "The clinical relevance of partially inhibiting thromboxane are unknown. These findings raised a concern about the potential for Vioxx to cause cardiovascular thrombotic events."[4]

Despite this concern and the statistically significant doubling the risk of thrombotic CV events in women in still- blinded osteoarthritis studies (see below), the minutes reflect the recommendation to make no change in the conduct of Vioxx clinical trials.

---

[2] MRK-ABS0037036; pg MRK-ABS0037039-40.

[3] MRK-ABC0009947; pg MRK-ABC0009949.

[4] Ibid.

24.    The plan to evaluate CV adverse events referenced in paragraph 20 resulted in a report authored by Doug Watson, Merck employee, dated February 2, 1998.[5] Watson's analysis revealed a statistically significant excess risk of thrombotic CV events among women in the blinded Vioxx clinical trials of osteoarthritis (included all patients: Vioxx, non-selective NSAIDs, and placebo) compared to the control group in Merck's Fosamax trials, adjusted rate ratio 2.16 (95% CI 1.14-3.94).[6]  The Watson report downplayed the importance of this finding in two ways: first, it claimed (post hoc) that the incidence of CV events in the Fosamax was "atypically low." And second, again post hoc, Watson changed the design of the study to also use the Cardiovascular Health Study as a comparator population with its reassuringly high (38%) rate of CV disease.  However the population in the Cardiovascular Health Study was considerably older (average age for women was 72)[7] than the populations  the Vioxx and Fosamax trial databases (median ages in the 60-69 range), and the comparative rates of CV events in the Cardiovascular Health Study were not age adjusted in relationship to the other two data sets.   In addition the 38% rate of CV events documented in the Cardiovascular Health Study includes congestive heart failure, which accounted for 30% total incident events, but is not a thrombotic CV event and, therefore, was not included in the Vioxx and Fosamax databases.  For men the increase in risk of thrombotic CV events was 1.28 (NS) among the blinded Vioxx osteoarthritis studies.

25.    On April 13, 1998, Merck officer, Dr. Alan Nies, prepared a write-up for the meeting of the Board of Scientific Advisors, which discussed the results of Study 023

---

[5] MRK-NJ0272249.

[6] MRK-NJ0272249; MRK-NJ0272250.

[7] Mittelmark MB Psaty BM Rautaharju TM et al Prevalence of Cardiovascular diseases among Older Adults *American Journal of Epidemiology* 1993;137:311-17.

(the imbalance between thromboxane and prostcycline resulting from selective COX-2 inhibition). However, Dr. Nies' write-up failed to include the results of Watson's analysis as described above. Instead Dr. Nies wrote:

> "To assess the potential implication of these biochemical findings on cardiovascular health, the clinical team and epidemiology have analyzed the blinded Vioxx database for serious cardiovascular events. **The analysis does not suggest a concern.**"[8] [Emphasis added.]

The Scientific Advisor's Meeting Programmatic Review, May 3, 1998 to May 6, 1998, contains an entire section describing the mechanism whereby Vioxx could potentially promote destabilization of plaque and promote thrombotic CV events: by selectively decreasing prostacyclin production, COX-2 inhibitors might enhance "the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation."[9] Yet, as shown below, when Merck's worst fears were realized and the increased risk of thrombotic events became evident in the VIGOR trial, as detailed below, in my opinion Merck attempted to hide the true risk of CV events associated with use of Vioxx and failed to communicate this risk to physicians, healthcare providers, and consumers in a forthright and timely manner.

26.    In an email dated February 25, 1997 (more than two years prior to the approval and marketing of Vioxx), Dr. Briggs Morrison wrote to Merck colleagues that he "would allow low dose aspirin - I know this has been discussed to death but real world is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill the drug."[10] Merck came up with a solution that would avoid the use of aspirin (and the risk of neutralizing any potential GI benefit of Vioxx) and still

---

[8] MRK-AIR0041448; pg MRK-AIR0041457.

[9] MRK-AEI0002734 to 2746.

[10] MRK-NJ0315892 to 5894.

15

minimize the increased CV complications that might result from not allowing people to take aspirin during the clinical trials of Vioxx:   exclude people who qualify for prophylactic aspirin from the major clinical trials.  This tactic could - at the same time - avoid blunting the potential GI benefit and minimize the potential CV risk of Vioxx by excluding people at high risk of CV complications.  In other words, Merck came up with a design for its clinical trials that biased the results from the outset by a) excluding patients with a previous history of CV disease, thereby minimizing the risk of CV complications (which might make Vioxx look bad) and b) not allowing any patients to take aspirin, thereby maximizing any GI benefit of Vioxx.

27.    This is exactly the way that the pre-approval osteoarthritis studies, the VIGOR trial, and the Alzheimer's studies were designed - people with recent CV disease or qualifying for prophylactic aspirin were excluded from these studies.  This strategy increased the likelihood of Merck's studies casting Vioxx in a favorable light, but there were three problems.  First, it created unrepresentative, not "real world," study populations so that the results of these studies should have been applied only to similar low-CV risk patients and not to the general population that Merck knew would be taking Vioxx based on the results of these studies.  Second, it ignored the recommendations from Merck's own scientists and medical advisors to conduct clinical trials specifically designed to assess the CV risk of all of its COX-2 drugs, including Vioxx.  And third, as shown below, the strategy failed: *despite creating an artificially low-CV risk population, the people in the VIGOR trial taking Vioxx still developed significantly more CV complications and serious complications overall than the people taking naproxen.*

B.    **Merck's Clinical Trials - Including VIGOR - Hid Suspected CV Risks and Maximized Appearance of GI Benefit**

16

28.     Merck failed to adequately test Vioxx in the populations in which it would be used to ensure that the drug's overall benefits outweighed the risks of ingestion for that population. As stated above, Merck knew as early as 1996 that Vioxx had the potential to increase CV thrombotic events. As such, the clinical trials should have been designed to monitor closely for the occurrence of this serious and potentially fatal set of adverse events. In 1998, Merck executive, Alan Nies, wrote in response to specific requests from its scientific consultants to design studies to explore Vioxx's pro-thrombotic potential:

> "We would not be doing clinical studies [of the pro-thrombotic potential of Vioxx] at this time. When the drug is out many investigators will probably do such studies with or without our help."[11]

29.     Instead of designing studies that would have explored what Merck knew were legitimate scientifically based concerns about the potential CV risks of Vioxx, Merck designed clinical trials that would minimize the occurrence of CV adverse events and exaggerate any potential GI benefit.

30.     In response to the February 25, 1997, email by Dr. Morrison (noted above), expressing concern that failure to use aspirin in clinical trials of Vioxx may result in more thrombotic events and kill the drug, Dr. Alise Reicin of Merck responded:

> "I HEAR YOU! This is a no win situation. The relative risk may be as high as 2-4 fold. Yet the possibility of increased CV events is of great concern (I just can't wait to be the one to present those results to senior management!) What about the idea of excluding high risk CV patients - i.e. those that have already had an MI, CABG or PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be - Would we be able to recruit any patients?"[12]

---

[11] MRK-ABK0311068.

[12] MRK-NJ0315892.

31.    This exclusion was implemented for the pre-approval osteoarthritis trials, as well as the VIGOR and Alzheimer's disease trials - gathering scientific data on the CV risk of Vioxx from artificially constructed study populations designed to minimize the CV risk of Vioxx while creating results that were not applicable to the "real world" population of people to whom Merck intended to and did market Vioxx.

32.    Merck's studies comparing Vioxx to ibuprofen for pain control used a relatively high dose of Vioxx, 50 mg, and a relatively low dose of ibuprofen, 400 mg. Even so, Merck's studies showed that at these doses the two drugs provide equivalent pain relief for 6-8 hours.[13]   These findings are reflected in the product label, which states:

> "The analgesic effect (including onset of action) of a single 50-mg dose of Vioxx was generally similar to ...400 mg of ibuprofen."[14]

Notwithstanding the equivalent pain relief provided by ibuprofen 400 mg, Merck's studies of GI safety (as opposed to pain relief) compared twice the dose of ibuprofen (800 mg three times daily) to Vioxx.  No studies of GI safety were done with the lower dose.

33.    Such studies would have been of great importance to clinicians because there was strong evidence (available in 1996) that the lower, yet equally pain relieving, dose of ibuprofen was far less likely to cause serious GI complications than the dose that was used in Merck's trials of GI safety, 800 mg three times daily.  A meta-analysis

---

[13] Morrison BW, Christensen S, Yuan W, et al, Analgesic Efficacy of the Cyclooxygenase-2-Specific Inhibitor Rofecoxib in Post-Dental surgery Pain: A Randomized, Controlled Trial, Clinical Therapeutics, 1999;21:943-53.

[14] Vioxx Product Label, 1999, 2002.

