"education" failed to inform doctors of known risks and failed to update information about those risks as more data became available.

99.    The data presented in the Cardiovascular Card were pooled results from Phase IIb/III pre-approval studies completed prior to submission of the NDA for Vioxx, so-called Study 069.[102]  The FDA rejected the validity of pooling these trials because of the variability of length, dose, and comparator in 1999[103] and 2001.[104]  And again rejected such pooling in 2002, specifically referring to the proposed inclusion of the CV results from these pooled studies in the post-VIGOR label to show lack of CV risk:

> "Lack of differences [in cardiovascular thrombotic events] seen in a meta-analysis of phase IIb III studies are not adequately informative to warrant inclusion in the label. Phase IIb III studies included trials of different designs, size and duration, using different doses of Vioxx and different comparators."[105]

100.    The Cardiovascular Card provided incomplete and misleading data to prescribers in part because it failed to include all of the OA studies that were completed by April 2000, when the card was first used.  In particular, studies 085 and 090, completed in March and May 1999, respectively were not included.  The data for both studies were available no later than February 2000, [106] [107]  two months prior to the initial

---

[102] MRK-OS420124401-3 [Section B-47].  Note that the number of placebo patients in 6-week studies osteoarthritis studies (Tables E-73) is 412 and the number in 6 month OA studies is 371, totaling 783 -the number of placebo patients included in CV card.  Similarly, the number of patients taking 12.5 mg and 25 mg of Vioxx in the six week and six month OA studies is 1215 and 1614, respectively - the same as presented in the CV card.

[103] FDA Statistical Review Vioxx NDA, May 19, 1999, p. 15. http://www.accessdata.fda.gov/drugsatfda_docs/nda/99/021042_52_vioxx_statr_P2.pdf, accessed October 9, 2009.

[104] FDA Advisory Committee Briefing Document, Vioxx Gastrointestinal Safety, February 8, 2001, http://www.accessdata.fda.gov/drugsatfda_docs/nda/99/021042_52_vioxx_statr_P2.pdf (accessed May 14, 2008) p. 19.

[105] Telecon Minutes, Labeling Negotiations, February 8, 2002 p. 7.

[106] MRK-ABP0015346; pg MRK-ABP0015368, data available 4Q99.

[107] MRK-ABP0015346; pg MRK-ABP0015368, data available 2/2000.

use of the Cardiovascular Card. With the timely inclusion of data from these two additional studies (6 thrombotic CV events in people treated with Vioxx, none in people treated with placebo), the relative risk of thrombotic CV complications associated with Vioxx compared to placebo increased to 1.9.[108] This level of risk - even though not statistically significant - certainly was important for potential prescribers to know about, and would have caused concern for a drug that provided no better symptom relief than far less expensive non-selective NSAIDs.

101. Also omitted was the meta-analysis done by Merck's own statistician showing that when all data available in October 2000 were pooled together, Vioxx was more than twice as likely to cause a heart attack as other NSAIDs, RR=2.02 (1.14, 3.55),[109] belying the bar graph in the Cardiovascular Card, which showed that the risk of heart attack with Vioxx was virtually identical to that of other NSAIDS (0.6 versus 0.5 myocardial infarctions per 100 patient years, respectively).

102. The Cardiovascular Card was re-validated for use in August 2001,[110] but was not updated to include data from 085, 090, VIGOR or ADVANTAGE and; therefore, misled prescribers about the CV safety of Vioxx.

103. Cardiovascular Card mortality data showed that overall and CV mortality in patients taking Vioxx is virtually identical to those taking placebo, but did not include Alzheimer's studies mortality data known by Merck statistician, Deborah Shapiro, to be 30 versus 10 (Vioxx and placebo respectively) on January 29, 2001,[111] re-calculated by Merck statistician, Joshua Chen, on May 1, 2001, showing 38 deaths among people

---

[108] MRK-18940080095 Rofecoxib CV update—data through 10-June '03, Table 13.

[109] MRK-NJ0070364.

[110] MRK-AF10136524 [236 Email from Linda Coppola CV car 1 year Revalidation].

[111] MRK-ACF0004015.

taking Vioxx compared to 16 deaths among an equal number of people taking placebo, p = 0.001.[112] This p-value means that there are 999 chances out of 1000 that Vioxx increases the risk of death in this population.   An April 8, 2001, internal Merck memorandum presented combined mortality data from studies 078 and 091 based on intention-to-treat analysis. The Hazard Ratios for death among patients taking Vioxx in the two studies were 4.43 and 2.55 (both statistically significant), respectively.   At the completion of these studies there were 21 deaths from heart disease among patients treated with Vioxx compared to 6 in the placebo group (HR 3.84, P=<0.005).[113] (Despite the significantly higher death rate noted in the intention-to-treat analysis of interim data, the combined data were not published or made known to the medical community until made available through litigation.)[114]   In addition, Merck did not notify local institutional review boards about the significant increase in deaths in the study as a whole - there was no DSMB to oversee the safety of study participants - so Study 078 continued for about two years after the significant increase in the risk of death was known to Merck).[115]   Not only did Merck choose not to include this information in the Cardiovascular Card so that prescribers remained uninformed about this most serious of all drug risks, but Merck went even further and presented outdated and virtually meaningless mortality data from short studies that had been pooled together and expressed misleadingly as deaths per 100 patient-years (when the average length of these studies was in fact three months or less - hardly enough time for differences in mortality to appear when so few events occurred).

---

[112] MRK-ABY0030000 to 3030.

[113] Psaty BM, Kronmal RA, Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment, Journal of the American Medical Association, 2008;299:1813-17.

[114] Ibid.

[115] Ibid.

58

104. Despite the increased CV risk, Merck continued to instruct its sales force to focus on efficacy - which had never been shown to be superior to two Aleve tablets bought over-the-counter - and use the Cardiovascular Card to handle "obstacles" such as CV risk when questioned by physicians through its launch of marketing programs like Project Offense. Merck's "Project Offense Meeting"[116] with drug representatives reviewed Q4 2001 goals, including:

> "1.2 Obstacle Handling: Certify rep competency handling CV obstacles utilizing CV card, obstacle response and PIR process when asked unsolicited questions regarding the CV safety of Vioxx."[117]

In other words, sales representatives were not to bring up the CV safety of Vioxx in their presentation of information about Vioxx to doctors, and they were provided with scripted responses designed to parry inquiries about the CV risk of Vioxx demonstrated in the VIGOR trial should they be initiated by physicians. These instructions came after the February 2001 Advisory Committee had voted unanimously that physicians should be informed about the CV risks associated with taking Vioxx instead of naproxen in the VIGOR trial.[118]

105. The recommendation presented at the sales representatives' "Project Offense" meeting was consistent with the Bulletin that Merck sent out to all its field representatives one day after the Advisory Committee's vote: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS COMMITTEE...OR THE RESULTS OF THE...VIGOR STUDY."[119] If physicians asked about the VIGOR study, Merck representatives were directed to respond, "Because this study is not in the label,

---

[116] MRK-H.10STM001118.

[117] MRK-H.10STM001118; pg MRK-H.10STM001120.

[118] Waxman H, The Lessons of Vioxx - Drug Safety and Sales, *NEJM,* 2005;352:2576-8.

[119] MRK-H.3STM001173.

I cannot discuss the study with you."[120] Accordingly, Merck's training and bulletins to its field representatives served, for the most part, to minimize the CV and overall safety risk of Vioxx seen in the VIGOR and other trials.

106.   An e-mail, dated August 22, 2001, documents Merck's "re-validation of the Cardiovascular Card for another year."[121] Thus, Merck committed its representatives to another year of "educating" doctors about the CV risk of Vioxx using this selectively self-serving data despite:

a.   The FDA's rejection (described above) of "Study 069," which was the compilation of pre-approval studies presented in the Cardiovascular Card, and which was later deemed unacceptable for inclusion on the revised label of April 2002.

b.   The FDA Advisory Committee's unanimous recommendation six months earlier to inform practicing physicians of the CV results of VIGOR.

c.   The availability of far more comprehensive data from the VIGOR trial which showed a significant increase in the incidence of serious CV events in people taking Vioxx.

d.   Merck's May 2001 update of mortality data from its Alzheimer's studies showing that the death rate among those taking Vioxx 25 mg per day was 2.4 times greater than for those taking placebo ($P=0.001$).[122]

---

[120] MRK-H.10STM001118; pg MRK-H.10STM001130.
[121] MRK-AFI0136524.
[122] MRK-ABY0030000; pg MRK-ABY0030001.

107.   Nonetheless, in August 2001, Merck re-committed its representatives to misinforming physicians about the CV risk of Vioxx, and even requested "that we should increase the # of pieces that a rep can order...due to recent current events."[123]  The "recent events" referred to were most likely the publication of Mukherjee article in *Journal of the American Medical Association (JAMA)* (published the very same day as this e-mail), informing physicians for the first time in a major medical journal that the risk of serious thrombotic CV complications (the pre-specified CV complication that had not been reported in the *NEJM* article of November 2000) among those taking Vioxx in the VIGOR trial was 2.38 times greater than for those taking naproxen, p=0.002.[124]

108.   In the months following the adoption of the April 2002 label revision, Merck steadfastly stuck to its strategy of attempting to minimize the CV risk associated with Vioxx.  In Merck's "Long Range Operating Plan: 2002-2007," dated July 15, 2002, (three months after the new label for Vioxx was adopted) Merck projected $6 billion in COX-2 sales in 2007, "provided we...[e]ffectively convey the benefit-risk (CV safety) profile of our coxibs."[125]

C.   **Merck-Sponsored Publications Misled About CV Risk/Safety of Vioxx**

109.   The data in the Cardiovascular Card were reinforced by several Merck-sponsored articles that purported to show that Vioxx did not increase the risk of thrombotic CV and renovascular events:  Konstam, et al, 2001; Reicin, et al, 2002; Gertz, et al, 2002; and Weir, et al, 2003.  The purpose of these publications was identified in background material for the HHPAC Meeting on April 20, 2000 "related to

---

[123] MRK-AFI0136524.

[124] Mukherjee D, Nissen SE, Topol EJ, Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, *JAMA*, 2001;286:954-59.

[125] MRK-ABI0011027 to 1081.

the Vioxx/MK-0663 Interim review."[126]   The memo was distributed to attendees of this

meeting, including Dr. Gertz and Dr. Reicin.  Marketing needs for Vioxx identified in this

memo included:

> "Rapid publication and communication at opinion leader
> events of phase III OA results demonstrating comparable
> incidence of thromboembolic events with Vioxx, placebo,
> and NSAID comparators."[127]
>
> The presentation for the Arthritis and Analgesia Core
> Franchise meeting of April 17, 2001[128] reconfirmed this
> publication plan, citing Merck's objective of establishing
> "favorable safety profile for and within the class" for Vioxx.
> The publication plan for Vioxx included "renovascular,
> Phase IIb/III OA and IIb-V meta-analysis."[129]

110.   The article by Konstam, et al, published in *Circulation* in November 2001

and titled "Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib,"

relied upon data from trials that had been completed and unblinded by early September

2000, as well as interim data from Alzheimer's studies as of September 15, 2000.[130]

The "major outcome" presented in this article was the "combined endpoint used by the

Antiplatelet Trialists' Collaboration (APTC endpoint)."  This endpoint differs from the

endpoint identified in Merck's original SOP for the analysis of thrombotic CV

complications in its trials of COX-2 specific inhibitors,[131] [132] and also delineated in the

---

[126] MRK-AB10002269.

[127] MRK-AB10002269; p MRK-AB10002307.

[128] MRK-AHO0005433.

[129] MRK-AAD0226833; pg MRK-AAD0226846.

[130] Konstam MA, Weir MR, Reicin, A et al, Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib, *Circulation*, 2001; 104: 2280-8.

[131] Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Trials, December 30, 1997; MRK-ABS0037036. pp. MRK-ABS0037040, MRK-ABS0037043.

[132] Standard Operating Procedure for the Surveillance, Monitoring, and Adjudication of Acute Thrombotic Vascular Events in Clinical Trials of COX-2 specific inhibitors, August 30, 1999, MRK-18940077810; pg MRK-18940077827.

FDA's CV safety review of the VIGOR trial data.[133] The thrombotic CV complications in the SOP's definition include a) coronary events: myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, and sudden or unexplained death; b) cerebrovascular events: stroke and transient ischemic attack; and c) peripheral events: venous thrombosis and pulmonary embolism.[134]   (This is the primary endpoint presented in the article by Reicin, et al, 2002, although this article failed to include available data, discussed below.)  Use of APTC endpoints minimizes the apparent CV risk of Vioxx by not including peripheral venous thrombosis, unstable angina, or transient ischemic attacks.

