# EXHIBIT 14

11573141
Jun 19 2006
5:39PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

# MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR ORDER EXCLUDING INFORMAL COMMUNICATIONS FROM THE FDA CONCERNING PROMOTIONAL MATERIALS

*(Plaintiff's Opposition to Motion in Limine No. 2)*

Plaintiff Gerald Barnett, by and through his undersigned counsel, hereby opposes Defendant Merck & Co., Inc.'s ("Merck") *Motion in Limine* No. 2 seeking a ruling to prohibit Plaintiff from introducing communications from the U.S. Food and Drug Administration ("FDA") regarding Merck's marketing and promotional practices relating to its sale of Vioxx. Such evidence, which was admitted in both *Plunkett v. Merck* trials, is highly relevant, and is properly admissible for multiple purposes including: demonstrating that Merck rushed Vioxx to the market; demonstrating that Merck's warnings were inadequate and that Merck was on notice that its promotional activities contributed to this inadequacy; rebutting claims of good character; rebutting claims of efficacy or safety of Vioxx based on the FDA's "approval" or blessing; impeachment purposes; showing Defendant's motive, intent, and/or state of mind; and demonstrating a pattern and practice of misconduct for purposes of punitive damages.

1

In its motion Merck focuses on portions of the testimony of the Plaintiff's prescribing physicians while arguing that Merck's conduct could not have affected their prescribing decisions. However, the subject documents have relevance independent of issues relating to Dr. Mikola and Dr. McCaffrey. First of all, the September 17th, 2001 letter from the FDA is relevant and probative on the issue of notice to Merck that its marketing or sales or press releases or statements to doctors affirmatively overstated the cardiovascular safety of Vioxx. It demonstrates that Merck was aware that the Naproxen hypothesis was being used to explain away the 5 fold increase in heart attacks in Vioxx users over placebo shown in the VIGOR study. It also shows that Merck was aware that this was inappropriate, improper and misleading, and that this conduct should have been discontinued.

In essence, these are precisely the messages that Plaintiff contends Merck was making to doctors and the public about Vioxx and cardiovascular safety, including using the Naproxen hypothesis to try and erase or explain away the 5 to 1 risk for heart attack shown in the VIGOR results. This document is therefore relevant and admissible to show that Merck knew that its entire message about Vioxx and cardiovascular risks, and the VIGOR study and Naproxen, which was being presented to the public by its employees and agents, was minimizing serious risks, and was therefore, inappropriate and misleading, not to mention violative of the FDCA.

In addition to foregoing, there is another basis for admission which relates to the misleading communications to the Plaintiff's prescribing doctors, McCaffrey and Mikola. Dr. Mikola testified in his deposition that he read the Bombardier November 2000 VIGOR study publication in the New England Journal of Medicine to say that Naproxen was the explanation for the increased heart attack numbers in the VIGOR study for Vioxx over placebo. His testimony also makes it clear that had he seen some of the internal Merck memos and FDA

2

internal memos on the subject that give a fair balance to the Vioxx heart attack results in the VIGOR study and the questions concerning even making a claim that Naproxen is an explanation, he would not have prescribed Vioxx.

The September 17th, 2001 letter from the FDA demonstrates that Dr. Mikola was misled in the same manner that Merck was trying to mislead physicians who were listening to Dr. Holt's message. Dr. Holt's misleading message was in fact Merck's message, and therefore this document should be admitted into evidence in this case.

## I. STATEMENT OF RELEVANT FACTS

Merck focuses most of its energy on arguing for the exclusion of the September 17, 2001, warning letter issued by Dr. Thomas W. Abrams, R.Ph., MBA, then acting Director of the Division of Drug Marketing, Advertising and Communications for the FDA, to Merck President and CEO, Raymond V. Gilmartin. In the letter Dr. Abrams admonished Merck to cease and remediate promotional activities dating back to June of 2000 that the FDA found misleading in regards to Vioxx. (Exhibit A) Merck acknowledges that this letter was admitted by the Court in both *Plunkett v. Merck* trials on the ground it was relevant to the plaintiff's contention that Merck rushed Vioxx to the market. That same contention is made by the Plaintiff here, and the Court's reasoning is equally applicable here.

