# Exhibit 5



29818243

Mar  1 2010
9:49PM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION** | **MDL No. 1657** |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, | JUDGE ELDON E. FALLON |
| Plaintiffs, | MAGISTRATE JUDGE KNOWLES |
| v. | Case No. 05-3700 |
| MERCK SHARP & DOHME CORP., | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO MOTION TO EXCLUDE TESTIMONY OF DAVID Y. GRAHAM, M.D.

## TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................ 1

II. LEGAL STANDARD .................................................................................... 2

III. DEFENDANT'S MOTION DOES NOT CHALLENGE THE BASIS
FOR DR. GRAHAM'S OPINIONS THAT VIOXX IS GASTROTOXIC. ......... 2

IV. DR. GRAHAM'S OPINIONS REGARDING THE VIGOR STUDY,
INCLUDING THE LACK OF A GI BENEFIT OF VIOXX FOR
PATIENTS THAT ARE NOT TAKING STEROIDS, ARE BASED ON
HIS OWN RELIABLE ANALYSIS. .................................................................. 4

   A.   Dr. Graham's Opinions Are Based On His Review Of Newly
        Available Data That Merck Failed To Publish. ............................... 5

   B.   Dr. Graham Reasonably Relied On A Biostatistician's
        Straightforward Statistical Test Using Unchallenged Data, And
        Such Reliance Is Permitted Under Rule 703. .................................. 7

   C.   Defendant Relies On Inapposite Cases. ......................................... 9

   D.   Merck Knew That The Issue Of Vioxx GI Benefit Limited To
        Steroid Users Could Be "Damaging," And Such Knowledge
        Continues To Drive The Defendant's Position On This Motion. ........... 12

V. DR. GRAHAM'S OPINIONS ARE BASED ON RELIABLE
METHODOLOGY AND SUPPORTED BY PEER REVIEWED
LITERATURE THAT THE DEFENSE MEMORANDUM FAILS TO
MENTION. ...................................................................................................... 16

VI. DR. GRAHAM'S OPINIONS ARE CONSISTENT WITH HIS PRIOR
WORK AND NOT LITIGATION DRIVEN. ..................................................... 17

VII. DR. GRAHAM'S OPINIONS ARE CONSISTENT WITH OPINIONS
OF THE MEDICAL COMMUNITY THAT MERCK'S
MEMORANDUM OMITS ............................................................................... 21

VIII. CONCLUSION ............................................................................................ 23

# TABLE OF AUTHORITIES

Page

## CASES

*Daubert v. Merrell Dow Pharmaceuticals,*
   43 F.3d 1311 (9th Cir. 1995) ................................................................ 19

*Daubert v. Merrell Dow Pharmaceuticals,*
   509 U.S. 579 (1993) .................................................................... 9, 21

*In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*
   524 F.Supp.2d 1166 (N.D. Cal. 2007) ........................................................ 11

*In re Imperial Credit Industries, Inc. Securities Litigation*
   252 F.Supp.2d 1005 (C.D. Cal. 2003) ........................................................ 11

*In re Rezulin Products Liab. Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................ 9

*In re Vioxx Products Liability Litigation,*
   401 F. Supp. 2d 565 (E.D. La. 2005) ................................................ 7, 8, 9, 23

*Kumho Tire Co. v. Carmichael,*
   119 S. Ct. 1167 (1999) ...................................................................... 22

*LeBlanc v. Chevron USA, Inc,*
   No. 05-5485, 2009 U.S. Dist. LEXIS 106339
   (E.D. La. Nov. 13, 2009) .................................................................... 11

*Osborn v. Anchor Laboratories, Inc.,*
   825 F.2d 980 (5th Cir. 1987) ................................................................ 22

*Peteet v. Dow Chemical Co.,*
   868 Fed.2d 1428 (5th Cir. 1989) ............................................................ 22

*Smith v. Borden, Inc.,*
   188 F.R.D. 257 (M.D. La. 1999) ............................................................ 22

*Vienne v. American Honda Motor Co.,*
   2001 U.S. Dist. LEXIS 1301 (E.D. La. Jan. 26, 2001) ........................................ 11

**TABLE OF AUTHORITIES**
(continued)

Page

**OTHER AUTHORITIES**

Bombardier *et al.*,
"Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis,"
*New England J. Med.* 2000 ....................................................................... 5, 10, 16

El-Serag, Graham, *et al.*,
"Prevention of Complicated Ulcer Disease Among Chronic Users of Nonsteroidal Anti-Inflammatory Drugs: The Use of a Nomogram in Cost Effectiveness Analysis,"
162 *Arch. Intern. Med.* (2002) ...................................................................... 18, 19

Graham & Chan,
"Is the Use of COX-2 Inhibitors in Gastroenterology Cost-Effective?,"
1 *Gastroenterology & Hepatology* (2004) ..................................................... 19, 20

Lu & Graham,
"New Development in the Mechanistic Understanding of Peptic Ulcer Disease,
3 *Drug Discovery Today* (2006) .................................................................... 20, 21

Reference Manual on Scientific Evidence,
Second 74 (2005) ........................................................................................ 18, 21, 22

**RULES**

Federal Rules of Evidence 703 ............................................................................ passim

860455.3

## I.    **INTRODUCTION**

David Graham, M.D., a Professor at Baylor College of Medicine (BCM), is a world

leader in the field of gastroenterology, with several decades of specific experience in the analysis

of the gastrointestinal (GI) effects of nonsteroidal anti-inflammatory drugs (NSAIDs), including

COX-2 inhibitors such as Vioxx.  Dr. Graham has written hundreds of articles and book chapters

on these topics.  (Curriculum Vitae of David Graham, M.D.; Declaration of Jennifer Gross ("JG

Decl."), Exh. 1.)  His work has been cited frequently in Merck's own clinical trial protocols, and

in the articles written by its employees and consultants.  Dr. Graham's authoritative report in this

case employed a methodology found to be reliable by this Court in previous rulings, by

reviewing the same clinical trial data that Merck's experts relied upon, as well as unpublished

Vioxx clinical trial data that Merck's experts did not review.

Unable to challenge Dr. Graham's credentials, or his inherently reliable methodology,

Merck resorts to impugning Dr. Graham's character, claiming without basis that his opinions are

litigation driven and contrary to his prior publications.  However, Dr. Graham has directed that

his entire fee for consulting in this matter will be donated to BCM for research that will benefit

patients; he will not profit personally to the slightest degree.  Dr. Graham's opinions are driven,

not by litigation or profit motive, but by discovery and data: in the course of his work on this

case, Dr. Graham has reviewed clinical trial results that Merck failed to publish, and which

Dr. Graham could not have known when his prior works were written.  Dr. Graham has testified

in this case that he had been "fooled" by Merck's failure to publish such data, and that he would

not have written the same things had he known of the data that had been suppressed.

As in Defendant's motion to exclude the testimony of Plaintiff's expert Neil Julie, M.D.,

there is a wide gulf between the opinions actually expressed by Dr. Graham, and those that

Defendant attempts to exclude by its motion.  Defendant seeks to exclude all of Dr. Graham's

opinions, despite the fact that Defendant's Memorandum in support of the motion addresses very

few of them.  As in the motion regarding Dr. Julie, Defendant incorrectly asserts that Dr.

Graham's opinion that Vioxx is gastrotoxic was based on another expert's analysis of the

VIGOR clinical trial, when in fact, Dr. Graham's opinion concerning the GI toxicity of Vioxx

was based on several clinical trials of Vioxx compared to placebo, which were unrelated to the

VIGOR trial of Vioxx compared to naproxen.  Regarding the VIGOR trial itself, Dr. Graham

reviewed all of the relevant analyses that Merck conducted, published or submitted to the FDA

and formed his own opinions thereon; his limited reliance upon a test of statistical significance

performed by a biostatistician was (a) necessitated by Merck's failure to carry out or publish that

analysis; and (b) permissible under Rule 703 and prior rulings of the Court in similar

circumstances.

Dr. Graham is exceptionally well-qualified and applied a reliable methodology to reach

relevant conclusions as to the GI toxicity of Vioxx.  Therefore, Defendant's motion should be

denied.

## II.  **LEGAL STANDARD**

Plaintiff incorporates by reference § II of the Memorandum in Opposition to Motion to

Exclude Testimony of John MacGregor, M.D.

## III.  **DEFENDANT'S MOTION DOES NOT CHALLENGE THE BASIS FOR DR. GRAHAM'S OPINIONS THAT VIOXX IS GASTROTOXIC.**

Dr. Graham's expert report of November 6, 2009 concludes that "rofecoxib is

gastrotoxic" and "significantly worse than placebo," and that is "difficult if not impossible to

differentiate from traditional NSAIDs in terms of clinically important upper GI events, especially

bleeding[.]"  (Report of David Y. Graham, M.D. ("Graham Report") ¶ 37; JG Decl., Exh. 2.)

This conclusion is drawn from Dr. Graham's analysis of numerous studies and peer-reviewed

860455.3

literature, set forth in detail in his report. (*See id.* ¶¶ 14–36.) Over the course of these

paragraphs, Dr. Graham makes reference to the statistically significant four-fold excess risk of

GI side effects of Vioxx compared to placebo in the APPROVe study and the Alzheimer's

Protocol 078 trial, as well as the excess of GI adverse experiences compared to placebo in the

pooled, pre-market osteoarthritis (OA) trials identified by Merck as "Protocol 069." Dr. Graham

also reports that for the most clinically relevant endpoint of complicated perforations, ulcers and

bleeds ("PUBs"), there was no significant difference between Vioxx and the comparator

NSAIDs in Protocol 069. (*Id.* ¶¶ 19-27.) Dr. Graham's opinion that Vioxx is gastrotoxic is not

based on the VIGOR study nor any information from any other expert, but on the specific

clinical trials he identified. Despite this fact, Merck seeks to exclude Dr. Graham's opinions

regarding Vioxx GI toxicity by erroneously arguing that such opinions were based on the

VIGOR trial and Dr. Jewell's statistical analysis. (Defendant's Memorandum of Law in Support

of its Motion to Exclude the Testimony of David Y. Graham, M.D. ("Def. Mem.") at 1.)

This argument fails because it is demonstrably incorrect.

Notably, Merck does not even mention the specific clinical trials that Dr. Graham

actually relied on to form his opinion that Vioxx is gastrotoxic (APPROVe, 078 and 069). Nor

does Merck mention or refute Dr. Graham's opinions concerning the results of these trials.

Therefore, Dr. Graham's opinion that Vioxx is gastrotoxic, based upon Defendant's own clinical

trials, is unchallenged and admissible.[1]

---

[1] Defendant's expert gastroenterologist, David Sales, M.D., had been unaware of some of the
Vioxx clinical trial data showing excess GI adverse events on Vioxx compared to placebo, and
did not challenge the validity of such data. (Deposition of David Sales, M.D. ("Sales Tr.")
82:8-96; JG Decl., Exh. 3.) Dr. Sales agreed that the APPROVe and Protocol 078 studies cited
by Dr. Graham do show statistically significant excess PUBs on Vioxx 25 mg compared to
placebo. In addition, Dr. Sales acknowledged that a third placebo controlled trial showed a 4 to
5-fold excess risk of PUBs on Vioxx [the VICTOR trial, erroneously referenced as "VIGOR" in

860455.3

**IV.  DR. GRAHAM'S OPINIONS REGARDING THE VIGOR STUDY, INCLUDING THE LACK OF A GI BENEFIT OF VIOXX FOR PATIENTS THAT ARE NOT TAKING STEROIDS, ARE BASED ON HIS OWN RELIABLE ANALYSIS.**

Defendant argues that Dr. Graham did not reach his own conclusions regarding the VIGOR trial and the issue of disproportionate benefit to steroid users.  However, Dr. Graham reached his opinions only after reviewing all of the relevant Merck documents concerning the VIGOR trial, including the VIGOR Study Protocol, the Data Analysis Plan, the published VIGOR article, correspondence between the authors and the journal regarding the steroid user benefit issue, the Clinical Study Report of several hundred pages that Merck filed with the FDA, and the Final Adjudication List that provided details concerning the type and severity of GI events among patients in each treatment group.  (JG Decl., Exhs. 4, 5, 6, 7, and 8, respectively.) These documents demonstrated that "steroid versus non-steroid user" was a pre-specified subgroup for analysis as to the primary endpoint; that the primary endpoint data showed a difference in the risk between the two subgroups; that the disproportionate benefit to steroid users was a significant issue to the peer reviewers, who sought more information on the subject; and that the authors never reported  a subgroup analysis by steroid use as to the  endpoint of "complicated" PUBs, which comprised  the most serious and clinically relevant GI events. (Graham Report ¶ 33.)  Thus, Dr. Graham performed all of the work necessary to an understanding of the steroid use issue, and he reviewed all of the relevant Merck documents.

Dr. Graham's reference to Dr. Jewell's biostatistical report of the statistically significant difference between the steroid and non-steroid users' risk of complicated PUBs is typical of the standard practice of gastroenterologists in the analysis of clinical trial data. For example, defense expert Dr. Sales testified that he has been involved in many clinical trials, but that he does not

---

the transcript at p. 94:20-24).

perform the statistical analyses of the resulting data; instead, he relies on statistical experts. (Sales Tr. 22:17–22:23.)

In summary, the challenge to Dr. Jewell's report, and to Dr. Graham's reference to it, are not substantive. The report itself is a straightforward statistical test that Dr. Graham is able to reasonably rely upon under Rule 703, and defendant has no legitimate basis to challenge such reliance.

### A. Dr. Graham's Opinions Are Based On His Review Of Newly Available Data That Merck Failed To Publish.

The VIGOR clinical trial resulted in an article published in *The New England Journal of Medicine* in November 2000 (Bombardier *et al.*, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," *New England J. Med.* 2000; 343:1520-28 ("Bombardier Article"); JG Decl., Exh. 6.) The study was designed to test whether Vioxx 50 mg. would be associated with a lower rate of GI adverse events than naproxen 1000 mg. per day in RA patients. The primary pre-specified endpoint was "confirmed perforations, ulcers and bleeds (PUBs)"; a secondary endpoint was defined as "confirmed complicated PUBs," a subset of the primary endpoint consisting of only the most serious GI events. (*Id.*) Fifty-six percent (56%) of the VIGOR patients took steroids, a well-established risk factor for NSAID-related GI side effects. The study plan called for a "subgroup analysis" of the primary endpoint according to whether subjects were steroid users or non-steroid users; the plan also provided that subgroup analyses could be done as to secondary endpoints, and Merck did conduct subgroup analyses of the "complicated" PUBs for 3 of the 6 pre-specified subgroups, but never published the complicated PUB data according to steroid use.[2] (VIGOR Data Analysis Plan at 21–22; Sales Tr. 77:14–78:22; JG Decl., Exhs. 5, 3.)

---

[2] Complicated PUBs were analyzed for the subgroups of age ( > 65 or < 65 years), prior history

Dr. Graham became familiar with the published VIGOR study in the normal course of his research in the field when it appeared in 2000, and his subsequent articles cited the VIGOR study as evidence that COX-2 inhibitors could reduce the incidence of serious GI events. As a leading authority in the field, whose work was in turn relied upon by other researchers, Dr. Graham testified in no uncertain terms about his displeasure upon learning in 2009 that Merck had failed to disclose data from the VIGOR study which showed that essentially all of the reduction in complicated GI bleeds occurred in the subgroup of steroid users:

> So therefore, when I got the data and read it, they fooled me; and they had, therefore, fooled everyone. . . . And, therefore, people were taking this drug that probably shouldn't have taken it. They had heart attacks. I mean, to me, this is a serious problem.

(Deposition of David Graham, M.D. ("Graham Tr.") 62:20-63:3; JG Decl., Exh. 9.)

> What should have happened when they finished VIGOR is that study of the drug should have died at that point. . . . [I]t's only going to be useful for people who have rheumatoid arthritis and take steroids. It didn't work otherwise.

(Graham Tr. 336:9-16.)

> [The] published outcome from the VIGOR trial . . . [is] misleading, in the fact that — if you just said, 'rofecoxib users,' because the largest group of users have no benefit or no significant benefit.

(Graham Tr. 323:8-324:10.)

In his report, Dr. Graham stated that he could think of no reason why the authors would not have explored and reported the lack of benefit for serious GI events in non-steroid users, "as it likely would have had a major effect on physician's decisions regarding who would ultimately be candidates for the drug. Having this data would certainly have influenced what was written about rofecoxib in clinical reviews that appeared after VIGOR was reported," and Dr. Graham

---

of a PUB, and study location. (Sales Tr. 54:2–21; JG Decl., Exh. 3.)

"would have included the data about effectiveness with and without steroid use" in his own 2004 article referring to the VIGOR study, had he known about these data. (Graham Report ¶ 34.)

**B.    Dr. Graham Reasonably Relied On A Biostatistician's Straightforward Statistical Test Using Unchallenged Data, And Such Reliance Is Permitted Under Rule 703.**

Dr. Graham relied upon the biostatistician report of Professor Jewell for the limited purpose of testing the statistical significance of the difference in relative risks between the steroid and non-steroid users in the VIGOR trial. (Graham Report ¶¶ 33-34; Report of Nicholas Jewell, Ph.D. ("Jewell Report"); JG Decl., Exh. 11.)  The statistical test itself is non-controversial and was not challenged by the defense gastroenterologist nor any other defense expert. Indeed, tests of treatment-by-subgroup interaction were performed by Merck and its consultants for numerous of the VIGOR endpoints and subgroups, and there is no plausible basis to challenge the conduct of such a test of steroid use versus non-use, a known and pre-specified risk factor for GI events, for the serious and most clinically relevant event category.

The statistical analysis of Merck's own VIGOR data shows that the incidence rate ratio for complicated events among steroid users was 3.85, compared to 1.12 among non-steroid users; the interaction p–value was statistically significant ($p=0.047$) as to the difference in those ratios. (Graham Report ¶ 34.)  Dr. Graham's reference to this statistical calculation is reasonable, permissible under Federal Rules of Evidence 703, and within the bounds of similar expert evidentiary rulings by the Court in prior Vioxx cases.

For example, in *In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565 (E.D. La. 2005), Merck moved to exclude testimony by plaintiffs' expert Wayne Ray on the issue of whether short-term of use of Vioxx increases cardiovascular risk.  Merck argued then that Professor Ray had reached his opinion by relying upon a biostatistician's reanalysis of Vioxx clinical trial data.  Just as it does in this case, Merck claims that the biostatistician's analysis was

unreliable because it was conducted for purposes of the litigation, had not been published, and had not been subject to peer review. 401 F. Supp. 2d at 584-585. The Court denied Merck's motion to exclude Professor Ray's opinion that short-term use of Vioxx can cause adverse cardiovascular effects, despite his reliance upon the biostatistician's analysis of clinical trial data. (*Id.* at 586.) Also, on July 6, 2006, in an unpublished decision, the Court permitted another plaintiff's expert in the *Barnett v. Merck* case to rely upon the report of a biostatistician (Dr. Jewell) under Rule 703. (July 6, 2006 Tr. 82:22-83:2; JG Decl., Exh. 12.) As in these prior circumstances, Dr. Graham's reliance upon the statistician's calculation of relative risks and statistical significance was reasonable and permissible.[3]

At his deposition on January 26, 2010, defense expert David Sales, M.D., confirmed Dr. Graham's view that there is no controversy as to the data or the accuracy of the statistical analysis. Dr. Sales testified that after receiving Dr. Graham's November 2009 report, he asked defense counsel about the number of complicated PUBs in the steroid versus non-steroid users in VIGOR; that defense counsel told him the figures used by Dr. Graham were accurate; that he conducted his own calculation that confirmed the accuracy of the incidence rate comparisons; and that he had no basis to challenge the validity of either the raw data or the statistical calculation. (Sales Tr. 38:7–41:24; JG Decl., Exh. 3.) These admissions support the conclusion that there is no true controversy over the statistical analysis.[4] As this Court has held, where both

---

[3] Even if the Court were to disallow reliance upon the statistical report, Dr. Graham would nevertheless be entitled to testify to the opinions that he reached independently on the basis of his own review of the data.

[4] Dr. Sales also testified that he became aware of Dr. Jewell's report after reading Plaintiff's expert reports of Drs. Graham and Julie (which cited the Jewell report) in November 2009, and that he asked defense counsel to get the statistical report for him, but that it was not provided to him until the week before his January 26, 2010 deposition. (Sales Tr. 47:17-49:24.) Despite the defense expert's request to Merck's counsel, Plaintiff's counsel received no request to provide the Jewell report at any time prior to its production as part of Dr. Julie's file at his deposition on

860455.3

sides' experts rely on the same clinical trials but reach different conclusions, the methods are reliable and the opinions are admissible under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *In re Vioxx Products Liability Litigation*, *supra*, 401 F. Supp. at 599.. *In re Vioxx Products Liability Litigation*, *supra*, 401 F. Supp. at 587 ("Although Merck may disagree with the conclusions reached in the Fitzgerald hypothesis and supporting literature, a disagreement does not amount to improper methodology or scientifically unreliable data").

Finally, Dr. Graham's right to rely on the report of a biostatistician for a statistical calculation is supported by the fact that the defense expert follows a similar practice. Dr. Sales acknowledged that although he has been involved in many pharmaceutical clinical trials, he, like Dr. Graham, does not perform his own statistical analyses of the data. (Sales Tr. 22:20-23; DCA Decl., Ex. 3.) This fact supports the conclusion that gastroenterologists typically rely on statisticians for such calculations, and that such reliance is reasonable.

## C.    Defendant Relies On Inapposite Cases.

Defendant cites cases that are factually distinguishable and not controlling on the issue of what constitutes reasonable reliance under Rule 703. For example, in *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004), the court would not permit reliance on an estimate of the risk of Rezulin-induced liver failure that was not based on clinical trial data, and that was contradicted by the expert's own prior estimate. (*Id.* at 562-63.) Here, in contrast, the report relied upon by Dr. Graham explicitly states that the event counts were taken from the "VIGOR data files provided by Merck," and the patient years of exposure were taken from

---

January 13, 2010. Nor did defense counsel ever ask to depose Dr. Jewell on this report. (Note that the deposition transcript pages cited above erroneously refer to the statistical report of "Dr. Julie" instead of "Dr. Jewell." From context, it is clear that the questions and the witness' answers referred to the later receipt of Dr. Jewell's report, since the witness had already testified that he had previously received the November 2009 report of Dr. Julie, which triggered his request to defense counsel for Dr. Jewell's statistical report.)

Merck's own Clinical Study Report for the VIGOR trial. (Jewell Report ¶ 1; JG Decl., Exh. 11.)
Defendant's own expert has admitted that defense counsel confirmed the accuracy of the
complicated PUB event data cited by Dr. Julie, specifically 27 naproxen versus 7 Vioxx in the
steroid user subgroup, and 10 naproxen versus 9 Vioxx in the non-steroid user group; that he
determined the patient years of exposure for the incidence rate calculation using the same table
that Dr. Jewell cited, from Merck's VIGOR Clinical Study Report; that his own calculations of
incidence rates yielded relative risks that appeared similar to those in Dr. Jewell's statistical
report and Dr. Julie's expert report, specifically, a relative risk of 3.85 for the steroid users
compared to a relative risk of 1.12 for the non-steroid users; that the p-value for interaction was
p=0.047, which is statistically significant; and that he had "no reason to challenge the validity of
the P value for interaction set forth in paragraph 34 of Dr. Julie's report." (Sales Tr. 35:4-37:6;
41:9-18; 43:17-20; 45:18-48:3; 48:13-16.)  Further, Dr. Sales testified that tests for interaction
were done in the trials he had worked on; that a test for interaction is done to determine whether
or not two populations are different as a result of a particular factor; and that investigators like to
know if a secondary factor may be influencing the data because "[i]t *may change their
conclusion.*"  (Sales Tr. 23:19-25:10, emphasis added.)

Defendant's emphasis on the *Rezulin* decision's reference to lack of publication or peer
review of the analysis as a factor in assessing the reliability of the consultant's report merely
serves to highlight the distinction between *Rezulin* and this case. Here, Merck was specifically
asked by the peer reviewers for further analysis of the comparative benefits of Vioxx among
steroid versus non-steroid users, and the peer reviewers explicitly questioned whether the benefit
of Vioxx was confined to steroid users.  (Bombardier/NEJM Correspondence, July 17, 2000;
Reicin Memo/NEJM Corr., August 24-August 29, 2000; JG Decl., Exh. 7.)   Merck had the data

and could easily have published it, but actively and repeatedly resisted providing further analysis that would have proved the reviewers' point: when the serious GI events were analyzed, only the steroid users had a significant benefit. (*See* Section D, *infra*.)

Other cases cited by Merck are also inapposite. The "study" at issue in *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.* was a letter from a managed care organization to the FDA. 524 F.Supp.2d 1166, 1179 (N.D. Cal. 2007). Unlike Dr. Jewell's analysis, "the letter [did] not identify study design, the analysis used, or even the confidence intervals." *Id.* Testimony based on the letter was excluded not because it was not peer-reviewed or published, but because an expert could not rely on the contents to opine on whether Celebrex at 200 mg. would cause a heart attack — the letter revealed a very low risk for all doses of Celebrex, and failed to control for smoking. Unlike the Jewell statistical calculation, the content of the study did not provide reliable information about the question at hand. *Id. In re Imperial Credit Industries, Inc. Securities Litigation* did not even involve testimony from an expert on the issue — again, lack of publication or peer review was not the reason the testimony was excluded. 252 F.Supp.2d 1005, 1012 (C.D. Cal. 2003) ("Plaintiffs failed to designate a residual valuation expert and failed to present a report by a residual valuation expert opining that SPFC's valuation of its residuals was inflated"). *LeBlanc v. Chevron USA, Inc.*, involved a report that "noted that hourly workers at the facility had a statistically significant higher number of deaths from myelofibrosis and myelodysplasia, but that the reason for the increase was unknown." No. 05-5485, 2009 U.S. Dist. LEXIS 106339, *9-10 (E.D. La. Nov. 13, 2009). Such a report is clearly not "reliable scientific evidence establishing a causal relationship between those diseases and benzene exposure" — it explicitly states that it does not do so. *Id.* Finally, in *Vienne v. American Honda Motor Co.*, the court excluded reference to the magazines *Car and Driver, Dirt*

*Bike*, and *Cycle* — magazines geared to the general public, not safety experts — but allowed the expert to rely on an article by the Consumer Product Safety Commission, because "the CPSC article is of a type reasonably relied on by experts." 2001 U.S. Dist. LEXIS 1301 (E.D. La. Jan. 26, 2001). None of these cases involve materials analogous to Dr. Jewell's report, and none further Merck's argument to preclude reliance upon a report which presents the source of the data and the methods of analysis, and is of the type that medical researchers generally rely on biostatisticians to provide.

### D.   Merck Knew That The Issue Of Vioxx GI Benefit Limited To Steroid Users Could Be "Damaging," And Such Knowledge Continues To Drive The Defendant's Position On This Motion.

Plaintiff's expert opinions show that in the VIGOR study, serious GI events were only reduced on Vioxx compared to naproxen among those who used steroids. Merck's current opposition to such testimony is an extension of the company's entrenched resistance to assertion of that same opinion by non-partisan peer reviewers of the VIGOR study in 2000. Plaintiff submits, and the Court may reasonably infer, that Merck's opposition now is for the same reasons as it was then. In the market context, steroid users constitute a very small percentage of the Vioxx user population, and sales of Vioxx would have been drastically reduced if the medical community had known that only RA patients on steroids had a reduction in serious GI events. Similarly, in the litigation context, Merck's failure to divulge the data supports Plaintiff's position that the State of Louisiana approved Vioxx for the PDL on the basis of representations that Vioxx was safer for the GI tract, without limitation as to appropriate patient population, even though the vast majority of users would not have been prescribed Vioxx had the steroid versus non-steroid user disparity in GI benefits been disclosed. Internal documents show that the company knew that a publication showing benefit only for steroid users would be "damaging," and the company conducted a failed, undisclosed alternative analysis to try to explain away the

disparity. This background shows that Merck's opposition to evidence of a "steroid users only" benefit is a long-held strategic and economically-motivated position, rather than a merit-based opposition to the substance of Plaintiff's experts' opinions about the VIGOR study.

In its initial submission of the VIGOR manuscript to the New England Journal of Medicine in May 2000, the Merck authors reported statistically significant reduced rates of both the primary "PUB" endpoint and the secondary "Complicated [serious] PUB" endpoint. The authors denied any difference based on steroid use: "Treatment-by-subgroup interaction was determined to assess whether the effect of rofecoxib as compared to naproxen was consistent in the subgroups. . . . Subgroup analyses revealed no significant treatment-by-subgroup interactions in the following subgroups: . . . corticosteroid use . . ." (Initial VIGOR Manuscript Submission; JG Decl., Exh. 13.) However, a figure provided with the draft showed that there was a disparity in the relative risks between the steroid users and non-steroid users, and that for the latter there was no statistically significant difference between Vioxx and naproxen for the primary GI event end point. (*Id.* at MRK–NJ0245593.) This disparity prompted peer review concerns as described below.

The journal's initial response to the submission of the manuscript included "Reviewer B's" comment that, "The steroid finding is worthy of comment, even if the interaction is not statistically significant (the power for interactions is low). *It may well be that the new agent has little benefit for those not treated with steroids.*" (July 17, 2000 letter; JG Decl., Exh. 7, *emphasis added*.) The Merck authors rejected that view, claiming instead that the "test for interaction . . . is the appropriate way to assess subgroup effects," and that, since the interaction test was not significant, the result for non-steroid users should be interpreted as "no different from any other subgroup . . . ." (LEH 0027399–400.) The authors did not inform the journal

that the test for interaction *was* statistically significant for the serious GI event end point; by the authors' own reasoning, that test was the appropriate way to assess the subgroup effect, and it showed that only steroid users had a lower risk on Vioxx compared to naproxen, for serious GI events.

Merck's response did not resolve the reviewers' concerns. A subsequent letter from the journal to the authors directed them to "acknowledge the points raised by Reviewer D. These are the possibility that *the benefit in the patient population you studied is mainly limited to the users of steroids* and that the use of a selective COX-2 inhibitor may be more important in this higher risk group." (Reicin Memo and attached correspondence, August 28, 2000, at MRK-ABC0024528; JG Decl., Exh. 7; *emphasis added*.) Thus, two separate reviewers expressed the same view that the benefit of Vioxx may be limited to steroid users. Merck continued to resist this conclusion and wrote back to the journal suggesting a new paragraph be inserted into the text, once again claiming that the difference between steroid and non-steroid users "was not significant in a test of treatment-by-subgroup interaction" (*id.* at MRK-ABC0024531-32), and once again failing to disclose that the interaction test *was* statistically significant for the serious GI event endpoint.

Internally, Merck showed great concern over the NEJM reviewers' persistent comments about the limited benefits to non-steroid users. On August 29, 2000, Alise Reicin wrote that "we received another letter from the NEJM — they are insisting that we say in the discussion that rofecoxib may not be beneficial in patients with RA not on steroids." (Emails from Reicin to Yu, *et al.*, August 29-September 1, 2000; JG Decl., Exh. 14.) The initial, pre-specified subgroup analysis that raised the reviewers' concerns had been calculated for the "baseline" condition of study subjects' steroid v. non-steroid use prior to the beginning of the study; Reicin asked the

statistician to conduct a "post hoc," alternative analysis of the "concomitant use data," that is, VIGOR patients who used steroids <u>during</u> the study: "if the concomitant use data looked different we may have more data to convince the NEJM." (*Id.*)

Over the course of the next two days, Dr. Reicin asked the statistician for multiple post hoc re-analyses in the hope of turning up something to change the reviewers' minds. Dr. Reicin wrote: "This is important because we are in the last stages of negotiation with the NEJM. *We are concerned that even if they accept our changes, that they will have the reviewer who keeps insisting that rofecoxib only provides benefit in steroid users write a **damaging editorial**. We are hopeful that this new analysis will provide further proof that he/she is misinterpreting the data.*" (*Id.* at 123323; emphasis added.)

Ultimately, the Merck statistician's analysis merely confirmed what the prior analysis had demonstrated. Among the patients who had "None or Concomitant Steriods [*sic*] Use Less Than 30 Days in Study," there was no statistically significant difference in the rate of PUBs on Vioxx compared to naproxen, and there was a substantial difference in the relative risk for steroid users as opposed to non-users. ("Table x. Confirmed PUBs. Analysis of Treatment by Concomitant Steriods [*sic*] Use 30 Days or More in Study (Revised); JG Decl., Exh. 15.) Thus, the alternative calculation did *not* provide proof that the reviewer had misinterpreted the data, and there is no evidence that Merck ever submitted it to the journal.

Throughout the peer review process, and to this day, Merck has never published or revealed that there was essentially no reduction of serious GI events in the VIGOR study for non-steroid users. The peer reviewers were deprived of the evidence that would have confirmed their views that only a limited population of steroid users benefited from Vioxx. The published article included the claim, "There was a *greater reduction* in the relative risk of events in the

subgroup of patients who were taking glucocorticoids a base line, *but the difference between the groups was not significant."* (Bombardier Article at 1526; JG Decl., Exh. 7.) The claim of a lack of significant difference was not true for the serious GI events, as to which a statistically significant difference has been shown. Thus, Plaintiff's expert opinions are reinforced by the concerns initially expressed by the independent peer reviewers, which Merck thwarted by failing to produce the serious event analysis and claiming a lack of significant difference for a different endpoint.

Plaintiff submits that the history of Merck's concern over "damaging" conclusions about the limited benefit shown by the VIGOR study is still in evidence today, and that the motive for Merck's opposition to Plaintiff's expert opinions is based on a continued need to avoid such "damage" rather than on the merits. As noted previously, Merck's own expert agreed to the accuracy of the data relied upon by Plaintiff's experts, and he did not challenge the validity of the statistical analysis. The Court may consider this history in evaluating the defendant's assertion of a long-held strategic position rather than one based strictly on the merits.

## V. DR. GRAHAM'S OPINIONS ARE BASED ON RELIABLE METHODOLOGY AND SUPPORTED BY PEER REVIEWED LITERATURE THAT THE DEFENSE MEMORANDUM FAILS TO MENTION.

Defendant argues that Dr. Graham's views about Vioxx GI toxicity are "in direct disagreement with the published views of other gastroenterology researchers and experts." (Def. Mem. at 3-4.) However, Dr. Graham's views are consistent with and supported by those of scientists and peer-reviewed authors that the defense memorandum omits. For example, Dr. Graham's rebuttal report cites the peer reviewed study by Castellsague (2009) which found that "current rofecoxib and naproxen users had the highest risk for upper GI complications with adjusted ORs of 3.6 (95% CI 2.2-5.7) and 3.4 (95% CI 1.8-6.7) respectively." (Rebuttal Report

860455.3

of David Graham, M.D. "Rebuttal Report") ¶ 2; JG Decl., Exh. 12.) Thus, peer-reviewed
literature reports Vioxx having GI toxicity similar to naproxen under real-world conditions.

Dr. Graham's rebuttal report also cites a total of six recent peer-reviewed studies,
including a study cited by defense experts, that all reported risks of GI events on Vioxx in the
same range as those of traditional NSAIDs. (Rebuttal Report ¶ 2.) In conjunction with the
clinical trial data that Merck failed to publish, these studies provide support for Dr. Graham's
opinion that the GI toxicity of Vioxx cannot be distinguished from the GI toxicity of traditional
NSAIDs. His review of both peer-reviewed studies and unpublished clinical trial data that
Merck suppressed constitutes a reliable methodology for his opinions.

## VI. DR. GRAHAM'S OPINIONS ARE CONSISTENT WITH HIS PRIOR WORK AND NOT LITIGATION DRIVEN.

Merck argues that Dr. Graham's opinions should be excluded because they are
"exclusively litigation driven." (Def. Mem. at 12.) This is an entirely spurious argument. Merck
contends that Dr. Graham changed his opinion, presumably for profit based on consulting fees.
However, Dr. Graham is taking no fee for his work on this case, but instead his fees are paid to
Baylor College of Medicine for research. (JG Decl., ¶ 18.) Thus, there is no evidence of any
motive other than setting the record straight, by a dedicated career professional who was
"fooled" by Merck's failure to provide the key data for a study upon which he had relied. Merck
is free to cross-examine as to Dr. Graham's motives, but that is all it is entitled to do. Merck is
not entitled to exclude relevant testimony from a highly qualified expert who applied the reliable
methodology endorsed by this Court and others.

Furthermore, none of Dr. Graham's opinions are inconsistent with his prior writing;
instead they are a natural outgrowth of his prior writings in the light of newly available data.
Merck argues that an article Dr. Graham co-authored in 2002 is "consistent with the VIGOR

study." El-Serag, Graham, *et al.*, "Prevention of Complicated Ulcer Disease Among Chronic Users of Nonsteroidal Anti-Inflammatory Drugs:  The Use of a Nomogram in Cost Effectiveness Analysis," 162 *Arch. Intern. Med.* 2105, 2107 (2002) ("*Prevention*") (JG Decl., Exh. 17.)  As explained above, Dr. Graham's opinion today is *not* that the VIGOR study does not show, overall, that the Vioxx arm of the VIGOR study had a lower rate of GI events than the naproxen arm of the study.  Rather, Dr. Graham's opinion is that the reduction in serious GI events observed in VIGOR is limited to the fifty-six percent (56%) of patients in the study that were also taking steroids.  This is not inconsistent — Dr. Graham did not "change his mind" as Merck alleges. (Def. Mem. at 3.)  Dr. Graham's opinion today is entirely consistent with his prior view, and also benefits from refinement based on information that was not available to him in 2002.  Scientific viewpoints *should* evolve as information becomes available.  *See generally* Reference Manual on Scientific Evidence, Second 74 (2005) ("*Reference Manual*").

The *Prevention* article does not analyze the VIGOR data, nor does is it purport to show whether Vioxx is more or less gastrotoxic than other NSAIDs.  Rather, the article presents a nomogram, a type of decision-tree analysis, that can be used to determine which methods of long-term pain treatment are cost-effective under varying conditions.  The article specifically states that the analysis assumes that the published data on gastrotoxicity are correct, and relies on that data:  "the decision tree uses specific predefined estimates based on our interpretation of published literature, users of the nomogram can enter whatever assumptions they wish based on their own interpretation of the literature." (*Prevention* at 2109.)  Thus, in light of new data showing that the VIGOR serious GI event benefit was confined to steroid users, both the input to the nomogram, and its output, would change.

860455.3

Merck's only authority cited in support of its effort to show a contradiction between Dr. Graham's current opinions and his past writings is that the court should consider, "whether the experts are proposing to testify about matters flowing naturally and directly out of research they have conducted independent of the litigation." Merck's reliance on that authority is misplaced, since  Dr. Graham's current opinion *does* flow out of his prior research.  (Def. Mem. at 12, quoting the Ninth Circuit's *Daubert* decision.  43 F.3d 1311, 1317 (9th Cir. 1995).  Unlike any of Merck's experts, *Dr. Graham actually wrote a peer-reviewed paper on the cost-benefit analysis of Cox-2 inhibitors*, gastroprotective agents, and traditional NSAIDs.  In that paper, he specifically noted that "the incremental cost associated with [Cox-2 inhibitors] was high (>\$35,000) in persons with a low risk of clinical UGI event with traditional NSAIDs (*e.g.*, 2.5% per year)." *Prevention* at 2105.  Even under the assumption that the literature at the time accurately assessed the risk of a GI event, without taking into consideration whether the patient took steroids, nowhere does *Prevention* state that Cox-2's were cost-effective for those at low risk of a GI event.  Of course, Dr. Graham did not know was that there was no benefit to Vioxx over traditional NSAIDs in the subgroup of people who do not take steroids.  He could not know this, because Merck failed to share this aspect of the VIGOR results with the public. Now that he has this information, he has refined his opinion to incorporate the fact that Vioxx's gastroprotective effect is limited to the high-risk group of steroid users, and this represents a natural outgrowth of his prior work.

In the introduction to its brief, Merck cites a 2004 editorial co-authored by Dr. Graham. (Def. Mem. at 4, *citing* Graham & Chan, "Is the Use of COX-2 Inhibitors in Gastroenterology Cost-Effective?," 1 *Gastroenterology & Hepatology* 60-61 (2004) ("*Editorial*") (JG Decl., Exh. 18.)  Merck does not refer to the *Editorial* in its argument, however, and understandably,

from Merck's point of view. The *Editorial* states many of the same opinions that Dr. Graham

states today, including that "clinical outcomes are the most important metric" and that "ulcers

seen at scheduled endoscopies . . . have, at best, a very weak correlation with actual

gastrointestinal events." (*Editorial* at 60, 61.) The *Editorial* also states:

> Cox-2 inhibitors have not lived up to the goal of absence of
> gastrointestinal complications. The lack of well-designed studies
> that take into account critical variables regarding gastrointestinal
> safety and uncertainties about their cardiovascular safety have
> precluded meaningful cost-effectiveness comparisons with
> alternative approaches. . . . large multicenter trials of coxibs
> traditional NSAIDs and co-therapies, in which the critical variables
> influencing outcome are individually examined, are needed[.]

(*Editorial* at 61. ) Thus, Dr. Graham's *Editorial* is not inconsistent with his current opinions.

Additionally, Dr. Graham specifically states that the above referenced article would have

included the safety disparity between steroid and non-steroid users had he known of the data that

Merck did not publish. (Graham Report ¶ 35.)

Finally, Merck refers to an article coauthored by Dr. Graham in 2006, in an attempt to

show that "as recently as 2006, Dr. Graham regarded Cox-2 inhibitors as a valid means of

reducing the frequency of peptic ulcer disease." (Def. Mem. at 12, *citing* Lu & Graham, "New

Development in the Mechanistic Understanding of Peptic Ulcer Disease, 3 *Drug Discovery*

*Today* 431-37 (2006) (*New Development*); JG Decl., Exh. 19.) The bulk of the article addresses

*heliobacter pylori* infection, a major risk factor for development of gastric ulcers. (*See New*

*Development* at 131-134.) In the much smaller section relating to NSAID-induced ulcers (*New*

*Development* at 434-435) , the only mention of Vioxx is that it had been withdrawn from the

market, and the only mention of Cox-2 inhibitors presents the results of a study comparing a

different Cox-2 inhibitor to a proton pump inhibitor (PPI) plus a non-selective NSAID in high-

860455.3

risk NSAID users with a prior GI bleed.  The study showed "neither strategy proved to be clinically useful with rebleeding[.]"  (*New Development* at 435. )

Thus, nothing in the *New Development* article is inconsistent with Dr. Graham's present opinion.  The article makes no statement about whether the beneficial effect of Vioxx in VIGOR was limited to the patients taking steroids, and could not have, because "as recently as 2006" Merck had still not revealed that fact to the public.  (Def. Mem. at 12.)

## VII.   DR. GRAHAM'S OPINIONS ARE CONSISTENT WITH OPINIONS OF THE MEDICAL COMMUNITY THAT MERCK'S MEMORANDUM OMITS.

Merck's argument that Dr. Graham's opinions should be excluded because they lack general acceptance in the medical community misstates the law regarding the admissibility of expert opinions.  *Daubert* and its progeny do not require general acceptance at all.  Indeed, *Daubert* specifically held that general acceptance is not required:

> Nothing in the text of [Rule 702] establishes "general acceptance" as an absolute prerequisite to admissibility. Nor does respondent present any clear indication that Rule 702 or the Rules as a whole were intended to incorporate a "general acceptance" standard. The drafting history makes no mention of *Frye*, and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." [Citation.] ·Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention " 'general acceptance,' "the assertion that the Rules somehow assimilated *Frye* is unconvincing.  *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony.  That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials.

*Daubert*, 509 U.S. at 588-589.  Under *Daubert*, whether an expert's *methods* are generally accepted is one factor that the court may consider.  *See Reference Manual* at 23.  ("This reference to 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' is not synonymous with *Frye*'s insistence on 'general acceptance' of 'the thing

- 21 -

from which the deduction is made . . . in the particular field in which it belongs'").[5] Dr.

Graham's methods — review of the literature and review of materials published and unpublished

by Merck — are not, and cannot, be impugned by Merck. *See Smith v. Borden, Inc.*, 188 F.R.D.

257, 262 (M.D. La. 1999) (as to "whether the expert's theories have general acceptance in the

scientific community — the defendant does not seriously dispute the scientific principles

underlying the three theories . . . Neither is there any indication that there is any "bad science" at

work").

     *Daubert* simply does not require that Dr. Graham's *conclusions* be generally accepted.

Quite the opposite. The Supreme Court recognized that general acceptance was not synonymous

with accuracy, and "wished to avoid the result sometimes reached under *Frye* when testimony

was admitted once experts pointed to a consensus in a narrow field they had themselves

established." *Reference Manual* at 26, *citing Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167,

1175 (1999). Yet that is exactly what Merck argues should happen here. The opinions that

Merck seeks to exclude — and specifically, the opinion that VIGOR did not show a reduction of

serious GI events except for patients who were taking steroids — is contrary to the "consensus"

that Merck itself created by suppressing the contrary data.

     Merck's effort to exclude Dr. Graham's testimony is not supported by its references to

review articles that merely regurgitate the data that Merck itself generated concerning the

VIGOR study, since the authors of those articles had no access to the underlying data, nor the

---

[5] Indeed, even under *Frye*, it was general acceptance of the *methods* that was required, not the
conclusions. *Peteet v. Dow Chemical Co.*, 868 Fed.2d 1428, 1433 (5th Cir. 1989) ("the absence
of a scientific consensus on a given theory does not affect the admissibility of an expert's
opinion"). "What [was] necessary is that the expert arrived at his at his [theory] by relying upon
*methods* that other experts in his field would reasonably rely on[.]" *Osborn v. Anchor
Laboratories, Inc.*, 825 F.2d 980, 915 (5th Cir. 1987); *Peteet*, 868 F.2d at 1433, *quoting Osborn*
(*emphasis in original*).

ability to analyze the number of GI events in VIGOR across steroid users and non-users. These publications do not actually conflict with Dr. Graham's opinion at all — he does not argue that overall, that there was no beneficial effect of Vioxx shown in the VIGOR study. However, even if Dr. Graham's opinions did conflict with these publications, it would not be grounds to exclude those opinions, because they do not conflict with his *methods*, and that is what *Daubert* considers.

The Court may also consider that numerous of the authors of the review articles cited by Defendant were themselves paid Merck consultants, and one such author, Frank Lanza, was even a testifying expert for Merck in the Vioxx litigation, adding weight to the conclusion that Merck itself created the "consensus" of Vioxx' generalized greater GI safety by publishing the data that supported that claim, while failing to publish contrary evidence and resisting peer reviewers' entreaties to provide it.[6]

## VIII.   CONCLUSION

Dr. Graham is an unquestionably qualified world leader in the analysis of GI toxicity associated with NSAIDs and COX-2 inhibitors. Dr. Graham applied a reliable methodology to conclude that Vioxx is gastrotoxic, and that its toxicity cannot be readily distinguished from traditional NSAIDs, by reviewing the same clinical trials of Vioxx versus placebo that Merck's experts reviewed, and by delving further into data from the same trials that Merck failed to

---

[6] For example, Frank Lanza, the lead author of a review cited by Defendant, was a testifying expert for Merck; *see In re Vioxx Litigation*, *supra*, 401 F.Supp. at 579); Byron Cryer, the co-author of another such review, was considered by Merck to be a "thought leader" for Vioxx who was cultivated by the Merck Regional Medical Director and paid by Merck to give presentations about Vioxx. Dr. Cryer was listed as a "preferred External Speaker" in Merck's Scientific Communication Plan of March 2001. The purpose of the Plan was to "ensure competitive victories over Coxib competitors and non-selective NSAIDs," and to "[e]xpedite and expand Merck's position on the GI safety, cardiovascular effects and renal effects of VIOXX to key audiences . . . ." (Scientific Communications Plan, 3-27-01, MRK-ABO0000257, 263; JG Decl., Exh. 21.) (Kaiser Tr. 140:7–141:25; JG Decl., Exh. 20.)

publish.  Dr. Graham's opinions concerning the VIGOR trial are based on his own review of all Merck's relevant documents and data, supplemented only by reasonable reliance on an unchallenged statistical calculation of data that Merck failed to publish.  Such reliance is consistent with standard practice in the field, including the practice followed by the defense expert.  Dr. Graham has no financial motive, and his opinions represent the natural outgrowth of the review of newly available data in light of the expertise and knowledge he has amassed during several decades of experience.  His opinions are relevant, based on reliable methodology, and admissible.  Therefore, Defendant's motion should be denied.

Respectfully submitted, this 1st day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

860455.3

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Plaintiffs' Memorandum In Opposition To Motion To Exclude Testimony Of David Y. Graham, M.D has this day been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to pretrial order No. 8B, on this the 1st day of March, 2010.

/s/ James R. Dugan

860455.3