# Exhibit 8

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  VIOXX,                  )
                                     )
 5   Products liability litigation,  )
                                     )
 6   This Document Relates To:       )
                                     )
 7   STATE OF LOUISIANA,             )
                                     )
 8              Plaintiff,           )
                                     )
 9   vs.                             )  Case No. 053700
                                     )
10   MERCK SHARP,                    )
                                     )
11              Defendants.          )
     _____)
12

13

14             THE VIDEOTAPED DEPOSITION OF LOREN

15   LAINE, M.D., was taken on behalf of the Plaintiffs

16   at 9:14 a.m. on Tuesday, February 2, 2010, at

17   251 S. Olive Street, Flower Room, Los Angeles,

18   California, before SERENA WONG, CSR 10250,

19   Certified Shorthand Reporter for the State of

20   California.

21

22

23

24

25

                              2
```

```
11:27   1        Q    Now, do you recall which of those
        2   subgroup analyses were done on the secondary end
        3   point of confirmed complicated PUBs?
11:27   4             MR. ISMAIL:  Objection.  Form.
11:27   5             THE WITNESS:  None of them, I believe,
        6   were done initially on that.  In a subsequent
        7   publication for descriptive purposes, I believe we
        8   did it for age and prior event.
11:28   9             (The document referred to was marked for
       10        identification by the court reporter as
       11        Plaintiff's Exhibit 22 and attached hereto.)
11:28  12        Q    BY MR. ARBITBLIT:  Doctor, 22 is the
       13   Clinical Study Report for the VIGOR trial.
11:28  14             Have you seen this before?
11:28  15        A    I'm sure I've seen a clinical study
       16   report before.
11:28  17        Q    Did you participate in its preparation
       18   in any way?
11:28  19        A    Normally I wouldn't probably have done
       20   it.  It's possible I could have reviewed it.  But
       21   normally, it wouldn't be something that I would be
       22   involved in producing.
11:29  23        Q    Do you see that the Clinical Study
       24   Report at page ending in 742 analyzed the
       25   secondary end point of confirmed complicated PUBs
```

96

```
 1  by study region interaction?
 2       A    I see that.
 3       Q    And was that a prespecified subgroup
 4  applied to the secondary end point?
 5            MR. ISMAIL:  Objection.  Form.
 6            MR. MISHKIN:  Objection.
 7            THE WITNESS:  To my knowledge, this was
 8  not a prespecified analysis, so it would have been
 9  a post hoc analysis, as far as I understand it.
10       Q    BY MR. ARBITBLIT:  Do you have the Data
11  Analysis Plan handy?  What did we mark that as?
12  It's Exhibit 14, correct?
13       A    I have it now.
14       Q    And can you look at the page ending in
15  543 in the lower right corner of the list of
16  subgroup analyses, interactions, and associations
17  with the primary end point?
18       A    I see it.
19       Q    Is study region U.S. versus non-U.S. a
20  prespecified subgroup for analysis for the primary
21  end point?
22       A    Only for the primary end point, yes.
23       Q    And was the study region subgroup
24  interaction test applied to the confirmed
25  complicated PUB secondary end point?
```

97

| | | |
|---|---|---|
| 11:31 1 | A | Right. That's what I said. It makes |
| 2 | | it a post hoc analysis. |
| 11:31 3 | Q | Doctor, in the VIGOR article, did you, |
| 4 | | yourself, conduct a post hoc analysis of a |
| 5 | | nonprespecified subgroup that you identified as |
| 6 | | the very low risk patients? |
| 11:31 7 | | MR. ISMAIL: Objection. Form. |
| 11:31 8 | | THE WITNESS: There were post hoc |
| 9 | | analysis such as that in here, yes. |
| 11:31 10 | Q | BY MR. ARBITBLIT: And that was |
| 11 | | something that you agreed to do? |
| 11:31 12 | A | I didn't do the analysis, and I think |
| 13 | | it was somebody else's idea, I believe. But yes, |
| 14 | | I agreed with its insertion. |
| 11:31 15 | Q | So in the response to the New England |
| 16 | | Journal reviewers, did you also agree to a post |
| 17 | | hoc analysis of interaction according to high dose |
| 18 | | GI co-medication? |
| 11:32 19 | | MR. ISMAIL: Objection to form. |
| 11:32 20 | | THE WITNESS: I don't remember that. |
| 21 | | You have to show me that, please. |
| 11:32 22 | Q | BY MR. ARBITBLIT: All right. Please |
| 23 | | take a look at Exhibit 9. |
| 11:32 24 | A | Okay. |
| 11:32 25 | Q | Do you see at the page ending in 7402, |

98

LOREN LAINE, M.D.

BARKLEY
Court Reporters

```
 1        "Analysis of Treatment by Baseline High-Dose GI
 2    Co-Medication Use Interactions, All Patients
 3    Randomized"?
 4        A    I see that, yes.
 5        Q    If you look at the Data Analysis Plan,
 6    that is not a prespecified subgroup analysis, is
 7    it?
 8        A    I believe you're correct, yes.
 9        Q    So that one was post hoc also?
10        A    It was done at the request of the
11    reviewer, certainly.
12        Q    Did the reviewer specifically ask you
13    to do an interaction test, sir?
14             MR. ISMAIL:  Objection to form.
15             THE WITNESS:  I might have to review
16    it, but obviously the feeling was in order to
17    address the reviewer's request, this would be
18    useful.
19        Q    BY MR. ARBITBLIT:  Did you also do a
20    nonprespecified subgroup analysis of the
21    interaction with H. Pylori?
22        A    H. Pylori actually was specified in the
23    Data Analysis Plan at the time in terms of
24    clinical events.
25        Q    Where do you see that, sir?
```

```
11:34   1        A    What page were you just on?
11:34   2        Q    In the Data Analysis Plan, we were at
        3   the page ending in 543, which lists prior history
        4   of PUBs, study region, age group, ethnic group,
        5   gender, and use of systemic corticosteroids at
        6   baseline.
11:34   7        A    Further down it says, "Also, subsequent
        8   in his reporting and filing, will investigate" et
        9   cetera, et cetera, "as well as h. Pylori status
       10   at the time of an event."  So at least H. Pylori
       11   is mentioned there related to the events anyway.
11:34  12        Q    And "Subsequent to the initial report
       13   and filing, we will investigate," does that refer
       14   to a -- would you call that prespecified?
11:35  15        A    It's prespecified.  It's not, you know,
       16   the primary, but there is a mention of H. Pylori
       17   here, so --
11:35  18        Q    Just above that, there's a statement in
       19   the preceding paragraph that says, "Subgroup
       20   analyses may also be performed for more numerous
       21   of the secondary end points, i.e. confirmed plus
       22   unconfirmed PUBs."
11:35  23             Would you call that prespecified also?
11:35  24             MR. ISMAIL:  Objection.  Form.
11:35  25             THE WITNESS:  It does actually mention
```

100

LOREN LAINE, M.D.

**BARKLEY**
Court Reporters

```
                 1   it, so it says that for the confirmed plus

                 2   unconfirmed PUBs, yes, it may be done.  So it's

                 3   probably prespecified in a questionable way.

         11:35   4        Q    BY MR. ARBITBLIT:  And before that, it

                 5   actually refers to more numerous of the secondary

                 6   end points, not just a specific --

         11:35   7        A    But it also says i.e., so if it had

                 8   said e.g., you know, I agree.  But it says i.e.,

                 9   which to me means just confirmed plus unconfirmed.

         11:35  10        Q    But numerous doesn't mean one, does it?

         11:35  11             MR. ISMAIL:  Objection.  Form.

         11:35  12             THE WITNESS:  I'm not sure what it

                13   meant, but it says i.e., and that's -- there are

                14   more numerous end points, so I'm not sure what was

                15   meant.

         11:36  16        Q    BY MR. ARBITBLIT:  Is it correct that

                17   confirmed complicated PUBs were a prespecified

                18   secondary end point of the VIGOR study?

         11:36  19        A    Absolutely.

         11:36  20        Q    Is it correct that the confirmed

                21   complicated PUBs are the most important

                22   clinically?

         11:36  23             MR. MISHKIN:  Objection.

         11:36  24             MR. ISMAIL:  Objection.  Form.

         11:36  25             THE WITNESS:  I wouldn't -- that's such
```

101

LOREN LAINE, M.D.

BARKLEY
Court Reporters

```
 1    factor, even though we knew it wouldn't be that
 2    meaningful because of the small number.  And that
 3    was the age and the prior event.
 4              (The document referred to was marked for
 5         identification by the court reporter as
 6         Plaintiff's Exhibit 23 and attached hereto.)
 7         Q    BY MR. ARBITBLIT:  23 is an excerpt
 8    from your materials starting with 01295, and it's
 9    a couple of e-mails from July 2002 and June 2002.
10                   And you've seen these before?
11         A    I believe so, since I produced them, I
12    believe, yes.
13         Q    And on June 28, 2002, did you write an
14    e-mail to Bombardier, Davis, Hawkey, Shapiro,
15    Brett, and Reicin that in paragraph 1 said, "The
16    three most clinically relevant baseline risk
17    factors are age, prior events, and steroids"?
18         A    I did.
19         Q    And this was in the context of
20    preparing a paper about the effect of risk factors
21    on the events in the VIGOR trial; correct?
22         A    It was specifically in the context
23    within this paper of adding a bunch of factors
24    together so that people could say if somebody had
25    one, two, or three factors, would there be
```

103

LOREN LAINE, M.D.

BARKLEY
Court Reporters

|  |  |  |
|---|---|---|
|  | 1 | additive.  So that was the issue that this refers |
|  | 2 | to. |
| 11:39 | 3 | Q    Did you hear any discussion from anyone |
|  | 4 | during the time period June 30, 2000 when the |
|  | 5 | reviewer comments came in and the time that the |
|  | 6 | paper was accepted, about the possibility of doing |
|  | 7 | the steroid versus nonsteroid user at baseline |
|  | 8 | test on the secondary end point of confirmed |
|  | 9 | complicated events? |
| 11:40 | 10 | A    And you're talking about the original |
|  | 11 | VIGOR paper now, not the risk factor paper? |
| 11:40 | 12 | Q    That's correct. |
| 11:40 | 13 | A    Okay.  I don't remember it being |
|  | 14 | brought up. |
| 11:41 | 15 | Q    Going back to the Clinical Study |
|  | 16 | Report, Doctor, the page ending in 569 -- |
| 11:42 | 17 | A    Can I just make sure this is Exhibit |
|  | 18 | 22? |
| 11:42 | 19 | Q    Yes. |
| 11:42 | 20 | A    Go ahead. |
| 11:42 | 21 | Q    Please take a look at the page ending |
|  | 22 | in 569.  And Table 25 shows analysis of the |
|  | 23 | secondary end point of confirmed complicated PUBs; |
|  | 24 | correct? |
| 11:42 | 25 | A    It does. |

11:42  1      Q     At the bottom of the table, do you see
     2 that there is a result given for treatment by PUB
     3 history for this secondary confirmed complicated
     4 PUBs end point?
11:42  5      A     I do.
11:42  6      Q     And that was another example of the
     7 application of the interaction test of a
     8 prespecified subgroup to the secondary end point,
     9 isn't it?
11:43 10      A     I'm not sure I would agree with you,
    11 because I assume this was done because PUB history
    12 was a stratification -- was a single
    13 stratification factor in VIGOR.  So I would assume
    14 it was being done for that reason, not like the
    15 other separate analysis we've been talking about.
11:43 16      Q     Prior history of PUBS is listed as a
    17 specific subgroup analysis in the Data Analysis
    18 Plan; right?
11:43 19      A     Yes.  But that's not what I was just
    20 talking about.
11:43 21      Q     Did you do this test?
11:43 22      A     No, obviously I didn't do this test.
11:43 23            MR. ISMAIL:  Objection to form.
11:43 24      Q     BY MR. ARBITBLIT:  And So you don't
    25 know why they did it?

105

11:43  1                MR. ISMAIL:  Objection to form.
11:43  2                THE WITNESS:  I feel that it was quite
       3   likely that that was the reason.  I would feel,
       4   based on my knowledge of clinical studies, that
       5   that would be the reason, yes.  It would be quite
       6   clear to me, but that's my conclusion.
11:44  7        Q    BY MR. ARBITBLIT:  In your article on
       8   risk factors, you analyzed the prespecified
       9   subgroups of age, less than or greater than 65,
      10   and history of PUBs on the secondary end point of
      11   confirmed complicated PUBs; correct?
11:44 12        A    We did do that post hoc analysis, as I
      13   said, for descriptive purposes, yes.
11:44 14        Q    And there's nothing that prevented you
      15   from doing the same analysis on the steroid versus
      16   nonsteroid end plan, was there?
11:44 17                MR. ISMAIL:  Objection.  Leading.
11:44 18                MR. MISHKIN:  Objection.
11:44 19                THE WITNESS:  You're right.  We could
      20   have done it on a number of different end points.
      21   We chose the two most important based on that
      22   study, which were age and prior history, which
      23   were far more important risk factors based on the
      24   risk ratio.
11:44 25        Q    BY MR. ARBITBLIT:  For the overall

                               106

                        LOREN LAINE, M.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 12:06 | 1 | (Brief recess.) |
| 12:06 | 2 | THE VIDEOGRAPHER: We are back on the |
| | 3 | record. The time is 12:06 p.m. |
| 12:06 | 4 | (The document referred to was marked for |
| | 5 | identification by the court reporter as |
| | 6 | Plaintiff's Exhibit 25 and attached hereto.) |
| 12:06 | 7 | Q BY MR. ARBITBLIT: Doctor, Exhibit 25 |
| | 8 | is a table presenting data on confirmed |
| | 9 | complicated PUBs. Is this the type of table that |
| | 10 | people at Merck provided for you in response to |
| | 11 | your requests? |
| 12:06 | 12 | MR. ISMAIL: Objection. Lack of |
| | 13 | foundation, form. |
| 12:06 | 14 | THE WITNESS: It is similar, yes. |
| 12:07 | 15 | Q BY MR. ARBITBLIT: And do you see that |
| | 16 | the no baseline steroid use for confirmed |
| | 17 | complicated PUBs is nine on Vioxx and ten on |
| | 18 | Naproxen? |
| 12:07 | 19 | A I'm sorry. The -- please say that |
| | 20 | again. |
| 12:07 | 21 | Q Looking at the no baseline steroid use |
| | 22 | for confirmed complicated PUBs, do you see that |
| | 23 | there were nine patients with events on Rofecoxib |
| | 24 | and ten on Naproxen? |
| 12:07 | 25 | A Yes. |

120

LOREN LAINE, M.D.

```
12:07   1                MR. ISMAIL:  One second.  Is this a
        2    table that you created?
12:07   3                MR. ARBITBLIT:  I can talk to you about
        4    it off the record if you like.
12:07   5         Q      Baseline steroid use, do you see that
        6    it's seven events versus 27?
12:07   7                MR. ISMAIL:  Objection.  Lack of
        8    foundation.  There's no foundation set for where
        9    this document or this page came from, who created
       10    it, the accuracy of the data.
12:07  11                THE WITNESS:  I see that's what's
       12    written here, yes.
12:07  13         Q      BY MR. ARBITBLIT:  Doctor, I'll
       14    represent to you that these figures were presented
       15    to Merck's expert, Dr. Sales, at his deposition.
       16    And he said that he had no basis to dispute them.
       17    And I take you it have no basis to dispute them?
       18                MR. MISHKIN:  Objection.
12:08  19                MR. ISMAIL:  Objection.  Move to
       20    strike.
12:08  21                THE WITNESS:  I don't know Dr. Sales,
       22    and I wouldn't say anything about these one way or
       23    the other.  I can look at the numbers.
12:08  24                MR. ISMAIL:  I think the transcript of
       25    Dr. Sales will speak for itself.  I don't think
```

121

LOREN LAINE, M.D.

BARKLEY
Court Reporters

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       |  1 | this one came up in his deposition.                          |
| 12:08 |  2 | MR. ARBITBLIT:  I didn't say the                             |
|       |  3 | document, Counsel.  I said the numbers.                      |
| 12:08 |  4 | MR. ISMAIL:  We object to the Exhibit,                       |
|       |  5 | if it was created by counsel rather than something           |
|       |  6 | that came from one of the parties to the                     |
|       |  7 | litigation.  Go ahead.  It would be up to the                |
|       |  8 | judge to decide.                                             |
| 12:08 |  9 | Q    BY MR. ARBITBLIT:  Doctor, my question                  |
|       | 10 | is if you had asked Merck to prepare a table                 |
|       | 11 | showing the data for confirmed complicated PUBs              |
|       | 12 | analyzed by treatment by baseline steroid use                |
|       | 13 | interaction, and it had showed a p-value for                 |
|       | 14 | interaction of 0.048, would you have been bound to           |
|       | 15 | report it?                                                   |
| 12:09 | 16 | MR. MISHKIN:  Objection.                                     |
| 12:09 | 17 | MR. ISMAIL:  Objection.  Hypothetical,                       |
|       | 18 | lack of foundation.                                          |
| 12:09 | 19 | THE WITNESS:  If I had asked for this                        |
|       | 20 | and this was indeed what I had gotten back, I                |
|       | 21 | would have reported it.  It would have been -- it            |
|       | 22 | was really not functionally that different than              |
|       | 23 | what I did report for the overall, which was .043            |
|       | 24 | with both treatment effects in the same direction.           |
|       | 25 | So I don't see a major difference in the sense the           |

```
 1    p-value is similar.  There's a difference in the
 2    relative risk, but they're both in the same
 3    direction.  So there's no reason why I wouldn't --
 4    if I reported that one, I wouldn't have reported
 5    this one.
 6              (The document referred to was marked for
 7         identification by the court reporter as
 8         Plaintiff's Exhibit 26 and attached hereto.)
 9         Q    BY MR. ARBITBLIT:  Exhibit 26 is
10    another excerpt from your materials.  I see that
11    the page numbers were cut off at the bottom of my
12    version.  I don't know if yours has page numbers
13    or not.
14         A    The top has page 1 of 7, though, things
15    like that.
16         Q    Let's make sure we're okay.  Page 1 of
17    7, I don't have the Bates pages because they were
18    cut off, but it is a seven-page document with the
19    first page having a December 5, 2001 e-mail from
20    Qinfen Yu at Merck to Laurine Connors at Merck
21    with copies to -- it's also to you with copies to
22    Shapiro and Reicin; is that right?
23         A    Correct.
24         Q    And going to the back of the document,
25    does this have tables showing the analysis of new
```

123