# EXHIBIT 8

David Hood

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
      In re:  VIOXX                §   MDL No. 1657
 3    Products Liability           §
      Litigation                   §   SECTION L
 4    _____  §
                                   §
 5    STATE OF LOUISIANA,          §
      ex rel. JAMES D. CALDWELL,   §   JUDGE ELDON E.
 6    JR., Attorney General,       §   FALLON
                                   §
 7         Plaintiff,              §
                                   §
 8    v.                           §   MAGISTRATE
                                   §   JUDGE KNOWLES
 9    MERCK SHARP & DOHME CORP.,   §
                                   §
10         Defendant.              §   Case No. 05-3700
                                   §
11                                 §
12
13              MONDAY, FEBRUARY 8, 2010
14                      - - -
15       Videotaped deposition of DAVID HOOD,
16    held at the Louisiana Department of Health &
17    Hospitals, 628 N. 4th Street, Suite 617,
18    Baton Rouge, Louisiana 70802, Houston, Texas
19    commencing at 1:14 p.m., on the above date,
20    before Kari Jacob-Behan, Certified Court
21    Reporter for the State of Louisiana.
22                      - - -
23            GOLKOW TECHNOLOGIES, INC.
                    877.370.3377
24              deps@golkow.com
```

```
 1        Q.     On what basis do you
 2   believe that the DUR Program limited which
 3   drugs would be reimbursed by DHH or the State
 4   under Medicaid?
 5        A.     When there were instances of
 6   misuse of drugs, fraudulent use of drugs and
 7   so forth, the DUR Program could step in and
 8   make a decision not to reimburse.
 9        Q.     I understand what you're
10   saying.
11               But that -- the activities of
12   the DUR Program during your tenure as
13   secretary of DHH was to monitor and limit
14   abusive prescribing practices, correct?
15               MR. MURRAY:  Object to the form
16          of the question; mischaracterizes
17          former testimony, also lack of
18          foundation.
19               MR. ISMAIL:  You can answer.
20               THE WITNESS:  Again, I wasn't,
21          you know, involved in a detailed way
22          with DUR, so, you know,
23          there may have been examples
24          that I'm not aware of where they
```

1              had refused to reimburse for
2              certain drugs.
3     BY MR. ISMAIL:
4          Q.     Earlier I was asking whether
5     during the period of the open-formulary
6     system in Louisiana did the State have any
7     mechanism to exclude certain drugs from
8     reimbursement from Medicaid, and you
9     indicated that perhaps the DUR Program would
10    have some applicability in that scenario?
11         A.     Yes.
12         Q.     To your knowledge, during your
13    tenure as secretary of DHH, did the DUR
14    Program ever prospectively limit what drugs
15    would be reimbursed within Medicaid?
16         A.     I don't know.
17         Q.     And when you described
18    scenarios in which DUR did get involved, DUR
19    was looking retrospectively for scenarios in
20    which either the patient or the physician was
21    either writing too many prescriptions within
22    a class or writing multiple prescriptions to
23    the same patient, that kind of thing?
24                MR. MURRAY:  Object to the form

1          "involved in the legislation."
2                    MR. ISMAIL:  You can answer.
3                    THE WITNESS:  Yes.  I certainly
4          was, you know, aware of what
5          we were doing at the legislature.  And
6          to that extent, I was involved in
7          that activity.
8     BY MR. ISMAIL:
9          Q.     What's your recollection as to
10    the reasoning behind the change in
11    legislation?
12         A.     For one thing, drug --
13                   MR. MURRAY:  Object to the form
14         of the question to the extent it calls
15         for speculation as to what other
16         people may have reasoned or intended.
17                   You may answer.
18                   THE WITNESS:  As far as
19         what was going on at that
20         particular moment in time, drug costs
21         were rising rapidly, and I think
22         that the -- you know, the absence of
23         a preferred drug list probably
24         accelerated that.  We were looking for

1         a -- you know, a better way which
2         would measure cost effectiveness.
3    BY MR. ISMAIL:
4         Q.    Did DHH bring the idea of a
5    legislative change to the state legislators,
6    or was that a concept that originated within
7    the legislature itself?
8         A.    I think it originated
9    discussions between the Louisiana
10   State Medical Society and DHH.
11        Q.    What was your personal
12   involvement in the effort to change the
13   legislation to switch from an open-formulary
14   to a preferred drug list?
15        A.    Well, I would do what I would
16   typically do for any piece of
17   legislation affecting a department, and that
18   is that I would be ready to testify if
19   asked.  So if it was a topic that came before
20   a committee, they would probably ask me what
21   my opinion was.
22        Q.    Do you recall doing that for
23   the legislation that changed the Medicaid
24   program from open formulary to preferred drug

David Hood
Page 69

1    Q.    What does the -- focusing on
2    the last part of that, what I just read, what
3    did you mean by commenting that the Committee
4    should consider not just the cost of the
5    drugs themselves, but the cost of avoiding
6    illness or hospitalization?
7         MR. MURRAY:  Object to the form
8         of the question.  Witness didn't write
9         that sentence.
10        THE WITNESS:  Well, you know, I
11        think the cost of the drugs does not
12        determine whether your drugs are going
13        to be effective as far as avoiding
14        illness or a hospitalization
15        admission.
16   BY MR. ISMAIL:
17   Q.    Was it, in your view, part of
18   the responsibility of the P&T Committee to
19   consider not just the cost of the drugs
20   themselves, but the cost of avoiding
21   illnesses and hospitalizations?
22   A.    Well, in my view, it was
23   safety of the drugs.  The
24   effectiveness of the drugs, the

```
 1    cost-effectiveness, I think those
 2    were the primary criteria that they
 3    would deal with.
 4         Q.    Now, from the State's
 5    perspective, one of the objectives of the
 6    preferred drug list was to lower costs,
 7    correct?
 8              MR. MURRAY:  Object to the form
 9         of the question.
10              THE WITNESS:  Well, it
11         certainly wasn't the only
12         thing.  That was a very important part
13         of it.
14    BY MR. ISMAIL:
15         Q.    And the -- from the State's
16    perspective -- withdrawn.
17              Do -- if you look at this
18    phrase that's used in these minutes that
19    says:  The Committee should determine the
20    effectiveness of drugs based on medical
21    evidence, does that description mean anything
22    to you?
23         A.    Well, evidence-based medicine
24    means that you would take into account any --
```

1  review where Provider Synergies discusses the
2  promotional and marketing information that's
3  disseminated about the drugs?
4      A.    No, I'm not familiar with that.
5            MR. MURRAY:  Object to the form
6      of the question.
7  BY MR. ISMAIL:
8      Q.    Do you see instead that
9  Provider Synergies discusses the published
10 medical literature about the pharmacology
11 indications and clinical trials of the
12 medicines?
13     A.    I see that.
14     Q.    Is that consistent with your
15 understanding of the evidence-based medicine
16 that the P&T Committee was supposed to be
17 using to make their decisions?
18     A.    Well, I can't speak
19 for all the members of the P&T Committee, but
20 I think that that's -- that would be one
21 thing we were looking for.
22     Q.    If you turn to page 6, do you
23 see that Provider Synergies includes in its
24 written review of the COX-2 class, a section

```
 1    that's entitled Cardiovascular Concerns?
 2         A.    Yes.
 3         Q.    And then there's a subsection
 4    under that for cardiovascular events, and
 5    then another section for hypertension and
 6    edema?
 7         A.    Yes.
 8         Q.    Would Provider Synergies'
 9    description of cardiovascular concerns be the
10    type of thing that you as a P&T Committee
11    member would focus on?
12         A.    Well, I think we -- "we" being
13    DHH, were looking for information such as
14    that, among other things.  Again, I can't
15    speak for  each member of the P&T
16    Committee.  But I think they would share, you
17    know, our desire to have as much information
18    as possible.
19         Q.    So if you got -- when you
20    reviewed the February of 2002 Provider
21    Synergies' review of the COX-2 class and you
22    got to this section on cardiovascular
23    concerns, that'd be a section that you would
24    read and consider when making your decision
```

1   as to which drugs to put on the preferred
2   drug list?
3          A.     Well, I think there's lots of
4   information here.  All of it should be
5   considered.
6          Q.     Including the section on
7   cardiovascular concerns?
8          A.     Including that.
9          Q.     If you go to the ninth page of
10  the -- of Exhibit 9, which is the February
11  2002 review, you see there's a section there
12  that says "Recommendation"?
13         A.     Yes.
14         Q.     And then Provider Synergies
15  gives a recommendation for the three drugs we
16  just -- that we talked about, Celebrex, Vioxx
17  and Bextra?
18         A.     (Witness nods head.)
19         Q.     And they say either on list or
20  off list; do you see that?
21         A.     Yes.
22         Q.     So make sure I'm reading this
23  correctly:  Where Provider Synergies says PDL
24  recommendation on list for Celebrex, Provider

```
 1              MR. MURRAY:  You're referring
 2        to prior authorizations?
 3              MR. ISMAIL:  Yes.  Thank you.
 4        Let me restate.
 5   BY MR. ISMAIL:
 6        Q.    At the time that the PDL
 7   decisions for the COX-2 inhibitor class went
 8   into effect in June of 2002 -- I did say
 9   prior -- withdrawn.
10              One more time.  At the time the
11   PDL decisions for the COX-2 inhibitor class
12   went into effect in June of 2002, Vioxx
13   prescriptions within Louisiana Medicaid would
14   require prior authorization for
15   reimbursement, correct?
16        A.    Correct.
17        Q.    Was there any other action the
18   State could have done to restrict the
19   coverage of Vioxx prescriptions within
20   Medicaid beyond putting the drug on the
21   nonpreferred drug list?
22              MR. MURRAY:  Object to the form
23        of the question to the extent it calls
24        for a legal conclusion.
```

David Hood

1                THE WITNESS:  I don't know.
2     BY MR. ISMAIL:
3          Q.    Okay.  How often were drug
4     classes up for review?
5          A.    In the first year or two,
6     on a pretty regular basis.  As you can see,
7     there were meetings every two or three
8     months, I guess.  I'm not -- I haven't got
9     the exact timing here.  But the goal
10    was to review as many classes of drugs
11    as possible in the first couple of years.
12         Q.    Do you recall that some
13    manufacturers elected initially not to offer
14    supplemental rebates in response to the
15    change to the PDL?
16         A.    I don't know who they were.  I
17    think there may have been some, but I don't
18    recollect who those companies might have
19    been.
20         Q.    I take it you don't recall that
21    Merck in 2002 elected not to offer
22    supplemental rebates to the State?
23         A.    No, I don't.  I don't remember
24    that.

1    American Medical Association in August of
2    2001, the first line of that paragraph?
3         A.    Yes.
4         Q.    All that information about
5    cardiovascular concerns with Vioxx is
6    information the P&T Committee had, correct?
7         A.    I assume.
8         Q.    Then further down:  Provider
9    Synergies notes in its 2003 review that there
10   are concerns about hypertension and edema
11   with Celebrex and Vioxx?
12        A.    Yes.
13        Q.    If you go to page 12 under
14   "Conclusion," in the third paragraph,
15   Provider Synergies writes, quote:  The VIGOR
16   Study raised some questions regarding the
17   cardiovascular safety of Rofecoxib (Vioxx).
18   Patients receiving Rofecoxib (Vioxx) had a
19   significantly higher risk of developing a
20   cardiovascular thrombotic event compared to
21   patients receiving Naproxen, close quote.
22              You see that Provider Synergies
23   in 2003 is specifically noting for the P&T
24   Committee that in the VIGOR trial, Vioxx

```
 1    patients had an increased risk of a
 2    cardiovascular event compared to Naproxen?
 3                MR. MURRAY:  Object to the form
 4        of the question.  Object to the form
 5        you've taken -- to the extent that
 6        you've taken the sentence out of
 7        context; though the document
 8        completes.
 9    BY MR. ISMAIL:
10        Q.    See that, sir?
11        A.    Yeah, okay.  I've read it.
12    What's -- what is the question again, please?
13        Q.    The question was:  In its 2003
14    therapeutic class review, Provider Synergies
15    provided information to the P&T Committee
16    that in the VIGOR trial, patients receiving
17    Vioxx had a significantly higher risk of
18    developing a cardiovascular event compared to
19    patients receiving Naproxen?
20                MR. MURRAY:  Same objection.
21        Object to you --
22                MR. ISMAIL:  You can answer.
23                MR. MURRAY:  -- selectively
24        taking portions of this paragraph out
```

David Hood

Page 148

1        of context.  I suggest that you read
2        the witness the entire --
3               MR. ISMAIL:  Go ahead, sir.
4               MR. MURRAY:  -- paragraph and
5        that would eliminate my objection.
6               MR. ISMAIL:  I'm going to go
7        through it line by line.  I'm going to
8        go through it line by line.
9               THE WITNESS:  You know, to --
10       as far as I know,
11       that's -- I think you've
12       characterized, you know, the contents
13       of the paragraph.
14   BY MR. ISMAIL:
15       Q.    And to satisfy Counsel, the
16   paragraph goes on to say:  Aspirin for
17   cardiovascular prophylaxis was not permitted
18   in the study, which does not reflect
19   real-world use of NSAIDs.
20             Do you know what that sentence
21   means?
22       A.    No, not really.
23       Q.    Then the paragraph continues,
24   quote:  Although the significance of this

Page 149

1   potential cardiovascular risk is unknown, it
2   does raise questions, close quote.
3           That's information that the P&T
4   Committee had when reviewing the COX-2 class
5   in 2003, correct?
6       A.   Yes.
7       Q.   And then the last sentence
8   says, quote:  Hypertension and edema may
9   occur with all NSAIDs, and the COX-2-specific
10  inhibitors also has a potential for these
11  side effects, close quote.
12          So the P&T Committee had
13  information that COX-2 inhibitors can cause
14  hypertension and edema, correct?
15          MR. MURRAY:  Object to the form
16      of the question.  You mischaracterized
17      what was written there.  That's not
18      what's written.
19          THE WITNESS:  Well, I think
20      they had this information, clearly,
21      whatever is in this report.  But what
22      else they had, I don't
23      know.
24  BY MR. ISMAIL: