UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, | JUDGE ELDON E. FALLON |
| Plaintiffs, | MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., | Case No. 05-3700 |
| Defendants. | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I.     **INTRODUCTION**

Merck's Opposition does not challenge the data upon which Plaintiff relies. Therefore, it is undisputed (1) that the excess risk of complicated Perforations, Ulcers and Bleeds (PUBs) in the naproxen arm of the VIGOR study arises almost entirely from the steroid users (27 v 7), while the rate of complicated PUBs is almost identical (10 v. 9) among non-steroid users; (2) that 20 of the 21 excess complicated PUBs in the VIGOR study occurred in the steroid users, while only one extra event occurred in the non-steroid users; (3) that the relative risk is 3.85 among steroid users (statistically significant) and only 1.12 in the non-steroid users (non-significant); and (4) that this information does not appear in the VIGOR article, the Vioxx label, or anywhere else in the public domain.

A plain English reading of the label, by an unaffiliated witness, agreed with Plaintiff's construction that the text at issue claims an approximate 50% reduction in PUBs and complicated PUBs for patients with or without concomitant steroid use. In reality, without steroid use there was almost no reduction in complicated PUBs. Merck's Opposition presents only lawyer argument, unsupported by evidence. There are no genuine issues of fact, and the motion should be granted.

II.    **THE LABEL MISREPRESENTS A 50% RISK REDUCTION FOR COMPLICATED PUBS WITH OR WITHOUT STEROID USE**

The Vioxx label states:

> "The risk reduction for PUBs and complicated PUBs for VIOXX compared to naproxen (approximately 50%) was maintained in patients with or without the following risk factors for developing a PUB (Kaplan-Meier cumulative rate of PUBs at approximately 10 1/2 months, VIOXX versus naproxen, respectively): with a prior PUB (5.12, 11.47); without a prior PUB (1.54, 3.27); age 65 or older (2.83, 6.49); or younger than 65 years of age (1.48, 3.01). A <u>similar risk reduction for</u> PUBs and <u>complicated PUBs (approximately 50%) was also maintained in patients with or without *Helicobacter pylori* or concomitant corticosteroid use</u>."

(Vioxx label, previously marked as Taylor Exhibit 13 (emphasis added) [Declaration of Sarah R. London, (hereinafter "SRL Decl.") Ex. 1].)

The terms "PUBs," "complicated PUBs" and "cumulative rate" have defined meanings. They are not subject to the interpretation that Merck attempts to impose upon them. As explained below, the construction of the label is dictated by the definitions of the included terms, which lead to the conclusion that the GI benefit of Vioxx was misrepresented.

### A.   "PUBs" Are Defined in the Label to Include All Events, Complicated or Not, While "Complicated PUBs" Are a Specific Subset of the Data

Merck's central argument in its construction of the label is stated as follows: "Rather than reporting a risk reduction in both PUBs on the one hand and complicated PUBs on the other, the language instead reports a risk reduction in total PUBs—complicated and not." (Defense Mem. at 9). Merck then asserts that the use of the term *"cumulative* rate of PUBs" shows that a risk reduction was claimed only for the single endpoint of PUBs combined with complicated PUBs. (*Id.*; emphasis in Def. Mem.) This interpretation is contradicted by the label itself, and by the actual meaning of the terms "PUB," "Complicated PUB," and "cumulative rate," as described below.

First, Merck's the label defines "PUBs" to include *all* upper GI events, while "Complicated PUBs" are defined as "a *subset* of PUBs." Accordingly, any rate or risk reduction reported for "PUBs" *already includes the data for complicated PUB events.* (MRK-AAF0005923 at 929, Kaiser Ex. 20 [SRL Decl. Ex. 2]; emphasis added.)[1] Both FDA and Merck knew the difference between "PUBs" and "complicated PUBs," and precise terms were used to report whether the rates were all-inclusive or not. Thus, "Table 1" is preceded by the following text: "The VIGOR study showed a significant reduction in the risk of development of PUBs, *including* complicated PUBs, in patients

---

[1] Merck's exhibits November 2001 label proposal and the FDA response also confirm that complicated PUBs are included in the overall PUB endpoint: "PUB = *All* clinical upper GI events: *complicated upper GI events,* symptomatic ulcers & minor bleeding." (MRK-01420163696 at 708, Merck submission to FDA, Def. Ex. 4; and MRK-AAF0005350 at 357, the FDA response, Def. Ex. 5 (emphasis added).)

- 2 -

taking Vioxx compared to naproxen." (MRK-AAF0005923 at 5929 ;emphasis added). The Table then presents data for two different endpoints: rates are shown for the overall PUBs endpoint "including complicated PUBs;" then rates are shown for the "complicated PUBs" alone.

Second, the "subgroups" paragraph that at issue on this Motion states:"A similar risk reduction for PUBs *and* complicated PUBs (approximately 50%) was also maintained in patients with or without Helicobacter pylori infection or concomitant steroid use." (Pl. Ex. 2, above). Because the definition of PUBs already includes the complicated PUBs, it cannot be true that the phrase "PUBs *and* complicated PUBs" means the same thing as "PUBs" alone. Merck's construction would result in the following nonsensical and redundant meaning: "A similar risk reduction for *PUBs, including complicated PUBs*, and complicated PUBs (approximately 50%) was also maintained in patients with or without *Helicobacter pylori* or concomitant steroid use (emphasis added)."

It must be presumed that the phrase "and complicated PUBs" has meaning, otherwise it would not appear in the label.[2] The plain English meaning of the phrase, "*and* complicated PUBs" is that "complicated PUBs" are mentioned as a separate endpoint, not as a redundancy to the PUBs endpoint that includes them. Therefore, the phrase "risk reduction for PUBs and complicated PUBs" asserts a claim that there was a risk reduction "for PUBs [*including* complicated PUBs]" *and* a risk reduction for complicated PUBs as a separate endpoint.

As to the complicated PUBs alone, among steroid users, there was an approximate 4-fold

---

[2] This is a generally applicable rule of construction. *See, e.g.*, *Black v. St. Tammany Parish Hosp.*, 25 So. 3d 711 (2009); in the analogous context of statutory construction, stating presumption that "no unnecessary words or provisions were employed," and against construction of any word as "meaningless and surplusage." *Id.* at 7.  Similarly, "a contract should be interpreted as to give meaning to all of its terms--presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Isbell v. DM Records Inc. (In re Isbell Records, Inc.)*, 586 F.3d 334, 337 (5th Cir. 2009) (quoting *Transitional Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000)).

higher risk of complicated PUBs on naproxen than on Vioxx (27 v. 7); among non-steroid users, the risk of complicated PUBs on naproxen was approximately identical to the rate on Vioxx (10 v.9). The label misrepresented that, for PUBs *and* complicated PUBs, a 50% risk reduction was maintained with or without concomitant corticosteroid use.

### B. "Cumulative Rate" is a Statistical Term that Does Not Refer to Combining Rates of PUBs and Complicated PUBs

Merck claims that FDA's use of the term "cumulative rates" in the attachment to the Fax dated January 29, 2002, directed the company to "make clear that the table was reporting a 'cumulative rate,' reflecting both PUBs and complicated PUBs taken together," (Def. Mem. at 5, 9), but this is interpretation is contradicted by Merck's own documents and definitions, as well as the generally accepted meaning of the term "cumulative rate" in the field of statistics.

By directing Merck to "Provide cumulative rates," FDA did not, and could not possibly have meant that Merck should combine the rate of PUBs to the rate of complicated PUBs, because FDA (and Merck) knew that the total of 177 PUBs already included the subset of 53 complicated PUBs in the first place, as explained above. Thus, adding the "complicated PUBs" to the "PUBs" would improperly change the results of the study by doubling the numbers of complicated PUBs (from 53 to 106) and inflating the total number of PUBs (from 177 to 230). (See Table 1 of the label, MRK-AAF0005923 at 929.) Furthermore, the label states different "Cumulative Rates" for "PUBs" and for "complicated PUBs" *as separate endpoints,* demonstrating that "Cumulative Rate" does not refer to combining the complicated PUBs with anything.

Instead, as both FDA and Merck's scientists knew, "cumulative rate" is a statistical term that refers to a survival analysis of the incidence rate for any particular endpoint, having nothing to do with combining rates of events meeting different endpoint criteria. Merck's Clinical Study Report (CSR) for the VIGOR trial, in describing the general statistical methods, states as follows:

> "An estimate of the *cumulative event rates* at the end of the study was calculated using the Kaplan-Meier method. ... [G]raphical displays and *cumulative incidence rates* were truncated at the time point at which there were still at least 500 patients left at risk in each of the treatment groups."

(VIGOR CSR , MRK-AFV0451455 at 524 (emphasis added) [SRL Decl. Ex. 3].)

Using this terminology correctly, the CSR presented the "cumulative incidence" separately for the overall "PUBs" endpoint and for "Confirmed, Complicated PUBs," as displayed in Tables 23 and 25, respectively (MRK-AFV0451566, 569.) The text below the data in each Table states, "*Cumulative incidence* is from the survival analysis. ...," and the Kaplan-Meier survival analyses are presented separately for PUBs and complicated PUBs, with the legend "Cumulative incidence" appearing along the vertical axis of each Kaplan-Meier plot. (*Id*., at MRK-AFV0451455 at 566, 569 (emphasis added).)

Closing the door on Merck's erroneous reliance on the term "cumulative rate," Tables 23 and 25 of Merck's own CSR provide "cumulative incidence rates" that match the "Cumulative Rate" data in the final VIGOR label: for PUBs, 1.80 in the Vioxx group compared to 3.87 in the naproxen group; and, *separately*, *for complicated PUBs,* 0.52 in the Vioxx group compared to 1.22 in the naproxen group. (*Compare* VIGOR Label, MRK-AAF0005923 at 929, with MRK-AFV00451566, 569, showing identical figures). In other words, FDA merely instructed Merck to "Provide cumulative rates" as the term was understood by those familiar with clinical trials and statistics, and that is what Merck did. Since the "complicated PUBs and "PUBS" each have their own "Cumulative Rate" in the label, the plain meaning of "Cumulative Rate" does not encompass the notion that the term reflects "both PUBs and complicated PUBs taken together," as Merck argues.

In short, the Vioxx label establishes that the Complicated PUBs were already "included" in the PUB endpoint; that "cumulative" rates did not refer to combining rates that had already been combined by definition; and that an assertion about risk reduction for "PUBs *and* complicated PUBs" must refer to both separately—otherwise the reference, "and complicated PUBs" would be redundant.

### C. Label Negotiations With The FDA Did Not Cause The Labeling Misrepresentation

Merck's Opposition relies upon a history of exchanges with the FDA, arguing that the label representation as to complicated PUB event rates in relation to steroid use resulted from FDA's deletion of a table submitted by Merck, followed by Merck's proposal of a summary of the data in the text. (Def. Mem. at 3-10.) This argument has no factual basis, because neither the documents submitted by Merck with its Opposition to this motion, nor any other Merck documents, ever disclosed to FDA the analysis of complicated PUBs in the steroid user/ non-steroid user subgroups; thus FDA could not have directed that Merck revise the presentation of an analysis that it had never seen.

Merck's November 6, 2001 label proposal to FDA, submitted with its Opposition to the motion, includes two tables: Table 1, which shows the rates of "Complicated PUBs" only for the entire Vioxx group compared to the entire naproxen group; and Table 2, which shows the rates for the steroid use and non-use subgroups, but only "Based on the risk for developing a PUB," and not for the risk of developing a *complicated* PUB. (MRK-01420163708-09; Defense Ex. 4.) Neither Table presents an analysis of the *complicated* PUB rates for the Vioxx and naproxen groups according to steroid use versus non-use. Since the submission to FDA relied upon by Merck did not present a subgroup analysis of complicated PUBs among steroid users compared to non-users, no changes suggested by FDA could have caused Merck to change or remove what it had not submitted in the first place.

The VIGOR CSR submitted by Merck to the FDA in June 2000 similarly lacks any analysis of the complicated PUB event rates for the steroid/ non-steroid subgroup. (MRK-AFV0451455-779.) Among the hundreds of statistical analyses in the CSR, there are a dozen tables showing comparative rates of PUBs and complicated PUBs for various subgroups; but the steroid user/ non-steroid user subgroup analysis only presents the PUB endpoint, not the complicated PUB endpoint (Table 12.3-6; *id*. at MRK-AFV0451731), while the only subgroups analyzed for the *complicated* PUBs are "prior

history of GI event" (Table 25, *id*. at MRK-AFV0451569) and "study region." (U.S./Non- U.S.; Table 12.3-11, *id.* at MRK-AFV0451737.) Thus, there is no evidence that Merck *ever* submitted the analysis of the complicated PUB rate according to steroid use to the FDA, so any representations made on that subject could only have come from Merck, and not as the result of FDA suggestions or directives.

Merck also argues that its interpretation must be correct because the ultimate label includes data that is consistent with the November 6, 2001 proposal to FDA, but Merck does not explain where the supposed consistency lies. In fact, none of the risk factor incidence rates listed for any of the subgroups in the final label match those found in the November 6, 2001 version, and the November 6, 2001 proposal provides no rates at all for the "complicated PUBs" endpoint. For example, Table 2 of the November 6, 2001 version states the "Rates" of PUBs for patients over 65 as 8.63 per 100 patient years at risk for naproxen, compared to 3.54 per 100 patient years for Vioxx. In the final label, the rates for the same subgroup are "2.83, 6.59" for Vioxx and naproxen, respectively. (Def. Ex. 4 at MRK-01420163709; Kaiser Ex. 20, MRK-AAF0005923 at 929.) Further, these rates apply to "risk of developing a PUB," (Def. Ex. 4, *ibid*.), which includes complicated and non-complicated events, while the final label includes the new phrase, "PUBs and complicated PUBs," which does not appears in the November 2001 version that Merck sent to FDA, nor in the FDA's January 2002 counter-proposal..

### D. Merck's Interpretation of the Label Is Contrary to Its Plain Language and Context

In resisting a plain English construction, Merck breaks apart the "dependent clauses," into a strained and illogical reading of the key sentence. In Merck's view, "with or without" refers only to *H. pylori* infection, and not to "concomitant corticosteroid use." (Def. Mem. at 8.) However, Merck's construction, excluding the language between the clauses that it claims should be removed, would result in the following problematic sentence:

> "A similar risk reduction for PUBs and complicated PUBs (approximately 50%) was also maintained in concomitant steroid use."

- 7 -

As well as can be deciphered, Merck takes that sentence to mean that a 50% reduction was maintained among patients who *used* steroids concomitantly with Vioxx or naproxen, while making *no* claims of "GI benefit in the Steroid Non-Users Group." (Def. Mem. at 9-10.) There are two fundamental defects with this construction. First, the reader would have to accept that all the other risk factors in the paragraph are presented as mutually exclusive subgroups who either have or don't have the risk factor, while "concomitant steroid use" alone is presented for only those who *do* have the risk factor. Plaintiff submits that Merck's interpretation is not a reasonable English construction. Second, if the risk reduction referred only to the "Steroid Users Group," the percentage reduction of "approximately 50%" misstates the data. As noted above, there was a 4-fold difference in the rate of complicated PUBs between the "Naproxen + Steroid Users" and the "Vioxx + Steroid Users," while the rate in "Naproxen Non-Steroid Users" was almost identical to the rate in the " Vioxx Steroid Non-Users Group."

### E. Plaintiff's Interpretation Is Supported By the Only Non-party Witness Whose Statement Is In Evidence

As noted in Plaintiff's initial Memorandum, the only witness not affiliated with either Plaintiff or Merck who has interpreted the sentence in question is Valerie Taylor, the pharmacist at Provider Synergies, pharmacy benefit manager for the State; Dr. Taylor's testimony agreed with Plaintiff's interpretation that the key sentence means "the approximate 50 percent reduction in PUBs and complicated PUBs was true for patients *with or without concomitant steroid use*." (Taylor Dep. 112:14-113:8, January 15, 2010 [SRL Decl. Ex. 4]; emphasis aded).  Dr. Taylor believes the plain English interpretation that "with or without" modifies "concomitant steroid use," rejecting Merck's stilted view that "with or without" refers only to "*Helicobacter pylori* infection."[3] Merck attempts to discount Dr. Taylor's testimony on the grounds that it is unknown whether she interpreted the text the

---

[3] Merck's Opposition does not cite any evidentiary support for its label construction—only the argument of counsel.

- 8 -

same way in 2003 as in 2010, but there is neither evidence nor reason offered to believe Dr. Taylor has a different interpretation now than she did then; if that were true, all depositions in all cases would be subject to the inevitable defect that time has passed since the events took place.

## III.     OTHER LABEL SECTIONS ARE IRRELEVANT TO THIS MOTION

Merck claims that Plaintiff's motion is based on a mere fragment of the label, argues that there is no evidence that Plaintiff saw or relied on the misleading text, and suggests Plaintiff had other sources of information about risk reduction. (Def. Mem. at 10-12.) These arguments miss the point. The evidence that Vioxx did not reduce complicated PUBs among non-steroid users is not a "random fact," as Merck argues. (*id*. at 11.) Instead, it is a critically important fact, since (a) the label said Vioxx reduced serious GI events across the board, (b) that claim appeared in the Provider Synergies monographs upon which Plaintiff relied (Pl. Initial Mem. at 7); and (c) patients using chronic steroids are only a very small percentage of the patients to whom Vioxx was prescribed. Merck's CSR described the complicated PUBs as a "*key* secondary endpoint" (CSR, MRK-AFV0451455 at 568; emphasis added), contradicting the assertion that the text at issue is a "random fact." Also, since the February 2010 filing of this motion, Plaintiff has submitted the affidavit of David Hood, the State official who made the decision to approve Vioxx for the Preferred Drug List. Mr. Hood states that he would not have done so had he known of the actual VIGOR data showing that complicated event rates were essentially identical for the non-steroid users. (Aff. of David Hood [SRL Decl. Ex. 5].) As in other aspects of this case, claims are based on what Plaintiff *could not* know because Merck never made the data public. The same is true as to Merck's argument that Plaintiff had other sources of information, since all of them emanated from a single wellspring—Merck itself—and none of them could make known the data that Merck did not make available.

## IV.     PLAINTIFF'S CLAIM IS NOT PRE-EMPTED

Merck argues that Plaintiff's claim is preempted under *Wyeth v. Levine,* 129 S. Ct. 1187

- 9 -

(2009), on the grounds that FDA deleted the "complete subgroup tables" from Merck's November 6, 2001 proposal, thus suggesting that a direct conflict with federal policy would have arisen from any effort to meet a "stricter" standard. (Def. Mem. 14-16.) However, as shown above, the November 6, 2001 subgroup tables were *not* complete; neither that version nor any other version of the label ever disclosed the true absence of risk reduction of complicated PUBs in non-steroid users. Also shown above, Merck never disclosed the true data to the FDA in the CSR or otherwise, thus depriving FDA of the opportunity to provide input on the proper label disclosure of the lack of complicated PUB risk reduction among non-steroid users. No "direct conflict" with FDA authority appears, where Merck did not present the analysis for FDA to accept or reject

## V.     CONCLUSION

There are only three controlling facts on this motion, each undisputed. First, the Vioxx label asserted that a risk reduction of about 50% was maintained for complicated PUBs, with or without steroid use. Second, Merck's undisputed data show that statement was not true. Third, the absence of a true disclosure was a material fact in Plaintiff's decision to approve reimbursement of the cost of Vioxx. Plaintiff 'respectfully submits that the motion should be granted.

Respectfully submitted, this 16th day of March, 2010.

/s/ James R. Dugan
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130

James D. Caldwell
Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020
Facsimile: (225) 326-6096

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188
Facsimile: (225) 342-2232

Counsel for Plaintiff

- 11 -

- 12 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Reply Memorandum in Support of motion for Summary Judgment has this day been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to pretrial order No. 8B, on this the 16th day of March, 2010.

/s/ James R. Dugan

- 12 -

862416.3
3/16/10 5:50 PM