UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | * |
|     Products Liability Litigation | * |
| | * |
| This Document Relates to: | *   MDL No. 1657 |
| | * |
| STATE OF LOUISIANA, *ex rel.* JAMES D. CALDWELL, JR., Attorney General, | *   SECTION L |
| | * |
| | *   JUDGE ELDON E. FALLON |
|     Plaintiff, | * |
| | *   MAGISTRATE JUDGE |
|   versus | *   KNOWLES |
| | * |
| MERCK SHARP & DOHME CORP., INC., | * |
| | * |
|     Defendant. | * |
| | * |
| Case No. 05-3700. | * |
| | * |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE* NO. 9 TO EXCLUDE EVIDENCE OF AND REFERENCE TO POST-MARKETING ADVERSE EVENT REPORTS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.    ADVERSE EVENT REPORTS ARE NOT ADMISSIBLE TO "CONTRADICT" THE GASTROINTESTINAL DATA FROM MERCK'S CONTROLLED CLINICAL STUDIES. ........................................... 2

    II.    ADVERSE EVENT REPORTS ARE NOT A PROPER BASIS FOR EXPERT OPINIONS ABOUT CAUSATION ....................................................... 7

    III.    ADVERSE EVENT REPORTS ARE INADMISSIBLE HEARSAY .................. 9

    IV.    EVIDENCE OR TESTIMONY ABOUT ADVERSE EVENT REPORTS OFFERED TO SHOW THAT MERCK MISLED THE FDA IS PREEMPTED UNDER BUCKMAN ................................................................. 12

CONCLUSION ........................................................................................................................ 14

# TABLE OF AUTHORTIES

Page(s)

**Cases**

*Bouchard v. Am. Home Prods. Corp.*,
   213 F. Supp. 2d 802 (N.D. Ohio 2002) .................................................................................. 13

*Buckman Co. v. Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001) ............................................................................................................... 13

*Casey v. Ohio Med. Prods.*,
   877 F. Supp. 1380 (N.D. Cal. 1995) ........................................................................................ 5

*In re Baycol Prods. Litig.*,
   532 F. Supp. 2d 1029 (D. Minn. 2007) .................................................................................. 13

*In re Fosamax Products Liability Litigation*,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009) ..................................................................................... 7

*In re Neurontin Marketing, Sales Practices, and Products Liability Litigation*,
   612 F. Supp. 2d 116 (D. Ma. 2009) ......................................................................................... 8

*In re Phenylpropanolamine (PPA) Products Liability Litigation*,
   289 F. Supp. 2d 1230 (W.D. Wa. 2003) .................................................................................. 8

*Kemp v. Medtronic, Inc.*,
   231 F.3d 216 (6th Cir. 2000) ................................................................................................. 13

*Martinkovic v. Bangash*,
   No. 84 C 9568, 1987 WL 28400 (N.D. Ill. Dec. 18, 1987) ................................................... 11

*McCutcheon v. Zimmer Holdings, Inc*,
   586 F. Supp. 2d 917 (N.D. Ill. 2008) ..................................................................................... 13

*Rock v. Huffco Gas & Oil Co.*,
   922 F.2d 272 (5th Cir. 1991) ................................................................................................. 10

*Swank v. Zimmer, Inc.*,
   No. 03-CV-60-B, 2004 WL 5254312 (D. Wyo. 2004) .......................................................... 13

*Wilson v. Zapata Off-Shore Co.*,
   939 F.2d 260 (5th Cir. 1991) ................................................................................................. 10

*Worsham v. A.H. Robins Co.*,
   734 F.2d 676 (11th Cir. 1984) ........................................................................................... 9, 10

**Statutes**

Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 ......................................................................... 13

**Rules**

Fed. R.. Evid. 801(d)(2) ................................................................................................................ 11
Fed. R. Evid. 803(6) ..................................................................................................................... 10

**Regulations**

21 C.F.R § 314.80(k) .................................................................................................................... 12

## INTRODUCTION

Merck's Motion *in Limine* No. 9 requests that the Court exclude evidence of and testimony about a specific body of documents: post-marketing adverse event reports ("AERs") relating to Vioxx.[1]  Merck's opening brief explained that the Food and Drug Administration ("FDA") has repeatedly admonished that such reports, compiled by drug manufacturers from information submitted by consumers, caretakers and physicians, do not constitute evidence that the drug in question actually *caused* the reported adverse health event.  (Def.'s Mot. at 2-4.)  The FDA likewise cautions that tallies of the number of adverse event reports do not indicate the *rate* at which a given side effect actually occurs among patients taking a particular drug.  (Def.'s Mot. at 4.)  The reports themselves, as second-, third- or even fourth-hand accounts, are unreliable, and the frequency of reporting is influenced by a host of factors independent of the rate of a given adverse reaction.  Cognizant of these limitations, federal courts have routinely ruled that adverse event reports are inadmissible and unsuitable as a basis for expert opinion. (*See* Def.'s Mot. at 5-6, 11-13.)

Plaintiff's opposition to Merck's motion simply ignores this considerable body of commentary and case law.  Plaintiff argues that the number of adverse event reports about gastrointestinal complications demonstrates that the rate of such complications among Vioxx users was higher than shown that by Merck's controlled clinical studies -- although the FDA states that the number of reports cannot properly be used to establish incidence rates.  Plaintiff argues that post-marketing adverse event reports are relevant to show that Vioxx causes gastrointestinal complications and heart attacks -- although the FDA has cautioned that the reports do not establish causation.  Plaintiff argues that the reports are not hearsay -- although

---

[1]  The specificity of this motion *in limine* distinguishes it from similar motions in the Vioxx personal injury cases that were denied by the Court as "too broad and vague."  (*See, e.g., Plunkett v. Merck,* Case No. 05-4046, 11/20/05 Order re Merck's Motions *in Limine* at 5.)

Plaintiff plainly intends to offer the reports for the truth of what they assert, the reports themselves reveal they contain multiple layers of hearsay that do not come within any exception, and courts routinely comment on the untrustworthiness of the reports' information. And Plaintiff argues that adverse event reports can be regarded as admissions by Merck -- although the FDA regulation governing the submission of the reports states precisely the opposite.

As Plaintiff has offered no credible grounds for permitting evidence of or reference to post-marketing adverse event reports, Merck respectfully requests that its motion *in limine* be granted.

### ARGUMENT

I. **ADVERSE EVENT REPORTS ARE NOT ADMISSIBLE TO "CONTRADICT" THE GASTROINTESTINAL DATA FROM MERCK'S CONTROLLED CLINICAL STUDIES.**

Plaintiff argues that adverse event reports are admissible to show that they "contradict" the outcomes of Merck's clinical trials establishing the superior gastrointestinal safety of Vioxx relative to traditional non-steroidal anti-inflammatory drugs ("NSAIDs"). (*See* Pl.'s Opp'n at 1-3.) However, Plaintiff's argument employs the reports in precisely the manner that both the FDA and federal courts have deemed improper. Rather than supporting the admission of adverse event reports, Plaintiff's argument demonstrates vividly why such evidence should be excluded.

Plaintiff contends that Merck's publication of the results of an endoscopy clinical study showing that ulcer rates among patients taking Vioxx were "comparable to placebo" was "misleading." (*See* Pl.'s Opp'n at 1-3; Loren Laine, *et al.*, "A Randomized Trial Comparing the Effect of Rofecoxib, a Cyclooxygenase 2-Specific Inhibitor, with That of Ibuprofen on the Gastroduodenal Mucosa of Patients with Osteoarthritis," 117 *Gastroenterology* 776 (1999), attached as Ex. 2 to Pl.'s Opp'n.) Plaintiff does not dispute the validity of the clinical trial results; in fact, Plaintiff has admitted that Merck's clinical trials testing the gastrointestinal safety

of Vioxx "are reliable." (Pl.'s Reply Mem. in Supp. of Mot. to Exclude Certain Opinion Test. of Merck's Experts Concerning the Relative Safety and Efficacy of Vioxx Compared to Other Medications (filed Mar. 9, 2010), at 2.) Moreover, despite the endoscopy study results, the Vioxx label always carried a strong warning about gastrointestinal effects, as Plaintiff admits. Specifically, the label warned that "[s]erious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs)." (1999 Vioxx label, attached as Ex. A.) Graphs showing the endoscopy study data were included in a separate section of the label, but the label pointedly cautioned that "the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing Vioxx to placebo." (*See id.*)

Despite this cautious presentation of the data, Plaintiff contends that the Vioxx warning about potential gastrointestinal side effects was inadequate because it "included reference to the misleading clinical data claiming that Vioxx ulcer rates were comparable to placebo." (Pl's Opp'n at 3.) Plaintiff admits that "AERs are not as reliable as controlled studies," yet it claims that "the AER evidence is relevant to show the inadequacy and inaccuracy of the warning in light of contradictory data."[2] (*Id.* at 3.) The purported "contradictory data" consists of (1) adverse event reports compiled by the Merck Worldwide Adverse Event System, and (2) remarks by an FDA medical officer in 2001 that the gastrointestinal "post-marketing safety profile" of Vioxx was similar to that of other NSAIDs and that there had been 37 reports of deaths due to

---

[2]   Even aside from the inadmissibility of adverse event reports for Plaintiff's intended purposes, the argument for which Plaintiff would offer the gastrointestinal adverse event reports is so attenuated as to strain belief. Plaintiff apparently intends to argue that the Vioxx gastrointestinal warning was inadequate because it made reference to a reliable clinical study which included a finding that Plaintiff now claims is contrary to the experiences of some Vioxx users.

-3-

gastrointestinal complications associated with the use of Vioxx between May 1999 and October 2000. (*See* Exs. 6, 7, and 8 to Pl.'s Opp'n.)

As detailed in Merck's opening brief, this evidence cannot properly be used to show the rate of gastrointestinal complications among Vioxx users. The FDA cautions against drawing any inference of causation from adverse event reports: "For any given [AER], there is no certainty that the suspected drug caused the ADE [adverse drug experience]."[3] Just as importantly, the FDA also warns against using tallies of the number of adverse event reports to calculate the extent of risk posed by a particular drug:

> Accumulated [AERs] may not be used to calculate incidences or estimates of drug risk. Numbers from these data should be carefully interpreted as reporting rates and not occurrence or incidence rates.

*Annual ADE Rpt.: 1996* at 2.[4]

Plaintiff's opposition completely ignores these express directives by the FDA. It simply assumes that reports constitute evidence that Vioxx *caused* the reported gastrointestinal events.[5] And it argues that the receipt of these reports "contradicts" the findings of Merck's clinical trials and shows that "the rate of serious, complicated GI events was as high as, or higher than, the rate

---

[3]  Office of Epidemiology and Biostatistics, Food and Drug Administration, *Annual Adverse Drug Experience Report: 1996* (Oct. 30, 1997) ("*Annual ADE Rpt.; 1996*"), attached as Ex. B to Merck's Mem. In Supp. of Def.'s Mot. in Limine No. 9 to Exclude Evidence of and Reference to Post-Marketing Adverse Event Reports ("Def.'s Mot."), at 1; *see also* 21 C.F.R. § 314.80(k) (an adverse event report submitted to the FDA "does not necessarily reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse event"); Food and Drug Administration, *Drugs: Adverse Event Reporting System (AERS) ("AERS System")*, available at http:www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/default.htm (*last accessed* 3/18/2010) ("[T]here is no certainty that the reported event was due to the product.").

[4]  *See also AERS System* ("AERs cannot be used to calculate the incidence of an adverse event in the U.S. population.").

[5]  In an apparent effort to support this assumption, Plaintiff notes that in 75 reported fatalities from gastrointestinal complications found on the Merck Worldwide Adverse Report System database, the individual reporting the incident said that it was "related," "probably related," or "definitely related" to decedent's use of Vioxx. (Pl.'s Opp'n at 2.) Such an assertion by someone who may nor may not even be a physician is not evidence of causation because it is not thorough medical adjudication of the event or determination of the cause of death.

of such events among the population in the traditional NSAIDs groups in Merck's clinical trials." (Pl.'s Opp'n at 3.) But the *number* of reports by itself cannot show this. Adverse event reports cannot establish the relative risk of a particular side effect because they "simply describe[] reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group." *Casey v. Ohio Med. Prods.,* 877 F. Supp. 1380, 1385 (N.D. Cal. 1995). Nor can the FDA Officer's comment that Vioxx and traditional NSAIDs had comparable rates of *reported* GI adverse events during the first year Vioxx was on the market properly be taken as evidence that the actual *incidence* of adverse GI events was the same for Vioxx and traditional NSAID users. As an authority on adverse event reporting (relied upon by Plaintiff itself) explains, adverse event reporting is selective and therefore reporting rates cannot be accepted uncritically:

> The effect of selective reporting becomes potentially disastrous if the number of reports of an [adverse drug reaction] for different drugs is compared in an uncritical way. For example, in Sweden, as in many other countries, there was a surge of reports of gastrointestinal ulcers and bleeding suspected to have been caused by piroxicam soon after its introduction. If the number of ulcers and bleeding reported for piroxicam is compared with that reported for indomethacin or aspirin, one may be led to believe that the new drug is much more ulcerogenic than the old ones. However, there are many other possible reasons for the apparent differences. The rate of reporting is often higher during the first years a new drug is on the market. The reporting rate has increased in general, as well. Finally, a drug that is claimed to be very safe may first be tried on patients who have sensitive stomachs and who do not tolerate aspirin and indomethacin.

(Bengt-Erik Wiholm & Sten Olsson, "Spontaneous Reporting Systems Outside the United States," *in Pharmacoepidemiology,* 127 (Brian L. Strom, ed., 1989), attached as Ex. 9 to Pl.'s Opp'n.)

Similarly, here the number of gastrointestinal adverse event reports for Vioxx may have been inflated relative to those for traditional NSAIDs because Vioxx was a new drug and was

more likely to be prescribed to individuals at higher risk of developing gastrointestinal complications. Such selective, potentially biased and unreliable information cannot possibly "contradict" the results of controlled clinical trials, the undisputed "gold standard" in evidence-based medicine. And it certainly does not provide a basis for assessing the adequacy of Vioxx's gastrointestinal warning.[6]

Plaintiff contends that it seeks to admit the gastrointestinal adverse event reports merely to show "notice or knowledge of product defects." (Pl.'s Opp'n at 1.) This is obfuscation. First of all, Plaintiff's own comments in its opposition reveal that it will use "notice" as a pretext to argue causation. (*See, e.g.,* Pl.'s Opp'n at 3 ("[T]he AERs provide supportive and consistent evidence . . . showing that Vioxx is toxic to the GI system, that it is not comparable to placebo, and that the rate of serious, complicated GI events was as high as, or higher than, the rate of such events among the population in the traditional NSAIDs groups in Merck's clinical trials.").) Moreover, Merck was well aware that gastrointestinal complications were a potential safety issue with Vioxx, which is why it continued its VIGOR clinical trial for gastrointestinal safety even after marketing the drug. Even Plaintiff admits that adverse event reports are less reliable than controlled clinical trial results, and the number of reports cannot be accepted as a reliable indicator of the rate of events. At most, then, the reports provided notice that some patients using Vioxx suffered gastrointestinal adverse events, a risk about which Merck always warned on the Vioxx label.

Reports of gastrointestinal adverse events suffered by patients using Vioxx are not probative of any issue in this case. They will merely invite the improper conclusions proffered by Plaintiff in its opposition and cause undue delay in the trial. They should be excluded.

---

[6] In any event, during the period in which the "post-marketing safety profile" of Vioxx was reported by the FDA Officer as similar to that of other NSAIDs, Vioxx carried the NSAID class warning about gastrointestinal side effects. (*See* 1999 Vioxx label.)

1011283v.1

II.     **ADVERSE EVENT REPORTS ARE NOT A PROPER BASIS FOR EXPERT OPINIONS ABOUT CAUSATION.**

Ignoring the considerable body of case law cited by Merck, as well as commentary by the FDA, Plaintiff next argues that adverse event reports are "admissible to support plaintiffs' theories of causation" and may serve as the basis of expert opinions about causation. (Pl.'s Opp'n at 3-5.) However, the case law Plaintiff cites in support of this argument is all readily distinguishable.

In *In re Fosamax Products Liability Litigation,* 645 F. Supp. 2d 164 (S.D.N.Y. 2009), the court permitted the plaintiff's experts to refer to adverse event reports recounting instances of a rare condition called "osteonecrosis of the jaw" ("ONJ") among users of bisphosphonates such as Fosamax, although it deferred a decision about the admissibility of the reports until trial. *Id.* at 200. The court acknowledged that case reports "lack controls and therefore provide less information on causation than controlled studies"; hence they must be viewed with caution. *Id.* at 184 (citing Mary Sue Henifin *et al., "*Reference Guide on Medical Testimony," *in Ref. Manual on Scientific Evid.,* 633-34 (Federal Judicial Center, 2d ed. 2000)). However, three factors prompted the court to distinguish the case before it from those cases in which experts had been barred from reliance on adverse event reports for proof of causation: "[t]he rarity of ONJ, the relatively high number of recent reports from bisphosphonate users, and the fact that the reports were adjudicated by Merck." *Id.* at 200. In other words, a recent "explosion" of reports of ONJ was significant due to the rarity of the condition and the fact that the use of bisphosphonates was reportedly the only consistent factor in the reports. *See id.* at 181, 185. Moreover, the court noted that research on the link between oral bisphosphonates and ONJ was in the early stages, which made epidemiological study infeasible. *Id.* at 177. None of these factors is present here, where the cardiovascular and gastrointestinal events at issue are relatively

common, patients often have multiple risk cardiovascular and gastrointestinal risk factors, and the reports are not adjudicated.

In *In re Phenylpropanolamine (PPA) Products Liability Litigation,* 289 F. Supp. 2d 1230 (W.D. Wa. 2003), the court permitted expert reliance on adverse event reports where it found the volume of such reports significant. *See id.* at 1242. Plaintiff attempts to replicate those circumstances here, by citing the number of adverse event reports involving Vioxx and gastrointestinal complications. But given that Plaintiff has not established the occurrence of gastrointestinal problems in the population as a whole or the number of patients worldwide taking Vioxx, the mere recitation of a number is insufficient reason to permit the use of adverse event reports for a purpose condemned by the FDA.

Finally, in *In re Neurontin Marketing, Sales Practices, and Products Liability Litigation,* 612 F. Supp. 2d 116 (D. Ma. 2009), the court permitted an expert to rely upon post-marketing adverse event reports, in conjunction with adverse event reports from clinical trials, merely to establish "'that Neurontin can be *associated* with suicide-related behavior.'" *Id.* at 156 (emphasis added). Here, it is undisputed that Vioxx "can be associated with" cardiovascular and gastrointestinal side effects. As the expert in *Neurontin* took pains to point out, "these events do not prove that Neurontin causes suicidal behavior.'" *Id.* at 157. Therefore, *Neurontin* does not support Plaintiff's position that adverse event reports may be relied upon by experts for opinions about causation; in fact, it refutes it.

In sum, the case law cited by Plaintiff does not speak to the circumstances here and is insufficient to overcome the considerable body of law cited by Merck in which experts are properly barred from relying on unadjudicated adverse event reports as evidence of causation. While Plaintiff maintains that the case reports gain significance when viewed in the context of

the "totality of the data," this argument is not pertinent to the issues before the court in this case. In contrast to a personal injury case, here medical causation *per se* is not at issue. What is at issue is whether Merck misrepresented the known risks of Vioxx while the drug was on the market. Post-marketing adverse event reports considered in conjunction with evidence acquired later are not probative of this question. The Court should follow the relevant case law and preclude Plaintiff's experts from relying on or testifying about such reports.

### III.  ADVERSE EVENT REPORTS ARE INADMISSIBLE HEARSAY.

As Merck explained in detail in its opening brief, adverse event reports are inadmissible because they are hearsay. (*See* Def.'s Mot. at 6-10.) Plaintiff first attempts to get around the hearsay bar by arguing that it seeks admission of the reports "primarily" to prove notice and knowledge. (Pl.'s Opp'n at 5, 6.) But, again, Plaintiff's brief belies its own contention: "[T]hese reports are not offered primarily to prove the truth of what they assert -- that Vioxx caused serious GI or CV events -- but rather that Merck knew or had notice of these events and failed to warn doctors, patients, and the public." (Pl.'s Opp'n at 6.) This statement is internally contradictory. If Plaintiff is not asserting the truth of the reported events or of the allegations that Vioxx caused them, then the reports cannot give rise to any duty to warn because they are not evidence of a reliable association between Vioxx and adverse side effects.

Most of the cases cited by Plaintiff in this connection establish nothing more than that evidence offered to show notice is not subject to the hearsay rule. They do not support Plaintiff's contention that adverse event reports made to a prescription drug manufacturer constitute evidence of a drug's actual risks or create a duty to warn. The only cited case that concerns adverse event reports in any way comparable to those here is inapposite. In *Worsham v. A.H. Robins Co.,* 734 F.2d 676 (11th Cir. 1984), a medical device case, the court affirmed the admission of "reports by doctors and company field representatives" recounting adverse

-9-

reactions associated with Dalkon Shield use and "accompanied by responses from the Robins' doctor in charge of the shield." *Id.* at 686. Because the documents included contemporaneous responses by the manufacturer and adequacy of notice was a hotly contested issue, the Eleventh Circuit concluded that the documents were properly admitted "as proof of Robins' state of mind." *Id.* at 687. Unlike the documents in *Worsham,* the adverse event reports at issue here do not include commentary by Merck and are not offered to show Merck's state of mind.

Plaintiff next contends that adverse event reports are admissible under the business records exception to the hearsay rule or as Merck admissions. (Pl.'s Opp'n at 6.) This argument wholly ignores well-established Fifth Circuit precedent holding that "each participant in the making of the record must be acting in his normal course of business before the record becomes admissible under the Rule 803(6) exception." *Rock v. Huffco Gas & Oil Co.,* 922 F.2d 272, 279 (5th Cir. 1991); *see also Wilson v. Zapata Off-Shore Co.,* 939 F.2d 260, 271 (5th Cir. 1991); Fed. R. Evid. 803(6); Def.'s Mot. at 8-9. The records at issue here have multiple layers of hearsay, each of which must come within the business records exception in order for the report to be admissible. For instance, one of the records submitted as an exhibit to Plaintiff's opposition states: "The reporting physician noted that the patient's daughter stated that the treating physician felt that the patient's death was due to rofecoxib." (*See* Ex. 6 to Pl.'s Opp'n at 37.) Plaintiff cannot show that each of these four declarants (including the Merck employee who made the record) was acting within her or his "normal course of business."

In addition, documents do not come within the business records exception if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). As Merck explained in its opening brief, the circumstances under which adverse event reports are compiled render them untrustworthy for multiple reasons: FDA

regulations require prescription drug manufacturers to submit the reports regardless of whether there is any indication the drug caused the adverse event, information may be submitted by uninformed consumers as well as health care professionals, some reports are submitted in anticipation of litigation, and the reports often do not contain enough detail to evaluate them. (*See Annual ADE Rpt.: 1996*; *AERS System*; Def.'s Mot. at 2-4.)  Indeed, the untrustworthy nature of adverse event reports is sometimes evident on their face.  Among the reports that Plaintiff seeks to introduce is one that states:

> The reporter felt that the duodenal ulcer perforated, peritonitis, vomiting, diarrhea and syncope were related to therapy with rofecoxib.  The report has been evaluated by the agency [that conveyed the report to Merck], which commented that *the investigator was unsure if the patient had really used rofecoxib.*

(Ex. 6 to Pl.'s Opp'n at 20 (emphasis added); *see also id.* at 87 ("'The physician said that the patient was very old and was "near death" anyway.'"); *id.* at 66 (noting that the information in the report pertained to "a case in litigation").

Plaintiff's assertion that adverse event reports are admissible as party admissions under Rule 801(d)(2) is even more unfounded.  Plaintiff relies on *Martinkovic v. Bangash,* No. 84 C 9568, 1987 WL 28400 (N.D. Ill. Dec. 18, 1987) for this claim.  But *Martinkovic,* which addressed medical device reports, held only that records of the receipt of the reports were admissible as admissions of their *receipt* -- not of the truth of their contents or even notice of anything in the reports themselves.  *See id.* at *2.[7]  Moreover, the FDA regulation governing adverse event reporting expressly provides:

> A report or information submitted by an applicant under this section (and any release by FDA of that report or information) does not necessarily reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse effect.  An

---

[7]  The *Martinkovic* court also noted that "[a]dmissible, non-hearsay evidence must be adduced with regard to the prevalence of the adverse reactions."  *Id.* at *2.

-11-

>applicant need not admit, and may deny, that the report or information submitted under this section constitutes an admission that the drug caused or contributed to an adverse effect.

21 C.F.R § 314.80(k).

Plaintiff has not demonstrated that the adverse event reports at issue are admissible under any exception to the hearsay rule. Nor can they serve as notice of any association between Vioxx and the events they report -- because the documents themselves do not establish that association. The reports must therefore be excluded as unreliable hearsay.

### IV. EVIDENCE OR TESTIMONY ABOUT ADVERSE EVENT REPORTS OFFERED TO SHOW THAT MERCK MISLED THE FDA IS PREEMPTED UNDER *BUCKMAN*.

Finally, Plaintiff argues that adverse event reports are admissible to contest Merck's representations of its post-marketing experience with Vioxx in relation to cardiovascular risks. Specifically, Plaintiff seeks to challenge Merck's comments about post-marketing adverse event reports of myocardial infarction in a March 27, 2000 press release about the VIGOR trial results and in the Background Information it prepared for the February 8, 2001 FDA Arthritis Advisory Committee. (*See* Pl.'s Opp'n at 7-8; Exs. 13 & 14 to Pl.'s Opp.) Plaintiff suggests that evidence of Merck's "internal knowledge" of adverse event reports may give rise to "an inference of negligence or concealment" in these public statements. (Pl.'s Opp'n at 8.) But this is the same mistake Plaintiff makes throughout its opposition: It assumes that the rate of adverse event reports reliably indicates the rate of incidence of a given side effect. As discussed above, this is not so. Plaintiff cites Thomas Bold, a Merck employee, about the relevance of adverse event reports to label review, but Bold also testified that he had "seen statements by experts at the FDA, by people of the European Union who basically performed the same evaluations, and all of these experts said that it is virtually impossible to detect that signal [of myocardial infarctions]

from spontaneous reports." (July 29, 2005 Deposition of Thomas Bold, *In re: Vioxx Litig.,* Case No. 69, N.J. Sup. Ct., attached as Ex. B, at 475:7-476:3.)

Moreover, to the extent Plaintiff seeks to introduce evidence to show that Merck misled the FDA or concealed, misrepresented or distorted data in its submissions to the Agency, such evidence and testimony about it are preempted by *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). In *Buckman*, the Supreme Court concluded that when a pharmaceutical company commits a "fraud" on the FDA or otherwise misleads it, it is the exclusive province of the FDA to police such alleged misconduct. Thus the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.,* impliedly preempts state law tort claims predicated on allegations that a pharmaceutical company defrauded or misled the FDA -- whether or not the plaintiff expressly brings a claim of fraud-on-the-FDA.[8] *Buckman*, 531 U.S. at 350, 353; *McCutcheon v. Zimmer Holdings, Inc*, 586 F. Supp. 2d 917, 922 (N.D. Ill. 2008) ("Although [plaintiff] has not formally asserted that [defendant] violated some kind of Illinois prohibition against fraudulent representations to the FDA, her argument that [defendant] failed to disclose all relevant information to the agency essentially equates to that. Under *Buckman*, then, she cannot prevail."). Analogously, evidence and testimony are inadmissible when introduced to show that a manufacturer misled the FDA. *See In re Baycol Prods. Litig.,* 532 F. Supp. 2d 1029, 1053 (D. Minn. 2007) (precluding expert testimony offered to show that the defendant intentionally concealed information from, or misled, the FDA); *Swank v. Zimmer, Inc.*, No. 03-CV-60-B, 2004 WL 5254312, at *2 (D. Wyo. 2004) ("[R]egardless of the nature of the claim, evidence of

---

[8] Although *Buckman* involved medical devices, its reasoning and holding apply with equal force to cases involving pharmaceuticals. *See, e.g., Bouchard v. Am. Home Prods. Corp.,* 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002) ("The Court does not need to engage in searching analysis of *Buckman* to determine that claims of fraud on the FDA are preempted with respect to pharmaceuticals.") (citing *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000)).

communications with the FDA, used to show that Defendants made misrepresentations, must be excluded.").

Thus testimony about adverse event reports offered to show that Merck misrepresented or concealed such reports from the FDA would trench on the FDA's statutorily mandated powers of enforcement. It is preempted.

## **CONCLUSION**

For the reasons stated above, Merck respectfully requests that the Court grant its Motion *in Limine* No. 9 and exclude all evidence and testimony about post-marketing adverse event reports.

Dated: March 19, 2010

Respectfully submitted,

/s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Phone: (504) 581-3200
Fax:    (504) 581-3361

1011283v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Reply Brief In Support Of Defendant's Motion *in Limine* No. 9 to Exclude Evidence of and Reference to Post-Marketing Adverse Event Reports has been served on Liaison Counsel by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Plaintiff, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 19th day of March, 2010.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel