# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, Plaintiffs<br><br>v.<br><br>MERCK SHARP & DOHME CORP., Defendants | JUDGE ELDON E. FALLON<br><br>MAGISTRATE JUDGE KNOWLES<br><br>Case No. 05-3700 |

## AFFIDAVIT

BEFORE ME, the undersigned Notary, personally came and appeared:

DAVID HOOD

who, being duly sworn, did depose and say:

1. The following is based on my personal knowledge gathered in my role as Secretary of the Louisiana Department of Health & Hospitals from the time Vioxx first came on the market in 1999 to the time that I left the position of Secretary in February 2004.

2. I served as Secretary of the Louisiana Department of Health and Hospitals (LDHH) from 1998 to February of 2004.

3. In my capacity as Secretary of LDHH, I served as a member of the Medicaid Pharmaceutical & Therapeutics (P&T) Committee of the Louisiana Medicaid pharmacy reimbursement program responsible for recommending prescription drugs for inclusion on the Preferred Drug List.

Page 1 of 5

4. In addition to serving on the P&T Committee, I had ultimate authority over inclusion of prescription drugs on the LDHH Preferred Drug List, including whether to accept the recommendations of the P&T Committee regarding same.

5. While cost was certainly a significant factor in determining whether to include drugs on the Preferred Drug List, the P&T Committee's primary concern was with clinical aspects of safety and efficacy of drugs. Cost considerations were only applicable where there were competing drugs that were believed to be of comparable risk and benefit.

6. I approved the recommendations of the P&T Committee with respect to inclusion of Vioxx on the Preferred Drug List.

7. At the time that I approved the recommendations of the P&T Committee with respect to inclusion of Vioxx on the Preferred Drug List, I relied upon the evaluations of the physicians and pharmacists on the P&T Committee who concluded based on their personal and professional knowledge that any risks of Vioxx were outweighed by the benefits of the drug.

8. During the entire time that Louisiana Medicaid reimbursed Vioxx prescriptions, I held the understanding that, while there were various risks associated with the use of Vioxx, the risks were of acceptable levels for a prescription drug of widespread analgesic use such as Vioxx and that those risks were outweighed by the benefits provided by the drug;

9. During the entire time that I served as Secretary of LDHH and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Vioxx was not safe and effective when approved in 1999 due to the signal of CV harm that was not adequately investigated.

10. During the entire time that I served as Secretary of LDHH and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Merck, the manufacturer of Vioxx, was aware that Vioxx had the potential to induce cardiovascular side effects and failed to adequately investigate that question.

11. During the entire time that I served as Secretary of LDHH and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Merck manipulated published literature to greatly exaggerate the gastrointestinal (GI) benefits of Vioxx, including:

    A.    By April 2003, Merck's data showed that Vioxx had about a four times greater risk of GI harm compared to placebo, although the Laine study cited in Provider Synergies' Monographs provided to the P&T Committee stated that the Vioxx ulcer rate was "comparable to placebo";

    B.    Vioxx was only tested to show GI benefit against high doses of ibuprofen and other NSAIDs that are not taken by 90% of the NSAID users, while people who used lower doses (the vast majority) got no benefit;

    C.    Although the VIGOR study publication cited in the Provider Synergies monographs concluded Vioxx showed a statistically significant benefit over Naproxen for the most serious GI events, the VIGOR study results only showed such a benefit for patients taking steroids, which comprise only small percentage of Vioxx patients.

    D.    By February 27, 2003, Merck knew that the rate of the most serious GI events in the osteoarthritis studies was higher on Vioxx than on the traditional NSAIDs such as ibuprofen by the end of the study period, but this information was not disclosed in any of the Monographs

12.    During the entire time that I served as Secretary of LDHH and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Merck, the manufacturer of Vioxx, was aware that Vioxx significantly increased the risk of serious cardiovascular harm whether or not a patient had a previous history of cardiovascular disease (i.e., was "aspirin-indicated"), that Merck's evidence showed that this risk was not mitigated by concomitant treatment with low-dose aspirin, and that Merck manipulated published literature from its sponsored research to minimize the cardiovascular risks of Vioxx, including:

    A.    The VIGOR study publication referenced in the Provider Synergies Monographs did not include complete cardiovascular (CV) data that was pre-specified for analysis, which would have shown excess CV risk to all patients, not just the ones who were "Aspirin-indicated" (ie, had prior CV event);

    B.    The VIGOR study publication did not include the "Overall safety" results showing that Vioxx patients had 21% more serious adverse events than naproxen patients, when all types of harm were considered, which demonstrated that any GI benefit was outweighed by CV harm;

    C.    By 2001, Merck knew that Merck-sponsored Alzheimer's studies showed an excess risk of mortality among Vioxx patients versus placebo, and the same data showed an excess of cardiovascular mortality;

D. Although by April 2002, Merck's OA data showed a statistically significant 3-fold risk of thrombotic CV events compared to placebo, a 2002 Merck-sponsored study publication cited in the Provider Synergies Monographs provided to the P&T Committee only addressed pre-market OA studies and stated that there was no difference between Vioxx and placebo.

13. During the entire time that I served as Secretary of LDHH and Vioxx was on the market, I was never made aware, by Merck or anyone else, that while Merck-published studies cited in the Provider Synergies monographs concluded that further study was necessary to determine whether Vioxx posed a cardiovascular risk, Merck's internal documents recognized that Vioxx did pose a cardiovascular risk and Merck consciously steered its sponsored research away from investigating that risk.

14. During the entire time that I served as Secretary of LDHH and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Vioxx was significantly less safe and no more effective than so-called traditional NSAIDs such as Ibuprofren and Naproxen, drugs which cost a fraction of the price of Vioxx.

15. I attended meetings of the P&T Committee at which Merck representatives were present. The Merck representatives at those meetings did not provide any information of the sort set forth in paragraph 8-12, *supra*, even after the P&T Committee members questioned the safety and efficacy of Vioxx.

16. Had the matters set forth in paragraphs 8-12 which were not disclosed to me been disclosed to me at the time that I was Secretary of LDHH, then I would not have approved the inclusion of Vioxx on the Preferred Drug List.

17. Had the matters set forth in paragraphs 8-12 which were not disclosed to me been disclosed to me at the time that I was Secretary of LDHH, then I, in my capacity as Secretary, would not have been willing to reimburse Vioxx prescriptions, and in no event would I have been willing to be reimburse prescriptions of Vioxx at a cost greater than traditional NSAIDs such as ibuprofen and naproxen, which were both available as low cost generics both by prescription and over the counter.

18. Had the matters set forth in paragraphs 8-12 which were not disclosed to me been disclosed to me at the time that I was Secretary of LDHH, then I, in my capacity as Secretary, would have done everything within my power as Secretary to ensure that LDHH neither bore the cost of reimbursing prescriptions of Vioxx nor exposed Louisiana residents to the increased risk of serious cardiovascular harm from Vioxx..

19. Had the matters set forth in paragraphs 8-12 which were not disclosed to me been disclosed to me at the time that I was Secretary of LDHH, and had the Drug Utilization Review Board (DURB) recommended prospective edits to prevent the use of Vioxx in patients for whom Vioxx was not indicated, I would have approved the use of such edits to promote the safety of Medicaid patients.

20. If Vioxx had not been approved by the FDA, it would not have been reimbursed by LDHH.

*David W Hood*
DAVID HOOD

SWORN TO AND SUBSCRIBED BEFORE ME,
THIS  8th  DAY OF MARCH, 2010.

*Doug Plymale*
NOTARY PUBLIC
Douglas Plymale BAR#28409