# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| STATE OF LOUISIANA, ex rel JAMES D. | * | JUDGE FALLON |
| CALDWELL, JR. Attorney General, | * | |
|                     Plaintiff, | * | MAG. JUDGE KNOWLES |
| | * | |
|     versus | * | |
| | * | |
| MERCK SHARP & DOHME CORP., | * | |
|               Defendant | * | |
| **CASE NO. 05-3700** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **AFFIDAVIT OF TERRY D. LEACH, PHARM. D.**

I, Terry Leach, Pharm. D., affirm as follows:

1. Based on my review of the materials listed in Exhibit B, and based on my knowledge, experience and training in the field of Pharmacy, Pharmacy and Therapeutics (P&T) Committees and Pharmacy Benefit Managers (PBMs), the materials listed in Exhibit B further support the opinions in my original report, and I have the following additional opinions set forth in paragraphs 4- 26 below, to which my testimony at trial would also be consistent.

2. Attached as Exhibit A hereto is a true and correct copy of my expert report in this matter. At trial I would testify consistently with the matters set forth therein.

3. Attached as Exhibit B hereto is a list of additional materials I have reviewed since my report was submitted in this case.

4. It is my opinion that P&T Committees are primarily concerned with safety and efficacy of drugs when considering formulary status or placement on a Preferred Drug List (PDL). While cost was certainly a factor in determining whether to include drugs on its PDL, the Louisiana Department of Health and Hospitals' (LDHH) P&T Committee's primary concern was with clinical aspects of safety and efficacy of drugs, and cost considerations were only applicable where there were competing drugs that were believed to be of comparable risk and benefit.

1

5. It is my opinion, supported by LDHH P&T committee member affidavits, with respect to inclusion of NSAID and Cox II drugs on the LDHH PDL that, the LDHH P&T committee relied upon the clinical evaluations provided by Provider Synergies to the LDHH P&T Committee in the form of drug monographs, and on information provided to the LDHH P&T committee members directly by Merck during or as a follow-up to Merck representative meetings, and members of the LDHH P&T committee concluded based on their personal and professional knowledge that any risks of Vioxx were outweighed by the benefits of the drug.

6. It is my opinion that during the entire time that Louisiana Medicaid reimbursed Vioxx prescriptions, based on the information made available to them at the time, members of the LDHH P&T committee understood that, while there were various risks associated with the use of Vioxx, the risks were of acceptable levels for a prescription drug of widespread analgesic use such as Vioxx and that those risks were outweighed by the benefits provided by the drug. It is my opinion that the understanding by LDHH P&T committee members was based on incomplete and inaccurate information because critical information concerning the clinical risks and benefits of Vioxx were never made known to the public, including Provider Synergies or LDHH, and information that would be critical for a reasonable P&T committee to consider in deciding Vioxx's formulary status or placement on a PDL.

7. It is my opinion that during the entire time that Vioxx was on the market, it was never made known by Merck to the public, including to Provider Synergies or LDHH, that Vioxx was not safe and effective when approved in 1999 due to the signal of cardiovascular harm that was not adequately investigated. A reasonable P&T committee would find this information that Merck failed to disclose critical for deciding Vioxx's formulary status or placement on a PDL, and would have been critical for the LDHH P&T Committee in deciding whether to include Vioxx on its PDL.

8. It is my opinion that during the entire time that Vioxx was on the market, that Merck, the manufacturer of Vioxx, was aware that Vioxx had the potential to induce cardiovascular side effects and failed to adequately investigate that question. A reasonable P&T committee would find this information that Merck failed to disclose critical for deciding Vioxx's formulary status or placement on a PDL, and would have been critical for the LDHH P&T Committee in deciding whether to include Vioxx on its PDL.

9. It is my opinion that during the entire time that Vioxx was on the market, Merck never disclosed to the public, including Provider Synergies or LDHH, that Merck manipulated published literature to greatly exaggerate the gastrointestinal (GI) benefits of Vioxx, including:

    a.  By April 2003, Merck's data showed that Vioxx had about a four times greater risk of GI harm compared to placebo, although the Laine study

2

        cited in Provider Synergies' Monographs provided to the LDHH P&T Committee stated that the Vioxx ulcer rate was "comparable to placebo";

    b.    Vioxx was only tested to show GI benefit against high doses of ibuprofen and other NSAIDs that are not taken by 90% of the NSAID users, while people who used lower doses (the vast majority) got no benefit;

    c.    Although the VIGOR study publication cited in the Provider Synergies monographs concluded Vioxx showed a statistically significant benefit over Naproxen for the most serious GI events, the VIGOR study results only showed such a benefit for patients taking steroids, which comprise only a small percentage of Vioxx patients;

    d.    By February 27, 2003, Merck knew that the rate of the most serious GI events in the osteoarthritis studies was higher on Vioxx than on the traditional NSAIDs such as ibuprofen by the end of the study period, but this information was not disclosed in any of the Monographs.

10.    It is my opinion that during the entire time Vioxx was on the market, Merck never disclosed to the public, including Provider Synergies or LDHH, that Merck, the manufacturer of Vioxx, was aware that Vioxx significantly increased the risk of serious cardiovascular harm whether or not a patient had a previous history of cardiovascular disease (i.e., was "aspirin-indicated"), that Merck's evidence showed that this risk was not mitigated by concomitant treatment with low-dose aspirin, and that Merck manipulated published literature from its sponsored research to minimize the cardiovascular risks of Vioxx, including:

    a.    The VIGOR study publication referenced in the Provider Synergies Monographs did not include complete cardiovascular (CV) data that was pre-specified for analysis, which would have shown excess CV risk to all patients, not just the ones who were "Aspirin-indicated" (ie, had prior CV event);

    b.    The VIGOR study publication did not include the "Overall safety" results showing that Vioxx patients had 21% more serious adverse events than naproxen patients, when all types of harm were considered, which demonstrated that any GI benefit was outweighed by CV harm;

    c.    By 2001, Merck knew that Merck-sponsored Alzheimer's studies showed an excess risk of mortality among Vioxx patients versus placebo, and the same data showed an excess of cardiovascular mortality;

    d.    Although by April 2002, Merck's OA data showed a statistically significant 3-fold risk of thrombotic CV events compared to placebo, a 2002 Merck-sponsored study publication cited in the Provider Synergies

3

       Monographs provided to the P&T Committee only addressed pre-market OA studies and stated that there was no difference between Vioxx and placebo.

11. It is my opinion that the VIGOR study, there was a statistically significant 27% higher overall hospitalization rate among people who took Vioxx compared to people who took naproxen (338 versus 265 hospitalizations). This data from the VIGOR study report was never published. Although there were 20 fewer hospitalizations for gastrointestinal problems, there were 41 more cardiovascular hospitalizations among people taking Vioxx. Had Merck made this data available, it would have been clear that its claims of economic advantage based upon the representations of decreased GI. complications in the VIGOR trial (even in this highly unrepresentative population in which 56% of patients were concurrently taking steroids) were just the opposite: higher costs were associated with Vioxx because of the increased rate of cardiovascular complications and hospitalizations.

12. It is my opinion that during the entire time that Vioxx was on the market, the LDHH P&T committee was never made aware, by Merck or anyone else, that while Merck-published studies cited in the Provider Synergies Monographs concluded that further study was necessary to determine whether Vioxx posed a cardiovascular risk, Merck's internal documents recognized that Vioxx did pose a cardiovascular risk and Merck consciously steered its sponsored research away from investigating that risk.

13. It is my opinion that during the entire time that Vioxx was on the market, the LDHH P&T committee was never made aware, by Merck or anyone else, that Vioxx was significantly less safe and no more effective than so-called traditional NSAIDs such as Ibuprofren and Naproxen, drugs which cost a fraction of the price of Vioxx.

14. It is my opinion that the information Merck failed to disclose set forth in paragraphs 9 – 13, *supra*, is the type of information that P&T committees typically rely on when considering formulary status or placement on a PDL. P&T committees rely on published literature to be truthful, complete and accurate. A reasonable P&T committee would find this information, which Merck failed to disclose, critical for deciding Vioxx's formulary status or placement on a PDL, and such information would have been critical for the LDHH P&T Committee in deciding whether to include Vioxx on its PDL.

15. It is my opinion that due to Merck's failure to disclose the information set forth in paragraphs 7 – 13, *supra*, the Provider Synergies Monographs did not contain complete and accurate clinical information on the risks and benefits of Vioxx.

16. It is my opinion that the LDHH P&T committee relied on the Provider Synergies Monographs to be truthful, complete and accurate, but due to Merck's failure to

4

disclose the information set forth in paragraphs 7 – 13, *supra*, the LDHH P&T committee relied on information that was not complete or accurate concerning the clinical profile of Vioxx.

17. It is my opinion that the Merck representatives present at LDHH P&T committee meetings did not provide any information of the sort set forth in paragraphs 7-13, *supra*, even after the P&T Committee members questioned the safety and efficacy of Vioxx.

18. It is my opinion that, had the matters set forth in paragraphs 7-13, which were not disclosed to the LDHH P&T committee, been disclosed, the LDHH P&T committee acting as a reasonable P&T Committee member would not have included Vioxx on the LDHH PDL.

19. It is my opinion that, had the matters set forth in paragraphs 7-13, which were not disclosed to the LDHH P&T committee, been disclosed, the LDHH P&T committee acting as a reasonable P&T Committee would have recommended consideration by the LDHH Drug Utilization Review Board (DURB) of prospective edits to prevent the use of Vioxx in patients for whom Vioxx was not indicated.

20. LDHH has had the ability to limit or legally restrict the reimbursement of FDA-approved drugs using DUR edits since at least 1991. LDHH's capability to implement DUR prospective edits was facilitated by the LDHH DUR prospective edit system going electronic at the point of sale on July 1, 1996. Prior to 2001, LDHH did implemented DUR edits to restrict reimbursement of FDA-approved drugs.

21. DUR is based on clinical outcomes and the clinical appropriateness of therapy. Most DUR edits have clinical components and are implemented due to safety issues. For example, LDHH DURB limited the use of Tylenol because of liver toxicity, and limited the use of the NSAID ketorolac, brand name Toradol, for its potential side effect of causing bleeding. DUR prospective edits can be tailored so as to have the same effect as step-therapy or prior authorization programs.

22. The LDHH DURB implemented a prospective DUR deny edit for NSAIDs in June, 2001 which was effectively a prior authorization program in that prescriptions for therapeutic duplicates of NSAIDs were payable only after discussion with and approval from the prescriber.

23. After an FDA advisory was issued in December, 2004 for NSAIDS, on Jan. 26, 2005, the LDHH DURB approved a prospective DUR edit denying COX-2 inhibitor prescriptions unless the patient met certain clinical criteria.

24. Had the matters set forth in paragraphs 7-13, which were not disclosed to the LDHH DURB been disclosed, the LDHH DURB committee acting as a reasonable

5

DURB would have implemented DUR prospective deny edits for Vioxx to prevent its reimbursement the entire time it was on the market.

25. Had the matters set forth in paragraphs 7-13, which were not disclosed to the LDHH DURB been disclosed, the LDHH DURB committee acting as a reasonable DURB would have implemented DUR prospective deny edits for Vioxx to restrict reimbursement for any patients not concomitantly taking corticosteroids.

26. If Vioxx had not been approved by the FDA, it would not have been included on the LDHH PDL.

I swear under penalty of perjury that the foregoing is true and correct, and that this affidavit was signed at 4:40 pm on March 8, 2010

*Terry D. Leach*
Terry Leach, Pharm. D.

Signed before me on this 8th day of March 20, 2010

*Mary A. Fuchs*

MARY A. FUCHS
Notary Public, State of New York
No. 01FU5057502
Qualified in Nassau County
Commission Expires March 25, 2010