# EXHIBIT G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| STATE OF LOUISIANA, ex rel JAMES D. | * | JUDGE FALLON |
| CALDWELL, JR. Attorney General, | * | |
|                       Plaintiff, | * | MAG. JUDGE KNOWLES |
| | * | |
| versus | * | |
| | * | |
| MERCK SHARP & DOHME CORP., | * | |
|          Defendant | * | |
| **CASE NO. 05-3700** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF JOHN ABRAMSON, M.D.

STATE OF MASSACHUSETTS
ESSEX COUNTY

    BEFORE ME, the undersigned Notary, personally came and appeared:

JOHN ABRAMSON, M.D.

who, being duly sworn, did depose and say:

1. The following is based on my training in medicine, research skills acquired as a Robert Wood Johnson Fellow, and extensive research specifically related to Vioxx and Vioxx litigation.

2. Attached as Exhibit A hereto is a true and correct copy of my expert report in this matter. At trial I would testify consistently with the matters set forth therein and in the following affidavit.

3. Attached as Exhibit B hereto is a list of additional materials I have reviewed since my report was submitted in this case.

4. I have reviewed documents including publications in peer-reviewed medical journals, FDA Advisory Board briefing and other documents, internal Merck documents, monographs provided by Provider Synergies to the P&T Committee of the Louisiana Medicaid pharmacy reimbursement program, the depositions of Valerie Taylor,

1

PharmD, and Fran Kaiser MD, and the affidavits of Vincent Culotta MD and other members of the Medicaid Pharmaceutical and Therapeutics Committee (P&T Committee) of the Louisiana Medicaid pharmacy reimbursement program.

5. It is my opinion that the information provided by Merck (both directly and indirectly) about Vioxx to: Fran Kaiser M.D., in her role as Merck senior medical director for the South Central region that included Louisiana and 10 other states; Valerie Taylor Pharm.D., in her role as clinical director of Provider Synergies; Vincent Culotta M.D., in his role as Chairman of the P&T Committee; and other members of the Louisiana P&T Committee was incomplete, inaccurate, and biased. And further, the trust that decision makers in the Louisiana P&T committee had in the accuracy and completeness of the information about Vioxx that came to them directly and indirectly from Merck allowed these misrepresentations of the true benefits and risks of Vioxx to serve as the basis of the P&T committee's decisions about Vioxx.

6. Based upon their affidavits, it is my opinion that had members of the P&T Committee known the true risks and benefits of Vioxx, they would not have supported inclusion of Vioxx on the Preferred Drug List of Louisiana's Medicaid pharmacy reimbursement program. In addition, they would have taken steps to "prevent the use of Vioxx in patients for whom Vioxx was not indicated," which (as will be shown below) would have been the overwhelming majority of, if not all, Vioxx users.

7. Based upon their testimony in deposition, it is my opinion that Merck employee Fran Kaiser M.D. and Provider Synergies' employee Valerie Taylor Pharm.D. were not provided with complete, accurate, and unbiased information about the risks and benefits of Vioxx to present to the P&T Committee of the Louisiana Medicaid pharmacy reimbursement program. Had the information provided to Dr. Kaiser and Valerie Taylor been of the accuracy and completeness that each expected, it would have differed substantially and materially from what was in fact presented by them, and as documented in P&T Committee members' affidavits, would have led to dramatically less or no use of Vioxx by Louisiana Medicaid recipients.

8. Although it is true that additional information about the cardiovascular risk and GI benefit of Vioxx (from the 2002 Vioxx label update) was provided to the Louisiana P&T Committee by Dr. Kaiser and Valerie Taylor as well as in the 2003 and 2004 monographs, as will be shown below this information was far from complete, accurate, and unbiased. Importantly, there is no evidence that Dr. Kaiser or Valerie Taylor were aware of the extent to which they had been incompletely- or mis-informed by Merck, and therefore there is no reason to doubt that it was their belief that all relevant information about CV risks and GI benefits had been reasonably communicated to Louisiana P&T Committee.

9. Merck's omissions, inaccuracies, and bias occurred prior to the April 2002 label change and continued with the label change and in the information that was provided subsequently about the risk and benefit of Vioxx. Specifically with regard to the

2

information provided to the Louisiana P&T Committee, the monographs dated 2002, 2003, and 2004 provided by Provider Synergies relied upon articles published in peer-reviewed journals, FDA approved product labels, and material received from manufacturers, all of which served to perpetuate rather than remediate Merck's incomplete, inaccurate, and biased information about Vioxx.

10. Prior to the April 2002 label update, Merck was in possession of data that showed increased risk of thrombotic cardiovascular events associated with Vioxx, but failed to make that information known to patients, prescribers, or purchasers (including those in Louisiana). As described in my report, this information included (but was not limited to):

- Study 023 showing that Vioxx selectively inhibited prostacyclin without concurrent inhibition of thromboxane (raising the possibility of a prothrombotic effect);
- The exploratory "Watson study" completed in 1998 showed a possible significant increase in CV risk among female patients in the pre-approval osteoarthritis studies compared to the control group in Fosamax studies;
- The May 1998 opinion of Merck's Scientific Board of Advisors[1] that selective inhibition of prostacyclin resulting from selective COX-2 inhibition raised the possibility of Vioxx exerting a prothrombotic effect;
- Merck's Board of Scientific Advisors Summary Report presented in April 2000[2] stating that the VIGOR evidence "does not exclude…a prothrombotic action," and left open the question of "whether there is a Vioxx-naproxen difference in the risk of cardiovascular events at all levels of baseline risks..."
- Deborah Shapiro's deposition testimony that Merck had known since approximately the end of May 2000 (six months before the NEJM article was published) that there were three more heart attacks that occurred in people taking Vioxx in the VIGOR trial that had not been included in the data analyzed for the NEJM article, and that the inclusion of these three heart attacks in the calculations invalidated Merck's claim that the increased risk of heart attack extended only to people with a previous history of CV disease.[3]
- Deborah Shapiro's meta-analysis of October 2000 that showed significantly increased risk of MI in all studies to date comparing Vioxx to other NSAIDs;
- The VIGOR trial that showed significant increase in MI and total thrombotic CV events in aspirin not-indicated patients treated with Vioxx- compared to naproxen-treated patients (though neither of these findings was reported in the November 2000 NEJM article);
- Other findings associated with Vioxx in the VIGOR trial that were not reported in the November 2000 NEJM article included statistically significantly more: serious adverse events overall, edema-related adverse

---

[1] MRK-AE100002734
[2] Board of Scientific Advisors, April 26, 2000  MRK-NJ0025145
[3] Deposition of Deborah Shapiro, 4/29/04 p 273-274

3

  events, hypertension, and withdrawals from the study because of hepatic disease;
- Myocardial infarction rates in the ADVANTAGE study (completed the same month as VIGOR, March 2000) that were consistent with those in the VIGOR study (but did not reach statistical significance) and provided evidence that prophylactic low-dose aspirin did not mitigate the increased risk of Vioxx in patients with a previous history of cardiovascular disease (the results of the ADVANTAGE trial were not published until 2003, and then in an advantageously spun ghostwritten article);
- Mounting data from Merck's osteoarthritis clinical trials that Vioxx increased the risk of CV thrombotic events that reached statistical significance with the completion of Study 136 (file frozen April 25, 2002), relative risk 3.2, p=0.03.

11. The inclusion of cardiovascular risk data from the VIGOR trial in the April 2002 label update for Vioxx and in subsequent communications from Merck about Vioxx provided only limited correction of these omissions and inaccuracies. Prescribers and purchasers were still left with material and substantial omissions and misrepresentations (as described below) about the cardiovascular and GI risk, as well as affirmative misrepresentation about the GI benefit of Vioxx.

12. As described in my report, misleading, incomplete, and inaccurate publications of Merck's clinical trials included (but were not limited to): VIGOR in *NEJM* (2000), Konstam et al *Circulation* (2001) Reicin et al *American Journal of Cardiology* (2002), Gertz et al Current Research and Opinion (2002), and Weir et al *American Heart Journal* (2003). All of these articles were cited in Provider Synergies' monographs.

13. All of this set the stage for Provider Synergies' relationship with the Louisiana P&T Committee. Because Provider Synergies relied only upon articles published in peer-reviewed journals, FDA-approved labels, and to a lesser extent information provided on request from pharmaceutical companies, the information from randomized clinical trials included in their monographs was primarily that which was made available by manufacturers (with some trials sponsored by competing manufacturers).

14. The first of the Provider Synergies' NSAID monographs, published in February 2002, reported the higher incidence of MI in the Vioxx group of the VIGOR trial. But the MI rates presented—0.1 vs 0.4% for naproxen and Vioxx, respectively—show that the data from the FDA 2001 Advisory Committee briefing documents were not accessed and that Provider Synergies was not aware that three heart attacks that had occurred in patients taking Vioxx were not included in the November 2000 *NEJM* article. Importantly, without knowledge of these three MIs, one could not have known that the risk of MI was significantly increased for those taking Vioxx in the VIGOR trial, *whether or not they had a previous history of cardiovascular disease.* Nor could one have known that the prespecified cardiovascular complication for the VIGOR trial was total thrombotic cardiovascular events, and that the heart attack rate

4

presented in the November 2000 *NEJM* article was actually a *post hoc* safety endpoint. Similarly, without access to the FDA 2001 Advisory Committee briefing documents there was no way to know that the VIGOR trial showed that Vioxx was not only not safer than naproxen (the single reason for its use), but was actually significantly more dangerous: patients taking Vioxx developed significantly more serious adverse events overall than those taking naproxen, 21% increase, $p=0.013$.

15. Provider Synergies' 2002 NSAID monograph included data from the VIGOR trial published in the November 2000 NEJM article showing the reduction in GI events and serious GI events associated with Vioxx. The August 2001 article by Mukherjee et al published in *JAMA* was cited, but only to show that the rate of MI was similar in VIGOR to patients taking Celebrex in the CLASS study. The significant increase in risk of thrombotic cardiovascular events associated with Vioxx in the VIGOR trial in patients with and without a previous cardiovascular history was not presented in this or any other section of the monograph. (This instance of Provider Synergies not presenting more complete data from the article by Mukherjee et al is understandable given the overwhelming predominance of articles published in peer-reviewed journals showing the lack of CV risk associated with Vioxx in patients without a previous history of cardiovascular disease.)

16. The key issue from April 2002 forward is whether the disclosures about CV and GI risk as well as GI benefit that were included in the 2002 label for Vioxx (and Merck's subsequent communications based upon the updated label) constituted reasonable disclosure of the risks and benefits as known to Merck.

17. The CLINICAL STUDIES section of the April 2002 label presenting *Gastrointestinal Safety in VIGOR* showed those who took Vioxx in the VIGOR trial compared to those who took naproxen experienced significantly fewer PUBs and complicated PUB. In addition, the effect of taking Vioxx in reducing PUBs and complicated PUBs was presented for patients with and without certain risk factors:

    "The risk reduction for PUBs and complicated PUBs for Vioxx compared to naproxen (approximately 50%) was maintained in patients with or without the following risk factors for developing a PUB (Kaplan-Meier cumulative rate of PUB's at approximately 10 1/2 months, Vioxx versus naproxen, respectively: with prior PUB (5.12, 11.47); without a prior PUB (1.54, 3.27; age 65 or older (2.83, 6.49) or younger than 65 years of age (1.48, 3.01). **A similar risk reduction for PUB's and complicated PUB's (approximately 50%) was also maintained in patients with or without *Helicobacter pylori* infection or concomitant corticosteroid use.**" [Emphasis added]

18. The CLINICAL STUDIES section of the April 2002 label included data showing the comparative rates of serious cardiovascular thrombotic adverse events that occurred in VIGOR trial, showing significantly greater CV thrombotic events, cardiac events overall, and nonfatal heart attacks in people taking Vioxx.

5

19. The PRECAUTIONS section of the April 2002 label contained the following language:

    "The information below should be taken into consideration and caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease."

    "In VIGOR, a study in 8076 patients (mean age 58; Vioxx n-4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with Vioxx 50 MG once daily (n=45) as compared to patients treated with naproxen 500 MG twice daily (n=19)."

    "Because of its lack of platelet effects, Vioxx is not a substitute for aspirin for cardiovascular prophylaxis. Therefore, in patients taking Vioxx, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis."

20. The PRECAUTIONS section of the 2002 label also presented reassuring data on cardiovascular events that occurred in Alzheimer's prevention studies:

    "In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively."

21. The updated April 2002 label contained the following omissions and misrepresentations (none of which were corrected in Provider Synergies monographs):

    - The claim that Vioxx reduced the incidence of complicated PUBs by approximately 50% "in patients with or without *helicobacter pylori* infection or concomitant steroid use" was a misrepresentation of the data from the VIGOR trial. Among patients who were not taking steroids concurrently there was no reduction in complicated PUB's, 10 vs 9 for naproxen and Vioxx, respectively. Thus, the claim that Vioxx provided significant reduction of serious GI complications was only true for the 56% of patients taking corticosteroids currently with an NSAID in the VIGOR trial—a very small percentage of "real world" patients taking Vioxx.

- The language incorporated into the April 2002 label stating "caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease" reinforced the misrepresentation presented in the November 2000 NEJM article purporting to show that Vioxx did not increase the risk of myocardial infarction among those patients who did not have a previous history of cardiovascular disease (i.e. not aspirin indicated). The ADVANTAGE trial was completed the same month as the VIGOR trial, March 2000, and allowed people to take prophylactic low-dose aspirin, but the results suggested that this did not mitigate the increased cardiovascular risk.
- There was no language indicating the possibility that the increased rate of thrombotic CV complications associated with Vioxx might be due to a prothrombotic effect independent of its lack of antiplatelet activity.
- The rate of serious adverse events in the VIGOR trial, i.e. the overall health consequence, was 21% higher (p=0.013) in people taking Vioxx than in people taking naproxen. But this was not included in updated Vioxx label.
- The cardiovascular event rates from the Alzheimer's trials are presented, but overall mortality data were available to Merck no later than May 1, 2001, showing overall mortality rate in the Alzheimer's studies was 2.5 times greater among patients taking Vioxx than placebo (38 vs. 16 events), p=0.001.[4]

22. Based upon their testimony in deposition, neither Dr. Fran Kaiser nor Valerie Taylor were aware of the above deficiencies and misrepresentations in the April 2002 Vioxx label and Merck's subsequent communications that were based upon the 2002 label. In her deposition Valerie Taylor interpreted the language in the label about reduction of PUBs and complicated PUBs in patients taking Vioxx in the VIGOR trial to mean that Vioxx reduced the risk for PUBs and complicated PUBs for patients with or without concomitant steroid use.[5]

23. Notwithstanding Merck's awareness of the significant increase in heart attacks and thrombotic cardiovascular events overall associated with Vioxx in the VIGOR trial, Merck's US Long-Range Operating Plan for Vioxx and Etoricoxib, dated July 2001, identified "Key Success Factors for Merck" that included: "Effectively communicate CV safety profile."[6]

24. This was at the time when Merck was aware of the significantly increased rate of myocardial infarction and thrombotic cardiovascular complications overall in patients who took Vioxx in the VIGOR trial compared to those who took naproxen, and was

---

[4] MRK-ABY0030000; MRK-ABY0030001 ("Chen Memo May 1, 2001")
[5] Valerie Taylor deposition, p. 108
[6] U.S. Long Range Operating Plan Franchise: Analgesic & Anti-Inflammatory Products: VIOXX, Etoricoxib July, 2001. MRK-AB10008659; p. MRK-AB10008668

7

or should have been aware that the relative risk of thrombotic cardiovascular serious adverse events in its osteoarthritis studies versus placebo to date (Studies 010 through 090) showed a relative risk of 1.9 for Vioxx compared to placebo (not statistically significant).[7]

25. This same document projected the impact of different label change scenarios on Vioxx sales. An upside of 25% was projected if "No prothrombotic language" was included in the upcoming label change, and a downside of 50% if CV data were incorporated into the Warning rather than the Precaution section of the label.[8] For 2004, these projections translated into an upside of approximately $2.8 billion in Vioxx sales (with no prothrombotic language), and a downside of approximately $1.7 billion (if the CV data were presented in the Warning rather than Precaution section). The April 2002 label did not contain prothrombotic language and appeared in the Precaution rather than the Warning section of the label.

26. When asked in deposition whether she presented the mortality data from the "Chen memo" of May 1, 2001 to Dr. Culotta, Dr. Kaiser said, "If it wasn't in the label, it wasn't discussed."[9] Dr Kaiser also stated that she never knew that people taking Vioxx in the VIGOR trial had experienced significantly more serious adverse events,[10] and significantly more discontinuations due to hypertension occurred among people taking Vioxx in the VIGOR study.[11] Dr. Kaiser stated she believed that people for whom aspirin was not indicated who took Vioxx in the VIGOR trial did not experience significantly more heart attacks than non-aspirin indicated patients taking naproxen.[12] Dr. Kaiser believed that aspirin would mitigate the increased risk of heart attack in aspirin-indicated patients taking Vioxx,[13] despite evidence to the contrary from Studies 085, 090, and ADVANTAGE. And Dr. Kaiser was not aware of the results of Study 136, which showed that patients taking Vioxx plus prophylactic aspirin had the same risk of ulcers as those taking ibuprofen 2400 mg/day.[14]

27. Valerie Taylor stated the 2003 recommendation to place Vioxx on the Louisiana's Medicaid Preferred Drug List was based on Provider Synergies' monograph reviewing NSAIDs and presentation to the P&T committee, and that she does not believe that "Merck in any way misled or misrepresented the risks and benefits of Vioxx…"[15]

---

[7] MRK-18940080095
[8] U.S. Long Range Operating Plan Franchise: Analgesic & Anti-Inflammatory Products: VIOXX, Etoricoxib July, 2001. MRK-AB10008659; p. MRK-AB10008674
[9] Deposition of Fran Kaiser M.D. p.131
[10] Ibid, p. 183
[11] Ibid, p. 188
[12] Ibid, p. 192-3
[13] Ibid, p. 196
[14] Ibid, p. 196
[15] Valerie Taylor deposition, p. 93

28. Provider Synergies' monographs on NSAIDs/Selective COX-2 Inhibitors for 2003 and 2004 were virtually identical with respect to Vioxx. The VIGOR trial results showing significant reduction in confirmed and serious GI events are reported. There was no disclosure that the reduction in serious GI events pertained only to patients taking Vioxx and corticosteroids concurrently, and the monographs did not correct the affirmative misrepresentation about this in the 2002 label for Vioxx. The monographs also presented data showing that ulcer rates with Vioxx 25 and 50 mg/day were comparable to placebo, based on an endoscopy study published in 1999. However, data from Merck's Study 078, available no later than April 2003,[16] showed a statistically significant more than tripling in the incidence of PUBs in patients taking Vioxx 25 mg/day vs. placebo, relative risk 3.5, p=0.03,[17] and more than tripling of complicated PUBs as well, relative risk 3.4, p= 0.09 (statistical significance not achieved because of lower number of events).

29. The incidence of MI was reported in the monographs as:

> "lower in the naproxen group (0.1 percent) than the rofecoxib group (0.04 percent). Low dose aspirin for cardiovascular prophylaxis was not permitted and patients requiring aspirin for cardiovascular prophylaxis were excluded."

The rates of MI show that Provider Synergies was relying upon the November 2000 NEJM report of the VIGOR trial (which was missing three MIs in patients taking Vioxx), rather than the FDA 2001 Advisory Committee briefing documents or internal Merck reports. Analysis that did not include the three missing MIs produced the erroneous conclusion, expressed in deposition by Dr. Kaiser, that patients taking Vioxx in the VIGOR trial without a previous history of cardiovascular disease were not at increased risk of MI.

30. The section of the monographs titled ***Cardiovascular Concerns*** presented reassurance about Vioxx rather than concern: The 2001 article by Mukherjee et al was selectively referred to (see above) providing reassurance that the rate of CV events in Vioxx patients in the VIGOR trial was consistent with those taking Celebrex in the CLASS trial. And two falsely reassuring (Merck-sponsored) articles by Reicin et al and Konstam et al provided evidence that the risk of cardiovascular thrombotic events was numerically lower in patients treated with NSAIDs and non-naproxen NSIADs, respectively.

31. The section of the monographs addressing hypertension and edema did not include unpublished results from the VIGOR trial showing that patients taking Vioxx experienced 50% more edema-related adverse events (p=0.0002) and 70% more hypertension (p=0.0000001).[18]

---

[16] MRK-12690007833; p MRK-12690007836
[17] MRK-12690007833; p MRK-12690008102
[18] Report of John Abramson MD, paragraph 51

9

32. The *Conclusion* section of the monographs contained the following paragraph about the cardiovascular concerns raised by the VIGOR trial:

> The VIGOR study raised some questions regarding the cardiovascular safety of rofecoxib (Vioxx). Patients receiving rofecoxib (Vioxx) had a significantly higher risk of developing a cardiovascular thrombotic event compared to patients receiving naproxen. Aspirin for cardiovascular prophylaxis was not permitted in the study, which does not reflect "real world" use of the NSAIDs. Although the significance of this potential cardiovascular risk is unknown, it does raise questions. Hypertension and edema may occur with all NSAIDs, and the COX-2 specific inhibitors also have the potential of these side effects.

This is not, however, a full or reasonable presentation about the cardiovascular risk of Vioxx that was known to Merck:

- The risk of MI in particular or thrombotic CV events overall was significantly increased by Vioxx in the VIGOR trial in the group as a whole and among those patients for whom prophylactic aspirin was indicated. Thus, the fact that the VIGOR study design did not allow low-dose aspirin for cardiac prophylaxis (and therefore didn't reflect "real world") is irrelevant to the increased CV risk associated with Vioxx.
- Merck's osteoarthritis RCTs completed by April 2002 showed a relative risk of thrombotic CV events of Vioxx compared to placebo of 3.2, p=0.03, but these results were contained in Merck's Updated Cardiovascular Pooled[19] Analysis and not published so therefore not accessible to or considered by Provider Synergies.
- Hypertension and edema were shown to occur significantly more frequently in people who took Vioxx in the VIGOR trial.

33. Neither Provider Synergies' monographs nor communications from Merck after April 2003[20] included cardiovascular mortality data combined the combined Alzheimer's trials, which showed significantly more deaths due to heart disease in patients treated with Vioxx in the Alzheimer's studies compared to those treated with placebo, 21 vs. 6, Hazard Ratio 3.84, p < 0.005.[21]

34. Hospitalization rates in the Vioxx and naproxen groups would have been relevant to the Louisiana P&T committee from both a health/safety as well as a cost point of view. But this data was not published and was therefore not included in the monographs: Rather than reducing the hospitalization rate among people taking Vioxx in the VIGOR trial (20 fewer GI hospitalizations), there were more than twice as many (41) cardiovascular hospitalizations among people taking Vioxx. In total there were 27% more hospitalizations among people taking Vioxx compared to those taking naproxen (relative risk 1.27, p=0.002).

---

[19] MRK-18940080062; p. MRK-18940080095
[20] MRK-12690007833; p MRK-12690007836
[21] Psaty BM, Kronmal RA, Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment, Journal of the American Medical Association, 2008;299:1813-17

10

35. Both Valerie Taylor and Dr. Fran Kaiser state in their depositions that no member of the Louisiana Department of Health and Hospitals or of the P&T committee ever told her that Provider Synergies had provided inaccurate, misleading, false information about Vioxx or COX-2 inhibitors. But this is not evidence of the accuracy and completeness of the information provided about Vioxx, rather it is evidence—notwithstanding the contradicting facts presented above—of the effectiveness of the uncorrected misrepresentations that had been passed on from Merck through Provider Synergies to the Louisiana P&T committee.

36. In conclusion, in her position as Clinical Director at Provider Synergies, Valerie Taylor Pharm. D. played a major role in determining what was communicated to the Louisiana P&T committee about Vioxx and other NSAIDs through the monographs and directly in presentation. Valerie Taylor stated in her deposition:

    "I just would not believe that a manufacturer, any manufacturer, that they would provide false or misleading information."[22]

    "If it's peer-reviewed, it should be valid information."[23]

37. Dr. Fran Kaiser testified in her deposition that she provided "fair and balanced scientific information to Dr. Culotta,"[24] by which she meant:

    "...we reviewed the changes in the label, which included cardiovascular events that were included in the VIGOR trial as well as the GI outcomes of that trial..."

38. The evidence shows that Fran Kaiser MD, Valerie Taylor Pharm.D, and members of the P&T Committee of the Louisiana Medicaid pharmacy reimbursement program trusted that the information provided to them by Merck through its peer-reviewed publications, the FDA-approved label, and its direct communications provided fair and balanced information about the risks and benefits of Vioxx. At the same time, the evidence shows that the information provided by Merck was not fair and balanced, rather that it minimized the cardiovascular risk of Vioxx and exaggerated the GI benefit.

39. It is my opinion that Merck's actions as described above deprived the members of the P&T Committee of the Louisiana Medicaid pharmacy reimbursement program from making reasoned and balanced decisions about the risks and benefits of Vioxx. And had they know the truth about the risks and benefits of Vioxx, they would have made Vioxx available to a miniscule subpopulation of Louisiana Medicaid recipients, if they made it available at all.

---

[22] Valerie Taylor deposition, p 119
[23] Valerie Taylor deposition, p 120
[24] Fran Kaiser deposition, pp 213-4

11

_____
John Abramson, M.D.

Subscribed and sworn to before
me, a notary public, this _09_ day of _MARCH_ 2010.

_____
Notary Public

STEVEN ROBERT McCLENAGHAN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 8, 2011

12