# EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
|     STATE OF LOUISIANA, ex rel JAMES D. | * | JUDGE FALLON |
|     CALDWELL, JR. Attorney General, | * | |
|                                   Plaintiff, | * | MAG. JUDGE KNOWLES |
| | * | |
|     versus | * | |
| | * | |
|     MERCK SHARP & DOHME CORP., | * | |
|                                   Defendant | * | |
|     **CASE NO. 05-3700** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF VINCENT CULOTTA, M.D.

STATE OF LOUISIANA
PARISH OF ORLEANS

    BEFORE ME, the undersigned Notary, personally came and appeared:

                      VINCENT CULOTTA, M.D.

who, being duly sworn, did depose and say:

1. The following is based on my personal knowledge gathered in my role as a member and Chairman of the Medicaid Pharmaceutical and Therapeutics Committee (P&T Committee) of the Louisiana Medicaid pharmacy reimbursement program.

2. I served as a member and Chairman of the P&T Committee of the Louisiana Medicaid pharmacy reimbursement program responsible for recommending prescription drugs for inclusion on the Preferred Drug List from its inception until I resigned after December, 2003.

3. On numerous occasions, while serving as Chair of the P&T Committee, I was detailed in person by Merck representatives who discussed clinical issues with respect to Vioxx and was sent numerous marketing materials by Merck, including the VIGOR reprint and several "Dear Dr." letters that reviewed clinical studies relating to Vioxx. These meetings included dozens of sales representative calls at my private practice, as well as several meetings with Merck Government Affairs and Regional

      Medical Director representatives that discussed Vioxx clinical issues with me specifically in my capacity as Chairman of the P&T Committee.

4. While cost was certainly a significant factor in determining whether to include drugs on the Preferred Drug List, the P&T Committee's primary concern was with clinical aspects of safety and efficacy of drugs. Cost considerations were only applicable where there were competing drugs that were believed to be of comparable risk and benefit.

5. With respect to inclusion of NSAID and Cox II drugs on the Preferred Drug List, I relied upon the clinical evaluations of Provider Synergies, monographs provided to me as a member of the P&T Committee and information provided to me directly by Merck during or as a follow-up to Merck representative meetings and concluded based on my personal and professional knowledge that any risks of Vioxx were outweighed by the benefits of the drug.

6. During the entire time that Louisiana Medicaid reimbursed Vioxx prescriptions, I held the understanding that, while there were various risks associated with the use of Vioxx, the risks were of acceptable levels for a prescription drug of widespread analgesic use such as Vioxx and that those risks were outweighed by the benefits provided by the drug.

7. During the entire time that I served as a member of the P&T Committee and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Vioxx was not safe and effective when approved in 1999 due to the signal of CV harm that was not adequately investigated.

8. During the entire time that I served as a member of the P&T Committee and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Merck, the manufacturer of Vioxx, was aware that Vioxx had the potential to induce cardiovascular side effects and failed to adequately investigate that question.

9. During the entire time that I served as a member of the P&T Committee and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Merck manipulated published literature to greatly exaggerate the gastrointestinal (GI) benefits of Vioxx, including:

    a. By April 2003, Merck's data showed that Vioxx had about a four times greater risk of GI harm compared to placebo, although the Laine study cited in Provider Synergies' Monographs provided to the P&T Committee stated that the Vioxx ulcer rate was "comparable to placebo";

    b. Vioxx was only tested to show GI benefit against high doses of ibuprofen and other NSAIDs that are not taken by 90% of the NSAID users, while people who used lower doses (the vast majority) got no benefit;

      c.    Although the VIGOR study publication cited in the Provider Synergies monographs concluded Vioxx showed a statistically significant benefit over Naproxen for the most serious GI events, the VIGOR study results only showed such a benefit for patients taking steroids, which comprise only a small percentage of Vioxx patients;

      d.    By February 27, 2003, Merck knew that the rate of the most serious GI events in the osteoarthritis studies was higher on Vioxx than on the traditional NSAIDs such as ibuprofen by the end of the study period, but this information was not disclosed in any of the Monographs.

10. During the entire time that I served as a member of the P&T Committee and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Merck, the manufacturer of Vioxx, was aware that Vioxx significantly increased the risk of serious cardiovascular harm whether or not a patient had a previous history of cardiovascular disease (i.e., was "aspirin-indicated"), that Merck's evidence showed that this risk was not mitigated by concomitant treatment with low-dose aspirin, and that Merck manipulated published literature from its sponsored research to minimize the cardiovascular risks of Vioxx, including:

      a.    The VIGOR study publication referenced in the Provider Synergies Monographs did not include complete cardiovascular (CV) data that was pre-specified for analysis, which would have shown excess CV risk to all patients, not just the ones who were "Aspirin-indicated" (ie, had prior CV event);

      b.    The VIGOR study publication did not include the "Overall safety" results showing that Vioxx patients had 21% more serious adverse events than naproxen patients, when all types of harm were considered, which demonstrated that any GI benefit was outweighed by CV harm;

      c.    By 2001, Merck knew that Merck-sponsored Alzheimer's studies showed an excess risk of mortality among Vioxx patients versus placebo, and the same data showed an excess of cardiovascular mortality;

      d.    Although by April 2002, Merck's OA data showed a statistically significant 3-fold risk of thrombotic CV events compared to placebo, a 2002 Merck-sponsored study publication cited in the Provider Synergies Monographs provided to the P&T Committee only addressed pre-market OA studies and stated that there was no difference between Vioxx and placebo.

11. During the entire time that I served as a member of the P&T Committee and Vioxx was on the market, I was never made aware, by Merck or anyone else, that while Merck-published studies cited in the Provider Synergies monographs concluded that

further study was necessary to determine whether Vioxx posed a cardiovascular risk, Merck's internal documents recognized that Vioxx did pose a cardiovascular risk and Merck consciously steered its sponsored research away from investigating that risk.

12. During the entire time that I served as a member of the P&T Committee and Vioxx was on the market, I was never made aware, by Merck or anyone else, that Vioxx was significantly less safe and no more effective than so-called traditional NSAIDs such as Ibuprofren and Naproxen, drugs which cost a fraction of the price of Vioxx.

13. I attended meetings of the P&T Committee at which Merck representatives were present. The Merck representatives at those meetings did not provide any information of the sort set forth in paragraphs 6-12, *supra*, even after the P&T Committee members questioned the safety and efficacy of Vioxx.

14. Had the matters set forth in paragraphs 6-12, which were not disclosed to me been disclosed to me at the time that I was a member and Chairman of the P&T Committee, then I would not have supported the inclusion of Vioxx on the Preferred Drug List.

15. Had the matters set forth in paragraphs 6-12, which were not disclosed to me been disclosed to me at the time that I was a member of the P&T Committee, then I would have recommended consideration by the Drug Utilization Review Board (DURB) of prospective edits to prevent the use of Vioxx in patients for whom Vioxx was not indicated.

16. If Vioxx had not been approved by the FDA, it would not have been included on the Preferred Drug List.

_____
Vincent Culotta, M.D.

Subscribed and sworn to before
me, a notary public, this 5TH day of March 2010.

_____
Notary Public
Douglas Plymale BAR#28409