**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No.  1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, | JUDGE ELDON E. FALLON |
| Plaintiffs, | |
| v. | MAGISTRATE JUDGE KNOWLES |
| MERCK SHARP & DOHME CORP., | Case No.  05-3700 |
| Defendants. | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Note: Plaintiff reserves the right to seek appellate review of claims and/or issues as to which this Court has entered Summary Judgment.  The following proposed findings of fact and conclusions of law are limited to the cause of action of redhibition and issues as to which this Court denied summary judgment.  In submitting the following proposed findings of fact and conclusions of law, Plaintiff expressly reserves the right to seek appellate review of claims and issues as to which this Court granted summary judgment.

**FINDINGS OF FACT**

I.    **Background**

A.    **Development/Introduction of Vioxx**

1.    Vioxx was developed by Merck in the 1990's as a member of a class of drugs known as "COX-2 inhibitors," for the purpose of pain relief. For some twenty years prior, the class

- 1 -

of nonsteroidal anti-inflammatory drugs or "NSAIDs" had been used for effective pain relief; however, it was learned that NSAIDs had serious gastrointestinal ("GI") effects, including bleeding ulcers. Scientists discovered that there were (at least) two forms of an enzyme known as "cyclo-oxygenase," or "COX," called COX-1 and COX-2, which serve numerous functions in the body, and that NSAIDs inhibited the formation of both forms of the COX enzyme.  It was hypothesized that the GI harm came about as a result of inhibiting COX-1, and that a molecule that inhibited only COX-2 might relieve pain without causing GI side effects.

2.      Pharmaceutical company executives, including those at Merck, believed  that there was a large market for a drug that could provide pain relief without GI side effects. Over 25 million Americans suffer from some degree of osteoarthritis (OA), and another 1.3 million have rheumatoid arthritis (RA).  The serious bleeds associated with chronic use of NSAIDs resulted in many hospitalizations and deaths.  There was also a substantial market for relief of acute pain, but the arthritis patients who needed chronic pain relief constituted a large and growing market.

3.      As early as 1995, Merck knew that it was in a "race" with a competitor, Searle, which later became Pharmacia and then Pfizer, to be the first to market a COX-2 inhibitor. Merck's financial analysts predicted that the value of being first to market was $611 million.  The Vioxx Commercialization Sub-Team noted that there was "considerable financial pressure" on the company, and "rapid" development of Vioxx was encouraged.  A memorandum dated February 23, 1996, acknowledged that the race was a close one, and that "the most significant issue is speed of development."  The clinical trial program was "compressed and accelerated" to try to win the race with Searle, and a result of such compression was that the clinical program would be "incomplete from a scientific perspective."  (Gertz deposition at 82-117).

- 2 -

4. In the 1990's, Merck was also faced with a number of its products going off patent, which meant that competitors could sell generic versions of the same drug for lower prices, resulting in substantial losses of sales and income for Merck. (Deposition of Edward Scolnick ("Scolnick Dep.") 29:18-30:4, 32:13-33:20. 112:22-24.) Other Merck drugs that were newer to the market had disappointing sales. (Scolnick Dep. 116:1-11, P.1.001.) The loss of future income coupled with the race to market to increase the pressure on Merck to bring Vioxx to market. (Scolnick Dep. 34:8-34:16.) Edward Scolnick conveyed his concern about the future of the company and the critical role of Vioxx by forwarding an analyst report of a downgrade of Merck stock to the Vioxx Development Team. Scolnick's email also stated that it was up to the team to present positive data "not EVEN ONE day after launch" to "PRESERVE MERCK and MRL period for others, and yourselves." (Scolnick Dep. 118:1-118:22, P.1.001.)

5. Merck placed significant resources into Merck Research Labs specifically to push Vioxx to market. (Scolnick Dep. 42:6-9, 43:11-19.) The company emphasized the need for Vioxx to receive regulatory approval quickly. (Scolnick Dep. 117:18-118:13.) Scolnick demanded Merck "push Vioxx to market by May 22nd" or "Merck will be a different company." (Scolnick Dep. 156:7-10.)

6. There is a consensus in the scientific community that Vioxx increases the risk of serious and fatal heart attack (myocardial infarction, or "MI") and stroke, sometimes collectively called "thrombotic [clotting] events." As detailed in these Findings, there was a signal of such harm in the pre-market investigations of Vioxx. Although Merck conducted a number of studies of Vioxx before the drug was marketed, those studies were too small, both individually and collectively, to detect statistically significant differences in relatively rare events such as MI and stroke. Also, none of Merck's studies were specifically designed to answer that question. In light of the seriousness of

- 3 -

the type of harm; the intent to market the product to a wide market of millions of people including those at very high risk for such harm; and the multiple pieces of information pointing toward increased risk, a reasonable and prudent pharmaceutical company would have more thoroughly investigated the risk prior to marketing the product.  It is reasonable to infer, and the Court finds, that the combined economic pressures of products going off patent and racing with Searle to get to market influenced Merck's decision to sell Vioxx without adequately investigating the CV risk.

**B.   Merck Removed Vioxx From the Market on September 30, 2004 after APPROVe Trial Confirmed Excess CV Thrombotic Events.**

7.     The APPROVe clinical trial was designed to investigate whether Vioxx would reduce the incidence of adenomatous polyps, among subjects using either 25 mg Vioxx daily or placebo.  APPROVe was not designed to study cardiovascular (CV) thrombotic risk, but such events were collected and adjudicated under Merck's standard operating procedures.  The APPROVe trial began in 2000 and was terminated in late September 2004 upon the recommendation of the External Safety Monitoring Board (ESMB), which found a doubling of the risk of MI and stroke among the Vioxx patients.  Merck announced on September 30, 2004 that Vioxx would be immediately withdrawn from the market on the basis of the APPROVe findings.  At the same time, Merck cancelled two other studies of Vioxx 25 mg compared to placebo (VICTOR and ViP), which had been planned for a pooled analysis of CV thrombotic events along with APPROVe.  The combined analysis, known as Protocol 203, also showed a statistically significant excess risk of CV thrombotic events.

**C.   From the Time that the FDA Approved Vioxx in 1999, Louisiana Reimbursed Prescriptions of Vioxx for Louisiana Medicaid Patients.  Vioxx Was Widely Prescribed to Louisiana Medicaid Patients for Pain Relief.**

8.     After it was empowered to do so by legislative enactment of LSA-R.S. 46:153.3 on June 31, 2001, LDHH reviewed the clinical safety and efficacy of drugs to be

reimbursed by LDHH through a review by a Pharmaceutical and Therapeutic (P&T) Committee comprised of physicians, doctors of pharmacy, and officials within LDHH, to determine which drugs would be placed on a preferred drug list (PDL).  The P&T Committee then made recommendations regarding PDL status of prescriptions drugs to the Secretary of LDHH, who could adopt or reject the recommendations of the P&T Committee

9.     The LDHH P&T Committee hired a pharmacy benefit manager, Provider Synergies, to provide clinical safety and efficacy information about prescription drugs subject to reimbursement by LDHH and to make recommendations regarding PDL status of same.  The P&T Committee could either adopt or reject the recommendations of Provider Synergies.

10.     Throughout the time that the P&T Committee and Provider Synergies were charged with making recommendations to LDHH regarding the safety and efficacy of prescription drugs, Merck sales personnel targeted both the P&T Committee Members and Provider Synergies with Merck's pro-Vioxx message.  (August 25, 2003 Customer Profile, State of Louisiana, prepared by Holly Jacques and Mary Ogle; October 9, 2002 Customer Profile, Provider Synergies, by John Fevurly and Michael Davis).

11.     At no time did Provider Synergies or the P&T Committee recommend to LDHH that Vioxx be given unfavorable formulary status due to clinical issues of safety and efficacy.

## II.     Vioxx Was Defective

### A.     Premarket Concerns and Knowledge of Prothrombotic Mechanism.

12.     Long before Merck began to develop Vioxx, it was understood that thromboxane is a potent platelet aggregator and vasoconstrictor, and that a balance of prostacyclin and thromboxane in necessary to prevent thrombotic cardiovascular events, including myocardial infarctions and strokes.  (Scolnick Dep. 119:11-124:20.)  The role of thromboxane was described in detail in the Merck Manual, 16th Edition.  (Scolnick Dep. 118:2 – 122:20.)  Merck scientists realized

- 5 -

as early as 1997 that Vioxx suppressed the urinary metabolites of prostacyclin.  (Scolnick Dep. 130:5-13.)  This finding was consistent with a theory held by scientists, including Merck consultants, that suppression of systemic prostacyclin could cause thrombotic events in humans.  (Scolnick Dep. 131:9-20.)

13.    Discussion of the role of protacyclin and thromboxane was deleted from the Merck Manual before publication of the 17th Edition of the Merck Manual in 1999.  (Scolnick Dep. 127:11-129:19.)  The deletion of discussion of the mechanism that supported the view that Vioxx would cause heart attacks and strokes is not supported by any scientific research conducted between the publication of the 16th and 17th Editions of the Merck Manual.  (Scolnick Dep. 130:6-131:9.) The deleted material is still accurate.  (Scolnick Dep. 131:24-133:14.)

B.    **Vioxx was Rushed to Market to Compete with Celebrex, which Prevented Adequate Study of the Risks.**

14.    If Merck informed the FDA that there was a potential cardiovascular issue with Vioxx, or if Merck had conducted a pre-approval clinical trial to test whether Vioxx caused cardiovascular events, it would have slowed down the approval process for the drug.  (Scolnick Dep. 151:17-152:4.)  Consequently, Merck did not conduct such a study, or provide the FDA with data to show that Vioxx did not pose cardiovascular risks.  (Scolnick Dep. 152:5-152-24.)

C.    **Vioxx Increased the Risk of Heart Attacks and Other Cardiovascular Harm**

15.    The Court finds that Vioxx has a redhibitory defect in that it causes increased risk of numerous adverse cardiovascular consequences, including MI, stroke, congestive heart failure (CHF), hypertension, and edema (swelling/water retention).  The first signals of such a defect were observed in 1996, during drug development, and continued through pre-market studies of OA,  post-market studies such as VIGOR and the Alzheimer's trials, additional OA trials, and finally the APPROVe trial which brought about the withdrawal of Vioxx from the market.  When all of

864700.1

Merck's Vioxx trials are considered together, a highly statistically significant excess risk of thrombotic events is demonstrated compared to placebo, and this is the acknowledged gold standard in proving that Vioxx increased the risk of such events.  The chronology of information about CV risk is the subject of this section of the Findings of Fact.

        **D.**      **Early Signals of Defect**

       16.    Merck submitted a New Drug Application ("NDA") for Vioxx to the FDA on November 23, 1998.  Merck knew, before submitting the NDA, that Vioxx posed a risk of heart attacks or strokes, as a result of several consistent lines of evidence.

       17.    On October 10, 1996, in a Research Management Committee update evaluating a placebo-controlled high-dose study of Vioxx in Rheumatoid Arthritis (Clinical Trial Protocol 017) [hereinafter referred to as "Protocol 017], Merck officials wrote, "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina. . . .)"   MRK-ABC0048699 at 8706.  A table listing patients with non-fatal, serious clinical adverse experiences in Protocol 017 submitted to the FDA (Table E-152 of Merck's Integrated Safety Summary dated October 26, 1998) showed three thrombotic events (heart attack, unstable angina, and pulmonary blood clot) in Vioxx-treated patients and no thrombotic events in placebo-treated patients. MRK-ABS0067368.  While the dosage in this study involved a higher daily dose than was ultimately recommended in the drug's labeling, adverse events at a higher dose may portend safety issues at lower doses, especially since there are higher risk patients in the general population than in clinical trials.  The results of Protocol 017, showing 3 thrombotic events on Vioxx versus none on placebo, constituted an early signal, and it is noteworthy that such events were of "most concern" among Merck's scientists.

       18.    During May 1996 through January 1997, Merck carried out Protocol 023, a double-blind, placebo-controlled safety and pharmacokinetic study of Vioxx. Protocol 023 provided

evidence of a mechanism whereby Vioxx could cause MI and stroke, by creating an imbalance in the prostanoids known as thromboxane and prostacyclin (PGI-2), which regulate the likelihood of clotting and the constriction or dilation of blood vessels.  In Protocol 023, a decrease was noted in the urinary excretion of PGI-M, which "likely reflects . . . to some undefinable extent a decrease in PGI-2 synthesis.  PGI-2 is synthesized ubiquitously in blood vessel walls. . . .  It is the most potent of all platelet inhibitors of platelet aggregation, and has vascular dilatory properties as well." (Watson, Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials, 12/30/97 MRK-ABS0037036 at 7039).  Merck knew that Vioxx "had no effect on systemic thromboxane," which promotes clotting and blood vessel constriction. MRK-ABC0009947 at 949.  Merck knew that "[t]hese findings raised a concern about the potential for VIOXX to cause cardiovascular problems."  MRK-ABC0009947 at 949.  The results of Protocol 023 provided another signal that Vioxx could increase the risk of MI and stroke.

19.     In response to the findings of Protocol 023, in December 1997, Vioxx Project Team Manager Alan Nies, M.D., directed that Merck conduct an analysis of the ongoing OA clinical trial program to see whether there was evidence of elevated risk of MI, stroke and similar adverse events among Vioxx clinical trial subjects. Merck scientist Douglas Watson was assigned to lead this analysis.  On December 30, 1997, Watson's "Plan" to conduct the analysis said  that the results of Protocol 023, "raised concern about the potential for Vioxx to predispose to cardiovascular (CVD) thrombotic events. . ."  MRK-ABS-0037036 at 37039-40.

20.     On February 2, 1998, Merck scientist Watson reported a statistically significant relative risk of 2.16 [95%CI 1.14,3.94] for thrombotic cardiovascular serious adverse events in women based on patients in the pooled Vioxx -comparator-placebo osteoarthritis trials versus pooled Fosamax-placebo study patients [hereinafter referred to as "Watson analysis"]. MRK-

NJ006804 at 819.  Watson stated, "The overall incidence for women was elevated compared to Fosamax placebo controlled patients."  The value of comparing the incidence in pooled Vioxx-comparator-placebo osteoarthritis trials to pooled Fosamax-placebo study patients resided in the large number of "person years at risk," which according to Watson was over 14,500 person years at risk.  MRK-NJ0066804 at 819.[1]  Watson dismissed the elevated relative risk by suggesting that the Fosamax pooled population had an atypically low risk of cardiovascular disease.  MRK-NJ0066804 at 805.  However, two months earlier, on December 3, 1997, a Cardiovascular Task Force Agenda listed discussion about whether the Fosamax patients were "appropriate" controls for the Watson analysis; no concerns about the propriety of a Fosamax placebo control group were mentioned in the document, and Merck proceeded with the study.  (MRK-ABY0199809).  The Court infers that the Fosamax placebo population was appropriate for comparison, and that Merck did not find fault with it until after receiving news of a result that was adverse to Vioxx.  The Watson study was done to see if there was evidence of increased risk in the Vioxx trials, and the study did find such evidence, which was another signal of CV harm.

21.    Watson's February 2, 1998 report also downplayed the risk by including a comparison of the CV event incidence in the pooled Vioxx-comparator-placebo OA trials versus data from the Cardiovascular Health Study (CHS).  MRK-NJ0066804 at 805.  The original Plan for that analysis did <u>not</u> include comparison to, nor reference to, the CHS.  MRK-AB50037036, 048.  This comparison was undertaken as a "<u>post hoc</u>" or "after the fact" analysis, rather than a part of the original plan.

---

[1] In contrast, the Vioxx pre-market clinical trial database used for the safety analysis included only about 115 person years, which is too small a sample to provide reliable assurance of safety for relatively uncommon events such as heart attacks and strokes.

22.     Watson had previously read and cited the CHS in a Memorandum dated 11/21/96, which listed 15 different sources for "Estimates of Cardiovascular Disease Incidence for Planning GI Outcomes Mega-trial."  (MRK-ABS0210824; Musliner Ex. 8.)  Watson's Memorandum noted several "caveats," which included:  "Rates vary greatly by study population, gender, race and age," and rates "increase sharply with each successive decade in age."  (*Id.*, at 10825.)  The CHS was dissimilar to the Vioxx studies in that:  (a) the CHS population, on average, was 11 years older than the Vioxx clinical trial subjects; (b) the CHS population included community members with poor health and a wide range of cardiac risk factors, while the Vioxx trials subjects were a healthier group.  (Watson Dep. 118:22-120:13, 2/9/05).  The Court finds that the post hoc comparison of the Vioxx trials to the  CHS was done to downplay the importance of the significant excess of thromboembolic events in the Vioxx trials group according to the results of the original plan.

23.     Federal Food Drug and Cosmetic Act 21 U.S.C. § 355(b)(1)(A) and 21 CFR § 314.50 (d)(5)(iv) state that a New Drug Application is required to include "analysis of any other data or information relevant to an evaluation of the safety and effectiveness of the drug product . . . derived from clinical investigations . . . ."(emphasis added).   The Court finds that the Watson analysis, described above, was "derived from clinical investigations."  There is no evidence that the Watson analysis was submitted to the FDA as part of the Merck's New Drug Application dated November 23, 1998, and the Court finds that it was not submitted.

24.     On April 13, 1998, Merck scientist Dr. Alan Nies, in preparation for Merck's Scientific Advisory Board (SAB), prepared a "Write-up" for the meeting that would be held the next month.  Nies wrote, "the finding of an effect of COX-2 inhibition on the excretion of PGIM was entirely unexpected . . .To assess the potential implication of these biochemical findings on cardiovascular health, the clinical team and epidemiology have analyzed the blinded VIOXX

- 10 -

database for serious cardiovascular events.  The analysis does not suggest a concern.  An initial look at the unblinded safety data from the Phase III comparison study vs. diclofenac (approximately 1300 patients followed for 6 months) also does not indicate an excess of cardiovascular events in patients treated with VIOXX™.  Additional analyses will be performed on unblinded data when available." MRK-AIR0041448 at 457-58.  Nies' write-up did not present to the SAB that the relative risk in women was 2.16 in Watson's analysis.  The Court finds that the Watson analysis as originally planned did give rise to a concern that was not mentioned to the SAB.

25.    On May 3-6, 1998, Merck's SAB noted that Vioxx may remove an inhibitor of platelet aggregation (prostacyclin).  The SAB stated, "By removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation is enhanced.  More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality."  MRK-AEI0002734 at 2738.  The SAB stated, "It is therefore proposed that coronary events be predetermined endpoints in all future controlled trials with Vioxx. . . .  It is proposed that these endpoints be assessed by a uniform set of criteria so that meta analysis of coronary and cerebral vascular events from all these can be performed."  MRK-AEI0002739.  The SAB also said that Vioxx could reduce CV risk by reducing inflammation (*id.*).

26.    Merck's SAB stated that risk of adverse cardiovascular events and/or possible benefits should be "addressed in parallel with the conclusion of the process of acquisition and analysis of the data that will place the drug in the hands of patients."  MRK-AEI0002742.  The Court infers from this statement that the SAB advised Merck to address these questions at the same time as the plans to market Vioxx, not after marketing had already occurred.

864700.1

27.     Merck's Integrated Safety Summary (ISS), submitted as part of the New Drug Application (NDA) on November 23, 1998, stated:  "The basic safety of any new drug is defined by comparing it to placebo.  For this reason, the primary, pre-specified comparison is between MK-0966 [Vioxx] (12.5 and 25 mg) and placebo in the 6-week studies.  These studies have placebo controls for their entire duration.  By contrast, the only other studies with placebo controls were the U.S. and Multinational Endoscopy OA Studies (Protocols 044 and 045); however, placebo exposure in these studies was approximately one-third less than exposure to active drug.  The remainder of the Phase II/III OA studies did not use placebo controls."  (Vioxx ISS, MRK-ABS0066396 at 6781).

28.     Data submitted by Merck to the FDA in October 1998, in the ISS, revealed that the incidence of thromboembolic cardiovascular adverse experiences in osteoarthritis (OA) patients in six-week studies was only 0.2 percent in placebo treated patients versus 0.8 percent in 25 mg Vioxx treated patients and 0.7 in 12.5 mg Vioxx treated patients.  MRK-OS42014072 at 401-02.  As noted, the "primary safety analysis" was based on the 6-week studies of Vioxx versus placebo.  The Court finds that there was a 3 to 4 times higher rate of thromboembolic adverse experiences on Vioxx in the "primary safety analysis" of the 6-week studies.  In six-month studies of OA patients, the incidence of thromboembolic events was also higher on Vioxx (0.8 percent in placebo versus 1.0 in 25 mg treated patients and 1.2 in 12.5 mg Vioxx treated patients), though not statistically significantly higher..

29.     Based on this data, the FDA medical reviewer stated, "With the available data it is impossible to answer with complete certainty whether the risk of cardiovascular and thromboembolic events is increased in patients on [Vioxx].  A larger database will be needed to answer this and other safety comparison questions."  MRK-ADI0005375 at 5479.  Under FDA regulations, the manufacturer has to show that the drug is safe and effective.  However, the medical

officer applied an inverted test, i.e., the lack of complete certainty that the risk was increased. (Kessler Dep. 132:8-134:14.)

30.     There is no evidence that Merck resolved the risk of thrombotic events prior to submitting its NDA to the FDA on November 23, 1998.  There is no evidence that Merck resolved the risk of thrombotic events prior to extensive marketing and promotion of Vioxx beginning May 1999.

31.     Despite the SAB recommendation in 1998 that possible risk of adverse cardiovascular events should be "addressed in parallel with the conclusion of the process of acquisition and analysis of the data that will place the drug in the hands of patients," MRK-AEI00007742, Merck did not carry out any further clinical trials to evaluate CV risk before marketing Vioxx.  The SAB's recommendation in May 1998 to evaluate CV endpoints did not result in a plan to do such an evaluation until August 30, 1999, after the drug had been on the market for 3 months.   As late as January 12, 2000 Merck's plan was not to do formal statistical analyses of cardiovascular risk, and the "descriptive analyses" that were contemplated would not be done "for another year yet." MRK-NJ0120258 at 0265.

32.     The Court finds that Merck did not address the question of CV risk "in parallel" with concluding the process of acquiring and analyzing data that placed the drug in the hands of patients.  Instead, the drug was marketed first, and the questions posed by the SAB were not answered.  The Court further finds that Merck did not act in a reasonable time frame to collect and analyze data from additional Vioxx trials.

33.     The long term studies (ranging from 26-86 weeks) that Merck conducted on Vioxx prior to submission of its NDA did not resolve the potential risk of thrombotic events because 1) such long term studies were designed without a placebo arm, 2) the numbers of adverse

Case 2:05-md-01657-EEF-DEK   Document 39109   Filed 04/05/10   Page 14 of 49

cardiovascular events were too small to determine whether there was a cardiovascular risk of VIOXX and 3) patients at highest risk for cardiovascular events were excluded from the trials, which reduced the number of events and the ability to detect differences. (MRK-ADI0005375 at 478-479.)

34.     Merck's intended use of Vioxx included "relief of the signs and symptoms of osteoarthritis. . ."   MRK-99420021411.   Excess weight contributes to the development of osteoarthritis, and overweight patients have a high rate of risk factors for cardiovascular disease. The Court finds that by excluding high risk patients from the Vioxx trials Merck did not obtain reliable evidence of the safety of Vioxx for the population for whom it was intended and to whom it was marketed.

35.     The ISS showed that, in the Vioxx pre-market 6-week OA clinical trials, there was a statistically significant excess risk of "Clinical Adverse Experiences" (AE's) of the "Cardiovascular System."   The incidence of such AE's was 7.6% for Vioxx 25 mg, 7.6% for Vioxx 12.5 mg, and 3.4% for placebo, p=0.004. (*Id.*; ISS, MRK-ABS0066396 at 6793-94.) (Watson Dep. 2/9/05, at 64:18-65:15; 68;21-69:14.) The excess risk of "Cardiovascular System" AE's, which included myocardial infarction, stroke, transient ischemic attack, congestive heart failure, as well as hypertension, did not appear in the Vioxx label nor any publication, nor in the monographs prepared by Provider Synergies, upon which Plaintiff relied in selecting Vioxx for the Preferred Drug List (PDL).

36.     The 6-week OA studies reported in the ISS also showed statistically significant excess risks of digestive system AE's (23.4% for Vioxx, 25 mg compared to 14.1% for placebo) and respiratory system (4.1%, 2.8%, 0.7% for Vioxx 25 mg, Vioxx 12.5 mg, and placebo, respectively). (ISS at 6793-94.) The significant excess risks of digestive and respiratory system

AE's do not appear in the Vioxx label nor any publications, nor in the monographs prepared by Provider Synergies, upon which Plaintiffs relied.

37.     One of Merck's pre-market OA trials was Protocol 045, a study of Vioxx 25 mg and 50 mg compared to ibuprofen 2400 mg/day and placebo.  This study showed a statistically significant excess risk of "chest pain" for Vioxx 50 mg compared to placebo (3.6% v 0%, p=0.012) (MRK-OS420085469-464, 469, Table 44).  Systolic hypertension events exceeding "Predefined Limits of Change" (PDLOC; >20 mm increase and value >140 mm) were also statistically significantly increased in Protocol 045, for both the 25 mg and 50 mg Vioxx doses compared to placebo, but the ibuprofen group did not show a significant increase compared to placebo.  (*Id.*, MRK-OS420085570, Table 59.)  Chest pain and hypertension are closely linked to CV adverse events.

38.     Protocol 045 was the subject of a published article authored by Merck consultants Hawkey and Laine, along with several Merck employee authors.  (Hawkey, *et al.*, Arthritis and Rheumatism 2000; 43:370-377).  The published article did not mention the statistically significant excess incidence of chest pain or hypertension events among Vioxx patients compared to placebo.  Instead, the article reported no significant differences for other endpoints ("overall rates," "rates of discontinuation" and "serious clinical adverse experiences").  (*Id.*, at 374.)  The gastrointestinal event rates of Protocol 045 were included in the Vioxx label, but the excess risk of chest pain and hypertension in that trial were not disclosed in the label, nor in the monographs prepared by Provider Synergies, upon which Plaintiff relied.  (MRK-99420021411 at 419-20).

39.     In the Vioxx 6-month OA pre-market trials, as reported in the ISS, there were 38 chest pain AE's among Vioxx patients compared to zero chest pain AE's in the placebo group.

Statistical analysis was not presented.  These data do not appear in the Vioxx label nor any publication, nor in the Provider Synergies monographs.  (MRK-ABS0066871.)

### E. The VIGOR Study Showed Excess CV Risk and Overall Serious Event Risk of Vioxx

40.     The VIGOR clinical trial studied approximately 8000 RA patients who took either Vioxx 50 mg or naproxen 1000 mg/day for about nine months.  The trial results showed a statistically significant five-fold higher risk of MI, and a 2.37 times higher rate of the pre-specified thrombotic event "endpoint," which included cardiac, cerebrovascular and peripheral events.  The published article reported a lower rate in the naproxen group for a different endpoint, MI, stating that the rate was 0.4% on Vioxx and 0.1% for naproxen.  (Bombardier, NEJM 2000.)  Two of the article's authors were Merck employees (Reicin and Shapiro).  The rest were paid Merck consultants, including four members of Merck's "Advisory Board" who received $5,000 per day to attend meetings (Laine, Weaver, Schnitzer and Hochberg).  (Laine deposition).

41.     In public statements and in a published *New England Journal of Medicine* (NEJM) article dated November 23, 2000, Merck asserted that the difference in the incidence of heart attacks in the naproxen and Vioxx treated arms of the study was likely due to the possibility that naproxen is cardioprotective.  Merck's statements did not mention that it had been advised by its SAB that Vioxx could be a cause of thrombotic events.  The NEJM article did not mention that there was a reason to believe that Vioxx itself was possibly causing harm.  The Court finds that the omission of knowledge of such a risk was misleading in that it kept the public from learning that Merck had a concern over exactly the type of risk that had come to pass.

42.     Merck's own Regional Medical Director, Fran Kaiser, testified that "we were all surprised" by the VIGOR results (Kaiser deposition).  However, Merck's President Ed Scolnick wrote on March 9, 2000 that the "CV events are clearly there" and that they were "mechanism based

as we worried" they were, and that the consultants who told Merck in 1997 to study the thromboxane-prostacyclin imbalance issue had been right.  (Scolnick Dep. 147:7-16, 151:13-22, P1.0132.)  Outside of Merck's scientific group, the VIGOR results were a surprise; but within Merck's scientists the results had been predicted and warned about.

43.     After writing to his staff on March 9, 2000, that the "CV events are clearly there" and "mechanism based," Scolnick asked Alise Reicin to find support for the theory that naproxen was cardioprotective.  Reicin replied on March 13, 2000, with an abstract of a single article, "the only study [she] could find which assessed the potential cardioprotective effects of an NSAID."  (Scolnick Dep. 228:10-14, P1.0133.)  The study Reicin found involved flurbiprofen, not naproxen, and was uncorroborated.  (P1.0133.)  Reicin found no support to claim naproxen was cardioprotective, or that any of the other popularly-used NSAIDs, such as ibuprofen, were cardioprotective.  Despite the lack of any scientific support, Scolnick and Merck issued a press release on March 27, 2000, stating that the difference in cardiovascular events was due to the cardioprotective effect of naproxen.  (Scolnick Dep. 205:1-18.)

44.     The next day Reicin sent Scolnick an email reporting the view of Dr. Carlo Patrono, who did not believe that the results of VIGOR could be attributed to a cardioprotective effect of naproxen, and who stated there "is a weak pharmacological basis" and "no epidemiological evidence" supporting the naproxen theory.  (Scolnick Dep. 231:20-235:7, P1.1106.)   (Although Merck takes the position that Dr. Patrono later changed his mind and believed naproxen could be protective, it is apparent from his current peer-reviewed articles that Dr. Patrono aligns with the consensus view that Vioxx is cardiotoxic.)

45.     In its Standard Operating Procedure (SOP) for all Vioxx trials that began after the second quarter of 1998, there was a "prespecified" endpoint comprised of a combination of

thrombotic events (cardiac, cerebral, and peripheral).    (Vascular Events Monitoring and
Adjudication SOP. August 30 1999 /revised January 21 2000 MRK-I8940077810 at 813; "The
purpose of this SOP is to provide standardized data for pooled analyses of the incidence of vascular
events of patients treated with COX-2 inhibitors.")

> 46.    The NEJM article did not state that there was a predetermined endpoint, nor
what the results of the analysis were for that endpoint.   In April 2000, as documented in a
presentation to the SAB (the "April 2000 presentation"), Merck knew that there were 41 confirmed
serious thromboembolic events in the Vioxx treated group and 18 in the naproxen group.   MRK-
NJ408967 at 97; MRK-NJ0189526.   On July 5, 2000, based on completed reporting of adverse
events, reported in a memo from Deborah Shapiro to Dr. Alise Reicin (the "July 5, 2000 memo"),
Merck knew that there were 45 confirmed thromboembolic events in the Vioxx treated group and 19
in the naproxen treated group. MRK-NJ0071320 at 322.  As of April 16, 2000, a draft of the VIGOR
manuscript mentioned the pre-specified analyses which included thromboembolic events.  MRK-
NJ0346560 at 574 and 589.  These references to the prespecified thromboembolic endpoint were
removed from the manuscript before it was sent to NEJM.

> 47.    In the April 2000 presentation and in the July 5, 2000 memo, Merck had
included Kaplan-Meier data plots which revealed an increased incidence of serious thromboembolic
cardiovascular events beginning before two months and continuing to increase over the rest of the
study.  The Kaplan-Meier data plots showing increased risk of CV events were not provided to the
NEJM nor included in the November 23, 2000 VIGOR article.  Instead, Merck provided two similar
plots to NEJM showing reduced risk of GI events on Vioxx. MRK-NJ408967 at 998, MRK-
NJ0071320 at 323.  The Court finds that presentation of only the GI benefit picture did not provide
adequate information about CV risk.

48.     The VIGOR article said that there was a significant difference in the MI rate only for high-risk patients who should have been on aspirin.  However, the July 5, 2000 memo showed that there was a significantly higher rate on Vioxx for both high-risk and lower-risk patients, when the prespecified "thrombotic events" endpoint was analyzed.  The Court finds that the publication claiming that significant excess MI occurred only in a small group of high risk patients did not adequately inform readers that there was a significant excess of thrombotic events to all patients, regardless of baseline risk.

49.     Merck submitted the NEJM paper on May 18, 2000, then submitted an extensive revision of the manuscript of July 17, 2000 NEMJ 000028.  Further correspondence about the paper occurred over the next months before the paper was accepted for publication on September 13, 2000.  2000 NEMJ 000054.  The April and July 2000 data, cited above, were not provided to the NEJM during the exchanges of correspondence between May 2000 and the November 2000 publication.

50.     The pre-specified analyses in the VIGOR trial also included overall serious adverse experiences, discontinuation due to hypertension and edema, and congestive heart failure adverse events.  None of the results for these events appeared in the submitted manuscript or the published article.  On May 17, 2000, the day before the VIGOR manuscript was sent to NEJM, an internal Merck presentation showed those results.  For the serious adverse experience endpoint, there was a statistically significant excess risk in the Vioxx group (9.3 percent versus 7.8 percent, $p=0.013$).  Discontinuations due to hypertension were statistically significantly worse in the Vioxx group (28 versus 6, $p<0.001$), and discontinuations due to edema were numerically elevated and borderline statistically significant (25 versus 13, $p=0.057$).  Congestive heart failure (CHF) adverse events were numerically elevated and borderline statistically significant (19 versus 9, $p=0.065$), and

there was a statistically significant excess risk of CHF that met the criteria for "serious adverse events" (12 versus 3, p=0.025).  (Kaiser Dep. 178:21-190:2; Kaiser Ex. 39; VIGOR Clinical Study Report.)

51.     Fran Kaiser, the Merck Regional Medical Director (RMD) responsible for peer-to-peer communication with representatives of the State of Louisiana Pharmaceuticals and Therapeutics ("P&T") Committee about risks and benefits of Merck products, including Vioxx, did not know that the overall serious adverse experiences in the Vioxx group were statistically significantly greater than those in the naproxen group in the VIGOR study.  (Kaiser Dep. 184:4-8, 184:12.)  She did not recall whether she ever knew about the congestive heart failure or hypertension discontinuation data from the VIGOR study.  (Kaiser Dep. at 188:10-190:2.)  The data showing statistically significant excess risk of serious adverse experiences in the Vioxx group compared to naproxen are not found in the summary of the VIGOR study in the Provider Synergies monograph relied upon by Plaintiff in deciding to add Vioxx to the Preferred Drug List; the hypertension discontinuation data and congestive heart failure data are also absent from the monograph.  (Kaiser Dep. 182:18-24, 183:9; Kaiser Ex. 39.)

52.     Instead of the prespecified analyses of edema, hypertension, serious cardiovascular events including thromboembolic and congestive heart failure events, the VIGOR authors presented a post-hoc outcome measure of myocardial infarction (MI).  The authors stated that the significantly higher risk of MI did not extend to people for whom aspirin was not indicated. Had the article presented the prespecified cardiovascular outcome measure of serious thrombotic events, a significantly increased risk would have been demonstrated for those both with and without a previous history of CV disease.

53.     The VIGOR article stated that cardiovascular events were assessed for a future meta-analysis for the following reason:   "Because highly selective cyclooxygenase-2 inhibitors do not inhibit platelet aggregation, which is mediated by cyclooxygenase-1, there was a possibility that the incidence of thrombotic cardiovascular events would be lower among patients treated with nonselective cyclooxygenase inhibitors than among those treated with cyclooxygenase-2 selective inhibitors."   (Bombardier, NEJM 2000 at 1521.)   However, the Vioxx Project Team Minutes for May 12, 1998, which summarized the May 19998 Board of Scientific Advisors meeting, included a reference to the SAB's advice to systematically collect and analyze data on CV events. One of the two reasons stated for this process was:   "Based upon data on PGI metabolism data obtained for Vioxx, it is conceivable that Vioxx could disturb the [endothelium-platelet] interaction to favor platelet aggregation."   (Project Team Minutes, May 12, 1998, MRK-ABS0214762 at 4768, previously marked as Daniels Ex. 6 (emphasis added).)   Neither the published article nor the Provider Synergies monograph disclosed that the thrombotic events in VIGOR had been analyzed because of a concern that had existed since prior to marketing of Vioxx that the drug could disturb normal metabolic conditions to "favor platelet aggregation."

54.     The April 2000 draft of the VIGOR article showed that 101 patients would need to be treated with naproxen for one year to avoid one serious Vioxx-associated thromboembolic event, while 125 patients would need to be treated with Vioxx for one year to avoid one serious naproxen-associated GI event.   This calculation, showing greater risk of serious adverse events on Vioxx, was deleted from the manuscript and did not appear in the published article, Vioxx label, or Provider Synergies monographs.

55.     FDA Medical Review Office Villalba documented that there were 27% more hospitalizations in patients taking Vioxx than in those taking Naproxen in the VIGOR study (relative

risk = 1.27, p=0.002).  While there were 20 fewer hospitalizations for GI events in the Vioxx group, there were 41 more hospitalizations for CV events in the Vioxx group.  The statistically significant excess in hospitalizations in the Vioxx group was not disclosed in the published VIGOR article, nor in the Vioxx label, nor in the Provider Synergies Monographs relied upon by Plaintiff.

### F.    The OA Trials Showed Significant Excess Risk of Thrombotic Events.

56.    Merck continued to carry out OA clinical trials of Vioxx against placebo after Vioxx was on the market.  These included Protocols 083, 085, 090, and finally 136.  As the sequence of trials was completed, the number of events in the Vioxx group relative to placebo continued to increase, and the relative risk (RR) increased accordingly.  As of 200, when 083, 085 and 090 were complete, the RR of Vioxx versus placebo was approximately 1.9, but not statistically significant.  As of April 2002, when Protocol 136 was completed, the RR of Vioxx versus placebo was approximately 3.0, and the results were statistically significant (p=0.03).  The OA trials further show that Vioxx increased the risk of CV events.

57.    On April 28, 2000, Merck implemented the use of a sales aid known as the "Cardiovascular Card," which was used by Merck until the Vioxx label change in April 2002.  The Court finds that the Cardiovascular Card was based on incomplete data that did not adequately inform readers of the CV thrombotic risks of Vioxx.  As of March 9, 2000, the VIGOR results showing 5 times greater MI risk compared to naproxen had been known to Merck.  However, the Cardiovascular Card did not mention VIGOR and instead stated that Vioxx was not different from other NSAIDs studied in OA trials prior to marketing.  Also, the OA trials referenced in the Cardiovascular Card were themselves incomplete and outdated, since they did not include the results of 083, 085 and 090, which increased the RR of Vioxx to almost double that of placebo.

58.    Merck contends that its sales personnel could not discuss the VIGOR results between March 2000 and April 2002 because they were not on the label, and that a lengthy sequence

of exchanges with FDA delayed the addition of VIGOR data to the label.  However, the Court finds

that Merck could have added the VIGOR results to the label to warn of a reasonable association

between Vioxx and a serious hazard of MI and thrombotic events, without waiting for FDA's

approval, and that Merck's sales personnel could have discussed the VIGOR results without waiting

until April 2002.  The Court further finds that the proposed label submitted to FDA by Merck on

June 29, 2000 unreasonably attributed the difference in thrombotic events in VIGOR to the

cardioprotective qualities of naproxen, which had not been established by adequate or substantial

evidence.

G.      <u>The Alzheimer's Trials Showed Excess Mortality and CV Mortality</u>

59.     Between 1998 and 2003, Merck conducted three studies of patients with either

mild cognitive impairment (MCI) or Alzheimer's disease (Protocols 078, 091 and 126).  Protocol

091 failed to show that Vioxx was beneficial to patients with Alzheimer's disease, and Protocol 126

was stopped early because it had a similar design. The largest and longest study, Protocol 078, began

in 1998.  Initially planned for two years, it was extended to four years because of slow enrollment

and slow accumulation of the primary study endpoint of progression from MCI to Alzheimer's.  The

study documents show that safety analyses were to be conducted in two ways: "on-drug," and

"intention-to-treat," (ITT) the latter including patients followed after they stop taking the study drug.

60.     Protocol 078 suffered from poor compliance and high dropout rates, which

reduced its power to detect differences in outcomes.  Despite such reduced power, there was a

sufficiently great magnitude of adverse effects to nevertheless result in statistically significant excess

of mortality, and CV mortality.  As of April 8, 2001, a memo by Merck scientist Joshua Chen, shows

that patients taking Vioxx in Protocol 091, had a statistically significant "greater chance to die across

all of the four age and gender categories . . .," employing the ITT analysis.  Chen also reported that

in Protocol 078, "males aged 75 or older had the highest risk of death," and "the hazard ratio

- 23 -

between [Vioxx] and placebo was 2.55."   Merck also knew that the combined ITT analysis "indicated that survival was worse for patients receiving Vioxx."  MRK-AAX0000752 at 56, 57 and 59.  From Kaplan-Meier plots, the increased risk of death was noted after six months follow-up since treatment.  MRK-AAX0000752 at 59.

61.     The Alzheimer's trials data also showed a statistically significant excess risk of heart disease mortality, Relative Risk = 3.84, p < 0.005.  Psaty and Kronmal, JAMA 2008; 299:1813-1817 at 1815; Kaiser Ex. 22.  Dr. Psaty, the lead author, has not been involved in any litigation involving Vioxx on behalf of any party.  Dr. Kronmal, the co-author, is a retained expert for Plaintiff who obtained the data from the Alzheimer's trials through discovery in the litigation. Dr. Kaiser, Merck's RMD, recognized JAMA as a reputable journal.  She saw the article in the normal course of reviewing journals when it came out in 2008.  Dr. Kaiser has not seen any rebuttal by Merck to the accuracy of the numbers of heart disease related deaths in the Alzheimer's studies since the article was published.  The p value of < 0.005 means there is less than a one-in-100 likelihood that the heart disease mortality result was due to chance.  (Kaiser Dep. 126:4-129:12; Psaty article, Kaiser Ex. 22.)

62.     Dr. Kaiser was not aware of a statistically significant excess risk of mortality in the Alzheimer's trials before her deposition on January 29, 2010.  When Dr. Kaiser met with Dr. Culotta, Chairman of the Louisiana P&T Committee on August 6-7, 2002, she presented the 2002 label update.  The significant excess risk of mortality and heart disease mortality did not appear in the label.  Dr. Kaiser stated, "If it wasn't in the label, it wasn't discussed."  (Kaiser Dep. 124:3-10; 129:14-131:19.)

63.     Merck did not publish the data showing a statistically significant excess risk of mortality and heart disease mortality in the Alzheimer's trials at any time.  Provider Synergies,

which relied on the peer reviewed literature and the label, would not have had the unpublished data, and these results do not appear in the monographs prepared by Provider Synergies, upon which Plaintiff relied.

### H.  Vioxx' GI Benefits, If Any, Were Outweighed by CV Risk

64.     During the pre-marketing development of Vioxx, Merck was told by two different sets of expert consultants, both in 1996 and again in 1998, that the doses of traditional NSAIDs used in its OA trials were "too high," and that those doses did not comport with real world practice for the use of such medications.  The 1996 consultants meeting further informed Merck that the standard of care required use of the lowest effective dose for the shortest period of time.

65.     In August 1998, the consultants hired by Merck recommended that Merck not conduct a GI outcome study in OA patients, because OA chronic use of high dose NSAIDs is "rare" in OA patients, and because the results of such a study would not provide "real world" information. Instead, the consultants recommended that the outcome study be done with RA patients, because chronic high dose NSAID use was more common in RA patients due to their more severe inflammatory disease.  Merck did follow that recommendation in designing the outcome study that became known as VIGOR.   However, Merck had already completed its entire pre-market OA clinical trial program using precisely the model of chronic high-dose NSAIDs that the consultants criticized as inconsistent with real world conditions.

66.     Merck's OA clinical trials used a range of Vioxx doses, from 5 mg to 125 mg, in an effort to find the balance between clinical benefit and risk of toxicity.  However, only a single high dose of each traditional NSAID was used for comparison to Vioxx in the pre-market clinical trial program used to secure approval and labeling.  The OA clinical trials employed 2400 mg of ibuprofen per day, a dose described as "too high" by Dr. Brandt at the 1996 consultants meeting.

The 150 mg per day dose of diclofenac and the 1500 mg per day dose of nabumetone were each the maximum recommended OA doses in the labels for those drugs.

67.     There was undisputed evidence in this case that the risk of GI side effects of NSAIDs goes up as the dose goes up.  This is consistent with the well-known principle of dose-response relationship.  It was also undisputed that doctors in their real-world practice, including Merck's experts and its Regional Medical Director Dr. Kaiser, follow the standard of care by using the lowest effective dose for the shortest time, and by reducing the NSAID dose after an acute episode of OA (or "flare") has subsided.  Merck's OA trials exposed subjects to high chronic daily doses of NSAIDs for up to 86 weeks, and the rates of GI adverse events among subjects exposed to those doses for prolonged periods were necessarily higher than the rates that would be found among real-world patients using lower doses on an intermittent, as needed basis.

68.     A published scientific review of Merck's OA trials found that they had been designed to "favour rofecoxib" by using maximum or near maximum doses of NSAIDs that were known to yield high rates of adverse GI events.  Further, an internal Merck document admitted that "we have been guilty of stacking the deck in our studies" by the selection of doses used in the comparison of Vioxx to other drugs.   (E-mail from Baumgartner to Fanelle, 5/9/01, MRK-AFI0136847).  Although the latter email does not refer specifically to the OA pre-market trials, it constitutes supportive evidence that the trial design to favor Vioxx was accurately described in the scientific article.  The Court finds that Merck's OA studies were designed to favor Vioxx by comparing the Vioxx rate of GI side effects to unrealistically high rates among subjects exposed to unnecessarily high, chronic doses of NSAIDs.

69.     Despite the design to favor Vioxx, Merck's studies provide evidence that Vioxx is not comparable to placebo or meaningfully different from NSAIDs in causing complicated

GI events.  By April 2003, Merck knew that the rate of PUBs and complicated PUBs on Vioxx 25 mg was about 4 times greater than the rate for placebo patients in Alzheimer's Protocol 078, and the difference was statistically significant.  This information was not published while Vioxx was on the market; when the numbers finally appeared in print in March 2005, they were published in a small circulation specialty journal called "*Neuropsychopharmacology*," without statistical testing.  Internal documents from January 2004 show that there was "no great hurry" to publish the data from 078. (In contrast, in order to stay competitive with Celebrex, Merck compressed and accelerated publication of the VIGOR trial, which was submitted to NEJM only two months after the data were unsealed.)  Based on a 1999 study by Laine, Merck claimed that ulcer rates on Vioxx were "comparable to placebo."  This article was cited in the Provider Synergies monographs relied upon by Plaintiff, in each year from 2002 -2004, despite the 2003 evidence from Protocol 078 that Vioxx was not comparable to placebo.

70.     Additional clinical trial data confirm that Vioxx caused PUBs and complicated PUBs, and that it was not comparable to placebo.  Such trials include the APPROVe study, and the ViP study, which both reported 4 to 5 times higher rates of PUBs and complicated PUBs on Vioxx compared to placebo.  In 2004, the FDA review of the Alzheimer's trials 078 and 091 showed a difference of 11 on Vioxx versus zero on placebo, for GI bleeds causing discontinuation from the studies.

71.     As of February 2003, Merck's internal documents showed that there was a higher rate of complicated PUBs on Vioxx than on NSAIDs in the prespecified, pooled analysis of OA studies known as Protocol 069.  Although Merck had published 069 in 1999 with a claim of greater GI safety compared to NSAIDs, it did not publish the follow-up data showing that the rate of

complicated PUBs in the Vioxx group had caught up with, and surpassed, the rate of such events among the NSAIDs users.

72.     Post-marketing reports in themselves are not the most reliable source of evidence about risk of adverse events.  However, in conjunction with other evidence, they can be relevant.  In this case, the FDA found that the post-market experience with Vioxx was similar to NSAIDs, including 37 unduplicated reports of deaths due to GI events as of October 2000.  Merck received approximately 75 adverse event reports of fatal GI events in which the reporting individual said that the event was related to Vioxx.  In the vast majority of these reports, the reporter was a physician and the use of Vioxx was confirmed in the report.

73.     The VIGOR study has been cited by Merck and many reviewers as evidence of Vioxx' GI safety advantage over naproxen.  However, the most serious GI events, defined in VIGOR as the "confirmed, complicated perforations ulcers and bleeds" (CCPUBs), did not show a difference between Vioxx and naproxen except among subjects who also used steroids as a treatment for RA.  For users of steroids, the naproxen group had a much higher risk of CCPUBs than the Vioxx group (27 events on naproxen compared to 7 on Vioxx; RR= 3.85, statistically significant), while the non-steroid user incidence rates of CCPUBs were essentially identical for the Vioxx and naproxen groups (10 events on naproxen compared to 9 on Vioxx; RR=1.12, not statistically significant).  The VIGOR label and promotional materials reported the CCPUB data as an overall total of 37 on naproxen compared to 16 on Vioxx, without showing the difference between the steroid and non-steroid users.

74.     Scientists, including those at Merck, commonly rely on statistical tests of interaction to determine whether the results of a study are influenced by a particular factor that differs between two subgroups.  In Merck's exchange with the *New England Journal of Medicine*

(NEJM) about the VIGOR study, the reviewers raised a concern that Vioxx might only be beneficial to steroid users.  Merck's consultants and employee authors resisted that conclusion by asserting that the data did not show a significant interaction for steroid versus non-steroid use as to the endpoint of "PUBs," so they argued that there was no basis to distinguish between the two subgroups.  For the complicated PUBs, however, there was a statistically significant interaction based on steroid use or non-use, and for that reason it is not scientifically appropriate to lump the two groups together into a single risk estimate.

75.     Merck's documents called the CCPUBs a "key secondary endpoint," and the claim of GI benefit for the "most serious" GI events appears in Merck's press release about the Vioxx label change in 2002.  The Court finds that the label and related information about the VIGOR study did not adequately inform readers that only steroid users experienced a reduction in risk of the most serious GI events in the Vioxx group compared to naproxen.

76.     Steroid users make up a very small proportion of the Vioxx market.  A subset of RA patients use chronic steroids, while OA patients do not.  OA patients outnumber RA patients by about 25 million to 1.3 million in the United States.  Merck's documents show concern that NEJM might "have the reviewer who keeps insisting that rofecoxib only provides benefit in steroid users write a damaging editorial."   (Reicin email, 8/31/00, MRK-NJ012320, 12322-23).   In this context, the Court finds that "damaging" refers to the economic impact of making public the information that Vioxx GI benefit was limited to a small subset of the intended market.

77.     The Court finds that Vioxx itself is gastrotoxic, but that Vioxx did provide a significant GI benefit to the small subset of Vioxx users consisting of RA patients who used steroids, in that the rate of CCPUBs was significantly lower on Vioxx than on naproxen in that population.  However, the benefit to RA patients on steroids is not generalizable to OA patients who use lower

864700.1

doses of NSAIDs and do not use steroids.  The OA clinical trial data did not replicate real world conditions, but instead "stacked the deck" to favor Vioxx by exposing subjects to unrealistically high, chronic doses of traditional NSAIDs that are not typical of actual OA patient use.  The Court also finds that for the most serious, complicated events, the rate on Vioxx was greater than the rate on NSAIDs among OA patients, based on Merck's own data.  The reviewers cited for the claim of Vioxx' GI safety did not have access to the unpublished Merck data showing the toxicity of Vioxx compared to placebo in 078, nor the data showing the toxicity of Vioxx compared to NSAIDs in 069, nor the data showing that only steroid users experienced a reduction of risk of the most important GI events.

78.     The Findings above show that the claims of GI safety of Vioxx, including its "comparability to placebo," were overstated and contrary to the unpublished data.  However, even assuming that all of the GI benefit claims were true, Vioxx nevertheless would suffer from a redhibitory defect in that the CV thrombotic risks vastly outweighed the claimed GI benefits.   For instance, in the VIGOR trial, although GI hospitalizations were reduced slightly (and only for patients using concomitant steroids), hospitalizations for CV were significantly higher, resulting in substantially higher hospitalizations for Vioxx users than Naproxen users.  The fact that Vioxx was removed from the market and remains off the market supports the finding that its risks outweigh any claimed benefits.

III.    **The Defect In Vioxx Is Such That A Reasonable Buyer In LDHH's Position Would Not Have Purchased Vioxx.**

79.     This Court finds credible the testimony of LDHH Secretary David Hood that had he been aware of the defect in Vioxx, he would have done everything in his power to exclude reimbursement for Vioxx and ensure that Louisiana medicaid patients were not exposed to the increased cardiovascular risks posed by Vioxx.

80.     This Court finds credible the testimony of Dr. Terry Leach, Pharm. D., an expert in the administration of formularies for prescription drug reimbursements, that had the true safety profile of Vioxx been known, any reasonable third party payor would have excluded Vioxx from its formulary so as not to reimburse prescriptions for Vioxx..

81.     This Court finds credible the testimony of Dr. Terry Leach, Pharm. D., that had a reasonable Pharmacy Benefit Manager in the position of Provider Synergies been provided full and accurate information about the safety profile of Vioxx, such a reasonable PBM would have brought this information to the attention of LDHH and would have recommended against inclusion of Vioxx on any formulary.

82.     This Court finds credible the testimony of Dr. John Abramson, M.D., an expert in risk/benefit analyses undertaken by healthcare providers in making decisions about prescription drugs, that rational buyers knowing the full truth about the safety of Vioxx would not have purchased the drug.

83.     This Court finds that had the truth about the safety profile of Vioxx been known, a reasonable buyer in the position of LDHH would have exercised the authority granted to it by the Louisiana legislature to adopt a formulary that excluded reimbursement of Vioxx in order to ensure that Louisiana Medicaid patients were not exposed to the increased risk of serious cardiovascular harm from Vioxx.

## IV.     Merck's Marketing Of Vioxx Relied On Publication Of Analyses "If Positive," Non-Disclosure Of Adverse Data, And Efforts To Neutralize Opposing Views.

84.     In the Spring of 2000 and thereafter, following the results of the VIGOR study, Merck promptly adopted a plan to stand behind the CV safety of Vioxx, to attribute the higher risk of CV thrombotic events to naproxen's possible "protective" qualities rather than the harmful qualities of Vioxx, and to attempt to "neutralize" scientists who disagreed.  The plan also included

864700.1

the use of peer-reviewed scientific literature to promote the message that Vioxx was safe.  In particular, Merck's research agenda "in order to maximize growth" was based on developing strategies to . . . "[d]emonstrate that COX-2 inhibitors have a similar cardiovascular profile compared with placebo and non-naproxen NSAIDs."  MRK-ABT0078672 at 695-96.

85.    As part of this effort, Merck downplayed Vioxx's risk of myocardial thrombotic events in a manner that incurred regulatory enforcement.  As noted by the Food and Drug Administration's Division Director of the Division of Drug, Marketing, Advertising and Communications 'Dr. Thomas Abrams, on September 17, 2001.  MRK-ABA0003277 ("DDMAC letter") to Merck's President and CEO Raymond V. Gilmartin, "You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx.  Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)."  FDA was "aware of six promotional audio conferences, presented on behalf of Merck" that were in "violation of the Act."  MRK-ABA0003277 at 79.

86.    As noted by the Food and Drug Administration in the DDMAC letter, Merck's "promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs.  You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin.  That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties."  MRK-ABA0003277.  According to FDA, "there are no

adequate and well controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmocodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs.

87.   The DDMAC letter stated that Merck's minimizing "potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile."  MRK-ABA0003283.

88.   Merck responded to the DDMAC letter and the specific instances of promotion referenced in that letter were considered closed.  However, Merck's efforts to downplay CV thrombotic risk of Vioxx was a central element of its Integrated Marketing Campaign, and resolution of the limited issues of the September 17, 2001 letter did not end the promotion of that message.

89.   For example, Merck's presentation of cardiovascular risk data in its promotional "Cardiovascular Card" continued to omit contrary data from the VIGOR study between April 28, 2000 and the approval of the new label in April 2002.  In a bulletin to all field personnel with responsibility for Vioxx, Merck announced on April 28, 2000 the availability of a tri-fold pamphlet containing data that would ensure that its field "would be well prepared to respond to questions about the cardiovascular effects of Vioxx."  MRK-AAR0007383.  As summarized by staff of the U.S. House of Representatives Committee on Government Reform, according to the Cardiovascular Card, patients on Vioxx were 11 times less likely to die and 8 times less likely to die from heart attacks and strokes than patients on standard anti-inflammatory drugs.  In addition, the risk of MIs was less than half of that for patients taking placebo and identical to that of patients

receiving anti-inflammatory drugs.  The Cardiovascular Card did not present the cardiovascular risk data from the VIGOR study which, as FDA noted in its DDMAC letter, observed a four to five fold increase in MI's compared to patients on another non-steroidal.  MRK-AAR0019055-60.

90.    Merck's Cardiovascular Card also omitted contrary data regarding cardiovascular risk from Merck's other more recent clinical trials.  Merck's Cardiovascular Card was announced on April 28, 2000. MRK-AAR0038843.  Data from Clinical Protocols 085 and 090 were known to Merck by February 2000.  Data from Clinical Protocol 083 were known to Merck in September 2000.  MRK-ABP0015346 at 363 and 368.  Merck did not include the results of clinical protocols 083, 085 and 090 in discussing the risk of thromboembolic events in the Cardiovascular Card.  The omission of these three studies resulted in an incomplete picture of cardiovascular risk in Merck's OA trials.   Had these studies been included the relative risk of serious thrombotic cardiovascular events in osteoarthritis trials would have been 1.80 compared with Merck's reported relative risk of .94 in published studies.  MRK-ACD0122214 at 39 and *American Journal of Cardiology* Vol. 89, January 15, 2002 (Table 4b) at 207.

91.    About one month after the VIGOR results were known to the company, on April 14, 2000 Merck identified as "Marketing needs: . . . Rapid publication and communication at opinion leader events' of phase III OA results demonstrating comparable incidence of thromboembolic events with VIOXX, placebo and NSAID comparators."  MRK-AB10002269 at 307.  However, the full OA data did not support comparable incidence.

92.    Merck also identified as a need to "[e]stablish that Vioxx /Coxib do not increase the risk of thromboembolic events due to their unique [mechanisms of action] . . ."  MRK-ABI0002269 at 308.  This approach adopted a pre-conceived conclusion rather than an open inquiry

into the scientific issues, and ignored the mechanism-based evidence compiled by Merck's own scientific studies.

93.     On January 8, 2001, approximately one month after publication of VIGOR results, at a WHHM Competitive Assessment Task Force, Merck officials in a slide presentation stated that one of its objectives was to "[c]ontinue to neutralize any perceived safety (hypertension/edema, CV) concerns."  MRK-AHY0263589, 90; MRK-AHY0263592.  That strategy to neutralize the "perceived CV Safety Concerns" involved the publication of articles by the company's scientists and outside consultants.

94.     Merck's personnel also used the term "neutralize" to describe efforts to change the opinions of doctors and scientists.  Although Susan Baumgartner of Merck defined the term merely in terms of correcting those professionals' misinformed views, the "neutralize" list of July 23, 1999, includes references to "discrediting" opposing doctors, and to "show me the money" as a way to change opinions.  The "neutralize" list includes two Louisiana doctors, one of whom was invited to be a clinical trial investigator as part of the process of bringing him into alignment with Merck's views about Vioxx.  The Court finds that the term "neutralize" has both a positive meaning of providing information and a negative meaning of offering rewards for supporting Vioxx or discrediting those who did not agree.

95.     Merck's scientific communications strategy included "plans for abstracts, presentations, and peer reviewed publications" that focused on key safety messages, including the key message that "VIOXX does not increase the thromboembolic risk of patients compared to non-naproxen, non-selective NSAIDS."  MRK-AAD0106697 at 791.

96.     The first paper that Merck intended to publish was to be based on "CV safety (069 database)."  MRK-AHY0263596.  The first paper that was published based on CV safety (069)

appeared in the *American Journal of Cardiology* Vol. 89, January 15, 2002 ("AJC paper").  It was

authored by Alise Reicin and others at Merck, and received by the journal editors on July 2, 2001.

97.     The AJC paper did not include the results of clinical protocols 083, 085 and

090, for which data analyses were all completed by September, 2000.  MRK-ABP0015346 at 363

and 368.  Merck sales representatives received instructions on using the Reicin article to reassure

doctors about the CV safety of Vioxx.

98.     As of December 19, 2000, a cardiovascular safety in phase III studies

manuscript was under development.  MRK-ABP0015346 at 352.  Also as of December 19, 2000,

Merck's plan was also to "[c]onduct a meta-analysis of CV events from all PH III studies . . .,

VIGOR, ADVANTAGE, and all other studies for which data will be available."  Merck officials

stated that "[i]f results are positive, then publish."  MRK-ABP0015346.  The Court infers from this

statement, and from other consistent evidence, that Merck also followed the practice of not

publishing results that were not positive or favorable to the message Merck sought to convey about

the CV safety of Vioxx.

99.     As of January 30, 2001, Merck's plans to publish cardiovascular phase III OA

studies had been terminated.  MRK-ABP0016015 at 021.  Instead of publishing the phase III OA

studies, the "Team will focus on submitting the Meta-analysis of CV safety that was prepared to

support the VIGOR advisory committee."  MRK-ABP0016015, 6021.

100.     Published meta-analyses included papers listing Dr. Marvin Konstam and Dr.

Matthew Weir as first authors.  Both papers included names of several Merck scientists including

Dr. Alise Reicin.   These published meta-analyses by Merck scientists and outside consultants

included data from Alzheimer's studies in addition to OA and RA studies.  MRK-ABA0004431-

440; MRK-ADY0006153-166.  From Table 3 in Konstam article, the conclusion of whether VIOXX

resulted in increased Antiplatelet Trialists Collaboration (APTC) endpoints hinged on whether Alzheimer's results were included in the meta-analyses.  According to Merck's SOP for pooled analysis of vascular events dated August 30, 1999 and revised January 2000, Alzheimer's studies were placed in a separate "study block," which was not to be analyzed until late 2003.  MRK-I8940077810 at 827.  In addition, as of the publication date of Dr. Marvin Konstam's meta-analysis article, the Alzheimer studies were not complete.  Had Konstam, Reicin *et al.* analyzed the two blocks of studies that had been planned to be complete and available for analysis at the time of submission of the article, the TCVSAE results would have revealed a relative risk of 2.4 for Vioxx compared to placebo, borderline statistically significant (p = 0.06).  That analysis would not have been "positive" for Vioxx, and it was not published.

101.   Compliance and dropout rates were increased in the Alzheimer's cohort. MRK-I2690007833 at 857 and 951.  As Merck scientist Alan Nies wrote in the major pharmacology text, *The Pharmacological Basis of Therapeutics* by Goodman and Gilman, "[N]oncompliance, even if randomly distributed between both groups, may cause falsely low estimates of the true potential benefits or toxicity of a particular treatment."  9th edition, 1996 at 45.  The Konstam article did not mention the limitations of the Alzheimer's trials that would have affected the reliability of the data.

102.   The Konstam article also omitted data showing a statistically significant excess risk of mortality in the Alzheimer's studies, which was known to Merck by April 8, 2001, about six months before the Konstam article was submitted for peer review.  The submitted draft did not mention the elevated risk of all-cause mortality and heart disease mortality in the Alzheimer's trials.

103.   On April 17, 2001, Merck officials and scientists attended a presentation where slides read "establish favorable safety profile for and within class."  The slide also read,

"Maximize exposure of Alzheimer's Disease/Mild Cognitive Impairment placebo-controlled, CV safety data." MRK-AADO0226839 at 846.  In 2002, Merck issued a press release describing cardiovascular event rates in the Alzheimer's trials, which did not mention the statistically significant excess risk of mortality in the Vioxx patients in those trials.  (Kaiser Dep. 116:1-126:2, Kaiser Exs. 18, 19, 21).

104.    In its Scientific Communication Plan for Vioxx dated March 27, 2001, Merck noted that all the cardiologists "listed have been engaged" by Merck and "have demonstrated a clear understanding of Merck's point of view on cardiovascular and renal issues."  It added, "[t]hose cardiologists marked with an asterisk represent certified national speakers who consistently communicate Merck's point of view on these issues in presentations to their colleagues."  (MRK-ABO0000257 at 263.)

105.    After Merck scientists wrote the first draft of one of the meta-analysis papers, Merck contacted scientists who were on Merck's "consistently communicate list" to work with them on publication of the manuscript.  MRK-ABK0436556-57.  One such scientist, Dr. Marvin Konstam, was invited to be the first author of an article that concluded that there was "no evidence for an excess of CV events" for Vioxx.  MRK-ABA0004431-440.  Internally, a memo from Merck scientist Briggs Morrison described that conclusion as "wishful thinking," which attempted to impose a conclusion on the data.  That viewpoint was not published.

106.    The article by Konstam, Weir and Merck scientists and physicians was published in the journal *Circulation*.  The paper was originally rejected after being submitted through the express route to the *Journal of the American Medical Association*.  After receiving the rejection Merck officials, in an email titled, "Urgent decision needed about CV meta-analysis journal," recommended submitting the manuscript to *Circulation* because Dr. Konstam, the lead

author, was on the editorial board of *Circulation*.  They noted that the editor would let them know within a week whether the article would be accepted and would be fast tracked.   MRK-ABW0010182.  Peer review of journal articles normally takes weeks to months.  At the time Merck was trying to rush the publication of a "positive" analysis of the data, Merck recognized that "key events [were] negatively impact[ing] NRx volume for Vioxx."  MRK-ABI0008139 at 182.

107.   The key event negatively impacting Vioxx sales volume at that time was the publication of an article in JAMA by Drs. Topol, Mukherjee and others, which reviewed information from the FDA website that suggested Vioxx may have a prothrombotic risk.  Prior to its publication, Merck employees traveled to Cleveland to visit with Dr. Topol and persuade him that his analysis was wrong.  When Merck learned of the upcoming date of the publication of the article in August 2001, Merck issued another press release standing behind the CV safety of Vioxx, timed to become public just before the Topol article was published.

108.   The paper published by Dr. Matthew R. Weir *et al.* in the *American Heart Journal*, Volume 140, page 591, October 2003, did not include CV event data from Protocols 136 and 010, which had been completed before the manuscript was submitted for peer-review.  (MRK-ABSO415816 [protocol 136]; MRK-0S420045791 [protocol 010]; Gertz, BJ *et al.* Curr. Med. Res. and Op. 2002; 18:82-91 at 83-84; and MRK-I8940080062 at 095.)  In addition, the Weir paper employed an APTC endpoint that revealed fewer adverse events in the Vioxx treated arm than would have been reported had Merck employed the previously specified thrombotic cardiovascular serious-adverse events endpoint (TCVSAE).  The conclusion of the Weir paper was that a "review of the phase IIB/III OA program revealed no adverse CV safety signals. . . ." If Merck had reported all completed OA trials utilizing the TCVSAE endpoint, a statistically significant three-fold excess of such events would have been apparent.

109.    Merck retained noted epidemiologist Jerry Avorn, M.D., to conduct a study of the CV thrombotic risks of Vioxx.  Dr. Avorn's study found a higher rate of MI on Vioxx than other medications, as well as a small protective effect of naproxen which was not sufficient to explain the large excess risk of MI in the VIGOR study.  Merck sent Dr. Reicin to Dr. Avorn's unit in Massachusetts, where she told him that his findings were wrong, and that he would be embarrassed by their publication.  Dr. Avorn's article was published; however, Merck removed its own scientist, Dr. Carolyn Cannuscio, from the list of authors, although Dr. Avorn and his co-author Dr. Solomon believed that Dr. Cannuscio should have been included.

110.    Merck developed news releases concerning Vioxx that were designed to be reviewed by news reporters and disseminated to the public.

111.    Merck generally did not submit news releases to the FDA.

112.    Prior to the VIGOR study, Merck was aware of a publication from one of their paid advisors, Garret FitzGerald, that raised concerns about Cox-2 inhibitors and heart attacks.

113.    Merck was concerned about the FitzGerald article and responded by developing public relations materials to handle questions about it.

114.    Merck conducted a very successful media outreach for Vioxx.  Merck's public relations director, Jan Weiner, received a note in her personnel file stating that "Vioxx highlighted in articles reaching more than two billion-almost ten times per person [in the U.S.]"

115.    Merck's press releases consistently tout CV safety, but do not mention possible risk.

116.    Merck produced a video news release after the VIGOR study to tout GI safety, but did not mention CV risk.

117.     Merck produced a video news release following Eric J. Topol's 2001 article in JAMA that says Vioxx does not cause heart attacks, but did not disclose contrary data, including the VIGOR study.

118.     The Court finds that the course of conduct described above resulted in an imbalanced picture of Vioxx' CV thrombotic risk, in that "positive" analyses were published while adverse findings were not.  The Court further finds that Merck attempted to persuade independent scientists such as Dr. Topol and Dr. Avorn to modify their published analyses of Vioxx' CV risk in order to further the explicit strategic goal of neutralizing concerns over CV risk, and that the efforts to "neutralize" opposing views extended to practicing physicians in Louisiana, as documented in the Baumgartner list.  As a result of these practices, the Court further finds that Plaintiff could not have known of the unpublished, adverse information about Vioxx' CV thrombotic risk.

## V.     LDHH Was Unaware Of Defect

119.     The Court finds that LDHH was unaware of the defective condition of Vioxx.

120.     While Provider Synergies monographs presented to the LDHH P&T Committee discussed "cardiovascular concerns," these monographs reported that findings regarding any cardiovascular risk were inconclusive.

121.     The Provider Synergies monographs, relying chiefly upon and largely consistent with Merck-sponsored research, exaggerated the GI benefit of Vioxx and failed to advise LDHH that these benefits were outweighed by the significant cardiovascular risks.

122.     Members of the LDHH P&T Committee, including the chairman of the P&T Committee Dr. Vincent Culotta, were "targeted" by Merck sales force, who presented Merck's pro-Vioxx message, which centered around exaggeration of GI benefits and "neutralizing" any cardiovascular concerns.  (July 7, 2004 Memo to "Vioxx Team" from Michael Peoples re LA Medicaid Region Plan; Mary 28, 2003 Memo from Mary Ogle re Push through-pull through tactical

plans for LA Medicaid).  While Warren Lambert, the Merck manager in charge of the sales representatives who called on Louisiana P&T Committee members could not recall any of the specific messages delivered to P&T Committee members, this Court draws the reasonable inference that the messages presented were consistent with the misleading messages that were encompassed within Merck's national marketing program for Vioxx which was disseminated throughout the company's sales force, which strategies were outlined in Merck marketing documents received and/or prepared by Mr. Lambert. (2001 ArkLaTex Region Tactical Plan for Vioxx; 2002 ArkLaTex Region Tactical Plan for Vioxx; national Cross-Functional Team Meeting for Vioxx, Summary July 18-19, 2001).

123.    Merck Regional Medical Director Fran Kaiser met personally with P&T Chairman Dr. Vincent Culotta to deliver Merck's clinical message regarding Vioxx.  Dr. Kaiser did not provide any information about the risks of Vioxx beyond the incomplete and misleading information contained in the label.  While Dr. Kaiser could not recall the substance of any of her conversations with P&T Committee members, this Court draws the reasonable inference that the messages presented were consistent with the misleading messages that were encompassed within Merck's national marketing program for Vioxx which was disseminated throughout the company's salesforce.

124.    Provider Synergies was likewise targeted by Merck's salesforce with respect to Vioxx.  (October 9, 2002 Customer Profile, Provider Synergies, prepared by John Fevurly & Michael Davis).

125.    Merck Regional Medical Director Kerry Edwards met with personnel from Provider Synergies at least once or twice a year.  (Kerry Edwards deposition, 81:4-82:5)  At each of those meetings, Provider Synergies personnel asked about cardiovascular risks associated with

Vioxx. (*Id.*)  On each such occasion, Dr. Kerry responded with messages developed and approved by Merck headquarters and did not provide any information about the risks of Vioxx beyond the incomplete and misleading information contained in the label.  (Kerry Edwards deposition, 55:3-22). While Dr. Edwards could not recall the substance of any of her conversations with P&T Committee members, this Court draws the reasonable inference that the messages presented were consistent with the misleading messages that were encompassed within Merck's national marketing program for Vioxx which was disseminated throughout the company's salesforce.

126.    While the Provider Synergies Monographs discussed "cardiovascular concerns" they did not inform the P&T that the cardiovascular risks of Vioxx far outweighed any GI benefit.  The information regarding both "cardiovascular concerns" and GI benefits in the Provider Synergies monographs were substantially consistent with Merck's label.

127.    The record is devoid of any evidence that anyone at LDHH had any knowledge of the safety profile of Vioxx beyond what was included in Merck marketing materials presented to the P&T Committee members, the Provider Synergies monographs, and Merck's label for Vioxx.

128.    Merck has brought forth no evidence that anyone at LDHH had any understanding as to the safety of Vioxx other than that Vioxx was reasonably safe for widespread analgesic use.

129.    This Court finds credible the testimony of LDHH Hood Secretary David Hood that he understood that while there were various risks associated with the use of Vioxx, the risks were of acceptable levels for a prescription drug of widespread analgesic use such as Vioxx and that those risks were outweighed by the benefits provided by the drug.

130.    The Court finds credible the testimony of LDHH Secretary David Hood that he was unaware that the CV risks of Vioxx vastly outweighed the GI benefits.

131.    The Court finds that no one at LDHH was aware that Merck-sponsored studies cited in the Provider Synergies monographs and Vioxx label greatly exaggerated the GI benefits of Vioxx, examples of which include:

- By April 2003, Merck's data showed that Vioxx had about a four times greater risk of GI harm compared to placebo, although the Laine study stated that the Vioxx ulcer rate was "comparable to placebo";

- Vioxx was only tested to show GI benefit against high doses of ibuprofen and other NSAIDs that are not taken by 90% of the NSAID users, while people who used lower doses (the vast majority) got no benefit;

- Although the VIGOR study publication concluded Vioxx showed a statistically significant benefit over Naproxen for the most serious GI events, the VIGOR study results only showed such a benefit for patients taking steroids, which comprise only a small percentage of Vioxx patients;

- By February 27, 2003, Merck knew that the rate of the most serious GI events in the osteoarthritis studies was higher on Vioxx than on the traditional NSAIDs such as ibuprofen by the end of the study.

132.    The Court finds that no one at LDHH was aware that Merck-sponsored studies cited in the Provider Synergies Monographs and Vioxx label concealed the cardiovascular risks of Vioxx, examples of which include:

- The VIGOR study publication did not include complete cardiovascular (CV) data that was pre-specified for analysis, which would have shown excess CV risk to all patients, not just the ones who were "Aspirin-indicated" (i.e., had prior CV events);

- The VIGOR study publication did not include the "Overall safety" results showing that Vioxx patients had 21% more serious adverse events than naproxen patients, when all types of harm were considered, which demonstrated that any GI benefit was outweighed by CV harm;

- By 2001, Merck knew that Merck-sponsored Alzheimer's studies showed an excess risk of mortality among Vioxx patients versus placebo, and the same data showed an excess of cardiovascular mortality;

- Although by April 2002, Merck's OA data showed a statistically significant 3-fold risk of thrombotic CV events compared to placebo, a 2002 Merck-sponsored study publication only addressed pre-market OA studies and stated that there was no difference between Vioxx and placebo.

- The VIGOR study showed a statistically significant 27% greater rate of hospitalizations for Vioxx patients as opposed to Naproxen. Although there were 20 fewer hospitalizations for gastrointestinal problems, there were 41 more cardiovascular hospitalizations among people taking Vioxx. This data, which would have demonstrated that treatment with Vioxx presented a significant economic disadvantage to treatment with Naproxen was never published.

## VI.  Expenditures For Vioxx

133.    From June 13, 2001 to September 30, 2004, when Vioxx was taken off the market, LDHH expended a total of $11,172,072.00, net of rebates, in reimbursements for Vioxx prescriptions.

## CONCLUSIONS OF LAW

1.    This Court concludes that Plaintiff has met his burden to show that Vioxx suffers from a redhibitory defect in that the cardiovascular side effects of Vioxx rendered its use so inconvenient that it must be presumed that a reasonable buyer would not have purchased Vioxx had he been aware of the defect.  LSA-C.C. art. 2520.  Article 2520 provides:

> The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
>
> A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.

864700.1

2.     Consistent with this Court's previous holding, this Court holds that LDHH is a "buyer" entitled to assert the redhibition claim.  *See* March 31, 2010 Order & Reasons, at p. 18.

3.     This Court concludes that the redhibitory defect in Vioxx arises from the fact that the cardiovascular risks of Vioxx far outweigh any GI benefit and that Vioxx has not been shown to be any more effective in the treatment of pain than traditional NSAIDs, which do not pose the same cardiovascular risk.

4.     This Court concludes that LDHH has met its burden to show that it must be presumed that a reasonable buyer in LDHH's position would not have purchased Vioxx had it known of the defect.

5.     This Court has previously ruled that as of June 13, 2001, LDHH had the authority to refuse to pay for Vioxx by adopting a formulary which excluded reimbursements for Vioxx.  LSA-R.S. 46:153.3(B); March 31, 2010 Order & Reasons, at p. 12.

6.     This Court finds that plaintiff has met his burden to show that a reasonable buyer in the position of LDHH would have exercised its authority to refuse to pay for Vioxx had the defect been known.

7.     As a manufacturer of Vioxx, Merck is deemed to have been aware of the redhibitory defect.   LSA-C.C. art. 2545.   Furthermore, this Court finds that plaintiff has demonstrated by a preponderance of the evidence that Merck had actual knowledge of the defective condition of Vioxx no later than April of 2000, and that any ignorance of the true risk of Vioxx on Merck's part was due to Merck's failure to investigate the safety profile of Vioxx adequately.

8.     This Court concludes by a preponderance of the evidence that LDHH was unaware of the redhibitory defect in Vioxx.   While LDHH had been made aware of certain "cardiovascular concerns," the state was not aware that the cardiovascular risks so outweighed any

- 46 -

benefit of the drug so as to render it unfit for its intended use.  Mere awareness of a condition, even the condition which is the basis of the redhibitory defect, is not equivalent to awareness of the redhibitory defect when the buyer is unaware that the extent of the condition is so great as to give rise to a redhibitory defect.  *Buck v. Adams*, 446 So.2d 895 (La. App. 1st Cir. 1984).

9.      Plaintiff is entitled to a full refund of the purchase price of Vioxx.  LSA-C.C. art. 2520 ("The existence of [a redhibitory] defect gives a buyer the right to obtain rescission of the sale."); LSA-C.C. art. 2545 (a seller who knows of the defect "is liable to the buyer for the return of the purchase price . . .").

10.      This Court concludes that since the Vioxx pills are of no use to either the buyer or the seller, LDHH's inability to return the Vioxx pills to Merck does not preclude LDHH from asserting a claim in redhibition for return of the full purchase price.  *Edmondson Bros. v. F.M. Carriere & Son, Inc.*, 88-772 (La. App. 3d Cir. 11/8/89), 552 So.2d 1229; March 31, 2010 Order & Reasons, at pp. 19-20.

11.      The Court concludes that since Merck is deemed to have known of the defect, plaintiff is entitled to return of the full purchase price, together with interest from the date of purchase and attorneys' fees, subject to a credit for any value conferred on the buyer by the use of the Vioxx.  LSA-C.C. art. 2545.  The burden to show the value conferred on LDHH rests with *Merck. Magee v. Brown*, 2003-0600 (La.App. 4th Cir. 10/1/03), 859 So.2d 720, 724, *writ denied*, 2003-3016 (La. 1/30/04), 865 So.2d 68; *Holloway v. Gulf Motors*, 588 So.2d 1322 (La. App. 2d Cir.).  This Court finds that Merck has failed to meet its burden to show that LDHH obtained any value from Vioxx, and hence plaintiff is entitled to full recovery of full return of the purchase price, plus interest from the date of purchase and attorneys' fees.

864700.1

12.     Plaintiff is entitled to return of the full amount it paid in reimbursements for Vioxx from June 13, 2001 of $11,172,702, together with legal interest from the date of purchase and reasonable attorneys' fees.

Respectfully submitted, this 5th day of April, 2010.

*/s/ Stephen B. Murray, Jr.*
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
Justin Bloom
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Email: smurrayjr@murray-lawfirm.com

James D. Caldwell, Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188

COUNSEL FOR PLAINTIFF

864700.1

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW has this day been served on Liaison Counsel, Phillip A. Wittmann and Russ M. Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to Pretrial Order No. 8B, on this the 5th day of April, 2010.

*/s/ Stephen B. Murray, Jr.*
Counsel for Plaintiff