| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
| | * | |
| STATE OF LOUISIANA, *ex rel.* JAMES D. | * | SECTION L |
|     CALDWELL, JR., Attorney General, | * | |
| | * | JUDGE ELDON E. FALLON |
|                      Plaintiff, | * | |
| | * | MAGISTRATE JUDGE |
|    versus | * | KNOWLES |
| | * | |
| MERCK SHARP & DOHME CORP., | * | |
| | * | |
|                   Defendant. | * | |
| | * | |
| Case No. 05-3700. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MERCK SHARP & DOHME CORP.'S RULE 52(C) MOTION FOR JUDGMENT ON PARTIAL FINDNGS AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................. 4

    I.      LEGAL STANDARD ................................................................................ 4

          A.    Motion for Judgment on Partial Findings ................................... 4

          B.    The Court's Summary Judgment Order Set Forth Plaintiff's
               Causation Burden on Its Redhibition Claim ............................... 5

    II.     PLAINTIFF HAS NOT PRODUCED COMPETENT EVIDENCE THAT BUT
          FOR MERCK'S ALLEGED MISREPRESENTATIONS, THE STATE COULD
          HAVE, AND WOULD HAVE, ESTABLISHED A RESTRICTIVE
          FORMULARY EXCLUDING VIOXX ............................................... 6

          A.    Mr. Hood Does Not Know if Vioxx Was "Defective" or if Any
               Information About Vioxx Was Withheld from LDHH or the P&T
               Committee ................................................................................... 8

          B.    The Evidence Shows that LDHH Could Not Have Instituted a
               Restrictive Formulary .............................................................. 10

          C.    Even if LDHH Could Have Established a Restrictive Formulary, It
               Would Not Have Done So ........................................................ 13

    III.    PLAINTIFF HAS NOT PRODUCED EVIDENCE THAT LDHH COULD
          HAVE REMOVED VIOXX FROM A HYPOTHETICAL RESTRICTIVE
          FORMULARY UNDER FEDERAL MEDICAID LAW .................................... 16

    IV.    EVEN IF LDHH HAD EXCLUDED VIOXX FROM A HYPOTHETICAL
          RESTRICTIVE FORMULARY, FEDERAL LAW WOULD HAVE REQUIRED
          SOME REIMBURSEMENT UNDER A PRIOR AUTHORIZATION
          PROGRAM ................................................................................ 18

CONCLUSION .............................................................................................................. 20

i

1014019v.1

TABLE OF AUTHORITIES

Page

**Cases**

*Alston v. Fleetwood Motor Homes of Ind.,*
    480 F.3d 695 (5th Cir. 2007) ......................................................................... 5

*Dalme v. Blockers Mfd. Homes, Inc.,*
    2000-00244 (La. App. 3 Cir. 1/25/01); 779 So. 2d 1014, 1028................................. 5

*Edmonds v. Levine,*
    417 F. Supp. 2d 1323 (S.D. Fla. 2006) ........................................................ 7, 11, 18

*Feliciano v. Rullan,*
    378 F.3d 42 (1st Cir. 2004)............................................................................ 4

*In re Schering-Plough Intron/Temodar Consumer Class Action,*
    No. 06-5774, 2009 WL 2043604, at *25 (D.N.J. July 10, 2009) ........................... 19

*Ironworkers Local Union No. 68 v. Astrazeneca Pharm. LP,*
    585 F. Supp. 2d 1339 (M.D. Fla. 2008)......................................................... 19

*Lytle v. Household Mfg., Inc.,*
    494 U.S. 545 (1990)...................................................................................... 4

*Oyuela v. Seacor Marine (Nig.), Inc.,*
    290 F. Supp. 2d 713 (E.D. La. 2003)............................................................ 4

*Pharm. Research & Mfrs. v. Meadows,*
    304 F.3d 1197 (11th Cir. 2002) ................................................................. 7, 18

*Ritchie v. United States,*
    451 F.3d 1019 (9th Cir. 2006) ...................................................................... 4

*Univer. Computing Co. v. Mgmt. Sci. Am., Inc.,*
    810 F.2d 1395 (5th Cir. 1987) ..................................................................... 15

*Wechsler v. Hunt Health Sys., Ltd.,*
    330 F. Supp. 2d 383 (S.D.N.Y. 2004) .......................................................... 4

*Westinghouse Elec. Corp. v. M/V "Leslie Lykes,"*
    734 F.2d 199 (5th Cir. 1984) ....................................................................... 15

**Statutes**

2001 La. Acts 395 ................................................................................... passim

21 U.S.C. § 355(a) ...................................................................................... 14

i

TABLE OF AUTHORITIES
(continued)

Page

21 U.S.C. § 355(d) ................................................................................................ 14

42 U.S.C. § 1396r-8(a) ........................................................................................... 5

42 U.S.C. § 1396r-8(a)(1) ...................................................................................... 5

42 U.S.C. § 1396r-8(d) ........................................................................................... 5

42 U.S.C. § 1396r-8(d)(1) ...................................................................................... 5

42 U.S.C. § 1396r-8(d)(1)(b) .................................................................................. 5

42 U.S.C. § 1396r-8(d)(2) ...................................................................................... 5

42 U.S.C. § 1396r-8(d)(4) .................................................................................. 5, 7

42 U.S.C. § 1396r-8(d)(4)(C) ...................................................................... 6, 17, 18

42 U.S.C. § 1396r-8(k)(2)(A) ................................................................................ 5

42 U.S.C. § 1396r-8(k)(6) ...................................................................................... 5

La. Civ. Code Ann. art. 2520 ................................................................................. 5

La. Rev. Stat. Ann. § 46:153.3 ........................................................................... 5, 6

La. Rev. Stat. Ann. § 46:153.3(B)(2) (1999) ..................................................... 6, 10

La. Rev. Stat. Ann. § 46:153.3(C)(5)(c) .............................................................. 11

La. Rev. Stat. Ann. 46:153.3(B)(2)(d) (2002) ................................................. 12, 17

**Rules**
Fed. R. Civ. Proc. 41(b) ......................................................................................... 4

Fed. R. Civ. Proc. 50(a) ......................................................................................... 4

Fed. R. Civ. Proc. 52 .............................................................................................. 4

Fed. R. Civ. Proc. 52(c) ...................................................................................... 1, 4

**Regulations**
28 La. Reg. 1639-41 (July 2002) ....................................................................... 6, 12

28 La. Reg. 979-80 (May 2002) ......................................................................... 6, 12

1014019v.1

TABLE OF AUTHORITIES
(continued)

Page

42 C.F.R. § 430.12(c) ................................................................................................................ 13

Pursuant to Federal Rule of Civil Procedure 52(c), Merck Sharp & Dohme Corp. ("Merck") respectfully moves for judgment on partial findings given that the Court has heard all the evidence on a crucial and dispositive issue of fact -- whether, after the passage of Act 395 and consistent with the requirements of applicable state and federal law, the Louisiana Department of Health and Hospitals ("LDHH") could have, and would have, created an exclusive formulary with the effect of entirely eliminating reimbursement for Vioxx under Louisiana's Medicaid program if it had received additional or different information concerning the risks and benefits of Vioxx.

## INTRODUCTION

In ruling on Merck's motion for summary judgment, the Court carefully delineated the burden Plaintiff must carry in order to prevail on its redhibition claim: In order to establish causation, Plaintiff must show that, but for Merck's alleged misrepresentations, LDHH "could and would have created a restrictive formulary from which it excluded Vioxx."  (*See* Order on Merck's Motion for Summary Judgment (Mar. 31, 2010) ("Summ. J. Order") at 22.)  Plaintiff has failed to carry this burden in four ways.

**First,** the record contains no evidence that LDHH, given its legal, political and institutional constraints, *could* have instituted a restrictive formulary, and thereby denied reimbursements for Vioxx completely between June 13, 2001 and September 30, 2004, if it had believed that the risks of the drug outweighed its benefits.

**Second,** the record contains no evidence that LDHH officials *would* have acted to establish a restrictive formulary, with the aim of completely denying reimbursements for Vioxx, if they had believed that Vioxx's risks outweighed its benefits.  On the contrary, the evidence shows that LDHH officials never contemplated the establishment of a restrictive formulary or considered foreclosing all access by Medicaid recipients to any Medicaid-eligible, FDA-

1

approved prescription drug.

*Third,* the record contains no evidence that, even if LDHH had established a restrictive formulary with the goal of denying reimbursement for Vioxx, it would have been able to exclude Vioxx from such a formulary consistent with federal Medicaid law.  Specifically, the Plaintiff's experts did not show (as they must) that *based only on the FDA approved label*, Vioxx lacked a significant, clinically meaningful therapeutic advantage.  Indeed, Plaintiff's expert, Dr. Graham, testified that Vioxx had distinct gastrointestinal advantages over traditional NSAIDs in certain patients.  Thus, the evidence shows that, based solely on its FDA-approved labeling, Vioxx at all times possessed therapeutic and safety advantages over comparator drugs and therefore, under federal law, could not have been removed from a restrictive Medicaid formulary.

*And finally,* the record contains no evidence showing that, even if a restrictive formulary had been established by LDHH between June 13, 2001 and September 30, 2004, and Vioxx had been excluded from the formulary, all reimbursements for Vioxx would have ceased.  Because federal Medicaid law requires that a prior authorization program be instituted as part of any restrictive formulary, to carry its burden on causation, Plaintiff must show *which* Vioxx prescriptions would not have been reimbursed under this exception.  Plaintiff has not -- and cannot -- make the requisite individualized showing the Court had determined is necessary in such circumstances.  (Summ. J. Order at 15.)  *See also In re Zyprexa Prods. Liab. Litig.,* 617 F. Supp. 2d 397, 434-60 (E.D.N.Y. 2009).

Plaintiff attempted to satisfy its causation burden through the testimony of the former Secretary of LDHH, David Hood, an administrator with no medical expertise.  But Mr. Hood admitted that LDHH has never, to this day, implemented a restrictive formulary for Louisiana's Medicaid program and that neither LDHH nor the Medicaid Pharmaceutical & Therapeutics

Committee ("P&T Committee") ever contemplated such an action or a complete denial of reimbursement for any drug while Vioxx was on the market.  Mr. Hood's conclusory testimony provided no evidence of how such an exclusive formulary could be approved or established consistent with Louisiana and federal law.  In fact, Mr. Hood testified that he had no knowledge of the federal regulatory framework with which LDHH would have had to comply to establish a restrictive formulary, or even the scope of his power under Act 395 in that regard.  Instead, he testified, he would have sought advice from LDHH lawyers, the Attorney General, and key legislators before he could have determined if or how LDHH could have lawfully excluded Medicaid reimbursement an FDA-approved drug.  Mr. Hood's reluctance to unilaterally claim such sweeping powers is hardly surprising given his testimony about the State's earlier, pre-OBRA, failed experiment with a restrictive formulary, the subsequent political resistance LDHH faced when lobbying the Legislature simply to move from the preexisting open formulary to a preferred drug list ("PDL") with prior authorization, and the Legislature's continuing oversight of LDHH in 2002 as the Department established the preferred drug list and prior authorization program contemplated by Act 395.

The only evidence in the record as to what LDHH "would have" and "could have" done to restrict access to Vioxx beyond the existing PDL and prior authorization scheme was Mr. Hood's speculation that, hypothetically, if he had known Vioxx was defective, Mr. Hood would have done "something" to restrict coverage.  This speculative testimony, and the complete absence of any factual predicate for it, cannot defeat judgment for Merck in this case.

## ARGUMENT

I. **LEGAL STANDARD**

    A. **Motion for Judgment on Partial Findings.**

In a nonjury trial, once a party has been fully heard on an issue and the Court finds against the party on that issue, the Court "may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c); *see also* Notes of Advisory Committee on 1991 Amendments to Rule 52 (noting that Rule 52(c) "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence"). In deciding whether to enter judgment under Rule 52(c), the Court "is not required to draw any inferences in favor of the non-moving party; rather, the district court may make findings in accordance with its own view of the evidence." *Ritchie v. United States,* 451 F.3d 1019, 1023 (9th Cir. 2006); *see also Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-55 (1990) (discussing the difference between Rule 41(b), the predecessor to Rule 52, under which the court weighs evidence as the trier of fact, and Rule 50(a), under which the court must draw all factual inferences in favor of the nonmoving party). A Rule 52(c) motion brought by a defendant may be granted where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case, but the court determines that a preponderance of the evidence weighs against the plaintiff's claim. *Wechsler v. Hunt Health Sys., Ltd.,* 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004); *see also Oyuela v. Seacor Marine (Nig.), Inc.,* 290 F. Supp. 2d 713, 716 (E.D. La. 2003) (granting motion under Rule 52(c) based on the preponderance of the evidence). In determining where the preponderance of the evidence lies, the Court may assess the credibility of Plaintiff's witnesses. *See Feliciano v. Rullan,* 378 F.3d 42, 59 (1st Cir. 2004).

4

B.    **The Court's Summary Judgment Order Set Forth Plaintiff's Causation Burden on Its Redhibition Claim.**

In order to prevail its redhibition claim, Plaintiff must prove that the State would not have paid for Vioxx through its Medicaid program, but for Merck's alleged misrepresentation and concealment of Vioxx's risks.  *See* La. Civ. Code Ann. art. 2520 ("A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect."); *see also Alston v. Fleetwood Motor Homes of Ind.,* 480 F.3d 695, 699 (5th Cir. 2007) (an element of a redhibition claim is that the plaintiff "would not have bought" the product had it known of the alleged defect) (quoting *Dalme v. Blockers Mfd. Homes, Inc.,* 779 So. 2d 1014, 1028 (La. Ct. App. 2001)).  (*See also* Summ. J. Order at 22.)  However, as the Court found in its order on Merck's motion for summary judgment, the State's discretion to deny coverage for FDA-approved prescription drugs is extremely limited.

As a participant in the federal Medicaid program, Louisiana is subject to Medicaid's regulations regarding payments for outpatient drugs, including Vioxx.  *See* 42 U.S.C. § 1396r-8; La. Rev. Stat. Ann. § 46:153.3.  (*See also* Summ. J. Order at 8.)  States such as Louisiana that elect to provide a Medicaid prescription drug benefit must reimburse for all "covered outpatient drugs" that are subject to a rebate agreement between the pharmaceutical manufacturer and the U.S. Department of Health and Human Services.  *See* 42 U.S.C. § 1396r-8(a), (d).  A "covered outpatient drug" is a prescription drug that has been approved as safe and effective under the federal Food, Drug, and Cosmetic Act.  42 U.S.C. § 1396r-8(a)(1), (d)(1)(b), (k)(2)(A), (k)(6).  A state may deny reimbursement for a covered outpatient drug only under four specified circumstances.  *See* 42 U.S.C. § 1396r-8(d)(1), (2), (4).  The Court has ruled that three of these circumstances did not apply in the instant case.  (Summ. J. Order at 9.)  Thus the only way in

which Plaintiff can prove causation is by providing evidence that, but for Merck's conduct, the

State could have, and would have, established a restrictive formulary, and entirely excluded

Vioxx from it in compliance with 42 U.S.C. § 1396r-8(d)(4)(C) based on the absence of a

clinically meaningful advantage evident in the label, and thereafter refused payment for Vioxx

prescriptions.  (*See* Summ. J. Order at 9-10, 15.)

II.     **PLAINTIFF HAS NOT PRODUCED COMPETENT EVIDENCE THAT BUT FOR MERCK'S ALLEGED MISREPRESENTATIONS, THE STATE COULD HAVE, AND WOULD HAVE, ESTABLISHED A RESTRICTIVE FORMULARY EXCLUDING VIOXX.**

Plaintiff maintains that, but for Merck's alleged misrepresentations, it would have

instituted a restrictive formulary and excluded Vioxx from it.  However, the evidence shows that

LDHH neither could have nor reasonably would have taken such a step.  Prior to 2001, Louisiana

law required that LDHH "provide reimbursement for any drug prescribed by a physician that, in

his professional judgment and within the lawful scope of his practice, he considers appropriate

for the diagnosis and treatment of the patient."  La. Rev. Stat. Ann. § 46:153.3(B)(2) (1999).

(*See also* 4/13/10 Trial Tr. at 370:15-371:7.)  Thus the State was legally precluded from

establishing a restrictive formulary.  (*See* Summ. J. Order at 11.)  In June 2001, the Louisiana

State Legislature modified the State's open formulary system and, pursuant to the authority

granted by Act 395, LDHH instituted a Medicaid pharmacy program utilizing a preferred drug

list and prior authorization system.   *See* 2001 La. Acts 395, *amending* La. Rev. Stat. Ann. §

46:153.3; 28 La. Reg. 979-80 (May 2002) (implementing an Emergency Rule to create a prior

authorization program for drugs prescribed to Medicaid recipients); *see also* 28 La. Reg. 1639-41

(July 2002) (Notice of Intent to promulgate final rule establishing prior authorization program

for Medicaid prescription drug program).  Under this program, prescription drugs placed on the

preferred drug list are covered automatically, while reimbursement for drugs not on the preferred

drug list is conditioned on a prior authorization.  (*See* 4/13/10 Trial Tr. at 378:21-379:10.)  While

the prior approval procedure creates an incentive for physicians to prescribe drugs on the

preferred drug list, authorization for a drug not on the list cannot be withheld.  *See Edmonds v.*

*Levine,* 417 F. Supp. 2d 1323, 1329 (S.D. Fla. 2006) ("The Medicaid Act does not authorize a

state to use [this type] of prior authorization program to deny coverage for a covered drug; it can

only condition reimbursement upon a prescribing doctor first calling a state pharmacist to obtain

approval for the drug."); *see also Pharm. Research & Mfrs. v. Meadows*, 304 F.3d 1197, 1201,

1207 (11th Cir. 2002).

Plaintiff does not dispute that, under the Medicaid drug program LDHH actually adopted

in 2002, reimbursements for Vioxx could not be denied.  Plaintiff maintains, however, that but

for Merck's alleged misrepresentations LDHH would have established a restrictive formulary

pursuant to 42 U.S.C. § 1396r-8(d)(4) for the purpose of excluding Vioxx from the formulary

and thereby denying coverage for the drug.

The only witness to testify in support of this claim was David Hood, who served as

Secretary of LDHH from 1998 to 2004.  (*See* 4/13/10 Trial Tr. at 368:18-22.)  Mr. Hood testified

that, had he learned that Vioxx was a "defective drug," he would have "done everything that [he]

possibly could" to ensure Medicaid recipients did not receive the drug.  (*See id.* at 386:15-

387:17; *see also id.* at 453:19-454:1.)  Although he was Secretary of LDHH, Mr. Hood's

experience was constrained by both his training and his permissible statutory authority.  Mr.

Hood is not a medical doctor, and he readily admitted that he was not qualified to make

independent assessments of the clinical risks and benefits of prescription drugs.  (*Id.* at 400:16-

17; 426:7-17.)  For such assessments, he relied upon the judgment of the LDHH staff and the

doctors, pharmacists and pharmacologists on the Pharmaceutical & Therapeutics Committee

("P&T Committee") that was established by Act 395 to make recommendations about which drugs to include on the preferred drug list.  (*See id.* at 423:8-14, 426:18-20, 372:10-15, 372:21-373:1, 373:12-374:2, 375:15-25.)  The P&T Committee, in turn, contracted with Provider Synergies to complete clinical evaluations of drugs and make recommendations to the Committee about which products to place on the preferred drug list.  (*Id.* at 380:7-15, 432:9-20; *see also id.* at 434:13-20.)  Provider Synergies did so, in part, through monographs that provided detailed clinical information about various classes of drugs.  (*See id.* at 388:10-389:2.)

The record contains no evidence that the LDHH staff, P&T Committee members or Provider Synergies would have recommended the adoption of an exclusive formulary had they received different information about Vioxx.  In fact, Mr. Hood's testimony, taken as a whole, reveals that he has no idea whether Vioxx had a "defect" that would have prompted him to seek changes to the Louisiana Medicaid pharmacy program and, further, that even if he had become aware of an alleged "defect," he would not have sought, and Louisiana would not have instituted, a restrictive formulary.

### A.    Mr. Hood Does Not Know if Vioxx Was "Defective" or if Any Information About Vioxx Was Withheld from LDHH or the P&T Committee.

The premise of Mr. Hood's testimony is that, but for Merck's misrepresentations, he would have been aware that Vioxx's risks outweighed its benefits.  Yet he admits that he does not know if this was actually the case.  Mr. Hood testified that, had he been made aware while Secretary of LDHH that "Vioxx suffered from a defect which rendered it unfit for its intended use; specifically, risk of cardiovascular effects that outweighed any GI benefit over traditional, less expensive NSAIDs in a drug that was proven to be no more effective than traditional NSAIDs in terms of pain relief," he would not have been willing to reimburse for Vioxx prescriptions. (4/13/10 Trial Tr. at 386:15-387:4.)  However, Mr. Hood also testified that he actually has no

idea whether Vioxx did in fact possess such a defect.  (*Id.* at 400: 18-24.)  And while he testified, in response to Plaintiff's counsel's questions, that he was not made aware of certain alleged clinical study results or risks of Vioxx, Mr. Hood admitted that he does not know whether any of Plaintiff's counsel's representations were accurate or whether the purported risks of Vioxx of which he was not informed actually existed.  (*See e.g., id.* at 396:17-25; *see id.* at 399:2-400:15.) Mr. Hood further admitted that his affidavit supporting Plaintiff's opposition to Merck's motion for summary judgment, where he first declared that he would have limited reimbursements for Vioxx had he been supplied with certain information, was crafted entirely by Plaintiff's counsel. (*Id.* at 399:2-19.)  The affidavit was accurate only to the extent that Plaintiff's allegations about Vioxx were not made known to Mr. Hood while he was Secretary of LDHH.  (*See id.* at 400:2-24.)

In contrast to his attorney-drafted affidavit, Mr. Hood's testimony utterly fails to support Plaintiff's claim that he would have acted differently but for Merck's alleged misrepresentations. Mr. Hood admitted that, as Secretary of LDHH, he never made any decision about a prescription drug, including Vioxx, based on his independent assessment or understanding of the drug's risks and benefits.  (*Id.* at 423:8-14, 426:21-427:5.)  He assumed that Vioxx, like most drugs, carried certain risks, and testified that he was aware that it carried gastrointestinal and cardiovascular risks, but he relied on the judgment of the P&T Committee and Provider Synergies.  (*Id.* at 421:17-423:14, 426:18-427:5.)  He does not know what information the P&T Committee relied upon in making recommendations about Vioxx to him, aside from the monographs prepared by Provider Synergies.  (*Id.* at 425:25-426:6.)  Specifically, he does not know if any recommendation about Vioxx depended on the Committee's understanding of Vioxx's gastrointestinal benefits for patients not using steroids.  (*Id.* at 423:15-425:22.)  Similarly, Mr.

Hood does not know what information Provider Synergies relied upon in completing its drug assessments or what recommendations about Vioxx Provider Synergies might have made to the P&T Committee had it received different information about the drug.  (*Id.* at 435:4-9, 436:9-437:1.)

In short, there is no credible basis for the claim that Mr. Hood, as LDHH Secretary, would have acted to restrict Vioxx reimbursements but for Merck's alleged misrepresentation of the drug's risks.   Mr. Hood relied entirely on the recommendations of LDHH staff and the P&T Committee in making drug decisions, and there is no evidence in the record of what those recommendations might have been if different information about Vioxx had been provided. Even more significantly, there is no evidence in the record that either Mr. Hood's decisions about Vioxx, or the recommendations about Vioxx made by the P&T Committee and Provider Synergies, were affected in any way by Merck's representations about the drug.

B.    **The Evidence Shows that LDHH Could Not Have Instituted a Restrictive Formulary.**

Even if Mr. Hood had determined that LDHH should not reimburse for Vioxx prescriptions, LDHH would not have been able to establish a restrictive formulary,[1] given the political, financial and institutional realities in Louisiana while Vioxx was on the market.  Mr. Hood acknowledged that Louisiana had experimented with a closed formulary in the 1980s, and it had met with considerable opposition from physicians, pharmacists and patient advocates.  (4/13/10 Trial Tr. at 402:18-403:15, 451:19-24.)  Thus the State moved to an open formulary which, as discussed above, required the Medicaid program to reimburse for all covered prescription drugs. *See* La. Rev. Stat. Ann. § 46:153.3(B)(2) (1999).  When LDHH began to work toward passage of Act 395, the State wanted a system that would ensure that when a doctor made an individual

---

[1] Much less would LDHH have been able to do so on June 13, 2001, when Act 395 was enacted and which Plaintiff contends is the date from which damages should be calculated.

prescribing decision, there was a mechanism in place to get the prescribed drug to the patient. (*See* 4/13/10 Trial Tr. at 431:16-23.)  A restrictive formulary, Mr. Hood admitted, would not have been politically "palatable."  (*Id.* at 409:15-19.)

The fact that Act 395 provided for a prior authorization process -- not a closed formulary -- was a "selling point," as was the fact that a preferred drug list enabled the State to save money. (*Id.* at 409:8-410:1.)  As the court heard Mr. Hood himself state in the video of his testimony before the Louisiana House and Senate Joint Committee on Health and Welfare on May 22, 2002:

> There was brought up the concern about, would this be a replay of the 1989 formulary that was put into effect?  The answer is, no.  There was no prior authorization in 1989, that meant that it was either you use the drug on the list or you don't get the drug, period.  But that's not the case now, we do have prior authorization.

With these goals in mind, Louisiana's program took the Florida Medicaid program as its model. (*See id.* at 411:14-18.)  *See also Edmonds,* 417 F. Supp. 2d at 1329-30 (explaining that under the kind of prior authorization program established by Florida, doctors are encouraged to shift to more cost-effective drugs but retain final authority as to what drug a patient is prescribed).  In fact, once LDHH's prior authorization program was instituted, "it was not a particularly strict procedure."  (*See* 4/13/10 Trial Tr. at 379:18-380:6.)  As Mr. Hood put it, "the State wanted to allow individual prescribing decisions."  (*Id.* at 431:24-432:3.)

After Act 395 was passed, LDHH was required to return to the Louisiana House and Senate Joint Committee on Health and Welfare to gain approval of the prior authorization process and the initial formulary it had designed.  *See* 2001 La. Acts 395, *adding* La. Rev. Stat. Ann. § 46:153.3(C)(5)(c).  (*See also* 4/13/10 Trial Tr. at 404:1-13, 406:2-25.)  Mr. Hood admitted that, in the course of this process, legislators expressed concern that the State *not* return

11

to a system akin to the closed formulary of the 1980s.  (*Id.* at 407:3-7, 407:23-408:4, 408:9-16.)
As LDHH Secretary, he assured them that the prior authorization program would not restrict
access to drugs.  (*Id.* at 407:22-408:24, 409:15-19.)  Mr. Hood testified that he "took seriously
any directive from senators and representatives who passed Act 395 in deciding how [he] would
exercise his powers."  (*Id.* at 408:5-8.)

Even if LDHH had decided to attempt to institute a restrictive formulary, Mr. Hood
admitted, it could not have done so in June 2001.  (*Id.* at 418:3-5.)  Act 395 was not self-
executing and, as Mr. Hood admitted, LDHH did not promulgate regulations to implement it
until a year later.  *See* 28 La. Reg. 979-80 (May 2002); 28 La. Reg. 1639-41 (July 2002).  (*See
also* 4/13/10 Trial Tr. at 406:18-21, 413:24-414:13, 416:24-417:2.)  In the interim, LDHH was
required to identify members for the P&T Committee, form the Committee, establish by-laws,
review drugs to construct the initial preferred drug list, and gain approval of the list from the
legislature.  (*Id.* at 417:12-418:5.)  Moreover, Act 395 expressly provided that, to ensure
continuity of care, maintenance medications for which prescriptions had been written for
Medicaid recipients prior to the effective date of the Act could not be restricted or subjected to a
prior authorization until at least six months after the effective date of the Act.  *See* 2001 La. Acts
395, *adding* La. Rev. Stat. Ann. 46:153.3(B)(2)(d) (2002).  In accordance with this statutory
provision, LDHH precluded any restriction on prescriptions that had been written prior to June
10, 2002, the date the prior authorization program became effective, until six months after that
date.  (DX 3639 at 5; *see also* 4/13/10 Trial Tr. at 418:17-420:13.)

Plainly, the circumstances in Louisiana from June 13, 2001 to September 30, 2004 were
such that LDHH *could* not have established a restrictive formulary even if it had wished to do so.
Plaintiff's claims that LDHH would have done so (and would have done so on June 13, 2001 the

12

1014019v.1

very day the Act was passed) are without support and fly in the face of political, financial and institutional constraints on LDHH action, as Mr. Hood's own testimony illustrates.

      C.      **<u>Even if LDHH Could Have Established a Restrictive Formulary, It Would Not Have Done So.</u>**

Mr. Hood's testimony also reveals that, despite his assertions to the contrary, LDHH would not reasonably have attempted to institute a totally restrictive formulary in response to Vioxx and thereby worked a radical change in the Louisiana Medicaid pharmacy program for all drugs. To establish an exclusive formulary, the State would have been required to seek approval from the federal Center for Medicare and Medicaid Services ("CMS"). *See* 42 C.F.R. § 430.12(c). (*See also* 4/13/10 Trial Tr. at 444:3-8.) Mr. Hood admitted that he had never heard of any state making such an application. (*Id.* at 444:9-12.)

      Even more significantly, LDHH officials were not aware of any authority under which they might have instituted a restrictive formulary. Mr. Hood conceded that as LDHH Secretary he never even considered restricting the State's reimbursement of an FDA-approved drug. (*Id.* at 428:2-5.) He acknowledged that, while Secretary, he did not know of any authority under which he could have instituted a restrictive formulary had he decided one was necessary on account of Vioxx. (*Id.* at 438:20-439:14, 439:24-440:7.) At most, he admitted, he would have consulted with LDHH attorneys, the P&T Committee, and legislators. (*Id.* at 381:13-382:5; *see also id.* at 440:8-21.) But Charles Castille, an attorney and LDHH Undersecretary, testified that "the State could not have, for example, have done what, let's say, the FDA could do, and take a drug off the market. We obviously did not have that authority." (Deposition of Charles F. Castille, Dec. 10, 2009 ("Castille Dep.") at 73:13-16.) Taking a drug off the preferred drug list was "the most restrictive thing" LDHH could do, Mr. Castille testified. (*Id.* at 73:17-19.) Mr. Hood himself testified that he would have been required to return to the legislature to get a restrictive

13

formulary specifically authorized. (*Id.* at 450:23-451:4.)  As discussed above, however, Mr.

Hood admitted that in 2001 legislators had expressed sharp opposition to any return to the

strictures of a closed formulary and that he took the legislators' directives seriously.  (*See*

4/13/10 Trial Tr. at 407:22-408:8.)

Mr. Hood's testimony reveals that the P&T Committee would not likely have been any

more receptive to such a drastic change to the Medicaid pharmacy program.  Mr. Hood stated

that he would have favored action to deny reimbursements for Vioxx prescriptions had he

learned that the drug's risks outweighed its benefits.  Such a determination would necessarily

have contradicted the finding of the FDA, which approves prescription drugs for sale only upon

finding that they are safe and effective for their intended uses.  *See* 21 U.S.C. § 355(a), (d).  Mr.

Hood admitted that he was unaware of any instance in which the P&T Committee came to a

decision about the safety and/or efficacy of an FDA-approved drug that was at odds with the

FDA's determination.  (4/13/10 Trial Tr. at 430:5-16, 431:8-15.)  Nor, he conceded, did the P&T

Committee or the State ever entertain the idea of adopting an exclusive formulary in order to

deny access to an FDA-approved drug while he was Secretary, despite spirited discussions of

drugs' risks on the P&T Committee.  (*Id.* at 430:5-22.)  He acknowledged that "FDA approval of

a medicine is important to DHH and the P&T Committee" as "an indication . . . that it would be

a safe drug."  (*Id.* at 429:20-23.)  In addition, he has no knowledge of any discussions about

moving to an exclusive formulary since he left office, although they would likely have been

known in the Medicaid policy circles in which he continues to work.  (*Id.* at 428:16-429:14.)

It is probative of what the State reasonbly *would* have done to examine what the State

actually *did* do in an analogous situation.  LDHH continued to provide coverage for non-

steroidal anti-inflammatory drugs ("NSAIDs"), including COX-2 inhibitors, even after the FDA

determined that they carried cardiovascular risks.  On April 6, 2005, FDA's Center for Drug

Evaluation and Research issued a "Decision Memorandum" setting forth a comprehensive

analysis of the available data on traditional NSAIDs, such as ibuprofen and diclofenac, as well as

COX-2 inhibitors such as Vioxx and Celebrex.  (*See* DX 338.)  The Decision Memorandum

concluded that there is a "class effect" for increased cardiovascular risks with all NSAIDs

(except aspirin and possibly naproxen) and that it was not possible, based on available clinical

trial data, to create a "rank ordering" of these drugs.  (*Id.*)  In other words, in 2005 the FDA

concluded that Celebrex and traditional NSAIDs (except aspirin and naproxen) carried

cardiovascular risks at least equal to, and possibly greater than, those of Vioxx.  Nevertheless,

LDHH did not institute an exclusive formulary in response to this development.  Instead, it

continued to keep these drugs, including Celebrex, on its preferred drug list.  (*See* DX 2165.)

These actions by the P&T Committee and LDHH constitute powerful evidence that the State

would not have instituted a restrictive formulary in response to Merck's disclosure of allegedly

concealed information about Vioxx.

   In sum, Plaintiff has failed to produce credible evidence in support of its claim that, but

for Merck's conduct, the State could have and would have radically altered its Medicaid

prescription drug program for every FDA approved drug, instituted a restrictive formulary, and

excluded Vioxx from that formulary.  It is well settled that evidence amounting to mere

speculation is insufficient to establish causation.  *See, e.g., Univer. Computing Co. v. Mgmt. Sci.*

*Am., Inc*., 810 F.2d 1395, 1402 (5th Cir. 1987) (when testimony is no more than a "well-

informed guess . . . any inference drawn therefrom is merely speculative" and insufficient as a

matter of law to establish causation); *Westinghouse Elec. Corp. v. M/V "Leslie Lykes"* 734 F.2d

199, 214 (5th Cir. 1984) (finding insufficient proof of causation where the causal connection was

dependent on "speculation and unproved facts").  But speculation is all that the State offers.

Therefore, Plaintiff cannot establish causation for its redhibition claim, as the Court has ruled it

must, and Merck is entitled to judgment at this point.

III.    **PLAINTIFF HAS NOT PRODUCED EVIDENCE THAT LDHH COULD HAVE REMOVED VIOXX FROM A HYPOTHETICAL RESTRICTIVE FORMULARY UNDER FEDERAL MEDICAID LAW.**

The evidence also shows that even if the State had sought and received approval from

CMS to adopt a restrictive formulary, it could not have excluded Vioxx consistent with 42

U.S.C. § 1396r-8(d)(4)(C).  Under that provision, a State can only exclude a drug from the

formulary "if, *based on the drug's labeling* . . . the excluded drug does not have a significant,

clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome

of such treatment for such population over other drugs included in the formulary and there is a

written explanation (available to the public) of the basis for the exclusion."  42 U.S.C. § 1396r-

8(d)(4)(C) (emphasis added).  In other words, any action to remove a drug from a Medicaid

restrictive formulary must be based on the drug's safety and effectiveness as set forth in its FDA-

approved label -- *not* on an independent assessment of the drug's risks and benefits by a state

Medicaid program using other evidence or information.  Plaintiff has offered no evidence that it

could have satisfied this requirement.

At all times from June 2001 onward, Vioxx labeling established that it possessed

"significant, clinically meaningful therapeutic advantage[s]" over comparator drugs, such as

other NSAIDs.  First and most significantly, Vioxx offered superior gastrointestinal safety.

While the 1999 Vioxx label stated that it was "unclear" how the rates of gastrointestinal

complications found with traditional NSAID usage applied to Vioxx, the label also included data

from two endoscopy studies comparing the rates of endoscopically detectable gastroduodenal

ulcers in patients taking Vioxx, ibuprofen or placebo.  (DX 67 (MRK-LBL0000027-30) at MRK-

LBL0000027-28.)  The label reported: "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastrointestinal ulcers than treatment with ibuprofen 2400 mg daily."  (*Id.* at MRK-LBL0000027.)  Moreover, the table of study data showed that the rate of endoscopically detectable ulcers in patients taking Vioxx was equivalent to the rate of such ulcers in patients taking placebo.  (*Id.* at MRK-LBL0000027-28.)  Plaintiff has not produced evidence that any comparator NSAID offered this degree of gastrointestinal safety.[2]

The 2002 Vioxx label reported data from the VIGOR clinical trial and stated: "the results of the VIOXX GI outcomes research (VIGOR) study demonstrate that in patients treated with VIOXX, the risk of GI toxicity with VIOXX 50 mg daily is significantly less than with naproxen 500 mg twice daily."  (DX 273 (MRK-LBL0000063-66) at MRK-LBL0000064.)  Again, Plaintiff has not produced evidence that any other NSAID possessed equal gastrointestinal safety so as to provide grounds for removing Vioxx from a restrictive formulary consistent with the terms set forth in 42 U.S.C. § 1396r-8(d)(4)(C).  In fact, Plaintiff's own gastroenterology expert, Dr. David Y. Graham, testified that based on the available data, Vioxx "would be a better choice than a traditional NSAID" for patients taking steroids.  (4/13/10 Trial Tr. at 355:9-15; *see also id.* at 355:3-6 (stating that, for steroid users, Vioxx is better than traditional NSAIDs for safety).)

---

[2]  Additionally, even if LDHH had somehow satisfied itself that there was not a clinically meaningful advantage to Vioxx when Act 395 was passed in June 2001, the Act itself, as discussed above, bars the State from completely restricting reimbursement for six months for Medicaid patients who had preexisting prescriptions at the time.  *See* 2001 La. Act 395, *adding* La. Rev. Stat. Ann. § 46:153.3(B)(2)(d) ("[T]he department shall not restrict or require prior approval of maintenance medications for Medicaid recipients who have been prescribed such medications prior to the effective data of this Act for a period of six months after the effective date of this Act.")  (*See also* DX 3639 at 5; 4/13/10 Trial Tr. at 418:17-420:13.)

IV.   **EVEN IF LDHH HAD EXCLUDED VIOXX FROM A HYPOTHETICAL RESTRICTIVE FORMULARY, FEDERAL LAW WOULD HAVE REQUIRED SOME REIMBURSEMENT UNDER A PRIOR AUTHORIZATION PROGRAM.**

Finally, even if Plaintiff had proven that LDHH would reasonably have instituted a restrictive formulary and could have legally excluded Vioxx from that formulary, Plaintiff would not have satisfied its burden to show that it could have entirely ceased Vioxx reimbursement. The federal Medicaid statute provides that if a drug is excluded from a formulary pursuant to 42 U.S.C. § 1396r-8(d)(4)(C), as discussed above, the state must establish a prior authorization program that is consistent with § 1396r-8(d)(5).  *See* 42 U.S.C. § 1396r-8(d)(4)(D).  As the Eleventh Circuit has explained: "Because the statutory requirements of such a formulary also mandate a prior authorization program . . . we construe this requirement to mean that a state must *consider* coverage for an excluded drug on a case-by-case basis." *Meadows*, 304 F.3d at 1207-08 (emphasis in original); *see also Edmonds,* 417 F. Supp. 2d at 1328.  That is, "the prior authorization provision specified by subsection (d)(4)(D) permits the prescribing doctor to obtain an exception to [the] exclusion, presumably because of medical factors specific to his or her patient." *Meadows*, 304 F.3d at 1208 n.9.  Mr. Hood conceded that he was not aware of this provision when he claimed that he would have acted to cut off reimbursements for Vioxx. (4/13/10 Trial Tr. at 445:9-447:1.)

Given the statutory requirement that a restrictive formulary be accompanied by a prior authorization program, it cannot be presumed that the establishment of such a formulary would have resulted in the State's denial of coverage for *all* Vioxx Medicaid prescriptions.  Even in the absence of the misrepresentations alleged by Plaintiff and despite the removal of Vioxx from a restrictive formulary, certain doctors may have decided that Vioxx was medically necessary for a given patient and sought and received approval, either for access to a 72 hour supply in an emergency situation, or for a chronic condition (which the State would be required to respond to

18

in 24 hours or less).  To show that the State paid for certain prescriptions only due to Merck's

alleged misrepresentations, therefore, Plaintiff must establish either that **no** Vioxx prescriptions

would have been sought and received under the prior authorization program or show which of

the tens of thousands of Louisiana Vioxx prescriptions would not have been filled under the prior

authorization exception.  Plaintiff can do neither.  As the Court found in its summary judgment

ruling, the decisions made by doctors and patients are unique.  (Summ. J. Order at 14.)  The

Court rightly concluded that "[i]t is simply impossible, or close to it, to determine the individual

thought process of each of the thousands of doctors and patients" who prescribed and took

Vioxx.  (*Id.*)  Still less is it possible to determine what individual doctors and patients would

have done in the hypothetical situation of a restrictive formulary from which Vioxx had been

removed, but a prior authorization program existed.

In the absence of an individualized showing, however, Plaintiff offers only the

"generalized allegations and aggregate proof" that this Court has already found insufficient to

prove causation.  (*See* Summ. J. Order at 13 (citing *In re Schering-Plough Intron/Temodar*

*Consumer Class Action*, No. 06-5774, 2009 WL 2043604, at *25 (D.N.J. July 10, 2009).)) *See*

*also In re Zyprexa Prods. Liab. Litig.,* 617 F. Supp. 2d at 434-60; *Ironworkers Local Union No.*

*68 v. Astrazeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1344-46 (M.D. Fla. 2008).  Because the

federal Medicaid statute authorizes some reimbursement even for drugs excluded from a

restrictive formulary, Plaintiff is not entitled simply to assert that reimbursement for all Vioxx

prescriptions would have necessarily ceased once such a formulary was created.  In short,

Plaintiff has not proved through adequate and credible evidence that, but for Merck's conduct,

LDHH could have and would have established a restrictive formulary and could have made the

written findings (based solely on the FDA labeling) required to exclude Vioxx from that

formulary.  Nor has it proved how many fewer Vioxx prescriptions would have been written in that hypothetical circumstance, and it cannot do so through common proof.  Its redhibition claim therefore must fail.

## CONCLUSION

For the foregoing reasons, Merck respectfully moves for judgment on partial findings, and asks that the Plaintiff take nothing in this action.

Dated: April 15, 2010

Respectfully submitted,

*/s/Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
   WITTMANN LLC
546 Carondelet Street
New Orleans, LA 70130
Phone: (504) 581-3200
Fax:    (504) 581-3361

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Merck Sharp & Dohme Corp. ("Merck")'s Rule 52(c) Motion For Judgment on Partial Findings has been served on Liaison Counsel by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Plaintiff, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 15th day of April, 2010.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

1014019v.1