UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No.  1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General, Plaintiffs | JUDGE ELDON E.  FALLON |
| | MAGISTRATE JUDGE KNOWLES |
| v. | |
| MERCK SHARP & DOHME CORP., Defendants | Case No.  05-3700 |

**OPPOSITION TO MERCK, SHARP & DOHME'S
RULE 52(C) MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

# TABLE OF CONTENTS

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.     The evidence presented in plaintiff's case does not
              support a Judgment on Partial Findings. . . . . . . . . . . . . . . . . . . . . . . . . 1

       B.     Misrepresentation is not an element of redhibition.. . . . . . . . . . . . . . . . . 3

II.    LDHH had the power to exclude coverage for a defective drug. . . . . . . . . . . . 4

       A.     Secretary Hood's testimony demonstrates that LDHH would
              have exercised its power to exclude coverage for Vioxx. . . . . . . . . . . . . 9

       B.     The State could have adopted a restrictive formulary
              any time as of June 13, 2001.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       C.     LDHH would have adopted a restrictive formulary. . . . . . . . . . . . . . . . 12

III.   Federal law requiring that a drug can only be excluded from
       a formulary on the basis of clinical information in the drug's
       labeling would not preclude LDHH from restricting Vioxx had
       the defect been known. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.    Prior authorization requirement of Section (d)(4)(D) does not
       require that a state pay for excluded drugs. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## INTRODUCTION

As this Court has held, plaintiffs' burden in redhibition is to demonstrate a defect such that had the plaintiff been aware of it, he would not have purchased the product, and that plaintiff was in fact unaware of the defect. (March 31, 2010 Reasons for Judgment, p. 16). Plaintiff has met this burden by demonstrating that Vioxx has a risk of heart attack worse than any other Cox-2 or other NSAID, that Vioxx does not confer any discernable GI benefit over other NSAIDs, and that Vioxx has not been demonstrated to be any better than any other NSAID in terms of pain relief. Any reasonable state agency, charged with ensuring the well-being of medicaid recipients, would have refused to reimburse such a dangerous drug if it had the power to do so. This Court has concluded consistent with state and federal law, that LDHH had the power to do so, and Secretary Hood has offered testimony, uncontroverted during plaintiff's case, that Secretary Hood would have exercised that power to refuse to pay for Vioxx. Finally, plaintiffs have offered uncontroverted evidence that the state was unaware that Vioxx suffered from the defect set forth above. This proof satisfies plaintiffs' burden on a claim in redhibition.

I.   LEGAL STANDARD

    A.   THE EVIDENCE PRESENTED IN PLAINTIFF'S CASE DOES NOT SUPPORT A JUDGMENT ON PARTIAL FINDINGS.

Defendant is correct that the Court may enter a judgment on partial findings at the close plaintiffs' evidence, and that the Court need not draw inferences in favor of non-moving party at that stage. However, in ruling on a motion for partial findings, the Court must weigh and evaluate the evidence in the same manner as if he were making findings of fact at the conclusion of the entire

case." *Benton v. Blair*, 228 F.2d 55, 58 (5th Cir. 1955).[1]   The Court may not reject the uncontroverted

testimony of a witness.   As of the close of plaintiffs' evidence, Secretary Hood's testimony was

uncontradicted and unimpeached.   Plaintiff submits that Mr. Hood's testimony will remain so at the

close of the close of defendant's case, but whether defendant may be able to introduce contradictory

evidence in its case is not before the Court at this time.   Unless Mr. Hood's testimony is "inherently

incredible" the Court cannot reject it.   *Id.*

It should go without saying that in considering a judgment on partial findings at the close of

plaintiff's case, the Court may not consider evidence which has not been introduced prior to close

of plaintiff's evidence.   In order to create the appearance that Mr. Hood's testimony is controverted,

Merck cites to the *deposition* testimony of Charles Castille.   While plaintiff's can and will

demonstrate at the close of evidence why Mr. Castille's testimony does not contradict Mr. Hood's

testimony, reference to Charles Castille's deposition testimony in support of motion for judgment

on partial findings is entirely inappropriate.[2]   Merck did not introduce that testimony in plaintiff's

case in chief.   Merck did not even ask Secretary Hood about that testimony, which would afforded

Secretary Hood the opportunity to explain that Mr. Castille's testimony was entirely consistent with

his own testimony.   This Court cannot enter judgment on partial findings which is based on the

testimony of Charles Castille, which appears nowhere in the presentation of plaintiff's evidence.

---

[1]   Although the Benton case dealt with a judgment on partial findings under Rule 41 (b), the predecessor to Rule 52 c, as defendant notes in its Memorandum, the standard under the two provisions is the same.   See Merck Memorandum, p. 4.

[2]   Mr. Castille was testifying to the LDHH medicaid reimbursement program as it implemented in 2002, and offered no testimony as to what the Secretary of LDHH would have done or could have done in response to a determination that a drug was defective.   Mr. Hood's testimony is entirely consistent with that of Mr. Castille.

B.   MISREPRESENTATION IS NOT AN ELEMENT OF REDHIBITION.

Merck's motion hinges on a fundamental misunderstanding of the claim of redhibition. Merck argues, "In order to prevail on its redhibition claim, Plaintiff must prove that the State would not have paid for Vioxx through its Medicaid program, but for Merck's misrepresentation and concealment of Vioxx's risks.[3]  Plaintiff's burden in redhibition does not require any showing that plaintiff relied on or was otherwise misled by Merck misrepresentations or fraudulent concealment. Rather, plaintiff need only show that Vioxx suffered from a defect such that a reasonable buyer in plaintiff's position would not have purchased Vioxx had he known of the defect, and that plaintiff was unaware of the defect.  (March 31, 2010 Reasons for Judgment, p. 16).  Hence, even assuming that plaintiff cannot show that any misrepresentation by Merck influenced LDHH's decisions with respect to Vioxx (or those of the P&T Committee and Provider Synergies), plaintiff can still recover by demonstrating a redhibitory defect of which LDHH was unaware.

Merck may argue that this Court has held in its summary judgment ruling that reliance on a misrepresentation is necessary to prove a claim in redhibition, based on this Court's statement that "Plaintiff must show that a reasonable state department of health and hospitals would have created a restrictive formulary and would have excluded Vioxx from such a formulary but for Merck's misrepresentations." (March 31, 2010 Reasons for Judgment, p. 21).  However, this statement must be considered in the context of the entire ruling.  Taken in context, it is evident that this Court did

---

[3]  See also Merck Memorandum at p. 6, "Thus the only way Plaintiff can prove causation is by providing evidence that, but for Merck's conduct, the State could have, and would have, established a restrictive formulary..."; at p. 9, "Mr. Hood's testimony utterly fails to support Plaintiff's claim that he would have acted differently but for Merck's misrepresentations."; at p. 10 "there is no evidence in the record that either Mr. Hood's decisions about Vioxx, or the recommendations about Vioxx made by the P&T Committee and Provider Synergies, were affected in any way by Merck's representations about the drug."

not mean to introduce a new element of reliance on a misrepresentation into a claim of redhibition. This Court discussed Merck's misrepresentations solely as they related to plaintiff's burden to demonstrate that plaintiff did not know and could not have known of the defective condition.  As the Court noted on the previous page of its Reasons for Judgment, "it is a disputed question of fact whether LDHH knew of the extent of the risk, *and* whether Merck misled LDHH regarding the risks." (Reasons for Judgment, p. 20 (emphasis added)).

II.    **LDHH** HAD THE POWER TO EXCLUDE COVERAGE FOR A DEFECTIVE DRUG.

This Court has previously ruled that as of June 13, 2001, the Secretary of LDHH had the legal authority to exclude coverage for Vioxx by adopting a restrictive formulary.  This ruling is entirely consistent with applicable federal and state statutes and the jurisprudence considering those statutes. Act 395, effective June 13, 2001, revised LSA-R.S. 46:153.3 to allow the Secretary of LDHH to restrict reimbursements for prescription drugs to the full extent allowable pursuant to federal law. LSA-R.S. 46:153.3 (B)(1).   Federal law allows a state to exclude coverage for prescription drugs through the adoption of a formulary.  "A State may exclude or otherwise restrict coverage of a covered outpatient drug if... the State has excluded coverage of the drug from its formulary established in accordance with paragraph (4)." 42 U.S.C.A. 1396r-8(d)(1)(B)(iv).

Section (d)(4) sets forth the requirements a state must meet in order to establish a restrictive formulary:

> A State may establish a formulary if the formulary meets the following requirements:
>
> (A) The formulary is developed by a committee consisting of physicians, pharmacists, and other appropriate individuals appointed by the Governor of the State (or, at the option of the State, the State's

drug use review board established under subsection (g)(3) of this section).

(B) Except as provided in subparagraph (C), the formulary includes the covered outpatient drugs of any manufacturer which has entered into and complies with an agreement under subsection (a) of this section (other than any drug excluded from coverage or otherwise restricted under paragraph (2)).

(C) A covered outpatient drug may be excluded with respect to the treatment of a specific disease or condition for an identified population (if any) only if, based on the drug's labeling (or, in the case of a drug the prescribed use of which is not approved under the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 301 et seq.] but is a medically accepted indication, based on information from the appropriate compendia described in subsection (k)(6) of this section), the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion.

(D) The State plan permits coverage of a drug excluded from the formulary (other than any drug excluded from coverage or otherwise restricted under paragraph (2)) pursuant to a prior authorization program that is consistent with paragraph (5).

(E) The formulary meets such other requirements as the Secretary may impose in order to achieve program savings consistent with protecting the health of program beneficiaries.

A prior authorization program established by a State under paragraph (5) is not a formulary subject to the requirements of this paragraph.

All of the requirements for creation of a restrictive formulary consistent with Section (d)(4) were in place on June 13, 2001, the first date on which the Secretary was empowered by the Louisiana legislature to restrict reimbursements to the full extent allowed by federal law. Even though the P&T Committee authorized by LSA-R.S. 46:153.3 was not yet up and running, LDHH had a DUR board which pursuant to the express terms of Section (d)(4)(A) could have made the

-5-

clinical determination necessary to exclude Vioxx.  Hence, Secretary Hood had the express statutory authority to refuse to pay for Vioxx, and the means to do so, as of June 13, 2001.  Secretary Hood's testimony, uncontroverted during plaintiffs' presentation of evidence, that he would have done everything in his power to ensure that LDHH did not reimburse Vioxx prescriptions had he known of the defect meets plaintiff's burden to show that the state could have and would have refused to pay for Vioxx had it known of the defect.[4]

Numerous courts have held that under OBRA 90, a state can totally exclude coverage for a given drug (or for that drug for certain indications), by adopting a restrictive formulary. *Pharmaceutical Research and Mfrs. of America v. Meadows*, 304 F.3d 1197 (11th Cir. 2002); *Pharmaceutical Research and Mfrs. of America v. Thompson,* 259 F.Supp.2d 39, 62 (D.D.C. 2003); *Edmonds v. Levine*, 417 F.Supp. 2d 1323 (S.D.Fla. 2006).  A review of the history behind these key rulings is helpful to understanding their significance to the unique question presented in this case of whether a state can exclude coverage for a defective drug by excluding it from a formulary.

As more states began to use prior authorization programs to coerce manufacturers to enter into supplemental rebate agreements, the Pharmaceutical Research Manufacturers Association (PhRMA) mounted a series of legal challenges to such plans.  The thrust of PhRMA's argument was that states could not use prior authorizations to curtail prescriptions of different drugs solely on the basis of cost, rather than issues of clinical efficacy and safety, as was required for exclusion under a formulary.

---

[4]  Plaintiffs will demonstrate at the close of evidence that Secretary Hood's testimony has not been controverted during defendants' presentation of evidence either.

The courts deciding these challenges uniformly distinguished prior authorization programs, which they found could legally curtail prescriptions solely on the basis of cost, from exclusive formularies which excluded coverage altogether.  These courts held that states could adopt prior authorization programs which turned solely on questions of costs, as prior authorization was not subject to the requirement of exclusive formularies that drugs could only be excluded from formularies based on determinations of safety and efficacy.  These courts all noted, however, that states *could* adopt exclusive formularies, which had the effect of totally excluding payments for a drug, if the states complied with the requirement for exclusive formularies that formulary placement decisions be based on decisions of safety and efficacy.  These court's holdings with respect to limitations on use of prior authorizations have no bearing on the question in this case of whether a state can exclude coverage for a defective drug by excluding it from a formulary for reasons of clinical safety and efficacy.

Regardless of what restrictions these courts have placed on prior authorization programs, these courts have all recognized the ability of a state to totally exclude coverage for reasons of clinical safety and efficacy.  For example, in *Meadows*, the Eleventh Circuit held:

> Under § 1396r-8(d), the states are clearly given the authority to impose certain restrictions on the coverage of outpatient drugs, including a formulary for excluding coverage of certain outpatient drugs, *or* a distinct prior authorization program.

> Id., at 1206

The *Meadows* court went on to describe the effect of adopting an exclusive formulary, as opposed to a prior authorization:

> Under the federal Medicaid statute, exclusion of a drug from a "formulary" has the effect of actually denying coverage of, or payment for, certain Medicaid-eligible drugs. As the PhRMA correctly points out, a decision to remove a drug from a § 1396r-8(d)(4) formulary must be based solely on clinical factors.

*Id.*, at 1207-1208

In *Edmonds v. Levine*, which this Court has correctly cited for the proposition that Louisiana had the power to exclude Vioxx by adopting a restrictive formulary, a Florida district court held that a state could not use a prior authorization program to achieve the effect of excluding coverage for a drug.  However, the *Edmonds* court, consistent with the rulings in *Meadows* and *Thompson* reiterated that a state could exclude coverage on the basis of clinical findings by adopting a restrictive formulary.

Plaintiffs have presented ample evidence that Vioxx suffered from a serious safety defect, and that had LDHH been aware of the defect, it would have refused to pay for Vioxx on grounds of safety and efficacy.   Such action is authorized by the provisions of 42 U.S.C.A. §1396r-8 (d)(4), which allows a state medicaid agency to exclude coverage for drugs on the basis of safety and efficacy.  No court has ever held that a state cannot exclude coverage for a drug by excluding it from its formulary based on reasons of safety and efficacy.  More importantly, no Court has even come close to adopting Merck's suggestion that if a manufacturer has entered into a rebate agreement with the Secretary of the U.S. Department of Health and Human Services, a state is powerless to refuse to pay for a defective drug.  Entering into a rebate agreement does not grant a manufacturer license to sell a defective product to state medicaid departments.

A.    SECRETARY HOOD'S TESTIMONY DEMONSTRATES THAT LDHH WOULD HAVE EXERCISED ITS POWER TO EXCLUDE COVERAGE FOR VIOXX.

As this Court has held, LDHH had the legal authority to exclude coverage for Vioxx by adopting a restrictive formulary that excluded Vioxx for reasons of safety and efficacy.  Merck argues that Plaintiff has not met his burden to show that LDHH would have exercised its power to exclude Vioxx had it known of the defect, because Plaintiff has not shown that Secretary Hood was aware of any misrepresentations by Merck regarding Vioxx.  The fact that Merck has rested its Rule 52 motion on this assertion demonstrates Merck's fundamental misunderstanding of the cause of action of redhibition.  The plaintiff's lack of knowledge of the defect is an element plaintiff must *prove* in order to prevail on a claim of redhibition.  Merck asserts, "Mr. Hood's testimony, taken as a whole, reveals that he has no idea whether Vioxx had a "defect" that would have prompted him to seek changes to the Louisiana Medicaid pharmacy program..."[5]  Apparently, Merck concedes that the plaintiff was unaware of the defect and has met this element of the redhibition claim.

Merck's argument that judgment against plaintiff should be entered because Secretary Hood was unaware of Merck's claims with respect to Vioxx hinges on the fallacious assertion that Plaintiff must demonstrate reliance on a misrepresentation by Merck in order to prevail in redhibition.  Plaintiff need not prove that but for Merck's misrepresentations, plaintiff would have acted otherwise.  The only claim before this Court is a redhibition claim, not a fraud claim.  To prevail on redhibition claim, plaintiff need only show ignorance of the defect.  Plaintiff need not prove that

---

[5]  While it is true that Hood was not aware of the defect, this is not to say Hood would not have acted to exclude Vioxx had he known of the defect established by the evidence put forth in plaintiff's case.  Secretary Hood's uncontroverted testimony is that had he been advised that the risk of heart attacks outweighed any GI benefit in a drug that provided no demonstrably greater pain relief than safer alternatives, he would refused to reimburse it.

some misrepresentation prompted him to act.  Merck's misrepresentations are only relevant to the question of whether plaintiff knew or could have known of the defect.  Since Merck has apparently conceded that Secretary Hood was unaware of the defect, this Court need not even address the impact of Merck's misrepresentations.

      B.     THE STATE COULD HAVE ADOPTED A RESTRICTIVE FORMULARY ANY TIME AS OF JUNE 13, 2001.

Tacitly acknowledging that LDHH had the legal authority to create a restrictive formulary, Merck argues that LDHH could not have adopted a restrictive formulary "given the political, financial, and institutional realities in Louisiana while Vioxx was on the market."  This assertion is not supported by the only evidence in the record on this issue at the close of plaintiff's case: the uncontradicted testimony of Secretary Hood.

Secretary Hood, who is probably more familiar with the history behind the adoption of Act 395 than anyone in the world, testified that any of the concerns expressed over implementation of a restrictive formulary simply would not have come into play had such a restrictive formulary been adopted for the sole purpose of excluding coverage for a known defective drug. (Trial Testimony of David Hood, at 387:23-388:6).  This testimony is not only uncontested, but also entirely credible. To reject this testimony, this Court would have to conclude that LDHH would be willing to allow medicaid patients to needlessly suffer heart attacks because of theoretical or philosophical qualms about adopting a restrictive formulary.  While Secretary Hood acknowledged that, as a general proposition, restrictive formularies are not "politically palatable," it would not have less "politically palatable" to expose Louisiana citizens to heart attacks from a defective drug.  (*Id.*)

Merck further suggests that assuming LDHH could have adopted a restrictive formulary –

a reasonable assumption under the circumstances –  it could not have done so on June 13, 2001, the

first day Act 395 authorized such action.  At the outset, it should be noted that if Louisiana could

have implemented a restrictive formulary at *any* point prior to the withdrawal of Vioxx, then

Merck's motion for judgment on partial findings must fail.  Moreover, both the applicable statutes

and Secretary Hood's own testimony confirm that LDHH could have excluded Vioxx at any time

as of June 13, 2001.

Section (d)(4)(A) of the formulary provisions allows a DUR board to act as the board of

physicians making the determination of safety and efficacy on which the formulary exclusion is

based.  LDHH's DUR Board was up and running long before June 13, 2001.  Had LDHH known of

the defect, the DUR Board was empowered by federal statute to make the determination that Vioxx

should be excluded for clinical reasons.  It could have made this determination immediately upon

LDHH's having been empowered by Act 395 to restrict reimbursements in accordance with federal

law.

Merck suggests that Hood has admitted that the state could not have implemented a

restrictive formulary to exclude Vioxx on June 13, 2001.  Hood made no such admission.  Secretary

Hood most definitely did not testify that the state could not have implemented a restrictive formulary

on June 13, 2001.  In fact, he testified to the contrary, that he could have and would have

implemented a restrictive formulary to exclude coverage for Vioxx on June 13, 2001. (Hood Trial

Testimony, at 453:10-18).  He testified that he could have and would have submitted a restrictive

formulary to exclude coverage for Vioxx on June 13, 2001 had he known of the defect. (*Id*.)

Moreover, he testified that if the defect were known, which as for purposes of a redhibition claim

it must be presumed, he would have had no trouble eliciting the necessary legislative support, assuming such support were even necessary. This assertion is entirely consistent with reason. Who in their right mind would oppose protecting patients from a drug known to be defective?

C.    LDHH WOULD HAVE ADOPTED A RESTRICTIVE FORMULARY.

Merck has suggested that even if Louisiana could have adopted a restrictive formulary, the State would not have done so. This assertion is belied by the only witness to give evidence on this point in plaintiff's case, Secretary Hood. Secretary Hood said in no uncertain terms that in response to a known defective drug, he would done everything in his power to protect Louisiana's medicaid patients by excluding the drug. (Trial Testimony of David Hood at 439:24-440:21, 387:1-17, 453:19-454:1). Such an action would have been entirely consistent with the Secretary's broad discretion to restrict medicaid coverage in the best interest of medicaid patients. (Trial Testimony of David Hood at 382:9-22) The United States Supreme Court has held:

> We have made it clear that the Medicaid Act "gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interest of the recipients.'
>
> *Pharmaceutical Research and Mfrs. of America v. Walsh*, 538 U.S.644, 665, 123 S.Ct. 1855, 1868 (2003) (citations omitted).

Merck makes much of the fact that Secretary Hood testified that he had never heard of a state adopting a restrictive formulary to address a defective drug. Secretary Hood also testified that he had never encountered the extraordinary situation where a state discovered that a drug suffered from a defect in that its risks outweighed its benefits before that drug was removed from the market.(Trial Testimony of David Hood at 387:8-17, 454:4-8). There is no evidence to suggest that a state medicaid agency has *ever* been presented with this extraordinary situation, much less that a state

-12-

would have declined to take the reasonable step of excluding coverage for such a drug.  As for what a reasonable Medicaid agency would have done in response to this extraordinary situation, the only evidence on that issue in plaintiff's case in chief was Secretary Hood's testimony, which is consistent with both with the scope of authority recognized by the United States Supreme Court and common sense.   Presumably the person in the state charged with the responsibility for ensuring the best interest of Medicaid recipients would have taken the necessary steps to protect those recipients from exposure to a life-threateningly unsafe drug.

Merck argues that Hood testified that he did not know under what authority he could have excluded Vioxx.  This suggestion is a gross mis-characterization of Secretary Hood's testimony. Secretary Hood testified that he would have sought legal counsel to determine the best way of going about excluding coverage for Vioxx, but he also testified unequivocally that he had the authority to do so under the terms of Act 395 and his general charge as Secretary of LDHH to ensure the well-being of medicaid patients. (Trial Testimony of David Hood at 439:24-440:21, 381:10-12).  Merck suggests that this testimony is contradicted by the deposition of Charles Castille, but as was discussed *supra*, Merck's reference to Mr. Castille's deposition for purposes of this motion is entirely inappropriate.  Moreover, Mr. Castille was not asked what, if anything, the Secretary could do in response to a drug that was known to be defective.  Nothing in Mr. Castille's deposition testimony contradicts that of Mr. Hood.[6]

It is true that Secretary Hood testified that he would have been required to bring any formulary adopted in accordance with Act 395 before the House and Senate Committees on Health

---

[6]  Mr. Castille merely testified that LDHH "could not take a drug off the market" like the FDA could.  He did not testify that LDHH could not exclude coverage for a drug consistent with the provisions for formularies under OBRA 90.

& Welfare.  However, Secretary Hood, who has worked extensively with the members of those committees, testified that he had no doubt the Committees would approve a formulary implemented to exclude access to a drug known to be defective.  To believe that the Committees would not have approved the formulary, this Court would have to conclude that the Committee members (who after passage of Act 395 could only vote yes or no to a formulary recommendation by the Secretary), would put philosophical qualms over a restrictive formulary before the interests of protecting medicaid patients from unnecessary heart attacks.

Merck also argues that the P&T Committee likely would not have supported the Secretary in his decision to adopt a restrictive formulary, because, "such a determination would necessarily have contradicted the finding of the FDA..."  There is no evidence in the record that the P&T Committee would have been unwilling to act in response to a known defect simply because the FDA had not yet acted.  Moreover, Merck's suggestion that such action would "necessarily have contradicted the finding of the FDA" finds no support in the record.  Former FDA head Dr. Kessler testified that Merck had an affirmative duty to update its warning.  If Merck had known that Vioxx suffered from a defect – which under LSA-C.C. art. 2545, since plaintiffs have proven a defect, Merck is deemed to have known – Merck would have been required to identify the defect in its labeling.  There has been no evidence that the FDA would not have acted to exclude Vioxx had Merck done so.  Former FDA head Dr. David Kessler testified that now that the defect is known, the FDA has rebuffed Merck's attempts to return Vioxx to the market.

Finally, Merck suggests that LDHH would not have excluded coverage for Vioxx, because in "analogous situations" LDHH did not exclude coverage.  As Secretary Hood testified, there has never been an analogous situation.  LDHH has never been faced with the situation where it was made

-14-

aware of a defect in a drug before the drug was removed from the market. Merck's reference to situations with Celebrex and other drugs with black box warnings is not in the least bit analogous. Celebrex has never been removed from the market, and there has been no showing that the risks of Celebrex outweighed its benefits, much less that LDHH has ever been made aware of such a fact. Indeed, ample evidence produced during plaintiff's case in chief, including the testimony of cardiologist Dr. MacGregor, confirms that Vioxx is by far the worst all Cox-2s with respect to CV risks, and much more cardiotoxic than Celebrex. What the state decided to do with respect to Celebrex is in no way indicative of what the state would have done in response to a known defect in a drug that was subsequently removed from the market, and has never been allowed back.[7]

Secretary Hood's testimony as to what he would have done had the defect in Vioxx been disclosed is not mere speculation. It is based on his decades of service in the Louisiana Department of Health and Hospitals. It is based on his knowledge of his duties and authority granted to him as holder of the office of Secretary of LDHH. Most importantly, it is consistent with common sense. It stands to reason that had the Secretary of LDHH been confronted with the same information that prompted the manufacturer Merck to withdraw Vioxx from the market at the cost of billions of dollars, then the Secretary would have taken the comparatively easy step of excluding coverage by excluding it from the LDHH formulary.

III.   FEDERAL LAW REQUIRING THAT A DRUG CAN ONLY BE EXCLUDED FROM A FORMULARY ON THE BASIS OF CLINICAL INFORMATION IN THE DRUG'S LABELING WOULD NOT PRECLUDE LDHH FROM RESTRICTING VIOXX HAD THE DEFECT BEEN KNOWN.

---

[7] However, it should be noted that even with the much less cardiotoxic drug Celebrex, the state took steps to significantly curtail access to the drug through its DUR prospective review process (See generally testimony of Melwyn Wendt), demonstrating that the state was highly concerned about protecting medicaid recipient from heart attacks risks and was willing to take unpopular steps to do so.

Merck has suggested that even if LDHH would have excluded Vioxx from its formulary due to a known safety defect, it could not have done so, because it could only exclude drugs if "based on the drug's labeling... the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome... over other drugs in the formulary" and purportedly Merck's labeling of Vioxx as it existed when Vioxx was on the market indicated such an advantage.  Merck's assertion is based on the absurd premise that had the defect been known, the Vioxx label would have still been the same and there would have been no clinical basis for differentiation between Vioxx and traditional NSAIDs.  Plaintiff has offered evidence that there would have been substantial clinical grounds for differentiating Vioxx from traditional NSAIDs had Merck disclosed the true safety profile of Vioxx in its labeling.  Plaintiff notes that the label is not FDA's label.  It is *Merck's* label, and Merck has a continuing obligation to update labels to advise of safety concerns.  Had the defect been known to Merck, which for purposes of 2545 it is deemed to have been, then Merck would have had an obligation to disclose the defect in its label, thus affording the grounds for formulary removal consistent with 42 U.S.C.A. §1396r-8.

Deeming Merck to be aware of the defects in its product is entirely consistent with the FDA's labeling requirements.  As former FDA head Dr. David Kessler testified, under FDA guidelines a manufacturer has the ultimate responsibility to be aware of safety issues with its products and to update its label to advise of safety issues. (Tr. 51:10-54:23).  Dr. Kessler testified:

> It is a fundamental premise for the last almost hundred years that it is the purveyor of a drug that has responsibility to assure the safety and efficacy of any drug that it sells.  The responsibility to investigate, to study, to warn, that responsibility falls on the purveyor of the product.

(Tr. 51:10-51:16)

-16-

A manufacturer cannot avoid this responsibility by failing to conduct adequate testing of a signaled risk.  "The responsibility rests with the drug company to investigate any potential risks of safety, independent of what the FDA requires." (54:8-23).

By demonstrating that Vioxx suffered from a safety defect, plaintiff has met his burden to show that he could have refused payment by adopting a restrictive formulary.  Merck cannot escape liability by hiding behind the label as it existed at the time, because Merck had a duty to investigate potential safety defects and disclose the results of that investigation in the labeling.

IV.   PRIOR AUTHORIZATION REQUIREMENT OF SECTION (D)(4)(D) DOES NOT REQUIRE THAT A STATE PAY FOR EXCLUDED DRUGS.

Merck has suggested that since paragraph D of Section (d)(4) states that a restrictive formulary must allow for a prior authorization procedure, Louisiana cannot exclude coverage for a drug under a restrictive formulary even under Section (d)(4).  This Court already rejected this very assertion in its March 31, 2010 reasons for judgment, as did the Courts in *Meadows* and *Levine*, *supra*.  Moreover, this argument would render the distinction between an exclusive formulary under Section (d)(5) and a prior authorization procedure under Section (d)(4) utterly meaningless.  Indeed, this argument would render meaningless *all* the provisions of Section (d)(4) allowing a state to exclude coverage for drugs excluded from its formulary.

Both courts which have considered Merck's argument, apart from this Court, have, as one might expect, rejected it.  *See Meadows*, 304 F.3d at 1207-1208; *Edmonds*, 417 F.Supp.2d at 1329.  The *Meadows* court considered the significance of the prior authorization requirement in Section (d)(4), and concluded that the requirement was only intended to require a state to *consider* whether

to deny coverage based on the prescribing recommendations of the physician.  The Eleventh Circuit held:

> Because the statutory requirements of such a formulary also mandate a prior authorization program, see § 1396r-8(d)(4)(D) (specifying as one of the requirements of a formulary is that "[t]he State plan permits coverage [of an excluded drug] ... pursuant to a prior authorization program that is consistent with paragraph (5)"), we construe this requirement to mean that a state must *consider* coverage for an excluded drug on a case-by-case basis. The decision to provide coverage would presumably be based on medical information conveyed by the prescribing doctor to the state agency that administers the Medicaid program.

> *Meadows*, 304 F.3d at 1207-1208 (emphasis added).

The *Meadows* court did not conclude, as Merck suggests, that this prior authorization requirement precluded the state from ultimately excluding coverage.  Rather, the *Meadows* court concluded, consistent with the plain language of Section (d)(4), that the State could ultimately decide to exclude coverage after considering a physician's reasons for prescribing the drug in question.

The *Edmonds* court likewise held that the prior authorization requirement in the exclusive formulary provisions of 42 U.S.C.A. §1396r-8 do not preclude a state from excluding a drug.  The *Edmonds* court, held, consistent with *Meadows* and this Court:

> Congress has authorized two very distinct prior authorization programs; the one discussed above which is created in conjunction with a drug formulary which permits the state to have final authority to exclude a drug, and the one like Florida's which covers all Medicaid-eligible drugs and conditions payment for any such drug upon a doctor contacting the state before the drug is dispensed.

> *Edmonds*, 417 F.Supp. 2d at 1429.

No court has ever embraced Merck's tortured reading of the prior authorization requirement in the formulary provisions of §1396r-8.  To do so would be to render the exclusive formulary provisions of the statute meaningless.

## CONCLUSION

At a loss to refute Secretary Hood's uncontested, very credible testimony that he would have exercised his "broad discretion" to ensure the well-being of Louisiana medicaid patients by excluding coverage for a drug in which the risks outweigh the benefits, Merck has resorted to hyper-technical readings of statutory provisions, unrealistic assumptions about what would have happened had the defect been disclosed, and selective, misleading quotation of testimony.  As much as Merck would like to suggest so to this Court, the federal and Louisiana medicaid pharmacy benefit laws were never intended to leave a state medicaid authority powerless to protect itself and its citizens from exposure to defective drugs, nor do they.  Both now at the close of plaintiff's evidence, and at the conclusion of this case, this Court should find that LDHH had the both the authority and the will to refuse to pay for Vioxx, a drug which never would have been on the market had Merck done the investigation it should have done before exposing millions of patients to such a dangerous product. Respectfully submitted, this 20th day of April, 2010.

/s/ Stephen B. Murray, Jr.
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
Justin Bloom
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Email: smurrayjr@murray-lawfirm.com

-19-

James D. Caldwell, Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188

COUNSEL FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Opposition to Merck, Sharp & Dohme's Rule 52(c) Motion for Judgment on Partial Findings has this day been served on Liaison Counsel, Phillip A. Wittmann and Russ M. Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced, in accordance to Pretrial Order No. 8B, on this the 20th day of April, 2010.

/s/ Stephen B. Murray, Jr.
Counsel for Plaintiff

-20-