UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX® | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Knowles |

THIS DOCUMENT RELATES TO:

Kathleen Ackerman, et al.,

    v.                                                                 Docket No.: 2:06-CV-02198

Merck & Co., Inc., et al.

**Only with regard to:
Debra J. Miller and Douglas Miller**

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO RESCIND, VACATE OR DECLARE NULL, VOID AND
UNENFORCEABLE THE RELEASE AND CONSENT PLAINTIFFs
GAVE TO PARTICIPATE IN THE SETTLEMENT PROGRAM, AND TO
VACATE THIS COURT'S ORDER OF DISMISSAL DATED DECEMBER 12,
2009. TO REOPEN AND RESTORE THEIR INDIVIDUAL ACTION TO THE
DOCKET OF THE INSTANT PROCEEDINGS. AND FOR THIS COURT'S
RECUSAL AND REFERRAL OF THESE MOTIONS FOR
DETERMINATION BY ANOTHER JUDGE**

## INTRODUCTION

Plaintiff Debra J. Miller ingested Vioxx from January 3 to February 11, 2001, at which time she sustained the heart attack for which she and her husband Douglas Miller filed suit against defendant Merck & Co., Inc. ("Merck") for damages arising from her personal injuries. Between the time the Master Settlement Agreement ("MSA") program was announced in November 2007 and January 2008 when she

signed the papers releasing her Vioxx claims in exchange for participating in the resolution program, plaintiff's retained attorneys made representations to her and advised her about her eligibility for compensation that were made as a result of the conduct of defendant Merck & Co., Inc., in interfering with the attorney-client relationship under the Master Settlement Agreement ("MSA") and created a conflict of interest with respect to the plaintiff's right as their client to independent advice unencumbered by the interests of other plaintiffs or of the defendant.

At the time plaintiffs' retained counsel advised them to sign the release papers, said counsel was operating under the restraints and conflicts imposed on retained counsel by the terms of the Master Settlement Agreement requiring them to enroll all of their clients and withdraw from representing any client who did not elect to participate. As a result of Merck's interference, plaintiffs relied upon the legal advice they were given at that time to their detriment in signing onto the program as the best and only option available to him.

Only after her claim was rejected by the Claims Administrator on the grounds she did not meet both the duration and proximity gates criteria, and, therefore, would not be compensated under the resolution program and would lose her lawsuit, did plaintiff seek other counsel and learn of her retained counsel's conflict at the time she and her husband signed the release papers that was created as a result of the terms of Master Settlement Agreement.

Plaintiff Debra J. Miller moves to vacate the release and related waivers she and her husband signed to consent to enter the settlement program, and return her to the pre-release status in which her action against Merck was an active case on the

docket of this Court. The conduct of the defendant in procuring the conflict under which plaintiff's retained attorneys were operating prior to advising her and her husband to sign the release papers directly resulted from terms of the Master Settlement Agreement that required counsel to withdraw and the subsequent conduct by her counsel can and must be imputed to Merck as a direct corollary of that Agreement. Otherwise, Merck benefits from the coercive conduct knowing that plaintiffs, such as the instant plaintiff, would rely to their detriment on misinformation and advice intended to coerce participation in the settlement program and deprive the plaintiff of her right to a trial, all to the benefit of Merck.

Plaintiff respectfully submits that her motion to vacate and have her case restored if it has been discontinued by the stipulation signed by her prior counsel at the time she and her husband signed the releases should be decided by another judge given this Court's role as Chief Administrator of the settlement program, and for that purpose, asks that this Court recuse itself and refer the motions to another judge for determination.

## STATEMENT OF FACTS

Plaintiff Debra J. Miller began ingesting Vioxx 25 mg twice daily on January 3, 2001, when, after she was diagnosed with a mild case of fibromyalgia for which her rheumatologist, Ray Morris, M.D., recommended that she take Vioxx, she was given samples of the 25 mg Vioxx pill advising her to take this medication twice a day. *Affidavit of Debra J. Miller supporting this motion, at para. 2-3.* She ingested the Vioxx twice a day continuously until her next appointment with Dr. Morris on

January 23, 2001 at which time he gave her additional samples in sufficient numbers to last until or beyond February 11, 2001. *Id., at paras. 4-6; see also Affidavit of Ray Morris, M.D., submitted herewith as Exhibit A.* Mrs. Miller had substantial confidence in Dr. Morris, and ingested Vioxx 25 mg twice daily throughout the entire period from January 3 through February 11, 2001. *Miller Aff., at para. 6.*

On February 11, 2001, Mrs. Miller sustained a heart attack and after going to Samaritan Hospital was transferred to Grant Medical Center in Columbus, Ohio where a heart catheterization was performed February 13, 2001. *Id., at para. 8.*

At the time of her heart attack, she was 45 years old, 5'4" and weighed 128 pounds. *Id., at para. 9.* Until starting Vioxx on January 3, 2001, Mrs. Miller was quite healthy, only being diagnosed with a mild case of fibromyalgia; her blood pressure and cholesterol readings were normal, and she was a non-smoker and nondrinker. Moreover, Mrs. Miller exercised usually 4 to 5 times a week, and there was no history of heart disease in her family. *Id., at paras. 6-7.*

Mrs. Miller first learned in 2004 that Vioxx was being withdrawn from United States markets because of the risks involved, including but not limited to heart attacks, such as she had experienced back on February 11, 2001. *Id., at para. 12.* After seeing numerous advertisements by law firms throughout the country, she selected the law firm of Cellino & Barnes in Buffalo, New York, because she believed the firm was competent and experienced in handling pharmaceutical litigation such as would be involved in her suit against the manufacturer of Vioxx. *Id., at para. 14.* On November 14, 2004, she received a letter from the first acknowledging her inquiry and enclosing a retainer agreement which both she and her husband executed and

returned to the firm. *Id., at para. 15, and Ex. B.*

On December 7, 2004, Mrs. Miller received a letter from the firm thanking her for "trusting" them to handle the case. *Id., at para. 16, and Ex. C.* On January 18, 2005, the firm notified her that they had completed an initial review and made a finding that her case was meritorious, and asked that she return the fact sheet which ask me fairly comprehensive information, which she filled it out and returned to the firm. *Id., at para. 18.* On December 7, 2005, she received a response in which the firm advised they would continue to aggressively litigate her case and to move forward "without interruption". *Id., at para. 20, and Ex. D.*

Two days later Mrs. Miller received another letter from the firm advising they retained the firm of Trepanier & MacGillis, P. A., to serve as local counsel and that her case may be "grouped with other similarly situated individuals" but that this was done to benefit from strength in numbers and to reduce litigation costs. *Id., at para. 21, and Ex. E.* Shortly thereafter, on January 5, 2006, the firm advised Mrs. Miller a lawsuit was filed on her behalf, stating they had formally filed "your Vioxx lawsuit" so she simply thought the group idea was abandoned and that she did have her own individual case pending as of that date. *Id., at para. 23, and Ex. F.*

In June of 2006 the firm advised her that the information she provided was filed with the court and that the burden now shifted to Merck whom they indicated "will do all it can to drag its feet...," a characterization she viewed as advice that she should be patient about her claim being heard by a jury. *Id., at para. 25, and Ex. G.*

More than one year later, on or about November 9, 2007, Mrs. Miller received a letter from her attorneys advising that a settlement was reached and Merck agreed to

pay $4.85 billion to resolve many of the Vioxx cases involving heart attack, sudden cardiac death and certain strokes. *Id., at paras. 25-26, and Ex. H.* This letter advised this was not a class-action settlement and that each case would be reviewed on its own merits. *Id.* It was a form letter which indicated some cases may not qualify since the agreement required not only proof of a heart attack, certain cardiac death or ischemic stroke, but evidence of ingesting at least 30 Vioxx tablets within 60 days of the injury, and proof of use within 14 days of the injury. *Id.*

It was not until January 24, 2008, that Mrs. Miller was advised by letters with enclosures which included releases, that after carefully reviewing her file the firm was recommending she participate in the settlement. *Id., at para. 27.* She and her husband had numerous reservations about entering the program in the first instance, but trusted their attorneys, truly believed they were exercising their professional judgment on their behalf, and put our reservations aside and participated in the program to the best of our ability, thinking the firm would to do right by them so they sent in the releases that were enclosed in the letter. *Id., at para. 27, and Ex. I.*

In April, May, July and September 2009, Mrs. Miller's attorneys sent her copies of the Notices of Ineligibility issued to deny her compensation from the resolution program. *Id., Ex. J.* The notices make clear that, although plaintiff's ingestion of Vioxx 25 mg twice daily occurred over a period of twenty-nine (29) days between January 3 and February 11, 2001, and her heart attack was sustained on February 11, 2001, showing she ingested fifty-eight (58) Vioxx 25 mg pills for 29 days within the 60-day period immediately prior to her heart attack, the Claims Administrator rejected her claim on the ground she did not meet both the Duration or

the Proximity Gate criteria of the MSA settlement program. *See MSA Exhibits 2.2.1.2 (Duration) and 2.2.1.3 (Proximity).* The same resulted in this Court's Order of Dismissal With Prejudice dated November 12, 2009. *Id., at para. 29; see also Document 27274 in Case 2:05-md-01657-EEF.*

Plaintiffs now turn to their arguments.

## ARGUMENT

### I.

**This Court Should Grant Plaintiffs' Motion Seeking to Have the Release and All Other Consents and Waivers They Signed and Stipulations Regarding Participation in the MSA Settlement Program Rescinded, Vacated and Declared Null, Void and Unenforceable Because It Was the Product of Their Counsel's Legal Advice and Conduct That Should Be Imputed to Merck Given the Terms of the MSA That Directly Interfered With and Deprived Plaintiff of Independent Advice and Representation by Retained Counsel On Which She Detrimentally Relied to Defendant Merck's Benefit.**

The facts of Mrs. Miller's case were the same when she filed suit and when the Claims Administrator rejected the claim, indicating that it had never been in her best interests to enter the settlement program, and that plaintiff's retained attorneys should have advised her *against* entering the program and signing the release. The fact that retained counsel did the opposite despite the facts of her case failing to meet *both* the duration and proximity gates clearly evinces that, because of Merck's conduct directly interfering with her retained counsel's representation of her interests under the terms of the MSA, her attorneys were operating under a conflict of interest with respect to the plaintiff's right as their client to independent advice

unencumbered by the interests of other plaintiffs or of the defendant. It is doubtful that, absent the terms of the MSA requiring them to enter 100% of the firm's clients in the settlement program, plaintiff's counsel may have given her independent advice that would clearly have been that she should <u>not</u> sign any release papers that tied the fate of her claims against Merck to a settlement program that, on its face, would reject her claim.

It is respectfully submitted that it is a well settled principle that, "The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties.". <u>Howell v. Exxon Corp.</u>, 103 F.3d 125 (5th Cir. 1996), quoting Model Code of Professional Responsibility EC 5-1 (1980). An elaborate discussion of law is unnecessary since every jurisdiction in the United States has some version of the ABA rule 2.1 of the model rules of professional responsibility which requires lawyers to exercise their independent professional judgment to make recommendations to their respective clients. Similarly, the requirement in section 1.2.8.2 of the MSA that an attorney withdraw flies in the face of Model Rule 5.6 which inhibits an attorney from "offering or making... an agreement in which restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties. *See also* Section 13 (2) of the Restatement (Third) of the Law Governing Lawyers.

In <u>Zichichi v. Jefferson Ambulatory Surgery Center LLC</u>, 2008 WL 2859232 (E.D.La.), the Honorable Susan Vance stated:

> Although federal courts may adopt state or ABA rules as their ethical standards, whether and how these rules apply are questions of federal law. *See American Airlines,* 972 F .2d at 610. The ethical canons that are

> relevant to this Court's opinion include (1) the local rules for the Eastern District of Louisiana, (2) the ABA's Model Rules of Professional Conduct, (3) the ABA's Model Code of Professional Responsibility, and (4) the Louisiana State rules of conduct. *See Horaist v. Doctor's Hospital of Opelousas,* 255 F.3d 261, 266 (5th Cir.2001); FDIC v. United States Fire Ins. Co., 50 F.3d 1304, 1311-12 (5th Cir.1995).
> The United States District Court for the Eastern District of Louisiana has adopted the Rules of Professional Conduct adopted by the Supreme Court of the State of Louisiana for its Rules of Disciplinary Enforcement. *See* LR 83.2.10E.

*Id.,* at *1-2. Under the Louisiana professional code, an attorney is an "Advisor" and is charged with the following obligation to a client:

> In representing a client, a lawyer shall exercise independent professional judgment and render candid advice.

LA. ST. BAR ART. 16 RPC Rule 2.1.

On the face of the firm's communications with the plaintiff before she signed the release papers, it is apparent the firm's loyalty to plaintiff was displaced by other considerations related to terms of the MSA which required counsel to recommend to each of their clients that they participate in the settlement, and if not, to withdraw from representing their clients who did not cooperate, including clients, like the plaintiff here, who could not meet the gate criteria but relied on her attorney's advice when it was flatly against her interests to enter an irrevocable settlement process under which her claim was not eligible and would be rejected, leaving her with no compensation and no lawsuit.

Under the circumstances, the agreement was illusory and the only consideration given to plaintiff was the pleasure of engaging in an exercise in futility perpetrated by her counsel's conducting a charade for the benefit of Merck's "peace" and Merck allowing a patently ineligible plaintiff to be sucked into the program so

that it could escape paying her any compensation and force a dismissal of her action against Merck. The release papers plaintiff signed were the result of "fraud, misrepresentation and other misconduct of the adverse party." Fed.R.Civ.P. 60(b)(3).

There can be no doubt that, given the rejection of her claim based on the parameters Merck negotiated with the Negotiating Plaintiffs' Attorneys, plaintiff's reasonable reliance on her attorney's advice was detrimental to her interests. It was also clearly foreseeable that the MSA would place plaintiff attorneys in this conflict with their obviously ineligible clients, such as Debra Miller, and Merck should not be allowed to benefit from and enforce any release or other consent that plaintiff signed as a result of the same.

Plaintiff respectfully submits that this Court should grant the relief she seeks by rescinding, vacating and declaring her release and consents that placed her and her husband's claims in the settlement program null, void and unenforceable, and by vacating the stipulation of dismissal and, if already filed, restoring her action to the Court's docket.

## II.

### This Court Should Recuse and Refer the Instant Motions To Be Heard by Another Judge

The record in MDL No. 1657 makes clear this Court entered orders consistent with the terms of the agreement that required retained counsel such as her attorneys to recommend 100% participation of all of their clients in the settlement and to withdraw from representing any client who refused to accept the terms of the

settlement. Moreover, the Court incorporated certain terms of the settlement including compensating plaintiffs who sustained heart attacks, or ischemic strokes or sudden cardiac death, but excluded plaintiffs who sustained other cardiovascular injuries, as well as prerequisites such as the duration and proximity gates in the MSA which were used as the basis to reject Mrs. Miller's claim.

This Court is also Chief Administrator under the MSA and will be enforcing terms and conditions including those that have rejected and would exclude this plaintiff from compensation under the MSA and result in dismissing her lawsuit. According to the release papers plaintiff signed, apparently the only consideration Merck exchanged with this plaintiff was having set up the settlement program in the first place for which she was not eligible, but into which her retained counsel steered her. In light of the same, it is respectfully submitted this Court cannot fairly and impartially adjudicate any of the issues that are the subject matter of the instant motion.

This is especially true in connection with the terms of the MSA that either required or played a significant role in causing plaintiff's counsel to recommend to plaintiff that she participate in the settlement agreement despite what the Claims Administrator's rejection appears to have confirmed was obvious ineligibility on two of the three gate criterias, when in the exercise of independent professional judgment as to the circumstances of her individual case and the lack of probability of recovery under the program, no lawyer in her or her right mind would give any advice that would recommend the settlement to Mrs. Miller.

It is only necessary to assert that the plaintiff has a constitutional right to a

fair trial. <u>Aetna Life Insurance Co. v. Vavoie</u>, 475 US 813, 821-22 (1986), and due process requires that the trial judge be neutral and detached. <u>Concrete Pipe & Prods. v. Constr. Laborers Pension Trust</u>, 508 US 602, 617 (1993). Especially significant in the instant case is the premise that, "Justice must satisfy the appearance of justice". <u>Offutt v. United States</u>, 348 US 11, 14 (1954). The Supreme Court has made clear that the rule may bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. *See* <u>Concrete Pipe & Prods.</u>, *supra*, 508 U.S. at 618 [citation excluded].

This Court has already addressed the issue of recusal in the context of previous motions by other plaintiffs based on the Court's serving as Chief Administrator of the MSA and denied the same on the grounds that, in the first instance the Court serves in an administrative capacity with no substantive effect on managing the MDL proceedings, among other bases, and ruled that as such the motion for recusal was "without merit."  *See* <u>Agard v. Merck & Co., Inc.</u>, Order and Reasons dated December 10, 2008, at p. 6.

Plaintiff does not contend that this Court is biased in the sense of any type of personal animus or malice but does believe the Court may have become too close to the settlement negotiations which, as the Third Circuit has observed, can take on a life of its own and  have caused the Court to issue a series of orders without benefit of adversarial presentation which in the context of their issuance did not appear to stem from neutral and detached jurisprudence and may well lead a reasonable person to harbor doubts about the courts impartiality.  It is respectfully submitted that:

It is precisely because it is virtually impossible to prove actual bias that

due process is denied by circumstances that create a likelihood or appearance of bias because such a possibility of judicial bias creates a constitutionally unacceptable risk of actual bias.

Peters v. Kiff, 407 US 493, 502 (1972) [plurality opinion of Marshall J.].

Although there is certainly a subjective element, it is respectfully submitted that the issue of whether there is an appearance of impropriety in the Court's hearing of the instant motion is objective and must be approached from the vantage point of a reasonable litigant, not that of a lawyer or a judge.

## CONCLUSION

Plaintiff respectfully submits that plaintiff's motions for rescinding, vacating and declaring her release and consents that placed him in the settlement program null, void and unenforceable, and for vacating the stipulation of dismissal and, if already filed, restoring her action to the Court's docket, should be granted, but that the determination of the same should occur after recusal of this Court and referral of the motions to another Judge in this district.

Respectfully submitted,

*/s/ Ronald R. Benjamin*

RONALD R. BENJAMIN Fed. No. 110131
LAW OFFICE OF RONALD R. BENJAMIN
126 Riverside Drive, P O. Box 607
Binghamton, New York 13902-0607
607/772-1442

Attorneys for Individual Plaintiffs Debra J. Miller
and Douglas Miller in the Above-Captioned Action