| | |
|---|---|
| In re: VIOXX | * |
|     Products Liability Litigation | * |
| | * |
| This Document Relates to: | *   MDL No. 1657 |
| | * |
| STATE OF LOUISIANA, *ex rel.* JAMES D. | *   SECTION L |
|     CALDWELL, JR., Attorney General, | * |
| | *   JUDGE ELDON E. FALLON |
|                Plaintiff, | * |
| | *   MAGISTRATE JUDGE |
|   versus | *   KNOWLES |
| | * |
| MERCK SHARP & DOHME CORP., | * |
| | * |
|                Defendant. | * |
| | * |
| Case No. 05-3700. | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# MERCK SHARP & DOHME CORP. ("MERCK")'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## TABLE OF CONTENTS

FINDINGS OF FACT ...................................................................................................... 1

I.     THE DEVELOPMENT AND FDA APPROVAL OF VIOXX ...................................... 1

II.    MERCK ADEQUATELY INVESTIGATED VIOXX'S POTENTIAL
       CARDIOVASCULAR RISKS AND ACCURATELY REPRESENTED
       VIOXX'S KNOWN CARDIOVASCULAR RISKS .......................................................... 4

       A.    Pre-Market Clinical Studies of Vioxx Did Not Show that Vioxx
             Was  Associated with Increased Cardiovascular Risks .......................... 4

       B.    Prior to Marketing Vioxx, Merck Investigated the Questions
             Raised by Dr. Fitzgerald's Research....................................................... 6

       C.    Merck Promptly Disseminated the Results of the VIGOR Study to
             the FDA, the Medical Community and the Public ................................... 8

       D.    After Receiving the VIGOR Study Results, Merck Investigated the
             Reasons for VIGOR's Cardiovascular Outcomes and Vioxx's
             Potential Cardiovascular Risks. .............................................................. 9

       E.    Vioxx Labeling Accurately Represented Vioxx's Known
             Cardiovascular Risks at All Times Vioxx Was on the Market .............. 15

III.   THE EVIDENCE SHOWS THAT CARDIOVASCULAR RISKS ARE A
       CLASS EFFECT OF NSAIDS, EXCEPT NAPROXEN .............................................. 18

IV.    MERCK AT ALL TIMES ACCURATELY REPRESENTED VIOXX'S
       KNOWN GASTROINTESTINAL SAFETY RELATIVE TO TRADITIONAL
       NSAIDS ...................................................................................................................... 21

       A.    Randomized Clinical Trials and Meta-Analyses Established the
             Gastrointestinal Safety of Vioxx Relative to Traditional NSAIDs ......... 21

       B.    Vioxx Labeling Accurately Represented Vioxx's Gastrointestinal
             Risks and Benefits. ............................................................................... 25

       C.    The Publication of the VIGOR Study Accurately Represented Its
             Gastrointestinal Outcomes. .................................................................. 28

V.     VIOXX'S BENEFITS OUTWEIGHED ITS RISKS. .................................................. 29

VI.    THE STATE OF LOUISIANA COULD NOT DENY REIMBURSEMENT FOR
       MEDICAID VIOXX PRESCRIPTIONS...................................................................... 31

       A.    Overview of Federal Medicaid Requirements........................................ 31

       B.    Overview of Louisiana's Medicaid Pharmacy Program. ....................... 33

       C.    LDHH Was Required to Reimburse for Medicaid Vioxx
             Prescriptions at All Times Vioxx Was on the Market ............................ 36

1015096v.1

TABLE OF CONTENTS
(continued)

Page

VII.    PLAINTIFF HAS NOT PRODUCED ADEQUATE AND CREDIBLE
        EVIDENCE THAT LDHH COULD HAVE AND WOULD HAVE
        ESTABLISHED AN EXCLUSIVE FORMULARY IN ORDER TO DENY
        VIOXX REIMBURSEMENTS IN THEIR ENTIRETY HAD IT KNOWN
        DIFFERENT INFORMATION ABOUT THE DRUG ................................................ 38

        A.    The Evidence Shows that LDHH Could Not Have Instituted a
              Restrictive Medicaid Formulary ............................................................ 38

        B.    Plaintiff's Claim That, Had It Received Different Information
              About Vioxx, It Would Have Acted to Deny Reimbursement for
              the Drug Lacks Factual Support and Is Contradicted by the Record ...... 42

VIII.   FEDERAL MEDICAID LAW DID NOT PERMIT PLAINTIFF TO REMOVE
        VIOXX FROM A HYPOTHETICAL RESTRICTIVE FORMULARY ...................... 51

IX.     EVEN IF LDHH HAD EXCLUDED VIOXX FROM A HYPOTHETICAL
        RESTRICTIVE FORMULARY, FEDERAL LAW WOULD HAVE REQUIRED
        SOME VIOXX REIMBURSEMENT UNDER A PRIOR AUTHORIZATION
        PROGRAM. ...................................................................................................... 54

X.      BECAUSE THE EVIDENCE SHOWS THAT VIOXX WAS A USEFUL AND
        VALUABLE PRODUCT, THE BENEFITS OF WHICH OUTWEIGH ITS
        RISKS, PLAINTIFF FAILED TO ESTABLISH THE EXISTENCE OF A
        REDHIBITORY DEFECT ................................................................................ 57

XI.     THE LDHH AND LOUISIANA'S MEDICAID P&T COMMITTEE WERE
        AWARE OF THE RISKS AND BENEFITS OF VIOXX .................................... 59

        A.    LDHH and the P&T Committee Relied on Information and
              Analyses Provided by Unbiased and Knowledgeable Consultants,
              Not on Information or Marketing from Pharmaceutical Companies ....... 59

        B.    LDHH and the P&T Committee Were Adequately Informed About
              Vioxx's Risks and Benefits in 2002. ...................................................... 61

        C.    LDHH and the P&T Committee Were Adequately Informed about
              Vioxx's Risks and Benefits in 2003 ...................................................... 64

        D.    LDHH and the P&T Committee Continued to Receive Information
              and Monitor Vioxx's Risks and Benefits After It Was Placed on
              the PDL ................................................................................................ 66

        E.    Neither the LDHH Nor the P&T Committee Was Misled by
              Merck-Sponsored Publications, Vioxx Labeling or Marketing .............. 68

XII.    THE P&T COMMITTEE'S DECISIONS ABOUT COXIBS WERE
        CONSISTENTLY BASED ON COST, NOT SAFETY ...................................... 69

XIII.   PLAINTIFF DID NOT PROVE ITS ALLEGED AMOUNT OF DAMAGES ............. 70

1015096v.1

TABLE OF CONTENTS
(continued)

Page

CONCLUSIONS OF LAW ........................................................................... 75

I. PLAINTIFF FAILED TO PROVE THE EXISTENCE OF A REDHIBITORY
DEFECT .................................................................................................. 75

II. PLAINTIFF FAILED TO PROVE CAUSATION ........................................ 78

III. PLAINTIFF FAILED TO PROVE ENTITLEMENT TO A REMEDY ........ 92

IV. PLAINTIFF LACKED STANDING TO SUE IN REDHIBITION .............. 95

1015096v.1

# TABLE OF AUTHORITIES

Page

**Cases**

*Ark-La-Tex Builders & Realty, Inc. v. Hoge,*
   344 So. 2d 90  (La. App. 2d Cir. 1977) ............................................................. 76, 77

*Buckman Co. v. Plaintiffs' Legal Committee,*
   531 U.S. 341 (2001) ......................................................................................... 89

*Compte v. Rateau,*
   242 So. 2d 82 (La. App. 4th Cir. 1970) ........................................................... 76, 77

*Cornelious v. Bailey Lincoln-Mercury, Inc.,*
   566 So. 2d 85 (La. App. 4th Cir. 1990) ............................................................ 76

*D'Angelo v. Poche,*
   434 So. 2d 120 (La. App. 5th Cir. 1983) .......................................................... 93

*Dawson Farms, LLC v. BASF Corp.,*
   2008 WL 4600934 (W.D. La. Oct. 15, 2008).....................................................78

*Desiano v. Warner-Lambert Co.,*
   326 F.3d 339 (2d Cir. 2003).............................................................................. 96

*Drosdal v. Hurstell,*
   540 So. 2d 606 (La. Ct. App. 5th Cir. 1989)...................................................... 92

*Dupuy v. Rodriguez,*
   620 So. 2d 397 (La. App. 1st Cir. 1993)............................................................ 76

*Edmonds v. Levine,*
   417 F. Supp. 2d 1323 (S.D. Fla. 2006) ............................................................. 81

*In re Rezulin Prods. Liab. Litig.,*
   392 F. Supp. 2d 597& n.80 (S.D.N.Y. 2005)..................................................... 96, 97

*In re Zyprexa Prods. Liab. Litig.,*
   671 F. Supp. 2d 397 (E.D.N.Y. 2009) .............................................................. 90, 92

*Magee v. Brown,*
   859 So. 2d 720 (La. App. 4th Cir. 2003) .......................................................... 93

*McNeely v. Ford Motor Co.,*
   763 So. 2d 659 (La. Ct. App. 1st Cir. 1999) ..................................................... 95

1015096v.1

**TABLE OF AUTHORITIES**
(continued)

Page

*Pharm. Research & Mfrs. v. Meadows,*
  304 F.3d 1197 (11th Cir. 2002)..............................................................................82, 91

*Pharm. Research and Mfrs. of Am. v. Walsh,*
  538 U.S. 644 (2003) .....................................................................................................89

*Schafer v. State Farm Fire & Cas. Co.,*
  507 F. Supp. 2d 587 n.48 (E.D. La. 2007)..................................................................95

*Univ. Computing Co. v. Mgmt. Sci. Am., Inc.,*
  810 F.2d 1395 (5th Cir. 1987).....................................................................................87

*Westinghouse Elec. Corp. v. M/V "Leslie Lykes",*
  734 F.2d 199 (5th Cir. 1984)........................................................................................87

**Statutes**
21 U.S.C. § 355(a)..............................................................................................................1, 47

21 U.S.C. § 355(b)....................................................................................................................2

21 U.S.C. § 355(b)(1)(A)..........................................................................................................2

21 U.S.C. § 355(b)(1)(F).........................................................................................................25

21 U.S.C. § 355(d)(7).............................................................................................................25

21 U.S.C. § 355(i)......................................................................................................................2

21 U.S.C. § 393(b)(2)(B)...........................................................................................................2

42 U.S.C. §1396....................................................................................................................31

42 U.S.C. § 1396-1..................................................................................................................31

42 U.S.C. § 1396a(a)(10)(A)-(C)............................................................................................31

42 U.S.C. § 1396d(a)(12).........................................................................................................31

42 U.S.C. § 1396r-8................................................................................................................34

42 U.S.C. § 1396r-8(a)............................................................................................................31

42 U.S.C. § 1396r-8(a)(1)........................................................................................................32

1015096v.1

**TABLE OF AUTHORITIES**
(continued)

Page

42 U.S.C. § 1396r-8(d) ............................................................................................... 34

42 U.S.C. § 1396r-8(d)(1) .......................................................................................... 33

42 U.S.C. § 1396r-8(d)(1)(A) ..................................................................................... 33

42 U.S.C. § 1396r-8(d)(2) ..................................................................................... 32, 54

42 U.S.C. § 1396r-8(d)(4) .................................................................................34, 38, 88

42 U.S.C. § 1396r-8(d)(4)(A) ................................................................................ 39, 80

42 U.S.C. § 1396r-8(d)(4)(C) ............................................................................... passim

42 U.S.C. § 1396r-8(d)(4)(D) .............................................................................42, 55, 90

42 U.S.C. § 1396r-8(d)(5) ..................................................................................42, 55, 72

42 U.S.C. § 1396r-8(k)(6) ........................................................................................... 33

2001 La. Acts 395 ....................................................................................................... passim

La. Civ. Code art. 2439.................................................................................................. 95

La. Civ. Code art. 2520..................................................................................76, 92, 94, 96

La. Civ. Code art. 2521................................................................................................ 92, 93

La. Civ. Code art. 2522.................................................................................................. 93

La. Civ. Code art. 2545.................................................................................................. 92

La. Rev. Stat. Ann. § 46:153.3 ..................................................................................... 33

La. Rev. Stat. Ann. § 46:153.3(B) ............................................................................... 34

La. Rev. Stat. Ann. § 46:153.3(B) (1999)................................................................. 34, 38

La. Rev. Stat. Ann. § 46:153.3(B)(1) (2002)................................................................. 80

La. Rev. Stat. Ann. § 46:153.3(B)(2) (1999)........................................................34, 40, 79, 82

La. Rev. Stat. Ann. § 46:153.3(B)(2)(a)(ii) ................................................................. 35

1015096v.1

**TABLE OF AUTHORITIES**
(continued)

Page

La. Rev. Stat. Ann. § 46:153.3(B)(3) (1999) ........................................................... 34

La. Rev. Stat. Ann. § 46:153.3(B)(3)(a) ................................................................. 79

La. Rev. Stat. Ann. § 46:153.3(D)(5)(d) ........................................................... 39, 80

**Rules**
Federal Rule of Civil Procedure 52(a)(1) ................................................................. 1

**Regulations**
21 C.F.R. § 312.20 ................................................................................................. 2

21 C.F.R. § 312.23 ................................................................................................. 2

21 C.F.R. § 314.50(c)(2)(i) .................................................................................. 25

21 C.F.R. § 314.70 .............................................................................................. 27

21 C.F.R. § 314.105 .............................................................................................. 2

21 C.F.R. § 314.105(b) ....................................................................................... 25

21 C.F.R. § 314.125 .............................................................................................. 2

42 C.F.R. § 430.12 .............................................................................................. 84

42 C.F.R. § 430.12(c) ..................................................................................... 33, 40

28 La. Reg. 1639 (July 2002) ......................................................................... passim

28 La. Reg. 979-80 (May 2002) ............................................................... 34, 39, 80, 81

1015096v.1

Pursuant to Federal Rule of Civil Procedure 52(a)(1), Defendant Merck Sharp & Dohme Corp. ("Merck") respectfully proposes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I.      THE DEVELOPMENT AND FDA APPROVAL OF VIOXX

1.      Vioxx (rofecoxib) belongs to a class of pain relievers known as non-steroidal anti-inflammatory drugs ("NSAIDs").  (Pl.'s Second Am. Compl. ("SAC") ¶ 10.)  Traditional NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that promotes pain and inflammation, and have been a mainstay for treating pain from arthritis and other chronic inflammatory conditions.  (Deposition of Alan Nies, M.D., April 1, 2005 ("4/01/05 Nies Dep."), at 384:13-385:16.)  However, it is well recognized that chronic use of traditional NSAIDs significantly increases the risk of gastrointestinal problems, including perforations, ulcers and bleeds ("PUBs"), causing thousands of deaths and many thousands of hospitalizations every year.  (*See, e.g.*, 4/20/10 Trial Tr. at 1114:2-9; 4/01/05 Nies Dep. at 386:7-18.)  Vioxx was developed in order to provide a pain-relief medication for patients with chronic pain that would reduce the risk of those serious gastrointestinal injuries by selectively inhibiting only the COX-2 enzyme and sparing the COX-1 enzyme, which protects the stomach lining.  (4/01/05 Nies Dep. at 383:10-24, 384:13-385:16.)  Selective COX-2 inhibitors include not only Vioxx, but also Pfizer's Celebrex (celecoxib) and Bextra (valdecoxib).  (4/19/10 Trial Tr. at 925:11-17.)

2.      Evidence shows that physicians' prescribing decisions are highly individualized.  An NSAID that effectively relieves pain for one patient may not do so for another.  (4/19/10 Trial Tr. at 916:16-917:14.)  For some patients who had tried a host of medications for their pain, Vioxx was the only medication that was effective.  (*Id.* at 922:11-24.)

3.      Every prescription drug sold in the United States must first be approved by the FDA as "safe and effective" for its intended uses.  21 U.S.C. § 355(a), (d); 21 U.S.C. §

393(b)(2)(B).  The approval process begins with the manufacturer's submission of an

Investigational New Drug Application ("IND"), which describes the results of pre-clinical testing

in animals and the proposed uses of the drug by humans.  21 U.S.C. § 355(i); 21 C.F.R. §§

312.20, 312.23.  Following approval of the IND, a manufacturer may commence clinical trials

with human subjects.  21 U.S.C. § 355(i).  The FDA sets standards for the kinds of databases that

must be compiled in order to demonstrate a drug's risks and benefits.  (4/20/10 Trial Tr. at

1208:22-1209:7.)  Drug manufacturers submit their study protocols to the FDA before the studies

are conducted.  (*See* 4/20/10 Trial Tr. at 1270:22-1271:3.)  The FDA is authorized to request that

a protocol be altered, either before a study is conducted or even while it is underway.  (*See id.* at

1271:7-18.)  The FDA also analyzes clinical data itself.  (*See id.*)  For example, the FDA may

request a different primary or secondary endpoint than that specified by a drug sponsor or it may

analyze the data using endpoints different from those employed by the sponsor.  (*See id.* at

1271:7-18, 1273:15-20.)

    4.    When clinical trials are completed, the manufacturer submits to the FDA a New

Drug Application ("NDA"), which includes, among other things, "full reports of investigations

which have been made to show whether or not such drug is safe for use and whether such drug is

effective in use."  21 U.S.C. § 355(b)(1)(A).   A drug is approved for marketing in the United

States only if, after exhaustive review of the NDA, the FDA determines that the drug is safe and

effective for those uses identified by the manufacturer and authorized by the FDA.  21 U.S.C. §

355(b); 21 C.F.R. §§ 314.105, 314.125.

    5.    Merck studied Vioxx for over five years before submitting its New Drug

Application to the FDA on November 23, 1998.  (4/01/05 Nies Dep. at 387:1-5.)  Merck's

submission included data from over 55 studies involving over 8,000 patients exposed to Vioxx or

comparators for periods up to 86 weeks.  (DX43 (Nov. 23, 1998 Original New Drug Application for Vioxx); *see also* 4/20/10 Trial Tr. at 1231:24-1232:5.)  Merck's clinical trials included approximately 1,400 patients who took Vioxx for more than six months and approximately 820 patients who took it for over a year.  (DX43; *see also* 4/20/10 Trial Tr. at 1231-24-1232:5.)  The NDA was the largest that Merck had ever submitted to the FDA in terms of the number of patients on drug and the time of patients on drug.  (4/01/05 Nies Dep. at 435:15-22, 436:2-6.)  The pre-marketing investigation performed by Merck far exceeded the standards set out by the International Conference for Harmonization, which the FDA has adopted.  (4/20/10 Trial Tr. at 1232:6-20.)

6.      The NDA data compared the safety and efficacy of Vioxx to both placebo and traditional NSAIDs (predominantly ibuprofen, diclofenac, and nabumetone).  (4/01/05 Nies Dep. at 441:3-10; 4/19/10 Trial Tr. at 978:13-23.)  The NDA's integrated summary of safety results addressed the risk of heart attack and stroke, among other things.  (4/01/05 Nies Dep. at 438:15-439:14; DX40.)  The study data did not show any increased risk of these events with Vioxx as compared to placebo or NSAIDs.  (4/01/05 Nies Dep. at 440:20-441:2.)

7.      The FDA reviewed Merck's New Drug Application ("NDA") for six months and also convened an Advisory Committee of outside experts to review the data and make a recommendation.  (4/20/10 Trial Tr. at 1244:13-20.)  On May 20, 1999, the FDA approved Vioxx as safe and effective for treatment of osteoarthritis pain, primary dysmenorrhea (menstrual pain), and acute pain.  (DX73.)  Vioxx was thereafter sold in the United States until September 2004, when Merck voluntarily withdrew it from the market.  (Order on Merck's Mot. for Summ. J., Mar. 31, 2010 ("Summ. J. Order") at 3.)

8.      In April 2002, after reviewing data from additional controlled studies, the FDA

3

approved Vioxx as safe and effective for treatment of adult rheumatoid arthritis pain.  (*See Smith*

*v. Merck & Co.,* MDL No. 1657, Case No. 05-CV-4379, Trial Test. of Alise Reicin, M.D., Sept.

20, 2006 ("9/20/06 Reicin Test."), at 2271:14-2272:4; DX277.)  In 2004, the FDA further

approved Vioxx for treatment of migraine headaches and juvenile rheumatoid arthritis pain.

(9/20/06 Reicin Test. at 2272:5-20;DX321, DX324.)

## II.   MERCK ADEQUATELY INVESTIGATED VIOXX'S POTENTIAL CARDIOVASCULAR RISKS AND ACCURATELY REPRESENTED VIOXX'S KNOWN CARDIOVASCULAR RISKS.

### A.   Pre-Market Clinical Studies of Vioxx Did Not Show that Vioxx Was Associated with Increased Cardiovascular Risks.

9.      Merck appropriately and reasonably investigated Vioxx's cardiovascular safety

throughout its pre-market testing of the drug (4/20/10 Trial Tr. at 1233:19-1234:19), and it

provided the FDA with all of the important safety information relating to Vioxx.  (4/20/10 Trial

Tr. at 1215:20-23, 1233:2-5.)

10.      Neither the pre-approval clinical trial data nor prior published clinical trial data on

traditional NSAIDs gave any indication that Vioxx might increase the risk of heart attacks.

(9/20/06 Reicin Test. at 2189:22-2190:1.)  Indeed, some scientists hypothesized that selective

COX-2 inhibitors might reduce the risk of such events because inflammation can play an

important role in bringing them about.  (9/20/06 Reicin Test. at 2291:19-2293:4.)

11.      At the same time, Merck understood that selective COX-2 inhibitors did not share

the cardioprotective properties of aspirin.  Scientists have long known that aspirin, by

irreversibly inhibiting COX-1 activity in blood platelets, inhibits synthesis of thromboxane, a

prostaglandin that facilitates platelet aggregation (clotting) and constriction of blood vessels.

(*See, e.g.*, Deposition of Alan Nies, M.D., Mar. 2, 2005 ("3/02/05 Nies Dep.") at 140:18-20;

4/01/05 Nies Dep. at 391:13-22, 392:13-16; 4/19/10 Trial Tr. at 965:11-966:10.)  By suppressing

synthesis of thromboxane, aspirin effectively "thins" the blood, reducing the risk of a heart attack. Studies during Vioxx development confirmed that Vioxx, designed to inhibit COX-2 but not COX-1, does not inhibit clotting or affect bleeding time relative to placebo. (DX73 (Letter from R. Delap to R. Silverman, May 20, 1999), at MRK-99420021414 (Mechanism of Action) and MRK-99420021421 (Platelets).)

12.     In late 1997, as the Vioxx Phase III clinical trials neared completion, University of Pennsylvania scientist Dr. Garret FitzGerald observed in a clinical pharmacology study jointly conducted with Merck scientists that urine of patients treated with Vioxx contained lower levels of a metabolite of prostacyclin than urine of patients on placebo. (4/01/05 Nies Dep. at 391:13-392:5.) This finding was unexpected because, prior to this time, it was generally accepted that all prostacyclin was produced by COX-1. (*Mason v. Merck & Co.,* MDL No. 1657, Case No. 06-CV-810-L, Trial Test. of Briggs Morrison, Nov. 8, 2006 ("11/08/06 Morrison Test."), at 1701:18-1702:1.) However, these urine findings suggested, for the first time, that COX-2 might play a role in the production of some of the prostacyclin in the human body. (*Barnett v. Merck & Co.,* MDL No. 1657, Case No. 06-CV-485-L, Trial Test of Briggs Morrison, Aug. 11, 2006 ("8/11/06 Morrison Test.") at 2041:3-2041:16.) Prostacyclin is a prostaglandin that is produced in many areas throughout the body, and it has many different effects depending on its location in the body. (11/08/06 Morrison Test. at 1700:15-1701:3.) Scientists believe that in blood vessels prostacyclin, along with other compounds such as nitric oxide, exerts effects (*i.e.,* inhibition of clotting and dilation of blood vessels) that are the opposite of those produced by thromboxane. (4/01/05 Nies Dep. at 396:10-17.) Thus Dr. FitzGerald's study raised the possibility that, if Vioxx reduced the balance of prostacyclin relative to thromboxane in the bloodstream, it might have a net prothrombotic effect. (4/01/05 Nies Dep. at 392:6-393:3; 11/08/06 Morrison Test. at

5

1779:21-1780:18.)  Because all prostacyclin metabolites end up in the urine, however, measurements of urinary prostacyclin metabolites cannot determine the levels of prostacyclin at a specific site, including the vasculature.  (*See* 8/11/06 Morrison Test. at 2039:2-2040:11.)  Dr. Fitzgerald's study by itself could not confirm that the reduction in urinary prostacyclin metabolite was caused by COX-2 inhibition or, if it was, whether there was a clinically relevant reduction in the vasculature.  (4/14/10 Trial Tr. at 498:20-502:7.)

13.     In response to Dr. FitzGerald's research, Merck reanalyzed all of its Vioxx clinical trial data in order to ascertain whether there was a signal that Vioxx was associated with an increased risk of thrombotic events.  (4/01/05 Nies Dep. at 405:14-406:1.)  None of this data disclosed an elevated risk of thrombotic cardiovascular events for study participants taking Vioxx as compared to participants taking placebo or traditional NSAIDs.  (*Id.* at 407:1-408:25.)  As of May 1998, there was no signal that Vioxx posed a cardiovascular risk relative to placebo or traditional NSAIDs.  (*Id.* at 410:15-412:11, 415:13-19.)

**B.     Prior to Marketing Vioxx, Merck Investigated the Questions Raised by Dr. Fitzgerald's Research.**

14.     To ensure that the FDA and its Advisory Committee could fully consider Dr. FitzGerald's research, Merck included the data from the urine metabolite study, as well as all data from its individual clinical studies, in its November 1998 NDA submitted to the FDA. (Deposition of Edward M. Scolnick, M.D., April 29, 2005 ("4/29/05 Scolnick Dep.") at 151:21-152:4; 4/01/05 Nies Dep. at 437:22-438:5; *see also* 4/20/10 Trial Tr. at 1234:20-1236:14.)  And to ensure that the study would become available to the medical profession at large, Merck scientists and Dr. FitzGerald arranged for its publication in a peer-reviewed medical journal, which published it in May 1999.  (*See* 4/01/05 Nies Dep. at 388:14-24.)

15.     To test Dr. FitzGerald's hypothesis that Vioxx-induced reduction of prostacyclin

1015096v.1

metabolites in urine might reflect a reduction of prostacyclin in the blood vessels, researchers at Merck Frosst laboratories conducted a series of animal studies. (3/02/05 Nies Dep. at 338:8-10, 338:25-340:6.) The results did not support the hypothesis. (*Id.* at 338:25-340:13.) For example, in a rabbit study researchers observed that COX-2 did not appear responsible for prostacyclin synthesis in the arteries. (3/02/05 Nies Dep. at 338:8-10; 338:25-340:6.) Vioxx, which inhibits only COX-2, did not reduce arterial prostacyclin. (3/02/05 Nies Dep. at 338:25-340:6.)

16.     Merck also presented the questions raised by Dr. FitzGerald's study to an independent Board of Scientific Advisors. (4/01/05 Nies Dep. at 409:1-8.) On the Board's advice, Merck adopted in 1998 a standard operating procedure for independent blinded adjudication (*i.e.*, detailed medical evaluation) of all thrombotic cardiovascular events occurring in future Vioxx clinical trials. (DX79; Deposition of Alise Reicin, M.D., Mar. 2, 2005 ("3/02/05 Reicin Dep.") at 158:21-160:3; 4/01/05 Nies Dep. at 414:15-23, 418:1-12, 418:16-25, 419:15-17, 424:4-18; 3/02/05 Nies Dep. at 211:2-212:2; 4/20/10 Trial Tr. at 1325:4-9.) The procedure was recommended, and Merck adopted it, because the Advisory Committee felt it was "unlikely that any of the individual trials with Vioxx [would] have sufficient power to determine whether coronary events are increased or decreased by COX-2 inhibition." (3/02/05 Nies Dep. at 210:6-211:1.)

17.     The FDA approved Vioxx without requiring or requesting that Merck commit to further post-marketing clinical studies, demonstrating that it concluded from the NDA that Vioxx did not present any safety concerns requiring additional investigation. (4/20/10 Trial Tr. at 1209:12-21.) The agency did not find that the cardiovascular data submitted by Merck required any special statement in the product's label, other than the disclosure of the occurrence of cardiovascular adverse events, including heart attacks, at a very low frequency (less than 0.1 %)

in clinical trials.  (DX73 at MRK-99420021432.)  The 1999 labeling did note: "VIOXX is not a substitute for aspirin for cardiovascular prophylaxis."  (*Id.* at MRK-99420021426.)

      C.      **Merck Promptly Disseminated the Results of the VIGOR Study to the FDA, the Medical Community and the Public.**

      18.      In March 2000, Merck learned the preliminary results of the VIGOR trial. (Deposition of Edward M. Scolnick, M.D., June 1, 2005 ("6/01/05 Scolnick Dep."), at 885:25-886:4.)  VIGOR was an approximately 8,000 patient trial designed to assess the incidence of serious gastrointestinal adverse events in rheumatoid arthritis patients treated with Vioxx as compared to the incidence of such events in patients treated with naproxen, a traditional NSAID. (4/20/10 Trial Tr. at 1115:5-14; 9/20/06 Reicin Test. at 2196:5-19.)  Over treatment periods averaging nine months, half the study patients took daily doses of Vioxx 50 mg (double the highest recommended dose for continuous use), while the other half took twice-daily doses of naproxen 500 mg (a common, submaximal therapeutic dose).  (DX 586 (marked for identification); 9/20/06 Reicin Test. at 2195:25-2196:19, 2198:3-7.)

      19.      The VIGOR data showed that participants in the Vioxx arm of the study suffered more serious cardiovascular thrombotic events, adjudicated in accordance with Merck's standard operating procedure, than did study participants taking naproxen:  Vioxx users experienced 45 such events compared to 19 events in naproxen users, with non-fatal myocardial infarctions (20 on Vioxx compared to 4 on naproxen) accounting for most of the difference.  (9/20/06 Reicin Test. at 2250:17-20, 2267:4-11.)  There were only 26 incremental events in 4,047 patients, but the results were statistically significant.  (*See* 9/20/06 Reicin Test. at 2200:1-20.)

      20.      Merck quickly disclosed the cardiovascular results to the FDA, the medical community and the public.  (4/01/05 Nies Dep. at 451:17-22.)  On March 23, 2000, two weeks after it received the unblinded VIGOR data, Merck faxed a summary of the results to the FDA.

8

(DX116; 9/20/06 Reicin Test. at 2204:21-2205:1.)  On March 27, 2000, Merck issued a press release disclosing both the gastrointestinal and cardiovascular findings.  (4/29/05 Scolnick Dep. at 205:2-6.)

21.      Merck also participated in the November 2000 publication of the VIGOR study results in the *New England Journal of Medicine*.  (*See* DX586 (C. Bombardier *et al.,* "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," 343 *N. Engl. J. Med.* 1520 (2000)), marked for identification; 9/20/06 Reicin Test. at 2234:19-2235:1.)  The *NEJM* article disclosed that there was a statistically significant difference in the rate of myocardial infarctions between the Vioxx and naproxen arms of the study, both in the abstract and at several points in the text of the article.  (*See* DX586, marked for identification, at 1520, 1523, 1526.)

22.      The published study did not include adverse events reported after a pre-specified cutoff date for the primary study analysis, including three additional myocardial infarctions reported for Vioxx users and one additional stroke reported for a naproxen user. (9/20/06 Reicin Test. at 2236:22-2237:12; 2245:11-17.)  However, the additional events were promptly reported to the FDA, in conformity with FDA regulations.  (9/20/06 Reicin Test. at 2245:18-2246:8, 2246:21-25.)  The additional adverse events were also included in the revised Vioxx labeling describing the VIGOR cardiovascular results.  (DX273 (2002 Vioxx Label) at MRK-LBL00000064; 9/20/06 Reicin Test. at 2250:17-20.)

### D.      After Receiving the VIGOR Study Results, Merck Investigated the Reasons for VIGOR's Cardiovascular Outcomes and Vioxx's Potential Cardiovascular Risks.

23.      Upon receiving the VIGOR results, Merck also immediately commenced an internal analysis of the possible reasons for the disparity in the rate of myocardial infarctions in the two arms of the study.  (4/01/05 Nies Dep. at 452:17-453:3; 9/20/06 Reicin Test. at 2201:12-

1015096v.1

2202:24.)  Because VIGOR compared Vioxx directly against naproxen without a placebo arm, the study's results could not in themselves explain whether the disparity in cardiovascular adverse event rates reflected an increased risk associated with Vioxx, a decreased risk associated with naproxen, a chance finding, or some combination of those alternatives. (9/20/06 Reicin Test. at 2201:6-11; 3/02/05 Nies Dep. at 278:2-279:3.)  Analysis of the available clinical and scientific data concerning Vioxx, naproxen and other NSAIDs persuaded Merck's scientists that the explanation most consistent with the VIGOR data was an aspirin-like antiplatelet effect of naproxen when given in continuous high doses as it was in the VIGOR study.  (9/20/06 Reicin Test. at 2231:12-19; 3/02/05 Nies Dep. at 278:2-279:3; 6/01/05 Scolnick Dep. at 892:14-25, 894:16-895:23.)

### 1.   **Analyses of Clinical Trials.**

24.    As a starting point in its analysis of the causes of the VIGOR cardiovascular results, Merck conducted a comprehensive review of the growing body of data from randomized, controlled studies that compared Vioxx against placebo.  (9/20/06 Reicin Test. at 2201:12-2202:11.)  This review included data from two large-scale placebo-controlled studies underway to evaluate the effects of Vioxx on patients with Alzheimer's disease.  (4/01/05 Nies Dep. at 453:10-454:1.)  These ongoing trials provided a large, previously unavailable dataset comparing Vioxx against placebo in an elderly patient population already at increased risk for serious thrombotic cardiovascular events.  (9/20/06 Reicin Test. at 2214:25-2215:18.)  Analyses of interim data from these trials, performed in March 2000 and again in September 2000, showed no increase in cardiovascular event rates for patients on Vioxx.  (4/01/05 Nies Dep. at 454:18-455:1; 9/20/06 Reicin Test. at 2215:19-2216:3; 6/01/05 Scolnick Dep. at 897:8-899:10.)

25.    Merck scientists and consultants also prepared a comprehensive pooled analysis of all of Merck's Vioxx clinical trial data.  (4/01/05 Nies Dep. at 468:13-21.)  This analysis

incorporated all available data from studies of four weeks or longer comparing Vioxx against both placebo (including the interim data from the Alzheimer's studies) and traditional NSAIDs – a dataset encompassing controlled clinical trials involving over 28,000 patients representing over 14,000 patient-years of exposure.  (DX597 (M. Konstam et al., "Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib," 104 *Circulation* 2280 (2001)), marked for identification; 4/01/05 Nies Dep. at 468:13-23, 469:1-2, 469:4-9.)  The results showed no difference between cardiovascular thrombotic event rates for Vioxx and either placebo or traditional NSAIDs other than naproxen.  (DX597, marked for identification.)  Later published in the peer-reviewed journal *Circulation*, this analysis also strongly supported the conclusion that the VIGOR results likely reflected a decreased risk associated with naproxen, not an increased risk of Vioxx.  (DX597, marked for identification; 4/01/05 Nies Dep. at 469:23-470:5, 470:7-14.)

        2.      **Investigation of the Naproxen Hypothesis.**

      26.      At the same time, Merck scientists examined the available scientific literature and data concerning naproxen.  (4/01/05 Nies Dep. at 455:15-456:9.)  This literature indicated that naproxen in fact has potent aspirin-like antiplatelet effects if taken continuously in the manner prescribed for patients participating in the naproxen arm of the VIGOR trial.  (4/01/05 Nies Dep. at 455:25-456:9.)  Indeed, data from VIGOR itself indicated that the patients on naproxen experienced adverse symptoms associated with aspirin-like inhibition of platelet aggregation – such as bruising and nosebleeds – at double or triple the rates at which patients on Vioxx experienced such symptoms.  (9/20/06 Reicin Test. at 2229:3-2230:1.)

      27.      Further, an earlier study conducted by Merck scientists and consultants showed that of the traditional NSAIDs ibuprofen, diclofenac, and naproxen, only naproxen at 500 mg twice daily – the dosage in VIGOR – inhibited platelet activity across its entire dosing interval to nearly the same degree as aspirin.  (9/20/06 Reicin Test. at 2216:6-2217:25, 2218:22-2222:7.)

28.     Clinical studies conducted on other traditional NSAIDs also showed that NSAIDs that are potent inhibitors of COX-1, as naproxen is, were capable of acting as cardioprotective agents.  (9/20/06 Reicin Test. at 2228:8-18.)  One study was conducted with placebo and flurbiprofen, a traditional NSAID, on patients who had suffered an acute heart attack.  (9/20/06 Reicin Test. at 2224:17-2225:19.)  Seven patients taking flurbiprofen had a second heart attack during the study period, as compared to 24 patients taking placebo.  (9/20/06 Reicin Test. at 2225:20-2226:6.)  A second study showed that indobufen, also a traditional NSAID, reduced thromboembolic events, including heart attacks, strokes and blood clots in the lungs, by 65%.  (9/20/06 Reicin Test. at 2227:4-2228:7.)

29.     In addition, an article published in the journal *Circulation* in March 2004 reported that the regular administration of naproxen 1000 daily can mimic the antiplatelet effect of low-dose aspirin.  (9/20/06 Reicin Test. at 2287:19-2288:15; 4/01/05 Nies Dep. at 461:8-25, 462:7-20, 462:24-463:2, 470:23-471:2.)

3.     **Laboratory Studies.**

30.     Merck continued throughout this period, in coordination with other researchers, to investigate the hypothesis that Vioxx might encourage thrombosis by reducing prostacyclin levels in the blood vessels.  (3/02/05 Nies Dep. at 338:8-10, 338:25-340:6.)  As noted above, whereas Dr. FitzGerald had found that inhibition of COX-2 reduced the level of prostacyclin metabolites in urine, researchers at Merck Frosst laboratories observed in a rabbit study that COX-2 was not responsible for vasculature prostacyclin production.  (3/02/05 Nies Dep. at 338:25-339:23.)  A canine study also suggested that COX-2 was not responsible for prostacyclin production in the blood vessels.  (3/02/05 Nies Dep. at 338:25-339:23.)  And in an arm laceration study conducted on human volunteers, outside researchers observed that Vioxx did not reduce the level of prostacyclin in the blood at the site of the injury.  (*Id.*)

12

31.     All of these researchers concluded, consistent with a large body of preexisting pharmacological research in humans, that COX-1, not COX-2, appears to be the source of prostacyclin in the blood vessels.  (*Id.*)  These results cast serious doubt on Dr. FitzGerald's hypothesis that Vioxx, which inhibits COX-2 but not COX-1, would decrease prostacyclin production in human arteries.  (*Id.* at 339:24-340:13.)

4.      **Merck's Submissions to the FDA.**

32.     Merck provided its research data and analyses to the FDA, which convened an Advisory Committee for February 2001 to consider the results of the VIGOR study, among other issues.  (DX353 (Jan. 4, 2001 Background Package for Feb. 8, 2001 Advisory Committee Meeting); DX187 (Tr. of Feb. 8, 2001 FDA Advisory Committee Meeting); 9/20/06 Reicin Test. at 2251:11-25; 4/29/05 Scolnick Dep. at 237:20-238:8; 4/20/10 Trial Tr. at 1257:1-6.)  The committee concluded that it was uncertain whether the VIGOR cardiovascular outcome resulted from a cardioprotective effect of naproxen or a prothrombotic effect of Vioxx and recommended further study.  (DX187 at 148-185, 204-207.)  In July 2001, in response to FDA follow-up requests, Merck updated its pooled analysis of Vioxx clinical trial results to incorporate data available from additional recently completed trials or extensions of trials.  (9/20/06 Reicin Test. at 2285:15-2286:3; DX285.)  Merck's scientists and consultants updated the pooled analysis again in 2002 and published the data in the *American Heart Journal* in 2003.  (DX285; 9/20/06 Reicin Test. at 2282:4-2283:1.)  The data continued to show no difference in the cardiovascular event rates between Vioxx, placebo, and non-naproxen NSAIDs.  (9/20/06 Reicin Test. at 2283:2-2286:3.)

33.     In response to FDA requests, Merck continued to provide updated cardiovascular data from completed clinical trials, including the large placebo-controlled Alzheimer's trials, which ended in 2003.  (*See* DX319 ("Updated Cardiovascular Pooled Analysis," Mar. 22, 2004)

13

at MRK-18940080068.)  Merck's updated data from its Alzheimer's trials, submitted to the FDA

on March 31, 2004, was found by the FDA to show no difference in the rate of cardiovascular

thrombotic events with Vioxx as compared with placebo.  (*See* DX360 at 7; *see also* 4/20/10

Trial Tr. at 1261:19-1262:6.)  Merck's final pooled analysis of clinical trials, completed in 2004,

encompassed up to four years of follow-up in more than 32,000 patients collectively representing

over 19,300 patient-years of exposure to Vioxx and comparators.  (DX319.)  Like the previous

analyses, the 2004 analysis showed no differences in the cardiovascular risks associated with

Vioxx, placebo, or non-naproxen NSAIDs.  (*See* 4/19/10 Trial Tr. at 1059:7-1062:17.)

      34.     When an FDA internal reviewer assessed Vioxx clinical trial data in December

2004, after the withdrawal of Vioxx, the reviewer commented in an Interim Review: "It appears

that, up to the time of the APPROVe study, the cardiovascular safety signal with Vioxx did not a

warrant regulatory action by FDA."  (4/20/10 Trial Tr. at 1260:13-1261:9; DX 360, at 15.)

          5.    **The APPROVe Trial.**

      35.     As soon as it learned the VIGOR results in March 2000, Merck began to evaluate

the possibility of conducting a clinical study specifically designed to assess the cardiovascular

effects of Vioxx compared to placebo.  (*See* 9/20/06 Reicin Test. at 2297:1-2298:1; Deposition

of Edward Scolnick, March 22, 2005 ("3/22/05 Scolnick Dep.") at 128:1-22.)  The contemplated

study raised pragmatic and ethical concerns, however.  In a population that required pain relief,

the patients in the placebo arm would receive no pain medication.  (4/29/05 Scolnick Dep. at

246:25-247:19, 247:20-248:6.)  Alternatively, in a healthy population that did not require pain

relief, the patients in the Vioxx arm would receive no benefit from the medication.  (9/20/06

Reicin Test. at 2297:9-2298:1.)

      36.     Ultimately, in consultation with the FDA, Merck designed a study protocol

(known as "Protocol 203") for systematic analysis of adjudicated cardiovascular safety data from

three large scale, long-term, placebo-controlled trials designed to assess the utility of Vioxx in the prevention and treatment of colon or prostate cancer.  (9/20/06 Reicin Test. at 2297:2-8, 2298:5-2300:25, 2301:12-2303:2.)  Designed to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, APPROVe was a blinded, randomized, placebo-controlled clinical trial in which an external committee adjudicated adverse events that represented potential thrombotic cardiovascular events.  (*Smith v. Merck & Co.,* MDL No. 1657, Case No. 05-CV-4379, Trial Test. of Alise Reicin, M.D., Sept. 21, 2006 ("9/21/06 Reicin Test.") at 2309:15-2310:4, 2310:16-20; 11/08/06 Morrison Test. at 1817:15-23.)

37.     On September 24, 2004, Merck learned that APPROVe's external safety monitoring board recommended that the study be terminated early in light of interim data the board had received the preceding week.  (11/08/06 Morrison Test. at 1817:24-1818:3; 9/21/06 Reicin Test. at 2310:23-25.)  The interim data indicated that, after 18 months of continuous daily use, study participants on Vioxx 25 mg began to experience a gradually increasing rate of confirmed adverse cardiovascular events as compared to study participants on placebo. (11/08/06 Morrison Test. at 1819:7-1821:18; 9/21/06 Reicin Test. at 2309-15-2310:20.)

38.     The interim results from the APPROVe study prompted Merck to withdraw Vioxx from the market on September 30, 2004.  (9/21/06 Reicin Test. at 2313:12-16.)

E.     **Vioxx Labeling Accurately Represented Vioxx's Known Cardiovascular Risks at All Times Vioxx Was on the Market.**

39.     In June 2000, Merck petitioned the FDA to add the VIGOR results to the Vioxx label on an expedited basis.   (DX145; 9/20/06 Reicin Test. at 2205:16-21.)  In doing so, Merck acted very quickly to compile, process, analyze and present a very complex data set.  The FDA denied expedited consideration and instead convened an advisory committee to review the available cardiovascular and gastrointestinal safety data from VIGOR and offer

recommendations for revised labeling.  (DX353; DX187.)  The FDA's action indicates that it did

not regard the VIGOR data as information necessitating an immediate label change.  As

discussed above, the advisory committee acknowledged the plausibility of the naproxen

explanation proposed by Merck, but opined that the data were inconclusive.  (*See* paragraph 32,

*supra.*)

40.     In March 2001, Merck submitted a revised label proposal responding to the

advisory committee's view.  (9/20/06 Reicin Test. at 2260:15-21.)

41.     In April 2002, after considering additional incoming clinical trial data and

analysis, the FDA approved a new label for Vioxx, which detailed the cardiovascular findings in

VIGOR.  (DX273; 9/20/06 Reicin Test. at 2261:15-20.)  Specifically, the label stated that "[t]he

VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic

events in patients treated with Vioxx 50 mg once daily as compared to patients treated with

naproxen twice daily. . . . This finding was largely due to a difference in the incidence of

myocardial infarction between the groups."  (*Id.* at MRK-LBL0000063.)  The label did not

suggest that the difference in the number of myocardial infarctions might be due to a

cardioprotective effect of naproxen.  (*Id.*)  The 2002 Vioxx label also included cardiovascular

data from two placebo-controlled studies conducted in Alzheimer patients.  (*Id.* at MRK-

LBL0000064.)

42.     The 2002 Vioxx label expressly cautioned that the VIGOR and Alzheimer study

data "should be taken into consideration and caution should be exercised when Vioxx is used in

patients with a medical history of ischemic heart disease."  (*Id.* at MRK-LBL0000065.)  It

further stated: "The significance of the cardiovascular findings from these 3 studies (VIGOR and

2 placebo-controlled studies) is unknown.  Prospective studies specifically designed to compare

the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed." (*Id.*)  The 2002 label reemphasized the precaution from prior labels that, because Vioxx did not provide aspirin-like cardioprotection, patients needing such protection should not discontinue aspirin while on Vioxx.  (*Id.*)

43.     The statement in the Vioxx label that the significance of the VIGOR and Alzheimer study findings was "uncertain" was consistent with the findings of the February 2001 FDA Advisory Committee.  (DX187 at 206; *see also* 9/20/06 Reicin Test. at 2267:23-2268:2; 4/20/10 Trial Tr. at 1258:1-5.)  Likewise, the inclusion of the warning to physicians to use caution in prescribing Vioxx was consistent with the Committee's finding that follow-up study was necessary before it could be concluded that Vioxx carried a definitive cardiovascular risk. (DX187 at 147-185; 9/20/06 Reicin Test. at 2270:6-2271:3.)

44.     The information in the 2002 Vioxx label regarding the drug's cardiovascular risks appropriately conveyed to physicians the known cardiovascular risks of Vioxx.  (4/20/10 Trial Tr. at 1263:19-24, 1264:6-12.)

45.     The Vioxx label also reported that in clinical trials with rheumatoid arthritis patients, patients taking Vioxx 25 mg daily had an incidence of hypertension twice as high as patients taking naproxen 1000 mg daily.  (DX273 at MRK-LBL0000065.)  The label additionally reported that in trials with osteoarthritis patients, the effects on hypertension and edema had been similar in patients taking Vioxx 12.5 mg and 25 mg daily and patients taking comparator NSAIDs.  (*Id.*)  But hypertension and edema had occurred with increased frequency relative to comparator NSAIDs in patients taking Vioxx 50 mg daily.  (*Id.*)  The label warned:  "VIOXX should be used with caution and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension or heart failure."  (*Id.*)

17

III.   **THE EVIDENCE SHOWS THAT CARDIOVASCULAR RISKS ARE A CLASS EFFECT OF NSAIDS, EXCEPT NAPROXEN.**

46.   On February 16-18, 2005, the FDA convened Special Advisory Committee hearings to obtain recommendations on future regulatory treatment for the entire class of selective COX-2 inhibitors.  (PX 287; 4/19/10 Trial Tr. at 979:11-24; 4/20/10 Trial Tr. at 1222:23-1223:5.)  The Special Advisory Committee consisted of leading scientists and clinicians in the relevant fields from throughout the country.  (4/19/10 Trial Tr. at 979:11-24; 4/20/10 Trial Tr. at 1223:15-23.)  During its hearings, the Committee scrutinized the entire existing body of scientific research on coxibs, including the final APPROVe data and more recently unblinded data from long-term, placebo-controlled trials involving Celebrex and other coxibs.  (9/21/06 Reicin Test. at 2314:2-8.)  The Committee also examined available data on traditional NSAIDs and heard presentations from scientists, physicians, pharmaceutical companies, government regulators, and members of the public.  (PX287.)  A majority of the Committee members concluded that Vioxx's benefits outweighed its risks and the drug could be once again made available for prescription.  (PX287; 4/19/10 Trial Tr. at 1051:9-19; 4/20/10 Trial Tr. at 1224:12-20.)  To date, Merck has not sought to reintroduce Vioxx to the market.  (4/20/10 Trial Tr. at 1338:21-23.)

47.   On April 6, 2005, FDA's Center for Drug Evaluation and Research issued a "Decision Memorandum" setting forth a comprehensive analysis of the available data on coxibs and traditional NSAIDs in support of the regulatory actions the agency had decided to take.  (DX338.)  This Decision Memorandum was based on an analysis of all of the data provided to the February 2005 Special Advisory Committee, as well as additional data available only to the FDA, including the entire regulatory histories and data contained in the NDA files and post-marketing databases for all NSAIDs.  (DX338 at 3-4; *see also* 4/20/10 Trial Tr. at 1227:7-18.)

18

Scientists across nearly a dozen Divisions and Offices of the FDA participated in this

comprehensive review and analysis.  (DX338 at 3-4; *see* 4/20/10 Trial Tr. at 1226:17-1227:2.)

The FDA's principal conclusions included:

> a.   ***No evidence of short term risks:***  Short-term use of coxibs and
>       traditional NSAIDs to relieve acute pain, particularly at low doses,
>       do not appear to confer an increased risk of adverse cardiovascular
>       events.  (DX338 at 2.)

> b.   ***Uncertain evidence of long term risks due to lack of replication
>       and lack of basis for reliable estimation:***  While data from
>       APPROVe and a similar long-term clinical trial of Celebrex
>       against placebo provided evidence that *both* Vioxx and Celebrex
>       are associated with an increased risk of adverse cardiac events after
>       long-term continuous use, long-term data from the Vioxx
>       Alzheimer's trials and other long-term Celebrex trials "did not
>       replicate" these results, making it impossible "to reliably estimate
>       the absolute magnitude of the increased risk of serious adverse CV
>       events" for these drugs.  Likewise, "[t]he available data do not
>       permit a rank ordering of these drugs with regard to CV risk."  (*Id.*
>       at 9-10.)

> c.   ***Class effect for all NSAIDs except aspirin and possibly
>       naproxen:***  Data from long-term controlled clinical trials
>       comparing Vioxx and Celebrex with traditional NSAIDs do not
>       clearly demonstrate that Vioxx and Celebrex confer a greater risk
>       of serious adverse cardiovascular events than traditional NSAIDs
>       except aspirin (for which long-term trials have shown a
>       cardioprotective effect) and possibly also naproxen (for which the
>       data are "not entirely consistent").  Therefore, "it is reasonable to
>       conclude that there is a 'class effect' for increased CV risk for all
>       NSAIDs pending the availability of data from long-term controlled
>       clinical trials that more clearly delineate the true relationships."
>       (*Id.* at 10-11, 13; *see also* 4/20/10 Trial Tr. at 1229:15-25)

> d.   ***No support for FitzGerald hypothesis:***  Low-dose aspirin (which
>       inhibits COX-1) has not been observed to resolve any increased
>       CV risk associated with Vioxx and Celebrex (which selectively
>       inhibit COX-2).  Together with the overall inability to conclude
>       that traditional NSAIDs have lower cardiovascular risk than
>       coxibs, this casts serious doubt on the FitzGerald hypothesis that
>       selective inhibition of COX-2 is responsible for any such increased
>       risk.  (DX338 at 8.)

e. ***No consistent or reliable results from retrospective studies:*** Available cardiovascular data from retrospective observational studies of coxibs and traditional NSAIDs are not consistent and often fail to reach statistical significance, reflecting differing study designs, strengths, and weaknesses.  (*Id.* at 7.)

f. ***Only Vioxx is clinically proven to reduce serious GI bleeding:*** As a group, coxibs reduce the incidence of gstrointestinal ulcers as compared to traditional NSAIDs, but only Vioxx has been shown to reduce the risk of serious gastrointestinal bleeding as compared to traditional NSAIDs.  (*Id.* at 2, 11.)

g. ***Improved GI tolerability justifies continued availability of selective COX-2 inhibitors:***  Because "[i]mproved GI tolerability of NSAIDs is an important issue from an individual patient and public health perspective," there is "a valid rationale for maintaining a range of options in the NSAID class from which physicians and patients may choose."  (*Id.* at 11-12.)

48.      Given the agency's conclusion that any increased cardiothrombotic risk appeared to be a "class effect" common to both coxibs and traditional NSAIDs (other than aspirin and possibly naproxen), the agency required all NSAIDs on the market (other than aspirin) to include a "black box" warning about a possible increased risk of adverse cardiovascular thrombotic events.  (*Id.* at 13-14.)

49.      The FDA reaffirmed the statements in its 2005 Decision Memo following a discussion in 2007 and the Agency has continued to stand by the conclusions of the 2005 memo to this day.  (*See* 4/20/10 Trial Tr. at 1230:20-1231:9.)  Subsequent research has confirmed FDA's conclusion that increased cardiovascular risks are a class effect of NSAIDS -- both traditional NSAIDs and coxibs.  (4/19/10 Trial Tr. at 959:7-964:6.)  Published meta-analyses of randomized clinical trials have concluded that there is no difference in cardiovascular thrombotic events between COX-2 inhibitors and traditional NSAIDs, with the exception of naproxen.  (*Id.*)

50.      Research has shown that when naproxen is dosed at 500 mg twice daily, the dose

20

used in the VIGOR study, it appears to have a different cardiovascular risk profile than other NSAIDs.  (Deposition of Alise Reicin, M.D., Mar. 23, 2005 (3/23/05 Reicin Dep.") at 312:9-25.) As noted previously, naproxen 500 mg twice daily inhibits thromboxane production and platelet aggregation similar to aspirin.  (*Id.*)  However, in contrast to aspirin, which permanently interferes with platelet function by irreversibly inhibiting the COX-1 enzyme within platelets, naproxen's inhibition of the COX-1 enzyme is reversible.  (6/01/05 Scolnick Dep. at 907:17-25.) It must therefore be dosed repetitively and at sufficient dosage, as in the VIGOR study, to impair platelet aggregation. (*Id.* at 908:25-909:4.)  An antiplatelet and cardioprotective effect of naproxen is a reasonable explanation for the VIGOR results.  (*See* 3/23/05 Reicin Dep. at 313:6-20.)

IV.    **MERCK AT ALL TIMES ACCURATELY REPRESENTED VIOXX'S KNOWN GASTROINTESTINAL SAFETY RELATIVE TO TRADITIONAL NSAIDS.**

   A.    **Randomized Clinical Trials and Meta-Analyses Established the Gastrointestinal Safety of Vioxx Relative to Traditional NSAIDs.**

   51.    The totality of the data, including clinical trials of Vioxx and meta-analyses of trials of Vioxx and other COX-2 inhibitors, shows that Vioxx poses a lower risk of gastrointestinal complications than do traditional NSAIDs.  (4/20/10 Trial Tr. at 1136:3-25.) This reduced risk extends to non-users of steroids and is clinically significant.  (*Id.* at 1136:14-25.)

      1.    **Pre-Marketing Studies.**

   52.    Endoscopy studies have been a standard and well-established means of evaluating the gastrointestinal toxicity and safety of drugs in clinical trials, as Plaintiff's expert gastroenterologist Dr. David Graham admitted.  (4/13/10 Trial Tr. at 313:3-14.)  Dr. Graham himself has used endoscopy in a clinical trial to measure the gastrotoxicity and gastrointestinal safety of a COX-2 inhibitor.  (*Id.* at 313:11-315:16.)  Merck's Vioxx endoscopy studies showed

21

a statistically significant reduction in endoscopic ulcers.  (*See* Deposition of Briggs Morrison, M.D., Feb. 18, 2005 ("2/18/05 Morrison Dep.") at 579:10-25.)  Two endoscopy studies with a total of 1516 patients compared Vioxx to placebo and ibuprofen and found treatment with Vioxx was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen.  (*See* DX73 at MRK-99420021418-20.)

53.    Merck's pre-marketing investigation of Vioxx's gastrointestinal safety also included an analysis of pooled osteoarthritis efficacy studies.  Using a predefined set of diagnostic criteria, these studies found a "significantly lower incidence" of perforations, ulcers and bleeds in patients taking Vioxx, as compared to patients taking a traditional NSAID.  (DX40 at E4, E18.)  In the pooled studies, the comparator NSAIDs were ibuprofen 2400 mg daily, diclofenac 150 mg daily, and nabumetone 1500 mg daily.  (DX575 (M.J. Langman *et al.,* "Adverse Upper Gastrointestinal Effects of Rofecoxib Compared with NSAIDs," 282 *JAMA* 1929 (Nov. 24, 1999)), marked for identification, at 1929; *see also* 4/20/10 Trial Tr. at 1143:1-7.)  Each of these dosages was listed in the product label as an appropriate and approved dose for chronic use in the treatment of osteoarthritis.  (4/20/10 Trial Tr. at 1246:17-1247:6, 1254:4-10.)  The study protocols, including the dosages of comparator drugs, were approved by the FDA, which gave no indication it believed the dosing of comparator drugs was in any way improper. (*Id.* at 1247:7-13, 1250:15-1251:6; *see also id.* at 1251:11- 1254:3.)

54.    Vioxx was administered in the pooled osteoarthritis studies in dosages of 12.5 mg, 25 mg and 50 mg daily. (DX575, marked for identification, at 1929**.**)  25 mg was the maximum daily dose of Vioxx recommended for the treatment of osteoarthritis.  (DX273 at MRK-LBL0000066.)  Thus the study participants taking 50 mg Vioxx daily received double the maximum chronic dose of Vioxx, while participants in the comparator arms of the studies always

22

received doses of traditional NSAIDs within the range of FDA-approved dosages for osteoarthritis.  There is no evidence in the record that the dosages in these studies were selected to favor Vioxx and skew the gastrointestinal data in Vioxx's favor.

### 2.    The VIGOR Study.

55.    Merck continued to study Vioxx's gastrointestinal safety after FDA approval.  As discussed above, the VIGOR trial compared gastrointestinal outcomes in approximately 8,000 rheumatoid arthritis patients taking either 1000 mg of naproxen daily or 50 mg of Vioxx daily. (4/20/10 Trial Tr. at 1115:5-14; 9/20/06 Reicin Test. at 2196:5-19.)

56.    Designed to perform a "rigorous testing of the GI safety of rofecoxib," VIGOR's objective was "to demonstrate that rofecoxib at twice the maximum chronic dosage would be associated with a significant reduction in confirmed clinical upper GI events."  (DX187 at 32:15-18, 30:1-4; 9/20/06 Reicin Test. at 2196:20-2197:2.)  Its primary endpoint was all clinical gastrointestinal events: perforations, ulcers, bleeding and obstruction.  (4/20/10 Trial Tr. at 1116:2-5; Deposition of Briggs Morrison, M.D., Dec. 18, 2003 ("12/18/03 Morrison Dep.") at 62:18-63:5.)  The comparator dose of naproxen 1000 mg daily is within the range of commonly used doses of naproxen.  (*See* 4/13/10 Trial Tr. at 327:10-328:25.)

57.    Data from the VIGOR study confirmed that patients taking Vioxx 50 mg daily -- double the recommended dose for chronic use -- had approximately half the number of clinically serious perforations, ulcers and bleeds as did patients taking naproxen 1000 mg daily -- a recommended dose for chronic use.  (4/20/10 Trial Tr. at 1118:11-1119:10.)  A statistically significant reduction in confirmed gastrointestinal events was also seen in predefined subgroups of patients over 65 years old, under 65 years old, with a history of previous gastrointestinal events, without a history of gastrointestinal events, positive for the bacteria *H. pylori,* negative for *H. pylori*, and with concomitant steroid use.  ( *Id.* at 1124:4-1125:11.)  Although there was a

23

risk reduction in the VIGOR subgroup of patients without concomitant steroid use, the reduction was not statistically significant. (*Id.*. at 1121:15-1122:7.) However, the rate of adverse gastrointestinal events in the Vioxx arm of the study was similar in both the steroid users and steroid non-users subgroups. (*Id.* at 1125:12-1126:2. )

58.     The fact that there was not a statistically significant risk reduction for all PUBs in the steroid non-users group did not mean that Vioxx's gastrointestinal benefits relative to naproxen extended only to steroid users. (4/20/10 Trial Tr. at 1123:12-16.) There was a reduction of gastrointestinal complications in the steroid non-users group, although it did not reach statistical significance, and the most important endpoint was the entire study population, which included steroid non-users. (*Id.* at 1123:17-1124:3.) Clearly, Vioxx demonstrated superior gastrointestinal safety on the basis of that endpoint. (*Id.*) As a general matter, the fact that some subgroups do not reach statistical significance does not alter the validity of a study or its outcomes. (*Id.*)

### 3.     Meta-Analyses

59.     The VIGOR gastrointestinal results have been confirmed by more recent studies. A meta-analysis of Vioxx clinical studies involving approximately 17,000 patients showed that, relative to traditional NSAIDs, Vioxx use resulted in better gastrointestinal outcomes and that this benefit extended to steroid non-users. (4/20/10 Trial Tr. at 1129:4-14.)

60.     A second meta-analysis by Rostom examined 69 clinical studies of COX-2 inhibitors and traditional NSAIDs. (DX2644, marked for identification; 4/20/10 Trial Tr. at 1131:18-1132:20.) All of the studies showed that COX-2 inhibitors are safer than other NSAIDs in terms of gastrointestinal side effects. (4/20/10 Trial Tr. at 1132:21-1134:17.) The authors specifically found that Vioxx reduced the risk of perforations, ulcers, obstructions and bleeds ("POBs") by 58% and PUBs by 56%. (*Id.* at 1134:18-24.) The authors found remarkable

24

consistency in these results, which confirm the gastrointestinal outcomes in VIGOR and the superiority of Vioxx's gastrointestinal safety relative to traditional NSAIDs. (*Id.* at 1134:25-1136:18.)

      **B.**     **<u>Vioxx Labeling Accurately Represented Vioxx's Gastrointestinal Risks and Benefits.</u>**

             **1.**     **The 1999 Vioxx Label.**

      61.     The FDA specifically authorizes the labeling of every prescription drug. A New Drug Application must include the manufacturer's proposed labeling of the drug and an integrated summary of all available information concerning the safety and efficacy of the drug. 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. §§ 314.50(c)(2)(i), (d)(5)(v), (d)(5)(vi)(*a*). If the label submitted by a drug manufacturer for a new drug is found by the FDA to be "false or misleading in any particular," the NDA must not be approved. 21 U.S.C. § 355(d)(7). When Vioxx was approved by the FDA as safe and effective in May 1999, therefore, the FDA necessarily also approved every word of Vioxx's labeling. 21 C.F.R. § 314.105(b). (*See also* DX73.)

      62.     The Vioxx label approved by the FDA in 1999 included a strong warning about potential gastrointestinal side effects that was common to all NSAIDs. The label stated: "Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs)." (DX73 at MRK-99420021422.) The label additionally cautioned that "NSAIDs should be prescribed with extreme caution in patients with a prior history of ulcer disease or gastrointestinal bleeding. . . . For high risk patients, alternate therapies that do not involve the use of NSAIDs should be considered." (*Id.*) The label specified several co-therapies and co-morbid conditions that had been identified as increasing the risk of GI bleeding in patients taking NSAIDs. (*Id.* at MRK-

99420021423.)

63.     Vioxx's 1999 gastrointestinal warning did not make claims about Vioxx's gastrointestinal safety relative to other NSAIDs.  (DX73.)  Rather, the label included a paragraph noting that it was "unclear" how the rates of gastrointestinal complications found with traditional NSAID usage applied to Vioxx.  (*Id.* at MRK-99420021422.)  The paragraph provided data about the number of "serious upper GI event[s]" in 3,357 patients who had received Vioxx in clinical trials of six weeks to one year at daily doses ranging from 12.5 mg to 50 mg and noted that "[a]pproximately 23% of these 3357 patients were in studies that required them to be free of ulcers at study entry.  It is unclear if this study population is representative of the general population." (*Id.*)  The paragraph concluded: "Prospective, long-term studies required to compare the incidence of serious, clinically significant upper GI adverse events in patients taking VIOXX vs. comparator NSAID products have not been performed."  (*Id.*)

64.     A separate section of the 1999 Vioxx label ("Special Studies") reported data from two endoscopy studies in a total of 1516 patients that compared the percentage of patients who developed endoscopically detectable gastroduodenal ulcers with Vioxx 25 mg daily, Vioxx 50 mg daily, ibuprofen 2400 mg daily, or placebo.  (*Id.* at MRK-99420021418-21.)  The label noted that patients receiving aspirin were not enrolled in the studies.  (*Id.* at MRK-99420021418.)  In addition to providing detailed tables of the study results, the label reported: "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastrointestinal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."  (*Id.*)  There is no evidence in the record showing that the summary of the endoscopy studies in the Vioxx label was inaccurate or

1015096v.1

that the state of the ongoing research about Vioxx's gastrointestinal safety relative to traditional NSAIDs was misrepresented in the labeling.

65.     The Vioxx label appropriately informed physicians and users of the drug about Vioxx's gastrointestinal risks.  (4/20/10 Trial Tr. at 1269:19-1270:3.)  It plainly conveyed that Vioxx was potentially more gastrointestinally toxic than placebo.  (*Id.* at 1269:7-18.)

## 2.     The 2002 Vioxx Label.

66.     The FDA also expressly approves revisions to a prescription drug label made as part of a Supplemental New Drug Application ("sNDA").  *See* 21 C.F.R. § 314.70.  On April 11, 2002, following an extensive review and revision process, the FDA approved the 2002 Vioxx label, which included accurate data from the VIGOR study.  (DX273.)

67.     Like the 1999 label, the 2002 label included the NSAID class gastrointestinal warning.  (DX273 at MRK-LBL0000064.)  In place of the paragraph in the 1999 label that had stated that it was unclear if the data regarding the gastrointestinal safety of traditional NSAIDs applied to Vioxx, the 2002 label substituted a new paragraph stating:  "Although the risk of GI toxicity is not completely eliminated with VIOXX, the results of the VIOXX GI outcomes research (VIGOR) study demonstrate that in patients treated with VIOXX, the risk of GI toxicity with VIOXX 50 mg once daily is significantly less than with naproxen 500 mg twice daily." (*Id.*)  The label provided information about the VIGOR protocol and the scope of the study, including that the study had been conducted with rheumatoid arthritis patients and that patients were not allowed to use concomitant aspirin.  (DX273 at MRK-LBL0000064.)

68.     The 2002 label also accurately stated that VIGOR demonstrated a statistically significant risk reduction for all PUBs ("PUBs and complicated PUBs") in subgroups of patients under 65 years of age, over 65 years of age, with a history adverse gastrointestinal events, without a history of adverse gastrointestinal events, positive for *H. pylori* infection, negative for

27

1015096v.1

*H. pylori* infection, and with concomitant steroid use.  (DX273 at MRK-LBL0000063.)  The label did not specify the findings for a subgroup comprised of steroid non-users.  (DX273.)  Nor did the label specify findings for any subgroup regarding the secondary endpoint of confirmed complicated PUBs.  (*Id.*)

69.     When approving the 2002 Vioxx label, the FDA was aware that, with regard to the overall primary endpoint of the VIGOR trial -- all PUBs -- the difference between the two arms of the study was not statistically significant for the steroid non-user subgroup.  (4/20/10 Trial Tr. at 1272:20-25.)  Merck had provided that information with the VIGOR results, but the final approved version of the label included reported the relative risk reduction only for the subgroups in which the reduction was statistically significant.  (*See* DX2549-A; DX273 at MRK-LBL0000063; 4/20/10 Trial Tr. at 1271:25-1272:19.)

     C.    **The Publication of the VIGOR Study Accurately Represented Its Gastrointestinal Outcomes.**

70.     Gastrointestinal data from the VIGOR trial was reported in *The New England Journal of Medicine.* (DX586, marked for identification.)  The *NEJM* publication showed that the risk reduction of the primary endpoint -- all PUBs -- in the steroid non-users subgroup was not statistically significant.  (DX586, marked for identification, at 1523.)  The relative risk of all PUBs was cited as 0.7 with a 95% confidence interval of 0.4-1.2, showing that the risk reduction for steroid non-users did not reach statistical significance.  (DX586, marked for identification, at 1523.)

71.     The *NEJM* article did not include data about the occurrence of "complicated" PUBs in the steroid non-users subgroup.  Complicated PUBs were a secondary endpoint in the VIGOR study and the VIGOR study design did not pre-specify an analysis of the secondary endpoint for the steroid non-users subgroup. (4/20/10 Trial Tr. at 1116:14-17, 1116:24-25,

1120:21-1121:14; 1123:9-11, 1273:9-14.)  All PUBs is a clinically significant endpoint for investigating the gastrointestinal toxicity of a drug and the use of "all PUBS" as the primary endpoint in VIGOR was approved by the FDA before the study was conducted.  (4/20/10 Trial Tr. at 1117:1-19, 1270:10-1271:18.)

## V.  VIOXX'S BENEFITS OUTWEIGHED ITS RISKS.

72.    When the FDA approved Vioxx for sale in 1999, following a rigorous review of its pre-market testing, it found that the drug's benefits outweighed its risks.  (DX73; 4/20/10 Trial Tr. at 1208:22-1211:15.)  Each time Merck submitted supplemental applications to the FDA, requesting that Vioxx be approved for additional indications, the FDA again weighed Vioxx's risks and benefits.  (4/20/10 Trial Tr. at 1210:6-8.)  It found that Vioxx's benefits outweighed its risks in April 2002, when it approved the use of Vioxx for rheumatoid arthritis (DX277); in March 2004, when it approved the use of Vioxx for migraine (DX321); and yet again in August 2004, when it approved the use of Vioxx for juvenile rheumatoid arthritis. (DX324.)  (*See also* 4/20/10 Trial Tr. at 1211:16-1215:14.)  Dr. Eiswirth characterized the FDA as "the most unbiased and informative source of information to a practicing physician" who is weighing the risks and benefits of a drug.  (4/19/10 Trial Tr. at 953:19-954:3.)

73.    The Louisiana Medicaid pharmacy program relied upon the FDA's determinations of a drug's safety and efficacy.  (*See* 4/15/10 Trial Tr. at 722:7-11 (the Louisiana Pharmaceutical & Therapeutics Committee does not make determinations of a drug's safety and efficacy apart from the FDA); *id.* at 766:11-17 (the Pharmaceutical & Therapeutics Committee relied upon the FDA to make decisions about the safety, efficacy and labeling of prescription drugs); 4/13/10 Trial Tr. at 429:20-23 (FDA approval of a drug is important to the LDHH as an indication of drug safety); *see also id.* at 430:5-16, 431:8-22 (David Hood, former Secretary of LDHH, was unaware of any instance in which the Pharmaceutical & Therapeutics Committee

29

came to a decision about the safety and/or efficacy of an FDA-approved drug that was at odds with the FDA's determination); 4/15/10 Trial Tr. at 682:16-19 (all state Medicaid pharmacy programs rely upon the FDA for determinations of drugs' safety and efficacy).

74.     As discussed above, in February 2005, an FDA Special Advisory Committee, comprised of leading scientists and clinicians, examined the entire body of research on coxibs, in addition to hearing testimony from scientists, physicians, government officials and members of the public.  (PX 287; 4/19/10 Trial Tr. at 979:11-24; 4/20/10 Trial Tr. at 1222:23-1223:23.)  A majority of the Committee members concluded that Vioxx's benefits outweighed its risks and that the drug could be once again made available for prescription.  (PX287; 4/19/10 Trial Tr. at 1051:9-19; 4/20/10 at 1224:12-20.)

75.     As also discussed above, the FDA's Center for Drug Evaluation and Research concluded in an April 6, 2005 memorandum that of the coxibs, only Vioxx had been shown Vioxx has been shown to reduce the risk of serious GI bleeding as compared to traditional NSAIDs.  (*Id.* at 2, 11.)  At the same time, the memorandum concluded that it was not possible to "rank" coxibs in terms of their cardiovascular risks.  (*See* DX338 at 9-10.)  Hence it cannot be concluded that Vioxx's cardiovascular risks are greater than those of Celebrex, which was included on the Louisiana Medicaid preferred drug list as recently as 2008. (DX2165.)

76.     As discussed in paragraphs 129-30, *infra,* both Plaintiff's and Merck's experts testified that Vioxx carried clinically significant therapeutic and safety advantages that are not present in the primary comparator drugs, traditional NSAIDs.  Even Plaintiff's gastroenterology expert, Dr. David Y. Graham, admitted that Vioxx "would be a better choice than a traditional NSAID" for patients taking steroids.  (4/13/10 Trial Tr. at 355:9-15; *see also id.* at 355:3-6 (stating that, for steroid users, Vioxx is better than traditional NSAIDs for safety).)

30

## VI.   THE STATE OF LOUISIANA COULD NOT DENY REIMBURSEMENT FOR MEDICAID VIOXX PRESCRIPTIONS.

### A.   Overview of Federal Medicaid Requirements.

77.     Medicaid, an entitlement program created in 1965 by Title IX of the Social Security Act, is jointly funded by state and federal governments to provide health care coverage to low-income families with dependent children and to elderly, blind, and disabled individuals. 42 U.S.C. § 1396-1; 42 U.S.C. § 1396a(a)(10)(A)-(C). The state and federal shares of a Medicaid program's costs depend on the state's per capita income. (4/15/10 Trial Tr. 663:18-664:1; 4/16/10 Trial Tr. at 861:16-862:8.) In Louisiana, the federal government bears approximately 70% of the Medicaid costs. (4/16/10 Trial Tr. at 861:12-14.) States create and administer their own programs, but in exchange for this federal funding, they must accept significant federal regulation of the nature, scope, and attributes of their Medicaid programs. *See* 42 U.S.C. §1396 *et seq.* (*See also* 4/13/10 Trial Tr. at 444:13-18.)

78.     Under federal law, state Medicaid programs are permitted, but not required, to offer prescription drug benefits to Medicaid-eligible individuals. 42 U.S.C. § 1396a(a)(10); *see also* 42 U.S.C. § 1396d(a)(12). Louisiana elected to offer prescription drug benefits in its Medicaid program. (*See* 4/16/10 Trial Tr. at 864:19-865:2.)

79.     States that decide to provide a pharmacy benefit receive both federal funding and rebates from pharmaceutical companies under the Medicaid Drug Rebate Program. 42 U.S.C. §§ 1396r-8(a), (b). This rebate program – created by the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90") – requires a drug manufacturer to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services ("HHS") in order for states to receive federal funding for coverage of its drug products for Medicaid patients. *Id.* (*See also* 4/15/10 Trial Tr. at 663:3-17, 665:16-666:1.) These rebates are shared between the states and the

31

federal government according to their respective shares of the program's cost.  (4/15/10 Trial. Tr. at 665:16:16-661:1.)  In exchange for these rebates, which reduce the cost of the Medicaid programs, manufacturers are guaranteed coverage of their drugs under Medicaid, unless a particular drug is specifically exempted from coverage by the Medicaid statute.  (*Id.*)  *See* 42 U.S.C. § 1396r-8(d)(2) (specifying categories of drugs excluded from Medicaid coverage).

80.     States may negotiate with pharmaceutical companies for supplemental rebates in addition to those provided under the federal rebate program.  (4/16/10 Trial Tr. at 817:24-818:8, 871:13-872:10.)

81.     States that elect to provide a prescription drug benefit must reimburse for all "covered outpatient drugs" that are subject to a national rebate agreement.  "Covered outpatient drugs" are prescription drugs approved as safe and effective for their intended uses under the federal Food, Drug, and Cosmetic Act.  42 U.S.C. §§ 1396r-8(a)(1), (d)(1)(B), (k)(2)(A) & (k)(6).

82.     There are only four exceptions to the Medicaid mandatory reimbursement requirement.  Coverage may be denied where:  (1) a prescription is not made for a "medically accepted indication"; (2) a prescription is made for a category of drugs (such as barbiturates) or for an indication (such as smoking cessation) specified in 42 U.S.C. § 1396r-8(d)(2) or a drug has been determined by the Secretary of HHS to be subject to clinical abuse or misuse; (3) a state has executed a special rebate agreement with the manufacturer, approved by the Secretary of HHS, specifically restricting coverage of the prescription; or (4) a state has established a formulary meeting statutory requirements and exclusion of the drug from the formulary is based on the drug's label and is for a specified population and/or condition for reasons of safety or efficacy, and the exclusion conforms with procedures set forth in the federal Medicaid statute

32

(including making specified findings in writing and securing approval from the Secretary of HHS).  42 U.S.C. §§ 1396r-8(d)(1), (2), (4); 42 C.F.R. § 430.12(c).  (*See also* Summ. J. Order at 7-8.)

83.    The federal Medicaid statute defines "medically accepted indications" as all uses approved by the FDA, as well as any non-approved uses supported by the compendia listed in the statute:  the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information, or the DRUGDEX Information System.  42 U.S.C. §§ 1396r-8(k)(6), (g)(1)(B)(i).

84.    Although reimbursement for covered outpatient drugs is mandatory, save for the exceptions set forth in paragraph 82, *supra,* states are permitted to subject any covered outpatient drug to a prior authorization requirement, as long as the prior authorization program meets certain standards.  42 U.S.C. § 1396r-8(d)(1)(A).  First, to establish a prior authorization program, a state must obtain approval of the plan from the Center for Medicare and Medicaid Services and enact enabling legislation.  42 C.F.R. § 430.12(c).  Second, to comply with federal law, the state's approval system must: (1) provide a response by telephone or other telecommunication device within 24 hours of the request for authorization; and (2) permit a 72-hour supply of a covered outpatient drug to be dispensed in an emergency situation (as defined by the Secretary of HHS).  42 U.S.C. §§ 1396r-8(d)(1)(A), (d)(5).  The establishment of a prior authorization requirement for a given drug involves setting criteria for permissible use of the product.  (*See* 4/15/10 Trial Tr. at 681:11-23.)  Prior authorization requirements are not intended to interpose the state between a doctor and patient or to deny access to a drug altogether.  (*Id.*)

## B.    Overview of Louisiana's Medicaid Pharmacy Program.

85.    Louisiana's Medicaid Program is administered by the Louisiana Department of Health and Hospitals ("LDHH").  *See* La. Rev. Stat. Ann. § 46:153.3.

33

86.     Prior to June 13, 2001, Louisiana law mandated that LDHH "provide reimbursement for any drug prescribed by a physician that, in his professional judgment and within the lawful scope of his practice, he considers appropriate for the . . . patient." La. Rev. Stat. Ann. § 46:153.3(B)(2) (1999).   Specifically, it required Medicaid reimbursement of all FDA-approved drugs, except for certain specified categories of drugs (such as infertility drugs). La. Rev. Stat. Ann. § 46:153.3(B) (1999).  (*See* 4/15/10 Trial Tr. at 717:3-12; 4/16/10 Trial Tr. at 820:16-20, 865:20-866:1, 866:19-23.)  Therefore, prior to June 13, 2001, Louisiana law precluded the establishment of a Medicaid restrictive formulary[1] pursuant to 42 U.S.C. § 1396r-8(d)(4).  La. Rev. Stat. Ann. § 46:153.3(B).  (*See also* Order on Merck's Motion for Summary Judgment ("Summ. J. Order") at 11.)

87.     Prior to June 13, 2001, Louisiana law also did not permit the establishment of a preferred drug list ("PDL") or prior authorization requirements in the Medicaid pharmacy program.  La. Rev. Stat. Ann. § 46:153.3(B)(3) (1999).

88.     On June 13, 2001, the Louisiana State Legislature modified the State's Medicaid pharmacy program.  2001 La. Acts 395, *amending* La. Rev. Stat. Ann. § 46:153.3.  Pursuant to the authority conferred by Act 395, LDHH instituted a preferred drug list and a prior authorization program, which became effective on June 10, 2002 following legislative approval of the preferred drug list.  *See* 2001 La. Acts 395, *amending* La. Rev. Stat. Ann. § 46:153.3; 28 La. Reg. 979-80 (May 2002) (implementing an Emergency Rule to create a prior authorization program for drugs prescribed to Medicaid recipients); *see also* 28 La. Reg. 1639, 1640 (July 2002) (Notice of Intent to promulgate final rule establishing prior authorization program for Medicaid prescription drug program).  (*See also* 4/16/10 Trial Tr. at 820:24-821:3, 848:23-25.)

---

[1] 42 U.S.C. § 1396r-8(d) refers simply to a "formulary."  In practice and in the relevant case law, a formulary established pursuant to 42 U.S.C. § 1396r-8(d)(4) is referred to as a "restrictive" or "exclusive" formulary.

1015096v.1

Under this program, prescription drugs placed on the preferred drug list are covered automatically, while reimbursement for drugs not on the preferred drug list is conditioned on a prior authorization.  (*See* 4/16/10 Trial Tr. at 867:3-22; 4/13/10 Trial Tr. at 378:21-379:10.)

89.   Act 395 also authorized the creation of the Medicaid Pharmaceutical & Therapeutics ("P&T") Committee, which is responsible for recommending to the Secretary of LDHH which drugs to include on the preferred drug list and which drugs should require prior authorization.  2001 La. Acts 395, *amending* La. Rev. Stat. Ann. § 46:153.3(C).  (*See also* 4/16/10 Trial Tr. at 822:12-16, 867:23-868:4.)  The Act not only specified that the Committee must have twenty-one members, but established criteria for the members.  For example, Act 395 mandated that one member be a physician from Tulane with an expertise in pharmacology, while another be a practicing physician who participates in the Title XIX program as a surgeon recommended from a list of three names provided by the Louisiana Medical Society.  2001 La. Acts 395, *amending* La. Rev. Stat. Ann. § 46:153.3(C).  Act 395 required that all members be appointed by the Governor and confirmed by the Senate.  *Id.*

90.   Under Act 395, the P&T Committee is "responsible for developing and maintaining a pharmacopoeia established in conjunction with a prior approval process as provided in Subparagraph (B)(2)(a) of this Section."  2001 La. Acts 395, *adding* La. Rev. Stat. Ann. § 46:153.3(C)(5)(a).  Mirroring the prior authorization requirements under federal law, Act 395 required that the prior authorization program "[p]rovide for the dispensing of a minimum of a seventy-two hour supply of a covered outpatient prescription drug in an emergency situation as provided by federal rule or regulation."  *See* La. Rev. Stat. Ann. § 46:153.3(B)(2)(a)(ii).  Act 395 also made clear that "[t]he department shall not implement the pharmacopoeia authorized by this Subsection until the initial pharmacopoeia is submitted to and approved by the House and Senate

Committees on Health and Welfare."  2001 La. Acts 395, *adding* La. Rev. Stat. Ann. §
46:153.3(C)(5)(c).

91.     In addition to authorizing the P&T Committee and a prior authorization program,
Act 395 also empowered the Drug Utilization Review ("DUR") Board to "limit aberrant practice
patterns based upon peer-based practice patterns," but stated that "[n]othing contained herein
shall be interpreted or construed as to interfere with the provisions of Paragraph (2) of this
Subsection," which established the prior authorization program.  *See* 2001 La. Acts 395,
*amending* La. Rev. Stat. Ann. § 46:153.3(B)(3)(a).  Thus the DUR Board's power was very
limited, and it did not have the statutorily mandated power of the P&T Committee to establish a
pharmacopoeia and could not act in the P&T Committee's place.

C.     **LDHH Was Required to Reimburse for Medicaid Vioxx Prescriptions at All
Times Vioxx Was on the Market.**

92.     Because Vioxx was a "covered outpatient drug" subject to a rebate agreement
between the Secretary of HHS and Merck, LDHH was required under federal and Louisiana law
to provide reimbursements for Vioxx prescriptions the entire time the drug was on the market.
In 1999, when Vioxx was approved by the FDA, LDHH had an open formulary system, as
discussed above, and therefore was required to cover Vioxx prescriptions automatically.  (*See*
paragraph 86, *supra; see also* 4/16/10 Trial Tr. at 868:5-8, 896:4-6.)

93.     Following Louisiana's enactment of Act 395 and LDHH's establishment of the
prior authorization program in 2002, all covered drugs were included on the preferred drug list
until the P&T Committee determined whether they should be included on the list or subject to a
prior authorization requirement.  (4/15/10 Trial Tr. at 727:10-728:23; 4/16/10 Trial Tr. at 831:9-
20, 874:7-875:18.)  Vioxx prescriptions thus remained automatically reimbursable until June 10,
2002, when the P&T Committee's May 8, 2002 recommendation that Vioxx be excluded from

36

the preferred drug list was adopted by the Secretary of LDHH and became effective.  (4/15/10 Trial Tr. at 738:9-17 (COX-2 inhibitors were first considered for inclusion on the preferred drug list on May 8, 2002); 4/16/10 Trial Tr. at 838:13-840:11 (Vioxx was not recommended for the preferred drug list by the P&T Committee and required a prior authorization when the list was implemented on June 10, 2002).)

94.     Nevertheless, LDHH's obligation to pay for Vioxx prescriptions continued even after the implementation of the preferred drug list.  When it established the prior authorization program, LDHH prohibited for six months any restriction on prescriptions written prior to June 10, 2002, the date the prior authorization program became effective.  (DX3639 at 5; *see also* 4/13/10 Trial Tr. at 418:17-420:13.)  At that six-month point, reimbursement of Vioxx prescriptions was conditioned on prior authorization.  But while physicians were required to seek prior authorization, such authorization could not be withheld.  (Deposition of Gina C. Biglane, Oct. 28, 2009 ("10/28/09 Biglane Dep.") at 93:18-94:7; 4/16/10 Trial Tr. at 873:5-16.)  *See* also 28 La. Reg. 1639, 1640 (July 2002).  The Louisiana prior authorization program has a policy of deferring to prescribing physicians and does not appear ever to have rejected a request for prior authorization. (4/16/10 Trial Tr. at 823:18-824:1.)  Indeed, Secretary Hood chose not even to create a denial process.  (4/16/10 Trial Tr. at 824:2-9.)

95.     On July 14, 2003, LDHH Secretary David Hood accepted the recommendation of the P&T Committee to place Vioxx on the preferred drug list, making it once again automatically reimbursable.  (*See* 4/15/10 Trial Tr. at 749:23-750:16.)

1015096v.1

VII.   **PLAINTIFF HAS NOT PRODUCED ADEQUATE AND CREDIBLE EVIDENCE THAT LDHH COULD HAVE AND WOULD HAVE ESTABLISHED AN EXCLUSIVE FORMULARY IN ORDER TO DENY VIOXX REIMBURSEMENTS IN THEIR ENTIRETY HAD IT KNOWN DIFFERENT INFORMATION ABOUT THE DRUG.**

96.     Plaintiff does not dispute that, under the Louisiana Medicaid pharmacy programs actually in place from 1999 to 2004, the State was required to reimburse Medicaid recipients for Vioxx prescriptions.  Plaintiff does contend that it would have taken steps to modify its pharmacy program in order to deny reimbursement for Vioxx entirely if it had had different information about the drug.

97.     As set forth in paragraph 82, *supra,* there are only four circumstances under which a state Medicaid program is entitled to deny coverage for a covered outpatient drug. Plaintiff offered no competent evidence that any of the four circumstances were applicable here. Plaintiff claimed that, had it known of different information about Vioxx, LDHH would have established a restrictive formulary pursuant to 42 U.S.C. § 1396r-8(d)(4) for the purpose of excluding Vioxx from the formulary, and thereby denied coverage for the drug.  The evidence shows, however, that LDHH could not, and would not, have established such a formulary.

A.     **The Evidence Shows that LDHH Could Not Have Instituted a Restrictive Medicaid Formulary.**

98.     The evidence presented at trial demonstrates that for legal, political and institutional reasons, LDHH could not have instituted a restrictive formulary while Vioxx was on the market and that even a restrictive formulary would not have permitted LDHH to deny reimbursements for Vioxx entirely.

99.     As discussed above, until the Louisiana Legislature passed Act 395 in 2001, LDHH was legally prohibited from establishing a restrictive formulary.  La. Rev. Stat. Ann. § 46:153.3(B) (1999).

38

100.    Although Plaintiff contends damages should be calculated from June 13, 2001, the date Act 395 took effect, even Mr. Hood acknowledged that a restrictive formulary could not have been established immediately.  (4/13/10 Trial Tr. at 418:3-5.)  Act 395 was not self-executing, and LDHH did not promulgate regulations to implement it until a year later.  *See* 28 La. Reg. 979-80 (May 2002); 28 La. Reg. 1639 (July 2002).  (*See also* 4/13/10 Trial Tr. at 406:18-21, 413:24-414:14, 416:24-417:2.)  In the interim, LDHH was required to identify P&T Committee members to be appointed by the Governor, form the Committee, establish Committee by-laws, contract with Provider Synergies to perform drug assessments, review drugs to construct the initial preferred drug list, and gain approval of the list from the legislature.  (*Id.* at 417:12-418:5; 4/15/10 Trial Tr. at 728:24-730:14; *see also* 4/15/10 Trial Tr. at 677:16-678:5 (Jerry Wells describing steps required to set up prior authorization program in Florida).)

101.    These legalities would have had to be completed for an exclusive formulary as well.  *See* 42 U.S.C. § 1396r-8(d)(4)(A) (a restrictive formulary must be "developed by a committee consisting of physicians, pharmacists, and other appropriate individuals appointed by the Governor of the State");  La. Rev. Stat. Ann. § 46:153.3(D)(5)(d) (pharmacopoeia authorized by Act 395 cannot be implemented until initial pharmacopoeia is submitted to and approved by the Louisiana House and Senate committees on health and welfare).  While federal Medicaid law does permit a state's drug use review ("DUR") board to create an exclusive formulary if so authorized by the state (42 U.S.C. § 1396r-8(d)(4)(A)), Act 395 created the P&T Committee and authorized it to "develop[ ] and maintain[ ] a pharmacopoeia established in conjunction with a prior approval process."  2001 La. Acts 395, *adding* La. Rev. Stat. Ann. § 46:153.3(C)(5)(a). Development of an exclusive formulary by the DUR Board was not authorized by Act 395 and would have conflicted with the establishment of a P&T Committee.

39

102.    To establish an exclusive formulary, the State would also have been required to
file an amended state plan and seek approval from the federal Center for Medicare and Medicaid
Services ("CMS").  *See* 42 C.F.R. § 430.12(c).  (*See also* 4/13/10 Trial Tr. at 444:3-8.)  David
Hood, the LDHH Secretary from 1998 to 2004, admitted that he had never heard of any state
making such an application.  (*Id.* at 368:18-22, 444:9-12.)

103.    Additionally, the evidence shows that LDHH would not have been able to gain
the necessary legislative approval if it had attempted to institute a restrictive formulary.  In
general, proposals for restrictive formularies face political opposition from physician societies,
provider organizations, pharmacy societies and the pharmaceutical industry.  (4/15/10 Trial Tr. at
671:14-16, 671:22-672:3.)  This puts pressure on legislators to resist them.  (*Id.*)  Louisiana had
experimented with a closed formulary in the 1980s, and it had met with considerable opposition
from physicians, pharmacists and patient advocates.  (4/13/10 Trial Tr. at 402:18-403:15,
451:19-24.)  Consequently the State moved to an open formulary which, as discussed in
paragraphs 86, *supra*, required the Medicaid program to reimburse for all covered prescription
drugs.  *See* La. Rev. Stat. Ann. § 46:153.3(B)(2) (1999).

104.    When LDHH began to work toward passage of Act 395, the State wanted a
system that would ensure that when a doctor made an individual prescribing decision, there was
a mechanism in place to get the prescribed drug to the patient.  (*See* 4/13/10 Trial Tr. at 431:16-
23.)  As Mr. Hood put it, "the State wanted to allow individual prescribing decisions."  (*Id.* at
431:24-432:3.)  A restrictive formulary would not have been politically "palatable."  (*Id.* at
409:15-19.)  The fact that Act 395 provided for a prior authorization process, but no actual denial
of prescriptions, was a "selling point" that helped to get "buy in" from other actors in the
political process.  (*See id.* at 4/16/10 Trial Tr. at 824:10-17.)

40

105.    A program with a preferred drug list and prior authorization was also politically attractive because such a program in Florida showed that it could save the State money. (4/13/10 Trial Tr. at 411:14-18; 4/15/10 Trial Tr. at 671:3-13, 674:22-675:7; 4/16/10 Trial Tr. at 868:13-869:10.)  By contrast, Mr. Hood knew of no state that had instituted a restrictive formulary.  (4/13/10 Trial Tr. at 444:9-12.)

106.    Legislative opposition to a restrictive formulary was evident even after Act 395 was passed.  LDHH was required to return to the Louisiana House and Senate Joint Committee on Health and Welfare to gain approval of the prior authorization process and the initial formulary it had designed pursuant to the powers granted by Act 395.  *See* 2001 La. Acts 395, *adding* La. Rev. Stat. Ann. § 46:153.3(C)(5)(c).  (*See also* 4/13/10 Trial Tr. at 404:1-13, 406:2-25.)  Mr. Hood admitted that, in the course of this process, legislators expressed their opposition to any system akin to the closed formulary of the 1980s.  (*Id.* at 407:3-7, 407:23-408:4, 408:9-16.)  The Chairman of the Committee declared that the legislative intent was never to institute a formulary where LDHH "could say automatically these drugs are excluded."  (Testimony Before the Louisiana Health and Welfare Committee, May 9, 2002 (Ex. A to Merck's Notice of Filing of Transcript of Certain Testimony Before Legislative Committee Hearings Played During the Testimony of David W. Hood).)  Rather, he insisted, the legislature "didn't do anything different other than say it's a preferred provider list."  As LDHH Secretary, Mr. Hood assured the Committee that the prior authorization program would not restrict access to drugs.  (*Id.* at 407:22-408:24, 409:15-19.)  Specifically, he stated:

> There was brought up the concern about would this be a replay of the 1989 formulary that was put into effect.  The answer is no.  There was no prior authorization in 1989.  That meant that it was either you use the drug on the list or you don't get the drug, period.  But that's not the case now.  We do have prior authorization.

41

(Testimony Before the Louisiana Health and Welfare Committee, May 9, 2002 (Ex. A to Merck's Notice of Filing of Transcript of Certain Testimony Before Legislative Committee Hearings Played During the Testimony of David W. Hood).)

107.    In this atmosphere, the LDHH hewed closely to the non-restrictive spirit of Act 395.  When it established the prior authorization program, it prohibited for six months any restriction on prescriptions written prior to June 10, 2002, the date the prior authorization program became effective.  (DX3639 at 5; *see also* 4/13/10 Trial Tr. at 418:17-420:13.)

108.    Given the political opposition to restricting Medicaid recipients' access to FDA-approved drugs, it is not possible to conclude that, had LDHH received different or additional information about Vioxx, it could have garnered the necessary legislative approval to institute a restrictive formulary, radically transforming the Louisiana Medicaid pharmacy program, for the narrow purpose of trying to deny reimbursement for a single drug.

109.    Moreover, even if LDHH had been able to establish a restrictive formulary, it would not have been able to deny reimbursement for Vioxx entirely.  Federal Medicaid law requires that if a state establishes a restrictive formulary pursuant to 42 U.S.C. § 1396r-8(d)(4)(C),  it must also establish a prior authorization program that is consistent with 42 U.S.C. § 1396r-8(d)(5).  *See* 42 U.S.C. § 1396r-8(d)(4)(D).  Prior authorization programs must permit access to a 72-hour supply of covered drugs in an emergency situation.  42 U.S.C. § 1396r-8(d)(5).  Because Vioxx was approved for treatment of acute pain, with specific indications for migraine and dysmenorrhea, some requests for prior authorization and emergency access would have been received and granted.

B.      **Plaintiff's Claim That, Had It Received Different Information About Vioxx, It Would Have Acted to Deny Reimbursement for the Drug Lacks Factual Support and Is Contradicted by the Record.**

110.    Apart from the question of whether LDHH *could* have instituted a restrictive

formulary while Vioxx was on the market, Plaintiff offered no support for the claim that, had the

State possessed different clinical information about Vioxx, it *would* have sought to restrict Vioxx

Medicaid reimbursement entirely.  The record shows, in fact, that neither LDHH nor any

reasonable department of health and hospitals would have attempted to establish a restrictive

Medicaid formulary for the sole purpose of cutting off reimbursements for Vioxx.

        1.    **David Hood's Testimony Is Not Sufficient to Establish that LDHH Would Have Sought a Restrictive Formulary.**

      111.    David Hood was the only witness the State offered in support of its claim that,

had it possessed different information, it would have established a restrictive Medicaid formulary

in order to deny coverage for Vioxx.  Mr. Hood testified that if he had learned that Vioxx was a

"defective drug," he would have "done everything that [he] possibly could" to ensure that

Medicaid recipients did not receive the drug.  (4/13/10 Trial Tr. at 386:15-387:17; *see also id.* at

453:19-454:1.)  Mr. Hood's testimony is not sufficient to carry Plaintiff's evidentiary burden.

      112.    Mr. Hood's claim lacks foundation because Mr. Hood testified that he does not

actually know whether Vioxx possessed any defect alleged by Plaintiff, whether Vioxx

possessed any risks of which he allegedly was not informed, whether Merck withheld or

misrepresented any results from clinical trials of Vioxx, or whether Merck failed to test Vioxx

adequately, as alleged by Plaintiff.  (*Id.* at 390:7-394:4, 396:17-398:5, 400:6-24.)  That is, Mr.

Hood does not know if there was relevant information that he did not receive and that would

have caused him to deny reimbursements for Vioxx.  Indeed, while Mr. Hood claimed that

certain information about Merck's clinical studies would have prompted him to seek to deny

reimbursements, he admitted that he does not even understand Plaintiff's allegations about

Merck's reporting and analysis of its clinical trials.  (4/13/10 Trial Tr. at 400:18-24.)  In other

words, by his own account, Mr. Hood does not know the significance of the very information

that he contended would have incited him to overhaul the Louisiana Medicaid pharmacy program.

113.    Moreover, Mr. Hood admitted that, as Secretary of LDHH, he never made any decisions about a prescription drug, including Vioxx, based on his independent assessment or understanding of the drug's risks and benefits.  (4/13/10 Trial Tr. at 423:8-14, 426:21-427:5.) Mr. Hood is not a medical doctor and he readily acknowledged that he was not qualified to make independent assessments of the clinical risks and benefits of prescription drugs.  (*Id.* at 400:16-17, 426:7-17.)  For such assessments, he relied upon the judgment of the LDHH staff and the doctors, pharmacists and pharmacologists on the P&T Committee.  (*See id.* at 423:8-14, 426:18-20, 372:10-15, 372:21-373:1, 373:12-374:2, 375:15-25; *see also* 4/16/10 Trial Tr. at 830:24-831:2.)  The P&T Committee, in turn, contracted with Provider Synergies to complete clinical evaluations of drugs and make recommendations to the Committee about which products to place on the preferred drug list.  (4/13/10 Trial Tr. at 380:7-15, 432:9-20; *see also id.* at 434:13-20.)  Mr. Hood testified that he was aware that Vioxx carried cardiovascular and gastrointestinal risks, but he relied upon the judgment of the P&T Committee and Provider Synergies.  (*Id.* at 421:17-423:14, 426:18-427:5.)

114.    Mr. Hood cannot provide the factual predicate for how Plaintiff would have assessed different clinical information about Vioxx with regard to his own actions because, as mentioned above, assessing clinical risks and benefits was not his role at LDHH or on the P&T Committee.  Nor can Mr. Hood supply that factual predicate with regard to other State actors. Mr. Hood does not know what information P&T Committee members relied upon in making recommendations about Vioxx to him.  (*Id.* at 425:25-426:6.)  Specifically, he does not know if any recommendation about Vioxx depended on the Committee's understanding of Vioxx's

gastrointestinal benefits for patients not using steroids.  (*Id.* at 423:15-425:22.)  Similarly, Mr. Hood does not know what information Provider Synergies relied upon in completing its drug assessments or what recommendations about Vioxx Provider Synergies might have made to the P&T Committee had it received different information about the drug.  (*Id.* at 435:4-9, 436:9-437:1.)  Nor does the record contain information elsewhere about what recommendations might have been made to Mr. Hood by the LDHH staff, the P&T Committee and/or Provider Synergies if different information about Vioxx had been supplied.

115.     Because Mr. Hood made decisions about drugs in reliance on the recommendations of LDHH staff, P&T Committee members and Provider Synergies and there is no evidence in the record of what recommendations these entities would have made had they possessed different data, it is not possible to conclude that Mr. Hood would have acted to deny reimbursements for Vioxx had the State received different information about the drug.

116.     Mr. Hood also conceded that as LDHH Secretary he never even considered restricting the State's reimbursement of an FDA-approved drug.  (4/13/10 Trial Tr. at 428:2-5.)  He acknowledged that, while Secretary, he did not know of any authority under which he could have instituted a restrictive formulary had he decided one was necessary on account of Vioxx.  (*Id.* at 438:20-439:14, 439:24-440:7.)

117.     Mr. Hood testified that in order to deny reimbursement for Vioxx prescriptions, he would have consulted with LDHH attorneys.  (*Id.* at 381:13-382:5; *see also id.* at 440:8-21.)  This is not sufficient to establish that the State would have pursued the option of a restrictive formulary.  There is no factual record from which it could be inferred that Mr. Hood would have been advised that a restrictive formulary was an option.  This is particularly so given the political opposition to such a formulary.  It is simply impossible to infer from a blank record that an

unnamed lawyer from the State would have advised LDHH that Act 395 allowed the Department to pursue a completely restrictive formulary.  In fact, Charles Castille, an attorney and LDHH Undersecretary, testified that "the State could not have, for example, have done what, let's say, the FDA could do, and take a drug off the market.  We obviously did not have that authority." (*See* 4/15/10 Trial Tr. at 742:11-743:4.)  Taking a drug off the preferred drug list was "the most restrictive thing" LDHH could do, Mr. Castille testified.  (*Id.* at 743:3-4.)

118.    Plaintiff's lack of a factual record is compounded by the fact that Mr. Hood was unfamiliar with (or could not recall) the constraints federal law imposed on LDHH's formulary options.  (*See* 4/13/10 Trial Tr. at 443:20-445:12.)

119.    Plaintiff attempts to sidestep this absence of proof by suggesting that the missing information was that Vioxx was "defective."  But Plaintiff cannot define away its factual burden. Plaintiff must establish who could have and would have found that Vioxx was "defective."  As discussed above, in paragraphs 7-8, *supra,* throughout the relevant time period Vioxx was approved by the FDA as safe and effective, and Vioxx was a "covered drug" under the Medicaid regime.  Thus, the but-for determination that Vioxx was "defective" must be shown with regard to state actors, whether it is the P&T Committee, LDHH, Provider Synergies or someone else involved in assessing clinical information for Louisiana's Medicaid pharmacy program.  Plaintiff simply provided no evidence as to what any of these state actors would have done with different clinical information about Vioxx.

2.    **LDHH Officials Did Not Believe They Had Authority to Establish a Restrictive Formulary and Never Considered Doing So.**

120.    Plaintiff offered no evidence that anyone affiliated with LDHH believed during the time Vioxx was on the market that LDHH had the authority to seek a restrictive formulary. Several of the LDHH witnesses testified that their perception was that the preferred drug list with

46

1015096v.1

prior authorization was the most restrictive means available to deny Medicaid reimbursement for a covered drug.  For example, Ben Bearden, the Medicaid Director from March 2000 through December 2005, confirmed that putting a drug on the preferred drug list and requiring a prior authorization was "the most restrictive system that could be in place during the closed formulary period."  (*See* 4/16/10 Trial Tr. at 857:20-858:1, 858:15-859:13, 886:3-6; *see also* 4/15/10 Trial Tr. at 742:11-743:4 (Castille); 10/28/09 Biglane Dep. at 85:2-5.)  The contemporaneous belief of LDHH personnel regarding the scope of the department's authority is probative of what the State would have done in different circumstances.

121.    Mr. Hood testified that he would have been required to return to the legislature to get a restrictive formulary specifically authorized. (4/13/10 Trial Tr. at 450:23-451:4.)  As discussed above, however, Mr. Hood admitted that in 2002 legislators had expressed sharp opposition to any return to the strictures of a closed formulary (*see id.* at 407:3-7, 407:23-408:4, 408:9-16) and that he "[took] seriously any directive from senators and representatives who passed Act 395 in deciding how [he] would exercise [his] powers."  (*Id.* at 407:23- 408:8.)

122.    Like the Legislature, the P&T Committee would not have been receptive to establishing a restrictive formulary in order to deny reimbursements for Vioxx.  When the FDA initially approved Vioxx for sale in 1999 and when it approved it for additional indications in April 2002, March 2004 and August 2004, after the VIGOR study was completed, the FDA repeatedly found that Vioxx was safe and effective for its intended uses.  (*See* DX73; DX277; DX321; DX324; 4/20/10 Trial Tr. at 1210:6-1215:14.)  *See also* 21 U.S.C. § 355(a), (d).  All state Medicaid programs rely upon the FDA for determinations about the safety and efficacy of prescription drugs.  (4/15/10 Trial Tr. at 682:16-19.)  Louisiana is no different.  Mr. Hood testified that he was unaware of any instance in which the Louisiana P&T Committee came to a

decision about the safety and/or efficacy of an FDA-approved drug that was at odds with the FDA's determination.  (4/13/10 Trial Tr. at 430:5-22, 431:8-15; *see also* 4/15/10 Trial Tr. at 722:7-11 (Mr. Castille testifying that the State of Louisiana does not make determinations independent of the FDA about a drug's safety and efficacy).)  Mr. Hood acknowledged that "FDA approval of a medicine is important to DHH and the P&T Committee" as "an indication" that a product is "a safe drug."  (4/13/10 Trial Tr. at 429:20-23.)

123.     Finally, according to Mr. Hood himself, neither the P&T Committee nor other State officials ever entertained the idea of adopting an exclusive formulary in order to deny access to an FDA-approved drug while he was LDHH Secretary, despite the P&T Committee's spirited discussions of drugs' risks.  (*Id.* at 430:5-22.)  Nor does Mr. Hood have any knowledge of any more recent discussions among Louisiana officials about moving to a system that would allow the State to completely restrict reimbursement for an FDA-approved drug, although such discussions would likely have been known in the Medicaid policy circles in which he continues to work.  (*Id.* at 428:16-429:14.)

> 3.     **The Actions of LDHH and Other Medicaid Programs Demonstrate that a Reasonable Department of Health and Hospitals Would Not Have Established a Restrictive Formulary in Response to Different Information About Vioxx.**

124.     One can determine what a reasonable department of health and hospitals would have done if it had received different information about Vioxx by examining what LDHH and other departments of health and hospitals actually did in a closely analogous situation.  As discussed above (*see* paragraphs 47-48, *supra*), on April 6, 2005, FDA's Center for Drug Evaluation and Research issued a "Decision Memorandum" setting forth a comprehensive analysis of the available data on traditional NSAIDs, such as ibuprofen and diclofenac, as well as COX-2 inhibitors such as Vioxx and Celebrex.  (*See* DX 338.)  The Decision Memorandum

1015096v.1

concluded that there is a "class effect" for increased cardiovascular risks with all NSAIDs (except aspirin and possibly naproxen) and that it was not possible, based on available clinical trial data, to create a "rank ordering" of these drugs.  (*Id.*)  In other words, in 2005 the FDA concluded that Celebrex and traditional NSAIDs (except aspirin and naproxen) carried cardiovascular risks at least equal to, and possibly greater than, those of Vioxx.  Consequently, the FDA required manufacturers of all NSAIDs -- including COX-2 inhibitors -- to place a "black box" warning on the drugs' labeling about such potential cardiovascular risks.  (DX338; *see also* 4/15/10 Trial Tr. at 795:10-22.)

125.   LDHH did not institute an exclusive formulary in response to this development. Instead, it continued to keep these drugs on its preferred drug list.  (*See* DX 2165.)  As Plaintiff's expert Dr. John Abramson testified, Celebrex, another COX-2 inhibitor, was found in 2004 to carry an increased risk of cardiovascular thrombotic events and it possessed no statistically significant gastrointestinal benefit.  (4/15/10 Trial Tr. at 641:6-15.)  But despite these facts, and despite the addition of a black box cardiovascular warning to the Celebrex label in 2005, LDHH continued to include Celebrex on its preferred drug list as recently as 2008.  (*Id.* at 642:2-10; DX2165; DX2507.)  Similarly, the NSAID diclofenac has been shown to carry a statistically significant increased cardiovascular risk, yet even after that risk was established, diclofenac remained on the Louisiana preferred drug list.  (4/19/10 Trial Tr. at 1047:20-1050:3; DX2165.) In fact, the Louisiana preferred drug list contains a large number of drugs that carry black box warnings, as do the preferred drug lists of many other states.  (4/15/10 Trial Tr. at 686:6-11, 690:22-691:4.)

126.   Jerry Wells was the only expert witness in the case to testify about the practices of state Medicaid programs in general.  Mr. Wells, a registered pharmacist, worked for the Florida

49

Medicaid program for twenty-four years, retiring as the Bureau Chief for the Pharmacy Program for the State of Florida in 2007.  (4/15/10 Trial Tr. at 652:2-10, 652:17-20, 653:6-14.)  In that capacity, he was the administrator manager of the Florida P&T Committee from 2001 to 2007, and was responsible for the day-to-day operations of the prescription drug benefit under Medicaid, including the implementation and development of a prior authorization program.  (*Id.* at 653:10-654:2.).  Mr. Wells was and continues to be a member of both the Southern Association of Medicaid Pharmacy Administrators and the American Pharmacy Administrators Association, and chaired both groups on multiple occasions.  (4/15/10 Trial Tr. at 654:3-8.)

127.    Mr. Wells testified that he was unaware of *any* state Medicaid program that altered its formulary as a consequence of the FDA's findings about the potential cardiovascular risks of NSAIDs.  (4/15/10 Trial Tr. at 683:13-685:7.)  Mr. Wells also testified that he knew of no state that had instituted an exclusive formulary and denied all reimbursement for a Medicaid-eligible drug in response to any black box warning about cardiovascular risks or other safety concerns about a single drug.  (4/15/10 Trial Tr. at 686:12-16, 690:7-12.)  Nor is Mr. Wells aware of any state Medicaid program that has excluded an FDA-approved drug from its formulary and stated in the requisite published explanation for the exclusion that it had concluded the drug was not safe and effective, despite the FDA's findings to the contrary. (4/15/10 Trial Tr. at 682:24-683:4.)

128.    The practices of LDHH and other state Medicaid programs in response to the FDA's finding of an NSAID class cardiovascular risk constitute powerful evidence that a reasonable department of health and hospitals would not have instituted a restrictive formulary in response to Merck's disclosure of allegedly concealed information about Vioxx.  Notably, Plaintiff's expert Dr. David Kessler testified that the cardiovascular information in the Vioxx

50

label proposed by the FDA in October 2001 would have been appropriate to warn physicians of

the drug's potential cardiovascular risks as long as it was contained in the label's "warning"

section.  (4/12/10 Trial Tr. at 174:2-175:1.)  Notably Dr. Kessler declined to state that the Vioxx

cardiovascular warning should have been a prominent "black box" warning such as that the FDA

has required of all NSAIDs since 2005.  (*See* 4/12/10 Trial Tr. at 179:19-22; 4/20/10 Trial Tr. at

1267:10-17.)  One cannot conclude that, had the less powerful warning Dr. Kessler endorsed

been included in the Vioxx label, the LDHH would have instituted a restrictive formulary to

deny reimbursement for Vioxx when LDHH not only continued to reimburse NSAIDs with a

black box warning, but included them on the preferred drug list.

## VIII.   FEDERAL MEDICAID LAW DID NOT PERMIT PLAINTIFF TO REMOVE VIOXX FROM A HYPOTHETICAL RESTRICTIVE FORMULARY.

129.    Even if the State had been able and willing to establish a restrictive formulary as a

result of concerns about a single drug, the evidence shows that it could not have excluded Vioxx

from such a formulary consistent with 42 U.S.C. § 1396r-8(d)(4)(C).  (4/13/10 Trial Tr. at 444:9-

12.)  Under that provision, a State can only exclude a drug from the formulary "if, *based on the*

*drug's labeling* . . . the excluded drug does not have a significant, clinically meaningful

therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for

such population over other drugs included in the formulary and there is a written explanation

(available to the public) of the basis for the exclusion."  42 U.S.C. § 1396r-8(d)(4)(C) (emphasis

added).  In other words, any action to remove a drug from a Medicaid restrictive formulary must

be based on the drug's safety and effectiveness as set forth in its FDA-approved label -- *not* on

an independent assessment of the drug's risks and benefits by a state Medicaid program using

other evidence or information.  Plaintiff has offered no evidence that it could have satisfied this

requirement.  Nor has it shown that it could have, or would have, made the necessary public

written findings supporting its position, which would have contradicted the FDA, which repeatedly approved Vioxx as safe and effective.

130.    Vioxx labeling established that the drug possessed "significant, clinically meaningful therapeutic advantage[s]" over comparator drugs, such as other NSAIDs.  First and most significantly, Vioxx offered superior gastrointestinal safety.  While the 1999 Vioxx label stated that it was "unclear" how the rates of gastrointestinal complications found with traditional NSAID usage applied to Vioxx, the label also included data from two endoscopy studies comparing the rates of endoscopically detectable gastroduodenal ulcers in patients taking Vioxx, ibuprofen or placebo.  (DX 73 at MRK 99420021418-20.)  The label reported: "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily." (*Id.* at MRK 99420021418.)  Moreover, the table of study data showed that the rate of endoscopically detectable ulcers in patients taking Vioxx was equivalent to the rate of such ulcers in patients taking placebo.  (*Id.* at MRK 99420021419-20.)  There is no evidence that any comparator non-selective NSAID offered this degree of gastrointestinal safety.

131.    The 2002 Vioxx label reported data from the VIGOR clinical trial and stated: "the results of the VIOXX GI outcomes research (VIGOR) study demonstrate that in patients treated with VIOXX, the risk of GI toxicity with VIOXX 50 mg daily is significantly less than with naproxen 500 mg twice daily."  (DX 273 at MRK-LBL0000064.)  Again, Plaintiff has not produced evidence that any other NSAID possessed equal gastrointestinal safety so as to provide grounds for removing Vioxx from a restrictive formulary consistent with the terms set forth in 42 U.S.C. § 1396r-8(d)(4)(C).

132.    In fact, Plaintiff's own gastroenterology expert, Dr. David Y. Graham, testified that based on the available data, Vioxx "would be a better choice than a traditional NSAID" for patients taking steroids.  (4/13/10 Trial Tr. at 355:9-15; *see also id.* at 355:3-6 (Dr. Graham stating that, for steroid users, Vioxx is better than traditional NSAIDs for safety).)  Dr. Sales testified that Vioxx conferred a clinically meaningful gastrointestinal benefit, compared to traditional NSAIDs, and that this benefit was not limited to steroid users.   This gastrointestinal benefit was reflected in Vioxx's labeling.  (4/20/10 Trial Tr. at 1136:3-1137:6; 1194:1-21 (Sales).)  In addition, as previously discussed, the 2005 FDA Decision Memorandum found that of the coxibs, only Vioxx had been shown to reduce the risk of serious gastrointestinal bleeding compared to a traditional NSAID.  (4/20/10 Trial Tr. at 1230:7-10, 1275:24-1276:2.)  The FDA confirmed that position in 2007 and has continued to hold it to this day.  (*Id.* at 1230:20-1231:1, 1276:20-22.)

133.    Vioxx also offered other therapeutic advantages over comparator drugs, evident in its labeling.  Unlike ibuprofen or naproxen, it required only once-a-day dosing, which increases the chance of patient compliance with a treatment regimen.  (*See* DX 273 at MRK-LBL0000066; 4/19/10 Trial Tr. at 920:24-921:8; 4/20/10 Trial Tr. at 1275:1-10.)  Additionally, approximately 10% of the population has sulfa allergies and, unlike Celebrex or Bextra, Vioxx could be used with that population.  (4/19/10 Trial Tr. at 921:9-19); *compare* DX 273 at MRK-LBL0000064 (Contraindications) with DX2507 (Celebrex, 2006 PDR) (Contraindications).  Unlike ibuprofen**,** Vioxx did not interfere with aspirin's antiplatelet effects, which was a clinically meaningful advantage to clinicians and described on the labeling.  (DX 273 at MRK-LBL0000065; 4/19/10 Trial Tr. at 964:13-965:10; 4/20/10 Trial Tr. at 1275:11-16.)  In addition, Vioxx does not compete with aspirin for COX-1 binding sites -- again unlike traditional NSAIDs such as

ibuprofen.  This lack of aspirin competition, which is reflected in the Vioxx labeling, is a meaningful clinical advantage of Vioxx over traditional NSAIDs.  (4/19/10 Trial Tr. at 965:11-966:10.)  Vioxx also carried indications that other NSAIDs did not, including migraine and juvenile rheumatoid arthritis.  (4/20/10 Trial Tr. at 1275:17-23.)

134.    All of these uncontroverted attributes of Vioxx were, according to Merck's experts, clinically meaningful therapeutic advantages over other treatments.  (4/19/10 Trial Tr. at 921:5-8, 17-19, 965:5-8, 966:2-7; 4/20/10 Trial Tr. at 1274:16-25.)  Because Vioxx possessed such advantages over comparator drugs, Plaintiff could not have excluded it from an exclusive formulary consistent with 42 U.S.C. § 1396r-8(d)(4)(C).

## IX.    EVEN IF LDHH HAD EXCLUDED VIOXX FROM A HYPOTHETICAL RESTRICTIVE FORMULARY, FEDERAL LAW WOULD HAVE REQUIRED SOME VIOXX REIMBURSEMENT UNDER A PRIOR AUTHORIZATION PROGRAM.

135.    Apart from the list of excluded drug classes specifically enumerated under 42 U.S.C. § 1396r-8(d)(2), it is not possible, under OBRA 90, to have an entirely closed formulary and absolutely exclude Medicaid reimbursement of an FDA approved drug.  (4/15/10 Trial. Tr. at 669:18-670:2.)

136.    Even if Plaintiff had proven that LDHH would reasonably have instituted a restrictive formulary under federal law and made the public findings necessary to exclude Vioxx from that formulary, Plaintiff still could not have entirely ceased Vioxx reimbursement.  This is because all the Medicaid pharmacy options allowed under federal law, including programs with a restricted formulary, require a prior authorization program for all covered drugs except for those expressly excluded under 42 U.S.C. § 1396r-8(d)(2);  this is what Act 395 instituted.  (4/15/10 Trial Tr. at 675:24-676:11.)  Specifically, the federal Medicaid statute provides that if a drug is excluded from a formulary pursuant to 42 U.S.C. § 1396r-8(d)(4)(C), the state must establish a

54

prior authorization program that is consistent with § 1396r-8(d)(5).  *See* 42 U.S.C. § 1396r-8(d)(4)(D).  For example, the statute requires that all prior authorization programs permit access to a 72-hour supply of covered drugs in an emergency situation, and respond to a request for authorization for a chronic condition within 24 hours or less.  42 U.S.C. § 1396r-8(d)(5).  (*See also* 4/15/10 Trial Tr. at 672:11-673:5.)   Mr. Hood conceded that he was not aware of these provisions when he claimed that he would have acted to cut off reimbursements for Vioxx. (4/13/10 Trial Tr. at 445:9-447:1.)

137.    Thus, no matter what formulary system LDHH chose to adopt (including a restrictive formulary), the State would have been required to under federal law to reimburse Vioxx prescriptions for up to 72 hours in an emergency.  Plaintiff offered no evidence at trial to establish that such prior authorization requests would not have been sought for Vioxx.  Given Vioxx's approved indications for acute pain, migraine, and other short term uses, it is reasonable to infer the contrary.  Even with a restrictive formulary, therefore, some number of prior authorization requests for Vioxx would have been sought and would have been granted under 42 U.S.C. § 1396r-8(d)(5).  Once it is determined that at least some prior authorization requests would have been granted under any formulary system, to establish causation for its restitution claim, Plaintiff was required to offer individualized -- not aggregate -- proof of the decisions physicians would have made.  (*See* Summ. J. Order at 12-15.)  Plaintiff failed to do so.

138.    Because Vioxx was a covered drug that had a rebate agreement, under federal Medicaid law, the State had the responsibility to allow some access to Vioxx either through a prior authorization program or unrestricted coverage.  (4/15/10 Trial Tr. at 693:12-20.)  Thus, notwithstanding his testimony that he would have acted to stop Medicaid reimbursement of Vioxx had he been told it was defective, the limit of Mr. Hood's power as LDHH Secretary was

to take a drug off the preferred drug list and subject it to a prior authorization requirement with specified criteria for its use.  (4/15/10 Trial Tr. at 687:24-689:13.)  Notably, both Mr. Bearden, the State's Medicaid Director, and Mr. Castille, the Undersecretary and former general counsel of LDHH, testified that the most restrictive thing the State could have done with respect to Vioxx was to take it off the preferred drug list and put it in the prior authorization program. (4/15/10 Trial Tr. at 742:21-743:4; 4/16/10 Trial Tr. at 886:3-6; *see also* 10/28/09 Biglane Dep. at 85:2-5.)

139.    The required prior authorization program could not be a mere sham that would not allow access to Vioxx (or any other drug), once the criteria established by the State had been met. (4/15/10 Trial Tr. at 681:11-23.)  Indeed, Mr. Wells was not aware of any state that has enacted a prior authorization program that did not ultimately permit coverage of a drug if the program's criteria were met. (4/15/10 Trial Tr. at 681:25-682:3.)  There are public policy reasons for having a prior authorization program.  The Medicaid program is designed to *extend* prescription drug access to Medicaid recipients.  It is not designed to allow state pharmacy directors to override a physician's determination of what is best for a particular patient.  (4/15/10 Trial Tr. at 681:11-24.)

140.    Louisiana's actual experience with the prior authorization system it enacted with the preferred drug list is probative here.  Louisiana did not enact a "hard" prior authorization process designed to limit access to drugs.  Rather, the State wanted to use the process as a means to educate physicians about the availability of drugs on the preferred drug list, and did not actually deny any request made under the prior authorization system, and did not even set up a denial process when the prior authorization process was implemented in 2002.  (10/28/09 Biglane Dep. at 93:16-94:7; 4/16/10 Trial Tr. at 823:15-824:17, 873:5-874:6.)  As Ms.

56

Terrebonne testified, the State doesn't reject a doctor's request for a prior authorization for a particular drug because it defers to the medical judgment of prescribing physicians to determine the best interest of the patient.  (4/16/10 Trial Tr. at 823:22-824:1.)  Additionally, the State did not want to make the prior authorization process difficult on physicians and patients in order to get support for the changes to the Medicaid program.  (*Id.* at 824:10-17.)

**X.**      **BECAUSE THE EVIDENCE SHOWS THAT VIOXX WAS A USEFUL AND VALUABLE PRODUCT, THE BENEFITS OF WHICH OUTWEIGH ITS RISKS, PLAINTIFF FAILED TO ESTABLISH THE EXISTENCE OF A REDHIBITORY DEFECT.**

141.      Far from possessing a defect that rendered it "useless," as Plaintiff has alleged, Vioxx was an effective product that conferred value on those who purchased it.  The experiences of physicians and patients, as well as clinical trials, established that Vioxx was an effective anti-inflammatory and pain reliever.  (4/19/10 Trial Tr. at 917:24-918:1, 918:24-919:11, 919:22-920:2.)  It served its intended purpose of treating acute and chronic pain and inflammation.  (*Id.* at 920:20-23.)  Indeed, for some patients who had previously tried a host of other medications, Vioxx was the only pain-reliever that worked.  (*Id.* at 922:11-19.)  This was true of the Medicaid population as well as the population at large.  (*Id.* at 923:23-924:1.)

142.      In addition to being an effective pain reliever, Vioxx carried less risk of gastrointestinal complications than other NSAIDs or COX-2 inhibitors.  As discussed in paragraph 57, *supra,* the VIGOR trial showed that patients taking Vioxx 50 mg daily -- double the recommended dose for chronic use -- had approximately half the number of clinically serious perforations, ulcers and bleeds as did patients taking naproxen 1000 mg daily.  (4/20/10 Trial Tr. at 1118:11-1119:10.)  Plaintiff's own gastroenterology expert, Dr. David Y. Graham, testified that, based on the available data, Vioxx "would be a better choice than a traditional NSAID" for patients taking steroids.  (4/13/10 Trial Tr. at 355:9-15; *see also id.* at 355:3-6 (Dr. Graham

stating that, for steroid users, Vioxx is better than traditional NSAIDs for safety).)  Dr. Sales

testified that Vioxx was safer to the gastrointestinal tract than traditional NSAIDs and that this

benefit was *not* limited to steroid users.  (4/20/10 Trial Tr. at 1136:3-18; *see also id.* at 1133:22-

1134:9.)  In addition, the 2005 FDA Decision Memorandum found that of the coxibs, only Vioxx

had been shown to reduce the risk of serious gastrointestinal bleeding compared to a traditional

NSAID.  (4/20/10 Trial Tr. at 1230:7-10, 1275:24-1276:2.)  The FDA continues to hold that

position.  (*Id.* at 1230:20-1231:1, 1276:20-22.)  As Dr. Sales noted, there have been no clinical

studies in which a coxib other than Vioxx demonstrated a lesser risk of perforations, ulcers,

bleeds or of complicated PUBs, in comparison with traditional NSAIDs.  (4/20/10 Trial Tr. at

1137:7-15.)

143.    As discussed previously, Vioxx also offered other therapeutic advantages.  Unlike

ibuprofen or naproxen, Vioxx provided once-a-day dosing, which was less inconvenient than

other NSAIDs, and increases the chance of patient compliance with the treatment regime.  (*See*

DX 273 at MRK-LBL0000066; 4/19/10 Trial Tr. at 920:24-921:8; 4/20/10 Trial Tr. at 1275:1-

10.)  Vioxx could also be used by the 10% of the population that suffers from sulfa allergies;

Celebrex and Bextra cannot.  (4/19/10 Trial Tr. at 921:9-19; *compare* DX 273 at MRK-

LBL0000064 (Contraindications) with DX2507 (Celebrex, 2006 PDR) (Contraindications).)

Moreover, Vioxx did not interfere with aspirin's antiplatelet effects, unlike ibuprofen.  (DX 273

at MRK-LBL0000065; 4/19/10 Trial Tr. at 964:13-965:10; 4/20/10 Trial Tr. at 1275:11-16.)

Vioxx also does not compete with aspirin for COX-1 binding sites -- again unlike traditional

NSAIDs such as ibuprofen.  (4/19/10 Trial Tr. at 965:11-966:7.)  Finally, Vioxx carried

indications that other NSAIDs did not, including migraine and juvenile rheumatoid arthritis.

(4/20/10 Trial Tr. at 1275:17-23.)

144.    Like all prescription drugs, Vioxx carried risks as well as benefits.  However, as discussed in Section V, *supra,* the FDA, repeatedly approved Vioxx for additional indications, thereby confirming that Vioxx's benefits outweighed its risks.  (4/20/10 Trial Tr. at 1208:8-1210:7, 1211:18-1215:19.) Moreover, Vioxx's risks were well-known by the LDHH and its P&T Committee -- as demonstrated in Section X, *infra.*

145.    Given that patients who took Vioxx received effective pain relief -- which Plaintiff does not contest -- and that the FDA determined that Vioxx's benefits outweighed its risks, the State plainly received full value for its expenditures on Vioxx.  As Dr. Wiggins explained, this is confirmed in economic terms by the fact that, after Vioxx was withdrawn from the market, Vioxx purchasers were willing to pay for other COX-2 inhibitors offering a similar type of pain relief -- that is, the same "bundle of characteristics."  (4/19/10 Trial Tr. at 1088:18-1091:1.)  Physicians' and patients' revealed preference demonstrated that the value of Vioxx was equal to its cost.  (4/19/10 Trial Tr. at 1099:25-1100:4.)

XI.    **THE LDHH AND LOUISIANA'S MEDICAID P&T COMMITTEE WERE AWARE OF THE RISKS AND BENEFITS OF VIOXX.**

146.    The evidence shows that LDHH and the Louisiana Medicaid P&T Committee were aware of Vioxx's gastrointestinal and cardiovascular risks and benefits, and that they relied on information about Vioxx from objective third-party consultants, not from marketing materials.

A.    **LDHH and the P&T Committee Relied on Information and Analyses Provided by Unbiased and Knowledgeable Consultants, Not on Information or Marketing from Pharmaceutical Companies.**

147.    Since March 19, 2002, LDHH has contracted with Provider Synergies LLC to perform clinical and economic analyses of prescription drug data for the P&T Committee, which uses that information to make recommendations about which drugs to include on the preferred

drug list.  (4/15/10 Trial Tr. at 732:11-22, 766:3-10, 768:9-19; 4/16/10 Trial Tr. at 878:11-879:4, 879:17-21, 880:11-19, 881:21-25, 896:15-19.)

148.     The P&T Committee relies heavily on both the FDA's and Provider Synergies' independent assessments of the clinical evidence regarding the risks and benefits of prescription drugs.  (*See* 4/13/10 Trial Tr. at 429:20-23; 4/15/10 Trial Tr. at 722:7-11, 766:11-17; 4/16/10 Trial Tr. at 830:9-12.)  Provider Synergies, in turn, relies "on independent, peer-reviewed, published clinical data and FDA labeling and findings as [the] primary source of information for [its] reviews."  (4/15/10 Trial Tr. at 767:16-21.)

149.     Provider Synergies briefs the P&T Committee on the clinical strengths and weaknesses of the drugs the Committee considers for placement on or exclusion from the preferred drug list.  (*See* 4/15/10 Trial Tr. at 739:14-20; 4/16/10 Trial Tr. at 880:11-19.)  As part of the briefing process, Provider Synergies supplies the P&T Committee with monographs, which include recommendations based on cost, as well as published peer-reviewed clinical data and FDA labeling.  (*See* PX439 ("Selective Cyclooxygenase (COX)-2 Inhibitors," Feb. 2002; PX426 ("Nonsteroidal Anti-inflammatories (NSAIDs)," April 2003); DX2118 ("Nonsteroidal Anti-inflammatories (NSAIDs) Review," April 2004); *see also* 4/15/10  Trial Tr. at 739:14-20, 743:17-20, 772:21-773:10; 4/16/10 Trial Tr. at 816:21-25, 881:21-882:12.)

150.     Provider Synergies does not rely on marketing materials, internal emails, or formulary dossiers from pharmaceutical companies, although it does request clinical study information from manufacturers from time to time.  (4/15/10 Trial Tr. at 775:20-23.)  Likewise, LDHH did not supply members of the P&T Committee with marketing materials about the drugs under consideration.  (4/16/10 Trial Tr. at 832:19-25.)

151.     Representatives of pharmaceutical companies play no role in discussions among

P&T Committee members.  (4/15/10 Trial Tr. at 739:21-740:4; 4/16/10 at 829:7-10.)  While

there is a public comment period at P&T Committee meetings, during the period when Vioxx

was on the market, pharmaceutical representatives were not permitted to comment during the

Committee's deliberations prior to their voting.  (4/16/10 Trial Tr. at 829:11-830:4.)  There is no

evidence in the record that any Merck representative spoke about Vioxx or COX-2 inhibitors

during any comment period.  No member of the pharmaceutical industry has ever served on the

P&T Committee.  (*See* 4/16/10 Trial Tr. at 831:3-8.)

> **B.      LDHH and the P&T Committee Were Adequately Informed About Vioxx's Risks and Benefits in 2002.**

152.     The P&T Committee first considered the status of COX-2 inhibitors -- including

Vioxx, Celebrex, and Bextra -- on May 8, 2002.  (4/15/10 Trial Tr. at 738:9-17.)  At this time,

Merck had not offered a supplemental rebate to Louisiana for its drugs.  (4/15/10 Trial Tr. at

734:10-12, 738:22-25.)

153.     Both Dr. Eiswirth and Dr. Sales testified that the information provided to the P&T

Committee by Provider Synergies adequately informed the Committee about Vioxx's potential

cardiovascular and gastrointestinal risks and benefits.  (4/19/10 Trial Tr. at 935:21-936:1;

4/20/10 Trial Tr. at 1112:20-25, 1128:18-21; *see also* 4/15/10 Trial Tr. at 744:25-745:7; 4/16/10

Trial Tr. at 839:8-13.)  Provider Synergies relied on FDA-approved labeling and published, peer-

reviewed studies, including studies that were not sponsored or published by Merck.  (4/15/10

Trial Tr. at 767:16-21.)  Dr. Valerie E. Taylor of Provider Synergies testified that Merck did not

provide Provider Synergies with inaccurate or misleading information in responding to

information requests about Vioxx.  (4/15/10 Trial Tr. at 783:3-6.)

154.     The 2002 monograph on "Selective Cyclooxygenase (COX)-2 Inhibitors" that

was distributed to P&T Committee members accurately reported the results of controlled clinical

trials, including VIGOR, that tested Vioxx's safety and efficacy, as well as studies that compared the safety and efficacy of Vioxx and Celebrex.  (PX439 at 4-5.)

155.    The 2002 monograph included a section entitled "Cardiovascular Concerns." This section summarized the findings of a meta-analysis of COX-2 inhibitors published by Dr. Steven Nissen and Dr. Eric Topol in *JAMA* in August 2001 and noted that the authors of the analysis "concluded that a prospective trial may be necessary to evaluate the potential risk of cardiovascular events with these agents."  (*See* LAAG439 at 5-6 & n.33; *see also* 4/16/10 Trial Tr. at 884:18-885:10.)    Provider Synergies' reference to the *JAMA* article is significant because it indicates that the reviewers who prepared the monograph were familiar with the ongoing scientific discussion about the possible reasons for the VIGOR cardiovascular outcomes, including the possibility that Vioxx had a prothrombotic effect.   (*See* 4/19/10 Trial Tr. at 942:13-944:3.)  Plaintiff's expert, Dr. Kessler, testified that "anyone reading the article by Drs. Nissen and Topol would understand that one interpretation of the VIGOR study is that Vioxx increases the risks for thrombotic events."  (*See* 4/12/10 Trial Tr. at 188:4-16.)  In addition, the *JAMA* article reported the VIGOR results based on the complete data set, including the adverse cardiovascular events not included in the *New England Journal of Medicine* article, as discussed in paragraph 22, *supra.*  (*See* 4/19/10 Trial Tr. at 939:5-940:8.)

156.    The monograph included additional accurate information about the cardiovascular results of VIGOR consistent with the Vioxx label.  (PX439 at 5.)  The possibility that a cardioprotective effect of naproxen might be responsible for the VIGOR results was not mentioned.  (LAAG439.)  Nor did the 2002 monograph cite the Vioxx Alzheimer's trials as evidence of Vioxx's cardiovascular safety.  (PX439.)

157.    The 2002 monograph also included a section entitled "Hypertension and Edema."

(PX439 at 7.)  This section included a study reporting a higher incidence of edema and increased blood pressure in patients on 25 mg daily of Vioxx as opposed to those on Celebrex 200 mg daily.  (*Id.*)

158.    In regard to Vioxx's gastrointestinal safety, the 2002 monograph reported the results of the VIGOR study, specifically the number of confirmed "GI events" and "serious GI events" for the naproxen and Vioxx arms of the study.  (PX439 at 5.)  The monograph also reported about COX-2 inhibitors generally:  "The post marketing surveillance and recent trials seem to support at least equal or perhaps improved gastrointestinal safety of the COX-2 inhibitors over the traditional NSAIDs."  (*Id.* at 8.)  But the monograph also reported that all coxibs, including Vioxx, carried the NSAID class warning about gastrointestinal toxicity.  (*Id.*)

159.    Dr. Taylor of Provider Synergies presented information about Vioxx and other COX-2 inhibitors to the P&T Committee at its May 8, 2002 meeting.  She explained that there had been much discussion about whether the products "increase cardiovascular concerns" or "increase edema," but "no real conclusions at this point."  (DX2071 (Tr. of May 8, 2002 P&T Meeting) at 147:3-9.)  Dr. Taylor additionally noted that "we need to look at further trials to come to some type of conclusion for those particular instances."  (DX2071 at 147:9-12.)  In regard to gastrointestinal safety, she explained that users of the drugs "still can have GI side effects with these products, just the trials that have been done have shown a decreased risk of ulcerations using these particular products."  (*Id.* at 147:18-22.)  At trial, Dr. Taylor testified that she had "no doubt" that she alerted the P&T Committee that there were cardiovascular and gastrointestinal risks associated with Vioxx.  (4/15/10 Trial Tr. at 779:13-780:22.)

160.    Provider Synergies recommended that, of the COX-2 class, Celebrex and Bextra be placed on the PDL because they both were less expensive than Vioxx in light of supplemental

rebates.  (*See* DX2071 at 148:1-3; 148:21-149:6, 150:15-151:13; 4/15/10 Trial Tr. at 781:7-25;

4/16/10 Trial Tr. at 838:21-839:7.)  The Committee accepted Provider Synergies'

recommendation.  (4/16/10 Trial Tr. at 839:17-19.)

> ### C.     LDHH and the P&T Committee Were Adequately Informed about Vioxx's Risks and Benefits in 2003.

161.    The P&T Committee next considered the inclusion of Vioxx on the PDL at its

May 21, 2003 meeting.  (DX2095 (Transcript of May 21, 2003 P&T Committee Meeting).)

162.    In 2003, as in 2002, the Provider Synergies monograph provided to P&T

Committee members accurately and adequately set forth the gastrointestinal and cardiovascular

risks of Vioxx.  (4/19/10 Trial Tr. at 935:21-936:1; 4/20/10 Trial Tr. at 1128:22-1129:3.)  The

April 2003 monograph reported that COX-2 inhibitors had been shown to have "equal efficacy to

many of the other NSAIDs, but the issue of a better safety profile is less clear."  (PX426 at 1.)

163.    The 2003 monograph again discussed gastrointestinal and cardiovascular

concerns about the NSAID class.  It contained an even stronger caution about the potential

cardiovascular risks of Vioxx: "The VIGOR study raised some questions regarding the

cardiovascular safety of rofecoxib (Vioxx).  Patients receiving rofecoxib (Vioxx) had a

significantly higher risk of developing a cardiovascular thrombotic event compared to patients

receiving naproxen. . . . Although the significance of this potential cardiovascular risk is

unknown, it does raise questions."  (PX426 at 12.)  This statement is consistent with the FDA-

approved cardiovascular precaution in the 2002 Vioxx label.  (4/19/10 Trial Tr. at 950:15-951:1.)

The monograph provided thorough information about the VIGOR trial, including a detailed

discussion of the different rate of myocardial infarctions in the two arms of the study.  (4/19/10

Trial Tr. at 951:2-8.)

164.    The monograph specifically referenced the 2002 Vioxx label, which contained

1015096v.1

FDA-approved language discussing the VIGOR trial and cautioned against the use of Vioxx in patients with ischemic heart disease.  (PX426 at 3, 14 n.16; *see also* paragraphs 41-44, *supra*.)

165.    The 2003 monograph again summarized the 2001 *JAMA* meta-analysis and added information about meta-analyses published in *Circulation* in 2001 and *the American Journal of Cardiology* in 2002.  (*See* PX426 at 10; *see also* 4/16/10 Trial Tr. at 886:7-887:5.)  It reported that the *Circulation* study, a meta-analysis of studies involving over 28,000 patients, found the relative risk for cardiovascular thrombotic events was 0.79 for Vioxx when compared to non-naproxen NSAIDs and 1.69 for Vioxx when compared to naproxen.  (PX426 at 10.)  This was appropriate comparator information for a P&T Committee because the Committee was charged with making decisions between drug therapies.  (4/19/10 Trial Tr. at 948:20-949:14.)

166.    The 2003 monograph again reported the risks of hypertension and edema with COX-2 inhibitors, citing comparative studies of Vioxx and Celebrex showing more adverse hypertensive events with Vioxx than with Celebrex.  (PX426 at 10-11.)

167.    The Provider Synergies monograph was reviewed and discussed by the P&T Committee.  (4/15/10 Trial Tr. at 737:11-18; 4/16/10 Trial Tr. at 885:22-25.)  At the P&T Committee's May 21, 2003 meeting, Dr. Taylor discussed recent and ongoing studies of COX-2 inhibitors.  (4/15/10 Trial Tr. at 787:7-14.)  She emphasized that "[t]here are cardiovascular concerns with the COX-2 products at this point."  (DX2095 at 181:18-19; 4/15/10 Trial Tr. at 787:19-24.)  She did not discuss the theory that the VIGOR results could be explained by the fact that naproxen is cardioprotective.  (DX2095 at 177:20-190:16.)  Dr. Taylor noted that studies conflicted in terms of what they showed about the relative hypertension risks of Celebrex and Vioxx.  Some studies showed that blood pressure tended to rise more with Vioxx than with Celebrex, while others showed no difference between patients taking the two drugs.  (*Id.* at

181:20-182:4.)

168. Dr. Taylor testified that she had "no doubt" that she alerted the P&T Committee to the gastrointestinal and cardiovascular risks of Vioxx. (4/15/10 Trial Tr. at 785:1-786:1, 788:7-11.) LDHH officials likewise testified that P&T Committee members were adequately informed about Vioxx's potential cardiovascular risks in 2003. (*See* 4/16/10 Trial Tr. at 842:4-20, 886:7-887:5, 887:23-888:9.)

169. Provider Synergies recommended at the May 2003 P&T Committee meeting that Celebrex be taken off the preferred drug list and Vioxx put on it. (DX2095 at 182:22-25; 4/15/10 Trial Tr. at 745:8-746:4, 786:17-787:6.) For the most part, questions and comments of Committee members centered on pricing. (*Id.* at 177:21- 193:4.)

170. Following Provider Synergies' recommendation, the P&T Committee voted at the May 2003 meeting to recommend that Vioxx be placed on the preferred drug list and that Celebrex be removed. (DX2095 at 190:13-193:4.) Shortly after the P&T Committee met, the Secretary of LDHH, David Hood, approved the P&T Committee's recommendations, and Vioxx was on the preferred drug list for the first time on July 14, 2003. (4/15/10 Trial Tr. at 749:23-750:16.)

**D. LDHH and the P&T Committee Continued to Receive Information and Monitor Vioxx's Risks and Benefits After It Was Placed on the PDL.**

171. In July 2003, the LDHH Pharmacy Director, M.J. Terrebonne, and then-Secretary of LDHH, David Hood, received a letter from Pfizer, the manufacturer of Celebrex, requesting a review of Celebrex's exclusion from Louisiana's preferred drug list. (4/16/10 Trial Tr. at 843:20-844:13.) The Pfizer letter went to lengths to emphasize that Vioxx (unlike Celebrex) had a cardiovascular warning on its label, including a statement that Vioxx should be used with caution in patients with a history of ischemic heart disease. (*Id.* at 844:14-846:6.) Ms.

1015096v.1

Terrebonne testified that, having attended the P&T Committee meetings at which Vioxx was discussed, she already knew of the cardiovascular concerns with Vioxx raised in the July 2003 Pfizer letter.  (*Id.* at 846:7-11.)

172.    From July 2003 onward, Provider Synergies continued to supply information about Vioxx's potential cardiovascular risks and the P&T Committee continued to discuss those risks.  (*Id.* at 850:10-20.)

173.    During the December 17, 2003 P&T Committee meeting, for example, Dr. Weather, a member of the Committee, stated that he thought the COX-2 drugs and particularly Vioxx should be revisited because of cardiovascular concerns discussed in the package inserts and the increase in heart attacks seen in patients taking Vioxx.  (DX2112 (Transcript of Dec. 17, 2003 P&T Committee Meeting) at 181-82; 4/16/10 Trial Tr. at 890:17-891:6.)  While the Committee discussed negotiating with Pfizer about the price of Celebrex so that Celebrex could be added to the PDL in the future, there was no discussion of removing Vioxx from the preferred drug list.  (DX2112 at 182; 4/16/10 Trial Tr. at 846:12-847:19.)

174.    The April 2004 Provider Synergies monograph provided to the P&T Committee was similar to the 2002 and 2003 monographs, and it again adequately informed the Committee about Vioxx's potential cardiovascular and gastrointestinal risks associated with COX-2s. (DX2118 at 7-8, 13-15; 4/19/10 Trial Tr. at 935:21-936:1; 4/20/10 Trial Tr. at 1128:22-1129:3; *see also* 4/15/10 Trial Tr. at 753:4-15, 788:18-789:20.)

175.    The P&T Committee continued to actively monitor issues related to Vioxx's cardiovascular safety, as evidenced by the Committee's discussion of the Vioxx package insert at the May 5, 2004 meeting.  (DX2120 (Tr. of May 5, 2004 P&T Committee Meeting) at 25-31; DX2119 (Minutes of May 5, 2004 P&T Committee) at 4.)  Despite discussion in the P&T

1015096v.1

Committee about the cardiovascular risks of Vioxx, and despite a re-review of the clinical

information about the class and the pricing for those drugs, the Committee decided to keep

Vioxx on the preferred drug list.  (DX2119 at 4; 4/16/10 Trial Tr. at 847:20-848:5.)

176.    Vioxx remained on the Louisiana Medicaid preferred drug list until September 30,

2004, when Merck voluntarily withdrew it from the market.  (4/16/10 Trial Tr. at 850:10-22.)

     **E.     Neither the LDHH Nor the P&T Committee Was Misled by Merck-
         Sponsored Publications, Vioxx Labeling or Marketing.**

177.    There is no evidence that LDHH or the P&T Committee were misled by Merck-

sponsored publications, the Vioxx label, or Merck marketing.  In particular, there is no evidence

that in 2003 Dr. Taylor or anyone at Provider Synergies, the P&T Committee or LDHH was

unaware that in the VIGOR trial the risk reduction for all PUBs in the steroid non-users subgroup

was not statistically significant.  Nor is there any evidence that in 2003 Dr. Taylor, or anyone at

Provider Synergies, the P&T Committee or LDHH misunderstood the gastrointestinal

information set forth in the Vioxx label or assumed findings in VIGOR that were not stated in

the label or the *NEJM* publication that was cited in the 2002 and 2003 monographs.  (*See* PX439

at 10 n.24; PX426 at 14 n.31.)

178.    The P&T Committee's discussion of Vioxx at the May 2003 meeting, at which

the Committee decided to include Vioxx on the preferred drug list, did not include any mention

of marketing materials, press releases, or visual aids supplied by Merck sales representatives.

(4/16/10 Trial Tr. at 842:21-843:19.)

179.    Employees of LDHH testified that they were unaware of any misrepresentation

ever made by Merck to Provider Synergies or LDHH about Vioxx.  (4/15/10 Trial Tr. at 759:2-

10; 4/16/10 Trial Tr. at 851:15-852:10, 864:7-10; 10/28/09 Biglane Dep. at 111:5-8, 111:12-16.)

In fact, Mr. Bearden testified that, as the Director for the Louisiana Medicaid Program, he never

spoke to anyone from Merck about Merck's drugs and never relied upon any oral or written

communications in deciding whether to put Vioxx on the preferred drug list.  (4/16/10 Trial Tr.

at 894:24-895:15.)  Similarly, Charles Castille, LDHH Undersecretary, testified that he never

discussed the PDL process with any Merck representative.  (4/15/10 Trial Tr. at 758:23-759:1.)

## XII.   THE P&T COMMITTEE'S DECISIONS ABOUT COXIBS WERE CONSISTENTLY BASED ON COST, NOT SAFETY.

180.   The evidence shows that the P&T Committee's decisions about which drugs to

include on the preferred drug list were driven by cost, not safety concerns, such that additional

information about Vioxx's potential cardiovascular risks would not have prompted the

Committee to seek to deny reimbursements for Vioxx prescriptions.

181.   The LDHH's motive in establishing a preferred drug list and prior authorization

process was to save money.  Toward this end, Provider Synergies is charged with providing the

P&T Committee with an analysis of the comparative costs of drugs.  (4/16/10 Trial Tr. at 826:17-

22, 877:23-878:10.)  Provider Synergies plays a critical role in reducing prescription drug costs

to LDHH by securing supplemental rebate agreements from drug manufacturers.  (4/15/10 at

767:9-12; 4/16/10 Trial Tr. at 825:15-25, 877:10-22, 890:14-16.)

182.   When a particular drug manufacturer had not given the State a supplemental

rebate offer, the P&T Committee would ask Provider Synergies to go back to the company to

negotiate for one, and, in the meantime, the P&T Committee would not put that company's drugs

on the PDL.  (4/16/10 Trial Tr. at 878:2-879:4.)  A pharmaceutical company's unwillingness to

provide a supplemental rebate for its drugs would adversely affect the company's chances that its

products would be placed on the PDL.  (*See* 4/15/10 Trial Tr. at 734:5-9.)

183.   Charles Castille, the Undersecretary of DHH, testified that Merck's initial refusal

to provide supplemental rebates to Louisiana was "generally the reason" that Merck's products,

69

including Vioxx, were not included on the PDL in 2002.  (4/15/10 Trial Tr. at 734:10-17.)   By

the time the P&T Committee considered Vioxx for inclusion on the preferred drug list in 2003,

Merck offered had offered Louisiana a supplemental rebate on its drugs.  (4/15/10 Trial Tr. at

746:5-8.)  The Committee decided to include Vioxx on the preferred drug list because Merck's

supplemental rebate offer made Vioxx more cost-effective to the State than Celebrex.  (4/16/10

Trial Tr. at 889:10-890:13.)

184.    The P&T Committee's prioritization of cost continued throughout the time Vioxx

was on the market and beyond.  At the May 5, 2004 P&T Committee meeting, Provider

Synergies reported that the manufacturer of Celebrex had offered an additional rebate, but that it

was not sufficient to warrant putting the drug back on the PDL.  (DX2119 at 4; DX2120 at 25-

31; 4/15/10 at 754:7-755:11, 790:14-791:10.)

185.    By the August 11, 2004 meeting of the P&T Committee, however, Provider

Synergies and Pfizer had negotiated an acceptable price.  (*See* 4/15/10 Trial Tr. at 794:1-11.)

The Committee voted to follow Provider Synergies' recommendation that all three COX-2 drugs

be placed on the PDL.  (4/15/10 Trial Tr. at 757:7-758:7.)

## XIII.   PLAINTIFF DID NOT PROVE ITS ALLEGED AMOUNT OF DAMAGES.

186.    During the course of trial, the parties entered into a written stipulation in which

the parties agreed that Plaintiff contended that its damage relating to reimbursements was

$11,172,702.  This figure reflected the gross reimbursements the state paid for Vioxx for the

period June 13, 2001, the date of Act 395's enactment, to the date of Vioxx's withdrawal on

September 30, 2004, ($10,235,190), plus $937,512 the State paid in dispensing fees.  (April 14,

2010 Stipulation of the Parties.)

187.    However, for several reasons, a calculation of the total cost of the State's Vioxx

reimbursements from June 13, 2001 to September 30, 2004 does not reflect the State's actual

70

damages.  First, as discussed above, the evidence indicates that, even if the State could have implemented a restrictive formulary under State and federal law, it would have been impossible to operationally implement it on June 13, 2001 when Act 395 was enacted.  Mr. Hood admitted this fact.  (4/13/10 Trial Tr. at 418:3-5.)  He testified that as of June 13, 2001, no P&T Committee was in existence.  (4/13/10 Trial Tr. at 417:12-15.)  In order to implement Act 395, the Governor had to get names from the Louisiana Medical Society and appoint the P&T Committee, pass bylaws and get the structure of the Committee working, review and recommend drugs, have LDHH act on that recommendation, and then go back to the Legislature to get approval of its plan.  (4/13/10 Trial Tr. at 413:24-414:14, 416:17-418:16.)   In fact the evidence indicates that this process would, and did, take months to complete.  (4/15/10 Trial Tr. at 679:18-680:4.)  Mr. Hood testified that it took two months just for the P&T Committee to be appointed and have its inaugural meeting.   (4/13/10 Trial Tr. at 372:16-18, 373:12-22, 417:19-21.)  Therefore, Plaintiff's contention that it could have practically implemented a restrictive formulary (apart from the issue of whether it had the legal authority to do so) on June 13, 2001 when Act 395 was enacted, and that June 13, 2001 is therefore appropriate starting date for its damage calculation is unsupported, and indeed contradicted by, the record.

188.    Second, beyond the practical impossibility of actually implementing drug restrictions under Act 395 on the very day the law was passed, the Act itself, and the LDHH policy implementing it, created another barrier to fully implementing its provisions immediately on June 13, 2001.  To ensure continuity of care, the LDHH, in accordance with the Act, stated in its June 10, 2002 "Louisiana Medicaid Pharmacy Benefits Management Prior Authorization Program Instructions" that "[t]he prior authorization process will not impact original prescriptions (or refills) issued by a prescribing practitioner prior to the start date of the Prior

71

Authorization Process [June 2002] or prior to the effective PA dates of drugs as they are added to the PA Process.  Refills of prescriptions issued prior to an effective PA date will not be impacted as long as they are within the 5 refills and 6-month program limits."  (DX 3639 at 5; *see also* 4/13/10 Trial Tr. at 418:17-420:13.)  *See also* 2001 La. Act 395, *adding* La. Rev. Stat. Ann. § 46:153.3(B)(2)(d).).  Thus, for six months after the preferred drug list was implemented (until January 2003), LDHH could not and would not have restricted preexisting Vioxx prescriptions.

189.   Third, given the requirement, under both Act 395 and 42 U.S.C. § 1396r-8(d)(5), that even the most restrictive formulary must allow access to covered drugs under a prior authorization program, it cannot be presumed that the establishment of such a formulary would have resulted in the State's denial of coverage for *all* Vioxx Medicaid prescriptions.  Even in the absence of the misrepresentations alleged by Plaintiff and despite the removal of Vioxx from a restrictive formulary, certain doctors may have decided that Vioxx was medically necessary for a given patient and sought and received approval, either for access to a 72-hour supply in an emergency situation, or for a chronic condition (which the State would be required to respond to in 24 hours or less).  Given that Vioxx had approved indications for acute pain, including dysmenorrheal in 1999 (DX73) and migraine in 2004 (DX321), it is certainly a reasonable inference that some Louisiana doctors prescribed Vioxx for those conditions and would have continued to do so under the 72-hour prior authorization provision given that a short prescription would be all that was required to treat those conditions.  To show that the State paid for certain prescriptions only due to Merck's alleged misrepresentations, therefore, Plaintiff was required to establish either that **no** Vioxx prescriptions would have been sought and received under the state and federally mandated prior authorization program or show which of the tens of thousands of Louisiana Vioxx prescriptions would not have been filled under the prior authorization

1015096v.1

exception.  The State's proffered damage figure of $11,172,702 accounts for neither, and is therefore not probative of the State's damages.

190.    For all these reasons, Plaintiff's lone damage proffer of $11,172,702, measured from June 13, 2001, is not a factually or legally cognizable reasonable estimate of its damages. Because Plaintiff has offered no other damages estimate based upon any other time period, Plaintiff has failed to carry its burden of showing damages even under its theory of rescission.

191.    Further, a calculation of the total cost of Vioxx reimbursements to the State during the period it was on the market does not determine the State's damages because the reduced Vioxx expenditures one would expect with a restricted formulary would have been offset by the cost of alternative therapies used by patients who were not prescribed Vioxx.  As Dr. Wiggins (the only economist who testified at trial) stated, he was able to examine through his analysis of both the Louisiana Medicaid database and individual patient level data, the pattern of substitution of COX-2 and other NSAID drugs during the relevant time periods (*i.e.*, before a PDL was implemented in June 2002, when an PDL was implemented but Vioxx was not on it, and when Vioxx was placed on the PDL in 2003).  (4/19/10 Trial Tr. at 1077:12-20; DX4015; DX4016.)  The data showed that, prior to the time Louisiana implemented a preferred drug list, Vioxx expenditures were relatively constant, with a slight (not statistically significant) decline due to Bextra's increase in the market.  When the State implemented the preferred drug list in June 2002, and Vioxx was not on it, there was a sharp reduction in Vioxx expenditures, and a corresponding increase in the expenditures of Celebrex and Bextra.  (4/19/10 Trial Tr. at 1078:22-1079:10; DX4015; DX4016.)  However, despite the changing allocation of expenditures among Vioxx, Celebrex and Bextra from June 2002 to June 2003, there was no overall decrease

1015096v.1

in COX-2 expenditures, nor in the expenditures of the NSAID class generally.  (4/19/10 Trial Tr. at 1079:11-22; DX4015; DX4016.)

192.    Similarly, in June 2003, when Vioxx was placed on the preferred drug list, and Celebrex was removed, the reverse effect was observed.  Celebrex expenditures declined significantly, and Vioxx prescriptions increased -- but again, total COX-2 expenditures were statistically unchanged, meaning that patients merely switched among the COX-2 class.  (4/19/10 Trial Tr. at 1080:5-16.)  In neither switchover point (June 2002 and 2003) do patients switch to less expensive nonselective NSAIDs rather than COX-2's.  (4/19/10 Trial Tr. at 1079:16-22; 1080:17-19; DX4015; DX4016.)  In essence, after the PDL was instituted, patients and physicians merely switched between various COX-2 drugs, depending in large part on which was on the preferred drug list at any given time, but the overall amount the state spent on treating these patients under the Medicaid program was not statistically different.  (4/19/10 Trial Tr. at 1079:23-1080:4.)

193.    Using an analysis of both LDHH's aggregate and individual data shows that there is no statistically significant difference in total NSAID expenditures during the period Vioxx was not on the preferred drug list (from June 10, 2002 to July 14, 2003) as compared to the period immediately preceding its removal.  (4/19/10 Trial Tr. at 1083:17-1084:14.)  Specifically, for every dollar reduction in Vioxx expenditures due to its PDL status, the State was required to expend a $1.01 on other products.  (*Id.*)

194.    This data and analysis serve as a very good proxy of what would have happened with the State's overall NSAID expenditures had it been able to institute a restrictive formulary totally excluding Vioxx in June 2001 or shortly thereafter.  (4/19/10 Trial Tr. at 1085:5-22.).  The best economic analysis of what the state received from Vioxx is that the $11,172,702 the

74

state paid net of rebates for the period June 13, 2001 to September 30, 2004 would have gone to other products in the COX-2 class had Vioxx not been available.  (4/19/10 Trial Tr. at 1086:9-21.)

195.    This analysis also shows that the State and its Medicaid recipients received full value from the State's coverage of Vioxx, insofar as patients who moved off of Vioxx did not abandon this class of drugs and instead they and their doctors chose to use drugs of comparable price and positive characteristics.  (4/19/10 Trial Tr. at 1081:12-18; 1097:1-18; 1098:2-16; 1098:21-1099:3; 1099:25-1100:4.).   In economic terms, under the principle of revealed preference, the value physicians and patients place on Vioxx is reflected in their willingness to pay for Bextra and Celebrex which they perceive as alternative therapies offering comparable pain relief.  (4/19/10 Trial Tr. at 1088:18-1089:5; 1090:14-1091:1; 1094:8-23.)

196.    In short, a simple calculation of the cost of Louisiana Medicaid Vioxx prescriptions from June 13, 2001 to September 30, 2004 does not suffice as a measure of the State's damages.

## CONCLUSIONS OF LAW

1.    This Court concludes that Plaintiff's redhibition claim fails because:  (a) Plaintiff did not prove a defect that rendered Vioxx "useless for its intended purpose"; (b) Plaintiff did not prove causation; (c) Plaintiff did not prove entitlement to a remedy; and (d) Plaintiff lacked standing to sue under redhibition.

## I.    PLAINTIFF FAILED TO PROVE THE EXISTENCE OF A REDHIBITORY DEFECT.

2.    Plaintiff first failed to prove a defect.  To sustain a cause of action for a redhibitory defect, a plaintiff must prove that the claimed defect "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had

1015096v.1

he known of the defect." La. Civ. Code art. 2520. Plaintiff's burden is to show that the defect made the product "absolutely useless." *Ark-La-Tex Builders & Realty, Inc. v. Hoge*, 344 So. 2d 90, 91 (La. App. 2d Cir. 1977) (citation and internal quotation marks omitted).

3.      A plaintiff fails to show a product is "useless" where the evidence demonstrates that the plaintiff made or could have made "somewhat regular and periodical use" of it despite the alleged defect. *Id.* (holding that trailer was not absolutely useless where it was used for nine months despite leaky roof); *accord, e.g.*, *Dupuy v. Rodriguez*, 620 So. 2d 397, 400 (La. App. 1st Cir. 1993) (undeveloped property was not "useless" merely because of undisclosed "susceptibility to flooding" because it was feasible to modify the property to prevent flooding of any house built on it); *Cornelious v. Bailey Lincoln-Mercury, Inc.*, 566 So. 2d 85, 88 (La. App. 4th Cir. 1990) (car was not rendered "useless" by need for repairs "because plaintiffs used the car for three years after the sale and drove it in excess of 83,000 miles").

4.      Similarly, an undisclosed safety hazard does not perforce render a product "useless" within the meaning of the redhibition articles. In *Compte v. Rateau*, 242 So. 2d 82 (La. App. 4th Cir. 1970), for example, the plaintiffs purchased a used car, not realizing that it was missing a safety latch that helps keep the hood of the car closed during operation. *Id.* at 83. The plaintiffs made extensive use of the car after buying it. *Id.* Eight months after purchasing it, however, one of the plaintiffs suffered an accident when the hood suddenly opened, crashing into the windshield. *Id.* at 84. The plaintiffs sued the dealership where they bought the car, claiming a redhibitory defect. *Id.* The court rejected the claim, noting among other things that the absence of a safety latch was "not such a defect which renders the automobile absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer [Compte] would

76

not have purchased it, had he known of the vice." *Id.* at 85 (citation and internal quotation marks omitted).

5.      The reasoning of these cases bars Plaintiff's claims here.  It is clear that Plaintiff enjoyed substantial benefits from Vioxx, and Plaintiff offered no evidence to dispute the principal benefit conferred by Vioxx on its users – i.e., pain relief.[2]  On this basis alone, Plaintiff failed to prove that Vioxx suffered a defect that rendered it "useless."  *Ark-La-Tex Builders & Realty*, 344 So. 2d at 91.

6.      Although Plaintiff attempted to prove that Vioxx had undisclosed safety risks, these risks, even if proven, do not change the analysis.  Even in *Compte* – where the alleged defect actually manifested itself and caused personal injury – the court was clear that no cause for redhibition lay where the plaintiff had made substantial use of the product.  Plaintiff here similarly made substantial use of the product, notwithstanding any alleged safety risk in Vioxx.

7.      More than this, Plaintiff's own expert conceded that Vioxx was superior to alternative medications – at least for patients taking steroids.  (4/13/10 Trial Tr. at 355:3-15.) The only witness to address this question at trial was Louisiana prescriber Dr. Melvin Parnell whose uncontroverted expert opinion was that Vioxx in fact did work for its intended purpose. (4/19/10 Trial Tr. 920:20-23; 926:6-11.)  And other evidence at trial tended to show that Vioxx was a superior alternative to other NSAIDs – even other coxibs – with respect to gastrointestinal risks.  (4/20/10 Trial Tr. at 1230:7-10, 1275:24-12765:2; DX338 (Food & Drug Administration ("FDA") Decision Memorandum found that only Vioxx had been shown to reduce risk of serious

---

[2]  Of course, Plaintiff did not actually "use" Vioxx in the traditional sense of the word; rather, it was used by Medicaid beneficiaries.  For these reasons, the Court concludes in Part IV, *infra*, that Plaintiff is not actually a "buyer" of Vioxx.  But regardless of the true identity of the buyer, the question whether Vioxx was "defective" must be measured against the benefit it was purported to confer – in this case, pain relief.

1015096v.1

gastrointestinal bleeding).)  Because the evidence at trial conclusively demonstrated that Vioxx was not "useless," Plaintiff failed to prove its claim for redhibition.[3]

## II.    PLAINTIFF FAILED TO PROVE CAUSATION.

8.      Plaintiff also failed to satisfy its burden of proving causation because it did not establish at trial that:  (a) the State would have established an exclusive formulary but for the alleged defect in Vioxx; (b) the State would have excluded Vioxx pursuant to an exclusive formulary even if it had implemented such a formulary; (c) any decision to exclude Vioxx pursuant to an exclusive formulary would have been based on FDA-approved labeling; and (d) the State could have altogether excluded coverage of Vioxx.

9.      In ruling on Defendant's motion for summary judgment, this Court previously determined that Plaintiff's only viable theory of causation was that it would have refused to cover Vioxx but for Defendant's alleged conduct.  (*See* Summ. J. Order at 7-15.)  The Court also determined that the only way Plaintiff could prove this theory of causation was to show that it would have adopted an exclusive formulary, because that is the only means by which a state can exclude coverage of an FDA-approved drug under the federal Medicaid statute.  *See* 42 U.S.C. § 1396r-8(d)(4)(C).  (*See* Summ. J. Order at 10-12.)

10.      Plaintiff maintains that if it had known about the alleged defects in Vioxx, it would have instituted a restrictive formulary and excluded Vioxx from it.  But the evidence at trial did not support this allegation.

---

[3] Plaintiff has suggested that the withdrawal of Vioxx is itself evidence that the drug was defective, but under Rule 407 of the Federal Rules of Evidence, such evidence is inadmissible to prove defect because it constitutes a subsequent remedial measure.  *Dawson Farms, LLC v. BASF Corp.*, No. 06-0737, 2008 WL 4600934, at *4 (W.D. La. Oct. 15, 2008) (holding that defendant's withdrawal of a product from the market was a subsequent remedial measure and rejecting plaintiff's argument that withdrawal of product from the market was proof of defect in a redhibition case because the argument "would eviscerate the purpose of Rule 407").

1015096v.1

11.     As a preliminary matter, it is clear – and Plaintiff does not contest – that Louisiana could not have adopted an exclusive formulary before June 13, 2001.  Prior to that time, Louisiana law required that the Louisiana Department of Health & Hospitals ("LDHH") "provide reimbursement for any drug prescribed by a physician that, in his professional judgment and within the lawful scope of his practice, he considers appropriate for the diagnosis and treatment of the patient."  La. Rev. Stat. Ann. § 46:153.3(B)(2) (1999).  (*See also* 4/13/10 Trial Tr. at 370:15-371:7; Summ. J. Order at 11.)

12.     The Court further finds that Plaintiff failed to prove the date by which the State could have adopted an exclusive formulary, assuming arguendo that it ever would have. Plaintiff's only contention was that the State could have adopted an exclusive formulary as early as June 13, 2001, the effective date of Act 395.  Specifically, Plaintiff argues that it was authorized under federal law to have its Drug Utilization Review ("DUR") Board act as a formulary committee and, through it, exclude Vioxx from coverage.  Plaintiff is correct that *federal* law would have permitted this – if the DUR Board was empowered by an approved state plan to do so.  *See* 42 U.S.C. § 1396r-8(d)(4)(A) (providing that an exclusive formulary must be "developed by a committee consisting of physicians, pharmacists, and other appropriate individuals appointed by the Governor of the State (or, at the option of the State, the State's drug use review board established under subsection (g)(3))").  But *state* law would not have permitted it.  Act 395 vested the authority to establish a formulary in the P&T Committee.  2001 La. Acts 395, *adding* La. Rev. Stat. Ann. § 46:153.3(C)(5)(a).  In addition, the statute expressly bars the DUR Board from "interfer[ing] with the provisions" of the drug formulary process.  La. Rev. Stat. Ann. § 46:153.3(B)(3)(a).  Plaintiff made no showing at trial that the State would have

enacted legislation allowing the DUR Board to act as a formulary committee; accordingly, this theory fails for lack of proof.

13.     No other evidence supports the claim that the State could have adopted an exclusive formulary by June 13, 2001.  As set forth in the Findings of Fact, (*see* ¶ 88), Act 395 modified the State's open formulary system, authorizing LDHH to "establish a drug formulary that utilizes a prior approval process or any other process or combination of processes that prove to be cost-effective in the medical assistance program."  2001 La. Acts 395; *see also* La. Rev. Stat. Ann. § 46:153.3(B)(1) (2002) (as modified by Act 395).  But the Act was not self-executing; rather, LDHH was required to identify members for the P&T Committee, form the Committee, establish by-laws, contract with Provider Synergies to perform drug assessments, review drugs to construct the initial preferred drug list, and gain approval of the list from the legislature.  (*See* Findings of Fact ¶ 100, *supra*.)  The same requirements would have applied to an exclusive formulary.  *See* 42 U.S.C. § 1396r-8(d)(4)(A) (a restrictive formulary must be "developed by a committee consisting of physicians, pharmacists, and other appropriate individuals appointed by the Governor of the State"); La. Rev. Stat. Ann. § 46:153.3(D)(5)(d) (pharmacopoeia authorized by Act 395 cannot be implemented until initial pharmacopoeia is submitted to – and approved by – the Louisiana House and Senate committees on health and welfare).

14.     In light of these requirements, LDHH could not adopt a new system on June 13, 2001, and indeed it did not.  Instead, as Mr. Hood admitted, LDHH did not promulgate regulations to implement a prior authorization program under its provisions until a year later. *See*  28 La. Reg. 979-80 (May 2002); 28 La. Reg. 1639, 1639-41 (July 2002).  (*See also* 4/13/10 Trial Tr. at 406:18-21, 413:24-414:13, 416:24-417:2.)  And even after the Preferred Drug List

was instituted under the auspices of the power established by Act 395, LDHH followed a practice of permitting six months of coverage for drugs that had been prescribed before that date. (*See* Findings of Fact ¶ 107, *supra*.)

15.     This evidence conclusively establishes that -- assuming LDHH *ever* would have adopted an exclusive formulary -- it would have taken LDHH some time to establish such a formulary.  It was Plaintiff's burden to prove the date on which it would have begun denying coverage of Vioxx; it failed to do so.  For this reason alone, it failed to prove causation.

16.     In any event, Plaintiff's effort to prove that the State would have adopted an exclusive formulary -- in June 2001 or at any other time -- is not supported by the evidence.  For starters, with a few exceptions not relevant here, it is clear that the State lacked the authority to exclude any FDA-approved drug under the plan it has actually had in place since 2001.  Upon the enactment of Act 395, LDHH instituted a Medicaid pharmacy program utilizing a preferred drug list and prior authorization system -- not an exclusive formulary.  *See* 2001 La. Acts 395, *amending* La. Rev. Stat. Ann. § 46:153.3; 28 La. Reg. 979-80 (May 2002) (implementing an Emergency Rule to create a prior authorization program for drugs prescribed to Medicaid recipients); *see also* 28 La. Reg. 1639, 1639-41 (July 2002) (Notice of Intent to promulgate final rule establishing prior authorization program for Medicaid prescription drug program).  Under this program, prescription drugs placed on the preferred drug list are covered automatically, while reimbursement for drugs not on the preferred drug list is conditioned on prior authorization.  (*See* 4/13/10 Trial Tr. at 378:21-379:10.)  While the prior approval procedure creates an incentive for physicians to prescribe drugs on the preferred drug list, authorization for a drug not on the list cannot be withheld.  *See Edmonds v. Levine,* 417 F. Supp. 2d 1323, 1329 (S.D. Fla. 2006) ("The Medicaid Act does not authorize a state to use [this type] of prior

authorization program to deny coverage for a covered drug; it can only condition reimbursement upon a prescribing doctor first calling a state pharmacist to obtain approval for the drug."); *see also Pharm. Research & Mfrs. v. Meadows*, 304 F.3d 1197, 1201, 1207 (11th Cir. 2002). Plaintiff does not dispute that under the Medicaid drug program LDHH actually adopted in 2002, reimbursements for Vioxx could not be denied.

17.     Plaintiff argues that the State would have adopted an exclusive formulary instead of a prior authorization program but for Merck's alleged conduct.  The evidence does not support this contention.  Plaintiff relied entirely on the testimony of former LDHH Secretary David Hood to prove that the State would have adopted an exclusive formulary.  But Mr. Hood's testimony actually proves the contrary.

18.     In the first place, Mr. Hood testified that adoption of an exclusive formulary would not have been politically "palatable" because it would have restricted the ability of physicians to choose medicines for Medicaid beneficiaries.  (4/13/10 Trial Tr. at 409:15-19.) According to Mr. Hood, Louisiana's experiment with a closed formulary in the late 1980s resulted in significant opposition from physicians, pharmacists and patient advocates.  (*Id.* at 402:18-403:15, 451:19-24.)  As a result, the State moved to an open formulary that required the Medicaid program to reimburse all covered prescription drugs.  *See* La. Rev. Stat. Ann. § 46:153.3(B)(2) (1999).  The goal of Act 395 was to promote a reimbursement system in which doctors would have some mechanism to prescribe drugs to Medicaid beneficiaries based on their medical judgment.  (*See* 4/13/10 Trial Tr. at 431:16-23.)  At the same time, the new law also enabled the State to save money by providing for a preferred drug list.  (*See id.* at 409:8-410:1.) The legislative debate over Act 395 confirms that legislators continued to express concern that the State ***not*** return to a system akin to the restrictive formulary of the 1980s.  (*Id.* at 407:3-7,

82

407:23-408:4, 408:9-16.)  And Mr. Hood testified that he "took seriously any directive from senators and representatives who passed Act 395 in deciding how [he] would exercise his powers."  (*Id.* at 408:5-8.)

19.     The Court further concludes that an exclusive formulary would not have been adopted because it would have been at odds with the cost-savings goals that motivated the adoption of Act 395.  (*See* 4/19/10 Trial Tr. at 868:13 – 25; 898:13 – 18.)  Under a restrictive formulary regime, the decision to exclude a drug cannot be based on cost considerations, but must be based solely on clinical considerations found in the labeling.  A restrictive formulary would have significantly limited the State's power to consider and negotiate drug costs, and would have frustrated the intent of the Act.  No witness affiliated with LDHH testified that the State would have created a restrictive formulary which would have conflicted with the entire purpose of Act 395.  This Court therefore concludes that LDHH would not have attempted to institute a restrictive formulary in June 2001 or at any other point.

20.     The evidence at trial also made it clear that the notion of an exclusive formulary was never within the contemplation of LDHH officials.  Mr. Hood conceded that as LDHH Secretary, he never considered restricting the State's reimbursement of an FDA-approved drug.  (4/13/10 Trial Tr. at 428:2-5.)  Further, Mr. Hood did not know of any authority under which he could have implemented a restrictive formulary.  (*Id.* at 438:20-439:14, 439:24-440:7.)  Although Mr. Hood testified that he would have consulted with LDHH attorneys, the Pharmacy & Therapeutics ("P&T") Committee and legislators (*id.* at 381:13-382:5), there was no evidence that any member of these groups would have thought to suggest implementation of an exclusive formulary.  To the contrary, both Mr. Bearden, the State's Medicaid Director, and Mr. Castille, the Undersecretary and former general counsel of LDHH, testified that exclusion from the PDL

was the most restrictive action that could be taken.  (4/15/10 Trial Tr. at 742:21-743:4; 4/16/10 Trial Tr. at 886:3-6.)

21.     In this regard, it is worth noting that even though the State has brought other, similar lawsuits concerning alleged defects in other drugs, the State has not presented any evidence that LDHH ever prepared a proposed plan amendment for submission to the Center for Medicare and Medicaid Services, whose authorization would be required before LDHH could adopt an exclusive formulary.  42 C.F.R. § 430.12.  Mr. Hood admitted that neither the P&T Committee nor the State ever considered a proposal to adopt an exclusive formulary to restrict reimbursement coverage of an FDA-approved drug during the time he was Secretary.  (4/13/10 Trial Tr. at 430:5-22.)

22.     The State's continued reimbursement of Celebrex and other non-steroidal anti-inflammatory drugs ("NSAIDs") -- long after the withdrawal of Vioxx from the market – provides further compelling evidence that the State would not have adopted an exclusive formulary if Merck had disclosed additional information regarding Vioxx's alleged safety risks. LDHH continued to provide coverage for NSAIDs, including COX-2 inhibitors, even after the FDA determined that they posed cardiovascular risks.  In fact, despite the FDA's conclusion that Celebrex and traditional NSAIDs carried cardiovascular risks that were at least equal to, and possibly greater than, those of Vioxx, the State continued to list these drugs, including Celebrex, on its *preferred drug list*.  (*See* DX2165.)  The Court concludes that this conduct is evidence that the State would not have implemented a restrictive formulary in response to Merck's disclosure of allegedly withheld information about Vioxx.

23.     Plaintiff argues that it would not have needed to adopt a restrictive formulary instead of the preferred drug list it actually adopted in 2002.  Instead, Plaintiff contends that it

could have maintained the preferred drug list and excluded only Vioxx pursuant to the formulary provisions of the federal statute.  This argument is not supported by law or fact.  As a matter of law, the federal statute plainly contemplates the adoption either of a restrictive or an open formulary -- not some combination of both.  Indeed, the part of the statute governing formularies expressly provides that any formulary program must "include[] the covered outpatient drugs" that would ordinarily be available in an open formulary -- strongly implying that a state must choose between an open formulary or restrictive formulary approach.  42 U.S.C. 1396r-8(d)(4)(B).  This conclusion is supported by practice; not surprisingly, the only Medicaid expert to testify, Jerry Wells, testified that no State had established a restrictive formulary based on the safety concerns of one drug.  (4/15/10 Trial Tr. at 690:7-12.)  Moreover, there is no evidence in the record to support Plaintiffs novel and speculative assertion that multiple Medicaid systems could be maintained simultaneously.

24.    While Mr. Hood did testify at trial that LDHH would have adopted an exclusive formulary had he known of the alleged defects in Vioxx (4/13/10 Trial Tr. at 368:15-388:6), that testimony cannot be credited in light of the foregoing evidence.  This is particularly so given the contrast to Mr. Hood's testimony a few months earlier at his deposition.  When Mr. Hood was asked at his deposition whether there was "any other action the State could have done to restrict the coverage of Vioxx prescriptions within Medicaid beyond putting the drug on the nonpreferred drug list," he responded, "I don't know."  (Deposition of David Hood, Feb. 8, 2010 ("2/8/10 Hood Dep.") at 138:17-139:1.)  In addition, when asked at his deposition whether he was familiar with a "closed" or "restricted" formulary, Secretary Hood responded that he was only familiar with "a preferred drug list."  (*Id*. at 32:24-33:9.)  The Court cannot accept Secretary

Hood's assertions at trial that LDHH would have adopted a system about which he apparently had no knowledge until a few weeks before trial.

25.     Plaintiff also failed to prove that it would have excluded Vioxx from an exclusive formulary even if such a formulary had been adopted.

26.     Mr. Hood testified at trial that he would have excluded Vioxx from coverage if he had learned that Vioxx was a "defective drug."  (*See* 4/13/10 Trial Tr. at 386:15-387:17; *see also id.* at 453:19-454:1.)  But it is clear that Mr. Hood himself was not in a position to make independent clinical assessments of prescription drugs, including Vioxx, as he acknowledged at trial.  (*Id.* at 400:16-24, 426:7-17.)  Instead, Mr. Hood relied upon the judgment of the LDHH staff and the doctors, pharmacists and pharmacologists on the P&T Committee to make determinations about the clinical risks and benefits of prescription drugs, including Vioxx.  (*See id.* at 423:8-14, 426:18-20, 372:10-15, 372:21-373:1, 373:12-374:2, 375:15-25.)  Accordingly, the evidence does not suggest that Mr. Hood would have sought exclusion of Vioxx unless there was separate evidence that the P&T Committee would have recommended it.

27.     No such evidence was proffered.  Plaintiff offered no testimony from any LDHH or Provider Synergies representative that such a recommendation would have been made. Indeed, the record evidence – which indicates that the FDA would have approved the return of Vioxx to the market even after it was withdrawn – compels the opposite conclusion.  Thus, Mr. Hood's supposition that anyone would have told him that Vioxx was defective or that he should do something to limit its availability was not supported by the evidence.

28.     For these reasons, Mr. Hood's testimony that LDHH would have excluded Vioxx amounts to nothing more than speculation that others would have advised him to take such action.  The United States Court of Appeals for the Fifth Circuit has repeatedly held that

86

causation cannot be proven through speculative evidence. *See, e.g.*, *Univ. Computing Co. v. Mgmt. Sci. Am., Inc.*, 810 F.2d 1395, 1402 (5th Cir. 1987) (when testimony is no more than a "well-informed guess . . . any inference drawn therefrom is merely speculative" and insufficient as a matter of law to establish causation); *Westinghouse Elec. Corp. v. M/V "Leslie Lykes"*, 734 F.2d 199, 214 (5th Cir. 1984) (finding insufficient proof of causation where the causal connection was dependent on "speculation and unproved facts"). Therefore, Plaintiff has failed to establish causation for its redhibition claim.

29.     In addition, even if the evidence had suggested that the State could have adopted an exclusive formulary and would have done so to exclude Vioxx, the Court further finds that it could not have excluded Vioxx consistent with the specific requirements of federal Medicaid law.

30.     The requirements for excluding an FDA-approved drug pursuant to an exclusive formulary are as follows:

> A covered outpatient drug may be excluded with respect to the treatment of a specific disease or condition for an identified population (if any) ***only*** if, based on the drug's ***labeling*** . . . the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion.

42 U.S.C. § 1396r-8(d)(4)(C) (emphases added).

31.     Under this provision, a state's decision to exclude a covered outpatient drug must be based on information provided in the drug's FDA-approved labeling itself – and not on independent clinical analyses. Moreover, exclusion is only permitted if the label supports a conclusion that the drug "does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcomes . . . over other drugs included in

the formulary." 42 U.S.C. § 1396r-8(d)(4)(C).  For example, a state could exclude a brand-name drug from its formulary as long as the generic equivalent was included on the formulary.  *See* H. Comm. on Energy and Commerce, Omnibus Budget Reconciliation Act of 1993, H.R. Rep. No. 103-111, at 205 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 532 (1993).  In such a case, the drugs would have identical labeling, and thus, by definition, the brand-name drug would have no "clinically meaningful therapeutic advantage" over the generic.

32.     Plaintiff offered no evidence that the State would have been able to exclude Vioxx based on its FDA-approved labeling.  There were no generic versions of Vioxx, and Plaintiff has not shown, based on the Vioxx labeling, that the drug did not have a "clinically meaningful therapeutic advantage" over other drugs that the State would have included in its formulary.  (*See also* Findings of Fact ¶ 129-134, *supra.*)  Indeed, the State offered no evidence of what other drugs would have been included in its formulary at all.  Thus, the Court need not even address whether Vioxx has significant therapeutic advantages over other drugs.

33.     The Court nonetheless concludes that at all relevant times, Vioxx's FDA-approved labeling established that it possessed "significant, clinically meaningful therapeutic advantage[s]" over comparator drugs, such as traditional NSAIDs.  As set forth in the Findings of Fact, *supra*, the 1999 Vioxx labeling established that the drug offered superior gastrointestinal safety to other NSAIDs.  (*See* Findings of Fact ¶¶ 130-31, *supra*.)  Similarly, the 2002 Vioxx label reported data from the VIGOR clinical trial demonstrating GI benefits, which Plaintiff's own expert acknowledged were accurate.  (*Id.* ¶ 131-32, *supra*.)  And Vioxx offered other therapeutic advantages over comparator drugs, including once-a-day dosing, absence of sulfa and noninterference with aspirin's antiplatelet effects.  (*Id.* ¶ 133, *supra*.)

34.     Plaintiff argued at trial that the Vioxx labeling would have been different if the drug's alleged defects had been known at an earlier date.  But that contention is preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), which bars plaintiffs from calling into question decisions committed to a federal agency -- e.g., drug labeling -- under the auspices of state law duties of care.  Moreover, even if the argument were permissible, Plaintiff failed to establish at trial that the FDA would have refused to approve identical labeling had the alleged defects in Vioxx been known at an earlier date, or to prove what language would have been approved in the alternative.  Accordingly, the proper labels for analysis under the requirements of 42 U.S.C. § 1396r-8(d)(4)(C) are those that were operative at the time Vioxx was on the market.

35.     For all of these reasons, the Court concludes that the Vioxx labeling demonstrates that Vioxx *did* have a "clinically meaningful therapeutic advantage" over other drugs that the State would have included in its formulary.  As such, the State has not proven that LDHH could have excluded Vioxx from a restrictive formulary consistent with federal Medicaid law.  Moreover, putting aside the question of whether Vioxx was subject to exclusion under 42 U.S.C. § 1396r-8(d)(4), there is no evidence in the record to conclude that the State ever would have attempted to create a restrictive formulary had it had different information about Vioxx.  The State's argument that it would have sought to exclude Vioxx reimbursement under (d)(4) presupposes that the State had a restrictive formulary to begin with.  It is undisputed that the State never created a restrictive formulary, nor is it reasonable to believe that the State would have done so.  The very purpose of Act 395 was to combat the rising cost of the Medicaid program in Louisiana by allowing the State to negotiate supplemental rebates for drugs included on the preferred drug list.  (4/19/10 Trial Tr. at 868:13 – 25; 898:13 – 18.).  Exclusion under 42

89

U.S.C. § 1396r-8(d)(4), however, can be made only on clinical considerations and not primarily

on the basis of cost.  A restrictive formulary under (d)(4) would have stripped the State of its

power to consider and negotiate drug costs, and would have frustrated the intent of the Act.  No

witness affiliated with LDHH testified that the State would have created a restrictive formulary

which would have conflicted with the entire purpose of Act 395.  Not surprisingly, the only

Medicaid expert to testify, Jerry Wells, testified that no State had established a restrictive

formulary based on the safety concerns of one drug.  (4/15/10 Trial Tr. at 690:7-12.)  Nor is there

any legal or factual support to presume that any state could and would have simultaneously

maintained a preferred drug list with prior authorization for all covered drugs except for a

separate, single-drug "restricted" formulary under (d)(4).  The federal statute describes

alternative systems and there is no evidence in the record to support Plaintiff's novel

and speculative assertion that multiple systems could be maintained simultaneously.

36.     Even if the State could have restricted coverage of Vioxx consistent with federal

requirements, the State would still have been required under federal law to "permit[] coverage of

[] [Vioxx] . . . pursuant to a prior authorization program."  42 U.S.C. § 1396r-8(d)(4)(D).  Under

such a program, a state is required to "consider coverage for an excluded drug on a case-by-case

basis," "presumably [based on] medical factors specific to [each] patient."  *Meadows*, 304 F.3d

at 1208 & n.9.

37.     Plaintiff argues that such a program is no barrier to total exclusion because the

State was free to deny all requests for coverage through a prior authorization program under an

exclusive formulary.  But the law holds otherwise.  As the *Meadows* case suggests, and this

Court agrees, denial of authorization must be based on "medical factors specific to [each]

patient."  *Meadows*, 304 F.3d at 1208 & n.9.  Any other approach would contravene

90

Congressional intent "to permit the States to reduce Medicaid spending on prescription drugs *while not diminishing the medical care of Medicaid patients*."  H. Comm. on Energy and Commerce, Omnibus Budget Reconciliation Act of 1993, H.R. Rep. No. 103-111, at 205 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 532 (1993) (emphasis added).

38.      Plaintiff presented no evidence that prior authorization for Vioxx could have been universally withheld based on "medical factors specific to [each] patient"; indeed, Mr. Hood was not even aware of the prior authorization requirement.  (4/13/10 Trial Tr. at 445:9-447:1.)  More importantly, Plaintiff's own expert conceded that Vioxx "would be a better choice than a traditional NSAID" for patients taking steroids.  (*Id.* at 355:9-15; *see also id.* at 355:3-6 (stating that, for steroid users, Vioxx is better than traditional NSAIDs for safety).)  This concession demonstrates that the effect of an exclusive formulary could only be proven with individualized evidence.  No such showing has been attempted.  And as this Court previously held, it would be "impossible, or close to it, to determine the individual thought process of each of the thousands of doctors and patients" who prescribed and took Vioxx.  (Summ. J. Order at 14.)  *See In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 459 (E.D.N.Y. 2009) ("Such an inquiry is impractical and beyond the resources of any court.").

39.      Moreover, even if LDHH had adopted an exclusive formulary program and used it to bar or restrict the availability of Vioxx, it would still have been required under federal law to make emergency Vioxx prescriptions available for 72 hours.  42 U.S.C. § 1396r-8(d)(4)(D); *Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 653 (2003) (explaining that federal law requires provision "for the dispensing of at least a 72-hour supply of a covered drug in an emergency situation"); 2001 La. Acts 395, *adding* La. Rev. Stat. Ann. § 46:153.3(B)(2)(A)(ii) ("At a minimum any prior approval process shall . . . [p]rovide for the dispensing of a minimum

1015096v.1

of a seventy-two hour supply of a covered outpatient prescription drug in an emergency situation provided by federal rule or regulation.").  Thus, even if Plaintiff had proven that it would have implemented an exclusive formulary, and even if it had proven that it would have excluded Vioxx from that formulary, it would still have to show how many Vioxx prescriptions would have been filled on an emergency basis.  For example, Vioxx could have been dispensed on an emergency basis for authorized indications such as acute pain and migraine.  (*See* Findings of Fact ¶ 136, *supra*.)  Once again, such a showing would entail individualized showings that would be "beyond the resources of any court."  *In re Zyprexa,* 671 F. Supp. 2d at 459.  Plaintiff thus failed to prove causation for this reason as well.

## III.     <u>PLAINTIFF FAILED TO PROVE ENTITLEMENT TO A REMEDY.</u>

40.     Even if Plaintiff had proven the other elements of its redhibition claim, Plaintiff also failed to prove entitlement to relief for three reasons:  (a) Plaintiff was aware of any alleged defect in Vioxx at the time it covered the drug; (b) Plaintiff's only evidence of supposed over-payments for Vioxx was substantially over-inclusive; and (c) Merck is entitled to a credit for the value Plaintiff received from Vioxx, a value that equals or exceeds the price paid by Plaintiff

41.     As an initial matter, recovery is barred because Plaintiff was aware of the defects it alleges in Vioxx at the time it covered prescriptions for the drug.

42.     Under Louisiana law, no remedy for redhibition lies "for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things."  La. Civ. Code art. 2521.

43.     In *Drosdal v. Hurstell*, 540 So. 2d 606 (La. App. 5th Cir. 1989), for example, Drosdal sued for a reduction in price in a car she purchased from Hurstell.  Among other things, Drosdal complained that the car's air conditioner did not work.  *See id.* at 608.  The trial court found for Hurstell, and the Court of Appeal affirmed.  According to the court, the record

established that "Drosdal was informed at the time of sale that the air conditioner was not in proper working order, made noise, and should probably be changed.  This information was sufficient to place the purchaser on notice that the air conditioner was defective, and thus the action for redhibition does not lie on account of this disclosed defect."  *Id.* (citing La. Civ. Code art. 2522).

44.      The same is true here.  As set forth in detail in the Findings of Fact, the State's witnesses have unambiguously testified that they were informed of the possible cardiovascular risks posed by Vioxx each time the P&T Committee was briefed by Provider Synergies.  (*See* Findings of Fact ¶ 168, *supra.*)  Thus, the alleged "defects in the thing . . . were known to the [State] at the time of the sale," La. Civ. Code art. 2521, and Plaintiff's redhibition claim fails for this reason too.

45.      In any event, Plaintiff could not recover in redhibition because it also failed to proffer evidence of what payments for Vioxx it would have avoided had it known of the alleged defects.

46.      Entitlement to recover under redhibition is limited to payments for those things that Plaintiff can prove it "would not have bought" had it "known of the defect."  La. Civ. Code art. 2520.

47.      Although Plaintiff asserted a right to recover for all payments made for Vioxx from June 13, 2001 to September 30, 2004, the evidence at trial shows that Plaintiff would still have made many of the payments that occurred during this time period, even if it had adopted an exclusive formulary.  For example, as discussed *supra*, Plaintiff could not have adopted an exclusive formulary the same day that Act 395 became effective.  (*See* ¶¶ 12-15, *supra.*) Similarly, Plaintiff would have been compelled to cover Vioxx on an emergency basis and based

93

on demonstrated medical need – even under an exclusive formulary regime.  (*See* ¶¶ 36-39, *supra*.)

48.     As noted previously, the only proof offered by Plaintiff of its Vioxx expenses was a stipulation that its gross reimbursements for Vioxx between June 13, 2001 and September 30, 2004 totaled $11,172,702.  (*See* Findings of Fact ¶ 186, *supra*.)  This evidence does not account for the fact that Vioxx could not have been excluded until some (unproven) time after June 13, 2001 or for the fact that some Vioxx prescriptions would still have to be covered under an exclusive formulary.  Moreover, Plaintiff has offered the Court no means to determine – even roughly – what adjustment would be required from this figure.  Accordingly, Plaintiff has not met its burden of proof, and no award can be made.

49.     Finally, the Court concludes that Plaintiff would not be entitled to any recovery, even if it could have otherwise proven entitlement to restitution, because Defendant is entitled to a credit for the value Plaintiff received from covering Vioxx.  Plaintiff's restitutionary remedy is subject to an offset to the extent that "the use made of the thing, or the fruits it might have yielded, were of some value to the buyer."  La. Civ. Code art. 2545.  When this offset is equal to the purchase price, no remedy is available.  *See, e.g.*, *Magee v. Brown*, 859 So. 2d 720, 724 (La. App. 4th Cir. 2003) (reversing judgment in redhibition case involving taxicab because the "record indicates that both parties benefited from the contract").

50.     Louisiana courts have permitted parties in redhibition cases to prove value using expert testimony that compares the value of the product at issue to the demonstrated value of comparable products on the market.  In *D'Angelo v. Poche*, 434 So. 2d 120 (La. App. 5th Cir. 1983), for example, the court approved the use of expert testimony to prove the reduction in price due to the undisclosed fact that a house was subject to flooding.  *Id.* at 123.  Specifically,

1015096v.1

the expert looked to value of other houses that had a known propensity to flood and derived a discount based on that analysis.  *Id.*

51.     Here, Vioxx had a benefit to Plaintiff equal to (or in excess of) its purchase price. The undisputed testimony of Merck's expert economist, Dr. Wiggins, was that the State and its citizens received full value from the State's coverage of Vioxx, as demonstrated by overall usage patterns of COX-2 drugs.  (*See* Findings of Fact ¶¶ 191-96, *supra*.)  This testimony was competent evidence of the value of Vioxx, akin to that approved in *D'Angelo, supra.* Accordingly, the "record indicates that both parties benefited" from the State's coverage of Vioxx, and no redhibition remedy should be available.  *Magee,* 859 So. 2d at 724.

## IV.     PLAINTIFF LACKED STANDING TO SUE IN REDHIBITION.

52.     The Court also concludes that Plaintiff lacked standing to sue on behalf of the State because it was not a "buyer" of Vioxx.  Under the Louisiana Civil Code, "[t]he existence of a [redhibitory] defect gives a buyer the right to obtain rescission of the sale."  La. Civ. Code art. 2520.  Louisiana courts have held that a plaintiff asserting a claim for redhibition must allege that "the seller sold the thing to him."  *McNeely v. Ford Motor Co.*, 763 So. 2d 659, 669 (La. Ct. App. 1st Cir. 1999).  Nonbuyers lack standing to sue under the redhibition statute.  *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 601 n.48 (E.D. La. 2007).

53.     Pursuant to La. Civ. Code art. 2520, a "buyer" is a person to whom a "sale" is made.  A "sale" is defined as "a contract whereby a person transfers ownership of a thing to another for a price in money."  La. Civ. Code art. 2439.  The State of Louisiana never gained ownership or possession of the Vioxx that it financed on behalf of Louisiana Medicaid participants.  Thus, this Court agrees that the relevant "buyers" in this case are the Medicaid beneficiaries – and not the State.

95

54.    Plaintiff argues that the Court should conclude that the State was a "buyer" of

Vioxx because it paid for the drug, citing *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350

(2d Cir. 2003).  In *Desiano*, insurance companies and individuals sued Warner-Lambert, alleging

that it had failed to disclose risks of the drug Rezulin and seeking reimbursement for their

expenses on the drug.  The district court granted a motion to dismiss, in part because the

insurance companies had not adequately alleged causation.  According to the district court, the

insurance companies were merely "financial intermediaries" between insurance beneficiaries and

their employers, who financed the insurance plans.  *Id.* at 347.  Because this intermediary role

would likely result in most of their costs being passed on, the district court reasoned that "the

apportionment problems that would be created by allowing the [insurance companies] to sue here

would be monumental" and concluded that causation had not been alleged as a matter of law.  *Id.*

The U.S. Court of Appeals for the Second Circuit reversed.  In addressing this part of the district

court's holding, the court noted that insurance companies had been regarded as "purchasers" in

other contexts, and that it was inappropriate at the motion-to-dismiss stage to assume that they

had not purchased the drugs at issue.  *Id.* at 350-51 ("[T]he court is obliged to accept as true

Plaintiffs' assertion that they were, in fact, the purchasers of the drug.").

55.    Plaintiff's reliance on *Desiano* is misplaced for several reasons.  First, *Desiano*

construed New Jersey law.  It is therefore irrelevant to evaluating the meaning of the term

"buyer" under Louisiana redhibition law.

56.    Second, and even more importantly, the district court on remand applied

*Desiano*'s holding to Louisiana redhibition law and concluded that third-party payors are ***not***, in

fact, "buyers" for purposes of that cause of action.  *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp.

2d 597, 610-11 & n.80 (S.D.N.Y. 2005).  *Rezulin* began by acknowledging *Desiano*'s conclusion

96

in dicta that insurance companies can sometimes be considered "purchasers."  But it noted that this general principle could not trump the specific requirements of a particular cause of action. *Id*. at 610.  The *Rezulin* court then went on to hold that third-party payors are not "buyers" under Louisiana's redhibition statute, even if they might be considered "purchasers" in a more general sense.  It explained that courts have interpreted the word "buyer" as requiring the acquisition of ownership of the product with the alleged redhibitory defect.  *See id*. at 611.  And because the undisputed facts at the summary judgment stage showed that the insurance companies had never gained ownership over Rezulin, the court found that they could not be "buyers" for purposes of redhibition.  *Id*. (finding that Health Benefit Plans ("HBPs") were not buyers under Article 2520 because they "did not gain ownership of the drug within the meaning of the Louisiana Civil Code").

57.      Plaintiff argues that this precedent produces a harsh result because it means no one has standing to sue Merck in redhibition for Vioxx purchased through the Medicaid system. But the Court is not empowered to ignore established law governing claims of redhibition. Rather, any adverse policy consequences of such a definition would be better addressed by the Louisiana Legislature.  *See id*. at 610 (although "there may be good policy reasons to give HBPs remedies where pharmaceutical manufacturers make misrepresentations about their products[,] [t]he UCC . . . is a statute, and the Court presumes that it means what it says").

1015096v.1

58.   For these reasons, the Court finds that the State was not a "buyer" of Vioxx and that Plaintiff thus lacks standing to sue on behalf of the State under redhibition.  *See* La. Civ. Code art. 2520.

Dated: April 28, 2010                              Respectfully submitted,

                                                   /s/Dorothy H. Wimberly
                                                   Phillip A. Wittmann, 13625
                                                   Dorothy H. Wimberly, 18509
                                                   STONE PIGMAN WALTHER
                                                      WITTMANN LLC
                                                   546 Carondelet Street
                                                   New Orleans, LA 70130
                                                   Phone: (504) 581-3200
                                                   Fax:    (504) 581-3361

1015096v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Merck Sharp & Dohme Corp. ("Merck")'s Proposed Findings of Fact and Conclusions of Law has been served on Liaison Counsel by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Plaintiff, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 28th day of April, 2010.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel