UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | MDL No.  1657 |
| This Document Relates To: | SECTION L |
| STATE OF LOUISIANA, *ex rel.*, JAMES D. CALDWELL, JR., Attorney General,<br>        Plaintiffs<br><br>        v.<br><br>MERCK SHARP & DOHME CORP.,<br>        Defendants | JUDGE ELDON E.  FALLON<br><br>MAGISTRATE JUDGE KNOWLES<br><br><br>Case No.  05-3700 |

## CORRECTED PLAINTIFF'S POST-TRIAL PROPOSED FINDINGS OF FACT

**I.    VIOXX SUFFERED FROM A DEFECT SUCH THAT A REASONABLE PURCHASER IN THE POSITION OF LDHH WOULD NOT HAVE PURCHASED IT:**

1.      The cardiovascular risks of Vioxx, which were worse than any other NSAID, far outweighed the questionable GI benefit in a drug with no proven efficacy beyond traditional NSAIDs.

**A.    VIOXX POSES UNACCEPTABLE CARDIOVASCULAR RISKS.**

2.      Plaintiffs' expert, John MacGregor, is a board-certified cardiologist with a Ph.D. in biochemistry.  Dr. MacGregor is a Professor of Medicine at the University of California at San Francisco.  Dr. MacGregor has expertise in cardiology, the effects of prostacyclin and thromboxane

-1-

on the cardiovascular system, and the effects of Vioxx on the cardiovascular system. (458:23-461:23). The following findings of fact are based upon Dr. MacGregor's testimony, which the Court finds credible and reliable, and upon the authorities referenced in Dr. MacGregor's testimony.

3.      The Court finds that Vioxx is toxic to the cardiovascular system, and that Vioxx is the most cardiotoxic drug among the non-steroidal anti-inflammatory drugs (NSAIDs). (Tr., 462:21-463:5).

**An FDA Advisory Committee convened in February of 2005 concluded Vioxx was the most cardiotoxic of the NSAIDs.**

4.      An FDA Advisory Committee (AC) met on February 16-18, 2005 to address CV risks of Vioxx and other NSAIDs. The AC consisted of 32 people considered experts in the field. These experts voted 32 to 0 that "the available data support a conclusion that rofecoxib significantly increases the risk of cardiovascular events." (Tr., 979:11-980:8).

5.      The Advisory Committee stated "the blood pressure effects seen with [Vioxx] are clearly outside the norm and are undesirable." (Tr., 980:17-20).

6.      The Advisory Committee said, "a signal for heart failure is present and the other NSAIDs have not exhibited this same signal." The Committee also stated that the blood pressure and the heart failure data is "compelling," indicating Vioxx is "substantially worse than other Cox-2s." A strong dose relationship was found, which supports a causal relationship between the drug and cardiovascular events. (Tr., 980:17-981:16).

**The American Heart Association has recognized the mechanism of action whereby Vioxx causes heart attacks.**

7.      A Scientific Statement of the American Heart Association, published in 2007, states that selective Cox-2 inhibitors have important adverse cardiovascular effects that include increased risk for myocardial infarction (MI), stroke, heart failure and hypertension. Defense expert Eiswirth agreed with this finding. According to the Scientific Statement, the differences in the biological effects of Cox-2 inhibitors are a consequence of the degree of selectivity for Cox-2 versus Cox-1. Vioxx is at the extreme end of the spectrum in terms of high Cox-2 selectivity, which likely increases its cardiotoxic effects.  The AHA statement was peer-reviewed and approved by the AHA Science Advisory and Coordinating Committee on December 20, 2006.  (Tr., 463:8-466:10; 970:20-971:5; 972:12-21).

8.      The AHA Scientific Statement describes a plausible, generally accepted mechanism for the cardiotoxic effects of Vioxx.  This mechanism involves a reduction in the production of prostacyclin in comparison to thromboxane as a result of Cox-2 inhibition.    Prostacyclin opens blood vessels and prevents platelet aggregation, while thromboxane constricts blood vessels and promotes clotting.  The imbalance between thromboxane and prostacyclin results in an exaggeration of the effects of thromboxane in causing clots and cardiac events.  (Tr., 466:11-467:10).

9.      The AHA statement is supported by, and consistent with, the mechanism of cardiotoxicity described in an article by Grosser, Fries and FitzGerald, upon which Dr. MacGregor relied.  FitzGerald is considered the world's leading authority in this field.  FitzGerald's article concluded that selective inhibitors of Cox-2 relieve pain and inflammation and convey a "small but definite risk of myocardial infarction and stroke."  (Tr., 467:11-469:1; 983:25-986:1)).

10.     Suppression of Cox-2 by Vioxx may also predispose to a more gradual elevation of cardiovascular risk by initiating and accelerating atherogenesis, a mechanism for longer-term toxic effects. (Tr., 469:2-470:1).

11.     Laboratory studies cited by Dr. MacGregor show that Cox-2 has been identified in the endothelial cells of human coronary arteries with atherosclerosis. Thus, Cox-2 inhibition results in reducing prostacyclin in an area where such inhibition can result in cardiotoxic effects like myocardial infarction, due to the reduced amount of prostacyclin to oppose the clotting effects of thromboxane. (Tr., 471:7-476:9).

**Clinical studies of Vioxx have demonstrated cardiovascular risks  which could not be explained by the so-called "Naproxen theory."**

12.     Clinical trial evidence is consistent with this mechanism and supports the finding that Vioxx is cardiotoxic. The VIGOR clinical trial involved patients given 50 mg. of Vioxx compared to 1000 mg. naproxen per day. The Vioxx group had a five times higher risk of heart attacks and a 2.4 times higher risk of the overall category "thromboembolic events." The risks were statistically significant for the subgroups of aspirin indicated (higher risk) and non-aspirin indicated (lower risk) subjects of the study. The most likely cause of the higher rates of heart attacks and thromboembolic events in the Vioxx population was the cardiotoxic effect of Vioxx. The alternative explanation, a protective effect of naproxen, was not supported by reliable evidence, and two published analyses of multiple studies contradicted that hypothesis (Kearney and McGettigan, both published in 2006). (Tr., 476:12-480:9; LA AG 59, July 5, 2000 Memorandum from Shapiro to Reicin, Tables 3, 4; Tr., 489:5-13; 975:16-976:21).

13.     The APPROVe study involved 2,586 patients who received 25 mg. of Vioxx or placebo.  The results showed 46 thrombotic adverse events on Vioxx compared to 26 in the placebo group, providing a statistically significant hazard ratio of 1.92.  There was also a statistically significant hazard ratio of 2.8 for the category of cardiac events.  The most likely cause of the increased risk was the cardiotoxic effect of Vioxx.  (Tr., 480:23-482:10).

14.     The APPROVe study was part of a larger analysis called Protocol 203, which also included a trial called VICTOR.  The VICTOR study showed a statistically significant increased risk of thrombotic events, and the combined analysis of Protocol 203 also showed a statistically significant increased risk of cardiovascular events.  Again, the cardiotoxic effect of Vioxx was the most likely cause of the observed difference in risk.  (Tr., 483:4-485:1).

15.     In the Alzheimer's trials of Vioxx, there was a statistically significant increased risk of both heart disease mortality and all-cause mortality for Vioxx compared to placebo.  In the category of heart disease mortality, there were 21 events in the Vioxx group compared to 6 in the placebo group, and the relative risk was 3.84 and statistically significant.  The increased risk of cardiac mortality provides further evidence of the toxic effect of Vioxx operating through promotion of atherosclerosis.  (Tr., 485:2-487:14).

16.     Alzheimer's Protocol 078 trial and APPROVe were the only Vioxx clinical trials that followed patients and provided results of events after subjects had stopped taking Vioxx.  In both cases, there was an increased risk in the off drug period among patients who had taken Vioxx.  (Tr., 527:25-528:5; 528:13-18).

17.     A review of observational studies regarding Vioxx and other NSAIDs provided consistent evidence that Vioxx increased cardiac risk, compared to both placebo and other NSAIDs.

A dose response relationship was found, such that higher doses of Vioxx were associated with higher risk, which supports the cause and effect relationship between Vioxx and cardiac risk. (Tr., 487:20-489:4).

18.    The results of the VIGOR study were likely not a result of a protective effect of naproxen on cardiac risk. Separate studies by Kearney and McGettigan both reported results of multiple clinical trials and observational studies that found non-significant relative risks of 0.92 and 0.97, respectively, for comparisons of naproxen to placebo and naproxen to use of no NSAIDs. (Tr., 489:5-13; 975:16-976:21).

**The April 2005 FDA memorandum does not support a finding that Vioxx is no more cardiotoxic than other NSAIDs**

19.    Although an April 2005 FDA memorandum stated that it was not possible to rank order the Cox-2 inhibitors in terms of cardiovascular risk, evidence supports a finding that Vioxx has greater cardiotoxicity at approved and commonly used doses. The FDA found that the strongest evidence of cardiovascular toxicity of Vioxx arises from APPROVe, a study of 25 mg. Vioxx, the typical dose for arthritis. In contrast, Celebrex did not have evidence of risk at the 200 mg. dose taken by most people. Evidence of risk was "marginally positive" at the 400 mg. dose. Excess CV risk would likely be seen with the 800 mg. dose, which was used in a clinical trial but has never been approved for any indication. (Ex. Dx 338; Jenkins memo; Tr., 982:10-983:24).

20.    The 2005 FDA memo was issued before a 2006 review that found Vioxx was more cardiotoxic than Celebrex based on a pooled analysis of 23 studies. There was a statistically significant increased risk of 1.34 for Vioxx compared to Celebrex, for cardiac events. The authors reported: "The differences between rofecoxib and celecoxib appear important from both a clinical

and regulatory standpoint.  The data do not point to a safe dose level with rofecoxib, which justifies the decision taken to withdraw the drug from sale.  At doses of 200 mg. or less, there is no convincing evidence of an increased risk of cardiovascular events with celecoxib, which remains on international markets."  (Tr., 488:10-492:11; 528:19-530:23; Tr., 982:10-983:24; Ex. LAAG 287, Dx 338).

21.     While the 2005 FDA memo approved a black box warning for all NSAIDs, including Cox-2 inhibitors, later publications indicate that important differences exist between these agents in terms of risk of major thrombotic events.  In particular, naproxen has been reported to be neutral, that is, neither protective nor harmful to the cardiovascular system.  A review of 23 studies found no increased risk of cardiac events with ibuprofen.  (The (McGettigan, 2006).  Grosser, Fries and FitzGerald reported that most but not all studies had found no increased risk with ibuprofen.  (Tr., 470:14-471:3).  The Kearney article, referenced previously, reported a relative risk as to ibuprofen that was not statistically significant.  (Tr., 976:22-977:7).

22.     Based on these facts, the Court finds that there is a consensus of the scientific community that Vioxx is cardiotoxic and increases the risk of heart attacks, strokes, congestive heart failure, and that Vioxx is "substantially worse than other Cox-2s."

**B.     VIOXX PRESENTS LITTLE IF ANY GI BENEFIT OVER OTHER NSAIDS.**

23.     Plaintiffs' expert, Dr. David Y. Graham, is board-certified in internal medicine and gastroenterology.  Dr. graham is a professor at Baylor College of Medicine and the V.A. Medical Center in Houston.  He has not personally received any money for his participation in this case, but rather directed that his fees be paid to the Baylor Medical School to fund research.  Dr. Graham has expertise in the field of gastroenterology; the toxic effects of nonsteroidal anti-inflammatory drugs

(NSAIDs) on the GI tract, including Cox-2 inhibitors such as Vioxx; clinical trial methods to evaluate gastrointestinal toxicity in NSAIDs in humans; steroid use as a risk factor affecting GI toxicity; the use and interpretation of endoscopy to detect toxic effects of NSAIDs; and the dose response relationship between NSAIDs and GI toxicity.  (Tr. 203:22-204:1; 228:21-229:7; 202:5-8; 208:2-209:3; exhibit LAAG 532.)   The following findings of fact are based in part upon Dr. Graham's testimony, which the court finds credible and reliable, and upon the authorities referenced in Dr. Graham's testimony.

24.     The court finds that Vioxx is toxic to the gastrointestinal system, and that Vioxx does not differ substantially from other NSAIDs in terms of its gastric toxicity.  (Graham Testimony Tr. 210:5-11.)

**Pre-market studies of Vioxx GI toxicity exaggerated GI benefits by using comparator NSAID dosages that did not reflect real world conditions.**

25.     During the pre-marketing development of Vioxx, Merck was told by two different sets of expert consultants, both in 1996 and again in 1998, that the doses of traditional NSAIDs used in its osteoarthritis (OA) trials were too high, and that those doses did not comport with real world practice for the use of such medications.  The 1996 consultants meeting further informed Merck that the standard of care required use of the lowest effective dose for the shortest period of time. (1167:10-19; 1141:17-1142:23; exhibits LAAG 682, 806.)

26.     In August 1998, the consultants hired by Merck recommended that Merck not conduct a GI outcome study in OA patients, because chronic use of high dose NSAIDs is rare in OA patients, and because the results of such a study would not provide "real world" information.  Instead, the consultants recommended that the outcome study be done with RA (rheumatoid arthritis) patients,

because chronic high dose NSAID use was more common in RA patients due to their more severe inflammatory disease. Merck did follow that recommendation in designing the outcome study that became known as VIGOR. However, Merck had already completed its entire pre-market OA clinical trial program using precisely the model of chronic high-dose NSAIDs that the consultants criticized as inconsistent with real world conditions. (1141:17-1142:23; 1145:8-1146:12; 1168:20-1172:16; exhibit LAAG 682.)

27.    Merck's OA clinical trials used a range of vioxx doses, from 12.5 mg to 125 mg, in an effort to find the balance between clinical benefit and risk of toxicity. However, only a single high dose of each traditional NSAIDs was used for comparison to Vioxx in the pre-market clinical trial program used to secure approval and labeling. The OA clinical trials employed 2400 mg of ibuprofen per day. The 150 mg per day dose of diclofenac and the 1500 mg per day dose of nabumetone were each the maximum recommended OA doses in the labels for those drugs. (1169:20-1170:25; 1140:24-1141:15; exhibit LAAG 682.)

28.    There was undisputed evidence in this case that the risk of GI side effects of NSAIDs goes up as the dose goes up. This is consistent with the well-known principle of dose-response relationship. It was also undisputed that doctors in their real-world practice follow the standard of care by using the lowest effective dose for the shortest time, and by reducing the NSAID dose after symptoms abate. Merck's OA trials exposed subjects to high chronic daily doses of NSAIDs for up to two years, and the rates of GI adverse events among subjects exposed to those doses for prolonged periods were necessarily higher than the rates that would be found among real-world patients using lower doses on an intermittent, as needed basis. (217:6-25; 230:22-233:9; 233:24-234:6; 1167:10-1168:10; 1169:20-1170:25; 1140:24-1141:15.)

-9-

29.     Clinical trials may be designed to favor a drug in a GI toxicity and safety analysis. A published scientific review of Merck's OA trials found that they had been designed to "favor rofecoxib" by using maximum or near maximum doses of NSAIDs that were known to yield high rates of adverse GI events.  Further, an internal Merck document admitted that "we have been guilty of stacking the deck in our studies" by the selection of doses used in the comparison of Vioxx to other drugs.  Although the latter email does not refer specifically to the OA pre-market trials, it constitutes supportive evidence that the trial design to favor Vioxx was accurately described in the scientific article.  The court finds that Merck's OA studies were designed to favor Vioxx by comparing the Vioxx rate of GI side effects to unrealistically high rates among subjects exposed to unnecessarily high, chronic doses of NSAIDs.  (216:22-217:5; 1179:9-1180:5; 1181:13-1182:3; exhibit LAAG 808.)

**Unpublished Merck studies confirmed Vioxx's GI toxicity was much worse than was reported in published studies such as the Laine article.**

30.     Despite the design to favor Vioxx, Merck's studies provide evidence that Vioxx is not comparable to placebo or meaningfully different from other NSAIDs in causing complicated GI events.  By April 2003, Merck knew that the rate of PUBs and complicated PUBs (Perforation, Ulcers and Bleeds) on Vioxx 25 mg was about four times greater than the rate for placebo patients in Alzheimer's Protocol 078, and the difference was statistically significant.  This information was not published while Vioxx was on the market.  Based on a 1999 study by Laine, Merck claimed that ulcer rates on Vioxx were "comparable to placebo."  (258:17-19; 259:18-260:20; 264:8-265:19; 266:25-267:2; 267:16-20; 1162:12-1163:1; 1175:22-1176:11; 1176:25-1179:5.)

31.     The court finds that the 1999 Laine study is unreliable to show the GI safety of Vioxx for several reasons.  First, the study was not designed to study GI risks.  Second, the placebo arm had an unrealistically high incidence (9.9%) of endoscopic ulcers, which cast doubt on the validity of the study.  Third, the study used endoscopic endpoints that correlated poorly with actual numbers of bleeding ulcers, which are true clinical outcomes.  Finally, the 1999 Laine study used high dose comparator drugs that do not reflect real world clinical practice.  (234:25-240:20; 1152:22-1153:21; 1176:25-1179:5.)

32.     Additional clinical trial data confirm that Vioxx caused PUBs and complicated PUBs, and that it was not comparable to placebo.  Such trials include the APPROVe study, and the VIP study, which both reported 4 to 5 times higher rates of PUBs and complicated PUBs on Vioxx compared to placebo.  In 2004, the FDA review of the Alzheimer's trials 078 and 091 showed a difference of 11 GI bleeds on Vioxx versus zero on placebo, causing discontinuation of the studies. (256:3-258:16; 1165:14-1166:8; 1166:12-16; 1163:7-10; 1164:4-12.)

33.     As of February 2003, Merck's internal documents showed that there was a higher rate of complicated PUBs on Vioxx than on NSAIDs in the pre-specified, pooled analysis of OA studies known as protocol 069.  Although Merck had published 069 in 1999 with a claim of greater GI safety compared to NSAIDs, it did not publish the follow-up data showing that the rate of complicated PUBs in the Vioxx group had caught up with, and surpassed, the rate of such events among the NSAIDs users.  (243:3-245:5; 246:5-247:5; 247:12-252:14; exhibit LAAG 677.)

34.     Merck's internal data also showed that Vioxx was not safer than two traditional NSAIDs against which Vioxx was tested (nabumetone and arthrotec, the latter a combination of diclofenac and misoprostol).  There were no GI perforations, ulcers or bleeds among approximately

1900 subjects who took nabumetone and arthrotec.  These data support a finding that Vioxx is not "safer than NSAIDs" in general, and that relevant comparisons must be made to particular NSAIDs, and at particular doses.  (251:9-255:15.)

35.    The relative safety of nabumetone was demonstrated in a study by  Eversmyer that Merck included among the materials for the 1996 GI Consultants meeting.  In the Eversmyer study, all subjects were started on the lowest therapeutic dose of the comparison NSAID, and titration upward was permitted based on the discretion of the physician investigators based on the subjects' clinical response. This study design followed the community standard of care, did not expose subjects to unnecessarily high doses of NSAIDs, and was both known and available to Merck in designing its Vioxx clinical trials. Merck's failure to employ such a titration methodology further corroborates the finding that the Vioxx clinical trials were planned  to "favor rofecoxib" by using maximum or near maximum doses of comparator drugs that would result in high rates of GI adverse events   in  the  comparison  NSAID  arms  of  the  trials.   (216:22-217:5;  1170:20-1171:12; 1179:9-1180:5; Exhibit LAAG 682 at MRK-NJ0232023, 2080).

36.    Merck's 1996 Consultants Package shows that the company also knew of the superior GI safety that had been demonstrated in a study of misoprostol, which was one of the ingredients in the Arthrotec combination.  That study, published in 1995, was co-authored by Plaintiff's expert, David Y. Graham, M.D.  The misoprostol study demonstrated a statistically significant reduction in the risk of  clinically significant GI adverse events using objective criteria to demonstrate substantial bleeding, perforation or obstruction, unlike Merck studies, which permitted confirmation of PUBs based on endoscopic detection alone, regardless of whether bleeding was found.  Merck designed its studies to allow endoscopic detection of events despite its prior knowledge that "endoscopy

findings generally do not correlate closely with NSAID-induced GI clinical events." (220:20-228:8; 229:11-17; 234:25-239:12; 1148:5-11; Exhibit LAAG 682 at MRK-NJ0232058, 2089-90.)

**Observational studies confirm that Vioxx did not offer significant GI benefit over other NSAIDs in real world settings.**

37.     Six large observational studies further demonstrate that Vioxx is gastrotoxic and not meaningfully different from traditional NSAIDs in terms of gastrointestinal bleeding.  These include three as to which Dr. Graham testified with specificity as to the results.  (Laporte, *Drug Safety* 2004;27(6):411-420; Castellsague, *Pharmacotherapy* 2009;29(12):1397-1407; Garcia Rodriguez, *Lancet* 1994;343:769-72.)  While less powerful than randomized placebo-controlled trials, experts look at observational studies to check that clinical trials are consistent with real world patient experience.  In real world conditions, Vioxx was comparable to naproxen in GI toxicity, and both drugs were found to have a dose-response relationship, supporting cause and effect.  (282:16-283:25; 366:2-9; 1172:17-1175:18.)

38.     Merck's expert, Dr. sales, testified that "channeling" of higher risk patients to Cox-2 inhibitors may bias the results against Vioxx.  However, channeling does not affect the reliability of the observational studies cited above, because each of these studies adjusted the risk ratios to account for the relevant characteristics of the population that used each drug, such as age, gender, and prior history.   (Laporte, *Drug Safety* 2004;27(6):411-420, at 411; Castellsague, *Pharmacotherapy* 2009;29(12):1397-1407, at 1400; Garcia Rodriguez, *Lancet* 1994;343:769-72, at 770.)

-13-

**Merck used clinically insignificant endpoints of endoscopic ulcers in its studies comparing GI toxicity of Vioxx to placebo and other NSAIDs.**

39.    Merck used endoscopic ulcer end points for its clinical trials of Vioxx. Dr. Graham published an editorial in the *Journal of Clinical Gastroenterology and Hepatology*, 2009, entitled, "endoscopic ulcers are neither meaningful nor validated as a surrogate for clinically-significant upper gastrointestinal harm." Dr. Graham wrote, "a useful surrogate end point must be able to reliably identify and highly and consistently reproducible, with minimal observer variability-must be able to be reliably identified and highly and consistently reproducible with minimal interobserver variability. Endoscopic ulcers as currently used meet none of these prerequisites." The presence of an endoscopic ulcer does not mean that a drug causes clinically significant outcomes, nor does the absence of an endoscopic ulcer mean that the drug is safe. Dr. Graham stated, "in the absence of a very well-validated surrogate end point, the primary end point should be the true clinical outcome." In the case of gastric toxicity of NSAIDs, the true clinical outcome is a serious event-bleeding, perforation or obstruction. Dr. Graham further wrote, "considering all of the problems and uncertainties currently surrounding endoscopic ulcers, we believe it is unlikely they will ever become more than a marketing tool of uncertain relevance." Nevertheless, Merck-sponsored published articles touted GI safety using unreliable endoscopic ulcer endpoints. (220:20-228:8; 229:11-17; 234:25-239:12.) The court finds that endoscopic ulcers in the Vioxx clinical trials were not a meaningful surrogate endpoint for true clinical GI outcomes, and therefore studies that used endoscopic ulcers as endpoints did not provide a reliable measure for the GI safety of Vioxx.

40.    A 1998 FDA review agreed with Dr. graham's assessment of the important distinction between the surrogate endpoint of "endoscopic ulcers" and "meaningful clinical GI endpoints":

-14-

"although the large differences in endoscopically defined gastroduodenal ulcer rates between rofecoxib at the doses of 25 and 50 milligrams QD and ibuprofen 800 milligrams TID suggested a substantial difference in safety profile, analyses of meaningful clinical GI endpoints were not demonstrative of clinically significant differences between rofecoxib, ibuprofen, and diclofenac." (1296:1-20; exhibit laag 72.)

**The VIGOR study showed no significant benefit of Vioxx over Naproxen for the vast majority of Vioxx users.**

41.     The VIGOR study has been cited by Merck and many reviewers as evidence of Vioxx's GI safety advantage over naproxen.  However, the most serious GI events, defined in VIGOR as the "confirmed, complicated perforations ulcers and bleeds" (CCPUBs), did not show a difference between Vioxx and Naproxen except among subjects who also used steroids as a treatment for RA.  For users of steroids, the naproxen group had a much higher risk of CCPUBs than the vioxx group (27 events on naproxen compared to 7 on Vioxx; rr= 3.85, statistically significant), while the non-steroid user incidence rates of CCPUBs were essentially identical for the Vioxx and naproxen groups (10 events on naproxen compared to 9 on Vioxx; rr=1.12, not statistically significant).  The Vioxx label reporting the VIGOR results reported the CCPUBs data as an overall total of 37 on naproxen compared to 16 on Vioxx, without showing the difference between the steroid and non-steroid users. (270:5-273:11; 273:22-280:9; 361:8-13; 1154:20-1160:3; 1126:16-24; exhibit dx 945.)

42.     Scientists, including those at Merck, commonly rely on statistical tests of interaction to determine whether the results of a study are influenced by a particular factor that differs between two subgroups.  In Merck's exchange with the New England Journal of Medicine (NEJM) about the

VIGOR study, the reviewers raised a concern that Vioxx might only be beneficial to steroid users. Merck's consultants and employee authors resisted that conclusion by asserting that the data did not show a significant interaction for steroid versus non-steroid use as to the endpoint of "PUBs," so they argued that there was no basis to distinguish between the two subgroups. For the complicated PUBs, however, there was a statistically significant interaction based on steroid use or non-use, and for that reason it is not scientifically appropriate to lump the two groups together into a single risk estimate. (274:17-280:9.)

43.    Steroid users make up a very small proportion of the Vioxx market. A subset of RA patients use chronic steroids, while OA patients do not. OA is far more common than RA. (1160:8-19.)

44.    Vioxx provided a significant GI benefit only to the small subset of Vioxx users consisting of RA patients who used steroids, in that the rate of CCPUBs was significantly lower on Vioxx than on naproxen in that population; however, the benefit to RA patients on steroids is not generalizable to OA patients who use lower doses of NSAIDs and do not use steroids. The OA clinical trial data did not replicate real world conditions, but instead "stacked the deck" to favor Vioxx by exposing subjects to unrealistically high, chronic doses of traditional NSAIDs that are not typical of actual OA patient use. The court also finds that for the most serious, complicated events, the rate on Vioxx was greater than the rate on NSAIDs among OA patients, based on Merck's own unpublished data. The reviews (such as Rostom) cited by Merck for the claim of Vioxx's GI benefit did not have access to the unpublished Merck data showing the toxicity of Vioxx compared to placebo in 078, the data showing the toxicity of vioxx compared to NSAIDs in protocol 069, nor the

data showing that only steroid users experienced a reduction of risk of the most important GI events. The reviews are based on incomplete data and therefore unreliable.  (1162:9-1164:15.)

45.     The findings above show that the claims of GI safety of Vioxx, including its "comparability to placebo," were overstated and contrary to the unpublished data.

C.     ANY BENEFITS OF VIOXX ARE OUTWEIGHED BY THE RISK OF CV HARM.

46.     Dr. Jerry Avorn is a board certified physician in Internal Medicine, Chief of the Division of Pharmacoepidemiology and Pharmacoeconomics at Brigham and Women's Hospital, Professor of Medicine at Harvard Medical School, and past President of the International Society for Pharmacoepidemiology.  He does not accept any personal payment for his testimony, but rather directs any money that would be billed to a charitable fund to support noncommercial research about medication use and medication effects.  (Avorn 31:14-23; 45:16-46:8; 67:4-68:19)

47.     The Court finds credible Dr. Jerry Avorn's testimony as an expert in the following areas in which he has published in peer-reviewed medical literature: the field of pharmacoepidemiology, pharmacoeconomics, pharmaceutical study design, conduct of pharmaceutical studies, factors that drive prescribing practices and habits of physicians generally, the field of internal medicine, geriatric medicine, the communication of risks and benefits to physicians and elder care health providers, and the risks and benefits of nonsteroidal anti-inflammatory drugs, COX-2 inhibitors, and Vioxx.  (Avorn 60:13-62:11.)

48.     Dr. Avorn testified that the risks of Vioxx far outweighed the benefits of Vioxx. (Avorn 110:1-3; 20-24), in that:

a)     Vioxx is no more effective as an analgesic or pain reliever than any other nonsteroidal that was on the market.  (Avorn 274:21-275:5, 23-24; 276:1-277:2.)

-17-

b) Any gastoprotective effect of Vioxx is lost among patients taking aspirin alongside it. (Avorn 279:4-280:8.)

c) Available alternatives (including Celebrex) do not carry the same cardiovascular risk as Vioxx. (378:17-379:16.)

49. Based on the testimony of Drs. MacGregor, Graham, and Avorn, as well as the published studies and Merck internal documents cited in that testimony, this Court finds that Vioxx suffered from a defect which rendered it unfit for its intended use, specifically, an unacceptable increase in cardiovascular risk (greater than any other NSAID) which far outweighed its minimal GI benefits, if any, over other NSAIDs, in a pain reliever that was proven to be no more effective in relieving pain than traditional NSAIDs.

50. This Court's finding regarding the defect in Vioxx is further supported by the fact that since learning of the CV risks demonstrated in the APPROVe study, the FDA has indicated that Vioxx would not be allowed back on the market without FDA approval (DX 338), and to date the FDA has not approved return of Vioxx to the market.

## II. AS OF JUNE 13, 2001, THE SECRETARY OF LDHH HAD THE AUTHORITY TO REFUSE TO REIMBURSE VIOXX PRESCRIPTIONS AND WOULD HAVE DONE SO HAD HE KNOWN OF THE DEFECT.

51. This Court finds that as of June 13, 2001, LDHH had the authority to exclude coverage for Vioxx and would have done so had it known of the defect set forth hereinabove.

52. David Hood was Secretary of LDHH from 1998 to February of 2004, nearly the entire time that Vioxx was on the market. (Testimony of David Hood, Tr. 368:18-22).

-18-

53.     Prior to becoming Secretary in 1998, Secretary Hood served as undersecretary with responsibility for the medicaid program for two years. (Testimony of David Hood Tr. 368:2-17).

54.     On January 13, 2001, Act 395 went into effect, amending LSA-R.S. 46:153.3. Secretary Hood understood that the amendment granted the Secretary of LDHH broad latitude to implement restrictions on prescription reimbursements.  (Testimony of David Hood, Tr. 374:22-375:9

55.     Secretary Hood was personally involved in the passage and implementation of Act 395.  (Testimony of David Hood, Tr. 403:16-21).

56.     Although Act 395 granted the Secretary broad discretion to restrict and/or limit prescription reimbursements, after passage of Act 395, LDHH only implemented a Preferred Drug List (PDL) with a prior authorization requirement for drugs not included on the PDL.  (Testimony of David Hood, Tr. 375:10-14).

57.     As Secretary, David Hood had exclusive authority within LDHH to implement formulary decisions. (Testimony of David Hood, Tr. 369:17-370:8).

58.     Every witness from LDHH confirmed that Secretary Hood had ultimate authority to implement formulary decisions. (Testimony of Ben Bearden, tr. 882:8-20; Testimony of Charles Castille, 741:12-19; Testimony of Dr. Gina Biglane, deposition tr. 103:21-104:2) For example, when asked why LDHH had never refused to pay for a drug that a prescribing physician had prescribed to a patient, LDHH pharmacy benefit director M.J. Terrebonne answered, "Well, that was ultimately Secretary Hood's decision." (Testimony of M.J. Terrebonne, Tr. 824:2-5)

59.     Secretary Hood's uncontroverted testimony  is that had he known of the defect in Vioxx (that serious risk of heart attacks outweighed minimal GI benefits in a pain reliever no more

effective than any other NSAIDs) he would have excluded it from LDHH's formulary.  (Testimony of David Hood, Tr. 385:23-387:7).

60.     Secretary Hood's uncontroverted testimony was that he had the authority to exclude coverage for a drug in which the risks outweighed the benefits, and that such action would have been consistent with his responsibility "to protect the health and safety of the Medicaid population." (Testimony of David Hood, Tr. 382:11-22).

61.     Although other LDHH employees testified that, *as implemented*, the most restrictive action available under the LDHH medicaid reimbursement program was a prior authorization requirement, not one of these witnesses contradicted Secretary Hood's testimony that the Secretary could exclude coverage to protect Medicaid patients from a drug known to be defective. (See generally, testimony of Ben Bearden, M.J. Terrebonne, Charles Castille, and Gina Biglane).

62.     Secretary Hood testified that the reason LDHH had never used a restrictive formulary to exclude a drug known to be defective was that LDHH had never been confronted with a situation where it was made aware of such a defect before the drug was removed from the market. (Testimony of David Hood, Tr. 387:8-17; 454:4-8).

**Political considerations would not have precluded LDHH from refusing to reimburse Vioxx had the defect been known.**

63.     Secretary Hood's uncontroverted testimony was that any political opposition to implementation of a restrictive formulary would not have been present if LDHH were implementing a restrictive formulary for the sole purpose of excluding coverage for a defective drug. (Testimony of David Hood, Tr. 388:18-389:6; 451:12-452:5).

64.     Secretary Hood testified that had he known of the defect in Vioxx, "I think under those circumstances, what would have been unpalatable would be to expose Medicaid recipients to a drug where the risk outweighed the benefit." ((Id., at Tr. 388:2-6).

**The institutional mechanisms necessary to exclude Vioxx were in place when Act 395 went into effect on June 13, 2001, and Secretary Hood would have acted to exclude reimbursements immediately upon being empowered to do so.**

65.     Secretary Hood testified that with the passage of Act 395, he had authority to exclude coverage for Vioxx, and he would have acted immediately to exclude coverage for Vioxx. Testimony of David Hood, Tr. 440:13-21; 453:2-454:1).

66.     The DUR Board, which per 42 U.S.C.A. §1396r-8(d)(4)(A) can make the clinical determination necessary for excluding a drug from a state formulary (see Proposed Conclusions of Law), had been in existence since 1991 and was fully operational when Act 395 became effective on June 13, 2001. (Deposition of Melwyn Wendt, 50:21-23).

67.     The P&T Committee was up and running by August 8, 2001, less than sixty days after the effective date of Act 395 (LAAG 433, August 8, 2001 P&T Committee Meeting Minutes).

68.     This Court finds former Secretary David Hood's testimony that he could have and would have excluded coverage for Vioxx had he known of the defect described hereinabove credible. Accordingly, this Court finds that LDHH could have and would have refused to pay for Vioxx on June 13, 2001, the date on which Act 395 went into effect.

**Merck's Medicaid expert failed to refute Secretary Hood's testimony that he could have and would have excluded coverage for Vioxx had he known of the defect.**

69.     Merck's hired expert Jerry Wells was the only witness to offer testimony that a reasonable state medicaid authority could not or would not exclude coverage for Vioxx.

70.     Mr. Wells was a former pharmaceutical sales representative (Wells Testimony, Tr. 660:17-22) and former employee of Florida medicaid (*Id.*, 652:2-7), with no personal knowledge or experience with Louisiana Medicaid. (*Id.*, Tr. 658:15-25).

71.     Mr. Wells offered no opinion with respect to what formulary actions Louisiana's Medicaid statutes allow. (Id., Tr. 694:6-15).

72.     Mr. Wells based his assertion that LDHH did not have the authority to implement a restrictive formulary on his interpretation of the federal Medicaid statute (*Id.*, Tr. 694:21-695:13), but he was unaware that his interpretation of federal medicaid statutes had been rejected by several federal courts. (697:22-699:3.

73.     Although Mr. Wells testified that a reasonable Medicaid administrator would not have believed that he had the authority to refuse to pay for Medicaid prescriptions, Mr. Wells admitted that when he was serving as bureau chief in the Florida Medicaid department, the Secretary of Florida Medicaid believed that he had authority to refuse to pay for certain prescriptions, and Mr. Wells agreed with that conclusion at the time. (*Id.*, Tr. 697:13-19).

74.     Although Mr. Wells testified that to his knowledge, no state had adopted a restrictive formulary to exclude a single drug because of a black box warning, Mr. Wells testified that he was unaware of any situation in which it was determined that the risks of a drug outweighed its benefits before the drug was taken off the market.  (*Id.*, Tr. 699:4-700:10).

75.     This Court finds Mr. Wells' testimony as to what a reasonable a reasonable state Medicaid agency in the position of LDHH could have and would have done if made aware of the defective condition of Vioxx not to be credible.

76.     This Court finds former Secretary Hood to be a more reliable source of information about what LDHH would have and could have done if made aware of the defective condition of Vioxx than defendant's expert Mr. Wells, and accepts Secretary Hood's testimony that he could have and would have refused to reimburse prescriptions for Vioxx immediately upon being empowered to do so by Act 395.

**Requirements for exclusive formularies under federal Medicaid statute would not have precluded LDHH from refusing to reimburse Vioxx if the defect had been known.**

77.     Merck has suggested that LDHH could not have excluded Vioxx, because under the label as it existed when Vioxx was on the market, Vioxx had a significant clinical benefit over drugs on the Louisiana formulary and 42 U.S.C.A. §1396r-8(d)(4)(C) only allows exclusion of a drug if, according to the label, the drug does not have a clinical benefit over drugs on the formulary.  This Court finds this argument is factually unsupported.

78.     This Court finds that had Merck known of the defect (which Merck is deemed to know per LSA-C.C. art. 2545), then the defective condition of Vioxx would necessarily have been reflected in the Vioxx labeling. (Kessler Testimony, Tr. 52:19-25; 53:1-6)

79.     Had Merck disclosed the defective condition of Vioxx in its labeling, as this Court finds Merck was required to do, then the labeling would have supported exclusion of Vioxx on the grounds that Vioxx lacked significant clinical benefit over drugs on the Louisiana Medicaid formulary.

**There is no evidence that the Louisiana P&T Committee would not have supported Secretary Hood's decision to exclude Vioxx had the defect been known.**

80.     Merck has suggested that the Louisiana P&T Committee would not have supported Secretary Hood in his decision to exclude Vioxx, because to do so would have been contrary to the

FDA's approval of Vioxx.  Merck has presented no evidence that the P&T Committee would have declined to support Hood in exclusion of a defective product on the grounds that the FDA had not yet taken action with respect to the product. The only member of the P&T committee to testify on this matter was Secretary Hood, who testified that he would have acted to exclude Vioxx.

81.     Additionally, this Court finds that Merck cannot as a factual matter assert that the P&T Committee would not have acted to remove Vioxx on the grounds that the FDA had not acted to remove Vioxx, because had the defect been known, then the FDA would more likely than not have acted to remove Vioxx from the market.

82.     Since leaning of the CV risks in Vioxx found in the APPROVe study, the FDA has determined that Merck could not return Vioxx to the market without FDA approval. (DX 338). Since having been made aware of the cardiovascular risks of Vioxx, the FDA has not approved return of Vioxx to the market.  Accordingly, this Court finds it more likely than not that had Merck disclosed the defective condition of Vioxx (of which it is deemed to have known pursuant to LSA-C.C. art. 2545) then the FDA would have removed Vioxx from the market.

**LDHH's actions with respect to Celebrex do not indicate that LDHH would not have refused to pay for Vioxx had the defect been known.**

83.     Merck has suggested that LDHH's actions with respect to Celebrex indicate that LDHH would not have excluded coverage for Vioxx.  This Court rejects this suggestion on the preponderance of the evidence.  There has been no showing that Celebrex suffers from the same defect as Vioxx.  Celebrex remains on the market to this day, and the evidence adduced at trial indicates that Vioxx is much more cardiotoxic than Celebrex.  As such the Court is not swayed by Merck's Celebrex argument.

-24-

84.    Dr. MacGregor testified that a 2006 review that found Vioxx was more cardiotoxic than Celebrex based on a pooled analysis of 23 studies.   The authors reported: "The differences between rofecoxib and celecoxib appear important from both a clinical and regulatory standpoint. The data do not point to a safe dose level with rofecoxib, which justifies the decision taken to withdraw the drug from sale.  At doses of 200 mg. or less, there is no convincing evidence of an increased risk of cardiovascular events with celecoxib, which remains on international markets." (Tr., 488:10-492:11; 528:19-530:23; Tr., 982:10-983:24; Ex. LAAG 287, Dx 338).

85.    Moreover, although Celebrex remained on the Preferred Drug List, LDHH placed severe restrictions on use of Celebrex in response to CV concerns through its DUR process. (Deposition of Melwyn Wendt at 111:5-116:8)  The fact LDHH was sufficiently concerned about CV risks to impose DUR restrictions on Celebrex, a drug that posed less CV risk than Vioxx, supports Secretary Hood's contention that LDHH would have refused reimbursement for the much more dangerous drug Vioxx, had it known of Vioxx's CV risks. Additionally, Dr. Jerry Avorn has testified that one of the facts that supports his conclusion that the risks of Vioxx outweigh its benefits is the fact that Celebrex, a significantly less cardiotoxic Cox-2 inhibitor than Vioxx, is available to patients.  (Avorn deposition, at 378:17-379:16)

**Actions of Merck and the FDA upon revelation of cardiovascular risks of Vioxx support conclusion that LDHH would have excluded coverage for Vioxx had it known of the defect.**

86.    That LDHH would have excluded coverage for Vioxx is supported by the fact that Merck itself decided that Vioxx should not be made available to patients when it removed Vioxx from the market upon learning that the APPROVe study showed an unacceptable cardiovascular risk.

87.     That LDHH would have excluded coverage for Vioxx had it known of the defect is supported by the fact that, since learning of the cardiovascular risks associated with Vioxx, the FDA has indicated that Vioxx could not be returned to the market without prior FDA approval (DX 338), and to date Merck has not applied for and the FDA has not approved return of Vioxx to the market. (Tr., 1337:4-13).

88.     Based on all of the foregoing facts, this Court concludes that a reasonable state Medicaid agency in the position of LDHH would have refused to reimburse prescriptions of Vioxx had it known of the defect set forth hereinabove.

## III.    LDHH DID NOT KNOW AND COULD NOT HAVE KNOWN OF THE DEFECT:

89.     This Court finds that there has been no evidence that anyone at LDHH or acting on behalf of LDHH was aware of the defect in Vioxx set forth hereinabove or could reasonably have been expected to discover the defect.

### A.      THE RECORD DEMONSTRATES THAT LDHH DID NOT HAVE ACTUAL KNOWLEDGE OF THE DEFECT.

90.     This Court finds that there is no evidence that anyone at LDHH or acting on behalf of LDHH had actual knowledge of the defect set forth hereinabove.

91.     Former Secretary Hood testified that he understood that Vioxx was a safe and effective drug for many people.  (Testimony of David Hood, Tr. 383:23-384:9).

92.     Secretary Hood testified that he was unaware that Vioxx significantly increased the risk of heart attacks as compared to other NSAIDs. (Testimony of David Hood, Tr. 385:23-386:5)

93.     Secretary Hood testified that he was unaware that it was difficult if not impossible to differentiate Vioxx from other NSAIDs in terms of gastrotoxicity. (Testimony of David Hood, Tr. 386:6-14).

94.     Secretary Hood testified that he was unaware that "Vioxx suffered from a defect which rendered it unfit for its intended use; specifically, risk of cardiovascular effects that outweighed any GI benefit over traditional, less expensive NSAIDs in a drug that was proven to be no more effective than traditional NSAIDs in terms of pain relief." (Testimony of David Hood, Tr. 386:15-21).

95.     No witness from LDHH, the Louisiana Medicaid P&T Committee, or Louisiana's retained pharmacy benefit manager, Provider Synergies, has testified that LDHH was aware: that Vioxx significantly increased the risk of heart attacks compared to other NSAIDs; that Vioxx was difficult if not impossible to distinguish from other NSAIDs in terms of gastrotoxicity; or that Vioxx suffered from a defect such that its cardiovascular risks outweighed its limited GI benefit in a pain medication proven to be no more effective than traditional NSAIDs in terms of pain relief.

96.     Merck has offered no evidence that LDHH, the Louisiana Medicaid P&T Committee, or Louisiana's retained pharmacy benefit manager, Provider Synergies was aware: that Vioxx significantly increased the risk of heart attacks compared to other NSAIDs; that Vioxx was difficult if not impossible to distinguish from other NSAIDs in terms of gastrotoxicity; or that Vioxx suffered from a defect such that its cardiovascular risks outweighed its limited GI benefit in a pain medication proven to be no more effective than traditional NSAIDs in terms of pain relief.

**Provider Synergies Monographs and Vioxx labeling did not advise LDHH that Vioxx suffered from the defect.**

97.     All Merck has offered to support its contention that LDHH, the Louisiana Medicaid P&T Committee, or Louisiana's retained pharmacy benefit manager, Provider Synergies was aware of the defect in Vioxx was the 2002 Vioxx package insert and information set forth in the Provider Synergies Monograph, neither of which notified LDHH that Vioxx suffered from such a defect. See Provider Synergies Monographs: LAAG 439 (2002 monograph); LAAG 426 (2003 Monograph); DX 2118 (2004 Monograph) and LAAG 570 (2002 Label)

98.     Neither the 2002 package insert nor the Provider Synergies monographs were available to LDHH in June of 2001, when Secretary Hood testified LDHH would have excluded coverage for Vioxx.

99.     The package insert for Vioxx in June of 2001 did not contain any warning or precaution regarding even a potential for cardiovascular risk.  The pre-2002 versions of the package insert had no discussion in that label about the potential for cardiovascular toxicity of the drug.  The results of the VIGOR study were known in March 2000 but did not appear in the label until April 2002.  (Transcripts, 494:6-8; 495:17-20).

100.    The first Provider Synergies monograph was not available to LDHH until February 2002, eight months after Secretary Hood testified he would have excluded coverage for Vioxx.

101.    At most, the Provider Synergies Monographs, the first of which was not even available until February of 2002, advised LDHH that there was a *potential* cardiovascular risk of "unknown significance" in a drug with proven GI benefits over other NSAIDs.  This information was not sufficient to put LDHH on notice of the defect in Vioxx..  (LAAG 439; LAAG 426; DX 2118)

102.    At most, the Vioxx package insert first made available in April of 2002 advised LDHH that "the significance of the cardiovascular findings from these 3 studies (VIGOR and 2

-28-

placebo-controlled studies) is unknown" and that Vioxx offered proven GI benefits over other NSAIDs. This information was not sufficient to put LDHH on notice of the defect in Vioxx. (LAAG 570).

103. The 2002-2004 label stated that the cardiovascular mortality in the Alzheimer's studies was 8 for Vioxx compared to 3 for placebo, without a report of statistical significance, when in fact the cardiovascular mortality from these studies was 21 versus 6 events and was statistically significant with a relative risk of 3.84. The latter data never appeared in the Vioxx label, nor in the Provider Synergies monographs. (Tr., 495:21-496:15; 485:2-486:10; 1035:5-1036:13).

**Neither Provider Synergies nor its Clinical Direct Valerie Taylor were aware of or advised LDHH of the defect in Vioxx.**

104. Although Provider Synergies Clinical Director Valerie Taylor testified that she advised LDHH of the cardiovascular and gastrotoxicity risks of Vioxx, Taylor made clear in her testimony that the only risks to which she was referring were those set forth in the Provider Synergies monographs, which this Court concludes were insufficient to put LDHH on notice of the defect in Vioxx.

105. Valerie E. Taylor, the Clinical Director of Provider Synergies, was responsible for all clinical activities of Provider Synergies, including writing therapeutic class reviews, presentation at P&T Committee Meetings, and coordinating activities with the State accounts, including Louisiana. (Valerie Taylor, January 15, 2010 deposition transcript 7:1-8, 10:3-12, 11:12-13).

106. When advising the P&T Committee of the "Cardiovascular Concerns" and GI effects of Vioxx, Valerie Taylor would limit her presentation to the drug class review that she had previously submitted through Provider Synergies's monographs and then make recommendations

consistent with and based upon the information in the monographs. (Valerie Taylor, January 15, 2010 deposition transcript 45:21-46:11, 52:21-53:5, 53:14-54:10, 64:3-64:7, 65:21-66:6, 65:15-67:3, 67:14-67:24, 71:6-71:14, 97:7-98:2.

107.    If information regarding the CV and GI risks beyond that included in the Provider Synergies monographs had been made available to Provider Synergies, it would have been included in the monographs. (Valerie Taylor, January 15, 2010 deposition transcript 75:6-75:13)

       **B.**    THE RECORD DEMONSTRATES THAT **LDHH** COULD NOT HAVE LEARNED OF THE DEFECT.

108.    Merck itself asserts that it had insufficient information to indicate an increased cardiovascular risk associated with Vioxx until discontinuation of APPROVe study prompted removal of Vioxx from the market.

109.    Merck CEO Raymond Gilmartin testified before Congress, "Prior to APPROVe, there was no demonstrated increased risk of cardiovascular events for patients taking Vioxx compared to taking placebo or NSAIDs other than naproxen in randomized clinical trials, and we only found an increased risk of cardiovascular events because Merck continued to study Vioxx for a long time period." DX 442, at MRK-PUBLI0000131.

110.    Raymond Gilmartin further testified: "The first definitive data we had that demonstrated that there was a higher risk of cardiovascular events of Vioxx against placebo was when we got the call on September 23 [2004] in the evening and the data on September 24 [2004] in the morning. That's the first time there was a demonstrated risk in a randomized controlled clinical trial.... and that led us to act immediately to withdraw the drug from the market." DX 442 MRK-PUBLIC0000132.

111.    While this Court finds Mr. Gilmartin's testimony regarding Merck's awareness of CV risks is contradicted by internal Merck documents, Mr. Gilmartin's assertion that Merck was unaware of the risks that warranted removal of Vioxx from the market until the APPROVe study results were known supports this Court's conclusion that LDHH did not know and could not have known of the defect in Vioxx.

**Merck-sponsored studies neutralized any CV concerns about Vioxx raised in published literature.**

112.    The publication of the VIGOR study down-played any indications of CV risk of Vioxx and instead attributed the difference in heart attacks between Vioxx and Naproxen to an unsupported, hypothetical cardioprotective effect of Naproxen.

113.    In the VIGOR study, the authors reported an endpoint of myocardial infarction.  The authors stated that MI was less common in the naproxen group than in the Vioxx group, 0.1% versus 0.4%.  Subjects who required aspirin for secondary cardiovascular prophylaxis were supposed to be excluded from the VIGOR study.  However, the authors performed a *post hoc* analysis and determined that 4% of the subjects had a history of MI or other events that would have qualified them for aspirin prophylaxis.  These patients were described as "aspirin-indicated," and they were at increased risk for having another similar thrombotic event.  There was no trial plan to analyze patients who needed aspirin compared to patients who didn't.  Cardiovascular outcome was not an endpoint in the VIGOR trial; it was an endpoint of a standard operating procedure that was applied to the VIGOR trial.  The standard operating procedure endpoint was "thrombotic events," not myocardial infarctions.  "Thrombotic events" is a larger, broader endpoint with more power to detect a difference when you have more events.  (Tr., 986:5-989:7).

114.    The VIGOR article said that the aspirin-indicated patients accounted for 38% of the patients in the study who had MI, and that in the other patients the difference in the rate of MI between Vioxx and naproxen groups was not significant.  However, the results for the thrombotic endpoint specified in the Standard Operating Procedure showed that there was a statistically significant increased risk in the Vioxx group for both the aspirin-indicated and non-aspirin-indicated subjects in the VIGOR trial.  The thrombotic event endpoint provided a total of 64 events (45 versus 19), whereas the MI endpoint only provided 21 events.  A larger number of events provided greater power to detect a difference in both subgroups.  (Tr., 992:24-995:3).

115.    The VIGOR study was cited in each of the Provider Synergies Monographs, all of which concluded that Vioxx provided proven GI benefits and the potential CV risks of Vioxx were unknown. (LAAG 439; LAAG 426; DX 2118)

116.    Although the 2001 Mukherjee article in the Journal of the American Medical Association raised concerns about potential cardiotoxicity of Vioxx arising from the VIGOR study results, Merck-sponsored studies by Reicin, Konstam, and Weir, published subsequent to the Mukherjee article, suggested that there was no cardiovascular risk associated with Vioxx, reinforcing the contention in Merck's label that the significance of increased cardiovascular risks in the VIGOR study was "unknown."

117.    An April 19, 2002 PIR sent by Merck to Provider Synergies' Valerie Taylor in response to a request for cardiovascular information regarding Vioxx cited the Reicin and Konstam studies in response to the Mukherjee article.  The PIR claimed that the Reicin article demonstrated that "no difference exists between [Vioxx], comparator non-selective NSAIDs, and placebo in the risks of cardiovascular thrombotic events."  The PIR stated that the Konstam article concluded,

"[Vioxx] was not associated with excess CV thrombotic events compared with either placebo or non-naproxen NSAIDs." The PIR went on to re-urge the "naproxen theory" stating, "The data suggest, but are insufficient to ascertain, the cardioprotective effects of naproxen." LAAG 573.

118.    According to a March 13, 2001 Vioxx Commercialization Team Memo, Merck-sponsored studies such as the Reicin, Konstam and Weir articles were written to respond to marketing concerns and "neutralize non-GI Safety Concerns." LAAG 590.

119.    According to a May 31, 2001 Merck internal memorandum to Alise Reicin, the Reicin article was "revised multiple times based on marketing input." LAAG 800

120.    Reicin was not an uninterested first author, but a staunch defender of Vioxx. Her performance review for 2001 - the year the article was written, states, "Dr. Reicin's major efforts this past year were focused on defending the Vioxx franchise and building the scientific base for a 2-coxib business." (3/2/2005 Reicin Dep., 211:5-213:10; P1.1223, MRK-AAD 0800032.) Her review for 2003 states, "You have been a tenacious defender of the coxib franchise and are considered invaluable on the WBST (Worldwide Business Strategy Team)." (3/2/2005 Reicin Dep. 215:18-22; LAAG 229.)

121.    Merck scientist Briggs Morrison wrote an email dated August 17, 2001, describing the conclusion of the Konstam article as "wishful thinking." Morrison pointed out that the relative risks of 1.78 for RA patients and 1.53 for OA patients were both elevated and in a different direction from the data from the Alzheimer's clinical trials, that perhaps the groups should not be combined, and that the Alzheimer's trials could be the "outlier." Nothing prevented Konstam and the Merck co-authors of the paper from reporting that there were three different groups of patients, and that the

relative risk was higher in two of them.  As defense expert Eiswirth stated, "you can slice it any way you want to, I guess it's up to the person doing the cooking."  (Tr., 1007:8-1009:4; Ex. LAAG 805).

122.    Merck's Standard Operating Procedure (SOP) for CV events, adopted on August 30, 1999, specified that analyses of CV risk would be conducted based upon the indication (such as rheumatoid arthritis or osteoarthritis), study design and timing of completion.  The Alzheimer's trials were not scheduled for completion until 2003.  The SOP did not provide for including the interim Alzheimer's data into the same pool with the OA and RA data in 2001.  Merck made a choice to pool those data, contrary to the SOP, rather than reporting the data "by indication" as stated in the SOP. If the data had been reported as specified in the SOP, the OA and RA indications would both have shown increased risk of Vioxx compared to placebo.  (Tr., 1008:17-1009:21; 1042:15-1043:22; Ex. LAAG 804).

123.    The FDA has issued a Guidance for Industry that address concerns and cautions regarding pooled analyses of risk.  Of particular relevance to the Vioxx case, the guidance states: "When there is clinical heterogeneity among trials with regard to the safety outcome of interest (e.g., major disparity in findings for particular safety endpoints), sponsor should present risk information that details the range of results observed in the individual studies rather than producing a summary value from a pooled analysis."  This Guidance supports the finding that Merck should have presented the OA study block and the RA study block results showing greater risk of Vioxx separately from the Alzheimer's results which produced a "major disparity" for the CV risk endpoint, rather than relying upon a summary value from an analysis that pooled disparate study blocks of OA, RA, and Alzheimer's.  (Exhibit LAAG 811 at 22.)

124.    The pooled analysis of placebo studies submitted by Merck to FDA in March 2004 showed separate study blocks for OA, RA, Alzheimer's, and "other" studies, but reported a combined relative risk for all of the study blocks.  Dr. Eiswirth acknowledged that the OA trials would have shown about a three-fold, statistically-significant risk when all of the OA trials were done in 2002, including Protocol 010, and that the relative risk for the RA group was higher than 3, although not statistically significant.  Dr. Eiswirth again testified to his belief that the analysis was organized to report all of the adverse events across study blocks and not to try to do any subgroup analysis, based upon the standard operating procedure.  However, the SOP provided for analysis of separate study blocks according to the indication, rather than pooling them all together.  The ISS also provided that the "primary safety analysis" was based on the 6-week OA studies of Vioxx compared to placebo. As to those trials, the incidence of CV adverse events was substantially higher in the Vioxx groups than placebo (0.2% for placebo, compared 0.7, 0.8 and 1.0% for the Vioxx 12.5 mg, 25 mg and 50 mg dose groups, respectively).  (Tr., 1009:5-1012:8; 1032:21-1035:4; Exs. LAAG 129, 505, 804, Dx 40).

125.    Consistent with the PIRs sent by Merck to Provider Synergies, the Provider Synergies Monograph cited the Mukherjee article, but cautioned against use of such meta-analysis to establish CV risks, and then cited the Reicin and Konstam articles to conclude that the significance of the potential cardiovascular risk was unknown. Provider Synergies Monograph for 2003, LAAG 426; Provider Synergies Monograph for 2004 DX 2118, LAAG 573.

126.    This Court finds that the information publicly available about the risks and benefits of Vioxx at the time Vioxx was on the market was not sufficient to put LDHH on notice of the defect in Vioxx.

### C.   DUE TO MERCK'S FAILURE TO CONDUCT A CV OUTCOMES TRIAL, THERE WAS INADEQUATE INFORMATION TO DETERMINE WHETHER VIOXX SUFFERED FROM A DEFECT.

127.   This Court finds that the inability of information available at the time Vioxx was on the market to demonstrate the existence of a defect was a problem of Merck's own making, because Merck failed to conduct CV outcomes studies that early signals of cardiovascular risks indicated were necessary.

128.   Merck did not conduct the CV outcomes study that FDA reviewers stated was necessary to establish the cardiotoxicity of Vioxx. (Kessler Testimony, Tr. 73:21-25; 74:10-25; 75:1-25; 76:1-8).

129.   Merck did not conduct the CV outcomes study that president of Merck Research Labs, Dr. Edward Scolnick recommended Merck conduct. (Scolnick deposition testimony, 246:2-254:23).

**Pre-market signals of cardiovascular risks necessitated a CV outcomes study which Merck failed to conduct.**

130.   Long before Merck began to develop Vioxx, it was known that thromboxane is a potent platelet aggregator and vasoconstrictor, and that a balance of prostacyclin and thromboxane in necessary to prevent thrombotic cardiovascular events, including myocardial infarctions and strokes. (Scolnick Dep. 119:11-124:20.) Merck scientists realized as early as 1997 that Vioxx suppressed the urinary metabolites of prostacyclin. (Scolnick Dep. 130:5-13.) This finding was consistent with a theory held by scientists, including Merck consultants, that suppression of systemic prostacyclin could cause thrombotic events in humans. (Scolnick Dep. 131:9-20.) The issue was

raised in the medical literature, and one that concerned Merck about the development of Vioxx. (3/23/2005 Reicin Dep. 479:23-480:17.)

131.    From May 1996 through January 1997, Merck carried out Protocol 023, a double-blind, placebo-controlled safety and pharmacokinetic study of Vioxx. Doctors Garrett Fitzgerald and Francesca Catella-Lawson, both of the University of Pennsylvania, were external investigators on the study. Protocol 023 revealed a decrease in prostacyclin metabolites in the urine of patients taking Vioxx. (Morrison Dep. 178:1-18.) This outcome raised concern that Vioxx upset the balance of prostacyclin and thromboxane, increasing the risk of thromboembolic events. (Morrison Dep. 1779:21-1780:12.)   The external authors' draft of the manuscript concluded that "inhibition of [prostacyclin] by [Vioxx] implies a major role for Cox-2 in the biosynthesis of systemic prostacyclin." (P1.1840, Morrison Dep. 1783:9-1789:13.) The draft manuscript also stated that "caution should be used in clinical practice." *Id.*

132.    Merck's Briggs Morrison argued that the paper should exclude the "major role" language and the caution about clinical practice. Morrison and Barry Gertz ultimately went to the University of Pennsylvania to "come to some agreement on the wording of the paper." *Id.* Ultimately, there was no mention of "a major role" for Cox-2 in prostacyclin biosynthesis. The caution to physicians - one that might have saved lives - was also excluded.

133.    In October 1997, John Oates, a leading pharmacologist and Merck consultant recommended a study designed to investigate the implications of Vioxx's inhibition of prostacyclin. (Morrison Dep. 85:6-91:17, LAAG 86.) Dr. Oates was willing to conduct the study. Merck declined. (Morrison Dep. 88:20-21.) Dr. Oates sent a second letter to Barry Gertz with an analysis that suggested that prostacyclin synthesis takes place in the vasculature. This finding was consistent

with the view that Vioxx creates a prothrombotic state, a hypothesis Merck was "interested in." (Morrison Dep. 97:11-101:4.)

134.     The role of thromboxane was described in detail in the Merck Manual, 16th Edition. (Scolnick Dep. 118:2-122:20.)  Discussion of the role of prostacyclin and thromboxane was deleted from the Merck Manual before publication of the 17th Edition of the Merck Manual in 1999. (Scolnick Dep. 127:11-129:19.)  The deletion of discussion of the mechanism that supported the view that Vioxx would cause heart attacks and strokes is not supported by any scientific research conducted between the publication of the 16th and 17th Editions of the Merck Manual.  (Scolnick Dep. 130:6-131:9.)  The deleted material is still accurate.  (Scolnick Dep. 131:24-133:14.)

135.     After Protocol 023, Merck scientists were aware that Vioxx might be prothrombotic. (Morrison 2118:14-24.)   In August 1999, Merck implemented the Standard Operating Procedure for monitoring and adjudicating cardiovascular thrombotic events.  (3/23/2005 Reicin Dep. 160:4-160:19.)   Not only did Merck failed to disclose their concern to the State or the medical community, it failed to perform any clinical study designed to reveal that risk.  In an email related to the design of a gastrointestinal clinical study, Reicin told Morrison, "the possibility of increased cardiovascular events is of great concern (I just can't wait to be the one to present those results to senior management[!!])."  (3/23/2005 Reicin Dep. 286:2-286:10.)

**Merck did not adequately investigate pre-market signals of CV risk, because Merck did not want to delay bringing Vioxx to the market.**

136.     Merck never did a CV study prior to bringing Vioxx to market, even though such a study could have been done.  (Anstice 622:24-628:12.)

137.    In the 1990's, Merck was faced with a number of its products going off patent, which meant that competitors could sell generic versions of the same drug for lower prices, resulting in substantial losses of sales and income for Merck.  (Deposition of Edward Scolnick ("Scolnick Dep.") 29:18-30:4, 32:13-33:20, 112:22-24.)   Other Merck drugs that were newer to the market had disappointing sales.  (Scolnick Dep. 116:1-11, LAAG 7.)  Edward Scolnick conveyed his concern about the future of the company and the critical role of Vioxx by forwarding an analyst report of a downgrade of Merck stock to the Vioxx Development Team.  Scolnick's email also stated that it was up to the team to present positive data "not EVEN ONE day after launch" to "PRESERVE MERCK and MRL period for others, and yourselves."  (Scolnick Dep. 118:1-118:22, LAAG 7.)

138.    Merck knew that it was in a "race" with a competitor, Searle, which later became Pharmacia and then Pfizer, to be the first to market a COX-2 inhibitor.  The loss of future income coupled with the race to beat Searle's Celebrex intensified the pressure on Merck to bring Vioxx to market. (Scolnick Dep. 34:8-34:16.) Scolnick emphasized the need to accelerate regulatory approval and allocated significant resources to the Vioxx team.   (Scolnick Dep. 42:6-9, 43:11-19; 117:18-118:13.)  Scolnick demanded Merck "push Vioxx to market by May 22nd" or "Merck will be a different company."  (Scolnick Dep. 156:7-10.)

139.    If Merck informed the FDA that there was a potential cardiovascular issue with Vioxx, or if Merck had conducted a pre-approval clinical trial to test whether Vioxx caused cardiovascular events, it would have slowed down the approval process for the drug.  (Scolnick Dep. 151:17-152:4.)  Consequently, Merck did not conduct such a study, and could not provide the FDA with data to show that Vioxx did not pose cardiovascular risks.  (Scolnick Dep. 152:5-152:24; 3/23/2005 Reicin Dep. 165:14-18.)

**Former FDA director David Kessler opined that Merck should have conducted a CV outcomes study in response to these signals of CV risk.**

140.     Both before bringing Vioxx to the market and afterwards, Merck encountered numerous safety signals that indicated a potential cardiovascular risk, which Merck should have investigated through a CV outcomes trial.  (Kessler Testimony, Tr. 76:14-25; 77:1-12)

141.     Merck's duty to investigate the risk is heightened by Merck's decision to engage in wide-spread direct to consumer advertising, which marketed the drug directly to large populations of patients at higher risk of CV adverse events.  (Kessler Testimony, Tr. 78:11-12; 79:10-25; 80:1-25; 81:1-2).

142.     Merck should have responded to CV safety signals by designing a study specifically to investigate the cardiovascular risks.  (Kessler testimony, Tr. 81:15-19).

**Guidelines recognized by Merck's FDA expert Lisa Rarick as authoritative required further investigation of CV risks in response to pre-market signals.**

143.     The International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) states guidelines for the safety evaluation of new drugs. These guidelines state non-binding recommendations that are considered applicable to the conduct of the pharmaceutical industry by Merck's expert, Dr. Lisa Rarick.  Dr. Rarick testified to general guidelines regarding the appropriate size of the pre-market safety database, which according to Dr. Rarick's testimony Merck met or exceeded. However, several of the ICH guidelines support findings that Merck should have amassed a larger database of safety information for Vioxx to address and resolve the question of CV thrombotic risk before marketing the drug. (Exhibits LAAG 809, 810).

-40-

144.    The Integrated Safety Summary (ISS) for Vioxx states: "The basic safety of any new drug is defined by comparing it with placebo. For this reason, the primary pre-specified comparison is between Vioxx 12.5 and 25 milligrams and placebo in the six week studies." Those studies had placebo controls for their entire duration. The placebo controlled six week studies included only 412 placebo patients, and 1,780 Vioxx patients, treated for an average of 40 days. While there were 58 studies of Vioxx prior to marketing, only five studies comprised the primary safety analysis of Vioxx versus placebo (010, 029, 033, 040, and 058). (Tr., 1278:11-16; 1279:22-1280:11; 1281:4-9; Exhibit DX40, at MRK-OS420124093, 4124, 4165.)

145.    The ICH E1 Guideline is entitled, "The Extent of Population Exposure to Assess Clinical Safety for Drugs Intended for Long-term Treatment of Non-Life-Threatening Conditions." Paragraph 7 of this guideline provides exceptions to the general rules concerning the scope of the safety database, including the following: "Instances where there is concern that the drug will cause late developing ADEs (adverse drug events), or cause ADEs that increase in severity or frequency over time, would require a larger and/or longer term safety database. The concern could arise from:

> …(3) pharmacokinetic or pharmacodynamic properties known to be associated with such ADEs.

In the case of Vioxx, the evidence from the Protocol 023 pharmacodynamic study gave rise to a "concern" within Merck about the risk that Vioxx could cause heart attacks and strokes, and this ICH guideline would support the need for a larger and/or longer-term safety database in these circumstances. (Tr., 1281:22-1282:24; Exhibit LAAG809, page 2; 1285:17-1286:10; LAAG585 at 9949.)

146.    ICH E1 guidelines provide:  "Situations in which there is a need to quantitate the occurrence rate of an expected specific low-frequency ADE will require a greater long-term database.  Examples would include situations where a specific serious ADE has been identified in similar drugs or where a serious event that could represent an alert event is observed in early clinical trials."  In the early clinical trial of Vioxx known as Protocol 017 in 1996, there were three serious thrombotic adverse events that represented "alert events:" myocardial infarction, unstable angina and pulmonary embolism.  Merck's review at the time said that the "adverse events of most concern" were in the cardiovascular system and included MI and unstable angina.  According to the ICH guidelines, these early alert events required a "greater long-term database."  (Tr., 1282:25-1284:17; Exhibits LAAG 18, 580, 809.)

147.    ICH E1 further provides:  "in situations where there is concern that a drug may add to an already significant background rate of morbidity or mortality, clinical trials may need to be designed with a sufficient number of patients to provide adequate statistical power to detect pre-specified increases over the baseline morbidity or mortality."  Merck's documents show that there was such "concern" on multiple occasions prior to marketing of Vioxx, including the October 10, 1996 Research Committee Memo describing "adverse events of most concern" in the cardiovascular system; the Project Team Minutes for January 12, 1998 citing the results of Protocol 023 that "raised a concern about the potential for Vioxx to cause cardiovascular thrombotic events;" similar concerns mentioned in the (Watson) Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials; and the Scientific Advisory Board summary of May 1998 describing in detail the need to investigate the potential risk that Vioxx was pro-thrombotic and atherogenic.  These concerns support a finding that the Vioxx clinical trials

needed to be "designed with a sufficient number of patients to provide adequate statistical power to detect pre-specified increases over the baseline morbidity or mortality" due to risk of thrombotic events such as heart attacks and strokes. (Tr., 1286:11-19; Exhibits LAAG 38, 128, 580, 585, 809.)

148.    ICH E9 provides "Guidance On Statistical Principles For Clinical Trials." This guideline was published in the Federal Register on September 16, 1998. ICH E9 provides as follows: "3.5 Sample Size. The number of subjects in a clinical trial should always be large enough to provide a reliable answer to the questions addressed. This number is usually determined by the primary objective of the trial. If the sample size is determined on some other basis, then this should be made clear and justified.   For example, a trial sized on the basis of safety questions or requirements or important secondary objectives may need larger numbers of subjects than a trial sized on the basis of the primary efficacy question." In the case of Vioxx, no study was pre-specified to "answer the question" addressed to the cardiovascular risk of Vioxx for thrombotic events. "The [Vioxx] clinical development program tested the hypothesis that [Vioxx] a specific COX-2 inhibitor, would have efficacy equivalent to high doses of NSAIDs (non-specific COX inhibitors) in the treatment of OA and pain with a superior clinical safety profile with respect to the gastrointestinal (GI) tract." The program was thus addressed to efficacy (pain relief) and GI safety, and the clinical trials were designed to answer those questions. Merck did not design or conduct any clinical trials addressed to the question of whether Vioxx increased the risk of heart attacks and other thrombotic events, and the Vioxx clinical development program did not meet the ICH E9 guideline to establish a sample size  "large enough to provide a reliable answer" to that question. (Tr., 1291:17-1292:21; Exhibit LAAG 810 at 49591; Exhibit DX40 at MRK-OS420124073.)

149.    "Power" refers to developing a sample size sufficient to detect a difference between one group and another.  When a clinical trial is designed, the statisticians create a power calculation with a certain expectation of the rates of events, the size of the population and duration of the trial that will combine to provide sufficient power to detect an effect.  Even after Vioxx was approved and marketed, no trial of Vioxx was ever designed and powered to detect a difference in heart attack risk between Vioxx and placebo.  Protocol 203 was a post-approval Merck plan to pool placebo controlled trials in order to collect an appropriate number of events to have that power.  However, Protocol 203 was not submitted for FDA review until approximately December 2002, after Vioxx had been on the market for three and a half years; the data from Protocol 203 were never analyzed before Vioxx was taken off the market in September 2004; and the studies were designed and powered for the endpoints of polyps, prostate cancer and colon cancer prevention, rather than cardiovascular risk.  (Tr., 1290:1-1291:16.)

150.    The Center for Drug Evaluation and Research of the FDA prepared a "Guidance For Industry: Pre-Marketing Risk Assessment," which provides additional standards supporting the need for a larger database to detect CV thrombotic event risk prior to the marketing of Vioxx.  This guidance states that "the larger and more comprehensive the pre-approval database, the more likely it is that serious adverse events will be detected during drug developments.  The appropriate size of a safety database supporting a new product will depend on a number of factors specific to that product including:

*       its novelty (i.e., whether it represents a new treatment or is similar to available treatment)

-44-

* the availability of alternative therapies and the relative safety of those alternatives as compared to the new product

* the intended population and condition being treated

* the intended duration of use"

Each of these factors favored a larger database to answer safety questions. (1) It was known that the COX-2 inhibitors were a novel class of pharmaceutical products. Novel drugs involve unpredictable consequences, and when a particular type of drug has not been evaluated previously, there is a need to look at what it does to a larger sample of subjects. (2) By the time Vioxx came out, an alternative COX-2 inhibitor was available (Celebrex.) (3) The intended population of elderly patients with arthritis included many with increased CV risk due to co-morbidities. (4) The duration of use was intended to be chronic for arthritis patients, further increasing the risk  (Tr., 1293:12-1295:12; Exhibit LAAG 811 at 6.)

151. The Premarketing Risk Assessment Guidance states: "A larger database would help make risk-benefit decisions in situations when the benefit from the product . . .

"Is of uncertain magnitude (e.g., efficacy determination on a surrogate endpoint). "

A surrogate endpoint is something less than the actual clinical outcome. In the case of Vioxx, the FDA review stated the overall conclusion:  "Although the large differences in endoscopically designed gastroduodenal ulcer rates between rofecoxib at the doses of 25 and 50 mg QD [once a day] and ibuprofen 800 mg TID [three times a day] suggested a substantial difference in safety profile, analyses of meaningful clinical GI endpoints were not demonstrative of clinically significant differences between rofecoxib, ibuprofen, and diclofenac."  The disparity between the large differences in the surrogate endpoint of endoscopic ulcers and the lack of clinically significant

differences for meaningful GI endpoints supports the opinions of Plaintiff's expert David Graham, M.D., who testified that endoscopic ulcers are not a meaningful or valid surrogate for clinically significant GI adverse events.  Pursuant to the Premarket Risk Assessment Guidance, the uncertain magnitude of benefit based upon a surrogate endpoint  supports a finding of the need for a larger database to more accurately characterize the CV risk of the drug.  (Tr., 1295:6-1296:23; Exhibit LAAG811 at 7-8.)

152.    The foregoing statements from three separate guidance documents support Dr. Kessler's opinion that Merck could and should have conducted a large enough study to address and resolve the question of CV thrombotic risk prior to marketing Vioxx.  Additional statements in the Premarket Risk Assessment Guidance produce additional support for Dr. Kessler's related opinions.  For example, the Guidance states that it is common for clinical development programs to explore doses higher than those ultimately proposed for marketing, which may offer no efficacy advantage and show some dose-related toxicities.  "In such cases, data from subjects exposed to doses in excess of those ultimately proposed are highly informative for the safety evaluation and should be counted as contributing to the relevant safety database."  This is supportive of Dr. Kessler's opinion that the thrombotic cardiovascular events in rheumatoid arthritis Protocol 017 were relevant to the signal of CV risk, even though those events occurred at a higher than marketed dose.  The Guidance further states, "Premarketing safety databases should include, to the extent possible, a population sufficiently diverse to adequately represent the expected target population, particularly in phase III studies. . . . To the extent feasible, only patients with obvious contraindications or other clinical considerations that clearly dictate exclusion should be excluded from study entry."  This guidance supports Dr. Kessler's concern that Merck's clinical trial program inappropriately excluded patients at high risk

-46-

for CV events while at the same time targeting a high CV risk arthritis population for chronic use of Vioxx.  (Tr., 73:21-25; 74:10-25; 75:1-25; 76:1-8, 76:14-25, 77:1-12, 78:11-12; 79:10-25; 80:1-25; 81:1-2, 81:15-19, Exhibits LAAG 579 and 811, at 7, 9-10.)

153.     At the November 18, 2004 Senate Finance Committee Hearing Bruce Psaty, M.D., a cardiovascular disease epidemiologist with expertise in pharmacoepidemiology and drug safety, and with no financial interests in the Vioxx matter, testified:  "Medicines that will be used by large numbers of Americans for long periods of time are best evaluated in large, long-term clinical trials and are started as early as possible in the approval process."  Dr. Psaty also testified that Merck excluded patients recently diagnosed with cardiovascular disease and patients taking aspirin from the clinical trials.  "This approach maximized the possibility of finding a GI benefit and minimized the possibility of uncovering evidence of cardiovascular harm."  Dr. Psaty further testified that the biologic mechanisms known in 1998 suggested both the possibility of GI benefits and the possibility of cardiovascular harm, but that "the attentions to risk and benefits were not symmetrical. . . . Fundamentally, they chose not ask the question about cardiovascular answers.  But the lack of evidence about a drug is not evidence that the drug is safe."  (Exhibit DX442 at MRK-PUBLIC0000063, 0066, 0092.)  These comments offer support for the finding that the premarket investigation of Vioxx did not adequately evaluate the risk of heart attack and thrombotic events due to Vioxx.

154.     FDA Medical Review Officer Villalba stated, "It is impossible to answer with complete certainty whether the risk of cardiovascular and thromboembolic events is increased in patients on rofecoxib.  A larger database will be needed to answer this and other safety comparison questions."  Merck's expert, Dr. Rarick, acknowledged that there was nothing that FDA ever did that

stopped Merck from conducting a clinical trial to develop a larger database to answer these safety comparison questions before selling Vioxx to the public.  The decision not to conduct such testing to answer the CV risk question was Merck's alone, and Merck bears responsibility for that decision. (Tr., 1312:12-23; Exhibit LAAG 72.)

155.    The lack of a statistically significant difference between Vioxx and placebo for thromboembolic events in the pre-market studies does not obviate the need for further investigation of the risk, especially where the database was too small to provide a reliable answer to the question. As Dr. Villalba testified at a meeting of the FDA Arthritis Advisory Committee in 2001, "Actually, the p-values are kind of irrelevant in that when we look at safety, we don't look for statistical significance and differences; we look for trends."  That statement is consistent with the training that defense expert Dr. Rarick provided to Dr. Villalba as part of the medical reviewer training course. A trend toward higher CV risk did appear, where the results of the primary safety analysis in the six-week trials of Vioxx versus placebo indicated that the rates of thromboembolic events were several times higher in the Vioxx groups than the placebo group (0.2% for placebo, compared to 0.7, 0.8 and 1.0% for Vioxx 12.5, 25 and 50 mg, respectively).  (Tr., 1296:24-1297:24; Exhibit LAAG 129.)

**The Watson analysis indicated a need for a CV outcomes study**.

156.    Following the receipt of information from Protocol 023 that Vioxx resulted in an imbalance between the metabolites of prostacyclin and thromboxane, which gave rise to a concern over whether Vioxx could cause cardiovascular thrombotic events, Merck did not initiate any clinical trials specifically designed and powered to assess that risk.  If Merck had decided in late 1997 to conduct a study of cardiovascular endpoints large enough to provide a reliable answer to that

question, such a study would have taken more time to complete.  Instead, Merck took a "quick and crude look" at the question of the CV thrombotic risk of Vioxx by directing Doug Watson to conduct the analysis comparing the rate of thrombotic events in all of the arms of the Vioxx clinical trials to the rates of such event in the placebo populations from the studies of Fosamax and Proscar.  The Watson analysis was the subject of an initial task force meeting on December 3, 1997, and results were directed to be reported to the Merck Clinical Development Oversight Committee (CDOC) on January 7, 1998, about one month later.  Contemporaneous documents indicate that Merck was operating under "time pressures," and that completion of Watson's analysis was undertaken with "urgency."  Merck asked the FDA for a "priority review designation" which meant that the review clock was six months from submission to a decision on approval or non-approval.  The crude look at the question by Watson was promptly completed without delaying the submission of Merck's new drug application, as would have occurred if a large enough study to provide a reliable answer to the question of CV thrombotic risk had been carried out.  (Tr., 1312:24-1321:18; Exs. LAAG 128, 585, 813, 814).

157.  The Watson Plan was ostensibly conducted to determine whether a more formal analysis of CV thrombotic risk of Vioxx should be carried out.  The plan as written resulted in a statistically significant increased risk in the Vioxx trials group compared to the Fosamax placebo group, relative risk 2.16 for women, and non-significant increased relative risk of 1.28 for men.  Despite these results, Watson did not recommend and Merck did not conduct a more formal evaluation prior to marketing Vioxx, which again would have taken more time and delayed the new drug application process.  Merck never told the FDA about the analysis by Watson of whether there was a cardiovascular risk with Vioxx.  Internally, Merck downplayed the results of the Watson

analysis by after-the-fact criticism of its own decision to use the Fosamax placebo group as a control population, and by the addition of a comparison to a community health study that was not part of the original plan.  (Tr., 1319:4-8; 1320:6-9; 1321:13-18; Exs. LAAG 128, 565, 585). The decision to conduct a "quick and crude look" at the CV risk issue rather than a thorough evaluation with an adequate database was Merck's alone, and Merck alone is responsible for the consequences of that decision.

158.    This Court finds it more likely than not that had Merck conducted the CV outcomes study that  early signals of cardiotoxicity indicated was necessary, then information available to Merck would have demonstrated an unacceptable risk of adverse cardiovascular events at all times pertinent to this litigation, to wit June 13, 2001 to September 30, 2004.  This conclusion is supported by the fact that studies that were not CV outcome studies, such as VIGOR and APPROVe, demonstrated a significant increased CV risk in Vioxx patients.

159.    Without such a study, there was inadequate information to determine whether Vioxx suffered from the defect set forth hereinabove.  Accordingly, this Court finds evidence presented by Merck to the effect that the Provider Synergies Monographs, Merck-sponsored studies, and the Vioxx package insert adequately advised LDHH of information publicly available at the time Vioxx was on the market does not establish that LDHH was aware of a defect. (See also Conclusions of Law – Merck deemed to know of defect per La.C.C. art. 2545).

**D.    MERCK'S MARKETING TO PROVIDER SYNERGIES AND THE LOUISIANA MEDICAID P&T COMMITTEE DOWNPLAYED THE CARDIOVASCULAR RISKS OF AND EXAGGERATED THE GI BENEFITS OF VIOXX.**

160.    Merck targeted both LDHH and Provider Synergies with its core messages regarding Vioxx.  Merck Louisiana Customer Profiles identified a "Merck Strategy" to "[e]nsure unrestricted

access for key Merck products through work with the State of Louisiana, DHH and PS [Provider Synergies]" and "[c]ontinue to develop product advocates with Medicaid P&T and DUR committee members." LAAG 371, LAAG 376, LAAG 377.

**Merck's sales force targeted P&T Committee Members with Merck's pro-Vioxx message.**

161. Merck's sales force targeted Louisiana Medicaid P&T Committee Members with its core messages regarding Vioxx. For example, a January 24, 2001 memorandum from Regional Business Director Warren Lambert to office-based sales representatives re "Louisiana Medicaid – Action required" stated "The office-based team should contact each P&T Committee member to make sure that they are fully aware of the benefits and features of those products up for review...." using the clinical package created by Merck headquarters. LAAG 383. See also LAAG 382, LAAG 391, LAAG 392, LAAG 543, LAAG 371, LAAG 372, LAAG 375, LAAG 369.

162. Merck Senior Regional director Warren Lambert testified that in 2002, Mr. Lambert expected sales representatives under his supervision and as per the regional tactical plans to deliver core messages consistent with Vioxx product labeling to P&T Committee members. (Warren Lambert 12/18/09 deposition transcript, 157:13-17; 157:20-22; 157:24-158:7; 158:13-20; 159:6-12; 159:15-24; 160:20-161:8; 161:11-17; See also LAAG 393).

163. Merck's core messages for Vioxx, which were communicated to the sales force which called on P&T Committee members, included touting GI benefits and neutralizing CV concerns. See e.g. "National Team Meeting for Vioxx" LAAG 729; "ArkLaTex Tactical Plan 2001" LAAG 393.

164.   Mr. Lambert was copied on a July 2004 email titled "LA Medicaid Region Plan" which urged the Louisiana team "to deliver strong clinical messages consistent with our labels; differentiate our brands according to strategy, and to ask for a call to action which is fully within our approved contacts with Medicaid P&T members." (Warren Lambert 12/18/09 deposition transcript, 297:19-300:8) The email also referred to "call decks" which Mr. Lambert stated are lists of physicians, nurses, and pharmacies that Merck sales people called on. (Warren Lambert 12/18/09 deposition transcript, 301:11-21; See also LAAG 391 - "email string")

**Merck's national marketing message for Vioxx focused on emphasizing GI benefit and neutralizing CV concerns.**

165.   Merck trained sales representatives to make statements that did not adequately disclose the CV side effects of Vioxx. (Anstice 1473:22-23; 1473:25-1474:2; 1478:11-1478:15; 1498:7-1498:21;   1498:22-1499:21;   1499:24-1500:16;   1502:1-1502:15;   1597:21-1597:23; 1597:25-1599:6)

166.   Merck's national marketing materials downplayed the cardiovascular risks associated with Vioxx. (Anstice 1597:11-20; 1599:8-20; 1599:22-1600:14)

**National Account Executives presented Merck's pro-Vioxx message to Provider Synergies and LDHH.**

167.   John Fevurly was the Merck National Account Executive ("NAE") assigned to Provider Synergies from approximately May 2002, through 2004. (John Fevurly, November 12, 2009 deposition transcript 13:17-19, 40:1-5).

168.   Mr. Fevurly, as NAE, regularly met with and delivered clinical information to Provider Synergies, through clinical updates created entirely by Merck headquarters.  If additional information was requested outside of the product label, he would have a Regional Medical Director

speak with Provider Synergies or would request information be sent by Medical Services. (John Fevurly, November 12, 2009 deposition transcript (14:8-12, 14:25-16:4, 56:15-22, 89:8-24, 93:16-94:6).

169.     Mr. Fevurly also met directly with Dr. Culotta, the Chair of the P&T Committee for the State, in August 2002, to respond to specific information requested about Vioxx and other Merck products. (John Fevurly, November 12, 2009 deposition transcript (50:8-52:15).

170.     Mary Ogle was the National Account Executive assigned to Louisiana Medicaid with responsibility for ensuring optimal access to Merck products. (64:1-11; 66:2-15).

171.     Mary Ogle testified that she drafted a memorandum to Mark Dervishian, in which she wrote, "In addition to working with the OBR's, I also work very closely with the government affairs and the SC region medical director to regularly call on the chief of P&T and Pharmacy Director.  Our goal is to ensure that they fully understand the value that our product portfolio provides to the appropriate patient population versus the competition." (Mary Ogle 12/16/09 deposition, 293:17-15; 303:24-304:10; 305:17-306:8).

**Merck Regional Medical Directors met with both Provider Synergies and P&T Committee members to deliver Merck's clinical messages.**

172.     Dr. Kerry Edwards, a Merck Regional Medical Director delivered Merck's promotional messages to Provider Synergies through Power Point  slide presentations created entirely by Merck Medical/Legal teams in Merck  headquarters (Kerry I. Edwards, M.D. December 17, 2009 deposition transcript 55:6-56:3, 92:8-23, 159:17-160:23, 239:4-20, 240:2-19, 240:21-241:1, 241:4, 241:6-7, 241:10-11).

173.    At every opportunity of contact, Provider Synergies asked, and Dr. Edwards discussed, the CV safety of Vioxx (Kerry I. Edwards, M.D. December 17, 2009 deposition transcript 65:14-24, 69:19-24, 81:15-83:8, 87:12-88:8, 94:14-16, 94:22-96:23, 97:3-9).

174.    Regional Medical Director Dr. Fran Kaiser met repeatedly with members of the P&T Committee, including P&T chair Dr. Vincent Culotta. LAAG 551.

175.    Dr. Fran Kaiser also met with members of the LDHH DUR Board to provide clinical information regarding Vioxx.  LAAG 543.

**Kaiser and Edwards delivered clinical messages of GI benefit and neutralization of CV risk from Merck's Scientific Communication Plan to LDHH and Provider Synergies**.

176.    The Merck Scientific Communication Plan of March 27, 2001 was designed to maintain "vigorous growth of Vioxx" and "ensure competitive victories over Coxib competitors" by expediting and expanding dissemination of Merck's position on cardiovascular effects.   The "foundation of the plan [was] an evolved message platform" that included the "messages" that Vioxx had "CV effects similar to placebo and NSAIDs without potent, sustained anti-platelet effects; difference in MIs in VIGOR due to cardioprotection with naproxen."  (Ex. LAAG 127 at MRK-ABO0000257.)

177.    The Plan indicates that Merck Region Medical Directors (RMDs) Kerry Edwards and Fran Kaiser were both listed as "Internal Speakers" to deliver the Merck messages, and that a training session was scheduled for April 10, 2001 to "fully train all 30 Region Medical Directors on the available data for Vioxx and the Coxibs."  (Id. at 0263.)

178.    The Scientific Communication Plan supports a finding that the messages delivered to Louisiana by the RMDs followed the "CV Safety" information supplied by Merck.

179.    Valerie Taylor and Provider Synergies requested additional clinical information from Merck about Vioxx on numerous occasions.  Merck would respond with PIRs which contained clinical information generated by the Medical Services Department, which was relied upon by Provider Synergies as being accurate, thorough, and truthful. (Valerie Taylor, January 15, 2010 deposition transcript 58:1-25, 61:19-23, 80:14-22, 81:7-9).

180.    Valerie Taylor and Provider Synergies relied on the labeling information on Vioxx in developing the monographs for Cox-2 and NSAID drugs and making recommendations to the P&T Committee about inclusion in the preferred drug list.  (Valerie Taylor, January 15, 2010 deposition transcript 113:16-20).

181.    This Court concludes that Merck's cardiovascular message was successfully communicated to Provider Synergies, the P&T Committee and LDHH.  The Provider Synergies Monographs, consistent with Merck PIRs and Merck's Scientific Communication Plan, concluded that the significance of the potential CV risk was "unknown" and that Vioxx provided significant GI benefit over other NSAIDs.  The P&T Committee concurred in this conclusion by adopting the recommendations of Provider Synergies.   The Secretary of LDHH in turn adopted the recommendations of the P&T Committee.

### E.    MERCK FAILED TO DISCLOSE INFORMATION IN ITS POSSESSION REGARDING THE CV RISKS OF VIOXX.

182.    At times pertinent to this litigation, to wit June 13, 2001 to September 30, 2004, Merck had information regarding the safety profile of Vioxx that it did not make publicly available.

183.    Merck's marketing efforts with respect to Vioxx communicated the message that the significance of cardiovascular risks was "unknown" to both Provider Synergies and the P&T

Committee.  Merck did not disclose key information which would have refuted the contention that the risk was "unknown."

184.    Merck did not disclose that the president of Merck Research Labs, Dr. Edward Scolnick had recommended that Merck conduct a CV outcomes study, and Merck chose not to conduct such a study.

**Merck did not disclose that its own scientists had recognized that VIGOR demonstrated the Vioxx was cardiotoxic.**

185.    Alise Reicin acknowledged that the VIGOR results were a signal that Vioxx is cardiotoxic (Reicin, 3/23/2005, 393:16-395:2), a "red flag" to the company to "stop, look and listen" (394:15-395:2).   Alise Reicin acknowledged that "one of the first things we considered, was that Vioxx could have increased the risk compared with naproxen potentially due to an impact on prostacyclin." (3/23/2005 Reicin Dep. 504:34-505:13.)

186.    Merck's President Ed Scolnick wrote on March 9, 2000 that the "CV events are clearly there" and that they were "mechanism based as we worried" they were, and that the consultants who told Merck in 1997 to study the thromboxane-prostacyclin imbalance issue had been right.  (Scolnick Dep. 147:7-16, 151:13-22, LAAG 21.)

187.    Merck did not disclose these acknowledgments by key Merck scientists that the VIGOR study had demonstrated a mechanism-based cardiovascular effect.

188.    Rather than inform LDHH and the public that the key scientists within the company concluded that the VIGOR results showed a cardiotoxic effect of Vioxx, Merck engaged in a marketing campaign to portray the results of the study as the result of a cardioprotective effect of naproxen.   Dr. Scolnick asked Alise Reicin to find support for an alternative explanation for the

-56-

results, that naproxen was cardioprotective.  Reicin replied on March 13, 2000, with an abstract of

a single article, "the only study [she] could find which assessed the potential cardioprotective effects

of an NSAID." (3/23/2005 Reicin Dep. 339:5-11; Scolnick Dep. 228:10-14, LAAG 22.)  The study

Reicin found involved flurbiprofen, not naproxen, and was uncorroborated.  *Id.*  Reicin found no

support to claim naproxen was cardioprotective, or that any of the other popularly used NSAIDs,

such as ibuprofen, were cardioprotective.   In fact, there are no placebo-controlled trials that show

naproxen is cardioprotective.  (3/23/2005 Reicin Dep. 316:21-317:21; Morrison Dep. 57:5-16.)

189.    Although Merck-sponsored publications, marketing materials, PIRs and Scientific

Communication Plan all continued to urge the Naproxen theory, Merck did not disclose that its own

key scientists had been unable to find support for a cardioprotective effect of Naproxen after an

exhaustive review of the published literature.

**Merck did not publish key GI findings that demonstrated that Vioxx did not offer GI benefits over non-selective NSAIDs.**

190.    Although a Merck study had concluded by April 2003 that patients on Vioxx had four

times as many complicated PUBs compared to those on placebo, Merck did not publish this

information at any time while Vioxx was on the market.  Instead, Merck continued to assert, based

a 1999 study by Laine, that ulcer rates on Vioxx were "comparable to placebo."  This article was

cited in the Provider Synergies monographs relied upon by plaintiff, in each year from 2002 -2004,

despite the 2003 evidence from Protocol 078 that Vioxx was much worse than placebo in terms of

GI toxicity.  (258:17-19; 259:18-260:20; 264:8-265:19; 266:25-267:2; 267:16-20; 1162:12-1163:1;

1175:22-1176:11; 1176:25-1179:5; exhibits LAAG 173, DX 2043, DX 2069, DX 2075.)

191.    Merck chose not to disclose its comparisons of Vioxx to nabumetone.   The significance of Merck's decision not to disclose the comparison to nabumetone is emphasized by the company's prior knowledge of, and concern over, nabumetone's safety profile. In the planning stages of the GI outcome study in 1996, several references  are found to nabumetone's low GI risk compared to other NSAIDs, and Merck's scientists concluded that it was "very unlikely" that Vioxx could demonstrate superior GI safety in comparison to nabumetone.   The studies that Merck conducted confirmed the inability to demonstrate superior GI safety, but that fact was never disclosed to the public or the Plaintiff. (251:11-253:12; Exhibit LAAG 682 at MRK-NJ0232006, 2008, 2064, 2069.)

192.    This Court concludes, based on the foregoing issues of non-disclosure, as well as other unpublished Merck studies discussed throughout these Findings of Fact, that Merck was aware of and failed to disclose critical information regarding the existence of a defect in Vioxx, rendering it impossible for LDHH to learn of the defect while Vioxx was on the market.

**The existence of the defect in Vioxx could not have been discovered from any of the sources of information available to LDHH, the Louisiana Medicaid P&T Committee, or Provider Synergies.**

193.    There has been no evidence that Provider Synergies, the P&T Committee or LDHH ever received from any of the sources information available to them (published literature, label, RMD presentations, sales presentations) anything other than message that the CV risk of Vioxx was unknown and the GI benefit was significant.

194.    Dr. Jerry Avorn, whom this Court accepted as an expert in the communication of risks and benefits to physicians, testified:

-58-

> There was a pattern of gross distortion of the risks of Vioxx, and that no matter which way physicians turn, whether it was looking at the label, hearing what they were hearing from the Merck-trained sales representatives, trying to read the literature in the medical journals and trying to get some accurate, complete depiction of what was happening in the clinical trials, even the information their patients were bringing to them from the commercials and ads that they had seen, across the board there was a pattern of what I would characterize as systematic distortion that rose almost to the level of grotesque." (Avorn Dep. 6/29/06 431:9- 432:2.)

195.    Based on the foregoing, this Court concludes that LDHH did not know and could not reasonably been have been expected to know of the defect in Vioxx.

## IV.    FDA APPROVAL IS NOT A DEFENSE TO THE REDHIBITION CLAIM ESTABLISHED BY PLAINTIFFS

196.    Plaintiffs' expert Dr. David A. Kessler, is board certified pediatrician and former Commissioner of the United States FDA from 1990-1997, appointed by George H.W. Bush and re-appointed by President Bill Clinton.  This Court found  Dr. Kessler qualified as an expert in the "standard of care" a Pharmaceutical Company is held to in determining drug safety. The following findings of fact are based upon Dr. Kessler's testimony, which the court finds credible and reliable, and upon the authorities referenced in Dr. Kessler's testimony. (Kessler Testimony, Tr. 48:22-23)

197.    It is a fundamental premise for the last almost hundred years that it is the purveyor of a drug that has the responsibility to assure the safety and efficacy of any drug that it sells.  The responsibility to investigate, to study and to warn falls on the purveyor of the product. (Kessler Testimony, Tr. 51:12-16)

198.    Merck's FDA expert, Dr. Lisa Rarick, concurred with Dr. Kessler in this opinion, opining that ultimately it is the manufacturer that is responsible for the safety of its drug.  (Tr., 1321:22-25).

199.    A manufacturer always has superior knowledge about its product compared to FDA. In addition to adverse event data, the manufacturer has information regarding the impressions and conclusions of its scientists and consultants to which the FDA would not be privy.  The FDA requests clinical trial data, but the company is in a superior position to know about a drug, and that is why the responsibility to investigate, study and warn of risks associated with a drug rests with the manufacturer. (Kessler Testimony, Tr. 51:21-26; 52:1-5)

200.    A company has a duty to investigate potential risks of a drug and that duty to investigate flows from the general requirements to assure the safety and efficacy of drugs under federal law and under the duty to warn under state consumer protection laws. (Kessler Testimony, Tr. 52:8-10)

201.    The FDA regulation that concerns the duty to warn can be found on page 29 of 21 CFR 201.57.  The regulation states: "In accordance with certain other sections 314.70 and 601.12 of this chapter, the labeling be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a casual association with a drug."  In order to update a safety warning in the labeling, "A causal relationship need not have been definitively established." (Kessler Testimony, Tr. 52:19-25; 53:1-6)

202.    A drug company does not have to wait for FDA approval to warn of a hazard associated with one of its drugs.  A manufacturer can and must, consistent with this duty to warn, strengthen its warnings without prior FDA approval. (Kessler Testimony, Tr. 53:9-19)

203.    The responsibility rests with the drug company to investigate any potential risks of safety, independent of what FDA requires. (Kessler Testimony, Tr. 54:21-23)

-60-

204.     The Food, Drug and Cosmetic Act is the standard applied by FDA to decide whether to grant approval of a drug and the statute provides that the manufacturer has the burden of showing that the drug is safe and effective for its intended conditions of use by adequate and well controlled clinical trials. (Kessler Testimony, Tr. 55:8-15)

205.     As this Court held, *supra*, Merck should have responded to early signals of CV risk by conducting a CV outcomes study.  This Court finds it more likely than not that had Merck performed the CV outcomes study it had a duty to perform in response to early signals of CV risks, then the defect that prompted removal from the market in 2004 would have been discovered before June 13, 2001 and the FDA would have withdrawn its approval of the drug.  Accordingly, as a factual matter, Merck cannot assert FDA approval of Vioxx as a defense to plaintiff's redhibition claims.

## V.     LOUISIANA MEDICAID EXPENDITURES FOR VIOXX.

206.     The parties have stipulated that LDHH's total reimbursements for Vioxx from June 13, 2001 through September 30, 2004, net of rebates, were $11,172,702.00.

207.     The parties have stipulated that $937,512.00 of the total reimbursements for Vioxx were for pharmacy dispensing fees.  This Court finds that those pharmacy dispensing fees were reasonable expenses occasioned by the sale of Vioxx.

208.     This Court finds that LDHH would have and could have refused to pay for Vioxx as of June 13, 2001.

209.     This Court finds that there has been no showing any portion of the amount of Louisiana's expenditures for Vioxx from June 13, 2001 to September 30, 2004 was for prescriptions that would have been "grandfathered" pursuant to the requirements of Act 395.

210.     This Court finds that, even assuming that LDHH could not have excluded Vioxx until the P&T Committee was up and running – a factual contention which this Court rejects based on the preponderance of the evidence – there has been no showing that the amount of reimbursements for Vioxx from the date of establishment of the P&T Committee through withdrawal of Vioxx would have been any less than the amount of reimbursements for Vioxx from June 13, 2001 to the date of withdrawal of Vioxx.

211.     This Court finds that there has been has been no showing as to the value, if any, LDHH received for the use of Vioxx.

212.     Merck's economist, Stephen Wiggins testified that the state incurred no damage, because any prescriptions for Vioxx would have been gone to purchase Celebrex or Bextra, drugs of roughly equal cost to Vioxx.  However, Dr. Wiggins acknowledged that when Vioxx came off market, not all prescriptions went to Celebrex, and LDHH's total expenditures for NSAIDs went down, although Dr. Wiggins offered no opinion as to how much those expenditures went down.

213.     This Court finds that Dr. Wiggins opinion that all expenditures for Vioxx would have gone to equally expensive medications is based on unrealistic assumptions and not credible.  The uncontroverted evidence is that when Vioxx was removed from the market, the state's expenditures did not all go to equally expensive medications and Merck has failed to offer what amount of Louisiana's expenditures, if any, would have gone to equally expensive medications.  (Testimony of Stephen Wiggins, Tr. 1087:11-1088:17)

214.     Moreover, this Court finds that Dr. Wiggins' testimony provides no evidence of the value the State of Louisiana received for Vioxx when the defect is taken into consideration.  Dr. Wiggins testified as to his analysis, "If one were to say those positive characteristics don't exist in

Vioxx, the simply don't and the doctors were mistaken in the first place to buy Vioxx, then the analysis wouldn't apply." (Wiggins Testimony, Tr. 1099:16-21).

## PROPOSED CONCLUSIONS OF LAW

1.      This Court concludes that Plaintiff has met his burden to show that Vioxx suffers from a redhibitory defect in that the cardiovascular side effects of Vioxx outweighed any benefits such that it must be presumed that a reasonable buyer in Plaintiff's position would not have purchased Vioxx had he been aware of the defect.  LSA-C.C. art. 2520.  Article 2520 provides:

> The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
>
> A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.

2.      To establish a claim in redhibition, the plaintiff must satisfy the following elements:

> (1) the thing sold is absolutely useless for its intended purposes, or that he would not have bought it had he known of the defect; (2) that the defect existed at the time that he purchased the thing, but was neither known nor apparent to him; and (3) that the seller was given the opportunity to repair the defect.
>
> *Alston v. Fleetwood Motor Homes of Indiana*, 480 F.3d 695, 699 (5th Cir. 2007)

3.      This Court concludes that Plaintiff has met his burden to establish all three elements of a redhibition claim.  The cardiovascular risks of Vioxx so far outweighed its benefit that it must be presumed that a reasonable buyer in LDHH's position would not have paid for Vioxx had it known of this defect.  The defect existed at the time of purchase and  was neither known or apparent

to LDHH.  The third element is moot since the defect was not susceptible to repair and because, as a manufacturer, Merck is deemed to know of the defect and as such there is no requirement to give Merck notice and opportunity to repair. LSA-C.C. art. 2522.

4.     Consistent with this Court's previous holding, this Court holds that LDHH is a "buyer" entitled to assert the redhibition claim.  See March 31, 2010 Order & Reasons, at p. 18.

5.     This Court concludes that the redhibitory defect in Vioxx arises from the fact that the cardiovascular risks of Vioxx far outweigh any GI benefit and that Vioxx has not been shown to be any more effective in the treatment of pain than traditional NSAIDs which do not pose the same cardiovascular risk.

6.     This Court concludes that LDHH has met its burden to show that it must be presumed that a reasonable buyer in LDHH's position would not have purchased Vioxx had it known of the defect.

7.     This Court has previously ruled that as of June 13, 2001, LDHH had the authority to refuse to pay for Vioxx by adopting a formulary which excluded reimbursements for Vioxx.  LSA-R.S. 46:153.3(B); March 31, 2010 Order & Reasons, at p. 12.  This ruling is entirely consistent with applicable federal and state statutes and the jurisprudence considering those statutes.  Act 395, effective June 13, 2001, revised LSA-R.S. 46:153.3 to allow the Secretary of LDHH to restrict reimbursements for prescription drugs to the full extent allowable pursuant to federal law. LSA-R.S. 46:153.3 (B)(1).  Federal law allows a state to exclude coverage for prescription drugs through the adoption of a formulary.  "A State may exclude or otherwise restrict coverage of a covered outpatient drug if... the State has excluded coverage of the drug from its formulary established in accordance with paragraph (4)." 42 U.S.C.A. 1396r-8(d)(1)(B)(iv).  See also *Pharmaceutical Research and*

*Mfrs. of America v. Meadows*, 304 F.3d 1197 (11th Cir. 2002); *Pharmaceutical Research and Mfrs. of America v. Thompson,* 259 F.Supp.2d 39, 62 (D.D.C. 2003); *Edmonds v. Levine*, 417 F.Supp. 2d 1323 (S.D.Fla. 2006).

        8.     The plain language of LSA-R.S. 46:153.3 as amended by Act 395 does not limit LDHH's authority to restrict reimbursements of prescription drugs to a prior authorization requirement through a Preferred Drug List implemented by the P&T Committee.  Rather, LDHH is expressly authorized by the statute to restrict reimbursements in accordance with federal law. This Court need not consider Merck's selective citations to the legislative history of Act 395.  In interpreting Louisiana statutes, the Louisiana Supreme Court has held:

> What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the Legislature, nor shall the letter of the law be disregarded under the pretext of pursuing its spirit. The plain meaning of the legislation should be conclusive.

> *Borel v. Young*, 2007-0419 (La. 11/27/07) 989 So.2d 42, 49 (citations omitted).

Nothing in the plain language of LSA-R.S. 46:153.3 effective June 13, 2001 indicates any intent to preclude the Secretary of LDHH from refusing to pay for a drug with a known defect.  For that matter, nothing in the limited legislative history Merck has presented indicates such an intent either.  Reluctance of certain legislators to return to an exclusive formulary of the type that Louisiana had in the late 1980's is not indicative of any intent to require the Secretary of LDHH to pay for defective drugs.

9.     Section (d)(4) sets forth the requirements a state must meet in order to establish a

restrictive formulary:

> A State may establish a formulary if the formulary meets the following requirements:
>
> (A) The formulary is developed by a committee consisting of physicians, pharmacists, and other appropriate individuals appointed by the Governor of the State (or, at the option of the State, the State's drug use review board established under subsection (g)(3) of this section).
>
> (B) Except as provided in subparagraph (C), the formulary includes the covered outpatient drugs of any manufacturer which has entered into and complies with an agreement under subsection (a) of this section (other than any drug excluded from coverage or otherwise restricted under paragraph (2)).
>
> (C) A covered outpatient drug may be excluded with respect to the treatment of a specific disease or condition for an identified population (if any) only if, based on the drug's labeling (or, in the case of a drug the prescribed use of which is not approved under the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 301 et seq.] but is a medically accepted indication, based on information from the appropriate compendia described in subsection (k)(6) of this section), the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion.
>
> (D) The State plan permits coverage of a drug excluded from the formulary (other than any drug excluded from coverage or otherwise restricted under paragraph (2)) pursuant to a prior authorization program that is consistent with paragraph (5).
>
> (E) The formulary meets such other requirements as the Secretary may impose in order to achieve program savings consistent with protecting the health of program beneficiaries.
>
> A prior authorization program established by a State under paragraph (5) is not a formulary subject to the requirements of this paragraph.

-66-

10.     This Court concludes as a matter of fact and law that all of the requirements for creation of a restrictive formulary consistent with Section (d)(4) were in place on June 13, 2001, the first date on which the Secretary was empowered by the Louisiana legislature to restrict reimbursements to the full extent allowed by federal law.   Even though the P&T Committee authorized by LSA-R.S. 46:153.3 was not yet up and running, LDHH had a DUR board which pursuant to the express terms of Section (d)(4)(A) could have made the clinical determination necessary to exclude Vioxx.   Hence, Secretary Hood had the express statutory authority to refuse to pay for Vioxx, and the means to do so, as of June 13, 2001.   Secretary Hood's testimony that he would have done everything in his power to ensure that LDHH did not reimburse Vioxx prescriptions had he known of the defect meets plaintiff's burden to show that the state could have and would have refused to pay for Vioxx had it known of the defect.

11.     Exclusion of a drug to protect Medicaid recipients from a known defect is consistent with the State's broad discretion to limit coverage in the best interest of Medicaid recipients.   The United States Supreme Court has held, "the Medicaid Act 'gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interest of the recipients.'" *Pharmaceutical Research and Mfrs. of America v. Walsh*, 538 U.S.644, 665, 123 S.Ct. 1855, 1868 (2003).

12.     This Court rejects Merck's assertion that, pursuant to 42 U.S.C.A. 1396r-8 (d)(4)(C), LDHH could not have excluded Vioxx on the grounds that "based on the drug's labeling, the excluded drug [had] a significant, clinically meaningful therapeutic advantage in terms of safety." The fact that the label *as it existed* when Vioxx was on the market purportedly demonstrated that Vioxx had a "significant, clinically meaningful therapeutic advantage in terms of safety,

-67-

effectiveness, or clinical outcome" would not have precluded LDHH from excluding Vioxx from its formulary per the requirements of 42 U.S.C.A. §1396r-8(d)(4)  had the defect been known.  Had the defect been known, Merck would have been obligated under the "changes being effected" provisions of FDA regulations to change its label to disclose the defect. 21 CFR 201.57  Hence, the label would not have provided any support for the conclusion that Vioxx provides a "a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome" over drugs on the formulary.

13.     Vioxx does not have a "significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome," within the meaning of 42 U.S.C. Sec. 1396r-8. Where the "safety" of the relevant drug is an explicit consideration in determining whether a "therapeutic advantage" exists, that determination cannot be made on the basis of potential benefits alone. Instead, the safety risk of the drug is inherently included in the analysis. In the case of Vioxx, the risk of CV thrombotic events such as heart attack and stroke outweighed any possible GI benefit, even assuming that the GI benefits claimed for the product were as substantial as claimed.  Because the CV risks of Vioxx outweighed its benefits, Vioxx did not have a therapeutic advantage and was subject to exclusion.

14.     The statutory reference to clinically meaningful therapeutic advantage "based on the drug's labeling" or "based on information from the appropriate compendia" is intended as a limitation on the sources from which a potential advantage may be derived, and not as a guarantee to manufacturers that a State must reimburse for an unsafe product.  This interpretation of the statute is consistent with, and supported by, the overall text of the statute, which directs that safety be considered in the determination of whether an advantage exists.

-68-

15.     The statutory interpretation proposed by Merck is unreasonable in that it would require a state to reimburse for a product even where the labeled benefit is outweighed by risks, as in this case, or where the manufacturer has failed to meet its obligation to provide warnings of serious hazards in association with the product as required by 21 U.S.C. § 201.57( C).

16.     The statutory scheme's overriding purpose is to benefit Medicaid recipients by promoting their access to beneficial medicines.  *See Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001) ("The primary purpose of Medicaid is to enable states to provide medical services to those whose 'income and resources are insufficient to meet the costs of necessary medical services . . . .' 42 U.S.C. § 1396 (2000).  Congress expressly intended that the provision of medical services be administered by the state 'in a manner consistent with simplicity of administration and the best interests of the recipients.' Id.; 42 U.S.C.S. § 1396a.") (emphasis added.) That purpose would be subverted if a state were required to cover drugs whose risks outweigh the benefits, and the mere existence of a stated benefit in the label does not establish a therapeutic advantage where, as here, the established risks of serious and fatal thrombotic events clearly outweighs the claim of GI benefit.

17.     The requirement that an exclusive formulary include a provision for prior authorization does not preclude a state from completely denying coverage for an excluded drug. *See Meadows*, 304 F.3d at 1207-1208; *Edmonds*, 417 F.Supp.2d at 1329.  The *Meadows* court considered the significance of the prior authorization requirement in Section (d)(4), and concluded that the requirement was only intended to require a state to *consider* whether to deny coverage based on the prescribing recommendations of the physician.  The Eleventh Circuit held:

> Because the statutory requirements of such a formulary also mandate
> a prior authorization program, see § 1396r-8(d)(4)(D) (specifying as
> one of the requirements of a formulary is that "[t]he State plan
> permits coverage [of an excluded drug] ... pursuant to a prior
> authorization program that is consistent with paragraph (5)"), we
> construe this requirement to mean that a state must *consider* coverage
> for an excluded drug on a case-by-case basis. The decision to provide
> coverage would presumably be based on medical information
> conveyed by the prescribing doctor to the state agency that
> administers the Medicaid program.

> *Meadows*, 304 F.3d at 1207-1208 (emphasis added).

The *Edmonds* court likewise held that the prior authorization requirement in the exclusive

formulary provisions of 42 U.S.C.A. §1396r-8(d)(4) does not preclude a state from excluding a drug.

The *Edmonds* court, held, consistent with *Meadows* and this Court:

> Congress has authorized two very distinct prior authorization
> programs; the one discussed above which is created in conjunction
> with a drug formulary which permits the state to have final authority
> to exclude a drug, and the one like Florida's which covers all
> Medicaid-eligible drugs and conditions payment for any such drug
> upon a doctor contacting the state before the drug is dispensed.

> *Edmonds*, 417 F.Supp. 2d at 1429.

18.    The Medicaid pharmacy benefit provisions of 42 U.S.C.A. § 1396r-8 were never

intended to grant a manufacturer immunity for marketing of a defective product.   By entering into

a rebate agreement with the Secretary of HHS, manufacturers do not obtain a license to market a

defective product, conceal the defects in their products, or misrepresent the nature of their products

to state Medicaid authorities.

19.    This Court finds that plaintiff has met his burden to show that a reasonable buyer in

the position of LDHH would have exercised its authority to refuse to pay for Vioxx had the defect

been known.

-70-

20.     This Court concludes by a preponderance of the evidence that LDHH was unaware of the redhibitory defect in Vioxx.  While LDHH had been made aware of certain "cardiovascular concerns", the state was not aware that the cardiovascular risks so outweighed any benefit of the drug so as to render it unfit for its intended use.  Mere awareness of a condition, even the condition which is the basis of the redhibitory defect, is not equivalent to awareness of the redhibitory defect when the buyer is unaware that the extent of the condition is so great as to give rise to a redhibitory defect. *Buck v. Adams*, 446 So.2d 895 (La. App. 1st Cir. 1984).

21.     As a manufacturer of Vioxx, Merck is deemed to have been aware of the redhibitory defect. LSA-C.C. art. 2545.  Furthermore, this Court finds that plaintiff has demonstrated by a preponderance of the evidence that Merck could have, through reasonable investigation required of a drug manufacturer, discovered the defect in Vioxx well before June 13, 2001 and any ignorance of the true risk of Vioxx on Merck's part was due to Merck's failure to investigate the safety profile of Vioxx adequately.

22.     This Court rejects as both a matter of fact and law Merck's contention that FDA approval of Vioxx precludes LDHH from asserting a claim in redhibition. The United States Supreme Court has held that FDA regulation does not preempt state tort law duties to provide a safe and effective drug.  *Wyeth v. Levine*, 129 S.Ct. 1187 (2009).  The Wyeth court held:

> If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history. But despite its 1976 enactment of an express pre-emption provision for medical devices, see § 521, 90 Stat. 574 (codified at 21 U.S.C. § 360k(a)), Congress has not enacted such a provision for prescription drugs. See Riegel, 552 U.S., at ----, 128 S.Ct., at 1009 ("Congress could have applied the pre-emption clause to the entire FDCA. It did not do so, but instead wrote a pre-emption clause that applies only to medical devices"). Its

> silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness.

*Id.*, 129 S.Ct. at 1200.

23.    By rejecting Merck's FDA defense on the grounds that had the defect been known, the FDA would more likely than not have acted to remove Vioxx from the market, this Court is not recognizing a "fraud on the FDA" cause of action, nor is this Court suggesting that LDHH has a cause of action solely because the drug would not have been available had the FDA not approved it.  Rather, this Court has considered the FDA's actions in response to an affirmative defense raised by Merck.  Consideration of FDA action in response to an affirmative defense raised by a defendant is not recognition of a pre-empted "fraud-on-the-FDA" claim. *Desiano v. Warner-Lambert*, 467 F.3d 85, 96 (2006), *aff'd sub nom, Warner-Lambert, LLC, Co. v. Kent*, 552 U.S. 440, 128 S.Ct. 1168 (2008).  The *Desiano* court held:

> Finding preemption of traditional common law claims where fraud is not even a required element-but may be submitted to neutralize a drugmaker's use of an affirmative defense available under state law-would result in preemption of a scope that would go far beyond anything that has been applied in the past.

24.    This Court is mindful that Merck has claimed that Merck had no knowledge of the cardiovascular risk until discontinuation of the APPROVe study revealed a previously unknown risk, prompting removal of Vioxx from the market.  While this Court finds that Merck knew or should have known of the defect long before it withdrew Vioxx from the market, even if Merck had been unaware of the risk until it withdrew Vioxx from the market, that fact would not relieve Merck of liability in redhibition, since a manufacturer is deemed to know of the defect in its product. See LSA-

C.C. art. 2545.  However, this Court concludes that Merck cannot assert that plaintiff was aware of the risk when Merck claims that Merck itself was unaware of the risk until it decided to withdraw Vioxx from the market.

25.     This Court rejects Merck's assertion that Plaintiff was provided adequate notice of the defect because the Merck label and Provider Synergies monographs provided sufficient information about the CV and GI risks as they were known at the time that Vioxx was on the market. This Court has found that due to Merck's conduct, the label and monographs have not provided adequate information of the risks as Merck understood them at the time that Vioxx was on the market.  (See Proposed Findings of Fact, at Section III.D.).  More importantly, the inquiry for purposes of redhibition is not whether the buyer had all the information available at the time, but whether the defects were known to the buyer or could have been discovered by a reasonably prudent buyer.  LSA-C.C. art. 2521, *Alston v. Fleetwood Motor Homes of Indiana*, 480 F.3d 695, 699 (5th Cir. 2007).  Moreover, regardless of the sufficiency of information available at the time of sale, "A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing."  LSA-C.C. art. 2545.  The logic of this codal provision is particularly compelling in the instant case, where the manufacturer chose not to conduct CV outcomes studies that its own research scientists and FDA reviewers both indicated were necessary to resolve questions of cardiovascular risks.

26.     Since plaintiff has established the elements of a claim in redhibition, Plaintiff is entitled to the redhibitory remedy of a full refund of the price paid for Vioxx.  LSA-C.C. art. 2520 ("The existence of [a redhibitory] defect gives a buyer the right to obtain rescission of the sale.");

LSA-C.C. art. 2545 (a seller who knows of the defect "is liable to the buyer for the return of the purchase price...").

27.     This Court concludes that since the Vioxx pills are of no use to either the buyer or the seller, LDHH's inability to return the Vioxx pills to Merck does not preclude LDHH from asserting a claim in redhibition for return of the full purchase price.  *Edmondson Bros. v. F.M. Carriere & Son, Inc*., 88-772 (La. App. 3rd Cir. 11/8/89), 552 So.2d 1229; March 31, 2010 Order & Reasons, at pp. 19-20.

28.     The Court concludes that since Merck is deemed to have known of the defect, Merck is liable to Plaintiff for the return of the purchase price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and reasonable attorney fees, subject to a credit for any value of the use made of Vioxx to the Plaintiff. LSA-C.C. art. 2545.

29.     The burden to show the value conferred on Plaintiff for the use made of Vioxx rests with the Defendant Merck. *Magee v. Brown*, 2003-0600 (La.App. 4th Cir. 10/1/03), 859 So.2d 720, 724, *writ denied*, 2003-3016 (La. 1/30/04), 865 So.2d 68; *Holloway v. Gulf Motors*, 588 So.2d 1322 (La. App. 2d Cir.).   This Court finds that Merck has failed to meet its burden to show that LDHH obtained any value from Vioxx, and hence plaintiff is entitled to full return of the purchase price, plus interest from the date of purchase and attorneys' fees.

30.     Of the $11,172,702.00 that LDHH expended in reimbursements for Vioxx, the amount of $937,512.00 was paid to pharmacists as pharmacy dispensing fees.  This Court finds that such pharmacy dispensing fees are "reasonable expenses occasioned by the sale," and as such Merck is liable to plaintiff for these pharmacy dispensing fees pursuant to LSA-C.C. art. 2545.

31.     Merck is liable to Plaintiff for return of the full amount LDHH paid in reimbursements for Vioxx from June 13, 2001 of $11,172,702, together with legal interest from the date of purchase and reasonable attorneys' fees.

Respectfully submitted, this 29th day of April, 2010.

/s/ Douglas R. Plymale
James R. Dugan, II (La. Bar No. 24785)
Douglas R. Plymale. (La. Bar No. 28409)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Stephen B. Murray, Sr. (La. Bar No. 9858)
Justin Bloom
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Email: dplymale@dugan-lawfirm.com

James D. Caldwell, Attorney General
Trey Phillips
Bryan McMinn
L. Christopher Styron
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
885 North Third Street - 6th Floor
Baton Rouge, Louisiana 70802
Telephone: (225) 326-6020

Francisco H. Perez
Kim Sullivan
General Counsel
Louisiana Department of Health and Hospitals
P.O. Box 3836
Baton Rouge, Louisiana 70821
Telephone: (225) 342-1188

COUNSEL FOR PLAINTIFF

-75-

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Corrected Plaintiff's Post-Trial Proposed Findings of Fact has this day been served on Liaison Counsel, Phillip A. Wittmann and Russ M. Herman, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance to Pretrial Order No. 8B, on this the 29th day of April, 2010.

/s/ Douglas R. Plymale.
Counsel for Plaintiff