Janice M. Baum
6638 Quail Ridge Lane
Fort Wayne, IN 46804

May 13, 2010

Honorable Judge Eldon Fallon
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room c-456
New Orleans LA 70130

Re: VCN 1081541

Dear Judge Fallon:

I'm certain you've probably already made your decision on dismissing my Vioxx damage claim against Merck Pharmaceuticals for non-compliance with PTO 43. I'm a mess in my stress over this entire unbelievable nightmare I'm in, especially the past year with my former specialists dismissing me because I stumbled across a "Medicaid scam" with my "oxygen concentrator" billing.

Then, I got answers to why my vascular health was deteriorating further and why I needed nocturnal oxygen...answers and names to my 11 "idiopathic conditions" that I prayed were just that. But, unfortunately, they weren't idiopathic after all, and it took "fighting for my life" to be diagnosed in a timely manner and much sooner than most get because they believe their doctors are there to help them. (How ironic that my former specialists work at one of 8 fully credentialed "heart transplant" centers in the U.S....something I very possibly could need in the next few years from using Vioxx intermittently and continuously from Dec 1999 through Sept 30, 2004.)

I have "pulmonary hypertension", with no doctor within hundreds of miles who will touch me as a patient because my insurance company is OWNED by the same doctors who won't treat me because of THEIR illegal Medicaid billings. Then the insistence of my former attorney group continuously trying to get me dismissed by not doing the research I've been able to do on Vioxx (aka a Cox 2 Inhibitors.) After you ordered my then attorneys to represent me, they did nothing to attempt to help me. In fact, they gloated to me, "You'll never find any connection that Vioxx caused your "perceived" pulmonary hypertension." They didn't realize just how determined I am to fight on, with or without them, and my research has paid off. Today, I realized and did further research on "Rofecoxib", the generic name of Vioxx, also formerly marketed as Ceoxx and Ceoxx, per Wikipedia.

Earlier this year, I learned from a well-informed attorney with "insider" information that I'll never find another law firm to represent me in the entire U.S., and she was correct. Merck Pharmaceuticals worked out this "joke" of a settlement for victims of "heart attacks, strokes, or death victims", but only with their 14 day "proof" of Vioxx usage rule. So women like me, who apparently were misdiagnosed when a heart attack occurred, were ruled completely out of any type of monetary settlement.

The curator's office was there to assist and help the "Pro Se", but I found that they could only send me forms or names of "possible" other Vioxx attorneys to represent me. Everyone was a complete dead end...exactly where Merck Pharmaceuticals wanted those not eligible for their out-of-court settlement so they could pocket millions or billions of dollars more at the expense of other's health and lives. And now I've recently read Merck has come out with a drug to help their victims...a drug for pulmonary hypertension.

My intentions were to keep this short an simple about my new research on Rofecoxib and how my conditions have been developing slowly since I first began using Vioxx. But, in the many medical journal articles I've sent and have been submitted to my court records, all of my symptoms can be directly tied to Vioxx/Robecoxib: Idiopathic severe fatigue and falling asleep at work beginning in 2000-2001...unknown "hypoxia"; sudden onset of spiking but idiopathic hypertension in fall of 2001; idiopathic neuropathy; idiopathic cyanosis of lower extremities; idiopathic peripheral vascular disease with no blockages found anywhere; idiopathic "nocturnal oxygen" need for the rest of my life; idiopathic chronic cough; idiopathic loss of voice for 2 years, and so much more.

Yet, because of being non-compliant with PTO 43, my hours and hours of research and sweat equity in my own health care and my attempt to get the rightful justice due me could be over in one hit with your "judicial hammer". In one motion, I could be one of the many, many other unhappy but dismissed plaintiffs. They didn't have the persistence, desire, or guts to stand up against their former attorneys who dropped their cases, too, or the desire to make a huge wrong right for many others by fighting against Merck Pharmaceutical's and the bullying of our former attorneys. Please read this with an open mind and consider the huge errors already made by dismissing many with valid Vioxx damage who didn't have the inside legal information I've received from an "insider" and from my Registered Pharmacist daughter.

Your Honor, thanks again for letting me push through as far as I have. It's been a real challenge having to work full-time with 4 surgeries on my left hand from a clumsy fall last Oct. 26th, on top of my need to save for my July 1st Boston trip for medical care. My thousands of owed medical bills from needless testing by my former doctors prevents me from missing any work, so I've pulled many "all nighters" just to keep afloat at work and to do research after hours. Whatever your decision, I know I've done all I can and I'm really okay with it because I know it's God's will. But, my fight on this matter is far from over...and Merck Pharmaceutical's hasn't heard the end of me because I fully intend to become an advocate on this wrong to help others.

Sincerely and prayerfully,

Janice M Baum

Oct. 26, 2009

May. 13. 2010 5:00AM    Case 2:05-md-01657-EEF-DEK   Document 42326-1   Filed 05/18/10   Page 3 of 13    No. 2181   P. 3

May. 13. 2010 5:00AM   Case 2:05-md-01657-EEF-DEK   Document 42326-1   Filed 05/18/10   Page 4 of 13   No. 2181   P. 4



Oct 26, 2008



May 13, 2010

# Rofecoxib

From Wikipedia, the free encyclopedia that anyone can edit

**Rofecoxib** (pronounced /roʊfɪˈkɒksɪb/) is a nonsteroidal anti-inflammatory drug (NSAID) that has now been withdrawn over safety concerns. It was marketed by Merck & Co. to treat osteoarthritis, acute pain conditions, and dysmenorrhoea. Rofecoxib was approved by the Food and Drug Administration (FDA) on May 21, 1999, and was subsequently marketed under the brand names Vioxx, Ceoxx, and Ceeoxx.

Rofecoxib gained widespread acceptance among physicians treating patients with arthritis and other conditions causing chronic or acute pain. Worldwide, over 80 million people were prescribed rofecoxib at some time.[1]

On September 30, 2004, Merck voluntarily withdrew rofecoxib from the market because of concerns about increased risk of heart attack and stroke associated with long-term, high-dosage use. Rofecoxib was one of the most widely used drugs ever to be withdrawn from the market. In the year before withdrawal, Merck had sales revenue of US$2.5 billion from Vioxx.[2]

Rofecoxib was available on prescription as tablets and as an oral suspension.

## Rofecoxib

**Systematic (IUPAC) name**
4-(4-methylsulfonylphenyl)-3-phenyl-5H-furan-2-one

### Identifiers

| | |
|---|---|
| CAS number | 162011-90-7 |
| ATC code | M01AH02 |
| PubChem | 5090 |
| DrugBank | APRD00151 |
| ChemSpider | 4911 |

### Chemical data

| | |
|---|---|
| Formula | $C_{17}H_{14}O_4S$ |
| Mol. mass | 314.357 g/mol |

### Pharmacokinetic data

| | |
|---|---|
| Bioavailability | 93% |
| Protein binding | 87% |
| Metabolism | hepatic |
| Half life | 17 hours |
| Excretion | biliary/renal |

### Therapeutic considerations

| | |
|---|---|
| Pregnancy cat. | C (Australia) |
| Legal status | withdrawn |
| Routes | oral |

(what is this?) (verify)

## Contents

- 1 Mode of action
    - 1.1 Pharmacokinetics
    - 1.2 Fabricated efficacy studies
- 2 Adverse drug reactions
    - 2.1 Adverse cardiovascular events
        - 2.1.1 VIGOR study
            - 2.1.1.1 NEJM controversy
        - 2.1.2 Alzheimer's studies
        - 2.1.3 APPROVe study
        - 2.1.4 Other studies
        - 2.1.5 Other COX-2 inhibitors
        - 2.1.6 Other NSAIDs
- 3 Withdrawal
- 4 Litigation
- 5 Other effects
- 6 See also
- 7 References
- 8 External links

## Mode of action

*See also: Cyclooxygenase*

May. 13. 2010 5:00AM No. 2181 P. 7
Case 2:05-md-01657-EEF-DEK Document 43261-1 Filed 05/13/10 Page 7 of 13

Cyclooxygenase (COX) has two well-studied isoforms, called COX-1 and COX-2. COX-1 mediates the synthesis of prostaglandins responsible for protection of the stomach lining, while COX-2 mediates the synthesis of prostaglandins responsible for pain and inflammation. By creating "selective" NSAIDs that inhibit COX-2, but not COX-1, the same pain relief as traditional NSAIDs is offered, but with greatly reduced risk of fatal or debilitating peptic ulcers. Rofecoxib is a selective COX-2 inhibitor or coxib (CycloOXygenase-2 InhiBitors).

Others include Merck's etoricoxib (Arcoxia), Pfizer's celecoxib (Celebrex) and valdecoxib (Bextra). Interestingly, at the time of its withdrawal, rofecoxib was the only coxib with clinical evidence of its superior gastrointestinal adverse effect profile over conventional NSAIDs. This was largely based on the VIGOR (Vioxx GI Outcomes Research) study, which compared the efficacy and adverse effect profiles of rofecoxib and naproxen.[3]

## Pharmacokinetics

The therapeutic recommended dosages are 12.5, 25, and 50 mg with an approximate bioavailability of 93%.[4][5][6] Rofecoxib crosses the placenta and blood-brain barrier.[4][5][7] It takes 1 to 3 hours to reach peak plasma concentration and the effective half-life (based on steady-state levels) is approximately 17 hours.[4][6][8] The metabolic products are cis-dihydro and trans-dihydro derivatives of rofecoxib [4][8] which are primarily excreted through urine.

## Fabricated efficacy studies

On March 11, 2009, Scott S. Reuben, former chief of acute pain at Baystate Medical Center, Springfield, Mass., revealed that data for 21 studies he had authored for the efficacy of the drug (along with others such as celecoxib) had been fabricated in order to augment the analgesic effects of the drugs. Dr. Reuben was also a former paid spokesperson for the drug company Pfizer (who owns the intellectual property rights for marketing celecoxib in the United States). The retracted studies were not submitted to either the FDA or the European Union's regulatory agencies prior to the drug's approval. Drug manufacturer Merck had no comment on the disclosure.[9]

## Adverse drug reactions

*See also: Non-steroidal anti-inflammatory drug*

Aside from the reduced incidence of gastric ulceration, rofecoxib exhibits a similar adverse effect profile to other NSAIDs. Rofecoxib, however, does appear to increase the risk of adverse cardiovascular events.



There is a questionable mechanism proposed to explain rofecoxib's cardiotoxicity is the suppression of prostacyclin, an anti-clotting agent in the blood (Fitzgerald, 2004). Prostaglandin is a large family of lipids. prostaglandin I2/PGI2/prostacyclin is just one member of it. Prostaglandins other than PGI2 (such as PGE2) also play important roles in vascular tone regulation. Prostacyclin/thromboxane are produced by both COX-1 and COX-2, and rofecoxib suppresses just COX-2 enzyme, so there is no reason to believe that prostacyclin levels are significantly reduced by the drug. And there is no reason to believe that only the balance between quantities of prostacyclin and thromboxane is the dominant factor for vascular tone.[10]. Indeed Merck have stated that there was no effect on prostacyclin production in blood vessels in animal testing.[11] Other researchers have speculated that the cardiotoxicity may be associated with maleic anhydride metabolites formed when rofecoxib becomes ionized under physiological conditions. (Reddy & Reddy, 2005)

### VIGOR study

VIGOR (Vioxx GI Outcomes Research) study, conducted by Bombardier, et al., which compared the efficacy and adverse effect profiles of rofecoxib and naproxen, had indicated a significant 4-fold increased risk of acute myocardial

infarction (heart attack) in rofecoxib patients when compared with naproxen patients (0.4% vs 0.1%, RR 0.25) over the 12-month span of the study. The elevated risk began during the second month on rofecoxib. There was no significant difference in the mortality from cardiovascular events between the two groups, nor was there any significant difference in the rate of myocardial infarction between the rofecoxib and naproxen treatment groups in patients without high cardiovascular risk. The difference in overall risk was by the patients at higher risk of heart attack, i.e. those meeting the criteria for low-dose aspirin prophylaxis of secondary cardiovascular events (previous myocardial infarction, angina, cerebrovascular accident, transient ischemic attack, or coronary artery bypass).

Merck's scientists interpreted the finding as a protective effect of naproxen, telling the FDA that the difference in heart attacks "is primarily due to" this protective effect (Targum, 2001). Some commentators have noted that naproxen would have to be three times as effective as aspirin to account for all of the difference (Michaels 2005), and some outside scientists warned Merck that this claim was implausible before VIGOR was published.[12] No evidence has since emerged for such a large cardioprotective effect of naproxen, although a number of studies have found protective effects similar in size to those of aspirin.[13][14]. Though Dr. Topol's 2004 paper criticized Merck's naproxen hypothesis, he himself co-authored a 2001 JAMA article stating "because of the evidence for an antiplatelet effect of naproxen, it is difficult to assess whether the difference in cardiovascular event rates in VIGOR was due to a benefit from naproxen or to a prothrombotic effect from rofecoxib." (Mukherjee, Nissen and Topol, 2001.)

The results of the VIGOR study were submitted to the United States Food and Drug Administration (FDA) in February 2001, which led to the introduction, in April 2002, of warnings on Vioxx labelling concerning the increased risk of cardiovascular events (heart attack and stroke).

## NEJM controversy

Months after the preliminary version of VIGOR was published in the New England Journal of Medicine, the journal editors learned that certain data reported to the FDA were not included in the NEJM article. Several years later, when they were shown a Merck memo during the depositions for the first federal Vioxx trial, they realized that these data had been available to the authors months before publication. The editors wrote an editorial accusing the authors of deliberately withholding the data[15]. They released the editorial to the media on December 8, 2005, before giving the authors a chance to respond. NEJM editor Gregory Curfman explained that the quick release was due to the imminent presentation of his deposition testimony, which he feared would be misinterpreted in the media. He had earlier denied any relationship between the timing of the editorial and the trial. Although his testimony was not actually used in the December trial, Curfman had testified well before the publication of the editorial.[16]

The editors charged that "more than four months before the article was published, at least two of its authors were aware of critical data on an array of adverse cardiovascular events that were not included in the VIGOR article." These additional data included three additional heart attacks, and raised the relative risk of Vioxx from 4.25-fold to 5-fold. All the additional heart attacks occurred in the group at low risk of heart attack (the "aspirin not indicated" group) and the editors noted that the omission "resulted in the misleading conclusion that there was a difference in the risk of myocardial infarction between the aspirin indicated and aspirin not indicated groups." The relative risk for myocardial infarctions among the aspirin not indicated patients increased from 2.25 to 3 (although it remained statistically insignificant). The editors also noted a statistically significant (2-fold) increase in risk for serious thromboembolic events for this group, an outcome that Merck had not reported in the NEJM, though it had disclosed that information publicly in March 2000, eight months before publication.[17]

The authors of the study, including the non-Merck authors, responded by claiming that the three additional heart attacks occurred after the prespecified cutoff date for data collection and thus were appropriately not included (Utilizing the prespecified cutoff date also meant that an additional stroke in the naproxen population was not reported.) Furthermore, they said that the additional data did not qualitatively change any of the conclusions of the study, and the results of the full analyses were disclosed to the FDA and reflected on the Vioxx warning label. They further noted that of the data in the "omitted" table were printed in the text of the article. The authors stood by the original article.[18]

Merck stood by its editorial, noting that the cutoff date was never mentioned in the article, nor did the authors report the cutoff for cardiovascular adverse events was before that for gastrointestinal adverse events. The different cutoffs increased the reported benefits of Vioxx (reduced stomach problems) relative to the risks (increased heart

attacks).[17]

Some scientists have accused the NEJM editorial board of making unfounded accusations.[19][20] Others have applauded the editorial. Renowned research cardiologist Eric Topol,[21] a prominent Merck critic, accused Merck of "manipulation of data" and said "I think now the scientific misconduct trial is really fully backed up".[22] Phil Fontanarosa, executive editor of the prestigious Journal of the American Medical Association, welcomed the editorial, saying "this is another in the long list of recent examples that have generated real concerns about trust and confidence of industry-sponsored studies".[23]

On May 15, 2006, the *Wall Street Journal* reported that a late night email, written by an outside public relations specialist and sent to Journal staffers hours before the Expression of Concern was released, predicted that "the rebuke would divert attention to Merck and induce the media to ignore the New England Journal of Medicine's own role in aiding Vioxx sales."[24]

Internal emails show the New England Journal's expression of concern was timed to divert attention from a deposition which Executive Editor Gregory Curfman made potentially damaging admissions about the journal's handling of the Vioxx study. In the deposition, part of the Vioxx litigation, Dr. Curfman acknowledged that lax editing might have helped the authors make misleading claims in the article." The *Journal* stated that NEJM's "ambiguous" language "misled reporters into incorrectly believing that Merck had deleted data regarding the three additional heart attacks, rather than a blank table that contained no statistical information;" the New England Journal says it didn't attempt to have these mistakes corrected."[24]

### Alzheimer's studies

In 2000 and 2001, Merck conducted several studies of rofecoxib aimed at determining if the drug slowed the onset of Alzheimer's disease. Merck has placed great emphasis on these studies on the grounds that they are relatively large (almost 3000 patients) and compared rofecoxib to a placebo rather than to another pain reliever. Celecoxib had already been approved for this indication, and it was hoped to add this to the indications for rofecoxib as well. An additional aim of the study was to further evaluate the cardiovascular safety of rofecoxib.

### APPROVe study

In 2001, Merck commenced the APPROVe (Adenomatous Polyp PRevention On Vioxx) study, a three year trial with the primary aim of evaluating the efficacy of rofecoxib for the prophylaxis of colorectal polyps. Celecoxib had already been approved for this indication, and it was hoped to add this to the indications for rofecoxib as well. An additional aim of the study was to further evaluate the cardiovascular safety of rofecoxib.

The APPROVe study was terminated early when the preliminary data from the study showed an increased relative risk of adverse thrombotic cardiovascular events (including heart attack and stroke), beginning after 18 months of rofecoxib therapy. In patients taking rofecoxib, versus placebo, the relative risk of these events was 1.92 (rofecoxib 1.50 events vs placebo 0.78 events per 100 patient years). The results from the first 18 months of the APPROVe study did not show increased relative risk of adverse cardiovascular events. Moreover, overall and cardiovascular mortality rates were similar between the rofecoxib and placebo populations[26]

In summary, the APPROVe study suggested that long-term use of rofecoxib resulted in nearly twice the risk of suffering a heart attack or stroke compared to patients receiving a placebo.

### Other studies

A preapproval Phase III clinical trials, like the APPROVe study, showed no increased relative risk of adverse cardiovascular events for the first eighteen months of rofecoxib usage (Merck, 2004). Others have pointed out that study 090," a pre-approval trial, showed a 3-fold increase in cardiovascular events compared to placebo, a 7-fold increase compared to nabumetone (another [NSAID]), and an 8-fold increase in heart attacks and strokes combined

compared to both control groups.[27][28] Although this was a relatively small study and only the last result was statistically significant, critics have charged that this early finding should have prompted Merck to quickly conduct larger studies of rofecoxib's cardiovascular safety. Merck notes that it had already begun VIGOR at the time Study 090 was completed. Although VIGOR was primarily designed to demonstrate new uses for rofecoxib, it also collected data on adverse cardiovascular outcomes.

Several very large observational studies have also found elevated risk of heart attack from rofecoxib. For example, a recent retrospective study of 113,000 elderly Canadians suggested a borderline statistically significant increased relative risk of heart attacks of 1.24 from Vioxx usage, with a relative risk of 1.73 for higher-dose Vioxx usage (Levesque, 2005). Another study, using Kaiser Permanente data, found a 1.47 relative risk for low-dose Vioxx usage and 3.58 for high-dose Vioxx usage compared to current use of celecoxib, though the smaller number was not statistically significant, and relative risk compared to other populations was not statistically significant. (Graham, 2005).

Furthermore, a more recent meta-study of 114 randomized trials with a total of 116,000+ participants, published in JAMA, showed that Vioxx uniquely increased risk of renal (kidney) disease, and heart arrhythmia.[29]

### Other COX-2 inhibitors

Any increased risk of renal and arrhythmia pathologies associated with the class of COX-2, inhibitors, e.g. celecoxib (Celebrex), valdecoxib (Bextra), parecoxib (Dynastat), lumiracoxib, and etoricoxib is not evident[29], although smaller studies[30][31] had demonstrated such effects earlier with the use of celecoxib, valdecoxib and parecoxib.

Nevertheless, it is likely that trials of newer drugs in the category will be extended in order to supply additional evidence of cardiovascular safety. Examples are some more specific COX-2 inhibitors, including etoricoxib (Arcoxia) and lumiracoxib (Prexige), which are currently (circa 2005) undergoing Phase III/IV clinical trials.

Besides, regulatory authorities worldwide now require warnings about cardiovascular risk of COX-2 inhibitors still on the market. For example, in 2005, EU regulators required the following changes to the product information and/or packaging of all COX-2 inhibitors [32]:

- Contraindications stating that COX-2 inhibitors must not be used in patients with established ischaemic heart disease and/or cerebrovascular disease (stroke), and also in patients with peripheral arterial disease
- Reinforced warnings to healthcare professionals to exercise caution when prescribing COX-2 inhibitors to patients with risk factors for heart disease, such as hypertension, hyperlipidaemia (high cholesterol levels), diabetes and smoking
- Given the association between cardiovascular risk and exposure to COX-2 inhibitors, doctors are advised to use the lowest effective dose for the shortest possible duration of treatment.

### Other NSAIDs

Since the withdrawal of Vioxx it has come to light that there may be negative cardiovascular effects with not only other COX-2 inhibitors, but even the majority of other NSAIDs. It is only with the recent development of drugs like Vioxx drug companies have carried out the kind of well executed trials that could establish such effects and these sort of exceptions may be aspirin and naproxen due to their anti-platelet properties.

### Withdrawal

Due to the findings of its own APPROVe study, Merck publicly announced its voluntary withdrawal of the drug from the market worldwide on September 30, 2004 [33].

In addition to its own studies, on September 23, 2004 Merck apparently received information about new research by the FDA that supported previous findings of increased risk of heart attack among rofecoxib users (Grassley, 2004). FDA analysts estimated that Vioxx caused between 88,000 and 139,000 heart attacks, 30 to 40 percent of which were

probably fatal, in the five years the drug was on the market.

On November 5 the medical journal *The Lancet* published a meta-analysis of the available studies on the safety of rofecoxib (Jüni et al., 2004). The authors concluded that, owing to the known cardiovascular risk, rofecoxib should have been withdrawn several years earlier. *The Lancet* published an editorial which condemned both Merck and the FDA for the continued availability of rofecoxib from 2000 until the recall. Merck responded by issuing a rebuttal of the Jüni et al. meta-analysis that noted that Jüni omitted several studies that showed no increased cardiovascular risk. (Merck & Co., 2004).

In 2005, advisory panels in both the U.S. and Canada encouraged the return of rofecoxib to the market, stating that rofecoxib's benefits outweighed the risks for some patients. The FDA advisory panel voted 17-15 to allow the drug to return to the market despite being found to increase heart risk. The vote in Canada was 12-1, and the Canadian panel noted that the cardiovascular risks from rofecoxib seemed to be no worse than those from ibuprofen[5] -- though the panel recommended that further study was needed for all NSAIDs to fully understand their risk profiles. Notwithstanding these recommendations, Merck has not returned rofecoxib to the market.

Merck hired a firm in 2005, Debevoise & Plimpton, to investigate Vioxx study results and communications conducted by Merck. [citation needed] Through the report, it was found that Merck's senior management acted in good faith, and that the confusion over the clinical safety of Vioxx was due to the sales team's overzealous behavior. The report that was issued gave a timeline of the events surrounding Vioxx and showed that Merck intended to operate honestly throughout the process. Any mistakes that were made regarding the mishandling of clinical trial results and withholding of information was the result of oversight, not malicious behavior. The Martin Report did conclude that the Merck's marketing team exaggerated the safety of Vioxx and replaced truthful information with sales tactics. [citation needed] The report was published in February 2006, and Merck was satisfied with the findings of the report and promised to consider the recommendations contained in the Martin Report.

## Litigation

As of March 2006, there had been over 10,000 cases and 190 class actions filed against Merck over adverse cardiovascular events associated with rofecoxib and the adequacy of Merck's warnings. The first wrongful death trial, *Rogers v. Merck*, was scheduled in Alabama in the spring of 2005, but was postponed after Merck argued that the plaintiff had falsified evidence of rofecoxib use.[7]

On August 19, 2005, a jury in Texas voted 10-2 to hold Merck liable for the death of Robert Ernst, a 59-year old man who allegedly died of a rofecoxib-induced heart attack. The plaintiffs' lead attorney was Mark Lanier. Merck argued that the death was due to cardiac arrhythmia, which had not been shown to be associated with rofecoxib use. The jury awarded Carol Ernst, widow of Robert Ernst, $253.4 million in damages. This award will almost certainly be capped at no more than USD$26.1 million because of punitive damages limits under Texas law.[8] As of March 2006, the plaintiff had yet to ask the court to enter a judgment on the verdict; Merck has stated that it will appeal.

On November 3, 2005, Merck won the second case *Humeston v. Merck*, a personal injury case, in Atlantic City, New Jersey. The plaintiff experienced a mild myocardial infarction and claimed that rofecoxib was responsible, after having taken it for two months. Merck argued that there was no scientific evidence linking rofecoxib to cardiac events with short durations of use. The jury ruled that there is no scientific evidence linking rofecoxib to cardiac events with short durations of use. The jury ruled Merck had adequately warned doctors and patients of the drug's risk.[9]

The first federal trial on rofecoxib, *Plunkett v. Merck*, began on November 29, 2005 in Houston, Texas. The trial ended with a hung jury and a mistrial was declared on December 12, 2005. According to the *Wall Street Journal*, the jury hung on an eight to one majority, favoring the defense. Upon retrial in February 2006 in New Orleans, Louisiana, where the Vioxx multidistrict litigation (MDL) is based, a jury found Merck not liable, even though the plaintiffs had the NEJM editor testify as to his objections to the VIGOR study.

On January 30, 2006, a New Jersey state court dismissed a case brought by Edgar Lee Boyd, who blamed Vioxx for gastrointestinal bleeding that he experienced after taking the drug. The judge said that Boyd failed to prove the drug caused his stomach pain and internal bleeding.

In January 2006, *Garza v. Merck* began trial in Rio Grande City, Texas. The plaintiff, a 71-year-old smoker with heart disease, had a fatal heart attack three weeks after finishing a one-week sample of rofecoxib. On April 21, 2006 the jury awarded the plaintiff $7 million compensatory and $25 million punitive. The Texas state court of appeals in San Antonio later rules Garza's fatal heart attack probably resulted from pre-existing health conditions unrelated to his taking of Vioxx, thus reversing the $32 million jury award.[10]

On April 5, 2006, the jury held Merck liable for the heart attack of 77-year-old John McDarby, and awarded Mr McDarby $4.5 million in compensatory damages based on Merck's failure to properly warn of Vioxx safety risks. After hearing on April 11, 2006, the jury also awarded Mr McDarby an additional $9 million in punitive damages. The same jury found Merck not liable for the heart attack of 60-year-old Thomas Cona, a second plaintiff in the trial, but be liable for fraud in the sale of the drug to Cona.

Merck has reserved $970 million to pay for its Vioxx-related legal expenses through 2007, and have set aside $4.85bn for legal claims from US citizens. Patients who claim to have suffered as a result of taking Vioxx in countries outside US are campaigning for this to be extended.

In March 2010, an Australian class-action lawsuit against Merck ruled that Vioxx doubled the risk of heart attacks, and that Merck had breached the Trade Practices Act by selling a drug which was unfit for sale.[34]

## Other effects

Rofecoxib was shown to improve premenstrual acne vulgaris in a placebo controlled study.[35]

## See also

- COX-2 selective inhibitor
- Cyclooxygenase 2 inhibitors: drug discovery and development

## References

- ^ http://www.npr.org/templates/story/story.php?storyId=4054991
- ^ Reuters (2006-12-07). "Merck Sees Slightly Higher 2007 Earnings". New York Times. p. A1. http://www.nytimes.com/2006/12/07/business/07drug.html?ex=1323147600&en=19d27b5814f1c1e8&ei=5088&partner=rssnyt&emc=rss.
- ^ Bombardier, C; Laine, L; Reicin, A; Shapiro, D; Burgos-Vargas, R; Davis, B; Day, R; Ferraz, MB *et al.* (2000). "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. VIGOR Study Group.". *The New England journal of medicine* 343 (21): 1520–8, 2 p following 1528. doi:10.1056/NEJM200011233432103. PMID 11087881.
- ^ *a b c d* Merck & Co. VIOXX® (rofecoxib tablets and oral suspension). Accessed at: http://www.merck.com/product/usa/pi_circulars/v/vioxx/vioxx_pi.pdf 01 Feb 2010
- ^ *a b* Gold Standard Inc. Rofecoxib Vioxx® Accessed at: http://www.mdconsult.com/das/pharm/body/181267313-3/946237142/full/2399 01 Feb 2010
- ^ *a b* Davies, NM; Teng, XW; Skjodt, NM (2003). "Pharmacokinetics of rofecoxib: a specific cyclo-oxygenase-2 inhibitor". *Clinical pharmacokinetics* 42 (6): 545–56. PMID 12793839.
- ^ Padi, S.; Kulkarni, S. (2004). "Differential effects of naproxen and rofecoxib on the development of hypersensitivity following nerve injury in rats". *Pharmacology, biochemistry, and behavior* 79 (2): 349–358. doi:10.1016/j.pbb.2004.08.005. PMID 15501312.
- ^ *a b* Scott, LJ; Lamb, HM (1999). "Rofecoxib". *Drugs* 58 (3): 499–505; discussion 506–7. doi:10.2165/00003495-199958030-00016. PMID 10493277.
- ^ http://online.wsj.com/article/SB123672510903888207.html?mod=loomia&loomia_si=t0:a16:g2:r1:c0.0270612:b22894832
- ^ Vane, J.; Bakhle, Y.; Botting, R. (1998). "Cyclooxygenases 1 and 2". *Annual review of pharmacology and toxicology* 38: 97–120. doi:10.1146/annurev.pharmtox.38.1.97. PMID 9597150.
- ^ sfgate.com
- ^ www.safedrugsnow.org
- ^ Karha, J; Topol, EJ (2004). "The sad story of Vioxx, and what we should learn from it". *Cleveland Clinic journal of*

Case 2:05-md-01657-EEF-DEK   Document 42326-1   Filed 05/18/10   Page 13 of 13

14. ^ Solomon, DH; Glynn, RJ; Levin, R.; Avorn, J (2002). "Nonsteroidal anti-inflammatory drug use and acute myocardial infarction". *Archives of internal medicine* 162 (10): 1099–104. doi:10.1001/archinte.162.10.1099. PMID 12020178.
15. ^ Curfman, G.; Morrissey, S.; Drazen, J. (2005). "Expression of concern: Bombardier et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis," N Engl J Med 2000;343:1520-8". *The New England journal of medicine* 353 (26): 2813–2814. doi:10.1056/NEJMe058314. PMID 16339408.
16. ^ http://www.forbes.com/work/feeds/ap/2006/02/13/ap2523250.html
17. ^ a b Curfman, G.; Morrissey, S.; Drazen, J. (2006). "Expression of concern reaffirmed". *The New England journal of medicine* 354 (11): 1193. doi:10.1056/NEJMe068054. PMID 16495386.
18. ^ Bombardier, C.; Laine, L.; Burgos-Vargas, R.; Davis, B.; Day, R.; Ferraz, M.; Hawkey, C.; Hochberg, M. et al. (2006). "Response to expression of concern regarding VIGOR study". *The New England journal of medicine* 354 (11): 1196–1199. doi:10.1056/NEJMc066096. PMID 16495387.
19. ^ [1]
20. ^ [2]
21. ^ [3]
22. ^ [4]
23. ^ [5]
24. ^ a b David Armstrong (2006-05-15). "How the New England Journal Missed Warning Signs on Vioxx". Wall Street Journal. p. A1. http://online.wsj.com/article/SB114765430315252591.html.
25. ^ Konstam, MA; Weir, MR; Reicin, A; Shapiro, D; Sperling, RS; Barr, E; Gertz, BJ (2001). "Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib". *Circulation* 104 (19): 2280–8. doi:10.1161/hc4401.100078. PMID 11696466.
26. ^ Bresalier, R.; Sandler, R.; Quan, H.; Bolognese, J.; Oxenius, B.; Horgan, K.; Lines, C.; Riddell, R. et al. (2005). "Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial". *The New England journal of medicine* 352 (11): 1092–1102. doi:10.1056/NEJMoa050493. PMID 15713943.
27. ^ http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf
28. ^ Wolfe, MM (2004). "Rofecoxib, Merck, and the FDA". *The New England journal of medicine* 351 (27): 2875–8; author reply 2875–8. doi:10.1056/NEJM200412303512719. PMID 15625749.
29. ^ a b Zhang, J.; Ding, E.; Song, Y. (2006). "Adverse effects of cyclooxygenase 2 inhibitors on renal and arrhythmia events: meta-analysis of randomized trials". *JAMA : the journal of the American Medical Association* 296 (13): 1619–1632. doi:10.1001/jama.296.13.jrv60015. PMID 16968832.
30. ^ Solomon, S.; McMurray, J.; Pfeffer, M.; Wittes, J.; Fowler, R.; Finn, P.; Anderson, W.; Zauber, A. et al. (2005). "Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma prevention". *The New England journal of medicine* 352 (11): 1071–1080. doi:10.1056/NEJMoa050405. PMID 15713944.
31. ^ Nussmeier, N.; Whelton, A.; Brown, M.; Langford, R.; Hoeft, A.; Parlow, J.; Boyce, S.; Verburg, K. (2005). "Complications of the COX-2 inhibitors parecoxib and valdecoxib after cardiac surgery". *The New England journal of medicine* 352 (11): 1081–1091. doi:10.1056/NEJMoa050330. PMID 15713945.
32. ^ "European Medicines Agency concludes action on COX-2 inhibitors" (pdf). European Medicines Agency. http://www.emea.europa.eu/pdfs/human/press/pr/20776605en.pdf. Retrieved 2008-04-16.
33. ^ "Merck Announces Voluntary Worldwide Withdrawal of VIOXX" (pdf). http://www.merck.com/newsroom/vioxx/pdf/vioxx_press_release_final.pdf. Retrieved 2008-04-16.
34. ^ Drug unfit for sale, says judge in compo case The Age, March 6 2010
35. ^ http://tribine.utsc.utoronto.ca/archive/00002693/01/dw04120.pdf#search=%22acne%20rofecoxib%22

- FDA (2005). "Summary minutes for the February 16, 17 and 18, 2005, Joint meeting of the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee." Published on the internet, March 2005. Link
- Fitzgerald GA, Coxibs and Cardiovascular Disease, *N Engl J Med* 2004;351(17):1709-1711. PMID 15470192.
- Grassley CE (15 Oct 2004). *Grassley questions Merck about communication with the FDA on Vioxx*. Press Release.
- Jüni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M (2004). Risk of cardiovascular events and rofecoxib: cumulative meta-analysis *Lancet* (published online; see also Merck response below)
- Karha J and Topol EJ. The sad story of Vioxx, and what we should learn from it *Cleve Clin J Med* 2004; 71 (12):933-939. PMID 15641522
- Michaels, D. (June 2005) DOUBT Is Their Product, *Scientific American*, 292 (6).
- Merck & Co., (5 Nov 2004). *Response to Article by Juni et al. Published in The Lancet on Nov. 5*. Press Release.
- Merck & Co (30 Sep 2004) Merck Announces Voluntary Worldwide Withdrawal of VIOXX Press release [1].
- D. M. Mukherjee, S. E. Nissen, and E. J. Topol, "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," *Journal of the American Medical Association* 186 (2001): 954–959.
- Nussmeier NA, Whelton AA, Brown MT, Langford RM, Hoeft A, Parlow JL, et al. Complications of the COX-2