UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS

IN RE:  VIOXX PRODUCTS          :   CIVIL ACTION 05-MD-1657
        LIABILITY LITIGATION   :   SECTION "L"
                               :
                               :   New Orleans, Louisiana
                               :   November 18, 2009
                               :   3:00 p.m.
: : : : : : : : : : : : : : : :

STATUS CONFERENCE IN CHAMBERS
TAKEN BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:   Herman, Herman, Katz & Cotlar, LLP
                      BY:  RUSS M. HERMAN
                      820 O'Keefe Avenue
                      New Orleans, Louisiana  70130
                      (504)  581-4892

                      Levin, Fishbein, Sedran & Berman
                      BY:  ARNOLD LEVIN
                      510 Walnut Street, Suite 500
                      Philadelphia, Pennsylvania  19106-3697
                      (215)  592-1500

                      Seeger Weiss Law Firm
                      BY:  CHRISTOPHER A. SEEGER
                      One William St.
                      New York, New York  10004
                      (888)  584-0411

                      Blizzard, McCarthy & Nabers, LLP
                      BY:  EDWARD F. BLIZZARD
                      Lyric Center
                      440 Louisiana, Suite 1710
                      Houston, Texas  77002-1689
                      (866)  941-1947

For Merck:            Williams & Connolly
                      BY:  DOUGLAS R. MARVIN
                      725 12th Street. NW
                      Washington, DC  20005-5901
                      (202)  434-5000

**APPEARANCES (Continued):**

For Fee Objectors:      Stratton Faxon
                        BY:  MICHAEL A. STRATTON
                        54 Elm Street, Suite 315
                        New Haven, Connecticut  06510

For VLC:                Graves Dougherty Hearon & Moody
                        BY:  MATTHEW B. BAUMGARTNER
                        401 Congress Avenue, Suite 2200
                        Austin, Texas  78701
                        (512)  480-5600

For PSC:                Beasley Allen Law Firm
                        BY:  ANDY D. BIRCHFIELD, JR.
                        218 Commerce Street
                        Montgomery, Alabama  36104
                        (800)  898-2034


Reported By:            Arlene Movahed, CCR
                        OFFICIAL COURT REPORTER
                        500 Poydras Street, Room 406
                        New Orleans, Louisiana  70130
                        504-589-7777

        Proceedings recorded by mechanical stenography;
transcript produced by dictation.

1                          <u>P R O C E E D I N G S</u>

2                          **AFTERNOON SESSION**

3                          **(November 18, 2009)**

4          (The following is a transcript of the Status Conference

5     taken on November 18, 2009, in chambers.)

6          (In chambers.)

7          THE COURT:   Good afternoon.  We have a list of the

8     people present.  Let me just make some comments first just to

9     put this matter in prospective.

10          On February 16, 2005, MDL 1657 entitled IN RE:

11     VIOXX Products Liability Litigation was established.

12     Committees were appointed shortly thereafter, and discovery

13     proceeded.  After a time, some 9 million documents were

14     produced, over 1,000 motions were briefed, argued and ruled

15     on and six trials were had in the MDL process.  And at least

16     that number, or maybe twice that number, in state court.  And

17     after those matters, at the suggestion of this Court and my

18     colleagues in state court and conferences, discussions,

19     serious settlement discussions were entered into by the

20     Plaintiffs' Steering Committee, which was a settlement

21     committee comprised of members of the Steering Committee and

22     was formed at my request.  And they met with Merck's

23     representatives.  And the discussions lasted approximately a

24     year.  And sometime in November of 2007 a settlement program

25     was announced.  And the parties were given the opportunity to

1   opt into the program.  Over 95 percent of all of the people

2   eligible for the program opted into it.  And the matter

3   proceeded.  And as of November of this year over $3 billion

4   was paid out and cost was also handled after a method was

5   established to handle it.

6          At that point, or shortly before that point, I felt

7   that at that time it was appropriate for the Court to focus

8   on common benefit issues.  And on January 20, 2009,

9   Plaintiffs' Liaison Committee filed a motion seeking common

10  benefit fees.  On April 16, 2009, the Court issued an order

11  directing that and I posted that on the website and then I

12  directed anybody having any objection to that motion to file

13  any objection and before May the 8th, 2009.  That was done, a

14  number of people filed.

15         I convened a conference of all of the objectors and

16  it appeared to me that because of the number of objectors,

17  and I didn't know and couldn't know until I had the

18  opportunity to see how many objectors there were, that some

19  structure needed to be put into the objectors' group so that

20  the various arguments could be funneled through some

21  structure and brought to the Court.

22         I appointed, at the suggestion of the objectors,

23  Mr. Michael Stratton to serve as liaison counsel for the

24  benefit of the objectors to urge their position.  And the

25  liaison counsel, Russ Herman, to discuss it from the side of

1   the Plaintiffs' Committee.

2          I felt the first thing to do would be to have them

3   meet and confer and to discuss whether or not any discovery

4   was necessary, any discovery was of interest.  And, if so,

5   what was the nature and extent of the discovery.  It was my

6   hope that they could agree upon some method of either

7   determining that no discovery was necessary, or if there was

8   discovery, a certain discovery was to go forward and give me

9   some dates and suggestions as to those dates.  They both met

10  in good faith but were not able to agree upon the nature and

11  extent of the discovery, hence the conference here today.

12         The objectors take the position, as I understand it

13  from their memo, and I will give them an opportunity to state

14  anything on the record, as well as the Plaintiffs' Committee,

15  but as I read their memo they take the position that there

16  are really two issues involved.  One they term a contractual

17  issue.  And the other they term a reasonableness issue.

18         With regard to the contractual issue, they say that

19  entering into the settlement discussion they felt they had a

20  contract with the Plaintiffs' Committee to have a common

21  benefit fee of two percent.  Coming out of the settlement,

22  they find they are exposed to a potential eight percent.  And

23  I emphasize potential because the Court hasn't really focused

24  on that yet.  But it is true that it is not to exceed eight

25  percent.  Insofar as it's less than eight percent, I haven't

1    focused on it yet.  And they, therefore, because of the

2    difference in going in and coming out, they are concerned and

3    feel that they want to know why.  They feel that they were

4    told by, or they indicate that they were told by members of

5    the Committee that their objections would not be prejudiced

6    in any way by their accepting the settlement funds and now

7    they are concerned about that.

8              With regard to the reasonableness, they see that as

9    a separate issue involving other types of discovery.  Really

10   the focus at this conference would be primarily on the

11   contractual issue, although I will talk or express some

12   observation about the reasonableness issue too.

13             The Plaintiffs' Committee take the position that

14   this is a contract issue and it's not factual, being pregnant

15   in any way.  That is a legal issue.  That the parties in

16   signing on to the settlement agreed to the program.  In part

17   and parcel, the program was an agreement that any kind of

18   benefit figure would not exceed eight percent.  And that this

19   is a contractual issue voluntarily entered into by the

20   parties and that no discovery on that issue was necessary.

21             With regard to the reasonableness issue, it may

22   proceed after the first issue perhaps has been resolved.

23   That the reasonable issue, the Plaintiffs' Committee would

24   restrict the discovery to the Johnson Factors.  And I am not

25   quite sure what the objectors looked for.

1        Merck takes the position that this is a family

2  feud.  That this is a dispute by and among plaintiff lawyers

3  all of whom they respect but feel that it's not their fight.

4  They don't have a dog in that fight and feel that they

5  shouldn't be exposed to any discovery.

6        And that's what I understand the issues to be from

7  the documents and papers that were given to me.  But I will

8  hear from the objectors, if you have anything else to say.

9        MR. STRATTON:   Certainly, Your Honor.  I want to

10  thank you for appointing me to be the liaison for the

11  objectors.  My name is Michael Stratton.  I am here with Matt

12  Baumgartner who is with the Graves Dougherty Firm who Your

13  Honor is familiar with.

14        And I was concerned at first as to whether we had a

15  lot of different firms, dozens of law firms and was there a

16  way to create some unity among that group.  And so we worked

17  hard at creating that unity and we have.  So what you see in

18  front of Your Honor, in terms of our proposal as to how we

19  think this ought to go forward, is signed on to by everybody.

20  And we generally have a unity of interest.  Although I should

21  just point out there are some people who didn't have full

22  participation option contracts so there are some people whose

23  only dog in the fight is going to be the reasonableness issue

24  as opposed to a contractual issue as Your Honor has said.

25        And it's my goal that we do this in an efficient

1    way.  We don't want to turn this into a second major

2    litigation.  I understand that.  However, we're talking not

3    only about a large amount of money, we're talking about

4    hundreds of millions of dollars that are at stake.  It's not

5    a small amount economically we're talking about.

6          We're also talking, from our prospective, about

7    some very important principles of trust, confidence,

8    transparency, predictability, things that Your Honor, you

9    know, spoke of many different times.  You noted that these

10   cases catch the public's attention.  If we have

11   disproportionate results, inconsistent standards, you damage

12   the public's faith in this kind of litigation.  So it's

13   really important that we do this in a way that makes sense,

14   at least from our prospective.

15         We think that the contract issue should be dealt

16   with first.  And because that can be dealt with without

17   completing the rest of the litigation.  And we're still

18   paying these IS claims and we're still working on that.  So I

19   don't know how we get into how many hours have been put in by

20   this person versus that person.  I also think that if we

21   resolve the contractual issues, depending on the result, I

22   think we can take care of 95 percent of the problem.

23         So with regard to the contract issues, we see this

24   as absolutely not simply a matter of law.  These are two

25   percent contracts which Your Honor knows were drafted by the

1   PSC.  The contract is very very clear.  It indicated, "It is

2   the intention of the parties that such assessment, two

3   percent, shall be full and final satisfaction of any present

4   or future obligation on the part of each plaintiff or

5   participating attorney to contribute to any fund for the

6   payment or reimbursement of any legal fees, services, or

7   expenses incurred by or due to the MDL and/or any other

8   common benefit attorneys."  I mean, you could not have been

9   clearer.  This was intended to apply to all sorts of future

10  settlements with the exception of class actions which was

11  dealt with.

12        Your Honor noted at the time, so this means that

13  the only discretion I am going to have is to people who do

14  not sign on to those full participation option contracts, the

15  so-called traditional optional contract.  Those people who

16  didn't want to sign on, Your Honor said, that's where I would

17  have discretion to actually pick the fee.  So we have a

18  contract and a contract precedes equity.  And, you know, if

19  we're talking about a common benefit fee application here,

20  that's equity.  We don't get to equity if we have a contract.

21  The only reason that some people think we don't have a

22  contract is because within a settlement agreement, which we

23  were not a party to and had no party to negotiation, somehow

24  there's language in there that vitiates our contract rights.

25  I can't imagine how that ends up in a settlement agreement

1   between the NPC and Merck.  The NPC has a fiduciary

2   responsibility to be looking out for our interests, not to be

3   looking out for its own interests.  I am not prepared to say

4   that's exactly what happened.  I haven't done the discovery.

5   But it's certainly what people are thinking.  And so it's

6   important for us to find out how that got into the settlement

7   agreement.

8          It's also important for us to find out what the

9   intent was of the PSC when it initially offered these

10  contracts.  We have some idea of that based on things said on

11  the record.  But there is certainly a lot of communication

12  that occurred between the PSC and what their expectations

13  were.  And we need to know what those expectations were

14  because in the fee application that attorney Herman filed he

15  indicates, well, there has been a substantial change in

16  condition, this is not what we really intended, it wasn't

17  really intended to apply to this sort of a settlement.  Well,

18  you can't say that without allowing us some right of

19  discovery of what the actual intent was.  So we need to know,

20  from our perspective, we need to have limited discovery as to

21  what the intent of the PSC was when it initially drafted and

22  proposed these contracts.

23          And we also need to know how terminology made its

24  way into Section 9.2 of the Global Settlement Agreement to

25  the effect that our contractual rights were somehow vitiated

1  because it has the appearance of some collusion or some

2  subinterest or some lack of fiduciary duty being exercised.

3  Which is meaningful because if there was a lack of

4  consideration, or if there is some collusion or something,

5  then that has to be stricken out of the contract.

6          I will say that, you know, it really put a lot of

7  us individual plaintiffs' lawyers in a real problematic

8  situation.  We were left with a global settlement agreement

9  that had within it apparently the vitiation of our contract

10  rights.  We could not share with this recommend the

11  settlement agreement to our plaintiffs because we didn't like

12  the fact that language was in there.  And we had no place to

13  come to complain about it.  There's no due process hearing at

14  that point in time.  So we were left in the position of if we

15  wanted to assert out contract rights at that point in time we

16  would have had to have not recommended the deal to our

17  people.  You couldn't possibly do it if you're a lawyer of

18  any integrity.

19          So we come here now wanting to litigate this issue

20  and wanting to do some reasonable discovery.  We think that

21  it can be accomplished by doing time limited focus

22  depositions of the NPC members.  We're not talking, you know,

23  two-day long depositions here or depositions that go far and

24  wide.  We think we can do it with a very limited deposition

25  as to Merck's representative who is most familiar with the

```
 1   negotiation.  And I can understand Merck's concern here.  I
 2   don't think they want to be exposed as to all their thought
 3   processes.  But just talking about this limited term, how it
 4   got into the settlement agreement.  I don't think that
 5   exposes them too dramatically.  And that's it.  And we think
 6   we can do that in the next four to six weeks, eight weeks,
 7   depending on the discovery of the NPC members and Merck and
 8   then have a briefing schedule and have the issues closed and
 9   ready for Your Honor's review by the first of the year.
10             THE COURT:   I'll hear from the plaintiff.
11             MR. HERMAN:   I am going to defer to Merck first.
12   Your Honor, when this matter first came up and we were to
13   meet and confer, since Merck was at issue, I requested that
14   Merck be brought in to the meet and confer.  I want to thank
15   Mr. Stratton.  We did have two meets and conferred and
16   weren't able to agree.  Merck has a position.  That position
17   may be different than ours.  So if Your Honor will permit, I
18   would like Merck to respond.
19             MR. MARVIN:   This is Douglas Marvin.  As Mr.
20   Stratton said, there are two issues.  One is the contract
21   issue and the second is the reasonableness of the amount for
22   the common benefit fund.  As I understand it, in your reply
23   to our opposition, you indicated that as to Merck we're only
24   interested in discovery from Merck as to the first issue, the
25   contract issue, and not as to the reasonableness of the
```

1  amount or the eight percent or the application that was

2  submitted.

3          MR. STRATTON:   If I could respond, Your Honor.  I

4  can't go that far yet.  I haven't thought that fully through.

5  But certainly at this point in time the only thing we

6  anticipate doing is the contract issue, the Johnson Factors

7  issues.  Unless there was some substantial need shown, I

8  don't think we need things from Merck.

9          MR. MARVIN:   That was my understanding as well.

10  Now as to the contract issue, Your Honor, we believe that

11  that can be decided clearly within the four corners of the

12  agreement itself.  As Your Honor knows, this was a

13  negotiation of a document that established a settlement

14  program.  The program was open to all plaintiffs who had

15  filed Vioxx cases with eligible injuries.  And so, in a

16  sense, it was an offer to them to join the settlement to

17  abide by the terms of the agreement.  In fact, Section 1.2.4

18  said that if a claimant or his enrolling counsel enrolled in

19  the program, by that enrollment they were agreeing to the

20  terms of the Master Settlement Agreement.  And as Your Honor

21  knows, that Master Settlement Agreement was entirely

22  transparent.  Every term was available to any lawyer or any

23  plaintiff for that matter who wanted to read the contract.

24  It was posted on the Internet.  And so they had every

25  opportunity to see what those terms were.

1          One of those terms established a common benefit

2     fund.  And the term explicitly said that by enrolling in the

3     agreement the common benefit fund would supersede the two

4     percent agreement.  So we had as an offer by enrolling in the

5     program, that was the acceptance.  And by accepting, as I

6     say, you agreed to be bound by all the provisions of the

7     agreement, including the common benefit fund.  So as we see

8     it, it's a straight legal issue, an offer and acceptance and

9     then, of course, consideration of the $4.85 billion dollars.

10          The Master Settlement Agreement didn't vitiate the

11     two percent agreement.  What the Master Settlement Agreement

12     did was to say that if you chose to enroll in the program,

13     that's what vitiated or superseded the agreement.  It wasn't

14     the act by the person enrolling and not by the Master

15     Settlement Agreement.  So Merck's understanding as to the

16     purpose of the PTO 19, Merck's understanding as to the

17     purpose of the common benefit fund for its experience with

18     respect to other MDLs are all irrelevant to what is really a

19     straight legal issue here.  And that is, what does the

20     agreement say.  And that can be determined within the four

21     corners of that agreement.  We don't believe any discovery is

22     necessary.

23          MR. HERMAN:   Your Honor, I want to put on the

24     record a position, but I don't really want to argue the

25     merits at this point.

1           Your Honor indicated sort of a bifurcation of

2      issues.  It's not merely a contract issue.  It also deals

3      with the Court's inherent authority to determine reasonable

4      fees.  Whether they be common benefits or ordinary.

5           In the briefing that was submitted in connection

6      with PTO 19, which incidently was served on Drew Ranier, a

7      member of the objectors, it's very clear that that would be

8      subject to revision dependent upon circumstances.  And it's

9      clearly set out.

10          Now what happened in this litigation was unusual in

11     the sense that Your Honor was able to effect coordination

12     with three other jurisdictions.  New Jersey which had

13     substantial litigation.  Texas, which had had substantial

14     litigation until there was a defense peremption ruling in

15     California.  The Negotiating Committee was directed on the

16     plaintiffs' side as was Merck on the defense side to

17     negotiate concurrently with litigation ongoing and take into

18     consideration not the MDL solely but for jurisdiction in

19     which this litigation was being handled in order to form a

20     creative solution which would be global in context.

21          Once that directive occurred, we were not dealing

22     with a discrete number of MDL attorneys on the plaintiffs'

23     side, we were dealing with lawyers who in one way or another

24     had pursued the litigation and pursued it admirably in three

25     other jurisdictions.  And in order to do that, and to do

1    justice to a number of cases, some tried in Texas, some tried
2    in California, one in Illinois, I believe one in Florida,
3    there may have been one in Alabama, but I can't recollect
4    that, several in New Jersey, and in order to satisfy a
5    collective judiciary, an arm's length negotiation took a
6    year.  It was hard fought negotiation.  That was recognized
7    by folks within the legal profession, by the judiciary, and
8    in certain media.  To suggest that it was collusion or had
9    the appearance of collusion, there is no evidence of that.
10   And in order to even get into the issue of setting this
11   agreement aside, there would have to be some prima facia
12   showing of collusion.  This is not an equitable issue.  It's
13   a contract issue.
14           As a matter of fact, with all due respect to
15   learned counsel, he afforded himself of the contract in some
16   instances and in other instances kept his cases out.  The
17   real question is, in the cases that he kept out does PTO 19
18   apply at two percent, but as to the cases he put in and took
19   the benefit of a global settlement, the eight percent is
20   terra firma and it should be and that's a legal question.
21           Now I think the question, Your Honor, with due
22   respect to counsel's opposite position, is premature.  Many
23   of the same lawyers that come before Your Honor today to
24   enter a discovery schedule have two matters pending in the
25   Fifth Circuit challenging in effect a federal trial judge's

1   authority to determine fee issues.  The 32 percent issue.
2   Your Honor, from the plaintiffs'  --  well, I will only speak
3   for liaison counsel because the documents are filed in my
4   name and contend that the law and practice indicates that a
5   federal judge has the authority to determine fee issues.
6   Suppose that the Fifth Circuit rules that the position of
7   liaison counsel is correct, that a federal trial judge that
8   superintended litigation has the responsibility and the
9   authority to determine appropriate fees?  There is no eight
10  percent fee now in terms of the Master Settlement Agreement.
11  There's no two percent fee or six percent fee.  That issue
12  has not even been determined.  And it is a ceiling, it's not
13  written in stone.  Your Honor hasn't decided anything.  And
14  that's a matter for another day.  I think it would be very
15  premature to determine that issue before the Fifth Circuit
16  rules.  And, particularly, since the same objectors who are
17  here seeking discovery are the ones that have put that issue
18  before the Fifth Circuit.
19          Now I recognize intellectually that there is a
20  distinction between limiting attorney's fees or increasing
21  attorney's fees based on the Johnson Factors or other factors
22  in regard to the 32 percent issue and the validity of a
23  contract that says there should be no common benefit fee
24  greater than eight percent.  However, the underlying
25  principle is the same.  The question of equity, in our

1   judgment, doesn't arise here in terms of what percentage Your

2   Honor ultimately determines a common benefit should be or

3   contractually.

4           There are certain issues that arise when we get to

5   an allocation determined based upon the Fifth Circuit's

6   ruling on the 32 percent because Your Honor may well want to

7   weigh what individual law firms may earn in terms of their

8   contingent fee contract in weighing what an ultimate common

9   benefit fee is either by firm or in totality.

10          I have a reversed feeling about the issues.  I

11  think that in terms of Johnson Factors, that an inquiry could

12  proceed.  You know, I would be willing to give a deposition

13  on Johnson Factors.  We have a CPA's documents in terms of

14  hours, et cetera.  But I do not think  --  first of all, I

15  agree with Merck's counsel that that is a pure legal decision

16  in terms of the efficacy of the settlement agreement that was

17  entered into, the Master Settlement Agreement.  And,

18  secondly, I think it's premature.

19          I think the last thing that I want to say before I

20  talk to my colleagues, and I would like to have just a brief

21  moment to make sure I have covered the things that they would

22  like covered, is the fact that you enter this contract,

23  receive a benefit and your clients receive a benefit under

24  the Master Settlement Agreement, and you reserve your right

25  to attack that contract does not mean that the contract is

1  void or voidable.  What you have reserved is a determination.

2  The question is whether it's a fact determination or whether

3  it is a pure legal question.  And I think I have said enough

4  to cover those issues that I felt needed to be covered.  But

5  I would like to very briefly talk with the Executive

6  Committee.

7          THE COURT:   Before you do that, let me ask you a

8  question.  You haven't looked at the reasonableness now.

9  Suppose I would look at the reasonableness and decide the

10 common benefit fee should be the two percent, does that mean

11 they get nothing from your cases?  Or does that mean you get

12 two percent of their two percent?

13         MR. STRATTON:   If Your Honor  --  as I understand

14 the question, if Your Honor decided that two percent of the

15 gross was a reasonable common benefit fee  --

16         THE COURT:   Right.

17         MR. STRATTON:   --  that should be divided among

18 all common benefit, well, I guess our contractual  --  we

19 wouldn't much care about our contractual issue because it

20 would be down at the contract level.  Our two percent is two

21 percent of gross.

22         THE COURT:   They would get nothing from your fee

23 then?

24         MR. STRATTON:   Oh, sure, they would.  They would

25 get two percent.

```
 1               THE COURT:   Well, they would get your two percent?
 2               MR. STRATTON:   They would get two percent of the
 3   gross of any of the objectors' cases.
 4               THE COURT:   Well you would get nothing then?
 5               MR. STRATTON:   Well, I am not quite understanding.
 6               THE COURT:   Well you say you get two percent.
 7               MR. STRATTON:   Right.
 8               THE COURT:   That they have agreed to pay you two
 9   percent.
10               MR. STRATTON:   Okay.
11               THE COURT:   Suppose that their common benefit fee
12   is two percent?
13               MR. STRATTON:   What we have agreed to by contract,
14   we have agreed to give them two percent of the gross of all
15   of our cases.  That's an automatic two percent, plus one
16   percent cost.  That's the contractual obligation that we
17   have.
18               THE COURT:   So that would be moot then?
19               MR. STRATTON:   If you decided, Your Honor, that a
20   reasonable fee for the common benefit lawyers in this case
21   would be two percent, it's the same thing, it's a nullity
22   matter.  I don't care whether you call it a contract or
23   reasonableness, we would still be paying two percent.
24               THE COURT:   It would be mooted, right?
25               MR. STRATTON:   Right.  We would still be paying
```

1  two percent.

2          THE COURT:   So why wouldn't I try reasonableness

3  first to find out what is the fee?

4          MR. STRATTON:   We certainly could do that.   I

5  mean, we could certainly do that.   But I think it's a much

6  more intensive bunch of discovery.   I mean, that's a lot of

7  hours to go through.   It's a lot of work to analyze.   And

8  it's a lot of folks that would need to be deposed on the

9  Johnson Factors.

10          THE COURT:   Maybe that's the solution is to try

11  eventually and I have to wait until all the case is over to

12  see whether or not it is.   But then let's see what the amount

13  is first and if there is anymore issue, then we focus on it.

14  If there is no more issue, there's no sense in taking any

15  depositions.   If there is an issue, then there is.

16          MR. STRATTON:   So Your Honor is proposing that we

17  do reasonableness first?

18          THE COURT:   Well, yes.   The problem that I am

19  having with reasonableness is they're still working because

20  the case has not been resolved yet.   So it may be premature.

21  But it may be premature for other than what Mr. Herman is

22  saying.

23          MR. STRATTON:   The only thing I would point out is

24  the prejudice to the objectors.   This is all we should be

25  paying is two percent.   That contract has not been voided.

1    It's a real contract.  The PSC signed on to the contract.

2    And now the money is being held because they made a claim in

3    excess of our contractual rights.  So it's prejudicing us and

4    it's also raising collateral damage, or more consequential

5    damages by virtue of this money being out.

6             MR. HERMAN:   Perhaps I haven't made this clear.

7    But Drew Ranier, a member of the Consortium that is the prime

8    mover on this issue, understood from the very beginning that

9    PTO 19 might not apply.

10            MR. STRATTON:   For the life of me I mean, I have

11   looked through all of the history of this FPO contract and,

12   you know, the attorney Herman said earlier it was really

13   unusual.  I mean, we had these California cases that came

14   within the fold, the Texas cases came within the fold.  This

15   is Andrew Birchfield back in July 19. 2005, "Full

16   Participation  Option is designed to foster cooperation and

17   coordination between the lawyers that are litigating cases in

18   the MDL in federal court and those in state court

19   litigation."  That was the whole intention behind the two

20   percent contract was to get everybody to work together.  And

21   then the PSC comes in here asking for eight percent saying it

22   was highly unusual that state court lawyers and MDL lawyers

23   work together and that's why we should get more than two

24   percent.

25            THE COURT:   I understand the issue.  And I am not

1 prepared to say at this point whether it's a legal issue or a

2 factual issue.  I just am concerned as to whether or not it's

3 appropriate for obviously the reason that Mr. Herman says,

4 namely, the issue before the Fifth Circuit.  But also that

5 there are two issues.  And I think you are right, I think

6 there are two issues.  There's a question of contract issue

7 and there's a question of the reasonableness issue.

8        With regard to the reasonable issue, I really do

9 feel that it's more Johnson Factors oriented.  Now we can put

10 a different spin as to what it amounts to, because they do

11 tweak the Johnson Factors a bit in this jurisdiction to look

12 at what's fair percentage wise and how it works percentage

13 wise.  And the Johnson Factors are more of a check as opposed

14 to a rigid formula.  But they are significant.

15        And insofar as discovery, Johnson Factors are

16 really the discovery aspect of it, or the informational

17 aspect.  The percentage part is something that I can deal

18 with.  But that's something that I think may wait later.

19        THE COURT:  You have been waiting to say

20 something, so why don't you make your appearance for the

21 record.

22        MR. BAUMGARTNER:  Matt Baumgartner on behalf of

23 the Consortium.  And the only thing I wanted to say is that

24 Mr. Herman made a comment about a member of the Consortium,

25 Mr. Ranier, who is not present here today, about his

 1    knowledge of the extent and applicability of Pre-Trial Order
 2    19 and I just want to clarify for the record that the
 3    Consortium's position is that as far as they all knew, Pre-
 4    Trial Order 19 was intended to apply to the type of
 5    settlement that was reached in this case.  And what Mr.
 6    Herman said really only emphasizes the need for discovery.
 7    He says, well, Mr. Ranier fully understood that it wasn't
 8    intended to apply.  We need to know what it was intended to
 9    apply to, what the expectations of the offerers of those
10    agreements that were attached to Pre-Trial Order 19 were when
11    they made that offer, when they proposed those contracts.
12    Thank you.
13              MR. STRATTON:   Just one other comment, if I could,
14    Your Honor.  One of my concerns with continuing to delay this
15    is that, you know, I would like to have the monies that are
16    currently being held not only through the trial court's
17    ruling but also through any Fifth Circuit ruling by agreement
18    of all counsel.  I do not want to get into a situation of
19    having this money disbursed at the end of the trial court
20    ruling that may be for or against either of the parties and
21    having to put up supersedeas bonds for $300 million or chase
22    25 law firms around the country to get reimbursed.
23              THE COURT:   Well, an agreement is one thing.  But
24    if there is no agreement, then the only thing I can do is a
25    supersedeas bond does stop it.  If there is no supersedeas

1    bond, then there is no supersedeas bond.  If you all agree to

2    it, then it's one thing.  But, you know, in any case when I

3    rule the only way I would hold judgment is if somebody puts

4    up a supersedeas bond.

5            MR. LEVIN:   That's exactly what happened in the

6    Third Circuit, the objectors  --  well, they lost the case in

7    the Third Circuit.  But they didn't seek a supersedeas bond

8    and the panel looked at them like, so, the money was

9    disbursed.

10           More that than, Your Honor, we have here a

11   situation unlike other MDLs where a case is settled and there

12   is a set aside and the money is deducted and you set it in.

13   For that reason, when we initially sought an assessment, we

14   put in our brief that knowing that that had happened in other

15   cases and that was the law and the law in the Fifth Circuit

16   in Florida Everglades that a class action settlement or a

17   global settlement  --  we didn't say class action settlement,

18   we wouldn't even use the term quasi class.  We just crept

19   into the law in MDLs in the last two years which is even

20   stronger.  We said a global settlement and this was a global

21   settlement.  And Article 9 of the Master Settlement Agreement

22   recognized that we were in an area where counsel fees

23   couldn't be agreed to.  Whether you called it a class or

24   quasi class, global settlement or even a set aside without

25   the Court acting as a fiduciary of the plaintiffs, the

1   individual claimants, and insured the public trust.  And for

2   that reason whatever we say really doesn't matter, Your

3   Honor.  I mean, it's a benchmark.  If's what Your Honor says

4   that matters.  And that's the law in these cases.  And I will

5   give you two cases to look at.  Cendent Prides and Diet Drugs

6   appellate cases.  The Court can go down, the Court can go up

7   because the Court sits between we plaintiffs' lawyers and the

8   claimants and the public.

9          And that's where we are and that's where the brief

10  is going to go in part.

11         THE COURT:  That's the other issue.  I said two

12  percent.  I don't want anyone to be misled that I am going to

13  go to two percent or not two percent.  I am just saying that

14  is an issue that I think interfaces with it.

15         But it is also significant that it's presently on

16  appeal, because if the Court says that I have a right to deal

17  with fees, contractual fees, then I don't see any difference

18  between a contractual fee that you had with the claimant for

19  40 percent and when I say it's 32 percent, I to some extent

20  dealt with that contractual issue.  And it's the same

21  contractual issue that you are raising.  You say you have a

22  contract with the Plaintiffs' Committee.  You said in the

23  Fifth Circuit that you had a contract with the plaintiff.

24  And that I could not interfere with that contract.  You're

25  saying the same thing, that I cannot interfere with the

1    contract that you have with the plaintiff counsel.  Now if

2    the Fifth Circuit agrees with you, then that's significant.

3    If the Fifth Circuit says I can, then the fact that you have

4    a contract may not be significant.

5              MR. STRATTON:   I would just point out, Your Honor,

6    I am not a part of the group that had 40 percent.

7              THE COURT:   I understand.

8              MR. STRATTON:   I actually support Your Honor's

9    position.

10             THE COURT:   No, I understand.  No.  No.  I didn't

11   mean anything.

12             MR. STRATTON:   No.  No.  I just didn't want you to

13   think I charge people 40 percent.

14             THE COURT:   No.  No.  I guess what I am saying is,

15   that is the same issue to some extent.  It's with a different

16   person.

17             MR. STRATTON:   The difference  --  the way I would

18   distinguish it is in that decision on the 50, 32 percent,

19   Your Honor said, I believe you know, I don't like getting

20   involved in contract issues  --  I am paraphrasing obviously

21   --  I think people have the right to contract with their

22   lawyer.  But I have the right to get involved when I think

23   something is oppressive or overreaching.  Oppressive,

24   overreaching being the bellwether, that's the gateway for

25   Your Honor to come in and knock it 40 to 32.  I mean, I don't

1  think we could say that two percent is oppressive or

2  overreaching.

3           THE COURT:   It's the other side of the coin,

4  though.

5           MR. STRATTON:   This contract was entered midstream

6  in the litigation in front of Your Honor, drafted by the

7  people now trying to vitiate it.  It's a different  --  it's

8  a much different situation factually.

9           THE COURT:   Sure.

10          MR. STRATTON:   And I think having gotten the

11  benefit of the bargain, having gotten all the benefit of the

12  trust, cooperation, and transparency that the two percent

13  contract gave you, I mean, really people jumped on board

14  because of that.  Now to turn around and to say it's eight

15  percent or ask for eight percent, it's the height, and I say

16  it in my papers, it really is the height of hutzba and it

17  doesn't bode well I think in the future of this type of

18  litigation.  I mean, I certainly wouldn't trust a Plaintiffs'

19  Steering Committee in the future.

20          THE COURT:   Well, I understand the argument.  The

21  issue, as I see it to some extent at least in different

22  format, and I agree with you it's a different form that it's

23  raised, but if the Circuit says that the Court having the

24  litigation before it can review the contract by the lawyers

25  and the litigants or between the lawyers and the litigants

1   and that's appropriate, it seems that the Court then can

2   review the contract between plaintiff lawyer and plaintiff

3   lawyer whether or not it's a contract or not a contract.  I

4   then take into consideration other factors and I may need

5   discovery on both sides to make that call.  But if the

6   Circuit says a contract is a contract and the Court can't

7   alter, change, modify the contract, then it seems to me the

8   issue then is a different issue.  The issue is then whether

9   or not there is a contract.  If it's the first, it doesn't

10  really matter whether it's a contract, other things can be

11  considered which might require some discovery.  So I do

12  understand the arguments.  But I do think at this point it's

13  premature.  I don't know how premature it is.  I am willing

14  to wait a while to see what the Fifth Circuit does.  Once

15  they do something, I would like to then convene another

16  meeting and give you all the benefit of focusing on what the

17  Circuit has said and how that affects it and then I can rule.

18  I would like to get this over, frankly, as opposed to just

19  keeping it on ice forever.  But I don't think that is timely

20  at this point.

21       I am a little concerned about the discovery from

22  Merck, I should say that, because I think there are other

23  issues involved with Merck.  There is some privilege issues

24  involved with Merck that don't exist in the other.  I am not

25  prepared really to speak on that yet.  But if there is

1  discovery, I wouldn't include Merck in that discovery until
2  some very good cause is shown because I think they're an
3  observer in this as opposed to a participant from your
4  standpoint at least in this particular issue.  And I don't
5  see them participating in reasonableness.  They don't know
6  what went on and they can't say one way or the other.  And
7  they're biased anyway.  So I don't know what information they
8  would give that would be helpful at all.

9          But, you know, the main thing is I think that this
10  is not ripe for me to be speaking on while there is something
11  before the Circuit.

12          And on that issue, let me just speak just as a
13  colleague.  I really am just disappointed in this whole
14  situation, frankly.  This was a complicated case filed on
15  February 16, 2005.  In less than two years, the lawyers for
16  both sides did yeoman work and the case was resolved.  In
17  less than three years, over 40,000 claims have been paid.
18  Not one claimant has even mandamused the Court, going to the
19  Fifth Circuit, taken a position that brings it to the
20  Circuit.  I ruled on 1,000 motions.  Not one of the motions
21  went to the Circuit.  I say, "Not one of the motions," I had
22  an issue of discovery that I dealt with.  They didn't reverse
23  it.  They did it another way.  But other than that, nothing
24  has been taken that far except the lawyers who are arguing
25  about not their clients but themselves.  And I don't feel

1    anybody ought to ever be shut out of any rights or appeals or

2    the legal process.  But it's disappointing to look at this

3    case and see how far it's gone and how it's worked and come

4    up with only disagreements between and among plaintiffs'

5    lawyers.  I don't know why it's that way.  But it's that way

6    and it happens a lot these days.  It's just unfortunate.

7            I assume that people walking the same side of the

8    street know each other and oftentimes can get these matters

9    resolved in their way rather than bringing it to the Court.

10   It's just not the way it works this way.  But I will be

11   prepared to rule.  It's just that now is probably not the

12   time to do so.  But I appreciate your arguments.  I have

13   learned a lot from your briefs in looking at all the material

14   and I know that each side takes it seriously and they should.

15   But I assure you that I do too.  And I will give it the very

16   best that I can for both sides.  Thank you.

17           (End of proceedings.)

18

19

20

21

22

23

24

25

**REPORTER'S CERTIFICATE**

I, Arlene Movahed, Official Court Reporter, for the United States District Court for the Eastern District of Louisiana, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of proceedings had in the within-entitled and numbered cause on the date herein before set forth and I do further certify that the foregoing transcript has been prepared by me or under my direction.

s/   Arlene Movahed
ARLENE MOVAHED, CCR
Official Court Reporter
United States District Court
Eastern District of Louisiana