IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AvMed, Inc., et al.,<br><br>                     Plaintiffs,<br><br>vs.<br><br>BrownGreer PLC, U.S. Bancorp, Inc., and John Does,<br><br>                     Defendants. | CIVIL ACTION<br><br>No. 08-1633<br><br>SECTION L, MAG. 3<br><br>HONORABLE ELDON E. FALLON<br>HONORABLE DANIEL E. KNOWLES, III<br><br>In relation to:    MDL No. 1657<br><br>In re: Vioxx Products Liability Litigation |

**PLAN PLAINTIFFS' CORRECTED MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION: (A) TO IDENTIFY LAW FIRMS REPRESENTING CERTAIN ELIGIBLE PLAINTIFFS IN PLACE OF THE "JOHN DOE" DEFENDANTS; (B) TO ADD THE FEDERAL EMPLOYEE HEALTH BENEFITS ACT ("FEHBA") AND MEDICARE ADVANTAGE REIMBURSEMENT CLAIMS; (C) TO SEAL THAT PORTION OF THE CORRECTED DECLARATION OF MARK D. FISCHER, ESQ. THAT CONTAINS PROTECTED HEALTH INFORMATION UNDER THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996 ("HIPAA"); AND (D) FOR A PRELIMINARY INJUNCTION IMPOSING A CONSTRUCTIVE TRUST AND PROHIBITING DISTRIBUTION OF IDENTIFIED SETTLEMENT FUNDS**

By this corrected motion, Plan Plaintiffs seek leave to amend their First Amended Complaint to identify certain law firms (the "Defendant Law Firms") named as "John Does" therein. These firms represent certain personal injury claimants ("Eligible Claimants" or "ECs") in suits brought against Merck & Co., Inc. ("Merck"), the manufacturer of Vioxx, who (1) have settled claims against Merck for medical expenses paid by Plan Plaintiffs; (2) are members of plans under the Employee Retirement Income Security Act ("ERISA") that include reimbursement language qualifying those plans for equitable relief under *Sereboff v. Mid-Atlantic Medical Services, Inc.*, 547 U.S. 356 (2006); and (3) have chosen to forego the Private Lien

{1851 / MOT / 00102584.DOC v3}

Resolution Program approved by this Court. Plan Plaintiffs also seek to add claims for reimbursement as Medicare Advantage Organizations under the Medicare Secondary Payer Act of 1980 ("MSP") and as contracting plans under the Federal Employee Health Benefits Act ("FEHBA"), 5 U.S.C. § 8901 *et seq.* Further, because the identity of the ECs and the amount of their liens may qualify as "Protected Health Information" as defined in the regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. § 160.103, Plan Plaintiffs move to seal Exhibits "A" and "B" to the Corrected Declaration of Mark D. Fischer, Esq. ("Fischer Decl.") that identify this information.

Finally, Plan Plaintiffs seek to enjoin the Defendant Law Firms from paying specific sums to certain ECs so that the identified funds giving rise to Plan Plaintiffs' ERISA, Medicare Advantage, and FEHBA claims are maintained *pendente lite*. Plan Plaintiffs have addressed each deficiency that this Court previously identified in their prior motion. Accordingly, the injunction should issue. Without it, millions of dollars of plan money will be paid out to ECs before the plans' liens are resolved, rendering collection of valid reimbursement obligations virtually impossible.

## I. BACKGROUND

Plan Plaintiffs filed this ERISA action on April 14, 2008 and amended their Complaint as of right on April 18, 2008. *See In re Vioxx Prod. Liab. Litig.*, MDL No. 1657, 2008 WL 4681368, *3 (E.D. La. Oct. 21, 2008). The operative First Amended Complaint names BrownGreer, PLC, U.S. Bancorp; and certain "John Does" as defendants. The Complaint alleges that "John Does 1, 2, 3, etc. are . . . entities . . . which . . . (b) have received medical benefits from Plaintiffs' Health Benefit Plans, including ERISA plans, for medical treatment attributable to their use of Vioxx and who will claim money from the [Settlement] Funds; or (c) are agents or

attorneys of individuals identified in subsection (b) herein." (1st Am. Compl. ¶ 54). The Complaint seeks equitable relief under Section 502(a)(3) of ERISA in the nature of (1) imposition of a constructive trust over the Vioxx settlement funds, which come into the possession, custody or control of such agents or attorneys, to the extent of Plan Plaintiffs' liens; (2) a declaration that Plan Plaintiffs are the proper owners of the funds associated with their liens; and (3) injunctive relief preventing disbursement of the settlement funds prior to the adjudication of the Plan Plaintiffs' claims. (*Id.*, Prayer for Relief.)

A. **The Prior Preliminary Injunction Proceedings**

On June 9, 2008, Plan Plaintiffs filed a motion for a temporary restraining order and preliminary injunction seeking to compel BrownGreer PLC, U.S. ("BrownGreer"), as claims administrator, to disclose the names of ECs participating in the Vioxx settlement and to enjoin distribution of any settlement funds pending Plan Plaintiffs' assertion of their reimbursement rights against such ECs. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2008 WL 3285912, *5 (E.D. La. Aug. 7, 2008). In denying Plan Plaintiffs' motion on August 7, 2008, the Court made several observations about its deficiencies, including, by category:

1. **Likelihood of Success on the Merits**

   - "[t]he plaintiffs are unable to identify their own insureds against whom they wish to proceed, the precise amount of money they wish to collect, or the particular plan provisions they seek to enforce," *id.* at *7;

   - "[p]laintiffs attempt to enjoin distribution of funds to claimants who have no relation to the Plaintiffs, and against whom the plaintiffs have no claim whatsoever, let alone a substantial likelihood of success on the merits," *id.* at *12;

   - the differences among the exemplar plan language was "one of the factors considered by the Court" in assessing the likelihood of success on the merits, *id.* at *13 n. 17;

   - "[t]he Court has no reliable means of determining how many non-ERISA claimants might be affected by the proposed delay," *id.*;

   - "[a]t this early stage of the Vioxx Settlement proceedings . . . the Claims

Administrator has not finished [its work]" so there is no "identifiable fund" under the *Bombardier* test, *id.*;

- although the Court recognized that it was "likely" that "a significant portion of the settlement funds . . . will at some point in the future-belong to some of the Plaintiff health plans," Plaintiffs' request was premature and inequitable because of their inability to sufficiently tailor their request, *id.* at *15; and

- because "claimants in the Vioxx Settlement Program do not have possession over the lump, unallocated settlement fund currently held by Brown-Greer," *id.*, they did not yet have legal control over the *res*.

2. **Irreparable Injury**

- Plaintiffs had not shown that the attorneys will "disperse settlement funds before resolving private liens" *id.* at *16;

- the claims were premature, because "the *Sereboff* line of cases makes clear that Plaintiffs may still pursue equitable reimbursement after interim payments have been distributed to claimants and their attorneys," *id.* at *17; and

- "the Supreme Court's decision in *Sereboff* suggests that the Plaintiffs may even be able to seek equitable reimbursement from their beneficiaries in the event the beneficiaries or their attorneys do spend or commingle funds," *id.*

3. **Balance of the Harms**

- Plaintiffs do not stand to lose anything except the economies of scale that come with the multidistrict litigation, *id.* at *18; and

- the delay caused by enjoining interim payments would be improper, *id.*

4. **The Public Interest**

- "the public interest would be for better served by requiring private health insurers to devise a more effective means for identifying their own insureds against whom they seek to assert a claim." *Id.* at *20.

On appeal, the Fifth Circuit affirmed the denial of the preliminary injunction on the same grounds articulated by this Court. *See AvMed, Inc. v. BrownGreer, PLC*, No. 08-30802, 300 Fed. Appx. 261, 2008 WL 4909535 (5th Cir. Nov. 17, 2008).

B. <u>**The Private Lien Resolution Program**</u>

Following the preliminary injunction proceedings, the parties negotiated a voluntary

Private Lien Resolution Program, which was announced at the January 22, 2009 monthly status conference. The Court appointed the Garretson Firm Resolution Group, Inc. ("Garretson") to oversee the program as Lien Resolution Administrator. As part of the program, participating plans agreed to reduce all injury-related lien amounts by 50% ("Adjusted Lien Amount"). The participating plans also agreed to limit or cap all liens (the "Capped Lien Amount") at: (1) 15% of an EC's gross settlement amount (before deduction of attorneys' fees and litigation expenses) up to the first $100,000; (2) 12.5% of that amount over $100,000 and up to $250,000; and (3) 10% of all sums exceeding $250,000. The participating plans agreed that the Capped Lien Amount would not exceed the Adjusted Lien Amount. The Program was entirely voluntary for both ECs and the Plan Plaintiffs.

On February 10, 2009, the Plaintiffs' Steering Committee ("PSC") reported to the Court that (1) an information package including a list of participating insurers, a HIPAA compliant release and a participation form had been made available online and emailed to all relevant parties; (2) all ECs' attorneys had received a draft letter outlining the program that could be sent to their clients; and (3) Garretson had set up a toll free number to answer attorneys' questions about the program. (*See* Minute Entry re: February 10, 2009 Status Conference.) On March 27, 2009, the PSC informed the Court that approximately 16,000 eligible claimants had elected to participate in the program. This represented a participation rate of approximately 35% of all ECs.

Due to this low participation rate, Garretson extended the participation deadline to May 29, 2009 and sent another email to EC attorneys containing a supplemental list of approximately 70 additional private health plans that had by then agreed to participate in the program. On April 23, 2009, Garretson sent additional letters to a targeted group of nonparticipating claimants'

attorneys informing them of the extended response deadline and asked them to reconsider having their clients join the program. The extended deadline generated an additional 4,363 enrollees, bringing overall participation up to approximately 44%.

C.      **Plan Plaintiffs' Subsequent Efforts to Identify Their Liens**

Plan Plaintiffs suspected that a large number of the remaining 56% of ECs were their members and were subject to valid liens over their recoveries. Accordingly, at Plan Plaintiffs' request, on May 19, 2009, the Court ordered that the PSC and Plan Plaintiffs engage in a matching exercise to determine the extent to which Plan Plaintiffs covered nonparticipating ECs. (*See* Pretrial Order No. 40.) On June 5, 2009, representatives from Garretson and Rawlings & Associates PLLC (on behalf of Plan Plaintiffs) met at Garretson's offices and matched a partial list of nonparticipating ECs against Plan Plaintiffs' enrollment data. (*See* Corrected Fischer Decl. at ¶ 3.) Of the approximately 27,000 nonparticipating ECs, a sample of over 16,000 nonparticipating ECs was chosen to match against Plan Plaintiffs' enrollment data. Garretson identified 6,713 nonparticipating ECs from the partial list. (*Id.*) On June 29, 2009, Garretson informed the Court that (1) over 20,000 claimants had enrolled in the Private Lien Resolution Program; (2) the matching process had yielded a list of approximately 6,700 ECs with private insurance obligations who had not yet joined the lien resolution program; and (3) the parties were in the process of identifying any false matches.

Taking guidance from the Court's prior decision and proceedings, Plan Plaintiffs next conducted an exhaustive investigation to identify (1) ECs who were insured by Plan Plaintiffs and had opted not to cooperate in the Lien Resolution Program; (2) the relevant plan language providing a given Plaintiff with rights of reimbursement as to covered ECs; and (3) the specific amounts that Plan Plaintiffs were entitled to recover to reimburse them for paying the medical

expenses related to the Vioxx use of identified, non-cooperating ECs. (*Id.* at ¶¶ 5-7.)

Due to these efforts, the Plan Plaintiffs are now able to identify with particularity (1) the names of the EC and the law firms that represent them in connection with this litigation; (2) the plan language associated with each EC which gives rise to reimbursement rights under ERISA, FEHBA or Medicare Advantage coordination of benefits rules;[1] and (3) the exact amount of medical bills the Plan Plaintiffs paid to health care providers to treat such ECs as a result of their Vioxx use. (*Id.* at ¶¶ 5-7.)

### D. The Status of the Settlement Administration

Plan Plaintiffs understand from their discussions with representatives of BrownGreer that the remaining amounts to be distributed to the ECs have been determined and that the vast majority of the settlement funds were distributed to the ECs' law firms on Monday, June 14, 2010. (*Id.* at ¶ 10.)

## II. ARGUMENT

### A. Plan Plaintiffs Should Be Permitted to Amend Their Complaint

#### 1. Plan Plaintiffs Have Identified the "John Doe" Law Firms

Rule 15(a)(2) of the Federal Rules of Civil Procedure permits Plan Plaintiffs to amend their complaint a second time upon written consent of their adversary or leave of court, which it "should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). There is a strong presumption in favor of granting leave to amend, which is properly given where the amendments raise meritorious claims. *Fin. Acquisition Partners, LLP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006); *see also Krupski v. Costa Crociere S.p.A.*, __U.S.__, __, 2010 WL 2243705, at *8 (U.S. June 7, 2010) (interpreting Rule 15 expansively in light of the "preference expressed in the Federal Rules of Civil Procedure . . . for resolving disputes on their merits") (citations omitted).

---

[1] Because this information is voluminous, Plaintiffs have not submitted it with this motion, but will do so upon the

{1851 / MOT / 00102584.DOC v3}  7

Through extensive efforts (*see* Corrected Fischer Decl. ¶¶ 3-8), Plan Plaintiffs have identified Defendant Law Firms that represent non-participating ECs who are required to reimburse them for their medical bills from the Vioxx Settlement proceeds. These defendants should be substituted for the "John Doe" law firms identified in the amended complaint.

### 2. The ERISA Claims Against the Defendant Law Firms Are Ripe

The settlement administrator has identified the funds that are payable to each EC, and Plan Plaintiffs have identified their liens against specific ECs, as well as the plan language giving rise to Plan Plaintiffs' rights of recovery. The Court recognized that Plan Plaintiffs would need to satisfy these three preconditions before their ERISA claims against the law firms matured. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2008 WL 3285912, *passim*. Accordingly, these claims are now mature.

### 3. Plan Plaintiffs Have Viable Medicare Advantage and FEHBA Claims

Plan Plaintiffs' Second Amended Complaint adds reimbursement claims for Plan Plaintiffs' role as "Medicare Advantage Organizations" and as administrators of plans under contract with the Federal Office of Personnel Management to offer health care benefits to federal employees under FEHBA. (*See* 2d Am. Compl. ¶¶ 108-124.) These programs provide health benefits to Medicare enrollees and federal employees under standardized contracts that contain reimbursement language entitling Plan Plaintiffs to reimbursement of medical expenditures from tort settlements.

Under MSP, Medicare Advantage Organizations (those private health plans that offer Medicare Advantage Plans) have the same rights to reimbursement of medical expenses from their members as Medicare.[2] The Medicare program was instituted in 1965 as a part of the

---

request of either the Court or the "John Doe" law firms.

[2] Plaintiffs' Medicare Advantage plans are "MA Organizations" that manage "MA Plans" as defined by 42 C.F.R. § 422.2.

Social Security Act. *See* 42 U.S.C. § 1395 *et seq.* Medicare provides health care coverage for certain medical procedures provided to individuals who either (1) are more than 65 years old; (2) have received Social Security disability benefits for at least 24 months; or (3) have been diagnosed with kidney failure. *See* 42 U.S.C. §§ 1395c, 1395o.

Under the MSP, Congress sought to reduce Medicare's expenditures by making Medicare the "secondary payer" after any other entity obligated to pay for an individual's primary health care (the "primary payer"), including group health plans, workers' compensation, or an automobile or other liability policy or plan. 42 U.S.C. § 1395y(b)(2). If payment for covered services has been or is reasonably expected to be made by someone else, Medicare does not have to pay. *Id.* If Medicare has already paid for a service that should have been covered by a primary payer, Medicare is entitled to recoup its outlay. 42 U.S.C. § 1395y(b)(2)(B)(ii)-(iv). With a December 2003 clarifying amendment, *see* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 301, 117 Stat. 2066, 2221 (2003), the MSP "plainly entitles Medicare to reimbursement of any payment it makes for medical services if a primary plan later pays for those medical services as part of a settlement agreement," *see In re Zyprexa Prods. Liab. Litig.*, 451 F. Supp. 2d 458, 466-67 (E.D.N.Y. 2006) (discussing source of Medicare liens). "Primary Plans" under the statute includes self-insured tortfeasors, like Merck, or its liability insurers. 42 U.S.C. § 1395y(b)(2)(A). A Medicare Advantage Plan may recover "from any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to any entity." 42 U.S.C. § 13954(b)(2)(B)(iii); 42 C.F.R. § 411.24(e). The Department of Health and Human Services has elaborated on this provision by regulation:

> **(g)** **Recovery from parties that receive primary payments.**
> CMS has a right of action to recover its payments from any entity, including a beneficiary, provider, supplier, physician, alimony, state agency or private insurer that has received a primary payment.

42 C.F.R. § 411.24(a).

In addition, Medicare Advantage plans, such as Humana, have been granted regulatory authority by the Department of Health and Human Services to "exercise the same rights to recover from a primary plan, entity, or individual that the Secretary [for Health and Human Services] exercises under the MSP regulations in Subparts B through D of part 411 of this Chapter." 42 C.F.R. § 422.108(f). These rights include rights of reimbursement. *See* 42 C.F.R. 411.010, *et. seq.*

Further, Plan Plaintiffs have provided benefits to federal employees under FEHBA. Plaintiff Blue Cross Blue Shield Association (the "Association"), under the terms of its contract with the Federal Government, pays benefits to federal employees under plan language mandated by FEHBA. Pursuant to FEHBA, the Office of Personnel Management ("OPM") negotiates with private payers such as the Association and regulates health benefits plans for federal employees. *See* 5 U.S.C. § 8902(a). FEHBA provides Government payment of approximately 75% of health benefit premiums, with the member being responsible for the remainder. *See* 5 U.S.C. § 8906(b). The shared premiums are deposited into a Treasury Fund, from which the Association and other carriers draw to pay covered benefits. *See* 5 U.S.C. § 8909(a). As part of this program, plans are free to include subrogation and reimbursement language in member contracts and, in fact, do so. Funds recovered by FEHBA plans are refunded to the Federal Government's Treasury Fund for the purpose of paying future claims. As a result, Plan Plaintiffs have viable Medicare Advantage and FEHBA claims.

### 4. Defendants Will Suffer No Prejudice From the Amendments

The Defendant Law Firms will suffer no legal prejudice as a result of the amended complaint. These law firms, as fiduciaries for their clients, have a duty to withhold money from

settlement funds to repay valid liens. Law firms are proper defendants in reimbursement suits brought under ERISA. *See, e.g., Longaberger v. Kolt*, 586 F.3d 459 (6th Cir. 2009). These firms have ample time to defend themselves against these claims, because no trial date has been scheduled and this action is still in its early stages. Further, as "John Doe" defendants in this high profile suit, the law firms were aware as of the date of the filing of this action that they were the likely defendants in this action. As recently as June 8, 2010, Plan Plaintiffs gave these firms additional notice of their intention to sue the firms as trustees for the specific ECs identified in the suit absent their voluntary compliance. (*See Ex.* "B" to Fischer Decl.) The law firms Plan Plaintiffs seek to name as defendants have not volunteered to comply. As a result, Defendants can show no legal prejudice from their substitution for the "John Doe" law firm defendants in this action.

**B.      Exhibits A and B to the Corrected Declaration of Mark D. Fischer, Esq. Should Be Partially Sealed To Protect Against Disclosure of "Private Health Information" Under HIPAA and HITECH**

Certain limited portions of the Fischer Decl. contain information concerning the ECs which is protected from disclosure under HIPAA, its implementing regulations, *see* 45 C.F.R. Parts 160-164, and the Health Information Technology for Economic and Clinical Health Act, as incorporated into the American Recovery and Reinvestment Act of 2009 (the "HITECH Act"). In particular, Exhibits "A" and "B" to the Fischer Decl. contain a list of ECs on whose behalf Plan Plaintiffs paid health care providers for treatment incident to ECs' Vioxx use. These Exhibits also lists the amount of liens that Plan Plaintiffs assert against such ECs. Further, these Exhibits identify ECs by name.

HIPAA and HITECH penalize disclosure of "protected health information," defined as

> information that is created or received [by a covered entity, 45 CFR § 160.103] that relates to the past, present, or future physical or mental health or condition of a plan participant; the provision of

> health care to a plan participant; or the past, present, or future payment for the provision of health care to a participant; and that identifies the plan participant or for which there is a reasonable basis to believe the information can be used to identify the participant.

45 C.F.R. § 164.501. While the public has a common law right to inspect and copy judicial records, *see Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 429 (5th Cir.1981), here Congress has modified that right to protect certain health information of the ECs. Hence, the public's common law right must yield to the statutory protections of HIPAA and HITECH. This statutory protection overcomes the presumption of access to judicial records with respect to the ECs' "protected health information." As such, the Court should grant Plan Plaintiffs' motion to seal Exhibits "A" and "B" to the Fischer Decl.

### C. The Court Should Impose a Constructive Trust over the Identified Funds and Enjoin the Law Firms from Paying These Monies to the ECs *Pendente Lite*

Unlike their prior motion, which was made at a time when: (1) the settlement administrator had yet to adjudicate the lien amounts of the ECs; (2) there was no evidence that the ECs were attempting to avoid satisfying their lien obligations; (3) the plan language authorizing the liens had yet to be identified; and (4) the identity of the ECs who owe the liens had yet to be discovered, Plan Plaintiffs have cured *all* of the deficiencies the Court identified in the prior injunction proceeding. Following the Court's directives and months of hard work, Plan Plaintiffs now have been able to identify those ECs who, through their attorneys' stonewalling, are trying to avoid detection and failing to satisfy their liens. This motion seeks to preserve the status quo with respect to these ECs' liens by preventing their lawyers from distributing the specific amount of the asserted liens to their clients (and hold the money in their escrow accounts *pendente lite*). As demonstrated below, Plan Plaintiffs have satisfied each of the elements of the

preliminary injunction standard, entitling them to this equitable relief under *Sereboff* and Federal Rule of Civil Procedure 65.

The preliminary injunction standards are familiar to the Court. A preliminary injunction is designed to preserve the status quo between the parties pending a final determination of the merits of the action. *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997). To prevail on their motion, Plan Plaintiffs must establish that (1) there is a substantial likelihood that they will prevail on the merits; (2) there is a substantial threat that they will suffer irreparable injury if the motion is denied; (3) the threatened injury outweighs the threatened injury to the Defendant Law Firms to be enjoined; and (4) granting the motion will not disserve the public interest. *Walgreen Co. v. Hood*, 275 F.3d 475, 477 (5th Cir. 2001). These four prongs are not insulated; rather they are weighed together on a sliding scale such that a strong showing on one compensates for a weak showing on another. *See, e.g., Southerland v. Thigpen*, 784 F.2d 713, 715 & n.1 (5th Cir. 1986); *State of Tex. v. Seatrain Intern., S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

1. **Plan Plaintiffs Have Demonstrated A Likelihood of Success On The Merits of Their Reimbursement Claims**

Plan Plaintiffs will very likely succeed on the merits of their reimbursement claims. They have identified (1) the ECs who owe them reimbursement of medical bills; (2) the amount of the medical bills; and (3) the plan language that, under *Sereboff*, gives them the right to equitable relief against the settlement fund. Under similar circumstances, courts have not hesitated to impose constructive trusts against settlement funds in attorney trust accounts. *See, e.g., Longaberger Co., supra* (affirming grant of summary judgment against attorney of plan member where plan language meets the *Sereboff* standards). As the Court recognized previously, "it is possible, even likely, that a significant portion of the settlement funds do—or, perhaps more

accurately, will at some point in the future—belong to some of the Plaintiff health plans." *In re Vioxx Prods. Liab. Litig.*, *supra*, *15.

As this Court has interpreted *Sereboff*, Plan Plaintiffs' reimbursement language qualifies them for equitable relief under ERISA. This Court previously held that "[a]lthough the Supreme Court did not base its holding in *Sereboff* on the particular language of the health plan's reimbursement provisions, the Court took special care to demonstrate that the plan language complied with the equitable relief sought by the plaintiff." *Id.* at *12. The Court noted that the plan language identified (1) "a particular fund, separate from the Sereboff's general assets"; (2) and "a particular share of that fund to which [Plaintiff] was entitled—'that portion of the total recovery which is due [the Plaintiff Plan] for benefits paid.'" *Id.*

The plan language that Plan Plaintiffs rely on here meets these two *Sereboff* standards, and we will submit each contact upon request as proof. Now that there are identifiable funds, Plan Plaintiffs have identified their members and the amount of their medical bills, they will be able to prevail on their ERISA claims against the Defendant Law Firms.

Further, Plan Plaintiffs are likely to succeed on their Medicare Advantage and FEHBA claims. When they are acting as "Medicare Advantage Organizations", the plans provide benefits in accordance with Part C of Medicare and, for purposes of reimbursement under the MSP "exercise the same rights to recover from a primary plan, entity or individual that the Secretary [of Health and Human Services] exercises under the MSP regulations." 42 C.F.R. § 422.108(f). Plan Plaintiffs, accordingly, stand in the shoes of Medicare and may enforce Medicare Secondary Payer regulations identically. *See In re Zyprexa Prod. Liab. Litig.*, 451 F. Supp. 2d 458, 464-67 (E.D.N.Y. 2006) (describing Medicare liens). Plan Plaintiffs that administer the FEHBA program also have viable reimbursement claims for the medical benefits they provided under that

program. Under the contractual reimbursement provisions under FEHBA, Plaintiffs have stated breach of contract claims against the affected ECs for violating the reimbursement provisions of the standardized FEHBA contract.[3]

### 2. Plan Plaintiffs Have Demonstrated That They Will Suffer Irreparable Injury If The Injunction Does Not Issue

During the previous preliminary injunction proceedings, the Court rejected Plan Plaintiffs' showing of irreparable harm, concluding that: (1) "the Plaintiffs have provided no evidence to show that the claimants or their attorneys will disperse settlement funds before resolving private liens"; (2) the *Sereboff* claims were unripe; (3) "the Plaintiffs may still pursue equitable reimbursement after interim payments have been distributed to claimants and their attorneys"; and (4) *Sereboff* permits claims even if the funds are commingled or spent. *In re Vioxx Prods. Liab. Litig., supra*, *16. Plan Plaintiffs can now demonstrate with abundant evidence that nonparticipating ECs have not satisfied their private liens. The nonparticipating ECs and their attorneys have received several notices that explain that they have to resolve their liens and have refused to voluntarily resolve them. It is perfectly clear that these ECs are hiding, hoping they will never be made to resolve their private liens.

And while *Sereboff* may permit the suit to continue against the ECs and their attorneys without a preliminary injunction, there is no question that the "absence of an available remedy by which the movant can later recover monetary damages" has been found to be "sufficient to show irreparable injury." *Enterprise Int'l., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir. 1985). Allowing the lawyers to disperse settlement funds to the ECs while this action seeking reimbursement of such funds does not preserve the status quo with

---

[3] The Supreme Court concluded that these claims arise under state law. *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677 (2006). This Court, therefore, has supplemental jurisdiction over the proposed amended state law breach of contract claims relative to the FEHBA plans' claims. 28 U.S.C. § 1367(a).

{1851 / MOT / 00102584.DOC v3}   15

respect to this money; rather, it invites protracted and difficult litigation with each and every EC and their lawyers[4] over funds which are likely to be spent in a variety of different places.

The Court should reconsider that portion of its irreparable harm analysis that concludes that monetary damages are available in light of a very recent decision from the First Circuit. In *Iantosca v. Step Plan Services, Inc.*, 604 F.3d 24 (1st Cir. May 3, 2010), the court affirmed the grant of a preliminary injunction freezing ERISA assets *pendente lite*. The First Circuit upheld the injunction on the basis of a claimed lien interest of creditors. The Court concluded that injunctions freezing assets in actions involving equitable claims (such as those here) are consistent with Supreme Court precedent on the issue. *Id.* at 33 (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) (asset freezing orders in actions asserting equitable relief -- or in "mixed" cases -- are permissible)). Allowing distribution of the money to ECs while Plan Plaintiffs' liens are litigated would pose grave difficulties for the parties and the Court down the road, particularly when funds subject to Plan Plaintiffs' liens never belonged to ECs in the first place. Accordingly, Plan Plaintiffs would suffer irreparable injury if the injunction does not issue.

### 3. The Balance of Harms Weigh In Favor of The Injunction

The balance of harms clearly favors the issuance of an injunction. An injunction will prevent the ECs from receiving money they were never entitled to under their contracts with Plan Plaintiffs. The only money sought to be enjoined from distribution is that which the Plan Plaintiffs have identified as Vioxx-related liens. Balancing the harms of the ECs not receiving a

---

[4] The lawyers are responsible for paying the lien even if they have already paid their clients. *See Longaberger*, 586 F.3d at 469 ("[t]he fact that Kolt [the attorney] chose to disregard Longaberger's first priority lien and commingle the settlement funds does not defeat Longaberger's claim for equitable relief."; *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrier, Poirot & Wansbrough*, 354 F.3d 348, 550 (5th Cir. 2003) (permitting recovery of settlement proceeds from law firm); *Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000) (same).

{1851 / MOT / 00102584.DOC v3}                    16

windfall against the harm of the Plan Plaintiffs in making their recovery much more difficult to obtain, the Court should conclude the balance favors issuing the injunction.

### 4. The Public Interest Is Served By The Injunction

The proper allocation of risk among liability insurers (for torts committed by insureds) and/or self-funded tortfeasors and health insurers (for medical bills incurred by victims or victims' insurers as a result of tortious conduct) is an important public interest. Without the ability to effectively enforce reimbursement provisions in mass tort settlements such as this one, the health insurance industry will, as a practical matter, bear a significant portion of the burden that is supposed to be borne in this case by Merck and Merck's insurers. This injunction will preserve the status quo while a significant amount of liens involving expenditures associated with this tort settlement are adjudicated. The public interest is thus served by permitting the health insurers a mechanism to enforce their reimbursement rights efficiently in this Court.

### III.  CONCLUSION

The Court should grant the motion for the stated reasons.[5]

Dated: June 22, 2010

                              Respectfully submitted,

                              LOWEY DANNENBERG COHEN & HART, P.C.

                By: _/s/ Richard W. Cohen_____
                              Richard W. Cohen
                              Peter D. St. Phillip
                              Gerald Lawrence
                              Karen Iannace
                              One North Broadway, Suite 509
                              White Plains, New York  10601
                              Telephone:   (914) 997-0500
                              Facsimile:    (914) 997-0035

RAWLINGS & ASSOCIATES, PLLC
Mark D. Fischer
Jeffrey C. Swann
Robert Griffith
One Eden Parkway
LaGrange, Kentucky  40031
Telephone:   (502) 587-1279
Facsimile:    (502) 584-8580

*Attorneys for the Plan Plaintiffs*

---

[5] There is no need to provide for a bond as the funds themselves will be secured in the attorney trust accounts. *See Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978) ("[t]he amount of security required [under Rule 65] is a matter for the discretion of the trial court; it may elect to require no security at all").

{1851 / MOT / 00102584.DOC v3}