AVORN, MD, JEROME, DEPOSITIONS OF 6/29/06 & 6/30/06

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ███████████████████████████████ Plaintiffs Affirmative Designations are not. | | |
| **6/29/06 DEPOSITION** | | |
| | For reasons stated in Merck's Daubert Motion, Dr. Avorn is not qualified to offer much of what follows | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 31:2 to 32:19)    31<br>2   Q.   Good afternoon, Doctor.<br>3       A.   Good afternoon.<br>4       Q.   Would you please introduce<br>5   yourself to the members of the jury.<br>6       A.   Yes.  My name is Jerry<br>7   Avorn.<br>8       Q.   And where do you currently<br>9   live, sir?<br>10      A.   In Brookline, just outside<br>11  of Boston, Massachusetts.<br>12      Q.   And do you hold any academic<br>13  positions?<br>14      A.   Yes.  I'm a professor of<br>15  medicine at Harvard Medical School.<br>16      Q.   And do you hold any other<br>17  professional positions at Harvard Medical<br>18  School?<br>19      A.   Yes.  I am the chief of the<br>20  division of pharmacoepidemiology and<br>21  pharmacoeconomics at the Brigham and<br>22  Women's Hospital, which is one of the<br>23  main Harvard teaching hospitals.<br><br>24      Q.   And would you tell us a<br><br>   32<br>1   little bit about the division of<br>2   pharmacoepidemiology and<br>3   pharmacoeconomics?<br>4       A.   Yes.  That's a division that<br>5   I was asked to start in 1997, and it<br>6   opened its doors in 1998.  And it is a<br>7   collection of 25 researchers of whom<br>8   there's 11 faculty, and the rest are<br>9   programmers and research assistants and<br>10  administrators.  And our main agenda is<br>11  the study of patterns of medication use,<br>12  side effects caused by drugs, good<br>13  effects caused by drugs, the cost<br>14  effectiveness of drugs, the impact of<br>15  policy such as reimbursement and other<br>16  sorts of policy on how doctors prescribe<br>17  drugs, how patients use drugs, and,<br>18  finally, the way that physicians make<br>19  prescribing decisions and how those | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 32:20 to 34:6) 32<br>20  decisions can be made better.<br>21       Q.   And forgive me if<br>22  occasionally I ask you to explain some<br>23  terms.<br>24             You mentioned the term<br><br>1   "pharmacoepidemiology." Would you please 33<br>2   describe what that is?<br>3       A.   Sure.  That is the study of<br>4   the beneficial and adverse effects of<br>5   drugs as seen in, quote, the real world<br>6   as typical doctors and typical patients<br>7   use those medications, both the good<br>8   effects and the bad effects.<br>9       Q.   And what about the term<br>10  "pharmacoeconomics"?<br>11      A.   Pharmacoeconomics is the<br>12  study of the relationship between what a<br>13  drug does and what its cost is.  So, we<br>14  try to understand whether a given drug is<br>15  worth its price and whether it's cost<br><br>16  effective, whether it might even save<br>17  money for the healthcare system, and how<br>18  those balance out.<br>19      Q.   How is your division funded,<br>20  Dr. Avorn?<br>21      A.   Primarily by our<br>22  peer-reviewed research grants from the<br>23  National Institutes of Health, which is,<br>24  of course, the federal agency that<br><br>1   supports scientific research.  We also 34<br>2   receive money from foundations that are<br>3   devoted to, let's say, arthritis and<br>4   other areas that we are concerned in.<br>5   And we also will accept research grants<br>6   from pharmaceutical companies. | | |

3

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 35:9 to 36:15)  35<br>9   I'd like to go through some<br>10  of your education and experience a little<br>11  bit.  Okay?<br>12      A.   Sure.<br>13      Q.   All right.<br>14          Would you please tell the<br>15  men and women of the jury a little bit<br>16  about your educational background, how<br>17  you became a professor of medicine at<br>18  Harvard?<br>19      A.   Sure.  In brief, I grew up<br>20  in New York City.  I went to Columbia as<br>21  an undergrad.  I then went to Harvard<br>22  Medical School, where I was awarded the<br>23  M.D. degree in 1974.  I then did my<br>24  internship and residency in various of<br><br>                                36<br>1   the Harvard teaching hospitals and became<br>2   certified in internal medicine.  And<br>3   around the time that I was a resident, I<br>4   also began teaching at the medical school<br>5   in a variety of areas that primarily<br>6   related to medication use.<br>7      Q.   Do you currently teach<br>8   medical students and residents at<br>9   Harvard?<br>10      A.   Yes.  That's where I just<br>11  came from an hour ago.<br>12      Q.   Okay.<br>13          And do you conduct<br>14  independent research?<br>15      A.   Yes, I do. |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 36:18 to 37:3)  36<br>18  In what medical and<br>19  scientific fields do you conduct medical<br>20  research?<br>21      A.    The utilization of drugs by<br>22  doctors, the side effects of those drugs,<br>23  the utilization of drugs by patients, the<br>24  relationship between the healthcare<br><br>1  system and medication use, and in  37<br>2  general, the outcomes of drug use and how<br>3  it can be improved. | | |
| 37:4-37:17<br>37: 4 Q, Now, you mentioned Brigham<br>37: 5 and Women's Hospital. Does the division<br>37: 6 that you head have any relationship to<br>37: 7 the day-to-day function of the Brigham<br>37: 8 and Women's Hospital?<br>37: 9 A. Yes, 'One of the missions of<br>37:10 our division is to help advise the<br>37:11 hospital about what medications should be<br>37:12 used at the hospital and also to teach<br>37:13 the interns and residents and medical<br>37:14 students and physicians who are<br>37:15 practicing at the hospital about the best<br>37:16 way to use the drugs that are on our list<br>37:17 of drugs or the formulary. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 37:18 to 39:2)  37<br>18  Q.   Okay.<br>19          Now, you previously<br>20  described to the members of the jury<br>21  pharmacoepidemiology, pharmacoeconomics.<br>22  You also mentioned that you do research<br>23  in the field of looking at the factors<br>24  that affect prescribing choices of<br><br>                                 38<br>1  physicians?<br>2      A.   That's right.<br>3      Q.   Okay.<br>4          Would you describe your<br>5  particular interest in that area?<br>6      A.   Sure.  The first paper I<br>7  published in that area was actually back<br>8  in 1982 in which I was interested in how<br>9  doctors make decisions about what drugs<br>10  to use.  And I was interested in whether<br>11  -- the balance between the information<br>12  that we as prescribes get from the<br>13  medical literature versus from commercial<br>14  sources like advertising or sales reps.<br>15  And so we did a study of primary care<br>16  docs in the Boston area, and we asked<br>17  them where they got their information<br>18  from, and then we gave them little<br>19  quizzes about the drugs that they<br>20  commonly used.  And although they thought<br>21  that they got most of their information<br>22  from just reading the medical journals,<br>23  in fact, what our quiz showed was that a<br>24  lot of what they believed actually came<br><br>                                 39<br>1  from what you could only find in ads or<br>2  from sales reps. |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 39:3 to 40:17) 39<br>3  Q.   What is academic detailing,<br>4  Doctor?<br>5      A.   Academic dealing is an<br>6  approach that I pretty much invented in<br>7  the late 1970s and early 1980s.  And it<br>8  was based on the following idea:  That we<br>9  know that the drug manufacturers are<br>10  awfully good communicators.  They send<br>11  people into our offices.  They have very<br>12  well-presented spiels that they give us.<br>13  They interact with us in a very friendly<br>14  way.  They've got great graphical<br>15  material.  They will have dinner meetings<br>16  in good restaurants and show us their<br>17  presentations.  And that's really very<br>18  effective communication, but it's just to<br>19  sell product.  That's the only reason<br>20  that they do that communication.<br>21          By contrast, faculty in<br>22  medical schools tend to have a pretty<br>23  good handle on the evidence and don't<br>24  usually have a particular axe to grind<br><br>1  about selling a product, but we tend to 40<br>2  be lousy communicators.  We give dull<br>3  lectures.  We don't really have very good<br>4  graphical material.  We stay in our ivory<br>5  tower and we don't go out to doctors'<br>6  offices.<br>7          And what I began to wonder<br>8  about in the late '70s and early '80s is<br>9  whether we could kind of marry that very<br>10  effective communication approach that the<br>11  pharmaceutical industry has with the more<br>12  balanced evidence-based approach that<br>13  medical school or academic faculty have.<br>14  And because the approach of the sales<br>15  reps in the drug industry is called<br>16  detailing, I call that academic<br>17  detailing. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 40:18 to 42:10)  40<br>18   And our first study was<br>19   funded by the federal government in 1979<br>20   and ultimately was published in the New<br>21   England Journal in 1983 in which we<br>22   showed that by sending pharmacists that<br>23   we trained to be the so-called unsales<br>24   reps out to doctors' offices to teach<br><br>1   them about how to prescribe better in  41<br>2   this interactive and engaging manner, we<br>3   could actually influence their<br>4   prescribing for the better in a way that<br>5   was both effective and actually paid for<br>6   itself.<br>7        Q.   Doctor, have various<br>8   governments and different organizations<br>9   adopted the concept of academic<br>10   detailing?<br>11        A.   Yes.  As a matter of fact,<br>12   just a few weeks ago I came back from<br>13   Australia where the entire country has a<br>14   very large program of academic detailing<br>15   which we actually helped them set up<br>16   based on our early research in which they<br>17   have pharmacists and nurses going out to<br>18   doctors all over the country to advise<br>19   them on how to prescribe so that they are<br>20   not dependent on ads or sales reps from<br>21   the drug companies to know about the<br>22   drugs they use.<br>23        Q.   Any states have programs<br>24   and --<br><br>1        A.   Yes.  We're actually running  42<br>2   a program on behalf of the State of<br>3   Pennsylvania which has asked our group to<br>4   put together educational materials for<br>5   doctors all over Pennsylvania.  And the<br>6   State of Pennsylvania funds nurses and<br>7   pharmacists to go out and teach doctors<br>8   how to prescribe so that they are not,<br>9   again, dependent on just what they hear<br>10   from the sales reps and see in the ads. | | |

8

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 42:16-44:3<br>42:16 Have you published in each<br>42:17 of the areas that you've identified,<br>42:18 pharmacoepidemiology, pharmacoeconomics,<br>42:19 and physician drug practices?<br>42:20·A. Yes, I have.<br>42:21 Q. In the course of your<br>42:22 career, Dr. Avorn, have pharmaceutical<br>42:23 companies funded some of your research?<br>42:24 A. Yes. As I said, we do have<br>43: Page 43<br>43: 1 research support from a number of drug<br>43: 2 companies.<br>43: 3 Q. Do these Include some of the<br>43: 4 studies that you have conducted with<br>43: 5 respect --<br>43: 6 Well, first of all, let me<br>43: 7 back up.<br>43: 8 Have you studied the class<br>43: 9 of drugs that we'll talk about here today<br>43:10 called nonsteroidal anti-inflammatory<br>43:11 drugs or NSAIDs?<br>43:12 A. That's right.<br>43:13 Q. And have you studied COX-2<br>43:14 drugs?<br>43:15 A. That's right. We've been<br>43:16 looking at that class of drugs since<br>43:17 before 1990.<br>43:18 Q. Okay.<br>43:19 And have you received, grants<br>43:20 and funds from various pharmaceutical<br>43:21 companies to study that class of drugs?<br>43:22 A. Yes. Both drug companies<br>43:23 and also the National Institutes of<br>43:24 Health.<br>44: Page 44<br>44: 10. Would you tell us some of<br>44: 2 the drug companies who have funded your<br>44: 3 research? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 44:8-48:4<br>44: 8 A. In general, Pfizer, Glaxo,<br>44: 9 Pharmacia, Kabi, Merck.<br>44:10 Q. Are you currently being<br>44:11 funded by Merck?<br>44:12 A. Yes. Dr. Solomon In our<br>44:13 group has a project in which I'm<br>44:14 participating in which Merck has funded<br>44:15 us to look at the under use of drugs for<br>44:16 osteoporosis or bone thinning.<br>44:17 Q. And have you been funded by<br>44:18 Merck to do studies in the field of COX-2<br>44:19 drugs including Vioxx?<br>44:20 A. Yes, we have.<br>44:21 Q. Other than your experience<br>44:22 with Vioxx, which we'll talk about during<br>44:23 the course of this deposition, putting<br>44:24 that aside for a moment, how would you<br>45: Page 45<br>45: 1 have described your experience with<br>45: 2 Merck?<br>45: 3 A. Other than with our Vioxx<br>45: 4 experience?<br>45: 5 Q. Yes.<br>45: 6 A. I always thought of Merck as<br>45: 7 the most respected, upstanding, careful<br>45: 8 pharmaceutical company in the country, as<br>45: 9 most' everybody else did back in, let's<br>45:10 say, the 1980s and early '90s.<br>45:11 Q. Was your, and we'll talk<br>45:12 about this, but was your experience with<br>45:13 Merck different with respect to the COX-2<br>45:14 drugs?<br>45:15 A. Yes, it was.<br>45:16 Q. Do you currently hold any<br>45:17 leadership appointments within your<br>45:18 field?<br>45:19 A. Well, I have served in the<br>45:20 past as the president of the<br>45:21 International Society for<br>45:22 Pharmacoepidemiology, which is the main<br>45:23 professional body of researchers all<br>45:24 around the world who study drug side<br>46: Page 46 | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 46:11 Brigham and Young -- Brigham Hospital?<br>46:12 A. Brigham and Women's, yes, I<br>46:13 do.<br>46: 14 Q. Has there ever been a time<br>46: 15 in the past 20 years where you have not<br>46:16 treated or supervised treatment of<br>46:17 patients?<br>46:18 A. No. I've treated or<br>46:19 supervised continuously pretty much since<br>46:20 I got my M.D.<br>46:21 Q. Okay.<br>46:22 Do you specialize in the<br>46:23 treatment of any particular patient<br>46:24 populations, Dr. Avorn?<br>47: Page 47<br>47: 1 A. I've had a particular<br>47: 2 expertise and interest in medication use<br>47: 3 in the elderly, people over 65.<br>47: 4 Q. As an internist, do you<br>47: 5 supervise the treatment of patients with<br>47: 6 chronic pain conditions such as<br>47: 7 arthritis?<br>47: 8 A. Sure.<br>47: 9 Q. As an internist, you<br>47:10 supervise patients with acute pain<br>47:11 conditions?<br>47:12 A. Yes..<br>47:13 Q. How about cardiovascular<br>47:14 disease?<br>47:15 A. Certainly.<br>47:16 Q. Okay.<br>47:17 Have you had occasion to<br>47:18 prescribe or supervise the prescription<br>47:19 of medications for patients at t~e<br>47:20 Brigham Hospital, including nonsteroidal<br>47:21 anti-inflammatory drugs?<br>47:22 A. Yes.<br>47:23 Q. In addition to your--<br>47:24 Let me talk for a moment<br>48: Page 48<br>48: 1 about your publications, Doctor.<br>48: 2 Approximately how many original articles<br>48: 3 have you written for the peer-reviewed<br>48: 4 medical literature? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 48:12-49:13<br>48:12 Q. What are some of the<br>48:13 medical, the peer-review medical journals<br>48:14 in which you have been published?<br>48:15 A. The New England Journal of<br>48:16 Medicine, the Journal of the American<br>48:17 Medical Association, the British Medical<br>48:18 Journal, Health Affairs, the Archives of<br>48:19 Internal Medicine, the Annals of Internal<br>48:20 Medicine and a few dozen others.<br>48:21 Q. Okay.<br>48:22 Have you been or -- ,<br>48:23 Are you now or have you been<br>48:24 a peer reviewer yourself?<br>49: Page 49<br>49: 1 A. Yes. I regularly review<br>49: 2 articles for the New England Journal of<br>49: 3 Medicine and for JAMA in particular,<br>49: 4 "JAMA" being the Journal of the American<br>49: 5 Medical Association.<br>49: 6 Q. Thank you.<br>49: 7 Has your publications --<br>49: 8 Has your work as an<br>49: 9 academician in publishing information<br>49:10 been recognized generally?<br>49:11 A. Yes.<br>49:12 Q. Would you tell us a little<br>49: 13 bit about that? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 50: 1-51 :18<br>50: 1 THE WITNESS: That I was<br>50: 2 identified by the scientific body<br>50: 3 that keeps track of all medical<br>50: 4 references in the world as one of<br>50: 5 the most highly cited researchers<br>50: 6 in the field of medicine and<br>50: 7 social science because of the<br>50: 8 number of citations to my research<br>50: 9 that have been in the medical<br>50:10 literature.<br>50:11 BY MR. TISI:<br>50:12 Q. Doctor, have you published<br>50:13 specifically about the safety of Vioxx?<br>50:14 A. Yes, I have.<br>50:15 Q. Have you published<br>50:16 specifically regarding the safety of<br>50:17 COX-2 drugs including both Vioxx and<br>50:18 Celebrex?<br>50:19 A. Yes.<br>50:20 Q. Have you published<br>50:21 specifically about the safety of<br>50:22 nonsteroidal anti-inflammatory drugs?<br>50:23 A. That's right.<br>50:24 Q. How long have you been<br>51: Page 51 '<br>51: 1 publishing in that particular field?<br>51: 2 A. I think the first paper on<br>51: 3 nonsteroidals was one that I did with Dr.<br>51: 4 Gertz that I believe was in the Journal<br>51: 5 of the American Medical Association back<br>51: 6 in 19,90.<br>51: 7Q. Have you published<br>51: 8 specifically about Merck's conduct in<br>51: 9 their communication of risk and benefit<br>51:10 of Vioxx to physicians?<br>51: 11 A. I've written about that,<br>51:12 yes.<br>51:13 Q. Dr. Avorn, from the almost<br>51 :14200 peer-reviewed articles that are in<br>51:15 your curriculum vitae, I have pulled<br>51 :16 documents from your peer-reviewed<br>51:17 documents, the articles which I'm going<br>51 :18 to hand to you as an exhibit, and they | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 55:15-55:19<br>55:15 Q. Would these be the articles<br>55:16 that you have written in the<br>55: 17 peer-reviewed medical literature<br>55: 18 pertaining to nonsteroidal<br>55:19 anti-inflammatory drugs? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 55:22 to 57:14)  55<br>22   Yes, that's some of them.<br>23       Q.   Okay.<br>24             Would that include articles<br><br>1   you've written on various COX-2 drugs 56<br>2   including Vioxx?<br>3       A.   Yes.<br>4       Q.   Are any of these studies<br>5   funded by Merck?<br>6       A.   Yes.  The one from<br>7   Circulation that appeared in 2004 was<br>8   supported by Merck.  And several of the<br>9   others were based on our research funded<br>10  by Merck as well.<br>11      Q.   Could you identify the<br>12  article that was supported by Merck?<br>13      A.   Sure.<br>14      Q.   And identify it by exhibit<br>15  number.<br>16      A.   Sure.<br>17           (Witness reviewing<br>18  documents.)<br>19           Okay.  One of them is<br>20  Exhibit Number 7, which is the one that<br>21  appeared in the journal called<br>22  Circulation in 2004.<br>23           There's another one that<br>24  appeared in the journal called<br><br>1   Epidemiology in 2005 that was also  57<br>2   supported by Merck.<br>3       Q.   And the title of that --<br>4       A.   I'm sorry.<br>5       Q.   Those both involve Vioxx?<br>6       A.   Yes.  Those are both about<br>7   the COX-2 drugs, which were basically<br>8   Vioxx and Celebrex primarily.<br>9           There's also a paper we had<br>10  in the New England Journal of Medicine in<br>11  2004 called "Medicaid Prior-Authorization<br>12  Programs and the Use of COX-2<br>13  Inhibitors," and we acknowledge there<br>14  that we also were receiving a grant from | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 57:15 to 59:7)<br>57<br>15  Merck which contributed to that study.<br>16         I'm checking carefully<br>17  because we usually don't pay attention to<br>18  who's paying for the study when we do the<br>19  work.<br>20         We acknowledged in a paper<br>21  that came out in the Journal of Clinical<br>22  Epidemiology in 2005 about physician<br>23  preferences in relation to the use of<br>24  COX-2 drugs like Vioxx and Celebrex in<br><br>58<br>1  which we received funding from Merck, but<br>2  Merck did not specifically fund that<br>3  study.<br>4         There's another paper here,<br>5  Exhibit Number 13, "Cardiovascular<br>6  Outcomes in New Users of Coxibs and<br>7  NSAIDs," that also acknowledges that<br>8  we've received support from Merck to do<br>9  that work.<br>10        Not that one.<br>11        So, that's pretty much it.<br>12   Q.   Have you written any books<br>13  which pertain to issues of drug safety?<br>14   A.   Yes, I have.<br>15   Q.   Doctor, I'm going to hand<br>16  you a book.  I'm not going to mark it as<br>17  an exhibit unless we have to.  Is that<br>18  the book that you've written?<br>19   A.   Yes.  "Powerful Medicines:<br>20  The Benefits, Risks, and Costs of<br>21  Prescription Drugs."  It came out in<br>22  2004.<br>23   Q.   Doctor, have you been a<br>24  consultant for the United States Food &<br><br>59<br>1  Drug Administration at any time in the<br>2  past?<br>3   A.   Yes, I have.<br>4   Q.   Would you describe for the<br>5  members of the jury what that is about?<br>6   A.   Sure.  There was a<br>7  medication on the market called Lotronex, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 59:8 to 61:2) 59<br>8  which was a drug for irritable bowel<br>9  syndrome.  And there was a concern that<br>10  it was causing severe side effects, even<br>11  death, in patients who took it, and the<br>12  FDA was trying to determine whether its<br>13  safety was such that it should be kept on<br>14  the market or pulled from the market.<br>15  And the FDA asked me to consult with it<br>16  as part of its Advisory Committee that<br>17  would look at the safety of that drug.<br>18      Q.   Have you testified before<br>19  the United States Congress on issues<br>20  relating to drug safety and healthcare<br>21  policy?<br>22      A.   Yes.  On a number of<br>23  occasions, I was invited to testify by<br>24  the U.S. Senate, Special Committee on<br><br>1  Aging, the House Committee on Aging, and 60<br>2  other committees of Congress about<br>3  medication effects.<br>4      Q.   Have you advised the<br>5  President of the United States on drug<br>6  safety or drug policy?<br>7      A.   I was invited by a<br>8  transition team of the president-elect to<br>9  advise about drug policy.<br>10      Q.   And have you received grants<br>11  from the National Institute of Health to<br>12  conduct your research?<br>13      A.   Yes.<br>14      Q.   I'm going to ask you some<br>15  questions, Doctor, about your expertise<br>16  directly.<br>17      A.   Okay.<br>18      Q.   Dr. Avorn, are you an expert<br>19  in the field of pharmacoepidemiology?<br>20      A.   Yes.<br>21      Q.   Are you an expert in the<br>22  field of pharmacoeconomics?<br>23      A.   Yes.<br>24      Q.   Are you an expert in the<br><br>1  field of pharmaceutical study design? 61<br>2      A.   Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 61:3 to 62:21)     61<br>3    Q.    And are you an expert in the<br>4    field of the conduct of pharmaceutical<br>5    studies?<br>6        A.    Yes.<br>7        Q.    Are you an expert in the<br>8    factors that drive prescribing practices<br>9    and habits of physicians generally?<br>10        A.    Yes.<br>11        Q.    Are you an expert in the<br>12    field of internal medicine?<br>13        A.    Yes.<br>14        Q.    Geriatric medicine?<br>15        A.    Yes.<br>16        Q.    An expert in the<br>17    communication of risks and benefits to<br>18    physicians and elder health care<br>19    providers?<br>20        A.    Yes.<br>21        Q.    Are you an expert in the<br>22    risks and benefits of a class of drugs<br>23    known as nonsteroidal anti-inflammatory<br>24    drugs?<br><br>                                              62<br>1        A.    Yes.<br>2        Q.    COX-2 inhibitors?<br>3        A.    Yes.<br>4        Q.    How about an expert in the<br>5    field in the risks and benefits of Vioxx?<br>6        A.    Yes.<br>7        Q.    Are all the areas that I've<br>8    just asked you your expertise about areas<br>9    in which you have actually published in<br>10    the peer-reviewed medical literature?<br>11        A.    That's right.<br>12        Q.    Dr. Avorn, are you prepared<br>13    to offer the jury in this case your<br>14    professional opinions regarding the drug<br>15    Vioxx manufactured by Merck?<br>16        A.    Yes.<br>17        Q.    During the time that Vioxx<br>18    was on the market, did you have occasion<br>19    to speak with Merck officials concerning<br>20    Vioxx?<br>21        A.    Yes. | | |

18

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 62:22 to 63:19)  62<br>22   Q.   During the time that Vioxx<br>23   was on the market, did you formulate<br>24   opinions regarding Vioxx's safety,<br><br>1   efficacy and its cardiovascular risk?  63<br>2       A.   Yes.<br>3       Q.   Did you share those opinions<br>4   with Merck?<br>5       A.   Yes.<br>6       Q.   Until 2004, when Vioxx was<br>7   no longer available on the market, were<br>8   you asked to present your scientific and<br>9   medical opinions on Vioxx and other<br>10   NSAIDs, including naproxen, which we'll<br>11   talk about, at national and international<br>12   scientific and professional meetings?<br>13       A.   Yes.<br>14       Q.   During the time Vioxx was on<br>15   the market and shortly thereafter, did<br>16   you publish articles and editorials in<br>17   the peer-reviewed literature concerning<br>18   the FDA's role in evaluating Vioxx?<br>19       A.   I did. | | |
| 63:23-64:6<br>63:23 When you were formulating<br>63:24 these opinions and publishing them in the<br>64: Page 64<br>64: 1 medical literature, were you consulting<br>64: 2 with any lawyers like myself who were<br>64: 3 representing individuals who claim that<br>64: 4 they were injured as a result of Vioxx?<br>64: 5 A. No. I try to avoid<br>64: 6 consulting with lawyers whenever I can. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 64:18-66:8<br>64:18 Q. When is the first time you<br>64:19 met with any lawyer representing people<br>64:20 who claimed injuries as a result of<br>64:21 Vioxx?<br>64:22 A. I would say the only time I<br>64:23 actually -- well, the first time I<br>64:24 actually met with anybody, as opposed to<br>65: Page 65<br>65: 1 calling them back and saying no thank<br>65: 2 you, would have been May of '05.<br>65: 3 Q. Since May of 2005 when you<br>65: 4 first had your meeting with lawyers<br>65: 5 representing people who claim injuries as<br>65: 6 a result of Vioxx, have you been provided .<br>65: 7 with additional materials that you had<br>65: 8 not had an opportunity to see while you<br>65: 9 were conducting studies involving Vioxx,<br>65:10 NSAIDs and COX-2s?<br>65:11 A. Yes. There was a lot of<br>65:12 material that came out as a result of the<br>65:13 discovery process that I had not had<br>65:14 access to before.<br>65:15 Q. Have you formed additional<br>65:16 opinions since May of 2005 as a result of<br>65:17 reviewing those additional documents that<br>65:18 were provided to you?<br>65:19 A. Yes.<br>65:20 Q, Are you prepared to offer<br>65:21 those additional opinions to the members<br>65:22 of the jury today?<br>65:23 A. Sure.<br>65:24 Q. Doctor, are all the opinions<br>66: Page 66 '<br>66: 1 that you will testify about today,<br>66: 2 whether they were formed before you were<br>66: 3 retained as an expert in this litigation<br>66: 4 or since you were retained as an expert<br>66: 5 in this litigation, opinions that you<br>66: 6 hold to a reasonable degree of medical<br>66: 7 and scientific certainty?<br>66: 8 A. Definitely. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 66:12 to 67:9)<br>66<br>12     Are you aware that your<br>13  testimony is being videotaped so it could<br>14  be shown to the members of the jury?<br>15    A.  Yes.  The clue was that big<br>16  video camera in front of me.<br>17    Q.  Okay.<br>18     Why is it that you are not<br>19  appearing live to give your opinions to<br>20  the members of this jury?<br>21    A.  Because I have a day job,<br>22  and I spend an enormous amount of time<br>23  just running my division at Harvard and<br>24  at the Brigham and teaching medical<br>67<br>1  students and occasionally supervising<br>2  patient care, and I wouldn't have time to<br>3  do this for more than just once.<br>4    Q.  Are you being paid<br>5  personally for the time that you spent<br>6  consulting with us and appearing at this<br>7  videotape testimony?<br>8    A.  No.  I received no payment<br>9  for any of my work in this case. | 401,402 | overrule |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 67:10 to 68:18)<br>67<br>10   Q.   Well, don't doctors like<br>11   yourself usually submit bills when they<br>12   do work like this?<br>13   A.   They traditionally do, but I<br>14   prefer, since I've established a policy<br>15   in my division that none of us accepts<br>16   any direct payment from drug companies,<br>17   it seemed reasonable to also not accept<br>18   any payment personally from plaintiffs'<br>19   lawyers or plaintiffs either, and so I do<br>20   this pro bono, and if the attorneys I'm<br>21   working with want to make a donation to a<br>22   charitable cause, that's fine with me.<br>23   But I don't take any personal<br>24   remuneration.<br>68<br>1   Q.   Have you set up a charitable<br>2   fund which any money that would be billed<br>3   would go into that fund?<br>4   A.   Sure.  Right.<br>5   Q.   And what is the purpose of<br>6   this charitable fund?<br>7   A.   It is basically to have an<br>8   endowment to support noncommercial<br>9   research about medication use and<br>10   medication effects, because I think<br>11   there's a real need for that to be a<br>12   source of funding that is independent of<br>13   any particular companies.<br>14   Q.   Do you derive any personal<br>15   monetary benefit as a result of the money<br>16   that we may hourly -- any hourly rate you<br>17   may bill us which we pay into this<br>18   charitable fund? | 401, 402 (sustained in Smith) | Sustained |
| 69:10-69:11<br>69: 10 Q. Doctor, my name is Phil<br>69:11 Beck. I represent Merck. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 81:21-82:4<br>81 :21 Q. On this question of whether<br>81 :22 you are charging for the work that you<br>81 :23 did in this case, do you have an<br>81 :24 established hourly rate?<br>82: Page 82<br>82: 1 A. Yes.<br>82: 2 Q. And for consulting with<br>82: 3 lawyers?<br>82: 4 Yes. | | |
| 82:5-82:22<br>82: 5 Q. And what is the hourly rate<br>82: 6 that you use when consulting with<br>82: 7 lawyers?<br>82: 8 A, $750 an hour,<br>82: 9 Q, And how many hours have you<br>82:10 worked on this case?<br>82:11 A, Thus far, I would estimate<br>82:12 about 200, I think, I don't keep real<br>82:13 close track,<br>82:14 Q, So, 200 times 750, I'm not<br>82: 15 good at math, but how much does that -82:<br>16 can you figure out--<br>82:17 A, I think you should do the<br>82:18 math if you are asking the question,<br>82:19 Q, Okay, I'll do that then,<br>82:20 When I do the math, that<br>82:21 comes to $150,000,<br>82:22 A, Sounds about right | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 86:7-87:24<br>86: 7 Q, And how many times have you<br>86: 8 consulted with Mr. Tisi before the Vioxx<br>86: 9 litigation?<br>86:10 A, Before the Vioxx litigation?<br>86:11 Once,<br>86: 12 ,Q, And what was that in<br>86:13 connection with?<br>86:14 A, A drug called Rezulin,<br>86:15 Q, Have you also overcome your<br>86: 16 reluctance to consult with lawyers and<br>86: 17 work with them, plaintiffs' lawyers, on<br>86:18 the diet drug litigation?<br>86:19 A Right. I think there have<br>86:20 been about four cases total that I've<br>86:21 become involved with,<br>86:22 Q, So, Rezulin, which you did<br>86:23 with Mr, Tisi, right?<br>86:24 A, Right.<br>87: Page 87<br>87: 1 Q, And just so we don't have<br>87: 2 any loose ends, did he pay the bill in<br>87: 3 Rezulin?<br>87: 4 A, I don't even know who the<br>87: 5 bill was paid by because there's these<br>87: 6 consortia of lawyers, but something got<br>87: 7 paid independent of the outcome of the<br>87: 8 case,<br>87: 9 Q, And diet drugs, you<br>87:10 consulted with plaintiffs' lawyers,<br>87:11 right? '<br>87:12 A Yes,<br>87:13 Q, Am I correct that you also<br>87:14 consulted with plaintiffs' lawyers on a<br>87:15 drug called Baycol?<br>87:16 A, Yes,<br>87:17 Q. And did you say there was<br>87:18 another one other than those?<br>87:19 P P.A., phenylpropanolamine<br>87:20 Q. P.A.?<br>87:21lA. Yes.<br>87:22 Q. And all of this has been,<br>87:23 what, within the last five, six years?<br>87:24 A. Probably. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 97:1-97:14<br>97: 1 First of all, were you<br>97: 2 personally involved in how Merck managed<br>97: 3 the risks of Vioxx through your work with<br>97: 4 them on the observational studies that<br>97: 5 you testified to earlier?<br>97: 6 A. Yes. We performed research<br>97: 7 funded by them with which we worked very<br>97: 8 closely with Merck epidemiologists on the<br>97: 9 development of the study and on the<br>97:10 conduct of the study and on the<br>97:11 interpretation of the findings. And that<br>97:12 was germane to what was known at the time<br>97:13 as it was developing about the cardiac<br>97:14 risks of Vioxx. | | |
| ja062906 - Vol. I, (Pages 107:17 to 108:13)<br>107<br>17  Q.   Doctor, are you an expert on<br>18  the issue of Vioxx's risks throughout the<br>19  development and marketing of that drug?<br>20      A.   Yes.<br>21      Q.   Thank you.<br>22          Why?<br>23      A.   Is that a question?<br>24      Q.   Yes.  Why?<br><br>108<br>1      A.   Okay.<br>2          Because, as I said before,<br>3  pharmacoepidemiology and also the<br>4  research about medication risks and<br>5  benefits beyond the epidemiology is about<br>6  looking at all aspects of the drug's<br>7  properties, the pharmacology, the<br>8  clinical effects in the early trials, the<br>9  randomized trials that occur on a larger<br>10  scale, and the post-marketing use of that<br>11  drug.  And all of that is a part of what<br>12  I study and teach at Harvard and write<br>13  papers about. | Cumulative | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 107:21 to 108:13)<br>107<br>21  Q.   Thank you.<br>22        Why?<br>23      A.   Is that a question?<br>24      Q.   Yes.  Why?<br>108<br>1      A.   Okay.<br>2           Because, as I said before,<br>3   pharmacoepidemiology and also the<br>4   research about medication risks and<br>5   benefits beyond the epidemiology is about<br>6   looking at all aspects of the drug's<br>7   properties, the pharmacology, the<br>8   clinical effects in the early trials, the<br>9   randomized trials that occur on a larger<br>10   scale, and the post-marketing use of that<br>11   drug.  And all of that is a part of what<br>12   I study and teach at Harvard and write<br>13   papers about. | Cumulative | |
| 109:11-109:16<br>109:11 ' Have you carefully studied.<br>109:12 Vioxx?<br>109:13 A. Yes, I have.<br>109:14 Q. And have you carefully<br>109:15 studied Merck's conduct?<br>109:16 A. Yes, I have. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 109:18-110:13<br>109:18 Do you have an opinion that<br>109:19 you hold to a reasonable degree of<br>109:20 medical certainty as to whether or not<br>109:21 Vioxx is a drug for which the risks<br>109:22 outweigh the benefits?<br>109:23 A. Yes, I have that opinion.<br>109:24 Q. What is that opinion?<br>110: Page 110<br>110: 1 A. That Vioxx's risks do indeed<br>110: 2 outweigh its benefits, which is the view<br>110: 3 that the FDA agreed with as well.<br>110: 4 Q. And do you have an opinion<br>110: 5 that you hold to a reasonable degree of<br>110: 6 medical certainty as to whether or not<br>110: 7 Merck accurately conveyed through all of<br>110: 8 its activities, publications, detailing,<br>110: 9 direct-to-consumer advertising: labeling,<br>110:10 "Dear Doctor" letters, et cetera,<br>110:11 effectively communicated the risks and<br>110:12 benefits so doctors can make<br>110:13 evidence-based prescribing decisions? | Cumulative of other experts; not qualified to offer opinions of FDA "views" | overruled |
| ja062906 - Vol. I, (Page 110:1 to 110:3)<br>            110<br>1    A.   That Vioxx's risks do indeed<br>2  outweigh its benefits, which is the view<br>3  that the FDA agreed with as well. | Cumulative of other experts; not qualified to offer opinions of FDA "views" | |
| 110:18-110:22<br>110:18 THE WITNESS: Yes, I have<br>110:19 such an opinion.<br>110:20 BY MR. TISI:<br>110:21 Q. Okay.<br>110:22 And what is that opinion? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 110:24-111:10<br>110:24 THE WITNESS: That Merck's<br>111: Page 111<br>111: 1 conduct over the research program<br>111: 2 and analysis of its data and<br>111: 3 communication of those data to<br>111: 4 physicians, to patients, even to<br>111 : 5 FDA, was inadequate in that it<br>111: 6 failed to truthfully represent<br>111: 7 what was known to Merck at the<br>111: 8 time about the risks of its drug<br>111: 9 in relation to the cardiovascular<br>111:10 symptoms. | | |
| 112:2-112:5<br>112: 2 ;0. Do you have an opinion as to<br>112: 3 whether or not Merck acted reasonably and<br>112: 4 prudently in communicating the risks of<br>112: 5 Vioxx to physicians? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 112:11-113:15<br>112:11 , THE WITNESS: As someone who<br>112:12' has conducted years of research on<br>112: 13 how physicians make prescribing<br>112:14 decisions in relation to what<br>112:15 evidence is available to them and<br>112:16 have conducted studies and actual<br>112:17 interventions to improve<br>112:18 physicians' use of drugs which<br>112:19 have been published in the New<br>112:20 England Journal of Medicine and<br>112:21 other peer-reviewed journals, I<br>112:22 think a lot about how physicians<br>112:23 use information that they have<br>112:24 available to them in making<br>113: Page 113<br>113: 1 prescribing decisions. And my<br>113: 2 clear impression is that doctors<br>113: 3 did not have adequate information<br>113: 4 presented to them by Merck to make<br>113: 5 a fair and reasonable<br>113: 6 evidence-based decision about<br>113: 7 Vioxx.<br>113: 8 BY MR. TISI:<br>113: 9 Q. Doctor, let me move into<br>113:10 your, what I would call your factual<br>113:11 testimony portion of your deposition<br>113:12 here. But before I do, let me ask you<br>113:13 some basic questions about it so we can<br>113:14 orient the jury as to what some of the<br>113:15 terms are that we're talking about here. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 113:21-115:15<br>113:21 Q. First, I would like to help<br>113:22 the jury understand a little bit about<br>113:23 the drugs we'll be talking about today.<br>113:24 What are nonsteroidal<br>114: Page 114<br>114: 1 anti-inflammatory drugs?<br>114: 2 A. That's a class of drugs that<br>114: 3 actually includes aspirin, but the more<br>114: 4 modern nonsteroidal anti-inflammatory<br>114: 5 drugs began to appear in the 1970s, and<br>114: 6 they are called nonsteroidal '<br>114: 7 anti-inflammatory drugs because they<br>114: 8 reduce inflammation like steroids do, but<br>114: 9 they are not steroids. They have a<br>114:10 different mechanism of action that's a<br>114:11 little bit more ,like aspirin.<br>114:12 ,Q. Would you give us examples<br>114:13 of commonly known nonsteroidal<br>114:14 anti-inflammatory drugs that the jury<br>114:15 might be familiar with?<br>114:16 A. Sure. The most common and<br>114:17 oldest ones are ibuprofen, which is sold<br>114:18 as Motrin, ana it's also available<br>114:19 over-the-counter as Advil or Nuprin.<br>114:20 Another older and commonly<br>114:21 used one is naproxen, which used to be, I<br>114:22 guess is still sold as Naprosyn as a<br>114:23 prescription drug, and that's sold as<br>114:24 Aleve over the counter.<br>115: Page 115<br>115: 1 O. Let's talk about aspirin for<br>115: 2 a moment. Prior to 2000, *1999/2000* when<br>115: 3 Vioxx came on the market, was there any<br>115: 4 evidence that you're aware of that<br>115: 5 aspirin might be good for the heart?<br>115: 6 A. Yes. There were studies'<br>115: 7 that were actually done by colleagues of<br>115: 8 mine at Harvard and the Brigham and<br>115: 9 Women's Hospital In which thousands of<br>115:10 doctors were actually randomized to get<br>115:11 aspirin or a placebo or a dummy pill.<br>115:12 And they were followed for years. And<br>115:13 then Dr. Hennekens, who did the study,<br>115:14 and his colleagues attempted to find out<br>115:15 whether they had heart attacks or not. |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 116:6-117:9<br>116: 6  Doctor, in 2000 when Vioxx<br>116: 7 was being promoted on the market, was the<br>116: 8 use of aspirin, low-dose aspirin a<br>116: 9 standard of care for treatment of<br>116:10 patients with cardiovascular risk<br>116:11 factors?<br>116:12 A. Yes.<br>116:13 Q. And have you ever personally<br>116:14 prescribed aspirin to patients at risk<br>116:15 for heart disease?<br>116:16 A. Yes,<br>116:17 Q. And switching to a drug<br>116:18 called naproxen, I think we talked about<br>116:19 before, Aleve?<br>116:20 A. Yes.<br>116:21 Q. How long has naproxen or<br>116:22 Aleve been on the market?<br>116:23 A. I would say since the ,1970s.<br>116:24 Q. And what, if any, evidence<br>117: Page 117<br>117: 1 existed prior to 2000 that naproxen was<br>117: 2 good for the heart in the same way that<br>117: 3 aspirin was?<br>117: 4 A. Virtually no evidence.<br>117: 5 ,0. Did the manufacturers of<br>117: 6 naproxen ever make the claim that that<br>117: 7 drug was what we call cardioprotective?<br>117: 8 A. They couldn't because they<br>117: 9 had no grounds to claim that. | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Objection | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 117:11-118:4<br>117:11 Do you know whether the<br>117:12 manufacturer of naproxen makes that claim<br>117:13 even today?<br>117:14 A. No, they don't.<br>117:15 Q. Is it and has it ever been<br>117:16 the standard of care for physicians such<br>117:17 as yourself to prescribe naproxen to<br>117:18 patients to protect their hearts?<br>117:19 A. No.<br>117:20 Q. Have you ever prescribed<br>117:21 naproxen to patients for the purpose of<br>117:22 protecting their hearts?<br>117:23 A. No. There's no evidence<br>117:24 that it protects your heart in any useful<br>118: Page 118<br>118: 1 way.<br>118: 2 Q. And do you know anybody who<br>118: 3 does that?<br>118: 4 A. No | | |
| ja062906 - Vol. I, (Page 117:5 to 117:9)<br>                    117<br>5   Q.  Did the manufacturers of<br>6  naproxen ever make the claim that that<br>7  drug was what we call cardioprotective?<br>8     A.  They couldn't because they<br>9  had no grounds to claim that. | Speculation as to why manufacturers of naproxen could or could not make that claim | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 118:5-119:24<br>118: 5 Q. Second question.<br>118:6, NSAIDs in general,<br>118: 7 traditional NSAIDs as a class --<br>118: 8 A. Right.<br>118: 9 Q. -- are there safety issues<br>118:10 that are understood about traditional<br>118:11 NSAiDs?<br>118:12 A. Sure.<br>118:13 Q. Would you describe the<br>118:14 significant side effects of NSAIDs as you<br>118:15 knew them back in 2000,1999,2000, 2001?<br>118:16 A. Sure. We actually did some<br>118:17 of those studies in which we looked at<br>118:18 the capacity of the older NSAIDs, like<br>118:19 Motrin, to reduce kidney function in<br>118:20 older people. We did studies showing<br>118:21 that the older NSAIDs like, again, like<br>118:22 Motrin, which is ibuprofen, can raise<br>118:23 your blood pressure. Other people have<br>118:24 done studies showing the association<br>119: Page 119<br>119: 1 between the older nonsteroidals or NSAIDs<br>119: 2 and congestive heart failure. That was<br>119: 3 pretty well known by 2000.<br>119: 4 Q. What about GI, what we call<br>119: 5 gastrointestinal issues?<br>119: 6 'A. Yeah. That's the biggest<br>119: 7 problem from the traditional<br>119: 8 nonsteroidals. They can cause stomach<br>119: 9 pain, stomach upset in a lot of patients,<br>119:10 and they also can cause gastrointestinal<br>119:11 bleeding.<br>119:12 ' Q. Is that a serious problem<br>119: 13 associated with traditional nonsteroidal<br>119:14 anti-inflammatories?<br>119:15 A. Yes, it can be.<br>119:16 Q. Now, with that in mind, did<br>119:17 there come a time when you became<br>119:18 familiar with the fact that certain drug<br>119:19 manufacturers were developing a class of<br>119:20 drugs called COX-2 inhibitors?<br>119:21 A. Right.<br>119:22 Q. Would you describe for the<br>119:23 members of the jury what a COX-2<br>119:24 inhibitor is and your understanding about | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 120:9-121:17<br>120: 9 enzyme called cyclooxygenase, which is<br>120:10 abbreviated as cox. And people<br>120:11 discovered that there are two subsets of<br>120:12 that, COX-1 and COX-2. And one kind of<br>120:13 simple way of thinking about it was that<br>120:14 COX-2 was the bad subset, because that's<br>120:15 the one that caused pain and<br>120:16 inflammation, and COX-1, in a very<br>120:17 simplistic way, was thought to 'be the<br>120:18 good COX because that protected the<br>120:19 lining of your stomach. .<br>120:20 And viewed in that kind of<br>120:21 simple black and white way, the hope was<br>120:22 that if you could develop a drug -- since<br>120:23 nonsteroidals tend to block both the<br>120:24 COX-1 and the COX-2 enzymes, if you could<br>121: Page 121 •<br>121: 1 develop a drug that would only block the<br>121: 2 bad COX, or COX-2, you would be able to<br>121: 3 get rid of pain and inflammation without<br>121: 4 blocking the good COX, or COX-1, which<br>121: 5 protects the stomach lining.<br>121: 6 And the hope was, and this<br>121: 7 is what went into the development of<br>121: 8 Vioxx and Celebrex, that by doing so, you<br>121 : 9 would be able to have a drug that would<br>121:10 treat pain and inflammation and not cause<br>121 :11 as much risk of stomach bleeding.<br>121 :12 Q. Do you have any problem, Dr.<br>121 :13 Avorn, with Merck investigating COX-2s as<br>121 :14 a potential pain medication with the lack<br>121 :15 of a GI side effect?<br>121 :16 A. No. It seemed like a neat<br>121:17 idea at the time. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 123:17-124:19<br>123:17 BY MR. TISI:<br>123:18 Q. Doctor, do you recognize<br>123:19 that?<br>123:20 A. Yes. That is the VIGOR<br>123:21 study as it was published in the New<br>123:22 England Journal of Medicine in November<br>123:23 of 2000.<br>123:24 : Q. And what is the exact date<br>124: Page 124<br>124: 1 of this article?<br>124: 2 A. November 23, 2000.<br>124: 3 Q. When did you first learn of<br>124: 4 the VIGOR study?<br>124: 5 A. Well, actually, information<br>124: 6 about the findings began to circulate in<br>124: 7 the spring of 2000, I think it would have<br>124: 8 been March when I guess it was either<br>124: 9 presented or Merck issued a statement<br>124:10 about the findings.<br>124:11 Q. And do you know, would you<br>124:12 briefly describe the study and what it<br>124:13 was designed to do?<br>124:14 A. Sure. It was funded by<br>124:15 Merck, and a number of the co-authors<br>124:16 were Merck employees. And il was<br>124:17 designed to ask the question, is Vioxx<br>124:18 safer on your stomach than other<br>124:19 nonsteroidals? And so about 8,000 | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 126:1-127:20<br>126: 1THE WITNESS: About 8,000<br>126: 2 patients were randomly divided<br>126: 3into two groups. One group was<br>126:4given Vioxx at a dose of 50<br>126: 5milligrams a day, and the other<br>126:6group was given naproxen, this<br>126: 7older nonsteroidal. And them they<br>126:8were followed for a median period<br>126: 9 "of nine months. And there were a<br>126:10 number of outcomes that were<br>126:11 studied. One was whether or --<br>126:12 what kind of pain relief it gave,<br>126: 13 because its purpose was to be a<br>126:14 pain reliever. And another<br>126:15 outcome, which was the one of<br>126:16 particular interest, was whether<br>126:17 or not the patients who were<br>126:18 randomly assigned to the Vioxx<br>126:19 group were having a lower rate of<br>126:20 stomach bleeding and perforation<br>126:21 and ulcer.<br>126:22 And the findings, as they<br>126:23 emerged, were that as a pain<br>126:24 reliever, Vioxx worked about as<br>127: Page 127<br>127: 1 well as naproxen, no better, no<br>127: 2 worse, but there was the hope for<br>127: 3 reduction in gastrointestinal<br>127: 4 events like ulcers and<br>127: 5 perforations in the patients<br>127: 6 taking Vioxx compared to the<br>127: 7 patients taking naproxen. And a<br>127: 8 'surprise finding that emerged from<br>127: 9 that study was that there was an<br>127:10 approximately five-fold increase<br>127:11 in heart attacks in the people<br>127:12 randomly assigned to take Vioxx as<br>127:13 compared to taking naproxen.<br>127:14 BY MR. TISI:<br>127:15 Q. When you say "surprise<br>127:16 finding," was it a surprise to you,<br>127: 17 Doctor?<br>127:18 A. Well,therehadbeen<br>127:19 evidence of a potential there, but this<br>127:20 was a large demonstration of this in a | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 128:4-129:19<br>128: 4 pharmacoepidemiologist, was the finding<br>128: 5 about the cardiovascular risk a concern<br>128: 6 to you personally?<br>128: 7 A. If you mean personally in my<br>128: 8 professional role?<br>128: g Q. Yes.<br>128:10 A. Yes.<br>128:11 Q. Okay.<br>128:12 And why was that a<br>128:13 significant concern to you<br>128:14 professionally?<br>128:15 A. Because if there were a drug<br>128:16 that causes a five-fold increase in your<br>128:17 risk of having a heart attack, that's a<br>128:18 real problem. It's not a drug that you<br>128:19 would be happy about giving to a patient<br>128:20 unless it had some other incredible<br>128:21 benefit to outweigh that.<br>128:22 Q. At the time that VIGOR came<br>128:23 out, how prevalent was the use of Vioxx?<br>128:24 A. It was on the upswing. The<br>129: Page 129<br>129: 1 curve of Vioxx use was just heading for<br>129: 2 the moon, and by November of 2000, it was<br>129: 3 well on that upswing.<br>129: 4 Q. Given the findings of VIGOR<br>129: 5 and the number of patients that were<br>129: 6 actually taking it, did you, have an<br>129: 7 opinion at the time as to whether or not<br>129: 8 there were any potential public health<br>129: 9 issues concerned with Vioxx?<br>129:10 A. Yes. At the time, I clearly<br>129:11 remember saying and discussing with my<br>129:12 colleagues and with Dr. Sherwood and with<br>129:13 a number of people that if it were true<br>129:14 that this drug causes a five-fold or<br>129:15 four-fold increase in the risk of heart<br>129:16 attacks, then that could be a real issue<br>129:17 that could well outweigh whatever benefit<br>129:18 it might have in reducing stomach<br>129:19 problems. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Page 130:14 to 130:20)<br>130<br>14      Q.   When you reviewed the actual<br>15   text of the VIGOR article, as an<br>16   epidemiologist, in the way in which the<br>17   statistics were reported, were they<br>18   reported in a way that was of concern to<br>19   you?<br>20      A.   Yes. | Leading | *Waived* |
| ja062906 - Vol. I, (Page 131:2 to 131:19)<br>131<br>2    What was very unusual and<br>3   unorthodox about the way the findings<br>4   were presented in the VIGOR paper was<br>5   that instead of saying patients randomly<br>6   assigned to take Vioxx had five times the<br>7   number of heart attacks or four times,<br>8   there's different numbers in different<br>9   parts of the paper, compared to people<br>10   assigned to take naproxen, instead, it<br>11   was flipped around in a way that is<br>12   virtually never done in reporting a<br>13   clinical trial, which is to say the<br>14   patients assigned to take naproxen had a<br>15   reduction in their heart attack rate.<br>16   And that was striking.  I remember the<br>17   first time I read the paper, that was a<br>18   striking difference, because you just<br>19   never see reports written like that. | Narrative & non-responsive | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 132:3-133:15<br>132: 3 As somebody who does<br>132: 4 epidemiology, you work with statistics,<br>132: 5 would that be fair to say?<br>132: 6 A. Yes.<br>132: 7 Q. And in doing so, does the<br>132: 8 manner in which you convey statistics,<br>132: 9 present statistics, can that sometimes<br>132:10 convey a message about what the<br>132:11 statistics mean? '<br>132:12 A. Yes. In fact, there's a<br>132:13 whole section in my book about what's<br>132:14 called framing of risk information. And<br>132:15 it's been well known, and there's groups<br>132:16 at Stanford and, in fact, the Nobel Prize<br>132:17 was awarded in economics on this topic,<br>132:18 that how you frame a question can often<br>132:19 drive the kind of answer that you get or<br>132:20 the kind of belief that somebody has.<br>132:21 So, if you say that here's<br>132:22 an operation that works 95 percent of the<br>132:23 time, do you want to have that· operation,<br>132:24 you get a different answer than if you<br>133: Page 133<br>133: 1 say 5 percent of people who have this<br>133: 2 operation will get no benefit from it.<br>133: 3 And similarly - and we think a lot about<br>133: 4 framing when we do our programs to<br>133: 5 present information to doctors about<br>133: 6 choices, and what you want to do is have<br>133: 7 the framing be as neutral as possible and<br>133: 8 let the data speak for themselves.<br>133: 9 And if you frame the ViGOR<br>133:10 study as naproxen reduces the risk of<br>133:11 heart attack instead of framing it as<br>133:12 there were five times more people who<br>133:13 were given Vioxx who had heart attacks<br>133:14 than people given naproxen, it creates a<br>133:15 very different. sense of the | Speculative as to how physicians interpret VIGOR; duplicative | *Overruled* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Page 133:9 to 133:16)<br><br>               133<br>9  And if you frame the VIGOR<br>10  study as naproxen reduces the risk of<br>11  heart attack instead of framing it as<br>12  there were five times more people who<br>13  were given Vioxx who had heart attacks<br>14  than people given naproxen, it creates a<br>15  very different sense of the riskiness of<br>16  the drug to the doctor. | Speculative as to how physicians interpret VIGOR | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 133:23-135:12<br>133:23 Q. Doctor, having read the<br>133:24 paper, and I return your attention to the<br>134: Page 134 .<br>134: 1 last page of the paper and actually the<br>134: 2 page before the last paragraph --<br>134: 3 A. Yes.<br>134: 4 Q. -- does it discuss the<br>134: 5 cardiovascular findings in VIGOR in that<br>134: 6 section of the paper?<br>134: 7 A. Yes.<br>134: 8 Q. Okay.<br>134: 9 What, if anything, does the<br>134:10 paper say about naproxen and the role of<br>134:11 naproxen in heart disease?<br>134:12 A. Okay.<br>134:13 At the very bottom of Page<br>134:141526, the last two words "Thus, our,"<br>134:15 and then it goes on to 1527. "Thus, our<br>134:16 results are consistent with the theory<br>134:17 that naproxen has a coronary protective<br>134:18 effect and highlight the fact th~t<br>134:19 rofecoxib does not provide this kind of<br>134:20 protection owing to its selective<br>134:21 inhibition of cyclogenase-2," or COX-2,<br>134:22 "at its therapeutic dose and at higher<br>134:23 doses."<br>134:24 Q. Doctor, having reviewed the<br>135: Page J35<br>135: 1 entirety of the paper, but looking at<br>135: 2 this particular statement as well, did<br>135: 3 Merck and the Merck authors on this paper<br>135: 4 ever communicate that there was a<br>135: 5 potential for an increased risk of heart<br>135: 6 attacks related to the use of Vioxx as<br>135: 7 opposed to a decreased risk associated<br>135: 8 with the cardioprotectiveness of<br>135: 9 naproxen?<br>135:lOA. I don't think there is<br>135:11 anything in the paper that suggests that<br>135:12 Vioxx increases the risk of heart attack. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 136:14-137:12<br>136:14THE WITNESS: Yes. As<br>136:15someone who thinks about drug<br>136:16benefits and risks and patterns of<br>136:17use of drugs and has written about<br>136:18the presentation of risk data to<br>136:19physicians, I was concerned that<br>136:20it did not seem to be an accurate<br>136:21way of presenting the risk and, in<br>136:22fact, it was, I think the term<br>136:23that the Merck people might have<br>136:24used was "flipped" from the way<br>137: 1 that one would normally present<br>137: 2 risk information. '<br>137: 3 BY MR. TISI:<br>137: 4 Q. Let me ask you this<br>137: 5 question, Doctor.<br>137: 6 A reasonable and prudent<br>137: 7 company presenting the risks and the<br>137: 8 benefits, potential risks and benefits of<br>137: 9 a drug using evidence-based medicine,<br>137:10 does this comport with what is expected<br>137:11 of pharmaceutical companies in doing<br>137:12 that? | Beyond witness's expertise; duplicative | *overrule* |
| ja062906 - Vol. I, (Page 137:4 to 137:12)<br>137<br>4     Q.   Let me ask you this<br>5  question, Doctor.<br>6          A reasonable and prudent<br>7  company presenting the risks and the<br>8  benefits, potential risks and benefits of<br>9  a drug using evidence-based medicine,<br>10   does this comport with what is expected<br>11   of pharmaceutical companies in doing<br>12   that? | Beyond witness's expertise | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 137:17 to 138:16)<br>137<br>17  THE WITNESS:  Well, as<br>18      someone who reviews papers for the<br>19      New England Journal of Medicine<br>20      and JAMA and also runs programs<br>21      about communication of risks and<br>22      benefits to physicians and has<br>23      written a book about that topic, I<br>24      don't feel that this was a fair<br>138<br>1      way of presenting the data.  I<br>2      think a fair way would have been<br>3      to say, in essence, the good news<br>4      is, our drug seems to cause less<br>5      gastrointestinal problems.  The<br>6      bad news is, it doesn't work any<br>7      better or any worse than the<br>8      comparison drug in terms of being<br>9      a pain reliever.  And the really<br>10      bad news is that the people given<br>11      our drug had five times more heart<br>12      attacks than the people given a<br>13      comparison drug.  I think that<br>14      would have been a fair and neutral<br>15      presentation of the good and bad<br>16      news that came out of this study. | Beyond witness's expertise | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 138:17-140:11<br>138:17 BY MR. TISI:<br>138:18 Q. Now, Doctor, did there come<br>138:19 a time where you had contact with Merck<br>138:20 officials about the results of VIGOR?<br>138:21 .:A. Yes.<br>138:22 Q. Who is Lou Sherwood?<br>138:23 A Lou Sherwood was actually a<br>138:24 physician at the Beth Israel Hospital in<br>139: Page 139<br>139: 1 Boston, another one of the Harvard<br>139: 2 teaching hospitals, at around the same<br>139: 3 time that I was there. He was in<br>139: 4 academics before he went to work for<br>139: 5 Merck. And I kind of knew him a little<br>139: 6 bit around those years, and we had been<br>139: 7 at some meetings together in the<br>139: 8 intervening years.<br>139: 9 And around January of 2000,<br>139:10 I was asked by the chairman of our<br>139:11 department of medicine to set up a weekly<br>139:12 lecture that would be about controversies<br>139:13 in pharmaceuticals. And they asked me to<br>139:14 moderate it and to pick the presenters.<br>139:15 So, I thought it would be fair to pick<br>139:16 somebody from the pharmaceutical industry<br>139:17 and somebody from an HMO who had been<br>139: 18 critical of the pharmaceutical Industry<br>139:19 and have them discuss issues about<br>139:20 medications.<br>139:21 And I identified Dr.<br>139:22 Sherwood as somebody who had been an<br>139:23 academic who was known to me and who was<br>139:24 now in a senior position with the drug<br>140: Page 140<br>140: 1 company, and I asked Lou to come and be<br>140: 2 the pharmaceutical company guy. And I<br>140: 3 asked somebody from one of the HMOs in<br>140: 4 Boston to be the critic guy. And it was<br>140: 5 a very stimulating discussion which I was<br>140: 6 just kind of the referee for.<br>140: 7 And then afterwards, we<br>140: 8 arranged to have Dr. Sherwood meet with<br>140: 9 me and members of my division to talk<br>140:10 about matters of mutual interest, our<br>140:11 work on drugs, his work at Merck. And | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 140:16-142:10<br>140:16 as an epidemiologist was there, the<br>140:17 conversation turned to VIGOR and my<br>140:18 noting that it was a disturbing ending<br>140:19 that there was this dramatic increase in<br>140:20 the number of people who had heart<br>140:21 attacks in the VIGOR group -- in the<br>140:22 Vioxx group, I'm sorry.<br>140:23 And I was somewhat taken<br>140:24 aback because Dr. Sherwood said, oh,<br>141: Page 141<br>141: 1 that's just because naproxen prevents<br>141: 2 heart attacks.<br>141: 3 And I remember asking at the<br>141: 4 time, well, how do we know that? Is that<br>141: 5 something that should be studied or<br>141: 6 tested? And he kind of dismissed it as,<br>141: 7 well, you know, sort of it's an obvious<br>141: 8 finding, and that's what was said in the<br>141: 9 paper, and there was really nothing more<br>141:10 to be discussed.<br>141:11 Q. Doctor at the time you were<br>141:12 having this conversation with Dr.<br>141 :13 Sherwood, were you in the process of<br>141 :14 doing any research on the issue of the<br>141 :15 effect of NSAIDs on the heart?<br>141:16 A. Yes. As a matter of fact,<br>141:17 Dr. Solomon in my division and I had<br>141 :18 already become interested in this<br>141:19 question of regular nonsteroidals and the<br>141 :20 heart. And we realized that there was<br>141 :21 essentially no literature out there in<br>141 :22 humans that suggested that the older<br>141 :23 nonsteroidals like naproxen or Motrin or<br>141 :24 ibuprofen can protect the hear,\-<br>142: Page 142<br>142: 1 And Dr. Solomon and I<br>142: 2 decided it would be interesting to look<br>142: 3 at whether that was something you could<br>142: 4 find. If there was such a massive<br>142: 5 protective effect of naproxen as was<br>142: 6 found in VIGOR, you'd think that you<br>142: 7 would be able to find that in a study<br>142: 8 looking at tens of thousands of people,<br>142: 9 and we have databases in our division in<br>142:10 which we have information about | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 142:19-143:17<br>142:19 either not taking that drug or taking<br>142:20 another drug.<br>142:21 And so I believe we had been<br>142:22 talking about that throughout 2000. Our<br>142:23 interest in it was increased in the<br>142:24 spring of 2000 when the initial VIGOR<br>143: Page 143<br>143: 1 findings were released. And then, of<br>143: 2 course, when they were published in the<br>143: 3 New England Journal in 2000, we decided<br>143: 4 that this was definitely something that<br>143: 5 we wanted to proceed on just because it<br>143: 6 seemed like an important question. If<br>143: 7 naproxen was that great and no one had<br>143: 8 ever discovered it before, maybe that<br>143: 9 would be something that was worth<br>143:10 knowing.<br>143:11 Q. And did you do that study?<br>143:12 A. Yes, we did.<br>143:13 Q. Did you perform what we call<br>143:14 an epidemiologic study that studied the<br>143:15 question of naproxen's effect on the<br>143:16 heart?<br>143:17 A. Yes, we did. | | |
| 146:13-147:3<br>146:13 Q. And, in fact, did you<br>146:14 publish a study, the study results that<br>146:15 came out of this epidemiologic study that<br>146:16 we just talked about?<br>146:17 A. Yes, we did.<br>146:18 Q. And it's all right just for<br>146:19 the purposes of this deposition, I know<br>146:20 you studied a lot of drugs in the context<br>146:21 of that particular study, if I call it<br>146:22 the naproxen study?<br>146:23 A. That's fine.<br>146:24 Q. Okay.<br>147: Page 147<br>147: 1 Did you --<br>147: 2 You published it -- do you<br>147: 3 remember where it was published, Doctor? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 147:11-147:16<br>147:11 It was published in the<br>147:12 Archives of Internal Medicine in 2002, in<br>147:13 May of 2002.<br>147:14 Q. Are you the senior author on<br>147:15 the paper?<br>147:16 A. That's right | | |
| 147:22-148:16<br>147:22 Q. And what, if any,<br>147:23 conclusions did you and Dr. Solomon reach<br>147:24 regarding naproxen?<br>148: Page 148<br>148: 1 A. Well, overall, we found that<br>148: 2 nonsteroidals in general like Motrin and<br>148: 3 so forth taken as a group did not seem to<br>148: 4 have any important protective effect on<br>148: 5 the heart. But when you looked at<br>148: 6 naproxen separately, it had a very modest<br>148: 7 reduction in the risk of heart disease in<br>148: 8 people who tqok it compared to the<br>148: 9 comparison patients who were similar in<br>148:10 all other ways. That is, there was about<br>148:11 a 16 percent reduction in the risk of<br>148:12 heart attack, which is a pretty small<br>148:13 reduction.<br>148:14 Q. Did you address the findings<br>148:15 of VIGOR in the context of this, article?<br>148:16 A. Yes, we did | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 149:12-151:6<br>149:12 Q. Would you please go to the<br>149:13 section where that is addressed? And if<br>149:14 you go down to the last paragraph, I<br>149:15 think that's where that is.<br>149:16 A. Yes. Right.<br>149:17 in the end of the<br>149:18 discussion, "To place the effect of<br>149:19 naproxen in perspective, in a large<br>149:20 randomized trial of daily aspirin use in<br>149:21 primary prevention, patients in the<br>149:22 intervention arm experienced a 44%<br>149:23 reduction in the risk of acute myocardial<br>149:24 infarction" or heart attack. "Therefore,<br>150: Page 150<br>150: 1 it would be false to equate the more<br>150: 2 modest effect of naproxen," that is a 16<br>150: 3 percent reduction as compared to a 44<br>150: 4 percent reduction, "it would be false to<br>150: 5 equate the more modest effect of naproxen<br>150: 6 suggested in this study with the<br>150: 7 cardioprotection afforded by aspirin."<br>150: 8 ,Q. Would you tell the members<br>150: 9 of the jury in a very simple way what you<br>150:10 were saying there about the VIGOR study?<br>150:11 A. Yes. What we said in that<br>150:12 paper that came out in 2002 was that the<br>150:13 very, I guess you could say wimpy effect<br>150:14 of naproxen in protecting the heart of<br>150:15 just reducing the rate by 16 percent was<br>150:16 in no way big enough to account for what<br>150:17 would have had to have been an 80 percent<br>150: 18 reduction in risk to give you that 5 to 1<br>150:19 difference that was seen between Vioxx<br>150:20 and naproxen In the VIGOR study.<br>150:21 Naproxen would have had to have been the<br>150:22 most magical drug to protect your heart<br>150:23 that was ever invented, and we didn't<br>150:24 find that.<br>151: Page 151<br>151: 1 Q. And you wrote this in 2002,<br>151: 2 correct?<br>151: 3 A. Right.<br>151: 4 Q. And was that before you and<br>151: 5 I had ever met on the issue of Vioxx?<br>151: 6 A. Right. And in fact, let me | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 151:16-153:10<br>151:16 THE WITNESS: That's right.<br>151:17 BY MR. TISI:<br>151:18 Q. Okay<br>151 :19 Doctor, were the results of<br>151 :20 this paper actually presented before it<br>151 :21 was actually published?<br>151 :22 A. Yes, it was. Dr. Solomon<br>151 :23 presented them at the International<br>151 :24 Society for Pharmacoepidemiology<br>152: Page 152<br>152: 1 meetings.<br>152: 2 Q. The International Society<br>152: 3 for Pharmacoepidemiology, is that the<br>152: 4 international society that you had been a<br>152: 5 president of?<br>152: 6 A. That's right.<br>152: 7 Q. Okay.<br>152: 8 And do you remember actually<br>152: 9 that presentation?<br>152:10 A. Yes,<br>152:11 Q. And who made t he<br>152:12 presentation?<br>152:13 A. Dr. Solomon did.<br>152:14 Q. Do you remember when it was<br>152:15 in relationship to this paper?<br>152:16 A. Yes. The meetings occur in<br>152:17 August, and so given that we finished the<br>152:18 paper in late'01, this would have been<br>152:19 the August '01 presentation.<br>152:20 Q. And do you recall, do you<br>152:21 have any specific recollection whether<br>152:22 there were any people from Merck in the<br>152:23 audience to hear the presentation on your<br>152:24 naproxen study?<br>153: Page 153<br>153: 1 A. Yes, there were.<br>153: 2 Q. Okay.<br>153: 3 Do you remember who was in<br>153: 4 the audience from Merck to hear your<br>153: 5 presentation about the effect of<br>153: 6 naproxen?<br>153: 7 A. One person I remember<br>153: 8 clearly, because we talked about it right<br>153: 9 at the end of the presentation, was Dr.<br>153:10 Harry Guess: who at that time was the | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 153:12-155:3<br>153:12 'Q. What, if anything, was<br>153:13 presented to the audience, including Dr.<br>153:14 Guess, about the likelihood of Vioxx<br>153:15 being cardiotoxic as a result of your<br>153:16 study which you presented?<br>153:17 A. In the presentation, I·<br>153:18 recall that Dr. Solomon -- clearly what<br>153:19 was interesting was what does this mean<br>153:20 about the VIGOR findings. And I recall<br>153:21 that Dr. Solomon said essentially what is<br>153:22 in the paper that we later wrote on that<br>153:23 topic later that year, that we had found<br>153:24 only a very small effect, about 16<br>154: Page 154<br>154: 1 percent of reduction from naproxen, and<br>154: 2 that that made it unlikely that naproxen<br>154: 3 was the reason that •• that a<br>154: 4 cardioprotective effect of naproxen was<br>154: 5 the reason to explain this five-fold<br>154: 6 increase in heart attacks in the Vioxx<br>154: 7 group of patients in the VIGOR study<br>154: 8 compared to the naproxen group of<br>154: 9 patients. And that, therefore, the only<br>154:10 other possible explanation was if it<br>154:11 wasn't that naproxen was preventing heart<br>154:12 attacks, the only other logical<br>154:13 possibility was that Vioxx was causing<br>154:14 heart attacks.<br>154:15 Q. And this was in mid-2001?<br>154:16 A. The presentation was in<br>154:17 August of 2001, and we finished the<br>154:18 work -- actually, we finished the work<br>154:19 that summer.<br>154:20 Q. And you personally spoke to<br>154:21 Dr. Guess about these results?<br>154:22 A. Yes. The reason I spoke<br>154:23 with Dr. Guess was that Dr. Solomon had<br>154:24 been in touch with Dr. Cannuscio at Merck<br>155: Page 155<br>155: 1 since actually the beginning of 2001,<br>155: 2 because he had indicated to her that he<br>155: 3 thought this was -- | Hearsay; duplicative | Sustained |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 154:20 to 155:3)<br>154<br>20  Q.   And you personally spoke to<br>21  Dr. Guess about these results?<br>22      A.   Yes.  The reason I spoke<br>23  with Dr. Guess was that Dr. Solomon had<br>24  been in touch with Dr. Cannuscio at Merck<br>155<br>1  since actually the beginning of 2001,<br>2  because he had indicated to her that he<br>3  thought this was -- | Hearsay | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Page 155:8 to 156:24)<br>155<br>8 A.   -- that there was an issue<br>9 which we had been discussing in our<br>10 division that this needed to be studied<br>11 subsequent to the VIGOR paper.  And I<br>12 instructed Dr. Solomon to see whether<br>13 this was something which a study could be<br>14 funded by anybody.  And one of the<br>15 difficulties about adverse effects<br>16 research is that FDA doesn't have hardly<br>17 any money to spend on them and the<br>18 National Institutes of Health doesn't<br>19 spend that much money on them.  And<br>20 often, if you are a scientist studying<br>21 drug side effects, as we are, one needs<br>22 to go to the manufacturer of the drug and<br>23 say, we think this is an important issue<br>24 in relation to the drug that you're<br>ja062906 - Vol. I, (Page 156:1 to 156:20)<br>156<br>1 making, and we want to do a study.<br>2 And as I said earlier, we've<br>3 often had perfectly fine relationships<br>4 with companies.  Sometimes a company will<br>5 come to us and say we think there may be<br>6 a problem with our drug, would you study<br>7 it for us so that we can know what's true<br>8 about our drug.  We had a very good<br>9 experience with a Parkinson's drug not<br>10 long ago in that way.<br>11 And so I asked Dr. Solomon<br>12 to talk with people at Merck, and as it<br>13 turns out, Dr. Cannuscio had recently<br>14 graduated from the Harvard School of<br>15 Public Health in epidemiology and then<br>16 went to work for Merck so, she was kind<br>17 of a conduit for our communications with<br>18 Merck.  And nothing had come of those<br>19 discussions even though he was trying<br>20 hard.<br>21 And so I took Dr. Guess<br>22 aside as Dr. Cannuscio's boss at that<br>23 pharmacoepi meeting in August of 2001,<br>24 and sort of chief to chief, and I said, | Hearsay | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Page 157:1 to 157:24)<br>157<br>1  Harry, my guy has been talking to your<br>2  person and it doesn't seem to be getting<br>3  anywhere.  We think this issue is<br>4  important, and we now can study Vioxx as<br>5  well as naproxen, because when we first<br>6  did this study, Vioxx was new enough on<br>7  the market that there weren't enough<br>8  people actually taking it for us to be<br>9  able to do a big population study.  But<br>10  by the time it was getting to be the<br>11  summer of 2001, it was being very heavily<br>12  promoted, and the number of people taking<br>13  it was on the rise.<br>14      And I told Dr. Guess that I<br>15  thought that this really was something<br>16  that ought to move forward, because we<br>17  could do a study very much like the study<br>18  that we're looking at now, but instead of<br>19  looking at naproxen and the older<br>20  nonsteroidals, we would be able to have<br>21  the same design and to look at Vioxx and<br>22  Celebrex as well and answer that question<br>23  in a large population to try to get to<br>24  the bottom of this. | Continued | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 158:16-160:11<br>158:16 BY MR. TISI:<br>158:17 Q. I'm going to represent that<br>158:18 this document came from the Merck files.<br>158:1911 is Bates Number MRK-ACC0018681.<br>158:20 It's a memo from a gentleman<br>158:21 by the name of Doug Watson to various<br>158:22 people. These are some of the people<br>158:23 you've mentioned here in your testimony<br>158:24 here today?<br>159: Page 159<br>159: 1 A. Right.<br>159: 2 Q. And it includes some of the<br>159: 3 papers, actually, some of the '<br>159: 4 presentations that were made at that<br>159: 5 meeting in mid-2001?<br>159: 6 A. Right.<br>159: 7 Q. If you'd go to Page 1 -- the<br>159: 8 document that ends with 686. Is that the<br>159: 9 paper that Dr. Solomon presented?<br>159:10 ; A. Yes.<br>159:11 Q. Okay.<br>159:12 And following that is some<br>159:13 notes that Dr. Guess made of that<br>159:14 meeting. Do you see that?<br>159:15 A. Right. Handwritten notes.<br>159:16 Q. Have you had an opportunity<br>159:17 to read this, Doctor?<br>159:18 A. Yes.<br>159:19 Q. Is this something --<br>159:20 Just to be fair, is this<br>159:21 something I presented to you -- is this a<br>159:22 document you had ever seen at the time of<br>159:23 your involvement with Vioxx in mid-2001?<br>159:24 A. No.<br>160: Page 160<br>160: 1 Q. Okay.<br>160: 2 And do you see at the bottom<br>160: 3 of the second page where it says, "The<br>160: 4 Conclusion"?<br>160: 5 A. Yes.<br>160: 6 Q. Okay.<br>160: 7 Would you go to the next<br>160: 8 page, two pages down, please. Keep<br>160: 9 going. One more.<br>160:10 A. Actually, a couple more.<br>160:12 Now, have you read this, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 160:22-162:9<br>160:22 "NSAIDs as group, no effect.<br>160:23 Naproxen, 16-20% decrease in risk.<br>160:24 Hypothesis that selective" that is<br>161: Page 161<br>161: 1 selective COX-2 inhibitors like Vioxx,<br>161: 2 "may increase risk."<br>161: 3 Q. Is this something --<br>161: 4 Does this comport with your<br>161: 5 recollection of what you and Dr. Guess<br>161: 6 talked about?<br>161: 7 A. Absolutely.<br>161: 8 Q. Did you consider it<br>161: 9 important in mid-2001 to specifically<br>161 :10 study the relationship between COX-2s and<br>161 :11 heart attacks?<br>161:12 A. Yes.<br>161 :13 Q. Why?<br>161 :14 A. Because there are a couple<br>161 :15 of reasons, the largest of which was the<br>161 :16 VIGOR study, which, as I said, had been<br>161:17 published in November of 2000, had been<br>161 :18 kind of announced, the findings, in<br>161 :19 spring of 2000, and here was silting out<br>161 :20 there this finding that five time~ more<br>161 :21 people in the Vioxx group were having<br>161 :22 heart attacks than people in the naproxen<br>161 :23 group, and that seemed like an important<br>161 :24 public health issue that somebody should<br>162: Page 162<br>162: 1 look at.<br>162: 2 Q. How much does a study like<br>162: 3 that you discussed with Dr. Guess cost?<br>162: 4 A. Oh, about 5 or $600,000.<br>162: 5 Q. And how long does such a<br>162: 6 study typically take?<br>162: 7 A. If we pull out all the stops<br>162: 8 and can proceed real quickly, we can do<br>162: 9 it in about a year or less. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 163:13-165:8<br>163:13 BY MR. TISI:<br>163:14 Q. Following the meeting, the<br>163:15 ISPE meeting in August of 2001, did you<br>163:16 have followup contacts with Merck<br>163:17 regarding the proposed study to study<br>163:18 Vioxx and heart attacks?<br>163:19 A. Frequently.<br>163:20 Q. Okay.<br>163:21 When you say "frequently,"<br>163:22 what do you mean?<br>163:23 A. That there was ongoing<br>163:24 discussion from - really from the<br>164: Page 164<br>164: 1 beginning of 2001, I believe, that it was<br>164: 2 February of 2001 when I asked Dr. Solomon<br>164: 3 to begin those conversations through<br>164: 4 until actually the publication of the<br>164: 5 paper in 2004.<br>164: 6 Q. And is this an e-mail that<br>164: 7 you recall?<br>164: 8 A. Yes.<br>164: 9 Q. Okay.<br>164:10 , Did you have any role In<br>164:11 this' e-mail exchange?<br>164:12 A. Yes. I urged Dr. Solomon or<br>164:13 instructed Dr. Solomon to please move<br>164:14 things along as best he could with Merck.<br>164:15 Once there was an expression of interest<br>164:16 in such a study, to please get it<br>164:17 finalized so that we could actually get<br>164:18 the funding we needed to do the work.<br>164:19 Q. Okay.<br>164:20 Could you please go down to<br>164:21 the e-mail from Dr. Solomon. First of<br>164:22 all, is that an e-mail that you received<br>164:23 in the normal course of business?<br>164:24 A. Yes. It was cc'd to me.<br>165: Page 165<br>165: 1 Q. Okay.<br>165: 2 Is this an e-mail that you<br>165: 3 directed Dr. Solomon to send to Merck?<br>165: 4 A. Yes.<br>165: 5 Q. And would you please –<br>165: 6 Who is it sent to?<br>165: 7 A. It was sent by Dr. Solomon<br>165: 8 to Dr. Cannuscio, who, as I mentioned, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 165:20-166:19<br>165:20 presented our findings and about eight<br>165:21 months or seven or eight months after he<br>165:22 had initiated his first contact with Dr.<br>165:23 Cannuscio.<br>165:24 It says, "Dear Carolyn, I<br>166: Page 166<br>166: 1 was pleased to hear last week that Merck<br>166: 2 is indeed prepared to move forward with<br>166: 3 support of our study on NSAIDs, COX-2s,"<br>166: 4 including Vioxx, "and MI," which Is heart<br>166: 5 attack, "but as I mentioned when we<br>166: 6 spoke, after so many months we really<br>166: 7 need at least an e-mail note from you<br>166: 8 indicating that the commitment is truly<br>166: 9 there. We will need to forego other<br>166:10 possible sources of support fa, this<br>166:11 project to work with Merck, and given how<br>166:12 long it has taken thus far, we're nervous<br>166:13 about rejecting other possibilities<br>166:14 without any written indication of<br>166:15 commitment.:'<br>166:16 Q. Let me stop you there,<br>166:17 Doctor.<br>166:18 What was your purpose in<br>166:19 writing this to Dr. Cannuscio? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 167:3-168:4<br>167: 3 I told Dr. Solomon to<br>167: 4 essentially, after so many months from<br>167: 5 February to September, particularly on<br>167: 6 the heels of the meeting with Dr. Guess<br>167: 7 in August, to basically tell them to fish<br>167: 8 or cut bait, that I felt this was an<br>167: 9 important project to do, that there were<br>167:10 important clinical and public health<br>167:11 issues at stake, and that we had been<br>167:12 working along with Merck or trying' to<br>167:13 based on their indicating to us that they<br>167:14 were kind of interested in supporting the<br>167:15 study. '<br>167:16 But so many months later, I<br>167:17 told Dr. Solomon to write a note saying,<br>167:18 look, if you guys aren't going to really<br>167:19 fund this study, we need to know that so<br>167:20 we can look for funding from somewhere<br>167:21 else since we don't like to peddle the<br>167:22 same study to a lot of different people<br>167:23 and hope that somebody will accept it.<br>167:24 And so it was basically I asked him to<br>168: Page 168<br>168: 1 write a fish or cut bait memo to Merck.<br>168: 2 Q. And that's what this memo<br>168: 3 was?<br>168: 4 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 167:23-168:4<br>167: 3 I told Dr. Solomon to<br>167: 4 essentially, after so many months from<br>167: 5 February to September, particularly on<br>167: 6 the heels of the meeting with Dr. Guess<br>167: 7 in August, to basically tell them to fish<br>167: 8 or cut bait, that I felt this was an<br>167: 9 important project to do, that there were<br>167:10 important clinical and public health<br>167:11 issues at stake, and that we had been<br>167:12 working along with Merck or trying' to<br>167:13 based on their indicating to us that they<br>167:14 were kind of interested in supporting the<br>167:15 study. '<br>167:16 But so many months later, I<br>167:17 told Dr. Solomon to write a note saying,<br>167:18 look, if you guys aren't going to really<br>167:19 fund this study, we need to know that so<br>167:20 we can look for funding from somewhere<br>167:21 else since we don't like to peddle the<br>167:22 same study to a lot of different people<br>167:23 and hope that somebody will accept it.<br>167:24 And so it was basically I asked him to<br>168: Page 168<br>168: 1 write a fish or cut bait memo to Merck.<br>168: 2 Q. And that's what this memo<br>168: 3 was?<br>168: 4 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 171:1-172:20<br>171: 1 about having an agreement.<br>171: 2 Q. Okay.<br>171: 3 Doctor, at about the time<br>171: 4 that you were involved with the<br>171: 5 discussions with Dr. Cannuscio, were you<br>171: 6 aware that the company was in discussions<br>171: 7 with the Food & Drug Administration about<br>171: 8 what would go into the label on the<br>171: 9 results of VIGOR? '<br>171:10 A. No.<br>171:11 Q. Doctor, I did provide you<br>171: 12 material that was sent to the Food & Drug<br>171:13 Administration. Have I showed you this<br>171 :14 before today's deposition?<br>171:15 ,A. Yes.<br>171 :16 'Q. Have you had an opportunity<br>171 :17 to take a look at it?<br>171:18 A. Yes.<br>171 :19 Q. Is this a letter that was<br>171 :20 sent to the -- appear to be a letter sent<br>171 :21 to the Food & Drug Administration in part<br>171 :22 referring to your study results on the<br>171 :23 naproxen study?<br>171 :24 A. Yes. It was sent by Merck<br>172: Page 172<br>172: 1 by Dr. Silverman, I believe.<br>172: 2 Q. Okay.<br>172: 3 Can you turn to Page 3 of<br>172: 4 that cover letter that was sent to the<br>172: 5 Food & Drug Administration.<br>172: 6 A. (Witness complies.)<br>172: 7 Q. And the top part of it<br>172: 8 refers to "Thrombotic Cardiovascular<br>172: g Data," and has some discussion about the<br>172:10 VIGOR study. Do you see that, Doctor?<br>172:11 A. Yes.<br>172:12 Q. Okay.<br>172:13 If you'd go down to the<br>172:14 second full paragraph --<br>172:15 A. Yes.<br>172:16 Q. -- is there a reference to<br>172:17 your study?<br>172:18 A. Yes, there is.<br>172:19 Q. Okay.<br>172:20 ; Would you tell us where that | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 172:20 ; Would you tell us where that<br>172:21 is, Doctor?<br>172:22 A. Yes. That would be<br>172:23 beginning on line 4, the last word of the<br>172:24 line, "The." Okay.<br>173: Page 173<br>173: 1 Shall I read it?<br>173: 2 Q. Yes. Sure.<br>173: 3 A. "The concept that there are<br>173: 4 differences among NSAIDs is supported by<br>173: 5 external epidemiologic data from three<br>173: 6 separate studies that utilized different<br>173: 7 clinical databases, indicating that the<br>173: 8 use of naproxen, but not other NSAIDs, is<br>173: 9 cardioprotective." And then it Is<br>173:10 references 2, 3 and 4, and ours is<br>173:11 reference 4.<br>173:12 "Among these studies, is a<br>173: 13 U.S. study of over 22,000 patients in New<br>173:14 Jersey by a Boston academic group<br>173:15 unaffiliated with industry." And that's<br>173:16 us.<br>173:17 Q. Doctor, having read this<br>173:18 document, do you have any impression<br>173:19 about what was being conveyed to the FDA<br>173:20 about your study? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 173:22-174:21<br>173:22 THE WITNESS: Well, it's not<br>173:23 an impression. It's what they<br>173:24 say. What they say is that our<br>174: Page 174<br>174: 1 study shows that naproxen protects<br>174: 2 the heart. And in the context of<br>174: 3 what is on the rest of the page,<br>174: 4 it Is justification for the notion<br>174: 5 that Vioxx does not cause heart<br>174: 6 attacks, naproxen prevents them.<br>174: 7 BY MR. TISI:<br>174: 8 Q. Did they specifically single<br>174: 9 out your study as being, quote,<br>174:10 independent?<br>174:11 A. Yes.<br>174:12 Q. Doctor, were you aware at<br>174:13 the time that Merck was using your study<br>174:14 results that were presented to Dr. Guess<br>174:15 in August of 2001 to suggest that the<br>174:16 results of VIGOR were the result of the<br>174:17 cardioprotective effect of naproxen?<br>174:18 A. No, I was not aware of that<br>174:19 at the time.<br>174:20 Q. If you had been aware of<br>174:21 that, what would your reaction have been? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 174:24-176:2<br>174:24 THE WITNESS: Well, I can<br>175: Page 175<br>175: 1 tell you what my reaction is right<br>175: 2 now, which is I'm indignant that<br>175: 3 they took a finding of ours that<br>175: 4 was very clearly communicated,<br>175: 5 that is, the very modest effect of<br>175: 6 protection of the hearts that we<br>175: 7 found with naproxen, which we<br>175: 8 explicitly said was not enough to<br>175: 9 explain the increase in heart<br>175:10 attacks in the naproxenNioxx<br>175:11 comparison in VIGOR, that Dr.<br>175:12 Guess was in the room when we<br>175:13 presented that, and I now<br>175:14 understand, even wrote down, that<br>175:15 we hypothesized that what really<br>175:16 was probably going on was an<br>175:17 increased risk from the selective<br>175:18 COX-2, or Vioxx, as an explanation<br>175:19 of the VIGOR study.<br>175:20 I am ,Upset right now, and I<br>175:21 was the first time I saw this, to<br>175:22 : know that they were essentially<br>175:23 distorting our scientific findings<br>175:24 to justify exactly the opposite<br>176: Page 176<br>176: 1 position from what we have said<br>176: 2 both in writing and in public<;. | | |
| 176:12-176:18<br>176:12 Looking at that document, is<br>176:13 that a fair and accurate representation<br>176:14 of the science that you presented to Dr.<br>176:15 Guess at the ISPE meeting in August of<br>176:162001 ?<br>176:17 A. No, it's a distortion of<br>176:18 what was presented. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 177:1-178:1<br>177: 1 You mentioned the study that<br>177: 2 we talked about before, the published<br>177: 3 version of this study. Have you on other<br>177: 4 occasions said that the results of your<br>177: 5 study does not explain cardioprotective<br>177: 6 -- does not explain the results that were<br>177: 7 seen in VIGOR?<br>177: 8 A. Yes. There are a number of<br>177: 9 times in the course of early 2000 where I<br>177:10 stated that.<br>177:11 Q. Okay.<br>177:12 Would you go to another<br>177:13 article that I have in your book, Exhibit<br>177:14 Number 14?<br>177:15 A. Yes.<br>177:16 Q. Do you recognize that,<br>177:17 Doctor?<br>177:18 A. Yes. That is a paper ,that<br>177:19 was published in a journal called<br>177:20 "Pharmacoepidemiology and Drug Safety"<br>177:21 describing a panel that I was invited to<br>177:22 be on at another meeting of the<br>177:23 Pharmacoepidemiology Society that was<br>177:24 held in Edinborough in Scotland in August<br>178: Page 178<br>178: 1 of 2002, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 178:2-178:23<br>178: 2 Q. And among the co-authors is<br>178: 3 a gentleman by the name of Dr. Wayne Ray?<br>178: 4 A. Correct.<br>178: 5 Q. Who is Dr. Ray?<br>178: 6 A. Dr. Ray is a very respected<br>178: 7 pharmacoepidemiologist, probably one of<br>178: 8 the best in the field, who is a professor<br>178: 9 at Vanderbilt University.<br>178:10 Q. And David Graham, do you see<br>178:11 he's represented there as well?<br>178:12 A. Yes. Dr. Graham is a<br>178:13 physician and epidemiologist at the Food<br>178:14 & Drug Administration.<br>178:15 Q. Okay.<br>178:16 And Dr. Solomon is there as<br>178:17 well?<br>178:18 A. Right.<br>178:19 Q. Don't want to leave Dr.<br>178:20 MacDonald out. Who is Dr. MacDonald?<br>178:21 A. Tom MacDonald is a<br>178:22 pharmacoepidemiologlst who works in<br>178:23 Scotland. | | |
| 178:24-179:16<br>178:24 Q. And, of course, you are<br>179: Page 179<br>179: 1 listed there as well?<br>179: 2 A. Right.<br>179: 3 Q. Did you anywhere indicate,<br>179: 4 again, your feelings about the naproxen<br>179: 5 hypothesis as an explanation of VIGOR?<br>179: 6 A. Yes, I did.<br>179: 7 Q. Okay.<br>179: 8 Would you please go to the<br>179: 9 last page of the document, please?<br>179:10 A. Yes. The last full page?<br>179:11 Q. Actually the last full page.<br>179:12 A. Yes.<br>179:13 ~Q. Okay.<br>179:14 Would you tell the members<br>179:15 of the jury what you wrote in 2000, and I<br>179:16 guess this is 2003? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 180:2-181:6<br>180: 2 Right. In brief, the key<br>180: 3 sentence there is, "These studies," which<br>180: 4 reviews what was known at the time,<br>180: 5 "suggest that any potential protective<br>180: 6 effect of naproxen does not fully account<br>180: 7 for the findings in the VIGOR study."<br>180: 8 Q. And what were you trying to<br>180: 9 convey there in this article that was<br>180:10 published in 2002 -- 2003, excuse me.<br>180:11 A. Right. But based on<br>180:12 statements that we made in August of<br>180:13 2002, and this was pretty much a<br>180:14 transcript of what we had said at that<br>180:15 point. That we reviewed as a group the<br>180:16 existing data about evidence relating to<br>180:17 cardiac outcomes from nonsteroidal drugs.<br>180:18 And we discussed the dramatic increase in<br>180:19 rat~ of heart attack in VIGOR in people<br>180:20 taking naproxen -- in people taking Vioxx<br>180:21 compared to naproxen and the hypothesis<br>180:22 that had been offered by Merck that that<br>180:23 was because naproxen protects your heart.<br>180:24 And in that August of '02<br>181: Page 181<br>181: 1 symposium, all of us, I think, were in<br>181: 2 accord since we all signed off on this,<br>181: 3 "These studies suggest that any potential<br>181: 4 protective effect of naproxen does not<br>181: 5 fully account for the findings in the<br>181: 6 VIGOR study. | | |
| 181:23-181:24<br>181:23 Q. What were you trying to<br>181 :24 communicate there in this sentence? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 182:5-183:8<br>182: 5 THE WITNESS: Okay.<br>182: 6 What I said was, there are<br>182: 7 only -- and the context of the<br>182: 8 proceeding paragraph, there's only<br>182: 9 two ways that you can explain a<br>182:10 five-fold difference in heart<br>182: 11 attack between group A and group B<br>182:12 in a randomized trial. Either the<br>182:13 people in the group that has the<br>182:14 higher number of heart attacks<br>182:15 were given a drug that causes<br>182:16 heart attacks, or the people in<br>182:17 ; the group given the comparison<br>182:18 drug got a drug that prevents<br>182:19 heart attacks or perhaps some<br>182:20 combination of the two.<br>182:21 And what that sentence says<br>182:22 is that you can't explain the<br>182:23 five-fold increase in number of<br>182:24 heart attacks in VIGOR seen in<br>183: Page 183<br>183: 1 people given Vioxx by the data<br>183: 2 that were available at the time<br>183: 3 about naproxen preventing heart<br>183: 4 attacks because it just wasn't<br>183: 5 there.<br>183: 6 BY MR. TISI:<br>183: 7 Q. And did you draw any<br>183: 8 conclusions from that? | | |
| 183:15-184:2<br>183:15 A. The only logical-- this was<br>183:16 discussed widely from the podium, I<br>183:17 recall it vividly. The only logical<br>183:18 alternative is ·that if it is not because<br>183:19 naproxen is preventing heart attacks or<br>183:20 if only a teeny fraction of the<br>183:21 difference can possibly be expected, be<br>183:22 explained by that, then the only other<br>183:23 logical possibility is that Vioxx caused<br>183:24 heart attacks.<br>184: Page 184<br>184: 1 Q. Is that the same thing you<br>184: 2 told Dr. Guess in mid-2001? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 184:5-184:20<br>184: 5 THE WITNESS: In mid-2001, I<br>184: 6 told Dr. Guess that I thought that<br>184: 7 was an important question that<br>184: 8 needed to be addressed.<br>184: 9 BY MR. TISI:<br>184:10 O. All right. Moving forward.<br>184:11 Let's go back to your<br>184:12 negotiations with Merck to do your study.<br>184:13 Following the September fish<br>184:14 or cut bait e-mail with Dr. Cannuscio,<br>184:15 September 2001 fish or cut bait memo with<br>184:16 Dr. Cannuscio, did they execute a<br>184:17 contract? ,<br>184:18 A. Not for many, many months<br>184:19 until later did they finally actually<br>184:20 sign the contract | | |
| 189:7-189:15<br>189: 7;0. Okay.<br>189: 8 Doctor, did there come a<br>189: 9 time that the contract was actually<br>189:10 signed?<br>189:11 A. Yes. My recollection is<br>189:12 that it was in April of 2002, about 15<br>189:13 months after the initial conversation<br>189:14 that Dr. Solomon had with Dr. Cannuscio<br>189: 15 that the contract was eventually signed. | | |
| 190:24-191:9<br>190:24 Are you aware that at the<br>191: Page 191<br>191: 1 time that Merck executed the contract for<br>191: 2 your study on April 24th, 2002 that Merck<br>191: 3 had just received two weeks prior the<br>191: 4 approval for the new label that did not<br>191: 5 contain a cardiovascular warning?<br>191: 6 A. I was not aware of that.<br>191: 7 O. Doctor, are you familiar<br>191: 8 with the term "First, do no harm"?<br>191:9 A. Yes | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 193:7-194:20<br>193: 7 Q. Doctor, before we broke, I<br>193: 8 showed you a public affairs plan for the<br>193: 9 Label change for Vioxx dated March<br>193:10 23rd, 2001.<br>193:11 A. Right.<br>193:12 O. Have you seen that before?<br>193:13 I've shown you that in context of showing<br>193:14 you documents for litigation here.<br>193:15 A. That's right.<br>193:16 Q. Okay.<br>193:17 Would you please turn to the<br>193:18 page containing the Bates range 20167.<br>193:19 Do you see that?<br>193:20 A. Yes.<br>193:21 Q. See "Overall Communication<br>193:22 Objectives." Do you see that?<br>193:23 A. Yes.<br>193:24 Q. Do you see the first bullet<br>194: Page 194<br>194: 1 point?<br>194: 2 A. Yes.<br>194: 3 Q. Would you please tell the<br>194: 4 members of the jury what it says?<br>194: 5 A. It says "Do no harm,"<br>194: 6 Q. Can you read the rest?<br>194: 7 A. Yes.<br>194: 8 "Refrain from proactively<br>194: 9 generating coverage that jeopardizes<br>194:10 label negotiations and/or that links<br>194: 11 Vioxx to cardiovascular adverse events,"<br>194:12 Q. Doctor, were you concerned<br>194:13 in 2.001 and 2002 about the delay in<br>194:14 actually getting your study off the<br>194:15 ground?<br>194:16 A. Very concerned.<br>194: 17 Q. Do you have any explanation<br>194: 18 for Merck's inability to execute, a<br>194: 19 contract until after the label was<br>194:20 approved for Vioxx? | Speculation; No foundation; duplicative | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Page 194:17 to 194:20)<br>194<br>17    Q.   Do you have any explanation<br>18  for Merck's inability to execute a<br>19  contract until after the label was<br>20  approved for Vioxx? | Speculation; No foundation | *Overrule* |
| ja062906 - Vol. I, (Pages 194:24 to 195:13)<br>194<br>24  THE WITNESS:  At that time,<br>195<br>1    I had no understanding of the<br>2    label discussions that were going<br>3    on.  I just was concerned that<br>4    either this was a very big company<br>5    that couldn't get out of its own<br>6    way and make a decision in less<br>7    than a year on an important study,<br>8    or perhaps, and I vividly recall<br>9    raising this possibility with Dr.<br>10    Solomon, perhaps the foot dragging<br>11    was intentional because they<br>12    really didn't want the study to<br>13    get done. | Speculation; No foundation | |
| 195:24-196:3<br>195:24 First of all, was that what<br>196: Page 196<br>196: 1 was on your mind at the time, that there<br>196: 2 was a concern there was foot dragging on<br>196: 3 the part of the company? | | |
| 196:8-196:17<br>196: 8 THE WITNESS: We had<br>196: 9 conversations on almost a biweekly<br>196:10 basis about why is it taking so<br>196:11 long.<br>196:12 BY MR. TISI:<br>196:13 Q, Okay,<br>196:14 Now, Doctor, I assume that<br>196:15 once the contract was signed, you got<br>196:16 right to work on actually doing the<br>196:17 study; is that correct? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 196;19-200:4<br>196:19 THE WITNESS: We -- that was<br>196:20 our plan, but...<br>196:21 BY MR. TISI:<br>196:22 Q, What happened?<br>196:23 A. There was -- I learned a<br>196:24 lesson, which is that I had learned with<br>197: Page~ 97<br>197: 1 discussions with other pharmaceutical<br>197: 2 companies to never allow the funding to<br>197: 3 be contingent upon their acceptance of<br>197: 4 the work product because that, in effect,<br>197: 5 would give a company censorship over what<br>197: 6 we were able to publish, And we managed<br>197: 7 every step of the way except for one to<br>197: 8 not have as any of the benchmarks in the<br>197: 9 contract any words like "produce a<br>197:10 manuscript that Is acceptable to Merck"<br>197:11 or "produce data that are satisfactory to<br>197:12 Merck" because I learned not to do that.<br>197:13 The thing I hadn't learned<br>197:14 yet but learned from this was that as one<br>197:15 of the - as the only benchmark that was<br>197:16 there in the beginning was language, and<br>197:17 it's in the contract, and perhaps I<br>197:18 should actually refer to the contract,<br>197:19 the first milestone or benchmark was,<br>197:20 payment to our hospital to fund the<br>197:21 research "will be made upon acceptance of<br>197:22 a detailed protocol."<br>197:23 And it turns out that --<br>197:24 that's not a mistake I'll make again. It<br>198: Page ~ 98<br>198: 1 turns out that Merck's acceptance of the<br>198: 2 protocol even after more than a year of<br>198: 3 discussion about getting the contract<br>198: 4 signed, took another nine months before<br>198: 5 they actually accepted the protocol.<br>198: 6 MR. TISI: Doctor, I'm going<br>198: 7 to hand you a group of documents<br>198: 8 that I'm going to collectively<br>198: 9 refer to as Exhibits 23A through,<br>198:10 I think it's K.<br>198:16 BY MR. TISI:<br>198:17 Q. Doctor, is this -- what are<br>198:18 those, Doctor? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 199: 4 that. And this is what occupied the<br>199: 5 better part of 2002 before we could<br>199: 6 actually get their okay to start doing<br>199: 7 the work.<br>199: 8 Q. How long did it take<br>199: 9 Harvard and Merck to agree on the<br>199:10 protocol of the study?<br>199:11 A. Well, the first one in your<br>199:12 pile is dated June 7th, 2002, which was<br>199:13 relatively soon after the contract was<br>199:14 signed in the end of April. And then<br>199:15 there's another one dated September 4th,<br>199:162002, and then another revision dated199:<br>17 let's see, there's several revisions,<br>199:18 "Comments from Dan from 10-1," another<br>199:19 revision October 4th; October 22nd;<br>199:20 October 24th; another revision dated<br>199:21 October 31st, and then changed November<br>199:22 6th; another one from November 12th;<br>199:23 another one from December 17th; and<br>199:24 another one from February 2003.<br>200: Page 200<br>200: 1 And this was unprecedented<br>200: 2 in my many years of research, that there<br>200: 3 would be this long a period before a<br>200: 4 company signs off on a research protocol. | Non-responsive; duplicative | |
| ja062906 - Vol. I, (Page 200:1 to 200:4)<br>　　　　　　　　　　　　　200<br>　1　And this was unprecedented<br>　2　in my many years of research, that there<br>　3　would be this long a period before a<br>　4　company signs off on a research protocol. | Non-responsive | Sustained |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 203:9-206:22<br>203: 9 Q. Doctor, the protocols that I<br>203:10 laid in front of you, after those<br>203:11 protocols in early 2003, did you actually<br>203:12 get to start the study?<br>203:13 A. Well, no. Part of what<br>203:14 Merck asked us to do during this many,<br>203:15 many months of negotiation was they asked<br>203: 16 us to go back and review the individual<br>203: 17 patient records for a sample of the<br>203:18 subjects in our study to see if the<br>203:19 people that we were studying as having<br>203:20 heart attacks actually had heart attacks.<br>203:21 And we pointed out to Merck<br>203:22 that that was a question that had been<br>203:23 studied by other groups previously and<br>203:24 that there was pretty good evidence in<br>204: Page 204<br>204: 1 the medical literature that a combination<br>204: 2 of diagnosis codes and hospital codes<br>204: 3 virtually always meant that the person<br>204: 4 had had a heart attack. And Merck's<br>204: 5 response was, no, we really want to be<br>204: 6 sure, and so go out and validate, have<br>204: 7 people go down to Pennsylvania, get in<br>204: 8 contact with the hospitals, have them<br>204: 9 pull the patient's actual medical records<br>204:10 and check to see if they really had heart<br>204:11 attacks.<br>204:12 Q. Doctor, you've done •• how<br>204:13 many studies have you done with this<br>204:14 particular database that you're talking<br>204:15 about here?<br>204:16 A. Dozens.<br>204:17 Q. Have you ever had any<br>204:18 company ask you to do the kind of<br>204:19 validation that Merck asked you to do?<br>204:20 A. No. '<br>204:21 Q. Did you actually do what<br>204:22 Merck asked you to do?<br>204:23 A. We had to,<br>204:24 Q. What did you do? What<br>205: Page 205<br>205: 1 happened?<br>205: 2 A. We hired a professional<br>205: 3 review organization to go down to | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 205: 14 percent of the cases, they had heart<br>205:15 attacks, which is about as good as any<br>205:16 validation study gets.<br>205:17 Q. Doctor, who conducted the<br>205: 18 independent validation?<br>205:19 A. It was a company that was a<br>205:20 professional review organization. I<br>205:21 think they were called KeyPro, which is a<br>205:22 group sanctioned by the government to go<br>205:23 In and inspect hospital records.<br>205:24 Q. And did they find any<br>206: Page 206<br>206: 1 problem with what you did?<br>206: 2 A. No. They found that we had<br>206: 3 a remarkably high rate of validation.<br>206: 4 Q. Okay.<br>206: 5 And when you finally got the<br>206: 6 approval and the contract was signed and<br>206: 7 all of the protocols were done and the<br>206: 8 independent evaluation was done and all<br>206: 9 those things, did you finally get to do<br>206:10 your study?<br>206:11 A. No.<br>206:12 Q. What happened?<br>206:13 A. Merck told us that we could<br>206:14 not proceed until we had an independent<br>206:15 epidemiologist come in and review the<br>206: 16 protocol as an outsider and also review<br>206:17 all the programming code that our<br>206:18 programmers had written to do the<br>206:19 analyses.<br>206:20 : Q. And who was that? Who did<br>206:21 that?<br>206:22 A. That was Dr. Rhonda Bohn. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 210:7-211:2<br>210: 7 Q. Did she find any problems<br>210: 8 with your codes and the things she was<br>210: 9 asked to do?<br>210:10 A. No.<br>210:11 Q. Okay.<br>210:12 Now, Doctor, did there<br>210:13 finally come a time where you actually<br>210:14 had an opportunity to do the study?<br>210:15 A. Yes. By spring of 2003,<br>210:16 we -- there was finally no other concerns<br>210:17 that Merck had and we were given a green<br>210:18 light to proceed. ,<br>210:19 Q. And did you actually do the<br>210:20 data analysis at that time?<br>210:21 A. Yes.<br>210:22 Q. And what did you find?<br>210:23 A. We found that there was a<br>210:24 significant increase in the risk of heart<br>211: Page;!l1<br>211: 1 attack in patients taking Vioxx compared<br>211: 2 to comparator drugs | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 212:3-213:15<br>212: 3 Let me ask you these .<br>212: 4 questions.<br>212: 5 Did Merck have input into<br>212: 6 the design of the study?<br>212: 7 A. Yes, in that they would not<br>212: 8 let us proceed until they were perfectly<br>212: 9 satisfied with the protocol.<br>212: 10 Q. And did they indicate that<br>212:11 they were satisfied with the protocol in<br>212:12 the end of the day?<br>212:13 A. Yes. They signed off on the<br>212:14 protocol.<br>212:15 Q. Okay.<br>212:16 Did they have one of<br>212:17 their -<br>212:18 Did they have any employees<br>212:19 who they employed working on the study?<br>212:20 A. Yes. Dr. Cannuscio was a<br>212:21 key member of the project team, and she<br>212:22 was a Merck employee.<br>212:23 Q. All right.<br>212:24 Now, I put in front of you a<br>213: Page 213<br>213: 1 document entitled "The Relationship<br>213: 2 Between COX-2 Inhibitors and Acute<br>213: 3 Myo'cardiainfarctlon" dated May 5th,<br>213: 4 2003. Would you tell me what this is?<br>213: 5 A. Yes. This is just the<br>213: 6 tables, basically the data as we had it<br>213: 7 in May of 2003 from the study.<br>213: 8 Q. Okay.<br>213: 9 In an overview, what did it<br>213:10 tell the people at Merck about the<br>213:11 results of your study of the -- the<br>213:12 epidemiologic study?<br>213:13 A. That we found an Increased<br>213:14 rate of heart attacks in people taking<br>213:15 Vioxx compared to comparison drugs. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 214:21-216:9<br>214:21 Q. Okay.<br>214:22 Now, the results that you<br>214:23 saw here, from a public health<br>214:24 standpoint, did you consider them to be<br>215: Page 215<br>215: 1 Important findings?<br>215: 2 A. Yes.<br>215: 3 Q. Why?<br>215: 4 IA. Because in there -- let me<br>215: 5 just turn to the page with the data on it<br>215: 6 as it was eventually published. We found<br>215: 7 that in the final tables, there was a<br>215: 8 significant increase in the risk of heart<br>215: 9 attack that we found with Vioxx compared<br>215:10 to with Celebrex. We also found that it<br>215:11 was particularly high in people who were<br>215: 12 taking higher doses of Vioxx. And that<br>215:13 seemed like an important finding. The<br>215:14 data for the high-dose Vioxx versus<br>215: 15 high-dose Celebrex was a 70 percent<br>215:16 increase, or almost a doubling of the<br>215:17 risk of heart attack in our patient<br>215:18 population.<br>215:19 Q. Did you find an increased<br>215:20 risk with low dose?<br>215:21 A. Yes.<br>215:22 Q. Did you find an increased<br>215:23 risk at less than 30 days?<br>215:24 A. Yes.<br>216: Page 216<br>216: 1 Q. Did you find an increased<br>216: 2 risk at 30 to 90 days?<br>216: 3 A. Yes.<br>216: 4 Q. And was that increased risk<br>216: 5 seen whether you were comparing it to<br>216: 6 Celebrex or other NSAIDs?<br>216: 7 A. We found it with a wide<br>216: 8 variety of comparison drugs or<br>216: 9 nonexposures. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 217:1-217:15<br>217: 1 Q. Okay.<br>217: 2 Doctor, did there come a<br>217: 3 time where you sought to write·these<br>217: 4 results up in an abstract?<br>217: 5 A. Yes.<br>217: 6 Q. Did you speak to Dr.<br>217: 7 Cannuscio about doing that?<br>217: 8 A. Yes. The terms of our<br>217: 9 contract were that we would allow them to<br>217:10 see what we were publishing, although<br>217:11 they did not have the right to censure it<br>217:12 or to hold it back, but as a courtesy, we<br>217:13 agreed to let them see what we were going<br>217:14 to submit and give them a period of time<br>217:15 to comment. | | |
| 218:1-218:6<br>218: 1 Q. Okay.<br>218: 2 Doctor, did there come a<br>218: 3 time where there was discussion about<br>218: 4 whether or not Dr. Cannuscio would<br>218: 5 actually be on the paper?<br>218: 6 A. Yes. | | |
| 219:19-219:21<br>219:19 Q. Doctor, did you--<br>219:20 I've handed you what I've<br>219:21 had marked as Exhibit 27. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 220:14-223:14<br>220:14 Q. Does this include the<br>220:15 abstract that was written by your<br>220:16 division?<br>220: 17 A. Correct.<br>220: 18 Q. And there's an e-mail there<br>220:19 as well, correct<br>220:20 A. Right.<br>220:21 Q. What does the e-mail say<br>220:22 about the tables? It says. "These tables<br>220:23 all suggest that the higher adjusted odds<br>220:24 ratios seen in shorter duration use is<br>221: Page 221<br>221: 1 not confined to high.... risk users."<br>221 : 2 What does that --<br>221: 3 A. "High dosage users." '<br>221: 4 Q. "High dosage users."<br>221: 5 What does that mean?<br>221: 6 A. That's a note from Dr.<br>221: 7 Solomon to Dr. Cannuscio pointing out<br>221: 8 something about our findings, which is<br>221: 9 that ,this was not just about people<br>221:10 taking high-dose Vioxx, this was about<br>221 :11 people taking regular dose Vioxx as well.<br>221 :12 Q. Okay.<br>221: 13 And was there further<br>221: 14 discussion about the co-authorship of the<br>221:15 paper?<br>221 :16 A. Yes.<br>221 :17 Q. Okay.<br>221 :18 Would you please read that?<br>221: 19 A. Yes. In Paragraph 2, Dr.<br>221 :20 Solomon writes, "I would like to discuss<br>221 :21 your co-authorship on the paper. You<br>221 :22 have contributed substantially to the<br>221 :23 project and I am very comfortable with<br>221 :24 you being a co-author, assuming that you<br>222: Page 222<br>222: 1 are comfortable with its content. In<br>222: 2 light of our findings, there may be<br>222: 3 aspects of the paper that will be<br>222: 4 problematic from Merck's perspective.<br>222: 5 You may be in a difficult position as a<br>222: 6 Merck employee and a co-author."<br>222: 7 Q. Stop right there, Doctor.<br>222: 8 What did you and Dr. -- | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 222:19 that be problematic for her to have her<br>222:20 name on the paper.<br>222:21 Q. Old you actually present<br>222:22 this paper --<br>222:23 Did you actually present<br>222:24 this at a professional meeting?<br>223: Page 223<br>223: 1 A. Dr. Solomon presented it in<br>223: 2 the fall of *2003* at the American College<br>223: 3 of Rheumatology.<br>223:11 BY MR. TISI:<br>223:12 Q. I'm handing you what's<br>223:13 marked as Exhibit Number 23.<br>223:14 :A Yes | | |
| 226:22-227:15<br>226:22 Q. Doctor, is this the abstract<br>226:23 that was presented in -- at the.<br>226:24 association --<br>227: Page 227<br>227: 1 A. The American.<br>227: 2 Q. -- the American College of<br>227: 3 Rheumatology in 2003?<br>227: 4 A. Correct.<br>227: 5 Q. Okay.<br>227: 6 And is this the results of<br>227: 7 your study, your Merck-funded study?<br>227: 8 A. Correct.<br>227: 9 Q. Okay.<br>227:10 And does it *have* Carolyn<br>227:11 Cannuscio's name on the top?'<br>227:12 A Yes, it does.<br>227:13 Q. Does it *have* your name on<br>227: 14 the top?<br>227:15 A Yes, it does. | | |
| 228:2-228:9<br>228: 2 Q. Okay.<br>228: 3 Doctor, did there come a<br>228: 4 time when you sought to convert this<br>228: 5 abstract into an actual published<br>228: 6 article?<br>228: 7 A. Yes.<br>228: 8 Q. And did you do that?<br>228: 9 A. Yes | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 228:20-229:21<br>228:20 Did you submit that<br>228:21 manuscript to Merck for its comment?<br>228:22 A Yes, we did.<br>228:23 Q. Okay.<br>228:24 Did they *have* an opportunity<br>229: Page 229<br>229: 1 to make comments?<br>229: 2 A. Yes.<br>229: 3 Q. Did you accept some<br>229: 4 comments?<br>229: 5 A. We accepted some and we<br>229: 6 didn't accept others.<br>229: 7 Q. Okay.<br>229: 8 Would you describe for us<br>229: 9 the comments that Merck did not accept?<br>229:10 A. You mean that we did not<br>229:11 accept?<br>229:12 Q. You did not accept that<br>229:13 Me~ck --<br>229:14 A. Right, sure.<br>229:15 There were some helpful<br>229:16 comments that Merck made about making<br>229:17 things clearer. We accepted those. And<br>229:18 then there were others which we felt<br>229:19 would have deemphasized the importance or<br>229:20 the extent of our findings, and we tended<br>229:21 to not accept those. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 230:17-232:14<br>230: 17 Q. Would you please tell us<br>230:18 what was rejected by you that Merck had<br>230: 19 suggested?<br>230:20 A. Sure. As best I can recall,<br>230:21 there were, for example, in the abstract<br>230:22 of the paper, as it was eventually<br>230:23 presented, there was one finding that<br>230:24 demonstrated an increased risk of Vioxx,<br>231: Page 231<br>231: 1 and the statistical significance of that<br>231: 2 was a p-value of .054. Now, let me<br>231: 3 explain what that means.<br>231: 4 A p-value of .05 or 5<br>231: 5 percent means that there's a 95 percent<br>231: 6 certainty that the finding you are<br>231: 7 reporting was not the result of chance.<br>231 : 8 And that is a benchmark that is often<br>231: 9 used, it's not engraved in stone, but it<br>231:10 is a convenient benchmark that people<br>231 :11 often use to understand how likely it is<br>231 :12 that this was not just the result of<br>231 :13 happenstance.<br>231 :14 And one of our findings had<br>231:15 a p-value of 0.54, which means that<br>231 :16 instead of a 95 percent certainty or<br>231 :17 likelihood that this was not the result<br>231 :18 of chance, there was instead of 95<br>231 :19 percent, 94.6 percent likelihood that<br>231 :20 this was not the result of chance. We<br>231 :21 felt that given particularly the public<br>231 :22 health importance of heart attack and the<br>231 :23 widespread use of this drug that that<br>231 :24 needed to be in the abstract.<br>232: Page 232<br>232: 1 Merck objected that this<br>232: 2 was, quote, not a significant finding<br>232: 3 because it was a 94.6 percent probability<br>232: 4 that it was not chance instead of a 95<br>232: 5 percent and said we should take it out of<br>232: 6 the abstract.<br>232: 7 They also told us that we<br>232: 8 should change the way we described that<br>232: 9 finding as a numerical difference that<br>232:10 wa~ not significant or something to that<br>232:11 effect. And we disagreed on both points. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 232:15-233:1<br>232:15 Q. And did there come a time<br>232:16 where you had to make a decision about<br>232:17 what remained in the paper and what did<br>232: 18 not remain in the paper?<br>232:19 A. Yes. Dr. Solomon and I<br>232:20 discussed this on an almost daily basis<br>232:21 at that point.<br>232:22 Q. Okay.<br>232:23 And did you actually submit<br>232:24 the paper as you wished it to be?<br>233: Page 233<br>233: 1 A. Yes. | | |
| 233:2-233:9<br>233: 2 Q. And ,was it accepted for<br>233: 3 publication?<br>233: 4 A. Yes. It was initially sent<br>233: 5 to the New England Journal and JAMA, and<br>233: 6 they passed on it, and it was eventually<br>233: 7 accepted in Cardiology -- I'm sorry, in<br>233: 8 Circulation, which is the number one<br>233: 9 cardiology journal in the world.. | | |
| ja062906 - Vol. I, (Page 233:10 to 233:21)<br>          233<br>10    Q.   And did anything unusual<br>11  happen at about the time of the<br>12  publication of the article that we've<br>13  been talking about?<br>14    A.   Yes.  As the article was in<br>15  galley on page proof, which is the<br>16  printed version of the article that is<br>17  sent back to the authors to make sure<br>18  there's no typos, we received a phone<br>19  call from Dr. Santanello instructing us<br>20  to remove Dr. Cannuscio's name from the<br>21  paper. | Court struck in Smith | *[signature]* |
| ja062906 - Vol. I, (Page 241:2 to 241:6)<br>          241<br>2  Did her name come off the<br>3  paper?<br>4    A.   Her name came off the paper,<br>5  and I reluctantly agreed to let that<br>6  happen. | Court struck in Smith | *[signature]* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 243:12-244:19<br>243:12 Q. Did you acknowledge Dr.<br>243:13 Cannusclo in any other way in that paper?<br>243:14 A. Yes. I wrote an<br>243:15 acknowledgment that I asked Dr. Solomon<br>243:16 to include in the paper.<br>243:17 Q. And you did that?<br>243:18 A. Yes. That was my -- those<br>243:19 are my words.<br>243:20 Because I felt that leaving<br>243:21 aside the ethics of it, here was a young<br>243:22 woman starting out her career who was<br>243:23 about to have a paper in the best<br>243:24 cardiology journal in the world and that<br>244: Page 244<br>244: 1 she deserved to be a co-author of. And I<br>244: 2 was concerned, almost in my faculty role,<br>244: 3 that here somebody's hard work was being<br>244: 4 snatched away from her. '<br>244: 5 So, I wrote that language<br>244: 6 that indicated there was an unnamed<br>244: 7 epidemiologist who had worked with us, as<br>244: 8 it says, "Actively in the study design,<br>244: 9 statistical analysis, and interpretation<br>244:10 of the date and preparation of the<br>244:11 manuscript," which are, in fact, the<br>244:12 criteria for authorship. And while we<br>244:13 are forbidden from using Dr. Cannuscio's<br>244:14 name, I wanted her to be able to refer to<br>244:15 that as she went on in her career and say<br>244:16 that was really me. And so we did put<br>244:17 the acknowledgment that I wrote at the<br>244:18 end of the paper, but still respected her<br>244:19 wishes to be not listed as a co-author. | Court struck in Smith;duplicative | *strike* |
| ja062906 - Vol. I, (Page 244:12 to 244:14)<br>          244<br>12   And while we<br>13   are forbidden from using Dr. Cannuscio's<br>14   name, | Court struck in Smith | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 245:4-246:33<br>245: 4 Q. Now, Doctor, this article<br>245: 5 was then published in Circulation?<br>245: 6 A. That's right.<br>245: 7 MR. TISI: Okay.<br>245: 8 And I'm going to show you<br>245: 9 what I would like to have marked<br>245:10 as Exhibit 30.<br>245:11 (Whereupon, Deposition<br>Exhibit Avorn-30, Bulletin<br>4-21-04 MRK-AAR0069284, was<br>marked for identification.)<br>Final Avorn Direct<br>245:16<br>245:17 BY MR. TISI:<br>245:18 Q. And you testified before,<br>245:19 and I just want to refer you to that<br>245:20 testimony, that you felt this was an<br>245:21 important public health issue that your<br>245:22 study was addressing?<br>245:23 A. I've said that, and I felt<br>245:24 that, and I feel that.<br>246: Page 246<br>246: 1 Q. Okay.<br>246: 2 Now, let me show you what I<br>246: 3 have had marked as Exhibit Number 29 --<br>246: 4 THE COURT REPORTER: 30.<br>246: 5 BY MR. TISI:<br>246: 6 Q. 30. I will represent to you<br>246: 7 that it is a bulletin being used for<br>246: 8 retailers detailing Vioxx.<br>246: 9 A. You mean the sales<br>246: 10 representatives?<br>246:11 Q. The sales representatives.<br>246:12 A. For Merck?<br>246:13 Q. Yes.<br>246:14 And it's dated April 21 st,<br>246:152004.<br>246:16 A. Correct.<br>246: 17 Q. Do you see that, Doctor?<br>246: 18 And does it refer to your<br>246:19 particular study?<br>246:20 A. Yes.<br>246:21 Q. And it's called an "Obstacle<br>246:22 Response." po you see that?<br>246:23 A. Right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 246:24 : Q. Did you consider your paper<br><br>247: 1 an obstacle?<br>247: 2 A. No.<br>247: 3 Q. You're smiling. Why do you<br>247: 4 smile? | | |
| ja062906 - Vol. I, (Page 247:7 to 247:15)<br>                   247<br>7  THE WITNESS:  Because it was<br>8     an important finding about the<br>9     risks of a very, very widely-used<br>10    drug in relation to a very common<br>11    and important and dangerous side<br>12    effect that was only an obstacle,<br>13    I suppose, from the perspective of<br>14    Vioxx sales, but it was not an<br>15    obstacle in terms of science. | Speculation | |
| 247:20-248:7<br>247:20 Q. When it says "Action<br>247:21 required," it says, "Do not initiate<br>247:22 discussions on this article with<br>247:23 physicians." Do you see that?,<br>247:24 A. I see that.<br>248: Page 248<br>248: 1 Q. Doctor, as somebody who has<br>248: 2 been involved in academic detailing,<br>248: 3 which we spoke about before, can you<br>248: 4 think of any medical or scientific reason<br>248: 5 why a responsible drug company would not<br>248: 6 want to have all of the evidence<br>248: 7 discussed with physicians? | Question with no answer;duplicative | |
| ja062906 - Vol. I, (Page 248:1 to 248:7)<br>                   248<br>1   Q.   Doctor, as somebody who has<br>2  been involved in academic detailing,<br>3  which we spoke about before, can you<br>4  think of any medical or scientific reason<br>5  why a responsible drug company would not<br>6  want to have all of the evidence<br>7  discussed with physicians? | Question with no answer | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 248:13-248:18<br>248:13 Q. I'm not asking you to<br>248:14 speculate, Doctor. I'm asking you as<br>248:15 somebody who has done research in this<br>248:16 area, is there any medical or scientific<br>248:17 reason why this article and this research<br>248:18 should not be shared with doctors? | | |
| 248:20-249:10<br>248:20 THE WITNESS: No.<br>248:21 BY MR. TISI:<br>248:22 Q. Why not?<br>248:23 A. As someone who has' spent his<br>248:24 life studying how doctors make<br>249: Page 249<br>249: 1 prescribing decisions and written papers<br>249: 2 about and conducted programs in the fair<br>249: 3 and evidenced-based presentations of both<br>249: 4 benefit and risk data to physicians so<br>249: 5 that they can be helped to make more<br>249: 6 appropriate decisions to benefit their<br>249: 7 patients, I can think of no reason that<br>249: 8 anybody would -- no legitimate reason why<br>249: 9 it would be ever appropriate to suppress<br>249: 10 negative findings about a drug' risk. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 249:14-256:21<br>249: 14 Q. Is there anything in this<br>249:15 obstacle response that indicates that<br>249:16 Merck funded this study, approved the<br>249:17 protocol, approved the statistical<br>249:18 analysis and worked on the manuscript?<br>249:19 A. No.<br>249:20 Q. Doctor, I'd like for you to<br>249:21 turn, and I'm going to switch topics for<br>249:22 a moment. Let's go to Avorn Exhibit<br>249:23 Number 9, which is in the binder there<br>249:24 And it's an article entitled "Adjustment<br>250: Page 250<br>250: 1 for Unmeasured Confounders."<br>250: 2 A. Yes.<br>250: 3 Q. Do you remember that study?<br>250: 4 A. Yes.<br>250: 5 Q. Was that Merck funded?<br>250: 6 A. Yes.<br>250: 7 Q. And what was the purpose of<br>250: 8 that study?<br>250: 9 A. We wanted to be certain in<br>250:10-- :<br>250: 11 When we found that there was<br>250:12 a higher risk of heart attack in patients<br>250:13 taking *Vioxx*, as I said before, we wanted<br>250:14 to make sure that to be fair to the drug,<br>250:15 that was not because people ~ho happened<br>250:16 to be on *Vioxx* were sicker or had -- or<br>250:17 were more likely to be smokers, which we<br>250:18 know causes heart attack, or might have<br>250:19 been more overweight or perhaps were less<br>250:20 likely to be taking aspirin.<br>250:21 And these are all potential<br>250:22 risk factors for heart attack, but we did<br>250:23 not have information about them in our<br>250:24 data about their drug prescriptions and<br>251: Page 251<br>251: 1 their medical history. And we wanted to<br>251: 2 have some independent assessment of maybe<br>251: 3 people who were taking *Vioxx* were sicker<br>251: 4 than people taking Celebrex. And if that<br>251: 5 was the case, it would cast our findings<br>251: 6 into doubt and we wanted to get it right.<br>251: 7 Q. And when you did the study,<br>251: 8 what did you find? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 251 :20 A. Yes.<br>251 :21 Q. Do you see that?<br>251 :22 A. Yes.<br>251 :23 Q. Okay.<br>251 :24 "Are patient or physician<br>252: Page 252<br>252: 1 characteristics more important?"<br>252: 2 A. Right.<br>252: 3 Q. Do you see that?<br>252: 4 A. Yes.<br>252: 5<br>252:6<br>252: 7 wrote?<br>252: 8 A. Yes. With my team. ,<br>252: 9 Q. And it was published in<br>252:10 2003?<br>252:11 A. Yes.<br>252:12 Q. Okay.<br>252:13 What, if anything, briefly,<br>252:14 did you conclude?<br>252:15 ;A. Well, we were at that point<br>252:16 trying to understand how it could be that<br>252: 17 the use of COX-2 drugs, both Vioxx and<br>252: 18 Celebrex, were going through the roof<br>252: 19 despite the fact that they had never been<br>252:20 shown to be better pain relievers or<br>252:21 anti-inflammatory drugs and with the<br>252:22 evidence that was already out there about<br>252:23 their risks. The benefit that they had<br>252:24 in relation to less stomach symptoms did<br>253: Page 253<br>253: 1 not seem to us to be enough reason to<br>253: 2 explain that astronomical rise.<br>253: 3 So, we looked in our<br>253: 4 database at the patterns of use, and we<br>253: 5 thought, well, maybe there are more<br>253: 6 people out there who are getting this<br>253: 7 drug because they have a history of ulcer<br>253: 8 or a bleeding problem or are on<br>253: 9 anticoagulants, all of which would be<br>253:10 reasons to use them.<br>253:11 Q. And what did you find?<br>253:12 A. We found that that really<br>253:13 didn't predict.who was getting these<br>253:14 drugs.<br>253:15: Q. In the conclusion, if you go | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 254:11 that was gentler on the stomach, but not 254:12 in other people who didn't need that 254:13 extra degree of stomach protection. 254:14 Q. Could you turn to Pa!;le 254:15718 --719, excuse me. 254:16 A. Yes. 254:17 Q. It says, "Other factors" in 254: 18 the middle of the page. "Other factors 254: 19 may also be important correlates to 254:20 prescribing, Such as patients education 254:21 level and ...social" work, as well as -- 254:22 ' A. Social network. 254:23 Q. -- "social network," and 254:24 "patient...exposure to advertising." 255: Page 255 255: 1 Do you see that? 255: 2 A. Patient and physician' 255: 3 exposure to advertising. 255: 4 Q. Yeah. And what did you mean 255: 5 by that? 255: 6 A. That since we couldn't 255: 7 explain the very, very widespread use of 255: 8 these drugs based on their being 255: 9 prescribed to patients in whom it would 255:10 be worth the tradeoff of higher heart 255:11 attack risk in exchange for perhaps more 255:12 ulcer protection, that there must be 255:13 something else going on. And one of the 255:14 factors that was an obvious potential 255:15 cause was the extensive advertising to 255:16 patients and to doctors. 255:17 Q. Have you written about the 255:18 effect of direct-to-consumer advertising 255:19 in commercial detailing on prescribing 255:20 practices? 255:21 .: A. Yes, I have. 255:22 Q. What, if any, effect does 255:23 direct-to-consumer advertising have on 255:24 physician prescribing behavior? 256: Page 256 256: 1 A. As I've written, and as many 256: 2 people have found, it drives physician 256: 3 prescribing, which is why it gets done so 256: 4 much. And that patients will often tell 256: 5 a doctor, I saw this ad or I heard this 256: 6 commercial, do you think I ought to be on | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 256:20 medical certainty today? .<br>256:21 A. Absolutely. | | |
| 268:11-268:21<br>268:11 Q. Do you feel it important to<br>268: 12 the issues that we asked you to address<br>268:13 to review the deposition testimony or the<br>268: 14 trial testimony of every Merck witness<br>268:15 who has testified in this litigation?<br>268:16 A. That would not even be<br>268: 17 possible even if I wanted to. But my<br>268: 18 concern has been on what was done and<br>268:19 said and acted upon at the time, not a<br>268:20 reconstruction of that years later in the<br>268:21 midst of litigation. | | |
| 274:13-275:5<br>274:13 Q. Now, let me ask you some of<br>274:14 your opinions generally, and we can<br>274:15 hopefully move through these fairly<br>274:16 quickly.<br>274:17 Doctor, we addressed this<br>274:18 previously about what your opinions were<br>274:19 at the time that you were studying Vioxx.<br>274:20 Let's move forward in time.<br>274:21 As of today, do you have an<br>274:22 opinion to a reasonable degree of medical<br>274:23 certainty as to whether or not Vioxx was<br>274:24 any more effective as a pain reliever<br>275: Page 275<br>275: 1 than other nonsteroidal<br>275: 2 anti-inflammatories, whether it be<br>275: 3 aspirin, Motrin, naproxen, all the others<br>275: 4 we've talked about?<br>275: 5 A. Yes, I have such an opinion. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 275:23-277:17<br>275:23 Q. What is your opinion?<br>275:24 A. My opinion, I think it's<br>276: Page 276<br>276: 1 pretty universal, is that there's really<br>276: 2 no evidence that Vioxx was or is any more<br>276: 3 effective as an analgesic or a pain<br>276: 4 reliever than any of the older<br>276: 5 nonsteroidals that are on the market.<br>276: 6 Q. Do you know whether or not<br>276: 7 Merck ever claimed that Vioxx was better<br>276: 8 at pain relief than any other drug that<br>276: 9 was on the market?<br>276:lOA. it did not.<br>276:11 Q. Is that important in<br>276:12 applying the risk/benefit analysis that<br>276:13 we talked about before?<br>276:14 A. Yes. Because if there were<br>276:15 a drug that was -- when Vioxx first came<br>276:16 out, there were a lot of articles in the<br>276:17 newspapers calling it the super aspirin<br>276:18 and kind of implying that it worked much<br>276:19 better than aspirin or Motrin. If that<br>276:20 were true, then maybe for somebody with<br>276:21 really bad arthritis, you might even be<br>276:22 willing to consider a slight increase in<br>276:23 some other risks if this was really the<br>276:24 most fantastic pain reliever ever. But<br>277: Page 277<br>277: 1 it's about as good as all the others we<br>277: 2 have.<br>277: 3 Q. Let me go on.<br>277: 4 Do you know whether or<br>277: 5 not·- do you have an opinion as to<br>277: 6 whether or not Vioxx had any effect on<br>277: 7 the GI system?<br>277: 8 A. Yes.<br>277: 9 Q. And what is that opinion?<br>277:10 A. Well, like all drugs in the<br>277:11 nonsteroidal class, it's more irritating<br>277:12 than not taking anything. But i1 also,<br>277:13 in the VIGOR study, was found to actually<br>277:14 be less irritating to the stomach and<br>277:15 less producing of important gastric<br>277:16 problems than other drugs like naproxen<br>277:17 in particular | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 277:20-280:8<br>277:20 In assessing the benefits<br>277:21 and the risks of Vioxx, have you<br>277:22 considered the fact that at least<br>277:23 compared to naproxen it had a better GI<br>277:24 benefit? .<br>278: Page 278<br>278: 1 A. Yes. That was actually the<br>278: 2 substance of the discussions that I had<br>278: 3 with my colleagues around the time that<br>278: 4 the VIGOR data was coming out, that,<br>278: 5 well, if it is worse for your heart but<br>278: 6 better for your stomach, is that a<br>278: 7 tradeoff that was worth making? Because<br>278: 8 often in either practice or research or<br>278: 9 teaching medical students or residents, I<br>278:10 have to confront the issue of this drug<br>278:11 is worse in this respect but better in<br>278:12 this respect, and how do you balance<br>278:13 those two.<br>278:14 There's a couple of sections<br>278:15 in my book about that, because a lot of<br>278:16 drugs will have some pluses and some<br>278:17 minuses, and you have to be able to<br>278:18 measure them and then weigh them,<br>278:19 Q, Do you know whether or not<br>278:20 Merck, in connection with Vioxx, as time<br>278:21 went on, suggested that patients who are<br>278:22 at risk for heart problems should take<br>278:23 aspirin?<br>278:24 A. Yes.<br>279: Page 279<br>279: 1 Q, That Vioxx was no substitute<br>279: 2 for aspirin?<br>279: 3 A, Correct. They stated that.<br>279: 4 Q. In patients in which aspirin<br>279: 5 and Vioxx were taken, how did-that affect<br>279: 6 the GI benefit? Do you have an opinion<br>279: 7 as to that?<br>279: 8 A. I have an opinion.<br>279: 9 Q. And what is that opinion?<br>279: 10 A. Well, based on Merck's own<br>279:11 study, they did a study which I think was<br>279:12 called the aspirin endoscopy study in<br>279:13 which they actually looked at whether or<br>279:14 not the gentler on your stomach advantage | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 279:15 of Vioxx would still be there in patients<br>279:16 who needed to take a baby aspirin a day<br>279:17 to protect their heart. ,<br>279:18 Because after the VIGOR<br>279:19 study came out, Merck themselves were<br>279:20 saying, if you need to be on aspirin<br>279:21 while you're taking Vioxx, you should<br>279:22 take aspirin to protect your heart.<br>279:23 And in the study which they<br>279:24 conducted of patients who were given beth<br><br>280: Page 280<br>280: 1 aspirin and Vioxx, what they found was<br>280: 2 that the protective effect on the stomach<br>280: 3 of Vioxx was actually lost if a patient<br>280: 4 was taking aspirin in addition, That is,<br>280: 5 you couldn't demonstrate the '<br>280: 6 gastroprotective effect of Vioxx if a<br>280: 7 patient was taking a baby aspirin<br>280: 8 alongside it. | | |
| 280:11-281:2<br>280: 11 Do you have an opinion that<br>280:12 you hold to a reasonable degree of<br>280:13 medical and scientific certainty as to<br>280:14 whether or not Vioxx is capable of<br>280:15 causing heart attacks in human beings?<br>280:16 A. I have an opinion. '<br>280:17 Q. And what is that opinion?<br>280:18 A. That Vioxx does cause heart<br>280:19 disease, specifically heart attacks in<br>280:20 human beings.<br>280:21 Q. Would you briefly give us<br>280:22 the basis of that opinion?<br>280:23 A. Yes. I think that there's a<br>280:24 number of different reasons for coming to<br>281: Page 281<br>281: 1 that opinion, all of which, in my view,<br>281: 2 point in the same direction. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 284:11-286:12<br>284:11 What are the bases of your<br>284:12 opinion as an epidemiologist that Vioxx<br>284:13 is capable of causing heart attacks in<br>284: 14 human beings? .<br>284:15 A. The clinical trial evidence<br>284:16 I think is the number one strongest<br>284:17 indication for·· or evidence for this,<br>284: 18 that randomized controlled clinical<br>284:19 trials double blind in which patients who<br>284:20 were given Vioxx compared to other drugs,<br>284:21 the consistency of the evidence that<br>284:22 Vioxx causes a higher number of heart<br>284:23 attacks or other cardiovascular adverse<br>284:24 events from a number of studies which we<br>285: Page 285<br>285: 1 could go through, that is one key<br>285: 2 foundation of this association. :and that<br>285: 3 was found in VIGOR, in 090, in ADVANTAGE,<br>285: 4 in a number of studies, most of which<br>285: 5 actually were conducted by Merck which<br>285: 6 showed ••<br>285: 7 Q. approve?<br>285: 8 A.·· a higher •• I'm sorry?<br>285: 9 :C. APPROVE, does APPROVE fit in<br>285:10 there?<br>285:11 A. APPROVE, I'm sorry, that was<br>285:12 the one that got it off the market.<br>285: 13 All of those are studies<br>285:14 which showed a higher rate of· heart<br>285:15 attacks and other cardiovascular outcomes<br>285:16 in patients given Vioxx. That is one<br>285:17 line of evidence.<br>285:18 The other line of evidence,<br>285:19 which is totally separate, but also<br>285:20 points in the same direction, is studies<br>285:21 of the kind that we have done where you<br>285:22 look at people taking Vioxx compared to<br>285:23 people taking Celebrex compared to other<br>285:24 medications, and, again, finding that the<br>286: Page 286<br>286: 1 people taking Vioxx out there in the<br>286: 2 normal world, not in the clinical trial,<br>286: 3 are having more heart attacks than people<br>286: 4 not taking it.<br>286: 5 And then in a way, the icing | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 286: 6 on the cake is if there is some reason<br>286: 7 for being able to say we think we may<br>286: 8 know why this happens, that is 'additional<br>286: 9 helpful information.<br>286:10 Q. And did you have all three<br>286:11 of those in connection with _. to support<br>286:12 Vioxx? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 287:3-288:14<br>287: 3 A. Yes. I think all three<br>287: 4 lines of argument were present and<br>287: 5 reasonably clear in the case of Vioxx.<br>287: 6 Q. All right. Moving forward,<br>287: 7 Doctor. ,<br>287: 8 Do you have an opinion as to<br>287: 9 whether or not it is generally accepted<br>287:10 in the medical and scientific community<br>287:11 today that Vioxx is capable of causing<br>287: 12 heart attacks in human beings?<br>287:13 A. Yes. That was the unanimous<br>287:14 view of the FDA Advisory Committee that<br>287:15 met in 2005.<br>287: 16 Q. When you say "the unanimous<br>287:17 view," what do you mean?<br>287:18 A. I think there were 32 people<br>287:19 voting, and I believe that 32 in answer<br>287:20 to the question, does Vioxx cause<br>287:21 cardiovascular disease in humans, I think<br>287:22 32 out of the 32 said yes, and I don't<br>287:23 think anyone said no.<br>287:24 Q. Okay.<br>288: Page 288<br>288: 1 , Dr. Avorn, do you have an<br>288: 2 opinion that you hold to a reasonable<br>288: 3 degree of medical certainty as to whether<br>288: 4 or not a person has to be taking Vioxx<br>288: 5 for any particular period of time before<br>288: 6 they are actually at risk for a<br>288: 7 Vioxx-induced heart attack?<br>288: 8 A. Well, in our study, we found<br>288: 9 an increase in risk in 1 to 30 days, as<br>288:10 well as 30 to 90 days. 50·- and we've<br>288:11 recently just in the last week or two<br>288: 12 seen that the contention _.<br>288:13 Q. Let me ask you a question.<br>288:14 A. Okay. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
| --- | --- | --- |
| 290:5-290:11<br>290: 5 Has there been any evidence<br>290: 6 that has come out in the past two days<br>290: 7 that support your opinion that there is<br>290: 8 not a period of time in which It is<br>290: 9 necessary for a person to be on Vioxx<br>290:10 before they develop a Vioxx-Induced heart<br>290:11 attack | | |
| 290:15-291 :21<br>290:15 A. Well, let's call it the last<br>290:16 week, because it was put up on the<br>290:17 website of the New England Journal of<br>290:18 Medicine in the last several days, and I<br>290:19 don't remember if it was two or three.<br>290:20 Q. Go ahead.<br>290:21 A. But it has just become known<br>290:22 to the world at large that the analysis<br>290:23 which was performed on the delta from the<br>290:24 APPROVE study, which was the study that<br>291: Page 291<br>291: 1 was released in September of '04, which<br>291: 2 was the occasion for withdrawing the drug<br>291: 3 from the market, that the analysis which<br>291: 4 was initially done and reported in the<br>291: 5 New England Journal, to their<br>291: 6 embarrassment, was incorrect, and that it<br>291: 7 was -- it looked at this issue of before<br>291: 8 18 months versus after 18 months in a way<br>291: 9 that was erroneous in a statistical<br>291:10 sense. And that if one looks at it in<br>291 :11 the correct way, that there is not this<br>291 :12 phenomenon of no effect before 18 months<br>291 :13 and then the effect starts.<br>291 :14 Q. And--<br>291 :15 A. And if I could just complete<br>291 :16 that thought. .<br>291:17 • The New England Journal<br>291 :18 required the authors of that paper to<br>291: 19 publish a correction to their original<br>291 :20 report, which is the new element that has<br>291 :21 come out in just the last few days. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 292:2-293:8<br>292: 2 Q. Doctor, are there any other<br>292: 3 clinical trials that you are aware of in<br>292: 4 reviewing the materials we asked you to<br>292: 5 review which were shorter term studies<br>292: 6 where risks were seen?<br>292: 7 A. Yes. The VIGOR study itself<br>292: 8 only lasted nine months, and that was the<br>292: 9 study in which the four or five-fold<br>292:10 increase in heart attacks was seen. So,<br>292:11 if there was no effect before 18 months,<br>292:12 it would have not been seen in VIGOR, but<br>292: 13 it was.<br>292:14 In addition, studies like<br>292:15 ADVANTAGE and study 090 were much briefer<br>292: 16 than that, and they also found an effect<br>292:17 that was diff~rent in Vioxx users versus<br>292:18 the comparison group in well under six<br>292:19 mo~ths.<br>292:20 Q. And looking at all of those<br>292:21 together, in your opinion, did a pattern<br>292:22 emerge that in any *way* suggested, good or<br>292:23 bad, that there was not a cutoff period<br>292:24 of time where? the risk begins?<br>293: Page 293<br>293: 1 A I think looking at all the<br>293: 2 data together from the clinical trials,<br>293: 3 and in addition, separately looking at<br>293: 4 the data from the observational or the<br>293: 5 epidemiologic studies, the totality of<br>293: 6 the evidence does not suggest that there<br>293: 7 is a, quote, safe period early on when<br>293: 8 you don't get into trouble with the drug. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 294:21-296:6<br>294:21 Q. Doctor, we talked about the<br>294:22 VIGOR study in the earlier part of your<br>294:23 deposition. Have you since come to learn<br>294:24 that the data from the VIGOR study is<br>295: Page 295<br>295: 1 different than you initially thought it<br>295: 2 was at the time it was published?<br>295: 3 A. Yes. '<br>295: 4 Q. What did you understand is<br>295: 5 now different than what was originally<br>295: 6 reported by Merck in November of 2000?<br>295: 7 A. Well, apparently -- not<br>295: 8 apparently, it is now agreed, I think, by<br>295: 9 all parties that there were three cases<br>295:10 of heart attack in patients who were in<br>295:11 the VIGOR study, who actually were in the<br>295:12 Vioxx arm of the VIGOR study whose heart<br>295:13 attacks were not included in the original<br>295:14 report as it was published in the New<br>295:15 England Journal of Medicine. '<br>295:16 Q. Were those in any particular<br>295:17 subgroup in the VIGOR study that is of<br>295:18 clinical importance?<br>295:19 A. All of them were in what was<br>295:20 called the aspirin not indicated group,<br>295:21 which was the supposedly lower risk for<br>295:22 cardiac disease subgroup of the study,<br>295:23 Q, In terms of the whole, what<br>295:24 we call the naproxen issue, what<br>296: Page 296<br>296: 1 significance, in as simple a *way* as you<br>296: 2 can explain it, what significance is it<br>296: 3 that the three deaths --<br>296: 4 A. Heart attacks.<br>296: 5 Q. -- heart attacks were not in<br>296: 6 the aspirin-indicated group? | Cumulative with Dr. Curfman testimony; cumulative opinion on Naproxen with Drs. Graham, Topol and Curfman | *[handwritten signature]* |