| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 294:21 to 296:6)<br><br>294<br><br>21  Q.   Doctor, we talked about the<br>22  VIGOR study in the earlier part of your<br>23  deposition.  Have you since come to learn<br>24  that the data from the VIGOR study is<br><br>295<br>1  different than you initially thought it<br>2  was at the time it was published?<br>3      A.   Yes.<br>4      Q.   What did you understand is<br>5  now different than what was originally<br>6  reported by Merck in November of 2000?<br>7      A.   Well, apparently -- not<br>8  apparently, it is now agreed, I think, by<br>9  all parties that there were three cases<br>10  of heart attack in patients who were in<br>11  the VIGOR study, who actually were in the<br>12  Vioxx arm of the VIGOR study whose heart<br>13  attacks were not included in the original<br>14  report as it was published in the New<br>15  England Journal of Medicine.<br>16      Q.   Were those in any particular<br>17  subgroup in the VIGOR study that is of<br>18  clinical importance?<br>19      A.   All of them were in what was<br>20  called the aspirin not indicated group,<br>21  which was the supposedly lower risk for<br>22  cardiac disease subgroup of the study.<br>23      Q.   In terms of the whole, what<br>24  we call the naproxen issue, what<br>296<br>1  significance, in as simple a way as you<br>2  can explain it, what significance is it<br>3  that the three deaths --<br>4      A.   Heart attacks.<br>5      Q.   -- heart attacks were not in<br>6  the aspirin-indicated group? | Cumulative with Dr. Curfman testimony; cumulative opinion on Naproxen with Drs. Graham, Topol and Curfman | Overrule |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 297:11 to 299:5) <br> 297 <br> 11   THE WITNESS: Okay. <br> 12      The fact that the three <br> 13   heart attacks that were not <br> 14   originally reported in the first <br> 15   -- in the publication of the <br> 16   Vioxx -- of the VIGOR study, the <br> 17   importance of their having all <br> 18   occurred in the, quote, aspirin <br> 19   not indicated group is the <br> 20   following: <br> 21      The argument that was being <br> 22   made in the VIGOR study as it was <br> 23   published was that the reason that <br> 24   there were more heart attacks seen <br> 298 <br> 1   in people taking Vioxx compared to <br> 2   people taking naproxen was that <br> 3   naproxen had this very powerful <br> 4   aspirin-like effect on your <br> 5   placeless which made them not <br> 6   clot, and that Vioxx didn't have <br> 7   that effect, and that's how <br> 8   naproxen was supposedly preventing <br> 9   heart attacks rather than having <br> 10   Vioxx cause heart attacks. <br> 11      The importance of those <br> 12   three cases occurring in the <br> 13   patients who didn't need aspirin <br> 14   group is that that doesn't fit, <br> 15   that if the issue was that Vioxx <br> 16   lacked the aspirin-like effect <br> 17   that naproxen supposedly had, then <br> 18   you would not expect people who <br> 19   didn't need aspirin to do any <br> 20   worse, but, in fact, the people <br> 21   who didn't need aspirin also did <br> 22   worse on Vioxx, which is <br> 23   consistent with the idea that it <br> 24   wasn't just about some imagined <br> 299 <br> 1   naproxen protective effect, but, <br> 2   rather, about the likelihood, <br> 3   which I think is now quite <br> 4   plausible that Vioxx was actually | Cumulative with Dr. Curfman testimony; cumulative opinion on Naproxen with Drs. Graham, Topol and Curfman | _Overrule_ |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 300:9-301:15<br>300: 9 Q. Let's go to the next<br>300:10 question that we asked you to 'address,<br>300:11 which is Merck's investigation and<br>300:12 management of -- investigation of the<br>300:13 potential of Vioxx to cause heart attacks<br>300: 14 and their management of that issue, the<br>300:15 studies, the communications, et cetera.<br>300:160kqy?<br>300:17 First of all, have you<br>300:18 reviewed documents that were before the<br>300:19 new drug application was filed for Vioxx?<br>300:20 A. Yes. There were some<br>300:21 initial reports of clinical trials that<br>300:22 had been conducted.<br>300:23 ~ Q. What is the term "signal,"<br>300:24 Doctor? First of all, is the term<br>301: Page 301<br>301: 1 "signal" something that is commonly used<br>301: 2 in your field of pharmacoepidemiology?<br>301: 3 A. Yes.<br>301: 4 Q. Would you please explain to<br>301: 5 the jury what a "signal" is?<br>301: 6 A. Yes. I think a good regular<br>301: 7 language word would be "clue." That if<br>301: 8 there may be some evidence that comes up<br>301: g that is not in itself a slam dunk proof<br>301:10 that there's a problem, but something<br>301 :11 that might be called a smoking gun,<br>301 :12 something that sure looks suspicious and<br>301 :13 warrants followup, even though in itself<br>301 :14 it does not absolutely wrap up the<br>301 :15 certainty that there's a problem). | | |
| 301 :22-302:7<br>301 :22 Q. Okay.<br>301 :23 Doctor, do you have an<br>301 :24 opinion as to 'whether or not Merck should<br>302: Page 302<br>302: 1 have recognized  a reasonable and<br>302: 2 prudent company with the knowledge that<br>302: 3 Merck had before the drug was on the<br>302: 4 market should have recognized that there<br>302: 5 was the potential for cardiovascular<br>302: 6 disease in patients who took Vioxx?<br>302: 7 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 302:14·307:17<br>302:14 If one looks at the totality<br>302: 15 of the information that was<br>302:16 available as of the time that the<br>302:17 new drug application was<br>302:18 submitted, there were a number of<br>302:19 pieces of information from<br>302:20 clinical trial data, as well as<br>302:21 from other sources, that certainly<br>302:22 raised a question as to whether or<br>302:23 not this was a problem. And I'm<br>302:24 not saying that they were slam<br>303: Page 303<br>303: 1 dunk, to use a phrase from the<br>303: 2 current administration, slam dunk<br>303: 3 ~evidence that there was a problem,<br>303:12<br>303:13 BY MR. TISI:<br>303: 14 Q. I'm going to hand you what I<br>303:15 have had marked as Exhibit Number 31.<br>303:16 And for the record, this is a Research<br>303:17 Management Committee document dated<br>303:18 October 10, 1996, MRK-ABC0048699.<br>303:19 Have you seen this document<br>303:20 before?<br>303:21 A. Yes, I have.<br>303:22 Q. Is this a document you<br>303:23 relied on in supporting your opinion that<br>303:24 there was a, quote, signal of potential<br>304: Page 304<br>304: 1 cardiotoxicity for Vioxx prior to filing<br>304: 2 of the new drug application? '<br>304: 3 A. In part.<br>304: 4 Q. Okay.<br>304: 5 Would you please go to Page<br>304: 68.<br>304: 7 A. Yes.'<br>304: 8 Q. First of all, what is<br>304: 9 MK~966?<br>304: 10 A. That was the working name<br>304:11 for Vioxx before it was called Vioxx.<br>304: 12 Q. And is this a document that<br>304:13 is a Merck document?<br>304:14 A. Yes.<br>304:15 Q. In Section 3, it indicates a<br>304:16 section that says "Adverse Events." Do | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 305: Page 305<br>305: 1 point out that these were very, *very* big<br>305: 2 doses of Vioxx. This was before they<br>305: 3 really knew what the right dose would be,<br>305: 4 and so these doses were 125 to 175<br>305: 5 milligrams. I think that's part of the<br>305: 6 picture here,<br>305: 7 Q. Sure.<br>305: 8 A. Having said that, the second<br>305: 9 paragraph -- and the other important<br>305:10 point was that this study lasted only six<br>305:11 weeks. And so it was a really remarkably<br>305:12 short period of time in which you really<br>305:13 would not expect to see a cardiovascular<br>305: 14 risk: because it was only a<br>305:15 month-and-a-half long.<br>305:16 And the second paragraph<br>305:17 reads, "Adverse events of most concern<br>305:18 were in the cardiovascular system (e.g.,<br>305:19 MI" or heart attack, "unstable angina"<br>305:20 which is increasing chest pain from heart<br>305:21 disease, "rapid fall in hemoglobin and<br>305:22 hematocrit in some subjects, and a small<br>305:23 increase in blood pressure."<br>305:24 Q. And this is October of 1996?<br>306: Page 306<br>306: 1 A. Correct.<br>306: 2 And then the next sentence<br>306: 3 which I think is also relevant, "We plan<br>306: 4 to evaluate MK-966" or Vioxx "in a study<br>306: 5 where subjects are also given low-dose<br>306: 6 aspirin." ,<br>306: 7 Q. Was that study ever done?<br>306: 8 A. It was not until the VIGOR<br>306: 9 data came out in 2000 that Merck began to<br>306:10 advocate using aspirin in people taking<br>306:11 Vioxx, and so that would have been, oh,<br>306: 12 four years later.<br>306:13: Q. All right.<br>306:14 Now, Doctor, did you also<br>306:15 review the medical officer reviews for<br>306:16 Vioxx, the FDA medical officer review for<br>306:17 Vioxx when the drug was approved?<br>306:18 A Yes.<br>306:19 Q. And did you consider the<br>306:20 views of the medical officer when forming | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 306:21 your opinions?<br>306:22 A. Yes. Because that was what<br>306:23 was known at the time.<br>306:24 Q. What, if any, significance,<br>307: Page 307<br>307: 1 and I'm going to try to go through these<br>307: 2 fairly quickly, what, if any,<br>307: 3 significance was there in the<br>307: 4 cardiovascular section of the medical<br>307: 5 officer review for the Vioxx clinical<br>307: 6 trial program that assisted you In<br>307: 7 formulating your opinions?<br>307: 8 A. Well, a number of the FDA<br>307: 9 staff that were evaluating Vioxx, and I'm<br>307:10 thinking of Dr. Pulayo, Dr. Villalba and<br>307:11 Dr. Targum, were struck with and noticed<br>307: 12 and wrote about the fact that there<br>307:13 appeared to be an excess of<br>307:14 cardiovascular disease in patients who<br>307:15 were given Vioxx in the clinical trials<br>307:16 that were submitted by Merck to FDA in<br>307:17 the late '90s" | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 308:6-309:13<br>308: 6 Q, I'm going to show you a<br>308: 7 document. First of all, is this a<br>308: 8 document that you reviewed in the context<br>308: 9 of your opinions that you prepared to<br>308:10 render in this case?<br>308:11 A. Yes,<br>308:12 Q, Okay,<br>308:13 What is this document,<br>308: 14 Doctor?<br>308:15 A. This is labeled "Scientific<br>308:16 Advisors Meeting, May 3-May 6, 1998,"<br>308:17 Q, And what is this document?<br>308:18 A. This is a summary of the<br>308:19 report of a group of scientific advisors<br>308:20 that Merck pulled together to advise it<br>308:21 on the development of the -- of Vioxx as<br>308:22 it was in its preapproval state, \hat is,<br>308:23 before it was -- before the FDA approved<br>308:24 it.<br>309: Page 309<br>309: 1 Q, Would you turn to Page 11 of<br>309: 2 this document?<br>309: 3 A, Yes,<br>309: 4 'Q, Under the section entitled<br>309: 5 "Cardiovascular."<br>309: 6 A, Yes,<br>309: 7 Q, Do you see that?<br>309: 8 A. Yes,<br>309: 9 Q. Would you please tell the<br>309:10 members of the jury what Merck was being<br>309: 11 told by its Board of Scientific Advisors<br>309:12 about the potential problems for Vioxx<br>309:13 prior to the drug being on the market? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 309:21-311 :12<br>309:21 THE WITNESS: The Board of<br>309:22 Scientific Advisors drew the<br>309:23 company's attention to three<br>309:24 specific issues that are numbered<br>310: Page 310<br>310: 1 here. One was the possibility of,<br>310: 2 we talked about this balance of<br>310: 3 COX-1 and COX-2, that if you block<br>310: 4 COX-2 and don't block COX-1, the<br>310: 5 committe03, which was outside<br>310: 6 pharmacologist of some renown,<br>310: 7 :said here's something that could<br>310: 8 happen that one might expect or<br>310: 9 worry about if you block COX-2 and<br>310:10 don't block COX-1 as much.<br>310:11 One is "the development of<br>310:12 lipid rich ,coronary plaques:' And<br>310:13 that's basically gunk developed,<br>310:14 ; building up in the artery of the<br>310:15 heart, which can then erupt and<br>310:16 form a clot and cause heart<br>310:17 disease,<br>310:18 Two, 'The destabilization of<br>310:19 the cap of these plaques by<br>310:20 inflammatory cells, making them<br>310:21 'rupture prone':' And that is<br>310:22 what we now believe is the<br>310:23 mechanism of heart attacks. That<br>310:24 you have this fatty gunk sitting<br>311:Page311<br>311: 1 in your arteries, and then for<br>311: 2 some reason it ruptures and the<br>311: 3 fat is kind of spilled into the<br>311: 4 artery and that causes the clot to<br>311: 5 form and that causes the heart<br>311: 6 attack. .<br>311: 7 And three, "The thrombotic<br>311: 8 occlusion of the vessel at the<br>311: 9 site of plaque rupture with<br>311 :10 ensuing consequences of ischemic."<br>311 :11 That basically means having a<br>311:12 heart attack. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 311:21-312:8<br>311 :21 Q. Doctor, putting all the kind<br>311 :22 of evidence that we've been talking about<br>311 :23 together, do you have an opinion as to<br>311 :24 whether or not there was evidence prior<br>312: Page 312<br>312: 1 to Vioxx being on the market that a<br>312: 2 reasonable and prudent company reviewing<br>312: 3 the safety profile of this drug would<br>312: 4 have considered in terms of designing<br>312: 5 their clinical trial program and<br>312: 6 investigating this signal?<br>312: 7 A, Yes,<br>312: 8 Q. What is that opinion? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 313:13-316:8<br>313:13 And when I teach in a course<br>313:14 at Tufts Medical School for drug<br>313:15 ; company executives about thinking<br>313:16 about risks and benefits in drug<br>313:17 development, one of the points I<br>313:18 mention is that it's key to pull<br>313:19 together everything that's known<br>313:20 so that you can plan your clinical<br>313:21 development program, whether it's<br>313:22 animal studies or human studies or<br>313:23 followup epidemiologic studies so<br>313:24 as to follow up on signals. Some<br>314: Page 314<br>314: 1 signals may be good signals, like<br>314: 2 here is a potential really good<br>314: 3 effect of this drug that we want<br>314: 4 to find out more about, as well as<br>314: 5 the bad signals.<br>314: 6 And looking at it all<br>314: 7 together, there is the evidence<br>314: 8 from Merck's own pharmacology<br>314: 9 advisors saying here's some<br>314:10 problems that you guys need to<br>314:11 keep an eye out for because,<br>314:12 specifically, 1, 2, 3, here are<br>314:13 ways in which this drug might<br>314:14 ; cause heart attacks. Nobody knew<br>314:15 specifically at the time that it<br>314:16 would, but they were told, watch<br>314:17 out for this. I think there was<br>314:18 some phrase in here that they<br>314:19 should be actively pursued or<br>314:20 something to that effect. '<br>314:21 There were the earlier<br>314:22 clinical trials that Merck had<br>314:23 performed in which whatever the<br>314:24 dose, if you have a drug that<br>315: Page 315<br>315: 1 increases heart attacks in a<br>315: 2 six-week study, that's an<br>315: 3 important signal to worry about.<br>315: 4 There were the animal<br>315: 5 studies and other pharmacologic<br>315: 6 studies that say, gee, you know,<br>315: 7 maybe blocking CQX-2 selectively | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 315: 9 there are some important good<br>315:10 things a CBX-2 does that you don't<br>315: 11 want to block totally. And that<br>315:12 was in the literature before the<br>315: 13 drug was on the market.<br>315:14 ' And so combining the advice<br>315:15 from their scientific advisors,<br>315:16 the evidence from the animal<br>315:17 studies, from the pharmacologic<br>315:15 from their scientific advisors,<br>315:16 the evidence from the animal<br>315:17 studies, from the pharmacologic<br>315: 18 literature and the evidence from<br>315:19 ,their own clinical trial<br>315:20 ' suggesting an increase in events,<br>315:21 I'm not saying they should have<br>315:22 not marketed the drug, I'm not<br>315:23 saying they should have pulled it<br>315:24 off the market the day it was<br>316: Page 316<br>316: 1 approved, but I am saying that<br>316: 2 these were some smoking guns that<br>316: 3 a reasonable company would have<br>316: 4 said, as we market this drug,<br>316: 5 let's make sure that we're also<br>316: 6 keeping an eye on this potential<br>316: 7 problem that we've been warned<br>316: 8 about from multiple sources. | | |
| 327:18-328:1<br>327:18 Dr. Avorn, do you have an<br>327:19 opinion that you hold to a reasonable<br>327:20 degree of medical certainty as to when<br>327:21 there was reasonable evidence of an<br>327:22 association between Vioxx and heart<br>327:23 attacks?<br>327:24 A. Yes.<br>328: Page 328<br>328: 1 Q. What is that opinion? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 329:19-330:16<br>329:19 That said, I have such an<br>329:20 opinion, and it is that by the<br>329:21 time the data from the VIGOR study<br>329:22 were available to Merck, which<br>329:23 would have been the spring of<br>329:24 2000, combining the VIGOR data<br>330: Page 330<br>330: 1 with the evidence from the other<br>330: 2 clinical trials, all of which<br>330: 3 Merck had conducted itself,<br>330: 4 coupled with the guidance that<br>330: 5 Merck had sought and received from<br>330: 6 Its own Board of Scientific<br>330: 7 Advisors, coupled with the<br>330: 8 pharmacologic evidence that was<br>330: 9 out there in the literature prior<br>330:10 to that point, by the spring of<br>330:11 ,2000, the burden of evidence was<br>330:12' enough to suggest that there was<br>330:13 Indeed a reason for concern that<br>330:14 Vioxx was associated with heart<br>330:15 attack and other cardiovascular<br>330:16 disease in humans. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 331:5-333:13<br>331 : 5 'Q. Let's talk about a couple of<br>331: 6 those trials. You mentioned the<br>331: 7 ADVANTAGE trial before. Could you tell<br>331: 8 me, first of all, when did the ADVANTAGE<br>331: 9 trial data become available to Merck as<br>331 :10 best as you could tell from your review<br>331 :11 of the evidence?<br>331:12 A. As I understand it,<br>331 :13 ADVANTAGE was conducted around the same<br>331 :14 time frame as VIGOR, so that the evidence<br>331 :15 from ADVANTAGE was becoming available<br>in<br>331 :162000 just as the evidence from VIGOR was<br>331:17 becoming available.<br>331 :18 Q. Let's talk about ADVANTAGE<br>331:19 for a little bit.<br>331 :20 Would you please describe<br>331 :21 for the members of the jury what, if any,<br>331 :22 significance you attach to the ADVANTAGE<br>331 :23 study?<br>331 :24 A. Yes. That was a study that,<br>332: Page 332<br>332: 1 as I recall, enrolled a smaller number<br>332: 2 than VIGOR, my recollection would be<br>332: 3 something like 4 or 5,000 patients who<br>332: 4 were~ randomly allocated -- they were<br>332: 5 patients with osteoarthritis. And that's<br>332: 6 important because one of the concerns<br>332: 7 that was raised by Merck was, well, the<br>332: 8 VIGOR study was in patients with<br>332: 9 rheumatoid arthritis, and they are not<br>332:10 like typical patients, and they have more<br>332:11 heart disease, so that must be part of<br>332:12 why there were more heart attacks.<br>332:13 But ADVANTAGE was not about<br>332:14 rheumatoid arthritis, it was about<br>332:15 patients who had osteoarthritis, which is<br>332:16 the garden variety arthritis people get<br>332: 17 in their hips and hands and knees and so<br>332: 18 forth.<br>332:19 Secondly, ADVANTAGE was not<br>332:20 in comparison -- well, it was in<br>332:21 comparison with naproxen, but there were<br>332:22 patients in it who were taking aspirin as<br>332:23 I recall. And as a result, the issue of, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 332:23 I recall. And as a result, the issue of, <br> 332:24 well, this is only seen if you don't have <br> 333: Page 333 <br> 333: 1 people taking aspirin I don't believe was <br> 333: 2 the case in ADVANTAGE. <br> 333: 3 , It was also a relatively <br> 333: 4 brief study. It did not last for the <br> 333: 5 full nine months on average that VIGOR <br> 333: 6 lasted. It was much briefer than that, <br> 333: 7 and yet there was still a <br> 333: 8 disproportionate number of heart attacks <br> 333: 9 in the Vioxx group compared to the <br> 333:10 cor1'lparison group. And that was another <br> 333:11 kind of brick in the wall indicating that <br> 333: 12 there was a higher rate of cardiovascular <br> 333:13 disease in people given Vioxx. | | |
| 333:23-334:18 <br> 333:23 Q. Let's talk about the 090 <br> 333:24 trial that you mentioned before. <br> 334: Page 334 <br> 334: 1 A. Right. <br> 334: 2 Q. What is the 090 trial? <br> 334: 3 A. That was another study done <br> 334: 4 in patients who had arthritis, and it was <br> 334: 5 reviewed on the FDA materials along with <br> 334: 6 study 085, I believe. And 090 was <br> 334: 7 important in this whole story because it <br> 334: 8 was not testing Vioxx against naproxen, <br> 334: 9 and so the idea that this was all because <br> 334:10 naproxen prevents heart attacks and that <br> 334:11 explains the VIGOR findings did not apply <br> 334:12 because the comparison groups in 090 were <br> 334:13 another nonsteroidal called nabumetone <br> 334:14 and placebo.' And there again, there was <br> 334:15 an increase in study 090 in the number of <br> 334:16 cardiovascular events that were in people <br> 334:17 randomly assigned to Vioxx compared to <br> 334:18 people on placebo or nabumetone. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 335:21-336:18<br>335:21 Q. Let me just ask you this.<br>335:22 Do you know whether or not<br>335:23 the, I think you used the word<br>335:24 disproportionate distribution of heart<br>336: Page 336<br>336: 1 attacks in that study, was that reported<br>336: 2 in the ADVANTAGE study in the published<br>336: 3 literature?<br>336: 4 A. My understanding is that the<br>336: 5 version that eventually found its way<br>336: 6 into the press reported the so-called<br>336: 7 APTC composite but did not, as I<br>336: 8 understand it, report the actual number<br>336: 9 of heart attacks. And the difference in<br>336:10 the number of heart attacks on Vioxx<br>336: 11 compared to nabumetone or placebo was<br>336:12 much more striking than the difference in<br>336: 13 the so-called APTC composite outcome.<br>336:14 But that was not the way it was reported.<br>336:15 Q. Let's talk about 090 for a<br>336:16 moment. Do you know whether that study<br>336:17 was ever published by Merck?<br>336:18 A. I can't recall that it was. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 337:1-339:11<br>337: 1 ask you this question. Was 090, when did<br>337: 2 that become available to Merck?<br>337: 3 A. My understanding is that<br>337: 4 that was also around the same time of<br>337: 5 2000.<br>337: 6 Q. Okay.<br>337: 7 Now, in fairness, there's<br>337: 8 also another study called 085. Are you<br>337: 9 familiar with that study?<br>337: 10 A. Yes. That was very much<br>337: 11 like 090. And when the FDA reviewed the<br>337: 12 data, they reviewed them both together<br>337:13 and did find this imbalance with more<br>337:14 events in the Vioxx group than in the two<br>337:15 other comparison groups, but for reasons<br>337: 16 that are unclear, most of the action<br>337:17 seemed to be in the 090 and not in the<br>337:18085 piece of the study. '<br>337:19 Q. In small studies like this,<br>337:20 in other words, I think you mentioned it<br>337:21 was a small study, if you see something<br>337:22 in one small study and you don't see it<br>337:23 in another study, do you ignore what you<br>337:24 see, or how does that work in your<br>338: Page 338<br>338: 1 profession?<br>338: 2 A. The absence of a finding<br>338: 3 does not cancel out the presence of a<br>338: 4 finding especially if the finding is an<br>338: 5 excess risk of heart attacks. And--<br>338: 6 Q. Why is that? Why is that?<br>338: 7 A. Because sometimes you don't<br>338: 8 find a bad thing. Sometimes you don't<br>338: 9 find a good thing. So, for example,<br>338:10 companies will often do multiple clinical<br>338:11 trials, and if some show good effect and<br>338:12 the others don't, very often they will<br>338:13 bring the ones that show a good effect to<br>338:14 FDA and say approve our drug on that<br>338: 15 basis because a lot of things can cause a<br>338:16 study to yield a null finding, either a<br>338:17 good effect or a bad effect, ami we know<br>338:18 that. Studies are good things to do, and<br>338:19 often things don't go as expected.<br>338:20 Q. Okay. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 338:21 A. But I think when one looks<br>338:22 at a 12-week study and you are seeing<br>338:23 heart attacks, that's enormously<br>338:24 important because you shouldn't be on<br>339: 1 anything that will cause a higher risk of<br>339: 2 heart attacks in 12 weeks.<br>339: 3 Q. Using VIGOR, 090 and<br>339: 4 ADVANTAGE and all the other evidence you<br>339: 5 talked about before, do you have an<br>339: 6 opinion to a reasonable degree of medical<br>339: 7 certainty as to what a reasonable and<br>339: 8 prudent company looking at the totality<br>339: 9 of that evidence should have concluded<br>339: 10 about the cardiovascular safety of Vioxx<br>339: 11 in the spring of 2000 when -- | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
| --- | --- | --- |
| 340:3-342:23<br>340: 3 Q. Doctor, what is your<br>340: 4 opinion?<br>340: 5 A. My opinion is that the<br>340: 6 burden of evidence in the spring of 2000<br>340: 7 was such that there was evidence of a<br>340: 8 likely association between Vioxx and<br>340: 9 heart disease in humans.<br>340:17 BYMR. TISI:<br>340:18' Q. Doctor, I'm going to show<br>340: 19 you two documents I'm going to hand you<br>340:20 side by side. One is Exhibit Number 33,<br>340:21 which is the FDA Advisory Committee<br>340:22 briefing document, specifically the<br>340:23 report of Dr. Villalba, and that Is<br>340:24 February 8th, 2001.<br>341: Page 341<br>341: 1 And I'm also going to hand<br>341: 2 you a second document, which is the FDA's<br>341: 3 cardiovascular report consultation of a<br>341: 4 Shari Targum,<br>341: 5 Have you seen both of these<br>341: 6 documents in connection with your<br>341: 7 opinions?<br>341 : 8 A. I've reviewed both of these.<br>341:9 Q. Okay.<br>341 :10 Are these the kinds of,<br>341 :11 things that experts like yourself would<br>341 :12 review in considering issues like the<br>341 :13 ones we've asked you to address?<br>341 :14 A. Yes. This is exactly the<br>341 :15 kind of information that FDA asked me to<br>341 :16 evaluate in relation to Lotronex around<br>341 :17 the question of whether it should be<br>341 :18 taken off the market around 2000 or so.<br>341 :19 Q. Now, Doctor, let me ask you<br>341 :20 this.<br>341 :21 You reviewed both of these<br>341 :22 reports of these FDA medical officers. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 341 :23 Do you know that or do you have an<br>341 :24 understanding as to whether they looked<br>342: Page 342<br>342: 1 at these three studies together,<br>342: 2 ADVANTAGE, 090, 085 -- actually, we'll<br>342: 3 add 085 in there as well, and VIGOR, and<br>342: 4 reached the same conclusions you've<br>342: 5 reached?<br>342: 6 A. That is my impression.<br>342: 7 Q. Okay.<br>342: 8 Doctor, let me show you -<br>342: 9 let's go to Dr. Villalba's report for a<br>342:10 moment. If you can look at Page 11 and<br>342:11 12.<br>342:12 A. Yes.<br>342:13 Q. Do you see at the bottom of<br>342: 14 there, there is a paragraph that starts,<br>342:15 "The sponsor explanation for the excess<br>342:16 of cardiovascular events in the VIGOR<br>342:17 study"? Do you see that?<br>342:18 A. Right. Yes.<br>342:19 Q. Would you describe--<br>342:20 And, of course, this is Dr.<br>342:21 Villalba's report. Would you describe<br>342:22 the ,facts that -- what does Dr. Villalba<br>342:23 conclude here? | | |
| 343:13-344:5<br>343:13 A. Okay.<br>343:14 Dr. Villalba, who is an FDA<br>343: 15 official who has reviewed all the data<br>343:16 submitted while the drug was still on the<br>343:17 market, concluded that it was implausible<br>343:18 that the difference between _. in the<br>343:19 VIGOR study, that the difference in heart<br>343:20 attack rates, and one can see that graph<br>343:21 go up quite high for incidence of heart<br>343:22 attacks in·· or thrombotic<br>343:23 cardiovascular serious adverse<br>343:24 experiences, the evidence that this could<br>344: Page 344<br>344: 1 be explained by the fact that naproxen<br>344: 2 was preventing heart attacks was<br>344: 3 implausible.<br>344: 4 Q. And what are the factors<br>344: 5 that Dr. Villalba indicates? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 345:18-347:13<br>345:18 A. Dr. Villalba was speaking<br>345:19 specifically to the rapid rise in the<br>345:20 incidence of heart attacks in people<br>345:21 taking Vioxx as compared with naproxen.<br>345:22 And she notes that there is no -- there<br>345:23 are no placebo-controlled trials of<br>345:24 naproxen that ever have shown that it<br>346: Page 346<br>346: 1 reduces heart attacks.<br>346: 2 Q. Stop right there.<br>346: 3 Is that something that you<br>346: 4 agree with?<br>346: 5 A. Sure.<br>346: 6 Q. Is that something you agreed<br>346: 7 with at the time?<br>346: 8 A. I agree with it now too.<br>346: 9 Q. Okay.<br>346:10 Is it something that you<br>346:11 actually investigated?<br>346: 12 A. Yes.<br>346:13 Q. And you concluded that there<br>346:14 was no evidence - did you conclude --<br>346:15 What did you conclude about<br>346:16 the evidence of naproxen?<br>346: 17 A. At the time that this was<br>346:18 being discussed at FDA, we were<br>346:19 concurrently doing research in my<br>346:20 division on whether naproxen causes a<br>346:21 reduction in the risk of heart attacks.<br>346:22 Q. Ok~y.<br>346:23 Going to the next fact here<br>346:24 noted by Dr. Villalba.<br>347: Page 347<br>347: 1 A. This is also in parallel<br>347: 2 with our own research, in that she points<br>347: 3 out that the effect of naproxen, and this<br>347: 4 is almost the exact language that we used<br>347: 5 in our paper, even though I had not seen<br>347: 6 her report at the time, that the effect<br>347: 7 size that you would need to have, that<br>347: 8 is, the protective effect of naproxen<br>347: 9 would need to be so huge that it would<br>347:10 make It huger than had ever been seen | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 347:11 with aspirin or with, frankly, any other<br>347:12 drug for that matter, and that that also<br>347:13 made the naproxen idea implausible | | |
| 347:24-348:12<br>347:24 Q. Okay. Next thing.<br>348: Page 348<br>348: 1 Go to Section D.<br>348: 2 A. Okay.<br>348: 3 She cites the other studies<br>348: 4 which we've talked about just now, 085,<br>348: 5 090 ,and 102, suggest-- this is her exact<br>348: 6 words.<br>348: 7 "Suggest trends towards<br>348: 8 higher rates of myocardial infarction,"<br>348: 9 or heart attack "in the rofecoxib," that<br>348:10 is, Vioxx "group compared to active<br>348:11 control groups."<br>348:12 .Ia. Doctor, let's turn to-- | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 348:13 to 349:12)<br>348<br>13    A.   I'm sorry, just one other<br>14  point, Mr. Tisi.<br>15    Q.   Go ahead.<br>16    A.    The next sentence, which I<br>17  think is relevant here, is that she also<br>18  points out -- because one of the things<br>19  that we study in pharmacoepidemiology is<br>20  doses and duration and whether or not<br>21  there's a relationship to the effect.<br>22  And she points out in 2001 that 085, 090<br>23  and 102 involve lower doses of Vioxx and<br>24  shorter durations of exposure than were<br>349<br>1  seen in VIGOR and also allow the use of<br>2  aspirin.<br>3          So, the reasons that had<br>4  been put forward by Merck about why the<br>5  VIGOR findings could be explained away,<br>6  that is, no aspirin, patients had<br>7  rheumatoid arthritis, there was a big<br>8  dose of Vioxx used, and so this wouldn't<br>9  apply to lower doses, and it was a long<br>10  study, none of those were present in<br>11  these studies, and yet the same increase<br>12  in heart attack was seen. | Non-responsive speech | |
| 350:7-350:15<br>350: 7 a. Assuming it is February 8th,<br>350: 8 2001, is that about the time you had your<br>350: 9 conversation with Dr. Sherwood?<br>350:10 A. Yes.<br>350:11 a. Now, let's go to Dr.<br>350:12 Targum's report.<br>350:13 A. Okay.<br>350:14 Q. First of all, can we bring<br>350:15 that up | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 351:11-354:24<br>351 :11 This is the report of Dr.<br>351 :12 Targum at the cardiorenal division,<br>351 :13 correct?<br>351:14 A. Yes.<br>351:15 a. Okay.<br>351 :16 February 1st, 2004 --<br>351 :17 A. 200).<br>351:18 a. --2001,excuseme.<br>351 :19 IA. Right.<br>351 :20 Q. Okay.<br>351 :21 If you'd go to page --<br>351 :22 actually 36 -- 34.<br>351 :23 A. Got it.<br>351 :24 a. Do you see the Section 4 at<br>352: Page 352<br>352: 1 the bottom of the page there, it talks<br>352: 2 about "Assessment of the sponsor's claim<br>352: 3 of cit risk"?<br>352: 4 A. Yes.<br>352: 5 Q. First of all, the sponsor's<br>352: 6 claim there that the "Sponsor claims that<br>352: 7 the difference in myocardial infarctions<br>352: 8 between the two groups is primarily due<br>352: 9 to the anti-platelet effects of<br>352:10 naproxen."<br>352:11 A. Yes, I reviewed that<br>352:12 section.<br>352:13 Q. Is that what they said in<br>352:14 the VIGOR paper that we reviewed earlier<br>352:15 today?<br>352:16 A. Yes.<br>352:17 Q. Okay.<br>352:18 Is that what they were<br>352:19 telling you and your people at Harvard?<br>352:20 A. That's what Dr. Sherwood<br>352:21 told me.<br>352:22 Q. Okay.<br>352:23 Is that what was being said<br>352:24 by Merck publicly in your experience in<br>353: Page 353<br>353: 1 2000 and 2001?<br>353: 2 ~. Correct.<br>353: 3 Q. Okay.<br>353: 4 What does Dr. Targum say<br>353: 5 about the, quote, naproxen hypothesis? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 353: 6 A. I'll just read her words.<br>353: 7 "The sponsor claims that the difference<br>353: 8 in myocardial infarctions between the two<br>353: 9 groups is primarily due to the<br>353:10 anti-platelet effects" or the protective<br>353:11 effects "of naproxen."<br>353:12 And then she goes on to say,<br>353: 13 "This hypothesis is not supported by any<br>353:14 prospective placebo-controlled trials | | |
| 353:15 with naproxen. One can further argue<br>353:16 that, no matter what the attribution, the<br>353:17 results (from the cardiovascular<br>353:18 standpoint) are favorable for naproxen."<br>353:19 Q. Do you agree with that?<br>353:20 A. Yes. '<br>353:21 Q. Is that what you testified<br>353:22 to earlier?<br>353:23 A. Yes.<br>353:24 Q. Next one, next bullet point<br>354: Page 354<br>354: 1 on toe next page. "The sponsor claims<br>354: 2 that the majority of the cardiovascular<br>354: 3 events in the VIGOR study occurred in<br>354: 4 those patients who should have been<br>354: 5 taking aspirin for cardioprotection."<br>354: 6 A. Yes.<br>354: 7 Q. Is that the issue that we<br>354: 8 talked about before that had to be<br>354: 9 corrected in the New England Journal of<br>354:10 Medicine?<br>354:11 A. That's right.<br>354:12 Q. And that was corrected in<br>354:132005?<br>354: 14 A. That's correct.<br>354:15 Q. Okay.<br>354: 16 Do you agree with Dr. Targum<br>354: 17 as to the significance of that fact?<br>354: 18 A. Yes. As she states it in<br>354:19 her own words, "This claim has not<br>354:20 convinced this medical reviewer," and she<br>354:21 goes on to say that there are increased<br>354:22 events, heart attacks in the Vioxx group<br>354:23 even in patients who did not fall into<br>354:24 the aspirin-indicated subgroup. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 356:4-357:18<br>356: 4 Q. Could you turn to Page 36,<br>356: 5 please?<br>356: 6 A. Yes.<br>356: 7 Q. At the bottom of the page<br>356: 8 there.<br>356: 9 A. Yes.<br>356:10 Q. The very bottom it says,<br>356:11 "Suggested labeling."<br>356:12 A. Yes.<br>356:13 Q. Do you see that there?<br>356:14 A. Yes. '<br>356:15 Q. Would you read what she says<br>356:16 about that?<br>356:17 A. Yes.<br>356:18 Q. Well, actually, go to the<br>356:19 second sentence, if you don't mind.<br>356:20 A. All right.<br>356:21 In bold it suggests labeling<br>356:22 that would properly address CV risks.<br>356:23 Q. In the last sentence there?<br>356:24 A. "It would be difficult to<br>357: Page 357<br>357: 1 imagine inclusion of VIGOR results in the<br>357: 2 rofecoxib" or Vioxx "labeling without<br>357: 3 mentioning cardiovascular safety results<br>357: 4 in the study description as well as the<br>357: 5 Warnings section."<br>357: 6 Q. Okay.<br>357: 7 Do you agree with Dr.<br>357: 8 Targum?<br>357: 9 A. Yes.<br>357:10 Q. Are all the opinions --<br>357:11 So, in fairness, Doctor, I<br>357:12 just want to be clear. The opinions that<br>357:13 you gave earlier, are they consistent<br>357:14 with what the medical officers were<br>357:15 saying at the time when they reviewed the<br>357:16 same data that you reviewed in connection<br>357:17 with this litigation?<br>357:18 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 358:5-358:16<br>358: 5 Does your opinions about the<br>358: 6 confluence of 090,085, ADVANTAGE,<br>358: 7 APPROVE and all the other --<br>358: 8 A. Not APPROVE. You mean<br>358: 9 VIGOR.<br>358:10 Q. VIGOR, and all the evidence<br>358:11 surrounding that we've been talking<br>358:12 about, do you come to the same<br>358:13 conclusions about the validity of the<br>358:14 naproxen hypothesis that both of these<br>358:15 medical officers looking at the same<br>358:16 information came to? | | |
| 358:22-359:7<br>358:22 THE WITNESS: Yes, I do.<br>358:23 And I think equally importantly,<br>358:24 ; those are opinions which I wrote<br>359: Page 359<br>359: 1 myself in our publications around<br>359: 2 this period.<br>359: 3 BY MR. TISI:<br>359: 4 Q. Okay. .<br>359: 5 We haven't talked about the<br>359: 6 Alzheimer studies.<br>359: 7 A. Right. | | |
| 359:13-359:24<br>359:13 Do you have an opinion to a<br>359:14 reasonable degree of medical certainty as<br>359:15 to whether or not there was reasonable<br>359:16 evidence of increased mortality<br>359:17 associated with Vioxx?<br>359:18 A. Yes.<br>359:19 Q. What is that opinion?'<br>359:20 A. That opinion is that there<br>359:21 was an increase in mortality,<br>359:22 particularly as reflected in the<br>359:23 Alzheimer studies conducted by Merck with<br>359:24 Vioxx. | | |
| 366:23-367:1<br>366:23 Q. Doctor, when you looked at<br>366:24 cardiac death in the Alzheimer's trials,<br>367: Page 367<br>367: 1 was there an imbalance? | | |

126

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 367:2-367:3<br>367: 2 A. No.<br>367: 3 Q. Cardiac death | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 367:4-368:24<br>367: 4 A. I'm sorry. I thought you<br>367: 5 meant cardiac outcomes. I don't remember<br>367: 6 the cardiac death by heart. Let me look<br>367: 7 at that. I think that -. was the 8 to 2<br>367: 8 or 8 to 3 ratio of deaths, as I recall?<br>367: 9 And I can dig through it here, but if we<br>367:10 agree that it was 8to 2 or 8 to 3, the 2<br>367: 11 and 3 varied. But there was a<br>367:12 four-foldish increase.<br>367:13 Q. Is that significant, Doctor?<br>367:14 A. Well, it depends on what you<br>367:15 mean by "significant." It is striking.<br>367:16 With small numbers, I honestly don't<br>367:17 recall whether it was significant in the<br>367:18 statistical sense. But, again, I think<br>367:19 if you tell me ,that there are four limes<br>367:20 as many people having cardiac deaths in<br>367:21 group A versus group B, that would catch<br>367:22 my attention.<br>367:23 Q. All right.<br>367:24 Doctor, let's move on.<br>368: Page 368<br>368: 1 A. There's one point, Mr.. Tisi.<br>368: 2 in answer to your question that I didn't<br>368: 3 get to say. And that is, if one looks at<br>368: 4 the means of ascertaining events in these<br>368: 5 studies, I was struck with the fact that<br>368: 6 the studies did not seem to me as a<br>368: 7 geriatrician and as somebody who has<br>368: 8 written about geriatric pharmacology to<br>368: 9 be set up in a way that would ascertain<br>368:10 cardiac events in a systematic way so<br>368:11 that you could really be confident of the<br>368:12 results that would come from any part of<br>368:13 the study design that would identify who<br>368:14 had a heart attack or who didn't or who<br>368:15 had an angina and who didn't, who had a<br>368:16 stroke and who didn't.<br>368:17 I was underwhelmed with the<br>368:18 care with which those outcomes were being<br>368:19 looked at. Perhaps their focus was just<br>368:20 on tracking people's mental status. But<br>368:21 another reason that i suspect there was<br>368:22 not a clear difference seen in<br>368:23 cardiovascular events was that they were | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 368:24 not being looked for very carefully. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 369:10·371 :18<br>369:10 Q. Well, Doctor, did you review<br>369:11 the data analysis plan and the standard<br>369:12 operating procedure for ascertaining<br>369:13 cardiovascular events?<br>369:14 A. Yes, I did.<br>369:15 Q. Okay. And did you find, did<br>369:16 you have an opinion as to whether or not<br>369:17 this was set up appropriately to<br>369:18 ascertain and analyze events in the Vioxx<br>369:19 clinical trials?<br>369:20 A. Yes, I do.<br>369:21 Q. And what is that opinion?<br>369:22 A. Based on reviewing the<br>369:23 cardiac standard operating procedure that<br>369:24 Merck put together, which they argued was<br>370: Page 370<br>370: 1 their response to the VIGOR data to look<br>370: 2 for cardiac events in all their other<br>370: 3 studies, I was struck with the fact that<br>370: 4 a number of key presentations of heart<br>370: 5 attack, that is, key manifestations of<br>370: 6 having a heart attack, seemed to have<br>370: 7 been deleted in the course of that<br>370: 8 standard operating procedure being<br>370: 9 implemented.<br>370:10 So, for example, pulmonary<br>370:11 edema, which is well known to be a<br>370:12 presenting or a manifesting sign of a<br>370:13 heart attack, congestive heart failure,<br>370:14 arrhythmia, which is rhythm<br>370:15 disturbances, all were excised from<br>370:16 having been there before, were struck out<br>370:17 in the version of the standard operating<br>370:18 procedure at Merck that I saw, which<br>370:19 would clearly result in under<br>370:20 ascertainment or missing a lot of cases<br>370:21 of heart attack, which particularly in<br>370:22 the elderly, are going to present<br>370:23 themselves in precisely that way.<br>370:24 Q. Doctor, do you have an<br>371: Page 371<br>371: 1 opinion to a reasonable degree of medical<br>371: 2 certainty as somebody who has taught<br>371: 3 pharmaceutical company executives about<br>371: 4 looking at signals and designing clinical | | |

130

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 371: 5 trials as to whether or not it was<br>371: 6 feasible to do a cardiovascular outcomes<br>371: 7 study that would have definitively<br>371: 8 answered this question while Vioxx was on<br>371 : 9 the market?<br>371 :10 A. Yes, I do.<br>371 :11 Q. And what is that opinion?<br>371: 12 A. My opinion is that it would<br>371: 13 have been feasible and ethical and quite<br>371 :14 doable to have such a study done in<br>371 :15 response to the signals that emerged and<br>371 :16 that the more than signals, the data that<br>371 :17 emerged from the studies we have been<br>371: 18 discussing. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 374:18-384:19<br>374:18 Q. I'm 90in9 to show you what I<br>374:19 have had marked as Exhibit Number 36. Is<br>374:20 this the document to which you refer?<br>374:21 A. I think so.<br>374:22 Q. Okay.<br>374:23 And when you look at the<br>374:24 e-mail from Dr. Scolnick dated April 12,<br>375: Page 375<br>375: 1 2000, and this would have been right<br>375: 2 after the VIGOR study, the VIGOR on our<br>375: 3 timeline --<br>375: 4 A. Right.<br>375: 5 Q. -- right after VIGOR was<br>375: 6 unblinded and the data became available?<br>375: 7 A. Correct.<br>375: 8 Q. Okay.<br>375: 9 Would you read what Dr.<br>375:10 Scolnick has to say?<br>375:11 : A. Yes. This is to Dr. Reicin.<br>375: 12 "Hi, Alise. I have been trading e-mails<br>375:13 with Doug Greene in realtime. We are all<br>375:14 online too late. I will tell you my<br>375:15 worry quotient is high. I actually am in<br>375:16 minor agony. What I really want to do is<br>375:17 a 10,000 versus 10,000 patient study in<br>375:18 mild to moderate osteoarthritis Tylenol<br>375: 19 versus Vioxx with PRN," which means as<br>375:20 needed, "low-dose ASA," which is aspirin,<br>375:21 "for those judged to need it. Safety," I<br>375:22 guess he means would be the '~first<br>375:23 primary endpoint and efficacy secondary<br>375:24 or co-primary. WE WILL NOT" now this is<br>376: Page 376<br>376: 1 in capital letters, "WE WILL NOT KNOW FOR<br>376: 2 SURE WHAT IS GOING ON UNTIL WE DO THIS<br>376: 3 STUDY. PLEASE THINK HARP ABOUT THE<br>376: 4 DESIGN BEFORE THE PAC MEETING. Thanks,<br>376: 5 Ed."<br>376: 6 Q. As somebody who conducts<br>376: 7 clinical trials and conducts<br>376: 8 epidemiologic studies and looks at these<br>376: 9 kinds of issue's, would this have been an<br>376:10 ethical study to do? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 376:11 A. Yeah. I think he got it<br>376: 12 exactly right.<br>376:13 Q. And was any such study ever<br>376: 14 done?<br>376:15 A. Not to my knowledge.<br>376:16 Q. Moving on, Doctor.. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 376:17 , Do you have an opinion as to<br>376:18 whether or not to a reasonable degree of<br>376:19 medical certainty, having reviewed all<br>376:20 the documents you reviewed in connection<br>376:21 with your prior experience, as to whether<br>376:22 or not the benefits of Vioxx were<br>376:23 outweighed by its risks?<br>376:24 A. Yes,<br>377: Page 377<br>377: 1 Q, And what is that opinion?<br>377: 2 A, That its benefits were not<br>377: 3 outweighed by its risks, If one counts<br>377: 4 up the number of serious gastrointestinal<br>377: 5 complications that it prevented, and it<br>377: 6 did at least in people not taking<br>377: 7 aspirin, and you compare those with the<br>377: 8 number of serious cardiovascular events<br>377: 9 that it caused, the numbers are actually<br>377:10 quite close, And clinically, it is worse<br>377:11 to have a heart attack or a stroke than<br>377:12 to have a GI bleed because you can fix<br>377:13 the GI bleed by stopping the offending<br>377:14 drug, maybe the patient may need a blood<br>377:15 transfusion, and then they are as good as<br>377:16 they were before, But if you've had a<br>377:17 heart attack or a stroke, there's often<br>377:18 permanent damage to your heart or your<br>377:19 brain, and you're usually not as good as<br>377:20 you were before,<br>377:21 Q. Doctor, that brings me to<br>377:22 another question.<br>377:23 Do you have an opinion as to<br>377:24 whether or not all NSAIDs have the same<br>378: Page 378<br>378: 1 cardiovascular risk as Vioxx?<br>378: 2 A. I have such an opinion.<br>378: 3 Q. Okay.<br>378: 4 Is that something you've<br>378: 5 written about?<br>378: 6 A. Yes,<br>378: 7 Q, In fact, is that something<br>378: 8 that you looked at specifically in the<br>378: 9 context of your Vioxx studies compared to<br>378:10 Celebrex?<br>378: 11 A. Correct.<br>378: 12 Q. And, in fact, that's | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 378: 12 Q. And, in fact, that's<br>378:13 something that you looked at in your<br>378:14 NSAID study comparing naproxen to other<br>378:15 drugs?<br>378:16 ,A. Correct.<br>378:17' Q, And in looking at the<br>378: 18 totality of evidence, do you have an<br>378:19 opinion as to whether or not there is a,<br>378:20 quote, class effect, a cardiovascular<br>378:21 class effect between all nonsteroidal<br>378:22 anti-inflammatory drugs? | | |

135

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 378:23 I A. I do have such an opinion.<br>378:24 Q. And what is that opinion?<br>379: Page 379<br>379: 1 A. My opinion is that there is<br>379: 2 not a unitary class effect, that is, it<br>379: 3 is not the same for all drugs, and that,<br>379: 4 in fact, there is a gradient of effects<br>379: 5 where with some drugs, which happen to be<br>379: 6 the ones that were taken off the market,<br>379: 7 namely, Vioxx and Bextra, having the<br>379: 8 worst risk of heart attack and stroke and<br>379: 9 then lower risk for Celebrex, but<br>379:10 certainly Celebrex at high doses, and I<br>379: 11 think we know that from some clinical<br>379:12 trial data, and then probably lower risk<br>379:13 for the older nonsteroidals. And then,<br>379:14 of course, aspirin, on the other end of<br>379:15 the spectrum, not only has no cardiac<br>379:16 risk, but it prevents heart attacks.<br>379:17 Q. Have you communicated this<br>379:18 opinion to the Food & Drug<br>379:19 Administration?<br>379:20 A. Yes, I have.<br>379:21 Q. And is Celebrex still on the<br>379:22 market, by the way?<br>379:23 : A. Yes, it is.<br>379:24 Q. Is naproxen still on the<br>380: Page 380<br>380: 1 market?<br>380: 2 A. Yes, it is.<br>380: 3 Q. Is diclofenac still on the<br>380: 4 market?<br>380: 5 A. Yes, it is.<br>380: 6 Q. Aspirin?<br>380: 7 A. Yes.<br>380: 8 Q. Naproxen?<br>380: 9 A. Yes.<br>380:10 Q. Doctor, you testified that<br>380:11 you're an expert in the factors that go<br>380:12 into physician prescribing practices.<br>380:13 What are those factors?<br>380:14 A. We've done a number of<br>380:15 studies about what shapes physician<br>380:16 prescribing decisions, and I mentioned<br>380:17 the first one I published in 1982. And<br>380:18 in doing that work, we tried to define | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 380:19 what predicts or drives what a doctor 380:20 prescribes. And a great deal of it is 380:21 the doctor's perception of benefit versus 380:22 risk, which he or she learns from a 380:23 variety of sources. 380:24 Q. What are the sources in 381: Page 381 381: 1 which a pharmaceutical company 381: 2 communicates with doctors about their 381: 3 products? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 381: 4 A. Well, the legal governing<br>381: 5 document that is probably central because<br>381: 6 it determines what the company is allowed<br>381: 7 to say in all of its promotional material<br>381: 8 and all of Its sales presentations is<br>381: 9 what FDA calls the labeling or sometimes<br>381:10 it's called the package insert. But it's<br>381 :11 a lengthy document, usually in small<br>381: 12 print, that describes everything about a<br>381: 13 drug, what it's used for, what its<br>381 :14 benefits are, what its risks are, what<br>381:15 its dose is and so forth.<br>381 :16 Q. Are there any other methods<br>381 :17 by which a pharmaceutical company<br>381 :18 communicates with doctors that you're<br>381 :19 familiar with?<br>381:20 A. Sure. They will also, of<br>381:21 course, send out sales reps to doctors'<br>381 :22 offices to talk to us about the<br>381 :23 attributes of their drug, and, of course,<br>381 :24 they will take out ads in medical<br>382: Page 382<br>382: 1 journals. They will also take out ads or<br>382: 2 put commercials on TV for patients. And<br>382: 3 they' will sponsor continuing education<br>382: 4 programs for physicians.<br>382: 5 Q. What about publication of<br>382: 6 medical articles?<br>382: 7 A. Very often companies are<br>382: 8 heavily involved, as we've learned, in<br>382: 9 the publication of articles in the<br>382:10 medical literature.<br>382:11 Q. Let me talk about some of<br>382:12 those things for a moment. Let's talk<br>382:13 about the label for a moment.<br>382:14 First of all, what's a black<br>382:15 box warning?<br>382: 16 A. A black box warning is the<br>382:17 strongest kind of warning that appears on<br>382:18 a label which is literally in a black<br>382:19 box. And if the FDA feels that there is<br>382:20 a particularly important risk for a given<br>382:21 drug, it insists that the manufacturer-382:<br>22 because the manufacturer kind of owns the<br>382:23 words in the label and negotiates with<br>382:24 the FDA, but ultimately it is the | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 383: 1 manufacturer's words, the FDA will insist 383: 2 that., black box appear at the very 383: 3 beginning of the description of the drug 383: 4 in the labeling information warning about 383: 5 a particular problem. 383: 6 Q. What is a warning? 383: 7 A. A warning is the next, 383: 8 highest level of alert, and it is a 383: 9 section in the labeling in which the most Whereupon, Deposition Exhibit Avorn-37, Vioxx label 1999 MRK-LBL0000035MRK-LBL0000038, was marked for identification. ) Final Avorn Direct 383:10 important risks of a drug are presented. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 383:11 Q. What about a precaution?<br>383:12 A. That's a much milder part of<br>383:13 the labeling in which it's kind of a<br>383:14 "watch out for this," but it's known as<br>383:15 to be a lower standard of risk.<br>383:23 BY MR. TiSI:<br>383:24 Q. Let's look at the -- have<br>384: Page 384<br>384: 1 you reviewed the label that was in effect<br>384: 2 from 1999 through 2002? '<br>384: 3 A. Yes, I have.<br>384: 4 Q. And starting from the date<br>384: 5 of the VIGOR results, and let me hand<br>384: 6 that to you.<br>384: 7 Doctor, was there any black<br>384: 8 box )Warning for cardiovascular disease in<br>384: 9 this label?<br>384:10 A. There was no black box<br>384:11 warning of any kind.<br>384:12 Q. Was there a warning?<br>384:13 A. No.<br>384:14 Q, Was there even a precaution<br>384: 15 in the original label that dealt with<br>384:16 cardiovascular disease?<br>384:17 A. Let me just turn to the<br>384:18 precautions section because I want to be<br>384:19 sure I'm being fair to the company. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 384:22-385:8<br>384:22 No. I've just reviewed the<br>384:23 precautions section again and I don't see<br>384:24 anything about heart attack.<br>385: Page 385 ,<br>385: 1 Q. And that was in effect until<br>385: 2 April of 2002?<br>385: 3 A. That's correct.<br>385: 4 Q. Okay.<br>385: 5 And VIGOR came out, VIGOR<br>385: 6 results became available in 2000, early<br>385: 7 200fl?<br>385: 8 A. In the spring of 2000, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 386:15-386:20<br>386:15 Doctor, given what was known<br>386: 16 about Vioxx from 2000 to 2002, does this<br>386:17 label contain information about<br>386:18 cardiovascular risks that would have<br>386:19 allowed physicians to weigh those risks<br>386:20 against the benefits? | | |
| 388:19-389:5<br>388:19 Does this label contain<br>388:20 accurate medical and scientific<br>388:21 information about the increased mortality<br>388:22 seen in the Alzheimer's trials? .<br>388:23 A, There's nothing in the label<br>388:24 about the doubling of the death rate in<br>389: Page 389<br>389: 1 the Alzheimer's study in this label.<br>389: 2 Q. Is that, in your opinion,<br>389: 3 important information for doctors to<br>389: 4 consider in making a fair risk benefit<br>389: 5 analysis for their patients? | | |
| 389:11-390:3<br>389:11 THE WITNESS: As someone who<br>389:12 has published papers on doctors'<br>389:13;assessment of risk versus benefit<br>389: 14 and how that drives their<br>389:15 prescribing, and as someone who<br>389:16 has conducted and studied programs<br>389: 17 to present information to doctors<br>389: 18 in an unbiased manner, I can.<br>389: 19 assert with complete confidence<br>389:20 that failing to indicate that a<br>389:21 given drug has been associated<br>389:22 with a doubling of death rate in a<br>389:23 study that was statistically<br>389:24 significant, failing to have that<br>390: Page 390<br>390: 1 in the label does not give doctors<br>390: 2 the information they need to use<br>390: 3 that drug appropriately. | | |
| 390:15-390:18<br>390:15 Q. Doctor, have you looked at<br>390:16 the 2002 label which I'm handing to you<br>390:17 now?<br>390:18 A. Yes, I have. | | |

142

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 391:2-392:21<br>391: 2 Q. Is it your understanding<br>391: 3 that in April of 2002 the Vioxx label was<br>391: 4 changed to include some information about<br>391: 5 the cardiac findings in the VIGOR study?<br>391: 6 A. Yes.<br>391: 7 Q. And have you reviewed that,<br>391 : 8 Doctor<br>391: 9 A. Yes, I have.<br>391 :10 Q. And where does that ••<br>391 :11 First of all, let me ask<br>391 :12 you, is there a black box warning for<br>391 :13 doctors in the 2002 label?<br>391:14 A. No.<br>391 :15 Q. Is there a warning on<br>391:16 cardiovascular risk in the label?<br>391 :17 A. No.<br>391:18 Q. Where does the Information<br>391 :19 about VIGOR appear in this label?<br>391 :20 A. It is over here in the<br>391 :21 section that is called "Clinical<br>391 :22 Studies."<br>391 :23 Q. Is it also in the<br>391 :24 precautions section?<br>392: Page 392<br>392: 1 A. I believe there is a<br>392: 2 precaution about gastro •• about<br>392: 3 cardiovascular effects.<br>392: 4 Q. Do you know whether or not<br>392: 5 the--<br>392: 6 We talked about before, we<br>392: 7 looked at the medical officer report of<br>392: 8 Dr. Targum?<br>392: 9 A. Yes.<br>392:10 Q. Okay.<br>392:11 Which talks about the, I<br>392:12 think her words were, It is hard to<br>392:13 conceive that this information from VIGOR<br>392:14 would not be contained in the warnings<br>392:15 section. Do you remember that?<br>392:16 A. Correct.<br>392:17 Q. Okay.<br>392:18 Do you know whether or not<br>392:19 the FDA, in fact, did recommend that the<br>392:20 company include a warning about the<br>392:21 cardiovascular risk seen in VIGOR? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 393:9-393:16<br>393: 9 :Q. If that is the standard for<br>393:10 placing a warning--<br>393:11 A. Yes.<br>393:12 Q. -- would that information<br>393:13 alone have been enough to include the CV<br>393:14 risk in the warnings section of the Vioxx<br>393:15 label?<br>393:16 A. Yes. | | |
| 394:1-394:13<br>394: 1 Do you have an opinion,<br>394: 2 again, to a reasonable degree of medical<br>394: 3 certainty, as to whether or not the<br>394: 4 information in the warning label in *2002*<br>394: 5 contained information about increased<br>394: 6 mortality?<br>394: 7 A. Do I have an -- I'm sorry.<br>394: 8 Do I have an opinion as to whether it was<br>394: 9 there?<br>394:10 Q. Do you know whether it is<br>394:11 there or not?<br>394: 12 A. I know that it was not<br>394:13 there. | | |
| 395:19-395:24<br>395:19 Do you have an opinion to a<br>*395:20* reasonable degree of medical certainty as<br>395:21 to whether or not the evidence of an<br>395:22 association between Vioxx and increased<br>395:23 mortality should have been contained in<br>395:24 the warnings section of the Vioxx label? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 396:23-397:12<br>396:23 I have such an opinion, and<br>396:24 my opinion is that if a company is in<br>397: Page 397<br>397: 1 possession of data that indicates a<br>397: 2 statistically significant doubling of the<br>397: 3 death rate in a placebo-controlled<br>397: 4 randomized control trial that it<br>397: 5 conducted, then that information needs to<br>397: 6 be in the label to be able to guide<br>397: 7 physicians to make appropriate decisions<br>397: 8 about the use of that drug.<br>397: 9 Q. Have you seen any evidence<br>*397:10* that the FDA wanted to include<br>397:11 information about VIGOR and ADVANTAGE in<br>397:12 the warnings section? | | |
| ja062906 - Vol. I, (Page 398:11 to 398:16)<br>               398<br>11  Q.   Okay.<br>12       And do you know whether or<br>13  not the FDA proposed that information<br>14  about VIGOR and ADVANTAGE on<br>15  cardiovascular events and cardiovascular<br>16  risk be placed in the warnings section? | Foundation; no personal knowledge; question without answer | |
| ja062906 - Vol. I, (Page 399:19 to 399:19)<br>               399<br>19   A.   Yes. | Answer to different question than proceeding | |
| 399:19-400:4<br>399:19 A. Yes.<br>399:20 Q. Okay.<br>399:21 Having seen it, and as<br>399:22 somebody who is an expert in the factors<br>399:23 that drive doctors' prescribing<br>399:24 practices, do you have an opinion as to<br>400: Page 400<br>400: 1 whether or not that kind of information<br>400: 2 in the warnings section would have<br>400: 3 assisted doctors in making a risk/benefit<br>400: 4 analysis for their patients? | Answer to different question than proceeding | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 400:11-400:20<br>400:11 THE WITNESS: I have such an<br>400:12 opinion that that would have been<br>400:13 : an important piece of information<br>400:14 for doctors to have.<br>400:15 BY MR. TISI:<br>400:16 Q. Do you think that the lack<br>400:17 of that information deprived doctors of<br>400:18 an important piece of information from<br>400:19 which they could make reasonable<br>400:20 prescribing choices? | | |
| 401 :9-402:10<br>401: 9 As someone who has done<br>401 :10 research on published and peer-reviewed<br>401 :11 journals about physicians' assessments of<br>401 :12 risks and benefits, and as someone who<br>401 :13 teaches physicians about weighing risks<br>401 :14 and benefits, and has written a book<br>401 :15 about risks and benefits as drivers of<br>401 :16 drug use, and as somebody who has written<br>401:17 a paper recently in the New England<br>401 :18 Journal about the effect of labeling on<br>401 :19 warnings and on prescribing, I can say<br>401 :20 with a great deal of certainty that a<br>401 :21 physician not having information about<br>401 :22 doubling of mortality risk and of<br>401 :23 increased risk of heart attack caused by<br>401 :24 a drug would deprive that physician from<br>402: Page 402<br>402: 1 the ability to be able to make a wise<br>402: 2 prescribing decision.<br>402: 3 Q. Doctor, let me ask you this.<br>402: 4 Do you have any evidence you<br>402: 5 have seen in this case that the addition<br>402: 6 of such a warning, as opposed to a<br>402: 7 precaution, would have been made a<br>402: 8 difference with respect to prescribing<br>402: 9 practices with respect to Vioxx?<br>402:10 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Page 402:11 to 402:13)<br>402<br>11  MR. TISI:  Let me show you<br>12      what I'd like to have marked as<br>13      Exhibit Number 39. | Lack of foundation; witness has no expertise with financial forecasts (sustained in Mason) | |
| ja062906 - Vol. I, (Page 403:3 to 403:13)<br>403<br>3  Q.   Doctor, have you seen this<br>4  before in preparation for your testimony<br>5  today?<br>6      A.   Yes, I have.<br>7      Q.   Would you describe --<br>8          First of all, this is July<br>9  of 2001?<br>10      A.   Right.<br>11      Q.   This is before the label<br>12  change?<br>13      A.   Right. | Lack of foundation; witness has no expertise with financial forecasts (sustained in Mason) | 707 |
| ja062906 - Vol. I, (Page 404:8 to 404:11)<br>404<br>8  What does this document<br>9  indicate as to doctors' willingness to<br>10  prescribe Vioxx if there is a warning<br>11  versus a precaution?  Go ahead. | Lack of foundation; witness has no expertise with financial forecasts (sustained in Mason) | |
| ja062906 - Vol. I, (Pages 404:15 to 405:2)<br>404<br>15  THE WITNESS:  This document<br>16      indicates that the individuals at<br>17      Merck who prepared it had exactly<br>18      the same impression as I did about<br>19      the effect of a clear warning<br>20      versus what they call a mild<br>21      warning on utilization of the<br>22      drug.  And what their graph<br>23      indicates is their projection that<br>24      utilization of the drug would be<br>405<br>1      much lower if there was a strong<br>2      warning versus a mild warning. | Lack of foundation; witness has no expertise with financial forecasts (sustained in Mason) | |

147

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 405:14-406:21<br>405:14 Q. Is this consistent with your<br>405: 15 own research that the various levels of<br>405: 16 warning make a difference with doctors?<br>405:17 A. Yes.<br>405:18 Q, Doctor, you mentioned<br>405:19 another method by which doctors<br>405:20 communicate .- companies communicate with<br>405:21 doctors is their statements to the press,<br>405:22 I think you mentioned that before?<br>405:23 A. Right.<br>405:24 Q. Have you seen statements<br>406: Page 406 .<br>406: 1 that Merck has made to the press about<br>406: 2 the cardiovascular safety of Vioxx?<br>406: 3 A. Yes.<br>406: 4 **MR.** TISI: I'm going to hand<br>406: 5 you what I would like to have<br>406: 6 marked as Exhibit Number 40.<br>406: 7<br>406:<br>406:14 **THE** WITNESS: Sounds right.<br>406:15 BY **MR.** TISI:<br>406:16 Q. Doctor, have you seen this<br>406:17 before as an example of the kind of<br>406:18 communication that Merck made to the<br>406:19 press?<br>406:20 'A. Yes.<br>406:21 Q. What is this? | | |
| 407:3-407:14<br>407: 3 THE WITNESS: This is<br>407: 4 labeled as a news release on<br>407: 5 Merck's stationary for immediate<br>407: 6 release, and the title of it is --<br>407: 7 and it's dated May 22nd, 2001.<br>407: 8 And the title is "Merck Confirms<br>407: 9 Favorable Cardiovascular Safety<br>407:10 Profile of Vioxx."<br>407:11 BY MR**.** TISI:<br>407:12 Q. And this talks about the<br>407:13 VIGOR study?<br>407:14 A. Right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 408:2-408:6<br>408: 2 Knowing what you know about<br>408: 3 VIGOR, and looking at the medicine and<br>408: 4 science surrounding VIGOR, is this<br>408: 5 medically and scientifically accurate<br>408: 6 information to disseminate to the public? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 408: 16 how to present information to<br>408:17 patients back in the early 1980s<br>408:18 relating to antibiotic risks and<br>408: 19 benefits.<br>408:20 We have since produced<br>408:21 copious materials for patients in<br>408:22 our program in the State of<br>408:23 Pennsylvania explaining to them<br>408:24 the risks and benefits of various<br>409: Page 409<br>409: 1 drugs in addition to information<br>409: 2 for doctors to teach them about<br>409: 3 how to balance risks and benefits<br>409: 4 of drugs in a program supported by<br>409: 5 the State of Pennsylvania.<br>409: 6 Our other studies on<br>409: 7 presenting information about risks<br>409: 8 and benefits to patients and to<br>409: 9 physical\s have been supported by<br>409:10 the National Institutes of Health<br>409:11 : and the John A. Hartford<br>409: 12 Foundation and a variety of other<br>409:13 sources, including the Arthritis<br>409:14 Foundation and Merck itself in a<br>409:15 current study that I'm doing with<br>409:16 Dr. Solomon about explaining to<br>409:17 patients how to balance their<br>409:18 risks and benefits of osteoporosis<br>409:19 drugs, of which the most prominent<br>409:20 one is made by Merck.<br>409:21 I have spent 25 years<br>409:22 studying the question of how one<br>409:23 can condense complicated data,<br>409:24 epidemiologic data, clinical data,<br>410: Page 410<br>410: 1 biological data, to doctors and<br>410: 2 patients so as to inform their<br>410: 3 prescribing in a way that is<br>410: 4 driven by science and by patient<br>410: 5 benefit, rather than driven by the<br>410: 6 need to push or dump on a given<br>410: 7 product. That is what my career<br>410: 8 has been about.<br>410: 9 i spend most days thinking<br>410:10 ,about how to present such<br>410:11 'information fairly. And based on | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 410:12 that 25 and 20 years of<br>410:13 experience, published in<br>410:14 peer-reviewed journals, funded by<br>410: 15 federal agencies and peer-reviewed<br>410:16 grant proposals, I can tell you<br>410:17 that this is an inadequate and a<br>410:18 deceptive way of presenting this<br>410:19 information to the press, to<br>410:20 doctors, to patients or to anyone. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 413:7-414:23<br>413: 7 Medically and scientifically<br>413: 8 having reviewed the VIGOR data and<br>413: 9 knowing what you know as an<br>413:10 epidemiologist, was the information<br>413: 11 portrayed to doctors in a way that is<br>413:12 medically and scientifically accurate?<br>413:13 A. No.<br>413:14 Q. Why is that?<br>413:15 A. Several reasons. One is<br>413:16 that it is inappropriate for authors,<br>413:17 whether they work for a corporation or a<br>413:18 university, to know about important side<br>413:19 effects like a .heart attack in patients<br>413:20 in a study that they are reporting and to<br>413:21 fail 10 include that information in the<br>413:22 published version of that paper. That's<br>413:23 reason number one.<br>413:24 Reason number two is the<br>414: Page 414<br>414: 1 so-called flipping of the data, and,<br>414: 2 again, that's a Merck term, not mine, to<br>414: 3 present the difference in the heart<br>414: 4 attack rate between naproxen and Vioxx as<br>414: 5 being explained by the fact that naproxen<br>414: 6 was protecting patients' hearts, when at<br>414: 7 least an equally plausible conclusion,<br>414: 8 and, frankly, a far more plausible<br>414: 9 conclusion was that Vioxx was 'causing the<br>414:10 heart attacks, and that inversion is<br>414:11 something which was not a fair<br>414:12 presentation of the data,<br>414:13 Q, Let's move forward to the<br>414:14 APPROVE study. Having reviewed the<br>414:15 APPROVE study and now knowing what you<br>414:16 know and seeing what you've seen, was the.<br>414: 17 evidence presented and the information<br>414: 18 presented in the APPROVE study a<br>414:19 medically and scientifically accurate<br>414:20 presentation of the data collected in<br>414:21 that study so that doctors in the<br>414:22 scientific community would understand the<br>414:23 risks and benefits associated with Vioxx? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 415:3-417:2<br>415: 3 THE WITNESS: All right.<br>415: 4 APPROVE was not a fair and<br>415: 5 accurate depiction of the data, we<br>_ 415: 6 now know, for a couple of reasons.<br>415: 7 One is that it eliminated<br>415: 8 patients who had their cardiac<br>415: 9 events greater than two weeks<br>415:10 after stopping the drug, and we<br>415:11 now understand that there are<br>415:12 aspects of the way that Vioxx<br>415: 13 might cause damage that could<br>415:14 easily occur greater than two<br>415:15 weeks after stopping the drug,<br>415:16 and, in fact, the stroke data from<br>415:17 the APPROVE followup does indicate<br>415:18 that patients who had been on<br>415:19 Vioxx continued to have a<br>415:20 statistically significant higher<br>415:21 rate of stroke after the study was<br>415:22 completed or the active phase was<br>415:23 completed compared to the patients<br>415:24 who were on placebo, That's<br>416: Page 416<br>416: 1 reason number one.<br>416: 2 Reason number two is that it<br>416: 3 !s now fairly well recognized that<br>416: 4 the study used an incorrect<br>416: 5 statistical approach which created<br>416: 6 the misimpression that the risk<br>416: 7 from Vioxx in that study only<br>416: 8 began at month 18 and that anyone<br>416: 9 taking the drug for less than 18<br>416:10 months, according to the way that<br>416:11 study was originally presented,<br>416:12 had no risk.<br>416:13 As of the last few days,<br>416:14 that has been corrected in the New | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 416:15 England Journal, and the statement 416:16 that this is not a problem before 416:17 18 months has been modified, as I 416:18 understand it, in response to this 416:19 becoming known by the editors of 416:20 the New England Journal, who, as I 416:21 know it, requested that change. 416:22 And I think those are the 416:23 two most important ways that, and 416:24 very important ways, APPROVE did 417: Page 417 417: 1 not present the data in an 417: 2 accurate and balanced manner. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 417:23-419:8<br>417:23 Q. Doctor, we talked about the<br>417:24 ADVANTAGE study and the publication of<br>418: Page 418<br>418: 1 the ADVANTAGE study. Did the publication<br>418: 2 oft~e ADVANTAGE study contain<br>418: 3 information about myocardial infarction,<br>418: 4 heart attacks, as opposed to APTC events?<br>418: 5 A. No. The endpoint --<br>418: 6 although that data was collected, the<br>418: 7 endpoint that was chosen for publication<br>418: 8 was the so-called APTC or Anti-Platelet<br>418: 9 Trialists Collaborative definition, which<br>418:10 was much broader. That definition did<br>418:11 not reveal a striking difference in<br>418:12 outcomes, but had heart attacks, which is<br>418:13 exactly the issue at hand, been the<br>418:14 outcome that was presented, that would<br>418:15 have revealed a difference.<br>418:16 Q. Did any of the published<br>418:17 Alzheimer's studies publish the intention<br>418:18to treat analysis that Dr. Chen reported<br>418:19 about the increased mortality in both of<br>418:20 those studies?<br>418:21 A. No. Even though that<br>418:22 analysis was done by Merck and available<br>418:23 to Merck, it was not presented in<br>418:24 published form to doctors.<br>419: Page 419 '<br>419: 1:0. Looking at all the major<br>419: 2 publications that were submitted to the<br>419: 3 medical and scientific community, do you<br>419: 4 have an opinion as to whether or not the<br>419: 5 medical and scientific information that<br>419: 6 came to them in their totality was a<br>419: 7 reasonable exposition of the medical and<br>419: 8 scientific information known to Merck? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 419:14-420:13<br>419:14 THE WITNESS: As someone who<br>419:15 reviews articles for the New<br>419:16 England Journal of Medicine,<br>419: 17 reviews articles for JAMA, a<br>419:18 number of other publications in<br>419:19 which the editors seek my peer<br>419:20 review as to the appropriateness<br>419:21 of presentation of the data, as<br>419:22 someone who has published over 200<br>419:23 articles in which I myself have<br>419:24 been subjected to peer review<br>420: Page 420<br>420: 1 about the fairness of the<br>420: 2 presentation of our own data, as<br>420: 3 someone who has written Widely<br>420: 4 about physicians' and patients'<br>420: 5 perception of risk and how that<br>420: 6 perception drives their<br>420: 7 prescribing, I can say that I have<br>420: 8 never known a collection of papers<br>420: 9 on anyone topic in which there<br>420:10 : has been such a constellation of<br>420:11 skewed and distorted presentation<br>420:12 of data in any drug studies that<br>420:13 I've ever looked at. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 421 :22-423:2<br>421 :22 THE WITNESS: Yes. As I<br>421 :23 said in my Health Affairs article<br>421 :24 about direct-to-consumer<br>422: Page 422<br>422: 1 advertising a couple of years ago,<br>422: 2 it's vital that patients be able<br>422: 3 to get a reasonable depiction of<br>422: 4 both the good news and the bad<br>422: 5 news about a drug. And given what<br>422: 6 we now understand was available to<br>422: 7 Merck at the time that all - that<br>422: 8 those $100 million a year of<br>422: 9 commercials and ads were being<br>422:10 run, I think it is absolutely'<br>422: 11 correct to say that they provided<br>422:12 all the good news about the drug<br>422:13 and did an inadequate job of<br>422:14 presenting the bad news about the<br>422:15 drug to patients.<br>422:16 BY MR. TIS':<br>422:17 Q. Now, Doctor, let me turn to<br>422:18 the one last topic I would ask you about<br>422: 19 here, and that is the detailing of the<br>422:20 doctors, which is another method in which<br>422:21 companies will communicate with doctors.<br>422:22 Have you reviewed any of the<br>422:23 detailing information that was provided<br>422:24 to doctors?<br>423: Page 423<br>423: 1 A. Yes, as well as the training<br>423: 2 of the sales reps, which is part of that. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja062906 - Vol. I, (Pages 423:21 to 425:9)<br><br>423<br>21  Q.   Did you see any information<br>22  about how to respond to doctors'<br>23  inquiries about cardiovascular events in<br>24  your review of the documents?<br>424<br>1      A.   Yes.<br>2      Q.   What did you see?<br>3      A.   Well, the most memorable was<br>4  the dodge ball game that was apparently<br>5  developed as a training tool for their<br>6  sales reps to be able to respond to<br>7  doctors' questions about the<br>8  cardiovascular risks of Vioxx<br>9  particularly after the APPROVE study<br>10  findings had come out.  And I was<br>11  struck --<br>12      Q.   You meant VIGOR, right?<br>13      A.   I'm sorry.  That's what I<br>14  meant to say.<br>15      Q.   All right.  Okay.<br>16      A.   And I was struck by the fact<br>17  that the purpose is pretty much summed up<br>18  in the name, that it was to dodge<br>19  questions about this very important risk<br>20  of the company's drug.<br>21          Merck's training materials<br>22  to their sales reps explicitly tell them,<br>23  do not raise or do not initiate any<br>24  discussion of our paper or of other<br>425<br>1  papers related to cardiovascular risk.<br>2  And there were a number of completely<br>3  evasive answers that were being fed to<br>4  the sales reps for them to give as<br>5  responses to doctors who asked about<br>6  whether or not this drug could cause<br>7  heart attacks.  And that did not seem to<br>8  me to be a reasonable or scientifically<br>9  accurate presentation of the data. | Foundation; speculation; improper opinion on state of mind | Overrule |

158

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 430:4-430:21<br>430: 4 Q. Okay.<br>430: 5 , Now, let me ask you, given<br>430: 6 all 6f that experience, Doctor, in your<br>430: 7 experience of 20-some odd, 30-some odd<br>430: 8 years in teaching how to communicate the<br>430: 9 risks and the benefits, looking at all<br>430:10 the ways in which Vioxx was communicated,<br>430:11 the risks and the benefits, the good news<br>430:12 and the bad news to doctors, press<br>430:13 releases, medical journals, labels,<br>430:14 retailers, all of those things put<br>430:15 together, do you have an opinion to a<br>430:16 reasonable degree of medical and<br>430:17 scientific certainty as to whether or not<br>430:18 an accurate picture of the risks and<br>430:19 benefits of the drugs was communicated to<br>430:20 doctors so that they can make accurate<br>430:21 prescribing decisions for their patients? | | |
| 431 :9-431:24<br>431: 9 THE WITNESS: That there was<br>431:10 a pattern of gross distortion of<br>431 :11 the risks of Vioxx, and that no<br>431 :12 matter which way physicians turn,<br>431 :13 whether it was looking at the<br>431 :14 : label, hearing what they were<br>431 :15 hearing from the Merck-trained<br>431 :16 sales representatives, trying to<br>431: 17 read the literature in the medical<br>431:18 journals and trying to get some<br>431 :19 accurate, complete depiction of<br>431 :20 what was happening in the clinical<br>431 :21 trials, even the information their<br>431 :22 patients were bringing to them<br>431 :23 from the commercials and ads that<br>431 :24 they had seen, across the board, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 432:19-433:3<br>432:19 Q. Now, is that opinion you<br>432:20 just gave an opinion that you are basing<br>432:21 on the scientific and medical information<br>432:22 that you know was available at the time?<br>432:23 A. It is ,the opinion of me as<br>432:24 an expert who has spent 25 years studying<br>433: Page 433<br>433: 1 the risks and benefits of drugs and how<br>433: 2 those risks and benefits should be<br>433: 3 communicated to doctors and to patients, | | |
| **6/30/06 DEPOSITION** | | |
| 447:15 -447:16<br>447:15 Q, Doctor, once again, my name<br>447:16 is Phil Beck, and r represent Merck, | | |
| 447:17-448:12<br>447:17 As I understand it, sir, you<br>447:18 were retained as an expert by the<br>447:19 plaintiffs' lawyers in around May of<br>447:20 2005; is that right?<br>447:21 A That's right.<br>44722 Q And J think Mr. Tisi<br>447:23 mentioned this, but they provided you<br>447:24 with a large num~er *of* documents to<br>448:1 review; is that right?<br>4482 A Thousands of pages, yes.<br>448:3 Q And were these documents<br>448<4 contained in binders that Mr nsi allowed<br>448:5 to LIS during your first deposition?<br>4486 A Yes<br>448:7 Q And r think *you've* got those<br>448:8 binders with you today?<br>448:9 A, Right<br>448:10 Q, What, are there ten or so<br>44811 binders of documents that they gave you~)<br>448:12 A Sounds about right, yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 470:21-471 :7<br>470:21 Q, When you wrote your report,<br>470:22 did the lawyers that you worked with turn<br>470:23 around and mark it up and provide you<br>470:24 with suggestions and changes from your<br>471:1 report?<br>471:2 A, They did not do any marking<br>471:3 up, but they did ebmment on aspects of<br>471:4 it. This is unclear, this is unfair to<br>471:5 Merck, you forgot about this thing that<br>471:6 we had talked about, but they didn't make<br>471:7 any marks or changes. | | |
| 471:23-472:1<br>471:23 Q, Your testimony is that the<br>471:24 lawyers did not provide you with any ,<br>472:1 markups; is that right | | |
| 472:3<br>472:4<br>472:5<br>472:6<br>472:7<br>472:8<br>472:9<br>472:10<br>472:11<br>472:12<br>472:13<br>472:14<br>472:15<br>472:16 | | |
| 472:17 -472:18<br>472:17 Do you see that Exhibit 43<br>472:18 is an e-mail to | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 472:18 -473:15<br>472:18 from Jeff Grand?<br>472:19 A. Yes.<br>472:20 Q. And Jeff Grand is one of the<br>472:21 lawyers that you worked with?<br>472:22 A. That's right.<br>472:23 Q. Do you see at the bottom -<br>472:24 excuse me, I'll go back up to the top.<br>473:1 And this is dated March<br>473:2 12th,2006. Do you see that?<br>473:3 A. Yes.<br>473:4 Q. And that was before the date<br>473:5 of your expert report in this case,<br>473:6 right?<br>473:7 A. It was before it was<br>473:8 finalized, yes.<br>473:9 Q. Okay.<br>473:10 Before it was finalized.<br>473:11 And then do you see the very<br>473:12 last thing that Mr. Grand said in his<br>473:13 e-mail to you was, "Also, tomorrow, I<br>473:14 will send you a mark-up of your report as<br>473:15 we discussed." | | |
| 473:21-473:22<br>473:21 THE WITNESS: Yes, I see<br>473:22 that. | | |
| ja063006 - Vol. I, (Pages 473:24 to 474:4)   473<br><br>474 | | |
| ja063006 - Vol. I, (Page 476:2 to 476:7)   476<br>2 | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 477:19 to 478:2)<br>477<br>[redacted]<br>[redacted]<br>[redacted]<br>[redacted]<br>[redacted]<br>478<br>[redacted]<br>[redacted] | | |
| 494: 20 -494:22<br>494:20 Q. And were the<br>494:21 gastrointestinal bleeds an important<br>494:22 clinical problem? | | |
| 495:1-495:1<br>495:1 :the WITNESS: That's right. | | |
| 495:3 -495:14<br>495:3 Q. Have there been studies that<br>495:4 showed the number of hospitalizations<br>495:5 each year that came from gastrointestinal ' , ,<br>495:6 complications from traditional NSAIDs?<br>495:7 A. Yes, there were.<br>495:8 Q. And does it square with your<br>495:9 recollection that these studies showed<br>495:10 that there would be over 100,000<br>495:11 hospitalizations each year due to<br>495:12 gastrointestinal complications from<br>495:13 traditional NSAIDs7<br>495:14 A. That's-correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 495:17 -495:18<br>495:17 THE WITNESS: That's<br>495:18 **correct.** | | |
| 495:20 Q. Now, you talked about some<br>495:21 FDA Advisory Committees yesterday. Do<br>495:22 you remember that?<br>495:23 A. Yes.<br>495:24 Q. And I think you talked about<br>496:1 the 2005 Advisory Committee meeting,<br>496:2 right?<br>496:3 A. That's right<br>496:4. And 1think you may have<br>496:5 talked about the 2001 Advisory Committee?<br>496:6 A. That's right.<br>496:7 Q. Was there also an Advisory<br>496:6 Committee that was convened in 1999 to<br>496:9 consider whether Vioxx should be approved<br>496:10 by the FDA?<br>496:11 A. That's right.<br>496:12 Q. And is it the case that<br>496:13 before prescription medicines get<br>496:14 approved, the FDA often seeks the advice<br>496:15 of Advisory Committees made up of outside<br>496:16 doctors and professionals? | | |
| 496:20 -496:20<br>496:20 THE WITNESS: That's right | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 496:22 -498:19<br>496:22 Q. And there was such an<br>496:23 Advisory Committee convened concerning<br>496:24 whether to approve Vioxx, right?<br>497:1 A. That's right.<br>497:2 Q. Were you asked to be on that<br>497:3 committee?<br>497:4 A. No.<br>497:5 Q. Did that committee involve<br>497:6 or include medical doctors? . 497:7 A. Yes.<br>497:8 Q. Did it include<br>497:9 pharmacologists?<br>497:10 A. Yes.<br>497:11 Q. Other FTS?<br>497:12 A. Usually such people are on<br>497:13 those committees.<br>497:14 Q. Are you familiar with the<br>497:15 materials that were examined by that<br>497:16 committee and the conclusions that it<br>497:17 came to?<br>497:18 A. Yes.<br>497:19 Q. Did the Advisory Committee<br>497:20 in 1999 vote unanimously that Vioxx<br>497:21 should be approved for the treatment of<br>497:22 osteoarthritis?<br>497:23 A. They voted to approve, I<br>497:24 don't remember the vote numbers, but th!3Y<br>498:1 clearly voted to approve.<br>498:2Q. And you do not disagree with<br>498:3 the recommendation of the Advisory<br>498:4 Committee based on the information that<br>498:5 was available at the time, do you?<br>498:6 A. Right.<br>498:7 Q. And as you've testified,<br>498:8 Vioxx was approved by the Food & Drug<br>498:9 Administration for use in the United<br>498:10 States in May of 1999, right?<br>498:11 A. That's right.<br>498:12 Q. You do not disagree with<br>498:13 that decision either, do you?<br>498:14 A I do not.<br>498:15 Q. Yesterday you testified<br>498:16 about something that's been referred to<br>498:17 as an imbalance theory as a possible<br>498:18 explanation for what you say are higher<br>498:19 cardiovascular risks with Vioxx. Do you | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 498:20-498:20<br>498:20 Do you remember that? | | |
| 498:24 -499:8<br>498:24 THE WITNESS: That was one<br>499:1 of the issues we discussed, yes.<br>499:2 BY MR. BECK:<br>499:3 Q. At the time that the FDA<br>499:4 approved Vioxx in May of 1999, they were<br>499:5 aware of this imbalance theory that you<br>499:6 talked about yesterday, were they not?<br>499:7 A. I can't speak to what FDA<br>499:8 )Has or wasn't aware of | | |
| 505:8 -505:24<br>505:8 Q. Dr. Avorn, I've handed you<br>505:9 what I've marked as Exhibit 44. Do you"<br>505:10 recognize this as one of·the documents<br>505:11 that was provided to you for your review<br>505:12 and analysis by the lawyers that you've<br>505:13 been working with on this case?<br>505:14 A. Yes.<br>505:15 Q. And you understood it to be<br>505:16 '8 copy or excerpts of the report by one<br>505:17 of the medical review officers from the<br>505:18 FDA, correct?<br>505:19 A. Right.<br>505:20 Q. And in your analysis in this<br>505:21 case, you have relied on this document<br>505:22 and other reviews by medical officers of<br>505:23 the FDA; is that right?<br>505:24 A. Right | | |
| 506:2 -506:4<br>506:2 Let's turn over to the 20th<br>506:3 page in here, and I'll see how it's<br>506:4 numbered | | |
| 506:15-506:19<br>506:15 that you've got the page<br>506:16 that I put up on the board that says "In<br>506:17 summary" or up on the screen it says "In<br>506:18 summary" on the top?<br>506:19 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 507:5 -507:15<br>507:5 Do you see here that under ,_ ,<br>507:6 "Thromboembolic and Vascular Safety," do<br>507:7 you see that heading there?<br>507:8 A. Yes.<br>507:9 Q. And tor the benefit of the<br>507:10 jury, what does "thromboembolic" mean?<br>507:11 A. That refers to problems that<br>507:12 occur when there's a blood clot in the<br>507:13 artery.<br>507:14 Q. And "vascular" refers to?<br>507:15 A. Relating to blood vessels. | | |
| 508:7 -509:1<br>508:7 So, it was reviewed -in<br>508:8 advance of the approval of Vioxx in May<br>508:9 of 1999, right?<br>508:10 A. Correct.<br>508:11 Q. And so before the FDA<br>508:12 approved Vioxx in May of 1999, the FDA<br>508:13 medical officer understood the<br>508:14 information I've blown up on the screen, ~<br>508:15 that "There is a theoretical concrn that<br>508:16 patients chronically treated with a COX-2<br>508:17 selective inhibitor may be at higher risk<br>508:18 for thromboembolic cardiovascular adverse<br>508:19 experiences than patients treated with<br>508:20 ,COX-1ICOX-2 inhibitors (conventional<br>508:21 N5AIDs), due to the lack of *effect* of<br>508:22 CBX-1 inhibition on platelet function."<br>508:23 Now, that's a mouthful, but<br>508:24 would you agree with me, sir, that what's<br>509:1 referred to there is the same imbalance | | |
| 509:9 -509:16<br>509:9 THE WITNESS: I think it's<br>509:10 incorrect in that the so-called<br>509:11 imbalance theory has a lot more to<br>509:12 it than just platelet function.<br>509:13 There's a lot of differences in<br>509:14 prostacyclin versus thromboxane<br>509:15 balance that are not just about<br>509:16 platelet inhibition. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 509:19-509:24<br>509:19 Does the imbalance theory<br>509:20 that you talked about yesterday include<br>509:21 the notion of platelet functioning as<br>509:22 described here in this excerpt that we<br>509:23 put up?<br>509:24 A. That's one piece of it. | | |
| 510:2-510:6<br>510:2 So, certainly that piece of<br>510:3 the imbalance theory, at the very least,<br>510:4 was understood by the ~DA when they<br>510:5 approved Vioxx in May of 1999. Would you<br>510:6 agree with that? | | |
| 510:7-510:7<br>510:7 A. Yes | | |
| 510:15-510:20<br>510:15 Q. Do you also agree, sir, that<br>510:16 Vioxx worked to reduce pain and<br>510:17 inflammation for the vast majority of<br>510:18 patients Who used it without causing them<br>510:19 any side effects whatsoever?<br>510:20 A. That's probably true. | | |
| 512:14 THE WITNESS: Right. I<br>512:15 think I mentioned yesterday that<br>512:16 it was given in very high doses.<br>512:17 BY MR. BECK:<br>512:18 Q. And, in fact, it's so high<br>512:19 that it would be five to seven times as<br>512:20 high as the dose that was actually<br>512:21 recommended on the label, correct?<br>512:22 A. Right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 513:1-514:3<br>513:1 Q. How many people actually had<br>513:2 a heart attack in this study of protocol<br>513:3 017 that you said was a signal?<br>513:4 A. There was a very small<br>513:5 number. It was a handful, and I can't<br>513:6 tell you the number sitting here, but it<br>513:7 was a very small number.<br>513:8 Q. Is there something in-your<br>513:9 report that you could look to and tell us<br>513:10 how small a handful it was?<br>513:11 A. Np. I just know that it was<br>513:12 a very small brief study, but the reason<br>513:13 it seemed important was that it only<br>513:14 lasted six weeks, and Merck's review of<br>513:15 it indicated there was a worrisome<br>513:16 increase in heart attacks and unstable<br>513:17 angina.<br>513:18 Q. Well, do you know that, in<br>513:19 fact, there was only one person in the<br>513:20 whole study who experienced a heart<br>513:21 .attack?<br>513:22 A. The review within Merck<br>513:23 spoke of a number of cardiovascular<br>513:24 outcomes, including unstable angina, and<br>514:1 at this point 1do want to refer to my<br>514:2 notes rather than try to do all of this<br>514:3 from memory. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 514:4-514:20<br>514:4 D. Sure. I invited you to.<br>514:5 A Okay.<br>514:6 Q. I asked you if there was<br>514:7 anything in there that would help you ~~<br>514:8 A. Sure, sure<br>514:9 Q --figure out how many<br>514:10 people in this study that you called a<br>514:11 signal actually had a heart attack?<br>514:12 A. Again. the signal aspect of<br>514:13 it would not only be heart attacks. it<br>514:14 would also be if somebody develops<br>514:15 angina, which is the exact same kind of<br>514:16 'illness as a heart attack. but in six<br>514:17 weeks YOU would be very surprised that<br>514:18 anybody would progress to actually having<br>514:19 a heart attack But if you want, I<br>514:20 can | | |
| 514:21-515:7<br>514:21 Q. How many people had a heart<br>514:22 attack in this study?<br>514:23 A. If you confine it to heart<br>514:24 attacks as opposed to heart attacks,<br>515:1 unstable angina and other kinds of<br>515:2 cardiovascular disease, I wouldn't be<br>515:3 surprised that it was a very small<br>515:4 number. It could even have been one.<br>515:5 But that was not the total number of<br>515:6 cardiovascular adverse events that were<br>515:7 observed. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 519:7 -520:10<br>519:7 Q. Dr. Avorn, before we broke,<br>519:8 we were talking about protocol 017 which .. ,<br>519:9 you said was a six-week study involving<br>519:10 high doses of Vioxx. And my question for<br>519:11 you, sir, was, do you know how many<br>519:12 people actually had a heart attack in<br>519:13 this study?<br>519:14 A. Yes.<br>519:15 Q. And how many people actually<br>519:16 had a heart attack in this study?<br>519:17 A. One had a heart attack, and<br>519:18 about six others had what the FDA<br>519:19 characterized as cardiovascular adverse<br>519:20 experiences.<br>519:21 Q. So, for the one person who<br>519:22 actually had a heart attack, do you know<br>519:23 ~hat that person's risk factors were?<br>519:24 A. It was a 73·year-old person<br>520:1 who I believe was a male, and those are<br>520:2 risk factors in themselves. Having<br>520:3 rheumatoid arthritis is another risk .. ,<br>factor for heart disease. And I don't 520:4<br>520:5 know about other characteristics of that<br>520:6 one person.<br>520:7 Q. Do you know what the<br>520:8 investigator said about whether he<br>520:9 ,believed Vioxx caused the person's heart<br>520:10 attack? | | |
| 520:12 -520:16<br>520:12 THE WITNESS: I tend to not<br>520:13 pay attention to investigator<br>520:14 attributions especially in<br>520:15 company-funded~st~dies.<br>I think a<br>520:16 heart attack is a heart attack. | | |
| 520:18-520:21<br>520:18 Q. Well, do you know one way or<br>520:19 another what the investigator said is my<br>520:20 question?<br>520:21 A. No. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 521:1 -521:4<br>521:1 a. You're not taking the<br>521:2 position in this litigation that Vioxx<br>521:3 caused the patient's heart attack in<br>521:4 protocol 017, are you? | | |
| 521:6 -521:8<br>521:6 THE WITNESS: I have no way<br>521:7 of knowing in that particular<br>521:8 instance. | | |
| 521:10-522:9<br>521 :10 a. We're done with that n0W.<br>521 :11 Actually, we may --you were<br>521:12 looking at --when<br>you were answering<br>521:13 those questions, you were looking at<br>521:14 Exhibit 44 -<br>521:15 A, Exhibit 44,<br>521:16 a, -'which was Dr. Villalba's<br>521:17 medical review?<br>521 :18 A. Ri9ht<br>521:19 a, Is that what it's called?<br>521 :20 A Right. Primary review of . , . ,<br>521 :21 the new drug application.<br>521 :22 a. All ri9ht<br>521 :23 Is that what you called<br>521:24 yesterday the medical reviews?<br>522:1 A. Medical officer review I<br>522:2 think is what I called it.<br>522:3 a, Okay,<br>522:4 And yesterday you talked<br>522:5 about some of the medical officer<br>522:6 reviews, right?<br>522:7 A. Ri9ht<br>522:8 a. Let's look at the 13,th page<br>522:9 of this document, Exhibit 44. | | |
| 522:13-522:18<br>522:13 let me put it up on the<br>522:15 A, Got it<br>522:16 And table, what must be a<br>522:17 A Part of Table 38, Right<br>522:18 Do you see that? | | |

172

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 522:19-523:12<br>522:19 Q. And do you see, can you tell<br>522:20 from this page at the very bottom that<br>522:21 Or Villalba is beginning a discussion<br>522:22 there of study 017. That's the same<br>522:23 thing that you've been referring to as<br>522:24 protocol 017, correct?<br>523:1 A. Right.<br>523:2 Q. Is that right?<br>523:3 A. Right.<br>523:4 Q. Okay.<br>523:5 And then when we go over to<br>523:6 ,the next page --and let me ask here,<br>523:7 this document that was provided to you<br>523:8 for your review has some underlinings and<br>523:9 markings. Are those your underlinings<br>523:10 and markings?<br>523:11 A. That's right.<br>523:12 Q. Okay. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 523:13 -524:14<br>523:13 Do you see about halfway<br>523:14 down on the page there was a paragraph<br>523:15 that has a little handwritten bracket on<br>523:16 the side. Is that your handwritten<br>523:17 bracket?<br>523:18 A. That's right.<br>523:19 Q. And would you read; please, ,. ,<br>523:20 what this says, this paragraph that you<br>523:21 bracketed?<br>523:22 A. Sure. "There were more<br>523:23 patients with cardiovascular adverse<br>523:24 events in the rofecoxib or Vioxx 175<br>524:1 'milligram group than in the placebo<br>524:2 group."<br>524:3 Q. Would you read the next<br>524:4 sentence?<br>524:5 A. Sure. Table 9 is where they<br>524:6 are listed. "The number of patients<br>524:7 enrolled in this study was small and no<br>524:8 conclusions can be drawn from these<br>524:9 data." That's why it's a signal.<br>524:10 Q. Do you agree with the<br>524:11 medical officer from the FDA that because<br>524:12 of the small number of patients enrolled<br>524:13 in the study that no conclusions can be<br>524:14 drawn from these! data? | | |
| 524:16 -525:1<br>524:16 THE WITNESS: I would not<br>524:17 have phrased it as "no<br>524:18 conclusions." I would say that<br>524:19 there's no statistically<br>524:20 significant difference, there's no<br>524:21 proof, there's no hard and fast<br>524:22 evidence from this ane study, but<br>524:23 I think a conclusion that I would<br>524:24 draw was that this warrants<br>525:1 further scrutiny. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 525:19-526:15<br>525:19 Q Do you agree, sir, that<br>525:20 based on the information that was in this<br>525:21 document that you reviewed that the<br>525:22 incidence of thrornboembollc events with<br>525:23 Vioxx appeared to be similar to that of<br>525:24 comparator NSA1Ds?<br>526:1 A. So now we're not talking<br>5262 about study 017 anymore but the totality<br>526:3 of the document?<br>526:4 Q Yes<br>526:5 A Okay.<br>526:6 If you can refer me to where<br>526:7 it says that, that would speed things up<br>526:8Q. Okay.<br>526:9If we can go to, I think .. ,<br>526:10 it's the next page, No, it's not the<br>526:11 next page, It is about seven pages<br>526:12 forward. let me put it up on the screen<br>526:13 and it will help you find it. It is the<br>526:14 page that at the bottom has Table 52.<br>526:15 A. Right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 526:16-527:22<br><br>526;16 Q. And do you see where at the<br>526:17 bottom of the second paragraph Or.<br>526:'18 Villalba said, "The incidence of<br>526:19 thromboembolic events with rofecQxib<br>526:20 appears to be similar to comparator<br>526:21 NSAiDs." Do you see that, sir?<br>526:22 A. Yes, But it is important to<br>526:23 point out that a few lines later, to be<br>526:24 fair, in summary, which is where Or.<br>527:1 Villalba puts all of it together in her<br>527:2 summary statement, and i1 you want, we<br>527:3 can just perhaps<br>you might highlight<br>527:4 that a few lines down, "With the<br>527:5 available data. it is impossible to<br>5276 answer with complete certainty whether<br>5277 the risk of cardiovascular and<br>527:8 thromboernbolic events is increased in<br>52"/:9 patients on rafecoxib, A larger database " ~<br>527:10 win be needed to answer this and other<br>52111 safety comparison questions."<br>527:12 So, I think the most<br>527:13 Important piece on that page is her<br>52714 summary in which she says we can't tell<br>527:15 whether Viol\,( increases the risk of heart<br>527'16 disease, more information is needed to<br>527:17 answer that question. And I think that's<br>527:18 the culmination of Dr. Villalba's<br>527:19 analysis,<br>527:20 Q So, she said more<br>527:21 information is needed<br>and, of course,<br>527:22 other studies were done, correct? | | |
| 527:24 -528:5<br>527:24 THE WITNESS: I can't<br>528:1 identify a single study that was<br>528:2 done to specifically address the<br>528:3 question of cardiovascular safety.<br>528:4 BY MR. BECK'<br>528:5 Q. Okay. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 528:6-528:20<br>528:6 Well, let's move to another<br>528:7 document that we spent some time on<br>528:8yesterday, the comments of the Board of<br>528:9Scientific Advisors within Merck,<br>528:10 Do you remember that document?<br>528:11A. Yes.<br>528:12you have it in your stack<br>528:13 it was Exhibit 32. Do you want to take a<br>528:14moment and pull it out?<br>528:15A. I'll pull it<br>528:16 okay, I have it<br>528:17Q And up on the screen is<br>528:18this document that you've got in<br>528:19 front of you, Exhibit 32?<br>528:20 A Right | | |
| 530:23·531:6<br>530:23 Q. And in your testimony<br>530:24 yesterday, isn't it true that the way you<br>531:1 characterized this document was that the<br>531:2 Board of Scientific Advisors was alerting<br>531:3 Merck to the potential adverse<br>531:4 consequences of Vioxx when it came to<br>531:5 Item Number 1, 'The development of<br>531:6 lipid-rich corona~ plaques"? | | |
| 531:9-531:10<br>531:9 THE WITNESS: That was one<br>531:10 of the points that they made, yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 531:12 to 532:13) 531<br>12  Q.   Well, I'm talking about your<br>13  testimony yesterday.<br>14      A.   Right.<br>15      Q.   You characterized this<br>16  document, did you not, as alerting Merck<br>17  to the potential adverse consequences of<br>18  Vioxx when it came to "The development of<br>19  lipid-rich coronary plaque"?<br>20      A.   Correct.<br>21      Q.   And you also characterized<br>22  this document as alerting Merck to the<br>23  adverse consequences of Vioxx with the<br>24  second item listed, which is<br><br>  532<br>1  "destabilization of plaque," right?<br>2      A.   Right.<br>3      Q.   Now, let's look at this<br>4  document in a little bit more detail<br>5  because, in fact, maybe we can shorten<br>6  it.<br>7          Do you agree with me that,<br>8  in fact, the point of the document from<br>9  the scientific advisors was that Vioxx<br>10  could have benefits concerning the<br>11  development of lipid-rich coronary plaque<br>12  and could have benefits on the question<br>13  of destabilization of plaque? |  |  |
| ja063006 - Vol. I, (Pages 532:24 to 533:8) 532<br>24    point, the relevant pieces on the<br><br>  533<br>1        next page where they describe that<br>2        more fully, and this is the<br>3        destabilization of the junk in the<br>4        artery that when it bursts can<br>5        cause a heart attack and the --<br>6        let me just read this paragraph<br>7        briefly because it's what you're<br>8        talking about. |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 533:11 to 534:3) 533<br>11   Okay.  What they're saying<br>12        is that in the second sentence of<br>13        the paragraph on the next page,<br>14        "As the critical cells in this<br>15        process are inflammatory cells,<br>16        the possibility exists that the<br>17        products of COX-2 could regulate<br>18        thinning the cap of plaques and<br>19        render them rupture-prone."<br>20   BY MR. BECK:<br>21        Q.   And what that means, Doctor,<br>22   is that the COX-2 enzyme could cause<br>23   plaque rupture, and, therefore, something<br>24   that inhibits the COX-2 enzyme such as<br>1   Vioxx would help protect against plaque 534<br>2   rupture.  That was the real point of the<br>3   scientific advisors, isn't that true? | | |
| ja063006 - Vol. I, (Page 534:8 to 534:10) 534<br>8   THE WITNESS:  I can't tell<br>9        from this what their main point<br>10        was in that regard. | | |
| ja063006 - Vol. I, (Pages 534:12 to 535:1) 534<br>12   Q.   Yesterday you claimed that<br>13   their main point was the opposite, didn't<br>14   you?<br>15        A.   I claimed that they were<br>16   concerned that here was a brand new class<br>17   of drugs that had an effect on many<br>18   important aspects of the cardiovascular<br>19   system and that it was difficult, because<br>20   there had never been drugs like this<br>21   before, to know whether they would make<br>22   things better or make things worse.<br>23        Q.   Well, let's take a look in<br>24   more detail about what they said on both<br>1   of these subjects. 535 | | |

179

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 535:2 to 538:7)  535<br>2    We're going to look first at<br>3    the development of the lipid-rich<br>4    plaques.  That was Item Number 1, right?<br>5         A.    Right.<br>6         Q.    And before we get into their<br>7    discussion, just to back up for a minute<br>8    so the jury understands the significance.<br>9              People develop plaque in<br>10   their coronary arteries over time, right?<br>11        A.    Right.<br>12        Q.    And that can take many, many<br>13   years, decades, in fact, right?<br>14        A.    It can.<br>15        Q.    And some plaque is more<br>16   dangerous than others when it comes to<br>17   heart attacks; is that right?<br>18        A.    I'm not sure what you mean.<br>19        Q.    Sure.<br>20              There are some plaques that<br>21   are lipid rich and more prone to rupture<br>22   than other plaques.  Are you aware of<br>23   that?<br><br>24        A.    Well, but all plaques have<br><br>                                   536<br>1    lipid in them.<br>2         Q.    Yeah.  And you see that here<br>3    they're talking about lipid-rich coronary<br>4    plaques.<br>5              Are you aware, Doctor, that<br>6    cardiologists draw a distinction between<br>7    different kinds of plaques and say that<br>8    some are more dangerous than others when<br>9    it comes to heart attacks?<br><br>10        A.    Yes.  But they all contain<br>11   lipids.<br>12        Q.    Are you aware, sir, that<br>13   cardiologists, that people who actually<br>14   specialize in heart disease, say that the<br>15   plaques that have more lipids, that are<br>16   lipid rich, are more dangerous than the<br>17   plaques that have less lipid?<br>18        A.    Right.<br>19        Q.    Are you aware of that fact?<br>20        A.    Yes. | | |

180

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 536:21 to 538:7) 536<br>21    Q.    Okay.<br>22          So, here the Board of<br>23   Scientific Advisors is talking about the<br>24   especially dangerous lipid-rich coronary<br><br>1   plaques.  Isn't that what you understand? 537<br>2      A.    Right.<br>3      Q.    Okay.<br>4          Down here in the middle of<br>5   the page, do you see where the Board of<br>6   Scientific Advisors says that "There is a<br>7   growing body of evidence indicating that<br>8   inflammatory disease is a risk factor for<br>9   myocardial infarction, and such<br>10   inflammatory processes almost certainly<br>11   are accompanied by the release of" -- how<br>12   do you pronounce that next word?<br>13      A.    Cytokines.<br>14      Q.    -- "cytokines that affect<br>15   cells in the" --<br>16      A.    Monocytic.<br>17      Q.    -- "monocytic series in<br>18   general, and COX-2 expression in<br>19   particular."<br>20      A.    Right.<br>21      Q.    Now, when it says that<br>22   inflammatory disease is a risk factor for<br>23   myocardial infarction, what you<br>24   understand that to mean is that<br><br>1   inflammation might be a cause of heart 538<br>2   attacks, right?<br>3      A.    Correct.<br>4      Q.    And inflammation comes from<br>5   the COX-2 enzyme, I think you testified<br>6   yesterday, right?<br>7      A.    Right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 538:8 0 And so the point here IS<br>538:9 that the COX·2 enzyme, if it's causing<br>538:10 Inflammation, could cause this kind of--<br>538:11 could be a risk factor for the heart<br>538:12 attacks and contribute to the lipid.. rich<br>538:13 core, right? | | |
| 538:15-538:22<br>53815 THE WITNESS Actually. what<br>Link> AV32.36 538:16 they're saying in just the next<br>538:1/ sentence is it could go either<br>538:18 way. And if YOU just go to that<br>538:19 very next sentence.<br>538:20 BY MR BECK:<br>538:21 Q The "Accordingly"? .<br>538:22 A Yes. | | |
| ja063006 - Vol. I, (Pages 538:23 to 539:18)<br>538<br>23   Q.   "Accordingly, it is<br>24   appropriate to ask whether COX-2<br><br>539<br>1   expression in monocyte-macrophage" --<br>2       A.   I think maybe we can speed<br>3   this up, and I'll just, if you allow me,<br>4   skip a lot of the words, because they are<br>5   not germane to this argument.<br>6           But, accordingly, it is<br>7   appropriate to ask whether the COX-2<br>8   enzyme regulates the progression of<br>9   atherosclerosis either positively or<br>10   negatively.  And what they're simply<br>11   saying is, it seems to be involved in<br>12   this process, and it's appropriate to<br>13   study whether it makes things better or<br>14   it makes things worse.  And that's pretty<br>15   clearly what that next sentence says.<br>16       Q.   And it is pretty different,<br>17   actually, from how you characterized it<br>18   yesterday; isn't that true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 539:22 to 540:2)539<br>22  THE WITNESS:  No.  I<br>23      characterized it as they're<br>24      indicating that this could be a<br>1      problem, which is exactly what 540<br>2      they said in the sentence I just | | |
| 540:5 -540:9<br>540:5 Q. Well, actually, what they<br>540:6 said in the sentence: that you just read<br>540:7 was that it could be a problem or it<br>540:8 could be a benefit?<br>540:9 A. Correct. | | |
| 540:16-540:18<br>540:16 You left that out yesterday.<br>540:17 You didn't mention that it could be a<br>540:18 benefit yesterday, did you? | | |
| 540.,22-541:4<br>540:22 THE WITNESS: The issue at<br>540:23 hand is whether there was evidence<br>540:24 presented to Merck that there<br>541:1 could be a problem, that their<br>541:2 'drug caused heart attacks in 1998,<br>541:3 and I still contend that that is<br>541 :4 stated here. | | |
| 541:6-541:12<br>541:6 Q. How about on the next<br>541:7 question, which is destabilization.<br>541:8 Having read this document a few minutes<br>541:9 ago and this paragraph, is it still your<br>541:10 contention that this was somehow a red<br>541:11 tag, that it indicated that there might<br>541:12 be a problem with COX-2 inhibitors? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 541:17 THE WITNESS: What it states<br>541:18 here is in that second sentence, ,. 'I.,<br>541 :19 "the possibility exists that the<br>541 :20 products of COX-2 could regulate<br>541 :21 thinning the cap of plaques and<br>541 :22 rendering them rupture-prone."<br>541:23 And CBX-2 has numerous different<br>541:24 'products. And it is hard to tell<br>542:1 to what extent they were<br>542:2 referring, as they do throughout,<br>542:3 to the possible good or possible<br>542:4 bad issues, But what was key to<br>542:5 me was that they were saying,<br>542:6 look, this is a drug that is<br>542:7 intimately involved in inhibiting<br>542:8 an enzyme that has never been<br>542:9 inhibited before, and it could | | |
| 542:13 -542:22<br>542:13 Q. Well, this language that you<br>542:14 referred to, the products of COX-2, that<br>542:15 means the CBX-2 enzyme, right?<br>542:16 A. Right.<br>542:17 Q. That the possibility exists<br>542:18 that the COX-2 enzyme could regulate the<br>542:19 thinning of the cap of the plaques and<br>542:20 render them rupture-prone. It means that<br>542:21 the COX-2 enzyme could cause plaque<br>542:22 rupture, right? | | |
| 543:1 -543:11<br>543:1 Q, Is that correct?<br>543:2 A. The products of the COX-2<br>543:3 enzyme.<br>543:4 Q. Right.<br>543:5 Could cause plaque rupture?<br>543:6 A. Right.<br>543:7 Q. And isn't the point here<br>543:8 that that's something that would inhibit<br>543:9 ,COX-2, that would hold down that enzyme,<br>543:10 would be potentially helpful in guarding<br>543:11 against plaque rupture? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 543:14-543:15<br>543:14 THE WITNESS: I think that's<br>543:15 a fair interpretation. | | |
| 543:17-543:19<br>543:17 Q. That's not the<br>543:18 interpretation you put on it yesterday,<br>543:19 ,is it? | | |
| 543:22 THE WITNESS: No. | | |
| 544<br>11  Q.   Before you testified<br>12  yesterday about this document, had you<br>13  read the testimony of any other witness,<br>14  whether from Merck or independent experts<br>15  or experts testifying on behalf of the<br>16  plaintiffs, about the meaning of this<br>17  document?<br>18      A.   No.<br>19          But for the sake of<br>20  completeness, Mr. Beck, I think we<br>21  shouldn't just cherry pick which of the<br>22  points of this we want to discuss unless<br>23  you're about to get to events following<br>24  plaque rupture, which is the most<br><br>545<br>1  compelling place where the board of<br>2  expert advisors talks about this, and I<br>3  think it would be fair to the jury to not<br>4  only talk about the first two and ignore<br>5  the third. | | |
| 545:9-545:12<br>545:9 Q. Obviously if you didn't read<br>545:10 my testimony on this, that includes Dr.<br>545:11 Reicin's testimony, correct?<br>545:12 A. Correct. | | |

185

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 545:22 to 546:1) 545<br>22   Q.   So, you didn't read or learn<br>23   about from any other source what Dr.<br>24   Reicin said about this or what Dr.<br><br>1   Morrison said about this; is that right? 546 | | |
| ja063006 - Vol. I, (Page 546:3 to 546:4) 546<br>3   THE WITNESS:  That's<br>4       correct. | | |
| 546:9-546:17<br>546:9 Q. Have you ever heard of Dr.<br>546:10 Stephen Epstein?<br>546:11 A. The name does not ring a<br>546:12 bell.<br>546:13 Q. He's a non-retained expert<br>546:14 for the same lawyers that you're working<br>546:15 with. He's an expert in atherosclerosis.<br>546:16 Does that help you at all? Does that<br>546:17 ring a bell now? | | |
| 546:21 -547:6<br>546:21 THE WITNESS: There's a lot<br>546:22 of Dr. Epstein. No, it doesn't<br>546:23 ring a bell. He may well be a<br>546:24 fantastic expert, I just -- the<br>547:1 name just doesn't ring a bell.<br>547:2 BY MR. BECK:<br>547:3 Q. He, from his deposition,<br>547:4 said he took over for Or. Eugene<br>547:5 Braunwald as chief of cardiology at the<br>547:6 National Institutes of Health. | | |
| 547:9-547:15<br>547:9 Q. Does that rin9 a bell yet?<br>547:10 A. No.<br>547:11 Q. Before you testified about<br>547:12 whether the Board of Scientific Advisors<br>547:13 was a red flag or not, did you learn what<br>547:14 Dr. Epstein had to say about the meaning<br>547:15 of the points we just went over? | | |
| 547:18-547:18<br>547:18 THE WITNESS: No. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 547:20-547:22<br>547:20 Q. Do you know what Dr. Epstein<br>547:21 has said about whether Vioxx could have a<br>547:22 beneficial effect on atherosclerosis? | | |
| 548:4-548:14<br>548:4 THE WITNESS: I know' there<br>548:5 was the hope when Vioxx was being<br>548:6 developed, that as an<br>546:7 anti-inflammatory drug, it might<br>548:8 have the potential for helping<br>548:9 with inflammation in the<br>548:10 cardiovascular system. That was a<br>548:11 hoped for effect. That actually<br>548:12 never panned out, but it was a<br>548:13 plausible hope in the mid-'90s,<br>548:14 late '90s. | | |
| 548:16-548:19<br>548:16 Q. And part of that was that it<br>548:17 was hoped that it could help reduce both<br>548:18 the formation of plaque and the<br>548:19 possibility of plaque rupture, right? | | |
| 548:21-549:7<br>548:21 THE WITNESS: I think the<br>548:22 fairest way of presenting it is<br>548:23 that there was the understanding<br>548:24 that this recently described<br>549:1 enzyme called COX-2 had a very<br>549:2 important effect on the health of<br>549:3 the arteries, and that inhibiting<br>549:4 ,it could do bad things or could do<br>549:5 good things. And I think in 1998,<br>549:6 those possibilities were both on<br>549:7 the table, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 549:9 to 549:19)<br>549 | lack of foundation; argumentative; improper speech from counsel | Overruled |
| ja063006 - Vol. I, (Page 550:6 to 550:22)<br>550 | lack of foundation; argumentative; improper speech from counsel | |
| 550:24 -551:7<br>550:24 Q. Well, do you remember<br>551:1 yesterday when you went over this<br>551 :2 document you had no trouble at all<br>551:3 holding yourself to talking about the<br>551:4 potential bad consequences of COX-2<br>551:5 inhibitors? Do you remember that all you<br>551:6 talked about in connection with this was<br>551:7 the potential adverse consequences? | | |

188

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 551 :20 -552:8<br>551 :20 Q, 0.0 you remember that?<br>551.21 A, That was what we were<br>551:22 talking about.<br>551 :23 Q, Okay,<br>551:24 And so yesterday you<br>552:1 confined yourself to the potential<br>552:2 adverse consequences, and now I'm just<br>552:3 going to ask you Whether you can give me<br>552:4 answers that focus on the potential<br>552:5 positive consequences rather than this,<br>552:6 ,well, it may be goad or it may be bad.<br>552:7 Okay?<br>552:8 A, Yes. | | |
| 552:12 -552:20<br>552:12 Q. Now, do you agree with me,<br>552:13 sir, that back in 1998 and 1999 respected<br>552:14 scientists said th~t among the potential<br>552:15 good things that might come from Vioxx<br>552:16 were that it would protect -- it could<br>552:17 possibly protect against heart disease,<br>552:18 number one, by helping to guard against<br>552:19 the formation of plaque? Do you agree<br>552:20 with that? | | |
| 553:1-553:3<br>553:1 THE WITNESS:<br>553:2 there were both good and bad<br>553:3 potentials. | | |
| 553:5-553:10<br>553:5 Q, Now, why is it today that<br>553:6 you can1 confine yourself to the good<br>553:7 side that scientists talked about, when<br>553:8 yesterday, you've already admitted, you<br>553:9 were perfectly capable of confining<br>553:10 yourself to the bad side? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 553:17 -554:4<br>553:17 THE WITNESS: Because today,<br>553:18 Mr. Beck, we're here to talk about<br>553:19 the fact that it is now<br>553:20 universally agreed that Vioxx<br>553:21 causes heart attacks, and we're<br>553:22 now trying to look back and find<br>553:23 out what information was available<br>553:24 to Merck. We're not here<br>554:1 discussing the fact that Vioxx<br>554:2 prevents heart attack, in which<br>554:3 case maybe that would be<br>554:4 appropriate. | | |
| 555:7-555:16<br>555:7 Were you aware back in 1998<br>555:8 and 1999 what was being discussed in the<br>555:9 scientific and medical community about<br>555:10 the potential good things or bad things<br>555:11 of COX~2 inhibitors?<br>555:12 A Mound this period, I don't<br>555:13 know if it was 1999 or 2000, but when we<br>555:14 were doing our own work on this, We did<br>555:15 review what was known in the literature<br>555:16 about the potential for good and for bad. | | |
| ja063006 - Vol. I, (Page 555:17 to 555:24) 555<br>17   Q.   And around the time that<br>18   Vioxx came on the market, do you agree,<br>19   sir, that one of the potential good<br>20   things that scientists and doctors were<br>21   talking about was that Vioxx potentially<br>22   could be protective of the heart by<br>23   guarding against plaque formation?<br>24        A.   Yes. | | |
| 556:7 Q. And do you agree, sir, that<br>556:8 another potential 900d thing that<br>556:9 scientists and doctors were talking about<br>556:10 around the time that Vioxx came on the<br>556:11 market was that Vioxx could guard<br>556:12 against MM could possibly guard against<br>556:13 heart disease by helping to prevent<br>556:14 plaque rupture? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 557:10 to 561:12)<br>557<br>10 Q.   Doctor, would you please<br>11  turn to what was marked yesterday as<br>12  Exhibit 7.  It's in the folder of medical<br>13  articles that Mr. Tisi gave you.<br>14      A.   Right.  Got it.<br>15      Q.   And is Exhibit 7 an article<br>16  where you were one of the authors?<br>17      A.   Yes.  I was the senior<br>18  author.<br>19      Q.   And it's titled the<br>20  "Relationship Between Selective" -- how<br>21  do you pronounce that next word?<br>22      A.   "Cyclooxygenase."<br>23      Q.   Is that the same thing as<br>24  COX-2?<br><br>558<br>1      A.   COX-2.  Yes.  You can call<br>2  it COX.<br>3      Q.   So, the "Relationship<br>4  Between COX-2 Inhibitors and Acute<br>5  Myocardial Infarction in Older Adults,"<br>6  right?<br>7      A.   Correct.<br>8      Q.   Now, would you turn over --<br>9  and what's the date of this article?<br>10      A.   This was published in May of<br>11  '04, and I can look for the -- May 4th of<br>12  '04.<br>13      Q.   Okay.<br>14          So, some four or five years<br>15  after Vioxx was first approved by the<br>16  FDA, right?<br>17      A.   Right.<br><br>18      Q.   Okay.<br>19          Now, turn over, if you<br>20  would, please, to Page 2072, which I<br>21  think is the fifth page in.<br>22      A.   Got it.<br>23      Q.   I want to call your<br>24  attention in the second column and the<br><br>559<br>1  first full paragraph to one statement<br>2  here about emerging data.  Are you with<br>3  me on that? |  |  |

191

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 559:4 to 561:12) 559<br>4   A.   Yes.<br>5       Q.   In your copy?<br>6   A.   Yes.<br>7       Q.   "Emerging data support a<br>8   varied role for COX-2" -- and there we're<br>9   talking, again, just so the jury is<br>10   clear, we're talking about the enzyme,<br>11   not Vioxx or any other COX-2 inhibitors,<br>12   right?<br>13       A.   Correct.<br>14       Q.   So, "emerging data support a<br>15   varied role for the COX-2 enzyme," and<br>16   then you list various things concluding<br>17   with "atherogenesis."  Do you see that?<br>18       A.   Right.<br>19       Q.   And then you have these<br>20   cites to these two items, Number 27 and<br>21   28?<br>22       A.   Right.<br>23       Q.   What is atherogenesis?<br>24       A.   It's atherogenesis.<br><br>                     560<br>1       Q.   I'm sorry, atherogenesis.<br>2       A.   It's the development of<br>3   plaque in the artery wall.<br>4       Q.   Okay.<br>5           Same thing as<br>6   atherosclerosis?<br>7       A.   Well, atherosclerosis is<br>8   kind of the end product of atherogenesis.<br>9   Atherogenesis is the development of.<br>10       Q.   Okay.<br>11           The development of plaque.<br>12           And your statement here, at<br>13   least the portions I've highlighted, is<br>14   that there is new information.  That<br>15   would be emerging data, right?<br>16       A.   Yes.  Ongoing work, yes.<br>17       Q.   Ongoing work, new<br>18   information indicating that the COX-2<br>19   enzyme has some sort of possible role in<br>20   the formation of plaque, right?<br>21       A.   Correct.<br>22       Q.   And then you cite these two | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 560:23 to 561:12) 560<br>23   sources, and if you go to the end of your<br>24   article -- those were Sources 27 and 28,<br><br>561<br>1   and then if you go to the end of your<br>2   article, you've got the actual sources<br>3   that you were referring to, correct?<br>4       A.   Right.<br>5       Q.   And one of those is an<br>6   article by Burleigh, right?<br>7       A.   Right.<br>8       Q.   And the other is by -- how<br>9   is his name pronounced, do you know?<br>10       A.   After Burleigh, I think it's<br>11   Cipollone.<br>12       Q.   Cipollone.  Okay. | | |
| 562:1-562:17<br>562:1 Q. And I will hand you what I<br>562:2 'am marking as Exhibit 45. Do you<br>562:3 recognize Exhibit 45 as the first of your<br>562:4 cited references, the Burleigh article?<br>562:5 A. Yes. Correct.<br>562:6 Q. Let me put that up on the<br>562:7 screen.<br>562:8 Okay.<br>562:9 So, this is the article by<br>562:10 Burleigh that you cited when you said<br>562:11 that there's emerging data concerning the<br>562:12 role of the COX-2 enzyme on the<br>562:13 development of plaque, right?<br>562:14 A. Right.<br>562:15 Q. Okay.<br>562:16 And if you would please1urn<br>562:17 to Page 1822. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 563:7 -563:16<br>563:7 Q. We were on the Burleigh<br>563:8 article, which was cited in your article<br>563:9<br>563:10 A. Right.<br>563:11 Q. -- and we're on the last<br>563:12 page of the text of the Burleigh article,<br>563:13 Page 1822, right?<br>563:14 A. Right, yes.<br>563:15 Q. Are you with me, Doctor?<br>563:16 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 564:9 to 566:24) 564<br>9    And I've blown up here on<br>10   the screen the last concluding paragraph<br>11   of the article you cited.  Would you<br>12   please read that for the jury?<br>13        A.    Where would you like me to<br>14   start?  The whole paragraph?<br>15        Q.    "Mounting evidence."<br>16        A.    "Mounting evidence supports<br>17   an important role for inflammation in<br>18   atherosclerosis and plaque rupture.  We<br>19   present evidence that pharmacologic<br>20   inhibition of COX-2 reduces<br>21   atherosclerosis in the LDLR-deficient<br>22   mouse model of atherosclerosis, and we<br>23   provide genetic evidence indicating that<br>24   macrophage COX-2 promotes early<br><br>                          565<br>1    atherogenesis.  These results demonstrate<br>2    the potential of COX-2 inhibitors in the<br>3    treatment of atherosclerosis and support<br>4    the potential of anti-inflammatory<br>5    approaches to the prevention of coronary<br>6    heart disease."<br>7        Q.    And this article, I think we<br>8    can tell from the very top, was written<br>9    or at least published in April of 2002,<br>10   right?<br>11       A.    Correct.<br>12       Q.    And do you agree with the<br>13   statements that are in this paragraph?<br>14       A.    Yes.<br>15       Q.    And do you agree that what<br>16   this paragraph indicates is that there is<br>17   increasing support for the notion that<br>18   the COX-2 enzyme can, through<br>19   inflammation, can contribute to plaque<br>20   formation?  Do you agree with that?<br>21       A.    I'm not sure about the<br>22   increasing support, where that comes<br>23   from.<br>24       Q.    "Mounting evidence<br><br>                          566<br>1    supports," the very first sentence?<br>2        A.    Right.  That refers to just<br>3    inflammation. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 566:4 to 566:24) 566<br>4    Q.   Okay.<br>5          Well, it says, actually,<br>6    "Mounting evidence supports an important<br>7    role for inflammation in atherosclerosis<br>8    and plaque rupture," right?<br>9       A.   Right.<br>10       Q.   Okay.<br>11          And do you agree, sir, that<br>12   in 2002 there was evidence, number one,<br>13   that inflammation contributed to<br>14   atherosclerosis and plaque rupture?  Do<br>15   you agree with that?<br>16       A.   Correct.<br>17       Q.    And do you agree, number<br>18   two, that there was evidence that the<br>19   COX-2 enzyme could contribute to<br>20   inflammation, which, in turn, would --<br>21   could cause atherosclerosis and plaque<br>22   rupture?<br>23       A.    Well, the products of the<br>24   COX-2 enzyme, but yes. | | |
| 567:20 -567:21<br>567:20 THE WITNESS: That they had<br>567:21 potential use. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 568:1 to 569:1) 568<br>1   Do you agree with this final<br>2   sentence of the article that you cited,<br>3   that the "Results demonstrate the<br>4   potential of COX-2 inhibitors in the<br>5   treatment of atherosclerosis and support<br>6   the potential of anti-inflammatory<br>7   approaches to the prevention of coronary<br>8   heart disease"?<br>9       A.   Right.  This is part of the<br>10  same good news/bad news issue we've been<br>11  talking about, that there's potential for<br>12  good and there's potential for harm.<br>13      Q.   And here they're talking<br>14  about the potential for good, right?<br>15      A.   That's right.<br>16      Q.   And what publication did<br>17  this article appear in?<br>18      A.   Circulation.<br>19      Q.   Is that the same one that at<br>20  least some of your articles appeared in?<br>21      A.   Right.<br>22      Q.   And I think you said<br>23  yesterday that it's the top cardiology<br>24  journal in the world, right?<br>                                              569<br>1       A.   That's right. | | |
| 569;2-569;9<br>569:2 For completeness, we also<br>5693 cite the other side of the. story in our<br>569:4 paper. You've selected one or two<br>569:5 references where we talk about the<br>569:6 potential good effects. but the entire<br>669:7 part of the paragraph before the piece<br>6698 you pulled out also discusses the<br>569:9 potential bad, | | |
| 569;14-569;17<br>669:14 Q. Now, I want to move to the<br>569:16 second of the cited references that we<br>669:16 looked at in your article.<br>569:17 A, Okay. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 570;6 -570;9<br>570:6 Now I want to look at the<br>570:7 next one, which was the -- was it<br>570:8 Cipollone?<br>570:9 A. Right. | | |
| 572;3 -572;7<br>572:3 Is the document that I now<br>572:4 have on the screen the same thing as the<br>572:5 one that you have in front of you, which<br>572:6 is the Cipollone article?<br>572:7 A. Correct. | | |
| 572;17 -572;22<br>572:17 a. And what journal was the<br>572:1 Cipollone article published in?<br>572:19 A. Circulation.<br>572:20 Q. And what is the date of the<br>572:21 Cipollone article?<br>572:22 A. 2001. | | |
| 572:23-572:24<br>572:23 Q. Would you please turn to<br>572:24 Page 926. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 573:8 to 574:13) 573<br>8   Q.   Focusing on the last<br>9   sentence in this article, would you<br>10  please read that for the jury?<br>11      A.   Yes.  "From a practical<br>12  standpoint, these findings raise the<br>13  possibility that the selective COX-2<br>14  inhibitors now currently available for<br>15  clinical use, or future PGES inhibitors<br>16  might provide a novel form of therapy for<br>17  plaque stabilization of patients with<br>18  atherosclerotic disease and prevention of<br>19  acute ischemic syndromes."<br>20      Q.   And in 2001, did you agree<br>21  with Dr. Cipollone and his colleagues<br>22  that the findings in their study raised<br>23  the possibility that COX-2 inhibitors<br>24  such as Vioxx might provide a novel form<br><br>1   of therapy for plaque stabilization for 574<br>2   patients with atherosclerotic disease?<br>3       A.   No, I did not.<br>4       Q.   You disagreed with that?<br>5       A.   Correct.  Because by then,<br>6   there was evidence that the bad news<br>7   pieces, which we had previously cited,<br>8   were more likely to be real than a<br>9   theoretical study from animals.<br>10      Q.   And yet you cited this<br>11  article in your own 2002 article,<br>12  correct?<br>13      A.   That's right. | | |
| 574:17 -574:19<br>574:17 Q, I'm sorry, Your 2004<br>574:18 article?<br>574:19 A, 2004, Right. | | |