| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 575:16 to 575:22) 575<br>16   Q.   Do you agree, sir, that<br>17   during the entire time Vioxx was on the<br>18   market, scientists whom you considered to<br>19   be reputable were suggesting that Vioxx's<br>20   anti-inflammatory properties might slow<br>21   down the progression of atherosclerosis<br>22   and help stabilize plaque? | | |
| ja063006 - Vol. I, (Pages 575:24 to 576:6) 575<br>24   THE WITNESS:  I do not agree<br><br>            576<br>1        with that.  By the time it got to<br>2        be 2003 and 2004, I don't think<br>3        people were any more suggesting<br>4        with the evidence at hand that<br>5        Vioxx would be used to treat heart<br>6        disease. | | |
| 576:8 -576:9<br>576:8 Q. Your deposition of a few<br>576:9 weeks ago beginning on page 389. | | |
| 577:6 -577:18<br>577:6 Q. Line 23: 'Were you aware of<br>577:7 .any articles published by reputable<br>577:8 scientists while Vioxx was on the market<br>577:9 which said that Vioxx's anti-inflammatory<br>577:10 properties might actually slow down the<br>577:11 progression of atherosclerosis and help<br>577:12 stabilize plaque?<br>577:13 "Answer: Yes.<br>577:14 "Question: And that was a<br>577:15 theory that actually scientists were<br>577:16 suggesting during the entire time Vioxx<br>577:17 was on the market, true?<br>577:18 "Answer: Right." | | |
| 578:5 -578:9<br>578:5 Q. 15 that your sworn<br>578:6 testimony?<br>578:7 A. That's my testimony, which I<br>578:8 think differs from the question you just<br>578:9 asked me. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 578:16-578:22<br>578:16 Q. So that we can set the<br>578:17 stage, again, the VIGOR trial involved<br>578:18 Vioxx at 50 milligrams per day, correct?<br>578:19 A. Correct.<br>578:20 Q. Which was twice the maximum<br>578:21 dose that had been approved by the FDA at<br>578:22 the time of the VIGOR trial, right? | | |
| 578:24 ·580:9<br>578:24 THE WITNESS: I'd want to go<br>579:1 back end look at the label, but<br>579:2 that sounds reasonable. It was a<br>579:3 dose that was being used in<br>579:4 patients with arthritis commonly,<br>579:5 although it was not the dose that<br>579:6 was in the label.<br>579:7 !3Y MR. BECK:<br>579:8 Q. The label, 85 you recall,<br>579:9 specified 25 milligrams, right?<br>579:10 A. That's right.<br>579:11 Q. And that was the standard .. \<br>579:12 dose, right?<br>579:13 A. For osteoarthritis, but not<br>579:14 for rheumatoid arthritis,<br>579:15 Q. And the average use of the<br>579:16 people who were involved in the VIGOR<br>579:17 ~rial taking this 50 milligram dose was<br>579:18 how-long?<br>579:19 A Median duration was about<br>579:20 nine months.<br>579:21 Q. Now, do you know whether the<br>579:22 label said anything about how long; if<br>579:23 somebody is taking 50 milligrams a day<br>579:24 instead of 25 milligrams a day, how long<br>580:1 they should take that for?<br>580:2 A. Well, I thought you just<br>580:3 ~stipulated that the label didn't indicate<br>580:4 use for 50 milligrams.<br>580:5 Q. Well, do you remember<br>580:6 whether there was anything in the label<br>580:7 about if you're going to ~se 50 , . ,<br>580:8 milligrams, only do it for, you know,<br>580:9 five days or less? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 580:14 to 581:6) 580<br>14  Q.    The question is, do you<br>15  remember one way or the other?<br>16       A.   Yes, yes.  Typically doses<br>17  are recommended for a defined period of<br>18  time, but it's well known that doctors<br>19  tend to ignore that duration issue.<br>20       Q.    My question really is, do<br>21  you remember, you talked about the two<br>22  labels yesterday --<br>23       A.   Right.<br>24       Q.    -- with Mr. Tisi, and if you<br><br>581<br>1   don't remember, you don't remember, but<br>2   my question is, do you remember what the<br>3   label, the first label said about how<br>4   long somebody should use 50 milligrams<br>5   if, in fact, they're going to go up to<br>6   that dose? | | |
| 581:9 -581 :11<br>581:9 THE WITNESS: I think there<br>581 :10 was a time limit suggested in the<br>581 :11 label for 50 milligrams. | | |
| 581:13-581:14<br>581 :13 Q. And do you remember what<br>581 :14 that time limit was? | | |
| 581:16-581:18<br>581:16 THE WITNESS: Off the top of<br>581:17 my head, I would say ten days, but<br>581:18 we can check it out. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 581:20 -582:8<br>581:20 Q. Okay.<br>581:21 It certainly wasn't nine<br>581:22 months, though, right?<br>581:23 A. Right.<br>581:24 Q And on the--<br>582:1 You said that the VIGOR<br>582:2 trial involved patients who had what .• ~<br>582:3 condition?<br>582:4 A. Rheumatoid arthritis.<br>582:5 Q. Are people who have<br>582:6 rheumatoid arthritis by nature at<br>582:7 increased risk of heart attacks?<br>582:8 A. Yes. | | |
| 582:12-582:12<br>582:12 THE WITNESS: Yes. | | |
| 582:14-582:18<br>582:14 Q. And on the other side, on<br>582:15 the other arm of t~he trial, so to speak,<br>582:16 there were people who were taking<br>582:17 naproxen, right?<br>582:18 A. Correct. | | |
| ja063006 - Vol. I, (Page 583:9 to 583:20) 583<br>9   Q.   Now that you have the VIGOR<br>10   publication in front of you --<br>11       A.   Yes.<br>12       Q.   -- can you tell me what the<br>13   dose of naproxen was for the participants<br>14   who took naproxen rather than Vioxx?<br>15       A.   500 milligrams twice a day.<br>16       Q.   In terms of the<br>17   gastrointestinal results, did Vioxx<br>18   significantly reduce the incidence of<br>19   perforations, ulcers and bleeds?<br>20       A.   Yes. | | |
| 583:23-583:23<br>583:23 THE WITNESS: Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 584:1 to 585:18) 584<br>1   Q.   Did Vioxx significantly<br>2   reduce serious complicated<br>3   gastrointestinal problems?<br><br>8          For the people who used<br>9   twice the normal dose of Vioxx for<br>10   several months instead of days, was there<br>11   any doubt that Vioxx was superior to<br>12   naproxen from a gastrointestinal<br>13   perspective?<br>14       A.   Yes, there was a doubt.<br>15       Q.   On the cardiovascular<br>16   results, I think you testified yesterday<br>17   that the difference in the CV events was<br>18   that there were five times as many heart<br>19   attacks in the Vioxx group as in the<br>20   naproxen group; is that right?<br>21       A.   As I said yesterday, the<br>22   numbers are variably presented, whether<br>23   it's four times or five times.<br>24       Q.   And you said they are<br><br>1   variously presented.  And one of your 585<br>2   criticisms yesterday of Merck, as I<br>3   recall, was the way that this data was<br>4   recorded in the New England Journal<br>5   article.  Do you remember that?<br>6       A.   That's right.<br><br>13       Q.   Now, you know that when you<br>14   read the VIGOR article and you saw that<br>15   the risk of naproxen was represented as<br>16   .2 of the risk of Vioxx, you understood<br>17   .2 was one-fifth, right?<br>18       A.   Yes. |  |  |
| 585:19 Q And you understood that what .- ,<br>585:20 that meant was that there were five times<br>585:21 as many heart attacks in the group that<br>585:22 took Vioxx as in the group that took<br>585:23 naproxen, correct? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 586:1-586:5<br>586:1 THE WITNESS: Well l do<br>586:2 this for a living, but what it<br>586:3 said was that there were one·fifth<br>586:4 as many heart attacks in the<br>586:5 naproxen group. | | |
| ja063006 - Vol. I, (Pages 586:7 to 588:12)<sub>586</sub><br>  7   Q.   My question is, when you<br>  8   read that, you understood from reading<br>  9   the VIGOR article that there were five<br> 10   times as many heart attacks in the Vioxx<br> 11   group as in the naproxen group, didn't<br> 12   you?<br><br> 14        THE WITNESS:  If I stopped<br> 15        and thought about it and flipped<br> 16        around the numbers and did the<br> 17        math, I could derive that number.<br><br> 15        "You understood, from<br> 16   reading the results here in the abstract,<br> 17   that there were five times the number of<br> 18   heart attacks in the Vioxx arm than in<br> 19   the naproxen arm, right?<br> 20        "Answer:  Right."<br> 21        Was that your testimony?<br> 22   A.   Correct.<br><br>                                    588<br>  1        temporal association.<br>  2        MR. TISI:  Counsel, I'm<br>  3        going to object on improper<br>  4        impeachment.  Go ahead.<br>  5   BY MR. BECK:<br>  6        Q.   And your testimony that I<br>  7   just read was about when you first read<br>  8   the VIGOR article.  Do you recall that?<br>  9        MR. TISI:  Objection,<br> 10        improper impeachment.<br> 11   BY MR. BECK:<br> 12        Q.   Do you recall that or not? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 589:17 ·589:22<br>589:17 Q Doctor, the Question is<br>589:18 whether at the time you first read the<br>589:19 VIGOR article. my question 1S, did you<br>589:20 understand that there was five times as<br>589:21 many heart attacks in the Vioxx group as<br>58922 in the naproxen group? | | |
| 589:24 ·590:12<br>589:24 THE WITNESS: I think what's<br>590:1 fair to say is the first time I<br>590:2 read it, I read what it said,<br>590:3 which is that there were one~fifth<br>590:4 as many heart attacks in the<br>590:5 naproxen group<br>5906 BY MR. BECK:<br>590:7 Q Did you understand from that<br>590:8 that that's the same thing as five times<br>590:9 as many heart attacks in the Vioxx group?<br>590:10 A. To tell you tile truth, the<br>590:11 first time I read it, that did not strike .. ,<br>590:12 me | | |
| 590:18 ·591:9<br>590:18 Q. And before you even read the<br>590:19 VIGOR article, you knew that it had been<br>590:20 publically reported that there were five<br>590:21 times as many heart attacks in the Vioxx<br>590:22 group as in the naproxen group; isn't<br>590:23 that right?<br>590:24 A. No, that's not how it was<br>591:1 publicly reported.<br>591:2 Q. Well, did you understand<br>591:3 already by the time you read the article<br>591:4 that there were more heart attacks in the<br>591:5 Vioxx group than in the naproxen group?<br>591:6 A. Yes.<br>591:7 Q. And you understood there<br>591:8 were: five times as many, right?<br>591:9 A. To move things along, yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 591:19 to 592:11) 591<br>19  Q.   Yesterday you spent some<br>20  time talking about the New England<br>21  Journal article and the fact that --<br>22      A.   May I ask which New England<br>23  Journal article?<br>24      Q.   The same one we were just<br><br>592<br>1  looking at, Exhibit 16.<br>2      A.   Okay.<br>3      Q.   -- that there were three<br>4  heart attacks that were not included in<br>5  the data in the New England Journal<br>6  article.  Do you remember that subject?<br>7      A.   Yes.<br>8      Q.   Do you know from your review<br>9  of materials in this case whether Merck<br>10  informed the FDA about these three other<br>11  heart attacks in October of 2000? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 592:13·593:14<br>592:13 THE WITNESS: I know from my<br>592:14 conversations with editors of the<br>592:15 New England Journal that they did.<br>592:16 BY MR. BECK:<br>592:17 Q. That Merck did inform the<br>592:18 FDA of those three heart attacks?<br>592:19 A. Yes.<br>592:20 Q. You testified yesterday<br>592:21 about a report written by Dr. Targum. Do<br>592:22 you remember that?<br>592:23 A. Yes.<br>592:24 Q. Do you remember whether Dr.<br>593:1 Targum's analysis included those three<br>593:2 additional heart attacks?<br>593:3 A. I believe that it did.<br>593:4 Q. You testified yesterday<br>593:5 about the Advisory Committee that met in<br>593:6 February of 2001 to discuss the VIGOR<br>593:7 results. Do you remember that?<br>593:8 A. Yes.<br>593:9 Q. Do you know whether this<br>593:10 Advisory Committee was comprised of<br>593:11 doctors and scientists who you would<br>593:12 respect in their fields?<br>593:13 A. I expect that it would have<br>593:14 been, yes. | | |
| ja063006 - Vol. I, (Pages 593:20 to 594:7)<br>593<br>20  Q.    Were you invited to<br>21  participate?<br>22       A.   No.  We've already<br>23  established that.<br>24       Q.   Have you read the transcript<br>594<br>1  of that meeting?<br>2       A.   Yes.<br>3       Q.   And did the members of the<br>4  Advisory Committee also have information<br>5  concerning the three additional heart<br>6  attacks?<br>7       A.   I believe they did. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 595:17 -595:21<br>595:17 Yesterday you talked about<br>595:18 something becoming clear in either the<br>595:19 2000 or 2001 time frame. Do you remember<br>595:20 that?<br>595:21 A. Yes. | | |
| 596:5-596:7<br>596:5 Q. What were you talking about<br>596:6 yesterday when you said that something<br>596:7 became clear in that time frame? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 596:16 to 597:24) 596<br>16   THE WITNESS:  Sure.  That by<br>17       the spring of 2001, when the<br>18       original findings from the VIGOR<br>19       study were released by Merck, in<br>20       combination with the existing<br>21       information from a variety of<br>22       other studies that we've talked<br>23       about that were done at around the<br>24       same time, as well as the<br><br>1       information from the preapproval 597<br>2       studies and the evidence from the<br>3       pharmacology studies that were<br>4       also available by the spring of<br>5       2000, that at that point, there<br>6       was evidence of a likely<br>7       association or even of a possible<br>8       association between Vioxx and<br>9       cardiovascular outcomes.<br>10   BY MR. BECK:<br>11       Q.    You said spring of 2001.<br>12       A.    I'm sorry, I misspoke.  I<br>13   meant spring of 2000.<br><br>14       Q.    Okay.<br>15           So, by the spring of 2000,<br>16   several months before the publication in<br>17   the New England Journal, right?<br>18       A.    Correct.<br>19       Q.    You were saying that there<br>20   was evidence of a likely or possible<br>21   association between the use of Vioxx<br>22   and --<br>23       A.    And adverse cardiovascular<br>24   outcomes. | | |
| 598:7 -598:11<br>598:7 Q. And yesterday, did you say<br>598:8 'that you, yourself, had concluded that<br>598:9 there was this possible association back<br>598:10 in the 2000 time frame?<br>598:11 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 598:20 -599:8<br>598:20 Q. In any event, you, yourself,<br>598:21 back in 2000, based on information that<br>598:22 was available to you in the spring of<br>598:23 2000, have concluded in your own mind<br>598:24 that there was a likely or possible<br>599:1 association between Vioxx and adverse<br>599:2 cardiovascular outcomes? Is that your<br>599:3 testimony?<br>599:4 A. Certainly possible , . •<br>599:5 association, so, yes.<br>599:6 Q. Okay.<br>599:7 So, a possible association?<br>599:8 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 599:9 -600:14<br>599:9 Q Rather than ask you what was<br>599:10 your testimony yesterday, I'm going to<br>599:11 try to short-circuit it.<br>599:12 Is it your position that at<br>599:13 the time of the VIGOR publication late in<br>599:14 2000 that there was no reliable evidence<br>599:15 to support the naproxen hypothesis?<br>599:16 A. "No" is an extreme term, but<br>599:17 I would say virtually no. There was the<br>599:18 occasional naproxen platelet study, there<br>599:19 was our own research that indicated a 16<br>599:20 percent reduction. So, I think the<br>599:21 fairest way to characterize it would be<br>599:22 that there was no convincing evidence<br>599:23 that the so-called naproxen hypothesis ' . ,<br>599:24 explained the increased rate of<br>600:1 Cardiovascular disease seen in VIGOR.<br>600:2 But, clearly, all the<br>600:3 answers were not yet in, in part because<br>600:4 the definitive clinical trial never got<br>600:5 done, and there were unresolved . , '.<br>600:6 questions. But that's my position.<br>600:7 Q. Well, in fact, have you<br>600:8 stated before that at the time of the<br>600:9 VIGOR study alone that you thought it was<br>600:10 fairly obvious from the absence of any<br>600:11 'corroborating evidence of any kind on the<br>600:12 planet that naproxen was a major league<br>600:13 cardioprotective drug?<br>60014 A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 601:10-602:5<br>601:10 Q So, I want to talk about<br>601 :11 what you and others on the planet were<br>601:12 actually saying at the time about the<br>601:13 potential cardioprotective effect of<br>601 :14 naproxen.<br>601:15 During the time that Vioxx<br>601 :16 was on the market, were scientists whom<br>601:17 you considered to be reputable writing<br>601 :18 articles saying that, the difference in .. ,<br>601:19 heart attacks in the VIGOR results could<br>601 :20 be explained by naproxen?<br>601:21 A. You'd have to characterize<br>601 :22 when you mean about while it was on the<br>601:23 market, because certainly that was being<br>601:24 said credibly in 1999. It is much less<br>602:1 likely that it was being said credibly in<br>602:2 2004.<br>602:3 Q. Well, it wouldn't have been<br>602:4 said in 1999 since VIGOR hadn't come out<br>602:5 in 1999. right? | | |
| 602:7 -602:9<br>602:7 THE WITNESS: I'm sorry,<br>602:8 your question was about scientists<br>602:9 speaking about what? | | |
| 602:11-602:16<br>602:11 Q. About the difference in<br>602:12 heart attacks in VIGOR results could be<br>602:13 explained by naproxen. , , .<br>602:14 A. I'm sorry. Yes. 2000.<br>602:15 What was said in 2000 would have been<br>602:16 'more credible than what was said in 2004, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 602:17 to 603:15)<br>602<br>17   Q.   Do you know who Dr. Steven<br>18   Nissen is?<br>19       A.   Yes, I do.<br>20       Q.   Was he a member of the<br>21   Advisory Committee that met in February<br>22   of 2001 to discuss the results of VIGOR?<br>23       A.   I believe he was.<br>24       Q.   Is he a cardiologist whom<br><br>603<br>1   you respect?<br>2       A.   Yes.<br>3       Q.   At the time back in 2001, do<br>4   you know where Dr. Nissen was working?<br>5       A.   I think he was at the<br>6   Cleveland Clinic then.<br>7       Q.   Was he a colleague of Dr.<br>8   Topol's back then?<br>9       A.   That's right.<br>10       Q.   Is Dr. Nissen still at the<br>11   Cleveland clinic?<br>12       A.   Yes, he is.<br>13       Q.   Is Dr. Topol still at the<br>14   Cleveland Clinic?<br>15       A.   No. | | |
| 603:20 -604:11<br>603:20 Q. You said you reviewed the<br>603:21 transcript of the Advisory Committee<br>603:22 meeting, right, the 2001 meeting?<br>603:23 A. Right.<br>603:24 Q. Do you remember whether Dr.<br>604:1 Nissen made a presentation at that<br>604:2 meeting?<br>604:3 A. Yes, he did.<br>604:4 Q. Do you remember what Dr.<br>604:5 Nissen concluded about what could be<br>604:6 gleaned from the VIGOR results?<br>604:7 A. Well, rather than going on<br>604:8 my memory of what Or. Nissen said, it<br>604:9 'might be more helpful if I could just<br>604:10 look at the transcript you're referring<br>604:11 to. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 605:14 to 605:20) 605<br>14 Q.   First, let's just establish,<br>15 is Exhibit 47 the transcript of the<br>16 Advisory Committee meeting that you<br>17 reviewed?<br>18      A.   Yes.<br>19      Q.   And if you would please turn<br>20 to Page 206.  The -- | | |
| ja063006 - Vol. I, (Pages 606:8 to 607:7) 606<br>8 Q.   So, just referring to Page<br>9 206.  And Dr. Nissen is quoted on Page<br>10 206.  Did you review this quotation from<br>11 Dr. Nissen when considering the materials<br>12 in reaching your opinion?<br>13      A.   Yes.<br>14      Q.   And he's quoted here as<br>15 saying, "Briefly, I think what I would<br>16 say in the label that there was an excess<br>17 of cardiovascular events in comparison to<br>18 naproxen, that it remains uncertain<br>19 whether this was due to beneficial<br>20 cardioprotective effects of naproxen or<br>21 prothrombotic effects of the agent, and<br>22 leave it at that, that basically we don't<br>23 know the reason.  We do know there was a<br>24 difference.  That awareness should be<br><br>1 made available to the prescribe and to 607<br>2 the consumer, but without necessarily a<br>3 final judgment as to the reasons for that<br>4 difference."<br>5          Did I read that quotation<br>6 correctly?<br>7      A.   Yes, you did. | | |

215

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 607:16 to 608:2) 607<br>16   Q.   After Dr. Nissen made this<br>17   statement, do you know whether the<br>18   Advisory Committee voted on whether<br>19   that's how they recommended the subject<br>20   be treated in the label?<br>21       A.   I would want to look at the<br>22   actual vote.  I know there was a vote,<br>23   but I would want to see just how it was<br>24   characterized.<br><br>1       Q.   If you'd look at the next   608<br>2   page. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 609:6 to 610:22)609<br><br>6  has stopped, and during our pause, during<br>7  the musical interlude, Doctor, did you<br>8  have a chance to review the transcript<br>9  pages around Dr. Nissen's comments?<br>10     A.   Yes.  But I don't think it's<br>11  fair to characterize it as a vote on Dr.<br>12  Nissen's comments.<br>13     Q.   Okay.<br>14          How would you characterize<br>15  the vote?<br>16     A.   I would characterize it as<br>17  -- I will read the actual question that<br>18  was posed.<br>19     Q.   What page are you on?<br>20     A.   207.<br>21     Q.   And what line?<br>22     A.   5.<br>23          "So, let me ask for those<br>24  feeling yes, that there needs to be<br><br>1  something, some additional language,610 and<br>2  I'm not sure that comma is placed<br>3  appropriately.  I read it as, since it<br>4  doesn't make sense where the comma is,<br>5  "some additional language, perhaps along<br>6  the lines of Dr. Nissen in terms of the<br>7  label."  And so what it seems to me a<br>8  fair reading of this question is, should<br>9  there be something more in the label that<br>10  describes the VIGOR findings perhaps<br>11  along the lines that Dr. Nissen suggests.<br>12     Q.   Okay.<br>13          So --<br>14     A.   And the vote was mostly on<br>15  should there be more language in the<br>16  label about the VIGOR findings.<br>17     Q.   Well, nobody said that.<br>18     A.   "That there needs to be<br>19  something, some additional language," and<br>20  the topic was the VIGOR findings,<br>21  "perhaps along the lines of Dr. Nissen in<br>22  terms of the label." | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 611:12 to 612:4) 611<br>12 Q.   In any event, the actual<br>13 language that was voted on was, "So, let<br>14 me ask for those feeling yes, that there<br>15 needs to be something, some additional<br>16 language perhaps, along the lines of Dr.<br>17 Nissen in terms of the label."  Is that<br>18 the question that was posed?<br>19      A.   Yes.<br>20      Q.    And how did the vote come<br>21 out?<br>22      A.    The vote was, well, we can't<br>23 get a count, but it looks like everybody<br>24 but one voted for additional language.<br><br>1      Q.   Well, voted for the question 612<br>2 that was "some additional language<br>3 perhaps along the lines of Dr. Nissen,"<br>4 right? | | |
| 612:7 THE WITNESS: Right. But,<br>612:8 again, having read" many of these<br>612:9 transcripts and sat through some<br>612:10 of these meetings, I see the<br>612:11 question, and I think it's right<br>612:12 there in the language, that<br>612:13 "should there be something, some<br>612:14 additional language" about the<br>612:15 VIGOR findings, "perhaps along the<br>612:16 lines of Dr. Nissen." | | |
| 612:19 So, we agree that that was<br>612:20 the question, and it was everybody except<br>612:21 one person said yes to that?<br>61222 A. Right.<br>612:23 And my reading of that was<br>612:24 that they said yes, there should be some<br>613:1 additional language in the label. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 613:6 to 614:9) 613<br>6   Q.   You don't have any reason to<br>7   believe that the Advisory Committee<br>8   members in 2001 were biased in favor of<br>9   Merck, do you?<br>10       A.   The reason I'm having a hard<br>11   time answering that is that we know that<br>12   the Advisory Committee's vote later on,<br>13   and I simply don't know if it was the<br>14   same members or how many were the same,<br>15   definitely did split in their statements<br>16   about Vioxx, about the other COX-2s, in<br>17   relation to their affiliations with<br>18   industry.  And this has been widely<br>19   documented.<br>20           And the question has been<br>21   raised, I think understandably, that if<br>22   the votes in a subsequent meeting, the<br>23   one of 2005, I believe, of the Advisory<br>24   Committee correlated very closely with<br><br>1   the ties of Advisory Committee members to 614<br>2   industry, that that raised the question<br>3   as to whether there were perhaps<br>4   unconscious, perhaps unintentional, bias.<br>5   So, I don't think I can rule out that<br>6   possibility in relation to this Advisory<br>7   Committee either.<br>8       Q.   Your sworn testimony from a<br>9   few weeks ago, Page 379, line 20. |  |  |
| ja063006 - Vol. I, (Page 615:1 to 615:9) 615<br>1   Q.   "Question:  There's no<br>2   reason to think that the Advisory<br>3   Committee in February of 2001 was biased<br>4   in favor of Merck, was there, sir?<br>5           "Answer:  Not to my<br>6   knowledge."<br>7           Was that your sworn<br>8   testimony a couple weeks ago?<br>9       A.   Yes. |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 635:24 to 636:11)<br><br>635<br><br>636 | vague, lack of foundation, incomplete; include 639:9–14 and 640:4-7 | _(handwritten signature)_ |
| ja063006 - Vol. I, (Page 637:14 to 637:21)<br><br>637 | | |
| ja063006 - Vol. I, (Pages 637:23 to 638:8)<br><br>637<br><br>638 | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 640:24 to 641:8) 640 641 ▬▬▬▬▬ | | |
| ja063006 - Vol. I, (Pages 641:10 to 642:3) 641 642 ▬▬▬▬▬ | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 642:18 to 643:24) <br> **642** <br> 18   Q.   Doctor, I'd like to now <br> 19   spend a few minutes on study 090. <br> 20       A.   Okay. <br> 21       Q.   Do you remember discussing <br> 22   that study with Mr. Tisi yesterday? <br> 23       A.   Yes, I do. <br> 24       Q.   And that was a clinical <br><br> **643** <br> 1   trial that was completed not long after <br> 2   the completion of VIGOR; is that right? <br> 3       A.   Right. <br> 4       Q.   So, that would have been in <br> 5   the 2000 time frame? <br> 6       A.   Right. <br> 7       Q.   Do you know whether Merck <br> 8   provided the results of study 090 to the <br> 9   FDA? <br> 10       A.   I believe they did. <br> 11       Q.   And, in fact, did the FDA <br> 12   then make the results of study 090 <br> 13   publically available by posting it on the <br> 14   FDA website? <br> 15       A.   Virtually no doctor goes to <br> 16   the FDA website to look at study results. <br> 17       Q.   No, my -- <br> 18           Well, researchers do, do <br> 19   they not? <br> 20       A.   Sometimes, yes. <br> 21       Q.   And my question wasn't what <br> 22   prescribes do, but, rather, did the FDA <br> 23   make the results of study 090 available <br> 24   by publishing it on its website? | | |
| 644:3 -644:6 <br> 644:3 THE WITNESS: They did <br> 644:4 disseminate or not disseminate <br> 644:5 but they did make available what <br> 644:6 they had received from Merck, yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
| --- | --- | --- |
| 644:11 -645:3<br>644:11 Was study 090 discussed by<br>644:12 Dr. Targum in her memorandum that<br>644:13 'appeared around the time of the February<br>644:14 2001 Advisory Committee?<br>644:15 A. Yes.<br>644:16 Q. Yesterday when you were<br>644:17 discussing study 090, you testified that<br>644:18 there was an increase in numbers of<br>644:19 cardiovascular events. Do you remember<br>644:20 that?<br>644:21 A. Ri9ht.<br>644:22 Q. You did not testify<br>644:23 yesterday, did you, that there was a<br>644:24 statistically significant increase in<br>645:1 cardiovascular events in study 090?<br>645:2 A. I don't believe that I said<br>645:3 that. | | |
| ja063006 - Vol. I, (Page 654:9 to 654:19) 654<br>9   Q.   So, when Vioxx was compared<br>10   with people who took a sugar pill or<br>11   placebo, there was no statistically<br>12   significant difference in cardiovascular<br>13   thrombotic events; is that correct?<br>14        A.   When the placebo group<br>15   was -- when both of the referent groups<br>16   were combined, I believe there was.  When<br>17   the placebo group, per se, which was half<br>18   as large as the other study groups, was<br>19   broken out, it was not. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 656:9 to 660:13) 656<br>9   Q.   What journal was this<br>10  published in?<br>11       A.   Archives of Internal<br>12  Medicine.<br>13       Q.   And when was it published?<br>14       A.   It was accepted for<br>15  publication in January of '02, and it was<br>16  published in May of '02. So, it was<br>17  written in the end of '01.<br>18       Q.   Was this a study that you<br>19  and some colleagues did concerning<br>20  potential cardioprotective effects of<br>21  naproxen?<br>22       A.   Yes.<br>23       Q.   Did you study patients who<br>24  had taken naproxen, ibuprofen and other<br><br>657<br>1   traditional NSAIDs?<br>2        A.   Right.<br>3        Q.   Would you please turn to<br>4   Page 1104. And I'm going to put up on<br>5   the screen the same paragraph that Mr.<br>6   Tisi put on the screen and the two of you<br>7   discussed yesterday.<br>8        A.   Right.<br>9        Q.   Do you remember this<br>10  paragraph?<br>11       A.   Yes.<br>12       Q.   And it starts off with, "In<br>13  the study by Bombardier et al." And<br>14  that's in the VIGOR publication, correct?<br>15       A.   Correct.<br>16       Q.   And I think you went through<br>17  the first two sentences where it said,<br>18  "In the study by Bombardier et al.," --<br>19  that means and others, right?<br>20       A.   Right.<br>21       Q.   -- "in which patients with<br>22  rheumatoid arthritis were randomized to<br>23  receive rofecoxib or naproxen, the rates<br>24  of AMI were 4-fold higher in patients<br><br>658<br>1   taking rofecoxib."<br>2             Rofecoxib, as we know, is<br>3   Vioxx, right? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 658:3 to 660:13) 658<br>3  Vioxx, right?<br>4      A.   Right.<br>5      Q.   And I think you also<br>6  discussed the sentence that said, "These<br>7  findings could have resulted from a<br>8  protective effect of naproxen, a risk-<br>9  enhancing effect of rofecoxib, or both,"<br>10  right?<br>11      A.   Right.<br>12      Q.   Now, did you go on to say,<br>13  "The selective COX-2 inhibitors were not<br>14  available during the period that we<br>15  studied"?<br>16      A.   Right.<br>17      Q.   And to be clear, now you're<br>18  talking about the paper we're looking at<br>19  right now, your 2002 publication. Even<br>20  though Vioxx had been on the market since<br>21  May of 1999, in your, I think you might<br>22  have called it a look-back study --<br>23      A.   In our database.<br>24      Q.   -- you looked at a<br><br>                                              659<br>1  database --<br>2      A.   Right.<br>3      Q.   -- that went back in an<br>4  earlier period of time when neither<br>5  Celebrex nor Vioxx were on the market,<br>6  right?<br>7      A.   Or were on the market in<br>8  such small amounts. No, actually, you're<br>9  correct. We looked at data up until the<br>10  end of 1995. So, there were no COX-2s on<br><br>11  the market in that period.<br><br>12      Q.   Okay.<br>13          So, just to be completely<br>14  clear here, the study that you did when<br>15  focusing on whether naproxen had a<br>16  cardioprotective effect, there was no<br>17  looking at Vioxx at all, right?<br>18      A.   Correct. Not in this study.<br>19      Q.   Okay.<br>20          And because of that, did you | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 659:21 to 660:13) <br> 659 <br> 21  go on to say in your study that these <br> 22  findings do not clarify -- <br> 23      A.   Can you tell me where you <br> 24  are looking? <br><br> 660 <br> 1      Q.   Yes.  I'm highlighting it on <br> 2  the screen. <br> 3      A.   Right, right. <br> 4      Q.   And I'll underline it. <br> 5      A.   Right. <br> 6      Q.   That basically because <br> 7  rofecoxib or Vioxx wasn't even on the <br> 8  market during the period that you <br> 9  studied, the findings of this paper do <br> 10  not clarify the role of Vioxx.  That's <br> 11  what you said, correct? <br> 12      A.   Right.  We didn't study <br> 13  Vioxx. |  |  |
| 660:19 'You went on to say that <br> 660:20 while your study did not clarify the role <br> 660:21 about rofecoxib, you said, "However, the <br> 660:22 data presented herein are consistent with |  |  |
| ja063006 - Vol. I, (Page 661:1 to 661:8) <br> 661 <br> 1  A.   That's right.  And to really <br> 2  round it out, we need to point out that <br> 3  the number that that refers to was a 16 <br> 4  percent reduction, not an 80 percent <br> 5  reduction. <br> 6      Q.   And I think yesterday you <br> 7  used a phrase when talking about 16 <br> 8  percent, I can't remember, what was -- |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 661:11 to 661:20) 661<br>11  Q.   Wimpy.  Was that a phrase<br>12  you used?<br>13      A.   In explaining an 80 percent<br>14  reduction, yes.  In that context, it was<br>15  wimpy.<br>16      Q.   So, yesterday you testified<br>17  that a 16 percent increase in<br>18  cardioprotective effect was a wimpy<br>19  increase?<br>20      A.   No. | | |
| ja063006 - Vol. I, (Pages 661:23 to 662:21) 661<br>23    THE WITNESS:  No.  What I<br>24        said was in relation to the<br><br>1        supposed 80 percent effect that  662<br>2        Merck was attributing to Vioxx, it<br>3        was wimpy --<br>4  BY MR. BECK:<br>5      Q.   Okay.<br>6        I --<br>7      A.   I'm sorry -- to naproxen.<br>8      Q.   In any event, what you found<br>9  without putting an adjective on it for<br>10  the time being, what you did find in your<br>11  2002 study was that the information you<br>12  collected was consistent with a possible<br>13  protective effect of naproxen, right?<br>14      A.   Right.  But to be fair, we<br>15  need to read the rest of that section<br>16  and line 10 of the last paragraph.<br>17  Perhaps you can bring that up.  It's<br>18  right below where you just cited, in<br>19  which we say, to put this in<br>20  perspective -- it's line 10 of the last<br>21  paragraph. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 664:23 to 665:19) **664**<br>23  Q.   Let me see if I can do that.<br>24  How far down?<br><br>**665**<br>1        A.   Ending with the line<br>2  beginning "by aspirin."<br>3        Q.   Okay.<br>4        A.   Okay.  All right.<br>5              This is our summary that<br>6  follows the point that you had cited<br>7  above.<br>8              "To place the effect of<br>9  naproxen in perspective, in a large<br>10  randomized trial of daily aspirin use in<br>11  primary prevention, patients in the<br>12  intervention arm experienced a 44%<br>13  reduction in the risk of AMI.  Therefore,<br>14  it would be false to equate the more<br>15  modest effect of naproxen suggested in<br>16  this study with the cardioprotection<br>17  afforded by aspirin."<br>18              And that's a key point in<br>19  our concluding paragraph. | | |
| ja063006 - Vol. I, (Pages 665:21 to 666:11) **665**<br>21  Now, let's turn to Page 1.<br>22        A.   Of the paper?<br>23        Q.   Of the paper.<br>24              And there you have this<br><br>**666**<br>1  business at the top of the page that's<br>2  sometimes called an abstract, right?<br>3        A.   It's always called an<br>4  abstract.<br>5        Q.   Okay.<br>6              It's always called an<br>7  abstract, and you set forth the key<br>8  information in the abstract; is that<br>9  right?<br>10        A.   Right.<br>11        Q.   And then in the conclusions | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 666:12 to 668:3) 666<br>12  in the abstract, I take it that you set<br>13  forth the key conclusions in this<br>14  section, right?<br>15      A.   Right.<br>16      Q.   So, if it's okay with you --<br>17      A.   Sure.<br>18      Q.   -- I'll blow up the whole<br>19  thing, the conclusion.<br>20      A.   Sure.<br>21      Q.   Was your key conclusion that<br>22  you put in the abstract, "Although NSAIDs<br>23  have anti-inflammatory and anti-platelet<br>24  effects similar to those of aspirin, we<br><br>1  did not find that these drugs confer a 667<br>2  protective effect against AMI," being<br>3  heart attacks, right?<br>4      A.   Correct.<br>5      Q.   "However, use of one<br>6  specific NSAID, naproxen, appeared to be<br>7  associated with the reduced rate of AMI,"<br>8  or heart attack, "an effect recently<br>9  suggested by a large randomized<br>10  controlled trial as well." Is that<br>11  right?<br>12      A.   Correct.<br>13      Q.   And when you said that the<br>14  use of naproxen appeared to be associated<br>15  with a reduced rate of heart attack, that<br>16  was from your own data, right?<br>17      A.   That was the 16 percent<br>18  reduction.<br>19      Q.   And then you said that your<br>20  data -- that this same effect of<br>21  cardioprotection from naproxen was<br>22  recently suggested by a large randomized<br>23  control trial. Was that the VIGOR trial?<br>24      A.   Right. I believe then and I<br><br>1  believe now that naproxen reduces the 668<br>2  rate of heart attack by about 15 or 16<br>3  percent. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 668:4 to 668:18) 668<br>4   Q.   And the 16 percent figure<br>5   comes from the VIGOR trial, right?<br>6      A.   No.  That's from our own<br>7   research.<br>8      Q.   I'm sorry.  From your own<br>9   research?<br>10      A.   Right.  Others have found<br>11   similar things.<br>12      Q.   Well, in fact, others have<br>13   found higher rates of cardioprotection<br>14   from naproxen, right?<br>15      A.   Some lower, some higher, but<br>16   I think if you were to pull together all<br>17   the data, the most common finding is<br>18   about 15 percent. | | |
| ja063006 - Vol. I, (Page 669:1 to 669:19) 669<br>1   Q.   And in VIGOR, you know that<br>2   the people -- it was a controlled study<br>3   where they were using 500 milligrams<br>4   twice a day, right?<br>5      A.   Right.<br>6      Q.   And I think you said the<br>7   average length of time that people were<br>8   in the study was nine months?<br>9      A.   That's right.<br>10      Q.   And your study was not a<br>11   controlled study where everybody took the<br>12   same amount of the drug every day for<br>13   many months, right?<br>14      A.   That's correct.<br>15      Q.   Yours was looking back at<br>16   medical records of people who had<br>17   prescriptions for naproxen and other<br>18   drugs, right?<br>19      A.   That's right. | | |
| ja063006 - Vol. I, (Page 669:20 to 669:24) 669<br>20   Q.   And your study did not take<br>21   into account whether the patients were<br>22   taking lower doses of naproxen than they<br>23   were in the VIGOR study, right?<br>24      A.   We looked at all doses. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 670:7 -670:11<br>670:7 Q Well, my question is. you<br>670:8 did the study. You know from having done<br>670:9 the study, don't you, that lots of the<br>670:10 patients were taking lower doses than 500<br>670:11 milligrams twice a day? | | |
| ja063006 - Vol. I, (Page 670:20 to 670:22)<br>670<br>20   A.   Well, let me find out where<br>21   I want to be first.  I'm looking at<br>22   dosage on Page 1100. | | |
| ja063006 - Vol. I, (Pages 670:23 to 672:4)<br>670<br>23   Okay.  Actually, you're<br>24   incorrect.  If you look at Table 4 on<br><br>671<br>1   Page 1103, we look at the very small<br>2   cardioprotective effect of naproxen as it<br>3   related to the dose.  And I've got a very<br>4   bad Xerox, you may have a better copy,<br>5   but the last three lines in Table 4 look<br>6   at the odds ratio or the protection of a<br>7   number less than 1 is protection against<br>8   heart attack.<br>9          And we look at those three<br>10   numbers as a function of the dose, which<br>11   we expressed as the percent of the<br>12   maximum anti-inflammatory dosage.  So,<br>13   again, it is hard to read my Xerox, but I<br>14   believe the top line is greater than 75<br>15   percent of the maximum anti-inflammatory<br>16   dose.  The next line is 51 to 75 percent.<br>17   And the last line is 50 percent or less.<br>18          So, basically it's the<br>19   highest doses, the medium doses and the<br>20   smallest doses.  And looking at those<br>21   three numbers, there is no relationship<br>22   to the cardioprotective level of any<br>23   meaningful kind with dose.  They are all<br>24   between 77 percent and 81 percent.  So, I<br><br>672<br>1   would disagree with you that our findings<br>2   are explained by the fact that the people<br>3   taking naproxen in our study were taking<br>4   it at a lower dose. | | |

231

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 673:1 to 674:16) 673<br>1    Do you know whether lots of<br>2    people in your study were taking naproxen<br>3    at doses lower than 500 milligrams twice<br>4    a day?<br>5          A.    Well, in epidemiology, we<br>6    try to avoid terms like "lots of."  But I<br>7    can tell you that regardless of the dose,<br>8    people, lots of people were taking it at<br>9    the high dose, the medium dose and the<br>10   low dose, and they all had the same<br>11   effect.<br>12          Q.    You could not control in<br>13   your study whether the patients were<br>14   taking naproxen every day as they did in<br>15   VIGOR, correct?<br>16          A.    Correct.<br>17          Q.    Did you ever study a<br>18   subgroup of patients who used 500<br>19   milligrams twice a day to see what the<br>20   cardioprotective effect of naproxen would<br>21   be at that dose used on a regular basis<br>22   twice a day?<br>23          A.    That group -- the closest to<br>24   that group would be this highest greater<br><br>                    674<br>1    than 75 percent of the maximum<br>2    anti-inflammatory doses.  That would<br>3    calibrate with the population that you<br>4    described as best as possible.  And that<br>5    group went all the way up to 19 percent<br>6    instead of 16 percent.<br>7          Q.    But you don't know if they<br>8    used that twice a day or day in, day out<br>9    for nine months, right?<br>10          A.    Right.<br>11          Q.    Have other scientists found,<br>12   to your knowledge, that from a<br>13   pharmacologic mechanistic perspective<br>14   that naproxen at 500 milligrams twice a<br>15   day mimics the anti-platelet effect of<br>16   low-dose aspirin? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 674:24 to 675:5) 674<br>24   THE WITNESS:  I'm aware of<br><br>      675<br>1        the area of research you're<br>2        describing.  I wouldn't use the<br>3        word "mimics," but it is true that<br>4        people have found anti-platelet<br>5        effects of naproxen. | | |
| ja063006 - Vol. I, (Page 675:7 to 675:13) 675<br>7   Q.   Well, my question is, do you<br>8   know whether other scientists have found<br>9   not only anti-platelet effects of<br>10   naproxen, but that they mimic those of<br>11   low-dose aspirin?<br>12        A.   I just can't speak to the<br>13   word "mimic." | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 676:19 to 677:20)<br>676<br>19   Q.   What's the date of this<br>20   report?<br>21         A.   2004.<br>22         Q.   What publication was it in?<br>23         A.   Circulation.<br>24         Q.   Look at the conclusion as<br><br>677<br>1   set forth in the abstract.  Do you see<br>2   where Dr. Capone and her colleagues said,<br>3   "The regular administration of naproxen<br>4   500 milligrams BID can mimic the<br>5   anti-platelet" effect -- "anti-platelet"<br>6   COX-1 effect of low-dose aspirin"?<br>7         A.   Right.<br>8         Q.   So, this is one of the<br>9   studies that talks about how it can work<br>10   the same way that aspirin does?<br>11         A.   Right.  This is in nine<br>12   subjects followed for six days, correct.<br>13         Q.   Have other scientists found<br>14   that naproxen exerts an anti-thrombotic<br>15   effect at least as potent as that of<br>16   aspirin?<br>17         A.   I know that there's<br>18   literature out there indicating that<br>19   there can, under some circumstances, be<br>20   an anti-platelet effect of aspirin. | | |
| ja063006 - Vol. I, (Page 680:15 to 680:17)<br>680<br>███████████████<br>██████<br>██████████ | | |
| ja063006 - Vol. I, (Page 681:1 to 681:7)<br>681<br>████████████████<br>██████████████████<br>████████████████████<br>███████████████████<br>████<br>████████ | | |

234

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 682:8 to 683:9) 682<br>8   I think this is the language<br>9   that you focused on where Merck is<br>10   writing to the FDA and Merck said, "The<br>11   concept that there are differences among<br>12   NSAIDs is supported by external<br>13   epidemiological data from three separate<br>14   studies that utilized different clinical<br>15   databases, indicating that the use of<br>16   naproxen, but not other NSAIDs, is<br>17   cardioprotective."<br>18          And then there are three<br>19   citations, and I think Number 4 is to<br>20   your paper, correct?<br>21      A.   Right.<br>22      Q.   And then it goes on to say,<br>23   "Among these studies is a U.S. study of<br>24   over 22,000 patients in New Jersey by a<br><br>1   Boston academic group unaffiliated with 683<br>2   industry."<br>3          And that refers to your<br>4   group, right?<br>5      A.   That's right.<br>6      Q.   Yesterday you said that<br>7   Merck distorted the results of your<br>8   study.  Do you remember that?<br>9      A.   Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 683:15 to 685:11) <br> 683 <br> 15 Q.   Now, when describing your <br> 16 study as one of three -- well, let's just <br> 17 go through the language here. <br> 18         The Merck submission says, <br> 19 "The concept that there are differences <br> 20 among NSAIDs is supported by external <br> 21 epidemiological data from three separate <br> 22 studies."  Now, just let me stop there. <br> 23         Does your study support the <br> 24 concept that there are differences among <br><br> 684 <br> 1 NSAIDs? <br> 2     A.   Yes. <br> 3     Q.    And it says, "That" used <br> 4 "different clinical databases."  And your <br> 5 study obviously used a different clinical <br> 6 database than the other ones did, right? <br> 7     A.   Right. <br> 8     Q.    And then it goes on to say <br> 9 that these three separate studies <br> 10 indicate "a use of naproxen, but not <br> 11 other NSAIDs, is cardioprotective." <br> 12         Did your study indicate that <br> 13 the use of naproxen, but not other <br> 14 NSAIDs, is cardioprotective? <br> 15     A.   Yes. <br> 16     Q.    And then the next sentence <br> 17 that says, "Among these studies is a U.S. <br> 18 study of over 22,000 patients in New <br> 19 Jersey."  And was your study of over <br> 20 22,000 patients in New Jersey? <br> 21     A.   Yes. <br> 22     Q.    And then it says, "By a <br> 23 Boston academic group."  That's where <br> 24 you're from, right? <br><br> 685 <br> 1     A.   Right. <br> 2     Q.    "Unaffiliated with <br> 3 industry." And you are not affiliated <br> 4 with industry, correct? <br> 5     A.   Right. <br> 6     Q.    You've testified both <br> 7 yesterday and today, you've emphasized, I <br> 8 think it's fair to say, that the <br> 9 cardioprotective effect that you found | | |

236

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 685:12 to 686:10)<br>685<br>12 Are we done with this<br>13 document?<br>14    Q.   Yes.<br>15    A.   Because I think in fairness,<br>16 we need to point out that the reason I<br>17 feel there was a distortion was that it<br>18 follows a paragraph in which Merck was<br>19 arguing to the FDA that they could not<br>20 tell if the difference in effect from --<br>21 in the VIGOR study was because it was<br>22 explained away by naproxen or by a<br>23 prothrombotic or cardiotoxic effect of<br>24 Vioxx.<br>686<br>1        And the distortion piece has<br>2 to do with the fact that the paragraph<br>3 you just read was a justification for<br>4 their saying we don't know whether this<br>5 was because of naproxen or not, and let's<br>6 just not attribute it to Vioxx because we<br>7 can't tell.  And that was the distortion<br>8 that I was referring to.<br>9    Q.   Well, what they said about<br>10 your study was accurate, right? | Non-responsive; no question pending (sustained on Smith) | |
| ja063006 - Vol. I, (Pages 686:13 to 687:3)<br>686<br>13 THE WITNESS:  Not in the<br>14    context that they presented it,<br>15    no.<br>16 BY MR. BECK:<br>17    Q.   Well, they were making their<br>18 position to the FDA.<br>19    A.   And using my data to justify<br>20 it.<br>21    Q.   But what they said about<br>22 your data, everything they said about<br>23 your data was correct, isn't that true?<br>24    A.   Well, correct in the sense<br>687<br>1 that there was one-fifth as many heart<br>2 attacks in the naproxen group.  It is the<br>3 spin that I thought was the distortion. | Non-responsive; no question pending (sustained on Smith) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 687:4 to 687:15) 687<br>4  Q.   Now, back to my question.<br>5        You've talked repeatedly<br>6  about how the effect that you found was<br>7  16 percent, and I think you've agreed<br>8  that yesterday at least in one context<br>9  you said that that was wimpy, right?<br>10        MR. BUCHANAN:  Objection.<br>11        THE WITNESS:  Let me be very<br>12      clear.  Let me be very clear on<br>13      this, Mr. Beck.  It was wimpy, to<br>14      use that term, in trying to<br>15      explain the 80 percent reduction. | | |
| ja063006 - Vol. I, (Page 688:7 to 688:18) 688<br>7  THE WITNESS:  I think you<br>8      are confused about the use of the<br>9      word "significant."  Significant<br>10      refers here to statistically<br>11      significant, as we've discussed it<br>12      in the past.  It does not mean<br>13      clinically significant or big deal<br>14      significant.  And that is always<br>15      the way this word is used in<br>16      medical papers.  And to suggest<br>17      that it means clinically important<br>18      would be incorrect. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 688:20 to 689:23) <br> 688 <br> 20 Q.   So, "significant" here <br> 21 refers to this is statistically <br> 22 significant? <br> 23     A.   Correct. <br> 24     Q.   And that concept is one I <br><br> 689 <br> 1 think you discussed yesterday.  What that <br> 2 means conventionally is that the relative <br> 3 risk is above 1, and you talked about <br> 4 the -- I'm sorry, the confidence <br> 5 intervals would not include the number 1, <br> 6 right? <br> 7     A.   Correct. <br> 8     Q.   And there's a p-value that <br> 9 had to be, was it lower or higher than <br> 10 .05? <br> 11     A.   Lower than .05. <br> 12     Q.   Lower than .05. <br> 13         And so that's what's meant <br> 14 in your paper here that there's a <br> 15 statistically significant <br> 16 cardioprotective effect of naproxen, <br> 17 right? <br> 18     A.   That's right. <br> 19     Q.   And a 15 percent reduction, <br> 20 would you consider that to be clinically <br> 21 significant? <br> 22     A.   It can be.  It depends what <br> 23 you're looking at. | | |
| ja063006 - Vol. I, (Page 690:15 to 690:20) <br> 690 <br> 15 ███████████ | nonauthenticated – witness has never seen document, does not know who author is, or if author is a doctor; hearsay | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 691:6 to 691:8) 691 ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮ | nonauthenticated – witness has never seen document, does not know who author is, or if author is a doctor; hearsay | |
| ja063006 - Vol. I, (Page 691:10 to 691:11) 691 ▮▮▮▮▮▮ ▮▮▮ | nonauthenticated – witness has never seen document, does not know who author is, or if author is a doctor; hearsay | |
| ja063006 - Vol. I, (Page 692:15 to 692:20) 692 ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮ | nonauthenticated – witness has never seen document, does not know who author is, or if author is a doctor; hearsay | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 693:3 to 694:15) <br> 693 | nonauthenticated – witness has never seen document, does not know who author is, or if author is a doctor; hearsay | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 695:2 to 696:2)<br><br>695 ▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮<br>696<br>▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮ | nonauthenticated – witness has never seen document, does not know who author is, or if author is a doctor; hearsay | *Sustained* |

242

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 696:6 to 697:21) | nonauthenticated – witness has never seen document, does not know who author is, or if author is a doctor; hearsay | *Sustained* |

243

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 698:16 to 699:1) 698<br>16   Q.   I'm handing you what we've<br>17  marked as Exhibit 52.  Do you recognize<br>18  that publication?<br>19        A.   Yes.  It is worthy of<br>20  discussion since I was a co-author of it.<br>21             Sorry.  It's late.<br>22             No.  In all seriousness, it<br>23  it's also in a real journal, and it is<br>24  written by people who have actually done<br>1   research in this area. 699 | | |
| ja063006 - Vol. I, (Page 699:6 to 699:24) 699<br>6   Q.   As you indicated, you are<br>7   one of the authors right?<br>8       A.   Right.<br>9       Q.   Along with your colleague,<br>10  Dr. Solomon, whom you referenced several<br>11  times yesterday?<br>12       A.   Correct.<br>13       Q.   And what's the date of this<br>14  study?<br>15       A.   It was published in 2003.<br>16       Q.   And what publication was it<br>17  in?<br>18       A.   Current Opinion in<br>19  Rheumatology.<br>20       Q.   Now, is this an article<br>21  where you, among other things, review the<br>22  results of studies done by other people,<br>23  as well as yourself?<br>24       A.   Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 702:23 to 705:18) 702<br>23   Is it correct that these<br>24   three other studies found a reduction in<br><br>703<br>1   heart attacks in people using naproxen<br>2   compared to other NSAIDs of 17 to 39<br>3   percent?<br>4        A.   Yes.<br>5        Q.   And let me ask you before we<br>6   go to the table, are you telling me that<br>7   that number can't really be compared to<br>8   the 16 percent that you used because it's<br>9   been adjusted in some way?<br>10        A.   Correct.  And you also need<br>11   to point out, as you did, that the study<br>12   by Ray, et al., initially found a zero<br>13   reduction.  And it was the adjustment<br>14   that I wanted to talk about that is where<br>15   you get the numbers that you read.<br>16        Q.   Okay.<br>17              And you want to talk about<br>18   an adjustment?<br>19        A.   Right.<br>20        Q.   Do you want me to show Table<br>21   1?<br>22        A.   Sure.<br>23        Q.   Okay.<br>24        A.   Because where these numbers<br><br>704<br>1   come from was, to try and make the<br>2   studies comparable, we took the parent<br>3   findings, which for Ray, that first line,<br>4   would have been no reduction.  And we<br>5   then, as it says in the caption, excluded<br>6   persons with a prior heart attack or<br>7   stroke to reduce confounding by<br>8   unmeasured aspirin use.  And what that<br>9   means is that we wanted to make sure that<br>10   there were not people on aspirin in the<br>11   studies.  And so we looked at a subset of<br>12   the rate studies so that instead of no<br>13   effect, that caused a, I guess, 17<br>14   percent reduction.  And that's why our<br>15   number is 82 and not 86, as it was in the<br>16   original paper.<br>17        Q.   Okay. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 704:18 to 705:18) <br> 704 <br> 18      So, let me ask, then.  So, <br> 19  your study was one of the three studies <br> 20  that's referenced -- <br> 21      Your study that we talked <br> 22  about and we were saying 16 percent -- <br> 23      A.   Right. <br> 24      Q.   -- is one of the three <br><br> 705 <br> 1  studies that is referenced in here where <br> 2  it talks about 17-39 percent, right? <br> 3      A.   Right. <br> 4      Q.   And adjustments were made to <br> 5  yours, and so which one -- where does <br> 6  yours fall in the 17 to 39 percent? <br> 7      A.   Well, it has to do with <br> 8  whether you are looking at excluding <br> 9  people who have had a heart attack or <br> 10  stroke.  And that's what the numbers in <br> 11  this are. <br> 12      Q.   Right. <br> 13      A.   Whereas the numbers in the <br> 14  original paper are all comers, everybody. <br> 15      Q.   Yeah, I understand that. <br> 16  And when we look at the 17 to 39 percent <br> 17  reduction -- <br> 18      A.   Right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 705:7 to 706:10) 705<br>7   A.   Well, it has to do with<br>8   whether you are looking at excluding<br>9   people who have had a heart attack or<br>10   stroke.  And that's what the numbers in<br>11   this are.<br>12      Q.   Right.<br>13      A.   Whereas the numbers in the<br>14   original paper are all comers, everybody.<br>15      Q.   Yeah, I understand that.<br>16   And when we look at the 17 to 39 percent<br>17   reduction --<br>18      A.   Right.<br>19      Q.   -- you've explained, and I<br>20   appreciate it, that one of the three<br>21   studies was actually the one that we've<br>22   been talking about that you did --<br>23      A.   Right.<br>24      Q.   -- before, we said 16<br><br>706<br>1   percent, but an adjustment has been made?<br>2      A.   Right.  If you take out<br>3   everyone who had a heart attack or<br>4   stroke, it goes from 16 percent to 18<br>5   percent.<br>6      Q.   18 percent.<br>7         So, yours is still on the<br>8   low side in terms of what the three<br>9   studies from 2002 found in terms of<br>10   reduction in heart attack risk? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 706:15 to 707:9) 706<br>15   THE WITNESS:  No.  I think<br>16       79, 82, 83 would all be considered<br>17       about the same number.<br>18   BY MR. BECK:<br>19       Q.   17 to --<br>20       A.   I'm sorry.  79.  I'm reading<br>21   the actual -- I'm reading the actual<br>22   adjusted risk.  So, it's 100 minus those<br>23   numbers.  So, what I'm saying is, if you<br>24   have a relative risk or an odds ratio of<br><br>1   82 percent, 83 percent, 79 percent, we 707<br>2   would consider those to be pretty close<br>3   to being the same number.<br>4       Q.   Well, would you consider a<br>5   17 percent reduction in heart attacks to<br>6   be pretty close to a 39 percent reduction<br>7   in heart attacks?<br>8       A.   No.  The 39 was seen on the<br>9   paper by Dr. Watson, who works for Merck. | | |
| ja063006 - Vol. I, (Page 707:10 to 707:12) 707<br>10   Q.   And yours, I guess, would be<br>11   18 on this scale?<br>12       A.   Correct | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 708:8 to 709:24) 708<br>8  Q.   And is Exhibit 7 the same<br>9  document that I am showing up on the<br>10  screen?<br>11      A.   Yes.<br>12      Q.   And you just indicated this<br>13  is a Circulation paper, meaning it was<br>14  the one published in the journal<br>15  Circulation?<br>16      A.   Correct.<br>17      Q.   And what year was this one<br>18  published in?<br>19      A.   2004.<br>20      Q.   And you discussed this<br>21  article with Mr. Tisi yesterday.  Do you<br>22  remember that?<br>23      A.   That's right.<br>24      Q.   And, in particular, you<br><br>709<br>1  talked about the fact that Dr. Cannuscio<br>2  does not appear as an author on this<br>3  article as it was eventually published,<br>4  correct?<br>5      A.   That's right.<br>6      Q.   All right.<br>7          And I'll come back to that<br>8  subject in a little bit.<br>9          Yesterday when you were<br>10  testifying about the findings in this<br>11  article, you indicated that you found an<br>12  increased risk using Vioxx for 30 days.<br>13  Do you remember that?<br>14      A.   For up to 30 days.<br>15      Q.   Up to 30 days.<br>16          And you also said yesterday<br>17  that there was an increased risk that you<br>18  found using Vioxx up to 90 days.  Do you<br>19  remember that?<br>20      A.   That's right.<br>21      Q.   You did not testify<br>22  yesterday, did you, about what your paper<br>23  found concerning people who used Vioxx<br>24  for more than 90 days? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 711:20 to 712:13)<br><br>711<br>20  Q.   Did you set forth that<br>21  belief your article?<br>22        A.   I can look and see, but I<br>23  think even Merck agrees that there is a<br>24  risk after 90 days.  So, I'm trying to<br>712<br>1  understand why it is that we found no<br>2  risk.  And I think that in an<br>3  observational study, as you said, where<br>4  we do not give people drugs in a kind of<br>5  clinical trial setting, we can't make<br>6  people stay on the drug.  And if somebody<br>7  is having problems with the drug, we<br>8  often see in an observational study that<br>9  people who are having difficulty with the<br>10  drug stop taking the drug.  And my<br>11  belief, as the senior author of the<br>12  paper, is that that is probably why we<br>13  did not see a risk after 90 days. | Non-responsive speech, witness not qualified to opine what Merck "agrees" to; inaccurate testimony about Merck (sustained in Smith) | *(handwritten)* |

250

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 712:21 to 713:24)<br>712<br>21  THE WITNESS:  No.  The<br>22      differences I'm thinking of is<br>23      people's whose blood pressure went<br>24      up, people who develop chest pain,<br><br>713<br>1      people who develop congestive<br>2      heart failure, all which are known<br>3      side effects of Vioxx, may well<br>4      have dropped out of taking the<br>5      drugs since they were just in<br>6      normal care.  And I believe that<br>7      that is why, after 90 days, we<br>8      didn't see the risk.<br>9  BY MR. BECK:<br>10      Q.   Why don't we take a break,<br>11  and I would like you to read through your<br>12  article, and when we come back from the<br>13  break, tell me whether there is anywhere<br>14  at all in your article where you say<br>15  anything that would support your last<br>16  answer.<br>17      A.   I can save time and tell you<br>18  right now that it's not there because<br>19  it's my current understanding of what our<br>20  findings -- why our findings were as they<br>21  are in light of the consensus opinion now<br>22  that Vioxx does cause heart attacks after<br>23  90 days, but we did not engage in that<br>24  speculation in the paper. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 715:23 to 717:24) | | |

ja063006 - Vol. I, (Pages 715:23 to 717:24)

**715**
23  but then relative risk is a different
24  concept, and am I right that it's

**716**
1  basically a measurement of how much
2  higher is the risk?
3      A.   Exactly right.
4      Q.   Okay.
5          So, that --
6          And the way that it's
7  presented typically in one of these
8  papers is that if the relative risk is 1,
9  say if you're comparing Vioxx to no use
10  of medicine at all, and there was a
11  relative risk of 1, that would mean that
12  Vioxx was the equivalent of not using any
13  medicine at all, right?
14      A.   Correct.
15      Q.   So, 1 is kind of the
16  baseline, right?
17      A.   Correct.
18      Q.   And then, for example, if it
19  were 2, 2.0, that would mean that the
20  risk of whichever the drug was is two
21  times greater than the other one, right?
22      A.   Well, the risk of a given
23  event if you take that drug is twice,
24  yes.

**717**
1      Q.   Okay.
2          So, if you were measuring
3  heart attacks with drug A and drug B, and
4  drug A had a relative risk of 2, then you
5  would be saying that the chance or risk
6  that that person using that drug would
7  have a heart attack is twice as high as
8  somebody using the other drug?
9      A.   Exactly.
10      Q.   10 would be 10 times as
11  high?
12      A.   Correct.
13      Q.   Okay.
14          So, let's go back to your
15  article here.  Turn over to Table 2 on
16  Page 2071.
17      A.   Got it.

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 717:18 to 717:24) 717<br>18      Q.   And I'm going to highlight<br>19   the first half or so of that so that it's<br>20   just a little bit more legible.  And I<br>21   want to take a few minutes and walk<br>22   through this if you'll bear with me, and<br>23   I think it may help the jury understand<br>24   it. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 718:1 to 720:22) 718<br>1  A.   Okay.<br>2      Q.   The title is "Adjusted<br>3  Association Between Coxibs and Acute<br>4  Myocardial Infarction."<br>5         Now, that means you're<br>6  looking at the relative risk comparing<br>7  certain drugs to other drugs or no drugs<br>8  at all.  And what you're doing is looking<br>9  at that in terms of heart attacks, right?<br>10     A.   Correct.<br>11     Q.   Okay.<br>12        So, just looking at the<br>13  first one, it says, "Exposure" and then<br>14  "Reference group" in the heading on the<br>15  first column.  Do you see that?<br>16     A.   Right.<br>17     Q.   And then we have the<br>18  "adjusted odds ratio," which has two<br>19  components to it, right?  And the<br>20  "p-value" over here; is that correct?<br>21     A.   Correct, right.<br>22     Q.   Okay.<br>23        And let's see if we can make<br>24  that a little more concrete by, we'll<br><br>719<br>1  take the first example.<br>2        So, the exposure that the<br>3  drug that you're measuring the risk of in<br>4  this first item is rofecoxib, being<br>5  Vioxx, right?<br>6     A.   Correct.<br>7     Q.   And the reference group or<br>8  the drug that you're comparing it to is<br>9  celecoxib or Celebrex, right?<br>10     A.   That's right.<br>11     Q.   And is this for this 90-day<br>12  period or is this for --<br>13     A.   This is, I believe, for all<br>14  periods studied.<br>15     Q.   Okay.<br>16        And so when you compare it<br>17  in this first item, Vioxx to Celebrex,<br>18  what you found was a relative risk or<br>19  odds ratio of 1.24, right?<br>20     A.   Correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 719:21 to 721:14)<br>719<br>21  Q.   So, higher than even, but<br>22  less than twice as much, right?<br>23      A.   Correct.<br>24      Q.   And then there's this<br><br>720<br>1  confidence interval that we talked about<br>2  before, and that bracket is above 1.0,<br>3  and, therefore, traditionally it would be<br>4  considered statistically significant?<br>5      A.   Correct.<br>6      Q.   And then the p-value, using<br>7  the p-value, would that be statistically<br>8  significant?<br>9      A.   Correct.<br>10      Q.   And that's because it's<br>11  above or below .05?<br>12      A.   Less than .05.<br>13      Q.   Less than .05.<br>14      A.   Right.<br>15      Q.   Where on this table is it<br>16  indicated, or is it not, how long the use<br>17  is for this comparison of Vioxx versus<br>18  Celebrex?<br>19      A.   This is everybody in this<br>20  study.  This table includes all the data<br>21  we had.  So, it's all durations of use.<br>22      Q.   Okay.<br>23          Now, we talked about the<br>24  relative risk or odds ratio, this number<br><br>721<br>1  1.24.  Is it true, Doctor, that<br>2  epidemiologists generally consider an<br>3  association with a relative risk of less<br>4  than 2 to be a weak association?<br>5      A.   No.  That is not a universal<br>6  view at all.  Some people believe that,<br>7  others don't.<br>8      Q.   Are you familiar with Dr.<br>9  Brian Strom?<br>10      A.   Yes, I am.<br>11      Q.   And his publication,<br>12  Pharmacoepidemiology?<br>13      A.   You mean his textbook or the<br>14  journal?  I think you mean the textbook. | | |

255

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 721:15 to 722:9) 721<br>15  Q.   Yes.<br>16      A.   Yes.<br>17      Q.   In fact, I'll hand you the<br>18  text.<br>19      A.   Yes.<br>20      Q.   You're familiar with his<br>21  textbook, Pharmacoepidemiology?<br>22      A.   I am, yes.<br>23      Q.   And I think you have<br>24  indicated before that you consider Dr.<br><br>722<br>1  Strom's textbook, Pharmacoepidemiology,<br>2  to be one of the three or four leading<br>3  textbooks in the field.  Is that a fair<br>4  statement?<br>5      A.   Yes, right.<br>6      Q.   Okay.<br>7          I'll just hand you the<br>8  textbook here.<br>9      A.   Got it. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 724:14 to 725:16) 724<br>14   Q.   Doctor, before we took a<br>15   break, we had looked at a table from your<br>16   article showing a relative risk of Vioxx<br>17   versus Celebrex of 1.24, and then I had<br>18   asked you whether a relative risk of less<br>19   than 2 was considered by epidemiologists<br>20   to be a weak association.  You had<br>21   answered that question, and then I had<br>22   given you this textbook by Dr. Strom.<br>23   And I think you already indicated that<br>24   he's a leading man in the field and this<br><br>725<br>1   book is one of the three or four most<br>2   authoritative textbooks in the field of<br>3   pharmacoepidemiology, right?<br><br>7       Q.   I think you were nodding<br>8   yes; is that right?<br>9       A.   Correct.<br>10       Q.   Okay.<br>11           And when I handed it to you<br>12   and referred you to Page 20, you asked to<br>13   see the book itself, and one of the<br>14   reasons is you wanted to see who actually<br>15   wrote the chapter, right?<br>16       A.   Right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 725:7 to 726:4) 725<br>7   Q.   I think you were nodding<br>8   yes; is that right?<br>9       A.   Correct.<br>10     Q.   Okay.<br>11          And when I handed it to you<br>12   and referred you to Page 20, you asked to<br>13   see the book itself, and one of the<br>14   reasons is you wanted to see who actually<br>15   wrote the chapter, right?<br>16     A.   Right.<br>17     Q.   Because it is one thing if<br>18   the book is edited by Dr. Strom, it's<br>19   another thing if the chapter is written<br>20   some guy you've never heard of, right?<br>21     A.   Correct.<br>22     Q.   Who wrote the chapter?<br>23     A.   Dr. Strom.<br>24     Q.   Okay.<br><br>1          So, Dr. Strom, himself, 726<br>2   wrote the chapter that Page 20 is on, and<br>3   according to Dr. Strom --<br>4       A.   I have it here. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 726:9 to 727:17)<br>726<br>9  Q.   According to Dr. Strom, does<br>10  he state here, "Conventionally,<br>11  epidemiologists consider an association<br>12  with a relative risk of less than 2 a<br>13  weak association"?<br>14      A.   Correct.  Correct that he<br>15  says that.  I don't agree with that<br>16  statement.<br>17      Q.   You disagree with Dr. Strom<br>18  on that?<br>19      A.   That's right.  And if I can<br>20  explain why I disagree.  I think if I<br>21  were to say to a patient, here's drug X,<br>22  it doesn't work any better than drug Y in<br>23  your case, but it will increase your risk<br>24  of heart attack or stroke by 90 percent,<br><br>727<br>1  would you like this drug or would you<br>2  like the other drug, in my experience,<br>3  patients would say, why would I want a<br>4  drug that increases my risk of a heart<br>5  attack or stroke by 90 percent as, in<br>6  fact, Vioxx does?  An increase of 90<br>7  percent would be a relative risk of less<br>8  than 2.0.  Most of us would not want to<br>9  incur a risk of 90 percent increase.<br>10      Q.   Well, of course, one of the<br>11  things that epidemiologists and<br>12  statisticians do is they look at the<br>13  strength of associations to see how<br>14  likely something really is and to draw<br>15  judgments that lay people might not be in<br>16  a position to draw, right?<br>17      A.   Right. |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 728:19 to 730:1) 728<br>19  THE WITNESS:  I wouldn't use<br>20      the "just."  The association was<br>21      1.24 or a nearly 25 percent<br>22      increase in risk.<br>23  BY MR. BECK:<br>24      Q.   Okay.<br><br>1          You testified yesterday that 729<br>2  your 2004 study showed an increased risk<br>3  with a variety of comparison drugs.  Do<br>4  you remember that?<br>5      A.   Yes.<br>6      Q.   Let's look here.  Rofecoxib,<br>7  which is Vioxx -- I just want to look<br>8  here.<br>9          We've already looked at<br>10  rofecoxib versus Celebrex, right?<br>11      A.   Right.<br>12      Q.   Now here is rofecoxib or<br>13  Vioxx versus naproxen, and there, the<br>14  relative risk is lower, it's 1.17, right?<br>15      A.   Right.<br>16      Q.   And also there the<br>17  confidence interval goes below 1.0,<br>18  right?<br>19      A.   Right.<br>20      Q.   And under conventional<br>21  approaches to this sort of thing, that<br>22  would not be considered statistically<br>23  significant, correct?<br>24      A.   Right.<br><br>1      Q.   And then you also -- so, 730 | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 731:8 to 732:10) 731<br>8  Q.   Let me show you -- I'm<br>9  sorry.  You already have this document in<br>10  your stack somewhere.  Exhibit 28 from<br>11  yesterday.<br>12     A.   Can you tell me what it was?<br>13     Q.   It was a collection of<br>14  things that included the abstract that<br>15  you published.<br>16     A.   From the American College of<br>17  Rheumatology?<br>18     Q.   Yes.  The ACR document.<br>19     A.   Got it.<br>20     Q.   And the pages aren't<br>21  numbered, but if you count, I think it<br>22  was 17 we figured out yesterday, 17 or<br>23  18, you'll find the abstract that you<br>24  testified about?<br><br>1     A.   You mean our paper?  Is that 732<br>2  what you mean?<br>3     Q.   Yes.  Your abstract.<br>4     A.   Got it.<br>5     Q.   Okay.<br>6        So, do I have up on the<br>7  screen the abstract that you published<br>8  concerning this epidemiological study<br>9  we've been talking about?<br>10    A.   Right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 734:4 to 737:4) 734<br>4   Q.    You identified this<br>5   yesterday as an abstract that was<br>6   presented somewhere?<br>7        A.    Right.  The American College<br>8   of Rheumatology.<br>9        Q.    And you presented this<br>10   abstract, and then later on you turned<br>11   this abstract into the full blown article<br>12   that we've been looking at, right?<br>13        A.    That's right.<br>14        Q.    Okay.<br>15             And I want to just focus on<br>16   this subject that I raised before we turn<br>17   to this document, and that is, your<br>18   testimony yesterday that the study that<br>19   resulted in this abstract and your<br>20   article, you said, showed an increased<br>21   risk of heart attacks with lower doses of<br>22   Vioxx. Okay?<br>23        A.    Right.<br>24        Q.    Now, does this abstract<br>          735<br>1   break down the results of increased risk<br>2   by dosage for Vioxx?<br>3        A.    Yes.<br>4        Q.    And is that in the "Results"<br>5   section?<br>6        A.    Yes.<br>7        Q.    Okay.<br>8             Let me blow up the "Results"<br>9   section.  And there's a lot of<br>10   information in the "Results" section.<br>11   And I want to focus on where in the<br>12   "Results" section you show the results<br>13   for 25 milligrams or less of Vioxx.<br>14        A.    Okay.<br>15             Would you like me to<br>16   identify that for you?<br>17        Q.    Yes, I would.<br>18        A.    Sure.  If you go to the<br>19   third line which is where it says, "The<br>20   adjusted relative risk of AMI."<br>21        Q.    Right.<br>22        A.    Okay.<br>23             It's basically that line and | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 735:24 to 737:4) 735<br>24   the next line.<br><br>736<br>1       Q.   The first line is above 25<br>2   milligrams, right?<br>3       A.   Right.  Keep going.<br>4       Q.   Okay.<br>5            And rofecoxib, is it here<br>6   below 25 milligrams?<br>7       A.   Correct.  And they both are<br>8   significantly increased.<br>9       Q.   So, for comparing Vioxx<br>10   below 25 milligrams to Celebrex --<br>11       A.   In the low dose.  We<br>12   compared high dose of Vioxx to high<br>13   dose of Celebrex and low dose of --<br>14       Q.   Yeah, and I am just focusing<br>15   on the low dose now.<br>16       A.   Okay.<br>17       Q.   So, comparing low-dose Vioxx<br>18   to low-dose Celebrex, you had a relative<br>19   risk or odds ratio of 1.21, correct?<br>20       A.   Right.<br>21       Q.   And then you had a<br>22   confidence interval which starts just<br>23   above the 1.0 mark, which is the<br>24   traditional mark for statistical<br><br>737<br>1   significance, right?<br>2       A.   Right.<br>3       Q.   So, that's the comparison of<br>4   Vioxx versus Celebrex? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 738:2 to 741:14) 738<br>2   THE WITNESS:  Yes.  But I<br>3        need to explain the issue of<br>4        significance, and it relates to<br>5        your question earlier about the<br>6        studies that compared Vioxx to<br>7        placebo.<br>8              If the comparison group --<br>9        if any group is of small size, it<br>10       is much less likely that the<br>11       p-value will be statistically<br>12       significant.  Again, this is sort<br>13       of fancy statistics, but it is a<br>14       universally agreed upon concept,<br>15       that the smaller the group of<br>16       people that you are studying,<br>17       and/or the smaller of the<br>18       comparison group, the more<br>19       difficult it is to show<br>20       statistical significance because<br>21       that requires -- it's really a<br>22       combination of two things, this<br>23       significance stuff.  One is how<br>24       big the effect is; and the other<br><br>1        is the size of the population that 739<br>2        you are studying.<br>3              So, for example -- and I'm<br>4        sorry to go into length about<br>5        this, but it is very important.<br>6              If you were to do a study of<br>7        smoking and lung cancer, and you<br>8        only studied like 20 people, you<br>9        might find no statistically<br>10       significant connection between<br>11       smoking and lung cancer, not<br>12       because the effect isn't there,<br>13       but because the size of the group<br>14       that you are studying was too<br>15       small.<br>16             What we see here is that the<br>17       no NSAID group, and if we go back<br>18       to one of the tables, was a group<br>19       that was small in size in terms of<br>20       -- in our terms, we tend to have<br>21       huge populations, but -- or was |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 739:22 to 741:14) | | |

ja063006 - Vol. I, (Pages 739:22 to 741:14)

739
22      this other NSAIDs or no NSAIDs?
23  BY MR. BECK:
24      Q.   No NSAIDs.

740
1      A.   No NSAIDs.
2      Q.   What are you looking at
3  right now?
4      A.   Okay.
5          I'm trying to look at the
6  sizes of the group, because what I'm
7  going by, Mr. Beck, and I think what's
8  the relevant and most important depiction
9  of the dose effect is what appears in the
10  final paper, which is when you take all
11  comers and not just pick selectively
12  which comparison group you are going to
13  look at.  In the end of our results
14  section in the paper, as it was actually
15  published, what we say is that if you
16  look at rofecoxib less than 25 milligrams
17  or 25 or less, the odds ratio is 1.37 for
18  everybody with a p-value of .0004, which
19  is highly significant and was comparable
20  to what we found for rofecoxib in the
21  high dose, which was 1.38.
22          And the point about the low
23  dose is that it's a highly significant
24  association if you take all comers.  If

741
1  you take ever smaller comparison groups,
2  you are likely not to see significance.
3      Q.   I'm just focusing on the
4  abstract that you presented, and you did
5  include there a breakdown so that
6  somebody could look and say, okay, if I'm
7  interested in Vioxx versus somebody who
8  didn't take any pain medication at all,
9  and particularly the normal dose of Vioxx
10  of 25 milligrams, then according to your
11  abstract here, there's no statistically
12  significant difference between taking
13  Vioxx in 25 milligrams and not taking any
14  medicine at all, right?

265

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 730:2 to 731:2) 730<br>2  just to put that in layman's terms, from<br>3  a statistical point of view, when you<br>4  compared Vioxx to naproxen in your study,<br>5  there basically was no difference in<br>6  terms of the effect, no statistically<br>7  significant difference, right?<br>8      A.   Right.<br>9      Q.   Okay.<br>10         And similarly, we have Vioxx<br>11  down here versus ibuprofen.  Do you see<br>12  that?<br>13      A.   Right.<br>14      Q.   That's another NSAID, right?<br>15      A.   Right.<br>16      Q.   And there the relative risk<br>17  is 1.21, correct?<br>18      A.   Right.<br>19      Q.   And, again, the confidence<br>20  interval that we talked about starts at<br>21  .92.  So, that's below 1.0, right?<br>22      A.   Right.<br>23      Q.   So, again, that difference<br>24  between Vioxx and ibuprofen is not<br><br>731<br>1  statistically significant, correct?<br>2      A.   That's right. | | |

266

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 742:8 to 743:9) 742<br>8   When you turn the abstract<br>9   into the article that we have talked<br>10   about, did you keep in the information<br>11   about how there was no statistically<br>12   significant difference between 25<br>13   milligrams of Vioxx and the use of no<br>14   NSAID at all?<br>15       A.   We expressed it for the<br>16   whole study, including all the study<br>17   participants.  As you know, there's a<br>18   limit to how many things, how much space<br>19   you are allowed in an article.  I vividly<br>20   remember that we went back and forth with<br>21   Merck about this, and the language that<br>22   we ended up with, which is the language<br>23   that the journal accepted, was taking all<br>24   comers, looking at the dose of<br>743<br>1   rofecoxib/Vioxx compared to naproxen,<br>2   compared to other nonsteroidals, compared<br>3   to no use.  We looked at the entire<br>4   population, and that's where we came up<br>5   with the dose estimate because of our<br>6   belief, which the journal agreed with,<br>7   that the best way of looking at the dose<br>8   issue was to look at it across all comers<br>9   for all comparison groups. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 745:17 to 746:14) 745<br>17   But similarly, there's no<br>18      place where they can look at short<br>19      duration of low dose compared to<br>20      naproxen.  Because if you consider<br>21      how many different comparisons get<br>22      made, there would be literally<br>23      hundreds of comparisons, and you'd<br>24      need hundreds of points in your<br><br>746<br>1      table, datapoints in your table.<br>2         So, if you look, for<br>3      example, right next to the table<br>4      we were just looking at, the main<br>5      dose analysis is high dose versus<br>6      low dose.  And that was the one<br>7      that indicated a significant<br>8      increase for both high dose and<br>9      low dose.<br>10        You can't present dose by<br>11     duration by comparison for every<br>12     possible combination.  And that's<br>13     why that's not there.  It was not<br>14     an attempt to hide any findings. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 747:19 to 749:21)<br>747<br>19  Q.   Now, regardless of whether<br>20  you thought that Dr. Cannuscio should<br>21  have been included as an author, setting<br>22  that aside for a second, do you agree<br>23  that Merck never took any of the grant<br>24  money away from you because of the<br><br>748<br>1  results of your study?<br>2     A.   That's correct.<br>3     Q.   And do you agree that Merck<br>4  never did anything to try to persuade you<br>5  not to publish your study?<br>6     A.   That's correct.<br>7     Q.   And do you agree that Merck<br>8  never tried to intimidate you in any way<br>9  because of the results of your study?<br>10    A.   I'd have a hard time saying<br>11  yes to that in light of Dr. Reicin's<br>12  visit to our unit to tell us that our<br>13  findings didn't fit any of the other<br>14  findings that Merck had and that it would<br>15  be an embarrassment to us when our<br>16  findings were published because they were<br>17  wrong.  That wasn't intimidation like<br>18  with a baseball bat, but it was a kind of<br>19  scary statement.<br>20    Q.   Page 660 of your deposition,<br>21  Line 23.<br>22       "Did Merck ever try to<br>23  intimidate you because of the results of<br>24  your study?<br><br>749<br>1       "Answer:  No."<br>2       Was that your sworn<br>3  testimony just a couple of weeks ago?<br>4     A.   Yes.<br>5     Q.   And would you agree, sir,<br>6  that Merck never took any inappropriate<br>7  action after you published your study?<br>8     A.   Well, I consider the action<br>9  in relation to Dr. Cannuscio<br>10  inappropriate.  I don't know whether you<br>11  would call that after or during the<br>12  publication or before the publication,<br>13  but I think that was inappropriate. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 749:14 to 749:21) 749<br>14    Q.    Page 661, Line 5.<br>15         "Did Merck ever take any<br>16  inappropriate action after you published<br>17  your study?<br>18         "Answer:  No."<br>19         Was that your sworn<br>20  testimony just a couple of weeks ago?<br>21    A.   Yes.  But you're not talking | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 749:18 to 752:1) 749<br>18   "Answer:  No."<br>19         Was that your sworn<br>20   testimony just a couple of weeks ago?<br>21      A.   Yes.<br><br>10      Q.   Setting aside the authorship<br>11   issue, do you agree that Merck never took<br>12   any inappropriate action after you<br>13   published your study?<br>14      A.   I do not agree with that<br>15   statement.  I think that their<br>16   presentation of our study to their sales<br>17   reps, to the public through statements<br>18   they made was inappropriate because it<br>19   was scientifically wrong.<br>20      Q.   Page 661, Line 5 through<br>21   line 8.<br>22         "Question:  Did Merck ever<br>23   take any inappropriate action after you<br>24   published your study?<br>                                                    751<br>1         "Answer:  No."<br>2         That was your sworn<br>3   testimony?<br>4      A.   I want to see in what<br>5   context that was.  661, line?<br>6      Q.   5.<br>7      A.   Okay.<br>8         I think what we need to<br>9   explain here is that --<br>10      Q.   First of all, was that your<br>11   sworn testimony?<br>12      A.   To the questions about what<br>13   Merck did to us.  And I think it's very<br>14   important and only fair to point out that<br>15   your line of questioning a few weeks ago<br>16   was about things that Merck did to us.<br>17   And I think it's a real bait and switch<br>18   to try and make it seem as if we were<br>19   talking about the same thing.<br>20         You were talking about did<br>21   they take away grant money from you? –id<br>22   they try to intimidate you?  Did they try<br>23   to persuade you to publish the study?<br>24   Did they take any inappropriate action? |  |  |

271

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 751:13 to 752:1) 751<br>13  Merck did to us.  And I think it's very<br>14  important and only fair to point out that<br>15  your line of questioning a few weeks ago<br>16  was about things that Merck did to us.<br>17  And I think it's a real bait and switch<br>18  to try and make it seem as if we were<br>19  talking about the same thing.<br>20          You were talking about did<br>21  they take away grant money from you?  Did<br>22  they try to intimidate you?  Did they try<br>23  to persuade you to publish the study?<br>24  Did they take any inappropriate action?<br><br>1  And in the context of did they --  752 | | |
| ja063006 - Vol. I, (Page 752:2 to 752:4) 752<br>2  Q.   Those are exactly the same<br>3  four questions I just asked, aren't they?<br>4      A.   Right.  Well, I need to -- | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
| --- | --- | --- |
| ja063006 - Vol. I, (Pages 752:9 to 754:3) **752**<br>9  THE WITNESS:  At some point,<br>10       somebody else who has more time<br>11       can look at the words of the<br>12       questions, but what is absolutely<br>13       clear, looking at the deposition<br>14       of a couple of weeks ago, you were<br>15       talking about things that Merck<br>16       had or hadn't done to us to<br>17       intimidate us, and it was all in<br>18       the context of did they take away<br>19       grants from you, did they try to<br>20       intimidate you, did they ever try<br>21       to persuade you not to publish<br>22       your study?  And what I'm<br>23       responding to now is did Merck<br>24       ever take any inappropriate<br><br>                                                **753**<br>1  action.<br>2       When you asked it a couple<br>3  of weeks ago, it was all around<br>4  did Merck ever do anything to you.<br>5  And I quite appropriately<br>6  responded to that in the context<br>7  in which you asked it, no, Merck<br>8  did not ever do anything<br>9  inappropriate to me.<br>10       However, if you were to take<br>11  the question in isolation, as we<br>12  are now doing, did they ever take<br>13  any inappropriate action at all in<br>14  relation to our study?  Yes, they<br>15  did, in the way they presented our<br>16  study to the world.<br>17  BY MR. BECK:<br>18       Q.   Are you done?<br>19       A.   Yes.<br>20       Q.   Okay.<br>21            Did Merck have a right to<br>22  disagree with some of the conclusions in<br>23  your study?<br>24       A.   Yes.<br><br>                                                **754**<br>1       Q.   And was one of the<br>2  conclusions that Merck disagreed with --<br>3  let's look at your study now, Exhibit 7. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 754:4 to 754:12) 754<br>4   You talked about this generally<br>5   yesterday, although I'm not sure you<br>6   focused on the specific language in the<br>7   methods and results section.<br>8           But there was something in<br>9   the methods and results section that<br>10   Merck and you had a disagreement about,<br>11   correct?<br>12       A.   Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 754:12 to 756:18) 754 <br> 12   A.   Yes. <br> 13      Q.   And I'm highlighting some <br> 14   language in there where it says, "Current <br> 15   use of" Vioxx "was associated with an <br> 16   elevated relative risk of AMI," or heart <br> 17   attack, "compared with Celebrex," and <br> 18   then it gives these statistics, "and with <br> 19   no NSAID."  Do you see that? <br> 20      A.   Yes. <br> 21      Q.   And was that one of the <br> 22   areas where you and Merck had a <br> 23   disagreement about how the data should be <br> 24   presented? <br><br> 755 <br> 1      A.   Correct. <br> 2      Q.   And was one of the points <br> 3   that Merck made to you that if you looked <br> 4   at NSAIDs, Vioxx versus NSAIDs at the 25 <br> 5   milligram dose, that there was no <br> 6   statistically significant difference? <br> 7      A.   Wait a minute.  That's not <br> 8   what we're talking about here.  That's <br> 9   not what that says. <br> 10      Q.   No.  I know that's not what <br> 11   that says. <br> 12         Was one of the concerns that <br> 13   Merck articulated to you was that in the <br> 14   actual study, as we saw in the abstract, <br> 15   that when you compare a 25 milligram <br> 16   Vioxx to no NSAID use, there was no <br> 17   statistically significant difference, but <br> 18   that here, you combined all doses instead <br> 19   of breaking it down 25 versus 50 <br> 20   milligrams?  Was that one issue that they <br> 21   were concerned about? <br> 22      A.   They didn't like the fact <br> 23   that we had that line that you <br> 24   underlined, that section in the paper. <br><br> 756 <br> 1   They would probably have preferred that <br> 2   we focus on the nonsignificant finding. <br> 3   Our response was, and I think most <br> 4   epidemiologists and statisticians would <br> 5   agree, that the most appropriate way to <br> 6   present data is to take the largest group | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 756:7 to 756:18) 756<br> 7  possible and not present subgroups,<br> 8  especially if dividing things into<br> 9  subgroups makes the significance go away.<br>10  That would not seem to me and I think to<br>11  most people to be the fairest way to look<br>12  at data in the abstract.<br>13      Q.   Was one of the disagreements<br>14  that Merck had with you that even when<br>15  you combine 25 and 50 milligram use and<br>16  compared it with no NSAIDs that the<br>17  difference that you saw was not<br>18  statistically significant? | | |
| ja063006 - Vol. I, (Pages 756:21 to 757:8) 756<br>21  THE WITNESS:  Their position<br>22       was that a P.054 level of<br>23       significance should be considered<br>24       not important.  We differed with<br><br> 1       them and felt that .054, which I 757<br> 2       think I explained the other day<br> 3       was a 94.6 percent certainty<br> 4       versus a 95 percent certainty,<br> 5       that it was important enough that<br> 6       we felt it should remain in the<br> 7       paper.  That was a point of<br> 8       disagreement. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 757:10 to 760:20)    757<br>10   Q.   And Merck, did Merck feel<br>11   that in the abstract that it should be<br>12   pointed out that this was not<br>13   statistically significant?<br>14      A.   I believe they did.<br>15      Q.   And you disagreed with that?<br>16      A.   Correct.<br>17      Q.   Okay.<br>18      A.   I believe they wanted us to<br>19   say in the abstract this was not<br>20   statistically significant, which we<br>21   interpret as just an attempt to minimize<br>22   or undercut the finding.<br>23      Q.   Okay.<br>24         And that was a bone of<br><br>   758<br>1   contention between you and Merck?<br>2      A.   That was one, yes.<br>3      Q.   Okay.<br>4         Now, I think you may have<br>5   already agreed with this, but under a<br>6   conventional statistical approach, a<br>7   confidence interval that includes the<br>8   number 1 is traditionally not considered<br>9   statistically significant, right?<br>10      A.   It is right on the<br>11   borderline.<br>12      Q.   And --<br>13      A.   And reasonable people will<br>14   disagree as to whether it falls on one<br>15   side or the other.<br>16      Q.   And similarly, the .054,<br>17   reasonable people can differ on that,<br>18   whether it's statistically significant,<br>19   right?<br>20      A.   Right.  Some would round it<br>21   to .05, which is the way you would round<br>22   .054, and some would say, well, it is<br>23   bigger than .050, so, it's not.<br>24      Q.   And the conventional<br><br>   759<br>1   approach is if it is bigger than .050,<br>2   then it is not statistically significant,<br>3   right?<br>4      A.   But another conventional | | |

277

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 759:5 to 760:20)<br>759<br>5   approach is if the rounded .05 -- if it<br>6   rounds to .05, that's close.<br>7        Q.   All right.<br>8             So, in any event, you do<br>9   agree that on both the confidence<br>10   interval and whether this shows<br>11   statistically significant, or the<br>12   p-value, whether that shows statistically<br>13   significant, reasonable people can<br>14   disagree about that?<br>15        A.   Right.  But my recollection<br>16   was that they said take it out of the<br>17   abstract.  And we felt that the concern<br>18   about the confidence interval was<br>19   perfectly expressed by just putting the<br>20   numbers up there.  We put the confidence<br>21   interval having 1.0 in it.  We put the<br>22   p-value of .054, even though a lot of<br>23   times people will round p-values to just<br>24   two numbers.  And our position was if<br>760<br>1   there's a concern about that, all the<br>2   data that you need to deal with that are<br>3   in the abstract.  And I think their<br>4   position was, take it out of the<br>5   abstract.<br>6        Q.   Or put in the abstract the<br>7   statement that it is not statistically<br>8   significant, right?<br>9        A.   Right.  And I don't recall<br>10   which option they favored.  But in our<br>11   view, you'd need to highlight it by<br>12   saying this is not significant because<br>13   all the numbers are there for any reader<br>14   to judge.<br>15        Q.   Incidentally, do you agree<br>16   with Merck that this difference was not<br>17   statistically significant?<br>18        A.   No, I do not agree.<br>19        Q.   Let's go to Page 2071 of<br>20   your article.  At the very bottom of the | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 760:20 to 761:24) 760<br>20  your article.  At the very bottom of the<br>21  left-hand column, and then continuing<br>22  over to the top of the right-hand<br>23  columns, if I can get these things<br>24  aligned.<br><br>761<br>1      A.   Right.<br>2      Q.   Did you say in the actual<br>3  article, "The adjusted relative risk of<br>4  AMI," or heart attacks, "with rofecoxib<br>5  was elevated but did not reach<br>6  statistical significance compared to no<br>7  current NSAID"?  Is that what you<br>8  actually said in the body of the article?<br>9      A.   Right.  As I recall, that<br>10  was a concession that we made to Merck,<br>11  because they were so unhappy with that<br>12  number.  I think what we agreed in kind<br>13  of a horse trading way was, we're going<br>14  to leave it in the abstract, but we're<br>15  willing to point out in the body that it<br>16  was not statistically significant.  I<br>17  think that was the agreement we made.<br>18  Because we really were trying to come to<br>19  agreement with them.<br>20      Q.   And Merck's position was<br>21  it's misleading to have the information<br>22  in the abstract, but not the observation<br>23  that these numbers are not statistically<br>24  significant, right? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 762:3 to 763:9) 762<br>3   Q.   And this back and forth,<br>4   that was a position that you took, right?<br>5            MR. TISI:  Objection.<br>6            THE WITNESS:  I'm just<br>7   trying to remember.<br>8            I'm not sure how anyone<br>9      could say that there was anything<br>10      in the abstract that did not give<br>11      that impression because it was all<br>12      there with the p-value and the<br>13      confidence interval.  So, it's not<br>14      as if anybody would have missed<br>15      that in the abstract.<br>16            But I think that in an<br>17      attempt to come to some agreement<br>18      with them so that the paper could<br>19      actually get published, I think<br>20      they wanted us to say something<br>21      like it was numerically elevated,<br>22      but not significant.  And we felt<br>23      that that was a real -- again,<br>24      this is just my recollection of<br><br>1      the words from several years ago, 763<br>2      and we felt that that was not<br>3      acceptable because that seems to<br>4      really low ball the difference.<br>5      And I think this is what we<br>6      negotiated with them as the<br>7      wording.  And we put that in in an<br>8      attempt to just get to yes and to<br>9      move forward. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 763:11 to 764:1)<sub>763</sub><br>11   Q.   Yesterday you talked about<br>12   why you thought Merck decided to remove<br>13   Dr. Cannuscio as an author of the study.<br>14   Do you remember that?<br>15      A.   Right.<br>16      Q.   Now, the truth is that based<br>17   on your personal interactions with Merck,<br>18   you do not know why Merck decided that<br>19   they did not want Dr. Cannuscio's name to<br>20   appear on your paper; isn't that true?<br>21      A.   True.<br>22      Q.   In fact, you never discussed<br>23   the issue of Dr. Cannuscio being an<br>24   author with anybody from Merck, right?<br><br>             764<br>1      A.   Right. | | |
| 764:2 Q You did not have any direct<br>764:3 discussions with Dr. Santanello from<br>764:4 Merck about the issue of whether Dr, , , ,<br>764:5 Cannuscio's name WOULD remain on the<br>764:6 paper; is that right?<br>764:7 A Right. I just know the<br>764:8 facts.<br>764:9 Q. Well, you're repeating what<br>754:10 .somebody else told you. right?<br>76411 A. No. I-<br>764:12 Q You did not | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 764:13 to 765:1)<br>764<br>13  A.   Excuse me.  You just made a<br>14  misstatement that I need to correct.<br>15          I know the fact was that Dr.<br>16  Cannuscio indicated in correspondence<br>17  with both Dr. Solomon and me that she<br>18  wanted to be a co-author, and we<br>19  communicated back to her that we agreed<br>20  that she was to be a co-author.<br>21          And the other fact that I<br>22  know is that Dr. Santanello told Dr.<br>23  Solomon to take her off the paper, and<br>24  that I knew that that was not something<br>765<br>1   that was she was keen to do. | Non-responsive; witness has no personal knowledge of Dr. Cannuscio's position-see 765:5-9 | Overrule |
| 765:5-765:9<br>765:5 Q. You did not have any<br>765:6 discussions yourself with Dr. Cannuscio<br>765:7 about whether her name would remain on<br>765:8 the paper, correct?<br>765:9 A. That's right. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 765:10 to 768:3)<br>765<br>10  Q.  Now, in your testimony just<br>11  a few minutes ago, you said that the<br>12  journal agreed with you on the way that<br>13  the data should be presented in the<br>14  abstract.  Do you remember that?<br>15      A.   Right.  In the sense that<br>16  they accepted it and published it.<br>17      Q.   And the journal that we're<br>18  talking about is Circulation, right?<br>19      A.   Right.<br>20      Q.   Yesterday you said that you<br>21  had submitted your paper for publication<br>22  to the New England Journal of Medicine.<br>23  Do you remember that?<br>24      A.   Right.<br><br>766<br>1      Q.   And also you submitted it to<br>2  the Journal of the American Medical<br>3  Association, correct?<br>4      A.   Right.  Right.<br>5      Q.   And the phrase that you used<br>6  was that they passed on your paper,<br>7  right?<br>8      A.   Right.<br>9      Q.   In fact, the Journal of the<br>10  American Medical Association rejected<br>11  your article and refused to publish it,<br>12  correct?<br>13      A.   Well, I think that's --<br>14  rejected and refused.  Most submissions<br>15  to both of those journals do not get<br>16  accepted.  They accept only about 10<br>17  percent of submissions.  It's shooting<br>18  very high.  And it's no shame to not have<br>19  a paper in the New England Journal or<br>20  JAMA.<br>21      Q.   Well, in any event, the<br>22  Journal of the American Medical<br>23  Association rejected your article for<br>24  publication; is that true?<br><br>767<br>1      A.   Sure.<br>2      Q.   And the New England Journal<br>3  of Medicine rejected your article for<br>4  publication; is that true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 767:5 to 768:3) 767<br>5    A.   Sure.<br>6    Q.   And both of these journals<br>7  provided you with information explaining<br>8  the concerns that they had about the way<br>9  you presented data in your article,<br>10  didn't they?<br>11    A.   Well, they expressed<br>12  concerns with -- yeah, that's what<br>13  happens when a journal doesn't take your<br>14  paper.  I write letters like that to<br>15  journals all the time saying why they<br>16  shouldn't accept a given paper.  That's<br>17  what the peer-review process is about.<br>18    Q.   And the comments that you<br>19  received from both the Journal of the<br>20  American Medical Association, as well as<br>21  the New England Journal of Medicine about<br>22  concerns that they had about your paper<br>23  were, in some instances, exactly the same<br>24  concerns that Merck had expressed to you<br><br>1  about the way that you were presenting 768<br>2  information in your paper; isn't that<br>3  true? | | |
| 768:8 -768:10<br>768:8 THE WITNESS: I would need<br>768:9 to look at those reviewer's<br>768:10 comments before answering that. | | |
| ja063006 - Vol. I, (Page 769:12 to 769:17) 769<br>12  Q.   Doctor, I've handed you what<br>13  I've marked as Exhibit 54.  And you said<br>14  you would need to see the reviewer<br>15  comments when they decided not to accept<br>16  your manuscript.  Do you see that Exhibit<br>17  54? Let me put it up on the screen. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 770:1 to 770:8) 770<br>1  Q.   This is a fax cover sheet<br>2  from Dr. Solomon to Dr. Cannuscio,<br>3  correct?<br>4      A.   Correct.<br>5      Q.   And then over on the next<br>6  page, you see that he's transmitting a<br>7  letter from the Journal of the American<br>8  Medical Association dated September 30th, | | |
| ja063006 - Vol. I, (Page 770:9 to 770:23) 770<br>9  2003.  It's addressed to him.  Do you see<br>10  that?<br>11      A.   Yep.<br>12      Q.   And the middle paragraph of<br>13  the letter from JAMA to Dr. Solomon says,<br>14  "Based on our in-house evaluation" of the<br>15  comments -- I'm sorry.<br>16          "Based on our in-house<br>17  evaluation and the comments of external<br>18  reviewers, we will not accept your<br>19  article for publication.  I am enclosing<br>20  the" relevant -- "I am enclosing the<br>21  reviewer's comments, which I hope you<br>22  will find helpful."<br>23          Do you see that? | | |
| ja063006 - Vol. I, (Page 771:3 to 771:19) 771<br>3  Q.   Do you see that?<br>4      A.   Right.  Right after they say<br>5  that they don't accept 7/8ths of the<br>6  papers that are submitted to them.<br>7      Q.   Incidentally, you saw this<br>8  at the time, right?<br>9      A.   Yes.<br>10      Q.   Dr. Solomon shared it with<br>11  you, correct?<br>12      A.   Sure.<br>13      Q.   Including the reviewer's<br>14  comments?<br>15      A.   Yes.<br>16      Q.   Will you turn over, please,<br>17  to under the fax numbering is Page 5 of<br>18  7.<br>19      A.   Yes. | | |

285

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 771:20 to 772:5) 771<br>20  Q.   And this is some of the<br>21  comments from one of the reviewers,<br>22  correct?<br>23      A.   Right.<br>24        Q.   And you looked at these at<br><br>772<br>1   the time they were transmitted?<br>2      A.   Yes.<br>3       Q.   I'm going to focus on two of<br>4   the comments from the reviewer.  Comment<br>5   number one says -- | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 771:24 to 773:8) 771<br>24  Q.   And you looked at these at<br><br>772<br>1   the time they were transmitted?<br>2      A.   Yes.<br>3      Q.   I'm going to focus on two of<br>4   the comments from the reviewer.  Comment<br>5   number one says --<br>6           MR. TISI:  Let me just, can<br>7        I have a continuing objection to<br>8        the hearsay nature of this?<br>9           MR. BECK:  Yes.<br>10          MR. TISI:  Thank you.<br>11          MR. BUCHANAN:  I'll object<br>12       to hearsay.<br>13   BY MR. BECK:<br>14     Q.   "In the abstract, the<br>15   authors report a comparison of rofecoxib<br>16   with no NSAID and an odds ratio of 1.14,<br>17   95 percent confidence interval equals 1<br>18   to 1.31 as an elevated risk.  Only on<br>19   Page 11 did they point out that this did<br>20   not reach statistical significance."<br>21           Did you read that reviewer's<br>22   comment at the time?<br>23      A.   Right.  And that's why Dr.<br>24   Solomon wrote in after that, "Include<br><br>773<br>1   p-values in abstract."  And that was our<br>2   response to that.<br>3      Q.   This was quite similar to<br>4   the objection that Merck raised that you<br>5   indicated an elevated risk in the<br>6   abstract, but only later in the article<br>7   did you acknowledge that it did not reach<br>8   statistical significance, correct? | | |
| 773:13 -773:17<br>773:13 THE WITNESS: And our<br>773:14 response to that was in the<br>773:15 submission to Circulation to<br>773:16 include p-values in the abstract,<br>773:17 as he indicates. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 773:19 to 774:1)<br>773<br>19   Q.   And then the next comment<br>20   says, "The authors do not present actual<br>21   results, i.e. no AMIs in each group," or<br>22   "number of AMIs in each group." "This<br>23   information should be presented for all<br>24   groups and subgroups analyzed in the<br><br>774<br>1   tables." | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 774:4 to 778:2) 774<br>4   Q.   Was this also one of the<br>5   points that Merck raised, that they<br>6   thought that you should have the<br>7   information for subgroups such as 25<br>8   milligrams Vioxx versus no NSAID use?<br>9           MR. BUCHANAN:  Excuse me.<br>10         Objection to the form.<br>11            MR. TISI:  Object.<br>12            THE WITNESS:  What the<br>13         reviewer is clearly talking about<br>14         is what we call the N or the<br>15         number of people who had an MI.<br>16         And what the reviewer actually<br>17         says is the information, that is,<br>18         the number of heart attacks should<br>19         be presented for all the groups<br>20         and subgroups analyzed in the<br>21         tables.  And so what the reviewer<br>22         is really asking for is, if you<br>23         have a table, you should present<br>24         the numbers of heart attacks for<br><br>                                                    775<br>1         the people that you describe in<br>2         the table, and that is what we<br>3         actually did in Table 2.<br>4            In the caption of the table<br>5         and a part that you didn't show,<br>6         we do present the numbers of heart<br>7         attacks for the people in the<br>8         table.  What the reviewer does not<br>9         say, as you imply that he does, is<br>10         that analysis should be done on<br>11         all groups and all subgroups.<br>12         That's not at all what's said<br>13         here.<br>14            And since you characterized<br>15         this, Mr. Beck, as they refused to<br>16         publish the article and they<br>17         rejected it, I think in fairness,<br>18         it is important to point out that<br>19         the reviewers -- the first<br>20         reviewer in his or her main<br>21         comment about our paper said,<br>22         "This manuscript reports a well<br>23         thought out investigation and is | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 775:24 to 778:2) | | |

775
24     well written and concise.  There

776
1     are a number of probably minor
2     issues and one major issue."  That
3     was the first reviewer.
4         And then the other reviewer
5     said, the one whose comments you
6     are reading now, at the beginning
7     of the review as the summary
8     statement, "The authors have
9     conducted a large scale study with
10     appropriate analysis."  And then I
11     will just continue reading, "The
12     strength of the manuscript is the
13     consistency of the findings for
14     different subgroups and the
15     sensitivity analysis.  However,
16     conclusions must be tempered with
17     caveats regarding retrospective
18     data from a database, rather than
19     a prospective randomized control
20     trial," et cetera.
21     So, I think it is important
22     for the jury to understand that
23     these were both favorable reviews.
24     We often receive favorable

777
1     reviews.  I often write favorable
2     reviews in which I say, this is a
3     perfectly fine study.  I even tell
4     the editors if I'm reviewing
5     something, I think you should
6     publish it.  And then the editors,
7     since they end up rejecting
8     between 80 and 90 percent of the
9     submissions because you can't fit
10     all the articles that get
11     submitted, even the good ones,
12     into a journal, will turn it down.
13     But I think you gave the
14     misimpression that they rejected
15     your paper or refused to publish
16     it as if it had gotten reviews
17     that said it was a bad study.
18     In fact, if you are fair

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 777:19 to 778:2) 777<br>19    enough to read the summary<br>20    statements of the reviewers, they<br>21    say, both of them, this was a very<br>22    good study, and they make a couple<br>23    of suggestions, one of which we<br>24    dealt with and one of which you<br><br>                 778<br>1    just mischaracterized.<br>2          - - - | | |
| ja063006 - Vol. I, (Pages 782:19 to 783:17) 782<br>19  Q.   Please look at Exhibit 14,<br>20  which is in your binder.<br>21      A.   Got it.<br>22      Q.   And is Exhibit 14 one that<br>23  Mr. Tisi asked you about yesterday?<br>24      A.   Yes.<br><br>                 783<br>1      Q.   And this is an article where<br>2  the first listed author is Dr. Ray, and<br>3  then you are also an author of this<br>4  document; is that correct?<br>5      A.   That's right.<br>6      Q.   And what year was this<br>7  published in?<br>8      A.   It was published in 2003.<br>9  Actually, it was published online, it<br>10  says on top, in 2002.<br>11      Q.   So, late 2002/early 2003?<br>12      A.   Right.  Summarizing a<br>13  meeting that happened in August of 2002.<br>14      Q.   And what publication was<br>15  this in?<br>16      A.   Pharmacoepidemiology and<br>17  Drug Safety. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 783:18 to 784:11) 783<br>18  Q.    If you'll go over to the<br>19  second page, this language here, was this<br>20  language that you and Mr. Tisi discussed<br>21  yesterday, that these studies suggest<br>22  that --<br>23      A.   Right.<br>24      Q.    -- any protective effect of<br>1  naproxen does not fully account for the 784<br>2  findings in the VIGOR study?<br>3      A.   Correct.<br>4      Q.    And I think you've indicated<br>5  already the VIGOR study involved use of<br>6  50 milligrams of Vioxx, right?<br>7      A.   Right.<br>8      Q.    And in this study with Dr.<br>9  Ray, did you look at people, 20,000<br>10  people or so who used 25 milligrams or<br>11  lower Vioxx? | | |
| ja063006 - Vol. I, (Pages 784:19 to 785:5) 784<br>19  A.   Right.  Yeah.  This was not<br>20  the report of a research study.  This was<br>21  the proceedings of a panel discussion<br>22  that occurred at the pharmacoepi meetings<br>23  in 2002.<br>24      Q.    And did you attend the panel<br>1  discussion? 785<br>2      A.   I was part of it, yes.<br>3      Q.   Okay.<br>4          Then let's just go to the<br>5  last page.  It says here, "There was no | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 785:22 to 786:11) 785<br>22   THE WITNESS:  Yeah.  I'm<br>23        trying to understand when it says<br>24        "There was no evidence."  I need<br><br>786<br>1        to understand what he's talking<br>2        -- what this paragraph is talking<br>3        about.  It's "we."<br>4            (Witness reviewing<br>5        document.)<br>6            Okay.  So, what this is, the<br>7        "this" is a review of the paper<br>8        that Dr. Ray published that is<br>9        Reference Number 20 that was in<br>10       the Lancet.  So, this a<br>11       description of that paper. | | |
| ja063006 - Vol. I, (Pages 786:14 to 787:13) 786<br>14   And in the description of<br>15   that paper, does this commentary where<br>16   you are one of the authors say that in<br>17   that study he did from the Lancet that<br>18   there was no evidence of increased risk<br>19   of coronary heart disease for doses of<br>20   Vioxx at 25 milligrams or below?<br>21        A.   Right.  That's a statement<br>22   of Dr. Ray's findings.<br>23        Q.   Were you present at any<br>24   gatherings where Dr. Ray presented his<br><br>787<br>1   conclusions following his -- both before<br>2   and after his Lancet article?<br>3        A.   I am having a hard time<br>4   remembering that.  If I had been, it<br>5   would have been at these annual<br>6   pharmacoepi meetings, and I just don't<br>7   remember whether he made a presentation<br>8   that I attended at these meetings.<br>9        Q.   Do you remember hearing Dr.<br>10   Ray in late 2000 and early 2001 after the<br>11   VIGOR results came out and after he did<br>12   his analysis telling people that in his<br>13   judgment, 25 milligram Vioxx was safe? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 787:16 to 787:20) 787<br>16   THE WITNESS:  I know that<br>17        that was what the paper that we<br>18        just discussed reported, so, I<br>19        would expect that he would have<br>20        believed that. | | |
| 788:9 -788:10<br>788:9 Q. I'm handing you what we've<br>788:10 marked as Exhibit 56. | | |
| ja063006 - Vol. I, (Pages 788:14 to 789:18) 788<br>14   Q.   Yesterday you talked about<br>15   one of the things that you do is you work<br>16   with the medical students and residents<br>17   on how they ought to go about making<br>18   prescribing decisions.  Do you remember<br>19   that?<br>20       A.   Right.<br>21       Q.   And can you tell us what<br>22   Exhibit 56 is?<br>23       A.   Sure.  This is an<br>24   educational piece that Dr. Solomon<br><br>1   published, along with Cherylnn Griffin 789<br>2   and Kelly Curtis, who are two -- who were<br>3   two pharmacists at the Brigham on the<br>4   title is, "COX-2 Inhibitors:  Who Really<br>5   Needs Them?"<br>6       Q.   Does your name appear on<br>7   Exhibit 56?<br>8       A.   Right.  I was the editor of<br>9   this series.<br>10       Q.   Okay.  So, you say Dr.<br>11   Solomon, whom you've talked about a lot,<br>12   wrote this, but you were the editor of<br>13   this whole series; is that right?<br>14       A.   That's correct.<br>15       Q.   Okay.<br>16           So, you saw this at the time<br>17   that it was prepared and edited, right?<br>18       A.   That's correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 789:20 to 790:1) 789<br>20   I would like to look,<br>21   please, at the criteria for use, and let<br>22   me put this up on the screen.<br>23           Do you see at the bottom<br>24   there's a heading "Criteria for use"?<br><br>                                         790<br>1     A.   Yes.<br>ja063006 - Vol. I, (Page 790:1 to 790:17) 790<br>1   A.   Yes.<br><br>9     Q.   Well, you know who it was<br>10   used with, don't you?<br>11       A.   Yes.<br>12       Q.   Okay.<br>13             Who?<br>14       A.   The medical students and<br>15   interns and residents and faculty at the<br>16   Brigham and Women's Hospital.<br>17       Q.   Okay.<br>ja063006 - Vol. I, (Pages 790:19 to 791:6) 790<br>19   use, do you see that -- and this is what<br>20   date? I'm sorry.<br>21       A.   March 2002.<br>22       Q.   So, March 2002, a couple of<br>23   years after the VIGOR results are known,<br>24   right?<br><br>                                       791<br>1     A.   Right.  Yes.  A couple,<br>2   right.<br>3       Q.   And after the period where<br>4   you testified earlier that you had come<br>5   to the conclusion that Vioxx posed<br>6   serious cardiovascular risks, right? | | |
| ja063006 - Vol. I, (Page 791:9 to 791:11) 791<br>9   THE WITNESS:  No, I think<br>10         you are, once again, misstating<br>11         what I had said. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 791:19 to 793:20) | | |

791
19   By 2002, had you concluded
20   that Vioxx posed an increased risk of
21   cardiovascular disease?
22         A.   I would rather indicate what
23   I did conclude at that time, which is
24   that there was evidence of an association

792
1   between Vioxx and cardiovascular disease.
2         Q.   Okay.
3               So, 2002, criteria for use
4   in the publication used with the Harvard
5   medical students, it is stated, "Because
6   of their high cost, COX-2 selective
7   inhibitors should be reserved for
8   patients at high risk of bleeding who
9   require an NSAID."  And then they go on
10   to specify who that would be appropriate
11   for.  Do you see that?
12         A.   Yes.
13         Q.   Is there any statement in
14   here that the use of COX-2 inhibitors
15   should be avoided because of an
16   association with cardiovascular disease?
17         A.   Yes.  A few lines just below
18   that it says --
19         Q.   Are we on the next page now?
20         A.   Yeah.
21         Q.   Okay.
22         A.   At the very top.
23         Q.   Okay.
24         A.   "The VIGOR trial found a

793
1   four-fold higher rate of MI in rheumatoid
2   arthritis patients randomized to
3   rofecoxib compared to rheumatoid
4   arthritis patients randomized to
5   naproxen.  While it is possible that
6   naproxen confers a protective effect
7   against MI, it also may be the case that
8   COX-2 selective inhibitors are associated
9   with an increased risk of MI.  The
10   possible mechanism for this action might
11   be an imbalance in the activity of COX-1
12   to COX-2 enzymes producing a relative
13   tendency to clot or otherwise damaging

296

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Page 793:14 to 793:20) 793<br>14   the endothelial surface," which is the<br>15   surface of the arteries.  "This is an<br>16   active area of research."<br>17        Q.   And at the time that this<br>18   was presented to the Harvard medical<br>19   students, was this a fair summary of your<br>20   view of the existing state of knowledge?<br>ja063006 - Vol. I, (Pages 793:22 to 794:10) 793<br>22   THE WITNESS:  I would not --<br>23        no.  If these had been my words,<br>24        as opposed to my having presided<br><br>794<br>1        over the series, I would have<br>2        said, it has been suggested that<br>3        naproxen confers a protective<br>4        effect against MI, but it is<br>5        likely that COX-2 selective<br>6        inhibitors are associated with an<br>7        increased risk in MI.  That would<br>8        have -- and I think that was what<br>9        I was writing myself in my own<br>10       voice during this period. | | |

297

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 794:13 to 795:24)<br>794<br>13   But what Dr. Solomon, your<br>14   colleague, was writing --<br>15        A.    And the two pharmacists.<br>16        Q.    -- and presenting to the<br>17   Harvard medical students was, "While it<br>18   is possible that naproxen confers a<br>19   protective effect against MI, it may also<br>20   be...that COX-2 selective inhibitors are<br>21   associated with an increased risk of MI."<br>22        A.    Correct.<br>23        Q.    I know you were the editor<br>24   of this series.  Did you actually look at<br>795<br>1   this document back at the time?<br>2        A.    Yes.<br>3        Q.    Okay.<br>4        A.    And I still think that<br>5   naproxen does confer a very small<br>6   protective effect against MI.<br>7        Q.    Then down further on the<br>8   page, do you see that there's a table<br>9   that -- well, first, there's this heading<br>10   "Choosing between Celebrex and Vioxx if a<br>11   COX-2 agent is required."<br>12        A.    Right.<br>13        Q.    And then there's a table<br>14   that, am I right, it basically summarizes<br>15   the pros and cons of Celebrex versus<br>16   Vioxx for different types of patients?<br>17        A.    Yes.<br>18        Q.    Is there anywhere in this<br>19   training piece for the Harvard medical<br>20   students saying that other things being<br>21   equal, they ought to use Celebrex versus<br>22   Vioxx because of an increased association<br>23   of cardiovascular disease?<br>24        A.    No. | | |

298

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ja063006 - Vol. I, (Pages 796:10 to 797:2)<sup>796</sup><br>10  Q.  Let me show you what --<br>11      A.  I'm sorry, Mr. Beck, there's<br>12  just one thing I just want to point out<br>13  about the authorship here.  What I notice<br>14  is that it actually says this review was<br>15  prepared with help of Cherylnn Griffin<br>16  R.Ph., and Kelly Curtis, R.Ph., the two<br>17  pharmacists, and then it says, "For<br>18  further information, contact Dan Solomon<br>19  via hospital e-mail."  So, I guess I<br>20  can't really testify to what role Dr.<br>21  Solomon had in the writing of this, just<br>22  to be clear.<br>23      Q.  All you know is you reviewed<br>24  it before it was used with the Harvard<br><br>1  medical students and approved it, right?<sup>797</sup><br>2      A.  Right. | | |

299