ANSTICE, DAVID  DEPOSITIONS OF 3/16/05, 3/18/05,  4/12/05,  5/20/05

Plaintiff's Objections to Defendant's Counter Designations

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 3/16/05 DEPOSITION | | |
| da031605 - Vol. I, (Pages 236:10 to 237:2) | | |
| 10      Q.    That same physician who encounters a 11 patient who is slightly obese, has hypertension, may 12 have smoked cigarettes, what information did Merck 13 tell that physician in 2000, August of 2000, that 14 Merck had data that suggested strongly that that 15 person was at increased risk for heart attack or 16 stroke if he took Vioxx? 17          MR. RABER:  Objection to form. 18          THE WITNESS:  Merck did not have data 19 that that particular patient that you just described 20 was at increased risk of heart attack.  In the 21 middle of 2000, Merck had data that in a study with 22 naproxen there was a difference in CV events between 23 the naproxen and the Vioxx arm.  We had substantial 24 other data in non-naproxen comparators and with 25 placebo which said clearly that there was no  1 difference between Vioxx and these other placebo or 2 other agents in terms of unwanted CV side effects. | | |
| | 3/18/05 DEPOSITION | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 574:4-575:7 | | |

574: 4      Q.     Your name is David Anstice?
574: 5      A.     That's correct.
574: 6      Q.     Did I pronounce it right?
574: 7      A.     You did.
574: 8      Q.     All right.  I understand you're the
574: 9  president of some part of Merck.  What part are you
574:10  the president of?
574:11      A.     Human health for Canada, Latin
574:12  American, Japan, Australia and New Zealand.
574:13      Q.     At some point were you the president
574:14  of Merck America or something like that?
574:15      A.     Yes, I was.
574:16      Q.     When was that?
574:17      A.     From the period late '94 through to
574:18  the end of 2002.
574:19      Q.     Did you get promoted out of that or
574:20  demoted from that?
574:21      A.     I got a new assignment with Japan.
574:22      Q.     Is that a promotion or a demotion?
574:23      A.     That was an important, different
574:24  responsibility.
574:25      Q.     I understand.

575
575: 1            But was it a promotion or demotion?
575: 2      A.     It was neither.  It was --
575: 3      Q.     A lateral?
575: 4      A.     A lateral, correct.
575: 5      Q.     Merck made some tragic mistakes with
575: 6  Vioxx; didn't it?
575: 7      A.     I don't think so.

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 575:10-576:11 | | |

575:10        Q.      Well, sir, isn't rule number -- by
575:11    the way, are you a medical doctor?
575:12        A.      No, I am not.
575:13        Q.      You're the president of what part of
575:14    Merck now?  I'm sorry, let me write it down.  You
575:15    are the president of health and what?
575:16        A.      Human health, which is our commercial
575:17    operations.
575:18        Q.      You're the president of human health,
575:19    and you don't have a medical degree?
575:20        A.      I do not.
575:21        Q.      Well, did you go to any medical
575:22    school at all?
575:23        A.      No, I did not.
575:24        Q.      As the president of human health,
575:25    what kind of human health schooling do you have?

576
576: 1        A.      I'm responsible for sales and
576: 2    marketing activities, and I have the training and
576: 3    skills developed in 31 years at Merck.
576: 4        Q.      That wasn't my question, sir.
576: 5              What kind of schooling do you have in
576: 6    human health if you're going to be the president of
576: 7    the human health division?
576: 8        A.      I have schooling, I have tertiary
576: 9    education in economics, and I joined Merck, and
576:10    typical with many people on the business side, I do
576:11    not have a medical degree or a medical background.

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 577:24-578:20<br><br>577:24    Q.    So, when I say Merck messed up with<br>577:25    Vioxx and you say, no, we didn't, I guess you're<br><br>578<br>578: 1    speaking from a sales and marketing perspective?<br>578: 2    A.    I'm speaking as a senior executive at<br>578: 3    Merck.<br>578: 4    Q.    Well, y'all put a drug on the market<br>578: 5    that you had to withdraw; didn't you?<br>578: 6    A.    We put a drug on the market.  We have<br>578: 7    now withdrawn it.<br>578: 8    Q.    The drug shouldn't have been on the<br>578: 9    market to start with; should it?<br>578:10    A.    I believe it should have been on the<br>578:11    market.<br>578:12    Q.    Were you part of the decision to take<br>578:13    it off the market?<br>578:14    A.    I was part of that decision, yes.<br>578:15    Q.    Did you vote for taking it off or for<br>578:16    leaving it on?<br>578:17    A.    We did not have a vote.  I supported<br>578:18    the recommendation and the decision after the<br>578:19    APPROVe study that in the interest of patient<br>578:20    safety, Vioxx should be withdrawn from the market. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 580:7-580:24<br><br>580: 7    Q.    Well, y'all should have had that data<br>580: 8    from APPROVe before you ever put the drug on the<br>580: 9    market; shouldn't you?<br>580:10    A.    The data from APPROVe, APPROVe was a<br>580:11    study in colon polyps, and that study was started<br>580:12    some four-and-a-half years earlier.<br>580:13    Q.    And my point is, y'all ought to study<br>580:14    these things and decide if the drug is safe or not<br>580:15    before you sell it, not after you've been selling it<br>580:16    for years? Don't you agree?<br>580:17    A.    Merck did study the product.  Merck<br>580:18    did provide safety analysis.  And the basis of the<br>580:19    approval for the product in 1999 was based on the<br>580:20    safety data.<br>580:21    Q.    But you didn't study the product<br>580:22    adequate to decide whether or not you ought to keep<br>580:23    it on the market, because that study didn't happen<br>580:24    until the APPROVe study and you pulled it; right? | | |
| 581:1-581:5<br><br>581: 1    THE WITNESS:  The data that we had at<br>581: 2    the time of the new drug application was consistent<br>581: 3    with studies done for all other -- very similar to<br>581: 4    all other nonsteroidals and was appropriate for the<br>581: 5    marketing of the product, efficacy and safety. | | |
| 581:7-581:17<br><br>581: 7    Q.    Truth be told, you couldn't wait to<br>581: 8    get all the studies done because you had to get to<br>581: 9    market quickly; right?<br>581:10    A.    Merck completed all of the studies<br>581:11    that were required for the new drug application.<br>581:12    Q.    Oh, I'm not saying you didn't satisfy<br>581:13    the law. I'm talking about taking care of the<br>581:14    patients.  My point is, you didn't do all of the<br>581:15    studies you should have done before you went to<br>581:16    market because you couldn't afford to time-wise;<br>581:17    isn't that true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 581:19-583:2<br><br>581:19     THE WITNESS:  I do not accept that<br>581:20  that's correct.<br>581:21  BY MR. LANIER:<br>581:22    Q.  Well, let's look at a couple of<br>581:23  things.  Rule number one for a doctor, and I know<br>581:24  you don't have medical training, but you probably<br>581:25  heard it at least, that rule number one is, do no<br><br>582<br>582: 1  harm; right?<br>582: 2    A.  That's correct.<br>582: 3    Q.  And you think for a drug company that<br>582: 4  ought to be pretty high up the chain of rules also;<br>582: 5  wouldn't you?<br>582: 6    A.  Patient safety is paramount in our<br>582: 7  company.<br>582: 8    Q.  It should be anyway, shouldn't it?<br>582: 9    A.  It is.<br>582:10    Q.  Well, if it was, why didn't you do<br>582:11  all of your studies before you marketed the drug?<br>582:12    A.  We believed that we had the<br>582:13  appropriate studies based on the knowledge at that<br>582:14  time to support the benefits and risks of the<br>582:15  product.<br>582:16    Q.  If you had the appropriate studies,<br>582:17  why were you still doing more?<br>582:18    A.  Well, some of the studies were for<br>582:19  new indications, and so we were continuing to do<br>582:20  studies in different diseases.<br>582:21    Q.  No.  Y'all had trouble with<br>582:22  cardiovascular events, CV events, from the very<br>582:23  beginning with this drug, and you knew that; didn't<br>582:24  you?<br>582:25    A.  I did not know that.<br><br>583<br>583: 1    Q.  You didn't see --<br>583: 2    A.  Merck did not know that. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 583:10-583:14<br><br>583:10     Q.     You didn't see any of the VIGOR<br>583:11   results that showed y'all had a five-fold increase<br>583:12   of heart attacks over Naprosyn?<br>583:13     A.     Yes, of course I saw the VIGOR<br>583:14   results. | | |
| 584:4-584:12<br><br>584: 4     Q.     Let's break it down this way.<br>584: 5   Certain things you and I agree on, I believe, and I<br>584: 6   would like to get those out of the way.<br>584: 7        Number one, if we go to the mid-'90s,<br>584: 8   your company, Merck, was stuck in the middle in<br>584: 9   terms of drug companies in the rankings of it; fair<br>584:10   to say?<br>584:11     A.     Merck's been a large pharmaceutical<br>584:12   company for many years. | | |
| 585:25-586:14<br><br>585:25     Q.     So, you're the David W. Anstice.  And<br><br>586<br>586: 1   if you will look on Page 2 of the talking points, it<br>586: 2   says in the second from the bottom, "When we<br>586: 3   established this goal in 1994, we were performing<br>586: 4   somewhere in the middle of the pack."  Do you see<br>586: 5   that one?<br>586: 6     A.     Yes.<br>586: 7     Q.     So, when I use the language "middle<br>586: 8   of the pack," I'm using your language I got from<br>586: 9   your documents.  I didn't make that up.  Do you see<br>586:10   that?<br>586:11     A.     From a Merck document, yes.<br>586:12     Q.     A Merck document that went to you;<br>586:13   right?<br>586:14     A.     Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 587:16-587:23<br><br>587:16    Q.   I'm going to ask you again.  Sir,<br>587:17   isn't it true in 1994 y'all were performing<br>587:18   somewhere in the middle of the pack?<br>587:19     A.   In terms of growth rate, yes.<br>587:20     Q.   Y'all wanted to be the number one<br>587:21   pharmaceutical company in the world; didn't you?<br>587:22     A.   In terms of growth rates, yes.  Not<br>587:23   necessarily size. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 588:14-589:25 | | |

588:14      Q.      Are you familiar with that?
588:15      A.      I'm familiar with this product, yes.
588:16      Q.      That's called Pepcid AC.  Can you
588:17   hold that up to the video so the jury can see it,
588:18   please?
588:19      A.      (Witness complies.)
588:20      Q.      Thank you.
588:21            MR. LANIER:  Can we get a close up
588:22   where we can see what that is?
588:23            THE VIDEOTAPE TECHNICIAN:  Sure.
588:24            MR. LANIER:  That's good enough.
588:25   BY MR. LANIER:

589
589: 1      Q.      Thank you, sir.
589: 2            Y'all held the patent on Pepcid;
589: 3   didn't you?
589: 4      A.      Yes.
589: 5      Q.      And that patent was very valuable to
589: 6   your company; wasn't it?
589: 7      A.      Yes, it was.
589: 8      Q.      Made a lot of money off Pepcid;
589: 9   didn't you?
589:10      A.      Yes, we did.
589:11      Q.      But you had a problem because your
589:12   patent was about to run out and people were going to
589:13   be able to go buy this stuff at the grocery store;
589:14   true?
589:15      A.      All of our research-discovered
589:16   products, eventually the patent runs out and the
589:17   answer is to find new drugs to replace them.
589:18      Q.      I understand that, but that wasn't my
589:19   question.
589:20            My question is specific, sir.  The
589:21   end of 1998, '99, early 2000, y'all knew your patent
589:22   was running out on Pepcid, and a big moneymaker for
589:23   you was about to be commercially available to
589:24   everybody and it was going to hurt your bottom line;
589:25   true?

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 590:2-590:8<br><br>590: 2          THE WITNESS:  Well, we had known for<br>590: 3     many years that the Pepcid patent would expire.  So,<br>590: 4     this was not an unknown event.<br>590: 5     BY MR. LANIER:<br>590: 6          Q.    I know.  That's one of the reasons<br>590: 7     y'all had been working to try and get Vioxx up and<br>590: 8     going, you needed the money; true? | | |
| 590:10-590:12<br><br>590:10          THE WITNESS:  We were working in our<br>590:11     research labs to find new products, and Vioxx was<br>590:12     one of the important new products that we had. | | |
| 590:16-590:25<br><br>590:16          Q.    Sir, that wasn't my question.<br>590:17          I said you knew, your company knew<br>590:18     you had major drugs going off the market in 2000 and<br>590:19     2001 that was a significant percentage of your<br>590:20     sales; true?<br>590:21          A.    It was an important percentage of our<br>590:22     sales, correct.<br>590:23          Q.    A significant percentage; true?<br>590:24          A.    I can't define significant.  It<br>590:25     was -- | | |
| 594:10-594:18<br><br>594:10          Q.    Sir, if you'll look on the last page<br>594:11     of that document right there.<br>594:12          A.    I have it.<br>594:13          Q.    It says four points up from the<br>594:14     bottom, "The major drugs going off patent in 2000<br>594:15     and 2001," includes Pepcid, "together represent a<br>594:16     significant percentage of our sales."  That's what<br>594:17     it says; doesn't it?<br>594:18          A.    That's correct.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 595:1-597:6 | | |

595: 1     Q.    So, that's just what you're telling
595: 2  the jury today when I'm asking questions.  You knew
595: 3  what it meant when you got that memo; didn't you?
595: 4     A.    Yes, I did.
595: 5     Q.    So, now will you go back and agree
595: 6  with me that the major drugs going off patent
595: 7  represented a significant percentage of your sales?
595: 8     A.    Yes, I will agree with you.
595: 9     Q.    So, producing some replacement
595:10  revenue, some money to take the place through a
595:11  launch of products like Vioxx was very important for
595:12  y'all; wasn't it?
595:13     A.    Yes, it was important.
595:14     Q.    Because by the end of 1997, Merck had
595:15  put itself as the largest pharmaceutical company of
595:16  the world; hadn't it?
595:17     A.    I'm sorry.  The question was?
595:18     Q.    By the end of 1997, Merck had
595:19  regained its position as the largest pharmaceutical
595:20  company in the world; true?
595:21     A.    I don't know if it was at that time.
595:22  I don't remember.
595:23     Q.    Well, go back to the last page of
595:24  that document again.  Look at the second point from
595:25  the top.  "By the end of 1997, Merck had regained

596
596: 1  its position as the largest pharmaceutical company
596: 2  in the world."  Do you think he's lying when he said
596: 3  that?
596: 4     A.    No, I don't.
596: 5     Q.    All right.  So, we can assume that
596: 6  that's true, too, can't we?
596: 7     A.    Yes, we can.
596: 8     Q.    So, y'all went from the middle of the
596: 9  pack in '94 to the largest pharmaceutical company in
596:10  the world in '97, but you had major drugs like
596:11  Pepcid going off patent in 2000/2001.  I'm correct
596:12  so far; right?
596:13     A.    Yes.
596:14     Q.    And those drugs going off patent

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 596:15   represented a significant percentage of your sales; 596:16   true? 596:17      A.    Correct. 596:18      Q.    So, it was important y'all get some 596:19   replacement products like Vioxx to make the money; 596:20   right? 596:21      A.    New products are always important in 596:22   our business. 596:23      Q.    Well, but those products like Vioxx, 596:24   you saw it as something that replaced the revenue 596:25   y'all were going to lose; right? 597 597: 1      A.    That's the normal course of our 597: 2   business, yes. 597: 3      Q.    So, the timing of this, and by "this" 597: 4   I mean selling the Vioxx, is very important to your 597: 5   company; wasn't it? 597: 6      A.    Yes, it was important. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 597:21-599:5<br><br>597:21    Q.    If you realize that in a few months<br>597:22  you are not going to be having any money coming in,<br>597:23  you need to figure out how to get some in money in<br>597:24  the door if you are going to have to pay bills;<br>597:25  true?<br><br>598<br>598: 1    A.    Or spend less money.<br>598: 2    Q.    Don't get the bills; right?  But the<br>598: 3  point is, if Merck -- Merck has bills; doesn't it?<br>598: 4    A.    Yes, it does.<br>598: 5    Q.    Y'all got employees, y'all got to pay<br>598: 6  employees; don't you?<br>598: 7    A.    That's correct.<br>598: 8    Q.    You've got buildings and commitments<br>598: 9  to fund research and all these other things going<br>598:10  on, too; don't you?<br>598:11    A.    Yes.<br>598:12    Q.    You've got to pay money to do all of<br>598:13  that; don't you?<br>598:14    A.    Yes.<br>598:15    Q.    I'll bet y'all even have electric<br>598:16  bills and stuff for your buildings; don't you?<br>598:17    A.    Yes.<br>598:18    Q.    So, Merck has got to make sure<br>598:19  they've got money coming in the door to pay all of<br>598:20  these things; don't they?<br>598:21    A.    Yes.<br>598:22    Q.    Not the least of which they've got to<br>598:23  pay you; don't they?<br>598:24    A.    They have to pay all 60,000 of our<br>598:25  people.<br><br>599<br>599: 1    Q.    Yes.  But I mean you executives.<br>599: 2  Y'all are some of the highest paid executives in the<br>599: 3  industry; aren't you?<br>599: 4    A.    I think we're comparatively well<br>599: 5  paid. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 599:17-600:1<br><br>599:17     Q.    So, it is important to keep the money<br>599:18   coming into Merck so that Merck can keep paying you<br>599:19   and everybody else; right?<br>599:20     A.   It's important to keep finding<br>599:21   products to bring them to market and to generate<br>599:22   revenues, yes.<br>599:23     Q.   Merck hit a point where it wasn't<br>599:24   going to have any more money coming in on the Pepcid<br>599:25   and some of these other drugs that had been keeping<br><br>600<br>600: 1   the machine going; right? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 600:3-601:25 | | |

600: 3        THE WITNESS:  Patent expirations were
600: 4   going to reduce revenues for those products,
600: 5   correct.
600: 6   BY MR. LANIER:
600: 7      Q.    Reduce revenues for those products,
600: 8   you are an economics major.  In every day talk, that
600: 9   means y'all aren't going to get as much money
600:10   anymore; right?
600:11      A.    Those products will have less sales,
600:12   yes.
600:13      Q.    So, Merck has really invested a lot
600:14   of hopes and plans in Vioxx to pick up the slack for
600:15   the year 2000/2001; right?
600:16      A.    Merck invests a lot of hopes and
600:17   plans in Vioxx because it was going to be a really
600:18   important product for patients.
600:19      Q.    Well, sir, if you'll look at the last
600:20   page of that, it says Vioxx is very important to
600:21   you, but it says, "Producing replacement revenue
600:22   through the launch of new products like Vioxx is
600:23   important."  That's what it says; doesn't it?
600:24      A.    I'm sorry, which?
600:25      Q.    That's fourth point up from the

601
601: 1   bottom.
601: 2      A.    Yes, it does.
601: 3      Q.    Now, there's already, before y'all
601: 4   get on the market with your drug, a race, there's
601: 5   another COX-2 inhibitor that wants to get on the
601: 6   market too; right?
601: 7      A.    That's correct.
601: 8      Q.    And that's Celebrex; right?
601: 9      A.    Correct.
601:10      Q.    Do you remember which drug company
601:11   makes Celebrex?
601:12      A.    At the time, Searle.
601:13      Q.    It is now Pfizer Searle; right?
601:14      A.    Now it's Pfizer, yes.
601:15      Q.    Is it fair to say that y'all were
601:16   racing each other to try and see who could get to
601:17   the market first?

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 601:18    A.    Yes.  That's a fair characterization.<br>601:19    Q.    They beat y'all; didn't they?<br>601:20    A.    In the US they beat us, yes.<br>601:21    Q.    It was significant enough to where<br>601:22   y'all worked hard to overcome a late start; fair to<br>601:23   say?<br>601:24    A.    We were second.  It was something of<br>601:25   a disadvantage, but not overriding. | | |
| 602:1-602:3<br><br>602: 1    Q.    Your company really pushed hard to<br>602: 2    make Vioxx a winner from a marketing perspective and<br>602: 3    an income perspective; true? | | |
| 602:5-602:10<br><br>602: 5    THE WITNESS:  We believed in Vioxx as<br>602: 6    it came to market, we believed that it was a very<br>602: 7    important product for patients, we knew that there<br>602: 8    were a large number of patients that would benefit,<br>602: 9    and we believed that Vioxx would be a winner in this<br>602:10    market, yes. | | |
| 604:24-605:3<br><br>604:24    Q.    But y'all pushed for early FDA<br>604:25    approval?<br><br>605<br>605: 1    A.    And we received that early approval<br>605: 2    from the FDA.  We can request it, they have to<br>605: 3    accept it. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 605:4-605:12<br><br>605: 4        Q.      Sir, what you are telling this jury<br>605: 5        is that y'all pushed for early approval, you were<br>605: 6        losing the race against Celebrex, and every day you<br>605: 7        lost that race, you fell further and further behind,<br>605: 8        so, y'all pushed for early approval, because it was<br>605: 9        so important to replace that income stream from<br>605:10      these drugs going off patent, and the net result is<br>605:11      y'all put this on the market nine months before you<br>605:12      even got your first VIGOR test results back; right? | | |
| 605:14-606:2<br><br>605:14      THE WITNESS:  We asked for and<br>605:15      received six-month approval from the FDA based on<br>605:16      the medical importance of the product.  The reason<br>605:17      for doing the VIGOR study, which had been started<br>605:18      before the approval, was to get GI outcomes data<br>605:19      from the VIGOR study.  We had GI data in the label<br>605:20      from the endoscopy studies.  We were hoping that<br>605:21      those studies would enable a change in the GI safety<br>605:22      part of the label.  We were disappointed in those<br>605:23      efforts.<br>605:24      The VIGOR study was started, and the<br>605:25      VIGOR study was always going to -- the results were<br><br>606<br>606: 1      always going to come after the product approval,<br>606: 2      even if it had been a regular 12-month approval. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 606:4-606:25<br><br>606: 4    Q.    Well, truth be told, there were two<br>606: 5   main reasons y'all pushed for early FDA approval;<br>606: 6   isn't that right?<br>606: 7    A.    The first reason was that this was an<br>606: 8   important new product for patients.<br>606: 9    Q.    Well, no.  There was already a COX-2<br>606:10  inhibitor on the market.  That was Celebrex.<br>606:11      First reason was y'all were trying to<br>606:12  beat Celebrex, and they beat you to the market and<br>606:13  you needed to hurry your product out there; right?<br>606:14    A.    But at a certain point we knew we<br>606:15  were behind them.  And so that didn't change the<br>606:16  patent behavior at that time.<br>606:17    Q.    Well, one reason, though, was you<br>606:18  needed to get to market as quickly as possible<br>606:19  because you were losing the race.  And the second<br>606:20  reason is y'all didn't want the FDA to have forever<br>606:21  to look at this drug; did you?<br>606:22    A.    That's not a fair characterization.<br>606:23  We submitted an application, we asked for a<br>606:24   six-month review versus a 12-month review.  The FDA<br>606:25  accepted that. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 611:16-612:6<br><br>611:16      Q.    And y'all had an extravagant<br>611:17  incentive program, you were going to own the market,<br>611:18  and you had surpassed your goal of more than 560<br>611:19  advocates.  Is that right?<br>611:20      A.    That's -- if that's the right number,<br>611:21  yes.<br>611:22      Q.    Why don't you tell this jury what<br>611:23  y'all were doing when you are trying to surpass your<br>611:24  goal of 560 advocates?<br>611:25      A.    What we were trying to do is have<br><br>612<br>612: 1  people who would speak in support of Vioxx when the<br>612: 2  product came to the marketplace.  And based on the<br>612: 3  size of the US and the number of speaking events<br>612: 4  that we wanted to conduct around the US, we believed<br>612: 5  we needed a large number of speakers and advocates<br>612: 6  for the product. | | |
| 615:12-615:19<br><br>615:12      Q.    So, you're going to own the market<br>615:13  with an extravagant incentive program, you've got<br>615:14  more than 560 advocates, you've assembled the<br>615:15  largest sales force in history, you also decided<br>615:16  that you were going to give out more free samples of<br>615:17  this drug than you had ever given out of anything<br>615:18  before.  True?<br>615:19      A.    I think that was correct, yes. | | |
| 616:12-616:21<br><br>616:12      Q.    What's HEL stand for?<br>616:13      A.    Health education liaison.<br>616:14      Q.    Well, your commitment of health<br>616:15  education liaison dollars, HEL dollars, was the<br>616:16  largest of anything y'all had ever done with Vioxx;<br>616:17  wasn't it?<br>616:18      A.    Yes, it was.<br>616:19      Q.    Not only that, y'all had extra FMC<br>616:20  money; didn't you?<br>616:21      A.    Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 617:12-617:19 <br><br> 617:12    Q.    So, this is where they go out to <br> 617:13    doctors and they've got millions and millions of <br> 617:14    dollars to try and give extras to doctors so that <br> 617:15    doctors will start writing your Vioxx prescriptions? <br> 617:16    Is that what that boils down to? <br> 617:17        A.    This is to conduct speaking events <br> 617:18    and get doctors interested in our product.  Yes, to <br> 617:19    understand our product. | | |
| 618:25-619:16 <br><br> 618:25    Q.    Yes.  Those are the speaking <br><br> 619 <br> 619: 1    contracts that you've also got on there.  You're <br> 619: 2    paying doctors to stand up and give these speeches; <br> 619: 3    aren't you? <br> 619: 4        A.    Yes.  Yes, we do that. <br> 619: 5        Q.    These are advocates.  You've <br> 619: 6    marshaled over 560 of these people, you are going to <br> 619: 7    pay them money, and they are going to stand up and <br> 619: 8    say, look how wonderful this product is, here, have <br> 619: 9    a free dinner and go write prescriptions? <br> 619:10        A.    We have given money to speakers for <br> 619:11    speaking as a contract service to Merck to present <br> 619:12    their information about our product and other <br> 619:13    products because they are talking as people that <br> 619:14    have expertise in the area, that have knowledge <br> 619:15    about this disease, and they are passing on their <br> 619:16    experience as an opinion leader to other physicians. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 620:25-621:14<br><br>620:25         Q.      You didn't design the product to be<br><br>621<br>621: 1      safe, you didn't develop the product to be safe, you<br>621: 2      didn't drive the product to be safe, you designed,<br>621: 3      developed and drove that product to win the market;<br>621: 4      didn't you?<br>621: 5         A.      The development of Vioxx was based on<br>621: 6      all of our standards of efficacy and safety.  We<br>621: 7      designed the product with all of that in mind.<br>621: 8              From the marketing side, yes, we<br>621: 9      believed we had a winner, we believed we had a very<br>621:10      effective product, and we believed that with the<br>621:11      right promotion support, we're responsible for<br>621:12      promoting the product to physicians with the right<br>621:13      level of support, we could make this the leading<br>621:14      product in the category. | | |
| 622:24-623:5<br><br>622:24         Q.      But you never did a CV study.  You<br>622:25      never did a study to see if it caused heart attacks;<br><br>623<br>623: 1      did you?<br>623: 2         A.      We did not do that because we<br>623: 3      believed that the alternatives which we put in place<br>623: 4      would provide answers to the questions being posed<br>623: 5      by the VIGOR data. | | |
| 624:4-624:6<br><br>624: 4              You never studied Vioxx to see if it<br>624: 5      caused heart attacks or stroke or cardiovascular<br>624: 6      problems; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 624:8-624:21<br><br>624: 8        THE WITNESS:  We did not study Vioxx<br>624: 9  specifically with CV outcomes.<br>624:10  BY MR. LANIER:<br>624:11     Q.  Do you want to tell us why?<br>624:12     A.  Yes.  I would like to add that<br>624:13  because we considered it, as you know, on several<br>624:14  occasions, and ultimately we concluded that the best<br>624:15  way to get answers to the question was there a<br>624:16  difference in risk was through the various other<br>624:17  studies that we had underway.<br>624:18     Q.  The best way to get the answer does<br>624:19  it cause heart attacks is not by studying it?<br>624:20     A.  The best -- we were -- no.  That is<br>624:21  not what I said. | | |
| 625:23-626:5<br><br>625:23     Q.  Sir, before you ever sold the drug,<br>625:24  you could have studied it to see if it caused heart<br>625:25  attacks; couldn't you?<br><br>626<br>626: 1     A.  Before we launched the drug, there<br>626: 2  was no basis on which we thought it was necessary to<br>626: 3  study the drug in the way you just described.<br>626: 4     Q.  You don't know that.  You're not a<br>626: 5  doctor.  How would you know | | |
| 626:5-626:8<br><br>626: 5  doctor.  How would you know<br>626: 6  that?<br>626: 7     A.  The basis of the NDA was consistent<br>626: 8  with how you study agents in this category. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 628:3-628:6<br><br>628: 3    Q.    So, your company could have tested to<br>628: 4  see if the concerns about heart attacks and strokes<br>628: 5  was true?  Your company could have tested for that<br>628: 6  before you ever went to market; couldn't you? | | |
| 628:8-628:20<br><br>628: 8    THE WITNESS:  The company could have<br>628: 9  tested for that, but the scientists in considering<br>628:10  the discussions I just referenced concluded that<br>628:11  that was not necessary.<br>628:12  BY MR. LANIER:<br>628:13    Q.    Well, what was the downside to doing<br>628:14  a test like that?<br>628:15    A.    It was deemed to be not necessary.<br>628:16    Q.    That wasn't my question.<br>628:17    I said, what was the downside to it?<br>628:18    A.    Well, that would take -- I mean, to<br>628:19  do studies that are not scientifically necessary or<br>628:20  relevant would divert resources. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 629:19-630:10<br><br>629:19    Q.   Oh, what it would do is it would mean<br>629:20    that you might not get to market as early as you<br>629:21    wanted to, and you were in a race with Celebrex to<br>629:22    get to market first.  That's what it really boils<br>629:23    down to; doesn't it?<br>629:24      A.   I don't accept that at all.<br>629:25      Q.   Well, you were in a race with<br><br>630<br>630: 1    Celebrex to get to market first; weren't you?  You<br>630: 2    admitted that before.<br>630: 3      A.   There was a competitive development<br>630: 4    program between two companies.<br>630: 5      Q.   And if you take the time out for a<br>630: 6    year to do a study to see if this drug is going to<br>630: 7    kill people with heart attacks, that's going to<br>630: 8    delay you another year getting to market; isn't it?<br>630: 9      A.   That is not the reason that Merck did<br>630:10    not proceed with those studies. | | |
| 633:2-633:4<br><br>633: 2      Q.   You understand before you sell a drug<br>633: 3    you ought to check to see if it's safe; true?<br>633: 4      A.   Yes. | | |
| 633:20-633:22<br><br>633:20      Q.   And if you delay the introduction,<br>633:21    that delays making money on it; doesn't it?<br>633:22      A.   Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 640:22-641:10<br><br>640:22     Q.     Yes.  I want to talk about the<br>640:23    efforts and money y'all put into studying the<br>640:24    cardiovascular effects.  In other words, does Vioxx<br>640:25    cause heart attacks.  I want to compare on one side<br><br>641<br>641: 1    what money and efforts y'all did on that to the<br>641: 2    other side, the efforts y'all did to market and sell<br>641: 3    the drugs.  Let's see where you put your resources<br>641: 4    and effort.  Fair to say?<br>641: 5     A.     Okay.<br>641: 6     Q.     All right.  Cardiovascular effects,<br>641: 7    what money and resources did y'all put into studying<br>641: 8    that?<br>641: 9     A.     Every clinical study we've done has<br>641:10    studied the cardiovascular effects of Vioxx. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 643:6-644:8<br><br>643: 6    Q.    Sir, we're talking about it being the<br>643: 7    result of studies, but not the purpose of studies?<br>643: 8    Y'all didn't do a study just for cardiovascular<br>643: 9    purposes; did you?<br>643:10    A.    We did not do a study where the<br>643:11    primary endpoint was CV safety.<br>643:12    Q.    Right.  So, what other monies and<br>643:13    efforts did y'all put into trying to figure out if<br>643:14    cardiovascular problems were going to come from that<br>643:15    drug?<br>643:16    A.    But that's across a large number of<br>643:17    clinical studies, not only the original studies in<br>643:18    arthritis, rheumatoid arthritis, VIGOR, but also the<br>643:19    Alzheimer's disease studies and also eventually<br>643:20    finally three cancer studies.<br>643:21    Q.    All right.<br>643:22    A.    So, a large number of Phase III and<br>643:23    subsequent studies.<br>643:24    Q.    I'll list them.  VIGOR, Alzheimer's,<br>643:25    cancer.  What others?<br><br>644<br>644: 1    A.    All the Phase III programs.<br>644: 2    Q.    Phase III.  Any others?<br>644: 3    A.    Every study that we did with Vioxx.<br>644: 4    Q.    Can you think of any others?<br>644: 5    A.    I'm sure there were some other<br>644: 6    studies.<br>644: 7    Q.    I'm going to put "Maybe others."  Did<br>644: 8    I write it right? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 644:10-644:19<br><br>644:10       THE WITNESS:  You wrote down the<br>644:11  words that you said you were writing down, yes.<br>644:12  BY MR. LANIER:<br>644:13     Q.    Okay.  Now, let's just make sure<br>644:14  we're clear on this.  Y'all were not studying Vioxx<br>644:15  to see if it caused Alzheimer's or to see if it<br>644:16  caused cancer, to see if it was dangerous in that<br>644:17  way, y'all were studying it to see if you could sell<br>644:18  it as a cure or as a help for Alzheimer's and<br>644:19  cancer; right? | | |
| 644:21-645:9<br><br>644:21       THE WITNESS:  We were studying it to<br>644:22  see if there was a benefit to patients, and we're<br>644:23  assessing the risks at the same time so that we<br>644:24  could make a benefit/risk assessment.<br>644:25  BY MR. LANIER:<br><br>645<br>645: 1     Q.    In other words, you weren't studying<br>645: 2  it because you were worried it was going to cause<br>645: 3  cancer and you wanted to see, you were studying it<br>645: 4  to see if you could help cancer?<br>645: 5     A.    Yes, we were.  And another benefit of<br>645: 6  those studies was that we could use Vioxx in those<br>645: 7  studies along with placebo, which we believed would<br>645: 8  give us the best data in terms of answering all<br>645: 9  questions that may be raised about safety. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 645:16-646:17<br><br>645:16    Q.    But to be fair, we ought to put<br>645:17    number of researchers because there were a number of<br>645:18    researchers over on this side of the column that<br>645:19    were working on safety at least, even if it wasn't<br>645:20    cardiovascular; right?<br>645:21    A.    Correct.<br>645:22    Q.    Can you think of anything else y'all<br>645:23    were putting in other than researchers and studies?<br>645:24    Any other efforts to determine whether or not Vioxx<br>645:25    caused heart attacks?<br><br>646<br>646: 1    A.    Well, there are numerous scientific<br>646: 2    meetings, reviews at congresses, so, there was a lot<br>646: 3    of dialogue, and there's a lot of effort over and<br>646: 4    above the studies, because there's people discussing<br>646: 5    what all the options were, the alternatives were<br>646: 6    extensively, right through this period.<br>646: 7    Q.    So, that's kind of research, I guess,<br>646: 8    but more than that, it's just talking about<br>646: 9    research?<br>646:10    A.    It's having --<br>646:11    Q.    So, y'all had -- I'm sorry.  Go<br>646:12    ahead.<br>646:13    A.    So, it's people discussing what all<br>646:14    of the options are.<br>646:15    Q.    So, I've put down a third thing,<br>646:16    people talking about it.  Y'all had that going in to<br>646:17    try and figure it out; true?  Is that fair to say? | | |
| 646:19-646:21<br><br>646:19    THE WITNESS:  We had a lot of people<br>646:20    doing more than talking about it.  Working on this<br>646:21    issue, reviewing databases and so forth. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 647:25-648:4<br><br>647:25      Q.      Now, I would like to then move over<br><br>648<br>648: 1      to the other side of our chart, the marketing side.<br>648: 2      First of all, your company brought a lot of<br>648: 3      expertise into marketing; true?<br>648: 4      A.      We hired some people, yes. | | |
| 648:8-648:13<br><br>648: 8      Q.      Well, you are world-famous for it.<br>648: 9      You are world renowned for marketing; aren't you?<br>648:10      A.      We have a good reputation, yes.<br>648:11      Q.      I mean, you're not fussing the world<br>648:12      renowned language; are you?<br>648:13      A.      No.  No, I'm not. | | |
| 655:11-655:22<br><br>655:11      Q.      Another thing you did on marketing,<br>655:12      we'll list it as number 5.  You would study the<br>655:13      effects of label changes.  You actually spend money<br>655:14      to see if changing the label language was going to<br>655:15      hurt your sales; wouldn't you?<br>655:16      A.      We would do market research<br>655:17      constantly on our products, and that included<br>655:18      testing different language and labels.<br>655:19      Q.      And y'all would do that with outside<br>655:20      companies; wouldn't you?<br>655:21      A.      Market research was typically done<br>655:22      with outside companies. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 685:20-686:1<br><br>685:20      Q.      Who is your employer today?  What<br>685:21   company gives you a paycheck?<br>685:22      A.    Merck & Co. Inc.<br>685:23      Q.      When you made your lateral move, did<br>685:24   that change or is it Merck & Co. Inc. that was<br>685:25   giving you your salary, paycheck before?<br><br>686<br>686: 1      A.    The same company. | | |
| da031805 - Vol. I, (Page 693:2 to 693:7)<br>693<br>2      Q.     Well, you didn't, when you decided to<br>3   put Vioxx on the market without running a test to<br>4   see if it causes heart attacks, the way some of your<br>5   scientists thought it might?<br>6      A.      When Vioxx was brought to the market,<br>7   it was a safe product. | Vague;<br>mischaracterizes<br>the record | Sustained |
| da031805 - Vol. I, (Page 693:11 to 693:18)<br>693<br>11      Q.    Did the drug change from the time you<br>12   put it on the market until the time you pulled it?<br>13   Was it a different drug?<br>14      A.    We had one new piece of data in<br>15   September of last year, and for the first time in<br>16   the extensive period that we had studied Vioxx,<br>17   there was a relative risk difference between Vioxx<br>18   and placebo. | nonresponsive to<br>question;<br>move to strike | Sustained |
| 69410      694:10-694:17<br><br>694:10           Sir, that wasn't my question.  My<br>694:11   question is this.  Did the drug change from the time<br>694:12   y'all started selling it to everybody to the time<br>694:13   you pulled it off the market?<br>694:14      A.    Did it change in what regard?<br>694:15      Q.    Was it the same drug, did it have the<br>694:16   same chemical makeup?<br>694:17      A.    Yes.  It was the same product. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| **695:1-695:12**<br><br>695: 1     Q.    Sir, the product you pulled from the<br>695: 2  market, according to your own APPROVe study, causes<br>695: 3  an increased number of heart attacks and strokes,<br>695: 4  doesn't it?<br>695: 5     A.    The APPROVe study showed that there<br>695: 6  was a relative risk greater in the Vioxx group<br>695: 7  versus the placebo group for the first time in all<br>695: 8  of the placebo controlled studies, which have been<br>695: 9  extensive, and based on that relative risk<br>695:10  difference and based on the availability of<br>695:11  alternative therapies, Merck made a decision to<br>695:12  withdraw the product | | |
| **700:22-701:14**<br><br>700:22     Q.    All right.  So this study is going,<br>700:23  this semi-independent group is monitoring it, and<br>700:24  this group says to Merck, time-out, you got to stop<br>700:25  this study because the people who are taking Vioxx<br><br>701<br>701: 1  have a higher rate of heart attacks and strokes than<br>701: 2  the people who are just taking a sugar pill.  Is<br>701: 3  that right?<br>701: 4     A.    They -- that's right.<br>701: 5     Q.    All right.<br>701: 6     A.    They told Merck to stop the study.<br>701: 7  It was their recommendation.<br>701: 8     Q.    Now, this was not the first study<br>701: 9  y'all did where one group taking Vioxx had a higher<br>701:10  rate of heart attacks and strokes than a group that<br>701:11  was taking a different kind of pill.  True?<br>701:12     A.    It was not the first time, but it was<br>701:13  the first time in a placebo-controlled study that a<br>701:14  difference had been shown. | | |
| da031805 - Vol. I, (Page 701:15 to 701:18)<br>            701<br>15     Q.    Because the first time was the VIGOR<br>16  study, that was your very first study out of the box<br>17  that y'all were doing while you were selling the<br>18  drug on the fast track.  Right? | Mischaracterizes the record | *(handwritten)* Under cross x'allow it witness Clarifies & handles |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 701:20-702:7<br><br>701:20         THE WITNESS:  VIGOR was not the first<br>701:21    study that Merck did.  Merck had extensive studies<br>701:22    before VIGOR.  VIGOR, which did not have a placebo<br>701:23    arm, also showed a difference in CV events between<br>701:24    Vioxx and in that case naproxen.  Not a sugar pill,<br>701:25    but naproxen.<br><br>702<br>702: 1    BY MR. LANIER:<br>702: 2         Q.    And so y'all's reaction to the VIGOR<br>702: 3    study that showed people taking Vioxx were getting<br>702: 4    more heart attacks and strokes than the people<br>702: 5    taking the other pill was just to say the other pill<br>702: 6    must be really helpful for your heart?  That was<br>702: 7    your response then, wasn't it? | | |
| 702:9-702:15<br><br>702: 9         THE WITNESS:  Our response at that<br>702:10    time, after looking at whether or not Vioxx in the<br>702:11    VIGOR study, that's what we're talking about,<br>702:12    whether the Vioxx was prothrombotic, our conclusion,<br>702:13    based on looking at the then accumulated data we<br>702:14    had, was that Vioxx was not different from placebo<br>702:15    and not different from non-naproxen NSAIDs. | | |
| 703:3-703:8<br><br>703: 3         Q.    Sir, in other words, in common<br>703: 4    everyday language, when your VIGOR study showed<br>703: 5    people taking Vioxx were more likely to have heart<br>703: 6    attacks and strokes than people taking the other<br>703: 7    pill, the explanation that your company offered was,<br>703: 8    well, that other pill must help your heart.  True? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 703:10-703:25<br><br>703:10　　　　　　THE WITNESS:  After considering all<br>703:11　of the data, we believed that that was the most<br>703:12　likely reason for that difference, yes.<br>703:13　BY MR. LANIER:<br>703:14　　　　Q.　　Now, you couldn't very well pony up<br>703:15　that reason for the sugar pill, though, because<br>703:16　everybody knows the sugar pill is not going to help<br>703:17　your heart.  Right?<br>703:18　　　　A.　　The sugar pill should not have any<br>703:19　effect, positive or negative.<br>703:20　　　　Q.　　Let's go back, though, to that first<br>703:21　drug, naproxen.  That's something you and I can buy<br>703:22　if we go down to the drug store, because it's come<br>703:23　off of patent and because it's now over the counter.<br>703:24　True?<br>703:25　　　　A.　　That's true. | | |
| 704:16-704:20<br><br>704:16　　　　Q.　　Syntex was a drug company, wasn't it?<br>704:17　　　　A.　　Yes, it was.<br>704:18　　　　Q.　　And today Syntex is owned by who?<br>704:19　　　　A.　　Roche bought Syntex a number of years<br>704:20　ago. | | |
| da031805 - Vol. I, (Pages 704:21 to 705:4)<br>　　　　　　　　　　704<br>21　　　　Q.　　Did it ever occur to your guys that<br>22　if Syntex's drug was good for the heart, that Syntex<br>23　would have been selling it for that reason and<br>24　telling everybody and using all of their marketing<br>25　people like you to get that drug out there and sell<br>　　　　　　　　　　705<br>1　more prescriptions because it's good for your heart,<br>2　it will help stop heart attacks?  Did it occur to<br>3　you that maybe that would have been done if it were<br>4　true? | Foundation; calls for speculation; compound | Overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Page 705:6 to 705:13)<br>705<br>6  THE WITNESS:  I don't know the<br>7  reasons that -- at the point in time that it was<br>8  Syntex was many years ago, and I don't recall when<br>9  the fact of aspirin being known to be<br>10  cardioprotective was first acknowledged, and I don't<br>11  know -- I have no idea whether at that time Syntex,<br>12  the originator of naproxen, believed that that was<br>13  an appropriate study to do.  I have no information. | Foundation; calls for speculation; compound | Overruled |
| da031805 - Vol. I, (Pages 705:17 to 706:1)<br>705<br>17  Q.  Yeah.  But I'm just saying, before<br>18  you -- when your study shows that your Vioxx is<br>19  causing more -- or associated, as you like to say,<br>20  with more heart attacks and strokes than naproxen<br>21  before you just pell-mell and go tell everybody, oh,<br>22  naproxen is just good for your heart, did you bother<br>23  to call the people who studied it and tested it and<br>24  sold it for years and years and years and years,<br>25  call them up and say, hey, did y'all ever do any<br>706<br>1  testing to see if this is good for your heart? | Assumes facts not in evidence; calls for speculation; mischaracterizes the record; 602; 401; 402 | Sustained<br>also argumentitive |
| da031805 - Vol. I, (Page 706:3 to 706:3)<br>706<br>3  THE WITNESS:  I don't know. | Assumes facts not in evidence; calls for speculation; mischaracterizes the record; 602; 401; 402 | Sustained |
| da031805 - Vol. I, (Page 706:5 to 706:15)<br>706<br>5  Q.  I mean, don't you think that would be<br>6  a reasonable thing to do before you start telling<br>7  everybody naproxen is good for your heart, you ought<br>8  to call the people that invented it and sold it for<br>9  years and ask them if they ever did any studies and<br>10  if they knew?<br>11  A.  I think what would be reasonable and<br>12  what I know Merck did is reviewed the literature<br>13  extensively in order to draw the conclusion.<br>14  Whether that review included talking to the<br>15  originator, I don't know. | Assumes facts not in evidence; calls for speculation; mischaracterizes the record; 602; 401; 402 | Overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Page 706:16 to 706:18)<br>706<br>16    Q.    Yeah.  But in that review, y'all<br>17  never found one study that showed naproxen was good<br>18  for your heart, did you? | Mischaracterizes the record; vague | *overruled* |
| 706:19-706:21<br><br>706:19    A.    There were no studies conducted with<br>706:20  naproxen to show or not show that it was<br>706:21  cardioprotective. | | |
| da031805 - Vol. I, (Pages 706:22 to 707:16)<br>706<br>22    Q.    Did you ever see those monkeys where<br>23  one set of -- one monkey has got his eyes closed and<br>24  the other monkey got his ears closed and the other<br>25  monkey has his mouth -- with his hands over his<br>707<br>1  mouth?<br>2    A.    Yes.<br>3    Q.    You know, hands over the eyes.  Hear<br>4  -- see no evil, hear no evil, speak no evil.  You've<br>5  seen those monkeys?<br>6    A.    Yes, I have.<br>7    Q.    That's what y'all were doing on this,<br>8  is you were just closing your eyes, you didn't want<br>9  to know if that naproxen was good or bad for the<br>10  heart and you didn't want to know if your Vioxx was<br>11  good or bad for the heart, and you were closing your<br>12  ears because you didn't want to hear anybody tell<br>13  you that.  And you were closing your mouth, because<br>14  you weren't going to ask anybody, were you?<br>15    A.    I don't know that's a fair<br>16  characterization of Merck's behavior at all. | Lawyer argument; 602, 401, 402; mischaracterizes the record | *Sustained*<br>*argumentative* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 707:18 - 708: 1<br><br>707:18  over -- anywhere?  Who did you ask about studies to<br>707:19   see if naproxen is good for the heart?<br>707:20         A.     I was involved in meetings with our<br>707:21   research people who presented the alternative<br>707:22   explanations and presented the balance of evidence<br>707:23   for Vioxx versus placebo, Vioxx versus non-naproxen<br>707:24   NSAIDs, and also looked at all the data which<br>707:25   appeared to support the naproxen hypothesis, as it's<br><br>708<br>708: 1   called. | | |
| 709:4-709:9<br><br>709: 4         Q.     Let me understand this.  You're<br>709: 5   President of the Human Health part of Merck.  Right?<br>709: 6         A.     Correct.<br>709: 7         Q.     And as President of the Human Health<br>709: 8   part of Merck, your responsibility is to see that<br>709: 9   this drug gets sold, you have no | | |
| 709:10-709:10<br><br>709:10   responsibility for seeing that it's safe, | | |
| 709:11-709:13<br><br>709:11   that's in a whole different division<br>709:12   that doesn't even report to you.  Is that right?<br>709:13         A.     No, that is not correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Pages 709:23 to 710:10)<br><br>709<br>23   Q.   Yes, sir.  Then if you were<br>24  responsible for safety as well, I want to know who<br>25  you, as the President of Human Health, talked to to<br>710<br>1  see if that naproxen was as wonderful for the heart<br>2  as y'all were telling everybody it must be?<br>3    A.   Thank you.  Everybody at Merck has a<br>4  responsibility for safety, but at the end of the<br>5  day, it's our research people who have the<br>6  responsibility for understanding the data and<br>7  presenting it to the regulators and giving me, as<br>8  part of the sales and marketing group, a product<br>9  with defined benefits and risks so that I can take<br>10  that product to the market. | nonresponse to question; move to strike | *Overruled* |
| da031805 - Vol. I, (Pages 710:14 to 711:1)<br><br>710<br>14    Q.   I'm trying to understand your answer.<br>15  I need help here.  I'm saying you're the President<br>16  of Human Health, and you're telling me that, yes,<br>17  you have responsibility for safety so you're out<br>18  there peddling a drug that you're saying the whole<br>19  reason that the drug is causing more heart -- or<br>20  seems to be associated with more heart attacks and<br>21  strokes is because this other drug is just really<br>22  good for the heart.  And if you're out there<br>23  peddling that as the line for the company to make<br>24  more sales, I want to know who you went to to talk<br>25  to see if, in fact, naproxen was safer?  Who outside<br>711<br>1  of your company? | Form; compound; 611 | *Overruled* |
| 711:3-711:7<br><br>711: 3      THE WITNESS:  I did not personally<br>711: 4  talk to people outside my company.  But the people<br>711: 5  reporting to me were responsible for selling the<br>711: 6  product consistent with the benefits and risks set<br>711: 7  out for Vioxx. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Page 712:1 to 712:3)<br>712<br>1    Q.    Sir, you know it's billions of pills<br>2  you made, don't you?<br>3      A.    It probably is.  I don't know. | Foundation; lack of personal knowledge | *Sustained* |
| da031805 - Vol. I, (Page 712:5 to 712:10)<br>712<br>5  billions of these pills probably, and you're telling<br>6  me as the President of Human Health, you didn't<br>7  check with anybody outside the company to see if<br>8  your line about naproxen is just healthy for your<br>9  heart, to see whether or not that had any validity.<br>10  Is that what you're telling me? | 611; form | *Overruled* |
| 712:11-712:13<br><br>  712:11    A.    I did not do that because I knew that<br>  712:12    others who could make those determinations much<br>  712:13    better than I, were doing that. |  |  |
| da031805 - Vol. I, (Pages 714:25 to 715:2)<br>714<br>25    Q.    So it's safe -- it's safe for the<br>715<br>1  jury to assume that Vioxx was not a drug that could<br>2  sell itself.  Is that right? | 401; 402 | *Overruled<br>- Cross* |
| da031805 - Vol. I, (Page 715:4 to 715:9)<br>715<br>4  THE WITNESS:  The responsibility of<br>5  marketing is to take our product to our customers<br>6  and tell them of the benefits, tell them of the<br>7  risks and see if it's an appropriate choice for the<br>8  millions of patients that we thought could and did<br>9  benefit from Vioxx. | 401; 402 | *1 /* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Pages 715:15 to 716:2)<br>715<br>15   Q.   You've heard of a product that's so<br>16   good it sells itself, haven't you?<br>17      A.   I've heard the expression.  I don't<br>18   know the product.  I can't give you an example of a<br>19   product.<br>20      Q.   You can't think of one product that<br>21   is so good, it sells itself?<br>22      A.   I don't believe so.<br>23      Q.   Wow.  Well, at least if we were going<br>24   to start listing products like that, we wouldn't put<br>25   Vioxx on that list, would we?<br>716<br>1      A.   I don't -- I don't think such a list<br>2   will be put together. | 401; 402 | Sustained |
| da031805 - Vol. I, (Page 719:14 to 719:23)<br>719<br>14      Q.   All right.  Well, just assume for me<br>15   that I'm going to come up with a long list of<br>16   products that are so good that they basically sell<br>17   themselves.  They don't need hundreds of millions of<br>18   dollars behind them.  Would you want to put Vioxx on<br>19   that list?<br>20      A.   I would not put any of our products<br>21   on that list because I think all of the products<br>22   that we sell require our marketing and sales support<br>23   to maximize the benefit to patients. | 401; 402 | 11 |
| da031805 - Vol. I, (Page 756:5 to 756:8)<br>756<br>5   Q.   The amount of money you spent<br>6   studying the drug isn't anywhere near close to the<br>7   amount of money y'all spent trying to sell the drug<br>8   and market it.  True? | Foundation; calls for speculation – see 755:15-20; 401; 402 | overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Pages 756:14 to 757:2)<br>756<br>14    Q.   Sir, if we were to continue down the<br>15  list of things y'all did in marketing -- by the way,<br>16  have you compared the number of people at Merck who<br>17  are in charge of research to the number of people in<br>18  Merck who are in charge of sales?<br>19    A.   No, I have not done that comparison.<br>20    Q.   I bet you you got a ton more salesmen<br>21  than you do research scientists on Vioxx, don't you?<br>22    A.   Yes.  But the reason for that is, we<br>23  have the scientists supporting Vioxx sufficient for<br>24  the needs there and we have the sales reps<br>25  sufficient to support the marketing effort across<br>757<br>1  the audience of physicians and others that we were<br>2  covering. | 401; 402; foundation; calls for speculation | overruled<br><br>-Cross- |
| da031805 - Vol. I, (Page 757:7 to 757:20)<br>757<br>7    Q.   In addition to the eight reasons<br>8  we've -- or eight items we've listed here under<br>9  marketing, a ninth thing y'all did in marketing,<br>10  y'all would have marketing consultant meetings where<br>11  y'all would meet with consultants and discuss the<br>12  marketing plans.  True?<br>13    A.   There were market research consultant<br>14  meetings, yes.<br>15    Q.   And in addition to that, y'all had --<br>16  you spent a surplus or an extra amount of FMC money,<br>17  right, but you didn't remember what FMC meant, did<br>18  you?<br>19    A.   Yes, the people in the field had a<br>20  budget with their customers, yes. | 401; 402 | |
| da031805 - Vol. I, (Page 759:5 to 759:11)<br>759<br>5  Now, y'all also hired speech givers.  You paid<br>6  people to give speeches.<br>7    A.   We had --<br>8    Q.   True?<br>9    A.   We had a program of medical education<br>10  with physicians who were contracted with us to speak<br>11  to physician audiences, yes. | 401; 402 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Page 760:4 to 760:12)<br>760<br>4    Q.    Who would I need to talk to about<br>5    that?<br>6        A.    I think that would be -- that would<br>7    be DeeDee Scott.<br>8        Q.    All right. For number 12 I'm just<br>9    going to put possibly paid clinical paper writers<br>10   because you're not sure?<br>11       A.    I'm not sure.<br>12       Q.    All right. | 401; 402; foundation; calls for speculation | Overruled |
| Anstice 76021    760:21-764:11<br><br>760:21        Q.    Now, the marketing efforts that you<br>760:22    did, and by you here, I mean Merck. The marketing<br>760:23    efforts Merck did got them in some trouble with the<br>760:24    FDA, didn't it?<br>760:25        A.    We received a warning letter from the<br>760:ESQUIRE DEPOSITION SERVICES<br>761: 761<br>761: 1    FDA, yes.<br>761: 2        Q.    Well, you got more than one, didn't<br>761: 3    you?<br>761: 4        A.    With regard to Vioxx?<br>761: 5        Q.    Yes, sir.<br>761: 6        A.    I know we received a warning letter,<br>761: 7    and I think there had been an earlier complaint<br>761: 8    about homemade detail pieces.<br>761: 9        Q.    Yes. Let's look at that one first.<br>761:10    This is Exhibit 114.<br>761:11                - - -<br>761:12        (Exhibit Anstice 114 marked for<br>761:13    identification.)<br>761:14                - - -<br>761:15    BY MR. LANIER:<br>761:16        Q.    You got it in front of you now?<br>761:17        A.    Yes, I do.<br>761:18        Q.    This is from the FDA, the Food and<br>761:19    Drug Administration, isn't it?<br>761:20        A.    Yes. Yes, it is. | 401; 402; foundation; calls for speculation | Overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 761<br>21  Q.    And it went to Ellen Westrick, the<br>22  executive director, office of medical/legal.  Is<br>23  that right?<br>24      A.    That's correct.<br>25      Q.    Is she a lawyer?<br>762<br>1      A.    No, she is not a lawyer.<br>2      Q.    She's the executive director in the<br>3  medical/legal office of Merck?<br>4      A.    That's correct.<br>5      Q.    This was an FDA letter you've seen<br>6  before, haven't you?<br>7      A.    I may have.  I don't recall.  It's<br>8  quite possible.<br>9      Q.    Well, you sure would hope someone<br>10  would bring it to your attention if it slams the<br>11  marketing you're the president of?<br>12      A.    I'm sure it was -- I'm sure the issue<br>13  was brought to my attention.<br>14      Q.    Look at what it complains about on<br>15  the second sentence.  Well, first of all, look at<br>16  the first sentence, Reference is made to Merck's<br>17  letters in response to letters from the FDA dated<br>18  November 12 and December 1.  So this is now our<br>19  third letter from the FDA on this issue, isn't it?<br>20      A.    I don't know that it's in regard to<br>21  this issue.<br>22      Q.    Well, look at it.  It says, our<br>23  letters dated November 12.<br>24      A.    In response to letters.<br>25      Q.    Yeah.  "...concerned the alleged | 401; 402; foundation; calls for speculation – see 765:7-10, 767:25-768:13; see MIL #15 | Overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 763<br>1 dissemination."<br>2     A.    Yes.  Yes, it appears to.<br>3     Q.    All right.  So what you've got in<br>4 front of you now is your third letter from the FDA<br>5 concerned about what y'all were doing.  Right?<br>6     A.    This seems to be a third letter,<br>7 right.<br>8     Q.    And the FDA said, "Our letters<br>9 concerned the alleged dissemination of two<br>10 'homemade' promotional pieces, entitled 'TEN REASONS<br>11 WHY VIOXX IS BETTER THAN CELEBREX.'" Did I read<br>12 that right?<br>13     A.    Yes, you did.<br>14     Q.    You don't think that is the same top<br>15 ten reason type speech writer that homemade that one<br>16 that made your speech of the top ten, do you?<br>17     A.    I don't know.  I would be<br>18 speculating.<br>19     Q.    Well, did you ever investigate to see<br>20 to what extent these homemade pieces were used to<br>21 promote Vioxx?<br>22     A.    Yes, that was investigated by our<br>23 people at Merck.<br>24     Q.    All right.  Who was doing it?<br>25     A.    It was done by this group in<br><br>da031805 - Vol. I, (Page 764:1 to 764:11)<br>764<br>1 conjunction with our legal group.<br>2     Q.    Okay.  Who within Merck was handing<br>3 out promotional pieces entitled "TEN REASONS WHY<br>4 VIOXX IS BETTER THAN CELEBREX"?<br>5     A.    I don't know.<br>6     Q.    Well, how did you investigate it if<br>7 you don't know who did it?<br>8     A.    It was investigated at a level below<br>9 me.<br>10     Q.    Well, who investigated it?  Who did<br>11 you hand that off to? | 401; 402;<br>foundation; calls<br>for speculation –<br>see 765:7-10,<br>767:25-768:13; see<br>MIL #15 | *Overruled* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Pages 764:13 to 765:2)<br>764<br>13      THE WITNESS: I didn't hand it off.<br>14 This person, Ellen Westrick, is responsible for<br>15 office of medical/legal. She would have immediately<br>16 worked with our legal group to investigate it and<br>17 determine what happened and take steps to stop it.<br>18 BY MR. LANIER:<br>19     Q.    All right. Let me see if I<br>20 understand this. You're the head of marketing and<br>21 advertising, right, you're the president?<br>22     A.    I am, correct.<br>23     Q.    And you're getting multiple -- Merck<br>24 is getting multiple letters from the FDA complaining<br>25 about marketing, promotional pieces being handed out<br>765<br>1 on your biggest selling drug. Right?<br>2     A.    Yes. | 401; 402; foundation; calls for speculation – see 765:7-10, 767:25-768:13; see MIL #15 | Overruled |
| da031805 - Vol. I, (Page 766:1 to 766:5)<br>766<br>1     Q.    Well, if I'm understanding Merck's<br>2 position, though, this was a renegade group of<br>3 pieces being handed out, you've got people already<br>4 violating your procedures in an effort to try and<br>5 sell this drug. Did you bother to check to see who? | 401; 402; foundation; calls for speculation – see 765:7-10, 767:25-768:13; see MIL #15 | Overruled |
| da031805 - Vol. I, (Page 766:7 to 766:13)<br>766<br>7 THE WITNESS: No. Nor would I expect<br>8 to check at this level. If there were more than<br>9 2,000 sales representatives supporting Vioxx, then I<br>10 would expect that consistent with our policies and<br>11 procedures in the system, that somebody would<br>12 address this situation and take the appropriate<br>13 action. | 401; 402; foundation; calls for speculation – see 765:7-10, 767:25-768:13; see MIL #15 | Overruled |