| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da031805 - Vol. I, (Page 766:15 to 766:25)<br>766<br>15   Q.   So your company gets written up three<br>16   times here by the FDA for wrong dissemination of<br>17   promotional pieces that are out of line, and your<br>18   position on that is I'm sure somebody is going to<br>19   handle that, I don't need to?<br>20   A.   Well, I believe the three times would<br>21   relate, it seems, based on a quick look at this<br>22   letter, to one incident.  And, yes, I believe our<br>23   organization is well equipped, has been and is well<br>24   equipped to address these issues and take the<br>25   appropriate action. | 401; 402; foundation; calls for speculation – see 765:7-10, 767:25-768:13; see MIL #15 | *Sustained* |
| da031805 - Vol. I, (Page 767:1 to 767:11)<br>767<br>1   Q.   Well, sir, but it says we've reviewed<br>2   these promotional pieces and have determined they're<br>3   false or misleading.  They contain<br>4   misrepresentations of Vioxx's safety profile.<br>5   Unsubstantiated comparative claims.  They're lacking<br>6   in fair balance.  And it also says that these pieces<br>7   were being handed out, "in their respective<br>8   geographic regions," plural.  Now, did you bother to<br>9   go find out where they were handed out and try to<br>10   fix the false and misleading data that the FDA said<br>11   y'all were passing around? | 401; 402; foundation; calls for speculation – see 765:7-10, 767:25-768:13; see MIL #15 | |
| da031805 - Vol. I, (Page 767:14 to 767:23)<br>767<br>14   THE WITNESS:  I did not do that.  The<br>15   reason I did not do that is homemade detail pieces,<br>16   which is a phrase which means that the pieces, just<br>17   to be clear about that, were not approved through<br>18   our medical/legal system, were it seems in this<br>19   case, produced by one sales representative, and I am<br>20   sure that this issue was settled, that these are<br>21   clearly against Merck's policies, to do -- to do any<br>22   material that doesn't go through our medical/legal<br>23   approval. | 401; 402; foundation; calls for speculation – see 765:7-10, 767:25-768:13; see MIL #15 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 807:23-808:1<br><br>807:23    Q.    You never gave this to the FDA, did<br>807:24    you?<br>807:25    A.    But this is not a document that was<br><br>808<br>808: 1    used with customers. | | |
| 808:5-808:8<br><br>808: 5    Q.    You never gave this to the FDA, did<br>808: 6    you?<br>808: 7    A.    This is not a document that we would<br>808: 8    ever need to send to the FDA. | | |
| 808:12-808:20<br><br>808:12    Q.    You never gave this document to the<br>808:13    FDA, did you?<br>808:14    A.    We did not give this document to the<br>808:15    FDA nor would there be a reason that we would need<br>808:16    to.<br>808:17    Q.    There's a reason not to.  They'd<br>808:18    probably get you in trouble and say, it wasn't a<br>808:19    renegade salesman, it came from the president.<br>808:20    True? | | |
| 808:22-808:24<br><br>808:22    THE WITNESS:  No, I don't believe<br>808:23    they would regard this as a relevant document for<br>808:24    them to receive at all. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 819:14-820:1<br><br>819:14        Q.       So y'all have known for years that<br>819:15    Vioxx could cause blood pressure to go up while<br>819:16    Celebrex couldn't?<br>819:17        A.       No, we did not know that.  All of the<br>819:18    NSAIDs, Vioxx and Celebrex included, are associated<br>819:19    with two class effects.  One is that they can cause<br>819:20    blood pressure to go up.  The other is that they can<br>819:21    accumulate fluid in the body, neither of which are<br>819:22    good things.  Vioxx was associated with these two<br>819:23    effects.  This was captured in our early clinical<br>819:24    studies, documented in our label.  Celebrex is also<br>819:25    associated, but with a lower incidence, to these<br><br>820<br>820: 1    effects. | | |
| 943:4-943:12<br><br>943: 4        Q.       But prior to marketing the drug, you<br>943: 5    knew about that.  Correct?<br>943: 6        A.       Yes.  And that was anticipated<br>943: 7    because all nonsteroidals and now the newer COX-2<br>943: 8    selective agents all seemed to have a similar effect<br>943: 9    in some patients, some percentage of patients, to<br>943:10    elevate blood pressure and to cause fluid retention.<br>943:11    That was a known risk with using any of these<br>943:12    agents. | | |
| **4/12/05 DEPOSITION** | | |
| 1043:2-1043:14<br><br>1043: 2        Q.       Good morning, Mr. Anstice.  Would you<br>1043: 3    please introduce yourself to the jury?<br>1043: 4        A.       My name is David Westbrook Anstice.<br>1043: 5        Q.       Mr. Anstice, how are you currently<br>1043: 6    employed?<br>1043: 7        A.       I'm employed by Merck as president<br>1043: 8    for human health.<br>1043: 9        Q.       How long have you had that position?<br>1043:10        A.       Two years and three or four months.<br>1043:11        Q.       Mr. Anstice, does the title<br>1043:12    "president" mean that you're the head of the entire<br>1043:13    company?<br>1043:14        A.       No, it does not. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1043:22-1044:3<br><br>1043:22    Q.    What does the term "human health" in<br>1043:23   your title refer to?<br>1043:24    A.    This refers to -- my responsibility<br>1043:25   today is for sales and marketing activities in a<br>1044:<br>1044: 1   number of countries around the world.  Specifically<br>1044: 2   those countries are Canada, Latin America, Japan,<br>1044: 3   Australia and New Zealand. | | |
| 1044:8-1044:16<br><br>1044: 8    Q.    Can you tell us what the<br>1044: 9   significance, if any, is of the term "human health"?<br>1044:10    A.    Human health is a term we use in our<br>1044:11   company to cover the -- to describe the business of<br>1044:12   our prescription medicine business as distinct from<br>1044:13   vaccines or animal health products and, therefore, I<br>1044:14   am responsible for all of the prescription medicines<br>1044:15   sold by Merck, again, in the countries that I just<br>1044:16   described. | | |
| 1044:17-1045:10<br><br>1044:17    Q.    Before you were the president of<br>1044:18   human health, what was your position at Merck?<br>1044:19    A.    Up until December 2002, I was<br>1044:20   president, human health, the Americas.<br>1044:21    Q.    How long did you hold that position?<br>1044:22    A.    That position was from approximately<br>1044:23   1997 to 2002.<br>1044:24    Q.    What were your general duties and<br>1044:25   responsibilities as president of human health for<br><br>1045<br>1045: 1   the Americas?<br>1045: 2    A.    My responsibilities, again, were<br>1045: 3   responsible for sales and marketing activities<br>1045: 4   related to Merck's prescription medicine business,<br>1045: 5   this time for the U.S. market, for Canada and for<br>1045: 6   Latin America.<br>1045: 7    Q.    Did your responsibilities as<br>1045: 8   president of human health the Americas include<br>1045: 9   responsibility for Vioxx?<br>1045:10    A.    Yes, they did. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1045:14-1045:16<br><br>1045:14     Q.   Mr. Anstice, are you a medical<br>1045:15   doctor?<br>1045:16     A.   No, I am not. | | |
| 1045:17-1045:19<br><br>1045:17     Q.   Does the human health division at<br>1045:18   Merck deal with anything other than the sales and<br>1045:19   marketing side of Merck? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1045:22-1047:6<br><br>1045:22         THE WITNESS:  No.  We are the<br>1045:23  commercial arm for Merck.<br>1045:24  BY MR. RABER:<br>1045:25       Q.    Is there a division at Merck that's<br><br>1046<br>1046: 1  responsible for medical, scientific and research<br>1046: 2  part of Merck's business?<br>1046: 3       A.    Yes, there is.<br>1046: 4       Q.    What's the name of that division?<br>1046: 5       A.    That division is called Merck<br>1046: 6  Research Laboratories.<br>1046: 7       Q.    Are you a part of that division?<br>1046: 8       A.    No, I am not.<br>1046: 9       Q.    Who's the president of that division?<br>1046:10       A.    Today the president of that division<br>1046:11  is Dr. Peter S. Kim.<br>1046:12       Q.    Who was president of that division<br>1046:13  during the development of Vioxx?<br>1046:14       A.    During the development of Vioxx, Dr.<br>1046:15  Edward Scolnick was president of that division.<br>1046:16       Q.    What kind of training did Dr. Kim and<br>1046:17  Dr. Scolnick have?<br>1046:18       A.    Dr. Kim is a Ph.D. in medical<br>1046:19  science, and Dr. Scolnick is a medical physician,<br>1046:20  but also with extensive scientific training.<br>1046:21       Q.    In general terms, what kinds of<br>1046:22  backgrounds did the people have that work in the<br>1046:23  Merck Research Labs division?<br>1046:24       A.    Certainly at the senior levels, the<br>1046:25  people, physicians, in some cases physicians also<br><br>1047<br>  1047: 1  with doctorates in medical sciences, in other cases<br>1047: 2  they have Ph.D.s or other senior degrees in medical<br>1047: 3  research fields quite broadly.<br>1047: 4       Q.    Do those people in the Merck Research<br>1047: 5  Labs division report to you?<br>1047: 6       A.    No, they do not. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1047:7-1047:18<br><br>1047: 7      Q.      Mr. Anstice, to whom did you report<br>1047: 8   when you were president of human health for the<br>1047: 9   Americas?<br>1047:10      A.      I reported throughout that period to<br>1047:11   Mr. Ray Gilmartin, the CEO of Merck.<br>1047:12      Q.      To whom do you report in your<br>1047:13   position as president of U.S. -- I mean, strike<br>1047:14   that.<br>1047:15           To whom do you report now in your<br>1047:16   position as president of human health?<br>1047:17      A.      To the same person, Mr. Ray<br>1047:18   Gilmartin. | | |
| da041205 - Vol. I, (Pages 1047:19 to 1048:4)<br>1047<br>19      Q.      Other than the drug Vioxx, can you<br>20   tell us about some of the other Merck drugs that<br>21   you've been involved with in your career?<br>22      A.      Yes. I've been involved with many<br>23   drugs that lower blood pressure, products that lower<br>24   cholesterol, products that treat glaucoma, a cause<br>25   of blindness, drugs that treat Parkinson's disease,<br>1048<br>1   drugs that treat infectious diseases, urinary<br>2   infections, hospital infections, products that treat<br>3   HIV or AIDS disease, in fact, many different types<br>4   of products. | [401, 402, 403] | *overrul'd* |
| da041205 - Vol. I, (Page 1048:9 to 1048:10)<br>1048<br>9   Q.      Mr. Anstice, were you involved in<br>10   marketing those drugs? | | |
| da041205 - Vol. I, (Page 1048:12 to 1048:14)<br>1048<br>12   THE WITNESS:  I had responsibility<br>13   for the sales and marketing activities of those<br>14   products that I mentioned, yes. | | |
| da041205 - Vol. I, (Page 1048:16 to 1048:20)<br>1048<br>16   Q.      Are you familiar with the condition or<br>17   a disease known as river blindness?<br>18      A.      Yes, I am.<br>19      Q.      Did Merck develop and market any<br>20   drugs relating to that condition? | [401, 402, 403] | *overrul'd* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da041205 - Vol. I, (Pages 1048:22 to 1049:7)<br>1048<br>22   THE WITNESS:  Yes, Merck did.  Merck<br>23   discovered from an animal health program in the '80s<br>24   that a product used in animals could be helpful in a<br>25   disease called river blindness, which is a<br>1049<br>1   particular bug that causes blindness at very young<br>2   ages in peoples around the equator in many different<br>3   countries.  Merck, upon making that discovery, made<br>4   the product available in collaboration with many<br>5   external parties, and that drug today has treated<br>6   some 40 million people and helped many of them not<br>7   become blind. | [401, 402, 403] | *Overrule* |
| da041205 - Vol. I, (Pages 1049:11 to 1050:5)<br>1049<br>11   Q.    Mr. Anstice, are you familiar with a<br>12   program at Merck called the patient assistance<br>13   program?<br>14       A.   Yes, I am.<br>15       Q.    Did the patient assistant program<br>16   fall within your area of responsibility at Merck<br>17   while you were president of human health the<br>18   Americas?<br>19       A.    Yes.  That is a U.S. program and has<br>20   been in place for many decades and was part of my<br>21   responsibility in my U.S. position.<br>22       Q.    Can you tell us what that program is?<br>23       A.    Patient assistance program is a<br>24   program that can be used by any physician to have<br>25   Merck prescription medicines made available free to<br>1050<br>1   the patient if that patient in the view of the<br>2   doctor needs that medicine and does not have<br>3   government assistance or insurance assistance which<br>4   would enable them to pay for the drug and they<br>5   otherwise might not get the medicine that they need. | [401, 402, 403]<br>subject to MIL re<br>"Good Acts" | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1050:6-1052:6 | | |

1050: 6    Q.    Mr. Anstice, where are you originally
1050: 7    from?
1050: 8    A.    From Australia.
1050: 9    Q.    Are you married?
1050:10    A.    Yes, I am.
1050:11    Q.    Where do you and your wife currently
1050:12    live?
1050:13    A.    In Whitemarsh Township, Pennsylvania.
1050:14    Q.    Let's talk a little bit more about
1050:15    your background and how you came to work for Merck.
1050:16    Can you tell us about your formal education?
1050:17    A.    After high school, my formal
1050:18    education was to do a bachelor of economics degree
1050:19    at the University of Sydney in Sydney, Australia.
1050:20    Q.    In what subject was your Bachelor's
1050:21    degree?
1050:22    A.    The subject was economics with majors
1050:23    in political economy and economics.
1050:24    Q.    What did you do after you got your
1050:25    degree from the University of Sydney?

1051
1051: 1    A.    I joined the Pharmaceutical
1051: 2    Manufacturers Trade Association in Australia.
1051: 3    Q.    What were your general duties in that
1051: 4    position?
1051: 5    A.    I was an economist in that
1051: 6    organization, and I generally worked with the 50, 60
1051: 7    member companies to provide services to them, which
1051: 8    included extensive involvement with the government
1051: 9    on a broad range of different issues.
1051:10    Q.    Mr. Anstice, why did you take a job
1051:11    in the pharmaceutical industry at that time?
1051:12    A.    Upon leaving university, I took that
1051:13    position because of the mix -- because I wanted to
1051:14    work in the commercial world, but I was also
1051:15    interested in the linkage between the commercial
1051:16    world and the world of government, and this job
1051:17    provided a very interesting platform to do that.
1051:18    Q.    How long did you stay with the
1051:19    Pharmaceutical Manufacturers Association in
1051:20    Australia?
1051:21    A.    I stayed with that group for
1051:22    approximately five years.
1051:23    Q.    Why did you leave that position?

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1051:24    A.    I left that position because I was<br>1051:25    offered a position in a number of companies, but one<br><br>1052<br>1052: 1    of them was Merck, and I had grown to see the<br>1052: 2    importance of the industry, the benefit that it<br>1052: 3    provided to patients, and Merck in Australia at that<br>1052: 4    time was a fine company which had excellent<br>1052: 5    products, and I was very pleased to accept their job<br>1052: 6    offer at the time. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1052:12-1057:6 | | |

1052:12-1057:6

1052:12    Q.    What year did you join Merck?
1052:13    A.    1974.
1052:14    Q.    Can you describe for us in general
1052:15    terms the positions that you had and the nature of
1052:16    your responsibilities while you were working for
1052:17    Merck in Australia?
1052:18    A.    I worked in Australia for the next
1052:19    seven years, and I had a variety of different jobs
1052:20    in marketing and supporting marketing and selling
1052:21    activities in our business in Australia.
1052:22    Q.    Did there come a point in time where
1052:23    you moved to the United States?
1052:24    A.    I came on a temporary basis in
1052:25    '81/'82.  I then went for Merck to South Africa

1053
1053: 1    where I had responsibility for sales and marketing
1053: 2    and then returned to Australia in 1984.
1053: 3    Q.    Did you come to the United States on
1053: 4    a more permanent basis at some point?
1053: 5    A.    Yes, I did.  In 1988 I came to the
1053: 6    U.S. apparently on a more permanent basis, and at
1053: 7    that time I came to a position which was head of
1053: 8    marketing for our international -- the international
1053: 9    part of our business.
1053:10    Q.    Now, let's talk about the time when
1053:11    you were the president of human health for the
1053:12    Americas.  You've got that time frame all set?
1053:13    A.    Yes.
1053:14    Q.    Can you describe for us generally
1053:15    what your job entailed at that point?
1053:16    A.    Yes.  My responsibility was to
1053:17    oversee -- I had ultimate responsibility and
1053:18    accountability for all of Merck's prescription
1053:19    medicine business in the United States, as well as
1053:20    in the other areas that I mentioned, and as part of
1053:21    that, I was involved in interactions also with other
1053:22    divisions at Merck.
1053:23    Q.    Are you familiar with documents at
1053:24    Merck that are referred to as business plans and
1053:25    profit plans?

1054
1054: 1    A.    Yes, I am.
1054: 2    Q.    What are those documents?
1054: 3    A.    We use the term "business plan" to

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1054: 4    describe a document which is a planning and<br>1054: 5    financial document which projects our business<br>1054: 6    typically for the next five years.<br>1054: 7           A profit plan is a document which is,<br>1054: 8    in effect, our annual planning budget, both sales<br>1054: 9    revenues and expenses for the next calendar year,<br>1054:10    and that's something we work on each year as we put<br>1054:11    together our plans.<br>1054:12           Q.    Do those business plans and profit<br>1054:13    plans involve sales forecasts, for example?<br>1054:14           A.    Yes.  They are a very important<br>1054:15    component of those plans.<br>1054:16           Q.    What kinds of things does Merck<br>1054:17    consider when it does sales forecasts?<br>1054:18           A.    When we consider sales forecasts,<br>1054:19    they are what we describe as assumption based, that<br>1054:20    is, we survey all of the events that are knowable at<br>1054:21    least and consider what the impact of those events<br>1054:22    might be on our sales forecast.  We project trends<br>1054:23    for existing products.  We anticipate new products<br>1054:24    that would be competitive with the product.  We<br>1054:25    anticipate or assume new claims, new formulations.<br><br>1055<br>1055: 1    We also try and anticipate changes generally in the<br>1055: 2    marketplace that might affect the revenue or usage<br>1055: 3    of our products.<br>1055: 4           Q.    Does Merck ever keep track of what<br>1055: 5    its competitors are doing?<br>1055: 6           A.    We keep track of our competitors on a<br>1055: 7    constant basis because --<br>1055: 8           Q.    Why do you do that?<br>1055: 9           A.    Well, that's a very important part of<br>1055:10    assessing how our product is being seen in the<br>1055:11    marketplace, how it's being used, and we're<br>1055:12    constantly assessing both the perceptions related to<br>1055:13    our product and competitors, we're constantly<br>1055:14    assessing their market share, their sales.  We're<br>1055:15    also monitoring to see what new studies they might<br>1055:16    be doing and so forth.  It's a very important part<br>1055:17    of our activities.<br>1055:18           Q.    Mr. Anstice, did the forecasts that<br>1055:19    you mentioned have any effect on how Merck labels<br>1055:20    its drugs?<br>1055:21           A.    No.  The forecasts don't affect the<br>1055:22    label per se.  If we make assumptions with<br>1055:23    particular claims, then we might have a different<br>1055:24    audience of patients that might be suitable for a | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1055:25    product that could affect it in that way, but that<br><br>1056<br>1056: 1    would be a dialogue with the research group.<br>1056: 2        Q.      Let's go back to marketing, Mr.<br>1056: 3    Anstice, and I'd like to talk, if we can, about the<br>1056: 4    role that marketing plays at Merck and how it<br>1056: 5    relates to scientific research at Merck.<br>1056: 6            First, how does marketing in the<br>1056: 7    pharmaceutical business differ from other<br>1056: 8    businesses?<br>1056: 9        A.      I think it differs in some important<br>1056:10    ways.  To begin with, only a physician can prescribe<br>1056:11    a prescription medicine, and that makes it, I think,<br>1056:12    very different from many businesses.  I think that<br>1056:13    also the consumer is an important part ultimately,<br>1056:14    but it really is different in that our primary<br>1056:15    audience has to be the physician.<br>1056:16        Q.      How does the fact that your primary<br>1056:17    audience is the physician affect the way you market<br>1056:18    at Merck?<br>1056:19        A.      It affects it in a number of<br>1056:20    important ways.  First of all, our -- the product<br>1056:21    that we sell in the market, regulators agree with<br>1056:22    Merck on the label and what the benefits and risks<br>1056:23    of that product are, and that sets out what the<br>1056:24    basis of the discussion can be with a physician.<br>1056:25    That's a very important difference.  That, in turn,<br><br>1057<br>1057: 1    leads Merck to pay close attention to that as we<br>1057: 2    direct our marketing and selling activities to our<br>1057: 3    physician audiences.<br>1057: 4        Q.      How does it affect the type of<br>1057: 5    information that's provided to doctors as part of<br>1057: 6    the marketing? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1057:9-1057:25<br><br>1057: 9     THE WITNESS:  It affects the type of<br>1057:10  marketing because we are constantly reviewing the<br>1057:11  data of the products, and it affects it in the sense<br>1057:12  that we have to make sure that we're providing<br>1057:13  physicians with relevant and appropriate information<br>1057:14  to treat the disease that the product is directed<br>1057:15  towards.<br>1057:16  BY MR. RABER:<br>1057:17     Q.   In your experience, do physicians<br>1057:18  demand that type of information?<br>1057:19     A.   My experience is that, and I think<br>1057:20  broadly the experience of people in the commercial<br>1057:21  side of Merck, is that physicians treating diseases<br>1057:22  have very specific needs.  They have choices<br>1057:23  available to them.  Those needs are constantly being<br>1057:24  identified, and we hear that all the time on the<br>1057:25  sales and marketing side. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1058:1-1059:23 | | |

1058: 1       Q.      Are there rules and regulations that
1058: 2    control your marketing and sales of drugs in the
1058: 3    United States?
1058: 4       A.      Yes.  There are very important rules
1058: 5    and regulations.
1058: 6       Q.      Who oversees those rules and
1058: 7    regulations in the United States?
1058: 8       A.      For prescription medicines, the Food
1058: 9    & Drug Administration oversees it, but specifically
1058:10    through a group that's responsible for drug
1058:11    advertising.
1058:12       Q.      Mr. Anstice, can you please describe
1058:13    for us in general terms what the marketing group
1058:14    does at Merck?
1058:15       A.      In general terms, the marketing group
1058:16    works with all of our products collaboratively with
1058:17    the research group in the formative period of
1058:18    development of the product, and as we approach
1058:19    introduction of the product, then we begin to
1058:20    formally develop the plans for our marketing efforts
1058:21    for our salespeople.  We're responsible for forming
1058:22    a budget, directing activities related to all of the
1058:23    activities that we deem appropriate to support the
1058:24    marketing and selling.  That is, the work, really,
1058:25    of our people.

1059
1059: 1             We're actually charged with creating
1059: 2    awareness of the product that's insufficient.  We
1059: 3    are then charged with creating understanding, that
1059: 4    is, physicians need to understand the benefits and
1059: 5    the risks.
1059: 6             And, finally, we're charged with
1059: 7    encouraging physicians to trial and use the product
1059: 8    in appropriate patients.
1059: 9       Q.      Mr. Anstice, what role, if any, does
1059:10    the marketing group play in deciding what types of
1059:11    studies should be done for a drug at Merck?
1059:12       A.      I think the marketing group plays an
1059:13    important role in providing ideas for studies.  At
1059:14    the end of the day, the research group has the final
1059:15    say along with the regulators, but because the
1059:16    marketing group is talking to physicians and to
1059:17    payors, we're constantly aware, therefore, of gaps
1059:18    or information that would be valuable to physicians
1059:19    and payors.  And, therefore, marketing constantly is

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1059:20   presenting ideas to our research colleagues, many of<br>1059:21   which they may have already heard of and understood,<br>1059:22   but the marketing people are constantly engaged in<br>1059:23   that type of activity. | | |
| 1059:24-1060:9<br><br>1059:24      Q.      In general, what is the marketing<br>1059:25   group's view about scientific studies of drugs?<br><br>1060<br>1060: 1      A.      We regard them as extremely valuable<br>1060: 2   and important.  And the reason for that is that in<br>1060: 3   our marketing, we can describe the benefits and<br>1060: 4   risks of our product as included in the product<br>1060: 5   circular.  From a marketing and selling point of<br>1060: 6   view, the more data there is to support the usage of<br>1060: 7   our product and the appropriate usage, the better.<br>1060: 8   So, marketing is very supportive of doing as many<br>1060: 9   studies as possible related to all of our products. | | |
| 1060:10-1061:2<br><br>1060:10      Q.      Let's talk, if we can, about the<br>1060:11   different types of marketing materials that Merck<br>1060:12   uses, and let's start at the beginning.  What are<br>1060:13   the very first marketing materials that Merck uses<br>1060:14   with a new drug?<br>1060:15      A.      The first materials are often called<br>1060:16   launch materials, and perhaps the two most important<br>1060:17   materials there are the detail aid or a promotional<br>1060:18   brochure that we make available to our sales<br>1060:19   representatives, which typically begins with the<br>1060:20   label for the product, and then proceeds to a more<br>1060:21   colorful brochure.  The other primary vehicle is a<br>1060:22   journal ad, what's called a journal ad, which is<br>1060:23   then placed in appropriate relevant medical journals<br>1060:24   for the particular disease that the product -- or<br>1060:25   diseases that the product treats.<br><br>1061<br>1061: 1      Q.      Are these launch materials shared<br>1061: 2   with the FDA before they're made public? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1061:4-1061:10<br><br>1061: 4         THE WITNESS:  The FDA often requests<br>1061: 5   in its approval that materials, these launch<br>1061: 6   materials are presented to them.  Even if they<br>1061: 7   don't, the Merck practice is that we submit for FDA<br>1061: 8   review all of the materials related to the launch of<br>1061: 9   our products.  That's been a longstanding practice<br>1061:10   at Merck. | | |
| 1061:12-1061:13<br><br>1061:12       Q.     What is the particular division<br>1061:13   within FDA to whom these materials are submitted? | | |
| 1061:16-1061:22<br><br>1061:16         THE WITNESS:  The division that we<br>1061:17      submit  the  materials  to  is  known  by  the  name DDMAC,<br>1061:18   which is drug, marketing, advertising group.<br>1061:19   BY MR. RABER:<br>1061:20       Q.     Do the FDA rules and regulations<br>1061:21   require that these launch materials be submitted to<br>1061:22   the FDA before they're publicly used? | | |
| 1061:24-1062:6<br><br>1061:24         THE WITNESS:  They don't require,<br>1061:25   although sometimes the approval letters for our<br><br>1062<br>1062: 1   products request that all launch materials be<br>1062: 2   provided to the FDA before being used in the<br>1062: 3   marketplace.<br>1062: 4   BY MR. RABER:<br>1062: 5       Q.     Why does Merck make it a practice to<br>1062: 6   submit these materials to the FDA ahead of time? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1062:8-1063:2<br><br>1062: 8        THE WITNESS:  I think a couple of<br>1062: 9   reasons that we do that.  One is that the discussion<br>1062:10  on the label occurs between the scientific drug<br>1062:11  division and the company's regulatory people, which<br>1062:12  describes the benefits and risks for the product,<br>1062:13  but there needs to be an understanding with the drug<br>1062:14  advertising group as to how that language was<br>1062:15  determined, because all language can be -- needs to<br>1062:16  be interpreted.  And at the launch of a product, we<br>1062:17  think it's very important at Merck that we have not<br>1062:18  only followed the letter of the label, but that we<br>1062:19  are also fully in harmony with the FDA in terms of<br>1062:20  the spirit of how they believe that the product<br>1062:21  should be promoted.  And the only way to really<br>1062:22  validate or test that is by presubmitting the<br>1062:23  materials to the FDA so that they can assess them as<br>1062:24  being consistent with or in some cases they may<br>1062:25  suggest modifications to how we've incorporated the<br><br>1063<br>1063: 1  specifics out of the label into our promotional<br>1063: 2  materials. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1063:21-1065:1<br><br>1063:21    Q.    Let's talk, if we can, about<br>1063:22    marketing to physicians, if we can for a moment.<br>1063:23    Can you generally describe for us the review process<br>1063:24    at Merck that occurs with materials that are sent to<br>1063:25    physicians?<br><br>1064<br>1064: 1    A.    Yes.  We have a longstanding process<br>1064: 2    which we call medical/legal review.  And that<br>1064: 3    process mandates within the company as a policy that<br>1064: 4    all materials written and broadcast that are going<br>1064: 5    to be reviewed with our customers, in this case,<br>1064: 6    physicians, that those materials go through a group<br>1064: 7    which has at least two physicians and one lawyer.<br>1064: 8    They review all of the materials for consistency and<br>1064: 9    balance with respect to our label, make any<br>1064:10    appropriate adjustments, and they actually approve<br>1064:11    the material for use.  And only upon the approval of<br>1064:12    that group, whatever the final form of material is,<br>1064:13    can it be used with our customers.<br>1064:14    Q.    Does Merck share these physician<br>1064:15    marketing materials with the FDA?<br>1064:16    A.    The Merck practice is that upon our<br>1064:17    internal approval and upon our sending the material<br>1064:18    to whoever will be using it within the Merck system,<br>1064:19    we then routinely automatically send a copy of that<br>1064:20    material, whatever it is, to the FDA so that they<br>1064:21    have a record of all of our promotional materials.<br>1064:22    Q.    Did Merck follow that particular<br>1064:23    process that you've just described with respect to<br>1064:24    Vioxx?<br>1064:25    A.    Yes.  Merck always follows that<br><br>1065<br>1065: 1    process for all of our products. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1067:9-1069:10 <br><br> 1067: 9      Q.     Let's talk, if we can, about the <br> 1067:10   launch of Vioxx. Can you tell us when the FDA <br> 1067:11   approved Vioxx for marketing in the United States? <br> 1067:12      A.     Vioxx was approved for marketing in <br> 1067:13   the United States in May or June of 1999. <br> 1067:14      Q.     What was your view about Vioxx as a <br> 1067:15   new drug at that time? <br> 1067:16      A.     I believed at that time, and I still <br> 1067:17   believe that Vioxx was a very exciting and important <br> 1067:18   new product that could provide benefit to millions <br> 1067:19   of patients suffering from pain in markets around <br> 1067:20   the world and certainly in the U.S. <br> 1067:21      Q.     At the time of the launch, what had <br> 1067:22   Merck's studies showed about the potential for Vioxx <br> 1067:23   as a new drug? <br> 1067:24      A.     Merck's studies -- well, let me <br> 1067:25   describe that in two parts. <br><br> 1068 <br> 1068: 1      Merck's studies that supported the <br> 1068: 2   drug approval had shown across a large number of <br> 1068: 3   patients that the product was extremely helpful in <br> 1068: 4   relieving pain. Also, there were some studies, <br> 1068: 5   they're called endoscopy studies, included in the <br> 1068: 6   circular which helped physicians to understand that <br> 1068: 7   the original promise, the reason, in fact, Vioxx was <br> 1068: 8   developed and brought to the world in the first <br> 1068: 9   place is, that it would be gentler on the stomach. <br> 1068:10   Those studies versus Motrin, a commonly used agent, <br> 1068:11   showed that Vioxx was, in fact, gentler on the <br> 1068:12   stomach. So, the promise of Vioxx was that here was <br> 1068:13   another effective drug for relieving pain, but a <br> 1068:14   drug which may, in fact, offer benefits to patients <br> 1068:15   in terms of being more friendly to the stomach. <br> 1068:16      Q.     What were the nature of the stomach <br> 1068:17   problems that existed with traditional pain <br> 1068:18   relievers at that time? <br> 1068:19      A.     There was widespread knowledge that <br> 1068:20   all of the so-called traditional agents or all of <br> 1068:21   the pain relievers used at that time created in a <br> 1068:22   percentage of patients stomach problems, which went <br> 1068:23   from mild but through to more serious, which often <br> 1068:24   meant the patients could not take the medicine, <br> 1068:25   through to ulcers. There were -- at the serious end | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1069:<br>1069: 1   of the spectrum, there were perforations, ulcers,<br>1069: 2   bleeds which could occur with the use of these<br>1069: 3   agents, and those could occur in patients of any<br>1069: 4   age, they could occur in patients that took the<br>1069: 5   product for a long time or even for a relatively<br>1069: 6   short duration.  And so the promise of Vioxx was<br>1069: 7   that it might lessen the incidence of all of these<br>1069: 8   GI problems and that it might also, therefore, admit<br>1069: 9   more patients to be able to take an effective pain<br>1069:10   reliever because these problems did not occur. | | |
| 1073:3-1073:18<br><br>1073: 3        Q.      Let's go back, if we can, to the<br>1073: 4   formal launch of Vioxx.  How did Merck launch the<br>1073: 5   product and when?<br>1073: 6        A.      In the United States, we launched it<br>1073: 7   at a sales -- two large sales meetings.  We did that<br>1073: 8   in June of 1999, and that was somewhat typical of<br>1073: 9   the way that we introduced many of our large and<br>1073:10   important products.<br>1073:11        Q.      Where did this launch event occur?<br>1073:12        A.      This particular event occurred in San<br>1073:13   Francisco.<br>1073:14        Q.      Who attended the launch event?<br>1073:15        A.      The launch event was attended by all<br>1073:16   of the sales representatives and others in the<br>1073:17   organization who had primary responsibility for<br>1073:18   Vioxx at that time. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| **1073:23-1074:11**<br><br>1073:23    Q.    How long did this launch event go on?<br>1073:24    A.    Each of the meetings lasted<br>1073:25  approximately two-and-a-half days.  Therefore, the<br><br>1074<br>1074: 1  meeting -- the two meetings lasted for a week.<br>1074: 2     Q.    What kinds of subjects were discussed<br>1074: 3  and addressed at the meetings?<br>1074: 4     A.    The meetings were a mix of<br>1074: 5  motivational, excitement-creating activities.  Also,<br>1074: 6  there was extensive review of the product<br>1074: 7  information of the diseases for which Vioxx was<br>1074: 8  indicated, and also training of the representatives<br>1074: 9  in terms of their knowledge of Vioxx and the label<br>1074:10  in all aspects, the benefits and the risks and all<br>1074:11  of the details included in the label. | | |
| **1074:22-1075:17**<br><br>1074:22    Q.    Mr. Anstice, did the sales<br>1074:23  representatives who attended this event get any<br>1074:24  training beyond what they learned at the launch<br>1074:25  event?<br><br>1075<br>1075: 1     A.    Yes.  It's usual practice for us to<br>1075: 2  commence training for new products several months<br>1075: 3  prior to the product being approved.<br>1075: 4  Representatives received extensive training, again,<br>1075: 5  around the diseases for which the product was<br>1075: 6  indicated, around the competitive agents that<br>1075: 7  physicians could choose, as well as our own product.<br>1075: 8  After a launch meeting, our representatives<br>1075: 9  continually trained as changes to the circular<br>1075:10  occur, but even independently of that, we constantly<br>1075:11  update and ensure -- update our training and ensure<br>1075:12  that our representatives are very familiar with all<br>1075:13  of the information related to our product, and<br>1075:14  they're also getting updates on competitive products<br>1075:15  and changes in medicine which they need to be aware<br>1075:16  of in terms of the disease conditions for which the<br>1075:17  product is indicated. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1075:22-1076:23<br><br>1075:22　　　Mr. Anstice, has the word "obstacle"<br>1075:23　ever been used at Merck in training sales<br>1075:24　representatives?<br>1075:25　　　A.　Yes, it has.  In fact, in my<br><br>1076<br>1076: 1　experience, it's a term that has been used for<br>1076: 2　decades in the Merck organization.<br>1076: 3　　　Q.　What does the term "obstacle" mean in<br>1076: 4　that context?<br>1076: 5　　　A.　The word "obstacle" means a question,<br>1076: 6　or more specifically, a concern which, in fact, is<br>1076: 7　something which -- where a physician or a customer,<br>1076: 8　in fact, has a genuine either lack of knowledge or<br>1076: 9　wants more knowledge about a particular area or may,<br>1076:10　in fact, have a set of opinions, which means that<br>1076:11　they're not inclined to use your product.<br>1076:12　　　Q.　Why is the term "obstacle" used to<br>1076:13　refer to those kinds of questions or concerns that a<br>1076:14　doctor may have?<br>1076:15　　　A.　I think the reason that we use the<br>1076:16　word "obstacle" as opposed to "question" is that it,<br>1076:17　in fact, denotes that the physician requires more<br>1076:18　information in order to perhaps use the product at<br>1076:19　all or more information to use it more broadly, or,<br>1076:20　in fact, it's something which is fundamental to --<br>1076:21　until there is an answer, a satisfactory answer<br>1076:22　provided to a question, then a physician is not<br>1076:23　comfortable with the particular medicine. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1077:2-1077:25<br><br>1077: 2    Q.    Are doctors' questions important to<br>1077: 3   sales representatives at Merck?<br>1077: 4    A.    I think that doctors' questions are<br>1077: 5   fundamentally important.<br>1077: 6    Q.    Why is that?<br>1077: 7    A.    For the simple reason that it's very<br>1077: 8   important that you know what the issues, concerns,<br>1077: 9   questions are that your customers have.  And it's<br>1077:10   very important that you endeavor to your best extent<br>1077:11   to answer those questions and to respond to them in<br>1077:12   a helpful way.<br>1077:13    Q.    Mr. Anstice, did Merck train its<br>1077:14   sales representatives to dodge questions or avoid<br>1077:15   answering them when meeting with doctors?<br>1077:16    A.    No.  In my experience, Merck<br>1077:17   encouraged representatives to listen for questions,<br>1077:18   in fact, even probe to ask the doctor what concerns<br>1077:19   they may have, because unless they identified what<br>1077:20   the particular concerns or questions were that the<br>1077:21   doctor had, then they couldn't adequately address<br>1077:22   the issues the doctor may have.  So, in fact, for a<br>1077:23   salesperson, it was very important that they not<br>1077:24   only respond to the questions, but that they, in<br>1077:25   fact, draw them out from their customers. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1081:8-1082:3<br><br>1081: 8    Q.    Mr. Anstice, when Vioxx was launched,<br>1081: 9   there was another one of these COX-2 pain relievers<br>1081:10  on the market called Celebrex; is that right?<br>1081:11     A.    That's correct, yes.<br>1081:12     Q.    If Celebrex was already on the<br>1081:13  market, why was Vioxx necessary?<br>1081:14     A.    The development for Vioxx was started<br>1081:15  many years ago, and we believed that there was<br>1081:16  certainly room for more than one COX-2 agent.  At<br>1081:17  the time we were developing Vioxx, we could not be<br>1081:18  certain what the final ultimate profile for Celebrex<br>1081:19  would be, but we believed that Vioxx, for a variety<br>1081:20  of reasons associated with our development, would be<br>1081:21  an extremely effective pain reliever.  We also<br>1081:22  believed because of the COX-2 selectivity, its<br>1081:23  preference for COX-2 inhibition, that it could also<br>1081:24  provide substantial benefit in terms of GI safety.<br>1081:25  And I think our belief has always been that patient<br><br>1082<br>1082: 1   needs are best served if there's as broad a range of<br>1082: 2   choices as possible available to them for treatment<br>1082: 3   of important diseases. | | |
| 112319    1123:19-1124:4<br><br>1123:19     Q.    Did Merck have a policy of<br>1123:20  intimidating doctors or scientists who were critical<br>1123:21  of Merck?<br>1123:22     A.    No.  Merck has never had a policy to<br>1123:23  intimidate doctors.<br>1123:24     Q.    If you were to learn of allegations<br>1123:25  that doctors and scientists were being intimidated<br><br>1124<br>1124: 1   by people at Merck, how would you respond to that?<br>1124: 2     A.    Very promptly.  And I think very<br>1124: 3   strongly to if -- to find out if it was happening<br>1124: 4   and to stop it. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da041205 - Vol. I, (Pages 1166:20 to 1167:25)<br>1166<br>20   Q.   Did the Merck Research Lab decide to<br>21 do a CV outcomes study?<br>22   A.   They certainly tried to design such a<br>23 study, and there was a lot of discussions to that<br>24 effect in this time period we're talking about.<br>25   Q.   Did Merck seek the advice of any | 1168:8–17<br>[701, 702] | overruled |
| 1167<br>1 outside consultants on designing such a study?<br>2   A.   Yes.  I believe that the internal<br>3 discussions at Merck were also assisted by<br>4 discussions with outside advisors at that time in<br>5 order to help design such a study.<br>6   Q.   Did you attend any meetings where<br>7 different possible study designs were discussed?<br>8   A.   Yes.  I certainly attended some<br>9 meetings.<br>10   Q.   Do you remember whether there were<br>11 any problems in designing such a study, and if so,<br>12 what they were?<br>13   A.   Yes.  There were problems.  The<br>14 simple fact that nobody could come forward with a<br>15 clear hypothesis and study design indicated pretty<br>16 strongly to me that people were struggling with what<br>17 the appropriate design would be.  I certainly was<br>18 aware of two factors beyond that.<br>19       One was the difficulty in arthritis<br>20 populations of studying -- of using a placebo<br>21 control which, all things being equal, the way --<br>22 was the best way to determine the result.<br>23       The second factor was that using --<br>24 that if you were in patients with cardio -- studying<br>25 in a population with cardiovascular risk, then | Continued | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da041205 - Vol. I, (Page 1168:1 to 1168:25)<br>1168<br>1  medical ethics would suggest that those patients<br>2  should be provided with aspirin. But then the<br>3  inclusion of aspirin, which is known to have GI<br>4  safety problems in some proportion of patients,<br>5  would make it very difficult to interpret results<br>6  ultimately with regard to CV safety, because of --<br>7  because of the cardioprotective effects of aspirin.<br>8      Q.    Mr. Anstice, you mentioned problems<br>9  in using placebo in a study that would involve<br>10  arthritis patients. What's the problem with doing<br>11  that?<br>12      A.    The problem with doing that is<br>13  arthritis patients, there are many known treatments<br>14  which are of benefit to patients, and leaving them<br>15  without coverage of their pain relief beyond very<br>16  short periods of time is regarded as not medically<br>17  acceptable in clinical studies.<br>18      Q.    Well, if there were these problems in<br>19  designing a CV outcomes trial, what did Merck decide<br>20  to do?<br>21      A.    Merck ultimately concluded that in<br>22  order to answer the question which Merck wanted to<br>23  have as clear an answer to this question as<br>24  possible, that the best way to answer the question<br>25  would be to pool the data across a variety of | Continued | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da041205 - Vol. I, (Pages 1169:1 to 1170:3)<br>1169<br>1  studies, some of which were ongoing, and one which<br>2  was subsequently commenced in 2002, and that that<br>3  would be the best way to answer the question that<br>4  was being posed.<br>5      Q.    What were the studies that Merck<br>6  decided to pool together?<br>7      A.    In addition to the Alzheimer's<br>8  studies which I talked about before, there were at<br>9  this time, late 2001, there were two ongoing studies<br>10  in cancer, sets of cancer patients.  And then in<br>11  2002, a third cancer study was commenced.  And<br>12  the -- one of the substantial benefits of these<br>13  three studies is they were long-term, but they were<br>14  also versus placebo.  And we believed that these<br>15  studies across the patient populations being<br>16  studied, the length of time being studied and other<br>17  characteristics of the patient populations, that<br>18  this would provide a definitive or a more definitive<br>19  answer to the question being posed.<br>20      Q.    When did the first cancer study that<br>21  was going to be pooled together begin?<br>22      A.    The first cancer study was the colon<br>23  polyps study, and that study was begun in the first<br>24  quarter, early in 2000 and -- early 2000.<br>25      Q.    What was the name of that particular<br>1170<br>1  study?<br>2      A.    That study is called the APPROVe<br>3  study. | Continued | |
| 1171:9-1171:19<br><br>1171: 9           Did the FDA require Merck to take<br>1171:10   Vioxx off the market?<br>1171:11       A.    No.  That was -- Merck took the<br>1171:12   decision that we should voluntarily withdraw Vioxx<br>1171:13   after we became aware of the APPROVe results from<br>1171:14   their data set from the data monitoring group<br>1171:15   responsible for that study, and we advised the FDA<br>1171:16   and other regulators that we were taking that action<br>1171:17   voluntarily.<br>1171:18       Q.    Why did Merck decide to withdraw<br>1171:19   Vioxx from the market? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1171:21-1172:22<br><br>1171:21      THE WITNESS:  We decided to do that<br>1171:22    for two reasons.  One, there was, as seen in<br>1171:23    APPROVe, there was a relatively greater risk after<br>1171:24    18 months in patients taking Vioxx versus the<br>1171:25    placebo arm.  And based on that relatively greater<br><br>1172<br>1172: 1    risk and the fact that other agents were available<br>1172: 2    in this category, which seemed certainly at that<br>1172: 3    time had not shown this risk, we thought that it was<br>1172: 4    in the best interest of patient safety, given the<br>1172: 5    availability of alternatives, that we withdraw Vioxx<br>1172: 6    from the market.<br>1172: 7    BY MR. RABER:<br>1172: 8    Q.    Mr. Anstice, I have just a few more<br>1172: 9    questions before we break.<br>1172:10       The attorneys for the plaintiff have<br>1172:11    said, in effect, that Merck put profits ahead of<br>1172:12    patient safety.  What do you have to say about that?<br>1172:13    A.    I absolutely do not believe that that<br>1172:14    is true.  Merck puts patient safety first.  I've<br>1172:15    worked at Merck for 30 more and more years, and I<br>1172:16    have seen Merck consistently put patient safety<br>1172:17    first.  I've seen Merck bring to market wonderful<br>1172:18    products, but always be very concerned, not only<br>1172:19    about the benefits, but about really understanding<br>1172:20    the risks associated with that and being very clear<br>1172:21    to identify them and to communicate them to the<br>1172:22    physicians who prescribe our products. | | |
| da041205 - Vol. I, (Page 1173:12 to 1173:13)<br>                 1173<br>12    Q.    Did you ever take Vioxx?<br>13    A.    Yes, I have taken Vioxx. | [401, 402, 403] subject to MIL re Merck employee's use of Vioxx | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da041205 - Vol. I, (Pages 1173:20 to 1174:9)<br>1173<br>20    Q.    Can you please explain for us how<br>21  you've taken Vioxx over the years?<br>22      A.    Yes.  I have taken it pretty much<br>23  since it came to market, intermittently, relatively<br>24  short durations over several days, not for any<br>25  arthritic condition, but, rather, for stiffness,<br>1174<br>1  soreness associated with exercise, and I have<br>2  continued to take it.  I have a few remaining<br>3  prescriptions.  I obviously have not filled any<br>4  since September of last year, but I still have a few<br>5  Vioxx tablets.<br>6      Q.    Have any of your family members taken<br>7  Vioxx?<br>8      A.    Yes.  My mother took Vioxx on a<br>9  chronic basis up until the day it was removed. | [401, 402, 403]<br>subject to MIL re<br>Merck employee's<br>use of Vioxx | Sustained |
| da041205 - Vol. I, (Pages 1174:19 to 1175:3)<br>1174<br>19  THE WITNESS:  Yes.  My mother took<br>20  Vioxx for several years, up until the time it was<br>21  withdrawn from the market.<br>22  BY MR. RABER:<br>23      Q.    What was the reason she took it?<br>24      A.    She's 84 years old.  She has a number<br>25  of arthritic disorders.  She has a very bad spine<br>1175<br>1  and back.  She's recently had a hip replacement and<br>2  a knee replacement.  And she suffers significantly<br>3  from arthritis. | [401, 402, 403]<br>subject to MIL re<br>Merck employee's<br>use of Vioxx | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da041205 - Vol. I, (Pages 1175:23 to 1176:18)<br>1175<br>23    Q.    Mr. Anstice, what I'd like to do now<br>24  is follow up on some questions that were asked of<br>25  you during the first three days of your deposition<br>1176<br>1  on March 16th, 17th and 18th.<br>2       On the second day of your deposition<br>3  on Page 633, lines 2 through 4, you were asked the<br>4  following question, and you gave the following<br>5  answer:<br>6       "Question:  You understand before<br>7  you sell a drug you ought to check to see if it's<br>8  safe.  True?<br>9       "Answer:  Yes."<br>10      Do you recall that question being<br>11  asked and you giving that answer?<br>12    A.    Yes, I do.<br>13    Q.    Did Merck check to see if Vioxx was<br>14  safe before it sold the drug in the United States?<br>15    A.    Yes, Merck did extensive work with<br>16  regard to defining the efficacy.  That extensive<br>17  work related to identifying all safety aspects<br>18  related to the drug. | | |
| **5/20/05 DEPOSITION** | | |
| da052005 - Vol. I, (Pages 1472:23 to 1473:15)<br>1472<br>23    Q.    Well, but from March of 2000 through<br>24  April of 2002, none of the training materials taught<br>25  your people to discuss VIGOR or the data from VIGOR<br>1473<br>1  with prescribing physicians; correct?<br>2    A.    We did not ask our rep -- we asked<br>3  our representatives specifically to not initiate<br>4  discussions.<br>5    Q.    Now, and if they were asked a<br>6  question about VIGOR, what were they told to say?<br>7    A.    If they were asked a question about<br>8  VIGOR, immediately after the VIGOR results became<br>9  public, they were able to provide a physician's<br>10  information request letter, which provided a<br>11  response to the VIGOR study and then as they are<br>12  permitted for all of our products, if they had a -<br>13  had a further sets of questions, then that response<br>14  came through to our medical group, which in turn<br>15  could respond to the physician with a letter. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1473:17-1473:23<br><br>1473:17       So, let me just be clear on what your<br>1473:18  testimony is.<br>1473:19       I'm asking you about the sales reps<br>1473:20  right now.<br>1473:21     A.   Yes.<br>1473:22     Q.   Sales reps were not allowed to engage<br>1473:23  the doctors on VIGOR, you said; correct? | | |
| 1473:25-1474:2<br><br>1473:25       THE WITNESS:  What I said was our<br><br>1474<br>1474: 1  representatives were asked to not initiate<br>1474: 2  discussions on VIGOR.  That's what I said. | | |
| da052005 - Vol. I, (Page 1478:11 to 1478:15)<br>               1478<br>11      Look, my question is this:  You're<br>12  aware that Merck used in connection with training<br>13  its sales representatives something called a<br>14  cardiovascular card; correct?<br>15     A.   Yes. | 401; 402; *See* MIL #3 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Pages 1498:8 to 1499:21)<br><br>1498<br>8     Now, I would like to also mark or<br>9  show you what I've just marked as 165.<br>10     - - -<br>11     (Whereupon, Deposition Exhibit<br>12     Anstice-165, "Bulletin for Vioxx: New<br>13     Resource: Cardiovascular Card,"<br>14     MRK-AAR0007383 - MRK-AAR0007388, was<br>15     marked for identification.)<br>16     - - -<br>17  BY MR. SEEGER:<br>18    Q.    For the record, it is Bates stamped<br>19  MRK-AAR0007383 through 388.<br>20     This is another one of those<br>21  bulletins that you're talking about; right?<br>22    A.    Yes, that's right.<br>23    Q.    And this is dated April 28th; 2000;<br>24  correct?<br>25    A.    Correct.<br>1499<br>1    Q.    Now, if you go to where it says<br>2  "Background."  Well, first of all, the "to."  "All<br>3  field personnel with responsibility for Vioxx,"<br>4  that's all the sales reps selling the drug; right?<br>5    A.    Yes.  That's all the people involved<br>6  in selling Vioxx, that's correct.<br>7    Q.    Okay.<br>8     Below that there's a paragraph, and<br>9  in the middle of the paragraph there is bold<br>10  language.  I would just like to read it so we can<br>11  move through this.  "The Cardiovascular Card is an<br>12  obstacle handling piece and should only be used with<br>13  physicians in response to their questions regarding<br>14  the cardiovascular effects of VIOXX."  Correct?  Is<br>15  that correct?<br>16    A.    That's what it says.<br>17    Q.    Is it correct?<br>18    A.    It's read -- you read it correctly,<br>19  yes.<br>20    Q.    But is that correct, what I read?<br>21    A.    Well, I think -- | 401; 402;<br>foundation; calls<br>for speculation, see<br>MIL #3 | *Overruled* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Pages 1499:24 to 1500:16)<br><br>1499<br>24    Q.    Not that I read it correctly.  Now<br>25    I'm asking, is that correct?<br><br>1500<br>1     A.    But I think there's a -- there's a<br>2    broader context of instructions to representatives<br>3    that needs to be --<br>4     Q.    Where is that in here?<br>5     A.    If you go to the third page.<br>6     Q.    I'm there.<br>7     A.    The CV -- I'm going to read the first<br>8    two sentences underneath the black diagram.  "The CV<br>9    card will assist you with addressing your HI COXIB<br>10   or HI NSAID physician's questions about the<br>11   cardiovascular effects of VIOXX.  Use this resource<br>12   as an obstacle handling tool only, when your<br>13   physicians ask you about the cardiovascular effects<br>14   of VIOXX or express concern regarding the<br>15   cardiovascular effects of VIOXX based on the VIOXX<br>16   GI Outcomes Research trial." | 401; 402;<br>foundation; calls<br>for speculation, see<br>MIL #3 | _Overruled_ |
| da052005 - Vol. I, (Page 1502:1 to 1502:18)<br><br>1502<br>1     A.    And this is the bulletin that<br>2    accompanies the cardiovascular card that we've<br>3    talked about a moment ago.<br>4     Q.    Gotcha.<br>5     A.    There is also a preceding bulletin<br>6    after February 9th before April 28th which was in<br>7    existence which related to how the reps were<br>8    instructed around VIGOR.  So, this was specifically<br>9    designed for discussions beyond the VIGOR results to<br>10   deal with, as this says, "when your physicians ask<br>11   you about the cardiovascular effects of VIOXX or<br>12   express concern regarding the cardiovascular effects<br>13   based on" not about, but based on the VIGOR<br>14   findings.<br>15    Q.    I understand.<br>16          Mr. Anstice, will you now turn to the<br>17   CV card, please?<br>18    A.    Yes. | 401; 402; see MIL<br>#3 | |
| da052005 - Vol. I, (Page 1503:5 to 1503:7)<br><br>1503<br>5     Q.    Now, you're aware at this time that<br>6    the FDA had serious concerns about this data;<br>7    correct? | 401; 402;<br>foundation; calls<br>for speculation;<br>mischaracterizes<br>the record; see<br>MIL #3 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Pages 1503:9 to 1504:6)<br>1503<br>9   THE WITNESS:  About which data?<br>10   BY MR. SEEGER:<br>11        Q.      The OA data that's reflected in the<br>12   CV card.<br>13        A.      No, I am not aware of that.<br>14        Q.      Okay.<br>15              Well, why don't we go ahead and take<br>16   another look back at that FDA briefing document<br>17   which I marked earlier.  We'll do this as quickly as<br>18   we can. It's right there on top.<br>19        A.      Which is dated February 8, 2001?<br>20        Q.      Exactly.<br>21        A.      Because we're talking about a time<br>22   period here which is April/May 2000.<br>23        Q.      Are you testifying now that this card<br>24   was not in effect in February of 2001?<br>25        A.      No, no, I'm not.  I'm simply saying<br>1504<br>1   that this -- the discussion we were having about the<br>2   card related to its introduction.<br>3        Q.      No, put the bulletins aside.  Now<br>4   we're talking about a card that was in use from<br>5   April of 2000 to April of 2002.  Okay.<br>6              In February -- | 401; 402;<br>foundation; calls<br>for speculation;<br>mischaracterizes<br>the record; see<br>MIL #3 | |
| da052005 - Vol. I, (Page 1504:18 to 1504:20)<br>1504<br>18        Q.      In February of 2001, the FDA did an<br>19   analysis or, I'm sorry, your attorney doesn't like<br>20   that. | Colloquy | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Pages 1504:21 to 1505:11)<br>1504<br>21  The FDA medical reviewer took a look<br>22  at the original data from Merck's NDA, which is, you<br>23  would agree, is this OA, this osteoarthritis trial<br>24  data; correct?<br>25  A.  Yes.<br>1505<br>1  Q.  I'll find it for you in one second.<br>2  If you'd turn to Page 19.  Do you see where it talks<br>3  about "Study 058" at the top?<br>4  A.  Yes.<br>5  Q.  Okay.<br>6  And then in italics it says, "Because<br>7  of the small size and short duration, this study is<br>8  inadequate to detect differences in clinically<br>9  relevant adverse events between rofecoxib," which is<br>10  Vioxx, "and nabumetone."  Did I read that correctly?<br>11  A.  Yes, you did. | Foundation; lack of personal knowledge; witness was in Marketing, not Research or Regulatory – see 1637:1-25 | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Pages 1507:4 to 1508:13)<br>1507<br>4    Q.    I have just a couple of quick<br>5  questions.<br>6          The medical reviewer in this document<br>7  made that comment about that trial.  Has the fact<br>8  that this medical reviewer found that this<br>9  particular trial, the 058 trial, was inadequate to<br>10  detect relevant, clinically relevant adverse events<br>11  between Vioxx and the drugs it was compared to, did<br>12  that make its way into any of your sales materials?<br>13    A.    I don't know.  I just point out a<br>14  reference to study 058, and I do not know how many<br>15  patients were in study 058 is different from the<br>16  data presented here, which is across nine double<br>17  blind studies, 6,000 OA patients, and so it is a<br>18  very different data set.<br>19    Q.    How about study 069, do you know<br>20  anything about that?<br>21    A.    No.<br>22    Q.    Well, do you know that was a pooled<br>23  analysis of many different trials that were done and<br>24  provided to the FDA?  Does that refresh your<br>25  recollection?<br>1508<br>1    A.    I don't remember the details of it.<br>2  I've heard the number certainly.<br>3    Q.    Were you aware in February of 2001 of<br>4  this comment made by the medical reviewer where it<br>5  says, "The Division," and in this instance she's not<br>6  talking about her, she says, "The Division has<br>7  serious concerns with the combined analysis of<br>8  studies of different length and dosing regimens."<br>9  And it says, "Furthermore, combining multiple<br>10  different drugs within a single comparator arm may<br>11  not be reflective of the risk of any one drug."  Did<br>12  that material get disclosed to your sales<br>13  representatives who were selling the drug? | Foundation; lack of personal knowledge; witness was in Marketing, not Research or Regulatory – see 1637:1-25 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Pages 1508:15 to 1509:6)<br>1508<br>15    THE WITNESS:  I don't know the answer<br>16  to that.  It would not be usual for us to present<br>17  comments from FDA reviewers or divisions in our<br>18  material to representatives.  We would give our<br>19  representatives material that Merck believed to be<br>20  accurate and balanced and consistent without our<br>21  total knowledge of the product.  That's what we gave<br>22  our representatives.<br>23  BY MR. SEEGER:<br>24    Q.    And you didn't provide them with<br>25  concerns or discussions going on within the FDA<br>1509<br>1  about --<br>2    A.    We provided them with what we thought<br>3  were appropriate --<br>4    Q.    Okay.<br>5    A.    -- sets of information related to the<br>6  data that we gave them. | Foundation | |
| da052005 - Vol. I, (Page 1509:8 to 1509:13)<br>1509<br>8    Now, Mr. Anstice, let me just ask you<br>9  to take a look at what I've marked as 166.  For the<br>10  record, it's Bates stamped MRK-ACW0008375.  Do you<br>11  recognize this chart?  I'll represent to you that it<br>12  is a table from -- reflecting the mortality data<br>13  from VIGOR.  If you read above, you'll see. | Foundation | |
| da052005 - Vol. I, (Page 1509:15 to 1509:24)<br>1509<br>15  THE WITNESS:  I see that it is<br>16  represented as data from VIGOR.  I don't know the<br>17  source of the table, the broader context.<br>18  BY MR. SEEGER:<br>19    Q.    Now, you know this data was available<br>20  to Merck in March of 2000.  We've said that many<br>21  times today; correct?<br>22    A.    Yes, and quickly made available to<br>23  the regulatory authorities as well.<br>24    Q.    Absolutely. | Foundation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Pages 1509:25 to 1510:5)<br>1509<br>25        But it never made its way into the CV<br>1510<br>1  card, did it, the data that we're looking at?<br>2    A.    The purpose of the CV card was not to<br>3  discuss the VIGOR study, but to discuss the total<br>4  results from the OA studies.  That was the purpose<br>5  of the CV card. | 401; 402; see MIL #3 | overruled |
| da052005 - Vol. I, (Page 1510:6 to 1510:13)<br>1510<br>6  Q.    But let me just back up for a second.<br>7        Did you ever go to the FDA at any<br>8  point in time and say, we'd like to incorporate the<br>9  VIGOR mortality data in our training materials?<br>10    A.    I don't know.<br>11    Q.    Would there have been anything that<br>12  would have prevented you from doing that?<br>13    A.    I don't know. | Foundation; lack of personal knowledge; witness was in Marketing, not Regulatory – see 1637:1-25 | |
| da052005 - Vol. I, (Pages 1510:14 to 1511:12)<br>1510<br>14  Q.    So, doctors who were prescribing the<br>15  drug, let's say, in September of 2001, while this<br>16  was in use, if the only information they received<br>17  was from the sales rep and they didn't ask for a<br>18  pamphlet, would not have received the VIGOR data,<br>19  the mortality data from VIGOR from your sales<br>20  representatives; correct?<br>21    A.    Well, it's a -- sorry, could you just<br>22  restate the question?<br>23    Q.    Doctors prescribing -- excuse me one<br>24  second.<br>25        Doctors prescribing this drug --<br>1511<br>1    A.    Right.<br>2    Q.    -- let's say in September of 2001.<br>3    A.    Right.  September of 2001.<br>4    Q.    September of 2001.<br>5    A.    Right.<br>6    Q.    Where this card was in use.<br>7    A.    Right.<br>8    Q.    And they didn't receive any other<br>9  information from the company, they just had<br>10  discussions with the sales rep, would not have been<br>11  advised about the mortality data from VIGOR;<br>12  correct? | 401; 402 – Vioxx not considered for PDL until after VIGOR label; calls for speculation; See MIL #3 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Page 1511:14 to 1511:21)<br>1511<br>14      THE WITNESS:  In the hypothetical<br>15  situation where that particular physician had no<br>16  contact with the many other diverse ways in which<br>17  the information about VIGOR was being dispersed in<br>18  the medical community, they would not have had VIGOR<br>19  data from a Merck rep other than through a physician<br>20  information request.  But if they had wanted it, it<br>21  would have been available through that vehicle. | 401; 402 – Vioxx not considered for PDL until after VIGOR label; calls for speculation; See MIL #3 | *overruled* |
| da052005 - Vol. I, (Pages 1511:23 to 1512:3)<br>1511<br>23  Q.   And is there anything that you're<br>24  aware of, any rule or regulation that would have<br>25  prevented you from going to the FDA and saying we<br>1512<br>1  would like to include the VIGOR data in our sales<br>2  training material?<br>3     A.   I don't know of any such rule. | Foundation; calls for speculation | |
| da052005 - Vol. I, (Page 1512:4 to 1512:7)<br>1512<br>4  Q.   So, the doctors would not have gotten<br>5  the VIGOR material from your sales representative,<br>6  they would have had to get it from somewhere else;<br>7  correct? | 401; 402; lack of personal knowledge | |
| da052005 - Vol. I, (Page 1512:9 to 1512:17)<br>1512<br>9  THE WITNESS: No, that's not what I<br>10  said.  A doctor could ask for the VIGOR data from<br>11  our sales representative and get it through a PIR.<br>12  So, they did have access through our<br>13  representatives.  They also had access through other<br>14  forms.<br>15  BY MR. SEEGER:<br>16     Q.   And the Alzheimer's data as well, you<br>17  know that was unblinded in April of 2001; correct? | 401; 402; lack of personal knowledge | |
| da052005 - Vol. I, (Page 1512:19 to 1512:21)<br>1512<br>19  THE WITNESS:  I don't recall the<br>20  month.  I know it was unblinded very quickly after<br>21  the VIGOR results. | 401; 402; lack of personal knowledge | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Page 1513:12 to 1513:22)<br><br>          1513<br>12  Q.    You are also aware from the<br>13  Alzheimer's data, aren't you, that there were more<br>14  people -- that mortality was higher in people taking<br>15  Vioxx versus people taking placebo?  Are you aware<br>16  of that?<br>17      A.    I don't recall the numbers.<br>18      Q.    Do you recall if at any point in time<br>19  the Alzheimer's mortality data was included in the<br>20  CV card?<br>21      A.    I don't know if it was subsequently<br>22  added. | Foundation; lack of personal knowledge | *Overruled* |
| da052005 - Vol. I, (Page 1597:11 to 1597:23)<br><br>          1597<br>11      Q.    Well, we looked at the CV card<br>12  before, and I think we both agreed or you agreed<br>13  that it did not contain any information about the<br>14  VIGOR trial at least prior to April of 2002;<br>15  correct?<br>16      A.    Yes.  And I also stated that it was<br>17  for a reason.  Its purpose was to provide<br>18  information on the existing cardiovascular data, and<br>19  it did not, therefore, include VIGOR, as I believe<br>20  it didn't include the Alzheimer's data either.<br>21      Q.    But there was nothing preventing you<br>22  from adding the VIGOR trials to your training<br>23  materials; correct? | 401; 402 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Pages 1597:25 to 1599:3)<br>1597<br>25      THE WITNESS: Well, training<br>1598<br>1   materials is a separate thing from a brochure going<br>2   to a doctor.<br>3   BY MR. SEEGER:<br>4     Q.    I'm talking about the materials used<br>5   to train sales reps.<br>6     A.    All right.<br>7     Q.    There was nothing that prevented<br>8   Merck from training their sales reps to answer<br>9   questions about VIGOR?<br>10     A.    Yes, there was. Because we had --<br>11   first of all, we had an instruction to them to not<br>12   initiate discussions.<br>13     Q.    I understand.<br>14     A.    We also have a standard practice<br>15   still in place today, I believe, although I'm no<br>16   longer responsible for the U.S. business, of<br>17   longstanding, which is our representatives are asked<br>18   not to discuss information relating to our drugs<br>19   that's outside the label or inconsistent with the<br>20   current label.<br>21     Q.    Well, based upon --<br>22     A.    That is our practice at Merck.<br>23     Q.    Based upon this new important data<br>24   that came to light in March of 2000, did you go to<br>25   the FDA and ask the FDA for permission to begin to<br>1599<br>1   train your sales reps on that data?<br>2     A.    No, but that's consistent with --<br>3   that's not our practice or approach. | 401; 402 | Overrule |
| da052005 - Vol. I, (Page 1599:4 to 1599:6)<br>1599<br>4     Q.    But nothing would have prevented you<br>5   from going to the FDA and seeking that approval;<br>6   correct? | Calls for speculation; 401; 402 | |
| da052005 - Vol. I, (Page 1599:8 to 1599:8)<br>1599<br>8      THE WITNESS: I don't know. | Calls for speculation; 401; 402 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Page 1599:10 to 1599:17)<br>1599<br>10   Q.   There's nothing in that card, that<br>11   card that we discussed, the CV card, it doesn't<br>12   contain any information about the ADVANTAGE trial,<br>13   the date of which also became available in March of<br>14   2000; correct?<br>15     A.   I don't know the answer.  It deals<br>16   with OA studies.  ADVANTAGE was an OA study.  I<br>17   don't know if those data were included in the card. | Calls for speculation; 401; 402 | Overruled |
| da052005 - Vol. I, (Page 1599:18 to 1599:20)<br>1599<br>18   Q.   The OA studies that you discussed in<br>19   the CV card represented studies involving about<br>20   3,500 clinical trial patients; correct? | 401; 402 | |
| da052005 - Vol. I, (Page 1599:22 to 1599:24)<br>1599<br>22       THE WITNESS:  For Vioxx, I think<br>23   6,000 patients in all, about 3,500 on Vioxx, that's<br>24   correct. | 401; 402 | |
| da052005 - Vol. I, (Page 1600:9 to 1600:14)<br>1600<br>9   Q.   So, between VIGOR and ADVANTAGE,<br>10   really they were much, much larger when you combine<br>11   those two studies than the OA studies that you used<br>12   in the CV card; correct?<br>13     A.   Well, certainly VIGOR was more than<br>14   the OA patients in the card, yes. | 401; 402 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| da052005 - Vol. I, (Page 1637:1 to 1637:25)<br>1637<br>1 Q.   Mr. Anstice, I want to follow up on a<br>2 few questions from this morning.  You were asked<br>3 some questions by Mr. Seeger about the labeling<br>4 discussions that occurred between Merck and the FDA<br>5 after the results of the VIGOR study.  Do you recall<br>6 those questions?<br>7    A.   Yes, I do.<br>8    Q.    Did you have any personal -- strike<br>9 that.<br>10         Did you personally participate in any<br>11 way in the discussions with the FDA over the label<br>12 changes after VIGOR?<br>13         MR. WEISS:  Objection.<br>14         THE WITNESS:  No, I did not.<br>15 BY MR. RABER:<br>16    Q.    Is there a unit within Merck that did<br>17 participate in those discussions?<br>18    A.    Yes.<br>19    Q.    What's that unit called?<br>20    A.    Those discussions are conducted by<br>21 our regulatory affairs group, which is a part of<br>22 Merck Research Laboratories.<br>23    Q.    Did the regulatory affairs group<br>24 report to you?<br>25    A.    No, it does not.  It did not. | | |