| | Objections | Rulings |
|---|---|---|

**469:8  -  469:9  Nies, Alan 2005-04-01**

469   8     THE WITNESS:  More than 28,000

469   9     patients, it says.

**469:11  -  470:5  Nies, Alan 2005-04-01**

469  11     Q: Dr. Nies, have you ever heard the

469  12     term 'peer-reviewed journal'?

469  13     A:  Yes.

469  14     Q:  What does that mean?

469  15     A:  It means that articles that are

469  16     published in the journal, before they're published,

469  17     the manuscripts are sent out to external referees,

469  18     often experts in the field of the general field of

469  19     the article, and these referees review the article

469  20     and determine in their opinion whether it needs to

469  21     be -- it should be published, and if so, should it

469  22     be changed in some way before it's published.

469  23     Q:  Was this exhibit that we're looking

469  24     at here, Exhibit 1014, published in a peer-reviewed

469  25     journal?

470   1     A:  Yes. Circulation is the premier

470   2     cardiovascular journal.

470   3     Q:  Dr. Nies, would you please read the

470   4     conclusions that were reached based on the analysis

470   5     of this data?

*Re: [469:11-470:5]*
*Pltf Obj 470:3-5*
Hearsay

**470:7  -  470:14  Nies, Alan 2005-04-01**

470   7     THE WITNESS:  'This analysis provides

470   8     no evidence for an excess of CV events,'

470   9     cardiovascular events, 'for rofecoxib,' which is

470  10     Vioxx, 'relative to either placebo or the

470  11     non-naproxen NSAIDs that were studied. Differences

470  12     observed between rofecoxib and naproxen are likely

470  13     the result of the antiplatelet effects of the latter

470  14     agent.'

*Re: [470:7-470:14]*
*Pltf Obj* Hearsay

**470:16  -  471:11  Nies, Alan 2005-04-01**

470  16     Q:  Dr. Nies, you mentioned that this

470  17     exhibit was a combination of a number of studies

470  18     that had been done. Let me ask you this question:

470  19     Did Merck ever do one large single

470  20     study to show that Vioxx does not cause heart

470  21     attacks and strokes?

470  22     A:  No, we did not.

470  23     Q:  Did Merck try to design such a study?

470  24     A:  We had lots of discussions amongst

470  25     ourselves, and we had outside experts in and we had

471   1     several meetings, too, to talk about what might be

471   2     done to address that issue.

*Re: [470:16-471:11]*
*Pltf Obj* 471:14-472:3
No personal
knowledge, Hearsay

| | Objections | Rulings |
|---|---|---|

471  3      Q:  What type of a study would that be
471  4      called?
471  5      A:  A cardiovascular outcomes trial, I
471  6      guess.
471  7      Q:  Did Merck do a cardiovascular
471  8      outcomes trial, as you've described it there?
471  9      A:  We never did a single large study.
471  10     Q:  Why not?
471  11     A:  Well --

471:14 -    474:12 Nies, Alan 2005-04-01
471  14     THE WITNESS:  During this time
471  15     period, we had already started some studies that
471  16     were ongoing comparing Vioxx with placebo in
471  17     patients with colon polyps, and we had planned to do
471  18     studies also in some patients who had had colon
471  19     cancer and prostate cancer. And we felt that since
471  20     the real question can only be answered when
471  21     comparing with a placebo, that this would be an
471  22     actually more time efficient way than trying to
471  23     design a new cardiovascular outcomes trial to get
471  24     the data. So, we would combine -- what we would do
471  25     is take those trials, using our standard operating
472  1      procedure, and have a protocol that allowed the
472  2      combination of those trials into something that you
472  3      could call a cardiovascular outcomes trial.
472  4      BY MR. RABER:   :
472  5      Q:  About how many patients did you
472  6      expect to be studied in that combined protocol
472  7      you've just described?
472  8      A:  About 25,000 patients.
472  9      Q:  Can you tell us what a protocol is?
472  10     A:  A protocol is a plan for the study
472  11     that basically outlines what you're going to do in
472  12     the study, what are the endpoints.
472  13     Q:  Did Merck create a protocol to
472  14     combine the three cancer studies?
472  15     A:  Yes.
472  16     Q:  Was that protocol shared with the
472  17     FDA?
472  18     A:  Yes.
472  19     Q:  Did that protocol make sense to you?
472  20     A:  Yes.
472  21     Q:  Why?
472  22     A:  Well, this would give real clinical
472  23     data compared with placebo on Vioxx that would be in
472  24     patients who, although not having arthritis, would
472  25     be similar to the population of patients with
473  1      arthritis in terms of age range, et cetera.

04/07/10 20:08

**Objections**                    **Rulings**

473  2      Q: Were there any other benefits to
473  3      pooling existing studies with planned studies?
473  4      A: One gets -- well, we had already
473  5      started the one study. So, it was timing benefits,
473  6      that we'd be getting -- it would be kind of a
473  7      rolling thing. We'd get the data from each study,
473  8      and then we'd combine it as they occurred to
473  9      increase our power. So, we already had one study
473 10      ongoing.
473 11      Q: Did you feel like you would get data
473 12      sooner or later if you combined trials versus
473 13      starting a new large trial?
473 14      A: We thought we could get data more
473 15      efficiently and sooner with the -- combining the
473 16      trials.
473 17      Q: Let's go back to the attempts to
473 18      design one large CV outcomes trial. Were there any
473 19      problems you encountered in doing that?
473 20      A: Well, there were a number of
473 21      suggestions we got, and one of the ones that was
473 22      more popular for some people was to take individuals
473 23      who had unstable coronary disease, that is, they
473 24      were what's called in the jargon acute coronary
473 25      syndromes. These are people who are sort of on the
474  1      verge of a heart attack or have bad coronary
474  2      disease. The idea was this would be maybe a quicker
474  3      way to get an answer, because you could give Vioxx
474  4      to one group and nothing to another group, and you
474  5      could just count the problems that occurred during
474  6      this trial.
474  7      Q: Did Merck pursue that type of a
474  8      study?
474  9      A: Well, we didn't do it, but we did
474 10      talk about it a lot, and we talked about it with our
474 11      consultants.
474 12      Q: Why didn't you do it?

474:15 -    475:6   Nies, Alan 2005-04-01
474 15      THE WITNESS: Well, I thought, along
474 16      with others, that the problems were so great that
474 17      they would not allow us to either draw conclusions,
474 18      and it might actually be ethically not correct to do
474 19      such a study.
474 20      BY MR. RABER:   :
474 21      Q: Why not?
474 22      A: Well, we knew that the NSAIDs, the
474 23      nonsteroidal -- and we had shown with Vioxx that it
474 24      caused salt and water retention. And we also knew
474 25      from our clinical studies with the NSAIDs and with

| | | Objections | Rulings |
|---|---|---|---|

475 1    Vioxx that the drugs cause some increase in blood
475 2    pressure. Both of these things would be highly
475 3    disadvantageous, really not good for people with
475 4    acute coronary syndromes, and so we didn't think
475 5    that it made sense from that point of view.
475 6    We also --

475:24 -    476:19 Nies, Alan 2005-04-01
475 24    Q: Do you want to finish?
475 25    A: Yes, sure.
476 1    The other problem that we saw with
476 2    those studies is that these people with acute
476 3    coronary syndromes are all on anti-platelet
476 4    therapies. They're on aspirin and/or other
476 5    anti-platelet therapies. And so if there was no
476 6    difference in the two groups, people could say,
476 7    well, you know, you wouldn't expect anything because
476 8    everybody was on aspirin. And so, we didn't think
476 9    that it really addressed -- if the hypothesis is
476 10    really based on the fact that there's unopposed
476 11    thromboxane, these people don't have unopposed
476 12    thromboxane because they're already on aspirin. So,
476 13    it really wouldn't address even the hypothesis. So,
476 14    we thought there were ethical issues, as well as
476 15    completely confounding issues in terms of
476 16    interpretation.
476 17    Q: Dr. Nies, why didn't Merck just do a
476 18    big study with arthritis patients and compare Vioxx
476 19    against placebo?

476:24 -    477:6 Nies, Alan 2005-04-01
476 24    THE WITNESS: Arthritis patients have
476 25    pain. And any such study to look at cardiovascular
477 1    outcomes would have to be a long-term study, because
477 2    the events don't occur all that frequently, and so
477 3    one would have to have patients who are having pain
477 4    on placebo for a long period of time, and that is
477 5    not felt by anyone to be an ethical-type thing to
477 6    do.

482:12 -    484:13 Nies, Alan 2005-04-01
482 12    Q: What did Merck do to find out the
482 13    answer to whether the difference in CV rates in
482 14    VIGOR was mechanism based?
482 15    A: Well, from VIGOR itself, you can't
482 16    tell, because there's only naproxen and the Vioxx
482 17    arm, and you can't tell whether the mechanism for
482 18    the difference is related to naproxen's mechanism or
482 19    whether Vioxx was having an adverse effect. And so

04/07/10 20:08

| | Objections | Rulings |
|---|---|---|

482 20  we went to other studies that were ongoing which
482 21  included the placebo-controlled studies in
482 22  Alzheimer's disease and in pre-Alzheimer's disease
482 23  where we had a fair amount of data over the period
482 24  of time of the nine months that the VIGOR trial had
482 25  been done so we could compare the same time frame.
483  1  And comparing Vioxx with placebo in those studies,
483  2  we did not see any evidence that Vioxx caused heart
483  3  attacks or strokes.
483  4  Q:  Was the rate of heart attacks and
483  5  strokes, when you compared Vioxx to placebo,
483  6  different?
483  7  A:  They were statistically the same. In
483  8  fact, they were slightly less in the Vioxx arm.
483  9  Q:  I'm sorry. What else, then, other
483 10  than looking at the Alzheimer's data, did you do --
483 11  A:  Well, we went --
483 12  Q:  -- to answer this question?
483 13  A:  We went back again and looked at all
483 14  of our accumulated data in other studies against
483 15  other nonsteroidal anti-inflammatory drugs, and,
483 16  again, we did not see any increase in the Vioxx
483 17  group versus the nonsteroidal anti-inflammatory
483 18  drug.
483 19  Q:  When you say you 'did not see any
483 20  increase,' do you mean there was no difference or
483 21  something else?
483 22  A:  No. I mean that there was no
483 23  difference.
483 24  Q:  Other than looking at the placebo
483 25  data against Alzheimer's, looking at the existing
484  1  data you had against other NSAIDs, what else did
484  2  Merck do to answer the question of whether the rates
484  3  in VIGOR were mechanism based?
484  4  A:  We looked at the pharmacologic
484  5  effects of the drugs on platelets, and naproxen --
484  6  of course, Vioxx had no effect on the platelets, as
484  7  we predicted. But naproxen -- we had already done
484  8  these studies actually, but we looked at the data.
484  9  Naproxen inhibited platelet activity by greater than
484 10  90 percent and reduced thromboxane production by
484 11  that amount. And it was equivalent to -- when given
484 12  in the doses in VIGOR, 500 milligrams twice a day,
484 13  it was equivalent to what aspirin would produce.

485:8  -  485:18 Nies, Alan 2005-04-01
485  8  Q:  After reviewing all the data that you
485  9  just described, what was your feeling about the idea
485 10  that any difference in CV events from VIGOR was a

**Re: [485:8-485:18]**
**Pltf Obj** 485:16-18
Hearsay

*Overruled*

04/07/10 20:08

|  | Objections | Rulings |
|---|---|---|

485  11    mechanism-based effect of Vioxx?

485  12    A:  My feeling was that the weight of the

485  13    evidence was that naproxen was protective and that

485  14    Vioxx did not cause an increase in cardiovascular

485  15    risk.

485  16    Q:  Did anyone else at Merck tell you

485  17    that they felt the same way as you did after

485  18    reviewing the data?

485:21 -   485:23 Nies, Alan 2005-04-01

485  21    THE WITNESS:  Yes, yes.                    Re: [485:21-485:23]

485  22    BY MR. RABER:   :                          Pltf Obj Hearsay

485  23    Q:  Who was that?

486:1  -   487:12 Nies, Alan 2005-04-01

486   1    THE WITNESS:  Well, Dr. Scolnick is        Re: [486:1-487:12]

486   2    one of those.                              Pltf Obj 486:1-2

486   3    BY MR. RABER:   :                          Hearsay

486   4    Q:  I'd like to show you a document that

486   5    has been like as Exhibit Nies 1015.

486   6    - - -

486   7    (Whereupon, Deposition Exhibit

486   8    Nies-1015, E-mails, MRK-ACT0009918, was

486   9    marked for identification.)

486  10    - - -

486  11    BY MR. RABER:   :

486  12    Q:  Dr. Nies, can you identify this

486  13    exhibit, please?

486  14    A:  This is an e-mail from Edward

486  15    Scolnick to myself, Alise Reicin and Harry Guess in

486  16    February 4th of 2001.

486  17    Q:  What were the general circumstances

486  18    of Dr. Scolnick sending this e-mail to you at that

486  19    time?

486  20    A:  This was just prior to the Advisory

486  21    Committee for VIGOR.

486  22    Q:  Did you receive this e-mail?

486  23    A:  Yes.

486  24    Q:  Dr. Nies, I'm looking at Scolnick's

486  25    e-mail to you. About halfway in the body of it, it

487   1    says, 'We all worried to death about the CV events

487   2    last Spring. Merck is of course always an issue.

487   3    But I was sick at the thought we might be doing harm

487   4    to patients. I KNOW each of you well enough to know

487   5    you felt the same way. With all the data now

487   6    available I am no longer worried.' Do you see that?

487   7    A:  Yes.

487   8    Q:  Did you agree with Dr. Scolnick's

487   9    sentiment at that time in February of 2001?

| | Objections | Rulings |
|---|---|---|

487 10     A: Yes.

487 11     Q: Dr. Nies, are you familiar with Dr.

487 12     Scolnick's views about patient safety?

**487:15 -   487:20 Nies, Alan 2005-04-01**

487 15     THE WITNESS:  Patient safety is

487 16     really utmost in his mind all the time.

487 17     BY MR. RABER:   :

487 18     Q: Will you please describe for us Dr.

487 19     Scolnick's views about patient safety based on your

487 20     experiences with him?

*Objections:* **Re: [487:15-487:20]** **Pltf Obj** 487:11-12 Hearsay; 487:15-16

*Rulings:* Sustained

**487:23 -   488:4 Nies, Alan 2005-04-01**

487 23     THE WITNESS:  Dr. Scolnick wants to

487 24     hear about everything that has to do with patient

487 25     safety in our studies and would get very upset if

488 1     anything was withheld from him.

488 2     BY MR. RABER:   :

488 3     Q: How did Dr. Scolnick's views about

488 4     patient safety affect the way he did things?

*Objections:* **Re: [487:23-488:4]** **Pltf Obj** Hearsay

*Rulings:* Sustained

**488:11 -   488:14 Nies, Alan 2005-04-01**

488 11     A: Well, he made it very clear that he

488 12     wanted -- any time anyone had an issue relating to

488 13     safety, that he wanted to hear about it. And he

488 14     said that many times.

*Objections:* **Re: [488:11-488:14]** **Pltf Obj** Hearsay

*Rulings:* Sustained

**488:15 -   489:16 Nies, Alan 2005-04-01**

488 15     Q: Dr. Nies, on the first day of your

488 16     deposition on March 2nd, 2005, on Page 243 you were

488 17     asked the following question about Dr. Scolnick, and

488 18     you gave the following answer:

488 19     Question: Is he somebody you trust?

488 20     Answer: He's somebody that you have

488 21     to know in order to interact with him. He's not

488 22     what you would call a steady person.'

488 23     Do you remember that?

488 24     A: Yes.

488 25     Q: Dr. Nies, is Dr. Scolnick somebody

489 1     you trust?

489 2     A: Yes.

489 3     Q: Did you interact with Dr. Scolnick in

489 4     your time at Merck?

489 5     A: Yes, quite a bit.

489 6     Q: Can you explain what you mean when

489 7     you say, 'He's not what you would call a steady

489 8     person'?

489 9     A: Dr. Scolnick is a fairly volatile

489 10     person, and he wants -- when there's an issue, he

04/07/10 20:08

| | Objections | Rulings |
|---|---|---|

489 11    wants data, and he wants it yesterday. And so he
489 12    will call you up in the middle of the night, he will
489 13    send you e-mails in the middle of the night or
489 14    during the day, capitalized e-mails and things like
489 15    that. So, until the issue is settled, he does not
489 16    settle down.

498:15 -   499:3 Nies, Alan 2005-04-01
498 15    Protocol 023 which we talked about --
498 16    by the way, protocol 023 was a relatively small
498 17    clinical trial; right?
498 18    A: Yes.
498 19    Q: It had about 36 people?
498 20    A: Yes.
498 21    Q: I think it only went for a few weeks?
498 22    A: Yes.
498 23    Q: Because you were asked, one of your
498 24    questions on your direct was, you didn't see any
498 25    MIs, and you didn't see any strokes. You didn't
499  1    expect to see a profound result like an MI or a
499  2    stroke in a 36-person trial that only went a few
499  3    weeks; correct?

99:5 -   501:20 Nies, Alan 2005-04-01
499  5    THE WITNESS: We certainly weren't
499  6    expecting that.
499  7    BY MR. SEEGER:  :
499  8    Q: Right. That's not something you
499  9    expected, and that really would have been a profound
499 10    finding, to have people suffer a heart attack in a
499 11    very small study where they're only taking the drug
499 12    for a few weeks, wouldn't it have been?
499 13    A: Yes. It would have been something
499 14    that you obviously take note of.
499 15    Q: Right. Okay. But you do the study,
499 16    and you do have this result, and it generates a
499 17    hypothesis which we've all been calling the
499 18    prostacyclin hypothesis; correct?
499 19    A: Yes.
499 20    Q: Dr. FitzGerald, at that point he
499 21    writes you an e-mail and he says to you, hey, why
499 22    don't you take these little tests I'm suggesting and
499 23    implement them in your clinical trial protocols?
499 24    Isn't that basically what he was suggesting by that
499 25    e-mail?
500  1    A: No.
500  2    Q: What was he suggesting by that
500  3    e-mail? Let me ask you fairly what you think he was
500  4    saying. What is your understanding of what he was

Objections column:
**Re: [499:5-501:20]**
**Def Obj** 501:13-20;
501:22-23 -
Argumentative; 401;
402

| Objections | Rulings |
| --- | --- |

500  5     suggesting?

500  6     A:  He was suggesting doing additional

500  7     studies in animals and in genetically modified mice

500  8     and in humans to -- it would basically repeat kind

500  9     of what we'd already done, looking at urinary

500 10     metabolites.

500 11     Q:  But one of the phrases he uses, he

500 12     says if you really want to 'nail the site of drug

500 13     impact,' do these studies. Do you recall that from

500 14     the e-mail?

500 15     A:  I don't remember that phrasing.

500 16     Q:  Let me see if I can find it just to

500 17     move it along.

500 18     This has been marked today as Nies

500 19     1003. I think if you look, it's number 1 on that

500 20     e-mail, at the very end of that paragraph. Do you

500 21     see where he says that?

500 22     A:  Right.

500 23     Q:  Okay.

500 24     A:  He says, 'Here are suggestions of

500 25     things that we would like to do (with your help) to

501  1     investigate the COX2 PGI phenomenon.' I don't think

501  2     that says this nails the site of --

501  3     Q:  No. It's the next paragraph. Sorry,

501  4     Dr. Nies. It's Paragraph Number 1, I had said, and

501  5     at the very last sentence, if you look at the last

501  6     sentence of Paragraph 1, it says, 'This would nail

501  7     the site of drug impact on PGI as cleanly as you can

501  8     hope to do in a patient population.'

501  9     A:  Yes. That caveat at the end, 'as

501 10     cleanly as you can hope to do' means that you can't

501 11     do it. You cannot do it in that kind of a study.

501 12     It's an indirect way of measurement.

501 13     Q:  So, Dr. FitzGerald is a buffoon?

501 14     A:  I didn't say he's a buffoon.

501 15     Q:  You don't have a lot of respect --

501 16     A:  You said it.

501 17     Q:  I don't even know the man. The truth

501 18     is, Dr. Nies, he says you can nail the site cleanly,

501 19     and you're saying that's not true, so, he doesn't

501 20     know what he's talking about; right?

501:22 -  502:6    **Nies, Alan 2005-04-01**

501 22     THE WITNESS:  This is a point of

501 23     debate with him.

501 24     BY MR. SEEGER:   :

501 25     Q:  It is a debate he lost, because you

502  1     didn't care to follow up on it; right?

502  2     A:  We did not do those studies.

|  | | Objections | Rulings |
|--|--|--|--|

502  3   Q: Now, let's talk about Dr. Oates. Dr.
502  4   Oates also is a colleague of yours, correct,
502  5   somebody you know well?
502  6   A: Yes.

502:7  -   502:11 Nies, Alan 2005-04-01
502  7   Q: Dr. Oates writes a letter in 1997,
502  8   and he writes a very detailed letter that says if
502  9   you want to assure yourself of the safety of this
502 10   drug, why don't you do this test I recommend. Is
502 11   that a fair characterization of that letter?

502:20  -   505:13 Nies, Alan 2005-04-01
502 20   For the record, it's marked as Nies
502 21   1004. The language I just was talking about, just
502 22   so you don't think I'm making it up, is on Page 2 at
502 23   the top of this letter where he says -- it actually
502 24   starts at the bottom of Page 1. 'Determination of
502 25   the effects of Vioxx on thromboxane and prostacyclin
503  1   biosynthesis in cigarette smokers could reassure one
503  2   regarding safety if it were found that thromboxane
503  3   metabolite levels fall in both normal volunteers and
503  4   cigarette smokers.' That's a study you didn't do
503  5   either; right?
503  6   A: That's right.
503  7   Q: You weren't concerned with reassuring
503  8   yourself about the safety of the drug? Is that what
503  9   was going on?
503 10   A: No. We wanted to have real data.
503 11   Q: You wanted to have real data, but
503 12   now, Dr. Oates, he's somebody you respect, you said
503 13   you respected him?
503 14   A: Oh, yes.
503 15   Q: He's not a buffoon?
503 16   A: No.
503 17   Q: In fact, when you go and you get
503 18   outside consultants to come in -- you guys at Merck
503 19   are pretty smart, Dr. Nies. I mean, you would
503 20   describe the scientists at Merck as smart people;
503 21   right?
503 22   A: Yes.
503 23   Q: You, yourself, I will say, must be a
503 24   very smart guy because I read your CV, and it goes
503 25   on for like a hundred pages. You've done a lot
504  1   yourself in terms of research, haven't you?
504  2   A: Yes.
504  3   Q: When somebody like you calls in
504  4   outsiders to come in and give them advice, don't you
504  5   listen to it?

**Objections column:**

Re: [502:20-505:7]
**Def Obj** 503:17-504:2 --
Argumentative; 401;
402;If allowed,
completeness includes
428:17-19; 428:22-
429:15; 429:17-
430:14; 430:19-23;
504:7-15; 505:8-13;
505:15-17; 505:19-
506:18

**Objections**                    **Rulings**

504  6      A: Of course.
504  7      Q: Why didn't you listen to Dr. Oates
504  8      and Dr. FitzGerald?
504  9      A: Oh, we listened.
504  10     Q: You listened and you rejected what
504  11     they proposed; correct?
504  12     A: We listened, we continued to discuss
504  13     with him. Dr. Oates, as you know, was head of our
504  14     Advisory Committee. We presented all of this data
504  15     to them.
504  16     Q: Well, let's talk about that, but let
504  17     me ask you something.
504  18     Sitting here today, Dr. FitzGerald
504  19     and Dr. Oates were right, you should have done those
504  20     studies; isn't that true?
504  21     A: No.
504  22     Q: That was the first response of Dr.
504  23     Scolnick on March 9, 2000 when he got the VIGOR
504  24     results. He said, you guys were right on this
504  25     prostacyclin theory, didn't he?
505  1      A: That's what he said.
505  2      Q: He said that then on March 9, 2000
505  3      when the results came in, his first reaction as the
505  4      head scientist at Merck was, Alan Nies, you and John
505  5      Oates were right about this prostacyclin thing;
505  6      correct?
505  7      A: That's what he said.
505  8      Q: And this other e-mail that you read
505  9      to the jury today, that your lawyer asked you to
505  10     read, which I believe was to suggest that somehow
505  11     now there's been a reversal of Dr. Scolnick's
505  12     position, do you recall the exhibit, the e-mail you
505  13     read from?

505:15 -   505:17 Nies, Alan 2005-04-01
505  15     THE WITNESS: I recall it, yes. I
505  16     don't know if I can recall it word for word. If you
505  17     want me to look at it.

505:19 -   506:18 Nies, Alan 2005-04-01
505  19     Q: I'd like you to look at it, and the
505  20     exhibits are here, and maybe your attorney can hand
505  21     them to you, because they are kind of far. It's
505  22     Exhibit 1015.
505  23     A: Okay.
505  24     Q: Do you remember he had you read from
505  25     the bottom there --
506  1      A: Yes.
506  2      Q: -- and he said, I think the language

|  | **Objections** | **Rulings** |
|---|---|---|

506  3    he asked you to read were, 'We all worried to death

506  4    about the CV events last Spring. Merck is of course

506  5    always an issue. But I was sick at the thought we

506  6    might be doing patients harm.' He said, 'I KNOW

506  7    each of you well enough to know you felt the same

506  8    way. With all the data now available I am no longer

506  9    worried.' Correct? That's what he had you read;

506 10    right?

506 11    A: Yes.

506 12    Q: Let's read the beginning of that

506 13    e-mail. Let's read the part that Mr. Raber didn't

506 14    read. It says, 'I want one more time to thank you

506 15    for the fantastic effort you have all made preparing

506 16    for the meeting this week.' Did I see that

506 17    correctly? Did I read that correctly?

506 18    A: Yes.


506:21 -    507:23 Nies, Alan 2005-04-01

506 21    Q: Now, 'the meeting this week,' let's

506 22    talk about that. That's the Advisory Committee

506 23    meeting he's talking about; right?

506 24    A: I believe so.

506 25    Q: That was a big event in the life of

507  1    this drug, because if the FDA thought the VIGOR

507  2    results warranted it, they could have asked you to

507  3    take the drug off the market; right?

507  4    A: The advisors -- the Advisory

507  5    Committee only advises the FDA. They don't have

507  6    that kind of power.

507  7    Q: But the FDA listens to what the

507  8    Advisory Committee says, right?

507  9    A: In general.

507 10    Q: So, if the Advisory Committee says,

507 11    big problem, black box this drug, or take it off the

507 12    market, the FDA typically follows that

507 13    recommendation, won't they?

507 14    A: I think typically, yes.

507 15    Q: So, Dr. Nies, if you read the next

507 16    sentence, 'I have NEVER seen better preparation for

507 17    an Advisory meeting. As I said the other day and as

507 18    I have told Ray and MC, no matter what the ultimate

507 19    outcome you have distinguished yourselves.' I don't

507 20    think I need to read this word for word. What Dr.

507 21    Scolnick is talking about in this e-mail is the

507 22    Advisory Committee meeting; right? What's the

507 23    purpose of that e-mail?


508:1  -    508:2  Nies, Alan 2005-04-01

508  1    Q: To say good job; right?

| | Objections | Rulings |
|---|---|---|

508   2        A:  I think so.

512:10 -    512:25   Nies, Alan 2005-04-01
512   10        Q:  There was also another letter written
512   11        by Dr. Oates in 1999 to Dr. Scolnick; correct? Do
512   12        you recall that one?
512   13        A:  I remember that. You showed that to
512   14        me before. Is that what you're talking about?
512   15        Q:  Yes. It was just to remind you, and
512   16        if you want to see it, if it's here, we'll show it
512   17        to you, but that was the one where he says, here are
512   18        three cases of people who are taking the drug
512   19        Celebrex who suffered adverse cardiovascular events.
512   20        Do you recall that letter?
512   21        A:  Yes.
512   22        Q:  That letter, too, is also mentioned
512   23        in that March 9th e-mail by Dr. Scolnick. You
512   24        recall that, don't you? Do you recall the part
512   25        where he's --

513:5   -    515:1   Nies, Alan 2005-04-01
513   5        Q:  I'm talking about Dr. Scolnick's
513   6        March 9th e-mail where he says, Barry, John Oates
513   7        and Alan Nies were right, it's mechanism based as we
513   8        thought. Do you recall that e-mail?
513   9        A:  I remember that e-mail.
513   10        Q:  Do you remember in that e-mail he
513   11        also says, hey, I'd like to take a look at those
513   12        three cases that were sent to us by John Oates?
513   13        A:  He may have said that in there. I
513   14        don't remember.
513   15        Q:  When the three cases were referred to
513   16        you guys at Merck by John Oates, did anybody take a
513   17        look at them back in 1999?
513   18        A:  I don't know what you mean by 'take a
513   19        look at them.'
513   20        Q:  Well, he sent you descriptions of
513   21        three patients who had complicated medical
513   22        histories, I think one or two had lupus and other
513   23        type of vascular problems, they were given the drug
513   24        Celebrex, which is a COX-2 inhibitor; correct?
513   25        A:  Right.
514   1        Q:  And they suffered cardiovascular
514   2        events. And he sends those three cases to you
514   3        saying, hey, you ought to take a look at them. Do
514   4        you recall that letter?
514   5        A:  I don't recall that that's what he
514   6        said. He sent the three cases.
514   7        Q:  Well, why do you think he sent you

**Re: [513:5-515:5]**
**Def Obj** 514:21-515:5 -
Calls for speculation;
foundation

| | Objections | Rulings |
|---|---|---|

514  8      the three cases?
514  9      A: Because these were cases that he
514  10     thought were important for Celebrex, I guess.
514  11     Q: You think that John Oates sent you
514  12     these three cases to look at because he thought they
514  13     were important for Celebrex?
514  14     A: Well, Celebrex being a COX-2
514  15     inhibitor, I think that --
514  16     Q: Doesn't Celebrex share that quality
514  17     with Vioxx? They're both COX-2 inhibitors; correct?
514  18     A: Which quality?
514  19     Q: That they're COX-2 inhibitors.
514  20     A: Yes.
514  21     Q: So, you don't think that it makes
514  22     sense that John Oates sent you those three patients
514  23     because you made a COX-2 inhibitor and --
514  24     A: No.
514  25     Q: That's why; right?
515  1      A: Yes.

515:2  -  515:5  Nies, Alan 2005-04-01
515  2      Q: So, he wasn't really making a point
515  3      about Celebrex, he was saying to Merck, you make a
515  4      COX-2 inhibitor also, why don't you take a look at
515  5      these three cases; right?

**Re: [513:5-515:5]**
**Def Obj** 514:21-515:5 -
Calls for speculation;
foundation

515:7  -  515:21  Nies, Alan 2005-04-01
515  7      THE WITNESS: Well, you know, I don't
515  8      know what you mean by 'take a look at them.' If you
515  9      read the letter, you're taking a look at the three
515  10     cases.
515  11     BY MR. SEEGER:   :
515  12     Q: Let's back that up.
515  13     You do recall he sent you a letter
515  14     describing three cases; right?
515  15     A: He sent it to Scolnick. Is that what
515  16     you're talking about?
515  17     Q: He sent it to Scolnick. That's
515  18     right. But you're mentioned in the letter. You
515  19     recall that, don't you?
515  20     A: I think someone sent it. I don't
515  21     know if Scolnick sent it to me.

**Re: [515:7-517:4]**
**Def Obj** 515:7-10;
516:8-13 - Calls for
speculation;
foundation 517:1-4 -
Lawyer testimony

515:22  -  517:4  Nies, Alan 2005-04-01
515  22     Q: I'll show it to you. I only have one
515  23     copy. It says, 'I have communicated the first three
515  24     cases informally to Alan Nies by phone and I want to
515  25     make all of you aware of the expanded information.'
516  1      A: Okay.

**Re: [515:7-517:4]**
**Def Obj** 515:7-10;
516:8-13 - Calls for
speculation;
foundation 517:1-4 -

04/07/10 20:08

| | **Objections** | **Rulings** |
|---|---|---|

| | | |
|---|---|---|
| 516 2 | Q: That does that help refresh your | Lawyer testimony |
| 516 3 | recollection? | |
| 516 4 | A: Yes. | |
| 516 5 | Q: And he sends three cases of people on | |
| 516 6 | Celebrex; right? | |
| 516 7 | A: Yes. | |
| 516 8 | Q: Wouldn't you say the purpose for | |
| 516 9 | doing that is to make you aware of three people with | |
| 516 10 | complicated medical conditions taking a COX-2 | |
| 516 11 | inhibitor having cardiovascular events while on the | |
| 516 12 | drug? | |
| 516 13 | A: That's why he sent the letter, yes. | |
| 516 14 | Q: At that time, did you, Dr. Scolnick, | |
| 516 15 | or anybody at Merck, to the extent you know, say, | |
| 516 16 | hey, let's stop and take a look at those three -- | |
| 516 17 | get what we can on those three patients and find out | |
| 516 18 | as much as we can about these three studies -- these | |
| 516 19 | three cases? I apologize. Did anybody do that? | |
| 516 20 | A: We talked to John Oates about all of | |
| 516 21 | these cases, yes. | |
| 516 22 | Q: You talked to John Oates, but you | |
| 516 23 | never asked for the information on the cases, the | |
| 516 24 | specific information you had on those cases? | |
| 516 25 | A: I don't recall whether we did or not. | |
| 517 1 | Q: It wouldn't make sense that you did, | |
| 517 2 | because Dr. Scolnick on March 9, 2000 says, hey, | |
| 517 3 | we'd better take a look at those three cases that | |
| 517 4 | John Oates sent us. Do you recall that? | |

517:6 - 517:7 Nies, Alan 2005-04-01

| | | |
|---|---|---|
| 517 6 | THE WITNESS: That's what -- why | |
| 517 7 | don't we find that e-mail. | |

517:11 - 517:24 Nies, Alan 2005-04-01

| | | |
|---|---|---|
| 517 11 | Q: I will mark it just so you won't have | |
| 517 12 | as hard a time as I did finding it, but it was | |
| 517 13 | previously marked as Nies-16, Doctor. Do you see | |
| 517 14 | the language there? And because you have the only | |
| 517 15 | copy, if you wouldn't mind just reading that | |
| 517 16 | language? | |
| 517 17 | A: It says, 'It is important to find out | |
| 517 18 | about the cases that oates told us about.' | |
| 517 19 | Q: Wouldn't you agree -- did you read | |
| 517 20 | it? | |
| 517 21 | A: Yeah. | |
| 517 22 | Q: Wouldn't you agree it was just as | |
| 517 23 | important to find out about those cases in August of | |
| 517 24 | 1999 when he wrote you the letter? | |

04/07/10 20:08

| | Objections | Rulings |
|---|---|---|

518:1  -  518:3  Nies, Alan 2005-04-01

518  1     THE WITNESS:  He told us about the
518  2     cases. I don't understand what you're saying, find
518  3     out about them.

**Re: [518:1-519:11]**
**Def Obj** 518:14-22 -
Calls for speculation;
foundation

*Sustained*

518:5  -  518:13  Nies, Alan 2005-04-01

518  5     Q:  Well, are you just going to accept
518  6     his description, or as a scientist would you like to
518  7     go and actually look at that patient's medical
518  8     records, find out how much they were taking of
518  9     Celebrex?
518  10    A:  I mean, he had told us that summary,
518  11    and it seemed to me that that's plenty of
518  12    information. We're not going to gain much more by
518  13    looking at all those medical records.

**Re: [518:1-519:11]**
**Def Obj** 518:14-22 -
Calls for speculation;
foundation

518:14 -  519:1  Nies, Alan 2005-04-01

518  14    Q:  Well, you're on that e-mail on March
518  15    9th. Any idea why Dr. Scolnick at that point, March
518  16    9th of 2000 is saying, let's go find those cases?
518  17    A:  No. Well, that's not actually what
518  18    he's meaning here.
518  19    Q:  You don't know what he's meaning,
518  20    because only he knows what he's meaning?
518  21    A:  Well, then, you'll have to ask him
518  22    about it, I guess.
518  23    Q:  Fair enough. That's a fair answer.
518  24    But that is what that e-mail says;
518  25    right?
519  1     A:  Yes.

**Re: [518:1-519:11]**
**Def Obj** 518:14-22 -
Calls for speculation;
foundation

519:2  -  519:11  Nies, Alan 2005-04-01

519  2     Q:  Now, you talked about the scientific
519  3     board of advisors, and I'll pull that out now just
519  4     in case we need them. That's the committee that
519  5     John Oates chaired for Merck; correct?
519  6     A:  Yes.
519  7     Q:  Back in May of '98, you were asked
519  8     questions by the Merck lawyer who is here with you
519  9     about recommendations and discussions that went on
519  10    in that committee. Do you recall that?
519  11    A:  Yes.

**Re: [518:1-519:11]**
**Def Obj** 518:14-22 -
Calls for speculation;
foundation

520:5  -  521:17  Nies, Alan 2005-04-01

520  5     Q:  Doctor, would you take a look at
520  6     what's been previously marked as Nies-11?
520  7     A:  Yes.
520  8     Q:  You recall seeing this document;
520  9     correct?

04/07/10 20:08

| | Objections | Rulings |
|---|---|---|

520 10    A: Yes.

520 11    Q: Now, you were asked a lot of

520 12    questions today about this particular meeting;

520 13    right?

520 14    A: About this meeting, but not this

520 15    document.

520 16    Q: Exactly right. Yes.

520 17    I'd like you to take a look at Page

520 18    13. Now, in the discussions about the prostacyclin

520 19    hypothesis -- let me back up.

520 20    You say that the prostacyclin

520 21    hypothesis was specifically discussed at this

520 22    scientific board of advisors meeting; correct?

520 23    A: Yes.

520 24    Q: At that point, isn't it true that

520 25    they tell you -- one of the many things they say is,

521 1    it's a hypothesis that needs to be actively pursued?

521 2    A: Yes. I think they said that. I was

521 3    wondering if you were reading from something here.

521 4    Q: No, no, no. I'm not reading at this

521 5    point. I'm just talking to you.

521 6    A: That they said that that was one

521 7    of -- they talk about an alternative hypothesis.

521 8    There were several hypotheses that they presented.

521 9    Q: I think you described it as the board

521 10    was split, half the board thought, you know, maybe

521 11    some cause for concern, the other half said it could

521 12    be a beneficial effect. Fair enough?

521 13    A: That's right.

521 14    Q: But either way, in 1998, before the

521 15    drug was sold to 21 million people, there's a clear

521 16    consensus on actively pursuing this prostacyclin

521 17    hypothesis; isn't that right?

521:19 -   522:16 Nies, Alan 2005-04-01

521 19    THE WITNESS: Well, there's a      **Re: [521:19-521:20]**

521 20    suggestion that we continue to look at this, yes.  **Def Obj** Completeness

521 21    BY MR. SEEGER:  :        include 521:22-522:1

521 22    Q: Continue to look at it and study it.

521 23    So the jury understands when you say 'look at,' you

521 24    mean look at and study?

521 25    A: I mean study. They suggested this

522 1    standard operating procedure, which we did.

522 2    Q: One of the things that comes out of

522 3    this meeting is it says on page -- I'm sorry, I'll

522 4    find it for you. Under the 'Recommendations,' they

522 5    tell you to begin to incorporate -- let me use their

522 6    language. They say, 'It is...proposed that coronary

522 7    events be predetermined endpoints in all future

| | Objections | Rulings |
|---|---|---|

522  8    controlled trials with Vioxx and the 'back-up' COX-2
522  9    inhibitors.' Correct? You recall that?
522 10    A:  Yes.
522 11    Q:  That is not what Merck did; correct?
522 12    A:  That's exactly what Merck did.
522 13    Q:  No. That is not what Merck did,
522 14    Doctor. In fact, what Merck did was they started a
522 15    cardiovascular standard operating procedures
522 16    program; right?

**522:18 -   523:19 Nies, Alan 2005-04-01**
522 18    THE WITNESS:  Are you saying the same
522 19    thing as you just said before?
522 20    BY MR. SEEGER:   :
522 21    Q:  No. I think I'm saying something
522 22    else, but I'll ask the question again because it's
522 23    not clear to you.
522 24    You came out of this meeting, you
522 25    looked at that Pemrick memo you read from earlier.
523  1    Do you recall that?
523  2    A:  Yes.
523  3    Q:  You instruct Dr. Watson to go ahead
523  4    and begin to implement procedures for looking at
523  5    cardiovascular events; correct?
523  6    A:  Yes.
523  7    Q:  You did that?
523  8    A:  Yes.
523  9    Q:  That's not what you were told to do
523 10    by the Advisory Committee, though; was it?
523 11    A:  No, that was what we were told to do.
523 12    Q:  You were told to make as
523 13    predetermined endpoints in clinical trials
523 14    cardiovascular events?
523 15    A:  That's what that means.
523 16    Q:  That is not what that means, is it,
523 17    Doctor?
523 18    A:  Yes, it is what it means. It's
523 19    exactly what it means.

**523:21 -   523:24 Nies, Alan 2005-04-01**
523 21    A:  Predetermined -- let me just go
523 22    through the words. 'Predetermined' means that you
523 23    define what the definitions for these events are.
523 24    And that's what we did. That's what the SOP does.

**529:18 -   530:22 Nies, Alan 2005-04-01**
529 18    May of 1998 you're told to analyze
529 19    cardiovascular data by the committee. I'll put
529 20    aside what we're discussing about whether it's

|  | Objections | Rulings |
|---|---|---|

| | | |
|---|---|---|
| 529 21 | predetermined endpoints or the operating procedures. | |
| 529 22 | Right? That's the instruction you get? | |
| 529 23 | A:  Yes. | |
| 529 24 | Q:  Analyze CV data, they say; right? | |
| 529 25 | May of 1998. And shortly after that, you give that | |
| 530  1 | project to Doug Watson; right? | |
| 530  2 | A:  Well, I give him the project of | |
| 530  3 | setting up this systematic review. | |
| 530  4 | Q:  And when is this systematic review | |
| 530  5 | actually implemented? | |
| 530  6 | A:  It's implemented -- the first study | |
| 530  7 | that was done after that was VIGOR. | |
| 530  8 | Q:  In fact, those operating procedures | |
| 530  9 | that you had asked to be set up are, in fact, not | |
| 530 10 | even finalized until around September of 1999; isn't | |
| 530 11 | that right? | |
| 530 12 | A:  I'm not sure about those dates. | |
| 530 13 | Q:  Would you have any reason to believe | |
| 530 14 | it was done any sooner than that or you just don't | |
| 530 15 | know one way or another? | |
| 530 16 | A:  You know, the final details as to who | |
| 530 17 | is on the various committees and that sort of thing | |
| 530 18 | may not have been finalized. | |
| 530 19 | Q:  So, those are standard operating | **Re: [530:19-530:22]** |
| 530 20 | procedures. Now, in the meantime, is the only | **Def Obj** Question |
| 530 21 | clinical trial going on at this point, is it VIGOR | without answer |
| 530 22 | within Merck? | |

**530:25 -   532:5   Nies, Alan 2005-04-01**

| | | |
|---|---|---|
| 530 25 | Q:  Let me just give you the time frame | |
| 531  1 | to help you. I'm talking from May of 1998 to the | |
| 531  2 | time VIGOR begins. Is that the only clinical trial | |
| 531  3 | that's ongoing at Merck? | |
| 531  4 | A:  Well, I don't recall. Certainly it | |
| 531  5 | was the biggest. | |
| 531  6 | Q:  And I am talking about just as to | |
| 531  7 | Vioxx, obviously. VIGOR was the biggest? | |
| 531  8 | A:  Yes. I understood it to mean that, | |
| 531  9 | yes. | |
| 531 10 | Q:  But you don't know one way or another | |
| 531 11 | sitting here right now if there were other clinical | |
| 531 12 | trials going on between May of 1998 and September of | |
| 531 13 | 1999, do you? | |
| 531 14 | A:  I don't recall. | |
| 531 15 | Q:  So, these operating procedures are | |
| 531 16 | put in place. And let me ask you this, Doctor. | |
| 531 17 | What's a DSMB? | |
| 531 18 | A:  It stands for data safety -- Data and | |
| 531 19 | Safety Monitoring Board. | |

| | Objections | Rulings |
|---|---|---|

531 20    Q: And the VIGOR trial had a DSMB;
531 21    correct?
531 22    A: Yes.
531 23    Q: What's the purpose of a DSMB?
531 24    A: A DSMB -- trials are blinded to
531 25    Merck. So, Merck does not know what is going on in
532  1    the trial, who is on what drug. The DSMB is set up
532  2    usually in large trials to monitor the trial, and
532  3    they can be unblinded and look at the population to
532  4    determine whether or not there's any issues related
532  5    to safety in the trial.

553:10 -   555:7  Nies, Alan 2005-04-01
553 10    Q: Now, we talked also earlier about
553 11    animal studies that were done, and I believe your
553 12    testimony was that there were certain studies done
553 13    at Merck Frosst. Is that right?
553 14    A: Yes.
553 15    Q: What studies were those specifically
553 16    that you testified to that were done at Merck Frosst
553 17    that gave you comfort that there was no problem with
553 18    the prostacyclin hypothesis?
553 19    A: There were some studies -- as I said
553 20    before, that there were studies that were looking at
553 21    the source of the prostacyclin that comes from the
553 22    endothelium --
553 23    Q: Right.
553 24    A: -- or the lining of the blood vessel
553 25    and whether that source was related to COX-1 or
554  1    COX-2.
554  2    Q: Were these studies done before VIGOR,
554  3    after VIGOR?
554  4    A: They were being done -- I don't know
554  5    when they were actually completed, but they were
554  6    being done during this time period.
554  7    Q: That was the time period also that
554  8    would include while the drug was on the market;
554  9    correct?
554 10    A: Yes.
554 11    Q: Now, you're aware of studies being
554 12    done at Merck Frosst on African green monkeys;
554 13    right?
554 14    A: Yes. I know they did some studies on
554 15    African green monkeys.
554 16    Q: And Briggs Morrison, in fact, was a
554 17    colleague of yours at Merck; correct?
554 18    A: Yes.
554 19    Q: And he's somebody who worked on the
554 20    Vioxx project team; right?

04/07/10 20:08

| | Objections | Rulings |
|---|---|---|

554 21    A: Yes.

554 22    Q: And you know that Briggs Morrison had

554 23    actually monitored some of these studies being done

554 24    up at Merck Frosst. You know that, don't you?

554 25    A: No, I don't. I don't know if he --

555  1    Q: Are you --

555  2    A: -- I don't know.

555  3    Q: Are you aware -- I'm sorry if you

555  4    weren't finished.

555  5    Are you aware that Dr. Morrison

555  6    concluded that the testing that was done on African

555  7    green monkeys was not very flattering for Vioxx?

**Re: [555:3-555:7]**
**Def Obj** Question
without answer

555:9  -   556:16 Nies, Alan 2005-04-01

555  9    THE WITNESS: No, I'm not. I'm not

555 10    aware of that.

555 11    BY MR. SEEGER:  :

555 12    Q: You also testified earlier that when

555 13    you sent the NDA to the FDA, it was a truckload of

555 14    information. That was your testimony; right?

555 15    A: Yes.

555 16    Q: In fact, you did that in the context

555 17    of looking at the summary of the safety data that

555 18    was in front of you at that time. Do you recall

555 19    that?

555 20    A: Yes, I do.

555 21    Q: And your testimony was that the

555 22    actual raw data that goes to the FDA was a

555 23    truckload; right?

555 24    Now, Vioxx was a drug that received

555 25    priority review, didn't it, Doctor?

556  1    A: Yes.

556  2    Q: That means that from the time you

556  3    filed the NDA, which you described as a truckload of

556  4    material, until the time it's approved, the FDA has

556  5    six months to review the drug; right?

556  6    A: Yes.

556  7    Q: We can agree the FDA does no

556  8    independent testing and did no independent testing

556  9    on Vioxx; correct?

556 10    A: Yes. I think that's correct.

556 11    Q: I mean, they didn't run any of their

556 12    own clinical trials or anything like that; right?

556 13    A: No.

556 14    Q: Typically, the FDA doesn't run its

556 15    own clinical trials? Isn't that fair to say?

556 16    A: That's fair to say.

556:17  -   556:18 Nies, Alan 2005-04-01

04/07/10 20:08

| Objections | Rulings |
|---|---|

556  17      Q: They rely 100 percent upon -- let me
556  18      strike that.

**556:19 -    556:21 Nies, Alan 2005-04-01**
556  19      They rely primarily upon the data
556  20      supplied to them by the sponsor of a drug, in this
556  21      case Merck, on behalf of Vioxx; right?

**556:23 -    556:25 Nies, Alan 2005-04-01**
556  23      THE WITNESS: Yes. You know, I've
556  24      never been a reviewer at the FDA, but that's what
556  25      they have.

**559:8  -    560:4 Nies, Alan 2005-04-01**
559   8      Q: Now, you also testified that when you
559   9      got the results of VIGOR in, that you believed that
559  10      the weight of the evidence favored naproxen being
559  11      cardioprotective. Wasn't that your testimony?
559  12      A: When we looked at -- yes. When we
559  13      looked at all the other evidence outside of VIGOR
559  14      and looked at VIGOR, we felt the weight of the
559  15      evidence was that naproxen was cardioprotective.
559  16      Q: All right. Sir, now, when you tell
559  17      the jury that the weight -- when you talk about the
559  18      weight of evidence, are you taking into account the
559  19      e-mail that you have in March of 2000 describing the
559  20      discussion between one of the Merck employees and
559  21      Carlo Patrono about this issue?
559  22      A: Is this the e-mail we've talked about
559  23      earlier today?
559  24      Q: It's the e-mail we've talked about.
559  25      It's the one where Carlo Patrono says there is no
560   1      epidemiologic data and no pharmacological basis for
560   2      concluding that naproxen was sufficiently
560   3      cardioprotective to make up the difference in the
560   4      VIGOR trial.

**560:7  -    560:18 Nies, Alan 2005-04-01**
560   7      Q: Do you take that into account as you
560   8      sit here?
560   9      A: Yes.
560  10      Q: Do you also take into account that
560  11      your outside expert, Carlo Patrono, says that the
560  12      magnitude of the effect was -- strike that.
560  13      Do you also take into account the
560  14      fact that Patrono says that naproxen could not
560  15      account for the -- oh, boy.
560  16      Why don't we get the e-mail because
560  17      I'm screwing up what he's saying. I want to get his

|  | Objections | Rulings |
|---|---|---|

560 18     exact language.

**560:24 -    561:10 Nies, Alan 2005-04-01**
560 24     This is the language. It says, 'The
560 25     magnitude of the effect would not be plausible even
561 1     if the comparator had been aspirin itself.' Do you
561 2     take that into consideration when you say the weight
561 3     of the evidence was in favor of naproxen being
561 4     cardioprotective? It's in that first paragraph.
561 5     A:   (Witness reviewing document.)
561 6     Yes.
561 7     Q: Do you also take into account the
561 8     FDA's position on naproxen not being sufficiently
561 9     cardioprotective to account for the difference in
561 10     VIGOR?

**561:13 -    561:13 Nies, Alan 2005-04-01**
561 13     Q: Do you take that into consideration?

**561:15 -    561:16 Nies, Alan 2005-04-01**
561 15     THE WITNESS: I don't recall a memo
561 16     to me from the FDA.

**561:18 -    561:25 Nies, Alan 2005-04-01**
561 18     Q: Have you seen any documents in this
561 19     case or from attorneys who may have used them to
561 20     refresh your recollection about the FDA's briefing
561 21     document from February of 2001? Have you seen that?
561 22     A: I must have seen it at that time, but
561 23     I haven't seen it since.
561 24     Q: Well, do you recall when you saw it
561 25     that was the FDA's position?

**562:2 -    562:2 Nies, Alan 2005-04-01**
562 2     THE WITNESS: I don't recall.

**562:4 -    562:15 Nies, Alan 2005-04-01**
562 4     Q: You don't recall if that was the
562 5     FDA's position or not?
562 6     A: No. I don't recall that the FDA had
562 7     a position that they shared with me.
562 8     Q: Well, you know that you never were
562 9     able to make the claim that you make now, that
562 10     naproxen was the reason for the difference in VIGOR?
562 11     You couldn't make that claim in the label; right?
562 12     A: That's right.
562 13     Q: And you couldn't make that claim in
562 14     the label because it wasn't approved by the FDA;
562 15     isn't that right?

Re: [562:8-562:12]
**Def Obj** Completeness
include 562:13-15;
562:17; 562:19-24

| | Objections | Rulings |
|---|---|---|

**562:19 -   562:24 Nies, Alan 2005-04-01**
562  19      Q:  That naproxen is sufficiently
562  20      cardioprotective to make up the difference in VIGOR.
562  21      A:  You know, I don't know what the FDA's
562  22      motives were, but I think that, as we said before,
562  23      there were no randomized controlled trials on
562  24      naproxen.

**563:4 -   563:9 Nies, Alan 2005-04-01**
563  4      Q:  Are you aware sitting here today that
563  5      the FDA's position was that naproxen -- that you
563  6      could not make the claim, Merck could not make the
563  7      claim with the FDA's approval that naproxen was the
563  8      reason for the five time difference in heart attacks
563  9      in VIGOR? You do know that, right, Dr. Nies?

**563:11 -   563:12 Nies, Alan 2005-04-01**
563  11      THE WITNESS:  I know we could not put
563  12      that in the label.

**564:4 -   564:12 Nies, Alan 2005-04-01**
564  4      Q:  Would you take a look at the, when
564  5      you get there, at the italics language at the
564  6      bottom. Before you read it, let me ask you this:
564  7      You are aware that the company in press releases, in
564  8      fact, did make that claim that they believe the
564  9      reason for the five times difference in heart
564  10      attacks in VIGOR was because naproxen was
564  11      cardioprotective; right?
564  12      A:  Yes.

Re: [564:4-564:12]
**Def Obj**
Mischaracterizes the
press release

*Sustained*

**564:18 -   564:22 Nies, Alan 2005-04-01**
564  18      Q:  Do you now agree with me that the FDA
564  19      took the position that there was not sufficient
564  20      evidence to support Merck's claim that naproxen made
564  21      up the difference between the heart attacks in the
564  22      Vioxx group versus the naproxen group of VIGOR?

Re: [564:18-564:22]
**Def Obj** Hearsay

**564:25 -   565:1 Nies, Alan 2005-04-01**
564  25      THE WITNESS:  This is a briefing
565  1      document for the Advisory Committee.

Re: [564:25-565:1]
**Def Obj** Hearsay

**565:3 -   565:7 Nies, Alan 2005-04-01**
565  3      Q:  That's right. Right. And the part
565  4      in italics is the FDA medical reviewer's commentary?
565  5      A:  Right.
565  6      Q:  And you agree with me having just
565  7      read it that that is their conclusion?

Re: [565:3-565:7]
**Def Obj** Hearsay

|  | Objections | Rulings |
|--|------------|---------|

**65:11 -   565:16** Nies, Alan 2005-04-01

| | | |
|--|--|--|
| 565 11 | Q:  That is the medical review officer's | **Re: [565:11-565:16]** |
| 565 12 | conclusion in that document that there wasn't | **Def Obj** Hearsay |
| 565 13 | sufficient evidence to support Merck's claim about | |
| 565 14 | naproxen being the reason for the difference in | |
| 565 15 | heart attacks in VIGOR; correct? | |
| 565 16 | A:  Yes. | |

**572:21 -   574:1** Nies, Alan 2005-04-01

| | | |
|--|--|--|
| 572 21 | Q:  What's a black box warning? | **Re: [572:21-574:1]** |
| 572 22 | A:  A black box warning is a warning that | **Def Obj** 571:21-573:11 |
| 572 23 | the FDA wants physicians really to look at. They | - 407; 401; 402; 573:16- |
| 572 24 | want to catch their eye when they open up the label. | 574:1 Speculative; lack |
| 572 25 | Q:  They want them to be really aware of | of personal |
| 573  1 | it. They put it right at the top of the label; | knowledge; |
| 573  2 | correct? | Completeness include |
| 573  3 | A:  Yes. | 574:3 |
| 573  4 | Q:  And then next to a black box warning | |
| 573  5 | with regard to dangers that may be associated with | |
| 573  6 | the drug, wouldn't next to that be the warnings | |
| 573  7 | section? | |
| 573  8 | A:  Yes. | |
| 573  9 | Q:  And below that would be the | |
| 573 10 | precautions? | |
| 573 11 | A:  Yes. | |
| 573 12 | Q:  Now, you also talked earlier about | |
| 573 13 | the article that was published by Dr. Konstam. Do | |
| 573 14 | you recall that? | |
| 573 15 | A:  Yes. | |
| 573 16 | Q:  Now, Dr. Konstam, he's a paid | |
| 573 17 | consultant for Merck; right? | |
| 573 18 | A:  I don't know. | |
| 573 19 | Q:  Well, you know he has been a paid | |
| 573 20 | consultant for Merck; right? | |
| 573 21 | A:  Yes. I think he has attended some | |
| 573 22 | meetings where he was probably paid to advise Merck, | |
| 573 23 | yes. | |
| 573 24 | Q:  You're not aware sitting here right | |
| 573 25 | now that he's been a continuously paid consultant | |
| 574  1 | for Merck over the last several years? | |

**575:8  -   577:15** Nies, Alan 2005-04-01

| | | |
|--|--|--|
| 575  8 | Q:  Have you read a study by Dr. Juni? | **Re: [575:8-577:15]** |
| 575  9 | A:  I've seen it, yes. You're talking | **Def Obj** 576:2-577:3 - |
| 575 10 | about which study? | 401; 402; speculative; |
| 575 11 | Q:  It's a recent study, and if I can | 577:11-15 question |
| 575 12 | pull it out in front of me, I'll have it for you in | without answer; |
| 575 13 | two seconds. It was published in Lancet in 2004, I | completeness include |

| | **Objections** | **Rulings** |
|---|---|---|

577:19-578:5

| | |
|---|---|
| 575 14 | believe, after the drug was taken off the market. |
| 575 15 | Does that refresh your recollection? |
| 575 16 | A: Okay. Yes. |
| 575 17 | Q: I have it here somewhere. Now, |
| 575 18 | you're aware that Dr. Juni, he's not a paid |
| 575 19 | consultant for Merck; right? |
| 575 20 | A: I don't know. |
| 575 21 | Q: Have you actually seen this study |
| 575 22 | yourself, Dr. Nies? |
| 575 23 | A: Have I seen the manuscript -- |
| 575 24 | Q: Yes. |
| 575 25 | A: -- or the published article? Yes, I |
| 576 1 | have at one point. |
| 576 2 | Q: You didn't recognize any of the names |
| 576 3 | of anybody on that study being a Merck employee; |
| 576 4 | correct? |
| 576 5 | A: I don't even remember if I read all |
| 576 6 | the names, but. |
| 576 7 | Q: Well, Peter Juni is not somebody you |
| 576 8 | recognize as a paid Merck consultant or an employee; |
| 576 9 | correct? |
| 576 10 | A: I don't recognize him as that. |
| 576 11 | Q: And you don't recognize Linda Nartey |
| 576 12 | as a paid consultant or a Merck employee; do you? |
| 576 13 | A: No. |
| 576 14 | Q: How about Stephan Reichenbach, is |
| 576 15 | that somebody you'd recognize as a -- |
| 576 16 | A: Never heard of him. |
| 576 17 | Q: -- an employee. |
| 576 18 | No? |
| 576 19 | Rebekka Sterchi, is that somebody you |
| 576 20 | recognize, a name you recognize as a Merck employee? |
| 576 21 | A: No. |
| 576 22 | Q: Paul Dieppe, D-I-E-P-P-E, is that a |
| 576 23 | name that you recognize as a Merck employee? |
| 576 24 | A: No. |
| 576 25 | Q: Matthias Egger, E-G-G-E-R, that's |
| 577 1 | somebody you also do not recognize as a Merck |
| 577 2 | employee; right? |
| 577 3 | A: That's correct. |
| 577 4 | Q: Now, you're aware Dr. Juni also took |
| 577 5 | a look at Merck's clinical trials, aren't you? |
| 577 6 | A: Yes. |
| 577 7 | Q: And he, in fact, looked at 22 Merck |
| 577 8 | clinical trials. Do you remember what Dr. Juni's |
| 577 9 | conclusions were with regard to Vioxx? |
| 577 10 | A: I don't recall exactly. |
| 577 11 | Q: Well, under the heading |
| 577 12 | Interpretation,' it says, 'Our findings indicate |

| | Objections | Rulings |
|---|---|---|

577 13     that rofecoxib should have been withdrawn several
577 14     years earlier than it actually was.' You're aware
577 15     of that, aren't you?

577:17 -   577:17 Nies, Alan 2005-04-01
577 17     THE WITNESS:  I'm aware of what?

578:19 -   580:1 Nies, Alan 2005-04-01
578 19     Q:  Dr. Nies, I also think you testified
578 20     earlier in answering questions to Mr. Raber that you
578 21     said that there were studies that showed Vioxx
578 22     actually had, in certain clinical trials done at
578 23     Merck, had a lower rate of MIs than, was it placebo?
578 24     A:  Versus a comparator. I don't know
578 25     that we were talking about MIs. I think we were
579  1     talking about cardiovascular events.
579  2     Q:  Cardiovascular events.
579  3     Could you name for us any of those
579  4     clinical trials so we can go take a look at them?
579  5     A:  We could look through this integrated
579  6     summary of safety and --
579  7     Q:  That's where I'd find it?
579  8     A:  I think that's where you'd find it.
579  9     Because when you combine all the trials, there was
579 10     no difference. So, if there are trials that have
579 11     increased numbers, and the overall compilation shows
579 12     no difference, then there are trials that have less
579 13     to balance the increased numbers.
579 14     Q:  Well, you say when you combine all
579 15     the trials, that showed no difference, that's
579 16     Merck's conclusion of the data; correct?
579 17     A:  That's the data, that there was no
579 18     difference.
579 19     Q:  But that's Merck's interpretation of
579 20     that data; isn't that right?
579 21     A:  Well, data are data, I mean, and you
579 22     statistically compare. It's not really an
579 23     interpretation. It's actually what the data are.
579 24     Q:  Well, you know the FDA had concerns
579 25     about pooling data, even the data from the original
580  1     NDA I'm talking about?

580:6  -   580:9 Nies, Alan 2005-04-01
580  6     Q:  If you'd take a look at the document
580  7     that was marked as Nies-28 that's on Page 19 right
580  8     in the middle. I think I have yours. Right in the
580  9     middle of the page in italics.

587:3  -   588:7 Nies, Alan 2005-04-01

**Re: [578:19-580:1]**
**Def Obj** 579:24-580:1 -
Calls for speculation;
foundation; lack of
personal knowledge-

*overrule*

| | Objections | Rulings |
|---|---|---|

| | | |
|---|---|---|
| 587  3 | You indicated that you're no longer | **Re: [587:3-588:7]** |
| 587  4 | employed by Merck; is that correct? | **Def Obj** 587:13-588:3; |
| 587  5 | A: Yes. | 588:4-7 - 401, 402; MIL |
| 587  6 | Q:  When did you start to work for Merck? | #8 (granted in part) |
| 587  7 | A:  In mid-1992. | |
| 587  8 | Q:  When did you leave Merck? | |
| 587  9 | A:  In September of 2002. | |
| 587 10 | Q:  Have you done any consulting work for | |
| 587 11 | Merck since then? | |
| 587 12 | A:  A small amount. | |
| 587 13 | Q:  When is the last time you did | |
| 587 14 | consulting work for Merck? | |
| 587 15 | A:  I was at Merck earlier this year | |
| 587 16 | prior to the Advisory Committee that was held this | |
| 587 17 | year. | |
| 587 18 | Q:  Were you there at Merck to assist | |
| 587 19 | them in the preparation for the Advisory Committee | |
| 587 20 | meetings? | |
| 587 21 | A:  I was there to -- yes. You could say | |
| 587 22 | that. | |
| 587 23 | Q:  That would have been in January or | |
| 587 24 | February of this year? | |
| 587 25 | A:  Yes. It was the end of January, I | |
| 588  1 | think. I can't remember the exact date. | |
| 588  2 | Q:  Maybe two months ago or so? | |
| 588  3 | A:  Yes. | |
| 588  4 | Q:  Were you paid for your time? | |
| 588  5 | A:  Yes. | |
| 588  6 | Q:  At what rate? | |
| 588  7 | A:  $3,000 a day. | |

| | | |
|---|---|---|
| 593:7  -   595:18 Nies, Alan 2005-04-01 | | |
| 593  7 | Q:  Now, I want to ask you about some of | **Re: [593:7-595:18]** |
| 593  8 | the documents that you discussed this morning with | **Def Obj** 594:7-10; |
| 593  9 | Mr. Raber. And I'd like you to put them in front of | 594:18-595:18 - |
| 593 10 | you, if you would, as we go through them. And I'm | Speculation; |
| 593 11 | going to tell counsel, to make this somewhat easy if | foundation; lack of |
| 593 12 | we can, I'm going to start with 1005 and then 1006, | personal knowledge; |
| 593 13 | 1007, 1011 and then 1010, which at least, to my | Completeness include |
| 593 14 | recollection, are in chronological order. | 595:21; 595:24-25; |
| 593 15 | So, let's start with 1005, if we | 595:16-18 - 401;402 |
| 593 16 | could. | |
| 593 17 | Is that in front of you now, sir? | |
| 593 18 | A:  Yes. | |
| 593 19 | Q:  This was the Merck Research Labs | |
| 593 20 | epidemiology department final results of an analysis | |
| 593 21 | of the incidence of cardiovascular SAEs in the Phase | |
| 593 22 | IIb and III Vioxx osteoarthritis clinical trials. | |
| 593 23 | This was Dr. Watson's report of February of 1998. | |

04/07/10 20:08

| | Objections | Rulings |
|---|---|---|

593  24    Is that correct?

593  25    A:  Yes.

594   1    Q:  SAE, again, stands for what, sir?

594   2    A:  Serious adverse event.

594   3    Q:  You told Mr. Raber in answer to his

594   4    questions that this study involved 5,000 patients.

594   5    Do you recollect that?

594   6    A:  This -- yes.

594   7    Q:  How many of those patients had been

594   8    on Vioxx for at least a year?

594   9    A:  At this point, probably relatively

594  10    few. I can't tell you an exact number.

594  11    Q:  You're aware in the medical and

594  12    scientific literature certainly in recent months

594  13    there's been a study discussed at great length

594  14    called APPROVe where the risk of cardiovascular

594  15    adverse events was found to increase beginning at 18

594  16    months. Is that correct, sir?

594  17    A:  Yes.

594  18    Q:  So, how many of these 5,000 people

594  19    were in a clinical trial that had lasted at least 18

594  20    months? Would that be even fewer than the

594  21    relatively few that had had it for at least a year?

594  22    A:  Yes.

594  23    Q:  How many patient years were studied

594  24    in total with these 5,000 patients?

594  25    A:  I don't recall.

595   1    Q:  It would be way less than 5,000

595   2    patient years; correct?

595   3    A:  It would be less than 5,000 patient

595   4    years certainly at this time.

595   5    Q:  Would it be less than 1,000 patient

595   6    years?

595   7    A:  I don't know.

595   8    Q:  If it were 1,000 patient years, just

595   9    to give the jury some perspective, then that would

595  10    mean that the average patient would have been in a

595  11    clinical trial for one fifth of a year? Is my math

595  12    correct?

595  13    A:  With 5,000 patients?

595  14    Q:  Yes, sir.

595  15    A:  Yes.

595  16    Q:  Now, did you describe for Mr. Raber

595  17    limitations of this study when he asked you

595  18    questions this morning?

596:1  -  597:1   Nies, Alan 2005-04-01

596   1    Q:  Okay. Well, sir, I'd like you to

596   2    turn to Page I --

**Re: [596:1-597:1]**

**Def Obj** 596:7-14; 401;

| | Objections | Rulings |
|---|---|---|

596  3     A:  I --
596  4     Q:  -- which is the first page that has
596  5     text?
596  6     A:  Okay.
596  7     Q:  And take a look with me in the next
596  8     to last paragraph, and looking at the second
596  9     sentence, this is in the executive summary, and
596 10     that's what executives read sometimes; right, sir?
596 11     A:  Yes.
596 12     Q:  Like the bosses in the company; is
596 13     that correct?
596 14     A:  Yes.
596 15     Q:  And does this say, 'There are
596 16     necessarily a number of limitations to this study
596 17     including potential misclassification of events,
596 18     potential biases associated with the use of
596 19     historical controls and the inclusion of all
596 20     patients (including those treated with placebo NSAID
596 21     comparators)   from the Vioxx program in the incidence
596 22     rate calculations.' Did I read that correctly?
596 23     A:  Yes.
596 24     Q:  Do you recollect reading that for the
596 25     jury this morning in response to Mr. Raber's
597  1     questions?

**597:6  -   597:13 Nies, Alan 2005-04-01**
597  6     Q:  That's right. You weren't asked to
597  7     read it, were you, sir?
597  8     A:  I don't recall reading that this
597  9     morning.
597 10     Q:  And looking at Page 11, there's a
597 11     whole section on study limitations. Is that
597 12     correct?
597 13     A:  Yes.

**598:6  -   599:6 Nies, Alan 2005-04-01**
598  6     Q:  Now, let's next go to document 1006.
598  7     It's called 'Dr. Alan Nies' Writeup for Meeting of
598  8     Board of Scientific Advisors.' Now, do you
598  9     recollect discussing this document this morning?
598 10     A:  Yes.
598 11     Q:  This document was prepared by you
598 12     subsequent to having been sent written
598 13     communications from both Dr. FitzGerald and Dr.
598 14     Oates where they made a recommendation that certain
598 15     studies be done. Is that correct?
598 16     A:  Yes.
598 17     Q:  And in your writeup -- and this is an
598 18     11-page document; correct, sir?

**Objections column:**

402;596:24-597:1 -
401; 402; calls for
speculation;
foundation

**Re: [597:6-597:13]**
**Def Obj** 597:6-9 - 401;
402; calls for
speculation;
foundation

| | Objections | Rulings |
|---|---|---|

598 19 A: Yes.

598 20 Q: In your writeup for the meeting of

598 21 the board, did you tell the board members that Dr.

598 22 Oates had made recommendations for certain studies

598 23 that Merck believed should not, in fact, be done?

598 24 A: You're saying in this writeup?

598 25 Q: Yes, sir.

599 1 A: I don't believe there's a mention of

599 2 that in the writeup.

599 3 Q: Did you tell the board that

599 4 Dr. FitzGerald had made suggestions for certain

599 5 studies that Merck decided should not, in fact, be

599 6 done?

599:8 - 599:12 Nies, Alan 2005-04-01

599 8 THE WITNESS: You're talking about in

599 9 this document?

599 10 BY MR. SPECTER: :

599 11 Q: Yes.

599 12 A: No, it's not in the document.

**Re: [599:8-599:12]**
**Def Obj** Completeness includes 601:20-23; 601:25-602:4

601:20 - 601:23 Nies, Alan 2005-04-01

601 20 Q: Dr. Nies, tell us again in your own

601 21 words what the reasons were that Merck, according to

601 22 you, did not do the studies that Dr. Oates and

601 23 Dr. FitzGerald recommended.

**Re: [601:20-601:23]**
**Pltf Obj** Non-responsive; lack of personal knowledge

601:25 - 602:4 Nies, Alan 2005-04-01

601 25 THE WITNESS: My reasons for not

602 1 doing those studies were that they were not

602 2 addressing patient risks. They were indirect

602 3 studies that were not going to help us assess the

602 4 risks.

**Re: [601:25-602:4]**
**Pltf Obj** Non-responsive; lack of personal knowledge. (If the court permits 601:20-23 and 601:25-602:4, Plaintiff designates 602:7-602:13 for completeness.)

603:17 - 605:19 Nies, Alan 2005-04-01

603 17 Q: Now, let's go to document 1007, if we

603 18 could, please. This contains, beginning at Page 5,

603 19 a review of your presentation to the Board of

603 20 Scientific Advisors that occurred in May of '98. Is

603 21 that right, sir?

603 22 A: Yes.

603 23 Q: And for how many pages does this go

603 24 on?

603 25 A: It goes on to the next page about

**Re: [603:17-605:19]**
**Def Obj** Completeness includes 605:20-22; 605:24

| | Objections | Rulings |
|---|---|---|

604  1    halfway down. Well, wait a minute. No. That's it.
604  2    It goes on about halfway down.
604  3    Q:  So, about one full page?
604  4    A:  Yes.
604  5    Q:  It talks about -- these are actually
604  6    minutes of the meeting; correct?
604  7    A:  These are minutes of a project team
604  8    meeting.
604  9    Q:  Right. Minutes ordinarily are
604 10    supposed to reflect what occurs in a meeting;
604 11    correct?
604 12    A:  Yes.
604 13    Q:  And there are many topics and details
604 14    that are discussed at least on this one page. Is
604 15    that correct? There's at least one, two, three,
604 16    four, five, six, seven bullet points with prose that
604 17    follow. Is that correct?
604 18    A:  Yes.
604 19    Q:  Is there anywhere in these minutes a
604 20    statement to the effect that you presented -- well,
604 21    let me back up for a second.
604 22    It starts off by saying, 'Alan Nies
604 23    presented all data available on Vioxx at the time of
604 24    the meeting, along with all of the potential
604 25    problems.' And then it continues; correct?
605  1    A:  Yes.
605  2    Q:  And then it talks about how the
605  3    consultants considered the data and the potential
605  4    problems and offered the following suggestions for
605  5    future studies. Is that correct?
605  6    A:  Yes.
605  7    Q:  Now, is there anywhere in these
605  8    minutes a statement to the effect that you told the
605  9    group about these proposed studies of Dr. FitzGerald
605 10    and Dr. Oates?
605 11    A:  There's nothing on this page other
605 12    than the fact that I told them all the potential
605 13    problems and the data.
605 14    Q:  But a proposed study is not a
605 15    potential problem; correct?
605 16    A:  That's right.
605 17    Q:  And data is not a proposed study;
605 18    correct?
605 19    A:  That's correct.

606:1  -  606:25 Nies, Alan 2005-04-01
606  1    Q:  Now, let's go to Nies 1011, if we
606  2    could, please. I believe you described this
606  3    earlier, but if I'm wrong, please correct me, as the

| | Objections | Rulings |
|---|---|---|

606 4   summary data that was provided to the Food & Drug
606 5   Administration when the NDA or new drug application
606 6   was submitted. Is that a fair statement?
606 7   A: This is the, yeah, summary of safety.
606 8   Q: Summary of safety?
606 9   A: Yes.
606 10   Q: Now, have you read this document?
606 11   A: I have in the past.
606 12   Q: When is the last time you read the
606 13   document?
606 14   A: I would guess in 1998.
606 15   Q: Back when it was submitted?
606 16   A: Yes, when I read the whole document.
606 17   Q: What did it show about cardiovascular
606 18   adverse events in Vioxx?
606 19   A: My recollection is that there was no
606 20   difference between Vioxx and comparators.
606 21   Q: No numerical difference?
606 22   A: No statistical difference.
606 23   Q: Is there a difference in what you
606 24   said and what I said?
606 25   A: Yes.

**607:13 -   617:13 Nies, Alan 2005-04-01**

607 13   Q: The question was, Doctor -- let me
607 14   see if I can go back and remind you of the question.
607 15   The question was, was there a numerical difference?
607 16   And your response was that there was no statistical
607 17   difference. Is that correct, sir?
607 18   A: Was that my response?
607 19   Q: Yes.
607 20   A: That's what I said, yes.
607 21   Q: My question again, sir, is, was there
607 22   a numerical difference?
607 23   A: Well, this is almost seven years
607 24   after I've read it. I'd have to go through this.
607 25   If you could give me a couple of hours, I can do
608 1   that.
608 2   Q: I'll bet we can do it in less than a
608 3   couple of hours. Do you think we could?
608 4   A: I don't know. It's a big document.
608 5   Q: Let's start off this way.
608 6   As you sit here today, what is your
608 7   recollection as to whether there was a numerical
608 8   difference in cardiovascular adverse events between
608 9   Vioxx and the comparator drugs in this document?
608 10   A: Yes. I don't recall the actual
608 11   numerical difference.
608 12   Q: Let's turn, if we could, to Page

**Re: [607:13-617:13]**
**Def Obj** 607:13-
612:25; 613:3-615:2 -
401; 402; appropriate
comparison for PDL is
not placebo, but other
drugs on the PDL

108

04/07/10 20:08

|  | Objections | Rulings |
|--|-----------|---------|

608 13    E109. Are you with me?

608 14    A: Yeah, almost. It's a table?

608 15    Q: It's a table, sir.

608 16    And this describes studies 010 and

608 17    029; correct? These are osteoarthritis studies?

608 18    A: Uh-huh.

608 19    Q: You have to answer verbally, sir.

608 20    A: Yes.

608 21    Q: Thank you.

608 22    We have the generalized statement of

608 23    patients with adverse experiences. Is that correct?

608 24    And then it's specified as to various body systems.

608 25    Is that right?

609 1    A: Yes.

609 2    Q: Looking at placebo, there were 217

609 3    people in those two studies, correct, that were on

609 4    placebo?

609 5    A: Yes.

609 6    Q: And in the cardiovascular system

609 7    there were 5 adverse events; correct?

609 8    A: Okay, yes.

609 9    Q: That represented 2.3 percent. Is

609 10    that correct?

609 11    A: Yes.

609 12    Q: Looking across at Vioxx, were there

609 13    more events or fewer events in the cardiovascular

609 14    system than in the placebo for people taking 5

609 15    milligrams?

609 16    A: Well, it looks like in these two

609 17    Phase II studies, which is relatively small studies,

609 18    there were more events numerically in the Vioxx

609 19    groups.

609 20    Q: In the five milligram category; is

609 21    that correct?

609 22    A: Yes.

609 23    Q: Was there a higher percentage as

609 24    well?

609 25    A: Yes.

610 1    Q: It was 7 people, but that was in a

610 2    sample of 149, which is, of course, less than the

610 3    217 taking placebo; correct?

610 4    A: Yes.

610 5    Q: So, that was 4.7 percent; is that

610 6    correct?

610 7    A: Yes.

610 8    Q: So, it was a little more than twice

610 9    as many as in placebo; correct?

610 10    A: Percentage-wise, yes.

610 11    Q: Had cardiovascular adverse events;

**Objections**                    **Rulings**

610 12    correct?
610 13    A:  Yes.
610 14    Q:  Then looking at 12.5 milligrams, were
610 15    there more adverse events in the Vioxx group or in
610 16    the placebo group? Again, I'm talking about
610 17    cardiovascular.
610 18    A:  There are more in the Vioxx group.
610 19    Q:  And there were 9 out of 144 as
610 20    compared to placebo in which there were 5 out of
610 21    217. Is that correct?
610 22    A:  Yes.
610 23    Q:  And 6.2 percent of the people taking
610 24    Vioxx had adverse events; correct?
610 25    A:  Yes.
611  1    Q:  And that's a little more than
611  2    two-and-a-half times the percent in the placebo
611  3    group. Is that correct?
611  4    A:  Yes.
611  5    Q:  Then if we go to 25 milligrams,
611  6    that's the next one; correct?
611  7    A:  Yes.
611  8    Q:  There were 210 people who took Vioxx
611  9    in that group, which is almost exactly the same as
611 10    the 217 that took placebo. Is that right?
611 11    A:  Yes.
611 12    Q:  And there were 9 adverse
611 13    cardiovascular events in that group, which equaled a
611 14    percentage of 4.3 percent as compared to 5 in
611 15    placebo and 2.3 percent. Is that correct?
611 16    A:  Yes.
611 17    Q:  It's almost twice as many. Is that
611 18    right?
611 19    A:  Yes.
611 20    Q:  Then in the 50 milligram group, there
611 21    were far fewer people who took that dosage, only 97
611 22    of Vioxx, as compared to 217 of, yet there were 5
611 23    adverse cardiovascular events among those people
611 24    taking Vioxx. Is that correct?
611 25    A:  That's correct.
612  1    Q:  As against 5 taking placebo. Is that
612  2    right?
612  3    A:  Yes.
612  4    Q:  Which is 5.2 percent in the Vioxx
612  5    group; correct?
612  6    A:  Yes.
612  7    Q:  Which is more than twice the group
612  8    taking placebo; is that right?
612  9    A:  Yes.
612 10    Q:  Then in the 125 milligram group,

| | Objections | Rulings |
|---|---|---|

612 11   there were just 74 people who were on Vioxx; is that
612 12   correct?
612 13   A: Yes.
612 14   Q: And 4.1 percent of those people had
612 15   cardiovascular adverse events as compared to 2.3
612 16   percent in taking placebo; is that correct?
612 17   A: Yes.
612 18   Q: So, we had one, two, three, four,
612 19   five groups with various milligrams of ingestion of
612 20   Vioxx, and in all of those groups, the incidence of
612 21   cardiovascular adverse events was higher than in the
612 22   placebo ranging from just under twice as many to
612 23   just over two-and-a-half times as many. Is that
612 24   fair?
612 25   A: Yes.
613  1   Q: Is that all by chance?
613  2   A: I can't tell.
613  3   Q: Now, let's go to Page E115. Is that
613  4   a different study or the same study than the last
613  5   one?
613  6   A: Yes. I think this must be different
613  7   studies.
613  8   Q: Right. We can tell because, for
613  9   example, the number of people taking placebo is 412.
613 10   Is that correct?
613 11   A: Yes.
613 12   Q: Is there another basis beyond what
613 13   I've just said for concluding it was a different
613 14   study?
613 15   A: Well, I think it probably says.
613 16   These are the six-week osteoarthritis studies.
613 17   Q: Thank you.
613 18   And then in that study, we had 412
613 19   people taking placebo, and of that group, 14 had
613 20   adverse events on Vioxx -- I'm sorry.
613 21   Of the 412 taking placebo, 14 had
613 22   adverse cardiovascular system events, correct, which
613 23   was 3.4 percent?
613 24   A: Yes.
613 25   Q: Then among people taking Vioxx, we
614  1   had people taking 12.5 milligrams. There were 725
614  2   people in that group. That's a pretty good sized
614  3   trial, isn't it?
614  4   A: Yes.
614  5   Q: There were 55 adverse cardiovascular
614  6   events, which is 7.6 percent; is that correct?
614  7   A: Yes.
614  8   Q: That would be, oh, not quite
614  9   two-and-a-half times more than placebo. Is that

**Objections**                    **Rulings**

614 10   correct?
614 11   A: Yes, a little over two times, yeah.
614 12   Q: Then among 25 milligram takers of
614 13   Vioxx, there were 735 people in that group, 56
614 14   adverse cardiovascular events, 7.6 percent; is that
614 15   correct?
614 16   A: Yes.
614 17   Q: The numbers are almost exactly the
614 18   same among people who took 12-and-a-half milligrams
614 19   of Vioxx and 25 milligrams, the numbers were almost
614 20   exactly the same of adverse cardiovascular events in
614 21   both of those groups; correct? 55 in one and 56 in
614 22   the other; is that correct?
614 23   A: Yes.
614 24   Q: That's against 14 in the placebo with
614 25   two-thirds as many people in the study,
615  1   approximately; correct?
615  2   A: Yes.
615  3   Q: Vioxx also had a higher incidence of
615  4   cardiovascular system adverse events than comparator
615  5   drugs ibuprofen and nabumetone; correct?
615  6   A: You're talking about these last two,
615  7   nabumetone?
615  8   Q: Yes, sir.
615  9   A: Is that the drug you said?
615 10   Q: I mispronounced it, sir. But aside
615 11   from my mispronunciation, was I right?
615 12   A: It had 7 percent versus 7.6. And
615 13   ibuprofen had 6 versus 7.6.
615 14   Q: The higher incidence of
615 15   cardiovascular events in Vioxx that we see here
615 16   compared to the placebo group and compared to the
615 17   comparator drugs, is that by chance?
615 18   A: One can't tell about the comparator
615 19   drugs.
615 20   Q: How about the placebo group, is that
615 21   by chance?
615 22   A: Probably not.
615 23   Q: Are you talking about from the
615 24   standpoint of statistical significance? Is that
615 25   correct?
616  1   A: Right. These drugs cause increase in
616  2   blood pressure and fluid retention. We know that.
616  3   Q: Looking at Page E124. Is this a
616  4   different study now? This says protocol 010 and
616  5                                                    29
616  6   A: These are the same studies we went
616  7   through first.
616  8   Q: Are they? Okay. Thank you. Then

| | Objections | Rulings |
|---|---|---|

616  9   I'll skip over it, you'll be happy to know.

616 10   I'll go to Page 137. Is that the

616 11   same as the last one we just looked at? I'm

616 12   convinced it is, so I'm going to skip over that

616 13   also.

616 14   A:  Those are the same studies, yes.

616 15   Q:  Let's go to -- let me ask you this:

616 16   What is the trade name for

616 17   nabumetone?

616 18   A:  Relafen. Relafen, I think. Yes.

616 19   Q:  Is Relafen associated with

616 20   hypertension?

616 21   A:  All of these drugs are associated

616 22   with hypertension, all of the NSAIDs.

616 23   Q:  Would you expect to see some number

616 24   of people in these studies experience hypertension

616 25   while on nabumetone?

617  1   A:  Yes.

617  2   Q:  Taking a look at Page E174, how many

617  3   of the people on nabumetone -- let me wait until you

617  4   get there.

617  5   How many people on nabumetone

617  6   experienced hypertension?

617  7   A:  In this study?

617  8   Q:  Yes.

617  9   A:  Which study is this now? This is --

617 10   Q:  Is this the same study we've been

617 11   looking at on nabumetone, the same comparators,

617 12   right, ibuprofen and nabumetone?

617 13   A:  Right.


617:23 -   619:8   Nies, Alan 2005-04-01

617 23   Q:  Same study?

617 24   A:  Yes. This is the same study we're

617 25   looking at on Page 137.

618  1   Q:  Good. Thank you.

618  2   A:  Right. So, what was labeled

618  3   hypertension in this table, there were none in the

618  4   nabumetone. There were none in the 125 milligram

618  5   Vioxx. There were none in the 50 milligram Vioxx.

618  6   Q:  There were 16 in the 25 milligram

618  7   Vioxx; correct?

618  8   A:  Right.

618  9   Q:  That was the dosage most commonly

618 10   used; correct?

618 11   A:  25, yes.

618 12   Q:  There were 16 out of 735, which was

618 13   2.2 percent; correct?

618 14   A:  Right.

| | Objections | Rulings |
|---|---|---|

618 15    Q: I'm sorry, I couldn't hear your
618 16    answer, sir.
618 17    A: Yes, correct.
618 18    Q: The number of people that had
618 19    hypertension on nabumetone in that study was how
618 20    many out of 115?
618 21    A: Zero.
618 22    Q: Does that surprise you, sir?
618 23    A: Not really.
618 24    Q: Do you recollect telling me a moment
618 25    ago that you'd expect to see hypertension with
619  1    people taking nabumetone?
619  2    A: Yes.
619  3    Q: Now, let's go page E180.
619  4    A:   E180?
619  5    Q: Please.
619  6    Is this a new study? When I say
619  7    new,' I mean different from what we've already
619  8    looked at.

620:1  -  620:7  Nies, Alan 2005-04-01
620  1    Q: Let's turn, if we could, to Exhibit
620  2    1010, about which you were questioned this morning
620  3    by Mr. Raber. And to refresh the recollection of
620  4    anyone who has the burden of watching this one day,
620  5    this is Dr. FitzGerald's article that you were
620  6    speaking about this morning; is that right?
620  7    A: Yes.

623:16  -  626:15  Nies, Alan 2005-04-01
623 16    And then I'd like you to read what                      **Re: [623:16-626:15]**
623 17    appears two sentences above in this article which       **Def Obj** Completeness
623 18    you characterized for us as a, quote, fair summary,     includes 621:13-622:13
623 19    unquote. Let's start with the words, 'The results
623 20    of.'
623 21    A: 'The results of the VIGOR study
623 22    may...be explained by chance, depression of
623 23    prostacyclin and (PGE2) by the coxib, a
623 24    cardioprotective effect of naproxen, or a
623 25    combination of both the prostacyclin and naproxen
624  1    mechanisms.'
624  2    Q: Is that a fair summary, sir?
624  3    A: Yes.
624  4    Q: Was that your opinion at the time --
624  5    A: Yes.
624  6    Q: -- in 2002?
624  7    A: In 2002, no, not in 2002.
624  8    Q: Well, the article is written in 2002;
624  9    correct?

| | Objections | Rulings |
|---|---|---|

624 10    A:  Well, I'm not sure when it was
624 11    written. It was published in 2002.
624 12    Q:  All right. It was published March
624 13    21st, 2002. Was that your opinion when the article
624 14    was published?
624 15    A:  At that point, my opinion was not
624 16    that.
624 17    Q:  So, this article is a fair summary
624 18    except in relation to that sentence we just read?
624 19    A:  I'm saying it's a fair summary of
624 20    data. These are all opinions. These are his
624 21    opinions.
624 22    Q:  Well, whether you characterize them
624 23    as opinion or not, you don't regard that sentence as
624 24    being correct? Is that true?
624 25    A:  It's a correct statement of the --
625  1    when you looked at the VIGOR data, those were the
625  2    possibilities at the time of the VIGOR data coming
625  3    out.
625  4    Q:  Well, this is well after the VIGOR
625  5    data coming out.
625  6    A:  And that's the basis of my --
625  7    Q:  Let me finish --
625  8    A:  That's the basis of my comment.
625  9    Q:  Let me just finish my question.
625 10    This is almost exactly two years
625 11    after VIGOR came out; correct?
625 12    A:  Yes.
625 13    Q:  And two years after VIGOR came out,
625 14    Dr. FitzGerald was saying the results of the VIGOR
625 15    study may also be explained by chance, by the
625 16    prostacyclin hypothesis or a cardioprotective effect
625 17    of naproxen or a combination of both the
625 18    prostacyclin and naproxen mechanisms. Is that true?
625 19    A:  That's what he's saying.
625 20    Q:  Did you think he was wrong?
625 21    A:  Yes.
625 22    Q:  On the previous page, Page 30D, if
625 23    you go with me, sir, in the first column in the
625 24    third full paragraph, Dr. FitzGerald writes in the
625 25    second sentence, he asks the question, 'How strong
626  1    is the evidence that naproxen may differ from other
626  2    NSAIDs and offer cardioprotection, just like
626  3    aspirin?' Did he ask that question there?
626  4    A:  Yes.
626  5    Q:  And did he answer, 'It is limited.'
626  6    A:  Yes.
626  7    Q:  Did I read that correctly?
626  8    A:  Yes.

04/07/10 20:08

| | Objections | Rulings |
|---|---|---|

626  9  Q: Was that a true statement as to
626 10  medical knowledge in March of 2002?
626 11  A: The clinical -- it's a true statement
626 12  of the clinical evidence.
626 13  Q: Did you agree with it as of then,
626 14  sir?
626 15  A: I agreed that the data were limited.

631:20 -  632:5 Nies, Alan 2005-04-01
631 20  MR. SPECTER: Nies-30. Just for the
631 21  record, I guess we're marking ours in double digits
631 22  and we're marking Merck's exhibits in four digits.
631 23  - - -
631 24  (Whereupon, Deposition Exhibit
631 25  Nies-30, 'MK-0966  (COX-2 Inhibitor)
632  1  Consultants' Meeting Phase III
632  2  Monitoring of GI Clinical Events and
632  3  Design of a GI Outcomes Mega-Trial,'
632  4  9-28-96 Meeting Minutes, MRK-NJ0258901 -
632  5  MRK-NJ0258908, was marked for

632:15 -  633:3 Nies, Alan 2005-04-01

**Re: [632:15-633:3]**
**Def Obj** 401; 402; This study was never done. Completeness includes 633:4-9

632 15  Q: Let's just take a look at this for a
632 16  second. When is the last time you think you saw
632 17  this document, if ever? Maybe we should first
632 18  identify it for the record.
632 19  A: It looks like a document from 1996,
632 20  September 28th.
632 21  Q: These again are meeting minutes;
632 22  right?
632 23  A: These are meeting minutes of a
632 24  consultants meeting.
632 25  Q: Right. It is regarding the GI
633  1  outcomes mega trial and Vioxx; correct?
633  2  A: Yes. It appears to be some of the
633  3  planning.

634:14 -  635:25 Nies, Alan 2005-04-01

**Re: [634:14-635:25]**
**Def Obj** 401; 402

634 14  When do you think is the last time
634 15  you saw this document, if ever?
634 16  A: Oh, I've seen it probably on
634 17  September 28, 1996.
634 18  Q: How about since then?
634 19  A: No. I haven't seen it since then.
634 20  Q: All right.
634 21  Was it your custom to review minutes
634 22  of meetings that you were a part of?
634 23  A: Yes.
634 24  Q: Do you figure that you were a part of

| | Objections | Rulings |
|---|---|---|

634 25    this meeting?
635 1    A: Yes, I'm sure I was.
635 2    Q: Then on Page 5 at the bottom, there's
635 3    a discussion of comparator agents; correct?
635 4    A: Yes.
635 5    Q: The first sentence says, 'Dr. Strom
635 6    suggested that Vioxx be compared against drugs
635 7    perceived to be the safest (for example, Tylenol and
635 8    Motrin).'  It uses the generic name, acetaminophen
635 9    and ibuprofen; correct?
635 10    A: Right.
635 11    Q: Who is Dr. Strom?
635 12    A: He's an epidemiologist at -- I think
635 13    he's at Penn also.
635 14    Q: At Penn?
635 15    A: Yeah, I think so.
635 16    Q: In Philadelphia?
635 17    A: Yes.
635 18    Q: He was one of your outside
635 19    consultants; correct?
635 20    A: Yes.
635 21    Q: He was not a Merck employee; right?
635 22    A: No. That's right.
635 23    Q: Was he an expert in the field?
635 24    A: Well, he's an expert in the field of
635 25    epidemiology.

639:6  -  639:14 Nies, Alan 2005-04-01

639 6    Q: Towards the bottom of this paragraph,
639 7    at the top of Page 6, it says here that 'Dr.
639 8    Silverman and Mr. Khanna questioned the advisability
639 9    of a Tylenol arm, because the findings could
639 10    highlight favorable properties of Tylenol.' Did I
639 11    read that correctly?
639 12    A: I see that.
639 13    Q: Who was Dr. Silverman?
639 14    A: Dr. Silverman is in regulatory.

*Objections column:* **Re: [639:6-639:14]** **Def Obj** 401; 402

640:7  -  640:19 Nies, Alan 2005-04-01

640 7    Q: Who is Mr. Khanna?
640 8    A: Khanna was in marketing.
640 9    Q: Marketing. So, we have a man here --
640 10    he's not a doctor; correct? It says Mr.?
640 11    A: Yes, that's right.
640 12    Q: We have a man who's in marketing
640 13    taking part in a discussion on the design of a
640 14    gastrointestinal outcome mega trial; correct?
640 15    A: He's participating in this meeting.
640 16    Q: Right. And he's saying, at least

*Objections column:* **Re: [640:7-640:19]** **Def Obj** 401; 402

| | | Objections | Rulings |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 640 17 | according to the sentence, we shouldn't compare | | |
| 640 18 | Vioxx to Tylenol 'because the findings could | | |
| 640 19 | highlight the favorable properties of Tylenol.' | | |

**640:22 - 641:6 Nies, Alan 2005-04-01**

| | | |
|---|---|---|
| 640 22 | Q: Is that what the document indicates | Re: [640:22-641:6] |
| 640 23 | to you, sir? | Def Obj 401; 402 |
| 640 24 | A: He 'questioned the advisability of a | |
| 640 25 | Tylenol arm.' | |
| 641 1 | Q: 'Because the findings could highlight | |
| 641 2 | the favorable properties of Tylenol.' | |
| 641 3 | A: That's what this says. Correct. | |
| 641 4 | Q: Do you have any reason to question | |
| 641 5 | the accuracy of the recording of the minutes of | |
| 641 6 | these meetings? | |

**641:8 - 641:9 Nies, Alan 2005-04-01**

| | | |
|---|---|---|
| 641 8 | THE WITNESS: I don't have any reason | Re: [641:8-641:9] |
| 641 9 | to question it. | Def Obj 401; 402 |

**642:19 - 643:7 Nies, Alan 2005-04-01**

| | |
|---|---|
| 642 19 | Q: After Khanna from marketing and |
| 642 20 | Silverman from regulatory affairs questioned the |
| 642 21 | advisability of a Tylenol arm because the findings |
| 642 22 | could highlight favorable properties of Tylenol, did |
| 642 23 | you, sir, as a scientist say, fellas, that is an |
| 642 24 | inappropriate consideration? |
| 642 25 | A: I don't recall. |
| 643 1 | Q: Is there any indication that you said |
| 643 2 | this in these minutes? |
| 643 3 | A: All it says is that a conclusion was |
| 643 4 | not reached. |
| 643 5 | Q: Is there any indication that you said |
| 643 6 | a word on that subject? |
| 643 7 | A: I don't see any indication here. |

**646:3 - 646:19 Nies, Alan 2005-04-01**

| | |
|---|---|
| 646 3 | Q: Just so the jury understands what you |
| 646 4 | mean by that, 'endoscopically,' tell the jury what |
| 646 5 | that means. |
| 646 6 | A: Endoscopically means that a tube is |
| 646 7 | put down into the stomach through the mouth, and one |
| 646 8 | looks at the lining of the stomach. |
| 646 9 | Q: The tube has a light and a camera? |
| 646 10 | A: A little light and a camera. And |
| 646 11 | this is the kind of data that we had early on that |
| 646 12 | the FDA would not allow us to use for clinical, |
| 646 13 | because they saw it as surrogate endpoint. So, the |
| 646 14 | comparison -- the two looked comparable, I would |

|  | Objections | Rulings |
|---|---|---|

646 15    say, the two groups.
646 16    Q:  On the issue of the condition of the
646 17    stomach, when somebody was taking Motrin versus
646 18    somebody taking both Vioxx and aspirin?
646 19    A:  That's right.

**647:25 -   648:3   Nies, Alan 2005-04-01**
647 25    Q:  Merck never said that Vioxx was more
648 1    effective in relieving pain than any other NSAID;
648 2    correct?
648 3    A:  Yes, that's correct.

**648:20 -   649:2   Nies, Alan 2005-04-01**
648 20    Q:  Again, there are lots of people in
648 21    the United States who are taking aspirin --
648 22    A:  Right.
648 23    Q:  -- on a daily basis; correct?
648 24    A:  Yes.
648 25    Q:  Mostly for cardioprotective reasons;
649 1    correct?
649 2    A:  Yes.