KAISER, MD, FRAN, DEPOSITION OF 1/29/10

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Defendant's Counter Designations are highlighted. Plaintiffs Affirmative Designations are not. 1/29/10 DEPOSITION | | |
| Kaiser, M.D., Fran, (Page 7:6 to 7:11)<br><br>6  Q.  Good morning, Dr. Kaiser.  My name is Don<br>7  Arbitblit.  I'm an attorney with the plaintiffs'<br>8  steering committee and assigned to work on behalf of<br>9  the State of Louisiana in the case involving Merck and<br>10  Vioxx.  Do you understand that?<br>11    A.  Yes. | | |
| Kaiser, M.D., Fran, (Page 10:2 to 10:18)<br><br>2  Q.  Okay.  And you're a physician; is that right?<br>3    A.  I am.<br>4  Q.  Do you currently maintain a practice?<br>5    A.  I am not seeing patients at this time.<br>6  Q.  Did you at one point in your career?<br>7    A.  Over 30 years.<br>8  Q.  When did you stop seeing patients?<br>9    A.  I became a physician in 1974.  I saw patients<br>10  up until 1997 at a variety of university settings.  I<br>11  went back to seeing patients part-time while I was<br>12  working for Merck to maintain my connectivity with the<br>13  medical world and up until about 2005 was seeing<br>14  patients.<br>15    Q.  Okay.  That covered a lot of territory.<br>16        When did you first start working --<br>17  working for Merck?<br>18    A.  1997. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 10:19 to 11:22)<br><br>19  Q.  And before that, you had been a professor at<br>20  universities, medical schools?<br>21    A.  Yes.<br>22    Q.  Which ones?<br>23    A.  I was -- I did my training in New York and<br>24  then went to the University of Minnesota and stayed<br>25  there as faculty.  I was then at UCLA.  I went from<br><br>1  UCLA to St. Louis University.  I also had an<br>2  appointment at UT Southwestern here in Dallas as a<br>3  clinical professor of medicine.  I had to drop that<br>4  because that was voluntary and they needed too much<br>5  time.  But I maintain an appointment at St. Louis<br>6  University still, to this day.<br>7    Q.  And you are an endocrinologist; is that right?<br>8    A.  Endogeriatrician.<br>9    Q.  That was going to be my next question.  You<br>10  are endocrinologist and a geriatrician; is that right?<br>11    A.  Correct.<br>12    Q.  Are those both board-certified -- or is there<br>13  a certification as a geriatrician?<br>14    A.  There is a certification of added<br>15  qualifications.  I have not renewed that.  But I -- I<br>16  am -- I was certified in geriatrics.<br>17    Q.  When you were a practicing physician, did you<br>18  practice in those specialties or did you have a general<br>19  practice, or both?<br>20    A.  As an internist, you have a background in<br>21  everything.  In geriatrics, you deal with a variety of<br>22  issues.  It was not just endocrine functions, so .. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 11:23 to 12:21)<br><br>23    Q.  As a physician, did you treat patients with<br>24  arthritis?<br>25     A.  Yes.<br><br>                            12<br>1     Q.  Both osteo- and rheumatoid arthritis?<br>2     A.  Yes.<br>3     Q.  Did you have any special training as to<br>4  nonsteroidal anti-inflammatory drugs prior to coming to<br>5  Merck?<br>6     A.  Only the medications that I was familiar with<br>7  at the time.<br>8     Q.  Do you have -- you have published in<br>9  peer-reviewed journals, correct?<br>10    A.  Yes.<br>11    Q.  Have any of your publications concerned<br>12  COX-2-specific inhibitors?<br>13    A.  No.<br>14    Q.  Have any of your publications concerned<br>15  traditional NSAIDs -- and if -- if I use the term<br>16  traditional NSAIDs, would you understand that to mean<br>17  the nonsteroidal anti-inflammatory drugs that were in<br>18  general usage prior to the introduction of the<br>19  COX-2-specific inhibitors?<br>20    A.  I would understand that to be the case.  And I<br>21  did not publish in that area. | | |
|         Kaiser, M.D., Fran, (Pages 14:17 to 15:3)<br>                         14<br>17    Q.  Okay.  When you first came to Merck, what was<br>18  your job title?<br>19    A.  My job title was a senior medical director.<br>20    Q.  For what region?<br>21    A.  The South Central.<br>22    Q.  What's included in South Central?<br>23    A.  My recollection at the time is that there were<br>24  11 states within the South Central region.  They<br>25  included Louisiana, Texas, Arkansas, Oklahoma, Kansas,<br><br>                         15<br>1  Missouri, Arizona, New Mexico, and, I believe, Colorado<br>2  at the time.  There might have been one or two more<br>3  that were in there. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 15:7 to 16:1)<br><br>15<br>7   So what were the job duties of a senior<br>8   medical director?<br>9      A.  Like all the medical directors, our role was<br>10  to present scientific and clinical information in<br>11  support of diseases and products that Merck was<br>12  interested in, in a peer-to-peer fashion, predominantly<br>13  with physicians, some other healthcare providers as<br>14  well.<br>15     Q.  As a -- over the course of years from 1997 to<br>16  2004, did your position change or stay the same?<br>17     A.  I -- I left Merck in 2003, and just prior to<br>18  leaving, I actually became an executive medical<br>19  director with the company.<br>20     Q.  Where are you employed now?<br>21     A.  At Merck.<br>22     Q.  You left Merck and returned to Merck?<br>23     A.  That's correct.<br>24     Q.  What were the dates when you were gone?<br>25     A.  I left in November of 2003 and returned in<br>16<br>1   April of 2005. | | |
| Kaiser, M.D., Fran, (Page 16:2 to 16:18)<br>16<br>2   Q.  Why did you leave in November of 2003?<br>3      A.  There was a restructuring of our group and an<br>4   alteration in the role of medical directors.  They had<br>5   asked me to move to headquarters, and I chose not to do<br>6   that.<br>7      Q.  Headquarters in New Jersey?<br>8      A.  Pennsylvania.<br>9      Q.  Pennsylvania?<br>10        And -- so what did you do between November<br>11  2003 and April 2005?<br>12     A.  I formed a consulting firm.<br>13     Q.  What was that called?<br>14     A.  Kaiser & Associates.<br>15     Q.  And who did you consult for?<br>16     A.  I consulted for Merck, for the NIA, for a<br>17  variety of universities, and some educational<br>18  companies. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 17:6 to 18:9)<br><br>17<br>6   Q. I think you used the term senior medical<br>7   director as the position into which you were hired in<br>8   1997. Is that right?<br>9       A. Yes.<br>10      Q. Until you became executive medical director<br>11   sometime in 2003, did your title remain the same,<br>12   senior medical director?<br>13      A. Yes.<br>14      Q. I've seen the term regional medical director.<br>15   Is there any difference between a senior medical<br>16   director and a regional?<br>17      A. No. We were part of the regional medical<br>18   director team.<br>19      Q. Okay.<br>20          (Exhibit Number 1 marked.)<br>21      Q. Doctor, the court reporter has handed you a<br>22   document marked as Exhibit Number 1 to the deposition,<br>23   with the heading Regional Medical Director (RMD)<br>24   Activities.<br>25          Have you seen this document before?<br><br>18<br>1       A. I'd have to look at the document.<br>2       Q. Well, could you take a look at it, and I'd<br>3   just like to know whether you think it accurately sets<br>4   forth the job duties of your position during the time<br>5   that you served in -- as a regional medical director<br>6   for Merck.<br>7       A. I do not recall seeing this specific document.<br>8       Q. Have you seen documents like it?<br>9       A. Yes. | | |
| KAISER, MD, FRAN (Page 17:20 to 18:7)<br>17<br>20   (Exhibit Number 1 marked.)<br>21      Q. Doctor, the court reporter has handed you a<br>22   document marked as Exhibit Number 1 to the deposition,<br>23   with the heading Regional Medical Director (RMD)<br>24   Activities.<br>25          Have you seen this document before?<br><br>18<br>1       A. I'd have to look at the document.<br>2       Q. Well, could you take a look at it, and I'd<br>3   just like to know whether you think it accurately sets<br>4   forth the job duties of your position during the time<br>5   that you served in -- as a regional medical director<br>6   for Merck.<br>7       A. I do not recall seeing this specific document. | 602 | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 19:10 to 19:20)<br>19<br>10    In terms of the external commercial<br>11 activities on the first -- the second page of the<br>12 document in the left-hand column under activity,<br>13 there's a reference to state Medicaid, meet with state<br>14 Medicaid P&T committee members, and P&T presentations.<br>15    Is that something that you were asked to<br>16 do during the time frame 1997 to 2004 -- 2003?<br>17    A. Yes.<br>18    Q. And, specifically, you had such meetings with<br>19 members of the P&T committee for the State of Louisiana<br>20 Department of Health and Hospitals; is that right? | 602 | |
| KAISER, MD, FRAN (Page 19:22 to 20:2)<br>19<br>22  A. I had another member of my team who may have<br>23 met from -- and, again, I'm not sure of the date that<br>24 she left. It may have been somewhere in the '99/2000<br>25 time frame. So it -- it's possible that I did not<br>20<br>1  cover Louisiana for that entire time period. But<br>2  certainly around 2000, I -- and to 2003 I did. | 602 | |
| Kaiser, M.D., Fran, (Page 20:10 to 20:23)<br>20<br>10  Is it correct that you were not personally<br>11 involved in any of the clinical trials on Vioxx?<br>12    A. Correct.<br>13    Q. I'd like to know -- well, let's start with<br>14 this: When you first came to Merck in 1997, were there<br>15 particular products that you were asked to be<br>16 responsible for presenting to potential buyers?<br>17    A. I'm not sure what you mean by buyers. I spoke<br>18 to physicians.<br>19    Q. Okay. Well, you understood that if you were<br>20 speaking to state Medicaid P&T, pharmaceutical and<br>21 therapeutics, committee members, that one ultimate end<br>22 of those conversations would be to have the state<br>23 purchase Merck's products, right? | | |
| KAISER, MD, FRAN (Page 20:24 to 20:24)<br>20<br>24  MR. GOLDMAN: Object to the form. | Lawyer objection | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 20:25 to 21:10)<br><br>20<br>25  A.  The P&T committee made, hopefully, clinical<br><br>21<br>1  decisions of what would or would not be useful to the<br>2  patients.<br>3    Q.  And some of those decisions involved buying<br>4  Merck products?<br>5    A.  I -- I don't think the P&T committees actually<br>6  purchased the products.<br>7    Q.  Okay.  The P&T committees made recommendations<br>8  to the ultimate person who made the decision to buy the<br>9  products, correct?<br>10    A.  I believe they did. | | |
| Kaiser, M.D., Fran, (Pages 21:21 to 22:7)<br><br>21<br>21  Were there particular products that you<br>22  were asked to become familiar with in 1997 for the<br>23  purpose of making presentations to whoever the ultimate<br>24  target audience was?<br>25    A.  As a group, all of the RMDs covered what were<br><br>22<br>1  considered our, quote, in-line products, so -- I'm<br>2  trying to remember what was -- what we even had in '99.<br>3  Cozaar/Hyzaar, Zocor, Fosamax, when it -- when it was<br>4  approved.  I'm not sure of the date of approval of<br>5  Fosamax.<br>6        When -- when Vioxx was approved, yes, we<br>7  would -- we would each cover our geographic area. | | |
| Kaiser, M.D., Fran, (Page 22:16 to 22:19)<br><br>22<br>16    Q.  When did you first learn about a product that<br>17  would ultimately be called Vioxx?<br>18    A.  At or about just before the time of approval<br>19  in '99. | | |
| Kaiser, M.D., Fran, (Page 23:12 to 23:18)<br><br>23<br>12  Q.  And when you were asked to make<br>13  presentations -- this is going to be a broad question,<br>14  and we'll narrow it down as we go.<br>15        But the general thrust of the question is,<br>16  what were the sources of information that you received<br>17  with which to make your presentations about Vioxx to<br>18  your target audiences? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 23:22 to 24:11)<br><br>23<br>22  A. It depends on who that target audience was and<br>23  the context of the discussion.  There's a different<br>24  format that one can use in CME versus non-CME.  But<br>25  clearly sources of information for consideration -- I'm<br><br>24<br>1  not talking about exactly what got presented -- would<br>2  be obviously the label, the data which supported the<br>3  label, which came both from published literature and<br>4  from abstracts, conferences that may have been held<br>5  that we may have attended, knowledge about disease, in<br>6  general.  So talking about issues related to -- at the<br>7  time of approval, obviously -- osteoarthritis and pain.<br>8          So published literature, conferences, our<br>9  own label, FDA documents that were submitted by the<br>10  company.  And we were -- you know, we received training<br>11  from people who were experts in the area. | | |
| Kaiser, M.D., Fran, (Pages 26:21 to 27:17)<br><br>26<br>21  Q.  Doctor, do you have a recollection of a<br>22  specific document or set of documents that you reviewed<br>23  in preparation for the deposition that refreshed your<br>24  recollection, or did they all refresh your<br>25  recollection?<br><br>27<br>1      A.  They didn't all refresh my recollection, but<br>2  some of them did.<br>3      Q.  Which ones?<br>4      A.  I saw a document that indicated some of the<br>5  content of a meeting that I had.<br>6      Q.  And what meeting was that?<br>7      A.  That was a meeting with Dr. Culotta.<br>8      Q.  Dr. Culotta, who was head of the Louisiana P&T<br>9  committee?<br>10      A.  Yes.<br>11      Q.  And when did that meeting take place?<br>12      A.  That meeting took place in 2002.<br>13      Q.  And what was the document that you saw that<br>14  refreshed your recollection about the meeting?<br>15      A.  That we had a meeting in which a number of<br>16  products were discussed and a label update was<br>17  discussed. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 30:14 to 30:16)<br><br>14   Q.  And did your compensation package include<br>15   bonuses?<br>16      A.  Yes. | 401 | *Overruled* |
| Kaiser, M.D., Fran, (Page 30:18 to 30:21)<br><br>18   Do you know whether the calculation of<br>19   your bonus included any evaluation of the amount of<br>20   products that Merck sold in your region?<br>21      A.  They were absolutely not tied to that. | | |
| KAISER, MD, FRAN (Page 30:22 to 31:1)<br><br>22   Q.  What was the basis of your bonus?<br>23      A.  It was the overall position of the company,<br>24   how well the company did, how well our division did in<br>25   the context of the company.<br><br>1      Q.  Well, how was it -- how well your division did | 401; incomplete answer | |
| Kaiser, M.D., Fran, (Page 31:1 to 31:6)<br><br>1      Q.  Well, how was it -- how well your division did<br>2   in the context of the company evaluated?<br>3      A.  As a qualitative, not quantitative entity.  We<br>4   were a support service in terms of providing clinical<br>5   and scientific information.  We were not pegged to any<br>6   sales lines. | | |
| KAISER, MD, FRAN (Page 31:7 to 31:11)<br><br>7      Q.  And did you receive stock as part of your<br>8   compensation?<br>9      A.  Yes.<br>10    Q.  Actual shares or options or both?<br>11    A.  Options. | 401 | |
| KAISER, MD, FRAN (Page 32:7 to 32:14)<br><br>7      Q.  Doctor, did you give a presentation recently,<br>8   within the past few years, at which time you disclosed<br>9   owning significant shares in Merck?<br>10    A.  I'm not sure who would consider them<br>11   significant, but I do disclose that I own some shares<br>12   of Merck, yes.<br>13    Q.  Do you typically review the presentations<br>14   published with your name on them? | 401; incomplete designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 32:15 to 32:20)<br>32<br>15  A.  This might have been a verbal disclosure.<br>16  Again, as an employee of Merck and as someone who has<br>17  stock and stock options, I think it's important to<br>18  disclose that.  So what somebody chooses to term<br>19  significant -- I don't know how they make that<br>20  determination. | | |
| Kaiser, M.D., Fran, (Page 33:12 to 33:23)<br>33<br>12  Q.  Was there a standard training program that<br>13  regional medical directors participated in to learn<br>14  about Vioxx surrounding the product launch in 1999?<br>15    A.  There was training that was given to the<br>16  medical directors, yes.<br>17  Q.  As a group?<br>18  A.  Yes.<br>19  Q.  Did you receive a packet of documents in that<br>20  regard?<br>21  A.  I'm -- I'm sure we did.<br>22  Q.  What was your understanding as to who put<br>23  together the documents that you received? | | |
| Kaiser, M.D., Fran, (Page 34:3 to 34:9)<br>34<br>3  A.  The likely source for -- for the material<br>4  would have gone through medical services and been<br>5  medically/legally approved before they were shared with<br>6  us.  That was the general principle that was followed.<br>7    Q.  Have you ever heard the term protocol 023?<br>8    A.  I may have heard it.  I have no recollection<br>9  of what it refers to. | | |
| KAISER, MD, FRAN (Page 34:20 to 34:24)<br>34<br>20  Q.  Doctor, Exhibit Number 2 is a document with<br>21  the subject project team minutes for January 12, 1998,<br>22  starting at MRK-ABC0009947.<br>23      Have you seen this document before?<br>24  A.  No. | 602 | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 34:25 to 35:4)<br><br>34<br>25    Q.  With respect to --<br><br>35<br>1         MR. GOLDMAN:  Don, may -- I'm sorry to<br>2  interrupt you.  Can I have a standing objection on<br>3  lack-of-foundation grounds?<br>4         MR. ARBITBLIT:  You already have that, | | |
| KAISER, MD, FRAN (Page 35:15 to 35:19)<br>35<br>15   Q.  Doctor, if you could take a look at the page<br>16  ending in 9949, paragraph D, results of the analysis of<br>17  the incidence of cardiovascular disease in the Vioxx<br>18  clinical trials -- do you see that?<br>19      A.  Yes. | 602 | |
| KAISER, MD, FRAN (Page 35:22 to 35:24)<br>35<br>22  At any time before today, did you know<br>23  that there was an analysis of the incidence of<br>24  cardiovascular disease, CVD, SAEs in the Vioxx clinical | 602 | |
| KAISER, MD, FRAN (Page 36:3 to 36:6)<br>36<br>3   A.  I'm not quite sure.  Prior to launch, I had no<br>4  knowledge of any kind of meta-analysis of any of our<br>5  clinical trials, so I would not have been aware of this<br>6  information. | 602 | |
| KAISER, MD, FRAN, (Page 36:7 to 36:17)<br>36<br>7   Q.  Do you recall whether you have learned about<br>8  such an analysis having been done at any time prior to<br>9  today?<br>10      A.  I know that a meta-analysis was done of our<br>11  trials looking for cardiovascular signals in other<br>12  populations that were studied which did not show an<br>13  increased risk.  And we had additional data that did<br>14  not show increased risk of cardiovascular events.<br>15         But if you're asking me in particular<br>16  about study 023, I don't know what study 023<br>17  specifically refers to. | Non-responsive; lack of personal knowledge | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 36:20 to 37:13)<br><br>20  Q.  And, in particular, the statement under the<br>                   36<br>21  term background in -- at paragraph D, study 023 showed<br>22  that MK-0966 and indomethacin significantly reduced<br>23  urinary excretion of PGI-M, which may reflect a<br>24  decrease in prostacyclin biosynthesis.  Prostacyclin is<br>25  a potent inhibitor of platelet aggregation and has<br><br>                   37<br>1  vascular dilatory properties.  However, MK-0966 had no<br>2  effect on systemic thromboxane.  The clinical relevance<br>3  of partially inhibiting prostacyclin synthesis without<br>4  inhibiting thromboxane are unknown.  These findings<br>5  raised a concern about the potential for Vioxx to cause<br>6  cardiovascular thrombotic events.<br>7        Did I read that correctly?<br>8    A.  That's what -- what is in this document, yes.<br>9    Q.  Before you were assigned to present<br>10  information about Vioxx, in 1999, had you been told any<br>11  of the information that I just read?<br>12    A.  I don't have a specific recollection of this<br>13  information, no. | 602 | |
| KAISER, MD, FRAN (Page 38:16 to 38:22)<br><br>                 38<br>16  Q.  Exhibit 3 is a document previously marked at<br>17  the deposition of Douglas Watson called Plan to<br>18  Evaluate the Incidence of Cardiovascular SAEs in the<br>19  Phase IIb/III Vioxx Osteoarthritis Clinical Trials,<br>20  dated December 30, 1997.<br>21        Have you ever seen this document before?<br>22    A.  No. | 602 | |
| KAISER, MD, FRAN (Page 39:1 to 39:5)<br><br>                 39<br>1  Q.  Do you see, at the page ending with 7039,<br>2  there's an introduction and background section, and the<br>3  last paragraph on that page again begins with the<br>4  reference to protocol 023?  Are you following along?<br>5    A.  Yes. | 602; 701 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 39:9 to 40:7)<br>39<br>9   Q. Do you see the sentence starting with, it was<br>10   felt that the reduction in urinary PGI-M likely<br>11   reflects both a reduction in renal PGI2 generation, as<br>12   supported by an observed decrease in urinary 6-keto<br>13   PFG1 alpha, and to some undefinable extent a decrease<br>14   in systemic PGI2 synthesis.<br>15          Did I read that correctly?<br>16   A. I see that sentence.<br>17   Q. Do you know what PGI2 refers to?<br>18   A. It's one of the prostaglandins.<br>19   Q. And the next sentence, PGI2 is synthesized<br>20   ubiquitously in blood vessel walls from arachidonate<br>21   derived from either the vessel wall or the platelet.<br>22          Did I read that correctly?<br>23   A. That's how it appears, yes.<br>24   Q. It is the most potent of all inhibitors of<br>25   platelet aggregation, and has vascular dilatory<br>40<br>1   properties as well.<br>2          Did I read that correctly?<br>3   A. Yes.<br>4   Q. And do you agree with the statement that PGI2<br>5   is the most potent of all inhibitors of platelet<br>6   aggregation, and has vascular dilatory properties as<br>7   well? | 602; 701 | Sustained |
| KAISER, MD, FRAN (Page 40:12 to 40:12)<br>40<br>12   A. I'm not an expert in this area. | 602; 701 | |
| KAISER, MD, FRAN (Page 41:8 to 41:19)<br>41<br>8   Q. So going back to that sentence that goes from<br>9   7039 onto 7040, Doctor, these findings raised concern<br>10   about the potential for Vioxx to predispose to<br>11   cardiovascular (CVD) thrombotic events; however, there<br>12   has not been any evidence of an increased incidence of<br>13   such events in clinical trials of Vioxx to date.<br>14          Did I read that correctly?<br>15   A. Yes.<br>16   Q. And at any time before today, were you<br>17   informed that Merck scientists had raised concern about<br>18   the potential for Vioxx to predispose to cardiovascular<br>19   thrombotic events before the product was launched? | 602; 701 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 41:21 to 41:25)<br><br>21  A.  Prior to launch, no.<br>     41<br>22     Q.  And is it correct that the document marked as<br>23  Exhibit 3 was not provided to you at any time during<br>24  your work as a regional medical director?<br>25     A.  I've never seen this document before | Incomplete | |
| Kaiser, M.D., Fran, (Page 42:5 to 42:9)<br><br>5  Q.  Exhibit 4 is a document dated February 2nd,<br>     42<br>6  1998, a Final Results of an Analysis of the Incidence<br>7  of Cardiovascular SAEs in the Phase IIb/III Vioxx<br>8  Osteoarthritis Clinical Trials.<br>9       Have you seen this one before? | | |
| KAISER, MD, FRAN (Page 42:5 to 42:10)<br><br>5  Q.  Exhibit 4 is a document dated February 2nd,<br>     42<br>6  1998, a Final Results of an Analysis of the Incidence<br>7  of Cardiovascular SAEs in the Phase IIb/III Vioxx<br>8  Osteoarthritis Clinical Trials.<br>9       Have you seen this one before?<br>10  A.  No. | 602; No answer desgination | |
| KAISER, MD, FRAN (Page 42:23 to 43:8)<br><br>23    At -- the executive summary at the page<br>     42<br>24  ending in 6805 refers to -- under the executive<br>25  summary, the third -- the second paragraph refers to<br><br>     43<br>1  the incidence of CV SAEs from Vioxx patients (all<br>2  treatment groups) was compared to those of placebo<br>3  patients from selected Proscar and Fosamax trials ...<br>4       Do you see that?<br>5  A.  Yes.<br>6  Q.  And you were not aware that that had been<br>7  done?<br>8  A.  No. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 43:24 to 44:18)<br><br>43<br>24  sentence you've requested, Andy.<br>25      Q.  The overall, pooled incidence rate for men in<br><br>44<br>1  the Vioxx program was not statistically significantly<br>2  different from Proscar placebo controls (age- and<br>3  time-period-at-risk-adjusted rate ratio 1.28, 95<br>4  percent confidence interval 0.53 to 2.82).  The overall<br>5  incident rate for women was elevated compared to<br>6  Fosamax placebo controls (adjusted rate ratio 2.16, 95<br>7  percent confidence interval 1.14 to 3.94).<br>8          Did I read that correctly?<br>9      A.  Yes.<br>10      Q.  And is that information you were unaware of<br>11  before today?<br>12      A.  I have no context -- I'm not aware of this<br>13  information.  I have no context for it -- for this.<br>14      Q.  And this document was not provided to you --<br>15      A.  No.<br>16      Q.  -- as part of the materials you received for<br>17  the product launch?<br>18      A.  No. | 602 | |
| Kaiser, M.D., Fran, (Pages 44:19 to 45:7)<br><br>44<br>19  Q.  Do you know whether any study of the Fosamax<br>20  women was done to determine whether their rate of<br>21  cardiovascular events was atypically low or not?<br>22      A.  I do not know that.  But I'm looking at the<br>23  rest of the summary here.  It says, the CV SAE<br>24  incidence rates in patients on Vioxx appears to be<br>25  consistent with what would be expected in the general<br><br>45<br>1  population.  No clear evidence of consistently elevated<br>2  adjusted risks compared to placebo controls from<br>3  Proscar and Fosamax trials.<br>4          Again, without reading this, in the<br>5  patient populations, and knowing a little more about<br>6  who they looked at, it's hard for me to give you a<br>7  context for this. | Non-responsive; lack of personal knowledge | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 49:5 to 50:14)<br><br>49<br>5  Q.  Dr. Kaiser, Exhibit 5 is an e-mail dated<br>6  January 18, 2002 from Allan Goldberg to a group of<br>7  individuals.  And your name appears about<br>8  three-quarters of the way down in the cc's list.  Do<br>9  you see that?<br>10     A.  Yes.<br>11     Q.  Is this an e-mail that you received in January<br>12  2002?<br>13     A.  May I take a minute to look at it, please?<br>14     Q.  Certainly.<br>15     A.  I'm assuming, since I was cc'd on it, I did<br>16  get a copy of this.<br>17     Q.  Okay.  And the subject is request for<br>18  information State of Louisiana Medicaid, dated<br>19  January 18, 2002.<br>20         Is that -- does that refresh your memory<br>21  as to approximately when the request for information<br>22  came through?<br>23     A.  Yes.<br>24     Q.  There's a reference in the e-mail to binders<br>25  that would be assembled very much the same as that for<br><br>50<br>1  Oregon.<br>2         Did you have any role in the production of<br>3  binders for Oregon?<br>4     A.  No.  That was done by medical services and<br>5  went through a medical-legal review process as to what<br>6  was sent.<br>7     Q.  When you say, that was done, are you referring<br>8  specifically to what was done in Oregon, or are you<br>9  referring to --<br>10     A.  Any request for information went to medical<br>11  services.<br>12     Q.  Okay.  So in response to this request, did<br>13  Merck provide information to the State of Louisiana<br>14  that was prepared by medical services? | | |
| Kaiser, M.D., Fran, (Page 50:18 to 50:23)<br><br>50<br>18     A.  I believe they did receive it.  My role was to<br>19  actually make sure that they did get it.<br>20     Q.  That was going to be my next question, is<br>21  whether -- did you have any role in deciding what<br>22  materials went into the binder that --<br>23     A.  None. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 50:25 to 52:20)<br><br>25   Q.  For completion, Doctor, Exhibit Number 6 is a<br><br>50<br><br>51<br>1   letter from Charles Castille, undersecretary,<br>2   Department of Health and Hospitals, State of Louisiana,<br>3   that is referenced in the e-mail that you looked at a<br>4   moment ago.<br>5           And I just want to confirm that this was<br>6   part of the e-mail that you received.<br>7      A.  I don't know if this stood as an attachment<br>8   to --<br>9      Q.  Please take a look at the previous exhibit<br>10   first, the --<br>11      A.  Yes.  The Louisiana PDF.  I see that this<br>12   probably would have been appended.<br>13      Q.  And the -- again, there's a request in Charles<br>14   Castille's memo for a dossier on the various products.<br>15   Do you see that?<br>16      A.  Yes.<br>17      Q.  Is the dossier the same as the binder that you<br>18   were referring to that you didn't participate in<br>19   preparing?<br>20      A.  That was generally a synonym for that, yes.<br>21           (Exhibit Number 7 marked.)<br>22      Q.  Exhibit Number 7 is a memo from Warren Lambert<br>23   to a group of individuals, dated January 24, 2002.  And<br>24   the cc's on the second page show your name as a<br>25   recipient.<br><br>52<br>1           The first question is, have you seen this<br>2   document before?<br>3      A.  Again, I'm assuming, since I was cc'd on this,<br>4   I was a recipient of this.<br>5      Q.  Did you become aware at about this time,<br>6   January 24th, 2002, that the State of Louisiana<br>7   Department of Health and Hospitals had requested<br>8   clinical information concerning a list of<br>9   pharmaceuticals including COX-2?<br>10      A.  Yes.  That was in the January 18th request.<br>11      Q.  And it's referenced again on the January 24th<br>12   memo in the second paragraph; is that right?<br>13      A.  Yes.<br>14      Q.  On the second page, there's a paragraph with<br>15   the heading What's Being Done?  And it says, a team at<br>16   headquarters has been formed to address state requests<br>17   as they are becoming more common.  The team is creating<br>18   a clinical, medically, legally approved package for the<br>19   State of Louisiana.  The front line team of Holly<br>20   Jacques -- | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 52:22 to 54:4)<br><br>52<br>22  Q. -- (Government Affairs), Mary Ogle (Managed<br>23  Care), and Fran Kaiser (Regional Medical Director) are<br>24  working with the College of Pharmacy and the<br>25  legislature to provide information that has been<br><br>53<br>1  requested and to position Merck favorably.  They will<br>2  meet again with key decision-makers to learn more and<br>3  to educate on Merck products with policy.<br>4          Did I read that correctly?<br>5     A.  Yes.<br>6     Q.  And what do you recall about your role with<br>7  regard to the reference to your work in that paragraph?<br>8     A.  It was to ensure that the process that we used<br>9  when information was requested from the state went back<br>10  to medical-legal that they responded to the state with<br>11  a comprehensive package of information, and that the<br>12  state received it.<br>13          And then if there were further questions<br>14  or issues to be addressed on a clinical and scientific<br>15  basis, then they would be addressed to me, and I would,<br>16  again, try that process to see if we could get<br>17  information to resolve their questions.<br>18     Q.  In the next paragraph, there's a reference to<br>19  What Can We Do?  Do you see that heading?<br>20     A.  Yes.<br>21     Q.  There is a formulary meeting in March where<br>22  decisions will be made on which products are preferred<br>23  on the "pharmacopoeia."  The office-based team should<br>24  contact each P&T committee member to make sure that<br>25  they are fully aware of the benefits and features of<br><br>54<br>1  those products up for review.<br>2          Did I read that correctly?<br>3     A.  Yes.<br>4     Q.  Who's referenced by the office-based team? | | |
| KAISER, MD, FRAN (Page 53:21 to 54:4)<br><br>53<br>21  Q.  There is a formulary meeting in March where<br>22  decisions will be made on which products are preferred<br>23  on the "pharmacopoeia."  The office-based team should<br>24  contact each P&T committee member to make sure that<br>25  they are fully aware of the benefits and features of<br><br>54<br>1  those products up for review.<br>2          Did I read that correctly?<br>3     A.  Yes.<br>4     Q.  Who's referenced by the office-based team? | 602 | Sustained |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 54:7 to 54:9)<br>54<br>7    Q.  If you know.<br>8        A.  I did not write this memo, but I'm assuming<br>9   it's the sales representatives. | 602 | *Sustained* |
| Kaiser, M.D., Fran, (Page 54:10 to 54:16)<br>54<br>10      Q.  Did you have any chain of authority with<br>11  respect to sales representatives?<br>12      A.  None.<br>13      Q.  Did you have any meetings with sales<br>14  representatives?<br>15      A.  As few as possible.<br>16      Q.  Why is that? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 54:19 to 56:6) | | |

Kaiser, M.D., Fran, (Pages 54:19 to 56:6)

54
19  A.  Their role is to sell product.  My role is to
20  discuss science and clinical issues.  The two sometimes
21  had a very different focus, and so, again, some of the
22  individual physicians they called on were not people
23  that I would be working with.  We worked on a different
24  level, with different groups, again, to provide a
25  different level of information.

55
1      Q.  What is the -- the team in Upper Gwynedd, what
2  is that?
3      A.  That's a headquarters team.  It's sort of a
4  generic use of everybody at headquarters.
5      Q.  And the team in Upper Gwynedd, is that
6  Pennsylvania?
7      A.  Upper Gwynedd is indeed Pennsylvania.  It's
8  one of Merck's headquarter facilities, and that's where
9  medical services was housed.
10     Q.  So the team in Upper Gwynedd has created an
11  outstanding clinical package.  Does that relate to the
12  dossier or binder that you've referred to, as far as
13  you know?
14     A.  I -- again, I'm not sure of what he's
15  referring to.  I can't speak for his intent with this.
16  I'm assuming that is what he's referring to, is the
17  binder of information.
18           Again, at the time, there was a change in
19  the types of formats that different states were
20  requesting.  Again, PDLs, or preferred drug lists, was
21  a sort -- a relatively new concept, and so there was a
22  format that had come out from the Association of
23  Managed Care Pharmacists as to how they would like to
24  see information related to drugs.
25           So my belief and my understanding of what

56
1  medical services was doing at the time was pulling
2  together information that fit that format.

3           So processes were evolving, both external
4  to us and internal to us, as to how that information
5  was being requested and to how that information was
6  being formatted.

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 56:7 to 56:15)<br><br>7   Q.  Going on to the next sentence, it reads,<br>56<br>8   Holly, Mary, and Fran have already informed and guided<br>9   key decision-makers in the proper direction.<br>10          I know you didn't write this, but, first<br>11   of all, did I read that correctly?<br>12   A.  Yes.<br>13   Q.  And do you have an understanding as to who the<br>14   key decision-makers were in the relationship between<br>15   your team and the State of Louisiana? | 602 | |
| KAISER, MD, FRAN (Page 56:17 to 56:22)<br><br>17   A.  Again, it could have been meeting with key<br>56<br>18   rheumatologists in the state; it could have been --<br>19   again, I -- I don't have a context for this.  I did not<br>20   write this.  And, again, I know I had met with<br>21   Dr. Culotta, but in relation to when this memo was<br>22   written, I do not know. | 602 | |
| Kaiser, M.D., Fran, (Pages 57:9 to 58:3)<br><br>9   Q.  Between 1999 and 2002, when you had the<br>57<br>10   meeting with Dr. Culotta, did you meet with physicians<br>11   in the state of Louisiana concerning Vioxx?<br>12   A.  I'm sure I did.  Who I met with, I couldn't<br>13   tell you.<br>14   Q.  How did you go about determining who you would<br>15   meet with to discuss Vioxx between 1999 and 2002?<br>16   A.  Again, sometimes we were brought in by<br>17   other -- other folks at Merck.  If there were key<br>18   rheumatologists that had questions, needed information,<br>19   we would be asked to speak with them.  It was -- it was<br>20   usually at that level.<br>21   Q.  Do you, as you sit here today, recall any key<br>22   rheumatologists in the state of Louisiana that you met<br>23   with?<br>24   A.  I -- I actually don't.<br>25   Q.  Is it your best recollection that you did meet<br><br>58<br>1   with people you considered key rheumatologists in the<br>2   state of Louisiana?<br><br>3   A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 58:6 to 58:11)<br><br>58<br>6  Q.  And did that occur during the time period 1999<br>7  to 2003?<br>8     A.  I'm sure it did.<br>9     Q.  Did it occur both before and after the<br>10  creation of the legislation that led to the<br>11  pharmaceutical drug list? | | |
| Kaiser, M.D., Fran, (Page 58:14 to 58:16)<br><br>58<br>14    A.  I'd be speculating.  I'm assuming, given the<br>15  time course of Vioxx approval and the PDL, I met with<br>16  rheumatologists through that period. | | |
| Kaiser, M.D., Fran, (Pages 59:11 to 60:8)<br>59<br>11   Q.  Well, the -- who is -- who is Warren<br>12  Lampert -- Lambert, rather.<br>13     A.  Warren Lambert is a sales director.<br>14     Q.  And who are the people listed in the Tommie<br>15  Friday through Golden Zenon to whom this was addressed?<br>16  Do you know any of those people?<br>17     A.  Some of them were health science associates.<br>18  Their role was to interact with key scientific leaders.<br>19  Mike McClintock was the vice president for the South<br>20  Central region.  And I don't remember who the other<br>21  folks on this list are, truthfully.<br>22     Q.  And is health science associate a term for a<br>23  particular class of employees at Merck?<br>24     A.  Yes.<br>25     Q.  Are they in the sales department or a<br><br>60<br>1  different department?<br>2     A.  They've been situated in various departments<br>3  over time.  To the best of my recollection, in 2002, I<br>4  don't believe they were in -- in sales.<br>5     Q.  Was it your job to figure out who the key<br><br>6  scientists to meet with were in the state of Louisiana,<br><br>7  or were you given lists of people to meet with by<br><br>8  someone else, or how did that work? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 60:18 to 61:13)<br><br>60<br>18  A. We didn't have a list of people that said, you<br>19  have to see so-and-so and so-and-so.  No, we did not<br>20  have that.<br>21          And sometimes we would take it upon<br>22  ourselves to find individuals at universities, meet<br>23  with them, learn from them.  Part of our role was sort<br>24  of engaging key -- key scientists to learn how we, as a<br>25  company, were perceived as these areas were being<br><br>61<br>1  studied, what was happening out in their world in terms<br>2  of the science that they were learning about.<br>3          So we kind of had the -- a great job of<br>4  being able to sort of say, wait, there's somebody who<br>5  is doing interesting research.  I would like to meet<br>6  that person, if they're willing to meet with me.<br>7  Q.  And in the last paragraph, Mr. Lambert's memo<br>8  says, I will keep you posted on the progress.  Keep in<br>9  mind the business implications are tremendous, and<br>10  success in this segment will have positive spillover<br>11  into other areas.<br>12          Did I read that correctly?<br>13  A.  Yes. | | |
| KAISER, MD, FRAN (Page 61:14 to 61:16)<br><br>61<br>14  Q.  What did you understand he meant by, keep in<br>15  mind the business implications are tremendous?<br>16  A.  I can't speak for what -- what he meant. | 602 | *Sustained* |
| Kaiser, M.D., Fran, (Page 61:19 to 61:21)<br><br>61<br>19  Q.  Doctor, you understood that the company hoped<br>20  to sell its product to the State of Louisiana, didn't<br>21  you? | | |
| Kaiser, M.D., Fran, (Page 62:7 to 62:7)<br><br>62<br>7  A.  They hoped that it would -- | | |
| Kaiser, M.D., Fran, (Page 62:13 to 62:20)<br><br>62<br>13  A.  Again, my role in this was that medical and<br>14  clinical considerations that supported the product<br>15  would allow for its consideration.  That was my -- my<br>16  job.<br>17  Q.  And when Mr. Lambert's memo says in the<br>18  next-to-last paragraph, collectively, all efforts will<br>19  lead to success, you understood you were part of<br>20  collectively, right? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 62:23 to 62:24)<br><br>23  A.  Again, as I supported the clinical and<br>24  scientific information, yes | | |
| Kaiser, M.D., Fran, (Pages 64:10 to 66:13)<br><br>10   Q.  Doctor, Exhibit 9 is a memo dated March 11,<br>11  2002, Subject:  Louisiana P&T Committee Meeting,<br>12  March 6th, 2002.  And you are the second person to whom<br>13  it was directed.  Do you see that?<br>14     A.  Yes.<br>15     Q.  Do you recall seeing this document?<br>16     A.  No.  It was a long time ago.<br>17     Q.  Do you see, under the contract with Provider<br>18  Synergies, David Hood, secretary of DHH, then<br>19  introduced Terry Taylor with Provider Synergies to<br>20  brief the P&T committee on the work they have done for<br>21  the Florida Medicaid Department, et cetera?<br>22     A.  Yes.<br>23     Q.  And the next paragraph, that Dr. Culotta<br>24  announced that at the next P&T committee meeting,<br>25  Provider Synergies would present their recommendations<br><br>1  for a preferred product list for between 15 and 18<br>2  therapeutic categories.<br>3        Did I read that right?<br>4     A.  Yes.<br><br>5     Q.  Is this about the time that you learned that<br>6  Provider Synergies would be taking over the pharmacy<br>7  benefit manager role for the State of Louisiana?<br>8     A.  Yes.<br>9        (Off the record.)<br>10       (Exhibit Number 10 marked.)<br>11    Q.  Exhibit 10 is a memo that doesn't have a date<br>12  on it, but I think we can tell approximately when it<br>13  was bracketed by the reference to the committee having<br>14  met on August 8th, 2001 in the first paragraph and a<br>15  reference in the last line to a conference call<br>16  scheduled for September 6th.  And you are listed,<br>17  again, as the second person to whom this was sent.<br>18       Have you seen this one before?<br>19    A.  I don't recall this.<br>20    Q.  This refers to the State of Louisiana having<br>21  passed an SB 502 which authorizes the Department of<br>22  Health and Hospitals to establish a P&T committee with | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 65<br>23  authority to implement a Medicaid formulary and provide<br>24  for prior authorization.<br>25            Is August 2001 approximately when you<br><br>66<br>1   learned that that had taken place?<br>2      A.  I assume by the dates listed here, yes, that's<br>3   approximately correct.<br>4      Q.  I wanted to ask you about the submission<br>5   requirements on the second page of the document.  It<br>6   says, drug companies will be required to submit three<br>7   categories:  the first one, product information; the<br>8   second one, supporting clinical information, published<br>9   and unpublished; and the third, pharmacoeconomic<br>10  information, actual cost data and impact.<br>11            And my question has to do with the second<br>12  item, whether you know if Merck provided unpublished<br>13  information about Vioxx to the State of Louisiana. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 66:15 to 69:8)<br><br>66<br>15  A.  Again, requests go to medical services, and<br>16  they provide a comprehensive package of information.<br>17  As -- as is the case in all the dossier preparations or<br>18  AMCP or whichever format you choose, they do include<br>19  both published and unpublished information in that.<br>20      Q.  Was it your -- was it part of your role to<br>21  review and familiarize yourself with what was in a<br>22  dossier that went to a -- a potential buyer of the<br>23  products?<br>24      A.  If there were subsequent questions once the<br>25  dossier had been received, I would try to obtain from<br><br>67<br>1  medical services and did obtain from medical services<br>2  that information so I could review it and -- and see<br>3  what it was.  I did not necessarily have it beforehand.<br>4      Q.  After it was prepared, was it your practice to<br>5  review each dossier to see what was in it?<br>6      A.  If there were questions related to that<br>7  dossier that occurred, yes.<br>8      Q.  Was it your practice to only review the<br>9  dossier if there were questions raised, as opposed to<br>10  reviewing it just in the ordinary course of things?<br>11      A.  Those dossiers were often rather lengthy in<br>12  nature.  So, again, there were hundreds -- often<br>13  hundreds of pages involved.  So unless there was<br>14  something specific, I wouldn't necessarily review the<br>15  entire thing.<br>16          (Exhibit Number 11 marked.)<br>17      Q.  Doctor, Exhibit 11 is a document with the<br>18  heading Kaiser Quarterly Report, January to March 2002,<br>19  from your custodian file.<br>20          Did you prepare this document?<br>21      A.  I prepared, I believe, at least a portion of<br>22  this document.  If I can look through the document and<br>23  see if it's all me?<br>24      Q.  Of course.<br>25      A.  Yes.<br><br>68<br>1      Q.  Yes, you did prepare this document?<br>2      A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 68:3 to 69:8)<br>68<br>3    Q.  And does it accurately reflect what you did<br>4  during the time period January-March 2002 in a summary<br>5  fashion?<br>6     A.  It appears to do so, yes.<br>7    Q.  So under paragraph 1.C., Medicaid formulary in<br>8  Louisiana for multiple drug classes:  Working with<br>9  Government Affairs and MCO NAE on Medicaid, have<br>10  facilitated coordinating and providing dossiers for LSU<br>11  School of Pharmacy and now Provider Synergies, the PBM<br>12  charged with creating a preferred drug list for<br>13  Louisiana.  Have had discussions with Steve Shearer.<br>14          Is that all an accurate summary of what<br>15  you did?<br>16     A.  Yes.<br>17    Q.  With respect to the acronyms, what does MCO<br>18  stand for?<br>19     A.  Managed care organization, national account<br>20  executive.<br>21    Q.  And who are you referring to in that sentence?<br>22     A.  Depending on the time, possibly Mary Ogle.<br>23  There were a number of NAEs who covered Louisiana, and,<br>24  truthfully, I did not track the dates of when each one<br>25  was there.<br>69<br>1    Q.  This -- part of the paragraph that talks about<br>2  coordinating and providing dossiers for LSU School of<br>3  Pharmacy and now Provider Synergies -- my question is,<br>4  did you ever provide dossiers directly to Provider<br>5  Synergies for Vioxx?<br>6     A.  No.  That all would have gone through medical<br>7  services.  We provided a process to coordinate that<br>8  activity. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 69:11 to 70:8)<br><br>**69**<br>11    And when you say, medical services, you're<br>12  referring to a department of Merck?<br>13    A.  Yes.<br>14    Q.  Do you know whether the medical services<br>15  department of Merck ever provided dossiers directly to<br>16  Provider Synergies as opposed to LSU School of<br>17  Pharmacy?<br>18    A.  I can't tell you that with certainty.  I do<br>19  know that information was received by Provider<br>20  Synergies.  Do I know whether they got it from Gina<br>21  Biglane or directly from medical services?  My<br>22  assumption is they got it directly from medical<br>23  service.  But I wouldn't have been the one sending it.<br>24    Q.  And who is Steve Shearer?<br>25    A.  Steve Shearer, I believe, at the time had<br><br>**70**<br>1  national responsibility for Provider Synergies.  They<br>2  were starting to take a larger role in other states<br>3  other than Louisiana.<br>4    Q.  Was Steve Shearer a Merck employee?<br>5    A.  Yes.<br>6    Q.  What was his job title?<br>7    A.  I believe he was a national account executive<br>8  assigned to Provider Synergies | | |
| KAISER, MD, FRAN (Page 70:15 to 70:21)<br><br>**70**<br>15  Q.  Doctor, the top line of the next page ending<br>16  in 3315, the bullet point reads, had discussion with<br>17  Hosam Kamel of the Medical College of Wisconsin to<br>18  neutralize advocacy for P&G.<br>19        Who was Hosam Kamel?<br>20    A.  Actually, he was one of my former fellows in<br>21  geriatrics.  Terrible choice of words here. | 401; see MIL #6 | overruly |
| Kaiser, M.D., Fran, (Page 70:25 to 70:25)<br><br>**70**<br>25  Q.  What does P&G refer to? | | |
| KAISER, MD, FRAN (Page 70:24 to 71:1)<br><br>**70**<br>24  A.  Truthfully, I don't know what I meant here.<br>25    Q.  What does P&G refer to?<br><br>**71**<br>1    A.  Probably Procter & Gamble.  If I recall, he | Incomplete answer | |
| Kaiser, M.D., Fran, (Page 71:14 to 71:14)<br><br>**71**<br>14  A.  P&G was Procter & Gamble. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 71:17 to 72:18)<br><br>17   Q.  So what did you mean by neutralize advocacy?<br>18      A.  I had felt he had come out with some<br>19   unbalanced information on Actonel.<br>20      Q.  What was Actonel?<br>21      A.  It was another drug for -- another phosphonate<br>22   for osteoporosis.<br>23      Q.  In the same class as Merck's Fosamax drug?<br>24      A.  Yes.<br>25      Q.  And was neutralize a term that you had heard<br>                                   72<br>1   other people use at Merck?<br>2      A.  It was an error to use that.  I -- he's not a<br>3   pH that needs to be neutralized.  So, no, that's a poor<br>4   choice of words.<br>5      Q.  Did you say that he's not a pH that needs to<br>6   be neutralized, as in acids and bases?<br>7      A.  Right.<br>8      Q.  Okay.  So --<br>9      A.  To create a fair balance, as it were.<br>10      Q.  Okay.  Was neutralized a term that you had<br>11   heard other Merck employees use as of the time frame<br>12   2002?<br>13      A.  It is a term I had heard.<br>14      Q.  From whom?<br>15      A.  I can't give you a specific person that said<br>16   that, but I -- it's not a good term.  In my mind, it<br>17   does mean to fit -- to -- to give fair balance.<br>18      Q.  And why is it not a good term? | 401; see MIL #6 | *[handwritten: Overruled]* |
| KAISER, MD, FRAN (Page 72:22 to 72:23)<br><br>                                   72<br>22      A.  For me, it has a negative connotation, but --<br>23      Q.  What is the negative connotation? | 401; see MIL #6 | |
| KAISER, MD, FRAN (Page 73:1 to 73:5)<br><br>                                   73<br>1      Q.  To you, not speculating, what is your view of<br>2   the negative connotation?<br>3      A.  Well, neutralize -- you know, we didn't take<br>4   out popguns and neutralize people.  Again, poor choice<br>5   of words. | 401; see MIL #6 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 73:6 to 73:18)<br>73<br><br>6    Q. On the page ending in 3316, there's a<br>7  reference to the ANA national and regional advocates.<br>8       First, what is ANA?<br>9    A. Arthritis and analgesia or analgesia and<br>10 arthritis.<br>11    Q. And what does national and regional advocates<br>12 refer to?<br>13    A. People with scientific and clinical knowledge<br>14 who were considered nationally or regionally<br>15 significant.<br>16    Q. Are these people that you contacted as part of<br>17 your job as regional medical director concerning Vioxx?<br>18    A. Yes. | | |
| KAISER, MD, FRAN (Page 73:19 to 74:1)<br>73<br>19    Q. In the last bullet point, in St. Louis you met<br>20 with a Dr. Baldessare; is that right?<br>21    A. Yes.<br>22    Q. Had he contacted you or the company with<br>23 questions to which you were responding or did you<br>24 initiate that contact?<br>25    A. I believe --<br>74<br>1       MR. GOLDMAN: Objection, calls for | 401; see MIL #6 | |
| KAISER, MD, FRAN (Page 74:6 to 74:6)<br>74<br>6  A. I believe he had raised some concerns. | 401; see MIL #6 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 75:11 to 76:14)<br><br>75<br>11  Did this conversation with Dr. Baldessare<br>12  referenced under paragraph C include discussions over<br>13  whether Merck would fund some program that<br>14  Dr. Baldessare was interested in?<br>15      A.  Right.  We didn't fund these programs.  There<br>16  was a process for submitting information if they were<br>17  requesting funding from Merck.  I did not fund these<br>18  programs.<br>19      Q.  Do you recall what program he was asking<br>20  whether it could be funded by Merck?<br>21      A.  The specifics of the program -- it says a<br>22  regional rheumatology program -- regional rheumatology<br>23  program.  I don't recall whether it was CME, non-CME,<br>24  but there was a process in place at Merck for people<br>25  who were requesting funding of programs.<br><br>76<br>1      Q.  Do you understand he's referring to an<br>2  educational program?<br>3      A.  That's my assumption.<br>4      Q.  Do you know what the second sentence, reviewed<br>5  changes and granting mechanisms with him, and this<br>6  seemed to ease the situation somewhat, refers to?<br>7      A.  Again, there was a process, I believe, at this<br>8  time put in place as a request for funding for<br>9  educational programs that was becoming a little more<br>10  difficult to get funding at a regional level.  We were<br>11  removed from the decision-making of funding.  We were<br>12  not there to give him funds.  There was a process that<br>13  he would have to follow, and my understanding is that's<br>14  what occurred at this meeting. | Relevance | *overrule* |
| Kaiser, M.D., Fran, (Page 76:15 to 76:19)<br><br>76<br>15      Q.  And the last line of that paragraph says,<br>16  reviewed queries on Vioxx issues such as CV, renal in<br>17  response to his questions.<br>18          Did I read that right?<br>19      A.  Yes. | | |
| Kaiser, M.D., Fran, (Page 76:20 to 76:20)<br><br>76<br>20  Q.  What were his questions? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 76:22 to 77:6)<br>76<br>22   A.  I -- again, I don't recall the specifics.  I'm<br>23   assuming it may have been -- and I don't know.  This<br>24   was January, March -- it was just prior to the label<br>25   change.<br><br>1            If he had asked about CV issues, we would<br>2   have addressed that and made sure he got a PIR, a<br>3   physician-initiated request.  If -- and, again, I'm<br>4   assuming this -- if it was -- the label was April -- if<br>5   the label -- if this was during the time of the label<br>6   change, we would have discussed the label change. | | |
| Kaiser, M.D., Fran, (Page 83:15 to 83:21)<br>83<br>15   Q.  Do you recall whether you ever gave any slide<br>16   presentations to the Louisiana Department of Health and<br>17   Hospitals?<br>18      A.  No, I would not have done that.<br>19      Q.  Would you have given any slide presentations<br>20   to the pharmaceutical and therapeutics committee?<br>21      A.  No. | | |
| Kaiser, M.D., Fran, (Page 84:2 to 84:5)<br>84<br>2   Q.  Do you know of anyone who did a slide<br>3   presentation concerning Vioxx to the P&T committee for<br>4   Louisiana?<br>5      A.  No, I'm not aware of that. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 84:17 to 85:17)<br><br>84<br>17 Q. Okay. And going back to the January to March<br>18 Kaiser quarterly report from 2002 that you prepared --<br>19     MR. GOLDMAN: Which exhibit is that,<br>20 again? Which exhibit number? 11?<br>21     MR. ARBITBLIT: Exhibit 11. Thank you.<br>22    Q. The last page of the document is 3317, and the<br>23 last entry on that page says, presented training on new<br>24 label for Vioxx and responded to Q-and-A for SC NAEs --<br>25 oh, I'm sorry, is -- is that separate and apart from<br><br>85<br>1 the one with Patti Drake, planned training --<br>2    A. Yes.<br>3    Q. Okay. So the -- the next-to-last line, then,<br>4 for clarity, presented training on new label for Vioxx<br>5 and responded to Q and A for SC NAEs.<br>6    Did I read that correctly?<br>7    A. Yes.<br>8    Q. And SC is?<br>9    A. South Central.<br>10    Q. South Central region?<br>11    A. Yes.<br>12    Q. And that's your region?<br>13    A. Yes.<br>14    Q. And NAEs is national account executives?<br>15    A. Yes.<br>16    Q. For the managed care group?<br>17    A. Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 85:22 to 86:18)<br><br>85<br>22  Q.  So the part I'm -- I'm interested in is,<br>23  presented training on new label for Vioxx.<br>24          What did you use to train people on the<br>25  new label for Vioxx?<br><br>86<br>1      A.  Whatever medical services would have provided<br>2  as a deck that had gone through medical-legal for me to<br>3  use.<br>4      Q.  Did you receive training on the new label for<br>5  Vioxx from someone else?<br>6      A.  Yes.<br>7      Q.  From whom?<br>8      A.  I can't tell you specifically.  It was<br>9  usually, again, someone either within our own group or<br>10  MRL.<br>11     Q.  MRL, Merck Research Laboratories?<br>12     A.  Yes.<br>13     Q.  Do you recall whether you attended that<br>14  training with the group of other regional medical<br>15  directors?<br>16     A.  I believe there was a -- we were -- we were<br>17  kept apprised as a team, the -- the entire RMD team, of<br>18  any updates on the label, yes. |  |  |

Page 34 of  109

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 87:6 to 88:2)<br>87<br>6   Q.  Does the term Vioxx boot camp mean anything to<br>7   you?<br>8      A.  Yes.<br>9      Q.  What does it mean?<br>10     A.  An intensive educational effort.<br>11     Q.  And did you ever attend a Vioxx boot camp?<br>12     A.  Yes.<br>13     Q.  Where was that at?<br>14     A.  I don't recall where it was held.  It may have<br>15  been held back at headquarters.  I -- I don't recall.<br>16     Q.  When, approximately?<br>17     A.  I think -- I know that there was a boot camp<br>18  prior to the drug being launched where we learned,<br>19  again, more intensively about disease and the science<br>20  behind the product.<br>21     Q.  When you learned about the science behind the<br>22  product, did anyone ever inform you about research<br>23  showing that COX-2 inhibitors impair ulcer healing?<br>24     A.  That COX-2 inhibitors impair ulcer healing?<br>25  Not that I recall.<br><br>88<br>1      Q.  Have you ever learned that from any source<br>2   between 1997 and today? | | |

Page 35 of  109

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 87:21 to 88:2)<br><br>87<br>21   Q.  When you learned about the science behind the<br>22   product, did anyone ever inform you about research<br>23   showing that COX-2 inhibitors impair ulcer healing?<br>24        A.  That COX-2 inhibitors impair ulcer healing?<br>25   Not that I recall.<br><br>88<br>1     Q.  Have you ever learned that from any source<br>2   between 1997 and today? | Assumes facts not in evidence; 401; 701; 602 | Sustained |
| KAISER, MD, FRAN (Page 88:5 to 88:5)<br><br>88<br>5    A.  No. | Assumes facts not in evidence; 401; 701; 602 | |
| Kaiser, M.D., Fran, (Page 89:1 to 89:7)<br><br>89<br>1    Q.  Doctor, Exhibit 14 is a memo dated May 11th,<br>2   2002, with a summary of the P&T committee hearing on<br>3   May 9th, 2002 and summary of the joint House and Senate<br>4   Health and Welfare Committee hearing on May 10th, 2002.<br>5   And you are the fourth person listed as a recipient.<br>6          Have you seen this document before?<br>7    A.  I believe so, yes. | | |

Page 36 of  109

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 92:14 to 92:17)<br><br>92<br>14  Q.  Between 2002 and when you left Merck in<br>15  November 2003, were you ever asked by a member of the<br>16  Louisiana P&T committee to respond to questions<br>17  concerning cardiovascular risk of Vioxx? | | |
| Kaiser, M.D., Fran, (Page 92:20 to 92:20)<br><br>92<br>20  A.  I have no specific recollection of that. | | |
| Kaiser, M.D., Fran, (Pages 93:1 to 94:1)<br>93<br>1  Q.  Do you recall that initially Vioxx was not on<br>2  the preferred drug list for the State of Louisiana?<br>3      A.  Yes.<br>4      Q.  And was the result of that that patients would<br>5  need a prior authorization to have a Medicaid<br>6  prescription for Vioxx filled?<br>7      A.  Yes.<br>8      Q.  On the page 7219 of the exhibit -- which<br>9  number exhibit do you have there?<br>10     A.  14.<br>11     Q.  On page 7219 of Exhibit 14, you see the<br>12  criteria for a PA approval listed at the bottom?<br>13     A.  Yes.<br>14     Q.  Has the patient had a treatment failure on<br>15  drugs on the PDL, or preferred drug list; does the<br>16  condition have a condition which prevents them from<br>17  using the drug on the PDL; is there a potential for a<br>18  drug interaction with other medications which the<br>19  patient may currently be taking; or has the patient<br>20  experienced intolerable side effects with the drugs<br>21  offered on the PDL?<br>22          Did I read that correctly?<br>23     A.  Yes.<br><br>24     Q.  And is -- is that your understanding of what<br>25  the criteria were for prior authorization for a patient<br><br>94<br>1  seeking to use Vioxx at that time? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 94:3 to 94:15)<br>94<br>3  A.  Yes, for the State of Louisiana.<br>4     Q.  When -- when Vioxx was not added to the<br>5  preferred drug list in 2002 at the initial meeting of<br>6  the P&T committee on the COX-2 class, were there<br>7  meetings that you attended to discuss that?<br>8     A.  Internal meetings at Merck?<br>9     Q.  Yes.  Did you meet with other Merck employees<br>10 to discuss the fact that Vioxx had not been added to<br>11 the PDL list?<br>12    A.  I couldn't tell you if it was a meeting or a<br>13 teleconference.<br>14    Q.  The subject came up?<br>15    A.  Yes. | | |
| Kaiser, M.D., Fran, (Page 95:1 to 95:9)<br>95<br>1  Q.  Was there a discussion about what to do in<br>2  response to the fact that Vioxx had not been added to<br>3  the PDL?<br>4     A.  I don't recall specifically.<br>5     Q.  Do you recall generally that there was a<br>6  discussion of taking some action in response to Vioxx<br>7  not being added to the Louisiana PDL?<br>8     A.  I'd be speculating, but, yes, we generally<br>9  would say, what are we going to do now? | | |
| Kaiser, M.D., Fran, (Pages 95:24 to 96:16)<br>95<br>24  Q.  Doctor, Exhibit 15 is an e-mail to you from<br>25  Steve Shearer, dated May 16, 2002, with a series of<br>96<br>1  communications going back to the last page that started<br>2  on May 10th, 2002.<br>3        Have you seen this document before?<br>4     A.  I probably saw it in 2002.<br>5     Q.  And, in particular, and going to page 16262,<br>6  the last page of the document, there's an e-mail from<br>7  you to William McBride and Allan Goldberg.<br>8        And Mr. McBride was your supervisor,<br>9  supervising the regional medical directors at that<br>10 time; is that right?<br>11    A.  Yes.<br>12    Q.  Who was Allan Goldberg at that time in<br>13 relation to your job?<br>14    A.  Another medical director.  And Allan was<br>15 helping the information process for communicating with<br>16 medical services on Vioxx. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 96:17 to 97:5)<br><br>96<br>17   Q.  Your e-mail says, it was wonderful to share<br>18   time together this week with you both in a very<br>19   productive meeting.  I am enclosing the memo received<br>20   from Holly Jacques in Government Affairs re the<br>21   recommendations from Provider Synergies to the State of<br>22   Louisiana.  I will be going to Louisiana with Holly in<br>23   the hope of setting some of the clinical issues to<br>24   right with legislators.  Any comments you would -- you<br>25   have would be helpful.  Obviously, we wish to clarify<br><br>97<br>1   the ARB and coxib class clinical issues and ask for<br>2   reconsideration of Vioxx and Cozaar/Hyzaar if possible.<br>3   I would welcome your thoughts.<br>4           Did I read that right?<br>5      A.  Yes. | 401; see MIL #4 |  |
| Kaiser, M.D., Fran, (Page 97:6 to 97:10)<br><br>97<br>6   Q.  Does that accurately state what your<br>7   discussions and -- with McBride and Goldberg were at<br>8   that time?<br>9      A.  I would not be speaking to legislators, so<br>10   clearly I miswrote this.  That would not be my role. |  |  |
| Kaiser, M.D., Fran, (Page 97:15 to 97:17)<br><br>97<br>15   Q.  To your knowledge, were there people at Merck<br>16   who were assigned the task of speaking with Louisiana<br>17   legislators, about Vioxx or any other Merck product? | Lack of personal knowledge |  |
| Kaiser, M.D., Fran, (Page 97:20 to 97:22)<br><br>97<br>20   A.  I don't believe they would speak on product.<br>21   They would -- I would think that they -- I don't<br>22   believe that was Merck's practice. | Lack of personal kowledge |  |
| KAISER, MD, FRAN (Page 97:23 to 98:1)<br><br>97<br>23   Q.  What were you referring to by, setting some of<br>24   the clinical issues to right?<br>25      A.  Again, I would assume that -- I'd be<br><br>98<br>1   speculating. | Same; no answer designation |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 98:8 to 98:11)<br><br>8   A.  My practice would be to ensure, again, fair,<br>9   balanced information was provided.  And, again, I don't<br>10   remember my intent in 2002, so I can't tell you exactly<br>11   what this means. | Non-responsive | |
| KAISER, MD, FRAN (Page 98:14 to 98:19)<br><br>14   Q.  Do you recall what any of the clinical issues<br>15   were that were of interest to you concerning Vioxx in<br>16   2002?<br>17      A.  This would be post-label change.  I would want<br>18   to ensure that they had the aspects of the label and<br>19   had received information regarding that label. | 401; see MIL #4 | *overrule* |
| Kaiser, M.D., Fran, (Page 100:11 to 100:16)<br><br>11   Q.  Doctor, Exhibit 16 is an e-mail from Holly<br>12   Jacques to Allan Goldberg.  And you are listed as the<br>13   second on the cc list.  It's dated August 1, 2002.<br>14         And it goes on for four pages, from 6615<br>15   to 6618.<br>16      A.  I don't have -- | | |
| Kaiser, M.D., Fran, (Page 100:24 to 100:25)<br><br>24   So by agreement, we've added the next two<br>25   consecutive pages. | | |
| Kaiser, M.D., Fran, (Page 101:7 to 101:14)<br><br>7   Q.  So if you go to the page -- the last page that<br>8   has printing on it, you'll see a message from you to<br>9   Holly Jacques on August 8th, 2002.  Do you see that?<br>10      A.  Yes.<br>11      Q.  Did you attend a meeting with Holly Jacques<br>12   and Dr. Culotta of the Louisiana P&T committee in the<br>13   time frame leading up to August 8th, 2002?<br>14      A.  Yes | | |
| Kaiser, M.D., Fran, (Pages 101:25 to 102:2)<br><br>25   Q.  Had you ever met Dr. Culotta before?<br><br>1      A.  I had seen Dr. Culotta and -- and knew him to<br>2   be the head of the P&T committee.  Did I meet with him? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 102:6 to 102:20)<br>102<br>6  Your e-mail says, as always, it is great<br>7  to work with you.<br>8         You are really amazing.  We never would<br>9  have achieved any measure of success with the Louisiana<br>10  P&T committee if it had not been for your knowledge of<br>11  Louisiana issues as well as the relationship you have<br>12  with Dr. Culotta.  I am sure there is no one else from<br>13  Pharma that he would have even been willing to have a<br>14  meeting with, such as the one held yesterday.  The fact<br>15  he is even willing to entertain consideration of Zocor,<br>16  Vioxx, and Cozaar speaks volumes to the regard he has<br>17  for Merck, and that would not happen without you.<br>18         Thanks for all you do.<br>19         Did I read that correctly?<br>20     A.  Yes. | | |
| Kaiser, M.D., Fran, (Page 104:2 to 104:15)<br>104<br>2  Q.  Does your e-mail here mean that there was<br>3  discussion with Dr. Culotta, at which point he<br>4  indicated willingness to reconsider on Vioxx?<br>5     A.  It looks like, if we track this, he had<br>6  requested information, clinical information, on a heart<br>7  protection study, which is Zocor, GI outcomes data, and<br>8  Renaal -- the Renaal -- R -- two As -- Renaal study,<br>9  which was with ARBs.  We would have reviewed the<br>10  information, and on Vioxx certainly, again, the label.<br>11         And, again, just ensured that his<br>12  questions had received an answer.  That was the<br>13  practice that we had if somebody had questions, to<br>14  ensure that their questions were answered, did they<br>15  have further questions. | | |
| Kaiser, M.D., Fran, (Page 105:2 to 105:7)<br>105<br>2  Q.  And -- okay.  Holly Jacques' response on<br>3  August 8th, 2002 says, among other things, no one<br>4  person can fix this problem in Louisiana.  It's going<br>5  to take our entire team.<br>6         How did you interpret what she meant by<br>7  "this problem in Louisiana"? | | |
| Kaiser, M.D., Fran, (Page 105:13 to 105:16)<br>105<br>13  Q.  What did you understand her to be referring<br>14  to?<br>15     A.  You'd have to ask her what she was referring<br>16  to. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 105:17 to 105:17)<br>105<br>17  Q.  I'm asking you how you understood it. | 602 | *Sustained* |
| KAISER, MD, FRAN (Page 105:19 to 105:21)<br>105<br>19  A.  I'd be speculating on whether it was<br>20  considering all of the clinical aspects.  I don't know.<br>21  I don't know what this means. | 602 | |
| KAISER, MD, FRAN (Page 105:23 to 106:2)<br>105<br>23  Q.  Exhibit 17 is an e-mail to Lance Stewart from<br>24  Holly Jacques.  You're the first cc.  It's dated<br>25  August 16, 2002.<br>106<br>1        Have you seen this document before?<br>2    A.  I don't recall this document. | 602; see MIL #6 | |
| KAISER, MD, FRAN (Page 106:6 to 106:18)<br>106<br>6    A.  And it looks like this relates to Oklahoma.<br>7      Q.  And where are you referring to that it relates<br>8  to Oklahoma?<br>9      A.  Lance only covered Oklahoma and Arkansas, and<br>10  it looks like the DUR board meeting.  Oklahoma's P&T is<br>11  referred to also as their DUR.<br>12      Q.  And was Oklahoma part of your territory?<br>13      A.  It was.<br>14      Q.  In the middle of the first paragraph, there's<br>15  a statement, there was a large amount of chronic<br>16  utilization of the 50-milligram tablets and the<br>17  25-milligram tablets at a DACON of 2.0.<br>18      A.  Nods. | 602; see MIL #6 | |
| KAISER, MD, FRAN (Page 107:14 to 107:24)<br>107<br>14    Q.  Doctor, did you have any role, other than<br>15  being copied on this document, with respect to the<br>16  issue of 50-milligram tablets being used in larger<br>17  quantities than was appropriate?<br>18      A.  No.<br>19      Q.  The sentence near the bottom that says, any<br>20  proactive activity will be in our favor and a physical<br>21  presence of advocates at the meeting may be essential<br>22  to defeat any further restrictions, did I read that<br>23  right?<br>24      A.  Yes. | 602; see MIL #6 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 107:25 to 108:16)<br>107<br>25      MR. GOLDMAN:  Just, again, objection,<br><br>108<br>1  lacks foundation.<br>2      MR. ARBITBLIT:  To reading it right?<br>3      MR. GOLDMAN:  To having any clue about<br>4  what this is about, to the use of a document that she<br>5  has -- that you lack foundation -- that you have not<br>6  established personal knowledge of.<br>7      MR. ARBITBLIT:  All right.  Well --<br>8      MR. GOLDMAN:  And it's just improper to<br>9  have a document be read from when the witness doesn't<br>10  have personal knowledge of it.<br>11      MR. ARBITBLIT:  She's on it, Counsel.<br>12      THE WITNESS:  Not that one.<br>13  Q.  Well, did you -- was it your practice to read<br>14  e-mails that were sent to you?<br>15  A.  If I'm cc'd -- I'm cc'd on a lot of things.  I<br>16  don't always read everything that I'm cc'd on. | | |
| KAISER, MD, FRAN (Page 108:17 to 109:1)<br>108<br>17  Q.  Okay.  Were -- were you -- well, does the<br>18  phrase, defeat any further restrictions have meaning to<br>19  you?<br>20  A.  No. | 602 | |
| 108<br><br>23  Q.  Doctor, Exhibit 18 is a cover memo from K.<br><br>24  Grosser, Subject:  Arthritis & Analgesia (A&A) Core<br><br>25  Franchise Team Meeting--Agenda, dated April 12th, 2001,<br><br><br>109<br>1  with an attached slide presentation that says -- KAISER, MD, FRAN<br>(Page 108:17 to 108:20) | 602; see MIL #6 | |
| KAISER, MD, FRAN (Page 109:6 to 109:9)<br>109<br>6  Q.  -- Princeton annual meeting, 2001, A&A<br>7  franchise.<br>8      Have you ever seen the document before?<br>9  A.  No. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 110:16 to 111:12)<br><br>110<br>16  Q.  How about Jeffrey Melin, M-E-L-I-N; did you<br>17  ever speak with him?<br>18      A.  Medical services.  Yes.<br>19      Q.  Was he a person who put together dossiers?<br>20      A.  He was one of the people that put together<br>21  dossiers, yes.<br>22      Q.  Was -- did you have contact with Jeffrey Melin<br>23  in any other context except the preparation of<br>24  dossiers?<br>25      A.  When we had questions, we would ask medical<br><br>111<br>1  services to help us find information.<br>2      Q.  And it -- was it your understanding that<br>3  Mr. -- is it Dr. Melin?  I think it is.<br>4      A.  Uh-huh.<br>5      Q.  Was it your understanding that Dr. Melin's<br>6  role was then to provide information that you would, in<br>7  turn, provide to the person who asked the question in<br>8  the first place?<br>9      A.  It was sometimes for personal background,<br>10  just --<br>11      Q.  Because you wanted to know more?<br>12      A.  Correct. | | |
| KAISER, MD, FRAN (Page 111:13 to 112:7)<br>111<br>13  Q.  Turning to page 6842, market issues for<br>14  coxibs, in this 2001 document -- I know you haven't<br>15  seen the document, but I want to use this to see if<br>16  you've had discussions about any of these subjects that<br>17  you recall during your time of working with Vioxx in<br>18  2001. Did you ever participate in discussions on the<br>19  subject of market issues for coxibs, including that it<br>20  was a highly competitive field with several key<br>21  challenges?<br>22      A.  Did I participate?  Did I hear that from<br>23  somewhere?  Can you clarify what you're trying to get<br>24  at?<br>25      Q.  Okay.  Did -- did you hear from anyone at<br><br>112<br>1  Merck that one of the key challenges in the market<br>2  issues for coxibs was to demonstrate cardiovascular<br>3  safety?<br>4      A.  Specific to this time frame?<br>5      Q.  Well, let's start broadly.  At any time.<br>6      A.  I -- I still don't think I understand what<br>7  you're trying to get at.  Can you help clarify? | 602 | Sustained |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 112:8 to 112:14<br><br>112<br>8   Q.  After the VIGOR results in March 2000, did you<br>9   understand that questions had been raised about the<br>10  cardiovascular safety of Vioxx?<br>11  A.  Yes.<br>12  Q.  Did you understand that one of the market<br>13  issues for Vioxx was to demonstrate cardiovascular<br>14  safety following the VIGOR results? | | |
| Kaiser, M.D., Fran, (Page 112:18 to 112:22)<br><br>112<br>**18  Q.  Was it your personal goal to provide a fair**<br>**19  and balanced presentation of cardiovascular safety when**<br>**20  you made presentations about Vioxx after the VIGOR**<br>**21  study?**<br>**?2  A.  Yes.** | | |
| Kaiser, M.D., Fran, (Pages 112:23 to 113:3)<br><br>112<br>23  Q.  And going on to the third entry under the<br>24  bullet point, had you heard discussions from anyone at<br>25  Merck in the time frame of approximately 2001 regarding<br><br>113<br>1   combating imposed limitations on use of Vioxx?<br>2   A.  That's not how I'd characterize it.  Again,<br>3   appropriate medications for appropriate patients. | | |
| Kaiser, M.D., Fran, (Page 114:2 to 114:7)<br><br>114<br>2   Q.  Did -- during the time that you worked on<br>3   presenting information about Vioxx, between 1999 and<br>4   2004, did -- 2003, did it ever come to your attention<br>5   that any managed care organization was requiring<br>6   evidence of a prior gastrointestinal event in order to<br>7   get approval for a Vioxx prescription? | | |
| Kaiser, M.D., Fran, (Page 114:13 to 114:15)<br><br>114<br>13  A.  Yes.<br>14  Q.  Which managed care organization or<br>15  organizations had that limitation? | | |
| Kaiser, M.D., Fran, (Page 114:17 to 114:21)<br><br>114<br>17  A.  I know that that had been discussed.  I can't<br>18  give you specific managed care organizations, because I<br>19  don't recall it, but there were some that did require a<br>20  prior authorization.  I don't know the universe of<br>21  managed care organizations. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 115:4 to 115:7)<br><br>4   Q.  Was it your understanding of the prior<sup>115</sup><br>5   approval criteria of the State of Louisiana that having<br>6   a prior intolerable side effect of another drug was a<br>7   basis for having a Vioxx prescription approved? | | |
| Kaiser, M.D., Fran, (Page 115:12 to 115:22)<br><br>12   A.  Referring back to the requirements for a prior<sup>115</sup><br>13   authorization, I'd have to go back to what Louisiana<br>14   particularly stipulated in their list:  treatment<br>15   failure, condition preventing them from using the drug<br>16   that was on the PDL, potential for drug interaction<br>17   with other medications, intolerable side effects.<br>18           And, actually, there are things that, as a<br>19   clinician, one should consider; for example, prior<br>20   history of peptic ulcer or bleeding ulcers where you<br>21   wouldn't want the patient to fail on another drug<br>22   because they might end up with another bleeding ulcer. | | |
| Kaiser, M.D., Fran, (Page 116:7 to 116:9)<br><br>7   Q.  I have a different question, which is, could<sup>116</sup><br>8   you please identify the document you were looking at<br>9   when you gave your last answer. | | |
| Kaiser, M.D., Fran, (Page 116:11 to 116:13)<br><br>11   A.  Okay.  And that was -- I just lost it.  Here<sup>116</sup><br>12   we go.  Exhibit 14 that you had previously shown me.<br>13           Q.  And what's -- wha | | |
| Kaiser, M.D., Fran, (Pages 116:20 to 117:6)<br><br>20   Q.  Doctor, when you were providing information<sup>116</sup><br>21   about Vioxx, did you believe it was appropriate to give<br>22   a balanced view of the data on cardiovascular risk<br>23   rather than emphasizing any particular piece of<br>24   evidence?<br>25       A.  I'm assuming you mean post-label change?<br><br>1   Post-VIGOR?  Can you give me a time frame for that?<sup>117</sup><br>2       Q.  Post-VIGOR.<br>3       A.  It was not on the label.  I would have to<br>4   acknowledge, if a question was asked, that it was not<br>5   on a label and that there were a number of reasons that<br>6   the data might be the way the data was reported out. | | |
| Kaiser, M.D., Fran, (Page 117:7 to 117:7)<br><br>7   **Q.  And what were those reasons?**<sup>117</sup> | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 117:12 to 117:19)<br><br>117<br>12   A. There are a number of possible explanations<br>13   that the active comparator really did cause platelet<br>14   inhibition similar to that of aspirin, that Vioxx was<br>15   prothrombotic, and that the results occurred by chance,<br>16   and that more data was needed.<br>17       Q. Was it your practice to address each of those<br>18   possibilities in responding to questions about the<br>19   cardiovascular risk of Vioxx after the VIGOR study? | Non-responsive; lack of personal knowledge | |
| Kaiser, M.D., Fran, (Pages 117:23 to 118:4)<br><br>117<br>23   A. I think the data were a surprise to everybody.<br>24   There was no definitive answer.  The results of that<br>25   and the significance of that really wasn't -- wasn't<br><br>118<br>1   clear.  The study was not designed as a cardiovascular<br>2   outcomes trial, but that was one of the things that was<br>3   discussed, as well as the results, which were GI<br>4   benefits. | Non-responsive; lack of personal knowledge | |
| KAISER, MD, FRAN (Page 112:23 to 113:3)<br>112<br>23   Q. And going on to the third entry under the<br>24   bullet point, had you heard discussions from anyone at<br>25   Merck in the time frame of approximately 2001 regarding<br><br>113<br>1   combating imposed limitations on use of Vioxx?<br>2       A. That's not how I'd characterize it.  Again,<br>3   appropriate medications for appropriate patients. | 602 | Sustained |
| Kaiser, M.D., Fran, (Page 118:5 to 118:6)<br>118<br>5   Q. Take a look at page 6846.<br>6       A. You're back on number -- | | |
| KAISER, MD, FRAN (Page 118:7 to 118:8)<br>118<br>7   Q. The April 2001 PowerPoint that you're holding,<br>8   which was Exhibit 18. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 118:11 to 118:17)<br>118<br>11   Q.  Look at the page that ends in 6846 with the<br>12   heading Merck Coxib Objectives.  Under Cardiovascular,<br>13   do you see the second bullet point, maximize exposure<br>14   of Alzheimer's disease/mild cognitive impairment<br>15   placebo-controlled, CV safety data?<br>16         Did I read that right?<br>17   A.  Yes. | 602 | |
| Kaiser, M.D., Fran, (Pages 118:24 to 119:4)<br>118<br>24   Q.  Did you ever hear discussion at Merck about<br>25   maximizing exposure of that data?<br><br>119<br>1   A.  In this time frame?<br>2   Q.  At any time.<br>3   A.  That's not how I would characterize how they<br>4   would discuss the Alzheimer's data | | |
| Kaiser, M.D., Fran, (Pages 119:16 to 120:6)<br>119<br>16   Q.  And what did you do -- how would you<br>17   characterize what you did with information?<br>18         A.  Again, try and present balanced information.<br>19   So following the label change, when the label for the<br>20   Vioxx included the cardiovascular risks, the GI<br>21   benefits, but that there was also data from at-risk<br>22   populations with osteoarthritis that included elderly,<br>23   elderly with Alzheimer's disease, there was no signal<br>24   there, so people had to look at the totality of the<br>25   data.<br><br>120<br>1   Q.  Did you ever see the totality of the mortality<br>2   data from the Alzheimer's study during the time period<br>3   from the VIGOR results until 2003?<br>4   A.  Do I have a specific recollection of that<br>5   piece of data?  You'd have to refresh my memory.<br>6         (Exhibit Number 19 marked.) | | |
| KAISER, MD, FRAN (Page 120:7 to 120:11)<br>120<br>7   Q.  Exhibit 19 is a memo dated April 8th, 2001<br>8   from Chen to Bain, Subject:  MK-0966 -- or Vioxx --<br>9   Combined Mortality Analysis, Protocol 091 plus 078.<br>10         Have you ever seen this document before?<br>11   A.  No. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 121:18 to 122:1)<br>121<br>18  Q.  You -- you had discussions with people like<br>19  Dr. Baldessare that you mentioned earlier about<br>20  cardiovascular risk, right?<br>21     A.  Uh-huh.<br>22     Q.  When you spoke with Dr. Baldessare, if you had<br>23  known about a statistically significant excess risk of<br>24  all-cause mortality in the Vioxx Alzheimer's trials,<br>25  that would have been part of your discussion, wouldn't<br><br>1  it?<br>122 | 602; no answer designation | |
| **Kaiser, M.D., Fran, (Page 122:4 to 122:9)**<br>122<br>**4   A.  Again, my conversations generally went to the**<br>**5  information that was contained in the label.  If there**<br>**6  were specific questions asked of me, I would try to**<br>**7  ensure that we would respond to those questions and**<br>**8  that appropriate information would be solicited from**<br>**9  medical services to address those questions.** | Non-responsive | |
| Kaiser, M.D., Fran, (Pages 122:21 to 123:12)<br>122<br>21     Q.  Exhibit 20 is a letter from Lawrence Goldkind<br>22  of the FDA to Merck & Company, with a fax header of<br>23  April 11, 2002, attaching the package insert, starting<br>24  at the third page of the document.<br>25           Do you recognize that as the 2002 Vioxx<br><br>1  label?<br>123<br>2     A.  May I take a moment to look at this?<br>3     Q.  Yes.  If it helps, the VIGOR data is on the<br>4  page ending in 5930, if it helps you identify the time<br>5  frame of this label.<br>6           Doctor, do you see any reference to the<br>7  statistically significant excess risk of all-cause<br>8  mortality in the Alzheimer's studies in the 2002 label?<br>9     A.  In my very cursory reading of this, no.<br>10     Q.  Well, take your time, if you need more time,<br>11  and let me know if you see it.<br>12     A.  I don't see it.  I don't see it. | | |
| KAISER, MD, FRAN (Page 124:3 to 124:6)<br>124<br>3  Q.  Okay.  Well, did you know before today that<br>4  there was a Merck memo showing a statistically<br>5  significant excess risk of all-cause mortality in<br>6  Alzheimer's studies? | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 124:9 to 124:10)<br><br>9  A.  No, I'm not aware of the memo.  But I'm not<br>10  aware of all memos that circulate at Merck. | | |
| KAISER, MD, FRAN (Page 124:12 to 124:24)<br>124<br>12  Q.  21 is a For Immediate Release document,<br>13  Cardiovascular Event Rates in Analysis of Combined<br>14  Studies of Nearly 2,900 Elderly Patients Taking Vioxx<br>15  or Placebo.<br>16      Have you seen this document before?<br>17  A.  Yes.<br>18  Q.  When did you see it?<br>19  A.  I assume at the time -- I'm sorry.  I<br>20  shouldn't assume.  I believe this was a press release<br>21  that came out in 2002.<br>22  Q.  And this press release says that it's about<br>23  the 2900 elderly patients with Alzheimer's disease or<br>24  mild cognitive impairment, right? | 401 | *(handwritten notation)* |
| Kaiser, M.D., Fran, (Page 124:12 to 124:25)<br>124<br>12  Q.  21 is a For Immediate Release document,<br>13  Cardiovascular Event Rates in Analysis of Combined<br>14  Studies of Nearly 2,900 Elderly Patients Taking Vioxx<br>15  or Placebo.<br>16      Have you seen this document before?<br>17  A.  Yes.<br>18  Q.  When did you see it?<br>19  A.  I assume at the time -- I'm sorry.  I<br>20  shouldn't assume.  I believe this was a press release<br>21  that came out in 2002.<br>22  Q.  And this press release says that it's about<br>23  the 2900 elderly patients with Alzheimer's disease or<br>24  mild cognitive impairment, right?<br>25  A.  Yes. | | |
| KAISER, MD, FRAN (Page 125:24 to 126:2)<br>125<br>24  Q.  The press release does not mention the<br>25  statistically significant excess risk of all-cause<br><br>126<br>1  mortality in the Alzheimer's studies, does it?<br>2  A.  No. | 401 | |