| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 126:4 to 126:9)<br><br>4   Q.  Exhibit 22 is an article published in the 126<br>5   Journal of the American Medical Association.  Do you<br>6   recognize that as a reputable journal?<br>7      A.  Yes.<br>8      Q.  And have you seen this article by Psaty,<br>9   P-S-A-T-Y, and Kronmal before? | | |
| Kaiser, M.D., Fran, (Page 126:13 to 126:21)<br><br>13   Q.  Reporting Mortality Findings in Trials of 126<br>14   Rofecoxib for Alzheimer Disease or Cognitive<br>15   Impairment ...<br>16            Have you seen this before?<br>17      A.  I may have glanced at it when it came out,<br>18   yes.<br>19      Q.  Was that in the normal course of your<br>20   reviewing journals or was it brought to your attention?<br>21      A.  Reviewing journals | | |
| Kaiser, M.D., Fran, (Page 128:4 to 128:17)<br><br>4   Doctor, do you see that Dr. Psaty reports 128<br>5   that he has not been involved in any litigation related<br>6   to rofecoxib, either for plaintiffs or the defendants,<br>7   in the financial disclosures section following the text<br>8   of the article?<br>9      A.  Yes.<br>10      Q.  And do you see that Dr. Kronmal has been<br>11   retained by the plaintiffs' attorney?<br>12      A.  Yes.<br>13      Q.  And do you see that in the table the heart<br>14   disease deaths are 21 versus 6, with a hazard ratio of<br>15   3.84 and a P value of less than .005 for the<br>16   Alzheimer's studies?<br>17      A.  Yes. | | |
| **Kaiser, M.D., Fran, (Page 128:18 to 128:19)**<br><br>**18   Q.  And do you have any basis to dispute the 128**<br>**19   accuracy of those numbers?** | Non-responsive; lack personal knowledge | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 128:21 to 129:1)<br>21   A.  Again, you would have to go back to the **128**<br>22   original source population for these data and look at<br>23   relative risk in the population and what inclusion and<br>24   exclusion criteria there were for these studies.<br>25          MR. ARBITBLIT:  Move to strike,<br>   **129**<br>1   nonresponsive. | Non-responsive; lack personal knowledge | *Sustained* |
| Kaiser, M.D., Fran, (Page 129:2 to 129:6)<br>2   Q.  Have you seen any rebuttal by Merck to the **129**<br>3   accuracy of the numbers of heart disease-related deaths<br>4   in 091 and 078 since this publication on April 16,<br>5   2008?<br>6      A.  Have I seen it?  No. | | |
| Kaiser, M.D., Fran, (Page 129:7 to 129:8)<br>7   Q.  Is your understanding -- **129**<br>8      A.  That doesn't mean it doesn't exist. | Non-responsive; lack personal knowledge | |
| Kaiser, M.D., Fran, (Page 129:9 to 129:12)<br>9   Q.  Is it your understanding that a P value of **129**<br>10  less than .005 means there is less than 1 in 200<br>11  likelihood that the result is due to chance?<br>12     A.  Yes. | | |
| Kaiser, M.D., Fran, (Page 129:14 to 129:25)<br>14  Q.  Exhibit 23 is a memo from you to William **129**<br>15  McBride, dated September 9, 2002, Subject:  SC RMD<br>16  Travel Outcomes - August 2002.<br>17          Is this a document you prepared?<br>18     A.  Yes.<br>19     Q.  And it indicates that on August 6th and 7th,<br>20  you were in New Orleans at a meeting with the Louisiana<br>21  Medicaid P&T chair, presented with Dr. C. Cairns,<br>22  recent data on Zocor, Cozaar, and Vioxx; is that<br>23  correct?<br>24     A.  Yes.<br>25     Q.  And you did attend such a meeting? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 130:2 to 130:8) 130<br><br>2   A.  I don't recall if Chuck was with me with the<br>3   meeting with the P&T chair.  We may have had an<br>4   additional meeting in New Orleans.<br>5      Q.  When you say additional, you mean in addition<br>6   to the meeting you attended with Holly Jacques and<br>7   Dr. Culotta?<br>8      A.  Yes. | | |
| KAISER, MD, FRAN (Page 130:9 to 130:10) 130<br><br>9   Q.  And what recent data on Vioxx did you present<br>10  at that meeting? | No answer designation | |
| Kaiser, M.D., Fran, (Page 130:13 to 130:13) 130<br><br>13  A.  We would have presented the label update | | |
| KAISER, MD, FRAN (Page 131:5 to 131:8) 131<br><br>5   Q.  The Chen memo was dated April 2001; isn't that<br>6   right?<br>7      A.  Which one was that?<br>8         Yes. | 602 | Sustained |
| Kaiser, M.D., Fran, (Page 131:13 to 131:19) 131<br><br>13  Q.  In the context of the discussion that you had<br>14  with Dr. Culotta referenced in your travel outcomes<br>15  memo, is it correct that there was no discussion of the<br>16  all-cause mortality data from the Alzheimer's trials?<br>17     A.  Again, without the specifics of what we<br>18  discussed, we, I'm sure, discussed the label.  If it<br>19  wasn't in the label, it wasn't discussed. | | |
| KAISER, MD, FRAN (Page 134:10 to 134:19) 134<br><br>10  Q.  Exhibit 25 is an e-mail dated January 31st,<br>11  2003, Subject:  Customer Profile for Louisiana<br>12  Medicaid, from Mary Ogle, national account executive,<br>13  to Michael Davis.  And you are the -- copied just above<br>14  Mr. Lambert there.<br>15         Did you see this document before?<br>16     A.  I don't recall this document.<br>17     Q.  But it was addressed to you, and you would<br>18  have seen it at the time; is that fair?<br>19     A.  I -- again, I was cc'd on lots of things. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 134:23 to 135:9)<br><br>134<br>23  Q.  On the last page of the document, there's a<br>24  reference to Merck strategy and tactics, on paragraph<br>25  Roman numeral VI; do you see that?<br><br>135<br>1  A.  Yes.<br>2  Q.  The first bullet point says, continue to work<br>3  with the State of Louisiana and the DHH through<br>4  Provider Synergies to ensure unrestricted access for<br>5  key Merck products.<br>6        Did I read that right?<br>7  A.  Yes.<br>8  Q.  Did you understand that to be one of Merck's<br>9  approaches in Louisiana in January 2003? | | |
| KAISER, MD, FRAN (Page 135:15 to 135:17)<br><br>135<br>15  Q.  And did you understand that one of Merck's<br>16  tactics and part of its strategy was to maximize share<br>17  for Merck products preferred on the PDL? | 602 | |
| KAISER, MD, FRAN (Page 135:19 to 135:23)<br><br>135<br>19  A.  That was not my role with Merck.<br>20  Q.  Did you understand that that was one of<br>21  Merck's approaches?<br>22  A.  I can't speak for all of Merck.  Again, I --<br>23  I'm not sure what you're trying to get at here. | 602 | |
| Kaiser, M.D., Fran, (Pages 135:24 to 136:1)<br><br>135<br>24  Q.  Well, did you understand that the people you<br>25  worked with were trying to maximize share for Merck<br><br>136<br>1  products preferred on the PDL in Louisiana? | | |
| Kaiser, M.D., Fran, (Page 136:4 to 136:4)<br><br>136<br>4  A.  That's listed here, yes | | |
| KAISER, MD, FRAN (Page 136:18 to 136:22)<br><br>136<br>18  Q.  And the third bullet point says, continue to<br>19  develop product advocates with Medicaid P&T and DUR<br>20  committee members.<br>21        Did I read that right?<br>22  A.  Yes. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 136:23 to 137:2)<br><br>23    Q.  P&T is pharmaceutical and therapeutics, right?<br>24    A.  Yes.<br>25    Q.  And those are the folks that make the<br>137<br>1   recommendations to the director about what products to<br>2   purchase for the state of Louisiana citizens? | | |
| Kaiser, M.D., Fran, (Page 137:4 to 137:6)<br>137<br>4   A.  They don't purchase products; the state<br>5   doesn't purchase products.  They reimburse for products<br>6   that patients get from pharmacies. | | |
| Kaiser, M.D., Fran, (Page 137:10 to 137:11)<br>137<br>10   Q.  What does the P&T do, to your<br>11   understanding -- | | |
| Kaiser, M.D., Fran, (Page 137:13 to 137:13)<br>137<br>13   Q.  -- of what the P&T committee does? | | |
| Kaiser, M.D., Fran, (Page 137:15 to 137:22)<br>137<br>15   A.  I can't speak for everything that the P&T<br>16   committee did.  They helped formulate a preferred drug<br>17   list.<br>18    Q.  And what does DUR stand for?<br>19    A.  Drug utilization review.<br>20    Q.  Is that the committee that addresses the prior<br>21   authorization issues?<br>22    A.  Yes. | | |
| KAISER, MD, FRAN (Page 137:23 to 137:24)<br>137<br>23   Q.  Were you aware of a Merck strategy in 2003 to<br>24   develop product advocates with the Louisiana Medicaid | 602 | |
| KAISER, MD, FRAN (Page 138:3 to 138:4)<br>138<br>3   A.  I can't speak to what anybody did except my<br>4   role. | 602 | |
| Kaiser, M.D., Fran, (Page 138:14 to 138:16)<br>138<br>**14   Q.  Other than Dr. Culotta, did you, personally,**<br>**15   ever meet with any of the people on this list?**<br>**16    A.  No.** | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 139:3 to 139:5)<br><br>139<br>3   Q.  Exhibit 26 is a document that says, Vioxx<br>4   Point RMD 2003 Accomplishments.<br>5        Did you prepare this document? | 602 | |
| KAISER, MD, FRAN (Page 139:7 to 139:8)<br><br>139<br>7   A.  I don't recall this document.  I don't know if<br>8   I was the only one that prepared this. | 602 | |
| Kaiser, M.D., Fran, (Pages 139:21 to 140:2)<br><br>139<br>21   A.  I don't know what this is.<br>22        Q.  Well --<br>23        A.  And I don't know if this is even -- if -- if<br>24   what's appended onto Louisiana is even in the right<br>25   place.  I -- I just can't tell you, because I know I<br><br>140<br>1   didn't make a presentation to the P&T committee in<br>2   Louisiana. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 140:7 to 141:20)<br>140<br>7   Q. There's a section of the document that refers<br>8   to relationship development with opinion leaders and<br>9   academic centers.<br>10         Do you recognize the names of any of those<br>11   people as individuals with whom you had contacts?<br>12     A. Yes.<br>13     Q. Who?<br>14     A. I particularly remember Byron Cryer, George<br>15   Duna, and Ron Lindsay.  The others are -- I -- I don't<br>16   recall them.<br>17     Q. What -- what context do you recall with<br>18   Dr. Cryer?<br>19     A. I met with Dr. Cryer.  We discussed some of<br>20   his research.<br>21     Q. What does an opinion leader refer to?<br>22     A. Somebody -- the way in which -- my<br>23   understanding of how Merck utilized that term is<br>24   somebody who may not be at an academic center but is a<br>25   key -- what we would call a thought leader, a key<br>141<br>1   scientific expert.<br>2     Q. Who initiated the contact with Dr. Cryer, you<br>3   or him?<br>4     A. I would generally -- I think in -- in Byron's<br>5   case -- and I was also on faculty at Southwestern at<br>6   the time -- I believe he initiated the contact.<br>7     Q. Do you recall for what purpose?<br>8     A. I don't.<br>9     Q. Did any of these individuals make<br>10   presentations concerning Vioxx that you know of?<br>11     A. I know that Byron Cryer did, George Duna did.<br>12   I'm not sure about the others.<br>13     Q. Where -- where did each of them make<br>14   presentations about Vioxx?<br>15     A. I don't -- I couldn't give you any specifics.<br>16     Q. Did you participate in providing materials to<br>17   them that -- for use in their presentations?<br>18     A. No.<br>19     Q. And were they compensated for those<br>20   presentations? | | |
| Kaiser, M.D., Fran, (Page 141:23 to 141:25)<br>141<br>23   Q. If you know.<br>24     A. I believe they were compensated for -- for<br>25   their time, yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 142:23 to 143:1) <br> 142 <br> 23   Q. Is it within your purview to maintain your <br> 24   personal integrity when presenting information to <br> 25   someone who is going to decide whether a drug is <br> 143 <br> 1   appropriate for use in a patient population? | | |
| KAISER, MD, FRAN (Page 143:4 to 143:9) <br> 143 <br> 4   A. Yes. <br> 5      Q. And to maintain your personal integrity, would <br> 6   it be fair to say that you would want to know if there <br> 7   were information that was adverse to a drug or <br> 8   favorable to a drug? <br> 9      A. Yes. And I usually follow the label and the | Incomplete answer | |
| **Kaiser, M.D., Fran, (Page 143:10 to 143:10)** <br> 143 <br> **10   FDA recommendations related to that** | Non-responsive | _Sustained_ |
| KAISER, MD, FRAN (Page 143:14 to 143:18) <br> 143 <br> 14   Q. Doctor, Exhibit 27 is an excerpt of the CDOC <br> 15   Merck document, dated 10-4-2000. <br> 16         And since -- I'm assuming you haven't seen <br> 17   this before. Is that right? <br> 18      A. That is correct. | 602 | |
| KAISER, MD, FRAN (Page 144:11 to 144:14) <br> 144 <br> 11   Q. My question will be about the part that is <br> 12   completely stated on page 663, and that begins with the <br> 13   bold text, the competition is questioning -- <br> 14      A. I don't have -- oh, here. Yes, I do. | 602 | |
| KAISER, MD, FRAN (Page 144:23 to 145:5) <br> 144 <br> 23   Q. The competition is questioning Vioxx's renal <br> 24   and cardiovascular safety. <br> 25         Did I read that right? <br> 145 <br> 1      A. Yes. <br> 2      Q. And were you aware that the competition was <br> 3   questioning Vioxx's renal and cardiovascular safety in <br> 4   October 2000? <br> 5      A. I don't recall. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 146:13 to 146:17)<br><br>146<br>13  Q.  Number 28 is a WHHM Competitive Assessment<br>14  Task Force, Hypertension, slash, Edema, January 8th,<br>15  2001.<br>16          Have you ever seen this document before?<br>17  A.  No. | 602 | |
| KAISER, MD, FRAN (Page 147:7 to 148:2)<br><br>147<br> 7  Q.  And looking at the page ending in 3595, the<br> 8  box with the heading Renal and Cardiovascular Messages<br> 9  for Vioxx, there's a first line -- there are -- there<br>10  are columns labeled Public Affairs, Thought Leaders,<br>11  and Prescribing Physicians that have Xs in the boxes<br>12  for the message, hypertension and edema are<br>13  mechanism-based, dose-dependent, class effects of all<br>14  NSAIDs, including both coxibs and nonselective NSAIDs.<br>15          And then there's a source listed as Brader<br>16  publication, sales representative Q&A.<br>17          Were you familiar with the Brader<br>18  publication?<br>19  A.  I don't recall it.<br>20  Q.  Do you know who Brader is or was?<br>21  A.  I'd have to see the reference and where he's<br>22  from.<br>23  Q.  Do you --<br>24  A.  Or she.<br>25  Q.  Fair.<br><br>148<br> 1          Do you recall that this was one of the<br> 2  messages for Vioxx as of January 2001? | 602 | |
| KAISER, MD, FRAN (Page 148:5 to 148:13)<br>148<br> 5  A.  I -- I don't recall.<br> 6  Q.  Does the phrase "key messages" mean something<br> 7  to you in the context of Merck's vernacular?<br> 8  A.  That would not be a term I would use.<br> 9  Q.  Was it one that you heard at Merck?<br>10  A.  Yes.<br>11  Q.  In what context?<br>12  A.  Usually related to something related to the<br>13  sales force. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 148:24 to 149:5)<br>148<br>24   Q.  On the next page, ending in 3596, there's a<br>25   box with the heading Neutralize Perceived CV Safety<br><br>149<br>1   Concerns Publications.<br>2          Had you heard of the use of the term<br>3   neutralize in the context of CV safety concerns while<br>4   you were working at Merck between the time of the VIGOR<br>5   results in 2000 and the time you left in November 2003? | 602; see MIL #3 | |
| KAISER, MD, FRAN (Page 149:7 to 149:14)<br>149<br>7   A.  Not that terminology, no.<br>8      Q.  Do you think that's a poor choice of words?<br>9      A.  I don't think neutralize is a good choice.<br>10   But, again, if you're trying to bring balance, fair<br>11   balance, yes, then -- again, like the acid-base<br>12   relationship, if you're trying to bring balance to<br>13   concern based on data, then -- it's still not a great<br>14   word. | 602; see MIL #3 | |
| Kaiser, M.D., Fran, (Page 149:18 to 149:24)<br>149<br>18   Q.  Do you recognize Exhibit 29 as an article by<br>19   Reicin, Shapiro, Sperling, Barr, and Yu on the<br>20   Comparison of Cardiovascular Thrombotic Events in<br>21   Patients with Osteoarthritis Treated with Rofecoxib --<br>22      A.  Yes.<br>23      Q.  -- Versus Nonselective Nonsteroidal<br>24   Anti-Inflammatory Drugs? | | |
| Kaiser, M.D., Fran, (Page 150:2 to 150:3)<br>150<br>2   Q.  And you have seen that article before?<br>3      A.  Yes. | | |
| Kaiser, M.D., Fran, (Page 151:8 to 151:15)<br>151<br>8   Q.  How did you become familiar with Exhibit 29,<br>9   the Reicin article?<br>10      A.  I'm sure we were updated on this either by<br>11   Alise or by someone else.<br>12      Q.  How often did you have contact with Alise<br>13   Reicin?<br>14      A.  She presented, on occasion, to the RMDs.  I<br>15   couldn't give you a frequency. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 152:4 to 152:12)<br><br>152<br>4  Q.  Did you understand from Exhibit 29 that Merck<br>5  was publishing the information from its osteoarthritis<br>6  studies to address the issue of whether there was an<br>7  increased cardiovascular risk of Vioxx?<br>8     A.  Yes.<br>9     Q.  And when that study was published, did you<br>10  know whether Merck had completed any other<br>11  osteoarthritis studies?<br>12     A.  No. | | |
| KAISER, MD, FRAN (Page 152:14 to 152:17)<br><br>152<br>14  Q.  31 is a memo dated April 14, 2000, with an<br>15  MRK-ABI0002269 first Bates page.<br>16         Have you seen this document before?<br>17     A.  No. | 602 | |
| Kaiser, M.D., Fran, (Pages 152:24 to 153:10)<br><br>152<br>24  Q.  Do you recognize any of the names on the front<br>25  page of the document?<br><br>153<br>1     A.  Yes.<br>2     Q.  Which ones?<br>3     A.  David Anstice was head of human health.<br>4         I don't know what Margie McGlynn's role<br>5  was there, but I knew her later.<br>6         Ed Scolnick was the head of MRL.<br>7         Let's see if I -- Alise.<br>8  Q.  Reicin?<br>9  A.  Yeah.<br>10        Greg Geba.  That's it. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 153:11 to 154:1)<br><br>153<br>11   Q.  Okay.  If you'd turn to the page with the --<br>12   ending in 2290, please, there's a table of ongoing and<br>13   upcoming Vioxx studies.<br>14            Do you see a reference to the 085 and 090<br>15   studies with Mr. Geba's name?<br>16      A.  Dr. Geba.<br>17      Q.  Dr. Geba, excuse me.  Do you see those?<br>18      A.  Uh-huh.<br>19      Q.  And do you see that those were studies of<br>20   patients with osteoarthritis?<br>21      A.  Yes.<br>22      Q.  And do you see in the right-hand column that<br>23   the -- both studies were completed as of the date of<br>24   this memo?<br>25      A.  Yes.<br><br>154<br>1    Q.  Have you ever heard of those studies? | 602 | |
| KAISER, MD, FRAN (Page 154:4 to 154:8)<br><br>154<br>4    Q.  Have you heard about Vioxx studies in<br>5    osteoarthritic patients comparing Vioxx to nabumetone<br>6    and placebo?<br>7      A.  I believe so, yes, but I can't give you a<br>8    context of when. | 602 | |
| Kaiser, M.D., Fran, (Page 154:9 to 154:13)<br>154<br>9      Q.  And if you take a look at the Reicin article<br>10   that you have -- I think it's Exhibit 29 -- do you see<br>11   that it refers to studies done between 1995 and 1998?<br>12   On the first page, under methods, these studies were<br>13   conducted from 1995 to 1998. | | |
| Kaiser, M.D., Fran, (Page 154:19 to 154:20)<br>154<br>19   Q.  Do you see that, Doctor?<br>20      A.  Yes. | | |
| KAISER, MD, FRAN (Page 154:22 to 155:2)<br>154<br>22    Q.  And, Doctor, Exhibit 32 is a Merck document,<br>23   dated March 22nd, 2004, Information Amendment -<br>24   Clinical (Updated Cardiovascular Pooled Analysis).<br>25            I'm assuming you haven't seen this one.<br><br>155<br>1   Is that right?<br>2      A.  That would be correct.  And I had left Merck. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 155:8 to 156:1)<br><br>155<br>8  Q. If you go to the page ending in 0095 of the<br>9  document, do you see that there is a table of study<br>10  blocks for rofecoxib, or Vioxx, versus placebo for the<br>11  TCVSAE endpoint?<br>12      A. Yes.<br>13      Q. Do you know what the TCVSAE endpoint is?<br>14      A. I'm assuming that's -- I won't make an<br>15  assumption.  Can you tell me what that is?<br>16      Q. It's the thrombotic cardiovascular serious<br>17  adverse experiences.<br>18          Do you -- does that sound right?<br>19      A. I don't know this -- I have not seen this<br>20  document, and I don't know how they're defining this,<br>21  so I need a little bit of information.<br>22      Q. Well, take a look at Table 13 of the pooled<br>23  update.<br>24      A. Okay.<br>25      Q. And I want you to look at it side by side with<br><br>156<br>1  Table 4 from Dr. Reicin's article. | 602 | |
| KAISER, MD, FRAN (Page 156:7 to 158:21)<br><br>156<br>7  Q. Doctor, do you see that Table 13 has a series<br>8  of protocol numbers and a block that says OA next to<br>9  it?<br>10      A. Yes.<br>11      Q. And that -- if you look to the top of the<br>12  column under rofecoxib and placebo, each one has a<br>13  total number of patients under the letter N, then a<br>14  number of cases over the patient years, and then a rate<br>15  for the patient -- cases over patient years?<br>16      A. Yes.<br>17      Q. And if you add up the numbers of events in the<br>18  protocols 029 through 058 on the Vioxx side, you've got<br>19  three plus two plus one plus four plus three plus one,<br>20  right?<br>21      A. Uh-huh. | 602 | |
| KAISER, MD, FRAN (Page 158:23 to 159:5)<br><br>158<br>23  THE WITNESS: I'm a little lost here.<br>24      Q. Okay.  The --<br>25      A. This one?<br><br>159<br>1      Q. Here, let me see if that's the one.<br>2          Yes.  There they are.  Okay.  This is the<br>3  April 14, 2000 memo that lists 085 and 090.  And the<br>4  table of studies in the right-hand column says they<br>5  have been completed, right? | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 159:7 to 159:19)<br><br>159<br>7   MR. ARBITBLIT:  The right-hand column,<br>8   completed.<br>9       Q.  Correct?<br>10     A.  Yes.<br>11       Q.  And if you look at Table 13, do you see that<br>12   there are six additional events in the Vioxx side of<br>13   the ledger, and zero additional events in the placebo<br>14   side of the ledger?<br>15     A.  Yes.<br>16       Q.  And is it correct that Reicin's article<br>17   published in 2002 did not include data from studies<br>18   that had been finished in 2000 in the analysis of<br>19   thrombotic events in arthritis patients? | 602 | |
| KAISER, MD, FRAN (Page 159:22 to 160:5)<br><br>159<br>22     A.  It does not appear to be included.  It may be<br>23   that -- and, again, I -- I would be speculating about<br>24   the timing.  Sometimes if you just complete a study and<br>25   you have data, it doesn't necessarily get included in a<br><br>160<br>1   manuscript that's already taken time to prepare and<br>2   been sent to a journal.<br>3       Q.  Are there any other reasons you could think of<br>4   to not include that data?<br>5     A.  I -- I can't say. | 602 | |
| Kaiser, M.D., Fran, (Page 160:11 to 160:13)<br><br>160<br>11   Q.  Doctor, the -- the data from 085 and 090 is<br>12   not in the Reicin article comparing Vioxx to placebo,<br>13   is it? | | |
| Kaiser, M.D., Fran, (Page 160:16 to 160:20)<br><br>160<br>16   A.  No.<br>17       Q.  And just to confirm, if we didn't -- maybe we<br>18   have, and I'll get an asked-and-answered objection --<br>19   but did you see a reference to the Reicin study in the<br>20   2003 Provider Synergies monograph? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 160:25 to 161:17)<br><br>160<br>25      A.  I would have to look, having not seen this<br><br>161<br>1   document previously to today.<br>2      Q.  Please take a look.<br>3          If you'd look at the page ending in 3347,<br>4   I think you'll find it.<br>5          Under the heading Cardiovascular Concerns,<br>6   do you see the last paragraph of that, Reicin and<br>7   colleagues reviewed eight Phase IIb/III osteoarthritis<br>8   studies with rofecoxib for the rate of cardiovascular<br>9   thrombotic events?<br>10     A.  Yes.<br>11     Q.  And if you look at the page 3352, can you just<br>12  connect the footnote 60 following that Reicin and<br>13  colleagues sentence --<br>14     A.  Yes.<br>15     Q.  -- and see that we're talking about the same<br>16  article?<br>17     A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 161:20 to 163:6) <br><br> 161 <br> 20  Q.  Doctor, 33 is an article by Gertz, Krupa, <br> 21  Bolognese, Sperling, and Reicin of Merck Research <br> 22  Laboratories, entitled A Comparison of Adverse <br> 23  Renovascular Experiences Among Osteoarthritis Patients <br> 24  Treated with Rofecoxib and Comparator Non-Selective <br> 25  Non-Steroidal Anti-Inflammatory Agents. <br><br> 162 <br> 1          Did I read that right? <br> 2      A.  Yes. <br> 3      Q.  And are you familiar with this one? <br> 4      A.  Not in a long -- I haven't read this in a very <br> 5  long time. <br> 6      Q.  But you have read it? <br> 7      A.  I -- yes. <br> 8      Q.  Did you ever discuss this particular article <br> 9  in meetings with anyone about Vioxx? <br> 10      A.  I don't remember. <br> 11      Q.  Do you see that this refers to nine studies in <br> 12  Table 1 from the OA safety database? <br> 13      A.  Yes. <br> 14      Q.  And in the text on the previous page, under <br> 15  materials and methods in the right-hand column, the <br> 16  statement is made, a summary of the nine studies in the <br> 17  OA Phase IIb/III database is included in Table 1.  Is <br> 18  that right? <br> 19      A.  Yes. <br> 20      Q.  And does the summary on the first page of the <br> 21  document state the conclusion that in the rofecoxib <br> 22  Phase IIb/III OA database, the renal safety profile for <br> 23  rofecoxib, a selective inhibitor of COX-2, was <br> 24  generally similar to that of the comparator <br> 25  nonselective NSAIDs which were studied? <br><br> 163 <br> 1      A.  Yes. <br> 2      Q.  And was that your understanding of the <br> 3  scientific evidence concerning Vioxx and nonselective <br> 4  NSAIDs with respect to hypertension and edema as of the <br> 5  2000 to 2003 time period? <br> 6      A.  I would have to reread the paper. | | |
| KAISER, MD, FRAN (Page 163:11 to 163:13) <br><br> 163 <br> 11  A.  No, I don't recall that.  I do recall other <br> 12  data in the literature that went back and forth on <br> 13  this. | No question designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 163:19 to 163:24)<br><br>163<br>19   Q.  You -- you knew that the makers of Celebrex<br>20   had published a series of studies with their<br>21   consultants, Welton and White, that said that there was<br>22   more hypertension in patients on Vioxx than Celebrex,<br>23   right?  You were aware of --<br>24      A.  I was -- | | |
| Kaiser, M.D., Fran, (Page 164:1 to 164:11)<br><br>164<br>1   A.  -- aware of those data.<br>2      Q.  And you saw in the document a little while ago<br>3   that Merck planned a response that included a<br>4   publication by these authors on the subject, right?<br>5      A.  Yes.<br>6         (Exhibit Number 34 marked.)<br>7      Q.  34 is a table from the October 1998-dated<br>8   document concerning protocol number 045, and it's<br>9   Table 75.<br>10         Do you understand the initials CSR to<br>11   stand for clinical study report? | | |
| KAISER, MD, FRAN (Page 164:7 to 164:11)<br><br>164<br>7   Q.  34 is a table from the October 1998-dated<br>8   document concerning protocol number 045, and it's<br>9   Table 75.<br>10         Do you understand the initials CSR to<br>11   stand for clinical study report? | 602 | Sustain |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 164:15 to 165:24)<br>164<br>15  A.  I don't -- I don't know what this is from<br>16  or -- I'm assuming this comes out of somebody's file,<br>17  certainly.  I -- I don't recognize this.<br>18      Q.  Well, do you know what a CSR is, a clinical<br>19  study report?<br>20      A.  Yes.<br>21      Q.  And do you see at the bottom left this is<br>22  referenced as MK-0966 CSR?  That's a clinical study<br>23  report for Vioxx, right?<br>24      A.  Yes.<br>25      Q.  And it's got a Bates stamp coming from Merck's<br>165<br>1  files, right?<br>2      A.  Yes.  Where is that?<br>3      Q.  MRK-ABS0057150.<br>4      A.  Gotcha.<br>5      Q.  And the date is October 21st, 1998, approved?<br>6      A.  Oh, there we go.  October.<br>7      Q.  On the same line --<br>8      A.  Sorry, it's a little small.<br>9      Q.  I understand.<br>10         Do you see that date?<br>11     A.  Yes.<br>12     Q.  And in the upper left, it refers to MK-0966.<br>13  That's Vioxx?<br>14     A.  Yes.<br>15     Q.  Protocol number 045, right?<br>16     A.  Yes.<br>17     Q.  And if you look at the Gertz table from the<br>18  article, the previous exhibit, Table 1 shows 045 is one<br>19  of the studies included in this analysis, right?<br>20     A.  Uh-huh.  Yes.<br>21     Q.  And, in particular, the life table rate of<br>22  hypertension-type adverse experiences for 045 appears<br>23  in Table 75, correct?<br>24     A.  It appears to, yes. | 602 | |
| KAISER, MD, FRAN (Page 166:6 to 166:16)<br>166<br>6  Q.  Yes, I'm sorry.  I'm now comparing Table 75 to<br>7  the Gertz article.<br>8         First, in Table 75, do you see that the<br>9  life table rate of hypertension-type adverse<br>10  experiences on Vioxx was 10.5 for the 25 milligrams,<br>11  20.6 for the 50 milligrams, and 3.9 for ibuprofen?<br>12     A.  Yeah.  I'm not familiar with the term life<br>13  table rate.<br>14     Q.  Well, it's defined underneath, Doctor, life<br>15  table rate equals cumulative life table rate based on<br>16  the probability that an event occurs by the time. | 602 | |

*[handwritten notes at top of page, partially illegible]* Some ... may ... be relevant but not ... to admissibility ...

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 166:18 to 167:4)<br><br>166<br>18   Q.  Do you see that?<br>19      A.  Yes.<br>20      Q.  Did I read it right?<br>21      A.  Yes.<br>22      Q.  And for -- for that definition, the data are<br>23   indicated in the table, Vioxx 25 at 10.5 percent,<br>24   life -- 50 milligrams at 20.6 percent, and ibuprofen at<br>25   3.9 percent, right?<br><br>167<br>1      A.  Yes.<br>2      Q.  So about three times higher for 25 milligrams<br>3   and about six -- five to six times higher for 50<br>4   milligrams, right? | 602 *[handwritten] Foundation*  | *[handwritten] Sustained* |
| KAISER, MD, FRAN (Page 167:7 to 167:11)<br><br>167<br>7      A.  Of any one or more adverse experiences,<br>8   whatever that was?<br>9      Q.  Hypertension-type adverse experiences, right.<br>10   That's what it says under the table.<br>11      A.  Yes. | 602 | |
| KAISER, MD, FRAN (Page 168:19 to 168:20)<br><br>168<br>19   Q.  Have you seen the results of -- shown in<br>20   Table 75 published anywhere? | 602 | |
| KAISER, MD, FRAN (Page 168:22 to 169:10)<br><br>168<br>22   A.  I -- I do not recall these data, but that<br>23   doesn't mean it wasn't published, or it didn't appear<br>24   in an abstract somewhere.<br>25      Q.  Okay.  Do you consider a 10.5 versus 3.9 rate<br><br>169<br>1   to be similar or different?<br>2      A.  I would have to do a statistical -- somebody<br>3   would have to do a statistical analysis.  I assume that<br>4   they are, again, given the Ns, also different, but<br>5   without an accurate analysis -- remember, percent and<br>6   actual number may differ, depending on the size of the<br>7   population studied.<br>8           And, again, how -- how do you define<br>9   hypertension type?  So I -- I have no context for this<br>10   table. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 169:12 to 169:16)<br>169<br>12  Q.  Exhibit 35 is an excerpt from the protocol<br>13  number 034 clinical study report, dated September 16,<br>14  1998.<br>15          Have you seen this document before?<br>16  A.  No. | 602 | |
| KAISER, MD, FRAN (Page 169:20 to 170:22)<br>169<br>20  Q.  Do you see that Table 58 on the page ending in<br>21  2951 provides patients exceeding the predefined limits<br>22  of change on one or more visits vital sign parameters<br>23  (intention-to-treat approach)?  Do you see that?<br>24  A.  Yes.<br>25  Q.  And do you recall that protocol 034 is another<br><br>170<br>1  one of the studies included in the Gertz article?  You<br>2  can check that, if you want.<br>3  A.  Yes.<br>4  Q.  And do you see that compared with<br>5  diclofenac -- you can read the text on the other side<br>6  of the document, if you'd like -- compared with<br>7  diclofenac, the 12.5-milligram, 25-milligram MK-0966<br>8  groups demonstrated a significantly higher percent (P<br>9  equals 0.015 and P equals 0.007, respectively) of<br>10  patients exceeding the predefined limits of change in<br>11  systolic blood pressure (16, 17 and 8 percent in the<br>12  12.5-milligram, 25-milligram MK-0966, and diclofenac<br>13  groups, respectively).<br>14          Did I read that right?<br>15  A.  Yes.<br>16  Q.  And do you see in the table there's a little<br>17  star next to the 16.2 and 17.0 percentages for Vioxx<br>18  12.5 and 25 milligrams?<br>19  A.  Yes.<br>20  Q.  And underneath the star says, P less than 0.05<br>21  versus diclofenac, right?<br>22  A.  Yes. | 602; Question without answer | |
| KAISER, MD, FRAN (Page 170:23 to 170:23)<br>170<br>23  Q.  Statistically significant results, right? | Question without answer | |
| Kaiser, M.D., Fran, (Page 171:18 to 171:22)<br>171<br>18  Q.  If you take a look at the Gertz paper, do you<br>19  see anywhere in the description of what they did that<br>20  they included predefined limits of change as one of the<br>21  endpoints?<br>22  A.  No, but they did. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 170:24 to 170:24)<br>170<br>24   A.  Yes. | | |
| Kaiser, M.D., Fran, (Pages 171:24 to 172:2)<br>171<br>24   A.  -- include protocol 034.<br>25       Q.  Well, okay.  They included protocol 034.  But<br>172<br>1   did they include the predefined limits of change<br>2   endpoint in their pooled analysis? | | |
| Kaiser, M.D., Fran, (Page 172:9 to 172:16)<br>172<br>9    A.  Okay.  They looked at the mean changes.  They<br>10   didn't specify limits here.<br>11       Q.  And --<br>12       A.  That's what this appears to show.<br>13       Q.  And the predefined limit of change is defined<br>14   in Table 58 as an increase of more than 20 and a value<br>15   greater than 140 for systolic, right?<br>16       A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 173:14 to 175:20)<br><br>173<br>14  Q.  36 is the 2004 -- April 2004 Provider<br>15  Synergies monograph.<br>16      I'm assuming you haven't seen it before?<br>17  A.  No.<br>18  Q.  Can you --<br>19      MR. GOLDMAN:  Don, just a standing<br>20  objection on lack-of-foundation grounds?<br>21      MR. ARBITBLIT:  Yes.<br>22  Q.  Can you take a look at the page ending in<br>23  3366.<br>24      And the next-to-last paragraph, can you<br>25  confirm that the Gertz article that you've just been<br><br>174<br>1  looking at is the one referenced for footnote 72 on<br>2  renovascular adverse effects.  Footnote 72, Gertz,<br>3  Krupa, Bolognese, et al., is on page 3369.<br>4  A.  Yes.<br>5      MR. ARBITBLIT:  Let's take a short break.<br>6      (Recess 4:08-4:21 p.m.)<br>7      MR. ARBITBLIT:  Back on the record.<br>8      (Exhibit Number 37 marked.)<br>9  Q.  Exhibit 37 is an e-mail to<br>10  jeffrey_melin@merck.com, dated March 24, 2001, Subject:<br>11  Coxib Renal Profile.<br>12      Have you seen this document before?<br>13  A.  No.<br>14      MR. ARBITBLIT:  And you may have your<br>15  standing objection, Counsel.<br>16      MR. GOLDMAN:  Thank you.<br>17  Q.  And look at the second page, the paragraph<br>18  beginning data, from protocol 112.<br>19      Do you see the sentence that says, data<br>20  from protocol 112 shows that rofecoxib 12.5 milligrams<br>21  once daily has almost double the HTN -- hypertension --<br>22  AEs -- adverse events -- based on PDLOC -- predefined<br>23  limits of change -- compared with celecoxib 200<br>24  milligrams once daily ... ?<br>25  A.  Yes.<br><br>175<br>1  Q.  In your dealings with Dr. Melin concerning<br>2  Vioxx, did he ever tell you that data from protocol 112<br>3  showed Vioxx had almost double the hypertension adverse<br>4  events based on predefined limits of change compared<br>5  with Celebrex 200 milligrams?<br>6      MR. GOLDMAN:  Objection, lacks foundation.<br>7  A.  I don't have a recollection of that.<br>8  Q.  Do you recall that he did not tell you?<br>9  A.  I don't recall if he did or did not.<br>10  Q.  Did -- have you ever learned -- do you know<br>11  what protocol 112 is? | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 175<br><br>12    A.  No.  I'd have to be refreshed as to what that<br>Kaiser, M.D., Fran,<br>13   is.  I don't remember protocol 112.<br>14       Q.  Do you remember seeing in any published<br>15   document information that Vioxx 12.5 milligrams has<br>16   almost double the hypertension adverse events compared<br>17   with Celebrex 200 milligrams?<br>18           MR. GOLDMAN:  Objection, lacks foundation,<br>19   calls for speculation.<br>20       A.  I -- I have no recollection of such data. | | |
| Kaiser, M.D., Fran, (Pages 175:20 to 176:6)<br>175<br><br>21           (Exhibit Number 38 marked.)<br>22       Q.  Exhibit 38 is an article, Comparison of Upper<br>23   Gastrointestinal Toxicity of Rofecoxib and Naproxen in<br>24   Patients with Rheumatoid Arthritis, by Bombardier,<br>25   Laine, Reicin, and others.<br><br>176<br>1           And I assume you've seen this before?<br>2       A.  Yes.<br>3       Q.  Is this the VIGOR study?<br>4       A.  It is.<br>5       Q.  And the VIGOR study is referenced in the<br>6   monographs for 2003, right?  Take a look. | | |
| Kaiser, M.D., Fran, (Pages 176:17 to 177:6)<br>176<br>17   VIGOR study after March 2000?<br>18       A.  I believe I presented a label update to<br>19   Dr. Culotta.<br>20       Q.  That would have been after the April 2002<br>21   label change?<br>22       A.  Yes.<br>23       Q.  And what did you -- do you remember -- recall<br>24   the substance of that discussion?<br>25       A.  The substance of the discussion would have<br><br>177<br>1   been the additions to the label, which included the<br>2   VIGOR data, the cardiovascular issues that had been<br>3   raised in VIGOR, the GI outcomes, the new indication.<br>4       Q.  So, basically, just going through what the new<br>5   label said?<br>6       A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 177:7 to 177:9)<br><br>177<br>7   Q.  Did the article by Bombardier present any data<br>8   on the overall safety of Vioxx compared to naproxen in<br>9   terms of serious adverse experiences? | Non-Responsive | |
| Kaiser, M.D., Fran, (Pages 177:12 to 178:1)<br><br>177<br>12   A.  There is a safety section in here.<br>13          Q.  And does it include a -- an endpoint for the<br>14   overall number, percentage and rate of serious adverse<br>15   experiences in Vioxx versus naproxen?<br>16          A.  I'd have to really go through the data here.<br>17   It's been a while since I've looked at this.<br>18                Could you repeat your question again,<br>19   please.<br>20          Q.  Yes.  Do you see in the information providing<br>21   the number, percentage, or comparative rates of the<br>22   overall serious adverse experiences for Vioxx versus<br>23   naproxen?<br>24          A.  They have data on mortality, they have data on<br>25   cardiovascular causes, ischemic.  Is that what you're<br><br>178<br>1   asking?  It's on page 1523 of the article. | Non-responsive | |
| Kaiser, M.D., Fran, (Page 178:3 to 178:6)<br><br>178<br>3   When a -- a physician is deciding about<br>4   whether to prescribe a drug to a patient, does she take<br>5   into account the benefits and the risks?<br>6          A.  Yes. | | |
| Kaiser, M.D., Fran, (Page 178:21 to 178:25)<br><br>178<br>21   Q.  Exhibit 39 is a document marked as Vioxx<br>22   Interim Review, HH-PAC, May 17, 2000, previously marked<br>23   as Exhibit 14 to the Daniels deposition.<br>24                Have you seen this document before?<br>25          A.  No. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 178:21 to 179:1)<br><br>21    Q.  Exhibit 39 is a document marked as Vioxx<br>22  Interim Review, HH-PAC, May 17, 2000, previously marked<br>23  as Exhibit 14 to the Daniels deposition.<br>24          Have you seen this document before?<br>25    A.  No.<br><br>1            MR. ARBITBLIT:  You have a standing | 602 | Sustained |
| KAISER, MD, FRAN (Page 179:4 to 179:12)<br><br>4    Q.  Please take a look at the page ending in 1876,<br>5  with the heading General Safety.<br>6          And do you -- are you there?<br>7    A.  Yes.<br>8    Q.  Do you see that under the heading General<br>9  Safety, this Vioxx interim review, dated May 17, 2000,<br>10   showed serious adverse experiences of 378, 9.3 percent,<br>11   for Vioxx versus 315, 7.8 percent, for naproxen?<br>12    A.  Yes. | 602 | |
| KAISER, MD, FRAN (Page 179:15 to 179:22)<br><br>15    Q.  And do you see that the asterisk next to the<br>16  data relates to a P value of 0.013?<br>17    A.  Yes.<br>18    Q.  Do you see that that comparison of Vioxx<br>19  serious adverse experiences versus naproxen is -- shows<br>20  a statistically significantly higher incidence on<br>21  Vioxx?<br>22    A.  Yes. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 179:23 to 180:20)<br>179<br>23   Q.  And can you take a look at the Bombardier<br>24   article and see if that information appears in the<br>25   article.<br>180<br>1          Specifically, does the comparison for<br>2   serious adverse experiences showing Vioxx 9.3 percent<br>3   versus naproxen 7.8 percent statistically significant P<br>4   value appear in Bombardier article -- Bombardier's<br>5   article?<br>6      A.  I do not see it.<br>7          Can I just say that as a former<br>8   investigator, SAEs are not our -- again, I would have<br>9   to know if this was SAEs that were judged by the<br>10   investigator to be due to the drug or SAEs reported in<br>11   general.<br>12      Q.  I --<br>13      A.  Because there is a difference.<br>14      Q.  Well, let's talk about that for a moment.<br>15          Investigators decide whether an incident<br>16   is related to drug based on what's known or in the<br>17   literature about the risks and benefits of a drug,<br>18   right?<br>19      A.  But an AE can be reported as an SAE for any<br>20   cause, whether it's due to drug or not. | 180:7-180:20 -<br>Non-responsive | |
| KAISER, MD, FRAN (Page 182:18 to 182:24)<br>182<br>18   Q.  Okay.  The data for serious adverse<br>19   experiences reported in the May 17, 2000 interim review<br>20   is not in the published article, is it?<br>21      A.  No.<br>22      Q.  And the data on serious adverse experiences in<br>23   the interim review is not in the Provider Synergies<br>24   monograph summarizing the VIGOR study, is it? | 602 | |
| KAISER, MD, FRAN (Page 183:9 to 183:9)<br>183<br>9   A.  I'm not seeing it. | 602 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 183:10 to 183:23)<br>183<br>10  Q.  And is it correct that in the years you worked<br>11  as regional medical director for the South Central<br>12  region, including Louisiana, between May 2000 and<br>13  November 2003, you did not know that the rate of<br>14  serious adverse experiences on Vioxx was statistically<br>15  significantly greater than on naproxen in the VIGOR<br>16  study?<br>17      A.  No, but I'm not sure it would have made a<br>18  difference.  As I said, as an investigator and as<br>19  someone who has done studies prior to my life at Merck,<br>20  SAEs get reported whether they are attributable to drug<br>21  or somebody got hit by a car.  So there are a large<br>22  number of things that contribute to what might be in<br>23  that data set. | Non-responsive; lack of personal knowledge | |
| Kaiser, M.D., Fran, (Page 184:4 to 184:8)<br>184<br>4    Q.  Is it correct that you did not know during the<br>5  years you were regional medical director that serious<br>6  adverse experiences on Vioxx were statistically<br>7  significantly greater than serious adverse experiences<br>8  on naproxen in the VIGOR study? | | |
| Kaiser, M.D., Fran, (Page 184:12 to 184:12)<br>184<br>12  A.  I don't believe I knew that. | | |
| Kaiser, M.D., Fran, (Page 186:7 to 186:11)<br>186<br>7  Q.  As a clinician treating a patient, deciding<br>8  whether to prescribe a medication, was it your practice<br>9  to consider all the benefits and all the risks that<br>10   that drug might confer or impose on your patient?<br>11      A.  I tried to do that for my patients, yes. | | |
| Kaiser, M.D., Fran, (Page 188:10 to 188:14)<br>188<br>10    Q.  Is it correct that there were 28<br>11  discontinuations due to hypertension out of 4,047 Vioxx<br>12  patients, compared to six on naproxen out of 4,029?<br>13      A.  That's what this appears to state.<br>14      Q.  And is that in the published article? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 188:18 to 188:23)<br>188<br>18  A.  It does not appear.<br>19      Q.  Had anyone told you, when you were regional<br>20  medical director responsible for the region that<br>21  included Louisiana, about the data showing<br>22  statistically significant excess of discontinuation due<br>23  to hypertension on Vioxx in the VIGOR study? | | |
| Kaiser, M.D., Fran, (Page 188:25 to 188:25)<br>188<br>25  A.  I don't recall. | | |
| **Kaiser, M.D., Fran, (Page 189:7 to 189:9)**<br>189<br>7    Q.  And if you had 19 versus nine cases, would you<br>8   think it's appropriate not to report that simply<br>9   because the P value was marginally above .05? | Non-responsive; lack of personal knowledge | |
| **Kaiser, M.D., Fran, (Page 189:13 to 189:19)**<br>189<br>13  A.  I can't tell people what to include or not to<br>14  include.  This was, again, not statistically different.<br>15  It is possible that there were more patients at risk<br>16  for failure.  Sometimes populations are not equal in<br>17  their risk.<br>18      Q.  Is this more data that you had not seen as of<br>19  the time you were medical director? | Non-responsive; lack of personal knowledge | |
| Kaiser, M.D., Fran, (Page 189:22 to 189:22)<br>189<br>22  A.  I — I don't recall. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 190:3 to 190:12)<br>190<br>3  Q.  Is it difficult for you to see this data that<br>4  you didn't know about when you were in charge of --<br>5    A.  No.<br>6    Q.  -- presenting the information to the State of<br>7  Louisiana and your other clients?<br>8    A.  No.  Again, you know, there's -- there's lots<br>9  of data surrounding different medications that gets<br>10  reported, and the FDA helps adjudicate what gets into a<br>11  label.  We stick with and utilize what our label shows<br>12  and the data that supports that. | Non-responsive | |
| Kaiser, M.D., Fran, (Page 191:2 to 191:6)<br>191<br>2  Q.  When you served as regional medical director<br>3  providing information about Merck's products, was it<br>4  your intention to provide fair and balanced<br>5  information?<br>6    A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 191:7 to 192:13)<br><br>191<br>7    Q.  Could you take a look at the VIGOR article<br>8    and, in particular, the discussion about the heart<br>9    attack rates under general safety.  And I know this has<br>10   been a while, but is it -- take a look and just read<br>11   that general safety paragraph.<br>12            And let me know when you're done.<br>13   A.  (Nods head.)<br>14   Q.  Okay.  So the article states that myocardial<br>15   infarctions were less common in the naproxen group than<br>16   in the rofecoxib group, 0.1 percent versus 0.4 percent?<br>17   A.  Yes.<br>18   Q.  And then it gives the confidence intervals and<br>19   the relative risks, right?<br>20   A.  Yes.<br>21   Q.  And then it goes on after the parentheses, and<br>22   it says, 4 percent of the study subjects met the<br>23   criteria of the Food and Drug Administration (FDA) for<br>24   the use of aspirin for secondary cardiovascular<br>25   prophylaxis (presence of a history of myocardial<br><br>192<br>1    infarction, angina, cerebrovascular accident, transient<br>2    ischemic attack, angioplasty, or coronary bypass) but<br><br>3    were not taking low-dose aspirin therapy.<br><br>4            Did I read that right?<br>5    A.  Yes.<br>6    Q.  These patients accounted for 38 percent of the<br>7    patients in the study who had myocardial infarctions.<br>8    In the other patients, the difference in the rate of<br>9    myocardial infarction between groups was not<br>10   significant (0.2 percent in the rofecoxib group and<br>11   0.1 percent in the naproxen group).<br>12            Did I read that right?<br>13   A.  Yes. | | |
| Kaiser, M.D., Fran, (Pages 192:23 to 193:5)<br><br>192<br>23   How did you understand and interpret the<br>24   comparison in the article to aspirin-indicated versus<br>25   non-aspirin-indicated?<br><br>193<br>1    A.  That there were certain patients that clearly<br>2    should have been on aspirin prophylaxis and weren't.<br>3    And, again, if you reanalyze the data, it looks like --<br>4    if you took those -- those individuals out, you had<br>5    comparable rates in -- in the two groups. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 197:10 to 197:13)<br><br>10   Q.  So Exhibit 40 is the February 2002 Provider<br>11   Synergies monograph on selective COX-2 inhibitors.<br>12          Have you seen this one before?<br>13   A.  No. | 602 | *Sustained* |
| Kaiser, M.D., Fran, (Pages 197:17 to 199:2)<br><br>17   Q.  Looking at page 4 at the bottom, there's a<br>18   section on Vioxx.  And there's a reference in the<br>19   second paragraph to a total of 742 patients with<br>20   osteoarthritis without ulcer on baseline endoscopy were<br>21   randomly assigned to receive rofecoxib (25 or 50<br>22   milligrams daily), ibuprofen (800 milligrams tid) -- or<br>23   three times daily -- or placebo.<br>24          Did I read that right?<br>25   A.  Yes.<br><br>1   Q.  And is this a study that you were familiar<br>2   with when you were regional medical director?<br>3   A.  Yes.<br>4   Q.  How did you become familiar with it?<br>5   A.  It would have been presented to us.  It may<br>6   have been published.<br>7          Laine.  It was the Laine study.<br>8   Q.  Did that ring a bell when you read it?<br>9   A.  Laine?  Yes.<br>10   Q.  Why?<br>11   A.  Because I read the Laine study at some point.<br>12          MR. ARBITBLIT:  Could you mark that.<br>13          (Exhibit Number 41 marked.)<br><br>14          (Off the record.)<br><br>15   Q.  Doctor, is 41 -- is Exhibit 41 the Laine study<br>16   that you are familiar with on Vioxx?<br>17   A.  I was familiar with it back when it was<br>18   published.  It's been a long time since I've looked at<br>19   it.<br>20   Q.  And do you recall how you learned about this<br>21   study?<br>22   A.  I believe it would have been presented as part<br>23   of an update, and I probably would have gotten a copy<br>24   of this to read.<br>25   Q.  Do you know anything about the standard dosing<br>1   regimen for ibuprofen?<br>2   A.  Can you clarify for what kind of patient? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 199:3 to 199:7)<br><br>3   Q.  Okay.  Let's talk about a patient with mild<br>4   osteoarthritis.  Did you ever prescribe Vioxx to such a<br>5   patient -- excuse me.<br>6       A.  Ibuprofen?<br>7       Q.  Let me withdraw that. | Question withdrawn | |
| KAISER, MD, FRAN (Page 199:8 to 200:6)<br><br>8   Did you ever prescribe ibuprofen for a<br>9   patient with mild osteoarthritis?<br>10      A.  Yes.<br>11      Q.  What dose did you generally use?<br>12      A.  Usually the lowest dose that provided efficacy<br>13  and pain relief.<br>14      Q.  And that was consistent with the Physicians'<br>15  Desk Reference and the package insert and the standard<br>16  of care on prescribing, right?<br>17      A.  Right.  But some patients did not respond, and<br>18  you would have to escalate the dose.<br>19      Q.  And that's called dose titration; you could<br>20  either go up or down, depending on response, right?<br>21      A.  Right.<br>22      Q.  What dose --<br>23      A.  And depending on the level of pain and how<br>24  that was perceived by the patient.  Excruciating pain,<br>25  you hit it hard, and then you back off.  Mild pain, go<br><br>1   with a low dose.  If they respond, great.  If they<br>2   don't, you escalate.<br>3       Q.  And patients with osteoarthritis often have<br><br>4   intermittent pain that doesn't require constant dosing<br>5   at the same level, right?<br>6       A.  Correct. | 401 | *overrul[e]* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 200:15 to 201:20)<br>200<br>15  Q.  I'm asking for your personal experience as a<br>16  treating physician.  When you've had patients with mild<br>17  osteoarthritis, what was your starting dose of<br>18  ibuprofen?<br>19       A.  Again, it related to how that individual<br>20  patient perceived their pain, their functionality.  So<br>21  that's the other piece that had to be weighed in.<br>22  Usually, 2 to 400 milligrams, three times a day.<br>23       Q.  So between 6 and 1200 milligrams a day?<br>24       A.  Right.<br>25       Q.  Did you ever use the ARA -- or ARC, Rheum- --<br>201<br>1  the American College of Rheumatology, classification<br>2  system in deciding how severe your patients' arthritis<br>3  was?<br>4       A.  I don't think that system was in place back --<br>5  until the late '90s/early 2000s, so I couldn't tell you<br>6  prior to that.<br>7       Q.  Were you still treating patients in 1992?<br>8       A.  Yes.<br>9       Q.  Did you more use the vernacular mild,<br>10  moderate, and severe?<br>11       A.  Yes.<br>12       Q.  For patients with moderate osteoarthritis, as<br>13  you understood it, what was your range of starting<br>14  doses?<br>15       A.  Generally around -- around 400 for moderate, 4<br>16  to 800 of -- of Motrin three times a day.<br>17       Q.  And then if you -- so between 1200 and 2400?<br>18       A.  Right.<br>19       Q.  And then back off as soon as you could?<br>20       A.  Right. | 401 | Overruled |
| KAISER, MD, FRAN (Page 202:15 to 202:18)<br>202<br>15  Doctor, when you were practicing and<br>16  seeing patients, did you ever prescribe 2400 milligrams<br>17  of ibuprofen to a patient with mild to moderate<br>18  arthritis for 12 weeks at a time? | 401 | |
| KAISER, MD, FRAN (Page 202:21 to 202:22)<br>202<br>21  Q.  I'm asking for your personal knowledge and<br>22  experience, Doctor, noting the objection. | 401 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| KAISER, MD, FRAN (Page 202:24 to 203:4)<br>202<br>24   A.  Depends on their other issues that they may<br>25   have been receiving pain medication for.  Arthritis<br><br>203<br>1   usually -- again, in a population that has<br>2   osteoarthritis, they've got a lot of other things going<br>3   on, so -- it's certainly possible.  It wouldn't be<br>4   common, but it would be possible. | 401 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 204:21 to 207:5)<br>204<br>21 Q. Sure. The -- let's look at the article.<br>22         Do you see that the Laine article at the<br>23 conclusion says, ulcer rates comparable to placebo?<br>24 The last --<br>25     A. Yes.<br><br>205<br>1     Q. -- five words say, ulcer rates comparable to<br>2 placebo, right?<br>3     A. Yes.<br>4     Q. And then if you look at page 779 of the<br>5 article --<br>6     A. Yes.<br>7     Q. -- the last paragraph going on to 780 says,<br>8 the ulcer incidences in the rofecoxib group were<br>9 numerically lower than in the placebo group, and the<br>10 upper limit of the one-sided 95 percent confidence<br>11 interval -- intervals for the differences between each<br>12 rofecoxib group and placebo at 12 weeks was less than<br>13 the 4 percentage points, which were predefined as<br>14 indicating statistical equivalence.<br>15         Did I read that right?<br>16     A. Yes.<br>17     Q. Then on page 781, in the second sentence of<br>18 the first full paragraph on the left, the sentence<br>19 appears, the incidences of ulcer- ---<br>20     A. Wait, wait. Where are you?<br>21     Q. The left-hand column of 781, the first full<br>22 paragraph, the second sentence.<br>23     A. Okay. Yes.<br>24     Q. The incidences of ulceration after<br>25 administration of rofecoxib in 25-milligram or<br><br>206<br>1 50-milligram doses for 12 weeks were statistically<br>2 equivalent to background levels in patients receiving<br>3 placebo.<br>4         Did I read that right?<br>5     A. Yes.<br>6     Q. And then over on the right-hand column, the<br>7 last sentence of the paragraph for -- the -- the full<br>8 paragraph says, however, no prior study of an NSAID has<br>9 shown statistical equivalence in ulcer rates between<br>10 placebo and the active --<br>11     A. Wait. Where are you?  I've lost you again.<br>12 I'm sorry.<br>13     Q. Okay.  The right-hand column of 781. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 14      Do you see the big paragraph starting with [206]<br>15  although?<br>16   A.  Yes.<br>17   Q.  Go to the last sentence of that paragraph.<br>18      However, no prior study of an NSAID has<br>19  shown statistical equivalence in ulcer rates between<br>20  placebo and the active medication, as was observed in<br>21  our trial.<br>22      Did I read that right?<br>23   A.  Yes.<br>24   Q.  And then on the last paragraph of 782, there<br>25  is a fifth reference comparing to placebo, and the<br><br>1  first sentence of the last paragraph, the last five [207]<br>2  words -- six words, of that sentence are, with ulcer<br>3  rates comparable to placebo.<br>4      Do you see that?<br>5   A.  Yes. | | |
|      Kaiser, M.D., Fran, (Page 207:12 to 207:13)<br><br>12  Q.  How did you interpret this at the time that [207]<br>13  you read the study? | | |
| Kaiser, M.D., Fran, (Pages 207:15 to 208:5)<br><br>15  A.  That if you actually -- let's go to the ulcer [207]<br>16  data, specifically.<br>17      That at zero to six weeks -- this is<br>18  cumulative incidence of gastroduodenal ulcers greater<br>19  than 3 milligrams -- 3 millimeters, sorry, you've got<br>20  rates that are comparable to placebo, at least up to<br>21  the 12-week point.  Then you don't, obviously, have a<br>22  placebo control after that.<br>23   Q.  And did you have any understanding about the<br>24  clinical significance or lack of clinical significance<br>25  of the endpoint reported in the Laine study?<br><br>1   A.  That was very significant because, again, [208]<br>2  we're not just talking about erosions; we're talking<br>3  about ulcers, and ulcers that can bleed, and bleeding<br>4  that can lead to anemia, hospitalization problems.  So<br>5  that -- that was quite significant. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 210:12 to 211:17)<br>210<br>12 Q.  And will you take a look at the Provider<br>13 Synergies monograph for 2002.<br>14     A.  Which one was that?<br>15     Q.  That was the most recent one in the pile.<br>16     A.  Number 40?<br>17     Q.  And do you see that the -- page 4 of the<br>18 document, pertaining to the Laine article, ends with<br>19 the statement, ulcer rates for rofecoxib were<br>20 comparable to rates with placebo?<br>21     A.  Yes.<br>22     Q.  And can you locate in the pile the 2003<br>23 Provider Synergies monograph.<br>24         THE WITNESS:  Number 30.<br>25         MR. ARBITBLIT:  Thank you for that.<br><br>211<br>1         THE WITNESS:  You're welcome.<br>2     Q.  Exhibit 30, at page 6, appears to repeat the<br>3 identical paragraph from the 2002 monograph, correct?<br>4     A.  Yes.<br>5     Q.  And it ends, again, with ulcer rates for<br>6 rofecoxib were comparable to rates with placebo, right?<br>7     A.  Yes.<br>8     Q.  And, finally, if you look at the April 2004<br>9 monograph.<br>10     A.  Number 36.<br>11     Q.  Thank you.  Exhibit 36, at page 7, does that<br>12 appear to repeat the same language as the 2002 and 2003<br>13 monographs concerning the Laine study?<br>14     A.  Yes.<br>15     Q.  Again, ending with the sentence, ulcer rates<br>16 for rofecoxib were comparable to rates with placebo?<br>17     A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 212:2 to 213:12)<br><br>212<br>2   Q.  My name is Andy Goldman, and I represent Merck<br>3   in this case.  Thank you for spending the day here.<br>4   I'm going to ask you some questions now following up on<br>5   those that plaintiffs' counsel asked, okay?<br>6       A.  Yes.<br>7       Q.  Can you state your name for the record,<br>8   please.<br>9       A.  Fran Kaiser.<br>10      Q.  Are you a medical doctor?<br>11      A.  I am.<br>12      Q.  Where do you live, Dr. Kaiser?<br>13      A.  Dallas, Texas.<br>14      Q.  Can you briefly tell us where you went to<br>15   medical school and about your medical education after<br>16   that.<br>17      A.  I went to New York Medical College.  Following<br>18   that, I interned and residencied at Beth Israel Medical<br>19   Center in New York, where I was also a chief medical<br>20   resident.<br>21          I then went to the University of Minnesota<br>22   and was an endocrine fellow there, stayed on faculty<br>23   and became chief of endocrinology at one of the<br>24   university hospitals, St. Paul-Ramsey Medical Center.<br>25          I then was a Hartford scholar in geriatric<br><br>213<br>1   medicine at UCLA and stayed at UCLA until 1989, when I<br>2   moved to St. Louis University to become codirector of<br>3   the geriatric medicine division in internal medicine at<br>4   St. Louis University, and became professor of medicine<br>5   there.  And then in 1997, I joined Merck.<br>6       Q.  For how many years would you say you have<br>7   treated patients?<br>8       A.  Over 30.<br>9       Q.  You said you joined Merck in 1997?<br>10      A.  Yes.<br>11      Q.  What was your job title?<br>12      A.  Senior medical director. | | |
| Kaiser, M.D., Fran, (Page 213:18 to 213:21)<br><br>213<br>18   I want to ask you questions about a<br>19   meeting that you were asked about with Dr. Culotta.  Do<br>20   you remember being asked about that?<br>21      A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 213:22 to 214:8) <br> 213 <br> 22  Q.  Did you meet with Dr. Culotta in or about <br> 23  August of 2002? <br> 24     A.  Yes. <br> 25     Q.  You testified that you presented fair and <br><br> 214 <br> 1  balanced scientific information to Dr. Culotta, right? <br> 2     A.  Yes. <br> 3     Q.  What does that mean? <br> 4     A.  It means that at that time, we reviewed the <br> 5  changes in the label, which included cardiovascular <br> 6  events that were included in the VIGOR trial as well as <br> 7  the GI outcomes of that trial, and a new indication <br> 8  that was added to the label. | | |
| Kaiser, M.D., Fran, (Pages 214:9 to 215:1) <br> 214 <br> 9  Q.  Is Dr. Culotta a physician? <br> 10    A.  Yes, he is. <br> 11    Q.  Did he seem to be interested in the <br> 12  information you were providing? <br> 13    A.  Yes. <br> 14    Q.  Did you also know that Dr. Culotta had <br> 15  requested certain information of Merck in advance of <br> 16  the meeting? <br> 17    A.  Yes.  And we followed up on that to ensure <br> 18  that that information had met his needs, and did he <br> 19  have further questions. <br> 20    Q.  Why is it important to you, Dr. Kaiser, to <br> 21  present fair and accurate and balanced information to <br> 22  customers or physicians like Dr. Culotta? <br> 23    A.  It helps them ascertain both risks and <br> 24  benefits and also be provided with what's an -- an <br> 25  update to information that was deemed important enough <br><br> 215 <br> 1  to add to the label. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 215:3 to 215:12)<br>215<br>3   Q.  Since you mentioned the label, I've marked<br>4   Exhibit 44.<br>5         Let me ask you, Dr. Kaiser, if this is a<br>6   copy of the label that was approved by the FDA in April<br>7   of 2002.  And you can see that at the last page of the<br>8   document, the bottom right corner.<br>9      A.  Yes.<br>10      Q.  Was this the label that you would have<br>11   discussed with Dr. Culotta?<br>12      A.  Yes. | | |
| Kaiser, M.D., Fran, (Pages 215:22 to 216:4)<br>215<br>22   Q.  On the first page of the label from April<br>23   2002, do you see in the far right column a reference to<br>24   gastrointestinal safety in VIGOR, about halfway down?<br>25      A.  Yes.<br><br>216<br>1      Q.  Is that section, then, the section that<br>2   reveals the results in terms of the gastrointestinal<br>3   results from the VIGOR trial?<br>4      A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 216:5 to 217:24)<br><br>216<br>5   Q.  What is the section immediately beneath that<br>6   on the first page of the label?<br>7      A.  The summary -- VIGOR summary of patients with<br>8   serious cardiovascular thrombotic adverse events over<br>9   time, comparison to naproxen.<br>10     Q.  And that Table 2 falls under the section<br>11   called Other Safety Findings:  Cardiovascular Safety,<br>12   correct?<br>13     A.  Yes.<br>14     Q.  Do you see that it says, the VIGOR study<br>15   showed a higher incidence of adjudicated serious<br>16   cardiovascular thrombotic events in patients treated<br>17   with Vioxx 50 milligrams once daily as compared to<br>18   patients treated with naproxen 500 milligrams twice<br>19   daily (see Table 2)?<br>20        Do you see that?<br>21     A.  Yes.<br>22     Q.  Then does it say, this finding was largely due<br>23   to a difference in the incidence of myocardial<br>24   infarction between the groups?<br>25     A.  Yes.<br><br>217<br>1   Q.  What is a myocardial infarction?<br>2      A.  Heart attack.<br>3      Q.  So is this the information, then, that was<br>4   reported in the VIGOR study that you reported here to<br>5   Dr. Culotta?<br>6      A.  Yes.<br>7      Q.  And it's on the first page of the label,<br>8   right?<br>9      A.  Yes.<br>10     Q.  Then if you look at Table 2, do you see that<br>11   it reports, for the Vioxx 50-milligram arm, the number<br>12   of serious cardiovascular thrombotic adverse events<br>13   over time as 17, 29, and 45 with Vioxx?  Did you see<br>14   that?<br>15     A.  Yes. | 216:10-217:24:<br>Leading (Except<br>217:1- 217:2) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 117 | | |
| 16      Q.  And then underneath, for naproxen 1,000 17  milligrams, what does it say? 18      A.  Total number of events, 9, 15, and 19 for 19  naproxen. 20      Q.  So does this indicate the difference seen in 21  the VIGOR study in terms of serious cardiovascular 22  thrombotic adverse events over time in the naproxen arm 23  versus the Vioxx arm? 24      A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 218:7 to 222:10)<br><br>218<br>7   Q.  Okay.  Do you see on the next page -- the next<br>8   page, do you see Table 3 says, VIGOR serious<br>9   cardiovascular thrombotic adverse events?<br>10      A.  Yes.<br>11      Q.  And then does it report -- when you look at<br>12   any CV thrombotic event, what is the number under Vioxx<br>13   50 milligram?<br>14      A.  45.<br>15      Q.  And is the number 19 for naproxen 1,000<br>16   milligrams?<br>17      A.  Yes.<br>18      Q.  Then does it also break down the difference in<br>19   serious cardiovascular thrombotic events when you look<br>20   at fatal heart attacks or sudden death, nonfatal heart<br>21   attacks, and unstable angina, and the exact numbers are<br>22   reported there?<br>23      A.  Yes.<br>24      Q.  Then do you see -- if you turn with me to the<br>25   next page, in the left column under precautions, do you<br><br>219<br>1   see that it says, under cardiovascular effects, the<br>2   information below should be taken into consideration<br>3   and caution should be exercised when Vioxx is used in<br>4   patients with a medical history of ischemic heart<br>5   disease?<br>6      A.  Yes.<br>7      Q.  Below that, is there a discussion, then, of<br>8   the VIGOR study?<br>9      A.  Yes.<br>10      Q.  And if you just read with me, does it report<br>11   that the study involved 8,076 patients -- right?<br>12      A.  Yes.<br>13      Q.  That the risk of developing a serious<br>14   cardiovascular thrombotic event was significantly<br>15   higher in patients treated with Vioxx as compared to<br>16   patients treated with naproxen, right?<br>17      A.  Yes.<br>18      Q.  And then further down, do you see that there's<br>19   a discussion of the placebo-controlled studies?<br>20      A.  Yes.<br>21      Q.  Do you know -- remember what those studies<br>22   involved in terms of the patient population?<br>23      A.  Elderly patients.<br>24      Q.  And is that the patients that had dementia or<br>25   Alzheimer's in the Alzheimer's studies; do you | Leading: 218:7-10, 218:15-219:20, 219:24-220:2, 220:9-209:13 | Overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 220:1 to 222:10)<br><br>                                     220<br>1  remember?<br>2      A.  Yes.<br>3      Q.  Then could you read further down the sentence<br>4  that says, the significance of.<br>5      A.  Okay.<br>6      Q.  It's the last sentence.<br>7      A.  The last sentence. I'm sorry, I lost you<br>8  here.<br>9      Q.  Right above the bolded section, does it say,<br>10  the significance of the cardiovascular findings from<br>11  these three studies (VIGOR and two placebo-controlled<br>12  studies) is unknown?<br>13      A.  Correct.<br>14      Q.  Is that information you shared with<br>15  Dr. Culotta?<br>16      A.  Yes.<br>17      Q.  In your meeting with Dr. Culotta, did he agree<br>18  to do anything for Merck in exchange for you providing<br>19  information he had requested?<br>20      A.  No.<br>21      Q.  Was there any type of a quid pro quo where<br>22  Dr. Culotta said he was going to put Vioxx on the<br>23  PDL --<br>24      A.  No.<br>25      Q.  -- because of something you said, Dr. Kaiser?<br><br>                                     221<br>1      A.  No.<br>2      Q.  Did Dr. Culotta seem appreciative of the<br>3  information you provided?<br>4      A.  Yes.<br>5      Q.  You were asked about the P&T committee<br>6  meetings in Louisiana; do you remember that?<br>7      A.  Yes.<br>8      Q.  Did you attend one meeting during the time<br>9  that Vioxx was on the market in May of 2003 with the<br>10  Louisiana P&T committee?<br>11      A.  Yes.<br>12      Q.  Did you speak during the meeting?<br>13      A.  No.<br>14      Q.  Why not?<br>15      A.  It was not my role to speak.  That was not the<br>16  format that they used.<br>17      Q.  What did you do?<br>18      A.  I listened.<br>19      Q.  Was there an organization that did speak or an | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 221:20 to 222:10)<br>221<br>20  entity that did speak to the P&T committee?<br>21      A.  Yes.  Provider Synergies presented<br>22  information.<br>23      Q.  Did you observe Provider Synergies give their<br>24  presentation and make their recommendation to the P&T<br>25  committee in May of 2003?<br><br>222<br>1      A.  I did.<br>2      Q.  Did the committee then vote?<br>3      A.  Yes.<br>4      Q.  Did you participate in the vote?<br>5      A.  No.<br>6      Q.  Did you speak at all during the entire P&T<br>7  committee meeting when the P&T committee decided that<br>8  Vioxx should be put on the PDL in Louisiana in May of<br>9  2003?<br>10      A.  No. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| **Kaiser, M.D., Fran, (Pages 222:14 to 224:7)**<br><br>222<br>14 I want to start<br>15 with this article right here, which is Exhibit 22. Are<br>16 you there?<br>17    A. Yes.<br>18    Q. This is an article that Mr. Arbitblit used.<br>19 It's called reporting mortality findings in trials of<br>20 Vioxx for Alzheimer's disease or cognitive impairment:<br>21 a case study based on documents from the Vioxx<br>22 litigation. Do you see that?<br>23    A. Yes. It reads rofecoxib, but that's Vioxx.<br>24    Q. Right. Yes. I -- I replaced that because<br>25 rofecoxib is Vioxx, right?<br><br>223<br>1    A. Yes.<br>2    Q. And the authors are Dr. Psaty and Dr. Kronmal,<br>3 right?<br>4    A. Yes.<br>5    Q. Do you know if you've ever seen an article<br>6 before that was published based on documents produced<br>7 during a litigation?<br>8    A. It's a bit unusual.<br>9    Q. If you turn with me to the last page, at the<br>10 very end, do you see in the financial disclosure<br>11 section where, in the second or third sentence, it<br>12 says, Dr. Kronmal reports that in 2005 to 2007, he was<br>13 retained by plaintiffs' attorneys as an expert witness<br>14 in cases related to rofecoxib and cardiovascular<br>15 events. In this capacity, he was compensated for<br>16 reviewing this issue and providing expert opinions and<br>17 analyses for use in litigation. Plaintiffs' attorneys<br>18 reviewed and commented on the written report resulting<br>19 from this work.<br>20       Do you see that?<br>21    A. Yes.<br>22    Q. And then further down, it indicates that<br>23 although the initial review of these documents, now<br>24 public, was supported in the author's capacity as a<br>25 plaintiff expert -- and it continues -- Dr. Kronmal was<br><br>224<br>1 still involved in ongoing cases that involve Vioxx?<br>2    A. Yes.<br>3    Q. So the author of the article that you were<br>4 shown about all-cause mortality in the Alzheimer's<br>5 trials is a plaintiffs' expert witness hired by<br>6 plaintiffs' lawyers in this litigation?<br>7    A. Yes. | 223:5-8<br>Relevance, lack of personal knowledge; leading: 224:3-224:7 | *overruled* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 224:12 to 225:4)<br><br>224<br>12  Exhibit 29 is the article by Dr. Reicin<br>13  from 2002, right?<br>14      A.  Yes.<br>15      Q.  Exhibit 30 is the Provider Synergies monograph<br>16  from April 2003, correct?<br>17      A.  Yes.<br>18      Q.  Exhibit 31 is the April 14th, 2000 memo from<br>19  Dr. Grosser.<br>20          And Exhibit 32 is a March 22nd, 2004<br>21  submission to the FDA from Merck?<br>22      A.  Yes.<br>23      Q.  Are you with me?<br>24      A.  Yes.<br>25      Q.  Do you remember that Mr. Arbitblit spent a lot<br><br>225<br>1  of time talking about studies 085 and 090 and whether<br>2  Dr. Reicin decided to include those studies in her 2002<br>3  article?<br>4      A.  Yes. | Misstates record | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 225:12 to 227:5)<br><br>225<br>12  First of all, let's turn to Exhibit 32 and<br>13  Table 13, which is on the page that ends 095.  Are you<br>14  with me?<br>15      A.  Yes.<br>16      Q.  And just, again, you haven't seen this<br>17  document before today, correct?<br>18      A.  Correct.<br>19      Q.  And it says Table 13, TCVSAE endpoint, and you<br>20  were asked about whether certain of these OA trials<br>21  were included in a table that Dr. Reicin had in her<br>22  previous article in 2002, correct?<br>23      A.  Yes.<br>24      Q.  Do you see at the bottom of this Exhibit 32<br>25  what the date is in the left corner where it says,<br><br>226<br>1  rofecoxib CV update?  What does it say after that?<br>2      A.  Data through 10 June '03.<br>3      Q.  So was the data that is reflected in Table 13<br>4  in terms of its preparation data that covers a time<br>5  period through June of 2003?<br>6      A.  Yes.<br>7      Q.  Whereas Dr. Reicin's article that she<br>8  published was published in what year?<br>9      A.  2002.<br>10      Q.  And do you remember that Mr. Arbitblit pointed<br>11  you to the Reicin article, Exhibit 29, the right<br>12  column, first paragraph under methods, and he suggested<br>13  that the studies had been completed through 1998?<br>14      A.  Yes.<br>15      Q.  Do you see where it says in Dr. Reicin's<br>16  article, these studies were conducted from 1995 to 1998<br>17  and were the bases for the regulatory approvals<br>18  worldwide?<br>19      A.  Yes.<br>20      Q.  And just to refresh the jury, these are the<br>21  studies involving the osteoarthritis patients, correct?<br>22      A.  Yes.<br>23      Q.  Now, if we look at Exhibit 31 and go to the<br>24  page that ends 290, is this the table of ongoing and<br>25  upcoming Vioxx studies as of April of 2000?<br><br>227<br>1      A.  Yes.<br>2      Q.  And Mr. Arbitblit asked you about two entries.<br>3  The first one was study 085, and the second was 090,<br>4  correct?<br>5      A.  Correct. | Leading: 228:17-228:20; 228:24-229:6 | *[handwritten]* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 227:5 to 228:25) | | |

**227**

5    A.  Correct.
6        Q.  Let's look very carefully at the first bullet
7    point for study 085.  Do you see where it says, FPI
8    September 1998?
9        A.  Yes.
10       Q.  Do you see that?
11           Does that mean first patient in?
12       A.  Patient in, yes.
13       Q.  I'm sorry.  What does that mean?
14       A.  First patient in.  And LPO is last patient
15    out.
16       Q.  So when was the last patient finished with the
17    study 085?
18       A.  3-99.
19       Q.  So would that have been covered by the studies
20    that had been completed by 1998 in Dr. Reicin's
21    article?
22       A.  No.
23       Q.  If you look at the next study, 090, when was
24    the first patient in that study?
25       A.  October '98.

**228**

1        Q.  When was the last patient out of that study?
2        A.  May of '99.
3        Q.  So for study 090, was that completed after the
4    studies that Dr. Reicin had analyzed in her 2002
5    article?
6        A.  Yes.
7        Q.  Do you remember that Mr. Arbitblit referred to
8    Exhibit 30, which was the Provider Synergies monograph
9    from April 2003, right?
10       A.  Yes.
11       Q.  And he pointed out to you on page 10 of that
12    monograph that the folks at Provider Synergies decided
13    they wanted to report on the Reicin study here in the
14    cardiovascular event section of the Provider Synergies
15    monograph, right?
16       A.  Yes.
17       Q.  Did you understand Provider Synergies would
18    analyze the data about the drugs that they were
19    evaluating for the Louisiana P&T committee?
20       A.  Yes.
21       Q.  But did the folks at Provider Synergies only
22    talk about the Reicin article?
23       A.  No.

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 228:24 to 230:4)<br><br>228<br>24   Q.  In fact, in this whole section called<br>25   cardiovascular concerns that was prepared in April of<br><br>229<br>1   2003, the first sentence says, in a review of the COX-2<br>2   inhibitors and risk of cardiovascular events in JAMA in<br>3   August of 2001, authors concluded that a prospective<br>4   trial may be necessary to evaluate the potential risk<br>5   of cardiovascular events with these agents, right?<br>6       A.  Yes.<br>7       Q.  The JAMA article is an article that I think<br>8   Mr. Arbitblit referred to as the Topol/Mukherjee/Nissen<br>9   article.<br>10          MR. GOLDMAN:  Let me mark that as<br>11   Exhibit 45.<br>12          (Exhibit Number 45 marked.)<br>13       Q.  Is that an article that was published in JAMA<br>14   in 2001?<br>15       A.  Yes.<br>16       Q.  And if you look at Exhibit 30, the Provider<br>17   Synergies monograph, when they cite the JAMA article as<br>18   number 58, and you go to the references in the Provider<br>19   Synergies monograph, do you see that number 58 is the<br>20   Mukherjee article that I've marked as Exhibit 45?<br>21       A.  Yes.<br>22       Q.  So Provider Synergies was well aware of the --<br>23   withdrawn.<br>24          Was Provider Synergies well aware of the<br>25   Mukherjee article marked as Exhibit 45?<br><br>230<br>1       A.  Yes.<br>2       Q.  If you look at the Mukherjee article, do you<br>3   see, on the third page in the middle column, two<br>4   clinical trials in bold? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 230:8 to 231:18) | 230:11-231:18 leading | *overruled* |

Kaiser, M.D., Fran, (Pages 230:8 to 231:18)

230

8  Q.  What are the two studies that are in bold in
9  the Mukherjee article on page 956?
10     A.  Study 085 and study 090.
11     Q.  And does the JAMA article report on the
12  results of study 085 and study 090 for the medical
13  community to read?
14     A.  Yes.
15     Q.  Do -- do the authors here, Mukherjee and
16  Topol, talk about the number of cardiovascular events
17  in 085 as being one event in the Vioxx group and two
18  events in the nabumetone group and no events in the
19  placebo group?
20     A.  Yes.
21     Q.  And 090 reports that there were six events in
22  the Vioxx group, two in the nabumetone group, and one
23  in the placebo group, right?
24     A.  Yes.
25     Q.  So that information was no secret, was it?

231

1     A.  No.
2     Q.  Does this article also, if you turn to page
3  958, specifically comment on 085 and 090?  And I'll
4  direct you to the left column, last full paragraph,

5  second sentence, starting with two smaller studies.  Do
6  you see that?
7     A.  Yes.
8     Q.  Does it say that two smaller studies (study
9  085 and study 090) of Vioxx that both allowed the use
10  of low-dose aspirin did not demonstrate the significant
11  increase in cardiovascular event rate noted in VIGOR?
12         Do you see that?
13     A.  Yes.
14     Q.  And then do they add further that, however,
15  these studies had smaller sample sizes, used only
16  25 percent of the dose of Vioxx used in VIGOR, and had
17  few events for meaningful comparison?
18     A.  Yes.

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 231:19 to 232:10)<br><br>231<br>19  Q. Am I right, Doctor, that when you look at the<br>20  other Provider Synergies monographs from 2002, which is<br>21  Exhibit 40, and the next one, Exhibit 36, which is<br>22  Provider Synergies monograph 2004 -- tell me when you<br>23  have those.<br>24    A. I do.<br>25    Q. Am I correct that in the Provider Synergies<br><br>232<br>1  2002 monograph, Provider Synergies expressly refers to<br>2  the Mukherjee article again?<br>3    A. Yes.  The review of COX-2 inhibitors and risk<br>4  of cardiovascular events in JAMA in August of 2001.<br>5  And it's reference number 33, which I believe is the<br>6  Mukherjee article.<br>7    Q. If you look at the Provider Synergies 2004<br>8  monograph, do you see that it, too, refers to the<br>9  Mukherjee article?<br>10    A. Yes. | Leading | *overruled* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 232:11 to 234:4)<br><br>**232**<br>11  Q.  Do you remember Mr. Arbitblit asked you<br>12  whether you knew that something called protocol 023<br>13  when you first started training on Vioxx?<br>14      A.  Again, I don't know the protocol numbers and<br>15  what they refer to.<br>16      Q.  Do you remember being asked questions about<br>17  whether you knew, when you first started working with<br>18  Vioxx, that there had been a study showing a difference<br>19  in the urinary metabolite levels of prostacyclin versus<br>20  thromboxane in patients treated with Vioxx?  Do you<br>21  remember anything about prostacyclin and thromboxane?<br>22      A.  Yes.<br>23      Q.  And you said that you didn't know about that<br>24  prostacyclin/thromboxane study right when you first<br>25  started to work on Vioxx, right?<br><br>**233**<br>1      A.  That, I believe, was the Fitzgerald<br>2  hypothesis.<br>3      Q.  Did you learn about the Fitzgerald hypothesis<br>4  during the course of your work with Vioxx?<br>5      A.  Yes.<br>6      Q.  In fact, that Fitzgerald hypothesis is<br>7  identified on the first page of the Mukherjee article,<br>8  I believe.  And do you have it there in front of you?<br>9      A.  Yes.<br>10      Q.  Do you see on the first page, the left column,<br>11  the second-to-last sentence, it says, however,<br>12  selective COX-2 inhibitors decrease vascular<br>13  prostacyclin production and may affect the balance<br>14  between prothrombotic and antithrombotic eicosanoids?<br>15      A.  Eicosanoids.<br>16      Q.  And then do you see in the very next column<br>17  there's a reference to COX-2 antagonists may tip the<br>18  balance in favor of prothrombotic --<br>19      A.  Eicosanoids.<br>20      Q.  -- eicosanoids?<br>21          Do you see that?<br>22      A.  Yes.<br>23      Q.  So this Fitzgerald hypothesis is something<br>24  that you knew about when you were a senior medical<br>25  director?<br><br>**234**<br>1      A.  Yes.<br>2      Q.  Was it also in the published medical<br>3  literature?<br>4      A.  Yes. | Leading (232:23-234:4); leading, compound (232:16-22) | *Overrule* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 234:5 to 236:15)<br><br>234<br>5   Q.  Do you remember being asked about Exhibit 33,<br>6   which is the next exhibit -- that's the article by<br>7   Dr. Gertz?<br>8      A.  Yes.<br>9      Q.  Now, this is an article about blood pressure,<br>10   hypertension effects?<br>11      A.  Yes.<br>12      Q.  Of Vioxx and other NSAIDs, correct?<br>13      A.  Yes.<br>14      Q.  Do you know, from the labels of Vioxx, that<br>15   hypertension -- hypertension was a labeled potential<br>16   side effect?<br>17      A.  Yes.<br>18      Q.  And that was no secret to Provider Synergies<br>19   either, because if you look at the monograph -- just<br>20   look at the Exhibit 30.  Do you see on page 12 --<br>21   sorry -- do you have Exhibit 30 in front of you?<br>22      A.  I do.<br>23      Q.  Do you see on page 9 of the April 2003<br>24   Provider Synergies monograph that there is a whole<br>25   section in the table called edema?<br><br>235<br>1      A.  Where are you?<br>2      Q.  I'm on Exhibit 30, page 9.<br>3      A.  Yes.<br>4      Q.  So the Provider Synergies folks analyzed a<br>5   number of potential adverse effects, including edema.<br>6          And what is edema?<br>7      A.  Swelling, retention of fluid.<br>8      Q.  Is that similar to hypertension?<br>9      A.  No.<br>10      Q.  Is it a -- is it related?<br>11      A.  Yes.<br>12      Q.  How?<br>13      A.  Very often people who have hypertension also<br>14   have poor venous return, may have -- may have edema.<br>15      Q.  So in addition to addressing edema in this<br>16   table, do you see that on page 10, there's a whole<br>17   section that the Provider Synergies folks wrote called<br>18   hypertension and edema?<br>19      A.  Yes.  This may also be related to effects on<br>20   the kidney and, again, you know, salt retention.<br>21      Q.  Do you also see on page 12, Dr. Kaiser, in the<br>22   second-to-last paragraph, that the Provider Synergies | Leading (234:5-235:3; 235:15-236:15) | overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 235:23 to 236:15)<br>235<br>23  monograph says, the VIGOR study raised some questions<br>24  regarding the cardiovascular safety of Vioxx?<br>25   Do you see that?<br><br>1    A. Yes.<br>236<br>2    Q. Does the monograph then say, patients<br>3  receiving Vioxx had a significantly higher risk of<br>4  developing cardiovascular thrombotic events compared to<br>5  patients receiving naproxen?<br>6    A. Yes.<br>7    Q. Two sentences down, does it say, although the<br>8  significance of this potential cardiovascular risk is<br>9  unknown, it does raise questions?<br>10    A. Yes.<br>11    Q. And the last sentence says, hypertension and<br>12  edema may occur with all NSAIDs, and the COX-2<br>13  inhibitors also have the potential of these side<br>14  effects, right?<br>15    A. Correct. | | |
| Kaiser, M.D., Fran, (Pages 237:5 to 238:1)<br>237<br>5  Did you meet Valerie Taylor at the May<br>6  2003 P&T committee meeting?<br>7    A. I believe she was there, yes.<br>8    Q. So the May 2003 P&T committee meeting that you<br>9  attended, was that the one where the P&T committee<br>10  first recommended that Vioxx be added to the PDL in<br>11  Louisiana?<br>12    A. Yes.<br>13    Q. Was that a month after this monograph from<br>14  April 2003 was written?<br>15    A. Yes.<br>16    Q. Is there any reference at all in this Provider<br>17  Synergies monograph from April 2003 to the article by<br>18  Dr. Gertz? And if you want, you can look on page 14<br>19  that lists 41 references. If you turn to page 14 of<br>20  the Provider Synergies April 2003 monograph, there are<br>21  actually a total of 64 references. And if you wouldn't<br>22  mind, can you just look down there and see if you see<br>23  any reference at all to Dr. Gertz's article that<br>24  Mr. Arbitblit reviewed with you.<br>25    A. In April of 2003. It's a little light.<br>238<br>1      I'm not seeing it | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 240:4 to 240:12)<br><br>240<br>4   Q.  You were asked about a dossier request by the<br>5   State of Louisiana.  Do you remember that?<br>6      A.  Yes.<br>7      Q.  Did Merck do its best to respond on a timely<br>8   basis to requests by state Medicaid authorities for<br>9   information?<br>10     A.  To the best of my knowledge, yes.<br>11     Q.  I want to hand to you Exhibit 46.<br>12        (Exhibit Number 46 marked.) | | |
| Kaiser, M.D., Fran, (Pages 240:13 to 241:2)<br><br>240<br>13   Q.  Does this appear to be a letter dated<br>14  April 19th, 2002 from Dr. Jeff Mullin -- Melin to<br>15  Dr. Valerie Taylor of Provider Synergies?<br>16     A.  Yes.<br>17     Q.  And do you see, first of all, the letter is<br>18  dated April 19th, 2002, and at the very end of the<br>19  letter, it says, Enclosure:  Circular?<br>20     A.  Yes.<br>21     Q.  Is that another term for a package insert or a<br>22  label?<br>23     A.  Yes.<br>24     Q.  So would the new label including the VIGOR<br>25  results have been sent to Dr. Taylor on April 19th,<br><br>241<br>1   2002 along with this letter?<br>2      A.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 241:3 to 244:15)<br>241<br>3  Q.  And then the letter says, our national account<br>4  executive, Stephen Shearer, has referred your request<br>5  for information regarding Vioxx.  Your inquiry<br>6  concerned medical and product information on Vioxx for<br>7  a formulary review to support Provider Synergies for<br>8  the State of Louisiana.<br>9        In response to your specific request for<br>10  information for a formulary review, data summaries on<br>11  the topics listed below and product information for<br>12  Vioxx have been compiled.  This material was prepared<br>13  in response to the format for formulary submissions<br>14  developed by the Academy of Managed Care Pharmacy.<br>15        The enclosed medical and product<br>16  information for Vioxx includes product description,<br>17  efficacy studies in specific patient populations -- and<br>18  then it continues.<br>19        And do you see how the letter breaks down<br>20  the information that's being provided into five<br>21  sections?<br>22      A.  Yes.<br>23      Q.  What's the first section that --<br>24      A.  Product circular.<br>25      Q.  So was the first section that was sent to<br>242<br>1  Provider Synergies in April 2002 the new label that<br>2  contained the VIGOR results?<br>3      A.  Yes.<br>4      Q.  And then there's a second section that says,<br>5  product information, a third that says, supporting<br>6  clinical and economic information, and so forth, right?<br>7      A.  Yes.<br>8      Q.  Now I want to hand you what I'll represent is<br>9  in the same Bates range.  And this is a letter dated<br>10  April 19th, 2002 from Dr. Melin, if you turn to page<br>11  17.  It ends 981.<br>12        (Exhibit Number 47 marked.)<br>13      Q.  Is this an April 19th, 2002 letter signed by<br>14  Dr. Melin of Merck to Dr. Valerie Taylor?  Are you with<br>15  me so far?<br>16      A.  Yes.<br>17      Q.  And does it start off by saying, dear<br>18  Dr. Taylor, our national account executive, Stephen<br>19  Shearer, has referred your request for information<br>20  regarding Vioxx.  Your inquiry concerned the occurrence | 241:3-241:18; No question, lawyer colloquy; leading (241:25-244:15) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Pages 242:21 to 244:15) | | |

242
21  of cardiovascular effects in patients receiving Vioxx?
22      A.  Yes.
23      Q.  And then is this information that follows
24  information that Merck provided to try to provide
25  information it had to the folks at Provider

243
1  Synergies --
2      A.  Yes.
3      Q.  -- in response to their request?
4      A.  Yes.
5      Q.  So, for example, do you see on the first page,
6  there is a section called clinical studies, and it
7  starts with the VIGOR results, right?
8      A.  Yes.
9      Q.  On the second page, do you see at the top
10  there's a section called cardiovascular safety?
11      A.  Yes.
12      Q.  Is that the identical section, including the
13  tables, that were included in the label from April
14  2002?
15      A.  Yes.
16      Q.  Do you see under precautions on the second
17  page, it says, cardiovascular effects.  The information
18  below should be taken into consideration and caution
19  should be exercised when Vioxx is used in patients with
20  a medical history of ischemic heart disease?
21      A.  Yes.
22      Q.  Then is the next paragraph a verbatim
23  description from the label, including the sentence on
24  page 3 that the significance of the cardiovascular
25  findings from these three studies (VIGOR and two

244
1  placebo-controlled studies) is unknown?
2      A.  Yes.
3      Q.  If you turn with me to page 4, do you see that
4  in the first paragraph, there's a reference to the
5  Mukherjee article?
6      A.  Yes.
7      Q.  And then does it say in the Mukherjee article
8  that the Mukherjee analyzed the results of the VIGOR
9  trial, and noted that the rate of myocardial infarction
10  in rheumatoid arthritis patients treated with Vioxx was

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Kaiser, M.D., Fran, (Page 244:11 to 244:15)<br><br>244<br>11  greater than in patients treated with naproxen.  The<br> 12  authors then commented that the difference in MI rates<br>13  could be due either to an effect of Vioxx or an effect<br>14  of naproxen?<br>15    A.  Yes. | | |
| Kaiser, M.D., Fran, (Page 245:4 to 245:23)<br><br>245<br> 4    Q.  Mr. Arbitblit asked you whether you intend to<br> 5  use fair balance when you communicate with your doctors<br> 6  in a peer-to-peer fashion, right?<br> 7    A.  Yes.<br> 8    Q.  Do you intend to do that, Doctor, or do you<br> 9  also do your best to actually use fair balance in<br>10  communicating the complete safety profile of the drugs<br>11  for which you have responsibility?<br>12    A.  I do it.<br>13    Q.  Dr. Kaiser, did you or any of your<br>14  family members ever use Vioxx while it was on the<br>15  market?<br>16    A.  Yes.<br>17    Q.  Who?<br>18    A.  My sister and myself.<br>19    Q.  Would you, Dr. Kaiser, have taken yourself or<br>20  permitted your sister to take that medication if you<br>21  thought that it was unsafe or could cause heart<br>22  attacks?<br>23    A.  I would not. | 245:13-245:23<br>(MIL granted re<br>personal use,<br>3/26/10) | Sustained |