**KERRY EDWARDS, DEPOSITION OF 12/17/09**

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Defendant's Counter Designations are highlighted. Plaintiffs Affirmative Designations are not. **12/17/09 Deposition** | | |
| EDWARDS, M.D., KERRY I., (Page 6:16 to 6:19) 6<br><br>16   Q.   And what did you do to<br>17   prepare for the deposition?<br>18      A.   I've spent the last two<br>19   days with counsel. | 401 | |
| EDWARDS, M.D., KERRY I., (Page 7:4 to 7:12) 7<br><br>4   Q.   Was any other counsel<br>5   present?<br>6      A.   Yes.<br>7      Q.   Was that your personal<br>8   counsel?<br>9      A.   Yes.<br>10      Q.   And was that counsel<br>11   retained for you by Merck?<br>12      A.   Yes. | 401 | |
| EDWARDS, M.D., KERRY I., (Pages 9:9 to 10:17) 9<br><br>9   Q.   Let me begin, sir, could<br>10   you briefly tell the jury about your<br>11   educational background?<br>12      A.   I graduated from high<br>13   school, Alfred T. Bonnabel High<br>14   School in Kenner, Louisiana.  I<br>15   attended LSU in Baton Rouge for my<br>16   undergraduate degree, had a B.S. in<br>17   microbiology.<br>18          Then was accepted to LSU<br>19   Shreveport Medical School, which I<br>20   attended for four years, graduating<br>21   in 1986.  And I completed my<br>22   postgraduate training at the<br>23   University of Florida.<br>24      Q.   Was that your residency?<br><br>               10<br>1      A.   Yes.<br>2      Q.   When did you complete your<br>3   residency?<br>4      A.   1989.<br>5      Q.   And what was the focus of<br>6   your residency?<br>7      A.   General medicine.<br>8      Q.   Did you receive any -- or | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 9  have you received any Board<br>10  certifications?<br>11    A.  Yes.<br>12    Q.  And your Board<br>13  certifications are in...?<br>14    A.  Internal medicine.<br>15    Q.  Did you have any other<br>16  postgraduate medical training?<br>17    A.  No. | | |
| EDWARDS, M.D., KERRY I., (Page 11:8 to 11:10)<br>11<br>8  Q.  Tell me about your practice<br>9  after completing your residency,<br>10  please. | | |
| EDWARDS, M.D., KERRY I., (Page 11:13 to 11:18)<br>11<br>13   THE WITNESS:  I completed<br>14  my residency in 1989, and then I went<br>15  to work in the Emergency Department,<br>16  University of Florida, as an academic<br>17  emergency physician.  Did that for<br>18  one year. | | |
| EDWARDS, M.D., KERRY I., (Pages 11:20 to 13:5)<br>11<br>20  Q.  What is academic emergency?<br>21  Does that mean you were teaching as<br>22  well as --<br>23    A.  Yes.<br>24    Q.  -- practicing?<br>12<br>1    A.  Yes, sir.<br>2    Q.  Okay.  And from there?<br>3    A.  1990 I became chief<br>4  resident of medicine in the<br>5  Department of Medicine at the<br>6  University of Florida.<br>7        And then after my chief<br>8  residency year I joined the faculty<br>9  as an assistant professor.  And that<br>10  would be 1991.<br>11    Q.  Okay.  And as an assistant<br>12  professor on faculty, you still were<br>13  in active practice?<br>14    A.  Yes.<br>15    Q.  So you were a teaching<br>16  doctor?<br>17    A.  Yes.<br>18    Q.  Okay.  And from there?<br>19    A.  I stayed at University of<br>20  Florida until September of 1997, and | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 21  that's when I left University of<br>22  Florida and joined Merck.<br>23     Q.  Did you engage in any<br>24  clinical research during your tenure<br>                                        13<br>1  at University of Florida?<br>2     A.  Yes.<br>3     Q.  Okay.  Can you tell me<br>4  about the clinical research that you<br>5  were involved in -- | | |
| EDWARDS, M.D., KERRY I., (Page 13:8 to 13:9)<br>                                        13<br>8  Q.  -- when you were at<br>9  University of Florida? | | |
| EDWARDS, M.D., KERRY I., (Page 13:12 to 13:14)<br>                                        13<br>12  THE WITNESS:  Yes.  One was<br>13  an osteoporosis study sponsored by<br>14  Merck. | | |
| EDWARDS, M.D., KERRY I., (Page 13:16 to 13:24)<br>                                        13<br>16   Q.  And what was your<br>17  involvement in that study?<br>18     A.  I was the principal<br>19  investigator.<br>20     Q.  Was there a product<br>21  involved?<br>22     A.  Yes.<br>23     Q.  What was that product?<br>24     A.  Fosamax. | | |
| EDWARDS, M.D., KERRY I., (Pages 16:10 to 17:5)<br>                                        16<br>10   So in September of '97, you<br>11  left University of Florida to go to<br>12  Merck; is that correct?<br>13     A.  Yes.<br>14     Q.  And what was your first<br>15  position at Merck?<br>16     A.  An associate Region Medical<br>17  Director.<br>18     Q.  And to what region were you<br>19  assigned?<br>20     A.  I worked in the Southeast<br>21  region.<br>22     Q.  The Southeast region does<br>23  not cover Louisiana; correct?<br>24     A.  No.<br>                                        17<br>1     Q.  Did not at that time,<br>2  anyway? | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 3    A.  That's correct, it did not.<br>4    Q.  Louisiana is in the South<br>5  Central region; correct? | | |
| EDWARDS, M.D., KERRY I., (Page 17:7 to 17:8)<br>                             17<br>7  THE WITNESS:  To the best<br>8  of my recollection, yes. | | |
| EDWARDS, M.D., KERRY I., (Page 17:10 to 17:14)<br>                             17<br>10   Q.  In Merck's South Central --<br>11    A.  Yes.<br>12    Q.  -- I mean under Merck's<br>13  organization.<br>14    A.  Uh-huh. | | |
| EDWARDS, M.D., KERRY I., (Pages 17:18 to 18:8)<br>                             17<br>18   Q.  How was it that you came to<br>19  join Merck?  Were you headhunted or<br>20  did you apply for a job?  How did<br>21  that come about?<br>22    A.   I met my ultimate boss<br>23  prior to joining Merck.<br>24    Q.   And who was that?<br>                             18<br>1    A.  William McBride.<br>2    Q.  Is William McBride a<br>3  physician?<br>4    A.  Yes.<br>5    Q.  Okay.  What was his title<br>6  at the time?<br>7    A.  Senior Region Medical<br>8  Director. | | |
| EDWARDS, M.D., KERRY I., (Pages 28:9 to 29:2)<br>                             28<br>9   Q.  Did he tell you anything<br>10  about what would be entailed in your<br>11  employment -- prospective employment<br>12  with Merck?<br>13    A.  To the best of my<br>14  recollection, I just asked him about<br>15  his roles and responsibilities.<br>16    Q.   And what did he tell you<br>17  about his roles and responsibilities?<br>18    A.  To the best of my<br>19  recollection, he talked about<br>20  representing the clinical and<br>21  scientific face of Merck.<br>22    Q.  Anything else?<br>23    A.  And the quality<br>24  improvement. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 29<br>1   Q.  How was Merck involved in<br>2  quality improvement? | | |
| EDWARDS, M.D., KERRY I., (Page 29:5 to 29:17)<br>29<br>5   THE WITNESS:  At the time,<br>6   as an example, we had a drug Zocor,<br>7   in the cholesterol market, a statin,<br>8   and Merck was involved in a QI<br>9   initiative, quality improvement<br>10   initiative, that really helped<br>11   physicians better identify at-risk<br>12   patients who either had had previous<br>13   cardiac events or were at risk based<br>14   upon well-established guidelines and<br>15   standards, risk factors, to put the<br>16   process in place to improve their<br>17   identification and hopeful treatment. | | |
| EDWARDS, M.D., KERRY I., (Pages 31:2 to 32:16)<br>31<br>2   Q.  Okay.  And you started out<br>3   as an associate Regional Medical<br>4   Director for the Southeast region;<br>5   correct?<br>6   A.  Yes.<br>7   Q.  And what were your job<br>8  responsibilities at that time?<br>9   A.  My job responsibilities as<br>10   a Region Medical Director was to be a<br>11   primary scientific and clinical<br>12   resource providing balance,<br>13   scientific information.<br>14      Again, as I understood my<br>15   role, the second focus was around the<br>16   quality improvement area.<br>17   Q.  Okay.  You said that one of<br>18   your focus was to provide -- to be a<br>19   clinical and scientific resource to<br>20   provide balance, scientific<br>21   information.<br>22      Provide that information to<br>23  whom?<br>24   A.  A variety of individuals.<br>32<br>1   Q.  Okay.  Would that include<br>2  Merck's customers?<br>3   A.  Yes.<br>4   Q.  Okay.  Did you meet<br>5  directly with any customers of Merck?<br>6   A.  Yes. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 7     Q.  Did you meet with Managed<br>8  Care organizations --<br>9     A.  Yes.<br>10     Q.  -- at this time?  And I'm<br>11  referring to this aspect of your job.<br>12     A.  Yes.<br>13     Q.  Did you meet directly with<br>14  physicians who were prospective<br>15  prescribers of Merck products?<br>16     A.  Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 33:17 to 34:10)<br>33<br>17   Q.  Did you provide information<br>18  to P&T Committees of either Managed<br>19  -- of Managed Care organizations when<br>20  you were in the Southeast Regional<br>21  Medical Director position?<br>22     A.  Yes.<br>23     Q.  Okay.  Were you assigned at<br>24  that time to any particular Managed<br>34<br>1  Care organizations?<br>2     A.  I was not assigned.<br>3  Because of my geographic location in<br>4  Florida, I tended to work more<br>5  closely with Florida Managed Care<br>6  organizations.<br>7     Q.  At some point in your<br>8  career were you ever assigned or<br>9  designated as the RMD for certain<br>10  Managed Care organizations? | | |
| EDWARDS, M.D., KERRY I., (Page 34:13 to 34:13)<br>34<br>13  THE WITNESS:  Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 34:15 to 34:22)<br>34<br>15  Q.  Just not at the time that<br>16  you were Southeast medical -- I mean<br>17  Southeast Regional Medical Director.<br>18     A.  Correct.<br>19     Q.  Okay.  Were you ever<br>20  designated as the primary Regional<br>21  Medical Director for a certain<br>22  product or product line? | | |
| EDWARDS, M.D., KERRY I., (Page 35:1 to 35:1)<br>35<br>1  THE WITNESS:  Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 35:3 to 35:4)<br>35<br>3  Q.  That was during the | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 4   Southeast Regional period? | | |
| EDWARDS, M.D., KERRY I., (Page 35:7 to 35:7)<br>35<br>7   THE WITNESS:  Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 35:9 to 36:15)<br>35<br>9   Q.   Okay.  And what was that<br>10   product?<br>11       A.   To the best of my<br>12   recollection, Vioxx was one.<br>13       Q.   And that was during the<br>14   Southeast Regional?<br>15       A.   Yes.<br>16       Q.   Did you continue to have<br>17   responsibility for Vioxx after you<br>18   were Southeast Regional Medical<br>19   Director or -- and I may be -- how<br>20   long were you Southeast Regional<br>21   Medical Director?<br>22       A.   I moved to the MidAtlantic<br>23   region in 19 -- excuse me -- 2001.<br>24       Q.   What states are encompassed<br>36<br>1   in the MidAtlantic region?<br>2       A.   To the best of my<br>3   recollection, Pennsylvania, Virginia,<br>4   West Virginia, Ohio, Kentucky,<br>5   Washington, D.C.  Not as a state,<br>6   but...<br>7       Q.   Did you continue to have --<br>8   and maybe you can help me out with<br>9   the correct term -- were you<br>10   considered the primary Vioxx Regional<br>11   Medical Director?<br>12          What was the title of your<br>13   connection with Vioxx as -- or<br>14   assignment to Vioxx as a Regional<br>15   Medical Director, if there was one? | | |
| EDWARDS, M.D., KERRY I., (Page 36:18 to 36:19)<br>36<br>18   THE WITNESS:  At what point<br>19   in time? | | |
| EDWARDS, M.D., KERRY I., (Pages 36:21 to 37:1)<br>36<br>21   Q.   Well, I guess we'll start<br>22   with when you first became<br>23   responsible or were given that<br>24   responsibility, and then if it<br>37<br>1   changed over time, tell me over time. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| EDWARDS, M.D., KERRY I., (Page 37:4 to 37:10)<br>37<br>4   THE WITNESS:  When I joined<br>5   the medical director program, as the<br>6   group expanded, it was purely an<br>7   internal communication designation.<br>8   We developed point responsibilities<br>9   at an RBG level, a Regional Business<br>10   Group. | | |
| EDWARDS, M.D., KERRY I., (Page 37:12 to 37:24)<br>37<br>12   Q.   Okay.<br>13      A.   Our teams were aligned that<br>14   way.<br>15      Q.   Okay.  The Regional<br>16   Business Group level, I'm assuming<br>17   that's devised -- I mean, divided<br>18   among the same regions that the<br>19   Regional Medical Directors are?<br>20         So, in other words, if<br>21   you're the Regional Medical Director<br>22   for this MidAtlantic region, you're<br>23   also part of the Regional Business<br>24   Group for the MidAtlantic region? | | |
| EDWARDS, M.D., KERRY I., (Page 38:3 to 38:5)<br>38<br>3   THE WITNESS:  We are not<br>4   part of the organization.  We map to<br>5   the business groups at Merck. | | |
| EDWARDS, M.D., KERRY I., (Page 38:7 to 38:11)<br>38<br>7   Q.   Okay.<br>8      A.   So when you reference<br>9   Southeast, that was the Southeast<br>10   Regional Business Group, and then<br>11   Atlantic Regional Business Group. | | |
| EDWARDS, M.D., KERRY I., (Pages 39:22 to 40:6)<br>39<br>22   Q.   I was just curious, do you<br>23   know whether you were assigned point<br>24   responsibility for Vioxx before the<br>40<br>1   drug came to the market?<br>2      A.   No.<br>3      Q.   Okay.  So it would have to<br>4   be sometime after the drug came to<br>5   market?<br>6      A.   Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 41:9 to 41:13)<br>41 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 9  Q.  And when you moved to the<br>10  MidAtlantic region in 2001, did you<br>11  continue to have point responsibility<br>12  for Vioxx?<br>13    A.  No. | | |
| EDWARDS, M.D., KERRY I., (Pages 42:3 to 43:2)<br>42<br>3  Q.  Going back to when you<br>4  first came on board at the Southeast<br>5  region, what was your reporting<br>6  hierarchy within the company?<br>7    A.  I reported directly to<br>8  Dr. Bill McBride.<br>9    Q.  Was he assigned to the<br>10  Southeast region or did he have a<br>11  broader area of responsibility?<br>12    A.  He was the Senior Medical<br>13  Director in the Southeast.<br>14    Q.  Okay.  And do you know who<br>15  Dr. McBride reported to?<br>16    A.  At which time?<br>17    Q.  At this time, the Southeast<br>18  -- when you first came on to the<br>19  Southeast Regional.<br>20    A.  Yes.<br>21    Q.  And who was that?<br>22    A.  Dr. Louis Sherwood.<br>23    Q.  And what was Dr. Sherwood's<br>24  title?<br>43<br>1    A.  Vice president, Medical<br>2  Affairs. | | |
| EDWARDS, M.D., KERRY I., (Page 43:19 to 43:24)<br>43<br>19    Q.  Okay.  What division or<br>20  business group within Merck did this<br>21  chain of -- was this chain of command<br>22  housed in?<br>23    A.  The division was called<br>24  U.S. Human Health. | | |
| EDWARDS, M.D., KERRY I., (Page 45:1 to 45:5)<br>45<br>1  So USHH, and then Medical<br>2  Affairs is housed within USHH, and<br>3  I'm wondering if there's some entity<br>4  between the two in which Medical<br>5  Affairs is housed. | | |
| EDWARDS, M.D., KERRY I., (Page 45:10 to 45:11)<br>45<br>10    THE WITNESS:  Not to my | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 11   knowledge. | | |
| EDWARDS, M.D., KERRY I., (Page 45:13 to 45:21)<br>45<br><br>13   Q.   And then housed within<br>14   Medical Affairs would be the<br>15   different Regional Medical Directors?<br>16      A.   Correct.<br>17      Q.   Did that general structure<br>18   we just described -- USHH at the top,<br>19   Medical Affairs, Regional Medical<br>20   Directors -- did that basic hierarchy<br>21   continue in place through 2004? | | |
| EDWARDS, M.D., KERRY I., (Page 45:23 to 45:23)<br>45<br><br>23   THE WITNESS: Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 46:12 to 46:22)<br>46<br><br>12   Q.   Do you recall the time<br>13   frame when you transitioned out of<br>14   the MidAtlantic region?<br>15      A.   Yes.<br>16      Q.   And when was that?<br>17      A.   October 2003.<br>18      Q.   Okay.  And where did you<br>19   transfer in October 2003?<br>20      A.   To the Southeast.<br>21      Q.   Back to the Southeast?<br>22      A.   Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 48:2 to 48:12)<br>48<br><br>2   Q.   Okay.  You indicated that<br>3   at some point in your career with<br>4   Merck you did begin to become a<br>5   contact Regional Medical Director for<br>6   certain Managed Care organizations.<br>7         Did I understand that<br>8   correctly?<br>9      A.   Yes.<br>10      Q.   What point in time was<br>11   that?<br>12      A.   Approximately 2002. | | |
| EDWARDS, M.D., KERRY I., (Page 49:9 to 49:23)<br>49<br><br>9   At some point in time did<br>10   you become responsible for or the<br>11   point person for dealing with certain<br>12   PBMs?<br>13      A.   Yes.<br>14      Q.   Okay.  Do you distinguish<br>15   PBMs from Managed Care organizations? | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 16    A.   Yes.<br>17    Q.   Okay.  At what point in<br>18  time did you become responsible for<br>19  being the point person for PBMs?<br>20    A.   It wasn't all PBMs.<br>21    Q.   For any PBMs.  I'm sorry.<br>22    A.   To the best of my<br>23  recollection, early 2003. | | |
| EDWARDS, M.D., KERRY I., (Pages 50:3 to 51:15)<br>50<br>3   Q.   What PBM or PBMs did you<br>4  become responsible for being the<br>5  point person -- or become the point<br>6  person for?<br>7    A.   In that time frame,<br>8  Provider Synergies.<br>9    Q.   Okay.  Had you had any<br>10  contact with Provider Synergies prior<br>11  to becoming the point person for<br>12  Provider Synergies?<br>13        MR. O'DONOGHUE:  And just<br>14  to clarify that, you mean October<br>15  2003?<br>16        MR. MURRAY:  Correct.<br>17        MR. O'DONOGHUE:  So prior<br>18  to October 2003?<br>19        MR. MURRAY:  Yes, sir.<br>20        THE WITNESS:  Yes.<br>21  BY MR. MURRAY:<br>22    Q.   When was your first contact<br>23  with Provider Synergies?<br>24    A.   Approximately August 2002.<br>51<br>1    Q.   And in what capacity did<br>2  you come into contact with Provider<br>3  Synergies in that time frame?<br>4    A.   I attended a meeting with<br>5  Provider Synergies and provided the<br>6  balanced clinical -- scientific and<br>7  clinical information.<br>8    Q.   Was that a P&T meeting?<br>9    A.   No.<br>10    Q.   Was it with doctors at<br>11  Provider Synergies, or pharmacy<br>12  managers or directors of Provider<br>13  Synergies?  Do you know who at<br>14  Provider Synergies you met with at<br>15   that time? | | |
| EDWARDS, M.D., KERRY I., (Page 51:17 to 51:18)<br>51 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 17   THE WITNESS:  The Clinical<br>18   Pharm.D. team. | | |
| EDWARDS, M.D., KERRY I., (Page 52:3 to 52:15)<br>52<br><br>3   Q.   So, let's see, August '02,<br>4   you had a meeting with the clinical<br>5   Pharm.D. team?  Was that the term<br>6   that you used?<br>7      A.   Yes.<br>8      Q.   Okay.  Do you know what<br>9   that acronym, Pharm.D., stands for?<br>10    A.   Yes.<br>11    Q.   And what is that?<br>12    A.   Doctorate in Pharmacy.<br>13    Q.   Okay.  I see.<br>14         So they're a team of<br>15   Doctors of Pharmacy? | | |
| EDWARDS, M.D., KERRY I., (Page 52:18 to 52:18)<br>52<br><br>18   THE WITNESS:  Correct. | | |
| EDWARDS, M.D., KERRY I., (Pages 52:20 to 53:6)<br>52<br><br>20   Q.   And you said you provided<br>21   balanced information.<br>22         Was that with respect to a<br>23   certain product or products?<br>24    A.   Yes.<br>53<br><br>1      Q.   What product or products<br>2   did you provide information about in<br>3   that August '02 meeting?<br>4      A.   To the best of my<br>5   recollection, Cozaar/Hyzaar and<br>6   Vioxx. | | |
| EDWARDS, M.D., KERRY I., (Pages 54:14 to 56:22)<br>54<br><br>14   Q.   Did you provide verbal<br>15   information only or did you also have<br>16   any written materials that you<br>17   provided?<br>18         MR. O'DONOGHUE:  Objection.<br>19   Form.<br>20         By "written materials," do<br>21   you mean handouts or do you mean like<br>22   PowerPoints and presentations as<br>23   well?<br>24         MR. MURRAY:  That's<br>55<br><br>1   actually a good distinction.<br>2   BY MR. MURRAY: | Page 54:18-19<br>Remove<br>objection | |

12

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 3     Q.   Did you present anything<br>4   that was in writing, whether it was a<br>5   handout or it was a PowerPoint?<br>6     A.   As an RMD, I generally used<br>7   PowerPoint presentations.<br>8     Q.   Did the PowerPoint<br>9   presentation that you used at that<br>10   meeting, was that one that had a<br>11   particular title?<br>12     A.   Not to my recollection.<br>13     Q.   Okay.  Was it one that was<br>14   created by you or was it created by<br>15   somewhere else in the company?<br>16     A.   It was created somewhere<br>17   else in the company.<br>18     Q.   Okay.  Do you know where it<br>19   was created?<br>20     A.   The slide decks we<br>21   received, we received them after they<br>22   went through the appropriate<br>23   Medical/Legal review.<br>24     Q.   Okay.  Where was that<br>                       56<br>1   Medical/Legal review conducted, if<br>2   you know?<br>3     A.   Headquarters.<br>4     Q.   Okay.  Do you know who<br>5   prepared the slide decks?<br>6     A.   No, I do not.<br>7     Q.   Okay.  Was that a slide<br>8   deck that you had used on other<br>9   occasions at other places?<br>10     A.   I don't remember the<br>11   specific slide deck.<br>12     Q.   Did you leave behind any<br>13   materials during that visit?<br>14     A.   No.<br>15     Q.   Do you have any means of<br>16   going back through your records and<br>17   finding out what slide deck you used?<br>18     A.   No.<br>19     Q.   Do you know if there was a<br>20   slide deck or group of slide decks<br>21   that were directed towards Medicaid<br>22   PBMs? | | |
| EDWARDS, M.D., KERRY I., (Page 57:3 to 57:10)<br>                       57<br>3   A.   Not to my knowledge.<br>4     Q.   So there wouldn't be a --<br>5   okay, if I go pull the -- let's go | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 6   pull the Medicaid PBM slide decks and<br>7   it would be in that group.<br>8         To your knowledge, there<br>9   isn't something of that nature?<br>10    A.  No, sir. | | |
| EDWARDS, M.D., KERRY I., (Pages 57:24 to 60:14)<br><br>                                57<br>24   Q.  Doctor, we were discussing<br><br>                                58<br>1   your August '02 meeting with the<br>2   Clinical Pharm.D. team at Provider<br>3   Synergies.<br>4         Do you know the names of<br>5   any of the individuals that you met<br>6   with at that time?<br>7      A.  I remember two names<br>8   specifically.<br>9      Q.  Okay.<br>10     A.  One in attendance in<br>11  person.<br>12     Q.  And they were...?<br>13     A.  Steve Lyles.<br>14     Q.  Was that a Provider<br>15  Synergies person?<br>16     A.  Yes.<br>17     Q.  Do you know Steve Lyles's<br>18  position at Provider Synergies?<br>19     A.  To the best of my<br>20  recollection, he headed the clinical<br>21  team.<br>22     Q.  Okay.  Anyone else?<br>23     A.  On the phone I remember<br>24  Valerie Taylor.<br><br>                                59<br>1      Q.  You were doing a<br>2   PowerPoint; correct?<br>3      A.  Yes.<br>4      Q.  Is it Ms. or Dr. Taylor, or<br>5   do you know?<br>6      A.  To the best of my<br>7   recollection, she's a Pharm.D. as<br>8   well, so Doctor.<br>9      Q.  Okay, so she would be a<br>10  doctor.<br>11        Did Dr. Taylor have any<br>12  kind of way to see the slides that<br>13  you were putting up?<br>14     A.  Yes.<br>15     Q.  Okay.  How was that<br>16  accomplished? | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 17    A.   Through the internal<br>18  Provider Synergies Web X.  They used<br>19  a software program.<br>20    Q.   Did anyone else participate<br>21  in that meeting?<br>22    A.  Yes.<br>23    Q.   Okay.  And who were the<br>24  other participants?<br>                   60<br>1    A.  I can't recall.<br>2    Q.   Okay.  Were there any other<br>3  participants for Merck?<br>4    A.  Yes.<br>5    Q.   And do you recall who those<br>6  people were?<br>7    A.  Yes.<br>8    Q.   Okay.  And who were they?<br>9    A.   John Fevurly and Michael<br>10  Davis.<br>11    Q.   Okay.  About how long did<br>12  that meeting last?<br>13    A.   To the best of my<br>14  recollection, we were given one hour. | | |
| EDWARDS, M.D., KERRY I., (Page 61:3 to 61:7)<br>                   61<br>3   Q.   At the time you were given<br>4  an hour, Merck personnel were given<br>5  an hour, and only Merck personnel<br>6  were present during that hour?<br>7    A.   Correct. | | |
| EDWARDS, M.D., KERRY I., (Pages 61:13 to 62:24)<br>                   61<br>13  Q.   Okay.  Do you recall<br>14  whether there was any discussion of<br>15  supplemental rebates during that<br>16  presentation?<br>17    A.   No, there was not.<br>18    Q.   So the focus was strictly<br>19  clinical?<br>20    A.  Yes.<br>21    Q.   To your recollection, did<br>22  your slides reference any particular<br>23  studies involving Vioxx?<br>24    A.  Yes.<br><br>                   62<br>1    Q.   Do you recall any of those<br>2  studies that were referenced in that<br>3  slide deck?<br>4    A.   Not remembering the | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 5   specific slide deck that was used<br>6   during that presentation, we provided<br>7   any updates to the label for Vioxx at<br>8   every opportunity, and that would<br>9   have included at this point, although<br>10   the label had not been updated, the<br>11   cardiovascular safety information<br>12   related to Vioxx from the VIGOR<br>13   study.<br>14      Q.   Did you provide any other<br>15   data from the VIGOR study at that<br>16   meeting?<br>17      A.   No.<br>18      Q.   You didn't discuss the<br>19   gastro -- I'm sorry -- the GI<br>20   findings from the VIGOR study?<br>21      A.   Only if they asked the<br>22   question.<br>23      Q.   And was that because of a<br>24   policy reason within Merck? | | |
| EDWARDS, M.D., KERRY I., (Pages 63:3 to 67:12)<br><div align="center">63</div>3   THE WITNESS:  Our general<br>4   approach with customers was to<br>5   provide balanced credible scientific<br>6   on-label information and to respond<br>7   to questions that individuals may<br>8   have.<br>9   BY MR. MURRAY:<br>10      Q.   So the GI findings were not<br>11   yet on label from the VIGOR study?<br>12      A.   Correct.<br>13      Q.   So since they weren't on<br>14   label at that time, you would not<br>15   have discussed the GI findings from<br>16   the VIGOR study.<br>17      A.   Not proactively.<br>18      Q.   You would discuss them if<br>19   one of the people from Provider<br>20   Synergies asked about them, though;<br>21   correct?<br>22      A.   Yes.<br>23      Q.   Okay.  What if they asked<br>24   about GI indications without asking<br><div align="center">64</div>1   specifically about the VIGOR study,<br>2   could you then discuss the VIGOR<br>3   study?<br>4      A.   No.<br>5      Q.   So they had to mention the | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 6   VIGOR study by name for you to talk<br>7   about the GI findings of the VIGOR<br>8   study?<br>9     A.  Yes.<br>10    Q.  At that time?<br>11    A.  Yes.<br>12    Q.  Okay.  Did that change at<br>13  any point in time?<br>14    A.  After we got the label for<br>15  the VIGOR study.<br>16    Q.  Okay.  And when was that?<br>17    A.  2003, I believe.<br>18    Q.  Okay.  Do you recall when<br>19  in 2003?<br>20    A.  Not specifically.<br>21    Q.  Okay.  You recalled an<br>22  August of 2002 meeting that you<br>23  attended that involved West Virginia<br>24  and Provider Synergies.<br>                                        65<br>1       When was your next contact<br>2   with Provider Synergies?<br>3     A.  To the best of my<br>4   recollection, probably early part of<br>5   2003.<br>6     Q.  And what was that contact?<br>7     A.  It was with Valerie Taylor.<br>8     Q.  Was that a face-to-face<br>9   meeting or a phone conference?<br>10    A.  Phone conference.<br>11    Q.  Okay.  Do you recall the<br>12  subject of that meeting?<br>13    A.  No.<br>14    Q.  Do you recall anything<br>15  about that meeting other than that<br>16  you had a phone conference with her<br>17  in 2003?<br>18    A.  My general recollection<br>19  with every opportunity of contact<br>20  with Provider Synergies, questions<br>21  around the CV safety of Vioxx would<br>22  come up, and we would reinforce the<br>23  totality of the data to date and be<br>24  available to answer questions that<br>                                        66<br>1   they may have.<br>2     Q.  Okay.  Did you use any --<br>3   again, now I'm focused on this early<br>4   2003 contact.<br>5       Do you recall that CV | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 6   questions around Vioxx were the<br>7   subject matter of that contact?<br>8      A.   To the best of my<br>9   recollection, questions about the CV<br>10   safety for Vioxx came up routinely at<br>11   every interaction.<br>12      Q.   Okay.  During this early<br>13   2003 interaction, did you have any<br>14   written materials that you furnished<br>15   to Valerie Taylor?<br>16         Did she have access to a<br>17   slide show like she had during that<br>18   earlier meeting where she had access<br>19   on a computer?<br>20      A.   I don't recall.<br>21      Q.   Okay.  Were there any<br>22   written materials that you would have<br>23   relied on during that phone<br>24   conference?<br>                            67<br>1      A.   I don't recall.<br>2      Q.   Let me just talk generally<br>3   about in the time frame of this<br>4   contact in early 2003.<br>5         Were there any kind of<br>6   bulletins or memoranda or other<br>7   written materials that had been<br>8   circulated for your use that had been<br>9   approved by Legal and Medical at<br>10   headquarters for your use in<br>11   addressing CV questions about the<br>12   safety profile of Vioxx? | | |
| EDWARDS, M.D., KERRY I., (Pages 67:14 to 71:9)<br>                            67<br>14   THE WITNESS:  Are you<br>15   indicating pre-label change or<br>16   post-label change with VIGOR?<br>17   BY MR. MURRAY:<br>18      Q.   Well, this early 2003 time<br>19   frame, was that pre-label change or<br>20   post-label change?<br>21      A.   As I indicated before, I<br>22   don't know when the exact label<br>23   change came through.<br>24      Q.   Okay.  We talked about in<br>                            68<br>1   the August of '02 meeting that you<br>2   did talk about the CV effects of<br>3   VIGOR.<br>4      A.   Yes. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 5    Q.  Was that pre-label change<br>6  or post-label change?<br>7    A.  Pre-label change.<br>8    Q.  Pre-label change.<br>9        So let me ask if there were<br>10  any materials pre-label change of the<br>11  sort that I just described, that is,<br>12  materials that directed you -- one,<br>13  that had been cleared by Legal and<br>14  Medical at headquarters and directed<br>15  you as to how to respond to inquiries<br>16  about cardiovascular effects with<br>17  respect to Vioxx.<br>18        MR. O'DONOGHUE:  And,<br>19  Counsel, I think this is a<br>20  clarification, you mean other than<br>21  the PowerPoints he's already<br>22  testified to?<br>23  BY MR. MURRAY:<br>24    Q.  Well, yes, we already<br><div align="center">69</div>1  talked about a PowerPoint.<br>2        In addition to that, are<br>3  there any other materials?<br>4    A.  Not that I recall.<br>5    Q.  Okay.  I think in talking<br>6  about the August '02 meeting you said<br>7  that there was a -- that the<br>8  PowerPoint would have included<br>9  discussions about the cardiovascular<br>10  findings in VIGOR but not the GI<br>11  findings.<br>12        Do you recall -- am I<br>13  correct in that understanding?<br>14    A.  Yes.<br>15    Q.  Okay.  Do you recall<br>16  whether Provider Synergies asked any<br>17  questions about the cardiovascular<br>18  findings about VIGOR at that meeting?<br>19    A.  To the best of my<br>20  recollection, at every engagement I<br>21  had with Provider Synergies, they<br>22  asked about the cardiovascular safety<br>23  of Vioxx.<br>24    Q.  Let me see if I can<br><div align="center">70</div>1  understand how the presentation would<br>2  have gone.<br>3        Did you go through the<br>4  PowerPoint first and then there was a | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 5   question-and-answer session<br>6   afterwards?  This is -- I'm talking<br>7   about the August '02 meeting now.<br>8      A.  Yes.<br>9      Q.  Okay.  So would the<br>10   cardiovascular questions have come up<br>11   during the Q & A session?<br>12      A.  Or prior.  Our decks that<br>13   we used for clinical presentations<br>14   after VIGOR was announced and<br>15   published did include the<br>16   cardiovascular safety data.  They<br>17   added additional slides as balanced<br>18   information within those clinical<br>19   decks.<br>20      Q.  Right.<br>21         And now I'm just trying to<br>22   understand where in the presentation<br>23   the questions could have arisen.<br>24         In other words, was there<br>               71<br>1   an opportunity when you were going<br>2   through the slides for them to stop<br>3   and ask you a question, or did the<br>4   questions and answers sort of come at<br>5   the end?<br>6      A.  My general approach is I<br>7   ask people to stop me if they don't<br>8   understand or have a question.<br>9      Q.  I see. | | |
| EDWARDS, M.D., KERRY I., (Page 72:1 to 72:7)<br>               72<br>1   Q.  To your recollection, is<br>2   there any information that you<br>3   provided during that question-and-<br>4   answer session that was not contained<br>5   in the slides?  And I'm limiting this<br>6   with respect to the cardiovascular<br>7   effects of Vioxx. | | |
| EDWARDS, M.D., KERRY I., (Page 72:10 to 72:11)<br>               72<br>10   THE WITNESS:  Not to my<br>11   recollection. | | |
| EDWARDS, M.D., KERRY I., (Pages 72:18 to 73:1)<br>               72<br>18   I think your testimony is<br>19   that you would have answered GI<br>20   questions about the VIGOR study if<br>21   they were asked, but you don't know<br>22   if they were asked, or you don't | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 23   recall if they were asked as you sit<br>24   here today?<br>                                      73<br>1   A.   Correct. | | |
| EDWARDS, M.D., KERRY I., (Pages 74:23 to 75:10)<br>                                      74<br>23   So, anyway, I was just sort<br>24   of trying to understand the general<br>                                      75<br>1   protocol for PIR, and we discussed<br>2   that a Merck representative has a<br>3   discussion with either a physician or<br>4   it could be someone from a PBM, and a<br>5   question arises about a Merck product<br>6   that the representative is not<br>7   qualified to answer and it gets<br>8   referred to a Regional Medical<br>9   Director through a PIR; is that<br>10   correct? | | |
| EDWARDS, M.D., KERRY I., (Page 75:13 to 75:14)<br>                                      75<br>13   THE WITNESS:  That's<br>14   incorrect. | | |
| EDWARDS, M.D., KERRY I., (Pages 75:16 to 79:16)<br>                                      75<br>16   Q.   Okay.  Explain where I'm<br>17   misunderstanding that, please.<br>18      A.   The PIR process, if there's<br>19   a question that's of an off-label<br>20   nature, so most certainly for a<br>21   representative, they are not allowed<br>22   to talk about off-label information,<br>23   by policy, and they would submit a<br>24   PIR request on behalf of the<br>                                      76<br>1   healthcare provider.  That would go<br>2   in to Medical Services and a written<br>3   response would be sent back out.<br>4   Q.   I see.<br>5      Do PIR requests always<br>6   generate a written response?<br>7   A.   Generally, yes.<br>8   Q.   Okay.  What are the<br>9   exceptions, if any, to that rule?<br>10      A.   There were opportunities,<br>11   as questions would come up in the<br>12   setting with a PBM, a Managed Care<br>13   customer, if an unsolicited off-label<br>14   question was received, we as medical<br>15   directors, if we are qualified, we're | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 16  confident, we felt comfortable we<br>17  knew the answer, we could provide<br>18  that unsolicited off-label question<br>19  in response to the customer.<br>20     Q.  So it didn't have to go<br>21  through the formal channels with PIR<br>22  because a Regional Medical Director<br>23  was present when the question arose?<br>24     A.  Not at first, no.<br><br>                            77<br>1     Q.  Okay.  Again, where am I<br>2  misunderstanding you there?  Help<br>3  clarify that for me.<br>4     A.  In my experience as a<br>5  medical director, if I received an<br>6  unsolicited off-label question and I<br>7  felt confident that I could respond,<br>8  I would ask whoever the Merck field<br>9  person, if there was a National<br>10  Account Executive in attendance, to<br>11  submit the written PIR request on the<br>12  healthcare customer's behalf so they<br>13  got a written documentation from<br>14  whatever time frame the PIR was sent<br>15  back out.<br>16     Q.  All right.  So the -- I'm<br>17  trying to understand how in that<br>18  circumstance the PIR is initiated.<br>19          Is it that someone would<br>20  ask you a question, if you felt you<br>21  were able to answer?<br>22     A.  I responded.<br>23     Q.  You responded verbally?<br>24     A.  To an unsolicited question,<br><br>                            78<br>1  yes, verbally.<br>2     Q.  But then had a follow-up<br>3  with a written PIR so that a written<br>4  response would go.<br>5     A.  Of the exact same question.<br>6     Q.  Okay.  Are there any<br>7  instances that you recall where you<br>8  offered a verbal response to an<br>9  unsolicited question that was not<br>10  followed up with a written response<br>11  -- written PIR request and written<br>12  response?<br>13     A.  To the best of my<br>14  recollection, that's how I operated<br>15  as a Region Medical Director. |  |  |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 16    Q.   Was there a Merck policy<br>17  that governed that?<br>18    A.   Not at that time.<br>19    Q.   Okay.  And now when we say<br>20  "at that time," we're talking about<br>21  that April '03 time frame?<br>22    A.   Yes.<br>23    Q.   Okay.  At any time prior<br>24  to, say, August of '04, was there a<br><div align="center">79</div>1  policy that governed unsolicited<br>2  verbal responses of the type that you<br>3  described by RMDs that was<br>4  implemented?<br>5    A.   I don't remember the<br>6  specific date, but to the best of my<br>7  recollection, potentially late '04,<br>8  early '05.<br>9    Q.   So late '04, early '05, a<br>10  policy was put in place?<br>11    A.   A standard operating<br>12  procedure, yes.<br>13    Q.   Okay.  Did that standard<br>14  operating procedure follow your<br>15  personal procedure that you just<br>16  described? | | |
| EDWARDS, M.D., KERRY I., (Page 79:18 to 79:18)<br><div align="center">79</div>18   THE WITNESS:  Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 79:20 to 82:11)<br><div align="center">79</div>20    Q.   Do you know whether<br>21  following your conversation with<br>22  Dr. Valerie Taylor in early 2003 a<br>23  PIR was generated and a PIR response<br>24  sent out along the lines of what you<br><div align="center">80</div>1  just described?<br>2    A.   I can't recall.<br>3    Q.   If she had raised a<br>4  question during that phone conference<br>5  about cardiovascular effects, would<br>6  that have been the sort of thing that<br>7  would prompt a PIR, or does it depend<br>8  on the nature of the question?<br>9    A.   No, that would have been<br>10  something that would have prompted a<br>11  PIR, yes.<br>12    Q.   And under your personal<br>13  practice, you would have had a PIR | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 14 generated and a written response sent<br>15 back to Dr. Taylor as well?<br>16    A.   Although I don't remember<br>17 the specific case, if she asked the<br>18 question about the cardiovascular<br>19 safety of Vioxx, again, I would have<br>20 presented a very balanced clinical,<br>21 as the science was evolving over<br>22 time.<br>23        And if that were the case,<br>24 then I would request that a PIR would<br>                         81<br>1 be sent to her.  But in this case, I<br>2 don't know if I requested a PIR be<br>3 sent.<br>4    Q.   Okay.  What was your next<br>5 contact with Provider Synergies?  We<br>6 have the early '03 Valerie Taylor.<br>7 That you can recall, as you sit here<br>8 today.<br>9    A.   Specific to Vioxx?<br>10    Q.   Actually, any contact.<br>11    A.   To the best of my<br>12 recollection, I generally was in<br>13 Provider Synergies once or twice a<br>14 year.<br>15    Q.   Okay.  If you had meetings<br>16 with them once or twice a year, were<br>17 those meetings where you covered a<br>18 range of Merck products?<br>19    A.   Yes.<br>20    Q.   Okay.  Would Vioxx have<br>21 been covered in each one of those<br>22 meetings?<br>23    A.   To the best of my<br>24 recollection, the safe --<br>                         82<br>1 cardiovascular safety of Vioxx came<br>2 up at every interaction I had with<br>3 Provider Synergies, whether it was a<br>4 focus of the agenda of the meeting or<br>5 not.<br>6    Q.   Do you recall what -- any<br>7 of the specific questions that<br>8 Provider Synergies asked about the<br>9 cardiovascular safety profile of<br>10 Vioxx during any of the meetings that<br>11 you attended? | | |
| EDWARDS, M.D., KERRY I., (Pages 82:23 to 83:8)<br>                    82 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 23   A.  I don't remember specific<br>24   instances.  But in my execution of<br>               83<br>1   the role as a Region Medical Director<br>2   giving multiple presentations around<br>3   Vioxx, once the VIGOR results were<br>4   announced prior to the label change<br>5   and beyond, the cardiovascular safety<br>6   profile of Vioxx was raised generally<br>7   in the vast majority of those<br>8   interactions. | | |
| EDWARDS, M.D., KERRY I., (Pages 87:12 to 90:21)<br>               87<br>12   So there was -- once you<br>13   became the point person for Provider<br>14   Synergies, you would have gone to all<br>15   of the meetings with Provider<br>16   Synergies, regardless of the state<br>17   that was at issue?<br>18     A.   All of the Provider<br>19   Synergy-based meetings in Mason,<br>20   Ohio, yes.<br>21     Q.   Understood.  Understood.<br>22       Provider Synergies may have<br>23   been present at other state Medicaid<br>24   meetings, but that doesn't mean you<br>               88<br>1   were there just because Provider<br>2   Synergies was there?<br>3     A.  True.<br>4     Q.  Okay.  But if it was at<br>5   Provider Synergies' headquarters,<br>6   then you would have been the person<br>7   to go?<br>8   A.  Yes.<br>9     Q.  Understood.<br>10       Was there a usual group of<br>11   individuals who were at the meetings<br>12   that were once or twice a year at<br>13   Provider Synergies?<br>14       We talked about Valerie<br>15   Taylor and Steve Lyles.<br>16       Was there anyone else who<br>17   was a regular at those meetings?<br>18     A.   At some point, but I'm not<br>19   clear on the date, Chris Andrews.<br>20     Q.  Okay.  Was Chris Andrews a<br>21   Provider Synergies employee?<br>22   A.  Yes.<br>23     Q.  Do you know whether it's | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 24   Dr. Andrews or Mr. Andrews or...<br>89<br>1    A.   Chris Andrews is a Pharm.D.<br>2    Q.   Was Dr. Andrews present at<br>3  -- I'm sorry -- do you know<br>4  Dr. Andrews's title or position with<br>5  Provider Synergies?<br>6    A.   No.<br>7    Q.   So while there may have<br>8  been other individuals present, the<br>9  three that you recall being present<br>10  at -- regularly at those meetings<br>11  would have been Steve Lyles, Valerie<br>12  Taylor, and at some point in time<br>13  Chris Andrews?<br>14    A.   Yes.  I'm much more<br>15  confident in the Louisiana time<br>16  frame.  I remember Steve Lyles and I<br>17  remember Valerie Taylor.<br>18    Q.   Okay.  Explain to me what<br>19  you mean by "the Louisiana time<br>20  frame."<br>21    A.   Around the time when<br>22  Louisiana Medicaid was making their<br>23  decision around Vioxx --<br>24    Q.   Okay.<br>90<br>1    A.   -- after I had become<br>2  involved with providing the clinical<br>3  incentive information to Provider<br>4  Synergies.<br>5    Q.   What time frame is that, if<br>6  you can recall?<br>7    A.   So August of '02 was my<br>8  very first interaction, not specific<br>9  to Louisiana.  As I indicated, West<br>10  Virginia Medicaid.<br>11    Q.   Okay.<br>12    A.   And I -- restate your<br>13  question.<br>14    Q.   I was just asking what was<br>15  the time frame of the -- you said the<br>16  Louisiana time frame when Louisiana<br>17  was considering Vioxx on its<br>18  preferred drug list.<br>19       And I was just asking, what<br>20  is that time frame, as you recall it?<br>21    A.   Up until late of 2004. | | |
| EDWARDS, M.D., KERRY I., (Pages 91:22 to 92:1)<br>91 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 22   Did you attend that August<br>23   2004 P&T Committee meeting in<br>24   Louisiana?<br>92<br>1     A.  Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 92:8 to 93:13)<br>92<br>8   Q.   We talked about your<br>9   meetings once or twice a year with<br>10  Provider Synergies.<br>11        Did you have a slide deck<br>12  at every one of those meetings?<br>13      A.   To the best of my<br>14  recollection, for any face-to-face<br>15  meetings with Provider Synergies,<br>16  yes.<br>17      Q.   Would all of those slide<br>18  decks have been reviewed and approved<br>19  by Legal and Medical at headquarters?<br>20      A.   Yes.<br>21      Q.   Did you personally prepare<br>22  any of the slide decks?<br>23      A.   No.<br>24      Q.   To the best of your<br>93<br>1   recollection, did all of the slide<br>2   decks that you used at those once or<br>3   twice a year in-face meetings at<br>4   Provider Synergies include reference<br>5   to Vioxx?<br>6     A.   No.<br>7     Q.   Did you attend face-to-face<br>8   meetings at Provider Synergies where<br>9   you did not have a slide which<br>10  referenced Vioxx?<br>11     A.   Yes.<br>12     Q.   Okay.  Can you tell me<br>13  about those, how many and -- | | |
| EDWARDS, M.D., KERRY I., (Page 93:16 to 93:16)<br>93<br>16   Q.   -- what they involved? | | |
| EDWARDS, M.D., KERRY I., (Page 93:18 to 93:22)<br>93<br>18  THE WITNESS:  In the 2003<br>19  time frame, we had a label update for<br>20  Cozaar/Hyzaar around two new<br>21  indications based upon two large<br>22  outcome studies. | | |
| EDWARDS, M.D., KERRY I., (Pages 93:24 to 94:16)<br>93 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 24  Q.  Okay. <br>                                      94 <br> 1    A.  And I remember one of those <br> 2  meetings was focused on providing <br> 3  them the balanced clinical, <br> 4  scientific information around the new <br> 5  indications. <br> 6    Q.  Okay.  So you had one <br> 7  meeting that you're aware of where <br> 8  the focus was solely on a drug other <br> 9  than Vioxx? <br> 10    A.  Yes. <br> 11    Q.  But -- <br> 12    A.  There could have been <br> 13  others, yeah. <br> 14    Q.  Would the majority have <br> 15  been meetings that included reference <br> 16  to Vioxx? | | |
| EDWARDS, M.D., KERRY I., (Pages 94:22 to 95:7) <br>                                    94 <br> 22  THE WITNESS:  As I'd <br> 23  indicated previously, whether the <br> 24  agenda item stated Vioxx, we were <br>                                    95 <br> 1  there to talk about with Valerie and <br> 2  Steve, being very knowledgeable, very <br> 3  smart, very well versed in the <br> 4  science, the Vioxx questions came up <br> 5  routinely at every interaction with <br> 6  Provider Synergies. <br> 7  BY MR. MURRAY: | | |
| EDWARDS, M.D., KERRY I., (Pages 95:11 to 96:23) <br>                                    95 <br> 11  Were there meetings -- <br> 12  would the majority of meetings have <br> 13  involved slide decks that included <br> 14  reference to Vioxx? <br> 15    A.  At any point in time, if <br> 16  the meeting was set up to talk about <br> 17  new data, new science, label change <br> 18  for Vioxx or any product, then it <br> 19  would be scheduled as such, and I <br> 20  would use medically, <br> 21  legally-approved, balanced <br> 22  information to present to them. <br> 23      For the meetings that were <br> 24  not focused on Vioxx, we support <br>                                    96 <br> 1  additional products, different <br> 2  therapeutic areas, as I indicated, | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 3   Cozaar/Hyzaar, the LIFE and RENAAL<br>4   indication, large-scale landmark<br>5   outcomes trials, we provided that<br>6   information at one of those October<br>7   '03 meetings.  I don't know the<br>8   specific date.<br>9       But because of a lot of the<br>10  science that was evolving around the<br>11  coxib class of medications, those<br>12  questions routinely came up,<br>13  irrespective of what our agenda items<br>14  said, and they'd more typically come<br>15  up at the end of the meeting.<br>16      Q.  Were there more meetings<br>17  that -- I'm sorry -- were there any<br>18  meetings where Vioxx was the focus in<br>19  the way that Cozaar was the focus at<br>20  that October '03 meeting?<br>21      A.  Yes.<br>22      Q.  Can you recall any of the<br>23  dates of those specific meetings? | | |
| EDWARDS, M.D., KERRY I., (Page 97:3 to 97:9)<br>                                    97<br>3   Q.  Other than the August '02<br>4   which we've already discussed.<br>5      A.  August '02?<br>6          To the best of my<br>7   recollection, the April '03<br>8   teleconference with Valerie, and then<br>9   finally in I believe June 2004. | | |
| EDWARDS, M.D., KERRY I., (Pages 97:23 to 98:23)<br>                                    97<br>23   Q.  At some point in time did<br>24   you become responsible for Louisiana<br>                                    98<br>1   Medicaid?<br>2      A.  No.<br>3      Q.  I guess I'm trying to get<br>4   my hands on how it was that you came<br>5   to the August '04 meeting.<br>6          Do you know why it was that<br>7   you went to the August '04 Louisiana<br>8   P&T Committee meeting?<br>9      A.  Yes.<br>10     Q.  Why was that?<br>11     A.  The previous medical<br>12  director who had responsibility for<br>13  Louisiana separated from the company.<br>14     Q.  Okay.  That was Fran<br>15  Kaiser? | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 16    A.  Yes.<br>17    Q.  Okay.  So prior to that<br>18  time -- or at least throughout Fran<br>19  Kaiser's involvement, she had been<br>20  the medical director dealing with<br>21  Louisiana Medicaid?<br>22    A.  To the best of my<br>23  knowledge.  I did not manage Fran. | | |
| EDWARDS, M.D., KERRY I., (Pages 102:4 to 103:5)<br>                    102<br>  4  Q.  Dr. Edwards, you indicated<br>  5  that the people at Provider Synergies<br>  6  were very much aware of the<br>  7  cardiovascular issues surrounding<br>  8  Vioxx and I asked you questions about<br>  9  it at -- all of your interactions<br> 10  with them.<br> 11        Can you characterize the<br> 12  extent of their knowledge of those<br> 13  cardiovascular effects?<br> 14    A.  In my experience working<br> 15  with a variety of healthcare<br> 16  providers and Managed Care, PBM,<br> 17  Steve Lyles in particular, a very<br> 18  independent thinker, and I can always<br> 19  judge or I attempt to judge an<br> 20  audience around the type of questions<br> 21  they ask.<br> 22        And as part of my<br> 23  preparation to be sure I've provided<br> 24  fair, balanced, and credible and as<br>                    103<br>  1  complete information as I understood<br>  2  it, I always felt pushed, I felt<br>  3  challenged, but in a very respectful,<br>  4  professional way, by both Valerie and<br>  5  Steve. | | |
| EDWARDS, M.D., KERRY I., (Pages 103:10 to 104:21)<br>                    103<br> 10  Q.  Do you know or can you<br> 11  describe their specific awareness of<br> 12  the risk?  Were they aware of any<br> 13  studies post VIGOR that addressed the<br> 14  risk?<br> 15    A.  Could you restate the<br> 16  question?  I'm sorry.<br> 17    Q.  Were they aware of any<br> 18  studies conducted post VIGOR that<br> 19  quantified the risk?<br> 20    A.  Yes, they were aware of | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 21  other data, other science that was<br>22  out there that looked at this issue.<br>23     Q.  Do you know what any of<br>24  those studies were that they were<br>                     104<br>1  aware of -- of which they were aware?<br>2     A.  Yes.<br>3     Q.  Okay.  What were some of<br>4  those post VIGOR studies of which<br>5  they were aware?<br>6     A.  One was the Mujarkhee<br>7  reprint, the Solomon reprint.<br>8     Q.  Are there any others you<br>9  can think of?<br>10    A.  Of course the VIGOR<br>11  information, the information that --<br>12  the data from our label.  Which, by<br>13  the way, I misstated previously, the<br>14  label update for Vioxx was April of<br>15  2002.<br>16    Q.  Okay.<br>17    A.  But in the label was the<br>18  data from our placebo control elderly<br>19  studies in Alzheimer's patients.<br>20  That was presented to them, to the<br>21  best of my recollection. | | |
| EDWARDS, M.D., KERRY I., (Pages 104:22 to 105:2)<br>                   104<br>22  Q.  In your experience, did<br>23  they -- had they drilled down into<br>24  the data, the underlying data, of any<br>                   105<br>1  of those studies?<br>2     A.  Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 105:17 to 105:21)<br>                   105<br>17    Q.  Did they indicate to you<br>18  that they had any awareness as to<br>19  whether any studies -- as to whether<br>20  any individuals had dropped out of<br>21  studies for any reason? | | |
| EDWARDS, M.D., KERRY I., (Pages 105:24 to 106:5)<br>                   105<br>24  THE WITNESS:  Not that I<br>                   106<br>1  recall.<br>2  BY MR. MURRAY:<br>3     Q.  Had they ever indicated to<br>4  you that they had seen any of the raw<br>5  data from any of the studies? | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| EDWARDS, M.D., KERRY I., (Page 106:8 to 106:9)<br>106<br><br>8　THE WITNESS:  Not that I<br>9　recall. | | |
| EDWARDS, M.D., KERRY I., (Page 106:11 to 106:13)<br>106<br><br>11　Q.  Did you ever share with<br>12　them any of the raw data from any<br>13　studies that Merck conducted? | | |
| EDWARDS, M.D., KERRY I., (Page 106:17 to 106:17)<br>106<br><br>17　THE WITNESS:  No. | | |
| EDWARDS, M.D., KERRY I., (Page 106:19 to 106:22)<br>106<br><br>19　Q.  Did you ever share with<br>20　them adverse event reporting data<br>21　that Merck may have had in its<br>22　possession? | | |
| EDWARDS, M.D., KERRY I., (Page 107:1 to 107:1)<br>107<br><br>1　THE WITNESS:  No. | | |
| EDWARDS, M.D., KERRY I., (Pages 107:10 to 108:6)<br>107<br><br>10　Do you have any involvement<br>11　in the compilation of adverse<br>12　reporting data as required by the<br>13　FDA?<br>14　A.  Yes.<br>15　Q.  Okay.  What is that<br>16　involvement?<br>17　A.  If in the course of a<br>18　discussion with a healthcare provider<br>19　I am made aware of some adverse event<br>20　that involved a Merck drug, I was to<br>21　report it to the National Service<br>22　Center.<br>23　Q.  Do you receive any reports<br>24　of -- I'm sorry -- do you have any<br>108<br>1　involvement beyond reporting adverse<br>2　events of which you're made aware?<br>3　A.  No.<br>4　Q.  Did you ever receive<br>5　reports of adverse event reporting<br>6　data back from where you sent it? | | |
| EDWARDS, M.D., KERRY I., (Page 108:9 to 108:9)<br>108<br><br>9　THE WITNESS:  No. | | |
| EDWARDS, M.D., KERRY I., (Page 108:11 to 108:17)<br>108 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 11  Q.   So you did not receive<br>12  compilations of the adverse reporting<br>13  data that had been gathered by Merck?<br>14         I'm disregarding studies.<br>15  I'm now referring to the data that<br>16  they gathered pursuant to their<br>17  obligation under FDA regulations. | | |
| EDWARDS, M.D., KERRY I., (Page 109:2 to 109:4)<br>                              109<br><br>2   THE WITNESS:  Only that<br>3   which ended up in the label as part<br>4   of an update to the label. | | |
| EDWARDS, M.D., KERRY I., (Page 109:6 to 109:18)<br>                              109<br><br>6   Q.   Okay.  In your interactions<br>7   with the Provider Synergies<br>8   personnel, was there any information<br>9   that was not contained in the<br>10  prepared slides that you shared with<br>11  them?<br>12         And I guess I'm trying to<br>13  distinguish between -- you may have<br>14  answered questions that related to<br>15  the information that was in those<br>16  slides, but did you ever share<br>17  information that was -- went beyond<br>18  what was in the prepared slides -- | | |
| EDWARDS, M.D., KERRY I., (Pages 110:2 to 114:18)<br>                              110<br><br>2   A.  Proactively, I did not<br>3   provide any additional information<br>4   that was outside of the medically,<br>5   legally approved slide information<br>6   that I provided.<br>7         If I received an<br>8   unsolicited off-label question of<br>9   material not contained in the label,<br>10  as I previously indicated, if I felt<br>11  competent and comfortable that I knew<br>12  the answer, then I could provide a<br>13  response to them verbally, no written<br>14  material, and then ask that a PIR be<br>15  submitted on their behalf.<br>16  Q.   Are there any examples of<br>17  -- that you can think of as you sit<br>18  here of information you provided of<br>19  Vioxx in response to an unsolicited<br>20  question that went beyond information<br>21  that was contained in the provided --<br>22  prepared materials? | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 23   A.  Yes.<br>24   Q.  Okay.  And what are those<br><div align="center">111</div>1  examples?<br>2   A.  One example.<br>3   Q.  Okay.  There's only one<br>4  that you can think of?<br>5   A.  That I can recall.<br>6   Q.  Okay.  What was that one<br>7  example?<br>8   A.  The Solomon reprint.<br>9   Q.  Okay.  And what was your<br>10  discussion regarding the Solomon<br>11  reprint?<br>12   A.  The discussion around the<br>13  Solomon reprint with Provider<br>14  Synergies was around the data that<br>15  were presented in the abstract form<br>16  which ultimately -- you know, from<br>17  the ACR.<br>18   Q.  I'm sorry, ACR?<br>19   A.  American College of<br>20  Rheumatology.<br>21   Q.  Okay.<br>22   A.  We talked about the data,<br>23  obviously, in the abstract.  Put it<br>24  in the context of this was one piece<br><div align="center">112</div>1  of information, one piece of data, in<br>2  addition to the myriad of information<br>3  that they had available to them<br>4  through the course of my interactions<br>5  with them as questions would come up<br>6  around the CV safety of Vioxx.<br>7   Tried to provide some<br>8  context around the limitations of an<br>9  observational retrospective study,<br>10  not to minimize the study but to put<br>11  it in the proper context relative to,<br>12  say, a randomized control,<br>13  placebo-controlled trial.<br>14   Q.  Was there anything else<br>15  that you discussed with them that was<br>16  not in the prepared materials?<br>17   MR. O'DONOGHUE:  And you're<br>18  talking generally, not just in<br>19  relation to the Solomon article now?<br>20   MR. MURRAY:  No.<br>21  BY MR. MURRAY:<br>22   Q.  Well, there was the one | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 23  example.  I guess I'm focusing on<br>24  this one example that you recall.<br><div align="center">113</div>1     A.   Specific to the Solomon<br>2  article?  Those were kind of<br>3  generally my approaches as it came to<br>4  Solomon.  It was a piece of<br>5  information.  It was a data point.<br>6     Q.   Did you steer them to any<br>7  other data points that you considered<br>8  relevant in that discussion?<br>9     A.   Specifically when a<br>10  question came up around the Solomon<br>11  reprint?<br>12     Q.   Yes, sir.<br>13     A.   What I would generally do<br>14  then, not just with Provider but in<br>15  my approach with these customers, was<br>16  to go back to the label, reinforce<br>17  what we found in VIGOR around the<br>18  cardiovascular safety data that came<br>19  from the VIGOR study.<br>20         My general approach is if I<br>21  got an off-label question, I would<br>22  try to narrow the focus of the<br>23  question, provide the response, as<br>24  I'd indicated previously, and then<br><div align="center">114</div>1  attempt to transition back to an<br>2  on-label.<br>3     Q.   In talking to them about<br>4  how Solomon was one piece of the<br>5  puzzle, did you also refer them to<br>6  any studies other than VIGOR?<br>7     A.   At a time, they might have<br>8  had a general question pass Solomon<br>9  around the overall cardiovascular<br>10  safety of Vioxx, then I would review<br>11  with them the VIGOR data and had<br>12  previously reviewed with them, again,<br>13  through unsolicited off-label<br>14  questions they asked about other<br>15  studies, any pertinent information<br>16  that I felt at the time.  The data<br>17  were emerging, science was coming<br>18  out. | | |
| EDWARDS, M.D., KERRY L. (Pages: 115:15 to 116:13)<br><div align="center">115</div>15  Did you refer them to the<br>16  studies that were contained in the | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 17  label before the VIGOR study came<br>18  out?<br>19     A.  I would reinforce that from<br>20  the perspective of if you look<br>21  particularly around hypertension and<br>22  edema as a surrogate of effects on<br>23  the cardiovascular system.<br>24     And as my role as a Region<br>                   116<br>1  Medical Director, I was very explicit<br>2  at every discussion around Vioxx to<br>3  say there is no safety halo for Vioxx<br>4  relative to the kidney. It acts as a<br>5  traditional nonsteroidal through its<br>6  inhibition of the other COX<br>7  isoenzyme.<br>8     Therefore, patients who you<br>9  would be careful about using the<br>10  traditional nonsteroidal, you would<br>11  have to have that same degree of<br>12  caution with using a COX-2 selective<br>13  inhibitor like Vioxx. | | |
| EDWARDS, M.D., KERRY I., (Page 118:6 to 118:7)<br>                  118<br>6  (Exhibit Edwards-LA-1 was<br>7  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Page 120:3 to 120:8)<br>                  120<br>3  Q.  Okay.  In the course of<br>4  your employment at Merck, did you<br>5  ever see documents that purported to<br>6  outline Regional Medical Director<br>7  activities as this document purports<br>8  to do? | | |
| EDWARDS, M.D., KERRY I., (Page 120:16 to 120:16)<br>                  120<br>16  THE WITNESS:  Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 121:20 to 123:6)<br>                  121<br>20  Q.  Perhaps a better way to go<br>21  about it would be to -- I'll focus on<br>22  some certain activities outlined in<br>23  the document and you can tell me<br>24  whether those are activities in which<br>                  122<br>1  you engaged as Regional Medical<br>2  Director.<br>3     A.  Yes.<br>4     Q.  We'll do that.  Let me get<br>5  you to flip to the next page which | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 6   says External Commercial Activities.<br>7         In the first box there you<br>8   see MCO/PBM product reviews, updates<br>9   or responses to unresolved questions<br>10   (verbal PIR post-PIR submission or<br>11   formulary dossier submission).<br>12         And I understand that's<br>13   quite a lot in one box, so let me<br>14   break it down.<br>15         I think we've discussed<br>16   that you did engage in MCO.  I think<br>17   that's Managed Care Organizations; is<br>18   that correct?<br>19   A.  Yes.<br>20   Q.  PBM, we already talked<br>21   about PBMs.<br>22         Product reviews, would that<br>23   be the type of activities that we<br>24   were discussing such as the August<br><div align="center">123</div>1   '02 meeting about Vioxx?<br>2   A.  Yes.<br>3   Q.  Okay.  And those were<br>4   activities in which you engaged as a<br>5   Regional Medical Director?<br>6   A.  Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 123:20 to 124:24)<br><div align="center">123</div>20   Q.  Okay.  How about a<br>21   formulary dossier submission; do you<br>22   know what that's referring to?<br>23   A.  Yes.<br>24   Q.  Okay.  What is your<br><div align="center">124</div>1   understanding of what a formulary<br>2   dossier submission is?<br>3   A.  My understanding as a<br>4   medical director was there is a<br>5   dossier that followed the AMCP,<br>6   Association of Managed Care<br>7   Pharmacists.  They put out a paper<br>8   saying we would like to collect<br>9   similar types of information from<br>10   manufacturers in an organized,<br>11   succinct, and consistent way.<br>12         So the dossier -- when I<br>13   hear dossier, I think AMCP dossier,<br>14   and that would be sent out in<br>15   response to a request from an MCO or<br>16   a PBM, which was a very comprehensive | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 17 overview.<br>18    Q.  Did you participate in the<br>19 preparation of an AMCP dossier for<br>20 Provider Synergies?<br>21    A.  No.<br>22    Q.  Okay.  Do you know whether<br>23 Provider Synergies requested an AMCP<br>24 dossier? | | |
| EDWARDS, M.D., KERRY I., (Page 125:1 to 125:1)<br>125<br>1  A.  No. | | |
| EDWARDS, M.D., KERRY I., (Page 125:8 to 125:9)<br>125<br>8  THE WITNESS:  No.  That<br>9  request would not come through me. | | |
| EDWARDS, M.D., KERRY I., (Page 126:2 to 126:7)<br>126<br>2   Q.  Then the next box says,<br>3  Target audience, medical directors<br>4  and pharmacy directors.<br>5        Is that referring, do you<br>6  believe, to individuals within the<br>7  Managed Care organization or PBM? | | |
| EDWARDS, M.D., KERRY I., (Page 126:10 to 126:11)<br>126<br>10   THE WITNESS:  Yes.  But,<br>11   again, I did not write this. | | |
| EDWARDS, M.D., KERRY I., (Pages 126:13 to 127:8)<br>126<br>13   Q.  Okay.  And then it says<br>14  there's an objective to provide<br>15  additional medical and scientific<br>16  information to directors.<br>17        Does that correspond with<br>18  what you understood the objective of<br>19  your position as Regional Medical<br>20  Director in providing product reviews<br>21  to PBMs would have been?<br>22    A.   Again, I didn't write this<br>23  characterization around this scope of<br>24  this activity.<br>127<br>1    Q.  But regardless of whether<br>2  you wrote it, does that seem to be an<br>3  accurate portrayal of what you<br>4  understood your objectives to be as a<br>5  Regional Medical Director in<br>6  providing information -- I'm sorry --<br>7  in providing product reviews to<br>8  Managed Care organizations and PBMs? | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| EDWARDS, M.D., KERRY I., (Page 127:11 to 127:12)<br>127<br>11   THE WITNESS:  I would not<br>12   have chosen the word "additional." | | |
| EDWARDS, M.D., KERRY I., (Page 127:14 to 127:17)<br>127<br>14  Q.  I see.<br>15      A.  In my role as an RMD, I<br>16  provided credible, balanced medical<br>17   and scientific information. | | |
| EDWARDS, M.D., KERRY I., (Page 128:10 to 128:18)<br>128<br>10   Q.  Next is state Medicaid,<br>11  meet with state Medicaid P&T<br>12  Committee members, and then P&T<br>13  presentations.<br>14          As I understand it, with<br>15  respect to the state of Louisiana,<br>16  you did that on one occasion.<br>17      A.  I attended one Louisiana<br>18  Medicaid P&T Committee meeting. | | |
| EDWARDS, M.D., KERRY I., (Pages 128:19 to 129:4)<br>128<br>19   Q.  Did you ever have any<br>20  meetings with Louisiana Medicaid<br>21  state P&T Committee members outside<br>22  of the P&T Committee meeting that you<br>23  participated in -- I'm sorry -- that<br>24  you attended?<br>129<br>1      A.  That I attended the<br>2  meeting.  And, no, I did not have any<br>3  contact with any state of Louisiana<br>4  P&T Committee members. | | |
| EDWARDS, M.D., KERRY I., (Page 129:5 to 129:12)<br>129<br>5   Q.  Okay.  Did you have contact<br>6  -- I don't want to get into any of<br>7  the details, I'm just wondering as a<br>8  general proposition, did you have<br>9  contact as an RMD with state Medicaid<br>10  P&T Committee members for other<br>11  states, for the states that you had<br>12  responsibility for? | | |
| EDWARDS, M.D., KERRY I., (Page 129:17 to 129:19)<br>129<br>17  actually outside of formal P&T<br>18  Committee meetings.<br>19          THE WITNESS:  Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 132:1 to 132:7) | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 132<br>1  Q.  Dropping down, EPI support<br>2  (liaison work, speaker<br>3  training/coaching, target audience<br>4  physicians speaking from Merck).<br>5        Did you have any<br>6  responsibility or role in that sort<br>7  of activity? | | |
| EDWARDS, M.D., KERRY I., (Page 132:17 to 132:21)<br>132<br>17   THE WITNESS: Yes.<br>18  BY MR. MURRAY:<br>19    Q.  You worked with speakers<br>20  for Merck in helping to train them<br>21  and coach them? | | |
| EDWARDS, M.D., KERRY I., (Pages 132:24 to 133:2)<br>132<br>24    THE WITNESS: I<br>133<br>1  participated as a speaker at a<br>2  speaker training meeting. | | |
| EDWARDS, M.D., KERRY I., (Page 133:4 to 133:10)<br>133<br>4  Q.  Okay.  Did that have any --<br>5  do you know whether any of the<br>6  speakers who were trained gave any<br>7  presentations in the state of<br>8  Louisiana?<br>9    A.  I have no knowledge of<br>10  that. | | |
| EDWARDS, M.D., KERRY I., (Page 134:10 to 134:21)<br>134<br>10   Q.  Okay.  This next activity<br>11  where it says, e-health seminars<br>12  (liaison work), do you know what<br>13  e-health seminars might be referring<br>14  to there?<br>15   A.  Yes.<br>16    Q.  Okay.  What's an e-health<br>17  seminar as that term was used at<br>18  Merck when you were Regional --<br>19  actually, let me narrow it down to<br>20  1999 to 2004, if that term was used<br>21  at Merck at that time? | | |
| EDWARDS, M.D., KERRY I., (Pages 135:8 to 136:21)<br>135<br>8   A.  e-health seminars were<br>9  Web-based educational Merck speaker<br>10  programs.<br>11     Q.  And just so I understand, | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 12  there would be a speaker -- in other<br>13  words, it wasn't just a slide show<br>14  that someone would click onto, they<br>15  were actually Web-based speaker<br>16  programs with a live speaker?<br>17          I mean, he may be recorded,<br>18  but you know what I mean, a person<br>19  speaking as opposed to just a slide<br>20  that a doctor could go through on the<br>21  Web?<br>22     A.  Yes, that's correct.<br>23     Q.  Okay.  Did you have any<br>24  involvement in training speakers or<br>                            136<br>1  coaching speakers for those Web-based<br>2  seminars?<br>3     A.  Yes.<br>4     Q.  Okay.  Would that have been<br>5  the same two instances that we've<br>6  previously discussed?<br>7     A.  No.<br>8     Q.  Okay.  That was something<br>9  different?<br>10     A.  Yes.<br>11     Q.  Okay.  And what occasions<br>12  did you train speakers for Web-based<br>13  seminars?<br>14     A.  The second bullet there,<br>15  moderate programs.<br>16     Q.  Okay.  You moderated a<br>17  Web-based program?<br>18     A.  Multiple programs.<br>19     Q.  Did any of them involve<br>20  Vioxx?<br>21     A.  Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 138:7 to 138:13)<br>                            138<br>7  Q.  Were there written<br>8  materials either in the form of<br>9  things that could be downloaded or in<br>10  PowerPoints that were used during the<br>11  seminars in these e-health seminars<br>12  that you moderated, that dealt with<br>13  Vioxx? | | |
| EDWARDS, M.D., KERRY I., (Pages 139:5 to 140:15)<br>                            139<br>5  A.  My understanding and in my<br>6  experience in moderating these<br>7  programs, they were Web-based<br>8  programs only.  They were driven | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 9  through a third-party vendor, the Web<br>10  site.<br>11       The speaker had the control<br>12  to move from slide to slide.  And<br>13  there was no opportunity for an<br>14  audience member who might be sitting<br>15  in his or her office to print a<br>16  slide, download a slide.<br>17       And the only situation<br>18  where I'm aware where written<br>19  material may have been given is<br>20  sometimes these were during the day<br>21  and people were in an office setting.<br>22  And a Merck representative might be<br>23  there.  And they were asked to give<br>24  them the product circular --<br><br>                140<br>1    Q.  I see.<br>2    A.  -- for whatever product was<br>3  being discussed.<br>4    Q.  I see.<br>5       In terms of the slides that<br>6  the speaker might have used, were<br>7  those prepared by Merck?<br>8    A.  Yes.<br>9    Q.  And were these e-health<br>10  seminars limited, at least the ones<br>11  that you participated in, were they<br>12  limited to certain regions or could<br>13  people download them from all over<br>14  the country?<br>15    A.  They were not limited. | | |
| EDWARDS, M.D., KERRY I., (Pages 140:21 to 141:14)<br>                140<br>21  Q.  This final box here in<br>22  Activities of Regional Medical<br>23  Directors, Advocate development,<br>24  discuss clinical, scientific points<br><br>                141<br>1  of view regarding a therapeutic area.<br>2       Did you ever use the term<br>3  "advocate development" in your role<br>4  as a Regional Medical Director?<br>5    A.  No, not that I recall.<br>6    Q.  Did you ever hear that term<br>7  used -- I'm sorry, I didn't mean to<br>8  cut you off.<br>9    A.  I said no, I do not recall. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 10  But, yes, I have heard that term<br>11  used.<br>12    Q.  Okay.  Do you know what it<br>13  was referring to in the instances<br>14  where you've heard the term used? | | |
| EDWARDS, M.D., KERRY I., (Page 141:17 to 141:24)<br>                              141<br>17  THE WITNESS:  I heard it<br>18  used in several context.  I know in<br>19  my experience, I was an advocate<br>20  prior to coming to Merck.  And my<br>21  understanding of what it meant to me<br>22  to be an advocate for Merck is the<br>23  exact view I took when I joined the<br>24  company. | | |
| EDWARDS, M.D., KERRY I., (Page 142:2 to 142:11)<br>                              142<br>2  Q.  Okay.  And what view was<br>3  that?<br>4    A.  My role of advocacy was<br>5  really around education, providing<br>6  balanced clinical and scientific<br>7  information in an attempt to educate<br>8  physicians and other healthcare<br>9  providers around the most up to date,<br>10  the latest, in an attempt to improve<br>11  patient care. | | |
| EDWARDS, M.D., KERRY I., (Page 144:3 to 144:5)<br>                              144<br>3  Q.  Okay.  If I can get you to<br>4  turn to the next page.<br>5    A.  533? | | |
| EDWARDS, M.D., KERRY I., (Pages 144:8 to 145:5)<br>                              144<br>8  Q.  You see here, External<br>9  noncommercial activities.  MEDSA/MRL<br>10  support.<br>11      Do you know what those<br>12  acronyms are referring to?<br>13    A.  Yes.<br>14    Q.  Okay.  And what is MEDSA?<br>15    A.  Medical Scientific Affairs.<br>16    Q.  Okay.  Is that when we<br>17  talked about Medical Affairs before?<br>18    A.  Yes.<br>19    Q.  And then MRL, is that Merck<br>20  Research Labs?<br>21    A.  Yes.<br>22    Q.  Okay.  Was that -- did you<br>23  provide support -- in your role as | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 24   Regional Medical Director, and I'll<br><br>145<br>1  limit it to the time 19 -- actually,<br>2  limit it to prior to 2004.<br>3        Since coming into the<br>4  company through 2004, did you support<br>5  activities of MEDSA or MRL? | | |
| EDWARDS, M.D., KERRY I., (Page 145:7 to 145:7)<br>145<br>7  THE WITNESS:  Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 145:9 to 145:12)<br>145<br>9  Q.  Did you do anything to<br>10  investigate -- I'm sorry -- to<br>11  recruit investigators or train<br>12  investigators? | | |
| EDWARDS, M.D., KERRY I., (Page 145:15 to 145:19)<br>145<br>15   THE WITNESS:  In my role as<br>16  a medical director, having been a<br>17  clinical investigator for Merck and<br>18  other companies, I would identify<br>19  potential sites for Merck studies. | | |
| EDWARDS, M.D., KERRY I., (Pages 145:21 to 146:7)<br>145<br>21  Q.  Did you ever do that with<br>22  respect to Vioxx?<br>23     A.  Yes.<br>24     Q.  Okay.  And what studies did<br>146<br>1  you identify potential sites for<br>2  studies with respect to Vioxx?<br>3     A.  To the best of my<br>4  recollection, the Advantage study.<br>5     Q.  Okay.  And what was your<br>6  recommendation with respect to the<br>7  Advantage study? | | |
| EDWARDS, M.D., KERRY I., (Page 146:10 to 146:14)<br>146<br>10  THE WITNESS:  I simply<br>11  provided a list of names in to MRL<br>12  but had no role in the subsequent<br>13  decision of who was chosen or who was<br>14  not chosen as a site. | | |
| EDWARDS, M.D., KERRY I., (Pages 149:18 to 150:22)<br>149<br>18   Q.  Okay.  Turning to the page<br>19  that ends in 3535.<br>20     A.  Okay. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 21     Q.   In the heading Internal<br>22   noncommercial activities, let me take<br>23   you down to the -- actually, first,<br>24   FGB support, do you know what FGB is<br><br>                                        150<br>1   referring to there?<br>2       A.   In my experience, that's a<br>3   mistype.<br>4       Q.   Oh, okay.<br>5           You think that was -- what<br>6   do you think that's --<br>7       A.   FBG.<br>8       Q.   FBG.<br>9           What was FBG?<br>10      A.   Functional Business Group.<br>11      Q.   We talked about Regional<br>12   Business Group.<br>13          How does a Functional<br>14   Business Group differ from a Regional<br>15   Business Group, if you know?<br>16      A.   At Merck, a Functional<br>17   Business Group was a marketing team.<br>18      Q.   Okay.  Dropping down to the<br>19   last box which says, Member of RBG<br>20   extended sales management team.<br>21          Do you know what that's<br>22   referring to? | | |
| EDWARDS, M.D., KERRY I., (Page 151:1 to 151:4)<br>                                        151<br>1   THE WITNESS:  Again, I<br>2   didn't write this paper.  I'm not<br>3   sure what the intent of the author<br>4   was. | | |
| EDWARDS, M.D., KERRY I., (Page 151:6 to 151:9)<br>                                        151<br>6   Q.   Okay.  Did you have any --<br>7   were you ever a member of any<br>8   Regional Business Group sales<br>9   management teams? | | |
| EDWARDS, M.D., KERRY I., (Page 151:11 to 151:14)<br>                                        151<br>11   THE WITNESS:  I<br>12   participated on occasion with the<br>13   Regional Business Group extended<br>14   teams. | | |
| EDWARDS, M.D., KERRY I., (Pages 151:16 to 152:2)<br>                                        151<br>16   Q.   Okay.  What were some of<br>17   those extended teams on which you | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 18   participated?<br>19      A.   In what time frame?<br>20      Q.   1999 to 2004.<br>21      A.   Florida region extended<br>22   team.<br>23      Q.   Okay.  And what was the<br>24   extent of your participation?<br><div align="center">152</div><br>1      A.   Attending meetings.<br>2      Q.   For what purpose? | | |
| EDWARDS, M.D., KERRY I., (Page 152:7 to 152:10)<br><div align="center">152</div><br>7   THE WITNESS:  Generally, as<br>8   I remember my role, it was to provide<br>9   the customer perspective as a<br>10   physician. | | |
| EDWARDS, M.D., KERRY I., (Page 156:8 to 156:9)<br><div align="center">156</div><br>8   (Exhibit Edwards-LA-2 was<br>9   marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 157:22 to 158:19)<br><div align="center">157</div><br>22   counsel's caveat, is, do you<br>23   recognize the document now that<br>24   you've had a chance to review it?<br><div align="center">158</div><br>1      A.   Yes.<br>2      Q.   Okay.  And what is it you<br>3   recognize the document as?<br>4      A.   A standard operating<br>5   procedure.<br>6      Q.   Okay.  And I understand<br>7   this deals with a number of issues.<br>8   I think there's probably one issue<br>9   per page?<br>10      A.   There's a total of three<br>11   issues identified.<br>12      Q.   Okay.  Oh, I see.  That's<br>13   right, because one is covered in more<br>14   detail than the other.<br>15         Were there standard<br>16   operating procedures in place such as<br>17   this for Regional Medical Directors<br>18   in the time frame 1999 to 2004?<br>19      A.   Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 158:22 to 159:8)<br><div align="center">158</div><br>22   Q.   Let me refer you to the<br>23   first standard operating procedure.<br>24   The title is RMD, use of M/L-approved | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 159<br>1  EPI decks for external customer<br>2  presentations.<br>3         Do you recall whether there<br>4  was a standard operating procedure in<br>5  place for the use of M/L-approved EPI<br>6  decks for external customer<br>7  presentations in the time frame 1999<br>8  to 2004? | | |
| EDWARDS, M.D., KERRY I., (Page 159:10 to 159:11)<br>159<br>10   THE WITNESS:  I don't<br>11   recall. | | |
| EDWARDS, M.D., KERRY I., (Page 159:13 to 159:22)<br>159<br>13   Q.  You don't recall either<br>14   way?<br>15      A.   Correct, I don't recall<br>16   whether one was present or not.<br>17      Q.   And this one says, The use<br>18   of credible, nondescriptive activity,<br>19   use of credible scientifically based<br>20   educational materials is a valuable<br>21   resource for Regional -- it says<br>22   Region Medical Directors. | | |
| EDWARDS, M.D., KERRY I., (Page 160:13 to 160:23)<br>160<br>13   Q.  It says, Current<br>14   M/L-approved EPI decks for both the<br>15   peer to peer and e-health seminar<br>16   formats provide this resource.<br>17         M/L, is that Medical/Legal?<br>18      A.  Yes.<br>19      Q.  So M/L approved, like we<br>20   discussed earlier, means that they<br>21   were approved by Medical/Legal at<br>22   headquarters.<br>23      A.  Correct.  Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 162:17 to 163:3)<br>162<br>17   Q.  Okay.  EPI decks, I guess<br>18   is that the term of art that was used<br>19   for the slide decks that you were<br>20   using at -- in your presentations?<br>21      A.   Again, with whom and what<br>22   time frame are you talking?<br>23      Q.   I'm referring to the<br>24   presentations we were discussing<br>163<br>1  earlier with Provider Synergies in | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 2  the 1999 to -- well, in your case,<br>3  2001 to 2004 time frame. | | |
| EDWARDS, M.D., KERRY I., (Page 163:6 to 163:10)<br>163<br><br>6  THE WITNESS:  I don't<br>7  recall.<br>8  BY MR. MURRAY:<br>9      Q.  Okay.  Did they call them<br>10  EPI decks, you just don't recall? | | |
| EDWARDS, M.D., KERRY I., (Page 163:12 to 163:23)<br>163<br><br>12  THE WITNESS:  The EPI decks<br>13  were speaker decks that our<br>14  contracted speakers would go out and<br>15  use.<br>16        This policy as written<br>17  describes our ability to use this<br>18  deck in external customer<br>19  presentations.  I don't remember<br>20  which specific decks I used for<br>21  Provider Synergies, so I cannot<br>22  comment did I use an EPI slide deck<br>23  for Provider Synergies' presentation. | | |
| EDWARDS, M.D., KERRY I., (Page 164:1 to 164:20)<br>164<br><br>1  Q.  Were there a body of decks<br>2  with a different name, slide decks,<br>3  you might have EPI decks and maybe<br>4  there was another kind of slide deck?<br>5  A.  Yes.<br>6  Q.  Okay.  What were some of<br>7  the different names or acronyms that<br>8  were used with the different types of<br>9  slide decks?<br>10       MR. O'DONOGHUE:  From the<br>11  1999 to 2004 time frame?<br>12       MR. MURRAY:  Yes.  Yes.<br>13  And I really want to focus on that<br>14  time frame.<br>15       MR. O'DONOGHUE:  In fact,<br>16  can we just state that all your<br>17  questions relate to 1999 to 2004,<br>18  unless you state otherwise?<br>19       MR. MURRAY:  Yes, unless I<br>20  state otherwise, yes, that's fair. | | |
| EDWARDS, M.D., KERRY I., (Page 165:3 to 165:4)<br>165<br><br>3  THE WITNESS:  I knew them<br>4  as RMD slide decks. | | |
| EDWARDS, M.D., KERRY I., (Pages 165:24 to 169:13) | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 165<br>24   Q.  If you drop down, the last<br>166<br>1   line of the -- I'm sorry -- the<br>2   process line of this standard<br>3   operating procedure template, it<br>4   says, RMD receives a request for a<br>5   customer presentation and clarifies<br>6   the specific question needing to be<br>7   addressed.<br>8        Two, RMD decides that a<br>9   specific EPI deck would be the best<br>10  resource to meet the customer need.<br>11        Three, RMD will use the<br>12  deck in its entirety.<br>13        I'm wondering, was that the<br>14  same process that would have applied<br>15  to the RMD decks that you -- as you<br>16  referred to them, that you would have<br>17  used in the presentations we<br>18  discussed earlier?<br>19   A.  The decks that were used<br>20  that were provided after<br>21  Medical/Legal approval to the RMD<br>22  team to use in customer presentations<br>23  were generally general decks,<br>24  updates, a PI deck.<br>167<br>1        Say, we had a new<br>2   indication or a new product.  In<br>3   essence, it was a product circular<br>4   deck with, in essence, sections of<br>5   the circular taken out and put on a<br>6   PowerPoint slide.<br>7   Q.  Were the decks to be used<br>8   in their entirety?<br>9   A.  Yes.<br>10   Q.  Okay.  So whatever decks<br>11  you would have used in your<br>12  presentations to Provider Synergies<br>13  you would have used in their<br>14  entirety?<br>15   A.  Absolutely.<br>16   Q.  Okay.<br>17   A.  Yes.<br>18   Q.  And I'm wondering was --<br>19  whether you recall, was there a<br>20  resource that you could go to to find<br>21  which deck you would use?<br>22   A.  As I stated previously, |  |  |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 23  they were general decks.  So say it<br>24  was a new deck around Vioxx, a new<br><div align="center">168</div>1  deck around Cozaar/Hyzaar, in this<br>2  time frame, as I said, we had two new<br>3  indications for Cozaar/Hyzaar, one on<br>4  the LIFE study and one on the RENAAL<br>5  study.<br>6         There were separate decks<br>7  for use by medical directors that<br>8  included the data, the science from<br>9  LIFE and RENAAL, from the label that<br>10  we used in our customer<br>11  presentations.<br>12     Q.  Turning to the next page,<br>13  which is RMD Managed Care Customer<br>14  Discussion Guide, and under<br>15  Description of Activity it says, RMD<br>16  is routinely engaged in scientific<br>17  and clinical discussions with Managed<br>18  Care customers, including HMO, PBM,<br>19  and Medicaid customer segments.<br>20         Due to the scope of this<br>21  activity, specific guidance was<br>22  developed to guide the RMD in his/her<br>23  discussions with Managed Care<br>24  customers.<br><div align="center">169</div>1         I understand that this<br>2  document appears to have been<br>3  generated in July of 2004.<br>4         Do you know whether there<br>5  were standard operating procedures<br>6  that were in place with respect to<br>7  RMD discussions with PBM and Medicaid<br>8  Customer Segments prior to the<br>9  implementation of this standard -- I<br>10  mean, I don't mean to assume that<br>11  this standard operating procedure was<br>12  implemented, but prior to this July<br>13  15, '04, date? | | |
| EDWARDS, M.D., KERRY I., (Page 169:15 to 169:15)<br><div align="center">169</div>15  THE WITNESS:  Yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 169:17 to 170:6)<br><div align="center">169</div>17  Q.  There was or was not?<br>18     A.  Yes, there was.<br>19     Q.  Okay.  And it references<br>20  applicable policies, field policy | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 21  letter number one, communication with<br>22  healthcare providers and other<br>23  customers, and field policy letter<br>24  number ten, professional information<br>                  170<br>1  request.<br>2     Do you know whether there<br>3  were field policy letters extant from<br>4  1999 to 2004 that covered this topic<br>5  of RMD Managed Care customer<br>6  discussions? | | |
| EDWARDS, M.D., KERRY I., (Page 170:8 to 170:9)<br>                  170<br>8  THE WITNESS:  Yes, there<br>9  was. | | |
| EDWARDS, M.D., KERRY I., (Page 171:1 to 171:2)<br>                  171<br>1  (Exhibit Edwards-LA-3 was<br>2  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 171:4 to 174:15)<br>                  171<br>4  Q.  This document is titled or<br>5  has the subject line -- the first<br>6  page of it, rather, it's not the<br>7  first page of the document but the<br>8  first document in the in globo<br>9  document, has the line Vioxx Product<br>10  (sic) Review, second review for the<br>11  year.<br>12     MR. O'DONOGHUE:  Counsel,<br>13  I'm just going to object.  You<br>14  actually misread it.  It's Vioxx<br>15  project review.<br>16     MR. MURRAY:  I'm sorry.<br>17  Thank you.<br>18     MR. O'DONOGHUE:  No<br>19  problem.<br>20  BY MR. MURRAY:<br>21    Q.  Vioxx Project Review,<br>22  second review for the year.  39<br>23  Executive Conference Room, 4th floor.<br>24     Can you explain to me what<br>                  172<br>1  this -- if you recognize the format<br>2  of this document, if not the document<br>3  itself?<br>4    A.  I don't recall seeing this<br>5  document.<br>6    Q.  Okay.  Do you recognize the<br>7  format of -- there are a number of | Page 171:12-19<br>Attorney side<br>bar | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 8  documents that, the reason I put them<br>9  together in globo, that seemed to<br>10  follow a similar format.<br>11     I'm asking whether you<br>12  recognize just that sort of format as<br>13  a -- it looks like a meeting notice<br>14  or teleconference notice?<br>15     A.  The format does not look<br>16  similar, but I believe we use Outlook<br>17  calendar for our meeting scheduling<br>18  at Merck.<br>19     Q.  Okay.  Where it says<br>20  meeting status accepted in your<br>21  Outlook -- is this -- does your<br>22  Outlook calendar have a line for<br>23  that?<br>24     A.  I don't know whose Outlook<br>                 173<br>1  calendar this was produced from.<br>2     Q.  And I believe, Dr. Edwards,<br>3  that all of these represent, at least<br>4  according to the document that I got<br>5  as to the source provided by Merck --<br>6     A.  Uh-huh.<br>7     Q.  -- was that these came<br>8  from, you know, Kerry Edwards'<br>9  custodial file or that you're<br>10  identified as the custodian of these,<br>11  so I think that these would be your<br>12  records.<br>13     A.  Okay.  Thank you for that<br>14  clarification.<br>15     Q.  So with that clarification,<br>16  is that how you recall Outlook worked<br>17  is -- do you know what the<br>18  significance of this Accepted means?<br>19     A.  If I accepted the meeting<br>20  or if my administrative assistant<br>21  accepted the meeting.<br>22     Q.  Does that mean that you<br>23  attended the meeting?<br>24     A.  No.<br>                 174<br>1     Q.  Okay.  What does that mean?<br>2     A.  It means that when the<br>3  Outlook meeting request was initially<br>4  sent through, someone clicked<br>5  accepted on the accept button for the<br>6  meeting.<br>7     Q.  Okay.  As a general policy, | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 8   would you click accepted on meetings<br>9   that you could not attend?<br>10     A.   As a general policy, no.<br>11   But there are instances where I would<br>12   accept a meeting and then have a<br>13   schedule conflict or a travel<br>14   conflict and not actually attend the<br>15   meeting. | | |
| EDWARDS, M.D., KERRY I., (Page 174:17 to 174:22)<br>174<br>17   Do you recall attending a<br>18   meeting attended by the individuals<br>19   listed here regarding a Vioxx project<br>20   review in December of 2001?<br>21     A.   I don't recall this<br>22   meeting, no. | | |
| EDWARDS, M.D., KERRY I., (Pages 174:23 to 175:7)<br>174<br>23   Q.   Okay.  Turning to the next<br>24   meeting page, this refers to a May 1,<br>175<br>1   2002, meeting which required --<br>2   attendees included yourself.  And the<br>3   subject line was RMDs and Alise<br>4   Reicin Q & A for Vioxx labeling.<br>5         Do you recall attending a<br>6   meeting with Alise Reicin to discuss<br>7   Q & A for Vioxx labeling? | | |
| EDWARDS, M.D., KERRY I., (Page 175:10 to 175:18)<br>175<br>10   THE WITNESS:  Do I remember<br>11   specifically attending this meeting?<br>12   BY MR. MURRAY:<br>13     Q.   Yes.<br>14     A.   No, I do not recall.<br>15     Q.   Do you recall attending a<br>16   meeting in mid 2000 -- early to mid<br>17   2002 where Q & As for Vioxx labeling<br>18   were discussed with Alise Reicin? | | |
| EDWARDS, M.D., KERRY I., (Pages 175:21 to 176:1)<br>175<br>21   THE WITNESS:  I remember<br>22   being at a physical face-to-face<br>23   meeting where Alise Reicin presented.<br>24   I don't remember the date, the time<br>176<br>1   when that occurred. | | |
| EDWARDS, M.D., KERRY I., (Page 176:3 to 176:11)<br>176<br>3   Q.   Okay.  Were there more than | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 4  one meeting that you attended<br>5  physically face-to-face with<br>6  Dr. Reicin?<br>7     A.  I only remember one<br>8  meeting.<br>9     Q.  Okay.  Was the subject of<br>10   that meeting her Vioxx -- her<br>11   research on Vioxx? | | |
| EDWARDS, M.D., KERRY I., (Page 176:13 to 176:15)<br>176<br>13   THE WITNESS:  There were<br>14   many topics covered during that<br>15   meeting. | | |
| EDWARDS, M.D., KERRY I., (Page 176:17 to 176:18)<br>176<br>17   Q.  Was Vioxx the focus of the<br>18   meeting? | | |
| EDWARDS, M.D., KERRY I., (Page 176:20 to 176:22)<br>176<br>20   THE WITNESS:  Vioxx was one<br>21   of the subjects that were covered<br>22   during that meeting, yes. | | |
| EDWARDS, M.D., KERRY I., (Page 180:17 to 180:23)<br>180<br>17   Q.  The question is, are these<br>18   -- like the first three documents we<br>19   looked at, do they appear to you to<br>20   be Outlook appointments and would<br>21   your answers as to the significance<br>22   of the meeting status accepted, not<br>23   accepted line, be the same -- | Lack of foundation (see 182:2-15) | |
| EDWARDS, M.D., KERRY I., (Page 181:3 to 181:5)<br>181<br>3   Q.  -- as your previous<br>4   answers?<br>5     A.  Yes. | Lack of foundation (see 182:2-15) | |
| EDWARDS, M.D., KERRY I., (Pages 183:19 to 185:9)<br>183<br>19   Q.  Maybe I can get you to turn<br>20   to just one, 1102.<br>21     A.  Yes.<br>22     Q.  You're at 1102?<br>23     A.  Yes.<br>24     Q.  And I see the required<br>184<br>1   attendees at 1102 are Michael Davis,<br>2   John Fevurly, John Earl, Mary Ogle,<br>3   Holly Jacques, and yourself.<br>4        There are a number of<br>5   others, possibly excepting John Earl, | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 6  the same group of -- I think actually<br>7  John Earl was included.  The same<br>8  group of individuals were meeting, it<br>9  appears, starting in October and<br>10  going through sometime in 2000 --<br>11  going through 2004.<br>12        I'm just wondering whether<br>13  there was a standing meeting between<br>14  yourself and that group of<br>15  individuals or a standing<br>16  teleconference between yourself and<br>17  that group of individuals during that<br>18  time frame.<br>19     A.  Point of clarification.<br>20  That's John Earl Fevurly.<br>21     Q.  Oh, I'm sorry.<br>22     A.  That's the same guy.<br>23     Q.  Okay.  Thank you for<br>24  clarifying.  So John Fevurly.<br>                185<br>1     A.  And to answer your<br>2  question, yes.<br>3     Q.  Okay.  What was that group?<br>4  Did it have a title?  Did it have a<br>5  name?<br>6     A.  Not to my knowledge.<br>7     Q.  Okay.  What was the purpose<br>8  of the standing meeting with that<br>9  group of individuals? | | |
| EDWARDS, M.D., KERRY I., (Page 185:11 to 185:16)<br>                185<br>11  THE WITNESS:  As I'd<br>12  indicated in my earlier testimony<br>13  this morning, at some point late in<br>14  2003 I became designated as the point<br>15  clinical and scientific person for<br>16  Provider Synergies. | | |
| EDWARDS, M.D., KERRY I., (Pages 185:18 to 186:2)<br>                185<br>18  Q.  Okay.<br>19     A.  So this was an opportunity<br>20  to include me on the regular ongoing<br>21  communication of these other<br>22  individuals who had responsibility at<br>23  the Provider Synergy level or at a<br>24  state, potentially, that was a -- had<br>                186<br>1  contracted services with Provider<br>2  Synergy. | | |
| EDWARDS, M.D., KERRY I., (Pages 210:24 to 211:1) | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 210<br>24  (Exhibit Edwards-LA-8 was<br>211<br>1  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Page 211:3 to 211:6)<br>211<br>3  Q.  Dr. Edwards, this appears<br>4  to be another one of these Outlook<br>5  deals, and attached to the back of it<br>6  is a slide presentation. | | |
| EDWARDS, M.D., KERRY I., (Pages 211:21 to 212:1)<br>211<br>21   Q.  You do recall seeing the<br>22  document?<br>23     A.  I do not recall seeing this<br>24  specific document, but documents like<br>212<br>1  it. | | |
| EDWARDS, M.D., KERRY I., (Pages 212:10 to 213:16)<br>212<br>10   Dr. Edwards, the first page<br>11  of the document -- rather, the<br>12  Outlook page that the document is<br>13  attached to refers to, it looks like<br>14  an event at which you were identified<br>15  as primary moderator.  It looks like<br>16  it was a speaking event with a<br>17  Dr. Stephen Lindsey, M.D.<br>18       Do you recall a speaking<br>19  event with Dr. Lindsey, Stephen<br>20  Lindsey, where you were a moderator?<br>21     A.  I do not remember this<br>22  specific event, but I remember<br>23  similar events.<br>24     Q.  Okay.  Were you a moderator<br>213<br>1  at events where Dr. Stephen Lindsey<br>2  presented?<br>3     A.  Again, I don't remember<br>4  specifically who the speakers were --<br>5     Q.  I see.<br>6     A.  -- but I did serve as a<br>7  moderator on these type of programs.<br>8     Q.  Okay.  Do you remember<br>9  serving as a moderator on a program<br>10  where the title was Managing Patients<br>11  with Osteoarthritis and Rheumatoid<br>12  Arthritis?<br>13     A.  I don't remember the<br>14  specific talk title or the topic | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 15   title, but I did provide as moderator<br>16   to these types of presentations. | | |
| EDWARDS, M.D., KERRY I. (Pages 213:17 to 214:1)<br>213<br>17   Q.   And you've had an<br>18   opportunity to review the slides.<br>19         And I want to ask,<br>20   generally, are those the types of<br>21   slides that you would have presented<br>22   at your meetings with Provider<br>23   Synergies at that time as they<br>24   pertained to the cardiovascular<br>214<br>1   issues? | | |
| EDWARDS, M.D., KERRY I. (Pages 214:5 to 215:2)<br>214<br>5   THE WITNESS:  In my<br>6   recollection as my role as a medical<br>7   director, I would not use this format<br>8   type of slide around a case study.<br>9   BY MR. MURRAY:<br>10   Q.   Okay.  Explain that.  What<br>11   do you mean "around a case study"?<br>12   A.   Case studies, in my<br>13   experience, both having been on the<br>14   receiving end of medical education<br>15   programs and providing, they're good<br>16   when you're dealing with individual<br>17   providers.  Kind of real-life<br>18   examples, the type of patients they<br>19   might see in their -- you know, his<br>20   or her practice.<br>21         The types of presentations<br>22   I would give to a group like Provider<br>23   Synergies, again, were geared more<br>24   towards high science and not<br>215<br>1   specifically focused around managing<br>2   a patient with osteoarthritis. | | |
| EDWARDS, M.D., KERRY I., (Page 215:8 to 215:19)<br>215<br>8   on the CV slides.  There were some<br>9   slides in this presentation that<br>10   discussed the CV risk associated with<br>11   Vioxx.<br>12         And I'm wondering if that<br>13   -- if those slides are the sorts of<br>14   information that was contained in the<br>15   slides that you presented to Provider<br>16   -- in your -- | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 17   A.   Sure.<br>18   Q.   -- deck slides to Provider<br>19 Synergies at that time. | | |
| EDWARDS, M.D., KERRY I., (Pages 215:24 to 216:22)<br>215<br>24  THE WITNESS:  As I stated<br>216<br> 1  previously, I do not remember the<br> 2  specific decks I used with Provider<br> 3  Synergies.<br> 4          But having reviewed the<br> 5  data on this slide set here where it<br> 6  talks about the cardiovascular risk<br> 7  profile that was demonstrated in the<br> 8  VIGOR study, that is consistent with<br> 9  the types of information that we<br>10  would share.<br>11  BY MR. MURRAY:<br>12    Q.   Okay.  As you sit here<br>13  today, you can't think of any<br>14  information that you provided that<br>15  was not contained -- and I'm talking<br>16  in your meetings with Provider<br>17  Synergies in early 2003 -- just as<br>18  you sit here today, you can't think<br>19  of any information you would have<br>20  provided that was not contained in<br>21  the cardiovascular slides in that set<br>22  we just saw? | | |
| EDWARDS, M.D., KERRY I., (Pages 217:10 to 218:19)<br>217<br>10  THE WITNESS:  What we would<br>11  share proactively as part of a<br>12  prepared slide deck would include<br>13  similar information.  I can't say for<br>14  sure it was exact.  But it pointed<br>15  out the cardiovascular profile that<br>16  was found in the VIGOR study.<br>17          Your question was would<br>18  that be all of the information that<br>19  was provided.<br>20          If, again, they had<br>21  follow-up questions, information that<br>22  wasn't in the slide, then, as I<br>23  previously responded, I would -- if<br>24  it was an off-label question, I would<br>218<br> 1  narrow the focus of the question,<br> 2  provide a response, and in cases have<br> 3  a written PIR sent, or request that a | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 4  PIR would be sent.  I didn't do the<br>5  requesting.<br>6  BY MR. MURRAY:<br>7     Q.  But at least with respect<br>8  to the information that was provided<br>9  proactively, that is to say,<br>10  information that was not provided in<br>11  response to a specific question, as<br>12  you sit here, you can't think of<br>13  information that -- with respect to<br>14  the CV issue that would have been<br>15  presented in the slide sets presented<br>16  at the Provider Synergies conferences<br>17  at the time that would have been<br>18  different from the information<br>19  contained in those slides. | | |
| EDWARDS, M.D., KERRY I., (Pages 218:24 to 219:8)<br>218<br>24  THE WITNESS:  Again,<br>219<br>1  without knowledge of the specific<br>2  decks that were used, this<br>3  information is pulled straight from<br>4  the label for Vioxx.  And it is very<br>5  consistent, as I said previously, of<br>6  the type of information that were in<br>7  all of our decks as we talk about the<br>8  use of Vioxx. | | |
| EDWARDS, M.D., KERRY I., (Page 226:7 to 226:20)<br>226<br>7  Q.  Okay.  And you personally<br>8  did not communicate with state of<br>9  Louisiana officials except to the<br>10  extent that you attended P&T meetings<br>11  -- one P&T Committee meeting;<br>12  correct?<br>13     A.  Correct.  I attended one<br>14  P&T Committee meeting, but I've had<br>15  no contact with any state officials.<br>16     Q.  And if I recall correctly,<br>17  at that meeting, while you may have<br>18  heard what they said, you did not<br>19  make any presentations or statements.<br>20     A.  Correct, I did not speak. | | |
| EDWARDS, M.D., KERRY I., (Page 231:2 to 231:3)<br>231<br>2  (Exhibit Edwards-LA-11 was<br>3  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Page 232:4 to 232:9)<br>232 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 4  Q.  Dr. Edwards, now that<br>5  you've had a chance to review the<br>6  document, do you recognize it?<br>7     A.  Yes.<br>8     Q.  Okay.  What can you tell me<br>9  about the document? | | |
| EDWARDS, M.D., KERRY I., (Page 232:16 to 232:19)<br>232<br>16   I recognize the PowerPoint<br>17  presentation.  I do not recognize<br>18  this specific e-mail saying I<br>19  received it. | | |
| EDWARDS, M.D., KERRY I., (Pages 232:24 to 233:7)<br>232<br>24   Do you recall that specific<br>233<br>1   PowerPoint, or is it like in the<br>2  previous PowerPoint that we saw where<br>3  you recalled PowerPoints of that<br>4  type?<br>5     A.  Similar.  This is very<br>6  similar to the other PowerPoint that<br>7  we just saw. | | |
| EDWARDS, M.D., KERRY I., (Page 234:5 to 234:8)<br>234<br>5  Q.  Okay.  Do you recall<br>6  receiving slide decks like this at<br>7  this time frame?<br>8     A.  Similar decks, yes. | | |
| EDWARDS, M.D., KERRY I., (Page 234:10 to 234:24)<br>234<br>10   And with respect to the<br>11  questions about the -- I had several<br>12  questions about, earlier, a similar<br>13  deck that we saw that I think was<br>14  Edwards-LA-8.<br>15          And now turning to the time<br>16  frame of this document, which appears<br>17  to be December of 2003 --<br>18     A.  Yes.<br>19     Q.  -- with respect to that<br>20  time frame, would your answers with<br>21  respect to the cardiovascular slides<br>22  from Edwards-LA-8 be the same with<br>23  respect to the cardiovascular slides<br>24  that are contained in Edwards-LA-11? | | |
| EDWARDS, M.D., KERRY I., (Pages 235:22 to 236:17)<br>235<br>22  THE WITNESS:  The -- or<br>23  similar -- and I don't know specific | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 24   -- the cardiovascular safety slides<br>                    236<br>1   which previous here and here were<br>2   lifted straight from the label for<br>3   Vioxx and were included in this E-RSP<br>4   medical education program.<br>5        So my comments would be the<br>6   same as on the previous one.<br>7   BY MR. MURRAY:<br>8     Q.   Okay.  And with respect to<br>9   information that was contained<br>10   proactively -- I'm sorry -- that was<br>11   presented proactively in the Provider<br>12   -- in whatever slides you presented<br>13   to Provider Synergies, you would<br>14   believe would be the same information<br>15   that was presented in this slide with<br>16   respect to the CV issue with respect<br>17   to this time frame of December 2003? | | |
| EDWARDS, M.D., KERRY I., (Page 237:3 to 237:9)<br>                  237<br>3   THE WITNESS:  Again, I do<br>4   not remember the specific decks I<br>5   used with Provider Synergies.  Those<br>6   decks did include similar -- I can't<br>7   say they're exact -- language about<br>8   the cardiovascular effects of Vioxx<br>9   that were found in the VIGOR trial. | | |
| EDWARDS, M.D., KERRY I., (Page 237:11 to 237:17)<br>                  237<br>11   Q.  Would you believe that the<br>12   decks were substantively similar?<br>13   That is, while the language may have<br>14   varied differently, the information<br>15   presented with respect to<br>16   cardiovascular profile would have<br>17   contained the same substance? | | |
| EDWARDS, M.D., KERRY I., (Pages 237:22 to 238:7)<br>                  237<br>22   THE WITNESS:  Again, not<br>23   remembering the specific decks that<br>24   were used, the language from the<br>                  238<br>1   label that were included in decks<br>2   such as I reviewed here, I gave many<br>3   presentations around Vioxx, and it<br>4   strikes me as very similar, being<br>5   it's just language straight from the<br>6   label on the cardiovascular safety of<br>7   Vioxx. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| EDWARDS, M.D., KERRY I., (Page 239:4 to 239:20)<br>239<br>4  Q.  Well, what you've testified<br>5  to is that you did many<br>6  presentations --<br>7     A.  Yes.<br>8     Q.  -- where all of the decks<br>9  in terms of the information that was<br>10   presented proactively with respect to<br>11   CV contained similar information,<br>12   that is, derived directly from the<br>13   label.<br>14         And my question is, were<br>15   there any presentations that you did<br>16   where you ever presented information<br>17   that was not similar --<br>18     A.  I see what you're saying.<br>19     Q.  -- and not derived from the<br>20   labeling in that instance? | | |
| EDWARDS, M.D., KERRY I., (Page 240:2 to 240:19)<br>240<br>2  THE WITNESS:  Any deck I<br>3  would use in any customer<br>4  presentation, one was approved<br>5  through the Medical/Legal process and<br>6  had all the appropriate fair balance<br>7  information.  And these decks were<br>8  updated.  I was not responsible for<br>9  any of that process of updating.<br>10         As new data, new science<br>11   evolved, or most certainly around any<br>12   label change that occurred in any<br>13   product, not just Vioxx, those decks<br>14   -- any old deck was immediately<br>15   removed, it was replaced with a new<br>16   deck, the updated information, and<br>17   those were the decks that we<br>18   continued to use as part of our<br>19   presentations. | | |
| EDWARDS, M.D., KERRY I., (Pages 240:21 to 241:1)<br>240<br>21  Q.  Did you have any<br>22  responsibility with respect to the<br>23  decks that you used for ensuring the<br>24  fairness and the balance of the<br>241<br>1  information contained in the deck? | | |
| EDWARDS, M.D., KERRY I., (Page 241:4 to 241:4)<br>241<br>4  THE WITNESS:  No. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| EDWARDS, M.D., KERRY I., (Page 241:6 to 241:7)<br>241<br>6   Q.  That function was performed<br>7   at headquarters? | | |
| EDWARDS, M.D., KERRY I., (Page 241:10 to 241:11)<br>241<br>10    THE WITNESS:  Yes, through<br>11   the Medical/Legal review process. | | |
| EDWARDS, M.D., KERRY I., (Page 241:18 to 241:19)<br>241<br>18   (Exhibit Edwards-LA-12 was<br>19   marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 242:6 to 245:1)<br>242<br>6   Q.  Do you recognize the<br>7   document?<br>8      A.  I don't recognize this<br>9   specific document, no.<br>10      Q.  Okay.  The document<br>11   purports to be a -- appears to be an<br>12   e-mail from someone named Bob Calder<br>13   to a number of other recipients,<br>14   including yourself.<br>15          Do you remember Bob Calder?<br>16   A.  Yes.<br>17      Q.   The document shows that<br>18   he's an Executive Medical Director<br>19   for the Central region.<br>20          Is that your recollection<br>21   of his title?<br>22      A.  Yes.<br>23      Q.  Okay.  What is an Executive<br>24   Medical Director as opposed to, we<br>243<br>1   talked about Regional Medical<br>2   Directors?  Is there a difference?<br>3      A.  Yes.<br>4      Q.  What's the difference?<br>5      A.  It's a matter of a<br>6   promotion.<br>7      Q.  Okay.  He's the next level<br>8   up in the hierarchy?<br>9      A.  From a senior.<br>10      Q.  Okay.<br>11      A.  Associate Medical Director,<br>12   Medical Director, Senior Medical<br>13   Director, Executive Medical Director.<br>14      Q.  Was Dr. Calder your direct<br>15   report at the time of this e-mail,<br>16   March 2004? | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 17   A.  To the best of my<br>18  recollection, no.  It was during this<br>19  time, our boss, Dr. Bill McBride, who<br>20  I referenced previously, he died two<br>21  weeks later.<br>22          On an interim basis, I was<br>23  filling in while Bill was sick, but I<br>24  had not officially -- no changes had<br><div align=right>244</div>1  taken place.  I can't say for sure<br>2  that I was -- to the best of my<br>3  knowledge, I was a peer of Bob Calder<br>4  at this time.<br>5   Q.  Okay.<br>6   A.  The date is just kind of<br>7  tricky, just knowing when Bill passed<br>8  away.<br>9   Q.  I appreciate that.<br>10          The attachment to the<br>11  document bears the title Bulletin for<br>12  Vioxx, Action Required, Obstacle<br>13  Response for Whelton Abstract at<br>14  American College of Cardiology.<br>15          Do you recognize the<br>16  attachment?<br>17   A.  I do not recognize this<br>18  specific attachment, but I do<br>19  recognize a bulletin.<br>20   Q.  Okay.  Do you recall<br>21  receiving -- or did you regularly<br>22  receive bulletins of this sort, that<br>23  is, bulletins for a product, in your<br>24  capacity as Regional Medical Director<br><div align=right>245</div>1  at that time? | | |
| EDWARDS, M.D., KERRY I., (Page 245:4 to 245:9)<br><div align=right>245</div>4   THE WITNESS:  To the best<br>5  of my recollection, we had the<br>6  opportunity to opt in on the bulletin<br>7  service.  We would sign up and click<br>8  we wanted bulletins, you know, in<br>9  these therapeutic areas. | | |
| EDWARDS, M.D., KERRY I., (Page 245:17 to 245:18)<br><div align=right>245</div>17   Did you opt in for receipt<br>18  of these bulletins? | | |
| EDWARDS, M.D., KERRY I., (Pages 245:21 to 246:4)<br><div align=right>245</div>21   THE WITNESS:  Not knowing | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 22  specific when, I can't say for sure.<br>23        Have I participated in<br>24  receiving bulletins, you know,<br><br>                       246<br>1  through opting in through Medical<br>2  Services?  Yes.  But I could not tell<br>3  you what therapeutic areas, the time<br>4  frame. | | |
| EDWARDS, M.D., KERRY I., (Page 249:16 to 249:19)<br>                      249<br>16   Q.  Did bulletins of this sort<br>17   in any way inform the responses that<br>18   you gave to unsolicited questions<br>19   about Vioxx by Provider Synergies? | | |
| EDWARDS, M.D., KERRY I., (Pages 249:22 to 250:5)<br>                      249<br>22   THE WITNESS:  Not knowing<br>23  specific questions that potentially<br>24  they raised during any of my<br><br>                      250<br>1  presentations, it would be very hard<br>2  for me to say whether a particular<br>3  bulletin, or any bulletin, for that<br>4  matter, influenced or impacted what I<br>5  said in response to a question. | | |
| EDWARDS, M.D., KERRY I., (Page 250:8 to 250:9)<br>                      250<br>8  (Exhibit Edwards-LA-13 was<br>9  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 251:23 to 252:12)<br>                      251<br>23   Q.  Doctor, let me ask you if<br>24   you recognize that document, either<br><br>                      252<br>1  the document transmitting it or the<br>2  Power Ahead slide presentation that's<br>3  attached to it.<br>4   A.  No, I do not recall seeing<br>5  this document.<br>6   Q.  You don't recall seeing<br>7  either one?<br>8   A.  No, sir.<br>9   Q.  Okay.  Do you recall seeing<br>10  documents about a promotion plan for<br>11  migraine?<br>12   A.  No, sir. | | |
| EDWARDS, M.D., KERRY I., (Pages 252:13 to 253:7)<br>                      252<br>13   Q.  Do you recall seeing any<br>14   PowerPoints or having any involvement | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 15  with any slide presentations that<br>16  dealt with use of Vioxx for treatment<br>17  of migraines?<br>18    A.  This PowerPoint<br>19  presentation?<br>20    Q.  Just any in general.  You<br>21  said something generally that you<br>22  remember seeing or coming across in<br>23  your capacity as Regional Medical<br>24  Director.<br><div align=center>253</div>1    A.  I can't say for certainty.<br>2  I know we received an indication for<br>3  the use of acute migraine, but I<br>4  can't remember specifically providing<br>5  that presentation or providing, you<br>6  know, an overview of the new<br>7  indication. | | |
| EDWARDS, M.D., KERRY I., (Page 254:4 to 254:12)<br><div align=center>254</div>4  Q.  As we sit here today, you<br>5  don't have any reason to believe that<br>6  you didn't receive this slide<br>7  presentation; is that correct?<br>8    A.  Again, I see I'm on the<br>9  distribution list, but I can't state<br>10  affirmatively that I remember<br>11  receiving this slide presentation,<br>12  no. | | |
| EDWARDS, M.D., KERRY I., (Page 254:22 to 254:23)<br><div align=center>254</div>22  (Exhibit Edwards-LA-14 was<br>23  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Page 255:1 to 255:4)<br><div align=center>255</div>1  Q.  This document appears to<br>2  have you on the distribution list; is<br>3  that correct?<br>4    A.  Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 255:8 to 255:24)<br><div align=center>255</div>8  Q.  Okay.  The document<br>9  attaches an agenda for -- and the<br>10  attachment is apparently inside the<br>11  document, although it hasn't been<br>12  printed out here -- refers to a<br>13  Louisiana Medicaid P&T Committee<br>14  meeting on May 5th.<br>15       My understanding that -- am<br>16  I correct in my understanding that | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 17  you would not have attended that<br>18  particular P&T -- Louisiana P&T<br>19  Committee meeting?<br>20     A.  That is correct, I did not<br>21  attend that.<br>22     Q.  The only one you attended<br>23  was the one in August?<br>24     A.  August of '04, correct. | | |
| EDWARDS, M.D., KERRY I., (Page 256:14 to 256:15)<br><div align="center">256</div>14  (Exhibit Edwards-LA-15 was<br>15  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 256:19 to 257:24)<br><div align="center">256</div>19  Q.  And do you recognize that<br>20  document?<br>21     A.  I do not remember<br>22  specifically seeing this e-mail.<br>23     Q.  Okay.  Do you recognize the<br>24  attachment, the PIR request?<br><div align="center">257</div>1     A.  No.<br>2     Q.  Okay.  Doctor, I'll<br>3  represent to you that this was<br>4  printed from your custodial files.<br>5        Do you have any reason to<br>6  believe that you didn't receive it?<br>7     A.  Again, I could have<br>8  received it.  I just don't remember<br>9  the specific document.<br>10     Q.   Okay.  And the attachment<br>11  to the e-mail is a PIR request,<br>12  apparently generated by -- sent by<br>13  John Fevurly in response to an<br>14  inquiry that he received from Valerie<br>15  Taylor at Provider Synergies.<br>16        And in the document<br>17  Mr. Fevurly reports that Valerie<br>18  Taylor asked him, What is Merck's<br>19  perspective on the abstract, based on<br>20  the recent ACR, published on May 6th<br>21  regarding Vioxx?<br>22        Do you recall Valerie<br>23  Taylor making inquiry as to -- an<br>24  inquiry along these lines? | | |
| EDWARDS, M.D., KERRY I., (Page 258:5 to 258:6)<br><div align="center">258</div>5  THE WITNESS:  Around that<br>6  time frame, yes. | | |
| EDWARDS, M.D., KERRY I., (Pages 258:8 to 261:2) | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
| --- | --- | --- |
| 258<br>8  Q.  Okay.  Was this one of<br>9  these instances where she asked the<br>10  question of you, you answered it, and<br>11  then a PIR was later generated?<br>12    A.  Yes.<br>13    Q.  Okay.  Did you give her a<br>14  verbal response?<br>15    A.  Yes.<br>16    Q.  Do you recall the contents<br>17  of your verbal response?<br>18    A.  My general approach with<br>19  the Solomon data was to put it in a<br>20  perspective to say it is one piece of<br>21  data.  Again, the limitations in this<br>22  case, an observational study, and<br>23  even pointing out it's a piece of<br>24  data.<br>259<br>1      And given the totality of<br>2  the information -- this is fairly<br>3  late in the '04 time frame, so we'd<br>4  had plenty of opportunities through<br>5  previous engagements to talk about<br>6  the cardiovascular safety of Vioxx<br>7  and to put it in the perspective --<br>8  it's more data, still inconclusive.<br>9      Although the results of<br>10  this study claim one thing, I do<br>11  remember one specific thing.  The<br>12  conclusion of the author was about<br>13  the increased risk or five times, I<br>14  don't -- forget the specifics of it.<br>15      However, when you actually<br>16  looked at the P values that were<br>17  calculated as part of the analysis,<br>18  it was P is .054, which didn't reach<br>19  statistical significance, but yet the<br>20  claim was there.<br>21      So it was put in the broad<br>22  context, this is more data, this is<br>23  more information.  It was not a<br>24  positive study for Merck.  Talking<br>260<br>1  about all the other information we've<br>2  reviewed, which was there were<br>3  positive studies, negative studies.<br>4  This is another piece, the totality<br>5  of the evidence.<br>6      We were continuing -- you | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 7  know, at this point we had an ongoing<br>8  study to address the issue and to<br>9  move on.<br>10    Q.  Okay.  Earlier -- I think<br>11  you answered my question with your<br>12  answer as to what she's referring to<br>13  on the recent ACR published on May<br>14  6th.<br>15        That's the Solomon study?<br>16    A.  Yes.<br>17    Q.  Okay.  Earlier in your<br>18  testimony you talked about an<br>19  instance where you provided<br>20  information to Valerie Taylor in<br>21  response to her inquiry about the<br>22  Solomon study.<br>23        You believe this is that<br>24  instance?<br><div align="center">261</div>1    A.  Correct, earlier in the<br>2  day, yes. | | |
| EDWARDS, M.D., KERRY I., (Page 261:22 to 261:23)<br><div align="center">261</div>22  (Exhibit Edwards-LA-16 was<br>23  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 262:16 to 263:8)<br><div align="center">262</div>16  Q.  Doctor, this document<br>17  appears to be another bulletin of the<br>18  sort we discussed earlier in your<br>19  testimony with reference to I believe<br>20  it was Edwards-12.<br>21        Doctor, I'll represent to<br>22  you that this document was produced<br>23  from your custodial files.<br>24        I just ask, do you have any<br><div align="center">263</div>1  reason to believe that you did not<br>2  receive the document?<br>3    A.  Again, I see that I was on<br>4  this distribution list.  The Region<br>5  Medical Directors are clearly<br>6  outlined.<br>7        But do I remember<br>8  specifically this document?  No. | | |
| EDWARDS, M.D., KERRY I., (Page 264:8 to 264:9)<br><div align="center">264</div>8  (Exhibit Edwards-LA-17 was<br>9  marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 265:17 to 267:2) | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 265<br>17  Q.  Okay.  Dr. Edwards, now<br>18  that you've had an opportunity to<br>19  review the document, do you recognize<br>20  it, either the e-mail chain preceding<br>21  the attachment or the attachment?<br>22     A.  I do not recognize the<br>23  e-mail chain.  I do recognize the<br>24  slide content.<br>266<br>1     Q.  The e-mail chain portion<br>2  of it was produced from -- I'll<br>3  represent was produced from your<br>4  custodial files.<br>5        Do you have any reason to<br>6  believe that you did not receive the<br>7  e-mail chain portion?<br>8     A.  Again, I see I'm on the<br>9  distribution list, but I don't<br>10  remember the specific e-mail.<br>11     Q.  Okay.  Turning you to the<br>12  slide portion, you said you did<br>13  recognize the slide portion.<br>14     A.  Yes.<br>15     Q.  Can you tell me where you<br>16  recognize the slide portion from?<br>17     A.  As I referenced earlier,<br>18  kind of a PI slide deck.  This is, in<br>19  my opinion, what we would call a PI<br>20  slide deck.<br>21        There were new indications,<br>22  we had an update to the label for<br>23  Vioxx, a new deck was developed with<br>24  the new information from the label<br>267<br>1   and this is what we would use from<br>2   the customer. |  |  |
| EDWARDS, M.D., KERRY I., (Page 267:7 to 267:13)<br>267<br>7   MR. O'DONOGHUE:  By "PI,"<br>8  what do you mean?<br>9        THE WITNESS:  Product<br>10  insert.  That's what we called it.<br>11  In essence, it's data just lifted<br>12  from the circular and plopped into a<br>13  slide. |  |  |
| EDWARDS, M.D., KERRY I., (Pages 267:21 to 268:15)<br>267<br>21  Q.  Doctor, the chain of<br>22  e-mails indicates that that was a |  |  |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 23   slide deck that was prepared<br>24   subsequent to the VIGOR label change;<br>268<br>1   is that correct?<br>2       A.   After the label change,<br>3   yes.<br>4       Q.   Okay.  Do you believe that<br>5   that is a slide deck that you<br>6   presented to Provider Synergies?<br>7       A.   Again, without knowing<br>8   specifically what I presented to<br>9   Provider Synergies, with the update<br>10   to the label around the rheumatoid<br>11   arthritis indication as well as the<br>12   VIGOR data, it is likely that I did<br>13   present this deck to Provider<br>14   Synergies, but I do not remember<br>15   specifically. | | |
| EDWARDS, M.D., KERRY I., (Page 269:5 to 269:6)<br>269<br>5   (Exhibit Edwards-LA-18 was<br>6   marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 269:20 to 270:4)<br>269<br>20   Q.   Okay.  Do you recognize the<br>21   document, either the transmitting<br>22   e-mail or the attachment?<br>23       A.   I do not recognize the<br>24   transmitting document, but I do<br>270<br>1   recognize the attachment.<br>2       Q.   Okay.  What is the<br>3   attachment?<br>4       A.   It is a PIR. | | |
| EDWARDS, M.D., KERRY I., (Pages 272:21 to 273:3)<br>272<br>21   Q.   And, Doctor, do you have<br>22   any reason to believe that this<br>23   document, which I'll purport to you<br>24   is produced from your custodial<br>273<br>1   files, do you have any reason to<br>2   believe that you didn't receive it?<br>3       A.   No. | | |
| EDWARDS, M.D., KERRY I., (Page 273:11 to 273:12)<br>273<br>11   (Exhibit Edwards-LA-19 was<br>12   marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 274:6 to 276:10)<br>274 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 6   Q.  Okay.  I see that you were<br>7  copied on the transmitting e-mail.<br>8  The subject line, Urgent Request:<br>9  PIR-Vioxx (Provider Synergies.doc).<br>10        Doctor, do you have any<br>11  reason to believe that you were not<br>12  copied on that document?<br>13      A.  I see my name on the cc<br>14  list, but I do not remember receiving<br>15  this document.<br>16      Q.  Okay.  The attachment<br>17  appears to be a PIR request generated<br>18  by a request from Valerie Taylor to<br>19  Michael -- a person named Michael,<br>20  and I'm trying to see if on the<br>21  document there's a -- it looks like<br>22  -- oh, yes, name of Merck person<br>23  received the unsolicited request was<br>24  Michael Davis.<br><div align="right">275</div>1       Do you recall working with<br>2  Michael Davis with respect to the<br>3  Provider Synergies account?<br>4      A.  Yes.<br>5      Q.  Okay.  And in this PIR it<br>6  appears that Valerie Taylor writes to<br>7  Michael Davis -- PIR request,<br>8  rather -- Michael, Provider Synergies<br>9  would be interested in hearing<br>10  Merck's take on the latest<br>11  information published in the Wall<br>12  Street Journal about Vioxx.  We would<br>13  like to hear how the study was<br>14  conducted and how that affects the<br>15  results.  We are also interested in<br>16  any information you can provide us<br>17  that is not published about the<br>18  study.  Do you have any in-house data<br>19  that would refute this study's<br>20  results?<br>21        Doctor, you recall Valerie<br>22  Taylor making an inquiry of this<br>23  nature?<br>24      A.  No.<br><div align="right">276</div>1      Q.  Okay.  Do you recall being<br>2  involved in Merck's response, if any,<br>3  to this particular inquiry?<br>4      A.  No.<br>5      Q.  And, as I understand it, | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 6   since this is a formal PIR request,<br>7   this would have gone to Medical<br>8   Services to be the party to respond<br>9   to it; correct?<br>10     A.  Yes. | | |
| EDWARDS, M.D., KERRY I., (Page 276:23 to 276:24)<br>276<br><br>23   (Exhibit Edwards-LA-20 was<br>24   marked for identification.) | | |
| EDWARDS, M.D., KERRY I., (Pages 277:18 to 280:20)<br>277<br><br>18   Q.  Doctor, do you recognize<br>19   the document?<br>20     A.  Yes.<br>21     Q.  Okay.  Is that a document<br>22   that you drafted?<br>23     A.  I prepared the document,<br>24   yes.<br>278<br>1     Q.  Okay.  And what was the<br>2   purpose of your preparing the<br>3   document?<br>4     A.  At this point in time in my<br>5   career at Merck, I headed up the<br>6   entire Medical Director program.<br>7         As I had indicated, Bill<br>8   McBride passed away in April of this<br>9   year, and then I took over<br>10   responsibilities as the program<br>11   manager.<br>12     Q.  And for clarity's sake,<br>13   when you say "April of this year,"<br>14   from April of 2004?<br>15     A.  I'm sorry.  Yes.<br>16     Q.  Okay, the time of this<br>17   document?<br>18     A.  Yes, at the time of Bill's<br>19   death, I took over.<br>20         So this was a year-end<br>21   summary of the RMD activities for<br>22   2004.<br>23     Q.  You write -- I turn you to<br>24   the second page of the document under<br>279<br>1   Roman numeral I, Overall Activity<br>2   Summary.<br>3         You write under Roman<br>4   numeral I, the last sentence, This<br>5   should be used only for gross<br>6   directional purpose, but clearly | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 7   shows that the majority of our RMD<br>8   support is for that of the USHH<br>9   Managed Care sales organization,<br>10   including HMO/PBM and Medicaid<br>11   Customer Segments.<br>12         Did I read that correctly,<br>13   sir?<br>14     A.   Yes.<br>15     Q.   What did you mean by "RMD<br>16   support" as used in that sentence?<br>17     A.   The role of the medical<br>18   director, again, was to perform<br>19   balanced clinical and scientific<br>20   information to our customers.<br>21         So I was just indicating at<br>22   this time that the majority of that<br>23   balanced clinical, scientific<br>24   information provision was done so in<br>                      280<br>1   the Managed Care setting.<br>2     Q.   So most of the information<br>3   being presented by RMDs was being<br>4   presented to persons in the Managed<br>5   Care segment.<br>6     A.   Yes.  And you can see by<br>7   the tallies and the totals.  Although<br>8   I did note there's variability in how<br>9   people coded an interaction.<br>10     Q.   And then here, 32 percent<br>11   of the RMD activities were in support<br>12   of Vioxx.<br>13         What was the basis for that<br>14   information?  Was that the<br>15   self-reporting of RMDs?<br>16     A.   Yes.<br>17     Q.   So according to the self<br>18   reports of Regional Medical<br>19   Directors, they spent 32 percent of<br>20   their time working with Vioxx? | | |
| EDWARDS, M.D., KERRY I., (Pages 280:24 to 281:4)<br>                 280<br>24   THE WITNESS:  This purely<br>                 281<br>1   was lifted off an Excel spreadsheet,<br>2   a total number of activities divided<br>3   by those that supported the Vioxx<br>4   area. | | |
| EDWARDS, M.D., KERRY I., (Page 281:6 to 281:7)<br>                 281<br>6   Q.   Okay. | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 7    A.  And it was a calculation. | | |
| EDWARDS, M.D., KERRY I., (Page 281:11 to 281:13)<br>281<br>11   Q.  And, Doctor, turning you to<br>12   the state Medicaid support portion of<br>13   the document. | | |
| EDWARDS, M.D., KERRY I., (Page 281:16 to 281:17)<br>281<br>16   MR. MURRAY:  Starting at<br>17   1125. | | |
| EDWARDS, M.D., KERRY I., (Pages 281:20 to 283:5)<br>281<br>20   Q.  Doctor, I just wanted to<br>21   ask you, in the column there starting<br>22   at 1125 and then there's another at<br>23   1126 and another at 1127, some<br>24   tables, and I see there's a column,<br>282<br>1   it says number RMD unique contacts.<br>2        What is that referring to?<br>3     A.   Again, information taken<br>4   from the activity summaries that the<br>5   medical directors -- this was -- a<br>6   number of unique contacts could be a<br>7   face-to-face visit, a significant<br>8   phone call.  That was what was<br>9   counted as a unique contact.<br>10     Q.   Okay.  So unique contact<br>11   entailed either a face-to-face visit<br>12   or a phone call.<br>13        Anything else?<br>14     A.   Generally that was it.<br>15     Q.   Okay.  Did attending P&T<br>16   Committee meetings count as a unique<br>17   contact if no presentation was made?<br>18     A.   Yes.<br>19     Q.   Oh, it did count?  Okay.<br>20     A.   Yes.<br>21     Q.   And I see -- this is<br>22   limited, though, to the year 2004; is<br>23   that correct?<br>24     A.   Yes.<br>283<br>1     Q.   Okay.  So in the year 2004,<br>2   I see at 1126 for the state of<br>3   Louisiana, the RMDs on their<br>4   reporting sheets reported two unique<br>5   contacts? | | |
| EDWARDS, M.D., KERRY I., (Pages 284:15 to 285:11)<br>284 | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
| --- | --- | --- |

15   Q.   So that's indicating that
16   the Regional Medical Directors --
17   director or directors -- who had
18   contact with Louisiana self reported
19   that they had two, quote, unique
20   contacts, closed quote.
21     A.   Yes.
22     Q.   Turning to the next page,
23   which is 1127, there are PBMs listed,
24   and it indicates that the PBM

           285

1   Provider Synergies, there were six
2   RMD unique contacts.
3          And here there's another
4   column after that, RMD point.  And
5   for Provider Synergies it lists you,
6   Kerry Edwards.
7          Are all six of those
8   contacts -- were all six of those
9   made by you?
10     A.   To the best of my
11   recollection, yes.

---

**EDWARDS, M.D., KERRY I., (Page 285:12 to 285:15)**
           285

12   Q.   Okay.  Do the two for
13   Louisiana count in the six for
14   Provider Synergies?
15     A.   They could.

| | Speculation | overruled |
| --- | --- | --- |

---

EDWARDS, M.D., KERRY I., (Pages 286:18 to 287:23)
           286

18   Q.   Okay.  Turning you to the
19   last page, the document writes,
20   Several SOPs were developed during
21   the early part of 2004 to provide
22   direction and guidance to our team
23   for the major areas of activities.
24          Were you referring to

           287

1   standard operating procedures?
2     A.   Yes.
3     Q.   Okay.  And I think we saw a
4   document that was dated July of 2004
5   earlier that outlined some standard
6   operating procedures?
7     A.   I'm not clear on the date.
8   I'd have to go back and check.  I
9   know it was in the footer.
10     Q.   Yes, sir.  I think it's --
11   I think the document we discussed
12   earlier was Edwards-2 --

Note: Plaintiffs original affirmative designation included a typographical error designating 286:18-281:23 instead of 286:18-287:23- please see corrected designation

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 13     A.   It's down there.<br>14     Q.   -- and the footer indicates<br>15  07/15/04.  July 15, '04.<br>16         Do you know if those are<br>17  the SOPs to which this document is<br>18  referring?<br>19     A.   Yes.<br>20     Q.   Okay.  Does this refresh<br>21  your recollection as to whether there<br>22  were SOPs in place prior to early<br>23  2004? | | |
| EDWARDS, M.D., KERRY I., (Page 288:2 to 288:10)<br>288<br>2  THE WITNESS:  There were<br>3  policy letters in place prior to<br>4  these that guided the activities of<br>5  the Region Medical Director program.<br>6  BY MR. MURRAY:<br>7     Q.   So there were policy<br>8  letters, but there weren't documents<br>9  that bore the title SOP prior to<br>10  2004? | | |
| EDWARDS, M.D., KERRY I., (Page 288:14 to 288:15)<br>288<br>14   THE WITNESS:  Not to my<br>15  recollection, no. | | |
| EDWARDS, M.D., KERRY I., (Pages 288:23 to 289:22)<br>288<br>23   Q.   Doctor, turning you to the<br>24  PIR request --<br>289<br>1        MR. O'DONOGHUE:  Which is,<br>2  again, Exhibit Edwards-LA-19.<br>3  BY MR. MURRAY:<br>4     Q.   -- and referring to the<br>5  page that ends in Bates number 50573.<br>6        Doctor, Valerie Taylor<br>7  writes in her e-mail letter to<br>8  Michael Davis, How can we continue to<br>9  recommend Vioxx as a preferred drug<br>10  in light of this information?<br>11       Doctor, did you ever hear<br>12  -- you talked about many occasions<br>13  when Valerie Taylor asked you about<br>14  cardiovascular implications with<br>15  respect to Vioxx.<br>16       Did she ever express that<br>17  sentiment in her conversations with<br>18  you, or phrase a question in that<br>19  way, which is to the effect of her | Page 289:4-22<br>Hearsay | *Overruled* |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 20  having concerns about the ability to<br>21  recommend Vioxx as a preferred drug<br>22  in light of cardiovascular concerns? | | |
| EDWARDS, M.D., KERRY I., (Page 290:2 to 290:8)<br>290<br><br>2  THE WITNESS:  Not specific<br>3  as you have it stated.<br>4  BY MR. MURRAY:<br>5    Q.  Okay.  Was that a concern<br>6  that she ever expressed to you, the<br>7  ability to recommend Vioxx as a<br>8  preferred drug? | Hearsay | *overruled* |
| EDWARDS, M.D., KERRY I., (Page 290:11 to 290:13)<br>290<br><br>11   THE WITNESS:  No.  Her<br>12  concern was around the overall<br>13  cardiovascular safety of the drug. | Hearsay | |
| EDWARDS, M.D., KERRY I., (Pages 290:20 to 291:13)<br>290<br><br>20   Q.  – I just have a few quick<br>21  questions for you.<br>22        Have you, yourself, ever<br>23  used Vioxx?<br>24   A.  Yes.<br>291<br>1   Q.  Has any member of your<br>2  family ever used Vioxx?<br>3   A.  Yes.<br>4   Q.  Who?<br>5   A.  My wife.<br>6   Q.  Any other members of your<br>7  family used Vioxx?<br>8   A.  My oldest daughter.<br>9   Q.  And earlier today you<br>10  referred to your time before joining<br>11  Merck that you acted as an advocate.<br>12        What does the term<br>13  "advocate" mean? | Relevance –<br>MIL Ruling | |
| EDWARDS, M.D., KERRY I., (Pages 291:19 to 292:10)<br>291<br><br>19   THE WITNESS:  Again, an<br>20  advocate, in my mind, as I viewed my<br>21  role as an advocate prior to coming<br>22  to Merck and then in my interactions<br>23  as a Region Medical Director with<br>24  advocates, was clinicians who were<br>292<br>1  interested in science, who enjoyed<br>2  teaching, enjoyed sharing their<br>3  information, either from medical | | |

| PLAINTIFFS AFFIRMATION DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 4    clinical experience, based upon<br>5    knowledge in specific therapeutic<br>6    areas to portend that knowledge and<br>7    try and convey it to a broader<br>8    audience.  That's what I saw an<br>9    advocate.  That's, again, how I<br>10   viewed myself. | | |
| End | | |