**WARREN LAMBERT, DEPOSITION OF 12/18/09**

| PLAINTIFFS AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Defendant's Counter Designations are highlighted. Plaintiffs Affirmative Designations are not. **12/18/09 Deposition** | | |
| LAMBERT, WARREN J., (Pages 6:13 to 7:2)<br>6<br>15   Q.  Could you please state your<br>16  full name for the record?<br>17   A.  Yes.  Warren Jerome<br>18  Lambert.<br>19   Q.  And what is your business<br>20  address, sir?<br>21   A.  My business address is 5174<br>22  McGinnis Ferry, Alpharetta, Georgia<br>23  30005.<br>24   Q.  And who is your current<br>7<br>1  employer?<br>2   A.  Merck & Company. | | |
| LAMBERT, WARREN J., (Pages 9:12 to 10:1)<br>9<br>12   Q.  Sir, what did you do to<br>13  prepare for -- if anything, to<br>14  prepare for this deposition?<br>15   A.  I just met with counsel.<br>16   Q.  Okay.  You didn't do any<br>17  research on your own on the outside<br>18  or anything like that?<br>19   A.  No, sir.<br>20   Q.  Okay.  How many meetings<br>21  did you have with counsel?<br>22   A.  In the last two and a half<br>23  days, three days.<br>24   Q.  Okay.<br>10<br>1   A.  Including today. | Irrelevant | *overruled* |
| LAMBERT, WARREN J., (Page 10:5 to 10:13)<br>10<br>5   Q.  Okay.  How long were -- how<br>6  many meetings did you have?<br>7   A.  Well, yesterday and the day<br>8  before.<br>9   Q.  All right.  And were they<br>10  both full-day meetings? | Irrelevant | |

| | | |
|---|---|---|
| 11    A.  I can't recall the exact<br>12  amount of time, but I would say<br>13  close, yes. | | |
| LAMBERT, WARREN J., (Page 11:12 to 11:22)<br>11<br>12  Q.  Did you have an attorney<br>13  present?<br>14    A.  Yes, sir.<br>15    Q.  And who was your attorney?<br>16    A.  Peter Gelhaar.<br>17    Q.  And was Mr. Gelhaar -- am I<br>18  pronouncing that correctly?<br>19    A.  I believe so.<br>20    Q.  Okay.  Were Mr. Gelhaar's<br>21  services retained by Merck for you?<br>22    A.  Yes, sir. | Irrelevant | |
| LAMBERT, WARREN J., (Page 12:3 to 12:9)<br>12<br>3   Q.  Okay.  I don't want to know<br>4   anything that your attorneys told<br>5   you, but I do want to know whether<br>6   you reviewed any documents that<br>7   refreshed your recollection about the<br>8   matters that we're going to be<br>9   talking about today. | Irrelevant | |
| LAMBERT, WARREN J., (Pages 12:24 to 13:1)<br>12<br>24    THE WITNESS:  They did not<br>13<br>1  refresh my recollection. | Irrelevant | |
| LAMBERT, WARREN J., (Page 13:3 to 13:6)<br>13<br>3   Q.  Okay.  You reviewed<br>4   documents, but they did not refresh<br>5   your recollection?<br>6    A.  Yes, sir. | Irrelevant | |
| LAMBERT, WARREN J., (Page 15:14 to 15:16)<br>15<br>14  MR. SALES:  Do you know how<br>15  many documents were reviewed?<br>16    THE WITNESS:  No, sir. | Irrelevant | |
| LAMBERT, WARREN J., (Page 15:18 to 15:18)<br>15<br>18  Q.  Can you give it a ballpark? | Irrelevant | |
| LAMBERT, WARREN J., (Page 15:21 to 15:21)<br>15 | Irrelevant | |

| | | |
|---|---|---|
| 21   THE WITNESS:  No, sir. | | |
| LAMBERT, WARREN J., (Pages 15:23 to 16:2)<br><br>                                                      15<br>23   Q.   You reviewed documents, but<br>24   you have no idea how many you<br>                                                      16<br>1   reviewed, whether it was one or a<br>2   hundred or somewhere between the two? | Irrelevant | |
| LAMBERT, WARREN J., (Page 16:5 to 16:5)<br>                                                      16<br>5   THE WITNESS:  No, sir. | Irrelevant | |
| LAMBERT, WARREN J., (Pages 16:11 to 17:5)<br>                                                      16<br>11   Sir, what's your<br>12   educational background?<br>13      A.   I have a Bachelor's and a<br>14   Master's from Penn State.<br>15      Q.   Okay.  What years did you<br>16   -- what year did you get your<br>17   Bachelor's?<br>18      A.   1983.<br>19      Q.   Okay.  What was your<br>20   Bachelor's in?<br>21      A.   In general arts and<br>22   sciences.<br>23      Q.   And what is your Master's<br>24   in, sir?<br>                                                      17<br>1      A.   Marketing and information<br>2   systems.<br>3      Q.   And when did you retain<br>4   that?<br>5      A.   1986. | | |
| LAMBERT, WARREN J., (Pages 17:23 to 19:11)<br>                                                      17<br>23   Q.   What was your first job<br>24   after you retained your Master's?<br>                                                      18<br>1      A.   With Merck & Company.<br>2      Q.   Okay.  Were you recruited<br>3   from business school?<br>4      A.   Yes, sir.<br>5      Q.   And what was your first<br>6   position at Merck & Company?<br>7      A.   A sales representative.<br>8      Q.   That was the title, sales | | |

9   representative?
10     A.   Professional
11   representative, I believe was the
12   title.
13     Q.   Okay.  Were you in the --
14   in that job, what was the primary
15   focus of what you were doing there?
16     A.   The primary focus of the
17   job is to call on doctors and
18   communicate information that's in
19   alignment with the company's policies
20   and label.
21     Q.   Okay.  In the time frame of
22   1999 to 2004, which is the area that
23   we'll be focusing on mostly in this
24   deposition, I've seen use of the term

                              19

1   "OBR."
2     A.   Yes.
3     Q.   I think it stands for
4   office-based representative; is that
5   correct?
6     A.   I believe so, sir.
7     Q.   Okay.  Is the OBR position
8   essentially the same as the
9   professional representative position
10   that you held?
11     A.   Yes, sir.

**LAMBERT, WARREN J., (Pages 21:15 to 22:19)**

                              21

15   Q.   Okay.  And then your next
16   position was marketing analyst; is
17   that correct?
18     A.   After the sales rep
19   position, yes.
20     Q.   Yes, sir.
21     A.   Yes, sir.
22     Q.   And what year did you go
23   into the marketing analyst position,
24   roughly?

                              22

1     A.   I think about 1988.
2     Q.   Were you still in the
3   Allegheny region?
4     A.   No, sir.  That was a
5   headquarters position.

4

| | | |
|---|---|---|
| 6    Q.   Okay.  What did you do as a<br>7   marketing analyst?<br>8      A.   My role was to analyze data<br>9   for therapeutic areas and provide<br>10   that to the marketing team to make<br>11   decisions about resource allocation.<br>12   Q.   Okay.  Did you or were you<br>13   involved in making sales forecast as<br>14   a marketing analyst?<br>15   A.   No, sir.<br>16   Q.   Okay.  So the focus was<br>17   more on existing data, not projecting<br>18   out from existing data?<br>19   A.   That's correct. | | |
| LAMBERT, WARREN J., (Pages 23:15 to 24:8)<br>                                          23<br>15   Q.   Okay.  The product managers<br>16   in the sales end of things?<br>17      A.   In marketing.<br>18      Q.   Okay.  Marketing.<br>19          And as I understand the<br>20   distinction between marketing and<br>21   sales, let's see if we -- I just want<br>22   to make sure we're communicating.<br>23          I think I learned from<br>24   other depositions that marketing<br>                                          24<br><br>1   would focus on sort of overall<br>2   strategies and sales focused on the<br>3   implementation, that is, actually<br>4   taking the message to the customer,<br>5   whoever the customer may be.<br>6          Is that your understanding<br>7   of the differentiation between<br>8   marketing and sales? | Page 24:1-8<br>Lack of foundation,<br>assumes facts not in<br>evidence,<br>vague/ambiguous | |
| LAMBERT, WARREN J., (Page 24:11 to 24:14)<br>                                          24<br>11   THE WITNESS:  My<br>12   understanding is that sales were<br>13   responsible for calling on customers<br>14   with information. | Lack of foundation,<br>assumes facts not in<br>evidence,<br>vague/ambiguous | |
| LAMBERT, WARREN J., (Page 24:16 to 24:22)<br>                                          24<br>16   Q.   Okay.  And how does that<br>17   vary from marketing?  Just so we're<br>18   on the same page. | No personal<br>knowledge | |

| | | |
|---|---|---|
| 19     A.  I don't have a complete<br>20   understanding of all the nuances of<br>21   marketing.  But, again, I think they<br>22   develop strategy. | | |
| LAMBERT, WARREN J., (Page 31:16 to 31:16)<br>                                                31<br><br>16   Q.  After the sales trainer | | |
| LAMBERT, WARREN J., (Page 31:17 to 31:19)<br>                                                31<br><br>17   position, from roughly 1988 to 1990,<br>18   where did you go?<br>19     A.   District sales manager. | | |
| LAMBERT, WARREN J., (Page 31:20 to 31:23)<br>                                                31<br><br>20   Q.   Okay.  And what district<br>21   was that?<br>22     A.   It was in Harrisburg,<br>23   Pennsylvania. | | |
| LAMBERT, WARREN J., (Pages 31:24 to 32:14)<br>                                                31<br><br>24   Q.   And what were your job<br>                                                32<br> 1   responsibilities as district sales<br> 2   manager?<br> 3     A.   To manager a group of sales<br> 4   representatives.<br> 5     Q.   Did you have any<br> 6   responsibility for making calls on<br> 7   customers at that time?<br> 8     A.   Yes, sir.  I would make<br> 9   calls with the sales representatives.<br>10     Q.   Did you have training<br>11   responsibilities at that time as<br>12   well?<br>13     A.   No, sir.  Primarily,<br>14   coaching and counseling. | | |
| LAMBERT, WARREN J., (Page 32:15 to 32:17)<br>                                                32<br><br>15   Q.  Okay.  And about how long<br>16   did you hold that position?<br>17     A.   I think about three years. | | |
| LAMBERT, WARREN J., (Pages 33:20 to 34:3)<br>                                                33<br><br>20   Q.  Okay.  So after the<br>21   district sales manager position,<br>22   where did you go? | | |

| | | |
|---|---|---|
| 23     A.   Back to headquarters as a<br>24   sales planner.<br><br>                                      **34**<br><br>1     Q.   Roughly, how long did you<br>2   hold that position?<br>3     A.   About two years. | | |
| LAMBERT, WARREN J., (Page 40:5 to 40:13)<br>                                      40<br>5    And now I'd like to focus<br>6   on the 1999 to 2004 time frame.<br>7     A.   Okay.<br>8     Q.   Were there customer<br>9   managers in that time frame that had<br>10   similar responsibilities, that is,<br>11   developing and negotiating of<br>12   contracts with Managed Care<br>13   organizations? | Calls for<br>speculation, no<br>personal knowledge | Sustained |
| LAMBERT, WARREN J., (Page 40:16 to 40:18)<br>                                      40<br>16   THE WITNESS:  I believe<br>17   there could have been.  But in 1999,<br>18   I was in a different position. | Calls for<br>speculation, no<br>personal knowledge | |
| LAMBERT, WARREN J., (Pages 40:20 to 41:2)<br>                                      40<br>20   Q.   Okay.  Do you know whether<br>21   at that time customer managers would<br>22   have interfaced with an account<br>23   person in terms of interfacing with<br>24   the sales force in the manner that<br>                                      41<br>1   you would have done when you were in<br>2   the customer manager position? | Calls for<br>speculation, no<br>personal<br>knowledge, lack of<br>foundation | |
| LAMBERT, WARREN J., (Page 41:5 to 41:11)<br>                                      41<br>5   THE WITNESS:  My<br>6   recollection of the position when I<br>7   was in it was, customer manager<br>8   interacts with the account person.<br>9   Account person interacts with the<br>10   field.  And I don't know if it<br>11   changed after I left the position. | Calls for<br>speculation, no<br>personal<br>knowledge, lack of<br>foundation | |
| LAMBERT, WARREN J., (Page 45:1 to 45:11)<br>                                      45<br>1   Q.   Okay.  Do you recall<br>2   whether at that time P&I Committee<br>3   members would have had flags on their | Incomplete-add<br>45:12-15, 45:17-<br>46:6 | |

7

| | | |
|---|---|---|
| 4  calls?<br>5     A.  Again, my recollection<br>6  would be you could be a P&T Committee<br>7  member and be flagged, but just like<br>8  any other physician, you'd be<br>9  flagged, too.  So the focus wasn't in<br>10  looking at whether you were P&T or<br>11  non-P&T. | | |
| LAMBERT, WARREN J., (Pages 50:16 to 51:17)<br>                                      50<br>16  Q.   What was your next position<br>17  after that specialty director<br>18  position?<br>19     A.   Senior region director.<br>20     Q.   And about how long did you<br>21  hold that position?<br>22     A.   Approximately ten years.<br>23  Currently.<br>24     Q.   You still hold the position<br>                                      51<br>1  of senior region director?<br>2     A.   The title has changed,<br>3  executive director.<br>4     Q.   Do you recall when the<br>5  title change was?<br>6     A.  I think 2006.<br>7     Q.   Okay.  And what region were<br>8  you the senior director for?<br>9     A.   The ArkLaHoma region.<br>10     Q.   And I take it that's<br>11  Arkansas, Louisiana, and Homa?<br>12     A.   And East Texas.<br>13     Q.   I mean, Oklahoma.  We have<br>14  Homa in Louisiana.  There's a town<br>15  called Homa in Louisiana.<br>16        And East Texas?<br>17     A.   Yes. | | |
| LAMBERT, WARREN J., (Pages 51:21 to 52:4)<br>                                      51<br>21  Q.  Okay.  I've seen some<br>22  documents I think that refer to<br>23  ArkLaTex region.  Is that the same<br>24  region, just --<br>                                      52<br>1     A.  Different states. | | |

| | | |
|---|---|---|
| 2   Q.  Okay.<br>3      A.  I think at that time we<br>4   lost Oklahoma. | | |
| LAMBERT, WARREN J., (Page 52:9 to 52:16)<br><div align=center>52</div>9   Q.  Okay.  What were your<br>10  duties as senior region director?<br>11       And I guess we'll start<br>12  when you first took on the title, and<br>13  then if it evolved, tell me how it's<br>14  evolved, because, obviously, you've<br>15  done it for a while.  And I'm not<br>16  really interested post 2004. | | |
| LAMBERT, WARREN J., (Pages 53:5 to 54:11)<br><div align=center>53</div>5   Q.  So right now, I'm asking<br>6   what your duties were when you first<br>7   took the position of senior regional<br>8   director?<br>9      A.  So when I first took the<br>10  position, to manage a group of<br>11  managers and sales representatives<br>12  with responsibility for activities in<br>13  the states of Arkansas, Oklahoma,<br>14  Louisiana, and East Texas.<br>15     Q.  Okay.  At that time when<br>16  you first took on the job, did you<br>17  have any responsibility for managing<br>18  sales calls on Managed Care<br>19  organizations?<br>20     A.  No, sir.<br>21     Q.  Okay.  At that time that<br>22  you first took on that position, who<br>23  would have held the responsibility,<br>24  if anyone, for calling on Managed<br><br><div align=center>54</div>1   Care organizations?<br>2      A.  There was a sales director<br>3   of Managed Care, and national account<br>4   executives were responsible for those<br>5   calls.<br>6      Q.  Okay.  Did you interface<br>7   with those individuals in your<br>8   capacity as senior region director?<br>9      A.  Yes, sir. | Page 54:9-11<br>Calls for<br>speculation,<br>overbroad | Sustained |

| | | |
|---|---|---|
| 10  Q.  And what would have been<br>11  the purpose for that interface? | | |
| LAMBERT, WARREN J., (Page 54:15 to 54:19)<br>                 54<br><br>15  THE WITNESS:  So similar to<br>16  before, information about the Managed<br>17  Care accounts would be conveyed to<br>18  the sales team.  That was my<br>19  relationship. | Calls for<br>speculation,<br>overbroad | *Overruled* |
| LAMBERT, WARREN J., (Pages 54:21 to 55:2)<br>                 54<br><br>21  Q.   And the purpose for -- was<br>22  the purpose of conveying that<br>23  information to the sales team to<br>24  maximize their ability to call on<br><br>                 55<br>1  doctors who were within that Managed<br>2  Care organization? | Calls for<br>speculation,<br>assumes facts not in<br>evidence,<br>vague/ambiguous | |
| LAMBERT, WARREN J., (Page 55:5 to 55:12)<br>                 55<br><br>5  THE WITNESS:  So my<br>6  understanding of the account person<br>7  was to communicate formulary status.<br>8       And then the sales<br>9  representatives, in the course of<br>10  their normal calling on customers,<br>11  would be able to give the appropriate<br>12  status of the Merck product. | Calls for<br>speculation,<br>assumes facts not in<br>evidence,<br>vague/ambiguous | |
| LAMBERT, WARREN J., (Pages 56:2 to 59:1)<br>                 56<br><br>2  Q.   Okay.  When we started the<br>3  discussion about your<br>4  responsibilities as senior region<br>5  director, you had said that your<br>6  responsibilities -- and I don't want<br>7  to misquote you -- but were to manage<br>8  a group of managers and sales<br>9  representatives in activities in the<br>10  state of Arkansas, Louisiana,<br>11  Oklahoma and East Texas.<br>12       And we also talked that at<br>13  the time you had some interface with<br>14  sales directors of Managed Care, and<br>15  also possibly with national account<br>16  executives for Managed Care | | |

17   organizations.
18      A.   Yes, sir.
19      Q.   I'm asking whether those
20   duties that we just discussed would
21   have applied in the 1999 to 2004 time
22   frame?
23      A.   Yes, sir.
24      Q.   Okay.  When you first took

                                    57

1    on that position, who was -- who did
2    you report to?
3       A.   Vice president of the South
4    Central.
5       Q.   And who was that person at
6    that time?
7       A.   Mike McClintock.
8       Q.   And would that have held
9    true through the 1999 to 2004 time
10   frame?
11      A.   I'm vague a little bit on
12   the change because I transferred back
13   to -- well, I was living in Texas and
14   then moved to Atlanta.  So somewhere
15   in between 2003 and 2004 I got a
16   different boss.
17      Q.   Okay.  Somewhere between
18   2003, 2004 you were no longer in the
19   ArkLaHoma region?
20      A.   The region had changed
21   names a couple of times, and the
22   reporting relationship changed.  So
23   the job responsibilities stayed the
24   same.

                                    58

1       Q.   Okay.  So you still had
2    responsibility for ArkLaHoma, but not
3    -- but your reporting
4    responsibilities changed; is that
5    correct?
6       A.   Reporting relationship.
7       Q.   Okay.  How many managers
8    reported to you as the senior region
9    director?  Ballpark.
10      A.   Okay.  12.

| | | |
|---|---|---|
| 11    Q.   And would that have been<br>12  the case in the 1999 to 2004 time<br>13  frame?<br>14    A.   The numbers may have<br>15  changed with the shifting states, but<br>16  roughly around there.<br>17    Q.   Do you know how many sales<br>18  representatives were under each of<br>19  those managers?<br>20    A.   I think, on average, ten to<br>21  12.<br>22    Q.   Did the sales managers that<br>23  reported to you have similar duties<br>24  to those that you had during your<br><br>                              59<br>1  district sales manager position? | | |
| LAMBERT, WARREN J., (Page 59:4 to 59:6)<br>                              59<br>4  THE WITNESS:  The managers<br>5  had the responsibility of managing a<br>6  sales team and calling on customers. | | |
| LAMBERT, WARREN J., (Page 59:8 to 59:16)<br>                              59<br>8  Q.   In terms of calling on<br>9  customers, the managers -- and,<br>10  obviously, you're probably dealing<br>11  with different products, different<br>12  times and different doctors, but I'm<br>13  just trying to get a handle on did<br>14  the managers coach and participate in<br>15  sales calls as you did when you were<br>16  district sales manager? | Irrelevant, misstates<br>prior testimony | |
| LAMBERT, WARREN J., (Page 59:19 to 59:21)<br>                              59<br>19  THE WITNESS:  The managers<br>20  had a coaching and counseling<br>21  responsibility. | Irrelevant, misstates<br>prior testimony | |
| LAMBERT, WARREN J., (Pages 59:23 to 61:14)<br>                              59<br>23    Q.   And did those managers also<br>24  actually go on calls as -- I'll just<br><br>                              60<br>1  leave it at that.<br>2        Did those managers also go | | |

12

3   on calls in the 1999 to 2004 time
4   period?
5      A.   Yes, sir.
6      Q.   Were you part of any
7   working groups in the 1999 to 2004
8   time frame?
9      A.   When you say "working
10   groups," sir?
11      Q.   Okay.  Whether it was a
12   product group, a Managed Care group
13   or -- I've seen disease state
14   groups --
15      A.   Sure.
16      Q.   -- and teams were assembled
17   for different purposes.
18      A.   Sure.
19      Q.   Were you part of any groups
20   of that sort?
21      A.   Yes, sir.
22      Q.   Okay.  What were those
23   groups?
24         And, again, focused on the

                                    61
1   1999 to 2004 time frame.
2      A.   Okay.  And I can't remember
3   all of them, but anything that had to
4   do with those states, I would have
5   probably been informed about or part
6   of.
7      Q.   Okay.  Was there a -- I'm
8   sorry.  Let me back up.
9         Was there a group for
10   Louisiana Medicaid that you were part
11   of?
12      A.   Yes, sir.
13      Q.   Was there a group for Vioxx
14   that you were a part of?

LAMBERT, WARREN J., (Page 61:17 to 61:21)
                                    61
17   THE WITNESS:  As the person
18   responsible for the state, I would
19   work with groups.  So, again, I'd
20   bring kind of the sales function to
21   those groups.

LAMBERT, WARREN J., (Pages 61:23 to 62:20)

| | | |
|---|---|---|
| 61<br>23   Q.   You don't recall if there<br>24   was a special group set up for Vioxx<br><br><br>62<br>1   at that time?<br>2       A.   I'm sure we had groups that<br>3   focused on this.<br>4       Q.   And I think you started to<br>5   get in a little bit there, the<br>6   purpose of your interface with those<br>7   groups was, I think you said, to<br>8   bring the sales -- let me ask you to<br>9   put it in your words.  I don't want<br>10  to put words in your mouth.<br>11      A.   Sure.<br>12          So, again, as I described<br>13  with the national account position,<br>14  the individuals for their respective<br>15  segments would bring information that<br>16  was pertinent to the sales force.<br>17          And then my role was to<br>18  make sure the sales force was using<br>19  that information in the appropriate<br>20  way. | | |
| LAMBERT, WARREN J., (Page 63:9 to 63:18)<br>63<br>9   Q.   Mr. Lambert, getting back<br>10  to your duties as senior region<br>11  director, right now, and, actually,<br>12  for the duration of the deposition,<br>13  unless I say otherwise, I'm going to<br>14  be focused on 1999 to 2004.<br>15          But did you have<br>16  responsibility for communicating<br>17  marketing strategy to the sales<br>18  managers that were under you? | Vague/ambiguous | |
| LAMBERT, WARREN J., (Page 63:21 to 63:23)<br>63<br>21   THE WITNESS:  When you say<br>22  "marketing strategy," what are you<br>23  referring to? | Vague/ambiguous | |
| LAMBERT, WARREN J., (Page 64:1 to 64:10)<br>64<br>1   Q.   Okay.  You had indicated<br>2   earlier that marketing was involved | Lack of foundation,<br>vague/ambiguous,<br>no personal<br>knowledge | |

| | | |
|---|---|---|
| 3  with strategy and sales were involved<br>4  with making the sales calls.<br>5     A.  Yes, sir.<br>6     Q.  I'm wondering if you had a<br>7  role in facilitating the flow of<br>8  information from marketing to the<br>9  managers that you were responsible<br>10  for who made those sales calls? | | |
| LAMBERT, WARREN J., (Pages 64:12 to 65:7)<br><div align=center>64</div>12  THE WITNESS:  So my<br>13  understanding of the role is, is<br>14  information comes from, you have<br>15  marketing teams, through<br>16  headquarters, and their appropriate,<br>17  you know, venue, either the bulletin.<br>18  That's the information that we<br>19  communicate.<br>20          And what I do is kind of<br>21  oversee it, make sure the reps are<br>22  doing and the managers are doing what<br>23  they're supposed to appropriately.<br>24  BY MR. MURRAY:<br><br><div align=center>65</div>1     Q.  Okay.  That's what I'm<br>2  trying to understand is the flow of<br>3  information from marketing to the<br>4  managers.<br>5          How does that information<br>6  flow from marketing to -- I'm sorry<br>7  -- marketing to the sales force? | Page 64: 12-24<br>Lack of foundation,<br>vague/ambiguous,<br>no personal<br>knowledge<br><br>Page 65:1-7<br>Assumes facts not<br>in evidence, calls<br>for speculation | Overruled |
| LAMBERT, WARREN J., (Page 65:11 to 65:15)<br><div align=center>65</div>11  THE WITNESS:  As I<br>12  understand it, the information comes<br>13  from headquarters through the<br>14  bulletins.  And we, as the sales<br>15  teams, follow those bulletins. | Assumes facts not<br>in evidence, calls<br>for speculation | |
| LAMBERT, WARREN J., (Page 65:17 to 65:19)<br><div align=center>65</div>17     Q.  Okay.  Any other means of<br>18  marketing communicating with sales,<br>19  other than through bulletins? | Assumes facts not<br>in evidence, calls<br>for speculation | |
| LAMBERT, WARREN J., (Page 65:22 to 65:22)<br><div align=center>65</div> | Assumes facts not<br>in evidence, calls | |

| | | |
|---|---|---|
| 22   THE WITNESS:  No, sir. | for speculation | |
| LAMBERT, WARREN J., (Pages 65:24 to 66:11)<br><br>                                              65<br>24    Q.   Who is responsible for<br><br>                                              66<br>1   drafting the bulletins to the sales<br>2   force?<br>3          And I don't mean person.<br>4   I'm trying to figure out, is there an<br>5   entity, a group within marketing?  Is<br>6   it marketing that puts those<br>7   together?<br>8      A.   My understanding is, it's<br>9   typically the headquarters team.  It<br>10   could be individuals there that I'm<br>11   not privy to. | Page 66:1-11<br>Assumes facts not<br>in evidence, no<br>personal knowledge | *overruled* |
| LAMBERT, WARREN J., (Pages 66:23 to 67:2)<br>                                              66<br>23   Q.   Okay.  Did you have any<br>24   regular interface with anyone from<br><br>                                              67<br>1   marketing?<br>2      A.   No, sir. | | |
| LAMBERT, WARREN J., (Pages 67:11 to 68:23)<br>                                              67<br>11   Q.   How about promotional<br>12   materials that the sales force used;<br>13   where would those materials come<br>14   from?  Were they generated by<br>15   headquarters?<br>16      A.   Yes, sir.<br>17      Q.   Okay.  And am I correct in<br>18   my understanding that they wouldn't<br>19   have had the authority to make their<br>20   own promotional tools; correct?<br>21      A.   Yes, sir.<br>22      Q.   And did you have any<br>23   responsibility for furnishing those<br>24   promotional materials to the sales<br><br>                                              68<br>1   force that were under you?<br>2      A.   Typically, if the | Page 68:15-23<br>Calls for<br>speculation, no<br>personal<br>knowledge,<br>vague/ambiguous | |

| | | |
|---|---|---|
| 3   headquarters team sent information to<br>4   me that was, you know, medically,<br>5   legally approved, that could be a<br>6   vehicle by which we shared that<br>7   information with the field.  But,<br>8   typically, it went directly to the<br>9   field.<br>10      Q.  Okay.  Did the<br>11   medical/legal approval come from<br>12   headquarters with respect to those<br>13   sales materials?<br>14      A.  Yes, sir.<br>15      Q.  Okay.  And the sales<br>16   representatives, the office-based<br>17   representatives, people who were<br>18   actually making calls on customers,<br>19   they were required to present the<br>20   messages that were furnished to them<br>21   by -- medically, legally approved<br>22   messages furnished to them by<br>23   headquarters; correct? | | |
| LAMBERT, WARREN J., (Page 69:2 to 69:15)<br>                 69<br>2   THE WITNESS:  As I<br>3   understand, again, the job of a sales<br>4   rep is to communicate information<br>5   about our products that were<br>6   consistent with the labeling policies<br>7   and process and just communicate to<br>8   the customer.<br>9   BY MR. MURRAY:<br>10      Q.  And the entities<br>11   responsible for determining the<br>12   policies and the process and that<br>13   they're medically and legally<br>14   approved are all at headquarters;<br>15   correct? | Assumes facts not<br>in evidence, calls<br>for speculation, no<br>personal knowledge | |
| LAMBERT, WARREN J., (Pages 69:18 to 70:14)<br>                 69<br>18   THE WITNESS:  My<br>19   understanding is, the information<br>20   that comes, it could come from other<br>21   individuals who have worked with the<br>22   headquarters team or the<br>23   Medical/Legal team that I would not<br>24   be privy to. | Page 69:18-24<br>Assumes facts not<br>in evidence, calls<br>for speculation, no<br>personal knowledge<br><br>Page 70:7-14<br>No speculation,<br>lack of foundation, | |

| | | |
|---|---|---|
| 70 | no personal knowledge | |
| 1      But when they give us<br>2 information that's approved, that<br>3 they say this is appropriate to share<br>4 with customers, that's what we can<br>5 share.<br>6 BY MR. MURRAY:<br>7    Q.  Okay.  And that's coming<br>8 from headquarters; correct?<br>9      I mean, regardless of where<br>10 it may have originated before it got<br>11 to headquarters, at some point it has<br>12 to go to headquarters before it gets<br>13 to you to get to the sales force, so<br>14 before it gets to the sales force? | | |
| LAMBERT, WARREN J., (Page 70:17 to 70:21)<br>70<br>17   MR. MURRAY:  Other than the<br>18 label.<br>19      THE WITNESS:  Information,<br>20 typically, that I understand,<br>21 everything has to be approved first. | No speculation, lack of foundation, no personal knowledge | |
| LAMBERT, WARREN J., (Page 71:13 to 71:19)<br>71<br>13   Q.  Okay.  You said it has to<br>14 be approved.  I think you meant that<br>15 it has to be approved by<br>16 headquarters.  I just want to make<br>17 sure that I'm correct in that<br>18 understanding.<br>19   A.  Yes. | | |
| LAMBERT, WARREN J., (Pages 71:21 to 72:16)<br>71<br>21   Do you recall, focusing on<br>22 the 1999 to 2004 time frame, were<br>23 there sales managers that reported to<br>24 you that were focused on Louisiana?<br><br>72<br>1   A.  Yes, sir.<br>2   Q.  Okay.  Who were the<br>3 individual sales managers that<br>4 reported to you that would have had<br>5 responsibility for Louisiana?<br>6   A.  I can't remember all the | Page 72:1-16<br>Irrelevant | |

| | | |
|---|---|---|
| 7  names, but I believe there was -- and<br>8  the time periods I may have wrong,<br>9  too.  I'm just thinking of the<br>10 managers there.<br>11        There was a Stan Joseph,<br>12 there was a Ranita Howard, a Betty<br>13 Anderson, a Greg Planchard, a<br>14 Jacqueline Devone.  And I may be<br>15 missing someone.  I just can't<br>16 remember. | | |
| LAMBERT, WARREN J., (Pages 72:19 to 73:6)<br>72<br>19  Q.  And those are all at the<br>20 managerial level?<br>21    A.  Yes, sir.<br>22    Q.  Okay.  We talked about a<br>23 Louisiana Medicaid team that you<br>24 interfaced with.  Do you recall who<br>73<br>1  the members were of that team?<br>2    A.  Typically, the team would<br>3  be the Government Affairs person, a<br>4  National Account person, and,<br>5  typically, a Regional Medical<br>6  Director. | | |
| LAMBERT, WARREN J., (Page 73:12 to 73:14)<br>73<br>12  Q.  Okay.  With respect to<br>13 Louisiana Medicaid, was the National<br>14 Account Executive Mary Ogle? | | |
| LAMBERT, WARREN J., (Page 73:19 to 73:22)<br>73<br>19  Q.  I understand she may have<br>20 moved out of that position towards<br>21 the end of that period.  But for the<br>22 bulk of 1999 to 2004? | | |
| LAMBERT, WARREN J., (Pages 73:23 to 74:24)<br>73<br>23    A.  And I can't remember the<br>24 exact time, but she was an account<br>74<br>1  executive at one time.<br>2    Q.  Okay.  The Government<br>3  Affairs person, was that Holly | Page 74:21-24<br>No personal<br>knowledge | overruled |

4   Jacques?
5       A.   Yes.
6       Q.   And the Regional Medical
7   Director for Louisiana Medicaid,
8   would that have been Fran Kaiser?
9       A.   Fran Kaiser was a Regional
10  Medical Director.
11      Q.   Okay.  But that was part of
12  the Louisiana Medicaid team, do you
13  think it would have been Fran Kaiser?
14      A.   She was probably, yes, that
15  person.
16      Q.   Do you know what position
17  John Fevurly held?
18      A.   I can't recall, but I think
19  it was some account level team at
20  that time.  I can't remember what.
21      Q.   Do you think he could have
22  been a customer manager at that time?
23      A.   That's possible, but I
24  don't recall.

LAMBERT, WARREN J., (Pages 75:13 to 76:18)

                                   75
13  And for the record, I'll identify it
14  as MRK-EBES0048579.
15        Mr. Lambert, this appears
16  to be a memo from yourself to Mike
17  McClintock.
18        And right now, if you'd
19  look at where it talked about the --
20  it says, This is a note to brief you
21  on recent actions that have taken
22  place regarding Louisiana Medicaid.
23        This says the core team on
24  this project includes Terri Lee,

                                   76
1   Government -- is that Government
2   Affairs?
3       A.   Yes, sir.
4       Q.   Okay.  Holly Jacques,
5   Government.  I guess that's
6   Government Affairs again.  Mike
7   Kelly, Managed Care.  Mary Ogle,
8   Managed Care.  Fran Kaiser, M.D.,
9   Sales.

| | | |
|---|---|---|
| 10      Mary Dermody, Managed<br>11  Care.  Wendy Lepore, Government.<br>12  Carl Winfree, Contracting/Pricing.<br>13  Carl Bader, B-a-d-e-r, Customer<br>14  Manager, and me, open paren, Sales.<br>15      Do you remember being part<br>16  of a team that included those<br>17  individuals?<br>18      A.  Yes, sir. | | |
| LAMBERT, WARREN J., (Page 77:11 to 77:14)<br>77<br>11  Q.  Okay.  I was just asking,<br>12  does this refresh your recollection<br>13  as to the Louisiana Medicaid team<br>14  that we were talking about earlier? | | |
| LAMBERT, WARREN J., (Page 77:17 to 77:21)<br>77<br>17   THE WITNESS:  I think,<br>18  again, these were individuals who had<br>19  some responsibility in the State of<br>20  Louisiana that I would have been<br>21  talking to and working with. | | |
| LAMBERT, WARREN J., (Page 78:19 to 78:23)<br>78<br>19  Was there a time when -- that<br>20  you recall when you first began<br>21  focusing on delivering information to<br>22  your sales managers about Louisiana<br>23  Medicaid? | Calls for<br>speculation, lack of<br>foundation,<br>vague/ambiguous | *Overruled* |
| LAMBERT, WARREN J., (Page 79:2 to 79:23)<br>79<br>2   THE WITNESS:  And, again,<br>3  my -- in my role, what I would<br>4  typically do is, for the groups that<br>5  have responsibility for those<br>6  segments, if they provided<br>7  information, either directly to the<br>8  sales force or to me, my role was to<br>9  make sure that the team was<br>10  communicating or implementing that<br>11  information in the appropriate way.<br>12  BY MR. MURRAY:<br>13      Q.   Was there a time at which<br>14  you recall that you first began<br>15  providing information to the sales<br>16  team about Louisiana Medicaid? | Page 79:2-11<br>Calls for<br>speculation, lack of<br>foundation,<br>vague/ambiguous<br><br>Page 79:13-19<br>Calls for<br>speculation, lack of<br>foundation<br><br>Page 79:20-23<br>No personal<br>knowledge | |

| | | |
|---|---|---|
| 17    A.   Again, I can't recall.  Any<br>18  information related to Louisiana I'd<br>19  be talking to the team about.<br>20    Q.   Okay.  Do you know whether<br>21  Louisiana Medicaid high-volume<br>22  prescribers were flagged for your<br>23  sales team at any point in time? | | |
| LAMBERT, WARREN J., (Page 80:2 to 80:9)<br>80<br>2  THE WITNESS:  So, again, I<br>3  don't recall all the specifics around<br>4  that, but as a matter of normal<br>5  course, the sales reps who received<br>6  flags for therapeutic areas and other<br>7  different reasons, so it's possible<br>8  that they could have had flags on<br>9  different individuals in there. | No personal<br>knowledge | |
| LAMBERT, WARREN J., (Page 80:11 to 80:16)<br>80<br>11    Q.   You just don't recall<br>12  whether there was a Medicaid flag --<br>13  Medicaid high-prescriber flag?<br>14    A.   What I'm saying is, there<br>15  could have been, I just don't recall<br>16  the specifics. | No personal<br>knowledge, lack of<br>foundation | |
| LAMBERT, WARREN J., (Page 81:3 to 81:4)<br>81<br>3  (Exhibit Lambert-LA-1 was<br>4  marked for identification.) | | |
| LAMBERT, WARREN J., (Page 81:6 to 81:7)<br>81<br>6  Q.   I ask you, Mr. Lambert, if<br>7  you're familiar with the document? | | |
| LAMBERT, WARREN J., (Page 81:9 to 81:18)<br>81<br>9  I don't recall.<br>10    Q.   Okay.  Mr. Lambert, I'll<br>11  represent to you that this document<br>12  was presented to us by Merck from<br>13  your custodial files.  And I see that<br>14  the title of the document has the<br>15  title Targeting District<br>16  Level/Cluster Level.<br>17      How is the term "targeting"<br>18  used at Merck? | | |
| LAMBERT, WARREN J., (Pages 81:22 to 82:1) | | |

| | | |
|---|---|---|
| **81**<br>22   THE WITNESS:  Targeting is<br>23   used in a variety of fashions.  I'm<br>24   looking at this here, could represent<br><br>**82**<br>1   segments. | | *Overrule* |
| LAMBERT, WARREN J., (Page 82:3 to 82:7)<br>**82**<br>3   Q.   Okay.  As a regional sales<br>4   director in the period 1999 to 2004,<br>5   do you think targeting refers to<br>6   focusing sales efforts on a certain<br>7   segment of the customer? | Lack of foundation,<br>calls for<br>speculation, no<br>personal knowledge | |
| LAMBERT, WARREN J., (Page 82:11 to 82:20)<br>**82**<br>11   THE WITNESS:  Again,<br>12   targeting typically is, you know,<br>13   anyone who needs to have information<br>14   about our products.<br>15   BY MR. MURRAY:<br>16      Q.   Meaning you're going to<br>17   deliver information to a specific<br>18   group that you feel needs to have<br>19   information about your products;<br>20   correct? | Page 82:11-14<br>Lack of foundation,<br>calls for<br>speculation, no<br>personal knowledge<br><br>Page 82:11-14<br>Lack of foundation,<br>calls for<br>speculation, no<br>personal knowledge<br><br>Page 82:16-20<br>Calls for<br>speculation, no<br>personal knowledge | |
| LAMBERT, WARREN J., (Pages 82:23 to 84:17)<br>**82**<br>23   THE WITNESS:  Again, as I<br>24   look at this list, it's totally<br><br>**83**<br>1   common for the sales reps to go and<br>2   talk to each of these individuals and<br>3   it wouldn't be any one targeted<br>4   effort.<br>5   BY MR. MURRAY:<br>6      Q.   Okay.  And you'll see under<br>7   Paragraph 5 it says -- heading 5.  I<br>8   guess bullet point 5.  It's not<br>9   really a paragraph.<br>10      A.   Yes. | Page 82:23-83:3<br>Calls for<br>speculation, no<br>personal knowledge<br><br>Page 84:4-9<br>No personal<br>knowledge<br>Page 84:12-17<br>Calls for<br>speculation, no<br>personal knowledge | |

23

11    Q.   -- it says Medicaid.  And
12  then it says, A, External targets for
13  formulary support.
14        Do you know what that's
15  referring to?
16    A.  I can't say I do.
17    Q.  Okay.  And it says, Top
18  Medicaid prescribers of NSAIDs.
19        Do you recall whether at
20  the time, 1999 to 2004, there was any
21  effort to target top Medicaid
22  prescribers of NSAIDs?
23    A.   My recollection is, there
24  could be.  Again, just looking at

                                    84
1  this list, it would be normal for
2  sales reps to go in and call on all
3  of these people.
4    Q.   Okay.  And then you see
5  here, it says, C is Key
6  decision-makers/influencers.
7        Do you know what that's
8  referring to?
9    A.  I don't, sir.
10    Q.  Okay.  We'll go ahead, if
11  we haven't already marked it.
12        Let me ask you one other
13  question, sir.  Does this appear to
14  be the kind of document that you
15  would have received in the course of
16  your business as a senior business
17  director?

| LAMBERT, WARREN J., (Page 84:21 to 84:22) | Calls for speculation, no personal knowledge | |
| --- | --- | --- |
| 84<br>21  Q.  I'm sorry.  Senior region<br>22  director. | | |
| LAMBERT, WARREN J., (Page 85:1 to 85:3)<br>85<br>1    THE WITNESS:  Again, I<br>2  can't recall, but this is something<br>3  normal that sales reps would look at. | Calls for speculation, no personal knowledge | |
| LAMBERT, WARREN J., (Page 85:9 to 85:22)<br>85<br>9    that other document, we have a note<br>10  in the objective coding provided by | Page 85:9-17<br>No personal knowledge | |

| | |
|---|---|
| 11  Merck that this document is dated<br>12  September 1, '99 -- I'm sorry --<br>13  February 1, '99, although I don't see<br>14  any date on the document.<br>15      Do you have any knowledge<br>16  as to when this document may have<br>17  been generated?<br>18    A.  I don't, sir.<br>19    Q.  Okay.  Do you have any<br>20  reason to think that it wasn't<br>21  generated on the date identified in<br>22  Merck's coding as February 1, '99? | Page 85:18-86:2<br>No personal<br>knowledge, lack of<br>foundation |
| LAMBERT, WARREN J., (Page 86:1 to 86:2)<br>86<br> 1   THE WITNESS:  I don't know,<br> 2  sir. | |
| LAMBERT, WARREN J., (Pages 86:10 to 87:7)<br>86<br>10   Now, we're moving on to the<br>11   document that we'll mark as<br>12   Lambert-LA-2, which bears the Bates<br>13   number MRK-EBES00046428.<br>14      (Exhibit Lambert-LA-2 was<br>15   marked for identification.)<br>16  BY MR. MURRAY:<br>17    Q.   Feel free to take a moment<br>18  to review the document and then let<br>19  me know if it's a document you recall<br>20  seeing before.<br>21    A.   (Witness reviews document.)<br>22  I see my name here, but I don't<br>23  recall the document, and it makes<br>24  reference to an attachment.  Is there<br><br>87<br> 1  something else?<br> 2    Q.   Okay.  If there is an<br> 3  attachment, I don't have the<br> 4  attachment.<br> 5    A.   Okay.<br> 6    Q.   And do you recognize the<br> 7  matter that's being discussed here? | No personal<br>knowledge |
| LAMBERT, WARREN J., (Pages 87:10 to 90:6)<br>87<br>10   THE WITNESS:  I don't<br>11   recall the document.  I mean, | Page 87:10-13<br>No personal<br>knowledge |

| | |
|---|---|
| 12   formulary grids are a normal thing. | Page 88:7-90:6 |
| 13   BY MR. MURRAY: | Calls for |
| 14      Q.   Okay. | speculation |
| 15      A.   That's the only thing | |
| 16   that's familiar. | |
| 17      Q.   And these individuals that | |
| 18   are listed on the top, are these | |
| 19   sales managers that reported to you | |
| 20   on the To line, Stanley Joseph, Greg | |
| 21   Planchard, Ranita Howard, Betty | |
| 22   Anderson, David Luke, and Joseph | |
| 23   Torelli? | |
| 24      A.   These were managers who | |
| | |
| 88 | |
| 1   reported to me, with the exception of | |
| 2   Joe Torelli. | |
| 3      Q.   Okay.  Who was Doug Jordan? | |
| 4      A.   I can't recall his title, | |
| 5   but I believe he was in the Managed | |
| 6   Care group. | |
| 7      Q.   Okay.  Did you work with | |
| 8   him in the time frame of February | |
| 9   2001? | |
| 10      A.   That's very possible. | |
| 11      Q.   Okay.  I'd like to direct | |
| 12   your attention to the line where | |
| 13   Mr. Jordan writes to you -- writes to | |
| 14   the recipients of the letter. | |
| 15         He says, The Medicaid | |
| 16   market segments represents -- I'm | |
| 17   sorry -- The Medicaid market segment | |
| 18   represents a huge business | |
| 19   opportunity for us and should be an | |
| 20   area where you and your team consider | |
| 21   special focus, planning, and | |
| 22   execution. | |
| 23         Do you recall that | |
| 24   sentiment being expressed by people | |
| | |
| 89 | |
| 1   at Merck in the 2001 time frame? | |
| 2      A.   And, again, I can't speak | |
| 3   to whatever Mr. Jordan was thinking | |
| 4   about at that time.  I think what I | |
| 5   typically have seen with account | |

| | | |
|---|---|---|
| 6  people is they want you to pay<br>7  attention to their segment, so...<br>8      Q.  Okay.  Do you recall<br>9  whether -- without respect to what<br>10  Mr. Jordan may have said here, do you<br>11  recall whether you directed your<br>12  sales managers to consider special<br>13  focus, planning, and execution on the<br>14  Medicaid segment?<br>15      A.  So, again, I can't remember<br>16  all the details at that time.<br>17          But in the normal course of<br>18  my job, I would instruct the sales<br>19  team, make sure, again, their<br>20  communication was in alignment with<br>21  our products in the labeling of our<br>22  products, policies, et cetera.<br>23          And if there were<br>24  information about the various<br><br>           90<br>1  segments, then I would make sure that<br>2  they were aware of those things.<br>3      Q.  Okay.  Were these<br>4  individuals required to follow<br>5  instructions sent to them by Doug<br>6  Jordan? | | |
| **LAMBERT, WARREN J., (Page 90:9 to 90:19)**<br>           90<br>9  THE WITNESS:  And, again,<br>10  as I -- as I take a look at this<br>11  document, not knowing all the details<br>12  about it, Doug probably would be in a<br>13  position of informing them about<br>14  things.<br>15  BY MR. MURRAY:<br>16      Q.  Okay.  And if he informed<br>17  them about things, would they be<br>18  expected to act on the information<br>19  that he provided? | Page 90:9-14<br>Calls for<br>speculation<br><br>Page 90:15-19<br>Calls for<br>speculation, vague,<br>overbroad | |
| **LAMBERT, WARREN J., (Page 91:1 to 91:3)**<br>           91<br>1      A.  So, again, if it was in<br>2  alignment with the appropriate<br>3  guidance that we received, sure. | Calls for<br>speculation, vague,<br>overbroad | |
| **LAMBERT, WARREN J., (Page 91:21 to 91:24)** | | |

| | | |
|---|---|---|
| **91**<br>21   Do you have any reason to<br>22   believe that you didn't receive this<br>23   document?<br>24     A.  No, sir. | | |
| LAMBERT, WARREN J., (Page 92:5 to 92:6)<br>**92**<br>5  (Exhibit Lambert-LA-3 was<br>6  marked for identification.) | | |
| LAMBERT, WARREN J., (Page 92:13 to 92:15)<br>**92**<br>13   moment to review the document.  Let<br>14   me know if you're familiar with the<br>15   document. | | |
| LAMBERT, WARREN J., (Pages 92:20 to 94:18)<br>**92**<br>20   A.  I can't recall the<br>21   specifics, but it looks like a Region<br>22   Tactical Plan.<br>23      Q.  Did you draft Region<br>24   Tactical Plans in your position as<br><br>**93**<br>1  senior region director in the 1999 to<br>2  2004 time frame?<br>3      A.   Yes, sir.<br>4      Q.   Okay.  Do you know if you<br>5  were the person -- or do you know<br>6  whether you were the person who<br>7  drafted this particular Region Plan?<br>8      A.   I don't recall, sir.<br>9      Q.   Okay.  And I see on the To<br>10  line, it says, ArkLaTex Region Team.<br>11        Does that refer to the<br>12  sales managers that reported to you?<br>13      A.   Yes, sir.<br>14      Q.   Does it refer also to their<br>15  sales force?<br>16      A.   Yes, sir.<br>17      Q.   Okay.  Is there anyone else<br>18  that would be part of that ArkLaTex<br>19  Region Team who would have been sent<br>20  this -- would have been on the<br>21  receiving list of this memo?<br>22      A.   And, again, I can't recall,<br>23  but typically it would just be the | Page 94:1-18<br>No personal<br>knowledge | |

| | | |
|---|---|---|
| 24   managers and the sales team.<br><br>94<br>1   Q.  Okay.  And I'd like to<br>2   refer you to the page that bears the<br>3   Bates number 26, ends in the Bates<br>4   number 26.  And it says, Tactical<br>5   Plan for Vioxx, ArkLaTex regions.<br>6        And under Messages, do you<br>7   see where it says, Go on the offense<br>8   and focus on the efficacy of Vioxx<br>9   versus narcotic.  Efficacy is the<br>10   cornerstone and first message in all<br>11   calls?<br>12        Do you recall writing that?<br>13   A.  I don't, sir.<br>14   Q.  Okay.  Do you recall there<br>15   being a message that the sales force<br>16   conveyed in the time period of this<br>17   document of March of 2001 that<br>18   efficacy was the cornerstone? | | |
| LAMBERT, WARREN J., (Pages 94:21 to 95:5)<br>94<br>21   THE WITNESS:  While I can't<br>22   recall all the specifics of it,<br>23   something that sales reps would<br>24   normally do is communicate messages<br><br>95<br>1   consistent with the product labeling.<br>2   BY MR. MURRAY:<br>3   Q.  Okay.  And was this a<br>4   message that you recall being<br>5   communicated at that time? | Page 94:21-94:5<br>No personal<br>knowledge<br><br>Page 94:14-18<br>Overbroad<br><br>Page 94:21-95:5<br>Overbroad<br><br>Page 95:3-5<br>No personal<br>knowledge, calls<br>for speculation | |
| LAMBERT, WARREN J., (Pages 95:9 to 97:6)<br>95<br>9   THE WITNESS:  It's<br>10   possible, but I'm not sure.<br>11   BY MR. MURRAY:<br>12   Q.  Okay.  And then dropping<br>13   down to the bullet point that begins<br>14   Completely resolve.<br>15   A.  Yes, sir.<br>16   Q.  Do you see where it says,<br>17   Completely resolve physician concerns | Page 95:9-10<br>No personal<br>knowledge, calls<br>for speculation<br><br>Page 96:1-97:6<br>No personal<br>knowledge, calls<br>for speculation,<br>lack of foundation | |

| | | |
|---|---|---|
| 18   regarding renal and cardiovascular<br>19   issues (including high blood pressure<br>20   and edema) using the renal card, the<br>21   CV card, the PIR available from<br>22   MEDSA, and the Canon Reprint?<br>23       Do you recall writing that?<br>24   A.  No, sir, I don't.<br><br>96<br>1   Q.  Okay.  Do you recall<br>2   whether there was a strategy in place<br>3   to convey messages regarding renal<br>4   and cardiovascular issues using the<br>5   tools that are listed here?<br>6   A.   I can't recall<br>7   specifically, but as a matter of<br>8   normal course, whatever the sales<br>9   force receives from headquarters, any<br>10   approved information, if that was the<br>11   message or background information at<br>12   the time, that's what they would have<br>13   communicated.<br>14   Q.  Okay.  Do you recall a<br>15   renal card?<br>16   A.  I don't.<br>17   Q.  Okay.  Do you recall a CV<br>18   card?<br>19   A.  I don't, sir.<br>20   Q.  Okay.  Do you know what<br>21   it's referring to where it says the<br>22   PIR available from MEDSA?<br>23       A.   Again, I don't know what<br>24   specifically that was, but,<br><br>97<br>1   typically, if sales representatives<br>2   get questions from physicians or<br>3   medical personnel that they can't<br>4   answer, we send them inside to our<br>5   Medical Services group and they<br>6   provide information. | | |
| LAMBERT, WARREN J., (Pages 97:24 to 98:9)<br>97<br>24   Q.  Okay.  Do you remember what<br>98 | Page 98:3-9<br>Calls for<br>speculation, no<br>personal knowledge | |

| | | |
|---|---|---|
| 1  the Canon Reprint was?<br>2      A.  I don't.<br>3      Q.  Okay.  Do you have any<br>4  reason to believe that these<br>5  materials, that is, the renal card,<br>6  the CV card, the PIR available from<br>7  MEDSA and the Canon Reprint, were not<br>8  used by sales representatives in the<br>9  ArkLaTex region? | | |
| LAMBERT, WARREN J., (Page 98:12 to 98:13)<br>                                        98<br>12    THE WITNESS:  And, again, I<br>13   don't know. | Calls for<br>speculation, no<br>personal knowledge | *Sustained* |
| LAMBERT, WARREN J., (Page 98:21 to 98:22)<br>                                        98<br>21   (Exhibit Lambert-LA-4 was<br>22   marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 99:9 to 101:10)<br>                                        99<br>9    Q.  Do you see the document's<br>10   title is National Cross-Functional<br>11   Team Meeting for Vioxx?<br>12        Do you know what that's<br>13   referring to, a National<br>14   Cross-Functional Team?<br>15      A.  As it relates to this<br>16   document, I don't remember, but,<br>17   typically, cross-functional teams are<br>18   teams involved in products.<br>19      Q.  Okay.  Was there a<br>20   cross-functional team for Vioxx?<br>21      A.  There could have been.<br>22      Q.  Okay.  And this is<br>23   referring to a meeting held in July<br>24   18-19, 2001, in Philadelphia,<br><br>                                        100<br>1  Pennsylvania.<br>2        Do you recall attending a<br>3  meeting in Philadelphia,<br>4  Pennsylvania, at that time?<br>5      A.  I don't recall, but it's<br>6  possible.<br>7      Q.  Okay.  Let me ask you to<br>8  turn to the page of the document that<br>9  ends in the Bates number 193.  And it | Page 99:9-24<br>No personal<br>knowledge<br><br>Page:100:15-22<br>Lack of foundation,<br>no personal<br>knowledge, calls<br>for speculation | |

10  says, Overarching Recommendations.
11       And if you look at the last
12  bullet point there, it says, Improve
13  planning and pull-through in Managed
14  Care.
15       Do you know what
16  pull-through in Managed Care is
17  referring to there?
18     A.  And, again, I can't say in
19  relation to this document.  But my
20  understanding, pull-through means
21  sharing the formulary status of the
22  Merck product.
23     Q.  Okay.  And let me turn you
24  to the page that ends in Bates 196.

                          101
1  It says, Consistent Messaging.
2       If you look at the bullet
3  point, it says, Core Messages will
4  remain focused on efficacy and
5  safety.
6       Do you recall whether that
7  was a core message that your sales
8  force was delivering in the time --
9  with respect to Vioxx in the time
10  frame July of 2001?

| LAMBERT, WARREN J., (Pages 101:13 to 102:6) | Page 102:2-6 Lack of foundation, no personal knowledge, calls for speculation | *Sustained* |
|---|---|---|

                          101
13  THE WITNESS:  I don't
14  recall the Core Messages at that
15  time.  But, typically, reps would
16  communicate what's in the package
17  insert.
18  BY MR. MURRAY:
19     Q.  Okay.  In terms of
20  determining what would be a message
21  to be delivered by the sales force,
22  does that come from marketing or
23  sales?
24     A.  It comes from the

                          102
1  headquarters team.
2     Q.  Okay.  So would you believe
3  that this, if this was a -- if there

Page 102:9-10
Lack of foundation, no personal knowledge, calls for speculation

| | | |
|---|---|---|
| 4  was a message, a core message to be<br>5  delivered, that would have come from<br>6  headquarters? | | |
| LAMBERT, WARREN J., (Page 102:9 to 102:18)<br><div align=center>102</div>9   THE WITNESS:  Again, I'm<br>10  not familiar with this document.<br>11  BY MR. MURRAY:<br>12      Q.  Okay.  Based on the type of<br>13  document it is, the subject matter,<br>14  et cetera, and based on your<br>15  experience as a senior region<br>16  director in 1999 to 2004, do you<br>17  believe this document would have been<br>18  generated by headquarters? | Page 102:12-18<br>No personal<br>knowledge, calls<br>for speculation | *Sustained* |
| LAMBERT, WARREN J., (Pages 102:21 to 103:7)<br><div align=center>102</div>21   THE WITNESS:  I don't know.<br>22  BY MR. MURRAY:<br>23      Q.  Let me turn you to the page<br>24  ending in Bates number 200 under the<br><div align=center>103</div>1  heading Obstacle Handling<br>2  Hypertension/Edema Messages Vioxx.<br>3      Let me ask you, was<br>4  "obstacle handling" a term that you<br>5  recall being used in the 1999 to 2004<br>6  time frame among the sales force at<br>7  Merck? | Page 102:21<br>No personal<br>knowledge, calls<br>for speculation | |
| LAMBERT, WARREN J., (Page 103:10 to 103:11)<br><div align=center>103</div>10  THE WITNESS:  I believe I'm<br>11  familiar with the term. | | |
| LAMBERT, WARREN J., (Page 103:17 to 103:24)<br><div align=center>103</div>17   A.  Yes, sir.  Obstacle<br>18  handling is, typically, in response<br>19  to a customer inquiry.<br>20      Q.  Okay.  And do you recall<br>21  whether your sales force were trained<br>22  with respect to obstacle handling<br>23  with respect to the hypertension or<br>24  edema issues with Vioxx? | Page 103:20-24<br>Lack of foundation,<br>calls for<br>speculation,<br>assumes facts not in<br>evidence | |
| LAMBERT, WARREN J., (Pages 104:3 to 105:3)<br><div align=center>104</div> | Page 104:3-7<br>Lack of foundation, | |

| | | |
|---|---|---|
| 3    THE WITNESS: I can't<br>4   recall, again, the specifics.  But if<br>5   there are questions, the sales force<br>6   would be prepared to answer those<br>7   questions.<br>8   BY MR. MURRAY:<br>9      Q.  And the answers that the<br>10  sales force provided would be based<br>11  on messages that were approved by<br>12  Medical and Legal at headquarters;<br>13  correct?<br>14     A.   Consistent with the product<br>15  labeling.<br>16     Q.   Yes, sir.<br>17         And I ask you to turn to<br>18  page 206 of the document, please,<br>19  sir.<br>20         Under the heading Managed<br>21  Care where it says, under the second<br>22  bullet point, Train representatives<br>23  how to appropriate pull through<br>24  tiered co-pays and prior<br><div align="center">105</div>1   authorizations.<br>2        Do you know what that could<br>3   be referring to? | calls for<br>speculation,<br>assumes facts not in<br>evidence<br><br>Page 104:8-15<br>Calls for<br>speculation, lack of<br>foundation<br><br>Page 104:20-105:3<br>Calls for<br>speculation, no<br>personal knowledge | |
| LAMBERT, WARREN J., (Pages 105:6 to 106:20)<br><div align="center">105</div>6   THE WITNESS:  Again, I<br>7   can't remember the specifics around<br>8   it.<br>9   BY MR. MURRAY:<br>10     Q.  Do you recall during, that<br>11  time frame of '99 to 2004,<br>12  discussions of pull through of prior<br>13  authorizations?<br>14     A.   Again, not all the nuances,<br>15  but that would be something that the<br>16  sales reps would be aware of.<br>17     Q.   Okay.  Does that mean<br>18  informing medical -- I'm sorry --<br>19  informing healthcare providers that<br>20  the sales rep called on as to how to<br>21  comply with prior authorization<br>22  requirements? | Page 105:6-8<br>Calls for<br>speculation, no<br>personal knowledge<br><br>Page 106:10-16<br>No personal<br>knowledge<br><br>Page 106:17-20<br>Calls for<br>speculation | |

23    A.   That's my understanding.
24    Q.   Okay.  And here we see,

106

1    Increase advocacy for Vioxx in MC.
2         Do you believe MC there is
3    referring to Managed Care?
4    A.   Again, I don't know.  I
5    would assume it is, since the title
6    of it is Managed Care.
7    Q.   Okay.  And then here you
8    see Target list of advocates to
9    include key influencers.
10        Was key influencers a term
11   that was used with you and your sales
12   force in the 1999 to 2004 period with
13   respect to Managed Care?
14   A.   Again, I'd have to be back
15   at that time.  Key influencers could
16   include Managed Care or anyone.
17   Q.   Okay.  Do you have an
18   understanding as to what the term
19   "key influencers" means when it's
20   used in Merck documents?

---

LAMBERT, WARREN J., (Pages 106:23 to 107:4)
106
23   THE WITNESS:  No, sir.  Key
24   influencers could be a variety of

107
1    things.
2    BY MR. MURRAY:
3    Q.   Okay.  Could that include
4    members of P&T Committee?

| | |
|---|---|
| Page 106:23-24 Calls for speculation | |
| Page 107:3-4 Calls for speculation, lack of foundation, no personal knowledge | |

---

LAMBERT, WARREN J., (Pages 107:15 to 108:6)
107
15   THE WITNESS:  It's
16   possible.
17   BY MR. MURRAY:
18   Q.   Okay.  And do you recall
19   whether there was an effort among
20   your sales team in the 1999 to 2004
21   time frame to increase advocacy for
22   Vioxx products among doctors that the
23   sales team called on?
24   A.   And, again, I'm not clear

| | |
|---|---|
| Page 107:15-16 Calls for speculation, lack of foundation, no personal knowledge | |
| Page 108:3-6 Vague/ambiguous | |

| 108 | | |
|---|---|---|
| 1  on what this means, increasing<br>2  advocacy, with this document.<br>3     Q.  Do you remember any<br>4  discussions about sales calls with<br>5  doctors where the term "advocacy" was<br>6  used in connection with Managed Care? | | |
| LAMBERT, WARREN J., (Page 108:9 to 108:10)<br>108<br>9  THE WITNESS:  I can't<br>10   recall the specifics around it. | Vague/ambiguous | |
| LAMBERT, WARREN J., (Page 108:12 to 108:19)<br>108<br>12   Q.  Okay.  And I'll represent<br>13   to you, sir, that this document,<br>14   according to Merck, was produced from<br>15   your custodial files.<br>16         Do you have any reason to<br>17   believe that you did not receive the<br>18   document at the time that it was<br>19   generated? | No personal<br>knowledge | |
| LAMBERT, WARREN J., (Page 108:22 to 108:23)<br>108<br>22   THE WITNESS:  I can't<br>23   recall. | No personal<br>knowledge | |
| LAMBERT, WARREN J., (Pages 109:18 to 110:22)<br>109<br>18   (Exhibit Lambert-LA-5 was<br>19   marked for identification.)<br>20   BY MR. MURRAY:<br>21      Q.  Take a moment to review the<br>22   document and let me know if you<br>23   recall seeing the document before.<br>24      A.  (Witness reviews document.)<br><br>110<br>1  I can't recall the document, but I<br>2  see my name on there, so I assume I<br>3  read it.<br>4      Q.  Okay.  Does that appear to<br>5  be your signature, sir?<br>6      A.  Yes, sir.<br>7      Q.  Okay.  And I think we<br>8  already went through the individuals<br>9  that are listed on the To line, John | | |

| | | |
|---|---|---|
| 10   Fevurly, Holly Jacques, Rob Kincaid<br>11   and Mary Ogle.<br>12         You recall working with<br>13   those individuals in the time frame<br>14   of July of 2001?<br>15       A.  Yes, sir.<br>16       Q.  Okay.  And I'd like to<br>17   refer you to the line where you<br>18   write, Mary and John, The state of<br>19   Louisiana has passed prior<br>20   authorization legislation that is<br>21   scheduled to take effect in January<br>22   of 2002. | | |
| LAMBERT, WARREN J., (Page 111:9 to 111:17)<br>                             111<br>9   Do you recall being aware<br>10   in the time frame of July of 2001<br>11   that prior authorization with respect<br>12   to Louisiana Medicaid was going to<br>13   take effect?<br>14       A.  So, again, I can't remember<br>15   the specifics, but I know there was<br>16   some prior authorization in place at<br>17   that time. | | |
| LAMBERT, WARREN J., (Pages 112:3 to 113:16)<br>                             112<br>3   Q.  And then do you see the<br>4   next sentence where you write, Holly<br>5   is working the system to help us<br>6   understand what implications this may<br>7   have on Merck's interest?<br>8         Do you know what you meant<br>9   when you wrote Holly is working the<br>10   system to help us understand?<br>11       A.  I can't say I recall.<br>12       Q.  Okay.  And at the bottom<br>13   you write, Contact Kathy Arenson at<br>14   -- I'll delete the phone number -- on<br>15   your availability for an 8:00 a.m.<br>16   teleconference on August 20.  Your<br>17   expertise is greatly appreciated.<br>18         Do you know what the<br>19   purpose of -- well, first of all, do<br>20   you know who Kathy Arenson was?<br>21       A.  Yes.<br>22       Q.  Okay.  Who is that person? | Page 113:11-16<br>Lack of foundation,<br>no evidence | |

| | | |
|---|---|---|
| 23   A.  She was my secretary.<br>24   Q.  Okay.  So does it appear<br><br>               113<br>1  that you were advising the recipients<br>2  of this memo to participate in a<br>3  conference call on August 20 of 2001?<br>4    A.  And, again, I can't say for<br>5  sure who was arranging the conference<br>6  call, but it looks like there was<br>7  some schedule.<br>8    Q.  Okay.  Do you know what the<br>9  purpose of that call was?<br>10    A.  2001, I can't recall.<br>11    Q.  Okay.  Do you know why you<br>12  would have been participating in a<br>13  conference call with these<br>14  individuals to discuss Louisiana<br>15  Medicaid prior authorization prior to<br>16  it going into effect? | | |
| LAMBERT, WARREN J., (Page 113:19 to 113:24)<br>              113<br>19  THE WITNESS:  Again, I<br>20  don't recall the specifics here, but<br>21  it wouldn't be uncommon for me to<br>22  work with these individuals as they<br>23  have responsibility for the State of<br>24  Louisiana. | Lack of foundation,<br>no evidence | *Overruled* |
| LAMBERT, WARREN J., (Page 114:2 to 114:10)<br>              114<br>2   Q.  Okay.  Do you recall<br>3  whether you had any plans to discuss<br>4  with your sales force the upcoming<br>5  implementation of prior authorization<br>6  at this time?<br>7    A.  I don't recall, but if<br>8  there was information related to<br>9  processes, we would have wanted to<br>10  inform customers. | | |
| LAMBERT, WARREN J., (Page 119:3 to 119:4)<br>              119<br>3  (Exhibit Lambert-LA-7 was<br>4  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 119:11 to 120:21)<br>              119<br>11   Q.  Do you recognize the | Irrelevant | *Overruled* |

12  document?
13      A.  I don't recall it, but I
14  see my name there, so I received it.
15      Q.  Okay.  It appears to be a
16  string of e-mails.  The e-mail on the
17  last page of the document being the
18  first chronologically and going up
19  through the last chronologically
20  being the first e-mail on the first
21  page of the document.
22          And I'd like to draw your
23  attention to the second e-mail on the
24  first page, which I guess is the --

                                            120
1  also the second chronologically.  It
2  says, from Warren -- from Lambert,
3  Warren J., dated July 12, 2001, at
4  3:41 p.m.
5          Do you see where I am?
6      A.  Yes, sir.
7      Q.  Okay.  And if you drop
8  down, you'll see that you write, The
9  attached task force has been
10  established to assist in the
11  strategic planning of business
12  operations in the uncertain Medicare
13  and Medicaid arena.
14          Is it your recollection
15  that Merck set up a task force to
16  address the Medicaid market?
17      A.  I don't recall, sir.
18      Q.  Okay.  Do you have any
19  reason to believe that what you
20  report in this memo was inaccurate?
21      A.  No, sir.

| | | |
|---|---|---|
| LAMBERT, WARREN J., (Page 121:5 to 121:6)<br>                                  121<br><br>5   (Exhibit Lambert-LA-8 was<br>6   marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 121:13 to 123:17)<br>                                  121<br><br>13   Q.  Do you recall seeing the<br>14  document before?<br>15      A.  Again, I can't recall.<br>16  It's been a while.  But I see my name | Page 122:12-123:17<br>No personal<br>knowledge<br><br>Page 123:15-17<br>Calls for | overruled |

| | |
|---|---|
| 17  on it, so I assume I wrote it. | speculation |
| 18      Q.  Turning to the second page, | |
| 19  can you confirm that that's your | |
| 20  signature? | |
| 21      A.  Yes, sir, it is. | |
| 22      Q.  Okay.  The document appears | |
| 23  to be a memorandum from yourself to | |
| 24  your boss, Mike McClintock, dated | |

<div align="center">122</div>

1  November 9, 2001; is that correct?
2      A.  Yes, sir.
3      Q.  The Subject line is
4  Louisiana Medicaid; is that correct?
5      A.  Yes, sir.
6      Q.  Okay.  And you write, Mike,
7  This note is to brief you on recent
8  actions that have taken place
9  regarding Louisiana Medicaid.
10          Did I read that correctly?
11      A.  Yes, sir.
12      Q.  Okay.  And you refer to, I
13  think we already talked about this,
14  the core team on the project
15  includes, and then it lists some
16  individuals, we already discussed
17  that.
18          Turning you to the second
19  page of the document where it says
20  Next Steps.
21          Do you see where you write,
22  Mary Ogle and Holly are visiting the
23  pharmacy administrator of this
24  program to gain support in slowing

<div align="center">123</div>

1  the process?
2          Do you know what that's
3  referring to?
4      A.  No, sir, I can't say I do.
5      Q.  Okay.  Do you recall
6  whether Mary Ogle and Holly -- I'm
7  assuming that Holly Jacques.  Do you
8  think that's correct?
9      A.  I believe it would be.
10      Q.  Okay.  Do you know whether

<div align="center">40</div>

| | | |
|---|---|---|
| 11   Mary Ogle and Holly Jacques visited<br>12   the Pharm.D. administrator to gain<br>13   support for slowing the process?<br>14      A.  I can't say I do.<br>15      Q.  Okay.  Do you have any<br>16   reason to believe that what you wrote<br>17   there is inaccurate? | | |
| LAMBERT, WARREN J., (Page 123:20 to 123:21)<br>                          123<br>20   THE WITNESS:  I can't<br>21   recall. | No personal<br>knowledge, calls<br>for speculation | Sustained |
| LAMBERT, WARREN J., (Pages 123:23 to 125:15)<br>                          123<br>23   Q.  And then the next line you<br>24   write, The Representatives will<br><br>                          124<br>1   continue calls on physician targets<br>2   identified via P-3 high Medicaid to<br>3   gain physician level support for<br>4   Merck products.<br>5        Do you know what P-3 is<br>6   referring to?<br>7      A.  I can't remember.<br>8      Q.  Could that be some kind of<br>9   computer sales call list?<br>10      A.  I can't recall.<br>11      Q.  Do you recall whether in<br>12   this time frame, November of 2001,<br>13   you or anyone under you in the Sales<br>14   region that you were in targeted high<br>15   Medicaid gain -- I mean high Medicaid<br>16   prescribing physicians?<br>17      A.  The sales reps would call<br>18   on customers within their area, and<br>19   it's possible that individuals could<br>20   be a part of that group.<br>21      Q.  Okay.<br>22      A.  As a course of their<br>23   regular activities.<br>24      Q.  Okay.  Do you remember them<br><br>                          125<br>1   being instructed to focus on gaining<br>2   support for Merck products among<br>3   Medicaid physicians? | | |

| | | |
|---|---|---|
| 4  A.  And I don't recall the<br>5  specifics of this.  Sales reps would<br>6  typically go out and communicate,<br>7  again, any information about our<br>8  products consistent with the<br>9  labeling.<br>10      If there were processes,<br>11  like I think was being described<br>12  here, they would talk about those.<br>13    Q.  Okay.  And, again, you have<br>14  no reason to believe that what you<br>15  wrote in that line is inaccurate? | | |
| LAMBERT, WARREN J., (Page 125:18 to 125:18)<br>125<br><br>18   THE WITNESS:  No, sir. | | |
| LAMBERT, WARREN J., (Pages 126:6 to 127:14)<br>126<br><br>6  (Exhibit Lambert-LA-9 was<br>7  marked for identification.)<br>8  BY MR. MURRAY:<br>9    Q.  Mr. Lambert, have you seen<br>10  that document before?<br>11    A.  I can't recall seeing it,<br>12  but I see I'm listed on the cc line.<br>13    Q.  Okay.  And in the document<br>14  it appears that Mary Ogle, the<br>15  National Account Executive, is<br>16  writing to you and others attaching<br>17  a document called a Customer Profile<br>18  for Louisiana Medicaid.<br>19      Do you recall receiving a<br>20  Customer Profile for Louisiana<br>21  Medicaid at the time of this<br>22  document, which would be July -- I'm<br>23  sorry -- January of 2003?<br>24    A.  I can't recall.<br><br>127<br>1    Q.  Do you have any reason to<br>2  believe that you wouldn't have been<br>3  sent a Customer Profile for the State<br>4  of Louisiana?<br>5    A.  Are you referring to this,<br>6  the contents of this document?<br>7    Q.  Yes, sir.<br>8    A.  I'm on the cc list, so I | Page 127:10-14<br>Calls for<br>speculation, no<br>personal knowledge | *overruled* |

| | | |
|---|---|---|
| 9   assume I received it.<br>10   Q.  Okay.  Were Customer<br>11   Profiles the sort of thing that you<br>12   would have received in the course of<br>13   your role as senior director for --<br>14   senior region director? | | |
| LAMBERT, WARREN J., (Pages 127:17 to 128:17)<br>127<br>17   THE WITNESS:  I'm just<br>18   trying to think.  It's possible.<br>19   BY MR. MURRAY:<br>20   Q.  Okay.  And I just want to<br>21   turn you to the -- I think I just<br>22   want to turn you to the last page of<br>23   the document.<br>24        You see where it lists<br><br>128<br>1   Merck account, under Roman numeral<br>2   VII, Merck state account team?<br>3   A.  Yes, sir.<br>4   Q.  And I think we've already<br>5   talked about several of these<br>6   individuals.<br>7        Do you remember Michael<br>8   Davis?<br>9   A.  I don't.<br>10   Q.  Okay.  And then you're<br>11   listed there under senior business<br>12   director, Warren Lambert.  Which<br>13   looks like she's misspelled your<br>14   name.<br>15        But do you think that's you<br>16   that she's referring to there?<br>17   A.  I would assume so. | Page 127:17-18<br>Calls for<br>speculation, no<br>personal knowledge | |
| LAMBERT, WARREN J., (Pages 129:3 to 132:19)<br>129<br>3   Q.  And I'd like to draw your<br>4   attention to the Roman numeral<br>5   VI where it says Merck Strategy and<br>6   Tactics.<br>7        And there Ms. Ogle writes,<br>8   or Ms. Ogle and Holly Jacques, the<br>9   authors of the document write, first<br>10   bullet point is, Continue to work<br>11   with the State of Louisiana and DHH | Page 129:3-22<br>No personal<br>knowledge<br>Page 130:3-22<br>No personal<br>knowledge, calls<br>for speculation<br><br>Page 132:16-19<br>Calls for<br>speculation | |

12    through Provider Synergies to ensure
13    unrestricted access for key Merck
14    products.
15         Do you recall whether that
16    was a strategy employed by Merck at
17    the time of this document, which
18    would be 2003?
19       A.   I can't recall.
20       Q.   Okay.  Do you have any
21    reason to believe that that was not a
22    strategy employed by Merck?
23       A.   Again, I can't recall.
24       Q.   Okay.  And it says,

                                        130

 1    maximize share for Merck products
 2    preferred on the PDL.
 3         Do you recall there being a
 4    strategy in place to maximize share
 5    for Merck products that were
 6    preferred on the PDL, and I believe
 7    that refers to Preferred Drug List?
 8       A.   I can't remember specifics
 9    around that.
10       Q.   Okay.  You can't recall
11    whether it was a strategy, you can't
12    recall whether it wasn't?
13       A.   In this context, I can't
14    respond either way.  I mean, it's
15    Mary and Holly's document.
16       Q.   All right.  Just if I asked
17    you the question was there a strategy
18    at the time to maximize share for
19    Merck products that were preferred on
20    the PDL, can you answer that
21    question?
22       A.   I can't remember.
23       Q.   And then, finally, Merck
24    strategy and tactics, continue to

                                        131

 1    develop product advocates with Merck
 2    P&T and DUR committee members.
 3         Do you know what DUR is
 4    standing for there?
 5         MR. SALES:  Objection.  I

6  think there was a misstatement in
7  your question.
8  BY MR. MURRAY:
9    Q.  I'm sorry, did I say Merck?
10  Yes.
11        Continue to develop
12  advocates -- product advocates with
13  Medicaid P&T and DUR committee
14  members.
15        MR. MURRAY:  Thank you for
16  the clarification.
17  BY MR. MURRAY:
18    Q.  Do you know what DUR is
19  standing for there?
20    A.  I don't know what it stands
21  for in this document, but, typically,
22  it means Drug Utilization Review.
23    Q.  Okay.  And, typically, Drug
24  Utilization Review is an exercise

132

1  that's undertaken by a Managed Care
2  organization?
3    A.  That's my recollection.
4    Q.  Okay.  Do you have a
5  recollection as to whether that's an
6  exercise that was also undertaken by
7  Medicaid organizations?
8    A.  I can't remember all
9  specifics around that.
10    Q.  Okay.  Do you know whether
11  there was a strategy in place to try
12  to develop product advocates with
13  Medicaid, P&T and DUR Committee
14  members at the time frame of 2002?
15    A.  I can't say I remember.
16    Q.  Okay.  Do you have any
17  reason to disagree with the accuracy
18  of what the authors of this document
19  have reported?

| LAMBERT, WARREN J., (Page 132:22 to 132:23) | Calls for speculation | Sustained |
| 132 | | |
| 22   THE WITNESS:  I can't agree | | |
| 23   with what I didn't write. | | |
| LAMBERT, WARREN J., (Page 133:1 to 133:18) | Page 133:10-18 | |
| 133 | Calls for | |

| | |
|---|---|
| 1   Q.   Well, let me ask you this<br>2   question:  If I said was there a<br>3   policy in place at Merck to try to<br>4   develop product advocates with<br>5   Medicaid, P&T and DUR Committee<br>6   members, could you agree or disagree<br>7   with that statement?<br>8      A.  I'm sorry.  Restate your<br>9   question.<br>10     Q.   The question is, if I were<br>11  to ask you was there a policy to<br>12  develop product advocates with<br>13  Medicaid, P&T and DUR Committee<br>14  members in the time frame 2003, could<br>15  you agree or disagree with that<br>16  statement?<br>17     A.  I can't either way.  I just<br>18  can't recall. | speculation, no<br>personal knowledge |
| LAMBERT, WARREN J., (Page 134:5 to 134:6)<br>134<br>5   (Exhibit Lambert-LA-10 was<br>6   marked for identification.) | |
| LAMBERT, WARREN J., (Pages 134:10 to 137:24)<br>134<br>10  Q.   Do you recall the document?<br>11     A.  I don't recall, but it<br>12  looks like I authored it, my<br>13  signature.<br>14     Q.   Okay.  And turning to the<br>15  second page, is that your signature?<br>16     A.  Yes, sir, it is.<br>17     Q.   Okay.  And the recipients<br>18  of this document are a Tommie Friday.<br>19  Was he a member of your sales force?<br>20     A.  Not a member of my sales<br>21  team.<br>22     Q.   Okay.  Do you know who he<br>23  was?<br>24     A.  I don't recall what his<br><br>135<br>1  function was.<br>2     Q.   Okay.  Do you know whether<br>3  he was in sales?<br>4     A.  I can't recall.<br>5     Q.   Okay.  Mike Haynes? | |

46

6      A.   I believe Mike was a
7  specialty manager.
8      Q.   Okay.  As in specialty
9  sales?
10     A.   Yes, sir.
11     Q.   Okay.  Do you know what
12  specialty he was in?
13     A.   I can't recall.
14     Q.   Okay.  Ranita Howard we
15  discussed earlier, she was a manager
16  under you; correct?
17     A.   Yes, sir.
18     Q.   Stan Joseph?
19     A.   Yes, sir.
20     Q.   Mike McClintock was your
21  boss?
22     A.   Yes.
23     Q.   Greg Planchard, that was
24  another sales manager under you?

                                        136
1      A.   Yes, sir.
2      Q.   Okay.  Chris Prokop,
3  P-r-o-k-o-p?
4      A.   I know she was a manager.
5  I can't remember with what group.
6      Q.   Okay.  Sales?
7      A.   Yes, sir.
8      Q.   Robert Rodriguez?
9      A.   Yes.
10     Q.   In sales, sales manager?
11     A.   Sales manager.
12     Q.   Okay.  Dale Wilson?
13     A.   Sales manager.
14     Q.   And Golden Zenon,
15  Z-e-n-o-n?
16     A.   And I can't remember what
17  -- what his title was or which group
18  he was in.
19     Q.   Okay.  The document appears
20  to be dated January 24, 2002; is that
21  correct?
22     A.   Yes, sir.
23     Q.   And the Subject line is
24  Louisiana Medicaid Action Required;

|  | 137 |  |  |
|---|---|---|---|
| 1 | is that correct? |  |  |
| 2 | A.  Yes, sir. |  |  |
| 3 | Q.  Okay.  And turning you now |  |  |
| 4 | down to, under the heading, The |  |  |
| 5 | Second Request is Critical. |  |  |
| 6 | And beginning, I'll read to |  |  |
| 7 | you, The process now is Merck |  |  |
| 8 | provides clinical data on products in |  |  |
| 9 | the aforementioned categories and the |  |  |
| 10 | P&T Committee will decide which drugs |  |  |
| 11 | make the preferred list. |  |  |
| 12 | They then have the option |  |  |
| 13 | to determine which drugs will be |  |  |
| 14 | reimbursed based on current price, a |  |  |
| 15 | differential price, or supplemental |  |  |
| 16 | rebates. |  |  |
| 17 | Did I read that correctly? |  |  |
| 18 | A.  Yes, sir. |  |  |
| 19 | Q.  It appears from here that |  |  |
| 20 | the P&T Committee could first make a |  |  |
| 21 | decision whether or not the drug |  |  |
| 22 | would be on or off its list without |  |  |
| 23 | any reference to price; is that |  |  |
| 24 | correct? |  |  |

| LAMBERT, WARREN J., (Page 138:3 to 138:7) |  |  |
|---|---|---|
| 138 |  |  |
| 3   THE WITNESS:  I can only |  |  |
| 4   tell you what it says here. |  |  |
| 5   BY MR. MURRAY: |  |  |
| 6     Q.   Is that what you wrote |  |  |
| 7   there? |  |  |

| **LAMBERT, WARREN J., (Page 138:16 to 138:21)** |  |  |
|---|---|---|
| **138** |  |  |
| **16   "QUESTION:  It appears from** |  |  |
| **17   here that the P&T Committee could** |  |  |
| **18   first make a decision whether or not** |  |  |
| **19   the drug would be on or off its list** |  |  |
| **20   without any reference to price; is** |  |  |
| **21   that correct?")** |  |  |

| LAMBERT, WARREN J., (Page 139:1 to 139:3) |  |  |
|---|---|---|
| 139 |  |  |
| 1   THE WITNESS:  And, again, I |  |  |
| 2   can't confirm that.  I'm just reading |  |  |
| 3   what's written here. |  |  |

| LAMBERT, WARREN J., (Page 139:12 to 139:18) |  |  |
|---|---|---|

| | | |
|---|---|---|
| 139<br>12  Q.  I mean, does it not say<br>13  that first the committee decides on<br>14  whether or not it's on the preferred<br>15  list and then after it's made that<br>16  decision, they can determine whether<br>17  or not they will reimburse based on<br>18  its price or some other price? | | |
| LAMBERT, WARREN J., (Page 140:12 to 140:13)<br>140<br>12   Q.   Is that a reasonable<br>13   interpretation of what you wrote? | | |
| LAMBERT, WARREN J., (Pages 140:24 to 142:4)<br>140<br>24  THE WITNESS:  I can't<br><br>141<br>1  recall.<br>2  BY MR. MURRAY:<br>3     Q.   Okay.  And here on Page 2,<br>4  under What's being done, and I'll<br>5  turn you to the sentence beginning<br>6  The front line team.<br>7        And you write, The front<br>8  line team of Holly Jacques<br>9  (Government Affairs), Mary Ogle<br>10  (Managed Care), and Fran Kaiser<br>11  (Regional Medical Director) are<br>12  working with the College of Pharmacy<br>13  and the legislature to provide<br>14  information that has been requested<br>15  and to position Merck favorably.<br>16        They will meet again with<br>17  key decision-makers to learn more and<br>18  to educate on Merck products with<br>19  policy.<br>20        Did I read that correctly?<br>21  A.  Yes, sir.<br>22  Q.  Okay.  Do you know what you<br>23  were referring to here when you wrote<br>24  "key decision-makers"?<br><br>142<br>1     A.  I can't recall.<br>2     Q.  Do you know whether key<br>3  decision-makers would have included | Page 140:24-141:24<br>No personal<br>knowledge | Sustained |

| | | |
|---|---|---|
| 4   personnel at Louisiana Medicaid? | | |
| LAMBERT, WARREN J., (Pages 142:8 to 143:20) | Page 142:17-21 | |
| 142 | Calls for | |
| 8   THE WITNESS:  I can't | speculation | |
| 9   recall. | | |
| 10  BY MR. MURRAY: | | |
| 11      Q.   And then under the heading | | |
| 12   that you write, What Can We Do.  Do | | |
| 13   you know what the "we" is referring | | |
| 14   to there? | | |
| 15      A.   Again, I -- I mean, I'd | | |
| 16   just be speculating.  I don't know. | | |
| 17      Q.   As the author of the | | |
| 18   document, would it appear to you that | | |
| 19   the "we" refers to the personnel who | | |
| 20   were in the To line? | | |
| 21      A.   That's possible. | | |
| 22      Q.   Okay.  And under that | | |
| 23   heading you write, There is a | | |
| 24   formulary meeting in March where | | |
| | | |
| 143 | | |
| 1   decisions will be made on which | | |
| 2   products are preferred on the | | |
| 3   "Pharmacopoeia". | | |
| 4      The office-based team | | |
| 5   should contact each P&T Committee | | |
| 6   member to make sure that they are | | |
| 7   fully aware of the benefits and | | |
| 8   features of those products up for | | |
| 9   review. | | |
| 10      Do you know what you're | | |
| 11   referring to when you refer to | | |
| 12   office-based team there? | | |
| 13      A.   And, again, I can't recall | | |
| 14   all the specifics here, but, | | |
| 15   typically, office-based teams means | | |
| 16   sales teams. | | |
| 17      Q.   Okay.  Sales | | |
| 18   representatives who call on | | |
| 19   physicians? | | |
| 20      A.   Uh-huh. | | |
| LAMBERT, WARREN J., (Page 144:9 to 144:22) | | |
| 144 | | |
| 9   Q.   And here were you | | |
| 10   instructing the office-based sales | | |

| | | |
|---|---|---|
| 11  team to call on P&T Committee<br>12  members?<br>13      A.  I don't recall the<br>14  specifics here, but I mentioned<br>15  earlier, sometimes in the course of<br>16  sales reps calling on customers, they<br>17  could be P&T Committee members.<br>18      Q.  Okay.  Does it appear here<br>19  that there was or that you were<br>20  advocating an effort to call<br>21  specifically on P&T Committee<br>22  members? | | |
| LAMBERT, WARREN J., (Page 145:1 to 145:2)<br>145<br>1   THE WITNESS:  I'm not sure<br>2  here. | | |
| LAMBERT, WARREN J., (Pages 145:4 to 146:9)<br>145<br>4  Q.  You're just not sure how to<br>5  interpret it either way?<br>6      A.  Yes, sir.<br>7      Q.  Okay.  And then the last<br>8  sentence of that paragraph you wrote,<br>9  Let's do our part to ensure that the<br>10  P&T members know why our products are<br>11  the right choice for appropriate<br>12  patients.<br>13         Did I read that correctly?<br>14      A.  Yes, sir.<br>15      Q.  And then, finally, you<br>16  wrote in the last paragraph, Keep in<br>17  mind the business implications are<br>18  tremendous and success in this<br>19  segment will have positive spillover<br>20  into other areas.<br>21         Do you know what you were<br>22  referring to when you said that the<br>23  business implications are tremendous?<br>24      A.  No, sir.<br>146<br>1      Q.  Okay.  Do you know what's<br>2  meant by success in the segment will<br>3  have positive spillover into other<br>4  areas?<br>5      A.  No, sir.<br>6      Q.  Okay.  Could that be | Page 146:6-9<br>Calls for<br>speculation | Sustained |

| | | |
|---|---|---|
| 7   referring to if you're successful<br>8   with Medicaid, there may be greater<br>9   prescriptions in other areas? | | |
| LAMBERT, WARREN J., (Page 146:12 to 146:12)<br>                                        146<br><br>12   THE WITNESS:  I can't say. | Calls for<br>speculation | *Sustained* |
| LAMBERT, WARREN J., (Page 146:18 to 146:19)<br>                                        146<br><br>18   (Exhibit Lambert-LA-11 was<br>19   marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 147:11 to 150:9)<br>                                        147<br><br>11   Q.   Okay.  Is that your name on<br>12   the To line?<br>13      A.   Yes, it is.<br>14      Q.   Okay.  I'll represent to<br>15   you, sir, this document was produced<br>16   from your custodial files.<br>17         Do you have any reason to<br>18   believe that you did not receive it<br>19   at the time that it was written?<br>20      A.   No, sir.<br>21      Q.   Okay.  The date of the<br>22   document is 5/11/02; is that correct?<br>23      A.   Yes, sir.<br>24      Q.   Okay.  And it appears that<br>                                        148<br>1   the subject of the document, written<br>2   by Holly Jacques, is a summary of a<br>3   P&T Committee hearing on 5/9/02 and<br>4   summary of the Joint House and Senate<br>5   Health and Welfare Committee Hearing<br>6   on 5/10/02.<br>7         Did I read that correctly?<br>8      A.   Yes, sir.<br>9      Q.   Turning you to the page<br>10   ending in 272, under Cox-IIs, it<br>11   says, Provider Synergies recommended<br>12   the following drugs be included on<br>13   the PDL, Celebrex and Bextra.<br>14         Do you recall that when the<br>15   first PDL was issued for Louisiana<br>16   Medicaid, the only two Cox-IIs that<br>17   were given preferred status on the<br>18   PDL were Celebrex and Bextra?<br>19      A.   I don't recall the timing | Page 150:3-9<br>Calls for<br>speculation, lack of<br>foundation | |

20  of all that, but I do recall those
21  products being in the Cox-II
22  category.
23     Q.  Okay.  You recall that
24  Vioxx was not given preferred drug

149

1   status at that time, at the time that
2   Celebrex and Bextra were given that
3   status?
4      A.  I can't recall the specific
5   timing, but I know there was a point
6   that Vioxx was not there.
7      Q.  Okay.  And here Ms. Jacques
8   writes, A few members of the P&T
9   Committee asked about the recent news
10  stories about the Cox-IIs having
11  potential cardiovascular side
12  effects.
13        Did I read that correctly?
14     A.  Yes, sir.
15     Q.  Do you recall whether at
16  that time you were aware that members
17  of the P&T Committee had concerns
18  about cardiovascular side effects?
19     A.  I don't recall.
20     Q.  Okay.  The next sentence
21  Ms. Jacques writes to you, Provider
22  Synergies stated that there are no
23  conclusions on this issue at this
24  time.

150

1         Did I read that correctly?
2      A.  Yes, sir.
3      Q.  Okay.  In making sales
4   calls on P&T members, do you recall
5   whether part of Merck's message with
6   respect to the cardiovascular issue
7   was that there were no conclusions on
8   whether there was a cardiovascular
9   side effect at that time?

| LAMBERT, WARREN J., (Page 150:12 to 150:13) 150 | Calls for speculation, lack of foundation | Sustained |
|---|---|---|
| 12  THE WITNESS:  I can't<br>13  recall at that time. | | |
| LAMBERT, WARREN J., (Pages 150:15 to 151:2) 150 | Page 150:21-151:2<br>No personal | |

| | | |
|---|---|---|
| 15  Q.  Okay.  And then Ms. Jacques<br>16  writes to you, Provider Synergies did<br>17  not mention the fact that Vioxx has a<br>18  GI protective indication.<br>19        Did I read that correctly?<br>20     A.  Yes, sir.<br>21     Q.  Okay.  Do you recall<br>22  whether at the time that this<br>23  document was written, Merck's sales<br>24  managers under your direction were<br>                                    151<br>1  representing the benefits of Vioxx<br>2  with respect to GI issues? | knowledge, lack of<br>foundation | |
| LAMBERT, WARREN J., (Page 151:6 to 151:7)<br>                                    151<br>6  THE WITNESS:  I can't<br>7  recall the specifics around that. | No personal<br>knowledge, lack of<br>foundation | |
| LAMBERT, WARREN J., (Page 151:17 to 151:18)<br>                                    151<br>17   (Exhibit Lambert-LA-12 was<br>18  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 152:1 to 156:11)<br>                                    152<br>1  Q.  Okay.  And do you recognize<br>2  the document, sir?<br>3     A.  Yes, sir, I recognize it.<br>4     Q.  Okay.  And what do you<br>5  recognize the document as?<br>6     A.  It says here, ArkLaTex<br>7  Region, 2002 Tactical Plans.<br>8     Q.  And I believe you testified<br>9  earlier that you drafted tactical<br>10  plans.  Did you draft this particular<br>11  tactical plan?<br>12     A.  I can't recall.<br>13     Q.  Okay.  At the second page<br>14  of the document, is that a memo by<br>15  you?<br>16     A.  Yes, sir.<br>17     Q.  Okay.  And is that your<br>18  signature?<br>19     A.  Yes, it is.<br>20     Q.  And the To line is to<br>21  ArkLaTex region representatives?<br>22     A.  Yes, sir.<br>23     Q.  Okay.  From yourself, and | Page 154:2-10<br>Lack of personal<br>knowledge,<br>irrelevant | |

24   the Subject is 2002 Tactical Plans;

153

1   correct?
2       A.   Yes, sir.
3       Q.   Okay.  And you write in the
4   first sentence, Enclosed are tactical
5   plans for products within your area
6   of responsibility.
7           The condensed product focus
8   should allow you and your peers to
9   effectively "guard the door" for
10   those products under your
11   responsibility.
12          Did I read that correctly?
13      A.   Yes, you did.
14      Q.   Okay.  Do you know what you
15   meant by "guard the door"?
16      A.   I can't say I do.
17      Q.   Okay.  And then here it
18   says, As always, these documents
19   should never be taken into
20   physicians' offices, hospital
21   displays or any area where they could
22   fall into the wrong hands.
23          Do you know what you meant
24   by the wrong hands?

154

1       A.   No, sir.
2       Q.   Okay.  Do you know why you
3   were instructing that they should not
4   be taken into physicians' offices or
5   hospital displays?
6       A.   I can't recall the
7   specifics here, but, typically, we
8   wouldn't want company documents to be
9   available to the customer or patients
10   or anyone.
11      Q.   Okay.  Let me turn you,
12   sir, to the page that ends in 7.  The
13   heading Tactical Plan for Vioxx
14   ArkLaTex region.  It says, 1S 2002
15   goals for Vioxx.
16          Do you know what 1S is
17   referring to there?
18      A.   Typically, 1S means first
19   semester.

20    Q.  Okay.  Is semester a
21  quarter or is that a different time
22  frame?
23    A.   Semester would be the first
24  six months in a year.

155

1    Q.   Okay.  So this would be the
2  plan for the first six months of
3  2002?
4    A.  I would assume so.
5    Q.   Okay.  And here you --
6  rather, the plan calls for three
7  goals.  The first goal is, Deliver
8  efficacy message first which
9  differentiates Vioxx and drive market
10  share in the coxib class, maintain a
11  50 percent share for Vioxx.
12       Did I read that correctly?
13    A.   Yes, you did.
14    Q.   Okay.  The second is,
15  Maximize enrollment and pull VIP.
16  Achieve 80 percent market share in
17  each hospital with a signed contract.
18       Do you know what pull VIP
19  is referring to there?
20    A.  I don't.
21    Q.   Okay.  And then you write,
22  Provide balanced responses to
23  physicians CV and renal obstacles and
24  return to the core messages for

156

1  Vioxx.
2       Did I read that correctly?
3    A.   Yes, you did.
4    Q.   Okay.  Do you know what the
5  core messages for Vioxx were in the
6  first semester of 2002?
7    A.  I don't.
8    Q.   Okay.  Would you expect
9  your sales force to follow the
10  recommendations of this tactical plan
11  in making their calls on physicians?

LAMBERT, WARREN J., (Pages 156:14 to 157:17)

156

14  THE WITNESS:  Again, I
15  don't know all the specifics here.

| | | |
|---|---|---|
| 16  But what I would expect is the sales<br>17  -- sales force to communicate<br>18  information about the product<br>19  consistent with the product labeling.<br>20  BY MR. MURRAY:<br>21      Q.  Would those messages also<br>22  be consistent with core messages that<br>23  were communicated to them from<br>24  headquarters?<br>                                 157<br>1      A.  If it was a part of their<br>2  product labeling.<br>3      Q.  Let me see if I can<br>4  understand that.  Are core messages a<br>5  part of the product labeling?<br>6      A.  The core messaging is a<br>7  part of the product labeling, yes.<br>8      Q.  Or is it that the core<br>9  messaging has to be consistent with<br>10  the product labeling?<br>11      A.  It has to be consistent<br>12  with the product labeling.<br>13      Q.  Okay.  So, again, assuming<br>14  that the core messages are consistent<br>15  with the product labeling, you would<br>16  expect your sales force to deliver<br>17  that core message? | | |
| LAMBERT, WARREN J., (Page 157:20 to 157:22)<br>                                 157<br>20  THE WITNESS:  As long as it<br>21  was consistent with the product<br>22  labeling. | | |
| LAMBERT, WARREN J., (Pages 157:24 to 158:7)<br>                                 157<br>24  Q.  Okay.  And would that be<br>                                 158<br>1  true with respect to all sales calls<br>2  that they went on?<br>3      A.  Would what be true?<br>4      Q.  That you would expect them<br>5  to deliver the core message, provided<br>6  the core message was consistent with<br>7  product labeling? | | |
| LAMBERT, WARREN J., (Page 158:13 to 158:20)<br>                                 158<br>13  A.  I would expect that they | Page 158:16-20<br>Calls for<br>speculation | *Sustained* |

| | | |
|---|---|---|
| 14  would communicate messages consistent<br>15  with the product labeling.<br>16      Q.   My question was a little<br>17  different.  Would you expect that<br>18  they would communicate core messages<br>19  provided they were consistent with<br>20  the product labeling? | | |
| LAMBERT, WARREN J., (Page 159:6 to 159:12)<br><div align=center>159</div>6    THE WITNESS:  The message,<br>7   as long as it was consistent with the<br>8   product labeling.<br>9   BY MR. MURRAY:<br>10      Q.   Okay.  And would that also<br>11  be true for their calls on P&T<br>12  Committee members? | Page 159:6-8<br>Calls for<br>speculation<br><br>Page 159:10-12<br>Calls for<br>speculation,<br>overbroad | |
| LAMBERT, WARREN J., (Page 159:15 to 159:24)<br><div align=center>159</div>15   THE WITNESS:  Again, their<br>16  messages would be consistent with the<br>17  product labeling, no matter who they<br>18  were talking to.<br>19  BY MR. MURRAY:<br>20      Q.   Okay.  But would you expect<br>21  them to deliver the core message<br>22  provided it was consistent with the<br>23  product labeling when they call on<br>24  members of the P&T Committee? | Page 159:15-18<br>Calls for<br>speculation,<br>overbroad | |
| LAMBERT, WARREN J., (Pages 160:20 to 161:8)<br><div align=center>160</div>20   Q.   My question is, and I'll<br>21  limit it to the message that's<br>22  contained here in the first line of<br>23  the tactical plan for Vioxx for first<br>24  semester of 2002.<br><div align=center>161</div>1        During the first semester<br>2   of 2002, provided that the message<br>3   was consistent with product labeling,<br>4   would you expect the sales force<br>5   under your direction to deliver this<br>6   message as per the tactical plan when<br>7   they made sales calls on P&T<br>8   Committee members? | Lack of<br>speculation,<br>overbroad | |
| LAMBERT, WARREN J., (Page 161:11 to 161:17)<br><div align=center>161</div> | Lack of<br>speculation, | |

| | | |
|---|---|---|
| 11    THE WITNESS:  My<br>12    expectation would be that the sales<br>13    representatives, in talking to P&T<br>14    Committee members or anyone in the<br>15    medical community would deliver a<br>16    core message consistent with the<br>17    product labeling. | overbroad | |
| LAMBERT, WARREN J., (Pages 162:1 to 163:18)<br>162<br>1    (Exhibit Lambert-LA-13 was<br>2    marked for identification.)<br>3    BY MR. MURRAY:<br>4        Q.   And let me ask you to take<br>5    a moment to review the document.  Let<br>6    me know if you're familiar with the<br>7    document.<br>8        A.   (Witness reviews document.)<br>9    Yes, sir, I am.<br>10        Q.   Okay.  What is the<br>11    document?<br>12        A.   I can't remember all the<br>13    items here from 2002, but I did<br>14    business reviews for Mike McClintock<br>15    all the time.<br>16        Q.   Okay.  And this appears to<br>17    be one of the business reviews that<br>18    you prepared for Mike McClintock?<br>19        A.   Yes, sir.<br>20        Q.   Okay.  And this one is<br>21    dated June 10, 2002; correct?<br>22        A.   Yes, sir.<br>23        Q.   Okay.  And I'd like to turn<br>24    you to the page ending in 48, under<br><br>163<br>1    Performance Summary, where you wrote<br>2    to Mike McClintock, Areas of Focus.<br>3    And the first one is, Blunt negative<br>4    impact of Louisiana Medicaid prior<br>5    authorization.<br>6        Do you know what you were<br>7    referring to there?<br>8        A.   No, sir.<br>9        Q.   Okay.  Do you know what<br>10    negative impact there was from<br>11    Louisiana Medicaid's prior | | |

| | | |
|---|---|---|
| 12  authorization, if any, on Vioxx?<br>13     A.  No, sir.<br>14     Q.  Do you know what sales<br>15  personnel under your directive may<br>16  have been doing to blunt any negative<br>17  impact of Louisiana Medicaid prior<br>18  authorization -- | | |
| LAMBERT, WARREN J., (Page 163:21 to 163:21)<br>163<br>21   Q.  -- with respect to Vioxx? | | |
| LAMBERT, WARREN J., (Pages 163:24 to 164:6)<br>163<br>24   THE WITNESS:  No, sir.<br><br>164<br>1  BY MR. MURRAY:<br>2     Q.  Okay.  If you wrote that<br>3  this was an area of focus, would you<br>4  expect that that was something that<br>5  the sales force underneath you would<br>6  be focused on? | Page 164:1-6<br>Assumes facts not<br>in evidence | *overruled* |
| LAMBERT, WARREN J., (Pages 164:9 to 165:11)<br>164<br>9   THE WITNESS:  Again, I<br>10  can't say.  I would have gone back to<br>11  2002 to remember what I was thinking<br>12  at this time.<br>13  BY MR. MURRAY:<br>14     Q.  But, generally, when you<br>15  wrote regarding areas of focus to<br>16  Mike McClintock, are you talking<br>17  about areas of focus for the<br>18  personnel that are under your<br>19  direction?<br>20     A.  I can't recall.  In this<br>21  case, it could have been my area of<br>22  focus, it could have been the<br>23  managers.<br>24     Q.  But in your position as<br>165<br>1  senior director, you didn't make any<br>2  sales calls, did you?<br>3     A.  I made sales calls with<br>4  representatives.<br>5     Q.  Okay.  Well, let me ask<br>6  you, you made sales calls with | Page 164:9-12<br>Assumes facts not<br>in evidence<br><br>Page 165:5-11<br>Calls for<br>speculation | |