| | | |
|---|---|---|
| 7  representatives, would you have -- <br> 8  would those sales calls have involved <br> 9  the areas of focus that are directed <br> 10  -- I mean, that you identify as areas <br> 11  of focus here from Mr. McClintock? | | |
| LAMBERT, WARREN J., (Page 165:14 to 165:22) <br>                             165 <br> 14  THE WITNESS:  And, again, I <br> 15  can't recall all the things here. <br> 16        On sales calls, my <br> 17  expectation is to observe the sales <br> 18  rep, make sure, again, they're <br> 19  communicating the information that's <br> 20  in alignment with our, you know, <br> 21  labeling and our policies and hear <br> 22  back from customers. | | |
| LAMBERT, WARREN J., (Page 166:4 to 166:5) <br>                             166 <br> 4  (Exhibit Lambert-LA-14 was <br> 5  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 166:15 to 168:11) <br>                             166 <br> 15  Q.  Sir, do you recognize the <br> 16  document? <br> 17     A.  I see my name here on the <br> 18  To list, yes, sir. <br> 19     Q.  Okay.  And this is, <br> 20  actually, a series of e-mails that <br> 21  begins with, chronologically, with an <br> 22  e-mail from a Eugene Sun to a number <br> 23  of individuals, including yourself. <br> 24        And that e-mail is <br><br>                           167 <br> 1  responded to by Chuck Grezlak, again, <br> 2  writing to a number of individuals, <br> 3  including yourself; is that correct? <br> 4     A.  Yes, sir. <br> 5     Q.  Okay.  And then it appears <br> 6  that you forward an e-mail in <br> 7  response to Mr. Grezlak's e-mail to <br> 8  your boss, Mike McClintock; is that <br> 9  correct? <br> 10     A.  Yes, sir. <br> 11     Q.  Okay.  And then Mike <br> 12  McClintock wrote back to you; is that | | |

13  correct?
14      A.   Yes, sir.
15      Q.   Okay.  And in your e-mail
16  forwarding the e-mails to
17  Mr. McClintock, you write, Mike, I am
18  involved in all teleconferences and
19  have developed a tactical plan that
20  the OBR team is currently
21  implementing.
22          OBR team, is that referring
23  to office-based representatives?
24      A.   I can't recall the

                                168
1  specifics, but OBR in our world means
2  office-based reps.
3      Q.   Okay.  Do you recall
4  developing a tactical plan in 2002
5  that was being implemented by the
6  office-based teams?
7      A.   I do not recall.
8      Q.   Is that something that
9  would have fallen within your purview
10  as a senior director at that time
11  frame?

LAMBERT, WARREN J., (Pages 168:14 to 170:4)
                                168
14  THE WITNESS:  And, again,
15  not sure.
16  BY MR. MURRAY:
17      Q.   Okay.  My question, just to
18  clarify, for counsel's objection, is,
19  would developing of a tactical plan
20  to be implemented by the OBR team be
21  something that would have fallen
22  within your purview as the senior
23  region director?
24      A.   Tactical plans are

                                169
1  typically developed at headquarters.
2  Sometimes what we would do is just
3  put our region name on it to
4  personalize it.  So, yes to that.
5      Q.   And, in any event,
6  Mr. McClintock wrote back to you
7  indicating this is fine; is that
8  correct?

| | | |
|---|---|---|
| 9   A.   Yes, sir.<br>10   Q.   Okay.  In the next<br>11  paragraph you wrote, At this stage, a<br>12  meeting with key decision-makers in<br>13  the legislature was originally<br>14  scheduled for this Wednesday and was<br>15  postponed until next week.<br>16       Fran Kaiser and Holly<br>17  Jacques are in the process of seeking<br>18  an audience with the hopes of<br>19  planting seeds of inquiry to Provider<br>20  Synergies regarding the ARB class,<br>21  Vioxx, and Zocor.<br>22       Do you know what you -- who<br>23  you were referring to when you wrote<br>24  that they were seeking an audience?<br>              170<br>1   A.  No, sir, I can't recall.<br>2   Q.  Do you have any reason to<br>3  believe that what you wrote at that<br>4  time is inaccurate? | | |
| LAMBERT, WARREN J., (Page 170:7 to 170:8)<br>            170<br>7  THE WITNESS:  I see I wrote<br>8  it here. | | |
| LAMBERT, WARREN J., (Page 170:10 to 170:19)<br>            170<br>10   Q.  As you sit here, do you<br>11  have any reason to think that that's<br>12  wrong, that you were incorrect in<br>13  writing that Fran Kaiser and Holly<br>14  Jacques were in the process of<br>15  seeking an audience with the hopes of<br>16  planting seeds of inquiry to Provider<br>17  Synergies regarding the ARB class,<br>18  Vioxx and Zocor?<br>19   A.  No, sir. | | |
| LAMBERT, WARREN J., (Page 171:10 to 171:11)<br>            171<br>10  (Exhibit Lambert-LA-15 was<br>11  marked for identification.) | | |
| LAMBERT, WARREN J., (Page 171:16 to 171:23)<br>            171<br>16   Q.  Okay.  I'll represent to<br>17  you that Merck has represented to us<br>18  it has been produced from your | | |

| | | |
|---|---|---|
| 19  custodial files and that it had a<br>20  date of May 21, '02.<br>21      Do you have any reason to<br>22  believe that you did not receive this<br>23  document in that time frame? | | |
| LAMBERT, WARREN J., (Page 172:2 to 172:18)<br>                    172<br>2  THE WITNESS:  I can't<br>3  recall.<br>4  BY MR. MURRAY:<br>5     Q.  Do you see the heading<br>6  there, Medicaid Blitz Initiative --<br>7     A.  Yes, sir.<br>8     Q.  -- in the title?<br>9     A.  Uh-huh.<br>10     Q.  Do you recall there being<br>11  anything called a Medicaid Blitz or<br>12  Medicaid Blitz Initiative in the time<br>13  frame of May 2002?<br>14     A.  I don't remember.<br>15     Q.  Okay.  You can't say that<br>16  there was, can't say that there<br>17  wasn't?<br>18     A.  I just don't remember. | | |
| LAMBERT, WARREN J., (Pages 174:13 to 176:1)<br>                    174<br>13  Q.  Well, my question is,<br>14  whether you recall sending out a<br>15  state of Medicaid address via MVX on<br>16  May 15th of 2002?<br>17     A.  I don't recall.<br>18     Q.  Do you recall ever sending<br>19  out something called a state of<br>20  Medicaid address?<br>21     A.  I don't recall.<br>22     Q.  Okay.  MVX, is that the<br>23  voice mail system?<br>24     A.  Yes, sir.<br>                    175<br>1     Q.  Okay.  Do you have<br>2  abilities to send out mass voice<br>3  mails?<br>4     A.  Yes, sir.<br>5     Q.  Okay.  And you had ability<br>6  to send that out to your sales<br>7  representatives who were under your | | |

8   direction?
9      A.   That's correct.
10     Q.   Okay.  Turning you down to
11  the next line, which hopefully you
12  can read, I don't think it's a poor
13  copy there.
14          The author of this document
15  writes, Representatives will blitz
16  high Medicaid physicians with an
17  added message of 12 months of refills
18  to ensure that their patients get the
19  drug that they prescribe.
20          Do you recall instructing
21  your representatives to counsel the
22  physicians that they call on to --
23  I'm sorry -- or delivering a message
24  to the physicians that they call on

                              176
1   to prescribe for 12 months?

LAMBERT, WARREN J., (Pages 176:14 to 179:20)
                              176
14  And I'm asking whether he's
15  aware of, himself, ever having
16  advised persons under his direction
17  to deliver such a message.
18          THE WITNESS:  I can't
19  recall.
20  BY MR. MURRAY:
21     Q.   Okay.  And under the next
22  heading, the author of the document
23  writes, Managers will conduct a
24  cluster level overview of the

                              177
1   Medicaid business with their teams
2   within the next week.
3          Do you know what's meant by
4   a cluster level overview?
5      A.   I don't, sir.
6      Q.   Okay.  Was that a term,
7   "cluster level," was that a term that
8   was used by you or persons that you
9   worked with when you were senior
10  director during this time frame?
11     A.   Yes, sir.
12     Q.   Okay.  And what did cluster

13  level refer to?
14      A.   Cluster reflected the
15  territories in a given geographic
16  area.
17      Q.   Okay.  And what would
18  cluster level be within your
19  geographic area?  I guess, what were
20  the clusters?
21          Can you -- would it be by
22  city, by zone, or would it just vary?
23      A.   It would be territory
24  level.

                                        178

1       Q.   Okay.  So you would have,
2   you're a director over a region, and
3   then there are managers who are
4   directors.  Are they assigned
5   districts?
6       A.   Yes, sir.
7       Q.   Okay.  And then within the
8   districts, there would be clusters?
9       A.   Yes, sir.
10      Q.   Okay.  Do you recall there
11  being cluster level overviews of
12  Medicaid business in the 2002 time
13  frame?
14      A.   Again, I don't recall the
15  specific linkage here.  As a part of
16  sales reps calling on customers, they
17  could be physicians who are
18  affiliated with Medicaid.
19      Q.   Okay.  The author of the
20  document writes, Managers will
21  reinforce that all Merck products are
22  available on the Medicaid formulary.
23          Do you know what that's
24  referring to?

                                        179

1       A.   No, sir.
2       Q.   Was it possible for a drug
3   to be on the Medicaid formulary for
4   Louisiana without being on the PDL?
5       A.   I'm not sure.
6       Q.   Okay.  So do you know
7   whether this is referring to the drug
8   being on the PDL or being on the --

| | | |
|---|---|---|
| 9  or something else?<br>10    A.  Again, I don't know.  I<br>11  don't see a reference to PDL there.<br>12    Q.  Okay.  Just a reference to<br>13  formulary.<br>14        Do you know what -- I think<br>15  I may have already asked this, but do<br>16  you know what formulary is referring<br>17  to there?<br>18    A.  Yes, sir.<br>19    Q.  Okay.  What is formulary<br>20  referring to there? | | |
| LAMBERT, WARREN J., (Pages 179:24 to 180:17)<br>179<br>24  MR. MURRAY:  Generally.<br>180<br>1  Medicaid.  In specific, Medicaid<br>2  formulary.<br>3        THE WITNESS:  My<br>4  understanding is, the formulary is a<br>5  list of approved products in a<br>6  hospital system, Managed Care system,<br>7  or in a Medicaid system.<br>8  BY MR. MURRAY:<br>9    Q.  Okay.  So is it your<br>10  understanding a drug can be on<br>11  formulary, but not on a preferred<br>12  tier?<br>13    A.  My experience says yes.<br>14    Q.  Okay.  Do you have any<br>15  understanding as to whether Louisiana<br>16  Medicaid had the authority to exclude<br>17  drugs from its formulary? | | |
| LAMBERT, WARREN J., (Pages 180:22 to 181:1)<br>180<br>22  Q.  At this time frame.  And<br>23  I'm just trying to find your personal<br>24  understanding, whether you had one at<br>181<br>1  that time. | | |
| LAMBERT, WARREN J., (Page 181:3 to 181:4)<br>181<br>3  THE WITNESS:  I don't<br>4  recall. | | |
| LAMBERT, WARREN J., (Page 181:6 to 181:11)<br>181 | | |

| | | |
|---|---|---|
| 6   Q.   Okay.  The author of the<br>7   document writes, Medicaid initiative<br>8   has a direct impact on the future of<br>9   Merck.<br>10         Did I read that correctly?<br>11   A.   Yes, sir. | | |
| LAMBERT, WARREN J., (Pages 181:24 to 182:11)<br>                              181<br>24   Q.   Do you recall it being<br>                              182<br>1   communicated to you that Medicaid --<br>2   that a Medicaid initiative would have<br>3   a direct impact on the future of<br>4   Merck?<br>5     A.   No, sir.<br>6     Q.   Without respect to those<br>7   exact words, was it your<br>8   understanding that Medicaid was<br>9   important to the future -- the<br>10   Medicaid business segment was<br>11   important to the future of Merck? | Page 182:6-11<br>Calls for<br>speculation, lack of<br>foundation,<br>overbroad | *Sustained* |
| LAMBERT, WARREN J., (Page 182:14 to 182:15)<br>                              182<br>14   THE WITNESS:  I can't speak<br>15   to the future of Merck. | Calls for<br>speculation, lack of<br>foundation,<br>overbroad | |
| LAMBERT, WARREN J., (Page 182:17 to 182:21)<br>                              182<br>17   Q.   All right.  Had anyone<br>18   communicated to you that the Medicaid<br>19   business segment was important to the<br>20   future of Merck as of this time<br>21   frame, 2002? | | |
| LAMBERT, WARREN J., (Pages 182:24 to 186:12)<br>                              182<br>24   THE WITNESS:  No, sir.<br>                              183<br>1   BY MR. MURRAY:<br>2     Q.   Okay.  And Item J, Ask<br>3   representatives to capitalize on<br>4   existing relationships with high<br>5   Medicaid writers in their respective<br>6   geographies.<br>7         And then it says, i.e.,<br>8   request that physicians call<br>9   University of Louisiana College of<br>10   Pharmacy at Monroe, ULM, closed | Page 184:1-185:24<br>Lack of personal<br>knowledge<br><br>Page 186:1-12<br>Overbroad,<br>vague/ambiguous | |

11  parens.
12      Do you recall -- that's
13  what the author writes.  I'm not
14  suggesting that you were the author
15  of the document.
16      Do you recall whether you
17  ever instructed sales representatives
18  under your direction to capitalize on
19  existing relationships with high
20  Medicaid writers?
21    A.  And I can't, again, speak
22  to this, but in the course of a sales
23  representative's work, as they're
24  communicating about the products,

                                                184

1  their appropriate labeling,
2  balancing, features benefits, they
3  would develop relationships with
4  customers.
5    Q.  Okay.  And then M, Section
6  M, where it says, Reinforce the
7  following.  And at point five the
8  author writes, Ask reps to
9  sell/promote the efficacy and merit
10  of our products, not supplemental
11  rebate.
12      Do you know what that's
13  referring to there?
14    A.  I don't.
15    Q.  Okay.  Do you remember ever
16  communicating to your sales force
17  that they should promote the efficacy
18  in products as opposed to promoting
19  supplemental rebates?
20    A.  Again, I can't recall.  But
21  what our sales reps do, you know, as
22  I mentioned before, is, they go out
23  and they talk about the products
24  consistent with the labeling, they

                                                185

1  talk about, you know, all the things
2  related to the products.
3      And then as the processes
4  that impact the products, they
5  communicate that information to
6  customers as well.

| | | |
|---|---|---|
| 7   Q.  And turning you to the page<br>8  ending in 84, the next page, under<br>9  Tactics, A, Identify high medical<br>10  writers-use Merlin and P-3 data.<br>11      Did I read that correctly?<br>12   A.  Yes, sir.<br>13   Q.  Okay.  Do you know what<br>14  Merlin and P-3 data are referring to?<br>15    A.  I can't remember exactly,<br>16  but I know they are physician<br>17  information and sales information<br>18  databases.<br>19    Q.  Okay.  And then under note<br>20  four, it says, Call on the P&T<br>21  members.<br>22      Do you know what that's<br>23  referring to?<br>24   A.  I don't.<br>                  186<br>1   Q.  Okay.  Then it says,<br>2  Management will determine ownership<br>3  of P&T members.  Was ownership a term<br>4  of art among your sales force at<br>5  Merck?<br>6    A.  I can't recall what this<br>7  was at that time.<br>8   Q.  Okay.  And I guess<br>9  ownership might be -- did you ever<br>10  hear the term "ownership" used just<br>11  to refer to responsibility for a<br>12  certain physician contact? | | |
| LAMBERT, WARREN J., (Page 186:15 to 186:15)<br>                  186<br>15  THE WITNESS:  No. | Overbroad,<br>vague/ambiguous | |
| LAMBERT, WARREN J., (Pages 186:17 to 187:3)<br>                  186<br>17   Q.  Okay.  And then under C,<br>18  Future Resources, point three there,<br>19  it says, Ask physicians for support<br>20  via a grassroots campaign.<br>21      Do you know what that's<br>22  referring to?<br>23   A.  No.<br>24   Q.  Okay.  Did you ever ask<br>                  187<br>1  your sales force to ask physicians to | | |

| | | |
|---|---|---|
| 2  provide support for Vioxx via a<br>3  grassroots campaign? | | |
| LAMBERT, WARREN J., (Page 187:6 to 187:7)<br><div align="center">187</div>6  THE WITNESS:  I can't<br>7  recall. | | |
| LAMBERT, WARREN J., (Pages 187:9 to 188:6)<br><div align="center">187</div>9  Q.  And then if you turn to the<br>10  last page, there's reference to two<br>11  telephone conferences.<br>12       The second one there says,<br>13  June 6th, 9:00 a.m. Central Time.  It<br>14  says, A, Logistics established by<br>15  Betty Anderson (ten lines needed).<br>16       Betty Anderson, was that<br>17  one of the sales managers under<br>18  your --<br>19     A.  Yes, sir.<br>20     Q.  Okay.  And then B, it says,<br>21  Northern and Southern Louisiana<br>22  managers only, Warren Lambert, Mary<br>23  Ogle, Holly Jacques.<br>24       Do you recall ever being --<br><div align="center">188</div>1  being part of a teleconference on<br>2  June 6th, 2002, to discuss Medicaid?<br>3     A.  I don't recall<br>4     Q.  Okay.  Do you have any<br>5  reason to believe that you did not<br>6  participate in such a conference? | Page 188:4-6<br>Calls for<br>speculation | Sustained |
| LAMBERT, WARREN J., (Page 188:9 to 188:10)<br><div align="center">188</div>9  THE WITNESS:  I can't<br>10  respond either way. | Calls for<br>speculation | |
| LAMBERT, WARREN J., (Page 188:16 to 188:17)<br><div align="center">188</div>16  (Exhibit Lambert-LA-16 was<br>17  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 190:15 to 192:1)<br><div align="center">190</div>15  Q.  Okay.  Does the document<br>16  appear to be an e-mail from yourself<br>17  to -- I'm sorry -- from Ranita Howard<br>18  to yourself?<br>19     A.  It looks like the second | | |

| | | |
|---|---|---|
| 20  portion --<br>21     Q.   Okay.  That's the --<br>22     A.   -- came from Ranita to a<br>23  number -- I'm sorry.<br>24     Q.   I'm sorry.  I didn't mean<br>                            191<br>1  to cut you off.<br>2       That is the section I'd<br>3  like to focus you on, is the second<br>4  portion where you are carbon copied.<br>5     A.   Okay.<br>6     Q.   And Ms. Howard writes, Here<br>7  is the tactical plan for Louisiana<br>8  Medicaid thus far.  And she writes, I<br>9  have also received some great<br>10  suggestions from Warren, which I will<br>11  add this week as well.<br>12       Do you recall working with<br>13  Ranita Howard in formulating a<br>14  Louisiana Medicaid Tactical Plan?<br>15     A.   I recall working with<br>16  Ranita Howard as one of my managers,<br>17  but I don't recall the Medicaid<br>18  Tactical Plan.<br>19     Q.   Do you have any reason to<br>20  believe that you didn't receive that<br>21  document that she copied you on?<br>22     A.   No, sir, because I'm a cc.<br>23     Q.   Okay.  Go ahead and move on<br>24  to Number 17.  I ask you to take a<br>                            192<br>1  moment to review that document. | | |
| LAMBERT, WARREN J., (Pages 192:12 to 198:2)<br>                            192<br>12   Q.  Have you had an opportunity<br>13  to review the document?<br>14     A.   Yes, sir.<br>15     Q.   Okay.  Does it appear to be<br>16  a e-mail from you forwarding an<br>17  e-mail from Holly Jacques, which<br>18  forwards a newspaper article that<br>19  Ms. Jacques found regarding the<br>20  Louisiana Medicaid program?<br>21     A.   Yes, sir.<br>22     Q.   Okay.  And I'd like to<br>23  focus on the portion that you wrote. | | |

24   And you sent it to Michael

193

1   McClintock, Holly Jacques, Mary Ogle,
2   Betty Anderson, Robert Bousquet.
3          I don't think we've talked
4   about him here before.  Who's Robert
5   Bousquet?
6      A.  I can't remember.
7      Q.  Marsha Curtwright?
8      A.  She's a Merck employee.
9   I'm not sure what capacity.
10     Q.  Okay.  Do you know whether
11   she was in sales or not?
12     A.  I can't recall.
13     Q.  Okay.  Tommie Friday we
14   spoke about earlier.
15          Scott Hawthorne?
16     A.  Yes.
17     Q.  Sales manager?
18     A.  Sales manager.
19     Q.  Okay.  Michael Haynes?
20     A.  I'm not sure what capacity.
21     Q.  Okay.  Ranita Howard we
22   spoke about earlier.  Joseph Stanley
23   we spoke about.  David Luke we spoke
24   about, Greg Planchard, Christine

194

1   Prokop, Roberto Rodriguez, Dale
2   Wilson I think we already -- did I
3   ask you about Dale Wilson?
4      A.  I know he's a manager.  I'm
5   not sure which group.
6      Q.  Okay.  And then we spoke
7   about Golden Zenon.
8          And the document appears to
9   be dated June 11, 2002; is that
10   correct?
11     A.  That's correct.
12     Q.  Okay.  Subject line is,
13   Article on Louisiana Medicaid drug
14   program?
15     A.  Uh-huh.
16     Q.  Okay.  Do you recall
17   writing this e-mail?
18     A.  I don't.
19     Q.  Okay.

20    A.  But I see my name on it.
21    Q.  All right.  Is that your
22  name and phone number on the e-mail?
23    A.  Yes, sir.
24    Q.  Okay.  Do you have any

                                        195

1  reason to believe that you didn't
2  write the e-mail?
3    A.  No, sir.
4    Q.  Okay.  And did you write,
5  Remember, we -- it says k-a-n, but I
6  think that's can; correct?
7    A.  Yes, I see that.
8    Q.  -- lead our teams to
9  overwhelm the system given there is a
10  great deal of opposition among the
11  majority of physicians and
12  decision-makers.  Stan and I believe
13  Dale have lived through this in the
14  P-A-S-S -- but is that supposed to be
15  past?
16    A.  It says pass, yeah.  In the
17  past.  Oh, you're saying with a T.
18    Q.  Should it be with a --
19  okay.
20    A.  Yes.
21    Q.  -- where a similar system
22  failed.
23      Did I read that correctly?
24    A.  Yes, sir.

                                        196

1    Q.  Okay.  You write, This
2  system will only fail if we get our
3  teams to do their part, and that is
4  to have the physicians and nursing
5  staff push through the PA to get
6  Vioxx and Zocor.
7      Did I read that correctly?
8    A.  Yes, sir.
9    Q.  Okay.  The other products
10  are safe for now, however, our
11  greatest defense for them is high
12  utilization, physicians writing
13  dispense as written and refills for
14  one year.
15      Did I read that correctly?

                                    74

16    A.   Yes, sir.
17    Q.   Do you recall writing to
18 this group of individuals -- or,
19 rather, to your boss and certain
20 sales personnel under your direction,
21 about push through -- pushing through
22 PA to get Vioxx and Zocor?
23    A.   And, again, I can't speak
24 to all the specifics behind what I
                                    197
1 was thinking at the time.  But what I
2 do know is, it looks like there were
3 some changes going on in the -- in
4 the PA system or in the Medicaid drug
5 program at the time.
6       And, you know, what we
7 typically instruct the sales
8 representatives to do is, you know,
9 doctors, patients make the decisions
10 on products.  So we want to make sure
11 that there's access to products.
12       So it looks like here I was
13 just helping them to really make sure
14 they, you know, communicate the
15 changes of that process to the
16 customers in an appropriate way.
17    Q.   Okay.  Stan and Dale, would
18 that be Stan Joseph and Dale Wilson?
19    A.   Again, I assume that would
20 be.
21    Q.   Okay.  It says, they have
22 lived through this in the past where
23 a similar system failed.
24       Do you know what you were
                                    198
1 referring to there?
2    A.   No, sir, I don't.

LAMBERT, WARREN J., (Page 198:16 to 198:17)
                                    198
16  (Exhibit Lambert-LA-18 was
17  marked for identification.)

LAMBERT, WARREN J., (Pages 199:3 to 200:14)      Page 200:10-14
                                    199              Calls for
3  Q.   Okay.  The document bears          speculation
4  -- I'll represent to you, sir, that
5  the document was produced from your

| | | |
|---|---|---|
| 6  custodial files.<br>7       Do you have any reason to<br>8  believe that you did not receive the<br>9  document?<br>10    A.  No, sir.<br>11    Q.  Okay.  The document bears<br>12  the title Medicaid Prescribers.  It<br>13  says, RCQ-MRO -- MAR02.<br>14       Do you know what that's<br>15  referring to?<br>16    A.  I don't know in relation to<br>17  this, but, typically, RCQ is rolling<br>18  current quarter.<br>19    Q.  Okay.  Vioxx 02 targets<br>20  only.  Source, PDM.<br>21       Do you know what PDM is<br>22  referring to there?<br>23    A.  No, sir.<br>24    Q.  Do you know what that term<br>               200<br>1  "PDM" refers to generally?<br>2    A.  I can't recall.<br>3    Q.  Okay.  And then it says,<br>4  This report identifies physicians who<br>5  represent the top 80 percent of<br>6  Medicaid business in Louisiana.  And<br>7  then it appears to be a list of<br>8  individuals and numbers that follow<br>9  them.<br>10       Presuming that the<br>11  individuals are physicians, do you<br>12  know what these multi-digit numbers<br>13  are following their names?  Could<br>14  those be prescribing numbers? | | |
| LAMBERT, WARREN J., (Pages 200:17 to 201:20)<br>               200<br>17   THE WITNESS:  I don't know.<br>18  BY MR. MURRAY:<br>19    Q.  Like, you know, DEA numbers<br>20  or prescribing codes?<br>21    A.  I don't know.<br>22    Q.  The document refers to<br>23  Vioxx 02 targets.<br>24       Do you know what that's<br>               201<br>1  referring to? | Calls for<br>speculation | |

76

| | | |
|---|---|---|
| 2   A.  I don't.<br>3   Q.  Do you know whether Vioxx<br>4  02 targets could be referring to<br>5  physicians who are to be targeted?<br>6   A.  I don't.<br>7   Q.  Okay.  Do you have any<br>8  recollection as to whether, during<br>9  this time frame, high prescribing --<br>10  and by this time frame, I mean the<br>11  March '02 rolling current quarter --<br>12  whether physicians were targeted by<br>13  Merck sales force -- I'm sorry --<br>14  high prescribing Medicaid physicians<br>15  were targeted by Merck sales force?<br>16   A.  And, again, not sure as it<br>17  relates to this.  But as a matter of<br>18  sales representatives doing their<br>19  job, they would include individuals<br>20  from a variety of areas. | | |
| LAMBERT, WARREN J., (Page 202:12 to 202:13)<br>                       202<br>12  (Exhibit Lambert-LA-19 was<br>13  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 202:20 to 206:9)<br>                       202<br>20  Q.  This is another Business<br>21  Review that you prepared for -- I'm<br>22  sorry -- that you prepared for your<br>23  boss, Mike McClintock?<br>24   A.  Yes, sir.<br>                       203<br>1   Q.  Okay.  On what schedule did<br>2  you prepare business reviews?<br>3   A.  I can't recall exactly.<br>4  Normally I'm thinking quarterly.<br>5   Q.  Okay.  And if it's a<br>6  review, it's looking back at what<br>7  happened in the previous quarter, not<br>8  looking forward; am I correct in that<br>9  understanding?<br>10   A.  I can't say with<br>11  confidence.<br>12   Q.  Okay.  Let me turn you to<br>13  the third page, 2183, where it says<br>14  Performance Summary is the title.<br>15      Since it's a summary, do | | |

16  you think it's looking back on things
17  that happened in the last couple of
18  months?
19      A.   It's tough to make that
20  assumption because it says here,
21  April Market Share, but this is
22  September 5th.
23      Q.   Okay.  Do you know if
24  that's referring to the previous

204

1  April or anticipated coming April?
2      A.   I'm not sure.
3      Q.   Okay.  You just don't know
4  either way?
5      A.   Huh-uh.
6      Q.   Okay.  Well, it says, April
7  were 98.2 percent currently below the
8  RBG, and nation averages.
9          Because you used the past
10  tense, would you assume it was the
11  previous April?
12      A.   You could assume from the
13  past tense.  But, again, I don't
14  recall.
15      Q.   Okay.  And also write,
16  Vioxx 105.1 percent, and Zocor 98.7
17  percent were buoying the performance
18  for the region.  Is that overall?
19          Do you know what those
20  percentages refer to?
21      A.   Again, tough to know
22  without having all the labels.
23  Typically, these percentages would
24  represent performance to a sales

205

1  plan.
2      Q.   Okay.  And if we look at
3  Areas of Focus, the title is on 183,
4  but it carries over to 184, we see
5  that blunt negative impact of
6  Louisiana Medicaid prior
7  authorization.
8          That's the same notation as
9  was in the previous business plan --
10  I'm sorry -- business review document
11  that we reviewed.  And I presume that

| | | |
|---|---|---|
| 12  your answers would be the same with<br>13  respect to this notation?<br>14      A.  Yes, sir.<br>15      Q.   And also, on 72184, is this<br>16  a list of the managers that are --<br>17  that reported to you?<br>18      A.  Yes, sir.<br>19      Q.   Okay.  And I turn you to<br>20  Ranita Howard.  It says, Ranita does<br>21  a terrific job as point for Merck<br>22  Medicus.<br>23          What does that refer to,<br>24  Merck Medicus?<br>                            206<br>1      A.  Medicus.  I believe it's a<br>2  database for medical information.<br>3      Q.  Okay.  What kind of medical<br>4  information was on the Merck Medicus<br>5  database?<br>6      A.  I can't remember exactly.<br>7      Q.  Okay.  Do you have any idea<br>8  of what was on it?<br>9      A.  I don't. | | |
| LAMBERT, WARREN J., (Page 206:15 to 206:16)<br>                           206<br>15  (Exhibit Lambert-LA-20 was<br>16  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 207:1 to 208:2)<br>                           207<br>1      Q.  And it's an e-mail with<br>2  apparently two attachments.  Let me<br>3  ask whether you recognize either the<br>4  e-mail or either of the attachments?<br>5      A.  I don't.<br>6      Q.  Okay.  Let's start with the<br>7  e-mail, which is at 9918.  It appears<br>8  that there's an e-mail sent by a Jeff<br>9  Geweniger to John Harrington, and he<br>10  carbon copied Michael Kelly, John<br>11  Fevurly, and Mary Ogle; is that<br>12  correct?<br>13      A.  Yes, sir.  That's what I<br>14  see.<br>15      Q.  Okay.  Who is Jeff<br>16  Geweniger?<br>17      A.  Let's see.  It says here on | No personal<br>knowledge | Sustained |

| | | |
|---|---|---|
| 18  the signature that he was the<br>19  analyst.<br>20     Q.   Okay.  Region analyst?<br>21     A.   Region analyst.  Uh-huh.<br>22     Q.   Okay.  Who did he report<br>23  to?<br>24     A.   I'm trying to think.  I<br><div align="center">208</div>1  mean, it looks like he would have<br>2  reported to -- | | |
| LAMBERT, WARREN J., (Pages 208:7 to 211:3)<br><div align="center">208</div>7   Q.   Did you have a region<br>8  analyst that reported to you?<br>9     A.   I did.<br>10    Q.   Okay.  Do you know if Jeff<br>11  Geweniger was that person?<br>12     A.   I'm not clear on the time<br>13  frame that Jeff would have been in<br>14  the job.<br>15     Q.   Okay.  And he's sending<br>16  this to a John Harrington, it looks<br>17  like forwarded the e-mail on.<br>18         Do you know who John<br>19  Harrington was?<br>20     A.   I know John is a Merck<br>21  employee.  I can't remember what<br>22  capacity he was in.<br>23     Q.   Was he an analyst?<br>24     A.   I can't recall.<br><div align="center">209</div>1     Q.   Okay.  And Mr. Harrington<br>2  wrote to a number of individuals,<br>3  including yourself.<br>4         Do you see that on the top<br>5  line?<br>6     A.   Yes.  Sure.<br>7     Q.   Okay.  Do you have any<br>8  reason to believe you didn't receive<br>9  Mr. Harrington's e-mail?<br>10     A.   No, sir.<br>11     Q.   Okay.  And Mr. Harrington<br>12  writes, Michael Davis and Jeff<br>13  Geweniger analyzed the 2002 impact of<br>14  the PDL on Medicaid sales in<br>15  Louisiana. | Page 210:23-211:3<br>Lack of foundation,<br>assumes facts not in<br>evidence | |

<div align="center">80</div>

| | | |
|---|---|---|
| 16      Do you recall seeing<br>17  analyses of the impact of Louisiana's<br>18  PDL on Merck's Medicaid sales?<br>19     A.  I don't.<br>20     Q.  He goes on to write, The<br>21  analysis at the bottom of the e-mail<br>22  factors in efforts by field sales to<br>23  stem the loss in sales.<br>24      Do you know what efforts<br>                                       210<br>1  he's referring to there?<br>2     A.  No, sir, I don't.<br>3     Q.  Okay.  Do you know what<br>4  loss in sales he's referring to<br>5  there?<br>6     A.  No, sir.<br>7     Q.  Okay.  I'll represent to<br>8  you, and we can look at it more<br>9  closely as we flip through the<br>10  document, that the document shows<br>11  that after the implementation of the<br>12  PDL, there was a loss in sales, at<br>13  least with respect to Vioxx.<br>14      Does that refresh your<br>15  recollection as to whether that's the<br>16  loss of sales that this e-mail is<br>17  referring to?<br>18     A.  It does not.<br>19     Q.  Okay.  You can't say yes,<br>20  can't say no?<br>21     A.  It does not refresh my<br>22  recollection.<br>23     Q.  Okay.  Do you recall<br>24  instructing your sales force in<br>                                       211<br>1  certain efforts to reverse any loss<br>2  of sales that may have been caused by<br>3  the PDL? | | |
| LAMBERT, WARREN J., (Pages 211:6 to 212:20)<br>                                     211<br>6  THE WITNESS:  And, again, I<br>7  don't -- I'm not sure what your<br>8  question is in relation to.<br>9  BY MR. MURRAY:<br>10     Q.  Just in relation to your<br>11  job directing sales managers under | Page 211:6-9<br>Lack of foundation,<br>assumes facts not in<br>evidence<br><br>Page 212:9-20<br>No personal<br>knowledge, | *Sustained* |

| | | |
|---|---|---|
| 12  you with respect to what they were<br>13  directing their sales force to do.<br>14      A.  Got you.<br>15          So the direction would<br>16  clearly be, again, communicate the<br>17  benefits, features of the products<br>18  consistent with the product labeling<br>19  over time, and make sure, again, any<br>20  processes, formulary information,<br>21  inform customers to make sure they<br>22  have access for physicians and --<br>23      Q.  But do you remember any<br>24  directions that were specifically<br>                212<br>1  focused on the issue of trying to<br>2  turn around any sales loss that may<br>3  have been caused by the<br>4  implementation of Louisiana's PDL?<br>5      A.  And I can't remember<br>6  precisely, other than, again, just<br>7  making sure our customers were aware<br>8  of the process of how things worked.<br>9      Q.  Now, just talking in<br>10  general, not just with respect to<br>11  this document or even Louisiana<br>12  Medicaid, in your experience as<br>13  regional director, were there<br>14  occasions when certain Managed Care<br>15  events would have an impact, an<br>16  adverse impact on your sales and you<br>17  would focus your efforts in<br>18  instructing your sales personnel into<br>19  trying to do something about that<br>20  adverse impact? | overbroad,<br>vague/ambiguous | Sustained |
| LAMBERT, WARREN J., (Page 212:23 to 212:24)<br>             212<br>23    THE WITNESS:  I'm not sure<br>24  I'm following you. | No personal<br>knowledge,<br>overbroad,<br>vague/ambiguous | |
| LAMBERT, WARREN J., (Page 213:2 to 213:15)<br>             213<br>2    Q.  Are there instances where<br>3  as a result of, say, the change in a<br>4  formulary with a major -- doesn't<br>5  have to be Medicaid, but, let's say,<br>6  any major Managed Care organization, | | |

| | | |
|---|---|---|
| 7   and it's anticipated that that change<br>8   in formulary may have an adverse<br>9   impact on your sales, do you, as a<br>10   sales director -- I mean, as a<br>11   director of a sales team, ever focus<br>12   your efforts, that is, in directing<br>13   your sales team, do you say this is<br>14   an issue that we have and let's see<br>15   what we can do to correct it? | | |
| LAMBERT, WARREN J., (Page 213:18 to 213:23)<br>                                     213<br>18   THE WITNESS:  I can't say<br>19   -- speak to, again, the negative<br>20   influence.  But I will say when<br>21   there's changes in formulary, our<br>22   salespeople do communicate that to<br>23   physicians and nurses. | | |
| LAMBERT, WARREN J., (Page 214:1 to 214:4)<br>                                     214<br>1   Q.   And do they do it with the<br>2   hope that they can turn around any<br>3   negative impact that may have<br>4   resulted from a change in formulary? | | |
| LAMBERT, WARREN J., (Page 214:7 to 214:15)<br>                                     214<br>7   THE WITNESS:  I can't say<br>8   that.<br>9            I can say, again, that what<br>10   their hope is, is that they educate<br>11   the physician and the nurse so that<br>12   they can, you know, make the<br>13   appropriate decision that they want<br>14   consistent with their plans for their<br>15   patients. | | |
| LAMBERT, WARREN J., (Pages 214:17 to 217:20)<br>                                     214<br>17   Q.   Okay.  Let's look at the<br>18   document that you authored that's an<br>19   attachment to this e-mail.  Referring<br>20   to State of Louisiana Medicaid.<br>21            And if you turn to the page<br>22   that begins 9921, under the heading<br>23   Measuring the Impact, I'd like to ask<br>24   if you know what's meant by Measuring<br>                                     215<br>1   the Impact? | Page 217:13-20<br>Calls for<br>speculation,<br>assumes facts not in<br>evidence | Sustained |

2      A.   I can't recall the
3   specifics around what I meant here.
4      Q.   Okay.  Flipping you one
5   page prior, at 9920, it's the title
6   page of a PowerPoint; is that
7   correct?
8      A.   Yes, sir.
9      Q.   Okay.  And that's your name
10   on the PowerPoint title page?
11      A.   Yes, sir.
12      Q.   Do you believe that you
13   drafted this document?
14      A.   I can't remember.
15      Q.   Okay.  Do you have any
16   reason to believe that you did not
17   draft it?
18      A.   Again, I can't remember.
19      Q.   Okay.  Let's turn to
20   Measuring the Impact.  And you write,
21   The impact of the Medicaid PDL began
22   with June '02 data.
23         Did I read that correctly?
24      A.   It says, The impact of the
                                        216
1   Medicaid PDL began with June '02
2   data.
3      Q.   Okay.  Do you know what you
4   were referring to when you wrote
5   that?
6      A.   I don't recall writing it.
7      Q.   Do you know what June '02
8   data would be referring to?
9      A.   I don't.
10      Q.   The author of this
11   document, which bears your name,
12   wrote, Currently, we can only measure
13   the impact on the fee-for-service
14   portion of Louisiana Medicaid.
15         Do you know what
16   fee-for-service portion of Louisiana
17   Medicaid is referring to?
18      A.   No, sir.
19      Q.   Okay.  And then you, or the
20   author of this document, which bears
21   your name, writes, The data that we
22   have does not measure the spillover

84

| | | |
|---|---|---|
| 23  effect of the Medicaid PDL.<br>24  Do you know what spillover<br>        217<br>1  effect is referring to there?<br>2 A.  No, sir.<br>3 Q.  Have you ever heard the<br>4  term "spillover effect" referred to<br>5  in your capacity as senior director<br>6  at Merck?<br>7 A.  I have heard the term.<br>8 Q.  Okay.  And what does the<br>9  term refer to as you've heard it<br>10  used?<br>11 A.  In my experience, spillover<br>12  means impact to other areas.<br>13 Q.  So if one area is impacted<br>14  by, say, a change in formulary,<br>15  spillover effect would be an area<br>16  that is not directly related to that<br>17  formulary change, but because of that<br>18  formulary change results in some<br>19  change in those sales; is that<br>20  correct? | | |
| LAMBERT, WARREN J., (Page 217:23 to 217:24)<br>        217<br>23  THE WITNESS:  You said a<br>24  lot of things in there. | Calls for speculation, assumes facts not in evidence | _Sustained_ |
| LAMBERT, WARREN J., (Page 218:2 to 218:9)<br>        218<br>2  Q.  Okay.  I'm just trying to<br>3  think of examples.  You said impact<br>4  on one area affecting another, and<br>5  the other area that's affected is the<br>6  spillover.<br>7 Has that term, as you<br>8  understand it, ever been used in<br>9  connection with formulary changes? | Overbroad, calls for speculation | |
| LAMBERT, WARREN J., (Pages 218:13 to 219:3)<br>        218<br>13  Q.  In your experience as<br>14  senior director.<br>15 A.  And, again, I'm not sure I<br>16  follow you.<br>17 Q.  Okay.  Have you ever heard<br>18  the term "spillover" used in | Page 218:13-16<br>Overbroad, calls for speculation | |

| | | |
|---|---|---|
| 19   reference to the impact of a<br>20   formulary change?<br>21       A.   Yes, sir.<br>22       Q.   Okay.  And in that context<br>23   where you heard it used in reference<br>24   to a formulary change, was spillover<br>                                                      219<br>1   effect referring to an effect on the<br>2   marketplace that was not subject to<br>3   the actual formulary itself? | | |
| LAMBERT, WARREN J., (Page 219:6 to 219:9)<br>                                                      219<br>6    THE WITNESS:  What I<br>7   understand is, a spillover effect<br>8   affects another area based on what<br>9   happens in an area unaffected by it. | | |
| LAMBERT, WARREN J., (Pages 219:11 to 226:6)<br>                                                      219<br>11   Q.   Okay.  So can you give me<br>12   an example of what would be an area<br>13   that would be impacted by the<br>14   spillover effect from a formulary<br>15   change?<br>16       A.   Again, just thinking about,<br>17   in my experience, there could be<br>18   different, you know, formulary<br>19   changes in, let's say, the eastern<br>20   part of Texas, and that could<br>21   spillover impact some parts of<br>22   Western Louisiana.<br>23       Q.   Okay.  Does that mean that<br>24   part of Louisiana, Western Louisiana,<br><br>                                                      220<br>1   it didn't have the formulary change,<br>2   correct, in your example?<br>3       A.   Correct.  Yes, sir.<br>4       Q.   Okay.  So the formulary<br>5   change that happens in one area has<br>6   an impact on an area that doesn't<br>7   have the formulary change in your<br>8   example?<br>9       A.   It could, yes.<br>10      Q.   Okay.  Turning to the page<br>11   9923, Medicaid Gap, dollar sign,<br>12   dash, Vioxx, is the title. | Page 219:11-221:10<br>Irrelevant<br><br>Page 226:2-6<br>Vague/ambiguous,<br>overbroad | *Overruled* |

13        Do you know what Medicaid
14   Gap is referring to there?
15      A.   No, sir.
16      Q.   Okay.  And then I see a
17   bunch of numbers and then there are
18   dates on a XY graph, I guess you'd
19   call that.
20        Do you know what any of
21   these numbers are referring to?
22      A.   I don't, other than the
23   dates at the bottom.
24      Q.   Okay.  What about the dates

                                        221
1    on the bottom informs you about these
2    numbers, if anything?
3       A.   They don't.
4       Q.   Okay.  And do you know --
5    never mind.
6         Here I see, turning to page
7    9925, there's two charts.  One says,
8    Medicaid Gap Vioxx District 17.  The
9    other one says, Medicaid Gap Vioxx
10   District 35.
11        Do you know what District
12   17 and 35 refer to?
13      A.   Yes, sir.  They were
14   district numbers for districts in the
15   State of Louisiana.
16      Q.   Okay.  Would those two
17   districts put together encompass the
18   whole state of Louisiana?
19      A.   I can't recall exactly, but
20   they were two districts in Louisiana.
21      Q.   Okay.  And turning to 9926,
22   the heading Forecasting Sales, it
23   says, In order to utilize the YTD -
24   August data, the Medicaid impact

                                        222
1    (June, July, August) had to be
2    removed.
3         Do you know what that's
4    referring to?
5       A.   No, sir.
6       Q.   Okay.  And then the third
7    bullet point says, This approach
8    takes into account certain market

9  events that occurred June - August
10  that a Medicaid trend analysis would
11  not have included.
12       Do you know what that's
13  referring to?
14    A.  No, sir.
15    Q.  Okay.  Getting back to the
16  authorship of this document,
17  obviously, it includes some market
18  analysis.
19       In general, in your
20  capacity as senior director, in
21  presenting market analysis, would you
22  usually do the analysis yourself or
23  would that be more the purview of one
24  of the analysts under your direction?

                                 223

1       That's the end of the
2  question.
3    A.  Oh.  Typically, the analyst
4  would do analysis.
5    Q.  Okay.  Do you know at this
6  time that this document was prepared,
7  in -- I'm presuming based on the
8  cover e-mail sometime in 2002, who
9  the market analyst that reported to
10  you was?
11    A.  I don't recall.
12    Q.  Okay.  And I don't think
13  we've looked at 9929 yet, have we?
14    A.  No, sir.
15    Q.  Okay.  It says, Forecasted
16  Vioxx Sales Minus Medicaid.  And
17  there's a chart here, it says, Vioxx
18  Forecasted Sales Trend X Medicaid.
19       Do you know what that's
20  referring to?
21    A.  No, sir.
22    Q.  And turning to the next
23  page, 9930, Vioxx Forecasted Accuracy
24  Test.

                                 224

1       Did you ever hear the term
2  "Forecasted Accuracy Test" used when
3  you were -- I mean, in this time, in
4  your capacity as senior director?

5     A.  I don't recall, sir.
6     Q.  Okay.  You don't recall
7  hearing that term?
8     A.  No, I don't.
9     Q.  Okay.  How about the term
10  "projected sales," is that a term
11  that you recall hearing?
12     A.  In my experience as a sales
13  director, yes.
14     Q.  Okay.  And what is that
15  term or what was your understanding
16  of that term in your experience as a
17  sales director?
18     A.  My experience is, that's
19  kind of a prediction of what sales
20  could be.
21     Q.  And, generally, who makes
22  that prediction?  What members of
23  your staff, if any, would make that
24  kind of prediction?
                                   225

1     A.  So my direct reports would
2  not.  Analysts, typically, do these
3  things.
4     Q.  Okay.  And there was an
5  analyst that reported to you; is that
6  correct?
7     A.  Yes, sir.
8     Q.  But there were also
9  analysts at headquarters?
10     A.  Yes, sir.
11     Q.  Okay.  And, I guess, did
12  each of those fulfill a role in
13  projected sales?
14     A.  Yes, they do.
15     Q.  Okay.  So depending on what
16  the analysis was, it could be done by
17  one or by another, just depending on
18  what the analysis was?
19     A.  Yes, sir.
20     Q.  Then there's a -- under
21  Projected Sales there's a term
22  "Objective."
23        Do you know what that's
24  referring to?
                                   226

89

| | | |
|---|---|---|
| 1    A.  In this document, I don't.<br>2    Q.  Okay.  How about generally,<br>3  is there a term "objective" that<br>4  you've used, perhaps in -- or heard<br>5  used in the context of projected<br>6  sales? | | |
| LAMBERT, WARREN J., (Page 226:9 to 226:19)<br>                          226<br> 9  THE WITNESS:  My -- in my<br>10  experience, objective can mean a lot<br>11  of things.  Tactics.<br>12  BY MR. MURRAY:<br>13    Q.  How about in connection<br>14  with the term "projected sales"?<br>15        I mean, obviously,<br>16  objective can be a broad term.  But<br>17  have you heard that term used in<br>18  connection with the term "projected<br>19  sales"? | Vague/ambiguous,<br>overbroad | |
| LAMBERT, WARREN J., (Pages 226:23 to 229:12)<br>                          226<br>23  Q.  Okay.  And what did it mean<br>24  in those contexts where you heard the<br>                          227<br> 1  term "objective" used in connection<br> 2  with the term "projected sales"?<br> 3    A.  Typically, sales goal.<br> 4    Q.  Okay.  And here we see<br> 5  projected PPO.  And then there's a<br> 6  percentage for each district.<br> 7        Do you know what PPO is<br> 8  standing for there?<br> 9    A.  I don't know what it stands<br>10  for here.<br>11    Q.  Okay.  Was that a term -- I<br>12  mean, I've heard PPO referring to<br>13  preferred provider organization.  But<br>14  was there a different acronym for PPO<br>15  as it was used, say, in the projected<br>16  sales context?<br>17    A.  Again, not -- I don't know<br>18  what it's used in relation to this.<br>19  My understanding of PPO is profit<br>20  plan objective --<br>21    Q.  Okay.<br>22    A.  -- which is separate from | Page 226:23-227:3<br>Vague/ambiguous,<br>overbroad<br><br>Page 229:6-12<br>Calls for<br>speculation, lack of<br>foundation | |

90

```
23  this.
24     Q.  Okay.  And what did profit
                                          228
 1  plan objective mean, in your
 2  experience as senior director?
 3     A.  It's your sales target.
 4     Q.  Okay.  It's the amount of
 5  sales that you, at the beginning of a
 6  quarter or a certain fiscal period,
 7  you would hope you would be able to
 8  achieve by the end of that period?
 9     A.  Yes, sir.
10     Q.  Okay.  Turning to page
11  9931, which is calculating the impact
12  on sales.  And it's written, Trend
13  out September '02 to December '02
14  Medicaid sales.
15        This would allow us to
16  bring the district to a level of
17  where they were performing prior the
18  Medicaid PDL.
19        Do you know what that's
20  referring to?
21     A.  No, sir.
22     Q.  Okay.  And then the next
23  bullet point says, Calculate the
24  difference between projected sales in
                                          229
 1  Medicaid without a PDL versus with a
 2  PDL.
 3        Do you know whether that
 4  was something that was done?
 5     A.  I don't.
 6     Q.  In your experience as
 7  senior director, did you ever
 8  encounter sales projections that
 9  attempted to quantify or project out
10  the difference between the difference
11  that a formulary change might visit
12  on sales, projected sales?
```

| LAMBERT, WARREN J., (Page 229:15 to 229:15) | Calls for |
|---|---|
| 229 | speculation, lack of |
| 15   THE WITNESS:  No, sir. | foundation |
| LAMBERT, WARREN J., (Pages 229:17 to 230:6) | Page 230:2-6 |
| 229 | Lack of foundation |
| 17   Q.  That's just not something | |

| | | |
|---|---|---|
| 18  you recall coming across?<br>19     A.  In my area of<br>20  responsibility, it's all around sales<br>21  representatives, managers, coaching<br>22  and counseling, and ensuring that the<br>23  sales reps are communicating<br>24  appropriate information consistent<br><div align="center">230</div>1  with the label.<br>2     Q.  Whether or not that's<br>3  something that's done at Merck is a<br>4  question that would probably be<br>5  directed to one of the analysts we<br>6  discussed earlier? | | |
| LAMBERT, WARREN J., (Page 230:9 to 230:10)<br><div align="center">230</div>9     THE WITNESS:  I can speak<br>10  to my responsibility. | Lack of foundation | |
| LAMBERT, WARREN J., (Page 230:12 to 230:17)<br><div align="center">230</div>12    Q.  Let me ask you, in your<br>13  capacity as senior director, if you<br>14  wanted to know the answer to a<br>15  question like that, is an analyst the<br>16  person you would go to?<br>17    A.  Yes, sir. | | |
| LAMBERT, WARREN J., (Pages 231:11 to 232:4)<br><div align="center">231</div>11    Q.  Okay.  And turning to the<br>12  next page, 9926, the term "House<br>13  Account."<br>14        Do you know what "House<br>15  Account" was referring to there?<br>16    A.  I don't.<br>17    Q.  Okay.  Did you ever hear<br>18  the term "house account" used in your<br>19  experience as senior director?<br>20    A.  I have.<br>21    Q.  Okay.  And in your<br>22  experience, how is that term used?<br>23    A.  A place to put sales<br>24  objective.<br><div align="center">232</div>1    Q.  Okay.  Elaborate on that<br>2  for me a little, if you don't mind.<br>3        What do you mean "a place | Page 231:11-232:4<br>Irrelevant | |

| | | |
|---|---|---|
| 4   to put sales objective"? | | |
| LAMBERT, WARREN J., (Pages 232:7 to 233:2)<br>232<br><br>7   THE WITNESS:  So house<br>8   accounting could be sales that are<br>9   moved from one area to another, a<br>10  house account.<br>11  BY MR. MURRAY:<br>12      Q.   Okay.  So that in<br>13  determining whether or not sales<br>14  objectives are met, you might look at<br>15  a house account for a larger area or<br>16  a larger group than just a single<br>17  cluster's target?<br>18      A.   Again, it could be for a<br>19  variety -- so many different reasons.<br>20  I don't know.  I mean, it could be<br>21  therapeutic things.  There could be<br>22  the population shifts.  A variety of<br>23  things.<br>24      Q.   Is it a way of just looking<br>233<br><br>1   at sales targets through a larger<br>2   group of subsets? | Page 232:7-233:2<br>Irrelevant | |
| LAMBERT, WARREN J., (Page 233:5 to 233:20)<br>233<br><br>5   THE WITNESS:  I can't say I<br>6   agree with that.  Typically, again,<br>7   it's just a matter of moving sales<br>8   from one place to the other.<br>9   BY MR. MURRAY:<br>10      Q.   And in the summary section,<br>11  the author writes, Medicaid has had a<br>12  significant impact on sales and share<br>13  at the cluster district and region<br>14  level.<br>15          Do you know what that's<br>16  referring to?<br>17      A.   No, sir.<br>18      Q.   Okay.  Do you have any<br>19  reason to disagree with the statement<br>20  as it's written here? | | |
| LAMBERT, WARREN J., (Pages 233:23 to 234:1)<br>233<br><br>23      THE WITNESS:  I can't agree<br>24  or disagree with it.  I don't know | | |

93

| | | |
|---|---|---|
| 234<br>1 what it means. | | |
| LAMBERT, WARREN J., (Page 234:3 to 234:8)<br>234<br>3  Q.  Do you have any knowledge<br>4  as to whether Medicaid did or did not<br>5  have an impact on sales at either the<br>6  cluster district or region level, in<br>7  the time frame 1999 to 2004, in your<br>8  capacity as senior director? | Overbroad | |
| LAMBERT, WARREN J., (Pages 234:24 to 235:3)<br>234<br>24   THE WITNESS:  In my<br>235<br>1  capacity as senior director, Medicaid<br>2  is a segment that made up sales.<br>3  That's my understanding. | Overbroad | |
| LAMBERT, WARREN J., (Page 235:5 to 235:12)<br>235<br>5  Q.  Do you know whether changes<br>6  on -- do you have any knowledge as to<br>7  whether changes on the Louisiana<br>8  Medicaid PDL had an impact on sales<br>9  at either the cluster district or<br>10  region level?<br>11    A.  I don't recall what<br>12  changes, if any. | | |
| LAMBERT, WARREN J., (Page 235:13 to 235:21)<br>235<br>13  Q.  Okay.  And then we talked<br>14  about District 17 and 35.  And here I<br>15  see at page 9939 reference to a<br>16  District 64.<br>17      Was there a District 64 in<br>18  Louisiana also?<br>19    A.  I don't recall.  This<br>20  doesn't look like this was a document<br>21  from me. | | |
| LAMBERT, WARREN J., (Page 236:18 to 236:19)<br>236<br>18  (Exhibit Lambert-LA-21 was<br>19  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 236:21 to 239:14)<br>236<br>21  Q.  Does this appear to be<br>22  another one of these business reviews | | |

23  that you prepared for your boss, Mike
24  McClintock?

                                        237
1      A.   Based on what I see here,
2   it looks like, yes, sir.
3      Q.   And it looks like this one
4   is prepared in November of '02.
5      A.   Uh-huh.
6      Q.   Does the fact that this one
7   was prepared November '02 and the
8   previous one was prepared in I think
9   it was September of '02, does that
10  refresh your recollection as to the
11  frequency with which you prepared
12  these business reports?
13     A.   No, sir, it doesn't.
14     Q.   Okay.  And turning to
15  MRK-EBES0071782, under Performance
16  Summary, the heading one, Sales.  It
17  says, Districts underperforming the
18  average are 17 and 35 in Louisiana.
19         Do you know what you meant
20  when you wrote that?
21     A.   I don't.
22     Q.   Do you know what the term
23  "region average" was referring to
24  there?

                                        238
1      A.   No, I don't.
2      Q.   Do you know what the term
3   -- or is the term "region average" a
4   term that you were familiar with in
5   your capacity as senior director
6   during this time frame?
7      A.   Yes.
8      Q.   Okay.  And what did it mean
9   generally during that time frame?
10     A.   It can mean a lot of
11  things.  Average number of
12  physicians, average number of sales
13  reps, average number of a lot of
14  things.
15     Q.   Okay.  Average sales?
16     A.   That's possible.
17     Q.   Okay.  And region average
18  just is referring to -- or when you

                    95

| | | |
|---|---|---|
| 19  use the term "region average," you're<br>20  talking about the average of whatever<br>21  it is you're talking about across<br>22  your region?<br>23     A.  Yes, sir.<br>24     Q.  So whatever this is<br>                     239<br>1  referring to, District 17 and 35 in<br>2  Louisiana were under the region<br>3  average?<br>4     A.  I can't say that with<br>5  confidence.<br>6     Q.  Okay.  And turning to 1783,<br>7  under Roman numeral IV, Major issues<br>8  requiring immediate attention.<br>9         You wrote, Aggressive<br>10  promotion and education of the prior<br>11  authorization process for products,<br>12  including Vioxx, in the Louisiana<br>13  Medicaid system.<br>14        Did I read that correctly? | | |
| **LAMBERT, WARREN J., (Page 240:13 to 240:17)**<br>                  240<br>**13  Q.  Aggressive promotion and<br>14  education of the prior authorization<br>15  process for Zocor, Vioxx, ARBs, and<br>16  Maxalt in Louisiana Medicaid system.<br>17        Did I read that correctly?** | | |
| LAMBERT, WARREN J., (Pages 240:18 to 241:4)<br>                  240<br>18  A.  Yes, sir.<br>19     Q.  Okay.  And do you know what<br>20  that's referring to?<br>21     A.  No, sir.<br>22        But I will say that, again,<br>23  in this time period, prior<br>24  authorization, any changes we would<br>                  241<br>1  have instructed the sales force to<br>2  communicate to customers about those<br>3  changes to make sure access was<br>4  available. | | |
| LAMBERT, WARREN J., (Page 241:13 to 241:14)<br>                  241<br>13  (Exhibit Lambert-LA-22 was<br>14  marked for identification.) | | |

| | | |
|---|---|---|
| LAMBERT, WARREN J., (Pages 242:5 to 243:20)<br>242<br>5   Q.   Does it appear to be an<br>6   e-mail sent from Holly Jacques to a<br>7   number of individuals on which you<br>8   were copied?<br>9      A.   Yes, sir.<br>10     Q.   Okay.  And this e-mail,<br>11  Holly Jacques writes to Mary Ogle, In<br>12  preparation for the upcoming meeting<br>13  on May -- I'm sorry.  Let me back up.<br>14          The Subject line is, LA<br>15  Medicaid Pharmaceutical and<br>16  Therapeutic Committee; is that<br>17  correct?<br>18     A.   Yes, sir.<br>19     Q.   Okay.  And the date of the<br>20  document is April 3rd, 2003?<br>21     A.   Yes, sir.<br>22     Q.   Okay.  In this e-mail,<br>23  Holly Jacques writes to Mary Ogle,<br>24  Here is a list of members of the P&T<br>243<br>1   Committee.<br>2          In preparation for the<br>3   upcoming meeting on May 21st, it<br>4   would be helpful to have our<br>5   representatives touch base with the<br>6   members of the committee to ensure<br>7   that they have the latest and<br>8   greatest information on the following<br>9   products up for review.<br>10         And then she lists Vioxx as<br>11  one of the products.<br>12         Did I read that correctly?<br>13     A.   Yes, sir.<br>14     Q.   Okay.  Do you recall being<br>15  contacted by either Holly Jacques or<br>16  Mary Ogle with respect to having<br>17  representatives call on members of<br>18  the P&T Committee prior to P&T<br>19  Committee meetings?<br>20     A.   I don't. | | |
| LAMBERT, WARREN J., (Pages 243:24 to 246:4)<br>243<br>24   Q.   You have no recollection of | | |

244

1  that?
2      A.  I don't.  But, again, it
3  wouldn't be unusual for sales
4  representatives to call on members of
5  the P&T and nonmembers as well.
6      Q.  Okay.  Mary Ogle testified
7  in her deposition that, in response
8  to this e-mail, that it was not her
9  job to direct members of the sales
10  force with respect to an issue such
11  as this.
12          Would that have fallen
13  under your purview?
14      A.  So, again, just to make
15  sure I understand.  So, again, my job
16  would be to make sure the sales
17  representatives are going out,
18  calling on the appropriate customers
19  with information consistent with the
20  product label, balance.
21      Q.  In terms of getting
22  information about calling on certain
23  individuals as opposed to certain
24  others, would you be the person to

245

1  deliver that information to the sales
2  force?
3      A.  I don't understand what you
4  say when you mean call on certain
5  individuals.
6      Q.  Well, for instance, here
7  where Holly Jacques is recommending
8  that members of the sales force call
9  specifically on P&T Committee
10  members, if, in the event of such
11  recommendations, would you be the
12  person to direct the sales force to
13  follow up on that recommendation?
14      A.  I want to make sure I'm
15  responding to your question.  So this
16  says here, representatives do not
17  need to touch base with the following
18  P&T Committee members.
19          Again, that's over in
20  Mary's and Holly's world, so they

| | | |
|---|---|---|
| 21   would have responsibility for those<br>22   individuals.  But the other members<br>23   who the sales representatives would<br>24   typically go in and call on, they<br>              246<br>1   would do that.<br>2       Does that answer your<br>3   question?<br>4    Q.   Yes, I believe so. | | |
| LAMBERT, WARREN J., (Pages 246:9 to 247:10)<br>              246<br>9   Back to 22.  You indicated<br>10   that on occasion, as director, you<br>11   would attend sales calls on certain<br>12   individuals.  Is that correct?<br>13    A.   I would attend sales calls<br>14   with the sales representatives, yes,<br>15   sir.<br>16    Q.   With the sales<br>17   representatives?<br>18    A.   Uh-huh.<br>19    Q.   Let me just ask you whether<br>20   you recall attending sales calls with<br>21   sales representatives on any of the<br>22   individuals that are listed on page<br>23   1035 through -- I'm sorry -- 10035<br>24   through 10037?<br>              247<br>1    A.   I'm sorry, sir, I can't say<br>2   I did.<br>3    Q.   You can't say that you did.<br>4   Okay.<br>5       Do you recognize any of<br>6   those names as individuals on whom<br>7   sales calls were made, whether you<br>8   made them or someone under your<br>9   direction?<br>10    A.   I wouldn't know. | Irrelevant | |
| LAMBERT, WARREN J., (Page 247:17 to 247:18)<br>              247<br>17   (Exhibit Lamber-LA-23 was<br>18   marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 248:4 to 251:18)<br>              248<br>4   Q.   Okay.  The document appears<br>5   to be an e-mail from Jeff Geweniger | Page 249:24-251:18<br>Irrelevant, no<br>personal<br>knowledge, lack of | |

| | foundation | |
|---|---|---|

6   to yourself; is that correct?
7       And I'm talking about the
8   second e-mail in the chain.
9       A.   Yes, sir.
10      Q.   Okay.  And then it appears
11  that a person who was copied on that
12  e-mail then forwarded it to some
13  other individuals; is that correct?
14       Matthew Forney then
15  forwarded it to some other people?
16      A.   Yes, sir.
17      Q.   Okay.  Who is Matthew
18  Forney?
19      A.   I know he's a Merck
20  employee, and I can't recall what his
21  capacity was at that time.
22      Q.   Okay.  Anyway, the subject
23  of the e-mail from Mr. Geweniger to
24  yourself is Louisiana Medicaid

<center>249</center>

1   (through July '03); is that correct?
2       A.   Yes, sir.
3       Q.   Okay.  It appears the
4   e-mail is dated September 10, 2003;
5   is that correct?
6       A.   Yes, sir.
7       Q.   Okay.  And Jeff, because
8   I'm having a hard time pronouncing
9   the last name, writes to you, Warren,
10  attached is a PowerPoint reflecting
11  Louisiana Medicaid trends for the HMG
12  and coxib classes.
13       Did I read that correctly?
14      A.   Yes, sir.
15      Q.   Okay.  Do you recall
16  receiving analyses regarding Medicaid
17  trends from Mr. Geweniger?
18      A.   I don't.
19      Q.   Okay.  Do you recall
20  requesting analyses of Medicaid
21  trends for the coxib classes from
22  Jeff?
23      A.   I don't recall.
24      Q.   Do you have any reason to

<center>250</center>

1   believe you did not receive this

<center>100</center>

2  particular analysis?
3     A.  I guess not.  I mean,
4  again, assuming this is the
5  attachment here and that's the e-mail
6  that came to me.
7     Q.  Okay.  And then turning to
8  the chart that's at page 15849.
9        Let me ask you, did you
10  receive charts that looked like this,
11  that is, graphing trends over time
12  like this in your capacity as senior
13  director in this time frame?
14     A.  I can't say this chart,
15  but, yes, I received charts like
16  this.
17     Q.  Okay.  And are you familiar
18  with how to read those charts?
19     A.  In looking at this, I can
20  just tell that there's a progression
21  from August 1st to June 3rd.
22     Q.  Okay.  And this says, 17
23  Celebrex total, 17 Bextra total, 35
24  Vioxx total, 17 Vioxx total, 35

                                        251

1  Celebrex total, 35 Bextra total.
2        Do you know whether that's
3  referring to Districts 17 and 35
4  within Louisiana?
5     A.  I don't know for sure.
6     Q.  Okay.  And would you agree
7  with me that at approximately April
8  -- between April and June of '02,
9  there is a sharp decline in the Vioxx
10  sales on that line for 35 and 17,
11  whatever they're referring to?
12     A.  I don't know what the
13  figures on the Y axis represent.
14     Q.  Does it appear that there's
15  a sharp decline on the Y axis?
16     A.  It's difficult for me to
17  tell on this copy.
18     Q.  Okay.  We'll move on.

LAMBERT, WARREN J., (Page 251:23 to 251:24)
                                        251
23  (Exhibit Lambert-LA-24 was
24  marked for identification.)

101

| LAMBERT, WARREN J., (Pages 252:24 to 256:1) | Page 254:1-7 | |
|---|---|---|
| 252 | Lack of foundation, | *Sustained* |
| 24  Q.  Just -- I was just asking | calls for speculation | |

253

1  if this appears to be the same kind
2  of customer profile that we looked at
3  previously to you?
4        You're welcome to look at
5  Tab 9 to refresh your recollection.
6     A.  Okay.  (Witness reviews
7  document.)  It does appear that it
8  looks the same.
9     Q.  Both purport to be Customer
10  Profiles, correct, and they have some
11  of the same headings and areas of
12  discussion?
13     A.  It has the same heading,
14  yes.
15     Q.  Okay.  If I may refer you
16  to page 67433.  And as with the
17  previous document that you identified
18  as the senior business director;
19  correct?
20     A.  We can assume with the
21  misspelling there.
22     Q.  I was going to say, and
23  also as with the previous document,
24  she's misspelled your name again.

254

1        So it would appear that you
2  were still a member of the Merck
3  State Account team as of the date of
4  this document, September 18, 2003?
5     A.  And, again, that's a little
6  bit of an assumption.  Holly wrote
7  the document.  2003, I still had
8  State of Louisiana, so --
9     Q.  Okay.  That would
10  correspond with your understanding of
11  your responsibilities at the time?
12     A.  Yes, sir.
13     Q.  Okay.  And Ms. Jacques
14  writes, or Ms. Ogle, or Ms. Jacques
15  and Ogle together, write again, under
16  Roman numeral VI, Merck Strategy and
17  Tactics.

| | | |
|---|---|---|
| 18      The first bullet point, | | |
| 19   Ensure unrestricted access for key | | |
| 20   Merck products through work with | | |
| 21   State of Louisiana, DHH and PS. | | |
| 22      Do you know what DHH and PS | | |
| 23   are referring to there? | | |
| 24     A.  I don't know from what they | | |
|                  255 | | |
| 1   wrote here. | | |
| 2     Q.  Okay.  Do you think it | | |
| 3   would be safe to assume that's | | |
| 4   referring to the Department of Health | | |
| 5   and Hospitals and Provider Synergies? | | |
| 6     A.  I can't speak for this | | |
| 7   document, but in my experience, I | | |
| 8   know DHH stood for that, yes. | | |
| 9     Q.  Okay.  And PS, was that | | |
| 10   frequently used as an abbreviation | | |
| 11   for Provider Synergies? | | |
| 12     A.  Again, I don't know about | | |
| 13   it here, but, yes. | | |
| 14     Q.  Okay.  And during the 2003 | | |
| 15   time frame, was it your understanding | | |
| 16   Provider Synergies was the pharmacy | | |
| 17   benefit manager for Louisiana | | |
| 18   Medicaid? | | |
| 19     A.  I can't recall exactly. | | |
| 20     Q.  Okay.  With the exception | | |
| 21   of, I think, the addition of DHH and | | |
| 22   PS at the end of this sentence, is | | |
| 23   that the same strategy that was | | |
| 24   outlined in Lambert-LA-9 at the first | | |
|                  256 | | |
| 1   bullet point? | | |
| LAMBERT, WARREN J., (Page 256:6 to 256:14) | | |
|                  256 | | |
| 6   Actually, let me change | | |
| 7   that with the -- there's a little | | |
| 8   difference change in the structure of | | |
| 9   the sentence, but I think the | | |
| 10   strategy in terms of working with | | |
| 11   those entities to ensure unrestricted | | |
| 12   access for key Merck products is | | |
| 13   identified in both documents as a | | |
| 14   strategy; correct? | | |

| | | |
|---|---|---|
| **LAMBERT, WARREN J., (Pages 256:23 to 257:8)**<br>**256**<br>23   Q.  I think the way the author<br>24   has structured the sentence in the<br>**257**<br>1   two different bullet points is<br>2   different, but it would seem that the<br>3   general point of working with State<br>4   of Louisiana, DHH and Provider<br>5   Synergies to ensure unrestricted<br>6   access for key Merck products is<br>7   listed as a strategy in both; is that<br>8   correct? | | |
| LAMBERT, WARREN J., (Page 257:9 to 257:23)<br>257<br>9   A.   In reading these documents,<br>10   they read a little bit differently,<br>11   but it looks like it has some of the<br>12   same words, yes.<br>13       Q.   And my question would be<br>14   just with respect to that strategy,<br>15   would your answer be the same with<br>16   respect to this document, which<br>17   apparently was prepared September of<br>18   2003, as it was for this earlier<br>19   document which was prepared in<br>20   January of 2003?<br>21       A.   And, again, my answer would<br>22   be don't know.  Someone else authored<br>23   the document. | | |
| LAMBERT, WARREN J., (Page 258:1 to 258:11)<br>258<br>1   I just want to make sure so I don't<br>2   have to go through each point --<br>3       A.  Oh, okay.<br>4       Q.   -- that your answer would<br>5   be the same for each one?<br>6       A.   Yes, sir.<br>7       Q.   And for the same reasons,<br>8   because you're not familiar with the<br>9   document?<br>10      A.   Correct.  Somebody else<br>11   wrote it. | | |
| LAMBERT, WARREN J., (Page 258:15 to 258:16)<br>258<br>15   (Exhibit Lambert-LA-25 was | | |

| 16  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 259:1 to 261:24) | | |

                                              259
1    Q.  Do you recognize the
2  document?
3      A.  It looks like one I wrote.
4  I can't recall everything else on it.
5      Q.  It appears to be an e-mail
6  from you to Doug Welch, Michael
7  Peoples, Jacqueline Devone, Sean
8  Bauer, carbon copy to Mark Dervishian
9  and Beth Eastland; is that correct?
10    A.  Yes, sir.
11    Q.  I think we talked about
12  Doug Welch.
13        Who is Michael Peoples?
14    A.  Mike Peoples was a manager
15  on my team.
16    Q.  Okay.  Jacqueline Devone I
17  think we already talked about was a
18  manager on your team.
19        What about Sean Bauer?
20    A.  I believe Sean was a
21  special team manager.
22    Q.  Okay.  Mark Dervishian?
23    A.  I'm not sure what his
24  capacity was, but definitely a Merck
                                              260
1  employee.
2    Q.  Okay.  And Beth Eastland?
3    A.  Merck employee.  Again, not
4  sure what she was doing there.
5    Q.  Okay.  And then the Subject
6  line is, Pull through
7  follow-up - Louisiana Medicaid.
8        Do you know what pull
9  through follow-up is referring to
10  there?
11    A.  And, again, I can't think
12  of the -- everything that was going
13  in at this point in time.  I think I
14  mentioned earlier, typically, for us,
15  pull through means providing
16  information about the access to
17  Merck.
18    Q.  Generally, pull through is

19   advising Merck customers about the
20   status of Merck products on
21   formularies?
22      A.  Yes.
23      Q.  Okay.  And in it you write,
24   Doug has done a great job setting up
                                        261
 1   the -- I'm sorry -- to Mike,
 2   Jacqueline and Sean, Doug has done a
 3   great job setting up the opportunity.
 4        I know you guys are working
 5   with your teams on the importance of
 6   growing our trends for Vioxx in
 7   Medicaid.
 8        Do you know what you were
 9   referring to when you wrote about
10   Doug doing a great job setting up the
11   opportunity?
12      A.  I can't recall.
13      Q.  Okay.  Do you know if
14   that's any reference to the status of
15   Vioxx on Louisiana's formulary?
16      A.  Again, I can't recall.
17      Q.  Okay.  Just based on the
18   context of the document, can you tell
19   if that's what that's talking about?
20      A.  No, sir.
21      Q.  Would that be based on the
22   -- as the author of the document, can
23   you say whether that would be a fair
24   interpretation of the document?

| LAMBERT, WARREN J., (Page 262:3 to 262:4) | | |
|---|---|---|
|                                      262 | | |
| 3   THE WITNESS:  I'm sorry.  I | | |
| 4   can't recall. | | |
| LAMBERT, WARREN J., (Pages 263:8 to 264:22) | Page 264:19-22 | |
|                                      263 | Calls for | *Sustained* |
| 8   Q.  Okay.  Here it says, I know | speculation | |
| 9   you guys are working with your teams | | |
| 10   on the importance of growing our | | |
| 11   trends in Vioxx and Medicaid. | | |
| 12        Do you know what you were | | |
| 13   referring to there? | | |
| 14      A.  No, sir. | | |
| 15      Q.  Okay.  Again, you're | | |
| 16   writing to, among others -- well, | | |

| | | |
|---|---|---|
| 17  Mike, Jacqueline and Sean were all<br>18  sales managers; correct?<br>19      A.  Correct.<br>20      Q.  Okay.  When you would refer<br>21  to those individuals and their teams,<br>22  were you referring to the sales<br>23  forces that they managed?<br>24      A.  Typically, yes.<br><div align="right">264</div>1      Q.  Okay.  Do you recall<br>2  discussing with those individuals<br>3  growing Vioxx trends in Medicaid<br>4  through their sales teams?<br>5      A.  And, again, I don't recall<br>6  specific conversations.<br>7          Messages would clearly be,<br>8  again, making sure we communicate any<br>9  kind of processes that our customers<br>10  needed to know and then information<br>11  about our products that are<br>12  consistent with labeling and benefits<br>13  of the product, risk, et cetera, over<br>14  time.<br>15      Q.  Okay.  And, again, you<br>16  don't have any reason to believe that<br>17  you didn't write this memo?<br>18      A.  No, sir.<br>19      Q.  Okay.  And as you sit here<br>20  today, you're not aware of any<br>21  information that would contradict the<br>22  representations in the memo? | | |
| LAMBERT, WARREN J., (Page 265:13 to 265:15)<br><div align="right">265</div>13    THE WITNESS:  I can't<br>14  recall the specifics of all the<br>15  things here. | Calls for<br>speculation | *Sustained* |
| LAMBERT, WARREN J., (Pages 265:18 to 266:5)<br><div align="right">265</div>18  Let me just back up on the<br>19  last question again.<br>20        I mean, reading here,<br>21  reading this here, as you sit here<br>22  today, is there anything that strikes<br>23  you, you go, oh, no, actually, that's<br>24  wrong?  I know something that would<br><div align="right">266</div> | Page 265:13-15<br>Calls for<br>speculation | |

| | | |
|---|---|---|
| 1 contradict something in here?<br>2        Is there anything that just<br>3 strikes you as you read it today?<br>4    A.  2004, I just can't<br>5 remember. | | |
| LAMBERT, WARREN J., (Page 266:9 to 266:10)<br>                                                266<br>9  (Exhibit Lambert-LA-26 was<br>10  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 266:17 to 269:11)<br>                                                266<br>17  Q.  Okay.  Do you recognize the<br>18  document?<br>19    A.  I see I was copied on it,<br>20  but I don't recall it.<br>21    Q.   Okay.  And does the<br>22  document appear to be a chain of<br>23  e-mails, the last of which is an<br>24  e-mail from Michael L. Peoples to a<br>                                                267<br>1 number of individuals in which you're<br>2 copied?<br>3    A.  Yes, sir.<br>4    Q.   Okay.  And Mr. Peoples<br>5 writes, under the Subject line, For<br>6 Call Tomorrow<br>7 LA-Medicaid-Vioxx-Feb04.xls.<br>8        And Mr. Peoples writes,<br>9 Attached is an updated Vioxx Medicaid<br>10  Action Plan supplementing the one I<br>11  sent out on 4/28/04.<br>12        Do you recall receiving<br>13  Vioxx Medicaid Action Plans from<br>14  Michael Peoples?<br>15    A.  I don't recall, sir.<br>16    Q.   Okay.  Is that the sort of<br>17  thing that would have been sent to<br>18  you?<br>19    A.  Yes.<br>20    Q.   Okay.  And he writes, On<br>21  Monday, 5/3/04, Doug Welch,<br>22  Jacqueline and I met and discussed<br>23  the Medicaid situation with Vioxx.<br>24        Are you familiar with that<br>                                                268<br>1 meeting? | Page 296:4-11<br>Calls for<br>speculation,<br>overbroad,<br>vague/ambiguous | _Sustained_ |

| | | |
|---|---|---|
| 2   A.  No, sir, I'm not.<br>3   Q.  Okay.  And he writes, Let's<br>4  go for it and drive market share.<br>5       Do you recall receiving an<br>6  e-mail that contained those words?<br>7   A.  No, sir.<br>8   Q.  Okay.  Turning to the page<br>9  1589.  This appears to be the<br>10  attachment to Mr. Peoples' e-mail<br>11  that he refers to.<br>12       Under the title Some<br>13  suggested immediate and doable<br>14  immediate action steps would be:  and<br>15  the author writes, one, Utilizing<br>16  Managed Care formulary card, the new<br>17  1S04 Vioxx card, indicating that<br>18  Vioxx is on Louisiana Medicaid PDL<br>19  without restriction.<br>20       Are you familiar with what<br>21  he's referring to there, a Vioxx --<br>22  I'm sorry -- a Managed Care formulary<br>23  card?<br>24   A.  I'm not familiar with the<br>                  269<br>1  card, sir.<br>2   Q.  Okay.  Or a 1S04 Vioxx<br>3  card?<br>4   A.  I'm not familiar with it.<br>5   Q.  Okay.  Was the term "card"<br>6  referred to you -- in your experience<br>7  as senior director at this time, was<br>8  the term "card" used to refer to<br>9  sales materials that the<br>10  representatives would use in meeting<br>11  with physicians? | | |
| LAMBERT, WARREN J., (Page 269:14 to 269:15)<br>                269<br>14   THE WITNESS:  When you say<br>15  "card," what are you referring to? | Calls for<br>speculation,<br>overbroad,<br>vague/ambiguous | *Sustained* |
| LAMBERT, WARREN J., (Pages 269:17 to 270:2)<br>                269<br>17   Q.  Well, we've seen reference<br>18  to something called a renal card<br>19  earlier, a CV card.  Here there's<br>20  reference to using a Managed Care<br>21  formulary card and a 1S04 Vioxx card. | | |

| | | |
|---|---|---|
| 22      My question is, was the<br>23  term "card" used at that time frame<br>24  to describe promotional materials to<br>                   270<br>1  be used by sales representatives in<br>2  their visits with doctors? | | |
| LAMBERT, WARREN J., (Page 270:4 to 270:8)<br>                  270<br>4   THE WITNESS:  Again, card,<br>5   in and of itself, doesn't -- doesn't<br>6   mean anything to me.  The references<br>7   you make are resources I've heard of<br>8   before, yes. | | |
| LAMBERT, WARREN J., (Pages 278:24 to 279:5)<br>                278<br>24   "QUESTION:  When I asked<br>                279<br>1   you about cards and you referred to<br>2   the CV card and the renal card as<br>3   resources that you were familiar with<br>4   being used, I'm asking how were those<br>5   resources used?") | Calls for<br>speculation, lack of<br>foundation,<br>assumes facts not in<br>evidence | |
| LAMBERT, WARREN J., (Page 279:8 to 279:21)<br>                279<br>8   THE WITNESS:  And, again, I<br>9   was drawing a conclusion to what you<br>10  mentioned earlier.<br>11       So sales representatives<br>12  typically have approved resources<br>13  from headquarters that they use as,<br>14  you know, guidance that are<br>15  consistent with the company labeling.<br>16       They talk about the<br>17  features, benefits of our products,<br>18  they provide benefits, risk over<br>19  time, and they use those resources as<br>20  guides to communicate about our<br>21  products to customers. | Calls for<br>speculation, lack of<br>foundation,<br>assumes facts not in<br>evidence | |
| LAMBERT, WARREN J., (Pages 280:1 to 283:13)<br>                280<br>1   Q.  Do you see here on this<br>2   document, in bold print, under bullet<br>3   point one, Use this on each and every<br>4   call?<br>5       A.  I see those words, yes,<br>6   sir. | Page 280:1-281:12<br>No personal<br>knowledge, calls<br>for speculation<br><br>Page 282:1-283:13<br>Irrelevant | |

7     Q.   Okay.  Do you ever recall
8  instructions being given to members
9  of the sales force that were under
10   your direction to use particular
11   resources furnished by headquarters,
12   quote, on each and every call?
13     A.   I can't recall specifically
14  the times when that occurred.
15     Q.   Okay.  Was that something
16  that ever occurred, in your
17  recollection?
18     A.   In my experience, it could
19  have occurred.
20     Q.   Okay.  And then at bullet
21  point three, it says, Utilize all
22  available approved resources, primary
23  detail piece, reprints, give-aways,
24  et cetera.

                                        281

1        And it says, See 1S04 Vioxx
2  BOSS, closed parens, to differentiate
3  Vioxx from competition and give the
4  physician clinical as well as
5  positive formulary position as reason
6  to write first line.
7        Did I read that correctly?
8     A.   Yes, sir.
9     Q.   Okay.  Do you know what
10  this Vioxx BOSS could be referring
11  to?
12     A.   I don't, sir.
13     Q.   Did you ever hear of the
14  term "Vioxx BOSS" when you were
15  senior director in the 1999-2004 time
16  frame?
17     A.   I do remember that term.
18     Q.   Okay.  And how was that
19  term used, in your recollection?
20     A.   I can't recall.
21     Q.   Okay.  Was it referring to
22  some type of written document?
23     A.   I can't recall.
24     Q.   Okay.  And here we see the

                                        282

1  words "reason to write first line."
2        Do you know what write

                    111

| | | |
|---|---|---|
| 3  first line is referring to in this<br>4  document?<br>5    A.  I don't know.  Looks like<br>6  Mike wrote that document.<br>7    Q.  Okay.  Was writing first<br>8  line a term that you were familiar<br>9  with in your experience as senior<br>10  director in this time frame?<br>11    A.  I can't recall.<br>12    Q.  Okay.  Is it a term that<br>13  you're familiar with now?<br>14    A.  No, sir.<br>15    Q.  Dropping down, under the<br>16  paragraph that begins, This is the<br>17  proverbial low-hanging fruit.<br>18  Mr. Peoples writes, Remember in 2004,<br>19  bonuses driven by PPO and market<br>20  share, and this is a "blue chip"<br>21  opportunity to hit a home run in<br>22  2004.<br>23      Do you know what in 2004<br>24  bonuses driven by PPO and market<br>                  283<br>1  share could be referring to?<br>2    A.  No, sir, I don't.<br>3    Q.  We spoke earlier about PPO<br>4  being an acronym for something and it<br>5  was something, something objective, I<br>6  think.<br>7    A.  I don't know that that's<br>8  what this is in reference to, but PPO<br>9  typically is profit plan objective.<br>10    Q.  Okay.  Do you recall<br>11  whether in 2004 sales -- field sales<br>12  representatives bonuses were tied to<br>13  profit plan objectives? | | |
| LAMBERT, WARREN J., (Page 283:16 to 283:19)<br>             283<br>16  THE WITNESS:  I don't<br>17  remember all the nuances of the field<br>18  sales bonus in 2004.  It involves a<br>19  variety of things. | Irrelevant | |
| LAMBERT, WARREN J., (Pages 283:21 to 284:3)<br>             283<br>21    Q.  At any point in time has it<br>22  ever involved profit plan objective? | Page 283:21-24<br>Irrelevant<br><br>Page 284:1-3 | |

| | | |
|---|---|---|
| 23    A.   That's a portion of it,<br>24   yes.<br><div align="right">284</div>1    Q.   Okay.  And in your<br>2    experience, have bonuses involved<br>3    market share? | Irrelevant,<br>overbroad, calls for<br>speculation | |
| LAMBERT, WARREN J., (Page 284:6 to 284:8)<br><div align="right">284</div>6    THE WITNESS:  Again, I<br>7    can't remember all the components,<br>8    but it could have been a component. | Irrelevant | |
| LAMBERT, WARREN J., (Pages 284:10 to 287:20)<br><div align="right">284</div>10   Q.   Okay.  And then if we look<br>11   down, there's an e-mail that<br>12   apparently in this chain -- I think I<br>13   misspoke, sir, and I apologize.<br>14        I believe in talking about<br>15   the materials that we just went over,<br>16   I think I represented they were the<br>17   attachment to Mr. Peoples' e-mail.  I<br>18   think that's actually the body of<br>19   Mr. Peoples' e-mail.<br>20        Does that appear to be the<br>21   case?<br>22   A.   I mean, again, difficult to<br>23   say.  It looks like it.<br>24   Q.   And then underneath<br><div align="right">285</div>1    Mr. Peoples' e-mail, I see an e-mail<br>2    that was drafted by you to Jacqueline<br>3    Devone, Michael Peoples and Beth<br>4    Eastland.<br>5        Is that what that appears<br>6    to be to you also?<br>7    A.   Yes, sir.<br>8    Q.   And there you wrote to<br>9    Devone, Peoples and Eastland, Oh, my<br>10   goodness, exclamation point,<br>11   exclamation point, exclamation point,<br>12   exclamation point.  What a terrific<br>13   opportunity.<br>14        Jacqueline and Mike, I<br>15   understand you're meeting with Doug<br>16   via teleconference on this one.  I<br>17   know I can count on your full support | | |

<div align="center">113</div>

18  to arrest this situation.  Beth,
19  we'll collaborate with your team as
20  well, as this affects all of us.
21          And then we have, Operation
22  Save Vioxx, period, exclamation
23  point, exclamation point, exclamation
24  point.

<div align="right">286</div>

1          Do you recall writing that
2  e-mail?
3      A.  No, sir.
4      Q.  Do you know what the
5  terrific opportunity may have been
6  that you were referring to in that
7  e-mail?
8      A.  No, sir, I don't recall.
9      Q.  Okay.  It looks like
10  there's an attachment to an e-mail
11  from Doug Welch to yourself that
12  begins this e-mail chain.
13          Is that what appears to be
14  there?
15      A.  Uh-huh.
16      Q.  And then the next document
17  in the Bates range, again, seems to
18  be more some of these X and Y axis
19  charts and then some other data
20  behind those charts.
21          Do you recognize any of
22  these charts?
23      A.  No, sir.  I recognize the
24  products listed there.

<div align="right">287</div>

1      Q.  Okay.  Does a review of
2  these charts do anything to refresh
3  your recollection as to what it was
4  you were referring to in your e-mail
5  to which they are attached when you
6  wrote, Jacqueline and Mike, I
7  understand you're meeting with Doug
8  via teleconference on this one?
9      A.  No, sir, it doesn't.
10      Q.  Okay.  And, finally,
11  there's a chart and a list of numbers
12  behind some of the graphs, starting

| | | |
|---|---|---|
| 13 at 1595.<br>14    I ask whether that chart<br>15 and list of numbers means anything to<br>16 you?<br>17    A.  No, sir.  Other than,<br>18 again, I recognize the products as<br>19 Cox-IIs.<br>20    Q.  Okay. | | |
| LAMBERT, WARREN J., (Page 288:3 to 288:4)<br>288<br>3   (Exhibit Lambert-LA-27 was<br>4   marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 288:6 to 292:15)<br>288<br>6   Q.  Let me ask whether you<br>7   recognize that document?<br>8    A.  No, sir.<br>9    Q.  Okay.  It says, Pull<br>10   through performance expectations at<br>11   Louisiana Medicaid is the title, and<br>12   then there's kind of a form or grid<br>13   below.<br>14     Does that form look at all<br>15   familiar to you?<br>16    A.  It does not.<br>17    Q.  Okay.  And what I'm<br>18   referring to is the box with Title,<br>19   Originator, Purpose, Distribution<br>20   Requirements, Mode of Communication<br>21   Requirements, Update Frequency,<br>22   Filing/Retention, Sensitivity Logos<br>23   Requirements, Other Requirements.<br>24     So, in other words, not any<br><br>289<br>1   of the content.  I'm just wondering<br>2   if that's kind of a form you remember<br>3   seeing or people using at Merck.<br>4    A.  No, sir.<br>5    Q.  Okay.  How about this<br>6   little logo in the bottom right-hand<br>7   corner that says, Business<br>8   Confidential, and it's got a<br>9   triangle?<br>10    A.  Yes, sir, I've seen that on<br>11   documents. | | |

12      Q.  Okay.  You've seen that on
13  Merck documents?
14      A.  Yes, sir.
15      Q.  Okay.  And this line here,
16  For Internal Use Only.  Not to be
17  shown to anyone outside of Merck.
18         Is that something you've
19  also seen on documents in connection
20  with that little box?
21      A.  It's something I've seen on
22  documents.
23      Q.  Okay.  And the next page,
24  sir, is a memorandum, and it's

                                    290

1  addressed to three people I think
2  we've identified as sales managers
3  under your direction; correct?
4      A.  No, sir.
5      Q.  I apologize.  I forgot.
6         Jacqueline Devone was a
7  sales manager under your direction,
8  and I think Mike Peoples and Sean
9  Bauer?
10      A.  Mike Peoples and Jacqueline
11  Devone.
12      Q.  Okay.  And Sean Bauer was
13  the person I think you couldn't
14  recall what his title was; is that
15  correct?
16      A.  That's correct.
17      Q.  And then carbon copied on
18  the document are yourself, Mark
19  Dervishian and Beth Eastland.  The
20  date is May 21, '04.  The Subject
21  line is, Pull through performance at
22  Louisiana Medicaid.
23         Let me ask whether you have
24  any reason to believe that you did

                                    291

1  not receive this document on which
2  you were copied?
3      A.  No, sir.
4      Q.  Okay.  And under Purpose,
5  it says, The purpose of this memo is
6  to bring to your attention the need
7  for additional focus on improving

116

| | | |
|---|---|---|
| 8  "pull through" of our contracted<br>9  business for Louisiana at Louisiana<br>10  Medicaid.<br>11        Can you recall discussions<br>12  in the time frame of May 21, '04,<br>13  regarding a need to improve pull<br>14  through for Vioxx at Louisiana<br>15  Medicaid?<br>16     A.  No, sir, I don't recall.<br>17     Q.   And turning now to the next<br>18  page that ends in 1092, it says,<br>19  Objective:  Given the favorable<br>20  formulary status, it would be<br>21  expected that market share for Vioxx<br>22  in Louisiana Medicaid should increase<br>23  by six share points over the next<br>24  seven months.<br><div align=center>292</div>1        The current market share<br>2  for Vioxx in the Cox-II specific<br>3  inhibitor class at Louisiana Medicaid<br>4  is, a squiggly line, 19 percent.  And<br>5  then it says, See example below.<br>6        Do you recall seeing any<br>7  projections about possible increases<br>8  in share, given Vioxx's favorable<br>9  formulary status on Louisiana<br>10  formulary?<br>11     A.  No, sir, I don't recall.<br>12     Q.  Do you have any reason to<br>13  think that what's being reported in<br>14  terms of projected market share in<br>15  this document is incorrect? | | |
| LAMBERT, WARREN J., (Page 292:19 to 292:20)<br><div align=center>292</div>19   THE WITNESS:  I don't know,<br>20   sir. | Calls for<br>speculation, no<br>question-just an<br>answer | *Sustained* |
| LAMBERT, WARREN J., (Pages 292:22 to 295:3)<br><div align=center>292</div>22   Q.  Okay.  And turning to 1093.<br>23   There are a couple of charts here.  I<br>24   was wondering whether you recognize<br><div align=center>293</div>1   either of those charts.<br>2     A.  No, sir.  They look similar<br>3   to the ones you showed before. | Page 294:20-295:3<br>Calls for<br>speculation, lack of<br>foundation | |

4      Q.   Okay.  The author of the
5  document writes in the last
6  paragraph, Although plans were put in
7  place at the time the contract was
8  signed, it is necessary that we
9  revisit our pull through tactics.
10         Do you recall any
11  discussion about revisiting pull
12  through tactics with respect to
13  Louisiana Medicaid in the May of 2004
14  time frame?
15     A.   No, sir, I don't.
16     Q.   Okay.  You see under the
17  heading, next page, under the heading
18  Targeting, the author of the document
19  writes, When conducting pre-call
20  planning, utilize the most current
21  P-3 report to identify if Louisiana
22  Medicaid is a key plan for the
23  physician's practice.
24         If it is, then, one,

                                    294

1  increase sampling over a three-month
2  period of time and, two, provide
3  appropriate, approved, plan-specific,
4  payor messages over the same
5  three-month period of time.
6         Do you know what that's
7  referring to?
8     A.   No, I don't.  But, again,
9  this would not be unusual.  Sales
10  representatives, in the spirit of
11  providing access to products, will
12  provide information consistent with
13  the labeling.  They provide samples
14  as well.
15         And then payor messages,
16  again, if it helps them to know
17  what's available from a formulary
18  perspective, they would do that in
19  their normal course of operation.
20     Q.   In any event, in order to
21  facilitate providing the correct
22  information to the correct payor, the
23  sales force were able to identify
24  whether the payor was someone who

| | | |
|---|---|---|
| 295 | | |
| 1  wrote a large -- I'm sorry -- whether<br>2  Medicaid was a large portion of that<br>3  practice; is that correct? | | *Sustained* |
| LAMBERT, WARREN J., (Pages 295:9 to 297:2)<br>295<br><br>9   Q.   The question was, in order<br>10  to -- in the case of physicians who<br>11  were high prescribers for Louisiana<br>12  Medicaid, there were facilities<br>13  available for the sales<br>14  representatives to be able to<br>15  identify those persons as such so<br>16  that they could provide them<br>17  information about Louisiana Medicaid<br>18  program?<br>19      A.   Again, if the sales<br>20  representatives' normal course of<br>21  operation is to have physicians,<br>22  nurses who are affiliated with<br>23  Medicaid, affiliated with other areas<br>24  and based on the segment and their<br>296<br>1  information about the formulary in<br>2  that segment, they would go out and<br>3  call on those people.<br>4      Q.   Okay.  Do you see here<br>5  where it says MC pull through<br>6  message?<br>7      A.   Yes, sir.<br>8      Q.   Okay.  "The great news for<br>9  you and your patients at Louisiana<br>10  Medicaid is that Vioxx is a preferred<br>11  Cox-II specific inhibitor.  This<br>12  means no prior authorizations and no<br>13  paperwork."<br>14        One, did I read that<br>15  correctly?<br>16      A.   Yes, sir.<br>17      Q.   Okay.  Do you recall that<br>18  being a message that was employed by<br>19  sales representatives in calling on<br>20  physicians in the State of Louisiana?<br>21      A.   I can't recall, sir.<br>22      Q.   Okay.  Do you have any<br>23  reason to believe that that was not a | Page 295:9-296:3<br>Calls for<br>speculation, lack of<br>foundation<br><br>Page 296:22-297:1<br>Calls for<br>speculation | |

| | | |
|---|---|---|
| 24  message that was used by sales<br>297<br>1  representatives on calling on<br>2  physicians in the State of Louisiana? | | |
| LAMBERT, WARREN J., (Page 297:5 to 297:6)<br>297<br>5  THE WITNESS:  Again, I'm<br>6  not sure. | Calls for<br>speculation | |
| LAMBERT, WARREN J., (Page 297:10 to 297:11)<br>297<br>10  (Exhibit Lambert-LA-28 was<br>11  marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 297:19 to 306:6)<br>297<br>19   Q.  Okay.  Do you recognize the<br>20  document?<br>21   A.  I don't.<br>22    Q.  Okay.  Let me refer you to<br>23  the cc on the top e-mail, which is<br>24  the last chronologically.<br>298<br>1      Do you see your name there?<br>2   A.  Yes, sir, I do.<br>3    Q.  Okay.  Does that indicate<br>4  that you were copied on this<br>5  document?<br>6   A.  Yes, sir.<br>7    Q.  Okay.  And the author of<br>8  the document is Michael Peoples.  You<br>9  believe that's the same Michael<br>10  Peoples that we discussed earlier?<br>11   A.  Yes, sir.<br>12    Q.  And the next e-mail in the<br>13  chain from David Luke to a number of<br>14  individuals.<br>15      And do you see that you're<br>16  listed as one of the individuals to<br>17  whom David Luke sent that e-mail?<br>18   A.  Yes, sir.<br>19    Q.  And the Subject line of<br>20  that e-mail, and the next one, is, LA<br>21  Medicaid Region Plan; is that<br>22  correct?<br>23   A.  Yes, sir.<br>24    Q.  Okay.  The date of the<br>299 | Page 298:1-301:11<br>No personal<br>knowledge<br><br>Page 306:3-14<br>Calls for<br>speculation | *Sustained* |

```
 1   e-mail is July of 2004?
 2     A.   Yes, sir.
 3     Q.   Okay.  And in the first
 4   e-mail chronologically, Mr. Luke
 5   writes to you and others, LA Medicaid
 6   region tactical plan in preparation
 7   for upcoming medical review for Vioxx
 8   and Cozaar, colon.
 9          Did I read that correctly?
10     A.   Yes, sir.
11     Q.   And then Mr. Luke writes,
12   Team:  We are in a unique,
13   several-week window with the ability
14   to deliver strong clinical messages
15   consistent with our labels;
16   differentiate our brands according to
17   strategy, and to ask for a call to
18   action which is fully within our
19   approved contacts with Medicaid P&T
20   members through the end of August.
21          Did I read that correctly?
22     A.   Yes, sir.
23     Q.   Okay.  Do you recall at
24   this time whether you were aware that
                                      300
 1   sales representatives were calling on
 2   P&T members in anticipation of an
 3   upcoming Medicaid review for Vioxx?
 4     A.   I can't recall the specific
 5   review and timing of it.  But, again,
 6   as a matter of normal course, the
 7   sales representatives would call on
 8   P&T and non-P&T Committee members.
 9     Q.   Okay.  Then it says, it
10   goes on to write, The tactical plans
11   are simple and targets the following:
12   Three types of customers along with a
13   message, differentiation, and review
14   action.  And then there are four
15   bullet points.
16          Did I read that correctly?
17     A.   Yes, sir.
18     Q.   Okay.  And the first bullet
19   point is, high volume, strong
20   advocate for Vioxx or Cozaar.
21          Do you know what that's
```

121

22  referring to?
23    A.  No, sir.
24    Q.  Do you know whether that's

301

1  referring to high volume prescribers
2  of Vioxx?
3    A.  I don't know.
4    Q.  Do you know whether that's
5  -- or can you tell from the context
6  of the document whether that's
7  referring to physicians?
8    A.  I really don't know.
9    Q.  Okay.
10    A.  I would be speculating.
11    Q.  The next bullet point is,
12  Target of P&T members with respect to
13  call decks.
14        Do you know what call decks
15  is referring to there?
16    A.  Again, don't know in the
17  context of this document that Dave
18  wrote.  But, typically, call decks
19  list the physicians, nurses,
20  pharmacies that our salespeople call
21  on.
22    Q.  Okay.  High Medicaid RXer
23  (use P-3 and new flag for Medicaid).
24        Do you know what that's

302

1  referring to?
2    A.  No, sir.
3    Q.  Okay.  Bullet point,
4  Deliver compelling message, strong
5  close, and a call to action relating
6  to potential P&T advocacy regarding
7  upcoming Medicaid review.
8        Did I read that correctly?
9    A.  Yes, sir.
10    Q.  And do you know what that's
11  referring to?
12    A.  No, sir.
13    Q.  Do you recall, in your
14  experience as regional medical
15  director in the time frame of this
16  document, which is the summer of
17  2004, whether you received

122

18   information from people responsible
19   for the Louisiana Medicaid segment
20   about upcoming P&T Committee reviews?
21        MR. SALES:  Did you say
22   region medical director?
23        MR. MURRAY:  I'm sorry.
24   Senior regional director.

                                    303

1        THE WITNESS:  And when you
2    say "information," what are you
3    referring to?
4    BY MR. MURRAY:
5        Q.   Just being advised so that
6    you could pass on the information to
7    your sales team that P&T reviews were
8    upcoming.
9        A.   Yes, sir.
10       Q.   Okay.  And then in the
11   e-mail that Mr. Peoples sends in
12   response to this, and on which he
13   copied you, which is at 2000,
14   Mr. Peoples writes, Vioxx team:
15   Please see attached a Medicaid
16   Tactical Plan per Dave Luke.
17        Let's make sure we are
18   getting the clinical message out for
19   Vioxx and making the case that Vioxx
20   is the best choice for the right
21   reasons for the Medicaid patient.
22        Did I read that correctly?
23       A.   Yes, sir.
24       Q.   Do you recall ever seeing a

                                    304

1    Tactical Plan, Medicaid Tactical
2    Plan, prepared by Dave Luke in the
3    course of your position as senior
4    director in this time frame in July
5    of 2004?
6        A.   I don't recall seeing a
7    plan.
8        Q.   Do you recall seeing any
9    kind of Tactical Plan for Medicaid,
10   whether prepared by David Luke or
11   another individual, in the course of
12   your position as senior director for

| | | |
|---|---|---|
| 13 Medicaid -- I'm sorry -- senior<br>14 director, not for Medicaid, just<br>15 senior director for Merck in summer<br>16 of 2004?<br>17    A.  Yes, I have seen Tactical<br>18 Plans.<br>19    Q.  Okay.  And then Mr. Peoples<br>20 writes, Excellent and swift execution<br>21 is key to pull through and I am<br>22 confident that we have the team in<br>23 place to do everything within policy<br>24 to keep Vioxx on the Medicaid PDL.<br>                   305<br>1      Do you know what things<br>2 within policy Mr. Peoples may be<br>3 referring to?<br>4    A.  Not in the context of this<br>5 message.  But, again, everything that<br>6 the sales reps do has to be within<br>7 policy, has to be consistent with the<br>8 product labeling.<br>9      And, again, the information<br>10 about the process, they would<br>11 definitely convey that to customers<br>12 so that they're aware, provide access<br>13 to products.<br>14    Q.  How about the, in order to<br>15 keep Vioxx on the Medicaid PDL, do<br>16 you know what the teams would be<br>17 doing, again, understanding they<br>18 would be within policy, but what sort<br>19 of activities they would be<br>20 undertaking in order to keep Vioxx on<br>21 the Medicaid PDL?<br>22    A.  No, sir.  Other than their<br>23 normal routine of making customers<br>24 aware.  They get so little time with<br>                   306<br>1 customers, it's -- they've got to<br>2 keep doing their job.<br>3    Q.  And because they get so<br>4 little time with customers, do you<br>5 find they try to target certain<br>6 customers more than others? | | |
| LAMBERT, WARREN J., (Page 306:9 to 306:14)<br>               306 | Page 306:3-14<br>Calls for | |

| | | |
|---|---|---|
| 9   THE WITNESS:  I can't say<br>10   that -- I would say that, again, they<br>11   go out to call on customers based on<br>12   the customer's ability to help the<br>13   patients for the products that they<br>14   have responsibility for. | speculation | *Sustained* |
| LAMBERT, WARREN J., (Page 306:16 to 306:21)<br>306<br>16   Q.  And would certain<br>17   customers, say, P&T Committee<br>18   members, be deemed to have more of an<br>19   ability to help those patients than<br>20   other customers in terms of making<br>21   sales calls? | Calls for<br>speculation,<br>assumes facts not in<br>evidence | |
| LAMBERT, WARREN J., (Pages 306:24 to 307:6)<br>306<br>24   THE WITNESS:  I wouldn't<br>307<br>1   say that.  I'd say, again, if the<br>2   customers and the sales<br>3   representatives focus their call<br>4   tact, they would go and talk to those<br>5   individuals just like they were<br>6   anyone else. | Calls for<br>speculation,<br>assumes facts not in<br>evidence | |
| LAMBERT, WARREN J., (Page 307:13 to 307:14)<br>307<br>13   (Exhibit Lambert-LA-29 was<br>14   marked for identification.) | | |
| LAMBERT, WARREN J., (Pages 308:3 to 310:17)<br>308<br>3   Q.  Do you recognize the<br>4   document, either the transmitting<br>5   e-mails or the attachment?<br>6   A.  No, I don't.  But I see my<br>7   name is on the cc list.<br>8   Q.  Okay.  And then the Subject<br>9   line of the document says, Team Note,<br>10   Medicaid, related updates for updated<br>11   P&T related activities presentation.<br>12   And then there's an<br>13   attachment, which appears to be a<br>14   PowerPoint?<br>15   A.  Yes, sir.<br>16   Q.  Okay.  Does that PowerPoint<br>17   bear that symbol we saw before that<br>18   you said you recognize as something | Page 308:16-19<br>Irrelevant<br><br>Page 310:14-17<br>Calls for<br>speculation,<br>overbroad | |

19   from Merck documents?
20      A.   Yes, sir.
21      Q.   Okay.  The title of the
22   document is P&T Related Activities?
23      A.   Yes.
24      Q.   Okay.  Do you recall seeing

309

1   PowerPoints about P&T related
2   activities in your capacity as senior
3   director at Merck in this time frame?
4      A.   Not this one in particular,
5   but I do -- I'm sure I would see some
6   training documents.
7      Q.   Okay.  Do you recall
8   training documents that were specific
9   to P&T activities?
10     A.   Again, I can't tell you
11   specifics.  But it was part of the
12   representative's normal operations,
13   so I would expect that I would.
14     Q.   Okay.  Let me refer you to
15   the page that ends in Bates number
16   2206, Script of Close when formulary
17   review is occurring.
18           Let me ask whether you've
19   seen -- you're familiar with what
20   that particular page is discussing?
21     A.   Again, I don't know the
22   specific PowerPoint presentation.
23   Script of Close, that looks like it's
24   giving direction about what to say

310

1   with the formulary review.
2      Q.   That's direction to sales
3   representatives who would call on
4   doctors; is that correct?
5      A.   I can't say that that's
6   what this is.  Those words would be
7   typically what we'd do.
8      Q.   Okay.  In other words, the
9   word "Close" is a term of art that
10   was used by salespeople within --
11   under your direction at Merck;
12   correct?
13     A.   Yes, sir.
14     Q.   Okay.  And what does that

126

| | | |
|---|---|---|
| 15  term refer to, as you understand it,<br>16  the term "Close" as it was used by<br>17  salespeople in Merck at that time? | | |
| LAMBERT, WARREN J., (Page 310:21 to 310:24)<br><div align="center">310</div>21   THE WITNESS:  Close, in my<br>22  experience, means to summarize the<br>23  information that you share with the<br>24  customer. | Calls for<br>speculation,<br>overbroad | |
| LAMBERT, WARREN J., (Page 311:8 to 311:16)<br><div align="center">311</div>8   Q.   So it's something at the<br>9   end of the sales call, the message<br>10  you would deliver at the end of a<br>11  sales call?<br>12     A.   Yes, sir.<br>13     Q.   Okay.  Do you recall seeing<br>14  scripts for closes?<br>15     A.   In my -- in my experience,<br>16  yes, sir. | | |
| LAMBERT, WARREN J., (Pages 311:23 to 312:11)<br><div align="center">311</div>23  Q.  Mr. Lambert, just a couple<br>24  quick questions.<br><div align="center">312</div>1        Did you ever have the<br>2  opportunity to take Vioxx?<br>3     A.   Yes, sir, I did.<br>4     Q.   What did you take Vioxx<br>5  for?<br>6     A.   I had back pain.<br>7     Q.   Did it work for you?<br>8     A.   Yes, sir, it did.<br>9     Q.   Did you have any problems<br>10  with it?<br>11     A.   No, sir. | Relevant – MIL<br>Ruling | |
| End | | |

<div align="center">127</div>