SCOLNICK, MD, EDWARD, DEPOSITIONS OF 1/30/03, 3/22/05, 4/29/05, 5/17/05, 6/1/05, 8/16/05

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ███████████████████████ Plaintiffs Affirmative Designations are not. | | |

### 1/30/03 DEPOSITION

| | | |
|---|---|---|
| 102:17  102:22<br>17     Merck Research Labs publishes the Merck<br>18  Manual, does it not?<br>19     A.   The Merck Manual is published by a group<br>20  of people who publish the Merck Manuals, and I'm not<br>21  certain at this point, organizationally, where that<br>22  group actually sits. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | Overruled<br><br>607 |

*Relevant as to what Merck knew + when. Also goes to that credibility not confusing under 403 So will allow it even though it teeters on relevancy*

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 104:2    106:3<br><br>2    Q.    Doctor, I asked before we broke if you<br><br>3  were familiar with the Merck Manual.<br><br>4    A.    Yes, I am.<br><br>5    Q.    Okay.  And are you familiar with<br><br>6  Dr. Robert Berkow?<br><br>7    A.    I was familiar with Dr. Robert Berkow.<br><br>8    Q.    Is Dr. Berkow -- is Dr. Berkow passed<br><br>9  away?<br><br>10    A.    I believe he's retired.<br><br>11    Q.    He's retired?<br><br>12    A.    Many years since he was head of the<br><br>13  Merck Manual.  I don't recall the exact time, how<br><br>14  many.<br><br>15    Q.    Okay.  What was -- prior to his<br><br>16  retirement, what was Dr. Berkow's position at Merck.<br><br>17  Research Labs?<br><br>18    A.    To the best of my recollection, he was<br><br>19  in charge of the publication of the Merck Manual, and<br><br>20  that was his primary role.<br><br>21    Q.    Okay.  Is your -- in your position --<br><br>22  well, let me back up.<br><br>23      Did he retire from Merck Research Labs<br><br>24  after you took over as president of Merck Research<br><br>25  Labs? | 401; 402 -- no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on -- or even saw -- the Merck manual. Foundation; lack of personal knowledge<br><br>(see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 105 | | |
| 1    A.   Yes, I believe that he did. | | |
| 2    Q.   Okay. | | |
| 3    A.   Yes. | | |
| 4    Q.   How much overlap was there? | | |
| 5      Do you know when he retired? | | |
| 6    A.   I don't recall exactly when he retired. | | |
| 7   There were several years of overlap. | | |
| 8    Q.   Okay. | | |
| 9      Did you -- did you have interaction with | | |
| 10   him while he was with Merck Research Labs? | | |
| 11    A.   A few occasions, very few. | | |
| 12    Q.   As a president of Merck Research Labs, | | |
| 13   did you have any oversight on the Merck Manual? | | |
| 14    A.   No, none whatsoever. | | |
| 15    Q.   Did you have any input at all? | | |
| 16    A.   No, not to the best of my recollection. | | |
| 17    Q.   To your recollection -- your | | |
| 18   recollection, did you and Dr. Berkow ever speak about | | |
| 19   anything at Merck -- anything, at any time, about the | | |
| 20   Merck Manual or the publication or inclusion of | | |
| 21   information in the Merck Manual? | | |
| 22    A.   I don't recall any conversations with | | |
| 23   Dr. Berkow about the content of any specific item | | |
| 24   published in the Merck Manual. | | |
| 25    Q.   Okay. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 106<br><br>1     Let me review with you the foreword of<br><br>2  that book, and I want to ask you just some general<br><br>3  questions first about the -- about the manual. | | |
| 107:3     107:10<br><br>3     I will represent that Exhibit Number 3<br><br>4  is a copy of the front cover the book, the<br><br>5  publisher's page, the list of contributors of the<br><br>6  Merck Manual, Sixteenth Edition, publish date 1992,<br><br>7  Library of Congress catalog card number, 1-31760, and<br><br>8  that all pages that are stapled together as Exhibit<br><br>9  Number 3 came directly from the Sixteenth Edition of<br><br>10  the Merck Manual. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge<br><br>(see 105:12-24) | *[handwritten]* 007 |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 107:16 108:10<br><br>16   Q.    Let me go to the foreword with you,<br><br>17  Doctor.<br><br>18   A.    Uh-huh, yes.<br><br>19   Q.    First of all, have you ever used the<br><br>20  Merck Manual as a reference?<br><br>21   A.    I can't say that I've never used it, but<br><br>22  it's been rare that I've ever looked at it.<br><br>23   Q.    But it's not disputed that Merck<br><br>24  Research Labs and Merck & Company puts this out for<br><br>25  use by physicians, nurses or by the general public?<br><br>108<br><br>1  It's sold to the general public, is it not?<br><br>2   A.    I believe it's sold to the general<br><br>3  public.<br><br>4   Q.    Okay.<br><br>5     I want you to follow down with me about<br><br>6  four lines before the end of the first paragraph,<br><br>7  okay, where it starts the sentence, "Today."<br><br>8     Tell me if I read this correctly.<br><br>9  "Today, the manual is one of the most widely used<br><br>10  medical texts in the world." | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge<br><br>(see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 109:6      109:19<br><br>6      Q.    Okay.  Tell me if I read this correctly.<br><br>7           "Today, the manual is the most widely<br><br>8   used medical text in the world.  While the book has<br><br>9   grown to about 2800 pages, its primary purpose<br><br>10   remains the same, to provide useful clinical<br><br>11   information to practicing physicians, medical<br><br>12   students, interns, residents and other health care<br><br>13   professionals."<br><br>14      A.    You've accurately read it.<br><br>15      Q.    Okay.<br><br>16           And as a publication from the company<br><br>17   that you're with, is this -- do you -- can I take<br><br>18   this to be a statement from the company that this is<br><br>19   what they're claiming this book to be? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge<br><br>(see 105:12-24) | |
| 109:20  109:21<br><br>20           MR. MAYER:  You're asking him about this<br><br>21   1992 edition? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge<br><br>(see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 109:22  110:9<br><br>22    MR. MICELI:  Well, I'm going to go in<br>23  and talk about the 1999 one in a bit, but this is all<br>24  we're talking about right now.<br>25    A.    Well, the Merck -- the group that<br><br>110<br><br>1  publishes the Merck Manual is part of Merck &<br>2  Company.<br>3    I can't go beyond that in my statement<br>4  with regard to Merck's guaranteeing or endorsing what<br>5  is in the Merck Manual.  Merck is a company.<br>6    Q.    I'm not asking for any guarantees, but<br>7  what I'm -- you, as a former executive, and now<br>8  you're the president --<br>9    A.    Emeritus. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge<br><br>(see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 110:10-110:21<br><br>110:10    Q.    -- emeritus of Merck Research Labs<br><br>110:11 and -- do you still have your Board position with<br><br>110:12 them?<br><br>110:13    A.    No, I am no longer a Board member.<br><br>110:14    Q.    And are you any longer an executive vice<br><br>110:15 president?<br><br>110:16    A.    No, no.<br><br>110:17    Q.    You're now devoting your entire time to<br><br>110:18 the research and development of drugs to treat -- is<br><br>110:19 it Alzheimer's?<br><br>110:20    A.    Neuropsychiatric illnesses.<br><br>110:21    Q.    Neuro.  Okay. | | |
| 110:22  111:2<br><br>22        The Merck Manual is produced by Merck &<br><br>23  Company and/or Merck Research Laboratories, and<br><br>24  presents itself to be an authoritative treatise to<br><br>25  practicing physicians, medical students, interns,<br><br>111<br><br>1  residents and other health care professionals,<br><br>2  doesn't it? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge<br><br>(see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 111:9    113:7 | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

111:9    113:7

9    A.    Yes.  I really can't answer the question

10  the way you're phrasing it.

11        The Merck Manual was published by the

12  group that oversees its publication.

13        It has an Editorial Board, which is

14  designated on the frontage page of the 1992 edition,

15  which reviews the chapters in the manual that are

16  written by the persons who are part of the group that

17  publishes the Merck Manual, and that review group

18  interacting with the group who publishes the manual

19  are responsible for being accurate in the manual, and

20  that's the way I've always viewed this manual.

21    Q.    Okay.

22        In your research, have you ever had the

23  opportunity to consult this manual?

24    A.    As I said, I don't recall ever having

25  consulted the manual.


                                112

1        It's possible I looked at it once or

2  twice for something, but I certainly didn't use it as

3  a reference book.

4    Q.    Okay.  I want to go to the second

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 5  paragraph.  I'm just going to read the first<br><br>6  sentence, and tell me if I read this correctly,<br><br>7  because I want to make sure I understand it.<br><br>8       "Fewer physicians now attempt to manage<br><br>9  the whole range of medical disorders that can occur<br><br>10  in infants, children and adults, but those who do<br><br>11  must have available a broad spectrum of current and<br><br>12  accurate information."<br><br>13       The second sentence says, "Specialists<br><br>14  require precise information about subjects outside<br><br>15  their areas of expertise," and the last two lines,<br><br>16  and I know that I'm splitting a sentence here -- I'll<br><br>17  just read it -- the last sentence.<br><br>18       "Keeping up with the rapid and<br><br>19  extraordinary advances in cellular and molecular<br><br>20  biology, molecular genetics and medical technology is<br><br>21  more challenging than ever, but the Merck Manual<br><br>22  continues to try to meet these needs, addressing only<br><br>23  details --" excuse me "-- excluding only details of<br><br>24  surgical procedures."<br><br>25     A.    Again, that's what it says, yes.<br><br>113<br>1     Q.    Okay. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 2        Let me go to the second page of that<br><br>3        foreword.<br><br>4        I want you to read the first full<br><br>5   paragraph to yourself, and let me know when you're<br><br>6   done, and we'll want to talk to you about a few<br><br>7   things in it. | | |
| 113:8      113:20<br><br>8       A.    I've read the first paragraph.<br><br>9       Q.    Okay.<br><br>10      A.    The first full paragraph.<br><br>11      Q.    Right. The statement in this paragraph,<br><br>12   I'm just going to pull out a couple of key statements<br><br>13   that I see.<br><br>14       "Sections of that book were then sent<br><br>15   out -- sent to outside experts, who had nothing to do<br><br>16   with its preparation, to solicit their most candid<br><br>17   criticism."<br><br>18       That sounds to me like the beginning of<br><br>19   the peer-review process.<br><br>20       Would you agree with that? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 113:22  114:11<br><br>22    A.   I think that is a form of peer review.<br><br>23    Q.   Okay.<br><br>24      Dropping down a few lines, it says,<br><br>25  "Their manuscripts were painstakingly edited by our<br><br>114<br>1  inhouse staff to obtain every valuable morsel of<br><br>2  knowledge while eliminating sometimes elegant but<br><br>3  unneeded words."<br><br>4    A.   I can read what you're reading.<br><br>5    Q.   Sir, and is that again more of the<br><br>6  distillation process of peer-reviewing, taking the<br><br>7  most candid criticisms and distilling down those<br><br>8  things that are most needed and cutting out those<br><br>9  things that are -- trying to think how we put<br><br>10  that -- eliminating sometimes elegant but unneeded<br><br>11  words? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 114:14 115:7<br><br>14   A.   That part of the process is the<br><br>15   Editorial Board's opinion about the comments they're<br><br>16   getting back from the reviewers, yes.<br><br>17   Q.   Certainly.<br><br>18      And then the last two sentences or three<br><br>19   sentences, it says, "The authors then rework, modify<br><br>20   and polish their manuscripts.  Almost all of the<br><br>21   manuscripts were revised at least six times.  15 to<br><br>22   20 revisions were not uncommon.  We believe that no<br><br>23   other medical text undergoes as many reviews and<br><br>24   revisions as the Merck Manual does."<br><br>25      And I read that correctly, didn't I?<br><br><br>115<br>1   A.   Yes, you did.<br><br>2   Q.   And that -- those segments of that<br><br>3   paragraph that I've pulled out basically characterize<br><br>4   and describe what at least the editors of this book<br><br>5   published by the company you were aligned with, or<br><br>6   worked with, believed it to be the most peer-reviewed<br><br>7   and distilled piece of medical text in the world. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 115:10  116:3 <br><br> 10   A.   Yeah.  I think the paragraph says that <br><br> 11  this is a highly peer-reviewed book that tries to be <br><br> 12  clear and accurate in what it represents to people <br><br> 13  who would read it. <br><br> 14       I think that's how I understand this <br><br> 15  paragraph. <br><br> 16   Q.   And it explains the mechanisms of how <br><br> 17  that is done by saying that sometimes six revisions, <br><br> 18  but even, at times, 15 to 20, if necessary? <br><br> 19   A.   The statement that you read says, <br><br> 20  "Almost all of the manuscripts were revised at least <br><br> 21  six times.  15 to 20 revisions were not uncommon." <br><br> 22   Q.   Yes.  And in your professional <br><br> 23  experience, the purpose for doing that, those <br><br> 24  revisions, the sending it back to the editor, the <br><br> 25  rewriting it 10, 15 times, maybe 20, is so that you <br><br> <div align="center">116</div> 1  can weed out either bad science, improper opinions, <br><br> 2  or maybe something that's been disproven by recent <br><br> 3  scientific discovery? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 116:8        117:21<br><br>8    Q.    I'm not saying the reason that is done.<br><br>9   I'm saying that is the reason that we have peer<br><br>10   review, so that we can have some, albeit<br><br>11   confidential, discourse between professionals to get<br><br>12   to the very heart of the scientific issues.<br><br>13      A.    I would like to separate in my answer<br><br>14   peer review in general, which you're discussing and<br><br>15   we've discussed before --<br><br>16      Q.    Yes, sir?<br><br>17      A.     -- and at least my understanding of the<br><br>18   Merck manual's aim.<br><br>19         As you pointed out, The Merck Manual is<br><br>20   read widely and is even available to lay persons<br><br>21   without a special medical background, and I believe<br><br>22   that The Merck Manual, in its various revisions and<br><br>23   reviews, that a significant part of the purpose of<br><br>24   those reviews was to try to get language and<br><br>25   expression of the wide variety of complex fields that<br><br>           117<br>1   you've noted, so that it was clearly written and<br><br>2   understandable to a wide audience.<br><br>3         That's a slightly different purpose than | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 4   a technical peer review journal. | | |
| 5        Q.    Well, I understand. | | |
| 6        A.    Okay. | | |
| 7        Q.    And for that reason, Merck publishes | | |
| 8   about four or five different Merck manuals, don't | | |
| 9   they? | | |
| 10        A.    They publish four or five different | | |
| 11   Merck Manuals because the audience and the content of | | |
| 12   those manuals is somewhat different, and at this | | |
| 13   point, I can't recall exactly what manuals cover | | |
| 14   what. | | |
| 15        Q.    Okay. | | |
| 16            But there is a Merck Manual for | | |
| 17   diagnosis and therapy, which is what we have in front | | |
| 18   of you.  A portion of it is in front of you. | | |
| 19        A.    I don't see the rest of the title -- | | |
| 20        Q.    Okay. | | |
| 21        A.    -- but that -- I assume you're correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 118:2        118:14<br><br>2       Q.    Okay.  It's on this page, Doctor, that<br><br>3   says, "Sixteenth Edition, Merck Manual of Diagnosis<br><br>4   and Therapy."<br><br>5       A.    Okay.  Thank you.<br><br>6       Q.    Okay?  And there's a Merck Manual for<br><br>7   geriatrics?<br><br>8       A.    Yes.  I believe so.<br><br>9       Q.    And there's a Merck Manual for household<br><br>10   use, so that when they're writing to the audience of<br><br>11   people like myself, who don't have medical training,<br><br>12   we can understand it.<br><br>13       A.    There's a manual that's written for a<br><br>14   broader audience.  That's correct. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 118:20  119:4<br><br>20      If you could turn to the copy of page<br><br>21  2664.<br><br>22    A.   Yes.<br><br>23    Q.   Under the subheading, "Hematologic<br><br>24  Effects." This is from a section, I'll represent to<br><br>25  you, in the book.<br><br>             119<br>1    A.   Yes.<br><br>2    Q.   There's prostaglandins, thromboxanes<br><br>3  and -- I can't pronounce that last word --<br><br>4  leukotrines? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |
| 119:11  119:20<br><br>11    A.   "Prostaglandins, Thromboxanes and<br><br>12  Leukotrines."<br><br>13    Q.   Trines. Okay. I'd like to go back to<br><br>14  2664.<br><br>15      We've already covered some of this, but<br><br>16  there's a reason for me doing this in this context.<br><br>17      If you look at the last sentence of<br><br>18  the -- well, if you'll just read the first paragraph<br><br>19  to yourself, please.<br><br>20    A.   The first paragraph? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-105:24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 24      Q.      We're going to get to that in just a<br><br>25   bit.<br><br>                                 121<br>1            At the bottom of the -- at the bottom of<br><br>2   the page going one, two, three, four lines up, and<br><br>3   one word with the sentence that starts with "This."<br><br>4            Now, you can read the whole section if<br><br>5   you'd like.  I don't want to take things out of<br><br>6   context, but I don't want to --<br><br>7      A.    Do you want me to read that?<br><br>8      Q.    Yes.  You don't have to read it out<br><br>9   loud, but I just want you -- if you want to read the<br><br>10   whole "Hematologic Effects" section so we know in<br><br>11   what context we're talking about.<br><br>12      A.    Okay.  I've read it.  Thank you.<br><br>13      Q.    Okay.<br><br>14            Would it be fair to say that that short<br><br>15   section describes the relationship that prostacyclin<br><br>16   and thromboxane A2 play in both platelet aggregation<br><br>17   and in vasoconstriction? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 121:24  122:4<br><br>24    A.    The paragraph describes a relationship<br><br>25   between thromboxane A2 and prostacyclin, yes.<br><br><br>                          122<br>1    Q.    Okay.  And vasoconstriction and platelet<br><br>2   aggregation?<br><br>3    A.    That's what the paragraph discusses,<br><br>4   yes. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |
| 122:5        122:20<br><br>122: 5     Q.    In lay terms, what is platelet<br>122: 6   aggregation?<br>122: 7    A.    Platelet aggregation is the clumping<br>122: 8   together of platelets, in -- an early step in the<br>122: 9    formation of clots.<br>122:10    Q.    Okay.<br>122:11    A.    It can be reversible.  It cannot be<br>122:12   reversible.<br>122:13    Q.    Okay.<br>122:14        What is vasoconstriction in lay terms?<br>122:15    A.    Vasoconstriction, in lay terms, is<br>122:16    narrowing of small -- usually, small vessels in the<br>122:17   arterial tree.<br>122:18        That would be generally what<br>122:19   vasoconstriction would mean.  It can also apply to<br>122:20    veins. | | |
| 122:21-123:1<br><br>122:21    Q.    Okay.<br>122:22        What is -- well, could the -- and this<br>122:23 is -- let me -- the relationship between platelet<br>122:24 aggregation and vasoconstriction is -- plays an<br>122:25 important role in hemodynamic -- in hemodynamic<br>123: Page 123<br>123: 1 integrity.  Correct? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 123:4-123:10<br><br>123: 4     A.    I'm not sure that I would describe it<br>123: 5 exactly that way, no.<br>123: 6     Q.    Okay.<br>123: 7          If you have platelet aggregation coupled<br>123: 8 with vasoconstriction, would you agree with me that<br>123: 9 the likelihood of an occlusive event, be it a heart<br>123:10 attack or a stroke, is greater? | | |
| 123:13-123:17<br><br>123:13     A.    I wouldn't be able to draw any<br>123:14 conclusion about what was going on in a given animal<br>123:15 or a person's vascular tree based on just those two<br>123:16 comments.<br>123:17          I think that's too incomplete. | | |
| 123:18-124:13<br><br>123:18     Q.    Well, there are many factors that can go<br>123:19 into whether a person has a stroke or a heart attack,<br>123:20 and I understand that.<br>123:21          What we're talking about, when we talk<br>123:22 about platelet aggregation, we're talking about the<br>123:23 beginning of platelets clumping together to form a<br>123:24 clot.<br>123:25          Correct?<br><br>124<br>124: 1     A.    That's correct.<br>124: 2     Q.    And vasoconstriction is the inability of<br>124: 3 an artery or a vein to expand, but instead stay<br>124: 4 constricted or become smaller.  Right?<br>124: 5     A.    That is also correct.<br>124: 6     Q.    And there are enzymes within our body<br>124: 7 that regulate the dilation or the constriction of<br>124: 8 arteries and veins?<br>124: 9     A.    There are many enzymes and hormones that<br>124:10 regulate that process, in addition to, included in<br>124:11 that group are thromboxane and prostacyclins.<br>124:12          There are many other factors that affect<br>124:13 that process. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 124:14-124:16<br><br>124:14   Q.   There are, and that's not -- I'm not<br>124:15 here to argue that point with you.<br>124:16   A.   Right. | | |
| 124:17-124:20<br><br>124:17   Q.   But we do know that thromboxane A2 and<br>124:18 prostacyclin affect vasoconstriction and platelet<br>124:19 aggregation?<br>124:20   A.   That's correct. | | |
| 125:1     125:10<br><br>1          Let me show you what I'm going to mark<br><br>2   as Deposition Exhibit Number 4, and I'm going to make<br><br>3   my same representation.<br><br>4          This is The Merck Manual, Seventeenth<br><br>5   Edition, which was published, by the second page of<br><br>6   that exhibit, in 1999, and you can flip through and<br><br>7   review all of the pages if you'd like.  It has the<br><br>8   same general foreword, although somewhat cut, but I<br><br>9   want to draw your  -- ultimately draw your attention<br><br>10  to the last page of that exhibit. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 126:8   126:15<br><br>8      Q.    If you look at that index at page 2818<br><br>9   with me, and you may want to, just for your own<br><br>10   benefit, have the Sixteenth Edition at hand if you'd<br><br>11   like.<br><br>12            But if -- and I'll represent to you that<br><br>13   this -- that I went back to the -- if you look at the<br><br>14   Sixteenth Edition side by side, the last page of the<br><br>15   document -- | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |
| 126:16  126:18<br><br>16      A.    The very last page that you've stapled<br><br>17   together?<br><br>18      Q.    Yes.  The index. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |
| 126:23  127:1<br><br>23            On the Sixteenth Edition, page 2834,<br><br>24   between thrombotic, thrombocytopenic purpura and<br><br>25   thrush is where you find thromboxane discussed.<br><br>127<br>1   Correct? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 127:11  127:18<br><br>11      A.    Yes, it appears in the alphabetical<br><br>12  listing in the index --<br><br>13      Q.    Okay.<br><br>14      A.    Between thrombotic thrombocytic purpura<br><br>15  and thrush.<br><br>16      Q.    And in the Seventeenth Edition, between<br><br>17  thrombotic, thrombocytopenic purpura and thrush, what<br><br>18  is -- is there an entry for thromboxanes? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 127:22  128:19 | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

127:22  128:19

22  A.    The index in the Seventeenth Edition has
23  thrombotic thrombocytopenic purpura-hemolytic-uremic
24  syndrome, glomerulonephritis and then thrush.
25      I see no comment on this page about

128

1  thromboxane.

2  Q.    Between the publication of the Sixteenth

3  Edition in 1992 and the publication of the

4  Seventeenth Edition in 1999, was there any

5  ground-breaking research that was done with regard to

6  whether or not thromboxane was a potent

7  vasoconstrictor and vasodilator -- or excuse me --

8  vasoconstrictor and platelet aggregator?

9  A.    I can't answer your question.

10  Q.    All right.

11  A.    I don't know.

12  Q.    It's my understanding, correct me if I'm

13  wrong, from the FDA regs that govern how

14  pharmaceutical companies -- I'm not trying to make a

15  legal statement here, but it's my understanding that

16  it's the obligation of the company to keep up with

17  the medical literature that impacts upon the drugs

18  that your company markets and manufactures.

19      Is that a generalization?

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 129:3        129:19<br><br>3      A.    I can't answer your question.  I<br><br>4   would -- I would make the comment that the page in<br><br>5   the Seventeenth Edition that is not handed out here<br><br>6   by you is the page in the Sixteenth Edition, which<br><br>7   goes through the many external peer reviews that the<br><br>8   Sixteenth Edition went through.<br><br>9          To the best of my knowledge, The Merck<br><br>10  Manual is still peer-reviewed by many external<br><br>11  experts.<br><br>12      Q.    Oh, I -- that wasn't my question.<br><br>13      A.    It's not simply published by Merck &<br><br>14  Company.  It's reviewed by external experts, as you<br><br>15  so nicely pointed out in the Sixteenth Edition.<br><br>16      Q.    Certainly.  I'm trying to point out<br><br>17  though, and I'm just trying to find out, there's<br><br>18  obviously a reason why the prostacyclin thromboxane<br><br>19  section was removed between 1992 and 1999 -- | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 130:6      130:10<br><br>6  don't know, but I want to know is, are you aware of<br><br>7  any -- of any research, ground-breaking research that<br><br>8  would change the correctness of what is stated in the<br><br>9  Sixteenth Edition about thromboxanes and<br><br>10  prostacyclins and prostaglandins? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 130:16 131:12 <br><br> 16   A.   The only answer that I can give you to <br> 17 the general question you've asked about, but not the <br> 18 way you've phrased the question, is that to the best <br> 19 of my recollection, very, very little research or <br> 20 attention in the medical literature has been paid to <br> 21 thromboxane and prostacyclin since the mid-'80s and <br> 22 early '90s. <br> 23   In fact, probably very -- I would -- I <br> 24 don't know for certain, but I believe that the topic <br> 25 had received very little attention between 1992 and <br> 131 <br> 1 1999 in the medical literature. <br> 2   Q.   Okay. <br> 3   A.   Because its importance was not clear in <br> 4 the medical literature. <br> 5   Q.   Okay. <br> 6   A.   And -- <br> 7   Q.   Would you -- <br> 8   A.   And in your terms, no new discoveries <br> 9 had been made which gave it prominence. <br> 10   Q.   Right. I understand. <br> 11   Do you believe that that's the reason <br> 12 why it was removed from the Sixteenth Edition? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| **131:15  132:2**<br><br>15    A.    I have no idea why it was removed from<br><br>16   the Seventeenth Edition compared to the Sixteenth<br><br>17   Edition index.<br><br>18    Q.    Okay.<br><br>19    A.    I have no idea why it was removed.<br><br>20    Q.    Okay.<br><br>21    A.    I have never heard anything about why it<br><br>22   was removed.<br><br>23    Q.    Okay.<br><br>24          But you would agree with the accuracy of<br><br>25   the statements of what thromboxane and prostacyclin<br><br>132<br>1   are, and what they do in our vascular system as it is<br><br>2   stated briefly in the Sixteenth Edition? | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |
| **132:6      132:7**<br><br>6    A.    My comments earlier on that paragraph<br><br>7   remain accurate. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 133:1    133:8<br><br>1      I want you to just review it to<br><br>2  yourself, and I want to make sure that we can agree<br><br>3  that the book that's published by Merck & Company<br><br>4  that we're looking at, or the portion that we're<br><br>5  looking at, is factually and scientifically accurate,<br><br>6  although it may be brief and there may be other<br><br>7  exquisite points that we haven't discussed, but what<br><br>8  is stated is accurate. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 133:10 134:23<br><br>10   A.   What I would answer to your question is<br><br>11  the paragraph that you and I discussed together<br><br>12  beginning with the words "Following" and where the<br><br>13  word "thromboxane" and "PGI" are discussed is a<br><br>14  generally accurate paragraph.<br><br>15  Q.   What about the preceding paragraph that<br><br>16  starts with "PGI 1"?<br><br>17      Is that a generally accurate paragraph?<br><br>18  A.   The paragraph before that begins with<br><br>19  "PGE-1"?<br><br>20  Q.   "PGE-1," the first paragraph below<br><br>21  "Hematologic Effects."<br><br>22  A.   Yes.<br><br>23  Q.   Is that a generally accurate paragraph?<br><br>24  A.   I think, in 1992, this was generally<br><br>25  true.<br><br>                  134<br><br>1      I'm not sure every word in the paragraph<br><br>2  is accurate, but it's generally true.<br><br>3  Q.   Okay.  And, in 1992, Naproxen was being<br><br>4  used -- was widely used as an NSAID, was it not?<br><br>5  A.   I think Naproxen was available.  I -- I<br><br>6  don't know exactly how widely used it was.  It was | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 7  certainly used as an NSAID.<br><br>8    Q.    Fair enough.<br><br>9         In the bottom or the last paragraph<br><br>10  three lines up states:  "Low-dose aspirin<br><br>11  administration, 81 to 325 milligrams, is widely used<br><br>12  for preventive therapy in patients with angina,<br><br>13  post-myocardial infarction or stroke and in patients<br><br>14  with incipient risks for these catastrophes --"<br><br>15    A.    Yes.<br><br>16    Q.    "-- abnormal plasma, lipid, smokers,<br><br>17  positive family history," et cetera.  Correct?<br><br>18    A.    That is correct.<br><br>19    Q.    Okay.<br><br>20         And in 1992, when The Merck Manual was<br><br>21  published, it didn't want to tell anybody -- it<br><br>22  didn't publish to the world that aspirin and Naproxen<br><br>23  are used for that prophylactic purpose? | | |
| 134:25  135:2<br><br>25    A.    There's no commentary about Naproxen in<br><br>135<br>1  this paragraph in the 1992 edition of The Merck<br><br>2  Manual.  There is a commentary on aspirin. | 401; 402 – no evidence the State of Louisiana (DHH), the P&T Committee or Louisiana DHR relied on – or even saw – the Merck manual. Foundation; lack of personal knowledge (see 105:12-24) | |
| | **3/22/05 Deposition** | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 1505    15:5-15:7<br><br>15: 5    Q.    Are you Dr. Ed Scolnick?<br>15: 6    A.    Yes, I'm Dr. Edward<br>15: 7  Scolnick. | | |
| 22:13-22:18<br><br>22:13    Q.    Are you the Edward M.<br>22:14  Scolnick, President of MerckResearch<br>22:15  Labs and then the Executive Vice<br>22:16  President Science and Technology for<br>22:17  Merck & Company?<br>22:18    A.    Yes, I am. | | |
| 47:2-47:13<br><br>47: 2    Q.    Well, let me suggest it to<br>47: 3  you if you'll look at Exhibit Number 4.<br>47: 4        I'll bet you've seen this<br>47: 5  e-mail lately getting ready for your<br>47: 6  deposition, haven't you?<br>47: 7    A.    I don't recall seeing this<br>47: 8  e-mail before right now.<br>47: 9    Q.    You don't recall seeing this<br>47:10  e-mail before?<br>47:11    A.    I do not recall seeing this<br>47:12  e-mail before. | | |
| scolfinal - Vol. I, (Pages 47:13 to 48:2)<br>47<br>13    Q.    All right.  Well, if you'll<br>14  look down at your message dated December<br>15  5th, 2001, it's about an analyst who is<br>16  going to stand up in public and say<br>17  something negative about Vioxx.  And<br>18  you're the fellow who wrote, "David if he<br>19  says this I will boil him in oil at the<br>20  meeting."  That's what you said, isn't<br>21  it?<br>22    A.    That is the e-mail you're<br>23  referring to, yes.<br>24    Q.    Does that mean, yes, you<br><br>48<br>1  said it?<br>2    A.    That is my e-mail. | 401; 402 – not relevant to decisions of State of Louisiana (DHH), P&T Committee, or Louisiana DUR | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scolfinal - Vol. I, (Page 49:1 to 49:10)<br><br>49<br>1      So, you were saying you were<br>2  going to boil this fellow in oil because<br>3  this was an analyst who was going to<br>4  stand up and suggest that maybe Vioxx<br>5  causes CV events, heart attacks, strokes,<br>6  things like that; right?<br>7     A.  I don't recall the details<br>8  of his report.  I have not seen this<br>9  e-mail, and I don't recall the details of<br>10  this at all. | 401; 402 – not relevant to decisions of State of Louisiana (DHH), P&T Committee, or Louisiana DUR | |
| scolfinal - Vol. I, (Page 52:2 to 52:21)<br><br>52<br>2     Q.  Well, if you'll look behind<br>3  you'll see what it is that upset you.<br>4  It was this fellow named somebody, hang<br>5  on, his name is at the end, Richard<br>6  Stover, who prepared a reanalysis of<br>7  Merck's meta-analysis.  Do you see where<br>8  it says that?<br>9     A.  That is the title for the<br>10  article that you're referring to.<br>11     Q.  Now, those are a lot of big<br>12  words for nonscientist people.  But just<br>13  between you and me, what this really is<br>14  is it's a stock analyst, someone who<br>15  advises the investment community on<br>16  whether to buy or sell stock, and he's<br>17  basically examining some of what you guys<br>18  had been telling people about the safety<br>19  of your drug, isn't he?<br>20     A.  He's talking about the VIGOR<br>21  study and Vioxx, yes. | 401; 402 – not relevant to decisions of State of Louisiana (DHH), P&T Committee, or Louisiana DUR | |
| scolfinal - Vol. I, (Page 58:17 to 58:24)<br><br>58<br>17     Q.  Okay.  And that's why you<br>18  said "David if he says this I will boil<br>19  him in oil at the meeting."  You didn't<br>20  want that kind of talk out there, did<br>21  you?<br>22     A.  I didn't want -- having read<br>23  this memo, I didn't want an inaccurate<br>24  statistical analysis of our data. | 401; 402 – not relevant to decisions of State of Louisiana (DHH), P&T Committee, or Louisiana DUR | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 68:3-68:4<br><br>68: 3      Q.   I want to show you Scolnick<br>68: 4   Exhibit Number 7.  We're going to come | | |
| 68:11-68:18<br><br>68:11      Q.  Do you see your June 1, 1998<br>68:12  e-mail?<br>68:13      A.   Yes, I do.<br>68:14      Q.   You did threaten to quit,<br>68:15  didn't you?<br>68:16      A.   I was upset with a<br>68:17  particular marketing person.  I was --<br>68:18   and that is the thrust of this e-mail. | | |
| 69:1-69:15<br><br>69: 1      Q.   Well, when you said "If you<br>69: 2  lose I will leave, because I will not be<br>69: 3  able to have any respect for this<br>69: 4  company," that's threatening to quit,<br>69: 5  isn't it?<br>69: 6      A.   The e-mail is accurate.<br>69: 7      Q.   No.  That wasn't my<br>69: 8  question.<br>69: 9          I said, when you say in your<br>69:10  e-mail, "If you lose I will leave,<br>69:11  because I will not be able to have any<br>69:12  respect for this company," you're<br>69:13  threatening to quit, aren't you?<br>69:14      A.   I accept that<br>69:15  interpretation. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 69:23-70:12<br><br>69:23      Q.    You're saying "Merck<br>69:24   marketing for once has to compete and<br><br>70<br>70: 1   win.  If you do not beat Pfizer," which<br>70: 2   is who Searle was at the time; right?  If<br>70: 3   you don't beat Celebrex, that's what it<br>70: 4   means; right?<br>70: 5      A.   Yes, that's correct.<br>70: 6      Q.   "If you do not beat PFIZER<br>70: 7   2/1 MERCK should throw in the towel and<br>70: 8   just give up and hand the company over to<br>70: 9   someone else.  If YOU," all capitals,<br>70:10   "lose I will leave, because I will not be<br>70:11   able to have any respect for this<br>70:12   company."  You didn't threaten them to | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 70:13-71:12<br><br>70:13  boil them in oil, but you were pretty<br>70:14  upset with them, weren't you?<br>70:15      A.   It is a pointed e-mail.<br>70:16      Q.   Because you were upset;<br>70:17  weren't you?<br>70:18      A.   That is correct.<br>70:19      Q.   You were upset also because<br>70:20  of some study issues, research issues;<br>70:21  weren't you?<br>70:22      A.   I don't recall what you're<br>70:23  referring to.<br>70:24      Q.   Look at what it says at the<br><br>71<br>71: 1  start.  You're saying that the reason<br>71: 2  y'all were three months behind Searle,<br>71: 3  the reason you were losing the race is<br>71: 4  because people in marketing "demanded a<br>71: 5  label that said we cause no ulcers."<br>71: 6  And then the budgets were so high that<br>71: 7  nobody could get the money that they<br>71: 8  needed for the study.  And that's why<br>71: 9  y'all were behind?  That's what you say;<br>71:10  isn't it?<br>71:11      A.   That is what the memo says,<br>71:12  yes. | | |
| 78:7-78:12<br><br>78: 7      Q.   Bottom line is, you were<br>78: 8  saying marketing needs to stop their<br>78: 9  demands and just get out there and<br>78:10  compete and win for once; right?<br>78:11      A.   That's what my memo<br>78:12  indicates. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 79:6-79:11<br><br>79: 6      Q.   Sir, y'all weren't ready to<br>79: 7   go to market with your product, with<br>79: 8   Vioxx, when Celebrex hit the market?<br>79: 9   Y'all got beat; right?<br>79:10      A.   Celebrex got to the market<br>79:11   first.  That is correct. | | |
| 96:23-97:5<br><br>96:23      Q.   Well, we looked at an<br>96:24   exhibit a few minutes ago, the 1998 one<br><br>97<br>97: 1   where you said that y'all were killing<br>97: 2   basic research again at Merck, once<br>97: 3   again.  That's because y'all needed more<br>97: 4   money.  You didn't have enough money in<br>97: 5   the budget; right? | | |
| 98:3-98:9<br><br>98: 3      Q.   All right.  So, now you'll<br>98: 4   agree with me in 1998 y'all didn't have<br>98: 5   enough money in your budget to do all the<br>98: 6   research you wanted to do.  True?<br>98: 7      A.   That is true.  That is<br>98: 8   always true of any really productive<br>98: 9   research laboratory. | | |
| 101:12-101:20<br><br>101:12   BY MR. LANIER:<br>101:13      Q.   Well, sir, you weren't in<br>101:14   marketing yourself, were you?<br>101:15      A.   No.<br>101:16      Q.   Well, why did you keep<br>101:17   dabbling in the marketing end?  Why were<br>101:18   you sending broadside e-mails to people,<br>101:19   because y'all were too slow on the<br>101:20   marketing? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 101:23-102:3<br><br>101:23          THE WITNESS:  I was<br>101:24       competitive, and we had a terrific<br><br>102<br>102: 1       drug, and I wanted the company to<br>102: 2       present that drug well to<br>102: 3       physicians. | | |
| 115:3-115:10<br><br>115: 3       Q.   So, you had all the<br>115: 4   resources you needed to do the right<br>115: 5   studies, and if the studies weren't done,<br>115: 6   it was your fault for not doing them<br>115: 7   because you had the money.  Is that what<br>115: 8   you're telling me?<br>115: 9       A.   We had sufficient resources<br>115:10   to study Vioxx. | | |
| 118:5-118:11<br><br>118: 5       Q.   If you thought that there<br>118: 6   was an issue that needed debunking, you<br>118: 7   certainly knew how to order to get a<br>118: 8   study immediately to debunk the issue and<br>118: 9   destroy credibility, didn't you?<br>118:10       A.   And to find out if we were<br>118:11   wrong. | | |
| 118:18-119:3<br><br>118:18       Q.   That wasn't my question,<br>118:19   sir.  I said, you could have done a<br>118:20   study, and you could have ordered one to<br>118:21   be done with speed on the issue of<br>118:22   cardiovascular problems, heart attacks<br>118:23   and strokes, couldn't you?<br>118:24       A.   There was no reason to do<br><br>119<br>119: 1   such a study before Vioxx went to market<br>119: 2   based on all of the data, huge NDA, over<br>119: 3   5,000 patients studied. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 119:10-119:23<br><br>119:10   question.  My question is simple.  You<br>119:11   certainly could have ordered a study for<br>119:12   risks of heart attacks and strokes before<br>119:13   you put the Vioxx drug on the market,<br>119:14   couldn't you?<br>119:15         A.   If there had been a reason<br>119:16   to do that, I could have done that.<br>119:17         Q.   By the same token, any day<br>119:18   that Vioxx had been on the market, the<br>119:19   second it occurred to you that there<br>119:20   might be a problem with heart attacks and<br>119:21   strokes, you could have ordered<br>119:22   immediately a speed study to be done;<br>119:23   couldn't you? | | |
| 120:2-120:5<br><br>120: 2         THE WITNESS:  I could have<br>120: 3   asked or ordered a study to be<br>120: 4   done if I had thought there was a<br>120: 5   cardiovascular risk with Vioxx | | |
| 120:2-120:5<br><br>120: 2         THE WITNESS:  I could have<br>120: 3   asked or ordered a study to be<br>120: 4   done if I had thought there was a<br>120: 5   cardiovascular risk with Vioxx | | |
| 122:1-122:3<br><br>122: 1         THE WITNESS:  One of the<br>122: 2   studies that I'm aware of was not<br>122: 3   given final approval | | |
| 122:5-122:9<br><br>122: 5   Q.   Why not?<br>122: 6         A.   Because when the study was<br>122: 7   reviewed, several people objected to the<br>122: 8   design of the study, that it was not a<br>122: 9   good scientific study to do. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 122:10-122:15<br><br>122:10      Q.   So, you had the need for the<br>122:11  study, you just didn't design a good one.<br>122:12  Is that fair to say?<br>122:13      A.   We considered many study<br>122:14  designs before the approved design was<br>122:15  conceptualized. | | |
| 128:1-128:22<br><br>128: 1      Q.   Well, the truth is, the<br>128: 2  essential study that needed to be done<br>128: 3  for Vioxx was an outcomes study for heart<br>128: 4  attacks and strokes; right?<br>128: 5      A.   The study that would<br>128: 6  measure, as a predefined endpoint, heart<br>128: 7  attacks and strokes was an important<br>128: 8  study for Vioxx.<br>128: 9      Q.   Not an important.  It was,<br>128:10  at least in the world of things back in<br>128:11  2001, the only essential study for Vioxx,<br>128:12  wasn't it?<br>128:13      A.   It was an essential study to<br>128:14  do for Vioxx.<br>128:15      Q.   That wasn't my question.<br>128:16       The only essential study;<br>128:17  true?<br>128:18      A.   It wasn't the only essential<br>128:19  study to do.  It was --<br>128:20      Q.   That's what you said.<br>128:21      A.   It was a very important<br>128:22  study. | | |
| 136:9-136:12<br><br>136: 9      Q.   Well, certainly by the year<br>136:10  2000 you knew that there was an issue<br>136:11  about heart attacks and strokes, weren't<br>136:12  you? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 136:15-136:17<br><br>136:15      THE WITNESS:  The VIGOR<br>136:16   study was available in the year<br>136:17   2000. | | |
| 141:9-142:7<br><br>141: 9      MR. LANIER:  We're marking<br>141:10   that as Exhibit Number 13.<br>141:11 BY MR. LANIER:<br>141:12    Q.   If you'll look down at the<br>141:13 third question, that's the one I want you<br>141:14 to look at.<br>141:15    A.   Uh-huh.<br>141:16    Q.   "Why did Merck undertake<br>141:17 the," APPROVe, "trial?"<br>141:18    A.   Uh-huh.<br>141:19    Q.   Merck prepared an answer to<br>141:20 that.  Nowhere in that answer does it say<br>141:21 to see if people are having heart attacks<br>141:22 and strokes, does it?<br>141:23    A.   The answer to the question<br>141:24 does not refer to the cardiovascular<br><br>142<br>142: 1 outcome part of the study.<br>142: 2    Q.   I'm sorry.  That's a long<br>142: 3 answer.  Are you just saying, yes, you're<br>142: 4 right, it doesn't say heart attacks and<br>142: 5 strokes?<br>142: 6    A.   There's nothing about heart<br>142: 7 attacks and strokes in that answer. | | |
| scolfinal - Vol. I, (Page 146:2 to 146:5)<br>                    146<br>2      You, Dr. Scolnick, knew<br>3 Vioxx was causing heart attacks and<br>4 strokes by the time of March 2000; true?<br>5    A.   Not true. | Mischaracterizes evidence | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| **146:6-146:10**<br><br>146: 6    Q.   Well, we at least know that<br>146: 7  you're getting reports of it, that you're<br>146: 8  having summarized out of thousands of<br>146: 9  reports, right, Exhibit 10?<br>146:10    A.   Again, I've – | | |
| **146:13-147:4**<br><br>146:13      THE WITNESS: -- tried to<br>146:14  explain to you the fact that when<br>146:15  a drug goes on the market, adverse<br>146:16  experience reports are reported on<br>146:17  every drug, including Vioxx.  And<br>146:18  the challenge for analyzing those<br>146:19  reports is to try to figure out<br>146:20  whether they're happening by<br>146:21  chance associated with the drug or<br>146:22  whether the drug is actually<br>146:23  causing the adverse experiences<br>146:24  reported in the reports.<br><br>147<br>147: 1      And we did this -- we did<br>147: 2  this routinely and very, very<br>147: 3  carefully for every drug we ever<br>147: 4  brought on the market. | | |
| **147:7-147:12**<br><br>147: 7  jury, as of March 2000, you, Edward<br>147: 8  Scolnick, knew that the CV events, the<br>147: 9  heart attacks and strokes, were clearly<br>147:10  there, and you, Edward Scolnick, knew<br>147:11  that they were mechanism-based with<br>147:12  Vioxx? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 147:16-147:21<br><br>147:16    Q.   True?<br>147:17    A.   That was my very first<br>147:18  reaction when I saw the data from the<br>147:19  VIGOR trial.<br>147:20    Q.   You knew it from the get-go.<br>147:21  It was your first reaction; right? | | |
| 147:24-148:2<br><br>147:24        THE WITNESS:  It was my<br><br>148<br>148: 1    first reaction before other data<br>148: 2    was available. | | |
| 148:17-148:24<br><br>148:17    Q.   Sir, it is in March of 2000;<br>148:18  isn't it?<br>148:19    A.   Yes, it is.<br>148:20    Q.   And you said to everybody,<br>148:21  Alan es, Alise Reicin and Deborah<br>148:22  Shapiro certain things, didn't you?<br>148:23    A.   I did.  It says, "I just<br>148:24  received and went through the data." | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 149:8-150:2<br><br>149: 8      Q.  And you don't step out and<br>149: 9  say something unless you know it's true<br>149:10  and right.  Do you remember that?<br>149:11     A.  I don't remember saying what<br>149:12  you've just quoted me as saying.<br>149:13     Q.  I think your exact words<br>149:14  were, you hold yourself to a very high<br>149:15  standard.  Do you remember that?<br>149:16     A.  Yes, I do remember that.<br>149:17     Q.  And so you sent this e-mail<br>149:18  to everybody, and you said that you<br>149:19  received and you went through the data;<br>149:20  right?<br>149:21     A.  Uh-huh.  That's what it<br>149:22  says.<br>149:23     Q.  And I'm sure you did that<br>149:24  thoroughly.  You didn't do a half slop<br><br>150<br>150: 1  job; did you?<br>150: 2     A.  I don't think so. | | |
| 151:5-151:12<br><br>151: 5      THE WITNESS:  Excuse me.  If<br>151: 6  I can just look at the memo for<br>151: 7  one second.  "Pubs" in this<br>151: 8  context is talking about<br>151: 9  perforations, ulcers and bleeds<br>151:10  associated with the study.<br>151:11  BY MR. LANIER:<br>151:12     Q.  Okay.  Thank you. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 151:13-151:22<br><br>151:13        "There is no doubt about<br>151:14  the" perforations, ulcers and bleeds<br>151:15  "data." Then look at your next sentence.<br>151:16  "The CV events are," what's that word?<br>151:17        A.   The sentence reads, "The<br>151:18  cardiovascular events are clearly there."<br>151:19        Q.   They're clearly there.  That<br>151:20  was your choice of words; wasn't it?<br>151:21        A.   This is my e-mail.  That is<br>151:22  correct. | | |
| 151:23-152:16<br><br>151:23        Q.   So, after you studied the<br>151:24  data, you went through it, you sent a<br><br>152<br>152: 1  memo out to everybody, even though you<br>152: 2  hold yourself to a high standard, telling<br>152: 3  everybody that the CV events are clearly<br>152: 4  there, and that was March of 2000, wasn't<br>152: 5  it?<br>152: 6        A.   Yes, it is.<br>152: 7        Q.   And you never sent out an<br>152: 8  order at that point in time for a CV<br>152: 9  outcomes study, did you?<br>152:10        A.   We -- I did not send out an<br>152:11  order for a CV outcomes study.  We took<br>152:12  many immediate actions to try to<br>152:13  understand the cardiovascular events,<br>152:14  since we couldn't conclude what was going<br>152:15  on in the trial because there was no<br>152:16  placebo in the trial. | | |
| 156:7-156:10<br><br>156: 7        1999, I wrote, "Push Vioxx<br>156: 8  to market by May 22nd or" Merck will be<br>156: 9  "'a different company.'" That's what you<br>156:10  said in 1999; right? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 156:13-156:19<br><br>156:13       THE WITNESS: It accurately<br>156:14     reflects our earlier discussion.<br>156:15 BY MR. LANIER:<br>156:16     Q. Then also in 1999 you sent<br>156:17 out the e-mail that said if we can't beat<br>156:18 Celebrex two to one, you're going to quit<br>156:19 or leave the company. True? | | |
| 156:21-156:23<br><br>156:21       THE WITNESS: You reflected<br>156:22     my e-mail and some of my<br>156:23     sentiments in that e-mail. | | |
| 157:10-157:14<br><br>157:10       The drug Vioxx did go to<br>157:11 market in 1999, and y'all marketed it<br>157:12 before the VIGOR study was finished;<br>157:13 true?<br>157:14     A. Yes, that's correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 157:15-158:14<br><br>157:15     Q.  You couldn't afford to wait<br>157:16  for that VIGOR study to get done; could<br>157:17  you?<br>157:18     A.  No, that's not true.  That<br>157:19  was a study that was planned for being<br>157:20  done after the drug was approved and was<br>157:21  going to provide additional data about<br>157:22  gastrointestinal safety for the drug.<br>157:23     Q.  But, sir, the VIGOR study,<br>157:24  you could not afford to wait until it was<br><br>158<br>158: 1  over to market your drug, because if you<br>158: 2  waited, Merck would be a different<br>158: 3  company.  You never would have made May<br>158: 4  22nd of '99; right?<br>158: 5     A.  The VIGOR study was not<br>158: 6  required to market the drug.<br>158: 7     Q.  I'm not asking did the FDA<br>158: 8  require it.  I'm talking about, did you<br>158: 9  market the drug before you got the VIGOR<br>158:10  results in?<br>158:11     A.  Yes, we did.  The VIGOR<br>158:12  trial was never planned as part of the<br>158:13  very large NDA for the initial approval<br>158:14  of Vioxx. | | |
| 159:18-159:20<br><br>159:18     Q.  Then also in the year 2000,<br>159:19  you never ordered or had done a CV<br>159:20  specific study; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 159:23-160:6<br><br>159:23       THE WITNESS:  We<br>159:24    immediately, upon having the VIGOR<br><br>160<br>160: 1    results, did many additional data<br>160: 2    analyses on studies that we had to<br>160: 3    try to interpret the meaning of<br>160: 4    the VIGOR results.  And we did, in<br>160: 5    the end, come up with a study to<br>160: 6    measure cardiovascular outcomes. | | |
| 160:10-160:13<br><br>160:10    Q.   I said, very simple<br>160:11  question, sir.  It's a simple note.<br>160:12  2000, you never did a CV specific study;<br>160:13  true? | | |
| 160:16-160:23<br><br>160:16      THE WITNESS:  We did not do<br>160:17    a study where cardiovascular<br>160:18    outcomes were a primary endpoint.<br>160:19    We did do a study where<br>160:20    cardiovascular outcomes were a<br>160:21    predefined endpoint in our studies<br>160:22    to gather additional<br>160:23    cardiovascular outcomes data. | | |
| 161:20-161:23<br><br>161:20    Q.   Okay.  That's my point.  So,<br>161:21  you never did, never, one single study<br>161:22  where the primary outcome was, does it<br>161:23  cause heart attacks or strokes; right? | | |
| 162:2-162:3<br><br>162: 2      THE WITNESS:  You're<br>162: 3    correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 162:23-163:8<br><br>162:23     Q.   Sir, simple question.  Did<br>162:24  you change your warning label and tell<br><br>163<br>163: 1  people about the VIGOR results in the<br>163: 2  year 2000?  Yes or no?<br>163: 3     A.   We told people about the<br>163: 4  VIGOR results immediately after they<br>163: 5  became available to us.<br>163: 6     Q.   Okay.<br>163: 7     A.   And we submitted an NDA to<br>163: 8  the FDA to change our label. |  |  |
| 226:6-226:10<br><br>226: 6     Q.   Do you have Exhibit 18 in<br>226: 7  front of you?<br>226: 8     A.   Yes, I do.<br>226: 9     Q.   It's the day before your "to<br>226:10  do" list, isn't it, the 13th? |  |  |
| 226:15-226:17<br><br>226:15       THE WITNESS:  Yes.  It's the<br>226:16     day before this memo on the "to<br>226:17     do" list. |  |  |
| 227:7-227:9<br><br>227: 7     Q.   Four days away from your<br>227: 8  initial conclusion that Vioxx was causing<br>227: 9  heart attacks and strokes; right? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 227:11-228:14<br><br>227:11  THE WITNESS:  Four days from<br>227:12  my initial memo with my initial<br>227:13  conclusion, yes.<br>227:14  BY MR. LANIER:<br>227:15  Q.  All right.<br>227:16  Now, already by four days<br>227:17  later, you have got Ms. Reicin scouring<br>227:18  the medical literature trying to find a<br>227:19  study somewhere that indicates that<br>227:20  NSAIDs helped your heart; right?<br>227:21  A.  That was one of the<br>227:22  questions that I asked the team when they<br>227:23  suggested that NSAIDs could be<br><br>228<br>228: 1  Q.  And the only study she was<br>228: 2  able to find -- by the way, it is<br>228: 3  singular, there was only one study she<br>228: 4  could find; true?<br>228: 5  A.  That's what the e-mail says,<br>228: 6  yes.<br>228: 7  Q.  In fact, why don't you read<br>228: 8  that sentence where I've highlighted<br>228: 9  "Only study."<br>228:10  A.  "Alan and Ed:  Below is<br>228:11  attached the abstract from the only study<br>228:12  I could find which assessed the potential<br>228:13  cardioprotective effects of an NSAID.<br>228:14  Alise." | | |
| 229:2-229:8<br><br>229: 2  Q.  Did it occur to you that<br>229: 3  people were taking the drug that could be<br>229: 4  having these heart attacks, or is that<br>229: 5  what you meant when you said it's sad or<br>229: 6  it's a shame, but it's a low incidence,<br>229: 7  you just didn't figure there would be<br>229: 8  that many of them? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 229:11-229:19<br><br>229:11      THE WITNESS:  As I've<br>229:12  stated, my initial conclusion was<br>229:13  that Vioxx was causing heart<br>229:14  attacks in patients.  After<br>229:15  discussions of this article and<br>229:16  extensive other data that we had<br>229:17  available to ourselves in our own<br>229:18  trials, I concluded that I was not<br>229:19  correct in my initial conclusion. | | |
| 230:21-230:23<br><br>230:21    Q.  I'm going to hand you a<br>230:22  document marked Exhibit 19.  Do you have<br>230:23  it in front of you? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 231:20-233:5<br><br>231:20    Q.   First of all, this<br>231:21  well-respected Carlo Patrono said that he<br>231:22  does not think that you can attribute the<br>231:23  increase in heart attacks and strokes to<br>231:24  the fact that the other people were<br><br>232<br>232: 1  taking naproxen, and it must be good for<br>232: 2  your heart.  Fair to say?<br>232: 3    A.   That's what he writes, yes.<br>232: 4  That's what the person reflects on his<br>232: 5  comments.<br>232: 6    Q.   And then there are a number<br>232: 7  of reasons given why it can't be that<br>232: 8  naproxen is good; right?<br>232: 9    A.   What it says is, he<br>232:10  questions whether the magnitude of the<br>232:11  effects seen in VIGOR is consistent with<br>232:12  naproxen being cardioprotective.<br>232:13    Q.   Well, he said, first of all,<br>232:14  "There is a weak pharmacological basis."<br>232:15  Do you see where it said that?<br>232:16    A.   Yes, I do.<br>232:17    Q.   What that means to you and<br>232:18  me and folks who read this stuff more<br>232:19  than we probably should is that there's<br>232:20  really not a good medical science<br>232:21  pharmacy reason for saying it's naproxen.<br>232:22  That's what that means, doesn't it?<br>232:23    A.   It refers to the<br>232:24  pharmacology of the drug, and that's his<br><br>233<br>233: 1  interpretation.<br>233: 2    Q.   And then it says, "No<br>233: 3  epidemiological evidence."  Do you see<br>233: 4  where it says that?<br>233: 5    A.   Yes, I do. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 233:14-234:3<br><br>233:14    Q.   Well, do you see the word<br>233:15  "no"?<br>233:16    A.   I do see that.<br>233:17    Q.   How many are there, if it<br>233:18  says there's no evidence?  How much<br>233:19  evidence is there?<br>233:20    A.   I see his comment.  I don't<br>233:21  know the details of his review that he<br>233:22  refers to here.<br>233:23    Q.   Well, when he says there's<br>233:24  no evidence, don't you think that means<br><br>234<br>234: 1  zero?<br>234: 2    A.   I think that's a plausible<br>234: 3  explanation, yes. | | |
| 234:4-234:18<br><br>234: 4    Q.   Otherwise you think he'd use<br>234: 5  the word "some" or "a little" or "few" or<br>234: 6  "lots"?<br>234: 7    A.   He's talking about<br>234: 8  conventional nonsteroidals as part of his<br>234: 9  sentence.  And we actually agree with<br>234:10  that except for naproxen.<br>234:11    Q.   So, but you agree with the<br>234:12  statement even for naproxen, that there's<br>234:13  no epidemiological evidence that naproxen<br>234:14  is safe; right?  I mean, not safe, good<br>234:15  for the heart?<br>234:16    A.   There had been no prior data<br>234:17  to suggest that naproxen was<br>234:18  cardioprotective. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 234:20-235:5<br><br>234:20  next sentence.  He says, "Additionally"<br>234:21  which I guess means another reason, yet<br>234:22  another reason; right?<br>234:23      A.   Yes.<br>234:24      Q.   "Additionally the magnitude<br><br>235<br>235: 1  of the effect," in other words, how many<br>235: 2  more heart attacks you were causing,<br>235: 3  "would not be plausible even if" you'd<br>235: 4  been comparing it to aspirin.  He says<br>235: 5  that; doesn't he? | | |
| 235:7-235:17<br><br>235: 7          THE WITNESS:  He talks about<br>235: 8      the aspirin, yes, the comparator<br>235: 9      to aspirin.<br>235:10  BY MR. LANIER:<br>235:11      Q.   He says, "In fact,<br>235:12  in...three different trials, aspirin has<br>235:13  shown no effect on the primary prevention<br>235:14  of stroke, while we have seen a 50% lower<br>235:15  incidence of stroke in the naproxen arm<br>235:16  of VIGOR"; right?<br>235:17      A.   That's what he says. | | |
| 236:13-236:23<br><br>236:13      Q.   Well, you were hoping<br>236:14  naproxen helped the heart just like<br>236:15  aspirin did; right?<br>236:16      A.   We weren't hoping anything.<br>236:17  We were concluding based on this study<br>236:18  that you've referred to and all the other<br>236:19  analysis versus placebo and other NSAIDs,<br>236:20  that except for this naproxen study,<br>236:21  there was no evidence for an imbalance of<br>236:22  cardiovascular events attributable to<br>236:23  Vioxx. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 237:3-237:7<br><br>237: 3    Q.   Sir, what y'all were putting<br>237: 4  forth there as an idea was that naproxen<br>237: 5  helps the heart just like aspirin does;<br>237: 6  right?<br>237: 7    A.   Or -- yes, that's correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 237:8-239:3<br><br>237: 8    Q.  But the truth be told, even<br>237: 9  aspirin, if you'd used aspirin, even<br>237:10  aspirin couldn't help the heart as much<br>237:11  as naproxen would have to to come up with<br>237:12  tjese results; right?<br>237:13    A.  Aspirin, to my knowledge,<br>237:14  had never been studied in this kind of<br>237:15  patient population.<br>237:16    Q.  That wasn't my question,<br>237:17  sir.<br>237:18    My point is, y'all had so<br>237:19  many more heart attacks and strokes in<br>237:20  your Vioxx group than the naproxen, that<br>237:21  if the real reason why is because<br>237:22  naproxen was helpful, that naproxen would<br>237:23  have to be two, three, four times better<br>237:24  for you than even aspirin; right?<br><br>238<br>238: 1    A.  I can't conclude that.<br>238: 2  Aspirin has not been studied in patients<br>238: 3  with rheumatoid arthritis in this kind of<br>238: 4  trial. There was no way to make that<br>238: 5  quantitative comparison.<br>238: 6    Q.  Well, naproxen hadn't been<br>238: 7  studied in any other trials to show that<br>238: 8  it was cardioprotective. It never had<br>238: 9  been shown that in any of the testing<br>238:10  ever done; true?<br>238:11    A.  That is true, and I've tried<br>238:12  to explain to you why that study could<br>238:13  not have been done.<br>238:14    Q.  Well, sir, that study is<br>238:15  going to be an end result of every study<br>238:16  with naproxen. You're always going to --<br>238:17  when you study naproxen, you're going to<br>238:18  compare the favorable outcomes on a<br>238:19  cardio basis with those that don't;<br>238:20  right?<br>238:21    A.  Not compared to placebo to | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 238:22   really be able to answer that question.<br>238:23       Q.   Fine.  Compared to other<br>238:24   NSAIDs; true?<br><br>239<br>239: 1       A.   If naproxen had been studied<br>239: 2   that way, then some day it could have<br>239: 3   been achieved. | | |
| scolfinal - Vol. I, (Pages 266:13 to 267:17)<br>                                         266<br>13        much better than aspirin.<br>14   BY MR. LANIER:<br>15       Q.   I want to shift gears for a<br>16   minute.<br>17            By the way, did you ever<br>18   answer my question, before I shift gears,<br>19   on the fact that your idea that naproxen<br>20   was helping people was impossible to<br>21   prove and impossible to know?<br>22            MR. PERSCHETZ:  He did.<br>23            THE WITNESS:  I did answer.<br>24            MR. LANIER:  What did he<br><br>                                         267<br> 1        say?<br> 2   BY MR. LANIER:<br> 3       Q.   You agreed with me; right?<br> 4       A.   I said that a study to do<br> 5   that could never have been done.<br> 6       Q.   It is impossible to know<br> 7   with certainty that naproxen was helping<br> 8   people, even though y'all were telling<br> 9   everybody else that's what you thought;<br>10   right?<br>11            MR. PERSCHETZ:  Objection.<br>12            THE WITNESS:  I answered<br>13        your question.<br>14   BY MR. LANIER:<br>15       Q.   I just asked a new one.<br>16       A.   Go right ahead.<br>17            MR. LANIER:  Would you | Question without answer | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 268:13-268:17<br><br>268:13　　Q.　Just make sure we're on the<br>268:14　same page.  If we look at Exhibit 23, you<br>268:15　even sent a memo to this to the CEO and<br>268:16　to the president of Merck back in January<br>268:17　of 2001, didn't you? | | |
| scolfinal - Vol. I, (Page 269:1 to 269:1)<br>　　　　　　　　　　269<br>1　A.　Yes. | Answer is to a different question | |
| 269:2-269:21<br><br>269: 2　　Q.　You said you "want to point<br>269: 3　out to all of you at one time that, 1.<br>269: 4　there is no way to prove that in patients<br>269: 5　with rheumatoid arthritis that ALL of the<br>269: 6　differencebetween Vioxx and naproxen is<br>269: 7　due to the benefit of naproxen."  That's<br>269: 8　what you said, isn't it?<br>269: 9　　A.　That's right.  And all is<br>269:10　capitalized.<br>269:11　　Q.　And then you capitalize this<br>269:12　whole next phrase.  "IT IS IMPOSSIBLE TO<br>269:13　PROVE THIS."  Didn't you?<br>269:14　　A.　That's what the e-mail says.<br>269:15　　Q.　That's what you said, isn't<br>269:16　it?<br>269:17　　A.　Yes, it is.  It is.<br>269:18　　Q.　Then you capitalize for<br>269:19　emphasis this next sentence.  "IT IS<br>269:20　IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."<br>269:21　　A.　That's exactly what I said. | | |
| | 4/29/05 Deposition | |
| scol429fin - Vol. I, (Page 10:14 to 10:16)<br>　　　　　　　　　　10<br>14　　Q.　You retired from Merck Research Labs<br>15　in 2003; correct?<br>16　　A.　That is correct. | 401; 402; MIL #8 (granted in part) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 27:14 to 27:17)<br>27<br>14       In the late '80s and early '90s, you<br>15  were also the president of Merck Research Labs;<br>16  right?<br>17    A.   Yes. | 401; 402; MIL #8<br>(granted in part) | |
| scol429fin - Vol. I, (Pages 28:24 to 29:2)<br>28<br>24    Q.   At that point in time you did have<br>25  some concerns about what the prospects would be for<br><br>29<br>1  Merck in the late '90s and 2000 as several drugs<br>2  were coming off patent; right? | 401; 402; MIL #8<br>(granted in part) | |
| scol429fin - Vol. I, (Page 29:4 to 29:6)<br>29<br>4      THE WITNESS:  I had concerns.  It was<br>5  a way off, but, yes, I certainly remember vague<br>6  thoughts about that. | 401; 402; MIL #8<br>(granted in part) | |
| scol429fin - Vol. I, (Page 29:13 to 29:16)<br>29<br>13    Q.   You have to anticipate that drugs<br>14  would be coming off patent maybe ten years down the<br>15  road and seek to have new drugs to fill the drugs<br>16  that were once proprietary of the company? | 401; 402; MIL #8<br>(granted in part) | |
| scol429fin - Vol. I, (Pages 29:18 to 30:4)<br>29<br>18      THE WITNESS:  That is correct.<br>19  BY MR. BUCHANAN:<br>20    Q.   Because once a drug becomes generic<br>21  or goes off patent, then other competitors can enter<br>22  the market and seek to take market share; correct?<br>23    A.   That's correct.<br>24    Q.   Okay.  So, in the early '90s you knew<br>25  that beginning in 2000 and 2001, Merck would have<br><br>30<br>1  several drugs going off patent; correct?<br>2    A.   The one that comes to mind<br>3  immediately is Mevacor, but I don't recall the other<br>4  drugs at this point. | 401; 402; MIL #8<br>(granted in part) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 32:13 to 33:20)<br>32<br>13      All these drugs were significant<br>14  drugs for Merck?<br>15     A.    Yes.<br>16     Q.    Several of these were blockbuster<br>17  drugs for Merck; right?<br>18     A.    They were large selling drugs, yes.<br>19     Q.    Well, "blockbuster" has a meaning or<br>20  a connotation in the industry, doesn't it?<br>21     A.    "Blockbuster" means usually a very<br>22  large drug, very large sales drug.<br>23     Q.    Traditionally it meant more than a<br>24  billion dollars in sales; true?<br>25     A.    That is one interpretation given to<br><br>33<br>1  it.<br>2     Q.    So, several of these drugs were<br>3  blockbuster drugs.  You'd agree with that?<br>4     A.    Yes.<br>5     Q.    Okay.<br>6     Several of these drugs, even if you<br>7  can't remember all of them, were going off patent in<br>8  2000, 2001, 2002; correct?<br>9     A.    I'm not sure which ones, but some<br>10  drugs were going off patent at that point.<br>11     Q.    Well, you recall being concerned<br>12  about what the future will hold in 2000/2001 when<br>13  all these drugs were going off patent; correct?<br>14     A.    Yes.<br>15     Q.    You were concerned about that in the<br>16  early '90s?<br>17     A.    Yes.<br>18     Q.    And you were trying to design new<br>19  drugs to fill the void that would be left by these<br>20  drugs when they went off patent? | 401; 402; MIL #8<br>(granted in part) | |
| scol429fin - Vol. I, (Page 33:24 to 33:25)<br>33<br>24     THE WITNESS: We were trying to<br>25  develop and discover new drugs that would do that. | 401; 402; MIL #8<br>(granted in part) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 34:8 to 34:17)<br>34<br>8     Q.    One of the drugs that was going to be<br>9  filling the void left by these other drugs when they<br>10  went off patent was Vioxx; true?<br>11     A.    Vioxx was going to fill the void, but<br>12  in the early '90s, Vioxx -- I believe Vioxx was not<br>13  even on the Merck radar screen.  I don't even think<br>14  we had thought of the project at that point.  I<br>15  don't -- I don't recall the date when the Vioxx<br>16  project started.<br>17          - - - | 401; 402; MIL #8<br>(granted in part) | |
| 36:13-36:18<br><br>36:13     Q.    There's a reference to Dr. Peppi<br>36:14  Prasit.  Do you see that?<br>36:15     A.    Dr. Peppi Prasit.<br>36:16     Q.    Prasit.  He was a scientist at your<br>36:17  labs in Montreal; correct?<br>36:18     A.    Yes, a chemist. | | |
| 37:11-37:18<br><br>37:11     Q.    You see the date referenced here.<br>37:12  It's July 1992; correct?<br>37:13     A.    Yes, I do.<br>37:14     Q.    Does that refresh your recollection<br>37:15  as to when Merck started considering investigating<br>37:16  selective NSAIDs?<br>37:17     A.    Yes, it does.  I had not recalled we<br>37:18  started this project this early. | | |
| 42:6-42:9<br><br>42: 6        So, you put a lot of resources within<br>42: 7  Merck Research Labs onto this particular project;<br>42: 8  correct?<br>42: 9     A.    Yes, that is correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 43:11-43:19<br><br>43:11   Q.     And you encouraged Dr. Prasit and his<br>43:12   staff to pursue the Vioxx project with all resources<br>43:13   that were available at Merck Frosst; true?<br>43:14         A.     That is correct.<br>43:15         Q.     Okay.<br>43:16               You knew how important this drug<br>43:17   could be for the company; right?<br>43:18         A.     I knew that this could be a very<br>43:19   important project, yes. | | |
| 47:6-47:8<br><br>47: 6     Q.     You wanted to be the first to market<br>47: 7   with this selective COX-2 inhibitor; correct?<br>47: 8         A.     Yes. | | |
| 87:3-87:9<br><br>87: 3         Q.     All right, sir.  I want to get back<br>87: 4   to something.  I want to turn back to 1998.  I want<br>87: 5   to talk about the period prior to the time when<br>87: 6   Merck had Vioxx approved.  Okay?  Do you remember<br>87: 7   when Vioxx was approved?<br>87: 8         A.     I believe it was late 1999, middle of<br>87: 9   1999. | | |
| scol429fin - Vol. I, (Page 98:6 to 98:10)<br>98<br>6             For the record, it is an e-mail from<br>7   you to a series of individuals, Alan Nies, Beth<br>8   Seidenberg, Tom Simon, Robert Silverman.  Sir, are<br>9   all of those people Merck employees?<br>10         A.     Yes, they were. | 401; 402 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 99:22 to 100:13)<br>99<br>22    Q.    So, what you did here was you sent<br>23  these folks on your Vioxx development team and some<br>24  regulatory personnel an analyst report; correct?<br>25    A.    That appears to be correct.<br><br>100<br>1    Q.    Okay.<br>2       You sent it with high importance?<br>3    A.    That's what it's marked.<br>4    Q.    It was real important they saw this<br>5  analyst report?<br>6    A.    It's marked high importance.<br>7    Q.    Do you make it a practice, sir, to<br>8  send Wall Street analyst reports to employees who<br>9  are on projects within Merck?<br>10    A.    I sent a variety of information to<br>11  them, sometimes analyst reports which had relevant<br>12  information, sometimes scientific articles.  I send<br>13  a variety of things to my employees. | 401; 402 | |
| scol429fin - Vol. I, (Page 112:22 to 112:24)<br>112<br>22      So, it is, in fact, accurate to state<br>23  that in 1998 Merck had declining sales in several of<br>24  its key franchises; correct? | 401; 402 | |
| scol429fin - Vol. I, (Page 113:1 to 113:13)<br>113<br>1      THE WITNESS:  I've answered your<br>2  question.<br>3  BY MR. BUCHANAN:<br>4    Q.    I would like you to answer that<br>5  question, please.<br>6    A.    Some of its franchises had declining<br>7  sales.<br>8    Q.    And they were key franchises?<br>9    A.    And some of them were key.<br>10    Q.    Okay.<br>11      You also had several drugs going off<br>12  patent in the near future; right?<br>13    A.    Correct. | 401; 402 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 115:12 to 115:16)<br>115<br>12    Q.    Well, when you sent this, were you<br>13   sending it as a scientist, sir?<br>14    A.    Yes, because it was in my capacity as<br>15   head of the research laboratories to these people<br>16   who reported to the research laboratories. | 401; 402 | |
| scol429fin - Vol. I, (Pages 115:17 to 116:11)<br>115<br>17    Q.    You thought it was important to tell<br>18   your employees that Merck's base business was<br>19   eroding?<br>20    A.    Yes.<br>21    Q.    You thought it was important to tell<br>22   them that Merck had several products going off<br>23   patent?<br>24    A.    They knew that.  This was to<br>25   reemphasize that.<br><br>116<br>1    Q.    You thought it was important to tell<br>2   them that several of the recently launched products<br>3   had not been as successful as anticipated?<br>4    A.    I wanted to provide them the<br>5   information in this document, yes, that's correct.<br>6    Q.    You thought it was important to tell<br>7   them that several of the recently launched products<br>8   weren't as successful as you anticipated they'd be;<br>9   right?<br>10    A.    That's what's in here, and I wanted<br>11   to provide them that information. | 401; 402 | |
| scol429fin - Vol. I, (Pages 117:18 to 118:3)<br>117<br>18    Q.    They are the people who you would<br>19   hope would be able to facilitate a speedy approval<br>20   of your drug; correct?<br>21    A.    That is part of their responsibility.<br>22   Part of their jobs, yes.<br>23    Q.    And that's part of why you provided<br>24   this e-mail to them; right?<br>25    A.    Yes.<br><br>118<br>1    Q.    You wanted them to know how important<br>2   it was that this drug proceed quickly through the<br>3   regulatory approval process; right? | 401; 402 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 118:6 to 118:9)<br>118<br>6       THE WITNESS:  Yes.<br>7  BY MR. BUCHANAN:<br>8     Q.    It was essential to the financial<br>9  success of the firm; right? | 401; 402 | |
| scol429fin - Vol. I, (Page 118:11 to 118:18)<br>118<br>11      THE WITNESS:  It was essential to<br>12  Merck. It was important to Merck, yes.<br>13  BY MR. BUCHANAN:<br>14    Q.    Okay.<br>15      And, in fact, it was not only<br>16  essential, but Vioxx's success was necessary to<br>17  preserve Merck and Merck Research Labs period;<br>18  correct? | 401; 402 | |
| scol429fin - Vol. I, (Page 118:21 to 118:22)<br>118<br>21      THE WITNESS:  That is what I said in<br>22  my e-mail. | 401; 402 | |
| scol429fin - Vol. I, (Pages 118:24 to 119:1)<br>118<br>24    Q.    That's true; right?<br>25    A.    I believe it is an exaggeration, but<br><br>119<br>1  it has some truth. | 401; 402 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 122:17-123:7<br><br>122:17    Well, at this point in time, October<br>122:18   1998, what did you know about Vioxx's potential to<br>122:19  cause cardiovascular risks or cardiovascular<br>122:20   problems?<br>122:21    A.    I don't recall exactly what we knew<br>122:22   at this point. There was no evidence at all in the<br>122:23   Vioxx development program at this point that Vioxx<br>122:24   caused cardiovascular risks.<br>122:25    Q.    What do you mean by that, "caused<br><br>123<br>123: 1  cardiovascular risks"?<br>123: 2    A.    There was no evidence to say that<br>123: 3  Vioxx caused a cardiovascular risk.<br>123: 4    Q.    Well, you're not saying that in<br>123: 5  individual trials preapproval that you didn't see<br>123: 6  imbalances between cardiovascular risks in Vioxx and<br>123: 7  the comparator drugs, are you? | | |
| 123:9-123:14<br><br>123: 9    THE WITNESS:  Before the drug was<br>123:10  approved?<br>123:11  BY MR. BUCHANAN:<br>123:12    Q.    Yes.<br>123:13    A.    I don't recall any such data.  So, if<br>123:14  it was there, I certainly don't recall it. | | |
| 129:11-129:21<br><br>129:11    THE WITNESS:  No, actually, that is<br>129:12  not the conclusion that anyone drew or was certain<br>129:13  of.  The question was raised as to what the source<br>129:14  of that metabolite was in the source of the<br>129:15  prostacyclin and whether it was systemic or whether<br>129:16  it was not systemic.<br>129:17  BY MR. BUCHANAN:<br>129:18    Q.    I see.  So, if it was systemic, that<br>129:19  would mean that prostacyclin that was produced<br>129:20  ordinarily in the vasculature was being suppressed<br>129:21  by Vioxx; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 12923    129:23-130:3<br><br>129:23        THE WITNESS:  I don't think anyone<br>129:24   had any evidence nor felt that prostacyclin was<br>129:25   produced in the vasculature.  No one really knew<br><br>130<br>130: 1   where prostacyclin was produced exactly, in what<br>130: 2   organs, and the relationship of any of that to the<br>130: 3   metabolite in the urine.  None of that was known. | | |
| 130:5-130:11<br><br>130: 5        Q.    But you did conduct a clinical trial<br>130: 6   in 1997 with an individual named Garret FitzGerald;<br>130: 7   correct?<br>130: 8        A.    Yes.<br>130: 9        Q.    And he ran a clinical trial that<br>130:10   showed that Vioxx suppressed the urinary metabolites<br>130:11   of prostacyclin; correct? | | |
| 130:13-130:17<br><br>130:13        THE WITNESS:  Yes.<br>130:14   BY MR. BUCHANAN:<br>130:15 Q.    One of the conclusions that was drawn<br>130:16   by your consultants was that Vioxx was suppressing<br>130:17   systemic prostacyclin; correct? | | |
| 130:20-130:22<br><br>130:20        THE WITNESS:  I don't believe they<br>130:21   drew that conclusion.  I think they raised that<br>130:22   question. | | |
| 131:9-131:11<br><br>131: 9        And if that was happening, there was<br>131:10   a risk that Vioxx could cause thrombotic events in<br>131:11   humans; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 131:13-131:20<br><br>131:13    THE WITNESS: There was a theory that<br>131:14   that could occur with no evidence ever garnered to<br>131:15   substantiate or refute that theory.<br>131:16   BY MR. BUCHANAN:<br>131:17    Q.    Now, that theory was put forth after<br>131:18   the drug was marketed or before the drug was<br>131:19   marketed?<br>131:20    A.    Long before Vioxx ever existed. | | |
| 141:23-142:1<br><br>141:23    Q.    You weren't allowed to go out and<br>141:24   tell doctors through your sales representatives that<br>141:25   Vioxx reduced the serious clinical side effects<br><br>142<br>142: 1   associated with traditional NSAIDs; right? | | |
| 142:5-142:9<br><br>142: 5        THE WITNESS: Serious<br>142: 6   gastrointestinal side effects?<br>142: 7   BY MR. BUCHANAN:<br>142: 8    Q.   Yes.<br>142: 9    A.   That is correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ██████████████████████<br>████████████████████<br>████████████████████████<br>███████████████████████████<br>███████████████████ | | |
| ██████████████████████<br>███████████████████████<br>█████████████████████████<br>████████████████████████<br>████████████ | | |
| 151:17-152:4<br><br>151:17   Q.    If you had conducted a CV outcomes<br>151:18   trial in 1998, started it in 1998, that would have<br>151:19   slowed down the approval process for the drug; true?<br>151:20       A.    That is true.<br>151:21       Q.    If you had told the FDA, we're<br>151:22   concerned, we may have a potential cardiovascular<br>151:23   issue with the drug, we'd want to do a CV safety<br>151:24   study, that would have slowed down the approval<br>151:25   process.<br><br>152<br>152: 1   A.    That would have.  We gave the FDA all<br>152: 2   of the data, including Garret FitzGerald's data, in<br>152: 3   the NDA and all the other analyses we did<br>152: 4   preapprovcl. | | |
| 152:5-152:9<br><br>152: 5       Q.    You didn't give him the result of a<br>152: 6   CV outcomes trial preapproval; right?<br>152: 7       A.    We gave them an analysis of all the<br>152: 8   cardiovascular events in our NDA, which showed no<br>152: 9   evidence that Vioxx caused CV events. | | |
| 152:12-152:13<br><br>152:12   Q.    You didn't give them the results from<br>152:13   a CV outcomes trial preapproval, did you? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 152:15-152:24<br><br>152:15    THE WITNESS:  There was no -- we did<br>152:16    not do a separate CV outcomes trial preapproval.<br>152:17    BY MR. BUCHANAN:<br>152:18    Q.    So, you couldn't give them the data<br>152:19    from such a trial?<br>152:20        A.    I've answered your question.<br>152:21    Q.    You couldn't give them the data from<br>152:22    such a trial?  Could you answer that?<br>152:23        A.    Yes.<br>152:24    Q.    Thank you. | | |
| 174:5-174:17<br><br>174: 5    what's the Data Safety Monitoring Board, sir, in<br>174: 6    general terms?<br>174: 7        A.    In general terms, it's an external<br>174: 8    group that monitors the safety of the Merck trials,<br>174: 9    for all trials or many trials.<br>174:10    Q.    And you have a different group for<br>174:11    each trial or the same group for all trials?<br>174:12        A.    I think it's a different group for<br>174:13    each trial because the clinical expertise is<br>174:14    different clinical trials, different clinical<br>174:15    expertise.<br>174:16    Q.    Did the VIGOR trial have a DSMB?<br>174:17        A.    Yes, it did. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 174:21-175:9<br><br>174:21   Q.      To be clear in the DSMB's function,<br>174:22   the DSMB has access to unblinded data during the<br>174:23   conduct of clinical trials if they want it; correct?<br>174:24        A.     Yes, I believe that's true.<br>174:25   Q.     Because their function is to ensure<br><br>175<br>175: 1   the safety of patients in those clinical trials, at<br>175: 2   least one of their functions; true?<br>175: 3        A.     Yes.<br>175: 4   Q.     Okay.<br>175: 5        Do you recall that the DSMB in the<br>175: 6   VIGOR trial sent a letter to Merck stating that they<br>175: 7   wanted the cardiovascular events in the VIGOR trial<br>175: 8   separately analyzed as compared to other safety<br>175: 9   analyses the company was doing? | | |
| 175:16-175:17<br><br>175:16      THE WITNESS:  I became aware of that<br>175:17   memo long after it was sent to people at MRL. | | |
| 178:4-178:7<br><br>178: 4      Q.     When you saw that letter from Dr.<br>178: 5   Weinblatt to Dr. Reicin, did that letter suggest to<br>178: 6   you that Merck may have a cardiovascular issue with<br>178: 7   Vioxx? | | |
| 178:9-178:13<br><br>178: 9      THE WITNESS:  When I saw that letter,<br>178:10   I wondered what had been in Dr. Weinblatt's mind<br>178:11   when he sent the letter, and that's what I wondered.<br>178:12   I hadn't seen the letter.  I don't know what was in<br>178:13   his mind. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 179:2-179:12<br><br>179: 2    Q.    You've never spoken to him?<br>179: 3    A.    I don't recall speaking to Dr.<br>179: 4  Weinblatt.<br>179: 5  Q.    Never called him up after you got the<br>179: 6  results of the VIGOR trial and asked what concerned<br>179: 7  you and the data you were looking at during the<br>179: 8  conduct of the trial?<br>179: 9    A.    No, I never called Dr. Weinblatt.<br>179:10  Q.    Never asked Dr. Weinblatt why you<br>179:11  allowed the trial to continue in the face of the<br>179:12  cardiovascular events in the trial? | | |
| 179:14-179:16<br><br>179:14        THE WITNESS:  No.  I didn't.  I<br>179:15  didn't know what data he had.  I never dealt<br>179:16  directly with DSMBs. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 203:22-204:20<br><br>203:22   Q.      Before our break, we were talking<br>203:23   about -- at least a few moments before our break we<br>203:24   were talking about your March 9, 2000 e-mail.  Do<br>203:25   you recall that testimony?<br><br>204<br>204: 1      A.     Yes, I do.<br>204: 2      Q.      That was the e-mail where you<br>204: 3   identified that the CV events were "clearly there."<br>204: 4   Right?<br>204: 5      A.     Yes.<br>204: 6   Q.     That it appeared to be "mechanism<br>204: 7   based" as you "worried it was."  Right?<br>204: 8      A.     That's what the e-mail says, yes.<br>204: 9      Q.     And you said it was also "real."<br>204:10   Right?<br>204:11      A.     Yes.<br>204:12   Q.   Then we talked about what Merck and<br>204:13   you did in response to your initial concerns about<br>204:14   the CV issues with Vioxx; right?<br>204:15      A.     Yes.<br>204:16      Q.     Now, over a period of weeks, you<br>204:17   reached the conclusion, contrary to your March 9th<br>204:18   e-mail, that it wasn't Vioxx that was causing the<br>204:19   problems, it was naproxen that was protecting<br>204:20   against the problems; is that right? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 204:22-205:10<br><br>204:22        THE WITNESS:  That's correct.<br>204:23  BY MR. BUCHANAN:<br>204:24  Q.   You reached that conclusion in, what,<br>204:25  18 days?<br><br>205<br>205: 1     A.    Within that period of time.<br>205: 2    Q.   Well, Merck issued a press release to<br>205: 3  the public on March 27, 2000 letting them know about<br>205: 4  the CV events in the trial as well as the GI events<br>205: 5  in the trial; correct?<br>205: 6     A.   Yes.<br>205: 7    Q.   And you stated at that point in time<br>205: 8  that you believed that the explanation for the<br>205: 9  difference between the two arms was the<br>205:10  cardioprotective effect of naproxen; correct? | | |
| 205:17-205:18<br><br>205:17     THE WITNESS:  Yes, that's basically<br>205:18   what the press release said. | | |
| 207:6-207:8<br><br>207: 6    Q.   So, within 18 days, you had made a<br>207: 7  complete 180 in your view as to the cause of the CV<br>207: 8  events in the VIGOR trial; right? | | |
| 207:12-207:15<br><br>207:12  A.   Yes.  I thought the explanation which<br>207:13  best explained the results was naproxen's<br>207:14  cardioprotective activity based on data analysis,<br>207:15  literature analysis, as I've stated. | | |
| 209:8-209:11<br><br>209: 8    Q.   Did you bring in anybody who wasn't<br>209: 9  on the Merck payroll to look at the data from the<br>209:10   VIGOR trial before you reached the decision that<br>209:11  naproxen was cardioprotective? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 209:14 -209:18<br><br>209:14     THE WITNESS: As I've stated, I<br>209:15  didn't bring in an outside consultant. I do not<br>209:16  know who the team might have consulted as outside<br>209:17  investigators.<br>209:18  BY MR. BUCHANAN: | | |
| scol429fin - Vol. I, (Page 209:19 to 209:24)<br>            209<br>19   Q.   But you're pretty sure, though, if<br>20  you had told your team, I want to get this data<br>21  looked at by somebody independent of Merck, they<br>22  could have done that; right?<br>23     A.   They could have done it. I don't<br>24  know whether -- I don't that they didn't do it. | Calls for speculation | |
| 209:25 - 210: 3<br><br>209:25  Q.   But you do know you didn't tell them<br><br>210<br>210: 1  to do it?<br>210: 2     A.   I did not. I did not, that is<br>210: 3  correct. | | |
| 231:4-231:8<br><br>231: 4     Q.   Sir, did you ever just do a<br>231: 5  calculation to figure out what the implication to<br>231: 6  the public could be that were using your drug if<br>231: 7  your drug really was cardiotoxic, as you thought on<br>231: 8  March 9? | | |
| 231:12-231:15<br><br>231:12     THE WITNESS: The answer to your<br>231:13  question, I didn't make that calculation. I<br>231:14  considered patient safety, as I always have, and all<br>231:15  the data supported our hypothesis. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 231:17-232:4<br><br>231:17   Q.      Did you consider the implications to<br>231:18   the sales of the drug if your initial conclusion was<br>231:19   the final conclusion?<br>231:20   A.      Of course.  And that was not part of<br>231:21   my reason for reaching my conclusion.<br>231:22   Q.      What was the implication to sales of<br>231:23   the drug if your initial conclusion was, in fact,<br>231:24   the final conclusion?<br>231:25      A.      Sales of the drug would be<br><br>232<br>232: 1   significantly curtailed.  The sales of the drug<br>232: 2   would be curtailed.  Even with the publicly<br>232: 3   available information, sales of the drug would be<br>232: 4   curtailed. | | |
| 232:5-232:7<br><br>232: 5      Q.      So, you knew --<br>232: 6   A.      And we made all of the data available<br>232: 7   instantly anyway. | | |
| 232:8-232:11<br><br>232: 8      Q.      Did you ever tell the public your<br>232: 9   initial conclusion?<br>232:10   A.      I did not because I thought it was an<br>232:11   error. | | |
| 232:12-232:14<br><br>232:12   Q.      Did you ever send an e-mail out to<br>232:13   the people on this e-mail list and let them know,<br>232:14   guys, I think I made a mistake? | | |
| 232:16-232:19<br><br>232:16      THE WITNESS:  Substantial period of<br>232:17   time later with even more analysis, I told them that<br>232:18   I thought they had done a great job and that I was<br>232:19   confident in the safety of the drug. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 232:21-233:9<br><br>232:21    Q.    Did you ever send an e-mail at the<br>232:22  end of March 2000 saying, boy, I was way off on<br>232:23  this --<br>232:24      A.    No, I did --<br>232:25    Q.    -- I feel very comfortable with the<br><br>233<br>233: 1  data now?<br>233: 2      A.    I did not send that in an e-mail like<br>233: 3  that, no.<br>233: 4      Q.    In fact, at the end of March, you<br>233: 5  were still worried, weren't you?<br>233: 6  A.    Yes, I was, even though I had reached<br>233: 7  what I thought was the right conclusion.  I always<br>233: 8  worried about the safety of our drugs, and I<br>233: 9  continued to worry about it. | | |
| 233:10-233:19<br><br>233:10    Q.    But you weren't so worried to tell<br>233:11  the FDA, were you?<br>233:12  A.    The FDA had all the data.  The FDA<br>233:13  has competent scientists and can judge the data for<br>233:14  themselves.  They knew that this was a new finding<br>233:15  potentially for naproxen.  They could interpret the<br>233:16  data for themselves, and had they been concerned,<br>233:17  they would have expressed that to us and told us if<br>233:18  they were that concerned with the aggregate of data,<br>233:19  do something differently. | | |
| 233:23-234:2<br><br>233:23    Q.    Did you tell the FDA you were<br>233:24  worried?<br>233:25      A.    I didn't speak to the FDA, and I<br><br>234<br>234: 1  don't know what the regulatory affairs people told<br>234: 2  the FDA. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 235:23 to 236:1)<br>235<br>23      You don't think the FDA or the<br>24  medical community would have been interested in what<br>25  you, Ed Scolnick, were worried about with respect to<br><br>236<br>1  Vioxx? | Foundation; calls for speculation | |
| scol429fin - Vol. I, (Page 236:3 to 236:8)<br>236<br>3      THE WITNESS:  If the FDA had wanted<br>4  to ask me, they would have asked me, and I<br>5  communicated with members of the medical community<br>6  in consultants' meetings.  I don't know what the<br>7  medical community as a whole or the public as a<br>8  whole would havg liked to know. | Foundation; calls for speculation | |
| scol429fin - Vol. I, (Page 236:18 to 236:24)<br>236<br>18      Q.     So, you're saying that if the FDA had<br>19  wanted to figure out what you were thinking in terms<br>20  of concerns about Vioxx, they could have asked you?<br>21  Is that it?<br>22      A.     The FDA could have asked me any time<br>23  if they wanted to.  They had all the data available<br>24  to them. | Foundation; calls for speculation | |
| scol429fin - Vol. I, (Pages 236:25 to 237:3)<br>236<br>25      Q.     And if they asked you, you would have<br><br>237<br>1  told them you were worried?<br>2      A.     I would have told them my concerns,<br>3  what we did, what conclusions we reached. | Foundation; calls for speculation | |
| 237: 4 - 237: 5<br><br>237: 4      Q.     Would you have told them you were<br>237: 5  worried? | | |
| 237:9-237:10<br><br>237: 9   THE WITNESS:  I would have told them<br>237:10   my concerns -- | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 237:13-237:18<br><br>237:13     THE WITNESS: -- or my worries and<br>237:14  what the data was and what our conclusions were and<br>237:15  had a dialogue with them if they had asked me. My<br>237:16  regulatory affairs people routinely have discussions<br>237:17  like that with the FDA. They are my instrument for<br>237:18  dealing with the FDA. | | |
| 237:20-238:8<br><br>237:20     Q.    Well, ultimately there was an<br>237:21  Advisory Committee held in February 2001; right?<br>237:22     A.    I think that date is correct.<br>237:23    Q.    And it was to consider certain of the<br>237:24  clinical trial data from VIGOR; right?<br>237:25     A.    Yes.<br><br>238<br>238: 1    Q.    And in particular, GI safety; right?<br>238: 2    A.    Yes.<br>238: 3    Q.    As well as CV safety; true?<br>238: 4    A.    Correct.<br>238: 5    Q.    GI being gastrointestinal?<br>238: 6    A.    Yes.<br>238: 7    Q.    CV being cardiovascular?<br>238: 8    A.    Correct. | | |
| | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 240:4-240:9<br><br>240: 4   Q.     You never told the FDA at any point<br>240: 5   in time to the best of your knowledge that your<br>240: 6   initial conclusion was that the CV events seen in<br>240: 7   the VIGOR trial were mechanism based and<br>240: 8   attributable to Vioxx?<br>240: 9       A.     I never told them that. | | |
| ████████████████<br>████████████████<br>████████████████<br>███████████████<br>████████████████<br>███████<br>█████████████████<br><br>████████████████<br>████████<br>████████████████<br>█████████████████<br>█████████████████<br>██████████ | | |
| 242:18-242:21<br><br>242:18   Q.     Merck submitted a proposed label to<br>242:19   FDA sometime in 2000; right?<br>242:20     A.     Yes.  I believe within three month<br>242:21   of having the VIGOR data. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 243:22 to 244:14)<br>243<br>22      So, at the end of March of 2000,<br>23   Merck issues a press release and tells the world the<br>24   favorable properties of Vioxx found in the VIGOR<br>25   trial as it relates to GI effects; correct?<br><br>244<br>1     A.     That is correct.<br>2     Q.     Also discloses that there's an<br>3   increased number of -- excuse me -- a decreased<br>4   number of cardiovascular effects in the naproxen arm<br>5   of the VIGOR trial; right?<br>6     A.     That's correct.<br>7     Q.     You didn't tell the public that there<br>8   was an increased number of cardiovascular events in<br>9   the Vioxx arm; right?<br>10     A.     The press release was not worded that<br>11   way, that is correct.<br>12     Q.     Okay.  Because that would have<br>13   suggested that Vioxx had actually increased the<br>14   risk; right? | 401; 402 – PDL first considered Vioxx after introduction of the VIGOR label | |
| scol429fin - Vol. I, (Page 244:16 to 244:17)<br>244<br>16      THE WITNESS:  It might have suggested<br>17   that, and we didn't believe that. | 401; 402 – PDL first considered Vioxx after introduction of the VIGOR label | |
| scol429fin - Vol. I, (Page 244:19 to 244:25)<br>244<br>19     Q.     You were trying to convey to people<br>20   that it was, in fact, naproxen that was reducing the<br>21   risk?  That's why you reported the numbers that way?<br>22     A.     We were -- had concluded that it was<br>23   naproxen which had lowered the risk, and the press<br>24   release expressed our view, and it stated this was a<br>25   new finding for naproxen. | 401; 402 – PDL first considered Vioxx after introduction of the VIGOR label | |
| scol429fin - Vol. I, (Page 245:4 to 245:7)<br>245<br>4     Q.     You were trying to convey to people<br>5   that it was, in fact, naproxen that was reducing the<br>6   risk of cardiovascular events in the VIGOR trial;<br>7   true? | 401; 402 – PDL first considered Vioxx after introduction of the VIGOR label | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 245:9 to 245:10)<br><br>                           245<br>9        THE WITNESS:  True.  That's the way<br>10  the press release was worded, as I stated before. | 401; 402 – PDL first considered Vioxx after introduction of the VIGOR label | |
| 245:17-245:25<br><br>245:17   Q.    Doctor, before we go on, even two<br>245:18  weeks after you issued the press release, you,<br>245:19  Merck, issued the press release announcing the VIGOR<br>245:20  results, Dr. Ed Scolnick was still personally<br>245:21  worried about what the results from VIGOR really<br>245:22  meant; true?<br>245:23     A.    That's correct.<br>245:24  Q.   And you were worried that Vioxx was<br>245:25  actually causing cardiovascular events; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 246:2-247:19 | | |

246: 2     THE WITNESS:  I was worried that we
246: 3  couldn't exclude an effect of Vioxx, although the
246: 4  major effect, I was convinced, was due to naproxen.
246: 5  BY MR. BUCHANAN:
246: 6    Q.    And you actually told your staff that
246: 7  you personally were actually in minor agony over the
246: 8  issue; true?
246: 9     A.   True.
246:10    Q.    And you told your staff that we're
246:11  not going to know the answer until we do an outcomes
246:12  trial; right?
246:13   A. That we were not going to know -- we
246:14  were not going to be able to exclude an effect of
246:15  Vioxx until we did an outcomes trial.
246:16     Q.    You told your staff, your project
246:17  team, we will not know for sure what is going on
246:18  until we do an outcomes trial; true?
246:19     A.    True.
246:20 Q.    And you wanted to do a big outcomes
246:21  trial; right?
246:22     A.    Yes.  That's correct.
246:23    Q.    Not some pooled analysis; right?
246:24    A.    That's correct.
246:25    Q.    You wanted to do a 10,000 patient

247
247: 1  study on Vioxx, 10,000 people on a comparator agent;
247: 2  true?
247: 3     A.    True.  That's correct.
247: 4   Q.  You were advocating using Tylenol as
247: 5  the comparator agent; right?
247: 6     A.    That was my idea, yes.
247: 7     Q.    You wanted to do a 20,000 person
247: 8  study in April of 2000 to evaluate the

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 247: 9   cardiovascular safety of Vioxx; right?<br>247:10      A.      Correct.<br>247:11      Q.      It was going to be a head-to-head<br>247:12   trial, Tylenol on one arm, Vioxx on the other;<br>247:13   right?<br>247:14      A.      That's correct.<br>247:15      Q.      And when did you run that trial?<br>247:16   A.     The project team told me that was a<br>247:17   trial that could not be done because patients<br>247:18   couldn't be kept on Tylenol who had osteoarthritis<br>247:19   for that long a period of time. |  |  |
| 247:20-248:9<br><br>247:20      Q.      Is that right?<br>247:21      A.      That's what --<br>247:22      Q.      You can't --<br>247:23      A.      Tylenol is not sufficient as a<br>247:24   painkiller to patients with osteoarthritis, and,<br>247:25   therefore, the trial could not be done, and I had to<br><br>248<br>248: 1   accept that because they felt that way unanimously,<br>248: 2   very strongly, that you couldn't do the trial, and<br>248: 3   if the alternative was to do it against another<br>248: 4   comparator nonsteroidal, it might not give as clear<br>248: 5   an answer.  And so we were in a conundrum about what<br>248: 6   trial to do at that point.<br>248: 7      Q.      Well, you were the boss; right?<br>248: 8      A.      I never asked them to do a trial that<br>248: 9   they thought was undoable. |  |  |
| ███████████████████<br>███████████████████<br>███████████████████<br>███████████████████<br>███████ |  |  |
| ███████████████████<br>███████████████████<br>███████████████████<br>███████████████████<br>███████████████ |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 252:9-253:18 | | |

252: 9       Let's look at this e-mail, then, from
252:10  April 12, 2000 from you to Dr. Reicin.  You wrote
252:11  this late at night; right?
252:12     A.    Yes.  It's dated 10:42 p.m.
252:13     Q.    You sent it with high importance;
252:14  true?
252:15     A.    True.
252:16     Q.    And you wrote:  "Hi Alise.  I have
252:17  been trading e-mails with Doug Greene in real time."
252:18  Who is Doug Greene?
252:19     A.    Doug Greene at the time was head of
252:20  the clinical, regulatory and statistics department
252:21  at Merck, which is usually referred to as
252:22  development.
252:23     Q.    "We all are online too late.  I will
252:24  tell you my worry quotient is high.  I actually am
252:25  in minor agony."  Do you see that?

253
253: 1     A.    I do.
253: 2     Q.    You wrote that?
253: 3     A.    I did.
253: 4     Q.    You meant it?
253: 5     A.    I did.
253: 6     Q.    "What I really want to do is a 10000
253: 7  versus 10000 patient study in mild - moderate OA
253: 8  Tylenol versus Vioxx with PRN" -- is that
253: 9  preventative?
253:10     A.    No.  It means use if you need.
253:11     Q.    "With PRN low dose ASA."  Is that
253:12  aspirin?
253:13     A.    Yes.
253:14     Q.    "For those judged to need it."
253:15     Sir, are you telling me that you
253:16  couldn't do a long-term study in patients with even
253:17  mild osteoarthritis, Tylenol versus Vioxx?
253:18     A.    That's what my team told me.

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 253:25-254:4<br><br>253:25      Q.      You continue.  "WE WILL NOT KNOW FOR<br><br>254<br>254: 1  SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY.<br>254: 2   PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC<br>254: 3   MEETING."  You wrote that in all caps; right?<br>254: 4      A.    I did. | | |
| 254:5-254:8<br><br>254: 5    Q.  When did you do a CV outcomes study<br>254: 6   of any design comparing Vioxx to a comparator agent<br>254: 7    with the primary endpoint being cardiovascular<br>254: 8    events? | | |
| 254:10-254:18<br><br>254:10        THE WITNESS:  After debating many<br>254:11    protocols, we decided that we wanted -- the only way<br>254:12    we would answer any lingering doubt was to do it<br>254:13    against placebo and finally came up with a protocol<br>254:14    for doing that.<br>254:15    BY MR. BUCHANAN:<br>254:16    Q.      Right.  You didn't design a specific<br>254:17    trial with a predetermined endpoint to monitor<br>254:18    cardiovascular events, though; did you? | | |
| 254:20-254:23<br><br>254:20    THE WITNESS:  We did not do that.  We<br>254:21    aggregated three large trials with a predefined<br>254:22    endpoint to be cardiovascular mortality with an<br>254:23    ample power to look for cardiovascular events. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 263:23-264:8<br><br>263:23   Q.   Sir, I'm passing you over what we<br>263:24   just marked as exhibit, I think it's 7, to your<br>263:25   deposition. It's entitled, "VIOXX Outcomes Study<br><br>264<br>264: 1   Potential Designs." For the record, it is<br>264: 2   MRK-ABT0014818 to 827. Do you recognize this as a<br>264: 3   slide set, sir?<br>264: 4      A.   That's what it looks like it is.<br>264: 5   Q.   Okay. It's entitled, "VIOXX Outcomes<br>264: 6   Study Potential Designs." It is a PowerPoint<br>264: 7   printout. Is that what it looks like to you?<br>264: 8      A.   More or less. | | |
| 264:21-265:13<br><br>264:21   Q.   This document summarizes several<br>264:22   different outcomes studies concerning cardiovascular<br>264:23   issues that were being considered in or around April<br>264:24   of 2000; true?<br>264:25      A.   Yes.<br><br>265<br>265: 1   Q.   One of the outcomes studies that was<br>265: 2   being considered was the Vioxx versus Tylenol study;<br>265: 3   true?<br>265: 4      A.   Yes.<br>265: 5      Q.   There's some pros and cons listed<br>265: 6   there; right?<br>265: 7      A.   Yes.<br>265: 8      Q.   One of the pros is, "This study<br>265: 9   directly addresses the question of the CV safety of<br>265:10   COX-2 inhibitors." Do you see that?<br>265:11      A.   Yes.<br>265:12      Q.   I read that right; correct?<br>265:13      A.   Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 266:25-267:17<br><br>266:25     Q.    Okay.  There's two cons that are<br><br>267<br>267: 1  listed here; right?<br>267: 2     A.  Yes.<br>267: 3     Q.    One is, "Demonstration of a CV<br>267: 4  difference would likely be due to a COX-2 CLASS<br>267: 5  effect but would put VIOXX at extreme disadvantage<br>267: 6  to celebrex and negate existing OA and Alzheimers<br>267: 7  data."  Do you see that?<br>267: 8     A.  I do.<br>267: 9     Q.    The next point was there was a<br>267:10  possibility that you detect "small differences from<br>267:11  Tylenol in GI safety," and that would be of concern;<br>267:12  true?<br>267:13     A.    That's what it says.<br>267:14  Q.  Okay.  You were concerned that if you<br>267:15  went head-to-head Vioxx versus Tylenol, you might<br>267:16  highlight some favorable GI safety properties of<br>267:17  Tylenol.  Isn't that right? | | |
| 267:19-268:1<br><br>267:19     THE WITNESS:  That's what this says.<br>267:20  I wasn't concerned about that.  That's what this<br>267:21  says.<br>267:22  BY MR. BUCHANAN:<br>267:23     Q.    Okay.<br>267:24     There was also a possibility that you<br>267:25  might be wrong, and the cardiovascular effects seen<br><br>268<br>268: 1  in VIGOR was really due to Vioxx; right? | | |
| 268:3-268:4<br><br>268: 3     THE WITNESS:  That's what this says<br>268: 4  as a con for the study. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 268:16-268:21<br><br>268:16    So, it wouldn't have been unethical<br>268:17   to do a trial of Vioxx versus Tylenol?<br>268:18    A.    What I said is it would be undoable<br>268:19   based on other input people gave me because Tylenol<br>268:20   would not relieve pain enough to be monotherapy in<br>268:21   such a trial. | | |
| 268:22-269:10<br><br>268:22   Q.    So, someone was speculating that if<br>268:23   you did Vioxx versus Tylenol, people may fall out of<br>268:24   the Tylenol arm over time because it was<br>268:25   ineffective; is that right?<br>268:ESQUIRE DEPOSITION SERVICES<br>269: Confidential - Subject to Protective Order 269<br>269: 1    A.    Yes.  Not speculating, but saying it<br>269: 2   just as in -- the same manner as on this slide, that<br>269: 3   was another point brought up many times during the<br>269: 4   discussion.<br>269: 5   Q.    Well, that's what I'm wondering.  I<br>269: 6   don't see it on this slide.  Do you see that point<br>269: 7   raised on this slide, sir?<br>269: 8    A.    I do not, but it was something people<br>269: 9   talked about.  Not all points of meetings are on our<br>269:10   slides. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 270:2-270:17<br><br>270: 2        Now, apart from just asking your<br>270: 3    internal folks and thinking about yourself what type<br>270: 4    of CV study could be done, you actually consulted<br>270: 5    with some people from outside Merck; right?<br>270: 6        A.    Several.<br>270: 7    Q.    Okay.  You asked them whether a CV<br>270: 8    study could be designed to evaluate the<br>270: 9    cardiovascular safety of Vioxx, didn't you?<br>270:10    A.  I asked them what kind of study could<br>270:11    be designed, yes.<br>270:12        Q.    You actually spoke with a John Oates<br>270:13    about whether a trial could be done to test the CV<br>270:14    safety of Vioxx; right?<br>270:15        A.    I don't remember all the people that<br>270:16    our group talked to.  Dr. Oates was one of our<br>270:17    consultants on our board of advisors. | | |
| 271:10-271:24<br><br>271:10  Q.    Wasn't it Dr. Oates' view right after<br>271:11    the VIGOR data was released that you had to do<br>271:12    another trial comparing Vioxx with aspirin and<br>271:13    naproxen to see whether Vioxx was cardiotoxic?<br>271:14        A.    I don't remember.  I really don't<br>271:15    remember.<br>271:16  Q.    Do you remember that study design<br>271:17    being proposed?<br>271:18  A.    I remember that among several study<br>271:19    designs, yes.<br>271:20        Q.    Did you ever do that study?<br>271:21        A.    That study was not done.<br>271:22        Q.    You never did a study like that;<br>271:23    right?<br>271:24        A.    That study was not done. | | |
| 275:21-275:25<br><br>275:21  Q.    Do you remember Merck dealing with<br>275:22    Dr. Topol in 2001 concerning the design of a CV<br>275:23    outcome trial?<br>275:24  A.    I believe Merck research scientists<br>275:25    dealt with Dr. Topol, yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 276:6-276:11<br><br>276: 6     Q.     You'd agree he's a respected<br>276: 7   cardiologist?<br>276: 8        A.    He has a significant reputation in<br>276: 9   cardiology.<br>276:10   Q.    He's a respected cardiologist, sir?<br>276:11        A.    He has a significant reputation. | | |
| 276:20-276:22<br><br>276:20      Q.     Do you respect Dr. Topol?<br>276:21   A.    I think there are some things he's<br>276:22   done in science which have not held up to be true. | | |
| 277:2-277:3<br><br>277: 2   Q.  Do you respect Dr. Topol?  Yes or no?<br>277: 3        A.    I think he -- | | |
| 277:7-277:17<br><br>277: 7   Q.  Can you answer my question yes or no,<br>277: 8   sir?<br>277: 9        A.    I have mixed thoughts about his<br>277:10   publication record, so, I can't answer your<br>277:11   question.<br>277:12   Q.  Did you have mixed thoughts about his<br>277:13   publication record back in 2001?<br>277:14        A.    I can't recall.<br>277:15   Q.  Did you only have a mixed view of his<br>277:16   publication record after he started to publish<br>277:17   articles negative to Vioxx? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 277:19-278:2<br><br>277:19        THE WITNESS:  No.  No.<br>277:20  BY MR. BUCHANAN:<br>277:21 Q.    Well, what are you referring to then<br>277:22  concerning Dr. Topol's mixed publication record?<br>277:23     A.   I'm referring, one, to his<br>277:24  meta-analysis of the Vioxx data, which was, I've<br>277:25  been told by statisticians I respect, a completely<br><br>278<br>278: 1  flawed analysis, and some of his genetics work which<br>278: 2  has been proven to be wrong. | | |
| 278:4-278:6<br><br>278: 4  So, one of the things that you based<br>278: 5  your mixed view of Dr. Topol on is the negative<br>278: 6  study he published concerning Vioxx; correct? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 278:8-279:5<br><br>278: 8    THE WITNESS:  Base it not on the<br>278: 9   negative study, base it on the methods which he used<br>278:10   to do the methods -- the negative study.<br>278:11   BY MR. BUCHANAN:<br>278:12       Q.    Let's be clear about what we're<br>278:13   talking about.<br>278:14          In August of 2001, Dr. Topol<br>278:15   published a study in the Journal of the American<br>278:16   Medical Association; true?<br>278:17       A.    True.<br>278:18   Q.    That study was raising caution about<br>278:19   the potential for COX-2 inhibitors like Vioxx and<br>278:20   Celebrex to cause cardiovascular events; true?<br>278:21   A.    That's what that study claimed to<br>278:22   have shown.<br>278:23       Q.    And you're saying that you have<br>278:24   spoken to statisticians that challenge the work of<br>278:25   Dr. Topol in terms of its statistical rigor.  Is<br><br>279<br>279: 1   that what you're saying?<br>279: 2       A.    That's exactly what I'm saying.<br>279: 3       Q.    Did you tell Dr. Topol that?<br>279: 4       A.    I've never discussed anything<br>279: 5   directly with Dr. Topol. | | |
| 279:10-279:12<br><br>279:10   Q.    Well, did you know that some of your<br>279:11   scientists went out to talk to Dr. Topol about that<br>279:12   article even before it was published? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 279:14-279:23<br><br>279:14       THE WITNESS:  I believe that Dr.<br>279:15  Reicin told me that she and Dr. Demopoulos, who was<br>279:16  a cardiologist by training, were going out to see<br>279:17  him to discuss the article.<br>279:18  BY MR. BUCHANAN:<br>279:19  Q.    And they went out to see him before<br>279:20  the article in the Journal of the American Medical<br>279:21  Association was published; right?<br>279:22      A.   I believe they did.  I believe that's<br>279:23  what Dr. Reicin told me. | | |
| 280:9-280:14<br><br>280: 9  Q.    And the objective was that Dr. Topol<br>280:10  would not publish the article in the form it<br>280:11  currently existed because that was negative to<br>280:12  Vioxx; true?<br>280:13      A.   Because it was inaccurately done<br>280:14  statistically. | | |
| 282:2-282:16<br><br>282: 2      Q.    Well, the Journal of the American<br>282: 3  Medical Association has editors; right?<br>282: 4      A.   Yes, it does.<br>282: 5      Q.    I mean, Dr. Topol just didn't just<br>282: 6  publish this article in JAMA by himself; right?<br>282: 7      A.   That is correct.<br>282: 8      Q.    There were editors at JAMA who<br>282: 9  reviewed the article; right?<br>282:10      A.   I don't know who reviewed the<br>282:11  article.<br>282:12      Q.    Well, in your experience, sir, in the<br>282:13  peer-reviewed medical literature, there are editors<br>282:14  at medical journals; true?<br>282:15  A.    There are, but I don't know how that<br>282:16  article was reviewed or who reviewed it. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 283:1-283:5<br><br>283: 1     Q.    You would agree, sir, that it would<br>283: 2  be unusual for a journal like JAMA not to have an<br>283: 3  article like that peer reviewed?<br>283: 4  A.    It would be unusual, but I don't know<br>283: 5  what they did. | | |
| 283:11-283:13<br><br>283:11       In fact, Merck actually issued a<br>283:12  press release preemptively to challenge the results<br>283:13  from that JAMA article, didn't they? | | |
| 283:16-283:17<br><br>283:16    THE WITNESS:  I don't recall at all<br>283:17  whether that was done. | | |
| 284:5-284:17<br><br>284: 5  if we can get that out.  The peer-reviewed medical<br>284: 6  literature is the vehicle through which -- is a<br>284: 7  vehicle through which scientific opinion is<br>284: 8  exchanged; true?<br>284: 9     A.    Correct.<br>284:10  Q.   And the standard way of responding to<br>284:11  scientific opinion expressed in scientific<br>284:12  literature is to respond in scientific literature to<br>284:13  that particular issue raised; true?<br>284:14     A.    True.<br>284:15     Q.    It is not standard practice to<br>284:16respond to an opinion in a medical article with a<br>284:17  press release disparaging an article; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 284:20-285:15<br><br>284:20    THE WITNESS:  That's not the usual<br>284:21   practice.  I don't recall what Merck did.<br>284:22   BY MR. BUCHANAN:<br>284:23       Q.    Is that a practice you endorse?<br>284:24       A.    Absolutely not.<br>284:25 Q.    The appropriate way to respond is in<br><br>285<br>285: 1   the medical journal itself; true?<br>285: 2       A.    That is an appropriate way to<br>285: 3   respond.<br>285: 4       Q.    You could write a letter to the<br>285: 5   editor; right?<br>285: 6       A.    Yes, correct.<br>285: 7       Q.    You can submit your own article?<br>285: 8       A.    Correct.<br>285: 9       Q.    Or you can publish a competing<br>285:10   article in another journal; right?<br>285:11       A.    Correct.<br>285:12       Q.    But one of the things that you think<br>285:13   would be unusual is to issue a press release to<br>285:14   respond to an article in the medical literature;<br>285:15   true? | | |
| 285:17-285:20<br><br>285:17    THE WITNESS:  It would be unusual.<br>285:18   BY MR. BUCHANAN:<br>285:19       Q.    And just not right?<br>285:20       A.    It would be -- | | |
| 285:22-286:1<br><br>285:22   THE WITNESS:  It is not a standard<br>285:23   way of doing it.<br>285:24   BY MR. BUCHANAN:<br>285:25 Q.    And certainly nothing you'd endorse?<br><br>286<br>286: 1       A.    That is correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 293:11-293:20<br><br>293:11    Q.    But May of 2001, you were still<br>293:12  interested in a trial to evaluate the CV safety of<br>293:13  Vioxx; true?<br>293:14  A.    That is true.  I constantly wanted to<br>293:15  garner additional data to what we already had to<br>293:16  further prove what we had concluded.<br>293:17  Q.  And nobody had come up with an idea<br>293:18  by 2001 of a CV study that could be done to evaluate<br>293:19  the cardiovascular safety of Vioxx?  That's your<br>293:20  testimony? | | |
| 293:23-294:2<br><br>293:23    THE WITNESS:  As the discussions<br>293:24  evolved, what everybody focused on was a study<br>293:25  versus placebo, and no placebo-controlled trial had<br><br>294<br>294: 1  yet been brought forth that people were satisfied<br>294: 2  with the design on. | | |
| 296:8-296:9<br><br>296: 8  Q.  Do you remember the VALOR trial, sir?<br>296: 9    A.    I don't remember that name, no. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 296:25 to 297:19)<br><br>296<br>25   Q.    Dr. Scolnick, I just passed you over<br><br>297<br>1   what we marked as Exhibit 10 to your deposition.  It<br>2   is Bates stamped MRK-ABA0003490 to 3491.  It is a<br>3   letter from a Carlo Patrono; correct?<br>4   A.    Yes.  It's from Dr. Patrono.<br>5   Q.    Ever seen this before?<br>6   A.    I don't recall.<br>7   Q.    Who is Dr. Braunwald?<br>8   A.    Braunwald is a well-known<br>9   cardiologist at Peter Bent Brigham Hospital.<br>10   Q.    Here in Massachusetts?<br>11   A.    Yes.<br>12   Q.    That's affiliated with Harvard; is<br>13   that right?<br>14   A.    Yes, it is.<br>15   Q.    Merck was actually speaking to<br>16   Dr. Braunwald about running a VALOR trial; right?<br>17   A.    That's what this letter suggests.  I<br>18   remember Dr. Braunwald making suggestions, but I<br>19   don't remember the details involved. | Foundation - no evidence witness ever saw this letter between Drs. Patrono & Braunwald before | _Overruled_ |
| scol429fin - Vol. I, (Pages 298:24 to 299:11)<br><br>298<br>24   Q.    Well, do you recall at the end of<br>25   2001 there was increased urgency to do a<br><br>299<br>1   cardiovascular study; true?<br>2   A.    There was, because a number of<br>3   people, scientists and others, still were<br>4   questioning whether Vioxx had been a contributor in<br>5   the VIGOR trial as opposed to naproxen being<br>6   beneficial.<br>7   Q.    People were still worried about<br>8   whether Vioxx was causing cardiovascular events;<br>9   true?<br>10   A.    There were some people who still were<br>11   raising that question. | Foundation - no evidence witness ever saw this letter between Drs. Patrono & Braunwald before | |