| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 300:12 to 301:10)<br><br>300<br>12        I may have asked you this, but did<br>13  you run the VALOR trial?<br>14     A.    No, I don't think the VALOR trial was<br>15  run.<br>16     Q.    Why not?<br>17     A.    I don't remember why the VALOR trial<br>18  wasn't run.  This sounds like a pretty complicated<br>19  trial to me, and I don't remember why it wasn't run.<br>20     Q.    Was money an issue?<br>21     A.    I don't remember why the VALOR trial<br>22  wasn't run.  As I said, this seems like a fairly<br>23  complicated paragraph here from Dr. Patrono to Dr.<br>24  Braunwald, so, I'm not able to figure this out<br>25  quickly.<br><br>301<br>1     Q.    Do you see the third paragraph?  It<br>2  reads, "I have serious reservations about the role<br>3  of the Sponsor."  The sponsor would be Merck?<br>4     A.    Presumably.<br>5     Q.    "I have serious reservations about<br>6  the role of the Sponsor in monitoring and<br>7  termination of the study, as well as in the<br>8  statistical analysis of the results."  Do you see<br>9  that?<br>10     A.    I do. | Foundation - no evidence witness ever saw this letter between Drs. Patrono & Braunwald before | |
| 305:15-305:19<br><br>305:15     Following the Advisory Committee in<br>305:16  2001, a series of negotiations took place with FDA<br>305:17  concerning the label for Vioxx; right?<br>305:18       A.    Yes, a very long time before we<br>305:19  actually got a label from them. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 311:21-313:3<br><br>311:21  Q.    I want to pass you over what we just<br>311:22  marked as Exhibit 11 to your deposition.  It's an<br>311:23  e-mail dated January 31st, 2001 from you to Mr.<br>311:24  Gilmartin and Mr. Anstice.  The subject is "Monday<br>311:25  MC."  Do you see that?<br><br>312<br>312: 1      A.    Yes.<br>312: 2  Q.    "MC" refers to management committee?<br>312: 3      A.    Yes.<br>312: 4  Q.   It is Bates stamped MRK-ACR0008985.<br>312: 5          You write, I guess it's the second<br>312: 6  sentence or so:  "The Vigor meeting is next<br>312: 7  thursday.  On Monday I will show you the essence, an<br>312: 8  update, of the data that supports Vioxx is safe in<br>312: 9  the Cv sense.  But I want to point out to all of you<br>312:10  at one time that 1. there is no way to prove that in<br>312:11  patients with rheumatoid arthritis that," and you<br>312:12  put this in all caps, "ALL of the difference between<br>312:13  Vioxx and naproxen is due to the benefit of<br>312:14  naproxen."  Do you see that.<br>312:15      A.    I do.<br>312:16  Q.  Then you continue.  "IT IS IMPOSSIBLE<br>312:17  TO PROVE THIS."  That's all caps; right?<br>312:18      A.    Yes.<br>312:19      Q.    And you continue further.  "IT IS<br>312:20    IMPOSSIBLE  TO  KNOW  THIS  WITH  CERTAINTY."  That's<br>312:21  what you wrote; right?<br>312:22      A.    I did.<br>312:23      Q.    And that was -- that was your feeling<br>312:24  as of January 31st, 2001?<br>312:25      A.    Yes.  That's just what I've just told | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 312:21   what you wrote; right?<br>312:22       A.   I did.<br>312:23 Q.    And that was -- that was your feeling<br>312:24   as of January 31st, 2001?<br>312:25       A.   Yes.  That's just what I've just told<br><br>313<br>313: 1   you again.<br>313: 2 Q.    A week before the Advisory Committee?<br>313: 3       A.   Yes. | | |
| 313:25-314:15<br><br>313:25   Q.     You continue, "Knowing what is about<br><br>314<br>314: 1  to happen, managing the short term fall out, and<br>314: 2  facing and managing an{ longer term consequences."<br>314: 3   "Short term fall out," what are you thinking about<br>314: 4   there?<br>314: 5       A.     When all the data is presented again,<br>314: 6   people will raise questions whether we can prove the<br>314: 7 negative completely and, therefore, will question<br>314: 8   whether they should use Vioxx or not.<br>314: 9       Q.     "Short term fall out" also refers to<br>314:10   potential impact on Merck stock; right?<br>314:11       A.     I don't know.  I think I had in mind<br>314:12   just the effects on Vioxx.<br>314:13       Q.     Well, the effects of Vioxx would<br>314:14   include decreased sales of Vioxx; true?<br>314:15       A.     Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 315:11 to 315:24)<br><br>315<br>11     Q.    Well, did you think that negative<br>12  labeling for Vioxx would have an adverse effect on<br>13  Vioxx sales?<br>14     A.    Certainly.<br>15     Q.    Did you think that if there was a CV<br>16  warning for Vioxx, that that would have a negative<br>17  effect on Vioxx sales?<br>18     A.    Certainly, but I didn't expect a CV<br>19  warning based on the data.<br>20     Q.    Did you think that if there was a CV<br>21  warning on Vioxx, that would also have an effect on<br>22  Merck stock?<br>23     A.    Certainly.  But as I've said, I did<br>24  not expect a CV warning. | 401; 402 –<br>Louisiana Medicaid<br>was required to<br>reimburse Vioxx<br>once it met FDA<br>prerequisite | Overrule |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 322:6 to 325:17)<br>322<br>6    Q.    And you really thought it was a<br>7  challenge in your team to convince the FDA and the<br>8  Advisory Committee that Vioxx didn't have a<br>9  cardiovascular problem; true?<br>10    A.    We had all the data which said that<br>11  we didn't have a problem, and we wanted to make sure<br>12  we could present all that data, sure.<br>13    Q.    But it wasn't just a challenge, it<br>14  was almost impossible; right?<br>15    A.    It was impossible to prove the<br>16  negative, which I pointed out in my e-mail note.  It<br>17  was possible to present all the data which supported<br>18  our position.<br>19    Q.    Well, the Advisory Committee went<br>20  well from your perspective; true?<br>21    A.    Yes.  Quite well.<br>22    Q.    Your team did a fantastic job; true?<br>23    A.    Yes.<br>24    Q.    And they made the FDA look like<br>25  "grade d high school students."  Isn't that what you<br><br>323<br>1  said?<br>2    A.    I did in an e-mail note, yes.  I<br>3  regret those words, but we did a good job.<br>4    Q.    You meant them when you wrote it?<br>5    A.    It was -- I meant them.  It was an<br>6  allusion to something that had happened a few years<br>7  ago, but I did write those words.<br>8    Q.    This is the same FDA that you<br>9  respect?<br>10    A.    Yes.<br>11    Q.    This is the same FDA that's<br>12  responsible for the public safety?<br>13    A.    That's correct.<br>14    Q.    This is the same FDA that's<br>15  responsible for evaluating the cardiovascular data<br>16  concerning your drug?<br>17    A.    Yes.<br>18    Q.    And you were proud that your team<br>19  made the FDA look like grade D high school students;<br>20  true?<br>21    A.    I wrote those words.  I regret the<br>22  choice of words.  I wrote those words. | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 326:7 to 326:10)<br>326<br>7       You agree it is not very flattering<br>8  to refer to the agency responsible for protecting<br>9  the public health as it relates to drugs as "grade d<br>10  high school students." | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 326:12 to 326:16)<br>326<br>12       THE WITNESS:  No, it is not<br>13  flattering.  As I said, it came from an allusion to<br>14  an earlier event related to the crux of an Advisory<br>15  Committee meeting, and it was inappropriate in this<br>16  context. | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| 329:10-329:24<br><br>329:10    Q.    So, after this Advisory Committee in<br>329:11  February of 2001, you got a letter from the FDA<br>329:12  saying that they were conditionally approving<br>329:13  Merck's supplemental new drug application; right?<br>329:14    A.    At some point we got a letter back<br>329:15  from them, yes.<br>329:16    Q.    You didn't like the tone of the<br>329:17  letter, though, did you?<br>329:18    A.    We didn't like the tone, and we<br>329:19  didn't like the content.  As I said earlier, they<br>329:20  ignored all the GI data.  They completely left it<br>329:21  out.  They left out the Alzheimer's data, and they<br>329:22  had a warning, despite what had happened at the<br>329:23  Advisory Committee, where no warning was suggested<br>329:24  based on all the data, or voted for. | | |
| scol429fin - Vol. I, (Page 331:12 to 331:18)<br>331<br>12    Q.    For the record, Dr. Scolnick, I've<br>13  just passed you what we've marked as Exhibit 13 to<br>14  your deposition.  It's a two-page series of e-mails<br>15  Bates stamped MRK-ACR0009151 to 9152.  Doctor, you<br>16  are, in fact, an author and recipient on several of<br>17  these e-mails; true?<br>18    A.    Yes. | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 332:9 to 332:25)<br><br>332<br>9    Q.    You didn't like the tone of the<br>10  approvable letter you got from Merck's supplemental<br>11  NDA; true?<br>12    A.    That's correct.  I don't remember<br>13  what was in it at this point, so, it's very hard to<br>14  respond to your question.<br>15    Q.    I'll just read the first sentence.<br>16  "To ALL:  I am sure you imagine my reaction to the<br>17  tone of the letter.  The open ended request for<br>18  safety updates is a filibuster."  Do you see that?<br>19    A.    Yes.<br>20    Q.    What's a filibuster?<br>21    A.    It's a delaying tactic.<br>22    Q.    So, you thought the FDA was trying to<br>23  delay approval of your supplemental NDA request to<br>24  get safety information?<br>25    A.    That's what I wrote. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 333:11 to 334:12)<br>333<br>11    Q.    You viewed this is as a delay tactic<br>12  by the FDA?  Is that your testimony?<br>13    A.    That's what I was worried about.<br>14    Q.    Then you state, "When will you find<br>15  out what they have done for our competitor?  If by<br>16  any chance they get a better label now and we are<br>17  asked for this much more data, I will be in Janet's<br>18  office the next day."  Do you see that?<br>19    A.    Yes.<br>20    Q.    Your competitor would be Celebrex?<br>21    A.    Yes.<br>22    Q.    The manufacturer of Celebrex?<br>23    A.    Yes.<br>24    Q.    Okay.<br>25          You were concerned that the<br><br>334<br>1  manufacturers of Celebrex were going to get an<br>2  approved label before Vioxx was going to get an<br>3  approved label?<br>4    A.    For GI outcomes, yes, that's what I<br>5  think I was concerned about.<br>6    Q.    And if that happened, you were going<br>7  to go down there to the FDA and see Janet the next<br>8  day; is that right?<br>9    A.    That is what I said in the memo.<br>10    Q.    Who is Janet?<br>11    A.    Janet was Janet Woodcock, who was, I<br>12  believe, the head of the drug part of the FDA. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 334:20 to 334:24)<br>334<br>20    Q.    So, you felt you could go down there<br>21  to Janet's office, and you could tell her to<br>22  straighten things out and make sure that Merck's<br>23  label got approved on the terms you wanted it<br>24  approved on? | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 335:1 to 335:4)<br>335<br>1     THE WITNESS: I don't know exactly<br>2  what I was thinking. I certainly wanted to advocate<br>3  on Merck's behalf if this were to happen. That's<br>4  what this memo says. | 401; 402 –<br>Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 335:12 to 335:15)<br>335<br>12    Q.    Sir, is that the way it's supposed to<br>13  work, when you want to address a labeling request<br>14  with the FDA, you go down, and you go into Janet<br>15  Woodcock's office to address it? | 401; 402 –<br>Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 335:18 to 335:25)<br>335<br>18    THE WITNESS: The head of the drug<br>19  office can be involved in labeling negotiations.<br>20  BY MR. BUCHANAN:<br>21    Q.    Is that who Janet Woodcock was?<br>22    A.    I believe at the time she was head of<br>23  the drug approval part of the FDA as opposed to<br>24  vaccines and other parts of the FDA, I believe, but<br>25  I'm not certain. | 401; 402 –<br>Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 336:1 to 336:8)<br>336<br>1    Q.    So, in other words, if the FDA<br>2  perchance decided to give the Celebrex manufacturers<br>3  the label they had sought before you got it, you<br>4  were going to go down to the, what's this, the head<br>5  of drug approval and complain? Is that your<br>6  testimony?<br>7    A.    That was -- that's what this note<br>8  implies. | 401; 402 –<br>Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 340:24 to 341:5)<br><br>340<br>24      Q.     You said that you weren't just going<br>25   to stop with Janet; right?<br><br>341<br>1      A.     That's what this says.<br>2      Q.     You said you'd go beyond if you<br>3   needed to with other contacts you'd made in HHS;<br>4   right?<br>5      A.     That's what this says. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 341:17 to 341:20)<br><br>341<br>17       So, you'd go over Janet's head if you<br>18   needed to?<br>19      A.     In order to make scientific points<br>20   which I felt strongly about. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Pages 341:21 to 342:5)<br><br>341<br>21      Q.     I understand.<br>22         If you felt strongly and Janet didn't<br>23   give you the answers you wanted, you would go above<br>24   Janet's head; right?<br>25      A.     I would argue the science that we<br><br>342<br>1   based our -- particularly, I think, talking about<br>2   the GI labeling of the drug.  We had pristine data<br>3   about the GI safety -- the improved GI safety of<br>4   Vioxx which had not been acknowledged in the<br>5   approvable letter, to the best of my knowledge. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 343:1 to 343:11)<br>343<br>1     I see the last sentence here you say,<br>2  "I have never seen being nice to the FDA-except on<br>3  rare occasions-pay off."  You wrote that?<br>4  A.   Yes.<br>5  Q.   You meant it?<br>6  A.   Yes.<br>7  Q.   It's a true statement?<br>8  A.   It was my feeling.<br>9  Q.   True statement when you wrote it,<br>10 sir?<br>11  A.   It is my feeling when I wrote it. | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 353:12 to 353:25)<br>353<br>12  Q.   Then you say, "One cannot deal with<br>13 them in a rational way."  Right?<br>14  A.   That's what I said.<br>15  Q.   And rational way was your way; right?<br>16  A.   No.  Rational way was the way we had<br>17 been trying to deal with them when we submitted the<br>18 supplemental NDA, with all of the data that was<br>19 supported at the Advisory Committee meeting.<br>20  Q.   Right.<br>21     To be clear, what the FDA was asking<br>22 for was additional safety information in their<br>23 approvable letter; true?<br>24  A.   That's what the memo implies.  I do<br>25 not know nor recall what was in that request. | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 354:14 to 354:19)<br>354<br>14 BY MR. BUCHANAN:<br>15  Q.   The bottom line is that the FDA,<br>16 looking for additional data on Vioxx in connection<br>17 with your supplemental NDA request, jeopardized your<br>18 ability to get the label you wanted in the<br>19 marketplace; true? | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 354:21 to 355:5)<br>354<br>21     THE WITNESS: They were retarding the<br>22  process in my opinion.<br>23  BY MR. BUCHANAN:<br>24     Q.   And you needed that process to move<br>25  quickly; right?<br><br>355<br>1     A.   That was our goal. We wanted it to<br>2  move quickly. We had submitted our application very<br>3  quickly, and it still had been almost a year after<br>4  the application was submitted, and we didn't yet<br>5  have a label back. | 401; 402 –<br>Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 355:6 to 355:8)<br>355<br>6     Q.   Because you were concerned that in<br>7  the COX-2 market, the drug with the better label<br>8  would sell more drug; true? | 401; 402 –<br>Louisiana Medicaid was required to reimburse Vioxx once FDA prerequisite was met | |
| scol429fin - Vol. I, (Page 355:10 to 355:13)<br>355<br>10     THE WITNESS: We had substantially<br>11  better gastrointestinal safety data than our<br>12  competitor, and I wanted that to be represented in<br>13  our label. | 401; 402 –<br>Louisiana Medicaid was required to reimburse Vioxx once FDA prerequisite was met | |
| scol429fin - Vol. I, (Page 355:16 to 355:19)<br>355<br>16     You were concerned that in the COX-2<br>17  market, the company that had the better label for<br>18  its drug would sell more of that drug; true?<br>19     A.   True, if the data supported that. | 401; 402 –<br>Louisiana Medicaid was required to reimburse Vioxx once FDA prerequisite was met | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 355:23 to 356:10)<br><br>355<br>23   Q.   You did get a label at some point in<br>24  time in connection with your supplemental new drug<br>25  application for Vioxx; true?<br><br>356<br>1   A.   Yes.<br>2   Q.   You got that in the fall of 2001?<br>3   A.   I don't recall the exact date.  It<br>4  was certainly after this in 2001.<br>5   Q.   Had a CV warning?<br>6   A.   Yes.<br>7   Q.   CV means cardiovascular; right?<br>8   A.   Yes.<br>9   Q.   In the warnings section of the label?<br>10   A.   Yes. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 357:4 to 357:17)<br><br>357<br>4   Q.   The label you got from the FDA had a<br>5  cardiovascular warning in the warnings section;<br>6  true?<br>7   A.   I believe so.<br>8   Q.   You thought it was ugly?<br>9   A.   I did.<br>10   Q.   You thought it was ugly cubed?<br>11   A.   I did.<br>12   Q.   That's ugly times ugly times ugly;<br>13  right?<br>14   A.   Ugly cubed is exactly what you've<br>15  stated.<br>16   Q.   Ugly three times over; right?<br>17   A.   Right. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| ███████████████████<br>███████████████████<br>███████████████████<br>███████████████████<br>██████████████ | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ██████████████████████<br>████████████████████████<br>██████████████████████████<br>████████████████████████████<br><br>██████████████████████<br>█████████████████████████<br>███████████████████████<br>█████████████████████████<br>██████████████████████████<br>████████████████████████<br>██████████████████████████<br>████████████████████ | | |
| scol429fin - Vol. I, (Pages 360:22 to 361:4)<br>                    360<br>22    Q.    Sir, I'm going to pass over what<br>23   we've just marked as Exhibit 14 to your deposition.<br>24   It is a series of e-mails, three of them in<br>25   particular, from October 2001.  For the record, it<br><br>                    361<br>1   is Bates stamped MRK-ABW0004799.<br>2            Sir, you've seen this document<br>3   before; right?<br>4    A.    Yes, I have. | 401; 402 – Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 361:14 to 362:12) <br><br> 361 <br> 14     Q.    It is from October 15th, 2001? <br> 15     A.    Yes. <br> 16     Q.    You said -- <br> 17     A.    October 16th. <br> 18     Q.    You said, "David." That's David <br> 19 Anstice; right? <br> 20     A.    Yes. <br> 21     Q.    He's the president of U.S. human <br> 22 health? <br> 23     A.    Yes. <br> 24     Q.    That was the group within Merck <br> 25 responsible for all the marketing of Vioxx? <br><br> 362 <br> 1     A.    The domestic marketing of Vioxx. <br> 2     Q.    You told him, "Be assured we will not <br> 3 accept this label." Right? <br> 4     A.    That's what my memo says. <br> 5     Q.    David was concerned about this label; <br> 6 right? <br> 7     A.    Yes. <br> 8     Q.    Okay. <br> 9       Thought it put you at a competitive <br> 10 disadvantage; right? <br> 11     A.    Yes. And it didn't accurately <br> 12 reflect our data. | 401; 402 – Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 362:13 to 363:2)<br><br>362<br>13    Q.    You were telling David that I'm going<br>14  to do what I can to make sure we don't get that<br>15  label; right?<br>16    A.    Yes.<br>17    Q.    I'm going to do what I can to make<br>18  sure there's no CV warning in the Vioxx label;<br>19  right?<br>20    A.    That isn't what this says.  It says,<br>21  "We will not accept this label" and "if we need to<br>22  we will go to an Advisory Committee meeting" to get<br>23  them to review what our label should look like, a<br>24  scientific process to resolve the potential -- a<br>25  potential disagreement between the FDA and Merck.<br><br>363<br>1    Q.    So, you rejected the label you got<br>2  from the FDA that had the CV warning; true? | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 363:4 to 363:18)<br>363<br>4    THE WITNESS:  We rejected this label<br>5  in its totality.  It had a CV warning, and it<br>6  ignored the GI data that we had garnered in VIGOR.<br>7  BY MR. BUCHANAN:<br>8    Q.    David responded to you, "We knew it<br>9  would be UGLY and it is."  Right, he said that to<br>10  you?<br>11    A.    Yes.<br>12    Q.    He also said, "We'll fight back and<br>13  see where we get."  Right?<br>14    A.    Yes.  That's what he said.<br>15    Q.    And he again said, we'll "ask for an<br>16  advisory committee" if we can't make headway with<br>17  the FDA; right?<br>18    A.    That's what he said. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 364:12 to 365:12)<br><br>364<br>12   Q.   You then say here in the final one,<br>13  your final e-mail from October 16, 2001, "It is ugly<br>14  cubed." Right?<br>15   A.   Yes.<br>16   Q.   You say, "thye," that should be they;<br>17  right?<br>18   A.   Yes.<br>19   Q.   "Thye are bastards." True?<br>20   A.   That's what the e-mail says.<br>21   Q.   That's what you wrote?<br>22   A.   That's what I wrote.<br>23   Q.   You meant it when you wrote it?<br>24   A.   I was very upset when I wrote the<br>25  e-mail.<br><br>365<br>1   Q.   So, this particular group within the<br>2  FDA was devious and antagonistic; true?<br>3   A.   That's what I wrote.<br>4   Q.   They were bastards?<br>5   A.   That reflected my emotional<br>6  unhappiness with their label.<br>7   Q.   They had the ability of grade D high<br>8  school students; true?<br>9   A.   That's what I wrote.<br>10   Q.   And if you wanted to get anything<br>11  done with them, you couldn't treat them with<br>12  respect; true? | 401; 402 –<br>Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 365:14 to 365:22)<br>365<br>14   THE WITNESS: I wrote all of these<br>15  things, and I felt that we were not getting a fair<br>16  process from this division.<br>17  BY MR. BUCHANAN:<br>18   Q.   The FDA was pretty insistent this<br>19  drug needed a cardiac warning, weren't they?<br>20   A.   They presented this label to us, so,<br>21  they must have felt that way. This division felt<br>22  that way. | 401; 402 –<br>Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Page 366:3 to 366:9)<br>366<br>3    Q.    You took from that that the FDA at<br>4   least was concerned about the potential<br>5   cardiovascular implications of your drug; true?<br>6    A.    Yes.<br>7    Q.    And they wanted to warn the American<br>8   public about the potential cardiovascular<br>9   implications of Vioxx; true? | 401; 402 – Testimony re: pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 366:11 to 366:13)<br>366<br>11        THE WITNESS:  Yes, despite the<br>12  Advisory Committee meeting, which had not felt that<br>13  way. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| [redacted] | | |
| scol429fin - Vol. I, (Page 371:15 to 371:23)<br>371<br>15        Dr. Scolnick, I just passed you what<br>16  we marked as Exhibit 15 to your deposition.  It's a<br>17  three e-mail sequence from November 8, 2001.  The<br>18  subject here says "History lesson."  Do you see<br>19  that?<br>20    A.    Uh-huh, yes, I do.<br>21    Q.    It's an exchange between initially<br>22  from you to Doug Greene and Bonnie Goldmann; true?<br>23    A.    Yes. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 372:18 to 373:3)<br>372<br>18   Q.   You said, "Doug and Bonnie twice in<br>19  my life I've had to say to FDA 'That label is<br>20  unacceptable, we will not under any circumstances<br>21  accept it.'"  Do you see that?<br>22   A.   Yes, I do.<br>23   Q.   You continue there and you say, "You<br>24  WILL," in all caps, will, "have to do that on the<br>25  cardiac warning for Vioxx.  I assure you that you<br><br>373<br>1  will."  That's what you wrote; right?<br>2   A.   I did.  You skipped an intervening<br>3  sentences. | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Pages 373:12 to 374:2)<br>373<br>12   Q.   Paragraph continues where I was<br>13  before, "You WILL," in all caps will, "have to do<br>14  that on the cardiac warning for Vioxx.  I assure you<br>15  that you will."  Did I read that right?<br>16   A.   Yes, you did.<br>17   Q.   You put "will" in emphasis to these<br>18  people; right?<br>19   A.   Yes, I did.<br>20   Q.   And these were the people who were<br>21  dealing with the FDA in connection with the label<br>22  negotiations; right?<br>23   A.   Yes.<br>24   Q.   You told them, "And I assure you I<br>25  will NOT," and again in all caps, "NOT sign off on<br><br>374<br>1  any label that had a cardiac warning."  True?<br>2   A.   That's what the e-mail says. | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| scol429fin - Vol. I, (Page 376:10 to 376:15)<br>376<br>10   Q.   So, you negotiated with the FDA over<br>11  this label concerning cardiac and GI warnings from<br>12  October of 2001 until April of 2002; true?<br>13   A.   That's correct.  Because we believed<br>14  that the drug did not justify having a cardiac<br>15  warning based on our data. | 401; 402 –<br>Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| scol429fin - Vol. I, (Pages 381:11 to 382:2)<br><br>381<br>11     Q.    Doctor, I passed you over what we<br>12  marked as Exhibit 16 to your deposition.  It is a<br>13  relatively brief e-mail, Bates stamped<br>14  MRK-ACR0009297 dated February 25th, 2002 from you<br>15  again to this same team of people working on the<br>16  negotiations over the Vioxx label; true?<br>17     A.    Yes.<br>18     Q.    You wrote, "To ALL:  If you can get<br>19  this label it will be an Al Michaels quote:  'Do you<br>20  believe in miracles?'"  What are you referring to<br>21  there?<br>22     A.    I'm referring to Al Michael's quote<br>23  when the U.S. Olympic team beat the Russians in<br>24  whatever year it was in ice hockey.<br>25     Q.    It was like an impossible task;<br><br>382<br>1  right?<br>2     A.    It certainly appeared to be. | 401; 402 – Testimony re:  pre-2002 labeling negotiations is irrelevant as COX-2s were considered for PDL post VIGOR label; See MIL #5 | |
| | **5/17/05 Deposition** | |
| 415:12-415:15<br><br>415:12   Q.    Sir, passing over what we just marked<br>415:13   as Exhibit 18 to your deposition.  For the record,<br>415:14   it's a January 28, 2001 e-mail from yourself to Eve<br>415:15   Slater. | | |
| 415:24-416:1<br><br>415:24 Q.    Okay.  Do you see your e-mail at the<br>415:25   top?<br>416: page 416<br>416: 1     A.    Yes, I do. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 416:6-416:12<br><br>416: 6    Q.    Then you continue, "This Fries<br>416: 7   incident is a disaster for Merck." Do you see that?<br>416: 8    A.    Yes, I do.<br>416: 9    Q.    You wrote that?<br>416:10    A.    I did.<br>416:11    Q.    You believed it at the time?<br>416:12    A.    I did. | | |
| 416:21-417:5<br><br>416:21 Q.    Then you continued.  "Worse than<br>416:22   Vigor results themselves." Do you see that?<br>416:23    A.    Yes.<br>416:24    Q.    The VIGOR results were also a<br>416:25   disappointment for Merck; true?<br>417: page 417<br>417: 1    A.    Some of them were surprising, as you<br>417: 2   know, and some of them were excellent.<br>417: 3    Q.    Okay.<br>417: 4        And the ones that were surprising<br>417: 5   were the cardiovascular effects of Vioxx; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 417:8-418:6<br><br>417: 8   THE WITNESS:  The difference between<br>417: 9   naproxen and Vioxx was surprising in the VIGOR<br>417:10   results.<br>417:11   BY MR. BUCHANAN:<br>417:12   Q.    Well, you said, "Worse than Vigor<br>417:13   results themselves."  That's what you wrote; right,<br>417:14   sir?<br>417:15      A.   I did.<br>417:16   Q.    You were implying that the VIGOR<br>417:17   results were disappointing in some way; true?<br>417:18      A.   I was implying that the difference<br>417:19   between the Vioxx and naproxen arms were surprising<br>417:20   and created an issue which we had dealt with and<br>417:21   come up with what we thought was the best<br>417:22   explanation based on all the other data.<br>417:23      Q.    Well, sir, you didn't write "more<br>417:24   surprising" than the VIGOR results themselves when<br>417:25   you wrote this e-mail, did you?<br>418: page 418<br>418: 1   A.   No, I did not.<br>418: 2   Q.    You wrote, "Worse than VIGOR<br>418: 3   results"?<br>418: 4   A.   That's what I wrote.  It's a very<br>418: 5   short e-mail.  That's what I wrote.<br>418: 6   Q.   I understand. | | |
| 465:12-465:22<br><br>465:12  Q.    You'd agree with me, sir, wouldn't<br>465:13   you, that if you were wrong in your final conclusion<br>465:14  about Vioxx, and the problem was mechanism based,<br>465:15  that there could have been horrible public health<br>465:16   consequences to the folks who were taking Vioxx in<br>465:17   the general population; true?<br>465:18  A.   If we had been wrong, there would<br>465:19   have been serious consequences, yes.<br>465:20  Q.    Tens of thousands of people in the<br>465:21   general population taking Vioxx could have suffered<br>465:22   heart attacks as a result of your drug; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 466:1–466:3<br><br>466: 1      THE WITNESS:  If we had been wrong,<br>466: 2   there would have been negative consequences for<br>466: 3     public health.  We did not believe we were wrong. | | |
| 466:12–466:22<br><br>466:12        THE WITNESS:  I've read newspaper<br>466:13    reports of those.  I do not have any independent way<br>466:14   of assessing that evidence or the validity of those<br>466:15     reports.<br>466:16     BY MR. BUCHANAN:<br>466:17   Q.     Well, you've seen the FDA reports as<br>466:18     well; right?<br>466:19   A.     I've seen newspaper reports of the<br>466:20     FDA reports of incidences in trials.  I don't<br>466:21     understand the calculations made from those based on<br>466:22     the data I've seen. | | |
| 467:22–467:25<br><br>467:22        Q.     Merck has the skilled employees<br>467:23    necessary to estimate what the public health<br>467:24    consequences could be of a drug that it made that<br>467:25    caused cardiovascular side effects; true? | | |
| 468:2–468:9<br><br>468: 2     THE WITNESS:  Merck can estimate what<br>468: 3     the consequences would be if the drug were thought<br>468:4   by Merck to cause cardiovascular consequences.<br>468: 5     BY MR. BUCHANAN:<br>468: 6        Q.     And in March of 2000, no such<br>468: 7    analysis was done?<br>468: 8   A.     Correct.  Because we didn't believe<br>468: 9    the drug caused those events. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 469:15-469:18<br><br>469:15    You agree with the decision by Merck<br>469:16    not to analyze the potential public health<br>469:17    consequences to continuing to sell Vioxx in March of<br>469:18    2000? | | |
| 469:21-469:22<br><br>469:21    THE WITNESS:  Yes, I do, because we<br>469:22    believed the drug was safe. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 471:1 to 472:11)<br>471<br>1   Q.   Sir, I just passed you a document we<br>2   marked as Exhibit 19 to your deposition.<br>3            - - -<br>4            (Whereupon, Deposition Exhibit<br>5            Scolnick-19, "Vioxx Preliminary<br>6            Cardiovascular Meta-Analysis," Slide<br>7            Set, 10-18-00 (Shapiro), MRK-NJ0070364 -<br>8            MRK-NJ0070397, was marked for<br>9            identification.)<br>10           - - -<br>11   BY MR. BUCHANAN:<br>12   Q.   For the record, it's a document by<br>13   Deborah Shapiro.  Who is Deborah Shapiro?<br>14   A.   Deborah Shapiro was a statistician in<br>15   the Merck Research Laboratories.<br>16   Q.   She was the unblinded statistician in<br>17   the VIGOR trial; right?<br>18   A.   Yes, she was.<br>19   Q.   She's the statistician you contacted<br>20   to get an early look at the VIGOR data; right?<br>21   A.   To look at the data first when the<br>22   trial is completed.  That is correct.<br>23   Q.   For the record, the document is<br>24   entitled "Vioxx Preliminary Cardiovascular<br>25   Meta-Analysis," and it is Bates stamped<br>472<br>1   MRK-NJ0070364 through 397.<br>2         So, your testimony is that the<br>3   company conducted a meta-analysis preapproval?  That<br>4   was the first time; right?<br>5   A.   Yes.<br>6   Q.   In March of 2000; right?<br>7   A.   Yes.<br>8   Q.   And then again in October of 2000;<br>9   correct?<br>10   A.   As I said, I don't remember the dates<br>11   of all the other meta-analyses. | Foundation –<br>witness does not<br>recall seeing this<br>document (see<br>472:15-24) | *Sustained* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 473:22 to 474:16)<br><br>473<br>22     Q.    Okay.  I would like to direct your<br>23  attention to Page NJ0070394.<br>24     A.    (Witness reviewing document.)<br>25       Yes.<br><br>474<br>1     Q.    This is a "meta-analysis" that<br>2  describes the "Relative Risk of MIs," that's heart<br>3  attacks?<br>4     A.    Yes.<br>5     Q.    The "MI Endpoint with 95% CI."<br>6  What's "CI" mean?<br>7     A.    Confidence interval.<br>8     Q.    What does confidence interval<br>9  represent, sir?<br>10    A.    It's a term that describes the bounds<br>11  in which to analyze statistical significance.<br>12    Q.    And if the confidence interval is<br>13  greater than 1 or if the confidence -- if the<br>14  confidence interval doesn't encompass 1, it<br>15  indicates that the finding is statistically<br>16  significant; true? | Foundation – witness does not recall seeing this document (see 472:15-24) | Sustained |
| Transcript, (Page 474:19 to 474:19)<br>474<br>19      THE WITNESS:  I believe that's true. | Foundation – witness does not recall seeing this document (see 472:15-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 475:12 to 476:13)<br><br>475<br>12      At the bottom of the page it says<br>13  "Total Cohort."  Do you see that?<br>14      A.      Yes, I do.<br>15      Q.      What's a cohort?<br>16      A.      A cohort is a group of patients<br>17  that's been studied in this meta-analysis.<br>18      Q.      And then to the right it says "2.02."<br>19  Do you see that?<br>20      A.      Uh-huh.<br>21      Q.      That's the relative risk --<br>22      A.      Yes, I do, I'm sorry.<br>23      Q.      That's the relative risk of heart<br>24  attacks among all studies for NSAIDs versus Vioxx;<br>25  true?<br><br>476<br>1      A.      That is, I think, what this plots,<br>2  non-naproxen and naproxen NSAIDs.<br>3      Q.      That's right.<br>4          And the confidence interval, again,<br>5  is what, sir?<br>6      A.      The confidence inverval for 2.0?<br>7      Q.      For the 2.02.<br>8      A.      Is 1.14 to 3.55.<br>9      Q.      And the fact that the confidence<br>10  interval does not go below 1 indicates that the 2.02<br>11  relative risk is statistically significant; true?<br>12      A.      Yes.  This, I believe, aggregates<br>13  both naproxen and non-naproxen NSAIDs. | Foundation – witness does not recall seeing this document (see 472:15-24) | Sustained |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 476:18 to 477:5)<br>476<br>18    Q.    What does statistical significance<br>19  refer to, sir?<br>20    A.    That 95 times out of 100, the result<br>21  is an accurate one and not by chance.  There's only<br>22  a 5 percent chance that the result is a fluke.<br>23    Q.    Okay.<br>24          And a relative risk of 2.02 in this<br>25  total cohort indicates a doubling of the risk of<br><br>477<br>1  heart attacks among all of Merck's studies --<br>2    A.    What you --<br>3    Q.    -- comparing NSAIDs to Vioxx; true?<br>4    A.    Comparing all NSAIDs including<br>5  naproxen to Vioxx.  That's what this plots, yes. | Foundation – witness does not recall seeing this document (see 472:15-24) | |
| Transcript, (Page 477:7 to 477:18)<br>477<br>7          If you'd turn the page, sir, you see<br>8  an additional chart.  Again, "MI Endpoint," that's<br>9  heart attack endpoint; right?<br>10    A.    Yes.<br>11    Q.    It says "Rofecoxib versus NSAIDS."<br>12  Vioxx is rofecoxib; right?<br>13    A.    Yes.<br>14    Q.    And again reflects 2.02 being the<br>15  relative risk for all patients compared rofecoxib to<br>16  NSAIDs; true?<br>17    A.    To all NSAIDs.  As I've said,<br>18  naproxen and non-naproxen. | Foundation – witness does not recall seeing this document (see 472:15-24) | |
| Transcript, (Page 478:21 to 478:25)<br>478<br>21    Q.    Well, sir, would you endorse a<br>22  decision not to give an MI-only meta-analysis to the<br>23  FDA?<br>24    A.    That should be part of any<br>25  submission. | Foundation – witness does not recall seeing this document (see 472:15-24) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 480:9-480:18<br><br>480: 9  Q.     And you wouldn't endorse a decision<br>480:10  not to give unfavorable safety data to the FDA,<br>480:11     would you?<br>480:12     A.     I would endorse that all of the data<br>480:13  be submitted to the FDA.<br>480:14     Q.     Did you become aware of the results<br>480:15  of Merck's meta-analysis?<br>480:16          A.     I was shown summaries of<br>480:17  meta-analyses, yes, but I don't recall the details<br>480:18     of what was in those summaries at this point. | | |
| 481:15-482:8<br><br>481:15     Q.     Okay.  Sir, let me pass over to you<br>481:16     what we just marked as Exhibit 20 to your<br>481:17     deposition.<br>481:18               - - -<br>481:19          (Whereupon, Deposition Exhibit<br>481:20          Scolnick-20, Letter 1-8-01, with<br>481:21          attachment, "IND 46,894: VIOXX<br>481:22     (rofecoxib)" "Interim Cardiovascular<br>481:23     Meta-Analysis," MRK-NJ0267715 -<br>481:24          MRK-NJ0267777, was marked for<br>481:25          identification.)<br><br>482<br>482: 1               - - -<br>482: 2     BY MR. BUCHANAN:<br>482: 3          Q.     For the record, sir, I just passed<br>482: 4     you what we've marked as Exhibit 20 to your<br>482: 5  deposition.  It's a January 8, 2001 letter from a<br>482: 6     Robert Silverman, Senior Director of Regulatory<br>482: 7     Affairs to somebody at the FDA; is that right, sir?<br>482: 8          A.     Yes, correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 483:1-483:9<br><br>483: 1    Q.    It's a transmittal of information to<br>483: 2    the FDA?<br>483: 3    A.    Yes, it is.<br>483: 4    Q.    Transmittal of information to the FDA<br>483: 5    concerning Vioxx?<br>483: 6    A.    Yes.<br>483: 7    Q.    Transmittal of the "Interim<br>483: 8  Cardiovascular Meta-Analysis" for Vioxx; true?<br>483: 9    A.    Yes.  Yes, that's correct. | | |
| 485:17-487:4<br><br>485:17    Q.    Is there an MI meta-analysis in the<br>485:18    submission to the FDA?<br>485:19    A.    The meta-analysis done in this<br>485:20    document I do not see in this document.  I do see,<br>485:21  and it is important to point out, all of the data on<br>485:22    the four pages I cited to you.<br>485:23  Q.    And what you're trying to highlight,<br>485:24    sir, is that certain MI information was encompassed<br>485:25    within the APTC endpoint; right?<br><br>486<br>486: 1  A.    That is what I'm trying to point out,<br>486: 2    yes.<br>486: 3    Q.    But Merck did a specific analysis<br>486: 4  looking at the incidence of heart attacks across all<br>486: 5    of its trials; true?<br>486: 6    A.    That is indicated in this document,<br>486: 7  in the first document that you showed me in this<br>486: 8    discussion.<br>486: 9  Q.    That document is Exhibit 19; right?<br>486:10    A.    Yes, it is.<br>486:11    Q.    Merck did an MI meta-analysis in<br>486:12    October 2000; true?<br>486:13    A.    Yes, that's true.<br>486:14    Q.    And didn't give it to the FDA in<br>486:15    January 2001; true?<br>486:16  A.    The specific figures are not included<br>486:17  in the submission to the FDA.  The data is included.<br>486:18    Q.    Well, not only the figures, sir, the<br>486:19  MI meta-analysis is not in that submission to the<br>486:20    FDA; correct?<br>486:21    A.    That is correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 486:22  Q.      There might be some heart attack data<br>486:23    in that submission to the FDA; right?<br>486:24          A.      There is heart attack data in this<br>486:25    submission.<br><br>487<br>487: 1  Q.      But there's not an MI meta-analysis<br>487: 2    in Exhibit 20; right?<br>487: 3          A.      Not that I could find, no.  It does<br>487: 4    not -- it's not there. | | |
| 487:11-487:20<br><br>487:11      BY MR. BUCHANAN:<br>487:12              Q.      Is it your testimony that you were<br>487:13    never consulted by regulatory within Merck Research<br>487:14    Labs as to whether to give the MI meta-analysis or<br>487:15    not to give it to the FDA?<br>487:16 A.      That is my testimony.  I was never<br>487:17    consulted on that point.<br>487:18      Q.      Do you endorse the decision not to<br>487:19    give that MI meta-analysis to the FDA in January<br>487:20    2001? | | |
| 487:23-487:25<br><br>487:23    THE WITNESS:  I would have had no<br>487:24    objection to their submitting all of the<br>487:25    meta-analyses. | | |
| 489:3-489:14<br><br>489: 3          Q.      So, if your group didn't consult --<br>489: 4    if your group didn't submit this information to the<br>489: 5    FDA, they disregarded your standard operating<br>489: 6    procedure?<br>489: 7 A.      The standard operating procedure in<br>489: 8    the labs is to submit all data to the FDA.  All the<br>489: 9  data is in here.  The specific meta-analysis is not<br>489:10    included in this document.<br>489:11          Q.      You say all the data is in there,<br>489:12    sir, but there's not an MI meta-analysis in that<br>489:13    document; right?<br>489:14          A.      That is correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 490:6-490:9<br><br>490: 6   Q.     Yeah, but the one thing we can agree<br>490: 7   is, there's not an MI meta-analysis reflected in<br>490: 8     that particular document, the January 2001<br>490: 9     submission to the FDA; right? | | |
| 490:12-490:17<br><br>490:12     THE WITNESS:  There's no -- there's<br>490:13     no MI meta-analysis that I can find in the January<br>490:14     8th document.<br>490:15     BY MR. BUCHANAN:<br>490:16          Q.     And you didn't give it to the<br>490:17     Advisory Committee in February 2001 either, did you? | | |
| 490:21-491:2<br><br>490:21     THE WITNESS:  I don't recall what was<br>490:22     in the presentation.  I don't recall ever having<br>490:23  seen this first document, Exhibit 19, and I don't<br>490:24     recall ever having seen the second document which<br>490:25     was submitted.  I had an excellent group, and they<br><br>491<br>491: 1     handled the submissions to the FDA and the<br>491: 2     preparation for the Advisory Committees. | | |
| 499:18-499:25<br><br>499:18          The company ultimately published a<br>499:19     meta-analysis concerning cardiovascular events in<br>499:20     the peer-reviewed literature, didn't it?<br>499:21     A.     Yes.  I believe it did in Circulation<br>499:22     or another cardiovascular journal.<br>499:23     Q.     Fall of 2001.  Does that sound right?<br>499:24     A.     Sounds approximately right.  I don't<br>499:25     remember the date. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 500:11-500:22<br><br>500:11  Q.    Dr. Scolnick, I just passed you over<br>500:12  what we marked as Exhibit 21 to your deposition.  Is<br>500:13  this the publication of the meta-analysis you were<br>500:14  just referring to?<br>500:15  A.    I think it was the one you were just<br>500:16  referring to.  It is one of the ones I recall.  It<br>500:17  is one I recall.  I don't recall whether others were<br>500:18  published.<br>500:19  Q.    And to be clear, this is an October<br>500:20  2001 article published in the journal Circulation;<br>500:21  correct?<br>500:22    A.    Yes.  Correct. | | |
| 507:16-507:18<br><br>507:16  Q.    So, you were testing the drug in<br>507:17  Alzheimer's patients; right?<br>507:18    A.    Yes. | | |
| 509:3-509:10<br><br>509: 3  Q.    When your team was before the<br>509: 4  Advisory Committee that was convened to evaluate the<br>509: 5  safety of Vioxx in February 2001, that team cited<br>509: 6  the Alzheimer's data as data that was reassuring on<br>509: 7  the safety of the drug; true?<br>509: 8  A.    Yes. The Advisory Committee was<br>509: 9  convened to go over the gastrointestinal data, and<br>509:10  as part of that, all of the data on Vioxx. | | |
| 516:7-516:12<br><br>516: 7  Q.    Sir, I'm passing you over what we<br>516: 8  just marked as Exhibit 22 to your deposition.  For<br>516: 9  the record, it's Bates stamped MRK-ABP016650.  It<br>516:10  runs through Page 677.  It is a document entitled<br>516:11  "Vioxx AD Program."  Do you see that heading, sir?<br>516:12    A.    Yes, I do.  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 519:7-519:8<br><br>519: 7     Q.     "AD" is Alzheimer's disease?<br>519: 8     A.     Yes. | | |
| 523:2-523:11<br><br>523: 2   Q.     Now, if the company had a drug that<br>523: 3     would prevent the onset of Alzheimer's disease, that<br>523: 4     would be a significant medical discovery.  You would<br>523: 5     agree with that?<br>523: 6         A.     Yes, it would.<br>523: 7   Q.     And a significant revenue opportunity<br>523: 8     for the company; correct?<br>523: 9         A.     They would go together.  It would be<br>523:10     a magnificent discovery for medical and for<br>523:11     patients. | | |
| 529:14-529:21<br><br>529:14   Q.     Okay.  That's the APPROVe trial<br>529:15     that's being referenced there, isn't it?<br>529:16         A.     Yes, I believe so.<br>529:17   Q.     You'd agree with me, sir, that those<br>529:18     three paragraphs don't say anything about that trial<br>529:19     being conducted to test the cardiovascular safety of<br>529:20     Vioxx?<br>529:21         A.     Yes, I'd agree with that. | | |
| 530:20-531:2<br><br>530:20         Q.     Sir, the page continues and it<br>530:21   discusses the Alzheimer's disease trials; true?<br>530:22         A.     Yes.<br>530:23         Q.     Okay.<br>530:24             Merck is telling its shareholders<br>530:25   here that it is in the process of testing Vioxx in<br>531: page 531<br>531: 1     Alzheimer's patients; true?<br>531: 2         A.     Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 531:9-531:10<br><br>531: 9   saying that we're studying it.  It really doesn't<br>531:10   state whether it will or won't work.  It outlines | | |
| 531:13-531:20<br><br>531:13      Q.   Okay.<br>531:14    And just getting back now to where we<br>531:15   were, a treatment for Alzheimer's disease presented<br>531:16   a significant revenue opportunity for Merck if Vioxx<br>531:17   was able to demonstrate a reduction in the incidence<br>531:18   of Alzheimer's disease; true?<br>531:19   A.   Yes.  And as we said, an important<br>531:20   medical finding. | | |
| 538:15-538:16<br><br>538:15     Q.   Okay.  Let's take a step forward and<br>538:16   understand the death data in the Alzheimer's trials. | | |
| 539:1-539:9<br><br>539: 1      Q.   Sir, I'm passing over what we just<br>539: 2   marked as Exhibit 24 to your deposition.  It is a<br>539: 3   multi-page memo to you from a Dr. Gilbert Block.<br>539: 4      For the record, it is Bates stamped<br>539: 5   MRK-NJ0333225 to 35.  I don't know if I indicated<br>539: 6   this, but it is dated March 21st, 2001?<br>539: 7      Doctor, have you seen this before?<br>539: 8   A.   I don't recall seeing it.  It is<br>539: 9   addressed to me. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 543:8-543:18<br><br>543: 8      Q.    I think what we're looking at here,<br>543: 9   sir, right, is that 14 people died on Vioxx, 3 died<br>543:10   in placebo in this trial; true?<br>543:11      A.   Yes, that's true.<br>543:12      Q.   And 95 times out of 100, when you ran<br>543:13   this trial, you'd get the same result; right?<br>543:14      A.   That's what statistical significance<br>543:15   implies, yes.<br>543:16  Q.   So, 95 out of 100 times, if you reran<br>543:17   this trial, 14 would die on Vioxx, 3 would die on<br>543:18   placebo? | | |
| 543:24-544:6<br><br>543:24      Q.   So, in this particular trial, 11<br>543:25   people died on Vioxx more than died on placebo;<br><br>544<br>544: 1   true?<br>544: 2      A.   Yes, that's correct.<br>544: 3      Q.   Did you tell old people around the<br>544: 4  country who were taking this drug, we have this<br>544: 5   trial, 11 excess deaths were found in this trial,<br>544: 6   sir? | | |
| 544:8-544:9<br><br>544: 8   THE WITNESS:  I don't recall what<br>544: 9   information was disseminated on the trial. | | |
| 546:4-546:7<br><br>546: 4      Q.   So, the 11 patients who died<br>546: 5   unnecessarily in protocol 091 as compared to the<br>546: 6   placebo arm, died and they got no benefit from Vioxx<br>546: 7   in this trial; true? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 546:10-546:13<br><br>546:10     THE WITNESS:  There were 11 patients<br>546:11  who died in the trial more than in placebo.  The<br>546:12     aggregate group did not benefit from Vioxx based on<br>546:13     the statistical efficacy of the trial. | | |
| 551:15-552:15<br><br>551:15           Apart from the 091 trial, we also<br>551:16  know there was a second progression trial, that's<br>551:17     the 126 trial.  We established that this morning;<br>551:18     right?<br>551:19       A.    Yes.<br>551:20       Q.    Okay.<br>551:21  There was also an Alzheimer's disease<br>551:22     prevention trial; true?<br>551:23       A.    Yes.<br>551:24       Q.    Okay.<br>551:25            The folks in Merck Research Labs<br><br>552<br>552: 1    looked at the incidence of death in that trial, too,<br>552: 2    didn't they?<br>552: 3      A.    I don't recall the categories they<br>552: 4    looked at.  Death would be collected in any trial.<br>552: 5    Q.    Well, you see in the memo we were<br>552: 6    just looking at from Dr. Block, it says, "All deaths<br>552: 7    in the ongoing prevention trial...and the terminated<br>552: 8  second progression trial...will be unblinded and<br>552: 9    evaluated." Do you see that?<br>552:10      A.    Yes, I do.<br>552:11      Q.    Okay.<br>552:12          So, it's your understanding that the<br>552:13  deaths in the other trials were also looked at;<br>552:14    true?<br>552:15      A.    That's what this implies. | | |
| Transcript, (Page 553:4 to 553:5)<br>            553<br>4     Q.    Sir, I've just passed you over what<br>5  we have marked as Exhibit 25 to your deposition. | MIL #11 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 553:21 to 556:14) | MIL #11 | |

553
21      Do you agree with me, sir, that this
22  document is a combined intention to treat and
23  on-drug analysis of the death data in both protocol
24  091 and protocol 078?
25    A.    Yes, that's what the summary document

554
1  -- the summary page on the front page states, yes.
2    Q.    Okay.
3      If you'd turn to the next page, sir,
4  it identifies the mortality analysis or the death
5  analysis for the 091 and 078 trials on an
6  intent-to-treat basis.  Do you see that at the
7  bottom of the first page?
8    A.    It does it for both protocols, yes.
9    Q.    Number of deaths on Vioxx, 13.  Do
10  you see that?
11    A.    Yes.
12    Q.    Number of deaths on placebo, 3?
13    A.    Yes.  That's the trial we were
14  looking at.
15    Q.    Okay.
16      It is about what, four times as high,
17  a little more than four?
18    A.    Yes.
19    Q.    Okay. Go down to the ITT analysis
20  for protocol 078.  Do you see that below it?
21    A.    Yes.
22    Q.    Okay.
23      Number of deaths on Vioxx, 21; right?
24    A.    Yes.
25    Q.    Number of deaths on placebo, 9;

555
1  right?
2    A.    Yes.
3    Q.    And there's a rate next to each of
4  those numbers; right?
5    A.    There is.
6    Q.    And the rate for Vioxx is what, a
7  little under two-and-a-half times greater than the
8  rate for placebo?
9    A.    Yes.
10    Q.    And what that means is that

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 11  two-and-a-half times as many people died taking<br>12  Vioxx in the 078 trial as of this point in time as<br>13  compared to placebo; true?<br>14      A.    Yes.<br>15      Q.    Okay.<br>16            If you'd turn to Page 755, internal<br>17  numbering, 4, Bates number, 755.<br>18      A.    Just a moment, please.<br>19      Q.    Feel free.<br>20      A.    (Witness reviewing document.)<br>21            Okay.  Thank you.<br>22            Where do you want me to turn, 755?<br>23      Q.    I'm sorry.  756.<br>24      A.    Excuse me, I want to look at one<br>25  other thing.<br><br>                          556<br>1      Q.    There's calculations of something<br>2  called a "hazard ratio."  Do you see that?<br>3      A.    Just a moment.<br>4            (Witness reviewing document.)<br>5            On 756.  756?<br>6      Q.    Yeah.  There's a paragraph in between<br>7  the charts.  It says, "From the mortality frequency<br>8  and incident rate charts for protocol 091."  Do you<br>9  see that?<br>10     A.    Yes, yes.<br>11     Q.    And there's a hazard ratio<br>12  calculation in the last sentence for the 091 trial.<br>13  Do you see that?<br>14     A.    Yes, I do. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 557:7 to 558:2)<br>557<br>7        4.43 would be the relative increased<br>8  risk of death on Vioxx compared to placebo; true?<br>9      A.    The relative increase in risk, yes.<br>10    Q.    Okay.<br>11        So, folks on Vioxx in the 091 trial<br>12  were 4.4 times more likely to die compared to those<br>13  on placebo; true?<br>14    A.    It's a hazard ratio.  I think that's<br>15  true.<br>16    Q.    Okay.<br>17        If you'd turn the page, sir, you look<br>18  at the results for the 078 trial, paragraph<br>19  beginning, "From the mortality frequency and<br>20  incident rate charts for protocol 078."  Do you see<br>21  that?<br>22    A.    Yes.<br>23    Q.    Then it says at the end, "After<br>24  adjusting for Age and Gender, the hazard ratio<br>25  between" Vioxx "and placebo was 2.55."  Do you see<br><br>558<br>1  that sentence?<br>2    A.    Yes. | MIL #11 | |
| Transcript, (Page 558:9 to 558:22)<br>558<br>9    Q.    That indicates that folks on Vioxx<br>10  were 2.55 times more likely to die than patients on<br>11  placebo; true?<br>12    A.    Yes.<br>13    Q.    Okay.  So, let me understand, sir.<br>14  As of this point in time, April 8, 2001, the company<br>15  has two independent placebo-controlled trials<br>16  demonstrating a statistically significant increase<br>17  in the risk of death; true?<br>18    A.    Yes.<br>19    Q.    Okay.  In the one trial, 091, there<br>20  was a four times greater risk of death on Vioxx<br>21  compared to placebo; true?<br>22    A.    Yes. | MIL #11 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 560:25 to 561:13)<br>560<br>25      Well, you'd agree that mortality data<br><br>561<br>1  is important; right?<br>2     A.   Yes, it is.<br>3     Q.   That's the kind of data that a<br>4  physician should know; right?<br>5     A.   Yes, they should.<br>6     Q.   Any doubt in your mind that<br>7  physicians would like to know whether your drug,<br>8  Merck's drug, increased the risk of death?<br>9     A.   It's data that should have -- a<br>10  physician should know.<br>11     Q.   Any doubt that the FDA would have<br>12  wanted to know right after you knew this that Vioxx<br>13  increased the risk of death? | MIL #11 | |
| Transcript, (Page 561:18 to 561:20)<br>561<br>18      THE WITNESS: I don't know when -- I<br>19  don't know that this data was not submitted to the<br>20  FDA. I don't know what was done with this data. | MIL #11 | |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>▮▮▮  ▮▮▮▮▮▮▮ | | |
| Transcript, (Page 562:21 to 562:25)<br>562<br>21      The conclusions that were reached<br>22  within Merck concerning the statistically<br>23  significant increased risk of death should have been<br>24  shared with FDA no later than 15 days after this<br>25  analysis; right? | MIL #11 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Page 563:2 to 563:13)<br>563<br>2    THE WITNESS:  That's the usual<br>3  reporting time for data like this.<br>4  BY MR. BUCHANAN:<br>5    Q.    Did Merck send out a "Dear Doctor"<br>6  letter telling physicians around the country that<br>7  we've got these two trials, and we've got a<br>8  statistically significant increased risk of death?<br>9    A.    I don't recall them sending out a<br>10  "Dear Doctor" letter, no.<br>11    Q.    Did Merck issue a press release<br>12  telling doctors the same information?<br>13    A.    I don't recall a press release. | MIL #11 | |
| Transcript, (Pages 563:16 to 564:2)<br>563<br>16    Did Merck publish a letter in the New<br>17  England Journal of Medicine telling physicians about<br>18  the findings from these two trials?<br>19    A.    I don't recall such a letter.<br>20    Q.    Publish a letter anywhere in the<br>21  medical literature to get word out promptly that old<br>22  people are at a substantially increased risk of<br>23  death on the drug?<br>24    A.    I don't recall a letter being written<br>25  about these trials in the way you're asking the<br><br>564<br>1  question.<br>2    Q.    This was all on your watch; right? | MIL #11 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 564:4 to 565:4)<br>564<br>4       THE WITNESS:  This occurred while I<br>5  was president of research, yes.<br>6  BY MR. BUCHANAN:<br>7       Q.     Right.  And the responsibility for<br>8  communicating the scientific messages learned from<br>9  clinical trials in Merck Research Labs was<br>10  ultimately yours; true?<br>11      A.     Yes.  I was not shown this data.<br>12      Q.     Is that your position now, you were<br>13  not shown this data?<br>14      A.     I don't recall having seen this data.<br>15      Q.     Are you disavowing you had any<br>16  knowledge of the statistically significant increased<br>17  risk in death in the 078 and 091 trials in April of<br>18  2001?<br>19      A.     I don't recall anything about 078.<br>20  What I've told you I recall about 091 is what I've<br>21  said, that there was an imbalance of events and that<br>22  they weren't due to cardiovascular -- an excess of<br>23  cardiovascular events.  That is all I recall about<br>24  the Alzheimer's data.<br>25      Q.     Well, the one thing we do know and<br><br>565<br>1  you know now looking at this memo is that there were<br>2  statistically significant increased numbers of<br>3  deaths on Vioxx compared to placebo as of April<br>4  2001; true? | MIL #11 | |
| Transcript, (Page 565:6 to 565:10)<br>565<br>6       THE WITNESS:  The analyses that are<br>7  here indicate that, yes.<br>8  BY MR. BUCHANAN:<br>9       Q.     And you don't think that was due to<br>10  chance? | MIL #11 | |
| Transcript, (Page 565:15 to 565:17)<br>565<br>15      A.     It was statistically significant.<br>16      Q.     And you don't think that was due to<br>17  chance? | MIL #11 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Page 565:19 to 565:20)<br>565<br>19        THE WITNESS:  Therefore, it was not<br>20   likely due to chance. | MIL #11 | |
| 566:12-566:21<br><br>566:12     Q.     Sir, I'm passing you over what we<br>566:13     just marked as Exhibit 26 to your deposition.  It's<br>566:14   an e-mail, a series of e-mails beginning with an<br>566:15     e-mail to you from Dr. Gilbert Block.  Do you see<br>566:16     that?<br>566:17   A.     Where are we?  We are starting at the<br>566:18     bottom?<br>566:19   Q.     Starting at the bottom.  That would<br>566:20     be the earliest in time e-mail; correct?<br>566:21        A.     Yes. | | |
| 568:6-568:9<br><br>568: 6     Q.     And you wrote, "Doug, When I read<br>568: 7     this note about 30 minutes ago I tried to call you<br>568: 8     at home."  Do you see that?<br>568: 9        A.     I do. | | |
| 568:18-568:22<br><br>568:18   Q.     You were upset that Dr. Block shared<br>568:19     this information before a committee meeting before<br>568:20     he shared it with you; isn't that right?<br>568:21        A.     I don't remember what I was upset<br>568:22     about. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 569:12-570:7<br><br>569:12         You then get a response from Dr.<br>569:13   Greene; right?<br>569:14      A.    Yes.<br>569:15       Q.    He notes in the middle of his<br>569:16   response that you're going to be before the FDA on<br>569:17   April 11th to discuss labeling issues; right?<br>569:18      A.    Yes.<br>569:19    Q.    He then notes, "I expect that we will<br>569:20   need to inform them of this in some way since we<br>569:21   have included the CV events from the AD trials." Do<br>569:22   you see that?<br>569:23      A.    Yes.<br>569:24 Q.    CV events are cardiovascular events?<br>569:25      A.    Yes.<br>570: page 570<br>570: 1    Q.    And the AD trials, that's Alzheimer's<br>570: 2   disease again; right?<br>570: 3      A.    Yes.<br>570: 4   Q.    And what he's saying is, you're going<br>570: 5   to have to talk to the FDA about the mortality data;<br>570: 6   right?<br>570: 7      A.    He says cardiovascular events, yes. | | |
| 571:23-572:3<br><br>571:23         Well, sir, is it your testimony that<br>571:24   the folks in regulatory who went down to talk to the<br>571:25   FDA on April 11th about labeling issues would not<br>572: page 572<br>572: 1   have checked with you before going to determine what<br>572: 2   message should be communicated about Alzheimer's<br>572: 3   data? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 572:6-572:19<br><br>572: 6     THE WITNESS:  Yes.  They wouldn't<br>572: 7   necessarily have discussed with me the details of<br>572: 8   what they talked to with FDA.<br>572: 9   BY MR. BUCHANAN:<br>572:10   Q.     So, if the folks from Merck who went<br>572:11   down and talked to FDA on labeling issues on April<br>572:12   11th didn't disclose any of the mortality data, that<br>572:13   was their decision and not yours?  That's what<br>572:14   you're saying?<br>572:15        A.     I don't know what they disclosed, but<br>572:16   I did not give them any instructions, to the best of<br>572:17   my recollection, on what to disclose or not to<br>572:18   disclose to the FDA.  And I think most of the<br>572:19   content of this e-mail indicates that. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 573:4-574:7<br><br>573: 4   Q.    Sir, I'm going to pass you over what<br>573: 5     we're marking as Exhibit 27 to your deposition.  For<br>573: 6     the record, it's a document titled, "FDA - MRL<br>573: 7 Meeting."  "MRL," that's Merck Research Labs?<br>573: 8          A.    Yes.<br>573: 9          Q.    Okay.<br>573:10     Then it's got an NDA number.  That's<br>573:11    the NDA number for VIGOR?<br>573:12          A.    That's what it seems to indicate.<br>573:13          Q.    Okay.<br>573:14              April 11, 2001.  Do you see that?<br>573:15          A.    Yes, I do.<br>573:16          Q.    That's the date Doug Greene was<br>573:17 stating that you were going to be -- excuse me,<br>573:18    Merck was going to be before the FDA to discuss<br>573:19    labeling issues; right?<br>573:20          A.    Yes.<br>573:21  Q.    Take a quick look at the document,<br>573:22    sir.  Do you see any reference to two trials<br>573:23    demonstrating statistically increased<br>573:24    rates of death in the report of this particular<br>573:25    meeting?<br>574: page 574<br>574: 1          A.    (Witness reviewing document.)<br>574: 2    I don't see a comment about that in<br>574: 3    this summary.<br>574: 4          Q.    So, folks from Merck Research Labs<br>574: 5    and the regulatory group within Merck went down to<br>574: 6    the FDA on April 11, 2001 to talk about labeling for<br>574: 7    Vioxx; true? | | |
| 574:10 - 574:12<br>    574:10     THE WITNESS:  There was a meeting on<br>574:11    labeling of Vioxx on April 11th, yes.<br>574:12    BY MR. BUCHANAN: | | |
| Transcript, (Page 574:13 to 574:15)<br>574<br>13     Q.    That was the meeting where Doug<br>14    Greene suggested we should report this Alzheimer's<br>15    death data from the 091 trial; right? | Speculation | Sustained |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Page 574:18 to 574:23)<br>574<br>18      THE WITNESS:  I haven't had a chance<br>19  to read his e-mail to me, so, he says in the e-mail,<br>20  "I expect that we will need to inform them of this<br>21  in some way since we have included the CV events<br>22  from the AD trials."  Yes, I think he is suggesting<br>23  that. | Speculation | *Sustained* |
| 574:24 -  575: 2<br>574:24  BY MR. BUCHANAN:<br>574:25      Q.    Well, did you tell him not to do<br><br>575<br>575: 1    that?<br>575: 2      A.    Absolutely not. | | |
| 575:11-575:15<br><br>575:11    BY MR. BUCHANAN:<br>575:12    Q.   Do you endorse the decision not to<br>575:13  disclose two trials that have statistically<br>575:14  significant doubling in the rates of death to the<br>575:15    FDA? | | |
| 575:20-575:21<br><br>575:20    THE WITNESS:  I do not endorse that<br>575:21    decision, if that's what was done. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 595:1-595:14<br><br>595: 1          Q.     Dr. Scolnick, we're going to shift<br>595: 2    gears a little bit.  I want to talk about your role<br>595: 3    in the marketing of Vioxx.  Okay?<br>595: 4          A.     Uh-huh.<br>595: 5     Q.     You did have a role in the marketing<br>595: 6    of Vioxx; correct, sir?<br>595: 7          A.     Not a direct role, no.<br>595: 8     Q.     You assisted the marketing function<br>595: 9    within Merck in connection with the marketing of<br>595:10    Vioxx; true?<br>595:11          A.      Only in the initial data discussions<br>595:12    with marketing about what the data was in the file.<br>595:13    I did not prepare marketing information or approve<br>595:14    it or see it before it was used. | | |
| 596:14-597:12<br><br>596:14          Well, the document I just passed you<br>596:15    and we marked as Exhibit 30 to your deposition is a<br>596:16    memo from Wendy Dixon to you dated May 8th, 2000;<br>596:17    right?<br>596:18          A.     Yes.<br>596:19     Q.     Bates stamped MRK-ABI0002126 to 2128.<br>596:20    I take it you've seen this before, sir?<br>596:21    A.     I don't remember.  Perhaps.  I don't<br>596:22    specifically recall it.<br>596:23     Q.     Well, sir, do you have any reason to<br>596:24    doubt that you received the memo from Wendy Dixon<br>596:25    from May of 2000 that was sent to your attention and<br><br>597<br>597: 1    your attention alone?<br>597: 2          A.     No, I don't have any reason to doubt<br>597: 3    it, but I don't recall at the moment, except I'm<br>597: 4    reading it now.<br>597: 5          Q.     The subject line of this particular<br>597: 6    memo is, "Renal and Cardiovascular Issues for<br>597: 7    VIOXX." True?<br>597: 8    A.     Yes.<br>597: 9     Q.     Okay.<br>597:10    In fact, Wendy Dixon was in charge of<br>597:11    the marketing effort for Vioxx; true?<br>597:12          A.     Yes, I believe that's true. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 598:2-598:10<br><br>598: 2     Q.    Well, if you'd turn to the last page<br>598: 3   of the document, sir, it's Bates stamped ABI<br>598: 4   0002128.  Do you see the paragraph beginning, "David<br>598: 5   mentioned"?<br>598: 6     A.    Last page?  Oh, yes, I do.<br>598: 7 Q.   In fact, you offered to Mr. Anstice<br>598: 8   to assist in developing responses to the competitive<br>598: 9   messages that were out on the market concerning<br>598:10   Vioxx and Celebrex; true? | | |
| 598:12-598:13<br><br>598:12   THE WITNESS:  That's what the memo<br>598:13   says, yes. | | |
| 599:10-599:24<br><br>599:10     In particular, you were going to<br>599:11   assist in responding to the cardiovascular issues<br>599:12   being addressed by Pfizer as it related to Vioxx;<br>599:13   true?<br>599:14     A.    That's what she requests at the<br>599:15   beginning of the first page of the memo.<br>599:16    Q.   If you'd look at the third numbered<br>599:17 paragraph on Page 2 -- well, let me take a step<br>599:18   back.<br>599:19     This document is describing in<br>599:20   particular the steps that are being taken by Wendy<br>599:21   Dixon on behalf of the marketing department of Merck<br>599:22 to respond to the competitive challenges that are<br>599:23   being raised by Pfizer against Vioxx; true?<br>599:24     A.    That's what it appears to be. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 600:18 to 601:18)<br><br>600<br>18    So, she's telling you what materials<br>19  the sales force has to respond to the cardiovascular<br>20  issues concerning Vioxx; right?<br>21    A.    Yes.<br>22    Q.    The third item there is "A<br>23  cardiovascular card to handle the thromboembolic<br>24  events issue."  Do you see that?<br>25    A.    Yes, I do.<br><br><br>601<br>1    Q.    It says, "It compares cardiovascular<br>2  thromboembolic AEs for VIOXX comparator NSAIDs...and<br>3  placebo."  Do you see that?<br>4    A.    Yes.<br>5    Q.    And then a bunch of the NSAIDs that<br>6  are compared across the nine osteoarthritis trials<br>7  are referenced there; right?<br>8    A.    Correct.<br>9    Q.    You've seen that cardiovascular card,<br>10 haven't you?<br>11    A.    I don't recall it.<br>12    Q.    Okay.  Well, the next paragraph says,<br>13 "Copies of the renal card, cardiovascular card, and<br>14 the Rossat paper are attached."  Do you see that?<br>15    A.    I do.  I still don't recall.<br>16    Q.    Any reason to doubt that Ms. Dixon<br>17 was telling the truth when she said she was giving<br>18 you these things for your review? | 401; 402 – no evidence cardiovascular card was used with State of Louisiana (DHH), P&T Committee members and Louisiana DUR | *Overruled* |
| Transcript, (Page 601:20 to 601:25)<br>601<br>20      THE WITNESS:  She was giving them to<br>21 me.  I don't think I was given them for review.  I<br>22 think she says in the paragraph that the<br>23 representatives already have this information.  I<br>24 don't recall these cards, and I don't recall<br>25 discussing the cards with her at all. | 401; 402 – no evidence cardiovascular card was used with State of Louisiana (DHH), P&T Committee members and Louisiana DUR | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Page 632:16 to 632:20)<br><br>632<br>16    Q.   Mortality information, total<br>17  mortality information is important information that<br>18  should have been included in the CV card that was<br>19  used by sales representatives to respond to<br>20  physician inquiries concerning the drug; true? | 401; 402 – no evidence cardiovascular card was used with State of Louisiana (DHH), P&T Committee members and Louisiana DUR; foundation; lack of personal knowledge (see 602:20-603:5) | |
| Transcript, (Pages 632:22 to 633:5)<br><br>632<br>22      THE WITNESS: I think a CV card<br>23  should have contained all cardiovascular-related<br>24  information from the variety of data sources Merck<br>25  has, and --<br><br>633<br>1  BY MR. BUCHANAN:<br>2    Q.   Would --<br>3    A.   -- if there was mortality data<br>4  associated with those trials, each of the trials and<br>5  what the data was in each of the trials. | 401; 402 – no evidence cardiovascular card was used with State of Louisiana (DHH), P&T Committee members and Louisiana DUR; foundation; lack of personal knowledge (see 602:20-603:5) | |
| 699:25-700:9<br><br>699:25    Q.   Okay.  I want to start with you a<br>700: page 700<br>700: 1   section on the labeling of the drug and the<br>700: 2  progression of the labels of the drug.  You were<br>700: 3  intimately involved in that process; correct, sir?<br>700: 4    A.   I certainly knew what was going on,<br>700: 5  yes.<br>700: 6    Q.   When the drug was first brought on<br>700: 7  the market, it had a standard NSAID GI warning;<br>700: 8  correct?<br>700: 9    A.   I believe that's correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Pages 702:21 to 703:9)<br>702<br>21       Now, here we have a label which<br>22  appears to me anyway to be Merck's proposal to the<br>23  FDA post-VIGOR.  Am I correct that that's what this<br>24  document represents, Exhibit 39, sir?<br>25      A.    What's the date of this?<br><br>703<br>1    Q.    It says, "Original Label Submission."<br>2  I'm working with documents that were produced by<br>3  Merck, so, I can tell you Bates Numbers and I can<br>4  tell you what it says, and it says "Original Label<br>5  Submission for VIGOR."<br>6     A.    Well, if that's what it says, I<br>7  assume it is the original submission for VIGOR.  The<br>8  VIGOR study is referenced in this label, so, that's<br>9  probably what it is. | 401; 402 – P&T Committee voted on Vioxx for PDL post April 2002 VIGOR label<br>(see MIL #5) | |
| 702:21-703:9<br><br>702:21       Now, here we have a label which<br>702:22   appears to me anyway to be Merck's proposal to the<br>702:23   FDA post-VIGOR.  Am I correct that that's what this<br>702:24   document represents, Exhibit 39, sir?<br>702:25     A.    What's the date of this?<br><br>703<br>703: 1   Q.    It says, "Original Label Submission."<br>703: 2   I'm working with documents that were produced by<br>703: 3   Merck, so, I can tell you Bates Numbers and I can<br>703: 4  tell you what it says, and it says "Original Label<br>703: 5   Submission for VIGOR."<br>703: 6     A.    Well, if that's what it says, I<br>703: 7  assume it is the original submission for VIGOR.  The<br>703: 8   VIGOR study is referenced in this label, so, that's<br>703: 9   probably what it is. | | |
| Transcript, (Pages 703:22 to 704:1)<br>703<br>22       There's no cardiovascular warning<br>23  that's given on the drug relative to risks of<br>24  cardiovascular events or increase of risk of<br>25  cardiovascular events as was proven in the VIGOR<br><br>704<br>1  study; correct, sir? | 401; 402 – P&T Committee voted on Vioxx for PDL post April 2002 VIGOR label<br>(see MIL #5) | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| Transcript, (Page 704:6 to 704:9)<br><br>704<br>6      THE WITNESS:  The VIGOR study, as I<br>7  told you, we did not believe indicated Vioxx<br>8  increased CV events and, therefore, there was no<br>9  warning in this label.  That is correct. | 401; 402 – P&T Committee voted on Vioxx for PDL post April 2002 VIGOR label<br>(see MIL #5) | |
| Transcript, (Page 704:17 to 704:18)<br><br>704<br>17     Q.    When the FDA got this proposal, was<br>18  that their view of the data? | 401; 402 – Testimony re:  pre-2002 labeling negotiations are irrelevant as COX-2s were considered for PDL post-VIGOR label<br>(see MIL #5) | |
| Transcript, (Pages 704:25 to 705:13)<br><br>704<br>25     THE WITNESS:  The data was presented<br><br>705<br>1  in an Advisory Committee.  That was their view of<br>2  the data.  It was Merck's view of the data.  And the<br>3  FDA chose, I think in their first resubmission to<br>4  us, to take a different interpretation, yes.<br>5  BY MR. KLINE:<br>6     Q.    They did.<br>7        Did they suggest that there be a<br>8  warning on the drug, sir, based on the VIGOR data?<br>9     A.    Yes, they did.<br>10    Q.    And did Merck say, certainly we're<br>11  interested in public safety, and a warning would be<br>12  a good idea on a drug where there might be a<br>13  problem?  Is that what Merck said, sir? | 401; 402 – Testimony re:  pre-2002 labeling negotiations are irrelevant as COX-2s were considered for PDL post-VIGOR label<br>(see MIL #5) | |
| Transcript, (Page 705:16 to 705:19)<br><br>705<br>16     THE WITNESS:  Merck did not believe<br>17  there was a cardiovascular risk associated with<br>18  Vioxx, and as this warning indicates, there is<br>19  cardiovascular risk, we objected to that label. | 401; 402 – Testimony re:  pre-2002 labeling negotiations are irrelevant as COX-2s were considered for PDL post-VIGOR label<br>(see MIL #5) | |
| | **6/1/05 Deposition None** | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ES6105 - Vol. I, (Page 767:13 to 767:24)<br>767<br>13     Q.    Well, do you know, I can only ask you<br>14  what you know today, do you know of any label change<br>15  that was made between March of 2000 and April of<br>16  2002 reporting the VIGOR results in a label to the<br>17  prescribing physicians of this country and around<br>18  the world?<br>19     A.    No, I do not.<br>20     Q.    So, prescribing physicians who were<br>21  going by the label of your drug between March of<br>22  2000 and April of 2002, they're just looking at the<br>23  label, they wouldn't know anything about the VIGOR<br>24  results; correct? | 401; 402 – Testimony re: pre-2002 labeling negotiations are irrelevant as COX-2s were considered for PDL post-VIGOR label<br>(see MIL #5) | |
| ES6105 - Vol. I, (Page 768:2 to 768:5)<br>768<br>2     THE WITNESS:  If they were looking<br>3  only at the label?<br>4  BY MR. KLINE:<br>5     Q.    Yes. | 401; 402 – Testimony re: pre-2002 labeling negotiations are irrelevant as COX-2s were considered for PDL post-VIGOR label<br>(see MIL #5) | |
| ES6105 - Vol. I, (Page 768:7 to 768:14)<br>768<br>7     THE WITNESS:  I don't know what they<br>8  would be thinking.  The label was not changed on<br>9  VIGOR until, as you pointed out, April 2002.<br>10  BY MR. KLINE:<br>11     Q.    There is an obligation by a<br>12  responsible pharmaceutical company to keep the label<br>13  both clear and accurate and to timely update it;<br>14  correct? | 401; 402 – Testimony re: pre-2002 labeling negotiations are irrelevant as COX-2s were considered for PDL post-VIGOR label<br>(see MIL #5) | |
| ES6105 - Vol. I, (Page 768:16 to 768:16)<br>768<br>16     THE WITNESS:  Yes. | 401; 402 – Testimony re: pre-2002 labeling negotiations are irrelevant as COX-2s were considered for PDL post-VIGOR label<br>(see MIL #5) | |
| | **8/16/05 Deposition** | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 819:21-820:1<br><br>819:21    Q.    Good morning, Dr. Scolnick.  Would<br>819:22  you please tell us your full name?<br>819:23        A.    Edward M. Scolnick.<br>819:24        Q.    Dr. Scolnick, are you currently<br>819:25  employed by Merck?<br><br>820<br>820: 1      A.    No, I am not. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 820:5-822:9<br><br>820: 5   Q.     Why are you no longer employed by<br>820: 6   Merck?<br>820: 7     A.     I retired from Merck September 1st,<br>820: 8   2004.<br>820: 9       Q.      Can you tell us the reasons that you<br>820:10   retired from Merck in September of 2004?<br>820:11       A.     Yes.  I retired to pursue other<br>820:12   interests that I've developed in the field of severe<br>820:13   mental illness, specifically schizophrenia and<br>820:14   bipolar disorder.<br>820:15       Q.      Where are you pursuing those<br>820:16   interests right now?<br>820:17       A.     I'm pursuing interests at a<br>820:18   newly-formed genome institute called the Broad<br>820:19   Institute at MIT and Harvard, in the Harvard medical<br>820:20   hospitals.<br>820:21       Q.      What prompted your interest in this<br>820:22   field?<br>820:23     A.      My interests have been prompted by<br>820:24   unfortunate illnesses in some family members, and<br>820:25   because of that, interactions that I've had in<br><br>821<br>821: 1   service organizations that help families with family<br>821: 2   members beset by either of these two illnesses.<br>821: 3       Q.      Dr. Scolnick, can you just describe<br>821: 4   for us generally the type of work you're currently<br>821: 5   doing in this project?<br>821: 6       A.      Yes.  We have organized a new<br>821: 7   initiative in this field to try to find the genetic<br>821: 8   basis for these illnesses.  It is well known for<br>821: 9   many years that there's a heavy genetic basis for<br>821:10   both schizophrenia and bipolar disorder.  The genes<br>821:11   have not been found in this institute, which is<br>821:12   world class in genetics, is interested in the | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 821:13  problem, and I thought it was a wonderful<br>821:14  opportunity to try to really make a difference in<br>821:15  this field.<br>821:16      Q.      Dr. Scolnick, are you married?<br>821:17      A.      Yes, I am.<br>821:18      Q.      How long have you been married?<br>821:19      A.      Since 1965.  41 years.<br>821:20      Q.      Do you have children?<br>821:21      A.      Yes, three.<br>821:22      Q.      Any grandchildren?<br>821:23      A.      One.<br>821:24      Q.      Granddaughter or grandson?<br>821:25      A.      Granddaughter, recent vintage, about<br><br>822<br>822: 1  six months old.<br>822: 2      Q.      Where do you currently live?<br>822: 3      A.      We live in Wayland, Massachusetts.<br>822: 4      Q.      Dr. Scolnick, would you please tell<br>822: 5  us over what time period you were employed by Merck?<br>822: 6      A.      Yes.  I started working at Merck in<br>822: 7  July 1982, and retired in September 1st, 2004.<br>822: 8  Q.      What was your role in the development<br>822: 9  of the drug Vioxx? |  |  |
| 822:12-822:20<br><br>822:12      THE WITNESS:  During the development<br>822:13  of Vioxx, I was president of the research<br>822:14  laboratories and had the basic research group and<br>822:15  clinical groups, therefore, reporting to me, who<br>822:16  initiated and carried out the project.<br>822:17  BY MR. RABER:<br>822:18      Q.      What were your general duties and<br>822:19  responsibilities as the president of the Merck<br>822:20  Research Lab? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 822:23-823:4<br><br>822:23　　　　THE WITNESS:  My general<br>822:24   responsibilities were to oversee the quality of the<br>822:25   science and clinical science and basic science that<br><br>823<br>823: 1   was conducted by members of the laboratories.<br>823: 2   BY MR. RABER:<br>823: 3   Q.　　During what period of time were you<br>823: 4   the president of the Merck Research Lab? | | |
| 823:7-823:9<br><br>823: 7　　THE WITNESS:  I was president of the<br>823: 8   laboratories from, it's either from late April or<br>823: 9   early May 1985 through January 1st, 2003. | | |
| ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉<br>▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉<br>▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉<br>▉▉▉▉▉▉▉▉▉▉<br>▉▉▉▉▉▉▉▉▉▉▉▉▉▉ | | |
| 823:15-823:17<br><br>823:15　　　Q.　　Can you tell us generally the<br>823:16   backgrounds of the people who worked at MRL, Merck<br>823:17   Research Labs, while you were president? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 823:19-824:9<br><br>823:19      THE WITNESS:  We had people of<br>823:20  varying scientific backgrounds, many people with<br>823:21  medical degrees, training in various aspects of<br>823:22  cellular and biochemical science, physiology,<br>823:23  toxicology, drug metabolism, clinical research,<br>823:24  statistics, a whole variety of disciplines.<br>823:25  BY MR. RABER:<br><br>824<br>824: 1   Q.     About how many doctors and scientists<br>824: 2  worked within the Merck Research Labs division?<br>824: 3      A.     At the time I retired, the total<br>824: 4  number of persons in the laboratory and science were<br>824: 5  close to 10,000.  I think it was around 3,000 when I<br>824: 6  started.<br>824: 7      Q.     What type of research is done at<br>824: 8  Merck Research Labs and was done while you were<br>824: 9  president of the division? | | |
| 824:11-825:4<br><br>824:11      THE WITNESS:  Most of the research<br>824:12  was focused on finding new treatments or new<br>824:13  preventions for serious medical illnesses that<br>824:14  really had poor treatments or no treatments.  That<br>824:15  was the clear mantra of the laboratory.<br>824:16  BY MR. RABER:<br>824:17   Q.     Are there different types of research<br>824:18  that are done in a research lab like MRL?<br>824:19      A.     Yes.  There's very basic research,<br>824:20  which is sometimes described as discovery research.<br>824:21  There's chemistry that goes on associated with that.<br>824:22  There's also so-called development research, which<br>824:23  is the testing for safety and then clinical safety<br>824:24  and efficacy of the compounds or vaccines that are<br>824:25  brought into development as potential new treatments<br>825: 00825<br>825: 1  or preventions.<br>825: 2   Q.     When you mentioned clinical efficacy,<br>825: 3  is that another way to say that a drug works the way<br>825: 4  it's supposed to work or intended to work? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 825:6-825:12<br><br>825: 6      THE WITNESS:  Clinical efficacy is --<br>825: 7  it means the testing in people to see whether the<br>825: 8  drug works or does not work as you think it's going<br>825: 9  to, or sometimes it works even better than you think<br>825:10 it is going to or not quite as well as you think it<br>825:11  is going to.  It is trying to gather the clinical<br>825:12  data to see what a drug does in patients. | | |
| 826:3-826:6<br><br>826: 3      Q.     During your time as the president of<br>826: 4  Merck Research Labs, was there ever a time where you<br>826: 5  did not have enough money or resources to do<br>826: 6  development research for safety and efficacy? | | |
| 826:9-826:12<br><br>826: 9  THE WITNESS:  No.  We always had<br>826:10  sufficient resources to do anything clinical in<br>826:11  development with a drug to prove its efficacy and<br>826:12  safety. | | |
| ████████████████████<br>██████████████████<br>██████████████████████<br>███████████████████<br>██████████ | [401,402,403] | _signature_ |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| | [401,402,403] | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | [401,402,403] | |
| 829:1-829:6<br><br>829: 1    Q.    About how many new drugs were<br>829: 2  developed during the time that you were the<br>829: 3  president of Merck Research Labs?<br>829: 4  A.    The numbers range from somewhere in<br>829: 5  the range of 25 to 29, adding vaccines, drugs and<br>829: 6  new combination treatments. | | |
| ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 830:21-831:16<br><br>830:21    Q.    I want to change the subject very<br>830:22  briefly here.<br>830:23           Dr. Scolnick, is there a division at<br>830:24  Merck that is responsible for the sales and<br>830:25  marketing of Merck's drugs?<br><br>831<br>831: 1    A.    Yes, there are marketing divisions at<br>831: 2  Merck responsible for the sales of Merck's drugs.<br>831: 3    Q.    As president of the Merck Research<br>831: 4  Labs, were you a part of that division?<br>831: 5    A.    No, I was not a part of that<br>831: 6  division.<br>831: 7    Q.    In what area is your field of medical<br>831: 8  expertise?<br>831: 9    A.    My original training was in internal<br>831:10  medicine.  I subsequently was trained in<br>831:11  biochemistry and genetics, and then extensive<br>831:12  training in cancer research and virus research.<br>831:13     After coming to Merck, learned many<br>831:14  new fields, pharmacology, some aspects of clinical<br>831:15  research and the variety of disciplines that it<br>831:16  takes to develop -- discover and develop a drug. | | |
| 831:20-832:6<br><br>831:20    Q.    Where did you go to college and where<br>831:21  did you go to medical school?<br>831:22    A.    Went to Harvard College and Harvard<br>831:23  Medical School between 1957 and 1965.<br>831:24    Q.    Why did you decide that you wanted to<br>831:25  go to medical school?<br>832: 00832<br>832: 1    A.    I decided in my college life that I<br>832: 2  wanted to do something that was important, that<br>832: 3  would help people, was interested in science, and I<br>832: 4  thought I could better satisfy my desires by going<br>832: 5  to medical school than in going into pure basic<br>832: 6  research. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 832:20-833:13<br><br>832:20    Q.    Let's talk a little bit about what<br>832:21  you did after you graduated from medical school at<br>832:22  Harvard.  What did you do next?<br>832:23    A.    After I graduated from medical school<br>832:24  at Harvard, I was two years of internal medicine<br>832:25  training at the Mass General internship and a first<br>833: 00833<br>833: 1  year residency at the Mass General Hospital.<br>833: 2    Q.    Tell us what you did in general<br>833: 3  during the time you were an intern and a resident.<br>833: 4    A.    Responsibilities were to take care of<br>833: 5  any sick patient who came in the doors through the<br>833: 6  Mass General Hospital.  The hospital was open to any<br>833: 7  patient, indigent or ability to pay.  The hospital<br>833: 8  staff and the trainees, as I was, were proud of the<br>833: 9  fact that we could take care of absolutely anybody<br>833:10  who walked in the door without asking any questions,<br>833:11  and it was just a wonderful place to train and learn<br>833:12  medicine and how to take care of really sick<br>833:13  patients. |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 833:17-834:11<br><br>833:17    Q.    When you finished your internship and<br>833:18  residency at Massachusetts General, what did you do<br>833:19  next?<br>833:20  A.    We moved to Maryland, I joined the<br>833:21  National Institutes of Health, in specific, the<br>833:22  National Heart, Lung and Blood Institute, where I<br>833:23  did basic genetics research for about two or three<br>833:24  years.<br>833:25    Q.    What is the National Institute of<br>834: 00834<br>834: 1  Health?<br>834: 2  A.    The National Institute of Health is a<br>834: 3  government organization.  It is part, I think, of<br>834: 4  the Department of Health & Human Services, and it<br>834: 5  both conducts internal research in medical areas to<br>834: 6  try to improve the benefit of medicine for people,<br>834: 7  and it also sponsors with grants and contracts a<br>834: 8  great deal of extramural, so-called, outside of the<br>834: 9  NIH, in university-based research, to try to find<br>834:10  the causes and insights into diseases that affect<br>834:11  people. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 834:15-837:7 | | |

834:15   Q.   You mentioned NIH.  Do people
834:16   sometimes refer to the National Institutes of Health
834:17   as NIH?
834:18   A.   Yes.
834:19   Q.   Why did you pursue this area of
834:20   genetics at NIH?
834:21   A.   Genetics has been really a driving
834:22   force for medicine since the discovery of the
834:23   structure of DNA in 1953.  It has always captivated
834:24   me as being the very essence of life, and by
834:25   studying it, you could learn about how life occurs
835: 00835
835: 1   and how people develop.  The laboratory I was
835: 2   fortunate enough to go to was a pioneer in
835: 3   deciphering the so-called genetic code with Marshall
835: 4   Niremberg, and I was fortunate to be accepted to the
835: 5   lab.  He was a terrific teacher and mentor, and it
835: 6   really stimulated my research scientific career.
835: 7   Q.   How long did you spend working in
835: 8   that lab at NIH?
835: 9   A.   I worked for Dr. Niremberg for not
835:10   quite three years and finished my work there and
835:11   went on to the National Cancer Institute in either
835:12   late '69 or '70, I don't recall.
835:13   Q.   Is the National Cancer Institute
835:14   affiliated in any way with NIH?
835:15   A.   Yes.  It's one of the institutes
835:16   within the National Institutes of Health, within
835:17   NIH.
835:18   Q.   All right.  Why did you decide to go
835:19   work at the National Cancer Institute?
835:20   A.   Well, at the time, the underlying
835:21   molecular causes of cancer were really completely
835:22   unknown.  This goes back to the late '60s and early
835:23   '70s.  People who were more senior than I in science
835:24   felt strongly that the way to figure out what cancer
835:25   was about was to try to use a genetic approach to

836
836: 1   it.  And there were approaches using genetics
836: 2   available and there were one or two laboratories in
836: 3   the National Cancer Institute taking these
836: 4   approaches, and since I was interested in the
836: 5   general field and, again, wanted to do something
836: 6   important, chose that field to go into at that

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 836: 5   general field and, again, wanted to do something<br>836: 6   important, chose that field to go into at that<br>836: 7   point.<br>836: 8       Q.       How long did you spend working at the<br>836: 9   National Cancer Institute for NIH?<br>836:10       A.      I worked at the National Cancer<br>836:11   Institute for about a dozen years, studying genes<br>836:12   and viruses that cause cancer during that dozen<br>836:13   years.<br>836:14       Q.       Can you tell us about any of the<br>836:15   research achievements of your group at NIH?<br>836:16       A.      Yes.  I think the hallmark<br>836:17   achievement was the discovery of a gene called an<br>836:18   oncogene, that is a gene that causes cancer that we<br>836:19   discovered in basic research we did, and uncovered<br>836:20   the genetics, the biochemistry, the biochemical<br>836:21   pathways in which it worked.  And then the real<br>836:22   piece de resistance discovery was made late in my<br>836:23   time at NIH, in 1982, when in collaboration with a<br>836:24   laboratory at MIT we discovered that this gene was<br>836:25   altered in human bladder cancer, and it was the<br><br>837<br>837: 1   first example ever of an oncogene, a mutated human<br>837: 2   oncogene being identified as a cause of human<br>837: 3   cancer, and it totally transformed the cancer field.<br>837: 4   Thousands of people came into the field after that<br>837: 5   and many, many important discoveries and treatments<br>837: 6   have emanated as a result of this very important<br>837: 7   discovery. |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 837:11-838:10<br><br>837:11  Q.  When did you end your time working at<br>837:12  the National Cancer Institute?<br>837:13       A.      It was in late June of 1982.<br>837:14       Q.      What did you do then?<br>837:15       A.      Moved to Merck.  I had been recruited<br>837:16  there by Dr. Vagelos and Dr. Hillerman, who has just<br>837:17  passed away, to build a molecular group in the<br>837:18  vaccine department that Dr. Hillerman was so<br>837:19  competently overseeing at that point.<br>837:20  Q.      What position did you take when you<br>837:21  joined Merck in 1982?<br>837:22       A.      I was recruited as an executive<br>837:23  director in the vaccine department.<br>837:24       Q.      Why did you decide to join Merck in<br>837:25  1982?<br><br>838<br>838: 1      A.      I knew the reputation of the company<br>838: 2  and what it had done in the past in discovering<br>838: 3  medicines.  I saw the opportunity that had been<br>838: 4  discussed with me by Dr. Vagelos and Dr. Hillerman,<br>838: 5  that I could apply my basic science background and<br>838: 6  interest in medicine in applying that to medicine by going there<br>838: 7  in ways that I could never have done staying at NIH,<br>838: 8  and so I took that opportunity.<br>838: 9      Q.      What was new or different to the<br>838:10  approach you had about dealing with viruses? |  |  |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 838:12-839:11<br><br>838:12    THE WITNESS:  Well, we were used to<br>838:13   studying viruses from a very molecular perspective,<br>838:14   as how they grew, how they reproduced themselves,<br>838:15   how they cause disease, and up until that point in<br>838:16   the vaccine department, the major approach, which,<br>838:17   in fact, had been very successful, was to make<br>838:18   so-called live virus vaccines, that is, examples of<br>838:19   that are the mumps vaccine, the measles vaccine, the<br>838:20   rubella vaccine called MMR that so many children<br>838:21   get.  And their approach was consistent over a<br>838:22   number of years in that they would grow these<br>838:23   viruses outside humans in cultured cells, so that<br>838:24   they no longer caused disease, but they could still<br>838:25   replicate when put back into people and cause enough<br>839: 00839<br>839: 1   of an antibody response to protect the people from<br>839: 2   the real disease.  That was a technology they<br>839: 3   developed and perfected.<br>839: 4              It was now clear in the world of<br>839: 5   science that you could make vaccines in more<br>839: 6   molecular ways without using live attenuated<br>839: 7   viruses, and that was the difference in approaches<br>839: 8   we took when I came to Merck.<br>839: 9   BY MR. RABER:<br>839:10      Q.    You then were promoted to the<br>839:11   president of MRL in 1985; is that correct? | | |
| 839: 9   BY MR. RABER:<br>839:10      Q.    You then were promoted to the<br>839:11   president of MRL in 1985; is that correct? | | |
| ▇▇▇▇▇▇<br>▇▇▇▇▇▇▇▇▇▇▇▇<br>▇▇▇▇▇▇▇▇▇▇▇▇▇▇<br>▇▇▇▇▇▇▇▇▇▇▇▇▇<br>▇▇▇▇▇▇▇▇▇▇▇▇▇<br>▇▇▇▇▇▇▇▇▇▇▇▇<br>▇▇▇▇▇▇▇▇ | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ███████████████ ████████████████ ███████ ████████ | | |
| ██████████████ ██████████████ ███████████████ ████████████████ ███████████████████ ███████ ██ ██████████████ ████████████████ ████████████████ ████████████████ ███████████████ ██████████ █████████████ █████████ ███████████████ ███████████ | 841:2-17 [401,402,403] | Overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ████████████ | | |
| ███████████ | | |
| ██████████████ | | |
| ███████████ | | |
| ██████████████ | | |
| █████████████ | | |
| ██████████████ | | |
| █████████████ | | |
| █████████████ | | |
| █████████████ | | |
| ███████████ | | |
| █████████████ | | |
| █████████████ | | |
| █████████████ | | |
| ████████████ | | |
| ████████████ | | |
| ██████████████ | | |
| ████ | | |
| ███████████ | | |
| | | |
| █████████████ | | |
| █████████████ | | |
| ████████ | | |
| ████ | | |
| ███████████ | | |
| █████ | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ███████████████ | | |
| ████████████████ | | |
| ██████████████████ | | |
| ██████████████████ | | |
| ████████████████ | | |
| ██████████ | | |
| █████████████████ | | |
| ████████████ | | |
| ███████████████ | | |
| ██████████████ | | |
| ██████████████ | | |
| ██████████████ | | |
| █████████ | | |
| ████████████████ | | |
| █████████████████ | | |
| ██████ | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| | | |