**WENDT, MELWYN, DEPOSITIONS OF 12/14/09**

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| ████████████████████████ | | |
| Plaintiffs Affirmative Designations are not. **12/14/09 DEPOSITION** | | |
| mw121409, (Page 11:1 to 11:9)<br>　　　　　　　　　　　　11<br>1  A   After high school, I went to LSU for a couple<br>2      years.  Then went to Northeast Louisiana<br>3      University, got my pharmacy degree -- it is now<br>4      ULM, University of Louisiana Monroe.<br>5          Got my pharmacy degree in 1979, and then I<br>6      went back to the University of -- I got my BS.<br>7      Went back to University of Florida, did a distance<br>8      learning program, and got my Pharm.D. in 2003,<br>9      2004, one of those. | | |
| mw121409, (Pages 11:18 to 12:15)<br>　　　　　　　　　　　　11<br>18  A   After I graduated from Northeast, for about a<br>19      year, I worked relief in independent retail<br>20      pharmacies.<br>21          Then I worked in a hospital, a small<br>22      hospital, about a 200-bed hospital for about five<br>23      years.  And then that hospital opened up a retail<br>24      pharmacy, and I opened up that retail pharmacy for<br>25      four or five years.  I was there about ten years<br><br>　　　　　　　　　　　　12<br>1      with both jobs.  And then I came here in 1989.<br>2  Q   Did you join the Department of Health and<br>3      Hospitals in 1989?<br>4  A   Yes.<br>5  Q   What was your job when you first started here at<br>6      the Department of Health and Hospitals?<br>7  A   I worked in the program operations section.<br>8  Q   What was that?<br>9  A     Doing pharmacy operation stuff, day-to-day issues.<br>10      I worked in -- with audit, with pharmacy audit,<br>11      and worked with the contractor.  Worked with drug<br>12      utilization review, and that came about -- that<br>13      was OBRA 90, so I think that started in 1990,<br>14      1991, really.  And I worked in the pharmacy<br>15      lock-in program. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 13:16 to 14:15) <br><br> **13** <br> 16  Q   Is it fair to say that these audits of pharmacies <br> 17      are an attempt to see if the pharmacy is in <br> 18      compliance with both federal and state Medicaid <br> 19      policy and regulations? <br> 20   A   Yes. <br> 21   Q   Did you also, when you joined DHH in 1989, start <br> 22      to work in the lock-in program? <br> 23   A   Yes. <br> 24   Q   What is the lock-in program? <br> 25   A   The lock-in program is an educational program <br><br> **14** <br> 1      designed to assist or monitor Medicaid recipients <br> 2      who overutilize or misutilize prescription meds. <br> 3   Q   Would you explain how that works? <br> 4   A   That usually deals with meds that have a problem <br> 5      that can cause dependency; narcotics, antianxiety <br> 6      drugs, types of hypnotics, sometimes skeletal <br> 7      muscle relaxants. <br> 8         And records are reviewed, or claims are <br> 9      reviewed by recipient claims, and profiles are <br> 10        created.   And then we have four committees located <br> 11      throughout the state who review those profiles for <br> 12      potential overuse or misuse, specific -- I mean, <br> 13      primarily of those drugs.  It could be other <br> 14      drugs, but most of the time, some of the drugs in <br> 15      therapeutic classes I mentioned would be involved. | | |
| mw121409, (Page 16:16 to 16:25) <br><br> **16** <br> 16   A   I worked in program operations from 1989 till <br> 17      about 1993.  Then I moved to the program integrity <br> 18      section. <br> 19   Q   What is that? <br> 20   A   That is the section that encompasses the <br> 21      surveillance and utilization review subsystem. <br> 22      And I moved there primarily because of audit and <br> 23      lock-in, I would say.  And there were some drug <br> 24      utilization review done there, but I was really <br> 25      doing the retrospective component then.  And the | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 17:11 to 17:15)<br>17<br>11  A  I would say except for the brief period of time in<br>12     program integrity where a drug utilization review<br>13     was sort of split into two sections, as I moved<br>14     on, I just got more and more baggage.  There was<br>15     more -- more to do.  So I would say -- | No question designation | |
| mw121409, (Page 17:16 to 17:20)<br>17<br>16  Q  Is it fair to say, Dr. Wendt, that over the last<br>17     nine to ten years, you've been primarily involved<br>18     in the audit, lock-in and DUR processes here at<br>19     DHH?<br>20  A  Yes, sir. | | |
| mw121409, (Page 20:16 to 20:22)<br>20<br>16      A     The P&T Committee is a pharmacy and therapeutics<br>17     committee that meets on a periodic basis to<br>18     discuss issues that deal with the preferred drug<br>19     list and prior authorization, and maybe some other<br>20     issues too.<br>21  Q  Have you ever attended any of the meetings of the<br>22     P&T Committee? | | |
| mw121409, (Page 20:23 to 20:25)<br>20<br>23  A  I went to one piece of one meeting across the<br>24     street and listened to two therapeutic classes<br>25     being discussed about -- quite a few years ago. | Incomplete answer | |
| mw121409, (Page 21:1 to 21:2)<br>21<br>1     That's the extent of my involvement with going to<br>2     a meeting. | Relevance, lack of question in designation, lack of testimony, lack of complete answer in designation | Overruled |
| mw121409, (Page 21:6 to 21:9)<br>21<br>6   Q   Do you remember ever attending any meetings with<br>7     the P&T Committee where COX-2 inhibitors were<br>8     discussed?<br>9  A  No, sir. | Relevance, lack of personal knowledge | Overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 22:2 to 22:7)<br><br>22<br>2  Q  During the time that Vioxx was on the market,<br>3        which was from May 1999 through September 2004,<br>4      did you have any conversations about that drug or<br>5      COX-2 inhibitors with members of the P&T<br>6      Committee?<br>7  A  No. | | |
| mw121409, (Pages 23:25 to 24:13)<br><br>23<br>25            Would you defer to Ms. Terrebonne when it<br><br>24<br>1      comes to issues like the process that the P&T<br>2      Committee follows?<br>3  A  Yes, I would.<br>4  Q  Would you defer to Ms. Terrebonne on how the P&T<br>5      Committee went about deciding whether Vioxx should<br>6      be on the preferred drug list or not?<br>7  A  Would I defer to Ms. Terrebonne?  Yes, I would.<br>8  Q  Would you defer to Ms. Terrebonne on her views<br>9      about the quality of Provider Synergies' work as a<br>10      consultant to the Department of Health and<br>11      Hospitals?<br>12  A  Me, I don't know.  I don't know, so, yes, I would<br>13      defer to her. | Relevance, narrative, lack of personal knowledge | *[handwritten: Overruled]* |
| mw121409, (Page 24:15 to 24:23)<br><br>24<br>15      Dr. Wendt, about why Vioxx was originally not<br>16      included on the preferred drug list but later<br>17      added to the preferred drug list?<br>18  A  I do not.<br>19  Q  I take it you'd also defer to Ms. Terrebonne on<br>20      how she went about informing P&T Committee members<br>21      before their meetings about the classes of drugs<br>22      that were up for discussion?<br>23  A  I would have to defer to her. | Relevance, lack of personal knowledge | |
| mw121409, (Page 27:14 to 27:15)<br><br>27<br>14  Q  Was it true that the State of Louisiana relied on<br>15      the FDA to determine a drug's safety? | Relevance | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 27:20 to 28:1)<br><br>27<br>20      I guess I would have to say yes.  We<br>21      didn't try to be the FDA.<br>22  BY MR. GOLDMAN:<br>23  Q  Is it true that for as long as you've been here at<br>24     DHH, you've never second-guessed the FDA's<br>25     judgment about whether a drug should be approved<br><br>28<br>1     as safe and effective? | Relevance, lack of testimony, legal conclusion | |
| mw121409, (Page 28:6 to 28:6)<br><br>28<br>6      We did not second-guess the FDA. | Relevance, lack of testimony, legal conclusion | |
| mw121409, (Pages 28:8 to 29:5)<br><br>28<br>8  Q  Prior to the time that the State of Louisiana had<br>9     a preferred drug list, is it true, Dr. Wendt, that<br>10    if the FDA had approved the drug as safe and<br>11    effective, the State of Louisiana would reimburse<br>12    for that medication?<br>13  A  I think there were some restrictions.<br>14  Q  For certain classes?<br>15  A  For certain classes.<br>16  Q  Other than for these certain classes of<br>17    medications, such as drugs that were used for<br>18    anorexia or for the treatment of infertility and<br>19    other medications like that, am I correct that as<br>20    long as the FDA approved a drug as safe and<br>21    effective, the State of Louisiana would reimburse<br>22    prescriptions of drugs that had been approved by<br>23    the FDA?<br>24     MR. PLYMALE:<br>25      Objection.<br><br>29<br>1     You can answer.<br>2  THE WITNESS:<br>3     I think also the manufacturer had to<br>4    have signed a rebate agreement in<br>5    addition to that. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 32:24 to 33:3)<br><br>32<br>24   Q   Do you know Mr. Charles Castille?<br>25   A   I do.<br><br>33<br>1   Q   And who is he?<br>2   A   Mr. Castille is the second in command to the<br>3         secretary. | | |
| mw121409, (Page 34:7 to 34:11)<br><br>34<br>7   Q   Was it consistent with your understanding that<br>8         prior to the time that the State implemented a<br>9         preferred drug list/prior authorization program,<br>10        the State could not legally restrict payments for<br>11        any FDA-approved product? | Legal Conclusion | *(signature)* |
| mw121409, (Page 34:12 to 34:14)<br><br>34<br>12   A   With the exceptions of the rebate and the drugs,<br>13         the therapeutic classes that could be excluded, we<br>14         could do that. | No question designation | |
| mw121409, (Page 34:15 to 34:17)<br><br>34<br>15   Q   And COX-2 inhibitors like Vioxx were not part of<br>16         the classes that were excluded, right?<br>17   A   That is correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 34:18 to 35:6)<br>34<br>18  Q  Mr. Castille also testified, at page 27, line 12,<br>19       question: "And is it your understanding that the<br>20       State of Louisiana did not then, and does not<br>21       currently, make some determination independent of<br>22       the FDA whether a drug is safe and effective; is<br>23       that correct?"<br>24            And his answer was: "That's my<br>25       understanding, that is correct."<br><br>35<br>1            Is that also your understanding, Dr. Wendt?<br>2  A  That the State of Louisiana does not determine our<br>3       own safe and effective parameters, is that what<br>4       you're saying?<br>5  Q  Yes.<br>6  A  That would be true.  That's my understanding. | Hearsay, Legal Conclusion | Overruled |
| mw121409, (Page 36:10 to 36:14)<br>36<br>10       question: "In an open formulary system, could the<br>11       state prospectively limit usage of a drug other<br>12       than those instances where you're worried about a<br>13       physician or patient abusing the system?"<br>14            "Not -- not to my knowledge.  I mean, it's | Incomplete designation | |
| mw121409, (Page 37:14 to 37:17)<br>37<br>14            Back before there was a preferred drug list,<br>15       am I correct that the purpose of the edits that<br>16       were in place were to try to prevent abuse by<br>17       physicians or patients? | Relevance, responsiveness, lack of testimony, lack of answer in designation | |
| mw121409, (Page 37:18 to 37:22)<br>37<br>18  A  No, I don't think that's it.  The edits that we<br>19       started putting in place are -- in DUR, we were<br>20       able to -- we implemented point of sale April the<br>21       1st, 1996.  And we had the capability of putting<br>22       in edits since July the 1st, 1996, prospectively. | Incomplete designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 37:23 to 38:5)<br><br>          37<br>23     So there were edits in place, and I don't<br>24    remember specifically when things came on, and I<br>25    wasn't the prospective DUR person during all this<br><br>          38<br>1    time.  But we've had edits in place for early<br>2    refills, for therapeutic duplications, many of<br>3    those which would have -- which didn't have<br>4    anything to do or wasn't directly related to an<br>5    aberrant practice pattern from a prescriber. | Relevance, responsiveness, lack of question in designation, lack of complete answer in designation | |
| mw121409, (Pages 38:14 to 39:2)<br><br>          38<br>14     To the extent that there were any<br>15    prospective edits in place, was it your<br>16    understanding that those involved trying to<br>17    prevent things like early refills of medication<br>18    and situations where patients were using more than<br>19    one drug in a particular class at the same time?<br>20  A  Those were some of the edits, that is true.<br>21  Q  Can you think of any other kind of edits that were<br>22    in place prior to the time that the State<br>23    implemented the PDL and prior authorization<br>24    program?<br>25  A  When did PDL go in?  When was that?<br><br>          39<br>1  Q  2001, the law passed.<br>2  A  Okay.  So we had -- oh, multiple. | Relevance, lack of complete answer in designation | |
| mw121409, (Page 39:6 to 39:10)<br><br>          39<br>6     I'm going to miss some, but the early<br>7    refills, ingredient duplications, which<br>8    are at different stores, therapeutic<br>9    duplications on at least six classes at<br>10     that time. | No question designation | |
| mw121409, (Page 39:11 to 39:12)<br><br>          39<br>11  BY MR. GOLDMAN:<br>12  Q  What does that mean? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 39:13 to 39:19)<br>39<br>13  A   Therapeutic classes.  For instance, they had<br>14      therapeutic duplications on SSRIs, the<br>15      antidepressants.  They had -- we had therapeutic<br>16      duplications on -- there were six classes.<br>17    Potassium supplements -- I'm not going to probably<br>18      be able to name all six -- nonsteroidals.<br>19      Nonsteroidals, we had therapeutic duplication | Incomplete answer designated | *(handwritten: Overruled)* |
| mw121409, (Page 40:8 to 40:13)<br>40<br>8   A   If a patient was on an NSAID and there was an<br>9      active prescription, meaning there was still some<br>10      drug left, they hadn't used the whole prescription<br>11      up, and there was an incoming prescription for<br>12      another NSAID, that incoming prescription would<br>13      deny as a therapeutic duplication. | No question designation | |
| mw121409, (Page 40:14 to 40:24)<br>40<br>14    Q   In other words, if a patient was already being<br>15      treated for pain by one NSAID and the patient<br>16        tried to fill another NSAID, then the second NSAID<br>17      would be denied?<br>18    A   That's true.<br>19    Q   So other than that example where a patient tried<br>20      to fill more than one prescription, you know, for<br>21      multiple NSAIDs, do you know whether the State had<br>22      any other types of prospective edits in place for<br>23      the use of NSAIDs or COX-2 inhibitors, say, from<br>24      1999 through 2004? | Relevance, responsiveness, lack of testimony, lack of answer in designation | |
| mw121409, (Pages 40:25 to 41:2)<br>40<br>25    A   The other that would come to mind quickly is the<br><br>41<br>1      early refill and the ingredient duplications.  So<br>2      that's what I recall right now. | No question designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 41:3 to 41:18)<br>41<br>3  Q  Tell me what ingredient duplication means.<br>4  A  Ingredient duplication is basically an early<br>5     refill, but it's filled at a different store.<br>6     It's not filled at the same store as the initial<br>7     prescription or the prescription that the incoming<br>8     claim was bumping against.<br>9  Q  So between 1999 and 2004, when Vioxx was on the<br>10    market, am I right that the three types of<br>11    prospective edits that the State had in place for<br>12       NSAIDs and COX-2 inhibitors were situations where<br>13    patients tried to refill medication too early,<br>14    right?<br>15  A  Correct.<br>16  Q  Where patients tried to refill medication at<br>17    different stores?<br>18  A  Correct. | | Overruled |
| mw121409, (Page 41:19 to 41:24)<br>41<br>19  Q  And where patients tried to fill prescriptions for<br>20    more than one NSAID in a class at the same time?<br>21  A  That's correct.  And the only thing that I need to<br>22    add to that is the ingredient duplication, when it<br>23    was a different store, it would also have been too<br>24    early.  It wouldn't have been that they couldn't | Incomplete designation | |
| mw121409, (Pages 41:25 to 42:2)<br>41<br>25    switch pharmacies once the prescription was<br><br>42<br>1     completed.  There may be some other edits that I<br>2     don't recall right now. | Relevance, responsiveness, lack of question in designation, lack of complete answer in designation | |
| mw121409, (Page 42:13 to 42:15)<br>42<br>13  Q  Was there any safety-related prospective edit in<br>14    place for COX-2 inhibitors or NSAIDs prior to<br>15    2004? | Relevance, responsiveness, lack of testimony, lack of answer in designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 42:16 to 42:20)<br>42<br>16  A  Well, the therapeutic duplications could be a<br>17      safety issue, and so could the early refills in<br>18      those -- in the ingredient duplications.  And I --<br>19      I just don't recall other issues.  The COX-2s were<br>20      included as, you know, the nonsteroidals. | No question designation | |
| mw121409, (Page 42:21 to 42:24)<br>42<br>21  Q  Let me show you the statute that was passed to<br>22      allow the State to implement the preferred drug<br>23      list and prior authorization program, which I'll<br>24      mark as Exhibit 3. | | |
| mw121409, (Page 43:3 to 43:11)<br>43<br>3  Q  Do you see that under (B)(2)(a), this says that<br>4      the department may establish a drug formulary that<br>5      utilizes a prior approval process?<br>6          Do you see that?<br>7  A  Yes, I do.<br>8  Q  And the way that it's worked out in terms of who<br>9      decides what drugs should require prior approval<br>10      is that's been the responsibility of the P&T<br>11      Committee and not the DUR Board, right? | Relevance, document speaks for itself, responsiveness, lack of answer in designation | |
| mw121409, (Page 43:12 to 43:13)<br>43<br>12  A  The DUR Board did not -- that is correct, we did<br>13      not address prior approval issues. | No question designation | |
| mw121409, (Page 43:14 to 43:17)<br>43<br>14          MR. PLYMALE:<br>15              I'm going to insert an objection<br>16              identical to the one I made for Exhibit 2<br>17              to apply to Exhibit 3 as well. | | |
| mw121409, (Page 45:9 to 45:13)<br>45<br>9  Q  Is it true that if a doctor decided, even if a<br>10      drug was not on the PDL and required prior<br>11      authorization, that if his patient needed to be<br>12      prescribed the medication, the State reimbursed<br>13      for it? | Relevance, responsiveness, legal conclusion | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 45:21 to 45:24)<br><br>                        45<br>21        If the doctor got prior authorization<br>22        on a drug that required prior<br>23        authorization, the State would reimburse<br>24        for it.  That's my understanding, anyway. | Relevance, responsiveness, legal conclusion | |
| mw121409, (Page 46:1 to 46:2)<br><br>                        46<br>1  Q  Can you tell us what the DUR process in general<br>2     is? | Relevance, responsiveness, lack of testimony, lack of answer in designation | |
| mw121409, (Page 46:3 to 46:10)<br><br>                        46<br>3  A  The DUR process stands for drug utilization<br>4     review.  The DUR process came out of<br>5     regulations -- well, some of them did -- came out<br>6     of regulations from OBRA 90.  And it was designed<br>7     to try to -- to assist the states or to assist<br>8     Medicaid with making sure that drugs -- or to try<br>9     to help with assuring that drugs were appropriate<br>10    and medically necessary. | No question designation | |
| mw121409, (Page 46:11 to 46:24)<br><br>                        46<br>11  Q  Does the federal statute that you referred to<br>12    require that states like Louisiana retrospectively<br>13    and prospectively review certain treatment<br>14    standards to monitor for patients and doctors who<br>15    may be abusing the system?<br>16        MR. PLYMALE:<br>17          Object to form.<br>18    THE WITNESS:<br>19          As far as for treatment standards and<br>20        how it actually is written, I don't know.<br>21        The drug utilization review does have<br>22        three components:  A prospective<br>23        component, a retrospective component and<br>24        an educational component. | | |
| mw121409, (Page 47:1 to 47:1)<br><br>                        47<br>1  Q  What is a prospective DUR? | Relevance, responsiveness, lack of testimony, lack of answer in designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 47:2 to 47:8)<br><br>47<br>2  A   A prospective DUR, from the beginning of when drug<br>3     utilization review started in '91, basically<br>4     looked at prescription utilization within a store<br>5     with what a provider, a pharmacy provider had<br>6     available in his computer to see if there were any<br>7     possible reasons why an incoming prescription<br>8     should not be filled. | Incomplete designation | |
| mw121409, (Page 47:9 to 47:11)<br><br>47<br>9        As of 1996, prospective drug utilization<br>10     review went electronic, and we had the capability<br>11     of sending back edits to pharmacy providers. | Relevance, responsiveness, lack of question in designation, lack of complete answer in designation | |
| mw121409, (Page 48:3 to 48:3)<br><br>48<br>3   Q   What is a retrospective DUR? | Relevance, responsiveness, lack of testimony, lack of answer in designation | |
| mw121409, (Page 48:4 to 48:6)<br><br>48<br>4  A   Retrospective DUR is a review after prescriptions<br>5     have been filled of patterns and trends,<br>6     basically. | No question designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 48:7 to 48:25)<br>48<br>7  Q   And what's the purpose of that?<br>8  A   A lot of times when the Drug Utilization Review<br>9      Board wants to -- or attempts to implement<br>10         something new, they will look at what has happened<br>11      in the past.  If you see that something happens in<br>12      the past, we would send out correspondence to the<br>13         physician and pharmacy providers to let them know<br>14      what's going on with their patient.<br>15  Q   So is the main point of the retrospective DUR to<br>16      look at a doctor's prescribing habits and help<br>17      educate the doctor about alternatives that he may<br>18      be interested in considering?<br>19  A   No.<br>20  Q   How would you describe it?<br>21  A   That would be -- DUR is based upon patient<br>22      utilization, and so it does inform prescribers or<br>23      it does inform pharmacists about what's going on<br>24      with their particular patient based upon the<br>25      criteria that's being looked at that month.  But | | |
| mw121409, (Page 49:1 to 49:15)<br>49<br>1      it doesn't -- it's educational.  It's not intended<br>2      to say the prescriber is aberrant in drug<br>3      utilization review.  It's more of an educational<br>4      focus.<br>5  Q   So is the purpose of the retrospective DUR then to<br>6      try to monitor patients' use of medication and try<br>7      to educate patients if they're using the<br>8      information -- using medication appropriately?<br>9  A   It would be more to educate or to send information<br>10      to the prescriber and the pharmacist about what's<br>11      going on.  Retrospective drug utilization review<br>12      does not send information -- it didn't at that<br>13      time -- currently to patients.  It would have sent<br>14      information possibly to the prescribers or to the<br>15      pharmacist. | Relevance, responsiveness, lack of testimony<br>lack of question in designation, lack of complete answer in designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 49:17 to 49:21)<br>49<br>17    What was the point of sending educational<br>18    information to the doctor or pharmacist if you<br>19    learned that through a retrospective DUR process<br>20    that a lot of product was being prescribed to a<br>21    particular patient? | | |
| mw121409, (Page 49:22 to 49:25)<br>49<br>22  A   There's multiple purposes.  It's to allow the<br>23    prescriber to see if the patient is compliant or<br>24    non-compliant, if they're going elsewhere and<br>25    getting similar meds or the same meds.  If there | Incomplete designation | |
| mw121409, (Page 50:1 to 50:11)<br>50<br>1    are gaps in therapy.  Sometimes you're looking<br>2    for -- this would be more like in diabetes, you<br>3    might look to see if lab tests had been performed,<br>4    or something along that line.<br>5      So you're letting them know kind of what's<br>6    going on with their patient.  Similar type setting<br>7    to the pharmacist.  A pharmacist will have more<br>8    knowledge about compliance if the patient went to<br>9    them.<br>10   Q    What was your role in the DUR process, say,<br>from<br>11    1999 to 2004? | Relevance, responsiveness, lack of testimony lack of question in designation, lack of complete answer in designation | |
| mw121409, (Page 50:12 to 50:23)<br>50<br>12  A   I'm the department's liaison with the Drug<br>13    Utilization Review Board.  We have a contract with<br>14    our fiscal intermediary, Unisys, to create the<br>15    profiles that are performed, and I am the liaison<br>16    with the -- the person who works in that capacity.<br>17    That's changed from -- through the years some.  It<br>18    hasn't changed recently, but I don't think it's<br>19    the same in 1999 as it is now -- and maybe it is.<br>20    I'm not sure when that change happened.<br>21   Q  Do you remember when the DUR Board was first<br>22    implemented?<br>23  A  I'm pretty sure it was in 1991. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 50:24 to 51:2)<br><br>50<br>24   Q   Is it true that the DUR Board's main function is<br>25       to try to curb misuse of prescription drugs?<br><br>51<br>1   A   I wouldn't phrase it that way.<br>2   Q   How would you? | lack of question in designation, lack of complete answer in designation | |
| mw121409, (Page 51:3 to 51:5)<br><br>51<br>3       A       The DUR Board's function is to review prescription<br>4       drugs and try to assist with appropriate<br>5       utilization for recipients. | No question designation | |
| mw121409, (Page 51:6 to 51:16)<br><br>51<br>6   Q   Would it be fair then to say that the main<br>7       function of the DUR Board is to try to make sure<br>8       that patients utilize medications appropriately?<br>9   A   I think so, yes.<br>10   Q   How does the DUR Board's responsibilities differ<br>11       from the P&T Committee, if you know?<br>12       A       The DUR Board looks at utilization from a clinical<br>13       standpoint.  The DUR Board does not look at --<br>14       well, they don't determine what's on the PDL or<br>15       the -- you know, what's not.  They -- we really<br>16       aren't involved in that. | | |
| mw121409, (Page 52:3 to 52:4)<br><br>52<br>3   Q   Can you tell me about the backgrounds of the<br>4       members of the DUR Board. | Relevance, lack of answer in designation | |
| mw121409, (Page 52:5 to 52:6)<br><br>52<br>5   A   The DUR Board has eight members.  One is a<br>6       representative from industry, three are | No question designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 52:7 to 52:22)<br>52<br>7    physicians, and four are pharmacists.<br>8    Q    Would you consider the physicians and pharmacists<br>9    that are on the DUR Board to be experts in their<br>10    fields?<br>11    A   Depending on how you define "expert," you know, I<br>12    don't want to get into that definition.  But they<br>13    do know what they're doing.  They do practice<br>14    daily.  And so --<br>15    Q  Do you consider the physicians and pharmacists<br>16    that are on the DUR Board to be well informed in<br>17    their areas of expertise?<br>18    A  Yes.<br>19    Q  When you say there's a representative from the<br>20    pharmaceutical industry, do you know whether<br>21    anybody from Merck has ever been on the DUR Board?<br>22   A   No, nobody from Merck has ever been on the DUR | | |
| mw121409, (Page 54:21 to 54:23)<br>54<br>21  Q  So when these DUR Board meetings take place, can<br>22    you describe what happens at the meetings<br>23    themselves? | Relevance,  lack of answer in designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 54:24 to 55:25)<br><br>54<br>24  A   The previous minutes are read from the previous<br>25        meeting, and then there's usually a section on old<br><br>55<br>1     type business, where reviews that we have done<br>2     retrospectively in probably a six-month and before<br>3     time frame, the responses have come back in.<br>4     Those are captured, tabulated, and those are<br>5     brought to the committee's attention, what the<br>6     actual prescribers and pharmacists had responded<br>7     back.<br>8          The percentages and the numbers of letters<br>9     that were sent out, and the percentages of<br>10    responses that we received are brought out.<br>11    Sometimes there has been an issue that the board<br>12    wanted to address retrospectively, and then they<br>13    would look at it prospectively.  So then there may<br>14    be some prospective issues that come up either<br>15    based upon recommendations from the past, from<br>16    what other people have said, or responses that<br>17    have come in, or from one of the other sources<br>18    that I mentioned.<br>19         Sometimes there are also educational<br>20    initiatives that are suggested, that the DUR Board<br>21    would suggest we do a -- gosh -- an educational<br>22    outreach through our disease management program<br>23    that goes through the University of Louisiana<br>24    Monroe.  They usually attend the meetings.<br>25    Actually, one of the board members is faculty. | No question designation | |
| mw121409, (Page 56:1 to 56:5)<br>56<br>1  Q  At ULM?<br>2  A  At ULM.<br>3  Q  What's her name or his name?<br>4  A  Jessica Brady.  Dr. Jessica Brady right now.<br>5     She's a new member.  She hasn't been on very long. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 56:11 to 56:14)<br><br>56<br>11   Q   Do you know whether at these DUR Board meetings<br>12      Merck has ever made any kind of a presentation<br>13      about Vioxx or COX-2 inhibitors?<br>14   A   No, they have not. | | |
| mw121409, (Page 57:3 to 57:16)<br><br>57<br>3   Q   Are there materials that are sent to DUR Board<br>4      members in advance of the meetings?<br>5   A   They have a packet, a pre-meeting packet.<br>6   Q   And in the 1999 to 2004 time frame, can you<br>7      describe what would be in the pre-meeting packet<br>8      that was sent to DUR Board members?<br>9   A   There would probably be -- I'm not sure if the old<br>10      minutes were included in that or not.  There<br>11      probably would be an agenda, a draft agenda, which<br>12      could be subject to change.  And if there were<br>13      some issues to be discussed, there may be some<br>14      materials relating to that.  It would change<br>15      depending on what was being looked at and who was<br>16      compiling the packets. | | |
| mw121409, (Page 58:2 to 58:12)<br><br>58<br>2   Q   Do you know whether there were ever materials<br>3      other than the minutes and the draft agenda that<br>4      were sent to DUR Board members in advance of their<br>5      meetings between 1999 and 2004?<br>6   A   I'm not sure.<br>7   Q   Would there be presentations made at the board<br>8      meetings?<br>9   A   Not usually.<br>10   Q   Do you know whether in -- do you know whether you<br>11      ever sent any monographs from Provider Synergies<br>12      to members of the DUR Board? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 58:13 to 58:14)<br><br>58<br>13   A   DUR Board would not get monographs from Provider<br>14      Synergies.  Two separate entities. | No question designation | |
| mw121409, (Pages 59:25 to 60:6)<br><br>59<br>25   Q   Dr. Wendt, do you remember having any discussions<br><br>60<br>1      with anybody from Merck about Vioxx before it was<br>2      withdrawn from the market?<br>3   A  I do not.<br>4   Q  Do you know if Merck ever communicated with the<br>5      DUR Board at all about Vioxx?<br>6   A  I don't recall anything. | Lack of Personal Knowledge | *overruled* |
| mw121409, (Page 60:12 to 60:23)<br><br>60<br>12      Merck never participated in any of the DUR<br>13      Board meetings, right?<br>14   A  That is true.<br>15   Q  Merck never made any presentations to the DUR<br>16      Board, right?<br>17   A  That is true.<br>18   Q   Never submitted any written information to the DUR<br>19      Board, right?<br>20   A   That is -- to my knowledge, that's true.<br>21   Q  You've never passed along any information from<br>22      Merck to DUR Board members, right?<br>23   A   Correct. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 60:24 to 61:4)<br><br>                     60<br>24  Q  To the extent that the DUR Board made decisions<br>25     about COX-2 inhibitors, they were doing so based<br><br>                     61<br>1     on their own independent judgment, right?<br>2    A   Independent judgment or FDA advisory.  I remember<br>3     them -- we operated after the FDA advisory came<br>4     out. | | |
| mw121409, (Page 61:18 to 61:23)<br><br>                     61<br>18  Q  Is it fair to say that prior to the time that<br>19     Vioxx was withdrawn from the market in 2004, the<br>20     DUR Board members exercised their independent<br>21     judgment about deciding what sorts of edits should<br>22     be in place for COX-2 inhibitors?<br>23  A  I think that's fair. | | |
| mw121409, (Page 62:1 to 62:7)<br><br>                     62<br>1     Did the DUR Board rely at all on any<br>2     discussions with Merck, to your knowledge, in<br>3     their decisions about how to handle COX-2<br>4     inhibitors, including Vioxx, before the withdrawal<br>5     of Vioxx?<br>6  A  The DUR Board, to my knowledge, did not have<br>7     contact with Merck. | | |
| mw121409, (Page 62:12 to 62:22)<br><br>                     62<br>12  Q  Is it true that when the law changed in 1991 to<br>13     permit potential reimbursement restrictions based<br>14     on the PDL or prior approval -- I'm sorry, prior<br>15     authorization process, did the State hire ULM<br>16    School of Pharmacy to act as a consultant to DHH?<br>17  A  I wasn't involved in that process.<br>18  Q  Do you know when the state hired ULM to be a<br>19     consultant to DHH?<br>20  A  ULM, I believe, has always been in an advisory<br>21     capacity to DHH for drug utilization review since<br>22     its inception to -- I think, to -- or early on, | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 62:23 to 62:23)<br><br>           62<br>23     anyway.  The other stuff, I don't know, but... | Relevance, lack of question in designation, lack of complete answer in designation | |
| mw121409, (Page 69:6 to 69:9)<br><br>           69<br>6  Q  Back in the time that Vioxx was on the market, do<br>7     you remember whether ULM ever presented to the DUR<br>8     Board about COX-2 inhibitors or Vioxx?<br>9  A  I don't recall. | Relevance, lack of personal knowledge | |
| mw121409, (Page 73:22 to 73:25)<br><br>           73<br>22  Q  You don't know whether ULM ever sent any<br>23     information to the DUR Board about side effects<br>24     relating to COX-2 inhibitors, right?<br>25  A  I'm not sure. | Relevance, lack of personal knowledge | |
| mw121409, (Page 76:15 to 76:25)<br><br>           76<br>15  Q  In your experience working with ULM, do you feel<br>16     that they've had the necessary experience and<br>17     skills to do their job for the State?<br>18  A  I could only speak to the drug utilization review<br>19     capacity, and I would say for drug utilization<br>20     review, yes.<br>21  Q  Has it been your experience that ULM is -- has<br>22     stayed abreast of things like published literature<br>23     when they prepare their disease management<br>24     brochures?<br>25  A  Yes. | | |
| mw121409, (Page 77:13 to 77:14)<br><br>           77<br>13  Q  Do you believe they've always done an excellent<br>14     job in serving DHH as a consultant? | | |
| mw121409, (Page 77:19 to 77:21)<br><br>           77<br>19     They've done a very good job for me,<br>20     for the roles that they provide for drug<br>21     utilization review. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 77:23 to 77:25)<br><br>                           77<br>23  Q  You don't have any complaints about how ULM has<br>24      handled their role for the -- for DHH in the DUR<br>25      program, right? | | |
| mw121409, (Page 78:4 to 78:4)<br><br>                           78<br>4      That is true. | | |
| mw121409, (Page 78:6 to 78:12)<br><br>                           78<br>6  Q  Because the State has continued to renew these<br>7      contracts with ULM, and they still are a<br>8      contractor for the State, right?<br>9  A  That is true.<br>10  Q  I'm going to mark as Exhibit 6.<br>11      (Exhibit Wendt-6 was marked for<br>12      identification.) | 78:10-12 lack of testimony, document speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 78:14 to 79:12)<br><br>        78<br>14  Q   This is an e-mail from Amy Ponti to Ms. Terrebonne<br>15    and yourself and Rachel Broussard, right?<br>16  A  Yes.<br>17  Q  Dated February 13th, 2004?<br>18  A  Yes.<br>19  Q  Who is Amy Ponti?<br>20  A  Amy Ponti is a pharmacist on the -- in the<br>21    pharmacy benefits management section.<br>22  Q  And do you see that Ms. Ponti attaches a list of<br>23    disease management brochures?<br>24  A  Yes.<br>25  Q   Are these the brochures that were created by ULM?<br><br>        79<br>1  A  Yes.<br>2  Q  I take it Merck has no role in the creation of<br>3    these disease management brochures, right?<br>4  A  That's my understanding.<br>5  Q  Then do you see on the third page, there are a<br>6    number of brochures about the treatment of<br>7    arthritis?<br>8  A  Yes.<br>9  Q  And the first one says, "Complications of NSAID<br>10    therapy."<br>11      Do you see that?<br>12  A  Yes. | Relevance, document speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 79:19 to 80:19)<br><br>                          79<br>19  Q  Do you see that there were 13,953 brochures that<br>20     were mailed?<br>21  A  Yes.<br>22  Q  And that's just for that one on complications of<br>23     NSAID therapy, right?<br>24  A  Correct.<br>25  Q  Then there's other mailings about preventing<br><br>                          80<br>1     complications of NSAID therapy.<br>2       Do you see that?<br>3  A  Yes.<br>4  Q  13,596 --<br>5  A  Yes.<br>6  Q  -- that were sent in 1999?<br>7  A  Yes.<br>8  Q  Then do you see the second-to-the-last entry, "The<br>9     risk of NSAID-Associated Gastrointestinal<br>10     Complications," 5,509 were mailed?<br>11  A  Yes.<br>12  Q  And these were the sorts of brochures that were<br>13     sent to providers?<br>14  A  Yes.<br>15  Q  So that they would have information to consider<br>16     when they were deciding how best to treat their<br>17     patients for things like arthritis; is that fair<br>18     to say?<br>19  A  Yes. | Relevance, document speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 81:1 to 81:20)<br><br>                      81<br>1  Q  I'll hand you Exhibit 7, Dr. Wendt.  This is a<br>2      brochure called "The Risk of NSAID-associated<br>3      Gastrointestinal Complications" from<br>4      November 2003.<br>5        Do you see that?<br>6  A  Yes.<br>7  Q  That was the same brochure that we just saw<br>8      referenced in the previous exhibit, correct?<br>9  A  I think so.<br>10   Q   This was written by Edwin Adams, who's a Pharm.D.<br>11     at ULM, right?<br>12  A  That's correct.<br>13  Q  And --<br>14  A  Well, he's not there anymore, but he was at the<br>15     time.<br>16  Q  And also Sandra Blake, right?<br>17  A  Yes.<br>18  Q  Do you consider both of those individuals to be<br>19     very competent?<br>20  A  Yes, I do. | Relevance, document speaks for itself | |
| mw121409, (Pages 81:24 to 82:14)<br><br>                      81<br>24  Q  Do you see that in this brochure, it says that<br>25     arthritis and other musculoskeletal conditions are<br><br>                      82<br>1     among the most common chronic conditions in the<br>2     United States, affecting about 38 million people?<br>3  A  Yes.<br>4  Q  And then it says, two sentences down, some 16 to<br>5     20 million people in the United States are<br>6     estimated to have osteoarthritis, right?<br>7  A  That's what it says, yes.<br>8  Q  And then another 2 and a half million have<br>9     rheumatoid arthritis?<br>10  A  Correct.<br>11  Q  Was it true that musculoskeletal conditions<br>12     accounted for 12 percent of total health care<br>13     expenditures, with arthritis alone accounting for<br>14     4 percent? | Relevance, document speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 82:20 to 82:24)<br><br>82<br>20 Q No reason to disagree with this, though?<br>21 A Yes, I don't have a reason to disagree.<br>22 Q And then it says by the year 2020, it was<br>23    predicted that 58.4 million people will suffer<br>24    from OA and RA, right? | | |
| mw121409, (Page 83:3 to 83:3)<br><br>83<br>3       Yes, that's what it says. | Relevance, document speaks for itself, lack of personal knowledge | overruled |
| mw121409, (Page 83:5 to 83:7)<br><br>83<br>5 Q You agree that those conditions are very serious,<br>6    can be, right?<br>7 A They could be. | | |
| mw121409, (Page 83:20 to 83:23)<br><br>83<br>20 Q Do you agree that the advent of COX-2 inhibitors<br>21    have helped doctors treat osteoarthritis and<br>22    rheumatoid arthritis?<br>23 A Yes. | Relevance, expert medical opinion | |
| mw121409, (Page 84:1 to 84:4)<br><br>84<br>1 Q Then do you see on the next page, there's a<br>2    section called "NSAID Associated GI<br>3    Complications"?<br>4 A I see that. | Relevance, document speaks for itself | |
| mw121409, (Page 84:12 to 84:23)<br><br>84<br>12 Q And then in the last sentence of that paragraph,<br>13    it says the FDA estimates that these GI<br>14    complications cause between 10,000 and 20,000<br>15    deaths and approximately 76,000 hospitalizations<br>16    annually.<br>17      Do you see that?<br>18 A I see that.<br>19 Q You agree, Dr. Wendt, that these serious<br>20    gastrointestinal complications that can be caused<br>21    by NSAIDs are extremely serious for patients,<br>22    given that they can lead to up to 20,000 deaths<br>23    and 76,000 hospitalizations a year? | Relevance, document speaks for itself, assumes facts not in evidence, lack of personal knowledge | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 85:2 to 85:3)<br><br>85<br>2      I don't have a reason to dispute what's<br>3      here, what's written that you read. | Relevance, document speaks for itself, assumes facts not in evidence, lack of personal knowledge | |
| mw121409, (Pages 85:20 to 86:2)<br><br>85<br>20  Q  Is it true that NSAID-related GI complications in<br>21      the Medicaid population are serious for that<br>22      population, as well as the general population?<br>23  A  That would be a true statement, I believe.<br>24  Q   And these NSAID-associated GI complications, you<br>25      understood, were serious for both Medicaid<br><br>86<br>1      patients and also increased the cost for the<br>2      State? | Relevance, responsiveness, lack of answer in designation | |
| mw121409, (Page 86:3 to 86:4)<br><br>86<br>3  A  With a GI complication, it would -- it could -- it<br>4      could increase the cost for the State. | No question designation | |
| mw121409, (Page 86:5 to 86:8)<br><br>86<br>5  Q  And how could GI complications from NSAIDs<br>6      increase costs for the State of Louisiana?<br>7  A  If a patient had to be admitted or seen in the<br>8      emergency room. | | |
| mw121409, (Page 86:9 to 86:16)<br><br>86<br>9  Q  Then do you see in the last paragraph of that<br>10     section, one of the dangers associated with<br>11     NSAID-induced gastric ulcers is that most patients<br>12     remain asymptomatic until complications arise?<br>13  A  I see that.<br>14  Q  In other words, patients don't know they're<br>15     suffering from an ulcer until they start to feel<br>16     symptoms, right? | Relevance, document speaks for itself, expert medical opinion | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 86:20 to 86:20)<br><br>86<br>20          That would be -- that should be true. | Relevance, document speaks for itself, expert medical opinion | |
| mw121409, (Pages 88:18 to 89:20)<br><br>88<br>18  Q  If you'd turn to page 6, do you see that ULM<br>19     writes in the Discussion and Conclusion section<br>20     that -- in the first paragraph, third-to-last<br>21     sentence tell me when you're there.  It starts<br>22     with "Estimates."<br>23  A  "Estimates," okay.<br>24  Q  Do you see it says, "Estimates of the incidence<br>25     rate of GI adverse effect associated with NSAIDs<br><br>89<br>1     have reached as high as 20 percent"?<br>2          Do you see that?<br>3  A  Yes.<br>4  Q  Two sentences further, do you see the sentence<br>5     starting with "Although"?<br>6  A  Yes.<br>7  Q  Does ULM write, "Although most of these adverse<br>8     effects are classified as dyspepsia, there are a<br>9     menacing number of 'silent' GI bleeds occurring in<br>10    NSAID-treated patients"?<br>11         Do you see that?<br>12  A  Yes.<br>13    Q    Does  ULM  also  write  in  2003  that  "The appearance<br>14    of this 'silent killer' is unpredictable and is<br>15    often asymptomatic"?<br>16  A  Yes.<br>17  Q  So again, you agree that this silent killer that<br>18    can be attributed to NSAID-related GI toxicity is<br>19    a very serious matter?<br>20  A  Yes. | Relevance, document speaks for itself, lack of foundation, assumes facts not in evidence | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 92:13 to 92:21)<br><br>92<br>13  Q   Do you remember any suggestion by anybody at DHH<br>14     or the DUR Board concerning any prospective or<br>15     retrospective review of COX-2 inhibitors while<br>16     Vioxx was on the market?<br>17  A   I don't -- I'm not sure.  I'm not sure.<br>18  Q   From 1999 to 2004, do you remember whether anybody<br>19     at DHH or the DUR Board ever suggested any kind of<br>20     a clinical edit or step process relating to any<br>21     safety issue for the COX-2 inhibitor class? | Relevance, lack of personal knowledge, lack of answer in designation | |
| mw121409, (Pages 92:22 to 93:1)<br><br>92<br>22  A   What I recall is when the FDA advisory came out<br>23     that was addressing the cardiovascular risks with<br>24        COX-2s, we were supposed to address that in DUR,<br>25     bring that to the -- put that on as a DUR agenda<br><br>93<br>1     item.  Now, when that was exactly, I don't know. | No question designation | |
| mw121409, (Page 93:7 to 93:7)<br><br>93<br>7  Q   Do you know whether anybody on the DUR Board ever | Relevance, lack of complete question in designation, lack of answer in designation | |
| mw121409, (Page 93:8 to 93:13)<br><br>93<br>8     recommended or considered any type of an edit for<br>9     any COX-2 inhibitors relating to any safety issue<br>10     prior to the withdrawal of Vioxx?<br>11  A   The edits that would have been in place for the<br>12     nonsteroidals would have included the COX-2s, so<br>13     those would have -- would have been there. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 94:5 to 95:4)<br><br>              94<br>5  Q  Do you recall anybody from the DUR Board ever<br>6     raising any question about whether Vioxx or other<br>7     COX-2 inhibitors were overprescribed in the State<br>8     of Louisiana before 2005?<br>9  A  I don't know.  I -- I'm just not sure.<br>10  Q  Did the DUR Board in the State of Louisiana<br>11     monitor the amount of prescriptions of COX-2<br>12     inhibitors prior to the time that Vioxx was<br>13     withdrawn?<br>14  A   We would have -- we would have looked at it, yes.<br>15    Q   Can you describe how you looked at the utilization<br>16     of COX-2 inhibitors in the State of Louisiana<br>17     before Vioxx was withdrawn?<br>18  A  At some point when the COX-2s came out, the<br>19     therapeutic classification, the therapeutic<br>20     classes -- and I don't remember when this changed,<br>21     but the COX-2s were initially included just in the<br>22     overall nonsteroidal group.  They weren't<br>23     separated out as COX-2s.  And so they would have<br>24     been looked at as -- as the -- within the<br>25     therapeutic classifications of nonsteroidals.<br><br>              95<br>1     There were like two therapeutic classes, and<br>2     when they filled up one, they just went into<br>3     another one.  And I don't remember -- that changed<br>4     at some point, but I don't remember when that was. | Relevance, lack of knowledge | overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 95:11 to 96:24)<br><br>95<br>11    I'm asking Ms. Terrebonne, "Do you remember<br>12    why the State of Louisiana decided to implement<br>13    certain DUR procedures for COX-2 inhibitors after<br>14    Vioxx was withdrawn from the market?"<br>15    Her answer is: "I remember Dr. Cerise was<br>16    the secretary of the department at the time, and<br>17    he -- I want to say that he had some article that<br>18    Louisiana had a high use of COX-2s as compared to<br>19    other states, and he asked for some DUR criteria<br>20    to be developed."<br>21    Is that consistent with your recollection,<br>22    Dr. Wendt?<br>23  A  Yes.<br>24  Q  In fact, the article that came out, I'll mark as<br>25    Exhibit 8, is an article by Dr. Fischer called<br><br>96<br>1    "Medicaid Prior-Authorization Programs and the Use<br>2    of COX-2s."<br>3    (Exhibit Wendt-8 was marked for<br>4    identification.)<br>5  BY MR. GOLDMAN:<br>6  Q  Do you see that?<br>7  A  Yes.<br>8  Q  Then if you turn to Figure 1 on page 2190, is this<br>9    a figure that you remember reviewing?<br>10  A  I think I have seen this.<br>11  Q  And does this Figure 1 indicate that Louisiana,<br>12    which has a red bar, has the second highest use of<br>13    COX-2 inhibitors as a percentage of total NSAID<br>14    use when you look at those states that have prior<br>15    authorization programs?<br>16  A  This appears that for the time period that was<br>17    being reviewed, Louisiana -- of the states that<br>18    had a prior authorization program, Louisiana's<br>19    utilization was the second highest.<br>20  Q  And if you look at all the states that are<br>21    included, Louisiana had the fourth highest use of<br>22    COX-2 inhibitors, right?<br>23  A  According to this article, that is -- that is what<br>24    this article says. | Relevance, hearsay, documents speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 97:1 to 97:5)<br>97<br>1    It was this conclusion that prompted the<br>2    State to implement DUR edits in 2005, right?<br>3  A  I don't know that that was an exclusive thing. I<br>4    believe that this article had an impact in looking<br>5    at initiatives, and also the FDA advisory. I | | |
| mw121409, (Pages 97:14 to 98:14)<br>97<br>14    (Exhibit Wendt-9 was marked for<br>15    identification.)<br>16  BY MR. GOLDMAN:<br>17  Q  And do you see that this e-mail that you wrote has<br>18    the subject line "COX-2 inhibitors/NSAID Use"?<br>19  A  Yes.<br>20  Q  It's dated December 13th, 2004?<br>21  A  Yes.<br>22  Q  And if you look back at the article that we just<br>23    looked at, do you see that that was published<br>24    November 18th, 2004?<br>25  A  Yes.<br><br>98<br>1  Q  Does -- in your e-mail, sorry, do you see your<br>2    e-mail says, "Melissa, do you or yours have any<br>3    ideas about curbing COX-2 utilization?" And then<br>4    it says at the bottom, "Nationwide, Louisiana's<br>5    utilization of COX-2s is high"?<br>6  A  Yes.<br>7  Q  Do you think your reference to the "nationwide,<br>8    Louisiana's utilization of COX-2s is high" is a<br>9    reflection of this article?<br>10  A  It's possible.<br>11  Q  Does this e-mail refresh your memory about the<br>12    fact that the State was concerned about where it<br>13    ranked relative to other states with respect to<br>14    COX-2 use? | Relevance, documents speaks for itself, lack of answer in designation | _overruled_ |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 98:15 to 98:20)<br><br>98<br>15  A  I think that that may be -- my recollection is<br>16      that the driving force behind the DUR edits, or<br>17      some of the driving force was the FDA advisory.<br>18      And the fact that utilizations -- I mean,<br>19      Louisiana's utilization would be high would be<br>20      another reason to address the issue. | | |
| mw121409, (Page 99:21 to 99:23)<br><br>99<br>21  Q  Do you know what happened after you wrote your<br>22      e-mail to Melissa Dear at ULM asking her about<br>23      ways to curb COX-2 utilization? | Relevance, lack of foundation, assumes facts not in evidence | Overruled |
| mw121409, (Page 100:2 to 100:12)<br><br>100<br>2          I don't remember specific instances of<br>3              whatever, but we did implement an edit, I<br>4              believe, early the next year.<br>5  BY MR. GOLDMAN:<br>6  Q  In 2005?<br>7  A  Right.<br>8  Q  Now, when we talk about the utilization of COX-2<br>9      inhibitors in the State of Louisiana, did you know<br>10      that Vioxx had the lowest market share of COX-2<br>11      inhibitors in the state?<br>12  A  I would not have known that. | Lack of personal knowledge | |
| mw121409, (Pages 100:18 to 101:3)<br><br>100<br>18  Q  Let me hand you Exhibit 10, Dr. Wendt.  Is this<br>19      e-mail from Thomas Greene to Ms. Terrebonne,<br>20      cc'ing you?<br>21  A  Yes.<br>22  Q  May 2nd, 2005?<br>23  A  Yes.<br>24  Q  And then it says, "As part of the DUR and audit,<br>25      we looked at NSAID utilization and how the number<br><br>101<br>1      of claims paid changed after the withdrawal of<br>2      Vioxx from the market"?<br>3  A  Yes. | Relevance, document speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 102:4 to 102:7)<br>102<br>4   Q   So does this appear that the majority of COX-2 use<br>5       in the State of Louisiana in July of 2004 was<br>6       because of Bextra?<br>7   A   That's what this appears to look like, yes. | Relevance, document speaks for itself | Overruled |
| mw121409, (Page 102:15 to 102:25)<br>102<br>15   Q   So when you look at just the Pfizer COX-2<br>16       inhibitors, Bextra and Celebrex, there are more<br>17       than four times the number of prescriptions for<br>18       those two drugs in July 2004 than for Vioxx?<br>19   A   Looks like it's about four times.<br>20   Q   So to the extent that there was more use of COX-2<br>21       inhibitors in the State of Louisiana prior to the<br>22       withdrawal of Vioxx, do you agree, Dr. Wendt, that<br>23       the vast majority of that use had to do with<br>24       Bextra and Celebrex?<br>25   A   That's what this report indicates. | Relevance, document speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 111:5 to 116:8) | | |

**111**

5  Q  Do you see it says, "Criteria Parameters" on page
6      4, "Use of Celebrex or valdecoxib"?
7  A  "Criteria parameters," page 4 -- I'm sorry, I'm
8      just not --
9  Q  It's under "Retrospective Criteria Proposal."
10 A  No, I'm sorry.  I just -- on page 4, right?
11 Q  Page 4.
12 A  Okay.
13 Q  "Retrospective Criteria Proposal."
14 A  Okay.
15   Q   "Consider non-selective NSAID in place of COX-2
16      inhibitor if no GI risk factor or treatment
17      failure."
18         Do you see that?
19 A  Yes, I'm sorry.  I got you.
20 Q  And then it has a number of criteria parameters?
21 A  Right.
22 Q  Including "use of Celebrex or valdecoxib," right?
23 A  Right.
24 Q  Not "60 years or older," right?
25 A  Right.

**112**

1  Q  And then it goes on?
2  A  Right.
3  Q  Do you know who developed those criteria
4      parameters?
5  A  That would have been -- that would have been
6      recommendations from ULM, and we probably would
7      have brought it through the medical director here,
8      Dr. Townsend, just for -- and she may have had
9      some input into yes or no.  Since it's just these
10     two, these two COX-2s, then Vioxx was already off
11     the market would be why that wouldn't be included
12     here.
13   Q   Do you know who at ULM was involved in developing
14     these criteria parameters?
15 A  Don't -- I'm not positive, no.
16 Q  And then it says, under "Prospective Deny Edit

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 112 | | |

17    Proposal" -- do you see that?
18  A  Yes, I do.
19  Q  So is this a proposal by ULM?
20  A  Well, it's a proposal by -- it's a proposal to the
21     DUR Board, which would have been done in
22     conjunction with ULM and Unisys and DHH.  It's not

23     like an individual, necessarily.
24  Q  Were you involved in deciding what the --
25  A  I would have been involved in this discussion,

                                 113
1     yes.
2   Q  What do you remember about how the prospective
3      deny edit proposal here on page 4 was conceived?
4   A  What do I remember about how it was conceived?
5   Q  How did it happen?
6    A   Can you -- can you ask me some other way?  I don't
7      know how to answer you.
8   Q  Sure.  How is it that you all came up with these
9      criteria to include as the prospective deny edit
10     proposal?
11  A  Well, it was considered that if a patient were
12     sick -- I don't know if this is what you're asking
13     me.  But if a patient were older than 60, they
14     could be more at risk to have a GI issue.  If they
15     were -- if they were on a PPI or an H2 antagonist,
16     they could have a GI issue.  That's why they're on
17     these, so that it would look like appropriate use.
18     And if they were on a chronic corticosteroid or
19     warfarin that there would be some value in using a
20     COX-2.
21           And then they -- so you were going to deny
22     unless -- in other words, if one of these issues
23     happened, then the initial claim would not deny.
24  Q  So if patients were older than 60 years old, then
25     they would be able to have their prescriptions for

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 114<br>1    Celebrex or Bextra reimbursed by the State?<br>2  A  Without a denial.  Without an initial denial, yes.<br>3  Q  And if patients were on a PPI or an H2 antagonist,<br>4     then they'd be able to get --<br>5  A  That's right.<br>6  Q   -- their COX-2 inhibitors reimbursed?<br>7  A  Right.<br>8  Q  And then there's a statement that says, "Override<br>9     provision available with an appropriate diagnosis<br>10    code/reason supplied by the prescriber."<br>11 A  Right.<br>12 Q  "GI diagnosis, treatment failure."<br>13       What does that mean?<br>14 A  That would mean if -- if a patient -- if a<br>15    prescriber wrote a prescription for one of these<br>16    two COX-2s and we didn't know that there was a<br>GI<br>17    diagnosis, it wasn't apparent or whatever, and if<br>18    they said there is a gastrointestinal diagnosis<br>19    and they supplied a diagnosis code, then they<br>20    could -- the pharmacist could override the claim.<br>21    So the denial would then be null and void as such.<br>22    The same thing if they had said they had treatment<br>23    failure with other nonsteroidals.<br>24 Q  Okay.  Do you see in the next sentence down, it<br>25    says -- is it -- how do you --<br><br>115<br>1  A  Soileau.<br>2  Q  "Soileau asked about the relative cost associated<br>3     with the addition of a proton pump inhibitor to a<br>4     NSAID versus COX-2 inhibitor use."<br>5  A  Yeah, I see that.<br>6  Q  Do you see that?  And then in the next paragraph,<br>7     it says, "Terrebonne stated the P&T Committee<br>8     addresses clinical and monetary issues.  There are<br>9     clinical issues to address here."<br>10       Do you see that?<br>11 A  Yes.<br>12 Q  What did Ms. Terrebonne mean, if you know, by<br>13    that?<br>14 A  I think she was just trying to get the DUR Board<br>15    to focus on the clinical issues that were at hand. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 115<br><br>16  Q   Do you know whether this prospective deny edit was<br>17      then used after January 2005?<br>18  A  It was implemented, yes.<br>19  Q  Do you know whether the DUR Board considered the<br>20      FDA's recommendations on treatment guidelines for<br>21      the use of COX-2 inhibitors after they came out<br>22      with their advisory in determining what the<br>23      parameters should be for DUR going forward for<br>24      COX-2 inhibitors?<br>25  A   What I recall is the FDA advisory coming out, and<br><br><br>116<br>1      I thought that that was taken into consideration<br>2      at this board meeting.<br>3  Q   Do you know whether, in fact, the criteria that<br>4      was used was among the issues that the FDA<br>5      mentioned in their advisory e-mail?<br>6  A   I don't remember specifically, but I do believe it<br>7      had a big role in this -- this criteria being<br>8      developed. | | |
| mw121409, (Page 117:9 to 117:12)<br>117<br>9  Q   Would it surprise you to learn that the P&T<br>10      Committee was aware of potential cardiovascular<br>11      concerns with Vioxx for the entire time that Vioxx<br>12      was on the PDL? | | |
| mw121409, (Page 117:13 to 117:14)<br>117<br>13      MR. PLYMALE:<br>14          Objection. | Colloquy | |
| mw121409, (Page 117:15 to 117:19)<br>117<br>15      THE WITNESS:<br>16          I would --<br>17  BY MR. GOLDMAN:<br>18  Q   But the DUR Board never addressed any issues<br>19      relating to cardiovascular concerns? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 117:20 to 117:22)<br><br>117<br>20      MR. PLYMALE:<br>21          Objection.<br>22          Go ahead. | Colloquy | |
| mw121409, (Pages 117:23 to 118:3)<br><br>117<br>23      THE WITNESS:<br>24          The DUR Board operates independently of<br>25          P&T.  So the DUR Board would not<br><br>118<br>1      necessarily have been -- known what went<br>2      on at P&T, or would not have necessarily<br>3      been aware of what was happening at P&T. | | |
| mw121409, (Page 118:11 to 118:21)<br>118<br>11  A  Overall, drug utilization review is concerned with<br>12      the clinical appropriateness of therapy and is not<br>13   as concerned with monetary values.  Sometimes we<br>14      may look at something that if somebody thinks it<br>15      has a -- a strong clinical impact and it's --<br>16      there's not -- it's not a lot of dollars involved,<br>17      we still would look at it<br>18          Now, certainly we do capture cost avoidance<br>19      because the Feds tell us we need to look at that.<br>20      But that is not what drives DUR.  DUR is based<br>21      more on clinical outcome types of issues. | No question designation | |
| mw121409, (Page 121:16 to 121:21)<br>121<br>16   Q   Do you remember the DUR Board ever, before Vioxx<br>17      was withdrawn from the market, analyzing the<br>18      potential side effects of COX-2 inhibitors?<br>19  A  I don't recall that.<br>20   Q    Did you ever review the package insert for Vioxx?<br>21  A  Oh, I don't know. | Relevance, lack of personal knowledge | Overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 127:15 to 129:25)<br><br><div align="center">127</div>15    Exhibit 12. We'll do it this way.<br>16       (Exhibit Wendt-12 was marked for<br>17    identification.)<br>18 BY MR. GOLDMAN:<br>19 Q  Do you see that this is a monograph prepared by<br>20    Provider Synergies April 2003?<br>21 A  Yes.<br>22 Q  And it has "NSAIDs" on the top?<br>23 A  Yes.<br>24 Q  And then it goes through the pharmacology of<br>25    NSAIDs, right?<br><br><div align="center">128</div>1 A  Yes.<br>2 Q  And then it talks about the indications for<br>3    NSAIDs, correct?<br>4 A  Yes.<br>5 Q  Pharmacokinetics, right?<br>6 A  Right.<br>7 Q  Clinical trials?  Do you see that?<br>8 A  Yes.<br>9 Q  Then it goes through drug interactions on page 8?<br>10 A  Yes.<br>11 Q  It has a section on GI toxicity and warnings,<br>12    correct?<br>13 A  Yes.<br>14   Q   Then do you see on page 10 that Provider Synergies<br>15    discusses cardiovascular concerns?<br>16 A  Yes.<br>17 Q  This is April 2003, right?<br>18 A  Yes.<br>19   Q   And they include a whole section on cardiovascular<br>20    concerns about COX-2 inhibitors, right?<br>21 A  Yes.<br>22 Q  Do you see in the first sentence, "In a review of<br>23    the COX-2 Inhibitors and risk of cardiovascular<br>24       events in JAMA in August 2001, authors concluded<br>25    that a prospective trial may be necessary to | Relevance, document speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 129<br>1    evaluate the potential risk of cardiovascular<br>2    events with these agents"?<br>3  A  Yes.<br>4  Q   Then do you see that there is a section called<br>5    "Hypertension and Edema," and it talks about<br>6    Celebrex and Vioxx?<br>7  A  I see that.<br>8  Q   Then if you turn a few pages to "Conclusion," do<br>9    you see in the third paragraph, "The VIGOR study<br>10    raised some questions regarding the cardiovascular<br>11    safety of Vioxx"?<br>12  A  Yes.<br>13  Q   "Patients receiving Vioxx had a significantly<br>14    higher risk of developing a cardiovascular<br>15    thrombotic event compared to patients receiving<br>16    naproxen."<br>17       Do you see that?<br>18  A  Yes.<br>19  Q   And then two sentences down, "Although the<br>20    significance of this potential cardiovascular risk<br>21    is unknown, it does raise questions."<br>22       Do you see that?<br>23  A  Yes.<br>24  Q   Do you see it was no secret that there were<br>25    potential cardiovascular concerns with Vioxx? | | |
| mw121409, (Page 130:4 to 130:5)<br>130<br>4  Q   Here, that it was mentioned by the Provider<br>5    Synergies folks? | Relevance, document speaks for itself | overruled |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 130:9 to 131:1)<br>130<br>9        I see it was in here.<br>10 BY MR. GOLDMAN:<br>11 Q  And then on the -- page 14, there's a whole bunch<br>12      of references, right?<br>13 A  Correct.<br>14 Q  And the references include articles, don't they?<br>15 A  Yes, sir.<br>16 Q  And package inserts?<br>17 A  Yes, sir.<br>18 Q  Including the Vioxx package insert.  Do you see<br>19      that, on number 41 at the bottom?<br>20 A  I do.<br>21 Q  The VIGOR study itself is mentioned in here,<br>22      number 31.  Do you see that, by Dr. Bombardier?<br>23 A  I do.<br>24 Q  Now, can you tell us, Dr. Wendt, what, if<br>25      anything, you would have done had you seen this<br><br>131<br>1   from Provider Synergies in April of 2003? | Relevance, document speaks for itself | *overruled* |
| mw121409, (Page 131:5 to 131:15)<br>131<br>5        I'm not sure what I would have done.<br>6 BY MR. GOLDMAN:<br>7 Q  Is -- I'm sorry.<br>8 A  It's just -- it could have been an issue that<br>9      would be brought up to the DUR Board.  It -- it<br>10      could not have -- we work on cycles in drug<br>11      utilization review, looking at certain disease<br>12      states at meetings.  So it could have -- it could<br>13      have come up and it could not have.  I can't tell<br>14      you for sure what I would have done.  I don't<br>15      know. | Lack of personal knowledge, speculation | |
| mw121409, (Page 131:20 to 131:24)<br>131<br>20       Is it fair to say, Dr. Wendt, that it would<br>21      be speculation for you to say what you or the DUR<br>22      Board would have done back in 2003 if you had<br>23      learned about potential cardiovascular concerns<br>24      with Vioxx? | Legal conclusion, speculation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 132:3 to 132:4)<br>132<br>3     I can never tell you what the DUR Board<br>4     would do. | Legal conclusion, speculation | *overruled* |
| mw121409, (Page 132:6 to 132:9)<br>132<br>6  Q  And even you, is it fair to say that you would be<br>7     speculating to say what you would have done had<br>8     you known about potential cardiovascular concerns<br>9     with Vioxx in 2003? | Relevance, speculation, lack of complete answer in designation | |
| mw121409, (Page 132:13 to 132:14)<br>132<br>13     I can't say for certain what I would<br>14     have done. | Relevance, speculation, lack of complete answer in designation | |
| mw121409, (Page 133:4 to 133:9)<br>133<br>4  Q  Is it fair to say, Dr. Wendt, that you have no<br>5     idea what, if anything, would have been discussed<br>6     with the DUR Board about potential cardiovascular<br>7     concerns with Vioxx if you had been informed about<br>8     the VIGOR study or Provider Synergies' report<br>9     here, April 2003? | | |
| mw121409, (Page 133:13 to 133:18)<br>133<br>13     I do think if something would have been<br>14     brought to the DUR Board, it would have<br>15     been taken and addressed as a serious<br>16     concern.  How the DUR Board would have<br>17     wanted to address that issue, I cannot<br>18     tell you. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 133:20 to 134:4)<br><br>             133<br>20 Q  There are lots of people from the Department of<br>21    Health and Hospitals at these P&T Committee<br>22    meetings, right?<br>23 A  Not me, but I think there are some people.  I know<br>24    there's some pharmacy folks.<br>25 Q  You know that the secretary of DHH attends the<br><br>             134<br>1    meetings sometimes, right?<br>2 A  Sometimes, I think so.<br>3 Q  Do you know that Ms. Terrebonne attends every one<br>4    of the P&T Committee meetings? | | |
| mw121409, (Page 134:8 to 134:9)<br><br>             134<br>8      Pretty much.  I think she's missed a<br>9      couple. | | |
| mw121409, (Page 135:13 to 135:18)<br><br>             135<br>13 Q  Between the time that Vioxx was on the PDL in 2003<br>14    through the time that Vioxx was withdrawn in<br>15      September 2004, did anybody from DHH ever suggest<br>16    to you that you should raise any potential<br>17    cardiovascular concerns with Vioxx with the DUR<br>18    Board? | Relevance, lack of personal knowledge | _Overruled_ |
| mw121409, (Page 135:22 to 135:22)<br><br>             135<br>22      I don't recall that. | Relevance, lack of personal knowledge | |
| mw121409, (Page 137:3 to 137:6)<br><br>             137<br>3 Q  If you ever thought that there was an issue that<br>4    was a safety concern for Medicaid patients, would<br>5    you bring it to the attention of the DUR Board?<br>6 A  It's possible. | MIL #2 | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 137:15 to 137:23)<br><br>         137<br>15 Q I've handed you what I've marked as Exhibit 13.<br>16    And this is a letter dated July 15th, 2003 from<br>17    Pfizer to Ms. Terrebonne.  And do you see that it<br>18    cc's Secretary Hood?<br>19 A I do.<br>20 Q He was a high-level person, right, at DHH?<br>21 A Yes.<br>22 Q The buck stopped with him, right?<br>23 A It should have. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 138:2 to 139:17)<br><br>138<br>2   Q   Here in July 2003, which is more than a year<br>3      before Vioxx was withdrawn, do you see that Pfizer<br>4      is writing to Ms. Terrebonne about Pfizer's desire<br>5      to have Celebrex included on the PDL?<br>6         Do you see that?<br>7   A   I see that.<br>8   Q   And then they include a Celebrex clinical update<br>9      on page 2.<br>10         Do you see that?<br>11   A   I do.<br>12   Q   If you look down about two-thirds of the page, do<br>13      you see a section that says, "Emerging data on the<br>14      use of COX-2 specific inhibitors in patients with<br>15      cardiovascular disease" --<br>16   A   I do.<br>17   Q   -- "has shown that Celebrex is a safe alternative<br>18      in this patient population"?<br>19   A   I see that.<br>20   Q   Then do you see that there's a bolded statement<br>21      that says, "Class CV, no differences in MI" -- or<br>22      myocardial infarction -- "stroke or TIA for<br>23      Celebrex versus NSAIDs"?<br>24         Do you see that?<br>25   A   I see that.<br><br>139<br>1   Q   Then do you see on the next page, there's a<br>2      statement that says, "Vioxx label change,<br>3      significant increase in cardiovascular events at<br>4      Vioxx, 50-milligram and 25-milligram doses"?<br>5   A   I see that.<br>6   Q   Then do you see that there's actually a section in<br>7      the middle that says, "The Celebrex Cardiovascular<br>8      Benefit.  The Celebrex PI has no precaution for<br>9      use in patients with a history of ischemic heart<br>10      disease"?<br>11         Do you see that?<br>12   A   I do.<br>13   Q   Then it says, "The Vioxx PI states 'caution should<br>14      be exercised when Vioxx is used in patients with<br>a<br>15      medical history of ischemic heart disease,'"<br>16      right?<br>17   A   Yes, I see that. | Document speaks for itself | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 139:22 to 140:5)<br><br>139<br>22    Do you understand that what Pfizer is<br>23    telling Ms. Terrebonne is that Pfizer believes<br>24    Celebrex should be on the PDL because, in their<br>25    view, Vioxx carried a cardiovascular risk but<br><br>140<br>1    Celebrex did not?<br>2  A  That's what it appears to say.<br>3  Q  Did you see this letter prior to the time that<br>4    Vioxx was withdrawn?<br>5  A  I don't think so. | Relevance, hearsay, document speaks for itself, lack of personal knowledge | *Overruled* |
| mw121409, (Page 142:5 to 142:9)<br><br>142<br>5  Q  Do you know what you would have done, Dr. Wendt,<br>6    had Ms. Terrebonne shown you this letter from<br>7    Pfizer in July of 2003?<br>8    MR. PLYMALE:<br>9      Objection. | MIL #2 | |
| mw121409, (Page 142:10 to 142:17)<br><br>142<br>10    THE WITNESS:<br>11      If -- if Ms. Terrebonne had asked me to<br>12    address an issue, I would have -- we<br>13    would have addressed an issue.  We<br>14    probably would have -- if research needed<br>15    to be done, we would have asked ULM to do<br>16    some research to get some -- some<br>17    background. | Incomplete answer | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 142:18 to 143:16)<br><br>142<br>18    We may have done -- I may have done a<br>19    little on my own, and the pharmacist at<br>20    Unisys may have done some other, but we<br>21    consider ULM to be our consultant here.<br>22    And if -- if somebody deemed it<br>23    appropriate, or if it was, it would be --<br>24    it would be brought to the DUR Board.<br>25    That's -- if there -- if she were<br><br>143<br>1    getting correspondence and it was<br>2    addressing one issue, and there were<br>3    other sideline issues in there, and it<br>4    appears that their issue is to get the<br>5    drug on the PDL, she may be trying to<br>6    address that issue first. I could see<br>7    how this would not be brought to the<br>8    forefront right away.<br>9    It doesn't mean that it wasn't going to<br>10    happen. I can't tell you what would --<br>11    would happen, but we get bombarded with<br>12    multiple things on a daily basis, and<br>13    there are some things that maybe don't<br>14    get addressed that would if there weren't<br>15    35,000 other things happening on that<br>16    day. | Responsiveness, speculation, lack of personal knowledge | Overruled |
| mw121409, (Page 144:9 to 144:20)<br><br>144<br>9    Did you know that there was a debate in the<br>10    medical community about whether Vioxx carried<br>11    cardiovascular risks prior to the time it was<br>12    withdrawn from the market?<br>13  A  I'm not sure when I knew.<br>14  Q  Vioxx was withdrawn from the market<br>15    September 30th, 2004, right?<br>16  A  Okay.<br>17  Q  There was a DUR Board meeting the next month,<br>18    October 2004. And I can tell you that's actually<br>19    referenced in the --<br>20  A  Okay. | Responsiveness, lack of personal knowledge, narrative | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 147:6 to 147:20)<br>147<br>6  Q   Well, look at page 2, if you would, on the board<br>7      minutes from January 26th, 2004, please.<br>8  A   Okay.  Page 2, okay.<br>9  Q   And this is the old business section, right?  If<br>10     you look on the first page, it's under "Old<br>11     Business."  Are you with me?<br>12  A   Okay, yes.  Yes.<br>13  Q   So on page 2, there's a discussion of the business<br>14     that was discussed back in October of 2004 at the<br>15     DUR meeting, right?<br>16  A   Right.<br>17  Q   And there's a discussion about retrospective DUR,<br>18     chronic pain disorders, NSAIDs and COX-2<br>19     inhibitors, correct?<br>20  A   Yes. | Relevance, document speaks for itself | |
| mw121409, (Page 149:16 to 149:16)<br>149<br>16  Q   So let's try to get the chronology down. | Relevance, lack of personal knowledge | |
| mw121409, (Page 149:17 to 149:20)<br>149<br>17      September 2004, Vioxx was withdrawn, okay?<br>18  A   Okay.<br>19  Q   October 2004, the DUR Board meets and actually<br>20      discusses appropriate use of COX-2 inhibitors? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 149:24 to 151:6)<br><br>149<br>24      Okay, they're meeting, and they are<br>25      discussing what has happened with COX-2<br><br>150<br>1      inhibitors in that prior six months or<br>2      so.<br>3  BY MR. GOLDMAN:<br>4  Q  And they're also talking about what they should be<br>5      moving forward in terms of prospective edits,<br>6    right?<br>7  A  They are also talking about some prospective<br>8      edits, yes.<br>9  Q  In October 2004, even after Vioxx was withdrawn,<br>10     there's no suggestion by the DUR Board that there<br>11     be a prospective edit in place for Celebrex and<br>12     Bextra as of October 20th, 2004, true?<br>13  A  Wait.  Hold on a second.  I'm looking at the<br>14     January meeting minutes.  That's what you --<br>15     that's --<br>16  Q  Correct.<br>17  A  Okay.<br>18  Q  But this is under old business.  And if it's<br>19     easier, I can just get -- I'll be happy to get the<br>20     October 20th, 2004 minutes.  There's not a word<br>21     about Bextra and Celebrex, okay?<br>22  A  Okay.<br>23  Q  So October 20th, 2004, the DUR Board meets, talks<br>24    about COX-2 inhibitors and prospective edits to be<br>25     put in place for DUR purposes, and does not talk<br><br>151<br>1    about cardiovascular issues, right?<br>2  A  That's what it appears, yes.<br>3  Q  November 18th, 2004, there's an article written by<br>4    Dr. Fischer that says Louisiana has the fourth<br>5     highest usage of COX-2s in the country, right?<br>6  A  Yes. | Relevance, lack of question in designation, lack of personal knowledge, document speaks for itself, hearsay | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 151:10 to 151:21)<br><br>151<br>10  Q   You then write a letter December 2004 -- sorry, an<br>11      e-mail December 2004 to ULM saying, "Do you have<br>12      suggestions about how to curb the utilization of<br>13      COX-2 inhibitors going forward?"<br>14  A  Yes, and I think -- I'm telling you, I think that<br>15      was after the FDA advisory came out.<br>16  Q   And you may very well be right.<br>17  A  And I do believe that that was part of it, I<br>18      really do.<br>19  Q   And you may very well be right about that.  And<br>20      I'm not quarreling with that because I don't have<br>21      that document in front of me. | Relevance, document speaks for itself | *Overrule* |
| mw121409, (Page 151:22 to 151:25)<br><br>151<br>22          It was the publication of Louisiana's high<br>23      COX-2 inhibitor usage rate that was one of the<br>24      significant factors that led to the DUR edit that<br>25      was put in place in January 2005, true? | Incomplete question | |
| mw121409, (Page 152:1 to 152:5)<br><br>152<br>1  A  I believe that is a true statement.<br>2  Q   Another factor that went into the decision to<br>3      implement a DUR edit in January 2005 was this FDA<br>4      advisory that you remember?<br>5  A  Yes. | | |
| mw121409, (Page 152:6 to 152:9)<br><br>152<br>6    Q   The DUR Board took into account the FDA's position<br>7      on the appropriate use of COX-2 inhibitors in<br>8      deciding what the parameters should be for the<br>9      prospective deny edit for Bextra and Celebrex, | Speculation, lack of personal knowledge, hearsay | |
| mw121409, (Page 152:14 to 152:14)<br><br>152<br>14          I would think, yes. | Speculation, lack of personal knowledge, hearsay | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 154:16 to 154:18)<br><br>154<br><br>16  Q    And do you know if subsequent to this that the FDA<br>17       came out and said that non-selective NSAIDs may<br>18       also carry a risk of – cardiovascular risk? | Relevance, Hearsay | |
| mw121409, (Page 154:22 to 154:22)<br><br>154<br><br>22            Yes. | Relevance, Hearsay | |
| mw121409, (Pages 154:24 to 155:3)<br><br>154<br><br>24  Q   You know that?  Did the State put out any DUR<br>25       edits for non-selective NSAIDs?<br><br>155<br>1  A   Not yet.<br>2  Q   Are they going to?<br>3  A   I don't know. | Relevance, lack of personal knowledge | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 157:14 to 158:15)<br><br>157<br>14 Q  But as you sit here today, Dr. Wendt, you don't<br>15      remember the DUR Board having a specific meeting<br>16      to discuss whether they should have an edit put in<br>17      place for non-selective NSAIDs given the FDA's<br>18      comments that they may increase the risk of<br>19      cardiovascular events?<br>20 A  That's a true statement.  I don't remember that.<br>21 Q  Now, looking back at Exhibit 14, do you see that,<br>22      again, the first sentence says, "The FDA issued a<br>23   Public Health Advisory on December 23rd, 2004"?<br>24      Do you see that?<br>25 A  Yes.<br><br>158<br>1   Q   Look back, would you please, Dr. Wendt, at Exhibit<br>2      9, which is your e-mail.<br>3 A  Yes.<br>4 Q  Do you see the date of your e-mail is<br>5      December 13th, 2004?<br>6 A  Yes.<br>7 Q  Does this refresh your recollection that your<br>8      suggestion to ULM to come up with ways to curb<br>9      COX-2 utilization was initially based on the<br>10      information you learned about the high usage of<br>11      COX-2 inhibitors in Louisiana compared to other<br>12      states?<br>13      A      It probably was based on some of that information,<br>14      and a directive probably from M.J., from<br>15      Dr. Cerise. | Relevance, lack of personal knowledge, document speaks for itself | *overruled* |
| mw121409, (Page 159:6 to 159:9)<br><br>159<br>6 Q  Now that we've walked through some of the<br>7      documents, does it seem right that Vioxx was<br>8      withdrawn on September 30th, 2004, right?<br>9 A  Yes. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 160:9 to 160:22)<br>160<br>9   Q   Vioxx is withdrawn September 2004.  There's a DUR<br>10      Board meeting the very next month, and there's no<br>11      discussion of cardiovascular risks with respect to<br>12      the other agents like Celebrex and Bextra, right,<br>13      as best you recall?<br>14   A   Right.<br>15   Q   There's an article written about Louisiana having<br>16      a high usage rate of COX-2 inhibitors compared to<br>17      other states in November of 2004, right?<br>18   A   Right.<br>19   Q   Dr. Cerise and you decide that you want to<br>20      consider ideas to curb COX-2 utilization by<br>21      December 13th, 2004, the date of your e-mail,<br>22      right? | | |
| mw121409, (Page 161:1 to 161:11)<br>161<br>1      That probably would have been a<br>2      Dr. Cerise, Dr. Townsend, M.J.<br>3      discussion.<br>4   BY MR. GOLDMAN:<br>5   Q   You write your e-mail to ULM saying, "Do you have<br>6      any ideas to curb COX-2 utilization" based on the<br>7      article by Dr. Fischer, right?<br>8   A   Based on probably a directive coming down.  That<br>9      may have been indirectly from there, but that<br>10     would not have been -- I would not have had this<br>11     article and said, "Do this." | Relevance, document speaks for itself, lack of foundation, assumes facts not in evidence, speculation, lack of personal knowledge | *overruled* |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 161:15 to 162:1)<br><br>          161<br>15      Based on your discussion with Ms.<br>16    Terrebonne, you understood that Louisiana had a<br>17    high utilization of COX-2s compared to other<br>18    states, right?<br>19 A  True.<br>20  Q   You write an e-mail December 13th, 2004 to ULM<br>21    saying, "Do you have ideas to try to curb COX-2<br>22    utilization?"<br>23 A  Yes.<br>24  Q  Ten days later, the FDA comes out with a public<br>25    health advisory about all COX-2 inhibitors, right?<br><br>          162<br>1 A  Yes. | | |
| mw121409, (Page 162:5 to 162:17)<br>          162<br>5      On January 26th, 2005, the DUR Board<br>6    implements a prospective edit denying COX-2<br>7    inhibitor prescriptions unless the patient is<br>8    younger than 60 years old, right?<br>9 A  Yes.<br>10  Q  And the other edits that were put in place by the<br>11    board in January were if the patient was on a<br>12    proton pump inhibitor or an H2 antagonist, right?<br>13 A  Correct.<br>14  Q  And the other criteria were approved by the DUR<br>15    Board January 26th, 2005, right?<br>16 A  Correct.<br>17  Q  For Celebrex and Bextra, am I right? | | |
| mw121409, (Page 162:18 to 162:18)<br>          162<br>18 A  Yes. | Relevance, lack of question in designation | *overruled* |
| mw121409, (Page 164:9 to 164:11)<br>          164<br>9      The public health advisory was a<br>10    significant factor in the criteria<br>11    development -- | No question designation | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 164:12 to 164:23)<br><br>164<br>12  BY MR. GOLDMAN:<br>13  Q  So --<br>14  A  -- as I recall.<br>15  Q  -- do you agree there then that the FDA's position<br>16     on cardiovascular risks with respect to COX-2<br>17     inhibitors was a significant factor in the DUR<br>18     Board's decision about whether to implement an<br>19     edit going forward for Bextra and Celebrex?<br>20        MR. PLYMALE:<br>21          Objection.<br>22        THE WITNESS:<br>23            Yes, I believe it was. | | |
| mw121409, (Page 165:1 to 165:8)<br><br>165<br>1       Do you ever make recommendations yourself to<br>2      the DUR Board about what should be done with<br>3      respect to DUR edits?<br>4  A  I do.<br>5  Q  Did you ever make any recommendations to the DUR<br>6      Board about potential edits for Celebrex and<br>7      Bextra at the October 20th, 2004 DUR meeting?<br>8  A  I don't believe I did. | | |
| mw121409, (Page 168:4 to 168:7)<br><br>168<br>4  Q  Okay.  Am I right, Dr. Wendt, that you would defer<br>5      to the FDA in deciding whether or not the results<br>6      of a study like the VIGOR study warrant some type<br>7      of edit to be used for DUR purposes? | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 168:11 to 169:10) | | |

mw121409, (Pages 168:11 to 169:10)

**168**

```
11          Let me answer the best way I know how.
12      DUR edits are not implemented --
13      prospective DUR edits are not implemented
14      lightly.  So the DUR -- and the DUR
15      Board, I can honestly never tell you for
16      sure what -- what they're going to vote
17      or how they're going to vote.  A lot of
18      times I think it's going -- it seems to
19      me to be a no-brainer, and it doesn't
20      turn out the way that I would have
21      thought they would have proceeded.
22          So to bring something up to the DUR
23      Board, there's no way I would know what
24      would happen or how things could -- could
25      turn about or go about.  The pharmacy
```

**169**

```
1      program and DHH wants patients to receive
2      prescriptions if the prescriber thinks
3      that they are appropriate and medically
4      necessary.  And we do put in edits
5      when -- when we -- when the DUR Board
6      does believe that it's appropriate, and
7      the department is in agreement with that.
8      So I don't know if I answered your
9      question or not.  I kind of got off
10     there.
```

mw121409, (Pages 171:21 to 172:4)

**171**

```
21          Is one of the reasons that the DUR doesn't
22      want to implement prospective edits lightly
23      because they don't want to deprive patients of
24      medicine that will help them?
25          MR. PLYMALE:
```

**172**

```
1          Objection.
2      THE WITNESS:
3          That could be one of the criteria, one
4          of the reasons.
```

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 172:20 to 172:23)<br>172<br>20  Q  Is it true that you would be speculating,<br>21     Dr. Wendt, if you were asked what the State or the<br>22     DUR Board would have done had the State known<br>23     about potential cardiovascular risks with Vioxx -- | Relevance, speculation | *overruled* |
| mw121409, (Page 173:4 to 173:4)<br>173<br>4  Q  -- before the withdrawal? | Relevance, speculation | |
| mw121409, (Page 173:8 to 173:11)<br>173<br>8         I could not tell you what -- I can't<br>9         tell you what the DUR Board would do.<br>10  BY MR. GOLDMAN:<br>11  Q  Or the State? | Relevance, speculation | |
| mw121409, (Page 173:15 to 173:15)<br>173<br>15         I guess or the State. | Relevance, speculation | |
| mw121409, (Page 173:17 to 173:23)<br>173<br>17  Q  The State of Louisiana hired Provider Synergies in<br>18     March of 2002 to replace ULM as a consultant for<br>19     purposes of the PDL and prior authorization<br>20     program; does that sound about right?<br>21  A  I was not involved in that.<br>22  Q  You don't interact with Provider Synergies, right?<br>23  A  I do not. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 175:9 to 177:5) | | |

**175**

```
 9  Q  Dr. Biglane, Ms. Terrebonne, Mr. Bearden and
10     Mr. Castille all testified that they had no reason
11     to think that Merck misrepresented anything to
12     them about Vioxx.
13        Do you feel the same way?
14     MR. PLYMALE:
15        Objection.
16     THE WITNESS:
17        I never talked to Merck, ever, about
18     Vioxx.
19  BY MR. GOLDMAN:
20  Q   So Merck didn't misrepresent anything to you about
21     Vioxx?
22  A  There's been no communication --
23     MR. PLYMALE:
24        Objection.
25     THE WITNESS:
```

**176**

```
 1        -- with me and Merck about Vioxx.
 2  BY MR. GOLDMAN:
 3  Q  So the answer to my question is yes, they didn't
 4     misrepresent anything?
 5  A  Well, I didn't ever talk to them, so...
 6  Q  You don't feel to this day, Dr. Wendt, that Merck
 7     misled you in some way with respect to Vioxx,
 8     true?
 9     MR. PLYMALE:
10        Objection.
11     THE WITNESS:
12        I never talked to Merck about Vioxx,
13        ever, so I have no communication with
14        them.
15  BY MR. GOLDMAN:
16  Q  Do you have any reason to believe that Merck
17     misrepresented anything about Vioxx to the DUR?
18     MR. PLYMALE:
19        Objection.
20     THE WITNESS:
21        Merck never spoke to DUR about Vioxx,
22        to my knowledge.
23  BY MR. GOLDMAN:
```

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| 176<br><br>24  Q  Do you have any reason to believe that Merck ever<br>25    misrepresented anything about Vioxx to doctors in<br><br><br>177<br>1    Louisiana?<br>2      MR. PLYMALE:<br>3        Objection.<br>4      THE WITNESS:<br>5        I would not know. | | |
| mw121409, (Pages 177:23 to 178:9)<br>177<br>23    Q    Has anyone from the DUR Board ever complained to<br>24    you about Merck's handling of Vioxx?<br>25  A  No.<br><br>178<br>1  Q  Has anybody from DHH ever complained to you about<br>2    Merck's handling of Vioxx?<br>3  A  No.<br>4    Q    Has anybody from ULM or Unisys ever complained to<br>5    you about how they thought Merck handled Vioxx<br>6      while it was on the market?<br>7  A  Who are we talking about, ULM and who?<br>8  Q  Unisys.<br>9  A  No. | | |
| mw121409, (Page 178:20 to 178:25)<br>178<br>20  Q  Dr. Wendt, I asked you about the -- whether the<br>21    State prospectively limited the usage of drugs<br>22    approved by the FDA before the preferred drug list<br>23    and prior authorization systems were implemented.<br>24      Do you remember that?<br>25  A  I think I do. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 180:12 to 180:16)<br>180<br>12  Q  Prior to the time that the preferred drug list was<br>13      implemented in 2001, were there any other type of<br>14      prospective edits by DUR that were put in place<br>15      other than early refill, therapeutic duplications<br>16      ingredient duplications, that you remember? | Relevance, lack of testimony, lack of answer in designation | *overruled* |
| mw121409, (Page 180:17 to 180:19)<br>180<br>17  A  Prior to 2001, there -- there may be some others.<br>18      The duration of therapy issues and the dosage<br>19      issues in some drugs.  In some things, we require | **Incomplete designation** | |
| mw121409, (Page 180:20 to 180:21)<br>180<br>20      diagnosis codes.  Don't think we required that<br>21      until 2005. | Relevance, lack of testimony, lack of answer in designation | |
| mw121409, (Page 181:7 to 181:13)<br>181<br>7  Q  Prior to the time Vioxx was withdrawn in 2004, am<br>8      I right that the only prospective edits that you<br>9      remember were early refills, therapeutic<br>10     duplications, ingredient duplications, duration of<br>11     therapy edits, dosage edits?<br>12  A  That's what I remember.  There may be some more<br>13     that I -- that I don't recall. | Relevance, lack of personal knowledge | |
| mw121409, (Pages 185:10 to 185:22)<br>185<br>10  Q  Did the DUR Board ever take steps to limit the use<br>11     of Tylenol because of liver toxicity?<br>12  A  Yes.<br>13  Q  In what context?<br>14  A  We look at -- we don't allow -- or we would deny<br>15     claims when a person is getting more than 4 grams<br>16     of acetaminophen a day.<br>17  Q  When did that start?<br>18  A  I don't know.  It was very difficult to do.<br>19  Q  Why?<br>20  A  I don't -- because there are so many combination<br>21     products that have acetaminophen in it, and<br>22     different strengths. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 185:23 to 186:1)<br><br>23  Q  Did that start recently?<br>24  A  I don't -- I'm -- it's been in place for a while.<br>25     I really don't know.<br><br>                              186<br>1    Q    Now, with respect to COX-2 inhibitors, and NSAIDs, | 602; incomplete answer | overrule |
| mw121409, (Page 189:7 to 189:15)<br>                              189<br>7          Well, I think -- I mean, I think there's<br>8          safety concerns in a lot of the edits.<br>9          We have maximum doses on some other<br>10         drugs.  The therapeutic duplications are<br>11         a safety -- I mean, that's a safety<br>12         issue.  Actually, the early refills could<br>13         be a safety issue.  I mean, pretty much<br>14         most of the DUR edits have a safety issue<br>15         component. | Incomplete answer | |
| mw121409, (Page 189:19 to 189:23)<br>                              189<br>19         Can you think of any example where the DUR<br>20         Board implemented a prospective edit to try to<br>21         prevent a specific side effect for any drug?<br>22  A  The ketorolac, Toradol.<br>23  Q  What was the side effect there? | | |
| mw121409, (Page 189:24 to 189:24)<br>                              189<br>24  A  Potential for bleeding.  Let's see.  Then there's | Incomplete answer | |
| mw121409, (Pages 189:25 to 190:3)<br>                              189<br>25         some things that we look at -- and these are<br>                              190<br>1          primarily I think retrospectively, where one drug<br>2          might inhibit the dose level of other drugs.  So<br>3          those are -- those are in place. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 190:4 to 190:15)<br>190<br>4 Q That's an efficacy issue, though, right?<br>5 A Yeah, I guess you could say that. You know, it<br>6 depends on your definitions. And then we have<br>7 maximum doses on the antipsychotics. We have<br>8 maximum doses on some other things too. I'm<br>9 trying to think. The antipsychotics, the -- it's<br>10 just so much to try to think through.<br>11 The narcotics. The narcotics. I mean, with<br>12 your duplication and your early refills, you're<br>13 trying to prevent potential dependency and other<br>14 issues. It's possible that there's some more that<br>15 I'm not thinking of right now. | | |
| mw121409, (Page 192:1 to 192:3)<br>192<br>1 Q I believe you gave in your educational background<br>2 that you have a Pharm.D. degree, correct?<br>3 A That is correct. | | *Overruled* |
| mw121409, (Page 192:9 to 192:11)<br>192<br>9 Q Do you read -- do you regularly read peer-reviewed<br>10 medical scientific journal articles --<br>11 A No. | Relevance | |
| mw121409, (Pages 192:18 to 193:6)<br>192<br>18 Q Do you expect peer-reviewed journal articles to<br>19 contain accurate and complete data?<br>20 A I don't think that things would be -- data would<br>21 be complete necessarily because they're in a<br>22 peer-reviewed article. I do not believe that that<br>23 is necessarily true, no.<br>24 Q Have you ever read any journal articles other than<br>25 Exhibit 8 concerning COX-2 inhibitors?<br>193<br>1 A It's possible. I really don't know.<br>2 Q Do you recall reading any peer-reviewed journal<br>3 articles concerning Vioxx?<br>4 A I don't recall.<br>5 Q Are you aware of the term "ghost writing"?<br>6 A Not really, no. | Relevance, lack of personal knowledge | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 194:3 to 194:5)<br><br>194<br><br>3  Q  Are you aware of any of the DUR Board members<br>4     being detailed at any time by a pharmaceutical<br>5     representative? | | |
| mw121409, (Page 194:9 to 194:19)<br><br>194<br><br>9       I'm not aware of -- of what they do.<br>10 BY MR. PLYMALE:<br>11  Q   Do the physicians on the DUR Board maintain<br>12     private practices?<br>13  A   One of them does.  The other two work in clinics,<br>14     and I don't think they have private practices<br>15     outside of a public clinic that's affiliated with<br>16     the university.<br>17  Q   And you don't know if any of them were ever<br>18     detailed about any COX-2 inhibitor drug?<br>19  A   I do not know. | Relevance, lack of personal knowledge | *overruled* |
| mw121409, (Page 195:12 to 195:14)<br><br>195<br><br>12  Q  I believe you said that the prospective edits went<br>13     electronic in July 1996?<br>14  A   April 1st, 1996. | | |
| mw121409, (Page 196:18 to 196:25)<br><br>196<br><br>18  Q  The DHH had the ability to put prospective DUR<br>19     edits in place for COX-2 inhibitors prior to 1999,<br>20     correct?<br>21      MR. GOLDMAN:<br>22        Objection; calls for speculation.<br>23      THE WITNESS:<br>24        Yeah, I mean we had the capability,<br>25        yeah. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Page 198:13 to 198:24)<br><br>198<br>13    Q    You were asked whether you review peer-reviewed<br>14    journals, right?<br>15  A  Yes.<br>16  Q  You said you don't remember ever reading any<br>17    journal articles about Vioxx, right?<br>18  A  Yes.<br>19  Q  Do you remember any discussions at all about any<br>20    Vioxx-related articles at any DUR Board meetings?<br>21  A  No.<br>22  Q  Do you remember any discussions by any board<br>23    members, ever, about their interactions with sales<br>24    representatives from drug companies? | Relevance, lack of personal knowledge | *overruled* |
| mw121409, (Page 199:3 to 199:9)<br><br>199<br>3    No.<br>4  BY MR. GOLDMAN:<br>5   Q  Do you remember any meetings where any DUR Board<br>6    member said, "Gee, I think we should make certain<br>7    decisions based on a discussion I had with a sales<br>8    representative"?<br>9  A  I don't remember that. | Relevance, lack of personal knowledge | |
| mw121409, (Page 199:10 to 199:18)<br><br>199<br>10  Q  Has it been your experience with members of the<br>11    DUR Board that they make their judgments based on<br>12    clinical data and utilization data?<br>13    MR. PLYMALE:<br>14    Objection.<br>15    Go ahead.<br>16    THE WITNESS:<br>17    Clinical data, utilization data, and<br>18    their -- their practice experiences. | | |

| PLAINTIFF'S AFFIRMATIVE DESIGNATIONS & DEFENDANT'S COUNTER DESIGNATIONS | ALL OBJECTIONS | COURT RULING |
|---|---|---|
| mw121409, (Pages 199:20 to 200:3)<br><br>                    199<br>20  Q   And do you have any reason to expect that any of<br>21      the decisions made by the DUR Board were<br>22      influenced in any way by sales representatives<br>23      from Merck?<br>24  A   No.<br>25  Q   Do you have any reason to believe that any of the<br>                    200<br>1      decisions by the DUR Board at any time were<br>2      influenced by anybody at Merck?<br>3  A   I have no reason to believe that, no. | Relevance, lack of personal knowledge, speculation | *sustained* |

| LAAG | DESCRIPTION | DEPO EXB # |
|------|-------------|------------|
| | WENDT Exhibits | |
| 294 | 8-page copy of document entitled "Westlaw" | 3 |
| 299* | 1-page copy of E-mail dated 2/13/04 to M. J. Terrebonne Melwyn Wendt and Rachel Broussard  from Amy Ponti, plus attachments, LaAG-VIOXX-003803-3810<br>*Also marked LAAG 350 and LAAG 356* | 4 |
| 339* | 12-page copy of letter to M.J. Terrebonne from Chris Chapman dated 7-15-03, with attachments, LaAG-VIOXX-003212-3223<br>*Also marked LAAG 352* | 13 |
| 341 | 8-page copy of document from The New England Journal of Medicine dated 11-18-04 entitled "Medicaid Prior Authorization Programs and the Use of Cyclooxygenase-2 Inhibitors" | 8 |
| 342 | 6-page copy of document entitled "DUR Board Minutes," dated 1-26-05 | 11 |
| 349 | 11-page document entitled "Risk of NSAID-Associated Gastro-Intestinal Complications,"  VIOXX-LaAG-2009-008243 -VIOXX-LaAg-2009-008253 | 7 |
| 361 | 5-page copy of E-mail from Thomas Greene to M.J. Terrebonne  dated 5-2-05, LaAG-VIOXX-007024 - LaAG-VIOXX-007028 | 10 |
| 363 | 2-page copy of letter dated 3-1-05  to Dear Prescribing Practitioner from Frederick P. Cerise, M.D., LaAG-VIOXX-007079-7080 | 14 |
| 367 | 1-page copy of E-mail from Amy Ponti to M.J. Terrebonne, Melwyn Wendt and Rachel Broussard dated 2-13-04, with attachments, LaAG-VIOXX-003803-3810 | 6 |
| 426 | Provider Synergies Document, "Nonsteroidal Anti-inflammatories (NSAIDs)," LaAG-VIOXX-003338-3352 | 12 |