**la ag v merck**
**Deposition Designations for Fevurly_J_20091112**

|  |  | Objections | Ruling |
|---|---|---|---|

3:8    -    5:2    Fevurly_J_20091112.txt

| | | | Objections | Ruling |
|---|---|---|---|---|
| 3 | 8 | EXHIBIT INDEX | Re: [3:8-5:1] | overruled |
| 3 | 9 | NO.          PAGE | Def Obj Lack of | |
| 3 | 10 | FEVURLY EXHIBIT 1      37Performance Review Fo | foundation, not | |
| 3 | 11 | FEVURLY EXHIBIT 2      37 | testimony | |
| 3 | 12 | Medicaid State Team, PowerPoint,Bates MRK-EBBL 005694 | | |
| 3 | 13 | 56961 - 63, 56970 | | |
| 3 | 14 | FEVURLY EXHIBIT 3      38Memo from Holly Jacques, Bates | | |
| 3 | 15 | MRK-EAWX 0095117 - 119 | | |
| 3 | 16 | FEVURLY EXHIBIT 4      40E-mail from Michael Davis, Bates | | |
| 3 | 17 | MRK-EBBL 0058972 | | |
| 3 | 18 | FEVURLY EXHIBIT 5      44Memo from Check Grezlak and Michael | | |
| 3 | 19 | Davis to Margie McGlynn and DavidAnstice, Bates MRK-EBDE 0051271 - | | |
| 3 | 20 | 51275 | | |
| 3 | 21 | FEVURLY EXHIBIT 6      49E-mail from Mary Ogle to Michael Davis | | |
| 3 | 22 | Bates MRK-EBDE 0067336 - 67345 | | |
| 3 | 23 | FEVURLY EXHIBIT 7      53E-mail from Holly Jacques to Allan | | |
| 3 | 24 | Goldberg, Bates MRK-MEH 0016614 | | |
| 3 | 25 | | | |
| 4 | 1 | FEVURLY EXHIBIT 8      67E-mail from Michael Davis to Rich | | |
| 4 | 2 | Patrylak, et al, Bates MRK-AGTXAI0001430 - 1433 | | |
| 4 | 3 | FEVURLY EXHIBIT 9      67 | | |
| 4 | 4 | E-mail from John Fevurly to DanielKincaid and Terry Taylor, Bates | | |
| 4 | 5 | MRK-AGTXAH 0000086 | | |
| 4 | 6 | FEVURLY EXHIBIT 10      67E-mail from John Fevurly to Rich | | |
| 4 | 7 | Patrylak, Bates MRK-AGTXAI 0000542 -543 | | |
| 4 | 8 | FEVURLY EXHIBIT 11      77 | | |
| 4 | 9 | E-mail chain ending from JohnHarrington to Jacqueline McLarty, et al, | | |
| 4 | 10 | Bates MRK-AGLAAD 0009918 - 9919 | | |
| 4 | 11 | FEVURLY EXHIBIT 12      85E-mail chain ending from John Fevurly | | |
| 4 | 12 | To Tim Wissman, Bates MRK-EBDE0066338 - 66341 | | |
| 4 | 13 | FEVURLY EXHIBIT 13      87 | | |
| 4 | 14 | E-mail from John Fevurly to Michael KellyBates MRK-EBBL 0056856 | | |
| 4 | 15 | FEVURLY EXHIBIT 14      89 | | |
| 4 | 16 | Customer Profile State of LouisianaBates MRK-EBDE 0067429 - 67435 | | |
| 4 | 17 | FEVURLY EXHIBIT 15      94 | | |
| 4 | 18 | PIR, Bates MRK-AGTXAH 0000030 | | |
| 4 | 19 | FEVURLY EXHIBIT 16      94Letter to Dr. Taylor from Dr. Christiane | | |
| 4 | 20 | Arsever, Bates MRK-AKT 1456746 - 1456765 | | |
| 4 | 21 | FEVURLY EXHIBIT 17      101E-mail from John Fevurly to Patrice | | |
| 4 | 22 | McMonagle, Bates MRK-EBBL 0059161 - 62 | | |
| 4 | 23 | FEVURLY EXHIBIT 18      101E-mail from Michael Davis to Charles | | |
| 4 | 24 | Grezlak, et al, Bates MRK-EBDE 0072661 | | |

1

|  | Objections | Ruling |
|---|---|---|

```
      4 25
      5  1        FEVURLY EXHIBIT 19  `           103PIR, Bates MRK-AGTXAH 0001342, 1341
      5  2
```

```
9:25   -   10:1   Fevurly_J_20091112.txt
      9 25        What is your current position now?
     10  1        A.  Current position is national account director.
```

```
10:2   -   10:24  Fevurly_J_20091112.txt
     10  2        Q.  How long have you been in that position?
     10  3        A.  Well, the name -- the title has changed, so the
     10  4        job that I'm doing has stayed the same since 2001, but
     10  5        I've had different clients, and they've had a title
     10  6        change, so I've basically done the same type of job
     10  7        since 2001.
     10  8        Q.  What is your current job?
     10  9        A.  United States.  I have a customer that covers
     10 10        the whole United States.
     10 11        Q.  Is it one customer you're responsible for?
     10 12        A.  It's a PBM, and they have like 4700 customers
     10 13        under them.
     10 14        Q.  Which PBM?
     10 15        A.  It's called CVS Caremark now C-a-r-e-m-a-r-k.
     10 16        Q.  And how long have you been the national account
     10 17        director for CVS Caremark?
     10 18        A.  Since about April of '04.
     10 19        Q.  And immediately prior to that were you the -- I
     10 20        think it was called at that time a national account
     10 21        executive --
     10 22        A.  Yes, national account executive.
     10 23        Q.  -- for Provider Synergies?
     10 24        A.  It was one of my customers.
```

```
11:23  -   12:6   Fevurly_J_20091112.txt
     11 23        Q.  (BY MR. BLOOM)  So if you can flip to a number
     11 24        of pages in.  On the bottom of the page it's identified
     11 25        by the Bates number MRK AGTXAH 0800007.
     12  1        If you look under No. 4, Evaluation of
     12  2        Objective, Using Specific Examples of Data, the second
     12  3        legible or third legible sentence -- or rather, last
     12  4        sentence says, "He has created a well-developed clinical
     12  5        update approach which relies on integration and teamwork
     12  6        at the customer level."
```

**Re: [11:23-11:25]**
**Def Obj** Lack of
foundation

```
12:12  -   12:18  Fevurly_J_20091112.txt
     12 12        Q.  (BY MR. BLOOM)  Do you know what this is
     12 13        referring to?  Do you remember creating a clinical
     12 14        update approach relying on integration and teamwork at
     12 15        the customer level?  Do you know what this sentence is
     12 16        referring to?
```

**Re: [12:12-12:16]**
**Def Obj** Calls for
speculation, no
personal knowledge

|  | Objections | Ruling |
|---|---|---|

|  |  |  |
|---|---|---|
| 12 17 | A.  This performance section is written by my boss | |
| 12 18 | at the time.  And I assume he means -- is talking | |

**13:17  -  14:12  Fevurly_J_20091112.txt**

|  |  |  |
|---|---|---|
| 13 17 | Q.  Do you recall a time in 2002 when you began | |
| 13 18 | working with Provider Synergies? | |
| 13 19 | A.  Yes. | |
| 13 20 | Q.  Would you have created a clinical update | |
| 13 21 | approach for the Provider Synergies account? | |
| 13 22 | MR. SALES:  Objection to form. | |
| 13 23 | A.  Can you be more specific? | |
| 13 24 | Q.  (BY MR. BLOOM)  Well, I'm trying to find out | Re: [13:24-14:7] |
| 13 25 | whether or not this applied to your -- whether this | **Def Obj** Lack of |
| 14  1 | applied to Provider Synergies or your other accounts. | foundation |
| 14  2 | So I'm asking you whether or not you would have had an | |
| 14  3 | opportunity or whether you recall creating a clinical | |
| 14  4 | update approach for Provider Synergies? | |
| 14  5 | MR. SALES:  Objection, lack of foundation. | |
| 14  6 | A.  I don't recall developing any different | |
| 14  7 | clinical approach for any customer at that time. | |
| 14  8 | Q.  (BY MR. BLOOM)  So would you have had the same | Re: [14:8-14:12] |
| 14  9 | kind of clinical approach to Provider Synergies as, | **Def Obj** Lack of |
| 14 10 | let's say, Blue Cross Blue Shield of Arkansas? | foundation, |
| 14 11 | MR. SALES:  Objection to form. | ambiguous |
| 14 12 | A.  It would have been very similar. | |

**14:25  -  16:4  Fevurly_J_20091112.txt**

|  |  |  |
|---|---|---|
| 14 25 | Q.  (BY MR. BLOOM)  Okay.  Outside of the document | |
| 15  1 | what was your approach to providing clinical updates to | |
| 15  2 | your accounts in 2002? | |
| 15  3 | A.  My approach generally would be to take the | |
| 15  4 | information that was provided to Merck -- provided by | |
| 15  5 | Merck to me to be able to speak to the client; and if | |
| 15  6 | the client needed additional information that they | |
| 15  7 | requested, I would either have the regional medical | |
| 15  8 | director come in and speak with them or I would submit a | |
| 15  9 | professional information request to medical services so | |
| 15 10 | that they would have the information that they are | |
| 15 11 | requesting, try to be as customer responsive as possible | |
| 15 12 | to any questions they may have. | |
| 15 13 | Q.  Did you -- when you -- at the beginning of your | Re: [15:13-16:4] |
| 15 14 | answer you sounded like you, as well as your regional | **Def Obj** Calls for |
| 15 15 | medical director, would provide clinical information. | speculation, |
| 15 16 | Would you of your own initiative provide clinical | vague/ambiguous |
| 15 17 | information to an account? | |
| 15 18 | MR. SALES:  Objection, form.  Vague and | |
| 15 19 | ambiguous. | |
| 15 20 | A.  Well, I represent the product to the customer, | |
| 15 21 | so I have to be certified and trained on it to be able | |
| 15 22 | to speak to it within the guidelines and regulations and | |

| | Objections | Ruling |
|---|---|---|

15 23    the product circular, so if there was something the
15 24    customer specifically asked about in the product
15 25    circular, I would answer the question within the
16   1    guidelines and regulations to the best of my ability.
16   2    And if I couldn't answer that question, I
16   3    would refer it to medical services folks who could, or
16   4    the regional medical director.

16:10   -   16:25   Fevurly_J_20091112.txt
16 10    Q.  And look on the next page, 30, Statement of
16 11    Objective.  The first arrow says, "Maintained or
16 12    enhanced PDL status/access for Merck products on State
16 13    Medicaid programs through Provider Synergies," and then
16 14    a number of different states.
16 15    I guess I have a couple of questions.  I'm
16 16    trying to figure out the time frame in which you began
16 17    working with Provider Synergies to maintain or enhance
16 18    access to -- for Merck products.
16 19    Do you recall the time in which you shifted
16 20    your job duties and objectives to include Provider
16 21    Synergies?
16 22    A.  I manage a broad portfolio of customers, so at
16 23    that time I had a new -- I picked up Provider Synergies
16 24    as a new account, and stopped calling on Blue Cross Blue
16 25    Shield of Texas.

17:1   -   17:2   Fevurly_J_20091112.txt
17   1    And that would have been about June to July
17   2    of '04.  No.  Sorry, June to July of '02.  2002.

17:16   -   18:9   Fevurly_J_20091112.txt
17 16    Q.  Could you flip to the next page.  It's 31.  It
17 17    says Louisiana Medicaid.  "Despite competitive threats
17 18    and therapeutic reviews by P&T, retained unrestricted
17 19    access for the following Merck products through
17 20    negotiations with PBM and State."
17 21    I want to try to get a better idea of how
17 22    things worked with that account.  I understand that you
17 23    had direct negotiations with PBM which -- was the PBM
17 24    Provider Synergies in this case?
17 25    A.  Yes.
18   1    Q.  Did you also negotiate with the State?
18   2    A.  No.  The State had a contract with Provider
18   3    Synergies.  I didn't negotiate with them.
18   4    Q.  So --
18   5    MR. SALES:  Can you speak up a little bit.
18   6    She's having a hard time hearing you, and we need a
18   7    clear record.  Please speak up.
18   8    Q.  (BY MR. BLOOM) So then --
18   9    A.  I negotiated with the PBM, not with the State.

|  | Objections | Ruling |
|---|---|---|

●9:11   -   19:19   Fevurly_J_20091112.txt
19 11        Q.  (BY MR. BLOOM)  Did you negotiate directly with
19 12        Provider Synergies, or did you negotiate with Provider
19 13        Synergies and the State?
19 14        A.  I negotiated with Provider Synergies.
19 15        Q.   And did you ever have occasion to directly
19 16        negotiate with the states that Provider Synergies was
19 17        acting as the PBM for?
19 18        A.  I don't recall ever negotiating with the states
19 19        that Provider Synergies was responsible for.

21:7   -   21:18   Fevurly_J_20091112.txt
21  7        Did field sales have a role in your
21  8        relationship and your duties with respect to Provider
21  9        Synergies?
21 10        A.   Field sales did not have responsibility for
21 11        calling on Provider Synergies.  That was my role.
21 12        Q.   Would you coordinate any field sales activities
21 13        as part of your duties with respect to Provider
21 14        Synergies?
21 15        MR. SALES:  Objection, asked and answered.
21 16        A.   With regard to Provider Synergies field sales
●21 17      would not have any interaction with the customer -- with
21 18        Provider Synergies as the customer.

22:1   -   22:19   Fevurly_J_20091112.txt
22  1        When you picked up the Provider Synergies
22  2        account, who was your supervisor?  Who did you --
22  3        A.  Mike Kelly.
22  4        Q.   What was his title?
22  5        A.  I believe it was Senior Director Managed Care.
22  6        Q.   And did you have any Merck counterparts that
22  7        worked on an account with you?
22  8        A.  Yes.
22  9        Q.  Who were they?
22 10        A.  Michael Davis.
22 11        Q.  His title?
22 12        A.  Customer Manager.  Might have had a "Senior"
22 13        before that or "Associate Director" or some other part
22 14        of it, but Customer Manager.
22 15        Q.   Anyone else?
22 16        A.  Responsible for the account for Provider
22 17        Synergies?
22 18        Q.  Uh-huh.
●22 19      A.  We were the lead.

22:20   -   23:13   Fevurly_J_20091112.txt
22 20        Q.  And did anyone direct -- did anyone answer to
22 21        you?  Was anyone underneath you with respect to that

| | Objections | Ruling |
|---|---|---|

| | | |
|---|---|---|
| 22 22      account? | | |
| 22 23      A.  No. | | |
| 22 24      Q.  Were you part of a larger Louisiana Medicaid | | |
| 22 25      team? | | |
| 23  1      A.  Not a formal organizational structure. | **Re: [23:1-23:8]** | |
| 23  2      Q.  Who else do you recall worked on -- or who | **Def Obj** No personal | |
| 23  3      would you work with with respect to the Louisiana | knowledge, lack of | |
| 23  4      Medicaid account? | foundation, calls for | |
| 23  5      MR. SALES:  Objection, vague. | speculation, | |
| 23  6      A.  I had responsibility with Michael to call on | vague/ambiguous | |
| 23  7      Provider Synergies, and Louisiana was one of the states | | |
| 23  8      Provider Synergies managed. | | |

Overrule

23  9      Q.  (BY MR. BLOOM)  Did you coordinate with other
23 10      Merck employees working with Louisiana Medicaid?
23 11      A.  I would communicate with the people responsible
23 12      for business in the State of Louisiana on the Merck
23 13      side.

**23:14  -  23:23  Fevurly_J_20091112.txt**
23 14      Q.  I'm handing you a document.  It looks like the
23 15      title is Medicaid State Team, and it's a document
23 16      identified at the bottom by Bates MRK EBBL 0056949
23 17      through 970.
23 18      I apologize for how this looks, but that's
23 19      how it was provided to us.  I imagine these pages were
23 20      laid out differently in the chart.
23 21      Do you recall being part of a Louisiana
23 22      Medicaid State Team?
23 23      A.  I don't recall that specific name.

**24:16  -  24:25  Fevurly_J_20091112.txt**
24 16      Q.  And in looking at this as what appears to be a
24 17      table, would it appear to you that at the end of that
24 18      line, the PS and SC would relate to Louisiana?
24 19      A.  Yes.  PS appears to relate to Louisiana.  And
24 20      SC also, yes.
24 21      Q.  And does that PS stand for Provider Synergies?
24 22      A.  Yes.
24 23      Q.  And so I guess that would fit in the PBM
24 24      column?
24 25      A.  Correct.

**25:19  -  26:12  Fevurly_J_20091112.txt**
25 19      Reading this as a continuation of the line
25 20      that we were looking at with Holly Jacques as the next
25 21      entry after SC, do you recall Holly Jacques working on
25 22      the Louisiana account as a government affairs policy
25 23      Merck employee?
25 24      A.  Yes, I do.
25 25      Q.  Do you recall Terri Lee working on the  6

| | | | Objections | Ruling |
|---|---|---|---|---|

| | | |
|---|---|---|
| 26 | 1 | Louisiana account? |
| 26 | 2 | A.  I don't recall her working directly on the |
| 26 | 3 | Louisiana account.  Holly Jacques reports to Terri Lee. |
| 26 | 4 | Q.  Do you remember working with Mary Ogle on the |
| 26 | 5 | Louisiana Medicaid account? |
| 26 | 6 | A.  Can you rephrase the question? |
| 26 | 7 | Q.  Do you remember working with Mary Ogle on the |
| 26 | 8 | Louisiana account -- on the Louisiana Medicaid account? |
| 26 | 9 | MR. SALES:  Objection to the form. |
| 26 | 10 | A.  Mary Ogle, from my recollection, was the |
| 26 | 11 | national account executive responsible for the State of |
| 26 | 12 | Louisiana accounts and Medicaid. |

**26:23 - 27:3   Fevurly_J_20091112.txt**

| | | |
|---|---|---|
| 26 | 23 | Q.  And what do you think MCCSG stands for which is |
| 26 | 24 | the next box over? |
| 26 | 25 | A.  Managed Care Customer Segment Group, I believe. |
| 27 | 1 | Q.  And the next is RMD, which I assume is Regional |
| 27 | 2 | Medical Director? |
| 27 | 3 | A.  Correct. |

**27:4 - 27:23   Fevurly_J_20091112.txt**

| | | |
|---|---|---|
| 27 | 4 | Q.  And below that on the same line that we were |
| 27 | 5 | looking at for Louisiana it says Fran Kaiser, Kerry |
| 27 | 6 | Edwards and then PS. |
| 27 | 7 | And you have stated earlier that Fran |
| 27 | 8 | Kaiser worked with you on the Provider Synergies |
| 27 | 9 | account.  Do you recall Kerry Edwards also working with |
| 27 | 10 | you on the Provider Synergies account? |
| 27 | 11 | A.  I don't recall saying that Fran Kaiser worked |
| 27 | 12 | with me on the Provider Synergies account. |
| 27 | 13 | Q.  Did Fran Kaiser work with you on the Provider |
| 27 | 14 | Synergies account? |
| 27 | 15 | A.  More than one regional medical director may |
| 27 | 16 | have come in to call on Provider Synergies at any given |
| 27 | 17 | time. |
| 27 | 18 | Q.  Was Fran Kaiser one of those medical directors? |
| 27 | 19 | A.  I don't recall Fran Kaiser calling on Provider |
| 27 | 20 | Synergies directly. |
| 27 | 21 | Q.  Do you recall Kerry Edwards calling on Provider |
| 27 | 22 | Synergies? |
| 27 | 23 | A.  Yes. |

**29:15 - 29:23   Fevurly_J_20091112.txt**

| | | | |
|---|---|---|---|
| 29 | 15 | Q.  And was Louisiana part of the geography that | Re: [29:15-29:23] |
| 29 | 16 | you were responsible for back in -- at the end of 2002? | **Def Obj** Lack of |
| 29 | 17 | A.  Through Provider Synergies the business for | foundation |
| 29 | 18 | their customers would have been geographies that you | |
| 29 | 19 | could say I was responsible for from the Provider | |
| 29 | 20 | Synergies perspective. | |

*overruled* (handwritten)

| | Objections | Ruling |
|---|---|---|

29 21   Q.  And was Louisiana one of Provider Synergies'
29 22   customers?
29 23   A.  Correct.

30:6   -   30:19   Fevurly_J_20091112.txt
30   6   Q.  (BY MR. BLOOM) Do you recall working with
30   7   Warren Lambert on the Louisiana account?
30   8   MR. SALES: Objection, asked and answered.
30   9   A.  I communicated with Warren Lambert and other
30 10   senior directors for the states that Provider Synergies
30 11   had customers.  So I would have communicated with Warren
30 12   Lambert.
30 13   Q.  (BY MR. BLOOM) Okay.  Do you recall
30 14   specifically working with Warren Lambert on Louisiana
30 15   through your Provider Synergies account?
30 16   MR. SALES: Objection, asked and answered,
30 17   vague.
30 18   A.  I recall speaking with Warren Lambert about the
30 19   State of Louisiana Medicaid.

**Re: [30:13-30:19]**
**Def Obj**
Vague/ambiguous

31:20   -   31:23   Fevurly_J_20091112.txt
31 20   Q.  Do you know what FSPR stands for?
31 21   A.  FSPR, yes.
31 22   Q.  What does it stand for?
31 23   A.  Field Sales Performance Report.

**Re: [31:20-31:23]**
**Def Obj** Irrelevant

32:19   -   32:22   Fevurly_J_20091112.txt
32 19   Q.  And would you -- while working on the Provider
32 20   Synergies account, would you create field sales
32 21   performance reports?
32 22   A.  No.

**Re: [32:19-32:21]**
**Def Obj** Irrelevant

36:10   -   36:14   Fevurly_J_20091112.txt
36 10   Q.  Would you lead monthly teleconferences with
36 11   State Medicaid Teams for the State of Louisiana in 2004?
36 12   A.  I recall being on teleconferences with National
36 13   Account Executive and Customer Manager, Government
36 14   Affairs Executive for the State of Louisiana.

**Re: [34:21-37:7]**
**Def Obj** Lack of
foundation

36:15   -   36:20   Fevurly_J_20091112.txt
36 15   I don't know if monthly -- I don't
36 16   recollect the exact frequency.
36 17   Q.  Do you recall being the leader of the call as
36 18   this sentence implies?
36 19   A.  I don't recall specifically being the leader of
36 20   the calls.

**Re: [34:21-37:7]**
**Def Obj** Lack of
foundation

36:21   -   37:7   Fevurly_J_20091112.txt
36 21   Q.  And during those calls would you coordinate
36 22   strategies, including clinical strategies, contracting

**Re: [34:21-37:7]**
**Def Obj** Lack of

Overrule

04/11/10 20:25

| | | Objections | Ruling |
|---|---|---|---|

| | | |
|---|---|---|
| 36 23 | strategies and/or message targeting? | foundation |
| 36 24 | And by saying "you," I mean as part of the | |
| 36 25 | State Medicaid Team or along with the State Medicaid | |
| 37 1 | Team. | |
| 37 2 | A.  What I recall from these teleconferences would | |
| 37 3 | have been a dialogue around communication updates.  So | |
| 37 4 | if the State had a product on formulary, I would | |
| 37 5 | communicate that to the State NAE.  Or if there was a | |
| 37 6 | review coming up, they might let me know there was going | |
| 37 7 | to be a review coming up. | |

**37:13   -   37:14   Fevurly_J_20091112.txt**

| | | |
|---|---|---|
| 37 13 | (FEVURLY Exhibit No. 1 marked.) | **Re: [37:13-37:18]** |
| 37 14 | (FEVURLY Exhibit No. 2 marked.) | **Def Obj** Irrelevant, |
| | | lack of foundation, |
| | | question without |
| | | answer |

*Overruled*

**37:15   -   38:18   Fevurly_J_20091112.txt**

| | | |
|---|---|---|
| 37 15 | Q.  (BY MR. BLOOM)  I'll be handing you another | **Re: [37:13-37:18]** |
| 37 16 | document.  At the bottom of the first page it's | **Def Obj** Irrelevant, |
| 37 17 | identified by the Bates stamp MRK EAWX 0095117 and end | lack of foundation, |
| 37 18 | with 5119. | question without |
| 37 19 | This appears to be a Merck memo from Holly | answer |
| 37 20 | Jacques to a number of individuals including yourself. | |
| 37 21 | Does that appear to be the case to you? | |
| 37 22 | A.  Yes. | |
| 37 23 | Q.  The subject matter, Louisiana Medicaid | |
| 37 24 | Pharmaceutical and Therapeutics (P&T) Committee Meeting. | |
| 37 25 | Now, in the first paragraph it indicates | |
| 38 1 | that the committee met on August 8th, 2001 for the first | |
| 38 2 | time, and although it doesn't have a date on it, the way | |
| 38 3 | that we receive documents that come with some objective | |
| 38 4 | coding which indicate the date of the document and | |
| 38 5 | "from," "to," and this was identified as being generated | |
| 38 6 | on August 23rd of 2001. | |
| 38 7 | I guess the question that I'm trying to get | |
| 38 8 | at is:  This appears to be a document that is specific | |
| 38 9 | to Louisiana.  And I'm wondering why you think you would | |
| 38 10 | have received it back in 2001 before you started working | |
| 38 11 | on the Provider Synergies account. | |
| 38 12 | A.  I don't believe I would have received it at the | |
| 38 13 | time. | |
| 38 14 | Q.  Do you have any reason -- do you know why you | |
| 38 15 | might have received it? | |
| 38 16 | MR. SALES:  Objection, calls for | |
| 38 17 | speculation. | |
| 38 18 | A.  I don't know -- I don't recall this document. | |

**38:22   -   38:22   Fevurly_J_20091112.txt**

04/11/10 20:25

| | | | Objections | Ruling |
|---|---|---|---|---|

|  |  |  |
|---|---|---|
| 38 | 22 | (FEVURLY Exhibit No. 3 marked.) |

**Re: [38:22-39:17]**
**Def Obj** Rule 802, no
personal knowledge

*Overruled*

**38:23  -  39:17  Fevurly_J_20091112.txt**

| 38 | 23 | Q.  This is a document, a one-page identified by |
|---|---|---|
| 38 | 24 | MRK EBBL 0058972.  It appears to be an e-mail from |
| 38 | 25 | Michael Davis to Mary Dermody.  Is that pronounced |
| 39 | 1 | Dermody? |
| 39 | 2 | A.  Dermody. |
| 39 | 3 | Q.  And John Fevurly on 5/28/2002. |
| 39 | 4 | Do you recognize this document? |
| 39 | 5 | A.  No. |
| 39 | 6 | Q.  Does it appear to you this would have been an |
| 39 | 7 | e-mail sent from Michael Davis to you in May of 2002? |
| 39 | 8 | A.  Yes. |
| 39 | 9 | Q.  And the subject being Louisiana Medicaid offer |
| 39 | 10 | for Provider Synergies. |
| 39 | 11 | The question I have with this document is |
| 39 | 12 | to try to narrow down the timing of when you would have |
| 39 | 13 | started working on the Provider Synergies account. |
| 39 | 14 | Do you know why you would have received |
| 39 | 15 | this at the end of May in 2002? |
| 39 | 16 | MR. SALES:  Objection. |
| 39 | 17 | A.  I don't know. |

**Re: [38:22-39:17]**
**Def Obj** Rule 802, no
personal knowledge

**40:1  -  40:5  Fevurly_J_20091112.txt**

| 40 | 1 | Q.  From looking at this e-mail does it appear that |
|---|---|---|
| 40 | 2 | you had begun working with Provider Synergies in May of |
| 40 | 3 | 2002? |
| 40 | 4 | A.  From looking at this e-mail, it looks like I |
| 40 | 5 | started somewhere in that time frame, yes. |

**Re: [40:1-40:7]**
**Def Obj** Rule 802, no
personal knowledge

**40:7  -  40:7  Fevurly_J_20091112.txt**

| 40 | 7 | (FEVURLY Exhibit No. 4 marked.) |
|---|---|---|

**Re: [40:1-40:7]**
**Def Obj** Rule 802, no
personal knowledge

**41:1  -  41:4  Fevurly_J_20091112.txt**

| 41 | 1 | Do you recognize the document? |
|---|---|---|
| 41 | 2 | A.  No. |
| 41 | 3 | Q.  Do you recall ever seeing it before? |
| 41 | 4 | A.  No.  I don't recall seeing it before. |

**41:22  -  42:1  Fevurly_J_20091112.txt**

| 41 | 22 | Q.  (BY MR. BLOOM)  Is it your understanding that |
|---|---|---|
| 41 | 23 | at some point in time Vioxx was designated as a Merck |
| 41 | 24 | product that required prior authorization on the |
| 41 | 25 | Louisiana Medicaid account?  Or for Louisiana Medicaid? |
| 42 | 1 | A.  Yes. |

**42:8  -  42:24  Fevurly_J_20091112.txt**

| | Objections | Ruling |
|---|---|---|

| | | |
|---|---|---|
| 42 8 | Q. (BY MR. BLOOM) Were you working with a | |
| 42 9 | Provider Synergies account on May 7th of 2002 when there | |
| 42 10 | was a hearing wherein the Louisiana Medicaid considered | |
| 42 11 | various Merck drugs to be on the Medicaid formulary? | |
| 42 12 | A. No. I don't believe I was. | |
| 42 13 | Q. Do you recall being involved in conversations | |
| 42 14 | with legislators in the State of Louisiana shortly after | |
| 42 15 | that hearing in May of 2002 to -- | |
| 42 16 | A. No. | |
| 42 17 | Q. Did you ever have any conversations with any | |
| 42 18 | legislators in the State of Louisiana? | |
| 42 19 | A. Not that I recall. | |
| 42 20 | Q. Do you know who would have had those types of | |
| 42 21 | conversations? | |
| 42 22 | A. Yes. | |
| 42 23 | Q. Who would that have been? | |
| 42 24 | A. Holly Jacques. | |

**43:3 - 43:13   Fevurly_J_20091112.txt**

| | |
|---|---|
| 43 3 | Do you recall being part of a negotiation |
| 43 4 | team for negotiating access with Provider Synergies for |
| 43 5 | Merck drugs? |
| 43 6 | A. Yes. |
| 43 7 | Q. And it talks about the team, which includes you |
| 43 8 | and Michael Davis, would be under the direction of Mary |
| 43 9 | Dermody. |
| 43 10 | Did Mary Dermody lead those -- or direct |
| 43 11 | your negotiations with Provider Synergies for the |
| 43 12 | Louisiana account? |
| 43 13 | A. Yes. |

**44:1 - 44:1   Fevurly_J_20091112.txt**

| | |
|---|---|
| 44 1 | (FEVURLY Exhibit No. 5 marked.) |

**44:2 - 44:21   Fevurly_J_20091112.txt**

| | |
|---|---|
| 44 2 | Q. I'm handing you a document which begins with |
| 44 3 | MRK EBDE 0067336 through 7345. And it is an e-mail -- |
| 44 4 | appears to be the first page is an e-mail, and the |
| 44 5 | subsequent pages are, as I understand, an attachment to |
| 44 6 | the e-mail. |
| 44 7 | It was from Mary Ogle to Mr. Davis and |
| 44 8 | Mr. Fevurly copying a number of individuals on January |
| 44 9 | of 2003. |
| 44 10 | Do you recall Mary Ogle sending you a |
| 44 11 | customer profile for the State of Louisiana? |
| 44 12 | A. I don't recall. |
| 44 13 | MR. SALES: Objection. |
| 44 14 | Q. (BY MR. BLOOM) Do you recall receiving at any |
| 44 15 | time the customer profiles for the State of Louisiana? |
| 44 16 | A. Yes. |

| | | Objections | Ruling |
|---|---|---|---|

44 17    Q.  Who would have sent those profiles to you?
44 18    A.  Mary or Holly.
44 19    Q.  Okay.  And does this appear to be the customer
44 20    profile form for the State of Louisiana?
44 21    A.  Yes.

44:22  -  45:8    Fevurly_J_20091112.txt
44 22    Q.  Turn to page 7341.  And I want to look at this
44 23    section on PDL process.
44 24    A.  Okay.
44 25    Q.  First, can you review this section on PDL
45  1    process, and I want to see if what is written here
45  2    comports with your understanding of the process.
45  3    Have you had a chance to review that
45  4    section?
45  5    A.  Yes, sir.
45  6    Q.  Does that comport with your understanding of
45  7    the PDL process for the State of Louisiana?
45  8    A.  That's what I recall the process to be.

45:21  -  46:12    Fevurly_J_20091112.txt
45 21    Q.  (BY MR. BLOOM) Does this generally describe
45 22    how you engaged with Provider Synergies, or did your
45 23    engagement with Provider Synergies follow the general
45 24    guidelines set out here in this document?
45 25    A.  This -- my -- from my understanding, this
46  1    generally outlines the guidelines that Provider
46  2    Synergies provided to Michael and I on how the process
46  3    worked for the State of Louisiana.
46  4    Q.  And in creating this document, it indicates it
46  5    was prepared by Mary Ogle and Holly Jacques.
46  6    Would they have asked you to provide
46  7    information to create this section?
46  8    A.  I believe -- I don't recall.
46  9    Q.  Do you know how they would have found out about
46 10    the PDL process?
46 11    MR. SALES:  Objection, form.
46 12    A.  I don't know.

**Re: [46:9-46:12]**
**Def Obj** Calls for
speculation

*[handwritten: overruled]*

46:13  -  46:17    Fevurly_J_20091112.txt
46 13    Q.  (BY MR. BLOOM) I believe you came on to -- or
46 14    took on the Provider Synergies account after the initial
46 15    review by the State of Louisiana.
46 16    Is that correct?
46 17    A.  That's my recollection.

46:23  -  48:4    Fevurly_J_20091112.txt
46 23    Q.  Well, it says here the process is that the drug
46 24    is first reviewed by Provider Synergies on its clinical
46 25    merits.  And then after clinical review Provider

| | | Objections | Ruling |
|---|---|---|---|

47  1    Synergies performs a financial analysis.

Re: [47:1-47:9]
**Def Obj** No answer given, no testimony

47  2    Did you in their evaluation of Vioxx
47  3    provide Provider Synergies with clinical information
47  4    pertaining to Vioxx?
47  5    MR. SALES: I object. That is not a
47  6    complete recitation of the process of what's happening
47  7    in the document. But you can answer the question.
47  8    A.  Can you give me a specific time frame or
47  9    explain what you're wanting me to answer.
47 10    Q.  (BY MR. BLOOM) Did you participate in the
47 11    first review in 2002 on or about May of 2002?
47 12    A.  No.
47 13    Q.  It's my understanding that after that there was
47 14    another review which included a reconsideration of Vioxx
47 15    by Provider Synergies.
47 16    Is that correct?
47 17    A.  My understanding or recollection is that it was
47 18    the following year.
47 19    Q.  And were you involved in providing information
47 20    to Provider Synergies to assist them in their review of
47 21    the drug Vioxx?
47 22    A.  Provider Synergies touted their own independent
47 23    review based upon peer reviewed clinical literature that
47 24    was out there.
47 25    From my observation and experience with
48  1    them, that's what they followed.  So they would do their
48  2    own clinical review, provide their own recommendation
48  3    independently to the State of Louisiana on any of these
48  4    therapeutic categories.

48:5   -   48:15   Fevurly_J_20091112.txt
48  5    Q.  And in performing that review, did you play a
48  6    role in providing them with clinical information?
48  7    A.  If the customer asks for specific information,
48  8    I would respond to them with the information that I had
48  9    within the guidelines and regulations and the product
48 10    circular.
48 11    And if they had additional questions, I
48 12    obviously wanted to provide good customer service, I
48 13    would make sure that the question was referred on to
48 14    Professional Information or Medical Services or to a
48 15    physician so that they could be addressed appropriately.

48:24   -   49:16   Fevurly_J_20091112.txt
48 24    Q.  (BY MR. BLOOM) You indicated just now that you
48 25    thought that the second review took place a year after
49  1    the May 2002 review; is that correct?
49  2    A.  Yes.
49  3    Q.  Do you know if in that second review whether
49  4    there was any significant new -- and I'm looking at this

| | Objections | Ruling |
|---|---|---|

49  5    last paragraph that's on page 342, not the last sentence
49  6    but the paragraph.
49  7    Do you know if there was any significant
49  8    new clinical or financial information provided to
49  9    Provider Synergies for the second review?
49 10    A.  Yes.
49 11    Q.  Do you remember if there was any significant
49 12    new clinical information?
49 13    A.  I don't recall.
49 14    Q.  Do you recall whether there was any significant
49 15    new financial information?
49 16    A.  Yes.

49:18  -  49:18  Fevurly_J_20091112.txt
49 18    (FEVURLY Exhibit No. 6 marked.)

49:19  -  50:1  Fevurly_J_20091112.txt
49 19    Q.  I'm handing you a document identified by MRK
49 20    MEH 0016614.  It's a one page e-mail from Holly Jacques
49 21    to Allan Goldberg and copying a number of individuals,
49 22    including yourself, dated August of 2002.  Subject:
49 23    Emergency Request For Information.
49 24    Do you recognize this as a Merck e-mail in
49 25    which you were copied?
50  1    A.  Yes.

50:2  -  50:6  Fevurly_J_20091112.txt
50  2    Q.  Do you recognize the document?
50  3    A.  No.  Recognize meaning do I remember having
50  4    seen it?
50  5    Q.  Do you remember having seen it?
50  6    A.  I don't remember having seen it.

50:8  -  50:14  Fevurly_J_20091112.txt
50  8    Do you recall a time in August or
50  9    thereabouts in 2002 in which you met with Dr. Culotta,
50 10    the chair of the Louisiana P&T committee?
50 11    A.  Yes.
50 12    Q.  And do you remember who you were with in that
50 13    meeting, who participated in the meeting?
50 14    A.  I recall Holly Jacques and Fran Kaiser.

50:15  -  52:15  Fevurly_J_20091112.txt
50 15    Q.  This appears to be Holly Jacques telling
50 16    Dr. Goldberg that the chair of the P&T committee had
50 17    asked for specific information, including the heart
50 18    protection study, the comparison of GI outcomes between
50 19    Celebrex, Bextra and Vioxx and the Renaal study,
50 20    R-e-n-a-a-l.
50 21    And then you -- she indicates that you

**Re: [50:15-50:25]**
**Def Obj** no personal
knowledge, Rule 802

14

| | Objections | Ruling |
|---|---|---|

50 22   scheduled a meeting with Dr. Culotta which you just
50 23   indicated that occurred.
50 24   In the context of this document, thinking
50 25   back at that time, do you recognize what Ms. Jacques is
51  1   referring to when she discusses the heart protection
51  2   study?
51  3   A.  No.
51  4   Q.  Or the comparison of GI outcomes between
51  5   Celebrex, Bextra and Vioxx?
51  6   A.  I don't know what she's referring to.
51  7   Q.  Or the Renaal study?
51  8   A.  No.

**Re: [51:4-51:8]**
**Def Obj** No personal knowledge

*Sustained*

51  9   Q.  Do you know what the Renaal study refers to --
51 10   A.  Yes.
51 11   Q.  -- in general?
51 12   A.  In general.  It's a study about Cozaar and as
51 13   an ARB -- I can't remember the specific details about
51 14   it.
51 15   Q.  Similarly, do you recognize the heart
51 16   protection study?
51 17   A.  I vaguely remember it.
51 18   Q.  And what do you remember about it?
51 19   A.  I remember that calling the heart protection
51 20   study.  I don't remember the details.
51 21   Q.  Do you remember what drug it referred to or
51 22   involved?
51 23   A.  I don't recall.
51 24   Q.  Do you know what drug the Renaal study referred
51 25   to?
52  1   A.  Cozaar.
52  2   Q.  Do you remember -- talking in general now, this
52  3   comparison of GI outcomes between Celebrex, Bextra and
52  4   Vioxx?

**Re: [52:2-52:5]**
**Def Obj** No personal knowledge

*Sustained*

52  5   A.  I don't recall a comparison of the GI outcomes.
52  6   Q.  Do you recall whether a heart protection study
52  7   was ever performed to assess the impact of Vioxx on
52  8   cardioprotection?
52  9   MR. SALES:  Objection, calls for
52 10   speculation, lack of foundation.  You've not established
52 11   it's talking about Vioxx.
52 12   A.  No.  I don't recall.
52 13   Q.  (BY MR. BLOOM)  Do you know whether or not this
52 14   is talking about Vioxx?
52 15   A.  I don't believe it is, but I don't know.

**Re: [52:6-52:15]**
**Def Obj** Lack of foundation, calls for speculation, irrelevant

*overruled*

2:16  -   52:23   Fevurly_J_20091112.txt
52 16   Q.  Do you recall in that meeting discussing Vioxx?
52 17   A.  I don't recall the specifics about that
52 18   meeting.

15

| | | Objections | Ruling |
|---|---|---|---|

52 19      Q.  Do you recall the purpose of the meeting?
52 20      A.  No.
52 21      Q.  Do you recall discussing any clinical
52 22      information at that meeting?
52 23      A.  No.

53:6   -   53:9   Fevurly_J_20091112.txt
53  6      Q.  Would it have been your general practice at the
53  7      time to take notes at a meeting with a chair of a P&T
53  8      committee?
53  9      A.  No.

53:10  -   53:10  Fevurly_J_20091112.txt
53 10      (FEVURLY Exhibit No. 7 marked.)

53:11  -   54:2   Fevurly_J_20091112.txt
53 11      Q.  I hand you a document identified by Bates range
53 12      MRK AGLAAD 0009871 and ends at 9877.  It appears to be
53 13      an e-mail with an attachment, mostly redacted with the
53 14      exception of one page.  And the e-mail is from you to
53 15      Mary Ogle, received August 23rd 2002.
53 16      Does this appear to be a copy of an e-mail
53 17      that you sent to Mary Ogle?
53 18      A.  Yes.
53 19      Q.  And it appears that it's a forwarded e-mail.  I
53 20      don't think that you created it, but I ask you if you
53 21      would look at the only page in the attachment that is
53 22      legible.  It's a chart, graph, titled Medicaid NRx
53 23      Louisiana versus SC, January '02 through June '02.
53 24      What does SC stand for?
53 25      A.  Probably South Central.
54  1      Q.  Is Louisiana part of South Central --
54  2      A.  I don't recall.

55:3   -   55:6   Fevurly_J_20091112.txt
55  3      Q.  (BY MR. BLOOM)  Do you know whether Louisiana
55  4      Medicaid fell into the SC region?
55  5      A.  I don't recall what region Louisiana Medicaid
55  6      fell into.

Re: [55:3-55:6]
**Def Obj** No personal knowledge

Sustained

56:4   -   56:22  Fevurly_J_20091112.txt
56  4      Q.  (BY MR. BLOOM)  Yeah.  Why don't you go ahead
56  5      and tear them apart.  We'll look first at what's been
56  6      marked as State's Deposition Exhibit 179.  And that has
56  7      the Bates numbers MRK AGTXAI 0001430 to 1433.
56  8      Then the second one had been previously
56  9      marked as State's Deposition Exhibit 180 with Bates
56 10      ending with 86.  It is a one-page document.
56 11      And then third was State's Deposition
56 12      Exhibit 181, which is a two-page document beginning with

Re: [56:4-56:18]
**Def Obj** Improper testimony by lawyer

Sustained

| | Objections | Ruling |
|---|---|---|

56 13    the Bates MRK AGTXA No. 542 to 543.
56 14    This appears to be three e-mails that I've
56 15    just identified.  And I'll characterize them as a
56 16    meeting with Provider Synergies, and I want to ask
56 17    whether you recall having a meeting in October of 2002
56 18    with Provider Synergies?
56 19    Do you recall that meeting in October 2002?
56 20    MR. SALES:  Objection, form.
56 21    A.  Yes, I recall meeting with Provider Synergies
56 22    in 2002.

57:7  -  57:23  Fevurly_J_20091112.txt
57 7    Q.  Do you recall having created a customer profile
57 8    for Provider Synergies?
57 9    A.  Michael Davis and I jointly developed a
57 10    customer profile for Provider Synergies.  Yes.
57 11    Q.  Would you look at the next exhibit, which is
57 12    State's 180, which appears to be an e-mail from you to
57 13    Dan Kincaid at Provider Synergies and Terry Taylor at
57 14    Provider Synergies regarding a Wednesday meeting.
57 15    Does this look to be like an e-mail that
57 16    you sent to those recipients on October 7th?
57 17    A.  Yes.
57 18    Q.  And you're discussing our 11:30 a.m. meeting
57 19    Wednesday.
57 20    Does this refresh your recollection about
57 21    when that meeting might have occurred with Provider
57 22    Synergies?
57 23    A.  Yes.

58:11  -  58:23  Fevurly_J_20091112.txt
58 11    Q.  The subject being a follow-up letter to
58 12    Provider Synergies.  And the back appears to be a
58 13    follow-up letter to Provider Synergies.
58 14    A.  Yes.
58 15    Q.  Looking at these three documents together,
58 16    would you agree that you participated in a meeting with
58 17    Provider Synergies?
58 18    A.  Based on these three documents.
58 19    Q.  Sometime around the date indicated?
58 20    A.  Yeah.
58 21    Q.  And do you recall having that -- independently
58 22    recall having that meeting?
58 23    A.  No.  I don't recall the meeting.

9:14  -  59:20  Fevurly_J_20091112.txt
59 14    Q.  Would you have, in preparing for a meeting with
59 15    Provider Synergies in October 2002, developed objectives
59 16    for the upcoming meeting, or would someone else have
59 17    done that?

17

| | Objections | Ruling |
|---|---|---|

59 18      MR. SALES:  Objection, form, assumes facts
59 19      not in evidence.
59 20      A.  I don't recall.

60:4  -  60:6    Fevurly_J_20091112.txt
60 4      A.  Since I didn't author this, and really, I don't
60 5      know whether this would have been the objectives of that
60 6      meeting or not.

60:11  -  61:1    Fevurly_J_20091112.txt
60 11      Q.  Look at the first page of the attachment under
60 12      Provider Synergies growth strategy.  The second sentence
60 13      says, "They do not plan to expand their product offering
60 14      to include typical TPA services but, rather, grow
60 15      through acquisition of new customers (states)."
60 16      What are TPA services?
60 17      A.  Third party administrator.
60 18      Q.  Then after that the next sentence says:  PS is
60 19      only targeting states focusing -- excuse me -- that can
60 20      implement a high control PA process.
60 21      Do you understand PA in this context to
60 22      mean prior authorization?
60 23      A.  Yes.
60 24      Q.  And therefore provide high PDL compliance.  PDL
60 25      stands for Preferred Drug List?
61 1      A.  Yes.

62:1  -  62:5    Fevurly_J_20091112.txt
62 1      Q.  (BY MR. BLOOM) It appears you and/or Michael
62 2      Davis wrote the paragraph.  What does high control mean
62 3      to you in this context?
62 4      A.  I would have to speculate on what this would
62 5      mean at that time.  Is that what you're asking?

62:12  -  62:16    Fevurly_J_20091112.txt
62 12      Q.  Do you recall in 2002 whether or not Louisiana
62 13      was a state that had a high probability of accepting
62 14      Provider Synergies' clinical and financial
62 15      recommendations with little resistance?
62 16      A.  No.

63:17  -  64:3    Fevurly_J_20091112.txt
63 17      Q.  The next paragraph, formulary compliance.  I'm
63 18      looking at what looks to be the third sentence.  It
63 19      says, "Thus states managed by PS are considered very
63 20      high control.  An example of the control follow:  In the
63 21      State of Louisiana Vioxx and Zocor were placed in a PA
63 22      and market share went from 33 percent to 4 percent, and
63 23      24 percent to 7 percent respectively in two months."
63 24      Looking at this document now, understanding

| | | | Objections | Ruling |
|---|---|---|---|---|

| | | |
|---|---|---|
| 63 | 25 | that you and Michael Davis wrote it, would you agree |
| 64 | 1 | that at the time you thought that the State of Louisiana |
| 64 | 2 | was considered high control? |
| 64 | 3 | A.  According to this document it appears that way. |

**64:16  -  64:19  Fevurly_J_20091112.txt**

| | | |
|---|---|---|
| 64 | 16 | Q.  What is your understanding of what Vigor means? |
| 64 | 17 | A.  As I recall, Vigor was a clinical trial |
| 64 | 18 | comparing Vioxx to Naproxen and evaluating effects on GI |
| 64 | 19 | tolerability. |

**66:8  -  66:15  Fevurly_J_20091112.txt**

| | | | |
|---|---|---|---|
| 66 | 8 | Q.  Do you know whether or not the Vigor study had | **Re: [66:8-66:15]** |
| 66 | 9 | any influence on Provider Synergies' decision to reopen | **Def Obj** Calls for |
| 66 | 10 | the class in which Vioxx was a drug? | speculation, no |
| 66 | 11 | MR. SALES:  Objection to form.  Calls for | personal knowledge |
| 66 | 12 | speculation. | |
| 66 | 13 | A.  Can you rephrase the question? | |
| 66 | 14 | (The testimony was read.) | |
| 66 | 15 | A.  No, I do not know. | |

Ruling: Sustained

**66:21  -  67:12  Fevurly_J_20091112.txt**

| | | |
|---|---|---|
| 66 | 21 | Do you know or recall whether or not the |
| 66 | 22 | Vigor study was part of Merck's approach to communicate |
| 66 | 23 | clinical differentiation messages? |
| 66 | 24 | MR. SALES:  Objection, incomplete, |
| 66 | 25 | misstates the document. |
| 67 | 1 | A.  Can you be more specific about your question? |
| 67 | 2 | Q.  (BY MR. BLOOM)  Well, let's just see if you can |
| 67 | 3 | answer the way it was. |
| 67 | 4 | (The testimony was read.) |
| 67 | 5 | MR. SALES:  Same objection. |
| 67 | 6 | A.  From my recollection once the Vigor study was |
| 67 | 7 | included in the product's label, it would have been |
| 67 | 8 | discussed with customers in compliance with the |
| 67 | 9 | regulations and guidelines outlined by the company. |
| 67 | 10 | Q.  (BY MR. BLOOM)  Do you recall discussing the |
| 67 | 11 | Vigor study with Provider Synergies? |
| 67 | 12 | A.  I don't recall. |

**67:13  -  67:18  Fevurly_J_20091112.txt**

| | | |
|---|---|---|
| 67 | 13 | Q.  Would it have been consistent with your role as |
| 67 | 14 | the NAE for Provider Synergies to provide Provider |
| 67 | 15 | Synergies with information about the Vigor study? |
| 67 | 16 | A.  My role would have been to make sure that I |
| 67 | 17 | provided Provider Synergies with the information that |
| 67 | 18 | was contained within the label. |

**67:22  -  67:24  Fevurly_J_20091112.txt**

| | | |
|---|---|---|
| 67 | 22 | (FEVURLY Exhibit No. 8 marked.) |

04/11/10 20:25

|  | Objections | Ruling |
|--|--|--|

```
67 23        (FEVURLY Exhibit No. 9 marked.)
67 24        (FEVURLY Exhibit No. 10 marked.)

68:1   -   68:11   Fevurly_J_20091112.txt
   68   1        Q.  (BY MR. BLOOM)  I want to go back to what is
   68   2        marked as Fevurly 10, and ask you a couple of questions
   68   3        about this document which, as I described earlier, was
   68   4        an e-mail from you to Rich Patrylak with an attached
   68   5        draft of a letter, which it appears, from reading the
   68   6        e-mail, that you and Michael Davis prepared for
   68   7        Mr. Patrylak, sent to Terry Taylor of Provider
   68   8        Synergies.
   68   9        Is that a correct characterization of it?
   68  10        A.  It looks like a draft letter we sent to Rich to
   68  11        send on to Terry.

68:15  -   69:9    Fevurly_J_20091112.txt
   68  15        Q.  (BY MR. BLOOM)  So looking at that draft
   68  16        letter, the first paragraph of that second sentence, to
   68  17        me, implies that the relationship is approved between
   68  18        Merck and Provider Synergies, the last sentence in that
   68  19        paragraph.
   68  20        How would you characterize the relationship
   68  21        prior to that?
   68  22        A.  Well, what I recall about this was prior to my
   68  23        coming into this position and this discussion was that
   68  24        Provider Synergies, who was negotiating contracts on
   68  25        behalf of states, was unhappy with Merck because we
   69   1        didn't have supplemental rebates.  And because we didn't
   69   2        have discounts that would make their -- it was not
   69   3        helpful in their negotiation with us.  And because we
   69   4        didn't participate from a discounting perspective on
   69   5        something of rebates, they really didn't want to spend a
   69   6        lot of time with Merck as a company on these different
   69   7        portfolio products that we had.
   69   8        So that was one of the challenging pieces
   69   9        that Provider Synergies had with Merck as a company.

69:10  -   69:21   Fevurly_J_20091112.txt
   69  10        Q.  So since you began discussions about
   69  11        supplemental rebates, that's when and how those
   69  12        relationship improved?
   69  13        A.  When I came in position, we had no supplemental
   69  14        rebates.  It changed while I was in that position to
   69  15        allow us to provide supplemental rebates, which opened
   69  16        up the dialogue more with Provider Synergies because
   69  17        that was their main focus, was negotiating contracts for
   69  18        deep discounts in their mind with manufacturers.
   69  19        And that's -- if you didn't have that as
   69  20        part of your offering, it appeared that they weren't
```

| | Objections | Ruling |
|---|---|---|

69  21    really going to have much of a dialogue with you at all.

**69:22  -  70:7**  Fevurly_J_20091112.txt

| | | |
|---|---|---|
| 69  22    Q.  Would you say that they gave more weight to | **Re: [69:22-70:15]** | |
| 69  23    supplemental rebates than clinical information in their | **Def Obj** Calls for | |
| 69  24    consideration -- in their negotiations or in their | speculation, lack of | |
| 69  25    consideration of drugs for their state clients? | foundation, no | overruled |
| 70  1    A.  I can't speculate on what parameter or | personal knowledge | |
| 70  2    characteristic was the most important to them or what | | |
| 70  3    they -- how they weighted the different pieces.  All I | | |
| 70  4    can say is that the majority of my time that I spent | | |
| 70  5    with Provider Synergies was speaking specifically about | | |
| 70  6    rebates, discounts and so forth as a commercial dialogue | | |
| 70  7    between the folks at Provider Synergies and myself. | | |

**70:8  -  70:15**  Fevurly_J_20091112.txt

| | | |
|---|---|---|
| 70  8    Q.  Am I correct that the dialogue with respect to | **Re: [69:22-70:15]** | |
| 70  9    clinical information would have occurred with the | **Def Obj** Calls for | |
| 70  10    involvement of a medical director? | speculation, lack of | |
| 70  11    MR. SALES:  Objection, form. | foundation, no | |
| 70  12    A.  From what I recall, my standard operating | personal knowledge | |
| 70  13    procedure would be we would bring in a region medical | | |
| 70  14    director by teleconference or in person to have a | | |
| 70  15    clinical dialogue with the folks at Provider Synergies. | | |

**73:21  -  74:6**  Fevurly_J_20091112.txt

73  21    Q.  I've just handed you another document
73  22    identified by Bates MRK AGLAAD 0009918.  It's two pages.
73  23    It's an e-mail from you to -- I'm sorry, from John
73  24    Harrington to a number of individuals, copying you and
73  25    others in October 2002.
74  1    It attaches a one-page document that
74  2    appears to be referred to as the Louisiana Medicaid
74  3    presentation.
74  4    Do you recognize either the e-mail or
74  5    attachment?
74  6    A.  I don't.

**74:7  -  74:11**  Fevurly_J_20091112.txt

74  7    Q.  Looking at it now, do you understand what
74  8    information is being presented in this appears to be a
74  9    slide?
74  10    A.  No, I'm not familiar with this document here or
74  11    this slide.

**75:3  -  75:18**  Fevurly_J_20091112.txt

75  3    Q.  Does it appear that that slide identifies the
75  4    impact of the PDL on Vioxx sales with respect to
75  5    Louisiana Medicaid?
75  6    MR. SALES:  Same objection.

04/11/10 20:25

| | Objections | Ruling |
|---|---|---|

75  7      A.  I have no way of knowing what the intended
75  8      slide is.
75  9      Q.  (BY MR. BLOOM)  Would that be consistent with
75  10     what you read in the e-mail chain?
75  11     MR. SALES:  Same objection.
75  12     A.  I don't -- it talks about first and second and
75  13     below, so I don't know if the slide you're referring to
75  14     is the first or the second.  I don't know the context of
75  15     the details around this.
75  16     I would hate to speculate on somebody
75  17     else's document.  I don't have any information one way
75  18     or the other.

76:9  -  77:4    Fevurly_J_20091112.txt
76  9      Q.  (BY MR. BLOOM)  You see on the bottom it says,
76  10     "The impact of the Louisiana PDL on our products will
76  11     impact approximately 4 to 6 months of sales in 2002"?
76  12     A.  Yes.
76  13     Q.  Was it your understanding that the impact of
76  14     the Louisiana PDL reduced sales of Vioxx for 2002?
76  15     MR. SALES:  Objection, calls for
76  16     speculation.
76  17     A.  My recollection of this time frame with regard
76  18     to PDL status was that having a PA would have reduced
76  19     access for products to patients and providers.
76  20     So physicians wouldn't have access to the
76  21     product.  It could negatively affect the patients by
76  22     providing access to the product, and this could be Vioxx
76  23     or any other coxib or any other brand that manufacturers
76  24     make.
76  25     So the PA -- though not being on the PDL
77  1      and therefore having a PA could reduce the access.  And
77  2      our goal is to have access so physicians can make the
77  3      appropriate decision whether the product was right for
77  4      them.

**Re: [76:9-77:4]**
**Def Obj** Calls for
speculation, no
personal knowledge

*Overruled*

77:5  -  77:8    Fevurly_J_20091112.txt
77  5      Q.  Would you agree that increased access would
77  6      correlate with increased sales?
77  7      A.  Not necessarily.  There are a lot of different
77  8      factors that go into when you say "increased sales."

77:17  -  77:22    Fevurly_J_20091112.txt
77  17     Q.  (BY MR. BLOOM)  Do you know whether or not the
77  18     inclusion of Vioxx in the PA list reduced sales of
77  19     Vioxx?
77  20     A.  I don't know for sure.  It could have an effect
77  21     because the physician would have more challenges getting
77  22     access to the product for their patients.

04/11/10 20:25

| | | Objections | Ruling |
|---|---|---|---|

77:24  -  77:24  Fevurly_J_20091112.txt
    77  24        (FEVURLY Exhibit No. 11 marked.)

80:8  -  80:17  Fevurly_J_20091112.txt
    80   8        I think before we were talking about the
    80   9        2002 review and hearing which the State of Louisiana
    80  10        reviewed Vioxx and discussed whether or not to include
    80  11        it in their prior authorization list.
    80  12        Do you recall that time frame?
    80  13        MR. SALES:  Objection, form.
    80  14        A.   My recollection of the review of Vioxx of their
    80  15        PDL inclusion occurred before I started.  I had
    80  16        responsibility for Provider Synergies in the spring of
    80  17        '02.

80:18  -  80:20  Fevurly_J_20091112.txt
    80  18        Q.   (BY MR. BLOOM)  And I believe you also stated
    80  19        before that they would have an annual review?
    80  20        A.   That's correct.

80:21  -  81:7  Fevurly_J_20091112.txt
    80  21        Q.   And do you recall when the next review -- the
    80  22        first review occurred after you started working on the
    80  23        Provider Synergies account?
    80  24        A.   My recollection was that the State of Louisiana
    80  25        had their next annual review in about the April, Mayish
    81   1        time frame, 2003, after we had started participating
    81   2        with supplemental rebates, specifically around Vioxx.
    81   3        There may have been another review in
    81   4        between there for Zocor or other products.  I don't
    81   5        recall exactly that there was another review or not for
    81   6        similar products -- for the category that Merck products
    81   7        compete.

81:14  -  81:23  Fevurly_J_20091112.txt
    81  14        Q.   I'll restate it.  Did you begin negotiating a
    81  15        supplemental rebate agreement including Vioxx prior to
    81  16        the spring 2003 review?
    81  17        A.   My recollection is that once we had an account
    81  18        team that had been provided the opportunity to present a
    81  19        supplemental rebate to Provider Synergies on Medicaid
    81  20        states, that we went ahead and engaged in that
    81  21        discussion and negotiation.
    81  22        What I mean by negotiation, is to present
    81  23        it.

82:7  -  82:24  Fevurly_J_20091112.txt
    82   7        Q.   (BY MR. BLOOM)  This document begins with MRK
    82   8        EBDE 0039562.  The data that was provided to us along
    82   9        with this document indicated that it was created on

| | Objections | Ruling |
|---|---|---|

82 10   11/18/2002, but there was no cover letter or e-mail that
82 11   I could see.
82 12   However, that the way it's produced it has
82 13   certain objective coding that I identified this as being
82 14   a 11/18/02 document.
82 15   Do you recall participating in any Medicaid
82 16   pricing authority meetings that discussed the Louisiana
82 17   Medicaid account?
82 18   A.  Yes.
82 19   Q.  And do you recall having such a meeting on or
82 20   around 11/18/2002?
82 21   A.  I don't recall a specific time.
82 22   Q.  How frequently would you have pricing authority
82 23   meetings?
82 24   A.  I don't know any specific frequency.

**82:25  -  83:6  Fevurly_J_20091112.txt**
82 25   Q.  Do you recall having several pricing authority
83  1   meetings that addressed Louisiana Medicaid?
83  2   A.  With regard to pricing authority meetings what
83  3   I recall is having dialogue about -- at different times
83  4   different states, and different products because there
83  5   were multiple state and multiple products that we were
83  6   dealing with.

**83:7  -  83:16  Fevurly_J_20091112.txt**
83  7   Q.  Generally who -- who would be present at those
83  8   pricing authority meetings?  What types of Merck
83  9   employees.
83 10   A.  In a meeting that I would participate in with
83 11   regard to pricing authority would be customer manager
83 12   Michael Davis, Mary Dermody probably, potentially
83 13   someone from economic affairs, someone from brand team
83 14   of whatever product we're discussing, potentially my
83 15   boss at the time frame.  That would probably be the team
83 16   that would be involved.

**84:9  -  85:3  Fevurly_J_20091112.txt**
84  9   Q.  Looking down towards the bottom of that page
84 10   where there is an e-mail from Mr. Wissman to you,
84 11   subject: Regarding State Formulary Grid.
84 12   It says, "John, Michael I talked with Terri
84 13   Lee about getting this grid approved.  She thought it
84 14   was too full of PA criteria that we off label.  If we
84 15   removed the PA criteria, it may not be valuable to you."
84 16   Are you familiar with -- look at the
84 17   document.  Do you recall the creation of this State
84 18   Formulary Grid that's being discussed?
84 19   MR. SALES: Objection, form.
84 20   A.  Can you repeat the question, please?   24

| | Objections | Ruling |
|---|---|---|

84 21   Q.  (BY MR. BLOOM)  Do you recall the State
84 22   Formulary Grid that's being referred to in this
84 23   document?
84 24   A.  From my recollection there was a need for the
84 25   account executives to remember what products were on
85  1   what state formularies, and so this with a -- from our
85  2   recollection this is a suggestion for them to do that,
85  3   from a centralized system.

**85:4  -  85:8**  Fevurly_J_20091112.txt
85  4   Q.  What does this mean she thought it was too full
85  5   of PA criteria that we off label?
85  6   MR. SALES:  Objection, calls for
85  7   speculation.
85  8   A.  I don't have any idea.

**Re: [85:4-85:8]**
**Def Obj** Calls for speculation, no personal knowledge, assumes facts not in evidence

*Sustained*

**85:10  -  85:10**  Fevurly_J_20091112.txt
85 10   (FEVURLY Exhibit No. 12 marked.)

**85:11  -  86:1**  Fevurly_J_20091112.txt
85 11   Q.  (BY MR. BLOOM)  I have handed you an e-mail
85 12   identified by the Bates range MRK EBBL 0056856.  It
85 13   appears to be an e-mail from you to Michael Kelly, CC
85 14   Mary Ogle on August of 2003.  And the subject is:
85 15   Business Review with Warren.
85 16   Would that be Warren Lambert?
85 17   A.  Yes.
85 18   Q.  Do you recall participating in the business
85 19   review with Warren Lambert in August of 2003?
85 20   A.  Not specifically.
85 21   Q.  Looking at this e-mail, do you have any reason
85 22   to believe that you didn't have a business review with
85 23   Warren Lambert some short time prior to you preparing
85 24   this e-mail?
85 25   MR. SALES:  Objection, form.
86  1   A.  No.

**Re: [85:21-86:1]**
**Def Obj** Calls for speculation

*Sustained*

**86:12  -  86:15**  Fevurly_J_20091112.txt
86 12   Q.  Do you recall a specific Louisiana Medicaid
86 13   tactical plan?
86 14   A.  Generally I remember a Louisiana Medicaid
86 15   tactical plan.

**87:4  -  87:4**  Fevurly_J_20091112.txt
87  4   (FEVURLY Exhibit No. 13 marked.)

**87:5  -  87:6**  Fevurly_J_20091112.txt
87  5   Q.  Do you recognize the name Desarae Lewis?
87  6   A.  No.

04/11/10 20:25

|  | Objections | Ruling |
|---|---|---|

87:7   -   87:19   Fevurly_J_20091112.txt

    87  7    Q.  I've handed to you a document identified by MRK
    87  8    EBDE 0067429 and ending with 7435.  The title is
    87  9    Customer Profile State of Louisiana, indicating it's
    87  10    prepared by Holly Jacques and Mary Ogle, updated
    87  11    September 18th, 2003.
    87  12    Does this look like the type of customer
    87  13    profile that was prepared by Holly Jacques and Mary Ogle
    87  14    for the State of Louisiana?
    87  15    A.  Yes.
    87  16    Q.  Do you recall ever receiving this updated
    87  17    customer profile?
    87  18    A.  Not this particular one, but I recall receiving
    87  19    it sometimes.

87:20   -   87:23   Fevurly_J_20091112.txt

    87  20    Q.  Would it generally be the case that if Holly
    87  21    Jacques and Mary Ogle updated the customer profile, that
    87  22    they would send you a copy of any updates?
    87  23    A.  Probably.

89:6   -   89:6   Fevurly_J_20091112.txt

    89  6    (FEVURLY Exhibit No. 14 marked.)

89:8   -   89:24   Fevurly_J_20091112.txt

    89  8    Q.  (BY MR. BLOOM) I'm handing you a document that
    89  9    appears to be a fax.  It was used in the prior state
    89  10    deposition as Exhibit 187 and has a Bates number MRK
    89  11    AGTXAH 0000030, which is one page.
    89  12    I want you to take a moment to review the
    89  13    document.
    89  14    A.  Okay.
    89  15    Q.  Do you recognize the document?
    89  16    A.  It's a PIR form.
    89  17    Q.  And PIR stands for what?
    89  18    A.  Professional Information Request.
    89  19    Q.  It looks like this -- and correct me if I'm
    89  20    wrong.  It looks like this is a PIR that you sent to
    89  21    Dr. Bernadette McKeon, following up on a request made by
    89  22    Valerie Taylor who was, I believe -- tell me, was
    89  23    Valerie Taylor the president of Provider Synergies?
    89  24    A.  No, clinical director.

90:6   -   90:16   Fevurly_J_20091112.txt

    90  6    Q.  This was in late 2003.  Is this a fairly common
    90  7    event that Provider Synergies would make a request to
    90  8    you for clinical information?
    90  9    MR. SALES:  Object to the form, vague.
    90  10    A.  I wouldn't characterize it as a common request
    90  11    for them to ask me for clinical information from my

Re: [90:6-90:16]
**Pltf Obj**
Nonresponsive 90:12-16

26

04/11/10 20:25

| | Objections | Ruling |
|---|---|---|

90 12    recollection, if any customer who asks a nonsolicited
90 13    question that I don't have in the label to respond to,
90 14    to point them to in the label, I automatically refer it
90 15    to medical services, and they respond in the appropriate
90 16    manner.

90:17  -  91:8    Fevurly_J_20091112.txt
90 17    Q.  (BY MR. BLOOM) I'm reading the specific
90 18    question requested. There is a colon after that.  It
90 19    states that Dr. Taylor asked, "Why does the data in the
90 20    Solomon abstract look different than what Merck has
90 21    recorded in their circular?"
90 22    So as I understand it, Dr. Taylor would ask
90 23    you that question.  You would then forward that to
90 24    Dr. McKeon as a PIR request?
90 25    A.  Correct.
91  1    Q.  Would you know whether or not Dr. McKeon or
91  2    anybody in medical services would respond to that
91  3    request?
91  4    A.  Well, my experience, the folks in medical
91  5    services consistently responded to requests from
91  6    physicians and customers or pharmacists.
91  7    So, yes.  They would normally respond to
91  8    the question.

91:21  -  92:1    Fevurly_J_20091112.txt
91 21    Q.  Do you remember Dr. Taylor asking you about
91 22    this Solomon abstract?
91 23    A.  I don't remember the specific question at all.
91 24    Q.  Do you know what she's referring to?  Do you
91 25    know what the Solomon abstract refers to?
92  1    A.  No.

92:12  -  92:21    Fevurly_J_20091112.txt
92 12    Q.  And that's something that you would -- without
92 13    having to go through medical services, that you would in
92 14    the course of your interactions with Provider Synergies
92 15    be able to provide or discuss things within the
92 16    circular?
92 17    A.  I'm trained and certified to be able to address
92 18    the things that are within the label or the circular,
92 19    but again, the majority of my time was speaking to
92 20    Provider Synergies about price and discounts for the
92 21    states.  That's my primary role.

2:22  -  93:9    Fevurly_J_20091112.txt
92 22    Q.  You can hold on to that. I pass you this.
92 23    This is a following exhibit from the State Texas
92 24    Deposition Exhibit 188.  MRK AKT 1456746 through 6764.
92 25    If you could just look at the first page.    27

| | Objections | Ruling |
|---|---|---|

93   1      I'm not telling you to not look at the rest
93   2      of the document.
93   3      A.  I just want to see what it is.
93   4      Q.  Go ahead and familiarize yourself with it.
93   5      A.  Okay.
93   6      Q.  Does this appear to be a medical services
93   7      response to a PIR?
93   8      A.  From what I recall, this is a response to a
93   9      PIR.

93:16   -   94:6   Fevurly_J_20091112.txt
93  16      Q.  But anyway, the author says that our national
93  17      account executive John Fevurly has referred your request
93  18      for information regarding Vioxx.
93  19      And then in parentheses (rofecoxib tablets
93  20      and oral suspension).  Your inquiry concerns the recent
93  21      manuscript the relationship between selective
93  22      Cyclooxygenase 2 inhibitors and acute myocardial
93  23      infarction in older adults by Solomon et al.
93  24      Would it appear to you that this is a
93  25      response to a PIR requesting information about the
94   1      Solomon article?
94   2      A.  The PIRs that we request have very specific
94   3      information, as specific as the customer will provide to
94   4      us.  So this does look like, as I mentioned before, a
94   5      response to a PIR, and I don't know if these two are
94   6      related or not.

**Re: [93:24-94:6]**
**Def Obj** Calls for
speculation, no
personal knowledge

_Overruled_

94:7   -   94:9   Fevurly_J_20091112.txt
94   7      Q.  I understand that.  Do you have any reason to
94   8      believe that they would not be related?
94   9      A.  Yes.

94:12   -   94:14   Fevurly_J_20091112.txt
94  12      Q.  (BY MR. BLOOM)  And what would that reason be?
94  13      A.  This is admitted in November of 2003.  This is
94  14      dated May of 2004.

94:24   -   94:25   Fevurly_J_20091112.txt
94  24      (FEVURLY Exhibit No. 15 marked.)
94  25      (FEVURLY Exhibit No. 16 marked.)

95:8   -   95:19   Fevurly_J_20091112.txt
95   8      Q.  (BY MR. BLOOM)  Is your understanding that the
95   9      request would be directly made to medical services and
95  10      no other division within Merck?
95  11      A.  My recollection if a request is made for
95  12      information like this in the form of a PIR, I would send
95  13      it directly to medical services.  They would respond
95  14      directly back to the customer and then they would send

| | Objections | Ruling |
|---|---|---|

```
95  15        us a copy.
95  16        Q.  Are regional medical directors part of the
95  17        medical services division?
95  18        A.  I don't believe that medical services includes
95  19        regional medical directors.
```

```
95:20  -  95:24   Fevurly_J_20091112.txt
95  20        Q.  Okay.  I have handed you an e-mail identified
95  21        by Bates range MRK EBBL 0059161 to 162.  It's an e-mail
95  22        from you to Patrice McMonagle.  Can you tell me who
95  23        Patrice McMonagle is.
95  24        A.  I believe she's an administrative assistant.
```

```
97:15  -  98:18   Fevurly_J_20091112.txt
97  15        Q.  Do you recall the meeting that is referred to
97  16        in this e-mail which appears to have occurred on May 13,
97  17        2004?
97  18        A.  I generally recall this meeting occurring, yes.
97  19        Q.  It says underneath the names of the various
97  20        participants that -- I'll just read the sentence:  "I am
97  21        planning a follow-up meeting between PS and Merck with
97  22        Pat Counihan, Andy Tedeschi, Michael Davis and me to
97  23        further discuss customer specific Medicaid and
97  24        commercial issues.
97  25        You, I'm assuming -- or "I" is referring to
98   1        you in this case; is that correct?
98   2        A.  Yes.
98   3        Q.  I know I mentioned his name before, but I'm not
98   4        sure if you told me exactly, Pat Counihan?
98   5        A.  He's the vice-president of managed care.
98   6        Q.  At that time in 2004?
98   7        A.  Yes.  Reporting to Rich Patrylak.
98   8        Q.  So in 2004 Pat Counihan was the president of
98   9        managed care that reported to Rich Patrylak?
98  10        A.  Correct.
98  11        Q.  Why would Andy Tedeschi be participating in the
98  12        follow-up meeting which you're referring to here?
98  13        A.  I don't recall.  From my recollection of this
98  14        particular situation, Michael Davis was taking over the
98  15        national account executive responsibilities, moving from
98  16        Customer Manager to National Account Executive to call
98  17        on Provider Synergies to replace me as I moved over to
98  18        call on CVS Caremark.
```

```
98:23  -  98:25   Fevurly_J_20091112.txt
98  23        Q.  Do you recall having a follow-up meeting after
98  24        the May 13th meeting?
98  25        A.  No, I don't recall any specific meeting, what
```

```
99:2  -  100:1   Fevurly_J_20091112.txt              29                        04/11/10 20:25
```

| | Objections | Ruling |
|---|---|---|

| | |
|---|---|
| 99 2 | Q.  And I hand you -- I'm still going to refer to |
| 99 3 | this original document.  I hand you what appears to be |
| 99 4 | the agenda for the May meeting.  And it's MRK EBDE |
| 99 5 | 0072661 and it's e-mail from Michael Davis to Charles |
| 99 6 | Grezlak and others, CCing Mr. Fevurly on March 12th. |
| 99 7 | The subject being The Final Agenda for Provider |
| 99 8 | Synergies. |
| 99 9 | Looking at this document, does this appear |
| 99 10 | to you to have been the agenda for the meeting which was |
| 99 11 | discussed in the previous document? |
| 99 12 | A.  Yes. |
| 99 13 | Q.  Who is Sam -- back in 2004 do you recall |
| 99 14 | working with Sam Jones? |
| 99 15 | A.  From my recollection Sam Jones was in charge or |
| 99 16 | becoming in charge of the Medicaid business and, I |
| 99 17 | believe, Medicare at the time. |
| 99 18 | Q.  Do you remember what his title would have been |
| 99 19 | back in 2004 or at this time in 2004? |
| 99 20 | A.  No. |
| 99 21 | Q.  What do you mean being in charge of Medicaid |
| 99 22 | Medicare? |
| 99 23 | A.  So the customer segment of Medicaid and |
| 99 24 | Medicare would be under Sam.  The people who would call |
| 99 25 | on Medicaid would be from a strategy perspective or |
| 100 1 | customer manager perspective would fall under Sam. |

101:12 -   101:13 Fevurly_J_20091112.txt

| | |
|---|---|
| 101 12 | (FEVURLY Exhibit No. 17 marked.) |
| 101 13 | (FEVURLY Exhibit No. 18 marked.) |

102:19 -   103:16 Fevurly_J_20091112.txt

| | | |
|---|---|---|
| 102 19 | Q.  And what is the request that -- could you tell | **Re: [102:19-102:25]** |
| 102 20 | me what is being requested in this PIR? | **Def Obj** Lack of |
| 102 21 | A.  From what I read here, it says Valerie Taylor | foundation, no |
| 102 22 | requested, "What is Merck's perspective on the abstract | personal knowledge |
| 102 23 | based on the recent ACR published on May 6th regarding | |
| 102 24 | Vioxx." | |
| 102 25 | Q.  Do you know what she refers to when she | |
| 103 1 | mentions ACR? | **Re: [103:1-103:18]** |
| 103 2 | A.  No. | **Def Obj** Lack of |
| 103 3 | Q.  Or what she's referring to in general with this | foundation, no |
| 103 4 | request? | personal knowledge |
| 103 5 | A.  I don't know anything more than what it says | |
| 103 6 | here, the abstract, at the recent ACR published May 6th | |
| 103 7 | regarding Vioxx. | |
| 103 8 | Q.  Do you recall an abstract regarding Vioxx | |
| 103 9 | published around that time? | |
| 103 10 | A.  I don't recall what was published at that time. | |
| 103 11 | Q.  Do you know whether or not this PIR was | |
| 103 12 | responded to? | |

*Sustained*

|  | Objections | Ruling |
|---|---|---|

103 13    A.  I do not know for sure.  It's standard practice
103 14    for Merck to respond to every PIR with the appropriate
103 15    information to medical services to answer the customer's
103 16    question.

103:18 -   103:18 Fevurly_J_20091112.txt
    103 18    (FEVURLY Exhibit No. 19 marked.)

**Re: [103:1-103:18]**
**Def Obj** Lack of
foundation, no
personal knowledge

*Sustained*

103:21 -   104:3 Fevurly_J_20091112.txt
    103 21    Q.  (BY MR. BLOOM)  Have you, yourself, taken
    103 22    Vioxx?
    103 23    A.  No.  I've never been on Vioxx.  My dad took
    103 24    Vioxx, but I haven't.
    103 25    Q.  At the time that your dad took Vioxx, was he
    104  1    on -- a member of a medical plan that you're on?
    104  2    A.  No.  From my recollection the doctor prescribed
    104  3    Vioxx for my dad, and he paid out-of-pocket.

**Re: [103:21-104:3]**
**Pltf Obj** Relevance,
Prejudicial (personal
use MIL granted)

104:7  -   107:25 Fevurly_J_20091112.txt
    104  7    Q.  Mr. Fevurly, I have a couple of quick follow-up
    104  8    questions.  If you could pull out in the stack there
    104  9    Fevurly Exhibit 6.
    104 10    Mr. Fevurly, Mr. Bloom asked you some
    104 11    questions earlier today about Fevurly Exhibit 6, which
    104 12    is the customer profile for Louisiana Medicaid, appears
    104 13    to be dated about January 31, 2003.
    104 14    Do you recall that?
    104 15    A.  Yes.
    104 16    Q.  Specifically if you look to the page marked
    104 17    last three numbers 342.  The second paragraph on page
    104 18    response to Mr. Bloom's question you said that there was
    104 19    some significantly new financial information in 2003
    104 20    since the time of Vioxx and other Merck products were
    104 21    reviewed in 2002.
    104 22    Do you recall that testimony?
    104 23    A.  Yes.
    104 24    Q.  What new financial information were you
    104 25    referring to?
    105  1    A.  As I mentioned before, before I came in the
    105  2    position and the first review had occurred, Merck at
    105  3    that time had not participated in supplemental rebates.
    105  4    So Merck's strategy evolved and changed so
    105  5    that when I was in the position in the summer there of
    105  6    '02, they allowed us to do supplemental rebates.
    105  7    And that was really highly important to
    105  8    Provider Synergies.  So we were able to come in with
    105  9    that new financial information to Provider Synergies

04/11/10 20:25

| | | Objections | Ruling |
|---|---|---|---|

105 10     regarding Vioxx and the State of Louisiana.

105 11     Q.   And when you came into the position to be the

105 12     National Account Executive responsible for Provider

105 13     Synergies, did you try to understand the status of Merck

105 14     products with regard to Provider Synergies with regard

105 15     to the State of Louisiana?

105 16     A.   Yes.  I wanted to understand the PDL division

105 17     for all the Merck products and all the states that

105 18     Provider Synergies managed.

105 19     Q.   And did you come to have an understanding as to

105 20     why you mentioned today Zocor and Cozaar and Vioxx were

105 21     not on the preferred drug list in 2002 when you came in

105 22     that position?

105 23     A.   Yes.  It's my understanding that Provider

105 24     Synergies was not going to recommend any of those Merck

105 25     products that did not have a supplemental rebate, and I

106 1     don't know if the State was going to consider any

106 2     without a supplemental rebate.

106 3     So my understanding was without

106 4     supplemental rebates, Provider Synergies would not

106 5     present that recommendation to the State of Louisiana.

106 6     Q.   And you mentioned earlier today in response to

106 7     some of Mr. Bloom's questions that you had an

106 8     understanding that Provider Synergies said that they

106 9     were going to do an independent review of clinical

106 10     information and financial assessments.

106 11     Is that correct?

106 12     A.   That's correct.

106 13     Q.   Is that how, in your dealings with Provider

106 14     Synergies, Louisiana Medicaid actually did that?

106 15     A.   In my experience Provider Synergies took an

106 16     approach with the State of Louisiana and did an

106 17     independent review of each state that they represented.

106 18     Q.   And that included all drugs within a

106 19     therapeutic class that was going to be reviewed?

106 20     A.   Yes, from my understanding.

106 21     Q.   And in 2003 maybe you can remember a specific

106 22     date when the coxib therapeutic class was up for an

106 23     annual review.

106 24     At that point in time had Merck agreed to

106 25     provide supplemental rebates to the State of Louisiana

107 1     through Provider Synergies?

107 2     A.   Yes.

107 3     Q.   Do you have an understanding is to whether that

107 4     was the primary or significant factor for Provider

107 5     Synergies to recommend Vioxx to be on the preferred drug

107 6     list?

107 7     A.   My understanding is that one of the key

107 8     components they had to make with regard to proposing or

107 9     recommending a product would be to the PDL.  So in that

|  | Objections | Ruling |
|---|---|---|

107 10       case, having a supplemental rebate for Vioxx was

107 11       critical to presenting that to the State for inclusion

107 12       on the PDL.

107 13       Q.  Was that similar to Zocor?

107 14       A.  Absolutely.

107 15       Q.  Has anyone from Provider Synergies ever told

107 16       you that they felt any way misled about any of the Merck

107 17       products, specifically Vioxx, with regard to their

107 18       recommendations with PDL status?

107 19       A.  No one from Provider Synergies has ever told me

107 20       that they had felt misled by any of the information

107 21       provided by me or Merck regarding Vioxx in the state of

107 22       Louisiana.

107 23       Q.  Or the other products?

107 24       A.  Or any other product that we had discussions

107 25       on.


108:4  -  108:4  Fevurly_J_20091112.txt

   108   4       (Deposition concluded at 2:50 p.m.)

04/11/10 20:25