**la ag v merck**
**Deposition Designations for Turner_H_20091022**

|  | Objections | Ruling |
|---|---|---|

5:14   -   5:15     Turner_H_20091022
　　5 14　　Q.  Would you please state your full name.
　　5 15　　A.  Sure.  Holly Jacques Turner.

10:3   -   10:14    Turner_H_20091022
　　10  3　　Q.  What is your educational background?
　　10  4　　A.  I went to Millsaps College in Jackson,
　　10  5　　 Mississippi and have a bachelor's.
　　10  6　　Q.  What year did you graduate?
　　10  7　　A.  '97.
　　10  8　　Q.  What was your -- did you graduate from
　　10  9　　 Millsaps?
　　10 10　　A.  I did.
　　10 11　　Q.  What was your degree in?
　　10 12　　A.  Political science.
　　10 13　　Q.  That was a BA?
　　10 14　　A.  Yes.

12:1   -   12:2     Turner_H_20091022
　　12  1　　A.  I graduated from Millsaps in '91 and went to
　　12  2　　 work for Merck in '97.  Sorry.

12:11  -  12:17    Turner_H_20091022
　　12 11　　Q.  Can you describe those responsibilities for me,
　　12 12　　 just generally?
　　12 13　　A.  When I worked for the lieutenant governor, I
　　12 14　　 was the health policy director.
　　12 15　　Q.  So you were health policy director for the
　　12 16　　 lieutenant governor?
　　12 17　　A.  I was.

14:5   -   14:7     Turner_H_20091022
　　14  5　　Q.  From the position at the lieutenant governor's
　　14  6　　 office, where did you go?
　　14  7　　A.  To Merck.

16:13  -  16:25    Turner_H_20091022
　　16 13　　Q.  Starting with when you first were a manager in
　　16 14　　 the state government -- in government affairs in 1997,
　　16 15　　 did you have a territory that you covered or an area
　　16 16　　 that you were responsible for?
　　16 17　　A.  I do.
　　16 18　　Q.  Okay.  Has that changed over time.  Or has it

|  | Objections | Ruling |
|---|---|---|

16 19    always been the same area?
16 20    A.  It's always been the same area.
16 21    Q.  And what area was that?
16 22    A.  Louisiana, Oklahoma and Texas.
16 23    Q.  The area has not expanded since you've gone
16 24    through these different titles?
16 25    A.  It has not.

**17:23 - 18:1**    Turner_H_20091022
17 23    Q.  Can you give me a general idea of what that is
17 24    that you do?
17 25    A.  Responsible for legislative and regulatory
18  1    work.

**25:5 - 25:8**    Turner_H_20091022
25  5    Q.  Did you go through a training period?  Was
25  6    there a time when you said, Okay, you're now a trainee
25  7    in this job?
25  8    A.  No.  We haven't had, like, training seminars.

Re: [25:5-25:8]
**Def Obj** Relevance

*Overruled*

**26:10 - 27:3**    Turner_H_20091022
26 10    Q.  Have you ever received any instruction from
26 11    Merck as to what you are allowed to say with respect to
26 12    certain pharmaceutical products?
26 13    MR. SALES: Objection, form.
26 14    A.  I've been given an overview of products, but I
26 15    don't recall being in a room and being told what I can
26 16    say about a product.
26 17    Q.  (BY MR. MURRAY) Or even products in general?
26 18    In other words, has the Merck policy on what can be said
26 19    about different products been talked to you or
26 20    communicated to you?
26 21    A.  No, not that I can recall.
26 22    Q.  Have you ever received any kind of intercompany
26 23    correspondence -- intracompany correspondence that says,
26 24    These are the rules on what can be said about
26 25    pharmaceutical products?
27  1    A.  Not that I can recall.  I may have been copied
27  2    on something, but I just don't recall anything in
27  3    detail.

Re: [26:10-26:15]
**Def Obj** Lack of
foundation

**27:20 - 28:22**    Turner_H_20091022
27 20    Q.  On the regulatory side, I'd like to focus on
27 21    Louisiana.
27 22    Who are the regulators that you have
27 23    contact with?
27 24    A.  I have worked with M.J. Terrabonne.  He's the
27 25    pharmacy director.  She has someone who works for her
28  1    named Rachel Broussard.  I've worked with Ben Bearden
28  2    when I was still employed with the Department of Health

| | Objections | Ruling |
|---|---|---|

```
28  3        and Hospitals, referred to as DHH.
28  4        Q.  Anybody else on the regulatory side in
28  5        Louisiana that you can think of?
28  6        A.  I've had interactions with David Hood.
28  7        Q.  He was the secretary; is that correct?
28  8        A.  That's correct.
28  9        And I've had interactions with a woman
28 10        named Christine Arbo, A-r-b-o.
28 11        Q.  And what was her capacity?
28 12        A.  I can't remember her title at DHH.
28 13        Q.  What were the nature of your contacts with M.J.
28 14        Terrabonne?
28 15        A.  Touching base with her probably to find out
28 16        what the effective date of coverage would be for a
28 17        product.
28 18        Q.  Anything else?
28 19        A.  Learning about how the PDL and supplemental
28 20        rebate process would work.
28 21        Q.  Okay.  Anything else?
28 22        A.  No.
```

**29:3  -  29:9  Turner_H_20091022**

```
29  3        Q.  (BY MR. MURRAY)  Do you know whether you ever
29  4        provided Ms. Terrabonne with any written materials
29  5        specific to Vioxx?
29  6        A.  I don't remember.
29  7        Q.  Do you recall whether she ever requested any
29  8        materials specific to Vioxx from you?
29  9        A.  I just don't recall.  I'm sorry.
```

**30:10  -  30:16  Turner_H_20091022**

```
30 10        Q.  (BY MR. MURRAY)  Did you have any contact with
30 11        her before the implementation of the PDL?
30 12        A.  Yes.
30 13        Q.  Do you recall what that contact would have
30 14        entailed?
30 15        A.  I stated earlier similar to try calling to find
30 16        out kind of the effective date for a product coverage.
```

**30:19  -  31:1  Turner_H_20091022**

```
30 19        Before the PDL was implemented, were all
30 20        products covered?
30 21        A.  They were.
30 22        Q.  So prior to the implementation of the PDL,
30 23        there wouldn't have been a reason to talk to her about
30 24        effective dates of product coverage?
30 25        A.  Actually, there would have been.
31  1        Q.  Okay.  Can you explain that to me?
```

**Re: [30:19-31:1]**
**Pltf Obj** Incomplete
response, include
31:2-17

**31:2  -  31:11  Turner_H_20091022**                    3

| | Objections | Ruling |
|---|---|---|

31  2    A.  My recollection is the State of Louisiana got
31  3    their updates in terms of new products from a service
31  4    called First DataBank.
31  5    And it was information that was downloaded
31  6    from their system, but I don't recall how often that
31  7    they downloaded.  And so when we had a new product
31  8    approved by the FDA, we would call to touch base to find
31  9    out what the effective date of coverage would be based
31 10    on when they would download the information, and it
31 11    would be in their system.

32:6  -  32:21  Turner_H_20091022
32  6    Q.  (BY MR. MURRAY)  Finding out when there would
32  7    be meetings of the P&T committee, for instance?
32  8    A.  That could be a reason, yes.
32  9    Q.  Did you find out from Ms. Terrabonne what
32 10    information Merck would be allowed to submit in
32 11    connection with that process?
32 12    A.  I don't remember if that was one of the issues
32 13    that I asked M.J.
32 14    Q.  Was that an issue that you inquired about in
32 15    the PDL process; that is, what information can Merck
32 16    provide?
32 17    A.  I think at a meeting I did ask the question,
32 18    trying to get clarification on what expectations the
32 19    State would have and their contractor ULM and Provider
32 20    Synergies would have in terms of what they wanted from
32 21    the companies, trying to understand that process.

32:25  -  33:15  Turner_H_20091022
32 25    Q.  Help me with that.  What they wanted changed
33  1    over time?
33  2    A.  It took them a long time to get the PDL and
33  3    supplemental rebate process up and running, and they
33  4    had -- they hired two different entities to consult them
33  5    on that process:  University of Louisiana, College of
33  6    Pharmacy at Monroe, also referred to as ULM; and then
33  7    they hired Provider Synergies.
33  8    So it took them a long time to figure out
33  9    who was doing what, what was going to be expected of the
33 10    companies, what the meetings were going to look like.
33 11    And so I had -- I did touch base with M.J. and the P&T
33 12    committee members during those public hearings to try to
33 13    understand the process so we could understand what it
33 14    was, if anything, they would be asking from the
33 15    manufacturers.

34:2  -  34:11  Turner_H_20091022
34  2    A.  It was just so up in the air.  One day they
34  3    would tell you one thing; the next meeting they would

04/11/10 20:25

| | | | Objections | Ruling |
|---|---|---|---|---|

| | | |
|---|---|---|
| 34 | 4 | say something else. |
| 34 | 5 | It was just -- it was -- for so long, it |
| 34 | 6 | was so undefined and unclear.  And so it really didn't |
| 34 | 7 | get formalized until they hired Provider Synergies.  But |
| 34 | 8 | I think the State may have sent out a couple of letters, |
| 34 | 9 | but the information letters also changed and were |
| 34 | 10 | conflicting and confusing. |
| 34 | 11 | So that's why I'm saying it was changing so |

**34:12   -   34:12   Turner_H_20091022**

| 34 | 12 | much. |
|---|---|---|

Re: [34:12-34:12]
**Pltf Obj** Incomplete designation

**35:1   -   35:16   Turner_H_20091022**

| 35 | 1 | Q.   Uh-huh.  Do you know whether Merck had any role |
|---|---|---|
| 35 | 2 | in providing peer reviewed literature to Provider |
| 35 | 3 | Synergies? |

Re: [35:1-35:4]
**Def Obj** Speculative, lack of foundation

| 35 | 4 | A.   I have no idea. |
|---|---|---|
| 35 | 5 | Q.   Before Provider Synergies came on line, did |
| 35 | 6 | Merck provide peer reviewed literature to DHH or someone |
| 35 | 7 | acting on behalf of DHH? |
| 35 | 8 | A.   I don't recall. |
| 35 | 9 | Q.   Assuming that Merck were asked to provide |
| 35 | 10 | information, would that have fallen within your job |
| 35 | 11 | responsibilities? |
| 35 | 12 | A.   If the department had asked for information on |
| 35 | 13 | the P&T and that request was given to me, then I would |
| 35 | 14 | have sent it to my director or my medical director, and |
| 35 | 15 | they would have forwarded the request on to the |
| 35 | 16 | appropriate folks at Merck to provide that response. |

Re: [35:5-35:16]
**Def Obj** Speculative

**37:14   -   37:25   Turner_H_20091022**

| 37 | 14 | Q.   (BY MR. MURRAY)  Mrs. Turner, we had been |
|---|---|---|
| 37 | 15 | talking about your interactions with M.J. Terrabonne. |
| 37 | 16 | Do you recall any discussions with M.J. |
| 37 | 17 | Terrabonne specific to Vioxx? |
| 37 | 18 | A.   I don't. |
| 37 | 19 | Q.   What about -- is there anything else, any other |
| 37 | 20 | contacts with M.J. Terrabonne that we haven't gone over? |
| 37 | 21 | MR. SALES: Objection. |
| 37 | 22 | Q.   (BY MR. MURRAY)  Any other subject matters of |
| 37 | 23 | conversations you may have had? |
| 37 | 24 | MR. SALES: Objection, form. |
| 37 | 25 | A.   I don't recall. |

Re: [37:19-37:25]
**Def Obj** Overbroad, speculative

**38:7   -   38:15   Turner_H_20091022**

| 38 | 7 | Q.   What about Ben Bearden?  What were the nature |
|---|---|---|
| 38 | 8 | of your contacts with Ben Bearden? |

| | | Objections | Ruling |
|---|---|---|---|

38  9      A.  I don't recall.
38  10     Q.   You just know that you had some dealings with
38  11     Mr. Bearden?
38  12     A.  I did.
38  13     Q.   Do you know whether they were related to the
38  14     PDL process?
38  15     A.  I just don't remember exactly.

38:16   -   38:18   Turner_H_20091022
38  16     Q.   Did you have any role in the negotiation of
38  17     rebates?
38  18     A.  No.

39:15   -   39:25   Turner_H_20091022
39  15     Q.   When you say you talked with them about
39  16     process, can you elaborate on that a little bit for me?
39  17     A.   Just trying to understand how the PDL and the
39  18     supplemental rebate process was being designed by the
39  19     State and Provider Synergies and ULM.
39  20     Q.   So as you -- for instance, as you got --
39  21     correct me if I'm wrong -- but as you got information
39  22     from M.J. Terrabonne about that process, you might
39  23     relate that information to Messrs. Fevurly and Davis so
39  24     they could understand the process?
39  25     A.   That could be one point.

**Re: [39:15-39:19]**
**Def Obj** Lack of
foundation

40:5   -   40:8   Turner_H_20091022
40  5      Q.   Did you ever provide Merck marketing materials
40  6      for products to anyone at Louisiana Department of Health
40  7      and Hospitals?
40  8      A.   Not that I recall.

40:13   -   41:5   Turner_H_20091022
40  13     Q.   Let's see.  The other person that we spoke
40  14     about was the secretary, Secretary Hood.
40  15     Do you recall the subject matter of your
40  16     interactions with Secretary Hood?
40  17     A.   Just trying to understand the process.
40  18     Q.   Sort of the same type --
40  19     A.   He would be at the public hearings.
40  20     Q.   Did you have conversations with Mr. Hood at
40  21     those public hearings?
40  22     A.   I would ask a question at those public
40  23     hearings.
40  24     Q.   When you asked questions of Mr. Hood, you were
40  25     in the audience asking the question
41  1      raising-your-hand-type thing?
41  2      A.   That's correct.
41  3      Q.   Did you have any conversations with him just
41  4      one on one?

6

| | | | Objections | Ruling |
|---|---|---|---|---|

41   5          A.  Not that I recall.

**41:6   -   41:6   Turner_H_20091022**
   41   6          Q.  Tell me a little bit more about these public          Re: [41:6-41:6]
                                                                            **Pltf Obj** Incomplete
                                                                            designation

**41:7   -   41:11   Turner_H_20091022**
   41   7          hearings.  Would these be public hearings about the      Re: [41:6-41:11]
   41   8          implementation of the PDL and how it was going to be     **Def Obj** Speculative,
   41   9          implemented, or are we talking about hearings of the P&T  overbroad
   41  10          committee or both?
   41  11          A.  There were both those types of meetings.

**42:18   -   44:4   Turner_H_20091022**
   42  18          Q.  Was anyone else from Merck present at those
   42  19          hearings that you recall?
   42  20          A.  At which hearings?
   42  21          Q.  Right now, I'm just limiting it to those
   42  22          hearings where people from LDHH were describing what the
   42  23          process would be for the PDL.
   42  24          A.  I was at the hearing, but I don't remember if
   42  25          there was anybody else with me from Merck.  I just don't
   43   1          recall.
   43   2          Q.  Now, I also gathered that you were present at
   43   3          P&T committee hearings?
   43   4          A.  I was.
   43   5          Q.  Can you tell me about those P&T committee          Re: [43:5-43:8]
   43   6          hearings?  What was your understanding of their purpose,  **Def Obj** Speculative,
   43   7          how were they held, that sort of thing.                 overbroad
   43   8          MR. SALES:  Objection, form.
   43   9          A.  Would you ask me that question again?
   43  10          Q.  (BY MR. MURRAY)  What was your understanding of
   43  11          how those P&T committee meetings were held?  Can you
   43  12          help me understand what they were and how often they
   43  13          were?
   43  14          MR. SALES:  Let me object to the form.  Go
   43  15          ahead.
   43  16          A.  Well, they were different from the very outset.
   43  17          At one point, ULM was running -- assisting the
   43  18          department in kind of running that program and
   43  19          development.  And then they hired Provider Synergies, so
   43  20          it changed in terms of that format.
   43  21          Q.  When you say "that format," I understand ULM
   43  22          and then later Provider Synergies would provide
   43  23          information that the P&T committee used at their
   43  24          meetings or consulted at their meetings?
   43  25          A.  I can't remember what ULM provided to the
   44   1          committee, but Provider Synergies would provide -- when
   44   2          Provider Synergies had the contract, they would provide

04/11/10 20:25

| | Objections | Ruling |
|---|---|---|

```
44   3      an overview of the class or the product and make a
44   4      recommendation to that committee.
```

**44:9   -   44:13**  Turner_H_20091022
```
44   9      Q.  So what would happen at the P&T committee
44  10      hearings?  I understand they had some recommendations
44  11      already.
44  12      Were those recommendations formulated
44  13      before the P&T committee would meet?
```

Re: [44:9-44:13]
**Pltf Obj** For
completeness,
include 44:14-19

*Overrule*

**44:14   -   45:25**  Turner_H_20091022
```
44  14      A.  So the P&T committee and the State of Louisiana
44  15      hired Provider Synergies to advise them on the
44  16      development of the PDL and to negotiate those
44  17      supplemental rebates.  And at those meetings, they would
44  18      make that -- they would present that information and
44  19      have discussion with the P&T members.
44  20      Q.  So provider Synergies would present
44  21      recommendations.  And would then members of the P&T
44  22      committee ask questions of the Provider Synergies
44  23      personnel?
44  24      A.  There were situations where that did happen.
44  25      Q.  Were -- people from Merck asked questions at
45   1      those P&T committee hearings about the recommendations?
45   2      A.  Not that I recall.
45   3      Q.  Do you know whether anyone from Merck provided
45   4      information to Provider Synergies in compiling their
45   5      recommendations?
45   6      A.  Not that I recall.
45   7      Q.  At the P&T committee hearings, was Merck
45   8      allowed to make public comments?
45   9      A.  At the P&T committee, at the end of the
45  10      meeting, they would allow for public testimony, but only
45  11      for two to three minutes.  It was either two minutes --
45  12      they either gave you two minutes or three minutes, and
45  13      they cut you off.
45  14      Q.  Okay.  Did Merck take advantage of that
45  15      opportunity?
45  16      A.  I don't remember.
45  17      Q.  Do you know whether Merck ever provided public
45  18      comment about Vioxx?
45  19      A.  I don't remember.
45  20      Q.  We talked about Christine Arbo, someone else at
45  21      LDHH with someone you had interaction.
45  22      Can you tell me about that interaction?
45  23      A.  I don't remember the details.
45  24      Q.  Was that an infrequent contact?
45  25      A.  Yes.
```

Re: [45:20-45:25]
**Def Obj** Relevance

| | | | | Objections | Ruling |
|---|---|---|---|---|---|

| 46 | 21 | You talked about the people from LDHH that |
| 46 | 22 | you had contact with, Bearden, Terrabonne, Hood, Arbo |
| 46 | 23 | and Ms. Terrebonne's assistant. |
| 46 | 24 | Is there anyone else you can think of, as |
| 46 | 25 | you sit here, that you had contacts with at LDHH? |
| 47 | 1 | A.  Not that I can think of. |

**47:8  -  47:24  Turner_H_20091022**

| 47 | 8 | A.  Dr. Vincent Culotta was the legislative chair |
| 47 | 9 | for the Louisiana State Medical Society, so he would be |
| 47 | 10 | at the Capitol.  Marty McKay and -- I can't remember the |
| 47 | 11 | gentleman's name -- I think it was Adams were |
| 47 | 12 | pharmacists that were on the P&T committee but were very |
| 47 | 13 | active at the Capitol for their societies as well. |
| 47 | 14 | Those were the only people I remember seeing outside the |
| 47 | 15 | P&T committee. |
| 47 | 16 | Q.  When you saw those members of the P&T committee |
| 47 | 17 | outside of the P&T committee meetings, when you saw them |
| 47 | 18 | at the Capitol, were they at the Capitol in their |
| 47 | 19 | capacity of P&T committee members or some other |
| 47 | 20 | capacity? |
| 47 | 21 | A.  I saw them in some other capacity. |
| 47 | 22 | Q.  Did you ever have some discussions with them |
| 47 | 23 | about Vioxx? |
| 47 | 24 | A.  Not that I recall. |

**47:25  -  48:3  Turner_H_20091022**

| 47 | 25 | Q.  In your capacity as manager in the different |
| 48 | 1 | titles you have for governing affairs, you didn't have |
| 48 | 2 | occasion to call on members of the P&T committee outside |
| 48 | 3 | of attending P&T committee meetings? |

Re: [47:25-48:3]
Pltf Obj For
completeness,
include 48:4-5

**48:4  -  50:19  Turner_H_20091022**

| 48 | 4 | A.  I did call on a member of the P&T committee |
| 48 | 5 | outside of a P&T meeting. |
| 48 | 6 | Q.  Tell me about that. |
| 48 | 7 | A.  I had a meeting with Dr. Culotta. |
| 48 | 8 | Q.  Okay.  And what was that meeting about? |
| 48 | 9 | A.  I don't recall the substance of that meeting. |
| 48 | 10 | Q.  Okay.  Were you meeting with him in his |
| 48 | 11 | capacity as a member of the P&T committee? |
| 48 | 12 | A.  I was. |
| 48 | 13 | Q.  Was Vioxx discussed at that meeting? |
| 48 | 14 | A.  I don't recall. |
| 48 | 15 | Q.  Do you have any recollection?  Can you tell me |
| 48 | 16 | anything about that meeting?  Where it took place?  If |
| 48 | 17 | anyone else was there?  How often you would have had |
| 48 | 18 | those meetings? |
| 48 | 19 | A.  It was in New Orleans, and Dr. Fran Kaiser was |
| 48 | 20 | present. |

04/11/10 20:25

|  |  | Objections | Ruling |
|--|--|------------|--------|

48 21      Q.   Okay.  And what was Dr. Kaiser's job title?

48 22      A.   She's a regional medical director for Merck.

48 23      Q.   Do you recall anything else about that meeting?

48 24      A.   I don't recall what we discussed.

48 25      Q.   Was it -- was there ever more than one meeting

49  1      with Dr. Culotta?

49  2      A.   There were two meetings.

49  3      Q.   Both in New Orleans?

49  4      A.   Yes.

49  5      Q.   Was that at his office?

49  6      A.   No, it was not.

49  7      Q.   Where were those meetings?

49  8      A.   At -- they were at restaurants in New Orleans.

49  9      Q.   Do you remember what restaurants?

49 10      A.   I don't.

49 11      Q.   Was Dr. Kaiser present at both of those

49 12      meetings?

49 13      A.   She was.

49 14      Q.   Other than they were meeting with Dr. Culotta

49 15      and Dr. Kaiser was present and they were at a

49 16      restaurant, do you remember anything else about the

49 17      meetings?

49 18      A.   I don't.

49 19      Q.   Do you remember whether you had any written

49 20      materials that you brought with you to the meetings?

49 21      A.   I do not.

49 22      Q.   Do you know whether Dr. Kaiser had any written

49 23      materials -- is it he or she?

49 24      A.   She.

49 25      Q.   -- brought with her to the meeting?

50  1      A.   During one of the meetings I remember she had

50  2      her computer, but I don't remember what she was showing

50  3      or you know -- I just don't remember the details of

50  4      that.

50  5      Q.   Was the primary interaction between Dr. Kaiser

50  6      and Dr. Culotta?

50  7      A.   Yes.

50  8      Q.   Do you recall any other meetings with members

50  9      of the P&T committee, times that you called on members

50 10      of the P&T committee?

50 11      A.   No.

50 12      Q.   How about Provider Synergies?  Did you have any

50 13      occasion to call on Provider Synergies?

50 14      A.   No.

50 15      Q.   You never called anyone at Provider Synergies?

50 16      A.   Not that I recall.

50 17      Q.   Do you recall anyone from Provider Synergies

50 18      either calling you or contacting you?

50 19      A.   No.

04/11/10 20:25

| | Objections | Ruling |
|---|---|---|

**52:12  -  52:19  Turner_H_20091022**

| | | |
|---|---|---|
| 52 12 | Q.  Do you know whether anyone from Merck | **Re: [52:12-52:19]** |
| 52 13 | encouraged anyone from LDHH to attend CMEs? | **Def Obj** Relevance, |
| 52 14 | A.  Not that I'm aware of. | speculative |
| 52 15 | Q.  Not for sure.  How about the P&T committee?  Is | |
| 52 16 | that something you would have any awareness of? | |
| 52 17 | A.  No. | |
| 52 18 | Q.  How about people from Provider Synergies? | |
| 52 19 | A.  I have no idea. | |

**52:22  -  53:4  Turner_H_20091022**

| | | |
|---|---|---|
| 52 22 | Q.  Do you know whether Merck had detailers that | **Re: [52:22-53:4]** |
| 52 23 | called on P&T committee members? | **Def Obj** Speculative, |
| 52 24 | MR. SALES:  Objection, form. | lack of foundation |
| 52 25 | A.  I don't know if we specifically had folks that | |
| 53 1 | were calling on the P&T committee members. | |
| 53 2 | Q.  (BY MR. MURRAY)  You just don't know either | |
| 53 3 | way? | |
| 53 4 | A.  I just don't know. | |

**53:21  -  54:2  Turner_H_20091022**

| | |
|---|---|
| 53 21 | This is a document entitled "Customer |
| 53 22 | Profile, State of Louisiana."  It says, "Prepared by |
| 53 23 | Mary Ogle and Holly Jacques." |
| 53 24 | Is that you? |
| 53 25 | A.  That is. |
| 54 1 | Q.  Do you recall preparing this document? |
| 54 2 | A.  I remember working with Mary Ogle on this. |

**55:16  -  55:19  Turner_H_20091022**

| | |
|---|---|
| 55 16 | Q.  Let me refer you to the second page of the |
| 55 17 | document where it says "Provider Synergies key |
| 55 18 | contacts." |
| 55 19 | A.  Okay. |

**55:20  -  57:3  Turner_H_20091022**

| | |
|---|---|
| 55 20 | Q.  Let me just ask you whether you recall having |
| 55 21 | contact with any of these individuals from Provider |
| 55 22 | Synergies Terry Taylor? |
| 55 23 | A.  I remember meeting Terry, yes. |
| 55 24 | Q.  What was the extent of your contacts with Terry |
| 55 25 | Taylor? |
| 56 1 | A.  Just at those meetings, in passing. |
| 56 2 | Q.  Uh-huh.  Do you recall whether Terry Taylor |
| 56 3 | made -- when you say "at those meetings," you mean at |
| 56 4 | the P&T committee meetings? |
| 56 5 | A.  That's correct. |
| 56 6 | Q.  Do you recall whether Terry Taylor made any |
| 56 7 | presentations at those meetings? |
| 56 8 | A.  I don't remember which staff person from |

11

| | | Objections | Ruling |
|---|---|---|---|

56  9   Provider Synergies was giving the actual presentations
56 10   for the product reviews and for the therapeutic category
56 11   reviews or the process.
56 12   Q.  But it's your recollection that someone from
56 13   Provider Synergies was giving a presentation at those?
56 14   A.  Oh, yes.  They were advising the P&T.
56 15   Q.  How about David Kincaid?
56 16   A.  I don't remember him.
56 17   Q.  Okay.  Jim Purtell?
56 18   A.  I don't remember him.
56 19   Q.  Valerie Taylor?
56 20   A.  I do remember Valerie.
56 21   Q.  What were your contacts with Valerie?
56 22   A.  Just seeing her at those meetings.
56 23   Q.  Do you recall whether she made presentations?
56 24   A.  She did.
56 25   Q.  Do you recall whether she made any
57  1   presentations on Vioxx at those meetings?
57  2   A.  I just don't recall if it was Terry or Valerie
57  3   that was presenting on the products and which products.

59:3   -   59:25   Turner_H_20091022
59  3   Q.  Let me refer you to the first sentence in the
59  4   second paragraph, please.
59  5   "In 2001, the Louisiana Legislature passed
59  6   Senate Bill 502 which authorized DHH to establish a drug
59  7   formulary in the medical assistance drug program."
59  8   Did I read that correctly?
59  9   A.  Yes.
59 10   Q.  Okay.  And was that your understanding that, in
59 11   2001, the legislate -- Bill 502 authorized DHH to
59 12   establish a drug formulary?
59 13   A.  To establish a preferred drug list and set up a
59 14   drug rebate program, yes.
59 15   Q.  That's the next sentence.  It says, "The bill
59 16   authorized DHH to establish a PDL that used prior
59 17   authorization to reduce costs in the Medicaid
59 18   prescription drug program."
59 19   A.  That's what it says, yes.
59 20   Q.  It's your understanding that the purpose of the
59 21   PDL process was to reduce costs?
59 22   A.  Yes.
59 23   Q.  Do you know whether it was effective in doing
59 24   that?
59 25   A.  I don't.

60:6   -   61:3   Turner_H_20091022
60  6   A.  We did work with members of the legislature to
60  7   educate them about our opinion about that bill.
60  8   Q.  (BY MR. MURRAY)  What was Merck's opinion about

Re: [60:6-60:15]
**Def Obj** Relevance

*overrule*

04/11/10 20:25

| | Objections | Ruling |
|---|---|---|

60  9        that bill?
60 10        A.  We felt like it interfered with the
60 11        physician-patient relationship.
60 12        Q.  Merck was opposed to it?
60 13        A.  Merck felt like that type of legislation would
60 14        interfere with the physician-patient relationship, so we
60 15        did not support that bill.
60 16        Q.  Did Merck have an opinion as to whether or not
60 17        that bill would have the ability to reduce costs in the
60 18        Medicaid prescription drug program?
60 19        A.  Not that I recall.
60 20        Q.  You don't recall whether Merck made any
60 21        comments on whether it could reduce costs -- whether it
60 22        would be effective in reducing costs?
60 23        A.  I don't remember us having a discussion about
60 24        that.  More that it may ultimately end up costing the
60 25        Medicaid program more money.
61  1        Q.  Do you know, did Merck provide clinical data to
61  2        LDHH prior to 2001 prior to the PDL process?
61  3        A.  I don't recall.

62:18  -  62:22  Turner_H_20091022
62 18        Q.  (BY MR. MURRAY)  Did anyone from Merck
62 19        communicate to you a concern that the prior
62 20        authorization process would have a negative impact on
62 21        sales of Merck products?
62 22        A.  Not that I recall.

64:1  -  64:16  Turner_H_20091022

| | Objections | Ruling |
|---|---|---|
| 64  1   Q.  No one else on that list that rings any bell? | **Re: [64:1-64:16]** | |
| 64  2   A.  Then Dr. Medon. | **Def Obj** Relevance | |

64  3        Q.  Okay.
64  4        A.  He was over the ULM program.
64  5        Q.  Dr. Philip Medon?
64  6        A.  Yes.
64  7        Q.  M-e-d-o-n.
64  8        And what context do you recall having with
64  9        Dr. Medon?
64 10        A.  Just seeing him at all the meetings that took
64 11        place before Provider Synergies was hired and then after
64 12        Provider Synergies was hired.
64 13        Q.  Do you recall any conversations with Dr. Medon;
64 14        that is, one-on-one conversations between you and
64 15        Dr. Medon about the P&T committee?
64 16        A.  Not that I recall.

65:4  -  66:9  Turner_H_20091022
65  4        Q.  The one Bates numbered, ends in 7152.  Under
65  5        the heading "PDL Process," it says, "The P&T committee
65  6        is responsible for reviewing Provider Synergies'

| | | | Objections | Ruling |
|---|---|---|---|---|

65  7   clinical evaluations and recommendations pertaining to
65  8   drugs to be included on the PDL.  Each drug is reviewed
65  9   by Provider Synergies on its clinical merits relative to
65 10   other medications in the same therapeutic class?"
65 11   Do you know who wrote this section?
65 12   A.  I don't remember.
65 13   Q.  Was that your understanding?
65 14   A.  Yes.
65 15   Q.  Next it says, "Published peer reviewed clinical
65 16   trials are the primary source of information used by the
65 17   Provider Synergies clinical staff for this review."
65 18   Do you know, did you write that?
65 19   A.  I don't remember if I wrote this.  I apologize.
65 20   Q.  It says the peer reviewed clinical trials are
65 21   the primary source of information.
65 22   Are you aware of any other information
65 23   considered by Provider Synergies' clinical staff in that
65 24   review?
65 25   A.  I was always under the impression that they
66  1   used peer reviewed clinical trials, peer reviewed
66  2   information to establish their recommendations.  I'm not
66  3   aware of what other sources they may have used.
66  4   Q.  And you don't know whether anyone from Merck
66  5   provided any information to Provider Synergies --
66  6   MR. SALES:  Objection.
66  7   Q.  (BY MR. MURRAY) -- for that clinical staff
66  8   review?
66  9   A.  I have no idea.

**67:5   -   67:25   Turner_H_20091022**

67  5   A.  Again, I don't remember exactly what Provider          Re: [67:5-67:25]
67  6   Synergies -- other than just reading what you're showing   **Def Obj** Speculative
67  7   me, in front of me, I didn't know the details of
67  8   exactly, you know, what they -- how they evaluated a
67  9   class and came up with their recommendations.  I don't
67 10   know if this information was something we downloaded
67 11   from Provider Synergies' web site or if this was part of
67 12   the P&T committee web site.
67 13   I just -- I don't recall.
67 14   Q.  Is it your recollection there was a two-tier
67 15   review process?  In other words, one with sort of a
67 16   clinical base, and then we'd go to the financial side?
67 17   A.  I don't know if they took those into
67 18   consideration together or separately.  I just don't
67 19   know.
67 20   Q.  You just don't know?
67 21   A.  I just don't know.
67 22   Q.  Do you have any reason to question the accuracy
67 23   of this section I just read describing the process?
67 24   A.  My recollection, it does sound familiar that

| | Objections | Ruling |
|---|---|---|

67 25     this was the process that they had laid out.

**68:5  -  71:14  Turner_H_20091022**

68  5     "Incorporating all of this information,

68  6     Provider Synergies makes suggestions to the P&T

68  7     committee regarding the PDL status on each medication.

68  8     After reviewing and discussing these suggestions, the

68  9     P&T committee makes recommendations to LDHH for final

68 10     decisions."

68 11     Was that your understanding of how the

68 12     process worked?

68 13     A.   Yes, but where it says "incorporating all of

68 14     this information Provider Synergies makes suggestions,"

68 15     it actually -- it was more recommendations.

68 16     Q.   So Provider Synergies would have a recommended

68 17     list when they went into the meetings?

68 18     A.   They would make a recommendation to the P&T

68 19     committee, and it was posted on a slide that Provider

68 20     Synergies would post at that meeting.

68 21     Q.   Let me ask you about that process of

68 22     providing -- posting the slides on the list.

68 23     At the meeting, would they go just drug by

68 24     drug?

68 25     A.   No.  They -- they would review -- it just

69  1     depended.  Like if the P&T committee was reviewing just

69  2     a drug or if the P&T committee was reviewing a

69  3     therapeutic category.

69  4     So if they were reviewing a therapeutic

69  5     category, they would verbally discuss that therapeutic

69  6     category, and then the P -- Provider Synergies would

69  7     then on a slide set post their recommendations so that

69  8     the members of the P&T committee could see it and then

69  9     the audience as well.

69 10     Q.   Would the P&T committee ask questions about

69 11     those recommendations?

69 12     A.   They would sometimes.

69 13     Q.   And at that point, Provider Synergies would

69 14     comment on those questions?

69 15     A.   Yeah.  The questions would be directed to

69 16     Provider Synergies.

69 17     Q.   Was anyone from the audience allowed to comment

69 18     at that phase of the presentation?

69 19     A.   No, not that I recall.  They reserved that for

69 20     the end of the meeting.

69 21     Q.   So if a question came up, someone from the

69 22     audience could take their two to three minutes and

69 23     respond to a question that came up?

69 24     A.   Yes.  There was a public comment period that

69 25     was available at the end of the meeting.

70  1     Q.   Was that something that occurred; that is,

| | Objections | Ruling |
|---|---|---|

70  2    someone from the audience taking their time to respond

70  3    to a question of the P&T committee?

70  4    A.  I did see people take opportunity in the public

70  5    comment period, yes.

70  6    Q.  Do you recall anyone from Merck ever taking

70  7    that opportunity to respond to questions?

70  8    A.  I don't recall.

70  9    Q.  If you don't recall --

70 10    A.  Just to clarify, not to questions; but, I mean,

70 11    we weren't asked direct questions, if that's what you're

70 12    asking.

70 13    Q.  I understand.  And the only party at the P&T

70 14    committee meetings to whom direct questions would be

70 15    addressed would be Provider Synergies, correct?

70 16    A.  That's correct.

70 17    Q.  And so my question was: Did anyone from Merck

70 18    during the public comment portion of the meetings

70 19    respond to a question that had been directed to Provider

70 20    Synergies, in your recollection?

70 21    A.  I don't remember.

70 22    Q.  That's just nothing you recall?

70 23    A.  I don't recall, no.

70 24    I just want to say, it was very discouraged

70 25    to get up and speak.  The committee was not supportive

71  1    of the public testimony component.

71  2    Q.  Do you recall whether personnel from Merck did

71  3    take advantage of the public testimony?

71  4    MR. SALES:  Objection, asked and answered.

71  5    A.  Again, I don't recall whether or not we ever

71  6    stood up to testify.  I know that I testified -- I stood

71  7    up at the end and asked like a clarifying question about

71  8    the process, but that's -- I don't remember anything

71  9    else.

71 10    Q.  (BY MR. MURRAY)  But the only times that you

71 11    stood up you asked questions; you didn't provide

71 12    information?

71 13    A.  Correct.  I was just asking how the process

71 14    worked.

72:19  -  73:5    Turner_H_20091022

72 19    A.  When the State and when Provider Synergies set

72 20    the agenda for which classes or products will be

72 21    reviewed for future meeting.

72 22    Q.  Okay.  So it's your understanding, this is

72 23    referred to when they've decided what products are going

72 24    to be discussed at a meeting, then they will ask --

72 25    Provider Synergies will ask a manufacturer to provide

73  1    rebate information and clinical information?

73  2    A.  You know, I remember them asking for rebate

73  3    information, but I do not remember whether or not

**Re: [72:19-72:21]**
**Def Obj** Lack of foundation, no question

04/11/10 20:25

|  | | | Objections | Ruling |
|---|---|---|---|---|

| 73 | 4 | Provider Synergies asked the manufacturers for clinical | | |
| 73 | 5 | information. | | |

**74:20  -  75:20  Turner_H_20091022**

| 74 | 20 | A.  I just stated that my understanding was | Re: [74:20-74:25] |
| 74 | 21 | Provider Synergies worked with DHH to set the agenda, | Def Obj No question |
| 74 | 22 | and then they would do an analysis of either the | |
| 74 | 23 | products or the class, and then request a rebate offer | |
| 74 | 24 | from the manufacturer.  And that was the process as I | |
| 74 | 25 | understood it. | |
| 75 | 1 | Q.  (BY MR. MURRAY)  And you just have no | |
| 75 | 2 | recollection as to whether they would request clinical | |
| 75 | 3 | information -- | |
| 75 | 4 | A.  I don't -- | |
| 75 | 5 | Q.  -- from the manufacturer? | |
| 75 | 6 | A.  I do not recall clinical information being | |
| 75 | 7 | requested from the manufacturer.  That it was -- that | |
| 75 | 8 | Provider Synergies prided themselves on the fact that | |
| 75 | 9 | they were going to be using public peer reviewed | |
| 75 | 10 | clinical data, that they were an independent entity | |
| 75 | 11 | advising the State. | |
| 75 | 12 | Q.  So it's your belief that this paragraph, at | Re: [75:12-75:20] |
| 75 | 13 | least insofar as it refers to requesting submission of | Def Obj Speculative |
| 75 | 14 | clinical information from a manufacturer, is inaccurate? | |
| 75 | 15 | MR. SALES:  Objection, form.  Asked and | |
| 75 | 16 | answered. | |
| 75 | 17 | A.  Again, as I said earlier, I just don't recall | |
| 75 | 18 | the process being such that Provider Synergies was | |
| 75 | 19 | asking the manufacturers for anything other than | |
| 75 | 20 | supplemental rebate information. | |

**79:1  -  79:7  Turner_H_20091022**

| 79 | 1 | Are you aware of any situations with |
| 79 | 2 | Louisiana P&T committee where an earlier review was |
| 79 | 3 | triggered because of significantly new clinical |
| 79 | 4 | information? |
| 79 | 5 | A.  Significantly new clinical information? |
| 79 | 6 | Q.  Correct. |
| 79 | 7 | A.  I don't recall. |

**82:6  -  82:9  Turner_H_20091022**

| 82 | 6 | Was that your recollection, that at some |
| 82 | 7 | time Vioxx was not preferred and Bextra and Celebrex |
| 82 | 8 | were preferred? |
| 82 | 9 | A.  At some point, that was the case. |

**88:11  -  88:18  Turner_H_20091022**

| 88 | 11 | Q.  The first bullet point says, "Continue to work | Re: [88:11-88:18] |
| 88 | 12 | with the State of Louisiana and the DHH through Provider | Def Obj Lack of |
| 88 | 13 | Synergies to ensure unrestricted access for Merck | foundation, lack of |

| | | Objections | Ruling |
|---|---|---|---|

88 14          products."                                            personal knowledge
88 15          Did you have any responsibility for
88 16          implementing that strategy and tactic?
88 17          A.  I wasn't the point person for Merck that worked
88 18          with Provider Synergies, so no.

95:2   -   96:1   Turner_H_20091022
95  2          Q.  Okay.  Do you know what Michael Davis'
95  3          responsibilities were with respect to Provider
95  4          Synergies?
95  5          A.  Negotiating the supplemental rebate contracts.
95  6          Q.  He was one of the people that -- he and
95  7          Fevurly, I think was the other name?
95  8          A.  He and John Fevurly.
95  9          Q.  Do you know if they had any other duties other
95 10          than negotiating the contracts, with respect to Provider
95 11          Synergies?
95 12          A.  Did they have other job responsibilities to
95 13          Merck?
95 14          Q.  Uh-huh.  With respect to Provider Synergies.
95 15          I'm just limiting it to that.
95 16          In other words, did they do anything with
95 17          Provider Synergies other than negotiate the contracts,
95 18          that you know of?
95 19          A.  I just don't know.  I know they did the
95 20          supplemental rebates.
95 21          Q.  Do you know whether they provided information    **Re: [95:21-96:1]**
95 22          to Provider Synergies, specifically clinical             **Def Obj** Speculative,
95 23          information, about Merck products?                       lack of personal
95 24          A.  I just -- I just know they negotiated the            knowledge
95 25          supplemental rebate.  I don't know if they did anything
96  1          like that.

97:12   -   97:23   Turner_H_20091022
97 12          Q.  Do you know, did Dr. Kaiser make presentations    **Re: [97:12-97:23]**
97 13          to the P&T committee?                                    **Def Obj** Lack of
97 14          A.  I don't remember.                                    personal knowledge
97 15          Q.  But if you had a question about information,
97 16          medical or clinical information, that was presented at a
97 17          P&T committee member meeting, Dr. Kaiser is there as a
97 18          resource to you?
97 19          MR. SALES:  Objection, form.
97 20          A.  She wasn't at all of the P&T committee
97 21          meetings; but if she was -- but I just don't remember if
97 22          she ever did testify at any of the P&T committee
97 23          meetings.

98:23   -   99:1   Turner_H_20091022
98 23          Q.  Do you know whether those sales reps would have   **Re: [98:23-99:1]**
98 24          called on P&T committee members?          18           **Def Obj** Lack of

04/11/10 20:25

| | Objections | Ruling |
|---|---|---|

| | | | |
|---|---|---|---|
| 98 25 | A.  I don't know exactly which one of our sales | foundation, | |
| 99  1 | reps, if anyone, was calling on P&T committee members. | speculative, assumes | |
| | | facts not in evidence, | |
| | | lack of personal | |
| | | knowledge | *Overruled* |

| | |
|---|---|
| 100:6  -  100:18 | Turner_H_20091022 |

| | | | |
|---|---|---|---|
| 100  6 | Q.  (BY MR. MURRAY)  Ms. Turner, during the break, | **Re: [100:6-100:18]** | |
| 100  7 | my colleague indicated he thought you might have said | **Def Obj** Lack of | |
| 100  8 | that with respect to ULM when ULM was preparing | foundation, lack of | |
| 100  9 | information for consideration by the P&T committee | personal knowledge, | |
| 100 10 | before Provider Synergies got involved in that | speculative | |
| 100 11 | process -- | | |
| 100 12 | A.  Uh-huh. | | |
| 100 13 | Q.  -- he thought that you may have said -- and | | |
| 100 14 | correct me if I'm wrong or he's wrong.  I just want to | | |
| 100 15 | make sure we're clear on it -- that ULM may have gotten | | |
| 100 16 | some clinical materials, clinical data from Merck. | | |
| 100 17 | MR. SALES:  Objection to form. | | |
| 100 18 | A.  No.  I don't recall that. | | |

| | |
|---|---|
| 102:2  -  104:4 | Turner_H_20091022 |

| | | | |
|---|---|---|---|
| 102  2 | Q.  Is that your recollection, that at some point | | |
| 102  3 | in 2002 Vioxx went from nonpreferred or non-PDL to being | | |
| 102  4 | on the PDL? | | |
| 102  5 | A.  It is my recollection at some point Vioxx did | | |
| 102  6 | become -- was placed on the preferred drug list. | | |
| 102  7 | Q.  Is it your recollection that that would have | | |
| 102  8 | occurred before August of 2003?  And I'm looking at the | | |
| 102  9 | date of the document. | | |
| 102 10 | A.  Yeah.  Looking at the date of the document, I | | |
| 102 11 | would guess the same thing. | | |
| 102 12 | Q.  Do you know why that switch took place? | | |
| 102 13 | A.  There was a recommendation by Provider | | |
| 102 14 | Synergies that Vioxx be placed on the preferred drug | | |
| 102 15 | list. | | |
| 102 16 | Q.  Did that recommendation to put Vioxx on the | **Re: [102:16-102:20]** | |
| 102 17 | preferred drug list come before or after consideration | **Def Obj** Relevance | |
| 102 18 | of pricing information? | | |
| 102 19 | A.  I'm sorry.  Say that again. | | |
| 102 20 | Q.  Actually, let me rephrase it. | | |
| 102 21 | A.  Okay. | | |
| 102 22 | Q.  Did that recommendation come before -- from | | |
| 102 23 | Provider Synergies to put Vioxx on the list, did that | | |
| 102 24 | recommendation come before or after negotiation of a | | |
| 102 25 | rebate as to Vioxx? | | |
| 103  1 | A.  A rebate would have been negotiated before the | | |
| 103  2 | meeting, but that would have been considered. | | |
| 103  3 | Q.  Was there a rebate negotiated, to your | | |
| 103  4 | recollection? | | |

| | | | Objections | Ruling |
|---|---|---|---|---|

| | | |
|---|---|---|
| 103 | 5 | A. It's my understanding we did negotiate a |
| 103 | 6 | rebate. |
| 103 | 7 | Q. Were you present at the meeting where that |
| 103 | 8 | recommendation was presented? |
| 103 | 9 | A. I think so. |
| 103 | 10 | Q. Do you recall any specifics of the discussion |
| 103 | 11 | regarding that recommendation? |
| 103 | 12 | A. I don't. |
| 103 | 13 | Q. Your understanding, the P&T committee adopted |
| 103 | 14 | the recommendation? |
| 103 | 15 | A. Yes. |
| 103 | 16 | Q. Do you know whether any clinical information |
| 103 | 17 | was submitted by Merck prior to the adoption -- let me |
| 103 | 18 | rephrase that. |
| 103 | 19 | Do you know whether any clinical |
| 103 | 20 | information was submitted by Merck either to the P&T |
| 103 | 21 | committee or to Provider Synergies prior to the adoption |
| 103 | 22 | of the recommendation? |
| 103 | 23 | A. I don't know. |
| 103 | 24 | Q. You just don't know either way? |
| 103 | 25 | A. I don't know, but again, Provider Synergies -- |
| 104 | 1 | that wasn't the practice. They did their own |
| 104 | 2 | independent review of information. It wasn't that the |
| 104 | 3 | manufacturers were to assist and submit the information |
| 104 | 4 | to them. |

Re: [103:16-104:4]
**Def Obj** Lack of
personal knowledge

**104:21 -   105:4   Turner_H_20091022**

| | | |
|---|---|---|
| 104 | 21 | Q. And again, this document is shown as being |
| 104 | 22 | drafted by you. |
| 104 | 23 | Is that your recollection that you drafted |
| 104 | 24 | it? By you and Mary Ogle? |
| 104 | 25 | A. It does state that it was drafted by both of |
| 105 | 1 | us. |
| 105 | 2 | Q. And is that your recollection? |
| 105 | 3 | A. I remember collaborating on the document, but I |
| 105 | 4 | don't know who submitted which information for the |

**105:19 -   105:20   Turner_H_20091022**

| | | |
|---|---|---|
| 105 | 19 | Q. (BY MR. MURRAY) Moving on to Tab 3, this is a |
| 105 | 20 | memo from appears to be from you to a number of |

**108:24 -   109:5   Turner_H_20091022**

| | | |
|---|---|---|
| 108 | 24 | Q. Is it fair to say this memo is outlining the |
| 108 | 25 | adoption of the P&T committee and some of the things |
| 109 | 1 | that the P&T committee maybe do, some of the process |
| 109 | 2 | things we've talked about earlier? |
| 109 | 3 | A. This was one phase of the process that the |
| 109 | 4 | State was working on in the development of the PDL and |
| 109 | 5 | supplemental rebate program. |

| | Objections | Ruling |
|---|---|---|

**109:10 -   110:22 Turner_H_20091022**

| | | |
|---|---|---|
| 109 10 | Q.  Notification of products to be reviewed.  It | |
| 109 11 | says, "The P&T committee will contact the respective | |
| 109 12 | pharmaceutical company's designated point person when | |
| 109 13 | their products will be reviewed.  At this point Terri | |
| 109 14 | Lee and I have determined that I will be the initial | |
| 109 15 | contact for the company." | |
| 109 16 | That means -- the "I" there is referring to | |
| 109 17 | Holly Jacques, now Holly Turner? | |
| 109 18 | A.  That is correct. | |
| 109 19 | Q.  "I will then immediately notify Terri and a | |
| 109 20 | point contact from sales." | |
| 109 21 | A.  Okay. | |
| 109 22 | Q.  Is that your recollection, that you would be | |
| 109 23 | contacted by someone from the P&T committee, and then | |
| 109 24 | you would notify your boss Terri Lee and a point contact | |
| 109 25 | from sales? | |
| 110  1 | A.  It wasn't really somebody -- a person that was | |
| 110  2 | on the P&T, that I recall.  It was somebody from either | |
| 110  3 | ULM or DHH -- again, the process was really not very | |
| 110  4 | clearly defined at this point -- they asked for a point | |
| 110  5 | person for each company, and then that person would | |
| 110  6 | help, you know, coordinate the response. | |
| 110  7 | Q.  But you would -- it was your understanding that | |
| 110  8 | once you were contacted by whomever it was that | |
| 110  9 | contacted you about the P&T committee, you would then | |
| 110 10 | immediately notify your boss Terri and a point contact | |
| 110 11 | from sales? | |
| 110 12 | A.  I remember notifying my boss Terri, but I | |
| 110 13 | don't -- I don't remember a point contact in sales. | |
| 110 14 | Q.  My next question is -- probably you don't know, | |
| 110 15 | but I have to ask it.  Do you know who the point contact | |
| 110 16 | person from sales was? | |
| 110 17 | MR. SALES: Objection, form. | |
| 110 18 | A.  I don't. | |
| 110 19 | Q.  (BY MR. MURRAY) Okay.  Do you remember the | |
| 110 20 | reason why at this point in time it was anticipated that | |
| 110 21 | you would notify a point contact from sales? | |
| 110 22 | A.  I don't recall. | |

**112:11 -   112:16 Turner_H_20091022**

| | | |
|---|---|---|
| 112 11 | Q.  So you don't know -- but you don't know for | |
| 112 12 | sure whether anyone at Merck provided any information to | |
| 112 13 | ULM? | |
| 112 14 | A.  I don't recall if ULM ever asked us formally on | |
| 112 15 | behalf of the State and the P&T committee for any | |
| 112 16 | information. | |

**113:1 -   113:16 Turner_H_20091022**

| | | |
|---|---|---|
| 113  1 | Q.  (BY MR. MURRAY) Did you have an understanding | Re: [113:1-113:7] |

| | | **Objections** | **Ruling** |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 113 | 2 | that if Merck had clinical information that was not | **Def Obj** Speculative, |
| 113 | 3 | published with respect to a drug at issue, that Merck | lack of foundation, |
| 113 | 4 | should submit that to the P&T committee? | lack of personal |
| 113 | 5 | MR. SALES: Objection, form. | knowledge, assumes |
| 113 | 6 | A.  It was not in my role to submit any | facts not in evidence |
| 113 | 7 | information, so I'm not really sure. | |
| 113 | 8 | Q.  (BY MR. MURRAY) So you were just transferring | |
| 113 | 9 | this information as to what had been told to you about | |
| 113 | 10 | the process to the people who may have some role in | |
| 113 | 11 | providing that information? | |
| 113 | 12 | A.  Yes.  So at the time, this is what had been | |
| 113 | 13 | laid out at the September -- sorry -- August 8th | |
| 113 | 14 | meeting, and I was just sharing with the folks listed on | |
| 113 | 15 | that e-mail what information was prepared -- was laid | |
| 113 | 16 | out at that meeting. | |

Overruled

**115:5 - 115:10 Turner_H_20091022**

| | | |
|---|---|---|
| 115 | 5 | To your knowledge, did Merck ever receive a |
| 115 | 6 | letter requesting information by the P&T committee? |
| 115 | 7 | A.  I don't remember if we did under this old |
| 115 | 8 | format. |
| 115 | 9 | Q.  Just no recollection either way? |
| 115 | 10 | A.  Huh-uh. |

**115:14 - 115:22 Turner_H_20091022**

| | | | |
|---|---|---|---|
| 115 | 14 | Q.  This information is to be submitted in a format | **Re: [115:14-115:22]** |
| 115 | 15 | designed by the Academy of Managed Care Pharmacies | **Pltf Obj** For |
| 115 | 16 | (AMCPs).  The reference for this document was AMCP's | completeness, |
| 115 | 17 | format for formulary submissions.  Principles of a sound | include 115:23-25, |
| 115 | 18 | drug formulary system, Appendix B; and AMCP guidance f | 116:1-3 |
| 115 | 19 | submission of clinical and economic evaluation data to | |
| 115 | 20 | support formulary listing in U.S. health plans and | |
| 115 | 21 | pharmacy benefits management organizations," and then it | |
| 115 | 22 | references a web site. | |

**115:23 - 116:13 Turner_H_20091022**

| | | |
|---|---|---|
| 115 | 23 | Do you know whether a submission was ever |
| 115 | 24 | put together for Vioxx -- and whether it was submitted |
| 115 | 25 | or not, but whether anything was put together for Vioxx |
| 116 | 1 | that followed this format for formulary submissions? |
| 116 | 2 | A.  I'm not sure if a request was ever made or if a |
| 116 | 3 | submission was ever fulfilled. |
| 116 | 4 | Q.  My question was a little bit different.  It |
| 116 | 5 | was: Do you know whether this was put together? |
| 116 | 6 | Whether it was submitted to anybody or a request for |
| 116 | 7 | submission was made, do you know whether such a document |
| 116 | 8 | was ever compiled? |
| 116 | 9 | A.  Are you finished?  I'm sorry. |
| 116 | 10 | Q.  That's the end of the question, yes. |
| 116 | 11 | A.  I'm not sure if anything was ever requested or |

|  | Objections | Ruling |
|---|---|---|

116 12    produced for any of our products as it relates to this
116 13    submission format.

117:15 -    118:13 Turner_H_20091022
117 15    Do you know whether ULM ever generated
117 16    formulary recommendations under that contract?
117 17    A.  I have no idea.
117 18    Q.  You don't know whether ULM had the contract for
117 19    a while, and they said, We'll bring in Provider
117 20    Synergies, before ULM ever finished everything?
117 21    A.  Yeah.  I don't have any idea of when it started
117 22    or stopped or what was done, officially.
117 23    Q.  But the procedure that's being discussed here     **Re: [117:23-118:1]**
117 24    is the procedure that was contemplated when ULM had the   **Def Obj** Lack of
117 25    contract?                                              foundation
118  1    A.  That's correct.
118  2    Q.  And you don't know whether this formal comment
118  3    procedure ever actually got enacted?
118  4    A.  When ULM had the contract, I do not.
118  5    Q.  The next page, Presentation to P&T committee.
118  6    A.  Okay.
118  7    Q.  It says, "It appears the committee will allow
118  8    formal product presentations.  I will follow up with
118  9    Gina Biglane and the P&T committee chairs to clarify the
118 10    presentation process."
118 11    Were you ever able to clarify that
118 12    presentation process?
118 13    A.  We never got to that point with ULM.

118:25 -    119:2 Turner_H_20091022
118 25    Q.  Do you know whether a team was developed -- I'm     **Re: [118:25-119:2]**
119  1    sorry -- a team was created to develop a clinical      **Pltf Obj** For
119  2    submission and business proposal?                       completeness,
                                                                include 119:3-5

119:3  -    119:23 Turner_H_20091022
119  3    A.  I don't think one was because, again, this --
119  4    ULM never got the program up and running, and the State
119  5    decided to hire Provider Synergies.
119  6    So again, I don't know that ULM ever even
119  7    got to the point of asking anybody for information.
119  8    Q.  Okay.  And now let me ask the question
119  9    irrespective of ULM --
119 10    A.  Okay.
119 11    Q.  -- whether Provider Synergies or anyone else.
119 12    Do you know whether a team was created to         **Re: [119:12-119:15]**
119 13    develop a clinical submission and business proposal,   **Def Obj** Speculative,
119 14    whether -- for the State of Louisiana, whether it had to   lack of foundation
119 15    deal with Provider Synergies or ULM?
119 16    MR. SALES:  Objection, form.
119 17    A.  The way the process was laid out was Provider

| | Objections | Ruling |
|---|---|---|

119 18   Synergies was only going to be reaching out to the
119 19   manufacturers for supplemental rebates and were not
119 20   going to be asking for any clinical information.  It was
119 21   just merely -- they were going to do their independent
119 22   research, and they were just asking the manufacturers
119 23   for pricing.

120:6  -  120:7  Turner_H_20091022
120  6   Q.  (BY MR. MURRAY)  Okay.  Now turning to Tab 4 --
120  7   A.  Okay.

120:17 -  120:20 Turner_H_20091022
120 17   Do you remember attending a Louisiana P&T
120 18   committee meeting January 9, '02?
120 19   A.  If I prepared the memo, then I would assume I
120 20   would be at that meeting.

121:6  -  122:1  Turner_H_20091022
121  6   Q.  Now, if you look at this document, it appears
121  7   that this document is written at the third P&T committee
121  8   meeting or after the third P&T committee meeting, and it
121  9   looks like ULM has, as of the drafting of this document,
121 10   actually announced some recommendations.
121 11   A.  Okay.
121 12   Q.  So does this refresh your recollection that ULM
121 13   may have actually gotten in the process of announcing
121 14   recommendations?
121 15   A.  By just reading that sentence -- to be honest
121 16   with you, I didn't remember that we ever got that far
121 17   along with ULM, and I'm surprised.
121 18   Q.  You have no independent recollection of that
121 19   outside the document?
121 20   A.  Right.  I don't remember that.
121 21   Q.  As you sit here today, you can't think of a
121 22   reason why that's -- to think that that statement is
121 23   wrong?
121 24   A.  I just don't recall -- I'm just surprised.  I
121 25   didn't realize ULM got that far along before Provider
122  1   Synergies was hired.

123:2  -  123:23 Turner_H_20091022
123  2   Does this refresh your recollection about
123  3   that issue?
123  4   MR. SALES:  Objection to form.
123  5   A.  By reading this, I draw the conclusion that
123  6   ULM, based on again what's written here, did a review
123  7   and made a recommendation.  And then it says then
123  8   they're going to review pricing information to determine
123  9   which products are finally added.
123 10   So it appears that when ULM was doing thi

Re: [123:2-123:9]
**Def Obj** Lack of
personal knowledge,
speculative, lack of
foundation

| | | Objections | Ruling |
|---|---|---|---|

123 11    that there were the two types of processes that you just
123 12    described.
123 13    Q.   Okay.  And actually, it says the committee
123 14    adopted these recommendations.
123 15    So does it appear that the committee
123 16    actually adopted them before they went to the pricing
123 17    phase for the final list?
123 18    MR. SALES:  Objection, form.
123 19    A.   I just don't recall that.
123 20    Q.   (BY MR. MURRAY)  Okay.  Is that a fair reading
123 21    of the document?
123 22    MR. SALES:  Objection form.
123 23    A.   It's what is written here, but I just, again,

**Re: [123:13-123:23]**
**Def Obj** Lack of personal knowledge

*Sustained*

123:24 -   123:24 Turner_H_20091022
123 24    don't recall.

**Re: [123:24-123:24]**
**Pltf Obj** Non-responsive, missing question

125:22 -   126:6 Turner_H_20091022
125 22    Q.   It says, "In the meantime, I have contacted
125 23    Mary Ogle and alerted her that DHH plans to send out the
125 24    next letter requesting information on the next
125 25    therapeutic categories in the next week or two."
126  1    And it says, "Mary will contact Fran Kaiser
126  2    to facilitate the clinical submissions."
126  3    Let me ask you:  Do you know why you would
126  4    be contacting Mary Ogle with respect to that issue?
126  5    A.   I don't recall why I would have contacted Mary
126  6    on that.

127:2  -   127:11 Turner_H_20091022
127  2    Do you remember I was asking you some
127  3    questions with respect to Document 3 about who might
127  4    prepare clinical submissions and I asked whether you it
127  5    was Fran Kaiser.
127  6    Does this refresh your recollection on that
127  7    issue?
127  8    A.   Well, it says here that Mary will contact Fran
127  9    Kaiser to facilitate the submission.  So Fran must have
127 10    helped facilitate our clinical submission, if we ever
127 11    received that request.

**Re: [127:2-127:11]**
**Def Obj** Lack of foundation, speculative

*Overruled*

127:15 -   127:24 Turner_H_20091022
127 15    Q.   (BY MR. MURRAY)  This document appears to be
127 16    dated May 11, 2002.  The subject is "Summary of the P&T
127 17    committee hearing on 5/9/02 and summary of the Joint
127 18    House and Senate Health and Welfare Hearing Committee on
127 19    5/9/02," and the author is Holly Jacques.
127 20    Is that you?
127 21    A.   It is.
127 22    Q.   Do you recall writing this document?   25

|  | Objections | Ruling |
|---|---|---|

127 23    A.  Now that you put it in front of me and my name
127 24    is on it, I would definitely assume it's written by me.

128:7 - 131:23 Turner_H_20091022
128 7    Q.  And it appears that, at this point as of May of
128 8    2002, it's Provider Synergies who is presenting
128 9    recommendations.
128 10    Does that refresh your recollection as to
128 11    when Provider Synergies took over that role?
128 12    A.  It appears, based on looking at this document
128 13    and the previous document that you sent me, that
128 14    sometime between January and May the State contracted
128 15    with Provider Synergies.
128 16    Q.  Okay.  And it looks like Cox IIs were among the
128 17    categories that were discussed at that meeting?
128 18    A.  That's what it says in this document.
128 19    Q.  And recommendations were presented.
128 20    It says, "The following is the summary of
128 21    the discussion and actions taken in each of these
128 22    therapeutic categories."
128 23    Is that correct?  Were you reporting on the
128 24    actions that were taken by the P&T committee with
128 25    respect to the categories?
129 1    A.  It appears I'm drafting a summary of an
129 2    activity that took place during that meeting.
129 3    Q.  Okay.  I'd like you to turn to the next page,
129 4    and there is a discussion of Cox IIs.
129 5    A.  Okay.
129 6    Q.  "Provider Synergies recommended the following
129 7    drugs be included on the PDL, as were Celebrex and
129 8    Bextra."
129 9    Vioxx is not included in Provider
129 10    Synergies' recommendation; is that correct?
129 11    A.  It doesn't state Vioxx. It states Celebrex and
129 12    Bextra.
129 13    Q.  Do you know whether that recommendation was
129 14    made at the clinical phase or after pricing data had
129 15    been considered?
129 16    A.  If Provider Synergies had been hired at this
129 17    point, those -- the clinical and the financial were
129 18    considered before this meeting and then recommendations
129 19    by Provider Synergies were provided to the committee.
129 20    Q.  Okay.  So it's your understanding that, once
129 21    Provider Synergies got involved, the process changed
129 22    from what was described with respect to ULM?  We had
129 23    earlier seen reference to a process that involved the
129 24    P&T committee being involved prior to consideration of
129 25    pricing data.
130 1    Do you recall that?
130 2    A.  Yes.  So when ULM had the -- was doing the

**Re: [129:20-130:7]**
**Def Obj** Speculative, lack of personal knowledge

04/11/10 20:25

|  | Objections | Ruling |
|---|---|---|

130 3   business for Louisiana, it appears through the memos you
130 4   showed me that they laid out the recommendations based
130 5   on clinical, and then they had a separate meeting, I
130 6   guess, to discuss the clinical.  I'm not sure if that
130 7   second meeting ever occurred.  I just don't know.
130 8   Q.   But it's your understanding that once ULM --
130 9   sorry -- once Provider Synergies was involved, by the
130 10  time you got to the recommendation of the P&T phase --
130 11  by the time you got to the phase of recommending to the
130 12  P&T committee, both clinical and pricing had been
130 13  considered?
130 14  A.   I know that Provider Synergies had reached out
130 15  to us for a supplemental rebate offer and so -- before
130 16  this meeting.  So...
130 17  Q.   How do you know that?  You say you know they
130 18  had reached out for supplemental offer before this May
130 19  2002 memo.
130 20  What's the basis for that?
130 21  A.   That's just how they --
130 22  Q.   That's your recollection?
130 23  A.   That's my recollection of how they reviewed all
130 24  the -- before all the categories were presented in a
130 25  meeting.  The contact we would have with Provider
131 1   Synergies is they would reach out to us to alert us that
131 2   a review was coming up and for us to submit a
131 3   supplemental rebate offer.
131 4   Q.   And was that true even for the first time that
131 5   Provider Synergies made a recommendation to the P&T
131 6   committee?
131 7   A.   That was my understanding.
131 8   Q.   That's your understanding.  Okay.
131 9   Then you say, "A few members of the P&T
131 10  committee asked about the recent news stories about the
131 11  Cox IIs having potential cardiovascular side effects."
131 12  Then it says, "Provider Synergies stated
131 13  that there are no conclusions on this issue at this
131 14  time."
131 15  Did I read that correctly?
131 16  A.   Yeah.
131 17  Q.   Was that your recollection?  Do you recall any
131 18  questions about potential cardiovascular side effects?
131 19  A.   I don't remember those coming up.  It was a
131 20  long time ago.
131 21  Q.   You just have no recollection of this either
131 22  way?
131 23  A.   I don't remember this.

131:24 -   132:6   Turner_H_20091022
131 24  Q.   We had talked about the way that the P&T
131 25  committee meetings worked when Provider Synergies was

| | Objections | Ruling |
|---|---|---|

132  1    involved and that the only people asking questions
132  2    during the presentation of recommendations were the P&T
132  3    committee members and the only ones answering those
132  4    questions were Provider Synergies.
132  5    Is that correct?
132  6    A.  That's correct.

132:17 -   135:2   Turner_H_20091022
132  17    Q.  (BY MR. MURRAY)  Do you recall who else was
132  18    present from Merck, if anyone, at this P&T meeting?
132  19    A.  I don't.
132  20    Q.  I assume there were some meetings where you
132  21    were present with other people from Merck?
132  22    A.  Correct.
132  23    Q.  And one of those people was Fran Kaiser?
132  24    A.  That's correct.
132  25    Q.  Do you know whether Fran Kaiser was here for
133  1    this meeting?
133  2    A.  I don't recall.
133  3    Q.  Do you have any information -- or let me
133  4    correct that.
133  5    At the time that this meeting took place,
133  6    did you have any information provided to you by Merck
133  7    with respect to cardiovascular side effects in Cox IIs?
133  8    A.  I don't recall.
133  9    Q.  Then you note:  "Provider Synergies did not
133  10    mention the fact that Vioxx has a GI protective
133  11    indication."
133  12    Was it your understanding that Vioxx has a
133  13    GI protective indication?
133  14    A.  If I wrote that back then, I must have been
133  15    under that impression.
133  16    Q.  Was that an impression that you related to
133  17    anyone from Louisiana Department of Health and
133  18    Hospitals?
133  19    A.  Not that I recall.
133  20    Q.  Do you remember making any statements about GI
133  21    protective indications at any P&T committee meetings?
133  22    A.  I never stood up and talked about products.
133  23    Q.  Do you recall anyone from Merck making any
133  24    statements about GI protective indications at any P&T
133  25    committee meetings?
134  1    A.  I don't recall.
134  2    Q.  Okay.  Do you recall anyone from Merck ever
134  3    making any statements about cardiovascular side effects
134  4    at any P&T committee meetings?
134  5    A.  I don't remember.
134  6    Q.  Do you know whether Fran Kaiser ever made any
134  7    statements at any P&T committee meetings?
134  8    A.  I don't remember if Fran Kaiser testified

28

| | Objections | Ruling |
|---|---|---|

134  9    any of the P&T committee meetings in Louisiana.
134 10    Q.  Did you ever attempt to provide any information
134 11    to either Provider Synergies or the P&T committee with
134 12    respect to either cardiovascular side effects or GI
134 13    protective indication subsequent to this meeting?
134 14    MR. SALES: Objection, form; asked and
134 15    answered.
134 16    A.  I'm sorry.  Ask me that again.
134 17    Q.  (BY MR. MURRAY) Did you ever attempt to
134 18    provide any information to -- about cardiovascular side
134 19    effects or GI protective indications to the P&T
134 20    committee after this meeting?
134 21    A.  I don't recall that.  I don't recall that.
134 22    Q.  Do you know whether anyone from Merck attempted
134 23    to provide any information about Cox IIs' potential
134 24    cardiovascular side effects or GI protective indications
134 25    to the P&T committee after these issues having been
135  1    raised at this meeting?
135  2    A.  I don't recall.


136:1  -  136:9  Turner_H_20091022
136  1    Do you remember preparing a report on a
136  2    meeting with Gina Biglane?
136  3    A.  I do.
136  4    Q.  Do you remember forwarding that memo to the
136  5    people who are copied on page 6703?
136  6    A.  I don't, except the fact that you're showing it
136  7    to me.
136  8    Q.  Does it sound like something you'd have done?
136  9    A.  Yes.


136:23  -  137:2  Turner_H_20091022
136 23    Q.  Actually, I probably don't have any questions
136 24    about this other than: Does this look like something
136 25    you prepared?  Do you think it's referencing something
137  1    you prepared and do you think it's referencing that
137  2    meeting we talked about earlier?

Re: [136:23-137:2]
Pltf Obj For
completeness,
include 137:3-7


137:3  -  137:15  Turner_H_20091022
137  3    A.  Just by reading the first page, it does appear
137  4    to be something that I drafted in regards to a meeting
137  5    that I had with Dr. Gina Biglane, again, trying to
137  6    further understand the process at the time ULM had the
137  7    contract.
137  8    Q.  And does that refresh your recollection that
137  9    Mary Ogle was present at that meeting?
137 10    A.  It does.
137 11    MR. MURRAY: We'll go ahead and attach that
137 12    is as Jacques 6 -- Turner 6.  I'm sorry.
137 13    Q.  (BY MR. MURRAY) Tab 8, I'd like you to

| | | Objections | Ruling |
|---|---|---|---|

137 14    ahead and take a second to flip through because it's a
137 15    chain of e-mails.  And it looks like you're copied on

**137:16 -   137:20 Turner_H_20091022**
137 16    some and not others, and I'm going to just direct you to
137 17    one point.  But I'm going to ask you if you recognize
137 18    this chain of e-mails, if you recall this discussion.
137 19    It looks it's like taking place in May of
137 20                                     2002

*Objections column:* **Re: [137:16-137:20]** **Pltf Obj** Incomplete designation

**138:10 -   138:23 Turner_H_20091022**
138 10    Q.   And it looks like it starts with revised --
138 11    "Subject:  Revised memo."  And this is sent from you to
138 12    a number of people, including Fran Kaiser.  It's dated
138 13    May 10, 2002.
138 14    We looked at a memo earlier, Exhibit 5,
138 15    that was reporting on a May 9, '02 P&T committee meetin
138 16    where Provider Synergies' recommendations were reported
138 17    on.
138 18    And then if you'd look at the context of
138 19    Fran's e-mail, Fran Kaiser's e-mail --
138 20    A.   Okay.
138 21    Q.   -- forwarding your e-mail, does it look like
138 22    she's talking to you about that memo regarding what we
138 23    looked at previously as Exhibit 5?

*Objections column:* **Re: [138:10-138:23]** **Pltf Obj** For completeness, include 138:24-25, 139:1

**138:24 -   139:4 Turner_H_20091022**
138 24    A.   It does state here that she's enclosing a memo
138 25    received by me -- from me regarding recommendations that
139 1    Provider Synergies made.
139 2    Q.   Okay.  So do you think that's that memo that
139 3    was referenced in Exhibit 5, or you just can't tell?
139 4    A.   I think it is.

**140:22 -   141:18 Turner_H_20091022**
140 22    Q.   In it Dr. Kaiser writes that she will be going
140 23    to Louisiana with Holly in the hope of setting some of
140 24    the clinical issues to right with legislators.
140 25    Does that ring a bell to you?  Do you
141 1    remember going with Holly to -- I'm sorry -- with
141 2    Dr. Frazier [sic] to Louisiana?
141 3    A.   In the context of what she's written here, I do
141 4    not recall that.
141 5    Q.   Okay.  Do you remember ever going to meet with
141 6    legislators to set them right on clinical issues?
141 7    A.   I do not.
141 8    Q.   Do you know why you would have occasion to
141 9    set -- to discuss clinical issues with legislators?
141 10    A.   I didn't write this.
141 11    Q.   I'm just asking.  Would you have an occasion to

*Objections column:* **Re: [140:22-141:18]** **Def Obj** Lack of personal knowledge

*Ruling column (handwritten):* Sustained

| | Objections | Ruling |
|---|---|---|

141 12    discuss clinical issues or would Dr. Frazier [sic] have
141 13    an occasion to discuss clinical issues with legislators
141 14    in connection with recommendations from Provider
141 15    Synergies?
141 16    MR. SALES: Objection, form.
141 17    A.  I never talked about clinical issues with
141 18    legislators, and I don't recall Dr. Kaiser ever talking.

**141:24 - 142:6 Turner_H_20091022**
141 24    Q.  (BY MR. MURRAY) Do you remember going to -- as
141 25    opposed to going to legislators, do you remember going
142 1    with Dr. Frazier --
142 2    A.  Kaiser.
142 3    Q.  I'm sorry -- Dr. Kaiser to Louisiana to discuss
142 4    clinical issues with regulators in response to the
142 5    Provider Synergies recommendations?
142 6    A.  I don't recall that.

**142:7 - 143:7 Turner_H_20091022**
142 7    Q.  Dr. Kaiser writes: "Obviously, we wish to
142 8    clarify the ARB and Coxib class clinical issues and ask
142 9    for reconsideration of Vioxx and Cozaar-Hyzaar, if
142 10    possible."
142 11    And then she writes to Dr. Goldberg she
142 12    would welcome his thoughts.
142 13    Do you recall any effort to clarify and
142 14    request for reconsideration of the decision not to put
142 15    Vioxx on the PDL?  Or recommendation not to put Vioxx on
142 16    the PDL?
142 17    A.  Will you ask that again?  I don't understand
142 18    the question.
142 19    Q.  Do you recall Dr. Frazier [sic]?
142 20    A.  Kaiser.
142 21    Q.  Sorry.  I don't know why I keep saying
142 22    Frazier --
142 23    -- Dr. Kaiser wanting to clarify class
142 24    clinical issues and ask for reconsideration of Vioxx?
142 25    A.  I don't.
143 1    Q.  Okay.  Do you recall any submissions being made
143 2    to Provider Synergies or the Louisiana P&T committee
143 3    with respect to asking for reconsideration of Vioxx?
143 4    A.  I didn't work directly with Provider Synergies,
143 5    so --
143 6    Q.  The answer is you don't know?
143 7    A.  I don't know.

**144:1 - 144:22 Turner_H_20091022**
144 1    And you're the last person on that list; is
144 2    that correct?
144 3    A.  That is my name.

Objections:

Re: [142:7-143:7]
**Def Obj** Lack of
personal knowledge,
relevance

Re: [144:1-144:22]
**Def Obj** Lack of
personal knowledge,

Ruling:

*Sustained* (handwritten)

*(handwritten)*

04/11/10 20:25

31

| | | | Objections | Ruling |
|---|---|---|---|---|
| | | | relevance, speculative | *Overrull* |

144   4      Q.  So the question I had is:  If an e-mail string
144   5      is sent like this, would you expect that, if you're
144   6      copied on it, you would have gotten the whole string?
144   7      Is that how it usually works with the Merck system, the
144   8      e-mail system you have?
144   9      A.  From looking at the document that you're
144  10      referring to, it does look like I was copied on this
144  11      string of e-mails; but I don't recall this e-mail.
144  12      Q.  Okay.  It looks like Steve Shearer is writing
144  13      about freedom of information request, FOI request, with
144  14      respect to the Provider Synergies' recommendations?
144  15      Does that appear to be correct?
144  16      A.  He does state in this about a meeting with
144  17      Provider Synergies and then submitting an FOI.
144  18      Q.  And my question is simply:  Do you recall being
144  19      involved or receiving e-mails about a freedom of
144  20      information request with respect to Provider Synergies?
144  21      Does this ring any kind of bell?
144  22      A.  I do not.  I do not.


146:15 -   146:24 Turner_H_20091022
146  15      It looks like Doug Welch sent this to you?
146  16      Or actually it looks like it says from you -- from Holly
146  17      Jacques to Doug Welch.
146  18      Anyway, does this ring a bell?  Do you
146  19      recall forwarding information from Lori Brown to either
146  20      Doug Welch or John Fevurly?
146  21      A.  I do not.
146  22      Q.  Is that your e-mail address on the from line on
146  23      the first e-mail here?  Jacques Holly?
146  24      A.  Yes.


147:25 -   148:5 Turner_H_20091022
147  25      Q.  Does that appear to be an e-mail to Doug Welch
148   1      from Holly Jacques?
148   2      A.  It does.
148   3      Q.  Is that your e-mail address?
148   4      A.  I can't see an e-mail address, but it is my
148   5      reference.


148:25 -   149:9 Turner_H_20091022
148  25      Q.  Okay.  Do you have any reason to believe it's
149   1      not?  You talk about a P&T committee member list.  It's
149   2      got the next Bates number, and here is a list of P&T
149   3      committee members.
149   4      It says there would be asterisks.  There
149   5      are asterisks here.
149   6      Does it appear to you that would be the
149   7      list that would be attached?
149   8      A.  It looks like the type of list I'm referencing

| | Objections | Ruling |
|---|---|---|

149   9          in this e-mail.

149:10 -   149:11 Turner_H_20091022
149  10          MR. MURRAY:  I'd like to go ahead and
149  11          attach both of Tabs 10 and 11 as Turner 9.

149:16 -   149:24 Turner_H_20091022
149  16          This is an e-mail drafted by you, correct?
149  17          A.  It does appear to be.
149  18          Q.  Do you remember sending a list of LA Medicaid
149  19          P&T committee members to Mary Ogle?
149  20          A.  I don't, but by putting this in front of me,
149  21          this does appear to be an e-mail from me.
149  22          Q.  Does it seem like something you would have
149  23          done?
149  24          A.  Based on what's in front of me, yes.

150:16 -   150:20 Turner_H_20091022
150  16          A.  Just from what I read here, it looks like I'm
150  17          sending an updated list of the P&T because it appears
150  18          there had been some changes, and just alerting Mary and
150  19          David Luke and Warren Lambert that this is an updated
150  20          list of the Louisiana Medicaid P&T committee members.

**Re: [150:16-150:20]**
**Pltf Obj** Missing
question, include
150:7-12

*[handwritten: Sustained]*

150:21 -   151:9 Turner_H_20091022
150  21          Q.  Does it look like you're sending it to them so
150  22          they can call on them?
150  23          A.  It does say the word "call on him" in terms of
150  24          referring to Dr. Kinchen, whether or not he's still a
150  25          member of that committee.  It's just alerting the
151   1          updated list of who the Louisiana Medicaid P&T committee
151   2          members are.
151   3          Q.  Do you know whether Mary Ogle contacted or
151   4          called on members of the Louisiana P&T committee?
151   5          A.  I do not.
151   6          Q.  Now, remember you left off State officials.  We
151   7          talked about that, and you said that's because you don't
151   8          want to be -- Mark doesn't want to appear to be lobbying
151   9          State officials, correct?

**Re: [151:6-151:9]**
**Def Obj** No answer,
relevance

*[handwritten: Overruled]*

153:13 -   154:13 Turner_H_20091022
153  13          Q.  (BY MR. MURRAY)  Turning to Tab 12, this
153  14          appears to be a document that you were copied on dated
153  15          November 11, 2004.
153  16          A.  Yes.  I do see my name on it.
153  17          Q.  Do you remember that?  And take a minute to
153  18          review it.  Do you remember that document or the subject
153  19          matter of that document?
153  20          A.  Yes.  I have read the document.
153  21          Q.  Okay.  Do you remember that subject matter?

**Re: [153:13-154:13]**
**Def Obj** Relevance,
no answer

04/11/10 20:25

| | | Objections | Ruling |
|---|---|---|---|

153 22      MR. SALES:  Objection to form.

153 23      Q.  (BY MR. MURRAY) Do you remember the discussion

153 24      that's going on in this document, in this e-mail?  Does

153 25      that ring a bell about anything that you were involved

154 1      in?

154 2      A.  By reading this, yes, I recall the issue.

154 3      Q.  And the issue was approval for contact with P&T

154 4      committee members?

154 5      A.  That's correct.

154 6      Q.  Okay.  And it looks like Terri Lee is writing

154 7      to Mark Dervishian, D-e-r-v-i-s-h-i-a-n.

154 8      Do you know who Mr. Dervishian is?

154 9      A.  Mark -- I don't remember what Mark's title was

154 10      at the time.  He switched roles.  I just don't remember

154 11      what his title was during this e-mail.

154 12      Q.  Do you know what his two roles were before and

154 13      after the switch?

**155:1 - 155:2 Turner_H_20091022**

155 1      A.  But, again, I don't remember at this time which

155 2      role he was in.

**155:3 - 155:6 Turner_H_20091022**

155 3      Q.  Okay.  But do you recall that approval was

155 4      given to contact P&T committee members by Mr. Lee [sic]

155 5      Is that something you recall?

155 6      A.  Yes, I do.

*Objections:* Re: [155:3-155:6] **Def Obj** Relevance, lack of foundation

**158:24 - 158:25 Turner_H_20091022**

158 24      It does not appear that you were copied on

158 25      this document or are a drafter of the document, but you

*Objections:* Re: [158:24-158:25] **Def Obj** Relevance, lack of foundation, fragment (no question)

**159:6 - 159:7 Turner_H_20091022**

159 6      Q.  Okay.  Do you recall the subject matter of this

159 7      document?  Does this ring a bell?

**159:9 - 159:9 Turner_H_20091022**

159 9      A.  It does not.

**160:3 - 160:20 Turner_H_20091022**

160 3      Q.  Under "what's being done" heading on the next

160 4      page, it says, "The frontline team of Holly Jacques,

160 5      government affairs; Mary Ogle, managed care and Fran

160 6      Kaiser, regional medical director, are working with the

160 7      College of Pharmacy and the legislature to provide

160 8      information that has been requested and to position

160 9      Merck favorably."

160 10      Do you know what that's talking about?

160 11      A.  It looks like this is when ULM had the contract

160 12      in the State of Louisiana to help and develop their

*Objections:* Re: [160:3-160:20] **Def Obj** Speculative

*Ruling:* Overruled

04/11/10 20:25

|  | Objections | Ruling |
|---|---|---|

160 13   pharmacopoeia PDL supplement rebate process, and it was
160 14   at the very beginning of that process, looking at the
160 15   date of this memo.
160 16   Q.  So you don't know if anything was actually
160 17   developed.  This might have been some of those earlier
160 18   memos we saw things were talked about being done, but we
160 19   don't know if they were being done?
160 20   A.  That's correct.

162:19 -   164:24 Turner_H_20091022

162 19   Q.  (BY MR. MURRAY) Let me ask you to take a look
162 20   at Tab 2.  It looks like this was sent -- an e-mail
162 21   chain that's sent to you, and ask you if you remember
162 22   that document or the subject matter discussed in the
162 23   document.
162 24   A.  I'm not familiar with this document, but I'm
162 25   familiar with the subject.
163  1   Q.  Is that your e-mail that it's sent to,
163  2   Holly_Jacques@Merck.com?
163  3   A.  It is.
163  4   Q.  And you're familiar with the subject matter of
163  5   the document?
163  6   A.  I am.
163  7   Q.  Let me refer you to -- and for reference the
163  8   document is MRK-AGLAAB 0000353, and it ends at 367.
163  9   Going right to this first paragraph
163 10   "Consistent with Strategy" -- and "strategy" is
163 11   capitalized -- "we are likely to respond to
163 12   supplementals and offer a disease management alternative
163 13   which would provide similar cash flow to the State,
163 14   i.e., modeled after our Illinois response."
163 15   Do you know what that's referring to?
163 16   A.  From what I read, it's stating that it's likely
163 17   that our response to a supplemental rebate request would
163 18   be no, and that we would be considering offering a
163 19   disease management alternative that would provide -- you
163 20   know, modeled after Illinois.
163 21   Q.  What is a disease management alternative?
163 22   A.  I don't know.
163 23   Q.  Were you involved in this decision, this
163 24   consistent with strategy or formulation of that
163 25   strategy?
164  1   A.  I was not.
164  2   Q.  Okay.  That would probably be a rebate
164  3   function?
164  4   A.  The decision as to whether or not we would
164  5   participate in supplemental rebate?
164  6   Q.  Uh-huh.
164  7   A.  I was not involved in that decision-making.
164  8   Q.  So moving down to the next paragraph.35

| | | Objections | Ruling |
|---|---|---|---|

164  9    "Without waiting for the teleconference, we
164 10    should be working towards developing the clinical
164 11    information (PIRs) to submit."
164 12    Do you know what PIRs is?
164 13    A.  Physician information requests.
164 14    Q.  How did those work?  Or do you know how those
164 15    worked?
164 16    A.  A physician information request is a request
164 17    for information from a -- provider information or
164 18    physician -- I'm not sure which it is -- a request for
164 19    information that would -- somebody from Merck would
164 20    respond to.
164 21    Q.  Okay.  So is this the sort of -- in terms of    **Re: [164:21-164:24]**
164 22    the information that's being requested, are those    **Def Obj** Speculative,
164 23    generally submitted to your medical directors?    lack of foundation
164 24    A.  I'm not sure who at Merck PIRs are sent to.

165:21 -    167:19 Turner_H_20091022

165 21    Q.  Do you remember Provider Synergies asking for    **Re: [165:21-166:14]**
165 22    PIRs?    **Def Obj** Speculative
165 23    A.  I do not remember Provider Synergies asking for
165 24    anything from the manufacturers other than supplemental
165 25    rebate requests because they were going to do their
166  1    own -- again, they prided themselves that they were
166  2    going to do their own independent analysis of the
166  3    products, and it was only going to be supplemental
166  4    rebate information they would be requesting from the
166  5    companies.
166  6    Q.  So it's your belief that no PIRs were
166  7    generated?
166  8    MR. SALES:  Objection, form.    **Re: [166:8-166:14]**
166  9    Q.  (BY MR. MURRAY) Or you just don't know either    **Def Obj** Lack of
166 10    way?    personal knowledge
166 11    A.  I have no idea, but again, it's my impression
166 12    Provider Synergies only asked for supplemental rebates
166 13    from the company.  So I'm not sure what Mary Dermody is
166 14    referring to here.
166 15    Q.  In any event, you don't recall any involvement
166 16    with such an effort?
166 17    MR. SALES:  Objection, form.
166 18    A.  Again, I would -- as to how the process in
166 19    Louisiana -- I'm confused by the question and the
166 20    answer.
166 21    Q.  (BY MR. MURRAY) My question is:  A person here
166 22    is writing that they presume that you're involved with
166 23    or will be working on this, and it seems to be referring
166 24    to providing or developing clinical information PIRs to
166 25    submit.
167  1    And I guess your answer -- I want to make
167  2    sure I understand your answer -- is that you have no

| | Objections | Ruling |
|---|---|---|

167 3    recollection of being involved in something like that?
167 4    MR. SALES: Objection to form.
167 5    A.  Again, when I read this, I see that we were
167 6    likely not to respond as it relates to supplemental
167 7    rebate offer, but are considering a disease management
167 8    alternative, and that Mary is suggesting that we should
167 9    be working towards a clinical information PIR to submit;
167 10   but I don't know that that was ever requested or if we
167 11   ever did that.
167 12   Q.  (BY MR. MURRAY) Okay.  And I'm trying to speed
167 13   this up, so that's why I just want to establish if you
167 14   don't have any recollection of that, I can move on.  But
167 15   I need to know whether you have any recollection of
167 16   being involved in developing clinical information PIRs
167 17   to submit.  If your answer is, "No, I have no
167 18   recollection of that," I can move on.
167 19   A.  I don't recall being a part of that process.

168:16 -   170:1   Turner_H_20091022
168 16   Q.  Okay.  It looks like you were copied on the
168 17   last e-mail on this chain at the top of the
168 18   Document 0373.  Is that correct?
168 19   A.  Is my name on the top of the document?
168 20   Q.  Uh-huh.
168 21   A.  It is.
168 22   Q.  So this document was sent to you.
168 23   Do you have any reason to believe it was
168 24   not sent to you?
168 25   A.  That is my e-mail address.
169 1    Q.  It says, "Based on Holly's response, we should
169 2    plan submitting dossiers for the following products to
169 3    Provider Synergies even those these dossiers were
169 4    submitted to the State of Louisiana."
169 5    Does that refresh your recollection as to
169 6    whether clinical data was submitted to the State of
169 7    Louisiana in connection with the PDL?
169 8    MR. SALES: Objection to form.
169 9    A.  It does not.
169 10   Q.  (BY MR. MURRAY) Okay.  Do you know what it's
169 11   referring to when it says "dossiers"?
169 12   A.  Dossier -- do I know what a reference to a
169 13   dossier is?  I do know what a reference to a dossier is.
169 14   Q.  What is that?
169 15   A.  In one of the documents you showed earlier
169 16   today, it listed information that could be included in a
169 17   dossier, but I can't remember in that document whether
169 18   or not if that was a directive from ULM.  I can't
169 19   remember who it was from.
169 20   Q.  Okay.  But you think that that's what the
169 21   dossier is referring to here in this memo from Allan

Re: [169:5-169:9]
**Def Obj** Assumes
facts not in evidence

*overruled*

04/11/10 20:25

|  | Objections | Ruling |
|---|---|---|

169 22      Goldberg?
169 23      A.  Again, I wasn't sure if the dossier that we
169 24      looked at earlier was per ULM's instructions or per
169 25      Provider Synergies' instructions.  So that's my
170  1      confusion.

176:2   -   176:20 Turner_H_20091022
176  2      Q.  Now, we saw a customer profile for Louisiana
176  3      earlier that you and Mary Ogle prepared for LDHH?
176  4      A.  We did.
176  5      Q.  Was that a customer profile?  Is that a
176  6      document that is routinely prepared at Merck for
176  7      different customers?
176  8      A.  Not that I'm aware of.
176  9      Q.  You prepared one for Louisiana for LDHH; is
176 10      that correct?
176 11      A.  I worked with Mary Ogle on a document that we
176 12      looked at earlier today.
176 13      Q.  And it was called a customer profile?
176 14      A.  I'm pretty sure that's what it said.
176 15      Q.  Do you ever remember being copied on any
176 16      customer profile with respect to Provider Synergies?
176 17      A.  No.
176 18      Q.  Do you ever remember working on a customer
176 19      profile with respect to Provider Synergies?
176 20      A.  No.

182:12 -   183:2   Turner_H_20091022
182 12      Q.  (BY MR. MURRAY) Let me ask you to just flip
182 13      through the document and ask if you recognize the
182 14      document.
182 15      A.  I'm not familiar with the document, but I do
182 16      see my name is attached to it.
182 17      Q.  Okay.  Your name is attached to it on the
182 18      "From" line, correct?
182 19      A.  That is correct.
182 20      Q.  At least with respect to the top e-mail and
182 21      what appears to be an e-mail chain, correct?
182 22      A.  That is correct.
182 23      Q.  And it looks like you have signed the
182 24      document --
182 25      A.  Yes.
183  1      Q.  -- again, as to the first e-mail?
183  2      A.  Yes.

183:3   -   183:4   Turner_H_20091022
183  3      Q.  But you don't remember drafting the document?
183  4      A.  I'm -- I don't recognize the document.

183:7   -   183:15 Turner_H_20091022                    38                              04/11/10 20:25

| | | Objections | Ruling |
|---|---|---|---|

183  7    Q.  And you were writing to Allan Goldberg; is that
183  8    correct?
183  9    A.  Yes.
183  10    Q.  Okay.  And in it, you're referencing a
183  11    conference call yesterday.  So I guess that would be
183  12    April 15, 2002, you were on a conference call.
183  13    Do you recall a conference call on
183  14    April 15, 2002?
183  15    A.  I don't.

183:16 -   185:12 Turner_H_20091022

183  16    Q.  It says, "Based on the conference call
183  17    yesterday, I followed up with my contacts in Louisiana
183  18    to verify if the information that Merck previously
183  19    submitted for Singulair, Vioxx and Zocor was forwarded
183  20    to Provider Synergies."
183  21    Does that refresh your recollection as to
183  22    whether information was submitted by Merck to Louisiana?
183  23    A.  It does appear, based on what I wrote, that I
183  24    followed up with my contacts in Louisiana; but I'm not
183  25    sure who that was in Louisiana that -- information that
184  1    Merck previously submitted would be forwarded to
184  2    Provider Synergies.
184  3    Q.  Okay.  So apparently some information was
184  4    submitted to someone on behalf of Louisiana, but as you
184  5    sit here, you don't know who that might have been?
184  6    A.  Yeah.  I wouldn't have been -- I'm not sure who
184  7    that would have been, and I'm not sure who at Merck
184  8    would have sent the information.
184  9    Q.  And at the time that you wrote this memo, you
184  10    didn't know whether it had been -- whoever you sent it
184  11    to in Louisiana had given it to Provider Synergies?
184  12    A.  That's what it appears to say.
184  13    Q.  And does it appear that you were of the opinion
184  14    that the information that had been submitted to
184  15    Louisiana should be submitted to Provider Synergies,
184  16    again, reading what you wrote in this document?
184  17    A.  It looks like I said I was unable to get an
184  18    answer to the question from anyone at the College of
184  19    Pharmacy or the Department of Health and Hospitals as to
184  20    whether or not information would be forwarded to
184  21    Provider Synergies.
184  22    Q.  And actually, I'm looking at now the third
184  23    sentence in that paragraph where you say, "After
184  24    visiting with my director, Terri Lee, I am recommending
184  25    that we submit complete dossiers for all of our products
185  1    under review."
185  2    That "I" is you, Holly Jacques, now Turner?
185  3    A.  That is correct.
185  4    Q.  So does that refresh your recollection that at

|  | | | Objections | Ruling |
|---|---|---|---|---|

185  5    that time you were of the opinion that you should submit
185  6    dossiers for those products?
185  7    A.  Reading it, it looks like I'm making a
185  8    recommendation.
185  9    Q.  Okay.  And my question is:  Do you know whether
185 10    that recommendation was followed with respect to Vioxx?
185 11    A.  I do not.
185 12    Q.  Okay.  We'll go ahead and attach that as

187:18 -   188:15 Turner_H_20091022
187 18    Q.  Okay.  Fair enough.  And this is -- the
187 19    document is entitled "Policy Letter No. 1."
187 20    A.  Uh-huh.
187 21    Q.  And it talks -- seems to be talking about
187 22    internal policies at Merck for conduct of people in
187 23    certain roles within the company.
187 24    Is that a fair representation of the
187 25    document?
188  1    A.  The title says "Communications with healthcare
188  2    professionals and other customers," and it is a Merck
188  3    policy letter.
188  4    Q.  Do you receive Merck policy letters from time
188  5    to time?  Is a policy letter something you would
188  6    receive?
188  7    A.  Yes.
188  8    Q.  Do you remember receiving policy letters
188  9    relating to government affairs personnel on the issue of
188 10    communications with healthcare professionals and other
188 11    customers?
188 12    A.  I know we do receive policy letters.  I just
188 13    don't remember this one in particular.  But I do
188 14    remember, again, the context of this part that you
188 15    referred me to.

189:1  -   189:16 Turner_H_20091022
189  1    It says, "Interact with state/federal
189  2    elected and appointed officials to communicate Merck's
189  3    position and nonproduct public safety issues affecting
189  4    the company."
189  5    Is that statement consistent with your
189  6    understanding of what Merck's policy is?
189  7    A.  You read it incorrectly.
189  8    Q.  I'm sorry.  Okay.  Let me read it again.
189  9    "Interact with state/federal elected and appointed
189 10    officials to communicate Merck's position and nonproduct
189 11    public policy issues affecting the company."
189 12    Did I read it correctly that time?
189 13    A.  You did.
189 14    Q.  And is that your understanding that that is
189 15    Merck's policy?

| | Objections | Ruling |
|---|---|---|

189 16          A.  Yes.

**190:11 -   191:1** Turner_H_20091022

| | | Re: [190:11-191:1] | *Overruled* |

190 11          Q.  Turning to page 181, continued -- government

190 12          affairs personnel continued, "Government affairs

190 13          employees may discuss product and distribute approved

190 14          promotional materials if they are certified on the

190 15          product."

190 16          Is that your understanding of Merck policy?

190 17          A.  Yes.

190 18          Q.  Are you approved on any products?  Do you know

190 19          what that -- I'm sorry -- certified on any products?

190 20          A.  I am.

190 21          Q.  What products are you certified on?

190 22          A.  I don't recall exactly which Merck products I'm

190 23          certified on.

190 24          Q.  We'll just limit it to Vioxx.

190 25          Were you certified on Vioxx?

191  1          A.  I don't recall.

Re: [190:11-191:1] **Pltf Obj** Non-responsive (190:21-25, 191:1)

**193:4  -   193:12** Turner_H_20091022

193  4          Q.  "Government affairs employees are permitted to

193  5          discuss the commercial terms necessary to add or

193  6          maintain a product to a government program, but are not

193  7          permitted to discuss the use, therapeutic effect or

193  8          benefit of a product unless they have been certified on

193  9          that product."

193 10          Again, is that consistent with your

193 11          understanding of Merck policy?

193 12          A.  It is.

**194:2  -   195:20** Turner_H_20091022

194  2          Can you -- just a little bit of background.

194  3          Where did you grow up?

194  4          A.  Lake Charles, Louisiana.

194  5          Q.  And you told counsel a little bit about your

194  6          college experience and moving to Austin.

194  7          Do you recall when you moved to Austin?

194  8          A.  In 1991.

194  9          Q.  And you went through a little bit of your work

194 10          history.  And you went to start with Merck in 1997; is

194 11          that correct?

194 12          A.  That is correct.

194 13          Q.  And again, can you tell the jury briefly what

194 14          you viewed as your responsibility as a government

194 15          affairs executive.

194 16          A.  I was responsible for legislative and

194 17          regulatory work.

194 18          Q.  And that's the same responsibility you carried

194 19          forward from 1997 to the present?          41

| | | Objections | Ruling |
|---|---|---|---|

194 20      A.  That's correct.
194 21      Q.  And during those 10 years, have you -- one of
194 22      the areas of responsibility has been in Louisiana?
194 23      A.  Correct.
194 24      Q.  Mr. Murray asked you some questions about
194 25      whether or not you would regularly attend the P&T
195  1      committee meetings in Louisiana.
195  2      Do you recall that?
195  3      A.  I do.
195  4      Q.  I believe you said you did recall regularly
195  5      attending those meetings?
195  6      A.  I did.
195  7      Q.  And Mr. Murray asked you about whether or not
195  8      Vioxx was -- he showed you some documents showing Vioxx
195  9      was put on the not preferred drug list, if you recall,
195 10      in 2002?
195 11      A.  That's correct.
195 12      Q.  That's consistent with your recollection?
195 13      A.  Correct.
195 14      Q.  And you were at the meeting where that decision
195 15      was recommended by Provider Synergies?
195 16      A.  I was.
195 17      Q.  What was your sense as to the basis of that
195 18      recommendation?
195 19      A.  That we were not participating in the
195 20      supplemental rebate program.

195:21 -   196:7   Turner_H_20091022
195 21      Q.  And I think Mr. Murray then showed you some
195 22      subsequent documents that showed a year later Vioxx was
195 23      put on the preferred drug list.
195 24      Do you recall that?
195 25      A.  I do.
196  1      Q.  And what was your -- you were at that meeting
196  2      where that was discussed as well?
196  3      A.  I was.
196  4      Q.  What was your impression as to the reason why
196  5      Provider Synergies recommended and the P&T committee
196  6      approved Vioxx for the preferred drug list in 2003?
196  7      A.  We were offering supplemental rebate.

196:8  -   196:19   Turner_H_20091022
196  8      Q.  And you continued to work with Louisiana
196  9      Medicaid/P&T members, DHH, Provider Synergies folks all
196 10      the way to the present; is that correct?
196 11      A.  That's correct.
196 12      Q.  Subsequent to Vioxx being withdrawn from the
196 13      market -- voluntarily withdrawn from the market in
196 14      September 2004, has any member of the Louisiana P&T
196 15      committee ever told you or complained to you that they

04/11/10 20:25

| | Objections | Ruling |
|---|---|---|

196 16    felt in any way that Merck had supplied incorrect or
196 17    inappropriate information about Vioxx related to the
196 18    decisions that they made?
196 19    A.  No.

196:21 -    197:7  Turner_H_20091022
196 21    Q.  (BY MR. SALES)  Can you tell the jury whether
196 22    or not any employee or representative of Provider
196 23    Synergies has ever complained to you or told you that it
196 24    believed it had received inappropriate or incorrect
196 25    information from Merck about Vioxx?
197  1    A.  No.
197  2    Q.  Same question with regard to the Department of
197  3    Health and Hospitals employees or representatives.  Had
197  4    any of them ever complained to you or told you that they
197  5    felt in any way that Merck provided incorrect or
197  6    inappropriate information about Vioxx?
197  7    A.  No.

197:19 -    198:2  Turner_H_20091022
197 19    Q.  (BY MR. SALES)  Can you tell the jury whether
197 20    or not any employee or representative of Provider
197 21    Synergies, DHH or any member of the P&T committee has
197 22    ever told you in all your years of dealings with them
197 23    that if they had had some other information from Merck
197 24    about cardiovascular issues or safety issues of Vioxx,
197 25    that they would have made some different decision in
198  1    2003 about Vioxx being on the PDL?
198  2    A.  No.

198:5   -   198:13  Turner_H_20091022
198  5    Q.  (BY MR. SALES)  Did you take Vioxx yourself?
198  6    A.  I did.
198  7    Q.  When did you take Vioxx?
198  8    A.  I don't recall the date.
198  9    Q.  Why?
198 10    A.  For a dental pain, dental-related pain and for
198 11    back issues.
198 12    Q.  Did it work for you?
198 13    A.  It did.

*Objections for 198:5-198:13:* Re: [198:5-198:13] Pltf Obj Relevance, prejudicial

*Ruling:* overruled

198:20 -    198:24  Turner_H_20091022
198 20    Q.  Have you ever had any discussions since the
198 21    time that Vioxx was taken off the market with anyone
198 22    from LDHH or Provider Synergies or ULM or the P&T
198 23    committee with respect to Vioxx at all?
198 24    A.  No.

04/11/10 20:25