UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
|     PRODUCTS LIABILITY LITIGATION | : | SECTION: L (3) |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE KNOWLES |

**THIS DOCUMENT RELATES TO:**
*James Franklin on behalf of the State of Colorado v. Merck & Co., Inc.,*
Case No. ~~06-10485~~ 07-2073

### ORDER & REASONS

Before the Court is Defendant Merck and Co, Inc.'s ("Merck's") Motion for Order to Show Cause Why Plaintiff's Complaint Should not be Dismissed (Rec. Doc. No. 23815). The Court heard oral argument on this matter on Tuesday March 23, 2010. For the following reasons, Merck's motion is GRANTED.[1]

### I. BACKGROUND

Vioxx (known generically as rofecoxib) belongs to a general class of pain relievers known as non-steroidal anti-inflammatory drugs ("NSAIDs"). This class of drugs contains well-known medications sold either over the counter–such as Advil (ibuprofen) and Aleve (naproxen)–or by prescription–such as Daypro (oxaprozin) and Voltaren (diclofenac). NSAIDs work by inhibiting cyclooxygenase ("COX"), an enzyme that stimulates synthesis of

---

[1] Merck's motion is titled as a "Motion for Order to Show Cause Why Plaintiff's Complaint Should Not Be Dismissed." Both parties have briefed and argued the matter as though it were a motion to dismiss, and the Court will construe it as such.

prostaglandins, which are chemicals produced in the body that promote certain effects.

Traditional NSAIDs have been a longstanding treatment option for patients needing relief from chronic or acute inflammation and pain associated with osteoarthritis, rheumatoid arthritis, and other musculoskeletal conditions. This relief, however, comes with significant adverse side effects. Specifically, traditional NSAIDs greatly increase the risk of gastrointestinal perforations, ulcers, and bleeds ("PUBs"). This risk is increased when high doses are ingested, which is often necessary to remedy chronic or acute inflammation and pain. Scientists estimated that traditional NSAID-induced PUBs caused a significant number of deaths and hospitalizations each year.

In the early 1990s, scientists discovered that the COX enzyme had two forms–COX-1 and COX-2–each of which appeared to have several distinct functions. Scientists believed that COX-1 affected the synthesis or production of prostaglandins responsible for protection of the stomach lining, whereas COX-2 mediated the synthesis or production of prostaglandins responsible for pain and inflammation. This belief led scientists to hypothesize that "selective" NSAIDs designed to inhibit COX-2, but not COX-1, could offer the same pain relief as traditional NSAIDs with the reduced risk of fatal or debilitating PUBs. In addition, scientists believed that such drugs might be able to prove beneficial for the prevention or treatment of other conditions, such as Alzheimer's disease and certain cancers, where evidence suggested that inflammation may play a causative role.

In light of these scientific developments, Merck & Co., Inc. ("Merck") and several other pharmaceutical companies began the development of such drugs, which became known as "COX-2 inhibitors" or "coxibs." Vioxx is a COX-2 inhibitor.

On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale

in the United States. From its initial approval, Vioxx gained widespread acceptance among physicians treating patients with arthritis and other conditions causing chronic or acute pain.

On September 30, 2004, Merck withdrew Vioxx from all markets worldwide, when interim unblinded data from a long-term, blinded, randomized placebo-controlled clinical trial, known as APPROVe, seeking to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions and ischemic strokes.

Thousands of lawsuits followed in both state and federal court. On February 16, 2005, as a result of the sheer mass of these lawsuits and the potential for many more, the Judicial Panel on Multidistrict Litigation ("JPML") ordered that the Vioxx litigation be centralized, designated as an MDL, and assigned to this Court.

Amongst these lawsuits were several government actions suits filed against Merck. These suits were brought on behalf of various states, including but not limited to Alaska, Colorado, Florida, Louisiana, Mississippi, Montana, Pennsylvania, Utah, Oklahoma, and South Carolina and seek damages for monies paid by the state for Vioxx, through the state's Medicaid program.

On or about September 6, 2006, Plaintiff's counsel in the present matter met and conferred with representatives of the Colorado Attorney General's Office and made a presentation on the potential legal claims the State of Colorado had against Merck for the purchase of Vioxx through Colorado's State Medicaid Program. Subsequent to that meeting, Plaintiff was advised by the Colorado Attorney General that the state would not be filing suit against Merck.

On September 29, 2006, Plaintiff James Franklin filed suit against Merck in his capacity

as a Colorado taxpayer, on behalf of the State of Colorado. On October 27, 2006, Merck removed the case to federal court, after which it was transferred into the Vioxx MDL No. 1657. Plaintiff's complaint asserts a claim for fraud and nondisclosure leading to the loss of millions of dollars that the State of Colorado spent to purchase Vioxx through the Medicaid program.

## II. THE MOTION

On September 15, 2009, Merck filed a Motion for Order to Show Cause Why Plaintiff's Complaint Should not be Dismissed (Rec. Doc. No. 23815). After thorough briefing by both parties, the Court heard oral argument on Tuesday March 23, 2010.

Merck argues that Plaintiff lacks authority to sue on behalf of the State of Colorado. Merck notes that Plaintiff does not have access to and cannot obtain any of the information possessed by the State of Colorado that is sought in Merck's discovery requests. Merck asserts that this is exemplary of the fact that Plaintiff is not the State of Colorado and has no authority to act on its behalf. Merck further argues that there is no constitutional or statutory authority which permits a Colorado taxpayer to bring a derivative action on behalf of the state, and no case has established such a right. In essence, Merck seeks to dismiss Plaintiff's claim for lack of standing.

Plaintiff opposes the motion and argues that Colorado law authorizes private plaintiffs to bring suit on behalf of the State. Plaintiff argues that while the right is not explicitly established by statute, it is implied, and the Colorado Supreme Court has recognized the implied right.

## III. ANALYSIS

Plaintiff has sued Merck for the recovery of monies spent by the State of Colorado to reimburse Vioxx prescriptions through its Medicaid program. The suit is a derivative action to assert state rights. "Authority to bring a suit of [this] nature depends on state law. Colorado has

-4-

no constitutional or statutory authorization for maintenance of derivative actions on behalf of the state. It has been held that absent statutory authorization citizens and taxpayers may not bring a derivative suit on behalf of the state. In Colorado, the right would have to be implied." *Gallagher v. Continental Insurance Co.*, 502 F.2d 827, 832 (10th Cir. 1974) (citations omitted) (dismissing plaintiff's suit brought on behalf of Colorado against a private entity to recover funds allegedly owed to the State). *See also Mountain States Legal Foundation v. Costle*, 630 F.2d 754, 771 (10th Cir. 1980) ("The general rule is that, by virtue of constitutional and/or statutory provisions or common-law power, the state attorney general, as chief law officer of the state, is the exclusive legal representative of the state in all litigation with regard to matters of public interest, and he alone has the right to represent the state as to litigation involving a subject matter of statewide interest.").

The *Gallagher* Court went on to find that "it is not the province of the federal judiciary to fashion implied state right of action." *Id*. Therefore, this Court looks to state law to determine whether an implied right to bring a derivative suit on behalf of the state has been found by a Colorado court to date.

Plaintiff makes two arguments with regards to an implied right of action. First, Plaintiff argues that a string of cases finding a taxpayer's right to sue the State indicate an implied right of action in taxpayer derivative suits on behalf of the State. Second, Plaintiff argues that the test for a taxpayer's right to bring an action on behalf of a municipality, cited in *McCroskey v. Gustafson, Quinn, & Co., Inc. et al*, 638 P.2d 51 (Colo. 1981), is applicable and satisfied in this case. Plaintiff's arguments fail for the following reasons.

It is clear that taxpayers of Colorado have standing to challenge Colorado governmental actions which harm them by bringing suit *against* the State. *See, e.g., Howard v. City of Boulder,*

-5-

290 P. 2d 237, 238 (Colo. 1955). However, taxpayer suits brought *against* the State of Colorado are distinct from the suit at issue, which is a derivative action *on behalf of* Colorado. Plaintiff cites several cases where taxpayers have brought suit against the State of Colorado, for the proposition that "not only does Colorado authorize private plaintiffs to bring suit on behalf of the state, it embraces it."[2] However, theses cases are factually distinguishable.

Secondly, Plaintiff suggests that the test for standing provided in *McCroskey*, 638 P.2d 51, is applicable here. *McCroskey* did involve a taxpayer derivative suit as here. However, *McCroskey* addresses the authority to sue on behalf of a municipality, in that instance, the city and county of Denver, Colorado. This case involves suit on behalf of the State of Colorado. Authority to sue on behalf of a municipality does not create authority to sue on behalf of a state. *See Frothingham v. Mellon*, 262 U.S. 447 (1923) (contrasting taxpayer derivative standing on behalf of a municipality, which was permitted, with taxpayer standing on behalf of the federal government, which was not), *Booth v. Hvass,* 302 F.3d 849, 851-852 (8th Cir. 2002) (finding that a taxpayer's suit against a state agency is more similar to a suit against a state, than to a suit against a municipality, and therefore case law addressing standing for country and municipal taxpayers was inapposite); *Freedom From Relgion Foundation, Inc. v. Olson,* 566 F. Supp. 2d 980, 992 (D.North Dakota 2008) ("Federal and state taxpayer standing is distinguishable from municipal taxpayer standing."). No case has extended *McCroskey's* holding to apply to suits on behalf of the state and this Court is not inclined to take such a leap where it would infringe on state sovereignty. Since the *McCroskey* test is not applicable, the Court need not determine if the present case satisfies the prongs of it.

---

[2]Rec. Doc. No. 24415 at 3.

## III.  CONCLUSION

For the above stated reasons, the Court finds that Plaintiff lacks standing to bring the present suit. The Court will construe Merck's Motion for Order to Show Cause as a Motion to Dismiss. The motion is hereby GRANTED. The matter is hereby DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 26th day of July, 2010.

*Eldon E. Fallon*
United States District Judge