**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: VIOXX | : | |
| | : | **MDL Docket NO. 1657** |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | **SECTION L** |
| | : | |
| This document relates to ALL ACTIONS | : | **JUDGE FALLON** |
| | : | **MAG. JUDGE KNOWLES** |
| | : | |

# PLAINTIFFS' LIAISON COUNSEL'S BRIEF REGARDING THE COURT'S AUTHORITY TO SET A COMMON BENEFIT FEE

Date:   July 30, 2010

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, L.L.P.*
820 O'Keefe Avenue
New Orleans, Louisiana  70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  The Plaintiffs' Steering Committee and Common Benefit
        Attorneys Are Entitled to a Fair and Reasonable Common Benefit
        Fee Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.  In the Context of a Global Settlement in an MDL, This Court Must
        Adjudicate a Common Benefit Fee Award Independent of Any
        Preexisting Contracts Among Attorneys. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.  Failure to Conduct an *Ex-Post* Analysis is an Abuse
            of Discretion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        2.  The Court Has Equitable Authority and Inherent
            Power to Adjust the Common Benefit Percentage
            Based on Changed Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    C.  The Court Did Not Waive Its Jurisdiction to Decide the Issue of
        Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    D.  By Accepting the Terms and Benefits of the Voluntary, Opt-In
        Global Settlement, 99.9% of all Vioxx Claimants Endorsed the
        PSC's Request for a Maximum 8% Common Benefit Fee . . . . . . . . . . . . . . . 27

        1.  The Settlement Agreement Is Binding on the Parties. . . . . . . . . . . . . . . 28

        2.  The Parties Cannot Accept Certain Provisions and
            Benefits of the Settlement Agreement While
            Rejecting Others.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    E.  The PSC Has Fulfilled Its Fiduciary Duties and Acted With
        Integrity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.  The PSC Has Not Included in its Fee Petition Any
            Time Devoted to Their Own Individual Actions. . . . . . . . . . . . . . . . . . 31

2.     The PSC Made its Common Benefit Work Product
Available to Plaintiffs' Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

3.     The NPC Kept This Court and the State Court
Judges Informed of Settlement Negotiations. . . . . . . . . . . . . . . . . . . . . . . 33

F.     The PSC's Efforts Benefited the Entire Plaintiff Class. . . . . . . . . . . . . . . . . . . . . 34

1.     All of the Plaintiffs Received Inherent Benefits of
MDL Consolidation and Coordination Regardless of
Whether or Not They Actually Used the PSC's
Work Product or Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

2.     The PSC Conducted Extensive Additional
Discovery in the MDL That Was Beneficial to All
Vioxx Claimants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

G.     A Common Benefit Fee Award of 7.5% is Fair and Reasonable in
This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1.     The PSC's Request Is Justified Based on All of the
*Johnson* Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

2.     The PSC's Request is Fair When Compared to
Other MDL and Class Assessments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

3.     The Court's Cap on Contingency Fees Does Not
Render the PSC's Request Excessive. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4.     The PSC's Request Does Not Violate Nevada Law. . . . . . . . . . . . . . . . 43

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**TABLE OF AUTHORITIES**

**Cases**                                                                                                        **Page(s)**

*Abrams v. Abrams, P.A.*, — F.3d —, 2010 WL 1971240
 (4th Cir. May 18, 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 42

*Acosta v. Master Maintenance*, 192 F. Supp. 2d 577 (M.D. La. 2001),
 *aff'd*, 69 Fed. Appx. 659 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Agretti v. ANR Freight Sys.*, 982 F.2d 242 (7th Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . 7 n.19

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 36

*Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885).. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494 (5th Cir. 2007) (en banc). . . . . . . . . . . . . 7 n.19

*Dunn v. H.K. Porter Co.*, 602 F.2d 1105 (3rd Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579,
 2007 WL 2800135 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7 n.19

*Fidel v. Farley*, 534 F.3d 508 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7 n.19

*Foster v. Boise-Cascade, Inc.*, 577 F.2d 335 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Good v. Pennsylvania R.R.*, 384 F.2d 989 (3rd Cir. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Green v. John H. Lewis & Co.*, 436 F.2d 389 (3rd Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gross v. Penn Mut. Life Ins. Co.*, 396 F. Supp. 373 (E.D. Pa. 1975) . . . . . . . . . . . . . . . . . . . . . 29

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3rd Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 19

*Hall v. Cole*, 412 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14 n.26

*Hensley v. Eckerhart*, 461 U.S. 424 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220
 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 22, 24

**Cases (cont.)**                                                                                       **Page(s)**

*Hoffert v. General Motors Corp.*, 656 F.2d 161 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296 (E.D.N.Y. 1985),
    *mod'd on other grounds*, 818 F.2d 226 (2nd Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006 (5th Cir. 1977). . . . . . . . . . passim

*In re Beef Industry Antitrust Litig.*, 607 F.2d 167 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . 7 n.19

*In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*,
    2006 WL 471782 (N.D. Cal. Feb. 28, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*,
    Pretrial Order No. 8A: Amendment to Order Establishing Common
    Benefit Fund (N.D. Cal. July 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 41

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3rd Cir.),
    *cert. denied*, 534 U.S. 889 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Clearsky Shipping Corp.*, 1998 WL 321527 (E.D. La. June 16, 1998) . . . . . . . . . . . . . . . 12

*In re Clearsky Shipping Corp.*, 2003 WL 1563820 (E.D. La. Feb. 26, 2003). . . . . . . . . . . . . . . 34

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981),
    *cert. denied*, 456 U.S. 998 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 124414 (E.D. Pa. Feb. 10, 1999). . . . . . 15-16, 21

*In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) . . . . . . . . . . 28

*In re Diet Drugs Prods. Liab. Litig.*, MDL 1203, 2002 WL 32154197
    (E.D. Pa. Oct. 3, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Diet Drugs Prods. Liab. Litig.*, Pretrial Order No. 1492
    (E.D. Pa. Nov. 8, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re Diet Drugs*, 582 F.3d 524 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**Cases (cont.)**                                                                **Page(s)**

*In re Ephedra Prods. Liab. Litig.*, MDL 1598,
    Case Management Order No. 7 (S.D.N.Y. Nov. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . 16

*In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3rd Cir.), *cert. denied*, 516 U.S. 824 (1995). . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Genetically Modified Rice Litig.*, MDL 1811,
    2010 WL 716190 (E.D. Mo. Feb. 24, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
    2008 WL 3896006 (D. Minn. Aug. 21, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
    2008 WL 682174 (D. Minn. Mar. 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*In re Hanford Nuclear Reservation Litig.*, No. CV-91-3015,
    Order Establishing Equitable Reserve Fund (E.D. Wash. Nov. 13, 2009) . . . . . . . . 21, 41

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . 21

*In re Medtronic, Inc. Implantable Defibrillator Prod. Liab. Litig.*,
    2008 WL 4861694 (D. Minn. Oct. 20, 2008), *Report and Recommendation*
    *Adopted By*, 2008 WL 4861693 (D. Minn. Nov 10, 2008) . . . . . . . . . . . . . . . . . . . . 29-30

*In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522 (D. Nev. 1987). . . . . . . . . . . 15, 21, 25, 42

*In re Nineteen Appeals Arising Out of San Juan Dupont*
    *Plaza Hotel Fire Litig.*, 982 F.2d 603 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*In re Orthopedic Bone Screw Prod. Liab. Litig.*, MDL 1014,
    1996 WL 900349 (E.D. Pa. June 17, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21, 41

*In re Propulsid Prods. Liab. Litig.*, MDL 135, PTO No. 16
    (E.D. La. Dec. 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Protegen Sling and Vesica System Prods. Liab. Litig.*, MDL 1387,
    2002 WL 31834446 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926,
    1994 WL 114580 (N.D. Ala. Apr. 1, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Cases (cont.)**                                                                      **Page(s)**

*In re Telectronics Pacing Systems, Inc.*, 137 F. Supp. 2d 1029 (S.D. Ohio 2001). . . . . . . . . 12, 22

*In re Vioxx Prods. Liab. Litig.*, Rec. Doc. No. 00511176837,
  slip op. (5th Cir. Jul. 16, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7 n.19, 17

*In re Vioxx Prods. Liab. Litig.*, 2008 WL 4681368 (E.D. La. Oct. 21, 2008). . . . . . . . . . . . . . . 17

*In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008),
  *reconsideration granted in part & denied in part*,
  650 F. Supp. 2d 549 (E.D. La. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549 (E.D. La. 2009). . . . . . . . . . . . . . . . . . passim

*In re Zyprexa Prods. Liab. Litig.*, 2007 WL 2340790 (E.D.N.Y. Aug. 17, 2007). . . . . . . . . . . . 16

*In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488 (E.D.N.Y. 2006). . . . . . . . . . . . . . . . . . 15

*In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256 (E.D.N.Y. 2006) . . . . . . . . . . . . . . passim

*Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974). . . . . . . . . . . . . . . . . passim

*Karim v. Finch Shipping Co., Ltd.*, 233 F. Supp. 2d 807 (E.D. La. 2002),
  *aff'd*, 374 F.3d 302 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Klein v. O'Neil, Inc.*, — F. Supp. 2d —, 2010 WL 1435161
  (N.D. Tex. Apr. 9, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31 n.34

*Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.*, 298 F.2d 801
  (3rd Cir.), *cert. denied*, 370 U.S. 939 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*Matter of Munford, Inc.*, 97 F.3d 449 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mercer v. Richardson Brands, Inc.*, 1992 WL 164711 (E.D. Pa. July 2, 1992),
  *aff'd*, 993 F.2d 224 (3rd Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Metropolitan Housing Development Corp. v. Village of Arlington Heights*,
  616 F.2d 1006 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Miller v. Cogoni*, 302 Fed. Appx. 898, 2010 WL 1971240 (11th Cir. 2008) . . . . . . . . . . . . 7 n.19

*Mints v. Educ. Testing Serv.*, 99 F.3d 1253 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Cases (cont.)**                                                                                   **Page(s)**

*Moore v. Permanente Med. Group., Inc.*, 981 F.2d 443 (9th Cir. 1992),
    *overruled on other grounds by*, *Martin v. Franklin Capital Corp.*,
    546 U.S. 132, 136 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir.), *cert. denied*, 449 U.S. 1011 (1980) .. . . . . . . passim

*Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139 (3rd Cir.),
    *cert. denied*, 525 U.S. 823 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14 n.26

*Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513 (6th Cir. 1993) . . . . . . . . . . . . 12, 22

*Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752 (D.S.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . 28

*Sea-land Service, Inc. v. Sellan*, 64 F. Supp. 2d 1255 (S.D. Fla. 1999),
    *aff'd*, 231 F.3d 848 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Smiley v. Sincoff*, 958 F.2d 498 (2nd Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Smillie v. Park Chemical Co.*, 710 F.2d 271 (6th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844 (5th Cir. 1998). . . . . . . . . . . . 18, 24

*Transam. Refining Corp. v. Dravo Corp.*, 952 F.2d 898 (5th Cir. 1992). . . . . . . . . . . . . . . . 7 n.19

*Trustees v. Greenough*, 105 U.S. 527 (1881) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Turner v. Murphy Oil*, 422 F. Supp. 2d 676 (E.D. La. 2006). . . . . . . . . . . . . . . . . . . . . . . passim

*Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977).. . . . . . . . . . . . . . . . . . . . . . . 15

*Walitalo v. Iacocca*, 968 F.2d 741 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Statutes**

28 U.S.C. § 1407(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Rules**

Federal Rule of Civil Procedure 23(g)(1)(C)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Rules (cont.)**                                                                                      **Page(s)**

Federal Rule of Civil Procedure 23(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Other Authorities**

*Awarding Attorneys' Fees and Managing Fee Litigation* (Fed. Jud. Ctr. 1994). . . . . . . . . . . . . . 14

Manual for Complex Litigation (Fourth), § 14.121 (Fed. Jud. Ctr. 2004).. . . . . . . . . . . . 14

Manual for Complex Litigation (Fourth), § 14.211. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Manual for Complex Litigation (Fourth), § 14.215. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

Manual For Complex Litigation (Fourth), § 22.927. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Herbert B. Newberg, 2 Newberg on Class Actions § 11.54 (2nd ed. 1985). . . . . . . . . . . . 7 n.19

Third Circuit Task Force Report, 208 F.R.D. 340 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

William B. Rubenstein, Alba Conte, Herbert B. Newberg,
    4 Newberg On Class Actions, §14:9 (4th ed. Jun. 2010). . . . . . . . . . . . . . . . . . . . 37 n.46

## EXHIBITS

Exhibit "A"     Deposition of Russ M. Herman, dated 4/28/2010

Exhibit "B"     Chart Summarizing Number of Cases Enrolled in Vioxx Settlement by Objectors to 8% Common Benefit Fee Assessment

Exhibit "C"     Letter from Michael A. Stratton to Judge Fallon dated July 28, 2010

Exhibit "D"     *In re Ephedra Prods. Liab. Litig.*, MDL 1598, Case Management Order No. 7 (S.D.N.Y. Nov. 29, 2004)

Exhibit "E"     *In re Propulsid Prods. Liab. Litig.*, MDL 135, PTO No. 16 (E.D. La. Dec. 26, 2001)

Exhibit "F"     *In re Hanford Nuclear Reservation Litig.*, No. CV-91-3015, Order Establishing Equitable Reserve Fund, 2 (E.D. Wash. Nov. 13, 2009)

Exhibit "G"     *In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, Pretrial Order No. 8A: Amendment to Order Establishing Common Benefit Fund (N.D. Cal. July 7, 2008)

Exhibit "H"     Letters exchanged with Stratton regarding trial package

Exhibit "I"     Deposition of Michael Stratton, dated 4/28/2010

Exhibit "J"     *In re Diet Drugs Prods. Liab. Litig.*, Pretrial Order No. 1492 at 5 (E.D. Pa. Nov. 8, 2000)

**PLAINTIFFS' LIAISON COUNSEL'S BRIEF REGARDING THE
COURT'S AUTHORITY TO SET A COMMON BENEFIT FEE**

**I.      INTRODUCTION**

On November 9, 2007, the Negotiating Plaintiffs Counsel ("NPC") and Merck formally

announced the achievement of a remarkable global Vioxx Settlement totaling $4.85 billion.  This

Settlement was a "voluntary opt in agreement" that was offered to all Vioxx claimants who at the

time of the Settlement were pursuing personal injury actions against Merck through this MDL,

through coordinated litigations in California, New Jersey and Texas and through other tribunals

in the United States, or who had valid tolling agreements in place.  *In re Vioxx Prods. Liab.

Litig.*, 650 F. Supp. 2d 549, 552-53 (E.D. La. 2009).  The Settlement "designated [this Court] as

its chief administrator."  *In re Vioxx Prods. Liab. Litig.*, Rec. Doc. No. 00511176837, slip op. at

3 (5th Cir. Jul. 16, 2010).  The Master Settlement Agreement (the "MSA") "expressly

contemplates that this Court shall oversee various aspects of the administration of settlement

proceedings, including appointing a Fee Allocation Committee, allocating a percentage of the

settlement proceeds to a Common Benefit Fund, approving a cost assessment, and modifying any

provisions of the Settlement Agreement that are otherwise unenforceable."  *Id.*

Article 9.2.1 of the MSA provides that subject to Court approval a maximum assessment

of 8% will be imposed on claimants' recoveries to ensure that common benefit attorneys are

fairly compensated for their efforts in the *Vioxx* litigation on behalf of all claimants.  The

Agreement expressly states that for purposes of settlement, this maximum 8% "fee assessment

shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial

1

Order No. 19."[1]  It is goes without saying that for those claimants choosing not to enroll in the Settlement program, any fee assessments previously imposed pursuant to PTO 19 would remain in effect.[2]

The global Vioxx resolution has been a tremendous success:  99.9% of all eligible claimants voluntarily opted to enroll in the Settlement and register for Settlement benefits.[3]  In total, approximately 58,000 out of 58,022 eligible claimants registered for the Settlement, thereby accepting the provisions of the Settlement Agreement, including Article 9 specifying the maximum 8% common benefit fee percentage sought by the Fee Applicants.[4]  As of July, 2010, more than $4.35 billion in Settlement benefits have been awarded and paid to eligible claimants, and additional claims are still being processed.[5]

At the time the Settlement was reached:  "Vioxx-related discovery had been moving forward in the coordinate jurisdictions [of New Jersey, California and Texas] for more than six years"; "[o]ver 50 million pages of documents had been produced and reviewed"; "more than 2,000 depositions had been taken"; "counsel for both sides had filed thousands of motions and consulted with hundreds of experts in the fields of cardiology, pharmacology, and neurology";

---

[1]  MSA at § 9.2.1.

[2]  *See* Deposition of Russ M. Herman ("Herman Dep."), dated 4/28/2010, at 120, attached hereto as Exhibit "A."

[3]  *See* Vioxx Claims Administrator Report No. 29 at 26 (Jul. 27, 2010), published at http://www.browngreer.com%2fvioxxsettlement%2fimages%2fpdfs%2fmdlreport_072710.pdf.  Some of the eligible claimants dismissed or abandoned their claims.  *Id*.

[4]  *Id*.

[5]  *Id*. at 71.

six bellwether trials had been conducted in the MDL[6]; and "approximately thirteen additional Vioxx-related cases were tried before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida."[7]  *Vioxx*, 650 F. Supp. 2d at 553 & n.5.  As this Court pointed out, it was "[w]ith the benefit of experience from these bellwether trials, as well as the encouragement of the several coordinated courts, [that] the parties soon began settlement discussions in earnest."  *Id*. at 552.  The global resolution of this litigation was brought about through hard-fought negotiations between the NPC and counsel for Merck over a period of approximately one year based on the prior efforts of the Plaintiffs' Steering Committee (the "PSC") and other  common benefit attorneys.[8]  Throughout this process, "[a]lthough the parties met and negotiated independently, they kept this Court – as well as the coordinate state courts of Texas, New Jersey, and California – informed of their progress in settlement discussions."  *Id*. at 552 n.4.  The NPC participated in more than 50 face-to-face settlement meetings and they had "several hundred telephone conferences" with representatives for Merck in an effort to resolve the litigation.  *Id*.[9]  After the Settlement was inked, the common benefit attorneys continued to work tirelessly to implement the Settlement Agreement and deliver benefits to all eligible

---

[6]  *See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (tried twice after hung jury); *Barnett v. Merck & Co.*, No. 06-485, 2006 WL 2667878 (E.D. La. Filed Jan. 31, 2006); *Smith v. Merck & Co.*, No. 05-4379, 2005 WL 4773855 (E.D. La. Filed Sept. 29, 2005); *Mason v. Merck & Co.*, No. 06-0810, 2006 WL 3462781 (E.D. La. Filed Feb. 16, 2006); *Dedrick v. Merck & Co.*, No. 05-2524, 2005 WL 4912665 (E.D. La. Filed June 21, 2005).

[7]  *See* Plaintiffs' Liaison Counsel's Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses (Rec. Doc. 17642), filed January 20, 2009 ("Common Benefit Fee Petition") at § II.B.4.

[8]  *See* Herman Dep. at 17.

[9]  *See also* Herman Dep. at 24.

claimants enrolled in the Settlement program and to defend the Settlement against attacks.[10] They continue to provide common benefit services to this day on behalf of Vioxx claimants.

On January 20, 2009, the PSC, Plaintiffs' Liaison Counsel ("PLC"), the NPC, the Fee Allocation Committee and other common benefit attorneys (collectively, the "Fee Applicants") filed a petition seeking an 8% common benefit fee award as compensation for their efforts in bringing this litigation to a successful resolution.[11]  In that petition, the Fee Applicants demonstrated that 8% was fair and reasonable considering all of the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974), namely, (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  The common benefit efforts of the Fee Applicants, which were necessary to achieve the global Settlement, have required the expenditure of more than 550,000 hours of legal services.  Pursuant to protocol established by the Court in Pretrial Order No. 6, the Court-appointed auditor has approved 562,943.55 hours of common benefit

---

[10]  *See* Common Benefit Fee Petition at § II.B.5-6.

[11]  Rec. Doc. 17642.

time, having a lodestar value of $249,546,751.20.[12]

   While the Fee Applicants still believe that an 8% award would be fair, reasonable and justified under the circumstances, they have reduced their request to 7.5% in light of the objections that were filed in response to their petition and in light of the fee discovery that ensued, as described in detail below.

## II.   STATEMENT OF FACTS

   In response to the Court's order of April 16, 2009 (Rec. Doc. 18264) allowing objections to the Common Benefit Fee Petition to be raised on or before May 8, 2009, only 59 timely notices of objection and/or accompanying memoranda of law were filed.[13]  The objections may be summarized as follows:

---

   [12]  The Court-appointed auditor, Philip A. Garrett, CPA, is in the process of preparing a Supplemental Report and Affidavit attesting to his examination of common benefit time records and his calculation of an updated lodestar since the date of his last report.  The Supplemental Report of Mr. Garrett will be filed shortly.

   [13]  *E.g.*, Objections of Law Offices of Douglas A. Allison & Jack Modesett, III; Arnold & Itkin, LLP; Barrett Law Office, PA; The Becnel Law Firm; Berrigan Litchfield Schonekas Mann and Traina, LLC and Arthur J. Lentini; Bowersox Law Firm, PC; Brown Chiari, LLP; Burton Law Firm; Cellino & Barnes, PC; Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co. LPA; Conway & Londregan, PC; Draper Law Firm; The Drug Liability Litigation Group, PLLC; English, Lucas, Priest & Owsley, LLP; Fayard & Honeycutt; Fazio, DiSalvo, Cannon, Abers, Podrecca, Fazio & Carroll; Fenner & Boles; Freese & Goss, PLLC; Godosky & Gentile, PC; Harrell & Harrell, PA; Harrison Davis Steakley; Hissey Kientz, LLP; Hornbuckle Firm; Hossley & Embry, LLP; Johnson & Benjamin LLP; Jose, Henry, Brantley, MacLean & Alvarado, LLP; Keller Rohrback LLP, Williamson & Williams, and Greener Burke Shoemaker PA; Kelley & Ferraro, LLP; Kentucky Vioxx Working Group (Bubalo) (Oldfather); Kopelman Law Group; The Law Group, Ltd.; Ted B. Lyon & Assocs.; Mainor Eglet Cottle; Margol & Pennington, PA; Matthews, Eastmoore, Hardy, Crauwels & Garcia, PA; Law Offices of Ian L. Mattoch; Mayfield & Ogle, PA; Michaels & Michaels; Milavetz, Gallop & Milavetz, PA; Miller, Curtis & Weisbrod; The Miller Firm, LLC; Miserendino, Seegert & Estoff, PC; The Monsour Law Firm; Moriarty Leyendecker Erben PC; James H. Porn; Price Ainsworth, PC; Reaud, Morgan & Quinn; Law Offices of Reed Schifferman; Simon Law Firm; Slack & Davis, LLP; The Snapka Law Firm; Spangenberg, Shibley & Liber, LLP; Stratton Faxon; Wayne Sullivan; Sullivan Papain Block; The Vioxx Litigation Consortium; Weiner, Carroll & Straus; Michael A. Wash; and Zimmerman Law Offices, P.C. (collectively referred to as "Settled Objectors" or "SO's."

- Most of the Settled Objectors did not specify any reasons or legal support for their objection.[14]

- One of the Settled Objectors, The Vioxx Litigation Consortium made up of five separate law firms, withdrew its objection to the common benefit fee request earlier this year.[15]

- More than half of the SO's, 36 in total, enrolled 100% of their cases in the Vioxx Settlement program.[16]

- Twenty of the SO's enrolled most of their cases in the Settlement program, while at the same time excluding, in the aggregate, 239 Vioxx cases for trial.[17]  With regard to the cases excluded from the Settlement, the common benefit fee assessment is not an issue because any previously agreed-to assessments would still be in effect and enforced as per PTO 19.

- Two of the Settled Objectors did not enroll any case in the Settlement,[18] which

---

[14]  *See*, *e.g.*, Objections of Douglas A. Allison; Arnold & Itkin; Barrett Law Office; Berrigan Litchfield; Bowersox Law Firm; Brown Chiari; Cellino & Barnes; Climaco, Lefkowitz; Drug Liability Litigation Group; Fazio, DiSalvo; Godosky & Gentile; Harrison Davis Steakley; Hornbuckle Firm; Hossley & Embry; Johnson & Benjamin; Kelley & Ferraro; The Law Group; Margol & Pennington; Ian L. Mattoch; Mayfield & Ogle; Miserendino, Seegert & Estoff; Monsour Law Firm; Moriarty Leyendecker; James H. Porn; Reed Schifferman; Slack & Davis; Snapka Law Firm; Vioxx Litigation Consortium; Wayne Sullivan; Michael A. Wash; and Zimmerman.

[15]  Herman Dep. at 99.

[16]  *See* Exhibit "B," attached hereto.

[17]  *Id*.

[18]  *See* Exhibit "B," attached hereto, showing no cases for Johnson & Benjamin and Miserendino, Seegert & Estoff.

denies them standing to object to the common benefit fee.[19]

Finally, one late Objector, Davis & Norris, LLP, enrolled 618 of the firm's cases in the Settlement Program, but nevertheless on July 29, 2010, filed a "submission" opposing the Fee Applicants' common benefit fee request.[20]  This firm failed to timely object to the Common Benefit Fee Petition in accordance with the Court's prior order.  Accordingly, Plaintiffs' Liaison Counsel is filing a motion to strike this submission and a response to same.  Notwithstanding the motion to strike, the issues raised in the Davis & Norris out-of-time objection are addressed and adequately refuted herein.  The arguments raised by Davis & Norris have no merit.

Some of the objecting law firms sought to take discovery on the issue of common benefit fees.  Following several conferences before this Court concerning the requests for fee discovery and briefing on the fee objections, Stratton Faxon, a Connecticut law firm representing approximately 87 Vioxx claimants, applied to the Court and was appointed to serve as liaison

---

[19]  The Fifth Circuit has ruled in this litigation that "[s]tanding ... is a prerequisite to th[e] court's exercise of jurisdiction."  *Vioxx*, Rec. Doc. No. 00511176837, slip op. at 5.  "Because the MSA was structured as an 'opt-in' private settlement rather than an 'opt-out' agreement, the [non-settling] plaintiffs cannot show that they have suffered the type of legal prejudice that would afford them standing to challenge the MSA."  *Id*. at 5-6; *see also Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496 n.1 (5th Cir. 2007) (en banc); *Transam. Refining Corp. v. Dravo Corp.*, 952 F.2d 898, 900 (5th Cir. 1992) (in context of class settlements, non-settling parties generally have no standing to challenge settlement.); *Agretti v. ANR Freight Sys.*, 982 F.2d 242, 246 (7th Cir. 1992) ("'[N]on-settling defendants in a multiple defendant litigation context have no standing to object to the fairness or adequacy of the settlement by other defendants,'" *quoting*, 2 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.54 (2nd ed. 1985)).  The rationale for this is that a settlement does not affect any substantive legal rights of non-settling parties.  *Transam. Refining*, 952 F.2d at 900; *In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 172 (5th Cir. 1979), *cert. denied*, 452 U.S. 905 (1981) (non-settling defendant has no standing to object since it is not prejudiced by settlement); *Miller v. Cogoni*, 302 Fed. Appx. 898, 900, 2010 WL 1971240, *1 (11th Cir. 2008) (non-beneficiary of settlement has no standing to object); *Fidel v. Farley*, 534 F.3d 508, 515 n.5 (6th Cir. 2008) (non-class members have no standing to object to class settlement); *Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579, 580, 2007 WL 2800135, *1 (5th Cir. 2007) (same).

[20]  *See* Submission Regarding Court's Authority to Set the Common Benefit Fee and Percentage at Which the Court Should Fix the Fee, filed July 29, 2010, Rec. Doc. No. 48105.

counsel for all Objectors.[21]  The Court granted reciprocal discovery on the issue of common benefit fees, and on April 28, 2010, Mr. Stratton deposed PLC Russ Herman, and then Russ Herman deposed Mr. Stratton.  On June 14, 2010, the Court denied supplemental requests for additional fee discovery, but it granted the Settled Objectors' request to review the PSC's time records, finding that "records of hours submitted by Common Benefit Counsel will assist the Court and interested parties in determining a reasonable Common Benefit Fee."[22]  On July 15, 2010, Mr. Stratton examined those records on behalf of all of the SO's.

Based on their examination of "500,000 hours submitted by common benefit lawyers," based on the fee discovery depositions, and based on their consultation "with mass tort class action fee experts in academia," the Settled Objectors have withdrawn their objections to the requested common benefit fee.  They now concur with the Fee Applicants that a 7.5% common benefit fee award is "fair" and "well supported by [their] investigation, precedent, and the academic writings in this field."[23]

Thus, it is crystal clear that Article 9 of the MSA is efficacious and the fee request is fair, reasonable and adequate.  The Settled Objectors have embraced the 7.5% request, but in light of the Court's duty to conduct its own analysis, for the record we summarize below the substance of the objections previously lodged and we respond accordingly:

1.       The Full Participation Option ("FPO") agreement, approved by the Court in PTO

---

[21]  *See* Tr. Status Conf., dated Nov. 18, 2009, at 4.

[22]  Rec. Doc. No. 44554 at 1.

[23]  *See* Letter from Michael A. Stratton to Judge Fallon dated July 28, 2010, Rec. Doc. No. 47906, attached hereto as Exhibit "C."

No. 19 on August 4, 2005, limits any common benefit award in this case to 3% in the aggregate (2% for fees and 1% for costs) and preempts this Court's authority to award anything more, regardless of the time and effort expended to achieve a global resolution of this litigation and regardless of any other *Johnson* factor or changed circumstance;

2.    The FPO is distinguishable from the Traditional Assessment Option and the Limited Waiver Option agreements also approved by the Court in PTO 19 and does not permit any modification of the fee assessment by this Court under any scenario;

3.    The Court "waived" its jurisdiction to decide the common benefit fee issue by not expressly reserving in PTO 19 its authority to reconsider common benefit fees at a later date;

4.    An 8% common benefit fee is unjustified, unreasonable and unnecessary because it is not consistent with other pharmaceutical litigation;

5.    An 8% common benefit fee is excessive because the Court already capped individual attorneys' contingency fees at 32%;

6.    The PSC and NPC violated their fiduciary duties to the other plaintiff attorneys when they negotiated the maximum 8% fee without the consent of the Settled Objectors, and it is clear that Merck did not negotiate this term with the NPC, as evidenced by Merck's refusal to take a position on the fee issue;

7.    The pre-MDL efforts of the state court litigants in New Jersey, Texas, California, Illinois, Alabama and Florida "should not be compensable as common benefit

9

fees";

8.      The MDL discovery is indistinguishable from pre-MDL discovery;

9.      It is not clear that all of the hours approved by the Court-appointed auditor were

for the common benefit of the plaintiffs;

10.     The efforts of the PSC did not advance the interests of the entire group of

plaintiffs and some of the SO's did not actually benefit from the PSC's work

product;

11.     The 100% enrollment requirement created an impermissible conflict of interest for

the objecting attorneys;

12.     An 8% common benefit fee would violate the United States Constitution, the

Nevada Constitution and Nevada common law;

13.     It is unfair to force the SO's to pay for litigation costs they did not specifically

approve; and

14.     An 8% common benefit fee is unfair to claimants receiving a fixed $5,000

payment.

None of the withdrawn objections has any merit.

## III.    <u>ARGUMENT</u>

### A.      **The Plaintiffs' Steering Committee and Common Benefit Attorneys Are Entitled to a Fair and Reasonable Common Benefit Fee Award**

The PSC was appointed by this Court to perform numerous coordination and

administrative functions to promote and facilitate the just and efficient prosecution of all Vioxx

cases filed against Merck in federal courts nationwide and transferred to this MDL.  *See* Pretrial

Order Nos. 6, 8, 9, 13, 18 (as amended).  Along with many dedicated common benefit counsel, the PSC and the NPC were successful in achieving a $4.85 billion global settlement for roughly 50,000 eligible Vioxx claimants.  An overwhelming 99.9% of those claimants voluntarily opted to enroll in the Settlement program.

Under the "common benefit" doctrine, it is appropriate to award common benefit attorneys' fees "where the plaintiff's successful litigation confers a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them."  *In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 546 (3rd Cir. 2009) (internal quotes and citation omitted).[24]  This long-standing fee doctrine was approved by the United States Supreme Court over 125 years ago in order "to avoid the problem of free-riding, that is, when individuals who benefit from the litigation avoid sharing the full burden and expense of litigation by relying on the work of others."  *Turner v. Murphy Oil*, 422 F. Supp. 2d 676, 680 (E.D. La. 2006), *citing*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479 (1980); *Trustees v. Greenough*, 105 U.S. 527, 532-33 (1881) and *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 123 (1885).

Accordingly, the Fifth Circuit Court of Appeals has held that the District Court "must have means at its disposal to order appropriate compensation for" lead counsel who serve on court-appointed management and negotiating committees and who make funds available to

---

[24]  Interestingly, in the *Diet Drugs* MDL that resulted in a class settlement providing initial and downstream opt-out rights to class members, the district court awarded Class Counsel a common benefit fee of 6.4% in cases where claimants received benefits from the supplemental class settlement fund, whereas counsel for downstream opt-outs who left the settlement to pursue litigation were levied an assessment of only 2% if their case was in federal court or 1.33% for state court cases.  *See Diet Drugs*, 582 F.3d at 535.  As mentioned, *infra* at p. 21, the district court in *Diet Drugs*, initially imposed a 9% set-aside for federal cases in the MDL prior to the creation of the $3.55 billion settlement fund in that case.

11

individual plaintiffs' counsel in the litigation.  Otherwise, "[t]he court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation."  *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1016 (5th Cir. 1977); *In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 606 (1st Cir. 1992) ("court supervising mass disaster litigation may intervene to prevent or minimize an incipient free-rider problem and, to that end, may employ measures reasonably calculated to avoid 'unjust enrichment of persons who benefit from a lawsuit without shouldering its costs.'"); *see also In re Diet Drugs Prods. Liab. Litig.*, MDL 1203, 2002 WL 32154197, *17 (E.D. Pa. Oct. 3, 2002) ("the court must be permitted to compensate fairly the attorneys who serve on ... a [court-appointed] committee."); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 3896006, *2 (D. Minn. Aug. 21, 2008) ("Court has the inherent authority to order an appropriate assessment to compensate common benefit attorneys for their substantial efforts"); *In re Genetically Modified Rice Litig.*, MDL 1811, 2010 WL 716190, *4 (E.D. Mo. Feb. 24, 2010) ("An MDL court's authority to ... order contributions to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power.").  Indeed, "[t]he ultimate task for the district court is to insure that counsel is fairly compensated for the amount of work performed and the results achieved."  *In re Telectronics Pacing Systems, Inc.*, 137 F. Supp. 2d 1029, 1041 (S.D. Ohio 2001), *citing Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993) (citation omitted); *In re Clearsky Shipping Corp.*, 1998 WL 321527, *2 (E.D. La. June 16, 1998) ("Having appointed lead counsel ... [court] adopt[ed] a mechanism to ensure reimbursement for services undertaken for the common benefit.").

The Court's power to award common benefit attorneys' fees is not limited to class actions.[25]  The Supreme Court held long ago that:

> when ... a fund is for all practical purposes created for the benefit of others, the formalities of the litigation - the absence of an avowed class suit or the creation of a fund, as it were, through stare decisis rather than through a decree - hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 166 (1939).  In *Florida Everglades*, the appellants challenged the district court's power in an MDL to award the plaintiffs' management committee common benefit fees from the plaintiffs' individual attorneys' recoveries.  The Fifth Circuit Court of Appeals held that levying such an assessment in an MDL is an appropriate exercise of the district court's inherent managerial powers "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Florida Everglades*, 549 F.2d at 1012, 1017.  The Court concluded that:

> Appellants approach the case as though it were purely a private contest over fees between competing lawyers.  This approach is a nostalgic luxury no longer available in the hard-pressed federal courts.  It overlooks the much larger interests which arise in litigation such as this.  Each case in the consolidated case was private in its inception.  But the number and cumulative size of the massed cases created a penumbra of class-type interest on the part of all the litigants and of public interest on the part of the court and the world at large.  The power of the court must be assayed in this semi-public context.

*Id*. at 1012.  *See also In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 265 (E.D.N.Y. 2006) ("transferee court in a federal multidistrict litigation has the power to determine the

---

[25]  *E.g.*, Stratton Obj. at 3.

compensation for appointed lead counsel and to impose its fee calculation on all federal plaintiffs"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, *5 (D. Minn. Mar. 7, 2008) ("use of a common fund[26] ... is not limited to class action cases"), *citing, Awarding Attorneys' Fees and Managing Fee Litigation* at p. 51 (Fed. Jud. Ctr. 1994) ("[a]lthough many common fund cases are class actions, ... the doctrine is not limited to class actions"); *Vioxx*, 650 F. Supp. 2d at 553 ("any court presiding over a mass tort proceeding possesses equitable authority to examine fee arrangements."); *In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606, 611-12 (E.D. La. 2008), *reconsideration granted in part & denied in part*, 650 F. Supp. 2d 549 (E.D. La. 2009); MANUAL FOR COMPLEX LITIGATION (FOURTH), § 14.121 at 186 (Fed. Jud. Ctr. 2004) ("The common-fund exception to the American Rule is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust enrichment."); *cf.* 28 U.S.C. § 1407(a) (district court's ultimate goal in multidistrict litigation is to "promote the just and efficient conduct of such actions").

Accordingly, courts have often referred to and treated multidistrict litigation as a *quasi class action*.  In cases where:  a "large number of plaintiffs [are] subject to the same settlement matrix approved by the court"; "special masters [are] appointed by the court to control discovery and to assist in reaching and administering a settlement"; the court "order[s] a huge escrow fund; and there are "other interventions by the court," courts have held that there exists "a degree of court control supporting its imposition of fiduciary standards to ensure fair treatment to all

---

[26]  "The origins of [the common benefit] doctrine can be traced to the common fund rule whereby those who share in a fund must participate in paying attorney's fees when a prevailing plaintiff's litigation redounds to the benefit of the common fund."  *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 145 (3rd Cir.), *cert. denied*, 525 U.S. 823 (1998), *citing, Hall v. Cole*, 412 U.S. 1, 5 n.7 (1973).

14

parties and counsel regarding fees and expenses."  *See, e.g.*, *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) ("While the settlement ... is in the nature of a private agreement between individual plaintiffs and the defendant, it has many of the characteristics of a class action and may be properly characterized as a quasi-class action subject to general equitable powers of the court").  *See also Guidant*, 2008 WL 682174 at *6 (MDL "is a coordinated litigation of many individual yet related cases that effectively is ... a quasi-class action").  In *Vioxx*, this Court has analogized this multidistrict litigation to a class action on numerous occasions:  *e.g.*, "the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action."  *Vioxx*, 574 F. Supp. 2d at 612; *Vioxx*, 650 F. Supp. 2d at 554.[27]

It is now commonplace for courts to award common benefit fees in mass tort cases in recognition of the efforts of the plaintiffs' management structure.  *See Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *Florida Everglades*, 549 F.2d 1006; *Diet Drugs*, 582 F.3d 524; *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 526 (D. Nev. 1987); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, MDL 1014, 1996 WL 900349 (E.D. Pa. June 17, 1996); *San Juan Dupont Plaza*, 982 F.2d at 606-07; *Smiley v. Sincoff*, 958 F.2d 498, 501 (2nd Cir. 1992); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296, 1317 (E.D.N.Y. 1985), *mod'd on other grounds*, 818 F.2d 226 (2nd Cir. 1987); *In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 124414 (E.D. Pa. Feb. 10, 1999); *In re Ephedra Prods. Liab. Litig.*, MDL 1598, Case

---

[27]  The Court has acknowledged that similar to *Zyprexa*, there are "approximately 50,000 eligible claimants currently enrolled in the *Vioxx* Settlement Program, all of whom are subject to the same settlement matrix for awarding points and valuating claims"; the "Court has benefited from the efforts of special masters throughout the course of the MDL proceedings and the settlement administration"; and "the $4.85 billion settlement fund ... is similar to the large settlement fund held in escrow in *Zyprexa.*" *Vioxx*, 574 F. Supp. 2d at 612.

Management Order No. 7 (S.D.N.Y. Nov. 29, 2004) (attached hereto as Exhibit "D"); *In re Zyprexa Prods. Liab. Litig.*, 2007 WL 2340790 (E.D.N.Y. Aug. 17, 2007); *In re Propulsid Prods. Liab. Litig.*, MDL 135, PTO No. 16 (E.D. La. Dec. 26, 2001) (attached hereto as Exhibit "E"); MANUAL FOR COMPLEX LITIGATION (FOURTH), § 14.215 at 202; *In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, 2006 WL 471782 (N.D. Cal. Feb. 28, 2006) (set-aside order for common benefit fees).

The Supreme Court reiterated in *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), that the district court's discretion in determining the amount of a fee award "is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."  *Hensley*, 461 U.S. at 437; *Piambino v. Bailey*, 610 F.2d 1306, 1329 (5th Cir.), *cert. denied*, 449 U.S. 1011 (1980) ("District Court is infinitely better situated to conduct the factual inquiry necessary under Johnson."); *Florida Everglades*, 549 F.2d at 1019 (transferee district court, which appointed lead counsel, "was the only tribunal that could effectively handle the fee matter"); *Vioxx*, 574 F. Supp. 2d at 614 ("this Court is uniquely situated to examine the reasonableness of attorneys' fees ... [h]aving overseen not only the course of the MDL proceedings but also the administration of the Vioxx Settlement Program....").[28]

In this litigation, the Court has been involved in all aspects of the suit, including:  the appointment of the PSC, a Plaintiffs' Executive Committee, Plaintiffs' Liaison Counsel, the

---

[28]  In its fee capping Order, this Court determined that reasonable fees for all counsel in this litigation would be subject to a 32% cap (except for "the rare case where an individual attorney believes a departure from this cap is warranted"), separate and apart from the contemplated common benefit award.  *Id.* at 607.

NPC, and a Defendant's Steering Committee; setting monthly status conferences; coordinating and consulting with State Court Judges overseeing other Vioxx cases; entering hundreds of procedural and substantive pretrial orders, orders and reasons and minute entries that addressed a variety of issues such as electronic service, deposition guidelines, confidentiality of documents, discovery requests and *Daubert* rulings; overseeing the establishment of a comprehensive discovery depository for the benefit of all plaintiffs; "selecting and preparing certain test cases to proceed as bellwether trials"; conducting "six Vioxx bellwether trials"; consulting with state court judges in California, Texas and New Jersey where *Vioxx* litigation was coordinated; monitoring the progress of global settlement negotiations; and overseeing "various aspects of the administration of settlement proceedings, including appointing a Fee Allocation Committee, allocating a percentage of the settlement proceeds to a Common Benefit Fund, and modifying any provisions of the Settlement Agreement that are otherwise unenforceable." *Vioxx*, 574 F. Supp. 2d at 608-09; *In re Vioxx Prods. Liab. Litig.*, 2008 WL 4681368, *2 n.6 (E.D. La. Oct. 21, 2008); *Vioxx*, 650 F. Supp. 2d at 552-53.  In fact, this Court is "expressly authorized to be the Chief Administrator of the Settlement Agreement." *Vioxx*, 574 F. Supp. 2d at 557; *Vioxx*, Rec. Doc. No. 00511176837, slip op. at 3.  Unquestionably, the Court is in the best position to assess a reasonable and fair common benefit fee for the PSC and other common benefit counsel.

**B.  In the Context of a Global Settlement in an MDL, This Court Must Adjudicate a Common Benefit Fee Award Independent of Any Preexisting Contracts Among Attorneys**

This Court has the ultimate discretion and duty to determine an appropriate and reasonable common benefit fee for the PSC and other common benefit counsel.  *See Florida Everglades*, 549 F.2d at 1019; *Vioxx*, 574 F. Supp. 2d at 614; *Zyprexa*, 467 F. Supp. 2d at 265.

17

The agreement between the PLC and the SO's to reduce the common benefit fee to 7.5% does not vitiate this duty.  Hence, the analysis provided herein is still necessary.

This Court is not duty-bound to award as a common benefit fee the exact percentages specified in the FPO (2% for fees and 1% for costs), as approved by the Court in PTO 19 more than four years ago on August 4, 2005, in cases that were enrolled in the MSA.  Under Fifth Circuit law, an initial fee agreement among counsel in an MDL or class action does not abrogate the need for the district court to conduct an *ex-post* determination of the common benefit fee assessment.  On the contrary, "[t]he court must scrutinize the agreed-to fees under the standards set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), and not merely 'ratify a pre-arranged compact.'"  *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 849 (5th Cir. 1998); *Piambino*, 610 F.2d at 1328 ("[i]n fixing the amount of attorneys' fees the court must, of course, take all of the Johnson criteria into account...."); *High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) ("After the court calculates the lodestar, it must scrutinize a fee award under the *Johnson* factors and not merely 'ratify a pre-arranged compact.'"); *Hoffert v. General Motors Corp.*, 656 F.2d 161, 165 (5th Cir. 1981), *cert. denied*, 456 U.S. 961 (1981) (despite parties' contingent fee agreement, Court applied *Johnson* analysis to insure fee was "reasonable under all circumstances of the case, including the risk and uncertainty of compensation."); *see also Dunn v. H.K. Porter Co.*, 602 F.2d 1105, 1110 (3rd Cir. 1979) ("district court may properly inquire into the reasonableness of an attorney's fee which, whether or not agreed to by contract, is to be satisfied through a settlement fund."); *Guidant*, 2008 WL 682174 at *4 ("the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper."); MANUAL FOR

18

COMPLEX LITIGATION (FOURTH), § 14.211 ("Judges have an *independent* duty to review fees and specifically determine if they are reasonable, applying traditional legal tests.") (emphasis added).

Courts have held that negotiations determining counsel fees at the outset of litigation, such as the "auction" or "bidding" process in securities cases, cannot possibly be used as a "benchmark of reasonableness" because they do not account for the future course of the litigation and many of the factors that will ultimately determine a reasonable fee, including the time ultimately devoted to the litigation and the amount recovered.  As the court in *Cendant PRIDES* stated:

> [A] preliminary bidding process cannot replace subsequent analysis of the factors listed in *Gunter* [*v. Ridgewood Energy Corp.*, 223 F.3d 190 (3rd Cir. 2000)].  The circumstances and progression of every case are different, and these unique factors must be taken into account by district courts awarding attorneys' fees.  Therefore, though the result of the bidding process may be of use to a district court in awarding fees at the end of the case, it cannot supplant post-settlement analysis to determine a reasonable fee.

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 735 n.18 (3rd Cir.), *cert. denied*, 534 U.S. 889 (2001); *see also* Third Circuit Task Force Report, 208 F.R.D. 340, 363, 375-76 & 420 (2002) ("Rule 23 requires courts to review the reasonableness of attorney fees at the end of the case.  A court's approval of a fee ... at the beginning of the case does not satisfy that obligation....  Thus, the auctioning process does not do away with an *ex post* assessment. ... [W]hile there are advantages to conducting a fee *negotiation* at the beginning of the case, a precise *ex ante* determination of fees is usually unworkable.  An *ex post* assessment, while obviously not perfect, is preferable...."); *Guidant*, 2008 WL 682174 at *12 (holding that prior set-aside agreement "was intended to cover the work product of pre-trial activities.  It did not contemplate the grueling

19

negotiation process to which certain Plaintiffs' attorneys contributed here, nor was it intended to cover the time and costs attributed to the negotiation process.").

### 1.   Failure to Conduct an *Ex-Post* Analysis is an Abuse of Discretion

Where the District Court fails to conduct its own analysis of the fee request and simply adopts the parties' agreed-to sum, the Fifth Circuit has held that the District Court "abdicate[s] its responsibility" and "its approval of the settlement [specifying the amount of attorneys' fees] must be reversed," even where there are no objections.  *Piambino*, 610 F.2d at 1328; *High Sulfur*, 517 F.3d at 227 (proper use of court's discretion is determined by "whether the record clearly indicates that the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation.") (internal quotation marks omitted); *Diet Drugs*, 582 F.3d at 538 ("abuse of discretion ... can occur if the judge fails to apply the proper procedures in making the [fee] determination, or bases an award upon findings of fact that are clearly erroneous.").  *See also Acosta v. Master Maintenance*, 192 F. Supp. 2d 577, 583 (M.D. La. 2001), *aff'd*, 69 Fed. Appx. 659 (5th Cir. 2003) (court is "not bound" by counsel's agreement to escrow a percentage of recoveries for PSC's common benefit efforts and court is "not bound" by state court's order approving said agreement); *Piambino*, 610 F.2d at 1328 ("district court is not bound by the agreement of the parties as to the amount of attorneys' fees."); *Foster v. Boise-Cascade, Inc.*, 577 F.2d 335, 336 (5th Cir. 1978).

As set forth in great detail in the Common Benefit Fee Petition, a proper *ex-post* analysis supports the PSC's request for a 7.5% common benefit fee award.

2.      **The Court Has Equitable Authority and
        Inherent Power to Adjust the Common Benefit
        Percentage Based on Changed Circumstances**

"In accordance with the common benefit doctrine, it has been a common practice in the federal courts to impose set-asides in the early stages of complex litigation in order to preserve common-benefit funds for later distribution."  *Murphy Oil*, 422 F. Supp. 2d at 680-81, *citing*, *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 668-69 (E.D. Pa. 2003) (imposing percentage set-aside in antitrust MDL for lead counsel); *MGM Grand*, 660 F. Supp. at 525 (imposing set-aside for costs and expenses of plaintiffs' liaison committee); *Diet Drugs*, 1999 WL 124414 at *2 (9% set-aside in pharmaceutical MDL for common benefit work); *Orthopedic Bone Screw*, 1996 WL 900349 at *3-*4 (12% set-aside for fees and 5% assessment for common benefit costs); *Bextra*, 2006 WL 471782 (set-aside order for common benefit fees and costs); *Guidant*, 2008 WL 682174 at *1-*2 (in PTO 6, court established common benefit fund); *Zyprexa*, 467 F. Supp. 2d at 266-67 (set-aside established for common benefit attorneys); *In re Hanford Nuclear Reservation Litig.*, No. CV-91-3015, Order Establishing Equitable Reserve Fund, 2 (E.D. Wash. Nov. 13, 2009) (13% set-aside for Common Benefit Fund) (attached hereto as Exhibit "F"); *Genetically Modified Rice*, 2010 WL 716190 at *1, *6 (common benefit set-aside of between 9%-11%, including 3% for costs, depending on type of case).  *See also* MANUAL FOR COMPLEX LITIGATION (FOURTH), § 14.215 ("Early in the litigation the court should ... establish the arrangements for the [leadership group's] compensation, including setting up a fund to which designated parties should contribute in specified proportions").

These set-asides, however, are not actual fee disbursements:  "no amounts are paid to attorneys from the set-aside fund until the attorneys demonstrate that they have worked for the

common benefit." *Murphy Oil*, 422 F. Supp. 2d at 681; *Zyprexa*, 467 F. Supp. 2d at 266 ("common benefit fund set-aside is a holdback, not a levy"); *Genetically Modified Rice*, 2010 WL 716190 at *7 ("order establishing a contribution amount is not an award of attorneys' fees"). Thus, regardless of the set-aside percentage, this Court must still determine what common benefit fee is warranted based on numerous factors including the results achieved by the PSC in the litigation. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *High Sulfur*, 517 F.3d at 227-28.

It is well settled that the law requires that "the district court must determine the reasonableness of the fee request *in light of the particular circumstances of the litigation*." *Telectronics*, 137 F. Supp. 2d at 1041 (emphasis added); *Rawlings*, 9 F.3d at 516; *Smillie v. Park Chemical Co.*, 710 F.2d 271, 275 (6th Cir. 1983). It is not uncommon, therefore, for courts to revisit common benefit assessments when circumstances warrant, especially in light of a global settlement. *See, e.g.*, *Guidant*, 2008 WL 682174 at *12 (increasing assessment from 4% to 15% of fund award); *In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, Pretrial Order No. 8A: Amendment to Order Establishing Common Benefit Fund (N.D. Cal. July 7, 2008) (court allowed assessment to be increased between 8% fees/2% costs and 10% fees/2% costs: "[g]iven the extensive work, including discovery, expert, and bellwether trial preparation, that has been conducted by Court-designated counsel, including Plaintiffs' Liaison Counsel and the members of the PSC (including its subcommittees), and given the size and length of the litigation, the Court finds that the current 2% costs and 2% fees assessment is inadequate to properly reimburse members of the PSC for their out-of-pocket costs and to pay for appropriate and necessary common benefit work.") (attached hereto as Exhibit "G"). Employing similar

22

reasoning, this Court initially imposed a 12% assessment in a local consolidated property damage litigation that later became a 17% award.  *See Murphy Oil*, 422 F. Supp. 2d at 683 (PTO No. 8); *cf. Guidant*, 2008 WL 3896006 at *10 (upward adjustment of court's earlier contingency fee cap "necessary and reasonable" "because of the unique facts and contours of th[e] MDL, and because of ... changed circumstances").

The objectors in *Guidant* contended that the 4% set-aside order previously agreed to by the parties "limit[ed] the amount of the common benefit fee to 4%, and that to impose a different common benefit fee [at the end of the case] would involve a 'bait & switch.'"  *Guidant*, 2008 WL 682174 at *11.  The court disagreed, pointing out that from the outset the parties contemplated additional common benefit fees in the event of a class action global settlement.  *Id*. Even though, ultimately, the parties in *Guidant* never sought class certification, the court held that "the Court and Plaintiffs did contemplate additional common benefit payments in the event of settlement." *Id*.

At the outset of this *Vioxx* litigation, in PTO No. 19, the Court ruled that a 3% assessment would be sufficient to address the discovery and docket management obligations of the committee.  Even then, however, the PSC recognized that circumstances would change in the event that a global or class action resolution was obtained.[29]  And, indeed, the circumstances have changed for most of the cases since not only has a global settlement been obtained, but common benefit counsel from all coordinated jurisdictions are now participating in the award provided by the Settlement Agreement.  This aggregation of counsel and their collective work

---

[29]  *See* PTO 19, Exhibit "A," ¶ 6 (Rec. Doc. 786).

product and additional common benefit time necessarily demands a higher assessment to permit a reasonable fee to common benefit counsel. In such circumstances courts have permitted increased assessments in the range of 10% to 17%. *See Guidant*, *supra*; *Bextra*, *supra*; *Murphy Oil*, *supra*. For the cases excluded from the Vioxx Settlement, preexisting PTO 19 assessment agreements are still in effect.

### C.   The Court Did Not Waive Its Jurisdiction to Decide the Issue of Attorneys' Fees

As discussed, *supra*, the Court may not abdicate its responsibility and duty to determine reasonable common benefit attorneys' fees under *Johnson* at the end of an MDL or class action case. *Strong*, 137 F.3d at 849; *Piambino*, 610 F.2d at 1328; *High Sulfur*, 517 F.3d at 228. Some of the SO's attempted to carve out an exception for the FPO by arguing that the Court in Pretrial Order No. 19 (approving common benefit assessments) did not "expressly reserve[] its right to modify the fee cap" provided in the FPO, as it allegedly did for both the Traditional Assessment Option and the Limited Waiver Option. All three agreements, however, which are expressly "incorporated by reference and have the same effect as if fully set forth in the body of" the Court's order, provide that "the PSC and Common Benefit Attorneys may also apply to the Court for class action attorneys' fees and reimbursement of expenses, if appropriate, and this Agreement is without prejudice to the amount of fees or costs to which the PSC and Common Benefit Attorneys may be entitled to in such an event."[30]   Therefore, the Court did reserve its

---

[30]  PTO 19, Exhibit "A," ¶ 6 (Rec. Doc. 786).

right to determine appropriate attorneys' fees in the event of a global settlement.[31]  The Court's

jurisdiction to determine said fees has not been waived.  In fact, the Settlement Agreement in this

case, which each of the SO's accepted, "expressly grants this Court the authority to oversee

various aspects of the global settlement administration," including the appointment of "an

Allocation Committee to assist in determining the appropriate amount of fees to be deposited

into the Common Benefit Fund," MSA at § 9.2.4, and consideration of "the Committee's

recommendations in making a final determination of common benefit fees as well as deciding

how those fees should be distributed to individual attorneys for their common benefit work," *id.*

at § 9.2.5.  *Vioxx*, 574 F. Supp. 2d at 614.

Under these circumstances, this Court has already ruled that it has subject matter

jurisdiction "to examine the reasonableness" of attorneys' fees.  *See Vioxx*, 650 F. Supp. 2d at

557 (ruling on the reasonableness of contingency fee contracts); *see also MGM Grand*, 660 F.

Supp. at 524-25 (courts have "the right and the duty to establish equitable fees for all of the

attorneys" involved in the case – those who make up the management structure as well as

individual counsel); *Abrams v. Abrams, P.A.*, — F.3d —, 2010 WL 1971240, *4 (4th Cir. May

18, 2010) ("federal district courts have inherent power and an obligation to limit attorneys' fees

to a reasonable amount.").  In any event, an express reservation of authority on the part of the

Court is not necessary.  *E.g.*, *Abrams*, 2010 WL 1971240 at *4 ("'[t]he district courts'

supervisory jurisdiction over contingent fee contracts for services rendered in cases before them

---

[31]  Plaintiffs' counsel were aware of this, as the PSC made clear in its Petition to the Court
seeking a set-aside fund for common benefit fees that:  "It is not intended that the Court's order apply to
any global or class action settlement reached in the litigation."  PSC's Petition for an Order Securing an
Equitable Allocation of Counsel Fees and Costs for MDL Administration and Common Benefit Work at
6 n.2 (Rec. Doc. 486).

is well-established.'").

The Court not only has the discretion to reassess the amount of common benefit fees that would be appropriate in this case in light of the global settlement achieved by the PSC, but it has the duty to make that determination in accordance with governing law.  Courts have held that "it is clear that an award of attorney's fees is a collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits."  *Moore v. Permanente Med. Group., Inc.*, 981 F.2d 443, 445 (9th Cir. 1992), *overruled on other grounds by*, *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005); *Mints v. Educ. Testing Serv.*, 99 F.3d 1253, 1258 (3rd Cir. 1996) (holding "the divesting of jurisdiction by the mailing of a certified copy of the order of remand does not preclude the award of attorney's fees and costs").

In fact, as the court held in *Zyprexa*, the set-aside fund for common benefit fees applies to "all cases pending-or to be pending-in this MDL, regardless of whether any of those cases are eventually remanded to state court or transferred to another federal court."  *Zyprexa*, 467 F. Supp. 2d at 274-75; *Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992); *Florida Everglades*, 549 F.2d at 1019 ("Normally [originating trial courts] would have the power to fix compensation between competing attorneys.  In a practical sense [the MDL transferee court] [i]s the only tribunal that could effectively handle the fee matter.  It would [be] unfeasible and irrational, and demeaning to the authority of the appointing court, to remit the [plaintiffs' steering] Committee to appearing all over the country ... to present prayers for compensation.").

**D.      By Accepting the Terms and Benefits of the Voluntary, Opt-In Global Settlement, 99.9% of all Vioxx Claimants Endorsed the PSC's Request for a Maximum 8% Common Benefit Fee**

In accordance with governing fee jurisprudence, the Vioxx Settlement Agreement that the parties presented to the Court on November 9, 2007, provides for judicial approval of common benefit attorneys' fees.  *See* MSA at § 9.2.3 ("Funds within the Settlement Fee and Cost Account shall be administered by the Honorable Eldon E. Fallon and all awards therefrom will be subject to approval ... in accordance with established Fifth Circuit precedent").  It is indisputable that virtually all of the Vioxx claimants – 99.9% – accepted the Settlement and registered for Settlement benefits.  Moreover, many of the SO's recommended this Settlement to their clients so that 95.96% of them could reap the benefits therefrom.[32]  Thus, all of these Vioxx claimants knew that the PSC intended to seek common benefit attorneys' fees of "no more than 8% of the gross amount recovered for every client that registers" for Settlement benefits.  MSA at § 9.2.1.  And, it was clear that the 8% ceiling was intended to "supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19."  *Id*.  Accordingly, all parties recognized that this Court would determine the appropriate percentage for a common benefit fee award in this case at an appropriate juncture and that the PSC would seek an award of "no more than 8%."

For all of the cases excluded from the Settlement program, the FPO has been or will be honored.  As sworn to by Mr. Herman, if an attorney "signed a [Full] [P]articipation [A]greement under [Exhibit] A [to PTO 19], it [the assessment] would be a 2-1 [2% for fees and 1% for

---

[32]  *See* Exhibit "B" hereto.

27

costs], and you would get a trial package, and you would get access to the depository."[33]

### 1.       The Settlement Agreement Is Binding on the Parties

Federal courts strongly favor and encourage the voluntary settlement of actions, especially in complex litigation "where substantial resources of the parties and the judiciary can be conserved by avoiding further litigation." *In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) (internal quotations omitted); *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3rd Cir.), *cert. denied*, 516 U.S. 824 (1995); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1013 (7th Cir. 1980); *accord Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981), *cert. denied*, 456 U.S. 998 (1982); *see also Sea-land Service, Inc. v. Sellan*, 64 F. Supp. 2d 1255, 1260 (S.D. Fla. 1999), *aff'd*, 231 F.3d 848 (11th Cir. 2000) ("Public policy strongly favors the enforcement of pretrial settlement agreements in all types of litigation."); *Matter of Munford, Inc.*, 97 F.3d 449, 455 (11th Cir. 1996). It is well established that "an agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties ... even in the absence of a writing." *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3rd Cir. 1970); *Good v. Pennsylvania R.R.*, 384 F.2d 989 (3rd Cir. 1967); *Mercer v. Richardson Brands, Inc.*, 1992 WL 164711, *4 (E.D. Pa. July 2, 1992), *aff'd*, 993 F.2d 224 (3rd Cir. 1993); *see Sadighi v. Daghighfekr*, 66 F. Supp. 2d 752, 759 (D.S.C. 1999) ("A settlement agreement is considered to be a contract."). As long as the parties agree to the terms and conditions of the settlement, the agreement is valid. *Main Line Theatres, Inc. v.*

---

[33] Herman Dep. at 120.

*Paramount Film Distrib. Corp.*, 298 F.2d 801, 803 (3rd Cir.), *cert. denied*, 370 U.S. 939 (1962). And, it remains binding on the parties even if one of the parties later "ha[s] a change of heart." *Gross v. Penn Mut. Life Ins. Co.*, 396 F. Supp. 373, 375 (E.D. Pa. 1975) (agreement binding even though it had not yet been reduced to a writing).

In this case, the parties' Settlement Agreement was not only reduced to a writing but said document contains 53 single-spaced pages and more than 17 exhibits, some of which contain additional exhibits. As part of the Agreement, attorneys were required to certify in the Registration Affidavit that they "agree[d] to the terms of the MSA and [would] recommend" it to all of their Vioxx clients. MSA, Exhibit 1.1, Exhibit A. Attorneys were certainly free to reject the Settlement entirely or exclude some of their cases from the Settlement and continue their pursuit of litigation against Merck, which would have entailed trying their cases one lawsuit at a time. Under this scenario, any preexisting assessment agreements would still be in effect.

### 2.    The Parties Cannot Accept Certain Provisions and Benefits of the Settlement Agreement While Rejecting Others

Parties to a settlement cannot accept only the benefits of the settlement and reject provisions that are not to their liking. *See Sea-land*, 64 F. Supp. 2d at 1262 ("Where a party accepts the benefits of a settlement agreement or a compromise of his case..., the party ratifies the settlement by accepting the benefits...."). The case of *In re Medtronic, Inc. Implantable Defibrillator Prod. Liab. Litig.*, 2008 WL 4861694 (D. Minn. Oct. 20, 2008), *Report and Recommendation Adopted By*, 2008 WL 4861693 (D. Minn. Nov 10, 2008) is instructive. In that MDL, the objectors argued that the "PSC unethically negotiated a separate fees agreement based upon a predetermined percentage rate" and the amount of common benefit fees was excessive.

29

*Id*. at *3.  The *Medtronic* Special Master recommended and the court adopted the recommendation to deny the objections, pointing out that "individual plaintiffs were given opportunity to accept or reject their individual allocations with full knowledge of both their own individual contingent fee rates and terms of the Amended Master Settlement Agreement, including the provision for separate settlement of common benefit fees."  *Id*. at *4.  And, "[e]qually important, the settlement negotiations, as well as the claims administration process, were undertaken and concluded under the very close supervision of the magistrate judge, and the final approval of fees [was] subject to court scrutiny and approval."  *Id*.

As in *Medtronic*, the Court was kept informed of the protracted settlement negotiations taking place in this litigation.  *Vioxx*, 574 F. Supp. 2d at 609 n.5 ("counsel for Merck and the [NPC] met together more than fifty times and held several hundred telephone conferences.... [T]hey kept this Court ... informed of their progress in settlement discussions.").  Each Vioxx claimant was given the opportunity to either accept the Settlement or reject it and continue with litigation.  The Settlement expressly provided that the PSC would be seeking a common benefit fee award not to exceed 8%.  MSA at § 9.2.1.  And, the Settlement made clear that this percentage was intended to *supersede* previous common benefit assessments in the MDL.  *Id*. Finally, all parties agreed that this Court would be the final arbiter of any fee award in this case in accordance with governing law.  *Id*. at § 9.2.3.  The fact that 99.9% of Vioxx claimants and their counsel voluntarily chose to accept the global settlement with these terms demonstrates an overwhelming endorsement of the PSC's fee request.[34]

---

[34]  *Cf. Klein v. O'Neil, Inc.*, — F. Supp. 2d — , 2010 WL 1435161, *18, *23 (N.D. Tex. Apr. 9,
(continued...)

30

### E.     The PSC Has Fulfilled Its Fiduciary Duties and Acted With Integrity

Certain objections purported to question the integrity of the PSC and its members, despite

the fact that the SO's submitted most of their cases to the Vioxx Settlement program and reaped

the benefits therefrom.  There is no evidence, however, to suggest that the PSC did anything

inappropriate or improper, and the PSC should not be impeded from realizing a fair and

reasonable fee for their remarkable efforts in achieving such tremendous benefits for 99.9% of all

Vioxx claimants.

### 1.     The PSC Has Not Included in its Fee Petition Any Time Devoted to Their Own Individual Actions

It is undisputed that the Court-appointed auditor vetted the hours and expenses of all PSC

members and common benefit counsel using Court-approved protocol, which provided that:  "No

time spent on developing or processing any case for an individual client (claimant) will be

considered or should be submitted."  PTO 6 at 5 (emphasis in original).  Mr. Herman confirmed

at his deposition that "no time on individual cases was submitted in connection with any

reporting required by the Court."[35]  After an examination of the common benefit time records, the

Settled Objectors have now recommended to the Court that a common benefit fee of 7.5% be

---

[34](...continued)
2010) (approving class settlement where "overwhelming percentage," *i.e.*, 97.3%, "affirmatively voted
for the settlement and requested court approval" and noting that "[p]arties give and take to achieve
settlements...neither Plaintiffs nor Defendants end up with exactly the remedy they would have asked the
Court to enter absent the settlement.").

[35]  Herman Dep. at 95-96.

awarded in this case.[36]  Any individual fees earned by common benefit counsel in concurrent

individual state cases that were tried is not relevant to this Court's determination of an

appropriate common benefit percentage.  As the Third Circuit pointed out in *Diet Drugs*, "[w]hat

individual counsel received in a particular state case ... is irrelevant to the fee award here, which

compensates Class Counsel for services that benefitted all class members, as well as the litigants

in coordinated state actions."  *Diet Drugs*, 582 F.3d at 544.

### 2. The PSC Made its Common Benefit Work Product Available to Plaintiffs' Counsel

PLC Russ Herman made clear at his deposition that:  "The trial package was ... available.

It's still available.  And it's still being supplemented.  Any lawyer that wants to try a case, the

depository is fully open, the trial package is available, they merely have to sign a confidentiality

agreement."[37]  The announcement of the availability of that trial package, as well as the

document depository, was made "in open court, during status conferences."[38]  Many counsel took

advantage of that availability.[39]  Mr. Stratton, for example, testified that he "got this trial

package, which has all the hot documents, all the experts' testimony."[40]  He said: "Everything I

need is right there."[41]

---

[36]  Exhibit "C."

[37]  Herman Dep. at 114.

[38]  *Id*. at 116.

[39]  *See, e.g.*, letters exchanged with Mr. Stratton, attached hereto as Exhibit "H."

[40]  Deposition of Michael Stratton ("Stratton Dep."), dated 4/28/2010, at 31, attached hereto as Exhibit "I."

[41]  *Id*.

### 3.    The NPC Kept This Court and the State Court Judges Informed of Settlement Negotiations

The parties were "directed [by this Court with input from the three coordinate State Court Judges] to negotiate ... with Merck's representatives towards a resolution."[42]  This Court has already confirmed that:

> In their efforts to develop a comprehensive, joint settlement agreement, counsel for Merck and the Negotiating Plaintiffs' Counsel ("NPC") met together more than fifty times and held several hundred telephone conferences.  Although the parties met and negotiated independently, they kept this Court-as well as the coordinate state courts of Texas, New Jersey, and California-informed of their progress in settlement discussions.

*See Vioxx*, 574 F. Supp. 2d at 609 n.5.

With regard to the actual terms of the Settlement, the parties were free to:  (1) reject the Settlement offer in its entirety and try their cases one-by-one; (2) appeal the propriety of any provision of the Settlement to the Court, which no attorney did[43]; or (3) place some of their cases in the Settlement while excluding others without penalty,[44] which is what many of the attorneys did.[45]

---

[42]   Herman Dep. at 15.

[43]   Herman Dep. at 33 ("any lawyer could appeal to the judge as to the [100% enrollment] requirement.  As far as I know, not a single appeal was ever taken to Judge Fallon on this issue.").

[44]   *See* Exhibit "B"; Herman Dep. at 50 ("there never was a requirement that I know about or any attempt to have the PSC require a particular lawyer to be penalized or limited in any way if they elected not to put all of their cases in [the Settlement]."); *see* MSA at § 1.2.8 ("nothing in this Agreement is intended to operate as a 'restriction' on the right of any Claimant's counsel to practice law [according to governing ethical rules]...").

[45]   For example, Mr. Stratton attempted to try one of the cases he excluded from the Vioxx Settlement, but when it became apparent that the case was not "worth pursuing" at trial, "Merck very kindly allowed [Stratton] to submit that case into the Settlement program after the fact."  *See* Stratton

(continued...)

**F.     The PSC's Efforts Benefited the Entire Plaintiff Class**

Some of the objections claimed that the efforts of the PSC did not "advance[] the interests

of the *entire* Plaintiff Class" because: (1) some of the Settled Objectors did not receive any

benefits whatsoever from the MDL and (2) much of the PSC's discovery was duplicative of

previous discovery conducted in state court.  Neither of these claims has any merit.

**1.     All of the Plaintiffs Received Inherent Benefits of
         MDL Consolidation and Coordination
         Regardless of Whether or Not They Actually
         Used the PSC's Work Product or Discovery**

It is well established in the context of an MDL that "[s]ubstantial benefit should be

determined with respect to the plaintiffs as a whole, not with respect to individual plaintiffs."

*See Genetically Modified Rice*, 2010 WL 716190 at *5-*6 ("Plaintiffs are substantially benefitted

by 'the mere availability' of relevant discovery, even if an objecting plaintiff chooses not [to] use

it."); *In re Clearsky Shipping Corp.*, 2003 WL 1563820, at *1-*4 (E.D. La. Feb. 26, 2003); *see

also Diet Drugs*, 582 F.3d at 548.  Without question, MDL consolidation and coordination

provide inherent benefits for all plaintiffs in the litigation.  Indeed, this Court has "pointed to the

many economies of scale that benefitted attorneys across the board, which meant that '[i]nstead

of pursuing individual discovery, filing individual motions, engaging in individual settlement

negotiations, or preparing individual trial plans, attorneys for eligible claimants who wish[ed] to

participate in the settlement need[ed] only [to] enroll the claimants in the settlement and then

carefully monitor their progress through the claims valuation process.'"  *Vioxx*, 650 F. Supp. 2d

_____

[45](...continued)
Dep. at 10.

34

at 555, *quoting Vioxx*, 574 F. Supp. 2d 606, 617 (E.D. La. 2008).  Likewise, in *Genetically Modified Rice*, the court recognized that:

> [T]he leadership group's work in discovery, motion practice, and the bellwether trials has provided a foundation for all of the cases involved in the litigation.  Evidence about what [defendant] did in developing and distributing the genetically modified rice is central to the proof on all the claims in this litigation.  This evidence was exclusively within [defendant]'s control, and the only realistic way for the evidence to be developed was through the type of centralized discovery that the leadership group conducted.  It would not have been possible for thousands of plaintiffs to separately obtain discovery from [defendant], and that, of course, is part of the reason the cases were combined in this MDL.  In addition to coordinating and conducting all the discovery against [defendant], the leadership lawyers have conducted two bellwether trials.  Those trials essentially provided a preview for all other plaintiffs of the trial testimony they might expect from the [defendant] witnesses and the types of cross-examination that their witnesses and clients might expect at trial from [defendant]'s counsel.  The trial preview, when combined with the discovery, is a great benefit for all plaintiffs....

*Genetically Modified Rice*, 2010 WL 716190 at *5; *see also Guidant*, 2008 WL 3896006 at *6 ("Claimants' attorneys generally benefit from economies of scale related to coordinated discovery, motion practice, and global settlement negotiations because they are not required to do certain work that they would otherwise do in an individual case."); *In re Diet Drugs Prods. Liab. Litig.*, Pretrial Order No. 1492 at 5 (E.D. Pa. Nov. 8, 2000) ("even if Plaintiffs' attorneys did not choose to use common benefit work product in the prosecution of Plaintiffs' case and its ultimate settlement, Plaintiffs clearly benefitted from the efforts of the [steering committee]") (attached hereto as Exhibit "J").

Moreover, the common fund doctrine does not contemplate that an award of fees will provide compensation for the abstract "benefit" involved in providing legal services or work

product to a common group of litigants.  Rather, as the name of the doctrine implies, it authorizes the award of fees only where a *fund* of money is created for the benefit of a class or group of MDL plaintiffs and then only in relationship to that monetary benefit.  *E.g.*, *Boeing v. Van Gemert*, 444 U.S. at 478 ("a litigant or lawyer *who recovers a common fund* for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.") (emphasis supplied); *In re Cendant Corp. Litig.*, 264 F.3d 201, 256 (3rd Cir. 2001), *cert. denied*, 535 U.S. 929 (2002) ("The 'common-fund doctrine ... allows a person who maintains a lawsuit *that results in the creation, preservation, or increase of a fund in which others have a common interest[]* to be reimbursed from that fund for litigation expenses incurred.'") (emphasis supplied; citations omitted).  In other words, the "benefit" that the doctrine focuses on is the monetary relief that is actually delivered to plaintiffs, not the underlying work.

The Third Circuit's decision in the *Diet Drugs* litigation, upholding the District Court's attorney fee award in excess of $567 million, is analogous.  In that MDL, there were "hundreds of thousands of class members spread all across the United States."  *Diet Drugs*, 582 F.3d at 547, *citing Florida Everglades*, 549 F.2d at 1012.  Some of the fee objectors there made similar arguments, that is, that their initial opt-out and PPH "clients did not enjoy a substantial benefit from the PMC's services."  *Id*. at 547.  These objectors reasoned that "because those clients were not parties to the Settlement Agreement, they did not receive any of the benefits – such as medical testing or claims preservation – for which the PMC bargained."  *Id*.  In overruling the objections, the *Diet Drugs* court held that:  the "PMC bestowed numerous benefits on initial opt-out and PPH claimants, even if their attorneys did not use the discovery that the PMC

36

marshaled and retained.  The mere availability of the discovery ... substantially influenced [the defendant's] evaluation of *every* plaintiff[']s case."[46]  *Id*.  In addition, the court ruled that "the PMC had, to the benefit of every claimant, helped to administer the MDL by tracking individual cases, distributing court orders, and serving as a repository of information concerning the litigation and settlement."  *Id*. at 548.  Moreover, the PMC "obtained a number of favorable discovery and evidentiary rulings that applied on a litigation-wide basis, and it enforced a uniform procedure for the production of documents, deposition testimony, and expert disclosures that governed every MDL case."  *Id*.

As pointed out in *Diet Drugs*, if MDL participants can avoid the payment of common benefit fees simply by arguing that they did not benefit from the use of the management committee's work product, this "would provide an incentive for lawyers who represent individual clients in an MDL to ignore the work product generated by Class Counsel in favor of generating duplicative discovery, and [this] would thereby undermine the efficiency gains that the judicial system realizes from MDLs."  *Id*. at 548 n.45.

### 2.    The PSC Conducted Extensive Additional Discovery in the MDL That Was Beneficial to All Vioxx Claimants

The evidence demonstrates that the PSC took numerous steps in the furtherance of the prosecution of Vioxx cases, which had not been taken by any other attorneys in any other cases and which were unique and beneficial to all Vioxx claimants.  PLC Russ Herman illustrated

---

[46]  *See* William B. Rubenstein, Alba Conte, Herbert B. Newberg, 4 NEWBERG ON CLASS ACTIONS, §14:9 (4th ed. Jun. 2010) ("even if the settling lawyers used none of the PMC's work product, the defendant itself might have assessed the value of the settling parties' case based on what had happened during the PMC's discovery process.").

some of these efforts at his deposition when he was asked whether discovery was complete by

the time the PSC tried its first Vioxx case in this MDL:

> Q:   Is it fair to say that by the time the first case was tried, the
> discovery was mostly complete?

> A:   No, not in my view.

> Q.   And what additionally needed to be done even after the first
> trial was done by the PSC?

> A.   Well, first of all, the privilege documents that Merck
> claimed as privileged were never produced.  The FDA was
> never brought into the case in any way.  Dr. Graham [from
> the FDA] gave a statement.  The Journal articles of what I
> term as junk science had not been discredited yet.  The
> APPROVe study had not yet been fully reviewed.  We were
> still receiving documents.  There were some 10 to 20
> generic experts hired by the PSC, retained by the PSC.
> There were hundreds of depositions taken.  There was a
> coordination of document depositories between New York,
> California and Alabama that took place.  Discovery, in my
> view, isn't complete while you're trying cases.  And since
> -- discovery is always ongoing.  I respect what Chris Seeger
> did.  I respect what Andy Birchfield did.  I respect what the
> two women lawyers in Texas did.  I think they did a
> wonderful job giving a basis in discovery.  But discovery
> was ongoing.[47]

Mr. Herman elaborated further on the singular efforts of the PSC when he described the

trial package that the PSC created for plaintiffs' attorneys.  He testified that:

> The chief responsibility of [the PSC] -- in this case was to create a
> trial package which in our judgment would allow a law firm to try
> the individual cases for somewhere between $200,000 and
> $250,000 rather than spend a million and a million and a half
> dollars.  We accelerated the trial package in order to give folks a
> choice as to whether they wanted to take the trial package and try

---

[47]  Herman Dep. at 42-43.

> their cases or whether they didn't.  The trial package was
> fundamentally complete.  It was reviewed.  It was available.  It's
> still available.  And it's still being supplemented.  Any lawyer that
> wants to try a case, the depository is fully open, the trial package is
> available, they merely have to sign a confidentiality agreement.
> And if they try their cases, then A applies.  If they don't try their
> cases and they enter the settlement, then the contract, global
> contract applies.[48]

As a result of the diligent, prodigious and continued efforts of the PSC and common benefit

attorneys to prosecute the *Vioxx* litigation, Merck came to the table and after one year of hard-

fought negotiations settled globally for $4.85 billion.  The NPC was comprised not only of PSC

members but also two state attorneys, Ed Blizzard representing the Texas group and Tom Girardi

for California.[49]  Chris Seeger was both a PSC member and Liaison Counsel for the New Jersey

*Vioxx* litigation.  Working in conjunction and employing all of the common benefit work

product, these attorneys were able to bring this litigation to a close.

### G.    A Common Benefit Fee Award of 7.5% is Fair and Reasonable in This Case

The stellar achievements of the PSC and its common benefit counsel have not been

challenged by anyone.  The NPC reached a global settlement with Merck in the amount of $4.85

billion at a point in time when there were approximately 26,000 active Vioxx cases pending

against Merck nationwide, representing approximately 47,000 claimant groups,[50] when there

were more than 12,000 Vioxx claimants with tolling agreements in place,[51] and when Merck was

---

[48]  *Id*. at 114.

[49]  *See* Herman Dep. at 14-15.

[50]  MSA, § "Recitals."

[51]  *Id*.

facing 80 trials in California alone,[52] and a possibility of thousands of additional trials in various other jurisdictions throughout the country.[53]  The PSC and common benefit counsel performed significant services for the benefit of all Vioxx claimants:  the parties engaged in Vioxx-related discovery in the MDL and in the coordinate state jurisdictions of New Jersey, California and Texas for over six years; they reviewed more than 50 million pages of documents that were produced; they took over 2,000 depositions; and they filed and/or defended "thousands of motions and consulted with hundreds of experts in the fields of cardiology, pharmacology, and neurology."  *Vioxx*, 650 F. Supp. 2d at 553 & n.5.  In addition, they tried six bellwether cases in the MDL and "approximately thirteen additional Vioxx-related cases ... in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida."  *Id.*

As attested to by PLC Russ Herman, "PSC members ... actually assisted ... in every single case that was tried wherever it was tried, either as a first chair or a second chair."[54]  The PSC was also responsible for coordinating pretrial efforts for all of the cases that were transferred to this MDL and for related state cases.  A detailed account of the PSC's common benefit services was filed in conjunction with the Common Benefit Fee Petition at §§ II.B.1-6.  The common benefit efforts in this litigation have been ongoing and are being updated by the Court-appointed

---

[52]  Herman Dep. at 148.

[53]  During the negotiation process, the NPC "followed" the Court's "directive" to settle the case and "at the same time [they] were directed to continue to try lawsuits against Merck."  Herman Dep. at 16.

[54]  Herman Dep. at 41.

auditor.[55]

### 1. The PSC's Request Is Justified Based on All of the *Johnson* Factors

In accordance with Fifth Circuit law, this Court has conducted "a hearing in the full sense of the word" on the issue of a fair and just common benefit fee for the PSC and common benefit counsel under the *Johnson* standards. *See Florida Everglades*, 549 F.2d at 1021. As set forth in the Common Benefit Fee Petition and incorporated herein, an application of each of the Fifth Circuit *Johnson* factors to the facts of this case amply supports a 7.5% common benefit award.[56]

### 2. The PSC's Request is Fair When Compared to Other MDL and Class Assessments

As discussed in our Common Benefit Fee Petition at length, a 7.5% common benefit fee in this case would fit squarely within the range of assessments and/or fees awarded in other MDLs and falls below the common benefit assessments in *Guidant*, *Bextra* and *Murphy Oil*. *See Murphy Oil*, 422 F. Supp. 2d at 683 (12% assessment increased to 17% award); *Bextra*, MDL No. 1699, Pretrial Order No. 8A: Amendment to Order Establishing Common Benefit Fund (assessment increased to between 8%/2% and 10%/2%); *Guidant*, 2008 WL 682174 at *12 (assessment increased to 15%); *Hanford*, Order Establishing Equitable Reserve Fund at 2 (13% set-aside for Common Benefit Fund); *Florida Everglades*, 549 F.2d 1006 (8% assessment); *Orthopedic Bone Screw*, 1996 WL 900349 (12%/5% assessment); *Genetically Modified Rice*, 2010 WL 716190 at *6 (between 9%-11% assessment, including 3% for costs, depending on type

---

[55] *See* fn. 12, *supra*.

[56] *See* Common Benefit Fee Petition at 51-66.

of case); *In re Protegen Sling and Vesica System Prods. Liab. Litig.*, MDL 1387, 2002 WL 31834446 (D. Md. 2002) (9%/6%); *MGM Grand*, 660 F. Supp. 522 (7% assessment).

### 3. The Court's Cap on Contingency Fees Does Not Render the PSC's Request Excessive

This Court "has the right and the duty to establish equitable fees for all of the attorneys" involved in this multidistrict litigation – those on the PSC, other common benefit attorneys and individual counsel, which will also include members of the PSC with individual cases. *See MGM Grand*, 660 F. Supp. at 524-25; *Vioxx*, 650 F. Supp. 2d at 553-55; *Abrams*, 2010 WL 1971240 at *4. The mere fact that the Court already capped individual contingency fees at 32% does not render a 7.5% common benefit assessment excessive. *Vioxx*, 650 F. Supp. 2d at 549. As long as this Court satisfies itself that based on all of the *Johnson* factors 7.5% is reasonable, that common benefit percentage would not be excessive.

The Court already discussed the fee adjudication analysis as requiring "a two-step process." *Id*. at 556 n.9. First, the Court "examin[ed] the reasonableness of all the contingent fee contracts in the global settlement and set[] an appropriate limitation on the amount of fees that attorneys may charge claimants." *Id*. Then, as the Court notified the parties in its order, "[t]he second step of the process will involve allocating a percentage of those fees for the Common Benefit Fund to be distributed to those who provided services that benefitted all claimants and their attorneys." *Id*. A reduction in individual counsel fees to 24.5% after subtracting a 7.5% assessment from the 32% cap is not necessarily unreasonable. Other courts have capped individual attorneys' fees at 25% or less. *See Guidant*, 2008 WL 682174 at *17-*19 (capping contingent fees at 20% subject to appeal to a special master for an upward departure based on

certain limiting factors)[57]; *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, 1994 WL 114580, *4 (N.D. Ala. Apr. 1, 1994) (capping contingent fees at 25% of a $4.2 billion settlement fund).

###### 4.    The PSC's Request Does Not Violate Nevada Law

One Objector argued that the PSC's common benefit fee request would abridge the United States Constitution, the Nevada Constitution and Nevada common law, inasmuch as Nevada permits attorneys to sign 40% contingency fee contracts with their clients.  However, the fact that Nevada law may allow contingency fee contracts to exceed 32% does not invalidate this Court's prior fee capping orders and certainly does not prevent the Court from awarding a reasonable common benefit fee.  This federal multidistrict Court has equitable powers to oversee the administration of the global Vioxx Settlement and under the Federal Rules of Civil Procedure, the Court "may require reasonable fees."  *See Vioxx*, 574 F. Supp. 2d at 611-12 (characterizing mass tort as quasi class action and relying on Fed.R.Civ.P. 23(g)(1)(C)(iii), Fed.R.Civ.P. 23(h) and MANUAL FOR COMPLEX LITIGATION (FOURTH), § 22.927).  The Court "also has the inherent authority and concomitant duty to exercise ethical supervision over the parties."  *Id*. at 612; *see also Karim v. Finch Shipping Co., Ltd.*, 233 F. Supp. 2d 807, 810 (E.D. La. 2002), *aff'd*, 374 F.3d 302 (5th Cir. 2004) ("Among the broad equitable powers of a federal court is its supervisory capacity over an attorney's contingent fee contracts.").  The Court already

---

[57]  This order was amended in *Guidant*, 2008 WL 3896006 at *10.  The court did increase the previously implemented 20% cap, but the fact remained that "the maximum amount of contingency fees that any firm will be allowed to collect is approximately 28%" under a new and complex formula.  *Id*. This decision was based on changed circumstances, and did not reflect a significant change in the court's reasoning.  *Id*. at *6-*7.

considered the fact that many counsel had contingency fee contracts with their clients that exceeded 32%, and some as high as "40% and even 50%," which presumably were valid under various state laws.  *Vioxx*, 574 F. Supp. 2d at 613 n.13.  Regardless of the validity of those contracts outside of the context of this multidistrict litigation, however, the Court lawfully and reasonably capped fees at 32% for the reasons set forth in the Court's previous fee opinions. *Vioxx*, 574 F. Supp. 2d 606, *reconsideration granted in part & denied in part*, 650 F. Supp. 2d 549.

## IV.  CONCLUSION

For all the foregoing reasons and for the reasons set forth in the Common Benefit Fee Petition, Plaintiffs' Liaison Counsel respectfully submits that this Court should award a common benefit fee in this matter in the amount of 7.5%.

Respectfully submitted,

Date:   July 30, 2010                    By:    /s/ Russ M. Herman
                                         _____
                                         **Russ M. Herman (Bar No. 6819)**
                                         Leonard A. Davis (Bar No. 14190)
                                         Stephen J. Herman (Bar No. 23129)
                                         ***Herman, Herman, Katz & Cotlar, L.L.P.***
                                         820 O'Keefe Avenue
                                         New Orleans, Louisiana  70113
                                         Telephone: (504) 581-4892
                                         Facsimile: (504) 561-6024

                                         **PLAINTIFFS' LIAISON COUNSEL**