# EXHIBIT A

Confidential

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

- - -

IN RE:                   : MDL DOCKET
VIOXX LITIGATION         : NO. 1647
                         :

- - -

April 28, 2010

- - -

CONFIDENTIAL

- - -

Oral deposition of RUSS M.
HERMAN, held at the law offices of Herman
Herman Katz & Cotlar, 820 O'Keefe, New
Orleans, Louisiana, beginning at 9:38
a.m. CST, on the above date, before Linda
L. Golkow, a Federally Approved Certified
Realtime Reporter, Registered Diplomate
Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph| 917.951.5672
deps@golkow.com

Confidential

| Page 2 | Page 3 |
|---|---|

**Page 2**

1  APPEARANCES:
2
3  STRATTON FAXON
   BY: MICHAEL A. STRATTON, ESQUIRE
4  59 Elm Street
   New Haven, Connecticut 06510
5  (203) 624-9500
   mstratton@strattonfaxon.com
6  Representing the Objectors to the
   PSC Fee Petition
7
8
   LEVIN, FISHBEIN, SEDRAN & BERMAN
9  BY: ARNOLD LEVIN, ESQUIRE
   510 Walnut Street
10 Suite 500
   Philadelphia, Pennsylvania 19106
11 (215) 592-1500
   alevin@lfsblaw.com
12 Representing the NPC and The
   Witness, Russ M. Herman
13
14
15 ALSO PRESENT:
16 BEASLEY, ALLEN, CROW, METHVIN,
   PORTIS & MILES, P.C.
17 ANDY D. BIRCHFIELD, JR., ESQ.
18
   HERMAN HERMAN KATZ & COTLAR
19 LEONARD A. DAVIS, ESQUIRE
   STEPHEN J. HERMAN, ESQUIRE
20
21 LEVIN, FISHBEIN, SEDRAN & BERMAN
   FREDERICK S. LONGER, ESQUIRE
22
23
24         - - -

**Page 3**

1  ALSO PRESENT (cont.'d):
2
   SEEGER WEISS LLP
3  JEFFREY S. GRAND, ESQUIRE
4
   WILLIAMS & CONNOLLY LLP
5  DOUGLAS R. MARVIN, ESQUIRE
6
7
8          - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

| Page 4 | Page 5 |
|---|---|

**Page 4**

1          - - -
2       I N D E X
3          - - -
4
5  Testimony of: RUSS M. HERMAN
6  By Mr. Stratton          7
7
8          - - -
9       E X H I B I T S
10         - - -
11 NO.      DESCRIPTION    PAGE
12 Herman-1 Pretrial Order No. 19  58
13 Herman-2 Transcript of Status  61
         Conference on July 19,
14       2005
15
16
17
18
19
20
21
22
23
24

**Page 5**

1          - - -
2  DEPOSITION SUPPORT INDEX
3          - - -
4
   Direction to Witness Not to Answer
5
      Page Line
6
      48 1
7
8
9
   Request for Production of Documents
10
      Page Line
11
12
13
14
   Stipulations
15
      Page Line
16
17
18
19
20 Question Marked
21    Page Line
22
23
24

| Page 6 |
|---|
| 1      - - - |
| 2      (It is hereby stipulated and |
| 3      agreed by and among counsel that |
| 4      sealing, filing and certification |
| 5      are waived; and that all |
| 6      objections, except as to the form |
| 7      of questions, be reserved until |
| 8      the time of trial.) |
| 9      - - - |
| 10      RUSS M. HERMAN, |
| 11      after having been duly sworn, was |
| 12      examined and testified as follows: |
| 13      - - - |
| 14      MR. STRATTON: As I |
| 15      understand it, I think we're each |
| 16      reserving our rights today to |
| 17      object and to not answer a |
| 18      question if we find it not to be |
| 19      relevant to the fee objection, and |
| 20      we will bring it before the Judge |
| 21      tomorrow and get a ruling from the |
| 22      Judge. |
| 23      MR. HERMAN: He's available |
| 24      today. |

| Page 7 |
|---|
| 1      MR. LEVIN: We'll call the |
| 2      judge. |
| 3      MR. STRATTON: Terrific. |
| 4      Terrific. |
| 5      MR. MARVIN: If I may say, |
| 6      I'm here because this deposition |
| 7      happens to coincide with the MDL |
| 8      status conference, but I'm not |
| 9      planning on participating in the |
| 10      deposition. |
| 11      - - - |
| 12      EXAMINATION |
| 13      - - - |
| 14   BY MR. STRATTON: |
| 15      Q. How would you like to be |
| 16   referred to? I don't want to be |
| 17   colloquial. |
| 18      MR. LEVIN: Mr. Herman. |
| 19   BY MR. STRATTON: |
| 20      Q. Mr. Herman works. |
| 21      Mr. Herman, can you tell me |
| 22   where you are licensed to practice law? |
| 23      A. In the state of Louisiana. |
| 24      Q. Anywhere else? |

| Page 8 |
|---|
| 1      A. I've been admitted to a |
| 2   number of Federal Courts, a number of |
| 3   Federal Courts of Appeal, to the United |
| 4   States Supreme Court. |
| 5      Q. And not to be disrespectful |
| 6   in the least, but have you ever had your |
| 7   license taken -- |
| 8      A. No. |
| 9      Q. -- or disciplined in any |
| 10   way? |
| 11      A. No. |
| 12      Q. And for how long have you |
| 13   held the Louisiana law license? |
| 14      A. Since the summer of 1966. |
| 15      Q. When you first started |
| 16   practicing law, what was the nature of |
| 17   your practice? |
| 18      A. Litigation. Did some real |
| 19   estate, did some probate work, or as we |
| 20   call it, successions. I was trained to |
| 21   have some familiarity with all aspects of |
| 22   civil practice, but my practice was and I |
| 23   was trained to do litigation. |
| 24      Q. Now, did you start your |

| Page 9 |
|---|
| 1   practice with a particular firm? |
| 2      A. Yes. |
| 3      Q. Who? |
| 4      A. Herman & Herman. |
| 5      Q. Was that a family firm or is |
| 6   that your own firm? |
| 7      A. My father and my uncle were |
| 8   the named partners, and there were other |
| 9   individuals. |
| 10      Q. When was the first time that |
| 11   you became involved in what I'll term |
| 12   mass tort litigation? |
| 13      A. Early '70s. |
| 14      Q. Tell me what your first |
| 15   experience was. What case or what cases |
| 16   was your first experience in this area? |
| 17      A. Hole in the ground. |
| 18      Q. What was the nature of that |
| 19   mass tort? |
| 20      A. Construction failure. |
| 21      Q. With workers getting crushed |
| 22   or dying on the site? |
| 23      A. Substantial property damage. |
| 24      Q. What was your next |

3  (Pages 6 to 9)

## Page 10

1   experience, if you recall?
2       A.   I don't really recall, but I
3   can give you several.
4       Q.   Give me several.  That's
5   fine.
6       A.   Mark Essex; Howard Johnson
7   terrorist attack; Continental Grain
8   explosion; several explosions; early
9   pharmaceutical case against Syntex and
10  Wyeth.  I don't know.  A number of cases.
11      Q.   Would you credit your
12  experience in those other mass torts and
13  the connections with people that you
14  made, other lawyers in those cases, with
15  in part being the reason why you were
16  appointed as PSC liaison in the Vioxx
17  cases?
18      A.   I don't know why Judge
19  Fallon appointed me other than the fact
20  that there was an election in various
21  cases that I've been appointed to.
22      Q.   So, tell me how you ended
23  up.  You're officially a member of the
24  Plaintiffs' Steering Committee for Vioxx,

## Page 11

1   right?
2       A.   Yes.
3       Q.   And how did you become a
4   member of the Steering Committee for
5   Vioxx?
6           MR. LEVIN:  Objection to
7       form.
8           THE WITNESS:  By
9       appointment.
10  BY MR. STRATTON:
11      Q.   What was --
12          MR. LEVIN:  You want to know
13      why?
14          MR. STRATTON:  I'm assuming
15      he wasn't elected to be a member
16      of the PSC.
17          MR. LEVIN:  I'm assuming the
18      judge appointed him, and you would
19      have to ask the judge that
20      question.
21  BY MR. STRATTON:
22      Q.   Well, did you apply to
23  become a member of the PSC?
24      A.   I don't think you can apply.

## Page 12

1   Oh, yes.  Sure.  I submitted a resume.
2       Q.   The judge issues an order
3   saying I would like to get applications
4   for members up to the PSC, and I want a
5   couple of pages about your background
6   here and why you think you might be a
7   valuable member, right?  Isn't that --
8       A.   Well, the order speaks for
9   itself, but generally that's true.
10      Q.   And it turned out that you
11  were appointed to the PSC by Judge
12  Fallon?
13      A.   Yes.
14      Q.   In his discretion, right,
15  apparently?
16      A.   Yes.
17      Q.   Who else was appointed
18  members of the PSC by Judge Fallon, if
19  you recall?
20      A.   Well, the executive
21  committee was Andy Birchfield and Chris
22  Seeger, myself.  Other members were
23  Arnold Levin, Troy Rafferty, Chris Tisi,
24  Mark Robinson, Richard Arsenault, I

## Page 13

1   believe Gerry Meunier.  I don't know how
2   many that is, but that's most -- oh, Drew
3   Ranier.  I think that's most of them.
4       Q.   Now, to your recollection,
5   were all of theses folks appointed at or
6   about the same time to the Plaintiffs'
7   Steering Committee for Vioxx?
8       A.   Yes.
9       Q.   Was anybody ever added later
10  on to join the Plaintiffs' Steering
11  Committee?
12      A.   No.
13      Q.   Now, I understand that there
14  was a negotiating committee appointed by
15  the judge, I believe, for the plaintiffs
16  to negotiate with Merck?
17      A.   No.
18      Q.   How did that work?
19      A.   How did what work?
20      Q.   There was a negotiating
21  committee, right, that negotiated a
22  settlement agreement with Merck?
23      A.   Yes.
24      Q.   Were there particular people

Page 14

1    who were on that negotiating committee?
2        A.   Yes.
3        Q.   Who?
4        A.   Tom Girardi from California;
5    Ed Blizzard from Texas; Arnold Levin from
6    Pennsylvania; Andy Birchfield from
7    Alabama; Chris Seeger from New Jersey/New
8    York; myself; and -- that's Texas,
9    California, New Jersey.  Yes.
10       Q.   Now, Tom Girardi and Ed
11   Blizzard, were they on the Plaintiffs'
12   Steering Committee?
13       A.   No.
14       Q.   Where did they come from?
15   How was it that they ended up on the
16   negotiating committee?  I have a
17   reasonable understanding of how that
18   occurred, but --
19       A.   Well, what's your
20   understanding?
21       Q.   Were these were folks who
22   were involved in the state court
23   litigation, and they were added in?
24       A.   That's not the reason.

Page 15

1        Q.   Okay.
2        A.   The reason is, is that Judge
3    Chaney in California had a liaison
4    counsel, and that was Mr. Girardi, and
5    that was Judge Chaney's recommendation.
6            Ed Blizzard had been
7    appointed liaison counsel in Texas by
8    Judge Wilson, and that was Judge Wilson's
9    designee.
10       Q.   Was there any formal
11   establishment by any judge of a
12   negotiating committee for the plaintiffs?
13           MR. LEVIN:  Objection to
14       form.
15           THE WITNESS:  There was an
16       order issued in the MDL.
17   BY MR. STRATTON:
18       Q.   Did the order specifically
19   refer to --
20       A.   It was not a written order,
21   it was a directive, because we were
22   directed to negotiate in -- with Merck's
23   representatives towards a potential
24   resolution, and that oral directive we

Page 16

1    followed at the same time we were
2    directed to continue to try lawsuits
3    against Merck.
4        Q.   Now, was that oral directive
5    at one of Judge Fallon's regular status
6    conferences?
7        A.   That oral -- no.
8        Q.   Do you know where that
9    occurred?
10       A.   It occurred in his office.
11       Q.   Is there a transcript
12   involved or was that more of an informal
13   conference?
14       A.   It wasn't informal.  There
15   were four judges present, and we were
16   given a directive.
17       Q.   Is there a transcript of
18   that proceeding?
19       A.   You'd have to ask Judge
20   Fallon.  I don't know.
21       Q.   Do you know when,
22   approximately, that directive was given?
23       A.   Yes.
24       Q.   When?

Page 17

1        A.   Sometime between September
2    of 2006 and December -- the first week or
3    second week of December of 2006.  I
4    believe it would be closer to December
5    than September.
6        Q.   Now, is there a syntax I
7    ought to use when I refer to that
8    negotiating team for the plaintiffs?  Was
9    it called the NPC?  What was the acronym?
10       A.   NPC, plaintiffs negotiating
11   committee, whatever.
12       Q.   So, we'll call it the NPC
13   just for ease of this deposition.
14       A.   Okay.
15       Q.   Was there a specific group
16   that the NPC negotiated with at Merck?
17       A.   Yes.
18       Q.   Do you recall who was a
19   member of that particular group?
20       A.   Well, I think it is fair to
21   give, from what I recollect, the lead
22   attorneys.  The lead attorney was Doug
23   Marvin, John Beisner, Adam Hoeflich for
24   some of the negotiation.

5 (Pages 14 to 17)

Page 18

1    Q.  Former Beta brother of mine.
2    A.  Huh?
3    Q.  Former fraternity brother of
4  mine.
5        Go ahead.  Strike that.
6    A.  I can't answer that
7  question.
8    Q.  I'll pay for that portion of
9  the transcript.
10       MR. LEVIN:  Hope you had as
11     much fun with him as we did.
12     THE WITNESS:  Merck had a
13     number of representatives from
14     different law firms and
15     paralegals.  But essentially Ben
16     Barnett, I believe, or his firm
17     was involved at some point.  I'm
18     not certain of that.  But
19     essentially my communications were
20     with Doug Marvin.
21  BY MR. STRATTON:
22    Q.  Now, at a certain point in
23  time, it was announced publicly that a
24  deal or a private agreement had been

Page 19

1  reached between the NPC and Merck.  Can
2  you tell me when that was?
3    A.  Yes.
4    Q.  When was that?
5    A.  November 9, 2007.  But it
6  wasn't a private deal.  It was a contract
7  that attorneys could opt in their clients
8  or pro ses could opt in for a global
9  resolution with an 85% opt-in rate.
10    Q.  Who came up with this term
11  "global"?  What's global about an 85%?
12       MR. LEVIN:  Objection to the
13     form.
14  BY MR. STRATTON:
15    Q.  Who came up with the term
16  "global"?
17    A.  I don't understand your
18  question.  A global has been around since
19  I've been practicing law.  It has a
20  meaning.  It means global.  Look, maybe I
21  can explain it to you.  I can't
22  understand it for you.
23    Q.  Maybe you can tell me what
24  other cases have used the term "global."

Page 20

1  What other mass torts have used the term
2  "global" in the settlement?
3    A.  Every explosion case I've
4  been in, every airplane crash, every
5  pharmaceutical case that was not an
6  inventory settlement.  Chemical cases,
7  environmental cases.  It is a term used
8  by lawyers generally to distinguish from
9  case-by-case trials and settlements or
10  inventory settlements to a resolution
11  either by class action or by private
12  contract that takes in the ponderosa of
13  outstanding claims in various types of
14  civil actions.
15    Q.  A global settlement in your
16  lexicon is any settlement that involves
17  an attempt to settle the entire inventory
18  of mass tort claims as opposed to just
19  trying them singularly one by one by one?
20    A.  Or by inventory.  But it is
21  not in my lexicon.  I believe it's a
22  well-established term in civil
23  litigation.
24    Q.  Approximately, in your

Page 21

1  experience, prior to the Vioxx
2  settlement, what percentage of the mass
3  torts you were involved in settled by way
4  of quote, unquote, global settlement?
5       MR. LEVIN:  Percentage of
6     the cases that he's been involved
7     in?
8       MR. STRATTON:  Yes.
9       MR. LEVIN:  Objection to
10     form and foundation.
11       THE WITNESS:  May I answer
12     or not answer, sir?
13       MR. LEVIN:  You can answer
14     it if you feel --
15       THE WITNESS:  95%, 98%.
16  BY MR. STRATTON:
17    Q.  So, 95 to 98% of the mass
18  torts you've been involved in have ended
19  up settling by way of some sort of global
20  settlement?
21    A.  Or court resolution.
22    Q.  Now, you were involved in
23  Propulsid, right?
24    A.  Yes.

6 (Pages 18 to 21)

Page 22

1    Q.   What was your involvement in
2  Propulsid?
3    A.   I think I was liaison
4  counsel and lead counsel.
5    Q.   Were more hours expended by
6  the common benefit attorneys in Propulsid
7  than in Vioxx?
8    A.   No.
9    Q.   Do you know what the
10 relative difference in the number of
11 hours spent is between Propulsid and
12 Vioxx?
13   A.   No.  I know Vioxx -- and
14 Propulsid is still ongoing.  But I know
15 that in Vioxx, we are about, according to
16 the CPA that was appointed by the Court,
17 approximately 500,000 to 550,000 hours.
18      In Propulsid, I can't
19 remember.
20   Q.   Less than, close, or not
21 even near it?
22      MR. LEVIN:  You --
23      THE WITNESS:  I cannot
24 recall.  But it certainly wasn't

Page 23

1  of the magnitude of Vioxx.
2  BY MR. STRATTON:
3    Q.   How about the expenditure of
4  funds by common benefit attorneys in
5  Propulsid versus the expenditure of funds
6  for the costs in Vioxx?
7        MR. LEVIN:  Objection to
8        form.  I just don't understand.
9        You're asking questions, and
10       there's no foundation for them.
11       MR. STRATTON:  There is
12       foundation, but I can get into
13       that with the judge or I can
14       continue to ask questions.
15       MR. LEVIN:  I'm not
16       directing him not to answer that
17       question because he's a very good
18       witness.
19       MR. STRATTON:  I understand
20       that.
21       THE WITNESS:  The magnitude
22       was much greater in Vioxx.
23 BY MR. STRATTON:
24   Q.   Now, when the NPC had these

Page 24

1  negotiations with the representatives
2  from Merck, I imagine there were all
3  sorts of different ways in which the
4  groups met or had communications.  Can
5  you tell me some of the ways that the two
6  groups met in order to reach final
7  resolution or this global settlement?
8    A.   Face-to-face negotiations,
9  conference calls, a large number of
10 communications between myself and Mr.
11 Marvin, mostly my -- I would say other
12 than face-to-face, I would say 90% by
13 telephone communications.
14   Q.   And the primary contact
15 points were Herman to Marvin, Marvin to
16 Herman?
17   A.   I wouldn't say that.
18   Q.   Were there negotiations that
19 occurred that you were not aware of
20 between the NPC and the Merck people?
21   A.   No.
22   Q.   Were minutes kept, any kind
23 of documents or memorialization of the
24 status of the settlement kept by the NPC?

Page 25

1    A.   As far as I know, there were
2  no formal minutes kept.
3    Q.   Were informal minutes kept?
4    A.   I don't recall.  I didn't
5  review them for this deposition if I have
6  them.
7    Q.   Were there drafts of
8  particular provisions sent back and forth
9  either by e-mail correspondence or in
10 hand?
11   A.   I'm sure there were.
12   Q.   If I wanted to do an
13 archeological dig of the settlement
14 negotiations from when they apparently
15 first commenced in September of '06 until
16 they were announced in November of '07,
17 would there be a place I could go to find
18 them?  Would you have records
19 demonstrating what occurred at various
20 times during the negotiations?
21   A.   No.
22   Q.   Would there be e-mails
23 between various NPC members and Merck
24 folks?

Page 26

1      A.   There might be.
2      Q.   Who would have those
3  e-mails?
4      A.   I don't know.
5      Q.   Do you have those e-mails?
6      A.   I don't know.
7      Q.   Did you ever send e-mails to
8  the people at Merck?
9      A.   I don't send e-mails.  If I
10  send an e-mail, it went through my
11  secretary.  But my communications were
12  either face-to-face or telephonically, 90
13  to 95% of them.  Of course there were
14  e-mails, but who has them, what do they
15  say, I have no idea.  I can't tell you.
16      Q.   Did you work off of a draft
17  agreement?  Did you have various drafts
18  that were improved upon as the
19  negotiations continued?
20      A.   I don't know.  I'm sure
21  there were.  I do know.  I shouldn't say
22  I don't know.  Sure there were drafts.
23      Q.   Would you have copies of
24  those drafts?

Page 27

1      A.   I don't know.  I think I
2  have some of them, but I don't know how
3  many or what they are or where they are.
4      Q.   At any point in time, did
5  the teams make use of the mediator or
6  neutral in order to assist them in the
7  negotiations?
8      A.   No.
9      Q.   Did the team ever go back
10  and see a judge for specific guidance as
11  to particular terms during the
12  negotiation period between September '06
13  and November of '07?
14      A.   No.  And I want to answer
15  the question fully.  Mr. Marvin and I
16  were required to report regularly, which
17  we did, as to general progress that we
18  were making.   We were given at some
19  point a very almost in stone deadline to
20  complete negotiations.  And we were also
21  instructed that negotiations were to be
22  conducted between the parties privately.
23      Q.   When did the two groups, the
24  NPC and the Merck negotiating team, when

Page 28

1  did they reach final agreement as to all
2  the terms of this quote, unquote
3  global --
4      A.   4:30 a.m. on November 9,
5  2007.
6      Q.   Now, were both sides
7  cognizant during the negotiations of the
8  statute of limitations on these claims,
9  on outstanding claims that maybe had not
10  been brought yet?
11          MR. LEVIN:  Well, I'm going
12      to object to the form.  You said
13      "were both sides."
14          MR. STRATTON:  Obviously you
15      can't know what was going through
16      Mr. Marvin's head or the other
17      team.
18          MR. LEVIN:  Good.
19  BY MR. STRATTON:
20      Q.   What I'm talking about, Mr.
21  Herman, is --
22      A.   The answer to your question
23  is yes for the NPC.
24      Q.   Is it fair to say that three

Page 29

1  years after Vioxx was withdrawn from the
2  market, that was a critical point in time
3  in terms of knowing that most all of the
4  outstanding claims that had not been
5  brought would be precluded from being
6  brought?
7      A.   No.  And I strongly disagree
8  about the question of preclusion.
9      Q.   Now, at 4:30 in the morning
10  on November 9, 2007, you said both
11  parties reached final agreement.  Was
12  that when the document was signed by the
13  various -- by the NPC?
14      A.   To my best recollection,
15  yes.  It sticks in my mind because it
16  was --
17      Q.   It was pretty early?
18      A.   Well, it sticks in my mind
19  because I had to call a Federal Judge at
20  4:30 in the morning and tell him we had
21  signed and that he wanted the papers
22  delivered to him.
23      Q.   That's one happy Federal
24  Judge.

8 (Pages 26 to 29)

Confidential

Page 30

1    A.   You know, if -- I'm not
2  going to comment on your comment.
3           MR. LEVIN:  That's right.
4    That's not a question, "one happy
5    Federal Judge."
6           MR. STRATTON:  It was pretty
7    benign.
8           MR. LEVIN:  Well...
9  BY MR. STRATTON:
10   Q.   Prior to this deal being
11 inked, did the NPC consult with any
12 experts in ethics regarding any of the
13 provisions of this particular potential
14 deal?
15   A.   Yes.
16   Q.   How many ethics experts were
17 consulted?
18   A.   Overall?
19   Q.   Yes.
20   A.   Five.  And I need to explain
21 the answer.  Not with any particular
22 provision, but with all provisions.
23   Q.   So, with each of these five
24 experts, you provided all of the

Page 31

1  provisions to them?
2           MR. LEVIN:  All the
3    provisions of what, the agreement?
4           MR. STRATTON:  Of the
5    putative settlement agreement.
6           THE WITNESS:  Well, the way
7    you phrased the question, the
8    answer is yes.  They were
9    consulted on an ongoing basis
10   until the eve of November 8, 2007,
11   and in a couple of instances, post
12   November 9, 2007.
13 BY MR. STRATTON:
14   Q.   Now, there's a particular
15 provision in the, quote, unquote global
16 settlement agreement that requires a
17 lawyer to either submit all of his
18 plaintiffs into the, quote, unquote
19 global settlement or none of his
20 plaintiffs?
21           MR. LEVIN:  I'm going to
22   object to this on relevance.  I
23   read your objections.  It seems to
24   me your objections go to quantum,

Page 32

1    not to anything else.  In fact,
2    you put most of your cases into
3    the settlement.  I don't know
4    where you are going.  Maybe you
5    can help me.
6           THE WITNESS:  Let me answer
7    the question.
8           MR. LEVIN:  My witness wants
9    to answer the question.  I've been
10   overrode.
11          THE WITNESS:  You had 84
12   cases.  You put 79 through the
13   settlement.  You elected which
14   ones to keep out, which ones to
15   put through.  You made a decision
16   in the best interest of your
17   clients as to what went through,
18   what did not.  I read the opinion
19   that you brought to Federal Court
20   which said that, in effect, you
21   had to make choices.
22          The judge under the MSA had
23   superintendence and the ability to
24   modify any provision counter to

Page 33

1    law, and as a matter of fact, any
2    lawyer could appeal to the judge
3    as to the requirement.  As far as
4    I know, not a single appeal was
5    ever taken to Judge Fallon on this
6    issue.
7  BY MR. STRATTON:
8    Q.   That was not Judge Fallon as
9  Judge Fallon, that was Judge Fallon as a
10 so-called Special Master or some other
11 title?
12          MR. LEVIN:  The --
13          THE WITNESS:  I disagree
14   with that strongly.  It was Judge
15   Fallon as Judge Fallon.
16 BY MR. STRATTON:
17   Q.   Did not Judge Fallon say
18 that he would not comment as to
19 particular terms in the settlement
20 agreement because he thought it was a --
21 he termed it a private agreement --
22   A.   You would have to talk --
23   Q.   -- over which he had no
24 authority?

9  (Pages 30 to 33)

Confidential

Page 34

1      A.   Well, that's not what he
2   said.  As a matter of fact, in the
3   transcript and in the agreement, he has
4   certain responsibilities as the
5   superintending federal judge, one of
6   which is to modify anything in the
7   agreement within certain parameters.
8      Q.   Was there any provision for
9   a fairness hearing within the global
10  settlement agreement that you negotiated
11  with Merck?
12     A.   I don't know that there's
13  ever a private contract agreement in
14  which there's a fairness hearing.
15  There's an opt-in situation in which each
16  lawyer exercises a judgment as to whether
17  for his clients it's fair or not.  And
18  the fact that 99.79% of 50,000 claimants
19  on the advice of their lawyers opted in I
20  think speaks to the fairness and
21  reasonableness of the private global
22  contract.
23        MR. STRATTON:  I would just
24     object to the response only

Page 35

1   because it wasn't responsive.
2   Nonetheless, let's move on.
3   BY MR. STRATTON:
4      Q.   What I'm saying is, you've
5   been involved in class actions, right?
6      A.   Yes.
7      Q.   And if a class action is
8   certified and later there's an agreement
9   between class action counsel and the
10  defendant, there is a fairness hearing.
11  The judge actually holds a fairness
12  hearing at which unrepresented class
13  members can come in and can object to
14  various terms of the agreement, right?
15        MR. LEVIN:  Objection to the
16     form.  Are you speaking of 23(b)3,
17     (b)2 or (b)1?
18        MR. STRATTON:  I have no
19     idea whether it's (b)3, (b)2,
20     (b)1.
21        MR. LEVIN:  Obviously.
22        MR. STRATTON:  But I know it
23     was a fairness hearing.
24        THE WITNESS:  Well, I can't

Page 36

1   affirm your understanding because
2   you evidently have no
3   understanding of the types of --
4   BY MR. STRATTON:
5      Q.   That's sort of unnecessary.
6      A.   Wait a minute.  I'm going to
7   finish my answer.
8        MR. LEVIN:  Will you let my
9   witness answer the question.
10        THE WITNESS:  The class
11     action --
12        MR. STRATTON:  He can do it
13  without bringing personalities.
14  I'm trying very hard, despite a
15  lot of personal feelings here, to
16  make this about the issues.
17        MR. LEVIN:  We have no
18     personal feelings.
19        MR. STRATTON:  And not
20     about --
21        MR. LEVIN:  Nothing's
22     personal.
23        THE WITNESS:  It's not
24     personal.  It is not personal.

Page 37

1   You indicated that you didn't know
2   the difference among the class
3   actions.  My response to you is
4   that since Ortiz, Amchem and other
5   decisions, there may or may not be
6   a fairness hearing.  To my
7   knowledge, any global contract
8   resolving mass torts does not have
9   or require a fairness hearing,
10  that attorneys either elect, in
11  their clients' best interest, to
12  participate or they don't.  They
13  either engage in negotiations
14  outside of the contract or they
15  try their cases.
16  BY MR. STRATTON:
17     Q.   Now, when you were appointed
18  to the Plaintiffs' Steering Committee for
19  Vioxx, based on your history with these
20  mass torts, did you expect in all
21  probability that the case would
22  eventually end in some sort of a global
23  settlement?
24     A.   No.

10  (Pages 34 to 37)

Page 38

1    MR. LEVIN: I'm going to
2    object to that. That's highly
3    speculative. Litigation goes on,
4    and there's a lot of alternatives.
5    THE WITNESS: Please, let me
6    answer.
7    No. I thought we were going
8    to have to try every case. That's
9    what happened in tobacco. That's
10   what happened, and I have to tell
11   you, tobacco ended up in a
12   three-year trial that's been going
13   on for more than ten years.
14   Merck's announced policy was a
15   scorched earth policy in which
16   they would try every single case.
17   Did I believe that? Absolutely.
18   Did I say that? Yes, absolutely.
19   At the time that the PSC was
20   formed, not only were there not
21   settlement negotiations, but
22   lawyers decided on the plaintiffs'
23   side that if they had to try every
24   case, they would try every single

Page 39

1    case. And it was not until much
2    later, five years after the first
3    case was tried, that there was any
4    inkling that Merck was going to go
5    a different way. So, at
6    inception, again, the answer was
7    yes, I thought we'd have to try
8    every case.
9    BY MR. STRATTON:
10   Q.   When was the first case
11   tried?
12   A.   Either 2001 or 2002. I
13   think 2001 -- well, there were cases
14   tried in Texas in 2002. I think there
15   was a case tried in 2001, but I'm not
16   certain.
17   Q.   When did the PSC try its
18   first case?
19   A.   PSC tried a case after
20   Hurricanes Katrina and Rita in Houston,
21   Texas in the Federal Courthouse.
22   Q.   What was the name of that
23   case?
24   A.   I don't know. I don't

Page 40

1    recall.
2    Q.   Do you recall when that was?
3    A.   Yes. It was after Hurricane
4    Katrina and Rita and after we moved the
5    depository to Houston and set up an
6    office, and it was after Judge Fallon
7    made arrangements to use the federal law
8    clerk -- Federal Courthouse in Houston.
9    I can tell you that Mr. Andy Birchfield
10   tried the first case.
11   Q.   Was that sometime in, I
12   think it was either late fall of 2005 or
13   am I getting --
14   A.   It was either late 2005 or
15   early in 2006.
16   Q.   What was the result of that
17   case?
18   A.   I can't tell you the
19   specific result, because one of the cases
20   was a hung jury or had to be retried,
21   although I was present during that first
22   case. The other cases resulted in Merck
23   verdicts.
24   Q.   How many cases in total did

Page 41

1    the PSC try as opposed to state court
2    counsel?
3    A.   Well, I'm going to answer
4    your question, and then I'm going to
5    explain it. Six.
6    Mr. Blizzard, who originally
7    was in Texas state actions, also had
8    filed a case or two in the MDL, tried an
9    MDL case. Two other Texas firms tried
10   MDL cases, and they had cases in both
11   state court and the MDL. Then there were
12   PSC members who actually assisted, as far
13   as I can recall, in every single case
14   that was tried wherever it was tried,
15   either as a first chair or a second
16   chair. And I believe there were 17 of
17   those cases.
18   Q.   Now, by the time that the
19   first case was tried by Mr. Birchfield in
20   Houston, was the discovery complete, the
21   discovery that the PSC had sought from
22   Merck?
23   A.   No.
24   Q.   Was that completed at the

11 (Pages 38 to 41)

Confidential

Page 42

1  time of that trial?
2      A.  No.
3      Q.  Would you agree with Mr.
4  Seeger that essentially all of the
5  discovery was complete by July of 2005?
6          MR. LEVIN:  Objection to the
7      form of that question.  Do you
8      have something where --
9          MR. STRATTON:  Status
10     conference, July of 20 --
11         MR. LEVIN:  I would ask that
12     you show the witness the
13     transcript.
14  BY MR. STRATTON:
15     Q.  Let me ask the question
16  differently.
17         Is it fair to say that by
18  the time the first case was tried, the
19  discovery was mostly complete?
20     A.  No, not in my view.
21     Q.  And what additionally needed
22  to be done even after the first trial was
23  done by the PSC?
24     A.  Well, first of all, the

Page 43

1  privilege documents that Merck claimed as
2  privileged were never produced.  The FDA
3  was never brought into the case in any
4  way.  Dr. Graham gave a statement.  The
5  Journal articles of what I term as junk
6  science had not been discredited yet.
7  The APPROVe study had not been fully
8  reviewed.  We were still receiving
9  documents.  There were some 10 to 20
10  generic experts hired by the PSC,
11  retained by the PSC.  There were hundreds
12  of depositions taken.  There was a
13  coordination of document depositories
14  between New York, California and Alabama
15  that took place.
16         Discovery, in my view, isn't
17  complete while you're trying cases.  And
18  since -- discovery is always ongoing.  I
19  respect what Chris Seeger did.  I respect
20  what Andy Birchfield did.  I respect what
21  the two women lawyers in Texas did.  I
22  think they did a wonderful job giving a
23  basis in discovery.  But discovery was
24  ongoing.

Page 44

1         Lastly, I don't know --
2  well, that's my view.
3      Q.  Who were these five ethics
4  experts that the NPC consulted with?
5      A.  Okay.  We have to
6  distinguish between three experts and two
7  experts.
8      Q.  Okay.
9      A.  Professor Issacaroff; Dean
10  Sherman, now former Dean Sherman,
11  Professor Sherman; and Professor Baker.
12  Those were PSC consultants.  And I
13  privately had a consultant of my own, who
14  was not a PSC consultant.
15         Then there were two
16  consultants.  Professor Silver was
17  brought in by the Texas consortium, along
18  with Harry Potter.  They were concerned
19  with a particular ethics provision in
20  Texas law which eventually was presented
21  to the PSC.  So, those were the ethics
22  folks.
23      Q.  You claim in the brief that
24  you submitted in support of the fee

Page 45

1  application that one of the jobs of the
2  PSC was having to defend against
3  challenges made specifically by me to the
4  provision that required a lawyer to
5  either put all of his clients into the
6  private settlement or put none of his
7  clients in.  Do you recall making that
8  statement in the brief in support of the
9  fee application?
10      A.  Well, out of context, no.
11  In context, yes.
12      Q.  Can you tell me any ethics
13  expert that the NPC or the PSC consulted
14  or you consulted that said that that was
15  an appropriate term to include within the
16  settlement agreement with Merck?
17         MR. LEVIN:  I'm going to
18      object to this question.  We're
19      beyond that.  You lost this case
20      in Connecticut.  I don't know the
21      relevance of what's at issue
22      before this court.  Didn't you?
23         MR. STRATTON:  No, I don't
24      think we lost the case.  I think

12  (Pages 42 to 45)

Page 46

```
1   it was --
2         MR. LEVIN:  Well, you never
3   pursued it, did you, after the
4   judge said no?
5         MR. STRATTON: We did pursue
6   it.  The judge said that it wasn't
7   right.  And the judge encouraged
8   us to go to the proper ethics
9   folks, to the statewide bar, which
10  we did, and we got an ethics
11  opinion indicating that the
12  agreement between the NPC and
13  Merck was professionally not
14  acceptable, and it would result in
15  a lawyer being grieved in
16  Connecticut.  So, if that's a
17  loss, I'll accept it.
18        MR. LEVIN:  How does that
19  fit into this case now?
20        MR. STRATTON:  Because you
21  are claiming -- one of the claims
22  of the common benefit lawyers
23  through Mr. Herman, one of the
24  claims is that they had to defend
```

Page 47

```
1   this agreement against, quote,
2   unquote, unwarranted attacks.  And
3   I want to know if, in fact, these
4   attacks really were unwarranted.
5         THE WITNESS:  Yes, they were
6   unwarranted.
7   BY MR. STRATTON:
8         Q.    What support do you have for
9   the fact that -- for the provision that
10  was put into the global settlement
11  agreement that requires a lawyer to
12  either put all of his clients in or none
13  of his clients?
14        MR. LEVIN:  Hold it, Russ.
15  Wait a minute.
16        That calls for a conclusion
17  of law.  You file a brief.  We'll
18  file a brief.  And if it's
19  relevant and it gets before Judge
20  Fallon, Judge Fallon will rule on
21  it.  You're not going to be here
22  quizzing Mr. Herman about the law.
23  Read our briefs.  Put that in a
24  brief.  We will respond.
```

Page 48

```
1         MR. STRATTON:  So, are you
2   instructing Mr. Herman not to
3   answer the question?
4         MR. LEVIN:  Yes, yes.
5         MR. STRATTON:  It's our
6   position that when our
7   fiduciaries, when the Plaintiffs'
8   Steering Committee jams an
9   unethical settlement agreement
10  down the throats of 50,000
11  plaintiffs, that that's not
12  something which ought to equate to
13  a very large common benefit fee.
14        MR. LEVIN:  Read the
15  concurring opinion in Corn
16  Derivatives.
17  BY MR. STRATTON:
18        Q.   So, as you sit here right
19  now, Mr. Herman, are you refusing to
20  answer the question as to whether there
21  was any --
22        MR. LEVIN:  I'm directing
23  him not to.
24  BY MR. STRATTON:
```

Page 49

```
1         Q.   I'm asking if there was any
2   expert ethical consultant or an ethics
3   expert, any ethics expert that was
4   consulted that supported this provision
5   being put into the global agreement?
6         MR. LEVIN:  You can answer
7   the question.
8         THE WITNESS:  Yes.
9   BY MR. STRATTON:
10        Q.    Who?
11        A.    There was a consensus of the
12  experts that as long as an attorney had a
13  right to go to the presiding judge with a
14  problem, and as long as there was
15  alternative, that there was not an
16  ethical prohibition.
17        Q.    What was that alternative
18  that was in the particular agreement that
19  we're talking about?
20        A.    Same alternative you took.
21  You had 84 cases.  You elected to put 79
22  through the contract agreement and to
23  keep out the others.  I don't know what
24  your basis was, but you made an election.
```

13  (Pages 46 to 49)

Page 50

1  No one ever required you to jam down all
2  of your cases.
3      Q.   So, how many lawyers across
4  the country with Vioxx plaintiffs elected
5  to put in less than either all of their
6  plaintiffs?
7      A.   A number.  I can't tell you
8  the number.
9      Q.   Do you have any idea?
10     A.   I can't tell you.  But I can
11 tell you this:  That there never was a
12 requirement that I know about or any
13 attempt to have the PSC require a
14 particular lawyer to be penalized or
15 limited in any way if they elected not to
16 put all of their cases in.
17     Q.   How many ischemic stroke or
18 heart attack cases, I'm just talking
19 about the universe of cases that included
20 ischemic strokes and heart attacks or
21 sudden deaths, those that qualify at
22 least initially for the global
23 settlement, how many lawyers put in less
24 than all of their ischemic stroke, heart

Page 51

1  attack or sudden death cases?
2          MR. LEVIN:  I'm going to
3      object on relevance.  I mean, the
4      facts speak for themselves.  Look
5      how it was received.  99% of the
6      cases went in, and you're
7      speculating that somebody didn't
8      want the case put in.  They put
9      the case in, they got their money,
10     and they said thank you.
11 BY MR. STRATTON:
12     Q.   Now, what was the
13 consequence, Mr. Herman, if somebody
14 decided, if a lawyer decided to not put
15 all of their cases into the agreement?
16 What was the potential consequence?
17     A.   I have no idea, because we
18 were never confronted with that issue.
19     Q.   Well, it's right in the
20 settlement agreement, isn't it --
21     A.   We were never confronted --
22     Q.   -- the consequence?
23     A.   No, it's not.  You're citing
24 the agreement out of context.

Page 52

1      Q.   To paraphrase the agreement,
2  there's nothing in the agreement that
3  says if you put less than all of your
4  cases in, it disqualifies the cases that
5  you put in and may make you ineligible
6  for any fee?
7          MR. LEVIN:  Objection.
8      You're now getting involved in the
9      agreement itself.  Would you show
10     Mr. Herman the agreement and what
11     provision --
12 BY MR. STRATTON:
13     Q.   You don't recall that
14 provision?  You don't recall the
15 agreement having consequences for lawyers
16 who didn't put all of their cases in?
17         MR. LEVIN:  Objection to the
18     form.
19         THE WITNESS:  Sir, you have
20     stated out of context.  You have
21     to read the document in para
22     materia.  I believe that there's
23     also a transcript in which Judge
24     Fallon said that if anyone has a

Page 53

1      problem, they should come to the
2      judge.  I also think there's
3      language to that effect in the
4      agreement itself.  I also think
5      the language is there for a very
6      good reason -- several very good
7      reasons.
8  BY MR. STRATTON:
9      Q.   Did you consult with any
10 ethics experts at NYU Law School?
11     A.   I don't know whether
12 Professor Issacaroff was at NYU at the
13 time or Columbia.  The ethics person I'm
14 familiar with at NYU would have been, I
15 believe, Jeff Miller.  But I don't know.
16 All I can tell you is the individuals
17 that were consulted, I've named.
18     Q.   How about Dillers?
19     A.   Who?
20     Q.   How about Dillers at NYU?
21     A.   Who?
22     Q.   You're not familiar with
23 that name?
24     A.   No, I'm not familiar as you

14  (Pages 50 to 53)

Page 54

1  pronounce it.
2       Q.   Gillers?
3       A.   Would you please --
4       MR. LEVIN:  Gillers,
5  G-I-L-L-E-R-S.  Stephen Gillers.
6       MR. STRATTON:  That's it.
7       THE WITNESS:  There is a
8  professor with that name.  Was he
9  consulted?  No.  Well, he wasn't
10  consulted by the PSC.
11  BY MR. STRATTON:
12       Q.   Who was he consulted by?
13       A.   I have no idea whether he
14  was ever consulted.
15       MR. STRATTON:  I think this
16  is a great time -- what time is it
17  right now?
18       THE COURT REPORTER:  It is
19  10:26.
20       MR. STRATTON:  Why don't we
21  take a 10-minute break.
22            - - -
23       (Whereupon, a recess was
24  taken from 10:26 a.m. until 10:33

Page 55

1  a.m.)
2            - - -
3  BY MR. STRATTON:
4       Q.   Now, at some point in time,
5  and I believe it was in the summer of
6  2005, Mr. Birchfield at a status
7  conference asked the judge to allow the
8  Plaintiffs' Steering Committee to enter
9  into so-called contracts with various
10  attorneys who had represented Vioxx
11  plaintiffs?
12       MR. LEVIN:  Could you show
13  the witness the transcript,
14  please?  You are obviously reading
15  from it.
16       MR. STRATTON:  I'm not
17  reading from it, actually.
18  BY MR. STRATTON:
19       Q.   Do you recall discussions
20  within the Plaintiffs' Steering Committee
21  about offering specific contracts to
22  people who represented Vioxx plaintiffs?
23       MR. LEVIN:  Objection to the
24  form.

Page 56

1       THE WITNESS:  I don't
2  understand the question.
3  BY MR. STRATTON:
4       Q.   Do you know what the full
5  participation option contract is?
6       A.   Yes.
7       Q.   How did that come into
8  being?
9       A.   It came into being with
10  petition to The Court and a brief.
11       Q.   What was the genesis of the
12  decision to offer such contracts?
13       MR. LEVIN:  Objection to
14  form.
15       THE WITNESS:  Well, there
16  were basically three reasons.
17  Number one, as I recall, between
18  the 2001 or -- let's say the
19  drug went on the market in '99.
20  It was withdrawn in 2004.  There
21  had only been a couple of hundred
22  cases.  One of the reasons was to
23  have a gravitas in the MDL of
24  cases.  Another was to foster

Page 57

1  cooperation among lawyers that had
2  state cases and federal cases.
3  And the third was to provide,
4  since we were going to have to try
5  these cases on a case-by-case
6  basis, every case, to make sure
7  that when a lawyer undertook the
8  expense and the resources to try a
9  single case, that he would not
10  feel like he couldn't cooperate
11  with the other lawyers.
12  BY MR. STRATTON:
13       Q.   Why would he feel that he
14  couldn't cooperate?  What was the thought
15  behind that?
16       A.   The thought was that if
17  there was cooperation among state and
18  federal lawyers, and we had to try every
19  single case against Merck and we needed a
20  gravitas in the MDL, that these were all
21  good things to have.
22       Q.   And do you recall how many
23  cases were in the MDL, how many actual
24  individual cases were in the MDL prior to

15  (Pages 54 to 57)

| | Page 58 |
|---|---|

1  the full participation option being
2  offered?
3      A.   I don't know.  I know after
4  2004 and at about the time that we were
5  designated or appointed, there may have
6  been as many as 2,000 to 4,000 cases.
7      Q.   After offering the various
8  agreements which are actually attached to
9  Pretrial Order No. 19 -- and I'll have
10  this marked.
11            - - -
12          (Whereupon, Deposition
13      Exhibit Herman-1, Pretrial Order
14      No. 19, was marked for
15      identification.)
16            - - -
17  BY MR. STRATTON:
18      Q.   I've marked Pretrial Order
19  No. 19 with all the various -- there were
20  three different contract options attached
21  to Pretrial Order No. 19.
22          After offering that, did
23  that have the desired effect at least in
24  terms of your thinking, Mr. Herman, in

| | Page 59 |
|---|---|

1  terms of achieving your goals?  As you
2  said before, there were three different
3  goals?
4      A.   Well, I don't think the
5  goals were achieved just by Pretrial
6  Order No. 19.  In fact, there were
7  various factors that achieved goals.
8      Q.   How many cases ended up in
9  the MDL?
10          MR. LEVIN:  At what point in
11      time?
12  BY MR. STRATTON:
13      Q.   Prior to the announcement of
14  the settlement agreement between -- just
15  prior to the announcement of the
16  settlement agreement.
17      A.   I can't really tell you
18  because I don't recall how many cases
19  were on tolling agreements.
20      Q.   Who actually drafted the
21  contracts that are attached to Pretrial
22  Order No. 19?
23      A.   I don't recall.
24      Q.   Was it some member of the

| | Page 60 |
|---|---|

1  PSC?
2      A.   I'm certain that the drafts
3  were prepared by a member or members of
4  the PSC.
5      Q.   So, it was done at the
6  direction of members of the PSC, the
7  drafting of these contracts?
8      A.   Yes.
9      Q.   Was there some sort of a
10  vote among the PSC as to whether these
11  should be offered?
12      A.   There was discussion.
13      Q.   Did anybody dissent?
14      A.   Nobody dissented to drafts.
15      Q.   Did anybody dissent to the
16  general concept of offering these
17  contracts?
18      A.   Well, the contracts are part
19  of -- nobody objected to Pretrial Order
20  No. 19.  As I recall it, there were
21  Exhibits A, B and C attached and made
22  part of PTO 19 or referenced.  I don't
23  recall whether they were attached or not.
24      Q.   I'm going to show a

| | Page 61 |
|---|---|

1  transcript, July 19, 2005.  This purports
2  to be a transcript from the status
3  conference before the Honorable Eldon
4  Fallon on that date.
5          Beginning on Page 20 of that
6  transcript, Mr. Birchfield is discussing
7  apparently the PSC's desire that The
8  Court approve and allow these three
9  contracts to be offered, three contracts
10  we see in PTO number 19.
11          I'll show this to you.  Do
12  you recall that particular status
13  conference?
14          MR. LEVIN:  You pointed to
15      Page 20.  I would like the witness
16      to review the document you've
17      given him, and I guess you should
18      mark it.
19          MR. STRATTON:  Why don't we
20      refer to this as Exhibit Number 2.
21            - - -
22          (Whereupon, Deposition
23      Exhibit Herman-2, Transcript of
24      Status Conference on July 19,

16  (Pages 58 to 61)

Confidential

| Page 62 | Page 63 |
|---|---|
| 1     2005, was marked for | 1     position of the PSC at the time or I can |
| 2     identification.) | 2     go through it line by line. |
| 3        - - - | 3       A.   If Mr. -- |
| 4  BY MR. STRATTON: | 4       MR. LEVIN:  Here's what I |
| 5     Q.   Sir, you can take a look at | 5     would prefer.  I would prefer that |
| 6  it. | 6     the witness read Exhibit 2 and |
| 7     A.   What's the question? | 7     that you ask questions about it if |
| 8     Q.   Does that refresh your | 8     you so choose. |
| 9  recollection of -- | 9  BY MR. STRATTON: |
| 10     A.   No. | 10     Q.   Certainly.  The only section |
| 11     Q.   Were you at that particular | 11  that's relevant for my purposes -- I |
| 12  status conference? | 12  mean, you are certainly willing to read |
| 13     A.   I would have to -- it says | 13  whatever you want to read -- is Page 20 |
| 14  that I'm there.  I don't recall missing | 14  through Page 24. |
| 15  any status conferences until last year. | 15     MR. LEVIN:  We'll determine |
| 16  I missed a couple. | 16     what he should read. |
| 17     Q.   Well, I'm going to go | 17     Do you have an extra copy of |
| 18  through -- | 18     that? |
| 19     What I can do is you can | 19     MR. STRATTON:  No. |
| 20  either read the comments -- you can | 20     THE WITNESS:  (Reviewing |
| 21  either read what Mr. Birchfield said at | 21     document from 10:45 until 10:48.) |
| 22  that hearing and tell me whether or not | 22     MR. STRATTON: Let the |
| 23  you agree with the contents of what Mr. | 23     record reflect the time at which |
| 24  Birchfield said in terms of it being the | 24     we're beginning the reading of the |

| Page 64 | Page 65 |
|---|---|
| 1     transcript. | 1  Pretrial Order Number 19.  In particular, |
| 2     THE WITNESS:  Okay, sir. | 2  I would like you to identify for me |
| 3     I've reviewed Exhibit Number 2. | 3  anything in Exhibit A, the full |
| 4     What is your question? | 4  participation option, that creates any |
| 5  BY MR. STRATTON: | 5  sort of exception to a 2% fee in the |
| 6     Q.   Is it fair to say that at | 6  event of a so-called global settlement? |
| 7  that particular hearing, status | 7     MR. LEVIN:  I'm going to |
| 8  conference, that Mr. Birchfield is | 8     object to the form of that |
| 9  speaking on behalf of the Plaintiffs' | 9     question.  I don't think he can |
| 10  Steering Committee? | 10     answer it.  I would like him to |
| 11     A.   Yes. | 11     read it. |
| 12     Q.   Is there anything that Mr. | 12     MR. STRATTON:  I know he |
| 13  Birchfield says to the Court in Exhibit 2 | 13     can't answer it.  That's why I'm |
| 14  with which you disagree? | 14     asking. |
| 15     A.   No. | 15     MR. LEVIN:  He can't answer |
| 16     Q.   Did anybody take Mr. | 16     your question.  He can answer a |
| 17  Birchfield aside after the status | 17     fair, substantive question. |
| 18  conference at any time after the status | 18  BY MR. STRATTON: |
| 19  conference and say, you know, you didn't | 19     Q.   Can you show me anywhere in |
| 20  represent the PSC's position accurately? | 20  the full participation option that was |
| 21     A.   Not that I know of. | 21  drafted and created by the Plaintiffs' |
| 22     Q.   Now, I'm going to show you | 22  Steering Committee anything within that |
| 23  Exhibit Number 1, and in particular, I'm | 23  contract which would give notice to a |
| 24  going to ask you to review Exhibit A of | 24  signatory, an attorney representing Vioxx |

Page 66

1  plaintiffs, that this was not going to
2  apply to a quote, unquote global
3  settlement of all the claims?
4       A.   I'm not sure I understand
5  your question, but I'll look at the
6  document.
7       Q.   Of course you don't.
8       A.   I'm sorry?
9            MR. LEVIN:  Do you have Mr.
10  Stratton's comment?
11           THE COURT REPORTER:  Yes.
12           THE WITNESS:  I'm looking at
13  Exhibit Number 1, Pretrial Order
14  No. 19.
15           (Witness reviewing document
16  from 10:51 until 10:53.)
17           MR. LEVIN:  When you're
18  ready, I want the question
19  repeated.
20                - - -
21           (Whereupon, the requested
22  portion of the transcript was read
23  by the court reporter.)
24                - - -

Page 67

1            MR. LEVIN:  Objection to the
2  form, requires him to get into
3  somebody else's head.  And also it
4  calls for a legal conclusion.  And
5  you'll read our briefs.
6            Having made those
7  objections, I'm going to let the
8  witness answer that question the
9  way he wants to answer that
10  question.
11           THE WITNESS:  The answer is
12  yes.
13  BY MR. STRATTON:
14       Q.   The answer is yes.  Where
15  would that be?
16       A.   Pretrial Order No. 19,
17  Paragraph 6, which is read in connection
18  with Exhibit A, Exhibit B and Exhibit C.
19       Q.   So, the answer is, there's
20  nothing actually within the full
21  participation option which would alert a
22  signatory, someone representing Vioxx
23  plaintiffs, that this 2% agreement would
24  not apply in the event of a global

Page 68

1  settlement?  Is that your answer?
2            MR. LEVIN:  Objection to the
3  form for the same reasons.  Calls
4  for a legal conclusion.
5            THE WITNESS:  That's not my
6  answer.
7  BY MR. STRATTON:
8       Q.   But what you've done is
9  you've referred to something outside the
10  contract.  I'm not asking for you to
11  refer to something outside of the
12  contract.  I'm asking you to look at the
13  four corners of that contract and tell me
14  whether there's anything within the
15  contract --
16           MR. LEVIN:  Objection to the
17  form and --
18           THE WITNESS:  I'm hope --
19           MR. LEVIN:  -- your
20  statement "outside the contract."
21           THE WITNESS:  Hopelessly, I
22  am a Louisiana lawyer trained in
23  civil code interpretation, and we
24  read documents in para materia,

Page 69

1  which means we must read the
2  entire document in order to answer
3  your question.
4            The answer to your question
5  is, Pretrial Order No. 19, Exhibit
6  1, Paragraph 6.
7  BY MR. STRATTON:
8       Q.   Let me take a look at that
9  for a moment.
10       A.   (Handing over document.)
11       Q.   Can you help me out here,
12  because I don't see it in Paragraph 6.
13  There's only four sections here.  Maybe
14  I'm missing something.
15       A.   Sir, I've given you the
16  document.  It's in Paragraph 6.
17       Q.   There are actually --
18           Are you talking about the
19  6th paragraph of Pretrial Order No. 19?
20  One, two, three, four, five, this one?
21  There's no 6.  There's no 6.  There's not
22  even a 6 -- there's not even a number 6
23  anywhere in Pretrial Order Number --
24       A.   Okay.  That's your

18  (Pages 66 to 69)

Page 70

1    testimony. Mine is mine.
2        Q.   Now, are you talking
3    about -- I don't think I'm trying to trip
4    you up here. I'm just trying to get on
5    the same page.
6        A.   There's an Exhibit A, which
7    is attached to Pretrial Order No. 19.
8    That's the full participation option.
9    There is a paragraph enumerated number
10   6 --
11       A.   Correct.
12       Q.   -- actually within the
13   contract.
14       A.   Correct.
15       Q.   So, you've actually
16   identified something within the contract
17   which you say --
18       MR. LEVIN:  Wait. What's
19       within and what's without, that's
20       objectionable as to form. He's
21       told you as a Louisiana lawyer
22       what he thinks a contract
23       embodies.
24   BY MR. STRATTON:

Page 71

1        Q.   The bottom line is --
2        MR. LEVIN:  He used Latin.
3    BY MR. STRATTON:
4        Q.   -- as I understand it, these
5    full preservation option contracts were
6    sent out, and people had 90 days to
7    decide whether or not they wanted to
8    participate, and they had to sign the
9    agreement, full participation option, if
10   that's what they wanted, and get it back
11   to the PSC, right?
12       MR. LEVIN:  Right?  That's a
13       question or is that a statement?
14       MR. STRATTON:  Was that the
15       process?
16       MR. LEVIN:  It sounds
17       argumentative to me.
18   BY MR. STRATTON:
19       Q.   Wasn't that the process?
20       A.   Is that a question to me?
21       Q.   Yes, if you recall.
22       A.   It was one of the processes.
23       Q.   And so it's your testimony
24   today that in Paragraph 6 of the full

Page 72

1    participation option, which reads, "It is
2    understood and agreed that the PSC and
3    Common Benefit Attorneys may also apply
4    to the Court for class action attorneys'
5    fees and reimbursement of expenses, if
6    appropriate, and this Agreement is
7    without prejudice to the amount of fees
8    or costs to which the PSC and Common
9    Benefit Attorneys may be entitled to in
10   such an event."
11       Is that the paragraph that
12   you're referring to that alerts
13   signatories to this agreement that the
14   PSC -- that this agreement will not apply
15   in the event of a global settlement?
16       MR. LEVIN:  I have no idea
17       what your question is now, it is
18       so mumbo jumbo.   Objection to the
19       form.
20       MR. STRATTON:  I've been
21       doing this a while, and it just
22       doesn't sound mumbo jumbo to me.
23       It sounds pretty clear.
24       MR. LEVIN:  You've been

Page 73

1    listening to yourself for a while.
2    That's why.  To others it may
3    sound mumbo jumbo.
4        MR. STRATTON:  I don't think
5        that's true.
6        MR. LEVIN:  I don't think he
7        can answer that question.  That
8        question is convoluted.
9    BY MR. STRATTON:
10       Q.   What about this, what you
11   call this global settlement, what about
12   this global settlement is a class action?
13       MR. LEVIN:  Objection.  That
14       calls for a legal conclusion.
15       MR. STRATTON:  It's not a
16       class action, is it?
17       MR. LEVIN:  That calls for a
18       legal conclusion, what is a class
19       action.  Have you read Judge
20       Fallon's opinions?
21   BY MR. STRATTON:
22       Q.   On November 9, 2007 at 4:30
23   in the morning, did the PSC and Merck
24   enter into the settlement of a class

19 (Pages 70 to 73)

| Page 74 | Page 75 |
|---|---|
| 1  action? Is that what happened? | 1  is not silly. |
| 2  MR. LEVIN: Objection to the | 2  MR. LEVIN: Your questions |
| 3  form of the question. | 3  are silly. The way this case -- |
| 4  BY MR. STRATTON: | 4  BY MR. STRATTON: |
| 5  Q.  Is that what happened at | 5  Q.  This $400 million extra that |
| 6  4:30 in the morning on November 9, 2007? | 6  you guys have asked for depends on the |
| 7  MR. LEVIN: The document | 7  answer to this question. |
| 8  speaks for itself. | 8  Was the settlement -- |
| 9  BY MR. STRATTON: | 9  MR. LEVIN: We'll respond to |
| 10  Q.  The answer is no, right? | 10  you in briefing. |
| 11  MR. LEVIN: Your | 11  BY MR. STRATTON: |
| 12  characterization calls for a | 12  Q.  Was the settlement at 4:30 |
| 13  legal -- no. We'll take your | 13  in the morning on November -- |
| 14  deposition next. You answered | 14  MR. STRATTON: Maybe not in |
| 15  your own question. | 15  front of Judge Fallon but maybe at |
| 16  MR. STRATTON: I want an | 16  the Fifth Circuit. |
| 17  answer to the question. | 17  BY MR. STRATTON: |
| 18  MR. LEVIN: You answered the | 18  Q.  Was the settlement that was |
| 19  question. You said no. I'm | 19  entered on November 7 -- November 9, 2007 |
| 20  directing him not to answer that | 20  at 4:30 in the morning, do you |
| 21  question. You're being very | 21  characterize that as a settlement of a |
| 22  argumentative with him, and it's | 22  class action? |
| 23  getting silly. | 23  MR. LEVIN: Objection to the |
| 24  MR. STRATTON: $400 million | 24  form of the question. It calls |

| Page 76 | Page 77 |
|---|---|
| 1  for a legal conclusion, what is | 1  characterize a document? |
| 2  and what is not a class action and | 2  Q.  It -- |
| 3  what is a quasi class, what it is. | 3  A.  As a global settlement in |
| 4  That's something that The Court | 4  the context of a contract. That's how I |
| 5  will determine. | 5  characterize it. |
| 6  MR. STRATTON: Mr. Levin -- | 6  Q.  I'm going to give you a |
| 7  can we put Mr. Levin -- I don't | 7  chance here to say whether or not at 4:30 |
| 8  think we put you under oath. | 8  in the morning on November 9, 2007 was a |
| 9  MR. LEVIN: No, you haven't. | 9  class action settlement. Was that a |
| 10  MR. STRATTON: But you are a | 10  class action settlement? |
| 11  PSC member, so -- | 11  A.  I have told you what I |
| 12  MR. LEVIN: Yes, I am. | 12  characterize it as, and that's my answer. |
| 13  MR. STRATTON: So, I suppose | 13  Q.  Is it called a class action |
| 14  they are admissions in a way. | 14  settlement anywhere within the settlement |
| 15  MR. LEVIN: Well, I could | 15  agreement between the NPC members? |
| 16  admit a lot of things. | 16  MR. LEVIN: Is the word |
| 17  MR. STRATTON: In any | 17  "class" in the settlement |
| 18  event -- | 18  agreement? |
| 19  MR. LEVIN: And have. | 19  BY MR. STRATTON: |
| 20  BY MR. STRATTON: | 20  Q.  Does class action occur |
| 21  Q.  Do you have an answer to the | 21  anywhere in regards to -- anywhere within |
| 22  question or are you not going to answer | 22  the four corners of the -- |
| 23  the question? | 23  MR. LEVIN: Objection to the |
| 24  A.  What is the question? How I | 24  form of the question. Are you |

Page 78

1    asking whether the word "class"
2    appears in the agreement?  Are you
3    calling for a legal conclusion?
4    BY MR. STRATTON:
5        Q.   Is the agreement
6    characterized, anywhere within the four
7    corners of the, quote, unquote, global
8    settlement agreement, is that global
9    settlement agreement, anywhere within
10   that global settlement agreement, ever
11   characterized as a class action
12   settlement?
13           MR. LEVIN:  That calls for a
14       legal conclusion.  A Court looks
15       at a document --
16           MR. STRATTON:  I didn't
17       draft it.  You drafted it.
18           MR. LEVIN:  That's exactly
19       right.  You will read our brief.
20   BY MR. STRATTON:
21       Q.   I'm asking you for a factual
22   answer.
23           Did anybody place within the
24   four corners of that global settlement

Page 79

1    agreement a characterization of that as a
2    class action?
3            MR. LEVIN:  Objection.  The
4        document speaks for itself.  You
5        draw a legal conclusion when you
6        look at the document.
7    BY MR. STRATTON:
8        Q.   Are we going to answer the
9    question?
10       A.   Can I answer the question?
11           MR. LEVIN:  Do you know how?
12       Do you want to answer the
13       question, Mr. Herman?
14           THE WITNESS:  I'm going to
15       do my best.
16           MR. LEVIN:  Oh, okay.  We're
17       going to let him do his best.
18           THE WITNESS:  Here's my
19       best.  You asked me as to whether
20       anybody got notice of a global
21       settlement and its effect or a
22       global resolution.  I said yes,
23       it's in Paragraph 6 of A.  That's
24       notice.  There were other notices,

Page 80

1    but that's notice.
2            Then you asked me how to
3        characterize the MSA.  I
4        characterize the MSA as a global
5        resolution by contract that
6        lawyers on behalf of their clients
7        either elect to enter into or not.
8        That's the way that I characterize
9        it.
10           MR. LEVIN:  Are you
11       satisfied?
12   BY MR. STRATTON:
13       Q.   Was this agreement, this
14   global settlement agreement, done
15   pursuant to Rule 23 of the Federal Rules
16   of Civil Procedure in any way?
17           MR. LEVIN:  The global -- so
18       now you are on the MSA?
19           MR. STRATTON:  Exactly.
20           MR. LEVIN:  That embodies
21       Article 9?
22           MR. STRATTON:  The master
23       settlement agreement.
24           MR. LEVIN:  Okay.  And your

Page 81

1        question is?
2    BY MR. STRATTON:
3        Q.   Is there any part of that
4    MSA which was done pursuant to Rule 23?
5    I mean, was this a Rule 23 settlement in
6    any form?
7            MR. LEVIN:  Well, that calls
8        for a legal conclusion.  Read
9        article 9.
10   BY MR. STRATTON:
11       Q.   What is a class action?
12   You've been doing this for a while.
13           MR. LEVIN:  Are you quizzing
14       him on the law now?  What is a
15       Rule 23 class action?
16           THE WITNESS:  I'm going to
17       try to answer --
18           MR. LEVIN:  Do you think his
19       name is Herb Newburg.
20           THE WITNESS:   Let me
21       answer.  Just let me answer.
22           This is a contract.  Lawyers
23       either enter it for their clients
24       or they don't.  There are a number

21  (Pages 78 to 81)

Page 82

1      of different types of, quote,
2      class actions.  But this is a
3      contract agreement for a global
4      resolution.  "Global" means 85% of
5      all the claimants that had cases
6      had to enter in order for it to be
7      effected.  That's why it's global.
8      It is, in effect, global because
9      99.79% of all claimants upon the
10     advices of their lawyers felt it
11     was in their best interest to
12     enter into a contract and did so.
13           Now, I don't know how else
14     or how many other ways you can
15     explain it.
16  BY MR. STRATTON:
17     Q.  So, a signatory to this
18  contract would have read in Paragraph 1,
19  "It is the intention of the parties that
20  such assessment shall be in full and
21  final satisfaction of any present or
22  future obligation on the part of each
23  plaintiff and/or participating attorney
24  to contribute to any fund for the payment

Page 83

1      or reimbursement of any legal fees,
2      services or expenses incurred by or due
3      to the MDL and/or any common benefit
4      attorneys."
5           MR. LEVIN:  Are you reading
6      from Exhibit 1 or Exhibit 2 now?
7           MR. STRATTON:  I'm reading
8      right from Exhibit 1, reading from
9      Paragraph 1 of the full
10     participation option.
11           MR. LEVIN:  Go ahead.
12     Answer the question.
13           MR. STRATTON:  I don't think
14     there is a question.
15           THE WITNESS:  I don't
16     either.
17           MR. LEVIN:  I'm sorry.
18  BY MR. STRATTON:
19     Q.  So, is it your testimony
20  that a signatory to this agreement,
21  somebody representing Vioxx plaintiffs,
22  should have known when they read that
23  provision that this is the intention, to
24  be in full and final satisfaction of any

Page 84

1  obligation to the PSC?
2           MR. LEVIN:  Objection to the
3      form.
4  BY MR. STRATTON:
5     Q.   That they should have known
6  that if there was a quote, unquote,
7  global settlement, a mass settlement,
8  that that would somehow open up them to
9  pay more than 2%?
10           MR. LEVIN:  Objection to the
11     form.
12           THE WITNESS:  I don't know
13     what other lawyers read or how
14     they interpreted it.
15  BY MR. STRATTON:
16     Q.   Wasn't one of the points of
17  offering this particular option was to
18  encourage lawyers to be able to trust the
19  PSC that at the end of the case, the PSC
20  wasn't going to come in and dupe them and
21  ask for more than what had been agreed
22  to?
23           MR. LEVIN:  That question is
24     totally objectionable as to form.

Page 85

1      You've used some words in there
2      that you shouldn't use, Mr.
3      Stratton.
4  BY MR. STRATTON:
5     Q.   Mr. Herman, you've been
6  involved in many, many fee disputes
7  between PSCs and individual attorneys?
8     A.   That's not true.
9     Q.   Any, have you been involved
10  in any?
11     A.   That's true.
12     Q.   Isn't that one of the
13  concerns that individual attorneys have
14  about joining MDLs, because they're
15  concerned about what portion of their fee
16  may be subject to a common benefit
17  application at the end of the case?
18           MR. LEVIN:  Objection to the
19     form.
20           THE WITNESS:  I have never
21     had that concern.
22  BY MR. STRATTON:
23     Q.   Well, of course, because
24  you're on the other side, right?

22  (Pages 82 to 85)

Page 86

```
 1        A.   No, sir, I have been on the
 2   other side.
 3        Q.   How many cases did you have?
 4   How many Vioxx cases did you actually
 5   have in this office?  How many people did
 6   you represent who actually were injured
 7   by Vioxx?
 8        A.   I'll answer that, but I'll
 9   have to qualify it after I answer.
10   Somewhere between 100 and 150.  Once I
11   was appointed to the PSC and the
12   Executive Committee, I refused, this firm
13   refused to take any cases so that we
14   could not be accused of trying to use a
15   position to gather cases.  That's number
16   one.
17        Number two, because this
18   firm felt that there was a conflict, this
19   firm felt, between handling Bextra cases
20   and Celebrex cases, we refused to take
21   Bextra and Celebrex cases.
22        So, the number of our cases
23   was limited by two issues.
24        And third, the third issue
```

Page 87

```
 1   was, we had our own internal hired expert
 2   cardiologist to review cases in order for
 3   us to determine whether those cases were
 4   viable or not.
 5        Q.   When did you get your first
 6   Vioxx case in this office?
 7        A.   Sometime before --
 8        MR. LEVIN:  You know, I'm
 9   going to object to that on
10   relevance.  Of what relevance is
11   that?  Maybe you can tell me.
12   I'll step out in the hall with
13   you, and you can tell me.
14        MR. STRATTON:  Well, why did
15   you ask for my deposition?  I'm
16   assuming you're going to be asking
17   questions about my cases.
18        MR. LEVIN:  We're going to
19   be asking questions that are
20   relevant to your position here.
21        MR. STRATTON:  Are you going
22   to be asking questions about my
23   case?  If you're not going to be
24   asking questions about my cases or
```

Page 88

```
 1   what I do with my cases, then I
 2   won't continue along with this
 3   line of questioning.
 4        MR. LEVIN:  What's that,
 5   what's good for the goose is good
 6   for the gander law?
 7        MR. STRATTON:  Absolutely.
 8   That's what we're here for.
 9   Fallon thought that, hey, come on
10   down.  I do Herman; Herman does
11   me.
12        MR. LEVIN:  I think it's a
13   question of relevance.  I don't
14   understand the relevance of that
15   question, when you got your first
16   case.
17   BY MR. STRATTON:
18        Q.   When did you get your first
19   case?
20        MR. LEVIN:  When did you get
21   your first tooth?
22        THE WITNESS:  I don't mind
23   giving you a time frame as long as
24   I am not violating an
```

Page 89

```
 1   attorney-client privilege with my
 2   clients.
 3   BY MR. STRATTON:
 4        Q.   I will say the same thing
 5   later on, I assume.
 6        A.   Well, I don't know what
 7   you're going to say.  But I will answer
 8   your question as long as you agree that I
 9   haven't waived an attorney-client
10   privilege.
11        Q.   I agree to that.  And we'll
12   seal whatever portion of the record that
13   you want to seal in order to --
14        A.   My first case that this firm
15   took in was before the recall in 2004 and
16   certainly before I was appointed by Judge
17   Fallon to any leadership position,
18   period.
19        Q.   So, that's one case before
20   the withdrawal?
21        A.   No.  You said my first case.
22   I'm saying to you, I'm certain that I --
23        Q.   How many cases did you have
24   in this office before the withdrawal of
```

23  (Pages 86 to 89)

Page 90

1  Vioxx on the market in, what was it, late
2  September of 2004 or early October?
3      A.   I can't tell you.  We had a
4  number of them, and we rejected a number
5  of them.
6      Q.   How many?  A dozen, less
7  than a dozen?
8      A.   I can't tell you.  I don't
9  know.
10     Q.   You said that prior to being
11 appointed to the PSC, you had about 100
12 to 150.  Were those all cases pending in
13 the MDL or pending in Federal Court?
14     A.   My best recollection is, we
15 had cases yet to be filed, and we had
16 cases filed in Federal Court in the
17 Eastern District before the MDL panel
18 referred the matter to the Eastern
19 District to Judge Fallon.
20     Q.   How did you get these cases?
21 Were they based --
22     A.   I don't advertise, if that's
23 what you're asking.
24     Q.   Nor do I.

Page 91

1      A.   So, they were on referral.
2  I had clients --
3      Q.   Anymore.
4      MR. LEVIN:  Okay.  Did you
5  get did the "anymore"?
6      THE COURT REPORTER:  Yes.
7      THE WITNESS:  -- that the
8      firm had served who came in or had
9      been referred by doctors and other
10     lawyers, and I had cases on
11     referral.
12 BY MR. STRATTON:
13     Q.   Did you get the bulk of your
14 cases from one source?
15     A.   I doubt it.
16     Q.   Because it seems like you
17 went from having a relatively few number
18 of cases to all of a sudden having 150
19 cases.  That must have happened over a
20 reasonably short period of time after the
21 withdrawal.  I'm just wondering if there
22 was a point at which a bunch of cases all
23 came in?
24     A.   Not that I recall.  You mean

Page 92

1  from one source?  Let me answer it this
2  way.  From one source, no.  However, once
3  the product was withdrawn from the
4  market, there was generated publicity.
5  And my recollection is that between the
6  case being sent to Judge Fallon -- I'm
7  sorry.  Between the case being
8  withdrawn -- the product being withdrawn
9  from the market and the MDL being
10 configured, that we had a number of
11 inquiries generated, not just with --
12 with all COX-2s in addition --
13     Q.   Who handled --
14     A.   Wait a minute.
15     Q.   Sorry.  Keep going if you're
16 still answering.
17     A.   Never mind.
18     Q.   Who or whom in your office
19 handled these individual cases?
20     MR. LEVIN:  I'm objecting on
21     relevance, but if you want to find
22     out how Russ became so successful,
23     be my guest.
24     MR. STRATTON:  I just want

Page 93

1      to know how he handles his
2      manpower distribution.
3      MR. LEVIN:  Very
4      effectively.
5  BY MR. STRATTON:
6      Q.   How did you manage these
7  100, 150 files in your office?  Was there
8  a particular lawyer or lawyers assigned
9  to it, paralegals assigned to it?  I
10 don't need names.  I just need --
11     A.   Yes.  We had a lawyer who is
12 brilliant that understands the law who
13 gave me advices on the law.  I have
14 probably, in my view, one of the finest
15 case administrators in my firm who looks
16 at the particulars, and I do whatever I
17 do.  We had paralegals.  And from time
18 to time, we have a physician lawyer of
19 counsel, and I might have asked him some
20 questions.  I mean, I don't know.
21     Q.   Well, you know, for example,
22 in our office, if there's an intake of a
23 case, that goes to a lawyer and then to a
24 paralegal.  Does a lawyer talk to the

Page 94

1    client initially?
2        A.   I'm not going to answer the
3    question, whether my co-counsel objects
4    or not, to how I run my office.
5        MR. LEVIN:  I was just
6        interested, Russ.
7    BY MR. STRATTON:
8        Q.   Why won't you tell me how
9    you handle these cases?
10       MR. LEVIN:  Because that's
11       totally not relevant.
12       THE WITNESS:  It is none of
13       your business.
14       MR. LEVIN:  That's right.
15       It's a none of your business
16       objection.
17   BY MR. STRATTON:
18       Q.   So, what effort you and your
19   firm put into the individual cases is not
20   my business?
21       A.   That's correct.
22       Q.   Because the effort of an
23   individual lawyer and how much time and
24   effort he or his firm put into an

Page 95

1    individual case is not relevant to your
2    fee application on behalf of the common
3    benefit attorneys?
4        A.   That's correct.
5        MR. LEVIN:  I'm going to
6        object.
7        THE WITNESS:  That's
8        correct.
9        MR. LEVIN:  I'm going to
10       direct him not to answer.
11   BY MR. STRATTON:
12       Q.   Why is it not relevant?
13       A.   Because it is an individual
14   time issue with individual clients, and
15   we are not allowed to submit that time.
16       Q.   Paralegals and secretaries
17   and lawyers aren't keeping time records
18   as to how much time they are putting into
19   an individual case?
20       A.   I didn't say that.  Let me
21   say to you that we are prevented from
22   submitting time to a Court-appointed CPA
23   that is spent on individual cases.
24   Therefore, no time on individual cases

Page 96

1    was submitted in connection with any
2    reporting required by the Court.
3    Anything else that I did or my firm did
4    in handling our own caseload is none of
5    your business.
6        Q.   Now, do you speak on behalf
7    of all the common benefit attorneys when
8    you filed this application for common
9    benefit fee of 8% in the Vioxx case?
10       A.   Do I speak for what?
11       MR. LEVIN:  The document
12       speaks for itself.
13   BY MR. STRATTON:
14       Q.   When you filed the
15   application for a common benefit fee,
16   were you speaking on behalf of the entire
17   group of common benefit attorneys?
18       A.   My belief is and
19   recollection is that -- are you talking
20   about all or just PSC members?
21       Q.   I'm just wondering who the
22   heck it is you represent.  I mean, what
23   is your role?
24       MR. LEVIN:  Let's stop right

Page 97

1    here.  We didn't put this on the
2    record.
3        Could you tell the court
4    reporter who you represent here in
5    this deposition.
6        MR. STRATTON:  You are going
7    to have an opportunity --
8        MR. LEVIN:  We should have
9    put it on at the beginning.  I
10   don't know.  Who do you represent?
11       MR. STRATTON:  I think Mr.
12   Herman is being deposed right now.
13       MR. LEVIN:  No.  This is for
14   the court reporter, just for her.
15   Who do you represent here?  You
16   don't want to tell us?
17       MR. STRATTON:  I don't --
18       MR. LEVIN:  Tell me who you
19   represent.
20       MR. STRATTON:  I think this
21   is out of order.
22       MR. LEVIN:  Wait, who you
23   represent is out of order?  She
24   has to put it in the transcript.

25  (Pages  94 to  97)

Page 98

1    MR. STRATTON: I'm here
2 because Judge Fallon told me to
3 take Mr. Herman's deposition, and
4 Judge Fallon told Mr. Herman to
5 take my deposition.  That's why
6 I'm here right now.
7    MR. LEVIN:  Okay.
8    THE WITNESS:  I
9 represented, among others, the
10 Negotiating Plaintiffs' Committee
11 appointed by four judges.  Was I
12 speaking for all plaintiff lawyers
13 that had cases?  I don't think so.
14 But I was speaking for all
15 plaintiff lawyers who entered a
16 contract known as the MSA.
17 BY MR. STRATTON:
18    Q.   When you filed a petition
19 for the common benefit fee asking for the
20 8%, who were you representing?  Are you
21 representing all common benefit
22 attorneys?
23    A.   I'm representing any common
24 benefit attorney whose work inured to

Page 99

1 common benefit and who entered a
2 contract.  I'm not speaking for any
3 attorney that did not do common benefit
4 work.  I'm not speaking for any attorney
5 who did not enter a contract.
6    Q.   What contract is that?
7    A.   MSA.
8    Q.   That's the master settlement
9 agreement?
10    A.   Correct.
11    Q.   Were there any members, any
12 common benefit attorneys, specifically,
13 to your knowledge, who objected to this
14 filing of an 8% fee request either on the
15 PSC, the NPC or anybody else?
16    A.   There was a meeting of the
17 PSC.  Those that attended approved.
18 Subsequently, Mr. Ranier, on behalf of
19 the Texas consortium and himself, did not
20 approve, and since then, he has approved.
21 So, other than that, I don't know, other
22 than the fact that I understand that you
23 were appointed for all the objectors, and
24 you have more knowledge than I do about

Page 100

1 who they are and why they object and what
2 they did or didn't do.
3    Q.   Has any deal been struck
4 with any lawyer to the MSA, any lawyer
5 who is part of the MSA, regarding the
6 amount of common benefit fee they would
7 have to pay?
8    A.   No.
9    Q.   So, at this point in time,
10 we're awaiting the judge's ruling on an
11 appropriate fee amount, and you're
12 telling me that lawyers involved in this
13 particular litigation will pay what Judge
14 Fallon says they have to pay, and there's
15 no separate piece that's been reached by
16 any party out there as to how much money
17 they are going to have to pay for common
18 benefit fees out of their cases?
19    A.   No agreement has been
20 reached with any lawyer that I know about
21 that has or had or will have a Vioxx case
22 that is different than whatever Judge
23 Fallon rules.
24    Q.   Now, have you been able to

Page 101

1 calculate the number of hours your firm
2 has invested on the individual cases?
3 I'm not talking about this firm and your
4 involvement with the common benefit work
5 and work that inured to the common
6 benefit.  I'm talking about just these
7 100 to 150 cases.
8    MR. LEVIN:  Objection to
9    relevance.
10    THE WITNESS:  No.
11 BY MR. STRATTON:
12    Q.   So, you have no idea how
13 many hours?
14    A.   No.
15    Q.   How many cases of the 100,
16 150 actually qualified for the settlement
17 program?
18    A.   Oh, I think less than 100.
19    Q.   Do you know what the gross
20 settlement amount was for all of those
21 less than 100 cases that qualified?
22    MR. LEVIN:  Objection.  It
23    is just not relevant.
24    THE WITNESS:  I think it is

26  (Pages 98 to 101)

| Page 102 | Page 103 |
|---|---|
| 1     about the same as yours, but I | 1     Q.   Are some of those hundred |
| 2     don't know. | 2  cases that qualified for the program, |
| 3  BY MR. STRATTON: | 3  were they cases that were referred to |
| 4     Q.   What's your understanding of | 4  your office by other lawyers? |
| 5  mine? | 5     A.   I'm assuming that within the |
| 6     A.   8 million plus. | 6  caseload, there are some. I do know that |
| 7     Q.   Do you have to pay, to your | 7  there was substantial inventories |
| 8  knowledge, and I won't specifically -- | 8  rejected after I was appointed. |
| 9  you can't know as to each individual | 9     Q.   And you had each one of your |
| 10  case. Are most of those cases referral | 10  cases reviewed by a cardiologist or at |
| 11  cases where you have to pay a referral | 11  least most of your cases reviewed? |
| 12  fee? | 12     A.   I would say that all of our |
| 13     A.   I don't know. | 13  cases were reviewed by a lawyer, that |
| 14     Q.   Is a referral fee legal | 14  many of our cases were reviewed by a |
| 15  around here in New Orleans? I'm | 15  cardiologist, and many of our cases were |
| 16  unfamiliar with whether New Orleans | 16  reviewed by nurse paralegals in addition |
| 17  allows the traditional one-third fee, | 17  to lawyers. |
| 18  that sort of thing. | 18     Q.   Who did you use as a |
| 19     A.   I think you should consult a | 19  cardiologist? |
| 20  Louisiana lawyer as to that. | 20     MR. LEVIN: Objection. You |
| 21     Q.   Well, I am. | 21  are well beyond anything -- |
| 22     MR. LEVIN: We're not here | 22     THE WITNESS: I'm not going |
| 23  to give you expert opinion. | 23  to tell. It is none of your |
| 24  BY MR. STRATTON: | 24  business. They are my cases. I |

| Page 104 | Page 105 |
|---|---|
| 1     don't have to disclose to you who | 1  administered the settlement program, is |
| 2  I go to to review my cases. | 2  that fair to say, Brown Greer? |
| 3  BY MR. STRATTON: | 3     A.   In the general sense, yes. |
| 4     Q.   Am I going to have to do the | 4     Q.   Let me step back a second. |
| 5  same thing? I'm going to have to | 5  At the time when the full participation |
| 6  disclose who I go to? | 6  option agreements were offered, was the |
| 7     A.   I don't know. | 7  Plaintiffs' Steering Committee handling |
| 8     MR. LEVIN: You haven't | 8  class actions in the MDL? |
| 9  heard the questions yet. | 9     A.   At the time -- well, there |
| 10     MR. STRATTON: Just tit for | 10  were certainly class actions filed, but |
| 11  tat. That's all. | 11  to my recollection, they were deferred. |
| 12     MR. LEVIN: We haven't | 12  So, I don't know what "handling" means. |
| 13  titted yet. | 13     Q.   So, what sorts of class |
| 14  BY MR. STRATTON: | 14  actions were you referring to? |
| 15     Q.   Now, do you know, what did | 15     A.   I can't recall, but there |
| 16  the -- | 16  were class actions filed. |
| 17     Brown Greer handled the | 17     Q.   Were they consumer class |
| 18  administration of the settlement program | 18  actions? |
| 19  in terms of -- | 19     A.   I can't recall. |
| 20     A.   The contract agreement? | 20     Q.   But certainly -- |
| 21  Yes. | 21     A.   Every person that purchased |
| 22     Q.   In terms of handling the | 22  a pill was a consumer. So, in that |
| 23  documents that came in and making sure | 23  sense, yes. But I don't recall all of |
| 24  all the documents were -- I mean, they | 24  the class actions that were filed. |

Confidential

| Page 106 |
|---|

1      Q.   Well, certainly when the
2   full participation option was offered by
3   the PSC, we had had, actually, a
4   Connecticut consumer class action that
5   had been transferred down here to the
6   MDL, which we were told was being handled
7   by the Plaintiffs' Steering Committee.
8      A.   Are you asking me a
9   question?
10         MR. LEVIN: Objection to the
11      form. Wait.
12   BY MR. STRATTON:
13      Q.   Do you recall that?
14         MR. LEVIN: Whoa, whoa. You
15      were told. Who told you?
16         THE WITNESS: I never had
17      such a conversation with you. I
18      didn't even know you existed until
19      you filed an objection.
20   BY MR. STRATTON:
21      Q.   Normally I would be hurt,
22   but I won't be hurt.
23         MR. LEVIN: You should be.
24   BY MR. STRATTON:

| Page 107 |
|---|

1      Q.   Did you have somebody on the
2   Plaintiffs' Steering Committee back when
3   Pretrial Order No. 19 was issued? I
4   guess I'm talking about -- I'm referring
5   to Exhibit 1 again, which is dated August
6   4, 2005. At that point in time, was
7   there a member of the PSC who was charged
8   with looking after any class actions that
9   had been brought into the MDL?
10      A.   I can't answer the question
11   the way you phrased it. I can tell you
12   that -- what I can tell you is that
13   several pretrial orders were issued
14   before Pretrial Order 19. I believe they
15   reference or there was at least at the
16   status conference a report that there
17   were class actions. As far as I know,
18   there was no member of the PSC who wasn't
19   familiar with class actions as such.
20      Q.   But certainly individual
21   lawyers signing a full participation
22   option would understand at the time he
23   signed that that not only did the MDL
24   have many individual cases, it also had

| Page 108 |
|---|

1   class actions?
2         MR. LEVIN: Objection to
3      form. I don't know what somebody
4      else would have understood. Only
5      they would know that.
6   BY MR. STRATTON:
7      Q.   Well, certainly if you
8   looked at the record, you would know that
9   the PSC was managing class actions as
10   well as individual cases?
11         MR. LEVIN: Who would know?
12         THE WITNESS: I don't know
13      what anybody did.
14   BY MR. STRATTON:
15      Q.   As of August of 2005.
16      A.   My best recollection is that
17   to this day, I don't know what individual
18   lawyers comprehended at that period of
19   time. I mean, there were over 1,200
20   lawyers, I think, or law firms. I don't
21   know how many lawyers.
22      Q.   In your experience, when
23   does a court set the fee in a class
24   action?

| Page 109 |
|---|

1         MR. LEVIN: Objection to the
2      form.
3   BY MR. STRATTON:
4      Q.   The fee for the attorneys.
5      A.   The fee in what?
6      Q.   In a class action.
7      A.   It depends. I mean, it
8   is -- it depends. Well, here's the
9   answer. In Louisiana and in Federal
10   Courts, the presiding judge has the
11   authority to superintend, monitor and
12   determine whether any fees are reasonable
13   or not. So, the fees are set at such
14   time as a court believes that they are
15   reasonable.
16      Q.   But fees for unrepresented
17   people need to be set by the Court,
18   right, in your experience in class
19   actions?
20         MR. LEVIN: Objection.
21         THE WITNESS: My
22      experience --
23         MR. LEVIN: This is
24      argumentative, it calls for legal

28  (Pages 106 to 109)

Page 110

1    conclusions, and now you're
2    talking about unrepresented
3    people.  Objection to form.
4         THE WITNESS:  As far as I
5    know, there were never
6    unrepresented people, because at
7    our request or at our -- at some
8    point, our suggestion to the Court
9    was there were going to be pro
10   ses, and the Court had been
11   receiving pro se information.
12   The Court appointed Robert
13   Johnston to represent pro ses.  At
14   what point, I don't know.  But
15   when you talk about unrepresented
16   people, you know, I don't know who
17   they are.  When they call here and
18   they are not represented, I refer
19   them to Mr. Johnston, in some
20   instances to the Special Master,
21   and in other instances, if they
22   want an attorney, I refer them to
23   you and Ms. Oldfather.
24   BY MR. STRATTON:

Page 111

1         Q.   Now, in August of 2005, and
2    I'm talking about consumer class actions,
3    had the Court set the fee to be paid
4    for -- had the Court set the fee the
5    class had to pay in consumer class
6    actions if there was a recovery in August
7    of 2005?
8         A.   To my knowledge, The Court
9    has never set a fee in this case other
10   than a reduction in contingent fees for
11   individual cases as between a lawyer and
12   a lawyer's client.
13        Q.   Now, did people from your
14   office meet --
15             When the MSA came out, when
16   the settlement program came out, did you
17   have people from your office meet with
18   each individual plaintiff to discuss
19   joining the settlement program?
20             MR. LEVIN:  Object to the
21   relevance.
22             THE WITNESS:  I'm not going
23   to discuss with you what our
24   personal office procedures were

Page 112

1    regarding our individual clients.
2    BY MR. STRATTON:
3         Q.   Well, I'm just curious as to
4    how it was decided that you put all of
5    your plaintiffs into the settlement
6    agreement.
7         A.   Ask me that question, and
8    I'll answer it.
9             MR. LEVIN:  That's the
10   question?
11             MR. STRATTON:  That's the
12   question.
13             THE WITNESS:  There were 17
14   trials.  Those trials cost
15   plaintiffs a $1,300,000.
16             MR. LEVIN:  Each?
17             THE WITNESS:  Each.  There
18   was a very -- a process by which
19   the negotiating committee under
20   folks reviewed inventories that
21   they had in order to establish a
22   certain grid.  I presume Merck had
23   folks on their side to do it, but
24   I don't know that.  I don't know

Page 113

1    what Merck did.  But I made the
2    decision that it was in my best
3    clients' interest, my clients'
4    best interest to enter all of the
5    cases because they would come out
6    better in the long run by having
7    those cases entered into a
8    contract called the MSA than
9    trying those individual cases.  My
10   clients were entered according to
11   my best judgment.
12   BY MR. STRATTON:
13        Q.   Did you give your clients a
14   decision or was it --
15        A.   I'm not telling you what --
16        Q.   Or was it --
17        A.   I'm not telling you what our
18   procedures are with individual clients.
19        Q.   Now, at the time when the
20   settlement program was announced, you had
21   the benefit of knowing what the trial
22   notebook looked like, right?
23        A.   What the what?
24        Q.   The trial package.

29  (Pages 110 to 113)

Page 114

1    A.   Yes, with an explanation.
2    The chief responsibility of -- in this
3    case was to create a trial package which
4    in our judgment would allow a law firm to
5    try the individual cases for somewhere
6    between $200,000 and $250,000 rather than
7    spend a million and a million and a half
8    dollars.  We accelerated the trial
9    package in order to give folks a choice
10   as to whether they wanted to take the
11   trial package and try their cases or
12   whether they didn't.  The trial package
13   was fundamentally complete.  It was
14   reviewed.  It was available.  It's still
15   available.  And it's still being
16   supplemented.  Any lawyer that wants to
17   try a case, the depository is fully open,
18   the trial package is available, they
19   merely have to sign a confidentiality
20   agreement.  And if they try their cases,
21   then A applies.  If they don't try their
22   cases and they enter the settlement, then
23   the contract, global contract applies.
24   Q.   Is it your testimony that

Page 115

1    the individual lawyer advising -- who is
2    trying to advise his clients as to
3    whether to join the settlement program or
4    not had the advantage of reviewing the
5    trial package?
6    A.   Yes.  It was announced.
7    Q.   And it is your recollection
8    that it was announced prior to the
9    deadline for the -- the initial deadline
10   for applying for the program?
11   A.   I can't give you the exact
12   date, but it was announced, and the
13   compliance, 90-day compliance, was
14   expended several times.  So, I can't tell
15   you that.
16   Q.   Now, I know you don't know
17   who the hell I am or didn't know who I
18   was until I filed the objection, but --
19   A.   No, that's not true.  I had
20   never heard of you in connection with
21   Vioxx before you filed your objection.
22   Q.   So, you wouldn't recall the
23   four letters that I sent requesting the
24   trial package, the note that I sent to

Page 116

1    Judge Fallon requesting the trial package
2    so that I could advise my clients as to
3    the --
4    A.   If you --
5    Q.   -- as to the contents of
6    that package and make an educated
7    recommendation to my clients?
8    A.   I don't recall it at this
9    time, no.
10   Q.   Okay.
11   A.   Do you have them with you?
12   I'd be happy to look at them.
13   Q.   You don't recall many
14   lawyers being upset by the fact that they
15   did not have access to the trial package
16   prior to the deadline for joining the
17   program?
18   A.   I will say to you that the
19   deadline was extended many times.  I
20   don't know which deadline you're talking
21   about, but I can categorically state that
22   in open court, during status conferences,
23   I have repeatedly said the trial package
24   is available, and the depository is

Page 117

1    available, made special accommodations,
2    which were never accepted until today.
3    Q.   Was there some sort of
4    problem with encrypting the trial
5    package?
6    A.   No.  The trial package was
7    made in such a way as it could be
8    accessed once a lawyer complied.
9    Q.   Do you think it would be
10   fair to make lawyers decide whether or
11   not to recommend the settlement program
12   to their clients without having the
13   benefit of the settlement -- of the trial
14   package?
15   MR. LEVIN:  Objection to the
16   form, and you're being
17   argumentative.
18   THE WITNESS:  I've told you
19   before, I think that we were
20   reasonable.  I think that we were
21   fair.  I think that lawyers made a
22   choice.  You know, that's all I
23   can tell you.  Lawyers had a
24   responsibility, and they made

30 (Pages 114 to 117)

Page 118

```
 1      their choices.
 2  BY MR. STRATTON:
 3      Q.   Now, one of the arguments or
 4  one of the points that you make in the
 5  common benefit fee application to Judge
 6  Fallon is that there are a lot more
 7  common benefit lawyers that are now
 8  involved in the case that were involved
 9  back when the full participation option
10  was initially offered.
11      A.   Yes.
12      Q.   Do you recall making that
13  point?
14      A.   It is an out of context
15  statement, but generally, yes.
16      Q.   But the corollary to that is
17  that there are exponentially more cases
18  involved in the global settlement, as you
19  call it, than there were in the MDL back
20  in 2005 when the agreement was offered,
21  right?
22      A.   I think that there was an
23  expansion of cases from the time the MDL
24  was sent to New Orleans until post MSA.
```

Page 119

```
 1      Q.   I think Mr. Birchfield says
 2  on Page 20 and after in Exhibit 2, I
 3  believe, something to the effect that
 4  there were like -- well, let me not refer
 5  to a document when I can't seem to find
 6  the actual point that I want to refer to.
 7          But is it not fair to say
 8  that from summer of 2005 to today, we've
 9  gone from having about 5,000 cases
10  involved in the MDL to now having some
11  50,000 cases, individual cases being
12  involved in the settlement program?
13      A.   I think it is a non
14  sequitur, but --
15      MR. LEVIN:  Objection.
16  BY MR. STRATTON:
17      Q.   I mean, as I understand it,
18  the common benefit fee petition that
19  you've submitted would apply to every
20  single case that was eligible for the
21  settlement program, right?
22      A.   No.
23      Q.   Which cases wouldn't it
24  apply to?
```

Page 120

```
 1      A.   It wouldn't apply to those
 2  that weren't found eligible.
 3      Q.   True.  Well, it would apply
 4  later, would it not?
 5      A.   It would not apply to those
 6  that were not found eligible.
 7      Q.   What would apply to those?
 8      A.   I don't know.  But if they
 9  weren't found eligible, I don't know what
10  they did.  Did they go try their case?
11  If they tried their case, it would be a
12  2-1.
13      Q.   What about the five cases
14  that our firm did not include in the
15  settlement agreement?
16      A.   I think if you signed a
17  participation agreement under A, it would
18  be a 2-1, and you would get a trial
19  package, and you would get access to the
20  depository.
21      Q.   Well, that's nice to know.
22      MR. LEVIN:  Nice to know?
23  So clear.
24      MR. STRATTON:  At least I
```

Page 121

```
 1  can protect five of my cases.
 2      MR. LEVIN:  It is obvious
 3  what it was.
 4      MR. STRATTON:  Really?
 5      MR. LEVIN:  Yes.
 6  BY MR. STRATTON:
 7      Q.   So, how many cases were
 8  deemed eligible for the MSA or the
 9  settlement program?
10      MR. LEVIN:  May I hear that
11  question again.
12  BY MR. STRATTON:
13      Q.   How many approximately?  You
14  can't possibly give me an exact number,
15  although you surprise me.  How many cases
16  were actually deemed eligible for a
17  payment under the settlement program?
18      MR. LEVIN:  You mean as of
19  today?
20      MR. STRATTON:  As of today.
21      MR. LEVIN:  If he knows?
22  And it is an approximation, and
23  you'll be surprised.
24      MR. STRATTON:  I may.
```

31 (Pages 118 to 121)

Page 122

1    THE WITNESS: How about
2    between 40,000 and 60,000.
3    BY MR. STRATTON:
4    Q.  Okay. How much money in
5    terms of gross amount of money are you
6    talking about? I mean --
7    A.  How much money for what?
8    Q.  We know it's 5 and a half
9    billion, right?
10    A.  No. Where did you get that?
11    Q.  We know that the total
12    amount that's going to be paid out under
13    this program is 5 billion, somewhere in
14    that range?
15    MR. LEVIN: Close.
16    THE WITNESS: It's close.
17    4.85.
18    BY MR. STRATTON:
19    Q.  That includes, what is it,
20    850 for the strokes and 4 billion for the
21    heart attacks and sudden deaths? Is
22    that --
23    A.  Well, I don't think that's
24    it because I think there are other

Page 123

1    elements. I mean, I think that's a
2    partial statement.
3    Q.  Is there any --
4    So, this 4.85 billion, this
5    unit covers a universe of what percentage
6    of the total number of Vioxx claims,
7    whether filed in state court or Federal
8    Court --
9    A.  99.79%.
10    Q.  What percentage of the cases
11    were in the MDL back in July, August of
12    2005?
13    A.  I don't know.
14    Q.  Would you agree with me that
15    it was far less than 50% were in the MDL
16    at the point when the limited
17    participation option was offered?
18    A.  I don't know. I believe --
19    but in fairness, that seems reasonable.
20    Q.  So --
21    A.  My --
22    Q.  So, while it's fair to say,
23    and I understand your point, that there
24    are lot more mouths at the trough in

Page 124

1    terms of common benefit fee lawyers who
2    now want a part of this overall fee --
3    MR. LEVIN: Objection to
4    the --
5    BY MR. STRATTON:
6    Q.  -- there's also a lot more
7    money available, and we're talking about
8    almost the entire universe of Vioxx
9    cases --
10    MR. LEVIN: Objection to the
11    form.
12    BY MR. STRATTON:
13    Q.  -- from which they can draw
14    a fee?
15    MR. LEVIN: Still objection
16    to the form.
17    THE WITNESS: If that is an
18    analogy, then I reject it, because
19    it's a propter hoc analogy. You
20    have an association, but you don't
21    have a connection.
22    BY MR. STRATTON:
23    Q.  Now, you said that one of
24    the reasons that you wanted to offer this

Page 125

1    limited participation or full
2    participation option of 2% was because
3    you wanted to create gravitas for the
4    MDL?
5    A.  That's one of several
6    reasons.
7    Q.  One of three reasons?
8    A.  Uh-huh.
9    Q.  And what were you going to
10    use this gravitas for?
11    A.  Well, the more gravitas you
12    have, the more resources that you have
13    among law firms. And Judge Fallon's
14    instruction in Propulsid, in Vioxx and
15    now in Drywall is don't limit
16    participation to just PSC members. So,
17    an effort is made, particularly when you
18    are threatened with a scorched earth
19    policy by a defendant, to get as many
20    lawyers involved in the process.
21    Q.  Is it fair to say that it's
22    much harder to settle the case if you
23    only control part of the group of
24    plaintiffs?

Page 126

1    A.   That's not --
2         MR. LEVIN:  Objection to
3    form.
4         Go ahead and answer the
5    question.
6         THE WITNESS:  That's not my
7    experience at all.  My experience
8    has been that lawyers go out with
9    an inventory, they participate
10   generally, but then they go off
11   piecemeal and try and settle their
12   own cases without regard to the
13   folks that are left behind.
14   That's the general practice.
15        Judge Fallon directed us
16   that there would not be piecemeal
17   inventory settlements, that he did
18   not want any claimant to suffer
19   because -- or be disadvantaged to
20   another claimant.
21   BY MR. STRATTON:
22   Q.   What cases have you been
23   involved in that involve piecemeal
24   inventory settlement?

Page 127

1    A.   The last one.
2    Q.   Which was what?
3    A.   Rezulin.
4    Q.   Anything else, any other
5    cases?
6    A.   Lots of them.  You know, I
7    can't give you all the names, but, I
8    mean, tobacco.
9    Q.   Right.
10   A.   There are a number of cases.
11   But my experience, this firm's experience
12   has been that many firms engage in
13   inventory settlements.  And my own view
14   is I don't like them.  My own view is
15   that I follow the Court's directive.
16   Judge Fallon made it very clear.
17   Q.   And the reason you don't
18   want to see fragmented inventory
19   settlements is because it has a tendency
20   to have similarly situated plaintiffs be
21   treated differently, right?  Isn't that
22   Judge Fallon's concern?
23   A.   Well, Judge Fallon has
24   expressed equitable treatment that he has

Page 128

1    indicated is not achieved through
2    inventory settlements.
3    Q.   It's achieved through a
4    quote, unquote, global settlement where
5    similarly situated people are treated
6    similarly, right?
7    A.   If lawyers choose, yes.
8    Q.   So, one of the reasons for
9    creating this gravitas was to be able to
10   create a global settlement where
11   similarly situated people --
12        MR. LEVIN:  Objection to the
13   form.
14        THE WITNESS:  No.  I've
15   explained it to you.  We didn't
16   think there would ever be a global
17   settlement.  The gravitas was
18   created in order to muster as much
19   resources as we could, because we
20   knew we were going to have to try
21   every single case.  And we never
22   knew at any point that there would
23   be a settlement unless we could
24   demonstrate, whether it was 10

Page 129

1         cases, 100 cases or 1,000 cases,
2         that we would be willing to try
3         every case.
4    BY MR. STRATTON:
5    Q.   So, are you telling me that
6    your offices, Mr. Herman, Mr. Seeger's
7    offices, Beasley Allen, that you guys
8    didn't have the economic resources to
9    handle the cases that were pending in the
10   MDL in the summer of 2005?  That's why
11   you offered this limited participation
12   option?
13   A.   I'm not telling you that at
14   all.
15   Q.   You just told me that?
16   A.   No, I didn't tell you that,
17   sir.  That wasn't your question.
18   Q.   Was there a problem with
19   financial resources back in the summer of
20   2005 that made it difficult for you to go
21   on, that you needed to bring more people
22   into the mix?
23   A.   It wasn't a question of
24   need.  It was a question of saying

33  (Pages 126 to 129)

Page 130

1  publicly, which we did, if we have to try
2  every case, we will, number one.
3       Number two, Judge Fallon's
4  announced policy, if you are going to
5  assume leadership in a case before me,
6  you must include lawyers who are not in
7  leadership.
8       Q.  Uh-huh.
9       Now, it strikes me as sort
10 of odd that you would want -- that as you
11 claim here today, knowing that you are
12 going to have to try every single one of
13 these cases, that you suddenly want to
14 bring tens of thousands of additional
15 cases in so that you can try them
16 individually?
17      MR. LEVIN:  Well, that's
18   your state of mind.  That's not a
19   question.
20 BY MR. STRATTON:
21      Q.  I mean, if your state of
22 mind was really, Mr. Herman, really that
23 you wanted more cases gravitas, you
24 wanted gravitas because you wanted more

Page 131

1  cases to be brought in so that you can
2  try all of these cases individually, if
3  that's really what was going through your
4  mind, I mean, who would do that to
5  themselves?
6       A.  Russ Herman.
7       MR. LEVIN:  Objection.
8       THE WITNESS:  Russ Herman
9  does it all the time, and I resent
10 the fact that you don't understand
11 that.  I made a commitment.  I was
12 appointed by a federal judge.  My
13 obligation is to create a trial
14 package so that lawyers may try
15 every case.  And I was willing to
16 stick it out and try every case
17 with a trial package that would
18 cost 200,000 or 250,000 rather
19 than a million.  And that
20 originally was the intention.  We
21 will have -- if there are 3,000
22 cases and 400 lawyers or 200
23 lawyers and 5,000 cases, and we
24 have to try every case, well, you

Page 132

1  know what, I've done it before.  I
2  did it in tobacco.  I was in trial
3  for three years.  I still haven't
4  been paid after 10 years.  I went
5  through a divorce because of it.
6  And that is the commitment that
7  this firm makes in every case.
8  When we take a case, you can bet
9  that a defendant knows that we'll
10 be there at the end.
11 BY MR. STRATTON:
12      Q.  So, you're saying that
13 adding all of these new cases, it reduced
14 the cost of the trial package, how much
15 total was expended in terms of actual
16 monies spent by the PSC in the MDL?
17      MR. LEVIN:  Objection.
18 BY MR. STRATTON:
19      Q.  Approximately?
20      MR. LEVIN:  First of all,
21   there's a lot of before the
22   question.  So, restate the
23   question, and we'll see if we can
24   answer it.  You had a preamble to

Page 133

1       your question.
2  BY MR. STRATTON:
3       Q.  How much money was spent by
4  the PSC in the MDL in creating the trial
5  package?
6       A.  100%.  Now, what that is, I
7  know that the numbers came in somewhere
8  between 25 million and 40 million, that
9  they were audited to the extent that the
10 judge gave instructions.  And when you
11 say PSC, I'm not limiting it to PSC.  I
12 think that's the total of cost
13 applications that were made.  And within
14 those, there were not any individual case
15 costs.  And my belief is that since then,
16 there have been costs expended by a
17 number of -- by several of the PSC firms.
18      Q.  So, you're saying that the
19 approximately, and I'll give you wide
20 berth here, but approximately as you sit
21 here right now, you're saying the trial
22 package costs about $40 million to put
23 together?
24      MR. LEVIN:  Wait a minute.

34  (Pages 130 to 133)

Page 134

1    You're saying costs.  You are
2    talking out of pocket costs?
3        MR. STRATTON:  Out-of-pocket
4    costs.  I'm not talking time.
5        MR. LEVIN:  Well, he's
6    testified --
7        THE WITNESS: :  Excuse me.
8    I need to go to the bathroom.
9        MR. LEVIN:  So do I.
10       MR. STRATTON:  I'll give you
11   guys a few minutes.
12           - - -
13       (Wherefore, a recess was
14   taken from 11:54 p.m. until 11:59
15   p.m.)
16           - - -
17   BY MR. STRATTON:
18       Q.   We were just speaking about
19   the cost of the trial package.  I was
20   just trying to get a number as to how
21   much money, hard costs, soft costs went
22   into creating this trial fact damage.
23   I'm not talking about the amount of human
24   resources, which I know were immense.

Page 135

1        A.   Okay.  Well, that clarifies
2    it.
3        My best recollection is
4    between 55 and $70 million.
5        Q.   So, even if you had only had
6    5,000 Vioxx cases pending in the MDL, I
7    mean, that's back in -- well, let's say
8    you had only had 5,000 cases that went
9    through -- strike that.
10       Let's say you only had 5,000
11   cases, each one of those cases had to be
12   tried.  I mean, in terms of actual hard
13   and soft costs, you are only talking
14   about a little over $100,000 per case in
15   terms of costs for the trial package?
16       A.   That's not true.
17       Q.   So, you're saying that back
18   when this full participation option was
19   offered, there was no thought in your
20   mind whatsoever that this case could
21   result in a mass settlement?
22       MR. LEVIN:  Objection to the
23   form.
24       THE WITNESS:  That's

Page 136

1    correct.
2    BY MR. STRATTON:
3        Q.   Despite the fact that 95% of
4    the prior mass torts you've been involved
5    in did result in a mass settlement?
6        A.   That's not correct.
7        Q.   And that being despite
8    testimony that you gave at about 10 of 10
9    this morning?
10       A.   It's not contradictory.
11       Q.   Why wasn't a provision
12   inserted in the full participation
13   contract which said that if the case
14   settles in a global settlement that this
15   contract will not apply?
16       MR. LEVIN:  Objection to
17   the form.  That contract speaks
18   for itself.  We'll brief it,
19   you'll brief it.  Why it wasn't
20   there?  It was there.  He's
21   testified.  His testimony speaks
22   for itself.  I'm directing him not
23   to answer that question.  It's
24   been asked and answered.

Page 137

1    BY MR. STRATTON:
2        Q.   Are you going to follow your
3    counsel's advice, or are you going to
4    answer the question?
5        A.   I'm going to follow his
6    advice.
7        Q.   Were there prior drafts of
8    these contracts that the PSC put together
9    that were reviewed?
10       MR. LEVIN:  It's been asked
11   and answered.
12       THE WITNESS:  Do I have a
13   specific recollection?  No.  Do I
14   believe that there were drafts?
15   Yes.
16   BY MR. STRATTON:
17       Q.   Where would they be kept?
18       A.   I have no idea.
19       Q.   Does the PSC have a place
20   where they keep records of their business
21   that they do, the business that's
22   conducted?
23       MR. LEVIN:  Do they have a
24   depository?

35  (Pages 134 to 137)

Confidential

Page 138

BY MR. STRATTON:
    Q.   Some place, some file.
Every case I've ever had, I have had a
file. Do you have a PSC file that
contains events that relate to PSC
business?
        MR. LEVIN: Go ahead and
answer the question. Do you have
files? We have files.
        THE WITNESS: I'm certain I
have files.
BY MR. STRATTON:
    Q.   So, if I did a document
request and asked for all of the
penultimate and rough drafts leading up
to the actual full participation option
being offered, who would I direct that
request at?
    A.   I don't know.
    Q.   So, you would have to go to
each PSC member and ask them to go
through their computer hardware files and
correspondence files?
    A.   I don't think so. I don't

Page 139

think so.
    Q.   Because you are asking me to
do a lot of work here. I just want to
find -- I'm just looking to go to one
place to be able to do my document
request.
    A.   I'm not directing you to do
anything or not do. I'm saying to you
that I don't know, and the reason I don't
know is I haven't reviewed all of my
files, and that there is a document
depository here, and to my knowledge,
you've never made a request to go to the
depository.
    Q.   Would you agree with me that
it's deceptive for the PSC, if, in fact,
they did this, to have offered a full
participation option that they didn't
intend to have apply in the event of a
mass settlement?
        MR. LEVIN: Objection to the
form of the question. It's
argumentative, and I'm going to
direct him not to answer that

Page 140

    question.
BY MR. STRATTON:
    Q.   What do you think --
        MR. LEVIN: Establish facts,
    and then draw your conclusions.
BY MR. STRATTON:
    Q.   What do you think, Mr.
Herman, this does to the individual
lawyer who represented Vioxx clients in
terms of their trust and faith in future
mass torts about whether a Plaintiffs'
Steering Committee is going to treat them
fairly when it comes to common benefit
cost?
        MR. LEVIN: Objection to the
    form.
BY MR. STRATTON:
    Q.   What do you think it does to
that?
        MR. LEVIN: It's
    argumentative, and I'm directing
    him not to answer that question.
BY MR. STRATTON:
    Q.   How many future PSCs do you

Page 141

think you are going to serve on if you
have 500 lawyers across the country who
now don't believe what you tell them in
terms of how much fee you are going to
take?
        MR. LEVIN: Same objection,
    same direction. Don't answer the
    question.
BY MR. STRATTON:
    Q.   Now, in the MSA that was
inked at 4:30 in the morning on November
9, 2007, there's a provision within that
MSA which indicates that any prior fee
agreement or fee contract between the PSC
and common benefit attorneys and
individual attorneys is no longer valid.
Are you familiar --
        MR. LEVIN: First of all,
    that's objectionable as to form,
    and put the agreement in front of
    him. You characterized it, and
    you are wrong. But put the
    agreement in front of him, and
    he'll be able to answer your

Page 142

1  question.
2        MR. STRATTON: I wish I
3  could, but I only have three hours
4  so it is --
5        MR. LEVIN: You don't have
6  the MSA?
7  BY MR. STRATTON:
8        Q.   Let me ask the question.
9        A.   Let me answer the question
10  so we can get through this. Paragraph 9
11  doesn't say that.
12        Q.   What does it say?
13        A.   It says that if you enter
14  this agreement, it is vitiated or
15  superseded.
16        Q.   Who --
17        A.   That's what it says.
18        Q.   How was that placed into the
19  MSA?
20        A.   I don't understand what you
21  are talking about.
22        Q.   How did Paragraph 9 that
23  says that this vitiation superseding
24  prior contracts, how did that language

Page 143

1  get into the MSA?
2        MR. LEVIN: How did it get
3  in?
4  BY MR. STRATTON:
5        Q.   How did it get in? Merck
6  didn't have a dog in this fight. Who put
7  that term into the MSA?
8        MR. LEVIN: You are being
9  argumentative now.
10  BY MR. STRATTON:
11        Q.   Which one of our
12  fidiciuaries put that term into the MSA?
13        MR. LEVIN: Objection to the
14  form. He's not going to answer
15  that question.
16  BY MR. STRATTON:
17        Q.   That's what I want to know.
18  That's what really makes me angry.
19        MR. LEVIN: You are
20  screaming, and you know what, you
21  are angry. You're angry.
22        MR. STRATTON: I'm
23  screaming --
24        MR. LEVIN: You're angry.

Page 144

1  You are a hostile person.
2        MR. STRATTON: That's pure
3  corruption, and it does make me
4  angry.
5        MR. LEVIN: You are
6  screaming corruption. I'm not
7  going to let him go on like that.
8  That is totally inappropriate.
9        MR. STRATTON: Somebody here
10  at this table better feel it in
11  the bottom of their damn stomachs
12  because this is disgusting. What
13  our PSC did is disgusting.
14        THE WITNESS: I'm going to
15  tell you, this is a glass top
16  table.
17        MR. LEVIN: Don't bang on
18  that.
19        MR. STRATTON:  I'm not I'm
20  sure I'm not the first person
21  that's ever banged on this
22  table.
23        THE WITNESS: Well, you may
24  be the first person that I've had

Page 145

1  to say, look, be careful, if you
2  bust this glass you are going to
3  cut yourself miserably.
4  BY MR. STRATTON:
5        Q.   Who put that term into the
6  MSA?
7        A.   I don't understand your
8  question. Okay? The MSA has to be read
9  in para materia. The negotiating --
10        Q.   Is that pig Latin? What
11  does that mean, "para materia"? I have
12  to talk in English. This is an English
13  deposition.
14        MR. LEVIN: It is a legal
15  term.
16        THE WITNESS: It means you
17  have to read everything inter say.
18  You can't take something out of
19  context. Now, how is it placed
20  there? From the plaintiffs' point
21  of view, point advantage, the
22  agreement, the contract was from
23  the NPC. So, in a generic way,
24  the NPC. On the other hand, every

Page 146

```
1    lawyer that elected in the best
2    interest of his clients to submit
3    to this contract agreed to its
4    terms. And as far as my knowledge
5    is concerned, no one, including
6    you, has ever suffered a
7    detriment.
8    BY MR. STRATTON:
9        Q.  Did Mr. Marvin or anybody on
10   the other side of the table for Merck
11   suggest including that term?  The
12   vitiation and superseding of the full
13   participation contracts, did anybody on
14   that end of the table suggest putting in
15   that language?
16       MR. LEVIN:  Objection to the
17   form of the question.
18       THE WITNESS:  Any issue
19   regarding fee was discussed after
20   every other element of substance
21   had been agreed to.  All I can
22   tell you is that it's there, it
23   was discussed, it was the NPC
24   speaking for the NPC.  I can tell
```

Page 147

```
1    you, and I'll take it on myself as
2    chair of the NPC, I believe it was
3    reasonable, I believe it was fair,
4    and I believe it is the only way
5    that a global resolution could
6    have been accomplished at the
7    direction of a federal judge and
8    three state judges.
9    BY MR. STRATTON:
10       Q.  So, are you telling me that
11   Mr. Herman inserted this term, along with
12   his other members of the NPC, that it was
13   your side of the table that inserted that
14   term into the MSA?
15       A.  I'm not going to say
16   anything like that.  It's a contract.
17   It's a contract.
18       Q.  It's a contract with who?
19       A.  It's a contract for a global
20   resolution at every --
21       Q.  Can you name one interest
22   that Merck has in how much the NPC gets
23   paid?
24       A.  Global resolution by
```

Page 148

```
1    contract calls for a meeting of the
2    minds.  I can't -- I can only tell you
3    that we were acting at the direction of
4    four judges.  There were 80 cases in
5    California set for trial.  I mean, I
6    don't know how -- what you do with
7    attorneys that have 80 cases set for
8    trial in California.
9        Q.  You are not being
10   responsive.
11       A.  I am responsive.
12       Q.  You indicated earlier that
13   during the settlement process, there were
14   no mediators.  Is that correct?
15       A.  That is correct.
16       Q.  So, these four judges, they
17   weren't near the settlement agreement
18   before it was announced publicly sometime
19   after 4:30 a.m. on November 9, 2007?
20       MR. LEVIN:  Objection to the
21   form.
22   BY MR. STRATTON:
23       Q.  These judges didn't know
24   anything about the contents of this
```

Page 149

```
1    agreement, what was in the agreement,
2    until it was publicly announced and inked
3    sometime after 430 a.m. on November 9,
4    2007?
5        MR. LEVIN:  Objection to the
6    form.
7        THE WITNESS:  I can't speak
8    for the judiciary.  I can only
9    indicate to you that Mr. Marvin
10   and myself on a regular basis
11   communicated with the progress of
12   negotiation.  Before an order was
13   entered, I know that the agreement
14   was reviewed by the judiciary.  To
15   my recollection, Judges Higbee and
16   Chaney were present physically.
17   To my recollection, Judge Wilson
18   had been intended to be present
19   but had some difficulty.
20   BY MR. STRATTON:
21       Q.  When are we talking about
22   here?
23       A.  Excuse me?
24       MR. LEVIN:  Will you let him
```

38  (Pages 146 to 149)

Page 150

1    answer the question.
2        No, finish the answer, Russ.
3        THE WITNESS:  There was a
4    full courtroom.  There were
5    lawyers participating also by
6    phone.  The document was
7    presented, it was reviewed, and
8    lawyers thereafter for more than a
9    year elected as to what they were
10    going to do.
11    BY MR. STRATTON:
12        Q.    What I'm asking you is, as
13    you sit here right now, are you saying
14    that the negotiators for Merck and Mr.
15    Marvin were involved in inserting a term
16    that vitiated and superseded or attempted
17    to vitiate or supersede the full
18    participation option contracts?
19        A.    It is a contract that was
20    signed by both parties.
21        Q.    Did they add the term?
22        A.    I've answered this question.
23        Q.    What did the plaintiff's
24    side get or what did the Merck side get

Page 151

1    by that term being added to the contract?
2        A.    Sir, fairness and
3    reasonableness.
4        Q.    What is Merck's interest in
5    whether or not the full participation
6    option contracts are enforced or whether
7    they are vitiated?  Can you name one of
8    their interests?
9        MR. LEVIN:  Wait a minute.
10    Article 9 speaks for itself.  Use
11    the language of Article 9.
12        MR. STRATTON:  No, I want to
13    know about the negotiations.
14    That's what I'm talking about.
15    This is negotiation.  Things don't
16    end up in settlement agreements
17    unless they are negotiated, right?
18        MR. LEVIN:  You are talking
19    two different --
20    BY MR. STRATTON:
21        Q.    Is that fair to say?  Things
22    don't end up in settlement agreements --
23        A.    I'm going to tell you
24    something.  If you raise your voice to me

Page 152

1    again or you hit this table again, we're
2    going to take a recess so that you can
3    calm down.
4        Q.    Yeah, well, for the record,
5    I am not out of control.  My voice is
6    raised because I'm trying to get an
7    answer, and I'm not getting the answer.
8    I'm getting the runaround.
9        What did Merck get in return
10    for that particular provision?
11        MR. LEVIN:  Objection.
12    BY MR. STRATTON:
13        Q.    What did the plaintiffs get
14    for that particular provision, Paragraph
15    9?
16        A.    Well, there are two
17    questions and a preamble.  First of all,
18    I disagree with the preamble.  I've
19    answered your questions directly under
20    oath to the best of my ability.  Your two
21    questions as to who got what, the answer
22    is a document, a contract was signed that
23    effected 99.79% of all claimants  in a
24    global contract resolution.  That's what

Page 153

1    resulted from the agreement.  That's what
2    both parties got.
3        Q.    I'm going to ask you a
4    question under oath.
5        MR. LEVIN:  All of the
6    questions have been under oath.
7    BY MR. STRATTON:
8        Q.    Do you know how Paragraph 9
9    specifically made it into the final MSA?
10    Do you know who proposed it?
11        A.    I know it was discussed, I
12    know we had ethics input into it, and I
13    know it was agreed to because the parties
14    signed off on it.
15        Q.    So, the ethics input would
16    have been so the NPC went out and sought
17    an ethics decision or opinion as to
18    whether it was appropriate to put that
19    provision into the MSA?
20        A.    All provisions.
21        Q.    Including that one?
22        A.    All provisions.
23        Q.    Did Merck ever propose this
24    language that appears in Paragraph 9, the

39  (Pages 150 to 153)

Page 154

1   viitation agreement?  Did anybody on
2   Merck's team ever propose that that
3   language go into the contract?
4       A.   I've answered this question
5   before.  I'm going to answer it again.
6   It was discussed.  That's number one.
7           Number two, it was included.
8           Number three, it constitutes
9   part of a contract, and 99.79 of all
10  claimants entered the contract.
11      Q.   I want to know who mentioned
12  it first.  Did --
13      A.   I don't know.
14      Q.   You don't know as you sit
15  here right now?
16      A.   I don't know.  My belief is,
17  I can tell you what my belief is, and I'm
18  willing to do that.  My belief is that
19  the judges requested Texas, California
20  and New York, and that the attorneys who
21  had carried the load be treated fairly
22  and reasonably, and, therefore, having
23  had that communicated to the NPC and
24  having all parties represented, that that

Page 155

1   issue of the entire agreement, including
2   9, was discussed, period.
3       Q.   Settlement drafts, we've
4   talked about this before.  Where would I
5   find the penultimate settlement MSA, the
6   rough drafts of the MSA?  Where would
7   those be?
8       A.   I don't know.  I haven't
9   looked.
10      Q.   Would they be in this office
11  somewhere?  Would you have possession of
12  them?
13      A.   Some of them.  All of them,
14  I don't know.  I haven't looked.
15      Q.   Well, given that you are the
16  liaison counsel, I guess these are things
17  that if you didn't have immediate access
18  to, you could gather them from other PSC
19  members, et cetera?
20      A.   I don't know.  I haven't
21  asked.  I haven't looked.
22      Q.   Would you agree with me that
23  if every one of these 50,000 plus cases
24  had to be tried that the common benefit

Page 156

1   attorneys would have done a lot more
2   work?
3       A.   Yes.
4       Q.   How many years do you think
5   that would have taken to try 50,000
6   cases?
7       A.   I don't know.  They would
8   all have to have been remanded to
9   wherever they originated.  I don't know
10  what would have happened to those that
11  were on tolling agreements.  I don't know
12  how long it would have taken.  I think it
13  would depend on a number of things that I
14  can't answer.
15      Q.   Just your 100 cases, your
16  100 or so cases you had here in the
17  office, based on your knowledge of being
18  in New Orleans for a long time, how long
19  would it have taken to try those 100
20  cases individually?
21      A.   I would have to look at the
22  docket numbers and to what judges
23  allotted and where they were.  I don't
24  know.  Some judges try six, ten cases at

Page 157

1   a time.  My guess, and it is purely a
2   guess, I don't know, because in these
3   pharmaceutical cases, as you know,
4   there's a difference between general
5   causation and specific.
6       Q.   Were you aware of the
7   defense costs to Merck for trying each
8   one of these cases?
9       A.   No.  I wouldn't say "aware."
10  I believe that, as I understand it,
11  substantially more than what plaintiffs
12  were spending.
13      Q.   So, if Merck had actually
14  engaged in a scorched earth strategy, is
15  it fair to say that it would be costing
16  them a half million dollars a case to try
17  them?
18      A.   I can't hear you.  What did
19  you say.
20      Q.   Half million bucks for each
21  case at least?
22      A.   Who?
23      Q.   If Merck tried each and
24  every one those cases?

Page 158

1       A.   No, I think it is
2  substantially more than that. I mean, I
3  monitored a number of these cases. I
4  mean, substantially more.
5       Q.   So, you actually at one
6  point in time thought that Merck was
7  actually going to engage in this scorched
8  earth strategy of trying some 50,000
9  cases individually?
10      A.   Whatever cases there were, I
11 was convinced for a substantial period of
12 time that Merck was going to try every
13 case and that we were going to be
14 required to try every case, however many
15 cases there were.
16      Q.   Well, we know there was some
17 50,000 cases. I mean, if we've got
18 50,000 cases and Merck is spending -- is
19 $1 million unreasonable in terms of how
20 much Merck is spending per case at least?
21 Is that a very conservative number on how
22 much it cost Merck to defend the case?
23      A.   Well, you know, you had
24 three predicates there. I'm going to

Page 159

1  answer no, no, no to your predicates, all
2  three predicates. Because, first of all,
3  we did not know how many cases were going
4  to have to be tried. We did know that
5  there would have to be a trial package
6  that would enable, whether it was 10
7  cases, 600, 6,000 cases to be tried.
8  Okay? That's number one.
9       Q.   Right.
10      A.   Number two, that 50 million
11 pages of documents had to be analyzed;
12 that 2,000 depositions had to be
13 analyzed; and that the bellwether cases
14 in the MDL, the cases in California, the
15 cases in New Jersey were going to go
16 forward and be tried. And I believe that
17 Merck's position was public, it was
18 published, and we believed it. And we
19 believed it based upon Merck's conduct
20 and the fact that we had experienced a
21 scorched earth policy in other
22 litigation. So, yes, we believed at the
23 time that we were going to have to try as
24 many cases as was in our inventory that

Page 160

1  could be tried.
2       Q.   Would you agree with Mr.
3  Birchfield that when the full
4  participation options were offered, the
5  PSC was aware that this case was likely
6  to be more difficult than the Propulsid
7  case?
8            MR. LEVIN:  Objection. Show
9       him where Mr. Birchfield said what
10      he said and let him look at it.
11           MR. STRATTON:  He's
12      already read it. He's already
13      looked at it.
14           MR. LEVIN:  You are
15      characterizing what somebody else
16      said, and there must be a document
17      where he said it. And Mr. Herman
18      is entitled to look at it.
19 BY MR. STRATTON:
20      Q.   I don't have time to mess
21 around with that. I'll withdraw the
22 question.
23           Other than the money that
24 the common benefit attorneys will get

Page 161

1  from the settlement program from the MSA,
2  are there other sources of funds to pay
3  for fees of common benefit attorneys?
4       A.   I can only speak for my
5  firm. I have a contingent fee with my
6  individual clients. That contingent fee,
7  and I don't know what the fee schedule
8  is, but I know it doesn't exceed 32% in
9  accord with Judge Fallon's ruling. I
10 don't know how many, if or what referral
11 fees there are due. I don't know what
12 individual case costs there are. But I
13 will receive for the firm some net amount
14 in fees from which 8% will be deducted
15 and go into a common benefit fund.
16      Q.   Any other sources, any class
17 actions, other cases that may settle in
18 the future involving Merck in the Vioxx
19 litigation that the common benefit
20 attorneys will be paid out of?
21      A.   Against Merck?
22      Q.   Well, yeah.
23      A.   I don't know what you mean.
24 I think that Chris Seeger as head, with

41 (Pages 158 to 161)

Confidential

Page 162

1  Mr. Levin and I assisting, there was a
2  settlement with Merck. I don't remember
3  whether it was Third-party payor or what
4  it is.
5      Q.   That was a separate payment,
6  right, for attorneys' fees, for the work
7  done on that?
8      A.   I can't tell you. I don't
9  have the agreement in front of me. You
10  asked me a general question.
11     Q.   Did you get paid for common
12  benefit work for some other aspect of
13  this MDL?
14     A.   We may be compensated for
15  whatever we help resolve with Merck in
16  terms of, I don't know whether it is
17  Third-Party payor, but I think it was
18  Blue Shield and a bunch of insurers we
19  helped facilitate. And I think it calls
20  for probably -- probably calls for a fee
21  that would be a common benefit fee. But,
22  you know, how much or whatever, I don't
23  know.
24     Q.   So, that was various health

Page 163

1  insurers who made subrogation claims on
2  the Vioxx plaintiffs, right?
3      A.   I'm not going -- no. And
4  I'm not going to characterize it as that.
5  All that I will tell you is I feel that
6  we performed a valuable and substantial
7  part in helping to resolve the
8  differences between the parties, and I
9  believe it calls for the payment of some
10  fee.
11     Q.   I'm just trying to figure
12  out exactly what we're talking about
13  here. Are we talking about a third-party
14  subrogation case here?
15     A.   It is a public record. You
16  would have to look at the record.
17     Q.   So, this would mean
18  theoretically, Mr. Herman, that you've
19  got a client, he pays you 32%, the client
20  has got a Blue Shield lien, they are
21  trying to get their money back, you
22  helped negotiate a settlement of that
23  lien, you believe you are entitled to a
24  percentage for helping to save some money

Page 164

1  right there --
2      A.   No.
3          MR. LEVIN: Wait. First of
4  all, it is objectionable to form
5  because you don't know the
6  agreement that you are talking
7  about.
8          MR. STRATTON: Just tell me
9  what it is then. You are leaving
10  me to guess here.
11         THE WITNESS: You don't
12  have to guess. It is in the
13  record. And the answer is no.
14         MR. LEVIN: You've
15  characterized it completely --
16         THE WITNESS: : The answer
17  is no. I have no fee interest
18  contrary to my clients.
19  BY MR. STRATTON:
20     Q.   So, I'm trying to figure out
21  what this third -- I mean, if you
22  actually assisted in helping to resolve
23  this, you should be able to explain to me
24  what exactly it is that you did.

Page 165

1      A.   Well, I can't without the
2  document in front of me.
3          MR. LEVIN: I don't think it
4  is fair to tell you when three
5  hours is up when it is three
6  hours, but you have two minutes.
7          THE WITNESS: I've got to go
8  to a press conference, but I will
9  give you another 15 minutes, and
10  when y'all go to lunch, I'll go to
11  my press conference before I start
12  your deposition. I don't know if
13  you have got 15 or 20 minutes
14  more.
15         MR. STRATTON: That's fine.
16  That's fine. It is better off
17  that way anyway. That's fair.
18  I'll do 15 on the button when we
19  come back.
20         Off the record.
21             -  -  -
22         (Whereupon, a luncheon
23  recess was taken from 12:29 p.m.
24  until 1:27 p.m.)

42  (Pages 162 to 165)

Page 166

1      - - -
2    BY MR. STRATTON:
3        Q.   Mr. Herman, would you agree
4    with me that in representing a client
5    generally, a lawyer has a fiduciary duty
6    to that client?
7        A.   Well, you certainly have an
8    ethical and professional duty to the
9    client.
10       Q.   To do what's in their best
11   interests as opposed to what's in the
12   lawyer's best interests?
13       A.   As long as it is within
14   ethical and professional guidelines.
15       Q.   That's fair.
16            Would you agree with me that
17   the NPC had the same responsibility when
18   it went in to negotiate to the individual
19   lawyers who were not on the negotiating
20   team?
21       A.   Not as you phrased that
22   question, I don't agree to it.
23       Q.   As a member of the NPC, did
24   you feel you had any responsibilities to

Page 167

1    the individual attorneys and their
2    clients?
3        A.   Not as you phrased it.
4        Q.   Did you feel you had any
5    responsibilities?
6        A.   Yes.
7        Q.   What responsibilities were
8    those?
9        A.   Well, there were layered
10   responsibilities, and that's why in
11   complex litigation, your first
12   responsibility is always to the Court,
13   because you are an officer of the Court.
14   You have corollary duty to your clients,
15   and if you are appointed to a leadership
16   position, then you have corollary duties
17   to clients you don't represent and
18   lawyers who are not in leadership.  So,
19   you have layered responsibilities, and
20   you are able to fulfill those
21   responsibilities.
22       Q.   Now, if a lawyer didn't
23   agree with Paragraph 9, the paragraph
24   that attempted to supersede or vitiate

Page 168

1    the contracts which we have in front of
2    us as part of PTO number 19, which is
3    Exhibit 1, what could they have done to
4    have avoided the consequence of that
5    section?
6            MR. LEVIN:  Objection to
7    form.
8            THE WITNESS:  Well, I don't
9        think anything could have been
10       done to avoid the contract.  I
11       think that for something they were
12       troubled with, they could petition
13       Judge Fallon.  I don't know of any
14       way that an arm's length, good
15       faith, reasonable global
16       settlement by contract such as
17       this could be vitiated or...
18   BY MR. STRATTON:
19       Q.   Do you think it would be
20   appropriate for a lawyer to not recommend
21   the settlement to his clients because
22   portions of the MSA risked his own
23   finances?
24            MR. LEVIN:  Objection to the

Page 169

1        form.  This is totally
2        speculative.  You want him to get
3        in the heads of other lawyers as
4        to how they are handling this
5        contract.
6    BY MR. STRATTON:
7        Q.   Let me put it more plainly.
8            MR. LEVIN:  Yes, plainly.
9    BY MR. STRATTON:
10       Q.   One of your arguments in the
11   application for the common benefit fee is
12   that by joining the agreement, all of the
13   lawyers who joined are stuck with
14   Paragraph 9 because they joined the
15   agreement and they have to accept all the
16   terms of the agreement?
17           MR. LEVIN:  Objection to the
18       form of the question.  Can you
19       show me the agreement where it
20       says "stuck."
21           MR. STRATTON:  I'm not even
22       finished.
23           MR. LEVIN:  Show me the word
24       "stuck."

43  (Pages 166 to 169)

Page 170

1    MR. STRATTON: Do we not
2 understand "stuck"?
3    MR. LEVIN: No. You were
4 quoting the agreement and used the
5 word "stuck." Now show me what
6 part of the agreement you are
7 quoting from or paraphrasing from.
8 BY MR. STRATTON:
9    Q.   We can come back do that.
10    How many hours is Mr. Herman
11 claiming as a common benefit lawyer in
12 the Vioxx cases?
13    A.   Right now, I don't know,
14 because there was some confusion. I know
15 I had 18,000 hours, the firm did, at some
16 point. I know I had an additional 2,100
17 hours to 2,500 hours in settlement. I
18 know that post settlement, I don't know
19 what the hours are, and I don't know how
20 many I'm claiming, and I have no idea.
21 My hours have been submitted under Court
22 Order to a court-appointed CPA. I don't
23 think the final hours have been
24 finalized. And I'm speaking of my own

Page 171

1 particular situation, because we had a
2 computer change somewhere along the line,
3 and we were or are in the process of
4 recovering and confirming exactly what
5 our settlement hours were.
6    Q.   In order for me to go out
7 and find the number of hours that have
8 been submitted by each lawyer or firm to
9 date, which I understand is incomplete
10 because there may be additional hours
11 coming, where would I find those?
12    A.   Or subtracted. Well, I
13 think the last CPA's report is about as
14 good as you can get.
15    Q.   And so where would that be?
16    A.   I think we may have a copy
17 of it in this office. The CPA certainly
18 has it.
19    Q.   Is that publicly available?
20    A.   As far as I know. Only the
21 lawyers that submit hours are privy, and
22 I don't think we've released that
23 information without an order. But I
24 can't really answer that question.

Page 172

1 That's a question the judge would have to
2 answer. I really don't know. I'm trying
3 to think of -- every lawyer was required
4 to submit contemporaneous hours, and if
5 they didn't have contemporaneous hours,
6 reconstructed hours to the CPA. He
7 reviewed them, and I'm talking only about
8 common benefit. After he reviewed those,
9 he issued a report. If there was
10 something in the report that concerned an
11 individual lawyer, they would have been
12 contacted about that. Then there were
13 periodical meetings generally among Judge
14 Fallon, a representative of this office,
15 more frequently Mr. Davis was present,
16 sometimes we were both present, the CPA,
17 the CPAs -- other staff CPAs. I believe
18 that Mr. Birchfield, Mr. Seeger, Mr.
19 Levin may have been involved in some of
20 those reviews where the CPA presented his
21 information.
22    Q.   I think you are going well
23 beyond my question.
24    A.   I'm trying to answer.

Page 173

1    Q.   You really aren't. The
2 question is simply, are the hours
3 publicly available? That was my
4 question.
5    A.   I don't know. I don't know.
6    Q.   So, I will have to talk to
7 The Court about that. That's fine.
8    Now, do you have any
9 recollection, as you sit here today, of
10 anybody from Merck inserting Paragraph 9
11 into the MSA?
12    MR. LEVIN: Objection.
13 That's been asked and answered.
14 BY MR. STRATTON:
15    Q.   I just want to clear up this
16 one last thing. Do you have any
17 recollection, as you sit here today, of
18 anyone from Merck inserting that term
19 into the agreement?
20    MR. LEVIN: He's answered
21 that question over and over again.
22    THE WITNESS: I stand on my
23 prior answers.
24 BY MR. STRATTON:

44  (Pages 170 to 173)

| Page 174 | Page 175 |
|---|---|

**Page 174**

1  Q.  All I need is a no.
2  A.  I stand on my prior answers.
3  Q.  Which have not been
4  adequate.
5      MR. LEVIN:  That's easy for
6  you to say.
7      MR. STRATTON:  I'm going to
8  have to notate this section of the
9  record because I will need an
10  adequate answer.  It seems to me
11  it would be a very easy answer to
12  simply tell me whether you
13  recollect Merck inserting that
14  term or not.
15      MR. LEVIN:  You've spent
16  about 15 minutes on this.
17      MR. STRATTON:  It is worth
18  15 minutes.  It is going to be
19  worth a lot more than that.
20      MR. LEVIN:  You've gotten
21  your answers.
22  BY MR. STRATTON:
23  Q.  You said before, I think,
24  and I think it was very approximate, Mr.

**Page 175**

1  Herman, that you thought there maybe were
2  400,000 hours or so totally expended by
3  common benefit lawyers in this case?
4      A.  I don't think that's what I
5  said.
6      Q.  Do you have any sense of how
7  many actual lawyer hours have been
8  expended on behalf of the common benefit?
9      A.  I gave you total hours, and
10  my recollection is that I said somewhere
11  between 450 or 475,000 and 550,000.
12      Q.  That includes paralegal
13  hours, secretary hours?
14      MR. LEVIN:  Secretary hours?
15      MR. STRATTON:  I don't know
16  what it includes.
17  BY MR. STRATTON:
18  Q.  Tell me what it includes.
19  Is that lawyer hours or is that --
20  A.  As far as I know, in cases
21  in which I have been involved or
22  consulted, common benefit are lawyer
23  hours and dedicated paralegals as far as
24  I know.

**Page 176**

1  Q.  In Propulsid, were you
2  awarded a specific hourly amount, a per
3  hour amount times a multiplier?
4  A.  No.
5  Q.  Have there been cases where
6  you have been awarded a specific hourly
7  rate for your work?  Mass torts, when
8  they distribute the actual funds?
9      MR. LEVIN:  I'm going to
10  object to the form.  Are you
11  talking about the allocation or
12  the --
13  BY MR. STRATTON:
14  Q.  The allocation of the money
15  after the money comes in.  So, you get
16  your percentage of the fund, and then you
17  have to distribute that percentage of the
18  fund to the various lawyers and common
19  benefit lawyers around.  Each common
20  benefit lawyer generally is given an
21  hourly rate, and then there's a
22  multiplier involved depending on the
23  complexity of the work and their
24  experience?

**Page 177**

1      MR. LEVIN:  Object to the
2  form of that question, and it is
3  not a matter of record.
4  BY MR. STRATTON:
5  Q.  What's the highest hourly
6  rate you've been awarded in a mass tort
7  on allocation?
8  A.  Gee, I don't know.  I know
9  what my highest hourly rate contracted
10  for and paid is.
11  Q.  How much is that?
12  A.  It was $5,000 an hour.
13  Q.  How many times has that
14  happened?
15  A.  Once.
16  Q.  How many hours did you put
17  in?
18  A.  Not a lot.
19  Q.  Four hours, five hours?
20  A.  Not a lot.  Look --
21  Q.  They wanted your services,
22  and they got them?
23  A.  They got them. I don't want
24  to mislead.  It wasn't a mass tort.

45  (Pages 174 to 177)

Page 178

```
 1        Q.   What hourly rate do you
 2   anticipate asking this Court in Vioxx
 3   for?
 4        A.   I'm not asking for an hourly
 5   rate.  We have a petition.  Until Judge
 6   Fallon decides what the common benefit
 7   fund is, I personally am not going to
 8   have personal input into how I feel that
 9   should be done.  I understand in the
10   Fifth Circuit, you use Johnson factors,
11   and you compare that to a percentage to
12   see if they are -- if you are entitled to
13   an enhancement.  I believe the last case
14   I'm aware of that Judge Fallon did that
15   was Murphy Oil, and I think he increased,
16   after considering the Johnson factors and
17   the percentage, to 17%.
18        Q.   Of the entire fund?
19        A.   That's my recollection.
20        Q.   But I'm talking about
21   allocation.  How much money do you expect
22   to make an hour in this case?
23             MR. LEVIN:  Objection.
24             THE WITNESS:  I don't have
```

Page 179

```
 1   any expectation.  We were told
 2   that until Judge Fallon knew how
 3   large the race was, we were not to
 4   allocate.  So, I don't have any
 5   idea.
 6   BY MR. STRATTON:
 7        Q.   Mr. Herman, how could you
 8   ask for 8% without knowing what that
 9   equated to in terms of at least
10   approximate amounts of money that are
11   going to go to each firm?
12        A.   Well, I can explain it to
13   you.  I have said, you look at the
14   Johnson factors, you look at the
15   difficulty, you look at the time and
16   money expended.  You look at all of the
17   Johnson factors.  And then you look at
18   all the cases that you think are
19   comparable.  And what was comparable was
20   9 to 20%.  And we took what we thought
21   was the lowest reasonable rate is what I
22   believe 8% is.  It is the lowest
23   reasonable rate for this litigation.
24        Q.   Eight percent of 4.85
```

Page 180

```
 1   million, that's what you are asking for,
 2   right?  That's what the common benefit
 3   fee application asks for?
 4             MR. LEVIN:  Objection.  The
 5        petition speaks for itself.  It
 6        has a loadstar analysis in it, it
 7        has an hourly analysis in it.
 8        It's all there.
 9             MR. STRATTON:  It does not
10        allocate per firm.
11             MR. LEVIN:  There has been
12        no allocation per firm, I'll state
13        that on the record as his counsel.
14   BY MR. STRATTON:
15        Q.   Is it fair to say that the
16   8% that the PSC is requesting right now,
17   if you are correct, that we have about
18   500,000 hours that have been put in
19   between dedicated paralegals and lawyers
20   and associates, et cetera, that that
21   equates to something like a median hourly
22   rate of about $850 an hour?
23             MR. LEVIN:  Objection to the
24        form of that question.  The
```

Page 181

```
 1        petition speaks for itself.
 2             THE WITNESS:  Do you want me
 3        to answer it?
 4             MR. LEVIN:  The underlying
 5        data is there.
 6             THE WITNESS:  Should I
 7        answer it or not answer it?
 8             MR. LEVIN:  No.
 9   BY MR. STRATTON:
10        Q.   That means that there are
11   going to be --
12             That includes all the
13   paralegal hours, and if it is anything
14   like my office, paralegals account for
15   75% of the hours.
16             MR. LEVIN:  He will ask you
17        that at your deposition.  That was
18        a statement, I take it?
19             MR. STRATTON:  You won't be
20        asking that in my deposition.
21             MR. LEVIN:  Well, that's
22        testimony.
23   BY MR. STRATTON:
24        Q.   How could you possibly
```

Page 182

1  justify a median hourly rate of $850 an
2  hour if I'm correct?
3          MR. LEVIN:  Objection to the
4      form of that question.  Now you
5      are being argumentative.
6  BY MR. STRATTON:
7      Q.   It's a lot of money.
8          MR. LEVIN:  It's a lot of
9      money?  It's a lot of work.
10 BY MR. STRATTON:
11     Q.   What justifies abandoning
12 the 2% contract and asking for 8%?
13         MR. LEVIN:  Objection to the
14     form of the question, the use of
15     the word "abandoning," and he's
16     answered the substance of that
17     question over and over again.
18     He's explained to you -- you know,
19     they have an expression down here
20     that he uses, he can tell you but
21     he can't make you understand it.
22 BY MR. STRATTON:
23     Q.   If the PSC and the common
24 benefit lawyers are willing to try every

Page 183

1  single case for a 2% assessment, how can
2  they possibly justify taking 8% when they
3  were able to cut off a tremendous amount
4  of work that they were going to have to
5  put in and do a mass settlement?
6          MR. LEVIN:  Objection to the
7      form of the question of being
8      argumentative --
9  BY MR. STRATTON:
10     Q.   I just don't understand.
11         MR. LEVIN:  I know you don't
12     understand it.  It is obvious that
13     there's a lot that you don't
14     understand.
15 BY MR. STRATTON:
16     Q.   Who was at the table?
17     A.   Wait a minute.  Can I answer
18 the question first?
19         MR. LEVIN:  Go ahead.
20     Answer.
21         THE WITNESS:  Because I
22     think it ought to be answered.
23         When you begin the case,
24     every lawyer is going to be

Page 184

1      required to try their case whether
2      they are in the PSC, California,
3      New Jersey or Texas.  Every single
4      lawyer is going to be required to
5      try their cases.  The PSC's
6      obligation is not only to try
7      bellwether cases, but to produce a
8      trial package which will enable
9      all the lawyers that want to try
10     cases that are required to try
11     cases can try their cases.  So,
12     the PSC embarks in a situation
13     where they are spending a million
14     and a million and a half bucks a
15     trial in order to produce a trial
16     package for lawyers that aren't on
17     the PSC to try a case between
18     200,000 and 250.  If a lawyer
19     wants to try his cases outside of
20     the MSA, he can go try his cases,
21     and there's a depository, and
22     there's a trial package.  If he
23     doesn't, and he feels it is in his
24     client's best interest to enter a

Page 185

1      contract called the MSA, the
2      lawyer enters it.
3  BY MR. STRATTON:
4      Q.   Can you --
5          MR. LEVIN:  I want you to
6      know that the 15 minutes is up.
7      It's been up a while ago, but I
8      just didn't want to interrupt Mr.
9      Herman.
10         MR. STRATTON:  I have three
11     more questions.
12         MR. LEVIN:  Well, I don't
13     know.
14         MR. STRATTON:  That's fine.
15     If you are going to cut me off,
16     that's fine.
17         THE WITNESS:  No.  I'm not
18     going to cut you off.  Let him ask
19     his three questions.
20         MR. STRATTON:  I have more
21     than that, but at this time --
22         THE WITNESS:  Ask three
23     questions.
24 BY MR. STRATTON:

47  (Pages 182 to 185)

Confidential

---

Page 186

1    Q.  You say you have this trial
2  package you've given people.  How many
3  trial packages have you sent out to
4  individual lawyers?
5    A.  Every lawyer that's
6  requested a trial package that's complied
7  with the requirements.  How many, I don't
8  know.  I can say this.  I haven't had a
9  lot of requests in the last two years.
10    MR. LEVIN: I wonder why.
11  BY MR. STRATTON:
12    Q.  Are there specific liability
13  experts that you've made available to
14  lawyers who want to try their own cases?
15    A.  Sure.
16    Q.  Who?
17    A.  Who are the experts?
18    Q.  Yes.
19    A.  They are listed.  I believe
20  they are listed in my brief in support of
21  the 8%.
22    Q.  And it is your belief that
23  these people are available and willing to
24  testify?

---

Page 187

1    A.  As far as I know, yes.
2  However, I don't think it is necessary,
3  because I think all their testimony has
4  been perpetuated either in perpetuation
5  depositions or at trial, and they have
6  been Daubertized.
7    MR. STRATTON:  I think I
8  have definitely exceeded my time
9  limits.  Thank you.
10    MR. LEVIN:  Thank you.
11    - - -
12    (Whereupon, the deposition
13  concluded at 1:46 p.m.)
14    - - -
15
16
17
18
19
20
21
22
23
24

---

Page 188

1
2    CERTIFICATE
3
4
5    I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
   It was requested before
8  completion of the deposition that the
   witness, RUSS M. HERMAN, have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
13
14
   _____
15  LINDA L. GOLKOW, a Federally
   Approved Certified Realtime
   Reporter, Registered Diplomate
16  Reporter and Notary Public
17
18
19
20    (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

---

Page 189

1    INSTRUCTIONS TO WITNESS
2
3    Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8    After doing so, please sign
9  the errata sheet and date it.
10    You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14    It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

---

Golkow Technologies, Inc. - 1.877.370.DEPS

| Page 190 | Page 191 |
|---|---|

**Page 190**

```
 1        - - - - - -
              E R R A T A
 2        - - - - - -
 3
 4    PAGE  LINE  CHANGE
 5    ____  ____  _____
 6        REASON:  _____
 7    ____  ____  _____
 8        REASON:  _____
 9    ____  ____  _____
10        REASON:  _____
11    ____  ____  _____
12        REASON:  _____
13    ____  ____  _____
14        REASON:  _____
15    ____  ____  _____
16        REASON:  _____
17    ____  ____  _____
18        REASON:  _____
19    ____  ____  _____
20        REASON:  _____
21    ____  ____  _____
22        REASON:  _____
23    ____  ____  _____
24        REASON:  _____
```

**Page 191**

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 1-191, and that the same
 7    is a correct transcription of the answers
 8    given by me to the questions therein
 9    propounded, except for the corrections or
10    changes in form or substance, if any,
11    noted in the attached Errata Sheet.
12
13
14    _____
15    RUSS M. HERMAN          DATE
16
17
18    Subscribed and sworn
      to before me this
19    _____ day of _____, 20____.
20    My commission expires:_____
21
      _____
22    Notary Public
23
24
```

**Page 192**

```
 1        LAWYER'S NOTES
 2    PAGE  LINE
 3    ____  ____  _____
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
```

49 (Pages 190 to 192)