# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

-   -   -

IN RE:                    : MDL DOCKET
VIOXX LITIGATION          : NO. 1647
                          :

-   -   -

April 28, 2010
-   -   -

CONFIDENTIAL

-   -   -

Oral deposition of MICHAEL

STRATTON , held at the law offices of

Herman Herman Katz & Cotlar, 820 O'Keefe,

New Orleans, Louisiana, beginning at 1:49

p.m. CST, on the above date, before Linda

L. Golkow, a Federally Approved Certified

Realtime Reporter, Registered Diplomate

Reporter and Notary Public.

-   -   -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph| 917.951.5672
deps@golkow.com

Page 2

```
 1   APPEARANCES:
 2
 3   STRATTON FAXON
     BY: MICHAEL A. STRATTON, ESQUIRE
 4   59 Elm Street
     New Haven, Connecticut 06510
 5   (203) 624-9500
     mstratton@strattonfaxon.com
 6   Representing the Objectors to the
     PSC Fee Petition
 7
 8
     HERMAN HERMAN KATZ & COTLAR, LLP
 9   BY: RUSS M. HERMAN, ESQUIRE
     820 O'Keefe
10   New Orleans, Louisiana
     (504)581-4892
11   Rherman@hhkc.com
     Representing the NPC
12
13
     LEVIN, FISHBEIN, SEDRAN & BERMAN
14   BY: ARNOLD LEVIN, ESQUIRE
     510 Walnut Street
15   Suite 500
     Philadelphia, Pennsylvania 19106
16   (215) 592-1500
     alevin@lfsblaw.com
17   Representing the NPC
18        - - -
19   ALSO PRESENT:
20
     BEASLEY, ALLEN, CROW, METHVIN,
21   PORTIS & MILES, P.C.
     ANDY D. BIRCHFIELD, JR., ESQ.
22
23
24
```

Page 3

```
 1   ALSO PRESENT (cont'd):
 2
 3
     HERMAN HERMAN KATZ & COTLAR, LLP
 4   LEONARD A. DAVIS, ESQUIRE
     STEPHEN J. HERMAN, ESQUIRE
 5
 6   LEVIN, FISHBEIN, SEDRAN & BERMAN
     FREDERICK S. LONGER, ESQUIRE
 7
 8
     SEEGER WEISS LLP
 9   JEFFREY S. GRAND, ESQUIRE
10
     WILLIAMS & CONNOLLY LLP
11   DOUGLAS R. MARVIN, ESQUIRE
12
13
14        - - -
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1        - - -
 2        I N D E X
 3        - - -
 4
 5   Testimony of: MICHAEL STRATTON
 6   By Mr. Herman              6
 7
          - - -
 8
        E X H I B I T S
 9
          - - -
10
11   NO.       DESCRIPTION       PAGE
12   Stratton-1  Von Clark v. Butler,  51
            916 F.2d 255, 258 n.
13          3 (5th Cir. 1990)
14   Stratton-2  8.1.4.4, Article 9,  57
            Attorneys' Fees
15
     Stratton-3  Excerpt from Black's  67
16          Law Dictionary
17   Stratton-4  Pretrial Order #13   86
18
19
20
21
22
23
24
```

Page 5

```
 1        - - -
 2   DEPOSITION SUPPORT INDEX
 3        - - -
 4
     Direction to Witness Not to Answer
 5
        Page Line
 6
 7
 8
 9
     Request for Production of Documents
10
        Page Line
11
12
13
14
     Stipulations
15
        Page Line
16
         6    2
17
18
19
20   Question Marked
21      Page Line
22
23
24
```

| Page 6 | Page 7 |
|---|---|

**Page 6**

```
 1          - - -
 2          (It is hereby stipulated and
 3      agreed by and among counsel that
 4      sealing, filing and certification
 5      are waived; and that all
 6      objections, except as to the form
 7      of the question, will be reserved
 8      until the time of trial.)
 9          - - -
10          MICHAEL STRATTON,
11      after having been duly sworn, was
12      examined and testified as follows:
13          - - -
14          EXAMINATION
15          - - -
16  BY MR. HERMAN:
17      Q.   Mr. Stratton, you are a
18  member of the Bar of Connecticut?
19      A.   Yes.
20      Q.   And in good standing?
21      A.   Yes.
22      Q.   And you've practiced
23  primarily plaintiff law for most of your
24  practice; is that correct?
```

**Page 7**

```
 1      A.   Yes, yes.
 2      Q.   And you were appointed
 3  liaison counsel for all objectors on
 4  November 18, 2009; is that correct?
 5      A.   I don't know the exact date,
 6  but that sounds correct.
 7      Q.   Do you know currently how
 8  many objectors you represent?
 9      A.   More than 60.  That's the
10  best I can tell you.
11      Q.   How many attorneys submitted
12  clients to contract known as the MSA?
13      A.   I have no idea.
14      Q.   None at all?
15      A.   I have no idea.
16      Q.   Where did the 500 number you
17  used before come from as to my offending
18  500 lawyers by entering into the MSA?
19      A.   Well, that might have
20  been -- I wasn't under oath, and it may
21  have been hyperbole.  Certainly in the
22  dozens.
23      Q.   Now, do you agree that a
24  Federal judge has inherent authority over
```

**Page 8**

```
 1  attorneys' fees to determine
 2  reasonableness and adequacy in the Fifth
 3  Circuit?
 4      A.   I'm not going to answer that
 5  question.  That's a question of law.
 6      Q.   How many clients, Vioxx
 7  clients, did you ultimately have?
 8      A.   That ultimately went into
 9  the MSA?  I think you actually were
10  correct.  I think it was about 84 total
11  clients.  I think 79 have been entered
12  into the MSA.
13      Q.   Did you explain to them the
14  provisions of the MSA?
15      A.   Yes, I did.
16      Q.   You felt it was in your best
17  interest to recommend to them as an
18  attorney under ethical duty that they
19  submit themselves to the MSA?
20      A.   It was actually not in my
21  best interests.  The ones who did
22  enter, it was in their best interests.
23  Sometimes it was not in their best
24  interests.  Some people did not follow my
```

**Page 9**

```
 1  advice when I told them they should not
 2  join, but they joined, nonetheless, for a
 3  quicker, easier resolution.
 4      Q.   Did some folks you not
 5  submit to the MSA?
 6      A.   That's very true.
 7      Q.   Did you understand that at
 8  the time that you advised your clients
 9  whether to enter or not enter the MSA
10  that you could elect to try your cases
11  for them?
12      A.   Yes.
13      Q.   Did you understand that if
14  you elected to try your cases for them,
15  that there would be a 2%-1% fee charge?
16      A.   That was the contract that
17  we had entered.
18      Q.   You understand that that
19  contract still exists?
20      A.   It's not being upheld by
21  some folks, but it is being upheld on our
22  end.
23      Q.   Have you set any cases for
24  trial yet under the 2%-1% rule?
```

Page 10

1      A.   The 2%-1%, I didn't set it
2  up under that particular rule.  There was
3  one case set in New Jersey right after --
4  it was supposed to start after the new
5  year.  Doug Marvin's crew did a fine job
6  and Merck did a fine job in defending
7  that case, and I saw that it wasn't worth
8  pursuing.  And Merck very kindly allowed
9  me to submit that case into the program
10  after the fact.
11      Q.   No one impeded you from
12  putting cases into the MSA contract, did
13  they?
14      A.   Impeded me?  I don't
15  understand the question.
16      Q.   Stopped you.
17      A.   There were two terms in the
18  MSA, two different sections of the MSA,
19  that we found extremely troublesome.  One
20  section of the MSA dealt only with our
21  contractual right, which we believed was
22  being improperly breached by the PSC and
23  common benefit lawyers.  That's the
24  Paragraph Number 9 which we referred to

Page 11

1  during your deposition.  That only
2  affected our fee.
3      We did not think it was
4  appropriate to advise or not advise
5  clients to join or not join based on our
6  mercenary lawyer interests.  We were very
7  concerned about it, however.  And there
8  was no fairness hearing, because it
9  wasn't a class action.  There was no way
10  to challenge it.  And we were told that
11  this would all be -- this all could be
12  dealt with during the fee application
13  later on.  So, we left that to the side.
14  So, that, while concerned us, didn't
15  impede us going forward.
16      The second thing that
17  concerned us was terminology in the MSA,
18  which, as I recall, required us to put
19  all of our clients in or none of our
20  clients in.  And if we attempted to put
21  less than all of our clients in, the ones
22  we did put in could be disqualified.
23      And then there were a couple
24  of other very nasty terms that involved

Page 12

1  forfeiture of fees and other stuff that
2  made it even less appealing.  We thought
3  that that violated our ethical
4  responsibilities under Connecticut law to
5  advise each client separately as to the
6  merits of the MSA.  So, we had a real
7  problem of it.  So, we brought an action
8  in Federal Court, as you are well aware.
9  That was declared, I believe, by Judge
10  Kravitz, I think it was Judge Kravitz, as
11  being, I think, not timely, not ripe.
12      We then followed, I believe,
13  his advice and went and sought an ethics
14  opinion from the Connecticut Bar
15  Association, which we believe protected
16  us.  And it says that a lawyer has an
17  absolute responsibility under these
18  circumstances to advise each person
19  individually and to put those people in
20  that he believes he ought to put in and
21  not put those people in that he doesn't
22  believe ought to go in.
23      So, that's what we did.  And
24  with that opinion in hand, we felt

Page 13

1  comfortable putting less than all of our
2  cases in.
3      Q.   Name a single lawyer that
4  said, Mr. Stratton, you've kept cases out
5  of the MSA, and you have put cases in,
6  you forfeit.  A single lawyer, name one.
7      A.   It was actually within the
8  four corners of the MSA.
9      Q.   I take it that you cannot
10  name a single lawyer that ever said to
11  you, Mr. Stratton, you've kept some cases
12  in, and you put some cases through, you
13  forfeit?
14      A.   No.  The only thing -- the
15  only indication I got that that was going
16  to be enforced was actually subsequent to
17  me putting my people in, and that was
18  when I was served a subpoena to testify
19  as to why I put less than a certain
20  number of my clients in.
21      Q.   Sir --
22      A.   And that was subsequently --
23  I think Mr. Davis actually served me in
24  court, and that issue was dropped.  I

4  (Pages 10 to 13)

Page 14

1  think it was used as a tool of
2  intimidation at the time.
3       Q.  Sir, give me a name.  Did
4  any lawyer ever say to you, look, you put
5  cases in the MSA, you kept cases out, you
6  forfeit your rights?
7       A.  And the inverse is true as
8  well.  Nobody told me that I wouldn't
9  forfeit my rights.
10      Q.  Now --
11      A.  They kept me in a nice,
12 unhappy limbo.  And actually, I should
13 add to that.  It was made very clear, I
14 believe by Mr. Birchfield, down in
15 Philadelphia at a -- he brought an ethics
16 professor from Texas to that.  It was an
17 explanation of the settlement agreement.
18 And I actually asked a question at that
19 meeting in the group of maybe 100 people
20 trying to learn more.  And I said, would
21 this be the net effect?  And I believe,
22 as I recall, Mr. Birchfield said, yes,
23 that is the net effect.  And then he had
24 an ethics professor tell me why that was

Page 15

1  okay for them to put into the settlement
2  agreement.  I then asked her an
3  additional question, and Mr. Birchfield
4  took her -- grabbed her and took her off
5  the stage and would not allow her to
6  answer the question.  He said, that's
7  enough questions, that's enough
8  questions.  There was a PowerPoint
9  presentation, and there was no allowance
10 of a spontaneous question.
11      Q.  Do you know what the Johnson
12 factors are?
13      A.  That's a legal question.
14 I'm not going to answer that.
15      Q.  I'm not asking you what they
16 are.  I'm --
17      A.  I'm not here for a bar exam.
18 I'm not here for a bar exam.  That gets
19 us nowhere.
20      Q.  How many hours did you put
21 in with retaining, vetting and deposing
22 or defending expert witness testimony?
23      A.  I didn't keep my hours, but
24 if I was going to estimate it, maybe

Page 16

1  about 250 hours.
2       Q.  How many Journal articles
3  did you attack as being either junk
4  science or fostered by Merck?
5       A.  Zero.
6       Q.  How many subpoenas did you
7  issue to the FDA under subpoena or FOIA?
8       A.  Zero.
9       Q.  Is that zero?
10      A.  Zero.
11      Q.  And I take it you never met
12 with the FDA, correct?
13      A.  Absolutely not.
14      Q.  Did you interview Dr. David
15 Graham?
16      A.  Never.
17      Q.  Did you interview anybody at
18 the Cleveland Clinic?
19      A.  Never.
20      Q.  Did you hire anybody to
21 study the APPROVe Merck study that was
22 done?
23      A.  I'm going to have to say,
24 that's attorney-client privilege.  If

Page 17

1  you're talking about before a certain
2  point in time, I'm happy to talk about
3  that.  But I've got Mr. Marvin here from
4  Merck who is in the room, and I'm
5  currently litigating cases involving
6  this.
7       Q.  I'm not asking you for
8  names.  I'm asking whether you did it?
9       A.  I'm not going to talk about
10 what I'm currently doing with the five
11 cases that I'm prosecuting.
12      Q.  Before you put any cases in
13 the settlement and before the settlement
14 was announced, did you have someone, a
15 professional consultant, analyze the
16 APPROVe study?
17      A.  Yes.
18      Q.  Did you ever challenge
19 Merck's attorney-client privilege with
20 designation and work product designation
21 of documents?
22      A.  No.
23      Q.  Did you ever request the
24 50,000 documents, or any portion of them,

5 (Pages 14 to 17)

Page 18

1  from any depository in Alabama, New York,
2  California, New Orleans or Houston?
3      A.   What's the 50,000 documents?
4  Tell me what that is.  Are you talking
5  about all the documents reviewed in this
6  case?
7      Q.   They all relate to the Vioxx
8  litigation.  Did you request them?
9      A.   I sent an associate down to
10  a depository I believe in New York.
11      Q.   At Mr. Seeger's office?
12      A.   I believe -- I don't know
13  where exactly he went.
14      Q.   How many documents did you
15  take copies of?
16      A.   I don't think we took any of
17  them.  I think his job was to mark things
18  as being of potential interest.  It was
19  very early on in the litigation.
20      Q.   How many depositions of
21  Merck employees did you take before the
22  settlement was announced?
23      A.   I couldn't take any.
24      Q.   Are you saying you took

Page 19

1  none?
2      A.   Yes.  I didn't have a right
3  to.
4      Q.   Did you attend depositions
5  of Merck employees?
6      A.   No.
7      Q.   Did you read trial
8  transcripts of the 17 trials that were
9  conducted against Merck before the
10  settlement?
11      A.   I followed each and every
12  one of them very closely.
13      Q.   Did you read the
14  transcripts?
15      A.   I probably did, but I don't
16  think I ever did an exhaustive from A to
17  Z.
18      Q.   From whom did you order the
19  transcripts to read?
20      A.   I never ordered transcripts.
21      Q.   Did you attend any of the 17
22  trials from any portion, from jury
23  selection through judgment?
24      A.   No.

Page 20

1      Q.   Did you send anyone to
2  monitor those trials?
3      A.   No.  I have read extensively
4  the Mark Lanier trial transcripts, but
5  that's the only trial where I have
6  actually read transcripts.
7      Q.   Which trial?
8      A.   The Lanier, was it in
9  Jersey?  Was it Humeston or was it --
10      Q.   That's Mr. Seeger and Mr.
11  Lanier's trial?
12      A.   Exactly.
13      Q.   Did you only read Mr.
14  Lanier, or did you read Mr. Seeger, too?
15      A.   No.  Mr. Lanier was the only
16  one worthwhile reading.
17      Q.   I see.
18          Where did you get that
19  transcript from, Merck?
20      A.   No.  I think I actually got
21  it -- I'm not sure where I got it, but it
22  showed up.  Oh, I called Mr. Lanier's
23  office, and he was kind enough to send me
24  a transcript of the trial.

Page 21

1      Q.   Did you call any of the
2  other plaintiff lawyers that tried cases?
3      A.   They didn't seem to be very
4  successful, so, I didn't see the point.
5      Q.   Is that an indication by you
6  that it was a difficult case?
7      A.   Or perhaps the advocacy and
8  the story line being given to the jury
9  wasn't terribly effective.  I thought
10  that Mr. Lanier had it right.
11      Q.   In the trial that Mr. Lanier
12  tried with Mr. Seeger in New Jersey and
13  with the backup from the Perry Weitz
14  firm, which of the attorneys for his
15  client received a complete verdict as
16  among them?
17      A.   It was not Mr. Lanier.
18      Q.   Okay.  Did you fault Mr.
19  Lanier in that situation?
20          Tell me --
21          MR. LEVIN:  Wait.  Let's get
22  an answer for that.
23          THE WITNESS:  Mr. Seeger and
24  I don't get along very well.  I

6  (Pages 18 to 21)

Page 22

1  think since he bumped me into the
2  side of a doorway the last time I
3  met him, I haven't had very fond
4  thoughts of him. So, I'm probably
5  mixing personality with the merits
6  of the case. I don't find Mr.
7  Seeger to be very professional.
8  BY MR. HERMAN:
9       Q.   What's your customary hourly
10 rate?
11      A.   I never do hourly rate work.
12 I don't think I have ever charged by the
13 hour.
14      Q.   Did you ever submit a fee
15 application based on an hourly rate?
16      A.   I must have in some ERISA
17 cases. I must have. I think I put in,
18 but they always settle. I probably -- if
19 I was going to put in an hourly rate, it
20 would be about 600 bucks an hour.
21      Q.   What cases did you turn down
22 as a result of your litigating Vioxx
23 cases, nonVioxx cases?
24      A.   What business did I have to

Page 23

1  exclude?
2       Q.   Yes.
3       A.   That's very difficult to
4  determine, because we started our
5  business -- our current business back in
6  2003, and we steadily raised the
7  threshold of the kind of cases we handle
8  and the number of cases. We have also
9  increased our staff, our capacity. So,
10 you know, think it is impossible to
11 quantify.
12      I certainly can tell you
13 that Vioxx over the last -- you know,
14 over the last six years has probably
15 taken in any given year between 10 and
16 25% of my personal time.
17      Q.   PreMSA contract, give me a
18 specific example of work that your firm
19 turned down as a result of Vioxx.
20      A.   I don't think that's
21 possible. I think you pick and choose
22 the mass torts that you are going to get
23 involved in.
24      Q.   Yes.

Page 24

1       A.   We've looked at many, many
2  mass torts. There's only a certain
3  amount of mass torts one can handle at a
4  given time, given I don't have any
5  associates. I've got four partners,
6  eight or nine paralegals. There's only
7  so much you can do. I can't think of
8  any -- I'm sure that there are things
9  that we decided we did not want to go
10 into until Vioxx was cleared off the
11 decks.
12      Q.   Well, name one.
13      A.   I can't.
14      Q.   Was the $4.85 billion global
15 resolution a good result?
16      A.   I recall PSC members early
17 on at meetings down in D.C., they weren't
18 PSC at that point in time, but later to
19 become PSC folks, indicating that Vioxx
20 was going to be the best mass tort ever,
21 that Bextra was nextra, a lot of other
22 crap. This is a $25 billion settlement.
23 And we got about a fifth of the initial
24 representations.

Page 25

1       Q.   I'm going to repeat my
2  question.
3       Sir, was the $4.85 billion
4  of global resolution a good result?
5       A.   I really don't have -- I
6  don't know what happened during the
7  negotiations.
8       Q.   Was it greater than Bextra?
9       A.   Bextra was confidential.
10      Q.   Was it bigger than Celebrex?
11      A.   Confidential. Don't know.
12      Q.   Was it bigger than Zyprexa?
13      A.   I wasn't involved in
14 Zyprexa. That's probably one of the
15 things I didn't do.
16      Q.   Was it bigger than Guidant?
17      A.   Guidant pretty hellacious,
18 as I recall, but that was a medical
19 device, I think.
20      Q.   Was it bigger than breast
21 implant?
22      A.   Yes, it was.
23      Q.   Was it bigger than diet
24 drugs?

7 (Pages 22 to 25)

Page 26

1    A.   You know, I don't know,
2  because you've got 50,000 people
3  involved.
4    Q.   Well --
5    A.   All I know is I have -- most
6  of my clients are unhappy.
7    Q.   You put clients through the
8  MSA and they're unhappy?
9    A.   Very unhappy.
10   Q.   Well, I guess you should
11 have tried those cases.
12   A.   I couldn't.
13   Q.   Why?
14   A.   Because my experts would not
15 testify.
16   Q.   Why?
17   A.   Because of the discovery
18 that had been done and the experts -- it
19 was because of the status of the case, we
20 couldn't bring it any further.
21   Q.   What experts wouldn't
22 testify?
23   A.   I'm not getting into that.
24 It is my work product.

Page 27

1    Q.   Was it based on prior
2  testimony that they gave?
3    A.   I'm not getting into it.
4    Q.   Well, if you didn't take any
5  depositions of experts and you hired
6  experts, they must have been deposed in
7  some other Vioxx litigation?
8    A.   That's my own business.  You
9  didn't disclose to me your cardiologists.
10   Q.   I don't have a testifying
11 expert, sir.  We're talking about
12 testifying experts.  Did you ever retain
13 a testifying expert?
14   A.   Yes.  I've got my Lone Pine,
15 my expert reports for cases I kept out of
16 the MSA.  Those people are prepared to
17 testify.
18   Q.   Now, for the clients that
19 you put through, did you hire testifying
20 experts for them?
21   A.   I hired consulting experts
22 for them.
23   Q.   Okay.
24   A.   In order to see if their

Page 28

1  cases were strong enough to proceed.
2    Q.   You made a decision after
3  hiring them to put them through the
4  global settlement?
5    A.   I had several that I thought
6  should not have joined the MSA.  They
7  did.  They're very unhappy that they did.
8         I had several others who are
9  damn lucky they joined the MSA, because
10 there was no way we could have proved
11 their case.  In those cases, it was an
12 excellent result for those clients.
13   Q.   In the cases that you put
14 through the global contract resolution,
15 how much money were your clients paid?
16   A.   I think you told me earlier
17 it was about $8 million.
18   Q.   You don't know?
19   A.   No, I don't know the exact
20 numbers.
21   Q.   You don't have any idea?
22   A.   Well, it is awful tough
23 because you get paid in this sort of odd
24 way, 40% here, 40% there. It comes in in

Page 29

1  dribs and drabs.  The points are always
2  changing.  I have no idea of what -- if
3  $8 million gross is the right number, and
4  that sounds within a million correct,
5  then our firm would have made -- the
6  gross legal fee would be somewhere around
7  $2.6, $2.7 million, maybe $2.5 million,
8  because we had a 32% reduction.  2.5
9  million.  We've got -- at least for the
10 time being, we've got 8% going to you
11 guys, so that's 25% of the fee.  So, that
12 gets me down to about 1.9, 1.85.  I've
13 got referring lawyers who want a third to
14 a half of what remains.  So, I made about
15 a grand total of about $1 million.
16   Q.   That wasn't my question, but
17 that's okay if that's what your answer
18 is.  That's not my question.
19        My question is, how much
20 money did clients gross from entering a
21 consensual MSA global resolution?
22   A.   I don't have those numbers
23 in front of me, but I told you I thought
24 that 8 million is probably correct, minus

8  (Pages 26 to 29)

Page 30

1  32%, minus whatever liens they had, minus
2  PSC costs. So, probably 60% of 8
3  million, which is about $4.8 million for
4  70 -- the 65 people who qualify.
5      Q.  How much did the clients
6  that you kept out of the settlement, how
7  much have they received?
8      A.  Nothing yet.
9      Q.  Huh?
10     A.  Nothing yet thanks to you.
11  You haven't exactly assisted in moving
12  the trial schedule along for the people
13  who didn't join the MSA.
14     Q.  Well, sir, I think the
15  record will speak for itself in this
16  case, but that's not true.
17     A.  Okay.  Well, we'll talk to
18  Ann Oldfather then.
19     Q.  It's not true.  It is simply
20  not true.
21     A.  Perfect.  Fine.
22     Q.  Have you made a trip to the
23  depository?
24     A.  Why would I need to do that?

Page 31

1      Q.  Well, if you're going to try
2  cases, don't you think it would be
3  helpful if you made a trip to the
4  depository to find out what the $50
5  million and the subjective analysis and
6  the objective analysis of the 50 million
7  pages of documents are, as to what the
8  2,000 depositions say and the 17 trial
9  transcripts?  You don't think that would
10  be helpful to you?
11     A.  No, I really don't think so.
12  I got a report from my associate who went
13  down several times.  He felt it was a
14  waste.  He felt people were down there
15  for the express purpose of just billing
16  and that nothing was really being
17  accomplished other than billing.  I got
18  -- thankfully, after a lot of hard work,
19  I finally got this trial package, which
20  has all the hot documents, all the
21  experts' testimony.  Everything I need is
22  right there.
23     Q.  Okay.  Who was responsible
24  for the trial package?

Page 32

1      A.  The people who are now
2  saying they put a half million hours into
3  creating it.
4      Q.  Who was responsible for the
5  trial package?
6      A.  That would apparently be
7  you, sir, and your fine group of common
8  benefit lawyers.
9      Q.  What did you contribute to
10  the trial package?
11     A.  Absolutely nothing.
12     Q.  Did you read the brief in
13  support of the original 2%-1%
14  application?
15     A.  Yes.  I read it after -- I
16  read it in preparation for preparing my
17  brief, which I think I submitted with the
18  original objection.
19     Q.  You never read it before
20  your objection?
21     A.  No, I don't think I did.
22     Q.  What is the largest global
23  resolution by trial or court-approved
24  mass tort that you participated in

Page 33

1  negotiating and effecting?
2      A.  I've never been on -- that's
3  not true.  I'm on two steering committees
4  now, but I'm not -- I've never had --
5  I've never been on a steering committee
6  where a case resolved in class action.
7      Q.  Have you ever worked with
8  other law firms in a major complex
9  litigation in which you were the
10  negotiating counsel for a contractual
11  resolution?
12     A.  I don't know what
13  "contractual resolution" means.  What
14  does that mean, "contractual resolution"?
15     Q.  Well, whatever the shape or
16  nomenclature of the resolution, have you
17  ever been a lead negotiating attorney
18  with other lawyers in effecting a mass
19  tort complex litigation resolution?
20     A.  Not to the point of
21  resolution, no.
22     Q.  Sir, isn't it true that on
23  July 1st, 2008, you requested the trial
24  package?

Page 34

1    A.  I don't know.  I don't have
2  my correspondence in front of me.
3    Q.   Isn't it true that you
4  delayed paying until December 31st, 2008?
5    A.  I don't know if that's true
6  or not true.  I certainly didn't avoid
7  paying.  It may have been a
8  miscommunication.  I do recall some talk
9  along those lines.  I don't know what
10  the -- I don't think that that was the
11  problem.  What I was told the problem
12  was, was that it had to go to Judge
13  Fallon to get approval to be released
14  because of the problem with security
15  encryption.  That was the issue.
16    Q.  Sir, do you know whether the
17  bellwether trials --
18    A.  That would have been three
19  months after, I think, when you opted in.
20  Anyway, go ahead.
21    Q.  Do you want to say anything
22  else?
23    A.  I'm just saying if there was
24  issues with money and payment, that was

Page 35

1  well after the cases had to be put into
2  the settlement program.
3    Q.  Sir, have you ever been a
4  lead trial counsel in a mass tort?
5    A.  Yes.
6    Q.  Which one?
7    A.  The St. Francis sex abuse
8  litigation.
9    Q.  What was the result?
10    A.  We haven't gotten that far.
11    Q.  Any others?
12    A.  Right now, we're -- it's too
13  early, but we'll be lead in an explosion,
14  a power plant explosion also in
15  Connecticut.
16    Q.  Have you been appointed as
17  lead?
18    A.  No.  I said it's too early.
19  We represent 17 of the people.
20    Q.  Are you a member of the
21  International College of Barristers?
22    A.  No.
23    Q.  Are you a diplomate of the
24  National College of Advocacy?

Page 36

1    A.  No.  I'm in the Million
2  Dollar Advocates Forum.
3    Q.  Are you a diplomate of any
4  peer review group?
5    A.  What does that mean?
6  Martindale-Hubbell, ABOTA?
7    Q.  I'm just asking a question.
8       Are you a diplomate of any
9  peer review group?
10    A.  I don't know what a
11  diplomate is.  I don't have that.  I'm a
12  member of the American Board of Trial
13  Advocates.
14    Q.  How many depositions or
15  court testimony of Dr. Reicin did you
16  review?
17    A.  Zero.
18    Q.  Dr. Scolnick?
19    A.  And I say this as of the
20  time when the settlement -- just before
21  the settlement agreement, the MSA was
22  released.
23    Q.  Dr. Scolnick?
24    A.  The same caveat.  I'm not

Page 37

1  going to talk about what I've done since
2  the settlement agreement was released.
3  But prior to that, no, absolutely not.
4    Q.  What about Dr. Morrison?
5    A.  Same answer.
6    Q.  Dr. Kronmal?
7    A.  Kronmal.  Is he the Yale
8  doctor?
9    Q.  I'm just asking questions.
10    A.  If you don't know who he is,
11  how am I going to know who he is.
12    Q.  Dr. Lucchesi?
13    A.  I have no idea who that is.
14    Q.  Dr. Ray?
15    A.  Same answer.
16    Q.  Zero before the settlement?
17    A.  Zero.
18    Q.  How many cases were set for
19  trial lawyers had committed to try
20  at the time the settlement was entered
21  that had not been tried yet?
22    A.  I have no idea.
23    Q.  Who tried cases in
24  California, plaintiff lawyers?

Page 38

1    A.    That was -- I don't recall
2 as I'm sitting here.  Tom Girardi is, I
3 think, out there.  I don't know.
4    Q.    Who tried cases in Alabama
5 before the MSA was announced?
6    A.    That would have been Andy
7 Birchfield's firm, I think, but I'm
8 guessing.
9    Q.    Who tried cases in Florida
10 before the MSA was announced?
11    A.    I do not know.
12    Q.    Who tried cases in Illinois
13 before the MSA was announced?
14    A.    I'm assuming this is all PSC
15 folks, and I don't know.
16    Q.    Who tried cases in Texas
17 before the MSA was announced?
18    A.    Are you talking about the
19 Garza case that was tried outside the
20 PSC?
21    Q.    I didn't ask that.  I said,
22 how many cases were tried in Texas before
23 the MSA was announced?
24    A.    I have no idea.  At least

Page 39

1 one.
2    Q.    Now, other than requesting a
3 transcript after a trial from Mr. Lanier,
4 did you request any transcripts from the
5 California lawyers that tried cases?
6    A.    No.
7    Q.    The Texas lawyers that tried
8 cases?
9    A.    No.
10    Q.    The PSC lawyers that tried
11 cases?
12    A.    No.
13    Q.    The Alabama lawyers that
14 tried cases?
15    A.    No.  Was I going to be
16 trying a case?
17    Q.    The Illinois lawyers trying
18 cases?
19    A.    No.
20    Q.    The Florida lawyers trying
21 cases?
22    A.    No.
23    Q.    Now, in the 17 bellwether
24 trials in the various jurisdictions of

Page 40

1 Louisiana -- strike that.
2    Of the 17 trials in
3 coordinated proceedings in the various
4 states and the MDL, in how many of those
5 trials did you order the minute entries?
6    A.    Zero.
7    Q.    How many Daubert transcripts
8 did you order?
9    A.    Zero.
10    Q.    When did you receive the
11 trial package?
12    A.    When did I receive the trial
13 package?  April of '09 maybe.  Somewhere
14 in that range.  That's a total guess.
15 But I know I took it on vacation with me.
16    Q.    After receiving the trial
17 package, what specific cases did you set
18 for trial?
19    A.    I don't set cases for trial.
20 Judges set them for trial.
21    Q.    I stand corrected.  What
22 cases did you request be set for trial?
23    A.    I sent motions off to Judge
24 Fallon asking him to get these cases

Page 41

1 moving on at least two occasions.  And
2 we're still caught in -- I came down here
3 at the hearings, asked Judge Fallon not
4 to lump my heart attack, stroke cases in
5 with a lot of preposterous claims
6 involving gallbladders and all sorts of
7 nonsense.  And Judge Fallon did exactly
8 that.  He lumped my cases in with a bunch
9 of cases that have, I think -- I mean,
10 they aren't heart attack and stroke
11 cases.  So I asked for my heart attack
12 and stroke cases to be taken out of that
13 group of cases that I don't think can
14 meet the drug science.
15    Q.    You understand that a
16 Federal judge has a primary
17 responsibility for control of his or her
18 docket?
19    A.    What Judge Fallon does with
20 his docket is absolutely his business.
21 He is an Article 3 appointed Judge with
22 all the power in the world to do whatever
23 he wants with his docket.  And he's done
24 a fabulous job not only in this case, but

11  (Pages 38 to 41)

Page 42

1  on many cases.
2      Q.   And he's managed the docket
3  well, wouldn't you say?
4      A.   My job for my clients is to
5  push the cases as fast as possible.  He
6  has not been responsive to my requests in
7  that regard.  And that doesn't -- that is
8  not a criticism of Judge Fallon.  It's
9  just a fact.
10      Q.   I was just asking you if
11  he's managed his docket well, in your
12  opinion, as an advocate?
13      A.   My gosh, if I start
14  critiquing a Federal judge, I'm going to
15  be in a lot of trouble, and you know
16  that.
17      Q.   Sir, I know that it's a fair
18  question.
19      A.   That's not a fair question.
20      Q.   Okay.
21      A.   You think Judge Fallon would
22  appreciate you asking other lawyers on
23  the record under oath how they feel about
24  him?  I think he would probably take

Page 43

1  offense.
2      Q.   I'm not asking you how you
3  feel about Judge Fallon.  I'm asking you
4  if the result has been a well-managed
5  docket in this MDL.  That's what I'm
6  asking you.  And either you have an
7  opinion or you don't have an opinion.
8      A.   I think any time you can
9  take credit within a very short period of
10  time relatively, credit for 50,000
11  people, the cases to be coordinated into
12  a settlement and disposed of, I mean,
13  that's the judge's job.  It's not his job
14  to decide whether the settlement is good
15  or bad.  It is his job to get the docket
16  moving.  He has done a fabulous job at
17  moving his docket.
18      Q.   Now, do you have any --
19           Well, have you stated in
20  writing or on a court record any
21  criticism of the job which Brown Greer
22  has done?
23      A.   I think there's confusion,
24  it may have been confusion on my part,

Page 44

1  and I don't recall.  I think there was
2  confusion initially as to who was -- as
3  to why things may have been moving so
4  slowly.  And it's a complicated
5  settlement agreement, and I think Brown
6  Greer has done about as well as they
7  could have done, although I think it has
8  been a long, long process to get these
9  settlements disbursed.
10      Q.   Have you voiced or written
11  any criticism of Mr. Garretson and the
12  way he's managed the liens?
13      A.   I think Mr. Garretson
14  encourages people at times to believe
15  that there are valid liens when -- or
16  potentially valid liens when there's
17  absolutely no argument supporting that
18  position.  I think that -- and so you've
19  asked me the question, and I'm giving you
20  the answer.  I have some difficulties
21  with how the Garretson firm does its job.
22      Q.   Have you voiced that opinion
23  or criticism in court?
24      A.   I haven't had to.  It hasn't

Page 45

1  come to that point.
2      Q.   Have you voiced that
3  criticism in writing in any motion,
4  brief?
5      A.   I don't think so.
6      Q.   Have you voiced that
7  criticism to any member of the
8  court-appointed negotiating committee?
9      A.   I don't think so.
10      Q.   Do you know who Robert
11  Johnson is and what his role is?
12      A.   Robert Johnson, I believe,
13  is the -- some sort of Special Master
14  appointed by Judge Fallon.  No?
15      Q.   Do you know who Mr. Pat
16  Juneau is?
17      A.   That's who I was thinking
18  of.  Mr. Juneau has done some mediation
19  type work.  I think he helps to resolve
20  disputes within the settlement agreement.
21      Q.   Do you have any criticism of
22  either Mr. Johnson or Mr. Juneau?
23      A.   No.
24      Q.   Do you know who Professor

12  (Pages 42 to 45)

Page 46

```
 1    Rice is?
 2        A.   Not as we're sitting here
 3    right now.  Oh, I think Professor Rice
 4    was the woman who may have appeared?  Was
 5    she from Texas?  I'm not sure.
 6        Q.   Have you reviewed any of the
 7    documents which were deprivileged by the
 8    PSC?
 9        A.   What documents are you
10    speaking about?
11        Q.   Documents to which Merck
12    claimed either a work product immunity or
13    an attorney-client privilege.
14        A.   I'm assuming that anything
15    that would be relevant for me trying a
16    case would be included within or referred
17    to within the trial package.  If not, it
18    ought to be supplemented.
19        Q.   Sir, have you specifically
20    reviewed the deprivileged documents?
21        A.   I don't know.  I have no
22    idea what you're talking about.
23        Q.   Prior to the MSA contract
24    being entered on November 7, 2007, did
```

Page 47

```
 1    you file any substantive motions or
 2    briefs in the MDL?
 3        A.   No.
 4        Q.   Any Interrogatories?
 5        A.   No.
 6        Q.   Direct any requests for
 7    production?
 8        A.   It would not have been
 9    allowed in the MDL.
10        Q.   Sir, prior to the MSA being
11    announced, did you direct any discovery
12    whatsoever to Merck --
13        A.   It's a silly question,
14    because there was a PSC that did all of
15    that.  And I would not have been allowed
16    to serve my own discovery.
17        Q.   Did you ever request that
18    the PSC serve specific Interrogatories,
19    requests for depositions, request --
20        A.   No.
21        Q.   You did not ever make that
22    request?
23        A.   Never, never, never.
24        Q.   Do you know of a single
```

Page 48

```
 1    prohibition that would not have permitted
 2    the PSC to file Interrogatories at your
 3    request?
 4        A.   Oh, I assume if I felt there
 5    was something missing, something that
 6    wasn't -- some document that wasn't
 7    being -- or some deposition that hadn't
 8    been taken or some Request for Production
 9    that hadn't been done, if that came to my
10    attention, I would assume you guys would
11    have been more than willing to have
12    served them for me.
13        Q.   You never made such requests
14    to the PSC, did you?
15        A.   No.
16        Q.   Did you ever request to
17    participate with the PSC in any discovery
18    or trial?
19        A.   Made myself available.  I
20    was never asked.
21        Q.   Sir, did you ever request
22    that the PSC include you in proceeding in
23    any discovery or trial against Merck?
24        A.   No.
```

Page 49

```
 1        MR. HERMAN:  Let's take a
 2    ten-minute recess.  I have 2:35.
 3    Let's try to begin again at 2:45.
 4          - - -
 5        (Whereupon, a recess was
 6    taken from 2:35 p.m. to 2:43
 7    p.m.)
 8          - - -
 9        MR. LEVIN:  Please mark this
10    transcript confidential, and Mr.
11    Stratton can take up with the
12    Judge whether or not the
13    confidentiality should be removed.
14        MR. STRATTON:  Mr. Levin,
15    are you referring to a specific
16    pretrial order?
17        MR. LEVIN:  I'm referring to
18    the fact that Phil Garrett's work
19    has been deemed to be kept
20    confidential.
21        MR. STRATTON:  Who is Phil
22    Garrett?
23        MR. LEVIN:  The CPA whose
24    name you didn't ask.
```

13  (Pages 46 to 49)

Page 50

1      MR. STRATTON: Where is that
2   particular order?
3      MR. LEVIN: The judge told
4   us --
5      THE WITNESS: I can't.
6      MR. HERMAN: I think it is in
7   the appointment of Mr. Garrett in
8   a court order in a PTO.
9      MR. STRATTON: That section
10  of the transcript which refers to
11  Mr. Garrett should be deemed
12  confidential and put under seal.
13     MR. DAVIS: The order
14  requires the transcript to be
15  marked confidential.
16  BY MR. HERMAN:
17     Q.   We're going to go on, and
18  we'll take this up again.
19     You previously in the
20  deposition of Russ Herman identified
21  Exhibit Number 1, Pretrial Order Number
22  19 and Exhibits A, B and C attached
23  thereto. Do you recall that?
24     A.   Yes.

Page 51

1      Q.   Did you execute either
2   Exhibit A, B, or C?
3      A.   I think A is the full
4   participation option, and we executed
5   that.
6      Q.   Can you tell me of the
7   people you represent which ones actually
8   signed Exhibit A, B or C?
9      A.   All but a very few. I know
10  that there are three or four that did not
11  execute the full participation option. I
12  can't break it down, but I can tell you
13  it is a very small percentage that did
14  not execute.
15     Q.   I'm going to show you
16  Stratton-1.
17        - - -
18        (Whereupon, Deposition
19     Exhibit Stratton-1, Von Clark v.
20     Butler, 916 F.2d 255, 258 n. 3
21     (5th Cir. 1990), was marked for
22     identification.)
23        - - -
24  BY MR. HERMAN:

Page 52

1      Q.   Do you agree or disagree
2   that the Federal Judge in the Fifth
3   Circuit in fee determinations should take
4   into account factors 1 through 12?
5      A.   I'm not going to get into
6   testifying about the law. It's silly.
7      Q.   I'm not asking you for a
8   legal conclusion.
9      A.   I have no idea how the Fifth
10  Circuit currently feels about this
11  particular issue. I don't know what --
12     Q.   Without --
13     A.   -- decisions got issued
14  yesterday or the day before about this.
15  I have no concept. I am familiar with
16  the Johnson factors.
17     Q.   You are familiar with it?
18     A.   Yes, sir. I'm familiar with
19  the Johnson factors.
20     Q.   So, without reference to the
21  case of Von Clark v. Butler and without
22  the statement of the Johnson factors, do
23  you believe that it's reasonable in
24  determining a fee that the time and labor

Page 53

1   required should be considered?
2      A.   Yes, yes.
3      Q.   Do you agree that the
4   novelty and difficulty of the question
5   should be considered?
6      A.   I mean, I'm talking about
7   common sense, what I think is equitable
8   and fair as counsel in this case and as
9   liaison counsel. I think that's a
10  reasonable thing to consider.
11     Q.   Do you believe that the
12  skill necessary to perform the legal
13  services should be considered?
14     A.   I think that's another very
15  important consideration.
16     Q.   Do you believe that the
17  preclusion of other employment by
18  attorneys due to acceptance of a case
19  should be considered?
20     A.   Makes sense to me.
21     Q.   Do you believe that
22  customary fees should be considered?
23     A.   Looking historically, it
24  makes sense to me.

14  (Pages 50 to 53)

| Page 54 | Page 55 |
|---|---|
| 1     Q. Do you consider whether the | 1   in the context of a mass tort, but I |
| 2   fee is fixed or contingent should be | 2   suppose the fact that somebody like Russ |
| 3   considered? | 3   Herman has been here for a long time and |
| 4     A. Yes, it makes sense to me. | 4   people know him and he's got good word of |
| 5     Q. Do you consider the time | 5   mouth reputation, and that's why people |
| 6   limitations imposed by circumstances of a | 6   come to him, that should be considered. |
| 7   client should be considered? | 7     Q. Awards in similar cases? |
| 8     A. Yes. | 8     A. Yes. By my last answers, I |
| 9     Q. Do you believe the amount | 9   do not mean to say that those are the |
| 10  involved should be considered? | 10  only things that should be considered. |
| 11     A. Yes. | 11  But everything you've mentioned are |
| 12     Q. The results obtained | 12  important. |
| 13  considered? | 13     Q. I'm going to show you a copy |
| 14     A. Yes. | 14  of Pretrial Order 19 and Exhibits A, B |
| 15     Q. The experience, reputation | 15  and C attached so you can refer to it as |
| 16  and ability of the attorneys? | 16  I ask you these questions. It's already |
| 17     A. Absolutely. | 17  been introduced as -- |
| 18     Q. The undesirability of the | 18     A. 1, I think. |
| 19  case, should that be considered? | 19     Q. -- Stratton-1. |
| 20     A. Absolutely. | 20     You may take whatever time |
| 21     Q. The nature and length of the | 21  you feel is necessary. My question is |
| 22  professional relationship with the | 22  going to be directed at Exhibit A, the |
| 23  client, should that be considered? | 23  full participation option. |
| 24     A. I don't know what that means | 24     A. Okay. Ready when you are. |

| Page 56 | Page 57 |
|---|---|
| 1     Q. I'm going to read Paragraph | 1   my clients. |
| 2   6. "It is understood and agreed that the | 2     Q. Now, with regard to the |
| 3   PSC and common benefit attorneys may also | 3   MSA -- |
| 4   apply to the Court for class action | 4     A. Other than the costs. |
| 5   attorneys' fees and reimbursement of | 5     MR. BIRCHFIELD: I'm sorry. |
| 6   expenses if appropriate. And this | 6   Other than the what? |
| 7   agreement is without prejudice to the | 7     THE WITNESS: Other than the |
| 8   amount of fees or costs to which the PSC | 8   costs. The plaintiffs all |
| 9   and common benefit attorneys may be | 9   anticipated only paying 1%, not |
| 10  entitled to in such an event." | 10  2%. The plaintiffs who joined the |
| 11     Did I read that correctly? | 11  MSA had no expectation they were |
| 12     A. Yes. | 12  going to pay double the costs. |
| 13     Q. Did you have in your files | 13     MR. HERMAN: I'm going to |
| 14  Exhibit A to Stratton 1 at the time you | 14  identify as Stratton Exhibit 2 |
| 15  recommended to clients to whom you | 15  Article 9 of the MSA and hand that |
| 16  recommended that they enter the MSA | 16  to you so you can review it. |
| 17  contract? | 17     - - - |
| 18     A. Did I have my full | 18     (Whereupon, Deposition |
| 19  participation option agreement in front | 19  Exhibit Stratton-2, 8.1.4.4, |
| 20  of me when I talked to my clients about | 20  Article 9, Attorneys' Fees, was |
| 21  the benefits and risks of joining the | 21  marked for identification.) |
| 22  MSA? | 22     - - - |
| 23     Q. Yes. | 23     THE WITNESS: (Reviewing |
| 24     A. I didn't discuss this with | 24  document from 2:53 p.m. until 2:54 |

15 (Pages 54 to 57)

Page 58

```
 1     p.m.)
 2        Okay.
 3   BY MR. HERMAN:
 4        Q.   Did you read Article 9 of
 5   the MSA contract before recommending or
 6   not recommending that your clients enter
 7   the MSA global settlement contract?
 8        A.   I definitely read it before.
 9        Q.   I'm going to read to you
10   Paragraph 9.2.1.
11        A.   Okay.
12        Q.   "To ensure that NPC, PSC,
13   PEC, PLC and common benefit attorneys
14   (hereinafter referred to as 'Common
15   Benefit Attorneys') are fairly
16   compensated but that their fees are in
17   conformance with reasonable rates, an
18   assessment of common benefit attorneys'
19   fees will be imposed at no more than 8%
20   of the gross amount recovered for every
21   client that registers under the terms of
22   the Settlement Agreement.  Any sum paid
23   as a common benefit fee shall be deducted
24   from the total amount of counsel fees
```

Page 59

```
 1   payable under individual plaintiffs'
 2   counsel's retainer agreement.  The
 3   maximum 8% attorneys' fee assessment
 4   shall supersede the assessment provided
 5   to MDL common benefit attorneys pursuant
 6   to Pretrial Order No. 19."
 7        Did I read that correctly?
 8        A.   Yes.
 9        Q.   Did you advise your clients
10   that common benefit attorneys would
11   receive no more than 8% to be determined
12   by The Court before you recommended that
13   they enter the MSA global contract
14   agreement?
15        A.   No, because it did not
16   affect them.
17        Q.   Now, other than --
18        A.   Other than the fear I had
19   that the -- that my clients' contract
20   rights were attempted to be -- I felt
21   that potentially -- the only thing that
22   concerned me was the costs, because we
23   had a contract with the common benefit
24   attorneys and PSC of 2% fees, 1% costs.
```

Page 60

```
 1   And if this was an attempt by the common
 2   benefit attorneys to breach that
 3   agreement, they potentially could be
 4   liable for more than 1%.  And I did
 5   discuss that with them, and I told them
 6   that I would do my best to make the other
 7   side comply with the original agreement.
 8        Q.   I would like you to look at
 9   Paragraph 9.2.4 of the MSA contract.  I'm
10   going to read a portion of 9.2.4.
11        "The Allocation Committee
12   shall take into consideration the common
13   benefit work of counsel in the MDL, and
14   the work of counsel in the state
15   litigations in Texas, California and New
16   Jersey.  The Allocation Committee shall
17   be guided by these objective measures of
18   common benefit counsel's contributions,
19   in addition to their subjective
20   understanding of the relative
21   contributions of counsel towards
22   generating the Settlement Fund in
23   accordance with established fee
24   jurisprudence and subject to the approval
```

Page 61

```
 1   of the Honorable Eldon E. Fallon in
 2   consultation with the Honorable Victoria
 3   G. Chaney, the Honorable Carol E. Higbee
 4   and the Honorable Randy Wilson."
 5        Did you read that before you
 6   recommended to your clients that they
 7   voluntarily enter the MSA global
 8   resolution?
 9        A.   Yes.
10        Q.   I'm going to read to you
11   9.2.5.  "The Honorable Eldon E. Fallon
12   shall provide appropriate notices
13   governing the procedure by which he shall
14   determine common benefit attorneys' fees
15   and reimbursement of common benefit
16   expenses, including Common Benefit
17   Attorneys' joint submission of papers by
18   the PLC requesting compensation for their
19   common benefit work, including the
20   submission of contemporaneous time
21   records, or properly reconstructed time
22   records and expense reports, and any
23   accompanying affidavits.  The Honorable
24   Eldon E. Fallon shall insure there's
```

Page 62

1  ample opportunity for objections and
2  comments to the application and notice of
3  a hearing regarding the same. The
4  Honorable Eldon E. Fallon shall set time
5  and place of said hearing."
6          Did I read that correctly?
7      A.   Yes, you did.
8      Q.   Did Judge Fallon direct that
9  you and I should meet and attempt to
10 resolve any discovery or hearing issues?
11     A.   He did.
12     Q.   Did we meet several times?
13     A.   We did.
14     Q.   Were we unable to resolve
15 difficulties?
16     A.   Yes, we were unable to.
17     Q.   You had notice, according to
18 this agreement from The Court, of ample
19 opportunity for objections and comments
20 to the application and notice of a
21 hearing which these depositions today are
22 part of?
23     A.   I haven't had any of my
24 discovery requests ruled on by Judge

Page 63

1  Fallon. I have several dozen requests.
2  I haven't had any opportunity to do
3  discovery. I've had no opportunity at
4  all.
5      Q.   Has Judge Fallon given you
6  ample opportunity to state your
7  objections and comments?
8      A.   No.
9      Q.   You haven't stated your
10 objections and comments?
11     A.   Not until I'm able to get
12 certain documents and after certain
13 depositions will I be able to have quote,
14 unquote, ample opportunity to file a
15 meaningful objection.
16     Q.   Was the fee --
17     A.   I don't know what meaningful
18 is down here in New Orleans, but up in
19 Connecticut, we actually are able to do
20 some discovery and get certain facts
21 before we file objections.
22     Q.   Was the fee application of
23 the PSC made public?
24     A.   Oh, yes.

Page 64

1      Q.   Was the briefing and
2  affidavit in support of the PSC's
3  application made public?
4      A.   Yes, they were.
5      Q.   And to that application and
6  affidavit and brief, did you file an
7  opposition?
8      A.   Yes, we did.
9      Q.   Is it fair to say that you
10 had notice and an opportunity to make
11 objections and comments?
12     A.   In a complete vacuum, yes.
13     Q.   I'm going to read to you
14 9.2.6. "Merck takes no position
15 regarding, and has no responsibility or
16 liability for, the award of common
17 benefit attorneys' fees and the
18 reimbursement of costs."
19         Do you see that?
20     A.   I see the rest of 36. I
21 don't have Page 37.
22     MR. LEVIN:  We don't have it
23 either.
24     MR. HERMAN:  I have it.

Page 65

1  BY MR. HERMAN:
2      Q.   I'm going the to read it
3  again. 9.2.6 of Stratton-2. "Merck
4  takes no position regarding, and has no
5  responsibility or liability for, the
6  award of common benefit attorneys' fees
7  and the reimbursement of costs" benefit
8  expenses of Common Benefit Attorneys',
9  which sum will be deducted on an equal
10 percentage basis from the MI Settlement
11 Fund and IS Settlement Fund. Is that
12 right? Have I read that wrong?
13     A.   Yes.
14     Q.   "Merck takes no position
15 regarding, and has no responsibility or
16 liability for, the award of common
17 benefit attorneys' fees and the
18 reimbursement of costs under this
19 Section, of the allocation of the same,
20 and waives the right to contest these
21 matters."
22         Did you read that before you
23 had your clients enter consensually the
24 MSA?

17  (Pages 62 to 65)

Page 66

1     A.   That's a cumulative
2  question.
3     Q.   Did you read Paragraph
4  9.2.6?
5     A.   Yes.
6     Q.   Did you read it before you
7  recommended that your clients enter the
8  MSA global settlement?
9     A.   Yes.
10     Q.   Is there anything in that
11  9.2.6 that you do not understand?
12     A.   No.  It's very prudent of
13  Merck to have put that in.
14     Q.   Now, I want to go back in
15  Stratton-2, and I want to make sure that
16  Page 37 is attached to Stratton-2.
17        I read the whole paragraph
18  before.  I've allowed you to read it.  In
19  Paragraph 9.2.1, "The maximum 8%
20  attorneys' fee assessment shall supersede
21  the assessment provided to MDL common
22  benefit attorneys pursuant to Pretrial
23  Order No. 19."
24        You indicated that you had

Page 67

1  read this before your clients were
2  recommended to enter the global
3  settlement contract, correct?
4     A.   Yes.
5        MR. HERMAN:  Stratton-3 will
6  be the definition of supersede --
7        - - -
8        (Whereupon, Deposition
9  Exhibit Stratton-3, Excerpt from
10  Black's Law Dictionary, was marked
11  for identification.)
12        - - -
13        THE WITNESS:  Can you make a
14  copy of that whole thing?
15        MR. HERMAN:  -- of supersede
16  from Black's.
17        THE WITNESS:  "Supersede"
18  means to vitiate, abrogate, veto,
19  make no longer in existence, void,
20  invalidate.  I understand.
21  BY MR. HERMAN:
22     Q.   "Obliterate, set aside,
23  annul, replace, make void,
24  inefficacious" --

Page 68

1     A.   Exactly.
2     Q.   "Or useless, repeal" --
3     A.   Useless, absolutely useless.
4     Q.   You agree that's the
5  definition?
6     A.   That is absolutely the
7  definition.
8     Q.   Now, of the folks you
9  represent -- and I've been requesting who
10  you represent, and you haven't given it
11  to me, but that's okay.
12     A.   I haven't been asked to
13  write it down by anybody.
14     Q.   I'm not going to argue with
15  you.  I'm not going to debate with you.
16  I'm merely going to ask questions.
17        How many of the folks that
18  you have been appointed to represent
19  signed Exhibit B to Herman-1?
20     A.   You mean the limited
21  participation option as opposed to the
22  full participation option?
23     Q.   How many?  Would you like to
24  look at Stratton-1 to answer the

Page 69

1  question?
2     A.   Well, this Exhibit A is the
3  full participation.  Exhibit B is a
4  limited participation.  Exhibit C is the
5  traditional option.  And I do not have
6  those exact numbers.  What I will tell
7  you is 95% of the folks who objected to
8  the PSC fee application had signed that
9  agreement.  There's probably 5% of those
10  folks who have not.  I understand they
11  have a number of objections, something
12  like 60 or 70.  But I don't know.  My job
13  is not to -- my job is simply to
14  coordinate the objections.  I don't
15  really care how many there are or how
16  many people they represent.
17     Q.   Or what the objections are?
18     A.   No.  I've read all their
19  objections.
20     Q.   Well, what are their
21  objections?  Tell me who it is that
22  signed Exhibit B that's objecting.
23     A.   I couldn't tell you right
24  now.  I mean, if I wrote it down, I could

Page 70

1  give you -- if you want me to, I can go
2  back and I can write down all the
3  objectors, which ones have different
4  options and what they specifically object
5  to. I will tell you that the reason that
6  there was a consensus of the group that I
7  was the appropriate person to do this was
8  because my objection in most ways most
9  cogently presented the group's objection.
10  Now, with one exception. There are some
11  folks out there that don't have the
12  contracts and are attacking the
13  reasonableness of the 8% on its face.
14  And we're also prepared to do that. But
15  our primary objection is the contract.
16      Q.   What is your duty? What do
17  you understand your duty to be?
18      A.   My duty is, I think, to work
19  with the PSC and you to get discovery on
20  the fee application, which we have been
21  unable to have any kind of rulings on as
22  of yet, to ultimately put together a
23  final brief on this, if The Court allows
24  it, to argue it. If Judge Fallon tells

Page 71

1  me differently, I'll just back right out
2  and just do my own thing. I'll still be
3  here.
4      Q.   Did you subpoena any
5  documents to my deposition?
6      A.   We agreed not to do that.
7      Q.   Sir, you agreed not to
8  subpoena documents to my deposition;
9  isn't that correct?
10      A.   I have e-mails from Lenny
11  Davis saying it is unnecessary to do an
12  official notice of deposition.
13      Q.   Well, did you agree with
14  that?
15      A.   I knew you'd do this,
16  because that's just the way you are.
17      Q.   Okay. I just want to know
18  if you agreed with it?
19      A.   That's why I asked the
20  question. And I've got it all down on
21  paper memorialized. I know what this is
22  all about. I knew you'd try to backdoor
23  me on that.
24      Q.   Sir, my question is, you

Page 72

1  agreed not to issue subpoenas for
2  documents to my deposition?
3      A.   I don't even know why I'm
4  here. I don't know why I'm being
5  deposed. I have no concept. I didn't
6  have any -- there was no hearing on this.
7  This was issued without even a hearing at
8  which I could attend and talk about this.
9  So, I think it's bizarre, frankly
10  bizarre -- let him keep going. Let him
11  keep going -- bizarre that we're here
12  deposing each other like this. I just
13  think it's really very odd.
14      Q.   You agree that it is a
15  question of law?
16      A.   What's a question of law?
17      Q.   Whatever it is -- whatever
18  your objections are.
19      A.   No. It is a question of
20  fact, not a question of law. It's about
21  the misuse of authority. It's about an
22  unethical agreement that was crammed down
23  plaintiffs' lawyers and plaintiffs'
24  throats, which is definitely not in the

Page 73

1  best interests of the plaintiff. It is
2  about the brazen breach of a contract
3  unilaterally in an elusory way. That's
4  what it is about. It is about asking for
5  an extreme, extreme fee without even
6  knowing how much it is going to equate to
7  in terms of hourly rate. It is about
8  duping your fellow plaintiffs lawyers.
9  That's what it's about. It's about trust
10  in PSCs in the future.
11      Q.   What ethics expert did you
12  consult between the time the MSA
13  settlement agreement was announced, made
14  public, and the time that you recommended
15  a client to enter the consensual
16  agreement, the contract MSA?
17      A.   I think I consulted three or
18  four different ethics either lawyers --
19  lawyers and professors about that.
20          I think I talked to
21  Professor Trowbridge at Quinnipiac Law
22  School.
23          I think I've talked to Wick
24  Chambers who heads the Connecticut Bar

Page 74

```
 1    Association Ethics Committee.
 2            I think I talked to Attorney
 3    Joseph Mirrione, who does the Trial
 4    Lawyers ethics committee in Connecticut.
 5            I tried to talk to Gillers
 6    at NYU, but he had to recuse himself
 7    because he's already talking to you guys.
 8    We had hired him on other issues that we
 9    had in other cases.
10        Q.   Sir, if you heard my
11    question, I want to make sure that you've
12    answered it.  Between the time that the
13    MSA became public and you recommended to
14    a client that they enter the MSA,
15    specifically what professor of ethics or
16    ethics expert did you consult?
17        A.   I got an actual Connecticut
18    Bar Association informal opinion on the
19    MSA before I put my people into the
20    program.
21        Q.   And --
22        A.   I had to sue in Federal
23    Court.  I went crazy in the first couple
24    months after this thing came out because
```

Page 75

```
 1    I didn't have enough time.
 2        Q.   Sir, I'm going to ask you
 3    just one more time.
 4            What ethics expert did you
 5    consult between the time that the MSA was
 6    public --
 7        A.   I just told you.  Wick
 8    Chambers, Joe Mirrione and Professor
 9    Trowbridge.
10        Q.   Are you saying you consulted
11    them before you ever recommended to
12    put --
13        A.   Absolutely.
14        Q.   Now, where does Mr.
15    Mirrione practice?
16        A.   In New Haven.
17        Q.   The other attorney you
18    mentioned?
19        A.   Wick Chambers is chair of
20    the ethics committee for the Connecticut
21    Bar Association.
22        Q.   And --
23        A.   Winnick, Ruben & Chambers in
24    New Haven.
```

Page 76

```
 1        Q.   What decision did you make
 2    after you got those opinions?
 3        A.   I made the decision first
 4    that I should try to file in Federal
 5    Court.  That was unsuccessful because it
 6    was determined unripe, or I can't
 7    remember the exact ruling, but I think it
 8    was something like that.  And then I
 9    decided the best way to go here was to
10    get a very quick and formal opinion from
11    the Connecticut Bar Association ethics
12    committee that would provide some support
13    for my position that it was okay to put
14    in less people --
15        Q.   Did you notice any of the
16    parties to the MSA contract that you were
17    seeking an independent opinion so that
18    other input could be given?
19        A.   You guys were right there
20    when I filed my federal case.  You were
21    all given notice of it.  In fact, we had
22    a couple of meet and confers on the
23    phone.  Nobody was going to allow less
24    than all of my cases to be submitted.
```

Page 77

```
 1    And I remember -- I think I specifically
 2    answered this question differently
 3    before, but now I'm recalling, we did
 4    have that conversation, because I was
 5    looking -- if somebody had said, look, it
 6    is okay, Mike, go ahead and submit
 7    whatever cases you think are appropriate
 8    and don't submit those that you don't
 9    think are appropriate, I would have been
10    happy.  All I was trying to do is make
11    sure that I wasn't putting my clients in
12    a position where they would be
13    disqualified.
14        Q.   Who did you have that
15    conversation with?
16        A.   We had the conversation when
17    we were doing the Federal Court --
18        Q.   Who is the "we"?  Who is the
19    "we" you had that conversation with?
20        A.   You were served, Russ.  You
21    were served with papers.
22        Q.   You never had any
23    conversation with me.  You recall a
24    specific conversation with me?
```

Page 78

1    A.   I recall a telephone
2  conference with folks from Merck, the
3  PSC, talking about the federal case and
4  ways to avoid the federal case.
5    Q.   Sir, I want to get back to
6  my original question.  My original
7  question, Mr. Stratton, was, did you give
8  notice to those people that you say were
9  on some call that you were going to go
10 seek an opinion from the Connecticut Bar
11 Association?
12   A.   No, I don't think I did.
13 You didn't give me notice when you
14 drafted the MSA.  You are the one that
15 put me in the position --
16   Q.   Sir --
17   A.   -- a very, very difficult
18 position.
19   Q.   Sir, after you got the
20 opinion that the agreement was unethical,
21 you say that's the opinion you got?
22   A.   Uh-huh.
23   Q.   You still, nevertheless,
24 entered your clients into the agreement?

Page 79

1    A.   They said that I had the
2  right to ignore that portion of the
3  agreement because it violated the rules
4  of professional ethics.
5    Q.   Sir, just answer my
6  question.
7    A.   I just did.
8    Q.   No, sir, you didn't.  I'm
9  going to ask it again.
10   A.   Go ahead.
11   Q.   After you got an opinion,
12 you said that the agreement contract was
13 unethical, you nevertheless thought it
14 was in the best interest of your clients
15 to enter into that contract?
16   A.   Well, objection.  It is
17 cumulative, and it's sophomoric.  So,
18 don't ask me sophomoric questions.
19   Q.   Is it a yes or a no?
20   A.   No.  That was not an answer.
21 I'm not answering the question because it
22 is ridiculous.  This isn't second grade,
23 Russ.
24   Q.   Did you ever make a protest

Page 80

1  to Judge Chaney that the agreement was
2  unethical?
3    A.   I don't think so, no.  No,
4  definitely did not.
5    Q.   Did you ever make a protest
6  to Judge Wilson that the agreement was
7  unethical?
8    A.   No.
9    Q.   Do you have cases in New
10 Jersey?
11   A.   No, not currently.
12   Q.   I'm sorry?
13   A.   Not right now.
14   Q.   No, sir.  Did you have cases
15 in New Jersey?
16   A.   No, I did not.
17   Q.   Did you make a protest to
18 Judge Higbee --
19   A.   No.
20   Q.   -- that the MSA contract
21 was unethical?
22   A.   No.
23   Q.   Did you make a protest to
24 Judge Fallon that the MSA contract was

Page 81

1  unethical?
2    A.   There might have been a
3  letter objection, but I can't -- I
4  wouldn't be able to locate anything.  No,
5  no.
6    Q.   Did you send Judge Chaney a
7  copy of the ethics opinion that you got
8  from these various lawyers?
9    A.   I didn't send an ethics
10 opinion to anybody.
11   Q.   Did you send to Judge Wilson
12 the ethics opinions?
13   A.   I think the question has
14 been asked and answered.
15   Q.   Did you send the ethics
16 opinions to Judge Wilson?
17   A.   No.
18   Q.   Did you send the ethics
19 opinions to Judge Higbee?
20   A.   No.
21   Q.   Did you send the ethics
22 opinions to the plaintiffs' negotiating
23 committee?
24   A.   I don't think so.

21 (Pages 78 to 81)

Page 82

1    Q.   Did you send the ethics
2  opinions to Judge Higbee?
3    A.   No.
4    Q.   Did you send the ethics
5  opinions to Merck?
6    A.   Don't think so.
7    Q.   How many substantive motions
8  did you file or defend in any
9  jurisdiction?
10   A.   In this case?
11   Q.   In Vioxx.
12   A.   None.
13   Q.   How many substantive motions
14 did the PSC file or defend in Vioxx?
15   A.   I don't know.
16   Q.   How many substantive motions
17 did the California coordinated committee,
18 plaintiffs committee, file or defend in
19 the California organized litigation?
20   A.   Same answer there, Jersey
21 and Texas.  None.  I have no knowledge.
22   Q.   In how many mass tort cases
23 have you received a trial package to
24 which you did not contribute?

Page 83

1    A.   No case that I recall.
2    Q.   Have you ever received a
3  trial package more complete than the one
4  you received in this case as developed by
5  folks other than yourself?
6    A.   Well, it's -- the technology
7  is so much better these days.  I think
8  you use CaseMap or something like
9  CaseMap.  And it is nice seeing the
10 pictures of the witnesses.  I don't know
11 if you want Mr. Marvin hearing all of
12 this.  I certainly don't.  But it's --
13   Q.   I asked you a yes or no
14 question.
15   A.   I really like the way that
16 it's laid out.  It's laid out in a way
17 that's user friendly.  It remains to be
18 seen, however, as to whether it will
19 actually be as useful.
20      MR. HERMAN: Would you read
21   back my last question.
22      THE WITNESS:  Have I ever
23   seen one as complete as the one in
24   this case?  No.

Page 84

1  BY MR. HERMAN:
2    Q.   You have a complaint about
3  the time frame it's taken to administer
4  the global settlement under the MSA?
5    A.   Yes.
6    Q.   Give me a specific
7  complaint.
8    A.   It's not a complaint based
9  on somebody not doing their job.  It's a
10 complaint -- really it is just personal.
11 Because when you've got 78 people that go
12 through a process like that and it takes
13 two years to get through, or more at this
14 point, it is just a lot of phone calls.
15 It is a lot of people wanting to come in
16 for consults.  And it's a pain in the
17 neck.  I've had to see people three, four
18 times about the settlement just to tell
19 them the same damn thing.  So, that's 3
20 or 400 communications that I've had to
21 have with clients because it has taken so
22 long to get this thing administered.  I'm
23 not saying that there's anything wrong
24 about it taking this long.  I'm just

Page 85

1  saying it's pretty intense in terms of
2  the amount of effort I've had to put in
3  because it has taken this long.
4      But certainly with 50,000
5  people, it is a lot of people, and it's a
6  lot of liens, and it's a lot of stuff you
7  have to wade through.  I'm not saying two
8  years is unreasonable, I'm just saying
9  it's a burden.  It is burdensome not on
10 the PSC, it's burdensome on the
11 individual lawyer and the clients.
12     You weren't going to ask
13 about my first wife, were you?
14     MR. LEVIN:  Absolutely not.
15     MR. HERMAN:  Let's take a
16   break.
17      - - -
18     (Whereupon, a recess
19   occurred from 3:26 p.m. until 3:29
20   p.m.)
21      - - -
22     MR. HERMAN:  That's all I
23   have, Mr. Stratton.
24     MR. LEVIN:  Just on the

22  (Pages 82 to 85)

Page 86

```
 1    record a second.
 2            Would you please mark the
 3    confidentiality order part of this
 4    record.
 5            - - -
 6            (Whereupon, Deposition
 7    Exhibit Stratton-4, Pretrial Order
 8    #13, was marked for
 9    identification.)
10            - - -
11            (Whereupon the deposition
12    concluded at 3:31 p.m.)
13            - - -
14
15
16
17
18
19
20
21
22
23
24
```

Page 87

```
 1
 2            CERTIFICATE
 3
 4
 5        I HEREBY CERTIFY that the
      witness was duly sworn by me and that the
 6    deposition is a true record of the
      testimony given by the witness.
 7
              It was requested before
 8    completion of the deposition that the
      witness, MICHAEL STRATTON, have the
 9    opportunity to read and sign the
      deposition transcript.
10
11
12
13
14
      _____
      LINDA L. GOLKOW, a Federally
15    Approved Certified Realtime
      Reporter, Registered Diplomate
16    Reporter and Notary Public
17
18
19
20            (The foregoing certification
21    of this transcript does not apply to any
22    reproduction of the same by any means,
23    unless under the direct control and/or
24    supervision of the certifying reporter.)
```

Page 88

```
 1        INSTRUCTIONS TO WITNESS
 2
 3            Please read your deposition
 4    over carefully and make any necessary
 5    corrections.  You should state the reason
 6    in the appropriate space on the errata
 7    sheet for any corrections that are made.
 8            After doing so, please sign
 9    the errata sheet and date it.
10            You are signing same subject
11    to the changes you have noted on the
12    errata sheet, which will be attached to
13    your deposition.
14            It is imperative that you
15    return the original errata sheet to the
16    deposing attorney within thirty (30) days
17    of receipt of the deposition transcript
18    by you.  If you fail to do so, the
19    deposition transcript may be deemed to be
20    accurate and may be used in court.
21
22
23
24
```

Page 89

```
 1        - - - - - -
            E R R A T A
 2        - - - - - -
 3
 4    PAGE  LINE  CHANGE
 5    ____  ____  _____
 6        REASON: _____
 7    ____  ____  _____
 8        REASON: _____
 9    ____  ____  _____
10        REASON: _____
11    ____  ____  _____
12        REASON: _____
13    ____  ____  _____
14        REASON: _____
15    ____  ____  _____
16        REASON: _____
17    ____  ____  _____
18        REASON: _____
19    ____  ____  _____
20        REASON: _____
21    ____  ____  _____
22        REASON: _____
23    ____  ____  _____
24        REASON: _____
```

23  (Pages 86 to 89)

Page 90

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5    hereby certify that I have read the
6    foregoing pages, 1-90, and that the same
7    is a correct transcription of the answers
8    given by me to the questions therein
9    propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15    MICHAEL STRATTON          DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20____.
20   My commission expires:_____
21
22   _____
22   Notary Public
23
24

Page 91

1              LAWYER'S NOTES
2    PAGE LINE
3    _____  _____  _____
4    _____  _____  _____
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____