# EXHIBIT D

```
                                                                    1

               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA


IN RE:  VIOXX PRODUCTS        *    Docket MDL 1657-L
        LIABILITY LITIGATION  *
                              *    January 18, 2008
                              *
                              *    9:00 a.m.
* * * * * * * * * * * * * * * *


              STATUS CONFERENCE BEFORE THE
              HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:       Herman Herman Katz & Cotlar
                          BY:  RUSS M. HERMAN, ESQ.
                          820 O'Keefe Avenue
                          New Orleans, Louisiana 70113


For the Defendant:        Stone Pigman Walther Wittmann
                          BY:  PHILLIP A. WITTMANN, ESQ.
                          546 Carondelet Street
                          New Orleans, Louisiana 70130


Also Participating:       Douglas R. Marvin, Esq.
                          Orran L. Brown, Esq.
                          Andy D. Birchfield Jr., Esq.
                          John Eddie Williams, Esq.
                          Matt L. Garretson, Esq.
                          Dawn M. Barrios, Esq.
                          Christopher A. Seeger, Esq.
```

3

## PROCEEDINGS

(January 18, 2008)

3  THE DEPUTY CLERK: Everyone rise.

4  THE COURT: Be seated, please. Good morning, ladies
5  and gentlemen.

6  Call the case, please.

7  THE DEPUTY CLERK: MDL 1657, In Re: Vioxx.

8  THE COURT: Counsel make their appearance for the
9  record.

10  MR. HERMAN: May it please the Court. Good morning,
11  Judge Fallon. I'm Russ Herman for the plaintiffs.

12  MR. WITTMANN: Phil Wittmann representing Merck,
13  Your Honor.

14  THE COURT: This is our monthly status conference. I
15  met with liaison counsel previous to this. I'll take the
16  material in the order in which it appears on Joint Report 31.

17  First, the settlement agreement. Anything to
18  report?

19  MR. HERMAN: Yes, Your Honor. The settlement
20  contract between the parties was entered November 9, 2007. In
21  connection with that, Pretrial Orders 28, 29, 30, 31, 32, 33,
22  and 34 were entered on the Court's Web site and on the other
23  Web sites, as well as made part of the record.

24  On January 7, 2008, Your Honor extended the
25  Pretrial Order 28 deadline to mail record preservation letters

4

1  to health care providers and pharmacies by 30 days, which
2  should give additional time for that material to be sent by
3  individual law firms on behalf of their clients.
4  　　　　　There were revisions to Exhibits A and B to
5  Pretrial Order 29. Those were also posted and a notice went
6  out.
7  　　　　　Pretrial 30 stays, with very few exceptions, all
8  activity in the MDL. Mr. Wittmann and I will be reporting on
9  the activity that has been stayed and matters that are going
10 forward.
11 　　　　　Pretrial Order 31, there were revisions on
12 December 4, 2007 and December 14, 2007, basically clarifying
13 registration affidavits and the claim spreadsheets, which were
14 clerical matters suggested by all parties.
15 　　　　　Pretrial Order 32 was an appointment made by
16 Your Honor, as stated and posted.
17 　　　　　Pretrial Orders 33 and 34 direct pro se
18 contacts. You'll receive two reports, one from Brown & Greer
19 on registration, and then later today I'll give Your Honor a
20 report. I have provided to Bryan and a copy to Your Honor of
21 those individuals who have requested an attorney be appointed
22 to represent them with all pertinent information. There are, I
23 believe, 78 of those.
24 　　　　　Attorney Ronald Benjamin has an appeal to
25 Pretrial Orders 28 and 31 in the Fifth Circuit. Both Merck and

5

the PLC have requested that the Benjamin appeal be dismissed on the basis that it's procedurally incorrect and substantively wrong.

Your Honor, at this time, if I may, I would like to ask Orran Brown and/or Lynn Greer both to step up and give Your Honor on the record a report.

Excuse me. I'm sorry. Thank you, Phil.

MR. WITTMANN: Mr. Marvin is going to discuss the amendments to the Pretrial Order.

THE COURT: All right.

MR. HERMAN: Mr. Birchfield, on behalf of the negotiating committee, after Mr. Marvin speaks to those amendments, will have some comments about the amendments, and then I understand a representative of the Texas delegation will speak.

MR. MARVIN: Good morning, Your Honor. Douglas Marvin for Merck. Your Honor, the parties would like to announce that they have agreed on certain amendments to the settlement agreement. These amendments, Your Honor, are largely clarifications of the parties' original intentions. The amendments fall into three basic categories.

The first addresses the extraordinary injury fund. The original agreement, Your Honor, placed a cap on individual awards of $600,000. In reviewing cases and talking to counsel, we understand that there may be some cases out

6

1  there -- relatively few -- that would exceed that amount in
2  terms of on reimbursable damages. Accordingly, we decided to
3  remove the cap on the individual awards under the extraordinary
4  injury fund.
5       THE COURT: Why don't you explain to us what the
6  extraordinary injury fund is. It's an extra fund.
7       MR. MARVIN: Certainly, Your Honor. Yes. All
8  claimants, once they pass through the gates, are eligible for
9  compensation according to the number of points that they have.
10 There is then a fund that has been set up to compensate those
11 individuals according to those points.
12      THE COURT: There's no limitation on that individual
13 fund, although there's a limitation on the aggregate.
14      MR. MARVIN: That is correct, Your Honor. Now, there
15 may be some instances where the person has sustained
16 extraordinary damages. There are certain criteria that can be
17 followed for those individuals who sustained those
18 extraordinary damages. Once they meet those criteria, they can
19 then go ahead and submit an application for funding or
20 compensation from the extraordinary injury fund that will go to
21 the claims administrator to review and determine whether they
22 have meet the criteria and what the award would be recommended
23 to be.
24      THE COURT: That is in addition to what they received
25 under the regular fund.

7

1    MR. MARVIN: Yes, it is, Your Honor, exactly. Thank
2 you.
3           So while the overall caps remain the same, we
4 think that this is a way to address those relatively few cases
5 that have the extraordinary injuries.
6           The second category, Your Honor, relates to
7 Sections 1.2.8.2 [sic] and 11.1.5. These deal with
8 participation in the program. Section 1.2.8.1 is -- I'm sorry.
9 I said "1.2.8.2." It's actually 1.2.8.1.
10          We have amended the agreement to take account of
11 this, but each enrolling counsel is expected to exercise his or
12 her independent judgment in the best interest of each client
13 individually before determining whether to recommend enrollment
14 in the program. That has been the parties' intentions all
15 along. We think it important that it be expressly stated here
16 in the agreement so that it is clear that each client is and
17 will be receiving the best judgment of the attorney
18 representing that client individually.
19          The second amendment is to Section 11.1.5, and
20 there the date has been changed. That has been changed so that
21 there can be no mistake that there is a sufficient period of
22 time for counsel to discuss the program with their clients and
23 make their decision as to whether to enroll in the program.
24          The third category of amendments is basically
25 miscellaneous. An important one, Your Honor, is that we have

8

1  amended the agreement so that your title is now "Judge Eldon
2  Fallon."
3        We have also made a clarification with respect
4  to the administration of the program when dealing with smoking,
5  for example. There was some confusion as to whether a person
6  who was an excessive smoker would be deducted once for smoking
7  and then a second time for excessive smoking. We clarified
8  that to mean no, we only meant the one deduction for the
9  excessive smoker to be that deduction designated for an
10 excessive smoker.
11        Your Honor, we have also amended the common
12 benefit fund provision so that people not only who participated
13 in working with respect to the four coordinating jurisdictions
14 are eligible, but also those from other states as well.
15        So those, basically, are the amendments. They
16 will be posted on the Brown & Greer Web site. We will also
17 make those available to the Court for its Web site as well as,
18 I believe, the plaintiffs' and Merck's Web sites as well.
19        THE COURT: On that last issue, with a common
20 benefit, that means that any plaintiff attorney who feels that
21 he or she is entitled to receive some common benefit funds,
22 they have the right to petition the Court for that?
23        MR. MARVIN: That is correct, Your Honor.
24        MR. BIRCHFIELD: Andy Birchfield for the plaintiffs'
25 committee. Mr. Marvin has given the details of these

1   amendments. If I could take just a moment to give a background
2   of how these amendments came about.
3              Following the announcement of the settlement on
4   November 9, the Plaintiffs' Negotiating Committee held a number
5   of conferences and meetings with lawyers across the country.
6   We met in New York, Philadelphia, Atlanta, Houston, Denver,
7   Los Angeles, and here in New Orleans. Through the course of
8   those meetings -- and there were nearly 1,000 lawyers that
9   attended those meetings -- as we focused on the settlement
10  agreement and we talked to lawyers who were reading and
11  understanding the agreement and attempting to understand and
12  make sure that they appreciated the details of the agreement,
13  we saw some areas where concerns had arisen and we knew that
14  there needed to be clarity provided.
15             Some of the things we recognized immediately
16  after the settlement, not long after it was signed, that it
17  didn't reflect what we had intended, like with the
18  extraordinary injury fund. There were some provisions about
19  the claims administrator versus the special master, so we knew
20  immediately that there needed to be changes made in that
21  regard.
22             As we met with lawyers and we heard from
23  lawyers, we saw some concerns that were raised regarding the
24  ethical implications of the settlement agreement. I'm very
25  encouraged at how diligent a number of lawyers were in making

10

1   sure that this settlement agreement in no way impinged on their
2   ethical obligations to their clients. It was never the intent
3   of the parties for the settlement agreement to in any way
4   interfere with a lawyer exercising independent judgment to his
5   client. It was never an intent of the parties for us to
6   impermissibly restrict the practice of law, for example.
7           As these questions arose, we recognized that we
8   needed to provide greater clarity in the agreement to make sure
9   that that was the intent of the parties and make sure that it
10  accurately reflected our intention in that regard and so we
11  began those discussions. Now that we have had this amount of
12  time, we have talked with the lawyers over these months, we are
13  confident that we have addressed these issues and provided the
14  clarity that is needed. I want to thank Merck's counsel for
15  working with us to provide the clarity needed here. Thank you,
16  Your Honor.
17          THE COURT: All right. Thank you very much.
18          MR. WILLIAMS: John Eddie Williams, Williams Kherkher
19  law firm. We filed, along with other Texas firms, an emergency
20  motion, which we have now withdrawn, that addressed three
21  issues, ethics, a timing issue, and fees.
22          The fee issue we will reserve for another day,
23  appropriately, I believe. The ethics issue, our ethics counsel
24  have all informed us that they are now satisfied with the
25  language changes. We appreciate the hard work of the

1  negotiating committee, Merck, and Merck's counsel in reaching
2  that.
3        One caveat: One or more of our firms from Texas
4  just got the information, wanted just a little bit of time to
5  make sure that they have dotted the I's and crossed the T's,
6  but I think I can represent to the Court that the ethics people
7  have signed off on it. I think I speak on behalf of my firm,
8  Williams Kherkher; Ranier, Gayle & Elliot; Provost Umphrey; the
9  Watts firm; the Kaiser firm; Kathy Snapka's firm; Fibich
10 Leebron law firm; the Mithoff law firm; Doug Allison's law
11 firm; and Dave Matthews' law firm.
12       The ethical issues were tough ones, Your Honor,
13 and obviously we wanted to make sure that we did it correctly.
14 That was of utmost importance. There may be some time where we
15 may have to say, "Judge, help us." If so, we will come back to
16 you because we all want to make sure we dot the I's and cross
17 the T's in that area.
18       THE COURT: You feel it has been done?
19       MR. WILLIAMS: Our ethics experts have told us and we
20 have negotiated on this, as you heard, for weeks and we do feel
21 that it has been done.
22       THE COURT: Thank you very much. Thank you for your
23 help in this matter and thanks for coming today and addressing
24 the Court.
25       I might say that I'm, of course, familiar with

```
 1  the document. I know that it was crafted by counsel over a
 2  number of months. For the last part of it, the state judges
 3  were kind enough to come to New Orleans and meet with me. We
 4  went over the document into the wee hours of the morning.
 5  There were some changes and some tweaking that was necessary at
 6  that time. Early on that morning -- 6:00 or 5:30, whatever it
 7  was -- I was back with counsel dealing with some issues that
 8  needed to be addressed.
 9              It's not surprising to me that, in that type of
10  process, there would be some aspects of the agreement that
11  perhaps needed to be clarified. I was kept advised of the
12  negotiations. I know early on in the negotiations the
13  Plaintiffs' Negotiating Committee retained an ethicist to look
14  over the matter and participate in its drafting. The efforts
15  focused on the ethics involved in the agreement.
16              It was always the intent of the parties
17  representing the plaintiffs, as well as parties representing
18  the defendant, to recognize the interest, responsibility, and
19  duty of the private attorneys in this matter. I am happy that
20  the amendment so provides in clear language that each enrolling
21  counsel is expected to exercise his or her independent judgment
22  in the best interest of each client individually before
23  determining whether to recommend enrollment in the program.
24              I do feel that nothing in the settlement
25  agreement, including the amendment, contemplates or even
```

13

1  requires the attorney to undertake any action that would
2  violate the Rules of Professional Conduct. Nothing in the
3  Vioxx agreement prohibits a lawyer representing multiple
4  claimants to exercise independent professional judgment when
5  advising each client with a Vioxx-related claim. I'm satisfied
6  that nothing in the agreement imposes upon a lawyer any
7  impermissible restriction on the practice of law.
8             Some of the reports that have been made to me
9  are that a large percentage of people have expressed an
10 interest at least in registering for this program. I think the
11 program will work and that it will be in the best interests of
12 all concerned.
13            Let's move to the next item.
14            MR. HERMAN: May it please the Court. Your Honor, I
15 want to amplify one thing. There will be an additional
16 conference, mainly directed to enrollment, with Mr. Blizzard,
17 Mr. Birchfield, myself, and Mr. Garretson discussing lien
18 issues on January 27. In addition to that, Mr. Levin has been
19 requested by the PLC to provide an up-to-date briefing on the
20 preemption issue, which will be provided to all registering law
21 firms between now and enrollment.
22            One other issue, may it please the Court.
23 Your Honor issued an order requiring lawyers to file individual
24 lawsuits rather than a combination of claims and under one
25 caption. On November 8 four suits were filed, Your Honor has

14

1  advised, that do not conform with the order. On September 14
2  two were filed and on November 11 one was filed. We will
3  undertake to notify those law firms that they must comply with
4  Your Honor's order.
5      THE COURT: That's a troubling situation, and I know
6  that it's troubling particularly to plaintiffs' counsel. I'm
7  not satisfied that we have the right approach for all times on
8  this. The difficulty that a court has -- and it's not only my
9  court, it's courts throughout the country -- is that filing a
10 complaint in federal court costs about $300. Now, I know that
11 for an attorney who has 1,000 cases, it's a hefty amount to
12 have to pay $300,000 to file a lawsuit. The difficulty is that
13 if one attorney has 1,000 cases and files one case with 999
14 cases behind it and pays $300 and another attorney has three
15 cases and files them separately, of course, then that attorney
16 has to pay $900, and that is inherently unfair. That's one
17 issue. That is not as much of a concern as the other aspect of
18 it because some adjustment can be made.
19      The other aspect of it is that oftentimes these
20 cases that are filed with the 999 claimants are not even listed
21 alphabetically. As the case proceeds, some of those claims are
22 subject to dismissal, but they are embedded in cases. The
23 clerk's office has difficulty finding the individual person in
24 that situation and in drawing a line through that particular
25 pleading. You can't dismiss the pleading because the pleading

1  is under one individual's name and that has not been dismissed.
2  Now, if that individual's name is dismissed, then the issue is:
3  Is everybody else on that pleading dismissed? There's some
4  logistical problems that are very difficult to handle in a case
5  where you have 30,000 claims filed. It's just rather
6  difficult.
7           Now, initially I allowed people to join in group
8  cases. We got to a point where that seemed not to be necessary
9  as the proceedings moved on. I announced in open court months
10 ago that I would be doing this and then I did it after a period
11 of time and we are at this point. It is a troubling problem.
12 I think that the courts, particularly the MDL transferee
13 courts, are going to have to focus a little bit more on this
14 issue.
15          Okay. Let's go to the registration.
16          MR. HERMAN: Yes, Your Honor. At this time I would
17 like to call Orran Brown and Lynn Greer to address the Court on
18 the registration process.
19          MR. BROWN: Good morning, Your Honor. I am Orran
20 Brown, from Brown Greer in Richmond, the claims administrator.
21 Also present today is Lynn Greer of our firm who is with me.
22          We would like to give the Court and the parties
23 an update on the registration and materials we have received
24 thus far, and then also to look beyond that a little bit to the
25 next phases in the settlement program and what has to happen