16

1  next; and then, of course, answer any questions the Court may

2  have of us as we go through this.

3           First of all, on the registration phase, when we

4  were here on the 14th of December, the Court referred to this

5  as a census where the law firms and the unrepresented claimants

6  needed to come forward and sign up for the program and identify

7  themselves.  For primary counsel, the Court's order required

8  filing of a registration affidavit and a claimant's spreadsheet

9  to identify their clients by January 15 of this year.  It also

10  required unrepresented claimants to submit, if they were doing

11  it by mail, by January 8 and gave them, as well, to January 15

12  to send in their materials to register for the program.

13           We have been receiving those materials from law

14  firms and unrepresented claimants since within a couple days

15  after this settlement was announced publically on November 9 of

16  last year.  We have continued to receive them through the 15th.

17  We received almost 200 law firm submissions that day alone.

18  After we got past the 15th, these are the firms

19  and the claimants that we have heard from.  We have

20  registration affidavits and materials from 814 law firms who

21  submitted them as primary counsel.  We received separate

22  submissions from 286 unrepresented claimants.  Once we look at

23  all of those and have done the process you need to do to take

24  out what appear to be duplicate people submitted by the same

25  firm more than once or by more than one firm, as of this

17

1  morning we have 57,067 claimants who have been identified in
2  this process and have submitted the materials to us from those
3  814 firms and 286 unrepresented folks.
4           We are still getting the materials after the
5  15th.  We have heard from another 11 law firms and another six
6  unrepresented people for another 100 claimants.  If you put all
7  of them together, the people that we have heard from, the total
8  is 57,167 people.
9           THE COURT:  That's about what, 95 or so percent of
10  the potential claimants in this case?
11           MR. BROWN:  Yes, Your Honor.  As I understand it, the
12  parties originally thought there would be about 60,000 people.
13  That in and of itself I think is a little bit of a rough
14  number, trying to count plaintiffs in multiple cases as the
15  Court just referred to, but I think that was the sort of number
16  people had in mind.
17           It's important, also, to remember that our
18  57,000 number will continue to change some for a couple of
19  reasons.  One, there's still some cleanup that has to be done
20  with the law firms in their spreadsheets.  We are going back
21  and forth with the law firms now to identify any places where
22  there's information missing, because the spreadsheet required
23  answers to about 70 data points on each person.  We are going
24  back with the firms to fill in where they didn't fill in.
25           There were some law firms, about 16 of them, who

18

1   sent us attachments that we really couldn't use. We couldn't
2   open them or they were just electronic images of a spreadsheet
3   and not a live Excel spreadsheet. Where we could, we counted
4   their people. They are in the numbers I have just given you,
5   but we have also had some others where the spreadsheet just had
6   zero people in it or they failed to attach all the information.
7        So we will continue to have this number move
8   about a little bit as we do that cleanup process and work with
9   the firms to identify people that were put in the wrong place
10   or spreadsheets that we couldn't use. We still expect it to
11   move for that reason. In addition, we are still receiving
12   these materials from firms and unrepresented claimants.
13        I think we are, as we do that, encouraging law
14   firms, if they haven't sent in their materials yet -- and
15   unrepresented claimants, if they haven't sent in their
16   materials yet -- to do so as soon as possible because we are
17   still receiving them. We are still counting them and putting
18   them into the system. It will be ultimately up to the parties'
19   efforts and the Court's decision as to the consequences of not
20   getting them in to us by the 15th, as the Court's order said.
21   I think at this stage we are, when people ask us, still
22   encouraging them to send in materials, if they haven't done so
23   already, as soon as they can.
24        **THE COURT:** Yes. I want to reinforce that. If
25   anybody has not done it and it's an opportunity that they have

M010F21071

19

1   missed, let's send it in now.  I would like to at least have

2   them counted in that number.

3         MR. BROWN:  Yes, Your Honor.  Beyond that, looking to

4   the next stages, we have the enrollment phase, which is upon us

5   now, as well, and beyond that submitting claims packages.

6            First, about enrollment, the next important

7   deadline is February 29 of this year for parties to send in

8   their enrollment packages for each claimant to move further

9   into the program.  There takes for each person seven forms

10  potentially to enroll in the program and move forward.  Three

11  of those forms are uniform forms, a release, a medical

12  authorization form, and an employment authorization form, to

13  receive employment records, if you are seeking the

14  extraordinary injury payments that the Court referred to

15  earlier today.

16            We prepare those forms for the law firms and for

17  unrepresented claimants using information that they gave us in

18  the claimant's spreadsheet.  We can prefill the forms with the

19  claimant's name, the law firm's name, and provide those to the

20  forms, which we create from our system, with a unique bar code

21  on each form.  Then we have created for each law firm and an

22  unrepresented claimant, if he or she wants it, a private Web

23  site portal on our system where that firm, with a secure

24  password, can go to their own private space or private Web site

25  and look up any of their claimants and receive forms from us,

M01OF21072

20

1  download them, print them, and then have their clients sign
2  them and send them back to us.  That process is the favored or
3  preferred way right now that we are sending information and
4  documents to the firms and for them to send information back to
5  us.

6          As of last night, we had created over 157,000
7  forms for law firms to use for their clients for that purpose,
8  and we have also sent them to all the pro se people,
9  unrepresented people.  We have sent them the forms by mail,
10 which is generally the way most of those folks are wanting to
11 communicate with us.  They can use the Internet and the Web
12 site, too, if they wish.

13         We are already getting back some of these
14 enrollment forms.  There are people already enrolling in the
15 process.  We have enrollment materials from 21 different law
16 firms already.  We, for example, received 3,165 releases
17 already.  So law firms and some of the unrepresented people are
18 already moving into the enrollment phase to send us the
19 documents necessary to proceed in the program.  We are
20 encouraging people to do that as soon as they can.  The
21 deadline, as I mentioned, is February 29.  It is always best
22 that not everything comes in at the deadline.  We would like to
23 receive these materials as soon as the law firms and the
24 claimants get them ready.

25         Beyond that, we are already working on the

21

1    claims process because the first important deadline after the
2    29th is July 1, under the settlement agreement, where the
3    claimants and the law firms have to send in a claims package
4    that consists of a claims form and their medical records that
5    the settlement agreement requires and some other materials.  We
6    are already receiving some of them.  We have actually gotten
7    ten claims packages already that we are reviewing.
8                    We are setting up our own processes to make sure
9    that we process and review and evaluate those claims according
10   to the criteria in the settlement agreement, as to the initial
11   gates that a claim must pass to move forward; and then if they
12   do, the process for evaluation of the points and what the
13   claims will actually end up with as a point value.
14                    On that aspect of the settlement, we are also
15   trying to make it as easy as possible for claimants/law firms
16   to submit this information.  We have created an online version
17   of the claims form.  The law firm can go to this secure Web
18   site.  They can search by their claimant name or claimant
19   number that we have given them.  They can show all of their
20   claimants and then go to a preprepared claims form that we set
21   up for them, for each person, with information already filled
22   in it so they won't have to type it over -- the demographics,
23   the name and the address -- from the claimant's spreadsheet
24   they have already given us.  Then they can fill out the rest of
25   that form online and download it and print it and have it

22

1  signed.  That information that they type in in that method is

2  already on our server, so it collapses that data entry step and

3  saves a lot of time and money for everybody.

4           That system is up and running right now for all

5  the law firms we have heard from and also includes the two

6  authorization forms.  They can make changes, if the information

7  has changed, online to that form and download it and print it

8  with the bar code and send it in.  All these steps, we are

9  trying to make it as simple as we can and as fast as we can for

10  law firms and unrepresented claimants to move through each step

11  of the program.  Thus far, we think it's working quite well.

12           Does the Court have any other questions?

13           THE COURT:  No.  I just want to verify the purpose of

14  the registration aspect of the case is to get a census, to find

15  out how many claims are out there, and also find out from those

16  claims how many are covered by this agreement, that is to say,

17  the MI's and the strokes and so forth.  Once that's done, then

18  those individuals, if they are interested, can enroll in the

19  program to go to the next step.

20           In that regard, then their claims are evaluated,

21  and that's done by a special master.  I have appointed

22  Patrick A. Juneau of Lafayette, Louisiana, to be the special

23  master.  I have also met with Judge Higbee from the

24  Superior Court in New Jersey, and she recommended Judge Marina

25

M010F21075

23

1   Corodemus and I appointed her to be a deputy special master.

2   The deputy special master will be of assistance or will help

3   the special master carrying out his tasks.

4            I talked with Judge Victoria Chaney of the

5   Superior Court in California, and she recommended that I

6   appointed Justice John Trotter, a retired justice, to serve as

7   a deputy special master; and in the event Justice Trotter is

8   unable to serve, that I appointed Justice Edward Panelli, a

9   retired justice, to also be a special master.

10           Therefore, I have appointed Special Master

11  Juneau and the deputy special masters to assist him. I have

12  asked Special Master Juneau to contact the deputies and to

13  begin familiarizing them with the program so that they can be

14  aboard with him during this evaluation process.

15           MR. BROWN:  Yes, Your Honor.  On those lines, we have

16  already met with the parties and Special Master Juneau.  We

17  have another meeting scheduled.  We have set up a process to

18  make sure that that information flow back and forth works

19  smoothly.

20           THE COURT:  Thank you very much.

21           MR. BROWN:  Thank you.

22           MR. HERMAN:  Your Honor, I would like to call

23  Matt Garretson to address you regarding Medicare and Medicaid

24  and VA liens.

25           THE COURT:  In a matter of this sort, particularly

24

1   with this type of drug, that is to say, a drug that targets
2   musculoskeletal problems, it's not unusual for the census of
3   that drug to include older individuals.  Oftentimes, in that
4   census these individuals have obtained Medicare or Medicaid and
5   Medicare and Medicaid have statutory liens that have to be
6   dealt with.  I'll hear from the parties at this time on that.
7           MR. GARRETSON:  Thank you, Your Honor.  Just to give
8   a general update, if I could, about the process today and where
9   we are going from here, we have met so far several times with
10  the claims administrator, Brown & Greer, to review our process,
11  procedures, and timelines.  We have also now had the
12  opportunity to meet with Special Master Juneau to speak with
13  him about those processes, procedures, and timelines so that we
14  are all moving in appropriate lockstep.
15          Also, as Your Honor is aware, this morning we
16  had signed the qualified protective order that will now allow
17  for HIPAA compliant transfer of data to 53 state and territory
18  agencies and to CMS.  We are working today, now with the
19  qualified protective order signed, to get all the data
20  formatted in a way that the agencies each like.  That will go
21  out starting today, through the weekend, and on into Monday, so
22  by Monday all of the states and territories and federal
23  agencies will have a listing in the appropriate format of the
24  enrolling claimants.
25          We have also had several meetings to date with

25

1   CMS, the Centers for Medicare & Medicaid Services.  I'm pleased
2   to report that they are very engaged with us in this process.
3   I'll be meeting with them in their home offices in Baltimore in
4   just a couple short weeks to review the progress and where we
5   are to date with them.
6           Further, yesterday we met in Houston with the
7   Veterans Administration.  As Your Honor mentioned, because of
8   the demographics of this population, there is a high percentage
9   of veterans that will be in the settlement program.  We want to
10  establish the appropriate framework with the VA that we have in
11  place with Medicare and Medicaid.
12          From an informational standpoint, we have
13  finalized with the NPC and the claims administrator the
14  frequently asked questions for attorneys regarding this
15  process.  It explains to them what our role is and what the
16  procedures will be.  Similarly, we have finalized a client
17  education piece that all the claimants can see and review to be
18  instructed about what is being done on their behalf with
19  respect to governmental authority liens.  All of that
20  information will be prepared.
21          We spoke this morning with the claims
22  administrator and we are prepared to list that both on their
23  Web site and then we will have vioxxlienresolution.com as a
24  separate Web site where this material will be kept and also
25  made available and updated as required.

26

1          So all those things are occurring, as I have

2     mentioned today, with respect to data exchange, which puts us

3     in a nice position to report to you at the next hearing the

4     number of states that have responded to us, the federal

5     agencies that have responded, and the rate at which we are

6     getting in the appropriate claims histories so we can start

7     dissecting what we need to dissect.  So at that time, at the

8     next hearing, Your Honor, I would also be able to share with

9     you any relevant statistics, based on our analysis of what we

10    have received in-house at that time, and then just report

11    progress in general.

12          THE COURT:  Thank you very much.  One aspect of a

13    case of this sort is not only to locate the liens and to find

14    out the amount of the liens, but when you're dealing with this

15    many liens, oftentimes the lien holder is willing and able to

16    reduce their liens when it's approached globally.  So the

17    individuals have some benefit from that aspect also.  Thank you

18    very much.

19          MR. HERMAN:  May it please the Court.  With respect

20    to nongovernment health care providers such as Blue Cross and

21    Blue Shield, Brown & Greer, as well as the liaison counsel and

22    the PNC, have received correspondence from various

23    nongovernment health care providers.  We will ask the

24    individual law firms who have registered not to undertake to

25    provide information to any nongovernment health care provider

27

1   at this time.  We intend to do that uniformly in order to

2   secure the best situation we can for claimants.  We'll be

3   coordinating that with Brown & Greer and with Matt Garretson.

4   We'll report to the Court at the next status conference and

5   attempt to have by then all such nongovernment health care

6   providers meet at one place and one location in order to

7   orderly handle the progress.

8           MR. WITTMANN:  Your Honor, I think next is your

9   introduction of the special master, if you want to do that.

10          THE COURT:  Right.  I have already dealt with the

11  special master.  Do you have any report?

12          THE SPECIAL MASTER:  No, sir.  I think Mr. Brown and

13  Mr. Garretson adequately described what we have done thus far.

14          THE COURT:  Thank you very much, Mr. Juneau.

15          MR. WITTMANN:  Your Honor, on the state court trial

16  settings, the only case that's currently set is the Smith case

17  in West Virginia, which is set to go to trial on May 19.  The

18  other cases have either been continued or are in the process of

19  being continued.  That's the only one that's actively set right

20  now.

21          THE COURT:  The next item on the agenda is Item VI,

22  class actions.  Anything on that?

23          MR. WITTMANN:  Nothing new, Your Honor.  You have

24  those motions under submission.

25          THE COURT:  VII is discovery directed to Merck.

M01DF21 069

28

1   Anything on that?

2           MR. WITTMANN:  That was all stayed pursuant to

3   Pretrial Order 30.

4           THE COURT:  The reason that I stayed the matter is

5   obvious.  We need to focus on this aspect of the case.  I need

6   the energy of all the parties to be directed to this aspect of

7   the case so that the claimants and the litigants on both sides

8   have the attention of their attorneys on this aspect of the

9   case.  After this aspect of the case clarifies itself, after

10  the dust settles a bit, then I will be meeting with counsel to

11  determine what's left, if anything.

12          After we determine what's left, I'll try to

13  group those issues, those areas, if they can be grouped, and

14  then I will talk to counsel about the most efficient way of

15  dealing with those groups.  We can either bellwether try some

16  aspects of the group or we can deal with them in some other

17  way.  The point is that now I've stayed everything, with the

18  exception of a couple areas, to give everybody an opportunity

19  to direct their full attention on this aspect of the case.

20          MR. WITTMANN:  Your Honor, I understand from

21  Mr. Herman that there will be a limited lifting of the stay

22  with respect to the FDA to allow some discovery go forward

23  there.

24          THE COURT:  I have done that in some aspects of the

25  case.

M010F2106

29

1          Discovery directed to third parties.

2          MR. WITTMANN:  The same situation, Your Honor.

3     There's a stay of all the deadlines that were set previously

4     pursuant to Pretrial Order 30.

5          THE COURT:  What about the records that we talked

6     about last time from Express Scripts?

7          MR. WITTMANN:  I think Mr. Herman can report on that,

8     Your Honor.

9          MR. HERMAN:  Yes, Your Honor.  May it please the

10    Court.  We have been in contact and negotiation with

11    Express Scripts.  We expect to reach an agreement with them

12    very shortly.  That agreement will make available 90 percent of

13    the ESI records on claimants on a cost basis rather than a

14    private profit basis.  Hopefully, we will be able to present

15    something to Your Honor next week.

16         THE COURT:  I do urge the parties, particularly

17    Express Scripts, to get this material as quickly as possible.

18    We are dealing with deadlines, and it's not going to be helpful

19    if they wait until the eleventh hour to produce the material.

20    So I urge them to do so.  If that's not forthcoming, I direct

21    counsel to let me know so I can get involved in it.

22         MR. HERMAN:  Yes, Your Honor.

23         THE COURT:  Deposition scheduling is IX.

24         MR. WITTMANN:  Your Honor, those were postponed by

25    agreement, and the parties are working together now to try and

30

1    reselect some dates.

2            THE COURT: X is state/federal coordination.

3    Anything from liaison counsel?

4            MS. BARRIOS: Good morning, Your Honor. Dawn Barrios

5    for the State Liaison Committee.

6            Recognizing your comments at the last status

7    conference with regard to the economic classes pending in the

8    MDL that are really not touched by the settlement and

9    recognizing your comments today on the need for a stay, we

10   certainly are following that. However, I can't remain idle.

11   What I have done, Your Honor, is I have put together a list

12   that I would like to give to your new law clerk, Bryan, and

13   welcome him to this litigation.

14           It's a list of 41 cases that we were able to

15   pick out through PACER that appear to me to be economic classes

16   or third-party payor cases to give you a sense of scope and

17   number of cases pending before you. I will reach out to these

18   attorneys for verification of this information and just, with

19   your permission, continue to comply with that so when the time

20   comes we'll have that information ready for Your Honor.

21           THE COURT: That's fine. Think about grouping them

22   in some way that makes sense so that we don't have to try every

23   case. See if they can be grouped into various categories and

24   then deal with one case in each category if that's possible.

25           MS. BARRIOS: Yes, Your Honor, I will endeavor to do

31

1   that.  I will also present Bryan with our two-disc set of the

2   remand motions.  I did not prepare another disc on the ten

3   cases that we call the "double remand cases" because they

4   remain the same.  We haven't found any additional ones.

5              THE COURT:  Thank you very much.

6              MS. BARRIOS:  Thank you, Your Honor.

7              THE COURT:  Anything on the pro se claimants?

8              MR. HERMAN:  Your Honor, to supplement the report

9   from Brown & Greer without repeating it, there were 1,160

10  pro se.  They each were sent certified letters and e-mails.

11  546 contacted our office in one or another, either through

12  submitting 286 registrations or requesting assistance and

13  information.  138 of the 1,160, we have been unable to trace

14  addresses or e-mails or other ways to notify them and the

15  information has come back to us.  78 have requested that the

16  Court consider appointing attorneys to represent them.  We

17  provided the Court and Merck with a list of those individuals.

18             THE COURT:  Okay.  I'll be meeting with counsel to

19  determine that.  My thinking is we can appoint somebody to

20  represent people who do not have representation.  Those pro se

21  claimants that have not responded, I will in time appoint

22  someone as curator to try to reach them.  We'll try to reach

23  them at the last known address.  We'll try to post something in

24  the newspapers to have them call.  We'll do whatever is

25  necessary to get the information out to them that they need to

32

1   call in.  If they still do not call in, then I will entertain a

2   motion from the defendants to dismiss the cases.

3        MR. HERMAN:  I should make it clear to Your Honor

4   that there are two types of pro se issues.  Individuals that

5   wanted substantive legal advice, because of our position as

6   liaison counsel, we would not be engaged by them because it

7   might portend a conflict.  Those individuals have requested

8   that a lawyer be appointed to advise them on substantive

9   rights.  We have undertaken approximately 600 advices on the

10  technical issues of registration.  Then there are another

11  category of individuals, approximately 138, whom we have had no

12  contact with.

13       THE COURT:  Okay.  What I'll be doing with counsel is

14  to discuss the potential of appointing somebody as standby or

15  advisory counsel.  I'll discuss that with counsel and also get

16  from them some suggestions as to the names of such a party.

17  We'll deal with that in time.

18       MR. HERMAN:  Yes, Your Honor.

19       THE COURT:  Merck's motions, XII.

20       MR. WITTMANN:  Your Honor, the motions that are

21  listed you have under advisement right now.  There's nothing

22  new to report on those.

23       THE COURT:  There are several motions that the last

24  time I was asked to withhold ruling on them.

25       MR. BIRCHFIELD:  Your Honor, we would ask you to

33

1  continue to withhold ruling for a short while if you could.

2          THE COURT:  I'll do it for a short while, but I do

3  have to rule on the matters.  I will withhold ruling.

4          XIII, issues relating to Pretrial Order 9.

5          MR. HERMAN:  There are no further comments,

6  Your Honor, necessary on that.

7          THE COURT:  Anything on the Vioxx suit statistics,

8  which is the next item on the agenda?

9          MR. WITTMANN:  The new suit statistics will be out

10  January 30, Your Honor, but there's not going to be much change

11  from the statistics reported in the status report from the last

12  time, so there's really nothing new to report on that.

13          THE COURT:  I'm glad to hear that because one problem

14  that I think MDLs traditionally have faced is that, once a

15  settlement is announced, there are oftentimes a great number of

16  cases filed after settlement to get in on the settlement.  I

17  expressed my concern about that.  I'm going to be, as I

18  mentioned the last time, skeptical of suits filed in mass

19  numbers subsequent to the settlement announcement.  I'm glad

20  that that concern has been heeded and I hope that it continues

21  to be heeded.

22          MR.         Motion to conduct case-specific discovery.

23          MR. HERMAN:  Your Honor, the PSC will not proceed

24  with case-specific discovery and it may not be necessary to do

25  so.  We will delay that matter at least until after the

34

1    enrollment period and the satisfaction of the contract
2    requirements with Merck.

3              THE COURT:  Okay.  The next item is Dr. Farquhar.

4              MR. HERMAN:  We have resolved that matter,
5    Your Honor.

6              THE COURT:  It can be taken off of the agenda, then.
7              The next item is XVII, PSC MDL trial package.
8    Anything on that?

9              MR. HERMAN:  Yes, Your Honor.  One of the attorneys,
10   Mr. Stratton, asked for some oral information and indicated
11   that he was going to register and recommend enrollment to his
12   clients, but what would happen if this Court in a single case,
13   for example, directed him to continue with representation with
14   a claimant that did not elect to enroll; would he, under those
15   circumstances, be able to get a trial package.  I indicated he
16   would; if this Court directed counsel to continue with a
17   nonenrolled claimant, they would certainly be entitled to the
18   trial package.

19             As Your Honor knows, the MI trial package is
20   complete.  I confirmed with Mr. Meunier, Mr. Rafferty,
21   Mr. Tisi, and Ms. Sanford this morning that by the time the
22   next status conference meets that Your Honor calls we will have
23   the stroke trial package complete and available, Your Honor.

24             THE COURT:  The next item is other motions.  Anything
25   on that?

35

1      MR. WITTMANN:  Your Honor, those have all been

2  resolved, I believe.

3      THE COURT:  The last item is --

4      MR. SEEGER:  Your Honor, I just wanted to note that I

5  have been in contact with Joe Danis and John Carey.  They are

6  in the group that filed the motions in Illinois.  We have had

7  numerous discussions and they have had legitimate concerns

8  about what things said and didn't say, and the amendment that

9  has been signed this morning has gone a long way to clarify

10  their issues.  I was informed this morning that they intend to

11  pull their motions down in state and federal court, which

12  pretty much mirrored the motions that were filed by John Eddie

13  Williams' group from Texas.

14      THE COURT:  All right.

15      MR. HERMAN:  Your Honor, that just leaves the

16  *Oldfather* motion, and we are working with them to try and

17  resolve that matter.

18      THE COURT:  The last item on the agenda is

19  third-party payor cases.  Anything on that?

20      MR. HERMAN:  No further discussion on that.

21      THE COURT:  Any new business that comes before the

22  Court?

23      MR. HERMAN:  No, Your Honor.

24      MR. WITTMANN:  No, Your Honor.

25      THE COURT:  The next status conference, then, will be

36

1    on February 21.

2         MR. BIRCHFIELD:  Your Honor, if I could just add one

3    comment to what Mr. Herman raised.  When he said we are working

4    with them to resolve that, all that means is that we will give

5    them, as it will be posted on the Web site, these amendments.

6    Since their issues mirror what have been previously raised, we

7    are confident that it will satisfy their concerns as well.

8    That's where we are with it.

9         THE COURT:  February 21 is the next date.  Court will

10   stand in recess.

11        THE DEPUTY CLERK:  Everyone rise.

12        (WHEREUPON the Court was in recess.)

13                         *  *  *

14                      CERTIFICATE

15        I, Toni Doyle Tusa, CCR, FCRR, Official Court

16   Reporter for the United States District Court, Eastern District

17   of Louisiana, do hereby certify that the foregoing is a true

18   and correct transcript, to the best of my ability and

19   understanding, from the record of the proceedings in the

20   above-entitled and numbered matter.

21

22

23

24                         Toni Doyle Tusa, CCR, FCRR
                            Official Court Reporter
25