1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  VIOXX PRODUCTS           *    Docket 05-MD-1657-L
            LIABILITY LITIGATION     *
6                                    *    July 27, 2010
                                     *
7   This Document Relates to All Cases  *  9:00 a.m.
    * * * * * * * * * * * * * * * * * * *

8

9

10              STATUS CONFERENCE BEFORE THE
                 HONORABLE ELDON E. FALLON
11              UNITED STATES DISTRICT JUDGE

12

13  Appearances:

14
    For the Plaintiffs:        Herman Herman Katz & Cotlar
15                             BY:  RUSS M. HERMAN, ESQ.
                               820 O'Keefe Avenue
16                             New Orleans, Louisiana 70113

17
    For the Defendant:         Williams & Connolly
18                             BY:  DOUGLAS R. MARVIN, ESQ.
                               725 Twelfth Street N.W.
19                             Washington, D.C. 20005

20
    Also Participating:        Lynn C. Greer, Esq.
21                             Orran L. Brown, Esq.
                               Terry McRoberts
22                             Matt L. Garretson, Esq.
                               Patrick A. Juneau, Esq.
23                             Dawn M. Barrios, Esq.
                               James R. Dugan, Esq.
24                             Ann B. Oldfather, Esq.

25

1    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, Room B-406
2                                    New Orleans, Louisiana 70130
                                     (504) 589-7778
3

4

5

6    Proceedings recorded by mechanical stenography; transcript
     produced by computer.
7

1                        **PROCEEDINGS**

2                        **(July 27, 2010)**

3          **THE DEPUTY CLERK:**  Everyone rise.

4              Be seated, please.

5          **THE COURT:**  Good morning, ladies and gentlemen.  Call

6    the case, please.

7          **THE DEPUTY CLERK:**  MDL 1657, *In Re: Vioxx*.

8          **THE COURT:**  Counsel, make your appearance for the

9    record, please.

10         **MR. HERMAN:**  May it please the Court.  Good morning,

11   Judge Fallon.  Russ Herman for plaintiffs.  I know you'll be

12   relieved that I developed laryngitis.

13         **THE COURT:**  Okay.

14         **MR. MARVIN:**  Good morning, Your Honor.  Douglas

15   Marvin for Merck.

16         **THE COURT:**  This is the monthly status conference,

17   one of our perhaps last status conferences, or at least moving

18   in that direction.  We have been meeting since February of 2005

19   on this matter.  I'm happy to say it's coming to a final

20   resolution.  I have a number of people on the phone, so please

21   speak in the microphone.

22             I've met with liaison counsel and lead counsel

23   for both sides and discussed with them the proposed agenda

24   today.  I have added some things to it.  We will take it in the

25   order that I have received it.

1    Settlement Agreement, anything on that?

2         **MR. HERMAN:**  May it please the Court.  Orran Brown

3    and Lynn Greer have a report from BrownGreer with regards to

4    the progress of distribution.  They will be followed by

5    Terry McRoberts, executive vice president of corporate trust of

6    U.S. Bank, who is here with vice president of the bank

7    Tom Tabor and the fund consultant.

8         **THE COURT:**  Before Lynn proceeds, I do want to

9    mention that my law clerk, Katie Wozencroft, will be leaving

10   us.  She is going to work in New York for a public defender

11   there.  Joe Escandon is replacing her.  We thank Katie for her

12   work and look forward to working with Joe as we complete this

13   matter.

14        **MS. GREER:**  Lynn Greer from BrownGreer, and I'm here

15   with Orran Brown today.  We, in our firm, have been privileged

16   to serve as the Vioxx claims administrator in this matter.

17   Today what we want to do is take the Court and those here and

18   on the phone through the process from the beginning to the end.

19   I want to just dispell the rumor that I think Mr. Marvin has

20   started that although we are going to cover a lot, no one needs

21   a brown-bag lunch to survive this presentation.

22             What we do want to do this morning is generally

23   give an overview of the Settlement Agreement and its basic

24   terms, what the goals of the Settlement Agreement were and what

25   our collective goals in this program have been, and then to go

1   through the steps in the program very briefly, to hit the high

2   points and to give the Court and those listening some

3   statistics on what the program has accomplished, and then to

4   provide a conclusion.

5            Your Honor, very briefly, the Settlement

6   Agreement was negotiated for approximately a year before it was

7   signed on November 9, 2007.  Shortly after the agreement was

8   signed, the leaders of the plaintiffs went out and had meetings

9   all over the country to explain the terms of the Settlement

10  Agreement, to answer questions about it.

11           Within a week of when the Settlement Agreement

12  was signed, we had a Web site and a toll-free number up and

13  running to be able to address the questions of those who had

14  not been able to attend the meetings.  Unrepresented claimants

15  were able to start calling in.  The process was underway within

16  a week of when the Settlement Agreement had been signed.

17           The settlement fund provided $4 billion in the

18  MI fund and $850 million in the IS fund.  To be eligible for

19  the program, there were three basic requirements:

20           You had to be a U.S. citizen, you had to be a

21  legal resident, or you had to be physically located in the

22  United States at the time you suffered your eligible event.

23           You also had to have a pending lawsuit or a

24  tolling agreement as of the date the Settlement Agreement was

25  signed, 11-9-07.

1          You had to have suffered losses or damages

2    allegedly as a result of an eligible event and to then be able

3    to pass the duration and proximity criteria that we'll talk

4    about in a little bit.

5          This program, Your Honor, as you have mentioned

6    several times, could not be possible without many, many

7    participants.  The Court is at the top of this circle to

8    signify the leadership that you have provided throughout this

9    program, and those surrounding the circle have had an equal

10   role in the success of this program.  It includes the NPC and

11   Merck, the special masters, all primary counsel, the claimants

12   themselves, the lien resolution administrator, the gate

13   committee, the *pro se* curator, the escrow agent U.S. Bank, and

14   the claims administrator.  None of what we are going to talk

15   about today, in terms of the final payments, could have

16   happened without the cooperation of everyone depicted on this

17   circle.

18         The Settlement Agreement provided for basic

19   deadlines in the program.  The first was registration, and that

20   deadline was January 15, 2008.  Enrollment for interim

21   payments, the deadline was February 29, 2008.  Claims packages

22   had to be submitted by July 1, 2008.  MI interim payments were

23   to begin in August of 2008.  The last date to enroll was

24   November 30, 2008.  The very final claims package submission,

25   after extensions that were provided for in the Settlement

 1    Agreement, the final deadline was 12-30-08, and the IS interim
 2    payments were to begin in February of 2009.
 3                  The goals of the Settlement Program, as we
 4    collectively have developed them, were that this program
 5    provide communication and transparency, that there be due
 6    process and fairness, and that the claims be timely processed
 7    and paid.
 8                  The communication and transparency was achieved
 9    primarily through these monthly MDL status conferences that
10    were open to everyone in person and on the phone.  After each
11    status conference, we made the presentations on at least the
12    claims status available on the claims administrator Web site.
13                  The communication was achieved primarily through
14    broadcast e-mails from the claims administrator.  What we did
15    was to provide any important news and developments that would
16    be posted and broadcast to all primary counsel, and these
17    e-mail blasts would alert firms to deadlines and to important
18    developments in the program.
19                  A secure Web portal was something that people
20    participated in.  What we did was we set up a secure portal for
21    each primary counsel firm.  It was a secure portal so that only
22    those people authorized by the firm could log in and see the
23    status of their claims.  What it allowed each lawyer to do for
24    his or her claimant was to view and monitor the status of the
25    claim as it progressed through the program, to be able to

1    provide information, to submit information around the clock
2    every day of the week.
3                   This is an example of some screenshots from the
4    portal, just to give the Court an idea of what counsel saw when
5    they signed on.  They can search by claimant, by last name, by
6    whatever the juncture in the program was that they were
7    interested in viewing.
8                   Further communication was achieved by claims
9    administrator contacts, which were folks in our office who were
10   assigned to firms, and that firm had one person at the claims
11   administrator's office to be able to call and to talk about any
12   claimant or any issue that arose.
13                  We also had a special *pro se* team that
14   communicated with the unrepresented claimants.  The *pro se*
15   curator's office did a remarkable job.  It was appointed by the
16   Court to assist and discuss the status of the Settlement
17   Program and the status of individual claims with the
18   unrepresented claimants as well.
19                  This slide depicts the Vioxx portal.  The portal
20   was not just available to primary counsel.  We designed, with
21   input from many people, a central hub where every participant
22   in the program could access the information that was stored
23   centrally in our database.
24                  The *pro se* curator could come into the portal
25   and see the status of the unrepresented claimants, who then log

1    their own call center information into the portal.  Primary

2    counsel we have discussed.  Merck and the gate committee, in

3    exercising its obligations under the Settlement Agreement, also

4    had their own portals where they could see the status of the

5    claims that they were reviewing.  The special master had access

6    to the portal to be able to decide the appeals.  The lien

7    administrator had access to the portal, and we worked together

8    to post information about the lien developments in the program.

9              The second goal was due process and fairness,

10   and this was achieved by the multiple layers of review that the

11   Settlement Agreement provided.  It started with the claims

12   administrator, but at every point there were multiple layers of

13   review with the gate committee and the gates process, Merck

14   then, and then the special master, who really was the fourth

15   level of review, sometimes the fifth and sixth because of how

16   many times we would look at a claim if an issue arose.

17             It was important that we post the results of our

18   reviews very timely.  The portal allowed us to post results of

19   a review instantaneously, as soon as our reviewers had

20   completed a review, so that law firms could see it immediately.

21   There was no delay in the mail.  We did mail notices to *pro se*

22   claimants in a timely fashion so that they could be apprised of

23   deadlines and be able to meet them.

24             The Settlement Agreement provided numerous

25   opportunities to perfect claims submissions.  Even though, for

1   example, the initial claims package deadline was July 1, 2008,

2   the Settlement Agreement provided three or four different

3   opportunities before it all cut off at the end of that year to

4   be able to perfect claims packages.

5                    Reasonable extensions were granted throughout

6   the program.  There were times, as Your Honor understands and

7   supported, where we had to say no more deadlines to be able to

8   meet the goals.  Throughout the process, when faced with a

9   request, we tried to be reasonable in granting those

10  extensions.

11                   The next part of the presentation will discuss

12  registration.  Orran is going to discuss registration and

13  enrollment, and then I will review the claims status.

14           **THE COURT:**  Good.

15           **MR. BROWN:**  Good morning, Your Honor.  I'm Orran

16  Brown from BrownGreer.  Many of you may be very happy, though

17  some may be quite dismayed, to know that I did not develop

18  laryngitis over the evening.

19                   We will take us back now to our early days, back

20  to the beginning of the program and very quickly just recap how

21  those initial steps worked because they were key to the success

22  of this program, starting with the registration phase.

23                   This slide, No. 19, just shows us how that

24  process worked.  With the Court's orders and the coordinated

25  orders from Texas, New Jersey, and California, this step

1   required all Vioxx claimants to step forward and identify

2   themselves.  Back in those days, the Court referred to this as

3   taking a census.  A lot of programs skip over this step and

4   just go to sign-up, but this was a key step, with the Court's

5   backing with those orders, to identify the population that was

6   involved so that then all the parties and the courts knew who

7   was involved and how many claims were out there.

8            So this is how that process worked, briefly.

9   When we first started working on this, we created a spreadsheet

10  that law firms could use in Excel to give us all the

11  information about their clients and their claims.  We made that

12  available to them electronically so they could fill it out and

13  give it back to us, and they e-mailed it back to us generally

14  or sometimes sent it on a CD.

15           Working in the electronic format made it faster,

16  easier for all of us, with the firms inputting that

17  information.  For *pro se* claimants, they had to do it by paper,

18  and we worked with them on paper to make sure they understood

19  what they needed to do to register, the first step for this

20  program.

21           That was the first information that went into

22  our database, the massive database that we now have that was

23  generated and allowed this program to work.  This was the first

24  information we started collecting about the claimants, the law

25  firms, who was involved.

1        Once we got that information from a law firm

2   that was designated as primary counsel for a claimant or group

3   of claimants, we then sent them an introductory letter to teach

4   them how to use this Web interface, the Vioxx portal that Lynn

5   described, so that that method of communication could take over

6   from that step forward, giving them a secure access to all

7   their claimant information that they use and access via secure

8   password.

9        The box down here shows us we ended up with

10  1,061 different firms who had Vioxx claimants who were involved

11  in this program, who sent us over time over 2,700 of these

12  spreadsheets, because firms would send us additional ones and

13  new ones as the information changed.  Some of those firms had

14  one client, some of them had hundreds or thousands of clients.

15       We also ended up with 1,126 of these

16  registration affidavits that the order required from

17  unrepresented claimants.  Obviously there, because there are

18  893 people, some of those folks sent us more than one, but we

19  sorted them out to get down to individual claimants.

20        This was the registration affidavit required by

21  that set of orders that started the program.  It provided basic

22  information about the lawyers involved, their clients, the

23  injuries that they asserted, derivative information, any of the

24  family members or spouses who were also connected to the claim

25  whose releases were also necessary in this program, and then

1    any other law firms who had an involvement as secondary

2    counsel.  This process was used to give us that information,

3    and law firms were required to provide us this affidavit

4    certifying that they were representing these folks and they

5    were authorized to act on their behalf.

6                    At the end of the day, we ended up with 59,365

7    Vioxx claimants who registered in the census for this program,

8    most all of whom were represented.  This number of 1,224

9    *pro se's* is the number we had to start out with.  The number of

10   unrepresented claimants moved around a lot because people would

11   gain law firms and become represented or law firms would

12   withdraw from clients, generally with the Court's permission,

13   and so the number of *pro se* claimants was a little bit of a

14   moving target.  It is always around 1,000.  This 1,224 was our

15   high point of how many people, in the early days, signed up

16   originally as registered as unrepresented people.

17                   Our next step was enrollment.  Item B on this

18   slide was once you're counted and we know the audience, how

19   many people actually want to sign up for the program and

20   participate in the program, and so we entered the enrollment

21   phase.  That required each claimant to complete a set of

22   documents.  The centerpieces were a release and a stipulation

23   of dismissal that if you had a lawsuit pending that we would

24   hold in escrow until the claim worked through the process.

25   They also were required to do a medical authorization form and

1   an authorization form to obtain employment records if they

2   intended to make a claim for lost wages or income in the

3   extraordinary injury program.  Those pieces are components of

4   the enrollment package.

5            Once we knew who the clients were from

6   registration, we were able to generate those documents and send

7   them to the law firms to fill out electronically, in an

8   electronic image that they would print out already bar-coded,

9   already labeled with a person's identifying information, so

10  that sped up the process for them and us to get those materials

11  back.

12           They could download them or we would send them

13  on CDs, and now most of the information was being exchanged

14  through this Web interface, the portal, with these law firms,

15  and it sped up the process for all of us.  They would then

16  obtain the signatures necessary on the documents and then

17  either e-mail them back to us or upload them on the portal and

18  in some instances mail them or deliver them to us.

19           Then we would process them, log them in, and in

20  the enrollment phase those documents had to be reviewed for

21  completeness:  Were they signed?  Were they signed by the right

22  person?  Merck and its counsel were involved in this process.

23           At this stage is where a lot of these programs

24  kind of founder because that paperwork process can take a long

25  time.  It's confusing.  You have to get the right people to

1  sign.  Sometimes there are estate issues involved about who can

2  sign, family members who won't sign.  Here the parties work

3  really hard with us to keep that moving.  Merck and its counsel

4  really put a lot of resources on making this happen and not

5  having it bog down the program, and it did not bog down the

6  program.  We promised it wouldn't and it didn't.  We moved

7  through that process and figured out, in many instances agreed

8  on ways to sort of relax some standards or temporize some

9  issues so that they could be put off until later so claims

10  could keep moving.

11              We would then give the results of reviews of

12  those documents and tell the law firms through their portal

13  what was wrong with them, how they could fix them, and how they

14  could submit cures to us, which they did, to get their

15  documents in order that they could then move through the

16  program.  Of course, all of this is done with *pro se's*,

17  unrepresented people, by letter.

18              This is what we ended up obtaining in the

19  enrollment phase.  These are the documents that were part of

20  the enrollment package, and we ended up with 51,000-plus

21  releases.  Now, that equated to about 92,000 documents because

22  a lot of releases came in in parts and repeated over and over

23  to get them right or more than one copy of it.

24              The left-hand column on claimants tells us how

25  many people.  These are all the documents that we collected in

1   the enrollment phase, with the net result being this 51,764

2   people who attempted to enroll.  Most of them ended up

3   successfully enrolling or had to send us some piece of this

4   enrollment package or all of it.  All the work that was

5   necessary on the claimant's part, the lawyer's part, this is

6   where we ended up in the enrollment world to have people

7   actually in the running now to start the claims process in the

8   program.

9               If we want to step back and look at the

10  registration phase and the enrollment phase and how did it

11  collect the Vioxx litigation world, at the end of the day, if

12  we look at the number of claimants who registered and then look

13  at and if we back out -- this number right here are people who

14  were not U.S. citizens or did not have a lawsuit or tolling

15  agreement.  They were not eligible for this program.  Then we

16  get down to a net number of 58,000-plus of people who are

17  eligible to participate in this resolution program.

18              Then if we count up all the people who were

19  enrolled in a program and went through the program to a finite

20  state -- they ended up getting paid, or they ended up dropping

21  out, or they ended up not finishing their claim and getting

22  closed, if you add up those and any of the folks who ended up

23  being dismissed -- as the Court well knows, there was a series

24  of dismissal orders where people hadn't perfected their

25  packages, or hadn't complied with various pretrial orders, or

1    in some instances claimants who just said, "I don't want a

2    claim anymore.  I'm abandoning my claim," or had been inactive.

3              Around 58,000 people -- and I say "around"

4    because that number is not static.  There are dismissals every

5    day.  There are withdrawn cases every day still.  There's still

6    cleanup activity going on on those.

7              In Row 5, there are only about 50 claims, or

8    around that number, or fewer than 50 that are still folks who

9    could have been in this program, are eligible for the program,

10   and are still not resolved, which gives us this kind of

11   remarkable number down here of almost 100 percent of the Vioxx

12   litigation audience, of people who could have been in this

13   program who ended up being resolved directly through this

14   program or as a result of the program.

15             The next phase of the program was the claims

16   section and all the steps involved in that, and Lynn is going

17   to walk us through how that process worked.

18        **MS. GREER:**  The claims package deadline, as I

19   mentioned before, was July 1, 2008, and there were four

20   components of the claims package that were required.  The first

21   was the claims form that firms could fill out on line for their

22   claimants.  The second were the required pharmacy, medical, and

23   event records, which were called the PME records, and this was

24   the crux of the claims package because this program was founded

25   on evaluation being performed only on contemporaneous medical

1    records.  Unlike many programs, where affidavits are allowed to

2    come in to produce, this program was masterful in requiring

3    that there be contemporaneous records at the time of the event,

4    at the time of dispensation of Vioxx, to be able to prove the

5    claim, and the effects of that we will talk about later in

6    terms of how successful this was.

7                The profile form, if the claimant had submitted

8    one in the litigation, was required in the claims package, and

9    then there was a catchall that if there was any other

10   information that we required or the special master required as

11   we reviewed the claims, that had to be submitted as well.

12               This slide shows the deadline in the claims

13   package submission.  Again, the first deadline was July 1.  The

14   Settlement Agreement provided the opportunity for three notices

15   of deficiency.  We sent those out in early September and early

16   November and late November to remind those who had not given us

17   the required components of the claims package that they must do

18   so.  The final deadline was December 30, 2008.

19               These were the number of deficiency notices that

20   we sent.  The first notice of claims package deficiency was

21   sent out to 12,431 claimants.  So there were this many folks

22   that as of July 2 or thereafter had not submitted us a claims

23   package.  Many people cured.  So in September the number of the

24   second notice that we sent out only went to 9,700.

25               In Row 3, more people were coming into the

1   program.  We sent out over 10,000 notices of claims package

2   deficiency.  We ultimately sent out notices of nonsubmitting

3   program claimant, which meant that the claimant had not been

4   able to submit enough material to be considered a claimant in

5   the program, to over 2,500 claimants.  We issued over 35,000

6   deficiency notices or notices of nonsubmitting program

7   claimant.  Ultimately, we closed almost 2,000 claims for

8   failure to be able to provide the required records.

9              This slide shows how many materials we received

10  in electronic and hard copy.  The total number of documents we

11  received as part of this process is 598,830.  That reflects

12  medical records, pharmacy records, and all of the records that

13  were required and were submitted through a lot of diligence by

14  firms and claimants together to gather those and submit those

15  to us.

16             The first review phase of the program was what

17  was called the gates review.  The Settlement Agreement provided

18  that a claim, to be able to make it through to a points review,

19  had to pass three gates:

20             The first gate was the injury gate, and that was

21  a requirement that you had to show that you suffered a heart

22  attack, a sudden cardiac death, or an ischemic stroke.

23             The second gate was the duration gate, and what

24  that required was that you had to show a minimum of 30 Vioxx

25  pills within a 60-day period prior to your event.

1          The third gate was the proximity gate.  The goal

2    of this gate was to try to be able to gauge how proximate your

3    use of the Vioxx was to your alleged injury, and there were

4    five different ways to be able to meet the proximity gate.

5          The last one, it all had to do with pill counts.

6    We didn't look to see whether there was proof that the Vioxx

7    pills had actually been ingested, only that they had been

8    dispensed.  There were time parameters and pill counts that

9    were prescribed in the Settlement Agreement.  The medical

10   records, when you went in and were suffering your heart attack,

11   if it showed you were on Vioxx as a current medication, that

12   was enough to pass the proximity gate as well.

13         The Settlement Agreement also provided different

14   levels of gate review, and the levels of discretion were

15   different at each level.  The first review was ours, the claims

16   administrator's review; very little discretion, if any.  We had

17   to strictly adhere to the terms of the Settlement Agreement.

18   There were things that were perhaps close calls that we could

19   not allow a claim to pass if it did not meet one of those

20   technical requirements of the Settlement Agreement.

21         The Settlement Agreement provided that the gate

22   committee could pass such claims if those claims met the

23   general intent of the Settlement Program.  The gate committee

24   had much more discretion than we.  The gate committee was

25   comprised of representatives from Merck and from the NPC, and

1   the committee worked very, very diligently in reviewing

2   thousands of claims in record time.  A majority vote of the

3   gate committee was enough to make the claim eligible.

4                   Merck had the right under the Settlement

5   Agreement, if the gate committee did not have the claim, to

6   push the claim.  It was a unilateral push right.  There were

7   limits on the numbers of claims that Merck could push.  They

8   did not push as many as the limits were.  They worked very,

9   very closely to pushing the claims that, again, were within the

10  spirit of the Settlement Agreement.

11                  By the time it got to the special master with

12  all of these increasing levels of discretion that were accorded

13  under the Settlement Agreement, the special masters would look

14  at this to see:  Is this a claim that just slipped through the

15  cracks?  Is this one that really does adhere to the terms of

16  the Settlement Agreement?

17                  So at that point, even though it was a *de novo*

18  review, the special master in essence was doing a lot of what

19  we had done in the beginning.  Maybe some additional documents

20  had come in along the way.  Really, the discretion at the gate

21  process rested in the hands of the gate committee and in the

22  hands of Merck and not so much with us or the special master,

23  although the special masters did put claims into the program

24  based on new evidence or things that the special master, in his

25  appellate review, decided to put in.

1     This slide shows the gates process.  What would

2  happen:  If we failed it, we would send the claim immediately

3  to the gate committee.  The first step was we would send a

4  notice to the claimant to be able to give them a chance to

5  submit documentation.  If they did, we could then pass it.  If

6  they didn't, we would send it to the gate committee.

7     If the gate committee passed it, then they would

8  get a notice of eligibility, the claimant would.  If the gate

9  committee failed it, then the claim was sent to Merck.  If

10  Merck passed it or pushed it into the program, the claimant

11  would go towards points review.  If Merck, after its review,

12  failed it, then the claimant would get a gate committee notice

13  of ineligibility.

14     At that point the claimant had two choices:  He

15  or she could either submit a future evidence stipulation, which

16  would allow the claimant to exit the program and return to

17  litigation, or the claimant could appeal to the special master.

18     If the special master granted the appeal,

19  obviously the claim would go towards points.  If the appeal was

20  denied, then the claimant would get a final notice of

21  ineligibility and the claim would be closed, as it would if the

22  future evidence stipulation expired.

23     This slide shows the ultimate pass rates for

24  heart attack and stroke claims.  The sudden cardiac deaths are

25  subsumed within the MI category.  What this slide shows us is:

1          Out of 30,499 MI claims that went through the

2    program, 20,611 passed for a pass rate of 67.6 percent; 9,888

3    failed for a failure rate of 32.4 percent.

4          For strokes, there were 17,863 claims that went

5    through the gates process.  Of those, 69.8 percent passed or

6    12,464 claims, 31.2 percent failed, for a total of 5,399

7    claims.

8          So out of 48,362 claims that went through,

9    33,075 passed, 15,287 failed.

10          This slide shows how claims passed.  You'll see

11    from the numbers that the claims administrator, upon first

12    review, found that 10,362 heart attack claims met the specific

13    terms of the Settlement Agreement.  4,343 stroke claims met the

14    specific terms of the Settlement Agreement.  So we were able to

15    pass, adhering to the terms of the Settlement Agreement, a

16    total of 14,705 claims.

17          When the gate committee and Merck reviewed the

18    claims, they were able to pass around 10,210 heart attack

19    claims, another 8,104 stroke claims.  So the gate committee and

20    Merck together passed more than we were able to -- again,

21    because they had more discretion -- and they passed 18,314 who

22    were allowed to come into the program.

23          The special master then, upon appeal, granted

24    appeals in 39 heart attack claims and 17 stroke claims for a

25    total of 56 claims.  Out of many that the special masters

1  reviewed, they put 56 in the program.

2          So the totals are, again, the 20,611 heart

3  attacks, 12,464 strokes, for a total of 33,075 claimants who

4  ultimately were able to go through the points process and be

5  paid.

6          This is what happened to the claims that failed

7  gates.  Of the 15,287 that failed, 6,019 did nothing.  They

8  neither appealed or submitted an FES, a future evidence

9  stipulation.  3,793 heart attacks and 2,226 strokes simply did

10  nothing after they received the gate committee notice of

11  ineligibility.  8,381 total appealed to the special master, and

12  the special masters affirmed the gate committee's and Merck's

13  decision and the claims administrator's decision.

14          5,319 claimants who appealed to the special

15  master for heart attack claims were not able to go further, and

16  3,062 claims were closed after the special master affirmed the

17  decision.  A total of 887 submitted the FES form:  776 heart

18  attack claimants and 111 stroke claimants.  This, again,

19  comprises the total population of the claims that failed gates

20  as 15,287.

21          Once a claim passed gates, it then joined the

22  queue for review for points, and the Settlement Agreement

23  provided that claims will be evaluated using four different

24  components:

25          The first was what we call basis points, and

1   that was looking at the claimant's age at the time of the

2   eligible event, the overall duration of Vioxx drug use, and the

3   injury level.  The Settlement Agreement prescribed very

4   specifically what the injury levels were.

5              Those were the basis points, and then you had to

6   alter those either positively or negatively for consistency of

7   use and label adjustment.  These two components had to do with

8   how much Vioxx the claimant used in the year prior to the

9   eligible event, which was the consistency of use adjustment,

10  and the label adjustment is when the claimant first started

11  taking Vioxx, the date on which he or she first started taking

12  Vioxx.

13             Then once you got that -- that was called the

14  subtotal points -- then you had to look at the risk factors,

15  and the risk factors in the Settlement Agreement were specific.

16  They were specific deductions that we were to take if the risk

17  factors were apparent, again, in the contemporaneous medical

18  records.

19             The deadlines for the points process were the

20  claims administrator completed a review of 2,500 MI claims by

21  August of 2008, so we had enough completed claims packages to

22  be able to do this.  At that point we were able to project what

23  a likely MI point total would be so that we could commence

24  making payments later that month.  So August of 2008 is when

25  interim payments began.

1          In February we had completed a review of 2,500

2    stroke claims, which is what the Settlement Agreement said,

3    again, that we needed to do to be able to do a projection, and

4    interim payments for stroke claims began and went out for the

5    first time on February 27, 2009.  We made final payments for

6    over 20,000 heart attack claimants on October 8, 2009, and most

7    recently made final payments for over 11,000 stroke claimants

8    on June 14 of this year.

9          Before a claim could become complete for points,

10   it had to be complete enough for us to do a review.  A claims

11   package could be complete for gates review and not for points

12   review because there was so much more that was required for a

13   points review.  This slide depicts the process that we would go

14   through if our reviewers picked up a claim and realized that

15   they could not proceed any further.

16         As we discussed before, this was a point in the

17   program that we hit a few snags simply because the percentages

18   of incomplete claims packages were very high.  The ultimate

19   incomplete rate for the heart attack claims was 15 percent, and

20   for stroke claims the first assessment of the claims package

21   being incomplete was in 28 percent of the claims.

22         What we would do is we would stop the review.

23   We had to stop the review, and we would send notices to the

24   claimant.  Most claimants, most counsel sent us what we needed,

25   what was missing.  The choices, if they were not able to do

 1    that, were to either elect at that point just to give up and

 2    become a nonsubmitting program claimant -- only one such person

 3    did that.  To be able to keep these claims moving, what we

 4    decided to do collectively was to say we have enough in the

 5    claims package to at least do something, we can assess an

 6    injury level.

 7                   What we needed to do, though, a lot of times the

 8    records that we were missing were records where we could have

 9    found a risk factor that we would need to assess.  So the

10    claimants were given a choice to either elect to become a

11    noncommitting program claimant or to take what we call the

12    standard deduction.  What we did was we had enough data at that

13    point to be able to say for claimants asserting this injury, on

14    this injury level, at this age:  "Here is the average risk

15    factor adjustment that we see in this population."

16                   There were 130 heart attack claimants who ended

17    up taking a standard deduction to be able to get paid.  The

18    average deduction that those claimants received was almost a

19    55 percent deduction, which means that in all of the claimants

20    similarly situated, that was the average risk factor adjustment

21    that we would take.  There were 102 stroke claimants who

22    ultimately accepted the standard deduction, and that was almost

23    a 62 percent deduction.  So the good news is that out of all of

24    the claims that we found initially incomplete, there were only

25    232 who ultimately had to take a deduction because they simply

1   could not get us the claims package materials.

2                   This slide is just a slide depicting how many

3   notices of incomplete claims packages we sent.  We sent a total

4   of 6,644.  As you read down this slide, which I won't do, this

5   just shows how many notices we issued as part of the points

6   process, including our initial notice of points, 33,000,

7   post-appeal notice of points awards after claimants would

8   appeal to us, and then special master notice of points awards

9   after they would appeal to the special master.

10                   Your Honor, in the past we have shown this

11  slide, which is a slide depicting the injury levels in the

12  heart attack claimant population, and we have shown what the

13  average points were.  We are able today, now that everything is

14  closed and the data is set, to show exactly how many claimants

15  ended up in the heart attack claimant population on each injury

16  level and what the percentages of claims were that landed on

17  each level.  The slide shows:

18                   Level 1:  2,878 claimants or 13.98 percent of

19  the total.

20                   Level 2:  539 claimants or 2.62 percent.

21                   Level 3:  3,572 claimants or 17.35 percent.

22                   Level 4:  1,330 claimants or 6.46 percent.

23                   Level 5:  9,729 claimants.  Almost 50 percent,

24  47.25 percent, of the heart attack claimants ended up on

25  Level 5.

 1                    Level 6:  1,289 claimants or 6.26 percent.

 2                    Special marker claimants -- and these were

 3       claimants that had point totals for the MI claimants of fewer

 4       than 10 -- there were 1,254 claimants, and that comprised

 5       6.09 percent of the entire MI claimant population.

 6                    For strokes, what this slide shows is that on

 7       Injury Level 1, there were 590 claimants who ended up there or

 8       4.74 percent of the total.

 9                    Injury Level 2 was 275 claimants or 2.21 percent

10       of the total.  The average points there were higher than the

11       average points on Injury Level 1 because the stroke grid

12       provided higher points on Injury Level 2 because it was the

13       disability level, with claimants who fell onto this level

14       generally needing longer term care.

15                    Injury level 3:  1,516 claimants or

16       12.18 percent.

17                    Injury level 4:  Only 62 claims at .5 percent.

18                    The vast majority of the stroke claimants were

19       Injury Level 5:  9,077 or almost 73 percent of the stroke

20       claimants.

21                    927 stroke claimants were special marker

22       claimants.  The point threshold there was that if the points

23       for a stroke claim were fewer than 2, then a stroke claim would

24       be a special marker claimant.  7.45 percent of the stroke

25       claimants were special marker claimants.

1          This program did have an audit provision, as

2   most do.  This slide shows the general level of activity that

3   surrounded these claims with audit.  The takeaway from the

4   audit program is that there were almost 7,000 claims that our

5   reviewers proposed for audit review initially.  What our

6   reviewers would do is they were trained to look through the

7   medical records and to see any inconsistency that caused a

8   question either about dates of use or claimant identity.  A lot

9   of times these are nothing more than two medical records

10  containing different dates of births and they were very, very

11  easily reconciled, no problem whatsoever.

12         So you will see that Row 1, for heart attack

13  claimants, there were almost 5,000 claims that were flagged

14  immediately by reviewers possibly having a problem, but almost

15  4,000 of those were released upon further review.  The same

16  with the strokes:  2,825 were proposed for audit review by our

17  reviewers, but almost 2,000 of those were almost immediately

18  released as having no concern.

19         We then subjected 1,128 heart attack claims and

20  841 stroke claims to a little further scrutiny.  At this level

21  we would use the medical authorization that Orran described as

22  being part of the enrollment package to go back and get

23  additional medical records to shed light on inconsistencies

24  that we would find.  Sometimes the inconsistency was nothing

25  more than a few missing pages in a document that we thought had

 1   sequential Bates numbers.  Because they were missing, we
 2   wondered why.
 3                    Again, our reviewers were trained for this, and
 4   we did a very lengthy review of this.  Happily -- and I think
 5   it's a testament to, again, the way this program was set up.
 6   Any time you have a program that deals with contemporaneous
 7   medical records and doesn't allow a lot of subjectivity to come
 8   in, the controls are much, much stronger and the likelihood of
 9   fraudulent activity is much, much lower.  That was certainly
10   true here.
11                    We only referred 8 heart attack claims and 3
12   stroke claims to the special master for review.  The totals of
13   all the claims that we looked at that possibly had any sort of
14   problem -- and most of them had absolutely no problem -- only
15   6 percent of the heart attack claims and 8 percent of the
16   stroke claims were held up for just a few days, in most
17   instances, because of our audit review.
18                    As part of the points process, claimants could
19   appeal their notice of points award.  The first step in that
20   was to appeal a claim to us.  Many times this involved sending
21   us additional medical records.  Many times, once the claimant
22   appealed to us and provided additional records, the claim was
23   resolved and the claimant accepted the award.
24                    There were 1,095 total claimants, though, who
25   even after we reviewed the claim wanted to go further to the

1  special masters, as they were certainly able to do under the

2  Settlement Agreement.  This slide shows the results of the

3  appeals to the special masters.

4           What it shows is that for the heart attack

5  claimants, 392 appealed a points decision to the special master

6  and -- well, 392 appeals were denied in full by the special

7  master or 76.3 percent.  Stroke claimants, 451 out of 581 were

8  denied in full for a percentage of 77.6 percent.  The special

9  master granted the appeals in 93 heart attack claims and 69

10  stroke claims or a total of 162 claims.

11           Claimants were able to appeal any one of the

12  issues that they disagreed with, so often they may succeed on

13  one issue but not on the other.  That's what this row

14  signifies, that they were successful in some aspect of their

15  appeal a total of 90 times:  29 heart attack and 61 stroke

16  claimants.

17           Again, these numbers reflect the layers of

18  review that we discussed early on, the multiple layers of

19  review, the chances the claimants had to submit additional

20  documentations up until this point, and the numbers really

21  reflect very focused effort by the special master to look

22  through the medical records, looking through every page,

23  looking through summaries and cover letters that counsel wrote

24  to support their appeals, oftentimes looking at additional

25  records, requesting that additional records be submitted to be

1    able to decide the appeal.  This slide represents and almost

2    oversimplified the tremendous amount of work that Mr. Juneau

3    and the deputy special masters dedicated to this program and

4    made possible.

5             The last thing that I will talk about are the

6    payments that have been made, and this slide shows the payments

7    that have gone out to the heart attack claimants.  There have

8    been 19,286 what we call nonspecial marker claimants, so these

9    are claimants with points awards greater than 10 that have been

10   paid.  The final MI point value was $1,865.01.  The total paid

11   to the nonspecial marker claimants is $3,603,121,746.  The

12   average nonspecial marker payment across all of the almost

13   20,000 heart attack claims is $186,825.  The 1,247 nonspecial

14   marker claimants were paid a total of $6,038,469.

15            Row 7 shows that 20,533 heart attack claimants

16   have been paid over $3.6 billion.

17            Row 8 shows that as of yesterday there were

18   still 58 heart attack claimants who had not yet been paid; of

19   these, 6 have perfected.  Most of the reason that the claimants

20   at this point have been unpaid are enrollment reasons dealing

21   with estate issues that Orran mentioned earlier.

22            Since we have prepared this slide and actually

23   since we paid the claims in July, there have been another 6

24   that will be paid in August.  So this number of unpaid

25   claimants goes down every day as documents are submitted to be

1    able to perfect any remaining deficiency.

2                    This slide shows the dollars associated with

3    each injury level in the heart attack population for the

4    nonspecial marker claims.  What this shows is that for

5    Injury Level 1, the average payment that was made to a heart

6    attack Injury Level 1 claim was $374,112.  The lowest payment

7    that was made on Injury Level 1 was $18,743.  The highest

8    payment was $1,795,072.

9                    This range, as you will see throughout the

10   slide, really reflects many things that the points process took

11   into account -- the age of a claimant, the number of risk

12   factors -- and that's why you have such a wide disparity on the

13   same injury level for the lowest and the highest payment.

14                   Injury Level 2, the average payment made to an

15   Injury Level 2 heart attack claim was $341,967, the lowest

16   payment at that level was $19,023, and the highest payment was

17   $1,328,820.

18                   Injury Level 3, the average payment was

19   $249,343, the lowest payment was $19,004, and the highest

20   payment was $1,135,959.

21                   Injury Level 4, the average payment was

22   $173,274, the lowest payment was $22,380, and the highest

23   payment was $822,469.

24                   Injury Level 5, the average payment was

25   $146,648, the lowest payment was $18,762, and the highest

1   payment was $822,488.

2                  Injury Level 6, the average payment was $92,149,

3   the lowest payment was $18,650, and the highest payment was

4   $427,684.

5                  It's important for folks to realize, as you look

6   at these, the averages are just that, and the lowest and the

7   highest reflect the very individualized approach that the

8   Settlement Agreement provided to take into account a myriad of

9   factors that affected these values.

10                 The stroke claimants, we have paid 11,306

11  nonspecial marker claimants.  The final point value for strokes

12  was $1,833.32.  We have paid over $691 million to the stroke

13  nonspecial marker claimants.  The average stroke payment is

14  $61,165.  We paid 1,047 special marker claimants over

15  $4.7 million.  We have paid 12,353 claimants over $696 million.

16                 Again, as of yesterday there were 94 unpaid

17  stroke claimants, 18 of which have been resolved.  So we have

18  only 76 stroke claimants that have yet to be paid or will not

19  be paid by the end of August unless they perfect their estate

20  issues.

21                 The total population, out of the thousands of

22  claims that have come into this program, of unpaid claims

23  today, taking into account those that we know will be paid in

24  August, is down to 128 claims.

25                 On the stroke claims, for Injury Level 1, the

1   average payment was $119,618, the lowest payment was $5,015,
2   and the highest payment was $818,119.

3              Injury Level 2, the average payment was
4   $181,576, the lowest payment was $5,812, and the highest
5   payment -- again, because the grid treated Injury Level 2
6   differently than the MI grid did with having higher points --
7   was $1,191,090.

8              Injury Level 3, the average payment was
9   $132,297, the lowest payment was $5,005, and the highest
10  payment was $647,052.

11             Injury Level 4, the average payment was $81,176,
12  the lowest payment was $8,580, and the highest payment on that
13  level was $215,158.

14             Injury Level 5, the average payment was $53,518,
15  the lowest payment was $5,004, and the highest payment was
16  $336,891.

17             Your Honor, that concludes the claims portion of
18  the presentation unless you have any questions.

19             **THE COURT:**  No, I don't.  Just by way of review, I do
20  think the Court ought to recognize that this case was very,
21  very effectively handled.  We began with over 59,000 claims.
22  The case was declared an MDL on February 16, 2005.  A
23  Settlement Agreement was reached in November of 2007.  In
24  between 2005 and 2007, we had six trials here in this Court.
25  My colleagues, who did a great job, the state judges, had about

1    twice that number of trials throughout the country.

2                   We had cases from every state in the union.  The

3    attorneys compiled 9 million documents.  I delivered 1,000

4    opinions in this case on discovery.  The Settlement Agreement

5    was reached in November of 2007.  Payments began the very

6    following year, 2008, and the payments have been concluded in

7    2010.

8                   So within five years this case, which was the

9    largest case in the history of the country in MDLs, has been

10   effectively resolved.  That is in large part because of the

11   ability of the attorneys, the lien administrator, the special

12   master, the *pro se* administrator, and all of those associated

13   with the case.

14                  We hear so much these days about bad lawyering

15   and ineffective mass cases being handled, black holes

16   developing in litigation, cases take decades to resolve, making

17   Dickens *Bleak House* look like it's hurried litigation, and this

18   has not been the case in this particular case.  I think this is

19   really a remarkable achievement, and it is because of all of

20   the ability and work that was put into it by the attorneys in

21   the case and by those associated with the case.

22                  All of you need to know that the Court

23   appreciates that.  I'm very proud of the way that you all have

24   effectively handled this case, the high level of

25   professionalism, and the high level of work that was done in

1    this case.  I think it's appropriate for me to at least take

2    note of that.  Thank you very much.

3             **MS. GREER:**  Thank you, Your Honor.  Orran is going to

4    now conclude with the extraordinary injury program.

5             **MR. BROWN:**  It's a brief recap of the rest of the

6    program, just to finish out our final report.  I will run

7    through the extraordinary injury program, which was another

8    piece of this Settlement Program, and then the final statements

9    about some last cleanup activities.  Then that will conclude

10   our report.

11            This Settlement Agreement, in addition to what

12   Lynn has described for the heart attack and stroke funds, it

13   provided that certain amounts of those funds could be used to

14   pay injuries that were catastrophic, that were truly

15   extraordinary beyond the underlying heart attack and stroke

16   injury.  In the extraordinary injury program which we

17   administered, there were some hurdles the Settlement Agreement

18   said you had to pass to get into the program:

19            You had to be eligible on your underlying claim;

20   you had to be above the special marker claim; you had to file a

21   claim with us for the EI program on time, which the deadline

22   was September 1, 2009; and you had to send us the paperwork to

23   support your claim.

24            The Settlement Agreement provided these benefits

25   for economic loss and for a special medical injury.  The

1    economic loss was past lost wages, which is before the

2    Settlement Agreement, exceeding $250,000; or past out-of-pocket

3    medical expenses before the Settlement Agreement of greater

4    than $250,000; or some combination of the two.  So it's large

5    injury, unreimbursed, lost wages, lost income, medical

6    expenses, or some medical injury that did not appear on the

7    heart attack and stroke grids and gate criteria.

8              What we found, Your Honor, throughout this

9    program was that there were relatively few people who had this

10   kind of economic loss.  We are not talking about businesses and

11   lost profits for ongoing business.  These were individuals

12   either on salary or in some instances an owner of a business or

13   a partner in a business.  It was not a huge economic loss

14   population of people with income in that period of time

15   exceeding these levels.  Because of the design of the

16   underlying grids, there were not many injuries associated with

17   these claimants that were not already on the grids.

18             We had made it clear from the beginning that the

19   extraordinary injury funds were not an opportunity just for a

20   second bite at the apple.  They were not for injuries that were

21   below the severity level of the heart attack and stroke grids,

22   and they were not for people who just wanted more money than

23   they had gotten on the heart attack or stroke grids.  That

24   meant that the extraordinary injury fund confined it down to

25   the truly catastrophic situations.

1          We made this completely transparent.  In March

2    of 2009, when the program first rolled out, we posted on the

3    portals and the general Web site a manual that laid out the

4    criteria to get into the program so everybody could see it.

5    Then when we began reviewing the claims in December of 2009, we

6    posted a criteria manual that made it completely transparent

7    how these claims would be evaluated and what it took to be

8    paid.  This was available to everyone to see.

9          The process we went through we have talked about

10   before, where we would review the claims, issue an assessment

11   to the claimants or the counsel.  They could request a second

12   review by us.  We would then go through it, issue another

13   determination.  Then if they were unhappy with that, they could

14   appeal to Mr. Juneau, as the special master, and that would

15   finish out the claim.

16         This is our time line for the EI program, where

17   we first started in September 1, 2009, with the deadline to

18   send in your claims package to us.  We started issuing notices

19   in November 2009, right on the heels of that.  We started doing

20   the second reviews in February of 2010.  We finished basically

21   in May.  Mr. Juneau really scrambled to get the appeals done

22   early in June so that we could make the EI final payments on

23   June 29.  We had promised them by June 30, and they were made

24   on June 29, 2010.

25         We ended up with this many people in the EI

1    program:  2,653 people who started out, but some of them did

2    not finish their claims, and we ended up with 2,610.  Some of

3    those were not eligible because they hadn't passed on their

4    underlying claim or they withdrew their claim.  We ended up

5    with 2,332 people in the EI program whose claims then we

6    processed.

7                 This is how those claims broke down among the

8    various types of injuries that were compensable in this

9    program:  Past medical expenses, past lost wages, special

10   medical injury.

11                The AED is additional extraordinary damages.

12   They were futures.  The program did not specifically guarantee

13   future expenses, but we worked out with the parties allowing

14   some future medicals and some future lost income for claims.

15   That's how many claims we got for each type.  There's more than

16   the number of people because a lot of people submitted more

17   than one type.

18                Your Honor, we went too far.  I know people were

19   delighted to see that end slide.  In the process, this is the

20   notices that we did.  The main takeaway from that is about half

21   of the people ended up asking for second review.  Only 99

22   people appealed their claims after our second review to the

23   special master.  The special master did those appeals very

24   thoroughly and very quickly and ended up denying 85 of the 99

25   and then granting appeals and payments in 14 of the 99.

```
 1                   The next two slides show us -- this is the first
 2       time we have been able to conclude and show this -- the amount
 3       of funds that were paid out in total in the extraordinary
 4       injury program, with the main takeaway being there were
 5       $48,744,627 paid in extraordinary injury payments for MI
 6       claimants.  On the IS side, we paid out $10,731,741 to stroke
 7       claimants.
 8                   Again, those numbers were a feature of the truly
 9       catastrophic injury situations.  The stroke number was lower.
10       We had fewer stroke claims because the stroke injury grid, the
11       underlying grid, encompassed just about every type of injury
12       that was normally associated with a stroke condition, so it was
13       difficult to have a special injury that wasn't already covered
14       by the grid.  That's where we ended up on the actual payments
15       for EI claims.
16                   Your Honor, brief remarks in conclusion, looking
17       back a little bit, a little bit of a retrospective.  In this
18       program the Court has already mentioned the scope and breadth
19       of this and the success of it.  These are just some factoids
20       that show we got over 1.2 million documents from claimants
21       throughout this process.  We generated ourselves over 70,000
22       different notices that we sent back to the claimants.  The
23       electronic storage that we have on this program -- just the
24       documents, not our database -- is 4 terabytes of data, which is
25       a lot of data.  A CD holds about 400 to 600 megabytes of data.
```

1    This is 4,194,304 megabytes.  It's over 7,000 CDs if we had to
2    put these documents on CDs.  A lot of information.
3              This number down here is the lawyers relied on
4    their portal to figure out where their claims were.  They could
5    look up any claim and see the status.  To enhance that, we also
6    made global reports in Excel to each firm:  "All your clients,
7    this is their status.  This is what's wrong with their release.
8    This is how you fix it."
9              We pushed those out regularly so that no one
10   could be surprised when a deadline passed.  We even monitored
11   to see who was opening their portal and looking at them.  If
12   they hadn't looked at them, we then e-mailed them the report
13   directly.  We wanted to make sure everybody had notice of
14   everything that was going on.  We issued over 174,000 notices
15   throughout this on 747 different days in the program.  Just
16   about every day we were sending e-mails to counsel, posting
17   things to counsel.
18             The last two blocks on here show that we kept
19   track of the calls we had with the unrepresented folks.
20   Remember, we only had about 1,000 unrepresented folks in the
21   program, and this does not count the calls that the *pro se*
22   curator got.  We received over 10,000 calls, and we then made
23   outgoing calls ourselves over 5,200 times to unrepresented
24   claimants.  They got a lot of attention in this program, and
25   they deserved it, but it helped them get through the program

1   successfully.

2              We like to make sure that we account for

3   everybody in the program, every claimant, and then all the

4   funds in the program.  This shows us the claimants and what

5   happened to them.  Basically, we had about 49,000-plus, almost

6   50,000 people who were really in the running to be reviewed and

7   submit claims.

8              Rows 2 through 7 show us how claims could fall

9   out of the program:  They weren't eligible if they were not

10  U.S. citizens; some withdrew; final gate failure.  We end up

11  with the numbers that Lynn has already talked about that were

12  the amounts of payments that we made and then the numbers Lynn

13  mentioned, too, of claimants that are still unpaid for various

14  reasons, mostly estate issues.  That's some of the mop-up that

15  we will be doing.

16             We also like to account for all the funds, and

17  this fund was a $4.85 billion fund.  It shows the payments that

18  we have made.  On the underlying stroke and heart attack claims

19  and in the EI world, there are some mop-up here with the claims

20  that haven't been paid yet, the estate issues that will be

21  flushed out.  There's a little bit of mop-up in these numbers

22  because there's some uncashed checks still.

23             So there's still some housekeeping that we will

24  tend to after today, but for the bulk of this, everything is

25  accounted for.  This number right here, the 479 number, are

1   withholdings for government liens, private liens, and the
2   common benefits fees and costs that we withheld from the
3   payments.

4           The Court has already mentioned the schedule
5   this was on.  It started November 9, 2007, finished with the EI
6   payments June 29, 2010, a very tight, collapsed schedule.

7           We looked at this comparison grid when we did
8   the interim payments because we were looking at how this
9   program compared to other programs for payments, how long it
10  took from start to getting money out.  Here we are down here
11  with this orangy color, interim payments in less than a year,
12  final payments in less than three years, really not much more
13  than two years after the claims packages started coming in.

14          Relative to other programs, this was a very
15  tight schedule, very complex, successful resolution, and these
16  other programs all have different issues.  This is not a
17  criticism of these programs but just a testament to the way
18  this program was designed at the outset, all the parties that
19  played a role in it.

20          We had sort of a dream team lineup here of all
21  the service providers, the special master, the escrow agent
22  U.S. Bank, Mr. Garretson and his firm, and all of the work that
23  those folks did to make this happen, and Mr. Johnston as the
24  *pro se* curator.  All those players played a big role in making
25  this keep moving, with the Court's guidance and leadership and

1  direction, plus the amazing work that Merck and its counsel and

2  the negotiating plaintiffs' counsel did to put this together

3  and then work together cooperatively to make sure it happened.

4           Lastly, all the primary counsel and the

5  claimants had to do what they were supposed to do.  There were

6  a lot of people that contributed to making this happen, to keep

7  this as successful a program in this amount of time.  We see

8  that compared to other mass tort settlement programs, we are

9  ending up in a much more compact schedule than most of those

10  programs have been able to achieve.

11          Your Honor, it's been a privilege and a pleasure

12  for us to be here at these sessions with you and the parties.

13  We have enjoyed working on this program.  Unless the Court has

14  any questions for us, then that concludes our final report.

15          THE COURT:  No, I don't.  Thank you very much for all

16  of your work, Orran.  You and your team have really done an

17  excellent job.  As I say, it's a tribute to all of the

18  attorneys who have worked on this case, and I do appreciate

19  that.  We have had over a thousand lawyers in this particular

20  case.  I think one of the keys, too, that helped this case is

21  the transparency that all of us have tried to maintain.  The

22  Court has developed a Web site.  We put everything on the Web

23  site.  You have also given a lot of information to the lawyers.

24          That's a criticism that I hear occasionally

25  throughout the United States on MDLs.  People sometimes don't

1    know what's happening.  They file a suit in Arizona, and all of

2    the sudden it winds up in New Orleans and they don't hear

3    anything at all thereafter.  I think we have changed that a

4    little bit in this particular case.  People have access to the

5    Web sites.  They know what's going on.

6              All of the transcripts of these hearings I put

7    on the Web site.  All of the Court's orders, everything

8    involving this particular case we put on the Web site for

9    people to see and look at.  It's accessible to the public,

10   accessible to the lawyers, and I think that's very helpful in

11   these cases too.  Of course, your Web site was invaluable to

12   the attorneys handling the case, so I appreciate all of your

13   work.

14             **MR. BROWN:**  Thank you very much.

15             **MR. HERMAN:**  May it please the Court.  The next item

16   is the report by U.S. Bank.

17             **THE COURT:**  Okay.

18             **MR. HERMAN:**  We want to thank again BrownGreer for

19   their excellent work.

20             Our choice of U.S. Bank by defense and plaintiff

21   counsel proved correct.  It's a major bank in this country

22   without problems.  The way they have handled themselves has

23   been excellent.  Terry McRoberts, the executive vice president

24   of corporate trust of U.S. Bank, has a presentation,

25   Your Honor.

1          **THE COURT:**  Okay.  Thank you.

2          **MR. MCROBERTS:**  Thank you.  Your Honor, it's a

3     privilege to be in front of your Court again on such a

4     successful and large case as those before me have presented

5     this morning.

6               U.S. Bank had the privilege of acting as escrow

7     and disbursement agent on the *Vioxx* settlement and

8     responsibility for many attributes, including the proceeds and

9     disbursing them to the beneficiaries.  The balances that reside

10    as a result of the $4.8 billion rolling through the escrow

11    funds over the last three years are an administrative expense

12    fund of $2,275, an MI settlement fund of $298,275,679, an IS

13    settlement fund of $136,010,019, and a 468 holding settlement

14    subfund of $4,354,059.

15              I'm happy to report on the payment and

16    disbursement activity that was reported by BrownGreer, that all

17    of those proceeds successfully passed through U.S. Bank and out

18    to the beneficiaries that I heard several times in my

19    appearances here was of the utmost importance to the Court.

20              We also have a subaccount for Medicare

21    subfunding of $43,716,778.  Also noted is that as proceeds did

22    come into the escrow and were held awaiting disbursement from

23    time to time, that at all times those funds were invested and

24    generated additional interest, at the direction of Merck, of

25    $3.2 million based on the earnings rates and the availability

1    of appropriate investments.

2                We would certainly like to thank Merck for all

3    of their flexibility and conscientiousness in terms of the

4    timing and cooperation they provided in funding the escrow over

5    the last three years and the everyday activity that we had with

6    BrownGreer in terms of readying and many times adjusting for

7    the last minute to try to get as many payments out as we could

8    at any given distribution date as they were scheduled out month

9    to month for the last three years.

10               In terms of where the investments were held, I

11   thought it would be important to note to the Court that as we

12   have discussed in previous hearings, the trust funds were

13   invested in a AAA rated money market fund at all times.  Any

14   dollars held in the escrow were held in a prime obligation

15   fund.  That fund is a $20.5 billion fund.  It's also AAA rated

16   by the rating agencies.  That was important because it lent

17   itself to, first of all, safety.  There was never any risk to

18   the proceeds as they were held in the escrow.

19               Also importantly, they also had liquidity so

20   that if we did -- and we did -- have large disbursements that

21   would get through the approval process that the Court has heard

22   this morning, that there wouldn't be any tie-up in proceeds as

23   they were ready and necessary and needed for disbursement.

24               Just a couple comments in terms of U.S. Bank as

25   the escrow agent bank.  Again, it's been a privilege to act in

1  this role as escrow and disbursement agent.  We just reported

2  record revenues again last week for our quarterly report:

3  $4.5 billion of revenue, which was up 9.5 percent in these very

4  difficult economic times, net income of $766 million that

5  resulted in a 14.5 percent growth over last year.  In short,

6  the best earnings report that any major bank has in the

7  United States.

8              I would say, too, that we remained profitable,

9  as I reported to the Court from time to time over the last

10  three years, throughout this very difficult financial time.

11  Quite simply, that's because our selection, part and parcel,

12  was because of our conservative nature, the strength of the

13  bank, and all of that proved as mettle as we went through some

14  very challenging times here in the last three years.

15              Just further data:  We continue to be rated a

16  AA rated bank.  We are $282 billion in assets.  Like the funds

17  that these were invested in, we were large enough, solvent

18  enough, stable enough to be able to handle this size of an

19  escrow and not to have any lapses either because of resource

20  constraints or size of the bank constraints, and from the

21  leading performance metrics have been the highest performing

22  bank in the country.

23              All of this results in, I think, the kind of

24  traits the Court was looking for in the handling and care of

25  the escrow proceeds over the last three years as funds were

1   held in escrow pending disbursement, pending the intensity of

2   the claims review process that was part and parcel to the *Vioxx*

3   case and the *Vioxx* processing.  So, once again, it's been a

4   pleasure to have a role in this.  I thank the Court for its

5   time and attention and for our opportunities and open up to any

6   questions.

7             **THE COURT:**  How much do you still have in your bank?

8   Do you know?

9             **MR. MCROBERTS:**  Yes.  We have got, as one slide

10  showed, about $438 million.

11            **THE COURT:**  Thank you very much.

12            **MR. MCROBERTS:**  Thank you.

13            **MR. HERMAN:**  I believe Matt Garretson is here with

14  the lien report.

15            **THE COURT:**  Let me hear from the lien administrator.

16            **MR. GARRETSON:**  Your Honor, I will be brief this

17  morning since I will reserve next hearing to give my final

18  report as there's still a few outstanding items of which the

19  Court is well aware.  I'm Matt Garretson.  I'm here to report

20  as the lien resolution administrator.  I will just give a few

21  combined statistics.

22            We moved the meter quite a bit since the last

23  hearing.  There are a few outstanding items that I'm going to

24  point out.  I'm not going to go into detail during this

25  hearing.  I think the most important thing to share with

1    everybody is these aren't black-hole issues that are going to

2    linger for years.  Every one of them has a game plan.  Where

3    there was not a game plan or there was concern, this Court has

4    issued orders since the last hearing to help move them along.

5    While I will give a quick overview, I don't think anyone should

6    have cause for alarm because it is normal that there would be a

7    few outstanding items.

8                    With respect to Medicare, we are 96 percent of

9    the way.  There's 4 percent outstanding.  Two-thirds of those

10   that are outstanding is because claimants have asked for a

11   reconsideration and we are in the process of finalizing those.

12   720 of them have been requested, and many of those within the

13   last 45 days.  So those are going to take some time for us to

14   process.

15                   Those that are older have been outstanding, and

16   the reason they are not finalized is we are asking the

17   claimants for additional information to support that.  I would

18   say during our next status hearing I will ask the Court to set

19   a date by which we must shut those down if we have already had

20   them in-house and cannot get the information from the

21   claimants.

22                   Twenty-five percent of the outstanding cases are

23   due to an issue we are working on with Medicare.  The ischemic

24   stroke model, as I have reported over the last several months,

25   did not accommodate -- there was a certain threshold of cases

1   that were above the special marker, where the global amount to

2   be received by Medicare for the ischemic stroke would have

3   actually made the net result to the claimant lower than the

4   individuals in the special marker category.  We are working

5   through that with Medicare.  We have their commitment to

6   resolve that before the next hearing.

7               We have some entitlement discrepancies I brought

8   to the Court's attention.  You have instructed us to work with

9   the claims administrator to tell the attorneys involved we need

10  them to give us that correct Social Security number or forever

11  hold your peace.  It is the attorneys' responsibility at this

12  point to return any funds they have received or to block those

13  funds and hold those funds because there is nothing we can do

14  when we are not in receipt of correct data.

15              With respect to Medicaid, we are also 96 percent

16  of the way done.  Four percent are outstanding due to the same

17  issues.  We don't have confirmation of the correct Social

18  Security number or the Social Security number has, in fact,

19  changed, and so we had to restart the process over again.  I

20  want to move the meter on those quite a bit by my final report

21  at the August hearing, and then similarly I will ask the Court

22  to just give us some guidance on how to instruct the attorneys

23  that our work is done.

24              THE COURT:  That's unfortunate because the whole

25  purpose of trying to do a lien resolution program within the

1    confines of an MDL is to provide a win/win situation.  Of
2    course, the Medicaid/Medicare institutions have one focal
3    point, where they get all their funds as opposed to 50,000
4    centers.  The claimants get something, too, because they get a
5    discount on what they legally otherwise have to pay.  So they
6    are going to lose that opportunity when it goes back, and the
7    attorneys are going to be responsible or liable for those
8    amounts.  As we know, with statutory liens, the attorneys are
9    responsible as well as the litigants.  It's unfortunate that
10   they are not participating.  It would be to their detriment.
11            **MR. GARRETSON:**  I believe some of this is going to be
12   corrected as soon as we tell the parties that the time is up,
13   we can no longer have files outstanding.
14            With respect to Medicaid, there's two issues
15   that I did need to bring to the Court's attention that I hope
16   to have resolved by next hearing.  The first is two states did
17   not accept the protocol we worked with the Court and the
18   special master to put forward, which was a 20 percent cap on
19   their Medicaid lien, 20 percent cap of gross settlement award,
20   plus a 35 percent reduction to those liens, which represents
21   the procurement costs that the claimant paid their attorneys
22   for their attorney fees and case expenses.
23            I do not feel that we are authorized, without
24   the Court's guidance, to accept that because I know this Court
25   has expressed the importance of uniformity.  So I bring that to

1   the Court's attention, and I will need guidance on what we do
2   with those two states that have yet to adopt the protocol.

3           **THE COURT:**  I want to meet with you on that so that
4   we can deal with it, but the claimants ought to at least bring
5   that to the attention of the attorney general as well as the
6   governor and the senators of that state because they're going
7   to be disadvantaged as opposed to 48 other states.

8               We have had 50 states involved in this program.
9   It's unfortunate that in two states the litigants will be
10  discriminated against as opposed to the litigants in those 48
11  other states who get some benefit.  These litigants in these
12  two states will not.  That's unfortunate.  At least it ought to
13  be explained that way, and they ought to express themselves to
14  their elected officials in that regard.

15          **MR. GARRETSON:**  Yes, Your Honor.  With respect to
16  other governmental liens, the Court issued an order this month
17  telling the facilities to produce their claims data or
18  surrender their right of recovery.  I am told by tomorrow that
19  the agency will surrender their right of recovery on those for
20  which they have not been able to produce claims data as the
21  Court has instructed.  There are some of those where we are
22  allowing them to have more time because of this Social Security
23  number issue I keep mentioning, the shift.  So they will have a
24  little bit of time to cure those, but two-thirds of them that
25  are outstanding will be released, my understanding is,

1    tomorrow.

2            The private lien program, there are only a few

3    items outstanding.  You may recall that 16,882 claimants agreed

4    to participate in the program voluntarily.  Actually, over

5    20,000 agreed to participate.  16,882 were the claimants that

6    agreed to participate who were also receiving a payment out of

7    the Vioxx program.  Just roughly over 9,000 of those claimants

8    had liens reported by the participating plans.  We are about

9    95 percent of the way done with those.  The remaining, there's

10   about 500 claims outstanding.  Now, mind you, they all have

11   caps, so it's not that the whole money is frozen on those.

12   There are, in fact, caps.

13           These issues are what I reported last time:

14   Determining an antisubrogation right of states, just making

15   sure we are looking at the funding status of the plan and the

16   plan language to make sure no obligations are created where

17   none would otherwise exist under state law.  We had duplicate

18   charges submitted by several plans.  Your Honor issued an order

19   this month that cleared that issue for us.  I want to report

20   that that has, in fact, resolved itself.

21           There are 152 claimants who had appeals, pending

22   our review of plan language, for liens that exceeded $50,000 in

23   their final audited state.  We have conducted that audit, we

24   have reported it to the parties, and it's my understanding that

25   that issue will now be resolved.

 1                   With that, Your Honor, there are just a few
 2     trailing issues.  I think you will see, as I said, the meter
 3     moved completely by next month or we will ask the Court for
 4     some deadlines so that we can shift any remaining obligations
 5     back to the attorneys.
 6                   THE COURT:  Thank you.
 7                   MR. GARRETSON:  Thank you very much for the
 8     opportunity, and we will report next month.
 9                   THE COURT:  Good.  Thank you very much.
10                   Special master, deputy special masters, any
11     report?
12                   THE SPECIAL MASTER:  Your Honor, unfortunately I
13     don't have a pie to present here today.
14                   THE COURT:  We enjoyed that pie.
15                   THE SPECIAL MASTER:  I meant to say technically that
16     it was offered into evidence for the Court's consumption.  I
17     understand you took care of that.
18                   Your Honor, a very brief comment.  The very
19     detailed report of BrownGreer incorporates the detail of the --
20                   THE COURT:  Excuse me, Pat.  We have the AT&T
21     operator.  They have some problems with the people who
22     apparently were cut off, so they want us to reconnect to them.
23                   We can continue.  Let's go.
24                   THE SPECIAL MASTER:  Your Honor, the very detailed
25     report of BrownGreer has the detail about the number of

1   appeals, the number of reversals, what was granted, what was

2   not granted, so that serves as my report.  This is not my final

3   report because I still have a few matters on the table to

4   address and I want to address those now.

5               I have developed, published, and sent out the

6   protocol and scheduling with regard to the lien matters that

7   exist between lawyers.  That is a matter that the Court has

8   instructed will be handled separately, but those notices have

9   been set.  They are scheduled.  All of that is in play and will

10  play out over the next couple months, some of which have been

11  resolved, fortunately, I might add, during the course of the

12  publication of those protocols.  I don't look for that to be a

13  detailed, involved matter.  It's just a procedural matter that

14  has to be addressed, but it is in fact being addressed.

15          **THE COURT:**  Pat, what about the fraud claims that you

16  have?

17          **THE SPECIAL MASTER:**  She mentioned the fraud claims.

18  The rulings were made in each and all of those claims.  We had

19  hearings in this courtroom before a court reporter.  Records

20  were made.  There were two of those claims -- I think there

21  were eight in total, as I recall -- which were rejected and

22  actually dismissed.  They were found to be misrepresentations

23  to the Court and to the process.

24              Notices of those rulings and so forth have been

25  mailed out and established.  That's all part of the matrix

1    that's been developed by BrownGreer and the ultimate decisions,

2    but we have taken care of it.  All of those matters are now

3    resolved.

4              **THE COURT:**  Those are unfortunate.  On the bright

5    side of it, there were 2 out of 50,000 claims that were

6    fraudulent, so I think the process worked.  We are always going

7    to have some of that, but the limited amount is noted.

8              **THE SPECIAL MASTER:**  I might add, Your Honor, it was

9    very interesting.  We had very detailed hearings, and there was

10   full due process afforded to everyone.  I think the process we

11   established and you adopted in this matter worked very well,

12   the processing for those claims.  With that said and done, I

13   will just reserve comments, Your Honor, regarding the finality

14   of these lien matters.

15             I would like to make just one brief comment,

16   Your Honor.  You talked about the black hole we have all read

17   about.  I've been in several black holes, I might add.  This

18   case, in my humble opinion, Your Honor, sets the hornbook

19   guidepost for class actions and mass actions, the track they

20   should be on, how they should be handled.

21             Obviously, everybody here enjoyed and

22   appreciates an opportunity to be a participant in that.  I

23   think it's truly a milepost in the whole country, but I would

24   like to make this final comment.  I'm speaking for myself.  I

25   know I'm speaking for everybody in this room:  The plaintiffs

1    and defendants, Merck, BrownGreer, and everyone.  The candid

2    response, Your Honor, is this really doesn't happen unless

3    there's a conductor at the train who has a strong hand on the

4    wheel and you push this matter, and that's how we got to where

5    we are today.

6            I don't think there's anybody here in this

7    courtroom that doesn't recognize that, but I think it's truly

8    remarkable the stage we have gotten to today.  I, frankly,

9    didn't think it could be done, but it has been done.  It's

10   effectively done with complete transparency.  On behalf of

11   myself and everybody else, we appreciate the strong leadership

12   and direction you gave us in this case.  Thank you.

13           **THE COURT:**  The next matter on the agenda is class

14   actions.  Any report on that?

15           **MR. HERMAN:**  Your Honor, there's nothing new.  You

16   have issued a schedule and there's a hearing on September 22.

17           **THE COURT:**  State and federal coordination.

18           **MR. DAVIS:**  Ms. Barrios is here.

19           **MS. BARRIOS:**  Thank you, Mr. Herman.  Good morning,

20   Your Honor.  Dawn Barrios for the state/federal committee.

21           I hope that Katie gets back into the courtroom

22   because I would like to officially thank her for all the help

23   that she has given all the attorneys in the courtroom,

24   particularly myself.  She is one very bright, energetic, and

25   polite young woman who usually works after business hours, so I

1    do thank her.  I welcome Joe to follow into Katie's footsteps.
2    We look forward to working with him.
3                    Your Honor, we have done a big push to try to
4    clean up the remands and that's what I would like to talk to
5    you about today.  Since my report in March, we have gotten over
6    100 cases with approximately 800 plaintiffs who had remands
7    dismissed to clean up the record.
8                    We have provided the *pro se* curator with the
9    names of *pro se* plaintiffs with pending remands, and I
10   understand Mr. Johnston's office is contacting those plaintiffs
11   regarding their desire to continue with the case.  We have
12   contacted counsel with the remaining pending remands to
13   determine their intentions in pursuing the cases, and we have
14   assisted them in dismissing the cases when it was their
15   intention to do so.
16                   We have provided a list of derivative claimants
17   whose case is still open with a remand although the primary
18   claimant's case is closed.  It's just something that fell
19   through the cracks.  Merck is going to address that issue and
20   get those cases dismissed so that we will continue to reduce
21   our numbers.
22                   There are five remand cases where all of the
23   plaintiffs have been terminated but for some reason remain on
24   PACER.  With Your Honor's permission, I would like to give Joe
25   the docket sheets of those five cases because that just

1    administratively has to be cleaned up.

2                    Currently, we have 380 cases that have pending

3    remands with 855 plaintiffs, and we are continuing to work on

4    cleaning those up.  As I said before, I have also been working

5    with Mr. Birchfield and with Mr. Davis on helping clean up the

6    record.

7            **THE COURT:**  Thank you for all of your help on the

8    coordination with the state cases.  I think that's something

9    that worked well in this case too.  It's really a tribute to

10   you and your work and also the work of my colleagues in state

11   court.

12           **MS. BARRIOS:**  Thank you, Your Honor.

13           **THE COURT:**  We were very fortunate in this case to

14   have great state court judges working with the MDL.

15           **MR. HERMAN:**  May it please the Court.  On July 23 I

16   received from Mark Menzer a counsel request that the 18 cases

17   in which his firm is involved be set for remand hearings.

18   Your Honor has previously addressed that Your Honor wanted to

19   hear these various remand matters at once.  I think Your Honor

20   has instructed plaintiff and defense counsel to organize those

21   attorneys to meet.

22           **THE COURT:**  Yes.  My thinking on it is that we need

23   to put some structure on the remand situation now.  We are

24   getting to the point where we need to address those issues

25   because the other cases have been dismissed or resolved.  My

1    thinking is that I need to get my hands around the number of

2    cases and the lawyers involved in the remand.  I'll then set a

3    status conference inviting all those lawyers to participate,

4    and I would like to talk about a method of dealing with them.

5                    I would like to know whether or not there's any

6    discovery that needs to be done, which cases need discovery, if

7    there are any; and then whether there's any legal issues that

8    need to be addressed, whether or not we can address those legal

9    issues once as opposed to in each case; and also deal with some

10   priorities.

11                   Some of them need to be remanded immediately.

12   Some of them need discovery.  Some of them may need to be

13   dismissed.  In any event, we need to address those.  I've

14   instructed liaison counsel for plaintiffs and defendants to

15   prepare the list and give me a list of the lawyers involved,

16   and then I will notice the status conference and we will talk

17   about all of the outstanding issues.  Hopefully we can get

18   these resolved within several months as opposed to years.

19                   The next item on the agenda is the trial

20   package.  Any report on that?

21           MR. HERMAN:  I want to thank Mr. Dugan, who is

22   providing a transcript, learned treatise, and exhibits for

23   supplement to the trial package based upon the Louisiana AG

24   trial.  We have had two requests since the last status

25   conference, and we have provided trial packages to the folks

1    that requested trial packages, Your Honor.

2         **THE COURT:**  That aspect has worked very well because

3    an MDL allows an opportunity for skilled lawyers to prepare for

4    trial and also to perpetuate their work and have other people

5    who are not participating in the process profit from it and use

6    it in connection with their trials.  I have reviewed the trial

7    packages.  They are very effective, they are very

8    professionally done, and will be of great help to those

9    individuals who want to try their cases in other locations.

10                    Government actions.

11        **MR. HERMAN:**  Mr. Dugan is here, Your Honor.

12        **MR. DUGAN:**  Good morning, Your Honor.  James Dugan on

13   behalf of the government action cases.  As Your Honor is aware,

14   on June 28 Your Honor entered judgment for Merck.  The

15   Louisiana Attorney General will be filing its notice of appeal

16   of that judgment.

17        **THE COURT:**  Okay.

18        **MR. DUGAN:**  In addition, Your Honor, the other 13

19   governmental action cases are on a remand schedule.  Your Honor

20   is involved in discovery issues, so those cases are moving

21   forward.

22        **THE COURT:**  I think we have a meeting --

23        **MR. DUGAN:**  Later in the week.

24        **THE COURT:**  -- later in the week.

25        **MR. DUGAN:**  Thank you, Your Honor.

1        **THE COURT:**  Thank you very much for your help, Jim.

2                Pending personal injury cases, anything on that?

3        **MR. MARVIN:**  Your Honor, as you indicated earlier,

4  there are still some cases that remain in the program.  It's

5  approximately 215 cases.  At the Court's instruction, we will

6  be working with Mr. Herman, Mr. Seeger, and Mr. Birchfield on

7  behalf of the PSC, as well as Ms. Oldfather on behalf of her

8  committee, in preparing a plan for dealing with those cases.

9        **THE COURT:**  Ann, do you have any comments?

10        **MS. OLDFATHER:**  Thank you, Your Honor.  Good morning.

11  Ann Oldfather under the PTO 56 and select PTO 28 and 29 cases.

12                Yes.  One of the things that I think the Court

13  has just addressed is getting together this information on

14  cases you just discussed regarding remand.  If my understanding

15  is correct, the Court intends -- I think Mr. Marvin just

16  indicated -- for that to cover all of these remaining cases.

17        **THE COURT:**  Right.  The names of the attorneys as

18  well as the cases and see where we are.  I understand that

19  you're working with the PSC and the defendants to come up with

20  some program and plan.  I would like to get that, and then when

21  we have everybody together I would like to determine whether or

22  not we can use that plan as a method for dealing with all of

23  the cases.

24        **MS. OLDFATHER:**  That would be great, Your Honor.  I

25  just wanted to confirm we were dealing with everything under

1   that plan.

2          **THE COURT:**  Yes.

3          **MS. OLDFATHER:**  I think the count right now is

4   somewhere around 46 cases that are under my leadership that

5   came out of PTO 29 and 43, about 80 to 100 that are under my

6   leadership that came out of PTO 28.  Then the original PSC has

7   elected to retain -- I guess we'll see when we see the list --

8   somewhere I think in the neighborhood of 80 other PTO 29,

9   PTO 43 cases, but none of that is particularly important.  It's

10   just to kind of get those numbers out there for anyone that's

11   listening on the conference call.  Thank you, Your Honor.

12          **THE COURT:**  Thank you.  Fee allocation committee,

13   anything on that?

14          **MR. HERMAN:**  Nothing new, Your Honor.

15          **THE COURT:**  Merck's motions and rules on PTOs,

16   anything on that?

17          **MR. MARVIN:**  Your Honor, there are four cases that

18   are up for consideration today.

19          **THE COURT:**  Right.  I will take those afterward when

20   we finish with this conference.  Any other motions?

21          **MR. MARVIN:**  Your Honor, Mr. Stratton has filed a

22   motion to transfer his cases or to set a discovery schedule for

23   those cases.  I think that that's encompassed within what

24   Your Honor has been discussing previously about a plan that's

25   going to relate to all the cases and not just to cases by firm.

1      **THE COURT:**  I would like to get everybody together on

2   it.  We may be able to come up with some kind of priority

3   dealing with the cases, but I would like everybody's input on

4   it.  I don't want to just deal with one group of cases without

5   everybody's input.  I think we can learn from it and maybe deal

6   with some issues that are common to those cases and shorten the

7   problem.

8      **MR. MARVIN:**  Yes, Your Honor.

9      **THE COURT:**  Jim mentioned an appeal.  There was also

10  an appeal recently that I received from Mr. Benjamin.  He had

11  appealed a matter.

12     **MR. MARVIN:**  That is correct.  Your Honor, the

13  Fifth Circuit dealt with one of the appeals that Mr. Benjamin

14  made and upheld Your Honor's rulings in that.  There are

15  several other appeals that address basically the same issues.

16  We expect that perhaps the Fifth Circuit will be consolidating

17  some of those appeals they are dealing with based upon its

18  rulings previously.

19     **THE COURT:**  Okay.  Motion for attorney fees to

20  enforce attorney's lien.

21     **MR. HERMAN:**  May it please the Court.  Mr. Stratton

22  is here.  The PSC executive committee and Mr. Levin would like

23  to meet in chambers with you and Mr. Stratton at a time

24  Your Honor designates.

25     **THE COURT:**  Is that okay?

1           **MR. STRATTON:**  That's fine, Your Honor.

2           **THE COURT:**  Let's do it that way, then.  Third-party

3    payoff settlement, anything on that?

4           **MR. SEEGER:**  No, Your Honor.  Claims have all been

5    paid.  The only issues is the attorneys' fees.

6           **THE COURT:**  Merck's motion to dismiss for failure to

7    prosecute, is that the other --

8           **MR. MARVIN:**  Yes.  That's what we have already

9    discussed.

10          **THE COURT:**  Motion to transfer and set

11   discovery/trial dates, we have talked about that.

12               The next status conference is August 26.  I have

13   mentioned to the parties that it looks like that the status

14   conferences in the future may have fewer people involved

15   because we really are finished the large portion of this

16   litigation, but I will still need the liaison and lead counsel

17   for plaintiffs and the defendants.  I've asked them to at least

18   consider whether or not we need everybody at the future

19   conferences, but I'll leave that up to you.

20               I understand we lost a number of people during

21   the process.  As you know, I make a transcript of this

22   conference.  We'll get the transcript and file it in the

23   record.

24          **MR. HERMAN:**  May it please the Court.  On behalf of

25   all counsel, we want to thank Katie for her service.  We wish

1    her well.  We understand she's going to a public defender

2    office in New York.  They certainly could use her intelligence

3    and personality in that role.  We thank you for everything.

4              THE COURT:  Good.  Well, likewise, the Court

5    appreciates all of her service.  She's done a great job in

6    working on the case, and certainly I have benefited by her

7    wisdom and work.  I appreciate it.  I'll be back in a couple

8    minutes.  Court will stand in recess.

9              THE DEPUTY CLERK:  Everyone rise.

10                          * * *

11                        <u>CERTIFICATE</u>

12              I, Toni Doyle Tusa, CCR, FCRR, Official Court

13   Reporter for the United States District Court, Eastern District

14   of Louisiana, do hereby certify that the foregoing is a true

15   and correct transcript, to the best of my ability and

16   understanding, from the record of the proceedings in the

17   above-entitled and numbered matter.

18

19

20                        <u>s/ Toni Doyle Tusa</u>
                          Toni Doyle Tusa, CCR, FCRR
21                        Official Court Reporter

22

23

24

25