UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*******************************************************************

IN RE:  VIOXX PRODUCTS                MDL No. 1657
LIABILITY LITIGATION                  Section: "L"
                                      New Orleans, Louisiana
                                      Monday, April 12, 2010

*******************************************************************
**THIS DOCUMENT RELATES TO:**

State of Louisiana, ex rel
James D. Caldwell, Jr.,
Attorney General

        versus

Merck

Case No. 05-CV-3700
*******************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
DAY 1, MORNING SESSION



APPEARANCES:


FOR THE LOUISIANA DEPARTMENT
OF HEALTH AND HOSPITALS:
                              DUGAN LAW FIRM
                              BY:  JAMES R. DUGAN, II, ESQ.
                              650 Poydras St., Suite 2150
                              New Orleans, LA 70130


                              MURRAY LAW FIRM
                              BY:  STEPHEN B. MURRAY, JR., ESQ.
                                   DOUGLAS R. PLYMALE, ESQ.
                                   JUSTIN BLOOM, ESQ.
                              650 Poydras St., Suite 1100
                              New Orleans, LA 70130

```
 1                                   LIEFF CABRASER HEIMANN & BERNSTEIN
 2                                   BY:  DONALD C. ARBITBLIT, ESQ.
                                     Embarcadero Center West
 3                                   275 Battery Street, Suite 3000
                                     San Francisco, CA 94111-3339
 4

 5

 6   FOR MERCK:                      GOLDMAN ISMAIL TOMASELLI
                                     BRENNAN & BAUM
 7                                   BY:  TAREK ISMAIL, ESQ.
                                     1 North Franklin St., Suite 625
 8                                   Chicago, IL 60606

 9                                   BAKER BOTTS
                                     BY:  TRAVIS J. SALES, ESQ.
10                                   One Shell Plaza
                                     910 Louisiana
11                                   Houston, TX 77002-4995

12
                                     O'MELVENY & MYERS
13                                   BY:  SCOTT M. VOELZ, ESQ.
                                     400 South Hope Street
14                                   Los Angeles, CA 90071-2899

15

16   Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR
17                                   500 Poydras Street, Room HB-406
                                     New Orleans, Louisiana 70130
18                                   (504) 589-7776

19

20       Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

1                          I N D E X

2

3                                              PAGE/LINE:

4

5   OPENING STATEMENTS:

6

7     By Mr. Murray                              4/13

8     By Mr. Ismail                              24/2

9

10

11

12  DAVID A. KESSLER

13

14    Voir Dire Examination by Mr. Dugan         43/22

15    Direct Examination by Mr. Dugan            50/3

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            (MONDAY, APRIL 12, 2010)

3                (MORNING SESSION)

4

5        (OPEN COURT.)

6            THE COURT:  Be seated, please.  Good morning, ladies and

7    gentlemen.  Let's call the case, please.

8            THE DEPUTY CLERK:  MDL 1657, *in re:  Vioxx*, civil action

9    05-3700, *State of Louisiana, James Caldwell, Jr., Attorney General,*

10   *v. Merck.*

11           THE COURT:  Counsel, make your appearance for the record,

12   please.

13           MR. MURRAY:  Good morning, your Honor, Stephen Murray,

14   Jr., here on behalf of James Caldwell, Attorney General for the

15   State of Louisiana.  I am here with cocounsel.

16           MR. DUGAN:  Good morning, your Honor, James Dugan on

17   behalf of the State of Louisiana.

18           MR. BLOOM:  Your Honor, Justin bloom for the plaintiff.

19           MR. FRANCO:  Your Honor, David Franco for the plaintiff.

20           MR. PLYMALE:  Douglas Plymale on behalf of the plaintiff.

21           MR. ISMAIL:  Good morning, your honor, Tarek Ismail on

22   behalf of Merck.

23           MR. SALES:  Good morning, your Honor, Travis Sales on

24   behalf of Merck.

25           MR. VOELZ:  Good morning, your Honor, Scott Voelz on

1    behalf of Merck.

2         THE COURT:  This matter grows out of the Vioxx

3    litigation.  On July the 6th, 2005, Louisiana Attorney General

4    filed suit against Merck in state court seeking injunctive relief

5    as well as damages.  On August the 5th, 2005, Merck removed the

6    case, after which it was transferred into the MDL-1657.

7         On May the 11th, 2009, James D. Caldwell, Attorney

8    General for the State of Louisiana, filed plaintiff's second

9    supplemental and amended complaint for injunctive relief and

10   damages.  In the second amended complaint, as parens patriae, on

11   behalf of the State of Louisiana, its citizens, and the Louisiana

12   Department of Health and Hospitals, the plaintiff asserts,

13   claimed -- or asserted claims for redhibition, violation of

14   Louisiana Unfair Trade Practices Act, LUPTA, violations of the New

15   Jersey Consumer Fraud Act, and unjust enrichment.

16        On March the 31st, 2010, the court granted in part and

17   denied in part Merck's motion for summary judgment against the

18   plaintiff's claims.  The court dismissed plaintiff's claims under

19   LUPTA, New Jersey Act, unjust enrichment.  The only claim remaining

20   is the plaintiff's redhibition claim.  The plaintiff seeks

21   restitution, damages, costs, penalties and attorneys' fees.

22        I met with the parties, they indicate that they're ready,

23   so I'll hear from them by way of opening statement.  First from the

24   plaintiff.

25        MR. MURRAY:  Good morning, your Honor.  Stephen Murray,

1    Jr., on behalf of the plaintiff, the State of Louisiana, Attorney

2    General James Caldwell and the Louisiana Department of Health and

3    Hospitals.

4         Your Honor, in the late 1990s, Merck was desperate for a

5    new blockbuster drug to replace a number of drugs that were going

6    off patent.  It was in a race with its competitors in order to

7    introduce the first COX-2 to market, and in this race it rushed to

8    market the drug known as Vioxx.  A drug that came with it

9    unacceptable risks of heart attacks and strokes.

10        Merck rushed this drug to market having conducted

11   inadequate testing of the CV potential of the drug, even though it

12   was aware premarket that the drug had a potential prothrombotic

13   mechanism and that it had received several signals of safety

14   concerns regarding the CV issue before bringing the drug to market.

15        In spite of the safety concerns, Merck did not conduct a

16   CV outcome study, Merck continued to not conduct a CV outcome

17   study, even as evidence of CV risk mounted after the drug was on

18   the market.  Even as that risk -- that evidence of that risk

19   mounted, Merck continued to assert that the risk was not

20   established all the while continuing to refuse to conduct the

21   necessary CV study.  Had a CV outcome study been conducted, it

22   would have shown that the risk of cardiovascular disease far

23   outweighed any benefit conferred by the drug.

24        On September 30th, 2004, Merck withdrew Vioxx from the

25   market when the APPROVe study was discontinued because of excess

1    heart attacks, the very risk that Merck had avoided studying for so

2    many years.

3              In the five years that Vioxx was on the market, Louisiana

4    Department of Health and Hospitals spent millions in reimbursements

5    of Medicaid pharmacy benefit payments for the drug Vioxx.  At least

6    as of June 13, 2001, the State would not have paid all of those

7    funds had it been aware of the risks.  These facts, your Honor,

8    give rise to a claim in redhibition.

9              Your Honor has stated the elements of a redhibition

10   claim.  In order to prevail on our claim for redhibition, we must

11   show that the thing sold is absolutely useless for its intended

12   purpose or that the plaintiff would not have bought it had he known

13   of the defect.

14             The second element that your Honor has held we must prove

15   is that the defect existed at the time that the plaintiff purchased

16   the thing but was neither known nor apparent to the plaintiff.

17   Both elements are met in this case.

18             A reasonable medical authority would have refused to pay

19   for Vioxx had it known of the unacceptable risks of heart attacks

20   presented by the drug.  And LDHH had no way of knowing that the

21   risk of heart attacks was such an extent as to render the drug

22   unfit for its intended use.

23             The first element we must prove is the existence of the

24   defect, your Honor.  That element is easily met.  The defect is the

25   one that prompted Merck to remove the drug when the APPROVe test

1   study revealed that the drug was causing excess heart attacks, as

2   Merck should have known all along.

3          The APPROVe study showed that the drug Vioxx contained a

4   defect and that it had an unacceptable risk of heart attacks in a

5   pain drug that was no more efficacious than other drugs on the

6   market and offered limited unquantifiable benefits over those other

7   drugs.

8          There is ample evidence of this defect in the record.

9   First, your Honor, there are the studies.  Your Honor will hear

10  plenty about them.  There is the APPROVe study itself, which

11  prompted removal.  Merck will claim that they were wrong about the

12  APPROVe study, that they later found out after they withdrew the

13  drug that the APPROVe study was an outlier.  This claim will not be

14  supported by the record.  If anything, the information that came

15  out after the APPROVe study has only strengthened the case that

16  Vioxx poses an unacceptable risk of cardiovascular events.

17         The other thing that they will argue about the APPROVe

18  study is, well, it was a class effect and we were rash removing the

19  drug because we were not aware that this was a class effect, that

20  is, that every drug in the NSAID class posed a risk of heart

21  attacks.  First of all, that's inconsistent with their contention

22  that there is no risk associated with Vioxx.  And second of all,

23  the question of class effect is a question of degree.  Vioxx is the

24  outlier.  Vioxx poses a greater risk than any of the other drugs in

25  the class.

1          Then we have the VIGOR study, your Honor, and your Honor

2     will hear quite a bit about the VIGOR study AND I'm sure has

3     already heard quite a bit about it.  The VIGOR study presented a

4     five time greater risk of heart attack than the drug naproxen, even

5     though the VIGOR study removed from its study population persons

6     who were particularly at risk for thrombotic events.  The VIGOR

7     study showed this risk both in aspirin indicated and non-aspirin

8     indicated patients.  The president of Merck research labs, upon

9     reviewing the VIGOR study data, concluded that the CV effect is,

10    quote, clearly there.  And that it is mechanism based.  That is,

11    the Vioxx is causing the effect.

12          Then we have the post market osteoarthritis studies,

13    which showed a three times greater risk of heart attack of Vioxx as

14    compared to placebo.  We have the Alzheimer's studies, which

15    although Merck has cited to them as support for the proposition

16    that the risk is unquantifiable or unknown, showed an eight to two

17    difference in CV mortality.

18          And then we have the numerous undisclosed premarket

19    safety signals, which show, as Merck failed to investigate, the

20    massive potential for its cardiovascular risks.  These risks

21    outweigh any benefit posed by the drug, and your Honor will hear

22    ample evidence of that effect.  Your Honor will hear from Dr.

23    Gerald Avorn, preeminent Harvard epidemiologist, who will testify

24    that because of the risk of cardiovascular events which far

25    outweigh any GI benefit, the drug is unsafe.

1      Your Honor will hear that in the VIGOR trial, there were

2  20 percent greater hospitalizations with Vioxx than with its

3  competitor Naproxen, a much cheaper and safer drug.  Which, again,

4  shows that the risk of heart attacks greatly outweighs any GI

5  benefit.  That was a test where they were testing for the GI

6  benefit and measuring the hospitalization rates of the GI benefit,

7  but Vioxx still has a higher hospitalization rate because of its CV

8  risk.

9      And you will hear something that you haven't heard in

10  previous cases.  You will hear from Dr. Graham that in VIGOR, the

11  GI benefit, which has been imputed to all patients who take Vioxx,

12  was actually only conferred on those patients who took steroids.

13  And patients who take steroids are only a very small percentage of

14  the patients that were on Vioxx.  Tellingly, Dr. Gerald Avorn was

15  not even aware of this information when he concluded that the risk

16  of CV events outweighed any benefit posed by the drug.

17      Now, the scale is tilted even more in favor of the risk

18  outweighing the benefits.  Dr. Avorn took it at face value that

19  there was a benefit, now the evidence will show that that benefit

20  is questionable at best.

21      And then your Honor will hear the science behind the risk

22  benefit analysis.  Your Honor will be able to conduct your own

23  conclusions with respect to whether the risk outweighed the

24  benefits.  Your Honor will hear from cardiologist Dr. Macgregor,

25  who will tell you that studies showed significant risk of heart

1    attack across different patient populations, different dosages and

2    different durations of exposure, both as compared to placebo and to

3    different comparator NSAIDS.  He will explain to you that this

4    increase in heart attacks is caused by the prothrombotic mechanism

5    of action that Vioxx promotes.  Vioxx causes an imbalance between

6    the PROSTAGLANDIN and THROMBOXANE enzymes, which is prothrombotic.

7    This is the same mechanism that was recognized by Merck prior to

8    ever bringing the drug to market.

9           Finally, your Honor will hear on the GI side from

10   Dr. David Y. Graham.  Dr. David Y. Graham will testify that the GI

11   benefits were greatly exaggerated.  That the benefit in VIGOR was

12   only conferred on steroid users, who comprised but a very small

13   proportion of the Vioxx patients.  He will tell you that the

14   comparator NSAIDs used in the various studies cited BY Merck in

15   support of its claims of GI benefit used inappropriate dosages,

16   high, high dosages of NSAIDs, which exaggerated the GI effect of

17   those comparator drugs.

18          And finally, he will tell you that the studies used

19   irrelevant end points for endoscopic -- of endoscopic ulcers, an

20   end point that didn't really tell you what the true number of PUBs,

21   that is, serious GI events were on the two drugs.  All of these

22   factors combined together led Dr. David Y. Graham to conclude that

23   it is difficult, if not impossible, to differentiate Vioxx from

24   other NSAIDs in terms of GI toxicity.  With this evidence, your

25   Honor will clearly be able to determine that the risk outweigh the

1    benefit in the Vioxx suffered from a defect, a redhibitory defect.

2           Finally, the defect is such that it must be presumed that

3    a reasonable state Medicaid agency would not -- would have adopted

4    a formulary excluding Vioxx.  This court has already ruled that

5    LDHH had the power to exclude Vioxx as of June 1, 2001.  The

6    question is, would the State have exercised that power?

7           The court is to answer that question using a reasonable

8    buyer standard.  That is, would a reasonable state Medicaid agency

9    have adopted an exclusive formulary to deal with the extraordinary

10   situation presented by Vioxx?

11      Secretary David Hood has testified, he was the secretary of

12   LDHH when Vioxx was on the market, and will testify in this court,

13   that he would have done everything in his power to exclude Vioxx

14   and avoid the exposure of Medicaid patients to the excess risk of

15   heart attacks.  Of course he has a great incentive to do so, your

16   Honor, because, as the Medicaid agency, they have to pay for the

17   hospitalizations for those heart attacks.  Secretary Hood will

18   testify credibly and frankly.

19           He will tell the court quite candidly that he doesn't

20   know if he had the authority to exclude Vioxx via an exclusive

21   formulary.  But what he will tell you is that the first thing he

22   would have done when posed -- when faced with information about the

23   defect was, he would have gone to LDHH's lawyers and asked them,

24   what can we do about this situation.  I want to get this drug off

25   the formulary, I don't want to pay for this drug, I don't want

1    Louisiana patients exposed to this drug, what can we do?  And I am

2    sure that those lawyers would have told him exactly as your Honor

3    concluded, that he had the power to do so by adopting exclusive

4    formulary that excluded Vioxx.

5         And your Honor will hear the testimony of Dr. Gerald

6    Avorn, who himself administers a hospital formulary, a drug

7    formulary, for Brigham and Women's Hospital.  He will testify that

8    had he been aware of the full risk of Vioxx, he would have excluded

9    Vioxx from the Brigham and Women's Hospital formulary.

10        Then your Honor will hear from Dr. John Abramson.

11   Dr. Abramson will testify that a reasonable buyer would not have

12   paid for Vioxx, and he will testify that LDHH would not have made

13   Vioxx available to Medicaid patients had they been aware of the

14   defective condition.

15        Finally, the most compelling evidence that LDHH would

16   have taken the drug out of circulation is the withdrawal itself.

17   Merck exercised the ultimate formulary exclusion decision.  Merck,

18   the manufacturer, with more information about the drug than anyone

19   else, decided that the risk was so great that the drug should not

20   be available to anyone and removed it from the market.

21        Defendants will make much of the fact that the State has

22   never adopted an exclusive formulary.  Your Honor, extraordinary

23   circumstances call for extraordinary measures.  The State has never

24   been faced with revelations of a defect that a drug that it was

25   paying for widely and was widely prescribed throughout the state to

1    many individuals, which posed little or no benefit over its

2    alternatives, was causing a dramatic increase in heart attack

3    deaths and hospitalizations.  That circumstance would have

4    warranted the extraordinary action of creating an exclusionary

5    formulary and taking Vioxx out of the Medicaid circulation.

6         Hence, there is a redhibitory defect, and the only

7    question now is whether the defect was apparent or known to

8    Louisiana Department of Health and Hospitals.  There is ample

9    evidence that the risk was not apparent and was not known to LDHH.

10   If Merck is right that the risk was not established prior to the

11   APPROVe study, then LDHH could not have known that there was a

12   risk.

13        Dr. Kessler will testify that no one in the medical

14   community could have been expected to know the risk because Merck

15   failed to do the necessary CV outcomes testing.  And, your Honor,

16   this is where Article 2545 comes into play.  Under Article 2545, a

17   manufacturer is deemed to know of the defects in its product.

18   Hence, the fact that Merck may not have been aware prior to the

19   APPROVe study that Vioxx suffered from a defect does not exculpate

20   Merck, but it does demonstrate that the State of Louisiana was not

21   aware.

22        And the policy rationale for Article 2545 is particularly

23   compelling in this case.  Here Merck had early signals of a CV risk

24   but chose not to conduct a CV outcome study.  The only arguable CV

25   outcome study that Merck even contemplated was its Protocol 203,

1   which would not be completed until 2006, some seven years after the

2   drug first came to market, and actually after the drug was removed

3   from the market by Merck.

4          Merck's studies were designed to avoid detecting the

5   risk.  At-risk patients were removed from study populations, and

6   the studies that did include at-risk patients lacked statistical

7   power in order to determine whether or not there was a risk.  Merck

8   designed its studies to look for market-favorable outcomes, that

9   is, GI benefits and other things that would help it in the

10  marketplace but not to look for the CV indication that would have

11  condemned its product.

12         Article 2545 is designed to keep a manufacturer from

13  doing just that.  It is intended to keep a manufacturer from

14  avoiding studies in order to avoid liability.

15         Merck will also tell you that because the FDA knew, the

16  plaintiff State of Louisiana must have also known.  They can't hide

17  behind the FDA, your Honor.  Dr. David Kessler, who your Honor will

18  hear from shortly, will testify that the standard of care requires

19  testing of safety signals whether the FDA requires it or not.  He

20  will also tell you that the FDA in this case just got it wrong.

21         But the case is not about what the FDA knew, the case is

22  not about whether the FDA got it wrong, the case is about whether

23  Merck provided the information of the defect to LDHH, and the

24  evidence will demonstrate that it did not.  That LDHH neither knew

25  nor could have known of the defect.

1       No witness from LDHH will testify that LDHH was aware

2   that the CV risk outweighed the benefits.  Secretary Hood will

3   certainly testify that he was not aware that the CV risk outweighed

4   the benefits.  He will testify that he believed the risk of an

5   acceptable level for a drug of widespread analgesic use, and you

6   will find that this testimony is consistent both with Merck's

7   label, Merck's marketing materials, and with Provider Synergies

8   recommendations to the State of Louisiana.  Your Honor will recall

9   that Provider Synergies was the pharmacy benefit manager that the

10  State of Louisiana contracted to evaluate the clinical data

11  regarding Merck and make recommendation -- I'm sorry, regarding

12  Vioxx and make recommendations to it.

13      The only evidence of any awareness of the risk that the

14  defendants can point you to is the Provider Synergies monographs

15  and the label.  Expert testimony will show that these materials did

16  not reveal the defect.  Neither of these materials were even

17  available until early of 2002, long after the date of which the

18  State would have first been able to do something about Vioxx and

19  the defect.  And these materials, at best, raised only concerns

20  without reaching any solid conclusions, as to the existence of the

21  defect.

22      Awareness of mere concerns is not the same as knowledge

23  of a defect, your Honor.  We have cited, your Honor, previously to

24  the case of *Buck v. Adams*, which provides a suitable analogy for

25  the situation presented here.

1       In *Buck v. Adams*, the plaintiff was aware that the boat

2  that he had purchased had worm holes.  What the plaintiff didn't

3  know was that the worm holes were of such an extent that the boat

4  was unseaworthy.  Here, the State was aware that there were

5  concerns about CV issues, what the State didn't know was that the

6  CV issues rendered Vioxx unsuitable for its intended use.

7       Gerald Avorn, who was at the vanguard of CV knowledge

8  with respect to Vioxx, testifies that he himself did not fully

9  appreciate the risk of Vioxx at the times that we are talking about

10  here, when Louisiana was making key decisions about keeping Vioxx

11  on its formulary.

12       The studies that Merck sponsored raised concerns but

13  continually asserted that the risks were not established.  This was

14  consistent with Merck's marketing message, and it was a message

15  that Merck was able to convey because of Merck's manipulation of

16  peer-reviewed literature so as to prevent the discovery of the true

17  risk.  Merck targeted both Provider Synergies and the P&T Committee

18  with its pro Vioxx message.

19       Your Honor will hear from the individuals who provided

20  advice to the Louisiana Department of Health and Hospitals with

21  respect to Vioxx, first Dr. Gina Biglane.  She will testify that

22  She was not aware of any misrepresentations by Merck, and then your

23  Honor will hear from Valerie Taylor, who will testify that she was

24  not aware of any misrepresentations by Merck.

25       Now, defendants will say that Valerie Taylor, and they

1    will cite to testimony from Ms. Taylor, where she said that she

2    made the State aware of risks, CV risks, with respect to Vioxx.

3    But you need to look at what she said, what she told the State and

4    what she made them aware of.  She made them aware of a concern, she

5    did not make them aware of a risk; and she certainly did not make

6    them aware of a risk that outweighed the defect -- I'm sorry, that

7    outweighed the benefit of the product.

8              Dr. Taylor testified that she trusted Merck.  She

9    testified that she had no reason to believe that she ever received

10   misleading info from Merck, the record will show otherwise.  She

11   claims that she did not rely on Merck marketing; again, the record

12   will belie her testimony.  Dr. Kerry Edwards, Merck's regional

13   medical director, met with her at least twice a year and on every

14   occasion she asked him repeated questions about the cardiovascular

15   profile of Merck, and on each of those occasions she would have

16   received a message that was consistent with Merck's position.

17             She also received PIRs, which are letters to doctors from

18   Merck explaining Merck's position and explaining what Merck's

19   position was with respect to the science.  Now, she claims that she

20   chiefly relied on peer-reviewed literature and the package insert,

21   that is, Merck's package insert and not on Merck's marketing

22   materials or her meetings with Merck's personnel.  Your Honor, the

23   literature that she relied on and Merck's package insert are the

24   same as Merck's message.

25             THE COURT:  You have five minutes, counsel.

1          MR. MURRAY:  Thank you, your Honor.  The proof is in the

2     pudding, your Honor.  The Provider Synergies monographs were a mere

3     conduit for the pro Vioxx message.

4          Slide 1, please.  In April of 2003, version Provider

5     Synergies monograph in which the decision to -- on which the

6     decision to include Vioxx in the PDL was based -- again, well after

7     June 13, 2001 -- fails to disclose that the risks outweigh the

8     benefits.  Merck's messages are repeated throughout this document.

9          Slide 2, please.  First, you'll see cited the figure of

10     16,500 deaths per year.  That is a figure that was cited repeatedly

11     in Merck's marketing materials.  16,500 deaths per year as a result

12     of GI events from NSAIDS.  That is a figure that Merck's own

13     scientist, Dr. Laine, said were, "bogus".

14          Next slide, please.  You have repeated cites throughout

15     the monograph, and this is the end notes of the monograph, repeated

16     cites to both the VIOXX package insert and to Merck's sponsored

17     research.

18          Slide 4, please.  Now, here is where we have the

19     cardiovascular concerns discussion.  And, your Honor, I would

20     submit to you that after you see this material, you will have no

21     reason to believe that Louisiana was aware that the risks

22     outweighed the benefits of the drug and that the drug suffered from

23     a redhibitory defect.

24          The CV concerns discussion talks begins with a discussion

25     of the Topol article but then discounts that article by saying that

1   the studies were not designed to evaluate cardiovascular risks and

2   cautions the users in interpreting that material.  But then it goes

3   on and cites to Merck-sponsored articles, which demonstrate or

4   purport to demonstrate that there is actually less of a risk with

5   Vioxx than with other NSAIDs.

6           Tellingly, this section about cardiovascular concerns

7   does not refer to the fact that Vioxx had a five times greater risk

8   of heart attack in the VIGOR study, both in aspirin and non-aspirin

9   indicated patients, and it certainly does not disclose, because

10  Merck never disclosed it, the Dr. Edward Sculnick, the president of

11  Merck research labs, determined that the Merck VIGOR study showed a

12  cardio effect that was clearly real and mechanism based.

13          Then we have the discussion of the clinical trials that

14  supposedly support the GI benefit.  Slide 5, please.  You'll see

15  cites again to Merck's sponsored Laine study and the Merck

16  sponsored Bombardier study.

17          Slide 6, again, discussing the impact, we have a cite to

18  the Merck package insert, which claims that there is a GI benefit.

19          Then, your Honor, we turn to the CV conclusion slide,

20  this is the last page where Provider Synergies makes the

21  recommendation to the State that they include Vioxx on the

22  preferred drug list.  And here they write, the VIGOR study raised

23  some questions regarding the cardiovascular safety of Vioxx.  But

24  they go on to write, aspirin for cardiovascular prophylaxis was not

25  permitted in the study, which does not reflect real-world use of

1    NSAIDs, suggesting that the use of aspirin could deal with the

2    problem.  This is contrary to what the VIGOR study showed, which

3    was that the risk existed both for aspirin and non-aspirin

4    indicated patients.

5         Most importantly, the conclusion, your Honor, is that the

6    significance of this potential cardiovascular risk is unknown.  A

7    risk that is unknown cannot form the basis for knowledge of the

8    defect.  What was excluded from here was that the CV risk was only

9    an aspirin -- I'm sorry, that the CV risk was in both aspirin

10   indicated and non-aspirin indicated patients, that the overall

11   safety in the VIGOR study showed 21 percent more serious adverse

12   events with VIGOR than with other -- I'm sorry, with Vioxx than

13   with Naproxen.  That figure is not in the VIGOR study because it

14   was omitted from the article.

15        There is no reference to the Alzheimer study access

16   mortality with respect to VIOXX, that figure was not made public.

17   There is no reference to the post market OA studies because they

18   were not disclosed in the Reicin articles, and there is no

19   reference to the 27 percent greater hospitalizations in Vioxx

20   patients because that was not published in the VIGOR study.

21        Slide 7, please.  With respect to the benefits, again,

22   your Honor will see exaggerations of this GI benefit.  Ulcer rates

23   for rofecoxib, that's Vioxx, were comparable to rates with placebo,

24   is what the Provider Synergies report says.  What it doesn't say is

25   that by April 2003, a month before this report came out, Merck's

1    own data showed a four times greater risk of GI incident than

2    placebo.  It doesn't state that Vioxx was only tested against NSAID

3    doses that 90 percent of NSAID patients don't use.

4           Whenever, and you'll see this throughout, whenever the

5    State of Louisiana asked about cardiovascular concerns from

6    Provider Synergies, they got the same message that Provider

7    Synergies got from Merck and that was, it is not established.  May

8    8th, 2002, Valerie Taylor Provider Synergies tells Louisiana P&T

9    Committee in response to questions about the CV risk, there is

10   still a lot of discussion going on about those particular topics,

11   but no real conclusions at this point.  So I think we need to look

12   at further trials to come to some type of conclusion for those

13   particular instances.

14          Your Honor will hear from John Abramson, the information

15   critical to understanding the safety profile of Vioxx was never

16   provided to Provider Synergies, LDHH or the P&T Committee, and

17   finally, your Honor, we will hear from Dr. Avorn, and Dr. Avorn

18   will tell you that based on the science that is contained in these

19   articles, which led Provider Synergies to reach the conclusion that

20   Vioxx was fit for inclusion on the preferred drug list.

21          Dr. Avorn will tell you, and I quote, "I have never known

22   a collection of papers on any one topic in which there has been

23   such a constellation of skewed and distorted presentation of data

24   in any drug studies that I've ever looked at.  There was a pattern

25   of gross distortion of the risk of Vioxx and that no matter which

1  way patients turned, whether it was looking at the label, hearing

2  what they were hearing from the Merck training sales

3  representatives, trying to read the literature in the medical

4  journals and trying to get some accurate complete depiction of what

5  was happening in the clinical trials, even the information that the

6  patients were bringing to them from commercials and ads that they

7  had seen, across the board, there was a pattern of what I would

8  characterize as systematic distortion that rose almost to the level

9  of grotesque.  And frankly, it was an embarrassment to me as a

10  member of the medical profession that this was going on in

11  presenting information to doctors in such a one-sided and lopsided

12  way.  No wonder Provider Synergies concluded that the significance

13  of the risk was unknown."

14        Had the real risk been known, LDHH would certainly have

15  exercised its authority to exclude Vioxx and, as such, LDHH is

16  entitled under redhibition to refund of the purchase price, plus

17  interest from the date of payment, plus reasonable expenses

18  incurred by the sale, which figure, less interest, comes $11.17

19  million as of June 13, 2001, through the date Vioxx was removed

20  from the market.

21        I thank your Honor for taking the time to listen to this

22  evidence, and at the end I believe you will conclude that we have

23  satisfied our burden to demonstrate that Vioxx suffered from

24  redhibitory defect and we are entitled to a refund.  Thank you

25        THE COURT:  Thank you, counsel.  Let's hear from the

1    defendant at this point.

2         MR. ISMAIL:  Good morning, your Honor.  The plaintiff

3    just previewed a case that has little or nothing to do with the

4    remaining issues in this action.  For some reason, the State of

5    Louisiana doesn't want to focus on the Louisiana issues.  They're

6    not going to bring here any Louisiana doctors, they'll bring here

7    one Louisiana witness, and they're going to seek to have the court

8    exclude or to ignore the Louisiana proof.  Merck will be the party

9    that will be discussing Louisiana issues with the Louisiana

10    witnesses.  We will do so because the parties are not writing on a

11    blank slate, this court already has defined the State's burden and

12    it is substantial.

13         The court already has foreclosed the State in two

14    important respects:  First, the State cannot predicate any recovery

15    based in any way upon individual prescribing decisions of

16    individual doctors.  You just heard a lot from Mr. Murray about

17    what doctors believed and how doctors treated or understood the

18    literature and the label.  That already is out of the case.

19         Second, the court already has determined that the State

20    must show it had the ability to completely restrict Vioxx

21    reimbursement within Medicaid.  And so, in essence, the court has

22    allowed the plaintiff a single narrow path forward.  It must show

23    it could have and would have restricted completely Vioxx

24    reimbursement or it will take nothing.  The evidence will show to

25    the contrary.

1          And, your Honor, we believe that the State's case will

2     fail for at least these four reasons:  First, the State could not

3     completely restrict Medicaid reimbursement.  Under either the

4     State's enabling statute or under federal law.  Two, the State

5     simply did not want to move to an exclusive formulary.  To the

6     extent they ever even had the option, they told the world they did

7     not want to adopt such a system.  Three, the State knew of the

8     potential cardiovascular risks of Vioxx.  And lastly, Vioxx worked

9     as intended for patients and was far from completely useless.

10          Now, the facts will overview is as follows, some of which

11    will be in summary fashion, in deference to the court's substantial

12    familiarity with the facts in this case:  Vioxx was approved in May

13    1999 as safe and effective.  At that time, the FDA scientists who

14    conducted the review, reviewed years of preclinical and clinical

15    data on the medicine.  The FDA scientists were also involved in the

16    design of the clinical studies that led to the approval of the

17    drug.  At the time, the State of Louisiana had an open formulary

18    system, which this court already has determined required it by law

19    to reimburse for Vioxx.

20          In March of 2000, Merck learned the preliminary results

21    of the VIGOR study.  And the court's well familiar with the results

22    of that study.  In summary, Vioxx was shown to have an

23    approximately 50 percent reduction in perforations, ulcers and

24    bleeds compared to Naproxen.  But the final adjudicated data also

25    showed a statistically significant difference in thrombotic events,

1    driven largely by a 20 to 4 difference in myocardial infarctions.

2    Now, the FDA was made completely aware of the cardiovascular data.

3          Now, following the VIGOR study, there were a great deal

4    of publications that addressed the implication of that data on the

5    cardiovascular safety of Vioxx.  Some took the position that VIGOR

6    demonstrated a potential increased cardiovascular risk.  Dr. Topol

7    would be an example of such an author.  Others believed that VIGOR

8    was best interpreted as demonstrating a cardioprotective effect of

9    Naproxen because Naproxen was known to act similar to aspirin.

10   Dr. Patrona (PHONETIC)  would be an example of such an author.

11         Now, the Merck scientists clearly believed that VIGOR did

12   not demonstrate an increased cardiovascular risk and that Merck's

13   analysis supported by others outside of the company is that based

14   on the totality of the data, not cherry picking data, but based on

15   the totality, that Vioxx compared favorably to placebo and to

16   non-Naproxen NSAIDs and that it was Naproxen that was the outlier.

17   But make no mistake, the debate was there and it was public.

18         The FDA convened an advisory committee in February of

19   2001 to address this precise issue, the interpretation of the VIGOR

20   data as to the cardiovascular safety of Vioxx, and also to get

21   input on the appropriate labelling for the drug.  The advisory

22   committee experts heard the view on the one hand that VIGOR

23   demonstrated an increased cardiovascular risk and also heard the

24   view on the other that the study could not be so interpreted.  The

25   advisory committee experts suggested and the FDA scientists agreed

1   that the best thing to do was to simply put the VIGOR data in the

2   label and let folks make up their own mind.

3          In April of 2002, the Vioxx label was amended to include

4   a precaution for cardiovascular risks and the cardiovascular data

5   from VIGOR that the FDA thought should be included.

6          So getting back to Louisiana Medicaid.  In June of 2001,

7   because the State was saddled with budgetary constraints within its

8   Medicaid program, it decided it needed a different system to help

9   control pharmacy costs and enacted what was known as Act 395.  Now,

10  the evidence will show that the Department of Health and Hospitals

11  did not seek nor did it want an exclusive formulary at that time.

12  In fact, in the words of its former secretary David Hood, an

13  exclusive formulary simply was not, quote, "palatable", and was

14  deemed not in the best interest of Louisiana.  We'll come back to

15  that point in a moment.

16         But first, Act 395 was not self-executed.  Within the

17  very terms of the statute by its legal constraints and the

18  practical realities of everything that needed to be done in terms

19  of setting up a P&T Committee and reviews, Act 395 was not

20  immediately implemented nor could it be.  In fact, that took a full

21  year.  So regardless of what formulary system was adopted, it was

22  not until June of 2002 that the State of Louisiana ended its open

23  formulary system.

24         Now, the system the State chose to implement after Act

25  395 was known as the Preferred Drug List with a prior

1   authorization.  Several departmental witnesses will testify that

2   they understood the State had no authority to restrict Vioxx or any

3   prescription drug reimbursement beyond the preferred drug list and

4   prior authorization.  Nor did it have any interest in doing so.

5   And this is significant.  This departmental knowledge and

6   expectation of what they can do informs what the State would have

7   done with different information.  If the State didn't think it had

8   the power, that certainly is informative as to what the State would

9   have done with different information.

10          You will hear the testimony of Dr. Gina Biglane, former

11   director of prior authorization for DHH; from Mary Terrebonne, who

12   is the pharmacy director for Medicaid; Ben Bearden, the former

13   Medicaid director; Charles Castille, the former undersecretary of

14   DHH; all of whom we will call by deposition in our case.  And the

15   story these witnesses tell is remarkably consistent:  The State did

16   not perceive nor did it want an exclusive formulary system and did

17   not perceive that it had the ability to restrict Medicaid

18   reimbursement beyond the preferred drug list and prior

19   authorization.

20          Then there's former Secretary David Hood whose personal

21   journey in this case the court knows well.  He was first deposed in

22   February of this year, and at that deposition, his testimony was

23   very consistent with the other department witnesses.  The State did

24   not want an exclusive formulary, did not believe the act entitled

25   it to an exclusive formulary, and always believed that it should

1   have a prior authorization to allow physicians access to any

2   FDA-approved drug.  Merck moved for summary judgment and the State

3   opposed with an affidavit from Mr. Hood, or at least an affidavit

4   that was bearing his name.

5           Now, we thought the affidavit was a curious thing because

6   in it there was a great deal of detail about facts and information

7   that Mr. Hood either did not recall or never was aware of when he

8   was secretary, so the court allowed and we took a second deposition

9   of Mr. Hood.  That occurred six days ago.  And this is what we

10  learned last week:  The affidavit that was submitted in opposition

11  to Merck's motion for summary judgment was written entirely by the

12  plaintiff lawyers, Mr. Hood did not edit a single word or so much

13  as move a comma.

14          More importantly, Mr. Hood admitted that he simply lacked

15  personal knowledge of many of the allegations contained in the

16  affidavit.  Now, to his credit, Mr. Hood freely admitted he was

17  asked to assume several of the facts that were contained in his

18  affidavit and that he had no information about many of those

19  allegations.

20          Now, Mr. Hood will be the State's only Louisiana witness.

21  And he cannot shoulder the State's burden.  His admissions are

22  substantial and they are dispositive.  First, the State's case is

23  that had different clinical information about Vioxx been available,

24  whether it's osteoarthritis, cardiovascular data, whether it's

25  Alzheimer's mortality, everything that Mr. Murray just went

1  through, they claim would have led the State to make different

2  decisions in Medicaid.

3         Now, Mr. Hood is not a doctor, he has no medical

4  training, and he admits he could not assess the risks and benefits

5  of medicines.  That wasn't his role.  He could not, he did not and

6  would not undertake a clinical review of any drug.

7         And the State will not bring any witness here to say that

8  had different clinical information been available, the State would

9  have interpreted that data in such a way to motivate them to take

10 the drastic step of changing their formulary system to an exclusive

11 formulary.  Mr. Hood cannot fill that void.

12        Mr. Hood also did not explain in his deposition how it

13 could be that the State would completely restrict Vioxx

14 reimbursement within Medicaid.  He had no answer for how that

15 actually would happen.  Now, Mr. Murray just said, I think I wrote

16 this down correctly, I'm sure those lawyers would have told him,

17 the DHH lawyers.  Mr. Hood can't fill that void, he can't testify

18 that he thinks somebody would have given him the right to create an

19 exclusive formulary, there will be no witness in this case that

20 will actually tell you that the State thought they could have an

21 exclusive formulary.  No one.

22        Now, we believe instead the testimony will be consistent

23 with the following:  We believe Mr. Hood will testify:  "When you

24 were secretary of DHH, did Louisiana ever consider implementing a

25 restrictive formulary along the type that you described earlier?  I

1   am not aware of consideration of that.  There may have been

2   something from time to time that came up in the legislature."

3        "As secretary of DHH, did you ever propose Louisiana move to

4   a restrictive formulary?"  His answer, "not that I recall.  And

5   here is the key question, why did you not consider moving to a

6   restrictive formulary?"  His answer, "Well, I think that a

7   formulary with a prior authorization component is probably more

8   palatable.  I think we'd get less opposition when you're trying to

9   get a law passed."

10       So I think that was one of the key factors here.  We

11  wanted to make sure that everyone was on board with it, and I think

12  that's most of what we got.  He goes on.

13       "And that was to ensure passage of some sort of a program

14  that would allow the State to save money?"  His answer, "yeah,

15  you've got to understand that we had no formulary, or a so-called

16  open formulary for quite some time, and I think, you know, it would

17  have been difficult to say, well, we're going to have a restrictive

18  formulary now.  There won't be any access to certain drugs."

19       "So your understanding when you were secretary of DHH,

20  Act 395, that you referred to, was to create, not a restrictive

21  formulary, but a preferred drug list with prior authorization,

22  correct?  Yes.  And if the department wanted to recommend the State

23  move to a restrictive formulary for Medicaid, you would have to go

24  back to the legislature and get that specifically authorized?

25  Yeah, as a general rule, yes."

1          Now, your Honor, this testimony is not surprising because

2     the State's Medicaid program that it adopted after Act 395 was not

3     random.  It was purposely modelled after the program implemented in

4     the state of Florida.  The reason was, was Florida was one of the

5     first states that moved away from open formularies, and, in fact,

6     at the time the state was considering what system to adopt, Florida

7     was litigating the extent to which a state could restrict

8     reimbursement under Medicaid.

9          And so the system Florida adopted was the preferred drug

10    list with prior authorization, and that's the program that

11    Louisiana expressly told the world it wanted to implement.  Not the

12    restrictive formulary the plaintiffs are claiming now.

13         Now, we will bring, your Honor, as an expert witness,

14    Mr. Jerry Wells, who was the former director of the Medicaid

15    program in Florida.  And Mr. Wells will testify that no state has

16    ever done what the plaintiff lawyers are alleging Louisiana would

17    have done here.  No state has ever adopted a restrictive formulary

18    because of safety concerns over one FDA-approved drug.  And he will

19    further testify as to the practical and procedural obstacles a

20    state would have in adopting a restrictive formulary.  Because what

21    I've been addressing so far is the State's enabling statute, but

22    there's also a federal law component as well.

23         And your Honor had addressed this point in your motion,

24    in the order for summary judgment.  And you quoted from Section

25    1396 of the Ober statute.  As your Honor set forth, and this is the

1    section dealing with restrictive formularies, "a covered outpatient

2    drug may be excluded with respect to the treatment of a specific

3    disease or condition, if and only if, based on the drug's

4    labelling."

5         Now, this phrase "based on the drug's labelling" is

6    important.  It doesn't say based on labelling the State believes

7    should be in effect, it doesn't say based on labelling years later

8    the State could claim should have been what the FDA adopted.  This

9    statute does not give states the opportunity to second guess

10   FDA-approved labelling and say, we think a different label should

11   be implemented, and therefore, we're going to seek to exclude a

12   drug under this section.

13        And there will be no dispute that the Vioxx label that

14   actually was approved by FDA demonstrated a clinically meaningful

15   therapeutic advantage.  I believe Mr. Murray just admitted as much

16   with respect to whether it was GI benefits even for a subset of the

17   population for steroid users or any of the other aspects that were

18   part of that labelling, there was a clinically meaningful benefit.

19   We will bring testimony from Louisiana doctors who will describe

20   for the court what that benefit was for patients.

21        But even with an exclusive formulary, federal law

22   requires a prior authorization.  Immediately below in the Ober

23   statute that the court cited is this paragraph, this is part of

24   1396 and what the state must do.  The State plan can permit

25   coverage of the drug -- it says:  "The State plan must permit

1    coverage of a drug excluded from the formulary pursuant to a prior

2    authorization program consistent with subparagraph five."  So even

3    if you have an exclusive formulary, the federal law requires a

4    prior authorization option to permit coverage.

5           And, your Honor, that Section 5 referred to here has

6    details as to how that prior authorization program has to be

7    adopted.

8           And so here is the problem for the State:  Now we're

9    right back to individual prescribing decisions for individual

10   doctors.  They can't tell you with aggregate proof how many doctors

11   would seek prior authorization for which patients and for which

12   indications.  And as a result, their case must fail.

13          Now, we've been addressing, your Honor, why the State

14   under state and federal law could not completely restrict Vioxx

15   reimbursement.  And as I've alluded to, nor did the State even want

16   to.

17          You've already heard what Mr. Hood's testimony likely

18   would be, and it's consistent with other departmental witnesses.

19   This is the testimony of undersecretary Mr. Castille, this is not

20   yet in evidence but we believe this is what the evidence will show.

21   Question:  "So that, in effect --" referring to the preferred drug

22   list and prior authorization system -- "was the most restrictive

23   thing the State of Louisiana could do with regard to reimbursement

24   for Vioxx in 2002; is that right?  A. I think that's correct."

25          Louisiana -- the State could not have, for example, have

1    done, let's say what the FDA could do, and take a drug off the

2    market.  We obviously did not have that authority.  So to the

3    extent that we placed them on a nonpreferred drug list, that was

4    the most restrictive thing we could do.

5           They never sought to have the authority the lawyers

6    claimed they would have exercised here.  They understood

7    differently at the time.

8           Now, your Honor, the testimony of these department

9    witnesses should end the speculative what-if game that the State is

10   advancing here, but there, in fact, is more.  The court will recall

11   that in April of 2005 -- let me back up, in February of 2005, the

12   FDA convened yet another advisory committee.  This committee looked

13   at not just the cardiovascular safety of Vioxx but all NSAIDs, and

14   then in April of 2005, FDA scientists released a memo with their

15   findings, and they found that Celebrex did not have any different

16   cardiovascular risks than Vioxx.  In fact, all of the NSAIDs were

17   deemed to have the same risks, except for Naproxen.

18          The FDA memo also found that it was Vioxx but not

19   Celebrex that had a proven GI benefit, so here you have the FDA

20   saying same cardiovascular risks, Vioxx has a proven GI benefit.

21   FDA then mandated Celebrex adopt a black box label that explicitly

22   warned of cardiovascular risks, the highest warning that was

23   available for Celebrex.

24          So now we have a controlled study.  We have a COX-2 drug

25   with an express explicit black box cardiovascular warning, the type

1   of which the State says should have been adopted on Vioxx.  And we

2   also have the FDA saying no proven GI benefit on Celebrex.  So what

3   would the State do?  Would it, armed with that information, scrap

4   its Medicaid program and go to an exclusive formulary?  Now your

5   Honor knows the answer already.  They did not do that, and instead,

6   they did something else, they put Celebrex on the preferred drug

7   list in 2007.  The State's reaction to the Celebrex black box

8   warning exposes the myth to their entire case here that they would

9   have done something different had clinical information been

10  available about Vioxx.  And, in fact, throughout the entire time

11  period, the State never sought an exclusive formulary based on

12  safety concerns of any drug.

13         Now, I mentioned that the State will be bringing Mr. Hood

14  live as their only Louisiana witness.  The rest of their witnesses

15  will be retained experts.  Three of which, Dr. Macgregor,

16  Dr. Graham, not that one, and Dr. Kessler will have nothing to say

17  about Louisiana.

18         Dr. Harris is their damages expert.  Now, Dr. Harris

19  admits he actually did not perform a damages analysis in this case.

20  He will say the State's lawyers asked him to perform five specific

21  calculations.  Now, here is the telling thing, your Honor:  None of

22  the calculations the State's lawyers asked Dr. Harris to do is

23  based in any way on this idea that the State would adopt a

24  restrictive formulary to completely restrict Vioxx reimbursement.

25  None of them.  And the reason is, when they were putting their case

1   together, they understood that it simply wouldn't be tenable for

2   them to argue here that the State had the ability to completely

3   restrict reimbursement for an FDA-approved drug.

4          THE DEPUTY CLERK:  Excuse me, five minutes.

5          MR. ISMAIL:  Thank you.

6          Now, last two witnesses, Dr. Abramson, of course he can't

7   fill the void, he is not going to testify what the State could

8   have done -- would have done with different information, he can't

9   opine as to what, how somebody would react to different clinical

10  information, nor can he say what the State, doesn't even purport to

11  offer an opinion on the State's rights under Medicaid.

12         Mr. Leach, who apparently the State will call live,

13  you've heard a lot about Mr. Leach already; the important thing

14  here is, not in any of the various iterations of his report does he

15  purport to offer an opinion as to what the State could have or

16  would have done with different clinical information nor that it

17  could have or would have adopted an exclusive formulary.

18         The rest of the case, plaintiff's case, apparently will

19  be 18 depositions of Merck witnesses of hundreds of pages dealing

20  with marketing and press releases and things happening far from

21  Louisiana.  But none of it's going to address could they and would

22  they have sought to completely restrict Vioxx reimbursement.

23         Now, your Honor, the third reason the case, the State's

24  case will fail is because they're well aware of cardiovascular

25  risks.  Now, we're not talking about boats with worm holes here,

1    we're talking about a pharmaceutical drug.  And you have to look at

2    what the state of knowledge was at the time.  It cannot be the case

3    under redhibition that years after a drug has been on the market, a

4    state can come and say, well, we now know there is a certain side

5    effect associated with the drug, so everything that we've done for

6    the last ten years we expect to be reimbursed.  That's not how you

7    can apply state, either tort or statutory law to the situation of a

8    pharmaceutical.  We've addressed this in the product liability

9    trials, that you have to consider both the warnings that were

10   available and the state of knowledge at the time.

11          Now, Provider Synergies, which you've heard about, was

12   the State's independent advisor.  I heard lots of criticisms about

13   their monographs, that's the group that they hired to do the

14   clinical reviews.  They didn't rely on Merck, they didn't even

15   receive marketing materials from Merck let alone rely on them.

16   Instead, they did independent analyses of the clinical data.

17   Including Dr. Topol.

18          Now, I don't know if the court's going to be disappointed

19   to learn we're not going to be able to watch Dr. Topol's video in

20   this case, and that is because the State realizes he hurts them in

21   this situation because his article was cited by Provider Synergies

22   in their monograph setting out the cardiovascular risks.  And these

23   monographs unquestionably raised the cardiovascular concerns in

24   light of VIGOR that were available at the time.

25          Just briefly, your Honor, I believe Mr. Murray put up an

1  example of one of the monographs, I think this is one of the ones

2  he put up.  There is no question that Provider Synergies discussed

3  the potential cardiovascular risks, they say right here that in

4  VIGOR, Vioxx had a significantly higher risk of developing a

5  cardiovascular thrombotic event compared to Naproxen.

6         You will hear from Valerie Taylor, we'll call her by

7  deposition, she was the doctor at Provider Synergies who helped and

8  put these monographs together.  She'll testify that -- I think this

9  is the testimony that Mr. Murray was referring to, so I'll just

10 show the court:  "Any doubt in your mind that you alerted the P&T

11 Committee to the potential cardiovascular concerns of Vioxx?  No

12 doubt.  Any doubt in your mind that you alerted the P&T Committee

13 of Louisiana about the potential GI toxicity of Vioxx, as well as

14 other NSAIDs?  No doubt."  She was presenting to the P&T Committee

15 where DHH employees were present about all of this data.

16        So, your Honor, there were multiple instances, and these

17 are just examples, of the State receiving information, either

18 through Provider Synergies in the written reviews at P&T Committees

19 where these issues were debated, or even information that the State

20 got from Pfizer, which, as you can understand, was pushing heavily

21 this idea that it was Vioxx that was associated with the

22 cardiovascular risk.

23        And while all of this was going on, the FDA continued to

24 say that Vioxx was safe and effective, aware of all of this

25 information that Mr. Murray just described, and, in fact, approved

1    the drug on two more occasions expanding the clinical uses of the

2    drug.

3           And as you know, the drug was withdrawn in September of

4    2004.  Apparently the State's going to argue that the fact of the

5    withdrawal should be used by the court as an inference, but as you

6    know under Rule 407, subsequent remedial measure, even in

7    redhibition cannot be used as proof of, in this case, redhibition

8    defect.

9           Now, lastly, your Honor, under the elements redhibition

10   the State cannot prove its case because far from being, quote,

11   "absolutely useless", Vioxx worked as intended for the vast

12   majority of patients.

13          Now, we're not talking -- apparently the State's going to

14   talk about APPROVe and placebo-control data, but these are patients

15   in pain and they needed treatment, placebo wasn't an option, and

16   you will hear that Vioxx was an effective pain reliever and for the

17   vast majority of patients they suffered no clinical adverse effect.

18   And, as the court is aware, there is a settlement program for

19   anyone who does allege cardiovascular side effect and the State can

20   participate through the lien program.  So we're not talking about

21   those patients.

22          The State will not call a single Louisiana doctor to

23   contest the benefits of Vioxx.  We will bring the Louisiana doctors

24   to talk about how the drug, far from being useless, was extremely

25   beneficial for their patients.

1      Now, in summary, your Honor, the State has made clear its

2  plan to try this case without regard to the case-specific facts.

3  They'll be talks of marketing and cardiovascular trials viewed in

4  20/20 hindsight and some out-of-context e-mails that we've seen a

5  time or two in this courtroom.  I guess we'll have a new twist,

6  we'll talk about the GI benefit.  In five years, no litigant has

7  ever contested the GI safety of -- or the safety profile of Vioxx,

8  and, in fact, many of their favorite experts, including Dr. Avorn

9  who got so much air time from Mr. Murray, admitted in the

10  deposition that will be submitted that Vioxx did have a proven GI

11  benefit.

12      And I guess the plaintiff has come up with a different

13  interpretation this time, but this change in tactics doesn't change

14  the outcome because no one will say, Mr. Hood or anyone else, that

15  a different clinical assessment of the GI data would have led the

16  State to do anything different with regard to Vioxx.

17      So this week we'll hear a lot of things that have nothing

18  to do with Louisiana Medicaid.  Next week, your Honor, we'll try to

19  bring the focus back.

20      And I just want to make one last comment.  As a result,

21  we may not do what we've done in the past and try and clean up

22  every misimpression that the State leaves with the e-mails, but

23  your Honor has the exhibits, you're going to have the depositions,

24  and we expect that's what the court is looking for and that's how

25  we'll try our case.  And at the conclusion of the evidence, we

```
1    believe the court will render a judgment for Merck.

2              Thank you, your Honor.

3              THE COURT:  Thank you, counsel.  All right.  Do you all

4    need a moment to get your witnesses or can we go?

5              MR. DUGAN:  Can we have five minutes, your Honor?

6              MR. MURRAY:  Before we break, your Honor.

7              THE COURT:  We'll take a five-minute break.

8              THE DEPUTY CLERK:  Everyone rise.

9              MR. MURRAY:  Your Honor, I'm sorry, before we depart.  At

10   this point the plaintiffs would move that your Honor revisit the

11   ruling with respect to Dr. Vincent Culotta and other members of the

12   P&T Committee.  I believe counsel has just opened the door with

13   respect to those issues, he is saying that there is no Louisiana

14   doctor who will testify that they were misled and no doctor from

15   LDHH that will testify that they were misled.  I think he's opened

16   the door wide open, your Honor.

17             MR. ISMAIL:  Your Honor, if there is going to be no

18   proof, that doesn't open the door.

19             THE COURT:  I agree.  I'll deny the motion.

20             MR. ISMAIL:  Thank you.

21        (WHEREUPON, A RECESS WAS TAKEN.)

22        (OPEN COURT.)

23             THE COURT:  Be seated, please.  Call your first witness.

24             MR. DUGAN:  The State calls as its first witness

25   Dr. David Kessler.
```

1           THE COURT:  Come forward, Dr. Kessler, please.

2           THE DEPUTY CLERK:  Please step into the witness box.

3   Doctor, please raise your right hand.

4       (WHEREUPON, DAVID A. KESSLER, WAS SWORN IN AND TESTIFIED AS

5       FOLLOWS:)

6           THE DEPUTY CLERK:  Please be seated and would you state

7   your name for the record.

8           THE WITNESS:  David Aaron Kessler.

9           THE COURT:  Would you spell the last name.

10          THE WITNESS:  K-E-S-S-L-E-R.

11          THE DEPUTY CLERK:  Thank you.

12          THE COURT:  You may proceed, counsel.

13          MR. DUGAN:  Your Honor, may I approach the witness?

14          THE COURT:  Yes.

15          MR. DUGAN:  Your Honor, what I've handed Dr. Kessler is a

16   binder of exhibits that will be discussed today, and I've given

17   your Honor a copy, which I see that you have.

18          THE COURT:  Right.

19          MR. DUGAN:  And Katie, and also have been provided to the

20   defendants.

21                        VOIR DIRE EXAMINATION

22   BY MR. DUGAN:

23   Q.  May it please the court, my name is James Dugan, and I am going

24   to be asking you questions obviously here today, Dr. Kessler.

25          Could you please tell the court, have you served as

1   commissioner of the United States Food & Drug Administration or the

2   FDA?

3   A.  Yes, I did.

4   Q.  And when did you serve in that position?

5   A.  From 1990 to 1997.

6   Q.  And who appointed you and what was the process?

7   A.  I was appointed by President George H.W. Bush, I was

8   re-appointed by President Bill Clinton; and it was a process that

9   required confirmation by the Senate.

10  Q.  In that position what were your responsibilities?

11  A.  Enforcement of the federal Food, Drug and Cosmetic Act enacted

12  in 1906 and then many times thereafter.

13  Q.  And what is your current employment?

14  A.  I am currently a professor of pediatrics epidemiology

15  biostatistics at the University of California, San Francisco School

16  of Medicine.

17  Q.  And have you lectured in medical school?

18  A.  Yes, I've lectured in a number of medical schools and

19  universities.

20  Q.  On what subjects?

21  A.  Range of subjects, certainly on the regulation of foods, drugs,

22  medical devices, public health issues generally.

23  Q.  Are you a licensed physician?

24  A.  I am, I'm board certified pediatrician.

25  Q.  When and where did you get your medical degree?

1   A.  I got my medical degree from Harvard Medical School, entered

2   1973 and graduated 1979.

3   Q.  And what positions did you hold after medical school?

4   A.  Did my residency, internship and residency at Johns Hopkins

5   Hospital, I served on the health staff in the Senate Labor and

6   Human Resources Committee doing FDA oversight and legislative

7   activities with regard to the agency.  I was medical director of

8   the hospital, the Albert Einstein College of Medicine, I mentioned

9   FDA commissioner, I became dean at Yale Medical School, Dean and

10  Vice-Chancellor at the University of California San Francisco

11  Medical School and currently professor.

12  Q.  Thank you.  What is pharmacoepidemiology?

13  A.  Pharmacoepidemiology is this study of drugs in populations and

14  the methods one uses to study the effects of drugs on populations,

15  concerned a good deal with understanding not only the benefits of

16  drugs but the adverse effects of drugs.  So it studies adverse

17  reactions to drugs.

18  Q.  Do you have any special training in that field?

19  A.  I do.  I studied that at Hopkins.

20  Q.  Do you have a law degree as well?

21  A.  I do have a law degree.

22  Q.  When and where did you get that degree?

23  A.  I got that degree from the University of Chicago Law School, I

24  graduated in 1978.  For the record, I am not a member of a bar.

25  Q.  Have you taught classes in food and drug law?

1  A.  I have.  I taught at Columbia Law School, I co-taught for about

2  five years food and drug law at the Columbia Law School, Columbia

3  University Law School.

4  Q.  Have you testified before the U.S. Congress on matters relating

5  to the responsibilities of drug manufacturers?

6  A.  I have, sir.

7  Q.  On drug safety?

8  A.  Yes, sir.

9  Q.  On about how many occasions?

10  A.  More than I can remember.  The commissioner of FDA is

11  constantly hauled up before the Congress, so on numerous occasions.

12  Q.  Have you authored any scholarly works on the subject of the

13  standards of care that apply to drug companies?

14  A.  I have.

15  Q.  And can you identify those for the court?

16  A.  Most recently I co-authored an article with then Professor

17  David Vladeck, he is currently head of the Bureau of Consumer

18  Protection at the FTC.  That article dealt with the

19  responsibilities of a drug companies under both federal and state

20  consumer protection laws, specifically looking at the question of

21  preemption.

22  Q.  Was that article cited in any judicial opinions?

23  A.  It has been.

24  Q.  And what case is that, sir?

25  A.  *Wyeth v. Levine*, I think we made it into a footnote into the

```
 1   Supreme Court decision.
 2   Q.  Thank you.  Is the statement a drug company's responsibilities
 3   you described in your article consistent with the Supreme Court's
 4   view of drug company's responsibilities regarding both state and
 5   federal standards?
 6             MR. ISMAIL:  Objection, your Honor.
 7             THE COURT:  Yes.  Are you going to qualify him?  Are you
 8   going to tender him as an expert or not?  Where are we going?
 9             MR. DUGAN:  Yes, I am, your Honor.
10             THE COURT:  Let's just go with his qualifications first.
11             MR. DUGAN:  Okay.
12   BY MR. DUGAN:
13   Q.  Do you have experience advising companies about the
14   responsibilities under federal and state consumer protection
15   standards?
16   A.  Yes.  I was a senior advisor to TPG, formerly known as Texas
17   Pacific Group, it's a private equity firm that owns pharmaceutical
18   companies.  I am on a board of a pharmaceutical company that is
19   developing a drug for prostate cancer, so in those roles and in
20   other instances I've had the opportunity to advise companies on
21   their responsibilities under both federal and state consumer
22   protection laws.
23   Q.  Thank you.  Dr. Kessler, are you an expert on the subjects of
24   the standards of care that apply to drug companies?
25   A.  I believe so, yes.
```

1   Q.  And does your expertise apply to the standards for new drug

2   development?

3   A.  Yes.  I've published in that area.

4   Q.  In the marketing and promotion of pharmaceuticals?

5   A.  Yes, I've published in that area, too.

6   Q.  Drug safety?

7   A.  Yes.

8   Q.  Duty to warn of risks?

9   A.  Yes.

10  Q.  Duty to investigate potential risks?

11  A.  Yes.

12          MR. DUGAN:  At this time, your Honor, I would like to

13  tender Dr. Kessler as an expert in standards of care, new drug

14  development, marketing and promotion of pharmaceuticals, drug

15  safety, duty to warn of risks and duty to investigate potential

16  risks.

17          MR. ISMAIL:  Your Honor, as to the various subjects,

18  potential I have an objection, we'll see how it goes, as to duty to

19  warn if he's going to get into like he just tried with Supreme

20  Court opinions; and as to promotional activities, perhaps we'll

21  have to see how that develops as well.

22          THE COURT:  Okay.  I'll accept him as an expert in the

23  standard of care and we'll take it a step at a time.  But I will

24  accept him and allow him to testify.  Thank you.

25          MR. DUGAN:  Thank you, your Honor.  And in connection

1    with that, I would like to identify and introduce as State of

2    Louisiana No. 1, which is tab number 1 in the blinder, is the CV of

3    Dr. Kessler.

4              THE COURT:  All right.  Any objection?

5              MR. ISMAIL:  No objection, your Honor.

6              THE COURT:  Let it be admitted.

7              MR. DUGAN:  And as a housekeeping measure, your Honor --

8              THE COURT:  Just one question.  Doctor, you've reviewed

9    this CV and it's accurate?

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  And up-to-date?

12             THE WITNESS:  Not quite.  Some of these are more of a

13   living document.

14             THE COURT:  What you're saying is that there are more

15   things on it, but what's on it is accurate?

16             THE WITNESS:  Yes, I believe so.

17             THE COURT:  Let it be admitted.

18             MR. DUGAN:  Thank you, your Honor.  And the way that I am

19   going through these exhibit is, as your Honor knows, we previously

20   submitted a plaintiff's exhibit list which has various numbers on

21   it.  And so I would like to -- most of these documents have those

22   numbers on.  But as I would like to go along, we'll mark them as

23   the court has instructed in the order in which they're presented

24   and put in.  Is that okay, your Honor?

25             THE COURT:  Yes, that's fine.

1          MR. DUGAN:   Okay.

2                    DIRECT EXAMINATION

3    BY MR. DUGAN:

4    Q.  Dr. Kessler, were you asked to review documents and provide

5    opinions regarding the case of the State of Louisiana regarding

6    Vioxx?

7    A.  Yes, I was.

8    Q.  And when was that, sir?

9    A.  Sometime last year I believe.

10   Q.  Thank you.  Before that did you have some familiarity with the

11   Vioxx case?

12   A.  Yes.

13   Q.  And what was that familiarity?

14   A.  I think, you know, as any physician, citizen I read what was

15   certainly in the press, in the law review article that we discussed

16   my colleague and I cited Vioxx as an example a number of times in

17   that law review.

18   Q.  Have you also reviewed documents that you received from the

19   attorneys in this case?

20   A.  I have.

21   Q.  And can you describe the sources of those documents?

22   A.  Those included Merck documents, FDA documents, scientific

23   articles, some expert reports, in general statutes, regulations, et

24   cetera.

25   Q.  Did those documents provide information about the company's

1  position on subjects relating to the case?

2  A.  It was documents certainly included information that related to

3  positions in this case.

4  Q.  And can you describe for the court what your specific

5  assignment was in this case?

6  A.  My assignment was to review those documents and form certain

7  expert opinions about Merck's actions in developing and marketing

8  Vioxx as related to standards of care that relate to the State of

9  Louisiana.

10  Q.  Thank you.  And can you tell the court what the basic

11  responsibility of the purveyor of a drug in its simplest terms?

12  A.  It is a fundamental premise for the last almost hundred years

13  that it is the purveyor of a drug that has responsibility to assure

14  the safety and efficacy of any drug that it sells.  The

15  responsibility to investigate, to study, to warn, that

16  responsibility falls on the purveyor of the product.

17  Q.  Can you tell the court if there's a difference between what the

18  FDA knows about a drug and what the company knows about the drug?

19  A.  There is.  FDA -- I mean, sometimes I'll refer to the company

20  as the manufacturer or the sponsor or the purveyor.

21        A manufacturer always has superior knowledge about its

22  product compared to FDA.  It will have information sooner, for

23  example, about adverse reactions.  It will have information that

24  relates to certain impressions, certain discussions that it's had

25  with its scientists, its consultants about the drug.  FDA requests

1    under the statute and the regulations the data about a drug.  So it

2    requests the data of clinical trials, of preclinical trials of

3    analyses of those, but the company is in a superior position to

4    know about a drug, and that's why the responsibility under the law

5    rests with the manufacturer.

6    Q.  And what are the sources of the company's duty to investigate

7    potential risks?

8    A.  That duty to investigate flows from the general requirements to

9    assure the safety and efficacy of drugs under federal law and under

10   the duty to warn under state consumer protection laws.

11   Q.  Do any FDA regulations concern the duty to warn?

12   A.  Yes, they do.

13   Q.  I will turn you to tab 2 in your binder.

14   A.  Yes, sir.

15   Q.  Is this the regulation that you were referring to?

16   A.  Yes.  Yes, sir.

17   Q.  And can you please read that regulation into the record, the

18   one you're referring to?

19   A.  Well, if I may, cite the court's attention to a particular

20   page, that regulation is a number of pages.  But if I can kindly

21   request the court to turn to page 29 of 21 CFR 201.57.  And really

22   the first existing paragraph on that page, I think it's the first

23   full sentence, the regulation states:  "In accordance with certain

24   other sections 314.70 and 601.12 of this chapter, the labelling --"

25   and that's a term of art, label and labelling -- "the labelling

1    must be revised to include a warning about a clinically significant

2    hazard as soon as there is reasonable evidence of a causal

3    association with a drug."

4         And it goes on.  It says:  "A causal relationship need

5    not have been definitively established."  That's an excerpt from

6    what some of the requirements that are imposed on a manufacturer.

7    Q.  Thank you.  Does a drug company have to wait for FDA approval

8    to warn of a hazard associated with one of its drugs?

9    A.  No.  A company, when it comes to warning, warning on the safety

10   side, obviously a company should notify the FDA when it is doing

11   that, but that has been certainly the policy when I was at the FDA,

12   it's in the regulations, and it's been upheld as what is required

13   for warnings about safety.

14        A company cannot go ahead and make claims about its

15   benefits on the efficacy side.  But when it comes to a safety

16   problem, you don't have to wait for FDA -- to notify the FDA of

17   course -- but a manufacturer certainly can consistent with this

18   duty to warn can make those warnings and not be in violation of any

19   federal law.

20   Q.  And is there a regulation that specifically permits a company

21   to do that?

22   A.  Yes, sir.  It's generally referred to I think as changes being

23   affected.

24   Q.  Dr. Kessler, I would ask you to take a look at tab number 3 in

25   your binder, please.

1   A.  Yes, sir.

2              THE COURT:  Are you introducing some of this?

3              MR. DUGAN:  They're regulations, your Honor.

4              THE COURT:  All right.  Okay.

5   BY MR. DUGAN:

6   Q.  Dr. Kessler, is this a regulation that you're referring to?

7   A.  Yes, yes, sir.

8   Q.  And can you tell the court about this regulation?

9   A.  So this is one of those regulations where you have to, there is

10  a lot of interspersed material.  But if you go to page, let's see.

11  Let me just get it.  Yeah, if you go kindly to page 114.  And you

12  go to 11 -- 114 and you go to on the right-hand column little 3A,

13  and again you have to trace it back to what applies, but this is

14  basically the exception that allows a company under little 3A, "to

15  add or strengthen a contraindication, warning, precaution or

16  adverse reaction for which the evidence of a causal association

17  satisfies the standard for inclusion in this labelling under a

18  certain section of this tab."

19  Q.  Is it the responsibility of a drug company to investigate

20  dependent on anything that the FDA does or does not do?

21  A.  No.  It is -- the responsibility rests with the drug company to

22  investigate any potential risks of safety, independent of what FDA

23  requires.

24  Q.  Thank you.  Now, Dr. Kessler let's talk about some of the

25  materials you reviewed in relation to the opinions that you formed

1   about Merck's conduct in this matter.

2   A.  Yes, sir.

3   Q.  Doctor, what is a new drug application?

4   A.  New drug application is the application that a company will

5   submit to the FDA to give it permission to market a drug for a

6   specific intended use in interstate commerce.  Some MDAs are

7   millions of pages.

8   Q.  And what is the standard applied by FDA to decide whether to

9   grant approval?

10   A.  The statute requires that the manufacturer has the burden of

11   showing that the drug is safe and effective for its intended

12   conditions of use by adequate and well controlled clinical trials.

13   Q.  And the statute that you're referring to is the Food Drug and

14   Cosmetic Act?

15   A.  Yes, sir.

16   Q.  Have you reviewed documents relating to Merck's investigations

17   of Vioxx before submitting a new drug application?

18   A.  Yes, I have.

19   Q.  And are there laws and regulations that say what has to be

20   submitted in an MDA?

21   A.  Yes, that's spelled out in this CFR.

22   Q.  Doctor, what is a safety signal?

23   A.  A safety signal is an indication that there may be a problem

24   with a drug.  It's a clue but it's what we're trained to do,

25   companies are trained to do this, the FDA is trained to do this.

1    When a drug is going to ultimately be used by millions of people,

2    thousands of people, millions of people and it's approved, you're

3    never going to be able to definitively determine from clinical

4    trials because there are limitations to those trials that are done

5    investigation, everything that is going to happen when the drug is

6    used by many more people.

7           So what's very important, and it really is the key to,

8    it's one of the major keys in studying drugs is to be able to look

9    at data and predict based on these clues, based on these signals

10   what may happen when the drug is used in a lot of people.

11   Sometimes the adverse reaction is rare, so if you study a drug in X

12   number of patients in a study, it won't show up until you use it in

13   many more people because the rate that that adverse reaction is

14   such that you can't detect it, there's not enough power in those

15   clinical trials.

16          Sometimes you're dealing with an event that's very hard

17   to determine, a common event or relatively common event, all right,

18   that you see in the population.  So to be able to tell whether a

19   drug causes that, you need a great deal of power in those studies.

20          So what a signal is is looking for clues, somewhat like a

21   detective.  They're not definitive, they're not necessarily

22   statistically significant, but it's being able to predict or think

23   about, identify those signals and then follow-up on those signals,

24   ultimately to prevent harm.

25   Q.  And what is the company's responsibility in regard to those

1    safety signals?

2    A.  So once you see a signal, the goal is to investigate that

3    signal and investigate that signal thoroughly.

4    Q.  And did Merck conduct clinical trials of Vioxx before the drug

5    was marketed?

6    A.  Yes, it did.

7    Q.  And were those trials submitted to the FDA?

8    A.  Yes.

9    Q.  And did you review the results of any of those trials?

10   A.  Some of those trials I did, yes.

11   Q.  Doctor, what was Protocol 017?

12   A.  Protocol 017 was one of those trials that was done by Merck to

13   study Vioxx in rheumatoid arthritis, primarily a safety study but

14   also some preliminary efficacy, if my memory serves me correct.

15   Q.  And did you review any data from Protocol 017?

16   A.  I did.

17   Q.  Dr. Kessler, I'd ask that you turn to tab number 4 in your

18   binder, please, sir.

19   A.  Yes.  Yes, sir.

20   Q.  And can you please turn to the page ending in 7368.

21   A.  If I may just turn my binder.  Yes, sir.

22   Q.  Is this the table that you reviewed?

23   A.  It's certainly one of them.

24   Q.  And what did you notice about that table?

25   A.  So this is a table that is part of the safety summary, and this

1    has, as you can see from the top heading, Merck's drug Vioxx

2    MK-0966 as it was known then, and this is safety experience from,

3    as I said earlier, in rheumatoid arthritis.  And you can see from

4    the study numbers which ones were 017 in the second column.  And

5    you can see on patients on assigned therapy, on Vioxx, you can see

6    the safety experience.

7             So these are non-fatal, the title is non-fatal serious

8    clinical adverse experiences in the rheumatoid arthritis studies,

9    one subset of studies that Merck did.  And you can see the number

10   of patients and who received treatment and then who compared people

11   who received placebo.

12   Q.  Thank you.  Are the conditions of unstable angina, pulmonary

13   embolism, and myocardial infarction related in some way?

14   A.  Yes.  So what I think you're -- counselor, if you look in

15   the -- and the answer is yes, they're all associated with

16   thrombotic, in essence, clotting mechanisms, they believe too.  So

17   if you look in those patients that received the drug, you'll see

18   three patients, for patients in 017, one that says acute myocardial

19   infarction, heart attack, unstable angina; also a cardiac

20   condition; and a pulmonary embolism which is a clot to the lungs,

21   all have a mechanism associated with a blood clotting,

22   arthrosclerosis circulatory condition.

23             So you can see three cases of those in that, those

24   patients who took the drug in 017.

25   Q.  Thank you.  And what is the dose of Vioxx in the patients who

 1   suffered the thrombotic events?

 2   A.  The dose was 125.  017 I believe had patients on 125 and 175.

 3   This table says these patients were on 125.

 4   Q.  Thank you.  And was there a comparison group in Protocol 017?

 5   A.  There was.  It was -- it's a placebo group listed above.  They

 6   obviously -- their placebo being in essence non-drug, was not

 7   Vioxx, commonly called a sugar pill.

 8   Q.  And were there any thrombotic events in the controlled group?

 9   A.  No.  You can see a basal cell carcinoma.

10          MR. DUGAN:  Your Honor, at this time I would move to

11   offer into evidence as Louisiana Exhibit No. 2 the document

12   previously identified as Louisiana Exhibit No. 580.

13          THE COURT:  All right.

14          MR. ISMAIL:  Your Honor, this is a snipit of a larger

15   safety report.  So perhaps through completeness we may ask for more

16   information be submitted.  We'll get with the plaintiff.

17          THE COURT:  That's fine.  I'll do them both or you can

18   put them in.  I'll admit the document in form and fashion plaintiff

19   wishes, with the exception under 106 the defendant has a right to

20   introduce the other.  Let's get with him.

21          THE DEPUTY CLERK:  Is that two you're putting in?

22          MR. DUGAN:  Yes, this will be Louisiana 2.

23          THE COURT:  Okay.  P-2, it's admitted.

24          MR. DUGAN:  Thank you, your Honor.

25   BY MR. DUGAN:

1    Q.  Dr. Kessler, did you review a Merck research committee document

2    that discussed the results of Protocol 017?

3    A.  I did.

4    Q.  I would ask you to turn to tab number 5 in your book.

5    A.  Yes, sir.

6    Q.  Is this the document that you reviewed?

7    A.  Yes, sir.

8    Q.  And what is the date of the document at top of the first page?

9    A.  October 10th, 1996.

10   Q.  And I would ask you to turn to page 8 of the document.

11   A.  Yes, sir.

12   Q.  Is there a reference to an update on Vioxx of MK-966?

13   A.  Yes.

14   Q.  And what does it say?

15   A.  Well, there are four paragraphs.  The first paragraph talks

16   about the study as I mentioned earlier, and the second paragraph

17   says adverse events of most concern were in the cardiovascular

18   system, e.g., MI, heart attack, unstable angina, rapid fall in

19   hemoglobin and hematic in some subjects, any small increase in

20   blood pressure.  We plan to evaluate MK-966 study.  The subjects

21   were also given low dose aspirin.

22   Q.  And how does that compare, how does that dose compare to the

23   doses that were eventually approved for use?

24   A.  So 125 milligrams is five times the dose that was approved for

25   Vioxx for chronic use.  The dose that was used for chronic was 25,

1    this was 125.  The dose that was used in the acute situation I

2    believe was 50 milligrams.

3            So this is as much as five times what the patients --

4    what was recommended in the label.  Some patients take more

5    obviously.

6    Q.  And, Doctor, what is the importance of the results of Protocol

7    017 to your opinions in this case?

8    A.  So it's a signal, it's not a definitive by any means, it is a

9    signal that just raises certain flags in my mind that should be

10   investigated.  So it's one piece of evidence, it's too small to

11   prove anything, but it's a signal.

12   Q.  And what is the basis for your opinion in reference to 017?

13   A.  I see in the treated, in the patients receiving drugs you see

14   three events that are, that have an underlying similarity of

15   mechanism, and my opinion obviously just reading what Merck thought

16   about those events, it realized that adverse events of most concern

17   were in the cardiovascular system.  We still don't know whether

18   those are associated with the drug or not at this stage, it's a

19   signal, it needs to be investigated.

20   Q.  Thank you.

21           MR. DUGAN:  At this time, your Honor, I would like to

22   admit as Plaintiff's No. 3 --

23           THE WITNESS:  Can I just add, counselor?

24           MR. DUGAN:  Yes, I'm sorry.

25           THE WITNESS:  One point I didn't stress.  The use of a

1   high dose, I also factored that in, that's important in assessing a

2   signal because what you want to do, again, because you're looking

3   to see what's going to happen when a drug is approved, in some ways

4   high doses give you -- they may be able to stress the mechanism a

5   little so you can see something earlier.  So especially on high

6   doses, I mean, again, I may be seeing something because it's high

7   dose earlier that I am only going to see later when I have a lot

8   more people exposed.

9              MR. DUGAN:  Thank you, Doctor.

10             Your Honor, at this time I would like to move to admit as

11  Plaintiff's No. 3 the previously identified exhibit Louisiana AG

12  No. 18.

13             THE COURT:  Any objection?

14             MR. ISMAIL:  Objection as to relevance, your Honor.

15             THE COURT:  I'll admit it and overrule the objection.

16             MR. DUGAN:  Thank you.

17  BY MR. DUGAN:

18  Q.  Dr. Kessler, did you review a clinical study report that was

19  part of the MDA that reported data from a pharmacology study known

20  as Protocol 023?

21  A.  I did.

22  Q.  And did you also review a document that discussed the results

23  of Protocol 023?

24  A.  I did.

25  Q.  I would ask you, Doctor, to turn to tab 6 in your binder.

1    A.  Yes, sir.

2    Q.  Is this the document you reviewed?

3    A.  This is one of the documents that I reviewed, yes, sir.

4    Q.  I would ask you to turn to page 9949 of the document.

5    A.  Yes.

6    Q.  How did Merck describe the results of Protocol 023?

7    A.  I mean in Merck's own words, what is labeled on page 2, page 2

8    of this document, under the heading background, it's the right-hand

9    column, on 949, under background it says:  Study No. 023 showed

10   that MK-0966, Vioxx, significantly reduced urinary excretion of

11   PGIM which may reflect a decrease in Prostacyclin biosynthesis.  It

12   goes on in Merck's words.  Prostacyclin is a potent inhibitor of

13   platelet aggregation and has vascular dilatory properties.

14          However, Vioxx has no effects on systemic thromboxane.

15   The clinical relevance of partially inhibiting Prostacyclin

16   synthesis without inhibiting thromboxane are unknown.  These

17   findings raised a concern about the potential for Vioxx to cause

18   cardiovascular thrombotic events.

19   Q.  Thank you, Doctor.

20          MR. DUGAN:  At this time, your Honor, I would like to

21   move as Plaintiff's No. 4 --

22          THE COURT:  You have numbers?

23          THE DEPUTY CLERK:  Judge, it seems that what he is

24   marking now is on the list as a different number, he doesn't have

25   to do that.

```
 1          THE COURT:  Jim, what we've done is we've got a list of

 2   your documents, you can put them in in the same number; in other

 3   words, you don't need to put them in -- whenever you put them in is

 4   fine, but just call them the same number.

 5          THE DEPUTY CLERK:  So can we go back?

 6          THE COURT:  Before we go too far.

 7          THE DEPUTY CLERK:  One, the CV of Dr. Kessler, what is it

 8   on the list?

 9          MR. DUGAN:  574.

10          THE DEPUTY CLERK:  So, Judge, we'll remove it as LA-1 and

11   then make it 574.  And then LA 2 I believe you said is 580 on the

12   list?

13          MR. DUGAN:  Yes.

14          THE DEPUTY CLERK:  So can we remove LA-2 and make it 580?

15          MR. DUGAN:  Sure.

16          THE DEPUTY CLERK:  And then I think three you had 518.

17          MR. DUGAN:  That's correct.

18          THE DEPUTY CLERK:  So now instead of four, what would

19   this document be?

20          MR. DUGAN:  585.

21          THE COURT:  That would be easier for you and we'll just

22   put it in that way.

23          MR. DUGAN:  That would be easier.  Thank you, your Honor.

24   BY MR. DUGAN:

25   Q.  Dr. Kessler, did Merck do any studies in response to the
```

```
 1   results of Protocol 023?

 2   A.  Yes.

 3   Q.  And was a study done by Douglas Watson in reference to this?

 4   A.  Yes.

 5   Q.  And did you -- I'm sorry, did you review the plan for the

 6   Watson study?

 7   A.  Yes.

 8   Q.  I would ask you to turn to tab number 7 in your binder.

 9   A.  Yes, sir.

10   Q.  Is this the document that you reviewed?

11   A.  Yes.

12   Q.  I would ask you to turn to page 7040.

13   A.  Yes.

14   Q.  What was the study design?

15   A.  This is a, if you go down to the middle of the page under the

16   heading Study Design, this is a comparative study of the incidence

17   of selected coronary vascular disorders serious adverse events.

18   From clinical trial databases for Vioxx, Proscar and Fosamax.  So

19   what Dr. Watson did is, he took all of the treatment arms from

20   patients on Vioxx trials, which included patients on Vioxx,

21   patients on other comparator drug arms, and placebo, and he

22   compared them to Proscar for men -- I'm sorry, the placebo arm of

23   the trials for Proscar for men and Fosamax for women.  So it was

24   all trial arms of Vioxx trials in the Vioxx arm versus the placebo

25   arms of Proscar and Fosamax.
```

1   Q.  Was that a standard clinical trial design?

2   A.  No.  It is not.

3   Q.  And why was it done that way?

4   A.  Well, if you go down to the study populations, you can see,

5   since the majority of the Vioxx studies are still blinded.  So

6   there are limitations, you know, to Merck's studies.  I mean, the

7   Vioxx are blinded, there's going to be small numbers.  What

8   Dr. Watson is doing here is he is looking because of this

9   biological mechanism that's identified in 023 that raises concerns

10  about whether Vioxx is inhibiting this inhibitor of blood clotting,

11  you see that biological mechanism of 023 and you want to see

12  whether you see signals of that in patients.  And he is trying to

13  look at the data in such a way to see if he sees a signal.

14  Q.  Thank you, Doctor.

15          MR. DUGAN:  At this time I would like to move into

16  evidence Louisiana AG 128.

17          THE COURT:  Let it be admitted.

18  BY MR. DUGAN:

19  Q.  Doctor, did you also review the results in a February 2nd,

20  1998, report?

21  A.  I did.

22  Q.  And can you please refer to tab number 8 in your binder.

23  A.  Yes, sir.

24  Q.  Is this the document that you reviewed?

25  A.  Yes, this is the results, the prior document was the plan.

1   Q.   Turn to the executive summary page at page 2 ending in 6805.

2   A.   Yes, sir.

3   Q.   What were the risk ratios for the men and women reported by

4   Watson?

5   A.   You're challenging my eyesight a little.  If you go to the

6   fourth paragraph under the executive summary, the second, beginning

7   with the second sentence, so it says:  "The overall pooled

8   incidence rate for men in the Vioxx program was not statistically

9   significant," but to answer your question it was 1.28.  So it's 28

10  percent higher, but it's not statistically significant.

11         The next sentence says:  "The overall incidence rate for

12  women was elevated compared to Fosamax, placebo controls."  And

13  again, to answer your question, the adjusted rate ratio is 2.16, so

14  more than twice.  And those numbers are statistically significant,

15  those confidence intervals; so 1.28 for men, 2.16 for women.

16  Q.   And, Doctor, what is the importance of those results to your

17  opinions in this case?

18  A.   Those numbers, again, they're just evidence of a signal.  It's

19  very important, none of these numbers by themselves, I think,

20  should be looked at.  You have to look at the totality.  So these

21  are pieces of a puzzle, these are signals.

22  Q.   And how did Merck respond to that signal?

23  A.   Dr. Watson, if you read the next paragraph -- no, not the next

24  paragraph, excuse me, the next sentence after the relative rate,

25  says:  "The incidence rate in women is driven by very low rates in

1    two of the Fosamax placebo strata."  So yet he is saying in

2    essence --

3              MR. ISMAIL:  Actually, I think it's the increased rate is

4    driven by.

5              THE WITNESS:  I'm sorry.

6              THE COURT:  The increased rate.  Yeah.

7              THE WITNESS:  I'm sorry, I'm sorry, I misread.

8              The overall increase rate -- the increased rate in women

9    is driven by very low rates in two of the Fosamax placebo strata,

10   and he gives those strata.

11             So what Dr. Watson is doing, he says, yes, there is an

12   increased relative risk in women, but he is explaining it based on

13   an explanation that he thinks, based on his looking at the data,

14   that the Fosamax placebo arm have a lower rate.  So he is

15   explaining, he is giving an explanation for why the women have, why

16   the relative risk is higher in women on Vioxx.

17   BY MR. DUGAN:

18   Q.  Hadn't they considered whether the Fosamax group was an

19   appropriate control population before the study was done?

20   A.  Yes.  In the plan, I didn't see anything that said it was not,

21   and I've seen at least one document that showed that Merck had

22   discussed that and it was a check mark next to that.

23   Q.  Thank you.  Do you have any concerns about how Merck responded

24   to this data?

25   A.  Yes.  Again, I don't want to overstate the importance of any

1   one piece of data, but I see relative risks that are higher in

2   women, statistically significant, a little higher in men, not

3   statistically significant, and an explanation given that may or may

4   not be true.  And my concern is, I am weary of explanations that

5   explain away signals.  Again, I am not saying that they don't turn

6   out, they can turn out to be true, they can turn out not to be

7   true; but when you're looking at signals, you have to be careful

8   that you don't just explain away the signals.

9   Q.  Thank you.  Did Merck look for advice from scientists outside

10  the company during the premarketing of Vioxx?

11  A.  Yes, that's common.  For pharmaceutical companies to do that.

12  Q.  And did they have a Scientific Advisory Board?

13  A.  Yes, they did.

14  Q.  Can you tell the court about that?

15  A.  A Scientific Advisory Board acts as consultants that allow a

16  company to engage with academics and outside experts.

17  Q.  And that was done in Vioxx?

18  A.  I don't know whether -- there was certainly the Scientific

19  Advisory Board was consulted, their data was presented.  I assume

20  that Scientific Advisory Board had to do with a range of issues,

21  not just Vioxx, but I certainly saw presentations of Vioxx to that

22  advisory board.

23  Q.  And was the subject of cardiovascular risk discussed with the

24  SAB?

25  A.  Yes.

1    Q.  Doctor, did you review a write-up by Alan Nies, a Merck

2    scientist, for the SAB meeting?

3    A.  I did.

4    Q.  Doctor, if I could turn you to tab number 9 in your binder.

5    A.  Yes, sir.

6    Q.  Is this the write-up you reviewed?

7    A.  Yes, sir.

8    Q.  I would ask you to turn to page 1457 of the document.

9    A.  Yes, sir.

10   Q.  What did Dr. Nies' write-up tell the SAB about the Watson

11   analysis?

12   A.  Give me one second.

13   Q.  And once again, the print is kind of small here if you could

14   identify.

15   A.  Just give me a second to review this.

16           So what you see in this major paragraph on this page is,

17   again, this biological mechanism that was identified in 023 that

18   showed an effect of Vioxx on Prostacyclin, that it inhibits this

19   chemical that has an effect on blood clotting.  And it's presenting

20   that, that information on 023.  And then it says to assess the

21   potential implication, the potential implications, the last

22   paragraph, to assess potential implication of these biochemical

23   findings, that's 023, on cardiovascular health, the clinical team

24   in epidemiology -- the clinical team and epidemiology have analyzed

25   the blinded Vioxx database, that's referring to the Watson report,

1    for serious cardiovascular events.  The analysis does not suggest a

2    concern.  And he goes on to talk about an initial look at the

3    unblinded studies also do not show, also do not indicate an excess

4    of cardiovascular events in patients.

5    Q.  Doctor, did you see any evidence that Merck provided the

6    outside advisors with the actual results of the Watson study,

7    showing a statistically significant doubling of risks in the Vioxx

8    patients compared to the placebo group from the Fosamax trial?

9    A.  Counsel, if I can just correct you.

10   Q.  Yes.

11   A.  Respectfully, it was a doubling of relative risks in women

12   overall, not in men.  And I do not see the Watson data being

13   presented, the actual data being presented to the SAB.

14   Q.  Thank you.  Is there an actual document showing what the SAB

15   recommendations were?

16   A.  Yes.  There was a write-up of a meeting, where the SAB

17   considered Vioxx and what to do about it.

18   Q.  Thank you, Doctor.

19          If I could ask you to look at tab number 10, please.

20   A.  Yes, sir.

21   Q.  Is this the document that you reviewed?

22   A.  Yes, sir.

23   Q.  I would ask you to turn to page 2738.

24   A.  Yes, sir.

25   Q.  What did the SAB say about the potential effects of altering

1    the balance of Prostacyclin and thromboxane?

2    A.  Again, these are, this is a document about a meeting, so it's

3    unclear exactly who is saying what.  But taking this as a summary

4    of the discussion, it says, if you go to the second new paragraph

5    on the page, it says:  "One hypothesis would be that the excretion

6    of this Prostacyclin metabolite does not reflect --" again, this

7    goes back to this 023 mechanism -- "does not reflect systemic

8    vascular Prostacyclin biosynthesis."  In essence, you don't have to

9    worry about it.

10          And it says:  "An alternative hypothesis is that

11   Prostacyclin biosynthesis in the vasculature is inhibited by Vioxx

12   (without blocking production of thromboxane A by the platelet) by

13   removing this potent inhibitor --" so again, you're inhibiting an

14   inhibitor -- "of platelet aggregation, the probability that a

15   coronary plaque rupture would lead to myocardial infarction or

16   ischemic ventricular fibrillation is enhanced."  So it says this

17   mechanism may lead to, may predict thrombotic events such as

18   myocardial infarction and other thrombotic heart disease.

19   Q.  Thank you.  I would ask you to turn now to page 2742 of this

20   document.

21   A.  Yes.

22   Q.  The last full paragraph of the SAB document, did the board

23   offer any advice to Merck about when the questions about

24   cardiovascular risk or benefits should be addressed?

25   A.  Yes.  So you see, beginning where it says, it's talking about

1    whenever you're developing a -- it says any truly novel

2    pharmacological entity, and the adverse effects as well as

3    potential benefits, should be addressed in parallel with the

4    conclusion of the process of acquisition and analysis of the data

5    that will place this drug in the hands of patients.

6    Q.  So, Doctor, what is the importance of that to your opinions in

7    this case?

8    A.  The SAB is, you know, talking about both the benefits and it

9    talks about the benefits and putting, there is a strong mandate for

10   introducing Vioxx into medical practice as soon as feasible, but

11   it's also saying that in parallel to the conclusion, I take that as

12   meaning before you conclude the process of putting this in the

13   hands of patients, you address this mechanism and understand what

14   the effects are on the cardiovascular system, either positive or

15   negative.

16   Q.  Thank you, Doctor.

17          MR. DUGAN:  At this time I would like to move into

18   evidence Louisiana Exhibit 38.

19          THE COURT:  Let it be admitted.

20   BY MR. DUGAN:

21   Q.  Now, Doctor, turning to the information about cardiovascular

22   events submitted to the FDA.  Did you review a document showing the

23   incidence of thrombotic events and osteoarthritis patients in

24   Merck's premarket studies?

25   A.  Yes, I did.

1   Q.  I would ask you to turn to tab number 11 in the binder, sir.

2   A.  Yes, sir.

3   Q.  Is this a document you reviewed?

4   A.  I reviewed for my report parts of this document.

5   Q.  I would ask you to turn to page 5480 of the document.

6   A.  Yes, sir.

7   Q.  Did you review this table?

8   A.  Yes, I did.

9   Q.  And what does this table show?

10  A.  So this is a table put together by the FDA medical reviewer for

11  Vioxx, and these are the thromboembolic adverse events regardless

12  of seriousness for all OA trials.  So one of the indications that

13  Merck is seeking is for use of Vioxx in osteoarthritis, so this is

14  looking at three different sets of OA trials.  First column is six

15  week studies, second trial is six month studies, third column is

16  greater than six month studies.  My understanding is that the

17  primary safety database focused on the six week trials.

18          And you can see here, again, looking at thromboembolic

19  adverse events, in the placebo arm of this, focussing on the first

20  column, the six week studies, you see there were 1 out of 412, and

21  that was a stroke.  And that gave you an incidence of 0.2 percent.

22          Then you see increasing doses -- so that's the placebo

23  arm, and then you see increasing doses, 12.5, 25, 50 milligrams,

24  125, and above.  And you see that the incidence of percentage of

25  thromboembolic events for those receiving 12.5 milligrams is 0.7,

1    those receiving 25 is 0.8, those receiving 50 is 1.1 percent.

2    Q.  Thank you.  If I can ask you to turn to the previous --

3    A.  And 125, 1.4 percent, sorry.

4    Q.  Thank you.  Anything else about the table, Doctor?

5    A.  You also see similar numbers, you can read the columns for the

6    six month studies and beyond six months.

7    Q.  Thank you.  I would ask you to turn to the previous page of

8    5479.

9    A.  Yes.

10   Q.  Did you review this part, the part of the document stating the

11   FDA medical reviewer's conclusions about the risk of cardiovascular

12   thrombotic events?

13   A.  Yes.

14   Q.  And what were they?

15   A.  The summary, the medical reviewer, it says with the available

16   data, it is impossible to answer with complete certainty whether

17   the risk of cardiovascular and thrombotic event is increased in

18   patients on Vioxx, and I think appropriately she states a larger

19   database will be needed to answer this and other safety comparison

20   questions.

21   Q.  Thank you.  And why is this important to the statements, why is

22   this statement important to the opinions in your case, in this

23   case?

24   A.  She is reviewing here the thromboembolic events in the OA

25   studies.  Again, this is another piece of information.  We have the

```
 1    017 study, the rheumatoid arthritis study; we have the 023, the
 2    biological mechanism; the Watson report; and now the OA studies
 3    themselves.  But these are, as she correctly said, they're too
 4    small to say definitively whether these numbers are -- definitively
 5    show, demonstrate that there's a risk, certainly there is an
 6    increased incidence and there's more work that needs to be done to
 7    answer this question, especially based on this biological
 8    plausibility model of its effect on Prostacyclin.
 9    Q.  Thank you, Doctor.
10              MR. DUGAN:  Your Honor, at this time, I would like to
11    move into evidence Louisiana AG 149.
12              THE COURT:  Okay.  Let it be admitted.
13    BY MR. DUGAN:
14    Q.  Doctor, based on the evidence that you've reviewed and
15    discussed so far today, and previously, do you have an opinion as
16    to whether there was a safety signal for adverse thrombotic events
17    before Merck marketed Vioxx?
18    A.  Yes, I have an opinion.
19    Q.  And what is your opinion?
20    A.  My opinion, based on not only the numbers, the numbers are
21    small and there's limitations to the numbers in the OA database,
22    but you see this increased trend of more events in --
23    thromboembolic events in the OA database, you see this in 017, you
24    see this signal in Watson.  Those, and this is important, combined
25    with this biological plausibility, without the biological
```

1  plausibility you can't, you can't give credence to a signal.  But

2  when you have this biological plausibility, and again, it's only

3  plausibility plus these numbers, I see a signal here.

4  Q.  Thank you, Doctor.

5       Do you also have an opinion about what Merck should have

6  done?

7  A.  Yes.

8  Q.  And what is that?

9  A.  To resolve, to get the answer on whether Vioxx increases,

10 whether Vioxx causes thromboembolic disease in patients, to do

11 exactly what the FDA is asking, for a larger database needed to

12 answer that question.

13 Q.  Thank you, Doctor.

14      Doctor, did you also have a chance to review a

15 description of the marketing and promotion launch of Vioxx?

16 A.  I did.

17 Q.  I would ask you to turn to tab 12 in your binder.

18 A.  Yes.

19 Q.  Is this a document you reviewed?

20 A.  This is one of the documents that I reviewed.

21 Q.  And what does this document say about the launch of Vioxx?

22      MR. ISMAIL:  Objection, your Honor, this is --

23      THE COURT:  Well, I am not going to admit it into

24 evidence, but even though if I don't admit it into evidence he can

25 use it.

1          THE WITNESS:  So this, if you go to the second column, is

2     just a quote from the president of Merck's human health division,

3     where he quotes, called Vioxx's introduction the company's, quote,

4     biggest, fastest and best prescription drug launch ever.

5          MR. DUGAN:  Your Honor, at this time I would like to move

6     into evidence Louisiana AG 578.

7          THE COURT:  No, I am going to deny that.  It's hearsay at

8     best, a newspaper, I am not going to admit it.

9          MR. DUGAN:  Okay.  Thank you, your Honor.

10    BY MR. DUGAN:

11    Q.  Dr. Kessler, did you also review any documents pertaining to

12    Merck's use of direct or consumer advertising?

13    A.  I did.

14    Q.  I would ask you to turn to tab 13 in your binder.

15         MR. ISMAIL:  Your Honor, we've gotten very far afield of

16    the issues in the case, direct or consumer advertising to the

17    extent it implicates patient prescribing individual decisions and

18    the what they're getting for their medicine is already been ruled

19    out of bounds.

20         THE COURT:  The only issue is that his burden is to show

21    defect and to show that he didn't have any notice of it.  So some

22    of this has some relevance on both of those matters, so I'll

23    overrule the objection.

24         MR. DUGAN:  Thank you, your Honor.

25         THE COURT:  You ought to make a little shorter -- I mean,

```
 1    once we do this, I don't really need to hear it another time.
 2                MR. DUGAN:  Absolutely, your Honor.
 3                THE COURT:  Go ahead, Jim.
 4                MR. DUGAN:  Thank you.
 5    BY MR. DUGAN:
 6    Q.  Is this one of the documents you reviewed?
 7    A.  Yes, sir.
 8    Q.  I would ask you to turn to page 8199 of this document.
 9    A.  Yes, sir.
10    Q.  And what did you find important about this page?
11    A.  This is in the year 2002, and it says DTC activated a million
12    consumers and delivered strong ROI.  And if you look at the DTC
13    investment of $65 million in this year, this -- that amount of
14    money being invested in promotion coupled with, with the very, the
15    statements previously of the fastest launch, the biggest, fastest
16    launch, how the -- how Merck, once it got approval, how it sold and
17    marketed the drug, this is -- I don't want to overstate it, but
18    this is the stuff that gives me concern because you study a
19    population -- you study a drug in a certain population and when
20    launched, when a drug gets approved and those are limited, when a
21    drug gets approved it used to be, certainly decades ago, a drug
22    would get introduced and it would be used in some patients.
23                But now with these very significant promotional marketing
24    efforts, these large launches, a drug goes from clinical trials
25    into a lot of people very quickly.  And if you worry that clinical
```

1   trials, especially if there are unanswered questions are not going

2   to get picked up, that rapid launch, you could turn around and find

3   yourself in real trouble very quickly.  And that concerns me.

4   Q.  And can you just articulate why the scenario you just discussed

5   is important to your opinions in this case?

6   A.  How it related to Merck's practices with regard to how it was

7   selling the drug.

8   Q.  Thank you.  And also did the marketing include promotion to any

9   populations that were at risk of cardiovascular disease?

10  A.  Yes.

11  Q.  And in light of how Merck conducted its clinical trials, did

12  the nature of the patient population to whom the drug was marketed

13  have any bearing upon Merck's duty to warn?

14  A.  Yes.  Let me try to answer your last two questions together.

15  If you look at the majority of studies, for example, the OA studies

16  that were done as part of the investigation that Merck did, they

17  excluded high-risk cardiovascular patients from those studies.

18  They excluded patients who had recent heart attacks, recent

19  strokes, uncontrolled hypertension.  But when the drug was put on

20  the market, there were no exclusions for those patients who were

21  excluded in those studies.

22       Certainly osteoarthritis patients, one of the issues, the

23  wear and tear on joints, there's increased weight, increased weight

24  has other cardiovascular effects.  So patients are being exposed, I

25  mean, the drug has been sold to patients who are at high risk for

```
 1  cardiovascular disease, even though in many of the trials they were
 2  excluded from that study.
 3  Q.  Thank you.
 4          MR. DUGAN:  At this time, your Honor, I would like to
 5  move into evidence Louisiana AG 579.
 6          MR. ISMAIL:  Your Honor.
 7          THE COURT:  Is that Merck's document?
 8          MR. DUGAN:  Yes, it is.
 9          MR. ISMAIL:  In motion limine number 3 your Honor denied
10  it because it was overbroad as stated, but indicated at the hearing
11  that internal marketing materials would be ruled out at trial.
12          THE COURT:  I understand but I'll allow it, I am going to
13  allow it in.  Overrule the objection.
14  BY MR. DUGAN:
15  Q.  Last question on this subject, Doctor.  How could Merck have
16  investigated this safety signal?
17  A.  It could have done the studies, developed the database that I
18  talked about and done the studies to look at cardiovascular safety,
19  design a study to look at cardiovascular safety.
20  Q.  Thank you.  Dr. Kessler, how are you doing, we've been going
21  for a bit now, do you need a break?
22          THE WITNESS:  I'm fine, your Honor.
23          MR. DUGAN:  Is the court okay?
24          THE COURT:  Let's go.
25  BY MR. DUGAN:
```

1    Q.  Dr. Kessler, can you tell us what your reading of the VIGOR

2    study is?

3    A.  The VIGOR study was a study conducted by Merck in approximately

4    8,000 patients, some 300 centers where it was conducted, I believe,

5    a comparison of Vioxx to Naproxen in patients with rheumatoid

6    arthritis for primarily a GI safety study.

7    Q.  And were those results statistically significant?

8    A.  So the results in VIGOR, again, you have to define which

9    results in VIGOR.  What you see is a statistically significant

10   increase in myocardial infarctions and heart attacks and thrombotic

11   events, approximately five times the rate of myocardial

12   infarctions, heart attacks and thrombotic events, if my memory

13   serves me correct, about a 2.3 relative risk with regard to serious

14   overall cardiovascular events.  They were statistically

15   significant, yes, sir.

16   Q.  Thank you, Doctor.

17        And what is the importance of the VIGOR study to your

18   opinions in this case?

19   A.  The VIGOR study shows that there was a statistically

20   significant increase of serious thrombotic events in patients that

21   received Vioxx over Naproxen.  It is probably the first

22   statistically significant study -- statistically significant

23   result, sorry -- that Merck receives on cardiovascular.  The

24   earlier things were signals, here you have a statistically

25   significant number, again, in light of this biological mechanism.

1    Q.  Thank you, Doctor.

2           Do you have an opinion as to whether the results of the

3    VIGOR study gave rise to a duty on the part of Merck to issue a

4    warning?

5    A.  Yes.

6    Q.  And what should Merck have warned of?

7    A.  Thrombotic and myocardial infarction.

8    Q.  And did Merck have the ability to issue that warning without

9    FDA approval?

10   A.  Yes, they certainly should notify the FDA, but they certainly

11   should warn.

12   Q.  And Dr. Kessler, as you discussed earlier, federal regulation

13   201.57(c), as to that regulation, do you have an opinion as to

14   whether Merck should have -- to whether that regulation applied to

15   Merck's duties after the VIGOR data?

16   A.  Yes.

17   Q.  And why was it important that they warn at that time?

18   A.  For the State of Louisiana, if you're buying drugs for the

19   State of Louisiana, you're not going to --

20          MR. ISMAIL:  Objection, your Honor, the witness did not

21   pose any Louisiana opinions and agreed at his deposition --

22          THE COURT:  Yes, I agree with that.  Let's rephrase the

23   question.

24   BY MR. DUGAN:

25   Q.  Dr. Kessler, I guess in general, why was it important that

1   Merck warn after the VIGOR data came out of cardiovascular risk, of

2   thrombotic event risk?

3   A.  To prevent harm.

4   Q.  Thank you.  Do you have an opinion as to whether the results of

5   VIGOR showed reasonable evidence of a causal association between

6   Vioxx and a clinically significant hazard?

7   A.  Yes, I do.

8   Q.  And what is your opinion?

9   A.  My opinion is, there is reasonable evidence of a causal

10  association, not definitive but it need not be, there is a

11  reasonable evidence of a causal association.  Again, both not

12  looking just at the numbers of VIGOR but looking at the biological

13  mechanism.  Combined I think provide the reasonable evidence.

14  Q.  Did Merck issue a warning after the VIGOR results?

15  A.  I have seen nothing that I would consider a warning.

16  Q.  What did Merck say publicly to explain the VIGOR results?

17  A.  It invoked what -- the -- what's called the, it was the --

18  termed the Naproxen theory, that Naproxen was cardioprotective,

19  that the problem wasn't Vioxx, that Naproxen was cardioprotective.

20  It advanced that theory.

21  Q.  Thank you.  Doctor, in your opinion, what is the standard to

22  which Merck should have been held in asserting that the VIGOR

23  results were due to Naproxen cardioprotection?

24  A.  If you're going to make that statement, you need adequate and

25  well-controlled trials in order to back that up.

1  Q.  Did Merck do that?

2  A.  There are no adequate and well-controlled clinical trials that

3  showed that Naproxen is cardioprotective to my knowledge.

4  Q.  Thank you, Doctor.

5         Doctor, did you also have a chance to review a warning

6  letter from the FDA Division of Drugs Marketing, Advertising and

7  Communications, or DDMAC, to Merck dated September 17th, 2001?

8  A.  I did.

9  Q.  I would ask you to turn to tab 14 in your binder.

10  A.  Yes, sir.

11  Q.  Can you please turn to page 3 of the document.

12  A.  Yes, sir.

13  Q.  Ending in 3279.

14  A.  Yes, sir.

15  Q.  Could you tell the court what the FDA was concerned with here?

16  A.  Well, if you go to the last paragraph, again, they're talking

17  about a number of different promotional materials, but what they're

18  concerned about, I read this, is this sentence in the last

19  paragraph, the second sentence is, "There are no adequate and

20  well-controlled studies of Naproxen that support your assertion

21  that Naproxen's transient inhibition and platelet aggregation is

22  pharmacodynamically comparable to aspirin or clinically effective

23  in decreasing the risk of MIs."  So it is saying there is not

24  adequate and well-controlled studies to make, to be able to -- for

25  this Naproxen theory.

1    Q.  Thank you.  Could you please turn now to page 6 of the document

2    ending in 3282?

3    A.  Yes, sir.

4    Q.  What was the FDA concerned with here under the heading Press

5    Release?

6    A.  It says they've identified a press release that the company put

7    out titled a press release, Merck confirms favorable cardiovascular

8    safety profile of Vioxx dated May 22nd, 2001, and it goes on to

9    say, "Your claim in the press release that Vioxx has "favorable

10   cardiovascular safety profile" is simply incomprehensible given the

11   rate of MI and serious cardiovascular events compared to Naproxen."

12   Q.  Do you agree with the FDA's description?

13   A.  I think it is a fair assessment, yes, sir.

14   Q.  And, to your knowledge, did Merck resolve the issues raised in

15   the 9/17/01 letter to FDA satisfaction?

16   A.  My knowledge is, the answer is yes, they did resolve the matter

17   with regard to the specific concerns that the agency related to --

18   there were concerns, if you read the entire letter, about marketing

19   to physicians at certain meetings and they had Merck send out a

20   correction.

21        I am not aware of whether, of what the, whether it was

22   corrective action or how the matter of the press release was dealt

23   with, but I believe the matter was closed and Merck resolved it to

24   FDA satisfaction.

25   Q.  Thank you.

```
 1              MR. DUGAN:  At this time, your Honor, I would like to

 2     move into evidence Louisiana AG Exhibit No. 4.

 3              THE COURT:  I'll admit it.

 4     BY MR. DUGAN:

 5     Q.  Dr. Kessler, did you also have a chance to review documents

 6     relating to Merck's plans for publication of articles relating to

 7     cardiovascular risks?

 8     A.  I did.

 9     Q.  Did you review a Merck document dated April 14th, 2000, that

10     discussed marketing needs?

11     A.  Yes, I did.

12     Q.  I would ask you to turn to tab 15.

13     A.  (WITNESS COMPLIES.)  Yes, sir.

14     Q.  How did this April 14, 2000, date relate to the time when the

15     VIGOR results were being known to the company?

16     A.  It was coincided, VIGOR results were known, increased rate of

17     problems, cardiovascular problems with the drug, I think this is

18     probably within about a month afterwards.

19     Q.  Thank you.  I'd ask you to turn to page 2307.

20     A.  Yes.

21     Q.  What's important to you on this page, Doctor?

22     A.  So if you, the heading of the page is Marketing Update.  And

23     then it goes, "The following are the marketing needs" is the

24     heading about three paragraphs down.  And what's important to me

25     is, if you look at the underlining of the first, of the last
```

1    paragraph, first sentence of the last paragraph, it says:

2    "Marketing Needs:  Rapid publication and communication at opinion

3    leader events of Phrase III OA results demonstrating comparable

4    incidence of thromboembolic events with Vioxx placebo and NSAID

5    comparative."

6    Q.  I would ask you to turn to page -- the next page, 2308.

7    A.  Yes.

8    Q.  Is there a statement at the top of this page that is important

9    to the opinions in your case?

10   A.  Yes.

11   Q.  And what would that be?

12   A.  First, the underline, established that Vioxx, again, these are

13   in the context of marketing needs, established that Vioxx/Coxib

14   could not increase the risk of thromboembolic events due to the

15   unique mechanism of action, even in patients recognized as being at

16   higher risk.

17            So these are, these are marketing needs the company needs

18   to, for marketing purposes to establish that Vioxx does not

19   increase the risk of thromboembolic events because of its unique

20   mechanism of action.

21            MR. DUGAN:  Your Honor, at this time I would like to move

22   into evidence Louisiana AG 588.

23            THE COURT:  I'll admit it.

24   BY MR. DUGAN:

25   Q.  Dr. Kessler, did you also review a January 8th, 2001,

1   memorandum of the Competitive Assessment Task Force?

2   A.  I did.

3   Q.  I would ask you to look at tab 16 in your binder.

4   A.  Yes.

5   Q.  Is this the document you reviewed?

6   A.  Yes.

7   Q.  I would ask you to turn to page 592 of the document.

8   A.  Yes.

9   Q.  And, once again, I apologize, the numbers are very small here.

10  It's the fourth page.

11  A.  Fourth page.

12  Q.  What were the objectives of Merck here?

13  A.  Again, if I can just turn, you could just turn to the page

14  before that.  I look at the list of the people putting together

15  this task force are marketing and planning individuals, officials

16  at Merck.  And then turning, the marketing and planning individuals

17  put together objectives and there are four:  One, to further

18  develop opinion leaders and the country's understanding and

19  confidence in the cardiovascular and renal safety of Vioxx; two, to

20  continue to neutralize any perceived safety hypertension, edema,

21  cardiovascular concerns; third bullet, regain the offensive by

22  shifting physician's focus back to efficacy and safety; and four,

23  develop action plans for rapid and ongoing responses in monitoring

24  of competitive tactics and new clinical information.

25  Q.  Thank you.  I would ask you to turn to page 596 now.

1    A.   Yes.

2    Q.   What did these neutralization efforts entail?

3    A.   Again, the print is getting smaller.  It says, to neutralize

4    perceived cardiovascular safety concerns, and then it uses the word

5    publications.  These are marketing officials talking about

6    publications, and as I read where the publications are going, AJC,

7    *American Journal of Cardiology*, so they're talking about putting

8    neutralizing perceived safety concerns by publishing articles in

9    the peer-reviewed literature on, first bullet, cardiovascular

10   safety, I think that's the osteoarthritis database, I think that's

11   06, I can't read the number, and then, for example, the last

12   bullet, meta-analysis of CV safety.

13           So it's marketing officials talking about neutralizing

14   the safety, the cardiovascular safety concerns, by -- in

15   publications, of certain data sets.

16   Q.   Thank you, Doctor.

17           MR. DUGAN:  At this time I would like to move into

18   evidence Louisiana AG 589.

19           THE COURT:  Admitted.

20   BY MR. DUGAN:

21   Q.   Doctor, did you also receive a commercialization team memo of

22   March 13, 2001?

23   A.   I did.

24   Q.   I would ask you to turn to tab 17 in your binder.

25   A.   Yes.

1    Q.  I would ask, also ask you to turn to page 6790.  About halfway

2    through the document.

3    A.  Yes, sir.

4    Q.  What does it tell you about the plans for publications of key

5    safety messages?

6    A.  So it talks about, under Appendix B, it talks about a

7    comprehensive, scientific communication strategy, including plans

8    for abstract presentations and peer-reviewed publications for Vioxx

9    focussing on key safety messages, including cardiovascular safety.

10          MR. ISMAIL:  Jim, I don't mean to interrupt, my tab at 17

11   I don't think tracks.  What was the Bates number you gave?

12          MR. DUGAN:  The Bates No. 106697.

13          MR. ISMAIL:  That's my tab 19, sorry.

14          THE COURT:  106791 or not?  What is the Bates number of

15   that?

16          THE WITNESS:  Your Honor, what I just read was 1067 --

17   106790.

18          THE COURT:  Okay.  Go ahead.

19          MR. DUGAN:  Your Honor, at this time I would like to move

20   into evidence Louisiana AG 590 as an exhibit to this case.

21          THE COURT:  That's the whole thing?

22          MR. DUGAN:  Yes, sir, your Honor.

23          MR. ISMAIL:  Your Honor, it seems to be dealing with

24   other drugs, internal marketing promotional plans.  Same objection

25   as we've issued earlier.

```
 1          THE COURT:  The only thing from the standpoint of

 2   marketing is that I am not interested in the marketing to show how

 3   many drugs were sold and that sort of thing.  But the marketing may

 4   have some relevance when the position of Merck is that Louisiana

 5   knew or could have known, I don't know whether it's indicative or

 6   not, I am not speaking on that.  But it is relevant, so I'll admit

 7   it.

 8          MR. DUGAN:  Thank you, your Honor.

 9   BY MR. DUGAN:

10   Q.  Dr. Kessler, did you also review Merck's scientific

11   communication plan dated March 27th, 2001?

12   A.  Yes, I believe I did.

13   Q.  I would turn you to tab 18 of your binder.

14   A.  Yes.  Yes, sir.

15   Q.  Is this the document that you reviewed?

16   A.  Yes, sir.

17   Q.  From the table at the bottom of page 257, what were Merck's

18   messages?

19   A.  With regard to cardiovascular safety, cardiovascular, the key

20   messages, the cardiovascular effects were similar to placebo and

21   NSAIDs, and that the difference in MIs in VIGOR were due to

22   cardioprotection with Naproxen based on limited data.

23   Q.  Thank you, Doctor.

24          Can you now turn to page 263 of this document?

25   A.  Yes, sir.
```

1    Q.  What does this page show and why is it important?

2    A.  This is an appendix to that document, and it talks about

3    certain preferred external speakers.  These include cardiologists

4    and nephrologists.  Cardiologists, under there it says MI,

5    myocardial infarction expertise with regard to myocardial

6    infarction, hypertension and edema, and the asterisk says "All

7    cardiologists listed have been engaged by Merck Research

8    Laboratories or their -- I can't read it -- and have demonstrated a

9    clear understanding of Merck's point of view on cardiovascular and

10   renal issues.  Those cardiologists marked with an asterisk

11   represent certified national speakers, who consistently communicate

12   Merck's point of view on these issues and presentations to their

13   colleagues."

14   Q.  Thank you, Doctor.

15          MR. DUGAN:  At this time, your Honor, I would like to

16   move into evidence Louisiana AG 127.

17          THE COURT:  Admitted.

18   BY MR. DUGAN:

19   Q.  Dr. Kessler, did you also review any of the articles written by

20   Merck employees and consultants regarding CV risks?

21   A.  I did.

22   Q.  Did you review an article where Dr. Konstam was listed as the

23   first author followed by Dr. Weir and some Merck employees?

24   A.  I did.

25   Q.  Did you also review an article by Dr. Reicin?

1    A.  I did.

2    Q.  And did you also review an article where Dr. Weir was listed as

3    the first author followed by some Merck employees?

4    A.  I did.

5    Q.  And based on your review of those articles, do you have an

6    opinion as to whether they communicated the Merck point of view as

7    indicated in the Merck documents from 2000 and 2001 that you've

8    been reviewing?

9    A.  I do have an opinion.

10   Q.  And what is that?

11   A.  That they did communicate the Merck position.

12   Q.  Doctor, did you also have a chance to review a Merck document

13   dated December 19th, 2000, that talked about the plan to conduct a

14   meta-analysis for possible publication?

15   A.  Yes.

16   Q.  Doctor, I would ask you to turn to tab 19 in your binder.

17   A.  Yes.

18   Q.  Is this the document you reviewed?

19   A.  Yes.

20   Q.  At the bottom of the first page ending in 5346 of this document

21   regarding meta-analysis, what was important to you about that?

22   A.  If you read it, it says:  "Conduct the meta-analysis of

23   cardiovascular events from all Phrase III studies," and then the

24   last sentence in that bullet, it says:  "If results are positive,

25   then publish."

```
 1              So you have to, I had -- again, taking that statement and

 2     trying to put it in context, if the results are positive for the

 3     drug, are the results positive on the meta-analysis, then publish.

 4     As in the context that I saw the results being published, the

 5     results were negative, so I took this to mean that if the results

 6     are positive for the drug, then we're going to publish.  But that

 7     was an inference.

 8     Q.  And why is that important to your opinions in this case?

 9     A.  My opinions had to do with whether there was selective

10     presentation of data.  And again, what Merck presented and what

11     people could have known depends on what Merck presents.

12     Q.  Thank you, Doctor.

13              MR. DUGAN:  At this time, your Honor, I would like to

14     move into evidence Louisiana AG 586.

15              THE COURT:  What exactly is this?

16              MR. DUGAN:  This is a Merck --

17              THE COURT:  Okay.  It's not an article, is it?

18              MR. DUGAN:  No, it's not, your Honor.

19              THE COURT:  Okay.  I'll admit it.

20     BY MR. DUGAN:

21     Q.  Dr. Kessler, I would ask you to turn to tab 20 in your binder.

22     A.  Yes.

23     Q.  What is this article in reference to?

24     A.  This is, this article was first authored by Alise Reicin, a

25     Merck employee, and she is reporting on the cardiovascular
```

1   thrombotic events for patients with osteoarthritis treated with

2   Vioxx and other drugs.

3   Q.  And if you look at the first page at the end of the summary of

4   the article, what was the conclusion?

5   A.  If you look at the abstract and you go to the last sentence, it

6   says:  "Thus, in the Vioxx osteoarthritis development program,

7   there were no differences between Vioxx comparator, nonselective

8   NSAIDs and placebo in the risks of cardiovascular thrombotic

9   events."  There was no difference between Vioxx and placebo in that

10  OA database.

11  Q.  Thank you.  So did the Reicin article present data on all of

12  osteoarthritis studies that Merck had conducted as of the time this

13  study was published?

14  A.  No, it did not.

15  Q.  Which studies did it publish?

16  A.  It published the studies that were available to the company up

17  through, I believe, 1998, as it says in the article.

18  Q.  Turning to page 207 of the article.

19  A.  Yes, sir.

20  Q.  Does Table 4-B show a comparison between Vioxx and placebo as

21  of 1998?

22  A.  Yes.  So you have to go, if you go to the second table on the

23  page and you go to the bottom half of that B section and you look

24  at where it says overall population, Vioxx versus placebo, and you

25  just move over to the relative risk estimate, you see a relative

1   risk of 0.94, and it's not statistically significant for the

2   overall population.

3   Q.  What other studies of osteoarthritis patients for Vioxx versus

4   placebo had Merck completed as of 2002 when this article was

5   published?

6   A.  I believe those are Protocols 083, 085, 090.  I believe they

7   were not included, they were done after 1998 but before this

8   article was published.  I also believe there was a study 010 that

9   wasn't included.

10  Q.  So did Dr. Reicin's article mention any of those trials?

11  A.  No.  Those additional trials, no.

12  Q.  Have you reviewed documents showing what the relative risk

13  would have been if Merck had included these studies?

14  A.  Yes.

15  Q.  Doctor, I would ask you to look at tab 21 in your binder.

16  A.  Yes, sir.

17  Q.  Is this the document that you reviewed showing the results of

18  the osteoarthritis trials?

19  A.  Yes, sir.

20  Q.  I would ask you to turn to page 2239 of the document.

21  A.  Yes, sir.

22  Q.  Doctor, can you tell the court what the relative risk would

23  have been if Merck had reported OA studies that you referenced

24  earlier instead of only those studies done through 1998?

25  A.  Yes.  So if you go to Table 10 on page 26 and you look at study

1  block OA, and you can see Reicin's article, I believe, is including

2  Protocols 029 through 058.  But if you include, as I say, 083, 085,

3  090, this is a pooled analysis that was done by Merck, if you

4  include those three other studies, you see a relative risk of 1.80

5  higher than, about double the number relative risk.  It is not

6  statistically significant.

7           This does not include 010, I believe that would increase

8  the relative risk to 1.9, again, not statistically significant.

9  Q.  And why would that information be important?

10 A.  It -- certainly a relative risk of 1.8 is considerably higher

11 than a relative risk of less than 1, even though it's not

12 statistically significant.  The problem is we're dealing with

13 relatively small sizes and it certainly is, it's certainly a

14 signal.

15 Q.  Dr. Kessler, do you have an opinion as to whether the Reicin

16 article accurately informed readers of the risk of thrombotic

17 events in OA cases?

18 A.  I do.

19 Q.  And what is that?

20 A.  It was not complete, it didn't indicate that other studies had

21 been done, and it didn't include those studies and the relative

22 risks would have been different.

23 Q.  Thank you.  I would ask you to turn -- I'm sorry, your Honor.

24          MR. DUGAN:  At this time I would like to move into

25 evidence Louisiana AG 587 as an exhibit.

```
 1              THE COURT:  Admitted.
 2   BY MR. DUGAN:
 3   Q.  Doctor, I turn you to tab 22.
 4   A.  Yes.
 5   Q.  Could you tell the court about this article?
 6   A.  This is an article that appeared in the journal Circulation,
 7   first author Marvin Konstam and it's titled, Cardiovascular
 8   Thrombotic Events in Controlled Clinical Trials of Vioxx.
 9   Q.  And what was the conclusion of this article?
10   A.  If you move down to the conclusion, there are two sentences:
11   "This analysis provides no evidence for an excess of cardiovascular
12   events for Vioxx relative to either placebo or non-Naproxen NSAIDs
13   that were studied.  Differences observed between Vioxx and Naproxen
14   are likely the result of the anti-platelet effects of the latter
15   agent."
16   Q.  Doctor, did you see any drafts of this article in your document
17   review in this case?
18   A.  I did.
19   Q.  And who prepared the draft that you saw?
20   A.  Merck.
21   Q.  And did you notice whether Dr. Konstam appeared as one of
22   Merck's cardiologists who had been engaged and demonstrated clear
23   understanding of Merck's point of view in the scientific
24   communication plan?
25   A.  He was one of the cardiologists that was listed with an
```

1   asterisk; the answer is yes.

2   Q.  Thank you, Doctor.  I turn you to tab 23 in the binder.

3   A.  Yes.

4   Q.  Can you tell us about this article?

5   A.  This is an article by Matthew Weir as the first author from the

6   University of Maryland Hospital, along with three Merck scientists,

7   physicians, and it is a review of the Vioxx development program and

8   its cardiovascular effect.

9   Q.  Are those Merck employees, Spurling (PHONETIC), Bryson

10  (PHONETIC) and Gertz?

11  A.  Yes.

12  Q.  Did Dr. Weir's name appear on the list of Merck's preferred

13  external speakers for scientific communications?

14  A.  Yes.  He did not have an asterisk, I believe.

15  Q.  Does Weir's affiliation as a Merck consultant appear anywhere

16  in this article?

17  A.  I did not see it anywhere in this article.

18  Q.  Looking at the end of the summary on the first page, Doctor,

19  what was the main message of the Weir article?

20  A.  The last sentence:  "The totality of data is not consistent

21  with an increased cardiovascular risk among patients taking Vioxx."

22  And then you move up two sentences, it says again:  "Naproxen

23  appeared to be the outlier suggesting a cardioprotective benefit of

24  Naproxen."

25  Q.  Did Weir include all of OA studies available at the time this

1    article was published?

2    A.  No, I believe he did not.

3    Q.  Could you tell us what would the relative risks have been if

4    all of the OA studies had been reported?

5    A.  I believe it would've been --

6            MR. ISMAIL:  Judge, can we have some foundation, your

7    Honor?

8            THE COURT:  Let's get a foundation.  That's not the 1.8?

9            THE WITNESS:  I'm sorry, your Honor?

10           THE COURT:  It's not the 1.8, no?

11           THE WITNESS:  No.

12           THE COURT:  Let's ask him how does he know.

13   BY MR. DUGAN:

14   Q.  Dr. Kessler, could you please tell the court how you would

15   arrive in determining a relative risk number here?

16   A.  Let me just try to remember the process that I did.  I believe

17   there were two things, if my memory serves me right, on the

18   process.  I believe that, that counsel may have had, again, what

19   we're talking about is the entire OA database run from 010 to 136

20   and had an outside consultant do that.  I believe I saw those

21   numbers.

22           I believe I checked those numbers by plugging those

23   numbers into the statistical software of 010 through 0 -- 1 through

24   136, it's the entire OA database.  So I believe I confirmed that

25   myself statistically.  I don't have an exact memory.

```
 1            THE COURT:  I'll sustain the objection.

 2            MR. DUGAN:  Okay.  Thank you.

 3   BY MR. DUGAN:

 4   Q.  Doctor, do you have an opinion as to whether Merck's overall

 5   presentation of cardiovascular risk information in the

 6   peer-reviewed literature accurately informs readers of the CV risk

 7   of Vioxx?

 8   A.  I do.  I do have an opinion.

 9   Q.  And what is that opinion?

10   A.  I do not believe the three articles that we just discussed

11   accurately reflect the CV risk in the peer-reviewed literature.

12   Q.  And, Doctor, do you have an opinion as to whether you believe

13   the State of Louisiana could have known of the true CV risks before

14   it was withdrawn on September 30th, 2004?

15            THE COURT:  Just -- objection.  I am going to sustain the

16   objection.

17            MR. DUGAN:  I'll rephrase the question.

18   BY MR. DUGAN:

19   Q.  Doctor, do you have an opinion as to whether you believe the

20   medical community or the public could have known of the true CV

21   risk of Vioxx before it was withdrawn on September 30th, 2004?

22            MR. ISMAIL:  Same objection.

23            THE COURT:  Same thing.  Yes, I sustain the objection.  I

24   understand what he is saying, but to extrapolate, that's just too

25   broad of a question.  Did they accurately state it, that's
```

```
 1    something he can say, but whether or not somebody understood it is

 2    a little far afield.  So to that extent, I'll sustain the

 3    objection.  Ask you to rephrase it if you need to.

 4             The question really is, did they accurately state the

 5    risk?

 6             THE WITNESS:  No.

 7             THE COURT:  All right.  Go ahead.

 8             MR. DUGAN:  Thank you.  Judge, I have about ten minutes

 9    left.

10             THE COURT:  Okay.  Why don't we go ahead.

11             MR. DUGAN:  Okay.  Thank you.

12    BY MR. DUGAN:

13    Q.  Dr. Kessler, did you review any documents regarding Merck's

14    submission of a proposed label revision to FDA after the VIGOR

15    study?

16    A.  I did.

17    Q.  I'd ask you to turn to tab 24.

18    A.  Yes.

19    Q.  Is this one of the documents you reviewed?

20    A.  Yes.

21    Q.  I would ask you to turn to page 8038 of the document.

22    A.  Yes.

23    Q.  Is this part of the information you reviewed?

24    A.  Yes.

25    Q.  And what is the importance of this document to your opinions in
```

1    this case?

2    A.  This is a proposed label that is being submitted to FDA, and if

3    you go to the third paragraph, it starts off, in this study, and

4    then it goes down, you can see where it goes, the second sentence:

5    "The incidence of confirmed acute myocardial infarction was 0.4

6    percent in patients treated with Vioxx and .1 percent of patients

7    treated with Naproxen."

8             And then it goes on to say:  "This is consistent with the

9    known anti-platelet effects of Naproxen."  So this is, again, the

10   Naproxen theory being advanced by Merck in the proposed label.

11             MR. ISMAIL:  Again, the copy of this exhibit that we

12   received stop.

13             THE COURT:  I'm sorry, I didn't hear that.

14             MR. ISMAIL:  The copy of the exhibit that we received

15   stopped at --

16             THE COURT:  It's on the back of the page I've got.

17             MR. ISMAIL:  Thank you.

18   BY MR. DUGAN:

19   Q.  Dr. Kessler, what is the importance of this document to your

20   opinions in this case?

21   A.  This is Merck advancing the Naproxen theory to explain the

22   VIGOR results.

23   Q.  Thank you.

24             MR. DUGAN:  Your Honor, at this time I would like to move

25   into evidence, this is Defendant's Exhibit 145.

1          THE COURT:  Admitted.

2    BY MR. DUGAN:

3    Q.  Doctor, did you also review another label proposal that Merck

4    submitted in March of 2001?

5    A.  I did.

6    Q.  I would ask you to look at tab 25.

7    A.  Yes.

8    Q.  Is this the document?

9    A.  Yes, I believe the label is, the proposed label is somewhere in

10   this document.

11   Q.  Yeah, I would ask you to look at page 6832.

12   A.  Yes, sir.

13   Q.  Are you there, Doctor?

14   A.  One second, please.  Yes.

15   Q.  What is the importance of this document to your opinions in

16   this case?

17   A.  This is another proposed label from Merck to FDA.  If you go to

18   the second paragraph under cardiovascular effects, it says in the

19   middle of that paragraph, again, after explaining VIGOR, slightly

20   different language than the prior label, it says:  "As noted in its

21   product circular, Naproxen may decrease platelet aggregation and

22   prolonged bleeding time."  Again, it's advancing little less

23   affirmatively the Naproxen theory with the FDA.

24   Q.  Thank you, Doctor.

25          MR. DUGAN:  Your Honor, at this time I would like to move

 1    into evidence Louisiana AG 590.

 2            THE COURT:  I'll admit it.

 3            MR. ISMAIL:  Your Honor, if we may have a moment since

 4    the witness apparently only reviewed one or two pages of this

 5    document, I will get with counsel.  If only a portion should be

 6    admitted, we'll raise it at that time.

 7            THE COURT:  Do you have any problem with that, admitting

 8    the pages that he reviewed?  I mean, it's just a question of

 9    material after a while.

10            MR. DUGAN:  Well, we're almost done, your Honor, if you

11    don't mind I'd like to --

12            THE COURT:  No, I don't mean that, I mean with the 25, is

13    there something else that you wanted to -- did you review the

14    entire document, Doctor?

15            THE WITNESS:  I focused on the label, your Honor, I

16    believe.

17            THE COURT:  What you reviewed was page 6832?

18            THE WITNESS:  I'm sorry, your Honor.  68 -- let's see,

19    the proposed, the proposed label really starts back, I think

20    Appendix C, so it's in the context, I think, of -- I certainly

21    focused on those aspects that related to the VIGOR trial.

22            MR. DUGAN:  And, your Honor, it's been previously

23    admitted in tab 17, so we admitted it earlier, we're just

24    referencing it a second time.

25            THE COURT:  Let's move on.  I'll admit it.

1          MR. DUGAN:  Okay.  Thank you.

2    BY MR. DUGAN:

3    Q.  Dr. Kessler, did you also review any proposed labelling

4    provided by the FDA to Merck?

5    A.  I did.

6    Q.  I would turn you to tab 26.

7    A.  Yes.

8    Q.  Is this the document you reviewed?

9    A.  Yes.

10   Q.  If you could turn to page 309, and once again, I apologize, the

11   print is very small.  It's one, two, three, four, five, six, seven,

12   eight, it's the eighth page.

13   A.  You are challenging me.  Yes, sir.

14   Q.  Did FDA propose that Merck include information about VIGOR in

15   the warning section of the label?

16   A.  So I read this document, this page specifically, to be the FDA

17   text of, the heading of October 15, 2001, with Merck showing the

18   revision marks and deletions.  So I read the, in comparing to the

19   previous, in this section, I read the agency saying, proposing in

20   the first paragraph, the label should say Vioxx should be used with

21   caution in patients at risk of developing cardiovascular thrombotic

22   events, such as those with a history of myocardial infarction and

23   angina and in patients with preexisting hypertension and congestive

24   heart failure.  I see that strucken.

25          And then on the comments, it is says, Merck proposes to

```
 1   revise and relocate this -- I take this because it's with

 2   anaphylactic reactions which is in the warning section, Merck is --

 3   I take this as striking that and it says Merck proposes to revise

 4   the language and relocate it to the precaution sections, not the

 5   warning section.  That's the way I read this document.

 6   Q.  Put simply, Merck did not accept the FDA's proposal?

 7   A.  That's correct.

 8   Q.  Dr. Kessler, did you also review any documents showing Merck's

 9   internal response to the FDA's proposal?

10   A.  I did.

11   Q.  I'd ask you to turn to tab 27.

12             THE COURT:  Did you admit 26?

13             MR. DUGAN:  I did not, Judge, because it wasn't

14   previously identified.  But I'd like to at this time move it into

15   evidence.

16             THE COURT:  I'll admit it.

17             THE DEPUTY CLERK:  How is it marked?

18             MR. DUGAN:  It's marked as -- by Bates numbers.

19             THE COURT:  No.  What exhibit number?

20             MR. DUGAN:  It wasn't previously identified in our

21   witness list as far as the labeling.

22             THE COURT:  Your last number on your list is 721, would

23   you like to make it 722?

24             MR. DUGAN:  722 would be great.

25             MR. ISMAIL:  Your Honor, we have no objection.
```

```
 1              THE COURT:  Okay.  Let it be admitted.

 2              MR. DUGAN:  Thank you.

 3  BY MR. DUGAN:

 4  Q.  Dr. Kessler, turning to tab 27.

 5  A.  Yes, sir.

 6  Q.  Did you review this document?

 7  A.  Yes, sir.

 8  Q.  And what does this document say about Merck's reaction to the

 9  FDA's proposal?

10              MR. ISMAIL:  Objection, your Honor, all he is going to do

11  is read somebody else's e-mail and give his characterization of

12  their reaction is not expert testimony.

13              THE COURT:  Yeah, that's -- from the standpoint of

14  admitting it, I am not going to admit it, but he can testify about

15  it.

16              MR. DUGAN:  Your Honor, he was qualified as an expert in

17  standard of care, and this is company -- top company executive

18  breaching that standard of care.

19              THE COURT:  Yeah, I understand.  But based -- you need to

20  frame the question with that in mind.  Based upon that, have you

21  reached a conclusion.

22  BY MR. DUGAN:

23  Q.  Dr. Kessler, after reading this document, do you have -- have

24  you reached a conclusion or an opinion as to this document?

25              THE COURT:  As to whether they breached the standard of
```

```
 1    care.

 2              THE WITNESS:  Your Honor, they are fighting the FDA here

 3    hard.  It is certainly, the way I read this, is Merck is saying it

 4    will not accept the label, it's going to take this -- they're going

 5    to ask to go to an advisory committee.  And this is ugly and leave

 6    aside how they characterize the agency in this.

 7              It is their -- I think it is their right to ask for an

 8    advisory committee.  I see in this document the company fighting

 9    not to include the FDA label.  My opinion, that fighting

10    breached -- by not accepting that label they breached their duty to

11    warn.

12    BY MR. DUGAN:

13    Q.  Thank you, Doctor.

14              Did you also review any documents showing whether Merck

15    was aware of effects that varying label changes could have on its

16    sale forecast?

17    A.  Yes, I did.

18    Q.  I turn you to tab 28.

19    A.  Yes.

20    Q.  If you could turn to page 674.

21              MR. ISMAIL:  Your Honor, these financial forecasting and

22    budget profit documents have already been ruled out of the case in

23    response to motion in limine number 8.

24              THE COURT:  Where are we going with this, Jim?

25              MR. DUGAN:  Once again, your Honor, it goes to the
```

1    standard of care.

2              MR. ISMAIL:  Your Honor, we're talking internal

3    forecasts, this witness has no personal knowledge and no expert

4    opinion on it.

5              THE COURT:  Yes, I don't see where this is -- I don't

6    know how that bears on the standard of care.

7              MR. DUGAN:  It goes to show the profit motive, your

8    Honor.

9              THE COURT:  I am not going to admit this, but ask him

10   about whether the document indicates any reason for their actions.

11   BY MR. DUGAN:

12   Q.  Dr. Kessler, does this document or this page in particular

13   allow you to opine on the standard of care of Merck's conduct in

14   this case?

15   A.  It has an effect on my opinion.

16   Q.  And what is that, your Honor -- I'm sorry, what is that,

17   Dr. Kessler?

18   A.  You see that, when I read this, the effect of putting a warning

19   on the label, cardiac warning, which I think should have been done,

20   rather than putting it -- they give two other options, they give a

21   case of putting a warning label on, which is the downside, doing it

22   as a precaution, sort of a watered-down warning, maybe not be an

23   accurate -- a precaution is not as strong as a warning as the base

24   case.

25              In the upside where there is, the labelling is in their

1   terms milder and no prothrombotic Vioxx is -- there is a sales

2   prothrombotic effect, you can see in one year that with sales of

3   $2.5 billion, if I read this document correctly, the effect of

4   putting a warning label, in one year according to sales, is a

5   billion dollars projected forecast; again, I can't, I have no

6   independent opinion on whether those numbers are right.

7           But you see, you see the economic stakes the company saw

8   at stake if it put a warning, a cardiac warning on the label, that

9   there would be tremendous financial stakes, and that certainly had

10  an influence, I mean, on the company.

11  Q.  Thank you, Doctor.

12          THE COURT:  What's the page number of that?  I'll admit

13  that page.

14          MR. DUGAN:  Thank you, your Honor.  That is page number

15  17.

16          THE COURT:  What's the number?

17          MR. DUGAN:  That is Bates number --

18          THE COURT:  No, I don't mean that.  I mean the number of

19  whole document.

20          MR. DUGAN:  Louisiana AG 55.

21          THE COURT:  I'll admit that page of that document.

22          MR. DUGAN:  Do you want the Bates number?

23          THE COURT:  No, I don't need it.

24          MR. DUGAN:  Okay.  I am about to wrap this up, your

25  Honor.

```
 1   BY MR. DUGAN:
 2   Q.  Dr. Kessler, do you have an opinion as to whether Merck met the
 3   standard of care in its handling of the label change with Vioxx
 4   after the VIGOR study?
 5   A.  Yes, I have an opinion.
 6   Q.  And what is that opinion?
 7   A.  It did not meet the standard of care on duty to warn based on
 8   the label.
 9   Q.  Do you also have an opinion as to whether there was an
10   obligation to expeditiously assure that the drug's label adequately
11   informed physicians and healthcare providers of the risks?
12   A.  Yes, I have such an opinion.
13   Q.  And what is that?
14   A.  That Merck should have more expeditiously warned providers of
15   the health risks of Vioxx.
16   Q.  And, Dr. Kessler, do you have an opinion as to whether Merck
17   accurately stated the risk of Vioxx prior to withdrawal of
18   September 30th, 2004?
19   A.  I do have such an opinion.  My opinion is that Merck
20   selectively presented data concerning Vioxx and that -- you know,
21   my opinion is that, my concern is that a company is confronted with
22   a lot of data about a drug and Merck -- Merck explained away some
23   of that data that I think was very important.
24             MR. DUGAN:  Thank you, Dr. Kessler.
25             I tender the witness, your Honor.
```

1         THE COURT:  Okay.  We'll stop here and come back at 1:30.

2    The court will stand in recess until 1:30.

3         THE DEPUTY CLERK:  Everyone rise.

4         MR. DUGAN:  Thank you, your Honor.

5       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

6

7                     *  *  *  *  *  *

8

9                     REPORTER'S CERTIFICATE

10

11     I, Karen A. Ibos, CCR, Official Court Reporter, United States

12    District Court, Eastern District of Louisiana, do hereby certify

13    that the foregoing is a true and correct transcript, to the best of

14    my ability and understanding, from the record of the proceedings in

15    the above-entitled and numbered matter.

16

17

18                     _____

19                     Karen A. Ibos, CCR, RPR, CRR

20                     Official Court Reporter

21

22

23

24

25