1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3

4
   IN RE:  VIOXX PRODUCTS          *
5          LIABILITY LITIGATION    *
                                   *
6  This Document Relates to:       *   MDL No. 1657
                                   *
7       STATE OF LOUISIANA, *ex rel.* *   Section L
        JAMES D. CALDWELL JR.,     *
8       Attorney General           *   New Orleans, Louisiana
                                   *
9          versus                  *   April 12, 2010
                                   *
10      MERCK & CO., INC.          *   1:30 p.m.
                                   *
11                                 *
        Case No. 05-CV-3700        *
12  * * * * * * * * * * * * * * * * * *

13

14
                TRIAL PROCEEDINGS BEFORE THE
15               HONORABLE ELDON E. FALLON
             UNITED STATES DISTRICT JUDGE
16              DAY 1, AFTERNOON SESSION

17
   APPEARANCES:
18

19  For the Plaintiff:           Dugan Law Firm
                                 BY:  JAMES R. DUGAN II, ESQ.
20                               650 Poydras Street, Suite 2150
                                 New Orleans, Louisiana 70130
21

22  For the Plaintiff:           Murray Law Firm
                                 BY:  STEPHEN B. MURRAY JR., ESQ.
23                                    DOUGLAS R. PLYMALE, ESQ.
                                      JUSTIN BLOOM, ESQ.
24                               650 Poydras Street, Suite 2150
                                 New Orleans, Louisiana 70130
25

                         DAILY COPY

```
 1    For the Plaintiff:          Lieff Cabraser Heimann
                                    & Bernstein, LLP
 2                                BY:  DONALD C. ARBITBLIT, ESQ.
                                  275 Battery Street, Suite 3000
 3                                San Francisco, California 94111

 4
      For the Defendant:          Goldman Ismail Tomaselli
 5                                  Brennan & Baum, LLP
                                  BY:  TAREK ISMAIL, ESQ.
 6                                     BRIAN P. O'DONOGHUE, ESQ.
                                  1 North Franklin Street, Suite 625
 7                                Chicago, Illinois 60606

 8
      For the Defendant:          Baker Botts, LLP
 9                                BY:  TRAVIS J. SALES, ESQ.
                                  910 Louisiana Street
10                                Houston, Texas 77002

11
      For the Defendant:          O'Melveny & Myers, LLP
12                                BY:  SCOTT M. VOELZ, ESQ.
                                  400 South Hope Street
13                                Los Angeles, California 90071

14
      Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
15                                500 Poydras Street, Room HB-406
                                  New Orleans, Louisiana 70130
16                                (504) 589-7778

17

18

19

20

21

22

23

24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer.
```

DAILY COPY

1                          **I N D E X**

2                                                      PAGE
David A. Kessler

3
        Cross-Examination                        118
4
        Redirect Examination                     182
5
        Recross-Examination                      187
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 13:16 | 1 | **AFTERNOON SESSION** |
| 13:16 | 2 | **(April 12, 2010)** |
| 13:16 | 3 | **THE DEPUTY CLERK:**  Everyone rise. |
| 13:34 | 4 | **THE COURT:**  Be seated, please.  We have a little |
| 13:34 | 5 | housekeeping matter. |
| 13:35 | 6 | **MR. DUGAN:**  James Dugan on behalf of the plaintiff, |
| 13:35 | 7 | Your Honor.  During Dr. Kessler's examination, we admitted into |
| 13:35 | 8 | evidence Defense Exhibit 145, which ultimately became |
| 13:35 | 9 | Plaintiff's Exhibit -- |
| 13:35 | 10 | **THE DEPUTY CLERK:**  No.  It stays DX-145. |
| 13:35 | 11 | **MR. DUGAN:**  Oh, it stays DX-145?  It's come to our |
| 13:35 | 12 | attention that the whole document is about 1,100 pages, and we |
| 13:35 | 13 | just want to offer the portions of the document that are |
| 13:35 | 14 | relevant.  So we are going to identify by Bates numbers the |
| 13:35 | 15 | range, and that range is MRK-00420008017 through |
| 13:35 | 16 | MRK-00420008099.  Thank you, Your Honor. |
| 13:36 | 17 | **THE COURT:**  Okay.  Let that be done. |
| 13:36 | 18 | You may cross-examine, Counsel. |
| 13:36 | 19 | **MR. ISMAIL:**  Thank you, Judge. |
| 13:36 | 20 | (WHEREUPON **David A. Kessler**, having been duly sworn, |
| 13:36 | 21 | testified as follows.) |
| 13:36 | 22 | **CROSS-EXAMINATION** |
| 13:36 | 23 | BY MR. ISMAIL: |
| 13:36 | 24 | **Q.**   Good afternoon, Doctor. |
| 13:36 | 25 | **A.**   Good afternoon, sir. |

| | | |
|---|---|---|
| 13:36 | 1 | **Q.**   You described for us this morning that you had a tenure at |
| 13:36 | 2 | the FDA back in the '90s; is that correct? |
| 13:36 | 3 | **A.**   I did. |
| 13:36 | 4 | **Q.**   Just so the record is clear, none of your activities at |
| 13:36 | 5 | FDA involved review or activities on the COX-2 drugs; is that |
| 13:36 | 6 | correct? |
| 13:36 | 7 | **A.**   I have no recollection of being involved. |
| 13:36 | 8 | **Q.**   Nor were you personally involved in any FDA activities on |
| 13:36 | 9 | the nonselective NSAIDs? |
| 13:36 | 10 | **A.**   I don't have a recollection, sitting here today, of being |
| 13:36 | 11 | involved. |
| 13:36 | 12 | **Q.**   Now, prior to your retention by the plaintiff lawyers to |
| 13:36 | 13 | serve as an expert in this case, it would be fair to say you |
| 13:36 | 14 | had limited scientific or clinical experience with NSAIDs; |
| 13:37 | 15 | true? |
| 13:37 | 16 | **A.**   Yeah.  It's not a class of drugs that I focused on when I |
| 13:37 | 17 | was at the FDA, nor is it a class of drugs that I've used a |
| 13:37 | 18 | good deal as a physician. |
| 13:37 | 19 | **Q.**   In fact, sir, do you recall, when I took your deposition |
| 13:37 | 20 | back in January, I asked you if you could identify any |
| 13:37 | 21 | nonselective NSAIDs, and after some thought the only one you |
| 13:37 | 22 | came up with was aspirin? |
| 13:37 | 23 | **A.**   I remember the interchange well, and there was something |
| 13:37 | 24 | that was going on in my mind.  I actually went back -- you are |
| 13:37 | 25 | correct.  I went back and I looked at Goodman & Gilman.  If you |

DAILY COPY

| | | |
|---|---|---|
| 13:37 | 1 | go to Chapter 26, one of the questions was whether |
| 13:37 | 2 | acetaminophen is an NSAID, and I couldn't recall. |
| 13:38 | 3 | Certainly, I learned it was an antipruritic.  But if |
| 13:38 | 4 | you go to Goodman & Gilman, in fact, Tylenol is listed as a |
| 13:38 | 5 | nonsteroidal antipruritic.  There's 24 listed, and I just -- I |
| 13:38 | 6 | didn't know.  Even I was surprised when I looked at Goodman & |
| 13:38 | 7 | Gilman.  So that was part of the interchange you and I had, |
| 13:38 | 8 | right. |
| 13:38 | 9 | Q.   Just so my question was clear, I didn't ask you about |
| 13:38 | 10 | Tylenol in your deposition.  I asked -- |
| 13:38 | 11 | A.   It did come up, I believe. |
| 13:38 | 12 | Q.   Yes, because later in the deposition you volunteered that |
| 13:38 | 13 | you thought Tylenol was a nonselective NSAID.  I actually |
| 13:38 | 14 | wanted to go back to the question I asked you this afternoon, |
| 13:38 | 15 | which was:  Isn't it true, sir -- and I'll show you your |
| 13:38 | 16 | deposition in the process -- |
| 13:38 | 17 | A.   It's exactly correct. |
| 13:38 | 18 | Q.   When I asked you in January of 2010 to name any |
| 13:38 | 19 | nonselective NSAID, the only one you could identify was |
| 13:38 | 20 | aspirin; true? |
| 13:38 | 21 | A.   Yes.  I did not list all the 24 that are in Table 26 in |
| 13:38 | 22 | Goodman & Gilman. |
| 13:38 | 23 | Q.   In fact, sir, you have never done any scientific or |
| 13:39 | 24 | clinical research with regard to nonsteroidal |
| 13:39 | 25 | anti-inflammatories? |

DAILY COPY

| | | |
|---|---|---|
| 13:39 | 1 | **A.**   That's correct. |
| 13:39 | 2 | **Q.**   Prior to your retention to serve as an expert in this |
| 13:39 | 3 | case, you hadn't done any scientific research on COX-2 |
| 13:39 | 4 | inhibitors; right? |
| 13:39 | 5 | **A.**   That's correct. |
| 13:39 | 6 | **Q.**   You had no publications in the peer-reviewed literature |
| 13:39 | 7 | about NSAIDs? |
| 13:39 | 8 | **A.**   With the one exception -- I guess the *Georgetown Law* |
| 13:39 | 9 | *Journal* is not peer-reviewed, and that was not the scientific |
| 13:39 | 10 | basis. |
| 13:39 | 11 | **Q.**   Nor, sir, did you read the medical articles about Vioxx |
| 13:39 | 12 | prior to the time you agreed to serve as an expert; true? |
| 13:39 | 13 | **A.**   That's probably correct.  We cited certain things in the |
| 13:39 | 14 | Law Review article, but I did not focus any more than maybe |
| 13:39 | 15 | what was in the general press. |
| 13:39 | 16 | **Q.**   Let me make sure my question is clear.  You have no |
| 13:39 | 17 | recollection of even reading any of the peer-reviewed medical |
| 13:40 | 18 | journal articles published about Vioxx prior to the time you |
| 13:40 | 19 | were retained to serve as an expert by the State of Louisiana; |
| 13:40 | 20 | true? |
| 13:40 | 21 | **A.**   I don't have any specific recollection one way or the |
| 13:40 | 22 | other whether I read any articles prior. |
| 13:40 | 23 | **Q.**   You have never prescribed Vioxx, Celebrex, or Bextra; |
| 13:40 | 24 | correct? |
| 13:40 | 25 | **A.**   That's my recollection.  I would have no reason to |

DAILY COPY

| | | |
|---|---|---|
| 13:40 | 1 | prescribe it. |
| 13:40 | 2 | **Q.**   You have no recollection of ever writing a prescription |
| 13:40 | 3 | for a nonselective NSAID; true? |
| 13:40 | 4 | **A.**   A prescription for a nonselective?  I don't recall the |
| 13:40 | 5 | answer to that question. |
| 13:40 | 6 | **Q.**   You have never done a risk/benefit analysis for a patient |
| 13:40 | 7 | with regard to the use of a COX-2 inhibitor; correct? |
| 13:40 | 8 | **A.**   No.  Again, as a pediatrician, it's not within the scope |
| 13:40 | 9 | of what I tend to do. |
| 13:40 | 10 | **Q.**   I don't believe you went over this on direct, but can you |
| 13:40 | 11 | tell the Court what your fee is to testify today. |
| 13:40 | 12 | **A.**   I get $1,000 an hour. |
| 13:40 | 13 | **Q.**   How much have the plaintiff lawyers paid you thus far? |
| 13:41 | 14 | **A.**   I don't have that number in my head.  I have probably |
| 13:41 | 15 | spent over -- as we talked in the deposition, probably over 100 |
| 13:41 | 16 | hours. |
| 13:41 | 17 | **Q.**   So at $1,000 an hour -- that's pretty quick math -- you |
| 13:41 | 18 | have made over $100,000 thus far from the plaintiffs? |
| 13:41 | 19 | **A.**   I think that's a correct number. |
| 13:41 | 20 | **Q.**   Now, you discussed in your direct examination some signals |
| 13:41 | 21 | that you say were apparent with regard to cardiovascular |
| 13:41 | 22 | toxicity.  I want to go over some of those, but first I want to |
| 13:41 | 23 | get oriented to what some of the clinical trial data show. |
| 13:41 | 24 | Okay? |
| 13:41 | 25 | **A.**   Okay. |

| | | |
|---|---|---|
| 13:41 | 1 | **Q.**   I believe you said this morning that the VIGOR study was |
| 13:41 | 2 | the first clinical trial that demonstrated any statistically |
| 13:41 | 3 | significant increased cardiovascular risk with Vioxx; is that |
| 13:41 | 4 | true? |
| 13:41 | 5 | **A.**   I believe I said that, yes. |
| 13:42 | 6 | **Q.**   Now, VIGOR was at 50 milligrams; correct? |
| 13:42 | 7 | **A.**   That's correct. |
| 13:42 | 8 | **Q.**   Right up until September 30, 2004, there had never been |
| 13:42 | 9 | any individual clinical trial that showed a statistically |
| 13:42 | 10 | significant increased cardiovascular risk with Vioxx; correct? |
| 13:42 | 11 | **A.**   I'm sorry.  Up to September 2004; right? |
| 13:42 | 12 | **Q.**   Yes. |
| 13:42 | 13 | **A.**   Could you repeat the question slowly so I can make sure I |
| 13:42 | 14 | understand it. |
| 13:42 | 15 | **Q.**   I think I left off the end of my question, so let me start |
| 13:42 | 16 | again. |
| 13:42 | 17 | **A.**   I'm sorry. |
| 13:42 | 18 | **Q.**   The VIGOR study was the only clinical trial, right up to |
| 13:42 | 19 | September of 2004, that showed a statistically significant |
| 13:42 | 20 | increased cardiovascular risk with Vioxx; right? |
| 13:42 | 21 | **A.**   I believe that's correct, yes. |
| 13:42 | 22 | **Q.**   VIGOR was at 50 milligrams; right? |
| 13:42 | 23 | **A.**   Yes. |
| 13:42 | 24 | **Q.**   So there was no study at 25 milligrams, right up to |
| 13:42 | 25 | September 2004, that showed a statistically significant |

DAILY COPY

| | | |
|---|---|---|
| 13:42 | 1 | increased cardiovascular risk with Vioxx; correct? |
| 13:43 | 2 | **A.**   That's correct. |
| 13:43 | 3 | **Q.**   VIGOR was a comparison of Vioxx to naproxen, as we now all |
| 13:43 | 4 | know. |
| 13:43 | 5 | **A.**   Yes, sir. |
| 13:43 | 6 | **Q.**   Right up until September of 2004, there had never been an |
| 13:43 | 7 | individual clinical trial that demonstrated at any dose an |
| 13:43 | 8 | increased cardiovascular risk compared to placebo; correct? |
| 13:43 | 9 | **A.**   Emphasizing the word *individual* trial, that's correct. |
| 13:43 | 10 | **Q.**   Right up 'til today, there has never been an individual |
| 13:43 | 11 | clinical trial that demonstrated a statistically significant |
| 13:43 | 12 | increased risk of Vioxx compared to any non-naproxen NSAID; |
| 13:43 | 13 | true? |
| 13:43 | 14 | **A.**   Compared to -- I'm sorry.  There has been no statistical |
| 13:43 | 15 | significant increase, non-naproxen, that's correct, because you |
| 13:43 | 16 | haven't done them.  Merck did not do those studies. |
| 13:43 | 17 | **Q.**   There were plenty of studies that compared Vioxx to |
| 13:43 | 18 | non-naproxen NSAIDs; correct? |
| 13:43 | 19 | **A.**   Yes. |
| 13:43 | 20 | **Q.**   None of those clinical studies, right up 'til today, any |
| 13:44 | 21 | individual study, showed a statistically significant increased |
| 13:44 | 22 | risk compared to Vioxx?  Other than naproxen, sir. |
| 13:44 | 23 | **A.**   That's correct, sir. |
| 13:44 | 24 | **Q.**   Now, you talked about Protocol 023, and that was the |
| 13:44 | 25 | prostacyclin metabolite study; is that right? |

| | | |
|---|---|---|
| 13:44 | 1 | **A.** Yes, sir. |
| 13:44 | 2 | **Q.** Now, just so we are all clear, that was a study that |
| 13:44 | 3 | measured the breakdown product of prostacyclin in the urine; |
| 13:44 | 4 | right? |
| 13:44 | 5 | **A.** Yes. |
| 13:44 | 6 | **Q.** Didn't actually measure any decreased prostacyclin in the |
| 13:44 | 7 | vasculature; correct? |
| 13:44 | 8 | **A.** It was a metabolite. I am not a biochemist. That's |
| 13:44 | 9 | correct. |
| 13:44 | 10 | **Q.** Now, just focusing on Merck's conduct here, did you look |
| 13:44 | 11 | to see whether Merck provided that study to the Food & Drug |
| 13:44 | 12 | Administration? |
| 13:44 | 13 | **A.** Yes, I did. |
| 13:44 | 14 | **Q.** You can confirm for the Court that Merck did provide |
| 13:45 | 15 | Protocol 023 to the FDA; correct? |
| 13:45 | 16 | **A.** So after the deposition and after my report, I went back |
| 13:45 | 17 | and I specifically looked for Protocol 023 in -- what was |
| 13:45 | 18 | accessible to me at the time were the things under the FDA Web |
| 13:45 | 19 | site, so I had the medical reviewers. I think there were 42 |
| 13:45 | 20 | parts. I also had the pharmacology part. |
| 13:45 | 21 | What I saw based on that was that 023 was mentioned |
| 13:45 | 22 | both in the pharmacology and in the clinical cardiology -- the |
| 13:45 | 23 | renal cardiovascular expert. I didn't see it cited in the |
| 13:45 | 24 | medical reviewers. But I am sure if that happened, Merck |
| 13:45 | 25 | supplied it to FDA. I'm sure it was in the NDA. |

| | | |
|---|---|---|
| 13:46 | 1 | Q.   The short answer to my question is:  You can confirm that |
| 13:46 | 2 | Merck, in fact, did submit Study 023 to the FDA; true? |
| 13:46 | 3 | A.   Yes. |
| 13:46 | 4 | Q.   Thank you.  Now, I want to talk about this study by |
| 13:46 | 5 | Dr. Watson that you described. |
| 13:46 | 6 | A.   Uh-huh. |
| 13:46 | 7 | Q.   Do you know what Dr. Watson's role at the company was? |
| 13:46 | 8 | A.   I assume he was -- I don't know his specific title.  I |
| 13:46 | 9 | assume he was a cardiovascular epidemiologist of sorts. |
| 13:46 | 10 | Q.   You did read Dr. Watson's deposition; correct? |
| 13:46 | 11 | A.   No, I did not read his deposition. |
| 13:46 | 12 | Q.   Now, I think you testified that Dr. Watson's study was -- |
| 13:46 | 13 | I think you called it a signal; right? |
| 13:46 | 14 | A.   I'm sorry? |
| 13:46 | 15 | Q.   You called it a signal? |
| 13:46 | 16 | A.   I saw an increased relative risk in women reported by |
| 13:46 | 17 | Dr. Watson, and that to me was a signal. |
| 13:46 | 18 | Q.   Okay.  I want to make sure we understand exactly what |
| 13:46 | 19 | Dr. Watson did and did not do. |
| 13:47 | 20 | A.   Uh-huh. |
| 13:47 | 21 | Q.   I'm going to use this flip chart to help.  I'm going to |
| 13:47 | 22 | write "Watson" up here. |
| 13:47 | 23 |     Now, Dr. Watson, I think you indicated that at the |
| 13:47 | 24 | time he did his analysis, the clinical trials were still |
| 13:47 | 25 | blinded; correct? |

| 13:47 | 1 | A.   That's correct. |
| 13:47 | 2 | Q.   And so the -- |
| 13:47 | 3 | A.   The OA trials. |
| 13:47 | 4 | Q.   So no one knew what the patients in those clinical trials |
| 13:47 | 5 | were taking, how their allocation was; correct? |
| 13:47 | 6 | A.   That's correct. |
| 13:47 | 7 | Q.   So over here I'm going to say "Vioxx Trials."  I'm going |
| 13:47 | 8 | to say "OA Trials" -- or just "OA."  Okay?  Because he only |
| 13:47 | 9 | looked at the OA studies; right? |
| 13:48 | 10 | A.   He looked at all the treatment arms on the OA, so that |
| 13:48 | 11 | included patients on Vioxx, on comparator, and on placebo. |
| 13:48 | 12 | Q.   Okay. |
| 13:48 | 13 | A.   "Vioxx OA Trials" is probably the way to characterize |
| 13:48 | 14 | that. |
| 13:48 | 15 | Q.   Fair enough.  So on the one side we had the blinded Vioxx |
| 13:48 | 16 | OA studies; right? |
| 13:48 | 17 | A.   Yes. |
| 13:48 | 18 | Q.   So the drugs that would have been included were Vioxx. |
| 13:48 | 19 | What else? |
| 13:48 | 20 | A.   Let me get the protocol.  Any comparison drugs to Vioxx |
| 13:48 | 21 | that were in the other arms, say, like diclofenac, and there |
| 13:48 | 22 | was one other, I believe. |
| 13:48 | 23 | Q.   Placebo was in there too; right? |
| 13:48 | 24 | A.   I have no reason to doubt that. |
| 13:49 | 25 | Q.   And, I believe, ibuprofen? |

| | | |
|---|---|---|
| 13:49 | 1 | **A.**   All the treatment arms of 029, 034, 035, and through 045. |
| 13:49 | 2 | **Q.**   No reason to doubt my representation here? |
| 13:49 | 3 | **A.**   No.  I think that's right. |
| 13:49 | 4 | **Q.**   Okay.  So we have on the one side Vioxx, placebo, |
| 13:49 | 5 | diclofenac, and ibuprofen, as a group? |
| 13:49 | 6 | **A.**   Yes, sir. |
| 13:49 | 7 | **Q.**   Then he compared it to the Fosamax and, I think you said, |
| 13:49 | 8 | Proscar trials? |
| 13:49 | 9 | **A.**   Yes, sir. |
| 13:49 | 10 | **Q.**   That was the placebo arm; right? |
| 13:49 | 11 | **A.**   Yes, sir. |
| 13:50 | 12 | **Q.**   So the comparison was not Vioxx to a placebo arm of |
| 13:50 | 13 | another study. |
| 13:50 | 14 | **A.**   Correct.  The Vioxx treatment arms. |
| 13:50 | 15 | **Q.**   Right.  Dr. Watson pooled all these patients together -- |
| 13:50 | 16 | **A.**   Uh-huh. |
| 13:50 | 17 | **Q.**   -- because we are still blinded, and he compared it to the |
| 13:50 | 18 | placebo arm of a completely different clinical trial program; |
| 13:50 | 19 | right? |
| 13:50 | 20 | **A.**   He designed the study this way. |
| 13:50 | 21 | **Q.**   Have I described it accurately? |
| 13:50 | 22 | **A.**   Yes. |
| 13:50 | 23 | **Q.**   Now, these were just preliminary results; correct?  The |
| 13:50 | 24 | studies were still ongoing? |
| 13:50 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 13:50 | 1 | **Q.**   First, I'm going to drop my outline, then I'm going to |
| 13:50 | 2 | write "Preliminary."  Good so far? |
| 13:51 | 3 | **A.**   Yes.  I think that's well done. |
| 13:51 | 4 | **Q.**   Thank you.  Do you have the analysis that you went over |
| 13:51 | 5 | with Mr. Dugan? |
| 13:51 | 6 | **A.**   Sir, I have the relative rates and then -- and when you |
| 13:51 | 7 | say "analysis," there are a number of different analyses that |
| 13:51 | 8 | he did. |
| 13:51 | 9 | **Q.**   I'll be specific.  The February 1998 document that you |
| 13:51 | 10 | referred to with Mr. Dugan. |
| 13:51 | 11 | **A.**   Yes, sir, I have that.  Let me get that.  I do have that. |
| 13:51 | 12 | **Q.**   I would like to turn your attention to Table 6. |
| 13:51 | 13 | **A.**   Is that the results table? |
| 13:51 | 14 | **Q.**   It is. |
| 13:51 | 15 | **A.**   Thank you, sir. |
| 13:51 | 16 | **THE COURT:**  You should have a small screen there. |
| 13:51 | 17 | **THE WITNESS:**  That's actually much better than my |
| 13:52 | 18 | copy.  Thank you. |
| 13:52 | 19 | **BY MR. ISMAIL:** |
| 13:52 | 20 | **Q.**   So Table 6 is a table that stratifies the results by |
| 13:52 | 21 | gender, age, and duration of use; correct? |
| 13:52 | 22 | **A.**   Yes, sir. |
| 13:52 | 23 | **Q.**   What you would do is you would look where it says "Vioxx" |
| 13:52 | 24 | here, but as we know that's not actually what Dr. Watson did, |
| 13:52 | 25 | because that's really Vioxx, placebo, diclofenac, and ibuprofen |

| | | |
|---|---|---|
| 13:52 | 1 | all together. |
| 13:52 | 2 | **A.**   Exactly. |
| 13:52 | 3 | **Q.**   Then he has got Proscar, Fosamax, placebo controls? |
| 13:52 | 4 | **A.**   Yes, sir. |
| 13:52 | 5 | **Q.**   And that's over here, which is the totally different |
| 13:52 | 6 | clinical trial development with two completely different drugs; |
| 13:52 | 7 | right? |
| 13:52 | 8 | **A.**   Yes, sir.  The placebo arm of those trials. |
| 13:52 | 9 | **Q.**   Right.  So if we go through, Dr. Watson provides IRR. |
| 13:52 | 10 | What is that? |
| 13:52 | 11 | **A.**   It's his risk ratio. |
| 13:53 | 12 | **Q.**   Then in this column he provides 95 percent confidence |
| 13:53 | 13 | intervals; right? |
| 13:53 | 14 | **A.**   Yes. |
| 13:53 | 15 | **Q.**   By convention, if the 95 percent confidence interval |
| 13:53 | 16 | straddles 1, that's generally deemed not statistically |
| 13:53 | 17 | significant? |
| 13:53 | 18 | **A.**   Yeah.  I mean, if the first number is less than 1, you can |
| 13:53 | 19 | assume that.  That's correct. |
| 13:53 | 20 | **Q.**   So if we go through the various groups of patients by |
| 13:53 | 21 | gender, by age, and by duration of exposure, all the results in |
| 13:53 | 22 | the male group are not significant; correct? |
| 13:53 | 23 | **A.**   As I said earlier, as I testified, that's correct.  The |
| 13:53 | 24 | relative rate was 1.28.  It was not statistically significant. |
| 13:53 | 25 | **Q.**   The only one of these lines here that show any statistical |

DAILY COPY

| | | |
|---|---|---|
| 13:53 | 1 | significance is for women aged 70 to 79; right? |
| 13:54 | 2 | **A.**   The overall was statistically significant.  You're |
| 13:54 | 3 | starting with the stratifications.  Overall, it was |
| 13:54 | 4 | statistically significant for women.  When you break it down |
| 13:54 | 5 | into the substrata, your answer is correct. |
| 13:54 | 6 | **Q.**   Great. |
| 13:54 | 7 | **A.**   You do see an increased relative risk ratio, I believe, |
| 13:54 | 8 | certainly for all periods.  I think you do see that for all |
| 13:54 | 9 | periods between 50 and 59, and 60 and 69, but the only one |
| 13:54 | 10 | that's statistically significant, again, when you start |
| 13:54 | 11 | stratifying and you break it down. |
| 13:54 | 12 | **Q.**   And that's the one I've highlighted? |
| 13:54 | 13 | **A.**   Yes, sir.  That's statistically significant. |
| 13:54 | 14 | **Q.**   You have talked about this biological mechanism, |
| 13:54 | 15 | Study 023? |
| 13:54 | 16 | **A.**   Whether it's a biological plausibility, yes. |
| 13:55 | 17 | **Q.**   So what is the biological plausibility that only women |
| 13:55 | 18 | aged 70 to 79 showed an increased relative risk and none of the |
| 13:55 | 19 | other data? |
| 13:55 | 20 | **A.**   The issue is just your statistical analysis.  Whenever you |
| 13:55 | 21 | substratify your statistics, you're cutting these groups.  The |
| 13:55 | 22 | way you're cutting the groups into sample size don't allow |
| 13:55 | 23 | certain substrata to be significant, but your overall number is |
| 13:55 | 24 | significant. |
| 13:55 | 25 | **Q.**   All right.  Then let's not substratify. |

13:55  1    **A.**    Okay.

13:55  2    **Q.**    Let's look at Table 7, which is the men versus women

13:55  3    study.  We are still, even though it says Vioxx versus

13:55  4    Fosamax --

13:55  5    **A.**    It's the way Watson did it, correct.

13:55  6    **Q.**    -- we are still doing it where all the Vioxx studies,

13:56  7    whether the patient was on placebo, ibuprofen, or diclofenac --

13:56  8    **A.**    Exactly.  It's somewhat a nonconventional way of doing it.

13:56  9    **Q.**    So this is the table that you say shows overall that

13:56  10   statistically significant risk for women; right?

13:56  11   **A.**    It's what Watson reported.

13:56  12   **Q.**    I believe, as you mentioned, there was no statistically

13:56  13   significant increase for men; right?

13:56  14   **A.**    A slight increase in ratio, not statistically significant,

13:56  15   correct, sir.

13:56  16   **Q.**    Again, we are going back to my question:  Did you identify

13:56  17   on direct examination the biologically plausible mechanism for

13:56  18   why this would be true?

13:56  19   **A.**    Why those numbers would come out to be what those numbers

13:56  20   are or why Vioxx might be causing increased cardiovascular

13:57  21   serious adverse events?

13:57  22   **Q.**    This isn't a comparison of Vioxx to anything, is it, sir?

13:57  23   **A.**    Again, the goal of this study, Watson's analysis, was to

13:57  24   look for a signal.  Merck decided to do this.  He is calling

13:57  25   this Vioxx.  You're correct.  I'm not necessarily saying I

| | | |
|---|---|---|
| 13:57 | 1 | would have done it this way.  Merck did it this way.  He is |
| 13:57 | 2 | comparing the Vioxx treatment arms with placebo arms of Proscar |
| 13:57 | 3 | and Fosamax. |
| 13:57 | 4 | Biological plausibility goes to the question of |
| 13:57 | 5 | whether Vioxx could cause serious cardiovascular events. |
| 13:57 | 6 | That's what biological plausibility is. |
| 13:57 | 7 | Q.   Do you remember my question, sir?  I was asking you to |
| 13:57 | 8 | confirm that Dr. Watson was not comparing Vioxx to anything. |
| 13:57 | 9 | True? |
| 13:57 | 10 | A.   Wasn't comparing Vioxx to anything?  I don't agree.  I |
| 13:58 | 11 | think that's an overstatement of what you tried to do earlier. |
| 13:58 | 12 | He is certainly trying to understand -- he is looking |
| 13:58 | 13 | for a signal here.  The best data he has is this pool group. |
| 13:58 | 14 | Vioxx is in there.  It is true that if you had a high -- let's |
| 13:58 | 15 | say ibuprofen and diclofenac itself was causing serious |
| 13:58 | 16 | cardiovascular events.  They could skew those numbers.  All |
| 13:58 | 17 | right?  But in those groups, Vioxx was in that, so he is |
| 13:58 | 18 | looking for a signal to say whether that group with Vioxx has |
| 13:58 | 19 | an increased cardiovascular event rate. |
| 13:58 | 20 | Q.   Do you see that I pulled out the footers below the table? |
| 13:58 | 21 | A.   Yes, sir. |
| 13:58 | 22 | Q.   I would like to focus your attention on the line that says |
| 13:58 | 23 | the placebo group from the Fosamax program has been previously |
| 13:59 | 24 | identified as having an atypically low MI incidence rate.  Now, |
| 13:59 | 25 | you have no information to know whether that's true or not; |

13:59   1   correct?

13:59   2   A.   I do have information.  I didn't see that identified in

13:59   3   the plan, so it's a post hoc -- a post-plan statement about the

13:59   4   placebo group.  I would have expected -- I'm not saying it's

13:59   5   true, as I think I testified on direct, whether it's true or

13:59   6   not true.

13:59   7   Q.   Thank you.  Now, after Dr. Watson's report, the studies

13:59   8   were completed; correct?

13:59   9   A.   Let's define "the studies" because I --

13:59   10   Q.   Sure.  Let me rephrase the question.

13:59   11          After Dr. Watson did his analysis where he pooled all

13:59   12   these patients, regardless what drug they were on, in these OA

13:59   13   trials, these osteoarthritis trials were completed; correct?

14:00   14   A.   Again, these studies -- yes, that's correct.  Those

14:00   15   studies, part of the OA data set went on to be completed, yes.

14:00   16   Q.   Then the results were unblinded?

14:00   17   A.   Yes.

14:00   18   Q.   Then a comparison could be made to see Vioxx versus

14:00   19   placebo or the active controls within the same study; correct?

14:00   20   A.   Yes, sir.  You could look at those studies individually or

14:00   21   in aggregate.

14:00   22   Q.   Now, you discussed some of these osteoarthritis studies

14:00   23   with Mr. Dugan on direct examination; correct?

14:00   24   A.   Yes, sir.

14:00   25   Q.   I believe you used the report of Dr. Villalba.

14:01  1   **A.**   It's a table of six-week studies, six-month studies, and

14:01  2   greater-than-six-month studies.

14:01  3   **Q.**   Do you recall what the exhibit number is for the

14:01  4   plaintiff?

14:01  5   **A.**   I can --

14:01  6   **Q.**   So this is the report that you looked at with Mr. Dugan;

14:01  7   right?

14:01  8   **A.**   Yeah, that's correct.

14:01  9   **Q.**   I think you testified this is a document you didn't review

14:01  10  the entirety of.

14:01  11  **A.**   That's not correct.  What I testified was, for the

14:01  12  preparation of my report, I mean, I looked at certain sections:

14:02  13  The thrombotic, thromboembolic, as well as the summary.  I went

14:02  14  back after my deposition, after my report was complete, and

14:02  15  looked at the entire report.

14:02  16  **Q.**   Well, when you and I chatted at your deposition, you

14:02  17  hadn't read the whole --

14:02  18  **A.**   No.  I looked at the relevant cardiovascular sections.  I

14:02  19  didn't look at all the sections.

14:02  20  **Q.**   So this is the table you went over with Mr. Dugan; right?

14:02  21  **A.**   Yes, sir.

14:02  22  **Q.**   You have here the placebo results, the results on Vioxx at

14:02  23  various doses, and then results as well on active comparators

14:02  24  like ibuprofen, nabumetone, and diclofenac?

14:02  25  **A.**   That's correct.

14:02    1    **Q.**    So the studies, once they became unblinded, they were

14:03    2    submitted in the NDA; right?

14:03    3    **A.**    Yes.

14:03    4    **Q.**    Now you can actually look to see Vioxx alone, comparing

14:03    5    Vioxx to both placebo and then Vioxx to other NSAIDs; correct?

14:03    6    **A.**    That's correct, sir.

14:04    7    **Q.**    By the way, while we are here, I'm just going to write:

14:04    8    "No SS risk for men."

14:04    9    **A.**    I would write a relative risk of 1.28 in confidence

14:04   10    intervals.  I think there's a relative risk.  It's slightly

14:04   11    increased, but it's not statistically significant.  It's not

14:04   12    as -- you know, a very great increase in relative risk.  1.28,

14:04   13    I think it is.

14:04   14    **Q.**    As you said:  "SS risk for women."  Right?

14:04   15    **A.**    About 2.1, I think it is.

14:04   16    **Q.**    Now we are back to the actual unblinded data.  Do you see

14:05   17    that, when you looked at all the unblinded data, Vioxx did not

14:05   18    have a statistically significant increased risk in the

14:05   19    preapproval osteoarthritis studies compared to placebo?

14:05   20    **A.**    Yes, because there were too small numbers.

14:05   21    **Q.**    The answer to my question is the risk was not -- there was

14:05   22    no statistically significant increased risk; right?

14:05   23    **A.**    Yes.  Because these were studies, I think, that were too

14:05   24    small.

14:05   25    **Q.**    Then when you compared Vioxx --

| | | |
|---|---|---|
| 14:05 | 1 | **A.**   If you could go back to that table, I think it would be |
| 14:05 | 2 | accurate -- again, I certainly would leave this to |
| 14:05 | 3 | statisticians to do, but if you go back to the prior table, you |
| 14:06 | 4 | saw -- you would have to calculate -- you'd have to get the |
| 14:06 | 5 | patient years.  You saw that there was an increase -- there was |
| 14:06 | 6 | a trend toward increased events in the higher doses. |
| 14:06 | 7 | **Q.**   Do you see that the medical reviewer also makes the |
| 14:06 | 8 | comment here the incidence of thromboembolic events with Vioxx |
| 14:06 | 9 | appears similar to comparator NSAIDs? |
| 14:06 | 10 | **A.**   Yes. |
| 14:06 | 11 | **Q.**   You know there was no statistically significant increased |
| 14:06 | 12 | risk when you compared Vioxx alone, once the studies were |
| 14:06 | 13 | complete, to comparator NSAIDs; right? |
| 14:06 | 14 | **A.**   Right.  I don't disagree with that. |
| 14:06 | 15 | **Q.**   At the time that these studies were done, was it expected |
| 14:06 | 16 | and believed that nonselective NSAIDs that were used in the |
| 14:06 | 17 | osteoarthritis trials had no increased cardiovascular risk? |
| 14:07 | 18 | **A.**   I would not want to give an opinion on that. |
| 14:07 | 19 | **Q.**   Now, the board of scientific advisors that you discussed |
| 14:07 | 20 | with -- I think you called it the scientific advisory board? |
| 14:07 | 21 | **A.**   SAB. |
| 14:07 | 22 | **Q.**   You went over that memo with Mr. Dugan? |
| 14:07 | 23 | **A.**   I think that there were both a briefing memo and then |
| 14:07 | 24 | there were this programmatic -- what was it called -- |
| 14:07 | 25 | programmatic review. |

DAILY COPY

| | | |
|---|---|---|
| 14:07 | 1 | **Q.**   That's the one I'm talking about. |
| 14:08 | 2 | **A.**   I don't know if it was a memo.  I don't know what the |
| 14:08 | 3 | format was. |
| 14:08 | 4 | **Q.**   Okay.  So this is the one where the board of scientific |
| 14:08 | 5 | advisors was commenting on the Vioxx program; right? |
| 14:08 | 6 | **A.**   Yes. |
| 14:08 | 7 | **Q.**   Do you recall what the board of scientific advisors |
| 14:08 | 8 | recommended that Merck do? |
| 14:08 | 9 | **A.**   Yes. |
| 14:08 | 10 | **Q.**   I'm going to put up on the screen here a portion of the |
| 14:08 | 11 | memorandum from the board of scientific advisors.  Do you |
| 14:08 | 12 | recall seeing this -- |
| 14:08 | 13 | **A.**   Yes, sir. |
| 14:08 | 14 | **Q.**   -- section before? |
| 14:08 | 15 | **A.**   Yes, sir. |
| 14:08 | 16 | **Q.**   The board advised that: |
| 14:08 | 17 | Since it's unlikely that any of the individual trials |
| 14:08 | 18 | of Vioxx will have sufficient power to determine whether |
| 14:08 | 19 | coronary events are increased or decreased, it is, therefore, |
| 14:08 | 20 | proposed that coronary events be predetermined endpoints for |
| 14:08 | 21 | all future controlled trials of Vioxx and the backup COX-2 |
| 14:08 | 22 | inhibitors.  It is proposed that these endpoints be assessed by |
| 14:09 | 23 | a uniform set of criteria so that meta-analysis of coronary and |
| 14:09 | 24 | cerebrovascular events for all these trials could be performed. |
| 14:09 | 25 | Do you see that? |

14:09  1  **A.**   Yes, I do.

14:09  2  **Q.**   Now, that was one of the recommendations of the board of

14:09  3  scientific advisors; correct?

14:09  4  **A.**   Absolutely.

14:09  5  **Q.**   Do you recall that one of the reasons why the board made

14:09  6  that recommendation was that there was, in their view, a

14:09  7  biologically plausible mechanism that Vioxx could reduce

14:09  8  cardiovascular risk?

14:09  9  **A.**   In discussing the biological mechanism, they considered

14:09  10  both, that's correct, sir.  They considered the biological

14:09  11  mechanism could increase cardiovascular risks, I think as I

14:09  12  mentioned.  A number of different hypotheses that they

14:09  13  advanced, yes.

14:09  14  **Q.**   In brief --

14:09  15  **A.**   They did not know.

14:09  16  **Q.**   In brief, the biologically plausible mechanism that would

14:10  17  suggest that Vioxx would lower cardiovascular risk was that

14:10  18  heart disease is an inflammatory condition and that an

14:10  19  anti-inflammatory may have cardiovascular value?

14:10  20  **A.**   That was considered.  Again, if you are looking for a

14:10  21  safety signal, you tend to look for -- what's paramount in your

14:10  22  mind is could it cause harm, but there's certainly that -- you

14:10  23  know, plausible hypotheses that were legitimately advanced.

14:10  24  **Q.**   In conclusion -- I think you went over this quickly on

14:10  25  direct, but just to make sure -- the board of scientific

| | | |
|---|---|---|
| 14:10 | 1 | advisors' recommendation is given in context.  Do they say, |
| 14:10 | 2 | "There is a strong mandate for introduction of Vioxx into |
| 14:11 | 3 | medical practice as soon as is feasible"? |
| 14:11 | 4 | **A.**   In context with the previous sentences that say that |
| 14:11 | 5 | acquisition and analysis of the data, the replacement drug -- I |
| 14:11 | 6 | mean, resolving these questions. |
| 14:11 | 7 | **Q.**   Sir, did I read that correctly? |
| 14:11 | 8 | **A.**   Yes, you read that, but -- |
| 14:11 | 9 | **Q.**   Thank you. |
| 14:11 | 10 | **A.**   -- if you put it in context of resolving the questions |
| 14:11 | 11 | about the effects of the drug. |
| 14:11 | 12 | **Q.**   Now, you talked about Study 017. |
| 14:11 | 13 | **A.**   Yes, sir. |
| 14:11 | 14 | **Q.**   Do you have the plaintiff exhibit number there for that? |
| 14:11 | 15 | This is where I got lost as to which plaintiff exhibit number |
| 14:11 | 16 | it was. |
| 14:11 | 17 | **A.**   If you give me one second, I'm sure I can -- I don't have |
| 14:12 | 18 | the plaintiff's number.  I have both the table that Merck |
| 14:12 | 19 | submitted as well as this research management committee review |
| 14:12 | 20 | of 017.  I can give you the Bates number of the table, if you |
| 14:12 | 21 | would like. |
| 14:12 | 22 | **Q.**   It's going to be Plaintiff's 580, I believe.  This is the |
| 14:12 | 23 | table you went over; correct? |
| 14:12 | 24 | **A.**   Yes, sir.  I believe this is submitted by Merck.  There's |
| 14:12 | 25 | also a table on 017 in Villalba's full report. |

| | | |
|---|---|---|
| 14:12 | 1 | **Q.**   Do you recall where this table came from? |
| 14:12 | 2 | **A.**   I assume this was part of the integrated summary.  It's |
| 14:12 | 3 | from the clinical safety database. |
| 14:12 | 4 | **Q.**   The integrated summary of safety that was part of the new |
| 14:12 | 5 | drug application Merck submitted to FDA? |
| 14:12 | 6 | **A.**   I would assume that's correct. |
| 14:13 | 7 | **Q.**   I mean, you didn't review the entirety of the integrated |
| 14:13 | 8 | summary of safety, did you? |
| 14:13 | 9 | **A.**   No, I did not. |
| 14:13 | 10 | **Q.**   So this is the Study 017, and I think -- |
| 14:13 | 11 | **A.**   It's actually 017, 017(c), and 011. |
| 14:13 | 12 | **Q.**   All right.  Thank you.  But this is the table you went |
| 14:13 | 13 | over with Mr. Dugan; right? |
| 14:13 | 14 | **A.**   Yes. |
| 14:13 | 15 | **Q.**   The dosage again, just to remind us, this was the |
| 14:13 | 16 | 125-milligram study? |
| 14:13 | 17 | **A.**   That's what Merck is reporting here, yes. |
| 14:13 | 18 | **Q.**   Do you recall that the lowest approved dose was |
| 14:13 | 19 | 12.5 milligrams? |
| 14:13 | 20 | **A.**   Yes. |
| 14:13 | 21 | **Q.**   So this would be 10 times the lowest approved dose? |
| 14:13 | 22 | **A.**   That's correct. |
| 14:13 | 23 | **Q.**   And five times the chronic dose of 25 milligrams? |
| 14:13 | 24 | **A.**   Right.  And two and a half -- |
| 14:13 | 25 | **Q.**   Two-and-a-half times the dose that was recommended for |

| | | |
|---|---|---|
| 14:13 | 1 | five days? |
| 14:13 | 2 | A.   Exactly correct, sir. |
| 14:13 | 3 | Q.   This study, I think you highlighted three events:  This |
| 14:14 | 4 | acute myocardial infarction here -- |
| 14:14 | 5 | A.   Yes. |
| 14:14 | 6 | Q.   -- and then this angina and embolism? |
| 14:14 | 7 | A.   Yes, sir. |
| 14:14 | 8 | Q.   I think you said, "Well, gee, this study shows three |
| 14:14 | 9 | events on Vioxx and zero on placebo"? |
| 14:14 | 10 | A.   There are three listed -- these three adverse events are |
| 14:14 | 11 | on Vioxx, and I don't see any of those type of events on |
| 14:14 | 12 | placebo, that's correct. |
| 14:14 | 13 | Q.   How long was the duration of this study? |
| 14:14 | 14 | A.   If you give me one second, I can get it if you know |
| 14:14 | 15 | what -- |
| 14:14 | 16 | Q.   Six weeks. |
| 14:14 | 17 | A.   No.  I'm just going to have -- I'd like to just pull up |
| 14:14 | 18 | Villalba's equivalent analysis, if I may, because there's two |
| 14:14 | 19 | tables of 017. |
| 14:14 | 20 | Q.   I just want to go over the table, sir, that you went over |
| 14:14 | 21 | with Mr. Dugan.  Okay? |
| 14:15 | 22 | A.   That's fine, sir. |
| 14:15 | 23 | Q.   All right.  This table is where you identified the three |
| 14:15 | 24 | events, and please confirm that this study was a six-week |
| 14:15 | 25 | study. |

14:15   1   **A.**   I have no reason to -- I believe that's correct.

14:15   2   **Q.**   So any events after six weeks is not in the controlled

14:15   3   portion of the study; correct?

14:15   4   **A.**   I don't have the study design in front of me.  I would

14:15   5   want to do that.  It's not --

14:15   6   **Q.**   So the study design you would want to review.  That would

14:15   7   be part of the clinical --

14:15   8   **A.**   I don't know what the specific study design said, what

14:15   9   period of times were included.

14:15   10   **Q.**   You didn't review the clinical study report; correct?

14:15   11   **A.**   I reviewed this and I reviewed the analysis by Villalba.

14:15   12        **MR. ISMAIL:**  I forgot how to get those arrows off the

14:15   13   screen.

14:15   14        **THE DEPUTY CLERK:**  There's a "Clear" button.  Just

14:15   15   touch the screen inside of the --

14:15   16        **THE COURT:**  I've got it.

14:15   17        **MR. ISMAIL:**  Thank you, Judge.

14:16   18   BY MR. ISMAIL:

14:16   19   **Q.**   Okay.  017 is a six-week study, and after six weeks we're

14:16   20   beyond the controlled portion of the study; correct?

14:16   21   **A.**   You use the word *controlled*.  It's probably off drug, yes,

14:16   22   certainly, I would agree with.

14:16   23   **Q.**   Well, whether it's off drug or not, there's no longer

14:16   24   patients continuing on the placebo arm; right?  That much we

14:16   25   know.

DAILY COPY

| | | |
|---|---|---|
| 14:16 | 1 | **A.**   That's probably correct, sir, yes. |
| 14:16 | 2 | **Q.**   And not surprisingly because this is an RA study, and you |
| 14:16 | 3 | wouldn't do placebo patients for a long period of time? |
| 14:16 | 4 | **A.**   I don't disagree with that. |
| 14:16 | 5 | **Q.**   All right.  So just to make sure we have the days right, |
| 14:16 | 6 | your unstable angina event was 108 days; correct? |
| 14:16 | 7 | **A.**   Yes, sir. |
| 14:16 | 8 | **Q.**   Your pulmonary embolism was 47 days; correct? |
| 14:16 | 9 | **A.**   That's correct.  And the acute myocardial infarction was |
| 14:16 | 10 | eight days. |
| 14:16 | 11 | **Q.**   So there was one event during the six-week portion of this |
| 14:16 | 12 | study; correct? |
| 14:17 | 13 | **A.**   That's correct, from that table.  There are a number of |
| 14:17 | 14 | different -- the reason I think it's important is that you also |
| 14:17 | 15 | have the table of adverse events from 017 by FDA, and that data |
| 14:17 | 16 | also has events but somewhat different. |
| 14:17 | 17 | **Q.**   My only question, sir, is:  Is it, in fact, correct that |
| 14:17 | 18 | there was only one event at 125 milligrams within the six-week |
| 14:17 | 19 | portion of Study 017? |
| 14:17 | 20 | **A.**   That's correct.  But if you are implying that the drug |
| 14:17 | 21 | can't have effect after that period of time, that's not true. |
| 14:17 | 22 | **Q.**   Now, the -- |
| 14:17 | 23 | **A.**   That's why FDA requires -- |
| 14:17 | 24 | **Q.**   Sir, there's not a question pending. |
| 14:17 | 25 | The 2002 pooled analysis, which I believe is |

DAILY COPY

| | | |
|---|---|---|
| 14:17 | 1 | Plaintiff's Exhibit 581 -- I caught on by this point.  Tab 21 |
| 14:18 | 2 | of the binder. |
| 14:18 | 3 | A.   Yes, sir. |
| 14:18 | 4 | Q.   Do you recall where this presentation of data came from? |
| 14:18 | 5 | A.   I do not know.  I assume this was done by Merck. |
| 14:18 | 6 | Q.   You assume it was done by Merck.  Do you know where it |
| 14:18 | 7 | went? |
| 14:18 | 8 | A.   I assume this went to FDA, but I don't know that as a |
| 14:18 | 9 | fact. |
| 14:18 | 10 | Q.   So the version of the exhibit that you went over with |
| 14:18 | 11 | plaintiff lawyers just began as the data tables and did not |
| 14:18 | 12 | include the origin or where the document went; right? |
| 14:18 | 13 | A.   I remember asking counsel a little bit more about this |
| 14:18 | 14 | document, and I don't have an answer.  I don't know that |
| 14:19 | 15 | sitting here today. |
| 14:19 | 16 | Q.   This might be a good time to understand how your document |
| 14:19 | 17 | review took place. |
| 14:19 | 18 | A.   Yes, sir. |
| 14:19 | 19 | Q.   You went to one of the plaintiff lawyers' offices? |
| 14:19 | 20 | A.   Yes, sir. |
| 14:19 | 21 | Q.   You sat in a room? |
| 14:19 | 22 | A.   Yes. |
| 14:19 | 23 | Q.   When you had a question about, "Gee, I'm curious about |
| 14:19 | 24 | this," the plaintiff lawyers would decide what documents you |
| 14:19 | 25 | would look at; right? |

14:19  1  **A.**   Yes.  With certain caveats.

14:19  2  **Q.**   Right.  You wanted them to be fair and balanced, for

14:19  3  example?

14:19  4  **A.**   I said that repeatedly, yes, sir.

14:19  5  **Q.**   Okay.  Because that would be important, right, before you

14:19  6  gave an opinion in court, that you would want to see a fair and

14:19  7  balanced set of materials?

14:19  8  **A.**   I would want to see as much evidence as I could both have

14:19  9  time to look at and try to present the important data, yes.

14:19  10  **Q.**   So this document that you went over with the plaintiff

14:19  11  lawyers this morning, you don't know where it came from and you

14:19  12  don't know where it went; correct?

14:19  13  **A.**   I know it's a pooled analysis of the OA studies through a

14:20  14  certain time.  I've seen similar tables.  Table 13 was

14:20  15  submitted to the FDA.  Later on, there was an updated safety

14:20  16  analysis that was also done that I believe went to the FDA.  I

14:20  17  know that Table 13 went.  I just wasn't able to confirm that

14:20  18  Table 10 went.

14:20  19          **MR. ISMAIL:**  Your Honor, because this is a bench

14:20  20  trial, I've been trying to be patient with the witness and --

14:20  21          **THE COURT:**  Just try to answer the question, if you

14:20  22  can.

14:20  23          **THE WITNESS:**  Yes, sir.

14:20  24          **MR. ISMAIL:**  May I approach?

14:20  25          **THE COURT:**  Yes.

| | | |
|---|---|---|
| 14:20 | 1 | **BY MR. ISMAIL:** |
| 14:20 | 2 | **Q.**   I'm going to hand you what's been marked as Defense |
| 14:20 | 3 | Exhibit 285.  This has been previously marked on our exhibit |
| 14:20 | 4 | list.  This is the same document, but I'm including the |
| 14:20 | 5 | correspondence that notes where the document went to. |
| 14:20 | 6 |         Can you confirm, sir, that Exhibit 285 shows a |
| 14:20 | 7 | correspondence cover letter dated May 22, 2002, from Merck to |
| 14:20 | 8 | the FDA? |
| 14:20 | 9 | **A.**   Yes. |
| 14:20 | 10 | **Q.**   I want to go over this document, if I may.  Not the |
| 14:21 | 11 | correspondence.  The one you went over with Mr. Dugan.  Do you |
| 14:21 | 12 | have tab 21 in front of you still? |
| 14:21 | 13 | **A.**   Yes. |
| 14:21 | 14 | **Q.**   I guess, for the Court's benefit, the front page shows |
| 14:21 | 15 | what new drug application number this submission is filed |
| 14:21 | 16 | under.  Here's the correspondence you and I just referred to a |
| 14:21 | 17 | moment ago; correct? |
| 14:21 | 18 | **A.**   Probably an SNDA, right, or was it an NDA? |
| 14:21 | 19 | **Q.**   Do you know one way or the other? |
| 14:21 | 20 | **A.**   It was an amendment to an SNDA. |
| 14:21 | 21 | **Q.**   You actually didn't review the SNDA submissions, did you? |
| 14:21 | 22 | **A.**   No, I did not.  There may have been tables from them that |
| 14:21 | 23 | I reviewed. |
| 14:21 | 24 | **Q.**   So this is where the plaintiff lawyers picked up the |
| 14:21 | 25 | examination, with just the table of contents and the tables; |

| 14:21 | 1 | correct? |
| 14:21 | 2 | A.   Yes.  That matches exactly. |
| 14:22 | 3 | Q.   581, okay.  Now, there's actually a great deal of |
| 14:22 | 4 | cardiovascular information that was contained in this |
| 14:22 | 5 | submission; correct? |
| 14:22 | 6 | A.   With regard to -- yes, there is cardiovascular. |
| 14:22 | 7 | Q.   Let me ask a different question first.  Did you read the |
| 14:22 | 8 | entirety of the cardiovascular pooled analysis that you went |
| 14:22 | 9 | over with the plaintiff lawyers? |
| 14:22 | 10 | A.   I remember focusing primarily -- I was trying to get a -- |
| 14:22 | 11 | to understand all the OA, RA, all the trials, and I was looking |
| 14:22 | 12 | for the relative risk of all the trials.  So there were certain |
| 14:22 | 13 | things that I was focusing on.  I don't want to represent that |
| 14:22 | 14 | I have read all of the data. |
| 14:22 | 15 | Q.   But if you had read all of the data, you certainly would |
| 14:22 | 16 | have learned that, in this pooled analysis, there was a great |
| 14:22 | 17 | deal of cardiovascular information that Merck is providing; |
| 14:22 | 18 | correct? |
| 14:23 | 19 | A.   A great deal? |
| 14:23 | 20 | Q.   More than one table.  How's that? |
| 14:23 | 21 | A.   Sure. |
| 14:23 | 22 | Q.   So one of the tables you didn't go over with the plaintiff |
| 14:23 | 23 | lawyers I have on the screen.  That's Table 3? |
| 14:23 | 24 | A.   Yes. |
| 14:23 | 25 | Q.   Maybe that's better.  So this is a comparison of Vioxx |

DAILY COPY

| 14:23 | 1 | against placebo; right? |
| 14:23 | 2 | **A.**   Right.  For an APTC endpoint. |
| 14:23 | 3 | **Q.**   An APTC endpoint. |
| 14:23 | 4 | **A.**   Versus the thrombotic endpoint. |
| 14:23 | 5 | **Q.**   We'll get into that in a minute.  So APTC endpoint is the |
| 14:23 | 6 | data comparison here; correct? |
| 14:23 | 7 | **A.**   Yes. |
| 14:23 | 8 | **Q.**   APTC is a composite endpoint of different adverse events |
| 14:23 | 9 | that you analyzed together; right? |
| 14:23 | 10 | **A.**   Yes.  Antiplatelet. |
| 14:23 | 11 | **Q.**   What this table does, similar to the other one you went |
| 14:23 | 12 | over, was it looks at the various studies by indication, or at |
| 14:24 | 13 | least by -- |
| 14:24 | 14 | **A.**   Study block. |
| 14:24 | 15 | **Q.**   -- study block.  So we have RA, rheumatoid arthritis -- |
| 14:24 | 16 | **A.**   Yes. |
| 14:24 | 17 | **Q.**   -- osteoarthritis, Alzheimer's, and other; correct? |
| 14:24 | 18 | **A.**   Yes. |
| 14:24 | 19 | **Q.**   This is, again, placebo-controlled data? |
| 14:24 | 20 | **A.**   Yes, sir.  Exactly. |
| 14:24 | 21 | **Q.**   When you look at the total, do I have it correctly that it |
| 14:24 | 22 | shows the relative risk of .94? |
| 14:24 | 23 | **A.**   Yes.  It shows that there are 46 APTC events in patients |
| 14:24 | 24 | on Vioxx and 45 on placebo, and that comes to that relative |
| 14:24 | 25 | risk, yes. |

150

14:24  1   **Q.**   So this is one look at the data that's contained in this

14:24  2   document; right?

14:24  3   **A.**   Yes, sir.  Relative risk of 1.53 in the OA.

14:25  4   **Q.**   You wanted to talk about that, so I suppose we can do that

14:25  5   now.  You are talking about this number right here; right?

14:25  6   **A.**   Yes, sir.

14:25  7   **Q.**   That's just in osteoarthritis patients?

14:25  8   **A.**   Yes, sir.

14:25  9   **Q.**   I think you and Mr. Dugan went over this on your

14:25  10  examination.  The only study block that you went with

14:25  11  specificity on is this osteoarthritis study block; correct?

14:25  12  **A.**   The vast majority of patients on Vioxx are on OA and so

14:25  13  there's meaning for that.

14:25  14  **Q.**   So the answer to my question is:  Yes?

14:25  15  **A.**   The answer is:  Yes.  I focused on the OA databases

14:25  16  because that's what patients were on.

14:25  17  **Q.**   So you identified that there was this -- and according to

14:25  18  the APTC endpoint, these differences are not statistically

14:26  19  significant; true?

14:26  20  **A.**   That's correct.

14:26  21  **Q.**   Well, let me ask this:  Do you think that there was a

14:26  22  specific reason to -- that there was an increased

14:26  23  cardiovascular risk for OA as a disease as opposed to folks who

14:26  24  had rheumatoid arthritis or other conditions?  Is that part of

14:26  25  your charge as an expert in this case?

DAILY COPY

14:26   1   **A.**   I don't know if that was part of my charge.  I did read

14:26   2   certain documents that patients with OA and RA are certainly

14:26   3   more similar in biological mechanisms than patients in

14:26   4   Alzheimer's, but I certainly would --

14:27   5   **Q.**   Well --

14:27   6   **A.**   I mean, as a physician, I can tell you that, and I'm sure

14:27   7   that makes sense.  That's common sense.

14:27   8   **Q.**   Sir, did you actually look to see, within the Vioxx

14:27   9   clinical development program, an attempt to pool all the

14:27   10   osteoarthritis patients to see what their relative risk was

14:27   11   against placebo?

14:27   12   **A.**   Yes, I did.

14:27   13   **Q.**   Did that include looking at osteoarthritis patients who

14:27   14   were in other study blocks, such as Alzheimer's or other?

14:27   15   **A.**   No.  I didn't go through the Alzheimer's study block for

14:27   16   the OA patients listed in the Alzheimer's.

14:27   17   **Q.**   The document we have been looking at actually shows

14:27   18   comparisons to other non-naproxen NSAIDs; correct?

14:28   19   **A.**   This has Vioxx versus other non-naproxen NSAIDs, yes.

14:28   20   **Q.**   This is Table 6?

14:28   21   **A.**   Yes, sir.

14:28   22   **Q.**   This is a study of, actually, Vioxx against non-naproxen

14:28   23   NSAIDs.

14:28   24   **A.**   Yes.  For the APTC endpoint.

14:28   25   **Q.**   This is the OA study block that you were talking about a

DAILY COPY

| | | |
|---|---|---|
| 14:28 | 1 | moment ago? |
| 14:28 | 2 | **A.**   Yes.  Well, I mean, again -- |
| 14:28 | 3 | **Q.**   All I asked, sir, is whether we are looking at the |
| 14:28 | 4 | osteoarthritis study part. |
| 14:28 | 5 | **A.**   Sir, again, the answer is, if you'll notice on this, |
| 14:28 | 6 | Protocol 920 is included, so the OA -- what's the OA study |
| 14:28 | 7 | block at any point in time changes on what protocols are |
| 14:28 | 8 | included.  That was my only caveat. |
| 14:28 | 9 | **Q.**   All right.  So looking at the osteoarthritis study block, |
| 14:28 | 10 | which you thought was important to look at, and when you look |
| 14:29 | 11 | at Vioxx compared to non-naproxen NSAIDs, was the relative risk |
| 14:29 | 12 | reflected here .87? |
| 14:29 | 13 | **A.**   Yes. |
| 14:29 | 14 | **Q.**   By the way, you weren't asked to form an opinion as to the |
| 14:29 | 15 | comparative cardiovascular risk of Vioxx to other NSAIDs; true? |
| 14:29 | 16 | **A.**   That's correct. |
| 14:29 | 17 | **Q.**   Nor were you asked to develop an opinion comparing the |
| 14:29 | 18 | cardiovascular risk of Vioxx to any other COX-2 inhibitor? |
| 14:29 | 19 | **A.**   That's correct. |
| 14:29 | 20 | **Q.**   Nor were you asked to give an opinion as to whether the |
| 14:29 | 21 | cardiovascular risk varies by dose? |
| 14:29 | 22 | **A.**   That's correct.  I declined to do that. |
| 14:29 | 23 | **Q.**   Or duration of exposure? |
| 14:29 | 24 | **A.**   That's correct.  I did not do that. |
| 14:29 | 25 | **Q.**   Or by patient population; correct? |

| 14:30 | 1 | A.   I believe that's correct. |
| 14:30 | 2 | Q.   Just so we are clear, in April of 2002, looking at all the |
| 14:30 | 3 | placebo-controlled data pooled together, there was no |
| 14:30 | 4 | statistically significant increased cardiovascular risk with |
| 14:30 | 5 | Vioxx; correct? |
| 14:30 | 6 | A.   I'm not sure that's a correct answer. |
| 14:30 | 7 | Q.   The table we just looked at, the APTC endpoint, shows that |
| 14:30 | 8 | to be true; correct? |
| 14:30 | 9 | A.   Yes. |
| 14:30 | 10 | Q.   Did you look to see the totality of the placebo-controlled |
| 14:30 | 11 | data using the all-thrombotic endpoint? |
| 14:30 | 12 | A.   Yeah.  But that's what I'm referencing to, and I would |
| 14:31 | 13 | have to check dates.  What I did -- |
| 14:31 | 14 | Q.   If you don't know, sir, just say you don't know. |
| 14:31 | 15 | A.   No.  Let me tell you what I did.  Okay?  I looked at all |
| 14:31 | 16 | the OA studies done by Merck, both in this OA block and the |
| 14:31 | 17 | three other studies that are not included in this block: |
| 14:31 | 18 | APPROVe, VICTOR, and ViP.  I don't know the date on which Merck |
| 14:31 | 19 | completed that, but that relative risk is statistically |
| 14:31 | 20 | significant. |
| 14:31 | 21 | Q.   Now, you're making reference to APPROVe, VICTOR, and ViP. |
| 14:31 | 22 | A.   Right. |
| 14:31 | 23 | Q.   My question was about April 2002. |
| 14:31 | 24 | A.   The reason -- this is very important.  I don't know the |
| 14:31 | 25 | dates in my head of when Merck had the data on those studies. |

14:32    1    I think that may have been possibly the next year, but they
14:32    2    were published later.  So I just don't know the dates in my
14:32    3    head.
14:32    4    Q.    The table I have on the screen is the table you went over
14:32    5    with Mr. Dugan; correct?
14:32    6    A.    Thrombotic endpoints, yes.
14:32    7    Q.    This is thrombotic endpoints versus placebo; correct?
14:32    8    A.    Yes, sir.
14:32    9    Q.    These are for all the placebo-controlled trials in the IIb
14:32   10    and Phase III program and Phase IV that had been completed by
14:32   11    this point in time; true?
14:32   12    A.    It depends on how you characterize Protocol 010.
14:32   13    Q.    You made reference to that protocol this morning.  There
14:32   14    was a single event in that protocol; correct?
14:32   15    A.    I believe that there may have been one or two.  I would
14:32   16    have to go back and look at that --
14:32   17    Q.    One on 25 milligrams and one on 125 milligrams or
14:32   18    175 milligrams?
14:33   19    A.    But as you understand --
14:33   20    Q.    Am I correct?
14:33   21    A.    Yes.  And those were --
14:33   22    Q.    Thank you.
14:33   23    A.    Yes.  So there were two.
14:33   24    Q.    If you add in the one event -- well, first let's, I guess,
14:33   25    reveal the total analysis.  So this is the endpoint you wanted

| | | |
|---|---|---|
| 14:33 | 1 | to look at with Mr. Dugan; right?  All thrombotic? |
| 14:33 | 2 | **A.**    I looked at the OA all thrombotic. |
| 14:33 | 3 | **Q.**    Yeah, I know you looked specifically at OA, but I'm asking |
| 14:33 | 4 | you to confirm what the totality of the data showed.  Okay? |
| 14:33 | 5 | **A.**    When you add everything together, is that what you're |
| 14:33 | 6 | asking me? |
| 14:33 | 7 | **Q.**    So this table is a comparison of Vioxx to placebo using |
| 14:33 | 8 | the all-thrombotic endpoint you went over with Mr. Dugan; true? |
| 14:33 | 9 | **A.**    Yes, sir. |
| 14:33 | 10 | **Q.**    The relative risk that is reflected, when you consider the |
| 14:33 | 11 | totality of the placebo-controlled data, is 1.04; correct? |
| 14:33 | 12 | **A.**    Yes, sir. |
| 14:34 | 13 | **Q.**    You discussed the publication by Dr. Reicin and others? |
| 14:34 | 14 | **A.**    Yes, sir. |
| 14:34 | 15 | **Q.**    Now, I believe one of your comments was the publication |
| 14:34 | 16 | did not include OA studies that occurred after the approval; |
| 14:34 | 17 | correct? |
| 14:34 | 18 | **A.**    I believe the question was were there OA studies that were |
| 14:34 | 19 | done before the publication of this paper that were not |
| 14:34 | 20 | included. |
| 14:34 | 21 | **Q.**    I pulled up on the first page under the "Methods" section, |
| 14:34 | 22 | the following paragraph.  Do you see where I am? |
| 14:34 | 23 | **A.**    Yes, sir. |
| 14:35 | 24 | **Q.**    Does the article make clear that what is being analyzed in |
| 14:35 | 25 | the article are eight double-blind, placebo, and active |

DAILY COPY

| | | |
|---|---|---|
| 14:35 | 1 | comparator studies that were done between 1995 and 1998 and |
| 14:35 | 2 | that served the basis for the regulatory approvals?  Is that |
| 14:35 | 3 | disclosed in the article? |
| 14:35 | 4 | **A.**   Yes, but it doesn't disclose that other studies were also |
| 14:35 | 5 | done by that time. |
| 14:35 | 6 | **Q.**   We'll get to that in a minute, sir.  The scope of the |
| 14:35 | 7 | study, the meta-analysis done by Reicin, was disclosed in the |
| 14:35 | 8 | paper; true? |
| 14:35 | 9 | **A.**   The thrombotic endpoint -- |
| 14:35 | 10 | **Q.**   No.  The studies that were considered and when they were |
| 14:35 | 11 | conducted and where they came from is disclosed in the paper? |
| 14:35 | 12 | **A.**   Yes, that's correct. |
| 14:35 | 13 | **Q.**   Table 2 shows a comparison of Vioxx to nonselective |
| 14:35 | 14 | NSAIDs? |
| 14:35 | 15 | **A.**   Yes, sir. |
| 14:36 | 16 | **Q.**   You have no reason to doubt the accuracy of any of this |
| 14:36 | 17 | data? |
| 14:36 | 18 | **A.**   For the cohort that is reported by Reicin, I do not object |
| 14:36 | 19 | to any of the data. |
| 14:36 | 20 | **Q.**   So these are investigator-reported cardiovascular |
| 14:36 | 21 | thrombotic events? |
| 14:36 | 22 | **A.**   As opposed to adjudicated, yes, sir. |
| 14:36 | 23 | **Q.**   Because these studies were done before the adjudication |
| 14:36 | 24 | protocol; right? |
| 14:36 | 25 | **A.**   That's correct. |

DAILY COPY

157

| 14:36 | 1 | **Q.**   So the total number of events was 32 on Vioxx with |
| 14:36 | 2 | slightly more than twice the patient cohort than the 16 on |
| 14:36 | 3 | nonselective NSAIDs; correct? |
| 14:36 | 4 | **A.**   That's what this study says for this cohort. |
| 14:36 | 5 | **Q.**   The myocardial infarction data is virtually identical; |
| 14:36 | 6 | right? |
| 14:36 | 7 | **A.**   For this cohort of OA studies. |
| 14:37 | 8 | **Q.**   The cohort that is described and analyzed in this paper |
| 14:37 | 9 | also includes a comparison of Vioxx to placebo data; correct? |
| 14:37 | 10 | **A.**   Yes, sir. |
| 14:37 | 11 | **Q.**   Actually, to get back to our friend Dr. Watson, these are |
| 14:37 | 12 | the eight OA studies that were analyzed by Dr. Watson; correct? |
| 14:37 | 13 | **A.**   Again, I don't challenge that these were the exact data -- |
| 14:37 | 14 | I haven't matched these up at this moment, but I assume that |
| 14:37 | 15 | that makes sense. |
| 14:37 | 16 | **Q.**   So the Table 2 we just looked at was the |
| 14:37 | 17 | Vioxx-versus-NSAID comparison; right? |
| 14:37 | 18 | **A.**   Right. |
| 14:37 | 19 | **Q.**   Now, Table 3 is the Vioxx-versus-placebo comparison; |
| 14:37 | 20 | correct? |
| 14:37 | 21 | **A.**   That's correct. |
| 14:37 | 22 | **Q.**   And there are -- |
| 14:37 | 23 | **A.**   For the cohort that's being represented. |
| 14:37 | 24 | **Q.**   And the total patient events here are practically |
| 14:38 | 25 | identical, .62 percent and .56? |

DAILY COPY

14:38   1   **A.**   When you go on the incidence, yes.

14:38   2   **Q.**   In fact, there was numerically more or at least, as a

14:38   3   rate, more myocardial infarctions on placebo; right?

14:38   4   **A.**   Those numbers are as you represent them for this cohort of

14:38   5   OA studies.

14:38   6   **Q.**   Your comment about "for this cohort" is because, after

14:38   7   approval, Merck continued to study Vioxx in osteoarthritis

14:38   8   patients; right?

14:38   9   **A.**   There were other studies for other purposes, yes, sir.

14:38   10   **Q.**   Including osteoarthritis studies; right?

14:38   11   **A.**   Yes, sir.

14:38   12   **Q.**   Those data were analyzed as part of a meta-analysis by

14:38   13   Dr. Konstam; correct?

14:38   14   **A.**   For a cohort of patients.  You're building -- I just don't

14:39   15   want -- I think it's important for the Court in answering your

14:39   16   question.  These are pieces of the total OA database.  Reicin

14:39   17   had a piece, and then Konstam has a piece of that OA database.

14:39   18   I don't want to represent that's the entire OA database.

14:39   19   **Q.**   Well, this is Dr. Konstam, Table 1, and this shows the

14:39   20   study that was included in his meta-analysis; correct?

14:39   21   **A.**   Yes, sir.

14:39   22   **Q.**   One of the comments you made was that Dr. Reicin's study

14:39   23   didn't include -- let's do it this way.  Those are the studies

14:39   24   that Dr. Reicin analyzed; right?

14:39   25   **A.**   I believe that's correct.

14:40  1   **Q.**   So these would be additional studies that Dr. Konstam's
14:40  2   meta-analysis included that took place after approval?
14:40  3   **A.**   083, 085, 090.  I believe those are the corresponding
14:40  4   numbers.  Yes, sir.
14:40  5   **Q.**   So putting Protocol 010 -- by the way, this analysis by
14:40  6   Dr. Konstam is described as analysis of the Phase IIb through
14:40  7   Phase IV clinical trials done; right?
14:40  8   **A.**   I don't dispute that.
14:40  9   **Q.**   And Study 010 was a Phase IIa study; correct?
14:40  10  **A.**   I think there's one reference, if my memory serves me
14:40  11  right, they reference IIb, but I will be happy to say it's a
14:41  12  IIa study.
14:41  13  **Q.**   Putting Protocol 010 aside for a moment, the Konstam
14:41  14  meta-analysis looked at all those studies you told Mr. Dugan
14:41  15  were not in Dr. Reicin's article?
14:41  16  **A.**   In a table, yes, sir.
14:41  17  **Q.**   The meta-analysis was published before Dr. Reicin's paper?
14:41  18  **A.**   Yes, I believe that's correct.
14:41  19  **Q.**   I want to turn now, sir, to two final topics.  You
14:41  20  described the warning letter you went over with Mr. Dugan;
14:42  21  right?
14:42  22  **A.**   Yes, sir.
14:42  23  **Q.**   Now, obviously, you haven't done a systematic review of
14:42  24  all the Vioxx promotional materials; correct?
14:42  25  **A.**   No, sir.

14:42   1   **Q.**   You described this letter from DDMAC, I think it was.

14:42   2   **A.**   Yes, sir.  That was an exhibit that I was shown.

14:42   3   **Q.**   Now, a warning letter is not, typically, the agency's

14:42   4   final action with respect to a promotional issue; correct?

14:42   5   **A.**   Define *final action*.

14:42   6   **Q.**   Did you have a problem with that question when I asked it

14:42   7   at your deposition?

14:42   8   **A.**   Again, I just -- for purposes of -- I just want to make

14:42   9   sure that I'm answering *final action*.

14:42   10  **Q.**   A warning letter begins the investigation process if DDMAC

14:42   11  has a concern about promotional materials; correct?

14:42   12  **A.**   I believe there was a previously untitled letter that's in

14:42   13  reference to this.  There are different -- at the time that

14:43   14  that was written, I think there were different stages of

14:43   15  letters, if that's what you're referring to, if my recollection

14:43   16  serves me right.  A warning letter tends to be more serious

14:43   17  than an untitled letter.

14:43   18  **Q.**   I'm showing you your deposition.  You were asked the

14:43   19  following questions, and did you give the following answers?

14:43   20          "Question:  A warning letter is not typically the

14:43   21          agency's final action with respect to a promotional issue;

14:43   22          right?

14:43   23          "Answer:  Final action?"

14:43   24  **A.**   My reaction is exactly the same, so I just want to be

14:43   25  clear --

DAILY COPY

14:43   1   Q.   Yeah.  Until I said, "Am I correct?" and you said, "That's
14:43   2   correct."  Have I read correctly your answers to those
14:43   3   questions at your deposition?
14:43   4   A.   Yes.  I --
14:43   5   Q.   Thank you.  Now, you didn't actually review Merck's
14:44   6   response to that warning letter; correct?
14:44   7   A.   After my deposition, I did go back and read, I believe,
14:44   8   Merck's response.
14:44   9   Q.   Let's try it this way:  At your deposition you had not
14:44   10  reviewed Merck's response to the warning letter; correct?
14:44   11  A.   That's correct.
14:44   12  Q.   When you were sitting in the plaintiff lawyers' office
14:44   13  requesting materials and you wanted that fair and balanced
14:44   14  presentation of materials, the plaintiff lawyers hadn't given
14:44   15  you Merck's response; true?
14:44   16  A.   That's correct.  I asked what happened.
14:44   17  Q.   No, I just want to know whether I had it correctly.  The
14:44   18  plaintiff lawyers didn't give you Merck's response to the
14:44   19  warning letter?
14:44   20  A.   I asked a question.  In response to that question, I got
14:44   21  an answer, and then I didn't ask for any further documents on
14:45   22  that at that point.
14:45   23  Q.   Nor did you review the FDA's reply in resolution to that?
14:45   24  A.   At the time, that's correct.  I have subsequently.
14:45   25  Q.   After your deposition and after you issued your report;

DAILY COPY

| | | |
|---|---|---|
| 14:45 | 1 | right? |
| 14:45 | 2 | A.   Yes.  And it doesn't change any opinion. |
| 14:45 | 3 | Q.   The warning letter discusses three specific promotional |
| 14:45 | 4 | activities; correct? |
| 14:45 | 5 | A.   Yes.  I believe that's correct. |
| 14:45 | 6 | Q.   Audio conferences by a Dr. Peter Holt? |
| 14:45 | 7 | A.   I believe that's correct. |
| 14:45 | 8 | Q.   Obviously, you don't know who or if anyone was listening |
| 14:45 | 9 | in on those audio conferences; right? |
| 14:45 | 10 | A.   No, sir. |
| 14:45 | 11 | Q.   And it discusses -- |
| 14:45 | 12 | A.   I assume if anybody -- I assume somebody.  It wouldn't |
| 14:45 | 13 | have taken place if no one was listening. |
| 14:45 | 14 | Q.   It discusses the activities of two specific sales |
| 14:45 | 15 | representatives:  One in Maryland and one in California? |
| 14:45 | 16 | A.   I don't challenge that. |
| 14:45 | 17 | Q.   And discusses this press release that you referenced |
| 14:46 | 18 | earlier; correct? |
| 14:46 | 19 | A.   That's correct. |
| 14:46 | 20 | Q.   And you do know that -- at least, the plaintiff lawyers |
| 14:46 | 21 | have told you that the issue raised by FDA was resolved to |
| 14:46 | 22 | their satisfaction; correct? |
| 14:46 | 23 | A.   I know the matter was closed.  I saw that there were |
| 14:46 | 24 | corrective actions with regard to the first two.  I didn't see |
| 14:46 | 25 | the corrective action with regard to the press release. |

14:46   1   **Q.**   Final topic:  Your discussion with Mr. Dugan of the label.

14:46   2   **A.**   The label, yes.

14:46   3   **Q.**   The earliest time you have a specific recollection of

14:46   4   reviewing any of the Vioxx labels was in 2009, pursuant to your

14:46   5   retention by the plaintiffs; right?

14:46   6   **A.**   That's correct.

14:46   7   **Q.**   In fact, you have no recollection, even, at least as of

14:46   8   the date of your deposition, of having reviewed any of the

14:46   9   labels for any other NSAID or COX-2 inhibitor; true?

14:47   10  **A.**   I have no recollection of that, that's correct, sir.

14:47   11  **Q.**   The question of the labeling that would be instituted

14:47   12  after the VIGOR study was the subject of an advisory committee;

14:47   13  is that right?

14:47   14  **A.**   I reviewed -- I'm sorry.  Just ask your question again.

14:47   15  Sorry.

14:47   16  **Q.**   Do you know, sir, one way or another whether the labeling

14:47   17  of the VIGOR study into the Vioxx label was the subject of an

14:47   18  advisory committee?

14:47   19  **A.**   The 2001 FDA advisory committee?  Is that the one you're

14:47   20  referring to?

14:47   21  **Q.**   Was labeling for Vioxx the subject of an FDA advisory

14:48   22  committee?

14:48   23  **A.**   The subject?  I looked at the -- let me tell you what I

14:48   24  know and what I don't know.  I have reviewed before today both

14:48   25  FDA's advisory committee in the late 1990s and one in 2001, and

14:48  1    I reviewed the questions as well as the transcript for, you

14:48  2    know -- questions specifically with regard to the labeling for

14:48  3    cardiovascular safety.

14:48  4    **Q.**   Just to follow up on that gratuitous comment you just

14:48  5    made, as of the date of your deposition, you had not reviewed

14:48  6    any of the advisory committee materials for 1999 or 2001; true?

14:48  7    **A.**   No.  I've looked at that subsequently.  I've studied that

14:48  8    subsequently.

14:48  9    **Q.**   So when you issued your report, laid out your opinions,

14:48  10   you had not reviewed any of the advisory committee materials;

14:48  11   right?  For 2001 and 1999.

14:49  12   **A.**   I believe that's correct.

14:49  13   **Q.**   The 2001 advisory committee, just to get back on track,

14:49  14   did discuss the cardiovascular information for the VIGOR study

14:49  15   in light of the Vioxx label; right?

14:49  16   **A.**   There were -- I mean, I literally -- I searched -- I

14:49  17   key-searched the words *label* and *labeling* throughout, and there

14:49  18   were mentions of both.

14:49  19   **Q.**   You were searching where?

14:49  20   **A.**   The transcript.

14:49  21   **Q.**   Is this something the plaintiff lawyers gave you after

14:49  22   your deposition?

14:49  23   **A.**   No.  It was something that I downloaded myself from the

14:49  24   FDA site.

14:49  25   **Q.**   So when you were sitting in their office and you were

DAILY COPY

| | | |
|---|---|---|
| 14:49 | 1 | forming opinions about the labeling and you wanted to get the |
| 14:49 | 2 | fair and balanced picture of how the labeling was handled after |
| 14:49 | 3 | VIGOR, the plaintiff lawyers didn't give you the transcript of |
| 14:49 | 4 | the advisory committee meeting; true? |
| 14:49 | 5 | A.   That is correct.  I have subsequently reviewed that, and |
| 14:49 | 6 | it does not change my opinion. |
| 14:49 | 7 | Q.   Well, let's take a look.  Is Exhibit 187, sir, the |
| 14:50 | 8 | transcript of the FDA advisory committee you looked at after |
| 14:50 | 9 | you formed your opinions in this case? |
| 14:50 | 10 | A.   It was a two-day advisory committee.  I obviously looked |
| 14:50 | 11 | at it online and I downloaded it on my computer.  So that was |
| 14:50 | 12 | the one I went through. |
| 14:50 | 13 | Q.   One of the days was -- |
| 14:50 | 14 | A.   I mean, on Celebrex -- one day was primarily -- this day |
| 14:50 | 15 | is on Vioxx. |
| 14:50 | 16 | Q.   Actually, let me get my question out.  One day was on |
| 14:50 | 17 | Vioxx and one day was on Celebrex; right? |
| 14:50 | 18 | A.   That's correct. |
| 14:50 | 19 | Q.   You just looked at the Vioxx day? |
| 14:50 | 20 | A.   I actually mixed up, at one point, the transcripts.  I was |
| 14:51 | 21 | reading the transcript on Celebrex until I get them sorted out. |
| 14:51 | 22 | Q.   Do you recall that one of the individuals in attendance at |
| 14:51 | 23 | the advisory committee was Dr. Stephen Nissen? |
| 14:51 | 24 | A.   Yes. |
| 14:51 | 25 | Q.   Dr. Nissen was a cardiologist that was specifically asked |

14:51   1   to be there to help give input on now to interpret the

14:51   2   cardiovascular data of VIGOR; true?

14:51   3   A.   Yes.  He was a consultant, yes.

14:51   4   Q.   Dr. Nissen, I believe, led the cardiology department at

14:51   5   The Cleveland Clinic at one point?

14:51   6   A.   I don't know exactly his position with Topol and others,

14:51   7   that group.

14:51   8   Q.   Dr. Nissen, at one point, was he president of the American

14:51   9   College of Cardiology?

14:51   10  A.   I have no reason to dispute that.

14:51   11  Q.   Dr. Nissen is an individual you believe is qualified to

14:51   12  fairly and competently interpret cardiovascular data?

14:52   13  A.   If he sees all the data, I would certainly think he is a

14:52   14  competent individual, yes.

14:52   15  Q.   Did you review the entirety of the transcript?

14:52   16  A.   There were three different volumes, and I went through --

14:52   17  I want to say that I studied -- I won't say that I studied

14:52   18  every page.  I searched *cardiovascular*, *cardiac*.  I looked at

14:52   19  the questions the committee was asking.  I looked at the slides

14:52   20  and I looked at the backup briefing material, but I wouldn't

14:52   21  want to say that I looked at everything.

14:52   22  Q.   So during the advisory committee, the floor was turned

14:53   23  over to Dr. Nissen for him to give his analysis of the VIGOR

14:53   24  data?

14:53   25  A.   Yes.  And I recall looking at that.

DAILY COPY

| | | |
|---|---|---|
| 14:53 | 1 | **Q.**   Great.  So here we are with Dr. Nissen giving his |
| 14:53 | 2 | analysis.  The way he framed the question -- page 148 of the |
| 14:53 | 3 | transcript at line 22. |
| 14:53 | 4 | **A.**   Yes.  Counsel, I want to make sure.  When you say |
| 14:53 | 5 | "question," do you have the questions for the advisory |
| 14:53 | 6 | committee?  Because I haven't seen that.  That's the question. |
| 14:53 | 7 | There were questions for the advisory committee. |
| 14:53 | 8 | **Q.**   We'll go through Dr. Nissen's comments.  If your lawyer |
| 14:53 | 9 | wants to go through some other material, he'll have the |
| 14:53 | 10 | opportunity to do so. |
| 14:53 | 11 | **A.**   Okay.  But I just don't want this -- you said "questions |
| 14:53 | 12 | for the advisory committee."  There are formal questions for |
| 14:53 | 13 | the advisory question that get asked. |
| 14:53 | 14 | **Q.**   Then I'll rephrase.  Do you recall seeing Dr. Nissen's |
| 14:53 | 15 | comments:  "Well, how can we go about analyzing which of the |
| 14:54 | 16 | two hypotheses makes the most sense?" |
| 14:54 | 17 | **A.**   Yes, sir. |
| 14:54 | 18 | **Q.**   Do you recall the hypotheses that were on the table at |
| 14:54 | 19 | that point was the difference in VIGOR due to naproxen or due |
| 14:54 | 20 | to Vioxx? |
| 14:54 | 21 | **A.**   Yes, sir.  Very much so. |
| 14:54 | 22 | **Q.**   So he says, "Well, one way is to ask the question whether |
| 14:54 | 23 | the naproxen event rates are similar to the event rates in |
| 14:54 | 24 | patients who receive aspirin and to see whether the rofecoxib |
| 14:54 | 25 | event rates are similar to patients who don't take aspirin but |

DAILY COPY

| | | |
|---|---|---|
| 14:54 | 1 | who are on placebo in a similar risk category." |
| 14:54 | 2 | **A.** Yes, sir. |
| 14:54 | 3 | **Q.** Do you recall Dr. Nissen actually prepared an analysis he |
| 14:55 | 4 | made of the issue as he framed it? |
| 14:55 | 5 | **A.** I believe there was some Italian results which he talked |
| 14:55 | 6 | about, if I'm correct, if my memory serves me right. |
| 14:55 | 7 | **Q.** After he goes through his analysis, he says, "Well, what |
| 14:55 | 8 | did we see here?" Then he goes on to say, "Well, it is a bit |
| 14:55 | 9 | reassuring that the naproxen event rates in VIGOR and the |
| 14:55 | 10 | aspirin event rates" -- and "PPP" is the primary prevention |
| 14:55 | 11 | studies? |
| 14:55 | 12 | **A.** Yes, sir. |
| 14:55 | 13 | **Q.** Those are aspirin studies looking at cardioprotection? |
| 14:55 | 14 | **A.** Yes, sir. |
| 14:55 | 15 | **Q.** So he says, "It's reassuring that naproxen and aspirin |
| 14:55 | 16 | were very, very similar." |
| 14:55 | 17 | **A.** That's correct. |
| 14:55 | 18 | **Q.** Do you recall seeing that when you read this? |
| 14:55 | 19 | **A.** That's correct. |
| 14:56 | 20 | **Q.** He goes on to say, "If you do the confidence intervals |
| 14:56 | 21 | here, these are really amazingly close." |
| 14:56 | 22 | **A.** Right. |
| 14:56 | 23 | **Q.** Again, talking about naproxen and aspirin? |
| 14:56 | 24 | **A.** Right. |
| 14:56 | 25 | **Q.** Then he goes on to say, "This provides some reassurance |

14:56  1  that what we may be seeing here is, at least in part, a
14:56  2  protective effect of naproxen."  Right?
14:56  3  **A.**   That's part of the transcript of what he is talking about.
14:56  4  You also -- he says he's --
14:56  5  **Q.**   Have I read that correctly?
14:56  6  **A.**   That's correct.
14:56  7  **Q.**   Then he goes on to analyze the Vioxx rate from VIGOR and
14:56  8  compares it to the placebo rate of another study; right?
14:56  9  **A.**   I believe that's correct.
14:56  10 **Q.**   You recall he presented the analysis of that data as well?
14:57  11 **A.**   My recollection is a little fuzzier on that at this
14:57  12 moment, but I have no reason to challenge that.
14:57  13 **Q.**   Do you recall that Dr. Nissen found that the event rate on
14:57  14 Vioxx was very similar to the placebo rate from the other
14:57  15 study?
14:57  16 **A.**   He got it wrong.
14:57  17 **Q.**   Do you recall that?
14:57  18 **A.**   Yes.
14:57  19 **Q.**   Then he goes on to note:  "Overall, the events were not
14:57  20 different but only the differences in MI" -- that's heart
14:57  21 attack; right?
14:57  22 **A.**   Right.
14:57  23 **Q.**   -- "are significant."
14:57  24       Then he goes on to say, "But there are very few
14:57  25 events.  I would point out to everyone at the table" -- that's

| | | |
|---|---|---|
| 14:57 | 1 | all the assembled experts on the advisory committee; correct? |
| 14:57 | 2 | **A.**   And consultants and FDA. |
| 14:57 | 3 | **Q.**   "In the entire cohort, there were only 24 myocardial |
| 14:57 | 4 | infarctions:  20 in the Vioxx group and 4 in the naproxen |
| 14:58 | 5 | group." |
| 14:58 | 6 | He is talking about the VIGOR study here; correct? |
| 14:58 | 7 | **A.**   That's correct.  Fivefold excess when you are talking |
| 14:58 | 8 | about myocardial infarctions. |
| 14:58 | 9 | **Q.**   So 24 myocardial infarctions out of 8,000 patients?  Is |
| 14:58 | 10 | the data accurate that I just reflected? |
| 14:58 | 11 | **A.**   8,000-some-odd, yes. |
| 14:58 | 12 | **Q.**   Then he says, "A shift of two or three MIs could easily |
| 14:58 | 13 | have made a difference here in terms of the outcome with |
| 14:58 | 14 | respect to this analysis." |
| 14:58 | 15 | Is that Dr. Nissen's comments at the advisory |
| 14:58 | 16 | committee? |
| 14:58 | 17 | **A.**   Yes. |
| 14:58 | 18 | **Q.**   You recall that the committee turned to the question of |
| 14:58 | 19 | labeling? |
| 14:58 | 20 | **A.**   I remember there was some discussion of labeling, yes. |
| 14:58 | 21 | **Q.**   And there was an extended back-and-forth amongst the |
| 14:58 | 22 | various experts at the advisory committee? |
| 14:58 | 23 | **A.**   Well, I remember searching for what I believe was the |
| 14:59 | 24 | members of the advisory committee discussing what they thought |
| 14:59 | 25 | should be in the label. |

| | | |
|---|---|---|
| 14:59 | 1 | Again, I don't remember, Counsel.  I may have missed |
| 14:59 | 2 | it, but I looked specifically whether there was a question for |
| 14:59 | 3 | the advisory committee on labeling.  I just didn't see it, an |
| 14:59 | 4 | FDA question, but I may have missed it. |
| 14:59 | 5 | Q.   So then Dr. Nissen goes on to say, "I think the question |
| 14:59 | 6 | for me is whether there is any evidence of an excess event rate |
| 14:59 | 7 | over placebo, and that is just not on the table.  So what can |
| 14:59 | 8 | we say?  What we can say is that, in this population, getting |
| 14:59 | 9 | naproxen was associated with a lower cardiovascular event rate |
| 14:59 | 10 | than getting rofecoxib.  Therefore, it seems to me what we |
| 14:59 | 11 | probably need to do, since we really don't know, is to make it |
| 14:59 | 12 | very clear that there's not a cardioprotective effect for the |
| 14:59 | 13 | COX-2 inhibitors, and the decision on whether or not to |
| 14:59 | 14 | administer aspirin is a matter of clinical judgment." |
| 14:59 | 15 | Then he says, "I don't think any guidance beyond that |
| 15:00 | 16 | is possible based upon the data." |
| 15:00 | 17 | Was that the comments of Dr. Nissen at the 2001 |
| 15:00 | 18 | advisory committee? |
| 15:00 | 19 | A.   He goes on to say, "We do not have data we need to make a |
| 15:00 | 20 | final determination if what we saw was a cardioprotective |
| 15:00 | 21 | effect of naproxen or excess risk."  He is saying Merck still |
| 15:00 | 22 | had not done that study.  Had Dr. Nissen looked -- |
| 15:00 | 23 | Q.   Had I read the transcript correctly? |
| 15:00 | 24 | A.   The portions of the transcript that you read, you read |
| 15:00 | 25 | correctly.  You didn't read the next sentence. |

| | | |
|---|---|---|
| 15:00 | 1 | **Q.**   How about we go to the section where they discuss the |
| 15:00 | 2 | label.  You said you couldn't find that when you went through |
| 15:00 | 3 | the transcript? |
| 15:00 | 4 | **A.**   It looks as this -- |
| 15:00 | 5 | **Q.**   When you were searching this transcript for the advisory |
| 15:00 | 6 | committee discussion of the labeling, did you come across this |
| 15:00 | 7 | discussion from Dr. Nissen? |
| 15:01 | 8 | **A.**   I believe so, but what -- can I just finish? |
| 15:01 | 9 | **Q.**   I haven't asked a question.  I just asked if you saw this. |
| 15:01 | 10 | Did Dr. Nissen say, "Briefly, I think what I would |
| 15:01 | 11 | say in the label" -- we are talking about the Vioxx label here? |
| 15:01 | 12 | **A.**   Yes. |
| 15:01 | 13 | **Q.**   -- "is that there was an excess of cardiovascular events |
| 15:01 | 14 | in comparison to naproxen, that it remains uncertain whether |
| 15:01 | 15 | this is due to the beneficial cardioprotective effects of |
| 15:01 | 16 | naproxen or the prothrombotic effects of the agent, and leave |
| 15:01 | 17 | it at that.  Basically, we do not know the reason." |
| 15:01 | 18 | Is that Dr. Nissen's comments as to what the content |
| 15:01 | 19 | of the label should be? |
| 15:01 | 20 | **A.**   That's what Dr. Nissen believed at the time based on what |
| 15:01 | 21 | Dr. Nissen -- data Dr. Nissen had. |
| 15:01 | 22 | **Q.**   Of course, you don't know what data Dr. Nissen had, do |
| 15:01 | 23 | you? |
| 15:01 | 24 | **A.**   (NO RESPONSE) |
| 15:02 | 25 | **Q.**   Do you, sir? |

15:02   1   **A.**   I don't know the specific data that Dr. Nissen had, no.

15:02   2   **Q.**   So, then, after Dr. Nissen gave his recommendation for how

15:02   3   the label should read -- that, basically, we should just put

15:02   4   out there that there was a difference and we don't know the

15:02   5   reason for the difference -- the advisory committee asked for a

15:02   6   show of hands to see who agreed of some additional language

15:02   7   along the lines of what Dr. Nissen suggested in terms of the

15:02   8   labeling.

15:02   9   **A.**   I see that.

15:02   10   **Q.**   There was one person who disagreed.  You see that?

15:02   11   **A.**   I see that.

15:02   12   **Q.**   Do you recall that that individual actually said there

15:02   13   shouldn't be any change to the label?

15:02   14   **A.**   I don't have a recollection on that.

15:02   15   **Q.**   So following this advisory committee, there was, in fact,

15:02   16   a change to the Vioxx label; correct?

15:03   17   **A.**   Approximately 18 months after the negotiations started.

15:03   18   **Q.**   After this advisory committee, there was a change to the

15:03   19   label; correct?

15:03   20   **A.**   In 2002, there was a change.

15:03   21   **Q.**   Thank you.  You went over with Mr. Dugan some of the

15:03   22   labeling that went back and forth.

15:03   23   **A.**   Yes, sir.  Different versions.

15:03   24        **MR. ISMAIL:**  What did you end up marking the exhibit

15:03   25   that wasn't on the exhibit list?

15:03   1   **BY MR. ISMAIL:**

15:04   2   **Q.**   Do you recall going over with Mr. Dugan the label that the

15:04   3   FDA sent to Merck in October 2001, the one that generated

15:04   4   the --

15:04   5   **A.**   The October 15 text.

15:04   6   **Q.**   That's the one that --

15:04   7   **A.**   I have the cross-outs, yes, sir.

15:04   8   **Q.**   Sure.   That's the one that generated Dr. Scolnick's

15:04   9   animated response?

15:04   10   **A.**   That's fair to say.

15:04   11   **Q.**   You indicated that Merck, in your view, did not exercise

15:04   12   standard of care by not just accepting that label; right?

15:04   13   **A.**   There was no cardiac -- it didn't accept the cardiac

15:04   14   warning.

15:04   15   **Q.**   The label that the FDA sent Merck in October of 2001, in

15:04   16   your view, was it acceptable?

15:04   17   **A.**   It should have had a cardiac warning.

15:04   18   **Q.**   That was contained in the FDA version of the label; right?

15:04   19   **A.**   There should have been a warning in the warning section is

15:05   20   my opinion.

15:05   21   **Q.**   Was that part of the FDA recommendation?

15:05   22   **A.**   The document that I saw had FDA language, what appeared to

15:05   23   be in the warning section because it was right above

15:05   24   "anaphylaxis," which I assume was the warning section, but it

15:05   25   wasn't the word *warning*.   My opinion was there should have been

DAILY COPY

15:05   1   a cardiac warning.

15:05   2   **Q.**   So your view is that the FDA label sent to Merck in

15:05   3   October 2001, so long as that warning information was in the

15:05   4   cardiovascular section --

15:05   5   **A.**   No.  The warning section, sir.

15:05   6   **Q.**   In the warning section.

15:05   7   **A.**   Yes, sir.

15:05   8   **Q.**   Okay.  So the language the FDA had, so long as it was in

15:05   9   the warning section.  Are we good so far?

15:05   10   **A.**   It should have warned of a cardiac risk.

15:05   11   **Q.**   That's the one that you believe Merck should have

15:05   12   accepted; right?

15:05   13   **A.**   I believe there should have been a cardiac warning in that

15:05   14   section of the label.

15:06   15   **Q.**   Along the lines that the FDA suggested?

15:06   16   **A.**   Again, I would want to look exactly at that language.  I

15:06   17   think there should have been a cardiac warning in the label.

15:06   18   **Q.**   Well, when you went over that label with Mr. Dugan this

15:06   19   morning, had you read it?

15:06   20   **A.**   I believe I read the section out loud here.

15:06   21   **Q.**   Was the information that you went over with Mr. Dugan in

15:06   22   the warning section?

15:06   23   **A.**   You couldn't tell from that individual piece of paper

15:06   24   because, again, I only had available to me portions of the

15:06   25   document.

DAILY COPY

15:06 | 1 | **Q.**   Okay.  So how about say it this way:  If that information

15:06 | 2 | was in the warnings section, that's what you believe Merck

15:06 | 3 | should have accepted.  Fair enough?

15:06 | 4 | **A.**   The language I read this morning warning of hypertension,

15:06 | 5 | myocardial thrombotic events, without explaining away those

15:07 | 6 | risks, I think were as important, yes.

15:07 | 7 | MR. ISMAIL:  Okay.  The actual label that was issued

15:07 | 8 | has been marked as Exhibit 273.  Your Honor, I just have about

15:07 | 9 | 10 more minutes.

15:07 | 10 | THE WITNESS:  You don't have a little larger copy, do

15:07 | 11 | you?

15:08 | 12 | MR. ISMAIL:  Your Honor, I offer Exhibit 285, which

15:08 | 13 | was the pooled analysis and the actual correspondence

15:08 | 14 | submitting it.

15:08 | 15 | THE COURT:  Admitted.

15:08 | 16 | MR. ISMAIL:  We also offer Exhibit 273, the label.

15:08 | 17 | THE COURT:  Admitted.

15:08 | 18 | MR. ISMAIL:  I also offer the 2001 advisory committee

15:08 | 19 | hearing transcript, Exhibit 187.

15:08 | 20 | THE COURT:  Admitted.

15:08 | 21 | BY MR. ISMAIL:

15:08 | 22 | **Q.**   You reviewed this label; right, sir?

15:08 | 23 | **A.**   Yes, I did.

15:08 | 24 | **Q.**   Does the Vioxx label, Exhibit 273, contain Table 2, which

15:08 | 25 | shows the VIGOR data?

DAILY COPY

| 15:08 | 1 | A.   Yes, sir. |
| 15:09 | 2 | Q.   The cardiovascular data that is set forth in Table 2 is |
| 15:09 | 3 | accurate; true? |
| 15:09 | 4 | A.   Yes, sir. |
| 15:09 | 5 | Q.   There are additional cardiovascular data from VIGOR set |
| 15:09 | 6 | forth in Table 3? |
| 15:09 | 7 | A.   Yes, sir. |
| 15:09 | 8 | Q.   The cardiovascular data -- |
| 15:09 | 9 | A.   Not in the warnings section. |
| 15:09 | 10 | Q.   The cardiovascular data set forth in Table 3 is accurate; |
| 15:09 | 11 | true? |
| 15:09 | 12 | A.   Yes, sir. |
| 15:09 | 13 | Q.   There is no statement in the April 2002 Vioxx label to the |
| 15:09 | 14 | effect that the explanation for the differential in VIGOR was |
| 15:09 | 15 | due to naproxen being cardioprotective; true? |
| 15:09 | 16 | A.   That is correct.  The label, in my judgment, does try |
| 15:09 | 17 | to -- |
| 15:09 | 18 | Q.   I didn't ask whether, in your judgment, it was adequate, |
| 15:09 | 19 | sir.  I just asked you to confirm that the April 2002 Vioxx |
| 15:10 | 20 | label did not give the explanation that the differential was |
| 15:10 | 21 | due to an effect of naproxen being cardioprotective. |
| 15:10 | 22 | A.   That label does not contain that, that's correct. |
| 15:10 | 23 | Q.   Thank you.  Now, the regulations you referenced this |
| 15:10 | 24 | morning with Mr. Dugan, I think it was tab 1 or tab 2. |
| 15:10 | 25 | A.   If you jump ahead a few pages -- |

| | | |
|---|---|---|
| 15:10 | 1 | **Q.**   Well, before I do that -- |
| 15:10 | 2 | **A.**   I'm sorry. |
| 15:10 | 3 | **Q.**   -- you actually went over the April 2009 version of these |
| 15:10 | 4 | regulations; correct? |
| 15:10 | 5 | **A.**   It's whatever counsel showed me, yes. |
| 15:11 | 6 | **Q.**   Did you review the exhibit that counsel showed you to see |
| 15:11 | 7 | if they were the regulations that were in effect prior to April |
| 15:11 | 8 | 2009? |
| 15:11 | 9 | **A.**   There may have been some changes with regard to certain |
| 15:11 | 10 | sections that were linked, I believe. |
| 15:11 | 11 | **Q.**   Do you recall one of the changes to the regulations here |
| 15:11 | 12 | is that there was going to be a merging of the precautions and |
| 15:11 | 13 | warnings section? |
| 15:11 | 14 | **A.**   Certainly back in 2002 and certainly when I was |
| 15:11 | 15 | commissioner, there was a warnings section. |
| 15:11 | 16 | **Q.**   My question was -- |
| 15:11 | 17 | **A.**   I have not reviewed any proposed regulations to that |
| 15:11 | 18 | effect. |
| 15:11 | 19 | **Q.**   This is the exhibit you went over with the plaintiff |
| 15:11 | 20 | lawyer; right? |
| 15:11 | 21 | **A.**   This is the C.F.R.  He showed me certain sections of the |
| 15:11 | 22 | C.F.R. with what's required with regard to the -- I believe |
| 15:12 | 23 | with regard to the duty to warn and what to include. |
| 15:12 | 24 | **Q.**   We got this exhibit from the plaintiff lawyers last night |
| 15:12 | 25 | with all this highlighting on it, and this is the exhibit they |

15:12   1   said they had gone over with you and you were going to review
15:12   2   with the Judge in court.
15:12   3   A.   Yeah.  I didn't do this highlighting.
15:12   4   Q.   Did you review this exhibit before you came in here today?
15:12   5   A.   I reviewed certain -- I looked at certain sections of this
15:12   6   and am familiar with certain sections of this.
15:12   7   Q.   Do you recall, sir, that this version of the regulations
15:12   8   has done away with the distinction between precautions and
15:12   9   warnings?
15:12   10  A.   In 2009, I didn't review this for that.
15:12   11  Q.   You didn't review this document sufficient to --
15:12   12  A.   Not on this C.F.R., no.
15:12   13  Q.   So in the highlighted section here, this -- let me ask it
15:13   14  this way:  Do you know today that product labels contain a
15:13   15  section -- don't have a distinction anymore between warnings
15:13   16  and precautions?
15:13   17  A.   This is warnings and precautions.  I would have to -- I
15:13   18  don't know what the current standard is at this moment, no.
15:13   19  Q.   That October 2001 FDA label you were talking about, one
15:13   20  thing we know for sure is that the FDA's proposal did not have
15:13   21  a black-box warning; right?
15:13   22  A.   No, it had a warning. It warned.
15:14   23  Q.   I have handed you Defense Exhibit 3637, a section of the
15:14   24  Federal Register that describes the change in labeling format
15:14   25  that resulted in the regulation that you went over with the

DAILY COPY

| | | |
|---|---|---|
| 15:14 | 1 | plaintiff lawyers this morning. |
| 15:14 | 2 | A.   In 2006, yes. |
| 15:14 | 3 | Q.   So down here, there's a section called "Warnings and |
| 15:14 | 4 | Precautions"; correct? |
| 15:14 | 5 | A.   You've given me part of the final rule.  Can you give me |
| 15:14 | 6 | the whole final rule? |
| 15:14 | 7 | Q.   Well, it's an extremely large document.  Consistent with |
| 15:15 | 8 | what the parties are doing here, we are going to be handing out |
| 15:15 | 9 | portions of exhibits we want to go over.  If there's something |
| 15:15 | 10 | else your lawyer wants to go over, he will have the opportunity |
| 15:15 | 11 | to -- |
| 15:15 | 12 | A.   These are in response to certain comments; right? |
| 15:15 | 13 | Q.   These are comments in response to the FDA's suggestion |
| 15:15 | 14 | they do away with the distinction between warnings and |
| 15:15 | 15 | precautions; true? |
| 15:15 | 16 | A.   In a comment; right? |
| 15:15 | 17 | Q.   Well, the original proposed rule was FDA saying, "We are |
| 15:15 | 18 | going to do away with the distinction between warnings and |
| 15:15 | 19 | precautions"; correct? |
| 15:15 | 20 | A.   I don't have the proposed rule here, so I can't tell you |
| 15:15 | 21 | what's in the proposed rules. |
| 15:15 | 22 | Q.   How about we do it this way. |
| 15:15 | 23 | A.   They tend to be part of the final rule. |
| 15:15 | 24 | Q.   "The comments agreed with FDA's findings, based on |
| 15:15 | 25 | physician surveys and focus testing, that the distinction |

| | | |
|---|---|---|
| 15:16 | 1 | between warnings and precautions is not meaningful to |
| 15:16 | 2 | practitioners who use labeling." |
| 15:16 | 3 | **A.**   Because it was confusing. |
| 15:16 | 4 | **Q.**   Do you see that? |
| 15:16 | 5 | **A.**   Yes. |
| 15:16 | 6 | **Q.**   You made the distinction between warnings and precautions |
| 15:16 | 7 | when you were going over the labeling with Mr. Dugan; right? |
| 15:16 | 8 | **A.**   Because at the time -- |
| 15:16 | 9 | **Q.**   Was that correct, sir? |
| 15:16 | 10 | **A.**   Yes, because at the time -- |
| 15:16 | 11 | **Q.**   There will be a time for your lawyer to continue to ask |
| 15:16 | 12 | you questions. |
| 15:16 | 13 | **MR. DUGAN:**  Objection. |
| 15:16 | 14 | **THE COURT:**  He can finish his answer. |
| 15:16 | 15 | Go ahead.  You can finish your answer, sir. |
| 15:16 | 16 | **BY MR. ISMAIL:** |
| 15:16 | 17 | **Q.**   Go ahead, sir. |
| 15:16 | 18 | **A.**   Because at the time the Vioxx labeling was being done, |
| 15:16 | 19 | there was a warnings section and a precautions section.  The |
| 15:16 | 20 | precautions section was a more diluted set of information than |
| 15:16 | 21 | the warnings section, so you could see how it could be |
| 15:16 | 22 | confusing to physicians. |
| 15:16 | 23 | **Q.**   Are you done? |
| 15:16 | 24 | **A.**   Yes. |
| 15:16 | 25 | **MR. ISMAIL:**  One moment, Your Honor. |

15:17  1              The last point of business is to offer
15:17  2    Exhibit 3637.
15:17  3              **THE COURT:**  I'll admit it.
15:17  4              **MR. ISMAIL:**  Thank you.
15:17  5              **THE COURT:**  We'll take a 15-minute break at this
15:17  6    time.  Court will stand in recess.
15:17  7              **THE DEPUTY CLERK:**  Everyone rise.
15:17  8              (WHEREUPON the Court took a brief recess.)
15:35  9              **THE DEPUTY CLERK:**  Everyone rise.
15:44  10             **THE COURT:**  Be seated, please.
15:44  11             You're still under oath, sir.  Redirect,
15:44  12   Counsel.
15:44  13                    **REDIRECT EXAMINATION**
15:44  14   **BY MR. DUGAN:**
15:44  15   **Q.**   Good afternoon, Dr. Kessler.
15:45  16   **A.**   Good afternoon.
15:45  17   **Q.**   Do you remember defense counsel's questioning in reference
15:45  18   to the Code of Federal Regulations?
15:45  19   **A.**   Yes.
15:45  20   **Q.**   Is it still your opinion that the Code of Federal
15:45  21   Regulations require a drug company to warn of a potential risk?
15:45  22   **A.**   Reasonable evidence of causal association, yes.
15:46  23   **Q.**   Dr. Kessler, do you remember the line of questioning
15:46  24   defense counsel raised in reference to a number of clinical
15:46  25   studies, including VIGOR, Protocol 023, Dr. Watson,

183

15:46  1   Dr. Villalba, Study 017, the Dr. Reicin article, the

15:46  2   Dr. Konstam article that we've been discussing today?

15:46  3   A.   Yes, sir.

15:46  4   Q.   In your opinion and judgment, do all of those studies help

15:47  5   you in your opinions to determine what Merck knew before it

15:47  6   marketed Vioxx?

15:47  7          MR. ISMAIL:  Objection, Your Honor.

15:47  8          THE COURT:  Counsel, you have to be a little bit more

15:47  9   specific on it.  I'll give him an opportunity to answer, but

15:47  10  just to throw out that and say, "Comment on it," is a little

15:47  11  broad, I think.  You should be a little more specific with your

15:47  12  question.

15:47  13         MR. DUGAN:  I understand, Your Honor.

15:47  14  BY MR. DUGAN:

15:47  15  Q.   Dr. Kessler, you testified earlier this morning that,

15:47  16  based upon the evidence reviewed and discussed thus far, you

15:47  17  had an opinion that there were safety signals for thrombotic

15:47  18  events before Merck marketed Vioxx; is that correct?

15:48  19  A.   Yes, sir.

15:48  20  Q.   Do you stand by that opinion in reference to your analysis

15:48  21  of the VIGOR trial?

15:48  22         MR. ISMAIL:  Judge, we're just repeating direct at

15:48  23  this point.

15:48  24         THE COURT:  Let's go through it.  Go ahead.  You can

15:48  25  answer.  Did it change your opinion at all?

DAILY COPY

| | | |
|---|---|---|
| 15:48 | 1 | **THE WITNESS:**  No, sir.  Nothing defense raised with |
| 15:48 | 2 | regard to the data in Watson or 071 or questions relating to |
| 15:48 | 3 | VIGOR changed my -- VIGOR was postapproval, but certainly the |
| 15:48 | 4 | data that was -- that we talked about earlier on direct, no |
| 15:48 | 5 | questions defense asked me changed my opinion. |
| 15:49 | 6 | **MR. DUGAN:**  Thank you, Dr. Kessler. |
| 15:49 | 7 | That's what I was attempting to do, Your Honor, |
| 15:49 | 8 | is to short-circuit these. |
| 15:49 | 9 | BY MR. DUGAN: |
| 15:49 | 10 | Q.   Would the same be true for the DDMAC warning letter that |
| 15:49 | 11 | defense counsel discussed with you earlier?  Do you have the |
| 15:49 | 12 | same opinion in reference to that letter? |
| 15:49 | 13 | A.   Yes.  The agency was concerned about the naproxen theory |
| 15:49 | 14 | and didn't see a basis for that in the DDMAC letter. |
| 15:50 | 15 | Q.   Dr. Kessler, do you remember the line of questioning from |
| 15:50 | 16 | defense counsel in reference to the labeling issues and |
| 15:50 | 17 | Dr. Nissen in reference to the arthritis advisory committee |
| 15:50 | 18 | report, February 8, 2001? |
| 15:50 | 19 | A.   Yes. |
| 15:50 | 20 | **MR. DUGAN:**  At this time I would like to approach the |
| 15:50 | 21 | witness with a document, Your Honor. |
| 15:51 | 22 | **THE COURT:**  That's fine. |
| 15:51 | 23 | BY MR. DUGAN: |
| 15:51 | 24 | Q.   I would like to ask you to take a second to review the |
| 15:51 | 25 | document. |

| | | |
|---|---|---|
| 15:51 | 1 | **MR. ISMAIL:**  Your Honor, I don't believe this |
| 15:51 | 2 | exhibit's on the -- my apologies if it is. |
| 15:51 | 3 | **THE COURT:**  What was it?  Is there an objection that |
| 15:51 | 4 | it's not on the -- |
| 15:51 | 5 | **MR. DUGAN:**  It's an article, Your Honor, by |
| 15:52 | 6 | Dr. Nissen done six months after the advisory committee. |
| 15:52 | 7 | Counsel opened the door talking in reference to this.  I have a |
| 15:52 | 8 | very short, specific question in reference to it, Your Honor. |
| 15:52 | 9 | **THE COURT:**  Let's ask it. |
| 15:52 | 10 | **BY MR. DUGAN:** |
| 15:52 | 11 | Q.   Dr. Kessler -- I'm sorry.  You're still reviewing the |
| 15:52 | 12 | document. |
| 15:52 | 13 | **THE COURT:**  If necessary, I'll give you recross on |
| 15:52 | 14 | that one area. |
| 15:52 | 15 | **MR. ISMAIL:**  Thank you, Your Honor. |
| 15:52 | 16 | **THE WITNESS:**  Yes, sir. |
| 15:53 | 17 | **THE COURT:**  What's the question? |
| 15:53 | 18 | **BY MR. DUGAN:** |
| 15:53 | 19 | Q.   The question is:  Dr. Kessler, could you please look at, |
| 15:53 | 20 | on the first page, the last paragraph. |
| 15:53 | 21 | A.   Yes. |
| 15:53 | 22 | Q.   Can you read that, please. |
| 15:53 | 23 | A.   In the abstract, it says: |
| 15:53 | 24 | "The available data raised a cautionary flag about |
| 15:53 | 25 | the risk of cardiovascular events with COX-2 inhibitors. |

15:53    1    Further prospective trial evaluation may characterize and
15:53    2    determine the magnitude of the risk."
15:53    3    Q.    So this is only six months after the February 8, 2001
15:53    4    advisory committee report; correct?
15:53    5    A.    Yes, sir.
15:53    6    Q.    Is that a different position that Dr. Nissen has taken?
15:53    7    A.    It certainly appears to be different with regard to the
15:53    8    class.  Just looking at the conclusion, it appears to be
15:54    9    different than the excerpts that counsel showed.  The last
15:54   10    paragraph of the paper is probably what I think is most
15:54   11    insightful:
15:54   12              "Our findings suggest a potential increase in
15:54   13    cardiovascular event rates for the presently available COX-2
15:54   14    inhibitors.  It is possible that concomitant use of aspirin may
15:54   15    not fully offset the risk of selective COX-2 inhibitors."
15:54   16              Again, what's most important here is:  "The
15:54   17    definitive evidence of such an adverse effect will require
15:54   18    prospective randomized trial."
15:54   19              The need for that trial to answer those questions was
15:54   20    paramount.  My opinion is Merck should have done that trial
15:55   21    sooner rather than later.
15:55   22    Q.    Is what Dr. Nissen wrote consistent with your opinion
15:55   23    regarding safety signals that you discussed earlier?
15:55   24    A.    Yes, it certainly is consistent with safety signals.  I
15:55   25    believe when you look at the individual studies, you add them

DAILY COPY

15:55   1   up, you see a clear safety signal.  When you look at all the OA

15:55   2   data -- not just any one study, not at any interim period of

15:55   3   time, but if you look at all the OA data, you see a

15:55   4   statistically significant increased risk of thrombotic event.

15:56   5           So not only did I see a signal, I see a statistically

15:56   6   significant increase in thrombotic events when one looks at all

15:56   7   the OA data.

15:56   8   **Q.**   Thank you, Dr. Kessler.  In conclusion, as you testified

15:56   9   at the beginning of this redirect, nothing that was covered in

15:56   10   your cross-examination will change any of the opinions that you

15:56   11   testified earlier to in this case?

15:56   12           **MR. ISMAIL:**  Objection.

15:56   13           **THE COURT:**  He objects to leading.  I sustain the

15:56   14   objection.

15:56   15           Anything further?  You can recross on that one

15:56   16   area.

15:56   17           **RECROSS-EXAMINATION**

15:56   18   **BY MR. ISMAIL:**

15:56   19   **Q.**   Mr. Dugan just went over and handed you a copy of the

15:56   20   article by Drs. Nissen, Topol, and Mukherjee, published in *JAMA*

15:57   21   in 2001?

15:57   22   **A.**   Yes.

15:57   23   **Q.**   So anyone reading the article by Drs. Nissen and Topol

15:57   24   would understand that one interpretation of the VIGOR study is

15:57   25   that Vioxx increases the risk for thrombotic events; right?

| | | |
|---|---|---|
| 15:57 | 1 | **A.**   As I remember this article when I read it at the time, |
| 15:57 | 2 | they were being -- they're saying that both are potential |
| 15:57 | 3 | mechanisms, yes.  There was a cautionary flag. |
| 15:57 | 4 | **Q.**   I'm just going to hand you your deposition and ask you to |
| 15:57 | 5 | turn to page 244, line 4.  Final question.  Were you asked the |
| 15:57 | 6 | following question at your deposition, and did you give the |
| 15:57 | 7 | following answer under oath: |
| 15:57 | 8 | "Question:  So anyone reading the article by |
| 15:57 | 9 | Drs. Nissen and Topol would understand that one |
| 15:57 | 10 | interpretation of the VIGOR study is that Vioxx increases |
| 15:57 | 11 | the risks for thrombotic events; right? |
| 15:58 | 12 | "Answer:  They are -- the three of them are certainly |
| 15:58 | 13 | laying that out as a possibility." |
| 15:58 | 14 | Were you asked that question and did you give that |
| 15:58 | 15 | answer? |
| 15:58 | 16 | **A.**   Yes. |
| 15:58 | 17 | **THE COURT:**  Thank you, sir.  You're excused.  Thank |
| 15:58 | 18 | you very much. |
| 15:58 | 19 | Any other witnesses today?  What's the lineup? |
| 15:58 | 20 | **MR. MURRAY:**  Your Honor, we don't have any additional |
| 15:58 | 21 | witnesses live today, but we would at this point introduce some |
| 15:58 | 22 | deposition testimony.  We don't have any intention of reading |
| 15:58 | 23 | it into the record, but we would introduce the depositions and |
| 15:58 | 24 | the exhibits and give Your Honor an idea of the context in |
| 15:58 | 25 | which they're being introduced and an opportunity for defense |

| | | |
|---|---|---|
| 15:58 | 1 | counsel to raise any objections to the depositions and the |
| 15:58 | 2 | exhibits thereto. |
| 15:58 | 3 | THE COURT:  Okay. |
| 15:58 | 4 | MR. MURRAY:  The first one that we would introduce is |
| 15:58 | 5 | one that we've already touched upon, and that is Dr. Gerald |
| 15:59 | 6 | Avorn's deposition and the exhibits that were referenced in -- |
| 15:59 | 7 | I'm sorry.  It's not just a deposition.  It was also a |
| 15:59 | 8 | deposition that was read at trial in the *Barnett* case.  I |
| 15:59 | 9 | believe that our designations directly follow the portions that |
| 15:59 | 10 | were read at trial in the *Barnett* case.  Dr. Avorn is an |
| 15:59 | 11 | epidemiologist who testifies chiefly on the issue of |
| 15:59 | 12 | risk/benefit analysis involved in assessing Vioxx. |
| 15:59 | 13 | THE DEPUTY CLERK:  What is the date of the |
| 15:59 | 14 | deposition? |
| 15:59 | 15 | MR. MURRAY:  The date of the deposition is June 29, |
| 15:59 | 16 | 2006. |
| 15:59 | 17 | THE COURT:  Just a minute.  What's the problem? |
| 15:59 | 18 | MR. ISMAIL:  I guess, first of all, we have |
| 15:59 | 19 | objections to the transcript.  *Barnett*, as played, was not -- |
| 16:00 | 20 | ultimately, the Court refined objections in subsequent trials. |
| 16:00 | 21 | I believe the transcript now should reflect everyone's |
| 16:00 | 22 | objections.  They want to play what the plaintiff played in |
| 16:00 | 23 | *Barnett*.  We've actually designated slightly different |
| 16:00 | 24 | testimony from that same deposition at this trial.  I believe |
| 16:00 | 25 | Your Honor probably had -- just like we did in the past with |

16:00    1   the objections and the responses written in the margin --

16:00    2          **THE COURT:**  I should have all of that, at least the

16:00    3   material that was admitted in *Barnett* or denied in *Barnett* or

16:00    4   whatever.

16:00    5          **MR. ISMAIL:**  Since our proffered testimony from that

16:00    6   deposition differs a little bit from that which we proffered in

16:00    7   *Barnett*, I think the transcript proffer here would reflect

16:00    8   their *Barnett* offer and our *Louisiana Attorney General* case

16:01    9   counter.  So the objections are there for the Court to rule.  I

16:01   10   don't know what exhibits they intend to offer from that

16:01   11   deposition and would ask an opportunity to --

16:01   12          **THE COURT:**  Yes.  What we need to do, folks, you-all

16:01   13   have to get together.  It's not fair for anybody, including the

16:01   14   Court, for you to offer, introduce, and file into evidence

16:01   15   things that the defendant doesn't even know that you're going

16:01   16   to do.  How are they going to make objections to it unless you

16:01   17   read it page by page and question by question?  How are they

16:01   18   going to do that?

16:01   19          **MR. MURRAY:**  Your Honor, with respect to Dr. Avorn's

16:01   20   deposition, it's my understanding the objections have already

16:01   21   been ruled on in connection with the *Barnett* case.  We would

16:01   22   also introduce --

16:01   23          **THE COURT:**  They take the position, though, that this

16:01   24   is a different case and it's different issues, so they urge

16:01   25   different objections and --

16:01  1      **MR. MURRAY:**  With respect to Dr. Avorn, I would

16:01  2  submit that there is no difference.  Dr. Avorn was testifying

16:02  3  with respect to general causation, which is the same issue

16:02  4  that's at issue in this case, Your Honor.

16:02  5      **MR. ISMAIL:**  I think all that we need to do is just

16:02  6  go back to what we proposed, which is submit to the Court for

16:02  7  ruling on depositions.  If we could get a heads-up as to what

16:02  8  exhibits they want to offer from a deposition, we can come

16:02  9  prepared to argue.  I still don't know what they intend to

16:02  10  offer from Avorn.  I think that's probably the right protocol,

16:02  11  Your Honor.

16:02  12      **THE COURT:**  I do too.  You may be right.  I'm not

16:02  13  saying you're wrong.  It's just that rather than do it at this

16:02  14  point and have them object to everything -- because they're

16:02  15  going to have to do that -- and then have me rule on

16:02  16  everything, you should get together and say, "This is what we

16:02  17  want to do," and see what they say about it.  If they make

16:02  18  objections, I will rule on those objections.

16:02  19      **MR. MURRAY:**  Your Honor, I think that has already

16:02  20  been done.  We designated, they counter-designated, and I

16:02  21  believe we indicated each other's objections.  So it's in a

16:03  22  format for Your Honor to rule on the objections.  Other than

16:03  23  reading through it, I don't know how else to present it to

16:03  24  Your Honor.  We certainly are trying to save the Court's time.

16:03  25      **THE COURT:**  No, no, no.  I don't need that.  If

16:03  1  you-all have done that already, then that's fine.  If you
16:03  2  haven't done it, then you need to do it.
16:03  3         **MR. ISMAIL:**  As to the transcripts, that's true.  I
16:03  4  think we should just submit it, Your Honor can rule on the
16:03  5  objections, and then the exhibits.  Just let us know.
16:03  6         **MR. MURRAY:**  We will get together with defense
16:03  7  counsel on the exhibits, Your Honor, and we'll bring any
16:03  8  conflicts to Your Honor with respect to the exhibits.
16:03  9         **THE COURT:**  What you're telling me is that you-all
16:03  10  have gone through the transcript, the portions, and so forth?
16:03  11         **MR. MURRAY:**  Right.  So what we would be introducing
16:03  12  for Your Honor to take with you are the transcripts with all
16:03  13  the notations of all of our objections so you can read and rule
16:03  14  on them as you read, as opposed to having to read them into the
16:03  15  record.
16:03  16         **THE COURT:**  Okay.
16:03  17         **MR. SALES:**  To cut this short a little bit, our
16:03  18  understanding is what they intend to offer today -- I think
16:04  19  that process, Your Honor, has been done except for with regard
16:04  20  to Dr. Scolnick, Dr. Kaiser, and Dr. Gertz, because there's
16:04  21  some counters that are not yet in that transcript.  There are
16:04  22  some objections that we had on Dr. Gertz that are not yet set
16:04  23  forth in the transcript.  So with regard to those three, I
16:04  24  don't think they're ready to be tendered to the Court because
16:04  25  that process is not finished.

16:04      1          **MR. MURRAY:**  Is that correct, also, for Scolnick?

16:04      2          **MR. SALES:**  That's correct.  It has not been done

16:04      3   yet.

16:04      4          **MR. BLOOM:**  That is not my understanding.

16:04      5          **MR. ISMAIL:**  We could probably do this without having

16:04      6   to watch us meet and confer.  The only thing I would say is we

16:04      7   object if they submit Dr. Pechmann because, as we noted in

16:04      8   chambers, it's four complete depositions of 800 pages.

16:04      9          **MR. MURRAY:**  If they would let me proceed,

16:04     10   Your Honor, then we'll know which ones we're dealing with.  I

16:04     11   was going to introduce at this time Dr. Avorn, who was the

16:04     12   person we just discussed.  The next would be Mr. Anstice.

16:05     13          **THE DEPUTY CLERK:**  What is the date?

16:05     14          **MR. MURRAY:**  June 29, 2006, for Dr. Avorn.  For David

16:05     15   Anstice, it's March 16, 2005.

16:05     16          David Anstice, as Your Honor may recall from

16:05     17   other trials -- I can give you the background, or if you

16:05     18   understand the context, I'll skip.

16:05     19          Then we have Dr. Alan Nies, March 2, 2005.  We

16:05     20   would introduce those.  All of the objections are written in

16:05     21   there.  Scolnick, I had what I thought were complete

16:05     22   defendant's designations.  If they tell me there's something

16:05     23   else, I'll hold off on introducing Scolnick at this time.

16:06     24          **THE COURT:**  Okay.

16:06     25          **MR. MURRAY:**  Those are the three that we would offer

| | | |
|---|---|---|
| 16:06 | 1 | and file at this time.  I will get with defense counsel on |
| 16:06 | 2 | exhibits, and that would conclude our presentation for today. |
| 16:06 | 3 | In light of Your Honor's ruling with respect to exhibits, I |
| 16:06 | 4 | thought we would be spending more time on those, but we'll get |
| 16:06 | 5 | with defense counsel. |
| 16:06 | 6 | **MR. SALES:**  Your Honor, it's our understanding that |
| 16:06 | 7 | we had submitted some material and documents to them.  We've |
| 16:06 | 8 | not yet received that back, so we're not in a position to agree |
| 16:06 | 9 | that that's ready to be submitted to the Court. |
| 16:06 | 10 | With regard to Dr. Avorn, it's our understanding |
| 16:06 | 11 | that they, the plaintiffs, have proffered from two days, not |
| 16:06 | 12 | one day of testimony. |
| 16:06 | 13 | **MR. BLOOM:**  That's correct. |
| 16:06 | 14 | **MR. MURRAY:**  That is correct.  I'm sorry.  That's |
| 16:06 | 15 | June 29, 2006 and June 30, 2006. |
| 16:06 | 16 | **THE COURT:**  Subject to your confirmation, I'll let it |
| 16:06 | 17 | in.  I won't do it as an exhibit, but I'll put them in as a |
| 16:06 | 18 | form of testimony.  Check on the exhibits.  Let me know what it |
| 16:06 | 19 | is.  I'll look at it tonight. |
| 16:07 | 20 | **MR. ISMAIL:**  It's tendered for ruling for objections, |
| 16:07 | 21 | not admitted yet? |
| 16:07 | 22 | **THE COURT:**  Right.  Get with him tonight and see what |
| 16:07 | 23 | it is, Travis. |
| 16:07 | 24 | **MR. SALES:**  Yes. |
| 16:07 | 25 | **MR. MURRAY:**  Your Honor, this binder includes |

16:07  1    Scolnick, which I understand may not be complete, so I'll hold
16:07  2    off on presenting the binder to Your Honor until defense
16:07  3    counsel confirms that what's here is --
16:07  4            **THE COURT:**  I would like to see some of the ones that
16:07  5    you have.
16:07  6            **MR. MURRAY:**  Certainly, Your Honor.  I think Avorn
16:07  7    and Anstice are both complete.
16:07  8            **THE COURT:**  You can do that in a minute, Stephen.
16:07  9    You don't need to do it right now.
16:07  10            Tomorrow, I would like to go to a reasonable
16:07  11    time.  I know we started early and you didn't know how long the
16:07  12    witnesses were going to last, but I hate to stop at 4:00 when
16:07  13    we've got some other time to go.  What is your lineup tomorrow?
16:07  14            **MR. MURRAY:**  Your Honor, tomorrow is Graham, Hood,
16:08  15    and, if we get to him, we may start McGregor.
16:08  16            **THE COURT:**  Those are three live witnesses?
16:08  17            **MR. MURRAY:**  Those are three live witnesses, correct,
16:08  18    Your Honor.  I hope that thereafter we will be able to proceed
16:08  19    with live witnesses until the end, with the exception of the
16:08  20    Harris situation that we discussed with Your Honor this
16:08  21    morning, which may need to be taken out of order.
16:08  22            **THE COURT:**  So you have three more witnesses, live
16:08  23    witnesses, or four more?
16:08  24            **MR. MURRAY:**  Hood, Graham, McGregor, Harris,
16:08  25    and --there's five more live, one who may be out of order.

DAILY COPY

| | | |
|---|---|---|
| 16:08 | 1 | **THE COURT:**  Any other depositions? |
| 16:08 | 2 | **MR. MURRAY:**  Yes.  We have quite a few.  In light of |
| 16:08 | 3 | what I'm learning, discussing with defense counsel, there may |
| 16:08 | 4 | be some more homework that needs to be done in terms of |
| 16:09 | 5 | finalizing, putting their objections into these binders. |
| 16:09 | 6 | **THE COURT:**  How do we look from the standpoint of the |
| 16:09 | 7 | trial proceeding?  Do you feel you are going to rest -- |
| 16:09 | 8 | **MR. MURRAY:**  Your Honor, I am very hopeful that we |
| 16:09 | 9 | would be able to rest by Thursday at the latest, with the |
| 16:09 | 10 | possible holding open for Harris, which we do not expect to |
| 16:09 | 11 | take very much time.  We're talking probably 10 minutes in |
| 16:09 | 12 | light of Your Honor having narrowed the issues and what we have |
| 16:09 | 13 | to ask him about.  He's simply doing some math for us, frankly, |
| 16:09 | 14 | Your Honor. |
| 16:09 | 15 | **MR. ISMAIL:**  Is the Court still Friday afternoon -- |
| 16:09 | 16 | **THE COURT:**  Yes.  I've got a commitment on Friday |
| 16:09 | 17 | afternoon, so I have to leave around noon. |
| 16:09 | 18 | **MR. ISMAIL:**  What time would you like us tomorrow? |
| 16:09 | 19 | **THE COURT:**  We could start at 9:00 tomorrow.  Let me |
| 16:10 | 20 | see counsel at 8:30 so we can deal with some of the other |
| 16:10 | 21 | things.  We'll stand in recess. |
| 16:10 | 22 | **THE DEPUTY CLERK:**  Everyone rise. |
| 16:10 | 23 | (WHEREUPON the Court was in recess for the evening.) |
| 16:10 | 24 | * * * |
| | 25 | |

DAILY COPY

1                              **<u>CERTIFICATE</u>**

2            I, Toni Doyle Tusa, CCR, FCRR, Official Court

3   Reporter for the United States District Court, Eastern District

4   of Louisiana, do hereby certify that the foregoing is a true

5   and correct transcript, to the best of my ability and

6   understanding, from the record of the proceedings in the

7   above-entitled and numbered matter.

8

9

10                                    s/ Toni Doyle Tusa
                                      Toni Doyle Tusa, CCR, FCRR
11                                    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              DAILY COPY