```
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA


**********************************************************************

IN RE:  VIOXX PRODUCTS              MDL No. 1657
LIABILITY LITIGATION                Section: "L"
                                    New Orleans, Louisiana
                                    Tuesday, April 13, 2010

**********************************************************************
THIS DOCUMENT RELATES TO:

State of Louisiana, ex rel
James D. Caldwell, Jr.,
Attorney General

        versus

Merck

Case No. 05-CV-3700
**********************************************************************

                    TRANSCRIPT OF TRIAL PROCEEDINGS
               HEARD BEFORE THE HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
                        DAY 2, MORNING SESSION




APPEARANCES:


FOR THE LOUISIANA DEPARTMENT
OF HEALTH AND HOSPITALS:
                               DUGAN LAW FIRM
                               BY:  JAMES R. DUGAN, II, ESQ.
                               650 Poydras St., Suite 2150
                               New Orleans, LA 70130


                               MURRAY LAW FIRM
                               BY:  STEPHEN B. MURRAY, JR., ESQ.
                                    DOUGLAS R. PLYMALE, ESQ.
                                    JUSTIN BLOOM, ESQ.
                               650 Poydras St., Suite 1100
                               New Orleans, LA 70130
```

-DAILY COPY-

```
 1
                                       LIEFF CABRASER HEIMANN & BERNSTEIN
 2                                     BY:  DONALD C. ARBITBLIT, ESQ.
                                       Embarcadero Center West
 3                                     275 Battery Street, Suite 3000
                                       San Francisco, CA 94111-3339
 4

 5

 6   FOR MERCK:                        GOLDMAN ISMAIL TOMASELLI
                                       BRENNAN & BAUM
 7                                     BY:  TAREK ISMAIL, ESQ.
                                       1 North Franklin St., Suite 625
 8                                     Chicago, IL 60606

 9                                     BAKER BOTTS
                                       BY:  TRAVIS J. SALES, ESQ.
10                                     One Shell Plaza
                                       910 Louisiana
11                                     Houston, TX 77002-4995

12
                                       O'MELVENY & MYERS
13                                     BY:  SCOTT M. VOELZ, ESQ.
                                       400 South Hope Street
14                                     Los Angeles, CA 90071-2899

15

16   Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
17                                     500 Poydras Street, Room HB-406
                                       New Orleans, Louisiana 70130
18                                     (504) 589-7776

19

20        Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

1

2                                  I N D E X

3

4

5    WITNESSES FOR THE PLAINTIFF:                    PAGE/LINE:

6

7    DAVID Y. GRAHAM

8

9      Voir Dire Examination by Mr. Arbitblit        202/1

10     Direct Examination by Mr. Arbitblit           209/15

11     Cross-Examination by Mr. Sales                284/13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                (TUESDAY, APRIL 13, 2010)

3                     (MORNING SESSION)

4

5      (OPEN COURT.)

6           THE COURT:  Be seated, please.  Good morning, ladies and

7  gentlemen.  Call your next witness.

8           MR. ARBITBLIT:  Thank you, your Honor.  The State of

9  Louisiana calls Dr. David Y. Graham, please.

10           THE COURT:  Dr. Graham, do you want to come forward,

11  please, sir.

12           MR. ARBITBLIT:  Your Honor, if I may offer the court the

13  binders of documents so that the court may follow along with the

14  testimony.

15           THE COURT:  Okay.  Good.

16           MR. ARBITBLIT:  I apologize for the delay.  That was to

17  put them in that same order.

18           THE DEPUTY CLERK:  Please step into the witness box,

19  Doctor.  Would you raise your right hand.

20       (WHEREUPON, DAVID Y. GRAHAM, WAS SWORN IN AND TESTIFIED AS

21       FOLLOWS:)

22           THE DEPUTY CLERK:  Please be seated.  And would you state

23  your name for the record.

24           THE WITNESS:  David Y. Graham.

25                     VOIR DIRE EXAMINATION

1    BY MR. ARBITBLIT:

2    Q.   Good morning, Dr. Graham.

3    A.   Good morning.

4    Q.   Could you state your current employment, please.

5    A.   I am employed by Baylor College of Medicine and the V.A.

6    Medical Center in Houston.

7    Q.   Are you a professor at Baylor?

8    A.   Yes.

9    Q.   And what is your field, sir?

10   A.   Internal medicine, subspecialty gastroenterology.

11   Q.   When did you get your medical degree?

12   A.   1966.

13   Q.   Where was that?

14   A.   At Baylor.

15   Q.   And following that did you serve an internship?

16   A.   Internship, residency, fellowship.

17   Q.   And did you serve in the military as a physician?

18   A.   Yes.

19   Q.   And when was that?

20   A.   During the Viet Nam conflict, in '67, '68, '69.

21   Q.   Can you give the court a brief description of the progression

22   of your career at Baylor from the time you started there to today?

23   It doesn't have to be too lengthy, but please give the court some

24   information about that.

25   A.   Well, I went on the -- I came back from Viet Nam and finished

1    my residency and then did my fellowship and then went on the

2    faculty as assistant professor and was promoted up through the

3    ranks to eventually become a professor in about 1983.  And then I

4    became chief of the section of gastroenterology until a couple of

5    years ago when I gave that up, and I am still there.  I won't be

6    there as long as Dr. DeBakey but I'll try.

7    Q.  And you were chief of the gastroenterology section at the V.A.

8    Medical Center for what years?  It says in your CV 1976 to 2007; is

9    that correct?

10   A.  Correct.

11   Q.  Do you have a current copy of your CV there in your binder at

12   tab 1?

13   A.  Yes.

14   Q.  It's a long career, sir, so if you need any help remembering

15   when things happened, please feel free to refer to it.  And for the

16   record that's identified as Exhibit LAAG 532.

17        Doctor, have you previously served as the president of

18   the American College of Gastroenterology?

19   A.  Yes.

20   Q.  Is that an elected position by the membership?

21   A.  Yes.

22   Q.  And you are certified in internal medicine since 1972; is that

23   right?

24   A.  Yes.

25   Q.  And also in gastroenterology since 1975?

1    A.  Yes.

2    Q.  Are you a member of professional societies dealing with issues

3    of gastroenterology?

4    A.  Yes.

5    Q.  Can you identify a couple of them?

6    A.  All of them except the Liver Society, I gave that membership

7    up.

8    Q.  Did you receive the Clinical Achievement Award from the

9    American College of Gastroenterology in 1995?

10   A.  Yes.

11   Q.  Have you received an Excellence in Research award from Baylor

12   College in 1998?

13   A.  Right.

14   Q.  Are you listed among the Top 50 Most Influential

15   Gastroenterology Professionals of the 20th Century?

16   A.  For whatever that means.

17   Q.  What does it mean?

18   A.  I don't have any idea, I didn't put myself on that list.

19   Q.  Someone else did it for you?

20   A.  Just some group did that and they told me about it, so I wrote

21   it down, it sounded pretty impressive.  My mother thought it was

22   impressive anyway.

23   Q.  Are you a fellow of the American Society for the Advancement of

24   Science?

25   A.  Yes.

1    Q.  And do you serve on editorial boards for professional journals?

2    A.  Several, yes.

3    Q.  In the field of gastroenterology?

4    A.  In the field of gastroenterology.

5    Q.  Have you served as a reviewer for many medical journals?

6    A.  Too many.

7    Q.  Including gastroenterology?

8    A.  Gastroenterology.

9    Q.  And the *New England Journal of Medicine*?

10   A.  The *New England Journal of Medicine*.

11   Q.  And the long list of others?

12   A.  And many others.

13   Q.  And you also hold some patents for -- what are the patents for,

14   sir?

15   A.  The patents are related to diagnostic tests for *Helicobacter*

16   *pylori* or for vaccine development for the cruise ship virus and

17   Norwalk virus.

18   Q.  You mentioned *Helicobacter pylori*, sir?

19   A.  Yes.

20   Q.  Has that been a subject of your research?

21   A.  *Helicobacter pylori* came along at the right time for me and so

22   I was able to get involved early and stay involved.

23   Q.  Just briefly what has -- what is *H. pylori* or *Helicobacter*

24   *pylori*?

25   A.  It's a bacterium that is very common in human beings, and it

1    turned out to be the cause of most ulcers and the cause of gastric

2    cancers, so it's still a major problem, gastric cancer is number

3    two in the world, and it's a preventive, treatable eliminatable

4    disease, and one of my goals is to see that we do that.

5    Q.  And have you authored more than 800 scientific articles and

6    more than 100 chapters in books?

7    A.  I have.

8    Q.  Did you start doing research on issues relating to aspirin and

9    effects on the gastric mucosa in the 1980s?

10   A.  In the 1980s, yes.

11   Q.  And looking at your CV, I see that there's a reference in 1985

12   to gastroenterology, did you author an article on that in 1985?

13   A.  I don't know which one you're talking about, but I've --

14   Q.  It's item number 130.

15   A.  I continued to publish in that area since I began.  Yes.  That

16   was not one my first but that was, yes, that was one of my papers.

17   Q.  And then going over onto the next page, 133.  Did you write one

18   of the early articles on the effects of nonsteroidal

19   anti-inflammatory drugs on the gastric mucosa?

20   A.  A number of the early ones, aspirin is a nonsteroidal

21   anti-inflammatory drug, so we work with aspirin, and then the new

22   drugs as they became available.

23   Q.  And you've also written articles about the effects of red

24   pepper, black pepper and spicy food on the stomach; is that right?

25   A.  Sure have.  Actually, I came over to Louisiana once and gave a

1  talk with Paul Prudhomme.  He talked about cooking, I talked about

2  what it did to you.

3  Q.  And, Doctor, we'll get into the substantive later, but I wanted

4  to mention number 170 on your CV at page 17, "Gastric Adaptation

5  Studies in Man During Continuous Aspirin Administration"; is that

6  an article you wrote on the subject of gastric adaptation?

7  A.  Yes, yes.

8  Q.  And then 178 -- there is 177, "Spicy Food and the Stomach"; is

9  that one of the ones you were talking about?

10  A.  Yes.

11  Q.  And 178, "Prevention of NSAID-induced Gastric Ulcer With

12  Misoprostol:  Multicenter, Double-Blind, Placebo-Controlled Trial"

13  published in *Lancet* in 1988.  Is that one of your works?

14  A.  Yes.

15  Q.  And have you worked in the area of the gastrointestinal effects

16  of NSAIDs or nonsteroidal anti-inflammatory drugs continuously

17  since the 1980s?

18  A.  I have.

19  Q.  And have you published repeatedly on that subject?

20  A.  Yes.

21  Q.  And when we use the term NSAIDs, do you include the COX-2

22  inhibitor class or cyclooxygenase-2 inhibitors class among the

23  NSAIDs?

24  A.  Yes.

25  Q.  So your articles have covered both; is that right?

1    A.  Yes.

2    Q.  Doctor, are you an expert in the field of gastroenterology?

3    A.  Yes.

4    Q.  And are you an expert on the subject of the toxic effects of

5    nonsteroidal anti-inflammatory drugs or NSAIDs on the GI tract?

6    A.  Yes.

7    Q.  And do you include the COX-2 inhibitors in that category?

8    A.  Yes.

9    Q.  And is Vioxx one of those?

10   A.  Yes.

11   Q.  Are you an expert on the subject of clinical trial methods to

12   evaluate gastrointestinal toxicity in NSAIDs?

13   A.  In humans, yes.

14   Q.  And you've published a number of peer-reviewed articles on the

15   subject?

16   A.  Yes.

17   Q.  Have you designed clinical trials to evaluate gastrointestinal

18   toxicity of NSAIDs?

19   A.  Yes.

20   Q.  Are you an expert on the subject of steroid use as a risk

21   factor affecting GI toxicity?

22   A.  Yes.

23   Q.  Are you an expert on the subject of the use and interpretation

24   of endoscopy to detect toxic effects of NSAIDs?

25   A.  Yes.

1   Q.  And are you an expert on the subject of the dose response

2   relationship between NSAIDs and GI toxicity?

3   A.  Yes.

4          MR. ARBITBLIT:  At this time, your Honor, plaintiff

5   tenders Dr. Graham as an expert on the subjects in the list we just

6   described, that I won't repeat unless your Honor needs me to.

7          MR. SALES:  No objection.

8          THE COURT:  Let him be admitted as an expert in the

9   designated fields.

10          MR. ARBITBLIT:  And may we tender the curriculum vitae

11   previously identified as the exhibit marked?

12          THE COURT:  I'll admit it into evidence as Exhibit 532.

13          MR. ARBITBLIT:  Thank you, your Honor.

14                         DIRECT EXAMINATION

15   BY MR. ARBITBLIT:

16   Q.  Dr. Graham, what was your assignment in this case?

17   A.  I was asked to review material with a question about whether

18   rofecoxib or Vioxx was damaging to the gastric mucosa; and

19   secondly, whether it was essentially any different from other

20   nonsteroidal anti-inflammatory drugs.

21   Q.  And have you formed opinions on those questions?

22   A.  I have.

23          MR. ARBITBLIT:  Your Honor, just as a matter of how the

24   court would like to proceed, the witness could state briefly what

25   his opinions are and then go forward.

1          THE COURT:  That's fine, you make that decision.

2   Whatever you're comfortable with I am.

3          MR. ARBITBLIT:  Thank you, your Honor.

4   BY MR. ARBITBLIT:

5   Q.  As to the first question, have you come to an opinion as to

6   whether Vioxx is gastro toxic?

7   A.  Yes, it is.

8   Q.  And as to the second question, have you formed an opinion as to

9   whether Vioxx differs substantially from other NSAIDs in terms of

10  its gastric toxicity?

11  A.  I have.  And it's not.

12  Q.  And we'll go into the reasons for your opinion during your

13  testimony today.

14          Before we get into the specifics on Vioxx, it probably

15  would be helpful for you to give a little background on the subject

16  so that the court understands what it is your testimony relates to.

17          Is there a range of effects that NSAIDs can cause?

18  A.  Yes.

19  Q.  And does that range vary in severity or seriousness?

20  A.  Widely, yes.

21  Q.  Do NSAIDs cause some effects that are temporary and others that

22  are long-lasting or permanent?

23  A.  It causes them, yes; and not necessarily permanent but more

24  serious.

25  Q.  What is a topical injury?

1   A.  Well, when you put something on the mucosa, on the lining of

2   anywhere in the gut, if it's toxic, corrosive, it will cause acute

3   damage just because the presence of it being there, just like

4   pouring acid on something.

5   Q.  Would it be like holding an aspirin in your mouth?

6   A.  Good example to a lay person would be, yes, if you hold an

7   aspirin in your mouth it'll cause damage in a little, small

8   ulceration.

9   Q.  Is that the type of damage that tends to go away fairly

10  promptly or persist?

11  A.  It heals quite rapidly.

12  Q.  What is an erosion?

13  A.  An erosion -- well, we define these by the depth of the damage,

14  and so if -- the stomach has a number of layers, the first one

15  called the mucosa, very thin surface, and if just goes through that

16  layer, it is called an erosion.

17  Q.  And are there also systemic effects of NSAIDs on the gastric

18  mucosa or lining?

19  A.  Well, the major effect is thought to be systemic for the class

20  of drugs, because they inhibit the enzymes that make the products

21  that protect the lining of the stomach.

22  Q.  Are those different from the topical effects?

23  A.  They're different from the topical effects, yes.

24  Q.  Can you explain how?

25  A.  Well, the topical effect is a product of the drug.  For

1   example, to damage the stomach the drug has to be soluble in

2   gastric acid and it has to be toxic, where if you put it on

3   anything it would cause damage, where the systemic effects are

4   bloodborne, and you get the same effect whether you gave the drug

5   by vein, for example, or put it rectally, you still see changes in

6   the stomach.

7   Q.  So, in other words, it doesn't matter whether you put the drug

8   right on the stomach lining or the effected tissue, it would cause

9   damage no matter how it got into the body?

10  A.  That's what happens, yes.

11  Q.  And that would be the systemic?

12  A.  That's the systemic effect.

13  Q.  And do doctors use the term natural history to describe a

14  course of an injury or disease?

15  A.  Yes.

16  Q.  How would you describe the natural history of the topical

17  effects of NSAIDs?

18  A.  Most topical effects are quite trivial.  For the individual.

19  They may be very dramatic to look at because you may see bleeding

20  and damage just the same as if you scratch yourself on a bramble

21  bush, but then they heal quite rapidly.  The body is well designed

22  to take care of what goes into the stomach.

23  Q.  Earlier we went over your CV, and there was an article or two

24  in the early days about a subject of mucosal adaptation.  Can you

25  explain what that is?

1    A.   That's a very interesting phenomenon, that the stomach, when

2    it's subjected to some damage, for example, aspirin, when you first

3    start taking aspirin, you see damage in almost everybody and it's

4    pretty widespread.  And if you continue to take aspirin, the damage

5    heals and goes away despite the fact that you're continuing to take

6    aspirin.  So that it's an adaptive response, if you like, in the

7    stomach to injury.

8    Q.   Does that adaptation take place generally without any long-term

9    consequences to the patient?

10   A.   I mean, it's a protective response to damaging agents.

11   Q.   What is the typical appearance of the GI mucosa after high dose

12   of an NSAID such as ibuprofen?

13   A.   Typically you'll see damage.  You'll see -- it varies

14   remarkably, but you typically see small bleeding points and small

15   erosions and possibly large erosions.  In some patients, if they

16   continue to take it, actually that might clear up and a large ulcer

17   might form.

18   Q.   So if you took ibuprofen because you had a sore back for a day,

19   would you likely get some topical effects from that?

20   A.   Yes.  In fact, endoscopy in looking in the stomach for another

21   reason would often I'd ask the patient, you took aspirin or

22   ibuprofen or something today or yesterday, didn't you.

23   Q.   In contrast to the topical effects, do systemic effects of

24   NSAIDs cause clinically-important ulcers?

25   A.   Yes, yes, they cause clinically-important disease.

1    Q.  And is that a public health issue that you've addressed a lot

2    of time and effort to over the course of your career?

3    A.  It's become an important problem.

4    Q.  Now, do you have slides of photographs showing the various

5    degrees and types of GI effects of NSAIDs that will help display

6    and explain your testimony?

7    A.  I brought some, yes.

8    Q.  And did you take these photographs yourself?

9    A.  Most of them, yes.

10   Q.  And have you published them in a textbook?

11   A.  Yes.

12   Q.  Is that textbook used as a teaching tool in medical school?

13   A.  Well, for gastroenterologists in general.

14   Q.  And do those slides show the range of GI effects of NSAIDs?

15   A.  Well, they show examples.

16   Q.  Can we show the slides, please.

17        Dr. Graham, can you start with this and explain what this

18   drawing shows?

19   A.  This is, I didn't make this drawing, this is widely used

20   schematic and it shows, again, the layers of the stomach, the

21   mucosa, the two muscle layers which are in gray; and then, as you

22   can see, the first one is just erosion, which is damage into the

23   mucosa and not going through the muscle layer.  If it goes through

24   that first muscle layer, it's called an ulcer, that would be an

25   acute ulcer; and then clinical disease is typically the third type,

1   where it goes all the way deeper and the response of the body is

2   fibrosis and the problem there is to heal that ulcer.

3           The problem with ulcers is that that's where the blood

4   vessels are and it can run into a blood vessel and bleed or it can

5   actually go penetrate through the whole wall of the stomach and

6   cause a perforation.

7   Q.  On the left-hand side showing the mucosa, that's the stomach

8   lining; is that right?

9   A.  The stomach lining, just like the lining on the inside of your

10  mouth or any gastrointestinal tract.

11  Q.  And the erosion that's next to that, is that something that,

12  where there's a black line dividing an erosion from an ulcer?

13  A.  The muscle layer is beneath it, and we arbitrarily say if it

14  goes through the muscle layer it is an ulcer.  For example, when I

15  do a gastric biopsy, I use big forceps and I always call it an

16  ulcer, but they heal right up.

17  Q.  So are the erosions among the type of damage that can heal

18  without further clinical relevance to the patient?

19  A.  Yes.

20  Q.  What is endoscopy?

21  A.  Endoscopy means to look into.  Nowadays we have fibroscopes

22  with a camera on the end and we have patients swallow it and we

23  look in their stomach, or we can put it up the other end and do a

24  colonoscopy.  That's how gastroenterologists make their money.

25  Q.  I was going to ask what the uses of endoscopy are, sir.

A.  Well, it's to help patients.  The world has changed, where in the past when someone had pain somewhere we had to X-ray it, now we can look at it, biopsy it.

Q.  Are endoscopies sometimes used in clinical studies of NSAIDs and COX-2 inhibitors?

A.  It's the easiest way to see what's going on in the stomach.

Q.  Do you have any concerns about the use of endoscopy for that purpose?

A.  Well, like anything else, it's a good tool if used correctly.

Q.  Are there times when you believe it has not been used correctly?

A.  Well, like any other tool, you can set up the circumstances to where you more likely to get an answer that you want.

Q.  And what do you mean by that, sir?

A.  Well, in the very early days of this when new drugs were coming out, because all we had for many years was aspirin, and when new drugs came out, they wanted to show they were safer.  And so they would test a very low dose of their drug against about two or two and a half grams of aspirin, a very large dose, and it was easy to show the stomach would look different.  But clinically, they weren't really much different.

Q.  Is it possible to design a study in a manner that favors a drug in a GI toxicity and safety analysis?

A.  Of course.

Q.  And how would you do that?

1  A.  Well, if you knew the characteristics of the different agents,

2  then you can decide which drug to use, whether a damaging drug,

3  non-damaging drug, how much, and to do a comparison so that you can

4  easily do a study that would come out with the answer that you

5  wanted.

6  Q.  Is there a dose-response relationship between the amount of an

7  NSAID and the degree of damage?

8  A.  Yes.  In most NSAIDs, the more you give, the more damage that

9  they cause.

10  Q.  And, for example, would there be a greater degree predictably

11  of GI damage from a 2400-milligram dose of ibuprofen than from a

12  1200-milligram dose per day?

13  A.  Both clinically and endoscopically.

14  Q.  What dose of ibuprofen did Merck use in its clinical trials?

15  A.  They used 2400 milligrams.

16  Q.  Did that dose predictably cause more GI effects than a

17  1200-milligram dose would have caused?

18  A.  Yes, it would.

19  Q.  Would the same be true for other NSAIDs such as diclofenac,

20  that if you gave a higher dose, you would get more damage than if

21  you used a lower dose?

22  A.  With almost all of the NSAIDs that's the truth, yes.  There's a

23  nice dose-response effect, and that leads to the clinical adage

24  that we always tell and write, patients should use the lowest dose

25  that's effective and for the shortest time.

1    Q.  Can we show the next slide, please.

2            What does this depict?

3    A.  This is an actual stomach, this is an actual ulcer through the

4    stomach, and you can see it again, the layer on the top, the

5    mucosa, and it's eroded all the way down through the wall, where

6    it's only protected from the holes in the bottom of the fat and

7    the -- outside the stomach and it's only protected by the fibrosis.

8    This was one that was removed surgically.

9    Q.  Doctor, can NSAIDs cause this type of damage?

10   A.  Yes.

11   Q.  Can Vioxx cause this type of damage?

12   A.  Any NSAID can cause this type of damage.

13   Q.  Including Vioxx?

14   A.  Including Vioxx.

15   Q.  Next slide, please.

16           What does this show?

17   A.  This is an endoscopic view of a stomach of a patient who had

18   taken aspirin, and you can see the little brown marks, that's blood

19   actually leaking out from little erosions into the stomach.  And

20   it's in the lining of the stomach, the acid in the stomach, you can

21   see streaks of blood in that stomach.

22           And that would mean clinically nothing, but if you're

23   comparing agents, this is what Tylenol did when they wanted to show

24   it was safer than aspirin, that they didn't cause it and aspirin

25   did cause it, and so that must be meaningful to someone.

1    Q.  It might look pretty bad to us lay people, but you're saying

2    that it's not clinically significant?

3    A.  It's not clinically significant.

4    Q.  And is this the type of damage that you were talking about that

5    heals promptly?

6    A.  Yes.

7    Q.  Can we show the next slide, please.

8            What are these representing?

9    A.  These are two examples of, if you took drugs for a day or two

10   and you caused that damage that we saw how it would heal.  On the

11   far side is small erosions, the little black points are some blood

12   on the surface and those are very, very superficial, no different

13   than, again, if you scratched yourself.  And you would see those

14   for maybe a day or two or three and they would disappear.

15           On the other side is more acute damage, and you can see

16   many of these little small erosions around the surface of the

17   stomach, and that's very dramatic, but again, it's clinically

18   insignificant.

19   Q.  Can we show the next slide, please.

20           What does this one represent?

21   A.  This is a much bigger type lesion and it's probably a half inch

22   and it's got the black surface on it, and many people would think

23   this was an ulcer, but it's actually very, very superficial and on

24   the next slide...

25   Q.  Next slide, please.

```
 1    A.  Go to the next slide.

 2    Q.  Actually, the next slide was considered too gory for public

 3    display.

 4    A.  Okay.  Well, as I just showed, the surface and the, the whole

 5    lining thickness was less than the width of a dime, I mean very,

 6    very thin, so it looks very dramatic, but it turns out to be very,

 7    very superficial and would heal up very quickly.

 8    Q.  Doctor, did you write an article or an editorial called

 9    "Endoscopic Ulcers Are Neither Meaningful Nor Validated," et

10    cetera?

11    A.  Yes.

12    Q.  And can we just show that.  Is there a way to show just the

13    front page of that?

14           MR. ARBITBLIT:  Your Honor, and Dr. Graham, if you could

15    turn to the second tab in the binder.

16           THE WITNESS:  All right.

17    BY MR. ARBITBLIT:

18    Q.  Are you there?

19    A.  Yes.

20    Q.  Sir, is the editorial that you wrote in the *Journal of Clinical*

21    *Gastroenterology and Hepatology* 2009?

22    A.  Yes.

23    Q.  And could you just read the complete title into the record,

24    please?

25    A.  "Endoscopic Ulcers Are Neither Meaningful Nor Validated as a
```

1    Surrogate For Clinically-Significant Upper Gastrointestinal Harm."

2    Q.  Was this editorial peer reviewed before publication?

3    A.  Yes.

4           MR. ARBITBLIT:  Your Honor, we would ask that it be

5    admitted to the extent permissible under the rules and that he be

6    allowed to read from it.

7           THE COURT:  Well, he can read from it, but I am not going

8    to make it a part of the record.  But he can do what he needs to do

9    from it.

10          MR. ARBITBLIT:  Thank you, your Honor.

11   BY MR. ARBITBLIT:

12   Q.  How did it come about that you wrote this editorial?

13   A.  Well, Pfizer makes nonsteroidal anti-inflammatory drugs also

14   and they were interested, for some reason, in this topic and wanted

15   to get it published primarily because the companies have all been

16   pushing for surrogate end points because these studies are very

17   easy to do and much less expensive than real studies that came with

18   real end points.

19          And they got a company to do a white paper, whatever that

20   means, to prove this.  And they gave that to their, some of their

21   people on their advisory board and asked them if they wanted to

22   turn it into a manuscript and they did.  And they submitted it for

23   publication, and I saw a draft and I talked to them, and sent a

24   note to the editor, saying this is a very biased manuscript and

25   avoids all of the options -- all of the examples where it doesn't

1  work.  And he said, my goodness, I think you need to write an

2  editorial about this to put the record straight.  And so I did and

3  there it is.

4  Q.  And was this written before you were ever contacted about a

5  Vioxx lawsuit?

6  A.  Yes.

7  Q.  You just mentioned a couple of terms that I would like you to

8  define for the court.  One of them was surrogate.  What is a

9  surrogate end point?

10  A.  Well, clinically, a surrogate end point is an end point that

11  stands for, in place of.  Probably one of the examples that we use

12  most widely is blood pressure because as your blood pressure goes

13  up, your risk of heart attack and stroke goes up, so that if you

14  can use bringing your blood pressure down as a surrogate for

15  prevention of strokes and heart attacks.

16  Q.  Are there scientifically-accepted criteria for what makes a

17  surrogate end point a useful predictor?

18  A.  Yes.

19  Q.  And what are those criteria?

20  A.  Well, they're listed in this paper and you've highlighted some

21  of them, but the major part is they have to be validated, they have

22  to reliably identify and be highly and consistently reproducible

23  that, that the end points you're measuring actually is a true

24  surrogate for the end point that you are using it as a surrogate

25  for.

1          And I think the beginning of the article is the most

2    striking as a quote from Dr. Fleming, who said, "A correlate does

3    not a surrogate make."  And the whole paper that have been written,

4    the white paper, the paper that I wrote the editorial about, was

5    only about correlations, that this correlated with that and

6    therefore it must be a surrogate, and that's not what a valid

7    surrogate is.

8          And there are many examples of times when surrogates that

9    were thought to be good surrogates failed, and this is one, there

10   are many easy to find failures for this showing that it was really

11   a pipe dream that you could use an endoscopic finding to substitute

12   for an actual bleed or perforation or clinically-important event.

13   Q.  We'll get into it a little more later, but just to tie in what

14   you're talking about to the facts of the case, did Merck use

15   clinic -- did Merck use endoscopic ulcer end points such as those

16   you're describing in this editorial for its clinical trials of

17   Vioxx?

18   A.  In all of their trials, they included endoscopic ulcers as one

19   of the criteria.

20   Q.  In the second column on the first page, could you read that

21   first highlighted text, either from your article or the screen?

22   A.  "In the absence of a very well-validated surrogate end point,

23   the primary end point should be the true clinical outcome."

24   Q.  And in the case of gastric toxicity of NSAIDs, what is the true

25   clinical outcome?

1    A.  Well, the events that we're trying to prevent are those serious

2    events, bleeding, perforation or obstruction, which are all

3    potentially life-threatening events that occurred in patients that

4    are caused by NSAIDs.

5    Q.  And are those different from endoscopic ulcers?

6    A.  Well, endoscopic ulcers occur, again, in potentially everyone,

7    and all they tell you is that that drug is likely to cause

8    bleeding, perforation or obstruction, but the absence of endoscopic

9    ulcers does not tell you that it will not do that.  There are good

10   examples of drugs that, when given, don't cause or rarely cause

11   endoscopic ulcers, and yet, when tested in patients, caused

12   bleeding, perforation and obstructions and were clinically more

13   dangerous drugs.  And so early shown that was not a good surrogate,

14   that it would tell you again that this one is one that you should

15   be careful about, not that this one is going to be safe.  You have

16   to test it to find out.

17   Q.  You give an example in this editorial of the experience with a

18   drug called sulindac.

19   A.  Sulindac, yes.

20   Q.  Can you briefly describe what happened and what people learned

21   about that?

22   A.  Sulindac is a very good drug, and it was one of the first

23   nonsteroidal anti-inflammatory drugs that was not aspirin.  And

24   when you gave it to people these endoscopic studies, it rarely

25   didn't cause damage.  And actually, we did studies to ask why it

1   didn't cause damage and there were several reasons; one, it's a pro

2   drug, so it's not an active nonsteroidal anti-inflammatory drug

3   when it's in the stomach.  And secondly, it's not soluble in

4   gastric contents, so it can't interact with the gastric mucosa.

5           And so people thought, well, this is a great drug.  You

6   can compare it to aspirin, for example, and show that it didn't

7   cause damage.

8           But then when it was taken to the market and they did a

9   big comparison study of taking nonsteroidal anti-inflammatory

10  drugs, it actually led the list associated with major bleeding and

11  proving that, I guess the best you can, that the surrogate is a

12  surrogate only when it's proven to be one.  And this showed that

13  endoscopic ulcers are not a surrogate for prevention or protection.

14  Q.  And when were those studies of sulindac done?

15  A.  In the '80s.

16  Q.  So those would have been known to scientists by the '90s when

17  Vioxx was being developed?

18  A.  It was a Merck drug, I think.

19  Q.  Sulindac was a Merck drug?

20  A.  Uh-huh.

21  Q.  Was sulindac a Merck --

22  A.  I think it was a Merck drug, yeah, we did those studies, I

23  think, with Merck.  Still is, it's -- I mean it's still used.

24  Q.  In the right-hand column of page 1148 under the heading Where

25  Do We Go From Here, could you just read that highlighted text for

1    the court?

2    A.  "A useful surrogate end point must be able to reliably identify

3    and highly and consistently reproducible, with minimal observer

4    variability -- must be able to be reliably identified and highly

5    and consistently reproducible with minimal interobserver

6    variability.  Endoscopic ulcers as currently used meet none of

7    these prerequisites."

8    Q.  And with respect to the prerequisite of interobserver

9    variability, what does that refer to?

10   A.  Well, that if two observers looked at the same lesion, that

11   they would call it the same thing.

12   Q.  Have you actually done studies to show the degree of variation

13   and the interpretation of endoscopic ulcers by people who've done

14   them as opposed to experienced endoscopists?

15   A.  Well, not a well really a prospectively designed randomized

16   trial, but we did take the videotape that's used to teach

17   endoscopists how to -- what to call things.  And I took the sound

18   off so no one knew what they were supposed to call them and sent

19   the tape to friends of mine who are experts in this field, and they

20   looked at it and called lesions what they would call them

21   clinically.  And about 40 percent of the time they disagreed with

22   what they were supposed to call them if it were for an endoscopic

23   study.

24          And, in fact, when I would do endoscopic studies like

25   this, they all were over called ulcers and I would code the ulcer

DAILY COPY

1   in my record as "ulcer for study purposes only."  Meaning it met

2   the criteria but clinically it was not.

3   Q.  You mentioned that you've done endoscopic studies yourself; is

4   that right?

5   A.  Yes.

6   Q.  Are those -- when you have done them, have they been to

7   conclude safety or to generate hypotheses?

8   A.  Well, most of the ones we did were to testing hypotheses.  But

9   sometimes they were to -- I mean, you don't do safety with those,

10  there are many times there are marketing studies, but the ones we

11  were doing would be to test, for example, new formulations to see

12  if they were protective.

13  Q.  And could you read the last highlighted statement from page

14  1149 of your article, and try to read it a little slower so we can

15  understand it.

16  A.  "Considering all of the problems and uncertainties currently

17  surrounding endoscopic ulcers, we believe it is unlikely they will

18  ever become more than a marketing tool of uncertain relevance."

19  Q.  And what do you mean there by calling endoscopic ulcer

20  detection a marketing tool?

21  A.  Well, that's how they were originally widely used, and they

22  would, the companies would have a new drug and they would, this is

23  in the early days particularly when new drugs were coming out, and

24  they would do one of these studies and they would show these

25  terrible-looking pictures and then they would show their drug with

1    no terrible-looking things and they would say, obviously, there

2    must be a difference here.

3    Q.  And, in your opinion, was that difference a real one?

4    A.  Well, those are strictly marketing, people that did them knew

5    they were marketing, and the people that read them knew they were

6    marketing.  But they extended that same approach into much more

7    serious problems like this, which is what they're not really --

8    they were never intended for this type of study.

9    Q.  I want to just mention one thing that I intended to address

10   with you earlier, Doctor, before we move on to the next subject.

11   And that is, are you personally taking any money that goes into

12   your bank account for your work on this case?

13   A.  No.

14        MR. SALES:  Objection, your Honor.  To the extent that he

15   is trying to solicit testimony regarding what he is going to do

16   with money he is being paid for in this case consistent with the

17   court's prior ruling.

18        THE COURT:  I understand.  It goes to credibility.  I'll

19   allow it.  Let's see where he is going with it.

20   BY MR. ARBITBLIT:

21   Q.  What has happened to the money that you invoiced for your work

22   on this case?

23   A.  It's deposited at the medical school and it'll be used to

24   support research, it'll be controlled by the section chief.  I'll

25   have a little input.  I've asked, for example, that we have an

1   annual conference or weekly conference, and the school is taken

2   away all of our coffee and I've asked that some of the money be

3   used to give us that coffee back.

4   Q.  Sir, other than the coffee fund, is the section chief

5   responsible for what happens to that money?

6   A.  Yes.  I hope I can encourage him to do things with it that

7   would support.  I mean, it will go to the young investigators.

8   Q.  Thank you.

9   A.  Except for the part the school took for whatever they do with

10  it.

11  Q.  Now, did Merck's clinical trials use the surrogate end point of

12  endoscopic ulcer detection?

13  A.  They did trials with endoscopic ulcers.

14  Q.  And is it your opinion today consistent with your editorial as

15  to whether endoscopic ulcers are a meaningful or validated

16  surrogate for clinically-significant gastrointestinal harm?

17  A.  Yes, I have not changed my opinion.

18  Q.  Do you have an opinion as to whether erosions that can go away

19  without further damage can be reliably distinguished from what are

20  called endoscopic ulcers?

21  A.  Well, they -- maybe, but not by the average person.  I mean, if

22  you're well trained in this and this is what you do routinely,

23  you're much better at it.  But the people who do these things, they

24  go out and get a bunch of plain gastroenterologists that have never

25  worked in this area and show them a tape and then they do things,

1    and it's clear they have no idea what they're looking at.

2    Q.  Is that the kind of tape you were talking about earlier, where

3    you compared it with experts?

4    A.  Right.  Yes.

5    Q.  And found the discrepancy?

6    A.  Yes.

7    Q.  Are there studies that have reported substantial rates of

8    endoscopically-detected ulcers among subjects taking a placebo?

9    A.  There are.

10   Q.  Does a placebo cause ulcers?

11   A.  Well, no, I mean, it shouldn't.

12   Q.  How do you explain the finding of endoscopic ulcers in subjects

13   taking placebo?

14   A.  The -- why you would use the placebo is to make sure that the

15   experiment is working because if you take a normal person and look

16   in their stomach and see there's nothing there and give them a

17   placebo for a relatively short time and then look again, you would

18   expect there to be nothing there.  And if there is something there,

19   that either means that the technique that you're using,

20   endoscopists that you're doing is over calling things, or that the

21   patient's repetitiously taking something besides the placebo.

22   Q.  Doctor, I want to briefly go over a subject relating to

23   something you talked about earlier just to expand on it a bit, and

24   that is the dose-response relationship.

25            What is the reason for the rule that you expressed a

1    little earlier about using the lowest effective dose for the

2    shortest time of an NSAID?

3    A.  Well, early on back in the '50s they first showed that

4    dose-response effect for ulcers with aspirin, and that's all we had

5    for an NSAID.  And so as they gave more and more aspirin, the

6    frequency of having gastric ulcer went up and up and up.  And then

7    in that modern era with NSAIDs, and that was looked at, it turned

8    out to be the same, that there's a dose -- the more you took, the

9    more likely you were to have an untoward event.

10           So it became obvious that a patient should take as low a

11   dose as they could that gave them the benefit that they wanted to

12   have.

13   Q.  Have you published on the subject of what is considered an

14   effective dose of ibuprofen?

15   A.  I've -- yeah, discussed the use of dosing for patients, yes.

16   Q.  And what have you written in your own published work?

17   A.  Well, I have not done the studies myself, what I've done is

18   quoted from the studies that were done.  And one of the models, one

19   of the standard models is dental pain, where you have a root canal

20   or you have a tooth taken out and they measure the amount of pain

21   that you have and the amount of pain relief that you get with the

22   drug.

23           And they've compared, for example, aspirin, Tylenol,

24   ibuprofen, and it turns out that in ibuprofen, 200 milligrams is a

25   very effective analgesic dose and 400 milligrams is slightly better

1    and more than that doesn't give you any more pain relief.  So if

2    you're using it for pain relief, there would be no indication to

3    give more and you're probably going to get all that you need with

4    200.  The same with aspirin.  One aspirin gives you good pain

5    relief, we knew that; two aspirin is better; more aspirin than

6    that, no more pain relief.

7            And so if you point out that if you're going primarily

8    after analgesia, there are certain dosages you use.  And then if

9    you want anti-inflammatory activity in addition, then you may have

10   to either use a different drug or go up higher on the dosing.

11   Q.  Did you survey the literature on ibuprofen dosing in order to

12   write the articles you've published?

13   A.  I have.

14   Q.  And if you could turn to your report, I just want you to expand

15   a little bit on the citations on dosing at paragraph 17, which

16   starts at page 6.

17           In particular, did you write an article stating that 200

18   milligrams of ibuprofen is a very effective analgesic dose and 400

19   milligrams provides maximum analgesic effect?

20   A.  That's what I said based upon those dental studies.

21   Q.  And that's cited to your own 1996 article in the report; is

22   that right?

23   A.  Right.

24   Q.  Would that be true on a daily basis of -- how many times a day

25   would a person take that if they wanted to have relief from pain

1  the whole day?

2  A.  Typically for ibuprofen, it would be three times a day.

3  Q.  So what would the range then be if you were taking 200 to 400

4  three times a day?

5  A.  Well, that would be 600 to 1200 milligrams.

6  Q.  If you took 2400 milligrams of ibuprofen, would you be getting

7  greater toxicity to the GI tract?

8  A.  You would be getting greater toxicity to the GI tract without

9  any improvement in analgesia.

10  Q.  Did you cite an article in your report by Garcia Rodriguez from

11  1994 published in *The Lancet*?

12  A.  Yes.

13  Q.  What did Garcia Rodriguez find about the number of subjects who

14  were taking 2400 milligrams of ibuprofen in that study population?

15  A.  Well, they found that there were, there really were not any,

16  there were only a couple of patients in a very large population

17  that were actually taking that much drug.

18  Q.  Well, you said a couple and your report says prescribed to only

19  two, was it actually two?

20  A.  Two.

21  Q.  Two subjects were taking 2400 milligrams ibuprofen out of the

22  whole population?

23  A.  Right.  80 percent were taking less than 1500 milligrams.

24  Q.  And could you just take a look at the closing sentence of that

25  paragraph and just read that into the record and tell us if that's

1   your opinion today?

2   A.   "The dose-risk association has been regularly confirmed with

3   standard dose ibuprofen being considered 1200 milligrams and

4   naproxen 750 milligrams.  The doses in the rofecoxib studies were

5   2400 milligrams of ibuprofen and 1000 milligrams of naproxen per

6   day."

7   Q.   Now, going back to the subject of Merck's use of the endoscopic

8   ulcer end point in its clinical trials.  Did you review an article

9   about Vioxx and GI toxicity in a study called Protocol 044 with the

10  lead author of Lauren Laine?

11  A.   Yes.

12  Q.   And can we bring that up?

13         MR. ARBITBLIT:  Your Honor, that's at the third index tab

14  of the binder.

15         THE COURT:  Okay.

16  BY MR. ARBITBLIT:

17  Q.   And could you turn, Doctor, to the third index tab of the

18  binder.  I apologize -- well, it's not the third one in my binder.

19         THE WITNESS:  The third one in my binder.

20         MR. ARBITBLIT:  It is the third one in your binder?  If I

21  could have just a moment, your Honor, I have a different article

22  twice instead of one of each.  I probably don't need mine so, since

23  it's here on the screen.  Let's proceed, then.

24  BY MR. ARBITBLIT:

25  Q.   Doctor, is this the article that you reviewed by Laine?

1    A.  Yes.

2    Q.  And is this something that you read when it was published in

3    1999?

4    A.  Yes.

5    Q.  Did this study use an endoscopic ulcer end point?

6    A.  Yes.

7    Q.  Looking at the section on the first page called Background and

8    Aims.  What were the different treatment arms of the study?

9    A.  The treatment arms were 25 or 50 milligrams of rofecoxib once

10   daily; ibuprofen, 800 milligrams three times a day; or placebo.

11   Q.  And that 800 milligrams three times a day comes to what as a

12   daily dose?

13   A.  2400 milligrams.

14   Q.  Was endoscopy done at baseline?

15   A.  Yes, before the patients received drug.

16   Q.  Does the article report whether the subjects were free of

17   ulcers at baseline?

18   A.  It does.

19   Q.  And were endoscopies repeated during the study?

20   A.  Yes.  They had three more endoscopies.

21   Q.  So at the start of the study none of these subjects had ulcers;

22   is that right?

23   A.  They had clean stomachs or at least no ulcers.

24   Q.  And then when were the endoscopies repeated, does it tell you

25   when?

1    A.  At 6, 12 and 24 weeks.

2    Q.  What was the results reported by these authors for the placebo

3    patients after 12 weeks in the study?

4    A.  9.9 percent, effectively 10 percent.

5    Q.  And when you read this article when it came out in 1999, what

6    was your opinion on seeing a report of a 9.9 percent rate of

7    endoscopic ulcers in a placebo group that had zero ulcers 12 weeks

8    earlier?

9    A.  A red flag.  You would expect none or, you know, one or two

10   just for background mistakes, but 10 percent was unbelievable.

11   Q.  And what was your opinion as to the reliability of the study

12   with that kind of finding?

13   A.  Well, when your placebo arm doesn't work, then you have to say

14   the whole study didn't work.

15   Q.  Now, when you look at page 780 of the article, sir, did the

16   authors report how many patients had actual ulcers that involved a

17   bleed?

18   A.  Yes.

19   Q.  And can you read into the record what that sentence says under

20   Adverse Experiences, second paragraph?

21   A.  "Three ulcer complications occurred:  Two upper GI bleeding

22   episodes in the ibuprofen group and one in the 25-milligram

23   rofecoxib group."

24   Q.  Were there any bleeding ulcers reported in the placebo group?

25   A.  No.

1  Q.  So is it correct, then, that there were 9.9 percent endoscopic

2  ulcers and zero percent bleeding ulcers?

3  A.  Yes.

4  Q.  And does that bear on your opinions in this case?

5  A.  Almost impossible to imagine a bleeding ulcer in a placebo

6  group.

7  Q.  And again, does this go back to the reliability of the study?

8  A.  Well, you have to discard the data from the placebo group.

9  Whether you had to discard the other data would be a judgment that

10  you would have to make.  But the whole thing would be suspect.

11  Q.  Now, going back to the first page of the article under the

12  Background and Aims, what does the article report for the rate of

13  endoscopic ulcers in the ibuprofen group?

14  A.  In the ibuprofen group, they report 27.7 percent.

15  Q.  And is that at the 12 week point?

16  A.  At the 12 week point.

17  Q.  What was it at the 24 week point a couple of lines further

18  down?

19  A.  At the 24 week point it went up to 45.8 percent.

20  Q.  So going back to the page 780 that you read from, there were

21  how many bleeding episodes for the ibuprofen patients?

22  A.  There were two.

23  Q.  And if you look at the Figure 1 of the article, does Figure 1

24  show you how many ibuprofen patients there were altogether?

25  A.  There were 186 -- pardon me, 184.

1   Q.   184.   So there were two ulcers that involved bleeding out of

2   184 patients?

3   A.   Yes.

4   Q.   And what does that work out to in percentage?

5   A.   That's about 1 percent.

6   Q.   And so there was 45.8 percent endoscopic ulcers versus 1

7   percent with a bleed; is that right?

8   A.   Right.

9   Q.   Does that bear on your opinions about the reliability of using

10  this study to predict whether Vioxx is safe?

11  A.   I don't understand the question.   But no.

12  Q.   I'll rephrase it.

13  A.   Yeah.

14  Q.   I'll rephrase it.

15  A.   I mean, it's not a safety question, so...

16  Q.   Okay.   My mistake, I'll try to rephrase it.   What is the

17  importance to your opinion of the difference between the 45.8

18  percent endoscopic ulcer rate and the 1 percent rate of ulcers that

19  actually involved a bleed?

20  A.   It would be, it would suggest that endoscopic ulcers rarely

21  cause bleeding if it was that low a percent.   But it just is kind

22  of independent.

23  Q.   The endoscopic ulcers don't relate to the bleeding ulcers?

24  A.   It related poorly to the ones that led to complications.

25  Q.   Do you have an opinion as to whether the endoscopic detection,

1    endoscopic ulcers detection method more likely than not included

2    things along the lines of erosions and topical damage that you

3    described earlier?

4    A.  By nature what it's done is, it included --

5              MR. SALES:  He is asking him to speculate.

6              THE COURT:  I'm sorry, wait.  Yes.  Well, he is an

7    expert, so he is asking his opinion on it.  I'll overrule the

8    objection.

9              THE WITNESS:  For the nature of what it was done, it

10   included both endoscopic ulcers, which were nothing, or there were

11   erosions, and some problem with clinical ulcers that were real

12   related to the use of these drugs.

13   BY MR. ARBITBLIT:

14   Q.  Now, going to the last sentence of the Background and Aims on

15   the first page of the article, sir.  Do you have an opinion as to

16   the validity of the statement:  "Ulcer rates comparable to placebo

17   as it applies to Vioxx based on this study"?

18   A.  Well, it had to be tongue and cheek because placebo was

19   terrible, so if it were comparable to placebo, that would mean it

20   was terrible.  So it's true from the data but it's meaningless.

21   Q.  And why is it meaningless?  Just to clarify.

22   A.  Because placebo should be close to zero and it wasn't; and so

23   the answer in this study where the placebo group gave you a

24   completely unexpected answer, Vioxx was comparable, I guess.

25   Q.  Can you interpret this as meaning Vioxx is comparable to

1    placebo from the standpoint of being harmless to the GI tract?

2    A.  Absolutely not.

3    Q.  Was there a companion study to Protocol 044 called 045?

4    A.  There were, yeah, two studies, one done in the U.S. and one

5    done in the U.K.

6    Q.  What were the findings generally from 045?

7    A.  Generally the same, similar.  There were lower placebo response

8    in the other one, but they were otherwise pretty much the same.

9    Q.  Do you have an opinion on the reliability of 045 to describe GI

10   risks?

11   A.  These studies were not designed to study GI risks, they were

12   designed for different questions.  So that you can't address GI

13   risk without studying GI risk.

14   Q.  And as to the study that gave 2400 milligrams of ibuprofen

15   every day for 16 weeks of this study, is that standard dose to give

16   for that kind of duration?

17   A.  Not clinically.

18   Q.  Would that be a highly unusual situation?

19   A.  Clinically, for osteoarthritis, that would be a very unusual

20   situation.

21   Q.  What was the effect of giving 2400 milligrams a day in the

22   Vioxx studies in terms of GI toxicity?

23   A.  Well, you would get maximum damage.  That was their intention,

24   I presume.

25            MR. SALES:  Objection, your Honor, he is speaking to the

1    state of mind for the company.

2            THE COURT:  Yes, I think that's right, I sustain the

3    objection.

4    BY MR. ARBITBLIT:

5    Q.  Setting aside the intention, Doctor, did the higher dose of

6    ibuprofen at 2400 milligrams per day have the effect of comparing

7    the rate in Vioxx to a rate in ibuprofen that was higher than it

8    would have been if they had used a dose that was more typical of

9    what patients actually use in the real world?

10   A.  It was not a good manifestation, yes, a clinical use of the

11   drug in that type of patient.

12           MR. ARBITBLIT:  Your Honor, we've been going for about an

13   hour, should we take a break or continue?

14           THE COURT:  Is this a good time?

15           MR. ARBITBLIT:  I am about to change topics, and I don't

16   want to --

17           THE COURT:  All right.  Let's take a break for 15 minutes

18   at this time.

19           THE DEPUTY CLERK:  Everyone rise.

20       (WHEREUPON, A RECESS WAS TAKEN.)

21       (OPEN COURT.)

22           THE COURT:  Be seated, please.  You're still under oath,

23   Doctor.  You may proceed, counsel.

24           MR. ARBITBLIT:  Thank you, your Honor.

25   BY MR. ARBITBLIT:

1    Q.  Dr. Graham, did you review a document referring to a collection

2    of Merck's studies known as Protocol 069?

3    A.  Yes.

4    Q.  Turning to tab 4 in the index binder, your Honor, and

5    Dr. Graham.  Is this the document that you reviewed?

6    A.  Yes.

7    Q.  If you could turn to page 12.  That also has the number 3507 in

8    the lower right.

9            MR. ARBITBLIT:  There are several different numbers on

10   these pages, your Honor, so sometimes they're up side down and in

11   the lower left and sometimes they're at the top.

12           THE COURT:  I have it.

13           MR. ARBITBLIT:  But we tried to give you as much as

14   possible.  In the upper right on page 12 is this part of the

15   synopsis summarizing the study?

16           MR. SALES:  I hate to interrupt.  The order you gave in

17   your book is different than what you gave today.  What number is

18   it?

19           THE COURT:  Bates No. 3507, the number is?

20           MR. ARBITBLIT:  The beginning -- oh, I'm sorry, your

21   Honor.

22           THE COURT:  What is the number?

23           MR. ARBITBLIT:  The exhibit number is P-1.4069 and it

24   starts at 3495.

25           MR. SALES:  I found it, your Honor, thank you.

1          THE COURT:  Okay.

2    BY MR. ARBITBLIT:

3    Q.  And, Doctor, is this the Protocol 069 report that you reviewed?

4    A.  Yes.

5    Q.  It's dated October 22nd, 1998 at the bottom; is that right?

6    A.  Yes.

7    Q.  Do you see a description of the study design on page 12?

8    A.  Yes.

9    Q.  What was the study design?

10   A.  This was a -- well, they described it as a prospective combined

11   analysis to compare the incidence of upper gastrointestinal events

12   in patients treated with rofecoxib three different doses and those

13   treated with nonsteroidal anti-inflammatory drugs, and then they

14   went on to look the a the drugs that were ibuprofen, diclofenac,

15   nabumetone.  It was a combined eight studies.

16   Q.  And you have an opinion about this study design?

17   A.  It wouldn't be -- might be interesting but it wouldn't have any

18   relevance because you can't mix all of the different drugs that

19   have different doses and durations, et cetera, together and get a

20   meaningful answer.

21   Q.  Does each NSAID have its own gastric toxicity profile?

22   A.  Yes.

23   Q.  Turning to page 20 of the document in the upper right corner,

24   which is Bates page 3515.  Did Protocol 069 include the studies

25   that you talked about earlier, Protocols 045 (SIC) and 045 in the

1    combined pooled analysis?

2    A.  What page are you on?

3    Q.  If you look at page 20 in the upper right, sir.

4    A.  Right.

5    Q.  And is there a reference to the studies that were included in

6    the pooled analysis?

7    A.  Yes.

8    Q.  Were Protocols 044 and 045 among them?

9    A.  Yes.

10   Q.  And then turning to the page that has an up side down 23 in the

11   lower right corner, is there a table there showing what the

12   criteria were for the confirmed event and for clinically

13   complicated events?

14   A.  Yes.

15   Q.  And did you review this table as part of your work on the case?

16   A.  I did.

17   Q.  Looking at the middle column, criteria for confirmed event,

18   what is the first entry in that lower box in the middle column?

19   A.  Endoscopy.

20   Q.  Was endoscopy sufficient to confirm an event that was counted

21   in the analysis in Protocol 069?

22   A.  Yes.

23   Q.  Does that effect your view of the relevance of the primary PUB

24   or perforation, ulcer and bleed end point from this study?

25   A.  Well, it would include, therefore, clinically significant

1  events and insignificant events.

2  Q.  And what is the effect of mixing those two types and then

3  analyzing the whole set?

4  A.  Well, you tend to overestimate the percentage of events in the

5  gastric toxic drug.

6  Q.  Was there another end point in 069 that was described in

7  Table 1 on the right-hand side of the table?

8  A.  Yes.

9  Q.  And what was that?

10  A.  That was their attempt to reduce that bias by defining ulcers

11  that were clinically important by the use of size criteria and they

12  used very robust ulcers three centimeters for gastric ulcers and

13  two centimeters for duodenal ulcers.

14  Q.  Do you have an opinion about how that end point fairs as a

15  measure of gastric toxicity?

16  A.  Obviously it's never going to be perfect, but it would be

17  better than taking one that would definitely include a lot of

18  insignificant events.

19  Q.  And turning to page 71 in the upper left, which is Bates page

20  3566 of this document, did Merck report the rates for the confirmed

21  complicated perforations, ulcers and bleeds, or PUBs?

22  A.  Yes.

23  Q.  And was cumulative incidence the primary statistical analysis

24  in this study?

25  A.  That was the primary predesignated statistical analysis.

1    Q.  And what was the result reported by Merck for cumulative

2    incidence of the confirmed complicated upper GI PUBs end point?

3    A.  With rofecoxib it was 0.45 percent and with other NSAIDs it was

4    0.55 percent on 12 months, which was not statistically significant.

5    Q.  Was there an article that you reviewed that was published with

6    the Protocol 069 data?

7    A.  Yes.

8    Q.  Was that -- who authored that?

9    A.  Primarily was Langman.

10   Q.  And were there some Merck employee authors on that as well?

11   A.  Of course.

12   Q.  And was the result that you see for the clinically complicated

13   upper GI PUBs not statistically significant as you read them,

14   reported in the published article?

15   A.  I didn't find it.

16   Q.  Turning to the next page, 72, for the cumulative incidence of

17   confirmed upper GI PUBs that were complicated.  Is there a figure

18   representing the course of those findings over the time of the

19   first 12 months of the study?

20   A.  Yes.

21   Q.  And what does that show?

22   A.  Well, it shows that the -- towards the end they're looking very

23   similar.

24   Q.  Do you have an opinion as to whether the results and the figure

25   at these two pages should have been include in the published

1    manuscript?

2    A.  If you wanted to make a statement about safety they should have

3    been included.

4    Q.  And why do you say that?

5    A.  Because those are the data, the important data.

6              MR. ARBITBLIT:  Your Honor, the court had asked earlier

7    that we mention it when we're going into matters that were

8    addressed during the rebuttal phase, and the next document was

9    mention in the rebuttal report.

10             THE COURT:  Okay.

11   BY MR. ARBITBLIT:

12   Q.  Doctor, turning to tab 5 of your binder.  Did you review a

13   February 27, 2003 memorandum from Qinfen Yu, that's spelled Y-U, to

14   Alise Reicin, Douglas Watson, Thomas Simon and Eric Maller?

15   A.  Yes.

16   Q.  Does this memorandum include additional information about the

17   results of Protocol 069 that you just described a moment ago?

18   A.  Yes.

19   Q.  And in particular you were looking at a figure that showed the

20   picture of the lines of incidence of Vioxx versus the traditional

21   NSAIDs a moment ago, is that right?

22   A.  We just looked at that.

23   Q.  And if you turn to the page ending in 4342 in the lower right,

24   which is page 49 of the 68 page document.  Let me know when you're

25   there.  Are you there?

1    A.  4342, yes.

2    Q.  And can you read the title of the appendix figure 1.3 above the

3    figure itself?

4    A.  That's not the one I'm looking at.

5    Q.  I am looking at page ending in 4342 in the lower right, figure

6    1.3.

7    A.  Oh, 4342, I'm sorry.  Okay.

8    Q.  Are you there now, sir?

9    A.  Yes, yes.  Cumulative incidence of confirmed complicated PUBs

10   based on combined data from active treatment period in 069 studies.

11   Q.  So does this refer to the same protocol that you talked about a

12   moment ago?

13   A.  Yes.

14   Q.  And how far out in time from the beginning of the study do the

15   data show for the cumulative incidence curves at this point?

16   A.  At this point it goes out to over 21 months.

17   Q.  If you could hold that place and go back to the front page of

18   the document for a moment.  I just want you to answer a question

19   about the second paragraph under Background.  Does it appear from

20   the document that this is a final update for the combined PUB

21   analysis?

22   A.  That's what it appears to be.

23   Q.  So what did the final updated analysis of the Protocol 069

24   study show for the cumulative incidence of confirmed complicated

25   perforations, ulcers and bleeds for the Protocol 069 studies that

1   have been published?

2   A.   From based on this figure?

3   Q.   Based on the figure, how do you interpret that figure?

4   A.   The figure showed that after the period that we saw before that

5   rofecoxib continued to increase and the nonsteroidal combined did

6   not.

7   Q.   Was the curve for cumulative incidence for rofecoxib higher

8   than the cumulative incidence for NSAIDs by 21 months?

9   A.   Yes.

10  Q.   Can you follow along from the cumulative incidence percentage

11  scale on the left-hand side of the graph to read approximately

12  where the rofecoxib curve comes out in comparison to the NSAIDs

13  curve?

14  A.   It's about 1 versus .5.

15  Q.   Is the rofecoxib cumulative incidence of confirmed complicated

16  PUBs approximately double the cumulative incidences for the NSAIDs

17  as represented in this curve?

18  A.   That's what the plot shows.

19  Q.   The date of this memorandum is February 27, 2003; is that

20  right?

21  A.   Right.

22  Q.   Did you ever see this figure in any published form?

23  A.   No.

24  Q.   Did you ever see it before you became involved as an expert

25  witness in this case?

1    A.   No.

2    Q.   Should this data have been published?

3    A.   I would hope so, yes, I mean, it was important data.

4    Q.   Is this confirmed -- do you have an opinion as to whether the

5    confirmed complicated PUB is the important end point from studies

6    of gastro toxicities of NSAIDs?

7    A.   That's the clinically important end point.

8    Q.   Was there a published study that involved Merck authors that

9    reported some of the data represented in this memo?

10   A.   Yes.

11   Q.   Did it include or exclude figure 1.3?

12   A.   It did not include figure 1.3.

13   Q.   Should it have?

14   A.   If they wanted to be fair and honest I would think they would.

15   Q.   Now, Doctor, you have written about Vioxx in your own published

16   works, have you not?

17   A.   Yes.

18   Q.   If you had known about the results shown in figure 1.3 during

19   the time that Vioxx was on the market, would you have included that

20   data in what you wrote?

21   A.   Probably, I mean, the trump data is always the double blind or

22   at least the controlled trial to ask specific question about events

23   and this was data that came from a different type of studies that

24   it's less valuable, but I would still think that it would be

25   important.  But clearly important to set the record straight.

1   Q.  And when you say set the record straight, what do you mean by

2   that?

3   A.  Compared to what was published in the paper for these analyses

4   were completed they implied that there wasn't a difference in the

5   other direction.

6   Q.  Was it suggested that Vioxx had a benefit that you find

7   contradicted by this data?

8   A.  Certainly not confirmed by this data.

9   Q.  Turning to page ending in 4334 of the document.

10  A.  Okay.

11  Q.  Is there a table showing the results of comparisons between

12  Vioxx and nabumetone in three studies?

13  A.  Yes.

14  Q.  What did those results show?

15  A.  These studies show that nabumetone was not associated with any

16  event in about 930 patients being kind.

17  Q.  And how about Vioxx, was Vioxx associated with any events?

18  A.  Vioxx was associated with under two events depending on how you

19  looked at it.

20  Q.  Was it two PUBs and one complicated PUB?

21  A.  Two pubs and one complicated PUB.

22  Q.  Versus zero for nabumetone?

23  A.  Versus zero for nabumetone.

24  Q.  Does that fact bear on your opinions in this case?

25  A.  Nabumetone was, it's considered one of the safer nonsteroidal

1    anti-inflammatory drugs, and clearly shows that they were not

2    better than nabumetone.

3    Q.  And in the published article that published some of the data

4    from the February 27, 2003 memorandum, was the comparison between

5    rofecoxib or Vioxx and nabumetone published?

6    A.  No.  They said the analysis had not been done.

7    Q.  Did the article itself say that the analysis had not been done?

8    A.  Right.

9    Q.  Was that an accurate statement?

10   A.  Well, not according to the data.

11   Q.  Does the analysis appear on table 23 in front of you?

12   A.  There it is.

13   Q.  Turning to page 4307 of this document.

14   A.  Okay.

15   Q.  Do you see table 7 listing the different NSAIDs that were

16   compared to Vioxx that were all lumped together in this analysis?

17   A.  Yes.

18   Q.  Do you see that Naproxen from rheumatoid arthritis was included

19   in the combined analysis?

20   A.  Yes.

21   Q.  Along with diclofenac, ibuprofen, nabumetone and Arthrotec; is

22   that right?

23   A.  Right.

24   Q.  Do you have an opinion about the validity of this study design

25   and lumping all of this together?

 1    A.  Well, I mean there's no rational reason to lump all things

 2    together.

 3    Q.  And why is that?

 4    A.  Again, because they all have different toxicities.

 5    Q.  And does the evidence you just described for nabumetone not

 6    having any PUBs bear on your opinion as to reporting all of this in

 7    a lumped together way?

 8    A.  It's just confusing.  The concept that I have of a safer NSAID,

 9    safer than what?  And it has to be safer than the safest or the

10    most dangerous, it's just saying this is like looking at the

11    different modes of transportation and lumping airplanes and trains

12    and cars together and making some kind of conclusion.

13    Q.  Now, looking at the bottom of the table, do you see a reference

14    to Protocol 902?

15    A.  Yes.

16    Q.  What was the comparative drug to Vioxx in that study?

17    A.  Arthrotec.

18    Q.  What is Arthrotec?

19    A.  Arthrotec is a combination drug, it's a combination of

20    diclofenac and misoprostol, misoprostol is a prostaglandin, and so

21    it was designed to be a safe drug conceptually because the

22    diclofenac has both COX-1 and COX-2 inhibition, but the

23    prostaglandin would be then replaced so that you would have

24    clinically a COX-2 inhibitor with protection of the stomach, is the

25    theory behind it.

254

```
 1   Q.  And did you have some experience with misoprostol that was

 2   used?

 3   A.  Yes.

 4   Q.  You published on misoprostol; is that right?

 5   A.  Right.

 6   Q.  Do you see the statement there on the table that Arthrotec was

 7   counted as diclofenac?

 8   A.  Yes.

 9   Q.  And then turn to page 4359, please, of this document.

10   A.  Okay.

11   Q.  Do you see a reference to what studies are included in this

12   table at the top?

13   A.  These are studies with rofecoxib versus diclofenac.

14   Q.  And did the study include Arthrotec with the diclofenac data?

15   A.  Yes.

16   Q.  How many events were there in the diclofenac patient population

17   numbering 456 people?

18   A.  None.

19   Q.  None.  Is that zero?

20   A.  Zero.

21   Q.  And were there events in the diclofenac groups above?

22   A.  Yes.

23   Q.  Do you have an opinion as to whether it was appropriate to lump

24   the Arthrotec data with the diclofenac data?

25   A.  It was inappropriate.
```

1    Q.  And why is that?

2    A.  Well, it's a different drug, I mean, it's a different mechanism

3    and there's no reason to include it with the diclofenac.

4    Q.  By lumping it with diclofenac, did the authors of the later

5    published work ever report that there was another comparator drug

6    as to which Merck did not show an improvement in GI events?

7    A.  I don't think so, no.

8    Q.  Should that have been reported that the Arthrotec data did not

9    show a benefit?

10   A.  I would think that if they're going to show the data from the

11   different drugs they need to show the data from the different

12   drugs, and there were two potential important comparators that were

13   not shown.

14   Q.  And those two are?

15   A.  Nabumetone and Arthrotec.

16   Q.  Doctor, I want to go back to the opinion you stated earlier

17   toward the beginning of your testimony that Vioxx is gastro toxic

18   and explore your reasons for that, okay?

19   A.  Yes.

20   Q.  Did you rely on any randomized clinical trials conducted by

21   Merck of Vioxx versus placebo to reach that conclusion?

22   A.  Yes.

23   Q.  Why would you rely on randomized clinical trials of Vioxx

24   versus placebo to determine whether Vioxx is gastro toxic?

25   A.  Well, randomized controlled trial is like the most powerful

1    tests that we have to ask a clinical question, and you always want

2    to go first to that data if it's available.

3    Q.  Did you read data from the APPROVe study concerning

4    gastrointestinal effects?

5    A.  Yes.

6    Q.  And could you turn to tab 6 in your binder, please.

7            MR. ARBITBLIT:  And, your Honor, I know you've heard a

8    lot about the APPROVe study but probably not about GI, so this will

9    be something newer.

10           THE COURT:  All right.

11   BY MR. ARBITBLIT:

12   Q.  So is this the article that you reviewed?

13   A.  This is the article.

14   Q.  And looking at the first page of the article under the

15   conclusions, what was the conclusion of the authors?

16   A.  Among patients with a history of colorectal adenomas, the

17   long-term use of 25 milligrams of rofecoxib was associated with

18   increased risk of clinically relevant upper gastrointestinal events

19   when compared to placebo.

20   Q.  And do you see what the relative risk was in the results just

21   above that?

22   A.  Yes.

23   Q.  What was it?

24   A.  The relative risk was 4.9.

25   Q.  And was that statistically significant?

1   A.  Yes.

2   Q.  And was there also a complicated end point for which the data

3   were numerically higher but not statistically significant?

4   A.  Yes.

5   Q.  And what were the data there?

6   A.  That was 3.8.

7   Q.  3.8 relative risk?

8   A.  Relative risk.

9   Q.  Now, if you could turn to page 492 of the document.  Is there a

10  figure showing the cumulative incidence of PUBs on Vioxx compared

11  to placebo?

12  A.  Yes.

13  Q.  And what does it show?

14  A.  Well, it shows that the rates continually diverge.

15  Q.  Which one is higher?

16  A.  Rofecoxib.

17  Q.  And when does that divergence begin?

18  A.  Very soon after the beginning of the drug.  Continues at about

19  the same rate.

20  Q.  How does this information influence your opinion as to whether

21  Vioxx is gastrotoxic?

22  A.  Well, it certainly strongly suggests that rofecoxib is

23  gastrotoxic compared to placebo.

24  Q.  Now going to the next page.  Is there another figure showing

25  comparisons between Vioxx and placebo for three different types of

1    gastric toxicity?

2    A.  Yes.

3    Q.  And what is the one on the left?

4    A.  Gastric ulcer.

5    Q.  And what was the rates for Vioxx versus placebo there?

6    A.  .33 to .09.

7    Q.  And was Vioxx rate higher for duodenal ulcer?

8    A.  Yes, 0.59 versus 0.03.

9    Q.  Was Vioxx rate higher for upper GI hemorrhage?

10   A.  Yes, 0.23 versus 0.06.

11   Q.  Was any of this information known to you when you were writing

12   about Vioxx during the time it was on the market?

13   A.  No.

14   Q.  And that's the article that was published in 2007; is that

15   right?

16   A.  Right.

17   Q.  Now, did you also review data from the 078 Alzheimer's study

18   concerning GI damage?

19   A.  Yes.

20   Q.  And could we turn to the next --

21        MR. ARBITBLIT:  Your Honor, before we move on to that.  I

22   neglected going through Protocol 069 to tender the exhibit that the

23   witness discussed, which is P-1.4069, and I would like to do that

24   at this time.

25        THE COURT:  Which one was that?

```
 1              MR. ARBITBLIT:  That was tab 4, Protocol 069, a Merck

 2   document.

 3              THE COURT:  Just a moment.  Okay.  All right.  I'll admit

 4   it.

 5              MR. ARBITBLIT:  Thank you, your Honor.

 6              THE DEPUTY CLERK:  Excuse me, how is it marked?

 7              MR. ARBITBLIT:  It's marked as P-1.4069.  My page does

 8   not have an LAAG -- is does not have an LAAG number yet.

 9              THE DEPUTY CLERK:  Are we going to admit it as that,

10   Judge, or give him the next number?

11              THE COURT:  It doesn't matter.  What do you want to do?

12              MR. ARBITBLIT:  The next in order would be fine, or

13   whatever is most convenient to you to keep track of it.

14              THE DEPUTY CLERK:  The next number on your list would be

15   LAAG 723.

16              MR. ARBITBLIT:  That would be fine.  Thank you, ma'am.

17   BY MR. ARBITBLIT:

18   Q.  Going back to the Alzheimer's report, and that's marked as LAAG

19   173, is this the clinical study report that you reviewed for the GI

20   damage data?

21   A.  Yes.

22              MR. ARBITBLIT:  And, your Honor, the witness certainly

23   didn't review all 400 or so pages concerning Alzheimer's, but for

24   completeness we provided the entire document, and we'll just

25   address what he did review.
```

```
 1            THE COURT:  All right.
 2   BY MR. ARBITBLIT:
 3   Q.  Turn to table 63 at page 268 of the document.  Let me know when
 4   you're there.
 5   A.  I'm there.
 6   Q.  Is this the table of GI data that you reviewed in coming to
 7   your opinions in this case?
 8   A.  Yes.
 9   Q.  And what does this table show about the GI data?
10   A.  This shows the confirmed events and the confirmed complicated
11   incidence in the rofecoxib and the placebo groups.
12   Q.  And what were the results?
13   A.  Well, in the rofecoxib for confirmed it was 14 versus 4 and for
14   confirmed complicated it was 10 versus 3.
15   Q.  And did you find it unusual that there was no statistical
16   significance test provided with this data?
17   A.  I was surprised there were none, but there were none.
18   Q.  Would it be standard to present that type of statistical
19   analysis with adverse event data?
20   A.  One expects it.
21   Q.  And you're not a statistician, are you, sir?
22   A.  No.
23   Q.  Did you rely on a statistician, Professor Nicholas Jewell to
24   conduct a statistical analysis of this data?
25   A.  Yes.
```

1   Q.  And is Dr. Jewell a professor at the University of California

2   at Berkeley?

3   A.  Yes.

4   Q.  What do you know about that institution?

5   A.  It's a very outstanding institute of higher learning.

6   Q.  Do you have colleagues on faculty there that you've worked

7   with?

8   A.  Yes.

9   Q.  And if you could take a look at the tab 8 of your binder, the

10  second page.  Is this a report that you received that was prepared

11  by professor Jewell?

12          THE COURT:  One moment before we go into that.  Counsel

13  has an observation, objection.

14          MR. SALES:  Yes, your Honor.  This is with regard to this

15  so-called Jewell report, and we object:  One, to foundation simply

16  knowing somebody at Berkeley is not a foundation.  We object that

17  this is an effort simply to parrot another non-designated expert's

18  opinion under Rule 702 is not permitted.  We also say that under

19  703 the report is hearsay, and it's not the types of facts at least

20  not the type of background work that Dr. Graham is going to be able

21  to rely upon reasonably relied by experts in his position, so we

22  would object to using this with this witness at this time, your

23  Honor.

24          THE COURT:  Okay.  Let's go into a little background

25  about what the report contain without going into what it contains,

1    the nature of it, whether it's customarily used by experts and so

2    forth.

3    BY MR. ARBITBLIT:

4    Q.  Dr. Graham, are you familiar with the practices of clinical

5    investigators with respect to relying on statisticians to conduct

6    calculations such as statistical significance and interactions?

7    A.  Yes.

8    Q.  And what is that practice?

9    A.  That practice clinical investigators rely heavily on

10   statisticians to help them with statistical analyses.

11   Q.  And when you publish articles in your normal professional life,

12   do you rely on statisticians to perform these types of

13   calculations?

14   A.  I certainly do.

15   Q.  And as far as what Professor Jewell did for you, is it any

16   different than what you would do in your normal professional life

17   to rely on a statistician to do these calculations?

18   A.  No.  It would be just routine.

19   Q.  And did Professor Jewell provide you with a statistical

20   significance calculation and p-value relative risk for the data

21   from table 63?

22   A.  He provided me with analysis that showed statistical

23   significant differences, yes.

24        MR. SALES:  We'll renew our objection at this time, your

25   Honor, because the witness has testified at his deposition at least

1    at that time that he's never spoken to Dr. Jewell or Mr. Jewell, he

2    didn't know what Mr. Jewell did with his report.  It was not

3    prepared for Dr. Graham, it was prepared for Mr. Arbitblit, which

4    was then handed to Mr. Gram and there's been no connection between

5    Dr. Graham and Dr. Jewell, at least as of the time of his

6    deposition.

7         THE COURT:  I understand that and I'll let you make that

8    point during the cross-examination of it.

9         As you know we go to 703 for the answer to the question,

10   and the 703 indicates that if the facts, if a type of facts is

11   reasonably relied upon by an expert in a particular field in

12   forming an opinion or inference on a subject, the facts or data

13   need not be admissible in evidence in order for an opinion to be

14   referenced, in order for the opinion to be admitted.

15        It goes on to say that facts and data that are otherwise

16   inadmissible shall not be disclosed to the jury by the proponent of

17   the opinion or inferenced unless the court determines that the

18   probative value in assisting the jury to evaluate their expert

19   opinion substantially outweighs their prejudicial effect.  We have

20   a judge trial here, and so the prejudicial effect is minimized.  I

21   look to the cases on point, and it's, *Engebretsen v. Fairchild*, 21

22   F.3d, 722.

23        And when I do this in a jury trial and I do allow the

24   information to be shown to the jury, I instruct the jury that if

25   such evidence is disclosed, the opposing party is entitled to a

1  limited instruction that the evidence may be considered solely as a

2  basis for the expert's opinion and not as substantive evidence

3  itself.  So I remind myself that this is not substantive evidence,

4  it is only a basis for the opinion of the expert.

5          I'll overrule the objection and allow you to do it.

6          MR. ARBITBLIT:  Thank you, your Honor.

7  BY MR. ARBITBLIT:

8  Q.  Dr. Graham, returning to the report that you received from me

9  that was prepared by Dr. Jewell, did you review that document and

10 rely on it in forming opinions in this case?

11 A.  I did.

12 Q.  And on the second page of the document did you rely on the

13 statistical calculations that Dr. Jewell performed based on the

14 data from table 63 that you read into the record a moment ago?

15 A.  I did.

16 Q.  Do you see in the second paragraph of the report that

17 Dr. Jewell reports the same numbers of confirmed complicated events

18 for Vioxx and placebo in the same number of patient years that

19 appear in the table?

20 A.  Exactly the same.

21 Q.  And what was the estimated incidence rate ratio for Vioxx

22 versus placebo based on that data?

23 A.  It was 3.83.

24 Q.  And what was the p-value?

25 A.  0.032.

1   Q.   Was that a statistically significant result?

2   A.   Yes.

3   Q.   And then going on to the fourth paragraph, did Dr. Jewell

4   mention the same numbers of confirmed perforations, ulcers and

5   bleeds in the same patients as seen in table 63?

6   A.   Yes.

7   Q.   And that was 14 versus 4?

8   A.   Right.

9   Q.   What was the incidence rate ratio that Dr. Jewell reported for

10   that data?

11   A.   4.02.

12   Q.   And what was the p-value?

13   A.   0.009.

14   Q.   Was that statistically significant?

15   A.   Yes.

16   Q.   And how did you rely on that information in forming your

17   opinions in this case?

18   A.   I accepted that the difference was real and statistically

19   significant.

20   Q.   And between the APPROVe study and the 078 study of Vioxx versus

21   placebo, what was your opinion as to whether they showed similar or

22   different results for GI toxicity?

23   A.   Very similar results and consistent with rofecoxib being

24   gastrotoxic.

25   Q.   Now, if you go back to the clinical study report, does it tell

266

1   you when the last patient was out of that study on page 7836?

2   A.   The study completion date 23 April of 2003.

3   Q.   Was Vioxx still on the market in April 2003?

4   A.   Yes.

5   Q.   Did this data showing a statistically significant excess of

6   PUBs and complicated PUBs ever appear in published literature

7   before Vioxx came off the market on September 30th, 2004?

8   A.   Not to my knowledge.

9   Q.   Should it have been published?

10  A.   Certainly should.

11  Q.   Why?

12  A.   Well, it would -- the data needed to be out there to counteract

13  the statements such as comparable to placebo from the clinical

14  trials.

15  Q.   In your own writing about Vioxx, would you have published this

16  data if it had been known to you while Vioxx was on the market?

17           I'll withdraw that question.

18           In your own writing, Doctor, would you have published

19  this data about Vioxx compared to placebo at any time since 2003 to

20  the present, whether on or off the market?

21  A.   Depends on the context.  Typically when I would write I would

22  writing about COX-2 inhibitors and neither one of them are superior

23  to placebo.  I would tend to lump them.

24  Q.   Do you think Merck should have published these data?

25  A.   I think Merck should have published these data and it should

1    have gotten into the package insert.  Certainly should have gotten

2    into the package insert since they haven't --

3             MR. SALES:  Your Honor, at this point in time we object

4    to the extent he is offering opinion about the package insert, he

5    did not disclose such an opinion in his report.

6             THE COURT:  I understand that.  Let's move on.  Sustain

7    the objection.

8             MR. ARBITBLIT:  That was not intended to illicit that,

9    your Honor, that was volunteered.

10   BY MR. ARBITBLIT:

11   Q.  Did the data from the APPROVe --

12            THE COURT:  And I assume you move to strike that?

13            MR. SALES:  Yes, your Honor.

14            THE COURT:  Okay.  Go ahead.

15   BY MR. ARBITBLIT:

16   Q.  Did the data for Vioxx versus placebo from the APPROVe and

17   Alzheimer's study disprove the claim that ulcer rates for Vioxx are

18   comparable to placebo?

19   A.  Yes, if that's a claim.  That's a statement, just proves as a

20   statement.

21   Q.  Dr. Graham, you're familiar with the VIGOR study; is that

22   right?

23   A.  Yes.

24   Q.  Is that a study that you read many times in the course of your

25   professional work?

1    A.  Yes.

2    Q.  Is it a study that you've written about in the course of your

3    professional work?

4    A.  Yes.

5    Q.  And briefly, what was that study about?

6    A.  VIGOR was a large 8000 person study designed to actually test

7    the hypothesis that rofecoxib would prevent or reduce the frequency

8    of significant clinical events, bleeding, perforation, obstruction.

9    Q.  Were there actually two end points in the -- as far as PUBs in

10   the VIGOR study?

11   A.  There were four potential end points.

12   Q.  What were those?

13   A.  And those were ulcer, then complicated ulcer which had three

14   subsets, which would be bleeding, perforation, and obstruction.

15   Q.  And was there a primary end point known as PUBs?

16   A.  There was a primary end point for PUBs.

17   Q.  And what was included in that?

18   A.  All four of those.

19   Q.  Was there a secondary end point called confirmed complicated

20   PUBs?

21   A.  There was a secondary end point confirmed complicated PUB.

22   Q.  Was that end point a subset of the main confirmed PUBs end

23   point?

24   A.  That's three of the four.

25   Q.  So three of the four meaning what?

1   A.  Clinically important one, perforation, obstruction and

2   bleeding.

3   Q.  And as far as the ulcer component of the PUBs, was it possible

4   in the VIGOR study to confirm and count an ulcer based on endoscopy

5   alone?

6   A.  Yes.

7   Q.  And do you have an opinion as to the effect of that study

8   design on the reliability of the primary end point?

9   A.  Well, the primary end point as it included those so-called

10  symptomatic ulcers would exaggerate the number of events,

11  particularly in the NSAID group.

12  Q.  Why is that?

13  A.  Because they had already shown that rofecoxib was less likely

14  to cause endoscopic ulcers than, for instance, Naproxen, and

15  already shown that rofecoxib was less likely to cause symptoms than

16  rofecoxib; so when they focused on endoscoping any patient with

17  symptoms, they by definition were going to enrich the group that

18  took Naproxen that had endoscopic ulcer that would be discovered

19  and called a clinical end point.

20  Q.  Were some of the endoscopic ulcers -- withdraw that.

21          Were some of the ulcers counted in that end point more

22  likely than not clinically insignificant?

23  A.  More likely than not, yes.  There's no way to avoid it.

24  Q.  Now, as far as the complicated events end point, was that of

25  greater interest to you?

```
 1   A.  That's the meat because that's -- those are hard end points,

 2   clinically significant, a threat to patient, impossible or

 3   essentially impossible to manipulate any way you want and so those

 4   give you the real facts.

 5   Q.  Now, if you turn to page, tab 10 of the binder.  Is this the

 6   VIGOR article that you've reviewed?

 7   A.  This is the VIGOR paper.

 8   Q.  Did you review it when it came out?

 9   A.  I read it when it came out.

10   Q.  And can you turn to table 4 at page 1525.

11   A.  Okay.

12   Q.  And do you see that there is a listing of types of events and

13   the rates and relative risks for those?

14   A.  Yes.

15   Q.  The top line confirmed upper gastrointestinal events, is that

16   primary end point?

17   A.  That's the primary end point.

18   Q.  And that's the one that you described that includes some that

19   are not significant clinically?

20   A.  That's the soft end point.

21   Q.  Now, underneath that is there a complicated confirmed upper GI

22   events end point described?

23   A.  Yes.

24   Q.  And is that the one that you think is most important?

25   A.  That's the clinically important end point.
```

```
 1   Q.  And what did the authors record for the results for Naproxen

 2   versus Vioxx for the complicated confirmed upper GI events?

 3   A.  They report rofecoxib had 16 and Naproxen had 27 --

 4   Q.  Is that 37?

 5   A.  Thirty-seven.  And that that was statistically significant.

 6   Q.  And when you read that data, what was your reaction?

 7   A.  That --

 8   Q.  I'm talking about ten years ago when you first read it.

 9   A.  Right.  That they had confirmed the hypothesis that rofecoxib

10   was less likely to cause significant events than was Naproxen.

11   Q.  And have your opinions changed since then?

12   A.  Yes.

13   Q.  And we'll get to the reasons why.  I have a couple of

14   preliminary questions for you.

15           If you look at page 1523 in the lower left, do you see a

16   discussion of subgroup analyses?

17   A.  Yes.

18   Q.  Now, if we could just for a moment look at tab 9 in the index

19   binder.  Is this the statistical data analysis plan for the VIGOR

20   study?

21   A.  Yes.

22   Q.  And did you review this document in preparing your opinions in

23   this case?

24   A.  Yes.

25   Q.  If you could turn to page 4543 of the document.
```

1   A.   Yes.

2   Q.   Is there a listing of prespecified subgroups for analysis in

3   the plan?

4   A.   There is such a list.

5   Q.   Do you see whether the use of systemic corticosteroids at

6   baseline was a prespecified subgroup analysis?

7   A.   It's listed.

8   Q.   And is it listed for the primary end point?  Do you see the

9   paragraph --

10  A.   For the primary end point.

11  Q.   Now, going over to the next -- now the primary end point was

12  all PUBs, all confirmed PUBs?

13  A.   Right.

14  Q.   And the secondary end point was the complicated PUBs?

15  A.   Complicated confirmed PUBs.

16  Q.   Is it correct that that was one of the secondary end points?

17  A.   Right.

18  Q.   Was it the most important one?

19  A.   It was should have been the primary end point.

20  Q.   Why do you say that?

21  A.   Because it's the most important one and clinically relevant and

22  least likely to be biased.

23  Q.   Now, going over to page 4544, in the middle paragraph, is there

24  a reference to subgroup analyses that may be performed?

25  A.   It says subgroup analysis may also be performed for more

1    numerous of the secondary end points, i.e., confirmed plus

2    unconfirmed PUBs.

3    Q.  Now, do you read that as -- withdraw that.

4         Was there anything that prevented Merck from conducting a

5    subgroup analysis of the complicated PUBs end point?

6    A.  Not that I know of.

7    Q.  Should such an analysis have been done and reported?

8    A.  Yes.

9    Q.  Why?

10   A.  Maybe, in my opinion, it's the most important of the end

11   points.  And because of that, the focus should have been there.

12   Q.  And what is the state of scientific opinion that you're aware

13   of based on your expertise about the role of steroid use in,

14   affecting the rate of GI serious adverse events associated with

15   NSAIDs?

16        MR. SALES:  Objection, your Honor, to the extent that he

17   is asking about other people's opinion, I don't mind if he's asking

18   about his opinion.

19        MR. ARBITBLIT:  I'll withdraw and rephrase.  Thank you.

20        THE COURT:  Right.

21   BY MR. ARBITBLIT:

22   Q.  Do you have an opinion, sir, about the relationship between

23   steroid use and the rate of GI adverse events with NSAIDs based on

24   your own knowledge in the field?

25   A.  Yes.

1    Q.  And what is your opinion?

2    A.  That it's a major significant risk factor for increasing the

3    probability of the significant event.  I mean, that was well-known

4    and accepted, that's the reason it became a potential subgroup

5    analysis, they chose the things that were well-known and accepted.

6    Q.  Is it also well-known and accepted that a number of drugs can

7    interact with steroids and that it's important to address whether

8    such interactions are affecting the results?

9    A.  I don't think I understand the question.

10   Q.  I'll withdraw it.

11          Have you personally studied interactions between NSAIDs

12   and other drugs that affect the rate of GI harm?

13   A.  Yes.

14   Q.  Is drug interaction a standard fact that professionals want to

15   know about in interpreting the data from clinical trials?

16   A.  Yes.

17   Q.  Now, turning to your report about this subject of the steroid

18   use versus nonuse in the VIGOR trial.  Did you review documents

19   concerning the exchange between the authors and the *New England*

20   *Journal of Medicine* on the subject?

21   A.  Yes.

22   Q.  In looking at paragraph 32 of your report, just as a guideline,

23   can you describe what it was that you reviewed and how it bears on

24   your opinions?

25   A.  Well, one of the reviewers picked up on the fact that there was

1    a potential problem with the data in relationship to the steroid

2    users versus the nonusers.  And asked for additional evaluations

3    and additional analysis to be done to exclude the question about

4    whether all of the events were not due to the, were not all focused

5    in the, or primary focused in the group of patients taking

6    steroids.

7    Q.  And how did the authors respond to that?

8    A.  Well, the authors basically evaded the question.

9    Q.  How did they do that?

10   A.  Well, they responded and they gave some data and they suggested

11   that there were no interactions statistically significant or

12   important interactions, and therefore, it wasn't necessary

13   basically to look at that per se.

14   Q.  Could the authors have responded by conducting the subgroup

15   analysis by steroid use or nonuse for the complicated PUBs?

16   A.  That's what they were really asked to do and they decided for

17   whatever reason not to do it, and they certainly could have done

18   it.

19   Q.  And have you -- I want to turn back to the VIGOR article and

20   focus your attention to page 1523, back to the subgroup section we

21   were talking about.  Sorry.

22   A.  That's all right.  Okay.

23   Q.  Before we do that, can you just look at table 2 above that

24   subgroup analysis discussion and, in particular, is there a table

25   called Baseline Characteristics of the Patients?

1   A.  Yes.

2   Q.  And about a little more than halfway down is there a reference

3   to treatment for rheumatoid arthritis?

4   A.  Yes.

5   Q.  Underneath that, what's the first entry?

6   A.  Glucocorticoids.

7   Q.  Now, is that the same thing as steroids?

8   A.  Yes.

9   Q.  So what was the percentage of steroid users in the Vioxx and

10  Naproxen groups in the VIGOR study?

11  A.  Slightly over half.

12  Q.  Is 55.8 percent for Vioxx and 56.2 for Naproxen?

13  A.  Yes.

14  Q.  It says treatment for rheumatoid arthritis, are glucocorticoids

15  used for chronic treatment of osteoarthritis?

16  A.  No, they're strictly for rheumatoid arthritis.

17  Q.  And going to the subgroup analysis paragraph, do you see a

18  report at the bottom that patients with no glucocorticoid therapy

19  at baseline had a relative risk of 0.7 and 95 percent confidence

20  interval of 0.4 to 1.2?

21  A.  Right.

22  Q.  What does that confidence interval going from below one to

23  above one mean, as to its statistical significance?

24  A.  Traditionally means it's not statistically significant.

25  Q.  And then does it -- does that relative risk of 0.7 equate to a

1    suggestion of a 30 percent benefit of Vioxx for this complicated --

2    for this overall end point?

3    A.   That's how it was interpreted.

4    Q.   And is it correct that these statistics apply -- these are

5    given for the primary end point of PUBs and not for the complicated

6    PUBs; is that right?

7    A.   Right.

8    Q.   Going to the top of the next column, there is a report of a

9    relative risk for those who were using steroids; is that right?

10   A.   Yes.

11   Q.   And what is the data for that?

12   A.   It says that that would be 0.4 with 95 percent confidence, from

13   0.2 to 0.6.  Using the same data that would be a 60 percent

14   statistically significant.

15   Q.   So for the primary end point, did this article suggest a

16   benefit to both steroid and nonsteroid users in different sizes, 30

17   percent for one group and 60 for the other?

18   A.   Yes.

19   Q.   Now, going to the complicated PUBs end point that you looked at

20   on table 4, were the data reported by steroid use versus nonuse or

21   only as a lumped-together group?

22   A.   They were not separated out between steroid use and nonuse.

23   Q.   Now, did Dr. Jewell perform an analysis of the complicated end

24   point for steroid users versus nonusers that was not provided in

25   this article?

1   A.  Yes.

2   Q.  And turning to tab 8 of your binder.  Can you take a look at

3   that, please.

4   A.  Right.

5   Q.  On the first page there is a reference to the VIGOR trial.  Did

6   you rely on Dr. Jewell's analysis for your opinions about the VIGOR

7   trial in this case?

8   A.  Yes.

9   Q.  And does Dr. Jewell report in the first paragraph that he used

10  data from table 12.36 of the clinical study report for the Vioxx

11  trial?

12  A.  Yes.

13  Q.  Does he report that he used the VIGOR data files provided by

14  Merck?

15  A.  Yes.

16  Q.  Now, you see the second paragraph, do the data that Dr. Jewell

17  reported for the overall secondary complicated PUBs end point match

18  to the table 4 that you looked at, 37 versus 16?

19  A.  Yes.

20  Q.  And did he report the overall estimated incidence rate ratio

21  for that comparison?

22  A.  Yes.

23  Q.  And what was it?

24  A.  2.32.

25  Q.  Going down to the third paragraph, did Dr. Jewell report a

1   stratified analysis of this data by baseline use of steroids?

2   A.  Yes.

3   Q.  And did he report an incidence rate ratio for those without

4   baseline steroid use on the third line?

5   A.  Yes.

6   Q.  And what was that incidence rate ratio?

7   A.  1.12.

8   Q.  And did he report in the next line what the estimated incidence

9   rate ratio was for the people who were using steroids?

10  A.  3.85.

11  Q.  Did Dr. Jewell then do a statistical interaction test to

12  compare those two rates?

13  A.  Yes.

14  Q.  And what was the result that he reported?

15  A.  He reported a statistically significant interaction of 0.047.

16  Q.  And how did that affect your opinions about the VIGOR trial and

17  your interpretation of it?

18  A.  Well, that was the analysis that was, I had been wanting to see

19  and apparently the reviewer was wanting to see in the beginning

20  because it was a necessary analysis to suggest or to ask whether or

21  not it was possible that all of the, or the majority of the benefit

22  was in one of the subgroups, and the data here suggests that that

23  would be the case.

24  Q.  When you wrote about the VIGOR article at any time between

25  November 2000 when it was published and the fall of 2009 when you

```
 1   got this report, did you know anything about this comparison?
 2   A.  No.
 3   Q.  If you had known about it, how would it have changed what you
 4   wrote about VIGOR and Vioxx?
 5   A.  Well, I would have changed my opinion in that they had not
 6   succeeded in proving the hypothesis that for, if you like, for
 7   general use that rofecoxib would prevent, or the data was not there
 8   that they would prevent significant events with people other than
 9   those taking the steroids.
10   Q.  What would have been the effect on the drug if that had been
11   reported?
12            MR. SALES:  Objection, your Honor, speculation.
13            THE COURT:  Yes, I agree with that.
14            MR. ARBITBLIT:  All right.  Withdraw that.  Sorry.
15   BY MR. ARBITBLIT:
16   Q.  What would the effect have been on your publication about Vioxx
17   if you had known that?
18            MR. SALES:  Same objection, your Honor.
19            THE COURT:  Yes.  We don't need to go there.
20            MR. ARBITBLIT:  All right.
21   BY MR. ARBITBLIT:
22   Q.  Doctor, did you publish articles that included a nomogram about
23   possible cost-effectiveness of the use of Vioxx in patient
24   populations?
25   A.  It was one of the examples, yes.
```

1    Q.  And what is a nomogram?

2    A.  A nomogram is a simplified way that if you have a number of

3    variables that you can plot them and get an answer.

4    Q.  And would the answer be something that would try to predict the

5    cost scenarios of using various drugs to prevent bad outcomes?

6    A.  That would be the way it would be theoretically used because

7    one of the questions always is, if you buy something that's better

8    and more expensive, is it actually cost saving, and this would

9    allow one to use that to come up with that kind of calculation.

10   Q.  Did you use Vioxx as an example in one of your published works

11   for a nomogram?

12   A.  Yes.

13   Q.  When you wrote that article, did you believe that there was a

14   generalized benefit in terms of the reduction of complicated GI

15   events based on the VIGOR study?

16   A.  That's what the data, published data told me.

17   Q.  If you were to do that nomogram again today, what would you say

18   about Vioxx?

19           MR. SALES:  Objection, calls for speculation, if there's

20   no foundation that he's actually done such a --

21           THE COURT:  I thought he just did one, didn't he?  Did he

22   write an article on it?

23           MR. ARBITBLIT:  He did write an article, your Honor, and

24   it's been the subject of his examination at deposition.  He's put

25   in his report that he would say things differently if he knew

 1   this -- if he knew now -- if he knew then what he knew today and I

 2   think it's relevant.

 3            THE COURT:  I'll overrule the objection and allow it.

 4   BY MR. ARBITBLIT:

 5   Q.  Doctor, how would what you wrote about Vioxx in the nomogram

 6   and cost-effectiveness change based on what you know today?

 7   A.  Well, I have to use a different example because if rofecoxib

 8   did not give me a benefit, then it would not, would not fit in a

 9   nomogram.

10            MR. ARBITBLIT:  I have one more subject area, I believe I

11   can finish before the lunch break, your Honor.

12            THE COURT:  All right.  Let's do it.

13            MR. ARBITBLIT:  And again, this is something that was

14   covered in the rebuttal report.

15   BY MR. ARBITBLIT:

16   Q.  Doctor, did you review observational studies of Vioxx in

17   comparison to other NSAIDs in relation to GI toxicity as part of

18   your work on this case?

19   A.  I did.

20   Q.  And can you turn to your rebuttal report and tell the court

21   what you did in that regard?  In particular, there's paragraph 2 at

22   the second page.

23   A.  We looked at the observational studies that were, obviously

24   observational studies that were less powerful than randomized

25   placebo-controlled trials, but when you're looking at them, you

1    always like to see things going in the same direction, and there

2    are six large observational studies that included rofecoxib and had

3    an end point of gastrointestinal bleeding, so we reviewed those to

4    ask what they showed, and that all six showed an increased risk

5    with Vioxx compared to not using NSAIDs, which would be a surrogate

6    for placebo.  And that it was not possible to differentiate

7    rofecoxib from the traditional NSAIDs in terms of gastrointestinal

8    bleeding.

9            And interestingly, where it could be examined, it was

10   also dose-response relationships were shown, that's what we

11   expected from Vioxx but also for rofecoxib, which would be, again,

12   very consistent with it not being not gastrotoxic.

13           And they also suggested that, showed that the lower dose

14   response effect with Naproxen.  In fact, one of the authors even

15   suggested that high-dose Naproxen would be an inappropriate NSAID

16   comparator as it would give, likely give a false sense of safety

17   for the drug being compared to Naproxen which I agreed with.

18   Q.  And is the data in these observational studies consistent with

19   the Vioxx versus placebo data that you described earlier showing

20   the elevated rates of GI damage in APPROVe in 078?

21   A.  Completely.

22   Q.  Is that type of consistency important to your opinions as a

23   scientist?

24   A.  Well, it adds to it, it adds weight to the -- as long as you

25   can keep adding bricks to your wall, it gets stronger.

```
 1    Q.  Does the available data show that Vioxx is gastrotoxic and

 2    significantly worse than placebo?

 3    A.  I think that's unquestionable.

 4    Q.  Is it possible to differentiate the gastrotoxicity of Vioxx

 5    from that of other NSAIDs?

 6    A.  No.

 7              MR. ARBITBLIT:  I have no further questions at this time.

 8              THE COURT:  Okay.  Let's see if we can go until 12:30

 9    because I have another matter at 1:30.

10              MR. ARBITBLIT:  Thank you, Doctor.

11              THE COURT:  Thank you.  You may cross-examine, Counsel.

12                         CROSS-EXAMINATION

13    BY MR. SALES:

14    Q.  Good afternoon, Dr. Graham.

15    A.  Good afternoon.

16    Q.  By about a minute.  You were first retained by Mr. Arbitblit, I

17    believe, on September 28th, 2009; does that sound correct?

18    A.  I think that's correct.  I'll accept it.

19    Q.  Thereabouts?

20    A.  Thereabouts.

21    Q.  It's true, Dr. Graham, is it not, that for the ten years before

22    you're called by Mr. Arbitblit as an expert witness for the

23    plaintiff in this case that you believed that COX-2 inhibitors,

24    including Vioxx, provided better GI safety than traditional NSAIDs?

25    A.  Say again.
```

1   Q.  For the ten years before you were hired as an expert witness in

2   this case, you believed, and we're going to go through some of your

3   writings, that COX-2s, including Vioxx, were -- had better GI

4   safety than traditional NSAIDs.

5   A.  The data, initial data, said that was the case, yes.

6   Q.  So is that a true statement?

7   A.  Well, it's not completely true, but it's a general.  After this

8   data came out for the CLASS study and the VIGOR study said these

9   drugs have better safety than at least what they were compared to.

10  Q.  And for those ten years, you told the medical community in some

11  very widely-published and reviewed articles that COX-2s had,

12  generally speaking, a better GI safety profile than traditional

13  NSAIDs, correct?

14  A.  I rarely say anything that dogmatically, but if you want to go

15  from that I'll accept it for the sake of reasonableness.

16  Q.  All right.  Let's take a look at what you told the medical

17  community before you were retained by Mr. Arbitblit in this case.

18          MR. ARBITBLIT:  Your Honor, I would just object to

19  counsel's repeated reference to my name, it's really not relevant

20  as to who obtained him.

21          THE COURT:  He has him under cross, I'll overrule the

22  objection and allow it.

23  BY MR. SALES:

24  Q.  You coauthored a paper in 2002, did you not, Dr. Graham, with a

25  Dr. Hashem El-Serag?

1    A.  I did.

2    Q.  It was peer reviewed?

3    A.  It was peer reviewed.

4    Q.  Is Dr. El-Serag a reputable doctor?

5    A.  Certainly.

6    Q.  I think you described him in your deposition as a smart guy?

7    A.  He is.

8    Q.  He understands GI issues very well with regard to NSAIDs,

9    right?

10   A.  No, he understands nomograms.

11   Q.  Did he sign off on that article with you?

12   A.  Of course.

13   Q.  Is Dr. El-Serag now the chief of gastroenterology at Baylor

14   College of Medicine?

15   A.  Yes, he is.

16   Q.  He took over from you, right?

17   A.  He did.

18   Q.  Let's see what Dr. El-Serag and you wrote in 2002, let's go to

19   DX 4000.

20           MR. SALES:  Do you have the article, do you need a copy?

21           MR. ARBITBLIT:  I need a copy.

22           MR. SALES:  May I approach the witness, your Honor?

23           THE COURT:  Sure.

24           Doctor, do you want to pull that microphone a little bit

25   closer to you, it moves.  That's fine.

1    BY MR. SALES:

2    Q.  You wrote an article titled "The Prevention of Complicated

3    Ulcer Disease Among Chronic Users of Nonsteroidal Anti-inflammatory

4    Drugs."  Correct?

5    A.  Yes.

6    Q.  And that's you, Dr. David Y. Graham and Dr. El-Serag, correct?

7    A.  Right.

8    Q.  Let's go to the next slide.

9            If you look at page 5 of your article, Doctor, lower

10   right-hand corner.  And it's blown up on the big screen here for us

11   if you need to look there.

12           You told the medical community that:  "The overall

13   finding of this study is rather straightforward:  it is

14   cost-effective to use relatively expensive medications such as

15   coxibs or to add a PPI to regimens for patients with a high risk

16   for clinical UGI events.  Including the cost of clinical UGI events

17   in the analysis strengthens the argument further.  Even in persons

18   with an intermediate risk of clinical UGI events," and you're

19   talking about gastrointestinal events, correct?

20   A.  Right.

21   Q.  "With conventional NSAIDs, the use of coxibs becomes a more

22   effective and less costly strategy than conventional NSAID

23   therapy."  You wrote that then, correct?

24   A.  Yes, I did.

25   Q.  And you talk about coxibs there, you're talking about Bextra,

1    Celebrex and Vioxx, right?

2    A.  We're talking about the concept.

3    Q.  Did that include Bextra, Celebrex and Vioxx?

4    A.  It could at the time.

5    Q.  Do you know of any other coxib on the market at that point in

6    time?

7    A.  Well, this was a theoretical article, it was based upon table

8    2, where what you do for this type of cost-effective analysis, is

9    you look in the literature and you get the very best estimates that

10   are currently published and you plug those in the equation.  And

11   we're plugging in here for a reduction in risk with COX-2s of 50

12   percent and with PPIs at 50 percent.  And then you do your

13   analysis.

14          Now, we're talking here about high-risk patients, which

15   is the minority of the population or moderate, which is still a

16   minority of the population; so it's not talking about general use

17   in the population, it's talking about for patients at high risk,

18   6.5 percent, and that would be at moderate risk.  That would be 6.5

19   out of 100 would have a major event, which is higher than anything

20   that you showed in any of the studies, that it would be -- if you

21   could reduce the rate by 50 percent by using this drug, it would be

22   cost-effective.  And that's straightforward.

23          Dr. Graham, my question was simply, there were three

24   coxibs on the market in 2003, correct?

25   A.  Well, your whole concept of this article on what we said was

1    taken so far out of context that I hardly recognized it.

2    Q.  Dr. Graham, were there three coxibs on the market in 2002?

3    A.  Probably.

4    Q.  Do you not know?

5    A.  Well, I know that -- I don't know when they came in and off.

6    Q.  And that would be Celebrex, Bextra and Vioxx, correct?

7    A.  Those were two -- three that were commonly available.

8    Q.  Have you ever retracted this article and written that that

9    article, that what you wrote in 2002 with Dr. Serag, is incorrect?

10   A.  It's not incorrect.  If you go back to table 2 and you now

11   change it to the new data that we now know that we have, you can

12   still take the same nomogram and get the same answer.  It would be

13   not true for this piece of information, but that's only because the

14   data that we used has changed, and this is using the best estimates

15   of annual risk of clinical GI advance in individual patient by risk

16   stratification with reference.

17   Q.  So the answer is no, you have not printed any type of published

18   retraction to this article?

19   A.  It's still valid today, I wouldn't need to retract it.

20   Q.  So you have not done that.

21          Let's go to another article you wrote in 2004, do you

22   know a Dr. Chan that you've worked with?

23   A.  Yes.

24          MR. SALES:  May I approach, your Honor?

25          THE COURT:  Yes.

1          THE WITNESS:  Thank you.

2   BY MR. SALES:

3   Q.  Dr. Chan is a reputable doctor?

4   A.  Yes.

5   Q.  You wrote an article in, called "Is the use of Cox-2 inhibitors

6   in gastroenterology cost-effective."  Correct?

7   A.  That's the title.

8   Q.  And you wrote that in 2004, right?

9   A.  That's when it was published.

10  Q.  You see, it says December of 2004 is the date of publish?

11  A.  Right.

12  Q.  Is that right?

13  A.  Yes.

14  Q.  And let's look at what you and Dr. Chan said in 2004 to the

15  medical community.  First, if you could actually go up to the last

16  sentence of the first paragraph where it says NSAIDs.

17          You wrote in 2004 that:  "NSAIDs are a major cause of the

18  endemic of ulcer complications, with as many as 103,000

19  hospitalizations and over 7,000 deaths a year attributable to NSAID

20  use in the US."  Correct?

21  A.  That's what we wrote.

22  Q.  You stand by that?

23  A.  It was the published information from Dr. Singh.

24  Q.  Yeah, is that what you -- you cited a Dr. Singh as the

25  reference to that point, correct?

1   A.   Right.

2   Q.   That's not a Merck-authored study, correct?

3   A.   Dr. Singh, he, whatever, don't work for Merck, no.

4   Q.   Have you ever published anything to take back your analysis

5   that there were 103 -- or your belief that there were 103,000

6   hospitalizations and over 7,000 deaths a year due to NSAID GI

7   complications?

8   A.   No.  Do you have different data?

9   Q.   NSAID use is historically, you knew traditional NSAIDs are a

10   major problem with regard to GI complications, correct?

11   A.   Right.

12   Q.   That was one of the beliefs behind the COX-2 inhibitors coming

13   on the market, correct?

14   A.   That was the hope, yes.

15   Q.   Now, let's see what else you said in this article in 2004.

16   "Trials using endoscopically defined ulcers as the endpoint have

17   consistently shown that COX-2 inhibitors induce significantly fewer

18   ulcers than conventional NSAIDs, although the desired frequency of

19   'none' or 'no ulcers' has not been achieved."  Correct?

20   A.   Right.

21   Q.   No doubt in your mind that you knew that COX-2s were not being

22   portrayed as a GI protective agent against placebo, correct?

23   A.   Say again.

24   Q.   We're going to go through a little bit of your comments about

25   the placebo data but even in 2004, everybody knew that COX-2s were

1    not being used to suggest that they were better than a sugar pill,

2    they were being used to suggest that they were safer than

3    traditional NSAIDs.  Correct?

4    A.  I'm sorry, but I don't have a database about what the

5    advertisements or the inserts that the company used to sell their

6    drug.

7    Q.  That's not my question, Dr. Graham.

8    A.  That's what you just asked me.

9    Q.  No, sir.  The question is, do you know that the database that

10   you relied upon in 2004 was not reporting that COX-2s were

11   receiving no ulcers, correct?

12   A.  I remember they said, if you look at your study, that they were

13   comparable to placebo.  And placebo in those studies caused ulcer.

14   Now, how do you interpret that?

15   Q.  We're going to talk, I don't think -- we have a few more

16   minutes before lunch, we're going to talk after lunch a little bit

17   about the placebo and I'll get into it.  But the point, in 2004 you

18   knew that there was not being reported that COX-2 inhibitors were

19   having no ulcers, correct?

20   A.  That's not what is -- if we continue to read, it said:  "The

21   published studies have important design problems, especially as

22   they typically allow entry to patients with an increased baseline

23   risk of ulcers or ulcer complications, such as those with *H. pylori*

24   infections, another cause of ulcers, that would be independent,

25   that would give you false positives, and/or aspirin use, another

1    cause of ulcers that would give you false positives.  These design

2    flaws have prevented identification of the actual level of risk of

3    COX-2 inhibitors independent of known risk factors.  Clinical

4    outcomes are the most important metric - large-scale clinical

5    outcome studies have shown reduction in the range of 50% in

6    clinical gastrointestinal events."

7         So it says nothing about what you're talking about.  It

8    says you can't measure that with this, with these tests.

9    Q.  Dr. Graham, right above that you say "Trials using

10   endoscopically defined ulcers as the endpoint have consistently

11   shown that COX-2 inhibitors," that was not specific to Vioxx, was

12   it, sir?

13   A.  That's right.  And then it goes on to say --

14   Q.  Sir, that's my only question.

15   A.  -- the problem with that --

16        MR. SALES:  With all due respect, your Honor, it's going

17   to be a long day if he won't answer the question.

18        THE WITNESS:  I just don't like to be taken out of

19   context.

20        THE COURT:  Let's see if we can do it this way.  Doctor,

21   just answer the question and then if you need to explain you can do

22   that.

23        THE WITNESS:  Thank you very much.

24   BY MR. SALES:

25   Q.  COX-2s you reference here includes Celebrex, Bextra and Vioxx,

1    right?

2    A.  Yes.

3    Q.  If I understand your testimony this morning, you believe that,

4    based upon this Dr. Jewell's analysis that you saw in this

5    litigation after being hired, changed your view about Vioxx with

6    regard to being GI protective.  Please tell the court what data you

7    had in 2004 to show that Bextra or Celebrex had a proven clinical

8    benefit through a clinical trial with PUBs, perforations,

9    obstructions (SIC) and bleeds.

10             MR. ARBITBLIT:  Object to form, conclusion of a statement

11   before the question.

12             THE COURT:  Yes.  You assume something.  Do you agree

13   with that assumption, Doctor?

14             THE WITNESS:  I didn't understand it.

15             MR. SALES:  Let me rephrase, your Honor.

16   BY MR. SALES:

17   Q.  Did you have any data from any Bextra trial in 2004 showing a

18   clinical statistical meaningful difference with Bextra versus a

19   traditional NSAID on a complicated PUB end point?

20   A.  No.

21   Q.  Did you have any studies in 2004 with regard to Celebrex with

22   regard to complicated PUB end point showing a statistically

23   significant difference between Celebrex and a traditional NSAID?

24   A.  By that time the CLASS study had been published.

25   Q.  And the CLASS study did not show a statistical difference

1    between Celebrex -- it did not meet an end point, and we're going

2    to talk about the end points this afternoon, it did not meet an end

3    point of a complicated PUB showing a statistical benefit, did it?

4    A.  I am going to have to look at that when we look at details this

5    afternoon.  My impression was for the first six months it did show

6    a difference.

7    Q.  For complicated PUBs?

8    A.  We'll have to look.

9    Q.  It didn't meet the end point designed by the study, did it,

10   sir?

11   A.  I haven't reviewed that in a long time.

12   Q.  So as you sit here today, can't speak to whether or not

13   Celebrex, which you also refer to in this article in 2004, had any

14   data to support that it was statistically better than traditional

15   NSAID on a complicated PUB end point?

16   A.  I have not reviewed that in a long time and could not make a

17   statement.

18   Q.  Have you -- since you changed your opinion, as we heard today,

19   after litigation when you saw Dr. Jewell's report, I take it you

20   haven't seen such a report done on Bextra or Celebrex?

21   A.  Well, Celebrex, their data died when they looked at the next

22   six months, they lost their statistical significance.  So Celebrex

23   was unable to maintain what they had said in their first six

24   months.

25   Q.  Are you aware to this day whether Celebrex has ever met an end

1    point in a clinical trial, an FDA-approved clinical trial, that

2    showed a statistical benefit, significant benefit, on a complicated

3    end point?

4    A.  I am not aware one way or the other.

5    Q.  And the same is true for Bextra, isn't it, sir?

6    A.  I know nothing about Bextra, I didn't ever look at Bextra data.

7    They pushed Bextra as an analgesic.

8    Q.  And let's go on to what else you wrote in 2004 with Dr. Chan.

9    Let's go to 532.  This is an article you wrote again with Dr. Chan

10   in 2004, correct?

11   A.  Yes.

12   Q.  And if you can go to page 3.  On the left-hand column, sir.

13   You wrote in the middle:  "Selective COX-2 inhibitors provide good

14   analgesia with increased safety but at a greater expense."

15   Correct?

16   A.  That's what it says.

17   Q.  You wrote it, right?

18   A.  Right.

19   Q.  And if you go down to the end of that paragraph, you say:  "If

20   all things including costs were equal, we would only prescribe

21   selective COX-2 inhibitors for any indication where an NSAID is

22   needed."  Correct?

23   A.  That's what it says.

24   Q.  Have you ever published any retraction of that article?

25   A.  Possibly.

1    Q.  Well, first of all, you're talking again about COX-2s, not

2    Vioxx, correct, specifically?

3    A.  In December the same here, the paper you just showed me, it

4    said:  "In conclusion, the COX-2 inhibitors have not lived up to

5    the goal of absence of gastrointestinal complications."

6    Q.  So you knew that in 2004?

7    A.  That's the same year but later on.

8    Q.  I understand that, sir.  You understood that in 2004 that it

9    wasn't -- COX-2s were not --

10   A.  This is early, this is later.

11   Q.  -- COX-2s were not providing pure no gastro events in 2004,

12   correct?

13   A.  Well, this is about the time of the year the heart problems,

14   etc., were appearing.

15   Q.  Have you ever published a retraction of the article you and

16   Dr. Chan wrote in 2004, in which you said, "if all things including

17   cost were equal, we would only prescribe selective COX-2s for any

18   indication where an NSAID is needed."?

19   A.  No.

20   Q.  And again, that includes Bextra and Celebrex along with Vioxx

21   in this article, correct?

22   A.  Well, I mean, you can include anything you want.  I mean, you

23   didn't ask each one of us what drug we would use if that were the

24   case.

25   Q.  I am saying, when you talk about COX-2s, you're not being

1  specific to any one, are you, sir?

2  A.  I am not being specific there.

3  Q.  And as recently as 2006, you wrote an article with Hong Lu in a

4  journal called *Drug Discovery Today*, correct?  Do you remember

5  writing an article with Dr. Hong Lu?

6  A.  Yes.

7  Q.  I take it Dr. Lu, you believe, is a competent, reputable

8  doctor?

9  A.  Yes.

10  Q.  Go to page 4, Dr. Graham, on the right-hand column.  You state

11  that:  "The highly selective COX-2 inhibitors such as rofecoxib

12  showed reduced gastrointestinal side effects," and then you go on

13  to talk about their potential cardiac events, correct?

14  A.  Right.

15  Q.  Again, that's talking about Celebrex, Bextra and Vioxx because

16  you talk about the highly selective COX-2 inhibitors such as

17  rofecoxib, correct?

18  A.  Right.

19  Q.  All right.  This was in 2006, correct?

20  A.  Right.

21  Q.  Have you ever published a retraction of this article?

22  A.  I only published retractions of things that are wrong.

23  Medicine, as you know, is a continuous process and as time goes on,

24  I have papers that said the treatment of peptic ulcer disease is

25  Maalox, seven doses a day.  I didn't write later, we don't, you

1   know, we sure need to retract that, we're now going to use H2

2   blockers or later, we're not going to use H2 blockers, use PPIs, or

3   later, we're going to cure the underlying disease, you don't

4   retract stuff.  You retract stuff that's wrong, that was a mistake,

5   but not where you stand at that time in the literature.

6   Q.  Because science evolves, correct?

7   A.  I need to -- say again.

8   Q.  Science evolves, as you say, correct?

9   A.  Science moves on.  That's what we've discovered when we found

10  out the data about your drug.

11  Q.  And what data did you discover about Celebrex?

12  A.  Say again.

13  Q.  Yes, sir.  You mentioned Celebrex and Bextra included in this

14  article that you claimed that they showed reduced gastrointestinal

15  side effects.  What studies did you base that opinion on?

16  A.  That's not what it says, it's using selective COX-2 inhibitors

17  as a concept.  Remember at that time there was a marathon

18  (PHONETIC) concept coming out, there were a whole bunch of them in

19  trial, and when you're giving this kind of talk or giving this kind

20  of discussion, you try and say as general as possible.

21          If you said every time, instead of COX-2 you said

22  Celebrex low dose, which would still probably fit for most of these

23  things, then people would say, well, you know, he works for

24  Celebrex or he works for such and such.  And you -- actually, the

25  only reason that you would do that is if you did work for them.

```
 1    You try and be as general as you can and as accurate as you can.

 2              And any time that you say I was talking about Bextra, to

 3    the best of my knowledge, I've never talked about Bextra, never

 4    even thought about Bextra.

 5    Q.  Did you say anywhere in these articles I am not talking about

 6    Bextra?

 7    A.  No, the studies weren't there yet for Bextra.  Remember, it was

 8    being pushed as a, give or take, two doses for arthritis but not

 9    for acute pain, not for long-term use.

10    Q.  So you didn't have any study support for stating that all

11    COX-2s were producing a gastrointestinal benefit?

12              MR. ARBITBLIT:  Object to the form, it does not say

13    "all", it says "the".

14              MR. SALES:  With the correction.

15              THE COURT:  Restate the question.

16    BY MR. SALES:

17    Q.  Yes.  So you didn't have any clinical evidence to support the

18    statements that we've gone over, when you're referring to COX-2

19    inhibitors generally and not Vioxx specifically, we've gone through

20    three different places now in your articles where you talk about

21    COX-2s are showing reduced gastrointestinal benefits, are you

22    telling the court that you had no clinical support for those

23    statements with regard to the other COX-2s?

24    A.  I am not saying one way or the other because there were data on

25    some, there were no data on others, and there was new data and all
```

1    of these new ones that were out there being tested.  This is a

2    concept, as COX-2s selective inhibitors are a concept.

3              THE COURT:  Let's get to a point where --

4              THE WITNESS:  We weren't trying to sell a specific agent

5    to any of them.

6              MR. SALES:  Your Honor, now is a good breaking point.

7              THE COURT:  Okay.  We'll come back at 1:45.  The court

8    will stand in recess until 1:45.

9              MR. ISMAIL:  Your Honor, can you advise the witness he is

10   on cross-examination.

11             THE COURT:  Yes.  Doctor, what we do in these trials is

12   to ask the witness not to talk to counsel in-between the break, so

13   please do that, don't talk to counsel.

14             THE WITNESS:  Thank you, sir.

15        (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

16

17                        *  *  *  *  *  *

18

19                      REPORTER'S CERTIFICATE

20

21        I, Karen A. Ibos, CCR, Official Court Reporter, United States
     District Court, Eastern District of Louisiana, do hereby certify
22   that the foregoing is a true and correct transcript, to the best of
     my ability and understanding, from the record of the proceedings in
23   the above-entitled and numbered matter.

24

25                      Karen A. Ibos, CCR, RPR, CRR
                        Official Court Reporter

DAILY COPY