1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3


4
     IN RE:  VIOXX PRODUCTS          *
5            LIABILITY LITIGATION    *
                                     *
6    This Document Relates to:       *    MDL No. 1657
                                     *
7         STATE OF LOUISIANA, *ex rel.* *    Section L
          JAMES D. CALDWELL JR.,     *
8         Attorney General           *    New Orleans, Louisiana
                                     *
9             versus                 *    April 13, 2010
                                     *
10   MERCK & CO., INC.               *    1:45 p.m.
                                     *
11                                   *
          Case No. 05-CV-3700        *
12   * * * * * * * * * * * * * * * * * *

13


14                    TRIAL PROCEEDINGS BEFORE THE
15                     HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
16                    DAY 2, AFTERNOON SESSION

17
     APPEARANCES:
18

19   For the Plaintiff:           Dugan Law Firm
                                   BY:  JAMES R. DUGAN II, ESQ.
20                                 650 Poydras Street, Suite 2150
                                   New Orleans, Louisiana 70130
21

22   For the Plaintiff:           Murray Law Firm
                                   BY:  STEPHEN B. MURRAY JR., ESQ.
23                                      DOUGLAS R. PLYMALE, ESQ.
                                        JUSTIN BLOOM, ESQ.
24                                 650 Poydras Street, Suite 2150
                                   New Orleans, Louisiana 70130
25


                              DAILY COPY

```
 1   For the Plaintiff:          Lieff Cabraser Heimann
                                   & Bernstein, LLP
 2                              BY:  DONALD C. ARBITBLIT, ESQ.
                                275 Battery Street, Suite 3000
 3                              San Francisco, California 94111

 4
     For the Defendant:          Goldman Ismail Tomaselli
 5                                 Brennan & Baum, LLP
                                BY:  TAREK ISMAIL, ESQ.
 6                                   BRIAN P. O'DONOGHUE, ESQ.
                                1 North Franklin Street, Suite 625
 7                              Chicago, Illinois 60606

 8
     For the Defendant:          Baker Botts, LLP
 9                              BY:  TRAVIS J. SALES, ESQ.
                                910 Louisiana Street
10                              Houston, Texas 77002

11
     For the Defendant:          O'Melveny & Myers, LLP
12                              BY:  SCOTT M. VOELZ, ESQ.
                                400 South Hope Street
13                              Los Angeles, California 90071

14
     Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
15                              500 Poydras Street, Room HB-406
                                New Orleans, Louisiana 70130
16                              (504) 589-7778

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

DAILY COPY

1                           **I N D E X**

2                                                          PAGE

3   David Y. Graham
            Cross-Examination                         306
4           Redirect Examination                      361

5   David W. Hood
            Direct Examination                        367
6           Cross-Examination                         398
            Redirect Examination                      451
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              DAILY COPY

|       |    |                                                                         |
|-------|----|-------------------------------------------------------------------------|
| 13:44 | 1  | **AFTERNOON SESSION**                                                   |
| 13:44 | 2  | (April 13, 2010)                                                        |
| 13:44 | 3  | THE DEPUTY CLERK:  Everyone rise.                                       |
| 13:46 | 4  | THE COURT:  Be seated, please.  You are still under                    |
| 13:46 | 5  | oath, Doctor.                                                           |
| 13:46 | 6  | MR. ARBITBLIT:  A little housekeeping matter.                           |
| 13:46 | 7  | THE COURT:  Sure.                                                       |
| 13:46 | 8  | MR. ARBITBLIT:  I was reminded that I had overlooked                    |
| 13:46 | 9  | offering LAAG-173, which was the Alzheimer's clinical study             |
| 13:46 | 10 | report and Merck document that the witness testified about.            |
| 13:46 | 11 | THE COURT:  Okay.  I'll admit it.                                       |
| 13:46 | 12 | MR. ARBITBLIT:  Thank you, Your Honor.                                  |
| 13:46 | 13 | MR. SALES:  Your Honor, before we start, another                       |
| 13:46 | 14 | housekeeping matter.                                                    |
| 13:46 | 15 | THE COURT:  Sure.                                                       |
| 13:46 | 16 | MR. SALES:  We would offer as learned treatises,                       |
| 13:46 | 17 | understanding they would not go into the permanent record,            |
| 13:46 | 18 | Defense Exhibit 4000, 4001, 4002, and 532, the four articles          |
| 13:46 | 19 | that we discussed.                                                      |
| 13:46 | 20 | THE COURT:  Well, you have used them and discussed                     |
| 13:46 | 21 | them, so I'm not going to admit them into evidence.                    |
| 13:46 | 22 | MR. SALES:  May I proceed, Your Honor?                                  |
| 13:46 | 23 | THE COURT:  Yes, please.                                                |
|       | 24 |                                                                         |
|       | 25 |                                                                         |

| | | |
|---|---|---|
| 13:46 | 1 | (WHEREUPON **David Y. Graham**, having been duly sworn, |
| 13:46 | 2 | testified as follows.) |
| 13:46 | 3 | CROSS-EXAMINATION |
| 13:46 | 4 | BY MR. SALES: |
| 13:46 | 5 | Q.   Good afternoon, Dr. Graham. |
| 13:46 | 6 | A.   Nice to see you again. |
| 13:46 | 7 | Q.   This morning you discussed an editorial that you had |
| 13:46 | 8 | written in 2009 in which, in response to some questions from |
| 13:47 | 9 | Mr. Arbitblit, you talked about your belief that using |
| 13:47 | 10 | endoscopies to determine PUBs was probably not the best way to |
| 13:47 | 11 | go with regard to clinical trials to determine meaningful |
| 13:47 | 12 | clinical events; is that correct? |
| 13:47 | 13 | A.   Not exactly, but I understand where you're going.  You're |
| 13:47 | 14 | saying what I said was that the ulcer, the clinical ulcer part |
| 13:47 | 15 | of the PUBs, was not as reliable as the other three. |
| 13:47 | 16 | Q.   Do you have that editorial still in front of you in your |
| 13:47 | 17 | notebook? |
| 13:47 | 18 | A.   That's not what that editorial is about, but I have the |
| 13:47 | 19 | editorial in front of me somewhere. |
| 13:47 | 20 | Q.   I believe counsel said it's tab 2 in your book. |
| 13:48 | 21 | A.   Yes. |
| 13:48 | 22 | Q.   Dr. Graham, this is the editorial that you were asked some |
| 13:48 | 23 | questions about this morning? |
| 13:48 | 24 | A.   Yes. |
| 13:48 | 25 | Q.   All right.  You wrote this editorial in response to an |

13:48  1   article that had been written by a group of opinion leaders who

13:48  2   took a different point of view than you; correct?

13:49  3   A.   Yes.

13:49  4   Q.   On the first paragraph you say, "In this issue of

13:49  5   *Clinical Gastroenterology and Hepatology*, a group of opinion

13:49  6   leaders make the argument that endoscopic ulcers might serve as

13:49  7   a surrogate endpoint for clinically significant ulcer

13:49  8   complications."   Correct?

13:49  9   A.   Yes.

13:49  10  Q.   You referenced a footnote to who you were talking about;

13:49  11  right?

13:49  12  A.   Right.

13:49  13  Q.   You were talking about an article that was written by a

13:49  14  group, as you said, of opinion leaders in gastroenterology;

13:49  15  correct?

13:49  16  A.   Right.

13:49  17       **MR. SALES:**  Can we see that article.

13:49  18  **BY MR. SALES:**

13:49  19  Q.   Is what's been marked as Defense Exhibit 4013 a copy of

13:50  20  that Moore article for which you are responding?

13:50  21  A.   Yes.

13:50  22  Q.   The authors were a Dr. Andrew Moore -- is he a reputable

13:50  23  doctor?

13:50  24  A.   I don't know Dr. Andrew Moore.

13:50  25  Q.   Well, you mentioned you were responding to a group of

| | | |
|---|---|---|
| 13:50 | 1 | opinion leaders.  Did you have the view that these gentlemen |
| 13:50 | 2 | and ladies -- and we'll go through them -- were opinion |
| 13:50 | 3 | leaders? |
| 13:50 | 4 | **A.**   A generic term, but -- |
| 13:50 | 5 | **Q.**   Did you know Dr. Ingvar Bjarnason? |
| 13:50 | 6 | **A.**   Yes. |
| 13:50 | 7 | **Q.**   What type of doctor? |
| 13:50 | 8 | **A.**   What type of doctor? |
| 13:50 | 9 | **Q.**   Yes.  What specialty? |
| 13:50 | 10 | **A.**   I don't know the specialty he practices.  He does his |
| 13:50 | 11 | research in gastroenterology and then NSAID-induced damage to |
| 13:51 | 12 | the small valve particularly. |
| 13:51 | 13 | **Q.**   Dr. Byron Cryer? |
| 13:51 | 14 | **A.**   Cryer is a gastroenterologist. |
| 13:51 | 15 | **Q.**   Dr. Luis Garcia-Rodriguez? |
| 13:51 | 16 | **A.**   We have already seen some of his papers that I have |
| 13:51 | 17 | quoted. |
| 13:51 | 18 | **Q.**   Is he a gastroenterologist? |
| 13:51 | 19 | **A.**   He is a gastroenterologist or epidemiologist, but this is |
| 13:51 | 20 | his area. |
| 13:51 | 21 | **Q.**   Dr. Larry Goldkind, do you know who Dr. Goldkind is? |
| 13:51 | 22 | **A.**   No. |
| 13:51 | 23 | **Q.**   Do you know whether he was actually an FDA reviewer? |
| 13:51 | 24 | **A.**   Don't know. |
| 13:51 | 25 | **Q.**   Dr. Angel Lanas? |

| | | |
|---|---|---|
| 13:51 | 1 | **A.**   He is another one of the people who we have quoted before |
| 13:51 | 2 | that does epidemiology in this area. |
| 13:51 | 3 | **Q.**   Dr. Lee Simon? |
| 13:51 | 4 | **A.**   He's a rheumatologist. |
| 13:51 | 5 | **Q.**   Do you know Dr. Simon? |
| 13:51 | 6 | **A.**   Uh-huh.  I've had papers with Dr. Simon. |
| 13:51 | 7 | **Q.**   Dr. Simon actually treats OA and RA patients; right? |
| 13:51 | 8 | **A.**   He should.  He is a rheumatologist. |
| 13:51 | 9 | **Q.**   That's the specialty area that treats that disease; right? |
| 13:51 | 10 | **A.**   Well, most everybody treats that disease, but the |
| 13:52 | 11 | rheumatologists take care of that specialty. |
| 13:52 | 12 | **Q.**   If you go down to the conclusions of the article that you |
| 13:52 | 13 | were responding on your editorial, all of these doctors state |
| 13:52 | 14 | that consistent and plausible findings from disparate |
| 13:52 | 15 | populations and design make endoscopic ulcers a strong |
| 13:52 | 16 | candidate for surrogacy, though direct progression from |
| 13:52 | 17 | endoscopic ulcers to ulcer complications cannot be |
| 13:52 | 18 | demonstrated; correct? |
| 13:52 | 19 | **A.**   Where are you reading that? |
| 13:52 | 20 | **Q.**   Under the "Conclusions" section of the article. |
| 13:52 | 21 | **A.**   All those opinion leaders were members of the panel of |
| 13:52 | 22 | people working with Pfizer. |
| 13:52 | 23 | **Q.**   Sir, is the conclusion of the article of the group of |
| 13:52 | 24 | opinion leaders that -- many which you know, is that their |
| 13:52 | 25 | conclusion? |

| | | |
|---|---|---|
| 13:52 | 1 | **A.**   I'm looking for that. |
| 13:52 | 2 | **Q.**   Lower left-hand corner, first page. |
| 13:52 | 3 | **A.**   First page? |
| 13:53 | 4 | **Q.**   Sir, my question simply is:  Does the article indicate |
| 13:53 | 5 | that that is the conclusion of that group of authors? |
| 13:53 | 6 | **MR. ARBITBLIT:**  I don't want to interrupt.  I would |
| 13:53 | 7 | just like a copy. |
| 13:53 | 8 | **THE WITNESS:**  Oh, I see.  I don't have that article. |
| 13:53 | 9 | **BY MR. SALES:** |
| 13:53 | 10 | **Q.**   Let me give you a copy. |
| 13:54 | 11 | **A.**   Thank you. |
| 13:54 | 12 | **Q.**   My question, sir, is:  Up on the screen is the excerpt |
| 13:54 | 13 | from the conclusion paragraph of that article; correct? |
| 13:54 | 14 | **A.**   That's what it says. |
| 13:54 | 15 | **Q.**   Right.  This article spurred your editorial comment; |
| 13:54 | 16 | right? |
| 13:54 | 17 | **A.**   Right. |
| 13:54 | 18 | **Q.**   Would you agree, sir, that reasonable doctors and |
| 13:54 | 19 | scientists have different opinions than you about whether |
| 13:54 | 20 | endoscopic ulcers are a good source for a primary endpoint to |
| 13:54 | 21 | study GI issues?  Correct? |
| 13:54 | 22 | **A.**   There are lots of doctors.  Each has their own opinion. |
| 13:54 | 23 | **Q.**   Do you think that these doctors were unreasonable to hold |
| 13:54 | 24 | this opinion? |
| 13:54 | 25 | **A.**   Remember, this was a white paper that was written by the |

DAILY COPY

311

| | | |
|---|---|---|
| 13:54 | 1 | pharmaceutical company that these guys took and then turned it |
| 13:54 | 2 | into a manuscript.  So, unfortunately, they didn't ever -- none |
| 13:55 | 3 | of them seemed to have read any papers about what a surrogate |
| 13:55 | 4 | was or what the guidelines were or what the details were.  If |
| 13:55 | 5 | they had or they thought about it in more detail than what was |
| 13:55 | 6 | given to them by the pharmaceutical company, I think they |
| 13:55 | 7 | probably wouldn't have written this.  In fact, I know they |
| 13:55 | 8 | offered authorship to several important people who said no, |
| 13:55 | 9 | they didn't want to be involved, because they didn't believe |
| 13:55 | 10 | it. |
| 13:55 | 11 | Q.   So you don't think these people are reasonable doctors who |
| 13:55 | 12 | have a different opinion than you, and they basically have been |
| 13:55 | 13 | bought out? |
| 13:55 | 14 | A.   No, I didn't say that.  I just -- it just -- you know, |
| 13:55 | 15 | people want to get papers, I guess.  I wouldn't have touched it |
| 13:55 | 16 | with a 10-foot pole, that's for sure. |
| 13:55 | 17 | Q.   Sir, you continue to prescribe Celebrex 'til this day; |
| 13:55 | 18 | correct?  To this day you continue to prescribe Celebrex, the |
| 13:55 | 19 | drug made by Pfizer; correct? |
| 13:55 | 20 | A.   If it were on our formulary, I would prescribe it. |
| 13:55 | 21 | MR. SALES:  Objection to the responsiveness. |
| 13:55 | 22 | BY MR. SALES: |
| 13:55 | 23 | Q.   My question is:  Do you prescribe it? |
| 13:56 | 24 | A.   I do not prescribe it. |
| 13:56 | 25 | Q.   At your deposition, under oath, did you say that you |

| | | |
|---|---|---|
| 13:56 | 1 | prescribed it? |
| 13:56 | 2 | **A.**   I did in the past. |
| 13:56 | 3 | **Q.**   Did you say at your deposition taken just a few weeks ago |
| 13:56 | 4 | that you still prescribe Celebrex for high-risk patients? |
| 13:56 | 5 | **A.**   I still recommend it. |
| 13:56 | 6 | **Q.**   So you recommend others to prescribe it? |
| 13:56 | 7 | **A.**   Again, it's not on my formulary. |
| 13:56 | 8 | **Q.**   Sir, that's not the question.  Do you recommend it to |
| 13:56 | 9 | others to take it? |
| 13:56 | 10 | **A.**   I do. |
| 13:56 | 11 | **Q.**   Let's look what you said at paragraph 15 of your report, |
| 13:56 | 12 | which I believe you have in front of you, sir.  Are you at |
| 13:57 | 13 | paragraph 15, Dr. Graham? |
| 13:57 | 14 | **A.**   Yes. |
| 13:57 | 15 | **Q.**   You wrote in your report that you prepared for this case |
| 13:57 | 16 | that "Despite the long history of using endoscopic studies that |
| 13:58 | 17 | examine gastric mucosa to assess gastroduodenal damage |
| 13:58 | 18 | following ingestion of potentially gastrotoxic compounds, this |
| 13:58 | 19 | approach" -- and then you go on to say has never been shown to |
| 13:58 | 20 | be a proper surrogate; correct? |
| 13:58 | 21 | **A.**   Right. |
| 13:58 | 22 | **Q.**   Now, you have recognized in your report that the |
| 13:58 | 23 | historical standard has been using endoscopy ulcer studies to |
| 13:58 | 24 | look at this issue; correct? |
| 13:58 | 25 | **A.**   No, I didn't say that that's -- they never have been the |

DAILY COPY

| | | |
|---|---|---|
| 13:58 | 1 | standard to look at this issue.  If they had been, there |
| 13:58 | 2 | wouldn't have been a mucosa trial. |
| 13:58 | 3 | **Q.**   Sir, have the vast majority of trials looking at |
| 13:58 | 4 | gastrotoxicity of various agents used endoscopic ulcers as the |
| 13:58 | 5 | means to determine that gastrotoxicity? |
| 13:58 | 6 | **A.**   They have been asked to see if they were gastrotoxic, yes. |
| 13:58 | 7 | **Q.**   That has been -- |
| 13:58 | 8 | **A.**   Not safety. |
| 13:58 | 9 | **Q.**   That has been used repeatedly in clinical trials -- |
| 13:58 | 10 | **A.**   Potential gastrotoxicity. |
| 13:59 | 11 | **Q.**   Yes.  In fact, that is a method that you yourself have |
| 13:59 | 12 | used on several occasions in clinical trials in which you were |
| 13:59 | 13 | primarily involved; correct? |
| 13:59 | 14 | **A.**   Absolutely. |
| 13:59 | 15 | **Q.**   Let's go to 4005.  Dr. Graham, you had been hired by |
| 13:59 | 16 | Searle, the predecessor to Pfizer, the maker of Celebrex; |
| 13:59 | 17 | correct? |
| 13:59 | 18 | **A.**   I worked with them, yes. |
| 14:00 | 19 | **Q.**   Searle was conducting the trials for Celebrex before |
| 14:00 | 20 | Pfizer bought -- or in that process when Pfizer bought Searle; |
| 14:00 | 21 | correct? |
| 14:00 | 22 | **A.**   I presume so.  I mean -- well, they got bought several |
| 14:00 | 23 | times. |
| 14:00 | 24 | **Q.**   You actually participated in a clinical trial |
| 14:00 | 25 | investigating Celebrex, and that was published in 1999; |

DAILY COPY

| 14:00 | 1  | correct? |
| 14:00 | 2  | **A.**   Yes. |
| 14:00 | 3  | **Q.**   This is a copy of that article that you wrote as a result |
| 14:00 | 4  | of that study? |
| 14:00 | 5  | **A.**   Yes. |
| 14:00 | 6  | **Q.**   Let's look under "Main Outcome Measures" on the first |
| 14:00 | 7  | page.  Do you see that, Dr. Graham? |
| 14:00 | 8  | **A.**   All right. |
| 14:00 | 9  | **Q.**   It says, "Main Outcome Measures:  Improvement in signs and |
| 14:00 | 10 | symptoms of rheumatoid arthritis as assessed using standard |
| 14:00 | 11 | measures of efficacy and GI tract safety as assessed by upper |
| 14:01 | 12 | GI tract endoscopy before and after treatment, compared among |
| 14:01 | 13 | treatment groups." |
| 14:01 | 14 |         Did I read that correctly? |
| 14:01 | 15 | **A.**   Right. |
| 14:01 | 16 | **Q.**   That was the measured outcome that you participated in for |
| 14:01 | 17 | the Celebrex trial in 1999, that was published in 1999? |
| 14:01 | 18 | **A.**   That's what it says. |
| 14:01 | 19 | **Q.**   It says that it was the standard measure.  Do you agree it |
| 14:01 | 20 | was the standard measure? |
| 14:01 | 21 | **A.**   It was. |
| 14:01 | 22 | **Q.**   Do you agree that, during that same time frame, the |
| 14:01 | 23 | studies we talked about a little earlier today in response to |
| 14:01 | 24 | Mr. Arbitblit's questions about the OA studies, they were using |
| 14:01 | 25 | standard measures? |

14:01  1   **A.**   They had a different reason and a different plan, but they
14:01  2   used the same general approach, yes.
14:01  3   **Q.**   Because that was the standard measure; correct?
14:01  4   **A.**   It was a measure to measure gastrotoxicity.
14:01  5   **Q.**   You say here that you used it not only to measure efficacy
14:01  6   but to measure GI tract safety; right?
14:01  7   **A.**   Right.
14:02  8   **Q.**   That article has never been retracted by you, has it, sir?
14:02  9   **A.**   I retracted no articles.  Any time you want to ask that
14:02  10  question, it's all articles would be yes, I have never
14:02  11  retracted them.
14:02  12  **Q.**   So any doctor wanting to look up this article about your
14:02  13  belief about GI tract measurements and safety of Celebrex or
14:02  14  anything else you have written about COX-2s, those are all
14:02  15  available for doctors; correct?
14:02  16  **A.**   Right.
14:02  17  **Q.**   Have you ever told or written anything about this article
14:02  18  to tell the medical community or anyone that this is not a
14:02  19  valid measure of clinical safety that you did in this study?
14:02  20  **A.**   No, but -- explanation.
14:02  21  **Q.**   I think --
14:02  22       **THE COURT:**  Well, he wants to explain.  He can do
14:02  23  that.  Go ahead.
14:02  24       **THE WITNESS:**  You've not understood this article.
14:02  25  I'll just take a moment to explain it to you.

| | | |
|---|---|---|
| 14:03 | 1 | At the time the COX-2s were a new drug, and the |
| 14:03 | 2 | hypothesis was that COX-2 drugs would not damage the gastric |
| 14:03 | 3 | mucosa.  This study was designed with different doses of COX-2 |
| 14:03 | 4 | and a placebo and high dose, known to be high dose, so that we |
| 14:03 | 5 | have locked in both ends:  No damage and severe damage.  To win |
| 14:03 | 6 | in this one, the celecoxib should cause no damage and there |
| 14:03 | 7 | should be no dose-response effect.  So that as you gave higher |
| 14:03 | 8 | doses, you should not see more ulcers. |
| 14:03 | 9 | As you'll notice very carefully when you talk in |
| 14:03 | 10 | the back, when it talks about the placebo, it makes it very |
| 14:03 | 11 | clear that despite the fact that it was not different from |
| 14:03 | 12 | placebo, that this study was not powered to measure |
| 14:03 | 13 | equivalents.  So this was a scientific study to ask one |
| 14:04 | 14 | question, and that is did celecoxib meet the criteria that it |
| 14:04 | 15 | should meet to go ahead to the next trials or subsequent |
| 14:04 | 16 | trials, which would be that it doesn't damage the mucosa, as |
| 14:04 | 17 | you would expect it to be.  Then you would go do the next |
| 14:04 | 18 | trial, which would test whether it was clinically safe. |
| 14:04 | 19 | So this is a developmental paper, not part of a |
| 14:04 | 20 | marketing scheme.  It was very well-designed and it was very |
| 14:04 | 21 | well-done, and it should be copied by other people when they |
| 14:04 | 22 | are doing their studies. |
| 14:04 | 23 | **BY MR. SALES:** |
| 14:04 | 24 | **Q.**   This was a paper that was published in *JAMA*, a well-read |
| 14:04 | 25 | and well-circulated medical journal; correct? |

DAILY COPY

| | | |
|---|---|---|
| 14:04 | 1 | **A.**   Yes.  Right. |
| 14:04 | 2 | **Q.**   Did you do anything to alert people that this should not |
| 14:04 | 3 | be used for marketing purposes by Celebrex? |
| 14:04 | 4 | **A.**   I don't think they used it for marketing.  It wasn't the |
| 14:04 | 5 | goal. |
| 14:04 | 6 | **Q.**   How do you know, sir? |
| 14:04 | 7 | **A.**   Well, I don't know.  It wasn't the goal.  Those of us who |
| 14:04 | 8 | are doing it are doing a scientific question and to develop a |
| 14:05 | 9 | new whole product or whole line of products. |
| 14:05 | 10 | **Q.**   Let's look at what you said on page 7 of the article: |
| 14:05 | 11 | "Celebrex demonstrated anti-inflammatory and |
| 14:05 | 12 | analgesic efficacy comparable with naproxen, with a significant |
| 14:05 | 13 | lower incidence of gastroduodenal ulceration than naproxen and |
| 14:05 | 14 | not significantly different from placebo." |
| 14:05 | 15 | Correct? |
| 14:05 | 16 | **A.**   That's what we said. |
| 14:05 | 17 | **Q.**   Using the standard measure of endoscopic -- |
| 14:05 | 18 | **A.**   It very carefully, remember, said that this was not a |
| 14:05 | 19 | measure that it's equivalent to placebo.  It says that in big |
| 14:05 | 20 | bold letters -- |
| 14:05 | 21 | **Q.**   This was a -- |
| 14:05 | 22 | **A.**   -- so there would be no confusion by anybody that this was |
| 14:05 | 23 | the same as placebo. |
| 14:05 | 24 | **Q.**   Well, you wouldn't want to say, using this endoscopic |
| 14:05 | 25 | ulcer method and measure of outcome, that one drug is superior |

| | | |
|---|---|---|
| 14:05 | 1 | to another drug with regard to a safety endpoint; correct? |
| 14:06 | 2 | **A.**   No. |
| 14:06 | 3 | **Q.**   Let's go to DX-4011.  Sir, did you write an article with a |
| 14:06 | 4 | number of doctors, including Naurang Agrawal, Donald Campbell, |
| 14:06 | 5 | and others, related to misoprostol? |
| 14:06 | 6 | **A.**   I'm sure I did. |
| 14:06 | 7 | **Q.**   From the testimony this morning, I think the Court will |
| 14:06 | 8 | recall misoprostol is a prostaglandin-replacement drug; is that |
| 14:06 | 9 | correct? |
| 14:06 | 10 | **A.**   Yes. |
| 14:06 | 11 | **Q.**   You were hired by the company to make some misoprostol; |
| 14:07 | 12 | correct? |
| 14:07 | 13 | **A.**   Say again. |
| 14:07 | 14 | **Q.**   Had you worked for the company who made misoprostol? |
| 14:07 | 15 | **A.**   A long time ago.  This was a study not done by -- it was |
| 14:07 | 16 | done by -- |
| 14:07 | 17 | **Q.**   You were the lead/first author of this study? |
| 14:07 | 18 | **A.**   Right. |
| 14:07 | 19 | **Q.**   Let's look at one -- |
| 14:07 | 20 | **A.**   I was not hired by them.  I got no money. |
| 14:07 | 21 | **Q.**   Let's look into the "Methods" section for how you |
| 14:07 | 22 | conducted this study that was published in 2002. |
| 14:07 | 23 | First of all, it was published in the *Archives of* |
| 14:07 | 24 | *Internal Medicine*; correct? |
| 14:07 | 25 | **A.**   Right. |

| | | |
|---|---|---|
| 14:07 | 1 | **Q.**   Another very widely read and circulated -- |
| 14:07 | 2 | **A.**   Right. |
| 14:07 | 3 | **Q.**   -- medical journal? |
| 14:07 | 4 | **A.**   Right. |
| 14:07 | 5 | **Q.**   Under the methods, sir, that you tested to determine the |
| 14:07 | 6 | GI toxicity of misoprostol was ulcer status determined by |
| 14:07 | 7 | endoscopy at 4, 8, and 12 weeks.  Do you see that? |
| 14:07 | 8 | **A.**   Yes. |
| 14:07 | 9 | **Q.**   You used prescheduled endoscopies, looking at ulcers, to |
| 14:07 | 10 | conduct this study in 2002, the very measure that you have been |
| 14:08 | 11 | very critical this morning of in response to Mr. Arbitblit's |
| 14:08 | 12 | questions; correct? |
| 14:08 | 13 | **A.**   This method is widely used to compare drugs. |
| 14:08 | 14 | **Q.**   That method you widely criticized this morning? |
| 14:08 | 15 | **A.**   I criticized it today and I criticized then.  I didn't |
| 14:08 | 16 | actually do this study. |
| 14:08 | 17 | **Q.**   You just signed your name to it? |
| 14:08 | 18 | **A.**   No.  I wrote it. |
| 14:08 | 19 | **Q.**   All right. |
| 14:08 | 20 | **A.**   They brought me the data and they said -- because they |
| 14:08 | 21 | knew that I was independent and not related to them or the |
| 14:08 | 22 | other side and that I knew the data, they asked me if I would |
| 14:08 | 23 | take all the data, read it very carefully, and write up the |
| 14:08 | 24 | article. |
| 14:08 | 25 | **Q.**   Now, you just said -- and we can go look at the |

DAILY COPY

| | | |
|---|---|---|
| 14:08 | 1 | transcript -- that you would never want to use that endoscopic |
| 14:08 | 2 | ulcer endpoint to make a statement about one drug being |
| 14:08 | 3 | superior to the other on gastrotoxicity; correct? |
| 14:08 | 4 | **A.**    Right. |
| 14:09 | 5 | **Q.**    Let's look at what you said in the conclusions of this |
| 14:09 | 6 | study: |
| 14:09 | 7 | "Proton pump inhibitors such as lansoprazole are |
| 14:09 | 8 | superior to placebo for the prevention of NSAID-induced gastric |
| 14:09 | 9 | ulcers but not superior to misoprostol." |
| 14:09 | 10 | Correct? |
| 14:09 | 11 | **A.**    That's what it says.  For endoscopic ulcers. |
| 14:09 | 12 | **Q.**    Again, that was the primary endpoint of the VIGOR study. |
| 14:09 | 13 | That was the primary endpoint of the OA studies.  Correct? |
| 14:09 | 14 | **A.**    Not the VIGOR study.  They were the two studies for |
| 14:09 | 15 | endoscopic ulcers.  It should have been designed like the one |
| 14:09 | 16 | we did to ask a scientific question.  This is not about safety; |
| 14:09 | 17 | this is about prevention of endoscopic ulcers. |
| 14:09 | 18 | **Q.**    Let me ask you that, Dr. Graham.  These studies that you |
| 14:09 | 19 | mentioned this morning, you understand every one of those |
| 14:09 | 20 | protocols for those studies/clinical trials were submitted to |
| 14:09 | 21 | the FDA ahead of time; correct? |
| 14:09 | 22 | **MR. ARBITBLIT:**  Object to form:  Speculative. |
| 14:09 | 23 | **BY MR. SALES:** |
| 14:09 | 24 | **Q.**    Do you know that as a clinical trial expert, who testified |
| 14:10 | 25 | this morning, that those type of clinical trials, the protocols |

| | | |
|---|---|---|
| 14:10 | 1 | are submitted ahead of time to the FDA? |
| 14:10 | 2 | **A.** Generally. |
| 14:10 | 3 | **Q.** You have no reason to dispute that here, do you? |
| 14:10 | 4 | **A.** No. |
| 14:10 | 5 | **Q.** Now, you know that the FDA accepted those primary |
| 14:10 | 6 | endpoints as a standard measure for perforations, ulcers, and |
| 14:10 | 7 | bleeds to test gastrotoxicity of Vioxx, don't you, sir? |
| 14:10 | 8 | **A.** Say again. |
| 14:10 | 9 | **Q.** You know that the FDA accepted those submitted protocols |
| 14:10 | 10 | on the clinical trials using endoscopic ulcers and the |
| 14:10 | 11 | endpoint, primary endpoint, of perforations, ulcers, and |
| 14:10 | 12 | bleeds -- the FDA accepted those as a proper measure to conduct |
| 14:10 | 13 | those studies; correct? |
| 14:10 | 14 | **MR. ARBITBLIT:** Your Honor, I think this is beyond |
| 14:10 | 15 | the scope and would involve 500 documents that the witness was |
| 14:10 | 16 | not provided to review in order to form a knowledgeable opinion |
| 14:10 | 17 | about the matter raised about what the FDA did or didn't accept |
| 14:10 | 18 | and how they defined different endpoints. |
| 14:10 | 19 | **THE COURT:** I understand your objection. |
| 14:10 | 20 | Can you answer the question, Doctor? |
| 14:10 | 21 | **THE WITNESS:** I don't know what the FDA -- if they |
| 14:11 | 22 | accepted all of it or part of it or whatever part they would |
| 14:11 | 23 | have accepted had it worked out to their satisfaction. |
| 14:11 | 24 | **BY MR. SALES:** |
| 14:11 | 25 | **Q.** The plaintiffs' lawyers gave you the documents you have |

DAILY COPY

14:11   1   reviewed in this case; correct?

14:11   2           **MR. ARBITBLIT:**  Object to form.

14:11   3   **BY MR. SALES:**

14:11   4   **Q.**   The documents you're going over in your notebook, did the

14:11   5   lawyers provide you copies, for example, of the Alzheimer's

14:11   6   study and the CSR for VIGOR and some of the other documents

14:11   7   that we looked at this morning?

14:11   8   **A.**   They provided me with the internal documents from Merck.

14:11   9   **Q.**   Did they provide you any document in which they noted that

14:11  10   the FDA had ever determined that the primary endpoints of those

14:11  11   studies that Merck was conducting were improper?

14:11  12   **A.**   And that they never gave me documents either way.

14:11  13   **Q.**   Do you have any doubt in your mind that if the FDA -- if

14:11  14   there was a document in this case that the FDA found that the

14:11  15   primary endpoint used in the VIGOR study was improper that

14:11  16   Mr. Arbitblit would have given it to you?

14:12  17   **A.**   I would have to ask --

14:12  18           **MR. ARBITBLIT:**  Objection:  Speculative.

14:12  19           **THE COURT:**  I sustain the objection.

14:12  20   **BY MR. SALES:**

14:12  21   **Q.**   Have you ever seen a document in all the reviews that you

14:12  22   have done with regard to Vioxx, whether in this litigation or

14:12  23   elsewhere, to suggest that the FDA ever found that the primary

14:12  24   endpoint used in the Merck OA or RA studies to determine

14:12  25   gastrotoxicity, or the data from there, was the improper

DAILY COPY

14:12  1  endpoint?

14:12  2  **A.**   The FDA, in the past, demanded that you show, like in the

14:12  3  mucosa trial, that you prevented significant real complications

14:12  4  for a meaningful outcome.  You mischaracterize this other paper

14:12  5  also for entry criteria.

14:12  6  **Q.**   Your lawyer will be able to go back and ask you whatever

14:12  7  questions --

14:12  8  **A.**   You mischaracterize it.

14:12  9          **MR. SALES:**  Your Honor --

14:12  10          **THE COURT:**  Let's stick with his question, please,

14:12  11  Doctor.

14:12  12  **BY MR. SALES:**

14:12  13  **Q.**   I'm asking you right now, sir:  Have you ever seen, in all

14:13  14  the work you have done, a document from the FDA that says the

14:13  15  primary endpoint used in the VIGOR study or the other clinical

14:13  16  trials that looked at primary endpoint of PUBs, using

14:13  17  endoscopic ulcers, was an improper primary endpoint?

14:13  18  **A.**   For what outcome?

14:13  19  **Q.**   Have you ever seen a document from the FDA saying that the

14:13  20  primary endpoint that was selected for the studies that you

14:13  21  went over this morning was an improper endpoint, an improper

14:13  22  primary endpoint?

14:13  23  **A.**   It's not the way the FDA works.

14:13  24  **Q.**   Have you seen such a document, sir?

14:13  25  **A.**   When I have worked with the FDA, they give guidelines:

324

| 14:13 | 1 | These are what you must do to get the indication you want. |
| 14:13 | 2 | **Q.**   Well, let's talk a little bit about what you have looked |
| 14:13 | 3 | at with regard to some of the opinions you gave this morning. |
| 14:13 | 4 | For example, you gave a number of opinions about dosing in |
| 14:14 | 5 | clinical trials.  Do you recall that? |
| 14:14 | 6 | **A.**   Yes. |
| 14:14 | 7 | **Q.**   Have you looked at the inclusion criteria that was used |
| 14:14 | 8 | for the OA studies and that was approved by the FDA? |
| 14:14 | 9 | **A.**   I read the paper for the inclusion criteria, yes. |
| 14:14 | 10 | **Q.**   Have you actually looked at the inclusion criteria that |
| 14:14 | 11 | was in the protocol and the CSRs for the studies? |
| 14:14 | 12 | **A.**   I read them, and I read the arguments back and forth about |
| 14:14 | 13 | what dose we should use and what dose we shouldn't use and what |
| 14:14 | 14 | the rheumatologist said, and the people who are on this side |
| 14:14 | 15 | and the people on that side, yes. |
| 14:14 | 16 | **Q.**   What were the maximum and minimum doses allowed for |
| 14:14 | 17 | ibuprofen by the FDA? |
| 14:14 | 18 | **A.**   Not by the FDA.  It's by the protocol.  You don't go -- |
| 14:14 | 19 | you go over the protocol with the FDA, and they say "yes" or |
| 14:14 | 20 | "no" or they negotiate the pieces. |
| 14:14 | 21 | **Q.**   Sir, those would have been submitted ahead of time to the |
| 14:14 | 22 | FDA.  You understand that? |
| 14:14 | 23 | **A.**   It's a negotiation process with the protocol. |
| 14:14 | 24 | **Q.**   Do you know, as you sit here on the stand today, what the |
| 14:15 | 25 | minimum and maximum doses were in the OA trials for ibuprofen? |

DAILY COPY

| | | |
|---|---|---|
| 14:15 | 1 | **A.**   I do not know at this moment. |
| 14:15 | 2 | **Q.**   Do you know what the minimum and maximum doses for |
| 14:15 | 3 | inclusion were for diclofenac? |
| 14:15 | 4 | **A.**   No. |
| 14:15 | 5 | **Q.**   Do you know the minimum and maximum doses for inclusion |
| 14:15 | 6 | for any of the comparator drugs? |
| 14:15 | 7 | **A.**   No. |
| 14:15 | 8 | **MR. ARBITBLIT:**  Your Honor, may I interject?  I don't |
| 14:15 | 9 | want to interrupt the examination, but I think this is a |
| 14:15 | 10 | misleading description of whether we are talking about |
| 14:15 | 11 | inclusion to get into the study or what the dose is once you're |
| 14:15 | 12 | in, because there is no evidence in these OA trials of any |
| 14:15 | 13 | other dose besides 2,400 milligrams. |
| 14:15 | 14 | **THE COURT:**  Okay. |
| 14:15 | 15 | **MR. ARBITBLIT:**  So, to that extent, it's |
| 14:15 | 16 | mischaracterizing -- |
| 14:15 | 17 | **THE COURT:**  I'll let you cover that on redirect. |
| 14:15 | 18 | **BY MR. SALES:** |
| 14:15 | 19 | **Q.**   Do you know the duration that somebody had to be on in the |
| 14:15 | 20 | OA trials of a certain dose of a traditional NSAID to be |
| 14:15 | 21 | qualified to even be in the study? |
| 14:15 | 22 | **A.**   No. |
| 14:16 | 23 | **Q.**   You mentioned some publications and observational data |
| 14:16 | 24 | earlier today; correct? |
| 14:16 | 25 | **A.**   Yes. |

326

| | | |
|---|---|---|
| 14:16 | 1 | **Q.**   Now, you are familiar, with publication of observational |
| 14:16 | 2 | data, that you can go out and do PubMed research on various |
| 14:16 | 3 | issues; correct? |
| 14:16 | 4 | **A.**   I'm not sure what you said, but I know about observational |
| 14:16 | 5 | data. |
| 14:16 | 6 | **Q.**   Well, if it's published, you can go out and usually find |
| 14:16 | 7 | it on PubMed if you do any kind of research; right? |
| 14:16 | 8 | **A.**   Right. |
| 14:16 | 9 | **Q.**   Do you know a Dr. Wayne Ray? |
| 14:17 | 10 | **A.**   No. |
| 14:17 | 11 | **MR. ARBITBLIT:**  Your Honor, this is an article about |
| 14:17 | 12 | coronary heart disease, and this witness has not been asked |
| 14:17 | 13 | anything about -- |
| 14:18 | 14 | **THE COURT:**  Wait. |
| 14:18 | 15 | **MR. SALES:**  Let me establish the relevance, |
| 14:18 | 16 | Your Honor. |
| 14:18 | 17 | **BY MR. SALES:** |
| 14:18 | 18 | **Q.**   You testified earlier today that you believe that there is |
| 14:18 | 19 | data to suggest that people typically are using 200, 400 |
| 14:18 | 20 | ibuprofen tablets for their pain and analgesic; correct? |
| 14:18 | 21 | **A.**   For analgesics. |
| 14:18 | 22 | **Q.**   This article by Dr. Ray, if you look at it, looked at a |
| 14:18 | 23 | Tennessee Medicaid database to look at a number of different |
| 14:18 | 24 | issues; correct? |
| 14:18 | 25 | **A.**   I don't know.  I've never read the paper, at least not |

DAILY COPY

14:18   1   read it in a long time.

14:18   2   **Q.**   Let's look at the "Methods" section in the paper.  It

14:18   3   says:

14:18   4          "We used data from the Tennessee Medicaid program

14:18   5   obtained between January 1, 1987 and December 31, 1998, to

14:18   6   identify a cohort for new NSAID users and an equal number of

14:19   7   nonusers matched for age, sex, and date NSAID use began."

14:19   8          Correct?

14:19   9   **A.**   Right.

14:19   10  **Q.**   All right.  So this was a database that was mined by

14:19   11  Dr. Ray to look at new NSAID use in the Tennessee Medicaid

14:19   12  database; right?

14:19   13  **A.**   Right.

14:19   14  **Q.**   If you look at what one of the tables on -- if you go to

14:19   15  page 121 at the bottom -- do you see that table, sir?

14:19   16  **A.**   Right.

14:19   17  **Q.**   It sets forth what they found with regard to the Tennessee

14:19   18  database with regard to what type of NSAIDs and NSAID dosings

14:19   19  were being used by people on the Medicaid database; correct?

14:19   20  **A.**   Okay.

14:19   21  **Q.**   Now, you notice that there is about -- as I said, it looks

14:20   22  like about 17 -- if we go back, actually, to the "Methods"

14:20   23  section for one second, Doctor, there's 181,441 subjects in

14:20   24  this study; correct?

14:20   25  **A.**   That's one of the advantages of these kinds of studies.

| | | |
|---|---|---|
| 14:20 | 1 | **Q.**   That's a large group of people; right? |
| 14:20 | 2 | Now, let's go to what they found with regard to the |
| 14:20 | 3 | percent of what they were using with regard to high NSAID dose |
| 14:20 | 4 | and low NSAID dose.  Now, I'm not a statistician, and I think |
| 14:20 | 5 | you said you are not either.  Correct? |
| 14:20 | 6 | **A.**   Correct. |
| 14:20 | 7 | **Q.**   But it's pretty easy math to look at, between high-dose |
| 14:20 | 8 | and low-dose NSAID, it's 2-to-1 in favor of high-dose on that |
| 14:20 | 9 | database, isn't it, sir? |
| 14:20 | 10 | **A.**   There were a lot of high-dose users, yes. |
| 14:21 | 11 | **Q.**   For those who are using naproxen -- that I think you said |
| 14:21 | 12 | should be using 500 to 1,000 this morning; correct? |
| 14:21 | 13 | **A.**   Right. |
| 14:21 | 14 | **Q.**   Over 2,000 compared to over 5,000 were using over 1,000 in |
| 14:21 | 15 | the Medicaid database; isn't that true? |
| 14:21 | 16 | **MR. ARBITBLIT:**  Object to the form.  It |
| 14:21 | 17 | mischaracterizes.  It says "greater than or equal to," |
| 14:21 | 18 | Your Honor.  It does not say "greater."  It mischaracterizes -- |
| 14:21 | 19 | **MR. SALES:**  I will revise the question. |
| 14:21 | 20 | **THE COURT:**  Restate it. |
| 14:21 | 21 | **BY MR. SALES:** |
| 14:21 | 22 | **Q.**   Sir, in that database, again, over 2-to-1 people were |
| 14:21 | 23 | using 1,000 or more milligrams of naproxen for their NSAID use; |
| 14:21 | 24 | correct? |
| 14:21 | 25 | **A.**   It's what they found. |

14:21  1   **Q.**   Look at under ibuprofen.  I think this morning you said
14:21  2   1,200-milligram would be about the maximum dose you would want
14:21  3   to use in your practice.
14:21  4   **A.**   That's right.
14:21  5   **Q.**   But, in reality, in the Tennessee database, almost 16,000
14:21  6   people to almost 9,000 were using equal to or greater than
14:22  7   1,800-milligram ibuprofen; correct?
14:22  8   **A.**   That's what they found.
14:22  9   **Q.**   Well, you've done no independent research to refute these
14:22 10   numbers, have you?
14:22 11   **A.**   The paper that we showed you about dosing was from the
14:22 12   same authors and the same database.
14:22 13   **Q.**   Sir, do you have any reason to dispute the accuracy of
14:22 14   these numbers being reported?
14:22 15   **A.**   I'm saying it's the same authors, the same database.  A
14:22 16   few years earlier, Marie Griffin, the senior author on this
14:22 17   one, is the one that showed the dose-response effect and taught
14:22 18   us all that we were using far too much at the time and they
14:22 19   were -- which means that those people in Tennessee had failed
14:22 20   to affect the doctor's practice.
14:22 21   **Q.**   But this was the real world they found; correct?
14:22 22   **A.**   Well, it was this one study.
14:22 23   **Q.**   You have no reason to think this study was not done
14:22 24   correctly?
14:22 25   **A.**   I have no reason to think it is or is not representative

| | | |
|---|---|---|
| 14:22 | 1 | of the country. |
| 14:23 | 2 | **Q.**   Sir, you see patients; right? |
| 14:23 | 3 | **A.**   Yes, sir. |
| 14:23 | 4 | **Q.**   If you have somebody that comes into your office saying, |
| 14:23 | 5 | "I have real stomach pain," okay, and you do an endoscopy, |
| 14:23 | 6 | would that be fairly standard? |
| 14:23 | 7 | **A.**   In many instances, yes. |
| 14:23 | 8 | **Q.**   We have seen that's the standard measure for a lot of |
| 14:23 | 9 | these studies; right?  Is that correct? |
| 14:23 | 10 | **A.**   Yes. |
| 14:23 | 11 | **Q.**   You're not going to turn that person away and not treat |
| 14:23 | 12 | them.  You're not going to say, "I'm not going to give you an |
| 14:23 | 13 | endoscopy.  Just go about your way.  It's a stomachache." |
| 14:23 | 14 | That's not your standard of practice, is it? |
| 14:23 | 15 | **A.**   Well, it depends on the patient and the rest of the |
| 14:23 | 16 | history, but many patients with stomach pain that meets certain |
| 14:23 | 17 | criteria will get an endoscopy as part of their workup. |
| 14:23 | 18 | **Q.**   So if you have a study criteria that uses symptomatic |
| 14:24 | 19 | endoscopies and excludes asymptomatic endoscopies, then you |
| 14:24 | 20 | would agree that that's a relevant measure of a clinical |
| 14:24 | 21 | situation; correct? |
| 14:24 | 22 | **A.**   That it's potentially relevant, yes.  A patient comes to |
| 14:24 | 23 | you with severe abdominal pain and you say, "I'm going to look |
| 14:24 | 24 | in your stomach," and that's a very reasonable thing to do. |
| 14:24 | 25 | **Q.**   Those doctor visits cost money. |

| | | |
|---|---|---|
| 14:24 | 1 | **A.**   Say again. |
| 14:24 | 2 | **Q.**   Those doctor visits, going to the doctor, costs money.  We |
| 14:24 | 3 | all know that; right? |
| 14:24 | 4 | **A.**   Well, not at my hospital. |
| 14:24 | 5 | **Q.**   Well, you're the VA. |
| 14:24 | 6 | **A.**   Right. |
| 14:24 | 7 | **Q.**   It costs somebody money. |
| 14:24 | 8 | **A.**   It costs somebody. |
| 14:24 | 9 | **Q.**   It costs the VA money; right? |
| 14:24 | 10 | **A.**   It costs the VA money. |
| 14:24 | 11 | **Q.**   Endoscopies cost money. |
| 14:24 | 12 | **A.**   Everything costs money. |
| 14:24 | 13 | **Q.**   You often in your practice have seen people -- I think you |
| 14:24 | 14 | mentioned this earlier today, that these NSAIDs are all |
| 14:24 | 15 | different; correct? |
| 14:24 | 16 | **A.**   Right. |
| 14:24 | 17 | **Q.**   Different effects on different people; right? |
| 14:24 | 18 | **A.**   Well, people react differently to them, yes. |
| 14:25 | 19 | **Q.**   So it's very important for a doctor on a |
| 14:25 | 20 | patient-by-patient basis to sit down with that patient and |
| 14:25 | 21 | figure out what NSAID or what drug works best for their pain |
| 14:25 | 22 | and analgesia as well as their stomach issues; correct? |
| 14:25 | 23 | **A.**   Well, that's theoretically how it's supposed to work. |
| 14:25 | 24 | **Q.**   The standard of care would suggest that; right? |
| 14:25 | 25 | **A.**   Well, that's how, theoretically, it should work. |

DAILY COPY

14:25  1   **Q.**   Why?  You think a lot of doctors are not meeting the
14:25  2   standard of care?
14:25  3   **A.**   Well, on these kind of drugs, a lot of doctors knee-jerk
14:25  4   doses and durations, and that's why we get to see ulcers and
14:25  5   bleeds and perforations in real life.
14:25  6   **Q.**   So in real life people are prescribing these higher doses
14:25  7   that we see like that.
14:25  8   **A.**   We see dentists, for some reason, love to give way too
14:25  9   much.
14:25  10  **Q.**   All right.  So if in real life people are prescribing high
14:25  11  doses, it would be a real benefit if you could have a drug that
14:25  12  could give that benefit with some lesser risk against those
14:25  13  comparably higher doses; correct?
14:25  14  **A.**   That was the hope for the COX-2s.
14:25  15  **Q.**   So it would make sense, would it not, sir, to test against
14:25  16  the real world, against doses of the real world that are
14:26  17  actually being used, especially with OA patients; correct?
14:26  18  **A.**   We are talking -- I have no problems with -- remember, in
14:26  19  our setting, we used high-dose.  We did it to mark the end, so
14:26  20  we know that we have both ends of the spectrum, upper and
14:26  21  lower, but it's for a different reason.
14:26  22  **Q.**   I want to go back to Defense Exhibit 4011, which was the
14:26  23  article you wrote that I handed you a few moments ago about the
14:26  24  misoprostol.  Do you still have that in front of you, Doctor?
14:26  25  **A.**   Somewhere.  I can find it quickly.

| | | |
|---|---|---|
| 14:27 | 1 | **Q.**   You recall earlier this morning you were critical of using |
| 14:27 | 2 | Study 44 and 45 for scheduled endoscopies to look at the OA |
| 14:27 | 3 | database for GI issues; correct? |
| 14:27 | 4 | **A.**   Say again. |
| 14:27 | 5 | **Q.**   Do you remember this morning you were critical of two |
| 14:27 | 6 | studies, Study 044 and 045, by Merck because they had scheduled |
| 14:27 | 7 | endoscopies? |
| 14:27 | 8 | **A.**   Yes. |
| 14:27 | 9 | **Q.**   Now, do you know whether, on 044 and 045, anybody who came |
| 14:27 | 10 | in with a scheduled endoscopy but was asymptomatic, whether |
| 14:27 | 11 | those ulcers were counted or not? |
| 14:27 | 12 | **A.**   They were very careful to try and avoid counting ulcers |
| 14:27 | 13 | that they would find on -- that's 069.  That's not 044 and 045. |
| 14:28 | 14 |          Count as what? |
| 14:28 | 15 | **Q.**   As events.  As PUBs. |
| 14:28 | 16 | **A.**   I mean, in that study, every time they looked, they |
| 14:28 | 17 | found -- whatever they found, they called it whatever they |
| 14:28 | 18 | wanted to call it.  On the two studies, the endoscopic ulcer |
| 14:28 | 19 | studies were designed to look at intervals to find cumulative |
| 14:28 | 20 | rate of ulcers. |
| 14:28 | 21 | **Q.**   Do you know whether or not, if somebody had been |
| 14:28 | 22 | asymptomatic for some period of time before the scheduled |
| 14:28 | 23 | endoscopy, those events were excluded from analysis? |
| 14:28 | 24 | **A.**   As an event? |
| 14:28 | 25 | **Q.**   Yes. |

DAILY COPY

| | | |
|---|---|---|
| 14:28 | 1 | **A.**   What studies are you talking about now, again? |
| 14:28 | 2 | **Q.**   The studies you mentioned this morning, sir, 44 and 45. |
| 14:28 | 3 | **A.**   I don't know the answer to that question.  I would be -- I |
| 14:28 | 4 | would think not, but I don't know the answer to that question. |
| 14:28 | 5 | **Q.**   In your misoprostol study, did you exclude people who were |
| 14:29 | 6 | asymptomatic some period of time before their scheduled |
| 14:29 | 7 | endoscopy, to exclude those events because they may not be |
| 14:29 | 8 | clinical and meaningful to you? |
| 14:29 | 9 | **A.**   This was not designed for a clinical.  This was designed |
| 14:29 | 10 | to answer whether the drug caused damage because, as I have |
| 14:29 | 11 | said before, drugs that cause damage are likely to cause |
| 14:29 | 12 | bleeding, perforations, and complications. |
| 14:29 | 13 | **Q.**   Sir, my -- |
| 14:29 | 14 | **A.**   You are trying to ask whether the -- so you don't care if |
| 14:29 | 15 | they are symptomatic or not symptomatic. |
| 14:29 | 16 | **Q.**   So you didn't do that? |
| 14:29 | 17 | **A.**   No.  It would be foolish to do that.  And they didn't |
| 14:29 | 18 | either on the other studies, I'm sure. |
| 14:29 | 19 | **Q.**   I want to ask you some questions about the VIGOR study. |
| 14:29 | 20 | Do you recall discussing that this morning with Mr. Arbitblit? |
| 14:29 | 21 | **A.**   Yes. |
| 14:29 | 22 | **Q.**   You were of the opinion that the VIGOR study, until we had |
| 14:29 | 23 | this event happen in 2009 with Mr. Arbitblit calling you and |
| 14:30 | 24 | talking about the Jewell analysis -- and we are going to talk |
| 14:30 | 25 | about that in a moment, but you were of the opinion that the |

| | | |
|---|---|---|
| 14:30 | 1 | VIGOR study was a well-controlled, well-designed, and |
| 14:30 | 2 | well-executed trial; correct? |
| 14:30 | 3 | A.   It was not terribly well-designed, but it was -- it was |
| 14:30 | 4 | well-enough done so that it was certainly interpretable, yes. |
| 14:30 | 5 | They included the important subgroup, which was those three, |
| 14:30 | 6 | and they hit -- and they got success. |
| 14:30 | 7 | Q.   Well, we're going to talk about that in a moment.  You |
| 14:30 | 8 | understood -- there was no hiding anything -- that that study's |
| 14:30 | 9 | primary endpoint was PUBs (perforations, ulcers, and bleeds). |
| 14:30 | 10 | Correct? |
| 14:30 | 11 | A.   The primary endpoint was ulcers, perforations, and bleeds. |
| 14:30 | 12 | Q.   Okay.  Some people use "perforations, ulcers, and bleeds" |
| 14:30 | 13 | and they call it "PUBs."  Is that okay? |
| 14:30 | 14 | A.   Okay. |
| 14:30 | 15 | Q.   Now, no doubt about it, you knew that.  Everybody knew it. |
| 14:30 | 16 | It was published in the VIGOR study back in 2000.  That was the |
| 14:30 | 17 | primary endpoint; right?  Is that correct? |
| 14:30 | 18 | A.   I know it. |
| 14:30 | 19 | Q.   You talked about prespecified cutoffs this morning.  You |
| 14:31 | 20 | understand that the protocol for VIGOR would have been sent to |
| 14:31 | 21 | the FDA and approved by the FDA ahead of that study being |
| 14:31 | 22 | conducted; correct? |
| 14:31 | 23 | MR. ARBITBLIT:  Your Honor, I don't recall the |
| 14:31 | 24 | witness ever using a *prespecified cutoff* terminology.  I object |
| 14:31 | 25 | to the form. |

| | |
|---|---|
| 14:31 | 1 |

        **MR. SALES:**  I think he did, Your Honor.

14:31   2          **THE COURT:**  Well, that's okay.  Let's see if you-all

14:31   3   can get on the same page.

14:31   4          **THE WITNESS:**  *Prespecified subgroups* is what you

14:31   5   meant.

14:31   6   **BY MR. SALES:**

14:31   7   **Q.**   Okay.  *Prespecified subgroups*.  You understood that the

14:31   8   protocol and the data analysis plan for VIGOR, that you went

14:31   9   over some this morning, would have been submitted to the FDA

14:31  10   ahead of time; correct?

14:31  11   **A.**   It would be.

14:31  12   **Q.**   Right.  It was published clearly in the article that that

14:31  13   was the primary endpoint; correct?

14:31  14   **A.**   It was.

14:31  15   **Q.**   It was published clearly in the study that the measure was

14:31  16   going to be endoscopic ulcers, such as the studies you had done

14:31  17   on misoprostol and Celebrex; correct?

14:32  18   **A.**   There's another misoprostol study.  The one that counts is

14:32  19   the one that's mucosa, and it was the first study to show that

14:32  20   you could prevent or reduce the rate of significant events by

14:32  21   giving something, in that instance was misoprostol.

14:32  22   **Q.**   The study we just went over, sir, you used as the standard

14:32  23   measure --

14:32  24   **A.**   That was not a measurement of safety.  That was not

14:32  25   looking for PUBs.  It was looking for endoscopic ulcers.  So

| | | |
|---|---|---|
| 14:32 | 1 | you're confusing the VIGOR study, which the comparative study |
| 14:32 | 2 | was the mucosa study, which was asked can you prevent |
| 14:32 | 3 | significant clinical events. |
| 14:32 | 4 | Q.   Sir, my question simply is:  The studies that we have just |
| 14:32 | 5 | gone over used endoscopic ulcer as the test measure; correct? |
| 14:32 | 6 | A.   We did. |
| 14:32 | 7 | Q.   Now, the article was published, you recall, in 2000; |
| 14:32 | 8 | right?  VIGOR. |
| 14:32 | 9 | A.   VIGOR, yes. |
| 14:32 | 10 | Q.   You remember giving your deposition a few weeks ago with |
| 14:33 | 11 | one of my colleagues? |
| 14:33 | 12 | A.   Yes. |
| 14:33 | 13 | Q.   In Houston?  Do you remember that? |
| 14:33 | 14 | A.   I remember that. |
| 14:33 | 15 | Q.   Now, sir, the article you went over this morning, you went |
| 14:33 | 16 | over the primary endpoint subgroup of steroid users; right? |
| 14:33 | 17 | A.   The steroid user within the primary endpoint, yes. |
| 14:33 | 18 | Q.   Let's go to page 6.  I think it's actually 1523. |
| 14:33 | 19 | Dr. Graham, are you on page 4 of the Bombardier article? |
| 14:34 | 20 | A.   Right. |
| 14:34 | 21 | Q.   Mr. Arbitblit asked you some questions about this |
| 14:34 | 22 | paragraph on the lower left-hand side about the results of the |
| 14:34 | 23 | VIGOR trial, and you went over the part where it says -- lower. |
| 14:34 | 24 |          It says:  "Patients with no glucocorticoid therapy at |
| 14:34 | 25 | baseline, relative risk .7." |

| | | |
|---|---|---|
| 14:34 | 1 | You knew that the relative risk, right there in the |
| 14:34 | 2 | publication, with the confidence interval, that it was not |
| 14:34 | 3 | significantly significant for nonsteroid users on the primary |
| 14:34 | 4 | endpoint; right? |
| 14:34 | 5 | A.   It says it right there. |
| 14:34 | 6 | Q.   Right.  Anybody who read this article would know that; |
| 14:34 | 7 | right?  Whoever is involved in these type of issues; right? |
| 14:35 | 8 | A.   Right. |
| 14:35 | 9 | Q.   You were asked that question in the morning of your |
| 14:35 | 10 | deposition, and you had it actually backwards, didn't you, sir? |
| 14:35 | 11 | A.   Well, we were -- the lawyer and I were -- got very |
| 14:35 | 12 | confused with the numbers at that point.  Both of us were |
| 14:35 | 13 | almost -- had to kind of just leave that because we were all |
| 14:35 | 14 | confused. |
| 14:35 | 15 | Q.   Did you say under sworn testimony the morning of your |
| 14:35 | 16 | deposition that, in the VIGOR publication, on the primary |
| 14:35 | 17 | endpoint, you believed it was statistically significant for |
| 14:35 | 18 | nonsteroid users on the primary endpoint? |
| 14:35 | 19 | A.   Would you repeat -- I don't remember what I said, but -- |
| 14:35 | 20 | Q.   Did you testify under oath the morning of your deposition |
| 14:35 | 21 | that actually, in reading this, you thought it meant that there |
| 14:35 | 22 | was a statistically significant difference on the subgroups for |
| 14:35 | 23 | nonsteroid users on the primary endpoint?  Do you recall that? |
| 14:35 | 24 | A.   No, I don't recall that, but I certainly could have said |
| 14:35 | 25 | it. |

DAILY COPY

| | | |
|---|---|---|
| 14:36 | 1 | **Q.**    Do you recall meeting with counsel during lunch break and |
| 14:36 | 2 | coming back in the afternoon and claiming you had just |
| 14:36 | 3 | misspoke? |
| 14:36 | 4 | **A.**    I remember that there was a lot of confusion at one point |
| 14:36 | 5 | there. |
| 14:36 | 6 | **Q.**    In any event, you're not at all confused now that there is |
| 14:36 | 7 | no statistical significance -- with regard to the primary |
| 14:36 | 8 | endpoint that was disclosed to the world, that there was no |
| 14:36 | 9 | statistically significant difference on the primary endpoint |
| 14:36 | 10 | for nonsteroid users? |
| 14:36 | 11 | **A.**    No, no confusion. |
| 14:36 | 12 | **Q.**    You understood that complicated PUBs were a subset of the |
| 14:36 | 13 | PUB endpoint, the primary endpoint; right? |
| 14:36 | 14 | **A.**    Right. |
| 14:36 | 15 | **Q.**    Any reader, again, would know that complicated PUBs are |
| 14:36 | 16 | subsumed within PUBs, and this article is not saying in the |
| 14:36 | 17 | VIGOR study that there was a benefit, statistically proven |
| 14:36 | 18 | benefit, for nonsteroid users; correct? |
| 14:36 | 19 | **A.**    What they do say here and then later in the discussion is |
| 14:37 | 20 | that there was a -- that both of them had a benefit, they |
| 14:37 | 21 | didn't worry about statistics, and it was different between the |
| 14:37 | 22 | two.  There was more benefit in the steroid users than in the |
| 14:37 | 23 | nonsteroid users.  If you read back over there, you would see |
| 14:37 | 24 | that that subgroup was not significant, but -- |
| 14:37 | 25 | **Q.**    Let's go to page 7.  They not only put it in statistical |

DAILY COPY

| | | |
|---|---|---|
| 14:37 | 1 | terms on the front page of the paper, but they put it in |
| 14:37 | 2 | narrative form in the paper as well; correct?  At the bottom: |
| 14:37 | 3 |      "There was a greater reduction in the relative risk |
| 14:37 | 4 | of events in the subgroup of patients who were taking steroids |
| 14:37 | 5 | at baseline than the subgroup who were not, but the difference |
| 14:37 | 6 | between the groups was not significant." |
| 14:37 | 7 |      Correct? |
| 14:37 | 8 | **A.**   That's what they said -- |
| 14:37 | 9 | **Q.**   Right. |
| 14:37 | 10 | **A.**   -- for the primary endpoint. |
| 14:38 | 11 | **Q.**   Now, I want to ask you about how you came to have Nicholas |
| 14:38 | 12 | Jewell's report in your possession.  Have you ever meet |
| 14:38 | 13 | Nicholas Jewell? |
| 14:38 | 14 | **A.**   Never. |
| 14:38 | 15 | **Q.**   Have you ever talked with Nicholas Jewell? |
| 14:38 | 16 | **A.**   Yes. |
| 14:38 | 17 | **Q.**   When did you talk with Nicholas Jewell? |
| 14:38 | 18 | **A.**   Three or four weeks ago. |
| 14:38 | 19 | **Q.**   After you gave your report in this case? |
| 14:38 | 20 | **A.**   Yes. |
| 14:38 | 21 | **Q.**   After you gave your deposition in this case? |
| 14:38 | 22 | **A.**   Yes. |
| 14:38 | 23 | **Q.**   Did you talk to Mr. Jewell at the urging of Mr. Arbitblit? |
| 14:38 | 24 | **A.**   No. |
| 14:38 | 25 | **Q.**   How did you come to even get Mr. Jewell's information? |

| | | |
|---|---|---|
| 14:38 | 1 | **A.**   You mean his report or what? |
| 14:38 | 2 | **Q.**   No, his contact information. |
| 14:38 | 3 | **A.**   Well, I asked Don for his contact information. |
| 14:39 | 4 | **Q.**   At the time you gave your deposition -- let's go back to |
| 14:39 | 5 | where we started right before lunch. |
| 14:39 | 6 |         For 10 years before September 28, 2009, you held the |
| 14:39 | 7 | opinion that COX-2 inhibitors -- Celebrex, Bextra, and Vioxx -- |
| 14:39 | 8 | provided a GI safety benefit versus traditional NSAIDs; |
| 14:39 | 9 | correct? |
| 14:39 | 10 | **A.**   Yes. |
| 14:39 | 11 | **Q.**   On September 28, 2009, Mr. Arbitblit called you and said, |
| 14:39 | 12 | "I've got this report from a Dr. Jewell."  Is that correct? |
| 14:39 | 13 | **A.**   No, that's not what he said, but -- |
| 14:39 | 14 | **Q.**   Something to that effect? |
| 14:39 | 15 | **A.**   But you can paraphrase it all down to I have data that |
| 14:39 | 16 | this was not true. |
| 14:39 | 17 | **Q.**   What was not true? |
| 14:39 | 18 | **A.**   The data that he had was that the benefit in the VIGOR |
| 14:40 | 19 | study was restricted largely, almost completely, to those who |
| 14:40 | 20 | were taking steroids.  That was the question that had been |
| 14:40 | 21 | asked repetitively by the reviewers and avoided by the article |
| 14:40 | 22 | and now was disclosed. |
| 14:40 | 23 | **Q.**   You're not suggesting that any reviewer for the |
| 14:40 | 24 | *New England Journal* ever said, "You must do or need to do a |
| 14:40 | 25 | secondary endpoint subgroup analysis on steroids," are you? |

14:40  1    **A.**    The reviewer was very concerned that -- and the editor
14:40  2    was -- and, in fact, the reviewer even said that they wanted to
14:40  3    know that all of the effect was not there.
14:40  4    **Q.**    Sir, you're not suggesting that any reviewer or any editor
14:40  5    from the *New England Journal* said, "In order to get this study
14:40  6    published, you need to do a secondary endpoint steroid subgroup
14:41  7    analysis," are you?
14:41  8    **A.**    We can read what they said if you want to read, but nobody
14:41  9    makes those kind of claims.
14:41  10   **Q.**    You know that the *New England Journal* doesn't have to
14:41  11   accept an article for publication, does it?
14:41  12   **A.**    They don't have to accept an article for publication.
14:41  13   **Q.**    I'm sorry?
14:41  14   **A.**    No, they don't have to.
14:41  15   **Q.**    The reviewers can stomp their feet and cause it not to be
14:41  16   published; right?
14:41  17   **A.**    It's very difficult sometimes if it's a big blockbuster
14:41  18   drug with a major finding.  The *New England Journal* wants those
14:41  19   papers, and they generally get published.
14:41  20   **Q.**    You know that the *New England Journal* published the
14:41  21   article with the primary endpoint disclosed and you know -- can
14:41  22   you point to any document that specifies that you must do a
14:41  23   secondary endpoint analysis of steroids?
14:41  24   **A.**    They kept asking for those data.
14:41  25   **Q.**    What data?

DAILY COPY

| | | |
|---|---|---|
| 14:41 | 1 | **A.**   The data about steroids.  In fact, on the Merck side, |
| 14:41 | 2 | their memos point out that they were very concerned that the |
| 14:42 | 3 | *New England Journal* would ask this reviewer to write an |
| 14:42 | 4 | editorial that said all of the benefit came from the steroid |
| 14:42 | 5 | people.  So they were very pleased when that didn't happen. |
| 14:42 | 6 | **Q.**   Sir, you know they never asked for the secondary endpoint |
| 14:42 | 7 | analysis.  You know that. |
| 14:42 | 8 | **A.**   Well, do you want to read what the -- |
| 14:42 | 9 | **Q.**   Yeah, we could, if you want to point me where they said |
| 14:42 | 10 | it.  I don't think the Court's going to -- |
| 14:42 | 11 | **A.**   They didn't say you had to do it. |
| 14:42 | 12 | **Q.**   Right.  Well, let's cut this short.  You know that they |
| 14:42 | 13 | published it.  The reviewers had whatever -- whatever knowledge |
| 14:42 | 14 | you think that they were concerned about, they had access to |
| 14:42 | 15 | question Merck; correct? |
| 14:42 | 16 | **A.**   (NO RESPONSE) |
| 14:42 | 17 | **Q.**   They did; right?  As you said. |
| 14:42 | 18 | **A.**   They asked questions and they were evaded. |
| 14:42 | 19 | **Q.**   Well, you understand that they published the article; |
| 14:42 | 20 | correct? |
| 14:42 | 21 | **A.**   They did publish the article. |
| 14:42 | 22 | **Q.**   They had no obligation to do so; correct? |
| 14:42 | 23 | **A.**   No, but they had a great desire to do so because it was -- |
| 14:42 | 24 | **Q.**   That's not my question, sir.  They had no obligation to do |
| 14:43 | 25 | so, did they? |

| 14:43 | 1 | A.   They didn't have any obligation. |
|---|---|---|

14:43  1  **A.**   They didn't have any obligation.

14:43  2  **Q.**   Now, going back to Dr. Jewell, when you had this report

14:43  3  sent to you, was it sent to you by -- earlier you suggested it

14:43  4  was sent to you by Mr. Jewell.  It was sent to you, actually,

14:43  5  by Mr. Arbitblit; correct?

14:43  6  **A.**   Yes.  Yes.

14:43  7  **Q.**   Until a few weeks ago, you had never spoken with

14:43  8  Mr. Jewell?

14:43  9  **A.**   Never had.

14:43  10  **Q.**   You had never replicated his analysis; correct?

14:43  11  **A.**   Say again.

14:43  12  **Q.**   You had never tried to replicate his analysis?

14:43  13  **A.**   No, I did.

14:43  14  **Q.**   At the time of your deposition, had you ever tried to

14:43  15  replicate his analysis?

14:43  16  **A.**   No, no.

14:43  17  **Q.**   So you have a newfound --

14:43  18  **A.**   But subsequently I did.

14:43  19  **Q.**   Is it typically good science in your field to reach a

14:43  20  conclusion on a report, give sworn testimony about that report,

14:43  21  and then confirm the data that forms the basis of that report?

14:43  22  **A.**   I don't think I've ever, in the past, felt it necessary to

14:43  23  take my colleague or whatever, statistician, and confirm it.  I

14:44  24  only did it because it was an interesting concept.

14:44  25  **Q.**   Sir, that's not my question.  Have you --

14:44   1   **A.**   I've never done it before.
14:44   2   **Q.**   The first time you have ever done this type of thing,
14:44   3   where you gave a report and then later did work to try to
14:44   4   confirm it, is in this case?
14:44   5   **A.**   Right, because they were going to challenge it.  And I
14:44   6   said, "Well, I'll go look and see what I get."
14:44   7   **Q.**   You have not produced any document from your own
14:44   8   replication in this case; correct?
14:44   9   **A.**   Say again.
14:44   10  **Q.**   You have not produced any such document to us in this
14:44   11  case?
14:44   12  **A.**   I haven't, but we could do one in about 30 seconds.
14:44   13  **Q.**   No, I am asking you.  You have not produced any such
14:44   14  document before you took the stand here today; correct?
14:44   15  **A.**   Produced what type of document?
14:44   16  **Q.**   Any kind of replication of the Jewell analysis; correct?
14:44   17  **A.**   I have.
14:44   18  **Q.**   Have you produced it in this case to us?
14:44   19  **A.**   No, I haven't given it to you.
14:44   20           **MR. SALES:**  All right.  Judge, we would obviously
14:44   21  move to strike such a late-filed, late-supplemented -- any
14:44   22  opinion based upon that.
14:45   23           **MR. ARBITBLIT:**  Your Honor, they opened the door by
14:45   24  asking.  There's been so much raised about whether the witness
14:45   25  has the information.  He is entitled to do it.

DAILY COPY

14:45  1              THE WITNESS:  Do you want me to read what the

14:45  2  reviewer asked?

14:45  3              MR. SALES:  There's not a question pending, sir.

14:45  4              THE COURT:  No.  Doctor, we have got to get on with

14:45  5  it.  You have got to listen to the questions and answer the

14:45  6  questions.

14:45  7              THE WITNESS:  Well, he asked before he wanted me to

14:45  8  read it, and I found it.

14:45  9  BY MR. SALES:

14:45  10  Q.   I never asked you to read anything about that.

14:45  11  A.   I'm sorry.

14:45  12             THE COURT:  Let's move on.

14:45  13  BY MR. SALES:

14:45  14  Q.   Sir, let's go to the Yu memo.  Do you remember that this

14:45  15  morning, your discussion about the Yu memo?  Do you recall

14:45  16  that?

14:45  17  A.   I recall that.

14:45  18  Q.   That predated a publication of the Watson article based

14:45  19  upon a data set of some 20 studies.  Do you recall that?

14:45  20  A.   Right.

14:45  21  Q.   That was the 17 OA studies.  What other studies were in

14:45  22  the Watson analysis?  Do you remember?

14:45  23  A.   No, but there's a list in here.  It's a bunch of them.

14:46  24  Q.   Do you know without looking it up in the paper?

14:46  25  A.   Huh?

| | | |
|---|---|---|
| 14:46 | 1 | **Q.**   Do you know what was analyzed in the YU memo and in the |
| 14:46 | 2 | Watson publication without looking it up? |
| 14:46 | 3 | **A.**   No. |
| 14:46 | 4 | **Q.**   Do you know that there was an analysis done of pooling the |
| 14:46 | 5 | complicated PUBs, which is the endpoint that you claim this |
| 14:46 | 6 | morning is the really important one, in those 20 studies? |
| 14:46 | 7 | **A.**   We looked at some of that this morning. |
| 14:46 | 8 | **Q.**   Right.  Let me show you.  If you could go on -- this is |
| 14:46 | 9 | Exhibit 677 of plaintiff.  I take it you don't know who Qinfen |
| 14:46 | 10 | Yu is? |
| 14:46 | 11 | **A.**   Qinfen. |
| 14:46 | 12 | **Q.**   Do you know her or him? |
| 14:46 | 13 | **A.**   No. |
| 14:47 | 14 | **Q.**   Do you have any doubt that the analysis done in the Yu |
| 14:47 | 15 | memo is a correct analysis? |
| 14:47 | 16 | **A.**   No. |
| 14:47 | 17 | **Q.**   Did you ever ask Mr. Jewell to do any type of analysis of |
| 14:47 | 18 | the complicated PUBs in the other studies, other than VIGOR, |
| 14:47 | 19 | the OA studies and the other RA studies? |
| 14:47 | 20 | **A.**   No. |
| 14:47 | 21 | **Q.**   Would it surprise you that that was done here? |
| 14:47 | 22 | **A.**   No.  I mean, remember, these are not randomized for that |
| 14:47 | 23 | event.  So, therefore, they're all interesting but not |
| 14:47 | 24 | definitive. |
| 14:47 | 25 | **Q.**   Well, look at page 19 of 68 of the Yu memo, Table 10. |

| | | |
|---|---|---|
| 14:48 | 1 | **A.**   These?   What page? |
| 14:48 | 2 | **Q.**   It's page 19 of 68, Table 10. |
| 14:48 | 3 | **A.**   Right. |
| 14:48 | 4 | **Q.**   There's a column for the collection of confirmed PUBs; |
| 14:48 | 5 | correct?   For base steroid users.   Do you see that at the |
| 14:48 | 6 | bottom? |
| 14:48 | 7 | **A.**   Right. |
| 14:48 | 8 | **Q.**   If you turn to the next page, there's a column for the |
| 14:48 | 9 | collection of all of the confirmed complicated PUBs.   Do you |
| 14:48 | 10 | see that there at the top?   We can highlight the top, |
| 14:48 | 11 | "Confirmed Complicated PUBs." |
| 14:48 | 12 | **A.**   Okay. |
| 14:48 | 13 | **Q.**   Have you ever seen this before? |
| 14:48 | 14 | **A.**   I'm sure I have. |
| 14:48 | 15 | **Q.**   What's the p-value shown off to the right of the |
| 14:48 | 16 | collection of confirmed PUBs with regard to the subgroup use |
| 14:48 | 17 | of -- baseline steroid use? |
| 14:48 | 18 | **A.**   Where are we looking? |
| 14:48 | 19 | **Q.**   Top of page 20.   It's up on the big screen here. |
| 14:49 | 20 | **A.**   Okay. |
| 14:49 | 21 | **Q.**   You see it's .891? |
| 14:49 | 22 | **A.**   Right. |
| 14:49 | 23 | **Q.**   Any reason to dispute that number? |
| 14:49 | 24 | **A.**   For this analysis? |
| 14:49 | 25 | **Q.**   Yes, sir. |

| | | |
|---|---|---|
| 14:49 | 1 | **A.**   No. |
| 14:49 | 2 | **Q.**   All right.  Doesn't .891 mean that there was no |
| 14:49 | 3 | statistically significant interaction and that, actually, for |
| 14:49 | 4 | the database for all the OA trials and RA trials -- |
| 14:49 | 5 | **A.**   These aren't interactions. |
| 14:49 | 6 | **Q.**   Sir, doesn't that show that treatment by subgroup was not |
| 14:49 | 7 | statistically significant such that you could, looking at the |
| 14:49 | 8 | OA and RA database from this set, say that your theory about |
| 14:49 | 9 | the VIGOR study didn't hold true when you looked at all the |
| 14:49 | 10 | other data; correct? |
| 14:49 | 11 | **A.**   No.  But, remember, the only set that counts is the |
| 14:49 | 12 | randomized controlled study where the patients are randomized |
| 14:50 | 13 | so that you could test for outcome.  That's the only study that |
| 14:50 | 14 | counts.  Anywhere else you look, you're looking at subgroups |
| 14:50 | 15 | that have very little significance and that can only be used as |
| 14:50 | 16 | other data to ask about placebo. |
| 14:50 | 17 | **Q.**   Sir, people do pooled meta-analysis all the time; correct? |
| 14:50 | 18 | **A.**   It would be very difficult to get someone to do a |
| 14:50 | 19 | meta-analysis when you mix the drugs on them.  You like to |
| 14:50 | 20 | define the meta-analysis that the duration, the dose, biologic |
| 14:50 | 21 | effect is the same. |
| 14:50 | 22 | **Q.**   You're not a statistician to know whether that could be |
| 14:50 | 23 | done or not, statistically valid; correct? |
| 14:50 | 24 | **A.**   I have done meta-analyses, and I have been taught by my |
| 14:50 | 25 | leaders about how critical it is to define it.  Otherwise, |

| | | |
|---|---|---|
| 14:50 | 1 | you'd get what they call a smeta-analysis (phonetic). |
| 14:50 | 2 | Q.   Did you ever ask Mr. Jewell to do any analysis or have you |
| 14:50 | 3 | ever done any analysis on your own looking at all of the other |
| 14:51 | 4 | data from other studies with regard to confirmed complicated |
| 14:51 | 5 | PUBs? |
| 14:51 | 6 | A.   Absolutely not. |
| 14:51 | 7 | Q.   You, earlier today, showed the Judge a chart that |
| 14:51 | 8 | Mr. Arbitblit showed you out of the Yu memo dealing with a |
| 14:51 | 9 | subgroup of 8 of these 20 studies; right? |
| 14:51 | 10 | A.   Right. |
| 14:51 | 11 | Q.   Did you go over with Mr. Arbitblit the same type of |
| 14:51 | 12 | Kaplan-Meier curve for all of the studies, not just a subgroup |
| 14:51 | 13 | of 8? |
| 14:51 | 14 | A.   We looked at all the data. |
| 14:51 | 15 | Q.   Sir, did you look at the Kaplan-Meier curve for all 20 of |
| 14:51 | 16 | the studies as opposed to this subgroup of 8 that Mr. Arbitblit |
| 14:51 | 17 | showed you? |
| 14:51 | 18 | A.   I'm sure I did. |
| 14:51 | 19 | Q.   Let's look at page 11.  You did not show the Court this |
| 14:51 | 20 | Kaplan-Meier curve that showed the incidence rates of the |
| 14:52 | 21 | confirmed complicated PUBs for the overall data analyzed by |
| 14:52 | 22 | you, did you? |
| 14:52 | 23 | A.   No. |
| 14:52 | 24 | Q.   In this Kaplan-Meier curve, as opposed to the one that was |
| 14:52 | 25 | shown the Court on a subgroup of the studies, with all 20 |

| | | |
|---|---|---|
| 14:52 | 1 | studies, it was clear there were more complicated PUBs on |
| 14:52 | 2 | traditional NSAIDs than on rofecoxib; correct? |
| 14:52 | 3 | A.   Well, you know, if you look at the two curves, they look |
| 14:52 | 4 | the same, basically, the lay of the -- |
| 14:52 | 5 | Q.   Sir, as far as this Kaplan-Meier curve goes out, at the |
| 14:52 | 6 | end of the day, there are more events on traditional NSAIDs |
| 14:52 | 7 | than on rofecoxib; correct? |
| 14:52 | 8 | A.   There are more with NSAIDs than rofecoxib, but they look |
| 14:52 | 9 | the same.  All of them really look the same. |
| 14:52 | 10 | The point is we used the one that you-guys showed in |
| 14:52 | 11 | a publication and carried it out for the next few months, and |
| 14:52 | 12 | it changed. |
| 14:52 | 13 | Q.   Dr. Graham, that's not my question.  The question is |
| 14:52 | 14 | simple.  There are more events; right? |
| 14:52 | 15 | A.   There's no difference. |
| 14:52 | 16 | Q.   We are trying to get through this. |
| 14:52 | 17 | A.   There's no difference. |
| 14:53 | 18 | Q.   Even though we just saw a statistical difference on the |
| 14:53 | 19 | p-value; right? |
| 14:53 | 20 | A.   There's not going to be a statistical difference on the |
| 14:53 | 21 | p-value on that. |
| 14:53 | 22 | Q.   Your position, looking at the Yu memo, is that there was |
| 14:53 | 23 | not a difference between traditional NSAIDs and Vioxx with |
| 14:53 | 24 | regard to complicated PUBs?  Is that what you're saying the Yu |
| 14:53 | 25 | memo says? |

DAILY COPY

| | | |
|---|---|---|
| 14:53 | 1 | **A.**   I can't answer that question specifically. |
| 14:53 | 2 | **Q.**   Let me ask you a few things.  We have been going at it for |
| 14:53 | 3 | quite a while.  We have some disagreement, but I think there's |
| 14:53 | 4 | a few things that we can agree on, Dr. Graham. |
| 14:53 | 5 |         One, Vioxx and Celebrex and Bextra and the |
| 14:53 | 6 | traditional NSAIDs, to your knowledge and experience, do |
| 14:53 | 7 | provide effective pain relief and analgesic; correct? |
| 14:54 | 8 | **A.**   They do. |
| 14:54 | 9 | **Q.**   Let's talk Vioxx specifically.  You would agree with that |
| 14:54 | 10 | comment with regard to Vioxx too; right? |
| 14:54 | 11 | **A.**   Right. |
| 14:54 | 12 | **Q.**   Right. |
| 14:54 | 13 | **A.**   An NSAID is an NSAID is an NSAID. |
| 14:54 | 14 | **Q.**   You have no dispute that Vioxx provides effective pain |
| 14:54 | 15 | relief and analgesia; correct? |
| 14:54 | 16 | **A.**   No question. |
| 14:54 | 17 | **Q.**   You have no doubt that the vast majority of patients who |
| 14:54 | 18 | took Vioxx received an effective pain relief and analgesia and |
| 14:54 | 19 | did not have any type of adverse GI event?  Despite the |
| 14:54 | 20 | numbers, you would agree with that, sir? |
| 14:54 | 21 | **A.**   Most patients who take any NSAID get good relief and have |
| 14:54 | 22 | no GI side effects. |
| 14:54 | 23 | **Q.**   I'm just asking you specifically about Vioxx now.  Okay? |
| 14:54 | 24 | **A.**   It's no different than the rest of them. |
| 14:54 | 25 | **Q.**   So you would agree with me that the vast majority of |

| | | |
|---|---|---|
| 14:54 | 1 | people who took Vioxx had pain relief, analgesia, and did not |
| 14:54 | 2 | have a GI event? |
| 14:54 | 3 | **A.**   Right. |
| 14:54 | 4 | **Q.**   The same would be true with CV event; correct? |
| 14:54 | 5 | **A.**   Say again. |
| 14:54 | 6 | **Q.**   Cardiovascular event, the same would be true with regard |
| 14:54 | 7 | to that?  The vast majority of people who took it -- |
| 14:54 | 8 | **THE COURT:**  Do you know that? |
| 14:55 | 9 | **MR. SALES:**  No, I'm not going to ask -- I'm asking a |
| 14:55 | 10 | big-picture question here, Your Honor.  I'm just simply |
| 14:55 | 11 | saying -- |
| 14:55 | 12 | **BY MR. SALES:** |
| 14:55 | 13 | **Q.**   You have seen the VIGOR study and others.  Even if you |
| 14:55 | 14 | assumed the worst case scenario on the numbers, you would agree |
| 14:55 | 15 | with me that the vast majority of people who took Vioxx did not |
| 14:55 | 16 | receive a GI event or a CV event; correct? |
| 14:55 | 17 | **MR. ARBITBLIT:**  Your Honor, I have to object.  That's |
| 14:55 | 18 | beyond the scope of his assignment or what he's reviewed. |
| 14:55 | 19 | **THE COURT:**  I agree.  Sustain the objection. |
| 14:55 | 20 | **BY MR. SALES:** |
| 14:55 | 21 | **Q.**   You have said, I believe, on the stand this morning and I |
| 14:55 | 22 | think you said at your deposition there's no doubt in your mind |
| 14:55 | 23 | that Vioxx is superior with regard to traditional NSAID with |
| 14:55 | 24 | regard to steroid users; correct? |
| 14:55 | 25 | **A.**   I don't understand the question. |

| | | |
|---|---|---|
| 14:55 | 1 | **Q.**   Let me rephrase it.  With regard to GI profile or GI |
| 14:55 | 2 | benefit, no doubt in your mind that, with regard to at least a |
| 14:55 | 3 | subgroup of people who are on steroids, Vioxx would be superior |
| 14:55 | 4 | to traditional NSAIDs; correct? |
| 14:55 | 5 | **A.**   That's what the data showed. |
| 14:56 | 6 | **Q.**   That's what you believe? |
| 14:56 | 7 | **A.**   I believe those data. |
| 14:56 | 8 | **Q.**   All right.  So -- |
| 14:56 | 9 | **A.**   For preventing bad events. |
| 14:56 | 10 | **MR. SALES:**  If I may approach Your Honor. |
| 14:56 | 11 | **BY MR. SALES:** |
| 14:56 | 12 | **Q.**   So the things we can agree upon with regard to Vioxx is |
| 14:56 | 13 | "effective" -- can I put "pain and analgesic relief"?  Is that |
| 14:56 | 14 | fair? |
| 14:56 | 15 | **A.**   All NSAIDs are the same. |
| 14:56 | 16 | **Q.**   Sir, I'm just asking about Vioxx right now. |
| 14:56 | 17 | **A.**   Vioxx is an NSAID. |
| 14:56 | 18 | **Q.**   You would agree that Vioxx has -- |
| 14:56 | 19 | **A.**   I agree with it.  It is.  It is -- |
| 14:56 | 20 | **Q.**   Okay. |
| 14:56 | 21 | **A.**   -- but it's not special. |
| 14:56 | 22 | **Q.**   The vast majority got that effect of pain and analgesia |
| 14:57 | 23 | without experiencing any type of gastrointestinal event? |
| 14:57 | 24 | **A.**   True for all NSAIDs and Vioxx. |
| 14:57 | 25 | **Q.**   I'm not asking you about all NSAIDs.  I'm asking you about |

| | | |
|---|---|---|
| 14:57 | 1 | Vioxx.  Now, you're -- |
| 14:57 | 2 | **A.**   You know, just -- they're all the same. |
| 14:57 | 3 | **Q.**   All right.  So there's no vast number, no GI event; is |
| 14:57 | 4 | that right?  What you have agreed now is Vioxx is better than |
| 14:57 | 5 | traditional NSAIDs for steroid users? |
| 14:57 | 6 | **A.**   For safety. |
| 14:57 | 7 | **Q.**   For safety. |
| 14:57 | 8 | **A.**   But they didn't strongly suggest that. |
| 14:58 | 9 | **Q.**   Put another way, Vioxx, in your opinion, would have |
| 14:58 | 10 | provided a clinically meaningful therapeutic advantage over |
| 14:58 | 11 | traditional NSAIDs for safety with regard to traditional |
| 14:58 | 12 | NSAIDs, based on the data as you understand it? |
| 14:58 | 13 | **A.**   For patients who got steroids and an NSAID, that it would |
| 14:58 | 14 | be a better choice than a traditional NSAID, what the data |
| 14:58 | 15 | suggests. |
| 14:59 | 16 | **MR. SALES:**  May I have one moment, Your Honor? |
| 14:59 | 17 | **THE COURT:**  Yes.  Do you tender the witness? |
| 14:59 | 18 | **MR. SALES:**  I have a few more questions. |
| 14:59 | 19 | **BY MR. SALES:** |
| 14:59 | 20 | **Q.**   I believe you had said before you are not currently aware |
| 14:59 | 21 | of the FDA's position with regard to -- this was in your |
| 14:59 | 22 | deposition, but are you aware currently of what the FDA's |
| 14:59 | 23 | current position is with regard to the NSAID class, including |
| 14:59 | 24 | COX-2 inhibitors, with regard to their findings on |
| 14:59 | 25 | cardiovascular safety and GI toxicity of those drugs? |

| | | |
|---|---|---|
| 14:59 | 1 | **A.**   No. |
| 14:59 | 2 | **MR. ARBITBLIT:**  Same objection, Your Honor. |
| 14:59 | 3 | **THE COURT:**  I think he said no. |
| 14:59 | 4 | **MR. ARBITBLIT:**  It's beyond the scope of the witness' |
| 15:00 | 5 | assignment. |
| 15:00 | 6 | **THE COURT:**  In any event, he said no. |
| 15:00 | 7 | **BY MR. SALES:** |
| 15:00 | 8 | **Q.**   One last topic.  You said you have obviously relied upon |
| 15:00 | 9 | this Jewell analysis for the change of heart you had in |
| 15:00 | 10 | September after being hired in this case.  You mentioned |
| 15:00 | 11 | earlier today that you believe that analysis -- by the way, |
| 15:00 | 12 | that was a two-page analysis.  It had never been peer-reviewed |
| 15:00 | 13 | or published anywhere; correct? |
| 15:00 | 14 | **A.**   Not yet. |
| 15:00 | 15 | **Q.**   You mentioned there were 53 events used in that analysis; |
| 15:00 | 16 | is that correct? |
| 15:00 | 17 | **A.**   53 was the number, I think. |
| 15:00 | 18 | **Q.**   If the numbers, overall complicated PUBs, were different |
| 15:00 | 19 | than 53, would that be something material to that analysis? |
| 15:01 | 20 | **A.**   These data came from the Merck database. |
| 15:01 | 21 | **Q.**   That's not my question, sir.  If the number is not 53 but |
| 15:01 | 22 | some other number -- |
| 15:01 | 23 | **A.**   If the data were inaccurate, then the analysis would have |
| 15:01 | 24 | to be redone. |
| 15:01 | 25 | **Q.**   Have you looked at the CSR for VIGOR? |

DAILY COPY

| | | |
|---|---|---|
| 15:01 | 1 | **A.**   English, please. |
| 15:01 | 2 | **Q.**   Do you know what a CSR is?  You've never heard of the term |
| 15:01 | 3 | *CSR*? |
| 15:01 | 4 | **A.**   I'm sure I've heard it. |
| 15:01 | 5 | **Q.**   You were shown one this morning that you said you |
| 15:01 | 6 | reviewed. |
| 15:01 | 7 | **A.**   What does *CSR* mean? |
| 15:01 | 8 | **Q.**   Clinical safety report. |
| 15:01 | 9 | **A.**   Okay.  We all have our own codes. |
| 15:01 | 10 | **Q.**   Give me one second. |
| 15:01 | 11 |      **MR. SALES:**  Mr. Arbitblit, this is from Plaintiff's |
| 15:02 | 12 | Exhibit 225.  It's going to be Table 41. |
| 15:02 | 13 |      **MR. ARBITBLIT:**  I object to a partial document. |
| 15:02 | 14 |      **MR. SALES:**  It's Plaintiff's Exhibit 225.  Judge, as |
| 15:02 | 15 | the Court is aware, the CSRs are thousands of pages.  I'm just |
| 15:02 | 16 | going to ask him a question about one page out of their |
| 15:03 | 17 | document that they've marked as an exhibit. |
| 15:03 | 18 |      **THE COURT:**  It's your document. |
| 15:03 | 19 |      **MR. SALES:**  They've got it.  They can ask questions |
| 15:03 | 20 | about -- |
| 15:03 | 21 |      **MR. ARBITBLIT:**  It's a Merck document.  There are |
| 15:03 | 22 | many questions we could have gone into on direct that we |
| 15:03 | 23 | didn't.  It's certainly not going to move things along to |
| 15:03 | 24 | introduce one page.  It's going to open the door to many more |
| 15:03 | 25 | questions that I would have on that document. |

| | |
|---|---|
| 15:03 | 1 |

15:03  1    **MR. SALES:**  Your Honor, I just need to ask him one

15:03  2  question on one document.

15:03  3    **THE COURT:**  I will let you do that.

15:03  4  BY MR. SALES:

15:03  5  Q.   Let me just put up on the board -- this is Table 41 from

15:03  6  the VIGOR CSR, if you look up here, sir.  Have you seen this

15:03  7  page of this table before giving your testimony today?

15:03  8  A.   I'm sure I have.

15:03  9  Q.   Is there, on this table, a line for confirmed complicated

15:03  10  PUBs?

15:03  11  A.   Right.

15:03  12  Q.   If you go across, what does it say for rofecoxib, how many

15:03  13  events?

15:03  14  A.   17.

15:04  15  Q.   How many does it say for naproxen?

15:04  16  A.   It says 40.

15:04  17  Q.   If you add those two together like you did with the 36 and

15:04  18  17, what do you get?

15:04  19  A.   47.

15:04  20    **THE COURT:**  57.

15:04  21  BY MR. SALES:

15:04  22  Q.   Maybe 57; right?

15:04  23  A.   57.

15:04  24  Q.   Now, you did an analysis with Dr. Jewell on 53; is that

15:04  25  correct?

DAILY COPY

| | | |
|---|---|---|
| 15:04 | 1 | **A.**   Right. |
| 15:04 | 2 | **Q.**   Do you have any knowledge about how Dr. Jewell selected |
| 15:04 | 3 | his 53 events? |
| 15:04 | 4 | **A.**   My understanding was he got the database from Merck and |
| 15:04 | 5 | used it. |
| 15:04 | 6 | **Q.**   You have not done any analysis on 57 events; is that |
| 15:04 | 7 | correct? |
| 15:04 | 8 | **A.**   Say again. |
| 15:04 | 9 | **Q.**   You have not done any analysis on 57 events, have you? |
| 15:04 | 10 | **A.**   No. |
| 15:04 | 11 | **MR. SALES:**  We'll tender the witness, Your Honor. |
| 15:04 | 12 | **THE COURT:**  Any redirect? |
| 15:04 | 13 | **MR. ARBITBLIT:**  May we have a few minutes, |
| 15:04 | 14 | Your Honor? |
| 15:04 | 15 | **THE COURT:**  Sure. |
| 15:05 | 16 | **MR. ARBITBLIT:**  Would 10 be okay? |
| 15:05 | 17 | **THE COURT:**  Well, I have something at 3:30.  Let's |
| 15:05 | 18 | see if you can do it while I'm here. |
| 15:07 | 19 | **MR. SALES:**  I have some housekeeping matters while he |
| 15:07 | 20 | is getting his papers together.  We talked about some exhibits |
| 15:07 | 21 | for the record, some of which were learned treatise that are |
| 15:07 | 22 | not going in.  With regard to the learned treatises 4011, 4005, |
| 15:07 | 23 | 4013, 2643, I understand the Court is not going to accept those |
| 15:08 | 24 | into evidence but just for identification purposes. |
| 15:08 | 25 | We would offer Plaintiff's Exhibit 677, which is |

360

| | | |
|---|---|---|
| 15:08 | 1 | the Qinfen Yu memo that both Mr. Arbitblit and I have discussed |
| 15:08 | 2 | with the witness. |
| 15:08 | 3 |    **THE COURT:**  All right.  Let it be admitted. |
| 15:08 | 4 |    **MR. ARBITBLIT:**  Your Honor, I would like to see if my |
| 15:08 | 5 | colleagues could locate the rest of the several hundred-page |
| 15:08 | 6 | document that we did not use so that they can follow along.  If |
| 15:08 | 7 | they can't, I would ask the Court's indulgence to show the |
| 15:08 | 8 | witness the one page. |
| 15:08 | 9 |    **THE COURT:**  Yes. |
| 15:08 | 10 |    **MR. ARBITBLIT:**  I would also like to show the witness |
| 15:09 | 11 | LAAG-40, which is the 2002 Vioxx label. |
| 15:09 | 12 |    **THE COURT:**  All right. |
| 15:09 | 13 |    **MR. SALES:**  Your Honor, I object. |
| 15:09 | 14 |    **MR. ARBITBLIT:**  He has been given a document to |
| 15:09 | 15 | suggest that there is an error in the data, and I would look to |
| 15:09 | 16 | confirm that the 37 versus 16 relied upon by the witness is the |
| 15:09 | 17 | data that's in the label and is the primary analysis.  I think |
| 15:09 | 18 | it's appropriate rebuttal. |
| 15:09 | 19 |    **THE COURT:**  Okay. |
| 15:09 | 20 |    **MR. SALES:**  Your Honor, if they want to go through |
| 15:09 | 21 | the CSR, that's what I used, but he specifically wasn't |
| 15:09 | 22 | discussing the labeling.  It was sustained earlier.  If they |
| 15:09 | 23 | do, that would reopen things. |
| 15:09 | 24 |    **THE COURT:**  I understand.  You brought up this |
| 15:09 | 25 | inconsistency, so I think it's fair to let him do that.  I'm |

| | | |
|---|---|---|
| 15:09 | 1 | not going to go into the label -- |
| 15:10 | 2 | **MR. SALES:** It's just to confirm the numbers that are |
| 15:10 | 3 | on the label? |
| 15:10 | 4 | **THE COURT:** Right. |
| 15:10 | 5 | **MR. ARBITBLIT:** That's my intention, Counsel. |
| 15:10 | 6 | REDIRECT EXAMINATION |
| 23:59 | 7 | BY MR. ARBITBLIT: |
| 15:10 | 8 | **Q.** Dr. Graham, I'm showing you the VIGOR label that's in fine |
| 15:10 | 9 | print and a little hard to read, but can you see in Table 1 of |
| 15:10 | 10 | the 2002 label the line reading "Complicated PUBs"?  Is the |
| 15:10 | 11 | print large enough for you to see the numbers in the Vioxx and |
| 15:10 | 12 | naproxen group? |
| 15:10 | 13 | **A.** Looks like 16 and 37. |
| 15:10 | 14 | **Q.** Are those the numbers that Dr. Jewell used in his |
| 15:10 | 15 | analysis? |
| 15:10 | 16 | **A.** Yes. |
| 15:10 | 17 | **Q.** What is a sensitivity analysis in a clinical trial? |
| 15:10 | 18 | **A.** Well, in lay terms, a sensitivity analysis is when you |
| 15:10 | 19 | ask:  If I change the parameters a bit up or down, what happens |
| 15:11 | 20 | to the outcome? |
| 15:11 | 21 | **Q.** Those are different from primary analyses; correct? |
| 15:11 | 22 | **A.** Yes. |
| 15:11 | 23 | **Q.** Did Mr. Sales show you page 5629, actually starting with |
| 15:11 | 24 | 5627, that the table that he showed you came under the heading |
| 15:11 | 25 | of "Sensitivity Analyses," 7.62 and thereafter from the VIGOR |

DAILY COPY

| | | |
|---|---|---|
| 15:11 | 1 | CSR? |
| 15:11 | 2 | **A.**   That's what it says. |
| 15:11 | 3 | **Q.**   Did he tell you that it was from a different analysis from |
| 15:11 | 4 | primary? |
| 15:11 | 5 | **A.**   No. |
| 15:11 | 6 | **MR. SALES:**  Objection:  Leading. |
| 15:11 | 7 | **THE COURT:**  I overrule the objection and allow it. |
| 15:11 | 8 | BY MR. ARBITBLIT: |
| 15:11 | 9 | **Q.**   Could you turn to the Yu memo, please, which is tab 5. |
| 15:12 | 10 | Please look at Table 9 at page 18 of 68 and again 4311. |
| 15:12 | 11 | **A.**   Okay. |
| 15:12 | 12 | **Q.**   In the VIGOR study, you testified that there was |
| 15:12 | 13 | approximately an equal number of steroid patients in both arms; |
| 15:12 | 14 | right? |
| 15:12 | 15 | **A.**   Yes. |
| 15:12 | 16 | **Q.**   Looking at the steroid user baseline for Vioxx versus |
| 15:12 | 17 | NSAIDs combined, are those numbers anywhere close to equal? |
| 15:12 | 18 | **A.**   Well, it looks like it's 10 percent and 7 percent instead |
| 15:12 | 19 | of 50 percent. |
| 15:12 | 20 | **Q.**   Those numbers, were these trials randomized to control so |
| 15:13 | 21 | that steroid users would be equal in both arms? |
| 15:13 | 22 | **A.**   No. |
| 15:13 | 23 | **Q.**   Does that affect the validity of attempting to do a |
| 15:13 | 24 | steroid versus nonsteroid user analysis? |
| 15:13 | 25 | **A.**   It might. |

| | | |
|---|---|---|
| 15:13 | 1 | **Q.**   Now, you were asked the question of whether anyone from |
| 15:13 | 2 | the *New England Journal* told the authors of the VIGOR study |
| 15:13 | 3 | that they must do a subgroup analysis for the complicated PUB |
| 15:13 | 4 | endpoint.  Do you remember that question? |
| 15:14 | 5 | **A.**   Yes. |
| 15:14 | 6 | **Q.**   Do you have an opinion as to whether the standard for |
| 15:14 | 7 | scientific analysis is dependent on what a reviewer tells you |
| 15:14 | 8 | you must do? |
| 15:14 | 9 | **A.**   No.  I have an opinion that the reviewer tells you things, |
| 15:14 | 10 | and you get to decide whether you want to do it or not. |
| 15:14 | 11 | **Q.**   Do you have an opinion as to whether or not the author |
| 15:14 | 12 | should have done that analysis to clarify the situation that |
| 15:14 | 13 | the journal editors mentioned? |
| 15:14 | 14 | **A.**   I think they should have.  There were enough questions |
| 15:14 | 15 | that should have raised a red flag and asked them to do it, and |
| 15:14 | 16 | then they would have settled it forever. |
| 15:14 | 17 | **Q.**   Now, the opinion leaders that were mentioned in the 2009 |
| 15:14 | 18 | article that you responded to, do you know how many of them are |
| 15:14 | 19 | or have been consultants to Merck as well as Pfizer? |
| 15:14 | 20 | **A.**   No. |
| 15:14 | 21 | **Q.**   Do you know that, in this case, they were paid as |
| 15:14 | 22 | consultants to industry? |
| 15:15 | 23 | **MR. SALES:**  Objection:  Leading. |
| 15:15 | 24 | **THE COURT:**  Sustained. |
| | 25 | |

15:15   1   **BY MR. ARBITBLIT:**

15:15   2   **Q.**   What is your understanding as to how it arose that those

15:15   3   authors wrote the article?

15:15   4   **A.**   Well, they were all consultants to Pfizer because they

15:15   5   were part of their group that was doing the CONDOR study.   So

15:15   6   Pfizer offered them the opportunity to take the white paper and

15:15   7   turn it into a manuscript, and some said yes and some said no.

15:15   8   **Q.**   Going back to the article you coauthored with Hashem

15:15   9   El-Serag on the nomogram --

15:15   10   **A.**   Right.

15:15   11   **Q.**   -- do you have that in front of you?

15:15   12   **A.**   Yes.

15:15   13   **Q.**   Could you turn to page 2019 of that article.   Are you

15:16   14   there?   Dr. Graham, I would like to just read something from

15:16   15   that article and see whether you still agree that users of the

15:16   16   nomogram can enter whatever assumptions they wish based on

15:16   17   their own interpretation of the literature and cost estimates

15:16   18   in their own practice settings.

15:16   19   **A.**   That's what a nomogram is assigned for.

15:16   20   **Q.**   If the assumption based on a 50 percent overall reduction

15:16   21   of complicated serious events were no longer supported by the

15:17   22   literature, would those assumptions change?

15:17   23   **A.**   Of course.

15:17   24         **MR. ARBITBLIT:**   Just a couple more minutes,

15:17   25   Your Honor.

DAILY COPY

| | | |
|---|---|---|
| 15:17 | 1 | **BY MR. ARBITBLIT:** |
| 15:18 | 2 | **Q.** Dr. Graham, is an 1,800-milligram dose of ibuprofen per |
| 15:18 | 3 | day safer than a 2,400-milligram-per-day dose? |
| 15:18 | 4 | **A.** I don't know. Probably, because it says the dose-response |
| 15:18 | 5 | effect, but it probably falls into -- I would suspect the |
| 15:18 | 6 | categories probably, but I don't think I know the test of that. |
| 15:18 | 7 | **Q.** Do you have the Ray article handy that was shown to you on |
| 15:18 | 8 | cross? |
| 15:18 | 9 | **A.** Yes. |
| 15:18 | 10 | **Q.** In the "Results" section, do you see the statement at the |
| 15:18 | 11 | bottom: "The rate ratio for ibuprofen greater than or equal to |
| 15:19 | 12 | 1,800 milligrams was significantly greater than that for lower |
| 15:19 | 13 | doses"? |
| 15:19 | 14 | **A.** Yes. |
| 15:19 | 15 | **Q.** Is that consistent with your understanding of the |
| 15:19 | 16 | dose-response relationship? |
| 15:19 | 17 | **A.** Yes. |
| 15:19 | 18 | **Q.** Does this document say whether those patients were using |
| 15:19 | 19 | 1,800 per day or more, or does it only say that it was greater |
| 15:19 | 20 | than or equal to? |
| 15:19 | 21 | **A.** It just says "greater than or equal to." |
| 15:19 | 22 | **Q.** Is ibuprofen available in a 600-milligram dose? |
| 15:19 | 23 | **A.** Not that I know. |
| 15:19 | 24 | **Q.** Now, you were asked a question about doses of NSAIDs used |
| 15:19 | 25 | in the real world. |

15:19    1    **A.**    Yes.

15:19    2    **Q.**    Did the observational studies that you looked at and

15:19    3    mentioned in your rebuttal report evaluate the comparative

15:20    4    safety of Vioxx in relation to traditional NSAIDs based on

15:20    5    real-world doses?

15:20    6    **A.**    Yes.

15:20    7    **Q.**    Based on those studies, was it possible to differentiate

15:20    8    the GI safety of Vioxx from those NSAIDs?

15:20    9    **A.**    No.

15:20   10         **MR. ARBITBLIT:**   Thank you, Your Honor.   I have

15:20   11    nothing further of this witness.

15:20   12         **THE COURT:**   You're excused, sir.

15:20   13              Let me see counsel just for a logistics

15:20   14    standpoint, please.

15:20   15              (WHEREUPON there was a conference at the bench

15:20   16    outside the presence of the court reporter.   Afterwards, a

        17    brief recess was taken.)

15:32   18         **THE DEPUTY CLERK:**   Everyone rise.

15:48   19         **THE COURT:**   Be seated, please.

15:48   20         **MR. MURRAY:**   I would like to introduce the Court to

15:48   21    Chris Styron from the attorney general's office, who's with us

15:49   22    today.   I'd like him to make an appearance.

15:49   23         **MR. STYRON:**   Chris Styron with the attorney general's

15:49   24    office.

        25

15:49   1          (WHEREUPON **David W. Hood**, having been duly sworn,

15:49   2   testified as follows.)

15:49   3          **THE DEPUTY CLERK:**  Please state your full name and

15:49   4   correct spelling for the record.

15:49   5          **THE WITNESS:**  David W. Hood.

15:49   6                    **DIRECT EXAMINATION**

15:49   7   BY MR. MURRAY:

15:49   8   **Q.**   Good afternoon, Mr. Hood.  Sir, can you tell us a little

15:49   9   bit about yourself.  Are you married?

15:49   10  **A.**   Yes.

15:49   11  **Q.**   Do you have any children?

15:49   12  **A.**   I have two.

15:49   13  **Q.**   What do you have?

15:49   14  **A.**   Two daughters and one granddaughter, by the way.

15:49   15  **Q.**   Sir, can you briefly tell the Court about your educational

15:49   16  experience.

15:49   17  **A.**   Yes.  I'm a graduate of Louisiana State University.  I

15:49   18  have a bachelor's degree and also a master's degree from LSU.

15:49   19  **Q.**   Have you had any military service?

15:49   20  **A.**   Yes.  I was an Air Force officer for six years.

15:50   21  **Q.**   When was that?

15:50   22  **A.**   That would be 1965 through 1971.

15:50   23  **Q.**   Now, Mr. Hood, I understand that at some point in time you

15:50   24  were secretary of the Louisiana Department of Health and

15:50   25  Hospitals; is that correct?

| | | |
|---|---|---|
| 15:50 | 1 | A.   That's correct. |
| 15:50 | 2 | Q.   Can you briefly describe your experience at Louisiana |
| 15:50 | 3 | Department of Health and Hospitals; that is, when you began, |
| 15:50 | 4 | how long you worked there, what your positions were there. |
| 15:50 | 5 | A.   Yes.  I actually started working at Louisiana Department |
| 15:50 | 6 | of Health and Hospitals in November of 1977.  I worked there |
| 15:50 | 7 | for three years.  In 1981, I began working for the legislature |
| 15:50 | 8 | as a senior fiscal analyst for health-care programs and |
| 15:50 | 9 | spending and so on.  In 1996, I was appointed undersecretary of |
| 15:51 | 10 | DHH.  I was in that position for two years and then became |
| 15:51 | 11 | secretary for six years. |
| 15:51 | 12 | Q.   Did you have any particular responsibilities as |
| 15:51 | 13 | undersecretary?  Were you undersecretary for a certain |
| 15:51 | 14 | department? |
| 15:51 | 15 | A.   Yes.  I was undersecretary of DHH, with responsibility for |
| 15:51 | 16 | budgets for the department, for fiscal matters of all types, |
| 15:51 | 17 | and also under my jurisdiction was the Medicaid program. |
| 15:51 | 18 | Q.   Do I understand that it was in roughly 1998 that you were |
| 15:51 | 19 | appointed secretary of LDHH? |
| 15:51 | 20 | A.   February of 1998. |
| 15:51 | 21 | Q.   How long did you hold that position? |
| 15:51 | 22 | A.   Six years, until February of 2004. |
| 15:51 | 23 | Q.   What has your employment been since the end of your tenure |
| 15:51 | 24 | as secretary of LDHH? |
| 15:52 | 25 | A.   Since the fall of 2005, I've been with the Public Affairs |

DAILY COPY

| | | |
|---|---|---|
| 15:52 | 1 | Research Council of Louisiana. |
| 15:52 | 2 | **Q.**   Can you briefly tell the Court what the Public Affairs |
| 15:52 | 3 | Research Counsel does. |
| 15:52 | 4 | **A.**   It's a not-for-profit, nonpartisan organization that's |
| 15:52 | 5 | been in existence since 1950.  It researches public issues of |
| 15:52 | 6 | all types, now including health care, and issues reports. |
| 15:52 | 7 | **Q.**   Is your role with the PAR associated with health care? |
| 15:52 | 8 | **A.**   Yes. |
| 15:52 | 9 | **Q.**   Have you issued reports with respect to health-care issues |
| 15:52 | 10 | in the state of Louisiana in connection with that role? |
| 15:52 | 11 | **A.**   Yes.  Yes, we have.  They range from reorganization of the |
| 15:52 | 12 | Charity Hospital system to long-term care issues, mental health |
| 15:52 | 13 | issues, and a variety of other reports as well. |
| 15:53 | 14 | **Q.**   When you were secretary of LDHH, did LDHH administer |
| 15:53 | 15 | Louisiana's Medicaid program? |
| 15:53 | 16 | **A.**   Yes. |
| 15:53 | 17 | **Q.**   If you could briefly familiarize the Court, what was the |
| 15:53 | 18 | reporting structure of the Louisiana Medicaid pharmacy benefit |
| 15:53 | 19 | program? |
| 15:53 | 20 | **A.**   The pharmacy benefit program was a subprogram in Medicaid. |
| 15:53 | 21 | The person who, when I was secretary, was in charge was |
| 15:53 | 22 | Ms. M.J. Terrebonne.  She reported directly to the director of |
| 15:53 | 23 | the program, who was Ben Bearden at that time.  Mr. Bearden |
| 15:53 | 24 | reported to Mr. Charles Castille, who was the undersecretary, |
| 15:53 | 25 | and he reported to me. |

| | | |
|---|---|---|
| 15:54 | 1 | **Q.**   Did any of the individuals that you just mentioned in |
| 15:54 | 2 | connection with the Louisiana Medicaid pharmacy benefit program |
| 15:54 | 3 | have any authority to implement formulary changes? |
| 15:54 | 4 | **A.**   No, they did not. |
| 15:54 | 5 | **Q.**   Who, if any, in the program had that authority? |
| 15:54 | 6 | **A.**   The secretary of DHH. |
| 15:54 | 7 | **Q.**   From 1988 to 2004, that was you? |
| 15:54 | 8 | **A.**   That's correct. |
| 15:54 | 9 | **Q.**   Let me ask you:  When you first became secretary of LDHH, |
| 15:54 | 10 | did LDHH have what some have referred to as an *open formulary*? |
| 15:54 | 11 | **A.**   Yes. |
| 15:54 | 12 | **Q.**   Did that formulary structure change at some point in time? |
| 15:54 | 13 |         **THE COURT:**  Why don't you explain what it was first. |
| 15:54 | 14 | **BY MR. MURRAY:** |
| 15:54 | 15 | **Q.**   Can you briefly explain to the Court what you understood |
| 15:54 | 16 | the open formulary to be with respect to the Louisiana Medicaid |
| 15:55 | 17 | pharmacy benefit program. |
| 15:55 | 18 | **A.**   Well, Louisiana's open formulary, which I think existed |
| 15:55 | 19 | since the mid 1980s until 2001, essentially would allow payment |
| 15:55 | 20 | for any FDA-approved drug. |
| 15:55 | 21 | **Q.**   Were there any restrictions that could be placed on |
| 15:55 | 22 | reimbursement of FDA-approved drugs during this open formulary |
| 15:55 | 23 | period? |
| 15:55 | 24 | **A.**   There were certain restrictions.  I don't remember what |
| 15:55 | 25 | they were, but I'm sure there were certain things that could |

| | | |
|---|---|---|
| 15:55 | 1 | not be reimbursed.  Over-the-counter drugs, for example, was |
| 15:55 | 2 | one example.  There were others, but I don't remember what they |
| 15:55 | 3 | were. |
| 15:55 | 4 | Q.   As a general proposition, if a prescription was presented |
| 15:55 | 5 | to Medicaid for an FDA-approved drug by a Medicaid patient, |
| 15:56 | 6 | Louisiana would, by statute, pay for that prescription? |
| 15:56 | 7 | A.   That's correct. |
| 15:56 | 8 | Q.   Did that formulary structure change at any point in time |
| 15:56 | 9 | when you were secretary? |
| 15:56 | 10 | A.   Yes.  It changed in 2001 with passage of Act 395. |
| 15:56 | 11 | Q.   Were you involved in the passage of Act 395? |
| 15:56 | 12 | A.   Yes. |
| 15:56 | 13 | Q.   What was entailed in obtaining that formulary structure |
| 15:56 | 14 | change? |
| 15:56 | 15 | A.   We had to get a law passed with the legislature in regular |
| 15:56 | 16 | session in 2001. |
| 15:56 | 17 | Q.   The law that was passed was Act 395? |
| 15:56 | 18 | A.   That's correct. |
| 15:56 | 19 | Q.   Was there anyone in particular who you considered |
| 15:56 | 20 | instrumental in the passage of Act 395? |
| 15:56 | 21 | A.   One person who was very instrumental was Dr. Vincent |
| 15:56 | 22 | Culotta.  He represented the Louisiana State Medical Society, |
| 15:56 | 23 | and they supported Act 395.  He helped to shape the legislation |
| 15:57 | 24 | in concert with myself, other DHH staff, and several other |
| 15:57 | 25 | legislators. |

372

| | | |
|---|---|---|
| 15:57 | 1 | **Q.**   Can you characterize the Louisiana Medical Society's |
| 15:57 | 2 | importance to passage of that legislation. |
| 15:57 | 3 | **A.**   Sure.  They represent physicians.  I guess it's the |
| 15:57 | 4 | largest physician organization in the state.  Certainly, they |
| 15:57 | 5 | have a lot of influence when it comes to legislative matters |
| 15:57 | 6 | that would affect physicians. |
| 15:57 | 7 | **Q.**   Was there any group in particular that opposed the passage |
| 15:57 | 8 | of Act 395? |
| 15:57 | 9 | **A.**   Generally, the pharmaceutical industry. |
| 15:58 | 10 | **Q.**   After the passage of Act 395, did LDHH have the authority |
| 15:58 | 11 | to create a P&T; that is, a pharmaceutic and therapeutic review |
| 15:58 | 12 | committee? |
| 15:58 | 13 | **A.**   Yes. |
| 15:58 | 14 | **Q.**   Did LDHH do so? |
| 15:58 | 15 | **A.**   Yes, we did. |
| 15:58 | 16 | **Q.**   How long after the passage of Act 395 was the P&T |
| 15:58 | 17 | committee constituted? |
| 15:58 | 18 | **A.**   Within 60 days or so. |
| 15:58 | 19 | **Q.**   Who was the first chair of the P&T committee? |
| 15:58 | 20 | **A.**   That would be Dr. Vincent Culotta. |
| 15:58 | 21 | **Q.**   Prior to the establishment of the P&T committee, was there |
| 15:58 | 22 | anyone at LDHH who reviewed safety and efficacy information |
| 15:58 | 23 | with respect to drugs reimbursed by LDHH? |
| 15:58 | 24 | **A.**   Yes, there were others.  The University of Louisiana at |
| 15:58 | 25 | Monroe, for example, was involved in that.  The staff of the |

DAILY COPY

| | | |
|---|---|---|
| 15:59 | 1 | DHH Medicaid program would have been involved in that as well. |
| 15:59 | 2 | THE COURT:  Before we get too far along, why don't |
| 15:59 | 3 | you flesh out a little bit as to what 395 did.  What are we |
| 15:59 | 4 | dealing with? |
| 15:59 | 5 | MR. MURRAY:  I'll be getting there, Your Honor. |
| 15:59 | 6 | BY MR. MURRAY: |
| 15:59 | 7 | Q.   Again, prior to the establishment of the P&T committee, |
| 15:59 | 8 | would you expect that the individuals that you just identified |
| 15:59 | 9 | would bring important matters of safety and efficacy to your |
| 15:59 | 10 | attention regarding drugs that were being reimbursed by LDHH? |
| 15:59 | 11 | A.   Yes. |
| 15:59 | 12 | Q.   Turning to Act 395, the Court has asked you what Act 395 |
| 16:00 | 13 | did.  What I would like to ask you is:  What did LDHH do in |
| 16:00 | 14 | response to the passage of Act 395? |
| 16:00 | 15 | A.   The first thing that we did was to structure the |
| 16:00 | 16 | committee.  The legislation called for a total of 21 members, |
| 16:00 | 17 | as I recall, and most of them were physicians or pharmacists or |
| 16:00 | 18 | pharmacologists.  I think there were legislators on the |
| 16:00 | 19 | committee as well.  So we appointed or had appointed people to |
| 16:00 | 20 | the appropriate positions to represent various bodies, such as |
| 16:00 | 21 | the Medical Society or the pediatricians, etc., and we had that |
| 16:00 | 22 | in place by August. |
| 16:00 | 23 | Q.   What was that P&T committee to do? |
| 16:01 | 24 | A.   The mission of the P&T committee was to review drugs for |
| 16:01 | 25 | either placement on what's called the preferred drug list or |

| 16:01 | 1 | not; and they were to review not only the safety and efficacy |
| 16:01 | 2 | but also the cost-effectiveness of those drugs. |
| 16:01 | 3 | **Q.**   Were there any other responsibilities with which that P&T |
| 16:01 | 4 | committee was charged? |
| 16:01 | 5 | **A.**   There was another responsibility to -- they had the |
| 16:01 | 6 | authority to apprise the secretary and make recommendations as |
| 16:01 | 7 | it pertained to the -- I think it's referred to as the prudent |
| 16:01 | 8 | administration of the Medicaid drug program. |
| 16:01 | 9 | **Q.**   Was that an authority granted to them by Act 395? |
| 16:02 | 10 | **A.**   Yes. |
| 16:02 | 11 | **Q.**   Do you recall during your deposition Mr. Ismail asking you |
| 16:02 | 12 | about that component of the P&T committee's authority? |
| 16:02 | 13 | **A.**   Yes. |
| 16:02 | 14 | **Q.**   Since your deposition, have you reviewed Act 395 to |
| 16:02 | 15 | confirm your understanding as to the scope of that authority? |
| 16:02 | 16 | **A.**   Yes. |
| 16:02 | 17 | **Q.**   What did you find in that review? |
| 16:02 | 18 | **A.**   Well, it's pretty much what I just said.  It grants that |
| 16:02 | 19 | authority to the P&T committee.  If they wanted to make any |
| 16:02 | 20 | broad recommendations about the Medicaid drug program, they |
| 16:02 | 21 | could do so. |
| 16:02 | 22 | **Q.**   To your understanding, was the scope of Act 395 limited to |
| 16:02 | 23 | the creation of a prior authorization process? |
| 16:03 | 24 | **A.**   Well, it envisioned a prior authorization process for |
| 16:03 | 25 | those drugs that were not placed on the preferred drug list, |

| | | |
|---|---|---|
| 16:03 | 1 | yes. |
| 16:03 | 2 | **Q.**   But do you know if that was the full scope of the |
| 16:03 | 3 | authority granted by 395 to Louisiana Department of Health and |
| 16:03 | 4 | Hospitals? |
| 16:03 | 5 | **A.**   Well, I think, you know, the scope of authority and |
| 16:03 | 6 | responsibility was greater than just the creation of the P&T |
| 16:03 | 7 | committee and the preferred drug list.  I think there was broad |
| 16:03 | 8 | latitude in terms of what the department could do and had to |
| 16:03 | 9 | do. |
| 16:03 | 10 | **Q.**   But do I understand correctly that in -- I'm sorry.  After |
| 16:04 | 11 | the passage of 395, Louisiana Department of Health and |
| 16:04 | 12 | Hospitals at that time only implemented the prior authorization |
| 16:04 | 13 | procedure in connection with P&T committee? |
| 16:04 | 14 | **A.**   That's correct. |
| 16:04 | 15 | **Q.**   In reviewing drugs for purposes of that prior |
| 16:04 | 16 | authorization review -- actually, can you briefly tell the |
| 16:04 | 17 | Court what was entailed in the prior authorization review |
| 16:04 | 18 | conducted by the P&T committee.  What was the P&T committee's |
| 16:04 | 19 | role with respect to that prior authorization process? |
| 16:04 | 20 | **A.**   Well, the P&T committee essentially would make a decision |
| 16:04 | 21 | based on evidence presented to them in terms of which drugs |
| 16:04 | 22 | would be placed on the so-called preferred drug list.  By |
| 16:05 | 23 | virtue of doing that, drugs that were not placed on that list |
| 16:05 | 24 | would require a prior authorization that a physician would have |
| 16:05 | 25 | to get. |

| | | |
|---|---|---|
| 16:05 | 1 | **MR. MURRAY:**  Approach the witness, Your Honor? |
| 16:05 | 2 | **THE COURT:**  Yes. |
| 16:05 | 3 | **MR. MURRAY:**  Approach, Your Honor? |
| 16:05 | 4 | **THE COURT:**  Thanks. |
| 16:05 | 5 | BY MR. MURRAY: |
| 16:05 | 6 | **Q.**   Mr. Hood, did you communicate to the members of the P&T |
| 16:05 | 7 | committee that that would be their role in connection with the |
| 16:05 | 8 | PDL list? |
| 16:05 | 9 | **A.**   Yes. |
| 16:05 | 10 | **Q.**   Did you communicate that to them at their first meeting? |
| 16:05 | 11 | **A.**   I did. |
| 16:05 | 12 | **Q.**   I've handed you an exhibit that is marked as LAAG-433 and |
| 16:06 | 13 | ask you if you recognize that exhibit. |
| 16:06 | 14 | **A.**   Yes, I do. |
| 16:06 | 15 | **Q.**   Can you identify it for the Court, please. |
| 16:06 | 16 | **A.**   It's the Medicaid pharmaceutical and therapeutic committee |
| 16:06 | 17 | meeting minutes from August 8, 2001. |
| 16:06 | 18 | **Q.**   Did you attend that meeting? |
| 16:06 | 19 | **A.**   Yes, I did. |
| 16:06 | 20 | **Q.**   I'd like to turn you to the second page of those minutes |
| 16:06 | 21 | and ask you to read the first two full sentences for me, |
| 16:06 | 22 | please. |
| 16:06 | 23 | **A.**   It says:  "Secretary David Hood opened the meeting by |
| 16:06 | 24 | introducing the DHH staff present.  He gave a brief synopsis of |
| 16:06 | 25 | legislation that has become Act 395, which requires the |

DAILY COPY

16:06    1    committee to determine the effectiveness of drugs based on
16:06    2    medical evidence and to determine the cost-effectiveness of
16:06    3    drugs not based solely on their cost but also on the cost of
16:06    4    avoiding illness or hospitalizations."
16:07    5    Q.    Is what you just read consistent with what you recall
16:07    6    advising the members of the P&T committee as to what their
16:07    7    charge was?
16:07    8    A.    Yes.
16:07    9    Q.    Was that consistent with what you recall the activity the
16:07   10    P&T committee engaged in, in terms of reviewing prescription
16:07   11    drugs, throughout your tenure as secretary of LDHH?
16:07   12    A.    Yes.
16:07   13          MR. MURRAY:  Your Honor, at this point in time, I'd
16:07   14    like to offer, file, and introduce LAAG-433.
16:07   15          THE COURT:  It's the minutes?  I'll admit it.
16:07   16          MR. MURRAY:  That's correct, Your Honor.
16:07   17          THE COURT:  Yes.
16:07   18    BY MR. MURRAY:
16:07   19    Q.    I ask you, Secretary Hood, did you regularly attend P&T
16:07   20    committee meetings?
16:07   21    A.    Yes, I did.
16:07   22    Q.    Through attending those meetings, did you come to develop
16:07   23    an understanding as to what the primary concern was of the P&T
16:08   24    committee in reviewing prescription drugs?
16:08   25    A.    Yes.

16:08    1   **Q.**   What was their primary concern?

16:08    2   **A.**   Well, I think their primary concern was health and safety

16:08    3   of the drugs or the efficacy.  Their secondary concern was the

16:08    4   cost or the cost-effectiveness.

16:08    5   **Q.**   Based on your attending those meetings, do you know

16:08    6   whether the P&T committee took its charge seriously?

16:08    7   **A.**   Yes.  They took that very seriously.

16:08    8   **Q.**   Did you rely on the P&T committee for recommendations?

16:08    9   **A.**   I did.  They were the experts.

16:08   10   **Q.**   Who had ultimate authority to determine whether to

16:08   11   implement P&T committee recommendations?

16:08   12   **A.**   According to Act 395, the secretary of the department had

16:08   13   that authority.

16:08   14   **Q.**   Again, through the end of your tenure in 2004, that was

16:08   15   you?

16:08   16   **A.**   That's correct.

16:09   17   **Q.**   At some point in the formulation of the P&T committee and

16:09   18   PDL process -- by the way, do you understand what I mean when I

16:09   19   refer to the term *PDL*?

16:09   20   **A.**   Preferred drug list.

16:09   21   **Q.**   What is the preferred drug list?

16:09   22   **A.**   The preferred drug list would be similar to a *formulary*,

16:09   23   which is another term for a very similar device that would

16:09   24   allow the state to decide which drugs met the criteria in terms

16:09   25   of cost-effectiveness and also safety and efficacy.  Those

| | | |
|---|---|---|
| 16:09 | 1 | would be on the list. |
| 16:09 | 2 | **Q.**   As that term was employed -- I'm sorry.  As implemented |
| 16:09 | 3 | during your tenure as secretary, that preferred drug list would |
| 16:10 | 4 | have related to the prior authorization process; is that |
| 16:10 | 5 | correct? |
| 16:10 | 6 | **A.**   That's correct. |
| 16:10 | 7 | **Q.**   So drugs that were on it did not require prior |
| 16:10 | 8 | authorization; correct? |
| 16:10 | 9 | **A.**   Correct.  And those that were not on it would require a |
| 16:10 | 10 | prior authorization. |
| 16:10 | 11 | **THE COURT:**  From whom? |
| 16:10 | 12 | **THE WITNESS:**  Well, it was a prior authorization from |
| 16:10 | 13 | the department, Your Honor, but the department contracted with |
| 16:10 | 14 | the University of Louisiana at Monroe, where the School of |
| 16:10 | 15 | Pharmacy was located, and they actually implemented the |
| 16:10 | 16 | procedure to prior authorize drugs. |
| 16:10 | 17 | **BY MR. MURRAY:** |
| 16:10 | 18 | **Q.**   During your tenure as secretary, when the prior |
| 16:10 | 19 | authorization program was in place, was there a policy with |
| 16:10 | 20 | respect to how LDHH would respond to prior authorization |
| 16:10 | 21 | requests from doctors? |
| 16:10 | 22 | **A.**   Well, I think at the outset, because this was new to |
| 16:11 | 23 | everybody in Louisiana, we were going to make a judgment over |
| 16:11 | 24 | time as to how well the PDL was working in terms of the types |
| 16:11 | 25 | of drugs and the usage and so forth, how many prior |

DAILY COPY

16:11   1   authorizations were done.

16:11   2              So basically our approach was that we would not have

16:11   3   a very strict prior authorization program.  As time went by, if

16:11   4   it was determined that that was necessary, then we would ramp

16:11   5   up the strictness of the procedure.  But at the outset, it was

16:11   6   not a particularly strict procedure.

16:11   7   **Q.**   Getting back to the line of questions I was beginning to

16:11   8   get on before I took you on that aside -- I apologize -- what

16:11   9   role did Provider Synergies play in connection with that PDL

16:11   10  process?

16:12   11  **A.**   Provider Synergies was a contractor, and their job was to

16:12   12  do the necessary research, gather the data, and present it to

16:12   13  the P&T committee, the pharmaceutical and therapeutics

16:12   14  committee, along with a recommendation to place the drug on the

16:12   15  PDL or not to.  So that was their general mission.

16:12   16  **Q.**   Was the P&T committee required to follow Provider

16:12   17  Synergies' recommendations?

16:12   18  **A.**   No.

16:12   19  **Q.**   In your experience, did the P&T committee scrutinize

16:12   20  Provider Synergies' recommendations in their meetings?

16:12   21  **A.**   Yes.  Yes, very much so.

16:12   22  **Q.**   Were you required to follow Provider Synergies'

16:12   23  recommendations?

16:12   24  **A.**   No.

16:12   25  **Q.**   Again, who had the ultimate authority with respect to

| | | |
|---|---|---|
| 16:13 | 1 | whether to follow a recommendation of Provider Synergies? |
| 16:13 | 2 | **A.**   The secretary of DHH.  I did. |
| 16:13 | 3 | **Q.**   Do you know whether, when you were secretary of LDHH -- |
| 16:13 | 4 | and I'd like to focus on the time frame from 1999 to 2004.  I'm |
| 16:13 | 5 | sorry.  Actually, I'd like to focus on the time frame from the |
| 16:13 | 6 | passage of Act 395 to 2004, rather, which would be June 2001. |
| 16:13 | 7 | Do you know whether LDHH had the authority to refuse |
| 16:13 | 8 | reimbursement prescriptions for a drug? |
| 16:13 | 9 | **A.**   Yes.  I think that's clear. |
| 16:13 | 10 | **Q.**   If you had wanted to exclude -- did you ever exercise that |
| 16:13 | 11 | authority? |
| 16:13 | 12 | **A.**   To exclude, no. |
| 16:13 | 13 | **Q.**   If you had determined it was appropriate to do so, is |
| 16:13 | 14 | there anyone that you would have consulted with respect to that |
| 16:13 | 15 | matter? |
| 16:13 | 16 | **A.**   Well, I think if an occasion had arisen where we wanted to |
| 16:14 | 17 | exclude a drug, I would, number one, consult with our legal |
| 16:14 | 18 | section and perhaps with other attorneys, the attorney |
| 16:14 | 19 | general's office, and so on, to make sure that, you know, |
| 16:14 | 20 | whatever we did was the correct thing to do. |
| 16:14 | 21 | **Q.**   Is there anyone else with whom you may have consulted |
| 16:14 | 22 | under that scenario? |
| 16:14 | 23 | **A.**   Well, I think in a case like that, I would certainly bring |
| 16:14 | 24 | the issue to the P&T committee because they had broader |
| 16:14 | 25 | responsibility in this area and would certainly want their |

| | | |
|---|---|---|
| 16:14 | 1 | opinion and want to keep them informed.  Perhaps also to |
| 16:14 | 2 | legislators, key legislators with the appropriate committees, |
| 16:15 | 3 | such as the house and senate health and welfare committee.  I |
| 16:15 | 4 | think they would deserve being fully informed about what we |
| 16:15 | 5 | might be doing. |
| 16:15 | 6 | **Q.**   Would you be bringing the matter to the legislators for |
| 16:15 | 7 | purposes of changing the law? |
| 16:15 | 8 | **A.**   Well, no.  I don't think that would have been necessary. |
| 16:15 | 9 | **Q.**   Upon what do you base your understanding that -- I'm |
| 16:15 | 10 | sorry.  Let me back up. |
| 16:15 | 11 | Do you believe that had you been faced with a known |
| 16:15 | 12 | safety issue concerning a drug, such that its risk outweighed |
| 16:15 | 13 | its benefits, you would have been able to deny coverage for it? |
| 16:15 | 14 | **A.**   Yes, I think we would have, and we certainly would have |
| 16:15 | 15 | wanted to if it was a defective drug. |
| 16:15 | 16 | **Q.**   Upon what do you base that belief? |
| 16:15 | 17 | **A.**   Well, you know, one of my responsibilities, of course, was |
| 16:15 | 18 | to protect the health and safety of the Medicaid population. |
| 16:16 | 19 | If there was a drug where the risks were such that it |
| 16:16 | 20 | outweighed the benefits and posed a threat to health, then |
| 16:16 | 21 | certainly we would want to do everything that we possibly |
| 16:16 | 22 | could. |
| 16:16 | 23 | **Q.**   Are you familiar with the class of drugs known as NSAIDs; |
| 16:16 | 24 | that is, nonsteroidal anti-inflammatory drugs, which includes |
| 16:16 | 25 | such drugs as naproxen and ibuprofen? |

| | | |
|---|---|---|
| 16:16 | 1 | A.    Yes.  In a general, layman's sort of way, yes. |
| 16:16 | 2 | Q.    Are you familiar with the class of drugs within the NSAID |
| 16:16 | 3 | class known as COX-2s? |
| 16:16 | 4 | A.    Yes. |
| 16:16 | 5 | Q.    Are you familiar with the prescription drug Vioxx? |
| 16:16 | 6 | A.    Yes. |
| 16:16 | 7 | Q.    Did you have an understanding that Vioxx was a COX-2 drug? |
| 16:16 | 8 | A.    Yes, I think so. |
| 16:16 | 9 | Q.    Do you recall seeing television ads for Vioxx when it was |
| 16:16 | 10 | on the market? |
| 16:16 | 11 | A.    From time to time. |
| 16:16 | 12 | MR. ISMAIL:  Objection, Your Honor. |
| 16:17 | 13 | THE COURT:  What does that mean? |
| 16:17 | 14 | MR. MURRAY:  What's the objection? |
| 16:17 | 15 | MR. ISMAIL:  The objection is the relevance of going |
| 16:17 | 16 | into the direct-to-consumer advertising. |
| 16:17 | 17 | MR. MURRAY:  It's direct to the secretary of LDHH, |
| 16:17 | 18 | Your Honor. |
| 16:17 | 19 | THE COURT:  I'll allow it.  Let's go. |
| 16:17 | 20 | BY MR. MURRAY: |
| 16:17 | 21 | Q.    Do you recall seeing advertisements at that time? |
| 16:17 | 22 | A.    From time to time, yes. |
| 16:17 | 23 | Q.    Did those ads leave you with any impression regarding |
| 16:17 | 24 | Vioxx? |
| 16:17 | 25 | A.    Just the impression that it was a safe and effective drug |

DAILY COPY

| | | |
|---|---|---|
| 16:17 | 1 | for many people. |
| 16:17 | 2 | **Q.**   When you were secretary of LDHH while Vioxx was on the |
| 16:17 | 3 | market, did you have any understanding as to the safety profile |
| 16:17 | 4 | of Vioxx? |
| 16:17 | 5 | **A.**   No.  I assumed that it was a safe drug. |
| 16:17 | 6 | **Q.**   On what did you base that assumption? |
| 16:17 | 7 | **A.**   Because we hadn't heard anything to the contrary.  There |
| 16:17 | 8 | was no -- nothing was presented to me that indicated that it |
| 16:18 | 9 | was not a safe drug. |
| 16:18 | 10 | **Q.**   Did the P&T committee review Vioxx? |
| 16:18 | 11 | **A.**   Yes. |
| 16:18 | 12 | **Q.**   Did the P&T committee at one point in time decide to put |
| 16:18 | 13 | Vioxx on the preferred drug list? |
| 16:18 | 14 | **A.**   They did. |
| 16:18 | 15 | **Q.**   Were you aware that Merck's sales force had targeted |
| 16:18 | 16 | members regarding Vioxx? |
| 16:18 | 17 |          **MR. ISMAIL:**  Objection:  Lack of foundation. |
| 16:18 | 18 |          **THE COURT:**  I sustain that objection.  You have to |
| 16:18 | 19 | approach it in a different way.  It's too conclusory. |
| 16:18 | 20 |          **MR. MURRAY:**  I'm not sure how else to approach it. |
| 16:18 | 21 |          **THE COURT:**  Did they give any information to the P&T |
| 16:18 | 22 | committee?  Did they talk to the P&T committee?  Did they |
| 16:18 | 23 | advertise?  You're loading the question. |
| 16:18 | 24 | **BY MR. MURRAY:** |
| 16:18 | 25 | **Q.**   Actually, my question is:  Were you aware of any contact |

16:19   1   between Merck's sales representatives and the members of the

16:19   2   P&T committee?

16:19   3   A.   I understood that that was routine; not just for Merck but

16:19   4   for other companies as well.

16:19   5         MR. ISMAIL:  Could we get a foundation, Your Honor?

16:19   6   If it's a hearsay statement that he's heard from somebody

16:19   7   else --

16:19   8         THE COURT:  Yes.

16:19   9         MR. MURRAY:  I'm asking about his understanding

16:19   10  through his -- what his understanding was when he was secretary

16:19   11  at LDHH, Your Honor.  I'm not offering it for the truth of the

16:19   12  matter asserted.  I'm asking for what his understanding was.

16:19   13        THE COURT:  Well, the only thing, if he got the

16:19   14  understanding from hearing somebody talking by the water cooler

16:19   15  or something, that's a problem.  Can't we move on?  He's said

16:19   16  what he said.

16:19   17        MR. MURRAY:  I think we can, Your Honor.  I think

16:20   18  there's ample evidence of that issue in the record.

16:20   19        THE COURT:  Let's not make any comment, Counsel.  I

16:20   20  strike that.  Just ask the witness questions.  Let's not

16:20   21  testify.

16:20   22  BY MR. MURRAY:

16:20   23  Q.   When you were secretary of LDHH, were you ever made aware

16:20   24  that Vioxx significantly increased heart attacks compared to

16:20   25  placebo or other NSAID comparators?

| | | |
|---|---|---|
| 16:20 | 1 | **A.**   No. |
| 16:20 | 2 | **Q.**   Is that information that would have been important to you |
| 16:20 | 3 | as secretary, responsible for Louisiana's Medicaid pharmacy |
| 16:20 | 4 | benefit program? |
| 16:20 | 5 | **A.**   Yes. |
| 16:20 | 6 | **Q.**   When you were secretary of LDHH, were you ever made aware |
| 16:20 | 7 | that Vioxx was difficult if not impossible to differentiate |
| 16:20 | 8 | from traditional NSAIDs in terms of clinically important upper |
| 16:20 | 9 | GI events? |
| 16:20 | 10 | **A.**   No. |
| 16:20 | 11 | **Q.**   Is that information that would have been important to you |
| 16:20 | 12 | as secretary, responsible for Louisiana's Medicaid pharmacy |
| 16:20 | 13 | benefit program? |
| 16:20 | 14 | **A.**   Yes. |
| 16:20 | 15 | **Q.**   When you were secretary of LDHH, were you ever made aware |
| 16:20 | 16 | that Vioxx suffered from a defect which rendered it unfit for |
| 16:21 | 17 | its intended use; specifically, risk of cardiovascular effects |
| 16:21 | 18 | that outweighed any GI benefit over traditional, less expensive |
| 16:21 | 19 | NSAIDs in a drug that was proven to be no more effective than |
| 16:21 | 20 | traditional NSAIDs in terms of pain relief? |
| 16:21 | 21 | **A.**   No. |
| 16:21 | 22 | **Q.**   Is that information that would have been important to you |
| 16:21 | 23 | as secretary, responsible for Louisiana's Medicaid pharmacy |
| 16:21 | 24 | benefit program? |
| 16:21 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 16:21 | 1 | **Q.**   If such a defect had been disclosed to you, would you, as |
| 16:21 | 2 | secretary of LDHH, been willing to reimburse prescriptions for |
| 16:21 | 3 | Vioxx? |
| 16:21 | 4 | **A.**   No. |
| 16:21 | 5 | **Q.**   Do you believe that if such a defect existed with respect |
| 16:21 | 6 | to Vioxx, you would have been able to refuse to pay for Vioxx? |
| 16:21 | 7 | **A.**   I do believe that we could do that, yes. |
| 16:21 | 8 | **Q.**   Secretary Hood, in the entire time that you were |
| 16:21 | 9 | secretary, had you ever proposed adopting a restrictive |
| 16:21 | 10 | formulary to exclude a defective drug? |
| 16:21 | 11 | **A.**   No.  It never arose like that. |
| 16:22 | 12 | **Q.**   Then how can you say that you would have done so with |
| 16:22 | 13 | respect to Vioxx? |
| 16:22 | 14 | **A.**   If there was a defective drug that was being used by |
| 16:22 | 15 | Medicaid recipients, then we certainly would not want to expose |
| 16:22 | 16 | them to that risk.  For that reason, we would do everything |
| 16:22 | 17 | that we possibly could to make sure that didn't happen. |
| 16:22 | 18 | **Q.**   Do you recall in your deposition Mr. Ismail asked you |
| 16:22 | 19 | about whether Louisiana had ever gone to a restrictive |
| 16:22 | 20 | formulary?  Do you recall that questioning during your |
| 16:22 | 21 | deposition? |
| 16:22 | 22 | **A.**   Yes. |
| 16:22 | 23 | **Q.**   Do you recall telling Mr. Ismail that Louisiana didn't |
| 16:22 | 24 | want to make such a move, didn't want to go to a restricted |
| 16:22 | 25 | formulary because it would have been unpalatable? |

DAILY COPY

16:22  1   **A.**   Yes.  That's what I said.

16:22  2   **Q.**   Do you have the same feeling about going to a restrictive

16:23  3   formulary for purposes to exclude a defective drug?

16:23  4   **A.**   No, not at all.  I think under those circumstances what

16:23  5   would be unpalatable would be to expose Medicaid recipients to

16:23  6   a drug where the risk outweighed the benefits.

16:23  7            **MR. MURRAY:**  Approach, Your Honor?

16:23  8            **THE COURT:**  Yes.

16:23  9   **BY MR. MURRAY:**

16:23  10  **Q.**   I have just handed you a document marked as LAAG-439.  Let

16:24  11  me ask you if you recognize that document.

16:24  12  **A.**   Yes.

16:24  13  **Q.**   Can you identify it for the Court.

16:24  14  **A.**   Well, I'm not sure I can pronounce it, but it's selective

16:24  15  cyclooxygenase COX-2 inhibitors.

16:24  16  **Q.**   Allow me to direct you to the lower right-hand corner of

16:24  17  the document, where it says "Provider Synergies."

16:24  18  **A.**   Yes.  This was produced by Provider Synergies.

16:24  19  **Q.**   Is that a document that Provider Synergies produced for

16:24  20  presentation to the P&T committee?

16:24  21  **A.**   Yes.  That was the purpose of this.

16:24  22  **Q.**   Did Provider Synergies produce such documents with respect

16:24  23  to all drugs subject to review by the P&T committee?

16:24  24  **A.**   Yes.

16:24  25  **Q.**   Have you ever heard those documents referred to as

16:24   1   monographs?

16:24   2   **A.**   Yes.

16:24   3   **Q.**   Do you recall Mr. Ismail asking you about this document at

16:25   4   your deposition?

16:25   5   **A.**   I do.

16:25   6   **Q.**   Do you recall whether you reviewed this document, this

16:25   7   February 2002 monograph, prior to the P&T committee meeting --

16:25   8   strike that.

16:25   9          Do you recall reviewing this document in connection

16:25  10   with the P&T committee meeting at which this monograph was

16:25  11   presented?

16:25  12   **A.**   I may have reviewed it.  I don't recall specifically this

16:25  13   document.

16:25  14   **Q.**   Were Provider Synergies' monographs documents that you

16:25  15   reviewed in connection with P&T committee meetings?

16:25  16   **A.**   Yes.  And I would try to review them whenever I could,

16:25  17   probably during the meetings.

16:25  18   **Q.**   Did anything about your review of any Provider Synergies

16:26  19   monograph change your general understanding about Vioxx?

16:26  20   **A.**   No, I don't believe so.  I don't recall that it did.

16:26  21   **Q.**   Were you ever made aware by Merck or anyone else that any

16:26  22   of the information in this document was incorrect?

16:26  23   **A.**   No.

16:26  24          **MR. MURRAY:**  Your Honor, at this point I would ask to

16:26  25   offer, file, and introduce LAAG-439, the February 2002

DAILY COPY

| | | |
|---|---|---|
| 16:26 | 1 | Provider Synergies monograph. |
| 16:26 | 2 | **THE COURT:**  I'll admit it. |
| 16:26 | 3 | **MR. MURRAY:**  Approach, Your Honor? |
| 16:26 | 4 | **THE COURT:**  Yes. |
| 16:26 | 5 | **MR. MURRAY:**  Thank you, Your Honor. |
| 16:27 | 6 | BY MR. MURRAY: |
| 16:27 | 7 | **Q.**   Secretary Hood, I've just handed you a document that is |
| 16:27 | 8 | marked as LAAG-426, and I'd like to ask you to take a look at |
| 16:27 | 9 | that document and tell the Court whether you recognize it. |
| 16:27 | 10 | **A.**   This is a monograph provided by Provider Synergies and |
| 16:27 | 11 | given to the P&T committee. |
| 16:27 | 12 | **Q.**   Do you see the date on that particular monograph? |
| 16:27 | 13 | **A.**   Yes.  April 2003. |
| 16:27 | 14 | **Q.**   Do you recall -- is this about the time that -- whether |
| 16:27 | 15 | this is around the time that the P&T committee recommended |
| 16:27 | 16 | Vioxx for inclusion on the PDL? |
| 16:27 | 17 | **A.**   Yes. |
| 16:27 | 18 | **Q.**   When you received that document in 2003, did it do |
| 16:28 | 19 | anything to change your general understanding about Vioxx? |
| 16:28 | 20 | **A.**   No, not that I'm aware of. |
| 16:28 | 21 | **Q.**   Were you ever made aware by Merck or anyone else that any |
| 16:28 | 22 | of the information in this document was incorrect? |
| 16:28 | 23 | **A.**   No. |
| 16:28 | 24 | **Q.**   I'd like to turn to page 6 of the document.  I'd like to |
| 16:28 | 25 | reference you to the portion of the document that begins on |

DAILY COPY

16:28  1    page 6 under the heading "Rofecoxib (Vioxx) and Ibuprofen."

16:28  2    A.   Yes.

16:28  3    Q.   Do you see at the bottom of that paragraph where it reads:

16:28  4    "Ulcer rates for rofecoxib were comparable to rates with

16:28  5    placebo?"

16:28  6    A.   Yes.

16:28  7    Q.   Do you ever recall receiving that particular information?

16:28  8    A.   No.  I'm sorry.  Repeat that.

16:29  9    Q.   I said:  Do you recall receiving that particular bit of

16:29  10   information?

16:29  11   A.   No.

16:29  12   Q.   Were you ever told that at the time that this report came

16:29  13   out, this Provider Synergies monograph dated April 2003, that

16:29  14   Merck sponsored -- the Merck-sponsored study that's referenced

16:29  15   there -- that Merck studies had shown a four-times greater risk

16:29  16   of serious GI events than placebo?

16:29  17   A.   No, I was not aware.

16:29  18   Q.   Were you ever told, in connection with this document or

16:29  19   otherwise, that doses of comparator NSAIDs used in the studies

16:29  20   referenced here were not used by 90 percent of NSAID patients?

16:30  21   A.   No, I was not aware of that.

16:30  22   Q.   Were you ever told that Merck knew that the rate of the

16:30  23   most serious -- were you ever told that Merck knew that the

16:30  24   rate of the most serious GI events in the osteoarthritis

16:30  25   studies that it conducted was actually higher on Vioxx than on

DAILY COPY

| | | |
|---|---|---|
| 16:30 | 1 | traditional NSAIDs such as ibuprofen? |
| 16:30 | 2 | **A.** No, I was not aware. |
| 16:30 | 3 | **Q.** Turning down to the next discussion that starts, "The |
| 16:30 | 4 | VIGOR study. . ." were you ever told that the VIGOR study only |
| 16:30 | 5 | showed a reduction in serious GI events in patients on |
| 16:30 | 6 | steroids, who comprise only a small percentage of Vioxx users? |
| 16:30 | 7 | **A.** I'm sorry.  What page are you on? |
| 16:30 | 8 | **Q.** I'm still on page 6.  There's a discussion about -- |
| 16:30 | 9 | **A.** At the bottom.  I see.  The VIGOR study. |
| 16:30 | 10 | **Q.** The VIGOR study.  Do you see there's a discussion about GI |
| 16:30 | 11 | events there? |
| 16:31 | 12 | **A.** Yes. |
| 16:31 | 13 | **Q.** I'm asking whether, when you received this document, you |
| 16:31 | 14 | were told that the VIGOR study only showed a reduction in |
| 16:31 | 15 | serious GI events for patients on steroids, who comprise only a |
| 16:31 | 16 | small percentage of Vioxx users? |
| 16:31 | 17 | **A.** No. |
| 16:31 | 18 | **Q.** Were you ever told that Merck was aware that Vioxx had the |
| 16:31 | 19 | potential to induce cardiovascular side effects and failed to |
| 16:31 | 20 | adequately investigate that question? |
| 16:31 | 21 | **A.** No, I was not aware of that. |
| 16:31 | 22 | **Q.** Turning to the next page, page 12 -- I'm sorry.  Page 10. |
| 16:31 | 23 | Do you see the section entitled "Cardiovascular Concerns"? |
| 16:32 | 24 | **A.** Yes. |
| 16:32 | 25 | **Q.** Were you ever told that any of the information contained |

| | | |
|---|---|---|
| 16:32 | 1 | in that section was inaccurate or misleading? |
| 16:32 | 2 | **A.**   Not to my knowledge. |
| 16:32 | 3 | **Q.**   Do you see where there's a reference to a Reicin study? |
| 16:32 | 4 | It says: |
| 16:32 | 5 | "Reicin and colleagues reviewed eight Phase IIb/III |
| 16:32 | 6 | osteoarthritis studies with rofecoxib for the rate of |
| 16:32 | 7 | cardiovascular thrombotic events." |
| 16:32 | 8 | Do you see that? |
| 16:32 | 9 | **A.**   Yes. |
| 16:32 | 10 | **Q.**   Were you ever told that this study referred to here only |
| 16:32 | 11 | addressed premarket osteoarthritis studies and that at the time |
| 16:32 | 12 | of this publication, Merck was in possession of postmarket |
| 16:32 | 13 | studies that showed a threefold increase in the risk of heart |
| 16:32 | 14 | attacks over placebo? |
| 16:32 | 15 | **A.**   No, not to my knowledge. |
| 16:32 | 16 | **Q.**   Were you ever told that studies conducted by Merck |
| 16:32 | 17 | excluded at-risk patients? |
| 16:32 | 18 | **A.**   No, not to my knowledge. |
| 16:32 | 19 | **Q.**   And Vioxx was going to be an at risk for cardiovascular |
| 16:32 | 20 | events? |
| 16:33 | 21 | **A.**   Yes.  I was not aware of that. |
| 16:33 | 22 | **Q.**   Were you told that the Merck premarket studies cited in |
| 16:33 | 23 | this article did not show a cardiovascular risk because they |
| 16:33 | 24 | lacked statistical power to demonstrate such a risk? |
| 16:33 | 25 | **A.**   Not to my knowledge. |

| | | |
|---|---|---|
| 16:33 | 1 | **Q.**   Were you told that Merck scientists had recommended a CV |
| 16:33 | 2 | outcomes study to investigate the risks and that Merck had not |
| 16:33 | 3 | done such a study? |
| 16:33 | 4 | **A.**   No, not aware of that. |
| 16:33 | 5 | **Q.**   I'd like to turn you to page 12, the "Conclusions" section |
| 16:33 | 6 | of this document.  Do you see the bottom of the page: |
| 16:33 | 7 | "Recommendations for the preferred drug list (PDL) are the |
| 16:33 | 8 | following"? |
| 16:33 | 9 | **A.**   Yes. |
| 16:33 | 10 | **Q.**   Do you see rofecoxib (Vioxx) on that list? |
| 16:33 | 11 | **A.**   I do. |
| 16:34 | 12 | **Q.**   What is the recommendation? |
| 16:34 | 13 | **A.**   To put it on the PDL list. |
| 16:34 | 14 | **Q.**   Did Provider Synergies' recommendation to put the drug on |
| 16:34 | 15 | the PDL list have any significance to you, as secretary, with |
| 16:34 | 16 | respect to the general safety and efficacy of the drug? |
| 16:34 | 17 | **A.**   If it was recommended by Provider Synergies, recommended |
| 16:34 | 18 | by the P&T committee, then it would be my understanding that it |
| 16:34 | 19 | was a safe drug. |
| 16:34 | 20 | **Q.**   Do you see in the "Conclusions" section -- and I'd like to |
| 16:34 | 21 | begin with the paragraph that begins, "The VIGOR study. . . ." |
| 16:34 | 22 |          Do you see where I'm reading? |
| 16:34 | 23 | **A.**   Yes. |
| 16:34 | 24 | **Q.**   It says, "The VIGOR study raised some questions regarding |
| 16:34 | 25 | the cardiovascular safety of rofecoxib (Vioxx)." |

DAILY COPY

| | | |
|---|---|---|
| 16:34 | 1 | Did that sentence change your understanding with |
| 16:34 | 2 | respect to the safety and efficacy of Vioxx? |
| 16:35 | 3 | **A.**   No.  You know, the overall conclusion was that it was a |
| 16:35 | 4 | safe drug, should be on the PDL. |
| 16:35 | 5 | **Q.**   Were you told that upon reviewing the VIGOR study |
| 16:35 | 6 | results -- I'm sorry, the results of the VIGOR study that are |
| 16:35 | 7 | cited here, the president of Merck Research Labs concluded that |
| 16:35 | 8 | "CV events are clearly there"? |
| 16:35 | 9 | **MR. ISMAIL:**  I think we've been very patient |
| 16:35 | 10 | throughout this whole litany, but it's getting well beyond the |
| 16:35 | 11 | witness' -- |
| 16:35 | 12 | **THE COURT:**  I agree. |
| 16:35 | 13 | **MR. MURRAY:**  The case is what was disclosed and what |
| 16:35 | 14 | was not disclosed to him, Your Honor.  I think we have to |
| 16:35 | 15 | establish what was not disclosed to him. |
| 16:35 | 16 | **THE COURT:**  But the fact that you're saying them |
| 16:35 | 17 | doesn't make them accurate.  You can say whatever you want to |
| 16:35 | 18 | say and then -- |
| 16:35 | 19 | **MR. MURRAY:**  Well, Your Honor, there are documents in |
| 16:35 | 20 | the record that will demonstrate the accuracy or inaccuracy of |
| 16:36 | 21 | that.  This witness is not here to testify to the inaccuracy or |
| 16:36 | 22 | accuracy.  He's here to testify to whether or not material that |
| 16:36 | 23 | was not disclosed to him was material.  I think the Court needs |
| 16:36 | 24 | to explore that and see whether that information is material, |
| 16:36 | 25 | especially since Merck is holding up this document to suggest |

| | | |
|---|---|---|
| 16:36 | 1 | that the state had some awareness that the drug suffered from a |
| 16:36 | 2 | defect. |
| 16:36 | 3 | MR. ISMAIL:  He can ask him if he saw internal |
| 16:36 | 4 | company e-mails from Merck or anyone else. |
| 16:36 | 5 | THE COURT:  The problem that I have, actually, is |
| 16:36 | 6 | that we just had a witness, so I don't know what -- we've only |
| 16:36 | 7 | had two witnesses so far in the case and other things are |
| 16:36 | 8 | coming in, so I'm just going to have to allow it.  I think |
| 16:36 | 9 | counsel is right.  Let's go on.  I overrule the objection. |
| 16:37 | 10 | MR. MURRAY:  Your Honor, I would refer you to the |
| 16:37 | 11 | deposition of Dr. Scolnick, which we introduced yesterday. |
| 16:37 | 12 | THE COURT:  Right. |
| 16:37 | 13 | MR. MURRAY:  May I ask the question again, |
| 16:37 | 14 | Your Honor? |
| 16:37 | 15 | THE COURT:  Yes. |
| 16:37 | 16 | BY MR. MURRAY: |
| 16:37 | 17 | Q.   Were you told that, upon reviewing the VIGOR CV results, |
| 16:37 | 18 | the president of Merck Research Labs, Merck's research arm, |
| 16:37 | 19 | concluded that "CV events are clearly there" and "real" and |
| 16:37 | 20 | that the effect was "mechanism-based, as we worried it was"? |
| 16:37 | 21 | A.   No, I was not aware of that. |
| 16:37 | 22 | Q.   Were you told that the VIGOR study showed a 27 percent |
| 16:37 | 23 | greater total hospitalization rate for patients on Vioxx than |
| 16:37 | 24 | on naproxen? |
| 16:37 | 25 | A.   No. |

| | | |
|---|---|---|
| 16:37 | 1 | **Q.**   Would you, as secretary of LDHH, have considered a |
| 16:38 | 2 | hospitalization rate greater for Vioxx than for naproxen to |
| 16:38 | 3 | have been significant? |
| 16:38 | 4 | **A.**   Yes. |
| 16:38 | 5 | **Q.**   Why is that? |
| 16:38 | 6 | **A.**   Well, for a number of reasons.  If the hospitalization |
| 16:38 | 7 | rate is greater, then you put Medicaid recipients at risk if |
| 16:38 | 8 | you're allowing that drug, and also it drives up the cost. |
| 16:38 | 9 | Hospitalization is very expensive. |
| 16:38 | 10 | **Q.**   Who pays for Medicaid hospitalizations, or |
| 16:38 | 11 | hospitalizations of Medicaid patients? |
| 16:38 | 12 | **A.**   The taxpayers. |
| 16:38 | 13 | **Q.**   Louisiana Medicaid? |
| 16:38 | 14 | **A.**   Louisiana Medicaid and all over the country as well. |
| 16:38 | 15 | **Q.**   Were you told that in the VIGOR study, the total number of |
| 16:38 | 16 | serious adverse events on Vioxx was 21 percent higher for Vioxx |
| 16:38 | 17 | users than for naproxen? |
| 16:38 | 18 | **A.**   No.  We were not aware. |
| 16:38 | 19 | **Q.**   Were you told that heart attack patients in the |
| 16:38 | 20 | nonaspirin-indicated group were removed from the VIGOR study |
| 16:39 | 21 | publication? |
| 16:39 | 22 | **A.**   No, not to my knowledge. |
| 16:39 | 23 | **Q.**   Were you told that VIGOR showed a risk of heart attack |
| 16:39 | 24 | even in patients who were not aspirin indicated? |
| 16:39 | 25 | **A.**   No. |

DAILY COPY

| | | |
|---|---|---|
| 16:39 | 1 | **Q.**   Secretary Hood, to wrap up, if you had been told the |
| 16:39 | 2 | matters to which you've testified you were not told with |
| 16:39 | 3 | respect to this monograph, would you, as secretary of LDHH, |
| 16:39 | 4 | have been willing to reimburse Vioxx prescriptions? |
| 16:39 | 5 | **A.**   No. |
| 16:39 | 6 | **MR. MURRAY:**  I tender the witness. |
| 16:39 | 7 | **THE DEPUTY CLERK:**  Mr. Murray, are you offering 426? |
| 16:39 | 8 | **MR. MURRAY:**  Thank you for the reminder. |
| 16:39 | 9 | Your Honor, at this point we would offer, file, |
| 16:39 | 10 | and introduce LAAG-426, which is the April 2003 Provider |
| 16:39 | 11 | Synergies monograph. |
| 16:39 | 12 | **THE COURT:**  Let it be admitted. |
| 16:39 | 13 | **CROSS-EXAMINATION** |
| 16:39 | 14 | BY MR. ISMAIL: |
| 16:41 | 15 | **Q.**   Good afternoon, almost evening, Mr. Hood.  Now, perhaps to |
| 16:41 | 16 | short-circuit some of this, this is the third time you and I |
| 16:41 | 17 | have had a chance to chat about your tenure as secretary of the |
| 16:42 | 18 | Department of Health and Hospitals; correct? |
| 16:42 | 19 | **A.**   Yes. |
| 16:42 | 20 | **Q.**   The most recent time was just last Tuesday; right? |
| 16:42 | 21 | **A.**   I think that's right. |
| 16:42 | 22 | **Q.**   Now, do you recall that between the two depositions that |
| 16:42 | 23 | you gave in this case, you submitted an affidavit? |
| 16:42 | 24 | **A.**   I do. |
| 16:42 | 25 | **Q.**   That was the subject of our deposition last week? |

16:42    1    **A.**    Yes.

16:42    2    **Q.**    Now, the litany of clinical studies and data and e-mails

16:42    3    and allegations that Mr. Murray just went over with you, that

16:42    4    essentially tracked almost verbatim the allegations in your

16:42    5    affidavit; right?

16:42    6    **A.**    I think so.

16:42    7    **Q.**    It's hard for you to remember because you actually didn't

16:42    8    write that affidavit, did you?

16:42    9    **A.**    No.

16:42    10   **Q.**    Plaintiff lawyers wrote it?

16:42    11   **A.**    Yes.

16:42    12   **Q.**    They wrote every word of it?

16:42    13   **A.**    Yes.

16:42    14   **Q.**    They e-mailed it to you, you read it a couple times, and

16:42    15   you signed it; right?

16:42    16   **A.**    I read it several times.

16:42    17   **Q.**    You read it several times, but you didn't change a word;

16:43    18   right?

16:43    19   **A.**    That's correct.

16:43    20   **Q.**    Now, when you signed the affidavit that the plaintiff

16:43    21   lawyers wrote for you, they didn't give you any documents for

16:43    22   you to read to sort of get up to speed on the allegations of

16:43    23   the affidavit; right?

16:43    24   **A.**    They offered that, and I did not take advantage of it.  It

16:43    25   seemed to me that the affidavit itself was correct and accurate

DAILY COPY

16:43  1    from my point of view.

16:43  2    Q.   You actually didn't have any personal knowledge of any of

16:43  3    the things that the plaintiff lawyers put in your affidavit

16:43  4    with respect to the clinical data regarding Vioxx; correct?

16:43  5    A.   No.  I'm not an expert on clinical data.

16:43  6    Q.   Even today, you don't have any information regarding the

16:43  7    accuracy of that information that was contained in your

16:43  8    affidavit or that you went over with Mr. Murray; right?

16:43  9         MR. MURRAY:  Referring to clinical information?

16:44  10         MR. ISMAIL:  Sure.

16:44  11   BY MR. ISMAIL:

16:44  12   Q.   The clinical information.

16:44  13   A.   Right.  As explained during the last deposition, I'm not

16:44  14   an expert on those matters, and I don't know whether they, in

16:44  15   and of themselves, are accurate or not.

16:44  16   Q.   You're not a doctor, are you?

16:44  17   A.   No, I'm not.

16:44  18   Q.   In fact, when you were just saying yes to Mr. Murray just

16:44  19   now that you weren't aware of certain facts as secretary, you

16:44  20   really didn't understand all of what he was saying regarding

16:44  21   the disease states and the various endpoints that was

16:44  22   describing; correct?

16:44  23   A.   Correct.  What I do know was that this information was not

16:44  24   made available to us.

16:44  25   Q.   We're going to go over that and as to what role you played

DAILY COPY

| | | |
|---|---|---|
| 16:44 | 1 | as opposed to what role other folks played in the entire |
| 16:44 | 2 | Louisiana Medicaid system.  But just so we're clear, the last |
| 16:44 | 3 | half hour that we just heard about OA and upper |
| 16:44 | 4 | gastrointestinal events and aspirin-indicated subgroups, that |
| 16:45 | 5 | doesn't mean anything to you today, nor would it have been back |
| 16:45 | 6 | when you were secretary; right? |
| 16:45 | 7 | **A.**   I wouldn't say it doesn't mean anything to me, but I'm not |
| 16:45 | 8 | an expert on those matters, so I can't -- as I just said, I |
| 16:45 | 9 | can't verify whether they're accurate or not. |
| 16:45 | 10 | **Q.**   The open formulary period that you just described with |
| 16:45 | 11 | Mr. Murray, that was the period when you began as secretary in |
| 16:45 | 12 | 1998 up to when that open formulary period ended in 2002; |
| 16:45 | 13 | correct? |
| 16:45 | 14 | **A.**   2001. |
| 16:45 | 15 | **Q.**   The statute was passed in 2001, but there was an open |
| 16:45 | 16 | formulary until the PDL was adopted in 2002; correct? |
| 16:45 | 17 | **A.**   Yes, that's correct. |
| 16:45 | 18 | **Q.**   From 1998 to 2001, all the manufacturer needed to do to |
| 16:46 | 19 | get one of its drugs covered by the Louisiana Medicaid program |
| 16:46 | 20 | was to obtain FDA approval; true? |
| 16:46 | 21 | **A.**   True. |
| 16:46 | 22 | **Q.**   So for Vioxx, assuming it was approved in 1999 by the FDA, |
| 16:46 | 23 | right up until the implementation of the PDL in 2002, Vioxx was |
| 16:46 | 24 | automatically reimbursed within Medicaid; right? |
| 16:46 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 16:46 | 1 | **Q.**   You mentioned that in 2001 the legislation was changed, |
| 16:46 | 2 | and I think you mentioned it was Act 395. |
| 16:46 | 3 | **A.**   Yes. |
| 16:46 | 4 | **Q.**   That is the act that allowed the department to create the |
| 16:46 | 5 | preferred drug list system? |
| 16:46 | 6 | **A.**   Correct. |
| 16:46 | 7 | **Q.**   At the time the legislation was pending, your feeling was |
| 16:46 | 8 | that a preferred drug list was the best solution for Louisiana; |
| 16:47 | 9 | true? |
| 16:47 | 10 | **A.**   Yes, within the context of what was palatable, as we |
| 16:47 | 11 | talked about a moment ago. |
| 16:47 | 12 | **Q.**   I think you told Mr. Murray that prior to the |
| 16:47 | 13 | implementation of Act 395, the state always had an open |
| 16:47 | 14 | formulary.  Do you recall saying that a little bit ago? |
| 16:47 | 15 | **A.**   No. |
| 16:47 | 16 | **Q.**   That's not entirely accurate; correct? |
| 16:47 | 17 | **A.**   I didn't say that. |
| 16:47 | 18 | **Q.**   Well, then let's clarify it.  The state, in the 1980s, had |
| 16:47 | 19 | a closed formulary period for a while; correct? |
| 16:47 | 20 | **A.**   There was a formulary.  Whether it was closed or not, I |
| 16:47 | 21 | don't recall. |
| 16:47 | 22 | **Q.**   Do you recall that that experience didn't go very well? |
| 16:47 | 23 | **A.**   Yes. |
| 16:47 | 24 | **Q.**   There was a great deal of opposition from physicians? |
| 16:47 | 25 | **A.**   Partly. |

| | | |
|---|---|---|
| 16:47 | 1 | **Q.**   There was some opposition from pharmacists? |
| 16:47 | 2 | **A.**   Partly. |
| 16:48 | 3 | **Q.**   There was opposition to the closed formulary by patient |
| 16:48 | 4 | advocates who were concerned that the state was restricting |
| 16:48 | 5 | Medicaid recipients access to drugs? |
| 16:48 | 6 | **A.**   I think that's all true, and I guess you're going to ask |
| 16:48 | 7 | me if there was opposition from the industry, the |
| 16:48 | 8 | pharmaceutical industry. |
| 16:48 | 9 | **Q.**   Sure.  There was lots of people opposed to that system; |
| 16:48 | 10 | right? |
| 16:48 | 11 | **A.**   Lots. |
| 16:48 | 12 | **Q.**   Not just pharmaceutical manufacturers but, as we |
| 16:48 | 13 | described, doctors in this state, pharmacists in this state, |
| 16:48 | 14 | and patient advocates in this state; right? |
| 16:48 | 15 | **A.**   Yes. |
| 16:48 | 16 | **Q.**   Now, one of the things that you did -- I think you told |
| 16:48 | 17 | Mr. Murray you were involved in the implementation of the act? |
| 16:48 | 18 | **A.**   Yes. |
| 16:48 | 19 | **Q.**   Let me back up.  You actually were involved in helping the |
| 16:48 | 20 | department advocate in favor of Act 395; correct? |
| 16:48 | 21 | **A.**   Correct. |
| 16:48 | 22 | **Q.**   So one of the things you did was -- what was the committee |
| 16:49 | 23 | you mentioned, the joint committee on health and welfare? |
| 16:49 | 24 | **A.**   Well, they don't meet as a joint committee for purposes of |
| 16:49 | 25 | passing legislation. |

DAILY COPY

16:49  1    **Q.**   Sometimes they meet as a joint committee when they have a,
16:49  2    say, secretary of the Department of Health and Hospitals appear
16:49  3    to describe a Medicaid program?
16:49  4    **A.**   Possibly, yes.
16:49  5    **Q.**   Not just possibly.  That, in fact, happened around
16:49  6    Act 395; correct?
16:49  7    **A.**   All right.  I don't recall, but I'm sure you're right
16:49  8    about that.
16:49  9    **Q.**   In fact, you appeared on behalf of the department, along
16:49  10   with some of your colleagues, to appear before a joint
16:49  11   committee of both the senate and the house here in this state
16:49  12   regarding the passage of Act 395; correct?
16:49  13   **A.**   Yes.
16:49  14   **Q.**   Do you recall testifying at committees?  Let's start with
16:50  15   that.
16:50  16   **A.**   I don't recollect right offhand that particular meeting,
16:50  17   but I have no reason to doubt it.
16:50  18   **Q.**   Well, do you recall that there was concern by legislators
16:50  19   who were considering Act 395 that the state not return back to
16:50  20   the closed formulary system that occurred in the 1980s?
16:50  21   **A.**   No.  But, again, you may well be correct about that.  I
16:50  22   don't have any reason to doubt it.
16:50  23   **Q.**   Do you recall that the department had to give some
16:50  24   assurances to the legislature that, even with the passage of
16:50  25   Act 395, the department would not return to a closed formulary

405

| 16:50 | 1 | system but would always allow a prior authorization? |

16:50    1    system but would always allow a prior authorization?

16:50    2    **A.**   I don't recall making those statements.

16:50    3         **MR. MURRAY:**  Well, Your Honor, I have an objection in

16:51    4    that we're getting into issues of statutory construction.  The

16:51    5    four corners of the statute as written are what's relevant to

16:51    6    this Court, not the legislative history, the law on that.  If

16:51    7    Mr. Ismail wants to ask him about his understanding of the law

16:51    8    after it was passed, I think that's relevant.  His testimony

16:51    9    with respect to what happened in passing the law is not

16:51    10   relevant to his understanding of what the law was after it was

16:51    11   passed.

16:51    12        **THE COURT:**  It may have some relevance as to the

16:51    13   methodology used in carrying out the subsequent law.  That's

16:51    14   what I'm hearing, where he's going.  Whether or not it's

16:51    15   accurate, I don't know.  I take your point.  I'll overrule at

16:51    16   this point, but let's make your point.

16:52    17        **MR. ISMAIL:**  Yes, sir.

16:52    18             Could I have an answer to the last question.  I

16:52    19   think there was an objection interposed.

16:52    20        (WHEREUPON the previous answer was read out loud by

16:52    21   the court reporter.)

16:52    22   **BY MR. ISMAIL:**

16:52    23   **Q.**   I'm going to show you, sir, a portion of that committee

16:52    24   hearing that I've been referring to and ask you if that

16:52    25   refreshes your recollection.

406

| | | |
|---|---|---|
| 16:52 | 1 | **A.**    Okay. |
| 16:53 | 2 | **Q.**    So do you recall, sir, that you had to appear in these |
| 16:53 | 3 | committee rooms to answer questions from legislators about the |
| 16:53 | 4 | passage of the act? |
| 16:53 | 5 | **A.**    Yes. |
| 16:53 | 6 | **Q.**    In fact, even after Act 395 was passed by both houses, |
| 16:53 | 7 | there was a period of time where you had to return to the |
| 16:53 | 8 | committee to describe what it was that DHH was going to do with |
| 16:53 | 9 | the power that was granted under Act 395; correct? |
| 16:53 | 10 | **A.**    So what you're saying is -- if I may ask.  It's your |
| 16:53 | 11 | understanding that this was after the legislative session?  In |
| 16:53 | 12 | other words, Act 395 had already passed, is that correct, when |
| 16:53 | 13 | this meeting occurred? |
| 16:53 | 14 | **Q.**    Yes, sir.  I'll show you the statute in a minute. |
| 16:53 | 15 | Act 395, by its terms, required the department to come back and |
| 16:54 | 16 | get approval for the pharmacopoeia that was authorized? |
| 16:54 | 17 | **A.**    Yes. |
| 16:54 | 18 | **Q.**    So even though the statute was enacted in June of 2001, it |
| 16:54 | 19 | wasn't self-executing; the department actually had to come back |
| 16:54 | 20 | and get approval.  Right? |
| 16:54 | 21 | **A.**    I believe that's correct, yes. |
| 16:54 | 22 | **Q.**    So this is a committee hearing from May 22, 2002, and that |
| 16:54 | 23 | would be after Act 395 was passed but before it was implemented |
| 16:54 | 24 | by your department.  Okay? |
| 16:54 | 25 | **A.**    All right. |

DAILY COPY

407

| | | |
|---|---|---|
| 16:54 | 1 | (VIDEO PLAYED) |
| 16:55 | 2 | BY MR. ISMAIL: |
| 16:55 | 3 | Q.   Does that refresh your recollection, sir, that when you |
| 16:55 | 4 | were returning back to the legislature to talk about how you |
| 16:55 | 5 | would implement Act 395, there was some concern expressed that |
| 16:55 | 6 | you not return to the closed formulary period? |
| 16:55 | 7 | A.   Yes. |
| 16:55 | 8 | Q.   Now, I think you indicated to Mr. Murray that if you read |
| 16:55 | 9 | the words of Act 395, you now think it gives certain powers to |
| 16:55 | 10 | restrict Medicaid reimbursement? |
| 16:55 | 11 | A.   I would say that it grants broad powers to the secretary |
| 16:55 | 12 | of DHH. |
| 16:55 | 13 | Q.   Do you recall that after the time Act 395 was passed and |
| 16:55 | 14 | before it was implemented, the department had to give |
| 16:56 | 15 | assurances that it was not going to move forward with a |
| 16:56 | 16 | restrictive formulary? |
| 16:56 | 17 | A.   You're referring to what you just played on the screen |
| 16:56 | 18 | there? |
| 16:56 | 19 | Q.   Well, is that how you interpret your comments? |
| 16:56 | 20 | A.   No.  I'm asking you.  I know I'm not supposed to ask |
| 16:56 | 21 | questions, but I'm just trying to clarify. |
| 16:56 | 22 | Q.   Sure.  Let me start with a new question. |
| 16:56 | 23 |       Do you recall that some of the members of the senate |
| 16:56 | 24 | and the house made clear to the department that they did not |
| 16:56 | 25 | want the Department of Health and Hospitals to implement a |

| | | |
|---|---|---|
| 16:56 | 1 | restrictive formulary that could bar reimbursement under |
| 16:56 | 2 | Medicaid? |
| 16:56 | 3 | **A.**   I think that that's generally correct, but I don't think |
| 16:56 | 4 | that covers every eventuality. |
| 16:57 | 5 | **Q.**   Certainly, you took seriously any directive from the |
| 16:57 | 6 | senators and representatives who passed Act 395 in deciding how |
| 16:57 | 7 | you would exercise your powers; correct? |
| 16:57 | 8 | **A.**   Of course. |
| 16:57 | 9 | **Q.**   Do you recall that it was communicated to you by the joint |
| 16:57 | 10 | committee on health and welfare in Louisiana that that |
| 16:57 | 11 | committee did not want you to implement a restrictive or closed |
| 16:57 | 12 | formulary? |
| 16:57 | 13 | **A.**   That's, of course, what -- yes, what was said in that very |
| 16:57 | 14 | small portion of that meeting.  We haven't heard the rest of |
| 16:57 | 15 | the meeting, so I don't know if that should be taken out of |
| 16:57 | 16 | context, just to focus on one sentence. |
| 16:58 | 17 | **Q.**   My question was different, not with respect to the portion |
| 16:58 | 18 | of your comments at that committee hearing, where you were |
| 16:58 | 19 | giving assurances that you weren't going to return to the |
| 16:58 | 20 | closed formulary.  My question was different. |
| 16:58 | 21 |        Do you recall members of the joint committee |
| 16:58 | 22 | communicating to you their intent that you not impose or adopt |
| 16:58 | 23 | a restrictive formulary? |
| 16:58 | 24 | **A.**   And I explained to them what we were going to do. |
| 16:58 | 25 | **Q.**   Let's answer my question first, then we'll get to that |

| | | |
|---|---|---|
| 16:58 | 1 | second part. |
| 16:58 | 2 | Do you recall that being expressed to you by the |
| 16:58 | 3 | joint committee who passed Act 395? |
| 16:58 | 4 | **A.**   I don't think you can say that the joint committee said |
| 16:58 | 5 | that.  The joint committee has 30-some-odd members.  So, you |
| 16:58 | 6 | know, one or two or ten may have actually said that, and I |
| 16:58 | 7 | responded to that. |
| 16:58 | 8 | **Q.**   Let me rephrase my question.  Do you recall some members |
| 16:59 | 9 | of the joint committee communicated to the Department of Health |
| 16:59 | 10 | and Hospitals that it did not want the department to move |
| 16:59 | 11 | forward with a restrictive or closed formulary? |
| 16:59 | 12 | **A.**   Again, I don't have any reason to doubt that they said |
| 16:59 | 13 | that and that I responded to it.  I don't think that's the |
| 16:59 | 14 | entire picture. |
| 16:59 | 15 | **Q.**   At the end of the day -- and I think you referred to this |
| 16:59 | 16 | with Mr. Murray -- you did not consider moving to a restrictive |
| 16:59 | 17 | formulary because a prior authorization procedure is more |
| 16:59 | 18 | palatable; correct? |
| 16:59 | 19 | **A.**   Correct. |
| 16:59 | 20 | **Q.**   The key factor that led you, as secretary, to conclude |
| 16:59 | 21 | that a restrictive formulary was not in the best interest of |
| 16:59 | 22 | Louisiana was that a PDL system ensured passage of some sort of |
| 17:00 | 23 | program to save the state money; true? |
| 17:00 | 24 | **A.**   Correct.  I think that was the selling point for Act 395. |
| 17:00 | 25 | And, of course, we did do exactly that, a PDL with a prior |

410

| 17:00 | 1 | authorization. |
| 17:00 | 2 | Q.  So, as we mentioned, Act 395 was not self-executing.  Let |
| 17:00 | 3 | me hand you a copy of the act so you have it in front of you. |
| 17:01 | 4 | MR. ISMAIL:  Since it's a statute, no need to offer |
| 17:01 | 5 | it into evidence. |
| 17:01 | 6 | MR. MURRAY:  Is this the 2002 version? |
| 17:01 | 7 | MR. ISMAIL:  Yes. |
| 17:01 | 8 | BY MR. ISMAIL: |
| 17:01 | 9 | Q.  Is that the statute we've been talking about, sir? |
| 17:01 | 10 | A.  I believe so. |
| 17:01 | 11 | Q.  I'd ask you to turn to page 5 of the document.  I pulled |
| 17:01 | 12 | out Subsection (c).  Are you with me, sir? |
| 17:01 | 13 | A.  Yes. |
| 17:01 | 14 | Q.  Subsection (c) reads:  "The department shall not implement |
| 17:01 | 15 | the pharmacopoeia authorized by this subsection." |
| 17:01 | 16 | That's the preferred drug list, pharmacopoeia; is |
| 17:02 | 17 | that right, sir? |
| 17:02 | 18 | A.  Yes. |
| 17:02 | 19 | Q.  By the way, the word that was used in the act, |
| 17:02 | 20 | *pharmacopoeia*, the nomenclature that later became used was the |
| 17:02 | 21 | *preferred drug list*; right? |
| 17:02 | 22 | A.  I think so.  I don't recall. |
| 17:02 | 23 | Q.  Do you recall that the change in nomenclature came about |
| 17:02 | 24 | because the state was following in the footsteps of the State |
| 17:02 | 25 | of Florida, who is a little bit ahead of Louisiana in |

DAILY COPY

411

| 17:02 | 1 | implementing a prior authorization procedure? |
| 17:02 | 2 | **MR. MURRAY:**  I object to the form of the question. |
| 17:02 | 3 | **THE COURT:**  Do you understand it? |
| 17:02 | 4 | **THE WITNESS:**  The State of Florida was ahead of |
| 17:02 | 5 | Louisiana, was that the thrust of your question? |
| 17:02 | 6 | **BY MR. ISMAIL:** |
| 17:02 | 7 | **Q.**   Sure, that's the thrust of my question. |
| 17:02 | 8 | **A.**   Yes, I would say so.  They had already done a successful |
| 17:03 | 9 | program there. |
| 17:03 | 10 | **Q.**   In fact, the State of Florida was in the process of |
| 17:03 | 11 | litigating the scope and the ability of a state Medicaid system |
| 17:03 | 12 | to restrict reimbursement; correct? |
| 17:03 | 13 | **A.**   I don't recall. |
| 17:03 | 14 | **Q.**   In any event, you do recall that Louisiana purposefully |
| 17:03 | 15 | looked to the Florida experience to help inform what system you |
| 17:03 | 16 | would implement; correct? |
| 17:03 | 17 | **A.**   Yes.  That was certainly one of the models that we were |
| 17:03 | 18 | looking at. |
| 17:03 | 19 | **Q.**   We got a little bit off track here, but we were explaining |
| 17:03 | 20 | what this word *pharmacopoeia* meant.  We were saying: |
| 17:03 | 21 | "The department shall not implement the pharmacopoeia |
| 17:03 | 22 | authorized by this subsection until the initial pharmacopoeia |
| 17:03 | 23 | is submitted to and approved by the house and senate committee |
| 17:03 | 24 | on health and welfare." |
| 17:03 | 25 | Did I read that correctly? |

DAILY COPY

| | | |
|---|---|---|
| 17:03 | 1 | **A.**   Yes. |
| 17:03 | 2 | **Q.**   So when you and I, a few moments ago, were talking about |
| 17:03 | 3 | how Act 395 was not self-executing, this provision mandated |
| 17:04 | 4 | that the department go back to the legislature and get approval |
| 17:04 | 5 | for whatever formulary or preferred drug list or whatever it |
| 17:04 | 6 | is; right? |
| 17:04 | 7 | MR. MURRAY:  I object to the form of the question.  I |
| 17:04 | 8 | think it's says *pharmacopoeia* in the statute that he's |
| 17:04 | 9 | referring to.  It doesn't say anything about a formulary drug |
| 17:04 | 10 | list in the section he's referring to. |
| 17:04 | 11 | MR. ISMAIL:  I thought we just went over the change |
| 17:04 | 12 | in nomenclature. |
| 17:04 | 13 | THE COURT:  I thought so too.  Is that the same as |
| 17:04 | 14 | the preferred drug list? |
| 17:04 | 15 | THE WITNESS:  Your Honor, I think it depends on who's |
| 17:04 | 16 | using the terms, but *pharmacopoeia* is generally another term |
| 17:04 | 17 | for *formulary*. |
| 17:04 | 18 | THE COURT:  From the standpoint of you using the |
| 17:04 | 19 | term, how would you use it? |
| 17:04 | 20 | THE WITNESS:  We use *preferred drug list* or |
| 17:04 | 21 | *formulary*.  *Pharmacopoeia* is another term that somehow made its |
| 17:04 | 22 | way into this particular act. |
| 17:04 | 23 | THE COURT:  Is it the same as the -- |
| 17:05 | 24 | THE WITNESS:  As far as I know. |
| 17:05 | 25 | MR. MURRAY:  Your Honor, may I approach?  I'd like to |

| 17:05 | 1 | have this conversation outside of the hearing of the witness. |

17:05    1    have this conversation outside of the hearing of the witness.

17:05    2    I don't intend to coach the witness.

17:05    3          (WHEREUPON the following proceedings were held at the

17:05    4    bench.)

17:05    5          **MR. MURRAY:**  Your Honor, I'm not going to object to

17:05    6    him asking the question *pharmacopoeia* or even *preferred drug*

17:05    7    *list*, but in this statute the word *formulary* is used in

17:05    8    different places from *pharmacopoeia*.  I believe it may have

17:05    9    some different significance than *pharmacopoeia*.

17:05    10         The statute is, in terms of the requirement to

17:05    11   go to the legislature, refers to *pharmacopoeia* and does not

17:05    12   refer to the sections of the statute that refer to *formulary*,

17:06    13   which is why I object to asking the question about the statute

17:06    14   using a word other than *pharmacopoeia* or, as the witness has

17:06    15   testified, *preferred drug list*, which he has said is synonymous

17:06    16   with *pharmacopoeia*.  I do have a problem with asking him the

17:06    17   word *formulary* because I believe that is a term of art within

17:06    18   the statute.

17:06    19         **MR. ISMAIL:**  Can I try to clear it up?

17:06    20         **THE COURT:**  Sure.

17:06    21         (WHEREUPON the following proceedings were held in

17:06    22   open court.)

17:06    23   **BY MR. ISMAIL:**

17:06    24   **Q.**   Mr. Hood, I think we were discussing earlier that after

17:06    25   the act was passed, there was a period of time where the

17:07  1   department was engaged in some activities to get, basically,
17:07  2   going under a new system.  You had to get a P&T committee
17:07  3   going, you had to get some bylaws passed, you ended up hiring
17:07  4   out Provider Synergies, and the like, and that took some time;
17:07  5   right?
17:07  6   A.   Yes.
17:07  7   Q.   But that amount of time, even when you had all that done,
17:07  8   the department went back to the legislature for approval;
17:07  9   right?
17:07  10  A.   That's right.
17:07  11  Q.   The reason why you did that is because you understood that
17:07  12  you needed to go back to the legislature to get their buyoff on
17:07  13  the system you implemented; right?
17:07  14  A.   Yes.
17:07  15  Q.   These terms *pharmacopoeia* and *formulary* and *preferred drug*
17:07  16  *list*, when the act was passed, different terms got put into
17:07  17  different places; right?
17:08  18  A.   Yes.
17:08  19  Q.   You, as secretary of the Department of Health and
17:08  20  Hospitals, took your lead for what you were authorized to do by
17:08  21  what the senators and representatives meant when they put the
17:08  22  various terms in in Act 395; correct?
17:08  23  A.   Partly.
17:08  24  Q.   So one of these committee meetings, these joint committees
17:08  25  of health and welfare, took place on May 9, 2002.  I'm going to

| | | |
|---|---|---|
| 17:08 | 1 | go ahead and ask if this refreshes your recollection about the |
| 17:08 | 2 | input you received from the department about what all these |
| 17:08 | 3 | terms meant and what you were authorized to do.  Okay? |
| 17:08 | 4 | **(VIDEO PLAYED)** |
| 17:08 | 5 | **BY MR. ISMAIL:** |
| 17:08 | 6 | **Q.**   By the way, do you recall Dr. Heinz was actually a senator |
| 17:09 | 7 | on the health and welfare committee? |
| 17:09 | 8 | **A.**   Senate health and welfare committee. |
| 17:09 | 9 | **Q.**   Thank you.  Dr. Heinz was very involved in this discussion |
| 17:09 | 10 | of the proper pharmacy program under Medicaid? |
| 17:09 | 11 | **A.**   Certainly. |
| 17:09 | 12 | **(VIDEO PLAYED)** |
| 17:10 | 13 | **MR. MURRAY:**  Can we pause this?  Is this being used |
| 17:10 | 14 | to impeach this witness? |
| 17:10 | 15 | **MR. ISMAIL:**  No.  It's used to refresh his |
| 17:10 | 16 | recollection.  In any event, these are state actors in a case |
| 17:10 | 17 | involving the State of Louisiana. |
| 17:10 | 18 | **MR. MURRAY:**  Your Honor, he hasn't even identified |
| 17:10 | 19 | who the player is.  This is not the witness. |
| 17:10 | 20 | **THE COURT:**  You're there, aren't you?  Do you know |
| 17:10 | 21 | who's there? |
| 17:10 | 22 | **BY MR. ISMAIL:** |
| 17:10 | 23 | **Q.**   That's Mr. Castille on the right? |
| 17:10 | 24 | **A.**   Mr. Castille on the right and Steve -- he's an attorney |
| 17:10 | 25 | with DHH -- in the middle. |

| | | |
|---|---|---|
| 17:10 | 1 | **Q.**   Mr. Castille is the undersecretary? |
| 17:11 | 2 | **A.**   Correct. |
| 17:11 | 3 | **MR. MURRAY:**  Well, if it's being used to refresh his |
| 17:11 | 4 | recollection as opposed to impeachment, it's never been |
| 17:11 | 5 | disclosed.  I don't think this is on their exhibit list.  They |
| 17:11 | 6 | haven't handed this video over. |
| 17:11 | 7 | **THE COURT:**  I understand, but he's under |
| 17:11 | 8 | cross-examination.  I overrule the objection.  Let's go forward |
| 17:11 | 9 | with it, folks. |
| 17:11 | 10 | **(VIDEO PLAYED)** |
| 17:13 | 11 | **BY MR. ISMAIL:** |
| 17:13 | 12 | **Q.**   By the way, the speaker who said off camera, "I would not |
| 17:13 | 13 | have authored the bill if that was the intent to create |
| 17:13 | 14 | something that was a restrictive formulary," do you recall |
| 17:13 | 15 | which senator or representative authored the bill? |
| 17:13 | 16 | **A.**   That sounded like Senator Schedler. |
| 17:13 | 17 | **Q.**   I think you told us that whatever the various terms in |
| 17:13 | 18 | Act 395, you knew you had to come back to get permission, |
| 17:13 | 19 | right, for whatever system you implemented? |
| 17:13 | 20 | **A.**   Correct. |
| 17:13 | 21 | **Q.**   So just for the sake of getting oriented to the timeline |
| 17:13 | 22 | here, 1998 begins your tenure as secretary; right? |
| 17:13 | 23 | **A.**   Yes. |
| 17:14 | 24 | **Q.**   I'm going to do a dotted line here for Act 395.  That was |
| 17:14 | 25 | June of 2001; right?  It wasn't until June 10 that Act 395 was |

17:14  1   implemented; right?  Correct?

17:14  2   A.   I think that's correct.

17:14  3   Q.   I apologize.  One of the lawyers had a prettier version of

17:14  4   this timeline yesterday.  This entire period reflects still an

17:15  5   open formulary period; right?  Until the department was able to

17:15  6   implement Act 395, it still proceeded under an open formulary;

17:15  7   right?

17:15  8   A.   You know, I think so.  Implementation didn't occur just in

17:15  9   June of 2002.  Partial implementation had already proceeded

17:15  10  with the naming of the committee members and various other

17:15  11  things that were done.

17:15  12  Q.   Right.  But one thing we know for certain is, as of the

17:15  13  time Act 395 was passed on June 13, 2001, there was no P&T

17:15  14  committee in place; correct?

17:16  15  A.   That's correct.

17:16  16  Q.   The governor had to appoint a committee.  You had to get

17:16  17  names from the Louisiana Medical Society; right?

17:16  18  A.   Correct.

17:16  19  Q.   Then I believe the first meeting was in August, the one

17:16  20  that Mr. Murray showed you; correct?

17:16  21  A.   Yes.

17:16  22  Q.   Then you had to get bylaws and sort of get the structure

17:16  23  of the committee going?

17:16  24  A.   Yes.

17:16  25  Q.   You still hadn't reviewed any drugs by that point,

17:16    1    correct, in the context of the committee?

17:16    2    **A.**    I'm not sure.  I don't recall.

17:16    3    **Q.**    One thing we know for sure is that you couldn't have

17:16    4    implemented a new system on June 13, 2001; correct?

17:16    5    **A.**    That's correct.

17:16    6    **Q.**    Practically, you needed to get a committee appointed, you

17:16    7    needed to get together, you needed to review drugs, and make

17:16    8    recommendations.  Then your understanding of your authority,

17:16    9    you still had to go back and get permission from the

17:16   10    legislature; right?

17:16   11    **A.**    We had to get their approval.

17:17   12    **Q.**    Their approval.  So all that had to occur before you could

17:17   13    change the open formulary system; correct?

17:17   14    **A.**    Yes.

17:17   15    **Q.**    In reality, that took until June 2002; correct?

17:17   16    **A.**    I think so.

17:17   17    **Q.**    One of the things the department and the P&T committee was

17:17   18    worried about was you had all these folks who had existing

17:17   19    prescriptions, some for chronic conditions, and you were

17:17   20    worried about how a change in the system might disrupt their

17:17   21    receipt of medications; right?

17:17   22    **A.**    I think so.

17:18   23    **Q.**    So regardless of the program the state would adopt in

17:18   24    light of Act 395, you wanted to make sure that you took care in

17:18   25    not disrupting the receipt of medication for those folks who

17:18   1   had ongoing, chronic receipt drugs; right?

17:18   2   **A.**   I think that's addressed in 395.

17:18   3   **Q.**   One of the things you did was you essentially

17:18   4   *grandfathered* in -- are you familiar with that term?

17:18   5   **A.**   Uh-huh.

17:18   6   **Q.**   Yes?

17:18   7   **A.**   Yes.

17:18   8   **Q.**   You essentially grandfathered in existing prescriptions

17:18   9   for a period of time, even after you changed the formulary,

17:18   10  that patients could go for six more months without having to go

17:18   11  get prior authorization or anything; right?

17:18   12  **A.**   That's correct.

17:18   13  **Q.**   I'm handing you what's been marked as Exhibit 3639.  Is

17:19   14  Exhibit 3639 a statement -- actually, let me pull this up

17:19   15  first.

17:19   16          I tested your memory a moment ago, sir.  Just for the

17:19   17  sake of the record, does this document reflect that the

17:19   18  effective date for the change in the pharmacy Medicaid system

17:19   19  was June 10, 2002?

17:19   20  **A.**   That's the effective date listed on this circular here.

17:20   21  **Q.**   If you look in the first paragraph, it talks about

17:20   22  Act 395, which is what we've been talking about for the last

17:20   23  little bit; correct?

17:20   24  **A.**   Correct.

17:20   25  **Q.**   I ask you to turn to page 5 of the document.  Do you see

DAILY COPY

| | | |
|---|---|---|
| 17:20 | 1 | the section that says:  "Prescriptions issued prior to the |
| 17:20 | 2 | implementation of prior authorization?" |
| 17:20 | 3 | **A.**   Yes. |
| 17:20 | 4 | **Q.**   Does this statement here regarding the implementation of |
| 17:20 | 5 | Act 395 make clear what you and I were just talking about, this |
| 17:20 | 6 | six-month period where patients could continue to get their |
| 17:20 | 7 | medication? |
| 17:20 | 8 | **A.**   Yes, I think so. |
| 17:20 | 9 | **Q.**   So even for a drug that was not on the preferred drug list |
| 17:21 | 10 | or for which the department decided needed prior authorization, |
| 17:21 | 11 | there was going to be a period where patients could still get |
| 17:21 | 12 | that medicine; right? |
| 17:21 | 13 | **A.**   Right. |
| 17:21 | 14 | **MR. ISMAIL:**  Your Honor, I offer Exhibit 3639. |
| 17:21 | 15 | **THE COURT:**  Let it be admitted. |
| 17:21 | 16 | **THE WITNESS:**  I believe that was spelled out in |
| 17:21 | 17 | Act 395.  This is a document subsequent to passage of the law. |
| 17:21 | 18 | **BY MR. ISMAIL:** |
| 17:21 | 19 | **Q.**   So what the department did was basically follow through on |
| 17:21 | 20 | that directive in Act 395 to go ahead and give the six-month |
| 17:21 | 21 | grandfathering rule? |
| 17:21 | 22 | **A.**   Yes. |
| 17:21 | 23 | **Q.**   Up here, for the timeline, where June 2002 -- so there's |
| 17:21 | 24 | some prescriptions that were written prior to the |
| 17:21 | 25 | implementation of the change in prescription drug program that, |

| | | |
|---|---|---|
| 17:21 | 1 | notwithstanding any rule on prior authorization, they would be |
| 17:22 | 2 | allowed to continue for a period of time? |
| 17:22 | 3 | A.   That's correct. |
| 17:22 | 4 | Q.   Now, you talked with Mr. Murray for a while about what you |
| 17:22 | 5 | knew and didn't know about Vioxx when you were secretary.  When |
| 17:22 | 6 | you made your decisions regarding Vioxx for the Louisiana |
| 17:22 | 7 | Medicaid program, you did not have in mind any specific |
| 17:22 | 8 | benefits Vioxx offered over alternative therapies for treating |
| 17:22 | 9 | pain; true? |
| 17:22 | 10 | A.   My decisions were based on the recommendations of the P&T |
| 17:22 | 11 | committee. |
| 17:22 | 12 | Q.   So you personally, Secretary Hood, did not have in mind, |
| 17:22 | 13 | when you were making your decisions about Vioxx, any particular |
| 17:22 | 14 | benefits that Vioxx offered over any other medicine; right? |
| 17:23 | 15 | A.   That's correct.  Only to the extent that that was |
| 17:23 | 16 | considered by the P&T committee. |
| 17:23 | 17 | Q.   During the time that Louisiana Medicaid reimbursed Vioxx |
| 17:23 | 18 | prescriptions, you held the understanding that there were |
| 17:23 | 19 | various risks associated with the use of Vioxx; correct? |
| 17:23 | 20 | A.   There may have been risks associated with it, yes.  I |
| 17:23 | 21 | assume so.  I'm not familiar with what they were. |
| 17:23 | 22 | Q.   Well, one of the risks you knew, as secretary, that was |
| 17:23 | 23 | associated with the use of Vioxx were cardiovascular risks; |
| 17:23 | 24 | right? |
| 17:23 | 25 | A.   Honestly, I don't recall what all the risks and what all |

| | | |
|---|---|---|
| 17:23 | 1 | the benefits were, but I'm sure there were risks and benefits. |
| 17:23 | 2 | **Q.**   Do you recall telling me last week one of the risks you |
| 17:23 | 3 | knew as secretary were cardiovascular risks? |
| 17:23 | 4 | **A.**   As stated in the affidavit, yes. |
| 17:24 | 5 | **Q.**   Earlier today, we had a witness who talked a great deal |
| 17:24 | 6 | about gastrointestinal issues.  I just want to understand what |
| 17:24 | 7 | you understood was the situation about those issues when you |
| 17:24 | 8 | were secretary.  Okay? |
| 17:24 | 9 | One of the risks you understood about Vioxx, when you |
| 17:24 | 10 | were secretary, was potential gastrointestinal risks; true? |
| 17:24 | 11 | **A.**   I don't recall. |
| 17:25 | 12 | **Q.**   Sir, I'm going to ask that you turn to page 229 of your |
| 17:25 | 13 | deposition from last week.  Are you there? |
| 17:25 | 14 | **A.**   No, I'm not.  It goes to 175. |
| 17:25 | 15 | **Q.**   Probably because I handed you your first volume of your |
| 17:25 | 16 | deposition.  My apologies.  If you would rather follow on the |
| 17:26 | 17 | screen, that would work as well.  Go to line 22.  Did I ask |
| 17:26 | 18 | you: |
| 17:26 | 19 | "Question:  Just focusing on the first part of that |
| 17:26 | 20 | paragraph" -- |
| 17:26 | 21 | You were walking through your affidavit; right? |
| 17:26 | 22 | **A.**   Right. |
| 17:26 | 23 | **Q.**   READING: |
| 17:26 | 24 | "Question:  -- what risks did you understand were |
| 17:26 | 25 | associated with Vioxx during your tenure as secretary? |

| | | |
|---|---|---|
| 17:26 | 1 | "Answer:  Possible cardiovascular risks. |
| 17:26 | 2 | "Question:  Anything else? |
| 17:26 | 3 | "Answer:  I think that's the major one.  I think |
| 17:26 | 4 | there were gastrointestinal risks as well." |
| 17:26 | 5 | Is that how you answered the question about what |
| 17:26 | 6 | risks you understood during your tenure as secretary? |
| 17:27 | 7 | **A.**   Yeah.  Thanks for refreshing my memory. |
| 17:27 | 8 | **Q.**   Yes, sir.  Do you recall making any decision about Vioxx |
| 17:27 | 9 | that depended in any way upon your understanding of the |
| 17:27 | 10 | gastrointestinal benefits of Vioxx in patients not taking |
| 17:27 | 11 | steroids? |
| 17:27 | 12 | **A.**   No, I don't recall that.  I think we've established that |
| 17:27 | 13 | the P&T committee was my source of information.  I put a lot of |
| 17:27 | 14 | faith into what they recommended to me. |
| 17:27 | 15 | **Q.**   Am I correct, sir, that you don't know whether anyone on |
| 17:27 | 16 | the P&T committee made any recommendation with respect to Vioxx |
| 17:27 | 17 | that was based in any way upon the committee's understanding of |
| 17:27 | 18 | the gastrointestinal benefits of Vioxx for patients not taking |
| 17:27 | 19 | steroids? |
| 17:27 | 20 | **A.**   No, I don't know that.  I think that they probably took |
| 17:28 | 21 | all the information that was provided to them into |
| 17:28 | 22 | consideration and then they made a recommendation.  I generally |
| 17:28 | 23 | follow that recommendation.  In fact, I don't remember |
| 17:28 | 24 | departing from it. |
| 17:28 | 25 | **Q.**   My question was different.  I just wanted you to confirm |

| | | |
|---|---|---|
| 17:28 | 1 | that you don't know whether the P&T committee made any |
| 17:28 | 2 | recommendation with respect to Vioxx that depended upon an |
| 17:28 | 3 | expectation of gastrointestinal risks in patients not taking |
| 17:28 | 4 | steroids? |
| 17:28 | 5 | **A.**   You know, I would say that I'm sure that they considered |
| 17:28 | 6 | those benefits and those risks and took that into consideration |
| 17:28 | 7 | when they formulated their recommendation. |
| 17:28 | 8 | **Q.**   If you wouldn't mind, sir, turning to page 259 of your |
| 17:28 | 9 | deposition, beginning at line 24, down there at the bottom I |
| 17:29 | 10 | say: |
| 17:29 | 11 | "Question:  Do you know whether the P&T committee |
| 17:29 | 12 | made any recommendation with respect to Vioxx that was |
| 17:29 | 13 | based in any way upon the committee's understanding of the |
| 17:29 | 14 | GI benefits of Vioxx for patients not taking steroids? |
| 17:29 | 15 | "Answer:  No, I don't know." |
| 17:29 | 16 | Correct? |
| 17:29 | 17 | **MR. MURRAY:**  Your Honor, this is improper |
| 17:29 | 18 | impeachment.  What he says is, "No.  I would rely on the P&T |
| 17:29 | 19 | committee," which is exactly what he just testified to earlier. |
| 17:29 | 20 | **THE COURT:**  Why don't you read what you need to read. |
| 17:29 | 21 | Under 106, you're entitled to do that.  What else do you want |
| 17:29 | 22 | him to read? |
| 17:29 | 23 | **MR. MURRAY:**  May I refer you to page 259, line 17. |
| 17:30 | 24 | Read through line 23. |
| 17:30 | 25 | **THE COURT:**  What is it? |

DAILY COPY

425

17:30   1        **MR. MURRAY:**  "So in response to my question, do you

17:30   2   recall making any decision about Vioxx that depended in any way

17:30   3   upon your understanding of the GI benefits of Vioxx in patients

17:30   4   not taking steroids?"

17:30   5            "No.  I would rely on the P&T committee."

17:30   6        That's exactly what he just testified to, Your Honor.

17:30   7   **BY MR. ISMAIL:**

17:30   8   **Q.**   The next question was:

17:30   9            "Question:  You don't know if the P&T committee based

17:30   10           any decisions or recommendations they made upon an

17:30   11           understanding of the GI benefits of Vioxx in patients not

17:30   12           taking steroids; true?"

17:30   13   **A.**   Well, I don't see a -- I don't necessarily see a

17:30   14   contradiction here.  If I say that I would rely on the P&T

17:30   15   committee, I don't know exactly what they took under

17:30   16   consideration, but, you know -- and I state this as

17:31   17   emphatically as I can.  I assumed that they took everything

17:31   18   under consideration; that there was little or nothing left out

17:31   19   of the consideration by that committee that was provided to

17:31   20   them by Provider Synergies and other sources.  So when I say I

17:31   21   don't know, I don't know precisely what happened.  I wasn't

17:31   22   there all the time while these things were under consideration.

17:31   23            **THE COURT:**  All right.

17:31   24   **BY MR. ISMAIL:**

17:31   25   **Q.**   Generally, sir, you don't know what the P&T committee

DAILY COPY

| | | |
|---|---|---|
| 17:31 | 1 | considered with respect to Vioxx; true? |
| 17:31 | 2 | A.   I don't know the details of it. |
| 17:31 | 3 | Q.   You don't know what medical literature the other folks on |
| 17:31 | 4 | the P&T committee considered when they were making |
| 17:31 | 5 | recommendations regarding Vioxx; true? |
| 17:31 | 6 | A.   No, of course not.  I am not an expert in pharmacology. |
| 17:32 | 7 | Q.   I want to understand further this question that Mr. Murray |
| 17:32 | 8 | posed to you as to what you would have done had different |
| 17:32 | 9 | information been available.  I just want to, before we get |
| 17:32 | 10 | there, orient back to what your role was, as opposed to other |
| 17:32 | 11 | folks in the system.  Okay? |
| 17:32 | 12 |          As we just mentioned, you have no medical training; |
| 17:32 | 13 | correct? |
| 17:32 | 14 | A.   Correct. |
| 17:32 | 15 | Q.   You are not qualified to assess the risks and benefits of |
| 17:32 | 16 | prescription pharmaceuticals yourself; correct? |
| 17:32 | 17 | A.   Correct. |
| 17:32 | 18 | Q.   As to clinical issues of safety and efficacy, you deferred |
| 17:32 | 19 | to the medical professionals on the P&T committee; true? |
| 17:32 | 20 | A.   True. |
| 17:32 | 21 | Q.   As secretary of DHH, you never made a decision on the |
| 17:32 | 22 | basis of your understanding of the clinical aspects of the |
| 17:33 | 23 | drug; correct? |
| 17:33 | 24 | A.   Only to the extent that that was considered by the P&T |
| 17:33 | 25 | committee. |

DAILY COPY

| | | |
|---|---|---|
| 17:33 | 1 | **Q.**   The one thing we know is that David Hood would not make |
| 17:33 | 2 | his own independent clinical assessment about scientific |
| 17:33 | 3 | information and make a decision about a drug without receiving |
| 17:33 | 4 | input from the P&T committee; right? |
| 17:33 | 5 | **A.**   That's correct.  I would never do that. |
| 17:33 | 6 | **Q.**   David Hood would not make clinical decisions.  That's |
| 17:33 | 7 | accurate; right?  Is that right, sir? |
| 17:33 | 8 | **A.**   How do you define *clinical decisions*? |
| 17:33 | 9 | **Q.**   David Hood would not clinically assess the risks and |
| 17:34 | 10 | benefits of the drug based on scientific or medical information |
| 17:34 | 11 | alone; right? |
| 17:34 | 12 | **A.**   I don't think that means clinical decisions.  I mean, |
| 17:34 | 13 | obviously any decision that I make in this regard would |
| 17:34 | 14 | certainly have an impact on the clinical use of these |
| 17:34 | 15 | medications. |
| 17:34 | 16 | **Q.**   I think I understand your point.  How about *clinical* |
| 17:34 | 17 | *assessments*? |
| 17:34 | 18 | **A.**   I think that's better. |
| 17:34 | 19 | **Q.**   All right.  Fair enough.  Instead, David Hood would defer |
| 17:34 | 20 | to the P&T committee; right? |
| 17:34 | 21 | **A.**   Correct. |
| 17:35 | 22 | **Q.**   As to the question of what you could have done, when you |
| 17:35 | 23 | were secretary of DHH, you never exercised any power to |
| 17:35 | 24 | restrict completely reimbursement for any FDA-approved drug; |
| 17:35 | 25 | true? |

428

| | | |
|---|---|---|
| 17:35 | 1 | **A.**   True. |
| 17:35 | 2 | **Q.**   When you were secretary of DHH, you never even considered |
| 17:35 | 3 | restricting the state's reimbursement of any FDA-approved drug; |
| 17:35 | 4 | true? |
| 17:35 | 5 | **A.**   I don't think that it ever came under consideration. |
| 17:35 | 6 | **Q.**   You do not know of any other action the state could have |
| 17:35 | 7 | taken to restrict coverage of Vioxx prescriptions within the |
| 17:35 | 8 | Medicaid program beyond putting the drug on the nonpreferred |
| 17:35 | 9 | drug list; true? |
| 17:35 | 10 | **A.**   Under the circumstances and within the confines of what we |
| 17:36 | 11 | did do, which was the preferred drug list and prior |
| 17:36 | 12 | authorization, I think that's a true statement.  But if you |
| 17:36 | 13 | take into account some of the other activities that have taken |
| 17:36 | 14 | place here and the possibility of a defective drug, I think |
| 17:36 | 15 | that changes the entire picture. |
| 17:36 | 16 | **Q.**   Now, I think you and Mr. Murray chatted about your ongoing |
| 17:36 | 17 | role in health-care policy in Louisiana. |
| 17:36 | 18 | **A.**   Yes. |
| 17:36 | 19 | **Q.**   Now, a change in formulary status within Medicaid, that |
| 17:36 | 20 | would be a well-publicized initiative, at least in health-care |
| 17:36 | 21 | policy circles? |
| 17:36 | 22 | **A.**   I would think so. |
| 17:36 | 23 | **Q.**   You're not aware, right up to the present, of any instance |
| 17:36 | 24 | in which Louisiana considered its options to restrict |
| 17:36 | 25 | completely Medicaid reimbursement of an FDA-approved drug; |

DAILY COPY

| | | |
|---|---|---|
| 17:36 | 1 | correct? |
| 17:37 | 2 | **A.**   Well, I'm not aware of it.  After February of 2004, I |
| 17:37 | 3 | wasn't there to know. |
| 17:37 | 4 | **Q.**   Right.  But in your -- I'm sorry.  I didn't mean to |
| 17:37 | 5 | interrupt. |
| 17:37 | 6 | **A.**   I wasn't there to see what was considered.  All I can tell |
| 17:37 | 7 | you is that we didn't consider it. |
| 17:37 | 8 | **Q.**   In your position as an interested participant in forming |
| 17:37 | 9 | Louisiana health-care policies, it has never come to your |
| 17:37 | 10 | attention in the last six years that Louisiana ever even |
| 17:37 | 11 | considered switching to a system that would allow the state to |
| 17:37 | 12 | completely restrict reimbursement for an FDA-approved drug; |
| 17:37 | 13 | correct? |
| 17:37 | 14 | **A.**   It hasn't come to my attention, that's correct. |
| 17:37 | 15 | **Q.**   FDA approval of a drug was important to DHH and the P&T |
| 17:37 | 16 | committee; correct? |
| 17:38 | 17 | **A.**   Correct. |
| 17:38 | 18 | **Q.**   How so? |
| 17:38 | 19 | **A.**   I'm sorry? |
| 17:38 | 20 | **Q.**   In what way was FDA approval of a medicine important to |
| 17:38 | 21 | DHH and the P&T committee? |
| 17:38 | 22 | **A.**   I think there was an indication if it had FDA approval |
| 17:38 | 23 | that it would be a safe drug. |
| 17:38 | 24 | **Q.**   The P&T committee took that into consideration when they |
| 17:38 | 25 | were assessing the preferred drug list? |

| | | |
|---|---|---|
| 17:38 | 1 | **A.** I think they took it into consideration. There was |
| 17:38 | 2 | discussion from time to time about the safety and efficacy of |
| 17:38 | 3 | the drug anyway. They didn't necessarily shut the door on that |
| 17:38 | 4 | discussion. |
| 17:38 | 5 | **Q.** So there were discussions on the P&T committee about |
| 17:38 | 6 | safety and efficacy of drugs? |
| 17:38 | 7 | **A.** Yes. |
| 17:38 | 8 | **Q.** Were there safety concerns of some drugs? Not talking |
| 17:38 | 9 | COX-2 inhibitors here, but other drugs discussed? |
| 17:38 | 10 | **A.** I'm sure there were. I was present at most of those |
| 17:39 | 11 | meetings. |
| 17:39 | 12 | **Q.** None of those concerns ever resulted in the state even |
| 17:39 | 13 | considering moving to a system of trying to completely restrict |
| 17:39 | 14 | Medicaid reimbursement for that drug; right? |
| 17:39 | 15 | **A.** Well, there was no conclusion that the risks outweighed |
| 17:39 | 16 | the benefits of those drugs. |
| 17:39 | 17 | **Q.** So the answer to my question is: Notwithstanding any |
| 17:39 | 18 | publicized risk information about any drug, the state never |
| 17:39 | 19 | even considered moving to a system of trying to completely |
| 17:39 | 20 | restrict Medicaid reimbursement for an FDA-approved drug; |
| 17:39 | 21 | right? |
| 17:39 | 22 | **A.** I think that's correct. |
| 17:39 | 23 | **Q.** So FDA approval as safe and effective was important to |
| 17:40 | 24 | P&T; right? |
| 17:40 | 25 | **A.** That's correct. It was an indication of safety and |

431

| | | |
|---|---|---|
| 17:40 | 1 | efficacy as, you know, the opposite indication would have been |
| 17:40 | 2 | if it had been removed from the FDA list. |

17:40  1  efficacy as, you know, the opposite indication would have been
17:40  2  if it had been removed from the FDA list.
17:40  3  **Q.**   You don't recall any instance in which the P&T committee
17:40  4  concluded that notwithstanding an FDA approval of a medicine as
17:40  5  safe and effective, the P&T came to a different conclusion
17:40  6  about the risks and benefits; right?
17:40  7  **A.**   Could you read that again.
17:40  8  **Q.**   Sure.  You do not recall any instance in which the P&T
17:40  9  committee concluded that notwithstanding FDA approval of a
17:40  10  medicine as safe and effective, the committee came to a
17:40  11  different conclusion that the risks outweighed the benefits;
17:41  12  right?
17:41  13  **A.**   Right.  I'm not aware of that, but I guess the point is
17:41  14  that there was discussion about safety and efficacy on many
17:41  15  different drugs.
17:41  16  **Q.**   Another important aspect of the Medicaid program was that
17:41  17  the state wanted a system to ensure that if a doctor was making
17:41  18  an individual prescribing decision for a patient that there
17:41  19  were still a mechanism for the doctor to get that drug to a
17:41  20  patient; right?
17:41  21  **A.**   Correct.
17:41  22  **Q.**   That's what the prior authorization program was all about?
17:41  23  **A.**   That's right.
17:41  24  **Q.**   I'm going to write:  "State wanted to allow individual
17:41  25  prescribing decisions."

| 17:42 | 1 | Now that we've got that all set -- |
|---|---|---|

17:42   1          Now that we've got that all set --

17:42   2   A.   I would expand that to say the state wanted to allow

17:42   3   individual prescribing decisions.  It's misspelled there.

17:42   4   Q.   Thank you.  It is getting late.

17:42   5   A.   Individual prescribing decisions for drugs that met the

17:42   6   criteria for safety and efficacy.

17:42   7   Q.   We need a flip chart that has spell check.  That would

17:42   8   make my life a lot easier.

17:42   9          Let's go back to how the process worked.  I think you

17:42   10   told Mr. Murray that Provider Synergies was retained to do

17:42   11   these assessments of risks and benefits; right?

17:42   12   A.   Right.

17:42   13   Q.   They would do class reviews for various classes of drugs

17:43   14   under consideration?

17:43   15   A.   Yes.

17:43   16   Q.   That was for the purpose of the preferred drug list?

17:43   17   A.   Yes.

17:43   18   Q.   Provider Synergies would make recommendations to P&T;

17:43   19   right?

17:43   20   A.   Correct.

17:43   21   Q.   I think you told us the P&T committee was an independent

17:43   22   body that did not simply rubber-stamp the recommendations of

17:43   23   Provider Synergies; right?

17:43   24   A.   Right.

17:43   25   Q.   So, then, the way the flow of decision making went, I

| | | |
|---|---|---|
| 17:43 | 1 | think you said it would go to DHH staff.  That would be folks |
| 17:43 | 2 | like Ms. Terrebonne, Mr. Bearden, Mr. Castille, and the like? |
| 17:43 | 3 | **A.**   Yes. |
| 17:43 | 4 | **Q.**   And there would be a recommendation to you; right?  Have I |
| 17:44 | 5 | got it correct? |
| 17:44 | 6 | **A.**   Well, the P&T committee was making a recommendation to me. |
| 17:44 | 7 | The procedure was to have my staff look at it, as well, to |
| 17:44 | 8 | ensure that from their point of view there was -- |
| 17:44 | 9 | MR. MURRAY:  I want to wait until the witness |
| 17:44 | 10 | finishes his answer and interpose an objection. |
| 17:44 | 11 | THE WITNESS:  The DHH staff was not an actual review, |
| 17:44 | 12 | but they were just going over the recommendations of the P&T |
| 17:44 | 13 | committee so that they could explain to me -- they could answer |
| 17:44 | 14 | any questions that I have and so on. |
| 17:44 | 15 | MR. MURRAY:  Your Honor, at this point I'd like to |
| 17:44 | 16 | interpose an objection to this line of questioning on relevancy |
| 17:44 | 17 | grounds.  When you're asking questions of the witness as to how |
| 17:44 | 18 | he received information for purposes of determining whether the |
| 17:44 | 19 | state was aware of the defect, I think that this has some |
| 17:45 | 20 | relevance.  Now we're being asked how he would theoretically |
| 17:45 | 21 | receive information, and I don't think that's relevant to the |
| 17:45 | 22 | redhibition statute. |
| 17:45 | 23 | The redhibition statute is we ask the question |
| 17:45 | 24 | of what he would do if he knew the information, and we assume |
| 17:45 | 25 | that he knew the information unless it's proven otherwise that |

DAILY COPY

17:45  1   he didn't know the information.  The relevance of how the

17:45  2   information filters through to him doesn't matter.  It isn't

17:45  3   there.

17:45  4          The question is what he would have done with the

17:45  5   information, assuming that he had it at any point in time.  It

17:45  6   doesn't matter how it gets to him.  I pose an objection to this

17:45  7   line of questioning to the extent he's talking about the

17:45  8   theoretical ways that information flowed to him as opposed to

17:45  9   the ways that information about Vioxx flowed to him in 2003.

17:45  10         THE COURT:  I thought it was the way you got the

17:45  11  information.

17:45  12  BY MR. ISMAIL:

17:46  13  Q.   I've just thus far tried to map out what they went through

17:46  14  on direct.  Provider Synergies did reviews.  P&T committee, not

17:46  15  a rubber stamp.  They would do an independent assessment.  It

17:46  16  would go to your staff at DHH.  You said on direct they weren't

17:46  17  obligated to accept just what P&T said.  They would discuss it

17:46  18  with you and make a recommendation; right?  That's how it

17:46  19  worked?

17:46  20  A.   Right.

17:46  21         THE COURT:  Let me interrupt, too, while we're doing

17:46  22  it.  How much further?  We're going to have to come back

17:46  23  tomorrow with this witness.  I can see us going until 8:00 or

17:46  24  9:00.

17:46  25         MR. ISMAIL:  No, it's not going to go that long,

DAILY COPY

17:46   1    Judge.  Maybe another half hour.

17:46   2                MR. MURRAY:  If I have more than five minutes --

17:46   3    BY MR. ISMAIL:

17:46   4    Q.    So in terms of what information you can provide this

17:47   5    Court, we've already determined you would not make clinical

17:47   6    assessments yourself; right?  And, in fact, you don't know what

17:47   7    Provider Synergies considered with respect to Vioxx; right?

17:47   8    A.    I don't know in detail what they did.  I can just tell you

17:47   9    what the process was.

17:47   10   Q.    Sure.  You don't know what Provider Synergies would have

17:47   11   done with different clinical information; correct?

17:47   12   A.    What do you mean?

17:47   13   Q.    Well, you can't speak --

17:47   14   A.    What they would have done?

17:47   15   Q.    You can't speak for Provider Synergies; right?  You don't

17:47   16   even know what they looked at; correct?

17:47   17   A.    Well, I think they took into account everything that was

17:47   18   available to them, and they processed that, they formulated

17:47   19   recommendations to the P&T committee, and that was the process.

17:47   20   Q.    Sure.

17:48   21   A.    So I'm comfortable that the process was comprehensive.

17:48   22   They didn't just do one thing in this case and something

17:48   23   entirely different in another.  It was a standardized,

17:48   24   comprehensive process.

17:48   25   Q.    My question wasn't specific enough.  Let me see if we can

17:48   1    try it this way.

17:48   2              You went over with Mr. Murray a lot of things like

17:48   3    what if osteoarthritis data were X not Y, what if aspirin

17:48   4    indicated was Z not B.  You don't know how Provider Synergies

17:48   5    would have assessed any of that scientific information; right?

17:48   6    Correct?

17:48   7    A.   What do you mean, I don't know how they would have

17:48   8    approached that?  I don't understand your statement.

17:48   9    Q.   I think you're reading too much into my question.  You're

17:48   10   not a doctor.  You're not a medical professional.  You've never

17:48   11   assessed risks and benefits yourself.  You don't even know what

17:49   12   Provider Synergies specifically looked at with respect to

17:49   13   Vioxx.  You can't speak to how the medical professionals at

17:49   14   Provider Synergies would have analyzed different pieces of

17:49   15   clinical information.  Correct?

17:49   16   A.   I think the operative word there is *specifically*.  No, I

17:49   17   don't know specifically, but I do know what the process was,

17:49   18   and there was a requirement they would look at every piece of

17:49   19   information that they could find, and that would go into their

17:49   20   decision making and the recommendations that they made to the

17:49   21   P&T committee.

17:49   22   Q.   That's fair.  So thus far I've talked process with you,

17:49   23   but now I want to get output.  You can tell me about the

17:49   24   process, but you can't tell me how Provider Synergies would

17:49   25   have assessed specific information; is that fair?

| | | |
|---|---|---|
| 17:49 | 1 | **A.**    Yes. |
| 17:49 | 2 | **Q.**    The P&T committee would perform their own assessment; |
| 17:49 | 3 | right?  Correct? |
| 17:50 | 4 | **A.**    Right. |
| 17:50 | 5 | **Q.**    Even though you were at P&T committee meetings, it wasn't |
| 17:50 | 6 | your job or role there to assess specific pieces of clinical |
| 17:50 | 7 | information; right?  Correct? |
| 17:50 | 8 | **A.**    That's correct.  I and others on the committee who were |
| 17:50 | 9 | certainly not qualified to make those kinds of decisions. |
| 17:50 | 10 | **Q.**    The recommendation of P&T would go to DHH staff.  That's |
| 17:50 | 11 | folks like Ms. Terrebonne and Mr. Castille and Mr. Bearden, and |
| 17:50 | 12 | I guess they can speak for themselves as to how they would |
| 17:50 | 13 | respond to specific information.  You wouldn't know exactly how |
| 17:50 | 14 | they would make a recommendation to you with respect to |
| 17:50 | 15 | particular clinical data that was out there; right? |
| 17:50 | 16 | **A.**    They could explain it to me, which they did, if necessary. |
| 17:51 | 17 | **Q.**    You don't know how they would take the recommendation, in |
| 17:51 | 18 | any particular case, from P&T; true? |
| 17:51 | 19 | **A.**    I don't understand what you're saying when you say you |
| 17:51 | 20 | don't know how they would take the recommendation from P&T. |
| 17:51 | 21 | **Q.**    How about, in the interest of time, I'll just put a |
| 17:51 | 22 | question mark there. |
| 17:51 | 23 | Now, we have what you said to Mr. Murray:  "Well, if |
| 17:51 | 24 | I had known different things, I would have sought to find out |
| 17:51 | 25 | what my power was."  Right? |

DAILY COPY

| | | |
|---|---|---|
| 17:51 | 1 | **A.**   If they had brought to me a recommendation on any drug |
| 17:51 | 2 | that said this drug has been found to be a defective drug, in |
| 17:51 | 3 | other words, where the risks exceed the benefits and this |
| 17:52 | 4 | should not be a safe drug, then, you know, I think then and |
| 17:52 | 5 | only then would we try to deny reimbursement for that drug. |
| 17:52 | 6 | **Q.**   My question was different.  Let me just read it |
| 17:52 | 7 | specifically: |
| 17:52 | 8 | You cannot tell us for the period that you were |
| 17:52 | 9 | secretary of DHH that you understood you had certain powers to |
| 17:52 | 10 | restrict completely the department's reimbursement of |
| 17:52 | 11 | FDA-approved drugs within Medicaid; true? |
| 17:52 | 12 | **MR. MURRAY:**  I object to the form to the extent it |
| 17:52 | 13 | calls for a legal conclusion. |
| 17:52 | 14 | **MR. ISMAIL:**  I'm going for the witness' understanding |
| 17:52 | 15 | of his own authority, Judge. |
| 17:52 | 16 | **THE COURT:**  I overrule the objection.  You can answer |
| 17:52 | 17 | your understanding.  I'm not talking about the law. |
| 17:52 | 18 | **THE WITNESS:**  Repeat, please. |
| 17:52 | 19 | BY MR. ISMAIL: |
| 17:52 | 20 | **Q.**   You cannot tell us for the period that you were secretary |
| 17:52 | 21 | of DHH that you understood you had certain powers to restrict |
| 17:52 | 22 | completely the department's reimbursement of FDA-approved drugs |
| 17:53 | 23 | within Medicaid; true? |
| 17:53 | 24 | **A.**   I can't say that it's true because I think that, you |
| 17:53 | 25 | know -- if I understand your question correctly, if you're |

| | | |
|---|---|---|
| 17:53 | 1 | suggesting that the secretary of DHH had no powers to restrict |
| 17:53 | 2 | reimbursement, I don't think that's accurate.  I think that the |
| 17:53 | 3 | department and the secretary did have fairly broad powers.  So |
| 17:53 | 4 | if you're suggesting otherwise, then I disagree. |
| 17:53 | 5 | Q.    First, we'll see how you answered the same question last |
| 17:53 | 6 | week.  Were you asked the following question and did you give |
| 17:53 | 7 | the following answer: |
| 17:53 | 8 | "Question:  As you sit here today, you can't tell us |
| 17:53 | 9 | for the period that you were secretary of DHH that you |
| 17:53 | 10 | understood you had certain powers to restrict completely |
| 17:54 | 11 | the department's reimbursement of FDA-approved drugs |
| 17:54 | 12 | within Medicaid; correct?" |
| 17:54 | 13 | "Answer:  Correct, because I don't think that |
| 17:54 | 14 | situation had arisen before." |
| 17:54 | 15 | **MR. MURRAY:**  Objection, Your Honor:  Improper |
| 17:54 | 16 | impeachment.  Again, I don't think this is inconsistent with |
| 17:54 | 17 | his prior testimony.  He says because that situation hadn't |
| 17:54 | 18 | arisen before. |
| 17:54 | 19 | **THE COURT:**  I understand. |
| 17:54 | 20 | **BY MR. ISMAIL:** |
| 17:54 | 21 | Q.    Is that your answer then, sir? |
| 17:54 | 22 | A.    Well, again, if the situation had arisen, then I think the |
| 17:54 | 23 | powers are there to deal with that situation. |
| 17:54 | 24 | Q.    I want to be more specific.  Do I understand you to be |
| 17:54 | 25 | saying that you think you had some powers; you just don't know |

| | |
|---|---|
| 17:54 | 1 |
| 17:54 | 2 |
| 17:54 | 3 |
| 17:54 | 4 |
| 17:54 | 5 |
| 17:55 | 6 |
| 17:55 | 7 |
| 17:55 | 8 |
| 17:55 | 9 |
| 17:55 | 10 |
| 17:55 | 11 |
| 17:55 | 12 |
| 17:55 | 13 |
| 17:55 | 14 |
| 17:55 | 15 |
| 17:55 | 16 |
| 17:55 | 17 |
| 17:55 | 18 |
| 17:56 | 19 |
| 17:56 | 20 |
| 17:56 | 21 |
| 17:56 | 22 |
| 17:56 | 23 |
| 17:56 | 24 |
| 17:56 | 25 |

what they were?

**A.**   That's correct.  I believe that Act 395 provided broad authorities to the Department of Health and Hospitals, to the secretary.  Specifically, what those were and how they would be implemented in a case where you had a defective drug and what to do about it, then I can't say the exact strategy that would be taken.

**Q.**   You can't tell us what the powers were; you just know that there were broad powers.  Right?

              **MR. MURRAY:**  Objection:  Mischaracterizes his testimony.

              **THE COURT:**  Is that true or not?

              **THE WITNESS:**  Well, I think that if you read Act 395, it's a very broad statute.  It's not at all a very constricted sort of application.  If that's the case, there are some things that you can do.  If I had been faced with that situation, as I stated before, I would have got some attorneys like Mr. Ismail, and he would tell me exactly what to do.  In no case would we allow Medicaid recipients in Louisiana to be exposed to a drug which is defective.  If it had come to my attention, then I'd say we have to figure it out, and we have to do it immediately.

**BY MR. ISMAIL:**

**Q.**   Let's do it this way:  I want to get back to your state of mind when you were secretary.  Your understanding, when you were secretary of DHH, was that Act 395 created not a

| | | |
|---|---|---|
| 17:56 | 1 | restrictive formulary but a preferred drug list with prior |
| 17:56 | 2 | authorization; true? |
| 17:56 | 3 | MR. MURRAY:  Objection, Your Honor:  Asked and |
| 17:56 | 4 | answered multiple times. |
| 17:56 | 5 | THE WITNESS:  What we did with Act 395 was to use the |
| 17:56 | 6 | option to do the preferred drug list and the prior |
| 17:56 | 7 | authorization. |
| 17:56 | 8 | BY MR. ISMAIL: |
| 17:56 | 9 | Q.   You said you would ask who for legal advice, other than |
| 17:57 | 10 | me? |
| 17:57 | 11 | A.   DHH staff. |
| 17:57 | 12 | Q.   Anybody in particular? |
| 17:57 | 13 | A.   Well, whoever would have the most experience and the most |
| 17:57 | 14 | relevant experience. |
| 17:57 | 15 | Q.   You would ask some lawyer? |
| 17:57 | 16 | A.   Some lawyer, please. |
| 17:57 | 17 | Q.   Tell me.  Who do you want?  Anybody in particular? |
| 17:57 | 18 | A.   We would get the expertise of our legal section.  It's not |
| 17:57 | 19 | just some lawyer. |
| 17:57 | 20 | Q.   How about I put "legal advice."  Is that better? |
| 17:57 | 21 | Since you don't know the extent of your powers under |
| 17:57 | 22 | Act 395, you don't know specifically what that legal advice |
| 17:57 | 23 | would have been; right? |
| 17:57 | 24 | A.   No, I don't know that exactly. |
| 17:57 | 25 | Q.   Do you recall, sir, that the attorney general was asked |

442

| 17:58 | 1 | for an interpretation of Act 395 at any time? |

17:58   1    for an interpretation of Act 395 at any time?

17:58   2    A.    No, I'm not aware of that.

17:58   3    Q.    So as far as you know, this hypothetical situation that

17:58   4    Mr. Murray and you went over never actually got to the point of

17:58   5    you seeking legal advice from the attorney general or anyone

17:58   6    else?

17:58   7    A.    Well, there was no reason to.  We didn't know we were

17:58   8    dealing with a defective drug at that point.

17:58   9    Q.    Is the answer to my question, yes, you never asked for

17:58   10   legal advice to inform what you didn't know, which was what

17:58   11   your powers were to restrict reimbursement?  Am I correct that

17:58   12   that didn't happen?

17:58   13   A.    To my knowledge, we did not ask the attorney general for

17:58   14   legal advice.

17:58   15   Q.    You mentioned with Mr. Murray that the P&T committee

17:59   16   basically had the mandate to give advice to the department on

17:59   17   the prudent management of the program?

17:59   18   A.    Yes.

17:59   19   Q.    You do not recall any occasion in which the P&T committee

17:59   20   recommended to DHH to advocate switching to a restricted

17:59   21   formulary; correct?

17:59   22   A.    No, I don't remember that.

17:59   23   Q.    Now, when you get to the point that -- I'm going to put

17:59   24   here "restrictive formulary" with a question mark as we

17:59   25   continue through how this process would work because you don't

DAILY COPY

| | | |
|---|---|---|
| 17:59 | 1 | know what Provider Synergies would say, P&T would say, DHH |
| 17:59 | 2 | would say.  You don't know what the legal advice would be. |
| 18:00 | 3 | Let's assume that all this process resulted in a recommendation |
| 18:00 | 4 | to go to a restricted formulary.  Okay?  That's the predicate |
| 18:00 | 5 | for my question. |
| 18:00 | 6 | MR. MURRAY:  Your Honor, at this point I would |
| 18:00 | 7 | interpose the objection I interposed earlier, which is when |
| 18:00 | 8 | we're talking about a hypothetical means by which he would |
| 18:00 | 9 | receive information, we're no longer talking about whether or |
| 18:00 | 10 | not he was aware of Vioxx -- |
| 18:00 | 11 | THE COURT:  We're going really far afield.  I agree |
| 18:00 | 12 | with counsel.  Let's shorten this.  The whole concept is that |
| 18:00 | 13 | he says he didn't know, and he didn't know, so he didn't do any |
| 18:00 | 14 | of these things. |
| 18:00 | 15 | MR. ISMAIL:  The context is, Your Honor:  When they |
| 18:00 | 16 | ask one witness what you would have done, I just want to make |
| 18:00 | 17 | sure that he can't answer all the other parts of the equation |
| 18:00 | 18 | that go into what the state would have done. |
| 18:00 | 19 | BY MR. ISMAIL: |
| 18:00 | 20 | Q.   So do you know, sir, whether the Medicaid program that any |
| 18:01 | 21 | state adopts has to be approved by anybody outside the state? |
| 18:01 | 22 | A.   I don't know to what extent that needs to happen.  There |
| 18:01 | 23 | may be federal approvals.  I don't recall. |
| 18:01 | 24 | Q.   Do you know who CMS is? |
| 18:01 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 18:01 | 1 | **Q.**   What are they? |
| 18:01 | 2 | **A.**   The Center for Medicare and Medicaid Services. |
| 18:01 | 3 | **Q.**   If the State of Louisiana wanted to go to some sort of |
| 18:01 | 4 | pharmacy Medicaid program for Medicaid, you would have to get |
| 18:01 | 5 | it approved by CMS; right? |
| 18:01 | 6 | **A.**   What you would probably have to do is to get them to |
| 18:01 | 7 | approve your state plan amendment.  It's a fairly routine |
| 18:01 | 8 | process. |
| 18:01 | 9 | **Q.**   Have you ever seen the situation where a state plan has |
| 18:01 | 10 | been submitted to CMS to create an exclusive formulary for one |
| 18:01 | 11 | drug? |
| 18:01 | 12 | **A.**   No.  I'm not aware of that. |
| 18:02 | 13 | **Q.**   Thus far, we've been talking about the state enabling |
| 18:02 | 14 | statute and all the points along the path to get to this |
| 18:02 | 15 | question of whether you could restrict completely Medicaid |
| 18:02 | 16 | reimbursement.  There's also a federal law component, as well, |
| 18:02 | 17 | that you understood when you were secretary; right? |
| 18:02 | 18 | **A.**   I think that's correct. |
| 18:02 | 19 |        **MR. ISMAIL:**  About 15 minutes, Judge. |
| 18:02 | 20 | **BY MR. ISMAIL:** |
| 18:02 | 21 | **Q.**   You've heard of the OBRA statute? |
| 18:02 | 22 | **A.**   The what statute? |
| 18:02 | 23 | **Q.**   OBRA. |
| 18:02 | 24 | **A.**   OBRA?  There have been many OBRA statutes. |
| 18:02 | 25 | **Q.**   OBRA 1396-r8. |

DAILY COPY

| | | |
|---|---|---|
| 18:03 | 1 | **MR. MURRAY:**  Your Honor, I want to interpose an |
| 18:03 | 2 | objection.  I think I know where this is going.  He's going to |
| 18:03 | 3 | show him the act, he's going to read to him from the act, and |
| 18:03 | 4 | ask him how he interprets the act.  That is asking this witness |
| 18:03 | 5 | for a legal conclusion.  I think, without showing him the act, |
| 18:03 | 6 | he can ask him whether he has any understanding as to what |
| 18:03 | 7 | limitations, if any, on his power are under OBRA 90. |
| 18:03 | 8 | **BY MR. ISMAIL:** |
| 18:03 | 9 | **Q.**   Let's try it that way.  Do you know or recall under |
| 18:03 | 10 | federal law, even if you proceed with an exclusive formulary, |
| 18:03 | 11 | you're required to give the option of prior authorization? |
| 18:03 | 12 | **A.**   No, I'm not aware of that. |
| 18:03 | 13 | **Q.**   I ask you to turn to the eighth page in of the document I |
| 18:04 | 14 | just gave you. |
| 18:04 | 15 | **MR. MURRAY:**  Your Honor, same objection.  He's asking |
| 18:04 | 16 | him to interpret it, and that's Mr. Ismail's interpretation.  I |
| 18:04 | 17 | don't think that's a correct interpretation of the law. |
| 18:04 | 18 | Regardless of what it is, the witness has said that that is not |
| 18:04 | 19 | his understanding.  He can't impeach him as to the |
| 18:04 | 20 | understanding he has with respect to what this law means. |
| 18:04 | 21 | **MR. ISMAIL:**  I haven't done anything yet.  I just |
| 18:04 | 22 | want you to look -- |
| 18:04 | 23 | **MR. MURRAY:**  He's asking him to turn to the page of |
| 18:04 | 24 | the law.  I'm sure he's going to ask him a question about it. |
| 18:04 | 25 | **THE COURT:**  What's the answer to the question? |

| | | |
|---|---|---|
| 18:04 | 1 | **MR. ISMAIL:**  I'll tell you the question I'm going to |
| 18:04 | 2 | ask, Judge. |
| 18:04 | 3 | **THE COURT:**  This is the question: |
| 18:04 | 4 | "Do you know or recall under federal law, even |
| 18:04 | 5 | if you proceed with an exclusive formulary, you're required to |
| 18:04 | 6 | give the option of prior authorization?" |
| 18:04 | 7 | He says, "No, I'm not aware of that." |
| 18:05 | 8 | **BY MR. ISMAIL:** |
| 18:05 | 9 | **Q.**   This is my question.  I'd ask that you look to paragraph |
| 18:05 | 10 | 4(d) and if that refreshes your recollection that under even a |
| 18:05 | 11 | restrictive formulary system a state must still allow for a |
| 18:05 | 12 | prior authorization -- |
| 18:05 | 13 | **MR. MURRAY:**  Your Honor, same objection.  He's asking |
| 18:05 | 14 | him to interpret the law.  He was just asked the question.  He |
| 18:05 | 15 | gave his answer.  Now he's being asked to read the law and tell |
| 18:05 | 16 | him what he thinks that law means. |
| 18:05 | 17 | **BY MR. ISMAIL:** |
| 18:05 | 18 | **Q.**   Don't read it out loud.  I just asked if it refreshes your |
| 18:05 | 19 | recollection. |
| 18:05 | 20 | **A.**   No.  I'm not familiar with this. |
| 18:05 | 21 | **THE COURT:**  Let's move on, then.  I sustain the |
| 18:05 | 22 | objection.  This person's not a lawyer. |
| 18:05 | 23 | **BY MR. ISMAIL:** |
| 18:05 | 24 | **Q.**   If there's a prior authorization requirement, you're not |
| 18:05 | 25 | aware of it; right? |

| | | |
|---|---|---|
| 18:05 | 1 | **A.**   No. |
| 18:05 | 2 | **Q.**   I'll put a question mark here. |
| 18:05 | 3 | Who was the entity in Louisiana that administered the |
| 18:05 | 4 | prior authorization program that you did have? |
| 18:06 | 5 | **A.**   The University of Louisiana at Monroe. |
| 18:06 | 6 | **Q.**   Who adopted their standards for how they would implement a |
| 18:06 | 7 | prior authorization? |
| 18:06 | 8 | **A.**   Who adopted their standards?  I'm sorry. |
| 18:06 | 9 | **Q.**   Let me ask it differently.  The prior authorization |
| 18:06 | 10 | program you had at ULM, that was staffed by pharmacists; |
| 18:06 | 11 | correct? |
| 18:06 | 12 | **A.**   Yes. |
| 18:06 | 13 | **Q.**   In fact, you contracted out to that organization to do it; |
| 18:06 | 14 | correct? |
| 18:06 | 15 | **A.**   We did. |
| 18:06 | 16 | **Q.**   The pharmacist would answer the prior authorization |
| 18:06 | 17 | requests? |
| 18:06 | 18 | **A.**   Correct. |
| 18:06 | 19 | **Q.**   There was an appeal system that allowed a doctor-to-doctor |
| 18:06 | 20 | communication? |
| 18:06 | 21 | **A.**   Yes, I think so. |
| 18:06 | 22 | **Q.**   There, in fact, was a further appeal where you could go to |
| 18:06 | 23 | administrative review; right? |
| 18:06 | 24 | **A.**   Correct. |
| 18:06 | 25 | **MR. MURRAY:**  Actually, Your Honor, with respect to |

448

| | | |
|---|---|---|
| 18:06 | 1 | this line of questions, Your Honor has ruled prior |
| 18:06 | 2 | authorization is a theory of recovery out of the case.  We |
| 18:06 | 3 | didn't ask him any questions about whether he would have used |
| 18:07 | 4 | prior authorizations to deal with the Vioxx situation. |
| 18:07 | 5 | MR. ISMAIL:  That's my point, Judge.  There is no -- |
| 18:07 | 6 | THE COURT:  This is part of the situation.  I'll |
| 18:07 | 7 | overrule that objection. |
| 18:07 | 8 | BY MR. ISMAIL: |
| 18:07 | 9 | Q.   There was an administrative appeal process available as |
| 18:07 | 10 | well? |
| 18:07 | 11 | A.   I think that's accurate. |
| 18:07 | 12 | Q.   I'm sorry.  I just didn't hear your answer. |
| 18:07 | 13 | Now, you weren't involved with the implementation of |
| 18:07 | 14 | prior authorization systems at ULM; correct? |
| 18:07 | 15 | A.   Well, I mean, it was our responsibility, what they were |
| 18:07 | 16 | doing.  We outsourced that process, but we were still |
| 18:07 | 17 | responsible for making sure that it was implemented correctly. |
| 18:07 | 18 | Q.   I didn't mean the royal *you*.  I meant you specifically, |
| 18:08 | 19 | David Hood, weren't involved, not DHH.  You weren't involved |
| 18:08 | 20 | and can't say what specifically the process was for how the |
| 18:08 | 21 | pharmacists and doctors at ULM would answer individual |
| 18:08 | 22 | prescribing decisions and requests by physicians; right? |
| 18:08 | 23 | A.   That's correct. |
| 18:08 | 24 | Q.   Nor do you know how often and for what patients and what |
| 18:08 | 25 | indications the ULM folks would have granted prior |

DAILY COPY

18:08   1    authorization; right?

18:08   2    **A.**   Right.  You know, I had a lot of things going on and I

18:08   3    just didn't have time for that.  But, again, you know, we were

18:08   4    responsible for making sure that it was done correctly.

18:08   5            **MR. ISMAIL:**  One more thing and I'll be done,

18:08   6    Your Honor.

18:08   7    **BY MR. ISMAIL:**

18:08   8    **Q.**   During the entire time of your tenure at DHH, you never

18:09   9    considered that the department had the option to move to a

18:09   10   restrictive formulary absent legislative approval; correct?

18:09   11   **A.**   I think that there may have been opportunities to do

18:09   12   whatever was necessary in order to ensure that patients were

18:09   13   not exposed to defective drugs.  That's my belief.  I may have

18:09   14   said something slightly different.

18:09   15   **Q.**   Turn to page 299, sir.  At page 299 at line 12 --

18:10   16   **A.**   Yes.

18:10   17   **Q.**   -- were you asked:

18:10   18           "Question:  At any time during your tenure at DHH,

18:10   19       did you ever consider that the department had the option

18:10   20       to move to a restrictive formulary absent legislative

18:10   21       approval?

18:10   22           "Answer:  No, I'm not aware of that?"

18:10   23   **A.**   Well, to say that I was not aware of it at any time during

18:10   24   my tenure is a different question or a different issue from

18:10   25   whether or not we actually had the authority or the power to do

DAILY COPY

| 18:10 | 1 | that if we wanted to. Did we consider it? No. |

18:10    1    that if we wanted to. Did we consider it? No.

18:10    2    **Q.** That's actually not what the question says. During your

18:10    3    tenure at DHH, did you consider that the department had the

18:11    4    option -- not did you consider the option. Did you consider

18:11    5    that the department had the option to move to a restrictive

18:11    6    formulary absent legislative approval?

18:11    7    **A.** Well, I thought you were asking me if I ever considered

18:11    8    that. That's literally what it says here.

18:11    9    **Q.** If the department wanted to recommend the state moving to

18:11    10    a restrictive formulary for Medicaid, you would have to go back

18:11    11    to the legislature and get that specifically authorized;

18:11    12    correct?

18:11    13         **MR. MURRAY:** Your Honor, he's asked the question,

18:11    14    he's gotten the impeachment, and he has gotten the explanation.

18:11    15         **THE COURT:** He's moving on to another question.

18:11    16         **MR. ISMAIL:** I thought I was supposed to move on to a

18:11    17    new question.

18:11    18         **MR. MURRAY:** I thought that was the same question.

18:11    19         **THE COURT:** No.

18:11    20    **BY MR. ISMAIL:**

18:11    21    **Q.** I'll restate it, sir.

18:11    22    **A.** Please.

18:11    23    **Q.** If the department wanted to recommend the state moving to

18:11    24    a restrictive formulary for Medicaid, you would have to go back

18:11    25    to the legislature and get that specifically authorized;

| | | |
|---|---|---|
| 18:11 | 1 | correct? |
| 18:11 | 2 | A.    Correct.  But under normal circumstances, I would say, and |
| 18:12 | 3 | I'm not sure that we're dealing with a normal circumstance |
| 18:12 | 4 | here. |
| 18:12 | 5 | Q.    When I asked you that same question seven days ago, was |
| 18:12 | 6 | your answer:  "Yeah.  As a general rule, yes?" |
| 18:12 | 7 | A.    As a general rule, yeah. |
| 18:12 | 8 | MR. ISMAIL:  Thank you, sir.  One moment, Your Honor. |
| 18:12 | 9 | Thank you.  I tender the witness. |
| 18:12 | 10 | REDIRECT EXAMINATION |
| 18:12 | 11 | BY MR. MURRAY: |
| 18:12 | 12 | Q.    Secretary Hood, do you recall the video clip that |
| 18:12 | 13 | Mr. Ismail played of your testimony to the joint session? |
| 18:12 | 14 | A.    Yes. |
| 18:12 | 15 | Q.    In that testimony, you referred to the plan being to not |
| 18:12 | 16 | implement a 1980s-type restrictive formulary.  Do you recall |
| 18:13 | 17 | that? |
| 18:13 | 18 | A.    Correct. |
| 18:13 | 19 | Q.    What did you mean by a 1980s restrictive formulary? |
| 18:13 | 20 | A.    Well, I think I was referring to the formulary that was |
| 18:13 | 21 | put into effect for a short time, probably less than a year, |
| 18:13 | 22 | and that's one that caused a lot of grief, I think, among |
| 18:13 | 23 | physicians and so forth.  We didn't have any desire to go back |
| 18:13 | 24 | to that.  I think that's what I was saying. |
| 18:13 | 25 | Q.    Was that a formulary with a whole lot of drugs not |

DAILY COPY

| | | |
|---|---|---|
| 18:13 | 1 | covered? |
| 18:13 | 2 | **A.**   Yes. |
| 18:13 | 3 | **Q.**   That wasn't a formulary to deal with restricting payments |
| 18:13 | 4 | for a defective drug, was it? |
| 18:13 | 5 | **A.**   No, it was not. |
| 18:13 | 6 | **MR. ISMAIL:**  Objection:  Leading. |
| 18:13 | 7 | **MR. MURRAY:**  I can rephrase the question, Your Honor. |
| 18:13 | 8 | I apologize. |
| 18:13 | 9 | **THE COURT:**  He's answered it. |
| 18:13 | 10 | **BY MR. MURRAY:** |
| 18:14 | 11 | **Q.**   Now, assuming that you had to go to the legislature for |
| 18:14 | 12 | approval of a restrictive formulary to eliminate coverage for a |
| 18:14 | 13 | defective drug, was there anything that prohibited you from |
| 18:14 | 14 | going to the legislature prior to June 10, 2002, when you did |
| 18:14 | 15 | go to the legislature with the PDL? |
| 18:14 | 16 | **A.**   No, I don't think so. |
| 18:14 | 17 | **Q.**   So on June 13, 2001, if you knew -- rephrase that. |
| 18:14 | 18 | Let's assume that on June 13, 2001, you knew that |
| 18:14 | 19 | Vioxx was defective.  Could you have gone to the legislature at |
| 18:14 | 20 | that day with a proposal to restrict Vioxx per Article 395? |
| 18:15 | 21 | **MR. ISMAIL:**  Objection:  Calls for speculation, |
| 18:15 | 22 | Your Honor. |
| 18:15 | 23 | **THE COURT:**  I don't think it does.  I'll overrule the |
| 18:15 | 24 | objection and allow him to answer. |
| 18:15 | 25 | **THE WITNESS:**  Restate, please. |

DAILY COPY

18:15    1    **BY MR. MURRAY:**

18:15    2    **Q.**    If you were aware on June 13, 2001, that Vioxx was

18:15    3    defective, could you have gone to the legislature on that date

18:15    4    to request approval of a formulary that restricted payment of

18:15    5    Vioxx in accordance with Article 395 -- I'm sorry.  Act 395?

18:15    6    **A.**    Well, if it was for purposes of amending the law, which

18:15    7    had already passed, that wouldn't have been possible.  If it

18:15    8    was, you know, to -- well, let me just say that, that the law

18:16    9    had already passed and been signed.

18:16    10   **Q.**    Actually, my question was more with regard to a

18:16    11   requirement, assuming that there was one, that you go back to

18:16    12   the legislature after passage to request approval of a

18:16    13   pharmacopoeia in accordance with Act 395.

18:16    14   **A.**    Well, yes.  There was nothing that would have restricted

18:16    15   us from doing so if we had known we were dealing with a

18:16    16   defective drug.  I dare say that the question and answer period

18:16    17   that was in the video would have been a completely different

18:16    18   story.

18:16    19   **Q.**    Let me ask you:  Regardless of whether you heard it from

18:16    20   the P&T committee, whether you heard it from Merck, or anywhere

18:16    21   else, I want you to assume that you knew of a defect in Vioxx,

18:16    22   regardless of where it came from.  Assume that you knew it on

18:16    23   June 13, 2001.  Regardless of the source of that information,

18:17    24   would you have taken steps not to reimburse Vioxx?

18:17    25   **A.**    Absolutely.  The first priority would be to protect the

| | | |
|---|---|---|
| 18:17 | 1 | health and safety of the Medicaid population. |
| 18:17 | 2 | MR. MURRAY:  One last question, Your Honor. |
| 18:17 | 3 | BY MR. MURRAY: |
| 18:17 | 4 | Q.   Secretary Hood, during your tenure at LDHH, were you ever |
| 18:17 | 5 | confronted with a situation where you were made aware that a |
| 18:17 | 6 | drug was unfit for its intended use before that drug was pulled |
| 18:17 | 7 | from the marketplace? |
| 18:17 | 8 | A.   No. |
| 18:17 | 9 | MR. MURRAY:  No further questions, Your Honor. |
| 18:17 | 10 | THE COURT:  Okay.  You're excused, sir.  Thank you. |
| 18:17 | 11 | We will start tomorrow at 9:00.  Court will |
| 18:17 | 12 | stand in recess. |
| 18:17 | 13 | THE DEPUTY CLERK:  All rise. |
| 18:18 | 14 | (WHEREUPON the Court was in recess.) |
| 18:18 | 15 | * * * |

16                          **CERTIFICATE**

17          I, Toni Doyle Tusa, CCR, FCRR, Official Court

18  Reporter for the United States District Court, Eastern District

19  of Louisiana, do hereby certify that the foregoing is a true

20  and correct transcript, to the best of my ability and

21  understanding, from the record of the proceedings in the

22  above-entitled and numbered matter.

23

24

                                    s/ Toni Doyle Tusa
25                                  Toni Doyle Tusa, CCR, FCRR
                                    Official Court Reporter


DAILY COPY