```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

     ****************************************************************
 3

     IN RE:  VIOXX PRODUCTS                MDL No. 1657
 4   LIABILITY LITIGATION                  Section: "L"
                                           New Orleans, Louisiana
 5                                         Wednesday, April 14, 2010

 6   ****************************************************************
     THIS DOCUMENT RELATES TO:
 7

     State of Louisiana, ex rel
 8   James D. Caldwell, Jr.,
     Attorney General
 9

             versus
10

     Merck
11

     Case No. 05-CV-3700
12   ****************************************************************

13                    TRANSCRIPT OF TRIAL PROCEEDINGS
             HEARD BEFORE THE HONORABLE ELDON E. FALLON
14                 UNITED STATES DISTRICT JUDGE
                      DAY 3, MORNING SESSION
15


16


17   APPEARANCES:


18
     FOR THE LOUISIANA DEPARTMENT
19   OF HEALTH AND HOSPITALS:
                                      DUGAN LAW FIRM
20                                    BY:  JAMES R. DUGAN, II, ESQ.
                                      650 Poydras St., Suite 2150
21                                    New Orleans, LA 70130

22
                                      MURRAY LAW FIRM
23                                    BY:  STEPHEN B. MURRAY, JR., ESQ.
                                         DOUGLAS R. PLYMALE, ESQ.
24                                       JUSTIN BLOOM, ESQ.
                                      650 Poydras St., Suite 1100
25                                    New Orleans, LA 70130
```

```
 1
                                    LIEFF CABRASER HEIMANN & BERNSTEIN
 2                                  BY:  DONALD C. ARBITBLIT, ESQ.
                                    Embarcadero Center West
 3                                  275 Battery Street, Suite 3000
                                    San Francisco, CA 94111-3339
 4

 5

 6  FOR MERCK:                      GOLDMAN ISMAIL TOMASELLI
                                    BRENNAN & BAUM
 7                                  BY:  TAREK ISMAIL, ESQ.
                                    1 North Franklin St., Suite 625
 8                                  Chicago, IL 60606

 9                                  BAKER BOTTS
                                    BY:  TRAVIS J. SALES, ESQ.
10                                  One Shell Plaza
                                    910 Louisiana
11                                  Houston, TX 77002-4995

12
                                    O'MELVENY & MYERS
13                                  BY:  SCOTT M. VOELZ, ESQ.
                                    400 South Hope Street
14                                  Los Angeles, CA 90071-2899

15

16
    Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
17                                  500 Poydras Street, Room HB-406
                                    New Orleans, Louisiana 70130
18                                  (504) 589-7776

19

20      Proceedings recorded by mechanical stenography, transcript
    produced by computer.
21

22

23

24

25
```

1                          I N D E X

2

3   WITNESSES FOR THE PLAINTIFF:                    PAGE/LINE:

4   JOHN S. MacGREGOR, M.D.

5

6     Voir Dire Examination by Mr. Arbitblit        458/20

7

8     Direct Examination by Mr. Arbitblit           462/9

9

10    Cross-Examination by Mr. Ismail               497/4

11

12    Redirect Examination by Mr. Arbitblit         525/10

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      P R O C E E D I N G S

 2                 (WEDNESDAY, APRIL 14, 2010)

 3                     (MORNING SESSION)

 4

 5      (OPEN COURT.)

 6           THE COURT:  Be seated, please.  Good morning, ladies and

 7   gentlemen.  Call your next witness, please.

 8           MR. ARBITBLIT:  Plaintiff calls John MacGregor, M.D.,

 9   your Honor.

10           THE DEPUTY CLERK:  Please step into the witness box.

11   Would you raise your right hand.

12      (WHEREUPON, JOHN S. MACGREGOR, WAS SWORN IN AND TESTIFIED AS

13      FOLLOWS:)

14           THE DEPUTY CLERK:  Please be seated.  And would you state

15   your name for the record.

16           THE WITNESS:  John S. MacGregor.

17           THE DEPUTY CLERK:  Would you spell the last name, please.

18           THE WITNESS:  M-A-C, capital G-R-E-G-O-R.

19                     VOIR DIRE EXAMINATION.

20   BY MR. ARBITBLIT:

21   Q.  Good morning, Dr. MacGregor.

22   A.  Good morning.

23   Q.  I would like to start with explaining to the judge a bit about

24   your background.  Are you a cardiologist?

25   A.  Yes, I am.
</pre>

```
 1   Q.  Are you a licensed physician?
 2   A.  Yes, I am.
 3   Q.  Are you practicing as a cardiologist?
 4   A.  Yes.
 5   Q.  And when did you get your medical degree?
 6   A.  I got my medical degree in 1984.
 7   Q.  Where did you do that?
 8   A.  Cornell University Medical College.
 9   Q.  And before you got your medical degree, did you also pursue an
10   advanced degree in biochemistry?
11   A.  Yes, I did.
12   Q.  Do you hold any academic positions?
13   A.  I do.
14   Q.  What are those?
15   A.  I am a professor of medicine at the University of California
16   San Francisco.
17   Q.  How long have you been in that position?
18   A.  I think since 2003.
19   Q.  And prior to that were you working your way up from assistant
20   professor and the like?
21   A.  Yes, beginning in 1991.
22   Q.  So about 19 years?
23   A.  Yes.
24   Q.  And have you studied molecular biology?
25   A.  Yes, I have.
```

1    Q.  Can you tell the court whether you're board certified?

2    A.  I am board certified in interventional, in interventional

3    cardiology, cardiovascular diseases and internal medicine.

4    Q.  And do you also have a Ph.D.?

5    A.  Yes.

6    Q.  And that is in biochemistry?

7    A.  Correct.

8    Q.  When did you obtain the Ph.D.?

9    A.  1981.

10   Q.  What is enzymology?

11   A.  Enzymology is the study of proteins in cells that catalyze

12   chemical reactions, which means they facilitate or speed up

13   chemical reactions.

14   Q.  Have you studied enzymology during your training?

15   A.  Yes, I have.

16   Q.  There's been a lot of talk in these cases about cyclooxygenase,

17   COX-1 and COX-2, are those enzymes?

18   A.  Yes, they are.

19   Q.  And did you study COX enzymes during your training?

20   A.  I studied them in the sense that I've reviewed the literature

21   on them, and I've attended seminars and other discussions of them.

22   Q.  And have you followed the literature on what's been learned

23   about the COX enzymes over the past 20, 30 years, since you started

24   studying that area?

25   A.  Yes.

1    Q.  Have you also done research for the pharmaceutical industry in

2    the areas relating to molecular biology?

3    A.  Part of my Ph.D. research was done in facilities owned by

4    Hoffmann-La Roche.

5    Q.  Are you a published author of peer-reviewed literature?

6    A.  Yes.

7    Q.  And are you a fellow of the American College of Cardiology?

8    A.  Yes.

9    Q.  Are you an expert in the field of cardiology?

10   A.  Yes.

11   Q.  Are you an expert in the effects of prostacyclin and

12   thromboxane on the cardiovascular system?

13   A.  Yes.

14   Q.  Are you an expert on the effects of Vioxx on the cardiovascular

15   system?

16   A.  Yes.

17   Q.  Are you an expert in the field of biochemistry?

18   A.  Yes.

19            MR. ARBITBLIT:  Your Honor, we would tender the witness

20   as an expert in those fields for the purposes of this case.

21            MR. ISMAIL:  No objection, your Honor.

22            THE COURT:  The court will accept him in the tendered

23   fields.

24            MR. ARBITBLIT:  Thank you, your Honor.  And if we may,

25   we'd offer the curriculum vitae, which is at the first tab of your

1    Honor's binder of materials.  It does not have an exhibit mark on

2    it, I don't know what the last number was yesterday.

3              THE DEPUTY CLERK:  The last number on your list is 723,

4    so I guess it would be 724.

5              MR. ARBITBLIT:  Thank you.

6              THE DEPUTY CLERK:  Admitted, Judge?

7              THE COURT:  Yes, admitted.

8                         DIRECT EXAMINATION

9    BY MR. ARBITBLIT:

10   Q.  Now, Dr. MacGregor, were you asked to review documents relating

11   to the question of whether Vioxx is toxic to the cardiovascular

12   system and to evaluate those in light of your training and

13   experience?

14   A.  Yes.

15   Q.  And were you asked to review documents on the question of

16   whether other nonsteroidal anti-inflammatory drugs or NSAIDs are

17   similar to or different from Vioxx in terms of cardiotoxicity?

18   A.  Yes, I was.

19   Q.  And have you arrived at opinions on those questions?

20   A.  Yes.

21   Q.  As to the first question, what is your opinion as to whether

22   Vioxx is toxic to the cardiovascular system?

23   A.  My opinion is that it is toxic.

24   Q.  And as to the second question, whether other NSAIDs are similar

25   to or different from Vioxx in terms of cardiotoxicity, what is your

1    opinion?

2    A.  My opinion is that Vioxx is the most cardiotoxic drug among the

3    NSAIDs, that some of the other NSAIDs, that is, nonsteroidal

4    anti-inflammatory drugs, do have cardiotoxic effects, largely as a

5    function of their COX-2 selectivity.

6    Q.  And we will get into the basis for your opinions as we proceed.

7    Thank you, sir.

8              Could you turn to the second tab in your binder, please.

9    Have you reviewed an article published in the journal *Circulation*

10   known as "The Scientific Statement of the American Heart

11   Association on the Use of Nonsteroidal Anti-Inflammatory Drugs or

12   NSAIDs"?

13   A.  Yes, I have.

14             THE COURT:  Do I have that binder?

15             MR. ARBITBLIT:  Do we not have the judge's binder?  I

16   apologize for that, your Honor.

17             THE COURT:  That's all right.  Thanks, go ahead.

18             MR. ARBITBLIT:  We're at tab 2, your Honor.

19             THE COURT:  What was the question?

20             MR. ARBITBLIT:  The question is whether the witness has

21   reviewed this document.

22             THE WITNESS:  Yes, I have.

23   BY MR. ARBITBLIT:

24   Q.  Is it a peer-reviewed journal article?

25   A.  Yes, it is.

1   Q.  Is it a scientific statement of the American Heart Association

2   published in the journal of the AHA called *Circulation*?

3   A.  Yes.

4         MR. ARBITBLIT:  And, your Honor, we would ask that it be

5   admitted but not received in evidence so that the witness may read

6   from it.

7         THE COURT:  Right.  The witness can use it.  As I have

8   indicated, I am not going to admit those, but the witness can

9   review it and read portions of it that he feels are important in

10  accordance with 803(3).

11        MR. ARBITBLIT:  Thank you, your Honor.

12  BY MR. ARBITBLIT:

13  Q.  Turning to page 7 of the document under the summary section,

14  Dr. MacGregor, can you tell the court whether you relied on this

15  statement in the summary section for any of your opinions?

16  A.  Yes.

17  Q.  Could you read that into the record, please?

18  A.  Sure.  It says:  "Current evidence indicates that selective

19  COX-2 inhibitors have important adverse cardiovascular effects that

20  include increased risk for myocardial infarction, stroke, heart

21  failure, and hypertension.  The risk for these adverse effects is

22  likely greatest in patients with a prior history of or at high risk

23  for cardiovascular disease."

24  Q.  Is that a statement you would agree with?

25  A.  Yes, it is.

1    Q.  Now, turning back to page 3 of the American Heart Association's

2    scientific statement, at the bottom right under the background

3    scientific information at the bottom, there's a statement beginning

4    with "the differences in biological effects".  And is this a

5    statement that you relied on for any of your opinions?

6    A.  Yes, it is.

7    Q.  And could you please read that starting with "the differences

8    in biological effects"?

9    A.  "The differences in the biological effects of COX-2 inhibitors

10   are a consequence of the degree of selectivity for COX-2 versus

11   COX-1 and tissue-specific variations in the distribution of COX and

12   related enzymes that convert prostaglandin H2 into specific

13   prostanoids."

14   Q.  Is that a statement that you would agree with?

15   A.  Yes, it is.

16   Q.  Does this article provide information about the degree of

17   selectivity of various COX-2 inhibitors?

18   A.  Yes, it does.

19   Q.  And is there a figure in the article that tells you about that?

20   A.  Yes.  Figure 6.

21   Q.  Could you turn to Figure 6, and that's at page 5 of the

22   article, your Honor.

23           What does the figure tell you as to rofecoxib or Vioxx in

24   terms of degree of COX-2 selectivity?

25   A.  It's at an extreme end with high COX-2 selectivity.

1  Q.  And how does that degree of Vioxx COX-2 selectivity bear upon

2  your opinions as to its cardiotoxicity?

3  A.  Well, you can see in this figure that the Y axis at each end,

4  so there's, as you face this figure, on the right is COX-1

5  selectivity, on the left is COX-2 selectivity; on the right with

6  more COX-1 selectivity there is increased gastrointestinal risk,

7  and on the left with increased COX-2 selectivity, there's

8  heightened cardiovascular risk.  So that's the end of the

9  rofecoxib, Vioxx, on the high cardiovascular risk end, the high

10 COX-2 selectivity end.

11 Q.  Now, there is a figure at the top of this page that we have a

12 better version of.  Could we show that.  Are you familiar with

13 Figure 5 from the AHA scientific statement?

14 A.  Yes.

15 Q.  Can you explain what this represents?

16 A.  Sure.  Again, as we face this figure, on the left is normal

17 endothelium, and you can see that normal endothelium produces

18 prostaglandin $I_2$ or prostacyclin, which is a cardioprotective

19 prostanoid, and the platelets produce thromboxane $A_2$, which is a

20 cardiotoxic prostanoid.

21       And on the right side, also under the normal, you can see

22 there is a relative balance, both are expressed in low levels in

23 this diagram and comparable levels.

24       On the atherothrombosis panel, it again depicts

25 production of prostacyclin by the endothelial cells and also

1    thromboxane A$_2$ by the platelets, but in this setting, if you impose

2    COX-2 inhibition, there is reduction in the prostacyclin production

3    and no change in the thromboxane A$_2$ production because that is a

4    COX-1 product.  And thus you get an exaggeration of the cardiotoxic

5    effects of the thromboxane A$_2$ with a reduction of the

6    cardioprotective effects of the prostacyclin.

7    Q.  And do you believe that the mechanism described for

8    cardiotoxicity in Figure 5, as you just explained it, is a

9    plausible mechanism that explains what's going on with Vioxx?

10   A.  Yes, I do.

11   Q.  If you could turn to tab 3 of the binder.  Is there an article

12   that you've reviewed by Grosser, Fries, and FitzGerald?

13   A.  Yes.

14   Q.  And what is the title of that?

15   A.  "Biological Basis For the Cardiovascular Consequences of COX-2

16   Inhibition:  Therapeutic Challenges and Opportunities."

17   Q.  Is this a peer-reviewed article in the *Journal of Clinical*

18   *Investigation*?

19   A.  Yes.

20           MR. ARBITBLIT:  Your Honor, we'd ask that it be allowed

21   for the same purposes previously.

22           THE COURT:  Right.

23           MR. ARBITBLIT:  Thank you.

24   BY MR. ARBITBLIT:

25   Q.  Do you rely on this article for some of the opinions you're

1  giving in this case?

2  A.  Yes.

3  Q.  If you would turn to page 5 of the article, which is actually

4  the second page in the, second page of the article in the binder.

5  There is a heading, "Mechanistic basis for a cardiovascular hazard

6  resulting from inhibition of COX-2."  Are you familiar with the

7  explanation that these authors have provided?

8  A.  Yes.

9  Q.  And can you summarize it in your own words?

10  A.  Sure.  It's similar to the explanation I gave previously with

11  respect to the diagram in the Antman article from the American

12  Heart Association.

13          So the mechanism that's proposed here is that selective

14  inhibition of COX-2 will result in reduced production of the

15  cardioprotective prostacyclin from endothelial cells, without

16  affecting the production of cardiotoxic thromboxane and, therefore,

17  lead to an exaggerated expression of the thromboxane and reduced

18  expression of the prostacyclin resulting in adverse cardiac events,

19  including myocardial infarction, heart failure, hypertension.

20  Q.  Doctor, do the authors also point out that there may be other

21  things going on in the body that affect this balance that would

22  result in thrombotic events?

23  A.  Sure.  They point out that the biology of the endothelium is

24  very complex and this is one factor.

25  Q.  And do you think it's an important factor?

1    A.  Yes.

2    Q.  Going over to the next page, page 6 of the article, in the

3    right-hand column, there is a paragraph beginning "aside from

4    effects," and is that part of the article that you reviewed?

5    A.  Yes.

6    Q.  And would you read that into the record, please?

7    A.  Sure.  It says:  "Aside from effects most relevant to acute

8    human syndromes of thrombotic vascular occlusion, suppression of

9    COX-2 may also predispose to a more gradual elevation of

10   cardiovascular risk during prolonged dosing with inhibitors."

11   Q.  Do you agree with that statement?

12   A.  Yes.

13   Q.  Do you find that there is a plausible mechanism for

14   atherogenesis involved in COX-2 inhibition?

15   A.  Yes, that's one of the mechanisms for the prolonged increase in

16   cardiovascular risk, another would be hypertension caused by COX-2

17   inhibitors.

18   Q.  At the bottom of this page just before the new section on

19   concordance of clinical experience, could you read that summary

20   statement?

21   A.  Sure.  "In summary, a substantial body of evidence has

22   accumulated that one mechanism, suppression of COX-2 dependent $PGI_2$

23   formation, can both augment the response to thrombotic and

24   hypertensive stimuli and initiate and accelerate atherogenesis."

25   Q.  And is that a statement that you agree with?

1    A.  Yes.

2    Q.  Now, do the authors of the Grosser and Fries and FitzGerald

3    article also discuss data concerning traditional NSAIDs at page 11?

4    A.  Yes.

5    Q.  Starting at page 10 and going over to 11.  And on page 10 of

6    the document, under the cardiovascular risk and the traditional

7    NSAIDs, what do the authors say about whether we do or don't have

8    placebo-controlled randomized clinical trials addressing

9    cardiovascular safety of traditional NSAIDs?

10   A.  They observed that we do not have trials of those NSAIDs.

11   Q.  So in the hierarchy of scientific evidence, are the randomized

12   clinical trials higher up than the observational studies?

13   A.  Yes.

14   Q.  Are the observational studies, nevertheless, something that

15   scientists take into account?

16   A.  Yes, they are.

17   Q.  Going over to page 11, is there a statement by these authors as

18   to what they found in the review of the literature concerning

19   ibuprofen and cardiovascular risks at the lower right?

20   A.  Yes, there is.

21   Q.  Could you please read that into the record?

22   A.  Sure.  They say:  "Most observational studies of traditional

23   NSAIDs last less than one year and most, but not all, are

24   consistent with no increased risk of cardiovascular events on

25   ibuprofen."

1   Q.  Is that consistent with your opinion based on your knowledge of

2   the literature?

3   A.  Yes.

4   Q.  Doctor, have you reviewed materials pertaining to the mechanism

5   in addition to those we've just described?

6   A.  Yes.

7   Q.  If you could turn to tab 4 of the index binder.  Did you review

8   an article by Baker in the journal that is probably

9   *Arteriosclerosis Thrombosis Vascular Biology*, is that what that

10  abbreviation stands for?

11  A.  Yes.

12  Q.  That's a mouthful.  And so is the type of study.  Doctor, what

13  is the type of study -- before we get there, is this an article you

14  relied on in coming to your opinions today?

15  A.  Yes.

16          MR. ARBITBLIT:  And, your Honor, I'd ask that he be

17  allowed to read from it as the others.

18          THE COURT:  Yes.

19          MR. ARBITBLIT:  Thank you.

20  BY MR. ARBITBLIT:

21  Q.  What is the topic of this article, sir?

22  A.  It covers several areas, but I think a pertinent area that they

23  cover is the localization of COX-2 in endothelial cells of human

24  arteries that are affected by atherosclerosis.

25  Q.  What is an immunocytochemical study as described in this

1  abstract of the article?

2  A.  It's a technique for identifying proteins in tissues, so if you

3  were identifying COX-2 in endothelial tissue, and it involves

4  raising an antibody to the enzyme so the -- a portion of the enzyme

5  is injected into a rabbit that makes an antibody to the protein and

6  then you use that protein, the antibody, to stain the COX-2 and the

7  endothelial cells to allow you to identify and localize it.

8  Q.  Just to be clear, these are human blood vessels that they're

9  studying; is that right?

10  A.  That's right.

11  Q.  And is there a figure at page 648 of the article that you

12  relied on in coming to your opinions today?

13  A.  Yes.  Specifically Figure 2, frame E.

14  Q.  And what does that show?

15  A.  That shows the kind of staining with the antibody to COX-2 that

16  I described earlier, and it shows localization of COX-2 in these

17  endothelial cells, and that's indicated by the arrows and by the

18  brown staining of the endothelial cells.

19  Q.  So did the scientist's technique, was it designed to stain

20  those areas in order to identify the location of the COX-2?

21  A.  That's right.

22  Q.  What is the relevance of finding that COX-2 is present in the

23  endothelium to the opinions you have about Vioxx and its

24  cardiotoxicity?

25  A.  Well, it supports the mechanism that I've described earlier,

1   that is, it shows that COX-2 is present in the endothelial cells of

2   human coronary arteries with atherosclerosis, and then applying the

3   mechanism to that, if you inhibit that with a specific COX-2

4   inhibitor, it reduced the prostacyclin and so you have the enzyme,

5   COX-2, expressed in an area where, if you inhibit it, it will cause

6   cardiotoxic effects like myocardial infarction.

7   Q.  Is that because you would not have the effects of prostacyclin,

8   as you described earlier, in combatting the effects of thromboxane?

9   A.  That's right.  So it shows that COX-2 is present where it's

10  indicated on the Antman diagram and where it's postulated to exist

11  in the, or proposed to exist in the FitzGerald Grosser article, and

12  this is a location where inhibition of that enzyme according to the

13  mechanism would result in cardiotoxicity.

14  Q.  And do you believe that that's a plausible mechanism for the

15  effects observed in the clinical trials?

16  A.  Yes.

17  Q.  Turning to the next tab, which is index tab 5.  Did you review

18  an article by Belton and others in the journal *Circulation*

19  concerning Cyclooxygenase-1 and -2 - Dependent Prostacyclin

20  Formation in Patients With Atherosclerosis?

21  A.  Yes.

22  Q.  Is this another peer-reviewed article that you relied on for

23  your opinions?

24  A.  Yes.

25          MR. ARBITBLIT:  I'd ask that it be admitted for the same

1    purposes and not received into evidence.  Thank you, your Honor.

2    BY MR. ARBITBLIT:

3    Q.  Looking at the methods at page 840, which is the first page of

4    the actual text of the article, what did the authors describe that

5    they did here?

6    A.  Well, they look at 42 patients with atherosclerosis who are

7    scheduled to undergo surgical revascularization, and they use

8    specific inhibitors of COX-1 and COX-2 to look at urinary

9    metabolites of the products of those enzymes.

10   Q.  And what did they find?

11   A.  Well, just looking here in the results section, the COX-2

12   inhibitor nimesulide, they indicate, reduced the concentration or

13   the production of the prostacyclin metabolite, clean metabolite,

14   2,3-dinor-keto-PGF$_{a1}$, in the urine of these patients to a

15   significant extent.  So the concentration was 378 petagrams per

16   milligram prior to the inhibiter and it went down to 167 after the

17   inhibitor was added, which is a statistically significant result.

18           In contrast, that inhibitor had no significant effect on

19   metabolites of thromboxane.  So it showed that this inhibitor was

20   inhibiting COX-2 and not COX-1.

21   Q.  And going to page 843 of the article under the discussion

22   section.  What did the authors say about their findings in the

23   second and third paragraphs?

24   A.  They say, just reading from the conclusions:  "Although COX-1

25   may be the primary source of thromboxane A$_2$ in normal subjects,

1    data from several studies show that COX-2 is the major source of

2    endogenous $PGI_2$, thus COX-2 inhibition markedly reduces the

3    excretion of PGI to a metabolites in normal volunteers."

4           And then they go on to say that:  "We showed through

5    several approaches that COX-2 was induced in atherosclerotic plaque

6    and that this was in part responsible for the increase in $PGI_2$

7    biosynthesis seen in patients with atherosclerosis."

8    Q.  Just going back, what does endogenous mean, sir?

9    A.  It means within the body.

10   Q.  And what is the relevance of this, these findings of this

11   article to your opinions?

12   A.  Well, it demonstrates that COX-2 is an important source of

13   prostacyclin in atherosclerotic arteries.

14   Q.  Are you aware of some scientists who question whether there is

15   COX-2 in the endothelium as opposed to COX-1?

16   A.  Yes.

17   Q.  And what do these two studies that you just referenced, Baker

18   and Belton, have to say on that subject?

19   A.  They both support the concept that they're present in

20   atherosclerotic arteries.

21   Q.  And does that relate to what the effects of inhibition of COX-2

22   would have on cardiotoxicity?

23   A.  Sure.

24   Q.  And can you explain that?

25   A.  Sure.  Again, it shows that there is important, there is an

 1   important contribution by COX-2 to the production of prostacyclin

 2   based on these inhibition studies, that is, you can inhibit the

 3   production of prostacyclin with a COX-2 inhibitor.  These studies

 4   taken together, that is, showing localization of the COX-2 enzyme

 5   by the immunohistochemical stains in the first article, and this

 6   one showing that you can inhibit the production of prostacyclin

 7   with specific inhibitors taken together I think demonstrate that

 8   endothelial cells in these patients with atherosclerosis produce

 9   prostacyclin, and the COX-2 inhibitors reduce that production.

10   Q.  Now, Doctor, I'd like to talk about some of the clinical trials

11   now that we've talked some about the mechanism.

12         In particular, if you could turn to tab 9 of your binder.

13   Is there a study called VIGOR that you've reviewed?

14   A.  Yes.

15   Q.  And did you review the article by Bombardier?

16   A.  Yes, I did.

17   Q.  And for the data from the VIGOR study, did you review the item

18   at tab 10, which is a July 5, 2000, memorandum from Dr. Deborah

19   Shapiro to Drs. Reicin, Barr and Erb?

20   A.  Yes, I reviewed that.

21         MR. ARBITBLIT:  And that's marked as Exhibit LAAG 59,

22   your Honor, at the 10th tab of the binder.

23   BY MR. ARBITBLIT:

24   Q.  Did this memorandum summarize the findings of cardiovascular

25   events in VIGOR?

1    A.  Yes.

2    Q.  And if you could turn to table 3 at page 5 of the document.

3    Are you there?

4    A.  Yes.

5    Q.  This is a summary of adjudicated thromboembolic, cardiovascular

6    serious adverse experiences safety update report; do you see that?

7    A.  Yes.

8    Q.  And for the top line, any thromboembolic event, what were the

9    results?

10   A.  In the group that received rofecoxib, there were 47

11   thromboembolic events; the group that received Naproxen, there were

12   20.

13   Q.  Going down below under cardiac events, what were the results

14   for acute myocardial infarction?

15   A.  There were 20 with rofecoxib and 4 with Naproxen.

16   Q.  Just above that for cardiac events in total, what were the

17   results?

18   A.  Twenty-eight with rofecoxib and ten for Naproxen.

19   Q.  If you could turn to the next page, which is table 4, is this a

20   summary of adjudicated thromboembolic serious adverse events in

21   selected subgroups of patients?

22   A.  Yes.

23   Q.  Does the top line report the results for the numbers of

24   patients with such events for the entire, all patients group?

25   A.  Yes, it does.

1    Q.   What was that result?

2    A.   There were 45 in the rofecoxib group and 19 in the Naproxen

3    group.

4    Q.   Excuse me, 45 in which group?

5    A.   In the Vioxx group.

6    Q.   And 19 in Naproxen?

7    A.   That's right.

8    Q.   And does the memorandum in the right-hand column provide an

9    estimate of the relative risk and statistical significance?

10   A.   Yes.

11   Q.   Is this data inverted from how you might usually see it?

12   A.   Yes, it's presented as if Naproxen was providing a protective

13   effect rather than Vioxx causing a deleterious effect.

14   Q.   Is that represented in this estimate of 0.42 rather than a

15   number greater than one?

16   A.   Yes.  If you wanted to see the increased risk, if you wanted to

17   look at it the other way around as increased risk from Vioxx, it

18   would be something like 2.4 or something like that.

19   Q.   And is the 95 percent confidence interval, 0.25 to 0.72?

20   A.   Yes, so that would make it statistically significant.

21   Q.   Underneath is there a presentation of data for people who are

22   aspirin indicated?

23   A.   Yes.

24   Q.   Are aspirin-indicated people at higher risk of events?

25   A.   They were at five times higher risk with Vioxx compared to

1   Naproxen.

2   Q.  And is that consistent with the flipping of the 0.2 estimate

3   into a number five if you reverse the equation?

4   A.  That's right.

5   Q.  Is that confidence interval statistically significant?

6   A.  Yes, it is.

7   Q.  Then for the aspirin not indicated group, are those folks at

8   lower risk in general terms than people who are aspirin indicated?

9   A.  Yes, they are.  Their risk is about a twofold increase with

10  Vioxx compared to Naproxen.

11  Q.  And what are the total numbers of events for that subgroup?

12  A.  Thirty with Vioxx, 16 with Naproxen.

13  Q.  And if you go over to the relative risk column, does that 0.53

14  relative risk convert into a number on the positive side of one?

15  A.  Yes, it would convert to around two.

16  Q.  So a relative risk of about two, then?

17  A.  Yes.

18  Q.  And is the confidence interval for that data statistically

19  significant?

20  A.  Yes, it is.

21  Q.  Does this table show that there is a statistically significant

22  increased risk for all patients in all of the subgroups reported?

23  A.  Yes, it does.

24  Q.  And do you have an opinion as to the most likely cause of the

25  higher rates of myocardial infarction and thromboembolic events in

1  the Vioxx population of the VIGOR study?

2  A.  Yes, I do.

3  Q.  And what is your opinion, sir?

4  A.  A cardiotoxic effect of Vioxx.

5  Q.  And is that -- what is the basis for your opinion?

6  A.  The information we've already discussed, the proposed mechanism

7  and the other articles we've reviewed, showing the localization of

8  COX-2 in human atherosclerotic endothelial cells and the inhibition

9  of metabolites of prostacyclin by specific inhibitors of COX-2.

10  Q.  Did you also review a study called APPROVe?

11  A.  Yes.

12  Q.  And is that at --

13        MR. ARBITBLIT:  Your Honor, before we move on, I don't

14  know for certain whether LAAG 59 is already in the record, but I

15  would move to admit it if it isn't.

16        THE COURT:  All right.  I'll admit it.

17        MR. ARBITBLIT:  Thank you, your Honor.

18        THE COURT:  If it's not already there.

19        THE DEPUTY CLERK:  It was not, Judge.

20        THE COURT:  Okay.  Let it be admitted.

21        MR. ARBITBLIT:  Thank you.

22  BY MR. ARBITBLIT:

23  Q.  At the index tab 11 of your binder, is this the APPROVe study

24  that you reviewed?  I notice that -- we'll move on.  I noticed the

25  slide go by me, your Honor, that I -- we'll move on in the interest

1    of getting through.

2            Is this the APPROVe study that you reviewed, sir?

3    A.  Yes.

4    Q.  And on the first page of the article, what do the authors

5    describe as the methods that they used?

6    A.  They randomized 2,586 patients who had a history of colorectal

7    adenomas, or cancer, to either receive 25 milligrams of Vioxx or

8    placebo, and they followed them and watched for recurrence of the

9    cancer.

10   Q.  And was this a placebo-controlled trial?

11   A.  Yes.

12   Q.  Did the authors report the results of cardiovascular thrombotic

13   events that were reported in the study?

14   A.  Yes.

15   Q.  And if you could turn to table 2 at page 5 of the Bresalier

16   article, turning to table 2 of the Bresalier article, incidence of

17   adjudicated thrombotic adverse events, what did the study show for

18   the total number and hazard ratio?

19   A.  It showed there were increased events in the rofecoxib group;

20   specifically, there were a total of 46 in the rofecoxib group and

21   26 in the placebo group, giving a hazard ratio of 1.92, which was

22   statistically significant.

23   Q.  And for cardiac events in the line below that, what was the

24   result?

25   A.  Thirty-one events in the Vioxx group versus 12 in the placebo

```
 1   group, giving a hazard ratio of 2.8, which, again, was
 2   statistically significant.
 3   Q.  And do you have an opinion as to the reason for the
 4   statistically significant increased risk of thrombotic and cardiac
 5   events that you just reviewed in table 2 of the APPROVe study?
 6   A.  Yes.
 7   Q.  And what is your opinion, sir?
 8   A.  The cardiotoxic effects of Vioxx.
 9   Q.  Is that for the same reasons you've previously explained?
10   A.  Yes.
11   Q.  If you could turn to tab 12 of your binder.  Does this article
12   represent the final analysis of the APPROVe trial after an
13   additional one year of follow-up?
14          MR. ISMAIL:  Your Honor, I don't believe this article is
15   on Dr. MacGregor's material list, his supplemental materials list
16   or the reference list cited to his report.
17          MR. ARBITBLIT:  Your Honor, it's simply the finalization
18   of the same study that he disclosed.  There was an agreement that
19   this witness was not going to be deposed because of an exchange
20   that their cardiologist wasn't going to be deposed.  And it's
21   simply to finalize the reporting on the same study that he just
22   talked about.
23          MR. ISMAIL:  This article came out before they served the
24   report in this case, which had a material list, a supplemental
25   material list, and a reference list, which article did not appear.
```

1      THE COURT:  Right.  Let's move on, then, past the

2  article.

3  BY MR. ARBITBLIT:

4  Q.  Turning to the next tab, 13, is this an article that you

5  reviewed in coming to your opinions on this case?

6  A.  Yes.

7  Q.  And what is this article about?

8  A.  This article is called the VICTOR trial, it's reporting on the

9  results of the VICTOR trial, and this was another trial that looked

10  at 25 milligrams of Vioxx versus placebo in patients with

11  colorectal cancer to see if Vioxx would reduce the recurrence of

12  these cancers.

13  Q.  And did the authors also report the cardiovascular events in

14  this study?

15  A.  Yes.

16  Q.  In the results section on the first page, what did they report?

17  A.  Just reading from the results, it says:  "Of the 23 confirmed

18  cardiovascular thrombotic events, 16 occurred in the rofecoxib

19  group during or within 14 days after the treatment period, with an

20  estimated relative risk of it 2.66."  And that gave confidence

21  limits that were statistically significant with a p-value of .04.

22  Q.  And did you rely on this for any of your opinions in this case?

23  A.  Yes.

24  Q.  And how is that?

25  A.  It's further evidence of the cardiotoxic effects of Vioxx.

1   Q.  And was, were the APPROVe and VICTOR studies part of a larger

2   analysis called Protocol 203?

3   A.  Yes.

4   Q.  And did you rely on the statistical analysis of the data from

5   those three studies by professor Nicholas Jewell for opinions in

6   this case?

7   A.  Yes.

8   Q.  Are you familiar with Dr. Jewell's reputation?

9   A.  Yes.

10   Q.  And what is his reputation?

11   A.  He has an excellent reputation as a mathematician and

12   statistician.

13   Q.  Is it the practice of cardiologists such as yourself to rely on

14   statisticians to perform statistical analyses such as those that

15   Dr. Jewell performed that you relied on?

16   A.  Yes.

17   Q.  And what did -- what is your opinion based on Dr. Jewell's

18   analysis?  And you may refer to your report if you'd like.

19   A.  Well, just, in general, without turning to the report, that his

20   analysis showed increased risk of cardiovascular events in the

21   pooled data from the three trials.

22   Q.  And do you have an opinion as to the reason for the increased

23   risk of cardiovascular thrombotic events shown in Protocol 203?

24   A.  Yes.

25   Q.  And what is that?

A.  The cardiotoxic effects of Vioxx.

Q.  Did you also review an article by Bruce Psaty, P-S-A-T-Y, and Richard Kronmal?

A.  Yes.

Q.  And if you could turn to the tab 19 in your binder.  Is this the article you reviewed?

A.  Yes.

Q.  If you could turn to page 1817.  Did the authors disclose that one of them is a plaintiff's expert in the litigation and the other is not?

A.  Correct.

Q.  And that would be Dr. Kronmal, who is a plaintiff's expert, and Dr. Psaty, who reports that he has not been involved in any litigation related to rofecoxib, either for plaintiffs or for defendants?

A.  That's right.

Q.  And if you could turn to table 3 at page 1815 of the document.  What did these authors report for the mortality findings from the Alzheimer's disease trials of Vioxx?

A.  They reported in this table using the intention-to-treat analysis that both studies resulted in a statistically significant increased hazard ratio for all-cause mortality and cardiovascular mortality.

Q.  And as to the combined hazard ratio for all-cause mortality, in the middle of the table, what was that figure?

1  A.  The combined hazard ratio was 2.99.

2  Q.  And was that a statistically significant result?

3  A.  Yes, it was.

4  Q.  Then did the authors further down in the table identify heart

5  disease mortality as a subset of all-cause mortality?

6  A.  Yes, they did.

7  Q.  What was the result there?

8  A.  There were 21 deaths in the Vioxx group and 6 in the placebo

9  group, giving a hazard ratio of 3.84, which was statistically

10  significant.

11  Q.  Do you rely on this information for any of your opinions in

12  this case?

13  A.  Yes.

14  Q.  Can you explain?

15  A.  Sure.  This is further evidence of the toxic effects of Vioxx.

16  Q.  And how does this bear on the mechanism issue that you

17  discussed earlier?

18  A.  Well, specifically, the heightened risk of cardiovascular death

19  in these patients would be concordant with the mechanism.

20  Q.  You mentioned that this was an intention-to-treat analysis, can

21  you explain what that means?

22  A.  Sure.  It means several things, but one thing it means is that

23  there was follow-up of the patients off drug.

24  Q.  And did some of the events that were reported here take place

25  substantially after patients had stopped taking Vioxx?

1    A.   Yes.

2    Q.   Which of the mechanisms you've described earlier would be

3    plausible to correlate to those types of events?

4    A.   The likely mechanism there would be the promotion of

5    atherosclerosis by Vioxx.

6    Q.   And is that a mechanism that was described in the mechanism

7    articles that you've reviewed?

8    A.   Yes, specifically, the Grosser FitzGerald article and the

9    Antman article.

10   Q.   So would the atherosclerosis or atherogenic mechanism be

11   responsible for events that occur after you stop taking the drug,

12   while the acute effects would be more related to the prostacyclin

13   and thromboxane having some immediate acute effect?

14   A.   That would be my interpretation.

15   Q.   Turning to tab 20 of your binder.

16            MR. ARBITBLIT:  Before we move on, your Honor, I'd ask

17   that, well, he's already read from it, so I guess it's in the

18   record to the extent as previous.

19   BY MR. ARBITBLIT:

20   Q.   So did you review an article by McGettigan and Henry at index

21   tab 20 of your binder?

22   A.   Yes.

23   Q.   And what was this article about?

24   A.   It's a review of observational studies regarding selective and

25   nonselective inhibitors of cyclooxygenase.

1   Q.  Is this posted in the *Journal of the American Medical*

2   *Association* in 2006?

3   A.  Yes.

4           MR. ARBITBLIT:  I'd ask that it be admitted for the same

5   purposes, your Honor.

6           THE COURT:  Let it be admitted for the same purposes

7   804(18).

8           MR. ARBITBLIT:  Thank you, your Honor.

9   BY MR. ARBITBLIT:

10  Q.  Looking at the paragraph heading Data Synthesis on the first

11  page, what did these authors find based on their study?

12  A.  Reading from that first sentence, data were combined using a

13  random effects model.  A dose-related risk was evident with

14  rofecoxib, summary relative risk with 25 milligrams per day or less

15  was 1.33, and it was 2.19 with more than 25 milligrams a day.  So

16  they found a dose-related escalation in cardiac risk:  lower risk

17  with lower dose, higher risk with higher dose.

18  Q.  What is the importance of that finding as to dose in terms of

19  an analysis of causation?

20  A.  It speaks to causation.

21  Q.  In what way, sir?

22  A.  It supports the causative effect of Vioxx on the

23  cardiotoxicity.

24  Q.  If there's a cause-and-effect relationship between a drug and

25  an effect, would you expect to see a higher rate when the dose goes

1    up?

2    A.  Sure, the principle being more is worse.

3    Q.  Is that what these data show?

4    A.  Yes.

5    Q.  Do the authors also report a review further down in the data

6    synthesis for what they found on Naproxen?

7    A.  Yes.

8    Q.  What was that result?

9    A.  .97 was the relative risk.

10   Q.  And what does that suggest to you about Naproxen?

11   A.  That Naproxen has a neutral effect.

12   Q.  And does neutral mean neither harmful nor protective?

13   A.  Correct.

14   Q.  And is there, just below that, a result reported for ibuprofen?

15   A.  Yes.

16   Q.  What is that result?

17   A.  1.07; again, neither harmful nor protective.

18   Q.  What was the author's conclusion here?

19   A.  They say, this review confirms the findings from randomized

20   trials regarding the risk of cardiovascular events with rofecoxib

21   and suggests that celecoxib in commonly-used doses may not increase

22   the risk, it contradicts claims of a protective effect of Naprosyn

23   and raises serious questions about the safety of diclofenac, an

24   older drug.

25   Q.  And is there a figure at page 1635 of the article that tells

 1   how many studies the authors reviewed to include in their analysis

 2   to come to these conclusions?

 3   A.  Yes.

 4   Q.  And how many did they include?

 5   A.  Twenty-three studies.

 6   Q.  If you could turn to page 1640 of the article, did the authors

 7   report the results of a comparison between Vioxx or rofecoxib and

 8   Celebrex or celecoxib in this article at the top left?

 9   A.  Yes.

10   Q.  What was the result of that?

11   A.  Found that rofecoxib or Vioxx was more toxic than celecoxib.

12   Q.  And what was the relative risk there?

13   A.  1.34, which was statistically significant.

14   Q.  Turning to page 1642 of the article.

15         MR. ISMAIL:  Judge, the witness has no discussion of this

16   article in his report.  I tried not to interrupt, if they were just

17   going to go discuss it briefly, but we've been spending the last

18   ten minutes on an article that didn't merit a mention in his expert

19   report.  In fact, he has no article, no observational studies

20   discussed in his report.

21         MR. ARBITBLIT:  Your Honor, as noted in the comments, it

22   was in his materials reviewed, he's been deposed three times in

23   various litigation, and he's entitled to talk about this.

24         THE COURT:  I'll let him do it.

25         MR. ARBITBLIT:  Thank you, your Honor.

1  BY MR. ARBITBLIT:

2  Q.  Going to the middle column on page 1642, the paragraph

3  beginning "the differences."  Can you, did you rely on this for any

4  of your opinions in this case?

5  A.  Yes.

6  Q.  Can you read that into the record, please?

7  A.  Sure.  It says:  "The differences between rofecoxib and

8  celecoxib appear important from both a clinical and regulatory

9  standpoint.  The data do not point to a safe dose level with

10  rofecoxib, which justifies the decision taken to withdraw the drug

11  from sale.  At doses of 200 milligrams or less, there is no

12  convincing evidence of an increased risk of cardiovascular events

13  with celecoxib, which remains on international markets."

14  Q.  Do they go on to say that there is data suggesting Celebrex

15  appears unsafe in doses of 400 milligrams or more?

16  A.  Yes.

17  Q.  And is 200 milligrams what the authors refer to as the commonly

18  used dose, may not increase the risk in the conclusion that you

19  read earlier?

20  A.  Correct.

21  Q.  Do the authors acknowledge that there is some limitations with

22  this type of study?

23  A.  Yes.

24  Q.  Is that a normal practice in writing an article, to acknowledge

25  what the limitations and strengths are?

1    A.   Sure.

2    Q.   Going over to the, 1643 of the article.  What did the authors

3    say about whether they believed the associations are real or not?

4    A.   They said they believe they are real.

5    Q.   And do you agree with that?

6    A.   Yes.

7    Q.   And then do they do an update reporting an additional study,

8    and what do they say about that?

9    A.   They did add another study to their analysis, and they said

10   that with the inclusion of that study there was no change in their

11   conclusions.

12   Q.   Do you have an opinion as to whether there is a consensus of

13   the scientific community about the cardiovascular risks of Vioxx

14   that you've just outlined for the court?

15   A.   Yes, I do.

16   Q.   And what is your opinion?

17   A.   My opinion is that the consensus of medical and scientific

18   opinion supports the mechanism that I've described and the

19   cardiotoxic effects of Vioxx.

20   Q.   Turning to your report at page 2.

21        MR. ARBITBLIT:  Your Honor, we don't plan to go into

22   labelling for any other purpose than to compare what was in the

23   label to what was known or scientifically known and not about any

24   regulatory matters.

25        MR. ISMAIL:  For any other purpose than that?  That's

```
 1  kind of a big purpose.
 2            MR. ARBITBLIT:  I think it's consistent with your Honor's
 3  rulings, and if you find otherwise I'm sure --
 4            THE COURT:  Let's take it a step at a time.
 5            MR. ARBITBLIT:  Thank you.
 6            MR. ISMAIL:  I'm sorry, what tab are you on?
 7            MR. ARBITBLIT:  It's in his report.
 8  BY MR. ARBITBLIT:
 9  Q.  Doctor, did you address certain labelling issues in your report
10  in this case?
11  A.  Yes.
12  Q.  And if you turn to page 2 of the report, did you discuss the
13  1999 label that was in effect until April 2002?
14  A.  Yes.
15  Q.  Was there any warning concerning cardiovascular events in that
16  label?
17  A.  In the 1999 label?
18            THE COURT:  Just a moment.
19            MR. ISMAIL:  Your Honor, he is giving an opinion on the
20  adequacy of the label.  Your Honor, we addressed in Daubert and
21  this witness isn't qualified --
22            MR. ARBITBLIT:  I'll rephrase the question.
23            THE COURT:  Yes, let's rephrase the question.  What was
24  in the label.
25  BY MR. ARBITBLIT:
```

1    Q.  Do you have an opinion as to whether the label accurately

2    reflected the scientific data that was known to Merck between --

3    I'll withdraw that.

4            MR. ISMAIL:  Going the wrong direction there.

5    BY MR. ARBITBLIT:

6    Q.  Do you have an opinion as to whether the label accurately

7    reflected the scientific information known about Vioxx between

8    March 2000 and April of 2002?

9            MR. ISMAIL:  There is aspects as to FDA regulations as to

10   what could be included in the label, there's obviously an FDA

11   review --

12           THE COURT:  No, I understand that and that's the

13   objection.  But he is not asking that.  He's asking whether it

14   reflected the medical literature of what was known in the medical

15   community.

16           MR. ISMAIL:  Notwithstanding whether it could even get in

17   there.

18           THE COURT:  Right.  I think you can take that under

19   cross.  That's your limited question.  Is that it?

20           MR. ARBITBLIT:  Thank you, your Honor.  Yes.

21           Since I said it right that time, can we read it back.

22           THE COURT:  Yes.

23       (WHEREUPON, THE QUESTION WAS READ BACK.)

24           THE WITNESS:  Yes, I have an opinion.

25   BY MR. ARBITBLIT:

1  Q.  What is your opinion?

2  A.  I don't think it accurately reflected the scientific medical

3  knowledge as of that point.

4  Q.  And what is the basis for your opinion?

5  A.  Well, the label discusses the VIGOR trial, and then it

6  concludes that the significance of the cardiovascular findings from

7  the VIGOR trial and also from the two Alzheimer's trials is unknown

8  and --

9       MR. ISMAIL:  Judge, there seems to be a disconnect

10  between the question.

11       MR. ARBITBLIT:  I didn't want to interrupt but thank you.

12  BY MR. ARBITBLIT:

13  Q.  Dr. MacGregor, the question was about the 1999 to 2002 label

14  that's referenced in page 2 of your report, and I believe you were

15  talking about the later label.  If we could go back.

16  A.  Oh, I'm sorry, I misunderstood.

17  Q.  And if you could answer what the basis is for your opinion as

18  to the 1999 to 2002 label, please.

19  A.  Sure.  There was no discussion in that label about the

20  potential for cardiovascular toxicity of the drug.

21  Q.  Now, do you have an opinion as to whether the revised label

22  that was in effect from April 2002 to September of 2004 accurately

23  reflected the scientific information known about Vioxx during that

24  time period?

25  A.  Yes, I do.

1  Q.  And what is your opinion on that, sir?

2  A.  That it does not reflect accurately the scientific and medical

3  information.

4  Q.  And what is the basis for your opinion?

5  A.  Again, that --

6  Q.  If you'd like -- go ahead.

7  A.  It states the VIGOR results and says that there are serious

8  cardiovascular thrombotic events were significantly higher in that

9  group, but then it references two other studies without describing

10  them and concludes that they did not show any heightened

11  cardiovascular risk, and then it says the significance of the

12  cardiovascular findings from these three studies, including the

13  VIGOR trial, is unknown, when, in fact, they knew and were well

14  aware of the potential mechanism or that the mechanism, the

15  accepted mechanism, of cardiovascular toxicity.

16         MR. ARBITBLIT:  I have nothing further at this time, your

17  Honor.

18         THE COURT:  All right.

19         MR. ISMAIL:  Time for a break?

20         THE COURT:  Yes, let's take a break at this time.  We'll

21  take a 15-minute break.  The court will stand in recess.

22         THE DEPUTY CLERK:  Everyone rise.

23    (WHEREUPON, A RECESS WAS TAKEN.)

24    (OPEN COURT.)

25         THE COURT:  Be seated, please.  You're still under oath,

1   Doctor.  You may cross-examine.

2              MR. ISMAIL:  Thank you, your Honor.

3                       CROSS-EXAMINATION

4   BY MR. ISMAIL:

5   Q.  Good morning, Doctor.

6   A.  Good morning.

7   Q.  I would like to begin where you began this morning.  You went

8   through what you described as biologically plausible mechanisms --

9   A.  Yes.

10  Q.  -- with counsel.

11  A.  Yes.

12  Q.  This concept of prostacyclin reduction and the like, that was

13  sometimes referred to as the FitzGerald hypothesis?

14  A.  Yes.

15  Q.  Now, the original study by Dr. FitzGerald, that was published,

16  correct?

17  A.  Yes.

18  Q.  Do you recall when it was?

19  A.  I am not sure what you mean by the original study.  There were

20  a couple of foundational studies, McAdam and Catella-Lawson that

21  established, those were the first authors of the two studies, both

22  of which showed suppression of the metabolites of prostacyclin in

23  the urine with the different COX-2 inhibitors.

24  Q.  One was Vioxx and one was Celebrex?

25  A.  Correct.

1   Q.  Catella-Lawson as the Vioxx study and McAdam was the Celebrex

2   study?

3   A.  I think that's right.

4   Q.  And both papers were published and out in the public realm even

5   before these medicines came to market, correct?

6   A.  I think around 1996 or 8, something like that.

7   Q.  By the way, the same laboratory, the same centers

8   Dr. FitzGerald's lab did the McAdam study for Celebrex the can a

9   tell Lawson study on Vioxx?

10  A.  That's right.

11  Q.  And both studies demonstrated this reduction in PGIM, which

12  we'll get to in a minute what that means, but they both found a

13  reduction in this urinary metabolite?

14  A.  Yes.

15  Q.  Do you recall, sir, that the McAdam paper found a greater

16  reduction in PGIM when the patients were dosed with Celebrex than

17  the Catella-Lawson study when they did the same exercise with Vioxx

18  patients?

19  A.  I don't remember specifically.

20  Q.  So you described this analysis on PGIM so that's actually not

21  prostacyclin in the vasculature, correct?

22  A.  PGIM is the metabolite that I mentioned earlier, it's that

23  2,3-dinor-keto-PGF$_{1a}$, something like that.

24  Q.  So just so we're clear, the PGIM study, PGIM is a breakdown

25  product of prostacyclin that you measure in the urine?

1  A.  That's correct.

2  Q.  And it doesn't directly measure prostacyclin anywhere in the

3  blood vessels, correct?

4  A.  That's right.

5  Q.  And there's lots of places in the body that are, which

6  prostacyclin is produced, correct?

7  A.  Yes, that's correct.

8  Q.  So if you're just measuring urinary metabolite, that doesn't

9  tell you where in the body there was this inhibition of

10  prostacyclin, true?

11  A.  Well, true to a point and I think the authors acknowledge that

12  in their articles; but I think if you take it in the context of the

13  other literature, for instance, the paper by Dr. Vane's laboratory

14  that indicated that the major source of systemic prostacyclin is

15  endothelium, that's the foundational research upon which FitzGerald

16  then built, then these significant reductions in prostacyclin in

17  the urine must have a component from that.

18        But you're right, it doesn't specifically measure which

19  tissue it came from, but the inference from those considerations is

20  that it comes from the endothelium.

21  Q.  So you're measuring urinary output and then you have to build

22  an inference for some biologically plausible mechanism that it

23  relates back to the blood vessels as opposed to the brain or the

24  heart or the kidneys or the lungs, right?

25  A.  Well, it's in part inference but it's also in part this

1  foundational article that shows that the bulk of systemic

2  prostacyclin comes from the epithelium.

3  Q.  And then when you did that set of research with counsel this

4  morning, then you jumped to different set of papers that looked at

5  the, where Cox-2 was expressed, right?

6  A.  Yes.

7  Q.  And then you discussed how COX-2 is expressed in

8  atherosclerotic plaque and other various localized spots in the

9  body, right?

10  A.  Yes.

11  Q.  But none of those studies that you went over with counsel

12  measured a reduction in prostacyclin in those localized areas due

13  to COX-2 inhibition, true?

14  A.  Not in those localized areas, correct; they just mentioned the

15  urine in metabolite.

16  Q.  I am trying to look at two different types of studies that you

17  did.  One set of studies -- not that you did, that you discussed --

18  one set of studies looked at urinary output and another set of

19  studies looked at, gee, where can we find COX-2?

20  A.  Yes.

21  Q.  And the latter set of studies actually didn't demonstrate a

22  reduction in prostacyclin regardless where COX-2 was expressed,

23  correct?

24  A.  That's right, they didn't measure that.

25  Q.  And, in fact, no human study has ever shown that Vioxx reduces

1    prostacyclin in the arteries around the heart, true?

2    A.  Only by the inference that I've described earlier.

3    Q.  And for this imbalance that you describe earlier to have

4    clinical impact for cardiovascular risk, you would need to show

5    this inhibition of prostacyclin in the blood vessels around the

6    heart, true?

7    A.  Well, that's what you would expect it to produce, but I think

8    the other evidence that I've described supports the hypothesis or

9    the mechanism sufficiently to conclude that it's likely correct.

10   Q.  You now jump to the clinical outcome data in response to that

11   question?

12   A.  No, just based on the articles that I've mentioned, Vane's

13   article demonstrating that prostacyclin, the major source of

14   prostacyclin in the blood is endothelial cells.  The articles that

15   show that COX-2, Celebrex and Vioxx, both inhibit the metabolites

16   of prostacyclin that must come from the endothelial cells because

17   that's the main source of it.

18           So to reduce the levels by 50 to 80 percent, you're going

19   to have to be effecting the major source.  The other sources aren't

20   as, they don't have the same magnitude of production.  And then the

21   article, the other articles that we discussed.

22   Q.  Perhaps my question wasn't clear and I'll restate it.

23           To have an impact on clotting, the reduction in

24   prostacyclin by COX-2 inhibitors would have to be a reduction in

25   the blood vessels, correct?

1    A.  Sure.

2    Q.  No human study has shown directly that any COX-2 inhibitor

3    reduces prostacyclin anywhere in the vascular system, correct?

4    A.  Again, the inference from the studies that I've described I

5    think demonstrate that.  However, you're correct, no one's measured

6    it directly in the endothelial cells or in the microenvironment

7    around the endothelial cells in the blood vessels.

8    Q.  No animal study has ever shown that COX-2 inhibition reduces

9    prostacyclin anywhere in the vascular system, correct?

10   A.  Not that I am aware of.

11   Q.  You're aware of studies that have shown the opposite, right?

12   A.  I would have to -- not offhand.

13   Q.  Are you aware and have been familiar with studies that have

14   shown that notwithstanding the administration of a COX-2 inhibitor

15   you can't show a reduction in prostacyclin in the vascular system?

16   A.  If you're referring to the article in the Polish literature

17   with the young healthy volunteers, is that the one you're referring

18   to?

19   Q.  That would be an example of others as well.

20   A.  Oh, okay.  So you're correct, that one does not demonstrate it.

21   The techniques used in that study I would say are arcane.

22   Q.  Was it significant to you, sir, that the patients in the, is

23   this the Tuleja study?

24   A.  I would have to look at it again to know for sure.  But I think

25   you recognize my description.

1   Q.  Right.  The study that you just described, you mentioned that

2   the subjects were healthy volunteers?

3   A.  That's what I recall.

4   Q.  Is that significant in your interpretation of that study?

5   A.  Well, not so much in terms of that you would expect

6   prostacyclin to be expressed in endothelial cells, and again I

7   think it's well accepted that it is, but just in the sense that

8   they don't represent the kinds of atherosclerotic artery -- they

9   don't have the kind of arthrosclerosis that many of the patients

10  that were taking Vioxx probably did given the age difference.

11  Q.  Just so I can understand where you're coming from on this.  Do

12  you believe that testing healthy volunteers and trying to find the

13  impact on prostacyclin is relevant to this question of the effect

14  of COX-2 inhibition?

15  A.  Sure.

16  Q.  Why is that?

17  A.  It's one category of investigation.  I mean, another category

18  of investigation is looking at patients who have known

19  arthrosclerosis like the articles that we discussed today, which I

20  think are more relevant to the Vioxx literature, and the proof of

21  concept, if you will, for the mechanism.

22  Q.  The Polish study that you described that was unable to find a

23  reduction in prostacyclin in the vascular system following COX-2

24  administration?

25  A.  That's right.

1   Q.  COX-2 inhibitor administration?

2   A.  Yes.

3   Q.  That was on healthy volunteers, right?

4   A.  As I recall, yes.

5   Q.  Did you look to see whether there were other studies in humans

6   or animals that were consistent with the Polish study; and that is,

7   even if you give a COX-2 inhibitor you may see some difference in

8   urinary output of a breakdown product, but you can't actually

9   measure any reduction in prostacyclin in the vascular system?

10   A.  I've seen them, I can't recall them in enough detail to discuss

11   them.

12   Q.  Okay.  We'll discuss them with another witness then.

13         Now, the studies that you went over with counsel, as you

14   describe the FitzGerald hypothesis was out there in the 1990s, I

15   think you even backed that up to some work by Dr. Vane, correct?

16   A.  Well, Dr. Vane, as I said -- yes, he didn't propose the

17   FitzGerald hypothesis, he showed that endothelium is a major source

18   of prostacyclin and then this was built upon with the other

19   observations.

20   Q.  I didn't mean to steal Dr. FitzGerald's thunder, I just wanted

21   to get the chronology correct that Dr. Vane that you referenced was

22   writing about this issue in the '90s, Dr. FitzGerald published some

23   papers on this whole hypothesis, and all of this was out and

24   discussed in scientific circles, right?

25   A.  Yes.

1   Q.  And then you went over with counsel a couple of studies, Belton

2   was one and I can't remember the other one, but those were studies

3   that were also, that you went over this morning were out there in

4   1999, 2000, and all of these theories that you, these mechanistic

5   theories that you went over were out there in the literature,

6   correct?

7   A.  Yes, the theory was out there in the literature.  I don't think

8   those papers were published that early though, the Grosser article

9   was in 2006 and the --

10  Q.  But Belton and whatever the other one was?

11  A.  Belton was published in 2000 and the other article was

12  published in 2006.

13  Q.  Okay.  So getting back to Dr. FitzGerald.  I'm handing you

14  what's been marked as Exhibit 635.  And is Exhibit 635 an article

15  published first author is Carlo Patrono?

16  A.  Yes.

17  Q.  Do you know of Dr. Patrono?

18  A.  Yes.

19  Q.  Is he widely considered an expert in this area?

20  A.  Yes.

21  Q.  And then we have -- and is this the Dr. Garret FitzGerald whose

22  hypothesis you went over this morning --

23  A.  Yes.

24  Q.  -- with counsel?

25  A.  Yes, it is.

1    Q.  If you would turn, sir, to page 245.  To the one that has

2    Figure 2 on it.

3    A.  I'm sorry --

4    Q.  The numbering is hard to see, but if you see Figure 2?

5    A.  I found it.

6    Q.  I want to direct your attention to the right hand column,

7    Section 2.1.

8    A.  Okay.

9    Q.  And this publication by Dr. Patrono and Dr. FitzGerald was made

10   available in September of 2004, do you see that?

11   A.  Yes.

12   Q.  So that would be many years, five, six, seven years after

13   Dr. FitzGerald himself said, gee, I have this hypothesis about

14   prostacyclin inhibition, correct?

15   A.  Yes.

16   Q.  And state the obvious in the orientation of the timeline here,

17   that's right around the time a few weeks later that Vioxx was

18   voluntarily withdrawn, correct?

19   A.  That's right.

20   Q.  So do you see here that Dr. FitzGerald and Dr. Patrono in this

21   section are discussing these theories of cardiovascular risks with

22   COX-2 inhibitors?

23   A.  I don't know that I've read this article recently, but go on.

24   Q.  You have seen it before, sir, right?

25   A.  Yes.

1   Q.  And they start out talking about the VIGOR study that you

2   referenced this morning?

3   A.  Yes.

4   Q.  If you turn the page with me.  Their discussion continues?

5   A.  Right.

6   Q.  If you look here in the middle of that carryover paragraph

7   right after the reference note 179 with the sentence that begins

8   "while the cause".  I'll highlight it on the screen for you if

9   that's easier.

10          "So while the cause of the apparent excess of MI in the

11  VIGOR trial cannot be conclusively established, a combination of

12  some cardioprotective effect of Naproxen and the play of chance

13  does seem to offer a plausible explanation for these unexpected

14  findings."  Is that what Dr. FitzGerald and Dr. Patrono wrote in

15  September of 2004?

16  A.  Yes.

17  Q.  And then the authors continue, in September of 2004 and make

18  this observation:  "While other mechanisms cannot be discounted,

19  there is currently little evidence in humans to support a

20  prothrombotic effect for coxib."  Is that what these authors

21  published in September of 2004?

22  A.  Yes.

23  Q.  So you discussed with counsel the mortality data as published

24  by Psaty and others from the Alzheimer's trials?

25  A.  Yes, right.

1   Q.  And just so I understand -- and you also went over some

2   clinical studies with counsel this morning, right?

3   A.  Yes.

4   Q.  Is it true, sir, that you are not an expert in designing or

5   interpreting clinical trials?

6   A.  I don't design them.  I read them and interpret them.

7   Q.  So you disagree with that?

8   A.  Yes.

9   Q.  This isn't your first Vioxx trial, correct?

10  A.  That's right.

11  Q.  What number trial is it?

12  A.  I believe it's my third.

13  Q.  Do you recall testifying once in New Jersey?

14  A.  Yes.

15  Q.  Rather than take the time to find which of those, I am just

16  going to show counsel my copy and ask if you were asked questions

17  under oath at that trial and if I read it correctly.  I am

18  referring to your examination in the *Doherty* trial in New Jersey.

19  A.  Yes.

20  Q.  Were you asked, sir, at page 914 of that trial transcript the

21  question:  "You're not an expert in designing or interpreting

22  clinical trials, that's not your area?  And was your answer then,

23  "Correct."?  Line 19.

24  A.  And which page?

25  Q.  This (INDICATING).

1    A.   (WITNESS REVIEWS DOCUMENT.)   So that is true, but if you go

2    down to page 916 there's a more complete explanation.   And when I

3    was qualified as a witness in this trial, I was qualified including

4    for doing biostatistical interpretations of medical literature.

5    Q.   Without reference to how you were qualified, did I read

6    correctly your sworn testimony?

7    A.   Yes.   That component of it.

8    Q.   Now, your discussion about the Alzheimer's trials, you

9    discussed -- one component of it was all-cause mortality?

10   A.   Yes.

11   Q.   And this concept of all-cause mortality, that means death for

12   any reason regardless of what actually precipitated the event?

13   A.   That's right, all cause.

14   Q.   And so if you had a patient in a clinical trial and they're

15   walking down the street and a piano falls on their head and they

16   die, that would count in the statistic of all-cause mortality,

17   correct?

18   A.   Yes.

19   Q.   And if for some fluke there were three people in a clinical

20   trial walking down the street and the piano fell on all three of

21   them, you would get three deaths for all cause in that study,

22   right?

23   A.   Yes.

24   Q.   And if all three of those people were taking Vioxx, you would

25   actually count three deaths of Vioxx in that study regardless of

1    cause, correct?

2    A.  That's right.

3    Q.  Even though everyone knows Vioxx doesn't cause pianos to fall

4    on people's heads, right?

5    A.  I think that's fair, yes.

6    Q.  So the analysis you looked at, you didn't go over with counsel

7    what made up the all cause portion of that analysis by Psaty and

8    others, right?

9    A.  No, we didn't go over that.

10          MR. ISMAIL:  Your Honor, I am handing the witness what's

11    been marked as Defendant's Exhibit 360.

12    BY MR. ISMAIL:

13    Q.  Doctor, you recognize Exhibit 360, correct?

14    A.  Yes.

15    Q.  Is it a review by an FDA medical officer dated December 18th,

16    2004, correct?

17    A.  Yes.

18          MR. ISMAIL:  Your Honor we offer Exhibit 360.

19          MR. ARBITBLIT:  No objection.

20          THE COURT:  Let it be admitted.

21    BY MR. ISMAIL:

22    Q.  You recognize Exhibit 360 as the medical officer's review of

23    cardiovascular thrombotic events in the Alzheimer's study?

24    A.  Yes.

25    Q.  Do you recall, sir, when you reviewed this document previously

1    that this review also discusses this concept of all-cause

2    mortality?

3    A.  Yes.

4    Q.  So if we turn to that discussion, which is on page 5 of this

5    document, and table 3a.

6    A.  Right, I see it.

7    Q.  So table 3a is deaths in Alzheimer's studies 078 and 091 that's

8    what table 3 is, and table 3a -- let me start that again that was

9    going nowhere.

10           Table 3 is the data for patients on drug and table 3a is

11   those patients off drug, correct?

12   A.  3a is on and 3b is off it looks like.  Is that what you said?

13   Q.  3 is on and 3a -- yes, 3a -- you said it better than I did.  3a

14   is on and 3b is off.

15   A.  Good.

16   Q.  Thank you for correcting me.

17           So looking at this table here, this includes a tabulation

18   of what we've been talking about, this concept of all-cause

19   mortality, right?

20   A.  Yes.

21   Q.  And this is in the studies that you discussed with counsel this

22   morning, right?

23   A.  Correct.

24   Q.  And do you see there is a section called infections and

25   infestations?

```
1    A.  Yes.

2    Q.  And I've called it up on the screen, you can't see the columns

3    anymore, but the first column is the events on Vioxx and the third

4    column is the events on placebo, correct?

5    A.  Correct.

6    Q.  And so if you looked here you would see in the tabulation of

7    all-cause mortality there were six infection deaths on Vioxx and

8    zero on placebo, right?

9    A.  Yes.

10   Q.  Even though no one has postulated a mechanism that Vioxx causes

11   any infections, right?

12   A.  Oh, I would disagree with that.

13   Q.  You would.  Did you describe any mechanistic explanation of

14   infections in your direct examination this morning?

15   A.  No one asked me until you just did.

16   Q.  Okay.  How about this section here on injury, poisoning and

17   procedural complications?

18   A.  Yes, I see that.

19   Q.  Five deaths on Vioxx and zero on placebo, right?

20   A.  Correct.

21   Q.  Did you look at all to see what made up these accidental

22   deaths?

23   A.  I've seen this table before.

24   Q.  And so you know included in the calculation of all-cause

25   mortality that Psaty and others published were things like somebody
```

1    who had an accident with a power tool?

2    A.  Yes.

3    Q.  And you saw there were someone who got confused while they were

4    in a hot tub and followed a bromide tablet by accident?

5    A.  Sounds familiar, I don't remember all of the details

6    specifically.

7    Q.  And there were three car crashes?

8    A.  Again, I don't remember specifically, but --

9    Q.  But there were, for whatever fluky reason, five dental deaths

10   on Vioxx and zero on placebo, right?

11   A.  Correct.

12   Q.  And then this study does a description of the cardiovascular

13   thrombotic events, correct?

14   A.  Correct.

15   Q.  If you go to page 7 you'll see a section called Cardiovascular

16   Thrombotic Events in the Alzheimer's Studies?

17   A.  Yes.

18   Q.  Table 5 includes that data?  Are you with me, sir?

19   A.  Yes -- I'm sorry, table 4 or table 5, I'm sorry we're on table

20   5, I'm sorry.

21   Q.  Table 5.  Are you with me now?

22   A.  Yes.

23   Q.  So this table shows, this first column here is Vioxx first set

24   of columns and the second set is placebo, right?

25   A.  Yes.

1   Q.  And if you wanted to go to acute myocardial infarction you will

2   see 14 on Vioxx and 14 on placebo, right?

3   A.  Correct.

4   Q.  If you wanted to do the total patients with the end points

5   analyzed here, you would see 42 on Vioxx and 48 on placebo,

6   correct?

7   A.  Yes.

8   Q.  If you turn to page 15.  The section called Conclusions.  And

9   again, the date of this was December 2004, right?

10  A.  Yes.

11  Q.  Does the FDA medical reviewer say:  "Based on the interim

12  review of the available data from the placebo-controlled studies in

13  patients with either established Alzheimer's disease or mild

14  cognitive impairment as submitted by Merck on March 30, 2004, it

15  appears that up to the time of the APPROVe study, the

16  cardiovascular signal with Vioxx did not warrant a regulatory

17  action by FDA."  Did I read that correctly?

18          MR. ARBITBLIT:  I would object to this, your Honor.  It's

19  the very issue that counsel objected to going into on direct is FDA

20  issues of labelling and regulatory action and that's what he just

21  read.  There was no reference to it on direct.  I'm sure that's

22  what the document says, but it's a regulatory question that should

23  not be coming in through this witness.  They will have Dr. Rarick

24  to address that.

25          MR. ISMAIL:  Your Honor, I think the witness was saying

1    that this data demonstrated some sort of signal and we're pointing

2    out that to the contrary there was, as determined by the FDA, no

3    signal to warrant any action.

4          MR. ARBITBLIT:  He's gone over the data, your Honor, what

5    the FDA thought about is not in the witness's domain.

6          MR. ISMAIL:  That's my last question on this topic,

7    Judge, or this document.

8          THE COURT:  I understand it.  This is the last one.  This

9    is not a big issue, a big area.  Let's just move on, counsel.

10         MR. ISMAIL:  I will take the hint and try one wrap up on

11   this topic rather than go through the documents.

12   BY MR. ISMAIL:

13   Q.  Sir, did you look at other clinical trials on Vioxx and confirm

14   that none of the other studies replicated this finding of a

15   difference in all-cause mortality?

16   A.  I don't believe it did.  I don't remember specifically, but I

17   don't believe this all-cause mortality finding was replicated.

18   Q.  Okay.  Saved us both some time.

19         The question of the label, and just so the scope of my

20   question is understood, I do not mean to ask you your

21   interpretation of the adequacy of the label, I am just going to do

22   what counsel did and ask if various data is reflected there, okay?

23   A.  Okay.

24   Q.  I am going to hand you my version, you probably have the same

25   one up there, but Defense Exhibit 272, which I believe is in

```
 1    evidence, it's a copy of the April 2002 label.

 2              THE DEPUTY CLERK:  273 is in.

 3              MR. ISMAIL:  Then I will offer 272.

 4              THE COURT:  All right.  Let it be admitted.

 5    BY MR. ISMAIL:

 6    Q.  I just want to make, ask you two questions, two topics about

 7    this document.

 8              If you would turn, sir, to page three, and the

 9    precautionary language regarding the cardiovascular risk.  Do you

10    see where I am?

11    A.  Are you going to tag something on this?  This is pretty small.

12    Q.  Yes, that's the benefit of a ten-foot screen.

13    A.  Yes.

14    Q.  So the section just so -- I just wanted to make sure you knew

15    where I was, the left column and the precaution on cardiovascular

16    risk, and I am not going to ask you whether what you thought of the

17    narrative here.

18              But just with respect to the data, the two

19    placebo-controlled studies that are reflected here, those are the

20    Alzheimer's studies, correct?

21    A.  Yes, correct.

22    Q.  And does the label show that there was an 8 to 3 difference in

23    cardiovascular thrombotic mortality for Vioxx versus placebo from

24    those studies?

25    A.  Yes, it does.
```

1  Q.  You also had -- I believe you went over Plaintiff's Exhibit

2  559, is that right?  The memo, plaintiff 59, tab ten in your

3  binder.  The memo from Dr. Shapiro?

4  A.  Yes.

5  Q.  And I think you went over table 4, right?

6  A.  We went over a couple of tables, but we did go over table 4

7  also.

8  Q.  I'll just ask you about table 4.

9  A.  Sure.

10  Q.  And this is the table that you went over with the 45 to 19?

11  A.  Yes.

12  Q.  If you go back to the label.

13  A.  Okay.

14  Q.  Does the approved April 2002 label show the 45 to 19 difference

15  that you went over with counsel this morning from the Merck memo?

16  A.  Yes.

17  Q.  And if you turn the page, and I don't mean to keep walking

18  through this, but does the cardiovascular data reflected in the

19  April 2002 label, to your knowledge, are those data accurate, just

20  the numbers themselves?

21  A.  I believe they are, yes.

22  Q.  Last topic, sir.  You went over the AHA statement with counsel

23  this morning?

24  A.  Yes.

25  Q.  Is that Exhibit 2-421?  Did you guys rename that?

1          Anyway, you have it up there, it was one of the first

2   documents you went through?

3   A.  Yes, I do.

4   Q.  So you described the focus of this paper was discussing the

5   cardiovascular toxicity of COX-2 inhibitors and NSAIDs, right?

6   A.  Yes.

7   Q.  And does the paper that you went over with counsel show the

8   black box warning for Celebrex --

9   A.  Yes.

10  Q.  -- for increased risk of serious cardiovascular thrombotic

11  events?

12  A.  Yes.

13  Q.  And am I correct, sir, that that black box warning for Celebrex

14  has been in place since July of 2005?

15  A.  I believe that's correct.

16  Q.  This paper makes reference -- I believe you gave the opinion

17  this morning that Vioxx showed greater cardiovascular toxicity than

18  other agents, right?

19  A.  Yes.

20  Q.  If you look at Figure 1 in the caption, does this article that

21  you went over reference a publication by Kearney and others?

22  A.  Yes, it does.

23  Q.  And you've read that article, right?

24  A.  Correct.

25  Q.  It's been marked for identification as Exhibit 773.  Doctor, is

1   Exhibit 773 the Kearney publication that you have read and is cited

2   in the Antman publication that you referenced this morning?

3   A.  Yes.

4   Q.  And this publication by Kearney is what's known as a

5   meta-analysis, right?

6   A.  Correct.

7   Q.  And it is an analysis of some hundred clinical trials or so?

8   A.  I don't remember how many, but it's a number of clinical

9   trials.

10  Q.  And what the authors did was they pooled together the clinical

11  trial data and tried to see how the agents stacked up against one

12  another?

13  A.  Yes.

14  Q.  If you would turn to table 3 -- I'm sorry, Figure 3 --

15  actually, I might try to do this faster.  Go to Figure 1.

16  A.  Okay.

17  Q.  So in this analysis of, pooling analysis of clinical trials you

18  have rofecoxib, that's Vioxx, right?

19  A.  Yes.

20  Q.  And this is looking at vascular events, correct?

21  A.  Right.

22  Q.  Number of trials that's 37 on Vioxx that was analyzed here?

23  A.  Yes.

24  Q.  And then that's Celebrex?

25  A.  Yes.

1   Q.   And 41 different clinical trials there?

2   A.   Correct.

3   Q.   And the total analysis had 120 some odd clinical trials?

4   A.   You mean the whole paper had 138 I think they said.

5   Q.   Thank you for clarifying that.

6          And then over here is the rate ratio against placebo,

7   right (INDICATING)?

8   A.   Yes.

9   Q.   And placebo is not obviously an effective treatment for

10  osteoarthritis or rheumatoid arthritis or anything of the sort,

11  correct?

12  A.   That's correct.

13  Q.   Does the meta-analysis by Kearney and others show that Celebrex

14  has a higher rate ratio than does Vioxx?

15  A.   I could give you two answers to that.  I would say numerically

16  it's slightly to the right, so it is numerically higher; but I

17  don't see a statistical analysis to see if they are different from

18  each other statistically.

19  Q.   Is that concept of statistical significance when trying to

20  compare agents important?

21  A.   Sure.

22  Q.   You want to look for statistically significant differences?

23  A.   Well, yeah, to answer your question of rofecoxib and celecoxib

24  are different here, I don't see a statistical test to say that they

25  are.

1    Q.  Am I correct, sir, that up until the APPROVe study in April --

2    sorry, in September of 2004 there had never been a clinical trial

3    on Vioxx that demonstrated a statistically significant difference

4    with placebo?

5    A.  A single trial I would have to agree with, but there were

6    aggregates of trials in similar patients that showed a

7    statistically significant difference.

8    Q.  The -- there are other meta-analyses that have been published

9    recently that also demonstrate no difference between Vioxx and

10   other Cox-2 inhibitors, right?

11   A.  None come to mind.

12   Q.  Do you recall a study by Dr. Chen and others?

13   A.  Yes.

14   Q.  Do you recall the conclusion, I don't want to take the time to

15   go through it with data, but do you recall the conclusion of that

16   study was that there was not a difference between Vioxx and

17   non-Naproxen NSAIDs?

18   A.  I would have to review the study to know if I agree with that.

19   Q.  Again, I will in the interest of time, last document, sir.  I

20   am handing you what's been marked as Exhibit 338.  This exhibit,

21   Defense Exhibit 338, an April 2005 memorandum from John Jenkins,

22   the director of Office of New Drugs and Paul Seligman, director of

23   the Office of Pharmacoepidemiology at the FDA?

24   A.  Yes.

25           MR. ISMAIL:  Your Honor, I would offer into evidence

1    Exhibit 338.

2              MR. ARBITBLIT:  I don't think it should come in through

3    this witness, your Honor, it's exactly the thing that we've been

4    objecting to and exactly what this witness was not permitted to

5    testify about on direct.  It's a regulatory document that the

6    witness does not rely on, did not mention, and is not part of his

7    testimony.

8              MR. ISMAIL:  Quite simply, your Honor, he testified to

9    some consensus view regarding the comparative risks of Vioxx to

10   other NSAIDs, and we intend to show that that testimony is out of

11   step with the findings of FDA.

12             I will not ask him the regulatory process by which this

13   memorandum was put together, we will do that with another witness,

14   but the conclusions you've permitted in the past with respect to

15   witnesses.

16             THE COURT:  I am not going to admit it, but you can use

17   it on this witness for that purpose.  You may admit it through

18   another witness if you get to that point.

19             MR. ISMAIL:  Sure.

20             Your Honor, may I display it notwithstanding it's not

21   admitted?

22             THE COURT:  Yes, that's fine.

23   BY MR. ISMAIL:

24   Q.  You've certainly seen this memo before haven't you, sir?

25   A.  Yes.

1   Q.  There is an Executive Summary and in the first bullet point the

2   FDA discusses how the three COX-2 inhibitors Vioxx, Celebrex and

3   Bextra are associated with an increased risk of serious adverse

4   events compared to placebo.  Do you see that?

5   A.  Yes.

6   Q.  And by this point April 2005 you had Vioxx against placebo in

7   the APPROVe study and then there were data that came out in

8   Celebrex and Bextra trials also compared against placebo, right?

9   A.  Correct.

10  Q.  And then -- so after noting the association, do the scientists

11  at the FDA who prepared this memoranda say:  "Data from large

12  long-term controlled clinical trials that have included a

13  comparison of COX-2 selective and non-selective NSAIDs do not

14  clearly demonstrate that the COX-2 selective agents confer a

15  greater risk of serious cardiovascular events than non-selective

16  NSAIDs."

17  A.  That's what this says, but the only thing I would disagree with

18  in your question when you say the scientists at FDA.  Dr. Jenkins

19  is more of an administrator with the FDA.

20  Q.  Okay.  I'm sure he'll be glad to hear that.

21          And I am not going to get into the scientists at FDA who

22  were part of this review, per my promise to counsel and the court,

23  so we'll just cover that with another witness.  Dr. Jenkins is the

24  author, you know others were involved, we'll just leave it at that,

25  right?

1   A.  Okay.

2   Q.  And right above what I just read where they were comparing

3   COX-2 inhibitors to non-selective NSAIDs, does this memoranda say:

4   "The available data do not permit a rank ordering of these drugs

5   with regard to CV risks."?

6   A.  Yes, that's what this says.

7   Q.  Does this memoranda say, in the next page, "Short-Term use of

8   NSAIDs to relieve acute pain, particularly at low doses, does not

9   appear to confer an increased risk of serious adverse CV events

10  (with the exception of Bextra in patients immediately following

11  CABG surgery).

12  A.  That's what it says, yes.

13  Q.  And if you go to page 8 there is a paragraph that is discussing

14  some of those mechanism theories that you went over with counsel.

15  And does that paragraph conclude that:  "These observations raise

16  serious questions about the so-called "COX-2 hypothesis", which

17  suggests that COX-2 selectivity contributes to increased CV risk."

18  Did I read that correctly?

19  A.  You did.

20          MR. ISMAIL:  Thank you, doctor, I have no more questions.

21          THE WITNESS:  Thank you.

22          MR. ARBITBLIT:  May I have a couple of minutes?

23          THE COURT:  Any redirect?

24          MR. ARBITBLIT:  Yes, your Honor.  I have a few things and

25  it will just take me a minute to organize.

1          THE COURT:  Okay.  We'll take a five minute break and let

2    you do that and come back in five minutes.

3          THE DEPUTY CLERK:  Everyone rise.

4       (WHEREUPON, A RECESS WAS TAKEN.)

5       (OPEN COURT.)

6          THE COURT:  Okay.  Be seated, please.  You may redirect,

7    counsel.

8          MR. ARBITBLIT:  Yes, thank you, your Honor.

9                        REDIRECT EXAMINATION

10   BY MR. ARBITBLIT:

11   Q.  Dr. MacGregor, you were asked on cross-examination about the

12   connection between urinary metabolites of prostacyclin and

13   thromboxane and the endothelium and the Vane research, and I would

14   like you to just take a moment to explain what you meant by that.

15   A.  Sure.  Well, Dr. Vane, I believe in the 1970s, published an

16   article in which he found that most of the prostacyclin in

17   *Circulation* -- most of the prostacyclin is elaborated by

18   endothelial cells, and the use of specific inhibitors of

19   cyclooxygenase, inhibitors of cyclooxygenase-1 and cyclooxygenase-2

20   reduce the prostacyclin metabolites in the urine, as I testified

21   earlier.  And the proportion of prostacyclin metabolites in the

22   urine from other organs would be small in comparison with the

23   amount from the endothelium; thus, the magnitude of the inhibition

24   by these inhibitors of COX-2 would indicate that a large proportion

25   of the effect was on the endothelial cells.

1  Q.  And is that consistent with the mechanism that you described

2  earlier?

3  A.  Yes.  And the other point about that is, the measurement of

4  these prostanoids in the *Circulation* in the vicinity of endothelial

5  cells is fraught with technical difficulty, and the usual method is

6  to measure the urinary metabolites, that's the standard method.

7  Q.  Now, you were asked something about your background on

8  interpretation of clinical trials, and the question you were asked

9  in the deposition, you mentioned that there was a more complete

10  explanation further on.  Would you like the opportunity to give

11  that more complete explanation?

12  A.  Sure.  It's on the adjacent page, I could read it if I had the

13  document.

14         MR. ARBITBLIT:  Do we have that deposition transcript

15  that you showed the witness?

16         While he is getting that, maybe we can move on to another

17  subject and come back.

18  BY MR. ARBITBLIT:

19  Q.  Doctor, in the article you referenced by Psaty and Kronmal, was

20  the cardio -- the heart disease death in the intended-to-treat

21  analysis statistically significant, setting aside whether pianos

22  fell on anybody's head?

23  A.  Yes, it was.

24  Q.  And is that important to your opinions?

25  A.  Yes.

1   Q.  Why is that?

2   A.  Again, it speaks to the cardiovascular toxicity of Vioxx.

3          MR. ARBITBLIT:  May I approach?

4          THE COURT:  Yes.

5   BY MR. ARBITBLIT:

6   Q.  Dr. MacGregor, is there a further explanation of the answer to

7   the question that you wanted to provide?

8   A.  Yes.  Could I have the next page, too?

9          MR. ISMAIL:  Would you like the whole thing?

10          MR. ARBITBLIT:  No, he asked for the next page.  Thank

11  you.

12          THE WITNESS:  Thank you.  Okay.  So I go on to discuss

13  some statistical background that I have.

14          "So just to back up, I used statistics in medicine to

15  analyze and review the credibility of articles.  So the extent that

16  doctors and scientists and biochemists use statistics in their

17  every day life going about these projects as applied to those

18  areas, yes; yes, I would say I am an expert and use statistics in

19  these fields."

20          MR. ARBITBLIT:  Thank you.

21  BY MR. ARBITBLIT:

22  Q.  And as for the subject of interpreting clinical trials, is that

23  a standard part of your work as a professor and cardiologist?

24  A.  Yes.

25  Q.  Now, you were asked whether there had been any replication of

1    the all-cause mortality excess in the Alzheimer's trials.  To your

2    knowledge, are there any studies other than Alzheimer's of Vioxx

3    versus placebo that followed patients after they were off drug?

4    A.  Just APPROVe.

5    Q.  What did APPROVe find?

6             MR. ISMAIL:  Your Honor, this goes back to that article

7    that he didn't disclose and didn't discuss.

8             MR. ARBITBLIT:  They raised -- they opened the door, your

9    Honor.

10            THE COURT:  I'll let you go into it, but let's not blow

11   it up.

12            MR. ARBITBLIT:  One question.  Go ahead.

13            THE WITNESS:  They found an ongoing risk for the

14   additional year off drug.

15   BY MR. ARBITBLIT:

16   Q.  And was that consistent with what the increase in ITT,

17   intention to treat, cardiac mortality showed?

18   A.  Yes.

19   Q.  Now, going to the Kearney article, do you have that in front of

20   you?

21   A.  Yes.

22   Q.  And could you take the Jenkins memo and do a little

23   side-by-side comparison of what these two say about each other?  In

24   the Jenkins memo, do you see a reference under, on page 4, to the

25   discussion of celecoxib?

1    A.  Yes.

2    Q.  And is there a reference in that first paragraph to the APC

3    trial?

4    A.  Yes.

5    Q.  What is the evidence of dose-response relationship referred to

6    and what are the doses per day of Celebrex that are talked about in

7    that paragraph?

8    A.  Let me just read it real quickly.  (WITNESS READS DOCUMENT.)

9    Sure.  So they point out in the Jenkins memo that the dose of

10   celecoxib is, two doses were tested, 200 twice a day and 400 twice

11   a day.  The 200 twice a day had a hazard ratio of two and a half

12   and with 400 twice a day the hazard ratio was 3.4.

13   Q.  And for 400 twice a day, is that an 800 milligram dose of

14   Celebrex?

15   A.  That's correct.

16   Q.  Is that approved for any population to take that much Celebrex?

17   A.  No, those are very high doses, both of them.  A standard dose

18   is 200, and COX-2 selectivity is not only a function of the

19   intrinsic selectivity of the molecule, but it also has to do with

20   the concentration of the drug you used, so at these high

21   concentrations, these unapproved concentrations, you would be

22   getting more COX-2 selectivity than at the standard dose of 200,

23   which most studies find to be harmless.

24   Q.  Going to the Kearney article at page 4, the figure that counsel

25   showed you on cross, do you see a reference under the polyps to the

530

1   APC same study that was referenced here as having doses of 800

2   milligrams and 400 milligrams a day?  Looking --

3   A.  Oh, yeah, under polyps, APC, right.

4   Q.  And do you see that the result of that shows an increased risk

5   at those high doses of Celebrex?

6   A.  Yes.

7   Q.  So the data in Kearney that they use came from the high dose

8   study, right?

9   A.  Correct.

10  Q.  And if you look at the next page of the Jenkins memo under

11  rofecoxib, did the strongest data cited in this memo for the

12  increased risk of serious adverse CV events with Vioxx come from

13  the APPROVe trial in which Vioxx 25 milligrams, the standard dose

14  was taken?

15  A.  Yes.

16  Q.  And is that relevant to your opinion?

17  A.  Yes.

18  Q.  In what way?

19  A.  Well, it goes to the point that I think we've been making that

20  Vioxx at the standard dose, the most commonly prescribed dose, is

21  toxic.  The other drugs, Celebrex at very high doses is also COX-2

22  selective, but at the standard dose there's not been produced

23  evidence of harm.

24  Q.  If you could turn to tab 21 of your binder, sir.  You were

25  asked about the Jenkins memo, and you made the distinction between

 1   scientists and administrators.  Was there also a committee of

 2   scientists that was asked by the FDA to address the questions of

 3   cardiovascular risk?

 4   A.  Yes, there was.

 5   Q.  And have you reviewed the advisory committee minutes for that

 6   February 2005 meeting?

 7   A.  Yes.

 8             MR. ISMAIL:  Judge, I thought I was asked not to go into

 9   the whole process.

10             THE COURT:  Yes, I thought we decided that --

11             MR. ARBITBLIT:  I am not asking about the regulatory

12   process, I am asking about the science that the scientists produced

13   in this memo, Judge, not about the regulatory process.

14             MR. ISMAIL:  That is the advisory committee that predated

15   the memo.

16             MR. ARBITBLIT:  There are a couple of distinct questions

17   that are important to rehabilitate what happened on cross as far as

18   doses.

19             MR. ISMAIL:  Then I'll just ask a couple of follow-up.

20             THE COURT:  All right.  I am going to let him do recross

21   on that area because he hadn't had a chance to do that.

22             MR. ARBITBLIT:  All right.  I'll withdraw that.

23   BY MR. ARBITBLIT:

24   Q.  Going back to the American Heart Association scientific

25   statements that you discussed earlier, did that article comment at

```
 1   page 3 about whether there should be a recognition of known
 2   differences among nonselective NSAIDs?
 3   A.  Yes, it does.
 4   Q.  And do you agree with that?
 5   A.  I do.
 6            MR. ARBITBLIT:  That's all I have.
 7            THE COURT:  Okay.  All right.  Let me see counsel.  Thank
 8   you, Doctor, you're finished.
 9            THE WITNESS:  Thank you.
10            THE COURT:  Just on logistics.  I don't need this on the
11   record.
12       (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)
13            THE COURT:  The court will stand in recess until 1:45.
14            THE DEPUTY CLERK:  Everyone rise.
15       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)
16
17                       *  *  *  *  *  *
18
19
20
21
22
23
24
25
```

1

2

3                              REPORTER'S CERTIFICATE

4

5

6          I, Karen A. Ibos, CCR, Official Court Reporter, United

7   States District Court, Eastern District of Louisiana, do hereby

8   certify that the foregoing is a true and correct transcript, to the

9   best of my ability and understanding, from the record of the

10  proceedings in the above-entitled and numbered matter.

11

12

13

14

15                         Karen A. Ibos, CCR, RPR, CRR

16                         Official Court Reporter

17

18

19

20

21

22

23

24

25