1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3


4
   IN RE:  VIOXX PRODUCTS           *
5           LIABILITY LITIGATION    *
                                    *
6   This Document Relates to:       *    MDL No. 1657
                                    *
7       STATE OF LOUISIANA, *ex rel.* *    Section L
        JAMES D. CALDWELL JR.,       *
8       Attorney General            *    New Orleans, Louisiana
                                    *
9           versus                  *    April 14, 2010
                                    *
10  MERCK & CO., INC.               *    1:45 p.m.
                                    *
11                                  *
        Case No. 05-CV-3700         *
12  * * * * * * * * * * * * * * * * * *

13

14
                 TRIAL PROCEEDINGS BEFORE THE
15                HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE
16               DAY 3, AFTERNOON SESSION

17
   <u>APPEARANCES</u>:
18

19  For the Plaintiff:          Dugan Law Firm
                                BY:  JAMES R. DUGAN II, ESQ.
20                              650 Poydras Street, Suite 2150
                                New Orleans, Louisiana 70130
21

22  For the Plaintiff:          Murray Law Firm
                                BY:  STEPHEN B. MURRAY JR., ESQ.
23                                   DOUGLAS R. PLYMALE, ESQ.
                                     JUSTIN BLOOM, ESQ.
24                              650 Poydras Street, Suite 2150
                                New Orleans, Louisiana 70130
25



                      DAILY COPY

```
 1   For the Plaintiff:          Lieff Cabraser Heimann
                                   & Bernstein, LLP
 2                               BY:  DONALD C. ARBITBLIT, ESQ.
                                 275 Battery Street, Suite 3000
 3                               San Francisco, California 94111

 4
     For the Defendant:          Goldman Ismail Tomaselli
 5                                 Brennan & Baum, LLP
                                 BY:  TAREK ISMAIL, ESQ.
 6                                   BRIAN P. O'DONOGHUE, ESQ.
                                 1 North Franklin Street, Suite 625
 7                               Chicago, Illinois 60606

 8
     For the Defendant:          Baker Botts, LLP
 9                               BY:  TRAVIS J. SALES, ESQ.
                                 910 Louisiana Street
10                               Houston, Texas 77002

11
     For the Defendant:          O'Melveny & Myers, LLP
12                               BY:  SCOTT M. VOELZ, ESQ.
                                 400 South Hope Street
13                               Los Angeles, California 90071

14
     Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
15                               500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana 70130
16                               (504) 589-7778

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

DAILY COPY

1                          **I N D E X**

2                                                          <u>PAGE</u>

3    John D. Abramson

4         Voir Dire                                     540

5         Direct Examination                            547

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAILY COPY

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
| 13:17 | 1  | **<u>AFTERNOON SESSION</u>**                                      |
| 13:41 | 2  | **(April 14, 2010)**                                             |
| 13:50 | 3  | **THE DEPUTY CLERK:**  Everyone rise.                            |
| 13:51 | 4  | **THE COURT:**  Be seated, please.  I understand we have         |
| 13:51 | 5  | an issue at the bench.                                            |
| 13:52 | 6  | (WHEREUPON the following proceedings were held at the            |
| 13:52 | 7  | bench.)                                                           |
| 13:52 | 8  | **MR. ISMAIL:**  Your Honor, we are outside the presence         |
| 13:52 | 9  | of the witness.  We wanted to put on the record our objection    |
| 13:52 | 10 | to the witness.  We discussed it with you in chambers, and we    |
| 13:52 | 11 | thought it was important to put it on the record.                |
| 13:52 | 12 | **THE COURT:**  I asked you to.                                  |
| 13:52 | 13 | **MR. ISMAIL:**  We are objecting to the proffered              |
| 13:52 | 14 | examination of Dr. Abramson as we know it from plaintiff         |
| 13:52 | 15 | counsel's delivery of materials to us.  In specific reference,   |
| 13:52 | 16 | I direct the Court's attention to the *Zyprexa Products*         |
| 13:52 | 17 | *Liability Litigation* opinion from Judge Weinstein, dated       |
| 13:52 | 18 | December 1, 2009, in which Dr. Abramson's testimony was          |
| 13:52 | 19 | specifically referenced as being insufficient for a case like   |
| 13:52 | 20 | this, to discuss what would be important to individual          |
| 13:53 | 21 | physicians.  We believe his testimony as offered by the         |
| 13:53 | 22 | plaintiffs will fall into the area that the Court has already   |
| 13:53 | 23 | excluded.  We want to preserve that objection, Your Honor.      |
| 13:53 | 24 | **THE COURT:**  Uh-huh.                                          |
| 13:53 | 25 | **MR. ISMAIL:**  We further have concerns that                  |

DAILY COPY

| | | |
|---|---|---|
| 13:53 | 1 | Dr. Abramson is not qualified on the breadth of opinions he |
| 13:53 | 2 | intends to offer.  We will see what exactly they elicit.  We |
| 13:53 | 3 | have concerns about his qualifications.  We further believe |
| 13:53 | 4 | many of the topics he offers opinions on are not true expert |
| 13:53 | 5 | opinions but, in effect, a closing statement and narrative of |
| 13:53 | 6 | the plaintiff's case rather than true expertise to assist the |
| 13:53 | 7 | finder of fact.  We raise concerns of cumulative evidence, |
| 13:53 | 8 | which we will take on a question-by-question basis. |
| 13:53 | 9 | THE COURT:  Do you want to respond? |
| 13:53 | 10 | MR. MURRAY:  Just briefly respond to the *Zyprexa* |
| 13:53 | 11 | point.  Dr. Abramson is an expert in the clinical |
| 13:53 | 12 | decision-making process by doctors with respect to drugs.  The |
| 13:54 | 13 | P&T committee of the Louisiana Department of Health and |
| 13:54 | 14 | Hospitals was comprised of doctors.  Therefore, his testimony |
| 13:54 | 15 | is directly relevant to decisions by the State of Louisiana |
| 13:54 | 16 | and, more importantly, to the state of knowledge of Louisiana |
| 13:54 | 17 | with respect to the issue of the existence of a redhibitory |
| 13:54 | 18 | defect. |
| 13:54 | 19 | We are mindful of Your Honor's cautions with |
| 13:54 | 20 | respect to limiting Dr. Abramson to areas of expert testimony |
| 13:54 | 21 | and not advocacy, and we intend to comply with Your Honor's |
| 13:54 | 22 | directive in that respect and believe that his testimony, as |
| 13:54 | 23 | offered, will be entirely relevant and admissible and will help |
| 13:54 | 24 | the finder of fact. |
| 13:54 | 25 | THE COURT:  I looked over his qualifications.  I felt |

| | | |
|---|---|---|
| 13:54 | 1 | that one of the issues in this particular case is risk/benefit |
| 13:54 | 2 | analysis.  I think that the defendant's objections go to mainly |
| 13:55 | 3 | the weight of the testimony, and I can deal with that at |
| 13:55 | 4 | another time. |
| 13:55 | 5 | I don't think it will be misleading to me as it |
| 13:55 | 6 | might well be to a jury.  I don't have the 403 problem.  I do |
| 13:55 | 7 | think there's some potential relevance to the testimony and |
| 13:55 | 8 | feel that it could be helpful to the finder of fact if it is |
| 13:55 | 9 | streamlined, as I mentioned to the plaintiff.  Whether or not |
| 13:55 | 10 | it's applicable to the issue or any issues or some of the |
| 13:55 | 11 | issues goes to the weight to be given to the testimony and not |
| 13:55 | 12 | the admissibility of it.  I'm going to allow the testimony and |
| 13:55 | 13 | deal with weight, as that presents itself, at a later time. |
| 13:55 | 14 | **MR. MURRAY:**  Thank you, Your Honor. |
| 13:55 | 15 | **MR. ISMAIL:**  Thank you. |
| 13:55 | 16 | **THE COURT:**  Thank you, folks. |
| 13:56 | 17 | (WHEREUPON the following proceedings were held in |
| 13:56 | 18 | open court.) |
| 13:56 | 19 | **THE COURT:**  Let's proceed. |
| 13:56 | 20 | (WHEREUPON **John D. Abramson**, having been duly sworn, |
| 13:56 | 21 | testified as follows.) |
| 13:56 | 22 | **THE DEPUTY CLERK:**  Please state your full name and |
| 13:56 | 23 | correct spelling for the record. |
| 13:56 | 24 | **THE WITNESS:**  John D. Abramson, A-B-R-A-M-S-O-N. |
| | 25 | |

DAILY COPY

| | | |
|---|---|---|
| 13:56 | 1 | **VOIR DIRE** |
| 13:56 | 2 | **BY MR. MURRAY:** |
| 13:56 | 3 | **Q.**   Good afternoon, Dr. Abramson.  What is your current |
| 13:56 | 4 | position, sir? |
| 13:56 | 5 | **A.**   I am a clinical instructor at Harvard Medical School, and |
| 13:57 | 6 | I serve as a consultant to Wells Fargo in a program to help |
| 13:57 | 7 | self-insured companies design benefit plans. |
| 13:57 | 8 | **Q.**   What are your licenses and certifications? |
| 13:57 | 9 | **A.**   I'm licensed as a physician in Massachusetts, and I'm |
| 13:57 | 10 | board-certified in family practice. |
| 13:57 | 11 | **Q.**   Doctor, do you have a copy of your current CV with you? |
| 13:57 | 12 | **A.**   I don't. |
| 13:57 | 13 | **Q.**   I have a copy. |
| 13:57 | 14 |         **MR. MURRAY:**  May I approach the witness? |
| 13:57 | 15 |         **THE COURT:**  Yes. |
| 13:58 | 16 | **BY MR. MURRAY:** |
| 13:58 | 17 | **Q.**   Dr. Abramson, have you had an opportunity to review that |
| 13:58 | 18 | document? |
| 13:58 | 19 | **A.**   Yes. |
| 13:58 | 20 | **Q.**   Is that document your current CV? |
| 13:58 | 21 | **A.**   Yes. |
| 13:58 | 22 | **Q.**   Is it up-to-date? |
| 13:58 | 23 | **A.**   Yes.  Some presentations may not be on it, but it is |
| 13:58 | 24 | otherwise up-to-date. |
| 13:58 | 25 |         **MR. MURRAY:**  Your Honor, at this point we would |

| | | |
|---|---|---|
| 13:58 | 1 | offer, file, and introduce -- what number are we on? |
| 13:58 | 2 | THE DEPUTY CLERK:  The next number would be 725, |
| 13:58 | 3 | LA-725. |
| 13:58 | 4 | MR. MURRAY:  LA-725, Your Honor. |
| 13:58 | 5 | THE COURT:  That's his CV? |
| 13:58 | 6 | MR. MURRAY:  Yes, Your Honor. |
| 13:58 | 7 | THE COURT:  All right.  I'll admit it. |
| 13:58 | 8 | (OFF-THE-RECORD) |
| 14:06 | 9 | BY MR. MURRAY: |
| 14:06 | 10 | Q.  Dr. Abramson, we just introduced your CV.  Rather than go |
| 14:06 | 11 | over -- |
| 14:06 | 12 | THE DEPUTY CLERK:  Judge, you need to rule on that. |
| 14:06 | 13 | THE COURT:  I did.  Let it be admitted. |
| 14:06 | 14 | BY MR. MURRAY: |
| 14:06 | 15 | Q.  Rather than go over your CV, I'll just ask you:  Do you |
| 14:06 | 16 | have any experience that is relevant to the opinions for which |
| 14:07 | 17 | you plan to testify today? |
| 14:07 | 18 | A.  I do. |
| 14:07 | 19 | Q.  Could you relate that to the Court briefly, sir. |
| 14:07 | 20 | A.  Yes.  I completed an internship and residency in family |
| 14:07 | 21 | medicine.  I completed a two-year Robert Wood Johnson |
| 14:07 | 22 | fellowship in family medicine that was designed to train family |
| 14:07 | 23 | practitioners to be academic physicians, and it focused on |
| 14:07 | 24 | statistics, research, design, and epidemiology. |
| 14:07 | 25 | I practiced for 20 years in family medicine about an |

DAILY COPY

14:07   1   hour north of Boston.  I've served as a clinical instructor at
14:07   2   Harvard Medical School since 1997.  I was an associate medical
14:07   3   director of PruCare of Massachusetts for, I forget, about four
14:07   4   years.  That was a managed-care organization.
14:08   5   Q.   What did you do for that managed-care organization,
14:08   6   Doctor?
14:08   7   A.   Helped to set policy and to work with physicians who were
14:08   8   members of the managed-care plan and did utilization review.
14:08   9            Often, if somebody was in the hospital longer than
14:08  10   expected, I would call the physician and find out if there was
14:08  11   anything that could be done to facilitate discharge or provide
14:08  12   care in a more effective or efficient venue.
14:08  13   Q.   I'm sorry to interrupt you, Doctor.  You were listing the
14:08  14   other experience you have that would be pertinent to the
14:08  15   opinion you are going to give in this case.
14:08  16   A.   Yeah.  I was a senior research associate at the Heller
14:08  17   School at Brandeis for a little over a year, working on a
14:08  18   health policy project.
14:08  19            I was chair of family medicine at Lahey Clinic from
14:08  20   the end of 1993, or the beginning of 1994, through 2001.
14:09  21   Q.   In your current teaching duties, do you teach medical
14:09  22   students how to integrate critically and interpret -- I'm
14:09  23   sorry, how to critically interpret and integrate medical
14:09  24   literature and data into a risk/benefit analysis for
14:09  25   prescribing drugs to patients?

DAILY COPY

14:09  1   **A.**   I do.  I did that for many years, teaching students as a

14:09  2   primary care physician in my office and then as a tutor at the

14:09  3   Harvard Medical School, and now teaching in a health policy

14:09  4   course that all first-year medical students take, providing a

14:09  5   lecture, or part of a lecture, and leading a discussion group

14:09  6   that helps students to understand the interface between

14:09  7   scientific evidence and the policy issues with the practice of

14:09  8   medicine.

14:09  9   **Q.**   Now, Doctor, did you have any experience, with respect to

14:09  10  Vioxx, prior to becoming engaged by attorneys connected with

14:10  11  *Vioxx* litigation?

14:10  12  **A.**   I did.

14:10  13  **Q.**   Could you briefly relate that to the Court, please.

14:10  14  **A.**   Well, I had some experience as a practicing physician but

14:10  15  left practice at the end of 2001 to write a book.  The book

14:10  16  that I thought I was going to write was an outgrowth of an

14:10  17  elective course that I was teaching at Harvard Medical School

14:10  18  about doctor-patient relationships, helping medical students to

14:10  19  understand that there was more than good science to be a good

14:10  20  doctor.

14:10  21          As I started to write that book, got into the data

14:10  22  from the advisory committee briefing documents from the

14:10  23  February 2001 advisory committee meeting and compared the data

14:10  24  that was there, particularly about Vioxx, with the data that

14:10  25  was available to practicing physicians and that had created the

14:11   1   belief in my colleagues -- and I was sort of agnostic about it,

14:11   2   but the belief that Vioxx was a superior drug because of its

14:11   3   greater safety -- and when I was able to spend time analyzing

14:11   4   the FDA data -- because I was working halftime and moving

14:11   5   towards taking a year off to write this other book -- I

14:11   6   realized --

14:11   7   Q.   Doctor, let me stop you just for a moment before the Court

14:11   8   stops us both.

14:11   9   A.   Okay.

14:11   10   Q.   I don't want you to give any opinions with respect to what

14:11   11   that research that you did back then may have led you to.  You

14:11   12   haven't yet been tendered as an expert, so I think if you could

14:11   13   just move on from -- so you were prompted by your review of

14:11   14   information to write a book.  Without respect to Vioxx, what

14:11   15   was generally the subject of that book?

14:11   16   A.   The subject of the book was the quality of the information

14:11   17   that's available to physicians and upon which physicians base

14:12   18   their therapeutic decisions.

14:12   19   Q.   Since writing that book, have you written peer-reviewed

14:12   20   articles with respect to that field, that area of expertise?

14:12   21   A.   I have.

14:12   22   Q.   Is that an area of expertise that is recognized in

14:12   23   peer-reviewed literature and on which experts routinely write

14:12   24   in peer-reviewed literature?

14:12   25   A.   Yes.

| | | |
|---|---|---|
| 14:12 | 1 | **Q.**   Are you an expert in the evaluation of clinical trials? |
| 14:12 | 2 | **A.**   Yes. |
| 14:12 | 3 | **Q.**   Are you an expert in the risk/benefit analysis undertaken |
| 14:12 | 4 | by physicians with respect to prescription drugs? |
| 14:12 | 5 | **A.**   Yes. |
| 14:12 | 6 | **Q.**   I believe we just talked about, but let me clarify:  Are |
| 14:12 | 7 | you an expert in the type of information prescribing physicians |
| 14:12 | 8 | need and expect in order to undertake a risk/benefit analysis? |
| 14:12 | 9 | **A.**   Yes. |
| 14:12 | 10 | **Q.**   By "risk/benefit analysis" I'm referring to specifically |
| 14:12 | 11 | with respect to prescription drugs. |
| 14:12 | 12 | **A.**   Yes. |
| 14:13 | 13 | **Q.**   Do you have expertise in the area of how pharmaceutical |
| 14:13 | 14 | company sponsored research and marketing affects doctors' |
| 14:13 | 15 | clinical decisions? |
| 14:13 | 16 | **A.**   Yes. |
| 14:13 | 17 | **Q.**   Is that an area in which you yourself have published in |
| 14:13 | 18 | the peer-reviewed literature? |
| 14:13 | 19 | **A.**   Yes. |
| 14:13 | 20 | **Q.**   Again, is that an area of expertise in which experts have |
| 14:13 | 21 | published articles in peer-reviewed literature as a regular |
| 14:13 | 22 | matter of course? |
| 14:13 | 23 | **A.**   Yes. |
| 14:13 | 24 | **Q.**   Is this an area in which you been asked to lecture to |
| 14:13 | 25 | medical schools, hospital grand rounds, and health insurers? |

DAILY COPY

| | | |
|---|---|---|
| 14:13 | 1 | **A.**   Yes. |
| 14:13 | 2 | **Q.**   Have you been accepted by courts of law as an expertise |
| 14:13 | 3 | with respect to that particular area? |
| 14:13 | 4 | **A.**   I have. |
| 14:13 | 5 | **Q.**   Could you name them, please, for the Court. |
| 14:13 | 6 | **A.**   I was accepted to testify in the *Kaiser v. Pfizer* |
| 14:13 | 7 | Neurontin trial in U.S. District Court in Boston and accepted |
| 14:13 | 8 | in federal court in Brooklyn on the *Zyprexa* class-certification |
| 14:13 | 9 | matter. |
| 14:14 | 10 | **MR. MURRAY:**  Your Honor, at this point in time, we |
| 14:14 | 11 | would tender Dr. Abramson as an expert in the following areas: |
| 14:14 | 12 | Expert in the design and analysis of clinical trials, expert in |
| 14:14 | 13 | the risk/benefit analysis undertaken by physicians with respect |
| 14:14 | 14 | to prescription drugs, expert in the type of information |
| 14:14 | 15 | prescribing physicians need and expect in order to undertake |
| 14:14 | 16 | risk/benefit analyses regarding prescription drugs, and an |
| 14:14 | 17 | expert in the area of how pharmaceutical company sponsored |
| 14:14 | 18 | research and marketing affect doctors' clinical decisions. |
| 14:14 | 19 | **MR. ISMAIL:**  Your Honor, we object for reasons |
| 14:14 | 20 | previously stated both on the record and memorandum. |
| 14:14 | 21 | **THE COURT:**  Do you want to question him on any of |
| 14:14 | 22 | those? |
| 14:14 | 23 | **MR. ISMAIL:**  I'll save it for cross. |
| 14:14 | 24 | **THE COURT:**  I will let him testify on the basis of |
| 14:14 | 25 | the information that physicians need to make a risk/benefit |

| | | |
|---|---|---|
| 14:14 | 1 | analysis and your last tender, how the hospitals -- how did you |
| 14:15 | 2 | put it? |
| 14:15 | 3 | MR. MURRAY:  The tender had four components:  One was |
| 14:15 | 4 | design analysis of clinical trials; the second was risk/benefit |
| 14:15 | 5 | analysis undertaken by physicians with respect to prescription |
| 14:15 | 6 | drugs; the third was the type of information prescribing |
| 14:15 | 7 | physicians need and expect in order to undertake risk/benefit |
| 14:15 | 8 | analyses regarding prescription drugs. |
| 14:15 | 9 | THE COURT:  I thought you said something about how |
| 14:15 | 10 | the drug companies -- |
| 14:15 | 11 | MR. MURRAY:  The final point, Your Honor, was the |
| 14:15 | 12 | area of how pharmaceutical company sponsored research and |
| 14:15 | 13 | marketing affects doctors' clinical decisions. |
| 14:15 | 14 | THE COURT:  The last one that you just mentioned, I |
| 14:15 | 15 | will let him testify on that, and the information physicians |
| 14:15 | 16 | need to make a risk/benefit analysis.  I'm uncertain about the |
| 14:15 | 17 | design analysis in trials, but I'll let him testify on that |
| 14:15 | 18 | also.  So those are the three areas that the Court will accept |
| 14:15 | 19 | him in to be able to testify. |
| 14:15 | 20 | MR. MURRAY:  Thank you, Your Honor.  May I proceed? |
| 14:16 | 21 | THE COURT:  Yes. |
| 14:16 | 22 | DIRECT EXAMINATION |
| 14:16 | 23 | BY MR. MURRAY: |
| 14:16 | 24 | Q.   Dr. Abramson, could you briefly summarize for the Court |
| 14:16 | 25 | the materials that you reviewed in reaching your opinions in |

| | | |
|---|---|---|
| 14:16 | 1 | this case. |
| 14:16 | 2 | **A.**   I reviewed documents from Merck describing the clinical |
| 14:16 | 3 | trials that were done.  I reviewed publications representing |
| 14:16 | 4 | those clinical trials in the medical literature.  I reviewed |
| 14:16 | 5 | provider data -- material from Provider Synergies that was |
| 14:16 | 6 | written up as monographs. |
| 14:16 | 7 |           I looked at depositions.  I read depositions of |
| 14:16 | 8 | Dr. Fran Kaiser and Valerie Taylor and Dr. Edwards. |
| 14:17 | 9 |           I went through the FDA data evaluating Vioxx. |
| 14:17 | 10 | **Q.**   Did you review documents that were referenced in the |
| 14:17 | 11 | Edwards, Kaiser, and Taylor depositions? |
| 14:17 | 12 | **A.**   I did. |
| 14:17 | 13 | **Q.**   Did you review minutes of the Louisiana Medicaid |
| 14:17 | 14 | pharmaceutical and therapeutics review committee? |
| 14:17 | 15 | **A.**   I did. |
| 14:17 | 16 | **Q.**   I believe you testified that you reviewed Provider |
| 14:17 | 17 | Synergies' monographs.  Do you have an understanding as to the |
| 14:17 | 18 | role between Provider Synergies and the Louisiana P&T committee |
| 14:17 | 19 | and Louisiana Medicaid? |
| 14:17 | 20 | **A.**   Yes. |
| 14:17 | 21 |           **MR. MURRAY:**  Your Honor, I don't intend to rehash |
| 14:17 | 22 | that testimony, but I wanted to establish some foundation. |
| 14:17 | 23 | **BY MR. MURRAY:** |
| 14:17 | 24 | **Q.**   Have you reached any opinions in this case with respect to |
| 14:17 | 25 | whether the drug Vioxx suffered from a defect such that a |

| 14:17 | 1 | reasonable buyer would not have purchased it? |
| 14:18 | 2 | **A.**   I have. |
| 14:18 | 3 | **Q.**   Can you briefly state the bases for that opinion. |
| 14:18 | 4 | **A.**   The risk/benefit analysis -- or the risk/benefit ratio, |
| 14:18 | 5 | when all the information is known, would show that Vioxx |
| 14:18 | 6 | created -- |
| 14:18 | 7 |      **MR. ISMAIL:**   Your Honor, I think the question was |
| 14:18 | 8 | what was the basis of his opinion.  I don't have the |
| 14:18 | 9 | foundation, and it seems to be beyond the tender anyway. |
| 14:18 | 10 |      **MR. MURRAY:**   Your Honor, actually, it's more by way |
| 14:18 | 11 | of background and foundation for the rest of his opinions.  The |
| 14:18 | 12 | questions he is going to be asked are going to be with respect |
| 14:18 | 13 | to whether or not there was adequate information to make a |
| 14:18 | 14 | risk/benefit analysis, and I think his understanding of what |
| 14:18 | 15 | the risk/benefit analysis would show is critical to that |
| 14:18 | 16 | understanding. |
| 14:18 | 17 |      I don't intend to belabor the point.  I think |
| 14:18 | 18 | that we have other experts who have already put that |
| 14:18 | 19 | information in the record.  I do want to understand what he |
| 14:19 | 20 | understands the defect to be. |
| 14:19 | 21 |      If you would prefer that I ask the witness to |
| 14:19 | 22 | assume that there is a defect and whether that defect has been |
| 14:19 | 23 | communicated, I could proceed in that manner, Your Honor. |
| 14:19 | 24 |      **THE COURT:**   Let's go the way you are proposing.  I'll |
| 14:19 | 25 | let the defendant cross-examine him on that. |

DAILY COPY

14:19  1          **MR. ISMAIL:**  Just lastly, Your Honor, the question
14:19  2    asked what a reasonable buyer -- that's not really an issue for
14:19  3    this witness as the Court has defined what that is for the
14:19  4    case.
14:19  5          **THE COURT:**  Well, let's rephrase the question again.
14:19  6    What is it?
14:19  7    **BY MR. MURRAY:**
14:19  8    **Q.**   Do you have any opinions in this case with respect to
14:19  9    whether the drug Vioxx suffered from a defect such that a
14:19  10   reasonable purchaser in the position of the State of Louisiana
14:19  11   Medicaid would not have purchased it?
14:19  12         **MR. ISMAIL:**  Same objection, Your Honor:  Lack of
14:19  13   foundation.
14:19  14         **THE COURT:**  That's all right.  I'll overrule the
14:19  15   objection.  Let's go.
14:20  16         **THE WITNESS:**  I do.
14:20  17   **BY MR. MURRAY:**
14:20  18   **Q.**   What is that opinion?
14:20  19   **A.**   That the risks outweigh the benefits.
14:20  20   **Q.**   So if I were to refer to the defect in the drug Vioxx in
14:20  21   my questioning, can we take that to mean I'm referring to your
14:20  22   conclusions with respect to the risk outweighing the benefits
14:20  23   of the drug?
14:20  24   **A.**   Yes.
14:20  25   **Q.**   Have you reached any opinion in this case with respect to

| | | |
|---|---|---|
| 14:20 | 1 | whether the State of Louisiana Department of Health and |
| 14:20 | 2 | Hospitals was aware of this defect? |
| 14:20 | 3 | **A.**   I have. |
| 14:20 | 4 | **Q.**   What is your opinion? |
| 14:20 | 5 | **MR. ISMAIL:**  Your Honor, it's speculative.  He can't |
| 14:20 | 6 | testify what the State of Louisiana was aware of. |
| 14:20 | 7 | **THE COURT:**  We are getting a little bit afield there. |
| 14:20 | 8 | **MR. MURRAY:**  He is an expert, Your Honor.  I can |
| 14:20 | 9 | rephrase the question. |
| 14:20 | 10 | **THE COURT:**  Yes, let's rephrase it.  Did they have |
| 14:20 | 11 | enough information is what the issue really is, not whether or |
| 14:20 | 12 | not they knew. |
| 14:20 | 13 | **BY MR. MURRAY:** |
| 14:20 | 14 | **Q.**   Have you reached any opinion in this case with respect to |
| 14:20 | 15 | whether the State of Louisiana Department of Health and |
| 14:20 | 16 | Hospitals had received sufficient information to make it aware |
| 14:21 | 17 | of the existence of that defect? |
| 14:21 | 18 | **A.**   I have. |
| 14:21 | 19 | **Q.**   What is that opinion? |
| 14:21 | 20 | **A.**   That the State of Louisiana did not have adequate |
| 14:21 | 21 | information about the cardiovascular risks or the GI benefits |
| 14:21 | 22 | to make a decision about the risk/benefit ratio. |
| 14:21 | 23 | **Q.**   Have you reached any opinion as to whether a reasonable |
| 14:21 | 24 | entity in the position of the Louisiana Department of Health |
| 14:21 | 25 | and Hospitals would have been willing to pay for Vioxx had it |

14:21   1   known of that defect?

14:21   2   **A.**  I have.

14:21   3         **MR. ISMAIL:**  Objection, Your Honor.

14:21   4         **THE COURT:**  See, that's the kind of information that

14:21   5   I think -- Mr. Hood and his group make the decision.  I think

14:21   6   that this witness can testify as to whether they had the right

14:22   7   information to make the risk analysis.  Whether or not they

14:22   8   would have is really beyond his deal unless he has been on

14:22   9   that --

14:22  10         **MR. MURRAY:**  I understand, Your Honor, and I will

14:22  11   move on.  I don't intend to ask any further questions on that

14:22  12   point.

14:22  13   **BY MR. MURRAY:**

14:22  14   **Q.**  Have you seen the sworn testimony of the secretary of the

14:22  15   Louisiana Department of Health and Hospitals, David Hood, that

14:22  16   at the time he was secretary and Vioxx was on the market, he

14:22  17   understood that while Vioxx had some risks, the benefits

14:22  18   outweighed the risks and the drug was suitable for widespread

14:22  19   analgesic use?

14:22  20   **A.**  I have seen that.

14:22  21   **Q.**  Based on the reviews of information prepared by Provider

14:22  22   Synergies and reviewed by the Louisiana P&T committee, do you

14:22  23   have an expert opinion as to whether Mr. Hood's understanding

14:23  24   was reasonable in light of the information reviewed by those

14:23  25   entities?

| | | |
|---|---|---|
| 14:23 | 1 | **MR. ISMAIL:**  Your Honor, this witness can't testify |
| 14:23 | 2 | what the reasonableness of a nonmedical professional state |
| 14:23 | 3 | health-care policy witness -- |
| 14:23 | 4 | **THE COURT:**  I understand that.  I'll overrule that |
| 14:23 | 5 | objection. |
| 14:23 | 6 | **THE WITNESS:**  Can you ask the question again. |
| 14:23 | 7 | BY MR. MURRAY: |
| 14:23 | 8 | Q.   I'll ask the question again, and I'm referring you back to |
| 14:23 | 9 | Secretary Hood's understanding -- or your understanding of what |
| 14:23 | 10 | Secretary Hood's understanding was with respect to the risks |
| 14:23 | 11 | and benefits of Vioxx. |
| 14:23 | 12 | My question is:  Based on the information that you |
| 14:23 | 13 | were aware was presented to Provider Synergies and reviewed by |
| 14:23 | 14 | the Louisiana P&T committee, do you have any expert opinion as |
| 14:23 | 15 | to whether Mr. Hood's understanding was reasonable in light of |
| 14:23 | 16 | the information available to those entities? |
| 14:23 | 17 | A.   His understanding as expressed in his affidavit? |
| 14:23 | 18 | Q.   Yes, sir. |
| 14:24 | 19 | A.   Yes. |
| 14:24 | 20 | Q.   What is that opinion? |
| 14:24 | 21 | A.   It would be that he believed at the time that he served in |
| 14:24 | 22 | that capacity that the risk/benefit ratio supported the use of |
| 14:24 | 23 | Vioxx but that had he known what he -- |
| 14:24 | 24 | Q.   Actually, Dr. Abramson, what I am asking you is simply not |
| 14:24 | 25 | whether what Dr. Abramson believed -- I'm sorry, what Secretary |

554

| | | |
|---|---|---|
| 14:24 | 1 | Hood believed.  I just want to know whether, based on the |
| 14:24 | 2 | information available to him, you deemed that -- whether you |
| 14:24 | 3 | have an opinion as to whether his understanding would have been |
| 14:24 | 4 | reasonable presented with that information. |
| 14:24 | 5 | **A.**   Yes. |
| 14:24 | 6 | **Q.**   What is that opinion? |
| 14:24 | 7 | **A.**   That his understanding was reasonable given the |
| 14:24 | 8 | information available to him. |
| 14:24 | 9 | **Q.**   Thank you, Dr. Abramson.  Have you developed an |
| 14:25 | 10 | understanding as to recommendations that the P&T committee made |
| 14:25 | 11 | to the secretary of health and hospitals with respect to Vioxx? |
| 14:25 | 12 | **A.**   Yes. |
| 14:25 | 13 | **Q.**   Generally, what is that understanding? |
| 14:25 | 14 | **A.**   That the committee made recommendations based on the |
| 14:25 | 15 | information available to it. |
| 14:25 | 16 | **Q.**   Do you have an opinion as to whether the recommendations |
| 14:25 | 17 | of the P&T committee -- more particularly, the physicians on |
| 14:25 | 18 | the P&T committee -- to the secretary were reasonable in light |
| 14:25 | 19 | of the information available to them? |
| 14:25 | 20 | **A.**   Yes. |
| 14:25 | 21 |         **MR. ISMAIL:**  Same objection, Your Honor. |
| 14:25 | 22 |         **THE COURT:**  Okay.  I overrule the objection. |
| 14:26 | 23 | **BY MR. MURRAY:** |
| 14:26 | 24 | **Q.**   Based on your review of the materials that you have -- |
| 14:26 | 25 | strike that. |

DAILY COPY

| 14:26 | 1 | Do you have an expert opinion, based on all of the |
|---|---|---|
| 14:26 | 2 | materials that you have reviewed with respect to the safety and |
| 14:26 | 3 | efficacy profile of Vioxx, whether the P&T committee's |
| 14:26 | 4 | recommendations to the secretary of Louisiana with respect to |
| 14:26 | 5 | Vioxx were correct; that is, were their conclusions, as they |
| 14:26 | 6 | reported them to the secretary, correct with respect to Vioxx? |
| 14:26 | 7 | A.   Based on the information available to them or based on the |
| 14:26 | 8 | information -- |
| 14:26 | 9 | Q.   Based on the information that you currently have. |
| 14:26 | 10 | A.   I think it was not correct. |
| 14:26 | 11 | Q.   Based on your review of the information made available to |
| 14:26 | 12 | Provider Synergies, do you have an opinion as to whether the |
| 14:27 | 13 | recommendations of Provider Synergies to the P&T committee |
| 14:27 | 14 | regarding Vioxx were reasonable in light of the information |
| 14:27 | 15 | available to Provider Synergies? |
| 14:27 | 16 | A.   I do. |
| 14:27 | 17 | Q.   What is that opinion? |
| 14:27 | 18 | A.   Based on the information available to Provider Synergies, |
| 14:27 | 19 | I think their recommendations were reasonable. |
| 14:27 | 20 | Q.   Do you have a slide that shows what those recommendations |
| 14:27 | 21 | are? |
| 14:27 | 22 | A.   Yes.  This would be the conclusion of the monograph that |
| 14:27 | 23 | Provider Synergies prepared in December of 2003. |
| 14:27 | 24 | Q.   How would you summarize for the Court what that |
| 14:27 | 25 | recommendation was, your understanding of that recommendation? |

14:27  1    A.    Yeah.  Very briefly, I would summarize this as saying that
14:27  2    there appears to be a GI safety advantage for Vioxx and there
14:27  3    is -- it says there are some questions that were raised by the
14:27  4    VIGOR study in terms of cardiovascular safety, but those are
14:27  5    not clear; and that study was conducted not in a real-world
14:28  6    environment and, therefore, that evidence is not damning.  They
14:28  7    say that the risk of hypertension and edema occurs in all
14:28  8    NSAIDs and that Vioxx is not distinguished as a bad actor from
14:28  9    that point of view.
14:28  10   Q.    Does it appear to you that they reached a conclusion as to
14:28  11   whether the risk of Vioxx outweighed its benefits?
14:28  12   A.    It appears that their conclusion is that the benefits of
14:28  13   Vioxx do outweigh the risks, and they went on and recommended
14:28  14   that Vioxx be on the preferred drug list.
14:28  15   Q.    I believe you have already testified that you understand
14:28  16   that based on the information available to them, that
14:28  17   conclusion was reasonable.  Let me ask you, based on the
14:28  18   information available to you that you have reviewed about
14:29  19   Vioxx, do you believe that that conclusion was correct?
14:29  20   A.    I do not believe that conclusion was correct.
14:29  21   Q.    Do you have an opinion as to whether the information
14:29  22   reviewed by Provider Synergies and reported to the P&T
14:29  23   committee painted a complete picture of the safety and efficacy
14:29  24   profile of Vioxx?
14:29  25   A.    I don't believe it painted a complete picture of the

DAILY COPY

14:29   1   safety and efficacy of Vioxx.

14:29   2   **Q.**   Is that an expert opinion that you hold?

14:29   3   **A.**   It is.

14:29   4   **Q.**   What source of information regarding the safety and

14:29   5   efficacy of Vioxx have you seen or made available to the P&T

14:29   6   committee of Louisiana Medicaid?

14:29   7   **A.**   The information made available to the Louisiana P&T

14:29   8   committee was the monographs that were provided by Provider

14:29   9   Synergies --

14:29   10   **Q.**   Let me stop you.  Is this document that's on the screen an

14:30   11   example of one of those monographs?

14:30   12   **A.**   Yes, the conclusion from one of those monographs.

14:30   13        The FDA-approved label for Vioxx and material that

14:30   14   came from Merck about Vioxx and -- excuse me, and published

14:30   15   articles about Vioxx.

14:30   16        **MR. ISMAIL:**  Your Honor, the witness didn't disclose

14:30   17   anything in his materials list or report about information that

14:30   18   came directly from Merck to the P&T committee.

14:30   19        **MR. MURRAY:**  I would be happy to explore that.  I

14:30   20   actually have a line of questions about what he reviewed,

14:30   21   but --

14:30   22        **MR. ISMAIL:**  Well, I don't care what he has reviewed

14:30   23   in the last week.  I want to know what was disclosed in his

14:30   24   report and in his materials list.

        25

14:30    1    **BY MR. MURRAY:**

14:30    2    **Q.**    Is the deposition of Dr. Fran Kaiser referred in your

14:30    3    materials list?

14:30    4    **A.**    Yes.

14:30    5    **Q.**    Can you tell us what, if anything, that deposition told

14:30    6    you with respect to information provided to -- first of all, do

14:30    7    you know who Dr. Fran Kaiser is?

14:30    8    **A.**    Yes.

14:30    9    **Q.**    What, if anything, can you tell us about information

14:31    10    contained in Dr. Kaiser's report that may elucidate whether or

14:31    11    not you have reviewed information provided to the P&T

14:31    12    committee?

14:31    13    **A.**    Dr. Kaiser describes information that she presented to P&T

14:31    14    committee members.  She also describes some of the things that

14:31    15    she did and didn't know about Vioxx and says that, if it wasn't

14:31    16    on the label, it wouldn't have been discussed.

14:31    17    **Q.**    We can explore what Dr. Kaiser said in a moment.  Let me

14:31    18    just ask you:  Is Dr. Kaiser's deposition included among the

14:31    19    materials that you reviewed and reported to opposing counsel

14:31    20    that you had reviewed?

14:31    21    **A.**    Yes.

14:31    22         **MR. MURRAY:**  Your Honor, may I continue?

14:31    23         **THE COURT:**  Yes.

14:31    24    **BY MR. MURRAY:**

14:31    25    **Q.**    Doctor, do you have an expert opinion as to whether the

| | | |
|---|---|---|
| 14:31 | 1 | information reviewed by Provider Synergies painted a complete |
| 14:32 | 2 | picture of the safety and efficacy profile of Vioxx? |
| 14:32 | 3 | I asked you that question with respect to the P&T |
| 14:32 | 4 | committee.  Now I'm asking you with respect to Provider |
| 14:32 | 5 | Synergies. |
| 14:32 | 6 | A.   I do. |
| 14:32 | 7 | Q.   What sources of information regarding the safety and |
| 14:32 | 8 | efficacy of Vioxx have you seen were made available to Provider |
| 14:32 | 9 | Synergies? |
| 14:32 | 10 | A.   Provider Synergies included a list of references in its |
| 14:32 | 11 | monographs and you can -- that's one thing. |
| 14:32 | 12 | Q.   What are those references to? |
| 14:32 | 13 | A.   Well, there are many references, maybe 40 or 50 |
| 14:32 | 14 | references.  Some of them -- |
| 14:32 | 15 | Q.   Just generally speaking, I mean, are they to literature? |
| 14:32 | 16 | Are they to other sorts of materials?  I'm just trying to -- |
| 14:32 | 17 | A.   Yes. |
| 14:32 | 18 | Q.   -- let the Court know what sort of materials were being |
| 14:32 | 19 | referred to. |
| 14:32 | 20 | A.   Yes, exactly.  Medical literature and other sources of |
| 14:32 | 21 | information about the drugs. |
| 14:32 | 22 | Q.   Other materials that you understand Provider Synergies may |
| 14:32 | 23 | have been made available -- I'm sorry, may have been available |
| 14:33 | 24 | to Provider Synergies? |
| 14:33 | 25 | A.   The label. |

560

| | | |
|---|---|---|
| 14:33 | 1 | **Q.**   And was there anything else? |
| 14:33 | 2 | **A.**   There was communication in the form of PIRs, or PIR-like |
| 14:33 | 3 | materials, from Merck to Valerie Taylor at Provider Synergies. |
| 14:33 | 4 | **Q.**   Do you know whether anyone from Merck had any contact with |
| 14:33 | 5 | individuals from Provider Synergies? |
| 14:33 | 6 | **A.**   Yes.  Dr. Kerry Edwards did. |
| 14:33 | 7 | **MR. ISMAIL:**  Your Honor, his deposition was not |
| 14:33 | 8 | disclosed.  In fact, I deposed this man two weeks ago, and he |
| 14:33 | 9 | had not read the deposition of Kerry Edwards. |
| 14:33 | 10 | **THE COURT:**  I'm trying to be patient with the |
| 14:33 | 11 | witness' testimony, but I want him to testify as to material |
| 14:33 | 12 | that everybody knows because he has given a report and the |
| 14:33 | 13 | other parties have had an opportunity.  Let's not go outside -- |
| 14:33 | 14 | **MR. MURRAY:**  I didn't plan to go into what, if |
| 14:34 | 15 | anything, Dr. Edwards may have provided, so I will withdraw the |
| 14:34 | 16 | question.  I will note for the record, Your Honor, that we have |
| 14:34 | 17 | introduced the deposition of Dr. Edwards in the exhibits. |
| 14:34 | 18 | **BY MR. MURRAY:** |
| 14:34 | 19 | **Q.**   Moving on, Dr. Abramson, I asked you whether you had an |
| 14:34 | 20 | opinion, based on the materials that you reviewed that were |
| 14:34 | 21 | made available to Provider Synergies, whether those materials |
| 14:34 | 22 | presented a complete picture of the safety and efficacy |
| 14:34 | 23 | profile.  You said you had an opinion.  What was that opinion? |
| 14:34 | 24 | **A.**   That the materials did not provide a complete picture of |
| 14:34 | 25 | safety and efficacy. |

14:35  1   **Q.**   Did the materials provide all of the information that
14:35  2   physicians would need in order to make an informed risk/benefit
14:35  3   analysis with respect to the drug Vioxx?
14:35  4   **A.**   No, they didn't, either for risks or benefits.
14:35  5   **Q.**   Can you identify for the Court -- and perhaps the best way
14:35  6   to proceed is to go through particular aspects of the
14:35  7   monograph, but can you identify for the Court instances in the
14:35  8   monograph where you feel that, in your expert opinion, you
14:35  9   believe that the monograph fails to provide complete
14:36  10  information upon which a doctor would need to make an informed
14:36  11  risk/benefit analysis.  Identify also for the Court what
14:36  12  additional information would be necessary in order to undertake
14:36  13  such analysis.  Is that something you are prepared to do for
14:36  14  the Court?
14:36  15  **A.**   Yes.
14:36  16  **Q.**   So that we proceed in question-and-answer fashion, we will
14:36  17  do them one at a time.
14:36  18          I see we just pulled up a slide with a portion
14:36  19  underlined here.  Doctor, do you have an opinion as to whether
14:36  20  this underlined portion provides complete information; and if
14:36  21  not, what additional information doctors would need and expect
14:36  22  in order to perform an informed risk/benefit analysis?
14:36  23  **A.**   Yes.  The underlined material from the conclusion of the
14:36  24  December 2003 monograph from Provider Synergies says:
14:36  25          "In the VIGOR study, the risk of GI toxicity is not

DAILY COPY

14:37  1  completely eliminated with the use of rofecoxib, but the risk
14:37  2  appears to be less for rofecoxib, 50 milligrams daily, compared
14:37  3  to naproxen, 500 milligrams twice daily."
14:37  4       That's an incomplete statement that doesn't show a
14:37  5  significant difference, differential effect, on GI
14:37  6  complications for the people who were and were not taking
14:37  7  steroids during the VIGOR study.
14:37  8  **Q.**   Do you have any analysis of that data?
14:37  9  **A.**   I do.  First, if I could present this information that was
14:37  10  sent to Terry Taylor, and it reflects what was adopted in the
14:37  11  label.
14:37  12  **Q.**   Let me stop you for a moment, Doctor.  Do you know who
14:37  13  Terry Taylor was?
14:37  14  **A.**   Terry Taylor was associated with Provider Synergies.
14:38  15  **Q.**   Thank you.  Please proceed.
14:38  16  **A.**   So this is information that was sent to Terry Taylor, and
14:38  17  it reflects exactly the information that was included in the
14:38  18  label in April 2002.  What it shows is that for both PUBs
14:38  19  (perforations, ulcers, and bleeds) and complicated PUBs, there
14:38  20  was a significant reduction amongst people taking Vioxx
14:38  21  compared to those taking naproxen.
14:38  22       The language underneath this table is very important.
14:38  23  It's the last sentence that is most important, but you have to
14:38  24  read the whole thing, I fear:
14:38  25       "The risk reduction for PUBs and complicated PUBs for

| | | |
|---|---|---|
| 14:38 | 1 | Vioxx compare to naproxen (approximately 50 percent) was |
| 14:38 | 2 | maintained in patients with or without the following risk |
| 14:38 | 3 | factors for developing a PUB." |
| 14:39 | 4 | Those risk factors included prior PUB or with or |
| 14:39 | 5 | without a prior PUB; older than age 65 or younger than age 65. |
| 14:39 | 6 | Then the last sentence is the important one.  It says: |
| 14:39 | 7 | "A similar risk reduction for PUBs and complicated |
| 14:39 | 8 | PUBs (approximately 50 percent) was also maintained in patients |
| 14:39 | 9 | with or without Helicobacter pylori infection or concomitant |
| 14:39 | 10 | steroid use." |
| 14:39 | 11 | Now, that creates the -- it communicates the fact |
| 14:39 | 12 | that the significant reduction in complicated PUBs, which is |
| 14:39 | 13 | the really important outcome, was maintained with or without |
| 14:39 | 14 | concomitant steroid use, but that was not the case. |
| 14:39 | 15 | **Q.**   Before you proceed, it has been suggested that there may |
| 14:39 | 16 | be a different interpretation, syntactical interpretation, of |
| 14:39 | 17 | that language.  Based on your experience in how doctors review |
| 14:40 | 18 | and evaluate clinical information in making a risk/benefit |
| 14:40 | 19 | analysis, do you have an opinion as to how reasonable |
| 14:40 | 20 | physicians might interpret that data? |
| 14:40 | 21 | **THE COURT:**  Hold it a moment. |
| 14:40 | 22 | **MR. ISMAIL:**  Your Honor, the witness wasn't tendered |
| 14:40 | 23 | as a labeling expert or regulatory.  They had such an |
| 14:40 | 24 | individual, chose not to go through this material with him.  To |
| 14:40 | 25 | the extent he is attempting to give a labeling opinion, we |

564

| | | |
|---|---|---|
| 14:40 | 1 | object. |
| 14:40 | 2 | **MR. MURRAY:**  He is not testifying to the label, |
| 14:40 | 3 | Your Honor.  He is testifying to information provided to |
| 14:40 | 4 | doctors and how doctors would interpret that information. |
| 14:40 | 5 | **THE COURT:**  I'll overrule the objection and allow him |
| 14:40 | 6 | to testify to that. |
| 14:40 | 7 | Do you understand the limited area, Doctor? |
| 14:40 | 8 | **THE WITNESS:**  I think so. |
| 14:40 | 9 | **THE COURT:**  Go ahead. |
| 14:40 | 10 | **BY MR. MURRAY:** |
| 14:40 | 11 | **Q.**   Doctor, again, just with respect to that sentence and |
| 14:40 | 12 | whether physicians who read that might interpret that to |
| 14:40 | 13 | indicate that there was such a benefit for both steroid users |
| 14:41 | 14 | and nonsteroid users, do you have an opinion? |
| 14:41 | 15 | **A.**   I do.  I think a reasonable reading of this is that the |
| 14:41 | 16 | last sentence says that the risk reduction was maintained for |
| 14:41 | 17 | patients with or without H. pylori infection or concomitant |
| 14:41 | 18 | steroids, meaning with or without H. pylori infection or with |
| 14:41 | 19 | or without concomitant steroid use. |
| 14:41 | 20 | I think my interpretation of that is supported by |
| 14:41 | 21 | Valerie Taylor, Provider Synergies, PharmD, who also read the |
| 14:41 | 22 | label that way, and then there was a press release that |
| 14:41 | 23 | clarified any ambiguity. |
| 14:41 | 24 | **Q.**   A press release by whom? |
| 14:41 | 25 | **A.**   By Merck. |

DAILY COPY

| | | |
|---|---|---|
| 14:41 | 1 | **MR. ISMAIL:**  Objection, Your Honor.  This was not |
| 14:41 | 2 | disclosed in his materials. |
| 14:41 | 3 | **THE COURT:**  Let's move on, Counsel. |
| 14:41 | 4 | **MR. MURRAY:**  We'll move on. |
| 14:41 | 5 | BY MR. MURRAY: |
| 14:41 | 6 | Q.   The Valerie Taylor -- |
| 14:41 | 7 | A.   We are getting a little out of order, but -- |
| 14:41 | 8 | Q.   Okay. |
| 14:41 | 9 | A.   This is from Valerie Taylor, and she says -- she's read |
| 14:42 | 10 | that paragraph.  I won't read it again.  She's asked: |
| 14:42 | 11 | "Question:  Did you take that in? |
| 14:42 | 12 | "Answer:  Yes. |
| 14:42 | 13 | "Question:  What does that mean to you? |
| 14:42 | 14 | "Answer:  That Vioxx had a lower rate of causing GI |
| 14:42 | 15 | toxicity than other NSAIDs in this particular study that |
| 14:42 | 16 | was cited. |
| 14:42 | 17 | "Question:  And would you interpret that to mean that |
| 14:42 | 18 | the approximate 50 percent reduction in risk for PUBs and |
| 14:42 | 19 | complicated PUBs was true for patients with or without |
| 14:42 | 20 | concomitant steroid use? |
| 14:42 | 21 | "Answer:  That's what's stated in there, yes." |
| 14:42 | 22 | BY MR. MURRAY: |
| 14:42 | 23 | Q.   Do you have an opinion, as an expert on the materials that |
| 14:42 | 24 | doctors rely on and expect with respect to performing |
| 14:42 | 25 | risk/benefit analyses, as to whether Dr. Valerie Taylor's |

14:42  1  understanding, as expressed in this testimony, was reasonable?

14:42  2  A.   Yes, I think it is reasonable.

14:42  3  Q.   Is there additional information that she could have used

14:42  4  in order to perform a risk/benefit analysis that would have

14:43  5  disclosed or helped to disclose the existence of a defect with

14:43  6  respect to that particular issue?

14:43  7  A.   Yes, there certainly was information.

14:43  8  Q.   Can you share that information with the Court.

14:43  9  A.   Yes.  This is a table that was included in the clinical

14:43  10  study report.

14:43  11       MR. ISMAIL:  Objection, Your Honor.  We had a

14:43  12  gastrointestinal expert who did this precise stuff yesterday

14:43  13  for three-fourths of the day.

14:43  14       MR. MURRAY:  Your Honor, I certainly understand and

14:43  15  appreciate that and don't intend to go over this in depth.

14:43  16            One of the things that I would like to point out

14:43  17  to Your Honor is that there was a strenuous objection and a

14:43  18  point made by opposing counsel with respect to Dr. Graham that

14:43  19  he had not performed his own statistical analysis with respect

14:43  20  to the conclusions on this issue.

14:43  21            I don't intend to offer cumulative testimony.

14:43  22  However, Dr. Abramson has performed that statistical analysis.

14:43  23  It was disclosed to defense counsel that he had performed the

14:44  24  statistical analysis, and he is prepared to testify briefly

14:44  25  simply to that analysis and as to whether or not that analysis

14:44    1    revealed information that should have been made available to a

14:44    2    person making risk/benefit analysis.

14:44    3         **THE COURT:**  See, the difficulty that I'm having in

14:44    4    following the testimony, though, is that he is passing on

14:44    5    information as if it's accurate or inaccurate.  He is not an

14:44    6    expert cardiologist.  He is not an expert epidemiologist.  I

14:44    7    think he can testify as to what type of information you need

14:44    8    for risk/benefit analysis.

14:44    9              When you get to the point of having him evaluate

14:45   10    the accuracy or inaccuracy of the information, you're expecting

14:45   11    him to be able to evaluate material in other fields that's not

14:45   12    his expertise or even experience.  You're asking him about

14:45   13    whether or not this is accurate or not accurate -- at least he

14:45   14    is testifying as to whether it's accurate or inaccurate -- and

14:45   15    that's not his field.  You're getting too far away from what

14:45   16    his use or at least his offer is in the case.

14:45   17              That's the way I see it.  We are getting

14:45   18    out-of-kilter from the standpoint of the scope of his

14:46   19    territory.  I'm going to sustain the objection.

14:46   20         **MR. MURRAY:**  Your Honor, I would simply put it to

14:46   21    Your Honor that, in connection with -- and I could have

14:46   22    explored it more on voir dire.  I mean, he was accepted as

14:46   23    someone who evaluates information that is presented to doctors.

14:46   24    In the course of his doing those sorts of evaluations, he

14:46   25    performs these sorts of statistical analyses all the time, and

568

14:46  1   he is going to present the statistical analysis and data

14:46  2   interpretation.

14:46  3          He is not offering an opinion with respect to

14:46  4   gastroenterology.  There's no need to understand

14:46  5   gastroenterology.  There's a need to understand the sort of

14:46  6   information that doctors rely upon and, certainly, the

14:46  7   statistical analysis involved in evaluating that data, and I

14:47  8   believe that he has the qualifications to do that.  If

14:47  9   Your Honor would like me to explore those qualifications

14:47  10  further, I would be happy to.

14:47  11          THE COURT:  Well, I don't have any problem his

14:47  12  testifying, as I said, with risk/benefit analysis, but if you

14:47  13  get into the point where he is being asked to testify as to the

14:47  14  validity of information, then I'm going to stop him from

14:47  15  testifying on those areas.

14:47  16          MR. MURRAY:  I will try to be conscious of that,

14:47  17  Your Honor --

14:47  18          THE COURT:  Let's be aware of that.

14:47  19          MR. MURRAY:  -- and, again, limit it to issues that

14:47  20  he felt doctors would need to know and the analysis that he is

14:47  21  capable of conducting without reaching conclusions as to

14:47  22  whether or not there are benefits, whether or not there is a GI

14:47  23  effect, GI benefit.  I understand that.

       24  BY MR. MURRAY:

14:47  25  Q.   Doctor, do you understand the Judge's instructions and

DAILY COPY

569

| 14:47 | 1 | limitations? |
| 14:47 | 2 | **A.**   I believe so.  We'll find out. |
| 14:47 | 3 | **Q.**   Let me ask you briefly to tell me if there is information |
| 14:48 | 4 | contained in this chart that a physician would need to know in |
| 14:48 | 5 | order to properly understand the risk/benefit profile of Vioxx? |
| 14:48 | 6 | **A.**   Yes, there is. |
| 14:48 | 7 | **Q.**   Can you explain that to the Court, please. |
| 14:48 | 8 | **A.**   Yes.  PUBs are a broad category of GI complications, and |
| 14:48 | 9 | complicated PUBs are kind of where the rubber hits the road. |
| 14:48 | 10 | That's serious.  Those are serious problems.  Doctors needed to |
| 14:48 | 11 | know what the effect of -- treating their patients with Vioxx |
| 14:48 | 12 | versus naproxen, in the case of the VIGOR trial, what the |
| 14:48 | 13 | effect of that was on complicated PUBs. |
| 14:48 | 14 | What this table shows, which I reconstructed and did |
| 14:48 | 15 | the statistics on, is that for those patients -- the population |
| 14:48 | 16 | of the VIGOR trial didn't represent the general population; |
| 14:48 | 17 | 56 percent of patients were on steroids.  Whereas in a regular |
| 14:49 | 18 | population of taking NSAIDs, that percentage is very small. |
| 14:49 | 19 | So given that, the important question for physicians |
| 14:49 | 20 | is:  Well, how will this GI benefit translate for my patients |
| 14:49 | 21 | who aren't taking steroids?  What this table shows is that for |
| 14:49 | 22 | the 44 percent of patients who weren't taking steroids |
| 14:49 | 23 | concurrently in the VIGOR trial, there was no reduction in the |
| 14:49 | 24 | risk of complicated GI events.  There were 9 such events in the |
| 14:49 | 25 | Vioxx group and 10 in the naproxen group, and there was not a |

570

14:49  1    statistically significant reduction in the incidence of

14:49  2    complicated PUBs in people who were not taking steroids.

14:49  3           The key point here is that the test of heterogeneity,

14:49  4    on the bottom line, shows that the GI effect on complicated

14:49  5    PUBs, the risk of complicated PUBs, is statistically

14:49  6    significantly different for patients who were taking steroids

14:50  7    at baseline and patients who were not taking steroids at

14:50  8    baseline.

14:50  9           And because that heterogeneity is statistically

14:50  10   significant, it's not valid to combine both of those groups

14:50  11   into an overall statistic about the effect of Vioxx versus

14:50  12   naproxen on complicated PUBs for those who were and weren't

14:50  13   taking steroids.  You've got to look at those two groups

14:50  14   differently because there's significant heterogeneity.

14:50  15          So the message that practicing physicians needed to

14:50  16   get but didn't get is that there was not a significant

14:50  17   reduction.  In fact, there's virtually no reduction in the risk

14:50  18   of complicated PUBs in the VIGOR trial for patients who weren't

14:50  19   taking steroids at baseline, but that information was not

14:50  20   presented to physicians.  It was never published.  It wasn't in

14:50  21   Provider Synergies' information that they passed on to the

14:50  22   Louisiana P&T committee.

14:50  23   Q.   We can move on, then.  What does this slide represent and

14:51  24   how does it relate to your opinion that the section of the

14:51  25   Provider Synergies monograph we just referred to did not

14:51   1   contain complete information that doctors would need in order

14:51   2   to make a risk/benefit analysis?

14:51   3   A.   Yes.  This is a slide from Dr. Villalba from the FDA.

14:51   4   What it shows is that even in this population, the VIGOR

14:51   5   population, where 56 percent of people were taking steroids --

14:51   6   so it's very unrepresentative of the population -- there was a

14:51   7   significant reduction in hospitalizations due to GI events that

14:51   8   were serious enough to cause hospitalization.  There 20 fewer

14:51   9   GI events.  Those 20 fewer GI events were far overshadowed,

14:51   10  more than twice overshadowed by the greater number of

14:51   11  cardiovascular events, but physicians didn't know that.

14:51   12  Q.   Is that information that Provider Synergies and the

14:52   13  Louisiana P&T committee and ultimately Louisiana Department of

14:52   14  Health and Hospitals would have needed in order to make a

14:52   15  complete and informed risk/benefit analysis with respect to

14:52   16  Vioxx?

14:52   17  A.   Absolutely.  This is where the rubber hits the road.  You

14:52   18  can look at different categories of events.  But if you look at

14:52   19  the tally of the hospitalizations, there are 27 percent more

14:52   20  hospitalizations in the people who took Vioxx than the people

14:52   21  who took naproxen.  That's statistically significant.

14:52   22       Given that the entire argument for using Vioxx was

14:52   23  that it was clinically safer than nonselective NSAIDs, this

14:52   24  shows that it's significantly more dangerous.

14:52   25  Q.   Was the argument that it was clinically safer expressed to

DAILY COPY

| | | |
|---|---|---|
| 14:52 | 1 | the State of Louisiana in the Provider Synergies monograph? |
| 14:52 | 2 | **A.**   Well, we saw -- yes.  We saw that in the brief section of |
| 14:52 | 3 | the conclusion that there was a GI benefit, and there were |
| 14:53 | 4 | questions about cardiovascular risks, but that was an open |
| 14:53 | 5 | question because of the problems with the data that we'll get |
| 14:53 | 6 | into. |
| 14:53 | 7 | **Q.**   Is there any other information on this slide that pertains |
| 14:53 | 8 | to your opinions with respect to the adequacy of information |
| 14:53 | 9 | presented in the Provider Synergies monograph? |
| 14:53 | 10 | **A.**   Well, this slide sort of begs even a broader category on |
| 14:53 | 11 | measure of the safety of the drug, which is the overall serious |
| 14:53 | 12 | adverse events that occurred, which were not reported in the |
| 14:53 | 13 | label or in the publications or in Merck's communications. |
| 14:53 | 14 | **THE COURT:**  Just a moment. |
| 14:53 | 15 | **MR. ISMAIL:**  Your Honor, this is the fourth speech in |
| 14:53 | 16 | a row that merges a multitude of topics about his assessment of |
| 14:53 | 17 | safety data.  He is first talking about physicians need to |
| 14:53 | 18 | know.  We are moving far afield.  In fact, who is even running |
| 14:53 | 19 | this?  Who is running the slide show? |
| 14:53 | 20 | **THE WITNESS:**  I am. |
| 14:53 | 21 | **MR. ISMAIL:**  Okay.  He is doing his own direct |
| 14:53 | 22 | examination.  I mean, he is moving the slide forward, and |
| 14:54 | 23 | counsel is saying, "What do you think?" and then he goes for |
| 14:54 | 24 | two pages.  It's hard for me to object as to what's proper |
| 14:54 | 25 | within his tender, what's within the ground rules the Court has |

| | | |
|---|---|---|
| 14:54 | 1 | said. |
| 14:54 | 2 | **MR. MURRAY:**  Your Honor, I have been proceeding in |
| 14:54 | 3 | question-and-answer fashion.  I have a copy of the slides here. |
| 14:54 | 4 | I don't want to cut the witness off before he is done providing |
| 14:54 | 5 | his testimony with respect to the slides that he has prepared |
| 14:54 | 6 | and he is here to tell the Court about. |
| 14:54 | 7 | I also request some latitude.  I'm trying to |
| 14:54 | 8 | expedite this somewhat because we have a bench trial, we don't |
| 14:54 | 9 | have a jury, and I know that Your Honor needs to get this |
| 14:54 | 10 | information in the record.  It all relates back to the Provider |
| 14:54 | 11 | Synergies monograph and whether or not this information was |
| 14:54 | 12 | included in the Provider Synergies monograph or the information |
| 14:54 | 13 | cited in the Provider Synergies monograph and whether or not |
| 14:54 | 14 | that's information doctors would rely upon.  I believe that's |
| 14:55 | 15 | exactly what the witness has testified to. |
| 14:55 | 16 | Mr. Ismail will have ample opportunity to |
| 14:55 | 17 | cross-examine him, and I'm sure he will -- |
| 14:55 | 18 | **THE COURT:**  I'm going to make your objection |
| 14:55 | 19 | continuing.  Let's do it that way. |
| 14:55 | 20 | **MR. ISMAIL:**  I appreciate it, Your Honor. |
| 14:55 | 21 | **THE COURT:**  I assume it's a continuing objection. |
| 14:55 | 22 | Let's ask questions -- |
| 14:55 | 23 | **MR. MURRAY:**  I will certainly do that. |
| 14:55 | 24 | **THE COURT:**  -- not speeches. |
| 14:55 | 25 | **MR. MURRAY:**  I will attempt to proceed in that |

574

| | | |
|---|---|---|
| 14:55 | 1 | fashion. |
| 14:55 | 2 | **BY MR. MURRAY:** |
| 14:55 | 3 | **Q.**   Are there any other conclusions or statements in the |
| 14:55 | 4 | Provider Synergies monograph that you feel did not provide |
| 14:55 | 5 | complete information to the State of Louisiana with respect to |
| 14:55 | 6 | the risk/benefit analysis for Vioxx? |
| 14:55 | 7 | **A.**   Yes.  There are several more. |
| 14:55 | 8 | **Q.**   I see that you have pulled up another one.  You are |
| 14:55 | 9 | referring to a sentence here:  "Aspirin for cardiovascular |
| 14:55 | 10 | prophylaxis was not permitted in the study, which does not |
| 14:55 | 11 | reflect real-world use of the NSAIDs." |
| 14:56 | 12 | Just one last question about that last slide:  Was |
| 14:56 | 13 | that information that was disclosed in any of the peer-reviewed |
| 14:56 | 14 | articles that were cited in the Provider Synergies monograph? |
| 14:56 | 15 | **A.**   I'm sorry, what was that? |
| 14:56 | 16 | **Q.**   The last slide. |
| 14:56 | 17 | **A.**   This slide? |
| 14:56 | 18 | **Q.**   Yes, Doctor. |
| 14:56 | 19 | **A.**   No. |
| 14:56 | 20 | **Q.**   Was that information that was disclosed in the label that |
| 14:56 | 21 | is referenced in the Provider Synergies monograph? |
| 14:56 | 22 | **A.**   No, it wasn't.  And if I could go back to your last |
| 14:56 | 23 | question, in fact.  In some of the material that Provider |
| 14:56 | 24 | Synergies provided, they, Merck, just took a subset of the |
| 14:56 | 25 | hospitalization data that showed a significant reduction in GI |

14:56   1   hospitalizations without presenting the entire data about

14:56   2   hospitalizations, which would have shown that, in fact, there

14:56   3   wasn't a benefit, but there was a significant harm.

14:56   4   **Q.**   Again, is that information that the State of Louisiana

14:56   5   would have needed in order to fully appreciate the risk/benefit

14:56   6   profile of Vioxx?

14:56   7   **A.**   Absolutely essential.

14:56   8   **Q.**   Again, proceeding on to the next slide and the section

14:57   9   here that I just read to you regarding aspirin for

14:57   10  cardiovascular prophylaxis, does that provide complete

14:57   11  information or is there additional information that would be

14:57   12  necessary to a treating physician in order to make -- I'm

14:57   13  sorry, not treating physicians.  To Provider Synergies in order

14:57   14  to make an informed decision about the risk/benefit profile of

14:57   15  Vioxx?

14:57   16  **A.**   Yes, there's information that's essential.  This

14:57   17  information that's in the conclusion of the monograph

14:57   18  obfuscates a fairly complicated issue and kind of paints over

14:57   19  the idea that the data from VIGOR is tainted because the

14:57   20  4 percent of people in the trial who were aspirin-indicated

14:57   21  weren't allowed to take aspirin.  That creates a smokescreen

14:57   22  for the fact that there was significant cardiovascular risk for

14:57   23  people who were or were not aspirin-indicated, which was the

14:58   24  original cardiovascular endpoint.

14:58   25           And even for the post hoc cardiovascular endpoint of

| | | |
|---|---|---|
| 14:58 | 1 | myocardial infarction, there was a significant risk whether or |
| 14:58 | 2 | not somebody had a previous history of cardiovascular disease |
| 14:58 | 3 | that would cause them to be recommended for prophylactic |
| 14:58 | 4 | aspirin. |
| 14:58 | 5 | THE COURT:  Let's get to the questions. |
| 14:58 | 6 | BY MR. MURRAY: |
| 14:58 | 7 | Q.   What additional information would the state have needed in |
| 14:58 | 8 | order to accurately assess this conclusion? |
| 14:58 | 9 | A.   They would have needed information that is represented in |
| 14:58 | 10 | the FDA's evaluation of this data, but the short of it is that |
| 14:58 | 11 | the endpoint that was prespecified was a series of thrombotic |
| 14:58 | 12 | cardiovascular events.  Those events were significantly |
| 14:58 | 13 | elevated in the patients taking Vioxx whether or not they were |
| 14:58 | 14 | aspirin-indicated.  Furthermore, the same pertains to the |
| 14:58 | 15 | subset of those complications, myocardial infarctions. |
| 14:59 | 16 | Q.   Can you refer the Court to the additional information from |
| 14:59 | 17 | the FDA materials that you believe should have been included. |
| 14:59 | 18 | A.   I can.  There are three charts:  One is for all thrombotic |
| 14:59 | 19 | events; one is for thrombotic events that occur in |
| 14:59 | 20 | aspirin-not-indicated patients; and one is for thrombotic |
| 14:59 | 21 | events that occur in aspirin-indicated patients. |
| 14:59 | 22 | Q.   Briefly, what would this additional information have |
| 14:59 | 23 | disclosed to Provider Synergies in making a risk/benefit |
| 14:59 | 24 | analysis, and ultimately to the P&T committee in making a |
| 14:59 | 25 | risk/benefit analysis? |

| | | |
|---|---|---|
| 14:59 | 1 | **A.**   For all patients in the VIGOR trial, this information |
| 14:59 | 2 | would have shown that there was one additional serious |
| 14:59 | 3 | thrombotic cardiovascular complication for every 100 patients |
| 14:59 | 4 | treated with Vioxx instead of naproxen in the VIGOR trial or, |
| 14:59 | 5 | as I said in the slide, 10 per 1,000 additional cardiovascular |
| 14:59 | 6 | events that occurred in people taking Vioxx. |
| 14:59 | 7 | **Q.**   There is a p-value there.  What is the reference to that |
| 15:00 | 8 | p-value? |
| 15:00 | 9 | **A.**   The p-value is the difference between the rate of |
| 15:00 | 10 | thrombotic cardiovascular events in people taking Vioxx and |
| 15:00 | 11 | naproxen, and the p-value is .0016. |
| 15:00 | 12 | **Q.**   What is the significance of the p-value to you as a |
| 15:00 | 13 | physician evaluating risk/benefit of drugs? |
| 15:00 | 14 | **A.**   Well, the lower the p-value is, the lower the probability |
| 15:00 | 15 | that the findings of this study happened purely by chance.  The |
| 15:00 | 16 | convention is that a p-value of .05, or less than 1 out of 20, |
| 15:00 | 17 | 1/20th of a chance -- excuse me, that a p-value of .05 or 1 out |
| 15:00 | 18 | of 20, underneath that is statistically significant. |
| 15:00 | 19 | This p-value is not 1 out of 20, but it's 1 out of |
| 15:00 | 20 | 625, which means, if the study were done 625 times, maybe once |
| 15:00 | 21 | this finding wouldn't be found to be meaningful. |
| 15:00 | 22 | **Q.**   Is there any additional data that would have needed to be |
| 15:00 | 23 | disclosed in the Provider Synergies monograph for the state to |
| 15:00 | 24 | be able to make an adequate assessment of the sentence that you |
| 15:01 | 25 | just read from the monograph? |

578

15:01   1   **A.**   Yes, specifically in patients with no cardiovascular
15:01   2   history, because the conclusion in the Provider Synergies
15:01   3   monograph suggested that preventing patients who would have
15:01   4   benefited from aspirin from taking aspirin created this sort of
15:01   5   unworldly situation.
15:01   6       If we look at people who have no cardiovascular
15:01   7   history, so it has nothing to do with whether patients should
15:01   8   or shouldn't have been allowed to take aspirin, we see that
15:01   9   there's a significant increase in the risk of cardiovascular
15:01   10  events in people taking Vioxx compared to people taking
15:01   11  naproxen.  This shows that if you treat 1,000 patients who
15:01   12  don't have any cardiovascular history, has nothing to do with
15:01   13  aspirin, with Vioxx instead of naproxen for one year, there
15:01   14  would be an additional 5.9 serious cardiovascular events among
15:01   15  the people treated with Vioxx.
15:01   16  **Q.**   Are there any other conclusions or statements in the
15:02   17  monograph that are incomplete or need additional information in
15:02   18  order to provide an accurate picture to physicians?
15:02   19  **A.**   Well, there are.  This shows the enormous amount of risk
15:02   20  for people with a cardiovascular history.  The important point
15:02   21  here is that there's an implication that allowing these people
15:02   22  to have taken aspirin would have mitigated this risk.
15:02   23      There was evidence that Merck had from the ADVANTAGE
15:02   24  study and from studies 085 and 090 that these studies allowed
15:02   25  people who had a risk, a previous history of cardiovascular

579

| | | |
|---|---|---|
| 15:02 | 1 | disease, to take prophylactic low-dose aspirin, and these |
| 15:02 | 2 | studies provided evidence -- not proof but evidence -- that |
| 15:02 | 3 | aspirin did not mitigate that risk.  Studies 085 and 090 were |
| 15:03 | 4 | completed by February of 2000, and the ADVANTAGE trial was |
| 15:03 | 5 | completed either in March or April of 2000. |
| 15:03 | 6 | **Q.**   All right.  Doctor, we have heard testimony about 085 and |
| 15:03 | 7 | 090 from other witnesses, so I just want to ask you whether you |
| 15:03 | 8 | feel that information contained in studies 085 and 090 should |
| 15:03 | 9 | have been included in this portion of the Provider Synergies |
| 15:03 | 10 | monograph in order to paint a complete picture of the risk and |
| 15:03 | 11 | safety benefit of Vioxx. |
| 15:03 | 12 | **A.**   Yes, it should have, along with the ADVANTAGE trial. |
| 15:03 | 13 | **Q.**   Let's move on. |
| 15:03 | 14 | **A.**   And another -- |
| 15:03 | 15 | **Q.**   Doctor, let's move on, again, past this one.  Let me see |
| 15:03 | 16 | the next conclusion in the Provider Synergies monograph. |
| 15:03 | 17 |         I'm sorry.  I should back you up.  What does this |
| 15:03 | 18 | slide represent with respect to what we just discussed about |
| 15:04 | 19 | additional information that needed to be disclosed in order to |
| 15:04 | 20 | understand the significance of the VIGOR study? |
| 15:04 | 21 | **A.**   This slide is taken from a draft that Merck made of the |
| 15:04 | 22 | manuscripts for the VIGOR trial, and it shows that they were |
| 15:04 | 23 | going to report upper GI symptoms, edema, hypertension, but |
| 15:04 | 24 | they were going -- the cardiovascular complication that they |
| 15:04 | 25 | were going to report was thromboembolic, not MI, and also the |

15:04   1   incidence of congestive heart failure, and that they were going

15:04   2   to look at the relative risk for events and for withdrawals

15:04   3   from the study because of those.

15:04   4   Q.   Doctor, let me stop you.  I understand these numbers here

15:04   5   are placeholders, though.  This isn't the actual information

15:04   6   that they were going to present in the VIGOR study report; is

15:04   7   that correct?

15:04   8   A.   Yes.  They're a little more than placeholders.  They're

15:04   9   preliminary data, but they are not the final data, so I don't

15:04   10   think that any conclusions should be made based on these

15:05   11   preliminary numbers.

15:05   12   Q.   Well, have you done an analysis of what this table would

15:05   13   have looked like with the final data, final numbers, if it had

15:05   14   been included in the VIGOR publication?

15:05   15   A.   I did.  To the extent that the numbers were available

15:05   16   either in the FDA's cardiovascular review of the VIGOR trial or

15:05   17   Merck's clinical study report of the VIGOR trial, I did fill

15:05   18   those numbers in.

15:05   19   Q.   What did those numbers show?

15:05   20   A.   Those numbers are filled in here.  I'm sorry that they are

15:05   21   so small.  Going down to thromboembolic complications, they

15:05   22   show that there's 2.36 times the risk of thromboembolic

15:05   23   complications in people who took Vioxx compared to those who

15:05   24   took naproxen and that that's statistically significant.

15:05   25          They also show statistically significant findings of

581

15:05    1    edema, hypertension, and congestive heart failure -- excuse me,
15:06    2    congestive -- yes.
15:06    3    **Q.**   I want to stay focused on the Provider Synergies
15:06    4    monographs and information presented there and information
15:06    5    which you believe should have been included.  Let's move on
15:06    6    past the Kerry Edwards.  Move on past this.  I want to move
15:06    7    this along.
15:06    8         Is this another portion of the Provider Synergies
15:06    9    monograph that you feel did not completely represent the -- or,
15:06   10    rather, do you feel that there's additional information that
15:06   11    would need to be disclosed to doctors in order to completely
15:06   12    represent the risk/benefit profile of Vioxx with respect to
15:06   13    this statement here in the monograph?
15:07   14    **A.**   I do.
15:07   15    **Q.**   What additional information would need to be considered by
15:07   16    doctors?
15:07   17    **A.**   The data that's presented in the monograph is reassuring
15:07   18    about two low-dose studies of Vioxx:  Vioxx 12.5 milligrams,
15:07   19    compared to naproxen, 500 milligrams twice daily, in 944
15:07   20    patients with osteoarthritis of the hip and knee.  It says the
15:07   21    monograph informs the Louisiana P&T committee that both
15:07   22    therapies were well-tolerated.
15:07   23    **Q.**   Is there additional information that would need to be
15:07   24    included there -- first of all, let me ask you:  The conclusion
15:07   25    that both therapies were well-tolerated, is that conclusion

| | | |
|---|---|---|
| 15:07 | 1 | taken from the study that's cited? |
| 15:07 | 2 | **A.**   Yes. |
| 15:07 | 3 | **Q.**   Do you know whether that was a Merck-sponsored study? |
| 15:07 | 4 | **A.**   I assume it was.  I don't know that. |
| 15:07 | 5 | **Q.**   Could you turn to the -- |
| 15:08 | 6 | **MR. MURRAY:**  Approach the witness, Your Honor? |
| 15:08 | 7 | **THE COURT:**  Yes. |
| 15:08 | 8 | **BY MR. MURRAY:** |
| 15:08 | 9 | **Q.**   This is the December monograph? |
| 15:08 | 10 | **A.**   Yes. |
| 15:08 | 11 | **Q.**   December 2003? |
| 15:08 | 12 | **A.**   Yes. |
| 15:08 | 13 | **Q.**   What was the footnote number? |
| 15:08 | 14 | **A.**   35. |
| 15:08 | 15 | **Q.**   I'm handing you now the endnote of Provider Synergies' |
| 15:08 | 16 | monograph. |
| 15:08 | 17 | **A.**   Yes. |
| 15:08 | 18 | **Q.**   Does that tell you whether or not that was a |
| 15:09 | 19 | Merck-sponsored article? |
| 15:09 | 20 | **A.**   It does not. |
| 15:09 | 21 | **Q.**   Regardless of whether it was a Merck-sponsored article, |
| 15:09 | 22 | what additional information would have been needed here for |
| 15:09 | 23 | doctors to fully appreciate the risks and benefits when it's |
| 15:09 | 24 | represented that both therapies were well-tolerated? |
| 15:09 | 25 | Let me rephrase that.  Doctors from Provider |

| | | |
|---|---|---|
| 15:09 | 1 | Synergies or the P&T committee. |
| 15:09 | 2 | **A.** There were studies that had been completed of Vioxx |
| 15:09 | 3 | 12.5 milligrams that contained more patients and that contained |
| 15:09 | 4 | both indications and a statistically significant finding of |
| 15:09 | 5 | harm associated with Vioxx. Those are studies 085 and 090, |
| 15:09 | 6 | which had 1,600 patients. |
| 15:10 | 7 | **Q.** Again, we've heard about those studies. Without going |
| 15:10 | 8 | into them, it's your opinion that information from those |
| 15:10 | 9 | studies would have been necessary in order to fully understand |
| 15:10 | 10 | the risk/benefit analysis as portrayed in the Provider |
| 15:10 | 11 | Synergies document? |
| 15:10 | 12 | **A.** Right. This creates the misrepresentation -- this creates |
| 15:10 | 13 | the impression or it communicates that two studies with |
| 15:10 | 14 | 12.5 milligrams show the drug Vioxx is safe when there were two |
| 15:10 | 15 | other studies that showed otherwise. |
| 15:10 | 16 | **Q.** Moving on. Patients taking low-dose aspirin, 13 percent |
| 15:10 | 17 | of the total population had similar results to the total |
| 15:10 | 18 | population for all parameters. What is the significance of |
| 15:10 | 19 | that to your expert opinion and what additional information, if |
| 15:10 | 20 | any, would be required to make an informed risk/benefit |
| 15:11 | 21 | analysis? |
| 15:11 | 22 | **A.** This is data from the ADVANTAGE trial, and it |
| 15:11 | 23 | misrepresents the actual findings of the ADVANTAGE trial. So |
| 15:11 | 24 | that doctors needed to know what was shown by the FDA to be the |
| 15:11 | 25 | analysis of the patients taking low-dose aspirin in the |

15:11  1   ADVANTAGE trial.

15:11  2   **Q.**   Is that analysis based on information that was -- I'm

15:11  3   sorry.  This patient is taking low-dose aspirin, 13 percent of

15:11  4   the total population.  Is that statement taken from the

15:11  5   published literature cited in this article?

15:11  6   **A.**   No, it's not -- I'm sorry.  I don't believe it is.

15:11  7   **Q.**   What additional information would have been necessary?  I

15:11  8   see there's a citation to some published information.  What

15:11  9   additional information would have been necessary to avoid that

15:11  10  interpretation?

15:11  11  **A.**   The actual data from the trial that the FDA analyzed that

15:11  12  showed that amongst the patients taking low-dose aspirin in the

15:12  13  ADVANTAGE trial, 2 percent of the patients taking Vioxx and

15:12  14  low-dose aspirin developed serious cardiovascular complications

15:12  15  compared to 0.5 percent of the people taking naproxen and

15:12  16  low-dose aspirin.  Therefore, the information available to

15:12  17  Merck at the end of March or beginning of April 2000 showed

15:12  18  that it was unlikely that aspirin mitigated the risk, the

15:12  19  cardiovascular risk.  I believe that the Louisiana P&T

15:12  20  committee needed to know that to adequately assess the

15:12  21  risk/benefit of Vioxx.

15:12  22  **Q.**   Are there any other references in this study -- I'm sorry,

15:12  23  in Provider Synergies' monograph that you feel needed further

15:12  24  information in order to paint an accurate picture of the

15:12  25  risk/benefit analysis?

15:12  1  **A.**   Yes.

15:13  2  **Q.**   Here you're referring to a sentence that says:  "For

15:13  3  rofecoxib, the rate of serious GI complications was 0.41 per

15:13  4  100 patient-years and 0.89 for naproxen."  What does that

15:13  5  communicate to doctors in your understanding of how doctors

15:13  6  perform risk/benefit analysis?

15:13  7  **A.**   That would suggest to physicians that Vioxx is a safer

15:13  8  drug because patients taking it were only -- patients taking

15:13  9  Vioxx in the VIGOR trial were only half as likely to develop

15:13  10  serious GI complications.

15:13  11  **Q.**   What additional information would need to be disclosed or

15:13  12  provided to doctors in order for them to make an informed

15:13  13  decision with respect to whether or not Vioxx posed an

15:13  14  unacceptable risk?

15:13  15  **A.**   Doctors would have to have the full range of the risk and

15:13  16  benefit for any given issue.  In this case, it's serious

15:14  17  clinical events defined, basically, by the kinds of things that

15:14  18  lead to hospitalization.

15:14  19        It's true that in this population where 56 percent of

15:14  20  people were taking steroids, there was a 50 percent reduction

15:14  21  of complicated PUBs; but just presenting that, without the

15:14  22  other data about the consequences of serious complications,

15:14  23  leaves a reader with a misimpression that, because of this

15:14  24  particular reduction in risks, Vioxx is a safer drug when

15:14  25  exactly the opposite was true.

586

| | | |
|---|---|---|
| 15:14 | 1 | **Q.**   Would additional information needed in order to paint an |
| 15:14 | 2 | accurate picture with respect to this issue include the |
| 15:14 | 3 | information about total hospitalization rates? |
| 15:14 | 4 | **A.**   Absolutely. |
| 15:14 | 5 | **Q.**   Are there any other sections?  Here you refer to the |
| 15:14 | 6 | Reicin article or you have highlighted the reference to the |
| 15:15 | 7 | Reicin article.  Now, Doctor, I know you haven't been here |
| 15:15 | 8 | before, but others have tread this ground, so I just want to |
| 15:15 | 9 | ask you:  With respect to the Reicin article, do you have an |
| 15:15 | 10 | opinion as to whether there is additional information needed in |
| 15:15 | 11 | order to communicate to the State of Louisiana the true |
| 15:15 | 12 | risk/benefit profile when the Reicin article is discussed? |
| 15:15 | 13 | **A.**   Yes.  The Reicin article did not present up-to-date |
| 15:15 | 14 | information, and members of the Louisiana P&T committee needed |
| 15:15 | 15 | the up-to-date information to make a decision. |
| 15:15 | 16 | **Q.**   I understand.  Now, with respect to the next article |
| 15:15 | 17 | that's cited there, what article is that?  Do you know? |
| 15:15 | 18 | **A.**   This is the Konstam article. |
| 15:15 | 19 | **Q.**   Okay.  I don't believe that we have heard testimony with |
| 15:15 | 20 | respect to the Konstam article as far as what additional |
| 15:16 | 21 | information may have been needed to be presented in order to |
| 15:16 | 22 | accurately depict the risk/benefit profile for Vioxx when |
| 15:16 | 23 | discussing the Konstam article.  Do you have an opinion with |
| 15:16 | 24 | respect to that issue? |
| 15:16 | 25 | **A.**   I do. |

15:16   1   **Q.**   What is that opinion?

15:16   2   **A.**   That the Konstam article did not present the data that

15:16   3   Merck had in a way that fairly represented or evaluated the

15:16   4   cardiovascular risk in that data.

15:16   5   **Q.**   Have you done an analysis of that data?

15:16   6   **A.**   Yes, I have.

15:16   7   **Q.**   Can you share that with the Court.

15:16   8   **A.**   Yes.  This is a table from the Konstam article, and what

15:16   9   you can see is that it's a pooled analysis of APTC endpoints,

15:16   10   which is a subset of serious thrombotic cardiovascular

15:16   11   complications.

15:16   12          The table presents rheumatoid arthritis and a

15:17   13   relative risk of 1.78 for the rheumatoid arthritis studies.

15:17   14   From the Table 13 that's in the slide set, you can see that if

15:17   15   you use not the APTC endpoint but the prespecified endpoint of

15:17   16   serious cardiovascular complications, that the relative risk is

15:17   17   actually 3.57 on exactly those same studies.

15:17   18          And then for osteoarthritis, the APTC endpoint gives

15:17   19   a risk of 1.53.  But if the data were presented completely for

15:17   20   studies 010 through 090 for thrombotic cardiovascular

15:17   21   complications, the risk wouldn't be 1.53, but it would be 1.9.

15:17   22          And for Alzheimer's and low-back pain data, which the

15:17   23   risk is lower for Vioxx than for placebo, those data, at least

15:18   24   the Alzheimer's data, had been prespecified by Merck to be

15:18   25   unblinded towards the end of 2003.  They were prematurely

588

| | | |
|---|---|---|
| 15:18 | 1 | unblinded and included in this analysis, and that makes the |
| 15:18 | 2 | inclusion of that data post hoc. |
| 15:18 | 3 | So if the data had been presented accurately and |
| 15:18 | 4 | completely that was available up 'til that point, you would |
| 15:18 | 5 | have 3.57 relative risk for rheumatoid arthritis, not |
| 15:18 | 6 | statistically significant.  You would have a 1.90 relative risk |
| 15:18 | 7 | for the osteoarthritis patients, not statistically significant. |
| 15:18 | 8 | If you combined those two, you would have a relative risk of a |
| 15:18 | 9 | little bit over 2, and the p-value would just miss statistical |
| 15:18 | 10 | significance at P equals 0.06. |
| 15:18 | 11 | Q.   Is that information that Provider Synergies or the P&T |
| 15:18 | 12 | committee would have needed in order to conduct an informed |
| 15:19 | 13 | risk/benefit analysis with respect to Vioxx? |
| 15:19 | 14 | A.   Well, that's critically important because if this table |
| 15:19 | 15 | had shown a relative risk of 2.04 or something, a doubling of |
| 15:19 | 16 | the risk of cardiovascular complications in people with |
| 15:19 | 17 | rheumatoid arthritis and osteoarthritis taking Vioxx, that |
| 15:19 | 18 | would have been critically important information.  The |
| 15:19 | 19 | conclusion of this table is exactly the opposite, that though |
| 15:19 | 20 | not statistically significant, the risk of Vioxx for |
| 15:19 | 21 | cardiovascular -- thrombotic cardiovascular events associated |
| 15:19 | 22 | with Vioxx is actually lower than the risk associated with |
| 15:19 | 23 | naproxen. |
| 15:19 | 24 | Q.   Are there any other studies cited in the -- I'm sorry. |
| 15:19 | 25 | Does this next table relate to the last study we -- |

| | | |
|---|---|---|
| 15:19 | 1 | **A.**    Yes.  It shows the 3.57 risk factor for the rheumatoid |
| 15:19 | 2 | arthritis numbers.  We could go back, but the numbers that |
| 15:19 | 3 | you're seeing in the patients who took Vioxx and placebo are |
| 15:20 | 4 | the same as the ones represented in the chart. |
| 15:20 | 5 | **Q.**    What is this table? |
| 15:20 | 6 | **A.**    This is a table from the CV pooled risk analysis.  It was |
| 15:20 | 7 | dated 2005, I believe -- 2004, provided by Merck. |
| 15:20 | 8 | **Q.**    So this is Merck's own analysis of that data, and it shows |
| 15:20 | 9 | the higher value, and that higher value should have been |
| 15:20 | 10 | disclosed in the Konstam article to give a full and accurate |
| 15:20 | 11 | picture to Provider Synergies? |
| 15:20 | 12 | **A.**    Yes.  It shows the higher value and it shows the |
| 15:20 | 13 | prespecified endpoint for their studies, which would be risks |
| 15:20 | 14 | associated with thrombotic cardiovascular serious adverse |
| 15:20 | 15 | events. |
| 15:20 | 16 | **Q.**    Are there any other comments in the Provider Synergies |
| 15:20 | 17 | monograph or any other portions that you feel require |
| 15:20 | 18 | additional information in order to provide a full and accurate |
| 15:20 | 19 | picture to the State of Louisiana with respect to the |
| 15:20 | 20 | risk/benefit profile of Vioxx? |
| 15:20 | 21 | **A.**    Yes.  The Weir study is cited.  It's not mentioned |
| 15:21 | 22 | explicitly in the text, but it's cited in the references. |
| 15:21 | 23 | **Q.**    What about the Weir article do you feel requires |
| 15:21 | 24 | additional information in order for the P&T committee or |
| 15:21 | 25 | Provider Synergies to make an informed analysis with respect to |

DAILY COPY

15:21   1   risk/benefit profile?

15:21   2   A.   The Weir article provides incomplete or not up-to-date

15:21   3   information.  The Weir article was submitted after Study 136

15:21   4   had been completed.  136 was the last of the osteoarthritis

15:21   5   studies versus placebo.

15:21   6           In this table, in the comparison of the rofecoxib

15:21   7   with placebo, you can see that there are -- under the

15:22   8   investigator reported cardiovascular thrombotic events, the --

15:22   9   let me go to the APTC composite endpoint.

15:22   10          You can see that the risk -- the .70 is a little bit

15:22   11  confusing because that's the risk for taking naproxen and the

15:22   12  risk -- one second.

15:22   13          That's the risk for taking Vioxx.  The rate is higher

15:22   14  in the placebo group.  So that's the risk for taking Vioxx.

15:22   15          The number of 711 patients taking placebo show that

15:22   16  the studies included in this trial include studies 029 through

15:22   17  058 only.  Had these studies included the current data, which

15:23   18  would have included 085, 090, and 136, the risk of Vioxx would

15:23   19  have been 3.2 times greater than the risk of taking placebo,

15:23   20  and that is statistically significant.

15:23   21  Q.   Are there any other references in the Provider Synergies

15:23   22  monograph that require additional information?

15:23   23  A.   I think that summarizes the problems that I found.

15:23   24  Q.   In this slide here, this is a presentation from Valerie

15:23   25  Taylor to members of the P&T committee; is that correct?

15:23   1   **A.**   Yes.

15:23   2   **Q.**   Do you have an opinion as to whether or not the

15:23   3   information communicated in this discussion by Ms. Taylor

15:23   4   provided all the information that a physician would need in

15:24   5   order to determine whether or not the risk of Vioxx outweighed

15:24   6   its benefit?

15:24   7   **A.**   It does not provide the information that's necessary to

15:24   8   make that evaluation.

15:24   9   **Q.**   Can you read her conclusion?

15:24   10   **A.**   Well, yes.  She says there's been a lot of looking at do

15:24   11   these products increase cardiovascular concerns, do they

15:24   12   increase edema, and then she recommends that in this class

15:24   13   would be to have Bextra and Celebrex available.  But what she

15:24   14   does not do is she is not able to fill in the blanks on the

15:24   15   cardiovascular risks and the edema risks and the hypertension

15:24   16   risks with Vioxx because that information hadn't been provided

15:24   17   to her.

15:24   18   **Q.**   Now, as someone who teaches clinicians in making

15:24   19   risk/benefit analysis, do you have an expert opinion as to

15:24   20   whether or not this discussion would have alerted the doctors

15:25   21   on the P&T committee to a risk that outweighs the benefit with

15:25   22   respect to Vioxx?

15:25   23   **A.**   It doesn't.  It just says there's been concern, but it

15:25   24   doesn't provide the evidence, the scientific evidence that

15:25   25   exists and that the members of the P&T committee needed to make

15:25  1   a decision about the risks and benefits.

15:25  2   Q.   Have you seen any communications to the P&T committee from

15:25  3   Provider Synergies that would have provided the information

15:25  4   necessary in order to determine that Vioxx suffered from a

15:25  5   defect?

15:25  6   A.   Well, there was limited information when the label changed

15:25  7   in April 2002, but I believe that information in the updated

15:25  8   label was also inadequate for the P&T committee to make a

15:25  9   reasonable decision.

15:26  10  Q.   Let's go to the next slide.  This is May 21, 2003.  Now,

15:26  11  is this after the additional information became available that

15:26  12  you just discussed?

15:26  13  A.   Yes.

15:26  14         THE COURT:  Counsel, I hope we are getting to the end

15:26  15  of his testimony.

15:26  16         MR. MURRAY:  I understand, Your Honor, and we are

15:26  17  very near the end.

15:26  18  BY MR. MURRAY:

15:26  19  Q.   Was there anything in this communication, along the lines

15:26  20  of my last question, that would have communicated to the

15:26  21  physicians on the P&T committee that there was a defect with

15:26  22  respect to Vioxx?

15:26  23  A.   No.  The questions are raised, but it's clear that they

15:26  24  don't have adequate information to make an informed decision.

15:26  25  Q.   Skip the CV card.  Finally, I just want to ask you

| | | |
|---|---|---|
| 15:27 | 1 | briefly:  Have you reviewed the deposition of Fran Kaiser? |
| 15:27 | 2 | **A.**   Yes, I have. |
| 15:27 | 3 | **Q.**   Do you understand Dr. Kaiser is a Merck employee? |
| 15:27 | 4 | **A.**   Yes. |
| 15:27 | 5 | **Q.**   Did Dr. Kaiser in her deposition testify that she had made |
| 15:27 | 6 | presentations to members of the P&T committee? |
| 15:27 | 7 | **A.**   Yes, she did. |
| 15:27 | 8 | **Q.**   That's the testimony you're referencing here? |
| 15:27 | 9 | **A.**   Yes. |
| 15:27 | 10 | **Q.**   Was there anything Dr. Kaiser told you about her |
| 15:27 | 11 | presentations to the P&T committee that would indicate to you |
| 15:27 | 12 | that there was a need for additional information in order for |
| 15:27 | 13 | the P&T committee to make an informed decision with respect to |
| 15:27 | 14 | whether or not there was a defect with Vioxx? |
| 15:27 | 15 | **A.**   No.  She testified -- yes.  She testified that she |
| 15:27 | 16 | presented the material that was in the label, but the label -- |
| 15:27 | 17 | the updated label from 2002, but that was not adequate to |
| 15:27 | 18 | inform the members of the Louisiana P&T committee of the risks |
| 15:28 | 19 | and benefits. |
| 15:28 | 20 | **Q.**   Did she testify that she herself was unaware of certain |
| 15:28 | 21 | information that she believed that a doctor would have needed |
| 15:28 | 22 | and expected in order to make a reasoned decision as to whether |
| 15:28 | 23 | or not there was a defective condition of Vioxx? |
| 15:28 | 24 | **A.**   Yes, she did. |
| 15:28 | 25 | **Q.**   What is that testimony? |

15:28  1   **A.**    There's several aspects of that testimony.  This is an

15:28  2   example of Dr. Kaiser not being aware of the Chen memo.  She

15:28  3   says if wasn't in the label, it wasn't discussed, the Chen memo

15:28  4   showing a significant increase in the deaths in the Alzheimer

15:28  5   studies dated in May of 2001.

15:28  6        She says she was not aware that there was

15:28  7   statistically significantly more serious adverse events in the

15:28  8   patients taking Vioxx in the VIGOR trial.  She says --

15:28  9   **Q.**    Let me stop you there.  Was that information that the

15:29  10  doctors at Provider Synergies, with whom she was communicating,

15:29  11  would have needed to know in order to perform an informed

15:29  12  risk/benefit analysis with respect to whether or not there was

15:29  13  a defect in the drug Vioxx?

15:29  14  **A.**    Absolutely.  If there was one statistic, that's probably

15:29  15  the most important one.

15:29  16  **Q.**    Dr. Kaiser testified she was not aware of that?

15:29  17  **A.**    Correct.

15:29  18  **Q.**    Any other information that Dr. Kaiser was not aware of

15:29  19  that would have been necessary to an informed decision with

15:29  20  respect to risk/benefit analysis as to Vioxx?

15:29  21  **A.**    Yes.  I believe this is a very important issue.  This is

15:29  22  concerning the data that was presented in the *New England*

15:29  23  *Journal of Medicine* article from 2000 in which the claim was

15:29  24  made that for patients for whom aspirin was not indicated,

15:29  25  there was not a statistically significant increase in the risk

| | | |
|---|---|---|
| 15:29 | 1 | of MI.  She believed that that was true, even given that there |
| 15:29 | 2 | was a post hoc endpoint, that it was thrombotic cardiovascular |
| 15:29 | 3 | complications that was the prespecified endpoint. |
| 15:30 | 4 | But even looking at the MIs presented in the |
| 15:30 | 5 | *New England Journal of Medicine*, the claim was made in that |
| 15:30 | 6 | article that there was not a significant increase in the risk |
| 15:30 | 7 | of MI amongst people who weren't aspirin-indicated.  Yet that |
| 15:30 | 8 | was not true because the three heart attacks that were not |
| 15:30 | 9 | included in that article would have undone that separation |
| 15:30 | 10 | between aspirin-indicated and aspirin-not-indicated people. |
| 15:30 | 11 | She was not aware of that.  She believed that for |
| 15:30 | 12 | aspirin-not-indicated people there was not an increased risk of |
| 15:30 | 13 | MI. |
| 15:30 | 14 | Q.   Anything else that Dr. Kaiser testified she was unaware of |
| 15:30 | 15 | that would have been necessary to an informed risk/benefit |
| 15:30 | 16 | analysis with respect to Vioxx? |
| 15:30 | 17 | A.   That she is believing that aspirin would mitigate the |
| 15:30 | 18 | increased cardiovascular risk, and that would be very important |
| 15:30 | 19 | for her and for Provider Synergies and for the Louisiana P&T |
| 15:31 | 20 | committee to know that there wasn't good evidence that aspirin |
| 15:31 | 21 | mitigated the risk for aspirin-indicated people. |
| 15:31 | 22 | MR. MURRAY:  Is that your last slide? |
| 15:31 | 23 | I tender the witness. |
| 15:31 | 24 | THE WITNESS:  I'm sorry? |
| 15:31 | 25 | MR. MURRAY:  I tender the witness. |

DAILY COPY

| | | |
|---|---|---|
| 15:31 | 1 | **THE COURT:**  Let me see counsel at the bench, please. |
| 15:31 | 2 | (WHEREUPON there was a conference at the bench |
| 15:31 | 3 | outside the presence of the court reporter.) |
| 15:32 | 4 | **THE COURT:**  We are going to stop here and start at |
| 15:32 | 5 | 8:30 tomorrow.  I ask that you not talk with anyone tonight.  I |
| 15:32 | 6 | am instructing all witnesses not to discuss their testimony |
| 15:32 | 7 | with counsel before taken under cross-examination.  Do you |
| 15:32 | 8 | understand that? |
| 15:32 | 9 | **THE WITNESS:**  Yes, Your Honor. |
| 15:32 | 10 | **THE COURT:**  I'll see you tomorrow. |
| 15:32 | 11 | **THE DEPUTY CLERK:**  Everyone rise. |
| 15:32 | 12 | (WHEREUPON the Court was in recess for the evening.) |
| 15:32 | 13 | * * * |
| | 14 | **CERTIFICATE** |
| | 15 | I, Toni Doyle Tusa, CCR, FCRR, Official Court |
| | 16 | Reporter for the United States District Court, Eastern District |
| | 17 | of Louisiana, do hereby certify that the foregoing is a true |
| | 18 | and correct transcript, to the best of my ability and |
| | 19 | understanding, from the record of the proceedings in the |
| | 20 | above-entitled and numbered matter. |
| | 21 | |
| | 22 | |
| | 23 | s/ Toni Doyle Tusa |
| | | Toni Doyle Tusa, CCR, FCRR |
| | 24 | Official Court Reporter |
| | 25 | |