UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  VIOXX PRODUCTS            MDL No. 1657
LIABILITY LITIGATION             Section: "L"
                                 New Orleans, Louisiana
                                 Thursday, April 15, 2010

*********************************************************************

***THIS DOCUMENT RELATES TO:***

State of Louisiana, ex rel
James D. Caldwell, Jr.,
Attorney General

        versus

Merck

Case No. 05-CV-3700
*********************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
DAY 4, MORNING SESSION



APPEARANCES:


FOR THE LOUISIANA DEPARTMENT
OF HEALTH AND HOSPITALS:
                        DUGAN LAW FIRM
                        BY:  JAMES R. DUGAN, II, ESQ.
                        650 Poydras St., Suite 2150
                        New Orleans, LA 70130


                        MURRAY LAW FIRM
                        BY:  STEPHEN B. MURRAY, JR., ESQ.
                             DOUGLAS R. PLYMALE, ESQ.
                             JUSTIN BLOOM, ESQ.
                        650 Poydras St., Suite 1100
                        New Orleans, LA 70130

DAILY COPY

1
2                                    LIEFF CABRASER HEIMANN & BERNSTEIN
                                      BY:  DONALD C. ARBITBLIT, ESQ.
3                                      Embarcadero Center West
                                      275 Battery Street, Suite 3000
4                                      San Francisco, CA 94111-3339

5

6  FOR MERCK:                    GOLDMAN ISMAIL TOMASELLI
                                      BRENNAN & BAUM
7                                      BY:  TAREK ISMAIL, ESQ.
                                      1 North Franklin St., Suite 625
8                                      Chicago, IL 60606

9                    BAKER BOTTS
                                      BY:  TRAVIS J. SALES, ESQ.
10                                    One Shell Plaza
                                    910 Louisiana
11                                    Houston, TX 77002-4995

12                    O'MELVENY & MYERS
                                    BY:  SCOTT M. VOELZ, ESQ.
13                                    400 South Hope Street
                                    Los Angeles, CA 90071-2899

14

15

16  Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR
                                    500 Poydras Street, Room HB-406
17                                    New Orleans, Louisiana 70130
                                    (504) 589-7776
18

19

     Proceedings recorded by mechanical stenography, transcript
20  produced by computer.

21

22

23

24

25

1  I N D E X

2

3  WITNESSES FOR THE PLAINTIFF:              PAGE/LINE:

4

5  JOHN D. ABRAMSON

6

7    Cross-Examination by Mr. Ismail          600/13

8

9

10

11  WITNESSES FOR THE DEFENDANT:

12

13  JERRY WELLS

14

15    Voir Dire Examination by Mr. Sales       651/24

16    Traverse Examination by Mr. Murray       658/11

17    Direct Examination by Mr. Sales          663/2

18    Cross-Examination by Mr. Murray          694/5

19

20

21

22

23

24

25

P R O C E E D I N G S

(THURSDAY, APRIL 15, 2010)

(MORNING SESSION)


1    (OPEN COURT.)

            THE COURT:  Be seated, please.  Good morning, ladies and
gentlemen.  Call your next witness -- or you're under cross.  Come
forward, please, sir.  Doctor, you're still under oath, sir.

            THE WITNESS:  Yes.

            THE COURT:  You may cross-examine, Counsel.

            MR. ISMAIL:  Thank you, your Honor.

                        CROSS-EXAMINATION

BY MR. ISMAIL:

Q.  Good morning, Doctor.

A.  Good morning.

Q.  You introduced yourself yesterday to the court as a clinical
instructor at Harvard Medical School, but that really isn't how you
spend the majority of your time, is it, sir?

A.  No.

Q.  Nor is it how you make a living, is it?

A.  No.

Q.  In fact, you're nearly -- or you are a near full-time witness
for plaintiff lawyers, correct?

A.  That depends on the definition of near full-time.

Q.  All right.  Well, let's flush that out a little bit.  You quit

1    practicing medicine eight years ago?

2    A.  Yes.

3    Q.  Currently you do not treat patients, right?

4    A.  That's correct.

5    Q.  Haven't done so since early 2002?

6    A.  That's correct.

7    Q.  Currently 70 percent of your professional time is spent related

8    to litigation activities, true?

9    A.  That's approximately right.

10   Q.  It's been true that the majority of your professional time over

11   the past four years has been on litigation-related activities,

12   true?

13   A.  That's correct.

14   Q.  In 2009, all of the time you spent on litigation-related

15   activities was on behalf of plaintiff lawyers, correct?

16   A.  That's correct.

17   Q.  And the vast majority of that work was testifying against

18   pharmaceutical companies, right?

19   A.  Correct.

20   Q.  Currently the vast majority of your income comes from

21   litigation activities, right?

22   A.  That's correct.

23   Q.  Over the past five years, money you receive from plaintiff

24   lawyers has been the dominant source of your income, correct?

25   A.  Yes.

1   Q.  In 2009, 80 to 85 percent of your income was derived from

2   litigation activities, correct?

3   A.  Yes.

4   Q.  And as we mentioned, last year all of that was from plaintiff

5   lawyers, correct?

6   A.  Yes.

7   Q.  And over your litigation career the vast majority of your

8   income has come from plaintiff lawyers?

9   A.  Yes.

10  Q.  In fact, sir, isn't it true that you've made -- you made

11  $500,000 last year alone doing work for plaintiff lawyers?

12  A.  That's approximately correct.

13  Q.  And the vast majority of that was testifying against

14  pharmaceutical companies, right?

15  A.  Yes.

16  Q.  Over the past five years you've made over $1.5 million doing

17  litigation work, correct?

18  A.  I believe so.

19  Q.  And the vast majority of that income comes from plaintiff

20  lawyers, right?

21  A.  Yes.

22  Q.  You've made about $500,000 in Vioxx litigation alone, right?

23  A.  I would have to go back and look at my records.

24  Q.  Well, we took your deposition in 2006 and at that point the

25  total was already $250,000, right?

1   A.   I assume.

2   Q.   Sounds about right?

3   A.   I assume so, yes.

4   Q.   And you've obviously done a lot of work in Vioxx litigation

5   since, correct?

6   A.   Yes.

7   Q.   Lots of plaintiff lawyers have hired you?

8   A.   Some.

9   Q.   Your work at Harvard that you -- you said you were a clinical

10   instructor?

11   A.   That's correct.

12   Q.   Did I understand you to say yesterday that you teach part of

13   one lecture?

14   A.   That's not the totality of what I do.

15   Q.   But you teach, and you said you led a discussion group, right?

16   A.   Well, the course is designed to have a lecture and then a

17   discussion group on most of its meetings.  So there's one lecture

18   or one or two lectures and then a discussion group with the

19   students.  And what I do is lead a discussion group after each of

20   the lectures and deliver -- the last two times the course ran I

21   delivered one lecture or shared a lecture with another of the

22   faculty members.

23   Q.   Right.  You don't do any hands-on instruction of medical

24   students, correct, currently?

25   A.   I am not sure what you mean, but the discussion group is a

1   group of eight medical students that meets throughout the course

2   and that's instruction.

3   Q.  Currently you do not do any hands-on clinical education for

4   medical students, correct?

5   A.  I don't know what "hands on" means.  I teach it -- I lead a

6   tutorial group in the health policy course, and that tutorial group

7   meets on most of the occasions that the course meets.  Sometimes

8   the lecture is two hours, but on most occasions the lecture is one

9   hour and then there's an hour discussion group.

10  Q.  In at least 2006, you were only spending a couple of hours a

11  month fulfilling your duties as a clinical instructor, correct?

12  A.  In my teaching -- yeah, in my teaching role.  There are other

13  lectures that I give at Harvard Medical School --

14  Q.  Right.

15  A.  -- as well as teaching medical students.

16  Q.  That essentially is an unpaid position, correct?

17  A.  No, I was paid $1600 for that.

18  Q.  You make about $600 a year from Harvard?

19  A.  Well, now I've gotten a raise, it's $1600.

20  Q.  So you used to make $600 a year and now you're up to $1600 a

21  year?

22  A.  For the teaching of medical students, and then for the lectures

23  that I give at the Harvard Medical School in their continuing

24  medical education courses I get paid as well.

25  Q.  So if I had a bar graph, you introduced yourself yesterday as a

1   clinical instructor at Harvard, and so if I had a bar graph here of

2   your income from Harvard, it would start at 600 and then you

3   recently got a raise to 1600, and then I can have a bar that shows

4   $500,000 from plaintiff lawyers, right; that would be accurate,

5   wouldn't it?

6   A.  Well, it would but yesterday I was asked what positions I hold,

7   and I think I answered that I hold the position of clinical

8   instructor at Harvard Medical School and consultant with Wells

9   Fargo.  My work with plaintiff attorneys isn't a position that I

10  hold.

11  Q.  You told the court yesterday you were an expert in the

12  evaluation of clinical trials, correct?

13  A.  Yes.

14  Q.  You have never been a principal investigator or even an

15  associate investigator for a clinical trial involving a

16  pharmaceutical product, correct?

17  A.  Yes.

18  Q.  You've never had any personal involvement in conducting a

19  clinical trial on a pharmaceutical product, correct?

20  A.  That's correct.

21  Q.  Never had responsibility for designing a clinical trial on any

22  drug, correct?

23  A.  That's correct.

24  Q.  Never even have been consulted about study design for a

25  clinical trial on any drug, correct?

1    A.  That's correct.

2    Q.  Never had responsibility for writing up the results and

3    conclusions of a drug clinical trial for a manuscript, correct?

4    A.  Correct.

5    Q.  You've never been listed as an author on any peer-reviewed

6    article publishing the results of a clinical trial?

7    A.  That's correct.

8    Q.  I think you had some testimony yesterday about the Louisiana

9    Pharmacy and Therapeutics Committee?

10   A.  Yes.

11   Q.  You yourself have never served on a P&T Committee, true?

12   A.  That's correct.

13   Q.  Told the court yesterday you were an expert in the risk benefit

14   analysis physicians go through with respect to medicines, right?

15   A.  Yes.

16   Q.  Now, first of all, you yourself haven't done a risk benefit

17   analysis for a patient you were treating for the last eight years,

18   true?

19   A.  That's correct.

20   Q.  I think you told Mr. Murray that you had written peer-reviewed

21   articles about your expertise in risk benefit analysis?

22   A.  Well, I wouldn't quite say it like that.

23   Q.  Well, that's what you said yesterday.

24   A.  Can you repeat --

25            MR. MURRAY:  I don't think that that is a proper

1    characterization of his testimony.  I think that what he said

2    yesterday was he read peer-reviewed articles with respect to the

3    other aspect of his expertise.

4              MR. ISMAIL:  I appreciate the clarification, so I'll just

5    ask the question.

6    BY MR. ISMAIL:

7    Q.  How many peer-reviewed articles have you written in the 25

8    years since medical school?

9    A.  Four, and there's one in press right now.

10   Q.  And how many of those deal with your purported expertise in the

11   risk benefit analysis that physicians go through?

12   A.  Three of them touch on it.  There are aspects, there are

13   different aspects of that and -- the one that's in press also

14   addresses issues of -- a critical analysis of a study to define the

15   risks and benefits of the treatment that's recommended.

16   Q.  You understand that FDA advisory committees are convened to

17   conduct risk benefit analyses of medicines, right?

18   A.  Yes.

19   Q.  That's one of the purposes?

20   A.  That's one of the purposes, yes.

21   Q.  You have never been a member of an advisory committee, true?

22   A.  True.

23   Q.  I think you were describing yesterday in response to counsel's

24   questions other litigation that you've been involved in, right?

25   A.  Yes.

1    Q.  So you've signed up to be an expert criticizing Pfizer in a

2    number of different pieces of litigation, right?

3    A.  I wouldn't quite say it like that.  I would say I've been

4    engaged by plaintiff's attorneys to participate in litigation.

5    Q.  And did the plaintiff lawyers engage you to praise Pfizer's

6    conduct or to criticize it?

7    A.  Plaintiff's lawyers engaged me to do an independent evaluation

8    of the material and express my opinion.

9    Q.  And how many of those litigations have you been involved in, at

10   least just against Pfizer?

11   A.  Two others come to mind.  It's possible that there's more.

12   Q.  And you signed up with the plaintiff lawyers to be an expert

13   against Eli Lilly, right?

14   A.  Well, I didn't sign up.  I was asked to consult.

15   Q.  And you agreed.

16   A.  And I agreed to consult.

17   Q.  And did you sign retention letters or agreements and the like?

18   A.  Probably.

19   Q.  Though I won't use the phrase "sign up," you agreed to be an

20   expert on behalf of the plaintiff lawyers against Eli Lilly, right?

21   A.  Yes.

22   Q.  And you have also given lectures or talks or you've gone on the

23   radio or the TV, and you have been critical of other pharmaceutical

24   companies, right?

25   A.  I would say critical of what I perceive as misrepresentations

1   about the scientific evidence by pharmaceutical companies, when

2   they occur.

3   Q.  Right.  So --

4   A.  When I become aware of them.

5   Q.  Just, I don't want detour too far down this lane, but can you

6   just give us an example of just the names of the companies that

7   you've gone on the radio or gone on TV to criticize the care and

8   responsible decision-making of those companies?

9   A.  Well, I did a radio debate on Minnesota public radio last week

10  with Dr. Steve Nissen about the Jupiter trial and the limitations

11  of the findings of the Jupiter trial that led to the broadening of

12  the indications for the use of Crestor, which is an AstraZeneca

13  drug.

14  Q.  We'll get to Dr. Nissen actually in a few minutes.  But you've

15  criticized AstraZeneca, Johnson and Johnson, Genentech, we can go

16  on and on and on.

17  A.  I don't think that's a fair characterization.  I have addressed

18  issues that I have felt don't fairly represent the scientific

19  evidence and misrepresent that evidence to physicians and to

20  consumers, and I think that it's very important, given the

21  imbalance in voice that the pharmaceutical industry has, for people

22  who understand that the information might be unbalanced to attempt

23  to rebalance it.

24  Q.  All right.  You were asked in your deposition, sir, if you

25  could name a single pharmaceutical company that you've not

1    criticized, either in litigation or on the radio, and the only ones

2    you could come up with were generic manufacturers, right?

3    A.  No, that's not true.  I may have been asked but that's -- if I

4    answered that it was incorrect.

5    Q.  Turning to your work in, or to your opinions on COX-2

6    inhibitors, I think you told us that you got interested in COX-2

7    inhibitors in the fall of 2001 after reading an article in the *New*

8    *England Journal of Medicine*, right?

9    A.  Yes.  I think it was the, I think it was August of 2001.

10   Q.  And as of the time that you read that article in August of

11   2001, you do not claim to have any specialized knowledge or

12   information relating to COX-2 inhibitors, right?

13   A.  I'm sorry, as of the time I read that article?

14   Q.  Right.  So I am just trying to get back to August of 2001, we

15   have you, Dr. Abramson, you pick up this article in the *New England*

16   *Journal*.  The moment you picked up that article you did not have

17   any specialized knowledge in COX-2 inhibitors, right?

18   A.  Well, I don't think that's quite fair.  I was a practicing

19   physician.  The issue of whether COX-2s provided a safety advantage

20   was on my radar screen since the articles initially appeared in

21   JAMA in 1999.  It was an open question for me, and it was very much

22   an issue because many patients were coming in to me asking and

23   sometimes demanding that I prescribe these drugs.  So I was

24   watching the issue very closely as a physician.

25            MR. MURRAY:  What page are you going to refer to?

1              MR. ISMAIL:   Page 53.

2    BY MR. ISMAIL:

3    Q.  Sir, I've handed you a transcript of your deposition taken

4    January 11th, 2010.  It's open to page 53.  And were you asked the

5    following question and did you give the following answer:  "Q.  As

6    of August of 2001, you don't claim you had any specialized

7    knowledge or information about COX-2 inhibitors, correct?  A.

8    That's correct."

9              Were you asked that question and did you give that

10   answer?

11   A.  I did, and I get tripped up on the issue of specialized

12   knowledge, the difference between the kind of specialized knowledge

13   that a physician has that allows that physician to make decisions

14   in patients' interests and the kinds of specialized knowledge that

15   the super specialists in the medical community recognized, super

16   specialists in the medical community would have.

17   Q.  When you read that article in the *New England Journal* that

18   discussed COX-2 inhibitors safety, that article peaked your

19   interest, right?

20   A.  It did.

21   Q.  And what specifically peaked your interest was the observation

22   by the authors that the difference in thrombotic events in the

23   VIGOR study could be explained by the play of chance?

24   A.  Is that a question?

25   Q.  Is that correct?

1    A.   That is correct and the fact that the authors of that article

2    in the *New England Journal of Medicine* said it may be due to the

3    play of chance because the numbers were small, and I think in

4    parenthesis it said less than 70.  And I recall that the number of

5    complicated GI events in the *New England Journal of Medicine* of

6    November 2000 was 53.  And what peaked my interest was the

7    discounting of the significance of the cardiovascular risks because

8    of a small number when it's less than 70 and the enormous

9    highlighting of the purported GI benefit in the reduction of

10   complicated GI events that were only 53.

11   Q.   You thought such a statement would not be possible from someone

12   who had even a rudimentary understanding of statistics, right?

13   A.   I thought the discounting of a statistically significant

14   finding as due to the play of chance flies in the face of why

15   statistics are done.  Statistics are done to integrate the

16   differences that are found and the number of, the number of

17   patients in the study and the number of events to determine what

18   the probability of that finding is.  And then to discount a

19   statistically significant finding, to ignore the calculations that

20   have been done of statistical significance was highly unusual to

21   me.

22   Q.   We'll go with highly unusual.  Do you recall telling us in your

23   deposition that such a statement in the article wouldn't be

24   plausible from someone who had a quote, rudimentary understanding

25   of statistics?

1   A.  I think I might modify that slightly and say that it is not

2   consistent with a rudimentary understanding of statistics.

3   Q.  Okay.  And you thought the *New England Journal of Medicine*

4   article that you read had taken drug salesmanship into new

5   territory, right?

6   A.  I don't recall those exact words, but I believe that it's

7   possible I said that.

8   Q.  In your own book?

9   A.  Okay.

10  Q.  Okay.  So we have this *New England Journal of Medicine* article

11  that flies in the face of, is what you said today, or rudimentary

12  understanding of statistics that you told us a couple of months

13  ago, published a book in which you said it was taking drug

14  salesmanship into new territory.  And you also thought this article

15  was very clearly biased, right?

16  A.  Well, I thought this part of the article was biased, to dismiss

17  a statistically significant finding as perhaps due to the play of

18  chance because the small number of events is an oxymoron.

19  Q.  So let's see who published this article that you think is an

20  oxymoron.

21  A.  That's not what I said, I said that phrase is an oxymoron.

22  Q.  That published a phrase that you think is an oxymoron.  Is

23  Exhibit 3651 the article in 2001 that you and I have been chatting

24  about?

25  A.  Yes.

1   Q.  So if we wanted to see these authors, who you thought at least

2   that portion of their article was very clearly biased, whose

3   statements flew in the face of statistics and took drug

4   salesmanship into new territory, that would be Dr. Fitzgerald and

5   Dr. Patrono, right?

6   A.  That's correct.

7   Q.  We had a witness yesterday who praised Dr. Fitzgerald as one of

8   the originators in scientific research into COX-2 enzymes.  Is that

9   the same fellow?

10  A.  It is.  And I think it's important to look at the back of the

11  article and see that Drs. Fitzgerald and Patrono were both serving

12  as consultants to Merck when they wrote this article.  And, in

13  fact, that violated the *New England Journal of Medicine*'s editorial

14  policy.

15  Q.  Why is it important to note here today that Drs. Patrono and

16  Fitzgerald had received research funding from Merck?

17  A.  Research funding and served as consultants.  Because the *New*

18  *England Journal of Medicine* had at the time a strict policy that no

19  authors of review articles or editorials could have conflicts of

20  interest because those types of articles were subject to

21  interpretation and subjective opinion.  And it's important because

22  the sentence that a statistically significant finding might be

23  dismissed because of the play of chance makes no sense whatsoever.

24          And their financial ties -- then one asks, you know,

25  where was this article, who looked at it, who contributed to it,

1    was it reviewed, all of those questions get raised because of their

2    financial ties.

3    Q.  Now, are you questioning the motives of Dr. Fitzgerald and

4    Dr. Patrono in making the observation that they thought VIGOR could

5    be explained by chance because they had received research funding

6    from Merck?

7    A.  What I'm saying is that the statement that statistically

8    significant finding may be due to the play of chance because of

9    small number of events makes no sense.  Especially when the number

10   of complicated GI events was even smaller.  And when I saw that

11   and -- again, to recreate the moment, the *New England Journal* comes

12   out August 9th, 2001, and I'm sitting in my office at lunch reading

13   this article, and I read this sentence and it makes no sense

14   whatsoever to me, and then I look and see if there are financial

15   conflicts of interest and there are so --

16   Q.  So there are -- I'm sorry.

17   A.  -- so I am not, I'm not attributing bad motives, I am not

18   reading anybody's mind.  I am just pointing out the facts.

19   Q.  And the facts you were pointing out was their funding, right?

20   A.  Yes.

21   Q.  And your funding today comes from the plaintiff lawyers, right?

22   A.  Plaintiff's lawyers pay me to, yes, to consult.

23   Q.  So you were painting this scene that we have, you were sitting

24   in your office in a small town in -- outside of Boston, right?

25   A.  Correct.

1  Q.  And you're a family practice doctor, correct?

2  A.  Correct.

3  Q.  And you pick up your copy of the *New England Journal of*

4  *Medicine*, and here you have two of the world's leading experts in

5  prostaglandin who publish an article, right?

6  A.  Correct.

7  Q.  And they make an observation, gee, we read VIGOR as being

8  potentially explained by the play of chance, right?

9  A.  I would say it more specifically, that they say that the

10  statistically significant finding may be due -- let me get the

11  exact phrase.

12  Q.  Sure.  It's on page 439, paragraph, "The difference in major

13  cardiovascular events in the VIGOR trial may reflect the play of

14  chance."  That's the phrase, right?

15  A.  Well, yes, let's keep going.  That's the first sentence, and

16  then it says:  "The end point was prespecified and the difference

17  in the frequency of events was statistically significant, but the

18  absolute number of cardiovascular events was small (less than 70)."

19       Now, I respect Dr. Fitzgerald and Dr. Patrono's work

20  tremendously, but those two sentences don't make sense.

21  Q.  So you disagree with them, right?

22  A.  I disagree with those two sentences, that's not a dispassionate

23  reading of the results of the VIGOR trial.

24  Q.  And then the next thing you did after your interest was peaked

25  was you went back to an article by Dr. Nissen, the fellow you

1    debated last week, right?

2    A.  Yes.

3    Q.  And Dr. Topol?

4    A.  And Dr. Mukherjee.

5    Q.  And Dr. Mukherjee.  And that's Exhibit 2637, right?

6    A.  Yes.

7            MR. ISMAIL:  Judge, I've handed this to you about five

8    times, do you want another one?

9            THE COURT:  No, I've got it.

10   BY MR. ISMAIL:

11   Q.  Exhibit 2637 is the publication by Drs. Mukherjee, Nissen and

12   Topol, which was the next step in your -- after you read the

13   Fitzgerald and Patrono article, you went and picked up this

14   article, correct?

15   A.  Right.  I had read this before and I went back to it.

16   Q.  We'll come back to the substance of this in a minute, but do I

17   have it correct that the major benefit to you in this article was

18   that it directed your attention to the online materials of the FDA

19   advisory committee?

20   A.  That's correct.

21   Q.  And, I guess, just to note where that is, if you go to the

22   reference list, you see a series of notes that direct the reader to

23   the online background packages for the advisory committee, right?

24   A.  Yes.

25   Q.  And then you yourself went to go take a look at those, correct?

1   A.  That's correct.

2   Q.  Doctor, is Exhibit 364 one of the medical officer review

3   documents that you accessed online after reading the article in

4   JAMA?

5   A.  Yes.

6   Q.  And this was authored by Dr. Targum?

7   A.  That's correct.

8   Q.  And pursuant to whatever the system is at FDA, it goes through

9   her supervisors and essentially comes out of her reviewing

10  division, right?

11  A.  Yes.

12  Q.  And you understood that this briefing package was a

13  cardiovascular review of Vioxx, right?

14  A.  Correct.

15  Q.  And the purpose of this background package was as a primer of

16  some of the issues for the benefit of the FDA scientists and the

17  advisory committee members themselves.

18  A.  I would say it slightly differently.  I would say it was the

19  FDA officer's independent review of the data that had been

20  submitted by Merck to the FDA.

21  Q.  You believe that the FDA scientists who helped prepare this

22  report did a magnificent job looking at the studies on Vioxx,

23  right?

24  A.  I believe -- I know I've said that.  I think they did a very

25  thorough job, as far as I'm aware, of evaluating in this case the

1    cardiovascular data about the VIGOR trial.

2    Q.   Okay.  So we have, in your prior words, a magnificent job, very

3    thorough job.  So Dr. Targum has done this very thorough review of

4    the cardiovascular data for the benefit of FDA and the advisory

5    committee, right?

6    A.   Yes.

7    Q.   So -- and this analysis includes many of the things you talked

8    about yesterday, for example, the updated data set with 20 MIs on

9    Vioxx in the VIGOR study, correct?

10   A.   Correct.

11   Q.   Breakdown of aspirin indicated, non-aspirin indicated; that's

12   included in here, correct?

13   A.   Right.  And I believe she -- I believe in this memo she says

14   that's a post hoc finding, it may be a subsequent FDA analysis.

15   Q.   She talks about studies 085 and 090 that you mentioned

16   yesterday, right?

17   A.   She does.  There's very little discussion of the ADVANTAGE

18   trial, which was completed approximately the same time that VIGOR

19   was, but the data hadn't been submitted to the FDA at this point.

20   Q.   So going back to you and your office in Massachusetts in 2001.

21   You've picked up the Targum report, you've read it, thought about

22   the issues, and the information that you obtained from the FDA web

23   site led you to conclude that the benefits of Vioxx outweighed its

24   risks, right?

25   A.   That's wrong twice.

1   Q.  Take them one at a time.

2   A.  One at a time is, it wasn't in my office in Hamilton,

3   Massachusetts, where I figured this out.  In the second half of

4   2001, I was working as a physician half time and preparing to write

5   a book, a different book about doctor/patient relationships, but

6   was only working as a clinician half time and had half time to do

7   research.  And it was in my free time, time free from clinical

8   practice, that I was able to spend an enormous amount of time going

9   through this data to figure out what the data meant.  And I think

10  you had it backwards, going through this data and concluded that

11  the risks outweigh the benefits, not the benefits outweigh the

12  risks.

13  Q.  I apologize, I meant to say it the other way.

14  A.  I believe you did, I'm not sure.

15  Q.  I'll just rephrase for the sake of the record.  So wherever you

16  were sitting and however long it took you to go over this material

17  with your other duties, you concluded that the -- from the material

18  the FDA had, you concluded the risks outweighed the benefits?

19  A.  I concluded that from a cardiovascular point of view the risks

20  outweighed the benefits.

21  Q.  Okay.

22  A.  But did not have access to the data to perform such an analysis

23  on the GI side of the equation.

24  Q.  Now, you testified yesterday to your opinion regarding the

25  standards for conducting risk benefit analyses for medicines,

1    right?

2    A.  I believe so.

3    Q.  When you concluded in 2001 that from a cardiovascular

4    perspective the risks of Vioxx outweighed its benefits, were you

5    applying the same standard you opined about yesterday?

6    A.  What the data that Dr. Targum presents in the memo shows is

7    that there was a statistically significant increase in the risk of

8    cardiovascular events for patients taking Vioxx in the VIGOR trial

9    compared to those taking Naproxen, and that that statistically

10   significant finding held for patients who did and did not have a

11   prior history of heart disease.  And given that Vioxx provides no

12   advantage in efficacy for the treatment of symptoms, the

13   cardiovascular risk, the significant cardiovascular risk, the 2.3,

14   2.4 times risk of cardiovascular events, outweighed or -- had to be

15   put into the equation of risk benefit.

16   Q.  I don't want to debate with you what the data shows and doesn't

17   show because we will be here all day.  I had a different question.

18         I just want to know, when you gave an opinion yesterday

19   as to the standards that should be employed for risk benefit

20   analysis, the opinion you gave yesterday is that the standard you

21   employed in 2001, when you concluded from a cardiovascular

22   perspective the risks of Vioxx outweighed its benefits?

23   A.  I think it's the same kind of approach, but it was impossible

24   to do in the VIGOR trial data because the population was not

25   representative of the population to which the data was going to be

1    applied, and the information was incomplete because the GI

2    information, the risk of complicated GI events wasn't accessible.

3    Q.  So the -- you conclude, based on whatever standards you apply

4    to doing risk benefit analysis, from a CV perspective the risks

5    outweigh the benefits.  Dr. Targum, who you thought did a

6    magnificent, thorough job, necessarily disagreed with that

7    conclusion, right?

8    A.  I'm sorry?

9    Q.  Dr. Targum never wrote in her review that the risks of Vioxx

10   outweigh its benefits, correct?

11   A.  She was looking at the cardiovascular issues, and from a

12   cardiovascular point of view her opinion was that it appeared -- I

13   think she said at one point, based on the difference in the

14   incidence of serious thrombotic cardiovascular events, or that

15   difference might lead one to conclude that Naproxen was the

16   preferred drug and she underlined preferred.

17   Q.  Right.  But nowhere did Dr. Targum suggest that Vioxx should

18   not be used going forward, correct?

19   A.  Well, you can't -- she's reviewing it from a cardiovascular

20   point of view and that's not the whole story.  You need to know the

21   GI side of the equation.  And the GI side of the equation was

22   available nowhere in these documents.  To the best of my knowledge,

23   the FDA didn't make a table of the GI side of the equation.  You

24   can't equate PUBs with serious cardiovascular events.  PUBs are not

25   serious events.  I was noticing, I think Dr. Valada said in the

1    assessment of the ADVANTAGE study that about 25 percent of PUBs are

2    really serious.  So you don't have the -- you can't make the

3    equation because you don't have the data.

4           MR. ISMAIL:  Judge, I was following the approach of

5    yesterday not trying to interrupt the witness, but...

6           THE COURT:  Well, let's listen to the question and see if

7    you can answer the question so that we can get out of here sometime

8    relatively soon.

9           THE WITNESS:  Okay.

10   BY MR. ISMAIL:

11   Q.  Let's see if we can get back on track and move forward.

12          Dr. Abramson, 2001, picks up Targum, thinks from a CV

13   perspective risks outweigh the benefits, right?

14   A.  Absolutely.

15   Q.  Dr. Targum who wrote the report does not say from a CV

16   perspective that the risks outweigh the benefits, correct?

17   A.  That's not true.

18   Q.  That's how you read Targum's report?

19   A.  Well, I just quoted her.

20   Q.  Right.  She says a warning would be a good idea, Naproxen may

21   be a good drug to use?

22   A.  No, that's not what happened -- she is not weighing the risks

23   and benefits.  She is analyzing the cardiovascular data.

24   Q.  So, then, Dr. Targum prepares her report, the FDA never

25   concluded that the risks of Vioxx outweighed its benefits in 2001,

1  correct?

2  A.  That's correct.

3  Q.  And the article we were looking at by Drs. Mukherjee, Nissen

4  and Topol, Dr. Nissen was on the advisory committee, right?

5  A.  Yes.

6  Q.  And the advisory committee members never concluded that from a

7  CV perspective the risks of Vioxx outweighed its benefits, right?

8  A.  From a purely CV perspective?

9  Q.  Right.

10  A.  I'm not -- I would have to see the discussion.

11  Q.  And then, so in this article that they wrote in 2001, Drs.

12  Mukherjee, Nissen and Topol, do they write that the data showed

13  that the risks of Vioxx outweighed its benefits?

14  A.  They didn't.  But again, I think it's very important to

15  remember that the other side of the equation isn't coming into the

16  picture at all, that there's not a significant reduction in

17  complicated PUBs for people not taking steroids concurrently.

18  Q.  The Mukherjee article does lay out a cardiovascular concern

19  with Vioxx, right?

20  A.  Yes, it says there needs to be more investigation.

21  Q.  Anyone who read the Mukherjee article published in JAMA in 2001

22  would understand that one of the explanations for VIGOR was that

23  Vioxx increased the risk of thrombotic events, correct?

24  A.  They would understand, they might get it from that reference.

25  But it's unlikely that a reader that wasn't really an expert in

1    this would have that statement trump the reassurances that were

2    presented in the *New England Journal of Medicine*.

3    Q.  I didn't ask you about who would win in a battle between JAMA

4    and the *New England Journal of Medicine*.  I have a very specific

5    question, sir, and it may sound familiar to you from another time

6    that you and I met.

7            Anyone who read the Mukherjee article published in JAMA

8    in 2001 would understand that one of the explanations for VIGOR was

9    that Vioxx increased the risk of thrombotic events, true?

10   A.  Would read that statement in JAMA, but that perspective was

11   being drowned out by other statements that were being made in, it's

12   not a matter of JAMA versus *New England Journal* but made in the *New*

13   *England Journal* and reiterated widely, and for which a warning

14   letter was issued by DDMAC.

15   Q.  The monographs, I think actually you looked at a single

16   monograph yesterday in court, from Provider Synergies.  You looked

17   at others or not?

18   A.  Yes.

19   Q.  You know that Provider Synergies' monographs discuss the

20   Mukherjee JAMA article, correct?

21   A.  They did --

22   Q.  Yes or no.

23   A.  Yes.

24   Q.  The Mukherjee article, do you have it in front of you?

25   A.  Yes.

1   Q.  Yesterday you told the court that if someone needed to make a

2   risk benefit decision about Vioxx, they would need to know that the

3   relative risk from VIGOR for thrombotic events was 2.38.  Do you

4   recall saying that?

5   A.  Yes.

6   Q.  Does the JAMA article in the abstract show that the relative

7   risk for thrombotic events in VIGOR was 2.38?

8   A.  Yes, that data is presented in the article.

9   Q.  Yesterday when you were discussing what data someone would need

10  to know to make a risk benefit analysis on Vioxx, you would need to

11  know 085 and 090, right?

12  A.  Yes.

13  Q.  Does the Mukherjee article published in JAMA include a

14  discussion of 085 and 090?

15  A.  Yes.  Some of the data is presented.

16  Q.  You mentioned statistical significance, and just so you and I

17  can get on the same page with statistical significance, sometimes

18  statistical significance is reflected as a p-value, correct?

19  A.  Correct.

20  Q.  Have you seen sometimes scientists when they report data from a

21  study give a relative risk and a confidence interval?

22  A.  Yes.

23  Q.  And by convention, if the confidence interval goes on either

24  side of one, we would say that result is not significant?

25  A.  Yeah, if both the boundaries of the confidence interval are on

1    either side of one, I'm sorry, is significant.  Is that what you

2    said?

3    Q.  So, well, let's make sure I understand.  If you have a relative

4    risk and a confidence interval and both boundaries of that

5    confidence interval span one, is that result significant?

6    A.  If the confidence interval crosses one it's not significant.

7    Q.  Great.  Now we're on the same page.

8          You testified yesterday that the -- well, yesterday when

9    you were going over the data from VIGOR, you actually put up

10   several of Dr. Targum's own tables, right?

11   A.  Yes.

12   Q.  And that means you have, I assume that means you have some

13   confidence in her ability to accurately reflect the calculations?

14   A.  Right.  And that Merck accurately submitted their results.

15   Q.  And you testified several times yesterday that with the

16   inclusion of the three additional heart attacks, the difference

17   between Vioxx and Naproxen for non-aspirin indicators was

18   statistically significant.

19   A.  That's a shortening of my testimony, which misstates it.

20   Q.  Okay.  Would you like to look at your testimony?  Well, first

21   of all, maybe we can short circuit this.  Are you claiming that

22   even with the inclusion of the three heart attacks, the difference

23   between Vioxx and Naproxen for non-aspirin users was statistically

24   significant?

25   A.  What I'm claiming is that, (A), heart attacks themselves were a

1    post hoc outcome measurement, the outcome measure was serious

2    thrombotic cardiovascular events.

3             But given that and looking at heart attacks, what I'm

4    claiming is that with the additional three heart attacks, it's not

5    statistically valid to look at the statistical significance in the

6    aspirin non-indicated subgroup, and therefore, the finding that for

7    aspirin non-indicated patients, there was not significant, a

8    significant increase in the risk of heart attacks associated with

9    Vioxx, is an irrelevant finding; and to bring it out as a finding

10   that states -- from which one could conclude that Vioxx is safe in

11   that subgroup of aspirin non-indicated patients not causing MIs is

12   not a statistically valid statement, and you have to look at the

13   group as a whole and the risk of MI, albeit post hoc, the risk of

14   MI for the population as a whole is statistically significant, and

15   therefore, that risk carries to the population as a whole, you

16   can't subdivide it.

17   Q.   Okay.  So looking at your sworn testimony yesterday, when you

18   said:  "Those events were significantly elevated in the patients

19   taking Vioxx, whether or not they were aspirin indicated."

20   A.   What I'm meaning there is that you have to look at the

21   population as a whole and that their aspirin-indicated status is

22   irrelevant.  For the population as a whole, the risk of MI was

23   significantly greater in those taking Vioxx, and the fact that

24   there's not significant heterogeneity between the aspirin-indicated

25   and the aspirin non-indicated group shows that you cannot subdivide

```
1   that population.
2   Q.  So just so we're clear, every time yesterday that you swore
3   under oath that the difference was significantly elevated in
4   patients not taking aspirin, you were meaning to say it wasn't
5   statistically valid, right?
6   A.  No.  What I was meaning to say is that the statistically
7   significant increase -- what I was meaning to say was that the
8   statistically significant increase in the risk of heart attack in
9   people taking Vioxx in the VIGOR trial pertained to the population
10  as a whole, and a subpopulation could not be legitimately addressed
11  and claimed to be free of that risk.
12  Q.  And just so I am clear so there's no ambiguity whatsoever, you
13  know, because Targum reported it, that in the non-aspirin indicated
14  group, whether you think it's a valid analysis or not, there was
15  not a statistical difference in heart attacks comparing Vioxx to
16  Naproxen, true?
17  A.  That's a -- yes, Targum says that, that's a post hoc division,
18  which does not have statistical validity, and the editors of the
19  New England Journal of Medicine when they wrote their expression of
20  concern made that very career.
21          MR. ISMAIL:  Move to strike, your Honor.
22          THE COURT:  Strike.
23  BY MR. ISMAIL:
24  Q.  Sir, the vast majority of people who took Vioxx suffered no
25  adverse event as a result, true?
```

1   A.  Yes.

2   Q.  There are -- during the time that Vioxx was on the market,

3   there were different treatment options for the conditions for which

4   Vioxx was prescribed, right?

5   A.  Yes.

6   Q.  The different COX-2 inhibitor was an alternative treatment?

7   A.  Yes.

8   Q.  Traditional NSAIDs were an alternative treatment option?

9   A.  Yes.

10  Q.  Narcotic pain relievers were an alternative treatment option?

11  A.  Yes.

12  Q.  Each of those alternative treatment options carried their own

13  risks, correct?

14  A.  They did and that risk was proportional to the dosage of the

15  drug, as well as the drug itself.

16  Q.  Some of those treatment options to Vioxx carry risks that Vioxx

17  does not have, right?

18  A.  Yes.

19  Q.  Certainly individual patients have individual response to

20  medicine, correct?

21  A.  That's correct.

22  Q.  For one patient a particular medicine will work great and for a

23  different patient for the same condition that medicine may not work

24  at all, right?

25  A.  There is a spread around the mean, yes.

1  Q.  And it's true on the tolerability side as well, for particular

2  medicine that may be well tolerated by a patient and then a

3  different patient for the same condition and the same medicine

4  might not be well tolerated, right?

5  A.  Yes.

6  Q.  Certainly there are individual patients who took Vioxx who

7  received greater efficacy than other options than they -- let me

8  restate that.

9          There are patients who took Vioxx who received greater

10  efficacy than they would have if they had taken other options,

11  right?

12  A.  That is certainly true, and yet in any case or for any

13  physician, one can't know whether it's the drug or a placebo effect

14  that is providing that benefit.

15  Q.  Turning now to the P&T Committee.  You understand the P&T

16  Committee for Louisiana Medicaid considered the COX-2 class of

17  drugs at annual reviews, right?

18  A.  Yes.

19  Q.  And the purpose of those P&T Committee reviews was for the

20  preferred drug list?

21  A.  Yes.

22  Q.  Do you know on how many occasions the Louisiana P&T Committee

23  considered the COX-2 class?

24  A.  I think -- I think at least twice a year.

25  Q.  I'm sorry?

```
1    A.  At least twice a year.

2    Q.  Twice a year?

3    A.  Yes.

4    Q.  So you think the Louisiana -- withdrawn.

5             When, in your understanding of the facts of this case,

6    did the P&T Committee for Louisiana Medicaid first review the COX-2

7    class?

8    A.  The February 2002 monograph and transcript, I believe, is the

9    first I've seen.

10   Q.  And your understanding of the facts is that, thereafter, the

11   P&T Committee reviewed the COX-2 class twice a year at least

12   through September of 2004?

13   A.  I believe that's correct.

14   Q.  By the way, you referenced Mr. Hood's testimony, I think you

15   called it yesterday?

16   A.  Yes.

17   Q.  Did you read his trial testimony?

18   A.  No.  I referenced his affidavit.

19   Q.  So you didn't read either his trial testimony nor either of his

20   depositions; is that correct?

21   A.  I believe that's correct, yes.

22   Q.  But even in Mr. Hood's affidavit, it's reflected there that he

23   left the department in February of 2004, correct?

24   A.  I believe that's true.

25   Q.  And do you have any idea who took Mr. Hood's place and was
```

1    involved in decision-making after February of 2004?

2    A.  No, I don't.

3    Q.  Now, the 2002 preferred drug list decision, you said that's the

4    first one you're aware of?

5    A.  Yes.

6    Q.  Provider Synergies recommended that Vioxx not be on the

7    preferred drug list, correct?

8    A.  Yes.

9    Q.  The February 2002 Provider Synergies monograph does not explain

10   the basis of the recommendation for Vioxx to be excluded from the

11   preferred drug list, true?

12   A.  Yes.

13   Q.  You have not seen anything from any source that describes the

14   basis upon which Vioxx was excluded from the preferred drug list

15   for the Medicaid program, right?

16   A.  There may have been referenced pricing in the transcript of the

17   meeting, I can't recall.

18   Q.  You understand Bextra was recommended to be on the preferred

19   drug list?

20   A.  Yes.

21   Q.  What was the scientific information that would have led to

22   Bextra being justified to be on the preferred drug list?

23   A.  Well, I think that the transcript reveals that it's kind of all

24   things equal.  The committee looked at pricing and, based on the

25   monographs, there was not a way to differentiate the COX-2

1    inhibitors.

2    Q.  In 2003 Provider Synergies recommended that Vioxx be on the

3    preferred drug list?

4    A.  Yes.

5    Q.  You don't know what information DHH looked at in deciding

6    whether to add Vioxx to the PDL, true?

7    A.  There's some discussion, I can't remember the date, about

8    premium pricing for Celebrex and that Celebrex, therefore, is not

9    on the list.  And I think it's at that time that Vioxx got put on

10   the list.

11   Q.  Do you still have your transcript up there?

12   A.  Yes.

13   Q.  Page 188.

14   A.  This is of the deposition?

15   Q.  Yes, sir.  Tell me when you're there.  Are you there?

16   A.  188.

17   Q.  Yes, sir, line 2.  "Q. Do you know what information the

18   Department of Health and Hospitals looked at in deciding whether to

19   add Vioxx to the preferred drug list?  A. I don't know."

20        Were you asked that question and did you give that

21   answer?

22   A.  I did.  And --

23   Q.  Do you --

24   A.  Yeah.

25   Q.  You do not know the basis of the P&T Committee's recommendation

1    to put Vioxx on the preferred drug list in 2003, true?

2    A.  Well, like I said, there was discussion about the premium

3    pricing of Celebrex and not -- the exact language is something like

4    not enough to change the dollar sign in the recommendation.

5           MR. MURRAY:  Your Honor, objection to this line of

6    questioning.  It goes beyond the opinions that he offered.  In

7    fact, he wasn't allowed to offer any opinions as to what was in the

8    mind-set of the State of Louisiana or Merck or anybody else.

9           THE COURT:  I understand.  Some of this goes to

10   credibility calls.

11          MR. ISMAIL:  Thank you, Judge.

12          MR. MURRAY:  Thank you.

13   BY MR. ISMAIL:

14   Q.  Sir, I am going to hand you your second deposition transcript,

15   turned over to page 142.  This deposition was actually only about

16   ten days ago, right?

17   A.  Yes.

18   Q.  And at line 6:  "Q. Do you know the basis of the P&T

19   Committee's recommendation to put Vioxx and Bextra on the PDL and

20   Celebrex off in 2003?  A. No."

21          Were you asked that question and did you give that

22   answer?

23   A.  I did.

24   Q.  Do you know the basis of the Department of Health and

25   Hospitals' decision to put Vioxx and Bextra on the PDL in 2003 and

1    Celebrex off?

2              THE COURT:  That's your question now?

3              MR. ISMAIL:  That's a question now.  Maybe you didn't

4    understand.

5              THE WITNESS:  I'm sorry, can you start again?

6    BY MR. ISMAIL:

7    Q.  Do you know the basis of the Department of Health and

8    Hospitals' decision to put Vioxx and Bextra on the PDL in 2003 and

9    Celebrex off?

10             MR. MURRAY:  Asked and answered.

11             MR. ISMAIL:  The first was the basis of the P&T

12   Committee's recommendation, and now I'm asking as to the

13   department.

14             THE WITNESS:  I'm sorry, I've lost the sequence.  I am

15   not sure whether you -- I thought you were asking me what's in the

16   transcript as opposed to what my understanding is as I sit here

17   now.  Can we go over --

18             MR. ISMAIL:  I actually did read the next question, but

19   let me just ask it and you can give your answer; and if I have to

20   refer to the deposition, I will, okay?

21             THE WITNESS:  So you're asking me right now as I sit

22   here?

23             MR. ISMAIL:  I'm asking you right now.

24   BY MR. ISMAIL:

25   Q.  You do not know the basis of the Department of Health and

1  Hospitals' decision to put Vioxx and Bextra on the PDL in 2003 and

2  Celebrex, off, true?

3  A.   The minutes of the P&T Committee meeting say that Celebrex is

4  being offered at a premium price, and I assume that that played

5  some role in their decision-making.

6  Q.   Twelve days ago were you asked the following question and did

7  you give the following answer under oath:  "Do you know the basis

8  of the Department of Health and Hospitals' decision to put Vioxx

9  and Bextra on the PDL in 2003 and Celebrex off?  A. No."

10         Were you asked that question and did you give that

11  answer?

12  A.   Yes.

13         MR. ISMAIL:  Your Honor, about ten more minutes.

14  BY MR. ISMAIL:

15  Q.   Am I correct, sir, that you have not seen any information to

16  indicate what the P&T Committee actually reviewed and relied upon

17  in making recommendations with regard to Vioxx for the Louisiana

18  PDL?

19  A.   Well, I think that the materials that were presented to

20  Provider Synergies or that Provider Synergies integrated into their

21  recommendations were published articles, the label and

22  communications from Merck, and Dr. Fran Kaiser called on the P&T

23  Committee and provided information as well.

24  Q.   If you would turn to page 191 of the first volume, please.

25         MR. MURRAY:  Your Honor, again, I don't think the witness

1   is offering an opinion as to what the totality of the material

2   reviewed by the P&T Committee were.  It's beyond the scope of his

3   opinions.

4           THE COURT:  Well, it's not a question of opinion at this

5   point, it's a question of his credibility.  That's the issue that

6   counsel is making.

7   BY MR. ISMAIL:

8   Q.  At line 3, were you asked the following question:  "Nor have

9   you seen any information to indicate what the P&T Committee

10  actually reviewed and relied upon in making recommendations with

11  regard to Vioxx for the Louisiana PDL, correct?  A. That's

12  correct."

13          Were you asked that question and did you give that

14  answer?

15  A.  Well, I was.  And there's, you know, what did they actually

16  review and rely upon, I wasn't there and I don't know what they

17  looked at.  What I know is that the statements that have been made

18  are that there were three sources of evidence that were relied

19  upon:  the published articles, the label and communications from

20  Merck.

21  Q.  Right.  You're talking about Provider Synergies now, correct,

22  not the P&T Committee?

23  A.  Yes.  And that the P&T Committee generally followed Provider

24  Synergies' recommendations.

25  Q.  There was actually another source of information, Doctor,

1    wasn't there, information Pfizer gave the department?

2    A.  Well, information --

3    Q.  The only question, sir, is, are you aware that the Department

4    of Health and Hospitals, when they were making decisions as to

5    COX-2 drugs, also had information from Pfizer?

6    A.  Yes.

7    Q.  Is Exhibit 2101 a letter from Pfizer addressed to M.J.

8    Terrebonne, copied to Secretary Hood?

9    A.  Yes.

10            MR. ISMAIL:  Your Honor, we move the admission of Exhibit

11   2101.

12            MR. MURRAY:  Your Honor, there's been no foundation laid

13   for the exhibit.

14            THE COURT:  If Ms. Terrebonne was asked that question, I

15   think it's a valid question.  But to put this witness on and say,

16   here is a letter from Ms. Terrebonne -- or to Ms. Terrebonne from

17   Pfizer and then you produce it, I mean, what does this witness know

18   about it other than that this is a letter?

19            MR. ISMAIL:  Your Honor, we have the deposition of

20   Ms. Terrebonne where she identifies receipt of the letter.

21   Obviously, plaintiffs didn't submit her testimony, we are.  If you

22   believe because it's not offered yet because it's not our case, you

23   don't want me to go through it with this witness I'll move on.

24            THE COURT:  Okay.  Let's move on.

25            MR. ISMAIL:  Yes, sir.

```
1    BY MR. ISMAIL:

2    Q.  So let's short circuit this discussion and just let me ask this

3    question:  When you were giving your opinions as to what

4    information the Department of Health and Hospitals or the P&T

5    Committee had with respect to COX-2 inhibitors, did you consider

6    the information the department may have received from Pfizer?

7    A.  The department was receiving information from drug companies.

8    My understanding is that what was in the monographs, what was

9    presented by Provider Synergies to the department was what counted.

10   Q.  Did you look to see what information Pfizer sent to either

11   Provider Synergies or the Department of Health and Hospitals about

12   COX-2 inhibitor drugs?

13   A.  I didn't see that.

14   Q.  Last topic.  You certainly agree that Celebrex increases the

15   risk of cardiovascular thrombotic events, right?

16   A.  It probably does.

17        MR. MURRAY:  Your Honor, objection, you ruled Celebrex

18   out of the case, we didn't ask him any opinions.

19        MR. ISMAIL:  If you want me to address that I will, but

20   it's -- what we talked about was his opinions about Pfizer at the

21   prior hearing.  And in any event, what the department did with

22   information about Celebrex is probative about what they would have

23   done with information about Vioxx.

24        THE COURT:  This is an issue that I think has some

25   relevance.  I'll overrule the objection and allow it.
```

1          MR. MURRAY:  Thank you, your Honor.

2          MR. ISMAIL:  I apologize, sir, I don't know if I got an

3     answer to the question.

4          THE WITNESS:  Let's start over.

5     BY MR. ISMAIL:

6     Q.  Sure.  You agree that Celebrex increases the risk of

7     cardiovascular thrombotic events?

8     A.  There is evidence that it does, though that evidence is not

9     nearly as strong as it is for Vioxx.

10    Q.  You believe Celebrex has no proven GI benefit, right?

11    A.  The CLASS study showed that the primary outcome measure of

12    reduction of complicated PUBs was not statistically significant.

13    Q.  And complicated PUBs, I think a moment ago you told me those

14    are the ones that matter, right?

15    A.  Those are the ones that matter.

16    Q.  So applying the risk benefit standard that you testified to

17    yesterday, it's certainly true that you think Celebrex is

18    appropriate only for the vast minority of patients who take it,

19    right?

20    A.  That's true.  The cardiovascular risk of Celebrex did not

21    become apparent until 2004, I believe.

22    Q.  Certainly under your risk benefit rubric, you don't think

23    Celebrex should be a widely used or preferred drug, right?

24    A.  I do not.

25    Q.  Am I correct?

1   A.  You are.

2   Q.  Certainly you know from your review in this case that the drug

3   Celebrex was placed on the Louisiana preferred drug list, right?

4   A.  Yes.

5   Q.  And you know from your review in this case that in 2005

6   Celebrex received a black box on its package insert, right?

7   A.  Yes.

8   Q.  With an explicit cardiovascular warning right there in the

9   black box, right?

10  A.  Yes.

11  Q.  Exhibit 2165 is a listing as late as 2008 from Louisiana

12  Medicaid showing what drugs were on the preferred drug list.

13          MR. ISMAIL:  Your Honor, we move the admission of Exhibit

14  2165.

15          THE COURT:  I'll admit it.

16          MR. MURRAY:  No objection.

17  BY MR. ISMAIL:

18  Q.  Do you have that in front of you, sir?

19  A.  I do.

20  Q.  If you would turn, just so we are oriented here, this is a

21  November 2008 update, and then it's got therapeutic classes, tells

22  you what drugs are on the preferred drug list, tells you which

23  drugs are available but only through prior authorization.  Do you

24  see that?

25  A.  Yes.

1    Q.  I would like to turn your attention, if I could, unfortunately,

2    these aren't numbered so if you want to follow along, but it's the

3    15th page of the exhibit, I'll put it on the screen if that's

4    easier to see.  And I am going to ask you to turn to the section

5    entitled Pain Management.  Are you there?

6    A.  Yes.

7    Q.  So we have the listing from 2008 from Louisiana for Pain

8    Management, and if you turn to page 16, you'll see the section on

9    Nonsteroidals.

10   A.  Yes.

11   Q.  And if you look, can you please confirm, sir, that in as late

12   as 2008, Louisiana Medicaid had Celebrex on its preferred drug

13   list?

14   A.  I'm sorry, the question?

15   Q.  Does this exhibit reflect that as late as 2008 Celebrex was on

16   the Louisiana Medicaid preferred drug list?

17   A.  It does.

18        MR. ISMAIL:  Your Honor, we have no further questions.

19   Thank you.

20        THE COURT:  All right.  We will take a 15-minute break.

21   The court will stand in recess 15 minutes.

22        MR. MURRAY:  We have no redirect, your Honor.

23        MR. ISMAIL:  Your Honor, he says they have no redirect.

24        THE COURT:  Oh, you have no redirect.  Okay.  Thank you,

25   Doctor, you're excused.

```
 1              THE MARSHAL:  All rise.

 2         (WHEREUPON, A RECESS WAS TAKEN.)

 3         (OPEN COURT.)

 4              THE COURT:  Okay.  Be seated, please.  Call your next

 5    witness.

 6              MR. MURRAY:  Your Honor will be glad to hear that

 7    plaintiffs are just about ready to rest and that we have no more

 8    live witnesses.

 9              THE COURT:  Okay.  But you're going to call witnesses by

10    depositions now?

11              MR. MURRAY:  That's correct, your Honor.  And those

12    witnesses are Fran Kaiser --

13              THE DEPUTY CLERK:  Would you spell the last name.

14              MR. MURRAY:  K-A-I-S-E-R, who is regional medical

15    director for Merck.  Dr. Kerry Edwards, and that's Kerry,

16    K-E-R-R-Y, another regional medical director for Merck.

17              THE DEPUTY CLERK:  Can you give me the dates on those

18    depos, do you have them?

19              MR. MURRAY:  Do we have the deposition dates?

20              THE DEPUTY CLERK:  You can give them to me after.

21              MR. MURRAY:  I'll give them to you after.  Stephen

22    Shearer, S-H-E-A-R-E-R.  And if you want to know who these people

23    are, your Honor, I will be happy to give your Honor some

24    information on them.

25              Mr. Shearer is on national account executive who had --
```

1    employee of Merck who had interface with Provider Synergies.

2    Dr. Kaiser was a regional medical director who had interface with

3    members of the P&T Committee.  Dr. Edwards is a regional medical

4    director who had interface with Provider Synergies.

5            Then we have Allan Goldberg.  Allan Goldberg is another

6    regional medical director, his testimony is offered just for a

7    limited purpose, your Honor, which is the preparation of a dossier

8    that was submitted to the University of Louisiana at Monroe and

9    there's some -- your Honor will see deposition testimony going

10   either way as to whether that ever made its way to Provider

11   Synergies.

12           And then Warren Lambert.  Warren Lambert is a -- and I

13   believe his title is business director.  He was assigned to the

14   ARKLATEX region, he was a type of manager relatively -- I don't

15   want to mischaracterize where he stands in the chain of command,

16   but he oversaw a sales force for a region that included Louisiana,

17   and he's offered for documents that he drafted with respect to

18   directing the sales force in its interactions with the Louisiana

19   P&T Committee.

20           Those are all -- and then there's one other issue that I

21   would like to bring to your Honor's attention.  I brought it to

22   opposing counsel's attention and I don't know what their response

23   is.

24           MR. ISMAIL:  Go ahead and make the offer.

25           MR. MURRAY:  The issue, your Honor, Melwyn Wendt was the

1   head of Louisiana Drug Utilization Review program.  After your

2   Honor ruled the Drug Utilization Review was out of the case, we

3   pulled her down.  The defendants originally said we're going to

4   affirmatively designate her and then decided to pull her down.

5          Just now the questions about Celebrex remaining on the

6   preferred drug list raised just one question, one issue in her

7   testimony that I would like to bring to the court's attention and

8   have in the record.  I don't think the Celebrex issue is much of an

9   issue in this case, but having been opened I would just like to put

10  it in the record.  Your Honor, I don't want to make you do more

11  work, so I can tell you if you don't read it, it's not going to

12  hurt my feelings, but I would like to get it in the record, and

13  that is Ms. Wendt's testimony that while Celebrex had preferred

14  drug list placement, it was subject to controls by the DUR and she

15  specifies what those controls are.

16         Since Celebrex has been brought up by counsel, I would

17  like to put that issue in.  I informed counsel of that just now,

18  they said they were going to huddle up and get back to me on their

19  position on that.

20         MR. ISMAIL:  Your Honor, our position is since you ruled

21  DUR out of the case in the original motion for summary judgment and

22  the denial for reconsideration, rightly so since we believe the

23  issue is exclusive formulary, not on formulary with restrictions;

24  and both sides pulled down Ms. Wendt's deposition, the examination

25  of Mr. Hood may have gotten into those issues if indeed counsel was

1    going to make them.

2            But I'll leave it up to the court.  I understand Stephen

3    wants to protect his appellate record, if you want to make it a

4    court exhibit, I don't know how you want to handle it.  We object

5    to the testimony as being relevant but understand plaintiffs want

6    to preserve the record.

7            THE COURT:  All right.  I'll allow it.

8            MR. MURRAY:  Thank you, your Honor.  And finally, your

9    Honor has actually already seen this deposition but we never

10   formally introduced it on the record and this is Dr. Edward

11   SCULNICK who is the president of Merck research labs, and I think

12   your Honor is familiar with his testimony.

13           THE COURT:  Very.

14           MR. MURRAY:  Probably painfully so.

15           Then we have a stipulation that we would like to --

16           THE COURT:  First off, I'll admit those depositions.

17           THE DEPUTY CLERK:  We're going to file them, right?

18           THE COURT:  We're going to tile them, that'll be part of

19   the record and be part of the testimony.

20           MR. MURRAY:  Your Honor, those depositions are in the

21   format that, for instance, the defendant's depositions that you had

22   to review to get their video together are in, they have the

23   objections listed and your Honor can rule on the objections as you

24   read them.

25           THE COURT:  Right.

1          MR. MURRAY:  And then, let's see SCULNICK.  We have the

2    stipulation which we can read into the record or just give it to

3    your Honor, it's a stipulation as to the amount of expenditures for

4    Vioxx by the State of Louisiana from the period June 13, 2001 to

5    September 30th, 2004.

6          THE COURT:  All right.  And you've seen the stipulation,

7    you all are agreeable to it?

8          MR. ISMAIL:  Yes, sir.

9          THE COURT:  All right.

10         MR. MURRAY:  And there are reservations on both sides as

11   to the significance of that figure, but that is the figure that

12   Louisiana is submitting as its proven -- redhibitory remedy.

13         THE COURT:  Plaintiff Stipulation No. 1.

14         Okay.  Let's make sure we have those depositions and the

15   stipulation in the form and fashion.

16         THE DEPUTY CLERK:  Judge, it's marked stipulation of the

17   parties.  Do you want it to be Plaintiff's No. 1?

18         THE COURT:  I can put stipulation of the parties, that's

19   fine.  Let's make it consistent with the title.

20         THE DEPUTY CLERK:  Okay.

21         MR. MURRAY:  And, your Honor, we finally have the issue

22   of outstanding exhibits that we addressed with your Honor.  Our

23   understanding is that we had furnished to opposing counsel all of

24   the exhibits that we would want to put into this record.  We

25   understand they will be furnishing us with a spreadsheet of

1    objections which will include a space for us to respond to their

2    brief objections, and we will -- as soon as we have that

3    spreadsheet we will put in all of the exhibits with the spreadsheet

4    and your Honor will be able to rule at that time.  Your Honor, will

5    be relieved to know that it is not the entire plaintiff's exhibit

6    list or anything like that, it's considerably culled down.

7            THE COURT:  Okay.

8            MR. MURRAY:  And another issue we have just for the

9    court's edification.  Many of those exhibits are related to certain

10   witnesses or are referenced in certain witness's testimony.  We

11   have some, those exhibits divided out by what deposition they're

12   referenced in for the ones that are referenced or germane to a

13   deposition just for the court's convenience, we can submit them

14   that way so that your Honor will know which ones relate to which

15   depositions.

16           The other thing we have, and the understanding is this

17   would not be going into the record, we are not offering it into the

18   record, but your Honor had indicated at one point in time that in

19   order to understand some testimony if you needed to be able to look

20   at an exhibit that is not being offered into evidence, we have a

21   disk that has all of the exhibits from all of these depositions for

22   the court's reference and understanding testimony but not all of

23   those are being admitted.

24           And we can give that to the court or not, it's up to you,

25   your Honor, we just wanted to let you know that's available.

```
 1          THE COURT:  You can give it to me.  I won't put it in the

 2  record but I may be able to short circuit some things that way.

 3          MR. MURRAY:  And then finally, your Honor, before we rest

 4  subject to your review of the depositions and your review of these

 5  documents, we have our proffers that we discussed this morning,

 6  they'll be Plaintiff's Proffer 1 or I guess LAAG Proffer 1, which

 7  would be the affidavit of Dr. Vincent Culotta; LAAG Proffer 2,

 8  which would be the affidavit of Dr. Richard Doskey; and LAAG

 9  Proffer 3, the affidavit of Dr. Brobson Lutz, L-U-T-Z.

10          THE COURT:  And your proffer is that if these individuals

11  were called, they would testify substantially the same as their

12  affidavit.

13          MR. MURRAY:  That's correct, your Honor.

14          And all of that having been said, I just want to turn to

15  my cocounsel and make sure I haven't forgotten anything?  What have

16  I forgotten?

17          THE COURT:  Let's get with Gaylyn later and make sure

18  we've got all of the material in the form and fashion that you need

19  them to be in.

20          MR. MURRAY:  Okay.

21          THE COURT:  And subject to that.

22          MR. MURRAY:  And one issue is because the Wendt issue

23  just came up, we have all of the defendant's objections, counter

24  designations, and everything to put it in, but we -- because we

25  didn't think we were putting it in have the printed up format and
```

1   we should have that this afternoon and put it in, furnish it to the

2   court this afternoon.  I guess we can say it's officially or

3   however you wants to do that.

4          THE COURT:  Let's proceed.  The plaintiffs have rested

5   and now the defendants have filed a motion, and what I am going to

6   do with the motion is that I am going to assume that they have

7   filed a motion at the appropriate time and submitted the

8   appropriate support and made the appropriate arguments, which they

9   will do at a later time.  But so that we can move the case, let's

10  call a witness.

11         MR. SALES:  Yes, your Honor.  Just one note on the motion

12  issue.  We will also be filing a Rule 52(c) at some point in time

13  in our case.  At this time Merck would call Jerry Wells.

14         THE COURT:  Okay.

15         THE DEPUTY CLERK:  Please step into the witness box.

16  Would you raise your right hand.

17     (WHEREUPON, JERRY WELLS, WAS SWORN IN AND TESTIFIED AS

18     FOLLOWS:)

19         THE DEPUTY CLERK:  Please be seated.  Would you state

20  your name for the record.

21         THE WITNESS:  My name is Jerry Wells, spelled with a J.

22         THE COURT:  Thank you.

23                     VOIR DIRE EXAMINATION

24  BY MR. SALES:

25  Q.  Good morning, Mr. Wells.

1   A.  Good morning, Mr. Sales.

2   Q.  Can you tell the court how you are currently employed?

3   A.  I am currently retired from the State of Florida as the bureau

4   chief for the Medicaid pharmacy program, and currently I am doing

5   some private consulting.

6   Q.  So you're retired and consulting?

7   A.  That is correct.

8   Q.  What position did you hold at Florida Medicaid prior to your

9   retirement?

10   A.  Bureau chief for the pharmacy program.

11   Q.  Did you hold any other positions while you were with the

12   Florida Medicaid?

13   A.  I was for some period a program manager for the pharmacy

14   program and later the bureau chief.

15   Q.  What year did you begin your work with Florida Medicaid?

16   A.  In 1984.

17   Q.  And how many years combined did you serve in your role, either

18   as Florida Medicaid prescription drug program bureau chief or

19   pharmacy manager?

20   A.  I served for 24 years.

21   Q.  Do you have a degree from a university?

22   A.  I do.

23   Q.  What is that degree?

24   A.  The degree, a bachelor of sciences in pharmacy.

25   Q.  From which university?

1    A.  From the University of Florida.

2    Q.  Are you a licensed pharmacist?

3    A.  I am a registered pharmacist is the term.

4    Q.  How long have you been a registered pharmacist?

5    A.  Since 1963.

6    Q.  Have you previously served on a pharmacy and therapeutic

7    committees?

8    A.  I have.

9    Q.  In what role?

10   A.  With the Medicaid program I was the administrator manager for

11   the P&T Committee for Medicaid for the last several years from 2001

12   to 2007 when I retired.  Many years prior to that, I was a member

13   of the Department of Health's P&T Committee for the State of

14   Florida as a representative for the pharmaceutical manufacturers.

15   Q.  What were your responsibilities, generally speaking, with

16   regard to being the bureau chief and pharmacy manager of the

17   Florida Medicaid drug program?

18   A.  Well, in addition to being the administrator for the P&T

19   Committee, I also was the administrator for the Drug Utilization

20   Review Board, I was responsible for day-to-day operations of the

21   prescription drug benefit under Medicaid, legislative bill

22   analysis, budget preparation, those kinds of things.

23   Q.  Did you have responsibility for what we've been talking much

24   about the last few days in this case about implementation of and

25   development of a prior authorization program for the State of

1   Florida?

2   A.  I did, beginning in 2001 and continuing until my retirement.

3   Q.  Are you -- have you been a member of any associations of

4   Medicaid pharmacy administrators?

5   A.  I was and continue to be a member of the Southern Association

6   of Medicaid Pharmacy Administrators, and I was a member of the

7   national or American Medicaid Pharmacy Administrators Association.

8   I served as chair for both of those groups on multiple occasions.

9   Q.  And you mentioned the Southern Association of Medicaid Program

10  Administrators (SIC).  Does that go by the acronym of SAMPA?

11  A.  It does, S-A-M-P-A.

12  Q.  What states are covered by SAMPA?

13  A.  SAMPA goes from Florida to Virginia on the East Coast and

14  includes the Carolinas, Tennessee, Kentucky, Louisiana,

15  Mississippi, sometimes Texas, the borders are not set in stone,

16  Texas participates in the western or the southern group at their

17  choice.

18  Q.  Do you know M.J. Terrebonne of the Louisiana Department of

19  Health and Hospitals?

20  A.  I do.

21  Q.  Is she a member of SAMPA?

22  A.  M.J. Terrebonne participates in the SAMPA organization, yeah.

23  Q.  Have you had much interaction with her and the other Medicaid

24  directors of drug programs from the southern states?

25  A.  Yes.

1   Q.  Have you also had similar interaction with the national

2   organization with states from around the country?

3   A.  Yes.

4   Q.  At these association meetings, have you had discussions

5   concerning exchanging ideas over Medicaid drug program coverage,

6   formulary options and things of that sort?

7   A.  That was one of the purposes for these organizations, yes.

8   Q.  In your role as state Medicaid drug program bureau chief and

9   pharmacy manager for the State of Florida, was it part of your job

10  responsibility to have an understanding of the federal and state

11  regulations that apply to state Medicaid prescription drug

12  coverage?

13  A.  That is a requirement of the job, yes.

14  Q.  And in your role as Florida Medicaid bureau chief, were you

15  integrally involved in the discussions, decisions and

16  implementation of the Florida preferred drug list and the prior

17  authorization program?

18  A.  I was.

19  Q.  Do you have experience with the implementation and operation of

20  both Medicaid open formularies that we've talked about in this

21  case, as well as preferred drug lists, as well as other types of

22  formularies and prior authorization programs?

23  A.  I do.

24  Q.  Was, to your knowledge, the Louisiana drug preferred drug list

25  and prior authorization program modelled after the Florida program

1    that you helped implement?

2    A.  Yes.

3    Q.  Sir, on tab 1 to the binder, I am not sure you have that in

4    front of you.

5    A.  I don't.

6    Q.  Let me bring you a copy.

7              MR. SALES:  May I approach, your Honor?

8              THE COURT:  Yes.

9    BY MR. SALES:

10   Q.  Mr. Wells, in tab ONE OF your binder is DX 2187; is that

11   correct?

12   A.  That's the first page, yes.

13   Q.  Is that a copy of your résumé?

14   A.  It is.

15   Q.  Is that a true and accurate representation of parts of your

16   career?

17   A.  Up-to-date except for what we're doing today.

18   Q.  Based on your qualifications and experience, do you consider

19   yourself to be an expert in the organization, implementation,

20   regulation, and operation of state Medicaid prescription drug

21   programs?

22   A.  I do.

23              MR. SALES:  Your Honor, at this time I would tender

24   Mr. Wells as an expert in the implementation and operation of state

25   Medicaid prescription drug programs and formularies and offer his

1    CV as Defendant's Exhibit 2187.

2              THE COURT:  Any questions on his qualifications?

3              MR. MURRAY:  Yes, your Honor.  Can I get that tender read

4    back, please?  Mr. Sales, could you just -- you said it rather

5    quickly and I just want to make sure I have the tender written down

6    here.

7              MR. SALES:  Can you read it back if he wants to be that

8    precise.

9         (WHEREUPON, THE TENDER WAS READ BACK.)

10             MR. MURRAY:  Your Honor, I have an objection to the CV.

11             THE COURT:  All right.  Let him ask questions on his

12   qualifications.

13             MR. MURRAY:  Can I address the objection to the CV just

14   briefly, your Honor?

15             THE COURT:  Sure.

16             MR. MURRAY:  Mr. Wells' CV, the first page I think is an

17   accurate depiction of his experience.  The second page, more than

18   just referring to his experience seems to offer what are almost

19   opinions about development of prior authorization processes, about

20   different programs and what they encompass, and it's not part of

21   his opinion, I don't think it's a proper curriculum vitae.  If it

22   is admitted, I want to make clear that that's not a part of his

23   opinion, and it's not being offered for any of the reasons that are

24   contained in there.

25             MR. SALES:  Your Honor, this is his résumé that he

1    normally has, it's a description of what he believes is some of the

2    highlights of his career and we tender it for that purpose.

3             THE COURT:  Yes.  I'll introduce it as just his

4    explanation of his experience, not any opinions, and will not put

5    any weight on any statements made other than as they pertain to the

6    depth and nature of his experience.

7             MR. MURRAY:  And, your Honor, I would like to voir dire

8    the witness if I may?

9             THE COURT:  Please.

10                         TRAVERSE EXAMINATION

11   BY MR. MURRAY:

12   Q.  Good morning, Mr. Wells.  My name is Stephen Murray, I

13   represent the State of Louisiana and the Louisiana Department of

14   Health and Hospitals.

15            Sir, have you ever been employed by the Louisiana

16   Department of Health and Hospitals?

17   A.  I am having trouble understanding you.

18   Q.  I apologize.  Sir, have you ever been employed by the Louisiana

19   Department of Health and Hospitals?

20   A.  I have not.

21   Q.  Do you have any personal experience in the implementation and

22   development of the Louisiana Department of Health and Hospitals

23   prior authorization program?

24   A.  I did not, except providing some information to the department

25   before their implementation.

```
 1   Q.  Sir, do you have a law degree?
 2   A.  I do not.
 3   Q.  Do you consider yourself an expert in the interpretation of
 4   Louisiana statutes?
 5   A.  I do not.
 6   Q.  Do you have any experience whatsoever in the interpretation of
 7   Louisiana statutes?
 8   A.  I did not offer myself as an attorney, I do not have experience
 9   in that.
10   Q.  Are you familiar with the Louisiana rules of construction with
11   respect to statutes?
12   A.  I am not.
13   Q.  You indicated that you have served on two different P&T
14   Committees.  Would you refresh my recollection as to what those P&T
15   Committees were?
16   A.  That was not what I said.  I served as the administrator for
17   the P&T Committee for the Medicaid program in the state of Florida.
18   I was not a voting member.  And that status continues and is fairly
19   standard, I think is the case as well in Louisiana.
20   Q.  So you didn't have responsibility for making decisions as a
21   member of a P&T Committee?
22   A.  I did not vote on inclusion or exclusion of a drug.  I managed
23   the committee and made a lot of decisions about the committee.
24   Q.  Did you partake in any risk benefit analysis with respect to
25   preferred drug list inclusion undertaken by the P&T Committee for
```

1   Florida Medicaid?

2   A.  Prior to the committee meetings, risk benefit analysis was one

3   of the functions that my agency and my office conducted, yes.

4   Q.  I am asking whether you yourself, sir, conducted risk benefit

5   analysis?

6   A.  Not alone, I used a statistician for that.

7   Q.  Again, sir, have you yourself conducted the risk benefit

8   analysis with respect to inclusion of drugs by the Florida P&T

9   Committee?

10  A.  No.

11  Q.  Thank you.

12          Can you tell me about that other P&T Committee that you

13  mentioned?

14  A.  That was the P&T Committee for the Department of Health in the

15  state of Florida.

16  Q.  And what was your role with that one again, sir?

17  A.  I was a representative for the pharmaceutical manufacturers.

18  Q.  Were you being paid by the pharmaceutical manufacturers

19  association?

20  A.  I was an employee of one of the pharmaceutical manufacturers.

21  Q.  Which pharmaceutical manufacturers?

22  A.  Roche laboratories.

23  Q.  And prior to your becoming an employee of the department of

24  Florida Medicaid, did you have any experience in the implementation

25  of Medicaid programs?

1   A.  I had, I think germane to your question, I was a government

2   affairs representative for Roche laboratories and did participate

3   regularly with meetings of the agency that was developing the drug

4   benefit for the Medicaid program.

5   Q.  So if I understand you correctly, your interface with Medicaid

6   at that time had to do with your employment for a pharmaceutical

7   manufacturer?

8   A.  Prior to my employment with the agency, correct.

9   Q.  And do you hold yourself out, sir, as an expert on the

10  Louisiana -- I'm sorry, on implementation of the Louisiana P&T --

11  I'm sorry, let me --

12          Do you hold yourself out as an expert in the

13  implementation and operation of the Louisiana prior authorization

14  process?

15  A.  I don't think that was what was said.  I hold myself as an

16  expert on the implementation and administration of Medicaid program

17  pharmacy benefits, preferred drug lists and prior authorization

18  programs, not specific, not specific to Louisiana.

19  Q.  And I understand the qualification, sir, and that's why I am

20  asking the question.  I understand you have held yourself out as an

21  expert in the implementation and operation of prior authorization

22  processes.  My question is whether you consider yourself an expert

23  with respect to Louisiana Medicaid implementation and operation,

24  pharmacy benefit implementation and operation?

25  A.  I think I have significant expertise, not to the level that

1    M.J. Terrebonne because I don't know Louisiana regulations as

2    intimately as she might, but I know a lot about Medicaid pharmacy

3    benefits.

4    Q.  Do you consider yourself to have greater expertise than the

5    secretary of Louisiana Department of Health and Hospitals with

6    respect to the Louisiana implementation of Louisiana Medicaid

7    pharmacy benefit program?

8    A.  I don't know the answer to that question.

9             MR. MURRAY:  Your Honor, we object to the tender as it

10   relates to Louisiana, also object to relevance in that he does not

11   have expertise with respect to Louisiana Medicaid.

12            THE COURT:  All right.  The court will accept him as an

13   expert in the implementation and operation of state Medicaid

14   programs, preferred drug list and prior authorization programs.  My

15   thinking is that there's certain areas that are general throughout

16   the United States, the process, procedures followed.  These

17   programs interface with Medicare on a federal level and there is

18   some consistencies.  Also, there's some consistency and interaction

19   in the regional area.

20            And finally, Florida has been one of the states that has

21   developed their programs up front initially and some of the other

22   states have either adopted, either in whole or in part, the Florida

23   program.  So I think that this individual would be of assistance to

24   the court and allow him to testify.  Let's proceed.

25            MR. SALES:  Thank you, your Honor.

```
1                        DIRECT EXAMINATION
```

BY MR. SALES:

Q.  What is the purpose of the Medicaid prescription drug program
generally?

A.  The Medicaid prescription drug program is a benefit enacted at
the same time the Medicare program was enacted as the 19th
amendment to the Social Security Act that provides healthcare, in
this case specifically prescription drug services, to people that
qualify for Medicaid, which is generally aged and disabled, low
income people that do not have other insurance coverage.

Q.  Do you recall how Medicaid, the Medicaid program was created?

A.  It was created as an amendment to the Social Security Act as
Title XIX to be funded jointly by states and the federal government
as part of an agreement to -- I think the understanding was to
allow Medicare to be passed, they included a Medicaid benefit.

Q.  What year was that?

A.  That was in 1965, as I recall.

Q.  You mentioned that Medicaid is jointly funded between the
federal and state governments.  Can you explain to the court how
that happens?

A.  Yes, sir.  The federal funding is a minimum of 50 percent of
the benefits that are paid.  State funding is contributed up to 50
percent based on per capita income in the state, can go from a high
of 50 percent for the state share and 50 percent federal to, I have
seen some states that have a 78 percent federal share and 22

1   percent state general revenue.

2   Q.  You mentioned that you started with Florida Medicaid in 1984?

3   A.  That's correct.

4   Q.  We've heard comments in this case about OBRA 90.  What is OBRA

5   90?

6   A.  OBRA 90 was the Omnibus Budget Reconciliation Act, they have

7   one each year.  The OBRA 90 legislation included the federal

8   prescription drug Medicaid rebate language, and so commonly is

9   referred to as the OBRA 90 legislation.  But there was other

10  materials covered.  But for our purposes OBRA 90 says rebate.

11  Q.  As part of your responsibilities, you mentioned that you had to

12  become very familiar with the federal regulatory scheme, as well as

13  state regulatory scheme; is that correct?

14  A.  That is correct.

15  Q.  Are you familiar with the OBRA 90 statute with regard to the

16  prescription drug program?

17  A.  I am.

18  Q.  If you look at tab 2 in your binder, and it's pretty small

19  print and I've gone to reading glasses, so I've tried to -- I'll

20  try to pinpoint the part of the statute where I want to ask you

21  some questions about.  If we go to 3631.7, which is page -- top

22  right-hand corner, I believe, there's markings on the page numbers.

23  A.  This monitor is out of focus and I can't read it.

24  Q.  It's actually page 3118 on your version, the top right-hand

25  corner.

1        MR. MURRAY:  Your Honor, I object to this witness being

2   asked to interpret a federal statute.  That's the role of the

3   court.  I don't know where the question is going.

4        THE COURT:  Hopefully it won't be an interpretation of

5   federal law.

6        MR. SALES:  I understand, your Honor.

7        THE WITNESS:  Okay.

8   BY MR. SALES:

9   Q.  You mentioned OBRA 90, and the version we've been talking about

10  is 1396 R-8; do you see the code number?

11  A.  I do.

12  Q.  I think in your report you had said Section 1927, is that the

13  predecessor number?

14  A.  That was the original number and what I referred to it as.

15  This is the same statute.

16  Q.  You mentioned OBRA 90 started federal rebates, I believe.  Can

17  you explain that to the court?

18  A.  The rebate legislation did a couple of things, it required that

19  manufacturers of prescription drugs provide a rebate back to the

20  state Medicaid programs, which was shared also with the federal

21  government at the rate of federal financial participation for each

22  state.  In exchange for that, rebates to reduce the cost of the

23  Medicaid program, the manufacturers were guaranteed access and

24  coverage under those Medicaid programs, unless the drug in question

25  was exempted, there's a list of a few drugs, categories that don't

1    have to be covered.

2    Q.  And now, is that the page that I'm referencing under 1396 R-8

3    D(2), is that the list of drugs that you're referencing that, after

4    OBRA 90 you mentioned states could exclude from coverage?

5    A.  This is the list of excluded drugs that the states did not have

6    to cover if they chose not to.

7            MR. MURRAY:  Your Honor, I think now we're beginning to

8    get into interpretation of federal statute.

9            THE COURT:  That's not necessarily interpretation.  I'll

10   overrule that objection.

11   BY MR. SALES:

12   Q.  Before OBRA 90 was enacted, did Florida have an open formulary?

13   A.  Florida had an open formulary and covered almost all drugs.

14   Q.  Before OBRA 90, did states have discretion with the types of

15   formulary that they were implementing with regard to covering

16   FDA-approved products?

17   A.  Prior to 1990, a few states had what they called closed

18   formularies, and a few states would not allow new drugs to be added

19   to their drug file until they had been on the market for six months

20   or 12 months.  And occasionally had certain classes of drugs that

21   they just chose not to make available under Medicaid.

22   Q.  And after OBRA 90, what happened with regard to Florida and the

23   other states, to your knowledge, in the associations you belonged

24   to with regard to these formulary decisions?

25   A.  OBRA 90 basically standardized the Medicaid prescription drug

1    programs and required all states to cover essentially the same

2    drugs except for that list of 13 categories that we just mentioned

3    in paragraph 2.

4    Q.  Not to belabor that point, the list of drugs or agents --

5             THE COURT:  Wait.  Wait.  Do you have an objection?

6             MR. MURRAY:  Your Honor, when he starts talking about

7    what OBRA 90 requires states to reimburse, he is starting to get

8    into legal opinion.

9             THE COURT:  I understand.  I'll overrule the objection.

10   BY MR. SALES:

11   Q.  We don't need to go through all 13, but there are various types

12   of approved products that the statute permits the states to not

13   cover under OBRA 90; is that correct?

14   A.  That's correct.  It gave the states the option.

15   Q.  Was, were NSAIDs a class of drugs that could be excludable by

16   the state formularies under OBRA 90?

17   A.  I'm sorry, I couldn't understand.

18            MR. MURRAY:  Same objection, your Honor, may I have a

19   standing objection?

20            THE COURT:  Make it continuing.  I'll overrule it.

21   BY MR. SALES:

22   Q.  Based on your role as chief of the Florida Medicaid drug

23   program, did you have an understanding as to which drugs you could

24   or could not exclude under OBRA 90?

25   A.  I did.

1  Q.  Were NSAIDs in a class of drugs that there was an understanding

2  that Medicaid directors and programs could exclude?

3  A.  No.

4  Q.  For a couple of definitional things, we've had multiple terms

5  used in this case describing the types of formularies.  When you

6  say open formulary, what does that mean?

7  A.  An open formulary means that if the drug is approved by the

8  Food & Drug Administration, then it's available on that drug file

9  for reimbursement without restrictions.

10  Q.  So there's no prior authorization or any type of restriction or

11  limitation whatsoever?

12  A.  Not in an open formulary, no.

13  Q.  And we've also heard various terms used by various witnesses in

14  this case to describe a closed formulary such as exclusive

15  formulary, restricted formulary, pharmacopeia.  Do you have an

16  understanding, generally speaking, as to what those types of

17  formularies are referring to?

18  A.  Those terms, exclusive or closed or restricted formulary, are

19  used somewhat interchangeably by people to mean that there are

20  certain drugs that are not included for reimbursement, either at

21  all, in a case of a closed formulary, or without some prior

22  authorization or some other criteria being met.

23  Q.  And your understanding in your job role in working with these

24  other Medicaid directors, could you have such a pure closed

25  formulary except for the drugs exempted under paragraph 2 that

1   we've looked?

2           MR. MURRAY:  Objection, now we are getting into

3   interpretation of federal statute.  This is an issue that your

4   Honor has ruled on and interpreted, and this witness is not

5   competent to rule on.

6           THE COURT:  Yes, I understand and I thought I made your

7   objection continuing.  But, in any event, I'll overrule the

8   objection and allow it.

9           MR. MURRAY:  Also, your Honor, we get to the relevance of

10  his understanding of what the law means.  His understanding isn't

11  relevant, it's the State of Louisiana's understanding and he has no

12  experience whatsoever with the State of Louisiana.

13          THE COURT:  I understand that.  Go ahead.

14          MR. SALES:  Thank you, your Honor.

15  BY MR. SALES:

16  Q.  Mr. Wells, do you need me to repeat the question?

17  A.  Please.

18  Q.  With regard to the implementation of any formulary decisions

19  that you either were involved in with Florida or were involved in

20  discussions with other Medicaid directors from around the state, in

21  the national association or the southern association, what was your

22  understanding with regard to whether you could have a pure closed

23  formulary without -- no reimbursement under any circumstance under

24  OBRA 90?

25  A.  Under OBRA 90, the only thing that you could absolutely exclude

1    was the list of drugs, drug categories, in paragraph 2 that we just

2    addressed.

3    Q.  There was a situation developing in the late '90s I think that

4    we can probably all recall that drug costs and state budgets were

5    somewhat under attack, for want of a better word.  Do you recall

6    that there was -- let me rephrase the question.

7              What was going on in the late 1990s that started changing

8    any of your focus at Florida Medicaid and, to your knowledge, with

9    these other states?

10   A.  Well, Florida and a number of other states recognized that the

11   prescription drug benefit under the Medicaid program was the

12   fastest growing single line item in general revenue expenditures

13   for the state, that was the state's share of match for the Medicaid

14   program.  And being the fastest growing single line item, it got

15   the focus of a lot of attention.

16   Q.  Was it the focus of a lot of discussions at the SAMPA meetings?

17   A.  At SAMPA and the national meeting, as well as in the state

18   legislature and the halls of our offices.

19   Q.  Did you have similar conversations with M.J. Terrebonne?

20   A.  I did, uh-huh.

21   Q.  And can you tell the court how M.J. Terrebonne's participation

22   in LDHH, where she would -- her role is compared to where your role

23   was in Florida?

24   A.  Ms. Terrebonne's job responsibilities were similar to those in

25   my office.

```
 1   Q.  Basically ran the prescription drug program?

 2   A.  She was the manager for the prescription drug program for LDHH.

 3   Q.  Now, faced with this growing situation of tightening budgets

 4   and increasing costs, did Florida, in your participation in that,

 5   start looking at various options or tools to try to go away from an

 6   open formulary to try to limit those costs?

 7   A.  Florida looked at a number of options, yes.

 8   Q.  And what did Florida decide to do?

 9   A.  Ultimately, Florida developed, in 2001 the legislature

10   authorized us, instructed the agency to develop a preferred drug

11   list and to negotiate supplemental rebates in conjunction with that

12   preferred drug list and prior authorization program with

13   manufacturers.

14   Q.  Can you describe some of the pressures that are borne to bear

15   when you change from an open formulary to some type of more limited

16   formulary?

17           MR. MURRAY:  Objection, beyond the scope of his report.

18           MR. SALES:  It's implementation of the drug program, your

19   Honor.

20           THE COURT:  Let's go, I'll allow it and overrule the

21   objection.

22           THE WITNESS:  Well, if you developed a closed formulary

23   or even a restricted formulary, you have a lot of political

24   opposition from a provider organizations, from physicians'

25   societies, from pharmacy societies, industry obviously is going to
```

1    object to that and, in turn, legislators get a lot of pressure, and

2    they're concerned about that because of the perceived finality of a

3    formulary.

4            MR. MURRAY:  Your Honor, move to strike that answer, it

5    is not contained or anything remotely like it anywhere in his

6    report.

7            THE COURT:  I don't know whether this is going to be

8    helpful to me.  I understand that situation.  We've had enough on

9    that.

10   BY MR. SALES:

11   Q.  Can you describe the prior authorization program that you and

12   the State of Florida implemented with regard to the option of going

13   to a preferred drug list?

14   A.  Our preferred drug program and prior authorization program gave

15   us a list of drugs that were available without prior authorization,

16   it established criteria for prior authorization for drugs that were

17   not on that list, it established a procedure for a 24 hour, I mean,

18   a 24-hour response to a request for authorization, for a three-day

19   emergency supply if response to that request was not available.

20   Q.  Why did that include a 24-hour response and a 72-hour supply

21   requirement?

22   A.  Our general counsel felt like that that was the requirement,

23   the standard that we had to meet, based on the federal statute that

24   allowed prior authorization programs.

25   Q.  Can you describe generally how that works with regard to why

1    you need a 24-hour response time and a 72-hour supply of the drug

2    on a prior authorization program?

3    A.  That was the advice that we got from our general counsel that

4    was included in the federal statutes that allowed us to have a

5    prior authorization program.

6    Q.  My question was probably poorly worded.  Why did y'all feel it

7    was necessary to do that?  Besides the legal requirement, was there

8    a practical reason why you would want to do that?

9    A.  Absolutely.  You want to make sure that you're not interfering

10   with access to a necessary prescription drug treatment for a

11   patient.  It was called an emergency supply, and the judgment of

12   whether or not that was an emergency was left up to the physician

13   and the pharmacist in the case.

14   Q.  And is the prior authorization program staffed 24/7, I mean, is

15   the phone bank open, is somebody there weekends 24/7?

16   A.  No.  That was not an option that we chose and that's another

17   reason that you have to have an emergency 72-hour supply available

18   for weekends and holidays, when there's not someone on the phone at

19   two o'clock in the morning to answer a request.

20   Q.  So if you had a prior authorization in place that's required,

21   is your understanding, and you have a drug that is restricted

22   under, but subject to a prior authorization -- authorization, and

23   somebody calls in on a weekend when a prior authorization program

24   is not staffed and seeking a prescription for a drug that's not

25   otherwise on the preferred drug list, are you with me?

1    A.  I am with you.

2    Q.  How does that work, then, to get that person still under the

3    Medicaid program the prescription that the physician wrote?

4    A.  The pharmacy has the option to submit a claim for a three-day

5    supply of that drug and designate that as a three-day emergency

6    supply and get paid for that prescription pending a resolution of

7    the request after the call center might be open.

8    Q.  When you chose this preferred drug list with a prior

9    authorization program in 2001 in consideration of these cost issues

10   that we talked about, did you look at the panoply of options

11   available to you to try to control those costs?

12   A.  We did.

13   Q.  Why did you choose the preferred drug list with a prior

14   authorization type of formulary?

15   A.  It gives the greatest flexibility to the agency and

16   manufacturers and allows the greatest range of choices for

17   physicians and patients and pharmacists.

18   Q.  Did you consider a restricted formulary?

19   A.  We looked at the requirements for that and felt like that was

20   pretty onerous and also much more restrictive and didn't give as

21   much flexibility to the agency.

22   Q.  Was one of the central features of this cost control trying to

23   negotiate with manufacturers supplemental rebates?

24   A.  It was.

25   Q.  Can you describe that for the court?

```
 1   A.  Manufacturers have an obligation to provide a federal rebate to
 2   the states, which is then shared back with the federal government.
 3   The preferred drug list in Florida and prior authorization program
 4   also enabled us to negotiate supplemental rebates in addition to
 5   the federal rebate, over and above the federal rebate, which
 6   further lowered the net cost to the Medicaid program for the
 7   prescription drug benefit.
 8   Q.  Was it your understanding when you looked at these various
 9   options that you could choose from and you chose the preferred drug
10   list that a restricted formulary under OBRA 90 still required a
11   prior authorization program?
12              MR. MURRAY:  My standing objection.
13              THE COURT:  I didn't understand that.  Let's restate the
14   question.
15              THE WITNESS:  That was the conclusion of our general
16   counsel --
17              THE COURT:  What was the question?
18              MR. SALES:  Under either option that they were looking at
19   required a prior authorization program.
20              MR. MURRAY:  I am certainly going to object to the
21   conclusion of the state of Florida's general counsel.
22   BY MR. SALES:
23   Q.  I'm not asking -- let me rephrase the question.
24              When you were considering as the program bureau chief
25   working with the officials of Florida, did you consider the various
```

1   options to get these cost controls in place?

2   A.  Yes.

3   Q.  I think you testified that you ended up deciding upon a

4   preferred drug list with a prior authorization program, correct?

5   A.  That is correct, yes.

6   Q.  And you considered other options, and did the other options

7   also with regard to the non-excludable drugs that we're talking --

8   or the excludable drugs we talked about earlier in paragraph 2, did

9   you also consider that those other options also required prior

10  authorization?

11  A.  We did.

12  Q.  Under the preferred drug program that you instituted, when you

13  decide if a drug is on the preferred drug list or the non-preferred

14  drug list, do you have to give any type of public written

15  explanation for that decision?

16  A.  Those are public meetings, but we don't have to post a written

17  explanation for it, no.

18  Q.  And was it considered that that would be something that would

19  not be in the interest of Florida Medicaid?

20  A.  I'm sorry, I don't understand the question.

21  Q.  Was the issue of having to post a public explanation for

22  finding a drug to be excluded as opposed to simply making a

23  decision on preferred and non-preferred, was that important to you

24  in the Florida Medicaid program?

25  A.  That was important to us in that it would have been

1   controversial and would not have achieved the goal that we had of

2   reducing costs.

3   Q.  Can you tell the court briefly what the steps were to implement

4   a preferred drug list, as you understood was required under the

5   federal and state law?

6               MR. MURRAY:  Your Honor, this goes beyond the scope of

7   his report, particularly if he's going to go into the steps that

8   are required to implement a restricted formulary.  Nothing in his

9   report says what those steps are, and it's certainly something we

10  would have crossed him with when his report disclosed it.

11              MR. SALES:  First of all, I didn't ask that question.

12              THE COURT:  Let's ask the question.  Do you remember the

13  question?

14              THE WITNESS:  I would like to have it restated.

15  BY MR. SALES:

16  Q.  Mr. Wells, my question was, what steps did you go through to

17  establish a preferred drug list with a prior authorization program,

18  what was required?

19  A.  Initially, discussions with the governor's office staff and

20  legislative staff.  The legislature passed appropriate authority

21  for the agency to implement that program, the governor's office

22  then appointed members for the P&T Committee that were specified in

23  the statute, those members were contacted, arrangements made for

24  the first meetings of the P&T Committee, and affected parties were

25  notified, manufacturers and pharmacists and physicians.  And then

1   the first meeting of the P&T Committee was held and scheduled

2   thereafter on a quarterly basis.

3   Q.  Do you have to file any type of documentation with this type of

4   formulary change with CMS?

5   A.  Yes, we filed a state plan amendment.

6           THE COURT:  Wait just a moment.  Counsel, you have an

7   objection?

8           MR. MURRAY:  Your Honor, there's nothing in his report

9   with respect to what has to be filed in connection with a formulary

10  change.

11          MR. SALES:  He does mention state plan.  His report is

12  all over this, your Honor, and I thought we had a standing

13  objection.

14          THE COURT:  I've had an opportunity to read the report,

15  I'll allow this area.

16  BY MR. SALES:

17  Q.  What is the state plan?

18  A.  The state plan amendment, the state plan is a description filed

19  by the state with CMS, Center for Medicare and Medicaid Services,

20  that describes the amount, duration and scope of the benefit by

21  Medicaid in each state.

22  Q.  How long do you recall it took for the appointment of P&T

23  members and the process to get started in Florida with regard to

24  the prior authorization program?

25          MR. MURRAY:  Objection, relevance, your Honor.  What

1    happened in Florida and how long it took in Florida is irrelevant.

2           THE COURT:  Yes.  Some of this is not going to be

3    relevant.  I mean, I don't really need to know what happened in

4    Florida and why it happened in Florida.

5           MR. SALES:  Your Honor, I appreciate that, but the point

6    here is, the issue is that we believe one of the requirements in

7    any state, and I'll get to this in a moment, is obviously the

8    establishment of P&T Committee.  And as the court is aware, there

9    is an issue in this case about June 13, 2001, the statute was

10   enacted which required the appointment of a P&T Committee, so I do

11   believe it's relevant to that issue.

12          THE COURT:  Yes, but you need to make the connection more

13   quickly as to why did you do it.  And then if he did it because of

14   some reason, well, I understand that.  But what they did in the

15   exquisite detail is not significant for Louisiana.

16          MR. SALES:  I understand.

17   BY MR. SALES:

18   Q.  Do you have an opinion with regard to, generally speaking,

19   whether or not all of these changes to formularies required the

20   establishment of a P&T Committee?

21   A.  It did.

22   Q.  And do you have an opinion as to, generally speaking, how long

23   it takes to get a P&T Committee up and running for a formulary?

24   A.  I know that in Florida it was under some urgency and it took

25   us, even with the urgency and cooperation from the governor's

1    office, it took a little over 60 days.

2    Q.  Do you have an opinion as to whether or not that process could

3    be done in one day?

4    A.  I don't think that's possible.

5    Q.  Now, after you implemented the Florida PDL, did you talk to

6    M.J. Terrebonne and others at LDHH about the process that y'all had

7    gone through in developing that formulary?

8    A.  I did.

9    Q.  And what at these conferences and various meetings with state

10   Medicaid director such as M.J. Terrebonne, was there a lot of

11   interest in what Florida was doing?

12           MR. MURRAY:  Your Honor, now we're getting into facts, he

13   is not a fact witness.  He is an expert witness, and again, nothing

14   about his conversations with M.J. Terrebonne are anywhere in his

15   report.

16           THE COURT:  All right.  Let's go on.  I'll overrule the

17   objection.

18           THE WITNESS:  I did speak with M.J. Terrebonne at one of

19   the meetings, I am not sure which one it was, but also had a

20   telephone conversation that I remember with M.J., just basically

21   outlining what we had done and how we had done it, because a lot of

22   states were interested in what we were doing and were calling and

23   asking for information.

24   BY MR. SALES:

25   Q.  Did she express interest that Louisiana would also --

```
 1              THE COURT:  Now wait.  I sustain the objection.  We're
 2    getting into hearsay at this point.
 3    BY MR. SALES:
 4    Q.  Did you gain an understanding that Louisiana subsequently
 5    adopted a PDL with a prior authorization program very similar to
 6    the State of Florida?
 7    A.  I am aware that Louisiana did adopt that using eventually the
 8    same contractor that Florida used.
 9    Q.  Which contractor was that?
10    A.  That's Provider Synergies from -- an Ohio company.
11    Q.  Under your understanding and with your understanding, your work
12    with other states, can you have a prior authorization program that
13    is in name only that does not permit restrictions, does not permit
14    coverage of a drug under any event?
15              MR. MURRAY:  A legal conclusion, objection, your Honor.
16              THE COURT:  He is giving an opinion, I'll allow him to
17    give the opinion.
18              THE WITNESS:  It is my understanding and it was our
19    understanding as a group of pharmacy administrators that prior
20    authorization meant that you set criteria that would ultimately
21    allow coverage of the drug.  You didn't want for the state agency
22    to be interposed between the doctor and the patient.  You might set
23    some criteria but ultimately you would allow access.
24    BY MR. SALES:
25    Q.  Are you aware of any state that has ever enacted a prior
```

1   authorization program that did not ultimately permit coverage of a

2   drug if those criteria were satisfied?

3   A.  No.

4   Q.  One of the -- let me rephrase that.  With regard to when you

5   were setting up your preferred drug list and prior authorization

6   program and in your discussions with other state Medicaid

7   officials, what role was the FDA playing with regard to these

8   decisions?

9   A.  The FDA is the arbiter of safety and efficacy for approval for

10  a drug to be marketed in this country.

11  Q.  Is there an understanding and census among state Medicaid

12  directors that under OBRA 90 at the starting point that an FDA drug

13  has been approved that it's covered?

14  A.  Well, that's the starting point but then the manufacturer has

15  to have signed an agreement for rebate with the secretary of HHS.

16  Q.  In your opinion, do state Medicaid programs give great

17  deference to the FDA?

18  A.  I think all state Medicaid programs depend on the FDA for that

19  determination of safety and efficacy.

20  Q.  Do your state Medicaid programs have the budgets to hire

21  chemist and biostatisticians and epidemiologists and doctors that

22  look into the clinical data of drugs like the FDA does?

23  A.  No.

24  Q.  Are you aware of any state Medicaid program publishing an

25  explanation for a drug that is still approved as safe and effective

1   by the FDA but the state Medicaid program has published that they

2   disagree with that and that they're excluding a drug because it is

3   not safe and effective?

4   A.  No.

5   Q.  In your role as Medicaid director, are you aware of the FDA

6   public statements regarding their findings on the NSAID class of

7   drugs?

8   A.  I have looked at a memorandum that was published, yes.

9         MR. SALES:  DX 338 and that's on tab 4, your Honor.

10  BY MR. SALES:

11  Q.  Are you with me there, Mr. Wells, on tab 4?

12  A.  I'm there.

13  Q.  Is this the FDA findings regarding NSAIDs that you mentioned

14  that you have reviewed?

15  A.  It is.

16  Q.  Are these types of findings important to state Medicaid

17  programs with regard to their coverage issues for prescription

18  drugs?

19  A.  They are.

20  Q.  If you look at the second page of Defendant's Exhibit 338 and

21  at the second bullet point, toward the end of that summary of the

22  FDA's position with regard to NSAIDs, it says:  "A class effect on

23  an increased risk of serious adverse CV events for COX-2 selective

24  and non-selective NSAIDs."  Correct?

25  A.  Yes, sir.

1    Q.  Were you aware of that?

2              MR. MURRAY:  Your Honor, this is way beyond the scope of

3    expertise of this witness the ability to testify what a class

4    effect means, what a class effect is, whether there is a class

5    effect.

6              MR. SALES:  He is a pharmacist for 45 years running a

7    prescription drug program and what they would do with this type of

8    information, not that he is making an independent judgment about

9    whether it's correct or not.

10             THE COURT:  Let's get to where what they would do with

11   this information from his standpoint, his opinion.

12   BY MR. SALES:

13   Q.  I would like to point out three features of this memo and then

14   ask you that specific question.  Number one we see the class effect

15   finding, correct?

16   A.  Correct.

17   Q.  And if you go to the fifth bullet point down there is a

18   statement that:  "Only rofecoxib has been shown to reduce the risk

19   of serious GI bleeding compared to a non-selective NSAID, Naproxen,

20   following chronic use."  Do you see that?

21   A.  I see that.

22   Q.  And finally, if you go to the second last to the bottom bullet

23   point, it says prescription, "all prescription NSAIDs should be

24   revised to include a boxed warning highlighting the potential

25   increased risk of serious adverse CV events."  Do you see that?

1   A.  I see that.

2   Q.  And you were aware of those general findings at that time?

3   A.  I was aware of the labelling change, yes.

4   Q.  Did, to your knowledge, any state Medicaid programs change

5   their formularies as a result of these -- the form of their

6   formularies with regard to these types of findings on NSAIDs?

7   A.  No.

8   Q.  Are you generally familiar also with Celebrex as being a member

9   of the NSAID class?

10  A.  I am.

11  Q.  If we could go to Defendant's Exhibit 2507, which is tab 8,

12  your Honor.

13  A.  I'm sorry, I didn't hear the tab number.

14  Q.  Tab 8.  Are you familiar with the Physicians' Desk Reference

15  listing drugs and their labels?

16  A.  I am.

17  Q.  This is a copy of the Celebrex label from 2006 PDR, correct?

18          MR. MURRAY:  Not identified in his report, your Honor.

19          MR. SALES:  He identified the fact that Celebrex and

20  other drugs were still covered on the PDL after the Vioxx was

21  withdrawn after the other issues.

22          MR. MURRAY:  He didn't identify this document.  That same

23  rule has been applied to me, I've been told with my witnesses if

24  they didn't identify a document in their report they weren't going

25  to be able to talk about it.

1        MR. SALES:  Your Honor, we could go -- I'll cut this

2    short.

3        THE COURT:  Let's just cut it short, counsel, we are not

4    going to -- we have to get over this.

5    BY MR. SALES:

6    Q.  Mr. Wells, are there a large number of FDA approved products to

7    your knowledge that have black box cardiovascular warnings on them?

8    A.  Yes, there are.

9    Q.  Are those drugs covered on the Louisiana and the Florida

10   preferred drug list?

11   A.  A lot of them are covered on both, yes.

12   Q.  And are you aware of either Florida or Louisiana or any state

13   making an exclusive formulary with no possibility for reimbursement

14   because of a black box warning of cardiovascular concerns of any

15   prescription drug?

16   A.  I am not.

17   Q.  Have you reviewed the depositions of DHH witnesses from

18   Louisiana in this case?

19   A.  I have reviewed a number of them, yes.

20   Q.  Ms. Terrebonne?

21   A.  I have.

22   Q.  Mr. Bearden?

23   A.  I did.

24   Q.  Mr. Hood?

25   A.  I have.

1   Q.  Mr. Castille?

2   A.  Yes.

3   Q.  Have you had an opportunity to review the Louisiana P&T

4   Committee minutes of meetings in which NSAIDs were discussed?

5   A.  Yes, I have.

6   Q.  Are those types of minutes at meetings standard, the

7   transcripts of those meetings standard in the Medicaid programs?

8   A.  They appear similar to the minute meetings -- minutes from

9   meetings in Florida and other states that I've looked at.

10  Q.  And have you seen in any of the materials you reviewed with

11  regard to the state of Louisiana any attempt ever made to change

12  from a prior -- a preferred drug list with a prior authorization

13  program to a restricted formulary?

14  A.  I have not.

15  Q.  Have you seen any evidence in any of the documents that you

16  reviewed that Louisiana ever even considered doing so?

17  A.  No.

18          THE COURT:  Did Florida have the authority to create a

19  restricted program, statutory authority to your knowledge?

20          THE WITNESS:  The statutory authority we had was specific

21  to a preferred drug list.  And I think we would have to have

22  statutory authority if we chose to use a restrictive formulary.

23  BY MR. SALES:

24  Q.  Mr. Wells, I want you to assume with me that Secretary Hood,

25  former DHH secretary of Louisiana, testified a few days ago that,

1    and assume with me this is his heart-felt belief, that had he

2    believed that the benefits of Vioxx were outweighed by its risks

3    that he would have done everything in his power to make sure that

4    Vioxx was completely excluded from any reimbursement on the

5    Louisiana Medicaid.

6            Based upon your experience and knowledge with formularies

7    and Medicaid programs, and assuming that was even -- that was a

8    heart-felt belief, could he have done that, in your opinion?

9            MR. MURRAY:  Your Honor, we're definitely beyond the

10   scope of his report.  He has not rendered anything in his report

11   that says that the state had the authority if it determined that a

12   determined that a drug was more -- that the risk outweighed the

13   benefits of a drug, he did not put anything in his report that

14   would indicate that the state did or did not have authority to do

15   so.

16           MR. SALES:  Your Honor, on page 13 of your report he

17   said, placement of Vioxx in the non-preferred drug list, prior

18   authorization required in June 2002 was the most restrictive action

19   that could have been taken against Vioxx by Louisiana Medicaid,

20   it's right in his report.

21           THE COURT:  Okay.  All right.  And also the question is

22   whether or not, assuming things that were testified to at this

23   time.  I think it is within the purview of what he said.  He didn't

24   say anything about Hood because Hood hadn't testified yet, but I'll

25   overrule the objection and allow it.  I think it's consistent with

1   what's at least the topics he indicated he would discuss.

2   BY MR. SALES:

3   Q.  Mr. Wells, that was a long question, do you want me to rephrase

4   or are you good with it?

5   A.  I think I understand the question.  Regardless of sincerity,

6   would that option have been available to Mr. Hood at the time, and

7   I think the remedy available to Mr. Hood at the time was the

8   preferred drug list that your legislature here had allowed the

9   agency or instructed the agency to adopt and then bring back for

10  approval, which they had done.  They could have moved Vioxx to a

11  non-preferred status and set up criteria for authorization, but

12  that was the limit of restrictions at that time that they could

13  have put on Vioxx.

14  BY MR. SALES:

15  Q.  Would it still have a prior authorization process for those

16  doctors and patients who would still want the product?

17  A.  It would still have to have a prior authorization access, yes.

18  Q.  Would there have to be some type of written explanation and

19  finding published by Louisiana to even attempt to do that?

20  A.  Well, they were not attempting to do that.  If they had chosen

21  to change the process and adopt a formulary as described in the

22  legislation, then I think they would have to have a written

23  explanation of the findings.

24  Q.  And even if they did that would there still be reimbursement

25  for some Vioxx prescriptions?

1  A.  Well, that provision as we understood it and the federal

2  statute still required a prior authorization and a 72-hour

3  emergency supply.

4  Q.  Is that one of the reasons why Florida and other states to your

5  knowledge did not enact that type of formulary?

6  A.  It's my opinion that it is because nobody has done that.

7  Q.  Are you aware, Mr. Wells, of any state that has ever instituted

8  an exclusive formulary in which no reimbursement is permitted under

9  any circumstance for one of the non-excluded products under

10 paragraph 2 that we talked about earlier based upon the safety

11 concerns of one drug?

12 A.  No.

13 Q.  We've gone through the topic and to expedite it we didn't go

14 through various drug labels with regard to cardiovascular black box

15 warnings that still appear on the Louisiana Department of Health

16 and Hospitals.  But that is your opinion that you can go to the PDL

17 today and find many cardiovascular --

18         THE COURT:  Counsel, you're testifying, so I sustain the

19 objection.

20         MR. SALES:  I'll rephrase.

21 BY MR. SALES:

22 Q.  What is your opinion with regard to whether or not you went to

23 the Louisiana Department of Health and Hospitals preferred drug

24 list today, what would you find with regard to whether there are

25 drugs with cardiovascular black box warnings on the preferred drug

1  list?

2  A.  The Louisiana Medicaid preferred drug list, as does Florida and

3  many other states, includes a large number of drugs that have black

4  box warnings with reference to cardiovascular adverse events.

5  Q.  And also are there drugs on the non-preferred drug list that

6  require prior authorization of drugs that have black box warnings?

7  A.  There are.  The black box warning is not to determine the

8  criteria for inclusion or exclusion.

9  Q.  Does your review of those preferred drug lists and your

10  knowledge of what is covered and not covered in these states inform

11  your opinion about whether or not not only could the State of

12  Louisiana that enacted a restricted formulary that allowed no

13  reimbursement for Vioxx, but does it inform your opinion as to

14  whether they would have done so under those circumstances?

15  A.  Yes.

16  Q.  How does it inform your opinion?

17  A.  First of all, I don't think that they really could --

18          MR. MURRAY:  I'm sorry.

19          THE WITNESS:  But I don't think --

20          THE COURT:  Wait just a moment.

21          MR. MURRAY:  I have an objection, now the witness is

22  being asked to testify to an ultimate issue of fact.  It's one

23  thing to give an opinion as to what a reasonable Medicaid

24  organization could do.  Now to give an opinion as to what Louisiana

25  would do, that's a question of fact in dispute, that's not this

1    witness's purview.

2          THE COURT:  That's accurate, it is a question of fact in

3    dispute, but 704 of the Federal Rules say that testimony in the

4    form of an opinion or inference otherwise admissible is not

5    objectionable because it embraces an ultimate issue to be decided

6    by the trier of fact.  That's just not the only reason for it, it

7    used to be, but it's not now 704.

8          So it is an ultimate issue of fact, but the witness can

9    testify on an ultimate issue of fact.

10          MR. MURRAY:  Well, in that case, your Honor, also we're

11   dealing with mind-set --

12          THE COURT:  No, I understand.

13          MR. MURRAY:  -- none of my witnesses could testify as to

14   Louisiana's mind-set, and I think that that's what this witness is

15   being asked to do.

16          THE COURT:  Okay.  I understand.  It's an opinion of his.

17   BY MR. SALES:

18   Q.  Mr. Wells, would you like me to rephrase the question?

19          THE COURT:  What they would have done in your opinion.

20          THE WITNESS:  Well, I think testimony in this trial

21   indicates that the department didn't want to be between the doctor

22   and the patient and the Food & Drug Administration, that they would

23   like the physician prescriber have as much choice and access as

24   they could.

25          MR. MURRAY:  Your Honor, now he's characterizing

1    testimony of the trial.

2              MR. SALES:  Not the trial, the testimony he's reviewed.

3    The evidence that he's reviewed.

4              MR. MURRAY:  Still, he's characterizing testimony, that's

5    your Honor's role.

6              THE COURT:  Counsel, let's move on with this.  This is

7    not as helpful to me.  What Louisiana would have done, it's not

8    helpful for me to hear what somebody thinks they'll do, even though

9    he may have an opinion on it.  The evidence is really going to

10   carry that or not carry that as opposed.

11   BY MR. SALES:

12   Q.  One last question, Mr. Wells.  Is it your opinion that based

13   upon the evidence that you have reviewed and your experience with

14   regard to the development of Medicaid drug programs that under any

15   circumstance Vioxx would have been reimbursed if it was FDA

16   approved by the State of Louisiana under some circumstance?

17   A.  Vioxx was a covered drug that had a rebate agreement, and I

18   think ultimately the state had a responsibility to allow some

19   access to Vioxx either through a prior authorization or

20   unrestricted coverage.

21             MR. SALES:  Tender the witness.

22             THE COURT:  Okay.  I've got a conference at 12:30, Gay?

23             THE DEPUTY CLERK:  No, Judge, 1:30.  We can either go now

24   or the best I can do is come back at 1:45.

25             MR. MURRAY:  Whichever your Honor prefers.

```
 1            THE COURT:  Why don't we go until 12:30 then if you're
 2   ready, and then we'll break and come back at 1:45.  We'll get some
 3   done.
 4                         CROSS-EXAMINATION
 5   BY MR. MURRAY:
 6   Q.  Mr. Wells, I want to make sure that I understand your
 7   testimony.  Are you testifying to this court that Louisiana's
 8   statutory regime did not allow the State of Louisiana to adopt a
 9   restricted formulary?
10   A.  I don't think that's what I said.
11   Q.  I want to know what you're testifying to.  I am asking you that
12   question, is that your opinion, do you have an opinion on that
13   issue?
14   A.  I don't think that that has to do with Louisiana statute, I am
15   not interpreting that statute.
16   Q.  Well, you had indicated that when Florida was considering its
17   program, Florida considered a restricted formulary; is that
18   correct?
19   A.  We talked about it.  I don't know how seriously it was
20   considered but it was discussed.
21   Q.  And by restricted formulary you mean a formulary that says that
22   we're not going to pay for a given drug?
23   A.  In Medicaid you can't do that.
24   Q.  And what is that based on, sir?
25   A.  On the Medicaid rebate statute that we've discussed earlier
```

1    today.

2    Q.  So that's based on your interpretation of the Medicaid rebate

3    statute; is that correct?

4    A.  Actually that's based on advice from CMS and from our general

5    counsel in Florida.

6    Q.  So that's based on advice from your general counsel in Florida,

7    that's not based on your own personal opinion?

8    A.  And from CMS.  And I concur, I agree with it, it's a plain

9    reading of the language.

10   Q.  That's your interpretation of the plain reading of the

11   language; is that correct, sir?

12   A.  I just told you that we've talked to CMS and to our general

13   counsel about that.  So it's not just my interpretation of it.

14          MR. MURRAY:  Objection to the response for hearsay, your

15   Honor, in terms of him talking to CMS in forming the basis of his

16   opinion.

17   BY MR. MURRAY:

18   Q.  Was your boss at one point in time a man named Allen Levine?

19   A.  The agency secretary was Allen Levine at one time.

20   Q.  He was your boss, right?

21   A.  I reported to him through someone else, yes.

22   Q.  Are you aware that at some point in time Mr. Levine decided

23   that the state of Florida was going to implement a prior

24   authorization with respect to Neurontin prescriptions where it

25   would not pay for Neurontin prescriptions if certain criteria were

1  not met?

2  A.  Yes.

3  Q.  You're aware of that situation?

4  A.  I am aware of that situation, I am not sure that that was

5  Mr. Levine's individual decision, but he was secretary during part

6  of that.

7  Q.  And ultimately it's the secretary who gets to those make

8  decisions, right?

9  A.  Yes.

10  Q.  Not you as much as you might like to as the -- I forget your

11  title -- the bureau chief, it's the secretary who gets to sign on

12  the dotted line, correct?

13  A.  The Medicaid director actually signed off on that sort of

14  thing.

15  Q.  Medicaid -- that was the Florida regime.  Do you know whether

16  that's the regime in Louisiana?

17  A.  It is.  There is a Medicaid director, that's not always the

18  agency secretary.  And I think that was the case here as well.

19  Q.  Your testimony is that that's the case in Louisiana, that's

20  your understanding?

21  A.  Not at all.

22  Q.  Well, you just said that in Louisiana the Medicaid director

23  signs off on it, is that your testimony; is that your

24  understanding?

25  A.  No, I said in Florida.

```
 1   Q.  Huh?

 2   A.  I said in Florida.

 3   Q.  That's the situation in Florida, you don't know whether that's

 4   the situation in Louisiana?

 5   A.  I do not.

 6   Q.  But anyway, you recall Secretary Levine decided through a prior

 7   authorization he was going to exclude certain -- not pay for

 8   certain Neurontin prescriptions if certain criteria were not met,

 9   correct?

10   A.  That's correct.

11   Q.  Do you recall that Mr. Levine got sued?

12   A.  Yes.

13   Q.  Yes.  Let me ask you this.  At the time that Florida decided

14   that it was going to not pay for certain prescriptions, I presume

15   it was the belief of the state of Florida that it could do so

16   legally under its prior authorization program; is that correct?

17   A.  It was the belief, yes.

18   Q.  Did you share in that belief?

19   A.  I did.

20   Q.  Now, do you know what happened in that lawsuit?

21   A.  Yes.

22   Q.  Don't you know that at the end of that lawsuit what the court

23   said was that the state of Florida could not refuse to pay for

24   prescriptions through its prior authorization process, but that it

25   could refuse to pay for prescriptions through a restricted
```

1    formulary; is that correct?

2    A.  I don't know that.

3    Q.  You don't know that?

4    A.  I don't know that.

5    Q.  Have you read that opinion?

6    A.  I read that opinion but it's been several years ago and I don't

7    recall that statement.

8    Q.  And you don't have an opinion as to whether that legal opinion

9    was correct, do you, sir?

10   A.  It's not my job to have an opinion about that, the judge made

11   his ruling.

12   Q.  The judge made his ruling.  And other judges have ruled

13   similarly, is that correct, sir, or do you know?

14   A.  I am not a student of the law.

15   Q.  Would you agree with me that the -- I want you to assume that

16   the opinion is as I've described it.  Would you agree with me that

17   that conflicts with your opinion?

18   A.  I don't know.

19        MR. SALES:  Objection, your Honor, he is trying to ask

20   him about a legal opinion that he said he is not a student of the

21   law.

22        MR. MURRAY:  I am asking him, your Honor, whether or

23   not -- let me put it this way.

24   BY MR. MURRAY:

25   Q.  On that question would you defer to the courts as to whether or

1   not a restricted formulary could be adopted under OBRA 90 to refuse

2   to pay for prescriptions?

3   A.  I think you would have to.

4   Q.  Now, you testified that no state has ever adopted an exclusive

5   formulary in response to a black box warning; is that correct?

6   A.  Not to my knowledge.

7   Q.  To your knowledge, has any state ever paid for drugs that it

8   determined through its P&T Committee, or otherwise, suffered from a

9   defect that rendered it unfit to be used by patients?

10  A.  I am not sure I understand your question.

11  Q.  It's a simple question.  To your knowledge, has any state ever

12  refused or not refused -- I'm sorry, has any state ever agreed to

13  pay -- let me rephrase it.

14         To your knowledge, has any state ever agreed to pay for a

15  prescription that it determined the risk outweighed the benefits?

16  A.  That's a very complicated statement, and I am not sure I am

17  smart enough to follow all of the twists and turns in that logic.

18  Can you make that a little simpler for me?

19  Q.  Is your answer that you don't have an opinion in answer to that

20  question?

21  A.  No, it's that I don't understand the twists and turns of the

22  language you're using.

23  Q.  In your experience as director, bureau chief -- I forget your

24  title, sir, and I apologize -- with the Florida Medicaid system,

25  were you ever confronted with a situation where it was determined

1   that the risk of a prescription drug outweighed its benefits before

2   that drug was removed from the market?

3   A.  I don't think that that was our position to be in.

4   Q.  Your testimony is that you didn't have the authority to make

5   that decision?

6   A.  That that authority rested with the Food & Drug Administration.

7   Q.  My question is whether you were ever in that situation, whether

8   or not you ever made that determination, whether or not the P&T

9   Committee for the state of Florida ever made that determination?

10  A.  No.

11  Q.  Certainly the P&T Committee for the state of Florida would not

12  want to subject its Medicaid patients to a drug to which, in which

13  the risk outweighed the benefits; is that correct?

14  A.  Well, I think the P&T Committee considers safety and efficacy

15  and cost on every drug, but they don't stand between the physician

16  prescriber and Food & Drug Administration in making that

17  determination of safety and efficacy.

18  Q.  With respect to that safety-efficacy versus cost or safety,

19  efficacy and cost consideration that you just talked about, does

20  the Florida P&T Committee have a ranking in terms of what should

21  come first, the safety and efficacy or the cost?

22  A.  I don't think that they had a ranking for that.

23  Q.  Do you think they put cost ahead of safety and efficacy?

24  A.  I think it would depend on the drug category.  I can't speak to

25  the internal workings of the minds of individual members.

1    Q.  Do you as an expert in the implementation of PDLs consider it

2    prudent for a P&T Committee to put cost ahead of safety and

3    efficacy?

4    A.  No.  I think to the extent that you can avoid doing that you

5    don't want to do that, you want to balance those equally.

6    Q.  Now, you testified about the FDA's recommendations with respect

7    to Vioxx in 2005, correct?  You've reviewed those?

8    A.  I saw that memorandum, yes.

9    Q.  In that memorandum when that memorandum was written Vioxx was

10   already off the market, correct?

11   A.  That's correct.

12   Q.  Did you review what the FDA said about Bextra, which was a drug

13   that was still on the market?

14   A.  I did.

15   Q.  Do you recall what the FDA's recommendation was with respect to

16   Bextra?

17   A.  I don't know exactly what you're driving at, but I think the

18   recommendation was Bextra should be withdrawn from the market.

19   Q.  That Bextra should not be made available to patients, correct?

20   A.  I don't think that was their word, but.

21   Q.  That's the ultimate outcome?

22   A.  They recommended that Bextra be withdrawn.

23   Q.  Well, they didn't make any recommendation, did they, that Vioxx

24   go back on the market, did they?

25   A.  I don't have that memorandum committed to memory, but as I

```
 1    recall, I think they left the door open that should Merck choose to

 2    do that they could.

 3    Q.  Where in the memorandum does it say that?

 4    A.  Like I said, I don't have that committed to memory.

 5    Q.  Would you like me to give you a copy and you can show me where?

 6    A.  I can go look at.  It may not be there, that was just my

 7    memory.  (WITNESS REVIEWS DOCUMENT.)

 8              Well, if you look on page 3.

 9              MR. MURRAY:  May I approach, your Honor?

10              THE COURT:  Yes.

11              THE WITNESS:  I think this bullet (INDICATING).

12              THE COURT:  Why don't you read it into the record.

13    BY MR. MURRAY:

14    Q.  Will you read that into the record.

15    A.  The third bullet on page 3 says:  The boxed warning -- I'm

16    sorry.

17              The fourth bullet.  "The agency should carefully review

18    any proposal from Merck for resumption of marketing of Vioxx

19    (rofecoxib).  We recommend that such a proposal be reviewed by the

20    FDA Drug Safety Oversight Board and an advisory committee before a

21    final decision is reached."

22    Q.  So they didn't say that the drug should be brought back on the

23    market, did they?

24    A.  I didn't say that.

25    Q.  You said that they left the door open?
```

1    A.  They left the door open.

2    Q.  To your knowledge, was the drug ever brought back on the

3    market?

4    A.  To date, the drug has not been brought back to the market.

5            MR. MURRAY:  One moment, your Honor?

6            THE COURT:  Yes.

7            MR. MURRAY:  Your Honor, I don't have any further

8    questions of the witness.

9            THE COURT:  Any redirect?

10           MR. SALES:  No, your Honor, but we would move to admit

11   Defendant 338 which was talked about in direct and cross.

12           MR. MURRAY:  What is 338?

13           MR. SALES:  It's the FDA memo that was used on direct and

14   cross that he reviewed.

15           THE COURT:  Is that the one that you just gave him?

16           MR. SALES:  Yes, your Honor.

17           MR. MURRAY:  We don't have an objection to the admission

18   of that.

19           THE COURT:  All right.  Let it be admitted.

20           All right.  You're excused.  Thank you, Doctor.

21           The court will stand in recess until 1:45.

22           THE DEPUTY CLERK:  Everyone rise.

23       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

24

25                      *  *  *  *  *

```
 1

 2

 3

 4                          REPORTER'S CERTIFICATE

 5

 6          I, Karen A. Ibos, CCR, Official Court Reporter, United

 7   States District Court, Eastern District of Louisiana, do hereby

 8   certify that the foregoing is a true and correct transcript, to the

 9   best of my ability and understanding, from the record of the

10   proceedings in the above-entitled and numbered matter.

11

12

13

14                          Karen A. Ibos, CCR, RPR, CRR

15                          Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```