1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3


4
   IN RE:  VIOXX PRODUCTS            *
5          LIABILITY LITIGATION      *
                                     *
6  This Document Relates to:        *    MDL No. 1657
                                     *
7       STATE OF LOUISIANA, *ex rel.* *    Section L
        JAMES D. CALDWELL JR.,       *
8       Attorney General             *    New Orleans, Louisiana
                                     *
9            versus                  *    April 15, 2010
                                     *
10      MERCK & CO., INC.            *
                                     *
11                                    *
        Case No. 05-CV-3700          *
12 * * * * * * * * * * * * * * * * * *

13


14                    TRIAL PROCEEDINGS BEFORE THE
15                     HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
16                     DAY 4, AFTERNOON SESSION

17
   APPEARANCES:
18

19 For the Plaintiff:          Dugan Law Firm
                               BY:  JAMES R. DUGAN II, ESQ.
20                             650 Poydras Street, Suite 2150
                               New Orleans, Louisiana 70130
21

22 For the Plaintiff:          Murray Law Firm
                               BY:  STEPHEN B. MURRAY JR., ESQ.
23                                  DOUGLAS R. PLYMALE, ESQ.
                                    JUSTIN BLOOM, ESQ.
24                             650 Poydras Street, Suite 2150
                               New Orleans, Louisiana 70130
25



                          DAILY COPY

```
 1   For the Plaintiff:        Lieff Cabraser Heimann
                                 & Bernstein, LLP
 2                             BY:  DONALD C. ARBITBLIT, ESQ.
                               275 Battery Street, Suite 3000
 3                             San Francisco, California 94111

 4
     For the Defendant:        Goldman Ismail Tomaselli
 5                               Brennan & Baum, LLP
                               BY:  TAREK ISMAIL, ESQ.
 6                                  BRIAN P. O'DONOGHUE, ESQ.
                               1 North Franklin Street, Suite 625
 7                             Chicago, Illinois 60606

 8
     For the Defendant:        Baker Botts, LLP
 9                             BY:  TRAVIS J. SALES, ESQ.
                               910 Louisiana Street
10                             Houston, Texas 77002

11
     For the Defendant:        O'Melveny & Myers, LLP
12                             BY:  SCOTT M. VOELZ, ESQ.
                               400 South Hope Street
13                             Los Angeles, California 90071

14
     Official Court Reporter:  Toni Doyle Tusa, CCR, FCRR
15                             500 Poydras Street, Room HB-406
                               New Orleans, Louisiana 70130
16                             (504) 589-7778

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

DAILY COPY

1                               **I N D E X**

2                                                                    PAGE

3
     Charles Castille
4          Examination                                               708

5    Valerie E. Taylor
           Examination                                               760
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 13:40 | 1 | **AFTERNOON SESSION** |
| 13:40 | 2 | **(April 15, 2010)** |
| 13:40 | 3 | **THE DEPUTY CLERK:**  Everyone rise. |
| 13:51 | 4 | **THE COURT:**  Be seated, please. |
| 13:51 | 5 | **MR. MURRAY:**  Your Honor, if I may, one housekeeping |
| 13:51 | 6 | matter was just brought to my attention.  Among the |
| 13:51 | 7 | Louisiana-specific Merck employee depositions that we |
| 13:51 | 8 | introduced, I forgot to name one of them, Mary Ogle, national |
| 13:51 | 9 | account executive, assigned to, among others, Louisiana |
| 13:51 | 10 | Medicaid.  She's in that binder. |
| 13:51 | 11 | **THE COURT:**  Okay.  We'll include that as part of the |
| 13:51 | 12 | transcript. |
| 13:51 | 13 | All right.  I understand we have several |
| 13:51 | 14 | depositions. |
| 13:51 | 15 | **MR. ISMAIL:**  Yes, Your Honor.  Merck calls by |
| 13:51 | 16 | deposition designation Charles Castille, former undersecretary |
| 13:51 | 17 | of DHH. |
| 13:51 | 18 | (WHEREUPON **Charles Castille**, having been duly sworn, |
| 13:51 | 19 | testified by video deposition as follows.) |
| 13:51 | 20 | **EXAMINATION** |
| 13:51 | 21 | **BY MR. SALES:** |
| 13:51 | 22 | **Q.**   Would you state your full name for the record. |
| 13:51 | 23 | **A.**   My name is Charles Francis Castille. |
| 13:51 | 24 | **Q.**   Mr. Castille, my name is Travis Sales.  I'm one of the |
| 13:52 | 25 | attorneys representing Merck in the lawsuit that the State of |

| | | |
|---|---|---|
| 13:52 | 1 | Louisiana has brought.  You and I just met briefly before the |
| 13:52 | 2 | start of the deposition today; is that correct? |
| 13:52 | 3 | **A.**   That is correct. |
| 13:52 | 4 | **Q.**   How are you employed, Mr. Castille? |
| 13:52 | 5 | **A.**   I'm employed as the undersecretary for the Department of |
| 13:52 | 6 | Health and Hospitals. |
| 13:52 | 7 | **Q.**   For the State of Louisiana? |
| 13:52 | 8 | **A.**   That is correct. |
| 13:52 | 9 | **Q.**   Have you ever given a deposition before today? |
| 13:52 | 10 | **A.**   Yes, I have. |
| 13:52 | 11 | **Q.**   On how many occasions? |
| 13:52 | 12 | **A.**   Probably, at least, 20 -- |
| 13:52 | 13 | **Q.**   Okay. |
| 13:52 | 14 | **A.**   -- over the last many years. |
| 13:52 | 15 | **Q.**   Were they in your capacity as undersecretary for the |
| 13:52 | 16 | Department of Health and Hospitals? |
| 13:52 | 17 | **A.**   Most of them were, yes. |
| 13:52 | 18 | **Q.**   I understand that you are originally a lawyer by training |
| 13:52 | 19 | yourself.  Is that correct? |
| 13:52 | 20 | **A.**   That is correct. |
| 13:52 | 21 | **Q.**   Can you give us a little bit of your educational |
| 13:52 | 22 | background. |
| 13:52 | 23 | **A.**   Yes.  I guess I'll start with I graduated from high school |
| 13:52 | 24 | in 1966, Cecilia High School.  I went to college at, at that |
| 13:52 | 25 | time, the University of Southwestern Louisiana, USL, received a |

DAILY COPY

| | | |
|---|---|---|
| 13:53 | 1 | B.A. in history in 1971. |
| 13:53 | 2 | I attend LSU law school and received my juris |
| 13:53 | 3 | doctorate in 1974 and then later on was admitted to the bar, |
| 13:53 | 4 | the Louisiana bar, in October of 1974. |
| 13:53 | 5 | Q.   Are you still currently licensed as a lawyer in the state |
| 13:53 | 6 | of Louisiana? |
| 13:53 | 7 | A.   Yes, I am. |
| 13:53 | 8 | Q.   Do you maintain your continuing legal education |
| 13:53 | 9 | requirements and maintain your license today? |
| 13:53 | 10 | A.   I do. |
| 13:53 | 11 | Q.   I think you said you became licensed as an attorney in |
| 13:53 | 12 | Louisiana in 1974.  What did you do after obtaining your |
| 13:53 | 13 | license? |
| 13:53 | 14 | A.   For a short period of time between my licensure and when I |
| 13:53 | 15 | became actually employed, I was a substitute teacher for a few |
| 13:53 | 16 | months.  Then I took a position as a staff attorney with, at |
| 13:54 | 17 | that time, the Department of Health and Human Resources, which |
| 13:54 | 18 | is the predecessor agency to the Department of Health and |
| 13:54 | 19 | Hospitals.  I worked in the legal -- generally did collections |
| 13:54 | 20 | work for a few years. |
| 13:54 | 21 | I was then promoted to a division director for our |
| 13:54 | 22 | collections section and then was promoted in 1980 to the |
| 13:54 | 23 | position of deputy general counsel for the department. |
| 13:54 | 24 | And then in 1981, approximately -- I think 1981 -- |
| 13:54 | 25 | the general counsel had to take a medical leave, medical |

DAILY COPY

711

| | | |
|---|---|---|
| 13:54 | 1 | retirement, and I replaced him and became general counsel for |
| 13:55 | 2 | the Department of Health and Human Resources. |
| 13:55 | 3 | **Q.**   How long did you serve in that role? |
| 13:55 | 4 | **A.**   I served in that role until 19 -- well, let me -- until |
| 13:55 | 5 | about 19 -- I'm trying to remember because at that -- at one |
| 13:55 | 6 | time -- I served in the role as general counsel in about 1991, |
| 13:55 | 7 | but there was a split of the department. |
| 13:55 | 8 | The department split into two departments:  The |
| 13:55 | 9 | Department of Health and Hospitals, and the Department of |
| 13:55 | 10 | Social Services.  Essentially, the legal staffs were split, and |
| 13:55 | 11 | then I retained my position as general counsel for the |
| 13:55 | 12 | Department of Health and Hospitals and remained in that |
| 13:55 | 13 | position until 1991. |
| 13:55 | 14 | Then, in '91, I assisted in drafting legislation to |
| 13:55 | 15 | create the Louisiana Health Care Authority, which essentially |
| 13:56 | 16 | was the authority to which the charity hospitals, Louisiana |
| 13:56 | 17 | charity hospitals, were transferred.  The charity hospitals |
| 13:56 | 18 | were at one time part of our department. |
| 13:56 | 19 | In 1991, I was asked to be the temporary acting CEO |
| 13:56 | 20 | of Louisiana Health Care Authority, and I remained in -- I was |
| 13:56 | 21 | supposed to be only for a few months but ultimately ended up |
| 13:56 | 22 | being about 18 months.  So at that time, between '91 and '92, I |
| 13:56 | 23 | was the -- I was general counsel but also acting CEO of the |
| 13:56 | 24 | Louisiana Health Care Authority. |
| 13:56 | 25 | **Q.**   Was the Louisiana Health Care Authority a part of the |

DAILY COPY

| | | |
|---|---|---|
| 13:56 | 1 | State of Louisiana government? |
| 13:56 | 2 | **A.**   Yes, it was. |
| 13:56 | 3 | **Q.**   Was that an appointed position from the governor or some |
| 13:57 | 4 | other official? |
| 13:57 | 5 | **A.**   It was, yes.  At that time there was -- between 1991 and |
| 13:57 | 6 | '92, there was a -- an election happened there.  There was a |
| 13:57 | 7 | dispute between the old board that was appointed by the |
| 13:57 | 8 | previous governor, Governor Roemer, and the new board that was |
| 13:57 | 9 | appointed by Governor Edwards, the new governor, who -- the |
| 13:57 | 10 | once and former governor, and I was asked by both sides to be |
| 13:57 | 11 | the interim CEO.  That was apparently the only thing they could |
| 13:57 | 12 | agree on.  So I remained in that position for a while.  So |
| 13:57 | 13 | that's how that occurred. |
| 13:57 | 14 | **Q.**   And so that lasted until 1993? |
| 13:57 | 15 | **A.**   1992. |
| 13:57 | 16 | **Q.**   Okay. |
| 13:57 | 17 | **A.**   And then I returned to the Department of Health and |
| 13:57 | 18 | Hospitals in -- no, I think you're right.  It was '93.  I think |
| 13:58 | 19 | it wasn't until 1993.  I returned as the general counsel for |
| 13:58 | 20 | the Department of Health and -- the Department, at that time, |
| 13:58 | 21 | of Health and Hospitals.  I returned as the general counsel of |
| 13:58 | 22 | the Department of Health and Hospitals, yes. |
| 13:58 | 23 | **Q.**   And how long did you again serve in that capacity? |
| 13:58 | 24 | **A.**   I served in that capacity until 1994.  And then I think it |
| 13:58 | 25 | was in June -- July, excuse me, of 1994, the deputy secretary |

| | | |
|---|---|---|
| 13:58 | 1 | of the Department of Health and Hospitals retired, and I took |
| 13:58 | 2 | his place.  And I remained in that position until February -- |
| 13:58 | 3 | January, excuse me, of 1995, I think.  Yes, 1995. |
| 13:58 | 4 | **Q.**   Did you take any position at that point? |
| 13:58 | 5 | **A.**   No.  I went back -- I went back to my classified position |
| 13:59 | 6 | as general counsel during that period of time until February of |
| 13:59 | 7 | 1998.  And then in February of 1998, I was appointed as |
| 13:59 | 8 | undersecretary of the Department of Health and Hospitals. |
| 13:59 | 9 | **Q.**   Who made that appointment? |
| 13:59 | 10 | **A.**   That appointment was made by Governor Foster. |
| 13:59 | 11 | **Q.**   As I understand it, you were undersecretary of management |
| 13:59 | 12 | and finance of DHH? |
| 13:59 | 13 | **A.**   Yes.  The undersecretary in the Department of Health and |
| 13:59 | 14 | Hospitals, at least when I was undersecretary, had two primary |
| 13:59 | 15 | responsibilities: |
| 13:59 | 16 | One was statutory, which is to be the head of the |
| 13:59 | 17 | Office of Management and Finance, which is generally the |
| 13:59 | 18 | support arm for the department responsible for budget, finance, |
| 13:59 | 19 | personnel, IT, those kinds of things. |
| 13:59 | 20 | In addition, the secretary delegated to me the |
| 13:59 | 21 | authority, the operational day-to-day authority, over the |
| 14:00 | 22 | Medicaid program. |
| 14:00 | 23 | So those were my two primary functions. |
| 14:00 | 24 | **Q.**   Have you served in that role and that general title from |
| 14:00 | 25 | 1998 to the present? |

| | | |
|---|---|---|
| 14:00 | 1 | **A.**   That is correct. |
| 14:00 | 2 | **Q.**   And that's been through Governor Foster, Governor Blanco, |
| 14:00 | 3 | and Governor Jindal's terms? |
| 14:00 | 4 | **A.**   That's correct. |
| 14:00 | 5 | **Q.**   Who was the secretary of DHH when you were first appointed |
| 14:00 | 6 | as the undersecretary? |
| 14:00 | 7 | **A.**   David Hood. |
| 14:00 | 8 | **Q.**   Mr. Castille, let me hand you what's been marked as |
| 14:00 | 9 | Exhibit 1 to your deposition.  This appears to be a 2002-2003 |
| 14:00 | 10 | Louisiana Medicaid annual report.  Your name is on the front, |
| 14:00 | 11 | as well as Secretary Hood and Ben Bearden.  Do you recognize |
| 14:00 | 12 | this document? |
| 14:00 | 13 | **A.**   I do. |
| 14:00 | 14 | **Q.**   And I really want to ask you about page 33, which is kind |
| 14:00 | 15 | of an organizational chart for the department in that time |
| 14:01 | 16 | frame.  Does the organizational chart on page 33 accurately |
| 14:01 | 17 | reflect, as far as you recall, the setup of the Department of |
| 14:01 | 18 | Health and Hospitals in an organizational management structure |
| 14:01 | 19 | in that time frame? |
| 14:01 | 20 | **A.**   Yes, it does. |
| 14:01 | 21 | **Q.**   So was there anything different in 1999 with regard to the |
| 14:01 | 22 | secretary, the undersecretary, the Medicaid director, and the |
| 14:01 | 23 | program manager for the pharmacy unit? |
| 14:01 | 24 | **A.**   No, I don't think there was anything different. |
| 14:01 | 25 | **Q.**   So, for example, when Vioxx came on the market in May of |

14:01  1   1999, you were undersecretary of office and management and
14:01  2   finance?
14:01  3   **A.**   I was.
14:01  4   **Q.**   And you would have reported to Secretary Hood for DHH?
14:01  5   **A.**   I did.
14:01  6   **Q.**   And reporting to you would have been Mr. Bearden?
14:01  7   **A.**   That is correct.
14:01  8   **Q.**   And Ms. Terrebonne would have been the program manager for
14:02  9   the pharmacy unit?
14:02 10   **A.**   Yes, she would have been.
14:02 11   **Q.**   Would it be a fair statement that Ms. Terrebonne and
14:02 12   Mr. Bearden would probably be more involved in the day-to-day
14:02 13   activities of the pharmacy benefit program at their level than
14:02 14   at your level?
14:02 15   **A.**   That would be fair, yes.
14:02 16   **Q.**   Let me ask you:  Have there been any changes to that
14:02 17   organizational structure other than Secretary Hood leaving, I
14:02 18   believe, in 2004?
14:02 19   **A.**   There was one change.  Jerry Phillips -- Ben Bearden
14:02 20   retired.  It's been probably about two, maybe three years now.
14:02 21   And Jerry Phillips, who was deputy director, became the
14:02 22   Medicaid director.
14:02 23   **Q.**   Let me ask it this way.  From 1999 'til 2004, was this an
14:03 24   accurate reflection of the organizational structure?
14:03 25   **A.**   Yes, I think it was.  Yes.

| | | |
|---|---|---|
| 14:03 | 1 | **Q.**   Other than, I believe, at some point in 2004, Secretary |
| 14:03 | 2 | Hood left; is that correct? |
| 14:03 | 3 | **A.**   Yes.  Secretary Hood -- yes, he did. |
| 14:03 | 4 | **Q.**   With regard to being the undersecretary in charge of |
| 14:03 | 5 | finance and management in the DHH, what kind of budget, in |
| 14:03 | 6 | general terms, are you responsible for? |
| 14:03 | 7 | **A.**   Well, in terms of more direct responsibility, I'm |
| 14:03 | 8 | obviously responsible for the budget for the Office of |
| 14:03 | 9 | Management and Finance, as well as having oversight over the |
| 14:03 | 10 | budget for the Medicaid program, both the Medicaid payments |
| 14:03 | 11 | program and a Medicaid administration program. |
| 14:03 | 12 | And then, in a more general sense, I am responsible |
| 14:03 | 13 | for presentation of the budget for the entire department, which |
| 14:04 | 14 | includes other programs, such as the Office of Mental Health, |
| 14:04 | 15 | Office of Public Health.  But I have more involvement directly |
| 14:04 | 16 | in the budgets for management, finance, and Medicaid. |
| 14:04 | 17 | **Q.**   Just so I understand it, then, so you're kind of |
| 14:04 | 18 | responsible for the overall budget, but with regard to -- |
| 14:04 | 19 | you're also responsible for a subset of that, which is the |
| 14:04 | 20 | Medicaid program? |
| 14:04 | 21 | **A.**   That is correct. |
| 14:04 | 22 | **Q.**   The Louisiana Medicaid program has a couple of different |
| 14:04 | 23 | components to it.  One, obviously, it provides medical |
| 14:04 | 24 | assistance to elderly or lower income folks; correct? |
| 14:04 | 25 | **A.**   That is correct. |

| | | |
|---|---|---|
| 14:04 | 1 | **Q.**   And it also provides a prescription drug program? |
| 14:04 | 2 | **A.**   That is correct. |
| 14:04 | 3 | **Q.**   Is that your recollection of the state of the legal |
| 14:04 | 4 | requirements when you took over as undersecretary, that |
| 14:04 | 5 | Louisiana did not have -- they had what's called an open |
| 14:04 | 6 | formulary in 1998? |
| 14:04 | 7 | **A.**   That is correct. |
| 14:04 | 8 | **Q.**   And that Louisiana basically relied upon the Food & Drug |
| 14:05 | 9 | Administration; if they found that a drug product was safe and |
| 14:05 | 10 | effective as labeled, then it was automatically covered under |
| 14:05 | 11 | Louisiana Medicaid.  Is that your understanding? |
| 14:05 | 12 | **A.**   That was my understanding, that is correct. |
| 14:05 | 13 | **Q.**   And then that's how, as you understood, it was applied? |
| 14:05 | 14 | **A.**   Yes, that's my -- that's how it was applied. |
| 14:05 | 15 | **Q.**   I'll show you what's been marked as Exhibit 3 to your |
| 14:05 | 16 | deposition.  Mr. Castille, this is the Louisiana Department of |
| 14:05 | 17 | Health and Hospitals Medicaid pharmaceutical and therapeutics |
| 14:05 | 18 | committee meeting on November 7 2001, and apparently it was |
| 14:05 | 19 | held over at the Southeastern Louisiana University School of |
| 14:05 | 20 | Nursing. |
| 14:05 | 21 |          You're familiar, generally, that minutes are taken |
| 14:05 | 22 | from these meetings of the P&T committee? |
| 14:05 | 23 | **A.**   Yes, I am familiar. |
| 14:05 | 24 | **Q.**   And Ms. Terrebonne is frequently present on behalf of DHH |
| 14:05 | 25 | at these meetings? |

| 14:05 | 1 | A.    That is correct. |
|-------|---|---|

14:05   1   **A.**    That is correct.

14:05   2   **Q.**    She often makes presentations, too, or at least has

14:05   3   discussions at these meetings?

14:05   4   **A.**    Yes, she does.

14:05   5   **Q.**    And there's an attachment called Attachment 2 to these

14:06   6   minutes from this November 7, 2001 meeting.  As you can see

14:06   7   actually on page 4 of the document under "New Business" -- I'm

14:06   8   sorry.  I'm kind of going backwards on you.

14:06   9         Under "New Business," at the end of that first

14:06   10   paragraph, it says:  "See Attachment 2 from Ms. Terrebonne's

14:06   11   presentation."

14:06   12         This one right here.  I'm just asking do you see

14:06   13   where it says --

14:06   14   **A.**    Yes.

14:06   15   **Q.**    -- that Ms. Terrebonne made a presentation that was

14:06   16   Attachment 2?

14:06   17   **A.**    Yes, I see that.

14:06   18   **Q.**    You have, I take it, no reason to believe that the minutes

14:06   19   that are taken at these meetings are anything but accurate;

14:06   20   right?

14:06   21   **A.**    That is correct.

14:06   22   **Q.**    If we go to that Attachment 2, toward the back, she was

14:06   23   giving an OBRA 90 and OBRA 93 overview and impact on

14:07   24   prescription drug coverage.  Do you see that?

14:07   25   **A.**    Yes, I do.

DAILY COPY

| | | |
|---|---|---|
| 14:07 | 1 | **Q.**   And, again, under your understanding, before there was |
| 14:07 | 2 | this law change -- |
| 14:07 | 3 |           **THE COURT:**  I'm just trying to follow the tab. |
| 14:07 | 4 |           **MR. ISMAIL:**  The Judge's binder, is that of exhibits? |
| 14:07 | 5 |                Oh, Your Honor, I apologize.  That's going to be |
| 14:07 | 6 | the proffered evidence at the conclusion of the deposition. |
| 14:07 | 7 |           **THE COURT:**  I've got it.  Okay. |
| 14:07 | 8 | **BY MR. SALES:** |
| 14:07 | 9 | **Q.**   -- that we are going to talk about in 2001 establishing a |
| 14:07 | 10 | preferred drug list, was it your understanding, as she lays out |
| 14:07 | 11 | here, that under A-1 a covered outpatient drug is a drug that |
| 14:07 | 12 | may be dispensed only by a prescription; and, B, a drug that's |
| 14:07 | 13 | been approved as safe and effective by the FDA? |
| 14:07 | 14 | **A.**   A-1? |
| 14:07 | 15 | **Q.**   Yes, sir. |
| 14:07 | 16 | **A.**   Yes, that was my understanding. |
| 14:08 | 17 | **Q.**   And that's how the State of Louisiana applied the |
| 14:08 | 18 | Louisiana Medicaid drug program from the time you took over in |
| 14:08 | 19 | 1998 until that law change, which we'll talk about, which I |
| 14:08 | 20 | think becomes effective in 2002; is that correct? |
| 14:08 | 21 | **A.**   Yes, that is correct.  That's my understanding. |
| 14:08 | 22 | **Q.**   Vioxx was a covered drug and, therefore, in 1999, when it |
| 14:08 | 23 | came on the market, it was approved by the federal drug |
| 14:08 | 24 | administration? |
| 14:08 | 25 | **A.**   Yes, it would have been. |

| 14:08 | 1 | **Q.** At that point in time, there was no prior authorization |
| 14:08 | 2 | process or any other process by which Louisiana would have in |
| 14:08 | 3 | any way restricted coverage or reimbursement for an |
| 14:08 | 4 | FDA-approved product; is that correct? |
| 14:08 | 5 | **A.** Yes, that's my understanding. |
| 14:08 | 6 | **Q.** Let me show you what's been marked as Exhibit 5.  Are you |
| 14:08 | 7 | familiar with this document? |
| 14:08 | 8 | **A.** Yes. |
| 14:09 | 9 | **Q.** It appears to be the September 4, 2002 minutes from the |
| 14:09 | 10 | Louisiana DHH Medicaid pharmaceutical and therapeutics |
| 14:09 | 11 | committee; is that correct? |
| 14:09 | 12 | **A.** That is correct. |
| 14:09 | 13 | **Q.** It looks like you were present at this one. |
| 14:09 | 14 | **A.** Yes.  My name appears on it. |
| 14:09 | 15 | **Q.** I want to ask you:  On page of the September 4, 2002 |
| 14:09 | 16 | meeting minutes, there is a presentation that you gave; is that |
| 14:09 | 17 | correct? |
| 14:09 | 18 | **A.** Yes. |
| 14:09 | 19 | **Q.** And about halfway down from that paragraph on your |
| 14:09 | 20 | presentation, it says, "He" -- Mr. Castille -- "explained the |
| 14:09 | 21 | relationship between a state Medicaid program and drug |
| 14:09 | 22 | manufacturers is not direct.  He stated that drugs are |
| 14:09 | 23 | purchased from pharmacies that provide the prescription |
| 14:09 | 24 | services and are reimbursed by states for a prescription drug |
| 14:09 | 25 | ingredient cost plus a dispensing fee."  Is that right? |

| | | |
|---|---|---|
| 14:09 | 1 | **A.**   Yes, that is correct. |
| 14:09 | 2 | **Q.**   And that's an accurate statement, as you understand it? |
| 14:09 | 3 | **A.**   Yes.  As I understand it, yes, that was -- it was an -- |
| 14:10 | 4 | was an accurate -- |
| 14:10 | 5 | **Q.**   And currently is? |
| 14:10 | 6 | **A.**   Yes, an accurate statement. |
| 14:10 | 7 | **Q.**   Was then and still -- that's still your understanding of |
| 14:10 | 8 | it; correct? |
| 14:10 | 9 | **A.**   Yes.  Except there is now somewhat a relationship with |
| 14:10 | 10 | regard to the state supplemental rebates.  But other than that, |
| 14:10 | 11 | that statement is correct. |
| 14:10 | 12 | **Q.**   And so there's not a direct payment, for example, from DHH |
| 14:10 | 13 | or Medicaid, Louisiana Medicaid, to a drug manufacturer; right? |
| 14:10 | 14 | **A.**   That is correct. |
| 14:10 | 15 | **Q.**   The drug manufacturer doesn't apply for a benefit or |
| 14:10 | 16 | submit a benefit to DHH; that's being applied for by the |
| 14:10 | 17 | pharmacies? |
| 14:10 | 18 | **A.**   That is correct. |
| 14:10 | 19 | **Q.**   Just going back, then.  So kind of breaking this down, |
| 14:10 | 20 | then, into a couple time frames.  Before the law change that |
| 14:10 | 21 | set up a preferred drug list process, as the undersecretary, |
| 14:10 | 22 | you understood that Louisiana Medicaid could not legally |
| 14:10 | 23 | restrict payments for any FDA-approved product; is that right? |
| 14:11 | 24 | I'm asking for your understanding as undersecretary. |
| 14:11 | 25 | **A.**   That is my understanding, yes, that is correct. |

DAILY COPY

| | | |
|---|---|---|
| 14:11 | 1 | **Q.**   And never tried to do so to your knowledge? |
| 14:11 | 2 | **A.**   Not to my knowledge. |
| 14:11 | 3 | **Q.**   It would be strictly relying upon, again, the FDA's |
| 14:11 | 4 | determination that a product has been approved for use by a |
| 14:11 | 5 | prescribing doctor to a patient? |
| 14:11 | 6 | **A.**   That is correct.  That's my understanding. |
| 14:11 | 7 | **Q.**   Is it your understanding that the State of Louisiana did |
| 14:11 | 8 | not then and does not currently make some determination, |
| 14:11 | 9 | independent of the FDA, whether a drug is safe and effective? |
| 14:11 | 10 | Is that correct? |
| 14:11 | 11 | **A.**   That's my understanding, that is correct. |
| 14:11 | 12 | **Q.**   Now, Mr. Castille, let me show you what's been marked as |
| 14:11 | 13 | Exhibit 6 to your deposition. |
| 14:11 | 14 | **A.**   Yes, I see it. |
| 14:11 | 15 | **Q.**   Do you recognize this document? |
| 14:11 | 16 | **A.**   Yes.  It appears to be the minutes of the Medicaid |
| 14:12 | 17 | pharmaceutical and therapeutics committee meeting of August 8, |
| 14:12 | 18 | 2001. |
| 14:12 | 19 | **Q.**   It obviously lists all the people who were present at the |
| 14:12 | 20 | meeting:  The P&T committee members.  Some people were absent. |
| 14:12 | 21 | And then it shows DHH staff.  Is that correct? |
| 14:12 | 22 | **A.**   Yes. |
| 14:12 | 23 | **Q.**   And it shows that you were present at this meeting? |
| 14:12 | 24 | **A.**   Yes, it does. |
| 14:12 | 25 | **Q.**   If you look at page 2, at the very top, it talks about: |

DAILY COPY

14:12    1    "Secretary David Hood opened the meeting by introducing the DHH
14:12    2    staff.  He gave a brief synopsis of the legislation that had
14:12    3    become Act 395."
14:12    4             Is that your recollection that this was the first
14:12    5    meeting of the P&T committee that had been established as a
14:12    6    result of the law change that we talked about?
14:12    7    A.   Yes, that is my recollection.  The timing would have been
14:12    8    about then, yes.
14:12    9    Q.   It talks about that "The act requires that the
14:12   10    committee" -- that's the P&T committee; right?
14:12   11    A.   Correct.
14:13   12    Q.   -- "determine the effectiveness of drugs based on medical
14:13   13    evidence and to determine cost-effectiveness of drugs not based
14:13   14    solely on their cost but also on the cost of avoiding illness
14:13   15    or hospitalizations, and Mr. Hood stated the committee must
14:13   16    ensure its integrity and credibility."
14:13   17    A.   That is what it says here.
14:13   18    Q.   You agree with that statement?
14:13   19    A.   Yes.
14:13   20    Q.   That the idea was that the P&T committee would be a group
14:13   21    that would make evidence-based decisions about which product
14:13   22    should be on the preferred drug list or the not-preferred drug
14:13   23    list; is that correct?
14:13   24    A.   Yes, that's my understanding.
14:13   25    Q.   And that they should consider in that medical

DAILY COPY

| | | |
|---|---|---|
| 14:13 | 1 | evidence-based determination not only the individual cost of a |
| 14:13 | 2 | product but the cost of avoiding illness and hospitalizations |
| 14:13 | 3 | in making those determinations? |
| 14:13 | 4 | **A.**   Yes, that is correct. |
| 14:14 | 5 | **Q.**   It was very important to have the committee be viewed as |
| 14:14 | 6 | having high integrity and independence and credibility; is that |
| 14:14 | 7 | correct? |
| 14:14 | 8 | **A.**   Yes, that was important. |
| 14:14 | 9 | **Q.**   And is that, in your experience, how that had worked? |
| 14:14 | 10 | **A.**   Generally, yes, I think that that is how it has worked. |
| 14:14 | 11 | **Q.**   Do you recall that, first of all, when the law changed in |
| 14:14 | 12 | 2001 to, for the first time, permit some type of potential |
| 14:14 | 13 | restriction, prior authorization on reimbursements for |
| 14:14 | 14 | FDA-approved products, that the state hired the University of |
| 14:14 | 15 | Louisiana-Monroe School of Pharmacy to act as a consultant to |
| 14:14 | 16 | DHH? |
| 14:14 | 17 | **A.**   I do recall that, yes. |
| 14:14 | 18 | **Q.**   Were you involved in that process of hiring or retaining |
| 14:14 | 19 | ULM? |
| 14:14 | 20 | **A.**   Yes, I was. |
| 14:14 | 21 | **Q.**   Dr. Gina Biglane, who was the pharmacist, PharmD, at ULM, |
| 14:15 | 22 | was the person that the state retained to help in that process? |
| 14:15 | 23 | **A.**   As I recall, yes, it was her. |
| 14:15 | 24 | **Q.**   And, obviously, the State of Louisiana DHH had a |
| 14:15 | 25 | significant budget to go out and, if they needed to, to hire |

| | | |
|---|---|---|
| 14:15 | 1 | credible, well-experienced experts to help consult; correct? |
| 14:15 | 2 | A.   Yes.  That was -- we had the administrative funding to be |
| 14:15 | 3 | able to hire the kinds of people that we needed to make this |
| 14:15 | 4 | work. |
| 14:15 | 5 | Q.   And ULM is still acting as a consultant currently? |
| 14:15 | 6 | A.   Yes, that's my understanding. |
| 14:15 | 7 | Q.   Have they, in your opinion, done a very professional, |
| 14:15 | 8 | credible job in consulting with the state in their role as both |
| 14:15 | 9 | originally dealing with setting up the prior authorization |
| 14:15 | 10 | process as well as implementing that process? |
| 14:15 | 11 | A.   Yes, I think they have done a pretty good job.  I've |
| 14:16 | 12 | always been pleased with their work. |
| 14:16 | 13 | Q.   Do you recall there was obviously some time necessary to |
| 14:16 | 14 | establish a significant change in the way the Medicaid program |
| 14:16 | 15 | had been run in Louisiana, to set up a P&T committee and set up |
| 14:16 | 16 | the process, from when the law changed until that first class |
| 14:16 | 17 | of drugs was actually reviewed and decisions were made? |
| 14:16 | 18 | A.   Yes.  That did not happen overnight. |
| 14:16 | 19 | Q.   Do you recall when that first review happened?  Was it in |
| 14:16 | 20 | 2002? |
| 14:16 | 21 | A.   Yes, I think it was.  I think there were some meetings in |
| 14:16 | 22 | 2001, generally, kind of setting out -- well, first of all, |
| 14:16 | 23 | appointing the P&T committee, and then briefing them on their |
| 14:16 | 24 | role, and then meetings -- then later meetings really addressed |
| 14:17 | 25 | the issue of establishing the preferred drug list. |

DAILY COPY

726

| | |
|---|---|
| 14:17 | 1 |
| 14:17 | 2 |
| 14:17 | 3 |
| 14:17 | 4 |

14:17    1              So I don't recall specifically if anything was done
14:17    2    in 2001 with regard to the PDL, but certainly in 2002 there
14:17    3    were meetings specifically with regard to the issue of
14:17    4    establishing the PDL.
14:17    5    Q.    We'll go through some of these meetings, but it's fair to
14:17    6    say that at least through 2002 -- did you understand that Vioxx
14:17    7    was in a group called a COX-2 inhibitor?
14:17    8    A.    I was not aware of that at the time.
14:17    9    Q.    Is that familiar with you now as far as just the class?
14:17   10    A.    Yes, now.  Now I am, obviously, familiar with it.
14:17   11    Q.    And it's in part of a larger group of traditional NSAIDs,
14:18   12    nonsteroidal anti-inflammatory drugs?
14:18   13    A.    That's my understanding, yes.
14:18   14    Q.    And this is going back before this process was instituted
14:18   15    after the law changed.  Those drugs were all automatically
14:18   16    covered without restriction by Louisiana Medicaid?
14:18   17    A.    That was my understanding, yes.
14:18   18    Q.    And the drug manufacturer, you know, had nothing to do
14:18   19    with regard to making some type of presentation or
14:18   20    representation or submitting anything.  If it was an
14:18   21    FDA-approved product, it was approved.
14:18   22    A.    That is my understanding how it happened, yes, how it
14:18   23    worked.
14:18   24    Q.    How it worked.  And so, for example, nothing Merck said or
14:18   25    did with regard to Vioxx had anything to do with the State of

DAILY COPY

| | | |
|---|---|---|
| 14:18 | 1 | Louisiana covering Vioxx in 1999 and 2000 and 2001 until those |
| 14:18 | 2 | products were reviewed; correct? |
| 14:18 | 3 | A.   That is my understanding, yes. |
| 14:18 | 4 | Q.   And so you would agree with me, you know, the State of |
| 14:19 | 5 | Louisiana covering Vioxx for Medicaid in that time frame had |
| 14:19 | 6 | nothing to do with any type of representation or |
| 14:19 | 7 | misrepresentation by Merck? |
| 14:19 | 8 | A.   Yes, that is my understanding, that it was based on the |
| 14:19 | 9 | fact that they were approved by the FDA. |
| 14:19 | 10 | Q.   Mr. Castille, let me show you what's been marked as |
| 14:19 | 11 | Exhibit 8 to your deposition.  Do you recognize that document? |
| 14:19 | 12 | A.   Yes, I do.  It's the minutes of the Medicaid |
| 14:19 | 13 | pharmaceutical and therapeutics committee meeting of January 9, |
| 14:19 | 14 | 2002. |
| 14:19 | 15 | Q.   It appears at this meeting you were present; is that |
| 14:19 | 16 | right? |
| 14:19 | 17 | A.   Yes, it does.  It shows that I was present. |
| 14:19 | 18 | Q.   On page 2 under "New Business" -- |
| 14:19 | 19 | A.   Yes, I see. |
| 14:19 | 20 | Q.   Under current program coverage, exclusion of new drugs, |
| 14:19 | 21 | B -- do you see that? |
| 14:19 | 22 | A.   Yes, I do. |
| 14:20 | 23 | Q.   It looks like Ms. Terrebonne was giving a presentation. |
| 14:20 | 24 | Under drugs currently covered by the program -- do you see |
| 14:20 | 25 | that? |

DAILY COPY

14:20    1    A.    Yes, I do.
14:20    2    Q.    It says, "Ms. Terrebonne presented the department's" --
14:20    3    she's talking about DHH?
14:20    4    A.    Yes.  Yes, she would be.
14:20    5    Q.    -- "presented the department's recommendation that all
14:20    6    drugs which are currently covered will remain in payable status
14:20    7    without requiring prior authorization until the P&T committee
14:20    8    reviews drugs or therapeutic classes under the
14:20    9    pharmacopoeia" -- I always mispronounce that -- "process and
14:20   10    makes decisions."
14:20   11    A.    Yes, that's what the statement says.
14:20   12    Q.    And that's how it worked?
14:20   13    A.    Yes, that's my understanding.
14:20   14    Q.    So, in other words, all FDA-approved products were covered
14:20   15    without restriction, fully reimbursed, as long as they were
14:20   16    FDA-approved, until they went through a review process by the
14:20   17    P&T committee and a decision was made.  For example, if they
14:21   18    were on the nonpreferred drug list prior authorization, that
14:21   19    would be the first time that drug or that class would be in any
14:21   20    way restricted under Louisiana Medicaid?
14:21   21    A.    Yes.  That was my understanding of how it would work.
14:21   22    Q.    And that's how it did work?
14:21   23    A.    Yes.  That is correct.
14:21   24    Q.    Mr. Castille, what is Exhibit 9 to your deposition?
14:21   25    A.    It shows this as the Medicaid pharmaceutical and

DAILY COPY

| | | |
|---|---|---|
| 14:21 | 1 | therapeutics committee meeting of March 6, 2002 minutes. |
| 14:21 | 2 | **Q.**   And it looks like, at this meeting, you were present. |
| 14:21 | 3 | **A.**   Yes, it indicates that I was present. |
| 14:21 | 4 | **Q.**   And if you see on -- under the minutes for the March 6, |
| 14:21 | 5 | 2002 meeting, under "Old Business," it reports that prior |
| 14:21 | 6 | authorization status reports, that Ms. Terrebonne and Dr. Gina |
| 14:21 | 7 | Biglane -- you understand that she's at ULM? |
| 14:21 | 8 | **A.**   That is correct, yes. |
| 14:21 | 9 | **Q.**   That's the state's consultant; right? |
| 14:21 | 10 | **A.**   That is my understanding, yes. |
| 14:22 | 11 | **Q.**   -- gave status reports on the prior authorization project. |
| 14:22 | 12 |         Is it fair to say at this point in time that the |
| 14:22 | 13 | prior authorization system was not yet up and running? |
| 14:22 | 14 | **A.**   Yes.  The notes indicate that there were delays so that -- |
| 14:22 | 15 | and that the minutes indicate that the realistic target date |
| 14:22 | 16 | would be April of 2002. |
| 14:22 | 17 | **Q.**   If you look under "New Business" on page 3, under B, |
| 14:22 | 18 | "Provider Synergies," it talks about Secretary Hood informing |
| 14:22 | 19 | the committee that he had invited Mr. Terry Taylor and |
| 14:22 | 20 | Mr. David Medvedeff from Provider Synergies to attend the |
| 14:22 | 21 | meeting and present their experiences with the Florida Medicaid |
| 14:22 | 22 | prior authorization and supplemental rebate process. |
| 14:22 | 23 | **A.**   Yes.  The minutes do indicate that, and that was my |
| 14:22 | 24 | remembrance. |
| 14:23 | 25 | **Q.**   You actually recall this?  This is a significant meeting; |

14:23   1    right?  In the sense that you were talking about hiring a new

14:23   2    consultant to work on this new prior authorization process?

14:23   3    A.   Yes, it was significant.

14:23   4    Q.   It says that "Mr. Hood indicated it was the department's

14:23   5    intent to utilize their services in Louisiana and would be

14:23   6    asking for the committee's consent after the presentation."

14:23   7              And then Mr. Terry Taylor, the president of Provider

14:23   8    Synergies, made a presentation on the Florida experience; is

14:23   9    that correct?

14:23   10   A.   Yes.  That's what the minutes indicate.  That was what I

14:23   11   remember.

14:23   12   Q.   And Provider Synergies -- the recommendation was approved

14:23   13   and Provider Synergies was hired?

14:23   14   A.   Yes, that was my recollection.

14:23   15   Q.   Were you involved in the selection process for Provider

14:23   16   Synergies?

14:23   17   A.   Yes, I was.

14:23   18   Q.   Can you explain that a little better.

14:23   19   A.   It was related, really, to Provider Synergies' experience

14:23   20   in Florida and the fact that Florida, after some -- Florida had

14:24   21   developed, really, to my understanding, the first preferred

14:24   22   drug list among the states, and there was litigation involving

14:24   23   that.  Ultimately, as a result of that litigation, the district

14:24   24   court indicated that Florida was -- that the use of a preferred

14:24   25   drug list and state supplemental rebates were allowable under

| | | |
|---|---|---|
| 14:24 | 1 | Medicaid law.  Provider Synergies was the contractor that |
| 14:24 | 2 | Florida had used to develop its program. |
| 14:24 | 3 | **Q.**   So the State of Louisiana decided to hire them, with their |
| 14:24 | 4 | expertise and experience with Florida, to come over and act as |
| 14:24 | 5 | a consultant on the preferred drug list prior authorization |
| 14:24 | 6 | program for Louisiana? |
| 14:24 | 7 | **A.**   That is correct. |
| 14:25 | 8 | **Q.**   Did you actually have any involvement in negotiating with |
| 14:25 | 9 | Provider Synergies their contract? |
| 14:25 | 10 | **A.**   Yes.  To some extent, I was involved. |
| 14:25 | 11 | **Q.**   And was it your understanding that Provider Synergies was |
| 14:25 | 12 | going to -- represented and, in fact, did bring expertise to |
| 14:25 | 13 | looking at classes of drugs independently, making a |
| 14:25 | 14 | recommendation to the P&T committee based on those classes of |
| 14:25 | 15 | drugs for the PDL list? |
| 14:25 | 16 | **A.**   That was my understanding, yes. |
| 14:25 | 17 | **Q.**   They had that experience, and you believe they had the |
| 14:25 | 18 | expertise to do that? |
| 14:25 | 19 | **A.**   I did. |
| 14:25 | 20 | **Q.**   Part of what you understood that they were being hired to |
| 14:25 | 21 | do and the expertise that they had is that they could do a cost |
| 14:25 | 22 | analysis of these drug classes, negotiate supplemental rebates |
| 14:25 | 23 | to get the State of Louisiana the best deal that it could for |
| 14:25 | 24 | those drugs, and then make a recommendation overall based upon |
| 14:26 | 25 | that cost analysis as well as their independent clinical |

| | | |
|---|---|---|
| 14:26 | 1 | review? |
| 14:26 | 2 | A.   Yes, that was my understanding. |
| 14:26 | 3 | Q.   And in your experience in working with Provider Synergies, |
| 14:26 | 4 | is that what they have done? |
| 14:26 | 5 | A.   Based on my experience, yes, that is what they have done. |
| 14:26 | 6 | Q.   Do you recall the process being that they were going to |
| 14:26 | 7 | look at peer-reviewed clinical published data and FDA labeling |
| 14:26 | 8 | as a primary source of what their recommendations were going to |
| 14:26 | 9 | be, other than the cost side? |
| 14:26 | 10 | A.   Yes, that was my understanding. |
| 14:26 | 11 | Q.   Mr. Castille, Exhibit 10 to your deposition, can you tell |
| 14:26 | 12 | the jury what that is. |
| 14:26 | 13 | A.   Yes.  This is a copy of the contract between the |
| 14:26 | 14 | Department of Health and Hospitals and Provider Synergies, |
| 14:26 | 15 | dated March 19, 2002 until March 18, 2005. |
| 14:26 | 16 | Q.   Is that consistent with your recollection as to the time |
| 14:26 | 17 | frame that Provider Synergies was hired? |
| 14:27 | 18 |        I think we saw the March 2002 minutes where the |
| 14:27 | 19 | recommendation was made.  So, to your recollection, is it that |
| 14:27 | 20 | Provider Synergies became the consultant, that independent |
| 14:27 | 21 | consultant to the state on March 19, 2002? |
| 14:27 | 22 | A.   Yes, that is my recollection. |
| 14:27 | 23 | Q.   It appears that the state agreed to -- well, as I |
| 14:27 | 24 | understand it -- and correct me if I'm misunderstanding it -- |
| 14:27 | 25 | is that the state agreed to pay a monthly fee to Provider |

DAILY COPY

| | | |
|---|---|---|
| 14:27 | 1 | Synergies not to exceed 7.56 million over the term of the |
| 14:27 | 2 | contract.  Is that -- |
| 14:27 | 3 | A.    That is correct.  The maximum contract amount is |
| 14:27 | 4 | 7.56 million.  It was based on a -- I'm trying to see the |
| 14:27 | 5 | payment provisions, but I understand it was monthly payments. |
| 14:28 | 6 | Q.    Do you recall that, at least, on this first contract, that |
| 14:28 | 7 | there was also some incentive payments, that Provider Synergies |
| 14:28 | 8 | would receive some percentage bonus for every $15 million of |
| 14:28 | 9 | savings the State of Louisiana received? |
| 14:28 | 10 | A.    I don't remember the exact number, but I do recall there |
| 14:28 | 11 | was an incentive payment provision. |
| 14:28 | 12 | Q.    I think if you look at the Bates number at the bottom of |
| 14:28 | 13 | 2850, that page, there's a chart set forth there that talks |
| 14:28 | 14 | about savings and performance bonuses. |
| 14:28 | 15 | A.    Yes, I see it. |
| 14:28 | 16 | Q.    So it looks like that after 20 million, about every |
| 14:28 | 17 | $15 million they would receive a $250,000 bonus? |
| 14:29 | 18 | A.    Yes, that is correct. |
| 14:29 | 19 | Q.    Do you recall Provider Synergies meeting these performance |
| 14:29 | 20 | savings goals and actually receiving performance bonuses? |
| 14:29 | 21 | A.    As I recall, they did. |
| 14:29 | 22 | Q.    So I take it you put this in here on behalf of DHH to |
| 14:29 | 23 | incentivize them to do a good job on the cost-savings |
| 14:29 | 24 | component; right? |
| 14:29 | 25 | A.    Yes.  That was the rationale. |

| | | |
|---|---|---|
| 14:29 | 1 | **Q.**    And obviously, they were also charged with negotiating |
| 14:29 | 2 | supplemental rebates with manufacturers as part of |
| 14:29 | 3 | recommendations to be on the preferred drug list? |
| 14:29 | 4 | **A.**    That is correct. |
| 14:29 | 5 | **Q.**    Do you recall that if companies didn't agree to the |
| 14:29 | 6 | supplemental rebates, that was going to obviously be a negative |
| 14:29 | 7 | factor in recommendation for their products to be on the |
| 14:29 | 8 | preferred drug list? |
| 14:29 | 9 | **A.**    Yes, that was my recollection. |
| 14:29 | 10 | **Q.**    And do you recall Merck initially not agreeing to |
| 14:30 | 11 | supplemental rebates in 2002 with regard to Merck products? |
| 14:30 | 12 | **A.**    Yes, I do recall that. |
| 14:30 | 13 | **Q.**    And we are going to get into a couple of -- the minutes |
| 14:30 | 14 | coming forward, but do you recall that that was the significant |
| 14:30 | 15 | reason that some of its products were put on the original |
| 14:30 | 16 | nonpreferred drug list? |
| 14:30 | 17 | **A.**    Yes, that was generally the reason. |
| 14:30 | 18 | **Q.**    Do you recall that in 2003 Merck agreed to negotiate |
| 14:30 | 19 | supplemental rebates through Provider Synergies with the State |
| 14:30 | 20 | of Louisiana and that that was, obviously, a welcome |
| 14:30 | 21 | development from your perspective? |
| 14:30 | 22 | **A.**    I don't recall the exact date, but I do recall Merck |
| 14:30 | 23 | changed their minds and did agree to participate in the |
| 14:30 | 24 | program. |
| 14:30 | 25 | **Q.**    And when they did that, some of those products that had |

| 14:30 | 1 | originally been put on the nonpreferred were recommended be put |
| 14:30 | 2 | on the preferred? |
| 14:30 | 3 | A.   As I recall, yes, that did occur. |
| 14:31 | 4 | Q.   It was your view and the department's view that Provider |
| 14:31 | 5 | Synergies had done a good job? |
| 14:31 | 6 | A.   Yes. |
| 14:31 | 7 | Q.   And that they had done what they had said, that they would |
| 14:31 | 8 | negotiate these supplemental rebates and that they would do an |
| 14:31 | 9 | independent review and make independent recommendations to the |
| 14:31 | 10 | committee? |
| 14:31 | 11 | A.   Yes.  They had complied with the terms of their previous |
| 14:31 | 12 | contract, and we felt they had done a good job. |
| 14:31 | 13 | Q.   I take it, obviously, as of November of 2004, you did not |
| 14:31 | 14 | have any complaint that they had made improper recommendations |
| 14:31 | 15 | about drug products for the preferred drug list? |
| 14:31 | 16 | A.   No, I do not recall any complaints. |
| 14:31 | 17 | Q.   I take it that's generally true and also specifically true |
| 14:31 | 18 | with regard to Merck or with regard to Vioxx, that there were |
| 14:31 | 19 | no complaints about any recommendations that Provider Synergies |
| 14:31 | 20 | had made to the P&T committee about Vioxx? |
| 14:31 | 21 | A.   I do not recall any such complaints. |
| 14:31 | 22 | Q.   Even to today, are you aware of any such complaints? |
| 14:32 | 23 | A.   I'm not aware of any complaints about the quality of the |
| 14:32 | 24 | work of Provider Synergies generally or with respect to Merck |
| 14:32 | 25 | and Vioxx. |

| 14:32 | 1 | **Q.**   Do you recall that Provider Synergies -- obviously, they |
| 14:32 | 2 | were negotiating with the manufacturers once they got those |
| 14:32 | 3 | notices for supplemental rebates, and they were also doing an |
| 14:32 | 4 | independent clinical review; right? |
| 14:32 | 5 | **A.**   That is correct.  That's my recollection of what they did. |
| 14:32 | 6 | **Q.**   And they would prepare what's called class monographs? |
| 14:32 | 7 | **A.**   Yes, that is correct. |
| 14:32 | 8 | **Q.**   Did you see the class monographs? |
| 14:32 | 9 | **A.**   I saw some of them.  I didn't always know what they said, |
| 14:32 | 10 | but I saw some of them. |
| 14:32 | 11 | **Q.**   Exhibit 12 to your deposition, Mr. Castille, appears to be |
| 14:32 | 12 | the first class monograph dated February 2002 prepared by |
| 14:32 | 13 | Provider Synergies for COX-2 inhibitors.  Is that correct? |
| 14:32 | 14 | **A.**   Yes, that is correct. |
| 14:32 | 15 | **Q.**   Do you recall seeing this particular monograph? |
| 14:32 | 16 | **A.**   I don't recall specifically, but generally I think I |
| 14:33 | 17 | probably would have seen it.  I can't say for sure. |
| 14:33 | 18 | **Q.**   Mr. Castille, would you read these monographs if you |
| 14:33 | 19 | received them? |
| 14:33 | 20 | **A.**   Yes, I would.  Not in any great detail, obviously.  I'm |
| 14:33 | 21 | not a pharmacist.  But, generally, I would read them. |
| 14:33 | 22 | **Q.**   If you look at page 6 of that original monograph, there's |
| 14:33 | 23 | a section called "Cardiovascular Concerns." |
| 14:33 | 24 | **A.**   Yes, I see that. |
| 14:33 | 25 | **Q.**   If you see, within that section of cardiovascular concerns |

| | | |
|---|---|---|
| 14:33 | 1 | prepared by Provider Synergies in February 2002, it discusses a |
| 14:34 | 2 | couple of different clinical trials.  Do you see that, the |
| 14:34 | 3 | VIGOR trial -- |
| 14:34 | 4 | **A.**   Yes. |
| 14:34 | 5 | **Q.**   -- and the CLASS trial? |
| 14:34 | 6 | **A.**   Yes, I see that. |
| 14:34 | 7 | **Q.**   It goes into some discussion about the studies and about |
| 14:34 | 8 | the potential cardiovascular concerns of COX-2 inhibitors; is |
| 14:34 | 9 | that correct? |
| 14:34 | 10 | **A.**   That is correct. |
| 14:34 | 11 | **Q.**   This monograph would have gone to the P&T committee |
| 14:34 | 12 | members? |
| 14:34 | 13 | **A.**   Yes, it would have. |
| 14:34 | 14 | **Q.**   As I understand it, this would go to the P&T committee |
| 14:34 | 15 | members sometime before the meeting so they would have a chance |
| 14:34 | 16 | to review; and if they had any questions, they could raise them |
| 14:34 | 17 | with Provider Synergies? |
| 14:34 | 18 | **A.**   Yes, that was my understanding. |
| 14:34 | 19 | **Q.**   Exhibit 13.  Mr. Castille, what is Exhibit 13? |
| 14:34 | 20 | **A.**   It's the minutes to the Medicaid pharmaceutical and |
| 14:34 | 21 | therapeutics committee of May 8, 2002. |
| 14:34 | 22 | **Q.**   And are you present at that meeting? |
| 14:34 | 23 | **A.**   Yes, it indicates that I was present. |
| 14:34 | 24 | **Q.**   Do you recall that COX-2s and NSAIDs and some other drugs |
| 14:35 | 25 | were being -- we saw that first group of drugs, or classes of |

14:35  1    drugs, that were going to be reviewed, and that did not include

14:35  2    the COX-2s.  Do you recall that the second -- that COX-2s were

14:35  3    included in the second group of review?

14:35  4    A.    I don't recall specifically.  I know, ultimately, they

14:35  5    were reviewed.

14:35  6    Q.    Does it appear that they were reviewed at this May 8, 2002

14:35  7    meeting?  Specifically, if you look at item 11.

14:35  8    A.    Yes, it indicates that they were reviewed.

14:35  9    Q.    And at this May 8, 2002, it was recommended that Bextra

14:35  10   and Celebrex be included on the preferred drug list, no prior

14:35  11   authorization required; and that Vioxx be included on the

14:35  12   nonpreferred drug list, prior authorization required.  Correct?

14:35  13   A.    That is correct.

14:36  14   Q.    Based upon what we talked about earlier, this would have

14:36  15   been the first time that Vioxx or COX-2s would have been

14:36  16   reviewed under the new law; is that right?

14:36  17   A.    That's my recollection, yes.

14:36  18   Q.    This would have been the first time that there could have

14:36  19   been any restriction placed by Louisiana Medicaid on Vioxx or

14:36  20   other COX-2s?

14:36  21   A.    Yes, that's my understanding.

14:36  22   Q.    You recall that prior to this recommendation being made

14:36  23   that Merck had not agreed to pay the supplemental rebates; is

14:36  24   that right?

14:36  25   A.    Yes, that is my recollection.

| | | |
|---|---|---|
| 14:36 | 1 | **Q.**   Mr. Castille, Exhibit 14 is the transcript from the P&T |
| 14:36 | 2 | committee meeting of May 8, 2002, from which we just reviewed |
| 14:36 | 3 | the minutes; is that correct? |
| 14:36 | 4 | **A.**   Yes.  That appears to be the case, yes. |
| 14:36 | 5 | **Q.**   And, again, you were at that meeting? |
| 14:36 | 6 | **A.**   Yes, I was. |
| 14:36 | 7 | **Q.**   I want to ask you to turn to page Bates number 2643. |
| 14:37 | 8 | **A.**   Yes. |
| 14:37 | 9 | **Q.**   Do you recall Valerie Taylor being the person at Provider |
| 14:37 | 10 | Synergies who was knowledgeable about and made presentations |
| 14:37 | 11 | about these classes of drugs that were being reviewed to the |
| 14:37 | 12 | P&T committee? |
| 14:37 | 13 | **A.**   Yes.  Yes, I do. |
| 14:37 | 14 | **Q.**   And it's true that, at these meetings, the way that it was |
| 14:37 | 15 | designed to work and did, in fact, work was that Provider |
| 14:37 | 16 | Synergies would provide a monograph of the class before the |
| 14:37 | 17 | meetings and then make their presentation about those class of |
| 14:37 | 18 | drugs at the meeting, and P&T members could ask Valerie Taylor |
| 14:37 | 19 | or the other Provider Synergies representative questions? |
| 14:37 | 20 | **A.**   Yes, that's my recollection. |
| 14:38 | 21 | **Q.**   Drug manufacturers such as Merck were not -- they didn't |
| 14:38 | 22 | get up and make presentations about their products; right? |
| 14:38 | 23 | **A.**   No.  That's not the way it worked. |
| 14:38 | 24 | **Q.**   In fact, it was designed not to do that.  The independent |
| 14:38 | 25 | review and recommendation was supposed to be done by Provider |

DAILY COPY

| | | |
|---|---|---|
| 14:38 | 1 | Synergies; right? |
| 14:38 | 2 | **A.**   Correct.  That is correct. |
| 14:38 | 3 | **Q.**   And that's how it worked for Vioxx? |
| 14:38 | 4 | **A.**   Yes, that's my recollection how it worked. |
| 14:38 | 5 | **Q.**   If you see, Ms. Taylor makes a presentation about COX-2 |
| 14:38 | 6 | inhibitors, as you see there on page 146 of the transcript, |
| 14:38 | 7 | talking about the three products:  Celebrex, Vioxx, and Bextra. |
| 14:38 | 8 | Right? |
| 14:38 | 9 | **A.**   That is correct. |
| 14:38 | 10 | **Q.**   As you go down on page 147, she talks about there have |
| 14:38 | 11 | been some trials for some of the products showing that there's |
| 14:38 | 12 | an increased risk of GI effects.  Latest information in this |
| 14:38 | 13 | class, there's been a lot of looking at do the products |
| 14:38 | 14 | increase cardiovascular concerns, do they increase edema. |
| 14:38 | 15 | **A.**   Yes, I see that. |
| 14:39 | 16 | **Q.**   Do you see that? |
| 14:39 | 17 | **A.**   Yes, I do. |
| 14:39 | 18 | **Q.**   If you go on to page 149, she's talking about the cost |
| 14:39 | 19 | issue of the three products.  Do you see that? |
| 14:39 | 20 | **A.**   Yes. |
| 14:39 | 21 | **Q.**   At the end of this process, as we saw in the minutes, they |
| 14:39 | 22 | recommended that Bextra and Celebrex be on the preferred drug |
| 14:39 | 23 | list and Vioxx be on the nonpreferred drug list. |
| 14:39 | 24 | **A.**   Yes, that is my recollection. |
| 14:39 | 25 | **Q.**   And do you recall at that point in time that Pfizer had, |

| | | |
|---|---|---|
| 14:39 | 1 | in fact, agreed to the supplemental rebates that Merck had not |
| 14:39 | 2 | agreed to? |
| 14:39 | 3 | A.    Not specifically.  I knew that -- I didn't understand, |
| 14:39 | 4 | necessarily, that Pfizer was a competing manufacturer of a |
| 14:39 | 5 | COX-2 at that time.  Of course, now I know, but -- so I can't |
| 14:40 | 6 | say for sure that -- but I do know that Pfizer did participate |
| 14:40 | 7 | and Merck did not. |
| 14:40 | 8 | Q.    And that, as you said, was the significant part of the |
| 14:40 | 9 | decision on recommending which one was on the preferred drug |
| 14:40 | 10 | list and which was not? |
| 14:40 | 11 | A.    Yes. |
| 14:40 | 12 | Q.    And we are going to go through this in a minute, but it -- |
| 14:40 | 13 | this is just a recommendation; right?  After this process, the |
| 14:40 | 14 | way it worked would have to be that the P&T would accept the |
| 14:40 | 15 | recommendations and then submit them to you and to Secretary |
| 14:40 | 16 | Hood to sign off and accept those recommendations to the |
| 14:40 | 17 | preferred drug list; is that correct? |
| 14:40 | 18 | A.    Well, specifically to Secretary Hood, to the secretary -- |
| 14:40 | 19 | ultimately, the secretary made the final decision. |
| 14:40 | 20 | Q.    Was it your recollection that the P&T committee would |
| 14:40 | 21 | typically follow the recommendations of the independent expert, |
| 14:40 | 22 | Provider Synergies? |
| 14:40 | 23 | A.    It was my recollection, yes.  In general, they would. |
| 14:40 | 24 | Q.    Do you recall of any instance in which they did not? |
| 14:41 | 25 | A.    There were instances, but I don't recall specifically what |

| | | |
|---|---|---|
| 14:41 | 1 | drugs they were. |
| 14:41 | 2 | **Q.**   Not with regard to the COX-2 class? |
| 14:41 | 3 | **A.**   Not to my recollection, no. |
| 14:41 | 4 | **Q.**   Exhibit 15, Mr. Castille, appears to be a letter that went |
| 14:41 | 5 | out from Mr. Bearden to prescribing practitioners and pharmacy |
| 14:41 | 6 | providers in the state of Louisiana following these |
| 14:41 | 7 | recommendations on the new preferred drug list related to |
| 14:41 | 8 | COX-2s; is that correct?  It also relates to proton pump |
| 14:41 | 9 | inhibitors.  You see that third paragraph? |
| 14:41 | 10 | **A.**   Yes, that is correct. |
| 14:41 | 11 | **Q.**   This, as you understand it, was to notify practitioners |
| 14:41 | 12 | that once the preferred drug list comes out, if you prescribe |
| 14:41 | 13 | the drugs that are on the nonpreferred drug list, you need to |
| 14:41 | 14 | get prior authorization? |
| 14:41 | 15 | **A.**   Yes.  That was my understanding of how the process would |
| 14:42 | 16 | work. |
| 14:42 | 17 | **Q.**   Is that the way it was designed to be? |
| 14:42 | 18 | **A.**   It was. |
| 14:42 | 19 | **Q.**   Is that the way it would actually work? |
| 14:42 | 20 | **A.**   It's my understanding, yes, that's the way it worked. |
| 14:42 | 21 | **Q.**   And so that, in fact, was the most restrictive thing the |
| 14:42 | 22 | State of Louisiana could do with regard to reimbursement for |
| 14:42 | 23 | Vioxx in 2002; is that right? |
| 14:42 | 24 | **A.**   I think that's correct.  Louisiana -- the state could not |
| 14:42 | 25 | have, for example, have done what, let's say, FDA could do and |

DAILY COPY

14:42    1    take the drug off the market.  We, obviously, did not have that
14:42    2    authority.  So to the extent that we placed them on a
14:42    3    nonpreferred list, that was the most restrictive thing we could
14:42    4    do.
14:42    5    Q.    Mr. Castille, let me show you what's been marked as
14:42    6    Exhibit 16 to your deposition, which is the April 2002 Provider
14:42    7    Synergies monograph for the NSAID class, which obviously also
14:42    8    would include COX-2s; correct?
14:42    9    A.    Yes, that's what it says.
14:42   10    Q.    Do you recall receiving this particular monograph?
14:42   11    A.    Not specifically.  I probably did, but not specifically.
14:43   12    Q.    It would be the general practice for you to receive them?
14:43   13    A.    Yes.  But I'm not the expert reviewer.  I feel it would
14:43   14    just be --
14:43   15    Q.    A courtesy copy?
14:43   16    A.    Yes, yes.
14:43   17    Q.    But, again, this monograph would go to the P&T committee
14:43   18    members, who would review it before the meeting; and if they
14:43   19    had any questions, they could ask Provider Synergies?
14:43   20    A.    Yes, that's the way it worked.
14:43   21    Q.    Let me just reference a couple of things in the April 2003
14:43   22    monograph.  On page 6 --
14:43   23    A.    Yes.
14:43   24    Q.    -- there is a section, Vioxx and Naproxen, and it talks
14:43   25    about the VIGOR study.  Do you see that?  At the very bottom.

DAILY COPY

| | | |
|---|---|---|
| 14:43 | 1 | A.   I see -- yes, I see it now. |
| 14:43 | 2 | Q.   Again, talking in very clinical detail about the VIGOR |
| 14:43 | 3 | trial? |
| 14:43 | 4 | A.   Yes. |
| 14:43 | 5 | Q.   And on page 10 of the monograph, there is a fairly lengthy |
| 14:44 | 6 | section on cardiovascular concerns and cardiovascular events. |
| 14:44 | 7 | Do you see that? |
| 14:44 | 8 | A.   Yes, I do. |
| 14:44 | 9 | Q.   And at the end of the monograph, it appears that Provider |
| 14:44 | 10 | Synergies would provide references for the material that they |
| 14:44 | 11 | had reviewed -- |
| 14:44 | 12 | A.   Yes. |
| 14:44 | 13 | Q.   -- in preparing the monograph? |
| 14:44 | 14 | A.   Yes, that's correct.  Extensive references. |
| 14:44 | 15 | Q.   And that's consistent with your recollection of how all |
| 14:44 | 16 | these drugs were reviewed; they would do a monograph and |
| 14:44 | 17 | reference the materials that they reviewed? |
| 14:44 | 18 | A.   Yes, that's my recollection. |
| 14:44 | 19 | Q.   And, again, as earlier, they would typically review |
| 14:44 | 20 | peer-reviewed published literature and labels; correct? |
| 14:44 | 21 | A.   That is my understanding, yes. |
| 14:44 | 22 | Q.   And for example, on reference No. 41 at the very bottom of |
| 14:45 | 23 | page 14, it references a Vioxx package insert, 2002; right? |
| 14:45 | 24 | A.   It does, yes. |
| 14:45 | 25 | Q.   Again, based upon the monograph that was presented to the |

DAILY COPY

| | | |
|---|---|---|
| 14:45 | 1 | P&T committee by Provider Synergies, it's clear that they |
| 14:45 | 2 | thoroughly discussed the cardiovascular clinical information |
| 14:45 | 3 | and labeling information on those issues with the P&T |
| 14:45 | 4 | committee; correct? |
| 14:45 | 5 | A.   Yes.  In terms of the presentation, the written |
| 14:45 | 6 | presentation made to the P&T committee, there was extensive |
| 14:45 | 7 | review of that. |
| 14:45 | 8 | Q.   And, Mr. Castille, let me show you what's been marked as |
| 14:45 | 9 | Exhibit 17.  Can you tell us what that is, please. |
| 14:45 | 10 | A.   Yes.  This is the minutes of the Medicaid pharmaceutical |
| 14:45 | 11 | and therapeutics committee meeting of May 21, 2003. |
| 14:46 | 12 | Q.   If you look at page 10 of the minutes, the COX-2 |
| 14:46 | 13 | inhibitors were again being reviewed.  This was a year after |
| 14:46 | 14 | the original decision, if you recall, back in May of '02; |
| 14:46 | 15 | right? |
| 14:46 | 16 | A.   Yes, that is correct. |
| 14:46 | 17 | Q.   We saw that they had submitted another updated monograph |
| 14:46 | 18 | in April of 2003 that we just reviewed; right? |
| 14:46 | 19 | A.   That is correct, yes. |
| 14:46 | 20 | Q.   The recommendation from Provider Synergies and accepted by |
| 14:46 | 21 | the P&T committee was that Bextra remain on the preferred drug |
| 14:46 | 22 | list; right? |
| 14:46 | 23 | A.   Yes. |
| 14:46 | 24 | Q.   Vioxx be put on the preferred drug list from the |
| 14:46 | 25 | nonpreferred? |

DAILY COPY

| | | |
|---|---|---|
| 14:46 | 1 | **A.**    Yes.  That's what it appears, yes. |
| 14:46 | 2 | **Q.**    And Celebrex would go from the preferred drug list to the |
| 14:47 | 3 | nonpreferred? |
| 14:47 | 4 | **A.**    Yes, that's what it indicates. |
| 14:47 | 5 | **Q.**    And as you indicated earlier, Merck at that point in time |
| 14:47 | 6 | had agreed with Provider Synergies to provide the supplemental |
| 14:47 | 7 | rebates leading to this change; is that correct? |
| 14:47 | 8 | **A.**    Yes, that's my recollection. |
| 14:47 | 9 | **Q.**    Mr. Castille, this is Exhibit 18 to your deposition.  What |
| 14:47 | 10 | is that document? |
| 14:47 | 11 | **A.**    This appears to be the transcript of the testimony taken |
| 14:47 | 12 | for the May 21, 2003 Medicaid pharmaceutical and therapeutics |
| 14:47 | 13 | committee. |
| 14:47 | 14 | **Q.**    So this goes with the minutes that we just discussed? |
| 14:47 | 15 | **A.**    Yes, the same date. |
| 14:47 | 16 | **Q.**    I just want to ask you one issue on these -- or one |
| 14:47 | 17 | question about these transcripts of the testimony.  On page 181 |
| 14:47 | 18 | of the testimony, which is Bates page 422 -- |
| 14:47 | 19 | **A.**    Yes. |
| 14:47 | 20 | **Q.**    -- this is part -- if you kind of go back a little bit, |
| 14:47 | 21 | this is again part of Ms. Valerie Taylor's presentations about |
| 14:48 | 22 | Cox-2s; is that right? |
| 14:48 | 23 | **A.**    Yes.  Yes, it is. |
| 14:48 | 24 | **Q.**    And, again, that would be the typical way this was done: |
| 14:48 | 25 | Monograph submitted; P&T committee meeting; Ms. Taylor would |

| | | |
|---|---|---|
| 14:48 | 1 | make her presentation, answer any questions P&T members had, |
| 14:48 | 2 | and then make the recommendation; and they would adopt it or, |
| 14:48 | 3 | on some rare occasion, not? |
| 14:48 | 4 | **A.**   Yes, that's the usual process. |
| 14:48 | 5 | **Q.**   And if you see on page 181 of the transcript, her |
| 14:48 | 6 | presentation, she talks about, if you look at the very last |
| 14:48 | 7 | paragraph on page 118:  "There are cardiovascular concerns with |
| 14:48 | 8 | the COX-2 products at this point." |
| 14:48 | 9 | **A.**   Yes, I see that. |
| 14:48 | 10 | **Q.**   All right.  And we've seen the monograph where it |
| 14:48 | 11 | discussed it; correct? |
| 14:48 | 12 | **A.**   Yes.  They were given that information. |
| 14:48 | 13 | **Q.**   Do you recall, having been at many of these meetings and |
| 14:48 | 14 | at least being courtesy-copied on the monographs, that with |
| 14:48 | 15 | regard to traditional NSAIDs, there was a real issue of stomach |
| 14:49 | 16 | problems:  Perforations, ulcers, bleeds? |
| 14:49 | 17 | **A.**   I do recall that, yes. |
| 14:49 | 18 | **Q.**   In fact, going way back, earlier this morning we talked |
| 14:49 | 19 | about one of the things that DHH was very interested in was not |
| 14:49 | 20 | just an individual drug pill cost but also looking at the whole |
| 14:49 | 21 | cost issue with regard to hospitalizations, complications of |
| 14:49 | 22 | products; right? |
| 14:49 | 23 | **A.**   That is correct.  We were interested in both cost and |
| 14:49 | 24 | efficacy of the drug. |
| 14:49 | 25 | **Q.**   And so when the DHH and its consultants and the P&T |

14:49  1   committee were looking at these issues, they would want to take
14:49  2   into account and did take into account, for example,
14:49  3   gastrointestinal toxicity of traditional NSAIDs?
14:49  4   A.   Yes, they would, and hence the reason for having experts
14:49  5   on the committee, the pharmacists and the physicians, who would
14:49  6   presumably be aware of these things, and based on presentations
14:50  7   by Provider Synergies and information provided by Provider
14:50  8   Synergies.
14:50  9   Q.   Let me show you Exhibit 19, Mr. Castille, which is an
14:50  10  article published by PharmD Edwin Adams and Eddie Myers and a
14:50  11  Dr. Sandra Blake at the University of Louisiana-Monroe School
14:50  12  of Pharmacy.  It appears that this was done in October of 2003,
14:50  13  talking about the risk of NSAID-associated gastrointestinal
14:50  14  complications.  Do you see that?
14:50  15  A.   Yes, I do.
14:50  16  Q.   At this point in time, the ULM School of Pharmacy remained
14:50  17  a consultant to the State of Louisiana; right?
14:50  18  A.   Yes, they did.
14:50  19  Q.   Do you know those individuals?
14:50  20  A.   Yes, I think I -- their names are familiar.  I'm trying to
14:50  21  remember.  I can't put a face on the name, but the names are
14:50  22  familiar.
14:50  23  Q.   If you look at page 7 of the article, under "Discussion
14:51  24  and Conclusion," do you see that the authors state that "GI
14:51  25  toxicity is a major limiting factor in the use of nonsteroidal

DAILY COPY

| | | |
|---|---|---|
| 14:51 | 1 | anti-inflammatory drugs (NSAIDs)"? |
| 14:51 | 2 | A.   Yes, I see that. |
| 14:51 | 3 | Q.   And there's a statement in there that "The overall risk |
| 14:51 | 4 | for GI events in Louisiana Medicaid patients in poor health |
| 14:51 | 5 | taking NSAIDs is 2.7 times greater than those not in poor |
| 14:51 | 6 | health." |
| 14:51 | 7 | A.   Yes, I see that. |
| 14:51 | 8 | Q.   And it talks about the risk being particularly acute in |
| 14:51 | 9 | elderly patients. |
| 14:51 | 10 | A.   Yes, it says that. |
| 14:51 | 11 | Q.   And then, toward the end, it talks about "Although most of |
| 14:51 | 12 | these adverse events are classified as dyspepsia, there are a |
| 14:51 | 13 | menacing number of 'silent GI bleeds' occurring in |
| 14:51 | 14 | NSAID-treatment patients." |
| 14:52 | 15 | A.   Yes. |
| 14:52 | 16 | Q.   It talks about the silent killer; right? |
| 14:52 | 17 | A.   Yes, it does. |
| 14:52 | 18 | Q.   So that would be, again, something that ULM and Provider |
| 14:52 | 19 | Synergies and the P&T committee have to take into account in |
| 14:52 | 20 | doing these class reviews, is if there are drugs that have |
| 14:52 | 21 | these other potential serious GI concerns; correct? |
| 14:52 | 22 | A.   Yep.  It would be my expectation, they would, yes. |
| 14:52 | 23 | Q.   Let me show you Exhibit 22, which I think clarifies that |
| 14:52 | 24 | they -- for the first time, it would have been -- Vioxx would |
| 14:52 | 25 | have been on the Louisiana preferred drug list. |

| | | |
|---|---|---|
| 14:52 | 1 | A.    Yes. |
| 14:52 | 2 | Q.    July 14, 2003? |
| 14:52 | 3 | A.    Yes.  This is a letter from Ben Bearden to practitioners |
| 14:52 | 4 | and pharmacy providers indicating that -- the drugs that would |
| 14:52 | 5 | be on the preferred drug list. |
| 14:52 | 6 | Q.    If you look at Bates number 2337, at the bottom it lists |
| 14:53 | 7 | the COX-2 class; correct? |
| 14:53 | 8 | A.    Yes, it does. |
| 14:53 | 9 | Q.    Off to the right of COX-2s, it shows an implementation |
| 14:53 | 10 | date of July 14, 2003? |
| 14:53 | 11 | A.    Yes, that is the date it shows. |
| 14:53 | 12 | Q.    All right.  Just so I correct my misstatement about the |
| 14:53 | 13 | date, July 14, 2003, would have been the first time in the |
| 14:53 | 14 | state of Louisiana that Vioxx would have been on the preferred |
| 14:53 | 15 | drug list? |
| 14:53 | 16 | A.    That is correct. |
| 14:53 | 17 | Q.    Mr. Castille, Exhibit 23 is a letter from Pfizer to |
| 14:53 | 18 | Ms. Terrebonne at Louisiana DHH dated July 15, 2003? |
| 14:53 | 19 | A.    Yes, that's what it is. |
| 14:53 | 20 | Q.    It cc's Secretary Hood? |
| 14:53 | 21 | A.    Yes. |
| 14:53 | 22 | Q.    It doesn't show you as an actual CC, but if something like |
| 14:53 | 23 | this came in to Ms. Terrebonne and to Secretary Hood, would you |
| 14:53 | 24 | have likely seen it as well? |
| 14:53 | 25 | A.    I probably would have because, you know, during this time, |

14:54   1   I would meet extensively with Mr. Bearden and Ms. Terrebonne.
14:54   2   So I probably would have.
14:54   3   **Q.**   And this is a letter from the manufacturer of Celebrex;
14:54   4   correct?
14:54   5   **A.**   Pfizer -- yes.  Yes, it shows that.
14:54   6   **Q.**   And if you recall, the May meeting, Celebrex had been
14:54   7   moved from the preferred drug list to the nonpreferred drug
14:54   8   list; right?
14:54   9   **A.**   Yes, that's my recollection.
14:54   10  **Q.**   And they are writing after that decision to the secretary
14:54   11  and to Ms. Terrebonne?
14:54   12  **A.**   Yes, that is correct.
14:54   13  **Q.**   And I take it that the DHH would consider such
14:54   14  information, if submitted by Pfizer, regarding this class?
14:54   15  **A.**   We would consider it.  Whether or not we would act on it
14:54   16  would be another matter.
14:54   17  **Q.**   Would this also, to your knowledge, go to Provider
14:55   18  Synergies?
14:55   19  **A.**   Yes, it would have been sent -- I'm fairly certain it
14:55   20  would have been sent to Provider Synergies.
14:55   21  **Q.**   If you look at page 3 of the document, this is yet another
14:55   22  piece of information being provided to Provider Synergies and
14:55   23  DHH from the Celebrex manufacturer talking about Vioxx having a
14:55   24  potential cardiovascular effect; correct?
14:55   25  **A.**   Yes.

DAILY COPY

752

| | | |
|---|---|---|
| 14:55 | 1 | **Q.**   Mr. Castille, what is Exhibit 24 to your deposition? |
| 14:55 | 2 | **A.**   It's the minutes of the Medicaid pharmaceutical and |
| 14:55 | 3 | therapeutics committee meeting of December 17, 2003. |
| 14:55 | 4 | **Q.**   And you were present at that meeting? |
| 14:55 | 5 | **A.**   Yes, it indicates that I was present. |
| 14:55 | 6 | **Q.**   It appears on page 13 of those minutes that there was |
| 14:55 | 7 | further discussion about the COX-2 class and, specifically, |
| 14:55 | 8 | Celebrex's not being on the PDL; is that right? |
| 14:56 | 9 | **A.**   That is correct. |
| 14:56 | 10 | **Q.**   Exhibit 25 is the transcript of that December 17, 2003 |
| 14:56 | 11 | meeting; right? |
| 14:56 | 12 | **A.**   Yes, that is correct. |
| 14:56 | 13 | **Q.**   I just want to ask you one quick question about that on |
| 14:56 | 14 | page Bates number 506, transcript page 181. |
| 14:56 | 15 | **A.**   Yes. |
| 14:56 | 16 | **Q.**   Dr. Weather, was he a member of the P&T committee? |
| 14:56 | 17 | **A.**   Yes, my recollection was that he was at the time. |
| 14:56 | 18 | **Q.**   Do you see, on the second paragraph of his comments, he |
| 14:56 | 19 | says, "Based on that" -- he's talking about revisiting |
| 14:56 | 20 | COX-2s -- "it's been recently shown that there's an increase in |
| 14:56 | 21 | myocardial infarction with Vioxx"? |
| 14:56 | 22 | **A.**   Yes, I see that. |
| 14:56 | 23 | **Q.**   With that information, do you recall that the committee |
| 14:57 | 24 | and Provider Synergies still viewed the decision to have Vioxx |
| 14:57 | 25 | on the preferred drug list after the supplemental rebates as |

DAILY COPY

| | | |
|---|---|---|
| 14:57 | 1 | appropriate? |
| 14:57 | 2 | A.   My recollection is that they remained on the preferred |
| 14:57 | 3 | drug list even after this information. |
| 14:57 | 4 | Q.   Let me show you Exhibit 26, which is the April 2004 COX-2 |
| 14:57 | 5 | NSAID review by Provider Synergies; correct? |
| 14:57 | 6 | A.   Yes, that's what it says. |
| 14:57 | 7 | Q.   And, again, typically you would have received a copy of |
| 14:57 | 8 | those? |
| 14:57 | 9 | A.   A courtesy copy at least. |
| 14:57 | 10 | Q.   I just want to point to page 13 of the monograph -- |
| 14:58 | 11 | A.   Yes. |
| 14:58 | 12 | Q.   -- where, again, there is a lengthy discussion of |
| 14:58 | 13 | cardiovascular events, cardiovascular concerns, and specific |
| 14:58 | 14 | clinical data about those issues by Provider Synergies. |
| 14:58 | 15 | A.   Yes, there is. |
| 14:58 | 16 | Q.   This information, again, would have been provided to the |
| 14:58 | 17 | P&T committee? |
| 14:58 | 18 | A.   It would have been, yes. |
| 14:58 | 19 | Q.   And that would have been presented at a P&T committee |
| 14:58 | 20 | meeting, as we have seen; right? |
| 14:58 | 21 | A.   Yes. |
| 14:58 | 22 | Q.   Do you recall if Celebrex agreed to -- was there ongoing |
| 14:58 | 23 | discussions between Provider Synergies, as the agent for DHH, |
| 14:58 | 24 | on the supplemental rebate negotiations with the manufacturers? |
| 14:58 | 25 | A.   Yes.  That was my understanding, that discussions went on |

DAILY COPY

| | | |
|---|---|---|
| 14:58 | 1 | all the time between Provider Synergies and drug manufacturers. |
| 14:58 | 2 | Q.   Do you have any recollection that Celebrex agreed to some |
| 14:58 | 3 | additional supplemental rebates to get back on the preferred |
| 14:58 | 4 | drug list? |
| 14:58 | 5 | A.   I'm not positive about that.  I really -- I seem to recall |
| 14:59 | 6 | that's the case, but I'm not positive. |
| 14:59 | 7 | Q.   Mr. Castille, let me show you Exhibit 27.  What is |
| 14:59 | 8 | Exhibit 27? |
| 14:59 | 9 | A.   It references the minutes of the Medicaid pharmaceutical |
| 14:59 | 10 | and therapeutics committee meeting of May 5, 2004. |
| 14:59 | 11 | Q.   Are you present? |
| 14:59 | 12 | A.   Yes, it indicates that I was present. |
| 14:59 | 13 | Q.   If you look at page 4 of those notes -- |
| 14:59 | 14 | A.   Yes. |
| 14:59 | 15 | Q.   -- it talks about a May 5, 2004 recommendation under the |
| 14:59 | 16 | class review for COX-2s? |
| 14:59 | 17 | A.   Yes, it does. |
| 14:59 | 18 | Q.   And under that, first, it talks about the Vioxx package |
| 14:59 | 19 | insert advising physicians and then -- do you see the second |
| 14:59 | 20 | paragraph?  It talks about Provider Synergies also reported |
| 14:59 | 21 | that some additional rebate had been offered by the |
| 14:59 | 22 | manufacturer of Celebrex; however, the amount was insufficient |
| 14:59 | 23 | to warrant recommending Celebrex be added to the PDL. |
| 15:00 | 24 | A.   Yes, I see that. |
| 15:00 | 25 | Q.   That's consistent with what you were talking about:  The |

| | | |
|---|---|---|
| 15:00 | 1 | ongoing negotiations between Provider Synergies and the drug |
| 15:00 | 2 | manufacturers? |
| 15:00 | 3 | A.   Yes, that would be consistent. |
| 15:00 | 4 | Q.   Does that refresh your recollection that there was this |
| 15:00 | 5 | negotiation with Celebrex that -- with Pfizer that you need |
| 15:00 | 6 | more rebate for Celebrex in order to get on the PDL? |
| 15:00 | 7 | A.   Well, it does indicate, yes, that an attempt apparently |
| 15:00 | 8 | had been made to offer some additional rebates, but apparently |
| 15:00 | 9 | our independent consultant did not feel that it was -- |
| 15:00 | 10 | Q.   Enough. |
| 15:00 | 11 | A.   -- enough to warrant adding them to the PDL. |
| 15:00 | 12 | Q.   Is Exhibit 28 the transcript from that May 5, 2004 P&T |
| 15:00 | 13 | committee -- |
| 15:00 | 14 | A.   Yes, it is. |
| 15:00 | 15 | Q.   -- meeting? |
| 15:00 | 16 | A.   Yes, it is. |
| 15:01 | 17 | Q.   If you just look at Bates page 551. |
| 15:01 | 18 | A.   Yes. |
| 15:01 | 19 | Q.   Actually starting at the bottom of page 26 on the |
| 15:01 | 20 | transcript itself.  I think you're on the right page. |
| 15:01 | 21 | A.   Uh-huh. |
| 15:01 | 22 | Q.   At the very bottom, there's more -- |
| 15:01 | 23 | A.   Yes. |
| 15:01 | 24 | Q.   It's more detail about what Provider Synergies was |
| 15:01 | 25 | negotiating with regard to Celebrex. |

15:01   1   **A.**   Yes, I see that.

15:01   2   **Q.**   All right.  It says:  "We also did go back to the

15:01   3   manufacturer for Celebrex.  They did offer some additional

15:01   4   rebate to the State of Louisiana.  However, at this point

15:01   5   Celebrex still remains the premium-priced product in that

15:01   6   category."

15:01   7   **A.**   Yes, that's what it says.

15:01   8   **Q.**   So does it appear -- and consistent with your recollection

15:01   9   of being in this meeting -- that the decision was, with regard

15:01   10   to Celebrex, to not be on the preferred drug list at this point

15:01   11   in time because they had not given sufficient rebates?

15:02   12   **A.**   Yes, that would be consistent with my recollection.

15:02   13   **Q.**   Mr. Castille, let me show you Exhibit 29 to your

15:02   14   deposition.

15:02   15   **A.**   Yes.

15:02   16   **Q.**   Does this appear to be another letter from Pfizer, the

15:02   17   maker of Celebrex, to Louisiana's consultant, Provider

15:02   18   Synergies, dated May 7, 2004?  Do you see in the middle of the

15:02   19   first big paragraph?

15:02   20   **A.**   Uh-huh.

15:02   21   **Q.**   "Pfizer is discussing their belief that rofecoxib (Vioxx)

15:02   22   is associated with a significantly increased adjudicated risk

15:02   23   of acute MI"?

15:02   24           Do you understand that to be a heart attack?

15:02   25   **A.**   Let me see if I can -- yes, I see that.

| | | |
|---|---|---|
| 15:02 | 1 | **Q.**   And so this was yet another piece of information that |
| 15:02 | 2 | Provider Synergies would have had in doing its independent |
| 15:02 | 3 | review and making recommendations about the status of these |
| 15:02 | 4 | products -- Vioxx, Celebrex -- on the preferred drug list for |
| 15:03 | 5 | the State of Louisiana; correct? |
| 15:03 | 6 | **A.**   Yes, it would.  The letter was sent to Provider Synergies. |
| 15:03 | 7 | **Q.**   What is Exhibit 31 to your deposition, Mr. Castille? |
| 15:03 | 8 | **A.**   It's minutes of the Medicaid pharmaceutical and |
| 15:03 | 9 | therapeutics committee meeting of August 11, 2004. |
| 15:03 | 10 | **Q.**   And if you look at -- well, first of all, you were present |
| 15:03 | 11 | at that meeting? |
| 15:03 | 12 | **A.**   Yes, it indicates that I was present. |
| 15:03 | 13 | **Q.**   If you look at page 11 in the minutes -- |
| 15:03 | 14 | **A.**   Yes. |
| 15:03 | 15 | **Q.**   -- at the bottom, there was another recommendation with |
| 15:03 | 16 | regard to COX-2 inhibitors? |
| 15:03 | 17 | **A.**   Yes. |
| 15:03 | 18 | **Q.**   And what was that recommendation? |
| 15:03 | 19 | **A.**   A recommendation to accept Provider Synergies' and for |
| 15:03 | 20 | committee recommendations for the PDL were Celebrex, Vioxx, and |
| 15:04 | 21 | Bextra. |
| 15:04 | 22 | **Q.**   Do you recall that specifically at this point? |
| 15:04 | 23 | **A.**   I don't recall it specifically, but generally, you know, |
| 15:04 | 24 | it was my remembrance that ultimately Celebrex did get onto the |
| 15:04 | 25 | PDL, but -- |

| | | |
|---|---|---|
| 15:04 | 1 | **Q.**   Is it -- I'm sorry.  I didn't mean to speak over you. |
| 15:04 | 2 | **A.**   That's okay. |
| 15:04 | 3 | **Q.**   And was that, from what we have seen before, based on your |
| 15:04 | 4 | recollection, that eventually Provider Synergies and Pfizer |
| 15:04 | 5 | agreed to the acceptable supplemental rebate? |
| 15:04 | 6 | **A.**   That would -- yes, that would be my understanding of how |
| 15:04 | 7 | that occurred. |
| 15:04 | 8 | **Q.**   Do you know when that recommendation was finalized and |
| 15:04 | 9 | actually implemented on the PDL? |
| 15:04 | 10 | **A.**   It would have probably been a month or two later, given |
| 15:04 | 11 | the time it took to get the approval by the secretary and then |
| 15:04 | 12 | the implementation.  I would say probably September, October. |
| 15:05 | 13 | **Q.**   I think I asked you earlier, Mr. Castille, about, in all |
| 15:05 | 14 | of your experience of the process and having been at many of |
| 15:05 | 15 | these meetings, that generally the drug manufacturers would not |
| 15:05 | 16 | make any presentation about their products or recommendations |
| 15:05 | 17 | to the P&T committee.  Correct? |
| 15:05 | 18 | **A.**   That is correct. |
| 15:05 | 19 | **Q.**   And that's true for Merck, specifically, as well? |
| 15:05 | 20 | **A.**   Yes.  There was a period later on in the meetings when we |
| 15:05 | 21 | would have public comment, but no presentations were made by |
| 15:05 | 22 | drug manufacturers. |
| 15:05 | 23 | **Q.**   Have you had discussions with any Merck representatives |
| 15:05 | 24 | directly with regard to any of their products and the PDL |
| 15:05 | 25 | process? |

DAILY COPY

| | | |
|---|---|---|
| 15:05 | 1 | **A.**   Not that I'm -- not to my recollection, no. |
| 15:05 | 2 | **Q.**   So is it fair to say that no one from Merck has ever |
| 15:05 | 3 | misrepresented anything to you about Vioxx or its product, to |
| 15:05 | 4 | you in your capacity as undersecretary of the Department of |
| 15:06 | 5 | Health and Hospitals? |
| 15:06 | 6 | **A.**   Not to my recollection. |
| 15:06 | 7 | **Q.**   Or, to your knowledge, in your presence to anyone else at |
| 15:06 | 8 | DHH? |
| 15:06 | 9 | **A.**   Not to my knowledge.  Not to my knowledge either with |
| 15:06 | 10 | regard to members of the P&T committee or Provider Synergies. |
| 15:06 | 11 | **Q.**   To go back to something we talked about earlier this |
| 15:06 | 12 | morning, to be clear, prior to the implementation of the |
| 15:06 | 13 | preferred drug list that we saw became effective in July of |
| 15:06 | 14 | 2002, I believe, the State of Louisiana and, specifically, DHH |
| 15:06 | 15 | and Louisiana Medicaid could not and, in fact, did not restrict |
| 15:06 | 16 | coverage for any FDA-approved product that was not specifically |
| 15:06 | 17 | listed under OBRA; correct? |
| 15:06 | 18 | **A.**   That is my understanding, correct. |
| 15:06 | 19 | **THE COURT:**  Let's take a 15-minute break at this |
| 15:06 | 20 | time. |
| 15:06 | 21 | **MR. ISMAIL:**  I think there's just two minutes left on |
| 15:06 | 22 | the video. |
| 15:06 | 23 | **THE COURT:**  Oh, I thought it was finished. |
| 15:07 | 24 | **MR. ISMAIL:**  Oh, is it?  There's absolutely nothing |
| 15:07 | 25 | left on the video. |

DAILY COPY

| | | |
|---|---|---|
| 15:07 | 1 | **THE COURT:**  That's what I said.  I mean, that's what |
| 15:07 | 2 | I read, anyway. |
| 15:07 | 3 | **THE DEPUTY CLERK:**  Everyone rise. |
| 15:07 | 4 | (WHEREUPON the Court took a brief recess.) |
| 15:14 | 5 | **THE DEPUTY CLERK:**  Everyone rise. |
| 15:50 | 6 | **THE COURT:**  Be seated, please. |
| 15:50 | 7 | Do we have exhibits first in Castille? |
| 15:50 | 8 | **MR. SALES:**  Yes, Your Honor.  Merck offers from |
| 15:51 | 9 | Charles Castille's deposition the following exhibits:  Defense |
| 15:51 | 10 | Exhibits 2044, 2070, 2071, 2094, 2095, 2100, 2101, 2111, 2112, |
| 15:51 | 11 | 2119, 2120, 2121, and 2127.  We have those exhibits in the |
| 15:51 | 12 | binder for the Court. |
| 15:51 | 13 | **THE COURT:**  Let them be admitted. |
| 15:51 | 14 | **MR. MURRAY:**  No objection, Your Honor. |
| 15:51 | 15 | **THE COURT:**  Let them be admitted.  Call your next |
| 15:51 | 16 | witness. |
| 15:51 | 17 | **MR. SALES:**  Merck calls Dr. Valerie Taylor by |
| 15:51 | 18 | deposition. |
| 15:52 | 19 | (WHEREUPON **Valerie E. Taylor**, having been duly sworn, |
| 15:52 | 20 | testified by video deposition as follows.) |
| 15:52 | 21 | **EXAMINATION** |
| 15:52 | 22 | BY MR. SALES: |
| 15:52 | 23 | Q.   Can you please state your full name for the record. |
| 15:52 | 24 | A.   Valerie, middle initial E, Taylor. |
| 15:52 | 25 | Q.   Where do you live currently? |

| | | |
|---|---|---|
| 15:52 | 1 | **A.** In Akron, Ohio. |
| 15:52 | 2 | **Q.** And how are you currently employed? |
| 15:52 | 3 | **A.** Actually, I'm working part-time for K-Mart. |
| 15:52 | 4 | **Q.** In what role? |
| 15:52 | 5 | **A.** As a pharmacist. |
| 15:52 | 6 | **Q.** Were you previously employed by Provider Synergies? |
| 15:52 | 7 | **A.** Yes. |
| 15:52 | 8 | **Q.** What position did you hold at Provider Synergies? |
| 15:52 | 9 | **A.** Originally, I held a clinical director position, and then |
| 15:52 | 10 | I was promoted to vice president clinical pharmacy. |
| 15:52 | 11 | **Q.** We will talk a little bit more about your role at Provider |
| 15:52 | 12 | Synergies, but can you please tell us a little bit about your |
| 15:52 | 13 | educational background. |
| 15:52 | 14 | **A.** Educated with a bachelor of pharmacy from Ohio Northern |
| 15:52 | 15 | University, received my PharmD, which is a doctorate of |
| 15:52 | 16 | pharmacy from The Ohio State University, and completed an |
| 15:52 | 17 | ASHP-accredited residency in clinical pharmacy at the |
| 15:53 | 18 | University of Cincinnati Hospital. |
| 15:53 | 19 | **Q.** When did you obtain your PharmD?  What year? |
| 15:53 | 20 | **A.** 1991. |
| 15:53 | 21 | **Q.** Prior to joining Provider Synergies, did you hold |
| 15:53 | 22 | employment? |
| 15:53 | 23 | **A.** Yes. |
| 15:53 | 24 | **Q.** Where? |
| 15:53 | 25 | **A.** I started my career in hospital practice at Harper |

| | | |
|---|---|---|
| 15:53 | 1 | Hospital in Detroit as an investigational drug coordinator. |
| 15:53 | 2 | From there, I went to ValueRx, which was a managed care |
| 15:53 | 3 | company; and then from there I went to Anthem Prescription |
| 15:53 | 4 | Management; and from there I went to Merck-Medco; and then from |
| 15:53 | 5 | there to Provider Synergies. |
| 15:53 | 6 | **Q.**   What year did you start at Provider Synergies? |
| 15:53 | 7 | **A.**   That would have been 1999. |
| 15:53 | 8 | **Q.**   Where were you headquartered when you were with Provider |
| 15:53 | 9 | Synergies? |
| 15:53 | 10 | **A.**   Provider Synergies was in Mason, Ohio. |
| 15:54 | 11 | **Q.**   Is that where you were located, as well, while you were |
| 15:54 | 12 | there? |
| 15:54 | 13 | **A.**   For some of the time.  I worked there for several years |
| 15:54 | 14 | and then relocated here to Akron, Ohio, worked from my home. |
| 15:54 | 15 | **Q.**   What type of business is Provider Synergies? |
| 15:54 | 16 | **A.**   Currently? |
| 15:54 | 17 | **Q.**   Well, let's start when you were there.  You were there |
| 15:54 | 18 | from 1999 until 2008? |
| 15:54 | 19 | **A.**   Correct.  When we started the business, we actually were |
| 15:54 | 20 | working with commercial health plans, negotiating |
| 15:54 | 21 | pharmaceutical rebates, as well as handling P&T |
| 15:54 | 22 | responsibilities.  We got our first state contract with the |
| 15:54 | 23 | State of Florida in -- I believe that was -- must have been |
| 15:54 | 24 | '01, I think.  It was either 2000 or '01.  I can't quite |
| 15:55 | 25 | remember. |

15:55   1          We still had some commercial business at that time,
15:55   2   although our focus became state Medicaid at that point and --
15:55   3   anyway, we grew it to 10 states, you know, over those years.
15:55   4   Q.   During that time frame, were you always the clinical
15:55   5   director?
15:55   6   A.   Yes, I was the clinical director.  The company was sold in
15:55   7   '06, January of '06, to Coventry Health Care, and I was
15:55   8   promoted to VP in November of '06.
15:55   9   Q.   What were your responsibilities as clinical director?
15:55   10  A.   I was responsible for all the clinical activities of the
15:55   11  company, which included writing therapeutic class reviews,
15:55   12  presentation at P&T committees, coordinating the activities
15:56   13  with the state accounts, and then also there were several
15:56   14  pharmacists over the time that reported directly to me that I
15:56   15  directed their activities.
15:56   16  Q.   And I believe you said that the first time that Provider
15:56   17  Synergies became involved with state Medicaid as a PBM for the
15:56   18  state's drug program would have been about 2001?
15:56   19  A.   Yeah.  That was '01.
15:56   20  Q.   And it was your recollection the first state was Florida?
15:56   21  A.   Yes.
15:56   22  Q.   Was Louisiana subsequent to that?
15:56   23  A.   Yes.  It was after that.  That was in '02.  I don't know
15:56   24  what number -- I can't remember if that was No. 2 or No. 3.
15:56   25  Texas and Louisiana were about the same time.

| | | |
|---|---|---|
| 15:56 | 1 | **Q.** Were you directly responsible for Louisiana? |
| 15:56 | 2 | **A.** Yes. |
| 15:56 | 3 | **Q.** What other states were you directly responsible for? |
| 15:56 | 4 | **A.** Florida, Wisconsin, Pennsylvania, and then there were some |
| 15:56 | 5 | varying time frames that I had some responsibilities for some |
| 15:56 | 6 | of the other states too. |
| 15:57 | 7 | **Q.** Okay.  Your recollection is that Provider Synergies would |
| 15:57 | 8 | have entered in a contract with those states? |
| 15:57 | 9 | **A.** Yes. |
| 15:57 | 10 | **Q.** Did you have any role with regard to negotiating the |
| 15:57 | 11 | contracts with the various states? |
| 15:57 | 12 | **A.** No. |
| 15:57 | 13 | **Q.** Who would have been responsible for that? |
| 15:57 | 14 | **A.** That would have been Terry Taylor and Dan Kincaid. |
| 15:57 | 15 | **Q.** Terry Taylor was the founder of Provider Synergies? |
| 15:57 | 16 | **A.** Correct. |
| 15:57 | 17 | **Q.** And who was Mr. Kincaid? |
| 15:57 | 18 | **A.** He was also a -- he was the vice president at Provider |
| 15:57 | 19 | Synergies.  He was a lawyer by trade. |
| 15:57 | 20 | **Q.** All right.  Is it your recollection that Louisiana -- and |
| 15:57 | 21 | we'll have the contract we will go through in a minute.  But |
| 15:57 | 22 | the original contract was in 2002.  Is that consistent with |
| 15:57 | 23 | your recollection? |
| 15:57 | 24 | **A.** Yes. |
| 15:58 | 25 | **Q.** Did Provider Synergies maintain that contractual |

DAILY COPY

| | | |
|---|---|---|
| 15:58 | 1 | relationship to serve as the PBM and consultant to the State of |
| 15:58 | 2 | Louisiana throughout the time period you were with the company? |
| 15:58 | 3 | A.   Yes. |
| 15:58 | 4 | Q.   Do you know if they still serve in that role? |
| 15:58 | 5 | A.   To the best of my knowledge. |
| 15:58 | 6 | Q.   Dr. Taylor, let me show you what's been marked as |
| 15:58 | 7 | Exhibit 1 to your deposition, which I believe this is some Web |
| 15:58 | 8 | materials describing Provider Synergies, the type of business |
| 15:58 | 9 | they do, and their philosophy.  Have you seen these types of |
| 15:58 | 10 | documents related to Provider Synergies before? |
| 15:58 | 11 | A.   Yes. |
| 15:58 | 12 | Q.   Do they look to be, to the best of your knowledge, true |
| 15:58 | 13 | and correct copies of Provider Synergies' marketing or business |
| 15:58 | 14 | information that would be put out? |
| 15:58 | 15 | A.   Yes. |
| 15:58 | 16 | Q.   In the middle it says:  "We maintain independence from |
| 15:58 | 17 | pharmaceutical manufacturers, wholesalers, chain pharmacies, |
| 15:58 | 18 | and large insurance carriers, which eliminates the potential |
| 15:59 | 19 | for divergent interests and guarantees that the focus remains |
| 15:59 | 20 | on the goals of our clients." |
| 15:59 | 21 |         Did I read that correctly? |
| 15:59 | 22 | A.   Yes. |
| 15:59 | 23 | Q.   Is that consistent with your recollection that Provider |
| 15:59 | 24 | Synergies claimed and, in fact, did exercise an independent |
| 15:59 | 25 | role as a consultant to the state apart from the manufacturers |

DAILY COPY

| | | |
|---|---|---|
| 15:59 | 1 | or the products that you would be reviewing? |
| 15:59 | 2 | **A.** Correct. |
| 15:59 | 3 | **Q.** As I understand it, when Provider Synergies contracted |
| 15:59 | 4 | with the State of Louisiana in 2002, the goal was to provide |
| 15:59 | 5 | integrated services to both contract with manufacturers for |
| 15:59 | 6 | supplemental rebates and do cost analysis for products, as well |
| 15:59 | 7 | as clinical class reviews that you mentioned a moment ago, and |
| 15:59 | 8 | then make recommendations to the P&T committee as to what drugs |
| 15:59 | 9 | should be on a preferred drug list.  Is that -- |
| 15:59 | 10 | **A.** That's correct. |
| 15:59 | 11 | **Q.** Is it a fair statement that Provider Synergies relies upon |
| 16:00 | 12 | the Food & Drug Administration to be the determiner of drugs |
| 16:00 | 13 | that are approved for use in this country? |
| 16:00 | 14 | **A.** Correct. |
| 16:00 | 15 | **Q.** And they rely upon the FDA to make decisions about safety |
| 16:00 | 16 | and efficacy and labeling of those products? |
| 16:00 | 17 | **A.** Correct. |
| 16:00 | 18 | **Q.** And, again, in the next paragraph, going back to what we |
| 16:00 | 19 | talked about a minute ago:  "The process used by Provider |
| 16:00 | 20 | Synergies in developing its PDL recommendations combines |
| 16:00 | 21 | clinical and financial information in a competitive contracting |
| 16:00 | 22 | process." |
| 16:00 | 23 | Did I read that correctly? |
| 16:00 | 24 | **A.** Yes. |
| 16:00 | 25 | **Q.** Let me rephrase the question.  Was it an important feature |

| | | |
|---|---|---|
| 16:00 | 1 | of what you were doing, in analyzing and making recommendations |
| 16:00 | 2 | with regard to drug classes, the financial component of rebates |
| 16:00 | 3 | and negotiations with the companies? |
| 16:00 | 4 | **A.**   No. |
| 16:00 | 5 | **Q.**   Was that something that you were not -- did you have any |
| 16:00 | 6 | direct responsibility for contracting with the manufacturers |
| 16:00 | 7 | for supplemental rebates? |
| 16:01 | 8 | **A.**   I did not. |
| 16:01 | 9 | **Q.**   Provider Synergies was responsible for the negotiations |
| 16:01 | 10 | with the manufacturers for rebates as well as doing the class |
| 16:01 | 11 | reviews; correct? |
| 16:01 | 12 | **A.**   Correct. |
| 16:01 | 13 | **Q.**   With regard to Provider Synergies, that was an important |
| 16:01 | 14 | overall feature; right? |
| 16:01 | 15 | **A.**   Yes. |
| 16:01 | 16 | **Q.**   What you at Provider Synergies were doing and saying you |
| 16:01 | 17 | would do and, in fact, did was rely on independent, |
| 16:01 | 18 | peer-reviewed, published clinical data and FDA labeling and |
| 16:01 | 19 | findings as your primary source of information for your |
| 16:01 | 20 | reviews; is that correct? |
| 16:01 | 21 | **A.**   Yes. |
| 16:01 | 22 | **Q.**   Did you oversee people that worked for you in your role as |
| 16:01 | 23 | clinical director? |
| 16:01 | 24 | **A.**   Yes. |
| 16:01 | 25 | **Q.**   What type of employees would those folks be? |

DAILY COPY

16:01    1    **A.**    PharmDs.

16:01    2    **Q.**    Let's talk about with regard to your role in Louisiana.

16:01    3    Were you the clinical director in charge of Louisiana?

16:01    4    **A.**    Yes.

16:01    5    **Q.**    Did you have employees that would assist you in preparing

16:01    6    class reviews and information with regard to Louisiana

16:02    7    Medicaid?

16:02    8    **A.**    Yes.

16:02    9    **Q.**    Dr. Taylor, let me show you what's been marked as

16:02    10   Exhibit 3 to your deposition and ask you if that, to your

16:02    11   knowledge, is a true and correct copy of the contract that

16:02    12   Provider Synergies entered with the State of Louisiana in March

16:02    13   of 2002 to act as the consultant to state Medicaid?

16:02    14   **A.**    Looks correct to me.

16:02    15   **Q.**    You've seen this document before?

16:02    16   **A.**    Yes.

16:02    17   **Q.**    It looks like the effective date is March 19, 2002, with a

16:02    18   termination date of March 18, 2005?

16:02    19   **A.**    Sounds correct.

16:02    20   **Q.**    It appears that the overall contract amount that the State

16:02    21   of Louisiana agreed to pay Provider Synergies for their expert

16:02    22   consultation services was in the amount not to exceed

16:02    23   $7,560,000; is that correct?

16:02    24   **A.**    That's what it says here, yes.

16:02    25   **Q.**    Under the scope it says, "The contractor" -- which, as you

DAILY COPY

769

| | | |
|---|---|---|
| 16:02 | 1 | understand it, was Provider Synergies; right? |
| 16:03 | 2 | **A.**   Correct. |
| 16:03 | 3 | **Q.**   -- "will pride clinical and contracting services required |
| 16:03 | 4 | by the department" -- and that's talking about the State of |
| 16:03 | 5 | Louisiana Medicaid; right? |
| 16:03 | 6 | **A.**   Yes. |
| 16:03 | 7 | **Q.**   -- "to develop, implement, and operate the department's |
| 16:03 | 8 | Medicaid pharmacy program preferred drug list and supplemental |
| 16:03 | 9 | rebate programs." |
| 16:03 | 10 |         Is that right? |
| 16:03 | 11 | **A.**   Correct. |
| 16:03 | 12 | **Q.**   Is that consistent with your recollection of what the |
| 16:03 | 13 | scope of your work was? |
| 16:03 | 14 | **A.**   Yes. |
| 16:03 | 15 | **Q.**   That's the scope of work that you and the company provided |
| 16:03 | 16 | at the time you were there from 2002, the date of this |
| 16:03 | 17 | contract, until the time that you left? |
| 16:03 | 18 | **A.**   Correct. |
| 16:03 | 19 | **Q.**   "A" talks about therapeutic class reviews.  I think you |
| 16:03 | 20 | mentioned that before.  Is another word for that -- we've seen |
| 16:03 | 21 | these documents called monographs. |
| 16:03 | 22 | **A.**   Correct. |
| 16:03 | 23 | **Q.**   Are monographs the same as therapeutic class reviews? |
| 16:03 | 24 | **A.**   Yes. |
| 16:03 | 25 | **Q.**   And then under "B" it talks about a savings analysis; that |

| | | |
|---|---|---|
| 16:03 | 1 | no later than 90 days after the end of each quarter, Provider |
| 16:04 | 2 | Synergies is to provide a savings analysis report? |
| 16:04 | 3 | **A.**   Correct. |
| 16:04 | 4 | **Q.**   To your knowledge were those prepared and sent to DHH? |
| 16:04 | 5 | **A.**   Yes. |
| 16:04 | 6 | **Q.**   Do you recall, generally speaking -- not with regard to |
| 16:04 | 7 | any particular number but through the work that you and |
| 16:04 | 8 | Provider Synergies did for the State of Louisiana -- that, in |
| 16:04 | 9 | fact, you did report savings to the State of Louisiana based on |
| 16:04 | 10 | your work for the preferred drug list? |
| 16:04 | 11 | **A.**   Correct. |
| 16:04 | 12 | **Q.**   Did you have a primary contact point at State of Louisiana |
| 16:04 | 13 | Medicaid for your work?  Once the contract was entered and you |
| 16:04 | 14 | began doing your work for them, did you have a primary contact? |
| 16:04 | 15 | **A.**   Yes. |
| 16:04 | 16 | **Q.**   Who was that? |
| 16:04 | 17 | **A.**   M.J. Terrebonne. |
| 16:04 | 18 | **Q.**   Did you also have any interaction with Ben Bearden? |
| 16:04 | 19 | **A.**   Yes. |
| 16:04 | 20 | **Q.**   Do you recall his role at Louisiana Department of Health |
| 16:04 | 21 | and Hospitals? |
| 16:04 | 22 | **A.**   I don't remember his official title.  He was M.J.'s boss. |
| 16:05 | 23 | **Q.**   M.J. Terrebonne kind of oversaw the day-to-day operations |
| 16:05 | 24 | of the pharmacy drug benefit program at Medicaid; is that |
| 16:05 | 25 | correct? |

| | | |
|---|---|---|
| 16:05 | 1 | **A.**   That's correct. |
| 16:05 | 2 | **Q.**   And then she reported to Mr. Bearden? |
| 16:05 | 3 | **A.**   Correct. |
| 16:05 | 4 | **Q.**   And Mr. Bearden reported to Charles Castille? |
| 16:05 | 5 | **A.**   Correct. |
| 16:05 | 6 | **Q.**   Did you have any interaction with Mr. Castille? |
| 16:05 | 7 | **A.**   Just at P&T meetings. |
| 16:05 | 8 | **Q.**   After the contract was entered and you started doing your |
| 16:05 | 9 | work as the clinical director for Provider Synergies as the |
| 16:05 | 10 | consultant to the State of Louisiana, did you regularly attend |
| 16:05 | 11 | the pharmacy and therapeutics committee meetings? |
| 16:05 | 12 | **A.**   Yes. |
| 16:05 | 13 | **Q.**   There would be some notice that a class of drugs is going |
| 16:05 | 14 | to be reviewed at some point in time in the future; correct? |
| 16:05 | 15 | **A.**   Correct. |
| 16:05 | 16 | **Q.**   And then Provider Synergies would do their independent |
| 16:05 | 17 | clinical review of that class and prepare a monograph; correct? |
| 16:05 | 18 | **A.**   Correct. |
| 16:06 | 19 | **Q.**   Also, your colleagues at Provider Synergies would be |
| 16:06 | 20 | negotiating with the manufacturers in that class for |
| 16:06 | 21 | supplemental rebates; correct? |
| 16:06 | 22 | **A.**   Correct. |
| 16:06 | 23 | **Q.**   And then those processes would come together in a cost |
| 16:06 | 24 | financial -- as we have seen in the materials, a cost financial |
| 16:06 | 25 | and clinical recommendation that would be presented to a P&T |

| | | |
|---|---|---|
| 16:06 | 1 | committee meeting on that class; correct? |
| 16:06 | 2 | **A.**   Correct. |
| 16:06 | 3 | **Q.**   And then the P&T committee would listen to that |
| 16:06 | 4 | presentation and either accept or decline to accept that |
| 16:06 | 5 | recommendation? |
| 16:06 | 6 | **A.**   That's correct. |
| 16:06 | 7 | **Q.**   Dr. Taylor, let me show you what has been marked as |
| 16:06 | 8 | Exhibit 5 to your deposition and ask you to identify that |
| 16:06 | 9 | document. |
| 16:06 | 10 | **A.**   Looks like a Provider Synergies therapeutic class review. |
| 16:06 | 11 | **Q.**   What was the class that was being reviewed? |
| 16:06 | 12 | **A.**   The COX-2 inhibitors. |
| 16:06 | 13 | **Q.**   That would include Vioxx, Bextra, and Celebrex? |
| 16:06 | 14 | **A.**   Correct. |
| 16:07 | 15 | **Q.**   This appears to you to be the monograph that was prepared |
| 16:07 | 16 | by Provider Synergies in February of '02 for the COX-2 |
| 16:07 | 17 | inhibitor class? |
| 16:07 | 18 | **A.**   Yes. |
| 16:07 | 19 | **Q.**   Either you or your team would have prepared this? |
| 16:07 | 20 | **A.**   That's correct. |
| 16:07 | 21 | **Q.**   We talked about earlier that what Provider Synergies and |
| 16:07 | 22 | you-all would do would be to do an independent review of the |
| 16:07 | 23 | peer-reviewed published literature and the FDA labeling of the |
| 16:07 | 24 | products and FDA findings about the products as the primary |
| 16:07 | 25 | source of information to prepare these; is that correct? |

| | | |
|---|---|---|
| 16:07 | 1 | **A.** Correct. |
| 16:07 | 2 | **Q.** You also, at the end of these, typically would list the |
| 16:07 | 3 | references -- |
| 16:07 | 4 | **A.** Yes. |
| 16:07 | 5 | **Q.** -- that you used? |
| 16:07 | 6 | **A.** Correct. |
| 16:07 | 7 | **Q.** Would you give these monographs ahead of time to the P&T |
| 16:07 | 8 | committee members so that they could review them before the P&T |
| 16:07 | 9 | meeting? |
| 16:07 | 10 | **A.** Yes. |
| 16:07 | 11 | **Q.** Do you recall generally how long, typically, before the |
| 16:07 | 12 | meeting you would provide them? |
| 16:07 | 13 | **A.** The state distributed them. |
| 16:08 | 14 | **Q.** The manufacturers could, if they wanted to, submit some |
| 16:08 | 15 | information to you-all for consideration; correct? |
| 16:08 | 16 | **A.** Correct. |
| 16:08 | 17 | **Q.** But, again, the primary materials you would rely upon |
| 16:08 | 18 | would be what you did on your independent review; right? |
| 16:08 | 19 | **A.** Correct. |
| 16:08 | 20 | **Q.** Exhibit 6 is a letter that was sent from Pfizer, who you |
| 16:08 | 21 | recall was a manufacturer of Bextra and Celebrex; is that |
| 16:08 | 22 | correct? |
| 16:08 | 23 | **A.** Correct. |
| 16:08 | 24 | **Q.** They submitted some information to Ms. Terrebonne, as the |
| 16:08 | 25 | pharmacy director for the State of Louisiana, with regard to |

DAILY COPY

16:08    1    Celebrex and comparisons to it and Vioxx.  If you take a

16:08    2    second -- we don't need to go through the whole document, but

16:08    3    does this appear to be clinical information and information

16:08    4    that Pfizer submitted to DHH regarding a COX-2 in the COX-2

16:08    5    class?

16:09    6    **A.**   Yes.

16:09    7    **Q.**   If you look at the response to the Pfizer letter that was

16:09    8    produced by Provider Synergies, it talks about:  "The letter

16:09    9    states that Pharmacia's dossier for Celebrex was lacking

16:09    10    critical information.  Provider Synergies does not use the

16:09    11    dossier as a primary source for drug information."

16:09    12    Do you agree with that?

16:09    13    **A.**   Yes.

16:09    14    **Q.**   "Rather, Provider Synergies reviews published

16:09    15    peer-reviewed controlled clinical trials to use in drug

16:09    16    analysis."

16:09    17    Is that a correct statement too?

16:09    18    **A.**   Yes.

16:09    19    **Q.**   It goes on to state:  "The letter states that, in addition

16:09    20    to the dossier, pharmacoeconomic data presents a compelling

16:09    21    case for a second review.  Their pharmacoeconomic data is not

16:09    22    relevant to Louisiana Medicaid as it uses costs not reflective

16:09    23    of those paid by Louisiana Medicaid and uses a distinctly

16:09    24    different patient population."

16:09    25    Again, this was part of the cost component that

| | | |
|---|---|---|
| 16:09 | 1 | Provider Synergies would be looking at for a class review; |
| 16:09 | 2 | correct? |
| 16:09 | 3 | **A.**    Correct. |
| 16:10 | 4 | **Q.**    Then if you look at bullet point 3, it says:  "Much of the |
| 16:10 | 5 | data presented by Pfizer for Celebrex in the letter has not |
| 16:10 | 6 | been published nor peer-reviewed.  Although such data is looked |
| 16:10 | 7 | at, Provider Synergies does not consider unpublished data from |
| 16:10 | 8 | the pharmaceutical manufacturer as worthy of consideration for |
| 16:10 | 9 | our unbiased reviews." |
| 16:10 | 10 |           Do you agree with that? |
| 16:10 | 11 | **A.**    Yes. |
| 16:10 | 12 | **Q.**    Again, it goes on to say:  "Published peer-reviewed data |
| 16:10 | 13 | mentioned in the letter had been considered in our analysis of |
| 16:10 | 14 | COX-2 inhibitors." |
| 16:10 | 15 |           Is all of this consistent with your recollection of |
| 16:10 | 16 | the type of review that you did at Provider Synergies and the |
| 16:10 | 17 | type of information that you actually considered as the primary |
| 16:10 | 18 | source of information? |
| 16:10 | 19 | **A.**    Yes. |
| 16:10 | 20 | **Q.**    So is it a fair statement that you don't, for example, |
| 16:10 | 21 | consider manufacturers' marketing materials in your clinical |
| 16:10 | 22 | reviews? |
| 16:10 | 23 | **A.**    Fair statement, yes. |
| 16:10 | 24 | **Q.**    Don't consider internal e-mails or analysis? |
| 16:10 | 25 | **A.**    Correct. |

| | | |
|---|---|---|
| 16:10 | 1 | **Q.**   Don't consider exchanges about unpublished data, what they |
| 16:11 | 2 | might mean, might not mean, from manufacturers in your |
| 16:11 | 3 | analysis? |
| 16:11 | 4 | **A.**   Correct. |
| 16:11 | 5 | **Q.**   Let me show you Exhibit 8 to your deposition, which is an |
| 16:11 | 6 | e-mail from Steve Liles.  Mr. Liles was another clinical |
| 16:11 | 7 | director at Provider Synergies; is that correct? |
| 16:11 | 8 | **A.**   Clinical coordinator. |
| 16:11 | 9 | **Q.**   What was the difference between clinical director and |
| 16:11 | 10 | clinical coordinator? |
| 16:11 | 11 | **A.**   Clinical coordinator reported to the clinical director. |
| 16:11 | 12 | **Q.**   So you were his boss? |
| 16:11 | 13 | **A.**   Correct. |
| 16:11 | 14 | **Q.**   It talks about "Subject:  Drug Information."  It's related |
| 16:11 | 15 | to -- this is Monday, December 1, 2003.  It says:  "Pfizer has |
| 16:11 | 16 | submitted the following formulary submission packets.  Would |
| 16:11 | 17 | any of you like them sent to you?"  And then it has packages |
| 16:11 | 18 | for, you see, Bextra and Celebrex, several? |
| 16:11 | 19 | **A.**   Yes. |
| 16:11 | 20 | **Q.**   And then at the end he notes:  "If nobody wants them, |
| 16:11 | 21 | they're going to the trash."  Is that correct? |
| 16:11 | 22 | **A.**   That's correct. |
| 16:11 | 23 | **Q.**   I'm sure he's being a bit factitious, but is that |
| 16:12 | 24 | consistent with your recollection that the dossiers were not |
| 16:12 | 25 | considered very important with regard to the work you were |

DAILY COPY

| | | |
|---|---|---|
| 16:12 | 1 | doing as an independent consultant -- |
| 16:12 | 2 | A.   Correct. |
| 16:12 | 3 | Q.   -- for Provider Synergies? |
| 16:12 | 4 | Dr. Taylor, before the short break, you talked about |
| 16:12 | 5 | your primary source of information being peer-reviewed |
| 16:12 | 6 | published data, FDA labeling and findings.  We've looked at |
| 16:12 | 7 | some of the correspondence, internal correspondence and e-mails |
| 16:12 | 8 | saying, basically, "If anybody wants the dossiers, fine; |
| 16:12 | 9 | otherwise, they're going in the trash."  You mentioned you |
| 16:12 | 10 | don't really rely on the e-mails and market material.  Why is |
| 16:12 | 11 | that, or why was that? |
| 16:12 | 12 | A.   We felt that that was a biased review of information. |
| 16:12 | 13 | Q.   Going with the independent review of the peer-reviewed |
| 16:12 | 14 | published data and the FDA findings would not have had that |
| 16:12 | 15 | same bias? |
| 16:12 | 16 | A.   That's correct. |
| 16:12 | 17 | Q.   Going back now to Exhibit 5, we had on the break a full |
| 16:13 | 18 | copy made.  This was the monograph of the COX-2 class, the |
| 16:13 | 19 | original one, correct, in February of '02? |
| 16:13 | 20 | A.   Yes. |
| 16:13 | 21 | Q.   If you go to page 6, which we now have on Exhibit 5, there |
| 16:13 | 22 | is a section called "Cardiovascular Concerns" and |
| 16:13 | 23 | "Cardiovascular Events."  Do you see that? |
| 16:13 | 24 | A.   Yes. |
| 16:13 | 25 | Q.   Do you recall preparing reviews on the COX-2 class -- |

| | | |
|---|---|---|
| 16:13 | 1 | including Vioxx, Celebrex, and Bextra -- in which you analyzed |
| 16:13 | 2 | and presented to the P&T committee information about potential |
| 16:13 | 3 | cardiovascular risks of those products? |
| 16:13 | 4 | **A.**   Yes. |
| 16:13 | 5 | **Q.**   Again, this information would have been presented to the |
| 16:13 | 6 | P&T committee meeting before the actual presentation you would |
| 16:13 | 7 | make? |
| 16:13 | 8 | **A.**   Yes. |
| 16:13 | 9 | **Q.**   Is it a fair statement that all of the references that you |
| 16:13 | 10 | put on page 10 would have actually been material that you or |
| 16:14 | 11 | your staff would have reviewed in preparation for the monograph |
| 16:14 | 12 | and presentation? |
| 16:14 | 13 | **A.**   Correct. |
| 16:14 | 14 | **Q.**   Do you see on page 10, reference 33 is to an article by |
| 16:14 | 15 | Mukherjee, Nissen, and Topol?  Do you see that? |
| 16:14 | 16 | **A.**   I'm having trouble seeing 33.  It's a little small. |
| 16:14 | 17 | **Q.**   Do you want to borrow my readers? |
| 16:14 | 18 | **A.**   Yeah.  Okay.  I see it now. |
| 16:14 | 19 | **Q.**   So that would have been a peer-reviewed published article |
| 16:14 | 20 | that you considered in your clinical review? |
| 16:14 | 21 | **A.**   Yes. |
| 16:14 | 22 | **Q.**   It talks about the risk of cardiovascular events |
| 16:14 | 23 | associated with selective COX-2 inhibitors? |
| 16:14 | 24 | **A.**   Yes. |
| 16:14 | 25 | **Q.**   It talks about coxibs and selective inhibitors of -- COX-2 |

DAILY COPY

| | | |
|---|---|---|
| 16:14 | 1 | inhibitors; correct? |
| 16:14 | 2 | **A.**   Yes. |
| 16:14 | 3 | **Q.**   Any doubt based on your recollection and specifically |
| 16:15 | 4 | looking at this monograph -- and we are going to go through |
| 16:15 | 5 | some more -- that you disclosed to the Louisiana P&T committee |
| 16:15 | 6 | that there was a potential cardiovascular risk associated with |
| 16:15 | 7 | these products? |
| 16:15 | 8 | **A.**   Correct.  We would have. |
| 16:15 | 9 | **Q.**   Any doubt in your mind that you disclosed to the P&T |
| 16:15 | 10 | committee, Louisiana Medicaid, that there was GI toxicity |
| 16:15 | 11 | associated potentially with these products? |
| 16:15 | 12 | **A.**   No doubt. |
| 16:15 | 13 | **Q.**   Doctor, tell the jury what Exhibit 10 to your deposition |
| 16:15 | 14 | is, please. |
| 16:15 | 15 | **A.**   It's the transcript from the May 8 Louisiana Medicaid P&T |
| 16:15 | 16 | committee meeting. |
| 16:15 | 17 | **Q.**   As I understand the way the process worked, as you |
| 16:15 | 18 | described it earlier and from these transcripts, is that you |
| 16:15 | 19 | would typically get up and make a presentation on the class |
| 16:15 | 20 | review that you previously submitted through the monographs; |
| 16:15 | 21 | right? |
| 16:15 | 22 | **A.**   That's correct. |
| 16:15 | 23 | **Q.**   And at the end of that, you would make a recommendation? |
| 16:15 | 24 | **A.**   Yes. |
| 16:16 | 25 | **Q.**   And this is the presentation in May of '02 on the initial |

DAILY COPY

16:16    1    review of the COX-2 class?

16:16    2    A.    Yes.

16:16    3    Q.    If you look on page 147, under your presentation that you

16:16    4    made to the P&T committee on this first class review of COX-2s,

16:16    5    you say there have been some trials for some of the products

16:16    6    showing that there is an increased risk for GI effects.

16:16    7           You also go on to say, the latest information in this

16:16    8    class, there's been a lot of looking at do the products

16:16    9    increase cardiovascular concerns, do they increase edema.

16:16   10           You go on to say there is a lot of discussion going

16:16   11    on and we need to look at further trials.

16:16   12           Do you have any reason to believe that that was

16:16   13    not the presentation you made to the P&T committee in May of

16:16   14    2002?

16:16   15    A.    It looks correct.

16:16   16    Q.    Consistent with the monograph, consistent with what we

16:16   17    talked about before?

16:16   18    A.    Yes.

16:16   19    Q.    Again, no doubt that you alerted the P&T committee that

16:17   20    there were cardiovascular concerns, there were GI toxicity

16:17   21    concerns?

16:17   22    A.    Correct.

16:17   23    Q.    On page 149, you go on and say:  "Both Bextra and Celebrex

16:17   24    are less expensive to the state, not to the extent that you

16:17   25    would end up going to another dollar sign.  From a strategy

16:17   1    perspective going forward, it's important to choose one or the

16:17   2    other."

16:17   3                That looks like Mr. Taylor's comments; correct?

16:17   4    A.    Yes.

16:17   5    Q.    Did he make a presentation with you?

16:17   6    A.    He would speak to the financial information.

16:17   7    Q.    Then there's a recommendation that we can see here at the

16:17   8    end, that we saw in the minutes, that Bextra and Celebrex be

16:17   9    put on the preferred and Vioxx be put on the nonpreferred.  And

16:17   10   we see Mr. Taylor talking about that being, one, Vioxx was more

16:17   11   expensive to the state?

16:17   12   A.    Correct.

16:17   13   Q.    There wasn't a recommendation that Vioxx be put on the

16:17   14   nonpreferred as opposed to Bextra and Celebrex because the

16:17   15   independent review revealed that one or the other was more or

16:17   16   less safe with regard to cardiovascular concerns or GI

16:18   17   toxicity; correct?

16:18   18   A.    Correct.

16:18   19   Q.    Based on your recollection and in the monographs that you

16:18   20   submitted and your presentation, that was not the basis of the

16:18   21   recommendation, correct, that one was more safe or less safe

16:18   22   than the other?  Correct?

16:18   23   A.    Correct.

16:18   24   Q.    It was based on cost; correct?

16:18   25   A.    Yes.

782

| 16:18 | 1 | **Q.**   We talked earlier, when we went through the Provider |
| 16:18 | 2 | Synergies materials, that you recognized that there would be an |
| 16:18 | 3 | annual review of the classes? |
| 16:18 | 4 | **A.**   Correct. |
| 16:18 | 5 | **Q.**   So if the first one was in May of '02 for COX-2s, the next |
| 16:18 | 6 | one would come up about May of '03? |
| 16:18 | 7 | **A.**   Correct. |
| 16:18 | 8 | **Q.**   If you had any question of a manufacturer, you could ask |
| 16:18 | 9 | and get information from them? |
| 16:18 | 10 | **A.**   Yes. |
| 16:18 | 11 | **Q.**   Dr. Taylor, Exhibit 11 is a letter from Merck to Mr. Terry |
| 16:18 | 12 | Taylor at Provider Synergies; correct? |
| 16:18 | 13 | **A.**   Yes. |
| 16:18 | 14 | **Q.**   Have you seen this form of letter before, when either you |
| 16:18 | 15 | or Mr. Taylor had a particular question of Merck or other |
| 16:19 | 16 | manufacturers, that they would respond with some type of letter |
| 16:19 | 17 | to you? |
| 16:19 | 18 | **A.**   Yes. |
| 16:19 | 19 | **Q.**   And without getting into the details of the specifics of |
| 16:19 | 20 | this letter, generally speaking, do you recall that Merck was |
| 16:19 | 21 | responsive if you or Mr. Taylor had a request for information, |
| 16:19 | 22 | that they would send you that information? |
| 16:19 | 23 | **A.**   Yes. |
| 16:19 | 24 | **Q.**   And, again, while you believe that they were responsive, |
| 16:19 | 25 | this was not the kind of primary information that you relied |

| | | |
|---|---|---|
| 16:19 | 1 | upon for your monographs and presentations; correct? |
| 16:19 | 2 | **A.**   Correct. |
| 16:19 | 3 | **Q.**   Do you have any reason to believe that Merck ever provided |
| 16:19 | 4 | you with inaccurate, misleading, false information based on |
| 16:19 | 5 | your requests? |
| 16:19 | 6 | **A.**   No. |
| 16:19 | 7 | **Q.**   Would you have typically received *Dear Health-care* |
| 16:19 | 8 | *Professional* letters from manufacturers, certainly with regard |
| 16:19 | 9 | to drugs that you were reviewing? |
| 16:19 | 10 | **A.**   Yes. |
| 16:19 | 11 | **Q.**   This is the 2002 FDA-approved label for Vioxx.  That would |
| 16:19 | 12 | have been information that you would have had and considered in |
| 16:20 | 13 | making your presentations and recommendations to the P&T |
| 16:20 | 14 | committee? |
| 16:20 | 15 | **A.**   Yes. |
| 16:20 | 16 | **Q.**   Is it significant to you that the FDA approves the |
| 16:20 | 17 | language in these labels? |
| 16:20 | 18 | **A.**   Yes. |
| 16:20 | 19 | **Q.**   It says:  "The information below should be taken into |
| 16:20 | 20 | consideration and caution should be exercised when Vioxx is |
| 16:20 | 21 | used in patients with a medical history of ischemic heart |
| 16:20 | 22 | disease." |
| 16:20 | 23 |         That would have been information that you would have |
| 16:20 | 24 | had and taken into consideration in making your |
| 16:20 | 25 | recommendations? |

| | | |
|---|---|---|
| 16:20 | 1 | **A.**   That's correct. |
| 16:20 | 2 | **Q.**   You would have presented that information to the P&T |
| 16:20 | 3 | committee? |
| 16:20 | 4 | **A.**   Correct. |
| 16:20 | 5 | **Q.**   Dr. Taylor, let me show you Exhibit 14.  Does that appear |
| 16:20 | 6 | to be another response from Merck to a question asked by |
| 16:20 | 7 | Mr. Taylor for information? |
| 16:20 | 8 | **A.**   Yes. |
| 16:20 | 9 | **Q.**   In the Merck -- this is August 8, 2002.  Merck was giving |
| 16:20 | 10 | Mr. Taylor additional information on the prescribing |
| 16:20 | 11 | information for Vioxx; is that correct? |
| 16:20 | 12 | **A.**   Yes. |
| 16:20 | 13 | **Q.**   He talks about the Vioxx gastrointestinal outcomes |
| 16:20 | 14 | research study? |
| 16:21 | 15 | **A.**   Yes. |
| 16:21 | 16 | **Q.**   If you look at page 3 of the letter, Mr. Taylor is also |
| 16:21 | 17 | informed about the gastrointestinal effects under the |
| 16:21 | 18 | "Warnings" section; correct? |
| 16:21 | 19 | **A.**   Yes. |
| 16:21 | 20 | **Q.**   But it would be something Merck was responding to, a |
| 16:21 | 21 | request for information from Provider Synergies? |
| 16:21 | 22 | **A.**   Correct. |
| 16:21 | 23 | **Q.**   It would be something that Provider Synergies could take |
| 16:21 | 24 | into consideration if it chose to do so? |
| 16:21 | 25 | **A.**   Correct. |

DAILY COPY

| | | |
|---|---|---|
| 16:21 | 1 | **Q.**   Dr. Taylor, can you identify Exhibit 15. |
| 16:21 | 2 | **A.**   It's an NSAID therapeutic class review from April of 2003. |
| 16:21 | 3 | **Q.**   That's a Provider Synergies prepared document? |
| 16:21 | 4 | **A.**   Yes. |
| 16:21 | 5 | **Q.**   You would have had responsibility for those? |
| 16:21 | 6 | **A.**   Correct. |
| 16:21 | 7 | **Q.**   COX-2s were part of the overall NSAID class; is that |
| 16:22 | 8 | correct? |
| 16:22 | 9 | **A.**   That's correct. |
| 16:22 | 10 | **Q.**   This is, essentially, your updating the monograph from the |
| 16:22 | 11 | prior year for the upcoming annual review; is that fair? |
| 16:22 | 12 | **A.**   Correct. |
| 16:22 | 13 | **Q.**   Do you specifically mention that VIGOR study, the Vioxx |
| 16:22 | 14 | gastrointestinal outcomes study, that you talked about before? |
| 16:22 | 15 | Is it VIGOR? |
| 16:22 | 16 | **A.**   Yes. |
| 16:22 | 17 | **Q.**   This would have been submitted, again, to the P&T |
| 16:22 | 18 | committee before the meeting for them to review? |
| 16:22 | 19 | **A.**   Correct. |
| 16:22 | 20 | **Q.**   Any doubt in your mind that you alerted the P&T committee |
| 16:22 | 21 | to the potential cardiovascular concerns of Vioxx? |
| 16:22 | 22 | **A.**   No doubt. |
| 16:22 | 23 | **Q.**   Any doubt in your blind that you alerted the P&T committee |
| 16:22 | 24 | of Louisiana about the potential GI toxicity of Vioxx as well |
| 16:22 | 25 | as other NSAIDs? |

DAILY COPY

| | | |
|---|---|---|
| 16:22 | 1 | **A.**   No doubt. |
| 16:22 | 2 | **Q.**   If you look at the reference page on page 14, Dr. Taylor, |
| 16:22 | 3 | reference 16 is the Vioxx package insert from 2002 that we just |
| 16:22 | 4 | looked at; correct? |
| 16:23 | 5 | **A.**   Yes. |
| 16:23 | 6 | **Q.**   That was provided or considered and also made available to |
| 16:23 | 7 | the P&T if they needed to look at it? |
| 16:23 | 8 | **A.**   Correct. |
| 16:23 | 9 | **Q.**   Dr. Taylor, just one last question on Exhibit 15, on the |
| 16:23 | 10 | reference list on the back, if you want to turn to that.  Is it |
| 16:23 | 11 | a fair statement that, again, you would have considered and |
| 16:23 | 12 | taken into consideration these published articles that are |
| 16:23 | 13 | listed -- such as Mukherjee on No. 58, Whelton on No. 62, and |
| 16:23 | 14 | then Whelton on No. 63 -- in your preparation of the monograph |
| 16:23 | 15 | and your presentation to the P&T committee? |
| 16:23 | 16 | **A.**   Yes. |
| 16:23 | 17 | **Q.**   Dr. Taylor, what is Exhibit 16? |
| 16:23 | 18 | **A.**   This is the Louisiana P&T committee meeting, May 21, 2003 |
| 16:23 | 19 | minutes. |
| 16:23 | 20 | **Q.**   Does it show you present? |
| 16:24 | 21 | **A.**   Yes. |
| 16:24 | 22 | **Q.**   It appears on page 10, under the section of "Selective |
| 16:24 | 23 | Cyclooxygenase COX-2 Inhibitors," that COX-2s were up for their |
| 16:24 | 24 | annual review again; correct? |
| 16:24 | 25 | **A.**   Yes. |

16:24   1   Q.   We just looked at the April monograph that would have been

16:24   2   submitted ahead of time to the P&T committee; right?

16:24   3   A.   Correct.

16:24   4   Q.   As a result of the clinical and financial review this

16:24   5   year, what were the recommendations?

16:24   6   A.   Vioxx, Bextra on the PDL, and nonpreferred was Celebrex.

16:24   7   Q.   Dr. Taylor, what is Exhibit 17?

16:24   8   A.   Transcripts from the May 21, 2003 Louisiana P&T committee.

16:24   9   Q.   So that's the transcript of the meeting for which the

16:24   10   minutes are reflected in Exhibit 16; correct?

16:25   11   A.   That's correct.

16:25   12   Q.   You would have made a presentation, again, based upon your

16:25   13   class review, the annual class review, of COX-2 inhibitors?

16:25   14   A.   Yes.

16:25   15   Q.   Would Mr. Taylor or some other representative from

16:25   16   Provider Synergies be there to give the financial rebate cost

16:25   17   analysis?

16:25   18   A.   Yes.

16:25   19   Q.   If you look at page 181 of the transcript, what do you

16:25   20   say -- on that third, last paragraph, what do you say about

16:25   21   cardiovascular concerns?

16:25   22   A.   It says:  "There are cardiovascular concerns with the

16:25   23   COX-2 products at this point.  Hypertension and edema have been

16:25   24   looked at for both celecoxib and rofecoxib."

16:25   25   Q.   And rofecoxib, as you understand, is Vioxx?

DAILY COPY

Case 2:05-md-01657-EEF-DEK   Document 53577   Filed 10/08/10   Page 84 of 104

788

| | | |
|---|---|---|
| 16:25 | 1 | **A.** Correct. |
| 16:26 | 2 | **Q.** It looks, at this point in time, the recommendation |
| 16:26 | 3 | obviously was made from Provider Synergies to put Vioxx and |
| 16:26 | 4 | Bextra on the preferred drug list and Celebrex on the |
| 16:26 | 5 | nonpreferred; right? |
| 16:26 | 6 | **A.** Correct. |
| 16:26 | 7 | **Q.** Again, no doubt, based on the monographs and your |
| 16:26 | 8 | presentations to the P&T committee in May of '03, that the P&T |
| 16:26 | 9 | committee of Louisiana Medicaid was well aware of the |
| 16:26 | 10 | cardiovascular concerns of COX-2 inhibitors? |
| 16:26 | 11 | **A.** Correct. |
| 16:26 | 12 | **Q.** Well aware of the potential GI toxicity as well? |
| 16:26 | 13 | **A.** Yes. |
| 16:26 | 14 | **Q.** Louisiana Medicaid adopted and accepted the |
| 16:26 | 15 | recommendations that Provider Synergies made about the COX-2 |
| 16:26 | 16 | class; is that your recollection? |
| 16:26 | 17 | **A.** From the minutes, it appears that way. |
| 16:26 | 18 | **Q.** Dr. Taylor, let me show you Exhibit 19.  Can you identify |
| 16:26 | 19 | that, please. |
| 16:26 | 20 | **A.** NSAID review dated April 2004 from Provider Synergies. |
| 16:26 | 21 | **Q.** Is that the updated class review for NSAIDs, including |
| 16:26 | 22 | COX-2s? |
| 16:26 | 23 | **A.** Yes. |
| 16:26 | 24 | **Q.** Is it a fair statement that you were obviously keeping up |
| 16:26 | 25 | with the issue in this class, as well as other classes that you |

DAILY COPY

| | | |
|---|---|---|
| 16:27 | 1 | were responsible for, so that if additional information became |
| 16:27 | 2 | available -- peer-reviewed literature, FDA pronouncements -- |
| 16:27 | 3 | that you would include them in the monographs? |
| 16:27 | 4 | **A.**   Yes. |
| 16:27 | 5 | **Q.**   And, again, on page 13 of the April '04 Provider Synergies |
| 16:27 | 6 | monograph, did you again have a detailed discussion about |
| 16:27 | 7 | cardiovascular concerns? |
| 16:27 | 8 | **A.**   Yes. |
| 16:27 | 9 | **Q.**   If you look at page 15 of the updated monograph, on the |
| 16:27 | 10 | second-to-last paragraph, you have a full paragraph on the |
| 16:27 | 11 | VIGOR study; is that correct? |
| 16:27 | 12 | **A.**   Yes. |
| 16:27 | 13 | **Q.**   Raising questions concerning the cardiovascular safety of |
| 16:27 | 14 | Vioxx? |
| 16:27 | 15 | **A.**   Yes. |
| 16:27 | 16 | **Q.**   Any doubt over the life of your reviews of COX-2s, |
| 16:27 | 17 | including Vioxx, with the P&T committee of Louisiana that you |
| 16:27 | 18 | made them aware of the cardiovascular potential risk of Vioxx |
| 16:28 | 19 | in the COX-2 class? |
| 16:28 | 20 | **A.**   Would I have made them aware?  Yes. |
| 16:28 | 21 | **Q.**   As we said before, also the GI toxicity issue? |
| 16:28 | 22 | **A.**   Correct. |
| 16:28 | 23 | **Q.**   If the P&T committee members had any questions whatsoever, |
| 16:28 | 24 | they could ask you; correct? |
| 16:28 | 25 | **A.**   That's correct. |

| | | |
|---|---|---|
| 16:28 | 1 | **Q.**   Has any P&T committee member from, say, Louisiana ever |
| 16:28 | 2 | told you that they felt they had inaccurate information from |
| 16:28 | 3 | Provider Synergies about the COX-2 class? |
| 16:28 | 4 | **A.**   Not to my knowledge. |
| 16:28 | 5 | **Q.**   That's up until the time you left in 2008? |
| 16:28 | 6 | **A.**   Correct. |
| 16:28 | 7 | **Q.**   Dr. Taylor, what is Exhibit 20? |
| 16:28 | 8 | **A.**   May 5, 2004 Louisiana P&T committee meeting minutes. |
| 16:28 | 9 | **Q.**   Does that show that you were present at that meeting? |
| 16:28 | 10 | **A.**   Yes. |
| 16:28 | 11 | **Q.**   This is the annual review.  We saw the monograph in April |
| 16:28 | 12 | of 2004.  That would have been submitted before this meeting? |
| 16:29 | 13 | **A.**   Correct. |
| 16:29 | 14 | **Q.**   If you look at page 4 of the minutes from the May 5, 2004 |
| 16:29 | 15 | P&T meeting, there is a section under "Celebrex."  Do you see |
| 16:29 | 16 | that? |
| 16:29 | 17 | **A.**   Yes. |
| 16:29 | 18 | **Q.**   And then "Class Review," you see it references a |
| 16:29 | 19 | December 17, 2000 recommendation that we looked at a few |
| 16:29 | 20 | minutes ago, where the committee was charged, Provider |
| 16:29 | 21 | Synergies -- specifically Mr. Taylor -- to continue to |
| 16:29 | 22 | negotiate on Celebrex? |
| 16:29 | 23 | **A.**   Yes. |
| 16:29 | 24 | **Q.**   What was the recommendation in May after those |
| 16:29 | 25 | negotiations? |

DAILY COPY

| 16:29 | 1 | **A.**   That Celebrex still remain off the PDL. |
| 16:29 | 2 | **Q.**   Does it say under the recommendation that "Provider |
| 16:29 | 3 | Synergies reported that some additional rebate had been offered |
| 16:30 | 4 | by the manufacturer of Celebrex; however, the amount was |
| 16:30 | 5 | insufficient to warrant recommending Celebrex be added to the |
| 16:30 | 6 | PDL"? |
| 16:30 | 7 | **A.**   Correct. |
| 16:30 | 8 | **Q.**   That's your understanding of the basis of the |
| 16:30 | 9 | recommendation? |
| 16:30 | 10 | **A.**   Yes. |
| 16:30 | 11 | **Q.**   Dr. Taylor, Exhibit 21 is a May 7, 2004 letter from Pfizer |
| 16:30 | 12 | to Provider Synergies; correct? |
| 16:30 | 13 | **A.**   Yes. |
| 16:30 | 14 | **Q.**   In that letter it appears, does it not, that Pfizer was |
| 16:30 | 15 | alerting Provider Synergies to -- or requesting Provider |
| 16:30 | 16 | Synergies to consider the Solomon reprint, Solomon study for |
| 16:30 | 17 | consideration of Celebrex in the COX-2 class; correct? |
| 16:30 | 18 | **A.**   Correct. |
| 16:30 | 19 | **Q.**   Would you have taken this information into consideration |
| 16:31 | 20 | for your recommendations? |
| 16:31 | 21 | **A.**   We would have reviewed this and then done our own |
| 16:31 | 22 | independent review and made a decision of what to include. |
| 16:31 | 23 | **Q.**   Do you recall that obviously Pfizer and Merck were |
| 16:31 | 24 | competitors in this class? |
| 16:31 | 25 | **A.**   Yes. |

| 16:31 | 1 | **Q.**   In addition to public material available to you and the |
| 16:31 | 2 | FDA material, your recollection -- we've seen some of it here |
| 16:31 | 3 | today -- would it be accurate to say that Pfizer would provide |
| 16:31 | 4 | the information if they thought it was something you should |
| 16:31 | 5 | consider in comparing Celebrex to Vioxx? |
| 16:31 | 6 | **A.**   Yes. |
| 16:31 | 7 | **Q.**   Dr. Taylor, does Exhibit 22 appear to be a letter that |
| 16:31 | 8 | Merck sent you in response to an information request that you |
| 16:31 | 9 | had made through a Mr. John Fevurly? |
| 16:31 | 10 | **A.**   Yes. |
| 16:31 | 11 | **Q.**   Again, as in the earlier question about one of these |
| 16:31 | 12 | letters, was Merck responsive to your request? |
| 16:31 | 13 | **A.**   Yes. |
| 16:31 | 14 | **Q.**   You saw the Pfizer letter about the Solomon article.  It |
| 16:32 | 15 | looks like you wanted to hear if there was any other view of |
| 16:32 | 16 | that from Merck; is that correct? |
| 16:32 | 17 | **A.**   Correct. |
| 16:32 | 18 | **Q.**   Did Merck provide you a detailed analysis of clinical |
| 16:32 | 19 | information surrounding some of these published studies? |
| 16:32 | 20 | **A.**   Yes. |
| 16:32 | 21 | **Q.**   Any reason to believe that Merck provided you inaccurate |
| 16:32 | 22 | or misleading information? |
| 16:32 | 23 | **A.**   No. |
| 16:32 | 24 | **Q.**   Has any Louisiana DHH official ever told you that Provider |
| 16:32 | 25 | Synergies provided incorrect or inaccurate or misleading |

DAILY COPY

| | | |
|---|---|---|
| 16:32 | 1 | information to them about the COX-2 class? |
| 16:32 | 2 | **A.**   No. |
| 16:32 | 3 | **Q.**   What about Vioxx specifically? |
| 16:32 | 4 | **A.**   No. |
| 16:32 | 5 | **Q.**   That's up through the time you left the company? |
| 16:32 | 6 | **A.**   Correct. |
| 16:32 | 7 | **Q.**   Do you recall that Vioxx was voluntarily withdrawn from |
| 16:32 | 8 | the market in September of 2004? |
| 16:32 | 9 | **A.**   Correct. |
| 16:32 | 10 | **Q.**   From that point forward for four years, you were with |
| 16:32 | 11 | Provider Synergies working with those folks; correct? |
| 16:33 | 12 | **A.**   Yes. |
| 16:33 | 13 | **Q.**   Working with the P&T committee members and working with |
| 16:33 | 14 | the Louisiana Department of Health and Hospital personnel; |
| 16:33 | 15 | correct?  Periodically. |
| 16:33 | 16 | **A.**   Yes. |
| 16:33 | 17 | **Q.**   During any of those conversations or meetings, did anybody |
| 16:33 | 18 | ever tell you from either the Louisiana Department of Health |
| 16:33 | 19 | and Hospitals or the P&T committee that Provider Synergies had |
| 16:33 | 20 | provided inaccurate, misleading, false information about Vioxx |
| 16:33 | 21 | or COX-2 inhibitors? |
| 16:33 | 22 | **A.**   No. |
| 16:33 | 23 | **Q.**   Or that Merck had provided such to you, false, misleading, |
| 16:33 | 24 | or inaccurate material? |
| 16:33 | 25 | **A.**   No. |

| | | |
|---|---|---|
| 16:33 | 1 | **Q.**   Dr. Taylor, what is Exhibit 23 to your deposition? |
| 16:33 | 2 | **A.**   August 11, 2004 Louisiana P&T committee minutes. |
| 16:33 | 3 | **Q.**   Are you present at that meeting? |
| 16:33 | 4 | **A.**   Yes. |
| 16:33 | 5 | **Q.**   If you look at page 11, it appears that the COX-2 |
| 16:33 | 6 | inhibitor class was looked at again; is that right? |
| 16:33 | 7 | **A.**   Yes. |
| 16:34 | 8 | **Q.**   Do you recall that at some point in time those |
| 16:34 | 9 | negotiations were sufficient to allow for recommendation for |
| 16:34 | 10 | Celebrex to go back on the preferred drug list? |
| 16:34 | 11 | **A.**   It appears that way from these recommendations. |
| 16:34 | 12 | **Q.**   Exhibit 24 appears to be an e-mail, internal, at Provider |
| 16:34 | 13 | Synergies trying to respond from a question from the state |
| 16:34 | 14 | about investigating the financial impact of Vioxx being |
| 16:34 | 15 | withdrawn from the market and obviously no longer on the |
| 16:34 | 16 | preferred drug list; correct? |
| 16:34 | 17 | **A.**   Correct. |
| 16:34 | 18 | **Q.**   Do you recall such analysis would be a regular part of the |
| 16:34 | 19 | business that you would do for the state? |
| 16:34 | 20 | **A.**   Yes. |
| 16:34 | 21 | **Q.**   On page 2 of Exhibit 24, which is a document produced by |
| 16:34 | 22 | Provider Synergies, Ms. Griffith reports back to Ms. Terrebonne |
| 16:34 | 23 | and to Harvey Taylor at Louisiana that:  "The cost of Celebrex |
| 16:35 | 24 | and Vioxx were almost the same.  So if most of the Vioxx |
| 16:35 | 25 | utilization shifts to Celebrex, there would be no difference. |

DAILY COPY

| | | |
|---|---|---|
| 16:35 | 1 | The analysis showed essentially no financial impact to the |
| 16:35 | 2 | removal of Vioxx." |
| 16:35 | 3 | Did I read that correctly? |
| 16:35 | 4 | **A.** Yes. |
| 16:35 | 5 | **Q.** So Provider Synergies was of the opinion, after doing its |
| 16:35 | 6 | analysis, that there would be no financial impact on the State |
| 16:35 | 7 | of Louisiana based on the removal of Vioxx from the Louisiana |
| 16:35 | 8 | preferred drug list? |
| 16:35 | 9 | **A.** Correct. |
| 16:35 | 10 | **Q.** Do you recall following and considering the FDA advisory |
| 16:35 | 11 | committee meetings and findings of the NSAID class in April of |
| 16:35 | 12 | 2005? |
| 16:35 | 13 | **A.** Yes. |
| 16:35 | 14 | **Q.** Do you recall that the FDA, after looking at all of the |
| 16:35 | 15 | data from all of the NSAIDs, traditional and selective, |
| 16:35 | 16 | concluded that there is no rank ordering of risk and that they |
| 16:36 | 17 | all have some potential cardiovascular risks? |
| 16:36 | 18 | **A.** Correct. |
| 16:36 | 19 | **Q.** Do you recall that as a result of their findings that all |
| 16:36 | 20 | NSAIDs, COX-2s, and traditional had a box warning for potential |
| 16:36 | 21 | cardiovascular risks? |
| 16:36 | 22 | **A.** Yes. |
| 16:36 | 23 | **Q.** The FDA findings in April 2005 are part of that hierarchy |
| 16:36 | 24 | of material that you look at -- FDA findings, labels, published |
| 16:36 | 25 | peer-reviewed literature -- in making your recommendations; |

| | | |
|---|---|---|
| 16:36 | 1 | correct? |
| 16:36 | 2 | **A.**   Correct. |
| 16:36 | 3 | **Q.**   So a drug or a class of drugs would be reviewed by |
| 16:36 | 4 | Provider Synergies at least on an annual basis and |
| 16:36 | 5 | recommendations would be made at the P&T committee; is that |
| 16:36 | 6 | correct? |
| 16:36 | 7 | **A.**   That's correct. |
| 16:36 | 8 | **Q.**   Did anyone from the State of Louisiana ever contact you, |
| 16:36 | 9 | to your knowledge, before filing this lawsuit and ask your |
| 16:36 | 10 | views of whether or not there had been any misrepresentation |
| 16:36 | 11 | about Vioxx? |
| 16:36 | 12 | **A.**   No. |
| 16:37 | 13 | **Q.**   Dr. Taylor, we have gone through a series of monographs |
| 16:37 | 14 | and the P&T committee meetings and minutes that reflected the |
| 16:37 | 15 | COX-2 and NSAID discussions earlier today.  Is it your |
| 16:37 | 16 | recollection that -- and I think you described the process, |
| 16:37 | 17 | about how you prepare and then present the monographs and then |
| 16:37 | 18 | make a presentation, oral presentation, at the meetings. |
| 16:37 | 19 |          From 2002 to 2004, while Vioxx was on the market and |
| 16:37 | 20 | Provider Synergies was doing class reviews, is it right that |
| 16:37 | 21 | the manufacturers at those meetings did not make presentations |
| 16:37 | 22 | to the P&T committee? |
| 16:37 | 23 | **A.**   No. |
| 16:37 | 24 | **Q.**   That's -- |
| 16:37 | 25 | **A.**   No, they did make presentations. |

| | | |
|---|---|---|
| 16:37 | 1 | **Q.**   In 2002 through 2004?  I know that they did subsequent to |
| 16:37 | 2 | that.  I think we can go through the transcripts.  Do you |
| 16:37 | 3 | recall -- if I understood the process -- let's back up a |
| 16:38 | 4 | second -- that you-all would make a presentation on the class |
| 16:38 | 5 | and then make a recommendation and the P&T could ask you |
| 16:38 | 6 | questions, and then there was an open period for public comment |
| 16:38 | 7 | at the end of those meetings.  Is that -- |
| 16:38 | 8 | **A.**   Correct. |
| 16:38 | 9 | **Q.**   Is that what you're talking about? |
| 16:38 | 10 | **A.**   Yes. |
| 16:38 | 11 | **Q.**   Okay.  But the presentation on COX-2 NSAIDs was made by |
| 16:38 | 12 | Provider Synergies to the P&T; correct? |
| 16:38 | 13 | **A.**   Correct. |
| 16:38 | 14 | **Q.**   And the P&T committee, as you understood it, pursuant to |
| 16:38 | 15 | the contract Provider Synergies had with the state, was relying |
| 16:38 | 16 | on Provider Synergies' review and recommendation and not the |
| 16:38 | 17 | manufacturers; right? |
| 16:38 | 18 | **A.**   Correct. |
| 16:39 | 19 | **Q.**   And based upon Provider Synergies' independent clinical |
| 16:39 | 20 | review and price negotiations that we talked about earlier of |
| 16:39 | 21 | the NSAID class, both traditional NSAIDs and COX-2s, Provider |
| 16:39 | 22 | Synergies made its recommendation that Vioxx be included on the |
| 16:39 | 23 | 2003 and 2004 preferred drug list; is that right? |
| 16:39 | 24 | **A.**   Yes. |
| 16:39 | 25 | **Q.**   And that recommendation was that after doing that |

16:39     1    independent review and the contract negotiations, rebate

16:39     2    negotiations, that it was cost-effective for the State of

16:39     3    Louisiana to have Vioxx on the preferred drug list for 2003 and

16:39     4    2004; is that correct?

16:39     5    **A.**    Correct.

16:39     6    **Q.**    And the state adopted that recommendation, as you recall?

16:39     7    **A.**    Yes.

16:39     8    **Q.**    And that recommendation that was adopted by the state to

16:40     9    place Vioxx on the preferred drug list in Louisiana in 2003 and

16:40    10    2004 was made after Provider Synergies and you, specifically,

16:40    11    presented the state with the monographs that we have been

16:40    12    through today, the information about the cardiovascular risks,

16:40    13    the information about the GI toxicity, made oral presentations

16:40    14    about those issues to the P&T; correct?

16:40    15    **A.**    Yes.

16:40    16    **Q.**    And that recommendation which was adopted was based, to

16:40    17    your knowledge, on the monograph class review and your

16:40    18    presentation and recommendations and not on Merck's

16:40    19    submissions; correct?

16:40    20    **A.**    Correct.

16:40    21    **Q.**    You do not have any information to believe that Merck in

16:40    22    any way misled or misrepresented the risks and benefits of

16:40    23    Vioxx that somehow had an effect on that decision; is that

16:41    24    correct?

16:41    25    **A.**    Correct.

| | | |
|---|---|---|
| 16:41 | 1 | **Q.**   I wanted to ask a bit more about the sources of |
| 16:41 | 2 | information that you used in developing your monographs and |
| 16:41 | 3 | recommendations.  Could you reiterate what the sources were |
| 16:41 | 4 | that you used in coming to your recommendation to the State of |
| 16:41 | 5 | Louisiana. |
| 16:41 | 6 | **A.**   We reviewed peer-reviewed articles that we searched |
| 16:41 | 7 | through PubMed.  We also procured articles from certain online |
| 16:41 | 8 | sources and downloaded package inserts from online sources or |
| 16:41 | 9 | requested them from pharmaceutical manufacturers. |
| 16:41 | 10 | **Q.**   Was there any other information that you used that helped |
| 16:41 | 11 | you to make your recommendations? |
| 16:41 | 12 | **A.**   No. |
| 16:42 | 13 | **Q.**   We looked at some documents earlier where it appeared that |
| 16:42 | 14 | Provider Synergies had requested information directly to Merck, |
| 16:42 | 15 | and then those documents appeared to be responding to what |
| 16:42 | 16 | Merck calls PIRs.  Was that also taken into consideration in |
| 16:42 | 17 | making your recommendation? |
| 16:42 | 18 | **A.**   The only thing used from those information articles would |
| 16:42 | 19 | be any references to published peer-reviewed articles. |
| 16:42 | 20 | **Q.**   After having participated in a number of P&T committee |
| 16:42 | 21 | meetings, were you aware that the P&T committee also relied on |
| 16:42 | 22 | other sources of information in making their decision? |
| 16:42 | 23 | **A.**   I have no idea what they would have relied on. |
| 16:43 | 24 | **Q.**   Do you know if they were aware of other sources of |
| 16:43 | 25 | information besides what was presented in the monograph or by |

| 16:43 | 1 | Provider Synergies at the P&T committee? |
| 16:43 | 2 | **A.**   I have no idea. |
| 16:43 | 3 | **Q.**   Do you recall if they brought up other sources of |
| 16:43 | 4 | information other than what you had digested and utilized in |
| 16:43 | 5 | preparing your monograph? |
| 16:43 | 6 | **A.**   I don't recall in this particular instance. |
| 16:43 | 7 | **Q.**   Do you recall ever discussing with the P&T committee, or |
| 16:43 | 8 | any members of the P&T committee, any data that was on the FDA |
| 16:43 | 9 | Web site? |
| 16:43 | 10 | **A.**   I don't recall. |
| 16:43 | 11 | **Q.**   Did you ever point out any other resources that might have |
| 16:44 | 12 | been available to members of the P&T committee? |
| 16:44 | 13 | **A.**   I don't remember. |
| 16:44 | 14 | **Q.**   Pardon me, then.  *PIR* is a Merck term.  Would this be the |
| 16:44 | 15 | form in which you would request additional information from |
| 16:44 | 16 | Merck? |
| 16:44 | 17 | **A.**   It could be one of the forms that we used, yes. |
| 16:44 | 18 | **Q.**   Does this appear that this was you asking for additional |
| 16:44 | 19 | information from someone from Merck? |
| 16:44 | 20 | **A.**   Yes. |
| 16:44 | 21 | **Q.**   Does it appear that you are responding to information |
| 16:44 | 22 | published in the *Wall Street Journal* about Vioxx? |
| 16:44 | 23 | **A.**   Yes. |
| 16:44 | 24 | **Q.**   And that you're asking for Merck's take on the latest |
| 16:44 | 25 | information from that article? |

| | | |
|---|---|---|
| 16:44 | 1 | **A.**   Yes. |
| 16:44 | 2 | **Q.**   In the second paragraph of your note, you're asking how |
| 16:45 | 3 | you can continue to recommend Vioxx as a preferred drug in |
| 16:45 | 4 | light of this information, new information; is that correct? |
| 16:45 | 5 | **A.**   That's what's stated here, yes. |
| 16:45 | 6 | **Q.**   Does it appear to you that you are asking for additional |
| 16:45 | 7 | information about how a study was conducted? |
| 16:45 | 8 | **A.**   Yes. |
| 16:45 | 9 | **Q.**   And you are asking Merck or you are telling Merck that you |
| 16:45 | 10 | are interested in any other information that Merck can provide |
| 16:45 | 11 | you that's not published about the study? |
| 16:45 | 12 | **A.**   Yes. |
| 16:45 | 13 | **Q.**   Would that appear to be that you are asking for |
| 16:45 | 14 | information beyond just the published study itself? |
| 16:45 | 15 | **A.**   That was part of our normal process. |
| 16:45 | 16 | **Q.**   How often would you, in general, ask a manufacturer for |
| 16:45 | 17 | additional information about a particular study? |
| 16:46 | 18 | **A.**   No idea. |
| 16:46 | 19 | **Q.**   Do you recall any other times that you asked for |
| 16:46 | 20 | additional information about a Vioxx study? |
| 16:46 | 21 | **A.**   I don't recall. |
| 16:46 | 22 | **Q.**   Okay.  I'm going to start over again, then. |
| 16:46 | 23 | "The risk reduction for PUBs and complicated PUBs for |
| 16:46 | 24 | Vioxx compared to naproxen (approximately 50 percent) was |
| 16:46 | 25 | maintained in patients with or without the following risk |

| | | |
|---|---|---|
| 16:46 | 1 | factors for developing a PUB, Kaplan-Meier, cumulative rate of |
| 16:46 | 2 | PUBs at approximately 10.5 months, Vioxx versus naproxen, |
| 16:46 | 3 | respectively. |
| 16:46 | 4 | "With a prior PUB (5.2, 11.47)" -- I'm sorry.  I |
| 16:46 | 5 | misread.  "(5.12, 11.47;) without a prior PUB (1.54, 3.27); age |
| 16:47 | 6 | 65 or older (2.83, 6.49); or younger than 65 years of age |
| 16:47 | 7 | (1.48, 3.01).  A similar risk reduction for PUBs and |
| 16:47 | 8 | complicated PUBs (approximately 50 percent) was also maintained |
| 16:47 | 9 | in patients with or without Helicobacter pylori infection or |
| 16:47 | 10 | concomitant corticosteroid use." |
| 16:47 | 11 | Did you take that in? |
| 16:47 | 12 | **A.**   Yes. |
| 16:47 | 13 | **Q.**   What does that mean to you? |
| 16:47 | 14 | **A.**   That Vioxx had a lower rate of causing GI toxicity than |
| 16:47 | 15 | other NSAIDs in this particular study that was cited. |
| 16:47 | 16 | **Q.**   Would you interpret that to mean that the approximate |
| 16:47 | 17 | 50 percent reduction in risk for PUBs and complicated PUBs was |
| 16:47 | 18 | true for patients with or without concomitant steroid use? |
| 16:48 | 19 | **A.**   That's what's stated in there, yes. |
| 16:48 | 20 | **Q.**   Would you have relied on the 2002 label, with that |
| 16:48 | 21 | paragraph included, in developing your monograph and making |
| 16:48 | 22 | your ultimate recommendation to the P&T committee? |
| 16:48 | 23 | **A.**   That plus additional information. |
| 16:48 | 24 | **Q.**   If you had additional information at your disposal in the |
| 16:48 | 25 | form of a peer-reviewed article or clarification by Merck about |

DAILY COPY

16:48  1    the cardiovascular effects of Vioxx, would that have been taken

16:48  2    into consideration?

16:48  3    A.    It would have to be peer-reviewed in order for us to

16:48  4    include it in our monograph.

16:48  5    Q.    Yet we've gone over a couple of instances, I think, in

16:48  6    this deposition where you ask for clarification from Vioxx --

16:48  7    excuse me, from Merck about Vioxx.  Is that your recollection?

16:49  8    A.    I'm not sure how to answer that.  I don't know what you

16:49  9    mean.  I mean, that was our standard procedure, to request

16:49  10   additional information from all manufacturers if we, indeed,

16:49  11   had any questions about any information that we had.

16:49  12   Q.    If you had received additional information which called

16:49  13   into doubt prior studies which you had reviewed and relied on,

16:49  14   would you have taken that information into consideration?

16:49  15   A.    We reviewed all information.  The only information we

16:49  16   presented to P&T was peer-reviewed published articles.

16:49  17   Q.    If you had learned that any of those peer-reviewed

16:49  18   published articles misrepresented the cardiovascular risks of

16:49  19   Vioxx, would you have addressed that?  How would you have

16:50  20   addressed that?

16:50  21   A.    I don't think I can specifically answer that in regards to

16:50  22   Vioxx.  I mean, I can tell you about our process of evaluating

16:50  23   articles.

16:50  24   Q.    Do you see in the second box down, under "Requesting

16:50  25   Health-care Professional," your name, Valerie Taylor?

| | | |
|---|---|---|
| 16:50 | 1 | **A.** Yes. |
| 16:50 | 2 | **Q.** And then the box below that indicates that the Merck |
| 16:50 | 3 | product was Vioxx and a specific question requested and that |
| 16:50 | 4 | Dr. Taylor asked in quotes: "Why does the data in the Solomon |
| 16:50 | 5 | abstract look different from what Merck has reported in their |
| 16:50 | 6 | circular?" |
| 16:50 | 7 | Do you recall having asked a Merck representative |
| 16:50 | 8 | this question? |
| 16:50 | 9 | **A.** No. |
| 16:50 | 10 | **Q.** Do you recall the Solomon abstract? |
| 16:50 | 11 | **A.** No. |
| 16:51 | 12 | **Q.** Had you learned that that information included false or |
| 16:51 | 13 | misleading information, would you have discounted the |
| 16:51 | 14 | information which you had received? |
| 16:51 | 15 | **A.** I just wouldn't have had any reason to believe that. I |
| 16:51 | 16 | can't answer that. I just would not believe that of a |
| 16:51 | 17 | manufacturer, any manufacturer, that they would provide false |
| 16:51 | 18 | or misleading information. So I don't have any grounds to |
| 16:51 | 19 | answer that hypothetical because I don't believe it. I don't |
| 16:51 | 20 | know. I don't know how to answer it. |
| 16:51 | 21 | **Q.** What sources would you find credible to debunk a |
| 16:51 | 22 | particular peer-reviewed journal article? |
| 16:51 | 23 | **A.** If it's peer-reviewed, it should be valid information. |
| 16:51 | 24 | **Q.** What if additional information came out after the |
| 16:51 | 25 | publication of the article which -- |

| | | |
|---|---|---|
| 16:51 | 1 | **A.**    Then we would have reviewed that and made appropriate |
| 16:52 | 2 | comments on it. |
| 16:52 | 3 | **Q.**    So, then, you're saying that the form of that additional |
| 16:52 | 4 | information would have needed to have been in another |
| 16:52 | 5 | peer-reviewed article? |
| 16:52 | 6 | **A.**    Yes. |
| 16:52 | 7 | **Q.**    What about had the FDA itself provided that information? |
| 16:52 | 8 | **A.**    I don't know.  It just depends on what it was and how it |
| 16:52 | 9 | came out and whether we believed what it said. |
| 16:52 | 10 | **Q.**    Dr. Taylor, just few more questions and then I'll be done. |
| 16:52 | 11 | Earlier on in the deposition, counsel went through a number of |
| 16:52 | 12 | the actual monographs that were prepared by Provider Synergies. |
| 16:52 | 13 | A number of those monographs would have been the monographs |
| 16:52 | 14 | used at the time of your developing and coming up with your |
| 16:52 | 15 | recommendation to the P&T committee for Louisiana.  I notice in |
| 16:53 | 16 | these -- do you recall that the monographs generally included |
| 16:53 | 17 | information about the VIGOR trial? |
| 16:53 | 18 | **A.**    It depends on what monograph, I guess.  I don't know.  I |
| 16:53 | 19 | would have to review them again to see. |
| 16:53 | 20 | **Q.**    Again, I think I've asked this question before, but I'm |
| 16:53 | 21 | going to ask it again over your objections. |
| 16:53 | 22 |         Had the results of VIGOR -- had you learned that the |
| 16:53 | 23 | VIGOR results understated the risks, the cardiovascular risks, |
| 16:53 | 24 | would you have reported VIGOR in the way that you did, included |
| 16:53 | 25 | it in the way that you did in this monograph? |

| 16:53 | 1 | **A.**   I don't know how to answer that.  I mean, I need |
| 16:53 | 2 | black-and-white data to look at to make a determination of how |
| 16:54 | 3 | we would have responded to it.  I don't know. |
| 16:54 | 4 | **Q.**   So you're unable to answer the question? |
| 16:54 | 5 | **A.**   Correct. |
| 16:54 | 6 | **Q.**   Were you to learn that the VIGOR study omitted three MIs |
| 16:54 | 7 | that were not reported in the study, would that have affected |
| 16:54 | 8 | your analysis of the study? |
| 16:54 | 9 | **A.**   I don't know.  I'd have to review whatever that |
| 16:54 | 10 | information was to make a determination. |
| 16:54 | 11 | THE COURT:  Okay, folks.  That's it? |
| 16:54 | 12 | MR. ISMAIL:  Maybe we'll offer exhibits.  Is that |
| 16:54 | 13 | okay, Your Honor? |
| 16:54 | 14 | THE COURT:  Yes. |
| 16:54 | 15 | MR. SALES:  Merck would offer the following |
| 16:55 | 16 | deposition exhibits from the Valerie Taylor deposition: |
| 16:55 | 17 | Defense Exhibits 2025, 2045, 2026, 2101, 2177, 2110, 2071, |
| 16:55 | 18 | 2094 -- |
| 16:55 | 19 | THE DEPUTY CLERK:  Some of these are duplicates. |
| 16:55 | 20 | MR. SALES:  We will clear that up to make sure |
| 16:55 | 21 | they're not duplicates, Your Honor. |
| 16:55 | 22 | THE COURT:  Do you have a list that you can use? |
| 16:55 | 23 | THE DEPUTY CLERK:  I have what they put in for |
| 16:55 | 24 | Castille, Judge, and several of these are duplicates. |
| 16:55 | 25 | MR. SALES:  We will obviously offer them only one |

DAILY COPY

| | | |
|---|---|---|
| 16:55 | 1 | time, so we will get together -- |
| 16:55 | 2 | THE COURT:  Right. |
| 16:55 | 3 | MR. SALES:  2095, 2118, 2119, 2121, 2127, 2137, and |
| 16:56 | 4 | 2123.  We will get together to make sure that we only offer |
| 16:56 | 5 | them one time. |
| 16:56 | 6 | THE COURT:  I'll admit them. |
| 16:56 | 7 | MR. MURRAY:  Your Honor, some of the exhibits that we |
| 16:56 | 8 | have for Dr. Taylor are also exhibits in the materials we have |
| 16:56 | 9 | already submitted to you, but I would like to confirm which |
| 16:56 | 10 | ones those are.  Can I introduce our exhibits for Dr. Taylor |
| 16:56 | 11 | tomorrow morning? |
| 16:56 | 12 | THE COURT:  Yes.  Get with Gaylyn on that and make |
| 16:56 | 13 | sure we don't have duplicates.  That's important. |
| 16:56 | 14 | MR. MURRAY:  That's what I'm trying to confirm right |
| 16:56 | 15 | now.  I just learned of that issue, and I would like to make |
| 16:56 | 16 | sure that we are not duplicating anything.  Of course, we don't |
| 16:56 | 17 | know what Your Honor's rulings are on those objections, but if |
| 16:56 | 18 | they were Taylor exhibits, we can address whether there are any |
| 16:56 | 19 | objections. |
| 16:56 | 20 | THE COURT:  What about the spreadsheet that you-all |
| 16:57 | 21 | were going to prepare?  Do you have that for him? |
| 16:57 | 22 | MR. MURRAY:  I have not yet, Your Honor.  We have no |
| 16:57 | 23 | objections, by the way, to the Taylor exhibits that have been |
| 16:57 | 24 | introduced by the defendants.  Tomorrow morning, we will |
| 16:57 | 25 | introduce the remainder once we've confirmed that they're not |

DAILY COPY

16:57   1    duplicative.

16:57   2              THE COURT:  We'll stand in recess until 9:00 tomorrow

16:57   3    morning.  Court will stand in recess.

16:57   4              THE DEPUTY CLERK:  Everyone rise.

16:57   5              (WHEREUPON the Court was in recess for the evening.)

16:57   6                              * * *

        7                            CERTIFICATE

        8              I, Toni Doyle Tusa, CCR, FCRR, Official Court

        9    Reporter for the United States District Court, Eastern District

       10    of Louisiana, do hereby certify that the foregoing is a true

       11    and correct transcript, to the best of my ability and

       12    understanding, from the record of the proceedings in the

       13    above-entitled and numbered matter.

       14

       15

       16                                  s/ Toni Doyle Tusa
                                           Toni Doyle Tusa, CCR, FCRR
       17                                  Official Court Reporter

       18

       19

       20

       21

       22

       23

       24

       25