```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   ****************************************************************

     IN RE:  VIOXX PRODUCTS            MDL No. 1657
 4   LIABILITY LITIGATION              Section: "L"
                                       New Orleans, Louisiana
 5                                     Friday, April 16, 2010

 6   ****************************************************************

 7   THIS DOCUMENT RELATES TO:

 8   State of Louisiana, ex rel
     James D. Caldwell, Jr.,
     Attorney General
 9

10        versus

11
     Merck

12   Case No. 05-CV-3700
     ****************************************************************

13                TRANSCRIPT OF TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
14               UNITED STATES DISTRICT JUDGE
                     DAY 5, MORNING SESSION

15

16

17   APPEARANCES:

18

     FOR THE LOUISIANA DEPARTMENT
19   OF HEALTH AND HOSPITALS:
                                     DUGAN LAW FIRM
20                                   BY:  JAMES R. DUGAN, II, ESQ.
                                     650 Poydras St., Suite 2150
21                                   New Orleans, LA 70130

22
                                     MURRAY LAW FIRM
23                                   BY:  STEPHEN B. MURRAY, JR., ESQ.
                                          DOUGLAS R. PLYMALE, ESQ.
24                                        JUSTIN BLOOM, ESQ.
                                     650 Poydras St., Suite 1100
25                                   New Orleans, LA 70130
```

```
 1                                    LIEFF CABRASER HEIMANN & BERNSTEIN
 2                                    BY:  DONALD C. ARBITBLIT, ESQ.
                                      Embarcadero Center West
 3                                    275 Battery Street, Suite 3000
                                      San Francisco, CA 94111-3339
 4

 5

 6   FOR MERCK:                       GOLDMAN ISMAIL TOMASELLI
                                      BRENNAN & BAUM
 7                                    BY:  TAREK ISMAIL, ESQ.
                                      1 North Franklin St., Suite 625
 8                                    Chicago, IL 60606

 9                                    BAKER BOTTS
                                      BY:  TRAVIS J. SALES, ESQ.
10                                    One Shell Plaza
                                      910 Louisiana
11                                    Houston, TX 77002-4995

12

                                      O'MELVENY & MYERS
13                                    BY:  SCOTT M. VOELZ, ESQ.
                                      400 South Hope Street
14                                    Los Angeles, CA 90071-2899

15

16
     Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
17                                    500 Poydras Street, Room HB-406
                                      New Orleans, Louisiana 70130
18                                    (504) 589-7776

19

20        Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

I N D E X

WITNESSES FOR THE DEFENDANT:                    PAGE/LINE:


VIDEO DEPOSITION OF MARY J. TERREBONNE          813/7


VIDEO DEPOSITION OF BEN BEARDEN                 857/14

<u>P R O C E E D I N G S</u>

(FRIDAY, APRIL 16, 2010)

(MORNING SESSION)

```
 1
 2
 3
 4
 5      (OPEN COURT.)
 6          THE COURT:  Be seated, please.  Good morning, ladies and
 7      gentlemen.  More television, right?  Should have brought some
 8      popcorn.
 9          MR. MURRAY:  Your Honor, with the court's indulgence, I
10      am going to be back in the corner trying to prepare something to
11      submit to the court.
12          THE COURT:  That's fine, Steve.
13          MR. SALES:  Your Honor, there's some housekeeping matters
14      from yesterday's exhibits real quickly.  Your Honor, yesterday
15      there were some duplicate exhibits put in from two different
16      depositions, the deposition from Valerie Taylor, we will withdraw
17      Defendant's Exhibit 2101, 2071, 2094, 2095, 2119, Defendant's 2121,
18      and Defendant's 2127.
19          THE COURT:  Okay.
20          MR. SALES:  Those were already in from Mr. Castille's
21      deposition.
22          THE COURT:  All right.  Let it be done.  And at the end
23      of the day today, Travis, you and Jim get together and make sure we
24      have all of the exhibits in the form and fashion that you need them
25      to be in.
```

```
 1              MR. SALES:  We will, your Honor.

 2              MR. DUGAN:  We will, your Honor.

 3              THE COURT:  Okay.  Let's call your next witness.

 4              MR. SALES:  Merck calls Ms. Terrebonne by videotaped

 5   deposition.

 6              THE COURT:  Do I have a transcript of that?

 7       (WHEREUPON, THE VIDEOTAPE DEPOSITION OF MARY JULIA TERREBONNE

 8        WAS PLAYED.)

 9   Q.  Good morning.

10   A.  Good morning.

11   Q.  Could you please state your name?

12   A.  Mary Julia Terrebonne.

13   Q.  Ms. Terrebonne, could you tell us about your education after

14   high school?

15   A.  I went to Nichols State University for two years in

16   pre-pharmacy, and subsequent to that, went to Northeast Louisiana

17   University in pharmacy school for two and a half years.

18   Q.  Where did you go to pharmacy school?

19   A.  It was called Northeast Louisiana University.  It's now called

20   University of Louisiana - Monroe.

21   Q.  When did you graduate?

22   A.  December 1978.

23   Q.  Can you tell us about your jobs after earning your pharmacy

24   degree?

25   A.  I worked at Cut Off Drugstore in Cut Off, Louisiana, from 1979
```

1    to 1980.  Then from 1980 to 1993, I worked at Kare Drugstore in

2    Port Allen, Louisiana, and in 1983, I came to the State.

3    Q.  What department were you hired at when you came to work for the

4    State, do you remember?

5    A.  I think it was the surveillance and utilization review section

6    in Medicaid.

7    Q.  Have you worked for the Department of Health and Hospitals or

8    DHH, since 1983?

9    A.  Yes.

10   Q.  To the present?

11   A.  Yes.

12   Q.  Can you just walk us through your titles since you joined in

13   1983, if you remember?

14   A.  I worked in surveillance utilization review, then worked in the

15   policy section, then worked in the program operations section.

16   Q.  If you could just also give me time frames, if you know.

17   A.  You're really pushing me.  I don't really know exactly, because

18   it's just, you know, we switch around a lot here.

19           Probably in the '80s I worked in the surveillance and

20   utilization review section for probably, I don't know, I'm going to

21   say three to four years.  Then switched to the policy section for

22   probably two or three years, and then the program operations

23   section for probably five or six years.  And then they formed the

24   pharmacy section, probably like '99 or 2000.

25   Q.  Since 1999 or 2000, have you worked in the pharmacy section

1    here at the DHH?

2    A.  Yes.

3    Q.  Have you been the pharmacy director --

4    A.  Yes.

5    Q.  -- of that section?

6             We had an opportunity to meet Dr. Bearden and took a

7    deposition of Dr. Bearden and tried to find out a little bit about

8    the organizational structure here at DHH.  We asked him about what

9    your role was with respect to pharmacy director, and he described

10   it as basically being the head of the pharmacy section, responsible

11   for all matters relating to the medical pharmacy program.  Is that

12   a fair characterization?

13   A.  To the pharmacy program, yeah.

14   Q.  How would you, then, describe your responsibilities as pharmacy

15   director since 1999?

16   A.  Responsible for the aspects of the pharmacy program, the

17   administration of the pharmacy program.  The rebate program.

18   There's lots of components to the pharmacy program.  I don't know

19   how much depth you want to get into.

20   Q.  What do you mean when you say "pharmacy program"?

21   A.  The payment of the pharmacy claims to the providers for

22   Medicaid recipients.

23   Q.  Was one of your responsibilities as pharmacy director and is it

24   still part of your responsibility to work with the Pharmacy and

25   Therapeutics Committee?

1    A.   Yes.

2    Q.   Can we call that the P&T Committee?

3    A.   Yes.

4    Q.   Can you tell us what you have done since 1999 for the P&T

5    Committee, as part of your responsibilities as pharmacy director?

6    A.   Well, the P&T Committee did not come into existence until '01,

7    '02.  And they meet on a -- at some frequency, and our

8    responsibility is to provide them with information and activities

9    surrounding the P&T Committee.  And the information that's provided

10   comes from our contractor, Provider Synergies.

11   Q.   When you're referring to information that comes from Provider

12   Synergies, are you referring to the clinical reviews of drug

13   products and also information about the supplemental rebate

14   program?

15   A.   The clinical and the cost information.

16   Q.   Are you responsible, Ms. Terrebonne, for preparing the

17   transmittal of the Provider Synergies monograph, if you will, to

18   the P&T Committee?

19   A.   Yes, we send the monographs with a memo in preparation for the

20   meeting.

21   Q.   So Provider Synergies prepares a monograph summarizing their

22   analysis of the clinical and cost information concerning drugs in a

23   class that's being reviewed by the P&T Committee, and then you

24   submit that to the P&T Committee along with a cover memo?

25   A.   Correct.

```
 1    Q.  And Ms. Wendt?
 2    A.  She doesn't Drug Utilization Review, lock-in, and pharmacy
 3    audits.
 4    Q.  What do you mean by "Drug Utilization Review"?
 5    A.  She is responsible for the Drug Utilization Review board, and
 6    the edits that are put in place that pertain to drug utilization,
 7    clinical edits.
 8    Q.  And then you also referred to pharmacy audits.  What does that
 9    entail?
10    A.  We audit pharmacies to see if they're in compliance with our
11    policy.
12    Q.  If you were to describe to somebody who's unfamiliar with the
13    way that your department works and the Medicaid system here in the
14    State of Louisiana, how would you describe the general goal of that
15    program?
16    A.  The goal of the Medicaid program is to deliver Medicaid
17    services to recipients who are eligible for Medicaid.  And those
18    include a host of services.
19    Q.  Is the Medicaid program a joint federal and state program?
20    A.  It is.
21    Q.  Do you know roughly what percentage of Medicaid payments are
22    reimbursed by the federal government?
23    A.  Generally, it's about 75.
24    Q.  Are you familiar with the term "supplemental rebate"?
25    A.  Yes.
```

1    Q.  What does that mean?

2    A.  Supplemental rebate is an additional rebate to the federal

3    rebate that states can choose to participate in and drug companies

4    can choose to participate in.

5    Q.  Is that one way that the State of Louisiana might be able to

6    get an additional rebate from manufacturers of drug products on top

7    of the rebate that the state gets from the federal government?

8    A.  Yes.

9    Q.  Do all pharmaceutical companies agree to provide a supplemental

10   rebate?

11   A.  I don't think so.

12   Q.  Do you recall, Ms. Terrebonne, that when the supplemental

13   rebate program started, some drug manufacturers wanted to

14   participate and others did not?

15   A.  Yes.

16   Q.  Do you know when the supplemental rebate program started?

17   A.  I believe it was '02.

18   Q.  What does Unisys do for the state concerning the pharmacy

19   program?

20   A.  Unisys is our fiscal intermediary.  They are our claims

21   processor, so they process our pharmacy claims.  They do other

22   components of the pharmacy program as well.  They assist us with

23   our lock-in program, our DUR program.  They do provide our update

24   articles.  They have a point-of-sale help desk for providers who

25   have questions.

1   Q.  You referred to lock-in program earlier, what is a lock-in

2   program?

3   A.  A lock-in program is an educational program for recipients who

4   misutilize or overutilize their pharmacy services by using multiple

5   prescribers and pharmacies.

6   Q.  Is the lock-in program, then, a means of stopping or helping to

7   curb abuse by patients who try to fill more scripts of a particular

8   medication than they should?

9   A.  What we do in the lock-in program is, we lock them in to one

10  physician or a couple of physicians and one pharmacy so we can have

11  more oversight and manage their prescription drugs better.

12  Q.  Let's switch to talk about formularies, because I want to

13  understand a little bit better about the difference between open

14  formularies and closed formularies.  Okay?

15  A.  Okay.

16  Q.  What is an open formulary?

17  A.  An open formulary, in my opinion, is all drugs are available to

18  patients.

19  Q.  When you say "all drugs are available to patients," that means

20  that the State of Louisiana would reimburse and pay for any drug

21  that a patient would pick up at a pharmacy under an open formulary

22  program; is that right?

23  A.  If you're asking me about -- are you asking me about the State

24  of Louisiana's open formulary --

25  Q.  Yes.

1    A.   -- or just an open formulary in general?

2    Q.   Well, when did the State of Louisiana have an open formulary?

3    A.   We had a pretty much open formulary, we did have some

4    exceptions to the rule, from '89 up until, I guess 2002 or so.

5    Q.   Can you tell us what that meant in terms of a patient's right

6    to receive coverage under the Medicaid system between 1989 and

7    2002, given that the State of Louisiana had an open formulary

8    system?

9    A.   And in-between that was when the federal rebate agreement came

10   along.  So if a drug -- if the manufacturer had signed the federal

11   rebate agreement, their drug would be available to the patients.

12   And there were some exceptions to that that were allowed, both in

13   federal law and state law.  So if the manufacturer had signed the

14   federal rebate agreement, the drug would be available to the

15   patient.

16   Q.   So during the period 1989 through 2002, when the State of

17   Louisiana had an open formulary, if a drug manufacturer had signed

18   a federal rebate agreement, then the drugs would be available to

19   Medicaid patients in the State of Louisiana?

20   A.   All except for the few exceptions, correct.

21   Q.   And the few exceptions, were those for drugs like weight

22   management products or cosmetic products?

23   A.   Right.

24   Q.   In 2001, did the state legislature pass a statute that allowed

25   the Department of Health and Hospitals to switch from the open

1   formulary system to a different kind of formulary?

2   A.  What it allowed was, as I recall, it allowed us to have a prior

3   authorization program.

4   Q.  What do you mean when you say "a prior authorization program"?

5   A.  Prior -- if the drug was on a prior authorization, it would

6   have to go through the prior authorization request, prior to the

7   recipient receiving the medication at the pharmacy.

8   Q.  In other words, before Medicaid, in the State of Louisiana,

9   would pay for a patient's drug that was on the prior authorization

10  list, the pharmacy would need to get prior approval from the state?

11  A.  The physician had to get prior approval.

12  Q.  So just so I'm clear on this, the prior authorization program

13  contemplates that physicians would contact the State of Louisiana

14  and get prior authorization or prior approval before whatever drug

15  the physician was going to write would be reimbursed by the State?

16  A.  Correct.

17  Q.  Is it fair to characterize the prior authorization program as a

18  restricted formulary?

19  A.  The prior authorization program as a restricted formulary?  I

20  would -- I would say no.

21  Q.  Before, when we were talking about the period 1989 through

22  2002, there was an open formulary system in the State of Louisiana,

23  right?

24  A.  Correct.

25  Q.  How would you describe the type of formulary system that was in

1  place after 2002?

2  A.  I would say we didn't have a formulary.  We had a preferred

3  drug list with prior authorization.

4  Q.  What is a preferred drug list?

5  A.  A preferred drug list is a list of drugs in therapeutic class

6  ranges, where the Pharmaceutical and Therapeutics Committee

7  reviewed the drugs based upon the recommendations of Provider

8  Synergies, who reviewed the drugs both clinically and by cost.  And

9  based upon their recommendations, drugs were voted on the preferred

10  drug list and drugs were voted on prior authorization within

11  therapeutic classes.

12  Q.  Who was it that decided what particular drugs would be on the

13  PDL, or preferred drug list, as opposed to having to be on a prior

14  authorization program?

15  A.  The P&T Committee made recommendations to the secretary, and

16  the secretary had the ultimate decision.

17  Q.  By "secretary," were you referring to Secretary Hood between

18  2002 and -- I don't know what year he was replaced?

19  A.  Yes.

20  Q.  So the P&T Committee votes on whether or not a particular drug

21  should be on the PDL or subject to a prior authorization, right?

22  A.  Right.

23  Q.  And then you bring that recommendation to the secretary here in

24  the State of Louisiana, who can approve that or not.

25  A.  Correct.

1    Q.  Did pharmaceutical companies have any role in deciding what

2    drugs would be on the PDL, or was that the P&T Committee itself?

3    A.  The P&T Committee.

4    Q.  Who administered the prior authorization program in Louisiana?

5    A.  The University of Louisiana in Monroe, College of Pharmacy.

6    Q.  Can you tell me how that would work, just logistically, if a

7    health care provider wanted to get approval to prescribe a drug

8    that was not on the PDL?

9    A.  They would contact a toll free number.  They would contact the

10   College of Pharmacy and answer their questions that are on the PA

11   form -- they could either fax them or phone it -- and it would

12   process.  And then it's processed to Unisys, so that when the

13   claim's gone through the system that it doesn't run into a PA

14   denial.

15   Q.  When you say "PA denial," that's just an abbreviation for prior

16   authorization?

17   A.  Right.

18   Q.  If a doctor wanted to describe a drug that required a prior

19   authorization, do you know if the University of Louisiana - Monroe

20   ever rejected that request?

21   A.  They did not.

22   Q.  Is the reason that the State doesn't reject a doctor's request

23   for a prior authorization for a particular drug because the State

24   defers the medical judgment of prescribing physicians to determine

25   what's in the best interest of the patient?

1   A.  Yes.

2   Q.  Are there other reasons why the State has not ever refused to

3   pay for a drug that a prescribing physician wants to prescribe to

4   the patient?

5   A.  Well, that was ultimately Secretary Hood's decision.

6   Q.  Can you tell me a little bit more about that?  Decision in what

7   context?

8   A.  Well, when we went to prior authorization, he opted to not have

9   that denial process there.

10   Q.  Do you know why Secretary Hood decided not to have a denial

11   process when a doctor would call and seek prior authorization for a

12   medication?

13   A.  Well, I'd say there were a number of reasons why.  One was, you

14   know, that the doctor could prescribe the drug he wanted for the

15   patient.  Number two, he didn't want to have to go through the

16   appeal process, if needed.  And three, to get -- buy into the

17   program.

18   Q.  With the exception of the closed formulary that existed in

19   1988, am I right that before the PA system was implemented in 2002,

20   the State never tried to restrict a doctor's ability to prescribe a

21   medication that had been approved by the FDA?

22   A.  Correct.

23   Q.  How often do the members of the P&T Committee meet to evaluate

24   classes of drugs?

25   A.  Currently, twice a year.

1  Q.  How often did the P&T Committee meet from 2002 through the end

2  of 2004?

3  A.  They were meeting quarterly for some time.

4  Q.  As far as you know, Ms. Terrebonne, from the time the Provider

5  Synergies first got involved in the program, do you believe that

6  they were the group that would decide what classes of medications

7  would get reviewed on a particular occasion?

8  A.  Yes.

9  Q.  And did the P&T Committee just defer to their expertise?

10  A.  Yes.

11  Q.  Were you ever involved in discussions with Provider Synergies

12  to help them determine what class of medications would be reviewed

13  on a given occasion?

14  A.  I generally do not.

15  Q.  What happens next after the P&T Committee and Provider

16  Synergies decide what class of medications to review?

17  A.  Provider Synergies notifies the drug manufacturers in order to

18  get any interest in negotiating rebates and providing other

19  documentation to Provider Synergies.

20  Q.  After the decision is made about what class of medications

21  would be reviewed, does Provider Synergies reach out to the drug

22  manufacturers to try to find out what their best price would be for

23  a given medication?

24  A.  Right.  They send out, I think, bid notifications or something

25  like that.

1    Q.  Do you know whether Provider Synergies then goes out and

2    analyzes the peer-reviewed public literature about clinical

3    information concerning the class of medications that will be

4    reviewed by the P&T Committee?

5    A.  I'm not sure what their process is, but I do know that they

6    look at clinical information.

7    Q.  Based on the clinical information that Provider Synergies

8    reviews, the published literature that they review, do they then

9    prepare a monograph summarizing their assessment of the different

10   drugs in a class?

11   A.  They do.

12   Q.  Does the monograph that Provider Synergies prepares include

13   their best assessment of the clinical profile of the medications,

14   as well as Provider Synergies' recommendations for which drugs

15   should be on the PDL?

16   A.  Yes.

17   Q.  Do the monographs that Provider Synergies prepare also reflect

18   the relative cost of the different drugs in a class --

19   A.  Yes.

20   Q.  -- in terms of which are the most expensive, which would be the

21   least for the State?

22   A.  They have relevant cost information, yes.

23   Q.  Do you remember how that information is described in these

24   monographs?  Are there dollar signs, for example?

25   A.  Yeah, dollar signs, exclamation marks.

1  Q.  The more dollar signs that are on there, the more expensive the

2  drug?

3  A.  Yeah.  I don't really understand the key, but there is some

4  method to that.

5  Q.  Were you, then, primarily responsible, Ms. Terrebonne, for

6  taking the monographs that you would receive from Provider

7  Synergies and then forwarding those to members of the P&T

8  Committee?

9  A.  Yes.

10 Q.  Generally, how long before the P&T Committee meets do you

11 receive the monographs from Provider Synergies?

12 A.  I would say generally six weeks before the meeting.

13 Q.  How long, then, would the actual meetings last, these P&T

14 Committee meetings, approximately?

15 A.  I would say probably four hours or so.

16 Q.  So the P&T Committee would come, and for about a half a day,

17 sit and hear information from Provider Synergies about the clinical

18 profile of medications in the class and cost information, and then

19 the P&T Committee would discuss that and vote; is that a fair

20 assessment?

21 A.  Yes.

22 Q.  Did the recommendations by Provider Synergies get communicated

23 actually during the meeting to the P&T Committee?

24 A.  Yes.

25 Q.  Who presented the recommendations?  Was that Provider Synergies

1    themselves?

2    A.  Yes.

3    Q.  Given that you were actually present, Ms. Terrebonne, at almost

4    all of these P&T Committee meetings, would it be fair to say that

5    there was discussion about the clinical profile and cost

6    information about the drugs that were being evaluated by the P&T

7    Committee?

8    A.  Yes.

9    Q.  Would you say that the discussion was a fairly active one?

10   A.  Yes.

11   Q.  Was it your view as an observer, Ms. Terrebonne, that the P&T

12   Committee members took seriously their role in evaluating drugs for

13   purposes of determining whether they should be on the PDL?

14   A.  Yes.

15   Q.  Was there sometimes debate among the different members of the

16   P&T Committee?

17   A.  Yes.

18   Q.  Sometimes people would agree with Provider Synergies, other

19   times they would not?

20   A.  Yes.

21   Q.  Ms. Terrebonne, what do you think was the result of this

22   dialogue and debate that you would observe at these P&T Committee

23   meetings since they started in 2001, 2002?

24   A.  The committees were presented with the Provider Synergies

25   recommendations, and there was open discussion when drugs were on

1    or off the PDL, so that the recommendations to the secretary were

2    that of consensus of the committee members.

3    Q.  Based on your observation, Ms. Terrebonne, was the process a

4    productive one that these P&T Committee members would engage in to

5    try to reach a consensus?

6    A.  Yes.

7    Q.  Am I right that the representatives from the pharmaceutical

8    companies were not involved in the discussion that the P&T

9    Committee members had?

10   A.  Correct.

11   Q.  Did the pharmaceutical representatives sometimes have an

12   opportunity to comment after the P&T Committee had already made

13   their decision about whether drugs would be on the PDL?

14   A.  Yes.

15   Q.  After the P&T Committee would vote, there would be an

16   opportunity for public comment; is that right, or was that before

17   the vote?

18   A.  No, it's after -- today, or back then?

19   Q.  Back -- I'd like to actually focus my questions, and if we

20   could have this understanding going forward, that will be great.

21   A.  Okay.

22   Q.  My questions are directed during the period 2001 through the

23   end of 2004, unless I mention a different time frame.  Okay?

24   A.  Okay.

25   Q.  During that time frame, Ms. Terrebonne, was there an

1    opportunity for public comment prior to the time that the P&T

2    Committee members voted, or was the public comment period after the

3    vote?

4    A.  After.

5    Q.  After the P&T Committee would vote to approve or reject the

6    recommendation by Provider Synergies, would you then take that

7    recommendation to the secretary?

8    A.  Yes.

9    Q.  Incidentally, was it clear to you, Ms. Terrebonne, that the P&T

10   Committee members relied heavily on Provider Synergies' assessment

11   of the clinical information concerning drugs in a class?

12   A.  Yes.

13   Q.  Based on your observations at the P&T Committee meetings, do

14   you know whether the committee ever decided not to follow Provider

15   Synergies' recommendation?

16   A.  They, on occasion, would not follow their recommendation.

17   Q.  So the members of the P&T Committee didn't just rubber stamp

18   Provider Synergies' recommendation, they would actively discuss it

19   before making their decision; is that fair to say?

20   A.  Correct.

21   Q.  Is it true that the vast majority of time the committee members

22   agreed with Provider Synergies' recommendations?

23   A.  Yes.

24   Q.  Do you know whether Secretary Hood ever rejected a

25   recommendation by the P&T Committee, or did he typically defer to

1    their judgment?

2    A.  He typically deferred to them.

3    Q.  Has there ever been a member of the pharmaceutical industry on

4    the P&T Committee in Louisiana?

5    A.  No.

6    Q.  Has a member of the pharmaceutical industry ever taken a vote

7    and decided what drugs should be on the PDL?

8    A.  No.

9    Q.  At the time the statute was enacted, am I right that any drug

10   that had been on the open formulary and was FDA approved would

11   continue to be paid by the State of Louisiana until the P&T

12   Committee decided that that drug should be on a prior

13   authorization?

14   A.  Yes.

15   Q.  So once the State moved from an open formulary to the PDL prior

16   authorization system, drugs that had already been approved by the

17   FDA, like Vioxx, were automatically paid by the State until such

18   time that the P&T Committee decided that the drugs required a prior

19   authorization?

20   A.  Correct.

21   Q.  Let me ask you:  Is it your view, based on dealing with the P&T

22   Committee members, that they have operated with integrity in the

23   process of determining what drugs should be on the PDL?

24   A.  I would say yes, but I'm not -- I don't know their actions

25   outside of the P&T Committee.

1    Q.  Is it your view, Ms. Terrebonne, that the P&T Committee

2    members, from your observations of them, have attempted to take

3    very seriously their obligations to evaluate the clinical profile

4    of medications they're voting on?

5    A.  Yes.

6    Q.  Did the P&T Committee members seem to take patients and the

7    needs of patients very seriously when they're voting on what should

8    be on the PDL?

9    A.  Yes.

10   Q.  Do the members seem to recognize that the State should attempt

11   to save taxpayer money if it can, but also, it's important that

12   drugs be available for patients?

13   A.  Yes.

14   Q.  What does pharmacopeia process mean?  Is that the formulary

15   process?

16   A.  Yes.  That was a term that was initially utilized.  It was

17   called the pharmacopeia process with prior authorization, rather

18   than a preferred drug list, initially.

19   Q.  During the time that you were transmitting the monographs

20   prepared by Provider Synergies to the P&T Committee members, did

21   you ever submit any other information to the P&T Committee members?

22   A.  I think we normally sent them the minutes and the monograph

23   information, direction to the meeting location, that kind of thing.

24   Q.  And you've never submitted any marketing materials?

25   A.  I have not.

1   Q.  You've never sent any internal e-mails from pharmaceutical

2   companies to the P&T Committee members, right?

3   A.  I have not.

4   Q.  Was there a time when you would request information directly

5   from the pharmaceutical companies to be sent to the outside

6   consultants like Provider Synergies, do you know?

7   A.  Repeat your question.

8   Q.  Did you ever contact any of the drug companies directly for

9   information about medications?

10  A.  Not to my knowledge.

11  Q.  You never contacted Merck, for example, about Vioxx, right?

12  A.  I don't believe so.

13  Q.  I apologize if I asked this before, Ms. Terrebonne, but do you

14  remember when the University of Louisiana - Monroe first got

15  involved in the Louisiana Medicaid program?

16  A.  They have had a contract with the department -- I would

17  probably say 30 years or so.  It's been quite awhile.

18  Q.  Were they contracted to operate the prior authorization

19  program?

20  A.  They are contracted to operate the prior authorization program.

21  Q.  So can you give us an idea of what that entails, just generally

22  what the university is required to do when they operate the prior

23  authorization program?

24  A.  They have staff at their university in Monroe that respond to

25  phone calls and faxes from physicians' offices in order to process

1    the prior authorization for the drugs that require PA.

2    Q.  Before the PDL was implemented in 2001, 2002, ULM served as

3    consultants for the State concerning the Medicaid program and the

4    Drug Utilization Review board; is that right?

5    A.  Yes.

6    Q.  Is it consistent with your recollection, Ms. Terrebonne, that

7    once Provider Synergies was contracted by the State, they were the

8    only entity that was responsible for reviewing the class of

9    products up for discussion by the P&T Committee and for negotiating

10   these supplemental rebates?

11   A.  Correct.

12   Q.  Was it your understanding that once Provider Synergies

13   contracted with the State of Louisiana in 2001, 2002 -- and we'll

14   look at the contract soon -- that Provider Synergies was the entity

15   responsible for doing the product reviews of the medications that

16   were to be evaluated by the P&T Committee?

17   A.  Yes.

18   Q.  Was Provider Synergies, once they were contracted by the State,

19   also the entity responsible for negotiating supplemental rebate

20   agreements with drug companies?

21   A.  Yes.

22   Q.  Do you know why the State decided to replace ULM with Provider

23   Synergies?

24   A.  At the time, Provider Synergies had secured a contract to do

25   the preferred drug list and prior authorization in Florida, and the

1    State was looking for an entity that had similar expertise.

2    Q.  I'll mark as Exhibit 8 a document that was prepared by Provider

3    Synergies.  And feel free to take a look at it if you want, but it

4    appears to be an overview of the PDL program results that Provider

5    Synergies has observed for the first 18 months that they were

6    hired.

7              Do you see that in the first paragraph on page 2?

8    A.  Yes.

9    Q.  You relied and the State relied on Provider Synergies to do a

10   thorough review of peer-reviewed clinical literature, right?

11   A.  We did.

12   Q.  And so did the P&T Committee, right?

13   A.  Yes.

14   Q.  Ever since you hired Provider Synergies in 2002, has it been

15   your view that they have provided an independent and balanced

16   assessment of the clinical data regarding the benefits and costs

17   and side effects of the drugs at issue?

18   A.  Yes.

19   Q.  Do you believe that Provider Synergies did a thorough job of

20   educating the P&T Committee members about the effectiveness, safety

21   and cost of drugs that were being reviewed?

22   A.  They present the information that they prepare in their

23   monographs at the P&T meeting, yes.

24   Q.  I may have asked you this before, but the summary sheets that

25   reflect cost figures --

1    A.  Yes.

2    Q.  -- that would be submitted by Provider Synergies, do you know

3    where those would be?

4    A.  We have those.

5    Q.  Who has those?  And just give me a sense of what they look

6    like.

7    A.  Germaine has those.  Those are the little sheets with the drugs

8    that have the exclamation marks and the dollar sign.

9    Q.  And would the right way to describe those be summary sheets

10   provided by Provider Synergies?

11   A.  Correct.

12   Q.  And instead of including actual dollar figures that would

13   reflect the rebate agreements, they would just have this system of

14   dollars and exclamation points to communicate the relative cost

15   among the agents, right?

16   A.  Correct.

17   Q.  Do you recognize this as a monograph prepared by Provider

18   Synergies on -- in February of 2002 called "Selective COX-2

19   Inhibitors"?

20   A.  Yes.

21   Q.  This is what you would have forwarded to the P&T Committee

22   members before the meeting, right?

23   A.  Correct.

24   Q.  We'll see in a minute that COX-2 inhibitors were up for

25   discussion at a May 2002 meeting for the first time.  Okay?

1    A.   Okay.

2    Q.   And this would have been the only thing that you would have

3    sent to the P&T Committee members before this meeting, the

4    monograph and details about the agenda and the location of the

5    meeting, right?

6    A.   Correct.

7    Q.   And then they had a section on page 6 called "Cardiovascular

8    Concerns."  Do you see that?

9    A.   Yes.

10   Q.   And there's a section in bold, "Cardiovascular Events."  And

11   Provider Synergies writes:  "In a review of the COX-2 inhibitors

12   and risk of cardiovascular events in JAMA in August 2001, authors

13   concluded that a perspective trial may be necessary to evaluate the

14   potential risk of cardiovascular events with these agents."  Do you

15   see that?

16   A.   Yes.

17   Q.   This was information that Provider Synergies identified in

18   their review of the literature and included in their monograph,

19   correct?

20   A.   Correct.

21   Q.   And then do you see there's also a section that talks about the

22   VIGOR trial, the review included the data from the VIGOR and CLASS

23   trials?

24   A.   Yes.

25   Q.   And they identify these rates of myocardial infarctions or

1   heart attacks in the VIGOR and CLASS trials.  Do you see that?

2   A.  Yes.

3   Q.  They also have a section on the next page about hypertension

4   and edema, right?

5   A.  Correct.

6   Q.  And they talk about clinical trials concerning that, right?

7   A.  Right.

8   Q.  Then after going through the benefits of the class of COX-2

9   inhibitors and potential side effects, including cardiovascular

10  concerns, does Provider Synergies then make a recommendation on

11  page 9 about what drugs should be on the PDL?

12  A.  Correct.

13  Q.  Do you see that their recommendations in February of 2002 was

14  that Celebrex be on the list, that Bextra be on the list, but that

15  Vioxx not be on the PDL list?

16  A.  Correct.

17  Q.  This recommendation that Provider Synergies is making is based

18  on their independent review of the clinical literature and what

19  they have here in the monograph, correct?

20  A.  Correct.

21  Q.  What does Mr. Taylor say about the reasoning for the

22  recommendation that Vioxx be kept off the PDL and Bextra and

23  Celebrex be put on in May of 2002?

24  A.  "Both Bextra and Celebrex are less expensive to the State, not

25  to the extent that you would end up going to another dollar sign.

1    From a strategy perspective going forward, it's important to choose

2    one or the other."

3    Q.  Was it your understanding, Ms. Terrebonne, that Provider

4    Synergies believed that, all things considered, Bextra and Celebrex

5    were less expensive than Vioxx and would be a better option for the

6    PDL than Vioxx?

7    A.  Yes.

8    Q.  Based on your review of the monograph that we looked at from

9    Provider Synergies and the discussion in this transcript, isn't it

10   true that the P&T Committee was well aware of the potential

11   cardiovascular risks with Vioxx at the time they voted in May of

12   2002?

13   A.  They were aware it was in the monograph.

14   Q.  And at the meeting where that issue of cardiovascular concerns

15   was addressed, right?

16   A.  Yes.

17   Q.  So the P&T Committee adopted Provider Synergies'

18   recommendation, correct?

19   A.  Correct.

20   Q.  I've handed you what I've marked as Exhibit 12.  This is a

21   letter dated May 24th, 2002, from Dr. Bearden to prescribing

22   practitioners and pharmacy providers.  Do you see that?

23   A.  Yes.

24   Q.  In this letter, is Dr. Bearden notifying doctors and

25   pharmacists in Louisiana about the PDL for certain classes of

1  medication?

2  A.  Correct.

3  Q.  Did you draft this letter for Dr. Bearden, do you know?

4  A.  Probably.

5  Q.  And then on the second page, do you see that under "Prior

6  Authorization PDL Implementation Schedule," the second entry for

7  COX-2 inhibitors, that it reflects Bextra and Celebrex are on the

8  PDL and Vioxx requires a PA, right?

9  A.  Correct.

10  Q.  And the implementation date is June 10th, 2002, right?

11  A.  Right.

12  Q.  Was there any more difficult step for a prescriber to take to

13  be able to prescribe a medication than one that was on the prior

14  approval or not on the PDL list after 2002?

15  A.  No.

16  Q.  And then do you see further below, the committee then approved

17  Provider Synergies' recommendations?

18  A.  Yes.

19  Q.  And at this meeting in May of 2003, did Provider Synergies, on

20  page 10, recommended that Vioxx and Bextra be on the PDL, but

21  Celebrex be off the PDL?

22  A.  Correct.

23  Q.  Does this appear to be a monograph prepared by Provider

24  Synergies, April of 2003?

25  A.  Yes.

1   Q.   And it has to do with NSAIDs, right?

2   A.   Correct.

3   Q.   This is the monograph that was done in advance of the May 2003

4   meeting, right?

5   A.   Yes.

6   Q.   This is what you would have sent to the P&T Committee members

7   before May of 2003, right?

8   A.   Correct.

9   Q.   And, once again, that would have been the extent of information

10  that you provided to the P&T Committee members before their May

11  2003 meeting, true?

12  A.   Correct.

13  Q.   On page 10, do you see that once again, that Provider Synergies

14  folks have a section about cardiovascular concerns and

15  cardiovascular events?

16  A.   Yes.

17  Q.   And again, they talk about the JAMA article, they talk about

18  the VIGOR study, and then they also have a section on hypertension,

19  true?

20  A.   Yes.

21  Q.   And incidentally, you can take as long as you'd like,

22  Ms. Terrebonne, to read this, but there's no marketing information

23  from pharmaceutical companies in this monograph, is there?

24  A.   No.

25  Q.   When you reviewed the Provider Synergies monographs, did you

1    ever see any information about marketing efforts by pharmaceutical

2    companies?

3    A.  No.

4    Q.  In the conclusion on page 12, do you see that Provider

5    Synergies says in the third paragraph:  "The VIGOR study raised

6    some questions about the cardiovascular safety of Vioxx.  Patients

7    receiving Vioxx had a significantly higher risk of developing a

8    cardiovascular thrombotic event compared to patients receiving

9    Naproxen."  Do you see that?

10   A.  Yes.

11   Q.  Do you know that Naproxen is a traditional NSAID?

12   A.  Yes.

13   Q.  Then two sentences down:  "Although the significance of this

14   potential cardiovascular risk is unknown, it does raise questions."

15   Do you see that, Ms. Terrebonne?

16   A.  Yes.

17   Q.  So again, Provider Synergies is informing the State and P&T

18   Committee members about the potential cardiovascular risks with

19   Vioxx here in April of 2003, true?

20   A.  Yes.

21   Q.  Have you reviewed this section in the May 21st, 2003,

22   transcript of the P&T Committee meeting?

23   A.  Yes.

24   Q.  Is there any mention in there about any marketing materials?

25   A.  I don't see -- marketing materials.

1    Q.  Do you see any reference to any press release by any

2    pharmaceutical company?

3    A.  I do not.

4    Q.  Do you see any mention of any visual aid that pharmaceutical

5    companies sometimes use in promoting their products?

6    A.  No.

7    Q.  Do you see any mention of any television advertisements or any

8    other advertisements that Merck or any other pharmaceutical company

9    sponsored?

10   A.  No.

11   Q.  Do you ever remember, at any of the meetings involving COX-2

12   inhibitors, where a P&T Committee member said, here's a visual aid

13   that I received from a sales representative, and I want everybody

14   to think about this visual aid?  Do you remember that?

15   A.  I do not.

16   Q.  Do you ever remember any P&T Committee members saying, I've

17   read a press release about Vioxx, and I think people on the

18   committee should know what this press release says?

19   A.  I do not.

20   Q.  Let me hand you what I'll mark as Exhibit 17.  Is this a letter

21   that was sent to you July 15th, 2003, from Pfizer concerning the

22   drug Celebrex?

23   A.  Yes.

24   Q.  And there's a cc on here, Secretary Hood, right?

25   A.  Correct.

1    Q.  And just for a time frame, this is July 2003, which is when

2    Vioxx and Bextra were on the PDL, but Celebrex was not, right?

3    A.  If that's what you say.

4    Q.  Well, we just saw the May 2003 --

5    A.  Right.

6    Q.  -- vote, and --

7    A.  Celebrex was off.

8    Q.  Yes.  So here's Pfizer writing you a letter, on behalf of U.S.

9    Pharmaceuticals, a Division of Pfizer Global Pharmaceuticals:  "I

10   respectfully request a second review of Pfizer's COX-2 medicine,

11   Celebrex, for potential inclusion on the State's preferred drug

12   list for Medicaid."  Do you see that?

13   A.  Yes.

14   Q.  And if you look through this, do you see that what Pfizer is

15   doing here is trying to convey to you the reasons they believe

16   Celebrex ought to be on the PDL, right?

17   A.  Right.

18   Q.  Do you see at the bottom of the first page that there's a

19   section called "CLASS CV"?  Do you see that in bold?

20   A.  Yes.

21   Q.  Do you know that CV stands for cardiovascular?

22   A.  Yes.

23   Q.  And Pfizer writes, in the check mark there, the first check, no

24   differences in MI, which is heart attack, stroke or TIA, when you

25   look at Celebrex versus other NSAIDs for doses above 25 milligrams.

1    Is that how you interpret that?

2    A.   Right.

3    Q.   Then on the next page, do you see they say "Vioxx Label Change"

4    in gold, and they have a check mark, significant increase in

5    cardiovascular events at Vioxx 50 milligrams and 25-milligram

6    doses?

7    A.   Yes.

8    Q.   The next section down is called the "Celebrex Cardiovascular

9    Benefit."  Do you see where they wrote that?

10   A.   Yes.

11   Q.   Do you see that they wrote, "The Celebrex PI" -- does that

12   stand for package insert?

13   A.   Yes.

14   Q.   "Has no precaution for use in patients with a history of

15   ischemic heart disease.  The Vioxx PI, or label, states, 'Caution

16   should be exercised when Vioxx is used in patients with a medical

17   history of ischemic heart disease.'"  Do you see that?

18   A.   Yes.

19   Q.   Was it your understanding when you read this, Ms. Terrebonne,

20   that Pfizer wanted you to know that the Vioxx package insert

21   contained a statement about increased risk of cardiovascular

22   events, whereas the Celebrex package insert did not?

23   A.   I would say that's one of the things, yes.

24   Q.   And they actually, when they cite the Vioxx label change, they

25   have a footnote 16, which if you look on the second to last --

1    sorry, third to last page at the bottom, it refers to the Vioxx

2    package insert.  Do you see that?

3    A.  Yes.

4    Q.  And right above it is actually a reference to an FDA advisory

5    committee meeting from February of 2001.  Do you see that citation?

6    A.  Yes.

7    Q.  Now, having sat through the previous P&T Committee meetings and

8    having read the monographs that Provider Synergies had previously

9    sent you, you already knew that there were potential cardiovascular

10   issues concerning Vioxx, right?

11   A.  Yes.

12   Q.  Let me hand you what I'll mark as Exhibit 18.  This is the next

13   P&T Committee meeting, December 17th, 2003.  And ask you whether

14   this is an accurate set of minutes describing the meeting?

15   A.  Yes.

16   Q.  And you attended, right?

17   A.  Yes.

18   Q.  Other members from DHH were there, and Provider Synergies.

19   Members from the industry were also there.

20        If you turn to page 13, please, Ms. Terrebonne.  Do you see

21   at the top under "COX-2s" that Dr. Weather stated -- let me back

22   up.  Do you know who Dr. Weather is, Weathers?

23   A.  He's a member of the P&T Committee.

24   Q.  Do you know his background or her background?

25   A.  I don't.

1    Q.  "Dr. Weather stated that the committee might want to revisit

2    the COX-2s as there are some new problems with at least the package

3    inserts, in particular Vioxx, and an increase in the myocardial

4    infarctions with Vioxx.  He said that the Celebrex is not on the

5    PDL.  Dr. Culotta agreed to review the concerns with Mr. Taylor" --

6    he would be with Provider Synergies, right?

7    A.  Correct.

8    Q.  "And assess the feasibility of renegotiating the one drug

9    rather than the whole class.  He said he would include this issue

10    as an agenda item at the next meeting."  Do you see that?

11    A.  Yes.

12    Q.  Does it appear to you, then, that the P&T Committee was aware

13    of the argument that Pfizer was making to you that there is a

14    statement in the Vioxx package insert about cardiovascular risk?

15    A.  Yes.

16    Q.  And the committee decided that what they would do would be to

17    talk to Pfizer about potentially renegotiating the price for

18    Celebrex so that Celebrex could be added to the PDL, right?

19    A.  Yes.

20    Q.  At the time that the P&T Committee decided to maintain the

21    status quo in May of 2004 and keep Vioxx on the PDL and Celebrex

22    off, the P&T Committee knew about the Vioxx package insert,

23    correct?

24    A.  Yes.

25    Q.  They knew that Celebrex had a different package insert, right?

1    A.  Yes.

2    Q.  And the P&T Committee knew from the monograph about the results

3    of the VIGOR study and potential cardiovascular risks of Vioxx,

4    right?

5    A.  Yes.

6    Q.  But from 1999, at the time Vioxx was first approved, through

7    2004, when Merck withdrew it, you were the pharmacy director of

8    Medicaid for the State of Louisiana, true?

9    A.  Correct.

10   Q.  During this time, if the State thought, for example, that

11   doctors were prescribing Vioxx too much to Medicaid patients, could

12   the State have used some educational efforts to try to reduce that

13   amount of overprescribing?

14   A.  We could have done some educational efforts, yes.

15   Q.  Between the time Vioxx was approved in 1999 to the time it was

16   withdrawn in 2004, do you remember ever having a concern that Vioxx

17   was overprescribed?

18   A.  I do not.

19   Q.  Was there ever a mention, as far as you can remember, in the

20   P&T Committee meetings that Vioxx was overprescribed or Celebrex

21   was overprescribed?

22   A.  I do not recall that.

23   Q.  In 2002, the State of Louisiana switched from an open formulary

24   to the PDL prior authorization system, right?

25   A.  Correct.

1    Q.  The State formed a P&T Committee that included experienced

2    doctors and pharmacists, right?

3    A.  Correct.

4    Q.  Those pharmacists and doctors brought their experience to the

5    process to evaluate the merits of drugs and the cost considerations

6    of drugs to see if they should be on the PDL, right?

7    A.  Correct.

8    Q.  In 2002, the State contracted with Provider Synergies to help

9    negotiate supplemental rebates and do an independent review of the

10   available clinical information, correct?

11   A.  Correct.

12   Q.  In June of 2002, when the State implemented the PDL, Vioxx was

13   not originally on the list for the PDL, but Celebrex and Bextra

14   were.  Do you remember that?

15   A.  Correct.

16   Q.  And if a doctor wanted to prescribe Vioxx after June of 2002,

17   it needed to get prior authorization?

18   A.  Correct.

19   Q.  Merck didn't do anything inappropriate with you to try to

20   change the State's mind about that, right?

21   A.  Not that I recall.

22   Q.  And you don't remember anything that Merck did that you'd say

23   was inappropriate to try to change the P&T Committee's mind, right?

24   A.  Not that I know of.

25   Q.  In July of 2003, Vioxx was placed on the PDL and Celebrex came

1    off.  Do you remember that?

2    A.  Yes.

3    Q.  Before that, Provider Synergies had advised the State and the

4    P&T Committee about the ongoing controversy about cardiovascular

5    safety with Vioxx, right?

6    A.  Correct.

7    Q.  In March of 2004, all of the COX-2 inhibitors were on the PDL,

8    right?

9    A.  Correct.

10   Q.  And during the entire time, from July of 2003, when Vioxx was

11   placed on the PDL, until September of 2004, when Vioxx was removed

12   from the market, Provider Synergies continued to note potential

13   cardiovascular risks with Vioxx, right?

14   A.  Yes.

15   Q.  You continued in that time frame to provide those monographs

16   that Provider Synergies prepared to the P&T Committee, right?

17   A.  Correct.

18   Q.  The P&T Committee discussed those issues at the meetings from

19   July 2003 and thereafter, correct?

20   A.  Yes.

21   Q.  And decided nevertheless to keep Vioxx on the PDL, right?

22   A.  Correct.

23   Q.  Did you think that Merck appropriately notified you about the

24   withdrawal?

25   A.  Yes.

1   Q.  Did you ever feel that anybody that you dealt with from Merck

2   was trying to do something inappropriate from your perspective?

3   A.  No.

4   Q.  Do you understand "inappropriate," what I mean by that?

5   A.  I think so, yeah.

6   Q.  Did anybody discuss with you the nature of this lawsuit before

7   it was filed?

8   A.  No.

9   Q.  Did any lawyers consult with you as the pharmacy director

10  before this lawsuit was filed?

11  A.  No.

12  Q.  Did anybody ever ask you whether the allegations are true that

13  they -- that plaintiff's lawyers have made in this case?

14  A.  No.

15  Q.  Do you know of any facts that would support the claim,

16  Ms. Terrebonne, that Merck somehow misled the State of Louisiana

17  concerning Vioxx?

18  A.  I do not know.

19  Q.  Did anyone from the P&T Committee ever complain to you about

20  how Merck handled Vioxx?

21  A.  No.

22  Q.  Did anyone from the P&T Committee complain to you about

23  anything that Merck's employees did?

24  A.  No.

25  Q.  Has anyone from the department where you work ever complained

1    about the way Merck handled Vioxx?

2    A.  No.

3    Q.  Has anybody from Provider Synergies or the University of

4    Louisiana - Monroe or Unisys ever complained to you about their

5    interactions with Merck?

6    A.  No.

7    Q.  As you sit here today, Ms. Terrebonne, do you have any reason

8    to think that Merck misrepresented anything to you as the pharmacy

9    director of the State of Louisiana?

10   A.  No.

11   Q.  Let me ask you about the Drug Utilization Review process.

12   Okay?

13   A.  Okay.

14   Q.  What is the Drug Utilization Review?

15   A.  Drug Utilization Review process is in federal statute, where

16   states using clinical criteria can place edits in their

17   point-of-sale system.  And they can also do reviews retrospective.

18   The edits in the point-of-sale system are called prospective prior

19   to the drug being filled.

20          There is a Drug Utilization Review Board, which consists

21   of pharmacists and physicians, who review or who make

22   recommendations to place those edits in the point-of-sale system,

23   and also what will be reviewed retrospectively.

24   Q.  Do you know how long there has been a Drug Utilization Review

25   process in Louisiana?

1   A.  That began in, I think, 1991 when OBRA 90 passed.  We probably

2   didn't start it till probably '92.

3   Q.  Is it fair to say that that federal statute requires states to

4   retrospectively and prospectively review certain standards to

5   determine the appropriateness of certain prescribing habits in

6   Louisiana?  For example, whether patients are refilling their

7   prescriptions too early?

8   A.  Yes.

9   Q.  And whether patients are using more than one drug in a class at

10  the same time?

11  A.  Yes.

12  Q.  Whether patients are going to different doctors and different

13  pharmacies to fill scripts of the same medication in a way that

14  seems to abuse the process?

15  A.  Yes.

16  Q.  What has been your role, if any, Ms. Terrebonne, in the DUR

17  process?

18  A.  I periodically will attend the meetings, but Mel handles that

19  for the most part.

20  Q.  Is Ms. Well Meant -- sorry --

21  A.  Mel Wendt.

22  Q.  -- Ms. Mel Wendt the most knowledgeable person here at the DHH

23  about the DUR process?

24  A.  She is.

25  Q.  Do you know whether the members of the DUR Board get copies of

1    the monographs that Provider Synergies prepares?

2    A.  They don't get it from me.

3    Q.  Do you know what, if anything, the DUR Board considers in

4    deciding whether to implement some type of an edit?

5    A.  I would let Mel explain that, because there is a process, so

6    she would be the better person to respond to that.

7    Q.  Do you know whether, at any time before Vioxx was withdrawn,

8    whether the DUR Board ever suggested a clinical edit or some type

9    of step process for Vioxx or other COX-2 inhibitors?

10   A.  I'm sorry, could you repeat your question?

11   Q.  At any point before Vioxx was withdrawn, did the DUR Board ever

12   suggest some type of clinical edit or way of curbing the number

13   prescriptions of COX-2 inhibitors?

14   A.  I would defer to Mel.

15   Q.  Do you remember, though, why the State of Louisiana decided to

16   implement certain DUR procedures for COX-2 inhibitors after Vioxx

17   was withdrawn from the market?

18   A.  As I remember, Dr. Cerise was the secretary of the department

19   at the time, and he -- I want to say that he had some article that

20   Louisiana had a high use of the COX-2s as compared to the other

21   states.  And he asked -- he asked for some DUR criteria to be

22   developed.

23   Q.  So does this, then, suggest that Louisiana had the second

24   highest percentage of use of COX-2 inhibitors compared to all other

25   states that had prior authorization programs?

1    A.  Yes.

2    Q.  And this is what you understand motivated Secretary Cerise to

3    want to implement a DUR procedure to try to reduce the amount of

4    prescribing of COX-2 inhibitors?

5    A.  That is what I recall.

6    Q.  It says:  "Deny edit for new COX-2 inhibitor prescriptions

7    unless a patient is 60 years or older."  Do you see that?

8    A.  Yes.

9    Q.  So under this procedure, any patient who was over 60 years old

10   and needed a -- well, withdrawn.

11           Is it true that if you were over 60 years old, then the

12   State would pay for your use of the COX-2 inhibitor under these DUR

13   procedures?

14   A.  And I'm going to defer to Mel because she knows this much

15   better than I.

16   Q.  So when the DUR is focused on the cost concerns for

17   prescriptions of COX-2 inhibitors, you're saying that's a topic for

18   the P&T Committee, not the DUR Board?

19   A.  The DUR Board should look at those things relative to their

20   role with Drug Utilization Review, right.

21   Q.  And do you remember under "New Business" there was an approval

22   of certain DUR edits?

23   A.  Right, but that doesn't happen that quick.

24   Q.  So to the extent there's been a decline in the prescriptions of

25   COX-2 inhibitors, Ms. Terrebonne, for reasons having nothing to do

1  with the DUR edit, doesn't it appear that the post withdrawal

2  events concerning Vioxx and FDA actions correlate to a decline in

3  the prescriptions of COX-2 inhibitors over time?

4  A.  Yes.

5  Q.  Am I right that Unisys is the fiscal intermediary under

6  contract with DHH to maintain and administer that claims database,

7  right?

8  A.  Correct.

9  Q.  And they're the ones who generate things like the DUR reports

10  for the DUR Board?

11  A.  Yes.

12  Q.  Has it been your experience, Ms. Terrebonne, in observing the

13  P&T Committee, beginning in 2001 through the end of 2004, that they

14  took seriously their mandate to evaluate the effectiveness of drugs

15  based on medical evidence?

16  A.  Yes.

17  Q.  Mr. Hood stated:  "The committee must ensure its integrity and

18  credibility."  Do you see that?

19  A.  Yes.

20  Q.  Based on your observations, Ms. Terrebonne, is that something

21  that the committee appeared to take seriously in their

22  deliberations?

23  A.  Yes.

24       THE COURT:  We'll introduce the exhibits connected with

25  this.

```
 1              MR. SALES:  Your Honor, I think all of the exhibits

 2      referenced here have been admitted from Mr. Castille.

 3              THE COURT:  Okay.  I understand we have one more

 4      deposition.  Why don't we take a ten-minute break at this time and

 5      come back.  How long will that one be?

 6              MR. ISMAIL:  One hour and three minutes.

 7          (WHEREUPON, A RECESS WAS TAKEN.)

 8          (OPEN COURT.)

 9              THE COURT:  Okay.  Be seated, please.

10              MR. ISMAIL:  May we proceed, your Honor?

11              THE COURT:  Yes, please.

12              MR. ISMAIL:  Merck calls by video deposition Mr. Ben

13      Bearden who is the former Medicaid director for the department.

14          (WHEREUPON, THE VIDEO DEPOSITION OF BEN BEARDEN WAS PLAYED.)

15      Q.  Good morning, Mr. Bearden.

16      A.  Good morning.

17      Q.  Is anyone compensating you for your time to appear today?

18      A.  No.

19      Q.  Am I correct, sir, that you're currently retired?

20      A.  No, not really.  I'm retired from the State.  I'm doing

21      consulting work and it's all Medicaid-related.  I have three

22      contracts that I work on on a fairly regular basis.

23      Q.  Okay.  When did you retire?

24      A.  Officially, it was in June of -- or no.  May of '06, but I

25      actually physically quit working at the last working day in
```

1    December of '05.

2    Q.  All right.

3    A.  I went on extended leave.  I had a lot of leave built up, so

4    couldn't get paid for it, so I took it.

5    Q.  What was your title when you --

6    A.  State Medicaid director.

7    Q.  Okay.  Can you give us -- trace through your educational

8    background briefly, but if you can give us a sense of your --

9    A.  Yeah.  I finished -- I have a B.A. from the University of

10   Louisiana at Monroe, was a major in social studies with a minor in

11   English and education.  I wanted to coach and teach, and didn't

12   realize until I finished college that teachers didn't make any

13   money and coaches didn't make any money either, so I went into the

14   social services instead.

15   Q.  What -- can you give us also a brief narrative of your

16   professional background as well?

17   A.  Well, I started right out of college as a welfare visitor in --

18   in Opelousas in St. Landry Parish.  And that was quite an

19   experience.  I was a redneck from north Louisiana going down there,

20   and a lot of my clients still spoke French, only spoke French, so

21   that was interesting having to use an interpreter and trying to get

22   information.

23        But I did teach school one year.  I was a visitor for

24   about three years, taught school, and I went back and became a

25   supervisor in Rapides, which is in Alexandria, in the middle part

1    of the state; and then went into quality control in Food Stamps.

2    And then I became a Food Stamp consultant in Lafayette and then

3    became regional manager in Lafayette over about 20 parishes.  I had

4    the Lafayette and Lake Charles regions.

5            And then I became director of field operations in '82 in

6    Baton Rouge.  I was in the old DHHR setup.  I had all of the parish

7    eligibility offices, support enforcement, disability

8    determinations, and seems like I had something else, but it's been

9    so long.

10           And then I came to DHH in January of '95 as their

11   director of field operations, and then in '96 I became the deputy

12   Medicaid director, and then in March of 2000 I became the Medicaid

13   director.

14   Q.  What does DHH stand for?

15   A.  Department of Health and Hospitals.  At one point the hospitals

16   was part of the department and it just kept that title.

17   Q.  What is the role of DHH?

18   A.  Well, there's numerous departments within -- agencies within

19   the department.  The office of public health that is responsible

20   for all public health activities in the State of Louisiana.

21           Medicaid, of course, that was -- was part of the -- we

22   were called the Bureau of Health Services Financing.  We are the

23   one that enrolled all of Medicaid providers and paid them for

24   providing Medicaid services.  And we did the eligibility also for

25   people who would qualify for Medicaid.

```
 1            You also have the Office of Mental Health that takes care
 2   of all of the mental health issues in the state, including --
 3   Louisiana is unique in not only the Charity Hospital system that we
 4   have, but also in that the State owns the mental health hospitals.
 5   It does most of the inpatient mental health care.
 6            And then you have your office -- let's see.  What's that?
 7   OAD, Office of Addictive Disorders, that handles your substance
 8   abuse and those type issues.
 9            And then you have your Office for Citizens with
10   Developmental Disabilities that we used to call that -- those that
11   had retardation.  We quit using that word.  It's not politically
12   correct to use, so...  But those are citizens that have some degree
13   of retardation that they say is --
14   Q.  Is that structure that you just described generally the
15   structure that was in place from at least when you became deputy
16   director in January of '96 up through your retirement?
17   A.  It is.
18   Q.  You're noted here as the Medicaid director?
19   A.  Correct.
20   Q.  And you held that title from January of 2000?
21   A.  March.
22   Q.  March of 2000 through your retirement?
23   A.  Correct.
24   Q.  Who provided the funding or I should -- let me ask that
25   differently.
```

1          Who determined the funding that your department would

2    get?

3    A.  Well, it's a budget process that we go through with the

4    legislature.  The way the budget process works, you develop a

5    budget, you take it to division administration.  You get approval

6    from them and the governor for your budget, and then you go before

7    the finance committees in the Senate and in the House and testify

8    on your budget and discuss your budget.  And, ultimately, the

9    legislature determines how much your budget is going to be.

10         In Medicaid, the federal participation is a lot greater

11   than the state participation, but you've got -- the State has to

12   put up the funds before they can get the federal funds.  Back then

13   our match rate was probably about 70 percent federal and about 30

14   percent state.  So it was always an issue of getting that 30

15   percent state funds to be able to do what you needed to do.

16   Q.  And just sort of explain what those concepts are.  You said

17   it's -- it was a -- am I correct that Medicaid is a joint

18   federal-state program?

19   A.  It is.

20   Q.  And federal government would put up a portion of a state's --

21   the funding necessary for a state's Medicaid program?

22   A.  Yeah.  The state, you know, has to put up a state match and

23   then there's a formula that is developed by the feds based on per

24   capita income of a state.

25   Q.  Basically, the state's ability to pay?

1    A.  Correct.

2    Q.  And at the time when you were Medicaid director, that mix was

3    approximately 70 percent federal funded, 30 percent state funded?

4    A.  Yeah.  There was at one point we had an 80/20 match.  We called

5    that the Breaux Amendment years.  I think that's when Foster first

6    came in as governor.  It was a two-year fix, but I think we only

7    did one year of it.  But then after that it reverted to about a

8    70/30.

9    Q.  Who provided the oversight for the Medicaid program within DHH?

10   A.  That was -- you know, of course, I was the Medicaid director

11   and was responsible for the day to day.  Charles Castille was

12   undersecretary.  He is still here as undersecretary.  I reported to

13   him, so he and I discussed those issues.  Also, the secretary.

14        Since Medicaid is, you know, such a large part of the

15   state budget, you have your health and welfare committees and the

16   legislature, both on the Senate and House side, and you have your

17   money committees on the Senate Finance and House Appropriations,

18   and the Division of -- Division of Commission Administration, so it

19   had a lot of oversight.

20        In addition, the Attorney General has a Medicaid fraud

21   unit that is involved in looking at the Medicaid program.  You have

22   the Office of Inspector General that looks at the program.  You

23   have the internal audit that looks at the program.  You have

24   legislative audit that looks at the program.  So you have a lot of

25   oversight.

1    Q.  What was the role of DUR within the pharmacy or the

2    prescription drug program within Medicaid for the state?

3    A.  Well, again, it was basically what I just -- had just

4    explained.  They were looking at prescribing habits, seeing if

5    people -- there was any variation in prescribers not prescribing

6    what their peers and looking to see if there's any misuse of drugs.

7            We had problems in New Orleans, mainly, with some what I

8    call Medicaid gins that was overprescribing some drugs that were --

9    had street value

10   Q.  You probably don't they remember these dates, it's been some

11   time, but you're familiar with the drug Vioxx, correct?

12   A.  Correct.

13   Q.  And I'll represent to you -- and I'm sure counsel won't

14   object -- that that drug was approved by the FDA for the first time

15   in 1999 and then came off the market in 2004, just to give you --

16   orient you on the time frame.

17           Am I correct, sir, that you were either deputy director

18   of Medicaid for the state or director of Medicaid for the state

19   throughout that entire time that Vioxx was on the market?

20   A.  I was.

21   Q.  Did the lawyers who brought this lawsuit consult with you in

22   any way regarding whether or not to file this action against Merck?

23   A.  No.

24   Q.  Did the lawyers who brought this lawsuit against Merck consult

25   with you as the then director of Medicaid for the whole state as to

1    whether or not this lawsuit was justified?

2    A.  No.

3    Q.  Did the lawyers who brought this lawsuit against Merck consult

4    with you as the director of Medicaid as to whether or not any of

5    the allegations in the lawsuit were true?

6    A.  No.

7    Q.  Do you have any facts or information, sir, that would support

8    the claim that the Department of Health and Hospitals was mislead

9    in any way with regard to Vioxx?

10   A.  Personally, no.

11   Q.  Do you, sir, have any facts or information that would support

12   the claim as to whether the State suffered any damages as a result

13   of anything Merck did with regard to Vioxx?

14   A.  No.

15   Q.  Do you have any facts or information that would support the

16   claim that Merck did anything improper with regard to Vioxx as it

17   relates to the Department of Health and Hospitals?

18   A.  No.

19   Q.  We've been talking a little bit about Medicaid and the program

20   administered by you and your colleagues.  Did that program have an

21   aspect for covering prescription drug benefits?

22   A.  Yeah.

23   Q.  When did that begin?

24   A.  Well, we had a pharmacy program when I came here in '95, and so

25   it started sometime before then.  I think Medicaid started in

1    Louisiana in the mid-'70s.  And I'm sure at some point they had a

2    pharmacy program.

3    Q.  Are you familiar enough that a manufacturer has to enter into a

4    Medicaid rebate agreement with the federal government to get a drug

5    covered?

6    A.  Yes.

7    Q.  And the way the prescription drug program works within

8    Medicaid, once a manufacturer enters into that rebate agreement

9    with the federal government, the state in part provides

10   reimbursement for prescription drugs within the system?

11   A.  The reimbursement is based on the ingredient costs at AWP I

12   think at that time it was AWP minus 10.5.

13   Q.  AWP is what?

14   A.  Average wholesale price.  And plus a dispensing fee.  And we

15   reimbursed on what we called the average dispensing fee, whatever

16   their normally charged dispensing fee.

17   Q.  Am I correct that the State does not actually purchase the

18   drugs, they're, rather, reimbursing prescriptions; am I correct?

19   A.  That's correct.

20   Q.  Are all drugs, once approved by the FDA, subject to

21   reimbursement within Medicaid?

22   A.  Originally, until we did the preferred drug list.  We had an

23   open formulary, so all drugs that were approved was covered.

24   Q.  Describe, if you could for the jury, what an open formulary is.

25   A.  Basically, any approved drug can be prescribed and dispensed

1   and paid for with Medicaid.

2   Q.   Who gets to decide whether a state is going to have an open

3   formulary or a closed formulary?

4   A.   Well, in our case, it was the legislature.  We had to go before

5   the legislature to get a change in the law because the law was an

6   open formulary.

7            It's always -- it's a very political and very hot issue

8   in a state.  It was in this state.  You know, the pharmaceutical

9   houses had some really good lobbyists that fought that for a long

10  time, wanted to keep an open formulary and fought the supplemental

11  rebate program that we put in.

12  Q.   And in an open formulary, does the state Medicaid system have

13  any discretion whether or not to reimburse a prescription drug?

14  A.   Basically, when we had the open formulary, all the drugs were

15  there, subject to some Pro DUR activities, where we would -- we had

16  what we called a lock-in program where we found that a recipient

17  was abusing, they would be locked in and had to get approval for

18  certain drugs and that type thing.

19  Q.   So other than instances where you were concerned about abuse,

20  either on a physician level or a patient level, in an open

21  formulary system, the State is reimbursing prescriptions for every

22  FDA approved drug?

23  A.   Correct.

24  Q.   In an open formulary system, could the State prospectively

25  limit usage of a drug, other than those instances where you're

1   worried about a physician or patient abusing the system?

2   A.  Not to my knowledge.  I mean, it's not anything we did.

3   Q.  And in a restricted or closed formulary system, can you

4   describe what that system is like?

5   A.  Well, basically, the limitations we put on ours was a preferred

6   drug list and we had a PA system, a prior authorization system, for

7   any prescriber who wanted to prescribe off of the preferred drug

8   list.

9           And basically, what -- we had certain classes of drugs,

10  some of them were preferred, some them were not.  So those that

11  were not were off the formulary.

12          Now, it didn't mean that the recipient couldn't get them

13  and they could get them through the PA process.

14  Q.  Okay.  So tell me if I have the system right.  In a closed

15  formulary system, the State maintains a preferred drug list where

16  the Medicaid reimbursements would be automatic?

17  A.  On the preferred drugs, right.

18  Q.  And for any drug not on the preferred drug list, there had to

19  be a prior authorization --

20  A.  Correct.

21  Q.  -- to get Medicaid reimbursement?

22  A.  Correct.

23  Q.  And was it up to the State to decide which drugs would be on

24  the preferred drug list and which drugs would not?

25  A.  Well, as we had -- the legislation that allowed us to do a

1   preferred drug list created a P&T Committee.  It was basically a

2   committee that determined based on information provided by a

3   contractor, Provider Synergies, as to which drugs would be on the

4   list.

5   Q.  Sir, when Vioxx was approved in 1999, was we were just

6   discussing, the State had an open formulary system and so Vioxx was

7   automatically reimbursed within the Medicaid program, correct?

8   A.  Correct.

9   Q.  The State did not rely on anything from Merck to make Vioxx a

10  covered drug in the Medicaid program during the time the State had

11  an open formulary; is that correct?

12  A.  That's correct.

13  Q.  What was the reason or the reasons that you can recall for the

14  change in the system within the state?

15  A.  Well, the pharmacy program was one that -- our programs, it was

16  really costing us a lot of money.  We had done several studies

17  trying to look at ingredient costs and it's very difficult to get a

18  true cost for ingredients.  You know, the other states were looking

19  at average manufacturing price, which was lower priced than the

20  average wholesale price.

21        And about that time we got some information about what

22  Florida had done with their program and doing a preferred drug

23  list, and they had achieved quite a bit of savings by doing that.

24  So we got the information about Florida's program and, basically,

25  our legislation was modeled after Florida's.

1   Q.  Did I understand you correctly that one of the models for the

2   State with regard to moving from an open to a closed formulary was

3   the system that the State of Florida had?

4   A.  Correct.

5   Q.  So do I understand correctly that the principle motivation for

6   moving from an open formulary to a closed formulary for the state

7   was to save money within the Medicaid program?

8   A.  Absolutely.  I mean, that was the motivating factor.  And all

9   of us that worked with the program felt that we were paying too

10  much for drugs.

11  Q.  So the system that was developed was one in which you tried to

12  maintain patient and public health as best you could, while at the

13  same time having a system that allowed the state to save some money

14  on prescription drug reimbursement?

15  A.  Yeah.  The committee itself was comprised of professional

16  people.  Most of them had Medicaid practices.

17  Q.  You're describing the P&T Committee?

18  A.  Correct.

19  Q.  The Pharmacy and Therapeutics Committee?

20  A.  Right.  And we had doctors and pharmacists, we had

21  psychiatrists.  We had -- the only two non-medical people on the

22  committee was myself and David Hood, the secretary.  And we

23  deferred to the physicians' expertise on what should be covered and

24  not covered.

25  Q.  So I take it the Department of Health and Hospitals supported

1    the legislation that changed the system from an open to a closed

2    formulary?

3    A.  Well, it was our legislation.

4    Q.  It was your idea.

5    A.  Right.

6    Q.  You being the Department's idea?

7    A.  Right.

8    Q.  Okay.  Now, you just described the makeup of the P&T Committee,

9    the Pharmacy and Therapeutics Committee.  Is that the committee

10   that decided which drugs would be on the preferred drug list?

11   A.  Correct.

12   Q.  And you said you were -- you and Mr. Hood were on the P&T

13   Committee?

14   A.  That's correct.

15   Q.  Were you on the P&T Committee from the time it was first formed

16   up through August of 2004?

17   A.  Yes.  I was on it when it was first formed.  When the original

18   legislation came out, it had the Medicaid director as a permanent

19   member of the committee.

20          At some point I had that changed to the Medicaid director

21   or its designee, because I had hired a physician as a Medicaid

22   medical director, Dr. Roxane Townsend.  And once I got that

23   legislation approved, Roxane became the designee on that committee

24   Q.  I think we'll see documents that that was in August of 2004.

25   So you --

1    A.  So I was on the committee until she became my designee.

2    Q.  What did you see your role was on the committee, the P&T

3    Committee?

4    A.  Well, my role was, as the committee member, was to review the

5    material they gave us and to vote on whether or not a particular

6    drug would be on the PDL.  Any time there was controversy, we

7    deferred to the physicians.

8            And there would be occasion on there when there would be

9    a particular drug where supplemental rebate hadn't been given and a

10   committee would ask that Provider Synergies, who was the

11   contractor, go back to that company.  So we would hold off decision

12   on that.

13   Q.  You mentioned a term earlier, the supplemental rebate.  Can you

14   describe what that concept is?

15   A.  Well, actually, you know, you had mentioned earlier about how

16   drugs get on, that they had to agree with CMS to do a rebate.

17           The supplemental rebate was the State's effort to go and

18   get an additional rebate, on top of the federal rebate they were

19   already receiving on the drugs, from the manufacturer -- and they

20   dealt directly with the manufacturing house on that.

21           And so, you know, if they were given a federal rebate of

22   a certain amount, then the supplemental rebate was added to that.

23   Q.  But let me make sure I have the basic system down.

24           So for a drug to be even eligible for Medicaid

25   reimbursement, the pharmaceutical company had to have a rebate

1   agreement with the federal government; correct

2   A.  Correct.

3   Q.  And then the states had the ability to negotiate an additional

4   rebate to effectively lower the cost of the Medicaid prescription

5   drug program for that individual state.

6   A.  That's correct.

7   Q.  And I guess it was up to the individual pharmaceutical

8   companies to agree whether or not to give an additional

9   supplemental rebate to any particular state; right?

10  A.  Correct.

11  Q.  Some companies did, some companies didn't?

12  A.  Correct.

13  Q.  And some companies did for some drugs but not others?

14  A.  Correct.

15  Q.  And until -- and a state couldn't do a supplemental rebate

16  until it was approved by the federal agency; correct?

17  A.  CMS?

18  Q.  Yes, sir.

19  A.  I don't know what the approval process -- I forget what the

20  approval process was.

21  Q.  Am I correct until Louisiana switched to a restricted

22  formulary, it did not have a supplemental rebate program within the

23  Medicaid prescription drug reimbursement system?

24  A.  No.

25  Q.  Am I correct?

1    A.   That's -- you're correct.

2    Q.   And you described earlier something called a prior

3    authorization?

4    A.   Correct.

5    Q.   How did it work for this state, prior authorization?

6    A.   We did a contract with the pharmacy school at University of

7    Louisiana at Monroe to -- they had pharmacists that -- on staff

8    there.   A doctor who wanted to prescribe off of the preferred drug

9    list would call the PA unit at the UL-Monroe to get approval to do

10   that.

11        The PA process itself, I described it as not a hard PA

12   process.   In that if a prescriber wanted to prescribe that drug, we

13   would approve it, but we used that opportunity as an education to

14   discuss the drug that he was recommending and other drugs that were

15   on the PDL that could be just as effective as the drug he was

16   prescribing.

17   Q.   Okay.   Let's make sure we understand how it worked.

18        So the prior authorization system was one where the

19   prescriber had to get permission in advance to write -- to get

20   coverage for a drug that was not on the preferred drug list?

21   A.   That's right.

22   Q.   And you've said the folks at University of Louisiana-Monroe

23   were administering that system?

24   A.   They had a contract with us to administer the PA process.

25   Q.   And I think the term you used was it wasn't a hard PA system?

1   A.  Correct.

2   Q.  And I think you described that as one in which, generally

3   speaking, if a physician wanted to write a prescription for a drug

4   that required a prior approval, prior authorization, the state

5   would allow that for the vast majority of the time?

6   A.  Correct.

7   Q.  Sir, Exhibit 5 is a copy of the January 9th, 2002 minutes of

8   the P&T Committee.  Do you see that?

9   A.  I do.

10  Q.  And so these would be -- Exhibit 5 would be the official

11  minutes of the P&T Committee?

12  A.  It would.

13  Q.  And you are noted as being present; is that right?

14  A.  That's correct.

15  Q.  If you'll turn to the second page, under New Business,

16  Section B.  Do you see where I am?

17  A.  I do.

18  Q.  The title reads, Current Program Coverage, Exclusions and New

19  Drugs.

20          All right.  So that Subsection 1 reads, "Mrs. Terrebonne

21  presented the department's recommendation that all drugs which are

22  currently covered will remain in payable status without requiring

23  prior authorization until the Pharmaceutical and Therapeutics

24  Committee reviews drugs or therapeutic classes under the

25  pharmacopeia process and makes decisions."

1   A.   Correct.

2   Q.   All right.  Close quote.

3          Is Ms. Terrebonne explaining to the committee the

4   recommendation that until the preferred drug list is adopted and

5   implemented, that the State would continue to reimburse all FDA

6   approved drugs within the Medicaid system?

7   A.   My understanding in reading this is that until a drug class

8   came up for review by the P&T Committee, all the drugs on that

9   class would be covered just like open formulary.

10  Q.   All right.

11  A.   Once it came up, then the decision would be made about which

12  drugs would be on the preferred drug list.

13  Q.   All right.  That's helpful.

14         So even though the enabling legislation was enacted in

15  2001, until a particular drug class came up for review by the P&T

16  Committee, all the drugs in that class would be reimbursed by the

17  state Medicaid program as if it were an open formulary system?

18  A.   That's correct.

19  Q.   Did you have any role in negotiating this particular contract?

20  A.   Well, I would have been as part of signing off, but I would

21  have depended on M.J. and her staff to draw up the contract.

22         And David Hood, of course, would have -- David was very

23  involved with -- pharmacy was one of his key areas of

24  concentration, so he was involved heavily in this legislation and

25  in formation of the committee and all of that.  So he would have

1    been involved in this to an extent.

2    Q.  At some point the P&T Committee decided to bring in a third

3    party to help develop the preferred drug list, and that's this

4    Provider Synergies you've referred to before?

5    A.  Correct.

6    Q.  Why was that decision made?

7    A.  They were doing Florida's at the time and felt they were doing

8    a good job in Florida from the feedback we got, and so a decision

9    was made to contract with them to do it for us.  They already knew

10   the process.

11   Q.  Do you recall getting information from Florida itself regarding

12   what Provider Synergies was able to do?

13   A.  I didn't personally get it.  M.J. may have.

14          This is something I've mentioned earlier.  David Hood

15   really, as the secretary, took a major role in this, and I know he

16   was the one that, actually, I think negotiated the contract with

17   Provider Synergies.

18   Q.  So I think you mentioned earlier that the State of Louisiana

19   was using Florida as a model --

20   A.  Correct.

21   Q.  -- for the implementation, preferred drug list?

22   A.  Correct.

23   Q.  And that extended to deciding which third-party consultant

24   would help educate the P&T Committees regarding the preferred drug

25   lists?

1    A.  Correct.

2    Q.  Do you know whether Provider Synergies -- who made the

3    introduction of Provider Synergies?

4    A.  I don't know.  You know, as I indicated, we picked up that they

5    were doing Florida and I think that's how we got into -- in contact

6    with them.

7    Q.  Did you have any role in negotiating the terms of this

8    contract, the initial contract, with Provider Synergies?

9    A.  No.  David Hood.

10   Q.  So Provider Synergies would make recommendations to the P&T

11   Committee that were designed to lower the State's overall

12   prescription drug costs within the Medicaid program?

13   A.  To lower the expenditures by getting supplemental rebates.

14   Q.  So can you tell us generally what was your understanding as

15   state Medicaid director of the role Provider Synergies was

16   suspected to play in the development of the preferred drug list?

17   A.  They had the primary responsibility for negotiating with the

18   manufacturers for a supplemental rebate.

19   Q.  And the supplemental rebate, is that the additional rebate that

20   the pharmaceutical company would have with a particular state for

21   Medicaid prescription drug reimbursement?

22   A.  Correct.

23   Q.  In addition to negotiating the supplemental rebates, did

24   Provider Synergies have any other role with regard to the preferred

25   drug list?

1    A.  Well, they presented to the committee.

2    Q.  And what was their responsibility for the presentations they

3    would make to the P&T Committee?

4    A.  Well, Valerie actually, the pharmacist, would actually present

5    the information to the committee.

6            And we had a, we had a handout that showed if the

7    pharmaceutical house was giving us a supplemental rebate or not,

8    but it would not tell you how much the supplemental rebate was.

9            It would have little symbols as to whether it was a good

10   rebate or a low rebate and that type thing, as I remember.

11   Q.  Did the P&T Committee look to Provider Synergies to provide

12   independent assessment of the clinical evidence of benefits?

13   A.  They did.  But let me tell you, we had some really good

14   discussions in there.  And because the prescribers, you know, they

15   had experience themselves for prescribing certain drugs and the

16   effectiveness of the drugs.  So we always discussed not necessarily

17   the cost, even though that was a factor in it, but what was

18   effective.

19           And there was always the issue of children and adults.

20   Because some of the pediatricians, apparently, used some drugs that

21   weren't specifically for children.  And so there was always some

22   discussions, you know, around those areas of clinical effectiveness

23   for adults and clinical effectiveness for children.

24           But there were drugs that we kept on the PDL that we

25   didn't get rebates for because of the physicians and others on it

```
 1    felt that it was more effective.

 2              And as I mentioned earlier, sometimes the committee would

 3    ask Provider Synergies, you know, we want you to go back and see

 4    about getting a supplemental rebate.  So we might do that.

 5    Q.  Exhibit 10, sir, is a copy of a document from Provider

 6    Synergies that's entitled Louisiana Medicaid PDL Program, Overview

 7    and Results.  Do you see that?

 8    A.  Yes, sir.

 9    Q.  Okay.  I want to turn to page 2 that is entitled Overview of

10    LDHH PDL Program Results.  Do you see that?

11    A.  I see that.

12    Q.  Do you know what LDHH is?

13    A.  I guess it's Louisiana Department of Health and Hospitals.

14    Q.  And Section 1 says, Description of PDL Recommendation Process.

15    Do you see that?

16    A.  Section 1.  Yes.  Yes.

17    Q.  And so Provider Synergies would not only negotiate rebates and

18    provide an independent review of the clinical evidence of drugs,

19    they would actually come forth with a recommendation to the

20    committee; is that right?

21    A.  That's correct.

22    Q.  And I want to go through this description of the role of

23    Provider Synergies to see if it's consistent with your experience

24    on the committee.  Okay?

25    A.  Okay.
```

1    Q.  First paragraph says, "Provider Synergies' clinical/account

2    management team is comprised of advanced degree clinical

3    pharmacists.  Most of the clinicians on this team participate in

4    clinical drug reviews and evaluation as well as account

5    management."  Do you see that?

6    A.  I do.

7    Q.  In your experience, did Provider Synergies, the folks who

8    actually worked on the Louisiana PDL, were those folks experienced

9    clinical pharmacists?

10   A.  Yes.

11   Q.  Then the next paragraph says, "Thorough review of the available

12   published peer-review clinical literature is performed to present

13   an accurate, balanced picture of the relative clinical strengths

14   and weaknesses of each agent within a therapeutic class."  Do you

15   see where I am?

16   A.  Yes.

17   Q.  Do you believe that that's an accurate statement regarding what

18   Provider Synergies services they were performing for the state?

19   A.  I do.

20   Q.  Did the pharmacy and -- did the P&T Committee expect Provider

21   Synergies to provide an accurate and balanced picture of the

22   relative clinical strengths and weaknesses of each drug class up

23   for review?

24   A.  They did.

25   Q.  Did the P&T Committee expect Provider Synergies to review all

```
 1   the available published peer-reviewed clinical literature on a drug

 2   class?

 3   A.  They did.

 4   Q.  In your experience, did Provider Synergies perform that

 5   function well?

 6   A.  To my knowledge.

 7   Q.  So this attachment is titled "Louisiana Department of Health &

 8   Hospitals, Process for Review of Therapeutic Categories and New

 9   Drugs."  Do you see that?

10   A.  I do.

11   Q.  All right.  So what we just walked through was a description of

12   Provider Synergies' role after they were contracted with the State,

13   and then this attachment describes the review process within P&T

14   and DHH.  I want to make sure this is consistent with your

15   experience there.  Okay?

16           Step 4 says, "Based on the clinical efficacy and cost

17   efficiency of the products being reviewed, recommendations are sent

18   to LDHH for review, and after approval, these recommendations are

19   sent to the P&T Committee members."  Do you see that?

20   A.  I do.

21   Q.  So Provider Synergies would make a recommendation as to which

22   drugs within a class should be on the preferred drug list, and

23   would do that on the basis of the cost analyses and their review of

24   the clinical information in the literature; right?

25   A.  That's correct.
```

1    Q.  And then those would be provided to the P&T Committee members?

2    A.  That's correct.

3    Q.  And then step 5 says:  "Provider Synergies presents the

4    therapeutic class reviews to the P&T."

5            Are those therapeutic class reviews like the monographs

6    we've been talking about?

7    A.  Right.

8    Q.  And then, "Those reviews are sent to P&T, which then makes

9    recommendations with respect to Provider Synergies' suggestions.

10   And then LDHH staff presents the P&T results to Secretary Hood for

11   final approval."  Do you see that?

12   A.  Correct.

13   Q.  So Provider Synergies would provide recommendations to P&T, who

14   would either adopt or reject the recommendations; is that correct?

15   A.  That's correct.

16   Q.  And then those -- that process would go back to DHH for final

17   approval?

18   A.  Well, you know, it would go to Hood.  I mean, M.J.'s staff

19   would prepare the results of the P&T Committee and then present it

20   to David Hood for final approval.

21   Q.  And did you personally make an effort to read the monographs

22   provided by Provider Synergies?

23   A.  I did.

24   Q.  In your experience, did your colleagues on the P&T Committee

25   also endeavor to read the monographs provided by Provider

1   Synergies?

2   A.  Yeah.  And, you know, normally, those meetings would last a

3   half a day.  So, you know, sometimes there would be reviewing and

4   it was actually discussing some of these clinical trials and that

5   type thing.

6   Q.  Okay.

7   A.  So there was discussion held.  We tried to limit how many

8   classes we did at a setting so that there could be a good

9   discussion about them.

10  Q.  All right.  So, in your experience, the P&T Committee wasn't

11  just rubber stamping the --

12  A.  Oh, absolutely not.

13  Q.  And, instead, you thought, in your experience, the P&T

14  Committee would have whatever dialogue and debate was necessary so

15  the P&T Committee could make a good decision for what drugs should

16  be on the PDL?

17  A.  Absolutely.

18  Q.  Sir, Exhibit 13 is a copy of the minutes of the P&T Committee

19  meeting held May 8th, 2002.  Do you see that?

20  A.  I do.

21  Q.  And you are noted as being present; is that correct?

22  A.  Correct.

23  Q.  And at this point now with Provider Synergies under contract,

24  you'll see below, you'll see Mr. Taylor and Ms. Taylor were both in

25  attendance?

884

1           You see that Provider Synergies recommended to the

2   pharmacy -- Pharmaceutical and Therapeutics Committee that Celebrex

3   be put on the preferred drug list?

4   A.  Yes.

5   Q.  And that Bextra be put on the preferred drug list?

6   A.  Yes.

7   Q.  And that Vioxx not be put on the preferred drug list.  Do you

8   see that?

9   A.  Yes.

10  Q.  Do you have any recollection, sir, of the basis of that

11  recommendation?

12  A.  No.

13  Q.  Consistent with the practice that was set up with Provider

14  Synergies at the time, would those recommendations be based on

15  Provider Synergies' review of the clinical literature regarding

16  that class of drugs and a cost-effectiveness analysis?

17  A.  Yes.

18  Q.  Do you see in the Provider Synergies monograph, dated February

19  2002, there was a section entitled "Cardiovascular Concerns"?

20  A.  I see that.

21  Q.  And then there's a subsection under that called "Cardiovascular

22  Events"?

23  A.  I do.

24  Q.  And if you look at the first line of the Provider Synergies

25  monograph, there's a discussion of the risk of cardiovascular

1    events that was published in the medical journal called JAMA?

2    A.  I see that.

3    Q.  And the Provider Synergies is advising the P&T Committee that

4    the authors of this JAMA article advised that there may be a need

5    for further clinical trials to evaluate the potential risk of

6    cardiovascular events with COX-2 agents?

7    A.  Yeah.  That's the way I read it.

8    Q.  And then the next sentence discusses data from the VIGOR trial.

9    Do you see that?

10   A.  I do.

11   Q.  But, in any event, this is the type of information that was

12   provided to the P&T Committee before it made its decision about the

13   PDL for COX-2s?

14   A.  Yes.

15   Q.  If you turn the page, there's another subsection under the

16   cardiovascular concerns heading on hypertension and edema?

17   A.  I see it.

18   Q.  And we're not going to read the whole thing here into the

19   record, but you'll see there's a discussion of clinical trials and

20   the data regarding hypertension associated with Vioxx and Celebrex?

21   A.  Yes.

22   Q.  And was it your expectation that the members of the P&T

23   Committee would review the clinical data provided by Provider

24   Synergies in advance of the meetings?

25   A.  Yes.

1          It was more a -- more educational, gave us an opportunity

2    to talk to a prescriber and see what his concerns were.

3    Q.  But on a class-wide basis, was not being on the PDL and

4    requiring a prior authorization the most restrictive system that

5    could be in place during the closed formulary period?

6    A.  Yes.

7    Q.  Exhibit 17 is a copy of the April 2003 Provider Synergies

8    monograph for the NSAID class of medicines.  Do you see that?

9    A.  I do.

10   Q.  In terms of written documentation upon which the P&T Committee

11   relied to help make their decisions, am I correct that P&T only

12   received written materials from Provider Synergies?

13   A.  That's correct.

14   Q.  And no one else.

15   A.  That's correct.

16   Q.  In your experience, the pharmaceutical companies did not send

17   in their own materials to P&T, right?

18   A.  Not to my knowledge.

19   Q.  Page 10, you'll see Provider Synergies has a discussion about

20   the cardiovascular concerns that exist with the COX-2 class of

21   drugs.  Do you see that section?

22   A.  I do.

23   Q.  And does Provider Synergies there discuss published medical

24   research and data that raise concerns about cardiovascular safety

25   with Vioxx?

1    A.   Yeah.  It says they have data from VIGOR and CLASS trials, as

2    well as data submitted to the FDA.

3    Q.   And all that data and those concerns were brought to the

4    attention of the P&T Committee in April of 2003; is that correct?

5    A.   That's correct.

6    Q.   Would it be consistent with your experience on the P&T

7    Committee that if there was no perceived clinical difference

8    between two drugs in a class that cost savings would be the primary

9    driver for inclusion on the PDL or not?

10   A.   Right.  And that could be the reason that occurred.

11   Q.   Exhibit 18 is a copy of the transcript of the May 21, 2003, P&T

12   Committee meeting.  Do you see that?

13   A.   I do.

14   Q.   And that's been the meeting we were just discussing in which

15   the committee decided to put Vioxx on the preferred drug list and

16   take Celebrex off?

17   A.   Right.

18   Q.   Turn to transcript page 177.

19   A.   Okay.

20   Q.   Do you see at line 19, Dr. Culotta introduces the next class of

21   drugs, the NSAIDs?

22   A.   Correct.

23   Q.   And then Ms. Taylor, as would be the usual practice, would

24   provide a narrative overview of the clinical information that was

25   delivered in the monograph; is that correct?

1   A.  That's correct.

2   Q.  And she does here for several pages.  And if you get to page

3   181, at line 18, do you see that Ms. Taylor included in her public

4   comments at the hearing the very same cardiovascular concerns that

5   we saw reported in the monograph?

6   A.  I see that.

7   Q.  And, again, that was information that was available to the P&T

8   Committee before they made their decision?

9   A.  It was.

10  Q.  Now, if you'll look at page 185, is that Dr. Batie there?

11  A.  Batie, yeah.

12  Q.  Do you recall that individual?

13  A.  Yeah.  I know Dr. Batie well.

14  Q.  So Dr. Batie, in this part of the -- I think you described

15  there was a rigorous debate and discussion amongst the P&T

16  Committee members whenever a class of drugs was up for review?

17  A.  Absolutely.

18  Q.  And all of the doctors and pharmacists were encouraged to raise

19  any questions or concerns they had?

20  A.  Correct.

21  Q.  So Dr. Batie here has an additional comment or question to

22  raise with the group.  Do you see where I am?

23  A.  I do.

24  Q.  He goes on at line 20 -- is it a he?  Dr. Batie, is it a he?

25  A.  Yes.

1    Q.  Dr. Batie says at line 20:  "The question I would ask is,

2    clinically in my experience, actually, I've had significant

3    benefits from using Celebrex.  Is there any possibility of going

4    back to that company and possibly getting better pricing."  Do you

5    see that?

6    A.  I do.

7    Q.  So Dr. Batie, at this meeting, was raising the possibility of

8    keeping Celebrex on the PDL; correct?

9    A.  Correct.

10   Q.  And Mr. Taylor responded, at page 186, line 7:  "In this

11   particular category, they've already provided pricing for the

12   product, and it's still priced at a premium to the ones that are

13   recommended.  So in this case you've got Vioxx and Bextra, and

14   Celebrex is at a significant premium to those two products."  Do

15   you see where I am?

16   A.  I do.

17   Q.  And so Mr. Taylor is advising the committee that Celebrex would

18   have a higher net cost to the State?

19   A.  That's correct.

20   Q.  Is it your reading of these comments at -- that were made at

21   the May 2003 P&T Committee that the reason why Celebrex was taken

22   off the PDL and Vioxx put on the PDL was because of the cost

23   differential?

24   A.  Generally speaking, it's that in that situation, where one

25   wasn't on, then it came on and one went off, the price was better.

1    Q.  So --

2    A.  And that's where the drugs was considered of the same

3    effectiveness in dealing with a particular illness.

4    Q.  Right.  So you had a period where originally Celebrex was on

5    the PDL and Vioxx was off, and then at this point in time that

6    flip-flopped, Vioxx came on and Celebrex came off.

7           And we have Mr. Taylor describing for the committee that

8    Celebrex is still a premium-priced product relative to Vioxx.

9    A.  Yeah.

10   Q.  All of that is true, correct?

11   A.  And, in effect, what he's saying, without coming out and saying

12   it is, we're getting a better rebate on Vioxx than we did on

13   Celebrex.

14   Q.  And it was -- was it Provider Synergies' responsibility to be

15   aware of and negotiate those supplemental rebates?

16   A.  It was.

17   Q.  Exhibit 19 is a copy of the minutes of the December 17th, 2003,

18   P&T Committee meeting.  Do you see that?

19   A.  I do.

20   Q.  And you are noted as being present?

21   A.  I was.

22   Q.  Along with other members of DHH, members of the committee,

23   Provider Synergies, ULM and Unisys?

24   A.  Yeah.

25   Q.  If you go to page 13.  Do you see the Section G, "COX-2s"?

1    A.  I do.

2    Q.  And it reads:  "Dr. Weather stated that the committee might

3    want to revisit the COX-2s, as there are some new problems with at

4    least the package inserts, and particularly Vioxx, and an increase

5    in myocardial infarctions with Vioxx."

6    A.  I see that.

7    Q.  Do you recognize myocardial infarctions as a term for heart

8    attacks?

9    A.  I do.

10   Q.  He goes on to say, he said that "Celebrex is not on the PDL."

11   A.  Yeah, I do.

12   Q.  And then the minutes continue to reflect that Dr. Culotta

13   agreed to work with Mr. Taylor from Provider Synergies to seek

14   renegotiation of the one drug rather than the whole class?

15   A.  I see that.

16   Q.  Would this be an example of members of the P&T Committee

17   raising an interest in assessing a class of drugs sooner than its

18   annual review?

19   A.  It would be.

20   Q.  Okay.  Did you ever have -- did you have an understanding on

21   the P&T Committee that Provider Synergies was performing similar

22   reviews for other states besides the State of Florida?

23   A.  Yes.

24   Q.  Do you see the second paragraph under there, it says:

25   "Provider Synergies also reported that some additional rebate had

1   been offered by the manufacturer of Celebrex"?

2   A.  I see that.

3   Q.  "However, the amount was insufficient to warrant recommending

4   Celebrex be added to the PDL."

5   A.  Right.

6   Q.  Does that information reflected here in these minutes suggest

7   that the reason why Celebrex was not on the PDL at this point in

8   time was because of the net cost associated with reimbursing that

9   drug?

10  A.  Yes.

11  Q.  So at this point in time, in May of 2004, the preferred drug

12  list had been up for approximately two years; is that correct?

13  A.  That's correct.

14  Q.  I think we saw earlier that, in the first year of that, Vioxx

15  was not on the preferred drug list.

16  A.  That's right.

17  Q.  And then we also saw that throughout this two-year period,

18  Provider Synergies included, in both its written monographs and

19  oral comments to the P&T Committee, a discussion of cardiovascular

20  concerns.

21  A.  That's right.

22  Q.  And that in 2003, the P&T Committee opted to put Vioxx on the

23  PDL and take Celebrex off, correct?

24  A.  Correct.

25  Q.  And the comments from -- reflected in the transcripts reflect

1    that decision was largely driven by net cost.

2    A.  Well, I think the reason Celebrex and Vioxx changed places, one

3    going on the PDL and then going off, was cost because they were

4    considered to be equally effective.

5    Q.  And then in December of 2003, there was a specific concern

6    raised by one of the P&T Committee members regarding cardiovascular

7    risk, and in May 2004, after rereview of both the clinical

8    information and the price, the P&T Committee opted to continue

9    Vioxx on the PDL and Celebrex off.

10   A.  Correct.

11   Q.  Exhibit 24 is a copy of the minutes for the August 11, 2004,

12   P&T Committee meeting?

13   A.  Correct.

14   Q.  And you are noted as being present?

15   A.  Right.

16   Q.  I believe this is likely your swan song at the P&T Committee?

17   A.  Probably was.

18   Q.  If you had the ability to send your designee, did you ever

19   attend a P&T Committee meeting after that?

20   A.  I don't think I ever attended another one.  Not that I didn't

21   find them stimulating and interesting.  I just had too much budget

22   problems.

23   Q.  All right.  Just to tie that up.  Page 13.  I think it needs a

24   much better heading than "Other," but you'll see your announcement

25   that this would be your final meeting?

1    A.  Yep.

2    Q.  All right.

3    A.  Yes.

4    Q.  I think we saw that, at least all of the ones that we've been

5    interested in, that you attended every P&T Committee meeting from

6    its maiden --

7    A.  Inception.

8    Q.  -- maiden voyage in August of '01 right up through August of

9    '04?

10   A.  Right.

11   Q.  And in each instance, did you vote along with the majority of

12   the P&T Committee with respect --

13   A.  I did.

14   Q.  Okay.  If you'd go to page 11, do you see down there it's

15   Section 3-1; 21?

16   A.  I do.

17   Q.  COX-2 inhibitors, where the committee voted to follow the

18   recommendations of Provider Synergies and place all three COX-2

19   drugs, Vioxx, Celebrex, and Bextra, on the PDL?

20   A.  I see that.

21   Q.  So the period of time that Vioxx was not on PDL was June 10th,

22   '02, through July 14th, '03?

23   A.  Yeah, I would say so.

24   Q.  As director for the state's Medicaid program, did you ever

25   speak to anyone from Merck about their drugs?

```
1   A.  No.
2   Q.  All right.  Do you recall ever speaking to anyone from Merck
3   about any of Merck's drugs, as it related to whether those drugs
4   would be on the preferred drug list or not?
5   A.  No.
6   Q.  I take it you didn't rely on any of the -- or any verbal
7   statement made by any Merck representative in deciding how to
8   vote --
9   A.  No.
10  Q.  -- on the P&T Committee?
11  A.  No.
12  Q.  As the state Medicaid director, do you recall ever getting
13  anything in writing from Merck that, upon which you relied for
14  deciding whether to put a Merck drug on the PDL or not?
15  A.  No.
16  Q.  Do you recall any discussion, while you were a member of the
17  P&T Committee, that, in which the P&T Committee considered having
18  none of the COX-2 drugs on the preferred drug list?
19  A.  No.
20  Q.  In 1999, you were deputy director of the State of Louisiana's
21  Medicaid program, right?
22  A.  Correct.
23  Q.  And at the time, the State had a prescription drug program
24  within Medicaid, right?
25  A.  Correct.
```

1  Q.  And it was what we have described today as an open formulary

2  system.

3  A.  That's correct.

4  Q.  And when Vioxx was approved as safe and effective in 1999, it

5  automatically became available for Medicaid reimbursement.

6  A.  That's correct.

7  Q.  And we saw that in 2002, the state -- in 2001, the legislature

8  passed the statute to create a P&T Committee.

9  A.  Correct.

10  Q.  And made available to Department of Health & Hospitals the

11  ability to create a preferred drug list.

12  A.  Correct.

13  Q.  And to institute prior authorizations for medicines.

14  A.  For those not on the PDL.

15  Q.  And in 2002, the State contracted with a third party called

16  Provider Synergies to help both negotiate supplemental rebates and

17  to do an independent review of the available clinical information

18  for the committee.

19  A.  That's correct.

20  Q.  And you think that Provider Synergies did a good job in

21  performing their services.

22  A.  I do.

23  Q.  Does that extend to ULM as well?

24  A.  Right.

25  Q.  And the Department of Health & Hospitals also had professional

1    staff as an additional resource to consider the decision-making

2    process of what drugs to put on the PDL?

3    A.  Correct.

4    Q.  And in June of 2002, the State for the first time implemented

5    its preferred drug list?

6    A.  Right.

7    Q.  And at that time, Vioxx was not on the preferred drug list?

8    A.  That's correct.

9    Q.  And in 2003, Vioxx came on the preferred drug list, right?

10   A.  Correct.

11   Q.  And Celebrex came off?

12   A.  Correct.

13   Q.  And in 2004, in August, all of the COX-2 drugs were on the

14   preferred drug list?

15   A.  That's correct.

16   Q.  And throughout this entire time that the State P&T Committee

17   was considering whether to put Vioxx on the preferred drug list,

18   the P&T Committee had information from Provider Synergies that

19   raised cardiovascular concerns with Vioxx?

20   A.  That's correct.

21   Q.  Both in writing and orally at committee meetings?

22   A.  Correct.

23   Q.  And we've seen examples throughout the day in which members of

24   the P&T Committee discussed the existing cardiovascular concerns

25   with regard to Vioxx?

1    A.  Correct.

2    Q.  And that information was available to the committee when they

3    made each decision along the way whether to keep Vioxx on the PDL

4    or not?

5    A.  That's correct.

6    Q.  In either the closed formulary system or the open formulary

7    system, was there any mechanism with the Drug Utilization Review

8    Board to restrict a class of drugs from Medicaid reimbursement?

9    A.  No.

10   Q.  The DUR Board, as we've discussed, only interceded on an

11   individual-prescriber or individual-patient basis?

12   A.  That's correct.

13   Q.  And I think we went back to the purpose of having the PDL, as

14   being one in which the State would allow physicians the room that

15   they could still prescribe medicines for the benefits of their

16   patient while, at the same time, helping the State save money in

17   covering Medicaid reimbursement.

18   A.  Correct.

19   Q.  And that would include, throughout this period, allowing

20   physicians the opportunity to allow their patients to benefit from

21   Vioxx, correct?

22   A.  That's correct.

23   Q.  Do you think the PDL, during the time that you were Medicaid

24   director, did a good job allowing physicians the room to make

25   decision s for their patients while, at the same time, generating

1    savings for the State?

2    A.  I do.

3              MR. ISMAIL:  That's it, your Honor.

4              THE COURT:  Any exhibits with that one?

5              MR. ISMAIL:  Yes, sir.  From Mr. Bearden's deposition,

6    the defendants offer DX 2117.

7              THE COURT:  Okay.  Let it be admitted.

8              MR. ISMAIL:  Your Honor, at this time, we have the fifth

9    state witness deposition that we are content to submit for your

10   Honor to review in writing and would offer from that deposition --

11   this is, sorry, Dr. Gina Biglane's deposition taken on October

12   28th, 2009.

13             THE DEPUTY CLERK:  I'm sorry, is this for the judge to

14   review?

15             MR. ISMAIL:  He's ruled on the objections, and we're

16   submitting it tender to file, and we have your copy.

17             THE DEPUTY CLERK:  Thank you.

18             MR. ISMAIL:  And we have Exhibits DX 2078 and 2098.

19             THE COURT:  Let it be admitted.

20             MR. ISMAIL:  That's all we were going to do this morning,

21   your Honor.

22             THE COURT:  Okay.  We'll stop here, then, and resume at

23   nine on Monday.  Do you all know who he's going to call and the

24   order?

25             MR. DUGAN:  We would like confirmation of that, Judge,

```
 1    no.  They said they are going to call eight witnesses, and I

 2    believe they said on Monday they're going to call Parnell and

 3    Watson; is that correct?

 4              MR. ISMAIL:  Parnell and Watson on Monday.

 5              MR. DUGAN:  Who is Tuesday?

 6              MR. ISMAIL:  Will be Sales, Wiggins and our cardiologist,

 7    which we'll confirm with you tomorrow.

 8              MR. DUGAN:  What about Wednesday?

 9              MR. ISMAIL:  Wednesday will be Rarick.

10              MR. MURRAY:  Any other witnesses that you plan to call at

11    this time?

12              MR. ISMAIL:  No, and we'll take a look, as we promised

13    yesterday, tomorrow to see if that even can be reduced.

14              THE COURT:  Okay.  And when you do, let them know.

15              MR. DUGAN:  Your Honor, also late last night the

16    defendants filed their 52(c) motion.

17              THE COURT:  Right.

18              MR. DUGAN:  And we were just wondering when you would

19    like a response to that.

20              THE COURT:  What's reasonable?

21              MR. MURRAY:  I can get the court something on Monday.

22              THE COURT:  Monday or Tuesday would be fine.

23              MR. MURRAY:  Thank you, your Honor.

24              And we have the, I believe we'll have the defendant's

25    spreadsheet of their objections to exhibits.  If we could have a
```

1    ten-minute break before we go on the record and introduce those.

2    Maybe we can just leave them and introduce them -- I don't want

3    your Honor to not have them if you want to look at them over the

4    weekend.

5              THE COURT:  Yes.  Okay.

6              MR. MURRAY:  But there obviously still need to be rulings

7    on objections.  I think we were going to tender those on paper.

8              THE COURT:  Give me the spreadsheet with your responses

9    and I'll take a look at them.

10             MR. MURRAY:  I don't know if that's something we need to

11   do on the record.

12             THE COURT:  No, I don't think so.

13             MR. MURRAY:  Okay.  Thank you, your Honor.

14             THE COURT:  All right, folks.  Thank you very much.  Have

15   a good weekend.  Thank you.

16             MR. DUGAN:  Thank you, your Honor, you, too.

17             THE DEPUTY CLERK:  Everyone rise.

18         (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

19

20                       *  *  *  *  *  *

21

22

23

24

25

1

2

3                    REPORTER'S CERTIFICATE

4

5     I, Karen A. Ibos, CCR, Official Court Reporter, United States

6  District Court, Eastern District of Louisiana, do hereby certify

7  that the foregoing is a true and correct transcript, to the best of

8  my ability and understanding, from the record of the proceedings in

9  the above-entitled and numbered matter.

10

11

12                    Karen A Ibos

13                    Karen A. Ibos, CCR, RPR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25