UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  VIOXX PRODUCTS            MDL No. 1657
LIABILITY LITIGATION             Section: "L"
                                 New Orleans, Louisiana
                                 Monday, April 19, 2010

*********************************************************************

***THIS DOCUMENT RELATES TO:***

State of Louisiana, ex rel
James D. Caldwell, Jr.,
Attorney General

        versus

Merck

Case No. 05-CV-3700
*********************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
DAY 6, MORNING SESSION


APPEARANCES:


FOR THE LOUISIANA DEPARTMENT
OF HEALTH AND HOSPITALS:
                              DUGAN LAW FIRM
                              BY:  JAMES R. DUGAN, II, ESQ.
                              650 Poydras St., Suite 2150
                              New Orleans, LA 70130


                              MURRAY LAW FIRM
                              BY:  STEPHEN B. MURRAY, JR., ESQ.
                                   DOUGLAS R. PLYMALE, ESQ.
                                   JUSTIN BLOOM, ESQ.
                              650 Poydras St., Suite 1100
                              New Orleans, LA 70130

```
 1

 2                                   LIEFF CABRASER HEIMANN & BERNSTEIN
                                     BY:  DONALD C. ARBITBLIT, ESQ.
 3                                   Embarcadero Center West
                                     275 Battery Street, Suite 3000
 4                                   San Francisco, CA 94111-3339

 5

 6   FOR MERCK:                      GOLDMAN ISMAIL TOMASELLI
                                     BRENNAN & BAUM
 7                                   BY:  TAREK ISMAIL, ESQ.
                                     1 North Franklin St., Suite 625
 8                                   Chicago, IL 60606

 9                                   BAKER BOTTS
                                     BY:  TRAVIS J. SALES, ESQ.
10                                   One Shell Plaza
                                     910 Louisiana
11                                   Houston, TX 77002-4995

12

                                     O'MELVENY & MYERS
13                                   BY:  SCOTT M. VOELZ, ESQ.
                                     400 South Hope Street
14                                   Los Angeles, CA 90071-2899

15

16
     Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR
17                                   500 Poydras Street, Room HB-406
                                     New Orleans, Louisiana 70130
18                                   (504) 589-7776

19

20        Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

I N D E X

WITNESSES FOR THE DEFENDANT:                    PAGE/LINE:


MELVIN L. PARNELL

  Voir Dire Examination by Mr. Ismail          907/1

  Direct Examination by Mr. Ismail             911/12




CLEMENT EISWIRTH

  Voir Dire Examination by Mr. Ismail          928/1


  Direct Examination by Mr. Ismail             932/10


  Cross-Examination by Mr. Arbitblit           968/16

```
 1                    P R O C E E D I N G S

 2                 (MONDAY, APRIL 19, 2010)

 3                    (MORNING SESSION)

 4

 5      (OPEN COURT.)

 6          THE COURT:  Be seated, please.  Good morning, ladies and

 7  gentlemen.  Let's call your next witness.

 8          THE DEPUTY CLERK:  Judge, we have a little housekeeping.

 9          MR. SALES:  One housekeeping matter.  We need to clarify

10  that the court has admitted the curriculum vitae of Jerry Wells, DX

11  2187.

12          THE COURT:  All right.  Let that be admitted.

13          MR. ISMAIL:  Good morning, your Honor.  Merck calls as

14  its next witness Dr. Melvin Parnell.

15          THE COURT:  Come forward, please, sir.

16          THE DEPUTY CLERK:  Please step into the witness box.

17  Would you raise your right hand.

18      (WHEREUPON, MELVIN L. PARNELL, JR., M.D., WAS SWORN IN AND

19      TESTIFIED AS FOLLOWS:)

20          THE DEPUTY CLERK:  Please be seated, and would you state

21  your name for the record.

22          THE WITNESS:  My name is Melvin L. Parnell, Jr., M.D.

23          THE COURT:  You may proceed.

24          MR. ISMAIL:  Thank you, your Honor.

25                        VOIR DIRE EXAMINATION
```

1   BY MR. ISMAIL:

2   Q.  Good morning, Doctor.

3   A.  Good morning.

4   Q.  Can you tell the court what you do for a living?

5   A.  I am an orthopedic surgeon.

6   Q.  Are you here to prepare to testify as an expert witness in this

7   matter?

8   A.  Yes, sir, I am.

9   Q.  Can you briefly summarize for the court your educational and

10  professional background?

11  A.  My undergraduate degree was from the University of New Orleans,

12  and then went to graduate school at the University of New Orleans

13  for master's in biology.  I left that to attend the School of

14  Public Health and Tropical Medicine at Tulane, where I received a

15  degree in health information systems.  I then went on to Tulane

16  Medical School, graduated in 1980, and my residency was through the

17  Tulane-affiliated hospitals, and I finished that orthopedic

18  residency in 1985 and have been in private practice of orthopedic

19  surgery since July 1st, 1985.

20  Q.  For the past 25 years, has it been your professional focus been

21  entirely devoted to patient care?

22  A.  Yes, sir, it has.

23  Q.  Can you describe what your practice is?

24  A.  Basically, my practice is general orthopedist.  I see a number

25  of different bone and joint conditions, anywhere from sprains and

```
 1    strains and acute injuries to treatment of pain, both chronic and

 2    acute.  I treat osteoarthritis, rheumatoid arthritis and other such

 3    musculoskeletal conditions.

 4    Q.  Are you board certified in any specialty?

 5    A.  I am board certified in orthopedic surgery and I've also been

 6    recertified.

 7    Q.  I think you mentioned in one of your prior answers, but just so

 8    your clinical experience is clear.  Do you treat on a frequent

 9    basis patients with acute and chronic pain?

10    A.  Yes, sir, I do.

11    Q.  Do you treat on a frequent basis patients with osteoarthritis?

12    A.  Yes, sir.  Arthritis actually is probably the majority of my

13    practice.

14    Q.  In addition, do you treat rheumatoid arthritis?

15    A.  Yes, sir.

16    Q.  Over the last 25 years, have you developed experience managing

17    patients for relief of acute and chronic pain and inflammation?

18    A.  Yes, sir, I have.

19    Q.  During that time, have you developed experience with the, with

20    prescribing nonsteroidal anti-inflammatory drugs?

21    A.  Yes, sir, I have.

22    Q.  Is there any way for you to estimate the number of occasions

23    you have prescribed nonsteroidals?

24    A.  I write for a nonsteroidal practically every day, so over 25

25    years it would be thousands and thousands.
```

```
 1   Q.  And have you had occasion over the last 25 years to manage

 2   patients who are taking nonsteroidals?

 3   A.  Yes, sir, I have.

 4   Q.  How about COX-2 inhibitors when they first came on the market

 5   in 1999, have you developed experience with prescribing those

 6   medicines?

 7   A.  Since they've been on the market, I've prescribed them a lot,

 8   yes, sir.

 9   Q.  And have you had experience over the last ten-plus years

10   managing patients who are taking COX-2 inhibitors?

11   A.  Yes, sir, I have.

12   Q.  Do you have clinical experience, sir, with the treatment

13   options that doctors here in Louisiana have for the treatment of

14   patients in acute and chronic pain?

15   A.  Yes, sir, I do.

16   Q.  Do you also treat patients who are recipients of Medicaid?

17   A.  Yes, sir, I do.

18   Q.  Has this been true -- how long has that been true?

19   A.  Basically, that's been true the entire time I've practiced.

20   Q.  Do you have personal experience with the prescription drug

21   program of the Louisiana Medicaid system?

22   A.  Yes, sir, I do.

23   Q.  Does your practice require you to be familiar with which drugs

24   are covered on the Louisiana Medicaid Preferred Drug List?

25   A.  Yes, sir, it does.
```

1    Q.  Have you utilized the prior authorization mechanism that

2    Louisiana has for the pharmacy program?

3    A.  Yes, sir, I have.

4    Q.  Have you had occasion to consult with pharmaceutical companies

5    in the past?

6    A.  Yes, sir, I have.

7    Q.  Have you received any consulting moneys from Merck?

8    A.  From Merck, no, sir.

9    Q.  Can you briefly describe what consulting experience you do

10   have?

11   A.  I gave talks, initially on Celebrex and eventually on Bextra,

12   with Searle then Pharmacia and then Pfizer, and I gave between 15

13   and 20 talks over a period of time.  I also attended a consultant's

14   meeting for Bextra, I was one of the launch coordinators when

15   Bextra first came out.  I've given talks for Arixtra, which is an

16   anticoagulant that's once a day, and I've probably given 25 to 30

17   talks on Arixtra and how to prevent blood clots following

18   orthopedic surgery.

19   Q.  Have you been sponsored also to give lectures on surgical

20   techniques?

21   A.  I have participated in the design of a hip and knee prosthesis

22   that originally was U.S. Medical and then became Hayes Medical, it

23   is now Consensus Medical, and I would go to Italy once a year, give

24   talks about current techniques for hip and knee replacement in the

25   United States and actually do surgical demonstrations on hip and

1    knee replacements.

2    Q.  Are you being compensated for your time today, sir?

3    A.  Yes, sir, I am.

4    Q.  At what rate?

5    A.  $600 per hour.

6           MR. ISMAIL:  Your Honor, we tender Dr. Parnell as an

7    expert in the treatment of pain and inflammatory conditions and the

8    clinical use of Vioxx and its alternative therapies.

9           MR. ARBITBLIT:  No objection.

10          THE COURT:  Okay, let him be admitted.

11                        DIRECT EXAMINATION

12   BY MR. ISMAIL:

13   Q.  Dr. Parnell, can you tell us what types of medical conditions

14   Vioxx was used for?

15   A.  Vioxx was used to treat pain, both acute and chronic.  There's

16   indication of osteoarthritis, there's an indication for rheumatoid

17   arthritis.  It also could be used for migraine, which I don't

18   usually treat, and dysmenorrhea, which is something that usually

19   obstetricians treat, but those are primary indications.

20   Q.  Focusing on 1999 and after, what types of treatment options

21   existed for the medical conditions that you just described?

22   A.  What we had originally was the nonsteroidal

23   anti-inflammatories, the Naprosyn, the Motrin, the other

24   medications well-known, and they've been on the market for years

25   and years.  With the advent of COX-2s that, Celebrex was the first

1    one we had additional treatment options for patients who may not be

2    a candidate for a nonsteroidal.  Some patients we treated with

3    acetaminophen and that worked for acute pain, but not as well for

4    chronic pain.  Another option would have been to use steroids.  And

5    for people that don't respond to anything, there is always the

6    option of using a pain reliever, such as narcotic pain pills.

7    Q.  We heard a lot last week about comparison of Vioxx to placebo

8    in various clinical trials, and we are not going to review those

9    trials today.  But from a person who is managing patients in acute

10   and chronic pain, is placebo or nontreatments really an option for

11   a physician like you?

12   A.  Placebo is not really an option because most of the patients

13   I've treated have already taken over-the-counter

14   anti-inflammatories and have not responded and that's prompted them

15   to seek care.  There are also a fair number who may have even had a

16   prescription medication and have not responded to that.  And those

17   are the patients I see mostly.  So to take a patient who's failed

18   active treatment to me would not be a candidate for placebo.

19   Q.  So when you see patients come for a prescription medication, do

20   you take that as a sign that the patient has already determined

21   nontreatment isn't an option?

22   A.  Yes, sir, I do.

23   Q.  You mentioned in your prior answer a reference to

24   over-the-counter medications.  We heard a little bit about that

25   last week as well.

1        When patients come to your office seeking a prescription

2   for anti-inflammatory or pain relief, in your experience, has that

3   patient already tried over-the-counter therapies?

4   A.  The majority of patients have.  But it's not uncommon for a

5   patient to try something for a few days and if they don't respond,

6   then to make an appointment.  I don't usually see the patients who

7   responded to over-the-counter medications.

8   Q.  In your experience, do patients who are managed well or

9   managing their pain well with over-the-counter options, do they

10  typically come seeking prescription alternatives?

11  A.  No, sir.  The majority of patients who are doing well, like I

12  said, I don't see.

13  Q.  In your experience, for patients who have pain and inflammation

14  from osteo or rheumatoid arthritis on a chronic basis, are

15  over-the-counter medications a good alternative to prescription

16  nonsteroidals?

17        MR. ARBITBLIT:  Objection, speculative.

18        THE COURT:  What's the objection, I'm sorry?

19        MR. ARBITBLIT:  It's speculative, it's vague, it's

20  overbroad, it's the whole universe.

21        THE COURT:  Yes, let's be a little bit more specific and

22  take it a step at a time.

23        MR. ISMAIL:  Yes, sir.

24  BY MR. ISMAIL:

25  Q.  In terms of the effectiveness of over-the-counter medications,

1    I think you indicated in one of your prior answers that patients,

2    when they come seeking a prescription, typically have already tried

3    over-the-counter therapies.  My question was focusing on those

4    patients who have chronic conditions like osteoarthritis and

5    rheumatoid arthritis.  In your experience, Doctor, are those

6    conditions often not effectively managed by over-the-counter

7    medications?

8    A.  Chronic pain is totally different from acute pain.  When you

9    get into long-term considerations of medication, you have to

10   consider an increased risk with side effects that comes with taking

11   medicine for a time.  Most patients have not responded to the

12   over-the-counter short term.

13          When you get into long-term management, the patients

14   start to take increasing dosages and these usually not medically

15   minded and so they can run into problems.  If you look at

16   anti-inflammatories, the traditional nonsteroidals, you worry about

17   increased risk of complications over time such as --

18          MR. ARBITBLIT:  Your Honor, I have to object to this.

19   The witness is going to start talking about the GI side effects of

20   NSAIDS, we have a gastroenterologist lined up tomorrow to do that.

21   This guy is here to talk about pain.  He has probably got about

22   four articles on GI side effects on his CV out of 24 he was given

23   to read.  I don't think it's appropriate for him to be talking

24   about GI side effects.

25          THE COURT:  Well, the extent and nature of it, your

1  objection goes to the depth of the GI side effects, perhaps; but I

2  would imagine that from the periphery that it's one of the aspects

3  that the doctor has to consider.  Let's not go into it with any

4  great depth, but I'll overrule the objection to the extent that it

5  is a factor that a treater considers when they prescribe certain

6  medications.

7          MR. ARBITBLIT:  Your Honor, so I don't have to jump up

8  again --

9          THE COURT:  We'll make it continuing, sure.

10          MR. ARBITBLIT:  -- whether that includes comparisons

11  between the GI safety of Vioxx versus other NSAIDs, because if it

12  does, it's going to be a very long cross and the same subject that

13  Dr. Sales is coming for tomorrow.

14          THE COURT:  That's fair.  Let's not get into the

15  specifics.

16          MR. ISMAIL:  We have no intention of doing comparison of

17  agents on gastrointestinal side effects.  And as counsel notes, and

18  you understand, Dr. Parnell, we have another witness to address

19  in-depth the gastroenterology questions that are attendant to

20  NSAIDs.

21  BY MR. ISMAIL:

22  Q.  So just focussing on, you were in the middle of your answer

23  discussing the difference between acute conditions and chronic

24  conditions and why that might lead to different considerations for

25  treatments.

A.  In chronic conditions with the nonsteroidals, we have to worry about liver function tests, it's something that is not usually a problem, and we have to test it with other medications.

          The other thing is, if you get into something like narcotics, you worry about a problem with addiction.  If you look at the steroids, long-term side effects can be increased risk of osteoporosis, so there are a different set of factors we have to consider in patients with chronic pain versus patients with acute pain.

Q.  To your knowledge, sir, were over-the-counter NSAIDs a medicine that was covered under Medicaid for reimbursement on the Preferred Drug List?

A.  To the best of my knowledge, they were not.  The way I remember it is that the patients, in order to get coverage through Medicaid, had to have a prescription medication.

Q.  Now, focussing on the medical conditions that you described that Vioxx was used for, generally as a matter of clinical care, can physicians treat those diseases in a uniform way?

A.  The treatment has to be individualized for each patient.  There are no two patients who are exactly the same.  You have to take into consideration the patient's medical history, you have to take into consideration any additional medical problems they have, look at the response to treatment that's been done in the past.  So, I mean, you have to really individualize treatment for every patient.

Q.  Your description of the generalized approach to medicine of

1    individualized care, does that apply as well to the treatment of

2    acute and chronic pain?

3    A.  It does as well, same principles definitely apply.

4    Q.  Do patients respond differently to treatment options?

5    A.  They do.  You can give two patients the same medication and the

6    same dosage and get completely different treatment responses.

7    Q.  Does that variability in treatment response apply to the

8    efficacy of the treatment that you're giving?

9    A.  It does.  I mean, this is where the art of medicine comes in,

10   trying to determine who is going to respond best to what

11   medication.

12   Q.  Does that variability in treatment response also apply to the

13   tolerability of the medicine?

14   A.  It does as well.

15   Q.  Now, in terms of the actual clinical uses of Vioxx, did all

16   patients take necessarily the same dose?

17   A.  No, sir.  There were different doses of Vioxx.

18   Q.  Did all patients necessarily take Vioxx for the same

19   conditions?

20   A.  No, sir.  They took it for different reasons.

21   Q.  Did all patients necessarily have the same usage patterns, in

22   terms of how frequently the medicine would be taken?

23   A.  No, sir.  Some took it more often than others.

24   Q.  Doctor, have you formed an opinion as to whether Vioxx was an

25   effective anti-inflammatory and pain reliever?

A.  My experience with my patients is that it was.

Q.  When you are making assessments as to the efficacy of a treatment option, do you consider your own personal experience managing patients with that treatment remedy?

A.  Yes, sir, I do.

Q.  Do you consider as well the response that you're getting from your patients when you're forming opinions regarding the efficacy of a medicine?

A.  I do.  One of the keys to me is the refill rate and if a patient is doing well with the medication, then he usually has to continue on the same medication.

Q.  Do you consider as well the information gleaned from clinical trials regarding the efficacy of a medicine?

A.  Yes, sir.

Q.  Do you consider as well the input you get from other physicians in the community who treat the same conditions that you do?

A.  I do.  To me, it's important if I have any questions on any medication to find out just what my colleagues' experience is to make sure they're have the same experience I do.

Q.  When you were forming your opinion in this case regarding the efficacy of Vioxx, did you follow that same approach in terms of forming your opinions regarding the benefit of the drug?

A.  Yes, sir, I did.

Q.  And I think you indicated in your, it was your opinion that Vioxx was indeed an effective pain reliever and anti-inflammatory?

1  A.  Based on my experience with my patients, yes, sir.

2  Q.  Is that opinion supported by information you received from your

3  patients for whom you were managing their care?

4  A.  Yes, sir, it is supported.

5  Q.  Is that opinion supported by information you've learned from

6  other physicians in the community regarding the efficacy of the

7  medicine?

8  A.  Yes, sir.

9  Q.  Is that information supported by the clinical trials you have

10  reviewed?

11  A.  Yes, sir, it is.

12  Q.  Can you explain in what way the clinical trials support your

13  opinion as to the efficacy of the medicine?

14  A.  If you look at the clinical trials --

15          MR. ARBITBLIT:  Foundation, your Honor.  There's a wide

16  range of them, he has not mentioned any and there's no exhibits

17  today.

18          THE COURT:  Let's give him a little background on which

19  ones he's reviewed and so forth.

20          MR. ISMAIL:  Sure.

21  BY MR. ISMAIL:

22  Q.  Doctor, have you reviewed clinical trials regarding the

23  efficacy of Vioxx?

24  A.  Yes, sir.

25  Q.  Have you done so for the purposes of forming your opinions in

1   this case?

2   A.  Yes, sir.

3   Q.  Just in terms of the question, without getting into comparative

4   efficacy, just the fundamental question of whether the drug was

5   effective, do the clinical trials support your opinion as to the

6   efficacy of the medicine?

7        MR. ARBITBLIT:  Same objection, your Honor.  What

8   clinical trials?  How are we supposed to cross-examine in a vacuum?

9        MR. ISMAIL:  Your Honor, there is an intent to -- we had

10  no intention of marching through a bunch of clinical trials with

11  this witness.  He's testified clinical trials have supported, they

12  are in his report, if you want to start getting out individual

13  clinical trials we can.  I don't believe counsel is going to

14  contest the efficacy of the medicine in the treatment of pain and

15  inflammation.

16       THE COURT:  Why don't you get on to something else, then,

17  I mean, I've heard what he said.

18       MR. ISMAIL:  Perfect.  Thank you, your Honor.

19  BY MR. ISMAIL:

20  Q.  In your experience, Doctor, did Vioxx work for its intended

21  purpose of treating acute and chronic pain and inflammation?

22  A.  The experience with my patients is that it did work for its

23  intended purpose.

24  Q.  In your experience, Doctor, did Vioxx have any clinical

25  advantages over other treatment options?

1   A.  It did.  The first advantage was the fact that it was a

2   once-a-day medication.  There are numerous studies that showed the

3   less times per day the patient has to take the medication, the

4   greater the chance they have of taking the medications prescribed.

5   Q.  Did you consider the dosing frequency of Vioxx compared to

6   other medicines to be a clinically meaningful, therapeutic

7   advantage for patients?

8   A.  Yes, sir, I did.

9   Q.  What other advantages did you see in the use of Vioxx in

10  clinical care?

11  A.  Vioxx did not have any warning about a sulphur allergy, and

12  that's something that we did have with Celebrex and with Bextra; so

13  since it's estimated approximately 10 percent of the patient

14  population in this country does have a sulphur allergy, it actually

15  allowed me to prescribe Vioxx to some patients who I couldn't

16  prescribe Celebrex or Bextra to.

17  Q.  Did you perceive that the avoidance of sulphur allergies to be

18  a clinically meaningful and therapeutic advantage for Vioxx?

19  A.  Yes, sir.

20  Q.  Any other advantages that you believe to be brought to bear by

21  the use of Vioxx?

22  A.  Vioxx did not have an effect on platelet aggregation.

23          MR. ARBITBLIT:  Your Honor, I move to strike that.

24  That's way beyond what this witness is allowed to testify to.

25  Platelet aggregation is the cardiologist's domain, not the --

```
1              THE COURT:  I got it.  I agree with that.  Let's strike

2    that.

3    BY MR. ISMAIL:

4    Q.  Did you have personal experience in terms of patients having

5    variability of response to the treatment options for acute and

6    chronic pain?

7    A.  Yes, sir, I did.

8    Q.  Do you have clinical experience in terms of the effectiveness

9    of Vioxx compared to other alternatives for some of your patients?

10   A.  My patients, yes, sir.

11   Q.  Do you have an opinion as to whether for some patients Vioxx

12   worked better than other treatment options?

13   A.  It did.  I mean, there was some patients whom Vioxx worked

14   better than others, some patients who had been on a whole host of

15   other medications that Vioxx was the only medication that worked

16   for them.

17   Q.  Is that opinion supported by feedback you got from your own

18   patients responding with respect to the efficacy of the medicine?

19   A.  Yes, sir.

20   Q.  Does that necessarily mean that, on average, that Vioxx was a

21   superior analgesic or anti-inflammatory to all other options?

22   A.  No.  It just means in some cases patients responded better, and

23   it goes back to the individualized treatment, that everybody can

24   respond differently to different medications.

25   Q.  Turning to the Louisiana Medicaid issue.  I think you mentioned
```

1    that you have treated Medicaid recipients here in Louisiana; is

2    that correct?

3    A.  Yes, sir, I have.

4    Q.  Does that include treatment of such patients for acute and

5    chronic pain?

6    A.  Yes, sir, it does.

7    Q.  Are Medicaid recipients as patients any different than any

8    other patient population that you treat for acute and chronic pain?

9    A.  No, sir.  We do the same analysis on Medicare patients we do

10   for everybody else.

11   Q.  So with respect to the opinions you gave regarding the

12   individualized nature of how you treat those patients, does that

13   apply also to Medicaid recipients?

14   A.  Yes, it does.

15   Q.  With respect to the opinions you gave with respect to the

16   treatment options for acute and chronic pain, do those opinions

17   apply to Medicaid recipients as well?

18   A.  They do.

19   Q.  With respect to your opinions regarding the variability of

20   response to treatment options for acute and chronic pain, do those

21   opinions apply also to Medicaid recipients?

22   A.  They do.

23   Q.  Do you have an opinion as to whether Vioxx was effective for

24   the treatment of acute and chronic pain for Medicaid recipients as

25   it was for the general population?

1  A.  My experience with, in my patients was that it was effective.

2  Q.  You indicated there was -- that you had experience with the

3  prescription drug program for Medicaid; is that right?

4  A.  Yes, sir.

5  Q.  Prior to 2002, were there any restrictions for Medicaid

6  reimbursement for any of the drugs that you used in your practice?

7  A.  No, sir, there were not.

8  Q.  Are you aware of the creation of a Preferred Drug List in 2002?

9  A.  Yes, sir, I am.

10 Q.  To your recollection, was Vioxx on that Preferred Drug List in

11 2002?

12 A.  No, sir, it was not.

13 Q.  Even with the development of a Preferred Drug List, was there

14 an availability for a physician like you to still write a

15 prescription for a Medicaid recipient for a medicine not on the

16 preferred drug list?

17 A.  There was, and prior authorization was required to approve that

18 prescription.

19 Q.  Do you have experience with the prior authorization system?

20 A.  Yes, sir.

21 Q.  Can you describe for the court what that system was?

22 A.  Initially, it was basically just a phone call, you would call

23 and say this is the medication I want to prescribe, these are the

24 reasons why I want to prescribe it, and usually got approval.

25 Q.  Was that the system that was in place during the time that

1  Vioxx was on the market?

2  A.  Yes, sir.

3  Q.  The court may need to consider what alternative therapies would

4  have been utilized had Vioxx not been on the market, and so I want

5  to ask you a few questions about that topic, okay?

6  A.  Yes, sir.

7  Q.  So focussing on the period from 1999 to 2004, had Vioxx not

8  been an available therapy -- first of all, was no treatment a

9  reasonable option for those patients who would have received Vioxx?

10  A.  No, sir.

11  Q.  What treatment options would you have considered or, in your

12  opinion, would have been considered or utilized had Vioxx not been

13  on the market or not been available for Medicaid recipients from

14  '99 to 2004?

15  A.  Had it not been on the market, I would have considered another

16  COX-2 inhibitor such as Celebrex.  Bextra was on the market for a

17  while.

18          The other NSAIDs would be an option.  Sometimes with

19  those you have to give another medication to help protect the

20  stomach, and I am not going to get into GI, but sometimes we have

21  to write for more than one medication is an option.

22          Tylenol can be taken by some patients, it usually doesn't

23  work that well.  Steroids are an option as well, and the other

24  option is simply pain killers.

25  Q.  Those are narcotic options?

 1   A.  Most of them are narcotic, but the Ultram, which is a

 2   non-narcotic, but most of the pain killers are narcotics.

 3   Q.  With respect to the therapeutic advantages for Vioxx that you

 4   testified to earlier, do you have an opinion as to whether those

 5   therapeutic advantages also apply to recipients of Medicaid?

 6   A.  In my patients, I feel they did.

 7   Q.  With respect to your opinions that Vioxx worked for its

 8   intended purpose of treating acute and chronic pain, do you

 9   believe -- do you have an opinion as to whether that applied to

10   Medicaid recipients as well?

11   A.  In my experience, it did.

12   Q.  With respect to the different treatment options that you

13   believe would have been considered had Vioxx not been available for

14   prescription, would acute or chronic -- would there be a difference

15   potentially between acute and chronic conditions that you're

16   treating for?

17   A.  There is a difference between acute and chronic conditions, as

18   I've already discussed.

19   Q.  Would the treatment of chronic conditions, in your view, sir,

20   more likely result in use of a different COX-2 inhibitor?

21   A.  It would be more common.

22          MR. ISMAIL:  Your Honor, that's all the questions we have

23   for Dr. Parnell this morning.

24          THE COURT:  Any cross?

25          MR. ARBITBLIT:  May I have a moment, your Honor?

1            THE COURT:  Sure.

2            MR. ARBITBLIT:  No questions, your Honor.

3            THE COURT:  You're excused.  Thank you, sir.

4            Call your next witness.

5            MR. ISMAIL:  We will, your Honor.  He is outside the

6    courtroom, so it will be just a minute.

7            THE COURT:  Is somebody going to get him?

8            MR. ISMAIL:  Yes, sir.

9            THE COURT:  He's got him.  Thanks, Marshal.  If you would

10   come forward, please, sir, and take the stand.

11           THE DEPUTY CLERK:  Please step into the witness box.

12   Would you raise your right hand.

13       (WHEREUPON, DR. CLEMENT EISWIRTH, WAS SWORN IN AND TESTIFIED

14       AS FOLLOWS:)

15           THE DEPUTY CLERK:  Please be seated, and would you state

16   your name for the record.

17           THE WITNESS:  My name is Dr. Clement Eiswirth.

18           MR. ISMAIL:  I am just going to clear out your glass of

19   water from the prior witness, if it's still up there.

20           THE COURT:  And how do you spell your last name, Doctor?

21           THE WITNESS:  Eiswirth is E-I-S-W-I-R-T-H.

22           THE COURT:  Thank you.

23           MR. ISMAIL:  May I proceed, your Honor?

24           THE COURT:  Yes.

25                        VOIR DIRE EXAMINATION

1   BY MR. ISMAIL:

2   Q.  Good morning, Doctor.

3   A.  Good morning.

4   Q.  Can you please tell us what you do for living?

5   A.  I'm a cardiologist in private practice at East Jefferson

6   Hospital.  I also have an academic appointment in clinical

7   cardiology at Tulane.

8   Q.  Dr. Eiswirth, are you prepared to testify here as an expert

9   witness in this matter?

10  A.  I am.

11          MR. ISMAIL:  Your Honor, I am going to hand out binders.

12  BY MR. ISMAIL:

13  Q.  Dr. Eiswirth, if you turn to tab 1.  Does that contain an

14  accurate and updated copy of your curriculum vitae?

15  A.  Yes, sir, it does.

16  Q.  Can you briefly review for the court your education and

17  professional background?

18  A.  Yes, sir.  I started in engineering, got my bachelor's of

19  science degree in that.  I entered medical school, did both of

20  those at Tulane.  After I finished my medical school, I went to

21  internship and residency at Ochsner in internal medicine.  I then

22  did a fellowship in cardiology.  Thereafter I did a special

23  fellowship at the University of Utah in congestive heart failure

24  and cardiac transplantation.

25  Q.  And following your fellowship at Utah, did you return to New

1    Orleans to begin your practice in treating patients here?

2    A.  I did.  I took a position at Ochsner, where I was the founder

3    of the cardiovascular advanced therapists clinic and the first

4    medical director of the transplant program.

5    Q.  Did you assume the position at any time as the director of the

6    cardiac transplant program?

7    A.  Yes, sir, I did.

8    Q.  When you returned to -- after your fellowship at Utah, did you

9    have any position at Tulane?

10   A.  I did.  That position at Tulane was after I was in private

11   practice.  Tulane had lost their director of their transplant

12   program, and they approached me and asked if I would be their

13   acting medical director and I accepted that.  And with that I

14   received an appointment as a clinical, I believe it was an

15   assistant professor, it may have been an associate professor but I

16   put assistant on my CV, in the department of cardiology.

17   Q.  Did you have occasion in that position to teach medical

18   students and young doctors issues of cardiology?

19   A.  I did.  Although to be honest, at Tulane, my role was, that's a

20   more advanced practice setting, so I believe I had a couple of

21   medical students around with me.  I really did not accept medical

22   students on a rotation as a rule and fellows.

23   Q.  Throughout the last -- what is your current clinical practice,

24   sir?

25   A.  I stayed here and while I was at Tulane doing that I was in

1   private practice full time doing my East Jefferson job, I just kind

2   of did that "on the side".  I am now co-medical director of their

3   cardiac transplant program for, so they can maintain their

4   certification.

5          I also teach the family practice residents, cardiology

6   rotations, they do the clinical cardiology rotations, and those are

7   the residents that are at East Jefferson's family practice program.

8          And I do a lecture series where I teach them EKG

9   interpretation, as well as their clinical involvement.

10  Q.  Can you describe what your clinical practice is today?

11  A.  I am a noninvasive and invasive cardiologist, I see the full

12  realm of cardiology patients.

13  Q.  Over the last 25 years, have you gained an understanding of the

14  treatment of cardiovascular disease?

15  A.  Yes, sir.

16  Q.  Throughout that time, sir, have you had experience reviewing

17  clinical trial results and implementing those results for your

18  practice?

19  A.  Yes, sir.

20  Q.  Does that include the potential cardiovascular effects of

21  prescription medicines?

22  A.  Yes, it does.

23  Q.  When it was on the market, did you prescribe or manage Vioxx --

24  or manage patients who were taking Vioxx?

25  A.  I did.

```
1    Q.  Is that also true for Celebrex and Bextra?

2    A.  Yes, it is.

3    Q.  Since -- or have you managed the care of Medicaid recipients?

4    A.  Yes, I do.

5    Q.  How long have you been doing that?

6    A.  The entire time I've been in practice.

7    Q.  Are you familiar as a clinician with the Medicaid prescription

8    drug program here in Louisiana?

9    A.  I am.

10   Q.  Have you been personally involved in the treatment decisions

11   that affect Medicaid recipients?

12   A.  Yes, I have.

13            MR. ISMAIL:  Your Honor, we offer Dr. Eiswirth's

14   curriculum vitae, Exhibit DX 2183.

15            THE COURT:  I'll admit the curriculum vitae.  Anything --

16   you're offering him -- you're tendering him as an expert?

17            MR. ISMAIL:  I am tendering Dr. Eiswirth as an expert in

18   cardiology and the cardiovascular safety profile of Vioxx and the

19   other medicines in the class, as well as the adequacy of the

20   information available to the plaintiff in this case.

21            MR. ARBITBLIT:  I object to the latter, your Honor.

22   Adequacy of information available.

23            THE COURT:  I'll allow him as an expert with the

24   exception of allowing -- that may be a fact question.

25            MR. ISMAIL:  We'll tender Dr. Eiswirth for the, on that
```

```
 1    latter point, your Honor, not from a fact perspective but in

 2    reviewing the monographs, as to whether it fairly and accurately

 3    depicts the cardiovascular safety.

 4              THE COURT:  All right.

 5              MR. ARBITBLIT:  I don't know if -- I'll withdraw the

 6    objection, your Honor.

 7              THE COURT:  I'll accept him in that area, as just stated.

 8              MR. ISMAIL:  Thanks, your Honor.

 9                        DIRECT EXAMINATION

10    BY MR. ISMAIL:

11    Q.  Dr. Eiswirth, are you familiar with the term evidence-based

12    medicine?

13    A.  I am.

14    Q.  Can you describe for the court what that is?

15    A.  Evidence-based medicine is where physicians in practice use the

16    information available from the literature to, to basically try to

17    apply that to the patients in your practice.  It's to avoid more of

18    an antidotal approach and allow patients to be treated in a more

19    uniform fashion for the best outcome.

20    Q.  Is that a method you've employed in your clinical care?

21    A.  It's a method I employ and teach.

22    Q.  Is that the method you employed when you approached the

23    scientific questions we posed to you?

24    A.  Yes, sir.

25    Q.  Have you reviewed the extensive literature on the
```

1   cardiovascular safety of COX-2 inhibitors?

2   A.  I have.

3   Q.  Did you do your own literature review?

4   A.  I did.

5   Q.  Approximately how many articles did you review in the course of

6   arriving at your opinions?

7   A.  Approximately 200.

8   Q.  In arriving at the conclusions that you formed for this case,

9   did you consider as well your own clinical experience treating

10  patients?

11  A.  I did.

12  Q.  I just want to give the court a sense of the materials that

13  you've considered in addition to the articles that you've

14  mentioned.  Did you also review data submissions sent to FDA and

15  FDA memoranda regarding Vioxx?

16  A.  I did.

17  Q.  Did you also consider the expert reports and testimony of

18  plaintiff's designated experts?

19  A.  I did.

20  Q.  Did you also consider portions of the clinical study reports

21  for the studies done on Vioxx?

22  A.  I did.

23  Q.  Did you also consider label with Vioxx?

24  A.  Yes, sir.

25  Q.  Was one of the questions we posed to you to review the

1   information provided in the Provider Synergies monographs to the

2   Louisiana P&T Committee?

3   A.  Yes, sir.

4   Q.  Are you familiar with how Pharmacy and Therapeutic Committees

5   work?

6   A.  I am.

7   Q.  Have you yourself served on a P&T Committee?

8   A.  I have.

9   Q.  Can you describe that for us, please.

10   A.  In the late 1990s when I was going through my Med Exec

11   experience at East Jefferson Hospital, I was asked by the CO of the

12   hospital to sit on Pharmacy and Therapeutics and I was appointed

13   there by the medical staff.  And my role was to try to assist in

14   the development of a bit more restrictive formulary, which at that

15   time was wide open, and that's how I got involved with it.

16   Q.  Was that in the context of the pharmacy and prescription drugs

17   available at East Jefferson Hospital?

18   A.  It was.

19   Q.  Through that work have you become familiar with information P&T

20   Committees consider when arriving at their decisions?

21   A.  Yes, sir.

22   Q.  When you were looking at the materials provided to the P&T

23   Committee, we've used this term "monograph" from Provider

24   Synergies.  Are you familiar with what that is?

25   A.  I am.

1  Q.  Which monographs did you consider or review when arriving at

2  your opinions?

3  A.  It was one in 2002, 2003 and 2004.

4  Q.  If you would look at tabs 2, 3, and 4 of your binders -- of

5  your binder, can you tell us whether those are the monographs you

6  reviewed in this case?

7          MR. ISMAIL:  And for the record, your Honor, they are

8  Plaintiff's 439, Plaintiff's 426 and Defendant's 2118, all of which

9  have been received in evidence.

10         THE WITNESS:  Those are the ones.

11  BY MR. ISMAIL:

12  Q.  We're going to go through, we're going to go through one of the

13  monographs, but can you confirm for us, generally the monographs

14  contain similar information regarding the cardiovascular safety

15  with Vioxx?

16  A.  Yes, sir.

17  Q.  Now, as we go through this, we're only going to be asking you

18  to comment on the cardiovascular sections, not those dealing with

19  the efficacy and gastrointestinal risk, okay?

20  A.  Okay.

21  Q.  Doctor, have you formed an opinion as to whether the Provider

22  Synergies monographs adequately informed the P&T Committee

23  regarding the potential cardiovascular risks of Vioxx?

24  A.  Yes, sir.

25  Q.  What is that opinion?

1    A.  They did.

2    Q.  Before we go through and get the basis for your opinion, sir, I

3    wanted to ask you a couple of questions about the scope of the

4    material in those monographs.  In your view, to adequately inform

5    the P&T Committee, did Provider Synergies need to include every

6    single piece of data or information that was out there?

7    A.  No, sir.

8    Q.  The court has seen summaries sent to FDA or study reports that

9    go on for hundreds of pages.  Practically, could a P&T Committee

10   review that volume of information?

11   A.  They could not and they would not.

12   Q.  Why do you say that, sir?

13   A.  It is just too time-consuming, and they have more than one drug

14   to consider.

15   Q.  Would it be necessary, in your view, to understand the safety

16   profile of a drug to have access to those hundreds of pages of

17   study reports and data compilations sent to FDA?

18   A.  No, sir.

19   Q.  I'd like to focus with you, Doctor, on the 2003 monograph,

20   which is tab 3 in your binder.  Plaintiff's Exhibit 426.

21   A.  I have it.

22   Q.  Is this a monograph that you reviewed in this case?

23   A.  I did.

24   Q.  Did you review it to see if it fairly and adequately informed

25   the P&T Committee of the potential cardiovascular risks of Vioxx?

1   A.  I did.

2   Q.  If you go to page 6 of the monograph, do you see a trial that

3   is referenced Vioxx and Naproxen, at the bottom of that page?

4   A.  I do.

5   Q.  What study is that?

6   A.  That is the VIGOR trial.

7   Q.  And the discussion of the VIGOR trial carries over onto the

8   next page, and does the monograph reflect that there was a

9   difference in the influence of myocardial infarction in the VIGOR

10  study?

11  A.  It does.

12  Q.  Now, the rate information provided here is .1 to .4 percent; is

13  that correct?

14  A.  That is correct.

15  Q.  Are you aware, sir, whether additional myocardial infarctions

16  were reported after the cut-off date for the data set used for the

17  VIGOR publication?

18  A.  I am.

19  Q.  How many additional myocardial infarctions were reported after

20  that cut-off date?

21  A.  There were three more infarctions.

22  Q.  Are there other articles that are referenced in the monograph

23  that utilized the complete cardiovascular data set from the VIGOR

24  study?

25  A.  There are.

1   Q.  When we go through the additional articles cited here, I'll ask

2   if you could point that out to the court as to those articles that

3   reference the complete data set, okay?

4   A.  Okay.

5   Q.  If you could turn to page 10 and we're going to go through

6   these paragraphs in detail, but just to give the court an overview

7   of the types of events that are discussed in these two sections

8   here, do you see the heading Cardiovascular Concerns?

9   A.  Yes, sir.

10  Q.  And then there's a heading called Cardiovascular Events?

11  A.  I see that.

12  Q.  And then there's a heading called Hypertension and Edema.  Do

13  you see that?

14  A.  Yes, sir.

15  Q.  Have you reviewed these paragraphs?

16  A.  I have.

17  Q.  Are the concerns that are addressed in these sections the

18  issues of concern that were being discussed in the scientific

19  literature from a cardiovascular perspective for COX-2 inhibitors?

20  A.  Yes, they do.

21  Q.  Just generally, and as we'll go through it in more detail,

22  what's discussed in the Cardiovascular Events section?

23  A.  The Cardiovascular Events section is in reference to a

24  Mukherjee article that talks about the difference in terms of the

25  event rates in the treatment group of patients who received these

1    agents.

2    Q.  And then I suppose in the Hypertension section they discuss

3    hypertension?

4    A.  Yes, sir.

5    Q.  So let's go through, in the first instance, the Cardiovascular

6    Events section.  There is -- in the first sentence discusses a

7    review of the COX-2 inhibitors and risk of cardiovascular events in

8    JAMA in August 2001.  Are you familiar with what that references?

9    A.  Yes, sir, that's Mukherjee's reference.

10   Q.  Is that the publication in JAMA?

11   A.  It is.

12   Q.  If you turn to tab 5 of the binder.  Can you tell us, sir,

13   whether that publication is the one that's referenced in the

14   monograph?

15   A.  That is the one.

16   Q.  And that's been marked for identification as Defendant's

17   Exhibit 2637.  Have you reviewed this publication, sir?

18   A.  I have.

19   Q.  Is this the publication that is cited in the monograph?

20   A.  It is.

21   Q.  If you look at the abstract.  There is a sentence here that

22   says "the results from VIGOR," can you read that sentence, please.

23   A.  "The results from VIGOR showed that the relative risk of

24   developing a confirmed adjudicated thrombotic cardiovascular event

25   (which includes myocardial infarction, unstable angina, cardiac

1   thrombus, resuscitated cardiac arrest, sudden or unexplained death,

2   ischemic stroke, and transient ischemic attacks) with rofecoxib

3   treatment compared with naproxen was 2.38."

4   Q.  Do you know, sir, whether the relative risk of those collection

5   of thrombotic end points comparing Vioxx to Naproxen and the VIGOR

6   study whether those were based on the complete data set, including

7   the additional three MIs you referred to earlier?

8   A.  Yes, sir, they were based on the complete data set.

9   Q.  Then there's a discussion here of the annualized myocardial

10  infarction rates for COX-2 inhibitors in both VIGOR and CLASS were

11  significantly higher than that in the placebo group, and it goes on

12  to describe what the comparison here is.  Can you --

13        MR. ARBITBLIT:  Your Honor, foundation.  The witness is

14  talking about adequacy of warning to the P&T Committee, and there's

15  been no evidence that the P&T Committee saw this article as opposed

16  to the monograph that stated a summary.

17        MR. ISMAIL:  I think the plaintiffs have forgotten who

18  Provider Synergies worked for, Judge.  They were the agent hired by

19  the State to do the reviews, this is information they considered

20  and then summarized for the benefit of the P&T Committee.

21        THE COURT:  I understand the issue.  I'll overrule the

22  objection.

23  BY MR. ISMAIL:

24  Q.  The sentence that I just highlighted, sir, makes reference to a

25  placebo comparison.  Can you explain to the court what the analysis

1    was that the Mukherjee authors -- the JAMA authors did in the

2    Mukherjee study that's being referenced here in the abstract?

3    A.  What they tried to do is identify a group of patients who were

4    on, had not had -- basically, a group of the population, for

5    instance, that may show up in your office.  And they looked at them

6    and said, well, what is the placebo group incidence in those groups

7    that later received aspirin, so they kind of combined those groups,

8    so to speak, and that's where that combined number came from.

9           And their purpose, I think, was trying to look and say,

10   okay, well, if this is what you would expect to see in the general

11   placebo population and you look at the event rates in the CLASS and

12   the VIGOR, it might not be unreasonable, in their opinion, to

13   compare that to this placebo rate to see if we see a difference.

14   Q.  And what conclusion -- or what result did the Mukherjee and his

15   co-authors report as to this comparison of the heart attack rate in

16   VIGOR to this collection of placebo control data?

17   A.  They found that in both the comparison of rofecoxib or Vioxx

18   and, as well as to Celebrex to that, that there was a statistically

19   significant difference in those.

20   Q.  And as to the conclusion that the authors reached in the

21   abstract, do they report that the available data raise a cautionary

22   flag about the risk of cardiovascular events with COX-2 inhibitors?

23   A.  They do.

24   Q.  If you turn to page 956 of the article.  Do you see the

25   reference to study 085 and 090?

1    A.  Yes, sir.

2    Q.  Are you familiar with those studies?

3    A.  I am.

4    Q.  What are they?

5    A.  Those were studies for osteoarthritis patients that compared

6    placebo to Vioxx and to another nonsteroidal, nabumetone, and they

7    randomized them, one patient in placebo, two to the Vioxx arm, and

8    two to the Relafen arm.

9    Q.  To the extent anyone believed these studies were important, are

10   the cardiovascular results from these studies reported here in the

11   Mukherjee article?

12   A.  They are.

13   Q.  If you would turn the page, under Comment, left column, first

14   paragraph.  Are you familiar, sir, with a hypothesis that was put

15   forward by Dr. Garret FitzGerald regarding balance between

16   Prostacyclin and thromboxane?

17   A.  I am.

18   Q.  And his hypothesis with respect to the potential effects of

19   COX-2 inhibition on that balance?

20   A.  I am.

21   Q.  In this paragraph, do the Mukherjee authors set forth the

22   mechanism theory of imbalance and COX-2 inhibition that was put

23   forth by Dr. FitzGerald?

24   A.  Yes, sir.

25   Q.  In this article, do the authors comment about their view as to

1   whether a cardiovascular outcome study should be undertaken?

2   A.  They do.

3   Q.  So going back to the issue that we discussed as to the

4   disclosure of the information regarding cardiovascular concerns.

5   Are you familiar with the scientific discussion that occurred after

6   the VIGOR results were reported from a cardiovascular perspective?

7   A.  I am.

8   Q.  Can you describe generally what that scientific discussion was

9   as reflected in the literature?

10  A.  Certainly.  There were basically two schools of thought.  One

11  was that Naproxen due to its anti-platelet effects may be

12  responsible for a protective effect in that group.  The other

13  thought was that FitzGerald's hypothesis may be correct and perhaps

14  the coxibs were prothrombotic.

15        The third was that there may be some combination of those

16  two factors involved in this study, which was relatively small

17  events for an end point that was not defined as a primary objective

18  at the trials and that chance may have played a role as well.

19  Q.  In your review of this article, sir, do you have an opinion as

20  to whether it discusses the range of viewpoints that you just

21  reviewed for the court that were part of the scientific discussion

22  after VIGOR?

23  A.  I believe it does.

24  Q.  In what way?

25  A.  Well, it talks specifically about the FitzGerald hypothesis in

1    the paragraph that you outlined, it talks about the need for a

2    cardiovascular outcome event trial in these authors feeling to try

3    to answer this question.

4    Q.  Does the article as well demonstrate or report the

5    statistically significant difference between Vioxx and Naproxen

6    from VIGOR?

7    A.  Yes, sir.

8    Q.  Does it also discuss other trials like 085 and 090?

9    A.  It does.

10   Q.  Does it also raise the potential of a difference versus

11   placebo?

12   A.  It does.

13   Q.  Going back to tab 3, the monograph.  I believe we were at page

14   10.  And we had gone over -- we stopped at the first line of the

15   first paragraph.  Did you review that paragraph to see what is the

16   discussion that the Provider Synergies folks put in the monograph?

17   A.  I'm sorry, I didn't quite understand the question.

18   Q.  Does the first paragraph continue to discuss the Mukherjee

19   publication in the balance of that first paragraph?

20   A.  Yes, sir, it does.

21   Q.  There's also a discussion -- the second paragraph, what trial

22   is discussed there?

23   A.  That's the CLASS trial, I believe.

24   Q.  And what drug was utilized in CLASS?

25   A.  Celebrex.

1  Q.  Then there's a discussion in the third paragraph and there's

2  reference to a couple of articles there, have you reviewed this?

3  A.  Yes, sir.

4  Q.  I would like to focus your attention on the last sentence here:

5  a more extensive review of Vioxx in phase IIB through V studies

6  with over 28,000 patients.  Do you know what study that's in

7  reference to?

8  A.  That will be the Konstam publication.

9  Q.  Have you reviewed the Konstam publication?

10  A.  I have.

11  Q.  If you would turn to tab 6 in your binder, which has been

12  marked for identification as Defendant's Exhibit 597.  Is that

13  article the Konstam publication that's referenced in the monograph?

14  A.  Yes, sir.

15  Q.  Can you just describe for the court in brief terms, the court's

16  familiar with this article but just to orient us, briefly describe

17  what's done here in the Konstam publication.

18  A.  What this was was an analysis of the randomized controlled

19  trials, and they had 23 that were phase IIA all the way to V, that

20  involved roughly 28,000 patients, 14,000 years -- of patient years

21  at risk, and it compared the initial Bryson articles, which had the

22  OA comparisons, to the active comparators for placebo, and then

23  ibuprofen, diclofenac, and nabumetone, which was relevant, and it

24  included, then, also the additional data that was available off of

25  the comparisons to Naproxen.

1   Q.  I believe you said IIA and just -- I want to reference you back

2   to the method section.  Can you tell us whether the trials

3   considered were the IIA trials or the IIB through phase V?

4   A.  No, it's the IIB trial.  If I said IIA, I apologize.

5   Q.  What was the end point that was utilized for the comparison

6   that you just described?

7   A.  For the Konstam publication they used the APTC end point.

8   Q.  And what is the APTC end point?

9   A.  The APTC end point is an anti-platelet trial collaboration end

10  point.

11  Q.  Are you familiar with that end point?

12  A.  I am.

13  Q.  Is it one that is utilized in the medical literature?

14  A.  It is.

15  Q.  I'd like to turn to Table 3, which is on page 4 of the

16  publication.  Can you tell the court what's being compared here in

17  Table 3?

18  A.  Yes, sir, this is a comparison of Vioxx to placebo, and in

19  terms of the events of the APTC events in that subgroup adjusted

20  for patient years.

21  Q.  Now, what's in the left column?

22  A.  The left column is Vioxx.

23  Q.  And is it broken down by various study blocks?

24  A.  It is.

25  Q.  And then do the authors give you a total comparison using these

1    placebo-controlled data?

2    A.  They do.

3    Q.  And what's that comparison?

4    A.  Comparative as a relative risk of .84, which is not

5    statistically significantly different.

6    Q.  And then briefly, if you could, can you tell us what's in Table

7    4, how does that differ from Table 3?

8    A.  Table 4 compares Vioxx once again, but instead of comparing it

9    to placebo, compares it to nonsteroid anti-inflammatory drugs and

10   excludes Naproxen in the comparison.

11   Q.  And what was the total for that comparison reflected in Table

12   4?

13   A.  0.79 was the relative risk, which is not statistically

14   significant.

15   Q.  I would also ask you to turn to figure 1 of this publication.

16   Can you tell us what is figure 1?

17   A.  Figure 1 is a representation of the graphs that we just

18   discussed but in kind of a figure form, I guess is the only way you

19   can word that, and it includes Naproxen.  So at the top you have

20   Vioxx versus placebo, then you have Vioxx versus the non-Naproxen

21   NSAIDs, and at the bottom is Vioxx versus Naproxen.

22         The line of 1, what you're going to do with that is, if

23   the answer is 1, then both sides are equal.  If the answer is less

24   than 1, then you have a reduction in your risk of Vioxx-treated

25   patients.  If it's greater than 1, you have an increased risk on

1   the Vioxx-treated patients.  And the triangle represents the, kind

2   of the reported data point, and the little bars are the standard

3   deviations.

4   Q.  If the bar that's around the triangle crosses 1, what's the

5   proper interpretation of that data?

6   A.  That the information is not statistically significant.

7   Q.  Does the figure 1 here reflect a statistically significant

8   difference in Vioxx compared to Naproxen?

9   A.  It does.

10  Q.  Do you recall whether this data is reflected anywhere in the

11  monographs?

12  A.  I know that it's referenced in the monograph.

13  Q.  So we were looking at the April 2002 monograph; is that

14  correct?

15  A.  I will go back and do that.  What tab is that under again?

16          THE COURT:  Three.  Tab 3.

17          MR. ISMAIL:  Tab 3, yes, sir.  See if we can do this

18  without making it more confusing.  Okay.

19  BY MR. ISMAIL:

20  Q.  So, what I have on the screen is the figure 1 you were just

21  looking at from the Konstam publication, and then I also pulled out

22  that third paragraph of the monograph that we were just reviewing.

23  A.  Yes, sir.

24  Q.  So you indicated that you believe that some of the data there

25  from Konstam is referenced in the monograph itself.  Can you tell

1   us which comparators the Provider Synergies folks put in the

2   monograph from the Konstam publication?

3   A.  They looked at the comparison of Vioxx to non-Naproxen NSAIDs

4   and to Naproxen.  They did not include the placebo group.

5   Q.  Do you have a view, sir, as to whether that was the appropriate

6   comparators to include when providing information to a P&T

7   Committee like this monograph was providing?

8   A.  Yes, sir.  I mean, there would be no point in giving

9   placebo-controlled data, so I think they appropriately reported the

10  correct information.

11  Q.  Why do you say that?

12  A.  Well, in the Pharmacy and Therapeutic Committee, you're

13  obviously picking choices between drug therapies, not no drug

14  versus therapy.

15  Q.  Okay.  So going back to the monograph itself, is there another

16  section on page 12 that -- under Conclusion, which again, discusses

17  the cardiovascular safety concerns with Vioxx?

18  A.  Yes, sir.

19  Q.  Which paragraph is that?

20  A.  Paragraph 3.

21  Q.  Does paragraph 3 in the first sentence make reference to the

22  VIGOR study?

23  A.  It does.

24  Q.  And then in the second sentence, does it read:  "Patients

25  receiving Vioxx had a significantly higher risk of developing a

1    cardiovascular thrombotic event compared to patients receiving

2    naproxen."?

3    A.  It does.

4    Q.  What does that mean?

5    A.  Well, it means that if you're going to be taking Vioxx on the

6    VIGOR dose at 50 milligrams twice daily and you compare that to

7    Naproxen dosed at 500 milligrams twice daily, that those patients

8    had a higher cardiovascular thrombotic event.

9    Q.  Does Provider Synergies describe that difference as being

10   significant?

11   A.  Well, they did comment that aspirin wasn't allowed in that

12   study so it wasn't the real-world experience, and they did comment

13   that it was significant.  But they also cautioned that the

14   potential cardiovascular risk is unknown, but it raises questions.

15   Q.  Let's go to that.  You said there is this discussion of aspirin

16   and then, and whether aspirin use was allowed and then you made

17   reference to this line here, "Although the significance of this

18   potential cardiovascular risk is unknown, it does raise questions,"

19   is that what you were referring to?

20   A.  Yes, sir.

21   Q.  Do you know whether that statement is consistent with the

22   FDA-approved labelling in the precaution section for Vioxx?

23   A.  Yes.

24   Q.  Is that how the cardiovascular issue is described in the

25   FDA-approved label?

1    A.  Yes, sir.

2    Q.  Doctor, what do you say to the argument that the Provider

3    Synergies monograph should have been -- should have said something

4    more definitive about the potential cardiovascular risks of Vioxx

5    at that time?

6    A.  I think it was pretty definitive.  I mean, it gave you the

7    infarction difference between the groups, and it discussed it in

8    detail.

9    Q.  By 2003 had there been any individual placebo-controlled study

10   that demonstrated a statistically significant increase in

11   cardiovascular risk with Vioxx?

12   A.  No, sir.

13   Q.  Was there any individual study other than VIGOR, which

14   demonstrated a statistically significant cardiovascular risk of

15   Vioxx?

16   A.  No, sir.

17   Q.  Are you aware of any peer-reviewed publication at the time that

18   definitively determined that Vioxx indeed caused thrombotic events?

19   A.  No, sir.

20   Q.  Are you aware of any peer-reviewed publication at the time that

21   suggested the risks of Vioxx outweighed its benefits?

22   A.  No, sir.

23   Q.  Are you aware of any peer-reviewed publication at the time that

24   suggested Vioxx should be withdrawn from the market?

25   A.  No, sir.

1   Q.  Do you believe -- do you have an opinion as to whether the data

2   reviewed and the conclusions reached by Provider Synergies were

3   consistent with the state of medical knowledge at the time?

4   A.  I do.

5   Q.  And what is that opinion?

6   A.  I think that it was well reflected, well represented and

7   completely accurate.

8   Q.  You indicated that you reviewed other, other monographs, tabs 2

9   and 4 that we made reference to earlier.  What's your understanding

10  as to how frequently the P&T Committee considered the COX-2 and

11  NSAID class?

12  A.  It was on a yearly review.

13  Q.  And do you recall when in the year those occurred in 2002, 3

14  and 4?

15  A.  I believe the meetings were in May.

16  Q.  So the monograph that we just looked at from April, would that

17  have been the one utilized for the May 2003 meeting?

18  A.  Right.

19  Q.  In your review of the 2002 and 2004 monographs, did they also

20  discuss the Mukherjee article that we reviewed with the court?

21  A.  Yes.

22  Q.  And it'll make reference to VIGOR as well?

23  A.  Yes.

24  Q.  Do those monographs make reference to the potential

25  cardiovascular concerns with Vioxx?

1    A.  They do.

2    Q.  Taken as a whole, sir, do you have an opinion as to whether the

3    monographs compared by Provider Synergies, including the

4    information that is referenced in them, fairly informed the P&T

5    Committee of the potential cardiovascular risks of Vioxx?

6    A.  I do.

7    Q.  And your opinion, sir?

8    A.  I think that they were very informative and state-of-the-art

9    they were adequate to the decision.

10   Q.  I would like to switch topics now if I could.  Tab 7 in your

11   binder, which is Exhibit 338, also already in evidence.  Can you

12   tell us what this document is?

13   A.  Yes, sir.  This is memo from Dr. Jenkins Seligman to the acting

14   director for the Center of Drug Evaluation and Research regarding

15   analysis of agency action regarding NSAIDs and cardiovascular risk.

16   Q.  Are you familiar with the events that led to the issuance of

17   this memorandum?

18   A.  Yes, sir.

19   Q.  Do you yourself, as a clinician, look to the Food & Drug

20   Administration when considering the risks and benefits of

21   medications?

22   A.  I do.

23   Q.  Why do you do that?

24   A.  It's probably the most unbiased and informative source of

25   information to a practicing physician.  I won't say that we give it

1    100 percent all the time perfect grades in how we handle things in

2    our practice, but it's a very -- it's certainly something that you

3    have to look at and pay attention to.

4    Q.  Is this memorandum you reviewed for the purposes of your

5    opinions in this case?

6    A.  Yes, sir.

7    Q.  I think a witness last week characterized this memorandum as

8    being issued by an administrator at FDA.  Have you reviewed the

9    background of this memorandum and the events that led to it to gain

10   an understanding as to what information was considered?

11   A.  Yes, sir.

12   Q.  And on page 3, is that background set forth?

13   A.  Yes, sir.

14   Q.  In the first paragraph, there is a reference to data that

15   prompted the agency to conduct a comprehensive review of the

16   available data and to present the issue for review to a joint

17   meeting of the FDA's Arthritis and Drug Safety and Risk Management

18   Advisory Committee, over a three-day period in 2005.  Are you

19   familiar with that advisory committee meeting?

20   A.  Yes, sir.

21   Q.  And what was the topics addressed at that meeting?

22   A.  They basically were looking at the data in terms of the

23   increased risk of Vioxx compared to placebo, and they also looked

24   at the data on, available for all nonsteroidals.

25   Q.  And then does the second paragraph describe that following the

1    advisory committee meeting, Center for Drug Evaluation and Research

2    conducted a thorough internal review of the available data?

3    A.  Yes, sir.

4    Q.  And then in the third paragraph, does the memorandum set forth

5    which divisions at FDA participated in this thorough review?

6    A.  It does.

7    Q.  I can't count them all right now, but are a number of different

8    reviewing divisions noted in that paragraph?

9    A.  Yes, sir.

10   Q.  So going back to the memorandum on page 1.  Did you review this

11   memorandum for and understand the conclusions that are reflected

12   here by FDA?

13   A.  I did review it and I do understand it.

14   Q.  I would like to review some of those for the benefit of the

15   court.

16            MR. ARBITBLIT:  Your Honor, I am not sure where this is

17   going, but past the time of the reliance on Provider Synergies, I

18   don't know what the purpose of this examination is but it's beyond

19   the scope of what the witness has testified to thus far, and he

20   is -- this memo does not refer to anything that was between

21   Provider Synergies and the plaintiff.

22            THE COURT:  We'll have to see where it's going.

23            MR. ISMAIL:  Your Honor, the tender was both as to

24   Provider Synergies' information and the cardiovascular safety of

25   the class, which, of course, is addressed specifically in this

1   memo.

2          THE COURT:  All right.

3          MR. ARBITBLIT:  Objection withdrawn.

4   BY MR. ISMAIL:

5   Q.  Going to the executive summary here.  The first bullet point.

6   "The three approved COX-2 selective NSAIDs," and then

7   parenthetically, are those Vioxx, Celebrex and Bextra?

8   A.  That's correct.

9   Q.  It says:  "Are associated with an increased risk of serious

10  cardiovascular events compared to placebo"?

11  A.  It does say that, yes, sir.

12  Q.  What does it mean for an agent to be associated with an

13  increased risk?

14  A.  It means that in a group of patients who received it, you see

15  an increased risk in that incident, whatever is being tracked.

16  It's not a causation issue, it's more of an observation issue.

17  Q.  And by this point in time in April of 2005, had there been

18  placebo-controlled data showing an association of increased

19  cardiovascular risk with all three of the COX-2 inhibitors?

20  A.  Yes, sir.

21  Q.  And for Vioxx what study was that?

22  A.  For Vioxx the -- compared to placebo would have been

23  VIGOR trial -- or not placebo, I'm sorry, it would have been the

24  APPROVe trial.

25  Q.  Is that the study that was made available in September of 2004?

1   A.  That is correct.

2   Q.  And following the notice of the APPROVe trial, were there

3   information about placebo-controlled data on Bextra and Celebrex?

4   A.  Yes, sir.

5   Q.  And then the FDA goes on to say:  "The available data do not

6   permit the rank ordering of these drugs with regard to CV risk."

7   What does that mean?

8   A.  That means that they cannot say that Bextra is any worse than

9   Vioxx or vice versa or Celebrex or any ordering, you can't put them

10   one, two, three, you'd have to list them on the line.

11   Q.  We'll get to it in a minute, but are there data that support

12   the FDA conclusion that one cannot rank the COX-2 inhibitors with

13   regard to CV risk?

14   A.  Yes, sir.

15   Q.  In the second bullet point:  "Data from large, long-term

16   controlled clinical trials that have included a comparison of COX-2

17   selective and nonselective NSAIDs do not clearly demonstrate that

18   the COX-2 selective agents confer a greater risk of serious

19   cardiovascular events than nonselective NSAIDs."  What does that

20   mean?

21   A.  What that means is that not only can you not rank the coxib in

22   terms of their risk, but if you compare them to the nonsteroidal

23   anti-inflammatory drug members, the other members of the class that

24   are not COX-1 specific, that you can't tell them apart from each

25   other.

1   Q.  Are there data that support that conclusion reflected here in

2   the memorandum?

3   A.  Yes, sir.

4   Q.  And on page 2, do the conclusions of FDA continue?

5   A.  Yes, sir.

6   Q.  And the second bullet point, can you tell us how the FDA

7   believes that the available data should be best interpreted with

8   respect to the COX-2 selective and nonselective NSAIDs with regard

9   to cardiovascular risks?

10  A.  Their message is that all nonsteroidal anti-inflammatory drugs,

11  which include both COX-1 specific and the nonselective -- or COX-2

12  specific and the nonselective COX inhibitors should be viewed as

13  equally having an increased cardiovascular risk.

14  Q.  Are you familiar, sir, as to whether following the issuance of

15  this memorandum, whether indeed there was class labeling with

16  regard to cardiovascular risk for the agents discussed here?

17  A.  Yes, sir, there was.

18  Q.  And what is that, generally, without getting into the details?

19  A.  Basically, they had everyone put in their label about the

20  potential for increased cardiovascular events.

21  Q.  Does the memorandum in the third bullet point describe -- why

22  don't you say it.  What is set forth in the third bullet point on

23  page 2 with regard to the topics that are being discussed in the

24  memorandum?

25  A.  What that bullet point refers to is that they can't determine

1    yet based on available data what duration of treatment,

2    uninterrupted treatment, is required to see that risk.  And so

3    they're just simply pointing that out.  However, they say that they

4    believe that if it's short-term risk, particularly at the lower

5    dose of the agent, that you're probably okay in terms of not having

6    adverse cardiovascular events.

7    Q.  Now, you mentioned that, with respect to the FDA's conclusions,

8    there are data that are supportive of the views expressed there.

9    If you turn to page -- tab 7, is that a publication that came out

10   after the FDA decision memorandum?

11              THE COURT:  Tab 8, huh?

12              MR. ISMAIL:  Thank you, your Honor, tab 8.

13              THE WITNESS:  Yes, sir, that is.

14   BY MR. ISMAIL:

15   Q.  And it's been marked for identification as Defendant's Exhibit

16   773.  And is this publication a publication by Kearney?

17   A.  Yes, it is.

18   Q.  Can you tell the court, first of all, was this published after

19   the Vioxx withdrawal?

20   A.  Yes, it was.

21   Q.  And indeed even after the FDA decision memorandum we just

22   looked at?

23   A.  Yes, sir, I believe this came out in 2006.

24   Q.  Can you tell the court basically what the Kearney publication

25   is all about?

1   A.  It is a meta-analysis of the available trials, it included

2   something like 150,000 patients in 138 trials, and they had enough

3   data to compare nonsteroidals to placebo, coxib nonsteroidals and

4   to one another and basically went through that analysis.

5   Q.  If you could turn to figure 1 on page 3 of the publication.

6   A.  Yes.

7   Q.  And in the top two panels there, can you help us understand

8   what's being shown here?

9   A.  Yes, sir.  What they're looking at in the top panel are all of

10  the COX-2 specific drugs and they then total those up.  And they

11  look at them for all vascular events, and then below that they do

12  the same thing but they look at them just for myocardial

13  infarctions.

14  Q.  In this the vascular events grouping, is that a collection of

15  these end points that you were making reference to earlier?

16  A.  Yes, sir.

17  Q.  And then they have a bunch of COX-2 inhibitors here, some of

18  which haven't necessarily been made available in the U.S.

19  A.  That is correct.

20  Q.  Then do they set forth the number of trials that were utilized

21  in the data comparison?

22  A.  They did.

23  Q.  And the number of patients -- by the way, is this comparison of

24  COX-2 inhibitors to what?

25  A.  This is compared to placebo.

1  Q.  And then, I think this looks similar to the way the graph was

2  laid out in the Konstam publication, but just real briefly, how are

3  these data points interpreted?

4  A.  If you're to the left, your event rate would favor the COX-2

5  inhibitors; if you're to the right, it favors placebo.  Once again,

6  that line that's vertical on the page is at a 1, if you carried it

7  all the way down, that would mean there's no risk.  And so your

8  dot, the first is where the analysis puts you and a little bar for

9  each one tells you the standard deviation, so it's significant if

10  it's to the right or left of the 1 and the bar does not touch the

11  line.

12  Q.  So if you pull all 121 COX-2 studies of some 30,000 patients,

13  what is reflected here for the relative risk?

14  A.  Relative risk is 1.42, which is statistically significant

15  compared to placebo.

16  Q.  And do they have the individual breakdown for each of the

17  COX-2s?

18  A.  They do.

19  Q.  In terms of this statement by FDA and the memorandum that you

20  can't rank order the COX-2 inhibitors with regard to CV risk, do

21  you have an opinion as to whether the comparison done in this

22  meta-analysis supports such a conclusion?

23  A.  I do.

24  Q.  Do the authors of this study comment anywhere regarding the

25  comparability of the COX-2 inhibitors with regard to cardiovascular

1    risks?

2    A.  They do.

3    Q.  And I put on the screen page 2, and I've called out the top

4    paragraph of the right column.  And what I'm highlighting is the

5    sentence:  "We found no evidence that the proportional excess of

6    incidence of vascular events varied among the different selective

7    COX 2 inhibitors."

8    A.  That is correct.

9    Q.  What does that mean?

10   A.  What it means is that they can't rank order the coxib, you have

11   to look at the data on it.

12   Q.  And then if you turn to figure 3, which is on page 5 of

13   publication, you see a similar looking set of comparisons.

14   A.  Yes, sir, you do.

15   Q.  Can you tell us what figure 3 is showing us?

16   A.  What it's showing you in the top for the vascular events, the

17   same end point that we looked at with the placebo, but in this

18   case, it's comparing COX-2 inhibitors to the NSAID group, which

19   means that you're not comparing to placebo, you're comparing to a

20   comparative treatment modality to an individual patient.

21   Q.  So with respect to the question of when you're considering

22   treatment options for patients, which data set do you believe to be

23   the most appropriate to consider when you're choosing between

24   agents?

25   A.  This would be the relative data.

1  Q.  And then they've broken it down by Naproxen, ibuprofen,

2  diclofenac, and then a pool of other agents; is that correct?

3  A.  That is correct.

4  Q.  And they've done so both for the selection of vascular events

5  and then also just heart attacks?

6  A.  That's correct.

7  Q.  Commenting here briefly on the Naproxen comparison.  So is this

8  Naproxen compared to all COX-2 inhibitors?

9  A.  It's Naproxen compared to -- this is all, yes, sir, I'm sorry,

10  yes, that's correct.

11  Q.  And what does the data show there?

12  A.  It shows that Naproxen is beneficial as noted by the fact that

13  you're to the right of the 1 and you don't touch the bar, and the

14  relative risk is 1.57 and the p-value is highly significant.

15  Q.  Is the differential between Naproxen and COX-2 inhibitors

16  greater even when you focus on MIs?

17  A.  If you focus on MI, the relative risk is 2.  The statistical

18  significance remains very high, slightly higher.

19  Q.  And just so I am clear, when the relative risk is 2, does that

20  favor Naproxen or the COX-2 inhibitors?

21  A.  That's favoring Naproxen.

22  Q.  And with respect to all the non-Naproxen NSAIDs, what does the

23  comparison of both vascular events in general and MI in particular

24  show with respect to non-Naproxen NSAIDs against COX-2 inhibitors?

25  A.  If you look at a non-Naproxen, is in the top panel for vascular

1    events, there's no difference.  If you look at the MI infarct rate

2    for any of the non-Naproxen, there's no difference.

3    Q.  And does this data support, in your view, the FDA conclusion

4    that there's a class effect for COX-2 inhibitors and nonselective

5    NSAIDs with the possible exception of Naproxen?

6    A.  That is correct.

7    Q.  Just turning back to your patients, Doctor.  You indicated you

8    have clinical experience treating Medicaid recipients?

9    A.  I do.

10   Q.  And in your view, is the treatment of Medicaid recipients any

11   different than the treatment of any other group of patients?

12   A.  No, sir.

13   Q.  In your experience, Doctor, did Vioxx offer any therapeutic

14   advantages compared to, and we are not going to get into GI or

15   efficacy, compared to other treatment options with respect to

16   bleeding or effect on platelets?

17   A.  Yes.

18   Q.  Can you describe for the court what that advantage was for

19   Vioxx over some other NSAIDs?

20   A.  Sure.  Vioxx has basically no effect on platelet function in my

21   patient population.  My patients, since I am a cardiologist, are

22   always going to be on aspirin and/or Plavix, which are very potent

23   platelet inhibitors and, therefore, they're at increased risk to

24   bleed already.  The other group of patients I frequently see are

25   coumadin patients, which are increased risk to bleed.  So if I can

1    use an agent, if they have to be on a nonsteroidal, for instance,

2    for pain and I can use one that does not affect platelet function

3    or increase the risk of bleeding, then that's the one I am going to

4    choose.

5    Q.  In your view, Doctor, is the avoidance of bleeding

6    complications with Vioxx a clinically meaningful therapeutic

7    advantage for that agent?

8    A.  Yes, sir.

9    Q.  Is that advantage reflected in the labelling for Vioxx?

10   A.  I believe it is.

11   Q.  Does the scientific literature support that some nonselective

12   NSAIDs can interfere with the beneficial effects of aspirin through

13   competitive inhibition?

14   A.  It does.

15   Q.  And just briefly, without too long of a discussion of it, can

16   you describe what that is?

17   A.  Sure.  When I give someone aspirin, it takes about 20 minutes

18   to get into their system and hit the platelet.  Once it hits the

19   COX-1, that platelet will never have COX-1 activity again, so it's

20   done with.

21        If, in the same token, I am giving them ibuprofen, for

22   instance, and they take them together, the ibuprofen is competing

23   with the aspirin for that binding site so that the aspirin doesn't

24   get its full range of benefit.  And when the ibuprofen, which wears

25   off of the anti-platelet pretty quickly, then the patient is not

1    protected through that anti-thrombotic.

2    Q.  For a selective COX-2 inhibitor, do you have that same concern

3    of competition for inhibition of the COX-1 enzyme?

4    A.  No, sir, that competition does not exist.

5    Q.  And for some patients is that potentially a meaningful

6    therapeutic advantage for a COX-2 inhibitor like Vioxx?

7    A.  It is.

8    Q.  Is the absence of COX-1 activity for Vioxx something that's

9    reflected in the labelling?

10   A.  It is.

11   Q.  Now, I think you indicated in response to earlier questions

12   that when you're managing patients for acute and chronic pain,

13   you're looking for an active treatment rather than placebo; is that

14   fair?

15   A.  That is correct.

16   Q.  Today do you continue to use Celebrex or manage cardiac

17   patients who are taking Celebrex?

18   A.  I do.

19   Q.  Is that even with the black box warning that is part of the

20   Celebrex labelling for cardiovascular risk?

21   A.  It is.

22   Q.  Is that even with the data that we went over from both the FDA

23   and in the meta-analysis that equates the cardiovascular risks of

24   Celebrex to that of Vioxx?

25   A.  Yes, sir.

1   Q.  If Vioxx were available today, would you use it with your

2   patients?

3   A.  I would.

4   Q.  And why is that?

5   A.  I found it to be no different than Celebrex, in my opinion, and

6   my personal experience with it was that many patients had better

7   relief of their symptoms.

8               MR. ISMAIL:  No further question, your Honor.

9               THE COURT:  We will take a 15-minute break here.  The

10  court will stand in recess.

11              THE DEPUTY CLERK:  Everyone rise.

12          (WHEREUPON, A RECESS WAS TAKEN.)

13          (OPEN COURT.)

14              THE COURT:  Be seated, please.  You're still under oath,

15  Doctor.

16              THE WITNESS:  Yes.

17              MR. DUGAN:  We lost Don.  You had good timing, Judge, he

18  walked out as soon as you walked in.

19              THE COURT:  Doctor, you've had a chance to use the

20  facilities?

21              THE WITNESS:  I have.

22              MR. ARBITBLIT:  I apologize, your Honor.

23              THE COURT:  You may proceed.  You may cross.

24              THE DEPUTY CLERK:  Judge, we might need to get systems.

25  Their computer is not coming up.

```
 1              THE COURT:  Let's get them here.

 2              MR. ARBITBLIT:  Should we wait, your Honor.

 3              THE COURT:  That's fine.  Whose computer is not up?

 4              MR. ARBITBLIT:  It has worked on previous occasions.

 5   Hopefully it will again.

 6              THE COURT:  Do you want to proceed or do you want to wait

 7   until we get it?

 8              MR. ARBITBLIT:  Sorry, your Honor.

 9              THE COURT:  That's all right.

10              MR. ARBITBLIT:  Your Honor, we'll just proceed.  If we

11   can get the electronics we will.

12              Is this going to be too distracting if I proceed, your

13   Honor?

14              THE COURT:  No, please go ahead.

15                        CROSS-EXAMINATION

16   BY MR. ARBITBLIT:

17   Q.  Good morning, Dr. Eiswirth.

18   A.  Good morning.

19   Q.  You became involved in this particular case when you received a

20   phone call from Joe Tomaselli, correct?

21   A.  That is correct.

22   Q.  And he asked if you would be willing to talk to him about a

23   case involving Louisiana Attorney General pursuing a suit against

24   Merck; correct?

25   A.  That is correct.
```

1   Q.  And you knew Joe before that phone call because you worked with

2   him as an expert before that on Vioxx cases, right?

3   A.  That is correct.

4   Q.  And you were loading up your U-Haul truck to take your son to

5   his residency when you spoke with Joe, and you told him that you

6   felt comfortable that there would not be an issue that you could

7   not help the defense on because you don't believe that Vioxx has

8   ever caused somebody to have a heart attack, right?

9   A.  That is correct.

10  Q.  And you have testified for Bayer in products liability cases

11  involving Baycol, correct?

12  A.  I have not testified for Bayer.

13  Q.  You've worked for Bayer?

14  A.  I have.

15  Q.  You've consulted for Bayer?

16  A.  I have.

17  Q.  And you've consulted with Wyeth in the diet drug cases?

18  A.  I did.

19  Q.  And you consulted for Merck in the Vioxx cases?

20  A.  That is correct.

21  Q.  And you have no publications on COX-2 inhibitors or NSAIDs,

22  right?

23  A.  That's correct.

24  Q.  You have no publications at all since 1994?

25  A.  That sounds right.

1    Q.  Now, you are a member of the American Heart Association,

2    correct?

3    A.  Yes, sir.

4    Q.  And you're familiar with the practice of the American Heart

5    Association concerning scientific statements, right?

6    A.  I am.

7    Q.  And those are peer reviewed scientific statements, in

8    particular a peer-reviewed statement concerning the use of

9    nonsteroidal anti-inflammatory drugs, right?

10   A.  Yes, sir.

11   Q.  And you've read that?

12   A.  I have.

13          MR. ARBITBLIT:  And do we have access to show it or not?

14   Not yet.  I'll go ahead.

15          This has been read from before, your Honor, and I am just

16   going to seek the witness's comments on it.  I'll wait then?

17          Thank you very much.  And we can go to the Aspen article

18   at page 7.

19   BY MR. ARBITBLIT:

20   Q.  Now, Doctor, the AHA statement that you're familiar with

21   summarizes the AHA's peer-reviewed view of the evidence.  Page 7,

22   are you following there?

23   A.  I am.

24   Q.  And what that says is:  "Current evidence indicates that

25   selective COX-2 inhibitors have important adverse cardiovascular

1    effects that include increased risk for myocardial infarction,

2    stroke, heart failure, and hypertension."  Correct?

3    A.  That's correct.

4    Q.  And do you agree with that?

5    A.  I do.

6    Q.  Now, the article also says that the scientific evidence, if you

7    look at page 6 on the right-hand side.

8              MR. ARBITBLIT:  This is not highlighted, your Honor, but

9    I want to go over it because it's relevant to what the witness

10   said.  The scientific evidence too date --

11             MR. ISMAIL:  Your Honor, does the witness have a copy?

12             THE COURT:  Do we have a copy?

13             MR. ARBITBLIT:  I apologize.  I am getting ahead of

14   myself.  There's a copy for counsel as well.

15             Can I approach?

16             THE COURT:  Yes.

17             MR. ARBITBLIT:  Does the court need one also?

18             THE COURT:  Yes.  Thank you.

19   BY MR. ARBITBLIT:

20   Q.  Now, this was written in 2007; is that right?

21   A.  That is correct.

22   Q.  And it was after the Kearney article that you testified about a

23   little while ago?

24   A.  Right.

25   Q.  That was written in 2006, right?

A. That's correct.
Q. So the AHA a year later says: "The scientific evidence to date," this is reading from page 6, "indicates that important differences exist between these agents in terms of risk of major thrombotic events." Now that's contrary to what you said earlier, isn't that?
A. First off, this isn't the AHA, this is Antman. This is a clinical statement, it's not a guideline for current practice.
But I can't see where you are on the page to be honest because I didn't catch the reference, so if you can direct me. If you read it, I assume you read it correctly.
Q. Please turn to the first page, Doctor, and read along the second paragraph at the bottom. "This statement was approved by the American Heart Association Science Advisory and Coordinating Committee on December 20, 2006." Did I read that right?
A. Yes, you did.
Q. And you don't have any disagreement with it, do you?
A. No, sir, not what you read.
Q. The next paragraph down, "Expert peer review of AHA scientific statements is conducted at AHA National Center." Is that correct?
A. Yes, sir.
Q. And you've never written in to tell them that you disagree with any aspect of this, have you?
A. No, sir.
Q. So if you could go to page 6, in the right hand column, the

```
 1    first full paragraph, sir.  Do you see that?

 2    A.  Page 6, right hand column, first paragraph, yes, sir.

 3    Q.  Could you read that sentence, please.

 4    A.  "The scientific evidence to date," and it references a table,

 5    "indicates that important differences exist between these agents in

 6    terms of risk of major thrombotic events.  Clinicians are cautioned

 7    against relying on meta-analysis that involve an incomplete set of

 8    trials, containing small numbers of events, and focused only on

 9    short-term follow-up in assessing the relevant risk of various

10    agents.  Naproxen appears to be the preferred choice.  Although the

11    ADAPT study which investigated the prevention of development of

12    Alzheimer's disease with either Naproxen or celecoxib compared with

13    placebo raised concerned about the safety of Naproxen the trial had

14    major limitations.

15            These include a very high rate of patients lost to

16    follow-up, almost 10 percent; a large number of enrollees who did

17    not receive their medication, a lack of specified criteria for the

18    cardiovascular events and no central adjudication of the report of

19    non-fatal events.

20    Q.  Doctor, I appreciate you reading on, and you may continue if

21    you feel it's relevant, but I just asked for the first sentence and

22    I didn't want you to take the time.

23    A.  I'm sorry, I thought you wanted me to read the whole thing.

24    Q.  If you feel the need, please proceed.

25    A.  No.
```

1      THE COURT:  What was the question though that you asked

2  whether it was consistent or inconsistent?

3      MR. ARBITBLIT:  Yes, thank you, your Honor.

4  BY MR. ARBITBLIT:

5  Q.  Is the statement, the first statement the scientific evidence

6  to date indicates that important differences exist between these

7  agents in terms of risk of major thrombotic events, contrary to

8  your statement that -- earlier today?

9  A.  I don't believe it does.

10 Q.  And is that solely because of Naproxen?

11 A.  What they're referencing you to is this table on the bottom of

12 page 2, I believe, and I think that that's what they're

13 referencing.  It specifically draws your attention to the table,

14 that's the only table that I see in the event group.

15 Q.  Okay.  Well, let's look at that.  In fact, that comes right

16 from the Kearney article that you cited, doesn't it?  You recognize

17 that table coming from Kearney?

18 A.  Yes, sir.

19 Q.  So what the authors did here is they chose to compare to

20 placebo, right, they took the table from Kearney compared to

21 placebo to show what the risk of the drug was, right?

22 A.  Correct.

23 Q.  And so if you compare a drug to another drug, you don't know

24 whether you've got two toxic drugs that come out the same or two

25 safe drugs that came out the same, right?

1    A.  That's correct.

2    Q.  The only way to know if a drug is toxic is to compare it to no

3    drug, right?

4    A.  That's correct.

5    Q.  And that's the standard way that drug companies do it, and

6    that's the standard that you would like to is the drug versus

7    placebo, right?

8    A.  Yes, sir.

9    Q.  And so when APPROVe came out, Merck pulled the drug from the

10   market because that was a placebo-controlled trial, right?

11   A.  I don't know if that was the only reason, but that's certainly

12   one of the reasons.

13   Q.  Well, it was a placebo-controlled trial that showed approximate

14   doubling of the risk of heart attack and stroke, right?

15   A.  Correct.

16   Q.  So let's look at what Kearney says about Naproxen in this table

17   that the American Heart Association adopted from Kearney.  The

18   meta-analysis of randomized clinical trials for vascular events had

19   a relative risk of .92 with a 0.67 to 1.26 confidence interval,

20   correct?

21   A.  That's correct.

22   Q.  And so that confidence interval spans one on either end and so

23   it's not a statistically significant result; is that right?

24   A.  That is correct.

25   Q.  And so that result does not show any protective effect of

1    Naproxen against placebo, does it?

2    A.  That's correct.

3    Q.  So if Naproxen does not have a protective effect then the

4    results of the VIGOR study showing five times greater heart attack

5    are due to that other option that you described, which is Vioxx

6    being prothrombotic?

7    A.  That would be an incorrect conclusion based on what you're

8    showing me today.  And may I explain my answer?

9    Q.  You may explain.

10   A.  If you look at the meta-analysis of the randomized controlled

11   trials for Naproxen, they're not giving you the dosage of those

12   trials so you don't know what the dosage of Naproxen was and that's

13   critical to the conclusion of the trial event.

14          Also, you don't know what the compliance issues are

15   either in terms of this, all I see is the analysis versus placebo.

16   Q.  Are you aware of any randomized clinical trial evidence

17   comparing Naproxen to placebo that shows that Naproxen has a

18   protective effect against placebo?

19   A.  For cardiovascular events?

20   Q.  Yes.

21   A.  No, sir, that trial has never been done.

22   Q.  Now, let's look at ibuprofen.  You testified earlier that if a

23   confidence interval goes below one on the bottom end and that

24   result is not statistically significant, correct?

25   A.  That is correct.

1   Q.  And so what the Kearney authors reported for ibuprofen for that

2   meta-analysis was a confidence interval of .96 at the bottom end;

3   is that right?

4   A.  That's correct.

5   Q.  And so that's not a statistically significant showing of an

6   increased risk of ibuprofen, correct?

7   A.  That's correct.

8   Q.  Now, if you look at diclofenac down below, you see the

9   meta-analysis for that particular medication as the relative risk

10  of 1.63; is that right?

11  A.  Yes, sir.

12  Q.  And then the 95 percent confidence interval is 1.12 to 2.37,

13  right?

14  A.  That's correct.

15  Q.  And that's actually the highest relative risk on the table,

16  isn't it?

17  A.  Well it's not statistically significant, I don't think you can

18  compare those, but it is the highest numerical value.

19  Q.  Sir, is the bottom end of the 95 percent confidence interval

20  greater than one for the diclofenac meta-analysis of vascular

21  events?

22  A.  Yes, it is.

23  Q.  And did you just testify that that's not statistically

24  significant?

25  A.  No, I don't think so.  But I didn't mean to if I did, but I

1  don't think that's what I was saying.

2  Q.  Is it statistically significant?

3  A.  I took the question to mean that I was trying to compare

4  diclofenac to the other agents, and I was just saying that I don't

5  think you can do that.

6  Q.  Well, Doctor, let's just clarify.  Is there a statistically

7  significant 1.63 relative risk for diclofenac shown in the table in

8  this article?

9  A.  Yes, there is.

10  Q.  And is 1.63 for diclofenac the highest relative risk shown for

11  any of the meta-analyses of randomized clinical trials?

12  A.  Yes, it is.

13  Q.  Now, sir, do you know whether diclofenac was one of the drugs

14  that Merck compared Vioxx to in the clinical trials before

15  marketing the drug?

16  A.  Yes.

17  Q.  Do you know about what percentage of the comparison was to

18  diclofenac?

19  A.  I don't think diclofenac -- you're saying before marketing?

20  Q.  Yes.

21  A.  I think the comparative before marketing, if I remember right,

22  were ibuprofen, nabumetone and diclofenac, but I can't tell you the

23  percentages off the top of my head.

24  Q.  Does about 70 percent sound right?

25  A.  I would really have to look at the paper to tell me.

1  Q.  Assuming the Vioxx comparison was to 70 percent of the patients

2  taking diclofenac that also has a risk of heart attacks, a

3  comparison to -- between Vioxx and diclofenac would not tell you

4  that Vioxx was safe, would it?

5  A.  That's correct.

6  Q.  Now, going on to the next document that I would like to talk

7  with you about.

8          MR. ARBITBLIT:  May I approach, your Honor?

9          THE COURT:  Yes.

10  BY MR. ARBITBLIT:

11  Q.  Dr. Eiswirth, I have handed you a document marked as LAAG 287,

12  consisting of the summary minutes for the February 16, 17 and 18,

13  2005 joint meeting of the Arthritis Advisory Committee and the Drug

14  Safety and Risk Management Advisory Committee.

15          And have you seen this document before?

16  A.  I have.

17  Q.  But you didn't mention it during your direct testimony, did

18  you?

19  A.  I don't think I was asked about it.

20  Q.  Well, let's take a look at some of what this advisory committee

21  said.  Now, you understand that the FDA chose the people on this

22  committee as people who are recognized as experts in the field,

23  right?

24  A.  Yes, sir.

25  Q.  And there were 32 of them, right?

1    A.   That sounds correct.

2    Q.   And those 32 experts took a vote on page 12 of the document and

3    the question they voted on was, "Do the available data support a

4    conclusion that rofecoxib significantly increases the risk of

5    cardiovascular events?"  Do you see that?

6    A.   I do.

7    Q.   And the vote was 32 to nothing, right?

8    A.   Correct.

9    Q.   They then had a vote on whether it could come back on the

10   market with a great deal of restrictions, right?

11   A.   I wouldn't classify it as a great deal because I would have to

12   know more about it, but there were some considerations of things

13   they would have to do.

14   Q.   The committee had the following comments after the vote of 17

15   to 15 under paragraph B.  Do you see that?

16   A.   Yes, sir.

17   Q.   The committee stated that:  "The blood pressure effects seen

18   with the product are clearly outside the norm and are undesirable."

19   Correct?

20   A.   Yes, sir.

21   Q.   And:  "A mechanism other than a prostacyclin mechanism could be

22   at play since the other COX-2s do not appear to have such a large

23   blood pressure effect.  Correct?

24   A.   Correct.

25   Q.   The committee also said, "A signal for heart failure is present

 1  and the other NSAIDs have not exhibited this same signal."  Is that

 2  right?

 3  A.  It does.

 4  Q.  And the blood pressure and the heart failure data is compelling

 5  indicating it is substantially worse than other COX-2s, correct?

 6  A.  It says that, yes.

 7  Q.  And a strong dose relationship is very apparent, do you see

 8  that?

 9  A.  Yes.

10  Q.  Now a dose relationship is important in analyzing causation

11  because if you have more of a bad thing you think it's going to

12  cause more harm, right?

13  A.  Correct.

14  Q.  So if you have a dose response relationship that tends to

15  establish that the product in question causes the harm, right?

16  A.  Yes, I can see the likely of that.

17  Q.  And so the restrictions that the -- that were suggested as

18  potential actions included a black box warning?

19  A.  Yes, sir.

20  Q.  Restrict director consumer advertising.

21  A.  Yes, sir.

22  Q.  Remove black box warning only if future clinical trial results

23  demonstrate safety?

24  A.  Yes.

25  Q.  Provide known and unknown information to patients and health

1   practicers?

2   A.  Yes, sir.

3   Q.  Requires strong post marketing follow-up, going over to the

4   next page?

5   A.  Yes, sir.

6   Q.  Require informed consent?

7   A.  Yes, sir.

8   Q.  And restrict patient population.  Do you see all of those?

9   A.  Yes, sir.

10  Q.  Now, on the question of whether these drugs are all the same,

11  can we take a look together at page 10 where they start discussing

12  celecoxib, Celebrex.  Do you see that?

13  A.  Yes, sir.

14  Q.  And so what they say there, again it's 32 to nothing, that the,

15  that Celecoxib significantly increases the risk of cardiovascular

16  events, right?

17  A.  That's correct.

18  Q.  But then if you turn over to the next page, what they say about

19  it is in the middle of that first bullet point paragraph -- well,

20  let's look at the risk benefit profile first, sir.

21          Instead of a 17 to 15 vote, it was 31 to 1 in favor of

22  allowing Celebrex to stay on the market, right?

23  A.  Yes, sir.

24  Q.  And the committee agreed in that first bullet point that there

25  appears to be no evidence of CV risk at the 200 milligram dose and

1  marginally positive evidence at the 400 milligram dose.  No signal

2  was seen on the epidemiologic study with regard to the colon polyp

3  study -- that's the APC, correct?

4  A.  Right.

5  Q.  The APC study, 400 and 800 milligram doses were studied.  And

6  excess CV risk would likely be seen with the 800 milligram dose,

7  that no one takes, right?

8  A.  Correct.

9  Q.  Never been approved for 800 milligrams has it?

10  A.  No, I don't believe so.

11  Q.  And even 400 milligrams is not the usual dose, right?

12  A.  It's not the usual dose, but I do have several patients that

13  are on 400 milligrams.

14  Q.  But 200 would be the vast majority, right?

15  A.  200 would be more common.

16  Q.  So there is no evidence of CV risk at the 200 milligram dose,

17  is there?

18  A.  That is what they concluded.  They appear -- that it appeared

19  to not have much risk.

20  Q.  When you testified earlier today that they were all the same,

21  you didn't include this information about the dose that the people

22  actually take in the real world having no evidence of a real risk,

23  did you say that?

24  A.  I did not.

25  Q.  Now, at your deposition you relied on your view that professor

1   FitzGerald had recanted his idea about the mechanism that's

2   responsible and changed his mind based on a 2004, September 2004

3   article that you testified about and mentioned in your report,

4   right?

5   A.  I did not say that he recanted it.  I said that in his 2004

6   test position he said there is little evidence that COX-2 that are

7   prothrombotic in humans.  I think my exact quote in the deposition

8   was a little different because I couldn't remember the quote from

9   the article.

10  Q.  You testified that he altered his view, right?

11  A.  It appeared to alter his view is probably the way that I worded

12  that, but in any event.

13  Q.  But in any case, Dr. FitzGerald is probably the leading

14  authority in the world on the subject, isn't he?

15  A.  Yes, sir.

16          MR. ARBITBLIT:  May I approach, your Honor?

17          THE COURT:  Yes.

18  BY MR. ARBITBLIT:

19  Q.  Now, this is an article that you've seen before, right, this a

20  biological basis for the cardiovascular consequences of COX-2

21  inhibition therapeutic challenges and opportunities by Grosser,

22  Fries, and FitzGerald in the *Journal of Clinical Investigation*

23  2006, right?

24  A.  That's correct.

25  Q.  And if you go to the 13th page under the Conclusions, do you

1    see that the FitzGerald and his coauthors concluded in that first

2    sentence:  "Just as low dose aspirin is effective in the secondary

3    prevention of myocardial infarction and stroke and causes a small

4    but definite risk of serious GI adverse effects, so selective

5    inhibitors of COX-2 relieve pain and inflammation and convey a

6    small but definite risk of myocardial infarction and stroke."  Did

7    I read that right?

8    A.  You did.

9    Q.  And is that the conclusion that FitzGerald had as of 2006?

10   A.  Well, this isn't a clinical article in terms -- this is an

11   animal study in the *Journal of Clinical Investigation*, so I think

12   it's a conclusion as to things they want to look at.  But it speaks

13   for itself.

14   Q.  This is the -- they said it was a definite risk, right?

15   Conveys a small but definite risk of myocardial infarction and

16   stroke; is that right?

17   A.  That is what it says.

18   Q.  And it also says in the left-hand column at the bottom, last

19   paragraph says:  "Both the FDA and the European Medicine Agency

20   concluded that rofecoxib, valdecoxib and celecoxib conveyed a small

21   but absolute hazard of myocardial infarction and stroke, right?

22   A.  That's what it says.

23   Q.  And that's not talking about animals, is it?

24   A.  No, sir.

25   Q.  That's people?

```
 1    A.   Correct.

 2              MR. ARBITBLIT:  May I approach, your Honor?

 3              THE COURT:  Yes.

 4    BY MR. ARBITBLIT:

 5    Q.   So the next document I've handed you, sir, is the Bombardier

 6    VIGOR article which you're no doubt familiar with, right?

 7    A.   Yes, sir.

 8    Q.   And if you turn to page 1523 under the General Safety

 9    discussion.  Are you there?

10    A.   Yes, sir.

11    Q.   And you see that the authors state that myocardial infarctions

12    were less common in the Naproxen group than in the rofecoxib group

13    0.1 percent versus 0.4 experience, 95 percent confidence interval

14    for the difference 0.1 to 0.6 percent?

15    A.   Hold on a second.  Can you bring me where you are?

16    Q.   I'm in about the seventh line down under General Safety

17    beginning with the words myocardial infarctions.

18    A.   I have it, yes, sir.

19    Q.   Okay.

20              THE COURT:  What was the answer?

21              MR. ARBITBLIT:  I think we didn't have it yet.  The

22    witness was finding the reference, your Honor.  I'll refer him back

23    to it.

24              THE WITNESS:  I believe your question was just if you had

25    read that correctly and you did.
```

1          MR. ARBITBLIT:  Thank you, sir.

2     BY MR. ARBITBLIT:

3     Q.  What they didn't record here was that there was a higher risk

4     of myocardial infarctions in the Vioxx group with the recommend

5     risk of 5.0, right?

6     A.  On this trial it would have been 4.25, but it's the same thing

7     whether you express it as the reciprocal or not.

8     Q.  And it would have been 4.25 because there were 17 heart attacks

9     versus four heart attacks, 17 in Vioxx versus 4 in Naproxen?

10    A.  That's correct.

11    Q.  And the domineers were approximately identical in terms of

12    patient years, so that's why the 17 versus 4 comes out pretty much

13    precisely as a 4.25?

14    A.  I think the way they did it is they calculated the risk .1

15    versus the .4 and at the .4 level and then looked at the years of

16    exposure and that's how they got that information.

17    Q.  When you testified a moment ago that it was 4.25 you were

18    testifying to it in the Vioxx on the top version with 17 events

19    over about 4,000 patient years -- excuse me, over about 2500

20    patient years versus 4 events over about 2500 patient years, right?

21    A.  I think that's correct.

22    Q.  Now, the authors go on to say that four percent of the study

23    subject met the criteria for the Food & Drug Administration for the

24    use of aspirin for secondary cardiovascular prophylaxis, right?

25    A.  Yes, sir.

1    Q.  And those criteria mean that the those patients had a history

2    of myocardial infarction, angina, cerebral vascular accident,

3    transient ischemic attack, angioplasty or coronary bypass; is that

4    correct?

5    A.  That is correct.

6    Q.  And those would all increase the risk for having another

7    similar thrombotic event; is that fair?

8    A.  Yes, they would.

9    Q.  So those patients who are aspirin indicated were not supposed

10   to be included in this study, is that your understanding?

11   A.  That is correct.

12   Q.  But this was a post hoc analysis where they went back and

13   looked at the population and found that indeed some of them were

14   qualified to take prophylactic aspirin, right?

15   A.  Pretty much, I guess.

16   Q.  There was nothing in the trial plan that said you should break

17   out the patients between aspirin versus non-aspirin, right?

18   A.  No, the trial plan was not to include that four percent of the

19   population at all.

20   Q.  And as far as analyzing cardiovascular events, there was no

21   plan to compare those who need aspirin to those who don't?

22   A.  No.  Cardiovascular outcome was not an end point in this trial.

23   Q.  It was an end point of a standard operating procedure that was

24   applied to this trial, right?

25   A.  Yes.

1   Q.  And the standard operating procedure end point was not

2   myocardial infarctions, was it?

3   A.  No, sir, it was thrombotic event.

4   Q.  It was thrombotic events, which is a larger, broader end point

5   with more power to detect a difference when you have more events,

6   right?

7   A.  Yes, sir.

8   Q.  So what they say here is that in those patients who qualified

9   for aspirin, those patients accounted for 38 percent of the

10  patients in the study who had myocardial infarctions, right?

11  A.  That's correct.

12  Q.  And in the other patients the difference in the rate of

13  myocardial infarction between groups was not significant?

14  A.  That's correct.

15  Q.  Then they go on to say when the data showing a reduction in the

16  rate of myocardial infarction in the Naproxen group became

17  available after the completion of this trial, Merck, the

18  manufacturer of rofecoxib, notified all investigators in ongoing

19  studies of a change in the exclusion criteria to allow patients to

20  use low dose aspirin, right?

21  A.  That's correct.

22  Q.  How did you understand that, sir, why would they be telling

23  their investigators to do that?

24  A.  Well, because I think they demonstrated with this trial that

25  Vioxx at least had certainly no cardioprotective mechanism.

1   Naproxen, which was similar to aspirin in terms when dosed at 500

2   milligrams BID in terms of its ability to inhibit platelets had a

3   positive effect, and so they were saying, well, we'll give

4   everybody aspirin in our trial so that we can lessen our

5   cardiovascular outcome events.

6   Q.  Sir, the authors of this study didn't say that Naproxen had a

7   positive effect, did they?

8   A.  Did the authors say that, no, sir.  I thought you asked me my

9   opinion as to what this was.

10  Q.  Is it your opinion that the authors were trying to convey that

11  Naproxen had a positive effect?

12  A.  I think the authors were just given the information and their

13  conclusion mentioned that it could be due to protective effects of

14  Naproxen.

15  Q.  So if you gave aspirin that would give you that protection that

16  the authors were suggesting might have come from the Naproxen; is

17  that what you're trying to say?

18  A.  Right.  I think what they said was 38 percent of all of our

19  events occurred in only four percent of the patients.  The infarct

20  rate is 8 to zero and that's a substantial rate, so I think I think

21  Merck was trying to say, well, look.  We'll let everybody use

22  aspirin, low dose aspirin and not worry about if there are any GI

23  issues in there, because this was a GI outcome trial as you might

24  recall for the primary event.  And I think that's the message to

25  take from this.

1          MR. ARBITBLIT:  May I approach, your Honor?

2          THE COURT:  Yes.

3    BY MR. ARBITBLIT:

4    Q.  Doctor, the next document I've handed you is Exhibit LAAG 59, a

5    July 5, 2000 memorandum to Alise Reicin, Eliav Barr and Dennis Erb

6    from Deborah Shapiro.  Have you seen this one before?

7    A.  I believe I have.

8    Q.  And this is the VIGOR results with the additional data that

9    came in after the decision had been made to establish a cut-off

10   date, right?

11   A.  That is correct.

12   Q.  So if you go to Table 4 at page 6.  Tell me when you're there.

13   A.  I'm here.

14   Q.  All right, sir, do you see that the heading of that is the

15   summary of adjudicated thromboembolic serious adverse events in

16   selected subgroups of patients?

17   A.  Yes, sir.

18   Q.  And the top row is for all patients, right?

19   A.  That is correct.

20   Q.  And that shows the patients with events 45 Vioxx, 19 Naproxen?

21   A.  That's correct.

22   Q.  And if you go over to the relative risk and confidence

23   interval, that's a statistically significant result because both of

24   those numbers are below one; is that right?

25   A.  That's correct.

1   Q.  And if you have a confidence interval above one that would be

2   significant where you look at the relative risk on the positive

3   side, and if you have -- if you're looking at the relative risk as,

4   on the lower side then you would want both numbers to be below one;

5   is that right?

6   A.  I think I understand what you're saying.

7   Q.  If you have to think about it I better try again.

8   A.  Maybe you ought to.

9   Q.  We were talking earlier about the over all relative risk could

10  be stated either as a positive number above one; for example, let's

11  look at aspirin indicated because that's a nice easy fraction.  If

12  you see that estimate for the aspirin indicated row, that's an

13  estimate of .2.  And if you turn that around that would be 5.0,

14  right?

15  A.  That is correct.

16  Q.  So if you state it in the negative then your confidence

17  interval is statistically significant if neither -- if that top

18  number stays below one, right?

19  A.  That is correct.

20  Q.  On the other hand, if you state it in the 5.0 way then your

21  confidence interval stays positive as long as the bottom number is

22  above one; is that right?

23  A.  That's correct.

24  Q.  So going back to the table then.  For aspirin indicated you've

25  got 15 patients with thromboembolic serious adverse events versus 3

1    on Naproxen, right?

2    A.  Yes, sir.

3    Q.  And that is a statistically significant result as well, right?

4    A.  Yes, it is.

5    Q.  Then if you go down below to the aspirin not indicated, this is

6    the group that the authors talked about in the paper as not having

7    a significant increase, right?

8    A.  Well, the group the paper referred to MI rates, not thrombotic

9    events.

10   Q.  That's correct.  Now, when you look at the larger end point

11   that the authors did not report, what you find is that it's a

12   statistically significant increased risk for the aspirin not

13   indicated patients as well, isn't it?

14   A.  I would take exception to your question, only because the

15   larger end point, the thrombotic, I am not so sure, I think you

16   used the word relevant or something like that.  But it's a little

17   bit different if you want to read back your question.

18   Q.  Sure.  I would be happy to rephrase it.

19          In the heart attacks that were reported in the paper,

20   there were 21 events, right?

21   A.  In the heart attacks reported in the papers there were 17

22   versus 4.

23   Q.  They didn't actually report those numbers but you know that

24   from other data?

25   A.  Yes.

1    Q.  So when you have -- you have some background in statistics,

2    right?

3    A.  Some, yes, sir.

4    Q.  Enough to know that when you have smaller numbers it's less

5    likely you're going to reach statistical significance even if you

6    have the same relative risk?

7    A.  Yes, sir.

8    Q.  A larger sample size gives you more power to find a difference

9    when there's a difference to find?

10   A.  That is correct.

11   Q.  And so what you have here instead of 21 events, you've got 45

12   versus 19, which is 64 events, right?

13   A.  Yes, sir.

14   Q.  So you've got about three times as many events, correct?

15   A.  Yes, sir.

16   Q.  And if you reported that for end point what you would report is

17   that there is 30 versus 16 absolute difference and a statistically

18   significant relative risk of 0.53 or about double if you put it in

19   the reverse direction, right?

20   A.  That's correct.

21   Q.  So in other words, the aspirin indicated were statistically

22   significantly higher on Vioxx?

23   A.  That's correct.

24   Q.  And the aspirin non-indicated were statistically significantly

25   higher on Vioxx?

1    A.  For all thrombotic events, that's correct.

2    Q.  But that wasn't what the paper said, was it?

3    A.  The paper didn't address thrombotic events.

4            Perhaps in the interest of the court, I should maybe

5    explain why that might be?

6    Q.  I think you'll have an opportunity on redirect to do that, sir.

7            Now, on the subject of numbers of events.  Let's go to

8    tab 9.

9            MR. ARBITBLIT:  May I approach, your Honor?  Sorry.

10           THE COURT:  Yes.

11   BY MR. ARBITBLIT:

12   Q.  The next document, sir, is marked Exhibit LAAG 129.  And it is

13   an excerpt from the Vioxx New Drug Application, Clinical Efficacy

14   and Clinical Safety.  Have you seen this one before?

15   A.  I have.

16   Q.  And do you, have you tried to figure out how the data in this

17   document and specifically the placebo events at Tables E-73 on the

18   page ending 7017 and E-74 at the next page 7018, how those relate

19   to the events and studies in the Reicin paper that you cited in

20   your report?

21   A.  Well, this includes the dose ranging curves and those were not

22   included in her report.

23   Q.  I'm sorry, I couldn't hear that answer.

24   A.  These tables include a dose ranging study, IIA, and hers were

25   IIB.

1   Q.  So this includes that Protocol 010; is that right?

2   A.  That's correct.

3   Q.  There's no scientific reason to exclude it, is there?

4   A.  Depends on what you're looking at.  If you're looking at the

5   dose of the drugs like I think she was that are going to be use

6   indeed clinical trials then it would make more sense to use that

7   dose.

8   Q.  So the 010 had an arm of the study that used 25 milligrams just

9   like this row, right?

10  A.  Yes, sir, it did.

11  Q.  And then it would another arm that used the trial dose of 125

12  milligrams as a test of its efficacy and safety, right?

13  A.  Right.  And it also had very low doses that we don't use.

14  Q.  Right.  So in any case, with the exception of 010 which had,

15  what, two TIA's, right?

16  A.  That's correct.

17  Q.  And those were both on Vioxx?

18  A.  That's correct.

19  Q.  So those are included on this table but they're not included in

20  Reicin?

21  A.  That's correct.

22  Q.  Let's look at Reicin.

23          MR. ARBITBLIT:  May I approach, your Honor?

24          THE COURT:  Yes.

25  BY MR. ARBITBLIT:

1   Q.  So, Doctor, just like you to do a little flipping back and

2   forth, hopefully it won't be too confusing for anybody.  But

3   staying with the Tables E-73 and 74.  Other than the two TIA's on

4   Vioxx from the 010 study that are included in these tables --

5   A.  Could you excuse me so I can find those tables, I put them off

6   to the side.

7   Q.  Sure.

8           MR. ARBITBLIT:  Your Honor, I think when you highlight

9   everything nothing is highlighted, so you can take this down.  It's

10  good try, but.  We do the best we can.  We can leave it up if it

11  would be helpful.  We'll leave it up.

12          THE WITNESS:  I am having trouble finding my E-73 table.

13          THE COURT:  It's right on the back of the 74.

14          THE WITNESS:  Unfortunately, your Honor, I mixed the

15  pages together, I thought we were done with that.

16          THE COURT:  If you find 74, you've got 73.

17          THE WITNESS:  Okay.  Let's see.

18          THE COURT:  It's on the back or the front of it.  Do you

19  want to help him, Don.

20          MR. ARBITBLIT:  Sure.  Thank you.

21          THE WITNESS:  I apologize.

22  BY MR. ARBITBLIT:

23  Q.  So we were looking at E-73 and 74.  And these are the premarket

24  osteoarthritis studies that Merck submitted to the FDA to get the

25  dug approved, right?

1    A.  Yes, sir.

2    Q.  And with the exception of 010 they're the same studies that

3    Reicin describes in her 2002 paper, right?

4    A.  That's correct.

5    Q.  But if you look at the number of events in Tables E-73 and E-74

6    for those Vioxx arms, you can count them up, on E-73 you've got

7    five plus six plus one is 12, right?

8    A.  That's correct.

9    Q.  And then if you go to E-74 you've got six plus nine plus four

10   is 19, right?

11   A.  That's correct.

12   Q.  So the events in these trials on Vioxx were 19 plus 12, which

13   is 31, right?

14   A.  I am not sure I am following exactly what it is you want me to

15   do.

16   Q.  Well, just adding 19 and 12 the two numbers we just went

17   through is 31, right?

18   A.  So the data from E-73 you want me to add to the Reicin tables?

19   Q.  No, just adding up the Vioxx events in E-73 and E-74 you get 31

20   of them, right?

21   A.  Okay.

22   Q.  And then placebo you get one on E-73 and three on E-74, so

23   you've got 31 versus 4; is that right?

24   A.  You're losing me, but I can't honestly follow what you're

25   doing.

1   Q.  I'd like you to, sir, I don't want to lose you.  So what I

2   would like you to do is look at the placebo column on the left-hand

3   side of Table E-73.  Are you there?

4   A.  Yes, sir.

5   Q.  And do you see that there was one patient with one or more

6   adverse experiences in this category for placebo?

7   A.  Yes, sir.

8   Q.  Now, if you flip the document to the other side you'll see an

9   identical column for the six month studies with the number three in

10  that column for three people who had those events, right?

11  A.  Yes, sir.

12  Q.  So if you add up the six week studies and the six month studies

13  and you get four events on placebo, right?

14  A.  If you include the dose ranging study, yes.

15  Q.  Well, there's no --

16          THE COURT:  There's no dose range for placebo.

17          MR. ARBITBLIT:  There's no dose range for placebo.

18          THE WITNESS:  You're right, okay.

19          MR. ARBITBLIT:  Let's look at Table 4B --

20          THE COURT:  Wait.  Just pursue that though.  Then with

21  the other he's adding the dose ranges, the five, the six and the

22  one.  See if you continue with patients with one or more adverse

23  experiences?

24          MR. ARBITBLIT:  The Judge is asking you a question.

25          THE COURT:  That's where he's adding.

DAILY COPY

```
 1              THE WITNESS:  I see where he's doing.  We're going to add

 2    the one event and the patient years, I assume, or the patients.  So

 3    you want me to add this one to the placebo and then you want me to

 4    add these to the event, right?

 5    BY MR. ARBITBLIT:

 6    Q.  Well, let's just go through it one step at a time.  On table

 7    E-73, do you see that there were 12 events in the Vioxx arms and

 8    one event in the placebo arm?

 9    A.  I am counting 13 events.

10              THE COURT:  Thirteen.

11              MR. ARBITBLIT:  Under 125 milligrams, I'm sorry.  I

12    stopped at 50 and I think Reicin does, too.  So why don't we stop

13    at 50.

14    BY MR. ARBITBLIT:

15    Q.  Are there 12 events in the 12.5 through 50 milligram doses --

16    A.  There are.

17    Q.  -- versus one?

18    A.  Yes, sir.

19    Q.  Now, to get to know what that relative risk would turn out to

20    be you would have to know the patient years, but in any case those

21    are the numbers of events, right?

22    A.  That's correct.

23    Q.  But you don't know what that relative risk is, do you?

24    A.  No, sir.

25    Q.  Now, if you look at the next page, just so we confirm that what
```

1001

1    we're talking about here is a total of 31 thromboembolic

2    cardiovascular adverse experiences on Vioxx in the only studies

3    that had placebo groups versus four in the placebo; is that right?

4    A.  So we got another 13, 19 plus we're going to add the 12 or the

5    13?

6    Q.  Twelve.

7    A.  If we add the 12, 19 and 12 would be 31.

8    Q.  So then if you go to Reicin, the article, 2002, this one was in

9    the monograph, right?

10   A.  Yes, sir.

11   Q.  Now, Reicin Table 4B at page 207.  Do you see that comparison

12   of rofecoxib with placebo?

13   A.  I do.

14   Q.  And she's got a different end point now, right, she's talking

15   about -- how is she defining it here?

16   A.  This table she is looking at thromboembolic events, I think

17   that's the same one we were looking at before.

18   Q.  Well, can you explain why Reicin's got 14 versus 4 events and

19   those tables showed 31 versus 4?

20   A.  Well, I would have to do the math again, but I think that all

21   she is doing is she is not including the dose ranging protocol, so

22   she is not including those events because she was a IIB and III

23   trial person.

24   Q.  The only dose ranging one was 010, right?

25   A.  Right.

1  Q.  And that only had two events, right?  So the difference between

2  31 and 14 isn't made up by those two events, could it be?

3  A.  No, sir.

4  Q.  Now, when you teach evidence based medicine, do you let your

5  students know that they should be cautious of publications that are

6  done for marketing purposes?

7  A.  I don't know of studies that are done for marketing purposes to

8  be honest.

9          MR. ARBITBLIT:  May I approach?

10          THE COURT:  Yes.

11  BY MR. ARBITBLIT:

12  Q.  Next document I've handed you, sir, is an e-mail dated May

13  31st, 2001 with Rhoda Sperling at the bottom there, Barry Gertz at

14  the top.  Specifically I am going to refer you to the bottom of it

15  where Rhoda Sperling is writing about the CV 069 manuscript.  By

16  the way, you'll see that Rhoda Sperling is one of the named authors

17  on the Reicin paper, do you see that?

18  A.  Yes, sir.

19  Q.  And you see in the middle of the e-mail that she wrote to Alise

20  Reicin and Barry Gertz on May 31st, the sentence:  "This manuscript

21  was revised multiple times base on marketing input and was given

22  priority over completing the CV meta-analysis, as this was of

23  highest priority to USHH."  U.S. Human Health.  Do you see that?

24  A.  Yes, sir.

25  Q.  Now, did you know that there was a marketing involvement in the

 1   Reicin Sperling paper about cardiovascular risk?

 2   A.  No, sir.

 3            MR. ARBITBLIT:  Excuse me, your Honor.

 4            I can move on to something else, your Honor, while those

 5   copies are made.

 6   BY MR. ARBITBLIT:

 7   Q.  Now, another article that you talked about in your testimony

 8   today was the Konstam article.

 9            MR. ARBITBLIT:  May I approach, your Honor?

10            THE COURT:  Yes.

11   BY MR. ARBITBLIT:

12   Q.  Have you seen this document before, sir, it's a draft of the

13   Konstam article?

14   A.  No, sir -- I have not seen this top page.  I don't think I've

15   seen any drafts of the Konstam article.  I only recall reviewing

16   the article that was published.

17            MR. ARBITBLIT:  Your Honor, I apologize.  My binder has

18   the final one and the draft was the one I wanted to talk about.  So

19   if I may either approach the witness or borrow from --

20            THE COURT:  Yes.

21   BY MR. ARBITBLIT:

22   Q.  Sir, Exhibit LAAG 505 is a draft that lists Konstam and shows

23   his e-mail down below and then says:  "Rhoda - for starters, why do

24   we want to convey any sort of 'association' between rofecoxib and

25   CVD events?  Most casual readers, and most journalists, will

1  unfortunately read this as one of causality!  I would strongly

2  suggest something different:  A pooled analysis of cvd events in

3  controlled trials of rofecoxib, for instance, is much more

4  neutral."  Do you see that?

5        THE WITNESS:  Yes, sir.

6  BY MR. ARBITBLIT:

7  Q.  And were you aware that the original title of this article was

8  Cardiovascular Thrombotic Events Associated with Rofecoxib and that

9  it was changed?

10 A.  No, sir.

11 Q.  And do you have a copy of the final one in your set of

12 materials you went through with your counsel, right?

13 A.  Yes, sir, I do.

14 Q.  And the final title was Cardiovascular Thrombotic Events in

15 Controlled, Clinical Trials of Rofecoxib, right?

16 A.  That sounds correct.

17 Q.  Now, do you know whether Dr. Konstam had a consulting

18 relationship with Merck before this article was written?

19 A.  I believe that he did.

20 Q.  Do you know if he was identified in their documents as a person

21 who consistently stated Merck's point of view on cardiovascular

22 issues?

23 A.  I would not know that.

24 Q.  Now, there was some talk about the APTC end point this morning

25 and let's go through that.

1      First of all, sir, the APTC, what does that stand for?

2  A.  That's anti-trial platelet collaboration end point.

3  Q.  I think that was close.

4  A.  Anti-platelet trial collaboration, I'm sorry, I misspoke.

5  Q.  Anti-platelet, no one is anti-trial.

6  A.  No, sorry.

7  Q.  So anti-platelet means they're studying things that act against

8  the platelet aggregation tendencies, right?

9  A.  That's correct.

10  Q.  So what they were studying was aspirin, right?

11  A.  Well, that's one of the ones when we were using these in trials

12  that was a cardiovascular end point, it's used in aspirin, Plavix,

13  for instance.

14  Q.  So it's used for pharmaceutical products that may have a

15  hemorrhagic risk, right?

16  A.  Or an anti-thrombotic, either or.

17  Q.  So it could be preventing heart attacks, but it could also be

18  causing bleeds?

19  A.  Correct.

20  Q.  And that would be because the tendency of the platelets to

21  aggregate would be counteracted, so if you had a plead it might get

22  worse?

23  A.  That's correct.

24  Q.  So what the APTC end point was designed to do was to see

25  whether the -- what you were saving on the preventing heart attack

1    side was more than you were losing on the stroke side, right?

2    A.  That might be a reasonable interpretation but I wouldn't

3    exactly agree with that characterization.  I think it's an end

4    point that stands for itself.  It's designed to look at outcomes in

5    cardiovascular trials, for instance, looking at anti-platelet or

6    anti-coagulant agents and it doesn't look at both sides.

7    Q.  Now, no one was suggesting that Vioxx caused strokes, were

8    they?  I mean, bleeding strokes, no one was suggesting that Vioxx

9    was an anticoagulant -- withdraw the question.  I stated too many

10   and they're not clear.

11          At any time are you aware of suggestions in the

12   literature that Vioxx was an anticoagulant?

13   A.  No, sir.

14   Q.  There was talk about that it could be something that would

15   promote aggregation but not that it would prevent it, right?

16   A.  That's correct.

17   Q.  So that APTC end point cuts the pie finer still, right?  You're

18   losing end points from thromboembolic down to thrombotic, right?

19   A.  You are but I think you're mischaracterizing the purpose of

20   that end point and why we use it in cardiology.  We use it because

21   it's a more definite and defined end point instead of a general end

22   point of thrombotic events.

23   Q.  Well, it may have that going for it, but it also cuts out

24   events, right, it cuts out --

25   A.  It cuts TIs, it cuts out unstable angina, it cuts out deep

1 venous thrombosis, it cuts out arterial thrombosis.

2 Q.  And it adds bleeding strokes?

3 A.  It adds bleeding strokes.  It adds deaths from hemorrhage as

4 well.

5 Q.  So can you name any articles that use the APTC end point other

6 than anticoagulants like Plavix or aspirin and Vioxx?

7 A.  Not off the top of my head I can't think of any.

8 Q.  So when Konstam wrote this article, the conclusion was that

9 there was no increased risk of Vioxx compared to placebo or

10 nonsteroidals other than Naproxen, right?

11 A.  That's correct.

12 Q.  But if you look at the data for rheumatoid arthritis and

13 osteoarthritis, what you actually see is that both of those are

14 elevated, neither one statistically significant but they're both

15 high, aren't they?

16 A.  Where are you on the paper?

17 Q.  I'm at Table 3 at 2283, I'm looking at rheumatoid arthritis

18 line and the osteoarthritis line.

19 A.  Is this it (INDICATING)?

20 Q.  At the Konstam article -- and look in your binder of the

21 materials that you had with your counsel.

22 A.  I'm sorry.  Okay.  You're actually looking at Table 3 of

23 Konstam's article, the final article, the published article?

24 Q.  Yes.  His conclusion is:  "This analysis provides no evidence

25 for an excess of CV events for rofecoxib relative to either placebo

1    or the non-Naproxen NSAIDs that were studied."  Right?

2    A.  I thought you were asking me to look at the table.  Where are

3    you now?

4    Q.  I am asking a different question now.  We'll get there.  But

5    did I read that right, the conclusion?

6    A.  I wasn't following because I was looking at the table trying to

7    see where you were, so what's the conclusion?

8    Q.  Fair enough.  The conclusion on the front page 2280 is that:

9    "The analysis provides no evidence for an excess of CV events for

10   rofecoxib relative to either placebo or the non-naproxen NSAIDs

11   that were studied."  Did I read that right?

12   A.  You did.

13   Q.  Now, sir, have you ever seen a document from one Merck

14   scientist to another that described that conclusion as wishful

15   thinking?

16   A.  No, sir, I have not.

17   Q.  Going to Table 3.  Do you see that the rheumatoid arthritis

18   population is elevated at a relative risk of 1.78?

19   A.  I do.

20   Q.  And the osteoarthritis is elevated at a 1.53 relative risk?

21   A.  I do.

22   Q.  And those are in a different direction from Alzheimer's, right?

23   A.  Correct.

24   Q.  So nothing prevented Konstam and the Merck coauthors on this

25   paper from saying that we have three different groups of patients

1    that we've looked at and the relative risk is higher in two of

2    them, they could have put it that way, couldn't they?

3    A.  You can slice it anyway you want to, I guess it's up to the

4    person doing the cooking.

5    Q.  Right.  And the way they sliced it was to lump it altogether

6    and say there was no increased risk; is that right?

7    A.  Oh, I think if you look at what it was defined as being, it was

8    defined that it was going to look at all of the IIB through V

9    trials and that's what they looked at, they looked at all of them

10   and this is a subgroup of those patients with the related to

11   placebo that it's showing here.

12         I am not sure if I follow your question other than that.

13   Q.  Have you ever seen any documents, sir, that indicated that

14   Merck wasn't planing to look at the Alzheimer's data until the

15   trials were done in 2003?

16   A.  No, I wouldn't have access to that.

17   Q.  Well, you would have had access to it if Merck's lawyers

18   provided it to you, wouldn't you?

19   A.  I'm sure I would have, I guess so.

20   Q.  And you do know that this is interim data, right?

21   A.  Yes, sir.

22   Q.  Now --

23         MR. ARBITBLIT:  May I approach, your Honor?

24         THE COURT:  Yes.

25   BY MR. ARBITBLIT:

1   Q.   Do you have your report handy, sir, or not?

2   A.   I do not.

3   Q.   You're familiar with the document that I handed you which is a

4   Table 13 from a pooled update?

5   A.   Yes, sir, I am.

6   Q.   And for that document, that shows all of the RA trials and all

7   of the OA trials and all of the Alzheimer's trials and trials

8   called Others, right?

9   A.   Yes, sir, that's correct.

10  Q.   And again you've got relative risk 2.84 for the osteoarthritis

11  cases, excluding 010, with the confidence interval it's just below

12  1.0, that is 0.97?

13  A.   Yes, sir.

14  Q.   And if you add that event it would go north of 1.0, wouldn't

15  it?

16  A.   I did not do that analysis.

17  Q.   Do you have an opinion as to whether it would?

18  A.   I think I saw it in MacGregor's expert report that he had done

19  it or someone he knew had done it, and he said it did.  So that's

20  the only knowledge I have on it.

21  Q.   You didn't try to do it to prove him wrong?

22  A.   No, I did not.

23  Q.   You have to basis to disagree that the osteoarthritis trials on

24  placebo would have shown about three-fold statistically significant

25  risk when you got through Protocol 136 in 2002, right?

1    A.  If you added that one dose ranging study and ignored the

2    arthritis, the osteoarthritis and the other placebo arm, for

3    instance the Alzheimer's group, and you just cut and diced it that

4    way, I'll speculate that you're correct based on MacGregor's quote,

5    but I don't have any independent verification.

6    Q.  Well, that osteoarthritis study block was created by Merck,

7    wasn't it?

8    A.  Yes, sir.

9    Q.  And the rheumatoid arthritis group was also created by Merck,

10   right?

11   A.  Yes, sir.

12   Q.  And the relative risk there was not statistically significant

13   but it was higher than three, wasn't it?

14   A.  Yes, sir.

15   Q.  And nobody made Merck add them altogether and come out with

16   insignificance, right, that was their choice?

17   A.  Well, as I recall the way this was organized, this was to

18   report all of the adverse events across study blocks and not to try

19   to do any subgroup analysis.

20   Q.  Well, who decided that?

21   A.  Merck and the advisory group that they had advising them.  I

22   think it was back in '99 but I don't honestly remember the year.

23   Q.  Your testimony is that in 1999 Merck decided to add the

24   Alzheimer's trial to the osteoarthritis and the RA?

25   A.  No, sir.  My testimony is that there was a standard operating

1  agreement or procedure employed to look at thrombotic events and to

2  not do subgroup analysis.  That's the way I read it.

3  Q.  Did you ever see a document that said that the studies would

4  actually be looked at precisely by date of completion and the

5  indication of use so that there would, in fact, be a plan to look

6  at osteoarthritis alone, rheumatoid arthritis alone, did you ever

7  see that document?

8  A.  Not that I recall.

9      MR. ARBITBLIT:  Your Honor, it's 12:05.  I don't know

10  what your Honor's thoughts are.  I probably have about an hour to

11  go.

12      THE COURT:  Why don't we stop then and come back at 1:30.

13  The court will stand in recess until 1:30.

14      THE DEPUTY CLERK:  Everyone rise.

15    (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

16

17                    *  *  *  *  *  *

18

19                REPORTER'S CERTIFICATE

20    I, Karen A. Ibos, CCR, Official Court Reporter, United
  States District Court, Eastern District of Louisiana, do hereby
21  certify that the foregoing is a true and correct transcript, to the
  best of my ability and understanding, from the record of the
22  proceedings in the above-entitled and numbered matter.

23

24

25    Karen A. Ibos, CCR, RPR, CRR
  Official Court Reporter