1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4
IN RE:  VIOXX PRODUCTS            *
5          LIABILITY LITIGATION       *
                                   *
6   This Document Relates to:        *   MDL No. 1657
                                   *
7       STATE OF LOUISIANA, *ex rel.* *   Section L
        JAMES D. CALDWELL JR.,       *
8       Attorney General             *   New Orleans, Louisiana
                                   *
9          versus                    *   April 19, 2010
                                   *
10   MERCK & CO., INC.               *   1:30 p.m.
                                   *
11                                   *
        Case No. 05-CV-3700          *
12   * * * * * * * * * * * * * * * * *

13

14
                 TRIAL PROCEEDINGS BEFORE THE
15                HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE
16                DAY 6, AFTERNOON SESSION

17
APPEARANCES:
18

19   For the Plaintiff:          Dugan Law Firm
                              BY:  JAMES R. DUGAN II, ESQ.
20                            650 Poydras Street, Suite 2150
                              New Orleans, Louisiana 70130
21

22   For the Plaintiff:          Murray Law Firm
                              BY:  STEPHEN B. MURRAY JR., ESQ.
23                                 DOUGLAS R. PLYMALE, ESQ.
                                   JUSTIN BLOOM, ESQ.
24                            650 Poydras Street, Suite 2150
                              New Orleans, Louisiana 70130
25

                        DAILY COPY

```
 1    For the Plaintiff:          Lieff Cabraser Heimann
                                    & Bernstein, LLP
 2                               BY:  DONALD C. ARBITBLIT, ESQ.
                                 275 Battery Street, Suite 3000
 3                               San Francisco, California 94111

 4
      For the Defendant:         Goldman Ismail Tomaselli
 5                                 Brennan & Baum, LLP
                                 BY:  TAREK ISMAIL, ESQ.
 6                                    BRIAN P. O'DONOGHUE, ESQ.
                                 1 North Franklin Street, Suite 625
 7                               Chicago, Illinois 60606

 8
      For the Defendant:         Baker Botts, LLP
 9                               BY:  TRAVIS J. SALES, ESQ.
                                 910 Louisiana Street
10                               Houston, Texas 77002

11
      For the Defendant:         O'Melveny & Myers, LLP
12                               BY:  SCOTT M. VOELZ, ESQ.
                                 400 South Hope Street
13                               Los Angeles, California 90071

14
      Official Court Reporter:   Toni Doyle Tusa, CCR, FCRR
15                               500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana 70130
16                               (504) 589-7778

17

18

19

20

21

22

23

24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer.
```

DAILY COPY

1                                **I N D E X**

2                                                              PAGE

3   Clement Eiswirth
         Cross-Examination                          1017
4        Redirect Examination                        1045

5

    Steven Wiggins
6        Voir Dire                                   1070
         Direct Examination                          1075
7        Cross-Examination                           1086
         Redirect Examination                        1099

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 13:10 | 1 | **<u>AFTERNOON SESSION</u>** |
| 13:13 | 2 | **(April 19, 2010)** |
| 13:13 | 3 | **THE DEPUTY CLERK:**  Everyone rise. |
| 13:32 | 4 | **THE COURT:**  Be seated, please.  Good afternoon, |
| 13:32 | 5 | ladies and gentlemen. |
| 13:32 | 6 | You are still under cross, Doctor. |
| 13:32 | 7 | **THE WITNESS:**  Yes, sir. |
| 13:32 | 8 | **THE COURT:**  You may proceed, Counsel. |
| 13:32 | 9 | **MR. ARBITBLIT:**  One housekeeping matter, Your Honor. |
| 13:32 | 10 | **THE COURT:**  Yes. |
| 13:32 | 11 | **MR. ARBITBLIT:**  There were a few documents that were |
| 13:32 | 12 | referenced this morning that we would like to tender for |
| 13:32 | 13 | admission.  There was 287, which is the summary minutes of the |
| 13:32 | 14 | FDA advisory committee that the witness testified about. |
| 13:32 | 15 | **THE COURT:**  I'm going to admit those. |
| 13:32 | 16 | **MR. ARBITBLIT:**  There was 129, which was the excerpt |
| 13:32 | 17 | from the integrated safety summary, with the tables E73 and 74. |
| 13:33 | 18 | It's a Merck document. |
| 13:33 | 19 | **THE COURT:**  I'll admit that. |
| 13:33 | 20 | **MR. ARBITBLIT:**  There was 800, which was a new number |
| 13:33 | 21 | we gave one that didn't have one, which was the e-mail that |
| 13:33 | 22 | referenced the marketing issue with the cardiovascular paper. |
| 13:33 | 23 | **THE COURT:**  I'll admit it. |
| 13:33 | 24 | **MR. ARBITBLIT:**  The last one is 505, which was the |
| 13:33 | 25 | draft of the Konstam article. |

| | | |
|---|---|---|
| 13:33 | 1 | **THE COURT:** I'll admit that. |
| 13:33 | 2 | **MR. ARBITBLIT:** Thank you, Your Honor. |
| 13:33 | 3 | **THE COURT:** I hate to introduce the whole document. |
| 13:33 | 4 | I think that the pertinent part of it that you used was the |
| 13:33 | 5 | title. Wasn't that the basic -- |
| 13:33 | 6 | **MR. ARBITBLIT:** Well, I would just say that it is |
| 13:33 | 7 | relevant beyond that simply to show that the document itself |
| 13:33 | 8 | had been drafted in pretty much final form by Merck. |
| 13:33 | 9 | **THE COURT:** I'll admit that for that purpose and not |
| 13:34 | 10 | for any other purpose. |
| 13:34 | 11 | **MR. ARBITBLIT:** Thank you, Your Honor. |
| 13:34 | 12 | **THE COURT:** Okay. |
| 13:32 | 13 | (WHEREUPON **Clement Eiswirth**, having been duly sworn, |
| 13:32 | 14 | testified as follows.) |
| 13:34 | 15 | **CROSS-EXAMINATION** |
| 13:34 | 16 | BY MR. ARBITBLIT: |
| 13:34 | 17 | **Q.** Doctor, as a cardiologist -- oh, good afternoon, sir. |
| 13:34 | 18 | **A.** Good afternoon. |
| 13:34 | 19 | **Q.** I didn't want to skip that. As a cardiologist, what is |
| 13:34 | 20 | the significance to you of chest pain? |
| 13:34 | 21 | **A.** It depends upon many issues in terms of just beyond that |
| 13:34 | 22 | diagnosis. You would want to know the quality, the duration. |
| 13:34 | 23 | You would have to look at it in terms of the clinical, what you |
| 13:34 | 24 | expound for that. In other words, there are many potential |
| 13:34 | 25 | causes of chest pain. |

1018

| | | |
|---|---|---|
| 13:34 | 1 | **Q.**   Is chest pain a sign that can be associated with |
| 13:34 | 2 | cardiovascular events? |
| 13:34 | 3 | **A.**   It can be.  But, in honesty, if you look at the diagnosis |
| 13:34 | 4 | of chest pain or the complaint of chest pain, it's more likely |
| 13:34 | 5 | a noncardiac event than a cardiac event. |
| 13:34 | 6 | **Q.**   If you were to see a clinical trial that had 38 complaints |
| 13:34 | 7 | of chest pain in one group and zero in another, would you be |
| 13:35 | 8 | concerned about that and want to look into it? |
| 13:35 | 9 | **A.**   I would definitely want to look into it and see what was |
| 13:35 | 10 | going on with that, yes. |
| 13:35 | 11 | **Q.**   There's a table for you, sir.  This is Table E36 from one |
| 13:35 | 12 | of the clinical trials.  Do you see, sir, that there's a |
| 13:35 | 13 | highlighted column for chest pain for an adverse event that was |
| 13:36 | 14 | recorded in the trial? |
| 13:36 | 15 | **A.**   I do. |
| 13:36 | 16 | **Q.**   Do you see that there was zero complaints of that type of |
| 13:36 | 17 | pain for placebo? |
| 13:36 | 18 | **A.**   I do. |
| 13:36 | 19 | **Q.**   Can you add up the number of complaints of chest pain for |
| 13:36 | 20 | the different doses of Vioxx, please. |
| 13:36 | 21 | **A.**   38. |
| 13:36 | 22 | **Q.**   That's in six-month studies; right?  Of Vioxx versus |
| 13:36 | 23 | placebo? |
| 13:36 | 24 | **A.**   That's what the title of this table would indicate, yes, |
| 13:36 | 25 | sir. |

DAILY COPY

1019

| | | |
|---|---|---|
| 13:36 | 1 | **Q.**   Now, how about if you saw a study where there was a |
| 13:37 | 2 | statistically significant increased risk of both chest pain and |
| 13:37 | 3 | hypertension in a clinical trial comparing a drug to placebo? |
| 13:37 | 4 | Do you think that would catch your eye? |
| 13:37 | 5 | **A.**   It would probably depend upon other factors than just |
| 13:37 | 6 | those numbers, but it would certainly lead someone to look at |
| 13:37 | 7 | it. |
| 13:37 | 8 |                    **MR. ARBITBLIT:**  May I approach, Your Honor? |
| 13:37 | 9 |                    **THE COURT:**  Yes. |
| 13:37 | 10 | **BY MR. ARBITBLIT:** |
| 13:37 | 11 | **Q.**   This is from Protocol 045 from the Merck submissions. |
| 13:37 | 12 | It's got an October 21, 1998 date on the inside first page.  Do |
| 13:37 | 13 | you see that? |
| 13:38 | 14 | **A.**   Yes, sir. |
| 13:38 | 15 | **Q.**   If you could turn to the page ending in "5469." |
| 13:38 | 16 | **A.**   I have it. |
| 13:38 | 17 | **Q.**   Do you see there's a 50-milligram dose, with chest pain |
| 13:38 | 18 | reported at 3.6 percent versus zero for placebo? |
| 13:38 | 19 | **A.**   I do. |
| 13:38 | 20 | **Q.**   If you go over to the next page, at the bottom, do you see |
| 13:38 | 21 | that a star next to a number indicates that the p-value is less |
| 13:38 | 22 | than 0.05? |
| 13:38 | 23 | **A.**   I do. |
| 13:38 | 24 | **Q.**   Do you understand that to represent statistical |
| 13:38 | 25 | significance as generally accepted? |

DAILY COPY

| | | |
|---|---|---|
| 13:38 | 1 | **A.**   Yes, sir. |
| 13:38 | 2 | **Q.**   On that same next page, is there a table that shows |
| 13:38 | 3 | systolic blood pressure exceeding what's called the "predefined |
| 13:39 | 4 | limit of change," which is involved with an increase of more |
| 13:39 | 5 | than 20 millimeters and an absolute value greater than |
| 13:39 | 6 | 140 millimeters of mercury? |
| 13:39 | 7 | **A.**   I see that. |
| 13:39 | 8 | **Q.**   Do you see that both doses of Vioxx, 25 and 50, involve |
| 13:39 | 9 | statistically significant increases compared to placebo, with a |
| 13:39 | 10 | 20.9 and 27.3 percent? |
| 13:39 | 11 | **A.**   I see that. |
| 13:39 | 12 | **Q.**   Did you ever see this data published anywhere? |
| 13:39 | 13 | **A.**   No, sir. |
| 13:39 | 14 | **Q.**   You didn't see it in a monograph either, did you? |
| 13:39 | 15 | **A.**   I saw something in the monograph that talked about |
| 13:39 | 16 | hypertension being increased and they compared it not to |
| 13:39 | 17 | placebo but to the other active comparators, which would make |
| 13:39 | 18 | more sense clinically, so I think it was disclosed in the |
| 13:40 | 19 | monograph. |
| 13:40 | 20 | **Q.**   You saw something in the monograph.  Why don't you turn to |
| 13:40 | 21 | that monograph.  Let's go to the 2003 monograph that you looked |
| 13:40 | 22 | at earlier. |
| 13:40 | 23 |       So do you see that, on page 10 of the 2003 monograph, |
| 13:40 | 24 | which ends in "3347," there's a reference to hypertension and |
| 13:40 | 25 | edema, Celebrex and Vioxx? |

1021

| | | |
|---|---|---|
| 13:40 | 1 | **A.**   I do. |
| 13:40 | 2 | **Q.**   That study reported greater hypertension on Vioxx; right? |
| 13:40 | 3 | **A.**   This study did, yes. |
| 13:40 | 4 | **Q.**   Then at the end of that it says the study was supported by |
| 13:40 | 5 | the manufacturer of celecoxib; right? |
| 13:41 | 6 | **A.**   Yes, it was.  It's supported by the manufacturer, not |
| 13:41 | 7 | reported.  I think it says "supported." |
| 13:41 | 8 | **Q.**   I may have misspoken.  This study was supported by the |
| 13:41 | 9 | manufacturer of celecoxib; correct? |
| 13:41 | 10 | **A.**   Correct. |
| 13:41 | 11 | **Q.**   And that's fair to say, that some competitor sponsored it; |
| 13:41 | 12 | right? |
| 13:41 | 13 | **A.**   That's correct.  That would mean Pfizer sponsored it. |
| 13:41 | 14 | **Q.**   Now, did you ever see any reference in the monograph from |
| 13:41 | 15 | Merck saying:  We did a study and it shows the same thing? |
| 13:41 | 16 | **A.**   I didn't, but I don't think Merck wrote this monograph. |
| 13:41 | 17 | **Q.**   Well, this monograph, sir, was written based on what was |
| 13:41 | 18 | in the peer-reviewed literature; right? |
| 13:41 | 19 | **A.**   You would have to ask Provider Synergies what they used |
| 13:41 | 20 | for their database because my understanding is they had |
| 13:41 | 21 | information other than the peer-reviewed. |
| 13:41 | 22 | **Q.**   Well, take a look at the references at the back of the |
| 13:42 | 23 | document, sir.  Do you see a series of peer-reviewed literature |
| 13:42 | 24 | and labels? |
| 13:42 | 25 | **A.**   Yes, sir. |

| | | |
|---|---|---|
| 13:42 | 1 | **Q.**   Do you see anything else? |
| 13:42 | 2 | **A.**   No, I don't.  I haven't really read it that detailed.  Do |
| 13:42 | 3 | you want me to take the time to do that or -- |
| 13:42 | 4 | **Q.**   Well, sure, take a look.  See if you spot anything besides |
| 13:42 | 5 | the package inserts and peer-reviewed literature. |
| 13:43 | 6 | **A.**   No, sir, it does not. |
| 13:43 | 7 | **Q.**   Just the peer-reviewed literature and the label; right? |
| 13:43 | 8 | **A.**   That is correct. |
| 13:43 | 9 | **MR. ARBITBLIT:**  May I approach, Your Honor? |
| 13:43 | 10 | **THE COURT:**  Yes. |
| 13:43 | 11 | **BY MR. ARBITBLIT:** |
| 13:43 | 12 | **Q.**   Sir, have you heard of Protocol 112 before today? |
| 13:43 | 13 | **A.**   I may have heard of it from a different -- by name, but I |
| 13:43 | 14 | can't honestly say.  I've seen stuff by Chen.  I can't tell you |
| 13:43 | 15 | if I knew it by that protocol name.  I'm honestly not sure.  Is |
| 13:43 | 16 | it named anywhere?  I probably -- |
| 13:43 | 17 | **MR. ARBITBLIT:**  May we have this marked as 801, |
| 13:43 | 18 | Your Honor, for identification? |
| 13:44 | 19 | **THE COURT:**  All right. |
| 13:44 | 20 | **BY MR. ARBITBLIT:** |
| 13:44 | 21 | **Q.**   Sir, do you see on the front page this is a |
| 13:44 | 22 | placebo-controlled trial comparing rofecoxib (Vioxx) 12.5 and |
| 13:44 | 23 | 25 milligrams with celecoxib 200 milligrams? |
| 13:44 | 24 | **A.**   I see that. |
| 13:44 | 25 | **Q.**   If you could go to the last page of the document, there is |

| 13:44 | 1 | a table, Table 63, which again reports this statistic that |
| 13:44 | 2 | Merck was looking at called "exceeding predefined limits of |
| 13:44 | 3 | change for hypertension."  Do you see that? |
| 13:44 | 4 | **A.**   I do. |
| 13:44 | 5 | **Q.**   In the table below, there's a row that says "Systolic |
| 13:44 | 6 | Blood Pressure."  Right? |
| 13:44 | 7 | **A.**   Yes, sir. |
| 13:44 | 8 | **Q.**   For the predefined limits of change, that's defined as an |
| 13:45 | 9 | increase of 20 millimeters at a value of 140 or greater? |
| 13:45 | 10 | **A.**   Yes, sir. |
| 13:45 | 11 | **Q.**   Do you see that the rofecoxib incidence was 10.0 percent |
| 13:45 | 12 | for the 12.5-milligram group and 10.5 percent for the |
| 13:45 | 13 | 25-milligram group? |
| 13:45 | 14 | **A.**   Yes, sir. |
| 13:45 | 15 | **Q.**   Then you compare that to Celebrex in the next row.  The |
| 13:45 | 16 | percent was 5.3? |
| 13:45 | 17 | **A.**   Yes, sir. |
| 13:45 | 18 | **Q.**   And the placebo was 4.8; right? |
| 13:45 | 19 | **A.**   That's correct. |
| 13:45 | 20 | **Q.**   Now, if you look at the page ending in "1281," at the top |
| 13:45 | 21 | of this document -- |
| 13:46 | 22 | **A.**   I have it. |
| 13:46 | 23 | **Q.**   -- do you see in the middle of that first paragraph the |
| 13:46 | 24 | word *approximately*? |
| 13:46 | 25 | **A.**   Yes, sir. |

1024

13:46  1   **Q.**    "Approximately 10 percent, 10.5 percent, 5.3 percent, and

13:46  2   4.8 percent of the patients in rofecoxib 12.5 milligrams,

13:46  3   rofecoxib 25 milligrams, Celebrex 200 milligrams, and placebo,

13:46  4   respectively, exceeded the predefined limits of change for

13:46  5   systolic blood pressure."

13:46  6           Did I read that correctly?

13:46  7   **A.**    You did.

13:46  8   **Q.**    The difference between rofecoxib 25 milligrams and placebo

13:46  9   was statistically significant, P=0.046.  The difference between

13:46  10  each of the rofecoxib groups and Celebrex 200 milligrams was

13:46  11  statistically significant, P=0.004, rofecoxib 25 milligrams.

13:46  12  And versus Celebrex 200 milligrams, P=0.012, rofecoxib 12.5

13:47  13  versus Celebrex 200.  Right?

13:47  14  **A.**    I see that, yes, sir.  That's correct.

13:47  15  **Q.**    So in this study, Protocol 112, the Vioxx group had a

13:47  16  statistically significant doubling of the incidence of

13:47  17  exceeding predefined limits of change with spikes of

13:47  18  20 millimeters of mercury in the systolic; right?

13:47  19  **A.**    That's correct.

13:47  20  **Q.**    You didn't see this in the Provider Synergies monograph

13:47  21  showing the plaintiff that Merck's study agreed with the

13:47  22  manufacturer of Celebrex, did you?

13:47  23  **A.**    I did not see this data.  I saw similar data reported.

13:47  24  Not compared to placebo, obviously, but to Celebrex.

13:47  25  **Q.**    Sir, did you ever see any data anywhere where Merck said,

DAILY COPY

| | | |
|---|---|---|
| 13:47 | 1 | "We cause more hypertension than Celebrex"? |
| 13:48 | 2 | **A.**   No, sir. |
| 13:48 | 3 | **Q.**   It's not in the label either; right? |
| 13:48 | 4 | **A.**   In the label, they have discussion about the hypertension |
| 13:48 | 5 | risk. |
| 13:48 | 6 | **Q.**   There's nothing in the label that says Vioxx was studied |
| 13:48 | 7 | and had more people exceeding predefined limits of change than |
| 13:48 | 8 | there were in Celebrex; right? |
| 13:48 | 9 | **A.**   I do not recall that being in the label, no, sir. |
| 13:48 | 10 | **MR. ARBITBLIT:**  May I approach, Your Honor? |
| 13:48 | 11 | **THE COURT:**  Yes. |
| 13:48 | 12 | **MR. ARBITBLIT:**  Before we move on, may we ask that |
| 13:48 | 13 | 801 be admitted, Your Honor? |
| 13:48 | 14 | **THE COURT:**  Let it be admitted. |
| 13:48 | 15 | **MR. ARBITBLIT:**  Thank you. |
| 13:48 | 16 | **THE COURT:**  Admitted. |
| 13:48 | 17 | **BY MR. ARBITBLIT:** |
| 13:48 | 18 | **Q.**   This next document is a Merck e-mail. |
| 13:49 | 19 | **MR. ARBITBLIT:**  May we have it marked as 802 for |
| 13:49 | 20 | identification. |
| 13:49 | 21 | **BY MR. ARBITBLIT:** |
| 13:49 | 22 | **Q.**   This is from Tom Cannell to Jim Dunn, dated April 12, |
| 13:49 | 23 | 2001. |
| 13:49 | 24 | By the way, do you see the date on this one that you |
| 13:49 | 25 | were just looking at was April 11, 2001? |

1026

| | | |
|---|---|---|
| 13:49 | 1 | **A.**   Okay. |
| 13:49 | 2 | **Q.**   So the statistical report for Protocol 112 is dated |
| 13:49 | 3 | April 11, and the next day here's this e-mail from Tom Cannell; |
| 13:49 | 4 | right? |
| 13:49 | 5 | **A.**   Right. |
| 13:49 | 6 | **THE COURT:**  Is it from Tom Cannell or from Michael |
| 13:49 | 7 | Butala? |
| 13:49 | 8 | **MR. ARBITBLIT:**  Your Honor, I'm looking at the top |
| 13:49 | 9 | e-mail, which appears to be from Mr. Cannell to Mr. Dunn. |
| 13:49 | 10 | **THE COURT:**  I see it. |
| 13:49 | 11 | **BY MR. ARBITBLIT:** |
| 13:49 | 12 | **Q.**   So the first line says -- |
| 13:49 | 13 | **A.**   Wait.  Can I correct one thing that I think you may have |
| 13:50 | 14 | misspoke on?  I'm not sure. |
| 13:50 | 15 | **Q.**   Yes, sir. |
| 13:50 | 16 | **A.**   This says the statistical report draft is prepared |
| 13:50 | 17 | April 11, 2001, but the one I'm reading on has a bottom date of |
| 13:50 | 18 | 4-12-02.  So I'm not sure what differences may have been made |
| 13:50 | 19 | in the draft from 2001 and the report I'm looking at, which is |
| 13:50 | 20 | 2002. |
| 13:50 | 21 | **Q.**   Can you go back to that first table we looked at with the |
| 13:50 | 22 | statistical significance on the back page of the statistical |
| 13:50 | 23 | report, and do you see the date in the upper right is |
| 13:50 | 24 | January 9, 2001? |
| 13:50 | 25 | **A.**   Yes, sir. |

1027

| | | |
|---|---|---|
| 13:50 | 1 | **Q.**   Then there's a report from Chen, April 11, 2001, labeled |
| 13:50 | 2 | "Draft," with this data in it? |
| 13:50 | 3 | **A.**   Yes, sir. |
| 13:50 | 4 | **Q.**   Now, on April 12, Tom Cannell writes to Jim Dunn: |
| 13:50 | 5 | "Not for this communication, but I'll also say that |
| 13:50 | 6 | eventually I think we should step up to the fact that we |
| 13:50 | 7 | probably do cause a little more hypertension/edema, |
| 13:50 | 8 | particularly in the marketplace where V-25 and C-200 are the |
| 13:51 | 9 | most common doses." |
| 13:51 | 10 | Did I read that correctly? |
| 13:51 | 11 | **A.**   Yes, sir. |
| 13:51 | 12 | **Q.**   Is "V-25" Vioxx 25 milligrams and "C-200" is Celebrex? |
| 13:51 | 13 | **A.**   That's the way I would interpret that. |
| 13:51 | 14 | **Q.**   Did you ever see Merck step up to the fact that they |
| 13:51 | 15 | probably cause a little more hypertension than Celebrex in the |
| 13:51 | 16 | marketplace? |
| 13:51 | 17 | **A.**   I can't say it was Merck, but I know that that data was |
| 13:51 | 18 | out there. |
| 13:51 | 19 | **Q.**   What data was out there, sir? |
| 13:51 | 20 | **A.**   That there's a greater hypertension risk in the Vioxx |
| 13:51 | 21 | group than the Celebrex group.  That was in the monograph. |
| 13:51 | 22 | **Q.**   That was in the monograph from the Celebrex manufacturer; |
| 13:51 | 23 | right? |
| 13:51 | 24 | **A.**   That was in the study supported by the manufacturer of |
| 13:51 | 25 | Celebrex. |

| | | |
|---|---|---|
| 13:51 | 1 | **Q.**   Do you know whether Merck tried to fight against people |
| 13:51 | 2 | believing that was true? |
| 13:51 | 3 | **A.**   No, I would not have knowledge of that. |
| 13:51 | 4 | **Q.**   But you would know that Merck did not step up to the fact |
| 13:51 | 5 | that they probably cause more hypertension than Celebrex; |
| 13:51 | 6 | right? |
| 13:52 | 7 | **A.**   I can't testify to that either. |
| 13:52 | 8 | **Q.**   You don't know?  You have never seen it; right? |
| 13:52 | 9 | **A.**   I have not seen it.  Well, again, let me correct that |
| 13:52 | 10 | answer:  I have seen it.  I have not seen it in a Merck |
| 13:52 | 11 | publication, which I guess is what you were asking me. |
| 13:52 | 12 | **Q.**   That's right.  I was asking you if you have ever seen a |
| 13:52 | 13 | Merck publication that said, "We cause more hypertension than |
| 13:52 | 14 | Celebrex." |
| 13:52 | 15 | **A.**   No, sir. |
| 13:52 | 16 | **Q.**   Now, have you ever seen any documents that relate spikes |
| 13:52 | 17 | in blood pressure to heart attacks on Vioxx? |
| 13:52 | 18 | **A.**   Not to spikes of blood pressure on heart attacks, no, I |
| 13:52 | 19 | have not seen that. |
| 13:52 | 20 | **Q.**   One of the things that could cause a heart attack would be |
| 13:52 | 21 | something that's enough pressure to knock a plaque loose and |
| 13:52 | 22 | causes a thrombus; couldn't it? |
| 13:52 | 23 | **A.**   I have not heard it described mechanistically like that. |
| 13:52 | 24 | Hypertension is a risk factor for coronary artery disease and |
| 13:53 | 25 | heart attack, though. |

| | | |
|---|---|---|
| 13:53 | 1 | **Q.**   What about the pressure on the plaque?  You have an artery |
| 13:53 | 2 | full of plaque.  If you have more pressure on that pipe, it's |
| 13:53 | 3 | more likely to break something loose; wouldn't that be |
| 13:53 | 4 | reasonable? |
| 13:53 | 5 | **A.**   I don't think that's a reasonable assumption to make. |
| 13:53 | 6 | **Q.**   Okay.  Do you know whether Merck itself found a |
| 13:53 | 7 | relationship between blood pressure spikes and thrombotic |
| 13:53 | 8 | events? |
| 13:53 | 9 | **A.**   I do not. |
| 13:53 | 10 | **Q.**   The next document is marked as P1.2901.  It's an e-mail |
| 13:54 | 11 | dated November 12, 2004, from Merck's statistician, James |
| 13:54 | 12 | Bolognese, to -- actually, from Hui Quan to Jim Bolognese.  Do |
| 13:54 | 13 | you see that? |
| 13:54 | 14 | **A.**   Yes, sir. |
| 13:54 | 15 | **Q.**   The subject is "Systolic Blood Pressure Greater Than or |
| 13:54 | 16 | Equal to 160 and Thrombotic Cardiovascular Serious Adverse |
| 13:54 | 17 | Events in APPROVe and Alzheimer's."  Right? |
| 13:54 | 18 | **A.**   Yes, sir. |
| 13:54 | 19 | **Q.**   So you see on the second page of the document that there |
| 13:54 | 20 | was a statistically significant interaction between systolic |
| 13:55 | 21 | blood pressure spike and treatment in the risk of a thrombotic |
| 13:55 | 22 | event?  It's down at the bottom of the page. |
| 13:55 | 23 | **A.**   I'm not sure where you read that from. |
| 13:55 | 24 | **THE COURT:**  What's the number, 74496? |
| 13:55 | 25 | **MR. ARBITBLIT:**  Yes, Your Honor. |

| | | |
|---|---|---|
| 13:55 | 1 | **THE WITNESS:**  Could you just point me out where you |
| 13:55 | 2 | are on that page. |
| 13:55 | 3 | **BY MR. ARBITBLIT:** |
| 13:55 | 4 | **Q.**   At the bottom:  "Results from APPROVe are shown in |
| 13:55 | 5 | Table 1.  The interaction between systolic blood pressure |
| 13:55 | 6 | spike," "yes" or "no," "and treatment in thrombotic |
| 13:55 | 7 | cardiovascular serious adverse event risks was statistically |
| 13:55 | 8 | significant." |
| 13:55 | 9 | Did I read that correctly? |
| 13:55 | 10 | **A.**   You did. |
| 13:55 | 11 | **Q.**   The last sentence, going on to the next page:  "These data |
| 13:55 | 12 | suggest that nearly all of the excess CV events observed on |
| 13:55 | 13 | rofecoxib versus placebo were in patients with at least one |
| 13:55 | 14 | systolic blood pressure spike.  However, in the placebo group, |
| 13:55 | 15 | the occurrence of SBP spike showed no increased rate in rate of |
| 13:56 | 16 | those events." |
| 13:56 | 17 | Is that right? |
| 13:56 | 18 | **A.**   That's what it says. |
| 13:56 | 19 | **Q.**   Now, sir, your reading of APPROVe, as you have testified |
| 13:56 | 20 | at your deposition, was that you thought that placebo curve |
| 13:56 | 21 | flattened out and that was the -- the only reason for the |
| 13:56 | 22 | difference was the flattening of that curve.  Is that what your |
| 13:56 | 23 | testimony was? |
| 13:56 | 24 | **A.**   I would paraphrase it a little bit differently.  My read |
| 13:56 | 25 | of the study was that the event rates in the first 18 months |

13:56  1  were similar between Vioxx and placebo.  In the second 18

13:56  2  months, the deviation from what the anticipated event rate

13:56  3  would be in a group of patients followed and looking at

13:56  4  expecting Framingham, for instance, database, something like

13:57  5  that.  If you drew those lines on there, your differences at

13:57  6  your placebo curve flattens as opposed to an increase in the

13:57  7  slope of the Vioxx group.

13:57  8  Q.   Have you seen any documents from the APPROVe authors about

13:57  9  what they think about your theory about that flattening?

13:57  10  A.   No, I have not.

13:57  11  Q.   So this is an e-mail.  At the top, it's to Christopher

13:57  12  Lyons at merck.com and Alise Reicin, Ned Braunstein, Joanne

13:57  13  Lahner, "re:  APPROVe paper."  Then down below, there's an

13:58  14  original message from Marvin Konstam; right?

13:58  15  A.   Yes, sir.

13:58  16  Q.   That's the same Konstam who wrote that article you looked

13:58  17  at before; right?

13:58  18  A.   Yes, sir.

13:58  19  Q.   Now, here's what Dr. Konstam says:  "I am deeply concerned

13:58  20  about mentioning the notion that the result relates to a

13:58  21  flattening of the placebo curve.  I believe that this

13:58  22  observation is weak, not supportable by statistics, and of no

13:58  23  identifiable clinical meaning.  Analysis of shapes of curves

13:58  24  are laden with hazards to begin with, and we are already going

13:58  25  out on a limb by emphasizing the 18-month issue.  I feel that

DAILY COPY

| | | |
|---|---|---|
| 13:58 | 1 | mentioning this flattening issue will subject us to the |
| 13:58 | 2 | accusation that we are trying to minimize a key finding, an |
| 13:59 | 3 | adverse effect of rofecoxib." |
| 13:59 | 4 | Did I read that correctly? |
| 13:59 | 5 | **A.**   You did. |
| 13:59 | 6 | **MR. ARBITBLIT:**  May we have that admitted, |
| 13:59 | 7 | Your Honor? |
| 13:59 | 8 | **THE COURT:**  Admitted. |
| 13:59 | 9 | **MR. ARBITBLIT:**  It's P1.2369, but it would be 803, I |
| 13:59 | 10 | believe. |
| 13:59 | 11 | **THE COURT:**  803. |
| 13:59 | 12 | **MR. ARBITBLIT:**  Thank you, Your Honor.  May I have a |
| 13:59 | 13 | moment? |
| 14:00 | 14 | I just have a few more, Your Honor.  May 802 be |
| 14:00 | 15 | admitted? |
| 14:00 | 16 | **THE COURT:**  Admitted. |
| 14:00 | 17 | **MR. ARBITBLIT:**  Thank you, Your Honor. |
| 14:00 | 18 | Now, I just wanted to go back to an area we were |
| 14:00 | 19 | talking about before the lunch break and follow up just for a |
| 14:00 | 20 | moment. |
| 14:01 | 21 | This is originally a defense exhibit, an excerpt |
| 14:01 | 22 | from the integrated safety summary, Your Honor, clinical |
| 14:01 | 23 | safety.  It's been marked as Defense Exhibit 40. |
| 14:01 | 24 | **BY MR. ARBITBLIT:** |
| 14:01 | 25 | **Q.**   What I direct your attention to, sir, is the next-to-last |

1033

| 14:01 | 1 | page, which says "4080" at the bottom. |
| 14:01 | 2 | **A.**   I have it. |
| 14:01 | 3 | **Q.**   Do you see the last paragraph says, "The clinical safety |
| 14:01 | 4 | of a drug is defined by comparison with placebo.  Therefore, |
| 14:01 | 5 | the primary safety evaluation for MK0966" -- |
| 14:02 | 6 | That's Vioxx; right? |
| 14:02 | 7 | **A.**   Yes, sir. |
| 14:02 | 8 | **Q.**   "The primary safety evaluation for Vioxx in this document |
| 14:02 | 9 | is the comparison of the OA clinical dose range with placebo in |
| 14:02 | 10 | the six-week studies using individual between-group |
| 14:02 | 11 | statistics."  Right? |
| 14:02 | 12 | **A.**   Yes, sir. |
| 14:02 | 13 | **Q.**   The reason why they used those studies is because those |
| 14:02 | 14 | are the only ones that have inclusion of placebo in all |
| 14:02 | 15 | studies; right? |
| 14:02 | 16 | **A.**   Yes, sir. |
| 14:02 | 17 | **Q.**   That's the one where the Table E73 that you looked at a |
| 14:02 | 18 | little while ago showed incidence of those thromboembolic |
| 14:02 | 19 | events of 0.2 for placebo, 0.7, 0.8, and 1.0 for the three |
| 14:02 | 20 | Vioxx groups; right?  Do you want to take a look and verify |
| 14:02 | 21 | that? |
| 14:02 | 22 | **A.**   Yes, sir.  Where would that be? |
| 14:02 | 23 | **Q.**   That is at Table E73 that you looked at earlier.  It's the |
| 14:03 | 24 | one with two tables, front and back. |
| 14:03 | 25 | **MR. ARBITBLIT:**  It's got LAAG-129 on the front, |

DAILY COPY

1034

| | | |
|---|---|---|
| 14:03 | 1 | Your Honor. |
| 14:03 | 2 | THE WITNESS:  Is that in this morning's, Paul? |
| 14:03 | 3 | MR. ARBITBLIT:  Yes, it was, sir. |
| 14:03 | 4 | THE COURT:  See if you can give him a hand. |
| 14:03 | 5 | MR. ARBITBLIT:  Thank you, Your Honor.  With the |
| 14:04 | 6 | Court's permission, I will just show him my copy. |
| 14:04 | 7 | THE COURT:  Yes. |
| 14:04 | 8 | THE WITNESS:  I just found it. |
| 14:04 | 9 | BY MR. ARBITBLIT: |
| 14:04 | 10 | Q.   Looking at Table E73, which we were just talking about, |
| 14:04 | 11 | for the six-week studies, those are called the primary safety |
| 14:04 | 12 | analysis; right? |
| 14:04 | 13 | A.   E73, six-week studies, I have them. |
| 14:04 | 14 | Q.   If you look at the incidence of these thromboembolic |
| 14:04 | 15 | cardiovascular adverse experiences, it's .2 in placebo; |
| 14:04 | 16 | correct? |
| 14:04 | 17 | A.   That is correct. |
| 14:04 | 18 | Q.   It's .7 for the 12.5 milligrams; correct? |
| 14:04 | 19 | A.   Correct. |
| 14:04 | 20 | Q.   It's .8 for the 25 milligrams; right? |
| 14:04 | 21 | A.   Yes, sir. |
| 14:04 | 22 | Q.   1.0 for the 50 milligrams? |
| 14:04 | 23 | A.   Yes, sir. |
| 14:04 | 24 | Q.   On the next page, the incidence is 0.8 for placebo, and |
| 14:05 | 25 | 1.2, 1.0, and 1.1 for the three last groups; right? |

DAILY COPY

1035

| | | |
|---|---|---|
| 14:05 | 1 | **A.**   That's correct. |
| 14:05 | 2 | **Q.**   So you can slice the data any way you want, but Merck |
| 14:05 | 3 | called that the primary safety analysis, didn't they? |
| 14:05 | 4 | **A.**   Yes, sir. |
| 14:05 | 5 | **Q.**   Now, Doctor, do you know what the label said the number of |
| 14:05 | 6 | cardiovascular thrombotic -- mortality due to cardiovascular |
| 14:05 | 7 | thrombotic events was when the label was changed in 2002?  Do |
| 14:05 | 8 | you know what the label said about that? |
| 14:05 | 9 | **A.**   What the mortality was? |
| 14:05 | 10 | **Q.**   Yes. |
| 14:05 | 11 | **A.**   I can't recall. |
| 14:05 | 12 | **Q.**   I'll give you a highlighted copy.  Now, there's a |
| 14:06 | 13 | discussion in that 2002 label that includes a reference to the |
| 14:07 | 14 | studies in the elderly, which were the Alzheimer's studies; |
| 14:07 | 15 | right? |
| 14:07 | 16 | **A.**   Yes, sir, it does. |
| 14:07 | 17 | **Q.**   At the end of that discussion, there's a reference to the |
| 14:07 | 18 | cardiovascular mortality from those same two studies, and it |
| 14:07 | 19 | says 8 versus 3; right? |
| 14:07 | 20 | **A.**   8 versus 3 events, right. |
| 14:07 | 21 | **Q.**   It doesn't give you any statistical significance report, |
| 14:07 | 22 | does it? |
| 14:07 | 23 | **A.**   No.  And it doesn't give you the percentage either of |
| 14:07 | 24 | events, what the rates would be. |
| 14:08 | 25 | **Q.**   This document is an article in the *Journal of American* |

DAILY COPY

| | | |
|---|---|---|
| 14:08 | 1 | *Medical Association*, September 2008.  Have you seen it before? |
| 14:08 | 2 | **A.**   Yes, sir. |
| 14:08 | 3 | **Q.**   There's a table that reports the mortality for heart |
| 14:08 | 4 | disease on page 1815 for the Alzheimer's studies; right? |
| 14:08 | 5 | **A.**   Yes, sir. |
| 14:08 | 6 | **Q.**   Was the heart disease mortality 21 versus 6 with the |
| 14:09 | 7 | statistically significant hazard ratio of 3.84 in the |
| 14:09 | 8 | Alzheimer's studies? |
| 14:09 | 9 | **A.**   Yes, sir. |
| 14:09 | 10 | **Q.**   Was that data ever on the Vioxx label? |
| 14:09 | 11 | **A.**   No, sir. |
| 14:09 | 12 | **Q.**   Was that data ever in the Provider Synergies monograph? |
| 14:09 | 13 | **A.**   No, sir. |
| 14:09 | 14 | **Q.**   Now, could you take out that monograph.  Let's look at the |
| 14:09 | 15 | 2003.  That's at tab 3 of the materials you had this morning; |
| 14:09 | 16 | right, sir? |
| 14:09 | 17 | **A.**   Yes, sir. |
| 14:10 | 18 | **Q.**   Now, there's a reference in there to a study that you also |
| 14:10 | 19 | have in your binder by Mukherjee; correct? |
| 14:10 | 20 | **A.**   Yes, sir. |
| 14:10 | 21 | **Q.**   And Topol is on that as well? |
| 14:10 | 22 | **A.**   Yes, sir. |
| 14:10 | 23 | **Q.**   Now, Mukherjee says that you should use -- there's a |
| 14:10 | 24 | cautionary flag about the risks of cardiovascular events; |
| 14:10 | 25 | right? |

1037

| | | |
|---|---|---|
| 14:10 | 1 | **A.**   He said that -- I believe the exact quote was "These |
| 14:10 | 2 | studies raise a cautionary flag" or "This data raises a |
| 14:10 | 3 | cautionary flag." |
| 14:10 | 4 | **Q.**   Let's look at it.  You are very close to it. |
| 14:10 | 5 | "The available data raise a cautionary flag about the |
| 14:10 | 6 | risk of cardiovascular events of COX-2 inhibitors."  Correct? |
| 14:11 | 7 | **A.**   Yes, sir. |
| 14:11 | 8 | **Q.**   Now, if you look at the monograph, the last line of the |
| 14:11 | 9 | reference about Mukherjee says:  "Caution should be used in |
| 14:11 | 10 | interpreting the meta-analysis results."  Right? |
| 14:11 | 11 | **A.**   Where are you?  I'm sorry.  You lost me. |
| 14:11 | 12 | **Q.**   I'm on page 10 of the 2003 monograph. |
| 14:11 | 13 | **A.**   You're on what part of that? |
| 14:11 | 14 | **Q.**   Under "Cardiovascular Events," do you see the reference to |
| 14:11 | 15 | *JAMA*, August 2001? |
| 14:11 | 16 | **A.**   Yes, sir.  I see where you are.  Yeah.  The last sentence |
| 14:11 | 17 | of the first paragraph under "Cardiovascular Events." |
| 14:11 | 18 | **Q.**   Right.  The monograph does not say, "There is a cautionary |
| 14:11 | 19 | flag about the risk of cardiovascular events," does it?  It |
| 14:11 | 20 | does not use that language. |
| 14:11 | 21 | **A.**   No, it does not. |
| 14:12 | 22 | **Q.**   Instead, the caution that's talked about is "Caution |
| 14:12 | 23 | should be used in interpreting the meta-analysis results"; |
| 14:12 | 24 | right? |
| 14:12 | 25 | **A.**   That's correct. |

DAILY COPY

14:12   1    **Q.**   As far as the 2.38 statistically significant excess risk
14:12   2    in the Vioxx arm of the study that Mukherjee, Nissen, and Topol
14:12   3    published, that does not appear in the monograph, does it?
14:12   4    **A.**   No, sir.
14:12   5    **Q.**   The expectation isn't that the plaintiff is going to go
14:12   6    out and read the literature, is it; it's going to rely on the
14:12   7    monograph?
14:12   8              **MR. ISMAIL:**  Objection, Your Honor.
14:12   9              **THE COURT:**  Yes, that's pushing it a little bit.
14:12   10   Let's see what's in the monograph.  Sustained.
14:12   11   **BY MR. ARBITBLIT:**
14:12   12   **Q.**   The same cardiovascular event concerns section closes with
14:13   13   references to two studies published by Merck and its
14:13   14   consultants, Reicin and Konstam; right?
14:13   15   **A.**   That's correct.
14:13   16   **Q.**   Both of those offered reassurance that there was no
14:13   17   difference in the risk; correct?
14:13   18   **A.**   They both reported the risk versus placebo, and they
14:13   19   reported the risk versus NSAIDs, and they reported the risk
14:13   20   versus the non-naproxen NSAIDs.  They did comment that the
14:13   21   relative risk for the cardiovascular thrombotic events for
14:13   22   Vioxx compared to other non-naproxens was 0.79 and compared to
14:13   23   naproxen it was 1.69.  That's what it says, so it does break
14:13   24   out the naproxen group.
14:13   25   **Q.**   Reicin and colleagues reviewed a Phase IIb/III study.

1039

14:14  1   That's a study that concluded there was no risk; correct?

14:14  2   **A.**   That concluded that there was no risk, that's correct.  If

14:14  3   you remember right, that was all non-naproxen comparators, so

14:14  4   I'm not sure the conclusions were any different.

14:14  5   **Q.**   Do you still have that article?  I think we compared it to

14:14  6   the E73 table, and there was a placebo comparison as well.

14:14  7   **A.**   I don't think I have the Reicin article in my binder up

14:14  8   here, but I should have it from what you gave me this morning.

14:14  9   **Q.**   I believe I gave it to you earlier.  I can help you find

14:14  10  it, if you like, with the Court's permission.

14:14  11           **THE COURT:**  Yes.

14:15  12           **MR. ARBITBLIT:**  Thank you.

14:15  13           **THE WITNESS:**  I have the Reicin article.

14:15  14  **BY MR. ARBITBLIT:**

14:15  15  **Q.**   Okay.  The Reicin article at page 207 has a table that

14:15  16  compares Vioxx to placebo, as well as Vioxx to other NSAIDs;

14:15  17  right?

14:15  18  **A.**   It does.

14:15  19  **Q.**   Do you know which osteoarthritis studies Reicin left out

14:15  20  of this table?

14:15  21  **A.**   The 010 trial.

14:15  22  **Q.**   Any others that were completed as of the date of this

14:15  23  article?

14:15  24  **A.**   Not that I'm aware of.  Not that I can think of anyway.

14:15  25  **Q.**   Do you know if the 085 and 090 trials that were mentioned

DAILY COPY

1040

14:15  1   in the Mukherjee article were completed by this time?

14:16  2   A.   I do not know.  But as I recall, this was to look at the

14:16  3   preapproval trials, is what she had said, and that she was

14:16  4   going after to report.  So I'm not sure if they were -- I don't

14:16  5   know if they were preapproval trials.

14:16  6   Q.   Is there anywhere in the Reicin article where the authors

14:16  7   say whether there have been additional osteoarthritis trials

14:16  8   that are not included in the analysis?

14:16  9   A.   Not that I'm aware of, but I didn't really look for that

14:16  10  verbiage.  I think, if I remember right, she said up front that

14:16  11  what this was was to look at the preapproval IIb/III trials.

14:16  12  Q.   Any scientific reason why you wouldn't include more

14:16  13  osteoarthritis patients four years later, when you're

14:16  14  publishing an article to tell the public about whether there's

14:16  15  a risk with your drug?

14:16  16  A.   I don't know if that was her purpose, but you would have

14:16  17  to ask her what her purpose was.  I would take from this read,

14:17  18  since it was published after Konstam, that that wasn't her

14:17  19  purpose; that she was trying to give the information that was

14:17  20  available for approval.

14:17  21  Q.   Sir, we are looking at an article that does not have

14:17  22  Dr. Konstam as an author.  Take a look at the article with

14:17  23  Reicin.  You will see at the bottom it says "from the Merck

14:17  24  Research Laboratories," and there's no external author

14:17  25  identified on this paper; is that correct?

1041

14:17  1  **A.**   No, but that mischaracterized the point I was trying to

14:17  2  make.  Reicin is looking at IIb/III preapproval trials for

14:17  3  osteoarthritis, and that's what this data reports.  Konstam was

14:17  4  already published when this data came out, so what you're

14:17  5  looking for would already be in that -- should be in that

14:17  6  publication.

14:17  7  **Q.**   Well, if it was already out there, sir, what was the point

14:17  8  of publishing this at all?

14:17  9  **A.**   That's what I told you.  You would have to ask her that.

14:17  10  But I would assume that her point of publishing this was to

14:17  11  show the medical community what they knew based on the

14:17  12  preapproval data.  But she would have to answer what her

14:17  13  motives were.

14:18  14  **Q.**   Well, you did read the e-mail earlier that said the

14:18  15  manuscript was revised multiple times based on marketing input

14:18  16  as this was of highest priority to USHH; right?

14:18  17  **A.**   I don't remember which e-mail and whether that referred to

14:18  18  this trial, but if you are saying that it is, then I will agree

14:18  19  with what you read is correct.  You would have to redirect me

14:18  20  to it to confirm it.

14:18  21          **MR. ARBITBLIT:**  Are there any documents that I have

14:18  22  mentioned that I didn't admit?

14:18  23          **THE DEPUTY CLERK:**  DX-40?  Did you mean to offer it?

14:19  24          **MR. ARBITBLIT:**  I will have to remember what DX-40

14:19  25  was.  I apologize.

DAILY COPY

1042

| | | |
|---|---|---|
| 14:19 | 1 | **THE DEPUTY CLERK:**  Clinical safety Vioxx |
| 14:19 | 2 | documentation, and you showed it. |
| 14:19 | 3 | **MR. ARBITBLIT:**  Yes, I would like to offer that. |
| 14:19 | 4 | That was part of the Merck documents, Your Honor. |
| 14:19 | 5 | **THE COURT:**  I thought it was already in. |
| 14:19 | 6 | **MR. ARBITBLIT:**  Is it? |
| 14:19 | 7 | **THE DEPUTY CLERK:**  No. |
| 14:19 | 8 | **THE COURT:**  It's not.  Okay.  What's the number? |
| 14:19 | 9 | **THE DEPUTY CLERK:**  Defense Exhibit 40. |
| 14:19 | 10 | **THE COURT:**  Defense Exhibit 40 is admitted. |
| 14:19 | 11 | **MR. ARBITBLIT:**  Oh, I have one more thing I wanted to |
| 14:19 | 12 | cover.  I apologize.  The documents just arrived.  I won't take |
| 14:19 | 13 | much time. |
| 14:19 | 14 | BY MR. ARBITBLIT: |
| 14:19 | 15 | Q.   This is the standard operating procedure for the |
| 14:20 | 16 | surveillance monitoring and adjudication of acute |
| 14:20 | 17 | thromboembolic cardiovascular events in the clinical trials of |
| 14:20 | 18 | COX-2 specific inhibitors, dated August 30, 1999, marked as |
| 14:20 | 19 | P1.0094.  Do you see that? |
| 14:20 | 20 | A.   Yes, sir. |
| 14:20 | 21 | Q.   Do you see that, at the bottom of the page marked 19602, |
| 14:20 | 22 | there's a reference to how the analyses will be conducted? |
| 14:21 | 23 | A.   I do. |
| 14:21 | 24 | Q.   What it says there is:  "Analyses will be performed on |
| 14:21 | 25 | blocks of studies grouped according to study design, |

| | | |
|---|---|---|
| 14:21 | 1 | indication, and the timing of their completion"; is that right? |
| 14:21 | 2 | A.   That is correct. |
| 14:21 | 3 | Q.   And *indication* means what it's used for; right? |
| 14:21 | 4 | A.   Yes, sir. |
| 14:21 | 5 | Q.   So an indication would be for osteoarthritis -- |
| 14:21 | 6 | A.   Yes, sir. |
| 14:21 | 7 | Q.   -- or an indication would be for rheumatoid arthritis? |
| 14:21 | 8 | A.   That's correct. |
| 14:21 | 9 | Q.   And an indication would be eventually, if they ever had it |
| 14:21 | 10 | approved, for Alzheimer's; right? |
| 14:21 | 11 | A.   Yes, sir. |
| 14:21 | 12 | Q.   Which never happened, did it? |
| 14:21 | 13 | A.   No, sir. |
| 14:21 | 14 | Q.   And so the timing of the completion, the Alzheimer's |
| 14:21 | 15 | studies weren't due to be completed until 2003; correct? |
| 14:21 | 16 | A.   I believe that's correct. |
| 14:21 | 17 | Q.   This document didn't say to put the Alzheimer's data into |
| 14:22 | 18 | the OA and RA pool, did it? |
| 14:22 | 19 | A.   No, it did not. |
| 14:22 | 20 | Q.   That was a choice Merck made, and they could have made a |
| 14:22 | 21 | different choice, couldn't they? |
| 14:22 | 22 | A.   Sure. |
| 14:22 | 23 |         MR. ARBITBLIT:  Last document, Your Honor. |
| 14:22 | 24 | BY MR. ARBITBLIT: |
| 14:22 | 25 | Q.   This is marked P1.1866.  It's an e-mail with an attachment |

DAILY COPY

1044

| | | |
|---|---|---|
| 14:22 | 1 | of the Konstam article in a draft form, and this is from Briggs |
| 14:22 | 2 | Morrison to Rhoda Sperling, Alice Reicin, Deborah Shapiro, and |
| 14:23 | 3 | several others.  Do you see that? |
| 14:23 | 4 | **A.**   I do. |
| 14:23 | 5 | **Q.**   If you want to take a look at your Konstam article from |
| 14:23 | 6 | your binder just to confirm that the data Dr. Morrison |
| 14:23 | 7 | references are the same as you talked about in Table 3 there |
| 14:23 | 8 | for the RA and OA studies. |
| 14:23 | 9 | **A.**   Yes, sir, I have it. |
| 14:23 | 10 | **Q.**   So the data is the same?  It's talking about the same |
| 14:23 | 11 | Konstam data; right? |
| 14:23 | 12 | **A.**   Right. |
| 14:23 | 13 | **Q.**   The last full paragraph, second -- well, let's start with |
| 14:23 | 14 | the first line.  Does Dr. Morrison say to his colleagues:  "I |
| 14:23 | 15 | guess what I am saying is that the data appears to have been |
| 14:24 | 16 | interpreted to support a preconceived hypothesis rather than |
| 14:24 | 17 | critically reviewing the data to generate hypotheses"?  Is that |
| 14:24 | 18 | what he said? |
| 14:24 | 19 | **A.**   That's what it says. |
| 14:24 | 20 | **Q.**   Then, going on, the second line of the discussion says, |
| 14:24 | 21 | "There was no evidence (emphasis mine)" -- meaning Briggs |
| 14:24 | 22 | Morrison. |
| 14:24 | 23 | "There was no evidence that rofecoxib was associated |
| 14:24 | 24 | with excess CV events compared with either placebo or |
| 14:24 | 25 | non-naproxen NSAIDs.  That seems wishful thinking, not a |

DAILY COPY

1045

| | | |
|---|---|---|
| 14:24 | 1 | critical interpretation of the data." |
| 14:24 | 2 | Did I read that correctly? |
| 14:24 | 3 | **A.**   You did. |
| 14:24 | 4 | **Q.**   That comment never saw the light of day outside of Merck, |
| 14:24 | 5 | did it? |
| 14:24 | 6 | **A.**   Not that I'm aware of. |
| 14:24 | 7 | **MR. ARBITBLIT:**  Thank you, Your Honor.  I have |
| 14:24 | 8 | nothing further except to admit that document if it hasn't |
| 14:24 | 9 | been -- |
| 14:24 | 10 | **THE DEPUTY CLERK:**  The last two were P1.  Did you |
| 14:25 | 11 | want to renumber those? |
| 14:25 | 12 | **MR. ARBITBLIT:**  804 and 805. |
| 14:25 | 13 | **THE COURT:**  Let it be admitted. |
| 14:25 | 14 | **MR. ARBITBLIT:**  Thank you, Your Honor. |
| 14:25 | 15 | **THE DEPUTY CLERK:**  The last one was P1.1866, which is |
| 14:25 | 16 | now 805. |
| 14:25 | 17 | **THE COURT:**  Any redirect? |
| 14:25 | 18 | **MR. ISMAIL:**  Yes, sir.  Do you want to continue or do |
| 14:25 | 19 | you want to take a break now? |
| 14:25 | 20 | **THE COURT:**  How long do you think you will be? |
| 14:25 | 21 | **MR. ISMAIL:**  Not long. |
| 14:25 | 22 | **THE COURT:**  Why don't we keep going. |
| 14:25 | 23 | REDIRECT EXAMINATION |
| 14:25 | 24 | BY MR. ISMAIL: |
| 14:25 | 25 | **Q.**   Good afternoon, Doctor. |

DAILY COPY

| | | |
|---|---|---|
| 14:25 | 1 | **A.**    Good afternoon. |
| 14:25 | 2 | **Q.**    Do you still have in front of you the Antman publication? |
| 14:26 | 3 | I don't know what number the plaintiffs gave it, but it's that |
| 14:26 | 4 | scientific statement.  It was one of the first exhibits they |
| 14:26 | 5 | gave you. |
| 14:26 | 6 | **A.**    I'm having that problem with my left eye. |
| 14:26 | 7 | **Q.**    If you would like, you can follow along on the screen.  If |
| 14:26 | 8 | for any reason you want to get a hard copy, we can do that. |
| 14:26 | 9 | **A.**    Okay. |
| 14:26 | 10 | **Q.**    Just let me know if you can't follow along.  Okay? |
| 14:26 | 11 | **A.**    Okay. |
| 14:26 | 12 | **Q.**    Do you recall counsel showed you this article several |
| 14:26 | 13 | hours ago? |
| 14:26 | 14 | **A.**    Yes, sir. |
| 14:26 | 15 | **Q.**    The Antman publication, I think, came out in 2007, was it? |
| 14:27 | 16 | **A.**    Could you bear with me?  I think I can find that. |
| 14:27 | 17 | **Q.**    Sure.  I've called out the date of, at least, the year of |
| 14:27 | 18 | the publication. |
| 14:27 | 19 | **A.**    I give up.  I have parts of it. |
| 14:27 | 20 | **Q.**    So whenever it came out, sometime in 2007.  Since that |
| 14:27 | 21 | time -- and I think counsel directed your attention to |
| 14:27 | 22 | discussions in there about the views of the author, that there |
| 14:27 | 23 | may be differences amongst the NSAIDs that were the subject of |
| 14:27 | 24 | their discussion. |
| 14:27 | 25 | **A.**    Yes, sir. |

1047

| | | |
|---|---|---|
| 14:28 | 1 | **Q.**   Since the publication of this article, do you know if the |
| 14:28 | 2 | FDA has gone back and amended its decisions memo that we went |
| 14:28 | 3 | through this morning that said there was no ability to |
| 14:28 | 4 | rank-order the COX-2 inhibitors with regard to cardiovascular |
| 14:28 | 5 | risks? |
| 14:28 | 6 | **A.**   No, sir, they have not changed that position. |
| 14:28 | 7 | **Q.**   Do you know whether the FDA has amended the class-wide |
| 14:28 | 8 | labeling that you testified to this morning that describes |
| 14:28 | 9 | cardiovascular risks with all the NSAID class? |
| 14:28 | 10 | **A.**   I do, and they have not changed that label. |
| 14:28 | 11 | **Q.**   Counsel directed your attention to a table here.  Bear |
| 14:28 | 12 | with me one second.  I think he directed you to this table on |
| 14:29 | 13 | page 1635 of the article.  Do you recall having a discussion |
| 14:29 | 14 | about this? |
| 14:29 | 15 | **A.**   I do. |
| 14:29 | 16 | **Q.**   He drew your attention to this drug diclofenac. |
| 14:29 | 17 | **A.**   Yes, sir, I remember that. |
| 14:29 | 18 | **Q.**   Is that a nonselective NSAID? |
| 14:29 | 19 | **A.**   Yes, sir. |
| 14:29 | 20 | **Q.**   Counsel directed your attention to the summary of the data |
| 14:29 | 21 | over here, which shows that diclofenac, by several measures, |
| 14:29 | 22 | has a statistically significant increased cardiovascular risk. |
| 14:29 | 23 | Do you recall that? |
| 14:29 | 24 | **A.**   I do. |
| 14:29 | 25 | **Q.**   I think he asked you whether diclofenac was one of the |

DAILY COPY

| | | |
|---|---|---|
| 14:29 | 1 | drugs that was a comparator for the preapproval arthritis |
| 14:30 | 2 | drugs. |
| 14:30 | 3 | **A.**   He did. |
| 14:30 | 4 | **Q.**   Now, that we are oriented, a couple questions about |
| 14:30 | 5 | diclofenac.  At the time prior to 1999 when the Vioxx studies |
| 14:30 | 6 | were comparing Vioxx to diclofenac, to your knowledge was there |
| 14:30 | 7 | an understanding that diclofenac increased cardiovascular risk? |
| 14:30 | 8 | **A.**   There was no basis for that, and there was no knowledge of |
| 14:30 | 9 | that, no. |
| 14:30 | 10 | **Q.**   So when a comparison was done from Vioxx to diclofenac, |
| 14:30 | 11 | what was the expectation in the medical community as to the |
| 14:30 | 12 | cardiovascular risk of diclofenac:  That it raised it?  Was |
| 14:30 | 13 | neutral?  Decreased it? |
| 14:30 | 14 | **A.**   The medical community assumed back at that time that it |
| 14:30 | 15 | was neutral even compared to placebo because we didn't have any |
| 14:30 | 16 | indication that it was not. |
| 14:30 | 17 | **Q.**   Then counsel pointed out that diclofenac does indeed have |
| 14:31 | 18 | one of the highest relative risks, if not the highest, on this |
| 14:31 | 19 | entire table.  Do you recall that discussion? |
| 14:31 | 20 | **A.**   Yes, sir. |
| 14:31 | 21 | **Q.**   Now, you testified this morning that you have familiarity |
| 14:31 | 22 | with the preferred drug list for Medicaid here in Louisiana; |
| 14:31 | 23 | right? |
| 14:31 | 24 | **A.**   Yes, sir. |
| 14:31 | 25 |          **MR. ISMAIL:**  Your Honor, this document has already |

DAILY COPY

1049

| | | |
|---|---|---|
| 14:31 | 1 | been admitted into evidence.  Would you like another copy? |
| 14:31 | 2 | MR. ARBITBLIT:  Your Honor, it was not used on |
| 14:31 | 3 | direct, and I certainly didn't mention it.  I don't know where |
| 14:31 | 4 | he is going on redirect. |
| 14:31 | 5 | MR. ISMAIL:  I'll tell you where I'm going.  He |
| 14:31 | 6 | pointed out that diclofenac, in 2007, according to the |
| 14:31 | 7 | consensus statement that he brought to the witness, has the |
| 14:32 | 8 | highest cardiovascular risk.  So let's see how Louisiana |
| 14:32 | 9 | Medicaid handled a drug with this relative risk.  The witness |
| 14:32 | 10 | has testified both as a clinician and as an expert. |
| 14:32 | 11 | THE COURT:  I understand.  I'll let him do it. |
| 14:32 | 12 | BY MR. ISMAIL: |
| 14:32 | 13 | Q.   So Exhibit 2165, which is already in evidence, is a copy |
| 14:32 | 14 | of the preferred drug list, at least as of November 2008.  Sir, |
| 14:32 | 15 | would the date of this version of the preferred drug list be |
| 14:32 | 16 | after the publication of that Antman article that counsel went |
| 14:32 | 17 | over with you this morning? |
| 14:32 | 18 | A.   Yes. |
| 14:32 | 19 | Q.   These pages aren't numbered, so it might be easier to |
| 14:33 | 20 | follow along on the screen.  There's a section here called |
| 14:33 | 21 | "Pain Management." |
| 14:33 | 22 | A.   I see it. |
| 14:33 | 23 | Q.   And you will see "Drugs on the PDL"? |
| 14:33 | 24 | A.   Yes, sir. |
| 14:33 | 25 | Q.   If you go to the next page, under the section of |

14:33   1   "Nonsteroidals," right under Celebrex, can you tell us what
14:33   2   drug is there.
14:33   3   A.   Diclofenac.
14:33   4   Q.   Do you see any dose restriction here, for the preferred
14:33   5   drug list, for Celebrex?
14:33   6   A.   I do not.
14:33   7   Q.   Do you still have, sir, the advisory committee memo or
14:33   8   vote, which was Plaintiff Exhibit 287?  It looks like this.
14:33   9   A.   I'm sure I still have it.  This is getting as organized as
14:34   10  my desk.
14:34   11  Q.   Again, if it's easier to follow on the screen, I'm happy
14:34   12  with that too.
14:34   13  A.   I'll follow it on the computer.
14:34   14  Q.   So a couple of questions about this document.  One of the
14:34   15  set of questions counsel asked you was whether the advisory
14:34   16  committee recommended some restrictions for Vioxx in the event
14:34   17  the drug is returned to market.  Do you recall that?
14:34   18  A.   I do.
14:34   19  Q.   There was also votes taken about Celebrex; right?
14:34   20  A.   Yes, sir.
14:34   21  Q.   Do you see that, for the Celebrex vote, the advisory
14:35   22  committee also had a number of suggestions for FDA to take with
14:35   23  regard to Celebrex?
14:35   24  A.   I do.
14:35   25  Q.   Now, these aren't exactly the same in total as the ones

DAILY COPY

| 14:35 | 1 | for Vioxx, but do you see similarities with the actions that |
| 14:35 | 2 | counsel directed your attention to with regard to Vioxx, like |
| 14:35 | 3 | "restrict patient population," "restrict dose"?  I think he |
| 14:35 | 4 | read this line with respect to Vioxx, "provide both known and |
| 14:35 | 5 | unknown information." |
| 14:35 | 6 | Does the advisory committee make similar comments, at |
| 14:35 | 7 | least in part, as to the continued marketing of Celebrex? |
| 14:35 | 8 | A.   They do. |
| 14:35 | 9 | Q.   Now, was there a vote from the advisory committee about an |
| 14:35 | 10 | overall risk/benefit profile of Vioxx? |
| 14:36 | 11 | A.   Yes, sir. |
| 14:36 | 12 | Q.   I think counsel said this advisory committee had 32 |
| 14:36 | 13 | members of expertise in the area that was being discussed.  Did |
| 14:36 | 14 | a majority of the advisory committee determine that the overall |
| 14:36 | 15 | risk/benefit profile for Vioxx supported a marketing of the |
| 14:36 | 16 | drug in the United States? |
| 14:36 | 17 | A.   They did. |
| 14:36 | 18 | Q.   Was this advisory committee taken in February of 2005? |
| 14:36 | 19 | A.   Yes, sir. |
| 14:36 | 20 | Q.   Was that before or after the APPROVe results were known? |
| 14:36 | 21 | A.   After. |
| 14:36 | 22 | Q.   The FDA memorandum dated April 2005 that we went over, the |
| 14:36 | 23 | one with the rank-ordering comments -- |
| 14:36 | 24 | A.   Yes, sir. |
| 14:36 | 25 | Q.   -- did that memorandum make reference to the advisory |

1052

| | | |
|---|---|---|
| 14:37 | 1 | committee that was held in February of 2005? |
| 14:37 | 2 | **A.**   Yes, sir. |
| 14:37 | 3 | **Q.**   Did that memorandum make clear that the FDA scientists |
| 14:37 | 4 | were considering the input of the advisory committee members? |
| 14:37 | 5 | **A.**   It did. |
| 14:37 | 6 | **Q.**   I want to return to the subject of hypertension, if I |
| 14:37 | 7 | could.  I pulled up the monograph from April 2003 that we went |
| 14:37 | 8 | over this morning and counsel, I think, had a couple questions |
| 14:37 | 9 | for you about as well.  There's a section on page 10 that |
| 14:37 | 10 | describes some of the data, for the benefit of the committee, |
| 14:37 | 11 | on hypertension on Vioxx and Celebrex; right? |
| 14:37 | 12 | **A.**   Yes, sir. |
| 14:37 | 13 | **Q.**   I think you were trying to make a point in response to |
| 14:38 | 14 | counsel's questions about Celebrex and Vioxx data.  What, sir, |
| 14:38 | 15 | did you see when you looked at the monograph as to the data |
| 14:38 | 16 | that Provider Synergies chose to include comparing the |
| 14:38 | 17 | hypertensive effects of Vioxx and Celebrex? |
| 14:38 | 18 | **A.**   They showed that Vioxx had a higher hypertensive rate than |
| 14:38 | 19 | did Celebrex. |
| 14:38 | 20 | **Q.**   With respect to the edema information, what's the rate for |
| 14:38 | 21 | Vioxx that they show? |
| 14:38 | 22 | **A.**   9.5 percent. |
| 14:38 | 23 | **Q.**   For Celebrex? |
| 14:38 | 24 | **A.**   4.9 percent. |
| 14:38 | 25 | **Q.**   Is there similar data on systolic blood pressure effects? |

| | | |
|---|---|---|
| 14:38 | 1 | **A.**   Yes, sir. |
| 14:38 | 2 | **Q.**   What was it for Vioxx? |
| 14:38 | 3 | **A.**   Systolic blood pressure was up 17 percent in Vioxx versus |
| 14:38 | 4 | 11 percent in Celebrex. |
| 14:38 | 5 | **Q.**   By the way, the whole concept of hypertension and edema, |
| 14:38 | 6 | do you have a view, sir, as to whether those are known class |
| 14:39 | 7 | effects of all nonsteroidals? |
| 14:39 | 8 | **A.**   Yes, sir. |
| 14:39 | 9 | **Q.**   How long has it been known or have you known about the |
| 14:39 | 10 | class effect of hypertension and edema? |
| 14:39 | 11 | **A.**   Since I was in medical school in the 19 -- do I have to |
| 14:39 | 12 | say that?  In the '80s. |
| 14:39 | 13 | **Q.**   To your knowledge, do all the nonsteroidal labeling |
| 14:39 | 14 | contain warnings about hypertension and edema? |
| 14:39 | 15 | **A.**   Yes, sir. |
| 14:39 | 16 | **Q.**   Do you have an opinion, sir, as to whether the monograph |
| 14:39 | 17 | adequately informs about the potential higher risks of |
| 14:39 | 18 | hypertension with Vioxx compared to Celebrex? |
| 14:39 | 19 | **A.**   Yes, sir.  I think it clearly did. |
| 14:39 | 20 | **Q.**   I think you told counsel there was additionally some data |
| 14:39 | 21 | in the labeling.  Do you still have the label he gave you? |
| 14:40 | 22 | **A.**   I do. |
| 14:40 | 23 | **Q.**   Was the label one of the sources of information that was |
| 14:40 | 24 | listed in the monograph? |
| 14:40 | 25 | **A.**   Yes, sir, it was. |

1054

| | | |
|---|---|---|
| 14:40 | 1 | **Q.**   Is there data regarding hypertension and edema in the |
| 14:40 | 2 | Vioxx label? |
| 14:40 | 3 | **A.**   Yes, sir. |
| 14:40 | 4 | **Q.**   Is there a precaution here in the Vioxx label with regard |
| 14:40 | 5 | to fluid retention, edema, and hypertension? |
| 14:40 | 6 | **A.**   Yes, sir. |
| 14:40 | 7 | **Q.**   Is there data provided with respect to the rate of |
| 14:40 | 8 | hypertension on Vioxx from clinical trials? |
| 14:40 | 9 | **A.**   Yes, sir.  It's comparable. |
| 14:41 | 10 | **Q.**   So do you see on page 4 there's this table of adverse |
| 14:41 | 11 | experiences occurring in the osteoarthritis clinical trials? |
| 14:41 | 12 | **A.**   Yes, sir. |
| 14:41 | 13 | **Q.**   Is there information on placebo, Vioxx, ibuprofen, and |
| 14:41 | 14 | diclofenac? |
| 14:41 | 15 | **A.**   There are. |
| 14:41 | 16 | **Q.**   Is there information here about hypertension? |
| 14:41 | 17 | **A.**   Yes, sir.  It's under the cardiovascular, the second |
| 14:41 | 18 | group. |
| 14:41 | 19 | **Q.**   The information in the label, what does it show with |
| 14:41 | 20 | respect to the effect of Vioxx on hypertension compared to |
| 14:41 | 21 | placebo? |
| 14:41 | 22 | **A.**   That it's increased, as one would expect. |
| 14:41 | 23 | **Q.**   Does the label also contain discussion of hypertension in |
| 14:41 | 24 | the rheumatoid arthritis studies? |
| 14:41 | 25 | **A.**   It does. |

1055

| | | |
|---|---|---|
| 14:41 | 1 | Q.   Is that in the bottom of the middle column on that page we |
| 14:42 | 2 | were just looking at? |
| 14:42 | 3 | A.   Yes, sir. |
| 14:42 | 4 | Q.   What was the comparison that's reflected in this section? |
| 14:42 | 5 | A.   It was a comparison of Vioxx in patients with rheumatoid |
| 14:42 | 6 | arthritis that received 25 milligrams of Vioxx versus naproxen. |
| 14:42 | 7 | Q.   What was the rate disclosed in the label relative to |
| 14:42 | 8 | another treatment option like naproxen? |
| 14:42 | 9 | A.   10 percent versus 4.7 or, basically, a doubling. |
| 14:42 | 10 | Q.   The monograph, counsel asked you about the Reicin article. |
| 14:42 | 11 | A.   Yes, sir. |
| 14:42 | 12 | Q.   Remember that whole exercise you went through where he |
| 14:43 | 13 | gave you tables E73 and 74 about placebo-controlled data, and |
| 14:43 | 14 | then he asked you to compare that to a table in the Reicin |
| 14:43 | 15 | article also looking at placebo data? |
| 14:43 | 16 | A.   I do. |
| 14:43 | 17 | Q.   We'll get to that in a second.  But with respect to the |
| 14:43 | 18 | actual data that Provider Synergies put in the monograph, what |
| 14:43 | 19 | was the comparison that they thought should be included in the |
| 14:43 | 20 | monograph? |
| 14:43 | 21 | A.   To an active drug comparator; in other words, one you are |
| 14:43 | 22 | going to use to treat a patient with. |
| 14:43 | 23 | Q.   Do you see any reporting here of the placebo table from |
| 14:43 | 24 | the Reicin article that counsel directed you to? |
| 14:43 | 25 | A.   No, sir.  There's no reporting of that in here. |

DAILY COPY

| | | |
|---|---|---|
| 14:43 | 1 | **Q.**   Now, the Reicin article, do you still have that? |
| 14:44 | 2 | **A.**   I have it. |
| 14:44 | 3 | **Q.**   In the interest of time, we can do it on the screen here. |
| 14:44 | 4 | Counsel asked whether, as of the publication date of this |
| 14:44 | 5 | article, whether additional osteoarthritis trials had been |
| 14:44 | 6 | completed. |
| 14:44 | 7 | **A.**   Correct. |
| 14:44 | 8 | **Q.**   I think you told him something with regard to that there |
| 14:44 | 9 | were additional data published by this point somewhere else? |
| 14:44 | 10 | **A.**   That's correct. |
| 14:44 | 11 | **Q.**   Could you explain what you were referring to. |
| 14:44 | 12 | **A.**   I was referring to Konstam, something like 23 IIb/III |
| 14:44 | 13 | through V clinical trials, encompassing about 28,000 patients |
| 14:44 | 14 | with over 14,000 patient-years of experience. |
| 14:44 | 15 | **Q.**   Does Dr. Reicin and colleagues make clear anywhere in the |
| 14:44 | 16 | publication that, for this analysis, they were looking at |
| 14:44 | 17 | preapproval studies? |
| 14:44 | 18 | **A.**   They do. |
| 14:44 | 19 | **Q.**   Is that all the way on page 1? |
| 14:45 | 20 | **A.**   It is. |
| 14:45 | 21 | **Q.**   The table that you looked at with plaintiff's counsel is |
| 14:45 | 22 | this Table 3; is that right? |
| 14:45 | 23 | **MR. ARBITBLIT:**  It mischaracterizes.  I looked at |
| 14:45 | 24 | Table 4. |
| 14:45 | 25 | **MR. ISMAIL:**  Oh.  No, you didn't.  You looked at this |

| | | |
|---|---|---|
| 14:45 | 1 | 14 to 4 on Table 3. |
| 14:45 | 2 | MR. ARBITBLIT:  I looked at 4B, Counsel. |
| 14:45 | 3 | MR. ISMAIL:  Okay.  14 to 4 down here, then. |
| 14:45 | 4 | BY MR. ISMAIL: |
| 14:45 | 5 | Q.   Now, do you know, sir, whether -- now, I think he told you |
| 14:45 | 6 | that the eight trials that were analyzed in the integrated |
| 14:45 | 7 | summary of safety were the same eight trials that were reported |
| 14:45 | 8 | in the Reicin article.  Do you recall that? |
| 14:46 | 9 | A.   I believe he did say that. |
| 14:46 | 10 | Q.   Do you know whether all the trials that were reported in |
| 14:46 | 11 | the integrated summary of safety -- well, let's do it this way. |
| 14:46 | 12 | I think he directed you to E73 and E74; is that right? |
| 14:46 | 13 | A.   Yes, sir. |
| 14:46 | 14 | Q.   Just to orient us, that's this table right here and this |
| 14:46 | 15 | table right here? |
| 14:46 | 16 | A.   That is correct. |
| 14:46 | 17 | Q.   Then what he had you do was he had you add up the events |
| 14:46 | 18 | on Vioxx and say, "Gee, there looks to be fewer in the placebo |
| 14:46 | 19 | section of the Reicin table."  Do you recall that discussion? |
| 14:47 | 20 | A.   Yes, sir. |
| 14:47 | 21 | Q.   I'm going to hand you a section of the integrated summary |
| 14:47 | 22 | of safety that includes those tables but actually tells you |
| 14:47 | 23 | whether all those studies are placebo-controlled.  So if you |
| 14:47 | 24 | turn to the second page of the exhibit, I guess we will call |
| 14:47 | 25 | this -- |

1058

| | |
|---|---|
| 14:47 | 1 |

           **MR. ISMAIL:**  Since Exhibit 40 is a very large

14:47    2    submission, folks have been using different sections.  Could we

14:47    3    admit this as DX-40A?

14:47    4            **THE COURT:**  Admitted.

14:47    5            **MR. ISMAIL:**  Thank you, Your Honor.

14:47    6    **BY MR. ISMAIL:**

14:47    7    **Q.**  So here we have -- you told us about Study 010.  What was

14:48    8    that study again?

14:48    9    **A.**  That was a dose-ranging study.

14:48    10    **Q.**  Are the rest of these studies the eight osteoarthritis

14:48    11    trials that were covered both in the integrated summary of

14:48    12    safety and in the Reicin publication?

14:48    13    **A.**  Yes, sir.

14:48    14    **Q.**  If you go down here to studies 334 and 335, can you tell

14:48    15    us whether they had any placebo patients in them.

14:48    16    **A.**  You're talking about 0334 and 0335?

14:48    17    **Q.**  Yes, sir.

14:48    18    **A.**  They did not.

14:48    19    **Q.**  So if you go, then, to tables E72 and E73, these tables

14:48    20    and the totals that counsel had you add up, do they include

14:49    21    trials that were not comparing Vioxx to placebo?

14:49    22    **A.**  I don't believe they are.  The ones we added up, I think

14:49    23    were all placebo-controlled trials.

14:49    24    **Q.**  If tables E73 and E74 include protocols 34 and 35, the

14:49    25    ones we just looked at earlier --

| | | |
|---|---|---|
| 14:49 | 1 | A.   Yes, sir. |
| 14:49 | 2 | Q.   The ones that did not have a placebo arm? |
| 14:49 | 3 | A.   Yes, sir. |
| 14:49 | 4 | Q.   -- would it be the case that these summary statistics here |
| 14:49 | 5 | include those studies which were not placebo-controlled? |
| 14:49 | 6 | A.   That's correct. |
| 14:49 | 7 | Q.   I'm going to hand you what has been marked as Defense |
| 14:50 | 8 | Exhibit 319.  Counsel handed you a couple pages of this |
| 14:50 | 9 | document.  I'm going to hand you the whole thing. |
| 14:50 | 10 | MR. ISMAIL:  I'm not sure if 319 is in evidence or |
| 14:50 | 11 | not, but we would move -- |
| 14:50 | 12 | THE DEPUTY CLERK:  No, it's not. |
| 14:50 | 13 | MR. ISMAIL:  We move the admission of 319, |
| 14:50 | 14 | Your Honor. |
| 14:50 | 15 | THE COURT:  Let it be admitted. |
| 14:50 | 16 | BY MR. ISMAIL: |
| 14:50 | 17 | Q.   Do you recognize this document, sir? |
| 14:50 | 18 | A.   I do. |
| 14:50 | 19 | Q.   Can you tell us what it is. |
| 14:50 | 20 | A.   It's an updated cardiovascular pooled analysis that was |
| 14:50 | 21 | submitted to the FDA in March of 2004. |
| 14:50 | 22 | Q.   Okay.  If you go to page 56 and 57, do you actually see a |
| 14:51 | 23 | line-listing of the various cardiovascular events that occurred |
| 14:51 | 24 | in each of the clinical trials done on Vioxx that are |
| 14:51 | 25 | summarized in this submission?  Are you there? |

DAILY COPY

1060

| | | |
|---|---|---|
| 14:51 | 1 | **A.**   Yes, sir. |
| 14:51 | 2 | **Q.**   Do you see protocols 34 and 35 on page 56 and 57? |
| 14:51 | 3 | **A.**   I do. |
| 14:51 | 4 | **Q.**   We are not going to go through and count these up, but do |
| 14:51 | 5 | you see and can you confirm that there was a large number of |
| 14:51 | 6 | events that are reported here to FDA in those protocols? |
| 14:51 | 7 | **A.**   Yes, sir, there were. |
| 14:51 | 8 | **Q.**   To the extent these events are the types of events that |
| 14:51 | 9 | are included in the integrated summary of safety, tables E73 |
| 14:52 | 10 | and E74, would that include data from nonplacebo-controlled |
| 14:52 | 11 | trials? |
| 14:52 | 12 | **A.**   What I'm looking at now does. |
| 14:52 | 13 | **Q.**   Thank you.  Now, counsel asked you about Table 13 from |
| 14:52 | 14 | this document. |
| 14:52 | 15 | **A.**   Table 13 from which document? |
| 14:52 | 16 | **Q.**   The 2004 pooled analysis. |
| 14:52 | 17 | **A.**   Oh. |
| 14:52 | 18 | **Q.**   I think you identified this as a document that went to |
| 14:52 | 19 | FDA; right? |
| 14:52 | 20 | **A.**   Yes, sir, it went to the FDA. |
| 14:52 | 21 | **Q.**   Now, Table 13, is that this page I have up on the screen? |
| 14:52 | 22 | **A.**   Yes, it is. |
| 14:53 | 23 | **Q.**   I think he directed your attention to the osteoarthritis |
| 14:53 | 24 | block. |
| 14:53 | 25 | **A.**   He did. |

DAILY COPY

| | | |
|---|---|---|
| 14:53 | 1 | **Q.**   Does this analysis show -- by the way, this is a |
| 14:53 | 2 | comparison of Vioxx to what?  What's the comparator here? |
| 14:53 | 3 | **A.**   To placebo. |
| 14:53 | 4 | **Q.**   Does this analysis show what the all-combined |
| 14:53 | 5 | placebo-controlled data is for Vioxx as of this point? |
| 14:53 | 6 | **A.**   Yes, it does for OA.  Are you talking about OA or |
| 14:53 | 7 | everything? |
| 14:53 | 8 | **Q.**   Everything? |
| 14:53 | 9 | **A.**   It does for both, actually. |
| 14:53 | 10 | **Q.**   Do you see whether Table 13 gives you an all-combined |
| 14:53 | 11 | placebo-controlled relative risk and confidence intervals? |
| 14:53 | 12 | **A.**   Yes, sir, it does. |
| 14:53 | 13 | **Q.**   What's that relative risk? |
| 14:53 | 14 | **A.**   1.26. |
| 14:53 | 15 | **Q.**   Is that statistically significant? |
| 14:53 | 16 | **A.**   No, it's not. |
| 14:53 | 17 | **Q.**   Do you have a view, sir, when you are assessing the |
| 14:54 | 18 | placebo-controlled data, whether you should look at the |
| 14:54 | 19 | totality of the data or just the slice of the data? |
| 14:54 | 20 | **A.**   You should always look at the totality of the data. |
| 14:54 | 21 | **Q.**   What does the totality of the data show as of this point |
| 14:54 | 22 | in time? |
| 14:54 | 23 | **A.**   That Vioxx compared to placebo is not an increased risk |
| 14:54 | 24 | for adverse thromboembolic events. |
| 14:54 | 25 | **Q.**   Does this pooled analysis also provide different |

| | | |
|---|---|---|
| 14:54 | 1 | comparisons of Vioxx to non-naproxen NSAIDs and naproxen as |
| 14:54 | 2 | well? |
| 14:54 | 3 | **A.**   In this table? |
| 14:54 | 4 | **Q.**   In the pooled analysis. |
| 14:54 | 5 | **A.**   Yeah. |
| 14:54 | 6 | **Q.**   The document. |
| 14:54 | 7 | **A.**   Yes, it does. |
| 14:54 | 8 | **Q.**   I'm directing your attention to Table 16.  This uses the |
| 14:54 | 9 | exact same endpoint from Table 13 that counsel used in your |
| 14:54 | 10 | examination this morning? |
| 14:54 | 11 | **A.**   Yes, sir. |
| 14:55 | 12 | **Q.**   Can you tell us, using the thrombotic endpoint in Table 16 |
| 14:55 | 13 | comparing Vioxx to non-naproxen NSAIDs, what's that relative |
| 14:55 | 14 | risk? |
| 14:55 | 15 | **A.**   The combined relative risk is 1.09. |
| 14:55 | 16 | **Q.**   Is that statistically significant? |
| 14:55 | 17 | **A.**   It is not. |
| 14:55 | 18 | **Q.**   For folks making treatment decisions, whether physicians |
| 14:55 | 19 | or P&T committee, what do you believe to be the most relevant |
| 14:55 | 20 | data comparison between the two tables we went through? |
| 14:55 | 21 | **A.**   The only relevant data in that case is to compare against |
| 14:55 | 22 | an active comparator.  You would never compare against a |
| 14:55 | 23 | placebo. |
| 14:55 | 24 | **Q.**   By the way, at the time this March 2004 analysis was done, |
| 14:55 | 25 | was there an expectation or understanding in the medical |

14:55  1  community that non-naproxen NSAIDs increased the risk of
14:55  2  thrombotic events?
14:55  3  **A.**   There was not.
14:55  4  **Q.**   I think you indicated when you were talking with counsel
14:55  5  that, if you really had a concern about osteoarthritis, you
14:56  6  should look at all the osteoarthritis patients in the Vioxx
14:56  7  clinical trials whether that was a primary or secondary
14:56  8  diagnosis.  Do you recall that?
14:56  9  **A.**   I did make that comment.
14:56  10  **Q.**   What are you referring to, sir?
14:56  11  **A.**   In the Alzheimer's group of patients that we have
14:56  12  placebo-controlled data on, there are percentages available
14:56  13  that tell you how many osteoarthritic patients were in that
14:56  14  group.
14:56  15  **Q.**   Have you seen an analysis, sir, that looks at pooling the
14:56  16  osteoarthritis patients from the OA trials and, also,
14:56  17  osteoarthritis patients who were studied in the Alzheimer's
14:56  18  trials?
14:56  19  **A.**   Yes, sir.
14:56  20  **Q.**   Can you tell us whether that analysis supports the view
14:56  21  that there's something special going on with osteoarthritis
14:56  22  patients?
14:56  23  **A.**   It demonstrates that there's nothing special about that
14:56  24  subgroup of patients.
14:56  25          **MR. ISMAIL:**  Just a couple more topics, Judge.  Are

| | | |
|---|---|---|
| 14:57 | 1 | you okay? |
| 14:57 | 2 | **THE COURT:**  Yes. |
| 14:57 | 3 | **BY MR. ISMAIL:** |
| 14:57 | 4 | **Q.**   Counsel asked you about Dr. FitzGerald.  I think he called |
| 14:57 | 5 | him the world's preeminent scientist in this area.  Do you |
| 14:57 | 6 | recall? |
| 14:57 | 7 | **A.**   I think he -- I don't remember him -- I think he called |
| 14:57 | 8 | him the father of the FitzGerald hypothesis. |
| 14:57 | 9 | **Q.**   He's definitely that.  And he also made reference to |
| 14:57 | 10 | testimony you gave in your deposition regarding what |
| 14:57 | 11 | Dr. FitzGerald's published views were during the time Vioxx was |
| 14:57 | 12 | on the market. |
| 14:57 | 13 | **A.**   Yes, sir. |
| 14:57 | 14 | **Q.**   I just want to give you the opportunity to show us what |
| 14:57 | 15 | you were referring to and the significance to you when you were |
| 14:57 | 16 | forming your opinions in this case.  I have handed you what's |
| 14:57 | 17 | been marked as Exhibit 635.  Can you tell us if you recognize |
| 14:57 | 18 | that document. |
| 14:57 | 19 | **A.**   I do.  This is an ACCP Conference on Antithrombotic and |
| 14:58 | 20 | Thrombolytic Therapy published in *Chest*. |
| 14:58 | 21 | **Q.**   Who are the authors? |
| 14:58 | 22 | **A.**   The authors are Patróno and FitzGerald and Hirsch, as well |
| 14:58 | 23 | as Roth. |
| 14:58 | 24 | **Q.**   Is this the article you were referring to in your |
| 14:58 | 25 | deposition when you commented upon published views of |

1065

14:58  1   Dr. FitzGerald before Vioxx was voluntarily withdrawn?

14:58  2   **A.**   Yes, sir.

14:58  3   **Q.**   If you go to page 246, I believe, is that carryover

14:58  4   paragraph.

14:58  5   **A.**   Yes, sir.  That's the paragraph I was referring to.

14:58  6   **Q.**   What was the significance of Dr. FitzGerald's comments in

14:58  7   September 2004 to the opinions you expressed in this case?

14:58  8   **A.**   He says:  "While other mechanisms cannot be discounted,

14:58  9   there is currently little evidence in humans to support a

14:58  10  prothrombotic effect for coxibs."

14:59  11  **Q.**   Is that the portion that you were referring to in your

14:59  12  testimony?

14:59  13  **A.**   That is.

14:59  14  **Q.**   The article from FitzGerald that counsel showed you, do

14:59  15  you recall whether that was published after Dr. FitzGerald's

14:59  16  observations here in September 2004?

14:59  17  **A.**   It was.  I believe it was published a couple years after

14:59  18  this.

14:59  19  **Q.**   There was a question from counsel as to, "Gee, does

14:59  20  anybody else use APTC besides Merck for looking at NSAID or

14:59  21  coxib cardiovascular safety?"  I want to direct you to the

14:59  22  Kearney publication, which is tab 8, if you still have things

14:59  23  in your binder.

14:59  24  **A.**   I have it.

14:59  25  **Q.**   We looked at earlier that Kearney was that meta-analysis

DAILY COPY

| | | |
|---|---|---|
| 15:00 | 1 | of 140,000 patients and looked at all the NSAIDs and coxibs. |
| 15:00 | 2 | A.   Right.  I think it was 138 different trials. |
| 15:00 | 3 | Q.   The event composite that we looked at was this thing |
| 15:00 | 4 | called vascular events? |
| 15:00 | 5 | A.   Yes, sir. |
| 15:00 | 6 | Q.   If you turn to the "Methods" section on page 2 -- by the |
| 15:00 | 7 | way, is this a Merck publication, Kearney? |
| 15:00 | 8 | A.   It is not. |
| 15:00 | 9 | Q.   Can you tell us what the serious vascular event endpoint |
| 15:00 | 10 | was used by Kearney and colleagues in this meta-analysis. |
| 15:00 | 11 | A.   The APTC. |
| 15:01 | 12 | Q.   Counsel asked you about the APPROVe study and your views |
| 15:01 | 13 | regarding the event rate in the placebo arm.  Do you recall |
| 15:01 | 14 | that? |
| 15:01 | 15 | A.   I do. |
| 15:01 | 16 | Q.   You made reference to Framingham and your expectations |
| 15:01 | 17 | regarding what ordinarily would happen with the placebo group. |
| 15:01 | 18 | Do you recall that? |
| 15:01 | 19 | A.   I do. |
| 15:01 | 20 | Q.   I don't have a copy of this, but I will ask, if you can |
| 15:01 | 21 | look at the first page, if you recall seeing the cardiovascular |
| 15:01 | 22 | safety report of APPROVe, which is Defense Exhibit 269. |
| 15:01 | 23 | A.   I did see it. |
| 15:01 | 24 | Q.   Did you see in this document any graphic depiction of the |
| 15:01 | 25 | Framingham group compared to placebo? |

DAILY COPY

| | | |
|---|---|---|
| 15:01 | 1 | **A.**   I did. |
| 15:02 | 2 | **Q.**   Is that what is shown in Figure 10? |
| 15:02 | 3 | **A.**   That's it. |
| 15:02 | 4 | **Q.**   Can you give us just a few sentences what Framingham is |
| 15:02 | 5 | and its significance to cardiologists. |
| 15:02 | 6 | **A.**   Framingham is one of the premier databases that we use to |
| 15:02 | 7 | predict events.  It's a study where you follow patients along |
| 15:02 | 8 | who have no disease processes, in effect, and you -- when they |
| 15:02 | 9 | develop their risk factors, they are continued to follow along, |
| 15:02 | 10 | and that information is added to the database.  It allows us to |
| 15:02 | 11 | predict who is at risk to develop coronary artery disease or a |
| 15:02 | 12 | coronary artery disease endpoint. |
| 15:02 | 13 |        There are two different endpoints that they use in |
| 15:02 | 14 | their Framingham endpoints, which is a 10-year risk of heart |
| 15:02 | 15 | attack or death from heart disease; and the other is a softer |
| 15:02 | 16 | endpoint, which includes things like angina and unstable |
| 15:02 | 17 | angina. |
| 15:02 | 18 |        **MR. ARBITBLIT:**  Your Honor, may we have a copy of |
| 15:02 | 19 | that document and a chance to examine on it? |
| 15:03 | 20 |        **THE COURT:**  Sure. |
| 15:03 | 21 |        **MR. ISMAIL:**  You asked him about this, and he made |
| 15:03 | 22 | reference to Framingham.  I am just letting him show the Court. |
| 15:03 | 23 |        **THE COURT:**  If he has a copy. |
| 15:03 | 24 |        **MR. ISMAIL:**  It's a very large document.  It's a |
| 15:03 | 25 | premarked exhibit.  It's in his report.  It's Reference 4 in |

DAILY COPY

1068

| | | |
|---|---|---|
| 15:03 | 1 | his material list. |
| 15:03 | 2 | **BY MR. ISMAIL:** |
| 15:03 | 3 | **Q.**   We'll just do it this way:  In the graphic depiction of |
| 15:03 | 4 | the placebo arm in APPROVe compared to the expected rate using |
| 15:03 | 5 | the Framingham analysis, what do you recall that data showed |
| 15:03 | 6 | and what was its significance to you? |
| 15:03 | 7 | **A.**   It shows exactly what I was speculating on when I wrote my |
| 15:03 | 8 | report, which is that if the -- the outlier here is the placebo |
| 15:03 | 9 | group drop in events and the APPROVe trial.  So if you look at |
| 15:03 | 10 | what the expected event rates were as to patient age, they |
| 15:03 | 11 | should have continued on that same line as the Vioxx group did |
| 15:03 | 12 | and the APPROVe placebo group did not.  There, that group was |
| 15:04 | 13 | demonstrated in this analysis to be the -- not really analysis, |
| 15:04 | 14 | this exhibit to be the outlier. |
| 15:04 | 15 | **Q.**   Last topic, a couple questions about the Alzheimer's |
| 15:04 | 16 | mortality data that counsel referred you to.  I'm going to hand |
| 15:04 | 17 | out Exhibit 334 and ask whether you recall this is a document |
| 15:04 | 18 | that you reviewed for developing your opinions in this case. |
| 15:04 | 19 | **A.**   Yes, sir, I reviewed this. |
| 15:04 | 20 | **Q.**   Do you want to tell us what it is? |
| 15:04 | 21 | **A.**   I'm sorry? |
| 15:04 | 22 | **Q.**   Can you tell us what it is. |
| 15:04 | 23 | **A.**   This is basically the background information on all the |
| 15:04 | 24 | Vioxx data going up to, I believe, 2005. |
| 15:04 | 25 | **Q.**   By the way, did counsel show you that article by Ptsay |

DAILY COPY

1069

| | | |
|---|---|---|
| 15:04 | 1 | talking about the mortality in the Alzheimer's studies? |
| 15:05 | 2 | **A.**   Yes. |
| 15:05 | 3 | **Q.**   First of all, do you recall when that was published? |
| 15:05 | 4 | **A.**   I believe that was published in 2009. |
| 15:05 | 5 | **Q.**   Do you know whether the Ptsay analysis included just |
| 15:05 | 6 | on-drug mortality or did it include off-drug mortality? |
| 15:05 | 7 | **A.**   It included off-drug mortality. |
| 15:05 | 8 | **Q.**   So if a patient was on the drug for 30 days and died two |
| 15:05 | 9 | years later from a cardiac cause, would that be included in the |
| 15:05 | 10 | Ptsay publication as being a death that they were counting? |
| 15:05 | 11 | **A.**   Yes, sir, that would have been included. |
| 15:05 | 12 | **Q.**   Exhibit 334, I would like to turn your attention to |
| 15:05 | 13 | page 125.  Do you know, sir, whether the mortality information |
| 15:06 | 14 | from the Alzheimer's study was replicated in any of the other |
| 15:06 | 15 | studies? |
| 15:06 | 16 | **A.**   It was not. |
| 15:06 | 17 | **Q.**   Does Exhibit 334 at page 125 show the mortality data for |
| 15:06 | 18 | Vioxx compared to whatever the comparator is in various study |
| 15:06 | 19 | blocks like osteoarthritis, VIGOR, rheumatoid arthritis, |
| 15:06 | 20 | ADVANTAGE clinical trial, and the Alzheimer's studies? |
| 15:06 | 21 | **A.**   Yes, sir. |
| 15:06 | 22 | **Q.**   The information reflected here, what does it show with |
| 15:06 | 23 | respect to whether there's ever been this mortality difference |
| 15:06 | 24 | shown in any other study? |
| 15:06 | 25 | **A.**   It shows that there has never been a difference against |

1070

| | | |
|---|---|---|
| 15:06 | 1 | Vioxx of any magnitude in all-cause mortality. |
| 15:07 | 2 | **MR. ISMAIL:**  Your Honor, give me one more second.  I |
| 15:07 | 3 | may be complete. |
| 15:07 | 4 | That's all we have.  Thank you, Doctor. |
| 15:07 | 5 | **THE COURT:**  Thank you.  You are excused, Doctor. |
| 15:07 | 6 | Come back in 15 minutes.  Court will stand in |
| 15:07 | 7 | recess. |
| 15:14 | 8 | **THE DEPUTY CLERK:**  Everyone rise. |
| 15:14 | 9 | (WHEREUPON the Court took a brief recess.) |
| 15:14 | 10 | **THE DEPUTY CLERK:**  Everyone rise. |
| 15:26 | 11 | **THE COURT:**  Be seated, please.  Call your next |
| 15:26 | 12 | witness. |
| 15:26 | 13 | **MR. SALES:**  Merck calls Steven Wiggins. |
| 15:26 | 14 | (WHEREUPON **Steven Wiggins**, having been duly sworn, |
| 15:26 | 15 | testified as follows.) |
| 15:26 | 16 | **THE DEPUTY CLERK:**  Would you state your name for the |
| 15:26 | 17 | record. |
| 15:26 | 18 | **THE WITNESS:**  Steven Neil Wiggins. |
| 15:26 | 19 | **THE DEPUTY CLERK:**  Would you spell *Steven* and *Neil*. |
| 15:26 | 20 | **THE WITNESS:**  S-T-E-V-E-N; N-E-I-L. |
| 15:27 | 21 | **MR. SALES:**  May I approach, Your Honor? |
| 15:27 | 22 | **THE COURT:**  Yes. |
| 15:27 | 23 | **VOIR DIRE** |
| 15:27 | 24 | **BY MR. SALES:** |
| 15:27 | 25 | **Q.**   Good afternoon, Dr. Wiggins. |

DAILY COPY

1071

| | | |
|---|---|---|
| 15:27 | 1 | **A.**   Good afternoon. |
| 15:27 | 2 | **Q.**   How are you currently employed? |
| 15:27 | 3 | **A.**   I'm a professor of economics at Texas A&M University. |
| 15:27 | 4 | **Q.**   What is your field of specialization? |
| 15:27 | 5 | **A.**   Industrial organization. |
| 15:27 | 6 | **Q.**   Have you conducted economic research into the |
| 15:27 | 7 | pharmaceutical industry? |
| 15:27 | 8 | **A.**   Yes, I have. |
| 15:27 | 9 | **Q.**   Beginning when? |
| 15:27 | 10 | **A.**   Beginning in 1977, when I began work on my PhD |
| 15:27 | 11 | dissertation. |
| 15:27 | 12 | **Q.**   Can you tell the Court a little bit about your educational |
| 15:27 | 13 | background. |
| 15:27 | 14 | **A.**   I received a bachelor's degree in economics from Oklahoma |
| 15:27 | 15 | State University in 1975 and a PhD in economics from MIT in |
| 15:28 | 16 | 1979. |
| 15:28 | 17 | **Q.**   You mentioned your dissertation.  What was that on? |
| 15:28 | 18 | **A.**   It was on product quality regulation and new drug |
| 15:28 | 19 | introductions. |
| 15:28 | 20 | **Q.**   After you received your PhD from MIT in 1979, where did |
| 15:28 | 21 | you go to work? |
| 15:28 | 22 | **A.**   I went to work at Texas A&M, and I've been there ever |
| 15:28 | 23 | since. |
| 15:28 | 24 | **Q.**   What is your current position? |
| 15:28 | 25 | **A.**   I'm a professor of economics at Texas A&M with tenure. |

DAILY COPY

| 15:28 | 1 | **Q.**   Have you received any awards regarding your teaching |
| 15:28 | 2 | career? |
| 15:28 | 3 | **A.**   Yes.  I had held several chaired professorships:  The |
| 15:28 | 4 | George and Mary Jordan professorship and the Rex B. Grey |
| 15:28 | 5 | professorship.  I've also lectured internationally three |
| 15:28 | 6 | times -- once in Italy and twice in Germany -- carrying out a |
| 15:28 | 7 | series of extended lectures on industrial organization and |
| 15:28 | 8 | American economic institutions. |
| 15:28 | 9 | **Q.**   What are some of your responsibilities as a tenured |
| 15:29 | 10 | professor of economics at Texas A&M University? |
| 15:29 | 11 | **A.**   I teach both graduate and undergraduate industrial |
| 15:29 | 12 | organization, economic theory, econometric methods, I carry out |
| 15:29 | 13 | research in industrial organization, and I advise graduate |
| 15:29 | 14 | students, as well as some service. |
| 15:29 | 15 | **Q.**   Over the course of your career, have you published |
| 15:29 | 16 | articles on economic issues? |
| 15:29 | 17 | **A.**   Yes, I have. |
| 15:29 | 18 | **Q.**   Approximately how many? |
| 15:29 | 19 | **A.**   On the order of 30. |
| 15:29 | 20 | **Q.**   Have you served on any editorial or journal boards? |
| 15:29 | 21 | **A.**   Yes, I have. |
| 15:29 | 22 | **Q.**   Which ones? |
| 15:29 | 23 | **A.**   The *Journal of Corporate Finance* and the *Journal of* |
| 15:29 | 24 | *Regulatory Economics.* |
| 15:29 | 25 | **Q.**   Have the articles that you have published on involved, in |

DAILY COPY

| | | |
|---|---|---|
| 15:29 | 1 | part, those involving pharmaceutical industry issues? |
| 15:29 | 2 | **A.**   Yes. |
| 15:29 | 3 | **Q.**   Have you also made presentations in addition to the |
| 15:29 | 4 | 30-some-odd published articles that you mentioned? |
| 15:29 | 5 | **A.**   Yes.  I've made presentations at leading universities |
| 15:29 | 6 | throughout the United States and conferences in the |
| 15:30 | 7 | United States and in Europe. |
| 15:30 | 8 | **Q.**   In addition to your academic work, do you also do |
| 15:30 | 9 | consulting work? |
| 15:30 | 10 | **A.**   Yes, I do. |
| 15:30 | 11 | **Q.**   Can you describe that consulting work. |
| 15:30 | 12 | **A.**   I generally consult with companies in various business |
| 15:30 | 13 | issues.  The majority of that work is in litigation-related |
| 15:30 | 14 | issues, where I bring the tools of industrial organization to |
| 15:30 | 15 | bear on economic problems faced by firms. |
| 15:30 | 16 | **Q.**   Do you do work with a company called Charles River |
| 15:30 | 17 | Associates? |
| 15:30 | 18 | **A.**   Yes, I do. |
| 15:30 | 19 | **Q.**   What is your position or role with regard to Charles River |
| 15:30 | 20 | Associates? |
| 15:30 | 21 | **A.**   I'm a senior consultant with Charles River Associates, |
| 15:30 | 22 | which I'm an independent contractor, but my formal title is a |
| 15:30 | 23 | senior consultant. |
| 15:30 | 24 | **Q.**   Did I retain you in this case to investigate the economic |
| 15:30 | 25 | issues relating to Louisiana Medicaid's reimbursement of Vioxx? |

DAILY COPY

| | | |
|---|---|---|
| 15:30 | 1 | **A.**   Yes, you did. |
| 15:30 | 2 | **Q.**   Are you being compensated for that work? |
| 15:30 | 3 | **A.**   Yes, I am. |
| 15:30 | 4 | **Q.**   At what rate? |
| 15:30 | 5 | **A.**   $600 an hour. |
| 15:30 | 6 | **Q.**   What materials did you review in the course of your work |
| 15:30 | 7 | on this matter? |
| 15:31 | 8 | **A.**   I reviewed depositions.  I reviewed various case |
| 15:31 | 9 | documents.  I also reviewed the data produced by Unisys |
| 15:31 | 10 | regarding the reimbursements for Vioxx and other NSAID |
| 15:31 | 11 | prescriptions and COX-2s. |
| 15:31 | 12 | **Q.**   You mentioned Unisys.  Is that a database? |
| 15:31 | 13 | **A.**   Yes.  It's a Unisys database that covers the |
| 15:31 | 14 | reimbursements that Louisiana Medicaid made for various |
| 15:31 | 15 | prescriptions for Vioxx and for other COX-2s and NSAIDs and |
| 15:31 | 16 | PPIs. |
| 15:31 | 17 | **Q.**   Specifically, what database did the State of Louisiana |
| 15:31 | 18 | produce in this case with regard to expenditures for which |
| 15:31 | 19 | products? |
| 15:31 | 20 | **A.**   It was with respect to NSAIDs in general and COX-2s, |
| 15:31 | 21 | including Celebrex, Bextra, and Vioxx, as well as proton pump |
| 15:31 | 22 | inhibitors, or PPIs. |
| 15:31 | 23 | **Q.**   What work did you perform in this case? |
| 15:31 | 24 | **A.**   I analyzed the economic environment that existed for |
| 15:32 | 25 | reimbursement, and I analyzed the data to determine the |

DAILY COPY

| | | |
|---|---|---|
| 15:32 | 1 | economic injury to the State of Louisiana. |
| 15:32 | 2 | **MR. SALES:**  Your Honor, we offer Dr. Wiggins as an |
| 15:32 | 3 | expert on the economic consequences and value of the Vioxx |
| 15:32 | 4 | which was reimbursed by Louisiana Medicaid in this case. |
| 15:32 | 5 | **MR. MURRAY:**  Accept as tendered, Your Honor. |
| 15:32 | 6 | **THE COURT:**  The Court will accept him in that field |
| 15:32 | 7 | of expertise. |
| 15:32 | 8 | **DIRECT EXAMINATION** |
| 15:32 | 9 | BY MR. SALES: |
| 15:32 | 10 | **Q.**   Dr. Wiggins, do you have an opinion in this case as to the |
| 15:32 | 11 | economic impact to the Louisiana Medicaid program due to Vioxx |
| 15:32 | 12 | being reimbursed? |
| 15:32 | 13 | **A.**   Yes, I do. |
| 15:32 | 14 | **Q.**   What is that opinion? |
| 15:32 | 15 | **A.**   My opinion is that the State of Louisiana received full |
| 15:32 | 16 | value for the expenditures that they made on Vioxx in terms of |
| 15:32 | 17 | the value that was received to the patients and to the state. |
| 15:32 | 18 | **Q.**   You have in front of you a notebook.  The Court has a |
| 15:32 | 19 | notebook, as well, and so does opposing counsel.  Is tab 1 to |
| 15:32 | 20 | that notebook a copy of your curriculum vitae? |
| 15:33 | 21 | **A.**   Yes, it is. |
| 15:33 | 22 | **Q.**   Is that accurate? |
| 15:33 | 23 | **A.**   Yes. |
| 15:33 | 24 | **MR. SALES:**  Your Honor, we would offer Dr. Wiggins' |
| 15:33 | 25 | curriculum vitae as Defense Exhibit 2188. |

1076

| | | |
|---|---|---|
| 15:33 | 1 | **THE COURT:**  The Court will admit it. |
| 15:33 | 2 | **MR. MURRAY:**  No objection to that but move to strike |
| 15:33 | 3 | the opinion that he just offered.  I don't think it's |
| 15:33 | 4 | encompassed within his report.  I think the Court -- |
| 15:33 | 5 | **THE COURT:**  I'm sorry.  I didn't hear you. |
| 15:33 | 6 | **MR. MURRAY:**  I'm sorry, Your Honor.  I was going to |
| 15:33 | 7 | move to strike his answer to the question about the value |
| 15:33 | 8 | received by the State of Louisiana.  I don't think his report |
| 15:33 | 9 | says what he believes the value received is by the State of |
| 15:33 | 10 | Louisiana. |
| 15:33 | 11 | **MR. SALES:**  Your Honor, his report is extensive.  He |
| 15:33 | 12 | was asked to investigate the damage issues.  We will show |
| 15:33 | 13 | through the graphs that we are going to present to the Court |
| 15:33 | 14 | showing exactly what he did in this case, which is, in his |
| 15:33 | 15 | opinion, the economic consequence to Louisiana for the value |
| 15:33 | 16 | that it received for the payment of Vioxx. |
| 15:33 | 17 | **MR. MURRAY:**  Your Honor, I think those are two |
| 15:33 | 18 | different questions and very different issues.  I don't think |
| 15:33 | 19 | the way he has expressed his testimony is expressed in his |
| 15:33 | 20 | report.  I don't think he has ever offered an opinion as to |
| 15:34 | 21 | what the actual value received to Louisiana is for having |
| 15:34 | 22 | received Vioxx. |
| 15:34 | 23 | **MR. SALES:**  Your Honor -- |
| 15:34 | 24 | **THE COURT:**  Let me take it a step at a time.  Let me |
| 15:34 | 25 | admit his exhibit first.  What's the number? |

| | | |
|---|---|---|
| 15:34 | 1 | THE DEPUTY CLERK:  2188. |
| 15:34 | 2 | THE COURT:  2188.  Let it be admitted. |
| 15:34 | 3 | BY MR. SALES: |
| 15:34 | 4 | Q.   Dr. Wiggins, you mentioned the database that was produced |
| 15:34 | 5 | by the State of Louisiana with regard to coxibs and NSAIDs in |
| 15:34 | 6 | this case; correct? |
| 15:34 | 7 | A.   Yes. |
| 15:34 | 8 | Q.   Have you had a chance to look at the measurements of the |
| 15:34 | 9 | expenses on a monthly basis that Louisiana spent for those |
| 15:34 | 10 | drugs that you just mentioned to the Court? |
| 15:34 | 11 | A.   Yes, I have. |
| 15:34 | 12 | Q.   Is tab 2 in your notebook a graphic plotting of those |
| 15:34 | 13 | expenditures over time for Bextra, Celebrex, Vioxx, all coxibs, |
| 15:34 | 14 | and all NSAIDs? |
| 15:35 | 15 | A.   Yes. |
| 15:35 | 16 | Q.   Have you also plotted a similar graph with regard to the |
| 15:35 | 17 | time period the year before Vioxx went on the nonpreferred drug |
| 15:35 | 18 | list, the year it was on the nonpreferred drug list, and the |
| 15:35 | 19 | year after? |
| 15:35 | 20 | A.   Yes, I have. |
| 15:35 | 21 | Q.   Can you tell the Court what happened to Louisiana Medicaid |
| 15:35 | 22 | expenditures when Vioxx went from the open formulary period in |
| 15:35 | 23 | June of '01 until when it went to the nonpreferred drug list in |
| 15:35 | 24 | June of '02. |
| 15:35 | 25 | A.   Total expenditures on NSAIDs or -- and on coxibs remained |

DAILY COPY

1078

15:35   1   unchanged.  If you test statistically, there was a slight

15:35   2   increase in expenditures, but those are not statistically

15:36   3   significant.  And so the total expenditures on COX-2s and the

15:36   4   total expenditures on NSAIDs remained unchanged when Vioxx went

15:36   5   on the NPDL.

15:36   6   Q.   So just so it's clear, what do the lines represent on the

15:36   7   graph?

15:36   8   A.   On the graph, you'll notice the bottom -- on the left-hand

15:36   9   side, the bottom red line is expenditures on Vioxx.  You can

15:36   10  see that there's a legend down at the bottom that explains

15:36   11  different products.  The next line up on the left-hand side is

15:36   12  Celebrex expenditures.  The next line up -- well, then the

15:36   13  green line that begins in '02 is Bextra expenditures.  Then you

15:36   14  have -- the gray line is total expenditures on COX-2s.  The

15:36   15  black line is total expenditures on all NSAIDs.

15:36   16  Q.   What is measured on the left axis of the graph?

15:37   17  A.   That is gross expenditures on each one of these products,

15:37   18  with the exception of the top two lines, of course, include

15:37   19  expenditures on the lines below.

15:37   20  Q.   Plotted on the lower axis?

15:37   21  A.   Is time.

15:37   22  Q.   Can you tell the Court economically what happened when the

15:37   23  State of Louisiana had an open formulary in June of '02 and

15:37   24  then went to a nonpreferred and preferred drug list.

15:37   25  A.   So what was happening leading up to the time that Vioxx

DAILY COPY

| | | |
|---|---|---|
| 15:37 | 1 | was placed on the NPDL, Vioxx expenditures were roughly |
| 15:37 | 2 | constant.  There was a slight decline there right in the period |
| 15:37 | 3 | just before June of '02 over the last several months, but |
| 15:37 | 4 | that's not statistically significant.  Then there was -- and |
| 15:37 | 5 | that is because Bextra was also having an increase in |
| 15:38 | 6 | expenditures during that period. |
| 15:38 | 7 | When Vioxx goes on NPDL status, there is a very sharp |
| 15:38 | 8 | reduction in expenditures on Vioxx, and there's a corresponding |
| 15:38 | 9 | increase in expenditures on Bextra and a slight increase in |
| 15:38 | 10 | expenditures on Celebrex. |
| 15:38 | 11 | Q.   Was there an overall decrease in coxib expenditures? |
| 15:38 | 12 | A.   No, there wasn't.  You can see that the trend line for |
| 15:38 | 13 | coxib expenditures continues basically uninterrupted.  It's a |
| 15:38 | 14 | slight monthly increase, and that continued throughout this |
| 15:38 | 15 | period. |
| 15:38 | 16 | Q.   Was there an overall drop in expenditures for the total |
| 15:38 | 17 | NSAID class? |
| 15:38 | 18 | A.   No, there was not.  In fact, the expenditures on non-COX-2 |
| 15:38 | 19 | NSAIDs is roughly constant during this period.  It's the |
| 15:38 | 20 | distance between the gray and the black lines.  If you look at |
| 15:38 | 21 | it, since those lines follow each other pretty closely, the |
| 15:39 | 22 | difference between them is pretty constant. |
| 15:39 | 23 | Q.   What does that tell you economically as to what was |
| 15:39 | 24 | happening with regard to the coxib class and Louisiana Medicaid |
| 15:39 | 25 | when Vioxx went from open formulary to nonpreferred? |

15:39    1    **A.**   That the patients and the doctors were substituting from

15:39    2    Vioxx into other coxibs and that the value of the Vioxx that

15:39    3    they had been receiving before is being realized through the

15:39    4    sale of Celebrex and Bextra during the NPDL period.

15:39    5    **Q.**   What happened when we had a switchover a year later

15:39    6    between Vioxx going on the preferred drug list and Celebrex

15:39    7    going on the nonpreferred drug list in June of 2003 or

15:39    8    thereabouts?

15:39    9    **A.**   What happened is when Vioxx comes off of the NPDL and goes

15:39   10    onto the PDL, then expenditures on it increase.  You'll notice

15:40   11    Celebrex is going off of the preferred drug list.  Expenditures

15:40   12    on Celebrex are declining significantly.  But once again, if

15:40   13    you will look up at the gray line, you will see that total

15:40   14    expenditures on coxibs are unchanged, and that means that

15:40   15    doctors and patients are switching to other comparable valued

15:40   16    products within this group.

15:40   17    **Q.**   Are they going to cheaper traditional NSAIDs?

15:40   18    **A.**   No, they are not.  During neither of these switchover

15:40   19    points do they switch to other NSAIDs.

15:40   20    **Q.**   I'm not sure if this works here.  What would you expect to

15:40   21    happen to the gray and the black lines of all coxibs and all

15:40   22    NSAID expenditures in this nonpreferred drug period if, in

15:40   23    fact, the State of Louisiana was not receiving full value for

15:41   24    what it paid for Vioxx?

15:41   25    **A.**   There would have been a decline in the black line.  So

15:41   1   what would have happened is total expenditures on coxibs would

15:41   2   have declined because now they can find other lower-value

15:41   3   products, lower-priced products, and that would mean there

15:41   4   would be a decline in the expenditures on coxibs and there

15:41   5   would be a similar decline in the expenditures on all NSAIDs,

15:41   6   although the distance between the gray and the black line would

15:41   7   increase slightly because people are substituting to the

15:41   8   cheaper NSAIDs that are outside the COX-2 class.  So there

15:41   9   should be a decline in the top two lines that kind of looks

15:41   10   like that decline in the red line down at the bottom, and there

15:41   11   is no such decline.

15:41   12   Q.   As an economist, what does that tell you, again, about the

15:41   13   value received by the State of Louisiana for its purchasing or

15:41   14   expenditures for Vioxx?

15:41   15   A.   That the State of Louisiana has received full value for

15:42   16   its purchases of Vioxx in that they are -- the physicians and

15:42   17   patients are substituting to these other expensive products

15:42   18   that exhibit the same characteristics.

15:42   19           THE COURT:  Wait one moment.

15:42   20           MR. MURRAY:  Your Honor, objection to the last

15:42   21   question.  Again, his report, his deposition testimony, it

15:42   22   doesn't talk about what the value received by the state is.  He

15:42   23   does talk about whether or not the state substitutes one

15:42   24   prescription drug for another, but he never gives an opinion

15:42   25   about the value of what was received by the state.  It's

| | | |
|---|---|---|
| 15:42 | 1 | nowhere in his report. |
| 15:42 | 2 | MR. SALES:  Your Honor -- |
| 15:42 | 3 | THE COURT:  How are we getting into this same type |
| 15:42 | 4 | situation?  What's the problem?  Where is his report? |
| 15:42 | 5 | MR. SALES:  It's here, Your Honor.  He talks about he |
| 15:42 | 6 | was -- he has a very long report with lots of graphs and |
| 15:42 | 7 | charts, like economists do.  He talks about, on page 22, that |
| 15:42 | 8 | the NPDL status of Vioxx shifted the expenditures to the other |
| 15:42 | 9 | selective and nonselective NSAIDs, did not reduce total LDHH |
| 15:43 | 10 | expenditures.  He has a number of other places in his |
| 15:43 | 11 | discussion exactly like that.  He was asked about this whole |
| 15:43 | 12 | restitution theory at his deposition.  He said, no, that would |
| 15:43 | 13 | not be a correct economic model here because, again, the |
| 15:43 | 14 | expenditures were being shifted and realized from going to |
| 15:43 | 15 | Vioxx to other COX-2s in the class; that is, the doctors were |
| 15:43 | 16 | shifting to a similarly priced medicine.  There was no savings |
| 15:43 | 17 | to the state, and they were receiving the value for which they |
| 15:43 | 18 | paid.  So I'm not really sure I'm following the objection, |
| 15:43 | 19 | Your Honor. |
| 15:43 | 20 | MR. MURRAY:  Your Honor, it's that last part.  It's |
| 15:43 | 21 | the "receiving the value for which they paid."  It's nowhere in |
| 15:43 | 22 | his report.  It's a significant issue.  If you want to talk |
| 15:43 | 23 | about substituting drugs, if you want to talk about where the |
| 15:43 | 24 | dollars got spent, that's fine, but he has never offered an |
| 15:43 | 25 | opinion as to value received for Vioxx.  It's nowhere in his |

| | | |
|---|---|---|
| 15:43 | 1 | report, Your Honor.  It's not an issue that he addresses.  If |
| 15:44 | 2 | you look at the sum of his conclusions, nowhere does it mention |
| 15:44 | 3 | that he addressed this.  I think he can be asked -- |
| 15:44 | 4 | THE COURT:  I understand the objection.  We may be |
| 15:44 | 5 | dealing with semantics.  Let's ask him consistent with his |
| 15:44 | 6 | report, and you can argue what the report says. |
| 15:44 | 7 | MR. SALES:  That's what I plan to do. |
| 15:44 | 8 | Also, as the Court is aware, we just, after much |
| 15:44 | 9 | negotiation, went back and forth about a stipulation.  So |
| 15:44 | 10 | that's just the recent -- obviously, that was not into play, as |
| 15:44 | 11 | the Court knows, back when we did the depositions and expert |
| 15:44 | 12 | reports of this matter with regard to this expenditure date of |
| 15:44 | 13 | June 13, 2001.  So that's -- |
| 15:44 | 14 | THE COURT:  Let's shape your questions consistent |
| 15:44 | 15 | with the report. |
| 15:44 | 16 | BY MR. SALES: |
| 15:44 | 17 | Q.  Did you do any other analysis, Dr. Wiggins, with regard to |
| 15:44 | 18 | graphing out the expenditures for Bextra, Celebrex, and Vioxx, |
| 15:45 | 19 | the total coxib class and the total NSAID class, to make sure |
| 15:45 | 20 | that this graphic depiction is statistically correct? |
| 15:45 | 21 | A.  Yes, I did.  I looked at individual patient data to |
| 15:45 | 22 | determine the patterns of substitution across drugs. |
| 15:45 | 23 | Q.  What did that analysis show? |
| 15:45 | 24 | A.  That analysis showed that, in fact, the lines on this |
| 15:45 | 25 | graph are very representative that if there is a one-dollar |

15:45   1   reduction in expenditures on Vioxx, that there is a

15:45   2   corresponding increase on expenditures of these other products

15:45   3   that more than offsets.  For each dollar reduction, there is

15:45   4   about a dollar and a penny increase in expenditures on other

15:45   5   products.

15:45   6   Q.   Did you do any statistically significant testing to

15:45   7   determine that dollar-for-dollar offset for the drugs that were

15:45   8   substituted for Vioxx by Louisiana Medicaid?

15:45   9   A.   Yes.  The increases in the other products is highly

15:45   10   statistically significant.  Most of this change, as this graph

15:46   11   reflects, is going into Bextra and Celebrex, and there is not a

15:46   12   statistically significant reduction in overall expenditures.

15:46   13   The point estimate, which includes no change at all, is that

15:46   14   there was a 1 percent increase.

15:46   15   Q.   Can you tell the Court briefly how you did that cohort

15:46   16   analysis, the individual prescription looking analysis.

15:46   17   A.   Yes.  I looked at individual patients.  Once they received

15:46   18   a Vioxx prescription, then on average in later months -- so a

15:46   19   month later, two months later, three months later -- what was

15:46   20   the average expenditures on Vioxx and on other products in the

15:46   21   dataset.  Then during this NPDL period, you put in a variable

15:46   22   that says:  Well, are those averages affected by the fact that

15:46   23   Vioxx has NPDL status?

15:46   24        It's kind of like you are taking a difference in two

15:46   25   averages, taking into account that now Vioxx has NPDL status.

| | | |
|---|---|---|
| 15:47 | 1 | It's a similar methodology as I used in my dissertation.  The |
| 15:47 | 2 | results show that there is no change in overall expenditures. |
| 15:47 | 3 | There's a slight increase as a point estimate, but it's not |
| 15:47 | 4 | statistically significant. |
| 15:47 | 5 | **Q.**   Why, to you, is it significant to look at this open |
| 15:47 | 6 | formulary to nonpreferred drug list with regard to analyzing |
| 15:47 | 7 | the economic consequences in this case of Vioxx expenditures? |
| 15:47 | 8 | **A.**   Because during this period -- this is a period in which, |
| 15:47 | 9 | if it is contemplated that there would have been a restrictive |
| 15:47 | 10 | formulary instituted in June of 2001, or some period shortly |
| 15:47 | 11 | thereafter, the kind of information that was available about |
| 15:47 | 12 | these products during that period is very similar to the kind |
| 15:47 | 13 | of information that existed during the NPDL period. |
| 15:47 | 14 | So you're controlling for the information that was |
| 15:47 | 15 | available in a very good way in that you are picking it from |
| 15:48 | 16 | kind of right in the middle of the period when Vioxx would have |
| 15:48 | 17 | been -- if Vioxx had been on a restricted access through a |
| 15:48 | 18 | restricted formulary, this period is very, very similar in |
| 15:48 | 19 | terms of information. |
| 15:48 | 20 | **Q.**   In your opinion, does this serve as a very good surrogate |
| 15:48 | 21 | or proxy for doing that analysis? |
| 15:48 | 22 | **A.**   Yes.  This is an excellent one. |
| 15:48 | 23 | **Q.**   If Louisiana spent $11,172,702 net of rebates for Vioxx |
| 15:48 | 24 | from June 13, 2001 to September 30, 2004, do you have an |
| 15:48 | 25 | opinion as to the amount of value that it received for that |

DAILY COPY

15:48   1   expenditure?

15:48   2           MR. MURRAY:  Objection, Your Honor.  It goes beyond

15:48   3   the report.  The amount of value for that expenditure is not in

15:48   4   the report.

15:48   5           THE COURT:  You have to reshape the question.

        6   BY MR. SALES:

15:48   7   Q.   Do you have an opinion, Dr. Wiggins, that if the State of

15:48   8   Louisiana expended $11,172,702 -- let me start that over.

15:48   9           Do you have an opinion if the State of Louisiana had

15:49  10   expended $11,172,702 net of rebates from June 13, 2001 to

15:49  11   September 30, 2004, would those expenditures have gone to other

15:49  12   products in the coxib class?

15:49  13   A.   Yes.

15:49  14   Q.   What is the basis of that opinion?

15:49  15   A.   The basis of that opinion is the aggregate data that -- or

15:49  16   the gross expenditure data, excuse me, that you have in front

15:49  17   of you, but also the individual cohort analysis that I

15:49  18   described earlier in my testimony.

15:49  19   Q.   Is that, in your opinion, the best economic analysis of

15:49  20   what the state received for Vioxx?

15:49  21   A.   Yes.

15:49  22           MR. SALES:  I tender the witness, Your Honor.

15:49  23                       CROSS-EXAMINATION

14:01  24   BY MR. MURRAY:

15:49  25   Q.   Just a few questions, Dr. Wiggins.  Do you have an opinion

                               DAILY COPY

1087

| | | |
|---|---|---|
| 15:49 | 1 | as to what happened to Vioxx expenditures or, rather, where |
| 15:50 | 2 | money that had been spending on Vioxx went after removal of |
| 15:50 | 3 | Vioxx on September 30, 2004? |
| 15:50 | 4 | **A.**    During the period afterwards and all of the changes that |
| 15:50 | 5 | happened during that same period -- the FDA changes, the |
| 15:50 | 6 | halting of several clinical trials -- then expenditures on |
| 15:50 | 7 | NSAIDs in general and on coxibs declined. |
| 15:50 | 8 | **Q.**    Do you have an opinion as to -- that wasn't exactly my |
| 15:50 | 9 | question. |
| 15:50 | 10 | **A.**    I'm sorry. |
| 15:50 | 11 | **Q.**    Do you have an opinion as to where the Vioxx expenditures |
| 15:50 | 12 | went?  In other words, the money that was being spent on Vioxx, |
| 15:50 | 13 | did it go to Celebrex and Bextra, or did it go to other NSAIDs? |
| 15:50 | 14 | **A.**    Some of it went to other NSAIDs, some of it went to |
| 15:50 | 15 | steroids, ordinary steroids, some of it went to narcotics, and |
| 15:50 | 16 | a variety of other places. |
| 15:50 | 17 | **Q.**    Is your opinion with respect to what happened on |
| 15:50 | 18 | September 30, 2004, when Vioxx was withdrawn from the market, |
| 15:51 | 19 | in terms of whether the same amount of dollars were spent, the |
| 15:51 | 20 | same with respect to the withdrawal on September 30, 2004? |
| 15:51 | 21 | **A.**    I'm sorry.  I got confused.  I'm sorry. |
| 15:51 | 22 | **Q.**    You had an opinion that when we are talking about the time |
| 15:51 | 23 | that Vioxx was on the market and the preferred drug list and |
| 15:51 | 24 | how if Vioxx was off the preferred drug list, another NSAID was |
| 15:51 | 25 | being paid -- I'm sorry, another coxib was being paid for -- |

DAILY COPY

1088

15:51    1    A.    That's correct.
15:51    2    Q.    -- and the dollar amounts were even.  We were just
15:51    3    swapping dollars.  If we were on Celebrex or we were on Bextra
15:51    4    or we were on Vioxx, we are swapping dollars basically.  Is
15:51    5    that a fair submission?
15:51    6    A.    That's a fair statement.  That's a fair statement.
15:51    7    Q.    Does that opinion hold when we go to September 30, 2004?
15:51    8    Are we still just swapping dollars, or is there a different
15:51    9    number?
15:51   10    A.    During the period September 30, 2004 and following, you
15:51   11    are not swapping dollars because there are a lot of changes in
15:52   12    this class, in the entire class, because information has
15:52   13    changed regarding the health and safety risks of all NSAIDs,
15:52   14    including the coxibs and a variety of information.  So you have
15:52   15    the withdrawal of Vioxx and a variety of other changes, but
15:52   16    there's an overall reduction in expenditures on coxibs and
15:52   17    NSAIDs.  I believe it extends to all NSAIDs as well.
15:52   18    Q.    That gets us to a point that I wanted to ask you about,
15:52   19    and that is:  What role does the information available play in
15:52   20    your opinions about whether the state has suffered economic
15:52   21    harm by withdrawal of -- by paying for Vioxx?
15:52   22    A.    The economic harm, that does not affect that opinion in
15:52   23    that during this period the value that is being placed on Vioxx
15:53   24    by the physicians and the patients is reflected in the
15:53   25    willingness to pay for Bextra and Celebrex.  So when you look

DAILY COPY

| | | |
|---|---|---|
| 15:53 | 1 | at economic harm and you say there -- I say there was no |
| 15:53 | 2 | economic harm here because the value that was received in terms |
| 15:53 | 3 | of pain relief is reflected in their willingness to pay for |
| 15:53 | 4 | these alternative therapies offering a similar type of pain |
| 15:53 | 5 | relief. |
| 15:53 | 6 | Q.   So your opinion that it's appropriate to consider the |
| 15:53 | 7 | compensating payments for other coxibs, other drugs that were |
| 15:53 | 8 | switched to instead of Vioxx, is hinged upon your belief that |
| 15:53 | 9 | the information available about those would indicate that they |
| 15:53 | 10 | are comparable to Vioxx? |
| 15:53 | 11 | A.   Yes, comparable in terms of the pain relief they offer. |
| 15:53 | 12 | Q.   If they weren't comparable, then you couldn't offer that |
| 15:54 | 13 | opinion? |
| 15:54 | 14 | A.   Yes.  It turns on they're comparable in terms of the pain |
| 15:54 | 15 | relief that is being offered. |
| 15:54 | 16 | Q.   Comparable in terms of the pain relief that's being |
| 15:54 | 17 | offered or comparable in terms of all clinical aspects of the |
| 15:54 | 18 | drugs? |
| 15:54 | 19 | A.   I'm not sure what you mean by other clinical aspects of |
| 15:54 | 20 | the drugs. |
| 15:54 | 21 | Q.   Well, let's assume for the purpose of this question that |
| 15:54 | 22 | the pain relief being delivered is the same for Vioxx as for |
| 15:54 | 23 | Celebrex as for Aleve. |
| 15:54 | 24 | A.   Okay. |
| 15:54 | 25 | Q.   The pain relief is the same for all of those.  So there |

1090

| | | |
|---|---|---|
| 15:54 | 1 | has to be some other clinical differentiation, correct, in |
| 15:54 | 2 | order to justify that price differential? |
| 15:54 | 3 | **A.**   If you put Aleve in there, you have -- this analysis is |
| 15:54 | 4 | saying that these patients are staying away from Aleve.  The |
| 15:54 | 5 | patients are going to the COX-2s during this period.  So |
| 15:54 | 6 | they're substituting in -- for whatever reason, they are |
| 15:54 | 7 | substituting in to other COX-2s and not in to Aleve when Vioxx |
| 15:55 | 8 | is not available. |
| 15:55 | 9 | **Q.**   But you don't know why they are substituting in to those |
| 15:55 | 10 | others; in other words, you don't know that it's just because |
| 15:55 | 11 | of pain relief or comparable pain relief? |
| 15:55 | 12 | **A.**   No.  They value this bundle of characteristics.  I cannot |
| 15:55 | 13 | be in the head of a physician or a patient. |
| 15:55 | 14 | **Q.**   The bundle of characteristics has to be the same in order |
| 15:55 | 15 | for your analysis to work? |
| 15:55 | 16 | **A.**   For my analysis to work, the patients have to understand |
| 15:55 | 17 | the bundle of characteristics that they are getting for |
| 15:55 | 18 | Celebrex and for Bextra.  That is the willingness to pay to get |
| 15:55 | 19 | pain relief to get this bundle of characteristics.  So they say |
| 15:55 | 20 | you can't buy this one or you have to get prior approval to buy |
| 15:55 | 21 | this one.  We choose to buy this one.  So what value am I |
| 15:55 | 22 | placing on the new one that I'm buying; and if that bundle of |
| 15:55 | 23 | characteristics, in terms of what they thought they were |
| 15:55 | 24 | getting in terms of pain relief and other characteristics, is |
| 15:56 | 25 | comparable, then that shows how much they valued what they were |

| | | |
|---|---|---|
| 15:56 | 1 | purchasing in terms of Vioxx. |
| 15:56 | 2 | Q.    Now, if Vioxx didn't deliver the same bundle of |
| 15:56 | 3 | characteristics, if it was unknown to the patients that Vioxx |
| 15:56 | 4 | didn't deliver the same bundle of characteristics as those |
| 15:56 | 5 | drugs that you are substituting in, then wouldn't it be true |
| 15:56 | 6 | that the measure of harm would be different? |
| 15:56 | 7 | A.    Well, the only two sets of characteristics that I know of |
| 15:56 | 8 | here, as an economist, is their positive characteristics, which |
| 15:56 | 9 | is the ability to relieve pain.  There are negative |
| 15:56 | 10 | characteristics regarding risk, and risk is a separate matter. |
| 15:56 | 11 | In terms of the pain relief, I'm not aware -- it is |
| 15:56 | 12 | my understanding that the positive characteristics of the |
| 15:56 | 13 | products is similar, and that is an assumption that I made. |
| 15:56 | 14 | I'm not here to testify that that is, in fact, medically true. |
| 15:56 | 15 | Q.    Do you have an opinion as to what the value received is by |
| 15:57 | 16 | the state for Vioxx if Vioxx doesn't have the same |
| 15:57 | 17 | characteristics in terms of positive benefits as Celebrex and |
| 15:57 | 18 | Bextra? |
| 15:57 | 19 | A.    That the information -- you're assuming that the patients |
| 15:57 | 20 | that are purchasing it, the doctors that are making the |
| 15:57 | 21 | assessment, that they value pain relief.  If those doctors |
| 15:57 | 22 | don't know how to value pain relief, which they are the agents |
| 15:57 | 23 | of the state, then, of course, things are different.  But I |
| 15:57 | 24 | have assumed that they can value the pain relief in Celebrex |
| 15:57 | 25 | and Bextra, and that is the measure that I'm using. |

15:57   1        **THE COURT:**  We are getting a little away from this

15:57   2   witness' expertise.  He is an economist.

15:58   3        **MR. MURRAY:**  Well, I think --

15:58   4        **THE COURT:**  That's all I'm hearing from you is when

15:58   5   one goes down, the other one goes up.

15:58   6        **THE WITNESS:**  That's correct.

15:58   7        **THE COURT:**  When Vioxx goes down, you say another

15:58   8   coxib goes up.

15:58   9        **THE WITNESS:**  Yes, and that the characteristics of

15:58   10  those products appear to be different from other NSAIDs in the

15:58   11  assessment of physicians.

15:58   12       **MR. MURRAY:**  Your Honor, I'm trying to understand the

15:58   13  bases for his opinion, as to the relevance of that, to

15:58   14  determine the economic harm to the state.  Maybe to get back to

15:58   15  economics, let's see.

15:58   16  **BY MR. MURRAY:**

15:58   17  **Q.**   You're at Texas A&M; correct, sir?

15:58   18  **A.**   That's correct.  Toughest job in the world; I teach

15:58   19  Aggies.

15:58   20  **Q.**   No comment there.  I'm sure that, as a professor at Texas

15:58   21  A&M, you know something about the economics of agricultural

15:59   22  products?

15:59   23  **A.**   I don't separately study agricultural products.  I'm not

15:59   24  an ag economist.  Ag markets, I study industrial organization.

15:59   25  **Q.**   You would agree that there are different rankings for

DAILY COPY

1093

| | | |
|---|---|---|
| 15:59 | 1 | different agricultural products; some are rated higher than |
| 15:59 | 2 | others.  Let's take the example of beef. |
| 15:59 | 3 | A.   I'm familiar that there is a ranking system for beef. |
| 15:59 | 4 | Q.   The FDA, they have prime, choice, select? |
| 15:59 | 5 | A.   Yes. |
| 15:59 | 6 | Q.   Let's say I go and buy prime beef.  I go to a vendor and |
| 15:59 | 7 | he tells me, "Here's some prime beef," and low and behold, I |
| 15:59 | 8 | didn't get prime beef; I got select instead of prime.  Select |
| 15:59 | 9 | is cheaper than prime; right? |
| 15:59 | 10 | A.   I don't know the ranking system of beef that well. |
| 15:59 | 11 | Q.   Let's assume for the purposes that prime is prime beef |
| 15:59 | 12 | and select is -- |
| 15:59 | 13 | A.   I'm willing to assume that.  I have never studied that |
| 16:00 | 14 | ranking system, but that sounds right. |
| 16:00 | 15 | Q.   Now, if we were to measure the economic harm that I |
| 16:00 | 16 | suffered for paying the prime beef price for select beef, we |
| 16:00 | 17 | wouldn't go and look to what I would pay for prime beef from |
| 16:00 | 18 | another vendor, would we? |
| 16:00 | 19 | A.   Well, in your example, you actually have the labels, so |
| 16:00 | 20 | you say, "I have a label here," but, in fact, in a real |
| 16:00 | 21 | economic setting, where you don't have someone saying, "This is |
| 16:00 | 22 | prime and this is select," you have a situation where I observe |
| 16:00 | 23 | a person buying a particular cut of meat, and that cut of meat |
| 16:00 | 24 | is no longer available.  The way I'm going to figure out what |
| 16:00 | 25 | that cut of meat was worth to that person is I'm going to go |

1094

| | | |
|---|---|---|
| 16:00 | 1 | out and figure out what else he bought when that one wasn't |
| 16:00 | 2 | available. |
| 16:00 | 3 | Q.   If what I bought was labeled as prime -- let's assume for |
| 16:00 | 4 | my scenario that it was mislabeled.  It was select beef and it |
| 16:01 | 5 | had been mislabeled as prime.  The vendor misled me and said it |
| 16:01 | 6 | was prime and it was select. |
| 16:01 | 7 | A.   Okay. |
| 16:01 | 8 | Q.   In terms of measuring the actual harm that I have |
| 16:01 | 9 | suffered, the actual economic harm that I have suffered, you |
| 16:01 | 10 | wouldn't say, "Well, he would have gone and bought prime from |
| 16:01 | 11 | somebody else, so he doesn't have an economic injury," would |
| 16:01 | 12 | you? |
| 16:01 | 13 | A.   No, I would not if I had an actual rating system where I |
| 16:01 | 14 | would have those two items are being separately priced.  But in |
| 16:01 | 15 | most economic markets -- and by the way, an example I am |
| 16:01 | 16 | familiar with is there's different gravities for oil.  You pay |
| 16:01 | 17 | a different price.  These things have different prices.  But |
| 16:01 | 18 | most markets are actually not like that.  You observe people |
| 16:01 | 19 | and you try to figure out what something is worth to them using |
| 16:01 | 20 | the principle of revealed preference.  Under revealed |
| 16:01 | 21 | preference, I look at if you bought this and then that was not |
| 16:01 | 22 | available and you bought this instead, those are of comparable |
| 16:02 | 23 | value. |
| 16:02 | 24 | Q.   Are you familiar with the Louisiana concept of |
| 16:02 | 25 | redhibition? |

16:02  1   **A.**   It has been explained to me and I am familiar with it in a
16:02  2   layman's economist way.  I'm not an attorney.
16:02  3   **Q.**   Have you been asked to render an opinion as to what the
16:02  4   proper remedies are under redhibition with respect to the
16:02  5   state's purchase of Vioxx?
16:02  6   **A.**   I have been asked to render the opinions at trial that I
16:02  7   have just rendered.  So to the extent that this fits into one
16:02  8   of those categories, it fits into one of those categories.  I'm
16:02  9   not a lawyer, though.
16:02  10  **Q.**   You have no opinion as to whether or not it fits into one
16:02  11  of those categories?  I just want to make sure --
16:02  12  **A.**   I do not.
16:03  13  **Q.**   Just one last question.  When we were talking about
16:03  14  compensating expenditures -- I think in your deposition, you
16:03  15  testified that we need to look at compensating expenditures in
16:03  16  order to determine what the damage to the state is; correct?
16:03  17  **A.**   Yes.
16:03  18  **Q.**   Because if you don't look at compensating expenditures,
16:03  19  you would end up in a windfall to the buyer?
16:03  20  **A.**   Yes.
16:03  21  **Q.**   Let's assume that the thing sold is represented to have
16:03  22  qualities that it does not have, but the compensating
16:03  23  expenditures do have the quality that the thing sold does not
16:03  24  have.  Do you still feel there's a windfall to the buyer?
16:03  25  **A.**   Yes, when there is a separate remedy for those other

1096

| | |
|---|---|
| 16:03 | 1 |
| 16:03 | 2 |
| 16:04 | 3 |

16:03   1  characteristics, which it is my understanding in this case that

16:03   2  separate remedy is available in terms of any injury that is

16:04   3  caused.  There's a separate remedy for it.

16:04   4  **Q.**   Again, getting back to my prime beef analysis and you sell

16:04   5  me prime as select -- you sell me select as prime, you mislabel

16:04   6  it, you say it's something that it's not, still we wouldn't

16:04   7  look to -- compensating expenditures is still an appropriate

16:04   8  measure of the harm that I have received?

16:04   9  **A.**   You just switched the analysis, so I don't know which one

16:04  10  you want to go with.  The one before, as you said, it had an

16:04  11  undesirable characteristic.  Here, that undesirable

16:04  12  characteristic has been compensated for.

16:04  13          In terms of the rating system, I am not aware of a

16:04  14  rating system.  If there were an objective rating system, then

16:04  15  you could use such an objective rating system.  Here, you are

16:05  16  left with looking at the principle of revealed preference.  In

16:05  17  terms of the characteristics -- and you asked me earlier if the

16:05  18  characteristics are somewhat different, does all the analysis

16:05  19  carry through.  And I said, well, no, I have assumed -- I'm

16:05  20  assuming that in terms of the positive characteristics here,

16:05  21  they're comparable.  I'm not a medical doctor.  I'm not here to

16:05  22  testify that they are.  This assumes that they are.

16:05  23          If there is an injury here, which is an undesirable

16:05  24  characteristic, that is being separately compensated for, is my

16:05  25  understanding.

16:05    1    **Q.**    Just so that we understand one another, you have no

16:05    2    opinion as to what the difference in value between Vioxx is,

16:05    3    assuming that Vioxx does not have the same positive

16:05    4    characteristics as the compensating expenditure drugs that you

16:05    5    considered?

16:06    6    **A.**    My opinion is that the doctors behaved as though they felt

16:06    7    like the value of the characteristics exhibited by Vioxx was

16:06    8    comparable.  That's how the physicians in this sample are

16:06    9    behaving.  If you say, "Is it possible that the physicians were

16:06   10    in error?" of course, that's possible.

16:06   11    **Q.**    But you don't have an opinion as to the difference in

16:06   12    value if they are in error?

16:06   13    **A.**    Except that I am using their valuation of these comparable

16:06   14    drugs, and I'm not aware of any dispute about the value -- the

16:06   15    characteristics in terms of the valuation of Celebrex and

16:06   16    Bextra.  The value of what the physicians thought they were

16:06   17    getting in Vioxx is reflected in the value that they received

16:06   18    for the purchases of Celebrex and Bextra.

16:06   19    **Q.**    Let's make sure I have an answer to my question.  You

16:07   20    don't have an opinion as to the difference in value between

16:07   21    Vioxx and the compensating expenditures, assuming that Vioxx

16:07   22    did not have the positive characteristics that those other

16:07   23    drugs had?  I just want to make sure that we are clear on that.

16:07   24    **A.**    Is the question if Vioxx does not offer analgesic pain

16:07   25    relief comparable to Bextra and Celebrex, then I don't have an

1098

16:07  1   opinion?  Is that the question you're trying to ask me?

16:07  2   **Q.**   I'm trying to understand why you are limiting it to

16:07  3   analgesic pain relief.  Do you have no opinion whatsoever as to

16:07  4   whether there could be a difference in value or perceived value

16:07  5   because of any grounds other than analgesic pain relief?

16:07  6   **A.**   I lumped this together earlier under the grouping of

16:07  7   positive characteristics, general positive characteristics, as

16:07  8   to what -- when the doctors couldn't buy this bundle of

16:07  9   positive characteristics, they went to another product that

16:07  10  exhibited those same positive characteristics.  So if I want a

16:08  11  value -- and you're saying, "Well, what if Vioxx doesn't have

16:08  12  the same positive characteristics as Bextra and Celebrex?"  I'm

16:08  13  saying, one, that it appears that doctors thought they did.

16:08  14  But if the doctors were mistaken, then their valuation might

16:08  15  not apply to Vioxx, but they sure behaved as though they

16:08  16  thought it did.

16:08  17  **Q.**   You don't have an opinion as to what the difference in

16:08  18  value would be assuming that the bundle of positive

16:08  19  characteristics is different?

16:08  20          **MR. SALES:**  Your Honor, objection.

16:08  21          **THE COURT:**  I sustain the objection.  This is the

16:08  22  third or fourth time.  I know where we are going with that.  I

16:08  23  think we are having two ships cross in the night.  As I hear

16:08  24  what he is saying, is that the way he has concluded the value

16:09  25  is by revealed preference.  He says when the doctors could not

DAILY COPY

16:09    1    buy Vioxx or could not -- when Vioxx wasn't available, they

16:09    2    looked to other coxibs and the same amount was spent.

16:09    3            THE WITNESS:  Yes.

16:09    4            THE COURT:  I don't know whether he can testify as to

16:09    5    what he assumed other than what the figures are.

16:09    6            MR. MURRAY:  I'm trying to understand the basis for

16:09    7    his assumptions, Your Honor, and the basis for his opinions.

16:09    8            THE COURT:  I think it's just revealed preference.  I

16:09    9    think he just says he sees the doctors, when they can't get

16:09   10    Vioxx, they go to other coxibs.  Since the same amount of money

16:09   11    that they would have spent on Vioxx is spent on the others, he

16:09   12    just assumes that they perceived that both offered the same

16:10   13    value.

16:10   14            THE WITNESS:  May I?

16:10   15            THE COURT:  Yes.

16:10   16            THE WITNESS:  They value this positive bundle of

16:10   17    characteristics as reflected in the dollars they spend on

16:10   18    Celebrex and Bextra.  If one were to say those positive

16:10   19    characteristics don't exist in Vioxx, they simply don't and the

16:10   20    doctors were mistaken in the first place to buy Vioxx, then the

16:10   21    analysis wouldn't apply.

16:10   22            MR. MURRAY:  No more questions, Your Honor.

16:10   23                        REDIRECT EXAMINATION

16:10   24    BY MR. SALES:

16:10   25    Q.   Just one question, then, since we went back and forth.

DAILY COPY

| | | |
|---|---|---|
| 16:10 | 1 | With regard to the 11-some-odd-million-dollar figure, do you |
| 16:10 | 2 | have an opinion, therefore, whether the state received value |
| 16:10 | 3 | for those expenditures for Vioxx? |
| 16:10 | 4 | **A.**   Yes, I do.  My opinion is that they received full value. |
| 16:10 | 5 | **MR. SALES:**  No further questions, Your Honor. |
| 16:10 | 6 | **THE COURT:**  Thank you.  You are excused, Doctor. |
| 16:10 | 7 | Does that end it today? |
| 16:10 | 8 | **MR. ISMAIL:**  Yes, sir. |
| 16:10 | 9 | **THE COURT:**  Where are we for tomorrow? |
| 16:10 | 10 | **MR. ISMAIL:**  We have two final witnesses, Your Honor. |
| 16:11 | 11 | Are we submitting any depositions this afternoon on the record? |
| 16:11 | 12 | We have that stipulation to submit trial testimony in lieu of |
| 16:11 | 13 | bringing Dr. Reicin and Dr. Morrison to court live.  There are |
| 16:11 | 14 | some other agreements with respect to record evidence that we |
| 16:11 | 15 | will offer today.  Tomorrow, we have Dr. Sales and Rarick, and |
| 16:11 | 16 | then we rest. |
| 16:11 | 17 | **THE COURT:**  You-all know the lineup, Steven? |
| 16:11 | 18 | **MR. MURRAY:**  We do, Your Honor.  I think there was |
| 16:11 | 19 | one question that Tarek and I discussed, and that was:  Do you |
| 16:11 | 20 | think we should prepare for closings tomorrow or on Wednesday? |
| 16:11 | 21 | **THE COURT:**  I think so.  Why don't we prepare for |
| 16:11 | 22 | closing tomorrow.  If we have to push it back, we can.  We will |
| 16:11 | 23 | start at 9:00 tomorrow. |
| 16:11 | 24 | Do you have any feel for how long it will take |
| 16:11 | 25 | with direct? |

1101

| | | |
|---|---|---|
| 16:11 | 1 | **MR. ISMAIL:**  The directs we are going to endeavor to |
| 16:11 | 2 | do as we did today.  The cross, as you saw, was quite |
| 16:11 | 3 | extensive.  So if the crosses are as long, we'll end up |
| 16:11 | 4 | probably with Dr. Rarick finishing around 4:00, 3:30. |
| 16:12 | 5 | **THE COURT:**  Let's see where we are with it.  Any |
| 16:12 | 6 | rebuttal so far? |
| 16:12 | 7 | **MR. MURRAY:**  Not at this point Your Honor, no. |
| 16:12 | 8 | **MR. ISMAIL:**  Your Honor, do you know your schedule |
| 16:12 | 9 | for Wednesday now? |
| 16:12 | 10 | **THE COURT:**  If we do come back on Wednesday, we will |
| 16:12 | 11 | come back at 11:00 and we can do it then. |
| 16:12 | 12 | **MR. SALES:**  Your Honor, Merck would tender the |
| 16:12 | 13 | written depositions of the following witnesses: |
| 16:12 | 14 | John Fevurly.  The deposition of Mr. Fevurly was |
| 16:13 | 15 | taken on November 12, 2009. |
| 16:13 | 16 | The trial testimony, pursuant to the stipulation |
| 16:13 | 17 | of the parties, of Alice Reicin from March 2, 2005. |
| 16:14 | 18 | The deposition of Holly Jacque-Turner, which was |
| 16:14 | 19 | taken on October 22, 2009. |
| 16:14 | 20 | **MR. ISMAIL:**  We'll submit Dr. Morrison tomorrow. |
| 16:14 | 21 | **THE DEPUTY CLERK:**  Do these have objections?  Does |
| 16:14 | 22 | the Judge have to see these? |
| 16:14 | 23 | **MR. SALES:**  Yes. |
| 16:14 | 24 | Your Honor, just to clarify on Alice Reicin, |
| 16:14 | 25 | obviously the Court will remember the testimony was more than |

DAILY COPY

| | | |
|---|---|---|
| 16:14 | 1 | one day:  March 3, 2005, March 23, 2005, May 27, 2005, |
| 16:14 | 2 | August 19, 2005, September 29, 2006, and September 21, 2006. |
| 16:15 | 3 | Thank you, Your Honor. |
| 16:15 | 4 | **THE COURT:**  We'll make that a part of the record. |
| 16:15 | 5 | Steven, you and Travis get together before the |
| 16:15 | 6 | case closes and make sure I have all the depositions that |
| 16:15 | 7 | you-all posted. |
| 16:15 | 8 | **MR. MURRAY:**  I believe Your Honor has all the ones |
| 16:15 | 9 | that we have submitted.  We are just waiting on the -- |
| 16:15 | 10 | **THE COURT:**  I think I do. |
| 16:15 | 11 | **THE DEPUTY CLERK:**  I'm waiting on Melwyn Wendt. |
| 16:15 | 12 | **THE COURT:**  Tomorrow at 9:00. |
| 16:15 | 13 | **THE DEPUTY CLERK:**  Everyone rise. |
| 16:15 | 14 | (WHEREUPON the Court was in recess for the evening.) |
| 16:15 | 15 | * * * |
| | 16 | **CERTIFICATE** |
| | 17 | I, Toni Doyle Tusa, CCR, FCRR, Official Court |
| | 18 | Reporter for the United States District Court, Eastern District |
| | 19 | of Louisiana, do hereby certify that the foregoing is a true |
| | 20 | and correct transcript, to the best of my ability and |
| | 21 | understanding, from the record of the proceedings in the |
| | 22 | above-entitled and numbered matter. |
| | 23 | |
| | 24 | |
| | 25 | s/ Toni Doyle Tusa |
| | | Toni Doyle Tusa, CCR, FCRR |
| | | Official Court Reporter |

DAILY COPY