```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

       ******************************************************************
 3
       IN RE:  VIOXX PRODUCTS              MDL No. 1657
 4     LIABILITY LITIGATION               Section: "L"
                                          New Orleans, Louisiana
 5                                        Tuesday, April 20, 2010

 6     ******************************************************************
       THIS DOCUMENT RELATES TO:
 7
       State of Louisiana, ex rel
 8     James D. Caldwell, Jr.,
       Attorney General
 9
              versus
10
       Merck
11
       Case No. 05-CV-3700
12     ******************************************************************

13                   TRANSCRIPT OF TRIAL PROCEEDINGS
             HEARD BEFORE THE HONORABLE ELDON E. FALLON
14                   UNITED STATES DISTRICT JUDGE
                        DAY 7, MORNING SESSION
15


16


17     APPEARANCES:


18
       FOR THE LOUISIANA DEPARTMENT
19     OF HEALTH AND HOSPITALS:
                                     DUGAN LAW FIRM
20                                   BY:  JAMES R. DUGAN, II, ESQ.
                                     650 Poydras St., Suite 2150
21                                   New Orleans, LA 70130

22
                                     MURRAY LAW FIRM
23                                   BY:  STEPHEN B. MURRAY, JR., ESQ.
                                          DOUGLAS R. PLYMALE, ESQ.
24                                        JUSTIN BLOOM, ESQ.
                                     650 Poydras St., Suite 1100
25                                   New Orleans, LA 70130
```

```
 1
 2                                   LIEFF CABRASER HEIMANN & BERNSTEIN
                                     BY:  DONALD C. ARBITBLIT, ESQ.
                                     Embarcadero Center West
 3                                   275 Battery Street, Suite 3000
                                     San Francisco, CA 94111-3339
 4
 5
 6   FOR MERCK:                      GOLDMAN ISMAIL TOMASELLI
                                     BRENNAN & BAUM
 7                                   BY:  TAREK ISMAIL, ESQ.
                                     1 North Franklin St., Suite 625
 8                                   Chicago, IL 60606
 9                                   BAKER BOTTS
                                     BY:  TRAVIS J. SALES, ESQ.
10                                   One Shell Plaza
                                     910 Louisiana
11                                   Houston, TX 77002-4995
12
                                     O'MELVENY & MYERS
13                                   BY:  SCOTT M. VOELZ, ESQ.
                                     400 South Hope Street
14                                   Los Angeles, CA 90071-2899
15
16
     Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR
17                                   500 Poydras Street, Room HB-406
                                     New Orleans, Louisiana 70130
18                                   (504) 589-7776
19
20       Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21
22
23
24
25
```

I N D E X

WITNESSES FOR THE DEFENDANT:                    PAGE/LINE:


DAVID J. SALES


  Voir Dire Examination by Mr. Ismail          1107/10

  Direct Examination by Mr. Ismail             1110/2

  Cross-Examination by Mr. Arbitblit           1138/8

  Redirect Examination by Mr. Ismail           1183/3




LISA RARICK


  Voir Dire Examination by Mr. Sales           1196/20

  Direct Examination by Mr. Sales              1208/7

<u>P R O C E E D I N G S</u>

(TUESDAY, APRIL 20, 2010)

(MORNING SESSION)


     (OPEN COURT.)

          THE COURT:  Be seated, please.  Good morning, ladies and
gentlemen.  Let's call your next witness.

          MR. SALES:  Your Honor, one housekeeping matter from
yesterday evening with Dr. Wiggins.  Merck would offer Defendant's
Exhibit 4015 and 4016, which are the graphs.

          THE COURT:  Those are the graphs, right, I'll admit it.

          MR. ISMAIL:  Good morning, your Honor, in addition to
that, we have provided the court a copy of the excerpts of those
committee hearing transcripts or the video that we played, there
was a request that we file a written transcript and we have done
that.  If your Honor would receive that into the record.

          THE COURT:  All right.  Fine.

          MR. ISMAIL:  Your Honor, Merck calls as its next witness
Dr. David Sales.

          THE COURT:  Come forward, Doctor.

          THE DEPUTY CLERK:  Please step into the witness box.
Would you raise your right hand.

       (WHEREUPON, DAVID J. SALES, M.D., WAS SWORN IN AND TESTIFIED
       AS FOLLOWS:)

          THE DEPUTY CLERK:  Please be seated and would you state

1        your name for the record.

2                THE WITNESS:  David J. Sales, S-A-L-E-S.

3                THE DEPUTY CLERK:  Thank you.

4                MR. MURRAY:  Excuse me, your Honor, just a housekeeping

5        matter.  Just so the record is clear, we have an objection on

6        relevance as to those video clips.  We note that your Honor has

7        admitted them with an objection.

8                THE COURT:  Right, and I'll overrule those.

9                        VOIR DIRE EXAMINATION

10       BY MR. ISMAIL:

11       Q.  Good morning, Doctor.

12       A.  Good morning.

13       Q.  Can you tell us what you do for a living?

14       A.  I am a gastroenterologists.

15       Q.  Are you prepared to testify today as an expert witness in this

16       matter?

17       A.  Yes, I am.

18       Q.  Can you trace for the court briefly your educational and

19       professional background?

20       A.  I will.  My undergraduate education was at the Massachusetts

21       Institute of Technology, I received a bachelors degree there.

22       Following that, all of my training was at the University of

23       Chicago.  I first received a Ph.D. in biochemistry there, however,

24       I received specialized training in doing research.  Following that

25       I received a medical degree.

1    I proceeded to have further training in internal medicine

2  with my internship and residency there.  And then I was granted a

3  fellowship in specialized training in gastroenterology.  I finished

4  there in 1982.

5  Q.  Are you board certified, sir?

6  A.  Yes, I am.

7  Q.  In what specialty?

8  A.  In both internal medicine and gastroenterology.

9  Q.  Have you been practicing in the field of gastroenterology for,

10  since your completion of your fellowship?

11  A.  Yes, I have.

12  Q.  Over that 20 plus year career practicing gastroenterology, have

13  you specialized in patient care?

14  A.  Yes, I have, I am a full-time clinician.

15  Q.  Can you describe what your clinical practice is?

16  A.  Yes.  My clinical practice is with a group of other

17  gastroenterologists.  We do 100 percent consultative

18  gastroenterology, we don't do primary care.  And I take care of the

19  entire spectrum of digestive disorders.

20  Q.  During the course of your career treating patients in

21  gastroenterology, have you had experience treating patients who

22  have developed gastrointestinal complications from NSAIDs?

23  A.  Yes, I have taken care of many patients with that complication.

24  Q.  Have you served as a clinical investigator in any clinical

25  studies?

1    A.  Yes, I participated in over 130 clinical studies, either as a

2    primary investigator at my clinical site or as an assistant

3    investigator.

4    Q.  Does a large portion of your practice deal with managing the

5    care of gastrointestinal complications generally and do you also

6    see several patients who have developed those complications with

7    NSAID treatment?

8    A.  Yes.  A large portion of our practice deals with the acid

9    peptic disorders and the prime cause of those is the

10   anti-inflammatory medications.

11   Q.  Doctor, in front of you is a binder, and if you would look at

12   Exhibit 1.  If you can tell us whether that's an accurate

13   up-to-date copy of your curriculum vitae?

14   A.  There is one minor change.  Our group has merged with other

15   groups to form the Illinois Gastroenterology Group.  So rather than

16   an employee of Northwest Gastroenterologist, I am now a member of

17   the Illinois Gastroenterology Group.

18   Q.  With that change is the curriculum vitae up-to-date?

19   A.  Yes, it is.

20        MR. ISMAIL:  Your Honor, we offer the CV of Dr. Sales,

21   which has been marked as Defendant's 2185.

22        THE COURT:  Anything from the plaintiffs?

23        MR. ARBITBLIT:  No objection, your Honor.

24        THE COURT:  Okay.  The court will help accept him as an

25   expert in the field.

```
 1                        DIRECT EXAMINATION

 2    BY MR. ISMAIL:

 3    Q.  Doctor, you be being compensated for your time today?

 4    A.  Yes, I am.

 5    Q.  At what rate?

 6    A.  $600 an hour.

 7    Q.  I would like to review for the court the materials you reviewed

 8    when you were investigating the scientific questions we posed to

 9    you.  Did you review the medical literature regarding NSAID GI

10    complications?

11    A.  Yes, I did.

12    Q.  Did you in addition conduct your own medical literature review

13    on those, that subject?

14    A.  Yes, sir.

15    Q.  Did you review the medical literature on clinical trials done

16    with Vioxx?

17    A.  Yes, I did.

18    Q.  Did you in addition review and consider the expert reports and

19    testimony of plaintiff's designated experts?

20    A.  Yes.

21    Q.  Did you consider as well clinical study reports done on -- that

22    were prepared for studies done on Vioxx?

23    A.  Yes, I did.

24    Q.  And did you consider materials provided to FDA and reviews by

25    FDA of certain clinical trials of Vioxx?
```

1    A.  Yes.

2    Q.  Did you also, sir, review the monographs prepared by Provider

3    Synergies for the benefit of the P&T Committee in Louisiana?

4    A.  Yes.

5    Q.  I'd like to begin, sir, with your opinions regarding the

6    monographs provided to -- prepared by Provider Synergies for the

7    benefit of the P&T Committee.

8            But before I do, I would like to ask, do you have

9    familiarity with how P&T Committees work in general?

10   A.  Yes, I do.  I've served and I'm currently serving on the

11   Pharmacy and Therapeutics Committee of one of the hospitals where

12   I'm on staff, and I've been on that committee for over 15 years.

13   Q.  Your work on the P&T Committee at that hospital, does that

14   require you to address clinical safety, efficacy and cost

15   efficiency information with regard to prescription pharmaceuticals?

16   A.  Yes, in two different ways.  One is for allowing drugs into

17   formularies, and the second is monitoring the safety of these drugs

18   once they've been accepted to the formulary.

19   Q.  Through your work on a P&T Committee for the past 15 years,

20   have you become familiar with the types of information P&T

21   Committees consider when arriving at their decisions?

22   A.  Yes, I have.

23   Q.  Now, with respect to the P&T Committee for Louisiana Medicaid,

24   did we ask you to form an opinion as to whether you believe the

25   monographs from Provider Synergies fairly and adequately disclosed

1    the gastrointestinal risks of Vioxx?

2    A.  Yes, you did.

3    Q.  Did you consider the Provider Synergies monographs that have

4    been produced in this case?

5    A.  Yes, I did.

6    Q.  Which ones did you consider?

7    A.  I considered monographs dated 2002, 2003, and 2004.

8    Q.  And we're going to go into detail over one of the monographs as

9    an example, but can you confirm for the court that all three of the

10   monographs discuss gastrointestinal risks with Vioxx and other

11   NSAIDs?

12   A.  Yes, they do.

13   Q.  In tab 3 of your binder there is a -- excuse me, tab 2 of your

14   binder there is a monograph which has been marked as Plaintiff's

15   Exhibit 426, which is already in evidence.  Doctor, I would ask

16   that you take a look at that monograph, and tell us whether that's

17   one of the documents you reviewed in this case for the purposes of

18   forming your opinions?

19   A.  Yes, it is.

20   Q.  Doctor, have you formed an opinion as to whether this monograph

21   fairly and adequately discloses to the P&T Committee the

22   gastrointestinal risks of Vioxx?

23   A.  Yes, I have formed an opinion.

24   Q.  And what is that opinion?

25   A.  That it does fairly and completely discuss the risks.

1    Q.  Let's turn to page 6 of the monograph.  Are you there?

2    A.  Yes, I am.

3    Q.  I'm sorry, are you with you on page 6?

4    A.  Yes, I am.

5    Q.  There are two studies referenced here on page 6 with respect to

6    gastrointestinal data of Vioxx compared to other active treatments;

7    is that right?

8    A.  That's correct.

9    Q.  Do you see that first paragraph Vioxx and ibuprofen?

10   A.  Yes, I do.

11   Q.  Are you familiar with the study that's described in this

12   paragraph?

13   A.  Yes, I am.

14   Q.  Can you tell the court in just general terms what that study

15   was?

16   A.  That was the study I believe that was published the primary

17   author was Dr. Loren Laine, and it was a study that was performed

18   on patients who had osteoarthritis and they were given either

19   rofecoxib or ibuprofen or a placebo.  And the point of the study

20   was a proof of concept to see whether or not Vioxx caused less

21   gastrointestinal damage than ibuprofen.  And they gave patients the

22   medication for a total of six months, and three times they looked

23   in their stomachs to see whether or not there was any damage or

24   not.  Actually it was four times, it was at baseline and after six

25   week, 12 weeks and 24 weeks.  And the prime end point was to see

1    whether or not ulcers had developed in the stomach.

2    Q.  When we talk about the gastrointestinal complications of

3    NSAIDs, are there a range of potential adverse events that are

4    associated generally with GI complications?

5    A.  Yes, there's a broad range.  Anything from abdominal discomfort

6    to life-threatening bleeding.

7    Q.  Is the development of ulcers one of the complications that can

8    occur through NSAID treatment?

9    A.  Yes, it certainly is.

10   Q.  Did you review the primary publication that is discussed here

11   in this paragraph in the Provider Synergies monograph?

12   A.  Yes, I did.

13   Q.  Can you tell us whether Provider Synergies' accurately

14   described the design of the study?

15   A.  Yes, they did.

16   Q.  Did they describe accurately the doses of both Vioxx and

17   ibuprofen that were utilized in that study?

18   A.  Yes.

19   Q.  Did the monograph describe the results of that study

20   accurately?

21   A.  Yes, they did.

22   Q.  There's another study that's referenced here, Vioxx and

23   Naproxen.  Is that the VIGOR study?

24   A.  Yes, it is.

25   Q.  If you turn to tab 3 in your binder, and this has been marked

1   for identification as Defendant's Exhibit 586.  What is Exhibit

2   586?

3   A.  That's the publication whose prime author was Dr. Bombardier,

4   and that discusses the results of the VIGOR study.

5   Q.  The court has heard several times a discussion of the VIGOR

6   study, but can you briefly review the doses that were under

7   consideration?

8   A.  Yes.  This was a comparison, it was event driven, it was

9   looking for the development of gastrointestinal complications in

10  patients who have rheumatoid arthritis, and they received either

11  Vioxx or they received Naprosyn.  The Vioxx was given at twice the

12  usually dose, 50 milligrams a day, and the Naproxen was given in

13  the range of the prescribed dosage, which was 1000 milligrams a

14  day.

15  Q.  What was the typical dose for chronic use of Vioxx?

16  A.  The typical dose was, for long-term use was either 12 and a

17  half or 25 milligrams a day.

18  Q.  So by designing the study to compare 50 milligrams of Vioxx,

19  what is your view as to the design of that study and how that was

20  meant to test the hypothesis of improved safety of Vioxx?

21  A.  There's a particular challenge for Vioxx because Vioxx was

22  given at a double dose.  If one accepts the fact that the higher

23  doses are associated with higher complications, then by doubling

24  the dose one would expect that the chance of a complication would

25  be higher than it would be for the regularly prescribed dose.  So

1    it actually tilted the field against Vioxx.

2    Q.  What was the primary end point of the study?

3    A.  Primary end point of the study was a development of ulcer

4    disease that were either symptomatic or causing perforations or

5    causing bleeding.  We call those PUBs.

6    Q.  Was there an adjudication procedure set up for this study?

7    A.  Yes.  This end point was prespecified, there were certain

8    criteria that needed to be reached to determine whether or not

9    these complications had occurred.  And the complications that

10   occurred were submitted to a panel that was blinded to whether or

11   not the patient was receiving either Vioxx or they were receiving

12   Naproxen.  And they reviewed the information to determine whether

13   or not a PUB had occurred.

14   Q.  What was the secondary end point of the study?

15   A.  The secondary end point were what we call POBs, P-O-Bs, and

16   those were ulcers that caused either obstruction or perforation or

17   bleeding.

18   Q.  Are POBs, the perforations, obstructions and bleeds a subset of

19   PUBs?

20   A.  Yes.  This is complicated, all POBs are PUBs, but not all PUBs

21   are POBs.

22            THE COURT:  Right.

23   BY MR. ISMAIL:

24   Q.  Was the secondary end point prespecified as well?

25   A.  Yes, it was.

1    Q.  The plaintiffs in this case have suggested that the event of

2    concern in the VIGOR study should be focused and limited to the POB

3    end point.  Do you agree with that?

4    A.  No, I disagree with that.

5    Q.  And why is that, sir?

6    A.  The reason is that we're looking for end points that are

7    significant for patients and the difference between the PUBs and

8    the POBs are whether or not patients have symptoms or not.

9    Symptomatic ulcers are very important for patients.  Patients who

10   are receiving these medications need to continue to take them, and

11   if they develop gastrointestinal problems they often need to stop

12   taking their medications.  It can cause considerable distress.

13          Furthermore, when patients have problems such as this,

14   they need to go to physicians, it takes time and money to do that;

15   and they often undergo endoscopic procedures to look to see why

16   they're having these problems.  So it's inconvenient, it's

17   uncomfortable, it's expensive, and these PUBs can in turn lead to

18   further complications such as POBs.  So I think PUBs are very

19   clinically significant.

20   Q.  Did the ulcer events that were included in PUBs, did they

21   require there to be clinical symptoms associated with them as well?

22   A.  Yes, they did.

23   Q.  If a patient came in to your office, as I assume has happened

24   many times over the past 20 years, with clinical symptoms of

25   gastrointestinal complications and you identify an ulcer, do you

1  just send that patient home without care?

2  A.  No, of course not.

3  Q.  And how does that impact your opinion as to whether the PUB end

4  point is an appropriate and relevant one to consider?

5  A.  Once again, that's the end point that's important in clinical

6  practice.  Patients who are receiving anti-inflammatories when they

7  develop symptoms, those are the ones that come to my attention and

8  receive medical care.  I can't think of a reason why if somebody is

9  developing a symptomatic ulcer that I would allow them to continue

10  to take the medicine without intervention.

11  Q.  I would like to focus on the results of the study.  If you turn

12  to Table 4, which I believe is on page 6.

13  A.  Yes, sir.

14  Q.  So what is the first line here, confirmed upper

15  gastrointestinal events?

16  A.  This is a summary of the primary end point of the study, and it

17  compared the number of events that occurred in patients who receive

18  Vioxx compared to the patients who had received Naproxen, and then

19  it calculated a rate.  And the rate for the patients who had

20  received Naproxen was approximately two percent of the patients,

21  whereas the rate for the patients who received Naproxen was four

22  and a half percent.  They calculated the relative risk and the risk

23  of developing a PUB was half for Vioxx compared to Naproxen.

24  Q.  So Vioxx here is the 2.1 and the Naproxen is the 4.5?

25  A.  Yes, sir.

1   Q.  And you said the relative risk is .5.  Does that translate to a

2   50 percent reduction in the development of the primary end point of

3   PUBs?

4   A.  Yes, it does.

5   Q.  Was that result statistically significant?

6   A.  Yes, it was highly significant.  You can see the p-value there

7   was less than .001.

8   Q.  By this data, did Vioxx meet the primary end point hypothesis

9   of the VIGOR study for reduction of GI complications?

10  A.  Yes, it did.

11  Q.  What is the -- by the way, the notation there for confirmed,

12  are those the adjudicated events?

13  A.  These are the ones that were adjudicated, yes, not just the

14  ones that were submitted to the panel.

15  Q.  Then what is the second line?

16  A.  The second line were called complicated confirmed upper

17  gastrointestinal events, these are the POBs that we were talking

18  about, the obstruction, perforation or bleeding.  The numbers there

19  are less because POBs are a subset of PUBs.  And once again you can

20  see from the figures there that the rate for the patients who

21  received Vioxx was .6 percent, whereas the rate for Naproxen was

22  1.4 percent.  The relative risk was 0.4 and that translates to a 60

23  percent reduction in the occurrence of POBs for the patients who

24  received Vioxx.  And once again, that was statistically significant

25  with a p-value of .005.

1   Q.  By these data, does that demonstrate that Vioxx met the

2   secondary end point of reduction of complicated gastrointestinal

3   events?

4   A.  Yes, it does.

5   Q.  What is a subgroup analysis?

6   A.  A subgroup analysis looks at parts of the population of

7   patients that were studied for the entire study.  There are two

8   different kinds of subgroups one can look for:  There are

9   prespecified subgroups, and the result of that can give additional

10  information that might be valuable such as whether the effect is

11  stronger in men rather than women; and then there are what are

12  called post hoc subgroups, and those are used to develop hypotheses

13  for further study later on, when something, for example, unexpected

14  may occur, it would be a good idea at some time or not, to follow

15  that up to see if there's further studies that can be developed.

16  Q.  Does the Bombardier publication report results of various

17  subgroup analyses?

18  A.  Yes, it does.

19  Q.  If you turn to page 1523.

20  A.  Yes.

21  Q.  In the left column does the article discuss certain subgroups

22  that were analyzed in the study?

23  A.  Yes.

24  Q.  What are some of the subgroups that are discussed here?

25  A.  There were subgroups on whether or not patients had had a

1    previous gastrointestinal event, patients who were or not receiving

2    steroids, patients who were younger or older, males or females, and

3    where the study took place.

4    Q.  So the subgroup discussion, the bottom of the left column and

5    then continue onto the right column?

6    A.  Yes, sir.

7    Q.  You referenced that there was data here on analysis of steroid

8    use?

9    A.  Yes.

10   Q.  By the way, the data that is reflected for all of these

11   subgroups, are they by what end point?

12   A.  These are the data for the primary end point for the study, for

13   the development of PUBs, and that's what was prespecified for the

14   study.

15   Q.  So we have this discussion of patients with no steroid therapy

16   at baseline, and what was the relative risk that was reported here?

17   A.  The relative risk for patients who had not received, were not

18   receiving steroids at the beginning were 0.7, that would translate

19   to a 30 percent reduction in PUBs.  And that was not statistically

20   significant.

21   Q.  And how to a physician reader like yourself is it clear that

22   the non-steroid use subgroup was not statistically significant in

23   this study?

24   A.  They're typically reported in a range called a 95 percent

25   confidence interval.  And when that doesn't cross the number 1.0,

1    then that shows it's not statistically significant at the level of

2    95 percent confidence.

3    Q.  So the range reported here of .4 to 1.2, do you have an opinion

4    as to whether that clearly discloses the not statistically

5    significant result for non-steroid users?

6    A.  That's correct.  It shows that it was not statistically

7    significant.

8    Q.  And then carrying over to the right column, does it report that

9    for steroid users there is a statistically significant reduction?

10   A.  Yes.  The range there is 0.2 to 0.6, and that interval doesn't

11   include one.

12   Q.  Sir, do you have an opinion as to whether the article should

13   have disclosed or should have even analyzed this, these subgroups

14   of steroid use by the secondary end point of POBs?

15   A.  Yes, I do.  I do not think that it was necessary to disclose a

16   secondary end point since it isn't statistically significant for

17   the primary end point, there's no reason at all to expect that it

18   would be significant for the secondary end point, which includes

19   smaller numbers and a more stringent requirement.

20   Q.  Why is that?  Why is it less likely to a physician reader like

21   you once you learn that for the primary larger end point the result

22   is not significant, what does that tell you about what the subset

23   and smaller number of events would reveal in terms of statistical

24   significance?

25   A.  Well, there are a couple of reasons.  Number one is because the

1    POBs are a subset of the PUBs and it doesn't reach significance for

2    the larger group, you wouldn't expect it to be significant for the

3    smaller group.  And there's a mathematical reason as well.  The

4    larger number of patients that are included in an analysis, the

5    greater the chance that you'll reached statistical significance,

6    that's the way statistics work.  So if you cut the numbers down,

7    then there's each less chance that the numbers are going to be

8    significant.

9    Q.  To your knowledge, sir, was the steroid subgroup analysis by

10   the secondary end point of POBs a prespecified analysis?

11   A.  It was not.

12   Q.  The plaintiff in this case has argued that the VIGOR study

13   demonstrates only a reduction or an improvement of gastrointestinal

14   safety for Vioxx in steroid users.  Do you have an opinion, sir, as

15   to whether that is a valid interpretation of the data?

16   A.  No, I disagree with that.

17   Q.  Why is that?

18   A.  First of all, there was a reduction looking at the patients who

19   were receiving steroids, although it didn't reach -- who were not

20   receiving steroids even though it didn't reach statistical

21   significance.

22        Secondly, the most important end point was the entire

23   population, which included patients both with and without steroid

24   use, and it clearly reached that end point.  When one starts

25   dividing patient populations into smaller groups and doing multiple

1    analyses, it's not at all unexpected that some of them won't reach

2    statistical significance, it doesn't change the validity of the

3    study or the effectiveness of the medication.

4    Q.  Have you reviewed portions of the clinical study report done on

5    the VIGOR study?

6    A.  Yes, I have.

7    Q.  If you'd turn to tab 4 of your binder.  And we included here a

8    few pages from that study report, it's been marked as Defendant's

9    Exhibit 2549.  I'd like you to turn to the second page of your

10   binder, which is Figure 11 of the study report.

11   A.  Yes.

12   Q.  Have you reviewed this?

13   A.  Yes, I have.

14   Q.  Can you tell us what this figure is showing?

15   A.  Yes.  This is what's called a whisker plot and it's another way

16   of demonstrating the data in a clinical study with multiple

17   subgroups.  The diamonds represent the value for that particular

18   subgroup and the lines on either side of the diamond represent the

19   95 percent confidence interval for each group.  And you can see

20   here that they look at gender and age, race, location, whether or

21   not they were receiving steroids, whether they have an infection

22   Helicobacter pylori or if they had PUBs before.  And finally, the

23   total cohort is summarized at the bottom.

24        If you look at this whisker plot, you can see that all of

25   the diamonds pretty much lineup above the total cohort value below.

1    Showing that all groups, the results show there was a decrease in

2    risk for patients receiving Vioxx compared to Naproxen.  The values

3    to the left of the line for 1.0 showing advantage for Vioxx or

4    whereas values to the right would represent an advantage for

5    Naproxen comparing to Vioxx.

6              In these 14 different categories, in one of them the

7    confidence interval crossed over one and that was a subcategory of

8    patients who weren't receiving steroids showing for that particular

9    value it was not statistically significant.  But if you look at the

10   total cohort of patients, it is actually quite clear from looking

11   at this whisker plot that there was an advantage for everybody.

12   Q.  If you'd turn to the next page in the binder and Table 12.3.

13   Did you look to see whether there was any material difference in

14   terms of the rate of PUBs that were developed on Vioxx in the VIGOR

15   study for steroid users and non-users?

16   A.  No.  It was very closely the same.  The patients who weren't

17   receiving steroids had about a two percent PUB risk whereas the

18   patients who were receiving steroids had about a two percent, 2.1

19   percent risk of developing PUBs.

20             That's in contrast to the patients who were receiving

21   Naproxen that had a three percent PUB risk if there was no baseline

22   steroid use, whereas the patients received Naproxen and had had

23   steroids had a five and a half percent.

24   Q.  So does this table show what I've highlighted the Vioxx data

25   here that no steroid and for steroid a comparable rate of the

1  development of PUBs?

2  A.  Yes, sir.

3  Q.  Did you look to see, sir, whether this steroid issue is

4  something that was analyzed in other publications regarding Vioxx

5  and gastrointestinal safety?

6  A.  Yes, I did.

7  Q.  And we'll look at one in a minute, but can you tell the court

8  whether, in other analyses from data sets other than VIGOR, whether

9  this steroid issue resulted in any difference in terms of the

10  gastrointestinal benefits of Vioxx?

11  A.  No.  In the study that I guess that you'll be asking me about

12  authored by Watson, that was looked at as well, and in that case,

13  there was statistical significance in the population of patients

14  who had received steroids and also in the patients who had not

15  received the steroids.

16  Q.  So if we go back to the Provider Synergies monograph that we

17  were looking at, we were looking at the VIGOR study reported on

18  page 6.  And then you'll see that there are data reported at the

19  bottom of page 6 and it carries over on to page 7.  What data did

20  Provider Synergies report coming out of the VIGOR study?

21  A.  They provided data on the primary end point, showing the

22  difference of 2.1 percent versus 4.5 percent.  And also on the

23  secondary end point of POBs, showing the risk of 0.6 percent versus

24  1.4 percent.

25  Q.  Do you have an opinion as to whether that was an appropriate

1    disclosure of the results of the VIGOR study?

2    A.  Yes, it was.

3    Q.  Were there other sections of this monograph that address the

4    question of gastrointestinal risk?

5    A.  Yes.

6    Q.  If you turn to page 9, is there a section there on GI toxicity

7    and warnings?

8    A.  Yes, there is.

9    Q.  Does the monograph report:  Serious GI toxicity can occur with

10   or without warning with all NSAIDs.  The package information for

11   the traditional NSAIDs and the newer COX-2 inhibitors contain this

12   warning?  Is that an accurate description of the package inserts

13   that are available for these agents?

14   A.  Yes, it is.

15   Q.  Do the COX-2 inhibitor package inserts disclose a warning for

16   GI toxicity?

17   A.  Yes, they do.

18   Q.  And last week we heard from Dr. Graham about lots of

19   comparisons of Vioxx to placebo.  In this paragraph here, does

20   Provider Synergies claim that COX-2 inhibitors do not increase risk

21   relative to placebo?

22   A.  No, they don't claim that.

23   Q.  Does the monograph continue to describe in this paragraph

24   additional factors that would lead to higher risk of developing a

25   gastrointestinal complication?

1    A.  Yes.

2    Q.  Have you formed an opinion as to whether the discussion of the

3    GI warning and the risk factors here are appropriate disclosure for

4    a P&T Committee?

5    A.  Yes, that's an appropriate disclosure.

6    Q.  If you continue on this page there's a discussion at the bottom

7    of the VIGOR study, where they describe the VIGOR study as showing

8    less risk of GI toxicity and then there's this phrase, "The risk of

9    GI toxicity is not completely eliminated with the use of Vioxx."

10   What does that mean?

11   A.  That means that there is an associated risk for

12   gastrointestinal toxicity with the use of Vioxx, that it's more

13   than placebo.

14   Q.  If you turn to the conclusion section.  Once again, does the

15   Provider Synergies monograph discuss the potential of serious GI

16   toxicity with both nonselective NSAIDs and the COX-2 inhibitors?

17   A.  Yes, it does.

18   Q.  Looking at the monograph as a whole, sir, did you form an

19   opinion as to whether it fairly and adequately disclosed to a P&T

20   Committee the potential GI risks of Vioxx?

21   A.  Yes, it does.

22   Q.  Have you reviewed, then, the other two monographs, the 2002 and

23   2004 monograph?

24   A.  Yes, I have.

25   Q.  Taking the monographs as a whole, did you form an opinion as to

1    whether, overall, the monographs fairly and adequately disclose to

2    the P&T Committee the potential GI toxicity of Vioxx?

3    A.  Yes, I believe they did.

4    Q.  I'd like to turn now to the Watson publication that you

5    referred to a moment ago.  Is that in tab 5 of your binder?

6    A.  Yes, it is.

7    Q.  And that has been marked for identification as Defendant's 658.

8    Can you tell the court what this analysis is all about?

9    A.  Yes.  This is a pooled analysis of all of the patients who

10    participated in studies of Vioxx versus other anti-inflammatory

11    medications, with the exception of the patients that were in VIGOR.

12    It encompasses something like 17,000 patients altogether, and it

13    looked at the development of gastrointestinal complications in all

14    of these studies.

15    Q.  Do the authors discuss why it is that the VIGOR study was not

16    part of this meta-analysis?

17    A.  Yes, they did.

18    Q.  And what was that explanation?

19    A.  The explanation was that because so many patients were part of

20    the VIGOR analysis that it would outweigh the other studies that

21    were involved, and because the VIGOR analysis stood by itself, that

22    the secondary analysis was another way of looking at the same

23    result that wasn't overshadowed by the VIGOR analysis.  I think it

24    was appropriate to exclude the VIGOR patients.

25    Q.  There was a discussion last week about methodologies in

1    clinical trials that use scheduled endoscopy as a way of detecting

2    ulcers.  Did the Watson analysis use or count as events scheduled

3    endoscopies?

4    A.  It included studies that had scheduled endoscopies, but these

5    scheduled endoscopies and their results were not included in the

6    Watson analysis.  So if a patient had an asymptomatic ulcer that

7    was simply detected on scheduled endoscopy, that was not counted as

8    one of the gastrointestinal events in this analysis.

9    Q.  You mentioned earlier that this analysis looked at subgroups

10   and whether the results varied in subgroup analyses?

11   A.  Yes, I did.

12   Q.  Are the subgroup results reported in figure 2 of this article?

13   A.  Yes, they are.

14   Q.  And again, this is a pooling of several thousand patients

15   across multiple Vioxx clinical trials?

16   A.  Yes, it is.

17   Q.  And is this one of those whisker plots you were describing

18   earlier?

19   A.  Yes, it is.

20   Q.  Is it significant to your opinion, sir, that the data points

21   for all of these subgroups consistently favor a reduced risk with

22   Vioxx?

23   A.  Yes, that's an important finding.

24   Q.  In what way?

25   A.  It shows that regardless of the various subgroup analyses, once

1    again the results favored Vioxx compared to the other nonspecific

2    anti-inflammatories.

3    Q.  Did this publication include analysis of this issue of steroid

4    use and nonuse?

5    A.  Yes, it did.

6    Q.  And is that this subgroup that I am highlighting here?

7    A.  Yes, it is.

8    Q.  And what is the proper interpretation of this data as to

9    whether the gastrointestinal benefit of Vioxx extended to

10   nonsteroid users?

11   A.  As you can see, for the patients who did not receive steroids,

12   the risk was .39, which translates to a 60 percent reduction in

13   risk.  And the 95 percent confidence interval does not cross unity,

14   so it shows it is statistically significant.

15   Q.  Doctor, did you look to other meta-analyses that were conducted

16   on not just Vioxx but other COX-2 inhibitors?

17   A.  Yes, I did.

18   Q.  Are you familiar with a publication by Rostom?

19   A.  Yes, I am.

20   Q.  If you turn to tab 6, can you tell us whether that is the

21   publication that you're familiar with?

22   A.  Yes, it is.

23          MR. ISMAIL:  Your Honor, it is marked for identification

24   as Defense 2644.

25   BY MR. ISMAIL:

1    Q.  Can you describe for the court what this analysis is?

2    A.  Yes, I can.  This is an analysis that uses a specific

3    methodology for interpreting clinical results, it's called a

4    Cochrane Collaboration systematic review, and there are various

5    criteria that are used to define whether or not a study is rigorous

6    enough and appropriately designed to be included in this review.

7              So they looked first at all studies that might be

8    included, and they found initially 1169 studies, and eventually

9    they winnowed it down to a much smaller number of studies that met

10   their clinical criteria.  And then they looked at them for patients

11   who not only received Vioxx, but the other COX-2s in comparison

12   with the nonspecific NSAIDs.

13   Q.  Is figure 1 that process of identification of relevant trials

14   and then that methodology described, the Cochrane review, of

15   identifying the most relevant for the purposes of the analysis?

16   A.  Yes.

17   Q.  And so, in total, how many clinical trials did the authors of

18   this analysis include in their examination of COX-2

19   gastrointestinal safety?

20   A.  If my arithmetic is right, it comes out to 69 trials.

21   Q.  And did you examine this analysis to see whether there was some

22   consistency across all of the COX-2s with regard to this question

23   of improved gastrointestinal safety?

24   A.  Yes, I did.

25   Q.  Do you have a view, sir, as to whether, what the consensus view

1  amongst gastroenterologists is with respect to COX-2 inhibitors

2  overall on this question of GI safety?

3  A.  Yes.  There's a clear consensus that COX-2s are safer in terms

4  of GI safety than the nonspecific NSAIDs.

5  Q.  Does this Rostom publication support that consensus view?

6  A.  Yes, it does.

7  Q.  Let's look at some of the results here.  If you turn to, I

8  guess we'll stay on that page 4 that I just had up.  You'll see

9  these two panels here.  Can you tell us what's described here?

10 A.  Yes.  The first panel is a complication of gastric ulcer and

11 the second was duodenal ulcer.  And again, to the left of the unity

12 line show that the results favored the coxibs, those are the COX-2

13 inhibitors.  And to the right would favor the nonspecific NSAIDs.

14 And as you can see from the whisker plots, that all of these

15 studies showed that the results favored the coxibs compared to the

16 nonspecific NSAIDs.

17 Q.  These individual authors and dates here, do they describe

18 studies done in various COX-2 inhibitors or is it just one COX-2

19 inhibitor?

20 A.  No, there were several different COX-2 inhibitors that were

21 included.

22 Q.  And the data points in terms of the relative risk, does the

23 consistency of response showing a reduced risk with the COX-2

24 inhibitors, how do you interpret that data to this question that we

25 posed to you as to whether Vioxx indeed has improved

1   gastrointestinal safety profile relative to traditional NSAIDs?

2   A.  It tells me two different things:  Number one, it confirms the

3   feeling in the gastrointestinal community that coxibs are safer

4   than nonspecific NSAIDs, and it also reinforces the results from

5   the specific Vioxx trial, showing that not only is this a result of

6   Vioxx, but that it makes logical sense that since Vioxx is a coxib

7   and since this is a class effect, it's not at all surprising that

8   Vioxx is safer for the gastrointestinal tract than a nonspecific

9   NSAID.

10  Q.  On page 6, figure 4, is there an analysis of clinical trial

11  data on coxibs compared to traditional NSAIDs for the POB end point

12  and PUB end point?

13  A.  Yes, there is.

14  Q.  And how would you interpret this data?

15  A.  Once again, you can see that all of the data points lie to the

16  left of unity showing that coxibs for both POBs and PUBs are more

17  favorable than the nonspecific NSAIDs.

18  Q.  Do the authors further down on this page include a specific

19  discussion of Vioxx data?

20  A.  Yes, they do.

21  Q.  And how do these authors of this meta-analysis describe the

22  Vioxx data with respect to this question of improved GI safety?

23  A.  They say here that it reduced the risk of POBs by 58 percent

24  and the risk of PUBs by 56 percent.

25  Q.  And in the discussion of this data overall, I would like you to

1    turn to page 7.  Do the authors discuss, they use this phrase, the

2    promise of reduced upper GI toxicity because of the ability to

3    spare COX-1, what is that in reference to?

4    A.  That's in reference to what's called the COX hypothesis,

5    showing that anti-inflammatories can reduce both COX-1 and COX-2.

6    COX-1 is an enzyme that causes the production of prostaglandins

7    that help to maintain the integrity of the stomach, whereas COX-2

8    is produced as part of the inflammatory process.  So one would

9    expect that by not reducing COX-1, by sparing COX-1, one would help

10   to protect the stomach.  That's what that sentence talks about.

11   Q.  Then they go on to say:  "The clinical studies assessed in this

12   review add weight to these assertions."

13          Do you have an opinion, sir, as to whether you agree with

14   the authors of this analysis with respect to that statement?

15   A.  Yes, I agree with them.

16   Q.  Do the authors describe the results, some of which we just went

17   over, as showing a remarkable consistency?

18   A.  Yes.

19   Q.  In your review of the data that the authors report, do you

20   agree with their assessment that the data show a remarkable

21   consistency in reduced GI toxicity?

22   A.  Yes.

23   Q.  And what is that opinion?

24   A.  Pardon me?

25   Q.  And what is that opinion?

1    A.  That everything is consistent.  When we looked at these whisker

2    plots, you could see that they all lined up to the left of unity.

3    Q.  So, Doctor, considering the data sources we've just described,

4    you mentioned the proof of concept study, the outcome study with

5    VIGOR, the meta-analysis done of other Vioxx studies, and then this

6    meta-analysis of several COX-2 studies.  Considering that totality

7    of the data, did you form an opinion as to whether you believe that

8    Vioxx does have a lower gastrointestinal risk compared to

9    nonselective NSAIDs?

10   A.  Yes, I do.

11   Q.  And what's your opinion?

12   A.  It does have a lower gastrointestinal risk compared to the

13   nonselective NSAIDs.

14   Q.  Do you believe, sir, that this reduced gastrointestinal risk

15   with Vioxx compared to nonselective NSAIDs is properly interpreted

16   considering the totality of the data to just those who are taking

17   steroids?

18   A.  No, it's not limited just to steroid users.

19   Q.  Do you believe, sir, that -- have you formed an opinion as to

20   whether or not this improved gastrointestinal safety with Vioxx is

21   a clinically meaningful therapeutic advantage for patients?

22   A.  Yes, I have.

23   Q.  And what is your opinion?

24   A.  I think that it's an important clinically meaningful difference

25   for patients.

1    Q.  Is the improved gastrointestinal safety with Vioxx that you've

2    just described as being an advantage for patients something that's

3    reflected in the labelling?

4    A.  I'm sorry, reflected?

5    Q.  In the labelling.

6    A.  Yes, it is.

7    Q.  To this day, sir, focussing on this outcome study that we

8    looked at earlier, the VIGOR study, has any other COX-2 inhibitor

9    met the primary and secondary end points of PUBs and POBs compared

10   to an active nonselective NSAID?

11   A.  Not to my knowledge.

12   Q.  And would Vioxx, at least for those that, coxibs that are

13   available in the U.S., be the only such coxib that has demonstrated

14   a -- meeting the primary and secondary end point?

15   A.  To my knowledge, that's correct.

16   Q.  And nevertheless, has the gastrointestinal community and

17   gastroenterologists, the consensus view as to whether COX-2

18   inhibitors overall have an improved GI safety compared to

19   non-selective NSAIDs?

20   A.  I am not sure I understand your question.

21   Q.  I'll rephrase it.  Even though other COX-2 inhibitors have not

22   met outcome studies as did Vioxx in the VIGOR study, what is the

23   consensus view of gastroenterologists as to whether COX-2

24   inhibitors overall do indeed reduce gastrointestinal risk compared

25   to NSAIDs?

```
 1    A.  There's a broad consensus that coxibs represent an advantage in

 2    gastrointestinal safety over the nonselective NSAIDs.

 3              MR. ISMAIL:  Thank you, your Honor, we have no further

 4    questions.

 5              THE COURT:  Do you have cross?

 6              MR. ARBITBLIT:  Yes, your Honor.  Just give me a moment.

 7                         CROSS-EXAMINATION

 8    BY MR. ARBITBLIT:

 9    Q.  Good morning, Doctor.

10    A.  Good morning.

11    Q.  Doctor, it's correct that you personally have not done any

12    research on the use of clinical -- of endoscopic ulcers to detect

13    valid surrogate for clinically meaningful results, correct?

14    A.  That's correct.

15    Q.  And you have not published any articles on COX-2 inhibitors,

16    correct?

17    A.  I have not.

18    Q.  As of the time of your deposition in January, you had not read

19    the VIGOR clinical study report that you testified about this

20    morning, correct?

21    A.  I had read the publication, I don't think I had read the

22    clinical study report.

23    Q.  So all of that stuff that you talked about this morning with

24    those whisker plots from the clinical study report, that's stuff

25    you've gone over with counsel since your deposition, right?
```

1    A.  I believe we went over them at the deposition as well.

2    Q.  But before your deposition and when I showed them to you, you

3    hadn't seen them?

4    A.  That's correct.

5    Q.  And your opinions that were reported prior to your deposition

6    did not take those into account because you hadn't read the

7    document?

8    A.  That's correct.

9    Q.  Now, isn't the important question, compared to what; in other

10   words, what are we comparing VIGOR -- Vioxx to in terms of the

11   doses that were used in the studies that you just went over in the

12   Rostom article?  Did you look to see?  Let's look.

13   A.  I'm sorry, I don't understand your question.

14   Q.  Okay.  I'll try to rephrase it.  Do you have the Rostom

15   article?

16   A.  Yes, I do.

17   Q.  Can you turn to the reference that you went over with counsel

18   to rofecoxib and the purported benefits for PUBs and POBs.  And do

19   you see that there's a reference there?

20          MR. ARBITBLIT:  This is at page 6 of the article, your

21   Honor.

22          THE COURT:  Okay.

23   BY MR. ARBITBLIT:

24   Q.  And that statement about the studies with the benefits claim

25   for rofecoxib has a reference to certain articles by number, right?

1    And one of them is number 29; do you see that, are you with me?

2    A.  I am looking at figure 4, I don't see the reference number.

3    Q.  Look at page 6, sir, under the heading Rofecoxib in the

4    left-hand side.

5    A.  All right, I see that now, yes.

6    Q.  Now, do you see after the first sentence there are four

7    references:  29, 46, 51, 53?

8    A.  Yes, I see that.

9    Q.  And 29, if you go to page 9 of the Rostom article, take a look

10   at reference number 29, what is that?

11   A.  That's a study authored by Langman.

12   Q.  And the Langman study is something that you're familiar with,

13   correct?

14   A.  Yes, sir, I am.

15   Q.  That is a study that was a pooled analysis of eight premarket

16   studies of patients with osteoarthritis; is that right?

17   A.  That's correct.

18   Q.  And Merck identified that as Protocol 069, correct?

19   A.  That's correct.

20   Q.  And let's take a look at that article.

21          MR. ARBITBLIT:  I apologize, your Honor, I believe I have

22   it.

23   BY MR. ARBITBLIT:

24   Q.  Doctor, do you recall that the Langman article described the

25   comparison to ibuprofen at 2400 milligrams a day, correct?

1   A.  That's correct.

2   Q.  And diclofenac at 150 milligrams per day, correct?

3   A.  I believe so.

4   Q.  And nabumetone at 1500 milligrams per day, right?

5   A.  Yes, sir.

6   Q.  And those were studies that varied in duration from 16 to -- 16

7   weeks to two years, right?

8   A.  I believe so.  I would have to have the article in front of me

9   to be sure.

10  Q.  Okay.  So the patients in those trials took those doses every

11  day for the duration of the trial; is that right?

12  A.  I would need to have the article in front of me.

13  Q.  That was the protocol, wasn't it, the daily use?

14          MR. ARBITBLIT:  May I approach, your Honor?

15          THE COURT:  Yes.

16  BY MR. ARBITBLIT:

17  Q.  I've handed you a document that's marked as P1.2590.  It's a

18  memo from Alise Reicin to the Human Health pack, including several

19  Merck folks.  Have you ever seen this document before?

20  A.  No, I haven't.

21  Q.  If you could take a look at the second page.  Do you see that

22  Merck had a consultants meeting to talk about planning a GI outcome

23  study in August 1998?

24  A.  Yes, I see that.

25  Q.  And do you see that the consultants meeting was summarized here

1   and under paragraph A from the August 6, 1998, consultants meeting,

2   there are some highlights listed, right?

3   A.  Yes.

4   Q.  So the first highlight that these consultants reported and that

5   was summarized by Dr. Reicin to the rest of the Merck folks on this

6   document was that the consultants advocated the need for more

7   outcomes data in a real world setting.  Do you see that?

8   A.  Yes, I do.

9   Q.  And do you see the first arrow underneath that, where

10  Dr. Reicin reported patients with OA -- that's osteoarthritis,

11  right?

12  A.  Yes.

13  Q.  Patients with OA are only rarely treated with high dose chronic

14  NSAIDs.  Do you see that?

15  A.  Yes, I do.

16  Q.  And you're not -- you aren't in a position to disagree with

17  that, are you, sir?

18  A.  No, I am not.

19  Q.  So what they say down below there is, "an outcome study in

20  patients with osteoarthritis would not provide any significant new

21  information, would be very difficult to enroll and would not

22  provide real world information."  Do you see that?

23  A.  Yes.

24  Q.  You've never seen that before, have you?

25  A.  I've never seen this document before.

1   Q.  And the studies in Langman and the studies in Rostom and the

2   studies in Watson are all consistently studies that used 2400

3   milligrams per day of ibuprofen, 1,000 milligrams per day of

4   Naproxen, 150 milligrams maximum dose for OA of diclofenac, and

5   1500 milligrams maximum dose of nabumetone throughout the life of

6   the study.  Correct?

7   A.  Yes, they did.

8   Q.  So according to this memo, the patients who took those doses

9   for osteoarthritis do not correspond to the real world, do they,

10  sir?

11  A.  There are a couple of things that I have to say about that.

12  First of all, this particular consultants meeting was designed,

13  judging from the timing of it and talking about a GI outcome study,

14  was not designed to talk about the studies that were included in

15  Langman, which were prerelease studies, but rather for a planned

16  outcome study in the future, so that these comments don't relate to

17  the outcome study.

18  Q.  Well, they relate to the real world, sir, don't they?

19  A.  Well, studies aren't the real world, as a matter of fact.

20  Studies are designed to answer particular questions, and I can tell

21  you that in the real world that I see patients who are indeed

22  receiving high-dose medications, and as a practicing clinician,

23  these are the patients that I would be interested in.  If somebody

24  has arthritis and they take two Advil and they feel better, they're

25  not going to come to my attention.  And I would be interested in

1   studies that showed a higher doses of the medications.

2   Q.  Sir, by the time you see a patient, that patient's already in

3   trouble, right?

4   A.  Not necessarily.  Generally, they do have gastrointestinal

5   symptoms, yes.

6   Q.  Most of your practice is referral from people -- from primary

7   care physicians who were not specialists in GI problems?

8   A.  That's correct.

9   Q.  So you don't know whether those patients were -- I'll withdraw

10  that.

11          The patients that you see are the ones who are referred

12  because somebody else didn't have the expertise that you have as a

13  gastroenterologist?

14  A.  That's correct.

15  Q.  And so as far as the number of people or the percentage who are

16  taking 2400 milligrams per day of ibuprofen or high doses of the

17  other NSAIDs, you haven't done any studies to know whether that's

18  one percent or two percent of the population, right?

19  A.  That's correct.  I've seen a study of the Tennessee Medicaid

20  population that shows that a significant number are taking the

21  doses that you mentioned.

22  Q.  Actually, sir, what that showed was 1800 or above, right, there

23  was no mention of 2400 anywhere in that article that you

24  referenced?

25  A.  No, but it showed 18 and above.

1   Q.  Yes, and it also showed 1800 and below.

2   A.  That's correct.

3   Q.  And you've seen other studies saying that's, 1200 milligrams of

4   ibuprofen is a therapeutic dose, correct?

5   A.  What study are you referring to?

6   Q.  Have you seen such studies?

7   A.  Yes, I have.

8   Q.  Now, by contrast, these same consultants here are saying

9   they're distinguishing between rheumatoid arthritis and

10  osteoarthritis.  Do you see that under heading B?

11  A.  Yes.

12  Q.  At the standard of care to treat patients with rheumatoid

13  arthritis with chronic high doses because they have a more severe

14  disease, right?

15  A.  Yes.

16  Q.  So the osteoarthritis patients cited for in the Langman study,

17  for example, that was all osteoarthritis, right?

18  A.  Yes, it was.

19  Q.  And if you go to that Watson article you looked at.  Which tab

20  is that, sir?

21          THE COURT:  Five.

22          MR. ARBITBLIT:  Thank you.

23  BY MR. ARBITBLIT:

24  Q.  Do you see that Table 2 at page 1543 gives you a breakdown of

25  the osteoarthritis patients versus the rheumatoid arthritis

1  patients?

2  A.  Yes.

3  Q.  And 80 percent of the people in the Watson analysis were from

4  Merck trials of osteoarthritis using the high doses that we just

5  talked about, correct?

6  A.  That's correct.

7  Q.  Now, the entire Watson analysis was post hoc, right?

8  A.  Yes, it was.

9  Q.  There was no plan to lump 20 studies together and try to come

10  up with an outcome for all 20 of them, right?

11  A.  That's right.  This was a pooled analysis of randomized

12  patients, and each individual study was prospective and randomized.

13         MR. ARBITBLIT:  Approach, your Honor.

14  BY MR. ARBITBLIT:

15  Q.  Sir, you've been handed a document marked as LAAG 677, and

16  you've seen this document before, right?

17  A.  Yes, I have.

18  Q.  This is a memo by Qinfen Yu, that's spelled Y-U, and you

19  understand that the data in this memo was used for the Watson paper

20  that you looked at before, right?

21  A.  That's my understanding.

22  Q.  Now, on the subject of the confirmed complicated PUBs which you

23  call POBs, perforations, obstructions and bleeds, you don't dispute

24  that those are the most serious end points that could be the

25  result, that could result in hospitalization or fatalities, right?

1    A.  They're certainly serious complications, yes.

2    Q.  And as far as the other end point of ulcers in VIGOR, for

3    example, there was no size requirement whatsoever for an ulcer to

4    be counted as an event, right?

5    A.  That's right.  They needed to be symptomatic, however, they

6    weren't asymptomatic ulcers.

7    Q.  And you know, sir, that up to 50 percent of Naproxen users can

8    have symptoms such as dyspepsia that could result in a referral for

9    an endoscopy in a clinical trial setting, whereas in your real

10   world practice, you would not give that endoscopy unless it were

11   going to change how you actually treated the patient?

12   A.  Generally, I won't do an endoscopy unless it's going to change

13   my therapy, that's correct.

14   Q.  But in a clinical trial, where the threshold is suspicion of an

15   event and the investigators are told if there are symptoms, send

16   them for an endoscopy, those endoscopies are going to happen much

17   more frequently than they would in a clinical practice where your

18   standard is, will it change how I treat the patient.  Correct?

19   A.  I am not sure I agree with that, no.

20   Q.  You don't send your patients -- or you don't perform an

21   endoscopy or send them unless it's going to change what you do to

22   treat them, right?

23   A.  Generally so, that's correct.

24   Q.  And in a clinical trial, the standard isn't whether they're

25   going to be treated for what is found or not found on endoscopy,

1    correct?

2    A.  As a matter of fact, on a clinical trial when patients come to

3    me with symptoms, I need to make a clinical judgment on whether or

4    not they require endoscopy at that time.

5    Q.  And you do know that there is a poor correlation between the

6    dyspepsia type of symptoms that people get from NSAIDs on the one

7    hand and a clinically meaningful ulcer on the other, correct?

8    A.  That's correct.

9    Q.  So you can have symptoms that are not related to an ulcer and

10   you can have an ulcer that doesn't have symptoms, right?

11   A.  That's correct.

12   Q.  And the primary end point in VIGOR and the other studies is

13   that type of ulcer that doesn't necessarily have any symptoms,

14   right?

15   A.  No, the primary end point of the study was symptomatic ulcers.

16   And it was the clinician's decision that the patient had symptoms

17   that might suggest an ulcer that prompted them to do the endoscopy,

18   not simply dyspeptic symptoms.

19           So if somebody was taking a study medication and the

20   doctor didn't know which one and they came in with heartburn or

21   indigestion, that would not trigger an endoscopy.

22   Q.  Sir, there's no way that you can tell whether the symptoms that

23   the patient was experiencing came from dyspepsia or an ulcer in a

24   particular case, can you?

25   A.  You can't tell for certain and that's why we do endoscopy.

1    However, the clinician used his judgment to both the severity and

2    the character of the symptoms.  So I would not say that someone who

3    comes in with nonspecific dyspepsia would automatically have an

4    endoscopy.  I think that these symptomatic ulcers were different

5    than simple asymptomatic endoscopic ulcers.  I would disagree with

6    you there.

7    Q.  The complicated end points are the ones that clearly have a

8    bleed or a perforation or an obstruction that define the

9    complication, correct?

10   A.  That's correct.

11   Q.  So if you are looking at the confirmed complicated PUBs, then

12   you're looking at bleeds, perforations, and obstructions, right?

13   A.  That's correct.

14   Q.  And the Watson article that you looked at, based on this Yu

15   memo, did not show the Kaplan-Meier curves for the complicated end

16   points of the study, did they?

17   A.  No, it did not.

18   Q.  And if we can take a look at that, it's at page ending in 4303

19   of the Yu memo.  Do you see that, sir?

20   A.  Yes, I do.

21   Q.  And the NSAIDs combined and the rofecoxib appear to be

22   separated by about one event; is that right?  If each of those

23   little steps up represents an event that occurred, then it looks

24   like there's one event more in the NSAIDs, correct?

25   A.  Yes.

1    Q.  Now, if you could turn to page ending in 4342 of the same

2    document.  This actually was the prespecified study group of 069,

3    right?

4    A.  Yes.

5    Q.  This was not a post hoc, this was the plan study that Langman

6    carried out and published in 1999 about Vioxx, right?

7    A.  Yes.

8    Q.  And what Langman didn't publish and what Merck never published

9    was this graph, showing that for the confirmed complicated PUBs,

10   rofecoxib was higher than NSAIDs combined by the end of the study,

11   right?

12   A.  By the end of the study, they already had the information in

13   lots of other studies.  So the additional information superseded

14   the 069 study.  They knew more by then.

15   Q.  Sir, is it your testimony today that a post hoc analysis

16   supersedes the planned analysis?

17   A.  No, it's my testimony that when there's additional information,

18   that should be considered as well.

19   Q.  And the same would be true of the additional information in the

20   VIGOR study that shows that the steroid users got all of the

21   benefit for the complicated PUBs; even though that's a post hoc

22   analysis, in your terms, it's not one that you just ignore, is it?

23   A.  First of all, I disagree that the steroid users got all of the

24   benefit, so I would disagree with your premise in the first place.

25   And secondly, they're not comparison, one is looking at a post hoc

1    subgroup of a secondary end point, and the second is using the same

2    analysis that's being used in the 069 study for the other studies

3    as well, using the same methodology and pooling additional

4    patients.  I don't think there's a comparison one to the other.

5    Q.  Let's take a look at this figure 1.3 for a moment and then

6    we'll get back to VIGOR in a moment after that.

7              Do you see that for the NSAIDs combined there's a flat

8    line from 4 months to 21 months?

9    A.  Yes, I do.

10   Q.  And does that mean, sir, that there was not a single confirmed

11   complicated PUB in the NSAIDs group for the 17 months, from four

12   months out to the end of the study?

13   A.  I believe so.

14   Q.  And in the meantime, the Vioxx patients stepped up, one, two,

15   three, four, five additional events during that time period?

16   A.  Yes.

17   Q.  So for the prespecified analysis that Langman carried out and

18   published in 1999, when you follow it to the end of the study,

19   there are -- rofecoxib has more events than the NSAIDs combined and

20   that was never published; is that right?

21   A.  That's correct.  Although the data were included as part of the

22   Watson study, so that these data were published in the sense that

23   they were part of the pooled analysis in the Watson study.  They

24   weren't hidden, but they weren't published by themselves.

25   Q.  Well, the complicated PUB end point that you looked at at page

1  ending in 4303, that wasn't published either, was it?

2  A.  No, it wasn't.

3  Q.  So the complicated PUB end point and what it looks like in a

4  Kaplan-Meier curve in fact was hidden, wasn't it?

5  A.  That Kaplan-Meier curve was not published.

6  Q.  Instead, the authors published only a picture of the other end

7  point that purported to show a benefit, right?

8  A.  That's correct, and I think that's the significant end point

9  and that was the primary end point of the studies, which is the

10  proper one to publish.

11  Q.  Well, they talked about the confirmed complicated PUBs in the

12  paper, didn't they?

13  A.  Yes, they did.

14  Q.  And that was published in the paper, wasn't it?

15  A.  Yes, it was.

16  Q.  But they didn't show the picture, did they?

17  A.  They didn't show the picture.

18  Q.  Now, the Langman study, 069, included the

19  endoscopically-detected ulcer studies by Laine and Hawkey, correct?

20  A.  It included those studies, but it did not include the ulcers

21  that were asymptomatic as part of their data analysis.

22  Q.  The Laine and Hawkey studies were endoscopic detection studies

23  that had only one patient with a confirmed complicated PUB out of

24  377, who used ibuprofen for 24 weeks, right?

25  A.  I'll take your word for it, that sounds about right.

```
 1    Q.  In contrast, the endoscopic detection method recorded rates of
 2    between 45 and 49 percent so-called endoscopic ulcers, right?
 3    A.  That's correct.
 4    Q.  And those endoscopic ulcers, there were 45 to 49 percent of
 5    those versus one person with a confirmed complicated bleed?
 6    A.  That's correct.
 7    Q.  And you are familiar with the term "mucosal adaptation," right?
 8    A.  Yes, I am.
 9    Q.  And that refers to the phenomenon of the stomach being able to
10    recover from an initial insult from something like an NSAID, so
11    that the initial effect never develops into a clinically
12    significant event, correct?
13    A.  That's correct.
14    Q.  And that could be something that the patient never even knows
15    he or she had, and in most cases that would be true, right?
16    A.  I don't know in most cases, but certainly in some cases the
17    patient can have an ulcer that heals on its own, yes.
18    Q.  Well, in 45 percent of the cases, they had an endoscopic ulcer,
19    but in only one patient was there a bleed, correct?
20    A.  That's right.  But in-between they could have had symptoms, so
21    they could have known that there was something there.
22    Q.  Now, you're familiar with what a test of interaction is, right?
23    A.  Yes.
24    Q.  And a test of interaction is something that's done to determine
25    whether or not two populations are different as a result of a
```

1   particular factor; is that right?

2   A.   That's correct.

3   Q.   You personally have not performed interaction tests, but

4   they've been done on the clinical trials where you have been an

5   investigator, correct?

6   A.   That's correct.

7   Q.   And they've been done by statisticians, right?

8   A.   Yes.

9   Q.   And in the course of analysis of clinical trials that include

10  various factors, one of the things that investigators want to do is

11  to see if there is an interaction of one factor with another,

12  right?

13  A.   Yes.

14  Q.   And the reason they want to do that is, they want to know if a

15  secondary factor may be influencing the data, right?

16  A.   That's correct.

17  Q.   And the reason they want to know that is because that knowledge

18  may change their conclusion, correct?

19  A.   That's correct.

20  Q.   Now, if you could go back to the VIGOR study that we were

21  talking about.   There was a prespecified subgroup for steroid

22  users, correct?

23  A.   Yes.

24  Q.   There was a prespecified analysis to compare what was happening

25  in the steroid users versus the nonsteroid users, right?

1    A.  That's correct.

2    Q.  And the reason for that was that it was known before the VIGOR

3    study was done that if you were taking steroids, it could be a risk

4    factor for having a higher rate of GI events when you're taking an

5    NSAID, right?

6    A.  That's correct.

7    Q.  And at your deposition in January, you testified to your belief

8    that Merck actually had done the subgroup analyses that were

9    specified for the complicated PUBs end point; do you remember that?

10   A.  Yes, I do.

11   Q.  But that turned out that you were wrong about that?

12   A.  That's correct.

13   Q.  And, in fact, the reason you thought they had was because you

14   had seen a subgroup analysis by steroid use in the Watson paper and

15   you just assumed they had done the same thing in VIGOR, right?

16   A.  That's correct.

17   Q.  And there would have been no -- no one would have complained

18   that they had done something wrong if they had reported the

19   complicated PUB end point by steroid users versus nonsteroid users

20   in VIGOR, would they?

21   A.  I can't answer to anybody else complaining about it, I don't

22   think that it was a necessary end point.

23   Q.  You first saw the results of the complicated PUBs end point in

24   VIGOR separated by steroid use versus nonuse in the reports of the

25   plaintiff's experts, correct?

1    A.  Yes, that's correct.

2    Q.  And what you saw was that there were, in the steroid users, 27

3    complicated PUBs in the Naproxen group versus seven in the Vioxx

4    group, right?

5    A.  Yes.

6    Q.  And for the nonsteroid users, the difference was ten versus

7    nine, right?

8    A.  That's correct.

9    Q.  And that prompted you to ask for more information from Merck's

10   lawyers about those numbers, right?

11   A.  Yes.

12   Q.  And then you did your own calculations of the incidence rates

13   and determined that the relative risk appeared to be about the same

14   as what plaintiff's experts had calculated, right?

15   A.  That's correct.

16   Q.  And what the plaintiff's experts calculated was that there was

17   a relative risk in the steroid users of 3.85, right?

18   A.  If you say so.

19   Q.  And the relative risk for the nonsteroid users was 1.12?

20   A.  That sounds about right.

21   Q.  And you saw also that the, those data were subjected to a

22   statistical analysis, which showed a statistically significant

23   difference between the steroid users and the nonsteroid users with

24   a p-value of 0.047, correct?

25   A.   I was shown that analysis, but I didn't do it myself, that's

1    correct.

2    Q.  And you have no basis to challenge it, do you, sir?

3    A.  I'm not a statistician.

4    Q.  You know plenty of statisticians, don't you?

5    A.  I know some statisticians, yes.

6    Q.  Your son is a statistician, right?

7    A.  He is a Ph.D. candidate in statistics, yes.

8    Q.  And you talked to him, in fact; you asked him to confirm for

9    you -- you just wanted to review what is an interaction p-value

10   after you saw that in the plaintiff's reports, right?

11   A.  That's correct.

12   Q.  So you talked to your son, and your son told you that a

13   statistically significant result tells you if you repeated the test

14   multiple times what was the likelihood you would get the same

15   result, right?

16   A.  That's correct.

17   Q.  And that's the whole point of statistical significance testing,

18   is to tell you whether the findings were reliable, right?

19   A.  It's to tell whether or not they're reproducible and if they

20   represent a significant difference between populations, yes.

21   Q.  And so the results of the convention is that if the p-value is

22   less than 0.05, it is statistically significant and considered

23   reproducible, right?

24   A.  That's correct.

25   Q.  So what you saw and didn't ask anybody else to tell you, hey,

1  did they do it right or did they do it wrong, but you just accepted

2  that that was accurate, right?

3  A.  I saw it, I don't know -- I didn't reproduce it.  I can't say

4  that I accepted it was accurate but I didn't dispute it.

5  Q.  You don't dispute it?

6  A.  I don't dispute it.

7  Q.  And so what you don't dispute is that there was a statistically

8  significant difference for the most complicated end point in the

9  VIGOR study between the people who are using steroids who had a 27

10  versus 7 difference versus the people who were not using steroids,

11  where the difference was 10 versus 9.  Correct?

12  A.  That's correct.

13  Q.  Now, in comparison -- back up a step.  The VIGOR trial was

14  randomized for steroid use, wasn't it?

15  A.  Yes, it was.

16  Q.  And each group had approximately 56 percent steroid users,

17  right?

18  A.  That's correct.

19  Q.  And randomization is a very important part of a clinical trial,

20  isn't it?

21  A.  Yes, it is.

22  Q.  When you do clinical trials, the 130 or so that you've been in,

23  randomization is the norm, right?

24  A.  Yes.

25  Q.  And that randomization assures that you have to the extent

1   possible made the test in your trial a -- you've made that test the

2   effect of the drug as opposed to any other factors that those

3   patients might have coming in, right?

4   A.  It's the best effort we have to make sure that comparable

5   populations are being tested.

6   Q.  Now, by contrast, you know, sir, that steroid use was not

7   randomized in the Watson paper, was it?

8   A.  That's correct.

9   Q.  In fact, the steroid use was only present in 10 percent of the

10  Vioxx users versus 7.4 percent of the NSAID users, right?  That's

11  in Table 2 at page 1543.

12  A.  That's correct.  That would actually tend to tilt the tables

13  against Vioxx in these studies.

14  Q.  Well, not if there's no relationship between Vioxx and steroid

15  use for the event in question; is that right?

16  A.  Well, we know that steroid use is a risk for developing

17  gastrointestinal complications.

18  Q.  That's not the way the data came out in VIGOR, though, is it?

19  In fact, the VIGOR -- in the VIGOR trial, the Vioxx patients in the

20  complicated PUBs steroid arm did not have an increased rate?

21  A.  That's correct.

22  Q.  But those in the Naproxen arm had a highly increased rate,

23  correct?

24  A.  That's correct.

25  Q.  And so for steroid users, there was a real difference there,

1   wasn't there?  In the complicated end point, there was a

2   statistically significant increased risk of a complicated PUB for

3   Naproxen users of 3.85?

4   A.  That's correct.

5   Q.  By the way, the VIGOR study was all rheumatoid arthritis

6   patients, right?

7   A.  Yes.

8   Q.  And rheumatoid arthritis patients use steroids as part of their

9   treatment, correct, that's why there was such a high percentage of

10  them in that study?

11  A.  Many of them do and that's correct.

12  Q.  But osteoarthritis patients don't use chronic steroids, right?

13  A.  Generally not.

14  Q.  And osteoarthritis patients make up the vast majority of the

15  arthritis patients, like 20 to one ratio, right?

16  A.  I don't know those numbers.

17  Q.  Do you accept that osteoarthritis is far more common than

18  rheumatoid arthritis?

19  A.  Yes, I do.

20  Q.  Now, at your deposition, one of your objections to the use of

21  the complicated PUB end point for the analysis by steroid versus

22  nonsteroid was that it got into small numbers, right?

23  A.  That's correct.

24  Q.  But you did not find the presentation of a steroid versus

25  nonsteroid users to be problematic for the Watson analysis, right?

1    A.  That's correct.

2    Q.  Now, do you know, sir, that the number of complicated PUBs in

3    the VIGOR study was over twice as high as the number of complicated

4    PUBs in the Watson study?

5    A.  No, I don't, but...

6    Q.  Well, if you take a look at the confirmed complicated PUBs on

7    Table 3 of the Watson paper at 1545.  Do you see that the total

8    number there is 25?  That's the third row down, your Honor.

9    Rofecoxib 12, NSAIDs 13, a total of 25 complicated events, correct?

10              THE COURT:  I see it.

11   BY MR. ARBITBLIT:

12   Q.  Do you see that, sir?

13   A.  Yes, I do.

14   Q.  And in contrast to that, if you look at the results in VIGOR,

15   there were 53 confirmed complicated events, right, 37 versus 16; is

16   that right?

17   A.  It's a totally different population of patients.

18   Q.  It's a totally different population of patients with more

19   complicated events, correct?

20   A.  That's correct.

21   Q.  And it was a single randomized trial with a prespecified

22   subgroup of steroids for the complicated -- for the primary end

23   point that could have been done for the secondary end point as

24   well.

25   A.  It certainly could have been, but it was prespecified for the

1    primary end point and was not prespecified for the secondary end

2    point.

3    Q.  You do know that the data analysis plan for VIGOR permitted

4    additional end points, secondary end points, to be analyzed by the

5    various subgroups, right?

6    A.  Yes.

7    Q.  So it didn't say don't do this test?

8    A.  Of course not.

9    Q.  Now, your definition of gastrotoxic is detrimental to the

10   stomach, right?

11   A.  Yes.

12   Q.  And you've reviewed data in the course of your work on this

13   case that you had not seen before on that subject, right?

14   A.  Yes.

15   Q.  In particular, you reviewed the Alzheimer's study 078 --

16   A.  Yes.

17   Q.  -- showing that there was a, approximately a four-fold

18   statistically significant increase of PUBs and complicated PUBs in

19   the Vioxx group compared to placebo, right?

20   A.  Yes.

21   Q.  And that data was not published at any time while Vioxx was on

22   the market, was it?

23   A.  Not to my knowledge.

24   Q.  And you hadn't seen it until you got the plaintiff's expert

25   reports in November 2009, right?

1  A.  I believe so.

2  Q.  You also reviewed the paper by Lanas, L-A-N-A-S, on the data

3  from the APPROVe study, which has been talked about for other

4  reasons, and that showed that there was a statistically significant

5  4.9 relative risk for PUBs for Vioxx versus placebo, right?

6  A.  Yes.

7  Q.  And you also reviewed data showing that for the 078 and 091

8  Alzheimer's studies, there was a combined 11 versus zero

9  discontinuation rate for events such as gastrointestinal hemorrhage

10  and perforations and ulcers, right?

11  A.  I'll take your word for it, yes.

12         MR. ARBITBLIT:  Approach, your Honor.

13  BY MR. ARBITBLIT:

14  Q.  Sir, if you could turn to page 26 of this document, which is

15  the December 18, 2004, interim review of Vioxx, an FDA document.

16  You saw this before at your deposition for the first time, right?

17  A.  I only have page 19 here.

18  Q.  Page 19?

19  A.  I don't have up to page 26.

20  Q.  That may be true for everyone, then, since these were all

21  copied together.  Does the document end at --

22         MR. ARBITBLIT:  Your Honor, does your copy go --

23         THE COURT:  19, yeah.

24         MR. ARBITBLIT:  19, wonderful.

25         THE COURT:  Can you put it on the overhead and show it to

1    us?

2            MR. ARBITBLIT:  Thank you, your Honor.

3    BY MR. ARBITBLIT:

4    Q.  Now, the data that you saw at your deposition, sir, involved

5    duodenal ulcers, two versus zero; gastric ulcers, four versus zero;

6    gastrointestinal hemorrhage not otherwise specified, three versus

7    zero; and upper gastrointestinal hemorrhage, two versus zero.  Does

8    that ring a bell now?

9    A.  Yes, I remember seeing that.

10   Q.  So that result was 11 versus zero for discontinuations due to

11   those gastrotoxic effects, right?

12   A.  Correct.

13   Q.  And that was information that you had not seen before your

14   deposition, right?

15   A.  That's correct.

16           THE COURT:  Let's get to a break and we'll take a break.

17           MR. ARBITBLIT:  Okay, your Honor.  We can take a break

18   now.

19           THE COURT:  We'll take a 15-minute break.

20           THE DEPUTY CLERK:  Are you going to admit that?

21           MR. ARBITBLIT:  May we complete that document and admit

22   it, your Honor?

23           THE COURT:  Yes.

24           MR. ARBITBLIT:  Thank you.

25           THE MARSHAL:  All rise.

1        (WHEREUPON, A RECESS WAS TAKEN.)

2        (OPEN COURT.)

3            THE COURT:  Be seated, please.  You're still under oath,

4    Doctor.  You may continue.

5            MR. ARBITBLIT:  Thank you, your Honor.  Before moving on

6    I wanted to tender P1.2590 which was the August 19th memoranda, the

7    first document used with the witness, a Merck memo.

8            THE DEPUTY CLERK:  Does it have an LAAG number?

9            MR. ARBITBLIT:  It does not yet.  I believe the next in

10   order would make it 806.

11           THE DEPUTY CLERK:  Yes.

12           THE COURT:  Okay.

13   BY MR. ARBITBLIT:

14   Q.  Doctor, we were discussing the evidence that you had seen

15   concerning Vioxx compared to placebo, and there was an additional

16   document I wanted to go over with you.

17           Doctor, Exhibit -- the next in order here, is an excerpt

18   from the clinical study report from the ViP trial of Vioxx versus

19   placebo and you saw this the first time at your deposition also,

20   right?

21   A.  Yes.

22   Q.  And going to the page with 6417 at the bottom, there is data

23   from the ViP trial for confirmed and unconfirmed GI events, and

24   then going over to the next page confirmed complicated events,

25   right?

1    A.  Yes.

2    Q.  And in the ViP trial of Vioxx versus placebo, the rate was 0.09

3    for placebo and 0.45 for Vioxx for a relative risk of five,

4    correct?

5    A.  Yes.

6    Q.  And for the confirmed complicated events, it was four versus

7    one and a relative risk of four, right?

8    A.  Yes.

9              MR. ARBITBLIT:  We would offer this, your Honor, as 807.

10             THE COURT:  All right.  Let it be admitted.

11   BY MR. ARBITBLIT:

12   Q.  So, Doctor, in these different populations, Alzheimer's,

13   polyps, colon cancer, all of them had an elevated risk of about

14   four to five times for PUBs and complicated PUBs, correct, for

15   Vioxx versus placebo?

16   A.  Yes.

17   Q.  And that is data that you had not seen when you wrote your

18   report?

19   A.  That's correct.

20   Q.  Now, I wanted to go back to the issue that we talked about when

21   we started which has to do with the doses that were used in the

22   Vioxx trials.  You had made the comment that 1998 when that memo

23   was written it wasn't, it was after the Langman studies had been

24   conducted, right?

25   A.  Yes.

```
 1    Q.  But you know, sir, that wasn't the first time that Merck's
 2    consultants had told them that their doses were too high for
 3    osteoarthritis patients, right?
 4    A.  I don't know what you're referring to.
 5              MR. ARBITBLIT:  May I approach, your Honor?
 6              THE COURT:  Yes.
 7              MR. ARBITBLIT:  It's a little bulky but it's the best we
 8    can do.
 9    BY MR. ARBITBLIT:
10    Q.  You've been handed a document that's a consultants meeting from
11    September 28, 1996, two years earlier than the memo you looked at
12    previously and you saw this at your deposition also, right?
13    A.  Yes, I did.
14    Q.  Now, this is another case where Merck's consultants were giving
15    Merck advice about planning osteoarthritis trials, right?
16    A.  I believe so.
17    Q.  And if you turn to the page ending in 1935.  Are you there,
18    sir?
19    A.  Yes, I am.
20    Q.  And in the second full paragraph about just below halfway down
21    you see the text that says:  When questioned about doses of the
22    comparator agents, the consultants suggested that dose titration be
23    considered in order to closer approximate real world OA treatment
24    practice s and guidelines."  Did I read that correctly?
25    A.  Yes, you did.
```

1   Q.  And dose titration refers to adjusting the dose depending on

2   the patient's response either going lower when symptoms abate or

3   higher if necessary, correct?

4   A.  Yes.

5   Q.  And the community practice is to start with the lowest

6   effective dose, correct?

7   A.  That's correct.

8   Q.  And the community practice is to reduce the dose as soon as

9   symptoms abate, correct?

10  A.  That's correct, in community practice.

11  Q.  Now, in response to this comment, the majority of the Merck

12  attendees at this meeting felt that Vioxx should be compared to

13  fixed, equi-potent doses of the comparator agents.  Do you see

14  that?

15  A.  Yes.

16  Q.  But Dr. Griffin, the consultant from Vanderbilt, argued that

17  equally efficacious doses are not necessarily known.  That's right,

18  isn't it?

19  A.  You read that correctly.

20  Q.  And, in fact, you note, sir, that Merck never tested Vioxx

21  against 1200 milligrams of ibuprofen for osteoarthritis, right?

22  A.  That's correct.

23  Q.  And they never tested Vioxx against 100 milligrams of

24  diclofenac, right?

25  A.  That's correct.

1    Q.  So there's no data to show whether Vioxx is the same or

2    different for pain relief from those lower doses of the NSAIDs,

3    right?

4    A.  That's correct.

5    Q.  On the other hand there is data, universally accepted that the

6    risk of GI harm from increasing those doses to 2400 ibuprofen or

7    1500 diclofenac would be higher than at 1200 ibuprofen or 100

8    diclofenac, right?

9    A.  That's correct.

10   Q.  So we don't know if it's more effective but we do know that the

11   doses they gave are more toxic than if they had given lower doses?

12   A.  That's correct.  And they were being compared with the high

13   doses of Vioxx as well.  So high doses of Vioxx were being compared

14   with doses that were in the acceptable range for the nonspecific

15   NSAIDs.

16   Q.  Sir, let's take a look at that then.

17           MR. ARBITBLIT:  May I approach, your Honor?

18           THE COURT:  Yes.

19   BY MR. ARBITBLIT:

20   Q.  This is an article by Cannon and others supported by Merck

21   Research Laboratories called Rofecoxib, a Specific Inhibitor of

22   COX-2 with Clinical Efficacy Comparable to that of diclofenac

23   sodium.  Do you see that?

24   A.  Yes, I do.

25   Q.  Have you seen this before?

1  A.  Not that I recall.

2  Q.  And do you know whether this study was one of the OA studies

3  included in Protocol 069?

4  A.  I would have to look and see.

5  Q.  I'll represent to you that it was, sir, and you can take it up

6  with your counsel if you disagree.

7         Can you look at the methods here, sir, on the first page

8  that patients were randomized to one of three treatment groups,

9  12.5 milligrams of rofecoxib, 25 milligrams of rofecoxib, and 50

10  milligrams of diclofenac three times daily.  Do you see that?

11  A.  Yes, I do.

12  Q.  So three times daily of diclofenac at 50 is 150, which is the

13  maximum permissible dose of diclofenac for osteoarthritis, right?

14  A.  Yes, that's correct.

15  Q.  And in comparison Vioxx, was given a break by going at a lower

16  dose for half the treatment arms and the standard dose for the rest

17  of it, right?

18  A.  Twelve and a half and 25 are both standard doses for treatment

19  of osteoarthritis.

20  Q.  And 12 and a half was the lowest dose approved for

21  osteoarthritis for Vioxx, right?

22  A.  I think that's the smallest pill they make.

23  Q.  And in comparison for diclofenac, it was the highest approved

24  dose, right?

25  A.  That's correct.

1   Q.  So going back, sir, to the consultants memo that we were

2   looking at a moment ago, do you see continuing on page 1935 that

3   Dr. Griffin questioned, whether it would be ethical if titration

4   were not allowed, as this is considered standard of care.  Placing

5   patients on near maximal doses of drug would not be consistent with

6   current treatment guidelines that recommend progressing from low to

7   high doses of an NSAID on an as-needed basis.  Correct?

8   A.  That's correct.

9   Q.  Now, they didn't do that in the protocol that you just looked

10  at, they gave the highest dose continuously for one year; is that

11  right?

12  A.  Yes.

13  Q.  So the data that goes into 069 and the data that goes into

14  Watson and the data that goes into Rostom, which you cited to this

15  court, all comes from studies like this where patients were given

16  the continuous highest approved dose of diclofenac for a year

17  period rather than following the standard of care which would be to

18  give them the medicine that they actually need; is that right?

19  A.  This illustrates the difference between community medical

20  practice and design of clinical trials.  First of all --

21  Q.  Can you answer my question, sir?  Is it right that what they

22  did was they gave these patients one year continuous treatment of

23  the highest dose, which is not consistent with community care?

24  A.  You stated that this is not according --

25  Q.  Sir, I would ask that you answer my question.

1           THE COURT:  If you can.

2           MR. ARBITBLIT:  If you can't answer it --

3           MR. ISMAIL:  May he be allowed to explain?

4   BY MR. ARBITBLIT:

5   Q.  Let's get an answer first and then we can get an explanation.

6   Is it correct, sir, that the protocol that you looked at that was

7   included in the Merck 069, which went into Watson and Watson that

8   went into Rostom was based on a one year continuous treatment

9   period of the highest permissible dose of the NSAID diclofenac for

10  osteoarthritis?

11  A.  Yes.

12  Q.  And is it correct that the community practice would be to

13  progress from low to high doses as needed and to stop giving high

14  doses as soon as possible when symptoms abate?

15  A.  I would agree that the trial was different than what is done in

16  community practice.

17  Q.  Now, sir, you cited in your report an observational study,

18  right, and that was by Garcia Rodriguez I believe?

19  A.  Yes.

20  Q.  Let me get that out.  Is this the study that you cited, sir?

21  A.  Yes, it is.

22  Q.  And you wrote about it in your report that it showed that

23  coxibs were safer than NSAIDs, right?

24  A.  Yes.

25  Q.  But what you didn't say in your report was that not all NSAIDs

1    are alike and not all COX-2 inhibitors are alike, and that, in

2    fact, in this article when you look at the point estimate for the

3    relative risk of upper GI complications at page 502, ibuprofen has

4    a lower relative risk than rofecoxib, doesn't it?

5    A.   That's correct.

6    Q.   And these observational studies, unlike clinical trials, are

7    reporting on actual users in a network database of real world users

8    of NSAIDs and COX-2s, correct?

9    A.   That's correct.

10   Q.   And in this study Vioxx was not safer than ibuprofen, was it?

11   A.   In this particular study it was not.

12   Q.   And that's the only one that you cited in your report for the

13   observational studies of real world users, but there are others,

14   correct?

15   A.   Yes, there are.

16   Q.   Sir, you did not cite in your report an article by

17   Castellsague, Risk of Upper Gastrointestinal Complications

18   Associated with COX-2 Selective and Nonselective Nonsteroidal

19   Antiinflammatories, correct?

20   A.   No, I didn't.

21   Q.   And if you look at the measurement and main results of this on

22   the first page, did the authors report:  "Current rofecoxib and

23   naproxen users had the highest risk for upper gastrointestinal

24   complications with agisted odds ratios of 3.6 and 3.4 respectively;

25   is that correct?

1    A.  You read that correctly.

2    Q.  And so the odds ratio for rofecoxib for this upper

3    gastrointestinal harm, was actually slightly higher than Naproxen,

4    right?  3.6 versus 3.4.

5    A.  Yes.  I don't know if that was a meaningful difference, but it

6    was higher, yes.

7    Q.  The point estimate is higher, right?

8         And the dose relationship was observed for Vioxx and

9    Naproxen so that the odds ratio went up to 5.2 and 5.1 when you

10   used higher doses, right?

11   A.  That's correct.

12   Q.  And dose response relationship is considered one of the factors

13   that you would look to for whether there's a cause and effect

14   relationship, right?

15   A.  Yes.

16   Q.  So their conclusion was:  "These findings support the

17   variability of individual NSAIDs in the elevated risk of upper

18   gastrointestinal complications.  Our results suggest that the risk

19   for rofecoxib is similar to that for Naproxen."  Correct?

20   A.  That was their conclusion.

21   Q.  And this is in another real world population involving over a

22   million person years of follow-up, right?

23   A.  That's correct.

24   Q.  I'll just do one more.  This is a study of Upper

25   Gastrointestinal Bleeding Associated with the use of NSAIDs, Newer

1    Versus Older Agents by Laporte.  And this one isn't in your report

2    either, right?

3    A.  No, it was not.

4    Q.  If you look at the design of this and the results on the first

5    page in the middle, you can see that the relative risk with

6    rofecoxib is 7.2, right?

7    A.  Yes.

8    Q.  And that's higher than meloxicam, higher than nimesulide,

9    higher than aceclofenac, right?

10   A.  Yes.

11   Q.  It's lower than Ketorolac, whatever that is, right?

12   A.  Yes.

13   Q.  Certainly wasn't the safest in this study, was it?

14   A.  That's correct.

15   Q.  And the conclusion of this study is that our results do not

16   confirm that greater selectivity for COX-2 confers less risk of

17   upper gastrointestinal bleeding, right?

18   A.  Those were their conclusions, that's correct.

19   Q.  Now, I want to go back to the monograph that you talked about.

20        MR. ARBITBLIT:  Just a moment, your Honor.

21   BY MR. ARBITBLIT:

22   Q.  Okay.  So the monograph refers to a study by Laine, right?  Do

23   you have that handy?  You looked at the 2003 monograph.

24   A.  Are you talking about the Provider Synergies' monograph.

25   Q.  The Provider Synergies monograph, that's right.

1    A.  Yes, sir.

2    Q.  Page 6 there's a reference to rofecoxib, Vioxx and ibuprofen,

3    right?

4    A.  Yes.

5    Q.  And the closing statement of that paragraph is:  "Ulcer rates

6    for rofecoxib were comparable to rates of placebo."  Right?

7    A.  That's correct.

8    Q.  But that wasn't true in Alzheimer's trials, it wasn't true in

9    APPROVe, it wasn't true in ViP, and it wasn't true in that FDA

10   document, correct?

11   A.  That's correct.

12   Q.  And this reference to the Laine article that you testified

13   about earlier, you had not even read that by the time of your

14   deposition, right?

15   A.  The Laine article and the -- there were two duplicate studies,

16   the Laine study and a similar study that were identical studies

17   that were done one in the United States and one internationally.

18   And then I cited one of them and not the other.

19   Q.  You hadn't read the Laine study at that time, right, you had

20   read Hockey but not Laine?

21   A.  I think in the list of studies that I had reviewed, I cited

22   Hockey and not Laine, that's correct.

23            MR. ARBITBLIT:  Can I approach, your Honor?

24            THE COURT:  Yes.

25   BY MR. ARBITBLIT:

1   Q.  So the monograph, I just have to do a little back and forth

2   here, sir, please bear with me, but if you look at monograph there

3   is a reference, it's a little faint, but do you accept that the

4   reference there is to the Laine study that I just handed you?

5   A.  Yes, I do.

6   Q.  And if you want to check it, it's out at page 14 --

7   A.  It's number 30.

8   Q.  Number 30, that's the Laine study, right?

9   A.  Yes.

10  Q.  And this one is an endoscopic ulcer study, right?

11  A.  Yes, it is.

12  Q.  This one had a 45.8 percent rate of endoscopic ulcers on

13  ibuprofen, right?

14  A.  Yes.

15  Q.  But only one -- only two ibuprofen patients actually had upper

16  GI bleeds, right?

17  A.  That's correct.

18  Q.  That's about one percent?

19  A.  That's correct.

20  Q.  Right?

21       So the ulcer rate comparable to placebo referenced at the

22  end of that paragraph in the monograph comes from the results for

23  placebo of 9.9 percent that had so-called endoscopic ulcers, right?

24  A.  Yes.

25  Q.  And you don't believe that the 9.9 percent is credible, do you?

1   A.  I am not sure that's a number that they found in this

2   particular study, that's a number that was there.

3   Q.  Well, you wouldn't expect more than one or two percent of a

4   population of people on placebo to have an ulcer when they didn't

5   have one when they came into the study, right?

6   A.  That's correct.

7   Q.  But these folks found 9.9 percent using their endoscopic

8   detection method, right?

9   A.  That's right, that's what they found.

10  Q.  And so they reported ulcer rates for rofecoxib are comparable

11  to rates with placebo but they didn't report that the method they

12  used had actually found an unacceptably and unbelievably high rate

13  of placebo events, right?

14  A.  They reported the numbers that they found, they didn't use

15  unacceptable or inconceivable, no.

16  Q.  To you, sir, you would not have expected 9.9 percent of people

17  taking a sugar pill to get an ulcer in the course of 12 weeks,

18  would you?

19  A.  No, I would not.

20  Q.  And placebo doesn't cause ulcers, does it?

21  A.  Shouldn't.

22  Q.  But they found them, right?

23  A.  They found them.

24  Q.  And this 2003 monograph does not include the four times higher

25  risk of Vioxx compared to placebo in the Alzheimer's trials, does

1  it?

2  A.  No, it was a report on a different trial.

3  Q.  And it couldn't have included that because Merck hadn't

4  published it yet, right?

5  A.  That's correct.

6        MR. ARBITBLIT:  Your Honor, may I approach?

7        THE COURT:  Yes.

8  BY MR. ARBITBLIT:

9  Q.  Sir, this article is called Rofecoxib, A Disappointing NSAID

10  Analgesic.  Have you seen it before?

11  A.  No, I've never seen this.

12  Q.  Do you see at the -- this is a description of the Vioxx

13  clinical trials that reports on the trials such as Hawkey, for

14  example, and Laine, if you look at reference list on the last page,

15  they're talking about the same studies we've been discussing this

16  morning.  The Cannon study I showed you is in there, Laine and

17  Hawkey are mentioned here as well.  Do you see that?

18  A.  I see that they're on the reference list, yes.

19  Q.  And do you see that the authors of this review in 2000 stated

20  in their conclusion:  "Contrary to the media hype that preceded the

21  release of rofecoxib, this drug changes nothing in the management

22  of patients with osteoarthritis.  Do you see that?  Did I read that

23  correctly?

24  A.  I don't know where you're reading.

25  Q.  Under the Conclusion heading, sir, on the last page.

1    A.  You read that correctly.

2    Q.  And the authors also say:  "In clinical trials designed to

3    favor rofecoxib (the comparator NSAID was used at the maximal

4    recommended dose).  Did I read that right?

5    A.  Yes, you did.

6    Q.  And that's a fair statement, isn't it, if you give 12.5 Vioxx

7    and 25 Vioxx and compare it to the maximum dose of diclofenac,

8    that's not a fair fight, is it?

9    A.  Well, actually I think it's an appropriate comparison.  And, in

10   fact, for the other comparator NSAIDs, they weren't at their

11   maximum dose but they were in the middle of their dose range.

12   Q.  Is 2400 the middle between 1200 and 3200, sir?

13   A.  It's in the middle, yes, between them, yes.

14   Q.  What's the middle between 1200 and 3200?

15   A.  It's probably about 2000.

16   Q.  And --

17   A.  2200, it's very close to 2400.

18   Q.  So 2400 is not a standard dose to give every day for a year to

19   a person with osteoarthritis unless they have a really severe

20   condition, right?

21   A.  Those are the patients that I would be interested in a trial

22   like that, yes.

23   Q.  Take a look at that Cannon article.  And there's a Table 1,

24   that describes the functional class of the patients in the study.

25   That's at page 980, your Honor.

1        Do you see that the functional class of about 75 to 80

2   percent of these patients was Class II or below; is that correct?

3   A.  Did you ask me a question?

4   Q.  Yes, I did ask you a question.  Are you at Table 1?

5   A.  Yes, I am.

6   Q.  Do you see that only 20 percent of the Vioxx patients and 23

7   percent of the diclofenac patients were in the severe Class III

8   category?

9   A.  Yes, I see that.

10  Q.  And by contrast the rest of the patients were either mild or

11  moderate, right?

12  A.  Most of them were in Class II and a minority were in Class I.

13  Q.  What does stacking the deck mean, sir?

14  A.  It's a colloquial term meaning giving one side an unfair

15  advantage over the other.

16  Q.  Do you know if Merck itself ever described its clinical trials

17  of Vioxx was stacking the deck?

18  A.  I do not.

19        MR. ARBITBLIT:  May I approach, your Honor?

20        THE COURT:  Yes.

21  BY MR. ARBITBLIT:

22  Q.  This is a May 9th, 2001, memo from Fanelle to Baumgartner, and

23  there's a discussion in the bottom paragraph, and I want to turn to

24  your attention to the statement three lines from the bottom that

25  says:  "We have been guilty of stacking the deck in our studies,"

1    and then refers to a Vioxx study against Celebrex and other drugs.

2    Do you see that?

3    A.  Yes, I see that.

4    Q.  And before today had you ever seen any reference to Merck

5    stacking the deck in its studies?

6    A.  No, I have not.

7          MR. ARBITBLIT:  I have nothing further, your Honor.

8    Thank you.

9          THE COURT:  Okay.  All of the material that you're going

10    to introduce, anything?

11          MR. ARBITBLIT:  Well, the articles to the extent that

12    they would permitted as exhibits would be offered.

13          THE COURT:  Right.

14          MR. ARBITBLIT:  And thank you for reminding me I think

15    that the consultants meeting memorandum of 1996 would be offered as

16    807 I believe.

17          THE DEPUTY CLERK:  You have 807.

18          MR. ARBITBLIT:  Then 808 would be the September 28,

19    1996 -- I apologize, it's previously been marked as LAAG 682, so we

20    wouldn't need a new number for that.

21          THE COURT:  Let it be admitted.

22          MR. ARBITBLIT:  The stacking the deck document, that's

23    what's up right now, and that would be 808, your Honor.

24          THE COURT:  Let it be admitted.

25          Any redirect?

```
 1              MR. ISMAIL:  Yes, sir.

 2                        REDIRECT EXAMINATION

 3   BY MR. ISMAIL:

 4   Q.  Doctor, if you just look at the e-mail counsel just showed you,

 5   they're discussing a study and does it describe it as an efficacy

 6   study?

 7   A.  Yes.

 8   Q.  Is this a gastrointestinal study?

 9   A.  No, it's not.

10   Q.  Does this have anything to do with the topics that counsel

11   spent two hours going over with you?

12   A.  No, it does not.

13   Q.  Now, you spent a good deal of time this morning talking about

14   dosing.  How many clinical trials have you been a clinical

15   investigator in?

16   A.  Over 130.

17   Q.  And when you act as a clinical trial investigator, do you bring

18   your own independent clinical judgment to bear as to the

19   appropriateness of the dosing comparisons?

20   A.  Yes, I do.

21   Q.  And for the various clinical trials that counsel made reference

22   to with respect to the dosing of the other NSAIDs, would they have

23   been conducted by clinical trial investigators that are outside of

24   Merck?

25   A.  Yes, they were.
```

1  Q.  And in your experience in over 100 clinical trials, would your

2  expectation be that those clinical trial investigators brought

3  their own clinical judgment to bear as to whether the dosing was

4  appropriate for this study?

5  A.  Yes, they did.

6  Q.  Are you familiar with institutional review boards?

7  A.  Yes, I am.

8  Q.  Can you describe what those are?

9  A.  An institutional review board is an independent board that

10  reviews proposed studies to make sure that patients' rights are

11  being protected and that the studies are appropriate.

12  Q.  Does that include an examination as to whether the dosing is

13  appropriate for the conditions being studied?

14  A.  Yes, it does.

15  Q.  Did counsel show you any indication of any objection from any

16  of the hundreds of clinical investigators studying Vioxx in the

17  clinical trials?

18  A.  No, he did not.

19  Q.  Did counsel show you any objection from any institutional

20  review board that the comparison was an unfair fight, to use his

21  terminology?

22  A.  No.

23  Q.  The studies that they went over, the Langman set of studies, I

24  think you described those as the preapproval studies, right?

25  A.  That's correct.

 1    Q.  Do you know, sir, whether those studies were submitted to FDA

 2    to support the approval of the drug originally?

 3    A.  Yes, they were.

 4    Q.  Did counsel show you any objection from the scientists at FDA

 5    that the dosing comparisons in those studies were inappropriate

 6    ones?

 7    A.  He did not.

 8    Q.  If you could turn to the Rostom publication, which is tab 6 of

 9    your binder.  And this again is the meta-analysis of COX-2

10    inhibitor trials against nonselective NSAIDs?

11    A.  Yes, it is.

12    Q.  Is there a supplemental Table 1 on page 12 of that publication

13    that describes the comparators and the doses used for the clinical

14    studies?

15    A.  Yes, there is.

16    Q.  And if you go through it you see that it's broken down by COX-2

17    trial?

18    A.  Yes, it is.

19    Q.  So at the top you've got celecoxib study, correct?

20    A.  Yes.

21    Q.  And then you see a comparison, for example, of 150 milligrams

22    diclofenac, right?

23    A.  Correct.

24    Q.  You see comparisons to 2400 milligram ibuprofen, what I've

25    highlighted on the screen?

1   A.   Yes.

2   Q.   Is that what TID means, three times daily?

3   A.   Yes, it does.

4   Q.   You can keep going down this list and look at other COX-2

5   comparator trials and will you see several, in fact, almost uniform

6   consistency in the trial design for the dosing comparators of the

7   nonselective NSAIDs?

8        You can just look at a few examples I've highlighted on

9   the screen for trials that have nothing to do with Vioxx.  Do you

10  see trials for Lumiracoxib, Valdecoxib, Etoricoxib using 2400

11  ibuprofen?

12  A.   Yes, that's correct.  That seems to be the standard dose

13  comparator for ibuprofen in all of these trials.

14  Q.   Would it be consistent with your experience as a clinical trial

15  investigator that each of these studies themselves would have

16  clinical trial investigators who would bring their own clinical

17  judgment to bear as to the appropriateness of the comparison?

18  A.   Yes, that's true.

19  Q.   And these many studies across many sites using many different

20  COX-2 inhibitors, did counsel show you a single objection from any

21  clinical trial investigator as to the appropriateness of the

22  dosing?

23  A.   No.

24  Q.   How about from IRBs or from FDA?

25  A.   No.

1    Q.  Sir, do you have an opinion -- before I get there.  You

2    indicated to counsel in response to one of his questions as a

3    clinician the dose that you were interested in was this 2400

4    milligram ibuprofen, that's the trial that you would be interested

5    in.  Can you tell us why?

6    A.  Yes.  Because we're interested in preventing gastrointestinal

7    complications and if someone takes, as I said before, a couple of

8    Advil and they get better, then those aren't patients who are very

9    likely to have gastrointestinal complications.  It's the patients

10   who need to take the higher doses for longer periods of time that

11   are at risk for the clinical complications, and these are the ones

12   that we're trying to prevent.

13          So if somebody came to me and showed me a study that a

14   patient was taking, say, 800 milligrams a day of ibuprofen, I

15   wouldn't pay attention to that study because it's not relevant to

16   the problem at hand.

17   Q.  You were describing the difference between a community care

18   setting and clinical trial setting.

19   A.  Yes.

20   Q.  Can you explain that, sir?

21   A.  I will.  In a community care setting we try and minimize the

22   doses of medication the patients are taking and taper them, but for

23   a clinical trial the protocol needs to be more standardized because

24   it needs to be done across several centers and we need to be sure

25   that we're comparing apples to apples, so to speak.  And in that

1    case it's better to perform things with a standard dose and a

2    standard protocol so that the results can be better interpreted.

3    And that's the difference, it's one of the differences between a

4    clinical study and community practice.

5    Q.  Sir, do you have an opinion as to whether the Vioxx clinical

6    trials in the design in terms of the comparators and doses were

7    consistent or not with the standard clinical trial designs that

8    have been used by researchers for many years?

9    A.  I do.

10   Q.  And what's that opinion, sir?

11   A.  That it was perfectly consistent with the standard for these

12   kind of trials.

13   Q.  Counsel asked you about the ViP trial and the APPROVe study.

14   A.  Yes.

15   Q.  When did those data become available?

16   A.  I don't know when they became available, I think it was after

17   Vioxx was taken from the market.

18   Q.  So after September of 2004?

19   A.  I believe so.

20   Q.  And were those studies comparison against a placebo?

21   A.  They were.

22   Q.  And the Alzheimer's data that counsel showed you, was that --

23   do you recall the date of the memorandum?

24   A.  Yes.

25   Q.  What was that?  December of 2004, the Villalba memorandum?

1  A.  I believe so, yes.

2  Q.  When we went through the Provider Synergies' monograph, was

3  there any claim in relation to the warnings that are part of the

4  COX-2 inhibitors that Vioxx or other coxibs are equivalent to

5  placebo in their utility GI toxicity?

6  A.  To the contrary.  The monograph pointed out that there is a

7  gastrointestinal risk associated with Vioxx.

8  Q.  Do these placebo-controlled trials and data that came out after

9  Vioxx was withdrawn from the market that counsel went over to you,

10  have any bearing on the issues that you described in your direct

11  examination this morning?

12          THE COURT:  Wait just a moment.

13          MR. ARBITBLIT:  I have an objection that that

14  mischaracterizes, I specifically went over 078 and there is

15  testimony in the record from Dr. Graham that that was completed by

16  April of 2003, and it's not an appropriate question to say that all

17  of those were after the fact.

18          THE COURT:  I understand.  Why don't you rephrase the

19  question.

20          MR. ISMAIL:  Yes, sir.

21  BY MR. ISMAIL:

22  Q.  Did the placebo-controlled data that counsel made reference to

23  in his examination have any bearing on the opinions you gave with

24  respect to the adequacy of the disclosure to the P&T Committee?

25  A.  No.

1  Q.  Counsel showed you some observational data, I don't have all of

2  the various articles here, but do you recall a couple of studies

3  that counsel went over with you?

4  A.  Yes, I do.

5  Q.  What is the concept of channelling bias?

6  A.  Channelling bias is a concept whereby in the community, which

7  is what's reviewed in observational data, that if there's a

8  perception that one drug is superior to another that practioners

9  will channel or give the more potent drug to the sicker patients.

10  Q.  Has this channelling bias concept or thought been discussed in

11  the context of NSAIDs, COX-2 inhibitors, and gastrointestinal

12  safety?

13  A.  Yes.  In fact, it's been studied and there have been

14  publications about it.

15  Q.  And what does the study of channelling bias in real world

16  settings like those observational studies tell us about the effect

17  of that bias on studies like the ones counsel showed you?

18  A.  It tells us a number of things.  First of all, it points out

19  that there is indeed channeling bias, that the sicker patients

20  receive the coxibs.

21       And secondly, it points out why I am relying my opinions

22  on the placebo -- I'm sorry, on the randomized prospective studies

23  of coxibs versus NSAIDs, it's standardized doses rather than on the

24  observational studies that are subject to channelling bias and

25  other inaccuracies as well.

```
 1   Q.  Counsel asked you about the number of events in the Watson

 2   study and he compared it to the number of events in VIGOR.  I think

 3   that's tab 5 to your binder.

 4   A.  Yes.

 5   Q.  And I believe he tried to compare the number of events in the

 6   VIGOR study to the number of events that are reported here in

 7   Watson.  And I want to go over what the number of those events

 8   actually were.

 9           MR. ARBITBLIT:  Your Honor, that mischaracterizes.  I

10   specifically compared only the complicated PUBs end point.

11           THE COURT:  Okay.  Well, just whatever he compared, why

12   don't you rephrase the question.

13           MR. ISMAIL:  Sure.

14   BY MR. ISMAIL:

15   Q.  Was there any comparison -- you and I went over the steroid

16   subgroup data in the Watson monograph, right?

17   A.  Yes, we did.

18   Q.  And that was at Figure 2 on page 1545?

19   A.  Correct.

20   Q.  And what is the end point that this comparison utilized?

21   A.  This was the prespecified primary end point, which were PUBs.

22   Q.  Was there any analysis here of that POB end point?

23   A.  No.

24   Q.  Did you rely on any analysis of a POB end point when it came to

25   subgroups?
```

```
 1    A.  No.  Because I think the PUB end point is the more important

 2    end point.

 3    Q.  And then if you actually went to see the number of events that

 4    was the primary analysis in the Watson study, if you look here, is

 5    it 97 events?

 6    A.  That's correct.

 7    Q.  And is that more than the 50 whatever events counsel asked you

 8    about from the VIGOR study?

 9              MR. ARBITBLIT:  Your Honor, I have to object.  He is

10    asking apples and oranges.  There were --

11              MR. ISMAIL:  I agree apples and oranges.

12              MR. ARBITBLIT:  He is mixing end points and it's not

13    appropriate.

14              THE COURT:  I understand.  I get that.

15    BY MR. ISMAIL:

16    Q.  Just so we're clear.  The data set you considered to give the

17    opinion this morning with respect to steroid use and non use from

18    the Watson study, was that based on the nearly hundred events

19    reported in that analysis?

20    A.  Yes.

21    Q.  Counsel made reference to the Langman publication.

22    A.  Yes, he did.

23    Q.  I don't want to characterize how he described the primary

24    analysis, the record will speak for itself.  But I just want to

25    confirm what indeed was the end point.  It's been marked for
```

1    identification as Exhibit 575.  If you look at the abstract, sir,

2    under Main Outcome Measure.  What was the primary analysis of?

3    A.  The primary analysis was based on the first diagnosis of a PUB.

4    Q.  Is that the end point you utilized as being the most important

5    for your analysis in this case?

6    A.  Yes, it is.

7    Q.  If anyone suggested this morning that Langman looked at POBs,

8    would that be accurate in terms of its main outcome measure?

9    A.  Not for its main outcome measure, and not what I relied on for

10   my opinion.

11   Q.  And final topic, sir.  Do you have that Yu memorandum?

12   A.  Yes, I do.

13   Q.  And counsel asked you about some graphic depiction of various

14   end points, and I think you were describing that the complete data

15   set was contained in the Yu memoranda; is that right?

16   A.  That's correct.

17   Q.  So if we wanted to look to see not the interim graph that

18   counsel showed you but the total data set, does this memoranda

19   provide a statistical analysis of confirmed PUBs and complicated

20   PUBs?

21            MR. ARBITBLIT:  Objection, mischaracterizes, I did not

22   show anything that was interim, your Honor.

23            MR. ISMAIL:  I'll rephrase.

24            THE COURT:  All right.  Rephrase.

25   BY MR. ISMAIL:

1  Q.  Let's look at this table to see what the total data set says of

2  confirmed and complicated PUBs, okay?

3  A.  Yes.

4  Q.  So we have Vioxx against all other NSAIDs here for confirmed

5  PUBs; is that right?

6  A.  Yes.

7  Q.  And what's the relative risk?

8  A.  Relative risk is .36 showing there's a 64 percent reduction.

9  Q.  And is that data significant to you with respect to your

10  opinions regarding the GI safety?

11  A.  Yes, it is.

12  Q.  In what way?

13  A.  It's, first of all, statistically significant; and second, it

14  points out that there is an important clinically significant

15  benefit for Vioxx versus the comparator NSAIDs.

16  Q.  And if we looked at complicated PUBs down here, what's the

17  relative risk?

18  A.  The relative risk is .40 showing once again that there is a 60

19  percent decrease in the incidence of these events.

20  Q.  Is that statistically significant?

21  A.  Yes, it is.

22  Q.  And whatever the Kaplan-Meier curve looks like, are these data

23  significant to you?

24  A.  Yes, they are.

25  Q.  In what way?

1 A. They show that there's both a statistically and clinically

2 significant decrease in complicated PUBs for patients who receive

3 Vioxx compared to the comparator NSAIDs.

4 Q. And finally, sir, there was some questions regarding a test for

5 interaction with steroid users and non-users.  Do you recall those

6 questions?

7 A. Yes, I do.

8 Q. Now, the Yu memorandum, if you turn to Table 10.

9 A. Got it.

10 Q. Is this a Test of Treatment by Subgroup Interaction looking at

11 the combinations of these thousands of patients in these clinical

12 trials?

13 A. Yes, it is.

14 Q. And is this similar to that interaction by subgroup tests that

15 counsel asked you about that his experts did?

16 A. Yes, it is.

17 Q. Do the scientists who prepared this memorandum on the next page

18 show you the interaction for steroid users -- oh, actually it

19 starts at the bottom.

20 A. Yes, they do.

21 Q. Is that interaction significant?

22 A. No, it's not.

23 Q. And that's by PUBs.  And if you go to the next page for

24 complicated PUBs, is that significant?

25 A. That's nowhere close to being significant.

```
 1              MR. ISMAIL:  Thank you, your Honor.  I have no further
 2   questions.
 3              THE COURT:  All right.  You're excused.  Thank you,
 4   Doctor.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  Let's call your next witness, we'll see if we
 7   can go to 12:30.
 8              MR. SALES:  Your Honor, we'll get her.  Dr. Lisa Rarick.
 9              THE COURT:  All right.  Do you want to call the doctor?
10              MR. SALES:  Yes, sir, she was on the other floor, they
11   had to go get her.
12              THE COURT:  Come forward, Doctor, take the stand.  Raise
13   your right hand.
14          (WHEREUPON, LISA RARICK, M.D., WAS SWORN IN AND TESTIFIED AS
15          FOLLOWS:)
16              THE COURT:  Have a seat, please.  Give us your name and
17   spell it for us.
18              THE WITNESS:  Hi, I'm Lisa Rarick, R-A-R-I-C-K.
19                          VOIR DIRE EXAMINATION
20   BY MR. SALES:
21   Q.  Is that microphone on?
22   A.  I don't know -- oh, yes, it is.
23   Q.  Good morning, Dr. Rarick.
24   A.  Good morning.
25   Q.  Are you a medical doctor?
```

1   A.   Yes.

2   Q.   What's your specialty?

3   A.   I am board certified in obstetrics and gynecology.

4   Q.   And do you -- are you licensed in a particular state?

5   A.   Yes, I am licensed in Maryland and in the District of Columbia.

6   Q.   Can you tell the court your education background?

7   A.   Sure.  I grew up in California, so both college and medical

8   school were in California, Loma Linda University School of Medicine

9   for my M.D.  And then I did my obstetrics and gynecology residency

10  at Georgetown University in Washington, D.C.

11  Q.   And were you chief resident?

12  A.   Yes.  The fourth year of residency I was chosen as the

13  administrative chief resident for that year.

14  Q.   What did you do after your residency at Georgetown?

15  A.   I initially stayed on, I was invited to be part of the faculty

16  in the OB/GYN department at Georgetown and I stayed there with a

17  practice and a teaching position, and then I also started a

18  part-time position at the U.S. Food & Drug Administration.

19  Q.   What years were you a clinical instructor at Georgetown?

20  A.   From about July '88 to sometime in '89, late '89.

21  Q.   And did you at one point in time have an active practice,

22  clinical practice with regard to treating patients?

23  A.   Yes.  While I was on faculty at Georgetown I had an active

24  practice and then after my time at Georgetown I continued to

25  practice part-time at a D.C. hospital called Columbia Hospital for

1    Women.

2    Q.  You mentioned that you became employed at the Food & Drug

3    Administration.  Can you tell the court, first, what was your first

4    involvement with the FDA?

5    A.  Sure.  My first involvement I actually wasn't employed.  While

6    I was on faculty at Georgetown I started in kind of a research

7    position at the FDA looking at pregnancy and drug exposure issues.

8    But I soon then was offered an actual paid position and I started

9    there at the end of 1988 as a medical officer.

10   Q.  Did you stop treating patients at that point?

11   A.  No.  When I started at the FDA I was part-time at the FDA,

12   full-time at Georgetown, and then as I described, I transitioned to

13   full-time at the FDA by middle 1989, but I continued to see

14   patients until probably 1993.

15   Q.  And we're going to go through your work at the FDA in steps,

16   but over all, how many years did you work at the FDA?

17   A.  About 15 years.

18   Q.  And from what year to what year?

19   A.  I started officially in December of 1988 and my last day I

20   think was July 1st of 2003.

21   Q.  You mentioned your first full-time position at the FDA was as a

22   medical reviewer; is that correct?

23   A.  Correct.

24   Q.  Can you tell the court what the responsibilities are and what

25   the job entails to be a medical reviewer at the FDA?

1  A.  Sure.  I was in the Center for Drug Evaluation Research, and as

2  a medical reviewer my responsibility was as the medical officer or

3  clinical reviewer for applications from drug companies, so that

4  would be investigational new drug applications, new drug

5  applications, and their labels, supplemental new drug applications,

6  advisory committee materials, meeting materials, things like that.

7  Q.  Does one, more than one reviewer typically work on a particular

8  drug?

9  A.  Well, there's certainly a team of reviewers that look at

10  particular drugs.  There's various disciplines, there's a chemist,

11  a pharmacologist, a statistician, a medical reviewer; and then

12  depending on the product and the indications, it may be distributed

13  throughout several medical officers.

14  Q.  If there are several medical review officers involved in

15  looking at a product, is one designated a primary reviewer?

16  A.  Yes.

17  Q.  And what is the responsibility for the primary reviewer?

18  A.  Well, the primary reviewer would be the one that was

19  essentially coordinating who was doing what part of the application

20  and putting it altogether in that risk benefit analysis kind of

21  primary review book.

22  Q.  During the time period that you worked as a medical review

23  officer, did you personally review INDs?

24  A.  Yes.

25  Q.  And what is an IND?

1    A.  IND stands for investigational new drug application, and those

2    are the applications that a sponsor makes to begin their studies in

3    humans in the United States and they continue those studies.

4    Q.  And approximately how many INDs did you review in your role at

5    the FDA?

6    A.  As a primary review medical officer, somewhere in the hundreds.

7    Q.  And what about new drug applications or NDAs?

8    A.  Yes.  New drug applications are the applications that sponsors

9    make once they've done the necessary testing and the necessary

10   human testing to consider for approval in the U.S.  And again, the

11   team looks at those and the medical officers review those

12   materials; and new drug applications as a primary reviewer and

13   their supplements, probably in the 20 to 30 range.

14   Q.  In your work at the FDA as part of the medical review officer

15   responsibilities, did you also review and comment on labelling for

16   drugs?

17   A.  Yes.  New drug applications and their supplements contain draft

18   proposed labeling from sponsors and the medical officers and the

19   team review that very carefully and make decisions about the

20   approved labelling.

21   Q.  And how long did you hold the job of medical review officer?

22   A.  I think for the first seven years at the FDA I was a primary

23   reviewing medical officer.

24   Q.  So through about November of 1995?

25   A.  Correct.

1  Q.  What do you do as your next role at the FDA?

2  A.  My next role was I became a division director for the division

3  of reproductive and urologic drug products.

4  Q.  And what does a deputy director do?

5  A.  I think -- are you speaking as a deputy director for the

6  division?

7  Q.  Yes.

8  A.  The first role, yes, I apologize.  I know my CV reads my first

9  role in November of '95 was a deputy division director.  I can

10  explain that.  We were creating a new division of reproductive and

11  urologic drug products, so while that was being officially created

12  formally, I was a deputy director with oversight over those drugs;

13  and then when it became an actual division, I was the division

14  director.

15       But in both of those roles I was then as a division

16  director, you look at information that's being reviewed by the

17  entire team for each product, IND and NDA and supplements, and

18  you're the one making decisions about actions.  So a primary

19  reviewer might recommend a particular action, it's the division

20  director who then generates and signs the letters to make

21  decisions.

22  Q.  So is it the deputy director who has actual signature authority

23  over approving a new drug application?

24  A.  In my role in that position, yes, and then in that next

25  position as a division director it continued.

1    Q.  And how long did you serve as director of the division of

2    reproductive and urological drug products?

3    A.  About three years.

4    Q.  And what did you do next at the FDA?

5    A.  I next moved up the chain of command another step, divisions

6    are organized into something called offices, and so I became the

7    deputy director for the Office of Drug Evaluation 2.  John Jenkins

8    was the office director and I was his deputy.

9    Q.  And what responsibilities did you have in that role?

10   A.  As I mentioned, division directors have substantial authority

11   regarding decisions that are made and actions that are taken and

12   letters that are signed, but there are certain decisions that then

13   go one step higher to the office.  And so in that position we had

14   oversight of three divisions that were reviewing products and then

15   we had specific responsibilities for certain types of applications.

16   Q.  Did you have any responsibility for training or developing

17   training programs for medical reviewers at the FDA?

18   A.  Yes.

19   Q.  Can you tell the court about that?

20   A.  Sure.  Around 1995 and 1996 the Center for Drugs began a new

21   program called good review practices initiative, it was a

22   center-wide program to look at good review practices across the

23   center.  And in that program, I was on the steering committee and

24   in my role I was also the chairman of the committee looking at

25   reviewer education; and we started a new course for new reviewers,

1   as well as getting current reviewers up to speed on good review

2   practices.

3   Q.  You've had a chance obviously, and we're going to go through

4   the materials you've reviewed, but to look through the FDA

5   documents related to Vioxx.  Did you notice any of the medical

6   reviewers who worked on Vioxx?

7   A.  Yes, I've looked at a lot of information from the FDA

8   reviewers, and certainly recognize those names.  People like

9   Dr. Villalba, Dr. Targum, Dr. Carlos Paliya (PHONETIC),

10  Dr. Goldkind, all were people that came through my course.

11  Q.  So you trained them?

12  A.  Yes.

13  Q.  Did you have any further roles at the FDA before you left?

14  A.  Yes.  After being in the Office of Drug Evaluation 2, I was

15  then asked to elaborate that role of good review practices in a new

16  position called the associate director for quality assurance for

17  the Center for Drug Evaluation and Research.  And that was in the

18  center director's office where I had a small staff and oversight

19  over review standards across the center.

20        So again, we essentially elaborated the training program,

21  looked at good review practices across the entire center,

22  implemented templates for standardizing reviews, monitoring,

23  evaluated and evolved those sorts of templates.

24        And then I did have one further job, you asked about the

25  FDA, right?

1    Q.  Yes.

2    A.  My last year was in the Food & Drug Administration's

3    commissioner's office in the Office of Women's Health.

4    Q.  And what year did you leave the FDA?

5    A.  2003.

6    Q.  And why did you leave?

7    A.  I enjoyed my time at FDA, I think I learned a lot there.  I

8    wanted to have less of a full-time job and see about doing some

9    other things.

10   Q.  I just want to go through some of the things you would have

11   been doing in your 15 years at the FDA.  Were you involved in

12   meeting with drug companies to discuss designs of study protocols?

13   A.  Yes.

14   Q.  Did you have experience in evaluation and analysis of clinical

15   trials and clinical trial data?

16   A.  Yes.

17   Q.  Did you have experience in writing medical review officer

18   reports?

19   A.  Yes.

20   Q.  Did you have experience in reviewing and revising in your

21   supervisory role other medical review officer reports?

22   A.  Yes.

23   Q.  Did you have experience in the review and approval of drug

24   labelling?

25   A.  Yes.

1   Q.  Did you have experience with the FDA in terms of meeting with

2   representatives of drug companies to go over those labelling of

3   prescription drugs?

4   A.  Yes.

5   Q.  And did you have experience in the review and analysis of

6   studies that come in after a drug has been approved in an ongoing

7   study role?

8   A.  Yes.  Both studies as well as post marketing advisement

9   reporting.

10  Q.  I want to ask you about the documents you have reviewed in

11  working on this litigation.  Have you had an opportunity to review

12  portions of the IND?

13  A.  Yes.

14  Q.  Have you reviewed the new drug application?

15  A.  Yes.

16  Q.  What about the -- we've heard about the ISS, what is the ISS?

17  A.  The ISS stands for Integrated Summary of Safety, which is part

18  of the new drug application that's provided by the sponsor.

19  Q.  And have you reviewed the entire ISS?

20  A.  Yes.

21  Q.  Have you reviewed documents regarding labelling and

22  correspondence with the FDA and FDA memos and issues related to

23  Vioxx?

24  A.  Yes.

25  Q.  Can you tell the court in terms of volume how many documents

1  you've approximately reviewed related to the FDA's work on Vioxx?

2  A.  I'm sure it's in the hundreds of thousands of pages of

3  documents.

4  Q.  And can you tell the court approximately how many hours you

5  have spent going through all of those documentation?

6  A.  Well, certainly at least 500, probably closer to 650 or 700 at

7  this point.

8  Q.  And approximately over what time period did it take you to

9  review those documents?

10  A.  I began the look at Vioxx at the end of 2004 through today.

11  Q.  In preparation for your work on this particular case, did you

12  also review the reports and depositions of Dr. Kessler and

13  Dr. Abramson, among others?

14  A.  Yes.

15  Q.  Has Merck agreed to compensate you for your time in doing the

16  work in looking from an FDA regulatory standpoint at the Vioxx

17  litigation?

18  A.  Yes.

19  Q.  And at what rate are you being compensated?

20  A.  $500 an hour.

21  Q.  Have you been retained as an expert regarding FDA matters

22  before?

23  A.  Yes.

24  Q.  Can you tell the court a little bit about that?

25  A.  Well, I've done Vioxx work in the past for the litigation

1    expert witness work, I do consulting for pharmaceutical companies,

2    but I also do some other expert witness work for Wyeth, I've done a

3    little bit of work for Schering, and I would have to look at my CV

4    to be sure I recollect them all.

5    Q.  And you have a notebook in front of you that has a series of

6    documents, some of which we may go through today, I believe it's

7    Defendant's Exhibit 2173.

8    A.  And I apologize, but can I get somebody to bring me my glasses.

9    They're in the outside of my briefcase.  Thank you.

10              I'm sorry, what?

11   Q.  2173.

12   A.  Yes, that's my CV.

13   Q.  Is that CV generally up to date and accurate?

14   A.  Yes, it has the date of September of 2008 so I would have to

15   say that my board certification is a yearly event so I would update

16   that, but it's current.

17   Q.  With that exception noted, is this accurate?

18   A.  Yes.

19              MR. SALES:  Your Honor, we would offer Dr. Rarick's

20   curriculum vitae as Defendant's Exhibit 2173.

21              THE COURT:  I'll admit the curriculum vitae.

22              Are you tendering her?

23              MR. SALES:  Yes, your Honor.  We would offer Dr. Lisa

24   Rarick as an expert in FDA regulations and guidance practices,

25   policies and procedures, the approval processes for prescription

1    medications, and labelling for prescription medications, as well as

2    regulations related to marketing and clinical trials.

3           MR. ARBITBLIT:  No objection, your Honor.

4           THE COURT:  The court will accept her as an expert in the

5    tendered fields.

6                            DIRECT EXAMINATION

7    BY MR. SALES:

8    Q.  Dr. Rarick, can you tell the court what it is that the FDA is

9    charged with doing with regard to prescription drugs?

10   A.  Sure.  As we described, there is a Center for Drug Evaluation

11   and Research and it is charged with a mission of reviewing

12   information for pharmaceuticals to consider them for approval and

13   do a risk benefit analysis and appropriate labelling for use in the

14   U.S.

15   Q.  Do they determine whether a drug is safe and effective before

16   it can be marketed in the United States?

17   A.  Correct.  That's the word they use to describe that risk

18   benefit analysis that a drug is safe and effective for its intended

19   uses as labeled.

20   Q.  And do all prescription drugs have risks?

21   A.  Yes.

22   Q.  And so how does the FDA go about making an assessment of risk

23   and benefits to determine whether it's safe and effective to be

24   marketed in the United States?

25   A.  Sure.  Well, the FDA has laid out particular regulations about

1    what companies need to do to even begin trials in humans, to rule

2    out large risks issues or know what those risks might be in humans,

3    and then it lays out what's required to considered as an adequate

4    database to think about benefit and risk.  And then, of course, the

5    center reviewers look at both side of that equation, both what is

6    the benefit for the product, what are the known and theoretical

7    risks, and decide if those benefits outweigh the risk.

8    Q.  And does the FDA have substantial resources in terms of

9    doctors, scientists and experts to help make that risk benefit

10   assessment?

11   A.  I believe they do so for pharmaceuticals, yes.

12   Q.  And does the FDA always maintain the authority and right to ask

13   for additional information from a drug manufacturer in order to get

14   approval for a prescription drug?

15   A.  Oh, yes, absolutely.  Even if a drug company has done all of

16   the things that are laid out in the regulations and they've

17   provided, you know, a database that seems adequate, the FDA is

18   always in a position of saying, no, we are not ready to approve

19   this.  We need further information.

20   Q.  And have you witnessed the FDA do that yourself?

21   A.  Yes.

22   Q.  Does the FDA have the right to review data and reject an

23   application for a new drug?

24   A.  Yes.

25   Q.  And if they do so, they're rejecting it based on their review

```
 1   of that risk benefit analysis?

 2   A.  Correct.

 3   Q.  That the information provided does not satisfy that the

 4   benefits outweigh the risks?

 5   A.  Exactly.

 6   Q.  And does the FDA perform that formal risk benefit analysis

 7   every time they look at an IND or NDA?

 8   A.  Yes.  And its supplements.

 9   Q.  I want to talk to you now specifically about Vioxx, and ask you

10   to turn DX 73 in your book.  Do you have DX 73 in front of you?

11   A.  Yes.

12   Q.  Is Defendant's Exhibit 73 the approval letter for Vioxx for its

13   original new drug application in May of 1999?

14   A.  Yes.

15           MR. SALES:  Your Honor, we would move to admit

16   Defendant's Exhibit 73.

17           THE COURT:  I'll admit it.

18   BY MR. SALES:

19   Q.  What was the original approval letter, for what indications was

20   Vioxx approved?

21   A.  The original approval letter was for two strengths of Vioxx for

22   the relief of signs and symptoms of osteoarthritis, the management

23   of acute pain, and the treatment of primary dysmenorrhea.

24   Q.  And I want to turn your attention to the fourth paragraph of

25   the approval letter.  It's also up on the big board if we need to
```

1  see it, for those who are, have eyesight challenges.

2  A.  Yes.

3  Q.  It says -- this is the FDA's response to the new drug

4  application and all of the review, correct?

5  A.  Correct.

6  Q.  It says:  "We have completed the review of the application, as

7  amended, and have concluded that adequate information has been

8  presented to demonstrate that the drug product is safe and

9  effective for use as recommended in the enclosed labelling text.

10  Accordingly, the application is approved effective on the date of

11  this letter."

12          Was that a typical, in that time frame the typical type

13  of approval letter that the FDA would issue if they had been

14  satisfied that a drug's benefits outweighed its risks?

15  A.  Exactly.

16  Q.  Please turn to Defendant's Exhibit 277.

17  A.  Yes.

18  Q.  Is Exhibit 277 the approval letter for in April 2002 for a new

19  indication for Vioxx?

20  A.  Yes.  The next page makes that even clearer.

21  Q.  Page 2, the first page is a cover letter, correct?

22  A.  Correct.  It's a fax, uh-huh.

23  Q.  And if we turn to --

24          MR. SALES:  Your Honor, I'm sorry they're not directly in

25  order.

```
1            THE COURT:  That's all right.  I've got it.  Go ahead.
2   BY MR. SALES:
3   Q.  If you turn to the cover letter of the actual approval letter,
4   there is a paragraph that says -- actually it's on page 3, excuse
5   me, of the document.
6            Do they again state that:  "We," the FDA, "have completed
7   the review of the supplemental applications, as amended, and have
8   concluded that adequate information has been presented to
9   demonstrate that the drug products are safe and effective for use
10  as recommended in the agreed upon enclosed labelling text."?
11  A.  Correct.  This is the April 2002 approval letter.
12  Q.  And what did the FDA approve Vioxx for at that point?
13  A.  This was an approval of several supplements, including a new
14  indication for rheumatoid arthritis.
15  Q.  And it talks about as labeling, and we are going to go into
16  this further in detail, but this is the label that contains
17  information from the VIGOR study that we've talked about in this
18  case, correct?
19  A.  Yes, yes, it is.
20  Q.  Before the FDA could issue this approval letter, did it do a
21  risk benefit analysis on Vioxx?
22  A.  Yes.
23  Q.  And by issuing an approval letter, did the FDA confirm that in
24  its opinion with its resources that the benefits of Vioxx
25  outweighed its risks?
```

```
 1    A.  Exactly.

 2            MR. SALES:  We would offer Defendant's Exhibit 277, your

 3    Honor.

 4            THE COURT:  Admitted.

 5    BY MR. SALES:

 6    Q.  If you could next, Dr. Rarick, turn to Defendant's Exhibit 321.

 7    Do you have it there?

 8    A.  Yes, I do.

 9    Q.  Is Defendant's Exhibit 321 an approval letter issued in March

10    of 2004 by the FDA for Vioxx?

11    A.  Yes, it is.

12    Q.  And if you note on the third line -- or fourth paragraph,

13    excuse me, it says:  "We have completed our review of this

14    application, as amended.  It is approved, effective on this date of

15    this letter, for use as recommended in the agreed upon labelling

16    text."

17    A.  Yes.

18    Q.  Did the FDA in order to issue this approval letter in March of

19    2004 do a formal risk benefit analysis of Vioxx?

20    A.  Yes.

21    Q.  Did they determine that the benefits of Vioxx in March of 2004

22    outweighed its risks?

23    A.  Yes.

24    Q.  Do you recall what the approval was for with regard to the

25    March 26, 2004 approval letter?
```

```
 1    A.  Yes.  This added information for the indication of migraine
 2    headaches.
 3              MR. SALES:  We would offer, your Honor, Defendant's
 4    Exhibit 321.
 5              THE COURT:  Admitted.
 6    BY MR. SALES:
 7    Q.  Doctor, if you could turn to Defendant's Exhibit 324.
 8    A.  Yes.
 9    Q.  This also has a fax cover letter, but attached to that fax
10    cover letter, is this another approval letter by the FDA with
11    regard to Vioxx?
12    A.  Yes, it is.
13    Q.  And what is the date of this particular approval?
14    A.  This is August of 2004.
15    Q.  And again, if we see the FDA pronounces that:  "We," the FDA,
16    "have completed our review of these applications, as amended.  And
17    these applications are approved, effective on the date of this
18    letter for use as recommended in the agreed upon labelling text."
19    Correct?
20    A.  Correct.
21    Q.  Again, this would have been done only after the FDA assured
22    itself of doing a risk benefit analysis that the benefits of Vioxx
23    outweighed its risks, correct?
24    A.  Correct.
25    Q.  And again, these were the required approval letters to market
```

1  for these indications, correct?

2  A.  Correct.  This was the juvenile rheumatoid arthritis

3  indication.

4  Q.  So in March -- excuse me, in August of 2004, the FDA looking at

5  the data decided that the benefits of Vioxx outweighed the risks,

6  even for juvenile rheumatoid arthritis; is that correct?

7  A.  Correct.

8          MR. SALES:  Your Honor, we would offer Defendant's

9  Exhibit 324.

10          THE COURT:  Admitted.

11 BY MR. SALES:

12 Q.  Dr. Rarick, with each of these approvals, did the FDA approve

13 Vioxx as safe and effective for its intended use?

14 A.  Yes, that's what an approval letter indicates.

15 Q.  And we will go into more detail of this in a moment, but in

16 your opinion did the FDA have all of the appropriate safety

17 information from Merck to make an informed risk benefit analysis on

18 each of these occasions?

19 A.  Yes.

20 Q.  Have you confirmed that the FDA had all of the appropriate

21 information to make an appropriate and correct risk benefit

22 analysis with regard to Vioxx?

23 A.  Yes.

24 Q.  And how have you done that?

25 A.  I've done that through my own review of the information

1    provided by Merck, by my review of the FDA's memos regarding that

2    information and their reviews, as well as FDA statements regarding

3    that review.

4    Q.  Have you also reviewed the, included in those materials, the

5    November 2004 testimony of Dr. Sandra Kweder before the U.S. Senate

6    Finance Committee regarding Vioxx?

7    A.  Yes, I have.

8    Q.  Who is Dr. Sandra Kweder?

9    A.  Dr. Sandra Kweder is a physician who has been at the Center for

10   Drug Evaluation and Research through various roles, her current

11   title and her title at that time was the deputy director for the

12   Office of New Drugs.

13   Q.  If you could turn to Defendant's Exhibit 442, Dr. Rarick.

14   A.  Yes.

15   Q.  Is this the testimony that Dr. Kweder gave before the U.S.

16   Senate?

17   A.  Yes.

18   Q.  And I would ask you to turn to Bates page, which is the lower

19   right-hand corner number, that ends in 110.

20   A.  Yes.

21   Q.  Does Dr. -- is Dr. Kweder being asked if she has the

22   authority --

23            MR. SALES:  Your Honor, if it makes it any easier, too,

24   we have it up on the big screen.

25            THE COURT:  Okay.

1    BY MR. SALES:

2    Q.   Is Dr. Kweder being asked by Senator Grassley to be assured

3    that Dr. Kweder was speaking officially on behalf of the FDA and

4    that there's no question about her being there in that capacity?

5    A.   Yes, he asked her that question and she said, yes, absolutely.

6    Q.   So these were not Dr. Kweder's personal opinions, but she was

7    speaking on behalf of the FDA; is that correct?

8    A.   Correct.

9    Q.   This was in November of 2004?

10   A.   Yes.

11   Q.   So after the voluntary withdrawal of Vioxx?

12   A.   Yes.

13   Q.   We're going to look at some of this later on today after lunch,

14   Dr. Rarick, but if you could turn to the page ending 118.

15   A.   Yes.

16   Q.   Senator Hatch asked Dr. Kweder whether there was any evidence

17   as far as the FDA is concerned, and this is in November of 2004,

18   and you're concerned that Merck acted improperly prior to the

19   removal, the pulling of the drug from the marketplace, or that they

20   acted to the pursuant to the scientific data that was accumulated?

21   And did Dr. Kweder confirm that she had not seen any data to

22   suggest that Merck had acted inappropriately with regard to Vioxx?

23   A.   Correct, that's her response.

24   Q.   Does that help inform your opinion of all of the materials that

25   you reviewed that the FDA had appropriate information with regard

```
 1  to reviewing Vioxx?
 2  A.  It certainly confirms my own review of that same information.
 3           THE COURT:  Let's get to a stopping point, counsel.
 4           MR. SALES:  This is a good time, your Honor.
 5           THE COURT:  All right.  We'll stop here then and come
 6  back at 1:45.  The court will stand in recess.
 7           THE MARSHAL:  All rise.
 8      (WHEREUPON, A LUNCH RECESS WAS TAKEN.)
 9
10                    *  *  *  *  *  *
11
12                    REPORTER'S CERTIFICATE
13
14    I, Karen A. Ibos, CCR, Official Court Reporter, United States
15  District Court, Eastern District of Louisiana, do hereby certify
16  that the foregoing is a true and correct transcript, to the best of
17  my ability and understanding, from the record of the proceedings in
18  the above-entitled and numbered matter.
19
20
21
22           Karen A. Ibos, CCR, RPR, CRR
23           Official Court Reporter
24
25
```