18

performed by Henry, et al,[15] found ibuprofen at less than maximal dose was the least likely of the NSAIDs for which there were comparative studies (nabumetone was not included) to cause serious GI complications - defined as "admission to the hospital for hemorrhage or perforation." The findings from this meta-analysis are summarized in the following table (created from data in the article):

### Relative Risk of Serious GI Event by Drug and Dose

| Daily Dose | ibuprofen | Naproxen | Indomethacin |
|---|---|---|---|
| Low | 1200-1500 | 500-750 | 75 |
| Relative Risk | 1.6 | 3.7 | 3.0 |
| High | 2400 | 1000 | 100 |
| Relative Risk | 4.2 | 6.0 | 7.0 |

Figure 1.

Low doses of ibuprofen (1200-1500 mg per day) were far less likely than the 2400 mg dose to cause serious GI complications. This is approximately the same benefit that is claimed for Vioxx in comparison to other NSAIDs. Furthermore, low dose ibuprofen was also far less likely to cause serious GI complications than naproxen 1000 mg per day (the dose used in the VIGOR trial). These data show that the relatively low doses of ibuprofen used by most patients confer far less risk of serious GI events than the high doses of ibuprofen and naproxen used as comparators to Vioxx in Merck's clinical trials. But besides very short-term studies of acute pain, Merck's studies failed to compare the safety and efficacy of Vioxx to ibuprofen 1200 mg per day. The article by Henry, et al, concluded:

> "It should not be assumed that the apparent advantage of ibuprofen persists when doses are increased beyond

---

[15] Henry D, Lim L L-Y, Rodriguez LAG, et al, Variability in risk of gastrointestinal complications with individual non-steroidal anti-inflammatory drugs: results of a collaborative meta-analysis, British Medical Journal, 1996;1563-6.

19

1600 mg daily. **The evidence reviewed indicates that it does not.**" [Emphasis added.]

Another study showed that patients treated with ibuprofen in doses of approximately 1200 mg per day were as satisfied with the relief provided as those treated with diclofenac or naproxen.[16]

34.   In summary, Merck's pain studies showed that ibuprofen 400 mg and Vioxx 50 mg provide equivalent relief. But Merck's safety studies compared Vioxx to ibuprofen 2400 mg daily - a dose that was far more likely to cause serious GI complications. Clinicians were thus deprived of critically important information required to determine which NSAID was in their patients' best interest.

35.   The VIGOR trial included over 8,000 patients with rheumatoid arthritis who were randomly assigned to take Vioxx 50 mg or naproxen 1000 mg daily, which was at the time the most commonly used NSAID used to treat rheumatoid arthritis. The study design excluded patients who had experienced a "cerebrovascular event" within two years of the study or a myocardial infarction or coronary bypass within the year prior to enrollment were explicitly excluded. But having far more effect in biasing the study population toward lower CV risk, people taking low-dose prophylactic aspirin were also excluded - this meant that anyone with a past history of stroke, transient ischemic attack, myocardial infarction, unstable angina, stable angina, coronary artery bypass surgery, or coronary angioplasty was excluded. After the study results became available, in a post-hoc re-evaluation of patient data, Merck found 4% of the patients had qualified for low dose aspirin (and; therefore, were at increased risk for CV events), but had not been identified as such during the intake process of the VIGOR study. In

---

[16] Hawkey CJ, Cullen DJE, Pearson G, et al, Ibuprofen versus other non-steroidal anti-inflammatory drugs: use in general practice and patient perception, Aliment Pharacol Ther, 2000;14:187-91.

20

other words, Merck's separate analysis of the CV risk for "aspirin-indicated" patients in the VIGOR trial was a post-hoc analysis that had not been included in the original experimental design.   A natural population of people requiring ongoing anti-inflammatory therapy would realistically include at least 20% of people taking low-dose aspirin.[17]   Thus the CV risk of the people included in the VIGOR trial was successfully minimized.

36.   Further, 56% of the patients enrolled in the VIGOR study were taking steroids to control their arthritis concurrent with their NSAID.  Among the real world of people taking Vioxx and other NSAIDs, outside the artificial context of this drug study, only 7% or fewer take steroids with NSAIDs.[18]  The disproportionately high number of patients in the VIGOR study on steroids skewed the results by exaggerating any potential GI benefit of Vioxx and rendered the results of the study not generalizable to the real-world population of NSAID users.

## VI. Results of Merck's VIGOR Trial

### A.   Prior to Completion of the Trial

37.   Even before the VIGOR trial was completed, the Data Safety Monitoring Board (DSMB) was aware at both its second and third meetings that significantly more people in "Group A" were developing more serious CV complications perhaps "due to a cardioprotective effect of Treatment B" and that "no cardiovascular analysis plan was in place for VIGOR or Vioxx."  On December 20, 1999, in a letter to Dr. Reicin, the Chair of the DSMB requested that a plan be developed to analyze and report the thrombotic CV

---

[17] Graham DJ, Campen D, Hui R, et al, Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study, The Lancet, 2005;365:475-81.

[18] Ibid.

21

complications that occurred in the VIGOR study.  The letter from Dr. Weinblatt of the DSMB stated:

> "Due to the interest about COX 2 inhibitors and their potential role in vascular events, we recommend that an analysis plan be developed to analyze adjudicated serious vascular events in the VIGOR trial separately from any other planned analyses of these data."[19]

38.     Despite the importance to clinicians and patients of knowing the truth about the CV risk data, Merck management made a request to the VIGOR DSMB on January 24, 2000, that a separate analysis of the VIGOR data not be performed.[20] Deborah Shapiro, a Merck statistician, confirmed in her deposition that she had received senior management approval not to pursue a CV data analysis plan.[21]  The DSMB rejected Merck's request not to do a separate analysis on the CV events from VIGOR.[22]  Nonetheless, when Merck published the results of its VIGOR study in the *NEJM*, the data on "serious thrombotic cardiovascular events," the pre-specified CV outcome, was simply not presented.  Instead, Merck presented data on myocardial infarctions alone - a post-hoc endpoint that was then incompletely and misleadingly reported.

39.     Thus, the VIGOR trial was designed and carried out in a population such that CV events were minimized, GI benefit was exaggerated, and the true risk and benefit were not tested in the population the drug was intended to treat.

40.     Even so, the overall design of the VIGOR trial is to be commended: Merck tested the safety of Vioxx "head-to-head" against the specific NSAID and the

---

[19] MRK-AAX0002759.

[20] MRK-NJ0071309.

[21] Deposition of Deborah Shapiro, 4/29/04 p 227.

[22] MRK-AAX0002760.

specific dose that was being used most to treat rheumatoid arthritis, naproxen 500 mg twice a day.  Despite the unrepresentative population included in this trial, had Merck disclosed the comprehensive CV, GI, and overall safety data in the *NEJM* article and its communications with physicians and other healthcare providers - which it failed to do - the results would have provided a clear and unambiguous answer to the question that mattered most to a clinician such as myself:  Is Vioxx a safer and/or more effective NSAID treatment for rheumatoid arthritis than the current treatment of choice?  Despite the unrepresentative study population, the answer came back loud and clear (if one had access to the complete data):  Overall Vioxx is no more effective than naproxen and significantly more dangerous.  Merck's failure to disclose the comprehensive CV, GI, and overall safety data and its promulgation of an unfounded theory to explain the heightened CV risk associated with Vioxx in comparison to naproxen, described below, left healthcare providers - even those reading the scientific articles in their most trusted journals - unaware of the true risks associated with Vioxx use and resulted in its being prescribed for millions patients, which would not have been the case if full and complete information had been provided to physicians and decision makers.  The bottom line is that even after Merck had definitive evidence that Vioxx was significantly more dangerous and no more effective than naproxen, Merck continued its aggressive and misleading sales and marketing campaign of Vioxx without disclosing its true CV and overall risk profiles.

**B.    Publication of the Results of the VIGOR Trial in the *NEJM***

41.    Results of the VIGOR study were published in the November 23, 2000, issue of the *NEJM*, one of physicians' most trusted medical journals.  The *NEJM* has the highest "impact factor" of any medical journal meaning, it is "the most widely read

23

and influential medical journal in the world."[23]  All 13 of the authors of the *NEJM* article were either employed by Merck or had financial ties to Merck.  Besides the GI findings, the data from the study showed that serious thrombotic CV events (including coronary events, cerebrovascular events, and peripheral blood clots) occurred 2.4 times more frequently in Vioxx users than in naproxen users (P=0.0016).  And on the broader measure of overall safety, Vioxx users developed significantly more serious adverse events overall than naproxen users (RR=1.21, P=0.013).[24]  But Merck failed to include either of these fundamentally important and pre-specified measures of safety to physicians in the *NEJM* article that reported the findings of the VIGOR study.  In their stead, data on only a post-hoc subset of serious thrombotic CV events, heart attacks (which were then incompletely reported, see below), were presented.  Merck then subdivided data on the post-hoc CV outcome measure of myocardial infarction into post-hoc subgroups of aspirin indicated and aspirin not indicated patients, and claimed that the significant increase in myocardial infarction was limited to the 4% of patients who were aspirin indicated, but not allowed to take aspirin because of the study design. The article claimed, "In the other [aspirin not indicated] patients the difference in the rate of myocardial infarction between groups was not significant..."  Merck then "explained" in the *NEJM* article that the greater number of heart attacks in Vioxx users was due to the cardioprotective properties of naproxen without any mention that its own scientific advisors had informed them in 1998 of the possibility of Vioxx being pro-thrombotic and despite Merck's being aware that there was no published scientific basis for

---

[23] Ovid Products and Services:
http://www.ovid.com/site/catalog/Journal/624.jsp?top=2&mid=3&bottom=7&subsection=12 (accessed 5/14/08).
[24] LI Q, Statistical Reviewer Briefing Document for Advisory Committee, Rofecoxib, N21-042 s-007 (Period of Review June-December 2000).

this statement.   Furthermore, this explanation contradicted Merck's own document describing the Standard Operating Procedure (SOP) for analysis of CV complications in studies of Vioxx and other COX-2 selective inhibitors:

> "[PGI2] is the most potent of all inhibitors of platelet aggregation, and has vascular dilatory properties as well. Conversely, thromboxane A2, a potent platelet aggregator and vasoconstrictor, is synthesized primarily by the platelet. The clinical implications of partially inhibiting the production of PGI2 without inhibiting thromboxane generation systemically are unknown."[25]

42.    Dr. Alise Reicin, a Merck employee directly involved in this trial and a co-author of the *NEJM* article, looked unsuccessfully for corroboration from the medical literature to support the theory that naproxen reduced the risk of CV complications.[26] Further, Merck was informed on March 28, 2000, that its own consultant, Dr. Carlo Patrono, did not believe that naproxen could have reduced CV events enough to explain the difference between CV events occurring in Vioxx users versus naproxen users.[27] Merck thus had knowledge from its own employees and consultants that there was no scientific evidence in March 2000 for dismissing the greater number of serious CV complications occurring in the VIGOR study among patients taking Vioxx as the consequence of a cardioprotective property of naproxen and had been explicitly warned, by its own advisors, of the possibility that Vioxx could actively cause CV harm.

43.    Merck's post-hoc claim that the difference in rates of myocardial infarction between those taking naproxen and those taking Vioxx in the VIGOR trial was due to the anti-platelet activity of naproxen was belied by Merck's own "Analysis Strategy for the Incidence of Serious Thromboembolic Events in COX-2-Specific Inhibitor Program,"

---

[25] MRK-18940077810; pg MRK-18940077815.

[26] MRK-ABH0017386.

[27] MRK-NJ0189508 to 9509.

25

dated January 6, 1999.[28]  This report acknowledged that lack of platelet inhibition "is a theoretical mechanism by which [COX-2 selective inhibitors] might have an elevated incidence of thromboembolic events compared to NSAIDs."  However, the report then stated that this theoretical risk has not been borne out in clinical studies:

> "Although NSAIDs are known to affect platelet function, there's little direct evidence that there is a decreased incidence of thromboembolic events among NSAID users compared to those not using NSAIDs."[29]

44.    Merck's theory about the cardioprotective property of naproxen was also rejected by its own consultants, FitzGerald and Patrono, in their August 2001 *NEJM* Drug Therapy review article on Coxibs:

> "There is no convincing evidence from epidemiologic studies that NSAIDs, including naproxen, protect against cardiovascular events."[30]

45.    Despite knowing from its own employees and consultants - at least one of whom was a co-author of this very article - that there was no reasonable scientific evidence to support its theory that the increased incidence of myocardial infarctions seen in Vioxx users was due to the cardioprotective nature of naproxen (and substantial concern expressed in Merck's own documents that Vioxx might create a pro-thrombotic state, described above), Merck proffered this as the sole explanation of the finding of increased heart attacks in the people taking Vioxx in the VIGOR trial in its November 23, 2000, *NEJM* article.

46.    Further, an article by Susan Jick, published in July 2000, showed that naproxen was not, in fact, cardioprotective in comparison to other NSAIDS.[31]  Despite

---

[28] MRK-AGV0021318.

[29] MRK-AGV0021318; pg MRK-AGV0021320.

[30] FitzGerald GA, Patrono C, The Coxibs, Selective Inhibitors of Cyclooxygenase-2, New England Journal of Medicine, 2001;345:433-42.

Jick's study having been available to Merck four to five months prior to publication of the VIGOR article in November 2000, Merck failed to modify its unfounded explanation for the excess CV risk seen with Vioxx in that study - that naproxen was cardioprotective - and failed even to cite this highly relevant study in its *NEJM* article.

47.    At the same time, Merck failed to inform physicians of the more plausible explanation of the increased number of CV complications in general and heart attacks in particular that occurred in people taking Vioxx in the VIGOR trial - expressed by its own scientific advisors two years earlier - that by selectively inhibiting prostacyclin without also inhibiting thromboxane, Vioxx could exert a pro-thrombotic effect.

## C.    The Complete and Unbiased Results from the VIGOR Trial: What Merck Knew and When They Knew It

48.    In my opinion, as a physician and scientist, in order to provide physicians with complete and balanced information, Merck's November 2000 *NEJM* article should have informed doctors of the significant increase in the risk of CV complications  (the pre-specified CV complication identified in the SOP for Vioxx studies in general and VIGOR in particular[32] associated with taking Vioxx instead of naproxen, whether or not patients had a previous history of heart disease, and of the potential pro-thrombotic mechanism of selective COX-2 inhibition to explain the increased CV risk associated with Vioxx.  But this was not done.  Instead, Merck's failure to report CV events in toto and overall serious adverse events and its presentation of a single unproven theory to explain the significantly increased risk of the post-hoc outcome measure myocardial infarction in people taking Vioxx in its VIGOR study left physicians and healthcare

---

[31] Jick SS, The Risk of Gastrointestinal Bleed, Myocardium Infarction, and Newly Diagnosed Hypertension in Users of Meloxicam, Diclofenac, Naproxen, and Piroxicam, Pharmacotherapy, 2000;20:741-744.

[32] MRK-AB10002269; pg MRK-AB10002273, 74.

27

providers misinformed about the true and significant risks associated with use of Vioxx. A striking example of the imbalance in the *NEJM* article is that Figure 1 presents a graph of the cumulative incidence of confirmed upper GI events, providing a dramatic graphical image of the purported GI benefit of Vioxx:



Figure 1. Cumulative Incidence of the Primary End Point of a Confirmed Upper Gastrointestinal Event among All Randomized Patients.

**Figure 2.**

A Merck memo from July 5, 2000, shows that at least four and a half months prior to publication of the VIGOR article in the *NEJM*, Merck had an analogous and equally dramatic diagram of the cumulative index of  the increased frequency of serious thrombotic CV events that occurred in people taking Vioxx in the VIGOR trial:[33]

---

[33] Curfman GD, Morrissey S, Drazen JM, Expression of Concern Reaffirmed, N Engl J Med, 2006;354:1193 and Supplementary Appendix 1.

28



Figure 1
Confirmed Thromboembolic Cardiovascular Serious Adverse Experiences
in Rheumatoid Arthritis Patients in the VIGOR Study
Time-to-Event Plot (All Patients Randomized)
Safety Update Report

Figure 3.

49.    But neither this diagram nor any presentation of the comparative rates of serious thrombotic CV complications between patients taking Vioxx and those taking naproxen in the VIGOR trial was included in the *NEJM* article.

50.    The discrepancies between Merck's early draft of the VIGOR article, dated April 16, 2000,[34] and the final version of the article highlight the extent to which Merck withheld critically important CV information from the *NEJM* article. Table 5 of the draft,

_____
[34] MRK-NJ0346560.

29

presenting "pre-specified analyses of adverse events,"[35] was not included in the *NEJM*

article:

Table 5: Adverse events and/or withdrawals for adverse events by treatment group

| Adverse event | Rofecoxib (n = xxx) | | Naproxen (n = xxx) | | Difference (95% CI) [FOR RELATIVE RISK] | |
|---|---|---|---|---|---|---|
| | Events | Withdrawals | Events | Withdrawals | Events | Withdrawals |
| Upper GI symptoms[1] | 855 (21.1%) | 159 (3.9%) | 944 (23.4%) | 202 (5.0%) | | |
| Edema | 207 (5.1%) | 24 (0.6%) | 139 (3.4%) | 14 (0.3%) | | |
| Hypertension | 360 (8.9%) | 28 (0.7%) | 215 (5.3%) | 7 (0.2%) | | |
| Renal Disease | 35 (0.9%) | 5 (0.1%) | 26 (0.6%) | 3 (0.1%) | | |
| Hepatic Disease | 65 (1.6%) | 11 (0.3%) | 39 (1.0%) | 2 (0.0%) | | |
| Serious Cardiovascular[2] Thromboembolic[3] Congestive Heart Failure | xx (yy) | xx (yy) | xx (yy) | xx (yy) | | |
| Total number of patients with adverse event | 2597 (64.1%) | 604 (14.9%) | 2553 (63.3%) | 587 (14.6%) | | |

**Figure 4.**

51. Had this table (with the column indicating statistical significance completed) and the accompanying text been included in the *NEJM* article, readers would have been informed that there were significantly more hypertensive, serious CV in total, and serious thromboembolic CV complications among people taking Vioxx.[36] After statistical calculations of significance had been entered in Table 5, readers would have seen that patients who took Vioxx experienced a significant increase in the risk of

---

[35] MRK-NJ0346560; pg MRK-NJ0346589.

[36] MRK-NJ0346560; pg MRK-NJ0346574.

30

the edema-related adverse events (RR=1.5, P=0.0002); hypertension (RR=1.7, p=0.0000001); withdrawal because of hepatic disease (RR=5.5, P=0.013), and thromboembolic CV complications (RR=2.36, P=0.001).[37]

52.    The draft presents the discrepancy in serious thromboembolic CV events:

"A significantly lower incidence of serious thromboembolic cardiovascular events was noted with naproxen as compared to rofecoxib: the relative risk reduction was 47%."[38]

53.    This finding was omitted from the *NEJM* article, replaced by the post-hoc outcome measure of myocardial infarction alone. And even then, three myocardial infarctions that occurred during the trial were not included in the *NEJM* article, allowing the (false) claim that the significantly increased risk of myocardial infarction did not extend to people for whom aspirin was not indicated. Had the article presented the prespecified CV outcome measure, serious thrombotic CV events, there would have been no doubt that the significantly increased risk extended to those with and without a previous history of CV disease.[39]

54.    The argument in defense of Vioxx put forth in the November 2000 *NEJM* article that it was not Vioxx that increased the risk of heart attacks but naproxen's anti-platelet properties that decreased the risk was predicated on there not being an intrinsic pro-thrombotic property of Vioxx. But Merck's own study 023, completed in 1997, had shown that Vioxx inhibits prostacyclin synthesis more than thromboxane

---

[37] MRK-NJ0346560; pg MRK-NJ0346589 (statistical significance calculated using openepi.com).

[38] MRK-NJ0346560; pg MRK-NJ0346578.

[39] Targum SL, FDA Memorandum: Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001, P. 20, www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf Accessed July 16, 2009.

synthesis.[40]  In 1998, Merck's own scientific advisers had advised them of the potential CV risk associated with selective prostacyclin inhibition.  Notwithstanding this early awareness, Merck did not even mention in the November 2000 *NEJM* article the possibility that the significant difference in serious CV events might be due to a pro-thrombotic effect of Vioxx rather than an anti-platelet effect of naproxen.  The FDA Cardio-Renal reviewer rejected the "naproxen protected against heart attacks" explanation of the greater number of CV complications experienced by those taking Vioxx in the VIGOR trial:

> "The sponsor claims that the difference in myocardial infarctions between the two groups is primarily due to the antiplatelet effects of naproxen.  This hypothesis is not supported by any prospective placebo-controlled trials with naproxen.  One can further argue that, no matter what the attribution, the results (from a cardiovascular standpoint) are favorable for naproxen." [Emphasis in original.][41]

55.   And finally, the draft, like the final version of the *NEJM* article, offered the hypothesis that the discrepancy in CV events (or myocardial infarctions) was due to the anti-platelet effect of naproxen.  But unlike the published article, the draft also informed readers of the possibility that the discrepancy in CV events was due to a pro-thrombotic effect of Vioxx:

> "Finally, the question of whether COX-2 specific inhibitors could increase thromboembolic events needs to be considered. Production of prostacyclin, which is produced in the vascular endothelium and acts as a vasodilator and an inhibitor of platelet aggregation, is mediated by COX-2. Thus, COX-2 specific inhibitors and nonselective and NSAIDs both decrease prostacyclin production. **It has been theorized that the inhibition of prostacyclin without the**

---

[40] MRK-AHR0009546.

[41] Op. cit. Targum, p. 34.

concomitant inhibition of thromboxane could potentially be pro-thrombotic." [My emphasis.][42]

56.    The possibility of Vioxx exerting a pro-thrombotic effect was presented even more forthrightly in a slide set titled "VIGOR Preliminary Results":

"COX-2 specific inhibitors could theoretically cause an imbalance in the platelet aggregation for the inhibition of prostacyclin without inhibition of thromboxane. This imbalance could potentiate thrombotic events."[43]

57.    This possibility was not included in the *NEJM* VIGOR article, so readers were not informed of the possibility that the discrepancy in thrombotic CV complications was due to this potentially harmful pro-thrombotic effect of Vioxx (as opposed to the hypothetical benefit of the anti-platelet activity of naproxen). Nor were readers of the Merck's Dear Healthcare Professional letter, issued in April 2002, informed of this possibility.[44]

58.    Language included in the draft would have provided readers with a simple way to understand the practical implications of the study findings - number needed to treat (NNT):

"...101 patients would need to be treated with naproxen instead of rofecoxib to avoid one serious thromboembolic event in one year."[45]

59.    In contrast to serious CV complications, the draft reported that 125 patients needed to be treated with Vioxx for a year in order to prevent one complicated GI event (see below for explanation of the misrepresentation included in even this number). And this finding was skewed by the experimental design in which

---

[42] MRK-NJ0346560; pg MRK-NJ0346581.

[43] MRK-NJ048967; pg MRK-NJ048995.

[44] Merck Dear Healthcare Professional letter re: Vioxx label change, sent April 2002.

[45] MRK-NJ0346560; pg MRK-NJ0346575.

33

56% of people in the VIGOR trial were taking steroids concurrently with naproxen or Vioxx (doubling the risk of so-called PUB GI complications for people taking naproxen, and tripling the risk of serious GI complications - so-called POBs, see below) and people experiencing GI symptoms were not allowed to take proton pump inhibitors or prescription strength doses of $H_2$ blockers.   Nonetheless, had the NNT for serious thrombotic CV complications and serious GI complications been presented in the *NEJM* article, readers would have seen quickly that taking Vioxx instead of naproxen caused more serious CV harm than it prevented serious GI harm.

60.    The FDA Cardiovascular Safety Review of the CV data from the VIGOR trial summarized the clinical import of the greater number of CV events in people taking Vioxx:

> "This analysis could lead one to conclude that naproxen, with a 51% risk reduction compared to rofecoxib, would be the preferred drug." [Emphasis in original.][46]

But readers of the *NEJM* article had no way of knowing this.

61.    Data from the VIGOR trial that Merck submitted to the FDA show that the incidence of serious thrombotic CV events overshadowed the incidence of serious GI events. Patients taking Vioxx were 2.37 times more likely to suffer a serious thrombotic CV event than patients taking naproxen (p=0.0016). Patients taking Vioxx were 5 times more likely to suffer a myocardial infarction (RR 5, p=0.0015). To put the enormity of this increase of risk in perspective, the 400% *increase* in risk of heart attack associated with Vioxx must be compared with the 30% decrease in the risk of heart attack achieved by treating people at increased risk with a cholesterol-lowering statin (the mainstay of

---

[46] Targum SL, FDA Memorandum: Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001, P. 12, www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf Accessed July 16, 2009.

preventive cardiology).  In other words, Vioxx increases the risk of heart attack many times more (without providing greater relief) than statin therapy reduces this risk.  Yet the conclusion expressed in Merck's publication of the VIGOR results in the *NEJM* was that treatment with Vioxx was associated with fewer clinically significant GI events than treatment with naproxen - exaggerating the benefits and minimizing the risks in a biased and unbalanced manner.  In the VIGOR study, Vioxx users did experience 21 fewer serious GI complications than those who took naproxen, but they experienced 27 more serious CV events.  Nonetheless, the only CV data included in the *NEJM* article was the post-hoc outcome measure of heart attacks.  The data for confirmed thromboembolic CV serious adverse experiences were simply not included in the article.  Thus, the presentation of the results of the VIGOR study, which was funded by Merck and all of the authors of which had financial ties to Merck, in the most influential medical journal in the world left physicians uninformed about the true incidence of serious CV risks associated with Vioxx.

62.    Other important outcome measures in clinical trials are overall serious adverse events and hospitalizations.  Merck's Clinical Study Report for the VIGOR trial, dated June 20, 2000, listed "Serious clinical adverse experiences (overall)" (aka "serious adverse events" or SAEs), first among the pre-specified adverse experiences to be analyzed.[47]  In the VIGOR trial, there were 21% more serious adverse events (causing hospitalization, prolongation of hospitalization, permanent disability, cancer or death) among those taking Vioxx (P=0.013).  This finding was appropriately listed first in Table 44 of Merck's CSR (dated June 20, 2000), but was not included anywhere in the *NEJM* article published November 23, 2000, the April 2002 label change, or the Dear

---

[47] MRK-AFV0451455; pg MRK-AFV0451532.

35

Healthcare Provider letter that was issued in April 2002.[48]   And, as shown in the following slide prepared by FDA Medical review officer Dr. Lourdes Villalba, overall there were 27% more hospitalizations in patients taking Vioxx than in those taking naproxen (RR=1.27, P=0.002).  Specifically, there were 20 fewer GI hospitalizations and 41 more CV hospitalizations.[49]



| VIGOR General Safety Hospitalizations | | |
|---|---|---|
| | Rofecoxib N=4047 | Naproxen N=4029 |
| Any | 338 | 265 |
| CV | 65 | 24 |
| GI | 29 | 49 |
| Hematologic | 7 | 6 |
| Hepatobiliary | 12 | 8 |
| Renal | 6 | 6 |
| Other | | |

**Figure 5.**

63.    Neither of these important findings was reported in the *NEJM* article, though the data were known to Merck.  Merck failed to disclose to physicians the true incidence of overall risk of serious adverse events and hospitalizations associated with

---

[48] MRK-AFV0451455; pg MRK-AFV0451606.

[49] www.fda.gov.lilac.une.edu/ohrms/dockets/ac/01/slides/3677s2_06_villalba.PPT (link no longer active).

36

use of Vioxx, despite funding the study, having access to the data, and having two Merck employees co-authoring the manuscript.

**D.    Merck Omitted Important Thrombotic Cardiovascular Events Including Three Myocardial Infarctions that Occurred in the VIGOR Trial from the *NEJM* Article**

64.    Notwithstanding Merck's replacement in the published *NEJM* article of the pre-specified CV complication - serious thrombotic CV events - with the single CV complication of myocardial infarction, Merck was aware of, but failed to include in its *NEJM* report, three heart attacks that had occurred in people treated with Vioxx.[50] Deborah Shapiro of Merck confirmed in her deposition of April 29, 2004, that she became aware around the end of May 2000, that the statement in the November 23, 2000 *NEJM* article, "The difference in the rate of myocardial infarction between groups was not significant" for patients without a previous history of heart disease was "no longer true." Thus, Merck knew or should have known since approximately the end of May 2000 (six months before the *NEJM* article was published), that there were three more heart attacks that occurred in people taking Vioxx in the VIGOR trial that had not been included in the data analyzed for the *NEJM* article, and that the inclusion of these three heart attacks in the calculations invalidated Merck's claim that the increased risk of heart attack extended only to people with a previous history of CV disease.[51]

65.    Part of Merck's justification for excluding these three heart attacks from the *NEJM* article was that the "pre-specified" cutoff date for the inclusion of reported CV events in the VIGOR trial was February 10, 2000.   However, this so-called "pre-specified cutoff date" for including reported CV events had not been identified at

---

[50] MRK-AJA0119085-MRK-AJA0119087.

[51] Deposition of Deborah Shapiro, 4/29/04 p 273-274.

37

the inception of the trial, but only three days earlier, on February 7, 2000.[52] Furthermore, CV events in the VIGOR trial that were reported after February 10, 2000, were not included in the analysis of data that was published in the *NEJM*, but GI complications that occurred through the end of the study on March 9, 2000, were included in this analysis.[53]

66.    A memo dated July 5, 2000, from Deborah Shapiro to Alice Reicin, Eliav Barr, and Dennis Erb,[54] leaves no doubt that Merck scientists were aware of the additional three heart attacks at least two weeks before the first of two revisions of the VIGOR article were submitted to the *NEJM*.[55] Yet the *NEJM* article (with Alise Reicin and Deborah Shapiro included as co-authors) falsely reassured doctors that in patients without a previous history of CV disease prescribing Vioxx instead of naproxen did not increase their patients' risk of heart attack, when exactly the opposite was true. Merck scientists - two of whom were listed as authors on the *NEJM* article - knew six months earlier that this statement was simply not true.

67.    On the other hand, the 11 non-Merck employee authors (including the lead author) knew about neither the differential cutoff dates for CV and GI events that occurred in the VIGOR trial, nor the three unreported heart attacks. These authors were left unaware of the inaccurate conclusion that Vioxx did not increase the rate of heart attack in patients who did not have a previous history of CV disease. In their

---

[52] MRK-AAX0002761.

[53] Kim PS, An Open Letter from Merck, December 15, 2005. http://www.merck.com/newsroom/Vioxx_withdrawal/Merck_Letter.swf (accessed May 14, 2008).

[54] Curfman GD, Morrissey S, Drazen JM, Expression of Concern Reaffirmed, N Engl J Med, 2006;354:1193 and Supplementary Appendix 1

[55] Curfman GD, Morrissey S, Drazen JM, Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," N Engl J Med 2000;343: 1520-8, 2005;353:2813-4

response to the "Expression of Concern"[55] issued by the editors of the *NEJM* about the three heart attacks that occurred in the VIGOR trial but were not included in the November 23, 2000 *NEJM* article reporting the results, the non-Merck employed authors wrote: "These events were neither in the locked database used in the analysis for the VIGOR paper nor known to us during the [manuscript] review process."[57]

68.    In November 2000, Dr. Weinblatt was concerned about the statistically significant difference in the rate of CV events occurring in the two groups of the VIGOR trial.[58]   In a letter, dated December 20, 1999,[59] he recommended that standard operating procedures (which had been established but abandoned with acknowledgement of Merck senior management)[60] be developed for analyzing the serious CV events that occurred in the VIGOR trial.  In another letter, dated January 24, 2000, Dr. Weinblatt indicated that it would be acceptable for Merck to do a subsequent meta-analysis of CV events that included other clinical trials involving Vioxx, but reiterated the need for a separate plan to analyze CV data from the VIGOR trial prior to unblinding.[61]   Merck informed Dr. Weinblatt on February 7, 2000, it would present only the total number of serious thrombotic and embolic CV adverse events in each group unless "the results indicate a potential safety concern, [in which case] additional analyses will be performed to provide better understanding of the initial results."[62]   The February 7, 2000 letter also stated that the cutoff for CV events was going to be those

---

[56] Ibid.

[57] Bombardier C, Laine L, Burgos-Vargas R, et al, Response to Expression of Concern Regarding VIGOR Study. *NEJM*, 2006;354:1196-8.

[58] MRK-GUE0035229.

[59] MRK-AAX0002759.

[60] MRK-AAX0002908; pg MRK-AAX0002908.

[61] MRK-AAX0002760.

[62] MRK-AAX0002761; pg MRK-AAX0002761.

*reported* by February 10, 2000,[63] while the cutoff for GI events was going to be those *occurring* through the later date of March 9, 2000.[64] (Moreover, no steps were taken after the VIGOR DSMB meetings of November and December, 1999, to stop the VIGOR trial, despite the statistically significant increase in serious thrombotic CV events in people taking Vioxx, as the APPROVe DSMB later did when faced with similar statistically significant different CV rates.)

69.    In their Expression of Concern about the November 2000 article by Bombardier, et al, *NEJM* editors stated:

> "Three myocardial infarctions, all in the rofecoxib group, were not included in the data submitted to the *Journal*. Until the end of November 2005, we believed that these were late events that were not known to the authors in time to be included in the article published in the *Journal* on November 23, 2000.   It now appears, however, from a memorandum dated July 5, 2000, that was obtained by subpoena in the Vioxx litigation and made available to the *Journal*, that at least two of the authors knew about the three additional myocardial infarctions at least two weeks before the authors submitted the first of two revisions and 4½ months before publication of the article."

70.    The editors then explained the impact that the three omitted myocardial infarctions would have had on the article by Bombardier, et al.  Omission of the three myocardial infarctions resulted in the article understating the increase in risk of myocardial infarction associated with taking rofecoxib instead of naproxen.  But far more important, omission of the three heart attacks misled readers about the increased risk of myocardial infarction associated with Vioxx in people without a previous history of CV disease ("aspirin not indicated" patients):

---

[63] Ibid.

[64] Op. Cit. Kim.

40

"[Omission of the three myocardial infarctions] also resulted in the misleading conclusion that there was a difference in the risk of myocardial infarction between the aspirin indicated and aspirin not indicated groups."[65]

71.    Readers of the November 23, 2000, article, thus, were falsely reassured that Vioxx did not significantly increase the risk of myocardial infarctions in patients for whom aspirin was not indicated:

"In the [aspirin not indicated] patients the difference in the rate of myocardial infarction between groups was not significant (0.2 percent in the rofecoxib group and 0.1 percent in the naproxen group)."[66]

72.    Despite the above evidence of increased overall risk, CV risk, and heart attack risk occurring in the VIGOR trial with Vioxx instead of naproxen, Merck failed to disclose to physicians and healthcare providers the true CV and overall risks of Vioxx.

**E.    VIGOR Showed that Vioxx Did Not Reduce the Risk of Complicated GI Events for Those Not Taking Steroids**

73.    One of the pre-launch Key Issues identified in the January 29, 1999 National Cross - Functional Team Meeting for Vioxx was "Label needs to differentiate Vioxx from NSAIDs & Celebrex."[67]  The following paragraphs explain how Merck misrepresented the most important GI results of the VIGOR trial, falsely claiming that people who were not taking steroids concurrently (like the vast majority taking Vioxx and other NSAIDs) developed fewer serious GI complications when treated with Vioxx instead of naproxen.  Merck did successfully achieve its goal of having the product label

---

[65] Curfman GD, Morrissey S, Drazen JM, Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," New England Journal of Medicine, 2000;343: 1520-8, 2005;353:2813-4.

[66] Op. Cit. Bombardier, et al, 2000.

[67] MRK-EBES0039480; pg MRK-EBES0039483.

differentiate the GI risk of Vioxx compared to other NSAIDs, but it did so by including this affirmative misrepresentation of the results of the VIGOR trial.

74.    Myocardial infarction was not a pre-specified outcome measure in the VIGOR trial, and "aspirin indicated" versus "aspirin not indicated" was not a pre-specified subgroup analysis. Nonetheless, the *NEJM* article reported an analysis of these subgroups, stating that the 4% of patients who met the FDA's criteria for secondary CV prophylaxis with aspirin, but were not taking aspirin, accounted for 38% of the myocardial infarctions in the study.  The article then reported that in the non-aspirin indicated patients:

> "The difference in the rate of myocardial infarction between groups was not significant (0.2 percent in the rofecoxib group and 0.1 percent in the naproxen group)."  (As described above this claim of significant heterogeneity of treatment effect on the aspirin indicated and non-aspirin indicated subgroups were no longer valid when the three missing myocardial infarctions were included in the analysis.)

75.    Unlike myocardial infarction, complicated confirmed upper GI events (also referred to as complicated PUBs) was a pre-specified end point in the VIGOR trial.  And unlike aspirin-indicated status, glucocorticoid (like prednisone, for arthritis) therapy at baseline was a pre-specified subgroup analysis.  The Statistical Analysis section of the *NEJM* article stated:

> "Interactions between treatments and subgroups were assessed to determine whether the effect of rofecoxib as compared with that of naproxen was consistent in the subgroups."

76.    However, unlike myocardial infarction, the subgroup analysis for complicated confirmed upper GI events was not presented in the *NEJM* article, which

reported 16 such events among patients treated with Vioxx versus 37 in those treated with naproxen:

> "The respective rates of complicated confirmed events (perforation, obstruction, and severe upper gastrointestinal bleeding) [for rofecoxib and naproxen] were 0.6 per 100 patient-years and 1.4 per 100 patient-years (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.8; P=0.005)."

77.   Had the pre-specified subgroup analysis been presented, it would have shown that among the 56% of patients who were taking steroids at baseline, there were 27 complicated PUBs among those who took naproxen versus 7 complicated confirmed upper GI events among the Vioxx-treated patients (RR=3.9, p=0.0004). However, among the 44% of patients not taking glucocorticoids at baseline, there were 10 complicated confirmed upper GI events among those who took naproxen and 9 among the Vioxx-treated patients (RR=1.1, p=0.82). Most important, reporting of this pre-specified subgroup analysis would have included the finding that the incidence of confirmed complicated GI events was significantly different in the subgroups that were and were not taking glucocorticoids at baseline.[68] (In statistical terms: there was statistically significant heterogeneity of naproxen versus Vioxx effect on complicated GI events between those who were and were not taking steroids concurrently.) And it would, therefore, have reported that the benefit of reduced incidence of complicated GI events associated with Vioxx occurred only in those patients taking steroids at baseline. For the patients in the VIGOR trial not taking steroids at baseline there was almost no numerical difference and not a statistically significant reduction in the incidence of complicated GI events for those taking Vioxx.

---

[68] See Report of Nicholas Jewell.

43

78.    An accurate and not misleading presentation of the results would have disclosed the data described above, showing no benefit for non-steroid users with respect to confirmed complicated PUBs. Had the *NEJM* article reported this significant interaction of baseline glucocorticoid use on complicated GI events the same way it reported the (purportedly) significant interaction between aspirin indicated status and myocardial infarction, it would have included the following statement:

> "However, the reduction in confirmed complicated GI events among patients taking Vioxx was limited to those patients who were taking steroids at baseline. Among the 44% of patients not taking steroids at baseline the incidence of complicated PUBs was the same for patients taking Vioxx and naproxen."

79.    But this information was not included in the *NEJM* article, leaving readers with the impression that treatment with Vioxx instead of naproxen significantly reduces the risk of complicated GI events, in patients who were and were not taking glucocorticoids at baseline. The article avoided reporting this significant interaction by presenting subgroup analysis (by baseline glucocorticoid use) for the risk of clinical GI events in toto without presenting analysis of the risk for complicated GI events. The 2002 label for Vioxx went one step further, affirmatively misrepresenting the results of such subgroup analysis:

> "The risk reduction for PUBs and complicated PUBs for Vioxx compared to naproxen (approximately 50%) was maintained in patients with or without the following risk factors…A similar risk reduction for PUBs and complicated PUBs (approximately 50%) was also maintained in patients with or without…concomitant corticosteroid use." [Emphasis added.]

80.    The language adopted in the 2002 label, thus, misrepresents the results of the VIGOR trial. There was no reduction in the incidence of complicated PUBs for non-steroid taking patients treated with Vioxx versus naproxen, and because the test for

44

interaction of baseline glucocorticoid use was statistically significant, the two subgroups - with and without baseline corticosteroid use - could not be legitimately combined. Therefore, presentation of the finding that Vioxx produced fewer complicated GI events would have to be accompanied by the finding that this was not true for patients not taking steroids at baseline.  Failure to present the former without the latter was a misrepresentation of the VIGOR trial results.

81.   The same language that appeared in the 2002 label was included in Merck's April 2002 Dear Healthcare Professional letter, repeating the affirmative misrepresentation that patients taking Vioxx in the VIGOR study experienced approximately 50% fewer complicated PUBs whether or not they were taking corticosteroids concomitantly.[69]

82.   In the VIGOR trial 56% of patients were taking steroids to treat rheumatoid arthritis[70] concurrently with an NSAID, but in the general population only a small minority of people taking NSAIDs take steroids concurrently.  Based on available information from Merck documents and peer reviewed articles, I have estimated that prior to rheumatoid arthritis becoming an approved indication for Vioxx in 2002, approximately 6.8% of patients taking Vioxx were also taking steroids concurrently.[71] After RA became an approved indication for Vioxx in 2002, the number of patients

---

[69] Dear Healthcare Professional letter, Merck, April 2002.

[70] MRK-AFV0451455;  pg MRK-AFV0451726.

[71] Graham, et al, found that 5% of patients taking Vioxx and Celebrex were taking prednisone concurrently (defined as >1000 mg total dose).  Correcting this for the finding in VIGOR that 73% of patients taking steroids were taking prednisone, approximately 6.8% of patients taking COX-2 inhibitors would have been taking steroids concurrently.  [Graham, DJ, Campen D, Hui R, et al, Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study. Lancet, 2005;365:475-81]

45

taking an NSAID concurrently with Vioxx would have increased by 1.4% to a total of 8.2%.[72]

### F.   Other Merck-Sponsored Clinical Trials of Vioxx

83.   The results of other Merck-sponsored studies reinforced its early knowledge regarding the adverse risk profile of Vioxx, but were similarly inadequately disclosed.

84.   The results of Merck's studies 085 and 090, available to Merck no later than February 2000,[73] were submitted to the FDA on June 29, 2000, along with the VIGOR data.[74]  These two studies, although short-term (lasting 6 weeks), provide important information because the dose of Vioxx was only 12.5 mg/day (compared to nabumetone 1000 mg daily) and patients with a previous history of CV disease were allowed to take prophylactic aspirin.[75] [76]  In study 090, the incidence rate of serious adverse events was statistically significantly greater in patients taking Vioxx than in those taking nabumetone.[77]  Commenting on studies 085 and 090, the FDA's Cardio-

---

[72] According to a Merck document in 2001 2.5% of patients taking Vioxx had rheumatoid arthritis. Merck projected an increase to 5% of Vioxx users with rheumatoid arthritis after the label change. [MRK-AAD0106697; pg MRK-AAD0106844].  About 40% of patients with older-onset rheumatoid arthritis are treated with prednisone. [Tutuncu Z, Reed G, Kremer J, Kavanaugh A, Do patients with older-onset rheumatoid arthritis receive less aggressive treatment? Ann Rheum Dis, 2006;65:1226–29]  In the VIGOR trial, 73% of patients treated with steroids were taking prednisone. [MRK-AFV0451455;  pg MRK-AFV0451752]  Thus, 55% of patients with rheumatoid arthritis are treated with prednisone or another steroid, meaning that prior to the approval of Vioxx for the treatment of rheumatoid arthritis, among patients taking Vioxx 55% of the 2.5% of rheumatoid arthritis patients, equaling 1.4% of could be expected to be taking a steroid concurrently. After the label change in 2002, this number doubled to 2.8% of patients taking Vioxx also taking a steroid concurrently.

[73] MRK-ABP0015346; pg MRK-ABP0015368.

[74] MRK-00420008018; pg MRK-00420008019.

[75] Targum SL, FDA Medical Officer Division of Cardio-Renal Drug Products, Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001. p. 24.

[76] Targum SL, FDA Medical Officer Division of Cardio-Renal Drug Products, Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001. p. 28-29.

[77] Targum SL, FDA Medical Officer Division of Cardio-Renal Drug Products, Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001. p. 31.

Renal Reviewer stated: "Despite lower dose, smaller sample size and aspirin use, the trend is against rofecoxib."[78]

85.   Publication of the results of the ADVANTAGE study in the *Annals of Internal Medicine (Annals)* in 2003[79] provides another example of Merck's effort to minimize the effect of the CV precautions and VIGOR data added to the April 2002 label.  (The ADVANTAGE trial, Study 102, had been completed in March 2000, but the complete study report was not submitted when the VIGOR data was submitted.)[80] [81] The FDA Medical Officer Review of the results of the ADVANTAGE study, submitted to FDA on July 12, 2001 and completed November 28, 2001,[82] found:

a.   Vioxx 25 mg "showed no overall safety advantage over naproxen 500 mg twice daily...   This is somewhat striking, given the theoretical assumptions of the COX-2 hypothesis and literature publications suggesting that COX-2 selectivity would provide superior safety than non-selective NSAIDs."

b.   "Consistent with VIGOR, there was a trend of excess in serious cardiac thrombotic events in the rofecoxib 25 mg group, compared to the naproxen group (ten and three events, respectively, as per FDA review)."

[78] Targum SL, FDA Medical Officer Division of Cardio-Renal Drug Products, Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001. p. 34.

[79] Lisse JR, Perlman M, Johansson G, et al, Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis, *Annals of Internal Medicine*, 2003;139:539-546.

[80] Villalba ML, FDA Advisory Committee Briefing Document, NDA 21-042, s007, Vioxx Gastrointestinal Safety, February 8, 2001, Overall Safety, p. 17.

[81] Villalba ML, Medical Officer Review, Vioxx S007 (Gastrointestinal Safety), March 30, 2001. p. 3.

[82] http://www.fda.gov/ohrms/dockets/AC/05/briefing/2005-4090B1_09_J-FDA-Tab-F-1.htm (Accessed May 14, 2008).

c.   "Consistent with VIGOR twice the number of patients discontinued due to cardiovascular related adverse events (40 and 21 from the rofecoxib and naproxen groups, respectively).   More patients discontinued due to HTN related events (15 and 7); edema related events (19 and 12) and laboratory adverse events (11 and 6) in the rofecoxib 25 mg group as compared to the naproxen group.  There were more CHF related events (11 and 6) in the rofecoxib group as compared to the naproxen group."

d.   "...prophylactic ASA may not eliminate the excess of cardiovascular events on rofecoxib compared to naproxen."

e.   "Data suggest that the of use low dose aspirin - such as the dose used for cardiovascular prophylaxis - may eliminate the GI advantage of rofecoxib over naproxen."

f.   The CV findings of ADVANTAGE "are of concern because this is only a 12-week study," the dose of Vioxx was 25 mg (not 50 as in VIGOR), and the population had osteo- rather than rheumatoid arthritis.

g.   Data from Alzheimer's disease studies 091 and 126 Vioxx (submitted by Merck October 1, 2001) show Vioxx is associated with significant risk compared to placebo: hypertension RR=3.3, P=0000004; edema-related complications RR=3.4, P=0.004; CHF-related complications RR=2.7, P=0.03.[83]  The reviewer's comment on this data was: "...*consistent with prior databases,*

---

[83] Calculated using openepi.com.

> rofecoxib 25 mg is associated with higher incidence of
> hypertension, edema, and CHF related events than placebo."

86.    The article reporting the results of this study published in the *Annals* in 2003 presented a very different picture: Vioxx "had statistically significantly superior GI tolerability and led to less use of concomitant GI medications." And specifically about the CV risk seen in the ADVANTAGE study the article reported:

> "The rofecoxib and naproxen groups did not differ
> significantly in the number of thrombotic cardiovascular
> events, as defined by the combined Antiplatelet Trialists'
> Collaboration end points (10 [0.4%] vs. 7 [0.3%]; *P* = 0.2)
> (17), or in adjudicated confirmed thrombotic events (9 [0.3%]
> vs. 12 [0.4%]; *P* 0.2)."

87.    The FDA Medical Officer Review of the CV events that occurred in the ADVANTAGE trial, dated November 28, 2001, disagreed with these results. Merck reported to the FDA and in the Lisse article 9 versus 12 serious CV events for Vioxx and naproxen, respectively. However, Table 16 of the Medical Officer Review shows the "FDA re-adjudicated" serious CV events as 12 for Vioxx and 10 for naproxen, respectively. And instead of the statistically significant greater number of strokes in people taking naproxen (6) compared to Vioxx (0) reported in the article by Lisse, et al, the FDA re-adjudicated numbers were 4 and 1, respectively (no longer statistically significant).[84]

88.    As quoted in the *New York Times*,[85] the lead "author" of the *Annals* 2003 article said:

> "Merck designed the trial, paid for the trial, ran the trial...
> Merck came to me after the study was completed and said,

---

[84] http://www.fda.gov/ohrms/dockets/AC/05/briefing/2005-4090B1_09_J-FDA-Tab-F-1.htm (Accessed May 14, 2008).

[85] Berenson A, Evidence In Vioxx Suits Shows Intervention by Merck Officials, NY Times, April 24, 2005.

'We want your help to work on the paper.' The initial paper was written at Merck, and then it was sent to me for editing."

89.    This article, published in a respected peer-reviewed journal, was ghost-written and violated the standard of the International Committee of Medical Journal Editors (ICMJE) that authors make "substantial contributions" to the study, drafting of the article, and final approval of the published version.[86]  In addition, the standards of the ICMJE require that the funding source of writing assistance should be disclosed.[87]

90.    As discussed above, the November 2000 *NEJM* article left readers with the false impression that the increased risk of heart attacks that occurred in the VIGOR patients with a previous history of CV disease was the result of these patients not being allowed to take prophylactic low dose aspirin, due to the design of the study.  The article states that the patients taking naproxen were not similarly deprived of the benefit of anti-platelet therapy and thus developed fewer heart attacks, and implies that treatment with low-dose aspirin would mitigate the increased risk:

> "When the data showing a reduction in the rate of myocardial infarction in the naproxen group became available after the completion of this trial, Merck, the manufacturer of rofecoxib, notified all investigators in ongoing studies of a change in the exclusion criteria to allow patients to use low-dose aspirin."

91.    But Merck knew and did not disclose that the results of its own ADVANTAGE study (which like the VIGOR results were available to Merck in March 2000), suggested that concurrent low dose aspirin therapy in patients with a previous history of CV disease did not, in fact, protect them from the increased risk of CV

---

[86] Uniform Requirements for Manuscripts Submitted to Biomedical Journals: Writing and Editing for Biomedical Publication, ICMJE, updated October 2007, http://www.icmje.org/#author (accessed May 14, 2008).

[87] Sean P. Wajert, Dechert LLP, Assessing the Impact of Medical and Scientific Journals on Drug and Device Litigation-Part one (of Three).

complications associated with taking Vioxx 25 mg instead of naproxen. And therefore, wrote the FDA Medical Reviewer of the ADVANTAGE study,[88] the results of ADVANTAGE argued against Merck's explanation that the increased risk of CV events seen in people taking Vioxx in the VIGOR trial could be explained entirely by the anti-platelet effect of naproxen, because unlike the VIGOR trial, people in the ADVANTAGE study taking Vioxx who had a past history of CV disease were not similarly deprived of antiplatelet therapy.

> "If the cardiovascular findings in VIGOR were all explained by naproxen anti-platelet effect, a difference would not be expected between naproxen and rofecoxib in ADVANTAGE, when patients at risk in both treatment groups were already maximally protected by ASA."[89]

92. The FDA Medical Officer Review of the ADVANTAGE trial data concluded that the ADVANTAGE "findings are not inconsistent with VIGOR" in demonstrating an increased risk of Vioxx in people with a previous history of heart disease, whether or not they were taking aspirin (see footnote below).[90] Furthermore, the results of 085 and

---

[88] http://www.fda.gov/ohrms/dockets/AC/05/briefing/2005-4090B1_09_J-FDA-Tab-F-1.htm (accessed May 14, 2008).

[89] Op. Cit., Villalba.

[90] Special populations: co-use of low dose ASA for cardiovascular prophylaxis.
Data suggest that the use of prophylactic ASA may not eliminate the excess of cardiovascular events on rofecoxib compared to naproxen.
The number of investigator reported serious cardiovascular adverse events for all patients (ASA users and non-users) was 23 (0.8 %) and 17 (0.6%) in the rofecoxib and naproxen groups, respectively. The number of these events in the subgroup of patients at known cardiovascular risk – as defined by concomitant use of low dose ASA – was 7/ 352 (2.0 %) and 2/ 367 (0.5 %) in the rofecoxib and naproxen group, respectively. These findings are not inconsistent with VIGOR, in which a post-hoc analysis conducted by the sponsor showed that the relative risk of developing serious cardiovascular thrombotic events for rofecoxib compared to naproxen increased from two fold in the whole population (RR:2.37, p= 0.001 for rofecoxib vs. naproxen) to five fold among those patients who might have benefited from prophylactic ASA (RR: 4.89, p= 0.01 for rofecoxib vs. naproxen).
If the cardiovascular findings in VIGOR were all explained by naproxen anti-platelet effect, a difference would not be expected between naproxen and rofecoxib in ADVANTAGE, when patients at risk in both treatment groups were already maximally protected by ASA.

51

090 combined with the preliminary results of the ADVANTAGE trial (Vioxx 25 mg versus naproxen 500 mg twice daily for 12 weeks in people with osteoarthritis) led the FDA Cardio-Renal Reviewer to cast doubt upon Merck's claim (put forth in the November 2000 *NEJM* article) that, but for the 4 percent of patients in the VIGOR trial taking Vioxx who had a history of CV disease and who were prevented from taking prophylactic aspirin because of the study design, there would not have been a significant disparity in thrombotic CV complications between Vioxx and naproxen users:

> "The sponsor claims that the majority of cardiovascular events in the VIGOR study occurred in those patients who should have been on aspirin for cardioprotection. This claim has not convinced this Medical Reviewer. The VIGOR data are consistent (i.e., increased events in the rofecoxib group) even in patients who did not fall into the 'aspirin-indicated' subgroup." [Emphasis in original.][91]

## VII. Marketing, Detailing, and Public Relations

93.     Drug representatives are a common sight in doctors' offices. Even though their purpose is obviously to increase prescribing of the drugs they are "detailing," they have an effect on doctors' beliefs about drugs and their prescribing choices. According to a 2002 survey conducted by the Kaiser Family Foundation, 74% of doctors consider the information provided by drug representatives very or somewhat useful, and 81% of doctors consider the information provided by drug representatives very or somewhat accurate.[92] Thus drug representatives - acting as agents of the drug companies - exert a major influence on doctors' prescribing decisions. Though most doctors find the information presented by drug representatives both useful and accurate, an article

---

[91] Op. cit. Targum p. 35.

[92] National Survey of Physicians *Part II: Doctors and Prescription Drugs*, The Kaiser Family Foundation, March 2002. http://www.kff.org/rxdrugs/loader.cfm?url=/commonspot/security/getfile.cfm&PageID=13965 accessed 1/8/07.

published in the *Journal of General Internal Medicine* shows that nearly half (42%) of the material given to doctors by drug representatives made claims in violations of FDA regulations. And only 39% of the material provided by drug representatives provided scientific evidence to back up claims.[93] The marketing of Vioxx by drug representatives was no exception.

A.      **Misrepresentation of the CV Risk of Vioxx**

94.      In 2000 and 2001, Merck purchased approximately 370,000 reprints of the *NEJM* VIGOR article, containing the knowingly false conclusions that a) Vioxx significantly reduced the risk of complicated PUBs for patients not taking steroids concurrently, and a) did not increase the risk of heart attack for patients without a previous history of CV disease. Then in 2002 alone, the year of the label change and Dear Healthcare Provider letter, Merck purchased 549,500 reprints of the *NEJM* VIGOR article[94] – virtually one for every prescribing physician in the U.S. These reprints carried forward false claims of benefit and safety that detracted from the impact of the inclusion of some of the CV data from the VIGOR trial in the April 2002 label and Dear Healthcare Provider letter. Indeed, some of the most important errors and omissions from the November 2000 *NEJM* article were not corrected in the April 2002 label change and Dear Healthcare Provider letter (the significant increase in overall serious adverse events associated with Vioxx, the risk applying to those without a previous history of CV disease, failure of aspirin to mitigate the increased risk of Vioxx in people with a previous history of CV disease, and reporting that among patients not taking glucocorticoids concurrently Vioxx caused significantly fewer complicated PUBs).

[93] Stryer D, Bero LA, Characteristics of Materials Distributed by Drug Companies: An Evaluation of Appropriateness, *Journal of General Internal Medicine*, 1996;11:575-583.

[94] Curfman deposition, 11/21/05, Exhibit 42; Armstrong D, How the New England Journal Missed Warning Signs on Vioxx, Wall Street Journal A-1 (May 15, 2006).

Merck knew that the overall effect of distributing the November 2000 *NEJM* article to physicians in 2002 would be exactly the opposite of the CV information from the VIGOR trial that was incorporated into the 2002 label change and Dear Healthcare Provider letter. Merck's success in minimizing the impact of the 2002 label change on physicians' attitudes about the CV risk associated with Vioxx was documented by marketing research in the first quarter of 2003. The conclusion drawn from in depth interviews of 31 physicians was:

> "Physicians do not know how to interpret the information regarding the CV data – to some, it appears to contain conflicting results. Some said that they would have to see more information, some said they have never believed VIOXX has CV [cardiovascular] issues, and yet cannot, and will not, fight patients who might ask for another COXIB by name. Only one physician (in Scottsdale) said that he proactively warns he [his] patients, and rarely starts any patients on Vioxx."[95]

95.     On February 8, 2001, the FDA Advisory Committee unanimously recommended that physicians be informed of the CV risk associated with taking Vioxx instead of naproxen in the VIGOR trial. But Merck instructed its sales representatives to do just the opposite: not to discuss the results of the VIGOR trial and to avoid bringing up the CV risk issue.[96] The day after the Advisory Committee's suggestion was made, Merck sent out a bulletin to all field personnel with responsibility for Vioxx, National Account Executives and Customer Managers instructing:

> "DO NOT INITIATE DISCUSSION ON THE FDA ARTHRITIS ADVISORY COMMITTEE (ADVISORY COMMITTEE) REVIEW OR THE RESULTS OF THE VIOXX GI OUTCOMES RESEARCH (VIGOR) STUDY. YOU MAY

---

[95] Expert Report of Cornelia Pechmann PhD, pp 55-6.

[96] Waxman H, The Lessons of Vioxx - Drug Safety and Sales, *NEJM*, 2005;352:2576-8.

RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW."[97]

96.     Even after the FDA Cardio-Renal reviewer had rejected Merck's hypothesis that the increased rate of CV complications that occurred in people taking Vioxx in the VIGOR trial was due to the anti-platelet effect of naproxen, Merck persisted in making this argument. Its Scientific Communication Plan for Vioxx, dated March 27, 2001, stated that the CV messages for February through May 2001 included that CV effects of Vioxx were similar to placebo (despite osteoarthritis studies 010 through 090 showing a relative risk for Vioxx of 1.9 as of that date, see below), and still made the rejected argument that "difference in MIs in VIGOR due to cardioprotection with naproxen..."[98]

**B.     Merck Used the "Cardiovascular Card" to Mislead Physicians**

97.     Rather than presenting the most up-to-date and complete risk information about Vioxx, Merck's sales representatives were instructed specifically how to "dodge" healthcare providers' concerns about the safety of Vioxx and incentivized to increase Vioxx sales[99] and given "obstacle handling" tools, including a "Cardiovascular Card"[100] - first available on April 28, 2000[101] - that substituted far less "hardy" scientific data than was available and failed to present the VIGOR CV risk results.

98.     The Cardiovascular Card presented data from small dissimilar pre-approval studies of varied duration (completed by the end of 1998) that Merck's drug representatives used to "educate" doctors about the CV safety of Vioxx. But Merck's

---

[97] MRK-H.3STM001173.

[98] MRK-ABO0000257.

[99] MRK-AAR0007240-MRK-AAR0007248, MRK-AAR0021103-MRK-AAR0021108.

[100] http://oversight.house.gov/features/Vioxx/Tab5.pdf (accessed May 14, 2008).

[101] Rep. Henry A. Waxman, Memorandum re: The Marketing of Vioxx to Physicians, May 5, 2005, p. 17. http://oversight.house.gov/documents/20050505114932-41272.pdf Accessed July 15, 2009.