111. The article by Konstam, et al, made the argument that certain non-selective NSAIDs (including naproxen) can reduce the risk of CV complications, although this argument had been rejected in Merck's own SOP, it's own consultants, and the FDA's Cardio-Renal review of the VIGOR trial data (all described above).  This analysis included all osteoarthritis studies from 029 through 090.  The relative risk of APTC CV complications associated with Vioxx compared to placebo in the osteoarthritis trials was reported to be 1.53.  Had the outcome measure for this analysis been the one identified in the SOP, serious thrombotic CV complications, the relative risk for studies 029 through 090 would have been 1.78.[135]  And had the article by Konstam, et al, also included Study 010 (which had been completed no later than February 24, 1998),[136] the

---

[133] www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf Accessed July 15, 2009.  P 11: "The SOP for the vascular event monitoring and adjudication can be found in 088c: Category 3: Appendix 3.2.1(pdf. Pages 1678-1691.  Original submission 6/29/00)."

[134] Ibid.

[135] MRK-18940080062; pg MRK-18940080095.

[136] MRK-OS420045785; pg MRK-OS420045791.

relative risk for Vioxx would have been 1.9, i.e., people taking Vioxx developed 90% more thrombotic CV complications than people taking placebo.

112.   In addition to rheumatoid arthritis and osteoarthritis categories of treatment, the article by Konstam, et al, included a category called "Alzheimer's/low back pain." The relative risk of CV complications associated with Vioxx in this category is much lower than the other two, 0.68 - neutralizing the (non-significant) increases in risk associated with rheumatoid and osteoarthritis:

**TABLE 3.   Pooled Analysis of APTC End Point: Rofecoxib Relative to Placebo**

| Indication for Treatment | Rofecoxib | | Placebo | | Relative Risk (95% CI) |
|---|---|---|---|---|---|
| | No. of Patients | APTC Events/ Patient-Years at Risk (Rate)* | No. of Patients | APTC Events/ Patient-Years at Risk (Rate)* | |
| Rheumatoid arthritis | 1622 | 3/337 (0.89) | 989 | 1/201 (0.50) | 1.78 (0.14; 9.37) |
| Osteoarthritis | 3165 | 12/655 (1.83) | 1215 | 3/232 (1.30) | 1.53 (0.43, 5.44) |
| Alzheimer's/low back pain | 1503 | 18/1197 (1.50) | 1278 | 28/1246 (2.25) | 0.68 (0.37, 1.23) |
| Total | 6290 | 33/2189 (1.51) | 3482 | 32/1678 (1.91) | 0.84 (0.51; 1.38) |

*Rate=APTC events per 100 patient-years at risk.

**Figure 6.**

113.   Merck's SOP for the surveillance, monitoring, and adjudication of acute thromboembolic vascular events in clinical trials of Vioxx and other COX-2 selective inhibitors [137] called for analysis of studies to be performed by predetermined blocks - according to study design, indication, and date of completion.[138]   Block 3, which included studies of Alzheimer's disease (Studies 078 and 091) and the colorectal adenoma study (APPROVe),[139] was not intended to be analyzed until the fourth quarter

---

[137] MRK-18940077810 Dated August 30, 1999 and revised on January 21, 2000.

[138] MRK-18940077810; pg MRK-18940077827.

[139] MRK-AGV0021318; pg MRK-AGV0021321.

64

of 2003.[140]   Merck's strategy for evaluating the incidence of serious thromboembolic events in its COX-2 specific inhibitor program did not include analysis of events that occurred in studies of low back pain.

114.   Had Konstam, et al, analyzed the two blocks of studies that had been planned to be available at the time of submission of their article[141] and had the analysis been based upon the more comprehensive endpoint of thrombotic CV complications (identified in Merck's SOP; the April 16, 2000, draft of the *NEJM* VIGOR article; and the FDA's CV safety review of the VIGOR data), the relative risk of thrombotic CV complications in patients taking Vioxx compared to placebo would have been reported as more than double and just missing statistical significance (RR 2.4, P=0.06 ).

115.   The second article, published in January 2002, was authored by Merck employees Alise Reicin, Deborah Shapiro, Rhoda Sperling, and Eliav Barr.[142]   Despite having been submitted July 2, 2001, this article included data only from the pre-approval osteoarthritis studies 029 through 058, all of which had been completed by the end of 1998.   The article provided false reassurance that in clinical trials of patients with osteoarthritis Vioxx did not increase the risk of thrombotic CV events, concluding:

> "In summary, an analysis of the rofecoxib osteoarthritis development program found no difference between rofecoxib, comparative nonselective NSAIDs, and placebo in the risks of cardiovascular thrombotic events."

116.   Had the authors included Studies 010 through 090 – which had been included in the earlier article by Konstam, et al, the data for which were available no

---

[140] MRK-AGV0021318; pg MRK-AGV0021319.

[141] MRK-18940080062: pg MRK-18940080095 As reported in Table 13 of the Updated Cardiovascular Pooled Analysis, without OA study 136, but with OA study 010.

[142] Reicin AS, Shapiro D, Sperling RS, et al, Comparison of Cardiovascular Thrombotic Events in Patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-inflammatory Drugs (Ibuprofen, Diclofenac, and Nabumetone), American Journal of Cardiology, 2002'89:204-9.

later than February 2000[143] (17 months before this article was submitted) - rather than providing reassurance about the CV safety of Vioxx, exactly the opposite message would have been conveyed: Instead of the reported relative risk of 0.94 associated with placebo versus Vioxx, the relative risk of serious thrombotic CV complications in patients taking Vioxx instead of placebo would have been 1.9. Although this risk did not reach statistical significance, it certainly would have sounded an alarm for potential prescribers.

117. A bulletin for Vioxx sales representatives provided background information on using reprints of the article by Reicin, et al, and instructed them how to respond to questions.[144] When sales representatives were asked questions about this article or the VIGOR trial, they were instructed to stay on script, offer to submit a Physician Information Request (PIR), and:

> "Then, you should transition to your approved promotional messages for Vioxx. DO NOT initiate discussions or respond to questions about this analysis or about VIGOR."

118. Had Merck followed through on the plan outlined in the "CRRC" meeting notes for January 3, 2001, to submit a manuscript for publication reporting the CV safety in Phase III osteoarthritis studies in December 2000[145] (033 through 090), it would have reported a 50% increase in the risk of CV complications in people taking Vioxx compared to those treated with placebo.[146] But this did not happen because, as documented in the CRRC meeting notes of February 7, 2001, "plans to publish this data

---

[143] MRK-ABP0015346; pg MRK-ABP0015368.

[144] Bulletin for Vioxx: BACKGROUND INFORMATION ONLY: Reprint Review of "Comparison of Cardiovascular Thrombotic Events In Patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-inflammatory Drugs.

[145] MRK-ABP0015346; pg MRK-ABP0015352.

[146] MRK-18940080062: pg MRK-18940080095 Table 13.

have been terminated."[147]   Instead, the team was to "focus on submitting a meta-analysis of CV safety that was prepared to support the VIGOR Advisory committee to the Amer. J. of Cardiology in 1Q01,"[148] the journal in which the article by Reicin, et al, was later published.

119.   An article written by Barry Gertz, et al (all Merck employees), compared renovascular adverse events in patients taking Vioxx and non-selective NSAIDs in the pre-approval osteoarthritis studies 010 through 058.[149]  Like the article by Reicin, et al, this article was published in 2002 but included only data from the osteoarthritis studies that had been completed by the end of 1998.  Unlike the article by Reicin, et al, the Gertz article included data from Study 010, showing once again that there was no reason to have left this out of the article by Reicin et al or the data presented in the Cardiovascular Card.   The article concluded that data from the pre-approval osteoarthritis studies, including over 5,000 patients, showed the renal safety profile for Vioxx "was generally similar to that of the comparator, non-selective NSAIDs which were studied."   The article made no mention of the renal safety profile from the 8,000 patient data set provided by the VIGOR trial, the Clinical Study Report for which was completed June 20, 2000.[150]  In contrast to the findings from the osteoarthritis studies presented in the article by Gertz, et al, the VIGOR trial showed (albeit with Vioxx 50 mg) significantly greater frequency of lower extremity edema in patients taking

---

[147] MRK-ABP0016015; pg MRK-ABP0016021.

[148] Ibid.

[149] Gertz BJ, Krupa D, Bolognese, JA, et al, A Comparison of Adverse Renovascular Experiences Among Osteoarthritis Patients Treated with Rofecoxib and Comparator Non-selective Non-steroids Anti-inflammatory Agents, Current Medical Research and Opinion, 2002;2:82-91.

[150] MRK-AFV0451455.

Vioxx[151] (RR=1.7, p=0.001); significantly more hypertension in people taking Vioxx[152] (RR=1.83, p=.0000005); and significantly more discontinuations for congestive heart failure and hypertension.[153]  The VIGOR trial used Vioxx 50 mg, but the greater clinical experience and significant findings certainly would have been of great interest to the readers of the article by Gertz, et al.  Compounding this omission, the report of the VIGOR trial published in *NEJM* minimized these significant findings as well:

> "The incidence of adverse effects related to renal function was low and was similar in the two groups (1.2 percent in the rofecoxib group and 0.9 percent in the naproxen group); only 0.2 percent of patients in each group discontinued treatment because of these adverse effects."[154]

120.  Thus the significant increase in hypertension, edema and congestive heart failure that occurred in the patients taking Vioxx in the VIGOR trial were not presented in the *NEJM* article and not mentioned in the subsequent reassuring article by Gertz, et al.

121.  Yet another article purporting to show the CV safety of rofecoxib was authored by Matthew Weir (not disclosed as having a financial relationship with Merck, although he was identified as a paid consultant to Merck in the article by Konstam, et al, on which he was a co-author and as one of Merck's "preferred external speakers" [155]) and three Merck employees.[156]  The article states that among 5,435 osteoarthritis trial participants, there were similar rates of CV thrombotic events reported in patients who

---

[151] MRK-AFV0451455; pg MRK-AFV0451630.

[152] Ibid.

[153] MRK-AFV0451455; pg MRK-AFV0451652.

[154] Op. Cit. Bombardier, et al, 2000.

[155] MRK-ABO0000257; pg MRK-ABO0000263.

[156] Weir MR, Sperling RS, Reicin A, Gertz BJ, Selective COX-2 inhibition and cardiovascular effects: A review of the rofecoxib development program, American Heart Journal, 2003;146:591-604.

took rofecoxib and placebo. The manuscript for this article was submitted on May 13, 2002. According to the number of patients included in Table II, this article included patients in Studies 029 through 090. Table II of the article did not include patients in Study 010, nor did it include patients in study 136, the file for which had been frozen April 25, 2002[157] - three weeks before submission of the article. (The Clinical Study Report for Study 136 was due to be published October 14, 2002, the manuscript was accepted November 8, 2002, and published in October 2003 - certainly enough time to add important data.) Had the paper truly included all of the osteoarthritis trial participants to date - Studies 010 through 136 - it would have shown that the relative risk of CV complications in people taking Vioxx was 3.2 times higher than people taking placebo, $P=0.03$ (Fisher exact).[158]

122. The above four articles fulfill the objectives of the Scientific Communication Plan for Vioxx, dated March 27, 2001:

    a.    "Expedite and expand dissemination of Merck's position on CV effects and renal effects of Vioxx to key audiences..."

    b.    "Regain the offensive by shifting physicians' focus back to the superior pain relief and superior safety provided by Vioxx."[159]

123. With regard to pain relief, most studies found no significant difference between Vioxx and other NSAIDS. With regard to safety, as described above, there was strong and mounting evidence that Vioxx increased the risk of serious thrombotic CV events.

---

[157] MRK-ABS-0415816.

[158] MRK-18940080095 Rofecoxib CV update—data through 10-June '03, Table 13, plus data from Study 010.

[159] MRK-ABO0000257.

124.   The outdated and invalidly pooled data in the Cardiovascular Card and the four Merck-sponsored articles cited above served not just to convince doctors that they did not need to be concerned about the CV risks of Vioxx, but also served to insulate them from appreciating the CV risk from the VIGOR trial that was surely going to be included in the updated label for Vioxx.   In my opinion, a true and fully informative Cardiovascular Card and Merck-sponsored articles would have disclosed that the true relative risk of serious thrombotic CV events for Vioxx compared to placebo was 1.9 in Merck's osteoarthritis studies at the time of publication of the Cardiovascular Card, that the VIGOR trial found that Vioxx caused more than twice as many serious CV complications as naproxen (RR 2.38, p=0.0016) and five times as many heart attacks (RR 5.0, p=0.0016), and that in its Alzheimer's studies patients taking 25 mg of Vioxx daily were three times as likely to die as those taking placebo.   In the face of such disclosures of increased CV risk - especially in combination with the lack of reduction of complicated GI events in people not taking steroids in the VIGOR trial – few, if any, physicians would have prescribed Vioxx and those who did certainly would have had to engage in lengthy risk-reward discussions about Vioxx with patients.

125.   Another Merck-funded article, by Laine, et al, published in *Gastroenterology* in 2002, concluded that data from the VIGOR trial showed that Vioxx provided significant reduction in NSAID-related GI events in high-risk patients.[160]   The article stated that GI events were reduced for patients not taking steroids at baseline, implying statistical significance when the difference was, in fact, not significant for complicated events.   The article reported that there was a "quantitative interaction

---

[160] Laine L, Bombardier C, Hawkey CJ, et al, Stratifying the Risk of NSAID-Related Upper Gastrointestinal Clinical Events: Results of Double-Blind Outcomes Study in Patients with Rheumatoid Arthritis, Gastroenterology, 2002;123:1006-12.

70

(P=0.043) between treatment and baseline use of corticosteroids..." There was no mention that there was not a statistically significant reduction nor even a numerical reduction in complicated GI events associated with Vioxx in patients not taking steroids at baseline. Based on the data presented in this article, readers were left with two fundamental misconceptions: 1) the reduction in "clinically important" GI events was significant in those patients not taking steroids at baseline; and 2) that patients not taking steroids at baseline were less likely to experience complicated GI events when taking Vioxx than when taking naproxen.

### D. PIRs Misled Physicians

126. An example of a PIR response from Merck to a physician requesting more information about the CV effects of selective COX-2 inhibitors is provided by a PIR letter dated October 2, 2001. The letter contains several misrepresentations that minimized and obfuscated the increased CV risk of Vioxx compared to naproxen shown in the VIGOR trial. The PIR states that the article by Mukherjee, et al, [161] noted "that the rate of myocardial infarction in rheumatoid arthritis patients treated with Vioxx was greater than in patients treated with naproxen." This hides the more important and pre-specified CV endpoint reported in the article by Mukherjee, et al:

> "The results from VIGOR showed that the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attack s) with rofecoxib treatment, compared with naproxen was 2.38 (95% confidence interval, 1.39-4.00; P=.002)."

---

[161] MRK-HND0000922.

71

127. The PIR that supposedly responded to physician inquiries about the article by Mukherjee, et al, thus misrepresented the findings from VIGOR presented in that article.

128. The PIR misrepresented the GI findings of the VIGOR trial, claiming that "Vioxx had a significantly lower incidence of all primary and secondary gastrointestinal endpoints." As discussed above, the secondary (and arguably the most important) endpoint of complicated GI events was not significantly reduced in the pre-specified subgroup of those not being treated with steroids concurrently. The PIR failed to present the results from the pre-specified CV endpoint in the VIGOR trial: serious thrombotic CV events. Instead it presented single components of this aggregate endpoint, with myocardial infarction being the only complication significantly increased by Vioxx.

129. The PIR offered the single explanation for the lower incidence of MIs in people taking naproxen in the VIGOR trial as "naproxen's ability to block thromboxane A2 and platelet aggregation," i.e., the cardioprotective effect of naproxen. As discussed above, this single explanation ignored Merck's own consultants having expressed concern about the possibility of Vioxx being pro-thrombotic; the FDA's cardiorenal reviewer having stating in her evaluation of the VIGOR data that, "This hypothesis is not supported by any prospective placebo-controlled trials with naproxen;"[162] and Merck having received a Warning Letter from Division of Marketing, Advertising and Communications (DDMAC) on September 17, 2001, stating that there were no adequate studies showing that naproxen was...

_____

[162] Targum SL, FDA Memorandum: Consultation NDA 21-042, S-007, Review of cardiovascular safety database, February 1, 2001 pp 34-35
www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf Accessed July 16, 2009.

"...clinically effective in decreasing the risk of MIs. Therefore, your representation that naproxen prolongs bleeding time and inhibits platelets identically to aspirin is misleading and minimizes the potential seriousness of this finding...it is also possible that Vioxx has pro-thrombotic properties."[163]

The PIR was issued two weeks after Merck had received this Warning Letter.

130.   And finally, the PIR provided reassuring data on the APTC endpoint for a meta-analysis of Phase IIb-V studies of Vioxx - similar to the article by Konstam, et al. Like Konstam, this meta-analysis diluted the evidence of excess CV risk in two ways. First, the endpoint was changed from serious thrombotic CV complications to APTC events, removing endpoints that Merck had prespecified for the analysis, and thus, artificially lowering the apparent relative risk of Vioxx treatment in both osteoarthritis and rheumatoid arthritis populations.  Second, the evidence of excess risk in the arthritis trials was diluted by the addition of patients from the Alzheimer's disease trials that were not scheduled to be analyzed until the fourth quarter of 2003.  (Osteoarthritis and Rheumatoid Arthritis trials in Blocks 1 and 2 had been planned to be analyzed in the fourth quarter of 2001.[164])  Further, neither the Konstam article nor the subsequent meta-analysis disclosed that the Alzheimer's studies were compromised by poor compliance, with a substantial percentage of patients (39%) who did not take Vioxx as described in the study protocol.[165]  As shown above, had the data been presented as planned for Blocks 1 and 2 with the pre-specified endpoint (serious thrombotic CV events rather than APTC endpoints), the PIR would not have been nearly as reassuring:

---

[163] Letter from Thomas W. Abrams dated 9-17-01, Director, DDMAC, FDA to Raymond Gilmartin, President and CEO Merck & Co., Inc.

[164] MRK-AGV0021318; pg MRK-AGV0021319.

[165] Study 078 CSR MRK-1290007833; pg MRK-1290007951.

Vioxx would have been shown to more than double the risk of serious thrombotic CV complications in comparison to placebo (RR=2.4, p=0.06).

131.   Another PIR, dated May 17, 2004, parallels the one described above in containing a similarly truncated summary of the article by Mukherjee, et al, and citing the incomplete and misleading articles by Konstam, et al (2001), and Reicin, et al (2002), described above.[166]  This PIR also included another study by Reicin, et al, published in 2003 (not published at the time of the PIR described above) purporting to present CV safety data (serious thrombotic CV and APTC events) from the pooled studies of patients with Alzheimer's Disease or cognitive impairment.   The article concluded, as reported in the PIR:

> "...rofecoxib continued to have a similar CV profile to placebo in this analysis of serious cardiovascular adverse events in elderly patients."[167]

The PIR failed to report that data from these same studies had shown the overall death rate was two and a half times higher among people taking Vioxx than people taking placebo, 38 versus 16, respectively (RR 2.49, p=0.001);[168] and the death rate from heart disease in particular was more than three and a half times higher for Vioxx than placebo, 21 versus 6, respectively (RR 3.84, p<0.005).[169] [170]

---

[166] LaAG-VIOXX-003290; pp LaAG-VIOXX-003293-8.

[167] LaAG-VIOXX-003290; pg LaAG-VIOXX-003294.

[168] MRK-ABY0030000; pg MRK-ABY0030001.

[169] Analysis is based on the July 2001 Safety Update Report for study091 and the Clinical Study Report for study 078 filed with the FDA in July 2003. (The latter occurred after publication of the article by Reicin et al, however data from these studies had been viewed intermittently and it is extremely unlikely that the ratio of deaths from heart disease differed in the months prior to publication of this article.)

[170] Psaty BM, Kronmal RA, Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment: A Case Study Based on Documents from Rofecoxib Litigation, *JAMA*, 2008 ;299(15):1813-17.

### E.     Medical Journal Advertising

132.    Merck ran advertisements for Vioxx in medical journals that provided materially incomplete impressions about the safety and efficacy of Vioxx in comparison to other NSAIDs.  For example, a medical journal advertisement that ran from October 2000 through August 2001 led with "Once Daily," then under "Selected Safety Information" made no mention of the potential to increase the risk of CV complications, or that Merck's VIGOR trial had shown that overall Vioxx causes significantly more serious adverse events than naproxen.  This ad also misleadingly said the 50 mg daily dose can be "used as needed," rather than stating the 50 mg dose should be used for no more than five days.[171]  Another medical journal ad that ran during the same time period stressed, "Strength, Safety, QD Simplicity."[172]  This and other ads like it created the false impression Vioxx has a "strength" advantage over conventional NSAIDS; whereas, studies consistently showed effectiveness in relieving symptoms of arthritis and pain that was equal, but not superior to, other NSAIDs.  Merck had data from the VIGOR trial during the prime period these ads ran that showed that not only did Vioxx not have a safety advantage, but that it was significantly more dangerous than naproxen.

### F.     Press Releases

133.    As discussed above, Merck knew from its own employees and consultants that there was no scientific evidence in March 2000 for dismissing the greater number of serious CV complications occurring in the VIGOR study among patients taking Vioxx as the consequence of a cardioprotective property of naproxen as opposed to CV harm

---

[171] MRK-P0001726.

[172] MRK-P0001815.

caused by Vioxx. And Merck knew from its own Phase IIb/III osteoarthritis studies 010 through 090 (data from the last was available in February 2000, as discussed above) that the relative risk of serious thrombotic CV complications with Vioxx was 1.9 compared to placebo. Notwithstanding Merck's knowledge of this increased CV risk and the theoretical possibility that this risk could be caused by a pro-thrombotic effect of selective COX-2 inhibition by Vioxx, Merck issued a series of misleading press releases. On March 27, 2000, Merck issued a press release titled "Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with Vioxx."[173] Merck included the following misleading information about its own data:

> "An extensive review of safety data from all other completed an ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events with Vioxx, placebo and comparator NSAIDs."[174]

134. Had Merck told the truth, it would have revealed that in its osteoarthritis trials to date showed 90% greater risk of CV complications in people taking Vioxx than in people taking placebo.

135. Despite this knowledge of increased risk of Vioxx in comparison to placebo in its osteoarthritis studies, and despite knowing that the study data from the VIGOR trial demonstrated the increased CV risk in Vioxx users overshadowed any presumed GI benefit, Merck misleadingly titled its press release of April 28, 2000, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx."[175] Again, Merck misrepresented what it knew to be the increased CV risk of Vioxx compared to placebo in its pre-approval osteoarthritis studies:

---

[173] MRK-PRL0000114.

[174] MRK-PRL0000114; pg MRK-PRL0000115.

[175] MRK-PRL0000122.

"In response to speculative news reports, Merck & Co., Inc. today confirmed the favorable cardiovascular safety profile of Vioxx..."

"Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx... have shown no difference in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx, other NSAIDs and placebo."

136.    Regarding the findings of the VIGOR clinical trial, this press release stated that while fewer heart attacks occurred in the naproxen users, "this result is consistent with naproxen's ability to block platelet aggregation." As shown above, there was no scientific basis for making this statement, which was likely to misled physicians regarding the true CV risk associated with Vioxx use.

137.    Merck's documents demonstrate that Merck focused its efforts on defusing and obfuscating instead of disclosing the CV and overall risks of Vioxx.  Margie McGlynn's email to Alise Reicin and copied to Ed Scolnick, dated May 25, 2000 (prior to publication of VIGOR), is evidence for this point.  In this memo, Ms. McGlynn stated "Alise, attached are 2 [stock market] analysts reports which most clearly demonstrate the success of our efforts to defuse the CV risk issue for Vioxx.  You played a major role in making this happen..."[176]

138.    Merck continued to issue a series of press releases specifically designed to prevent (or slow) the truth about the increased CV risk of Vioxx from becoming known:

a.    On February 8, 2001, Merck issued a press release entitled, "FDA Arthritis Advisory Committee Reviews Merck's Application for Revised Labeling for Vioxx Based on Vioxx Gastrointestinal

---

[176] MRK-NJ0320174.

Outcomes Study."[177]   A Merck Senior Vice President is quoted extolling the "excellent safety profile of Vioxx" in the data presented to the FDA Advisory Committee that met on the day of press release.   The data from the VIGOR trial showed; however, that overall Vioxx is significantly less safe than naproxen.   The press release reported that people taking naproxen in the VIGOR trial developed fewer heart attacks, but - despite the lack of evidence to support its theory - "Merck scientists said the VIGOR finding is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1 like aspirin..." and went on to report that "other explanations were advanced by the FDA review and were discussed with the Advisory Committee,"[178] but failed to mention the possibility that Vioxx might have a pro-thrombotic effect.

b.   On May 22, 2001, Merck issued a press release entitled, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx."[179] This press release was apparently issued in response to an article in the *New York Times* published the same date, which reported that a pharmaceutical industry stock market analyst had warned his clients on April 27, 2001, that "disturbing data" from the VIGOR trial could hurt the company's stock price.[180]   The explanation of the

---

[177] MRK-PRL0000170.

[178] MRK-PRL0000170; pg MRK-PRL0000171.

[179] MRK-ABI0003228.

[180] Petersen M, Doubts are Raised on Safety of 2 Popular Arthritis Drugs, *New York Times*, May 22, 2001. P. C1.

78

disparity in heart attack rates seen in the VIGOR trial is the same disinformation as in the February 8, 2001 press release.

c.   On August 21, 2001, Merck issued a press release entitled "Merck Stands Behind the Cardiovascular Safety Profile of Vioxx."[181]  This press release was issued the day before the Mukherjee, et al, article was to be published in *JAMA*, showing physicians for the first time in a major medical journal that the people taking Vioxx in the VIGOR trial developed significantly more serious thrombotic CV complications than those taking naproxen, RR=2.38 (P=0.002).[182] Despite the FDA's Medical Reviewer having rejected this explanation six months earlier, the press release explained the greater number of heart attacks seen in patients taking Vioxx in the VIGOR trial as "consistent with the ability of naproxen to inhibit platelet aggregation in a manner similar to aspirin."

d.   On August 23, 2001, Merck issued a press release entitled, "Merck Stand Behind Cardiovascular Safety Profile of Vioxx."  This press release offered no data on the CV risk of Vioxx, simply stating, "Merck said the Company stands behind the overall and cardiovascular safety profile and the favorable gastrointestinal (GI) profile of Vioxx."[183]

---

[181] MRK-PRL0000214.

[182] Mukherjee D, Nissen SE, Topol EJ, Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, *JAMA*, 2001, 286:954-59.

[183] MRK-PRL0000218.

79

139.   DDMAC of the FDA sent Merck a formal Warning Letter, dated September 17, 2001, in response to serious marketing violations of Vioxx and the persistence of its "violative promotion of Vioxx," despite the FDA's "prior written notification regarding similar violations."  The DDMAC Warning Letter specifically cited the title of Merck's press release "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," as "simply incomprehensible" in the face of the data from the VIGOR study.[184]

140.   Even after receiving this Warning Letter from DDMAC, Merck continued to issue misleading press releases:

a.   On March 4, 2002, Merck issued a press release entitled, "Vioxx 50 mg Compared to Oxycodone 5 mg/Acetaminophen 325 mg for Acute Pain After Dental Surgery in New Study"[185]  The study found that "Vioxx 50 mg provided superior pain relief over six hours" compared to Percocet, but the press release lacks reasonable balance by failing to also report that previous studies of dental pain had shown that the pain relief provided by Vioxx was equivalent - but not superior - to a single dose of naproxen sodium 550 mg or ibuprofen 400 mg (the equivalent of two over-the-counter Advil tablets).

b.   On June 25, 2002, Merck issued a press release entitled, "Cardiovascular Event Rates in Analysis of Combined Studies Of

---

[184] Letter from Thomas W. Abrams dated 9-17-01, Director, DDMAC, FDA to Raymond Gilmartin, President and CEO Merck & Co., Inc.

[185] MRK-PRL0000241.

Nearly 2,900 Elderly Patients Taking VIOXX or Placebo."[186]  This press release reported that CV complications were no higher in patients taking Vioxx compared to placebo in its Alzheimer's disease studies, but failed to provide the highly significant greater death rate in the those who took Vioxx (RR=2.38, P=0.001).  More important, the press release failed to inform readers of other finding reported in its own Safety Update Report from Studies 091 and 078, dated July 2001 - almost a year before this press release.  In these studies Vioxx almost quadrupled the risk of death from heart disease: 21 versus 6 for Vioxx and placebo, respectively, RR=3.84, p<0.005.[187]  This press release was misleading in claiming no increase in CV risk when the CV death rate was known to be so much greater in those taking Vioxx.

141.  Merck's U.S. public affairs manager for Vioxx from 1999-2001 testified in deposition that it was her job to keep the CV risk of Vioxx out of the news.  She was praised in her 2000 performance review for achieving her goal "to minimize the attention to heart attack issues" in the media coverage of Vioxx.  Merck's 2000 Year-End Media Analysis" reported that Merck's Public Affairs group was responsible for conveying 1 Billion positive media messages about Vioxx in the 2000 alone.[188]

---

[186] MRK-ADJ0042906.

[187] Psaty BM, Kronmal RA, Reporting Mortality Findings in Trials of rofecoxib for Alzheimer Disease or Cognitive Impairment, *JAMA*, 2008;299:1813-17.

[188] Expert Report of Cornelia Pchmann, p 20.

### G.    Direct to Consumer Advertising

142.    In 2000, the first full year that Vioxx was on the market, more was spent on direct to consumer advertising for Vioxx than for any other drug, $160.8 million. To put the magnitude of Merck's investment in perspective, in 2000 more money was spent advertising Vioxx to consumers than was spent advertising Pepsi or Budweiser beer.[189] Merck's "2001 Profit Plan for Vioxx" reported that the same amount would be spent again on direct to consumer advertising for Vioxx in 2001.[190]

143.    I was practicing family medicine in 2000 and 2001 and experienced the consumer demand for Vioxx created by this advertising campaign. Merck's "Operations Review for Vioxx January 31, 2003" documented the success of Merck's advertising of Vioxx:

> "Consumer requests drive brand choice: Consumers are generally knowledgeable, willing to ask for a brand by name, and highly influential in physicians' brand choice. Brand awareness of 85% among targets. Physicians honor 90% of requests for VIOXX."[191]

## VIII.  Marketing in Louisiana Reflected Merck's National Marketing Strategy

144.    Slides from the national cross – functional team meeting for Vioxx, dated January 29, 1999, show that Louisiana was part of the national sales strategy for Vioxx.[192]    After presenting the pre-launch strategy for Vioxx, which included differentiation from Celebrex and NSAIDs,[193] goals to be achieved included: developing 1250 "qualified advocates" and expanding the "definition of risk associated with an

---

[189] http://nihcm.org/~nihcmor/pdf/DTCbrief2001.pdf  Accessed November 1, 2009.

[190] Expert Report of Cornelia Pechmann PhD, p 25.

[191] Expert Report of Corneial Pchmann, p 49.

[192] MRK-EBES0039480.

[193] MRK-EBES0039480; pg MRK-EBES0039483.

NSAID gastropathy [see comments on Merck's exaggeration of this risk by Laine during promotional video taping above],"[194] and conducting tutorials (described below).[195] PCP Consultants' Meetings were scheduled in 13 locations around the country, including New Orleans Louisiana, thus showing that the approach outlined at a national level was, in fact, implemented locally in Louisiana.[196]

### A.    Tutorials

145.    Merck's Policy Letter No. 128 described "the regulations and principles Merck follows when considering the type and manner of educational programs it can support."[197]    Among these programs were tutorials, for which the healthcare professional was paid $250 to "reinforce the representative's basic knowledge and provide a training forum to interact with the healthcare professional."[198] A January 5, 2001, memo to the "Arklahoma Executive Team," titled "TUTORIAL Best Practices," identified Vioxx as important to success in 2001 and specifically described "the importance of conducting tutorials to maximize our success in 2001."[199]  Best practices on how to ensure a successful tutorial included several steps.  First, databases were consulted "to identify cluster weaknesses and target the physicians that are responsible for the weakness."  Recipients of the memo were instructed to "target the culprits!" (i.e., low Vioxx prescribing physicians).[200] The goals identified in the second step show that the true purpose of the tutorials was not to educate the drug representatives, but to

---

[194] MRK-EBES0039480; pg MRK-EBES0039486.

[195] MRK-EBES0039480; pg MRK-EBES0039494.

[195] MRK-EBES0039480; pg MRK-EBES0039507.

[197] MRK-EBES0030855.

[198] MRK-EBES0030855; pg MRK-EBES0030872.

[199] MRK-EBES0047057.

[200] Ibid.

influence the physician-tutor who was getting paid.  These goals were to get the physician "to read some information," "to start an advocate relationship," or "to change prescribing habits."  The drug representatives conducting tutorials were instructed to approach them as "marketing research" and to "act as if you truly need their help to educate you."[201]  And finally, representatives were instructed to, "Track your ROI [return on investment] with that physician by looking at future Rx habits."  In other words, these so-called tutorials were really events at which "culprit" (i.e., low Vioxx prescribing) doctors were paid to sit with drug representatives and the measure of a tutorial's success was the subsequent increase of the "tutor's" prescribing of Vioxx.[202]  The tutorial program was suspended on May 14, 2001,[203] but was in effect during the crucial time before and after the February 2001 Advisory Committee Meeting, at which the results of the VIGOR trial showing the increased risk of serious CV events associated with Vioxx were at risk of becoming known by physicians and the public.

### B.    Call Notes

146.  Merck's campaign to provide false reassurance of Vioxx's safety was brought to physicians in Louisiana, as demonstrated by sales representatives' call notes showing use of the "CV card" and distribution of reprints by Reicin, et al; Weir, et al; and Laine, et al, as well as the PIR on VIGOR described above.

147.  The text of Merck drug representatives' call notes for Dr. Ernest W. Kinchen, Jr. (a member of the Louisiana DHH P&T Committee) from May 14, 2001, and July 3, 2001, show a plan to "follow up with Key Core Messages."[204]  Such "Core

---

[201] Ibid.

[202] MRK-EBES0047057; pg MRK-EBES0047058.

[203] MRK-EBES0030855; pg MRK-EBES0030872.

[204] Kinchen Call Notes produced by Merck.

Messages" are outlined in Merck's national marketing documents from the preceding

months. "Positioning/Messages" defined by the Vioxx Commercialization Team in a

March 13, 2001, memo as follows:[205]

> "C. Positioning/Messages
>     1. Positioning
>
> For          Physicians who treat chronic pain and inflammation
>
> VIOXX® is the Best product in the breakthrough Coxib class
>
> That will    Enable you to provide more relief for more of your patients
>
> Because of   Strength
>              Safety
>              Simplicity
>              Selectivity"

"Strong" was defined in this document as being "as effective as very high doses of

traditional NSAIDs," which is true but Merck's studies also showed that Vioxx was as

effective as low dose NSAID (ibuprofen 400 mg) for the treatment of pain. And "Safe"

was defined as "the first and only Coxib to demonstrate a significant reduction in all GI

safety endpoints..." despite the fact that Vioxx did not demonstrate significant reduction

of complicated GI events in people not taking steroids concurrently. Omitted from this

claim of safety was the significant increase in serious adverse events overall, more than

doubling of the risk of serious thrombotic CV events overall, and five times the risk of

myocardial infarction associated with Vioxx compared to naproxen in the VIGOR trial.

148.   Merck's Scientific Communication Plan for Vioxx, dated March 27, 2001,

presented "an evolved message platform" for Vioxx that included CV effects:

> "CV effects similar to placebo and NSAIDs without potent,
> sustained antiplatelet effects; difference in MIs in VIGOR
> due to cardioprotection with naproxen (epidemiology,
> primate, assay-based data); CV effects of Coxibs that are
> comparable."[206]

---

[205] MRK-AAD0106697; pg MRK-AAD0106721.

[206] MRK-ABO0000257.

85

These are the misleading conclusions from Merck-sponsored articles, as described above. Although not sent until September 2001, DDMAC's Warning Letter to Merck reiterated the FDA's cardio-renal review of the VIGOR data that the anti-platelet activity of naproxen is only one possible explanation of the lower incidence of myocardial infarction among patients taking naproxen in the VIGOR trial, and that this hypothetical explanation "has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." Thus, the "Key Messages" that had been developed on a national level included misrepresentations about the "strength," GI safety, and the CV safety of Vioxx.

149. The CV and renal review of Vioxx presented to Merck's September 10, 2001 Human Health Marketing Committee (HHMC) presented the "Objectives/Strategy/Actions" and "Key messages" that would be used to "shape the customers perceptions" of CV and renal issues.[207] The following slide from that meeting shows the specific strategic objectives:[208]

---

[207] MRK-ABW0008495; pg MRK-ABW0008497.
[208] MRK-ABW0008495; pg MRK-ABW0008503.

86



**Figure 7.**

As shown above, Merck was aware that Vioxx had caused more hypertension and edema, as well as more serious thrombotic complications than naproxen in its VIGOR trial and that the findings from its ADVANTAGE study (using Vioxx 25 mg instead of 50 mg), completed the same month as VIGOR, showed the same pattern. Merck was also aware from its own Study 023 and its own consultants that there was a possibility that Vioxx was pro-thrombotic. These key core messages and strategies were designed to mislead customers. Rather than sharing these critically important scientific findings with doctors and the public, Merck's approach was to "Shape Customers Perceptions," but was in reality misleading customers on critical safety issues.

150.   The "XXceleration Tactical Plan for Vioxx" presented at the South Central Business Group shows that these strategies and goals were not just theoretical, aspirational, or discussed at a national level, but not implemented on a local level. Two

of the messages that were to be delivered by Merck drug representatives to physicians were:[209]



**Figure 8.**

The limitations of the information presented in the Cardiovascular Card are discussed above. According to a memo by Edward Scolnick, dated May 8, 2000, all drug representatives were provided with the Cardiovascular Card (the limitations and misrepresentations of which are described above), as well as the Renal Card "that highlights the demise and hypertension tolerability data" from the same outdated and inappropriately grouped studies relied upon in the Cardiovascular Card.[210]   These messages used to "completely resolve" physicians' concerns are the exact opposite of the conclusions reported in the FDA review of Merck's ADVANTAGE study (comparing Vioxx 25 mg to naproxen 1000 mg daily), the results of which were available to Merck in March 2000:

> "Consistent with the VIGOR study, a 8000-patient study of rofecoxib 50 mg and naproxen 1000 mg in patients with RA, the Data reviewed in this submission (ADVANTAGE, SUR, RA efficacy) suggest an increased cardiovascular risk (cardiovascular thrombotic events, hypertension, edema, congestive heart failure) in patients treated with rofecoxib 25 and 50 mg as compared with naproxen 1000 mg daily."[211]

---

[209] MRK-EBES0030779.

[210] MRK-ABI10002126; pg MRK-ABI10002127.

[211] http://www.fda.gov/ohrms/dockets/AC/05/briefing/2005-4090B1_09_J-FDA-Tab-F-1.htm (Accessed May 14, 2008).

88

The 2001 South Central Business Group Tactical Plan for Vioxx called for successful completion of "all aspects of 'project XXceleration tactical plan' by July 31."[212]   One aspect of this plan was described in a voice message from Jo Jerman, dated April 27, 2001, titled "Project A & A XXceleration," sent to field sales representatives.   The message comments on the success of Vioxx, having gained 51.2% of the Coxib market: "Woo Doggie!   That is exciting."   The message concluded with a description of the financial rewards that can be achieved by successful implementation of the program described above:

> "Last, but certainly not least, you've got some extra dollars to shoot for as well.   As you recall from the incentive program, if you hit those 2-4 share points increases, you'll be rewarded handsomely - both in the short term with the incentive program and the long term with overall PPO. Go get em guys, Good luck and Great selling!"[213]

151.   The bottom line is that strategies Merck developed at a national level were designed specifically to minimize, obfuscate, and misrepresent the growing body of the data from Merck's own trials in order to maximize Vioxx sales.   These national strategies and incentives were brought into play in Louisiana to provide false and misleading reassurance to Louisiana physicians about the CV and renal safety of Vioxx.

## C.    Louisiana Department of Health and Hospitals

152.   Data from Louisiana Medicaid for October – December 2001 show that even though Vioxx was not on the preferred drug list, 42.6% of COX-2 Inhibitor prescriptions, totaling 24,606 prescriptions were filled.[214]

---

[212] MRK-EBES0030786.

[213] MRK-H.10STM001203.

[214] Beardon Exhibit #12 p 11.

153. At the March 6, 2002 meeting of the Louisiana Medicaid P&T Committee Provider Synergies made a presentation as a prelude to providing their services to the Louisiana Department of Health and Hospitals Medicaid Pharmaceutical and Therapeutics Committee Meeting to advise about formulary management, specifically to establish and maintain a preferred drug list.[215] The first of a series of reviews of anti-inflammatory medications prepared by Provider Synergies is dated February 2002.[216] The VIGOR trial was summarized: greater than 50% reduction in the incidence of "confirmed GI events" and "serious GI events" in patients taking Vioxx compared to those taking naproxen. The CV risk of Vioxx shown in the VIGOR trial was summarized:

> "The incidence of myocardial infarction was lower in the naproxen group (0.1 percent) than the rofecoxib group (0.4 percent), but the overall mortality rate and rate of death from cardiovascular causes was similar in both groups."[217]

154. It is noteworthy that even a year after the correct CV data were available on the FDA website, this monograph relied on the erroneous incidence rates of myocardial infarction that had been published in the *NEJM* in November 2000, which misrepresented the risk of myocardial infarction as limited to those people who should have been taking aspirin prophylactically but weren't allowed two because of the study design. Also, the statistically significant increase in risk of serious adverse events overall associated with Vioxx and the failure of Vioxx to reduce the risk of complicated GI events in people who were not taking steroids concurrently were not reported in the monograph. The article by Mukherjee, et al, in *JAMA* was mentioned, but the

---

[215] Beardon Exhibit #8.

[216] #12.

[217] #12 p 5.

90

monograph did not report (as did Mukherjee, et al) the 2.38 increase in relative risk of thrombotic CV events associated with Vioxx in the VIGOR trial.[218]   The monograph concluded that all three COX-2 selective inhibitors "have been shown to have a lower incidence of ulcer rates than standard NSAIDs," despite not being true for complicated GI events for people not taking steroids concurrently for Vioxx.

155.   A subsequent version of this review provided by Provider Synergies in April 2003[219] included the findings of the articles by Reicin, et al, and Konstam, et al, described above, which provide incomplete and misleading reassurance about the CV safety of Vioxx.[220]   Although the monograph concluded that the VIGOR study "raised some questions regarding the cardiovascular safety of rofecoxib,"[221] its final recommendations were to include Vioxx and Bextra on the preferred drug list, but not Celebrex.[222]   Similar reports were issued in December 2003[223] and April 2004.[224]

## IX. Celebrex Was Not a Reasonable Alternative to Vioxx

156.   The argument might be made that had patients not taken Vioxx, they would have taken Celebrex, which actually could have cost more.   But for Pfizer's misrepresentations about the clinical usefulness of Celebrex, prescribers and patients would have known that this drug provided neither efficacy nor safety advantage over the non-selective NSAIDs.

---

[218] #12 p 6.

[219] LaAG-VIOXX-003338.

[220] LaAG-VIOXX-003338, pg  LaAG-VIOXX-003347.

[221] LaAG-VIOXX-003338, pg  LaAG-VIOXX-003349.

[222] Ibid.

[223] Merck-Vioxx-00987.

[224] Merck-vioxx-00793.

157. A manufacturer-sponsored study reported in *JAMA* in 1999 found:

"All Celecoxib doses generally demonstrated similar efficacy, and all were comparable to naproxen 500 mg twice per day."[225]

158. The FDA medical reviewer of the manufacturer-sponsored CLASS trial concurred:

"Celecoxib does not appear to be more effective for treating the signs and symptoms of OA or RA than the NSAID comparators."[226]

159. Given the lack of efficacy advantage over non-selective NSAIDs and the 10-fold or more higher cost, the only reason for the vast majority of Celebrex prescriptions was the belief that it was less likely to cause GI adverse events than non-selective NSAIDs. Certainly this is the message that was received from the largest study evaluating the risk of GI complications with Celebrex compared to non-selective NSAIDs. In September 2000, the results of the CLASS study were presented in *JAMA*:

"This study determined that celecoxib, A COX-2-specific inhibitor, when used for 6 months in a dosage 2 to 4 times the maximum therapeutic dosage, is associated with a lower incidence of combined clinical upper GI events than comparator NSAIDs (ibuprofen and diclofenac) used at standard therapeutic dosages."[227]

160. The following graph adapted from the *JAMA* article provided visual evidence of the reduction in GI complications in the CLASS study:

[225] Simon LS, Weaver AL, Graham DY, et al, Anti-inflammatory and Upper Gastrointestinal Effects of Celecoxib in Rheumatoid Arthritis, *Journal of the American Medical Association*, 1999,282:1921-8.

[226] FDA Medical Reivew, Celebrex NDA 20-998/S-009, September 20, 2000 p. 82.

[227] Silverstein FE, Faich G, Goldstein LS, et al, gastrointestinal Toxicity with Celecoxib vs Nonsteroids Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis, *Journa of the American Medical Association*, 2000;284:1247-55.



Figure 2. Annualized Incidence of Upper
Gastrointestinal Tract Ulcer Complications
Alone and With Symptomatic
Gastroduodenal Ulcers

Numbers above bars indicate events per patient-
years of exposure. NSAIDs indicates nonsteroidal anti-
inflammatory drugs.

**Figure 9.**

161.   Although the *JAMA* article provided convincing evidence that people

treated with Celebrex would experience fewer GI complications than those treated with

non-selective NSAIDs, the article misrepresented the data from the clinical trial.  The

study had actually lasted 12 months not 6, and the FDA Medical Officer's GI Review

rejected the manufacturer's justification for the post-hoc change from 12 to 6 months

after the study was completed:

> "The sponsor has not adequately justified the value of an
> analysis limited to 6-month data nor adequately justified
> replacing the original analysis with this post hoc analysis."[228]

162.   At the end of the 12 months of the trial, patients taking Celebrex did not

experience fewer GI complications.  The FDA Medical Reviewer of the CLASS study

concluded:

---
[228] http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b1_05_gi.doc P. 23 Access verified July 15,
2009.

93

"Celecoxib did not demonstrate statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of [clinically significant upper gastrointestinal events] at any point in the trial..."

163    The following graph shows that during the first 6 months of the CLASS study people taking Celebrex were experiencing numerically fewer ulcer complications (a subset comprised of the more serious GI complication related to anti-inflammatory therapy), but during the second half of the study this trend actually reversed so that by the end of the study there was no advantage for Celebrex:[229]



Figure 10.

164.    DDMAC sent a Warning Letter to Pharmacia on February 1, 2001, citing promotional materials for Celebrex that were "false, lacking in fair balance, and otherwise misleading..."[230]    Among other violations, DDMAC cited unsubstantiated comparative claims of superior efficacy:

---

[229] Adapted from: Juni P, Rutjes AS, Dieppe PA, Are selective COX 2 inhibitors superior to traditional non steroidal anti-inflammatory drugs, *British Medical Journal,* 2002;324:1287-8.

[230] DDMAC Warning Letter to Pharmacia RE: NDA 20-998, Celebrex (celecoxib) Capsules, MACMIS ID# 8432, February 1, 2001.

94

"Another example of your unsubstantiated comparative claims, is your claim that, '...in rheumatoid arthritic patients taking Celebrex at 200 mg twice a day, this was more efficacious than 1000 mg of Naprosyn in rheumatoid arthritics.' The study that you cited to support this superiority claim actually concludes that Celebrex produced improvement in the signs and symptoms of RA comparable to the improvements produced by Naprosyn. Therefore, your claim of Celebrex's superior efficacy to Naprosyn is false or misleading."

165.   This Warning Letter stated that two previous "untitled" letters from DDMAC to Pharmacia had cited violative promotion of Celebrex, and - despite Pharmacia's written assurances that such violative promotion had been stopped - promotional activities for Celebrex that "raise significant health and safety concerns" had continued.

166.   The bottom line is that notwithstanding Pharmacia's attempts to convince prescribers, consumers, and purchasers that Celebrex provided the safety and or efficacy advantage over non-selective NSAIDs, such was not the case.  The FDA never accepted the claim that (based on the CLASS study) Celebrex caused significantly fewer GI complications than other non-selective NSAIDs:

"*The sponsor has failed to demonstrate a statistically significant lower rate of* [clinically significant upper GI events] *compared to NSAIDs as a group or either individual comparator.*" [Emphasis in original.][231]

"*A secondary endpoint of* [both clinically significant and less serious upper GI events] *reflects the same trends as the primary analysis of CSUGIEs.*"[232]

167.   With no efficacy advantage, no substantial scientific evidence of significant GI safety, and the FDA not allowing the manufacturer to change the GI warning in its

---

[231] FDA Medical Officer's Gastroenterology  Advisory Committee Briefing Document, **NDA 20,998: Supplement # 9, Sponsor: Searle. P**
http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b1_05_gi.doc  Access verified July 16, 2009.
[232] Ibid.

95

product label from the standard NSAID GI warning, the only reason that Celebrex might have appeared to be a reasonable alternative to Vioxx (instead of a less expensive non-selective NSAID) was the success of the manufacturer's false and misleading marketing and promotional campaign.

## X. Formulary Dossier and Cost-Effectiveness Articles

### A. Formulary Dossier

168. Merck's literature cited estimates that non-selective NSAIDs caused 16,500 deaths and 100,000 hospitalizations each year.[233] The 2003 formulary dossier for Vioxx included claims of pharmacoeconomic benefit of treatment with Vioxx compared to naproxen in the VIGOR trial, based on the assertion that treating patients with Vioxx instead of non-selective NSAIDs reduced the hospitalization rate for GI complications. Data presented in the formulary dossier show that the rate of hospitalization for upper GI clinical events in the VIGOR trial was twice as high for naproxen as for Vioxx: 0.8% and 0.4%, respectively.[234] A reference by Laine, Bombardier, Reicin, et al, is cited as providing evidence of the lower hospitalization rate.[235] The remarks in the dossier were:

> "Patients treated with rofecoxib...were hospitalized for upper GI clinical events significantly less often than patients treated with naproxen."[236]

169. Although not noted as such in the dossier, this reference is not to a peer-reviewed article, but to a published abstract.

---

[233]Op. Cit., Bombardier.

[234] MRK-EAK0000063; pg MRK-EAK0000141.

[235] Laine L Bombardier C, Reicin A, et al, Gastrointestinal (GI) co-therapy, procedures, and hospitalizations in a GI outcomes study of rofecoxib vs. naproxen in rheumatoid arthritis, *American Journal of Gastroenterology*, 2000; 95(9): 762.

[236] MRK-EAK0000063; pg MRK-EAK0000141.

170. Hospitalization rate is certainly an important endpoint, from the point of view of both clinical and economic outcomes. And, as shown in the slide above prepared by Dr. Villalba of the FDA, it was true that there were fewer hospitalizations for GI complications among people taking Vioxx versus naproxen in the VIGOR trial, 29 and 49, respectively. However, Merck's claim that the lower rate of GI hospitalizations among people taking Vioxx provided evidence of an overall health and economic benefit was grossly misleading. Far overshadowing the 20 fewer GI hospitalizations among people taking Vioxx was the increase in CV hospitalizations: 65 versus 24 for Vioxx and naproxen, respectively, RR=2.7, P=.00001. And the most important statistic about hospitalizations from the VIGOR trial was the overall total in each group: 338 for Vioxx compared to 265 for naproxen, RR=1.27, P=0.002. Thus, the data from the VIGOR trial (even in the unrepresentative population in which 56% of participants taking naproxen had their risk of GI complications doubled by concurrent steroid) showed that treatment with Vioxx rather than naproxen led to a significantly higher hospitalization rate that would certainly have led to significantly higher hospital costs.

171. Another way of looking at the significantly higher hospitalization rate in the people taking Vioxx in the VIGOR trial is that for every 100 people who took Vioxx instead of naproxen for one year, there were 2.4 additional hospitalizations. Rather than compensating for the increased cost of Vioxx compared to naproxen by reducing the overall need for hospitalizations, the VIGOR trial showed that the higher cost of Vioxx was compounded by the additional cost of Vioxx of 2.4 hospitalizations per 100 patients treated per year. By presenting just the reduction in GI hospitalizations the

97

formulary dossier misrepresented the overall economic impact of Vioxx on third party payors.

172.   Dr. Loren Laine, in outtakes during taping of a promotional video for Merck, commented on the estimated 100,000 hospitalizations and 16,500 deaths in the United States each year as a result of NSAID-associated GI events, presented in the *NEJM* VIGOR article (of which he was a co-author):   "Those numbers that people use are totally incorrect...There's about five different reasons why those numbers are totally bogus...it's an impressive soundbite...The death rate is probably wrong, the hospitalization rate is probably right."   Then for the record he said: "In patients who take non-steroidal anti-inflammatory drugs such as Advil, Motrin, Aleve, it's been estimated that over 100,000 people are hospitalized for stomach problems such as bleeding and that over 16,000 die due to these problems every year."   And commented: "This is exactly what you have written."[237]

## B.   Cost-Effectiveness Reports

173.   Merck attempted to justify use of Vioxx by publishing a series of articles based upon cost-modeling that purported to show that, despite its higher cost, Vioxx reduced overall medical costs compared to treatment with non-selective NSAIDs.

174.   An article published by Merck employees in *Clinical Therapeutics* in 2001 relied on a decision analytic model to argue that use of Vioxx instead of non-specific NSAIDs in the United States would lead to a cost per PUB avoided of $4,738 and a cost per year of life saved of $18,614.   The article concluded:

> "Cost differences between rofecoxib and NSAIDs were markedly offset by expected cost savings in GI problems and co-medications averted with rofecoxib.   Cost per year of life

---

[237] Laine video clip.

saved with rofecoxib versus NSAIDs were well within accepted benchmarks for cost – effectiveness."[238]

175.   The model used to arrive at these conclusions relied upon the assumption that use of gastroprotective medication would be 75% lower among patients taking rofecoxib than among patients taking conventional NSAIDs.  This assumption was not, however, based on scientific evidence but, as described in the article, was based on the "input of an expert panel consisting of gastroenterologists, rheumatologists, and general practitioners," i.e., based upon the panelists' opinions only.  (The article was funded by Merck and written by Merck employees.)

176.   Another article published in 2001, also funded by Merck and written by Merck employees, concluded that the total cost per day of therapy (including the cost of both anti-inflammatory and gastroprotective medication) in Canada was $1.60 (Canadian) for non-selective NSAIDs and $1.67 (Canadian) for rofecoxib.  According to this model, the cost of avoiding one PUB by substituting rofecoxib for non-selective NSAIDs was $2,247 (Canadian).  These conclusions were based on the assumption that people using rofecoxib would be 90% less likely to be prescribed a gastroprotective agent (no explanation of the derivation of the 90% estimate was provided, other than it "was assumed to be...").[239]

177.   A third Merck-sponsored article about the cost effectiveness of rofecoxib versus non-selective NSAIDs for patients in the United Kingdom concluded that switching patients to rofecoxib would cost the National Health Service £ 0.32 more per

---

[238] Pellisier JM, Straus WL, Watson, et al, Economic evaluation of rofecoxib vs. nonselective nonsteroidal anti- inflammatory drugs for the treatment of osteoarthritis, *Clinical Therapeutics*, 2001, 23:1061-79.

[239] Marshall, JK, Pellissier JM, Attard CL, et al, Incremental cost – effectiveness analysis comparing rofecoxib with nonselective NSAIDs in osteoarthritis:  Ontario Ministry of Health Perspective, *PharmacoEconomics*, 2001;19:1039-1049.

day, but cost only £15,647 per year of life saved.  This analysis was also based on the consensus of the expert panel that had opined that users of rofecoxib would be prescribed 75% fewer gastroprotective medications than those taking NSAIDs.[240]

178.    The lack of validity of the above three Merck-sponsored cost effectiveness studies was shown in data that calculated the actual rates of gastroprotective agents (GPA) use in people taking selective COX-2 inhibitors compared to those taking non-selective, anti-inflammatory medication in a large preferred provider organization.[241] In the three studies described above, use rates of GPAs in combination with non-selective NSAIDs were 25.5%, 23%, and 20%, respectively.  Rather than the 75% to 90% lower rate of GPA use assumed in the models employed in the above studies, data from a population base of 320,000 patients enrolled in a PPO provide a very different picture:  Among new users of any NSAID (COX-2 selective or non-selective) matched for GI risk and the length of time they took the NSAID, patients taking COX-2s actually had a higher (rather than lower) rate of GPA use than patients taking conventional non-selective NSAIDS, 20%   versus 18%, respectively.[242]  Thus, the purported savings on GPA use associated with rofecoxib based upon unsubstantiated assumptions in the Merck-sponsored studies was actually the reverse, the use (and therefore cost) of GPAs was greater in people taking rofecoxib.  The article by Cox, et al, concludes:

---

[240] Moore RA, Phillips CJ, Pellissier JM, Kong SX, Health economic comparisons of rofecoxib vs. conventional nonsteroidal antiinflammatory drugs for osteoarthritis in the United Kingdom, *Journal of Medical Economics*, 2001;4:1-17.

[241] Cox RC, Motheral B, Mager D, Verification of the decision analytic model assumption using real – world practice data: Implications for the cost effectiveness of cyclo-oxygenase 2 inhibitors (COX-2s), *American Journal of Managed Care*, 2003;9:785-94.

[242] Ibid.

"Contrary to COX-2 cost – effectiveness model assumptions, the rate of GPA use is positive and marginally higher among COX-2 users than among nonselective NSAID users. These findings call into question the use of expert opinion in estimating practice pattern modeled inputs prior to a product's use in clinical practice."

179.   A potential weakness in the above argument is that the higher rate of GPA use in COX-2 users compared to non-selective NSAID users was not specifically about Vioxx-users, but patients taking both Vioxx and Celebrex.  The purported GI-protective advantage of Vioxx over Celebrex might have skewed the results for concomitant GPA use with Vioxx presented in the study by Cox, et al.  However, a study presented in the Vioxx Formulary Dossier (Schnitzer, et al, 2003) shows that this was not the case.[243] The study was based on 226,000 users of Vioxx and Celebrex.  Prior use of GPAs was the same for both groups, 17.11% and 17.09%, respectively.  The difference in rates of GPA use for patients taking Vioxx and Celebrex also turned out to be minimal:  Among the patients who had never used a GPA before, 6.99% of patients taking Celebrex and 6.29% of patients taking Vioxx, respectively started a GPA.  Among patients who had used a GPA before, 70.00% of patients taking Celebrex and 69.10% of patients taking Vioxx also used a GPA concurrently.  Although the small difference in rates of GPA use among those treated with Vioxx and Celebrex was statistically significant, the absolute difference was not large enough (no more than 0.9%) to change the findings presented by Cox, et al, with respect to Vioxx, showing a greater use of GPAs among patients taking Vioxx than among patients taking non-selective NSAIDs.

---

[243] MRK-EAK0000063; pg MRK-EAK0000136 [Tavs06].

101

## XI. Conclusion

180. Merck systematically failed to disclose and affirmatively misrepresented the CV risk and exaggerated the GI benefit of Vioxx in comparison to placebo and other non-selective NSAIDs. At the same time, Merck engaged in a comprehensive and systematic campaign to mislead physicians, consumers, and payors to believe that Vioxx was a superior drug worth a premium price when, in fact, it was of equal but not superior efficacy and carried significant safety risks. Given that the only reason for Vioxx to be used was its purported greater safety, rational buyers knowing the full truth about the safety of Vioxx would not have purchased the drug, or at most would have made it available to a small subset of patients being treated with steroids who required concurrent NSAID therapy.

181. I reserve the right to expound upon my opinions as stated in this declaration and to respond as necessary to other areas or topics raised in deposition or trial. As new information and literature becomes available, I reserve the right to supplement my opinions.


Dated: November ___, 2009      _____
                                John David Abramson, M.D.

102

## EXHIBIT 1

John Abramson, MD

Professional Address:   39 Spring Street, Ipswich, MA  01938

Email: john_abramson@hms.harvard.edu                 Phone: 978-312-1225

Place of Birth: Cambridge, MA

Education:
| | | | |
|---|---|---|---|
| 1970 | BA cum laude | Harvard College | Social Relations |
| 1971-2 | | Harvard College | Premedical courses |
| 1974 | BMS | Dartmouth Medical School | Medicine |
| 1976 | MD | Brown Medical School | Medicine |

Postdoctoral Training:
| | | | |
|---|---|---|---|
| 1982 | MS | Case Western Reserve University | Family Medicine |
| 1976-77 | Internship | Memorial Hospital, Chapel Hill, NC | Family medicine |
| 1979-81 | Residency | University Hospitals of Cleveland, OH (Case Western Reserve University) | Family practice |
| 1980-82 | Fellow | Case Western Reserve University | Robert Wood Johnson Fellow in Family Medicine |

Licensure and Certification:
| | |
|---|---|
| 1982 | Massachusetts Board of Registration in Medicine. License No. 49182 |
| 1982 | Diplomate, American Board of Family Practice 1982, recertified 1989, 1995, 2001, 2007 |

Academic Appointments:
| | |
|---|---|
| 1992-3 | Senior Research Associate, Institute for Health Policy, The Heller School, Brandeis University |
| 1997-present | Clinical Instructor, Dept. of Ambulatory Care and Prevention, Harvard Medical School |

Hospital or Affiliated Institution Appointments:
| | | |
|---|---|---|
| 1982-2002 | Medical Staff | Beverly Hospital |
| 1994-2002 | Medical Staff | Lahey Clinic |

Other Professional Positions and Major Visiting Appointments:
| | |
|---|---|
| 1977-9 | National Health Service Corps, US Public Health Service |
| 1982-2002 | Family physician, Hamilton-Wenham Family Practice, Hamilton, MA |
| 1986-1993 | Associate Medical Director, Pru-Care of MA |
| 1994-2001 | Chair, Department of Family Practice, Lahey Clinic, Burlington MA |
| 2005-present | Executive Director of Health Management, Wells Fargo Health Solutions |

Hospital and Health Care Organization Service Responsibilities:
| | |
|---|---|
| 1989-1991 | Member, Board of Trustees, Beverly Hospital |

Major Committee Assignments:
| | |
|---|---|
| 1993-5 | Chair, Graduate medical Education Committee (Family Practice Residency), Beverly Hospital |

Professional Societies:
| | |
|---|---|
| 1982-2002 | Massachusetts Medical Society |

| 1982 | American Academy of Family Practice |

Awards and Honors:

| 1996, 1999 | Community Newspapers "Readers' Choice Award for Best Doctor", Beverly, Hamilton, Wenham |
| 1999 | Center for the Study of Services "Guide to Top Doctors" |
| 2000 | Castle Connolly/Town and Country's Guide to Primary care Physicians |
| 2001 | Castle Connolly/AOL-Digital City "Guide to Top Doctors" |
| 2002 | Selected to be included in Lady's Home Journal: The Best Family Doctors in America (had left practice to write book so name did not appear in magazine) |
| 2003 | Profiled in Harvard Magazine article: "Doctored Research?" Nov-Dec issue |

Part II:
Research, Teaching, and Clinical Contributions

A. Primary Care Clerkship and mentorship program: Harvard Medical School, preceptor of third-fourth year student for the next eight years.  Teaching activities have also included the elective course and independent study in "Healing and Spirituality" as listed below.

D.  Report of Teaching
1.   Local Contributions

| 1992-1994 | Harvard Medical School<br>Two years<br>Primary Care Mentorship Program<br>Mentor<br>One first-year medical student per year |
| 1994-2001 | Harvard Medical School<br>Eight years (One student per year)<br>Primary Care Clerkship<br>Preceptor |
| 1999-2001 | Harvard Medical School<br>Three years (average 12 students per year)<br>Healing and Spirituality in Medicine<br>Elective<br>Faculty 1999, Course Co-director 2000 and 2001 |
| 2002 | Harvard Medical School<br>Independent Study<br>Healing and Spirituality |
| 2002-2007 | Harvard Medical School<br>Ongoing<br>Primary Care Clerkship<br>Tutor |
| 2003 | Harvard Medical School<br>Independent Study<br>Healing and Spirituality |
| 2008-2009 | Harvard Medical School<br>Two Years and Ongoing (Eight or nine students per group)<br>Health Policy Course (HC750) |

Discussion group leader (to continue in 2009 and 2010)

2. Presentations:

| | |
|---|---|
| 1981 | A prepaid primary care network for private and AFDC patients: an alliance between the private and public sectors. National Governor's Association Conference on Primary Care Networks, New Orleans, LA. |
| 1982 | Participation of a residency based family practice center in an innovative case management program. Society of Teachers of Family Medicine, Chicago, IL. |
| 1983 | The economic impact ofa primary care network on primary care physicians and Medicaid costs. Robert Wood Johnson Foundation, Princeton, NJ. |
| 1984 | Primary care of de-institutionalized retarded adults in the community. HCFA Meeting of Federal Surveyors of Intermediate Care Facilities, Portland, ME. |
| 1991 | The role of physicians in the Michigan Comprehensive Community Health Models Project. Pew Health Policy Annual Meeting, Cambridge, MA |
| 1999 | The role of the physician/patient relationship in the healing process. Topics in Internal Medicine (Lahey Clinic), Portsmouth, NH |
| 2002-5 | Healing our Critically Ill Health Care System.  Clinical Training in Mind/Body Medicine.  Mind/Body Medical Institute/Harvard Medical School Continuing Education, Boston, MA |
| 2004 | The Quality of Our Medical Knowledge: Vioxx and Statins.  Heller School for Social Policy |
| | NCEP Recommendations: Preventing Heart Disease or Pushing Drugs?. Encino-Tarzan Regional Medical Center, CA. |
| | Grand Rounds, Beverly Hospital Beverly MA: NCEP Recommendations: Preventing Heart Disease or Pushing Drugs? |
| 2005 | Williams College; Lessons from Vioxx: Misinforming Doctors, Harming Patients, and Making money, 1/11/05 |
| | New York City Department of Public Health, Chronic Disease Grand Rounds, 2/4/05 |
| | Bellevue Hospital Medical Seminar 2/9/05 |
| | Denver Forum, Denver CO 2/10/05 |
| | Woman's National Democratic Club, Washington DC, 3/3/05 |
| | Congressional Task Force on Prescription Drugs, Washington DC, 3/3/05 |
| | Mind Body Medical Institute Harvard Medical School 3/23/05 |
| | San Diego City Club 4/8./05 |
| | Alternative Therapy Conference, San Francisco, Keynote Address: "Overdosed America." 4/9/05 |
| | University of Michigan (Undergraduate course in health policy) 4/05/05 |
| | Health Care Benefits Forum, Chicago Hyatt Regency, Keynote Address: 4/7/05 |
| | City Club of San Diego, 4/08/05 |
| | Alternative Health Conference, San Francisco CA 4/9/05 |
| | Harvard Medical School, Cabot Lecture Series, 4/25/05 |
| | Drug Therapy Conference, British Columbia 4/16/05 |
| | Lutheran Medical Center, Brooklynn NY, 4/27/05 |
| | Cooley Dickinson Hospital, Northampton MA 4/29/05 |
| | Harvard School of Public Health, 5/02/05 |
| | Southern Vermont Area Health Education Center, 5/07/05 |
| | Chilten Club of Boston, 05/26/05 |
| | Hiram B. Curry Memorial Lecture, University of S. Carolina Dept Family Practice, 6/6/05 |
| | Harvard Medical School, Mind/Body Medical Institute Continuing Medical Education 6/15/05 |
| | Vermont Citizens Campaign for Health 6/16/05 |

Medical Foundation of Boston, 6/21/05
Harvard Club of Boston, 6/22/05
Hamilton Wenham Public Library 6/23/05
World Pension Forum, Chatham MA, 7/12/05
Boulderfest, Boulder CO, 7/14/05
Center for Popular Economic, Amherst MA, 8/1/05
Public Policy Virginia, Roanoke VA, 9/17/05
Fletcher Allen Hospital, Burlington Vermont 9/26/05
University of Vermont Medical School 9/26/05
Central Vermont Hospital 9/27/05
Vermont Medical Society 9/27/05
Cayuga Medical Center of Ithica, 9/30/05
Michigan State Medical Society Bioethics Conference, 10/08/05
Harvard Medical School, Mind/Body Medical Institute Continuing Education
        Course 10/17/05
U Mass Med School, Community Medicine 10/19/05
Massachusetts Medical Society/Medical students 10/19/05
Rotary Club, Charleston, WV, 10/21/05
National Legislative Association on Prescription Drug Prices, Charleston, WV
        10/21/05
League of Women Voters, Hamilton, MA, 10/30/05
Sharp Medical Center, San Diego, CA 11/04/05
Pacific College Symposium, San Diego CA 11/05/05
Allegheny General Hospital, Pittsburgh, PA 12/7/05

2006

LA Country Employee Pension Association  1/26/06
West Virginia House and Senate 2/1/06
George Washington Medical School panel about Drug reps on campus 2/9/06
HealthFirst Conference 2/22/06
Cambridge Health Alliance Family Medicine Grand Rounds 2/24/06
Harvard Medical School Pharmacology  Patient Safety Session "The Vioxx
        example" 2/28/06
Nieman Journalism Fellowship 3/1/06
Sudbury League of Women Voters 3/5/06
Bentley College, Business Ethics Lecture 3/7/07
Northwest Pharmacy Benefits Managers-Medical Directors Conference, Seattle
        WA 3/10/06
Harvard Medical School Continuing Medical Education, Mind Body Medicine
        3/13/06
Association of Health Care Journalists, Houston TX, 3/17/06
North Shore Seminars, Beverly MA 3/19/06
New England Biolabs, Ipswich MA 3/23/06
Florida State University Medical Grand Rounds, Tallahassee FL 3/30/06
Hampden County [MA] Medical Society 4/25/06
Boston Medical Center, Family Medicine Grand Rounds 4/25/06
Cooley Dickinson Hospital Northampton MA, Grand Rounds 5/1/06
University of Colorado Family Medicine Grand Rounds 5/3/06
American College of Lifestyle Medicine, Loma Linda CA 5/24/06
Harvard Medical School Lecture to students: Statins 5/30/06
The Regence Group Pharmacy Managers, Portland OR 6/14/06
Alta Bates Hospital, Berkeley CA, Grand Rounds 6/13/06
Harvard Medical School Mind/Body Medical Institute Continuing Medical
        Education 6/21/06
Tufts Family Medicine Residency  6/23/06
Forum for Behavioral Science in Family Medicine 9/17/06
Biomedical Research and the Law, Hofstra Law School 10/4/06

Sharp Community Medical Group CME Conference 10/8/06
Harvard Medical School, Course on Mind/Body Medicine 10/20/06
Idaho State University Family Practice Residency 10/26/06
Idaho State University Conference on Health Care 10/26/06
American Public Health Association, panelist : "Drug manufacturers, the FDA,
        and U.S. health care," Boston, MA 11/7/06


Loma Linda University, School of Pharmacy 11/3/06
Sharp Rees-Steely Community Group CME 11/4/06
Rollins College, Winter Park, FL, 11/13/06
Capital Health Plan, Tallahassee, FL, 11/15/06
National Federation of Women Legislators, Bachelor's Gulch, CO, 11/18/06
University of New Hampshire, Masters in Public Health Program Grand Rounds,
        Durham, NH, 11/28/06
Washington University, "Pharm-Free Day," St. Louis, MO, 11/30/06

**2007**

Panelist at George Washington University: Relations with the Pharmaceutical
        Industry, Washington, D.C., 1/25/07
Prescription Access Litigation Dinner, Keynote Speech, Washington D.C.,
        1/25/07
McDougall Program Health Conference, Santa Rosa, CA, 2/2-4//07
Sutter Medical Center, Family Medicine Grand Rounds, Santa Rosa, CA 2/5/07
Renown Medical Center, Grand Rounds, Reno NV., 2/6/07
Gila River Health Indian Community Health Center: "The Growing Gap Between
        Evidence-Based Medicine and Good Health Care," Sacaton AZ.,
        2/8/07
Harvard Medical School: "Why Primary Care Don't Get No Respect." 2/13/07
Indian Health Services, National Combined Councils: "Can We Trust the
        Evidence in Evidence-Based Medicine," San Diego CA. 2/25/07
Harvard Medical School Continuing Education: Mind/Body Medicine Clinical
        Training, Boston MA. 2/28/07
University of Michigan, Family Medicine Grand Rounds, Ann Arbor, MI 3/14/07
University of Texas, Medical Branch, Galvaston TX, 3/15/07
Puerto Rican Third Annual Public Health Conference, San Juan PR, 5/8/07
Harvard Medical School Continuing Education: Mind/Body Medicine Clinical
        Training, Boston MA. 6/25/07
International Academy of Law and Mental Health, Padua Italy, 6/29/07
Lee Memorial Health System, Continuing Education Conference, Sanibel Harbor,
        FL, 7/15/07
Orlando Regional Medical Center, Continuing Education Conference, Orlando
        FL, 7/16/07
American Association of Naturopathic Medicine Annual Meeting, Palm Springs,
        CA 8/25/07
Dept. of Psychiatry Grand Rounds, Massachusetts General Hospital, Boston, MA
        10/5/07
North Atlantic Health Sciences Libraries, When the Facts Aren't True, What's a
        Librarian to Do?, Woodstock VT, 10/29/07
Canadian Coalition for Health: Is Free Speech more Important than your Health,
        Toronto, CA March 4, 2008
Benson-Henry Institute for Mind Body Medicine/Harvard Medical School
        Coninuing Medical Education Program. Understanding our Critically Ill Health
        Care System and Offering a Real Alternative, Boston, MA, March18, 2008
Northwest Naturopathic Physicians Convention, Can We Trust the Evidence in
        Evidence-Based Medicine? Vancouver, British Columbia, April 5, 2008

Therapeutics Initiative, University of British Columbia , Lookin' For Health in All
the Wrong Places: The Commercial Distortion of Efforts to Reduce the Burdent of
Heart Disease, Vancouver, British Columbia,
April 7, 2008
Direct to Consumer Perspectives National Convention, What's Wrong with the
American Healthcare System (and How to Make it Right), Washington DC, April
16, 2008
Puerto Rican Third Annual Public Health Conference, San Juan PR, 5/8/07
Harvard Medical School Continuing Education: Mind/Body Medicine Clinical
           Training, Boston MA. 6/25/07
Lee Memorial Health System, Continuing Education Conference, Sanibel Harbor,
           FL, 7/15/07
Orlando Regional Medical Center, Continuing Education Conference, Orlando
           FL, 7/16/07
American Association of Naturopathic Medicine Annual Meeting, Palm Springs,
           CA 8/25/07
Dept. of Psychiatry Grand Rounds, Massachusetts General Hospital, Boston, MA
           10/5/07
North Atlantic Health Sciences Libraries, When the Facts Aren't True, What's a
Librarian to Do?, Woodstock VT, 10/29/07

2008

Canadian Coalition for Health: Is Free Speech more Important than your Health,
Toronto, CA March 4, 2008
Northwest Naturopathic Physicians Convention, Can We Trust the Evidence in
Evidence-Based Medicine? Vancouver, British Columbia, April 5, 2008
Direct to Consumer Perspectives National Convention, What's Wrong with the
American Healthcare System (and How to Make it Right), Washington DC, April
16, 2008
Leadership and Business Strategies for Integrative Health Care, American
Hospital Association, Phoenix AZ, May 17, 2008
Conference on Integrative, Complementary and Alternative Medicine and Mental
Health, Toronto, Canada, May 24, 2008
Countway Library, Boston MA, June 3, 2008
Federal Bureau of Investigation, "The Systematic Distortion of Medical
Knowledge: Licit and Illicit," Boston MA. June 26, 2008
Ontario Association of Naturopathic Doctors, Niagara Falls Canada, October 19,
2008
Benson-Henry Institute for Mind Body Medicine/Harvard Medical School
Continuing Medical Education Program. , Boston, MA, March18, 2008
Therapeutics Initiative, University of British Columbia , Lookin' For Health in All
the Wrong Places: The Commercial Distortion of Efforts to Reduce the Burden of
Heart Disease, Vancouver, British Columbia, April 7, 2008
Medical Grand Rounds, Tufts Medical Center, Boston MA. May 30, 2008
Univ. of Vermont Family Medicine Review Course, Burlington VT, June 12, 2008
Harvard School of Public Health CME course: Ethical Issues in International
Health, Boston MA, June 13, 2008
Western Maine Health System, CME, August 18, 2008
N.Y. State Academy of Family Medicine CME, September 27, 2008
Benson-Henry Institute for Mind Body Medicine/Harvard Medical School
Continuing Medical Education Program, Boston, MA, October 2, 2008
Boston University Medical Students, Primary Care Week, October 6, 2008
Boston University Dept of Psychiatry Grand Rounds, October 23, 2008
Cambridge Health Alliance, Family Medicine Grand Rounds, December 9, 2008

2009

Benson-Henry Institute for Mind Body Medicine/Harvard Medical School
Continuing Medical Education Program.  , Boston, MA, March18, 2008
Brookline Adult and Community Education, March 25, 2009
Cabot Lecture, Harvard Medical School, March 26, 2009
Stoeckle Center for Primary Care Innovation, Mass General Hospital, March 27, 2009
University of Michigan Family Medicine Grand Rounds, April 8, 2009
Exeter Hospital, Grand Rounds, June 2, 2009
Harvard School of Public Health, continuing education course on Ethical Issues
    In International Health, June 12, 2009

E. Report of Clinical Activities
1982-2002    Family Physician, Hamilton-Wenham Family Practice
1997-2001    Hamilton-Wenham School District Physician

Bibliography

Original Articles

1987    Competition, capitation, and case management: barriers to strategic reform.
    Milbank Quarterly 1987;65:3: 348-370
2003    Medical Reporting in a Highly Commercialized Environment: A family doctor
    prescribes eight guiding principles for accurate and fair coverage of research
    findings. Nieman Reports. 2003; Summer: 54-57
2003    Comments on the MRC/BHF Heart Protection Study. Correspondence. The
    Lancet. 2003; 362: 745-746
2005    When Health Policy is the Problem (with Bruce Spitz). Journal of Health Politics,
    Policy and Law, 2005; 30(2):327-366.
2005    The Effect of Conflict of Interest on Biomedical Research and Clinical Practice
    Guidelines: Can We Trust the Evidence in Evidence-Based Medicine? (With
    Barbara Starfield, MD, MPH). Journal of the American Board of Family Practice,
    2005; 18:414-418.
2007    Are Lipid-lowering guidelines evidence-based? (With James M. Wright MD,
    PhD). The Lancet, 2007: 369:168-169.
    The Reliability of Our Medical Knowledge as a Product of Industry Relationships.
    Hofstra Law Review, 2007; 35: 691-704.

Book

2004    Overdosed America: The Broken Promise of American Medicine. How the
    Pharmaceutical Companies Distort Medical Knowledge, Mislead Doctors, and
    Compromise Your Health (HarperCollins, Sept. 2004)

OP-EDS (Major Newspapers)
LA Times Drug Guidelines Fatten Bottom Line 7/25/04
NY Times Information is the Best Medicine 9/18/04
LA Times Physician Know Thy Patient 10/24/04
LA Times Drug Profits Infect Medical Studies 1/7/06
LA Times Healthcare Code Blue 11/3/06
Atlanta Journal Constitution Cold-hearted tug fails women 2/2/07

Partial list of National Media Appearances:

9/30/04 CBS Evening News
    Lou Dobbs
    CNN Headline News          •
    NPR Radio: All Things Considered
10/1/04 The Today Show
    CNN American Morning
10/18/04 FOX News Linda Vester: Bush and Kerry Health Plans
11/04/04 ABC News Vioxx article and editorial in Lancet
11/06/04 CNN "In the Money" DTC advertising
11/18/04 CNN HEADLINE NEWS Vioxx Hearings:
11/19/04 CNN AMERICAN MORNING Vioxx Hearings: Why didn't Doctors know?
11/22/04 FOX LINDA VESTER Merck's role in funding Vioxx research
11/29/04 Lou Dobbs Are We A Nation of Hypochondiracs?
12/05/04 C-Span BookTV: From Collected Works, Brattleboro, VT (Recorded 11-05-04)
12/14/04 (taped)TV Ontario, What to do after Vioxx?
12/17/04 CNN with Betty Nguyen
    CNN Wolf Blitzer (interviewed by Mary Snow)
    CNBC Closing Bell with Tyler Mathisen
    Lou Dobbs Tonight
    CNN Headline News
12/18/04 Ron Insana Show (radio)
    NBC Nightly News
12/20/04 Fox News: Neil Cavuto
    WBUR Radio: On Point
    News Night with Aaron Brown
    CNN Headline News
    NPR Radio: All Things Considered
12/21/04 CNN American Morning
    CNN Live
    MSNBC Market Wrap with Ron Insana
    MSNBC Ron Insana: The Death of a Wonder Drug
12/22/04 The Today Show
    CNN Live From
12/26/04 WSJ Report with Maria Bartiromo
1/13/05 MSNBC (Over the Counter Statins)
1/24/05 CBS Evening News: Celebrex
2/18/05 MSNBC Bull's Eye
2/19/05 CNN In the Money
    Fox News
    CNN Headline News
2/25/05 CNN Prime News
2/28/05 CNN Lou Dobbs Live
5/27/05 CNN Lou Dobbs Live
    CNN Judy Woodruff Inside Politics
5/28/05 Fox  with Bob Sellers
7/27/05 Fox and Friends, National
8/15/05 Fox 25, Boston
3/22/06 CNBC Live interview FDA, ADHD drug labeling
6/23/06 CNBC Morning Call: Zocor pricing

Expert Witness consulting and testifying fee: $550/hr

Testimony in the past 4 years:
August 3, 2006: Deposition Vioxx Products Liability Litigation, Robert G. Smith Versus Merck & Co., Inc. Attorney: Larry Wright, Watts Law Firm, One Congress Plaza, Suite 1000, 111 Congress, Austin, TX 78701.  (512) 479-0500

April 30, 2007: Deposition, Zyprexa Products Liability: MDL No 1596 Litigation Zyprexa.  Attorney: Jayne Conroy, Hanly, Conroy, Bierstein, Sheridan, Fisher & Hayes LLP. 112 Madison Avenue, New York, New York 10016. 212-784-6400

May 18, 2007: Deposition,  Estratest, Susannah K. Alexander Versus Solvay Pharmaceuticals, Inc., et al.  Attorney: Ed Notargiacomo, Hagens Berman Sobol Shapiro
One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

December 12, 2007: Deposition, TriCor, Joe Lukens, Hangley Aronchick Segal & Pudlin
One Logan Square, 18th & Cherry Streets, 27th Floor, Philadelphia, PA 19103-6933

December 18, 2007: Deposition, Nexium, Ed Notargiacomo,  Hagens Berman Sobol Shapiro,
One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

March 4, 2008: Deposition, CanWest Media Inc, vs. Attorney General of Canada (re restraint of CanWest's freedom of commercial speech due to the ban on direct-to-consumer advertising of prescription drugs.

March 18, 2008: Phone Deposition, Kathleen R Skiles vs. Richard M. Fruehling MD, Richard K Waggoner, PA, and Family Practice of Grand Island. Attorney: Mark A. Weber, Walentine O'Toole McQuillan & Gordon, 11240 Davenport Street, P.O. Box 540125, Omaha, NE 68154-0125

March 24-25, 2008: Deposition, Bextra Marketing, Sales Practices and Product
Liability Litigation, MDL No. 1699

April 1, 2008: Hearing before Judge Jack Weinstein: Multiple plaintiffs vs. Eli Lilly re: Marketing and Sales of Zyprexa, Hagens Berman Sobol Shapiro, One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

July 24, 2008: Deposition, Vioxx, Consumer Plaintiff's Renewed Motion for Class Certification, Tom Sobol, Hagens Berman Sobol Shapiro, One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

October 22, 2008: Deposition, Vioxx, Consumer Plaintiff's Renewed Motion for Class Certification (CA),  Tom Sobol, Hagens Berman Sobol Shapiro, One Main Street, 4th Floor Cambridge, MA, 02142-1531 Tel. (617) 482-3700

January 20-21, 2009.  Deposition, Neurontin Marketing, Sales Practices and Product Liability Litigation. Tom Greene, Greene and Hoffman, 33 Broad St, 5th Floor, Boston MA 02109, Tel. 617-261-0040.

July 28, 2009: Deposition, Zyprexa: South Carolina v. Eli Lilly (Zyprexa), Harrison, White, Smith & Coggins. P.O. Box 3547. Spartanburg, SC 29304

September 29-30, 2009: Deposition, Risperdal: Foti v. Janssen, Bailey, Perrin, and Bailey, 440 Louisiana, Suite 2100, Houston, TX 77002

## XI. Conclusion

180.   Merck systematically failed to disclose and affirmatively misrepresented the CV risk and exaggerated the GI benefit of Vioxx in comparison to placebo and other non-selective NSAIDs.  At the same time, Merck engaged in a comprehensive and systematic campaign to mislead physicians, consumers, and payors to believe that Vioxx was a superior drug worth a premium price when, in fact, it was of equal but not superior efficacy and carried significant safety risks.  Given that the only reason for Vioxx to be used was its purported greater safety, rational buyers knowing the full truth about the safety of Vioxx would not have purchased the drug, or at most would have made it available to a small subset of patients being treated with steroids who required concurrent NSAID therapy.

181.   I reserve the right to expound upon my opinions as stated in this declaration and to respond as necessary to other areas or topics raised in deposition or trial.  As new information and literature becomes available, I reserve the right to supplement my opinions.

Dated:  November 5, 2009

John David Abramson, M.D.

102