In the September 17, 2001 warning letter, the FDA advised Merck of its finding that Merck had engaged in misrepresentation regarding the risks associated with Vioxx during six (6) audio conferences (led by its national speaker, Dr. Peter Holt), one (1) press release ("Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx"), and in three (3) oral presentations made by Merck sales representatives (one at the Annual Meeting of the Maryland Pharmacists

3

Association and two at the Annual Meeting of the American Society of Health-Systems Pharmacists).

In Plaintiff's Complaint and through motion practice, Plaintiff has properly plead and alleged that Merck designed and initiated a marketing campaign that would impact physicians and consumers both directly and indirectly. Merck's marketing campaign, which included the hiring of its national speaker, Dr. Peter Holt, was designed to create a "buzz" among the public and medical community by which Vioxx's alleged benefits were promoted while simultaneously minimizing concerns and negative data relevant to its cardiovascular risks sufficient to establish, increase and maintain a multi-billion dollar market share at the expense of, and irrespective of, human safety and life.

Dr. Abrams' September 17, 2001 warning letter and the other FDA communications generically referenced in Merck's *Motion in Limine* No. 2 are directly relevant to establish Merck's efforts to foist a dangerous drug onto the market at the expense of patient safety, including the safety of Mr. Barnett, by failing to properly and adequately warn of the risks associated with Vioxx, a drug which, but for Merck's failure to warn, would never have been prescribed by Plaintiff's physician Dr. Mikola, nor ingested by Mr. Barnett. Moreover, such evidence goes directly to issues relating to the adequacy of Merck's warning and is further relevant and admissible: to rebut claims of good character and/or drug efficacy or safety; for impeachment purposes; for showing Defendant's motive, intent, and/or state of mind; and for showing a pattern and practice of misconduct for purposes of punitive damages.

## II.   STANDARD OF LAW

### A. Relevance (Federal Rules of Evidence 401 & 402)

Relevant evidence is broadly defined as "evidence having any tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. McGinnis*, 2005 WL 2464632 *12 (La. App. 5 Cir. 2005) (quoting LSA-C.E. art. 401); see also Fed.R.Evid.401 (same). Generally, courts have supported a trial court's broad discretion in determining relevancy of evidence. *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 340 (5th Cir. 1980). However, the Fifth Circuit has noted that: "[w]hen evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401--it must be without probative value as to *any* fact of consequence to the determination of the action. If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402. *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587, 599 (E.D.La.1993) (quoting *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 267 (5th Cir.1980) (emphasis in original).

A movant in limine has the burden of establishing that the evidence sought to be excluded on relevancy grounds is *not* relevant to *any* issue in the case. See *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587, 599 (E.D.La.1993)

### B. Prejudice (Federal Rules of Evidence 403)

The touchstone for excluding evidence under Rule 403 is not prejudice, but *unfair* prejudice, which must substantially outweigh the probative value of the evidence. See *Soll v. Provident Life & Acc. Ins. Co.*, 2002 WL 1461891 at 6 (E.D.La. July 5, 2002) Direct proof of a claim does not create the *unfair* prejudice that Rule 403 intended to avoid. See *Soll v. Provident Life & Acc. Ins. Co.* at 6. Moreover, Rule 403 is not a tool designed to permit the trial court to

5

"even out" the weight of the evidence, rather, the skill and acumen of professional trial lawyers who are keenly aware of the points of contest should be brought to bear. *Id.*

As observed by the Fifth Circuit Court of Appeals in *United States v. Pace*, 10 F.3d 1106 (5th Cir.1993), *cert. denied*, 511 U.S. 1149, 114 S.Ct. 2180, 128 L.Ed.2d 899 (1994):

> The exclusion of evidence under Rule 403 should occur only sparingly:
> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance. It is not designed to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.
> *Id.* at 1115-16 (quoting *United States v. McRae*, 593 F.2d 700, 707

(5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)).

## III. RELEVANCE OF FDA WARNING LETTERS ADDRESSING MERCK'S MARKETING SCHEME FOR VIOXX

In this litigation, Plaintiff asserts that Merck failed to adequately warn (and in so doing, affirmatively misled) consumers, physicians and other members of the medical community, including Plaintiff, regarding the safety and efficacy of Vioxx. This goal was accomplished chiefly in two ways. First, Merck spent millions of dollars on direct-to-consumer advertising to generate a "buzz" about Vioxx and to insure that patients would request Vioxx prescriptions from their physicians. Second, Merck promoted the drug directly to physicians fought on four fronts: 1.) Merck sought out highly respected physicians—who had influence in the medical community and with the FDA—to advocate the drug as part of its medical education program;

6

2.) Merck sought to use the financial gain and prestige associated with its medical programs, to influence individual physicians' opinions and prescribing habits with respect to the drug; 3.) Merck disseminated misleading sales and promotional materials—including its product labeling and product information circulars—directly to individual physicians; and 4.) Merck disseminated misleading safety and efficacy information through "press releases" and other communications to the medical community. The September 17, 2001 FDA warning letter along with other FDA communications directly support Plaintiff's claims that Merck failed to provide adequate warnings, and refute Merck's arguments or defenses that it acted appropriately under the facts of the case.

However, Merck attempts to assert several arguments in support of its contention that evidence regarding Dr. Abram's warning letter and other FDA communications regarding Merck's marketing or promotional activities are somehow irrelevant. Merck has not satisfied its burden of establishing that evidence of the FDA communications regarding Merck's acts and omissions are "without probative value as to *any* fact of consequence to the determination of the action". See *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 599 (E.D.La.1993)

Merck argues that such evidence is not relevant because Plaintiff's physicians, Dr. McCaffrey and Dr. Mikola did not attend any of the audiconferences, referenced in the letter. Merck also argues that there is no evidence that either was influenced by the representations detailed in the letter, since Dr. McCaffrey considered Vioxx to be an excellent medication, not in reliance on promotional materials or sales calls, and Dr. Mikola could not recall specifics of what Merck representatives said to him or any discussions about Naproxen.

First of all, Dr.McCaffrey, who initially prescribed Mr. Barnett with Vioxx, has signed a partnership agreement with Merck as a paid speaker each year for the last seven or eight years.

7

He was also paid by Merck for preceptorships, (McCaffrey Deposition, Exhibit B, 114:2-177-22) and received payments for speaking including expenses and 'honoraria.' (123:21- 125:3) He was considered to be a Merck 'top earner' for Vioxx (118:16-119:12 and 235:17-20) Despite the fact he cannot remember if after prescribing Vioxx to Mr. Barnett he came to learn about the VIGOR trial, and he does not read the New England Journal of Medicine, he claims that whatever it said did not factor into his decision to prescribe Vioxx. (102:4-104:25)

However, he admits that the warning label he would have shown Mr. Barnett in 1999 had no warning or contraindication regarding heart attacks and that Merck did not tell him that Vioxx was associated with heart attacks (161:4- 162:18). He agrees that there was nothing in the warnings about cardiovascular risks in the package insert and the warning that came out in 2002, and that to a doctor reading the package insert, Vioxx would appear to be safer than placebo with respect to serious cardiovascular thrombotic events for the study described. (224:15-226:19) He also agrees that in the time period he prescribed Vioxx to Mr. Barnett, he was never given a warning that Vioxx causes heart attacks. (228:5- 23)

On the other hand, Dr. Mikola, who treated Mr. Barnett from October 1999 to June of 2004 (Mikola Deposition, Exhibit C, 5:13-6:2 and 25:19-23), and began prescribing Vioxx for him at least as early as 12/28/2001 (103:10-105:7), was not aware when he first saw Mr. Barnett that Merck advisors were recommending analyses of whether COX-2 inhibition might alter the process of plaque formation, nor that an inflammatory component with plaque rupture was mediated by COX-2 (93:9-95:8) He does not recall anyone from Merck ever calling his attention to an article regarding Vioxx as a COX-2 inhibitor increasing the risk of cardiovascular events. He would expect that Merck would advise him of the potential of one of its drugs to increase the risk of cardiovascular events, but does not recall that happening while he was treating Mr.

8

Barnett. (370:6-372:10) If there was information that there was a statistically-significant increase in risk for serious cardiovascular thrombotic events, that was something Merck did not share with him. (405:24- 407:11)

Dr. Mikola testified that had he been aware of or seen the information in the FDA's proposed label change to the effect that Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events, such as those with a history of myocardial infarction and angina and in patients with preexisting hypertension and congestive heart failure, he would not have put Mr. Barnett on Vioxx. (28:3-9 and 63:13). When made aware of the risks of Vioxx which were withheld by Merck, Dr. Mikola testified unequivocally that he would not have prescribed Vioxx based upon what he knows today:

```
                         114
   3    Q.  I noticed that Mr. Barnett's weight
   4  fluctuates between 172, 182, in that area. Did you
   5  consider him really overweight?
   6    A.  No, I would say he was mildly
   7  overweight.
   8    Q.  Okay. But he did have coronary artery
   9  disease in his family, right?
  10    A.  Correct.
  11    Q.  And given what you've read today, that
  12  combined with his angina, would you say that from
  13  everything you've read about Vioxx today that you
  14  probably would not have prescribed Vioxx for him if
  15  you'd known all this information --
  16        MR. GOLDMAN: Object to the form.
  17  BY MR. ROBINSON:
  18    Q.  -- in 2000?
  19        MR. GOLDMAN: Object to the form.
  20  BY MR. ROBINSON:
  21    Q.  Go ahead.
  22    A.  Having known today what I know about
  23  Vioxx, I would not have prescribed it.
(114:3-23)
```

9

Had Merck advised Dr. Mikola, and Dr. McCaffrey, fully and adequately as required under the law, Mr. Barnett would not have suffered a heart attack from the ingestion of Vioxx. In its unsuccessful move to exclude this same type of evidence in *Plunkett*, Merck argued that the prescribing doctor had testified he did not recall ever reading or relying on any Merck promotional activities. However, Dr. Mikola and Dr. McCaffrey relied on Merck's omission in failing to provide necessary information to them. Merck removed the possibility that they could act as a learned intermediaries.

Much of Merck's promotional activities, including its audio conferences, press releases and sales force communications were not promotional in appearance but rather cloaked in a veil of medical, scientific and educational legitimacy. In fact, through the employment of physicians like Dr. Holt, whose conduct and improprieties are detailed in Dr. Abrams warning letter, Merck attempted to portray information provided directly and indirectly to physicians, including Dr. McCaffrey and Dr. Mikola, as objectively informative. Physicians like Dr. McCaffrey and Dr. Mikola relied upon information readily available to all medical providers through Merck "press releases" and other communications to the public and/or medical community, by which Merck created a presumption in the medical community that Vioxx was accepted as an efficacious pharmacologic tool for pain management and related therapies.

Finally, regardless of the direct effect of the specific conduct described in the subject letter upon the prescribing physicians, this type of evidence has relevance on a number of other issues:

Impeachment: In depositions of corporate witnesses, Merck has claimed that warning letters from the FDA were "extremely rare." Evidence of the FDA warning letters is relevant and admissible as impeachment evidence specifically to rebut these allegations.

Adequacy of Warnings: Alternatively, even if the FDA letters are not admissible for the truth of the matter asserted, i.e., that Defendant was in fact engaged in "a continuing pattern and practice of widespread corporate behavior to avoid compliance with the regulations concerning the disclosure of risk information", these letters are relevant to issues of whether Defendant was on notice that its warnings were made inadequate through over promotion. See, e.g., *Spinden v. Johnson & Johnson*, 177 N.J. Super. 605, 609 (App. Div.) *cert. denied.* 87 N.J. 376 (1981). The content of the very documents Merck attempts to exclude from the jury in this case related directly to Merck's conduct and are relevant to the issue of whether Merck failed to warn Plaintiff as to the risks associated with Vioxx.

State of Mind: The FDA letters are also relevant to show Defendant's state of mind with regard to the warnings. For example, despite repeated warnings, Defendant continued to minimize risk information in its labels.

Motive and Intent: Evidence of corporate misconduct with regard to mislabeling other drugs is also relevant to show motive and intent (to increase sales) pursuant to Federal Rules of Evidence 404(b).

Punitive Damages: Communications from the FDA reflecting Merck's unwillingness to abide by the legal rules and regulations which proscribe its behavior bear on the issue of whether Merck acted in a fraudulent or grossly negligent manner in marketing and promoting the drug despite its knowledge of the drug's risks; and whether Merck's conduct was reckless enough to warrant punitive damages, and are admissible for such purpose.

Rebuttal Evidence: As to the relevance of FDA communications which relate to Merck's conduct regarding Vioxx, including the September 17, 2001 warning letter, it is expected that Merck will attempt to infuse into the trial testimony, argument and/or a defense that Merck is not

11

liable to Plaintiff because Vioxx was "FDA approved" or otherwise had the proverbial FDA blessing. Moreover, it is expected that Merck will attempt to suggest that it acted appropriately at various points throughout the Vioxx era, from the investigation and new drug application phase through withdrawal from the marketplace, that it abided by the terms of the Federal Food, Drug, and Cosmetic Act and applicable regulations and that it never minimized potential risks associated with Vioxx nor misrepresented the Vioxx safety profile.

Regarding Merck's marketing practices which are wholly unrelated to its sale of Vioxx, Plaintiff would state that, to the extent Merck argues at trial any of the following, Plaintiff should be allowed to present evidence to the jury in the form of FDA communications or otherwise, which would be rebut the same: that Merck's marketing and promotion of its products are fair, thorough and/or adequate; that Merck or any of its employees or agents are credible given a pattern of proper conduct in marketing or promoting its products; that Merck always provided adequate warnings to physicians and/or should Merck offer testimony or evidence on direct by which Merck raises the issue of either Merck's marketing or promotion practices beyond the scope of its sale of Vioxx or the conduct of Merck and/or its agents.

## IV. THE SPECIFIC DOCUMENTS MERCK SEEKS TO EXCLUDE ARE NOT UNDULY PREJUDICIAL

As stated in relevant part by the Fifth Circuit Court of Appeals in *United States v. Pace*, "[r]elevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. "...Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Pace*, 10 F.3d 1106 (5th Cir.1993), *cert. denied*, 511 U.S. 1149 (1994).

The probative value of the letters or statements made by the FDA are high and, to the extent Merck argues that the jurors will not understand the context of the warning letters and mistake them for official and final findings, is misplaced and underestimates the good judgment of jurors.

In a survey of cases throughout the country, the notion that too much time will be spent on the introduction and surrounding testimony relating to an FDA statement or warning letter or that juror will mistake them for formal opinions is simply not found therein. On the contrary, such evidence is readily admissible. See *Kennedy v. Baxter Healthcare Corp.*, 348 F.3d 1073, 1074-75 (8th Cir. 2003) (in products liability action against manufacturer of latex gloves, admission of document about FDA employee statements to glove manufacturers was admissible and informal FDA pronouncements were probative of whether manufacturer acted reasonably in designing, labeling, and selling its gloves); *Carlin v. Superior Court*, 13 Cal.4th 1104, 1114 (Ca. 1996)( FDA action or inaction, though not dispositive, may be admissible to show whether a risk was known or reasonably scientifically knowable); *Inter Medical Supplies Ltd. v. EBI Medical Systems, Inc.*, 975 F.Supp. 681, 687 (D.N.J.1997) (plaintiffs introduced an FDA warning letter that Defendant received was admissible, through testimony did not ultimately establish seriousness of reported violations or the potential harm to patients); *U.S. v. Barile*, 286 F.3d 749, 755 (4th Cir 2002)(prior statements made by FDA which indicated that it was acceptable to provide information resulting from component testing for a FDA pre-market submission were inconsistent with witness' trial testimony were admissible for the purpose of impeaching witness).

In addition to the relevance and lack of prejudicial effect occasioned by the introduction of the FDA warning letter(s) or statements of FDA personnel, it is expected that Merck will

attempt to argue and/or assert an "FDA-type" defense by which it may assert that it is not liable to the Plaintiff for strict liability product design because Vioxx was "FDA approved," nor for strict liability failure to warn where it may argue that it acted appropriately and did not know of an unreasonable increased risk for injury associated with Vioxx. In this context, FDA communications refuting such assertions is equally admissible. Plaintiff would be prejudiced significantly if he is precluded from introducing evidence which would contradict such testimony or argument by Merck.

## V. THE SPECIFIC DOCUMENTS MERCK SEEKS TO EXCLUDE ARE NOT INADMISSIBLE HEARSAY

Merck argues that the FDA's warning letters are inadmissible as hearsay and that this Court's ruling in *Plunkett* admitting the September 17, 2001 warning letter was in error. However, such documents are clearly admissible under Fed.R.Evid. 803(8)(B) which provides in relevant part that "public records, reports and findings" are not excluded as hearsay if they set forth: "matters observed pursuant to duty imposed by law as to which matters there was a duty to report." In *Figueroa v. Boston Scientific Corp.*, 2003 WL 21488012, at 3 (S.D.N.Y. 2003), the court was presented with the issue of whether a report or statement by the FDA which set forth health risks presented by the use of a medical device was admissible under the public records exception to hearsay rule. The *Figueroa* court held against the manufacturer defendant, concluding that the FDA report or statement was admissible where the same was created pursuant to duty imposed by law. Figueroa 2003 WL 21488012 at 3.

With respect to Merck's argument that the FDA warning letters or communications are not trustworthy, the several cases cited by Merck are inapposite wherein Plaintiff does not argue that the FDA communications are admissible under Fed.R.Evid. 803(8)(C), but rather the same are admissible under Fed.R.Evid. 803(8)(B). Merck has failed to meet its burden of showing that

14

the subject documents (or type of documents) are untrustworthy. *See United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997) (documents that fall under public records exception "are presumed trustworthy, placing 'the burden of establishing untrustworthiness on the opponent of the evidence'").

## VI. CONCLUSION

These FDA communications are relevant not only as general contextual evidence but for the jury's consideration of what Merck knew or should have known regarding cardiovascular risks, how it reacted to that knowledge, whether if warned properly of risks, and whether it conduct is a basis for liability, including punitive damages. Additionally, the evidence goes to Merck's state of mind, its corporate indifference to patient safety, its predisposition to seek profits even at the risk of patient health, and the necessity for punitive damages. The probative value of the evidence is clear and is not substantially outweighed by any prejudicial effect. Furthermore, the documents are not inadmissible hearsay. For these reasons, Defendant's motion should be denied.

Date: June 19, 2006

Respectfully submitted,

By _____
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,

15

METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 19th day of June, 2006.

*/s/ Mark P. Robinson, Jr.*

MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson