1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4
IN RE:  VIOXX PRODUCTS          *
5        LIABILITY LITIGATION   *
                                *
6    This Document Relates to:  *    MDL No. 1657
                                *
7        STATE OF LOUISIANA, *ex rel.* *  Section L
         JAMES D. CALDWELL JR.,   *
8        Attorney General         *    New Orleans, Louisiana
                                *
9            versus             *    April 20, 2010
                                *
10   MERCK & CO., INC.           *    1:45 p.m.
                                *
11                               *
         Case No. 05-CV-3700    *
12   * * * * * * * * * * * * * * * * * *

13

14
                 TRIAL PROCEEDINGS BEFORE THE
15               HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE
16                DAY 7, AFTERNOON SESSION

17
APPEARANCES:
18

19   For the Plaintiff:          Dugan Law Firm
                                 BY:  JAMES R. DUGAN II, ESQ.
20                               650 Poydras Street, Suite 2150
                                 New Orleans, Louisiana 70130
21

22   For the Plaintiff:          Murray Law Firm
                                 BY:  STEPHEN B. MURRAY JR., ESQ.
23                                   DOUGLAS R. PLYMALE, ESQ.
                                     JUSTIN BLOOM, ESQ.
24                               650 Poydras Street, Suite 2150
                                 New Orleans, Louisiana 70130
25

DAILY COPY

1220

```
 1   For the Plaintiff:        Lieff Cabraser Heimann
                                 & Bernstein, LLP
 2                             BY:  DONALD C. ARBITBLIT, ESQ.
                               275 Battery Street, Suite 3000
 3                             San Francisco, California 94111

 4
     For the Defendant:        Goldman Ismail Tomaselli
 5                               Brennan & Baum, LLP
                               BY:  TAREK ISMAIL, ESQ.
 6                                  BRIAN P. O'DONOGHUE, ESQ.
                               1 North Franklin Street, Suite 625
 7                             Chicago, Illinois 60606

 8
     For the Defendant:        Baker Botts, LLP
 9                             BY:  TRAVIS J. SALES, ESQ.
                               910 Louisiana Street
10                             Houston, Texas 77002

11
     For the Defendant:        O'Melveny & Myers, LLP
12                             BY:  SCOTT M. VOELZ, ESQ.
                               400 South Hope Street
13                             Los Angeles, California 90071

14
     Official Court Reporter:  Toni Doyle Tusa, CCR, FCRR
15                             500 Poydras Street, Room HB-406
                               New Orleans, Louisiana 70130
16                             (504) 589-7778

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

DAILY COPY

1          **I N D E X**

2                                                    <u>PAGE</u>

3    Lisa Rarick

4          Direct Examination                        1222

5          Cross-Examination                         1277

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 13:26 | 1 | **<u>AFTERNOON SESSION</u>** |
| 13:27 | 2 | **(April 20, 2010)** |
| 13:27 | 3 | **THE DEPUTY CLERK:**  Everyone rise. |
| 13:28 | 4 | **THE COURT:**  Be seated, please. |
| 13:48 | 5 | Good afternoon, ladies and gentlemen.  You are |
| 13:48 | 6 | still under oath, Doctor.  You may proceed, Counsel. |
| 13:48 | 7 | (WHEREUPON **Lisa Rarick**, having been duly sworn, |
| 13:48 | 8 | testified as follows.) |
| 13:48 | 9 | **DIRECT EXAMINATION** |
| 13:48 | 10 | **BY MR. SALES:** |
| 13:48 | 11 | **Q.**   Good afternoon, Dr. Rarick. |
| 13:48 | 12 | **A.**   Hello. |
| 13:48 | 13 | **Q.**   Before lunch we had covered that the FDA, on four |
| 13:48 | 14 | different occasions, had approved Vioxx as safe and effective |
| 13:48 | 15 | and that the benefits outweighed the risks with regard to those |
| 13:48 | 16 | approval letters.  Do you recall that? |
| 13:48 | 17 | **A.**   Yes. |
| 13:48 | 18 | **Q.**   The last one being in August of 2004? |
| 13:48 | 19 | **A.**   Correct. |
| 13:48 | 20 | **Q.**   Then we had looked at Dr. Kweder's testimony in November |
| 13:48 | 21 | of 2004, looking back; correct? |
| 13:48 | 22 | **A.**   Yes. |
| 13:48 | 23 | **Q.**   After the voluntary withdrawal of Vioxx in September of |
| 13:48 | 24 | 2004, did the FDA also convene an advisory committee to again |
| 13:48 | 25 | look at the issue of whether Vioxx's benefits outweighed its |

| | | |
|---|---|---|
| 13:49 | 1 | risks? |
| 13:49 | 2 | A.    Yes.  There was a meeting in February of 2005 that looked |
| 13:49 | 3 | at all the various COX-1 and COX-2 inhibitors, both the |
| 13:49 | 4 | specific COX-2 inhibitors as well as the traditional NSAIDs, |
| 13:49 | 5 | and issues of cardiovascular risks. |
| 13:49 | 6 | Q.    I believe in your notebook it should be behind LAAG-287 -- |
| 13:49 | 7 | A.    Yes. |
| 13:49 | 8 | Q.    -- which is already in evidence.  Are those the minutes |
| 13:49 | 9 | from that -- or at least part of the minutes from the 2005 |
| 13:49 | 10 | advisory committee meeting? |
| 13:49 | 11 | A.    Yes. |
| 13:49 | 12 | Q.    Have you reviewed this document as part of the work you |
| 13:49 | 13 | have done in this case? |
| 13:49 | 14 | A.    Yes. |
| 13:49 | 15 | Q.    First of all, can you tell the Court the type of people |
| 13:49 | 16 | that had been appointed to the advisory committee by the FDA to |
| 13:49 | 17 | look at this NSAID class. |
| 13:49 | 18 | A.    Certainly.  The advisory committee that would convene, |
| 13:49 | 19 | there was a joint meeting of several advisory committees, so it |
| 13:50 | 20 | included members of the arthritis advisory committee, the drug |
| 13:50 | 21 | safety and risk management advisory committee, and it had |
| 13:50 | 22 | consultants including cardiologists and gastroenterology |
| 13:50 | 23 | experts. |
| 13:50 | 24 | Q.    After they looked at various data from various companies |
| 13:50 | 25 | and various products; correct? |

1224

| | | |
|---|---|---|
| 13:50 | 1 | **A.**   Yes. |
| 13:50 | 2 | **Q.**   As part of advising the FDA, did they actually take a |
| 13:50 | 3 | review and a vote of whether the benefits outweighed the risks |
| 13:50 | 4 | of particular products? |
| 13:50 | 5 | **A.**   Yes.  The expert advisors had discussions and votes on |
| 13:50 | 6 | particular questions posed by the FDA. |
| 13:50 | 7 | **Q.**   If you look at page 12 of Plaintiff's Exhibit 287 -- |
| 13:50 | 8 | **A.**   Yes. |
| 13:50 | 9 | **Q.**   -- does that contain the vote that was taken with regard |
| 13:50 | 10 | to Vioxx? |
| 13:50 | 11 | **A.**   Yes.  This is No. 3, rofecoxib, which is Vioxx. |
| 13:50 | 12 | **Q.**   On the second question that the advisory committee was |
| 13:51 | 13 | asked to answer, they were asked:  "Does the overall risk |
| 13:51 | 14 | versus benefit profile for rofecoxib support marketing in the |
| 13:51 | 15 | U.S.?" |
| 13:51 | 16 | Did they take that vote? |
| 13:51 | 17 | **A.**   Yes, they did. |
| 13:51 | 18 | **Q.**   Did they vote in the affirmative, 17 to 15, that the |
| 13:51 | 19 | benefits outweighed the risks? |
| 13:51 | 20 | **A.**   Yes. |
| 13:51 | 21 | **Q.**   Were the discussions that were taking place at the |
| 13:51 | 22 | advisory committee, and recommendations, monitored by the FDA |
| 13:51 | 23 | itself? |
| 13:51 | 24 | **A.**   Yes. |
| 13:51 | 25 | **Q.**   As a result of the ongoing look at the NSAID class, are |

| | | |
|---|---|---|
| 13:51 | 1 | you familiar with a memorandum that was prepared by the FDA in |
| 13:51 | 2 | April of 2005? |
| 13:51 | 3 | A.    Yes.  In response to this advisory committee meeting and |
| 13:51 | 4 | their own review, the FDA generated a memo in April of 2005 |
| 13:51 | 5 | regarding their findings and conclusions. |
| 13:52 | 6 | Q.    By the way, going back to the advisory committee meeting, |
| 13:52 | 7 | have you ever seen any documentation that the advisory |
| 13:52 | 8 | committee members felt they didn't have the appropriate |
| 13:52 | 9 | information to make the judgments they made and the |
| 13:52 | 10 | recommendations that they made? |
| 13:52 | 11 | A.    No, I have never seen anything to that effect. |
| 13:52 | 12 | Q.    In evidence already, Doctor, is Defense Exhibit 338, which |
| 13:52 | 13 | is also a tab in your notebook. |
| 13:52 | 14 | A.    Yes.  I have it. |
| 13:52 | 15 | Q.    Is that the April 6, 2005 memo you just referred to? |
| 13:52 | 16 | A.    Yes. |
| 13:52 | 17 | Q.    Who is Dr. Jenkins? |
| 13:52 | 18 | A.    Dr. Jenkins is a medical doctor.  He is actually trained |
| 13:52 | 19 | as a pulmonologist.  He worked in the Center for Drugs during |
| 13:52 | 20 | my tenure.  He started as a medical officer primary reviewer |
| 13:52 | 21 | for pulmonary products.  He became the division director for |
| 13:52 | 22 | pulmonary drugs.  Then he became the director of the office of |
| 13:52 | 23 | new drugs in the Center for Drugs, and he remains there today. |
| 13:52 | 24 | Q.    There has been some suggestion previous in this trial that |
| 13:53 | 25 | Dr. Jenkins was simply -- |

1226

| | | |
|---|---|---|
| 13:53 | 1 | **THE COURT:**  Doctor, can you move away a little bit |
| 13:53 | 2 | from the microphone. |
| 13:53 | 3 | **THE WITNESS:**  Sorry.  Am I breathing too hard? |
| 13:53 | 4 | Sorry.  Thank you. |
| 13:53 | 5 | **THE COURT:**  That's all right. |
| 13:53 | 6 | **BY MR. SALES:** |
| 13:53 | 7 | **Q.**   There was some suggestion by a witness for the plaintiff |
| 13:53 | 8 | earlier in this case that Dr. Jenkins was simply an |
| 13:53 | 9 | administrator.  Is that your view? |
| 13:53 | 10 | **A.**   That is not my experience with Dr. Jenkins.  He is a very |
| 13:53 | 11 | thorough expert and a very thorough scientist and a very |
| 13:53 | 12 | critical thinker. |
| 13:53 | 13 | **Q.**   If you go to page 3 of Exhibit 338, does it list the |
| 13:53 | 14 | various divisions and departments at FDA who participated in |
| 13:53 | 15 | and had input into these findings dated April 6, 2005? |
| 13:53 | 16 | **A.**   Yes. |
| 13:53 | 17 | **Q.**   Without, obviously, reading them all into the record, can |
| 13:53 | 18 | you just generally describe the types of departments that were |
| 13:53 | 19 | involved in looking at this issue about overall NSAID safety |
| 13:54 | 20 | and risk/benefit. |
| 13:54 | 21 | **A.**   Sure.  These are the kinds of folks who would be involved |
| 13:54 | 22 | in that review, including the various divisions involved in |
| 13:54 | 23 | looking at arthritis and pain and the over-the-counter |
| 13:54 | 24 | products, as well as the office of drug safety, the office of |
| 13:54 | 25 | statistics, pharmacoepidemiology, office of medical policy, |

1227

13:54    1    regulatory policy, and the center director, who this memo went

13:54    2    through.

13:54    3    **Q.**   Do each of those departments and divisions have doctors

13:54    4    and scientists that, in your opinion, are very capable people?

13:54    5    **A.**   Yes.  These would be MDs and PhD-level reviewers who would

13:54    6    have looked at this information.

13:54    7    **Q.**   What was your understanding as to what they looked at in

13:54    8    reaching their decision about the NSAID class?  And we'll get

13:54    9    into Vioxx specifically.

13:54    10   **A.**   I think there's another paragraph that describes the kind

13:54    11   of information that was reviewed.  So it looks at -- it's part

13:54    12   of this.  I'm sorry.  It says regulatory histories, the new

13:54    13   drug applications, postmarketing databases of the various

13:55    14   NSAIDs, the FDA and sponsor background documents that were

13:55    15   prepared for the advisory committee we just discussed, and the

13:55    16   materials submitted by other stakeholders.  As you can see from

13:55    17   this memo, they included some discussion of unapproved COX-2

13:55    18   inhibitors.

13:55    19   **Q.**   We have had some discussion about this document earlier in

13:55    20   the case so I won't go over in too much detail, but I want to

13:55    21   ask you about some of the findings that inform your opinions

13:55    22   from the FDA findings in April of 2005.

13:55    23            If you look at page 1, there's an executive summary;

13:55    24   is that correct?

13:55    25   **A.**   Yes.

13:55   1   **Q.**   The first bullet point on page 1, the second-to-last --

13:55   2   the second sentence -- the last sentence --

13:55   3   **A.**   Correct.  This is the primary conclusions listed in the

13:55   4   executive summary that there are three approved COX-2 selective

13:55   5   NSAIDs.  The available data don't permit a rank ordering of

13:55   6   these drugs with regard to cardiovascular risk.

13:56   7             THE COURT:  All right.  Wait just a moment.

13:56   8             Counsel.

13:56   9             MR. ARBITBLIT:  Your Honor, I don't know what this

13:56   10  witness' testimony about this is for other than to parrot

13:56   11  something that's in the document, which has already been

13:56   12  covered by someone else, and she has not been qualified as a

13:56   13  cardiologist.

13:56   14            THE COURT:  Yes.  Look, where are we going with this?

13:56   15  Just background information?

13:56   16            MR. SALES:  Yes, sir.  And also, again, at every step

13:56   17  of the way, they have confirmed this benefit/risk analysis.

13:56   18  I'm not going to belabor the document, but this is obviously an

13:56   19  important document in the case from an FDA regulatory

13:56   20  standpoint.

13:56   21            THE COURT:  I will allow it, but let's not get into

13:56   22  it with any specificity.

13:56   23  BY MR. SALES:

13:56   24  **Q.**   I just wanted to talk about two or three things in this

13:56   25  memo that you had reviewed in forming your opinions.  Number

| | | |
|---|---|---|
| 13:56 | 1 | one, there was a finding of no rank order between the various |
| 13:56 | 2 | NSAID class; is that correct? |
| 13:56 | 3 | **A.** Correct.  Between the selective NSAIDs, yes. |
| 13:56 | 4 | **Q.** The second bullet point down talks about carrying that |
| 13:56 | 5 | forward not only to the COX-2 class but the NSAID class |
| 13:56 | 6 | generally; correct? |
| 13:57 | 7 | **A.** Correct. |
| 13:57 | 8 | **Q.** Then on page 2, the second bullet, there's a statement |
| 13:57 | 9 | that The data is best interpreted as being consistent with a |
| 13:57 | 10 | class effect -- |
| 13:57 | 11 | **A.** Correct. |
| 13:57 | 12 | **Q.** -- with regard to increased risk of serious adverse CV |
| 13:57 | 13 | events of both COX-2s and nonselectives; correct? |
| 13:57 | 14 | **A.** Yes. |
| 13:57 | 15 | **Q.** From an FDA regulatory standpoint, what does that mean to |
| 13:57 | 16 | have a class effect? |
| 13:57 | 17 | **A.** That means they are looking at this information and |
| 13:57 | 18 | applying it to the entire class, both selective and |
| 13:57 | 19 | nonselective.  And you can see from the actions from this |
| 13:57 | 20 | that's how they applied this risk information. |
| 13:57 | 21 | **Q.** Is that a finding by the FDA that there is not a greater |
| 13:57 | 22 | risk, based upon the available data, with regard to Vioxx than |
| 13:57 | 23 | Celebrex than ibuprofen, etc.? |
| 13:57 | 24 | **A.** Right.  They are assigning that same level of risk across |
| 13:57 | 25 | the entire class. |

DAILY COPY

13:58   1   **Q.**   The fifth bullet point down, did the FDA reach a finding

13:58   2   or belief as to GI risks with regard to Vioxx?

13:58   3   **A.**   Yes.

13:58   4   **Q.**   Does this inform your opinion also with regard to

13:58   5   regulatory action, benefit and risk, with regard to Vioxx?

13:58   6   **A.**   Yes.

13:58   7   **Q.**   Did the FDA find that only Vioxx has been shown to reduce

13:58   8   the risk of serious GI bleeding compared to a nonselective

13:58   9   NSAID?

13:58   10  **A.**   Yes.

13:58   11  **Q.**   Then down further on the bullet points is there a

13:58   12  statement about labeling that's going to be necessary for the

13:58   13  class?

13:58   14  **A.**   Yes.

13:58   15  **Q.**   The second bullet point from the bottom, did the FDA find

13:58   16  in April of 2005 that the professional labeling for all

13:58   17  prescription NSAIDs will require a boxed warning highlighting

13:58   18  potential CV risks?

13:58   19  **A.**   Exactly.

13:59   20  **Q.**   Did the FDA have any subsequent advisory committee

13:59   21  meetings in which the findings of this April 6, 2005 memo were

13:59   22  readdressed?

13:59   23  **A.**   Yes.  They had another discussion in February of 2007

13:59   24  regarding some NSAIDs and reaffirmed the statements from this

13:59   25  memo, and it's a memo that continues to exist at the FDA's Web

| | | |
|---|---|---|
| 13:59 | 1 | site on this topic. |
| 13:59 | 2 | Q.   Based upon your review of all the information, is it true |
| 13:59 | 3 | that the FDA to this day, this continues to be their position |
| 13:59 | 4 | with regard to NSAIDs? |
| 13:59 | 5 | A.   Yes. |
| 13:59 | 6 | Q.   Including COX-2s? |
| 13:59 | 7 | A.   Correct. |
| 13:59 | 8 | Q.   Including Vioxx? |
| 13:59 | 9 | A.   Correct. |
| 13:59 | 10 | Q.   I want to turn to a couple of comments that Dr. David |
| 13:59 | 11 | Kessler made earlier in this trial.  You said you have reviewed |
| 14:00 | 12 | the report and deposition testimony of Dr. Kessler? |
| 14:00 | 13 | A.   Yes, I have. |
| 14:00 | 14 | Q.   Have you also had a chance to read his trial testimony |
| 14:00 | 15 | that he gave in this matter? |
| 14:00 | 16 | A.   Yes, I have. |
| 14:00 | 17 | Q.   Dr. Kessler suggested that Merck may have violated the |
| 14:00 | 18 | standard of care by ignoring some safety signals.  First of |
| 14:00 | 19 | all, do you agree with that suggestion? |
| 14:00 | 20 | A.   No. |
| 14:00 | 21 | Q.   First, he suggested and had some discussion about |
| 14:00 | 22 | preapproval testing of Vioxx.  Do you recall that testimony? |
| 14:00 | 23 | A.   Yes. |
| 14:00 | 24 | Q.   Can you, first of all, generally describe what the |
| 14:00 | 25 | premarket testing was that Merck undertook on Vioxx. |

DAILY COPY

| | | |
|---|---|---|
| 14:00 | 1 | **A.**   Well, they did premarket testing.  I won't go into the |
| 14:00 | 2 | chemistry and animal studies.  But in terms of humans, they did |
| 14:00 | 3 | human clinical trials in over 5,000 subjects, over 800 of whom |
| 14:00 | 4 | had gone for more than one year, and, of course, looked at CV |
| 14:00 | 5 | events as part of that data. |
| 14:00 | 6 | **Q.**   Are there any type of guidelines that manufacturers are to |
| 14:01 | 7 | follow with regard to preapproval testing of drugs? |
| 14:01 | 8 | **A.**   Certainly.  If you're talking about clinical testing, the |
| 14:01 | 9 | FDA has come to agreement with a couple of other regions of |
| 14:01 | 10 | regulatory bodies in Japan and the EU and published their |
| 14:01 | 11 | recommendations for the standard chronic-use products; that a |
| 14:01 | 12 | database for considering approval should be at least 1,500 |
| 14:01 | 13 | people exposed, with at least 100 that have been using a |
| 14:01 | 14 | product for a year. |
| 14:01 | 15 | **Q.**   What are those guidelines? |
| 14:01 | 16 | **A.**   That's called the International Conference on |
| 14:01 | 17 | Harmonization guidelines. |
| 14:01 | 18 | **Q.**   Do you have an opinion whether or not Merck met or |
| 14:01 | 19 | exceeded those ICH guidelines? |
| 14:01 | 20 | **A.**   Well, they clearly exceeded those guidelines. |
| 14:01 | 21 | **Q.**   Do you have an opinion whether Merck provided the FDA with |
| 14:01 | 22 | all required and requested and adequate safety data for Vioxx |
| 14:01 | 23 | before it was approved? |
| 14:01 | 24 | **MR. ARBITBLIT:**  Object to form:  Compound. |
| 14:01 | 25 | **THE COURT:**  Yes. |

DAILY COPY

| | | |
|---|---|---|
| 14:02 | 1 | **BY MR. SALES:** |
| 14:02 | 2 | **Q.**   Let me rephrase it.  Do you have an opinion, Doctor, |
| 14:02 | 3 | whether Merck provided the FDA with all of the important safety |
| 14:02 | 4 | information with regard to Vioxx? |
| 14:02 | 5 | **A.**   Yes, they did. |
| 14:02 | 6 | **Q.**   Do you have an opinion whether the FDA takes its duty to |
| 14:02 | 7 | review those types of applications seriously? |
| 14:02 | 8 | **A.**   Yes. |
| 14:02 | 9 | **Q.**   Did the FDA, in fact, perform that review conscientiously |
| 14:02 | 10 | with reviewing that data and making its decision to approve |
| 14:02 | 11 | Vioxx? |
| 14:02 | 12 | **A.**   Yes, they did. |
| 14:02 | 13 | **Q.**   We have already looked at a couple of excerpts from |
| 14:02 | 14 | Dr. Kweder's testimony.  If we can go back to Defense |
| 14:02 | 15 | Exhibit 442 -- |
| 14:02 | 16 | **A.**   Yes. |
| 14:02 | 17 | **Q.**   -- and particularly the page ending in Bates number 107. |
| 14:02 | 18 | **A.**   I'm there. |
| 14:02 | 19 | **Q.**   Was Dr. Kweder asked about and did she testify about what |
| 14:02 | 20 | the FDA had considered with regard to data and potential |
| 14:03 | 21 | cardiovascular risks before approval of Vioxx? |
| 14:03 | 22 | **A.**   Yes. |
| 14:03 | 23 | **Q.**   She testified that:  "The cardiovascular risk was examined |
| 14:03 | 24 | with a fine-tooth comb.  The company, Merck, provided a |
| 14:03 | 25 | database of 5,000 patients.  That's quite a large database for |

14:03  1    any drug, and the duration of exposure in many of the patients

14:03  2    exceeded international standards for clinical trials of new

14:03  3    drugs."

14:03  4             Do you agree with Dr. Kweder's assessment?

14:03  5    A.    Yes.  That was my finding, also, that they had exceeded

14:03  6    the usual requirements and the database was over 5,000

14:03  7    patients.

14:03  8    Q.    Based upon all of your review of all the FDA materials and

14:03  9    the materials that were submitted to the FDA, do you have an

14:03  10   opinion as to whether the FDA, here in November 2004, got it

14:03  11   right that Merck and the FDA had looked at this appropriately

14:03  12   before approval?

14:04  13   A.    Yes.  I think her comments that they looked at it with a

14:04  14   fine-tooth comb is a good example or explanation of how they

14:04  15   looked at this data.

14:04  16   Q.    Have you seen any evidence to support any suggestion in

14:04  17   this case that Merck had not appropriately tested Vioxx before

14:04  18   approval?

14:04  19   A.    No.

14:04  20   Q.    Dr. Kessler mentioned a Protocol 023.  Do you know what

14:04  21   Protocol 023 is?

14:04  22   A.    Yes.  023 is a protocol study performed by Garrett

14:04  23   FitzGerald at Merck regarding some urinary metabolites of

14:04  24   prostacyclin and thromboxane.

14:04  25   Q.    Was there a hypothesis that had been generated by that

| | | |
|---|---|---|
| 14:04 | 1 | study? |
| 14:04 | 2 | A.   Yes.  The study revealed a decrease in, I think, the |
| 14:04 | 3 | metabolites of the thromboxane -- I'm sorry, the prostacyclin, |
| 14:05 | 4 | not the thromboxane.  The thromboxane changes were -- |
| 14:05 | 5 | nonchanges were expected.  The prostacyclin possible decrease |
| 14:05 | 6 | wasn't.  So that article and the information with it that was |
| 14:05 | 7 | provided to the FDA prior to approval concluded that they |
| 14:05 | 8 | needed to continue to look at the issue of possible thrombotic |
| 14:05 | 9 | events. |
| 14:05 | 10 | Q.   If you could, turn in your book to Defense Exhibit 993. |
| 14:05 | 11 | A.   Okay. |
| 14:05 | 12 | Q.   Are you familiar with Exhibit 993? |
| 14:05 | 13 | A.   Yes.  This is the primary reviewer, medical reviewer's |
| 14:05 | 14 | review of Vioxx from May of 1999. |
| 14:05 | 15 | Q.   Is it signed off by Dr. Villalba? |
| 14:05 | 16 | A.   Yes. |
| 14:05 | 17 | Q.   You mentioned that Protocol 023 and that hypothesis had |
| 14:05 | 18 | been given to the FDA; is that correct? |
| 14:05 | 19 | A.   Yes. |
| 14:05 | 20 | Q.   If you look at page 104 of Dr. Villalba's medical |
| 14:06 | 21 | review -- |
| 14:06 | 22 | A.   Yes. |
| 14:06 | 23 | Q.   -- under paragraph 7.5 -- do you see that? |
| 14:06 | 24 | A.   Yes. |
| 14:06 | 25 | Q.   There is a subtitle of "Thromboembolic and Vascular |

14:06  1   Safety."  Is that right?

14:06  2   **A.**   Correct.

14:06  3   **Q.**   Did Dr. Villalba report in May of 1999, at the time of the

14:06  4   approval of Vioxx initially, that:  "There is a theoretical

14:06  5   concern that patients chronically treated with a COX-2

14:06  6   selective inhibitor may be at a higher risk for thromboembolic

14:06  7   cardiovascular adverse experiences than patients treated with

14:06  8   COX-1/COX-2 inhibitors (conventional NSAIDs) due to the lack of

14:06  9   effect of COX-2 inhibition on platelet function"?

14:06  10  **A.**   Yes, that's what she is addressing in this section.

14:06  11  **Q.**   Is there any doubt whatsoever that the FDA was thoroughly

14:06  12  aware of Protocol 023 and the theoretical concern that was

14:07  13  raised by it?

14:07  14  **A.**   No.

14:07  15  **Q.**   Did, in your opinion, the FDA take its responsibilities

14:07  16  seriously with regard to review of that theoretical concern?

14:07  17  **A.**   Correct.  They looked at this very closely.

14:07  18  **Q.**   Did they believe, considering all of the evidence with

14:07  19  regard to Vioxx, that, with knowledge of that theoretical

14:07  20  concern, the benefits outweighed the risks?

14:07  21  **A.**   Correct.

14:07  22        **MR. SALES:**  Your Honor, we would offer into evidence

14:07  23  Defense Exhibit 993.

14:07  24        **MR. ARBITBLIT:**  No objection, Your Honor.

14:07  25        **THE COURT:**  Let it be admitted.

14:07  1  **BY MR. SALES:**

14:07  2  **Q.**    So if, in fact, there had been some suggestion that O23

14:07  3  was a signal before approval, had that signal been discussed

14:07  4  and thoroughly reviewed by the FDA?

14:07  5  **A.**    Correct.  It had been submitted, both the protocol as well

14:07  6  as the results, and it was highlighted in terms of a

14:07  7  thromboembolic discussion in the integrated safety summary.  It

14:08  8  was part of the review of several of the medical officers'

14:08  9  reviews and the clinical pharmacologist reviews at the FDA.

14:08  10  **Q.**    Now, there was also a suggestion made in the case by

14:08  11  plaintiff that there was an analysis done called the Watson

14:08  12  analysis following up on O23.  Are you familiar with that

14:08  13  issue?

14:08  14  **A.**    Yes.

14:08  15  **Q.**    Can you tell the Court, just in general terms, what the

14:08  16  Watson analysis was.

14:08  17  **A.**    Yes.  The Watson analysis and memo, I believe, was

14:08  18  generated in early 1998 as a result of the Vioxx project's team

14:08  19  discussion of this very question of looking at a question of

14:08  20  potential increase in thrombotic events.

14:08  21       The Watson comparison, he went ahead and took a crude

14:08  22  look at the entire Vioxx OA database that was blinded at the

14:08  23  time, so it included Vioxx, the comparator NSAIDs, as well as

14:09  24  placebo group, and did a comparison of thrombotic events,

14:09  25  cardiovascular events, with the placebo groups of some

DAILY COPY

1238

| | | |
|---|---|---|
| 14:09 | 1 | previously approved products that Merck had developed, Fosamax |
| 14:09 | 2 | and Proscar. |
| 14:09 | 3 | Q.   Just so we can orient ourselves, then -- |
| 14:09 | 4 | A.   Right. |
| 14:09 | 5 | Q.   -- at that point in time, the approval OA efficacy trials |
| 14:09 | 6 | were still blinded; is that correct? |
| 14:09 | 7 | A.   Correct. |
| 14:09 | 8 | Q.   And there had been this 023 metabolite urine study by |
| 14:09 | 9 | Dr. FitzGerald? |
| 14:09 | 10 | A.   Correct. |
| 14:09 | 11 | Q.   And they were trying to get a crude assessment whether |
| 14:09 | 12 | there was anything to that? |
| 14:09 | 13 | A.   Right, to see if there was some kind of startling or |
| 14:09 | 14 | unexpected high level of risk that they hadn't realized.  And |
| 14:09 | 15 | so they had this question and wanted to look at that. |
| 14:09 | 16 | Q.   But, still, the data was blinded in the actual OA trials; |
| 14:09 | 17 | right? |
| 14:09 | 18 | A.   Yes.  This wasn't a comparison of actual Vioxx users to |
| 14:09 | 19 | anything. |
| 14:09 | 20 | Q.   So they took the blinded bundle, which had placebo and |
| 14:09 | 21 | comparator NSAIDs and Vioxx, and did a rough assessment just |
| 14:10 | 22 | looking at a database of placebo from Fosamax and Proscar |
| 14:10 | 23 | trials; is that correct? |
| 14:10 | 24 | A.   Correct. |
| 14:10 | 25 | Q.   Have you had a chance to review the Watson results and the |

| | | |
|---|---|---|
| 14:10 | 1 | memo from that? |
| 14:10 | 2 | **A.**   Yes. |
| 14:10 | 3 | **Q.**   Now, a couple months later were the actual OA trials |
| 14:10 | 4 | unblinded? |
| 14:10 | 5 | **A.**   Yes.  As you know, the Watson memo recommended that there |
| 14:10 | 6 | wasn't anything of alarming significance and to continue and |
| 14:10 | 7 | complete those trials and then, when they became unblinded, to |
| 14:10 | 8 | look at the question very carefully, and that's exactly how |
| 14:10 | 9 | they proceeded. |
| 14:10 | 10 | **Q.**   Did the company proceed to produce all of that unblinded |
| 14:10 | 11 | data from the actual Vioxx trials to the FDA? |
| 14:10 | 12 | **A.**   Oh, yes.  I think within just weeks of the memo the |
| 14:10 | 13 | information was unblinded, analyzed, and provided as final |
| 14:10 | 14 | study reports and analysis and integrated safety summary to the |
| 14:10 | 15 | FDA. |
| 14:11 | 16 | **Q.**   In your experience, would the medical reviewers want to |
| 14:11 | 17 | see the unblinded actual data comparing Vioxx to placebo, Vioxx |
| 14:11 | 18 | to comparator drugs, rather than a combination of blinded data |
| 14:11 | 19 | against Fosamax and Proscar placebo data? |
| 14:11 | 20 | **A.**   Correct.  The information they're interested in is the |
| 14:11 | 21 | unblinded data so they can make some kind of assessment of that |
| 14:11 | 22 | risk and benefit. |
| 14:11 | 23 | **Q.**   If you could go to Defense Exhibit 40. |
| 14:11 | 24 | **A.**   Yes. |
| 14:11 | 25 | **Q.**   Are you familiar with these type of clinical safety |

| | | |
|---|---|---|
| 14:11 | 1 | reports? |
| 14:11 | 2 | **A.**   This is actually the integrated safety summary from the |
| 14:11 | 3 | new drug application submission. |
| 14:11 | 4 | **Q.**   Are you familiar with this document? |
| 14:11 | 5 | **A.**   Yes. |
| 14:11 | 6 | **Q.**   Have you reviewed it in preparation for your work? |
| 14:11 | 7 | **A.**   Yes. |
| 14:12 | 8 | **MR. SALES:**  Your Honor, obviously these are very |
| 14:12 | 9 | thick documents.  I think the parties have just been submitting |
| 14:12 | 10 | parts of it. |
| 14:12 | 11 | **THE DEPUTY CLERK:**  We have a 40-A so far and that's |
| 14:12 | 12 | all. |
| 14:12 | 13 | **MR. SALES:**  I want to turn the Court's attention -- |
| 14:12 | 14 | it's actually at page E-328. |
| 14:12 | 15 | **THE WITNESS:**  Yes.  Yes. |
| 14:12 | 16 | **BY MR. SALES:** |
| 14:12 | 17 | **Q.**   It's under the 2.3.3.4 section of "Thromboembolic |
| 14:12 | 18 | Cardiovascular Adverse Experiences."  Is that correct? |
| 14:12 | 19 | **A.**   Yes. |
| 14:12 | 20 | **Q.**   At the end of that section, did Merck report the unblinded |
| 14:12 | 21 | data from the OA trials to the FDA? |
| 14:12 | 22 | **A.**   Yes. |
| 14:12 | 23 | **Q.**   If you look at the very bottom, it says review of these |
| 14:12 | 24 | data and statistical analysis indicate that Vioxx groups have a |
| 14:12 | 25 | similar incidence of thromboembolic cardiovascular adverse |

DAILY COPY

| | | |
|---|---|---|
| 14:13 | 1 | experiences compared with placebo and NSAID comparators; |
| 14:13 | 2 | correct? |
| 14:13 | 3 | **A.**   Correct. |
| 14:13 | 4 | **Q.**   Now, that's the type of data that the FDA expects and the |
| 14:13 | 5 | kind of information they actually got; correct? |
| 14:13 | 6 | **A.**   Correct.  Both in the integrated safety summary as well as |
| 14:13 | 7 | in the individual study reports. |
| 14:13 | 8 | **Q.**   Did the FDA independently review that data to make sure |
| 14:13 | 9 | that was their assessment as well? |
| 14:13 | 10 | **A.**   Yes. |
| 14:13 | 11 | **Q.**   Does the FDA have the right and the power to ask Merck at |
| 14:13 | 12 | that point in time "I want you to do additional studies" or "I |
| 14:13 | 13 | want you to analyze the data in some particular way"? |
| 14:13 | 14 | **A.**   Yes.  They can ask for further analyses.  They can ask for |
| 14:13 | 15 | further information.  They can ask for new clinical trials |
| 14:13 | 16 | either before or after approval.  They have many options. |
| 14:13 | 17 | **Q.**   Who, to your knowledge, was the medical reviewer who did |
| 14:13 | 18 | look at the unblinded trials? |
| 14:13 | 19 | **A.**   Dr. Villalba was the primary reviewer. |
| 14:13 | 20 | **Q.**   Would she have also had access to whatever resources she |
| 14:13 | 21 | needed at the FDA to do that? |
| 14:13 | 22 | **A.**   Oh, certainly.  She has statisticians at her disposal. |
| 14:14 | 23 | And, of course, she had other medical officers doing various |
| 14:14 | 24 | sections of this review also. |
| 14:14 | 25 | **MR. SALES:**  Can I go ahead and offer that one page as |

DAILY COPY

14:14   1   Exhibit 40-B, Your Honor.

14:14   2                THE COURT:  Okay.  Let it be admitted.

14:14   3                MR. ARBITBLIT:  As long as we have the opportunity to

14:14   4   add to it.

14:14   5                THE COURT:  Sure.

14:14   6   BY MR. SALES:

14:14   7   Q.   If you could go back to Defense Exhibit 993 now,

14:14   8   Dr. Rarick, which was Dr. Villalba's medical review.

14:14   9   A.   Yes.

14:14   10  Q.   Now to page 105.  I think before we had looked at

14:14   11  page 104.

14:14   12  A.   Yes.

14:15   13  Q.   On page 105, Dr. Rarick, there is a section at the top

14:15   14  where Dr. Villalba is reviewing that OA unblinded data; is that

14:15   15  correct?

14:15   16  A.   Correct.

14:15   17  Q.   She writes that:  "The data seem to suggest that, in

14:15   18  six-week studies, thromboembolic events are more frequent in

14:15   19  patients receiving rofecoxib than placebo but do not show a

14:15   20  clear dose-response relationship with Vioxx.  There is a trend

14:15   21  towards an increased incidence in longer trials, but it is

14:15   22  always expected to have some increase in the incidence of

14:15   23  adverse events with longer time of observation.  The incidence

14:15   24  of thromboembolic events with rofecoxib appears to be similar

14:15   25  to comparator NSAIDs."

14:15   1          Is that correct?

14:15   2   **A.**   Yes.

14:15   3   **Q.**   So she had and her team had the unblinded OA data and did

14:15   4   their own analysis of that data; is that correct?

14:16   5   **A.**   Yes, they did.

14:16   6   **Q.**   I want to ask you about the summary paragraph right below

14:16   7   that because Dr. Kessler had pointed out this summary paragraph

14:16   8   where it says:  "With the available data, it is impossible to

14:16   9   answer with complete certainty whether the risk of

14:16   10   cardiovascular and thromboembolic events is increased in

14:16   11   patients on rofecoxib.  A larger database will be needed to

14:16   12   answer this and other safety comparison questions."

14:16   13          First of all, have you reviewed Dr. Kweder's

14:16   14   testimony with regard to that analysis done by Dr. Villalba?

14:16   15   **A.**   Yes.

14:16   16          **MR. SALES:**  If we could just put up on the screen --

14:16   17   I don't think we need to go back to it -- DX-442, Bates number

14:16   18   117.

14:16   19   **BY MR. SALES:**

14:17   20   **Q.**   Senator Hatch was asking Dr. Kweder -- again, and this is

14:17   21   with the benefit of hindsight in November of 2004; correct?

14:17   22   **A.**   Correct.

14:17   23   **Q.**   "How seriously did the FDA take the concerns about the

14:17   24   cardiovascular risks associated with Vioxx during the drug

14:17   25   approval process and once it was approved and put in the

DAILY COPY

| | | |
|---|---|---|
| 14:17 | 1 | marketplace?" |
| 14:17 | 2 | Dr. Kweder commented: "We took it extremely |
| 14:17 | 3 | seriously, and Dr. Villalba's review was quoted regarding our |
| 14:17 | 4 | concern and our interest in combing through the data to detect |
| 14:17 | 5 | any evidence of a cardiovascular risk. We also raised this |
| 14:17 | 6 | issue and shared all the data that were available, up through |
| 14:17 | 7 | her review, with our arthritis drugs advisory committee before |
| 14:17 | 8 | approving the drug." |
| 14:17 | 9 | Do you see that? |
| 14:17 | 10 | **A.** Yes. |
| 14:17 | 11 | **Q.** Are you in agreement, first of all, with that assessment? |
| 14:17 | 12 | **A.** Oh, yes. Certainly. |
| 14:18 | 13 | **Q.** She's referencing an advisory committee meeting that was |
| 14:18 | 14 | convened. Was there an advisory committee meeting convened |
| 14:18 | 15 | before May '99 approval? |
| 14:18 | 16 | **A.** Yes. There was an advisory committee prior to the |
| 14:18 | 17 | approval discussing this very application. |
| 14:18 | 18 | **Q.** Again, that's a group of experts appointed by the FDA to |
| 14:18 | 19 | look at these types of issues? |
| 14:18 | 20 | **A.** Correct. |
| 14:18 | 21 | **Q.** Now, with regard to the summary section and Dr. Kessler's |
| 14:18 | 22 | comments about a larger database, first of all, do you believe |
| 14:18 | 23 | the FDA appropriately approved Vioxx in May of 1999 for its |
| 14:18 | 24 | approved indications? |
| 14:18 | 25 | **A.** Yes. |

| | | |
|---|---|---|
| 14:18 | 1 | **Q.**   We have seen where they independently reviewed and |
| 14:18 | 2 | assessed the OA trials that we talked about; correct? |
| 14:18 | 3 | **A.**   Correct. |
| 14:18 | 4 | **Q.**   We have seen that they were fully aware of the 023 study |
| 14:18 | 5 | and the FitzGerald hypothesis; correct? |
| 14:18 | 6 | **A.**   Correct. |
| 14:19 | 7 | **Q.**   With regard to Dr. Villalba's comments about a larger |
| 14:19 | 8 | database, did the FDA approve the drug knowing that was the |
| 14:19 | 9 | situation? |
| 14:19 | 10 | **A.**   Yes. |
| 14:19 | 11 | **Q.**   Did Merck, in fact, work with the FDA subsequently and |
| 14:19 | 12 | work with getting even a larger database? |
| 14:19 | 13 | **A.**   Absolutely. |
| 14:19 | 14 | **Q.**   In your opinion, was a larger database necessary on |
| 14:19 | 15 | cardiovascular risks before the FDA could or should have |
| 14:19 | 16 | approved Vioxx as safe and effective? |
| 14:19 | 17 | **A.**   No.  They were perfectly appropriate to approve it, as the |
| 14:19 | 18 | benefits outweighed the risks, with the information they had in |
| 14:19 | 19 | May of 1999. |
| 14:19 | 20 | **Q.**   Is the purpose of the NDA to give the FDA sufficient data |
| 14:19 | 21 | to be able to evaluate risks and benefits? |
| 14:19 | 22 | **A.**   Yes. |
| 14:19 | 23 | **Q.**   Did the FDA conclude they certainly had that sufficient |
| 14:19 | 24 | information to make that assessment? |
| 14:20 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 14:20 | 1 | **Q.**   Is the purpose of the NDA to rule out every conceivable |
| 14:20 | 2 | potential risk of a drug? |
| 14:20 | 3 | **A.**   No.  That would not be possible. |
| 14:20 | 4 | **Q.**   Is that possible with regard to any prescription drug? |
| 14:20 | 5 | **A.**   No. |
| 14:20 | 6 | **Q.**   Was this unique with regard to Vioxx? |
| 14:20 | 7 | **A.**   No.  I think all chronic-use drugs have this same element. |
| 14:20 | 8 | Reviewers often write this kind of language because larger |
| 14:20 | 9 | databases are always needed, especially to rule out small |
| 14:20 | 10 | increased risks. |
| 14:20 | 11 | **Q.**   So, therefore, in your opinion did the company and the FDA |
| 14:20 | 12 | fully address whatever potential signal Dr. Kessler suggested |
| 14:20 | 13 | in his testimony? |
| 14:20 | 14 | **A.**   Oh, yes.  They were well aware of it.  They considered it |
| 14:20 | 15 | a relatively open question and continued to look at it |
| 14:20 | 16 | throughout the lifetime of Vioxx and the NSAIDs. |
| 14:20 | 17 | **Q.**   I'm turning to another topic now.  There's also been some |
| 14:20 | 18 | suggestion, probably more than maybe the Court would like to |
| 14:20 | 19 | hear, about dosing issues in this case with regard to |
| 14:21 | 20 | specifically the OA efficacy trials. |
| 14:21 | 21 |         First of all, do you have an opinion with regard to |
| 14:21 | 22 | the suggestion that the OA studies, in terms of efficacy and/or |
| 14:21 | 23 | GI evaluation, used incorrect or improper dosing as compared |
| 14:21 | 24 | for comparator NSAIDs? |
| 14:21 | 25 | **A.**   No.  I looked at that carefully.  I looked at what was |

14:21   1   proposed by Merck.  I looked at what FDA agreed to.  I looked

14:21   2   at those comparator groups, which included 2,400 milligrams a

14:21   3   day of ibuprofen, 150 milligrams of diclofenac, for example, in

14:21   4   the OA large studies.  I looked at the labels for those

14:21   5   products and saw that those were the appropriate and approved

14:21   6   doses for osteoarthritis patients to be used chronically.

14:21   7   Q.   Does the FDA preview these type of protocols and study

14:21   8   designs, especially for these type of preapproval studies?

14:21   9   A.   Definitely.

14:21   10  Q.   Did they here with regard to these specific studies, with

14:22   11  the OA studies?

14:22   12  A.   Yes.  They saw the protocols and the proposed active

14:22   13  comparator groups and what those doses would be.

14:22   14  Q.   Let's go back to Exhibit 43, which is part of the clinical

14:22   15  study report for Vioxx.  Specifically, I believe it's page 1 of

14:22   16  the tab behind DX-43.

14:22   17  A.   Yes.

14:22   18  Q.   Is that protocol for Study 029?

14:22   19  A.   Yes.  This is one of the protocols as provided to the FDA.

14:22   20  Q.   Was Protocol 029 one of those OA studies, preapproval OA

14:22   21  studies?

14:22   22  A.   I believe so, but I don't have the first page, but yes.

14:22   23  Q.   I want to ask you about page 2 of Protocol 029 under

14:23   24  "Patient Definition and Inclusion Criteria."

14:23   25  A.   Yes.

DAILY COPY

14:23    1    **Q.**    Are you with me?

14:23    2    **A.**    Yes.

14:23    3          **MR. ARBITBLIT:**  Your Honor, I don't see anything like

14:23    4    this in the report.  Am I missing something, or is this not in

14:23    5    the report?

14:23    6          **MR. SALES:**  It's in the report about the fact that

14:23    7    all this information was provided to the FDA and was considered

14:23    8    by the FDA.  All of these issues, Your Honor, are in her

14:23    9    report.

14:23   10          **MR. ARBITBLIT:**  Where?  Show me.  Show me where it

14:23   11    is.

14:23   12          **MR. SALES:**  Your Honor, she's reviewed hundreds of

14:23   13    thousands of documents.  We didn't reference every single

14:23   14    document in her report.  She clearly talked about the FDA

14:23   15    approved every step of the way the information, the protocols,

14:23   16    the results.  I think if we got to the point, Your Honor, where

14:23   17    we had to, with an expert, list every single word --

14:23   18          **THE COURT:**  No, I don't think you need to do that,

14:23   19    but you need to tell each other what areas you are going to be

14:23   20    covering so that the parties on each side can get ready for the

14:23   21    issue as opposed to just glossing over it.

14:23   22          **MR. SALES:**  Let me rephrase.  I think we can address

14:24   23    it.

14:24   24    **BY MR. SALES:**

14:24   25    **Q.**   Dr. Rarick, have you reviewed all of the CSRs pertinent to

14:24  1   those OA studies with regard -- and the ISS's that you

14:24  2   mentioned before?

14:24  3              MR. ARBITBLIT:  Your Honor, I think this is way

14:24  4   beyond the scope of anything in this report.  There's nothing

14:24  5   about review of 029 or 034.  The witness has already testified

14:24  6   that she reviewed hundreds of thousands of pages and spent

14:24  7   several hundred hours doing so, and it's completely unknown to

14:24  8   plaintiff's counsel that this would be a subject of her

14:24  9   testimony.  It's not in her report whatsoever.

14:24  10             I would add that pursuant to an agreement to try

14:24  11  to reduce the burden of discovery, there was no deposition of

14:24  12  this witness.  There's been no disclosure in her report of

14:24  13  anything on the subject of 029, 034, inclusion criteria,

14:24  14  exclusion criteria.  It's just not in there.  I would encourage

14:24  15  the Court to take a look.

14:25  16             MR. SALES:  Your Honor, at least I'll do it globally

14:25  17  because, I mean, the point, obviously, we are making with this

14:25  18  witness is there's been a lot of criticism in this case with

14:25  19  regard to -- by the plaintiff about dosing.  The fact of the

14:25  20  matter is all of those doses were in the reports that she has

14:25  21  reviewed.  She said the FDA got all the important data, all the

14:25  22  important protocols.  I can do it globally.

14:25  23             THE COURT:  You're going to have to approach it in a

14:25  24  different way, then.  You know, counsel is right.  If you are

14:25  25  going to be very specific and go into various areas with the

| | | |
|---|---|---|
| 14:25 | 1 | witness, you have to at least give them an opportunity to |
| 14:25 | 2 | cross-examine the witness.  You can't go into specific areas. |
| 14:25 | 3 | Obviously, you thought about the testimony because you don't |
| 14:25 | 4 | have hundreds of thousands of documents; you have about 20 or |
| 14:25 | 5 | 30 of them.  It seems to me that you can't deprive your |
| 14:25 | 6 | opponent of an opportunity to prepare. |
| 14:25 | 7 |         **MR. SALES:**  Well, we certainly have not done that, |
| 14:25 | 8 | Your Honor.  They have been very well prepared for her, and we |
| 14:26 | 9 | have given these documents.  Let me handle it this way. |
| 14:26 | 10 | **BY MR. SALES:** |
| 14:26 | 11 | **Q.**   Dr. Rarick, you have reviewed all the protocols that were |
| 14:26 | 12 | submitted with regard to the NDA; correct? |
| 14:26 | 13 | **A.**   Yes.  As well as the end of Phase II meeting minutes that |
| 14:26 | 14 | discuss those protocols. |
| 14:26 | 15 | **Q.**   Do you have an opinion whether or not all of the |
| 14:26 | 16 | information about -- the important safety information with |
| 14:26 | 17 | regard to how these studies would be conducted, the analysis of |
| 14:26 | 18 | those reports or studies, were submitted to the FDA and |
| 14:26 | 19 | approved by the FDA? |
| 14:26 | 20 | **A.**   That's correct. |
| 14:26 | 21 | **Q.**   Have you ever seen any evidence in any of the FDA |
| 14:26 | 22 | documentation and materials that you have reviewed, the |
| 14:26 | 23 | extensive materials you have reviewed, to suggest that the FDA |
| 14:26 | 24 | was of the view that the OA studies used somehow improper |
| 14:26 | 25 | dosing comparisons? |

DAILY COPY

14:26  1          MR. ARBITBLIT:  It's not in the report, Your Honor.

14:26  2          THE COURT:  Well, I'll let that in.  I overrule that

14:26  3  objection.

14:26  4          THE WITNESS:  Right.  I think they affirmatively

14:26  5  agreed to those, even at the end of Phase II meetings, as well

14:26  6  as through their approvals of the protocols to go forward.

14:27  7          MR. ARBITBLIT:  Your Honor, can we at least have some

14:27  8  foundation for that opinion as to what document the witness is

14:27  9  relying on out of hundreds of thousands?

14:27  10  BY MR. SALES:

14:27  11  Q.   Have you reviewed Exhibit 43?

14:27  12  A.   Yes.  I reviewed -- as well as and I was trying to

14:27  13  emphasize that there was significant discussion of the

14:27  14  protocols that would be moving forward for osteoarthritis at

14:27  15  the end of Phase II meetings.  There was more than one meeting

14:27  16  and more than one discussion and telecom minutes regarding the

14:27  17  protocols themselves.

14:27  18          The protocols were submitted.  The analysis plans

14:27  19  were submitted.  Certainly, the protocols included the

14:27  20  description of what the active comparators would be.  I believe

14:27  21  there was an active discussion about the diclofenac 12-month

14:27  22  study, that after six months both arms, Vioxx and diclofenac,

14:27  23  would be allowed to use other pain medications also, which was

14:27  24  relevant to the dosing discussion.

14:27  25          MR. ARBITBLIT:  Your Honor, I move to strike that

DAILY COPY

| | | |
|---|---|---|
| 14:27 | 1 | last answer.  It had nothing to do with simply identifying a |
| 14:27 | 2 | document.  It went on about the opinions that were stated and |
| 14:28 | 3 | did not identify where the documents came from.  We are well |
| 14:28 | 4 | into the surprise mode. |
| 14:28 | 5 | **THE COURT:**  I understand, but you precipitated the |
| 14:28 | 6 | development. |
| 14:28 | 7 | **MR. ARBITBLIT:**  I asked for a document, not an |
| 14:28 | 8 | opinion. |
| 14:28 | 9 | **THE COURT:**  I understand. |
| 14:28 | 10 | **BY MR. SALES:** |
| 14:28 | 11 | **Q.**   Quickly, Dr. Rarick, would you look at page 3 of |
| 14:28 | 12 | Exhibit 43. |
| 14:28 | 13 | **A.**   Yes. |
| 14:28 | 14 | **Q.**   Under "Patient Definition," and it's paragraph G -- do you |
| 14:28 | 15 | see that? |
| 14:28 | 16 | **A.**   Yes. |
| 14:28 | 17 | **Q.**   This is for inclusion to be in these studies.  Does it |
| 14:28 | 18 | state that:  "Patients must be taking an NSAID on a regular |
| 14:28 | 19 | basis and a therapeutic dose level" -- and it says see Appendix |
| 14:28 | 20 | 1 -- "for at least 30 days prior to the study enrollment"? |
| 14:28 | 21 | **A.**   Correct. |
| 14:28 | 22 | **Q.**   Is Appendix 1 attached as page 4? |
| 14:28 | 23 | **A.**   Yes. |
| 14:28 | 24 | **Q.**   Does that list the doses that the FDA was aware of and |
| 14:29 | 25 | approved for these studies? |

DAILY COPY

14:29  1  **A.**   Well, these were the doses that patients needed to have
14:29  2  been on for at least one month prior to being included in the
14:29  3  study because this was an osteoarthritis study of patients who
14:29  4  had to have already been stable on an appropriate dose, and
14:29  5  these were the kinds of doses that the FDA was allowing to
14:29  6  state that they required NSAID therapy.  Then they were washed
14:29  7  out of these and put onto the protocols of Vioxx.  In this case
14:29  8  this was, I believe, the diclofenac study.
14:29  9  **Q.**   So, in the real world, people had to be on these type of
14:29  10  doses for at least 30 days before they would even qualify to be
14:29  11  in these studies?
14:29  12  **A.**   Right.  Taking real-world prescribed, you know, products
14:29  13  that patients were already on and allowing them to then assert
14:29  14  that those patients required NSAID therapy for their OA and so
14:29  15  then could be enrolled in this active controlled study.
14:29  16  **Q.**   Just really quickly, if you can look at the naproxen line,
14:29  17  the diclofenac line.
14:29  18  **A.**   Right.  Naproxen was allowable for the last 30 days from
14:30  19  anywhere from 500 to 1,500 milligrams a day to have what the
14:30  20  FDA considered a therapeutic dose to be enrolled.  Diclofenac
14:30  21  was 100 to 150.  As you can see, ibuprofen, 1,200 to
14:30  22  3,200 milligrams per day.
14:30  23  **Q.**   You have seen the actual OA studies that were submitted to
14:30  24  the FDA; right?
14:30  25  **A.**   Yes.

| | | |
|---|---|---|
| 14:30 | 1 | **Q.**   The people who were in those studies, did they all meet |
| 14:30 | 2 | these criteria? |
| 14:30 | 3 | **A.**   Yes. |
| 14:30 | 4 | **Q.**   Do you have an opinion, therefore, from an FDA regulatory |
| 14:30 | 5 | standpoint, whether there was any -- is there anything to this |
| 14:30 | 6 | suggestion of complaining about the dosing comparator of the OA |
| 14:30 | 7 | trials? |
| 14:30 | 8 | **A.**   No.  The dosing comparator needed to be an appropriate |
| 14:30 | 9 | dose to manage osteoarthritis to be able to compare the |
| 14:30 | 10 | effectiveness of Vioxx. |
| 14:30 | 11 | **Q.**   New topic. |
| 14:30 | 12 | **A.**   Okay. |
| 14:30 | 13 | **Q.**   Keeping moving.  Protocol 017.  There was a brief mention |
| 14:31 | 14 | several days ago about Protocol 017.  Was that an RA dosing |
| 14:31 | 15 | trial? |
| 14:31 | 16 | **A.**   Yes.  That was a pilot study of rheumatoid arthritis, |
| 14:31 | 17 | looking at dosing for rheumatoid arthritis. |
| 14:31 | 18 | **Q.**   I think Dr. Kessler suggested that Protocol 017, while it |
| 14:31 | 19 | didn't necessarily substantively mean anything, may have been a |
| 14:31 | 20 | signal. |
| 14:31 | 21 | **A.**   Yes, I believe he said that. |
| 14:31 | 22 | **Q.**   Can we go back to Defense Exhibit 993 -- |
| 14:31 | 23 | **A.**   Yes. |
| 14:31 | 24 | **Q.**   -- at page 90.  First of all, again, this is in the |
| 14:31 | 25 | medical review officer's report? |

DAILY COPY

| | | |
|---|---|---|
| 14:31 | 1 | **A.**   Yes.   This is the FDA medical review of the integrated |
| 14:31 | 2 | safety summary and the safety information provided in the NDA |
| 14:31 | 3 | for Vioxx. |
| 14:31 | 4 | **Q.**   Again, this was the document right at the time of the |
| 14:32 | 5 | first approval; correct? |
| 14:32 | 6 | **A.**   Correct. |
| 14:32 | 7 | **Q.**   What did Dr. Villalba report -- first of all, is there a |
| 14:32 | 8 | section under there, under No. 1, "Study 017, Pilot Study for |
| 14:32 | 9 | RA"? |
| 14:32 | 10 | **A.**   Right.   This is her section discussing the safety found |
| 14:32 | 11 | from other indications that weren't up for approval, such as |
| 14:32 | 12 | rheumatoid arthritis. |
| 14:32 | 13 | **Q.**   If you go to the bottom paragraph right before Table 40, |
| 14:32 | 14 | there's a statement that:  "There were more patients with |
| 14:32 | 15 | cardiovascular AEs in the rofecoxib 175-milligram group than in |
| 14:32 | 16 | the placebo group.  The number of patients enrolled in this |
| 14:32 | 17 | study was small, and no conclusions can be drawn from these |
| 14:32 | 18 | data." |
| 14:32 | 19 |         Is that what Dr. Villalba found with regard to 017? |
| 14:32 | 20 | **A.**   Yes. |
| 14:32 | 21 | **Q.**   Do you know whether or not 175-milligram Vioxx was ever |
| 14:32 | 22 | approved? |
| 14:32 | 23 | **A.**   No, it was never approved. |
| 14:32 | 24 | **Q.**   So was that a high dose for a dosing study? |
| 14:32 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 14:32 | 1 | **Q.** Is it clear from your review of the materials, Dr. Rarick, |
| 14:32 | 2 | that the FDA thoroughly considered 017 before they approved |
| 14:33 | 3 | Vioxx as safe and effective, having benefits outweighing its |
| 14:33 | 4 | risks? |
| 14:33 | 5 | **A.** Yes, it's clear they looked at that. |
| 14:33 | 6 | **Q.** Is it clear, to your opinion, whether Merck fully |
| 14:33 | 7 | disclosed that -- using Dr. Kessler's terminology -- *potential* |
| 14:33 | 8 | *signal* to the FDA? |
| 14:33 | 9 | **A.** Yes, it was fully disclosed. |
| 14:33 | 10 | **Q.** Let's talk now about the VIGOR study.  The Court has heard |
| 14:33 | 11 | an abundance of information about the VIGOR study, but I want |
| 14:33 | 12 | to ask you a few questions about it. |
| 14:33 | 13 | First of all, no doubt the results of the VIGOR study |
| 14:33 | 14 | were disclosed to the FDA; correct? |
| 14:33 | 15 | **A.** Correct. |
| 14:33 | 16 | **Q.** Do you recall when the VIGOR study results came out? |
| 14:33 | 17 | **A.** Vioxx -- I'm sorry.  Merck started to look at the |
| 14:33 | 18 | unblinded data for VIGOR in the end of March of 2000 and |
| 14:33 | 19 | submitted it as a study report in June of 2000 as a |
| 14:34 | 20 | supplemental new drug application to the FDA. |
| 14:34 | 21 | **Q.** Was that, in your opinion, the appropriate way to handle |
| 14:34 | 22 | getting that data to the FDA? |
| 14:34 | 23 | **A.** Yes.  Well, they also called the FDA in March, and I think |
| 14:34 | 24 | they even had a meeting and discussed how to get those to the |
| 14:34 | 25 | FDA, and then they submitted that supplement in June. |

| | | |
|---|---|---|
| 14:34 | 1 | **Q.**   Did the FDA convene an advisory committee meeting to |
| 14:34 | 2 | discuss the VIGOR results? |
| 14:34 | 3 | **A.**   Yes.  They had an advisory committee in February of 2001 |
| 14:34 | 4 | to discuss VIGOR, the VIGOR results, as well as any other |
| 14:34 | 5 | information that they put together for that meeting about |
| 14:34 | 6 | cardiovascular events. |
| 14:34 | 7 | **Q.**   Do you recall that there was a healthy debate at the |
| 14:34 | 8 | advisory committee meeting with regard to what those results |
| 14:34 | 9 | meant or didn't mean? |
| 14:34 | 10 | **A.**   Yes.  There was a lot of discussion amongst the experts |
| 14:34 | 11 | about the meaning of the VIGOR specific results and also a lot |
| 14:34 | 12 | of discussion about the context of those results and what was |
| 14:34 | 13 | known about Vioxx up to that point. |
| 14:34 | 14 | **Q.**   Was Dr. Steve Nissen a member of the advisory committee? |
| 14:35 | 15 | **A.**   Dr. Nissen was at the table. |
| 14:35 | 16 | **Q.**   What was his position with regard to the VIGOR data and |
| 14:35 | 17 | how it should be interpreted and labeled pursuant to his work |
| 14:35 | 18 | on the advisory committee? |
| 14:35 | 19 | **A.**   He made several statements about the VIGOR information, |
| 14:35 | 20 | trying to put into context what he would have expected for |
| 14:35 | 21 | rates in the background, what he would have expected for |
| 14:35 | 22 | placebo rates.  He made statements such as "This is important |
| 14:35 | 23 | information.  We need to put this into this prescriber's hand." |
| 14:35 | 24 | But he also made statements that he wasn't sure how exactly to |
| 14:35 | 25 | interpret it or what the significance was. |

14:35  1   **Q.**   Do you have an opinion about whether the April 2002 label
14:35  2   is consistent with recommendations made by Dr. Nissen and the
14:35  3   other members of the FDA advisory committee meeting?
14:35  4   **A.**   Yes.  The cardiovascular information presented in the
14:35  5   April 2002 label was very much what Dr. Nissen had proposed.
14:36  6   **Q.**   And to the extent that Dr. Kessler suggested that the
14:36  7   VIGOR trial was a signal, was that, in your opinion, that
14:36  8   signal, thoroughly reviewed with the FDA in an FDA advisory
14:36  9   committee meeting?
14:36  10  **A.**   Yes.
14:36  11  **Q.**   I'm going to ask you a few questions about the label in a
14:36  12  few minutes, but just a few other topics first.
14:36  13          There's also been some discussion in this case about
14:36  14  the Alzheimer's trials:  078, 091, and 126.  Are you familiar
14:36  15  with those trials?
14:36  16  **A.**   Yes.
14:36  17  **Q.**   What were those studies designed to analyze?
14:36  18  **A.**   Those were placebo-controlled studies looking at various
14:36  19  questions about Alzheimer's, progressions of Alzheimer's,
14:36  20  prevention of progression, and also mild cognitive impairment
14:36  21  and progression to Alzheimer's.
14:36  22  **Q.**   Do you recall when the VIGOR study came out that there was
14:36  23  some unblinding of some data to look at the Alzheimer's
14:36  24  database to see if there was anything in these other databases
14:36  25  to confirm or refute data from the VIGOR study?

1259

| | | |
|---|---|---|
| 14:37 | 1 | **A.**   Yes.   At the time of the VIGOR study results being |
| 14:37 | 2 | submitted, there was a discussion amongst Merck and FDA about |
| 14:37 | 3 | the question of possibly unblinding those placebo-controlled |
| 14:37 | 4 | data because those were large databases that might help answer |
| 14:37 | 5 | these questions that had been raised by VIGOR.   And so, yes, |
| 14:37 | 6 | that interim analysis was done regarding cardiovascular events. |
| 14:37 | 7 | **Q.**   Did Merck provide the safety data from the Alzheimer's |
| 14:37 | 8 | studies to the FDA? |
| 14:37 | 9 | **A.**   Yes. |
| 14:37 | 10 | **Q.**   Did the FDA review the cardiovascular mortality data from |
| 14:37 | 11 | those results? |
| 14:37 | 12 | **A.**   Yes. |
| 14:37 | 13 | **Q.**   Were the relevant on-drug cardiovascular mortality numbers |
| 14:37 | 14 | included in the April 2002 label? |
| 14:37 | 15 | **A.**   Yes. |
| 14:37 | 16 | **Q.**   There's some suggestion about whether or not Merck acted |
| 14:37 | 17 | properly or improperly with regard to some of the Alzheimer's |
| 14:37 | 18 | data.   Have you had a chance to review a December '04 review by |
| 14:38 | 19 | Dr. Villalba regarding the Alzheimer's data? |
| 14:38 | 20 | **A.**   Yes. |
| 14:38 | 21 | **Q.**   I believe it's already in evidence from this morning, but |
| 14:38 | 22 | I have as DX-360 -- and it's in your notebook there, |
| 14:38 | 23 | Dr. Rarick. |
| 14:38 | 24 | **A.**   Yes. |
| 14:38 | 25 | **MR. SALES:**   Would you prefer that I use the |

| | | |
|---|---|---|
| 14:38 | 1 | plaintiff's number? |
| 14:38 | 2 | THE DEPUTY CLERK:  It came in on the 14th. |
| 14:38 | 3 | MR. SALES:  Is it the same number? |
| 14:38 | 4 | THE DEPUTY CLERK:  DX-360. |
| 14:38 | 5 | MR. SALES:  Okay.  It is. |
| 14:38 | 6 | THE DEPUTY CLERK:  The interim review of 12-18? |
| 14:38 | 7 | MR. SALES:  Yes, ma'am. |
| 14:38 | 8 | THE DEPUTY CLERK:  It's in. |
| 14:38 | 9 | BY MR. SALES: |
| 14:38 | 10 | Q.  With regard to DX-360, if you could look at -- I believe |
| 14:38 | 11 | it's page 15. |
| 14:39 | 12 | A.  Yes. |
| 14:39 | 13 | Q.  Just to orient ourselves, this was, again, a review by |
| 14:39 | 14 | Dr. Villalba as well as a clinical team leader for the FDA, |
| 14:39 | 15 | Dr. James Witter; is that right? |
| 14:39 | 16 | A.  Yes. |
| 14:39 | 17 | Q.  What is the date of this review? |
| 14:39 | 18 | A.  This says December of 2004. |
| 14:39 | 19 | Q.  So this, again, to orient ourselves, is after Vioxx has |
| 14:39 | 20 | been voluntarily withdrawn from the market? |
| 14:39 | 21 | A.  Yes, and before the February '01 advisory committee. |
| 14:39 | 22 | Q.  Is Dr. Villalba and Dr. Witter looking at information |
| 14:39 | 23 | about these Alzheimer's studies? |
| 14:39 | 24 | A.  Yes.  This is an update of their review of cardiovascular |
| 14:39 | 25 | thrombotic events in two of the Alzheimer's studies, 78 and 91. |

DAILY COPY

14:39  1   **Q.**   What did they conclude with regard to reviewing, even
14:39  2   after the fact, the Alzheimer's data, looking back again with
14:39  3   the updated information?
14:39  4   **A.**   Right.  They state in their conclusions that:  "It appears
14:39  5   that, up to the time of the APPROVe study, the cardiovascular
14:40  6   safety signal with Vioxx did not warrant a regulatory action by
14:40  7   FDA."
14:40  8   **Q.**   Did you agree with that assessment?
14:40  9   **A.**   Yes.
14:40  10  **Q.**   Do you have an opinion whether the FDA had the appropriate
14:40  11  information about the Alzheimer's studies to include in making
14:40  12  these risk/benefit assessments that we saw that they made at
14:40  13  least on four different occasions through August of 2004?
14:40  14  **A.**   Yes.
14:40  15        **MR. SALES:**  If we can just put up Dr. Kweder's
14:40  16  comments about this issue at page ending 108 of Defense
14:40  17  Exhibit 442.
14:40  18  **BY MR. SALES:**
14:40  19  **Q.**   Did Dr. Kweder comment in November of 2004 that:  "What we
14:40  20  had available at the time or shortly thereafter were two
14:40  21  ongoing studies to prevent Alzheimer's disease in relatively
14:41  22  elderly patients comparing Vioxx to placebo.  There were no
14:41  23  suggestions of cardiovascular risks in those data"?
14:41  24  **A.**   Correct.  This is where she is talking in November of '04
14:41  25  about the state of knowledge on Vioxx and cardiovascular

| | | |
|---|---|---|
| 14:41 | 1 | disease and describes the Alzheimer's placebo-controlled |
| 14:41 | 2 | studies here. |
| 14:41 | 3 | **Q.** Do you agree with that assessment, looking at that |
| 14:41 | 4 | cardiovascular data from Alzheimer's, that there was no |
| 14:41 | 5 | suggestion of untoward cardiovascular risks in those data? |
| 14:41 | 6 | **A.** Correct. |
| 14:41 | 7 | **Q.** In your opinion, did Merck fully disclose and work with |
| 14:41 | 8 | the FDA regarding the Alzheimer's trials and Alzheimer's data? |
| 14:41 | 9 | **A.** Oh, yes. They had discussions about the possible |
| 14:41 | 10 | unblinding of this information, how to present that |
| 14:41 | 11 | information, and provided the FDA with the cardiovascular risk |
| 14:41 | 12 | information. |
| 14:42 | 13 | **Q.** So to kind of wrap up these various suggestions that we |
| 14:42 | 14 | have had in the case about potential safety signals or |
| 14:42 | 15 | potential issues, after reviewing all of the material you have |
| 14:42 | 16 | reviewed that you described for the Court, do you have an |
| 14:42 | 17 | opinion about whether Merck fully disclosed to the FDA the data |
| 14:42 | 18 | relating to each of those alleged safety signals? |
| 14:42 | 19 | **A.** Yes. |
| 14:42 | 20 | **Q.** What is that opinion? |
| 14:42 | 21 | **A.** I believe that that information was fully disclosed and |
| 14:42 | 22 | fully vetted and fine-tooth-comb-reviewed by the FDA. |
| 14:42 | 23 | **Q.** Do you have an opinion as to whether Merck met the |
| 14:42 | 24 | standard of care with regard to testing and disclosures to the |
| 14:42 | 25 | FDA? |

DAILY COPY

| 14:42 | 1 | A.    Yes, they did. |
| 14:42 | 2 | Q.    I now want to turn to the April 2002 label.  I take it you |
| 14:42 | 3 | are familiar with this document; correct? |
| 14:42 | 4 | A.    Yes. |
| 14:42 | 5 | MR. SALES:  I believe it's DX-273, Your Honor. |
| 14:42 | 6 | BY MR. SALES: |
| 14:43 | 7 | Q.    First, what did the FDA-approved April 2002 label say with |
| 14:43 | 8 | regard to the cardiovascular risk with regard to Vioxx |
| 14:43 | 9 | following, as we talked about, the VIGOR study and the FDA |
| 14:43 | 10 | advisory committee meeting, and how did that information end up |
| 14:43 | 11 | in the label? |
| 14:43 | 12 | A.    That ended up as a new precaution section called |
| 14:43 | 13 | "Cardiovascular Effects." |
| 14:43 | 14 | Q.    I think if you look at page 3 of Exhibit 273, the |
| 14:43 | 15 | left-hand column -- and we'll also put it on the big screen -- |
| 14:43 | 16 | there's a section under "Precautions" that says "Cardiovascular |
| 14:43 | 17 | Effects."  Is that correct? |
| 14:43 | 18 | A.    Correct. |
| 14:44 | 19 | Q.    Obviously, the document speaks for itself, but do you have |
| 14:44 | 20 | an opinion whether or not the information contained in the |
| 14:44 | 21 | April 2002 label with regard to cardiovascular risks was |
| 14:44 | 22 | appropriately in the label and appropriately apprised readers |
| 14:44 | 23 | of the label of the cardiovascular risks of Vioxx at that time? |
| 14:44 | 24 | A.    Yes, I believe it did reflect that information. |
| 14:44 | 25 | Q.    I think we mentioned this earlier, but in your opinion did |

| | | |
|---|---|---|
| 14:44 | 1 | this information reflect what seemed to be the consensus of the |
| 14:44 | 2 | 2001 FDA advisory committee meeting as to how best to display |
| 14:44 | 3 | the VIGOR information? |
| 14:44 | 4 | **A.**   Yes.   I think this is the type of presentation that |
| 14:44 | 5 | Dr. Nissen was describing and the committee discussion. |
| 14:44 | 6 | **Q.**   Does that label present the appropriate information about |
| 14:44 | 7 | the potential cardiovascular risks of Vioxx to inform doctors |
| 14:44 | 8 | of those risks? |
| 14:44 | 9 | **A.**   Yes.   It describes the VIGOR and naproxen-controlled study |
| 14:45 | 10 | as well as the placebo-controlled studies and, as Dr. Nissen |
| 14:45 | 11 | suggested, suggests that the significance is unknown, but it's |
| 14:45 | 12 | important to inform prescribers. |
| 14:45 | 13 | **Q.**   There was some discussion in Dr. Kessler's testimony about |
| 14:45 | 14 | precaution versus warnings section.   I want to go back to |
| 14:45 | 15 | Dr. Kweder being asked about this issue in November of 2004 by |
| 14:45 | 16 | the U.S. Senate at page ending in Bates number 111. |
| 14:45 | 17 | Does Dr. Kweder report to the Senate that:  "The |
| 14:45 | 18 | specifics of whether or not something goes in a precaution or a |
| 14:45 | 19 | warning is very difficult to address.  And, in fact, in our |
| 14:45 | 20 | proposed physician labeling rule which we are about to |
| 14:45 | 21 | finalize, the agency is in the process of collapsing those two |
| 14:45 | 22 | sections into one because historically -- well, both from a |
| 14:45 | 23 | regulatory perspective and what the regulations tell us, as |
| 14:46 | 24 | well as from a practical perspective, determining what goes in |
| 14:46 | 25 | which section is not particularly helpful." |

14:46  1          Did I read her testimony correctly?

14:46  2  **A.**   Yes, you did.

14:46  3  **Q.**   Do you agree with that assessment?

14:46  4  **A.**   Yes.

14:46  5  **Q.**   Are you aware of whether or not those FDA regulations

14:46  6  were, in fact, revised pursuant to this comment by Dr. Kweder

14:46  7  that the two sections really don't mean any difference, that we

14:46  8  should meld them together?

14:46  9          **MR. ARBITBLIT:**  Objection:  Relevance.

14:46 10          **THE COURT:**  I'll allow it.  Go ahead.

14:46 11          **THE WITNESS:**  Yes.  The final rule regarding the

14:46 12  labeling format went into effect in 2006 in which the sections

14:46 13  for warnings and precautions were collapsed into one section

14:46 14  entitled "Warnings and Precautions."

14:46 15  **BY MR. SALES:**

14:46 16  **Q.**   I believe that's DX-3637 in your binder, Dr. Rarick.  Is

14:47 17  DX-3637 the regulation that you just mentioned where those were

14:47 18  folded together?

14:47 19  **A.**   Yes.

14:47 20          **MR. SALES:**  Your Honor, I don't think we need to

14:47 21  offer it.

14:47 22          **THE DEPUTY CLERK:**  It's in.

14:47 23          **MR. SALES:**  It is in already?  Thank you.

14:47 24  **BY MR. SALES:**

14:47 25  **Q.**   I would like to show you Plaintiff's Exhibit 722, which is

| | | |
|---|---|---|
| 14:47 | 1 | in the back of your notebook. |
| 14:47 | 2 | **A.** Yes. |
| 14:47 | 3 | **Q.** You have read Dr. Kessler's testimony in this case? |
| 14:47 | 4 | **A.** Yes. |
| 14:47 | 5 | **Q.** Did he discuss this draft label from October 15, 2001? |
| 14:47 | 6 | **A.** Yes, he did.  This is Merck's response to that draft |
| 14:48 | 7 | label.  I'm not sure exactly the date of this response.  There |
| 14:48 | 8 | is quite a bit of back-and-forth, but I understand this was the |
| 14:48 | 9 | one he was talking about. |
| 14:48 | 10 | **Q.** Thank you for the clarification. |
| 14:48 | 11 | In this draft that's marked up, first of all, assume |
| 14:48 | 12 | with me that Dr. Kessler suggested that this type of warning |
| 14:48 | 13 | should have been in the 2001 or 2002 Vioxx label. |
| 14:48 | 14 | **A.** Yes.  I believe he stated that the warning, as originally |
| 14:48 | 15 | proposed on October 15, 2001, would have been an appropriate |
| 14:48 | 16 | statement in that label. |
| 14:48 | 17 | **Q.** First of all, would it have been possible for Merck to |
| 14:48 | 18 | even have accepted the label as presented here? |
| 14:48 | 19 | **A.** Well, you can see from the October 15, 2001 draft comments |
| 14:48 | 20 | and draft labeling that was submitted to Merck from FDA there |
| 14:48 | 21 | was still a lot of open areas, a lot of tables to be filled in, |
| 14:48 | 22 | a lot of requests for information to go ahead and consider the |
| 14:48 | 23 | next draft of how to present this information.  So, no, you |
| 14:49 | 24 | couldn't have taken the October 15, 2001 preliminary draft and |
| 14:49 | 25 | just made it a label.  It wasn't a complete label. |

14:49  1  **Q.**   Assume with me, Doctor, though, that Dr. Kessler, looking
14:49  2  back at this, said, okay, this would have been a good warning.
14:49  3  **A.**   Okay.
14:49  4  **Q.**   What does that mean from an FDA regulatory standpoint, if
14:49  5  this label had been accepted in 2001, with regard to whether
14:49  6  the benefits outweigh the risks of Vioxx?
14:49  7  **A.**   Oh, yes.  If this had been a warning or a precaution, the
14:49  8  FDA's conclusion for either, with an approved label, would be
14:49  9  restating the benefits outweigh the risks as labeled.
14:49  10  **Q.**   How does the cardiovascular safety label here, generally
14:49  11  endorsed by Dr. Kessler in Plaintiff's Exhibit 722, compare to
14:49  12  the current black-box warning for cardiovascular risks for all
14:50  13  NSAIDs, including traditional NSAIDs and Celebrex today?
14:50  14  **A.**   Oh, yes.  This proposal was not for a black-box warning,
14:50  15  which is essentially the highest type of warning that the FDA
14:50  16  can impose upon a label.  So it's of less seriousness, I guess,
14:50  17  or it's less highlighted than a black box.
14:50  18  **Q.**   What is the position, as you understand it, with regard to
14:50  19  the FDA, with regard to traditional NSAIDs and Celebrex
14:50  20  currently with black-box warnings?  Does the FDA review those
14:50  21  products having benefits that outweigh the risks?
14:50  22  **A.**   Absolutely.  They have concluded that the prescription
14:50  23  products need a black-box warning for the cardiovascular risks
14:50  24  but that, again, those benefits still outweigh those risks as
14:50  25  labeled.

| | | |
|---|---|---|
| 14:50 | 1 | Q.   Do you have an opinion that Dr. Kessler's testimony, then, |
| 14:50 | 2 | is consistent with the FDA's finding that, indeed, the benefits |
| 14:50 | 3 | of Vioxx outweigh the risks? |
| 14:51 | 4 | A.   Yes. |
| 14:51 | 5 | Q.   What is that opinion? |
| 14:51 | 6 | A.   I agree. |
| 14:51 | 7 | Q.   In this label there's been, also, a lot of discussion in |
| 14:51 | 8 | this case about gastrointestinal risks.  I want to ask you a |
| 14:51 | 9 | few questions about the April 2002 label with regard to GI |
| 14:51 | 10 | warning.  If we could go back to DX-273. |
| 14:51 | 11 | A.   Yes. |
| 14:51 | 12 | Q.   If you could go to page 2 of the document.  Are you with |
| 14:51 | 13 | me? |
| 14:51 | 14 | A.   Yes, I am. |
| 14:51 | 15 | Q.   All right.  I also have it on the big screen. |
| 14:51 | 16 |      Is there a section under warnings for |
| 14:51 | 17 | gastrointestinal effects with regard to Vioxx? |
| 14:51 | 18 | A.   Yes. |
| 14:51 | 19 | Q.   Without reading it all into the record, I'll just read the |
| 14:51 | 20 | first sentence:  "Serious gastrointestinal toxicity such as |
| 14:51 | 21 | bleeding, ulceration, and perforation of the stomach, small |
| 14:51 | 22 | intestine, or large intestine, can occur at any time, with or |
| 14:52 | 23 | without warning symptoms, in patients treating with |
| 14:52 | 24 | nonsteroidal anti-inflammatory drugs." |
| 14:52 | 25 |      Did I read that correctly? |

1269

14:52  1   A.   Yes.

14:52  2   Q.   While there may be slight wording changes, essentially

14:52  3   from the time Vioxx was on the market in May 1999 until

14:52  4   September of 2004, when it was voluntarily withdrawn, was a

14:52  5   similar warning always in place?

14:52  6   A.   Yes.

14:52  7   Q.   There has been a lot of discussion in this case about

14:52  8   whether or not Vioxx is better or different than placebo with

14:52  9   regard to gastrointestinal side effects.  Is there any doubt

14:52  10  that the FDA told everyone in this Merck label that Vioxx was

14:52  11  not the same as placebo, that it had gastrointestinal toxicity?

14:52  12  A.   Well, that's the exact intent of this warning, is to point

14:52  13  out that it has gastrointestinal toxicity more than anybody

14:52  14  expected in placebo.

14:52  15  Q.   Is the label, in your opinion, clear that Vioxx is not

14:53  16  being represented as better than placebo with regard to GI

14:53  17  issues?

14:53  18  A.   Exactly.

14:53  19  Q.   Do you have an opinion as to whether or not the label that

14:53  20  was in effect from May of 1999 through September 2004, with

14:53  21  regard to Vioxx, appropriately informed users and doctors of

14:53  22  the appropriate information about the gastrointestinal risks of

14:53  23  Vioxx?

14:53  24  A.   Yes.

14:53  25  Q.   What is that opinion?

DAILY COPY

| | | |
|---|---|---|
| 14:53 | 1 | **A.**   That it did.  This is the warning that has been existing |
| 14:53 | 2 | since it was approved in 1999.  That warning has always been |
| 14:53 | 3 | the first warning on this label. |
| 14:53 | 4 | **Q.**   We have also heard a debate about primary versus secondary |
| 14:53 | 5 | endpoints with regard to GI events.  First of all, does the |
| 14:54 | 6 | warning contained in traditional NSAIDs -- you're familiar with |
| 14:54 | 7 | the warnings generally, with regard not just to Vioxx but |
| 14:54 | 8 | traditional NSAIDs, on GI toxicity? |
| 14:54 | 9 | **A.**   Yes. |
| 14:54 | 10 | **Q.**   Does the warning that is currently in effect and has been |
| 14:54 | 11 | in effect with regard to GI toxicity do so in the big warning |
| 14:54 | 12 | with regard to what's known as PUBs (perforations, ulcers, and |
| 14:54 | 13 | bleeds)? |
| 14:54 | 14 | **A.**   Correct.  The GI warning is about PUBs, and the current |
| 14:54 | 15 | black-box warning is about PUBs. |
| 14:54 | 16 | **Q.**   Has that been standard, to your knowledge, with regard to |
| 14:54 | 17 | how the FDA views clinically important primary endpoints of |
| 14:54 | 18 | these drugs? |
| 14:54 | 19 | **A.**   It's been the commonly used term and outcome measured to |
| 14:54 | 20 | place information into the label as part of the review of these |
| 14:54 | 21 | products. |
| 14:54 | 22 | **Q.**   Similar to what we talked about in the OA studies, the |
| 14:54 | 23 | VIGOR protocol and the data analysis plan and all those |
| 14:54 | 24 | documents would have been submitted to the FDA before the study |
| 14:54 | 25 | was conducted; is that correct? |

DAILY COPY

| | | |
|---|---|---|
| 14:54 | 1 | **A.**   Correct.  Well, the data analysis plan could be submitted |
| 14:55 | 2 | while it's being conducted, but yes.  Those revisions were |
| 14:55 | 3 | always provided, yes. |
| 14:55 | 4 | **Q.**   The FDA was, therefore, aware of what the primary endpoint |
| 14:55 | 5 | of that study was going to be? |
| 14:55 | 6 | **A.**   Yes. |
| 14:55 | 7 | **Q.**   If the FDA felt in any way that that was an inappropriate |
| 14:55 | 8 | primary endpoint for that study or that complicated PUBs should |
| 14:55 | 9 | have been the primary endpoint, did they have the authority to |
| 14:55 | 10 | get with the manufacturer and demand that? |
| 14:55 | 11 | **A.**   They could have done that in advance of the protocol and |
| 14:55 | 12 | said, "We want a different primary outcome."  In retrospect, |
| 14:55 | 13 | they could have looked at it and said, "We're going to analyze |
| 14:55 | 14 | it for a different outcome even though you prespecified one or |
| 14:55 | 15 | the other."  But, yes, they have the ability to either change |
| 14:55 | 16 | the entire protocol in advance; or if they change their mind |
| 14:55 | 17 | while it's being studied, they can look -- certainly ask for |
| 14:55 | 18 | that analysis. |
| 14:55 | 19 | **Q.**   Did Merck, in your opinion, provide the safety data on GI |
| 14:55 | 20 | toxicity to the FDA with regard to VIGOR and its other trials? |
| 14:56 | 21 | **A.**   Yes. |
| 14:56 | 22 | **Q.**   To your knowledge, did the FDA review and consider that |
| 14:56 | 23 | data with regard to these labeling decisions? |
| 14:56 | 24 | **A.**   Yes. |
| 14:56 | 25 | **Q.**   If we could go to DX-2549-A.  This was a document |

14:56     1    discussed earlier today by counsel.  Are you familiar with
14:56     2    Defense Exhibit 2549-A?
14:56     3    A.    Right.  This is part of the supplement that was provided
14:56     4    to the FDA for the VIGOR results.
14:56     5    Q.    Obviously another very thick document, but at page 283 was
14:56     6    there a submission that set forth the confirmed PUBs in the
14:57     7    VIGOR trial?
14:57     8    A.    Yes, this did.
14:57     9    Q.    Did they report the results of the primary endpoint for
14:57    10    both no baseline steroid use and steroid use to the FDA?
14:57    11    A.    Yes.  That's what this table is describing.
14:57    12    Q.    If you look under the relative risk estimates, is the
14:57    13    relative risk for no steroid use .68?
14:57    14    A.    Correct.
14:57    15    Q.    Is that statistically significant?
14:57    16    A.    No, it's not.
14:57    17    Q.    Then if you look over for baseline steroid use, it's .37.
14:57    18    Is that statistically significant?
14:57    19    A.    Yes, that number is.
14:57    20    Q.    Any doubt in your mind that the FDA was aware that, with
14:57    21    regard to the overall primary endpoint of the VIGOR trial, it
14:57    22    was not statistically significant for the nonsteroid user
14:57    23    subgroup?
14:57    24    A.    No.  This was provided to them, and this is part of their
14:57    25    review also.

DAILY COPY

| | | |
|---|---|---|
| 14:57 | 1 | **Q.**   It was your understanding that the primary endpoint of |
| 14:58 | 2 | perforations, ulcers, and bleeds included the secondary |
| 14:58 | 3 | endpoint of complicated PUBs? |
| 14:58 | 4 | **A.**   Correct. |
| 14:58 | 5 | **MR. SALES:**  We would offer DX-2549-A.  It's page 283 |
| 14:58 | 6 | of the document. |
| 14:58 | 7 | **THE COURT:**  I'll admit it. |
| 14:58 | 8 | **BY MR. SALES:** |
| 14:58 | 9 | **Q.**   Having reviewed the information about the VIGOR trial |
| 14:58 | 10 | submitted to the FDA, was it ever prespecified that Merck would |
| 14:58 | 11 | do a subgroup analysis of steroid versus nonsteroid users for |
| 14:58 | 12 | the secondary endpoint of complicated PUBs? |
| 14:58 | 13 | **A.**   No.  It was only for the primary endpoints that they were |
| 14:58 | 14 | going to look at that. |
| 14:58 | 15 | **Q.**   Could the FDA have requested, if they thought it was of |
| 14:58 | 16 | import, a secondary endpoint subgroup analysis done on |
| 14:58 | 17 | complicated PUBs by Merck? |
| 14:58 | 18 | **A.**   Sure.  They could have requested that in advance.  They |
| 14:58 | 19 | could have requested it once they saw the results.  They could |
| 14:58 | 20 | have done it themselves or they could have asked the sponsors. |
| 14:59 | 21 | **Q.**   Is there any evidence that they thought that that was |
| 14:59 | 22 | significant to the overall analysis with regard to the GI |
| 14:59 | 23 | safety of Vioxx? |
| 14:59 | 24 | **A.**   No. |
| 14:59 | 25 | **Q.**   Are you familiar with the -- I think you mentioned this |

| | |
|---|---|
| 14:59 | 1 |
| 14:59 | 2 |

14:59   1   before.  You're familiar with the labeling of the traditional

14:59   2   NSAIDs as well as Celebrex?

14:59   3   **A.**   Yes.

14:59   4   **Q.**   If we could look at DX-2507, please.  Is this a 2006

14:59   5   Celebrex label out of the *Physicians' Desk Reference*?

14:59   6   **A.**   Yes.  It's from the *PDR* in 2006.

14:59   7           **MR. SALES:**  Your Honor, we would move to admit

14:59   8   Defense Exhibit 2507.

15:00   9           **MR. ARBITBLIT:**  Your Honor, I thought earlier in the

15:00   10  case there was a ruling that Celebrex was really not in this

15:00   11  case, and there's been an awful lot of Celebrex in the case.  I

15:00   12  don't know what the purpose of it is.

15:00   13          **THE COURT:**  Well, it may have some relevance.  I will

15:00   14  overrule the objection and allow it.

15:00   15  **BY MR. SALES:**

15:00   16  **Q.**   Do you have an opinion, based upon your knowledge of the

15:00   17  Vioxx label that was in effect in 2001 and 2002 and 2003 up

15:00   18  until the time of withdrawal, whether or not Vioxx provided a

15:00   19  significant clinical, meaningful, therapeutic advantage over

15:00   20  traditional NSAIDs as they were labeled?

15:00   21  **A.**   Yes, I do.  I think that it provided a different option

15:00   22  with some significant differences.

15:00   23  **Q.**   Is it important for doctors and patients to have different

15:00   24  treatment options?

15:00   25  **A.**   Yes.

| | | |
|---|---|---|
| 15:00 | 1 | **Q.**   Was one of those clinical advantages based upon the |
| 15:00 | 2 | labeling that Vioxx only needed one pill per day? |
| 15:00 | 3 | **A.**   Certainly, that was an issue of compliance and |
| 15:01 | 4 | convenience, that traditional NSAIDs are generally given in |
| 15:01 | 5 | split doses -- either two, three, and up to four times a day -- |
| 15:01 | 6 | and Vioxx was a once-a-day dosing. |
| 15:01 | 7 | **Q.**   In your opinion, does that have to do with an issue with |
| 15:01 | 8 | compliance of patients? |
| 15:01 | 9 | **A.**   Right.  Compliance; just pill-taking in general, that it's |
| 15:01 | 10 | easier to take one pill a day than three or four. |
| 15:01 | 11 | **Q.**   Was there also a clinical, therapeutic, meaningful |
| 15:01 | 12 | difference based on the label of Vioxx versus traditional |
| 15:01 | 13 | NSAIDs with regard to platelet aggregation? |
| 15:01 | 14 | **A.**   Certainly.  Since it's a COX-2 specific inhibitor, it |
| 15:01 | 15 | doesn't inhibit platelet aggregation, whereas the COX-1s and |
| 15:01 | 16 | COX-2s would. |
| 15:01 | 17 | **Q.**   Did Vioxx have additional indications that many other |
| 15:01 | 18 | traditional NSAIDs do not have? |
| 15:01 | 19 | **A.**   Right.  I believe many of them don't have the |
| 15:01 | 20 | osteoarthritis indication.  And, of course, once there was |
| 15:01 | 21 | migraine and juvenile rheumatoid arthritis, those also gave |
| 15:01 | 22 | some superior benefits or benefit information that some of the |
| 15:01 | 23 | traditionals did not have. |
| 15:01 | 24 | **Q.**   We have seen, going back from earlier today, that with |
| 15:02 | 25 | regard to Vioxx, anyway, the FDA said they had the only proven |

DAILY COPY

| | | |
|---|---|---|
| 15:02 | 1 | GI benefit; is that correct? |
| 15:02 | 2 | A.   Correct, they have stated that. |
| 15:02 | 3 | Q.   Dr. Rarick, you're a medical doctor.  You're familiar with |
| 15:02 | 4 | prescribing medications; correct? |
| 15:02 | 5 | A.   Yes. |
| 15:02 | 6 | Q.   As a prescribing doctor, do you need to make |
| 15:02 | 7 | individualized patient risk assessment with medicines? |
| 15:02 | 8 | A.   Yes. |
| 15:02 | 9 | Q.   Does the FDA have an important role in informing on that |
| 15:02 | 10 | risk/benefit decision? |
| 15:02 | 11 | A.   Yes. |
| 15:02 | 12 | Q.   What is that role? |
| 15:02 | 13 | A.   Well, the Center for Drugs is charged with assuring that |
| 15:02 | 14 | labels describe the intended uses as well as the risks and |
| 15:02 | 15 | benefits for those products. |
| 15:02 | 16 | Q.   To this day, has the FDA ever found that Vioxx has more |
| 15:02 | 17 | cardiovascular thrombotic risks than traditional NSAIDs or |
| 15:02 | 18 | COX-2s? |
| 15:02 | 19 | A.   No. |
| 15:02 | 20 | Q.   To this day, has the FDA ever changed its position that |
| 15:02 | 21 | Vioxx has the only proven GI benefit of all the NSAIDs? |
| 15:03 | 22 | A.   No. |
| 15:03 | 23 | Q.   Based upon the FDA's findings, do you have an opinion if |
| 15:03 | 24 | Vioxx were on the market today that it would have the same |
| 15:03 | 25 | black-box warning that traditional NSAIDs and Celebrex have? |

| | | |
|---|---|---|
| 15:03 | 1 | MR. ARBITBLIT:  Objection. |
| 15:03 | 2 | THE COURT:  I sustain the objection. |
| 15:03 | 3 | BY MR. SALES: |
| 15:03 | 4 | Q.   Based on the FDA's findings, is it your opinion that Vioxx |
| 15:03 | 5 | was useful for its intended purpose? |
| 15:03 | 6 | A.   Yes. |
| 15:03 | 7 | Q.   Based upon the FDA's findings and your review of all the |
| 15:03 | 8 | information, are you of the opinion that Vioxx provided a |
| 15:03 | 9 | significant therapeutic advantage over Celebrex and traditional |
| 15:03 | 10 | NSAIDs? |
| 15:03 | 11 | A.   Yes. |
| 15:03 | 12 | MR. SALES:  I tender the witness, Your Honor. |
| 15:03 | 13 | THE COURT:  Let's take a 15-minute break at this |
| 15:03 | 14 | time.  We will come back in 15 minutes. |
| 15:03 | 15 | THE DEPUTY CLERK:  Everyone rise. |
| 15:03 | 16 | (WHEREUPON the Court took a brief recess.) |
| 15:18 | 17 | THE DEPUTY CLERK:  Everyone rise. |
| 15:27 | 18 | THE COURT:  Be seated, please. |
| 15:27 | 19 | You are still under oath, Doctor.  You may |
| 15:27 | 20 | cross-examine, Counsel. |
| 15:27 | 21 | CROSS-EXAMINATION |
| 15:27 | 22 | BY MR. ARBITBLIT: |
| 15:27 | 23 | Q.   Good afternoon, Dr. Rarick. |
| 15:27 | 24 | A.   Good afternoon. |
| 15:27 | 25 | Q.   I would like to start with a document that was in the |

| | | |
|---|---|---|
| 15:27 | 1 | materials that you were provided by Merck's counsel, and that |
| 15:27 | 2 | is the clinical safety summary marked as Exhibit 40-B. |
| 15:27 | 3 | **MR. ARBITBLIT:**  Mine says "40" on the front page. |
| 15:27 | 4 | **THE COURT:**  The whole thing is 40, but they have been |
| 15:27 | 5 | introducing independent, separate sheets, A and B.  If you want |
| 15:28 | 6 | to use something else -- |
| 15:28 | 7 | **MR. ARBITBLIT:**  Thank you, Your Honor.  There are a |
| 15:28 | 8 | number of pages I would like to refer to in the document as a |
| 15:28 | 9 | whole. |
| 15:28 | 10 | **BY MR. ARBITBLIT:** |
| 15:28 | 11 | **Q.**   Doctor, you testified earlier today about the number of |
| 15:28 | 12 | tests that Merck conducted.  The number of 58 clinical trials |
| 15:28 | 13 | is in your report, with 8,500 patients and 1,400 who had taken |
| 15:28 | 14 | Vioxx for over six months, and all of that, in your views, |
| 15:28 | 15 | exceeds the ICH guidelines; right? |
| 15:28 | 16 | **A.**   Correct. |
| 15:28 | 17 | **Q.**   Now, if you look at pages 4093 through 4095, we can see |
| 15:28 | 18 | what these 58 studies are, is that right, just by their general |
| 15:28 | 19 | categories? |
| 15:28 | 20 | **A.**   You're speaking to the Bates numbers? |
| 15:29 | 21 | **Q.**   Yes, in the lower right corner of each page.  If you could |
| 15:29 | 22 | turn to 4093.  Do you see -- |
| 15:29 | 23 | **A.**   Yes. |
| 15:29 | 24 | **Q.**   -- a summary of studies in the osteoarthritis safety |
| 15:29 | 25 | section? |

15:29  1      I did a count of how many of them are Phase I

15:29  2  clinical pharmacology studies.  I'm not sure I got it right,

15:29  3  but I think I counted up about 36 of them.  Does that sound

15:29  4  about right?

15:29  5  A.   That looks like it's approximately correct.

15:29  6  Q.   Those were 1 to 50 days with a variety of doses but did

15:29  7  not have control groups; right?

15:29  8  A.   There's some placebo groups here and active comparator

15:29  9  open label control groups.  Is that what you're asking?

15:29  10  Q.   In the Phase II and III studies, there are placebo control

15:29  11  groups; correct?

15:29  12  A.   I think even in the Phase I.  You're looking on page 093?

15:29  13  Q.   Which ones had placebo and for how many patient-years?

15:30  14  A.   Well, we would have to look at subjects and patients

15:30  15  treated.  In the Vioxx group, there's 777; placebo group, 318;

15:30  16  active comparator open label controls, 394.  Is that what

15:30  17  you're looking at?

15:30  18  Q.   Those were for a duration of 1 to 50 days; is that right?

15:30  19  A.   I would have to look at each study to know which ones were

15:30  20  placebo and active controlled; but, yes, that's what this

15:30  21  describes.

15:30  22  Q.   Now, there is a statement I would like you to take a look

15:30  23  at page 4165, a little further in, under heading 2.3.1.  That's

15:30  24  the overview of the clinical safety profile of MK-0966, which

15:30  25  is Vioxx; right?

| | | |
|---|---|---|
| 15:30 | 1 | **A.**   Yes. |
| 15:30 | 2 | **Q.**   What that says in the third paragraph is that:  "The basic |
| 15:30 | 3 | safety of any new drug is defined by comparing it with placebo. |
| 15:31 | 4 | For this reason, the primary prespecified comparison is between |
| 15:31 | 5 | Vioxx 12.5 and 25 milligrams and placebo in the six-week |
| 15:31 | 6 | studies." |
| 15:31 | 7 |          Did I read that correctly? |
| 15:31 | 8 | **A.**   Yes. |
| 15:31 | 9 | **Q.**   These studies have placebo controls for their entire |
| 15:31 | 10 | duration; is that right? |
| 15:31 | 11 | **A.**   That's what it says. |
| 15:31 | 12 | **Q.**   So if you want to look at the ones that were |
| 15:31 | 13 | placebo-controlled, six-week studies, there's a reference to |
| 15:31 | 14 | that in the document at page 4124, exposure to MK-0966 in the |
| 15:31 | 15 | six-week studies.  Is it correct that there were 412 placebo |
| 15:31 | 16 | patients, in the six-week studies, exposed for approximately 40 |
| 15:32 | 17 | days each? |
| 15:32 | 18 | **A.**   That's what this says, yes. |
| 15:32 | 19 | **Q.**   So the 58 studies that you reference and the 5,000 |
| 15:32 | 20 | patients, that's not part of what Merck itself calls the basic, |
| 15:32 | 21 | primary prespecified safety analysis; correct? |
| 15:32 | 22 | **A.**   No, I would disagree with that statement. |
| 15:32 | 23 | **Q.**   Well, did you agree that Merck called it the primary |
| 15:32 | 24 | prespecified comparison between Vioxx and placebo, is in the |
| 15:32 | 25 | six-week studies for the safety analysis, which we just read at |

| | | |
|---|---|---|
| 15:32 | 1 | 4165? |
| 15:32 | 2 | A.   Yeah, and I thought -- that wasn't your question. |
| 15:32 | 3 | Q.   I'll withdraw the question and try to make it clearer. |
| 15:32 | 4 | For the studies that fit the definition of the |
| 15:32 | 5 | primary prespecified comparison of Vioxx versus placebo in the |
| 15:32 | 6 | six-week studies, is it correct that the numbers are 1,780 |
| 15:33 | 7 | patients with osteoarthritis on various doses of Vioxx and 412 |
| 15:33 | 8 | placebo patients treated for an average of 40 days? |
| 15:33 | 9 | A.   Right.  To describe the safety compared to placebo, yes. |
| 15:33 | 10 | Q.   Thank you.  Now, you state in your report and in your |
| 15:33 | 11 | testimony that Merck went well beyond the standards set out by |
| 15:33 | 12 | the ICH; right? |
| 15:33 | 13 | A.   Yes. |
| 15:33 | 14 | Q.   But there are standards of the ICH that you did not |
| 15:33 | 15 | mention; correct? |
| 15:33 | 16 | A.   Maybe you should point those out to see what you're |
| 15:33 | 17 | speaking to. |
| 15:33 | 18 | Q.   All right. |
| 15:34 | 19 | MR. ARBITBLIT:  May I approach, Your Honor? |
| 15:34 | 20 | THE COURT:  Yes. |
| 14:29 | 21 | BY MR. ARBITBLIT: |
| 15:34 | 22 | Q.   Doctor, is the document I have handed to you, ICH E1, the |
| 15:34 | 23 | extent of population exposure to assess clinical safety for |
| 15:34 | 24 | drugs intended for long-term treatment of nonlife-threatening |
| 15:34 | 25 | conditions? |

DAILY COPY

| | | |
|---|---|---|
| 15:34 | 1 | **A.**   This is the step 4 version of October '94.  I believe it |
| 15:34 | 2 | was finalized in February or later in '95. |
| 15:34 | 3 | **Q.**   Turning to paragraph 7, at page 2 -- |
| 15:34 | 4 | **A.**   Yes. |
| 15:34 | 5 | **Q.**   -- there are a number of circumstances where the |
| 15:34 | 6 | harmonized general standards for the clinical safety evaluation |
| 15:34 | 7 | may not be applicable; correct? |
| 15:35 | 8 | **A.**   Correct. |
| 15:35 | 9 | **Q.**   Reasons for and examples of these exceptions are listed |
| 15:35 | 10 | below.  It is expected that additional examples may arise; |
| 15:35 | 11 | right? |
| 15:35 | 12 | **A.**   Correct. |
| 15:35 | 13 | **Q.**   Those exceptions include under heading A:  "Instances |
| 15:35 | 14 | where there is concern that the drug will cause late developing |
| 15:35 | 15 | ADEs, or adverse drug experiences, or cause ADEs that increase |
| 15:35 | 16 | in severity or frequency over time, would require a larger |
| 15:35 | 17 | and/or longer term safety database." |
| 15:35 | 18 | Correct? |
| 15:35 | 19 | **A.**   Correct. |
| 15:35 | 20 | **Q.**   "The concern could arise from" -- if you look at paragraph |
| 15:35 | 21 | 3 -- "pharmacokinetic or pharmacodynamic properties known to be |
| 15:35 | 22 | associated with such adverse drug experiences." |
| 15:35 | 23 | Right? |
| 15:35 | 24 | **A.**   Correct. |
| 15:35 | 25 | **Q.**   Going to paragraph B: |

DAILY COPY

15:35    1          "Situations in which there is a need to quantitate

15:35    2    the occurrence rate of an expected specific low-frequency

15:36    3    adverse drug experience will require a greater long-term

15:36    4    database."

15:36    5          Correct?

15:36    6  A.    Correct.

15:36    7  Q.    "Examples would include situations where a specific

15:36    8    serious adverse drug event has been identified in similar

15:36    9    drugs, or where a serious event that could represent an alert

15:36   10    event is observed in early clinical trials."

15:36   11          Do you see that?

15:36   12  A.    Yes.

15:36   13  Q.    Now, in the early clinical trial of 017, which is the

15:36   14    rheumatoid arthritis study that you mentioned a little while

15:36   15    ago, there were three events that fit the definition of

15:36   16    thrombotic or thromboembolic; is that right?

15:36   17  A.    Why don't we look at that again.

15:37   18          MR. ARBITBLIT:  This has previously been marked as

15:37   19    Exhibit LAAG-18, Your Honor.

15:37   20  BY MR. ARBITBLIT:

15:37   21  Q.    Turning to the last page of the document, past all the

15:37   22    blacked-out, redacted pages about other products, you can go to

15:37   23    the MK-966 update; correct?

15:37   24  A.    Yes.

15:37   25  Q.    Have you seen this document before?

1284

15:37  1    **A.**   I can't say for sure.  I know the trial and protocol were

15:37  2    submitted to the FDA.  So I have seen the protocol and the

15:37  3    results, but I don't know about this particular document.

15:38  4    **Q.**   Do you see that the adverse events of most concern were in

15:38  5    the cardiovascular system?

15:38  6    **A.**   That's what it states.

15:38  7    **Q.**   For example, they say MI.  That's a heart attack; right?

15:38  8    **A.**   Correct.

15:38  9    **Q.**   Unstable angina; right?

15:38  10   **A.**   Correct.

15:38  11   **Q.**   Those two events both involve thrombosis; right?

15:38  12   **A.**   Correct.

15:38  13   **Q.**   Clotting of the coronary arteries; correct?

15:38  14   **A.**   It can be.

15:38  15   **Q.**   The term that's used here to describe them in 1996 is

15:38  16   *adverse events of most concern*; right?

15:38  17   **A.**   Correct.

15:39  18   **Q.**   So going back to the ICH E1 that we were looking at a

15:39  19   moment ago -- I'll withdraw that.

15:39  20           Protocol 023 that you testified about this afternoon,

15:39  21   was that a pharmacology study?

15:39  22   **A.**   Yes.

15:39  23   **Q.**   Did that indicate that there was a cause for concern

15:39  24   according to any documents that you have seen in your review of

15:39  25   this case?

DAILY COPY

15:39   1   **A.**   I'm sorry.  The question was:  Did that identify a

15:39   2   particular urinary metabolite that was reason to continue to

15:39   3   look at cardiovascular events?

15:39   4   **Q.**   Well, not quite.  I don't think the question was very

15:39   5   clear, so I don't blame you for not understanding it.  Let me

15:39   6   try again.

15:39   7           Have you reviewed documents relating to Protocol 023

15:39   8   and its connection to the Watson study that you talked about?

15:40   9   **A.**   Yes.

15:40   10          **MR. ARBITBLIT:**  I may be short an exhibit on this

15:40   11  one.

15:40   12          **THE COURT:**  That's all right.  I don't need one.

15:40   13          **MR. ARBITBLIT:**  I apologize, Your Honor.

15:40   14          **THE COURT:**  That's all right.

15:40   15          **THE WITNESS:**  Thank you.

        16  **BY MR. ARBITBLIT:**

15:40   17  **Q.**   Have you seen this document before, which is the

15:40   18  February 9, 1998 project team minutes for the January 12, 1998

15:41   19  meeting of the project team for Merck?

15:41   20  **A.**   Yes.

15:41   21  **Q.**   Do you see a reference to Study 023 under the background

15:41   22  there on page ending in 9949?

15:41   23  **A.**   Yes.

15:41   24  **Q.**   Now, what it says is:

15:41   25          "Study 023 showed that Vioxx and indomethacin

DAILY COPY

| | | |
|---|---|---|
| 15:41 | 1 | significantly reduced urinary excretion of PGI-M, which may |
| 15:42 | 2 | reflect a decrease in prostacyclin biosynthesis.  Prostacyclin |
| 15:42 | 3 | is a potent inhibitor of platelet aggregation and has vascular |
| 15:42 | 4 | dilatory properties.  However, Vioxx had no effect on systemic |
| 15:42 | 5 | thromboxane.  The clinical relevance of partially inhibiting |
| 15:42 | 6 | prostacyclin synthesis without inhibiting thromboxane are |
| 15:42 | 7 | unknown.  These findings raised a concern about the potential |
| 15:42 | 8 | for Vioxx to cause cardiovascular thrombotic events." |
| 15:42 | 9 | Did I read that correctly? |
| 15:42 | 10 | A.   Yes. |
| 15:42 | 11 | Q.   The ICH E1 says at paragraph 7D, page 3: |
| 15:43 | 12 | "In situations where there is concern that a drug may |
| 15:43 | 13 | add to an already significant background rate of morbidity or |
| 15:43 | 14 | mortality, clinical trials may need to be designed with a |
| 15:43 | 15 | sufficient number of patients to provide adequate statistical |
| 15:43 | 16 | power to detect prespecified increases over the baseline |
| 15:43 | 17 | morbidity or mortality." |
| 15:43 | 18 | Correct? |
| 15:43 | 19 | A.   That's what it states, yes. |
| 15:43 | 20 | Q.   Doctor, when Protocol 023 came to the attention of Merck |
| 15:43 | 21 | in the fall of 1997, which triggered Watson's analysis starting |
| 15:43 | 22 | in December of that year, is it correct that every single one |
| 15:43 | 23 | of those 58 studies you referenced had already either been |
| 15:43 | 24 | started or completed? |
| 15:43 | 25 | A.   I don't know their completion dates or if there was others |

DAILY COPY

15:43  1  that were ongoing at the time.  I don't know the answer to

15:43  2  that.

15:43  3  **Q.**   Can you identify a single study that Merck started after

15:44  4  receiving the news of Protocol 023 that gave rise to a concern

15:44  5  that the imbalance with thromboxane and prostacyclin could

15:44  6  cause thrombotic cardiovascular events?

15:44  7  **A.**   I'm sorry.  Your question is:  Did they do any further

15:44  8  studies after that date?

15:44  9  **Q.**   I'll withdraw that.

15:44  10         Between the time of 023 in the fall of 1997 and the

15:44  11  time when Merck submitted the new drug application in

15:44  12  November 1998, was there a single, solitary study started to

15:44  13  investigate the risk of cardiovascular thrombotic events?

15:44  14  **A.**   I don't know if any of these extensions were continuing.

15:44  15  I forget the exact start date of VIGOR.  I think it was after

15:44  16  that date but before the approval.  But I don't know the answer

15:44  17  to that question about how many studies might have been

15:45  18  continuing to collect data.

15:45  19  **Q.**   There was, in the words of the ICH, no study to detect a

15:45  20  prespecified increase over the baseline for cardiovascular

15:45  21  thrombotic events at any time before Merck submitted the new

15:45  22  drug application, was there?

15:45  23  **A.**   No.  I think they submitted the plan for looking at that

15:45  24  during the review, the cardiovascular standard operating

15:45  25  procedure.  Is that what you're speaking to?

15:45   1   **Q.**   No, I was not, ma'am.  I was asking whether there were any

15:45   2   clinical trials, prior to selling the drug to the public, that

15:45   3   were designed with adequate statistical power to detect

15:45   4   prespecified increases over the baseline morbidity or mortality

15:45   5   for thrombotic events for Vioxx.

15:45   6   **A.**   I think the safety information was collected in the

15:45   7   standard way until the CV SOP was in place, you're correct.

15:46   8        **MR. ARBITBLIT:**  I move to strike the nonresponsive

15:46   9   part of it.

15:46   10  **BY MR. ARBITBLIT:**

15:46   11  **Q.**   Is it correct that no study to look at cardiovascular

15:46   12  risks of Vioxx for thrombotic events was prespecified prior to

15:46   13  marketing the drug?

15:46   14  **A.**   As a primary analysis, correct.

15:46   15  **Q.**   Now, instead, Merck conducted the Watson analysis that you

15:46   16  described in your testimony as crude; correct?

15:46   17  **A.**   Yes.

15:46   18  **Q.**   It was crude because it didn't directly address the

15:46   19  question; correct?

15:46   20  **A.**   I think I used the word *crude* because it wasn't a formal

15:46   21  statistical analysis of Vioxx compared to anything.

15:47   22  **Q.**   It was an analysis of Vioxx, plus the comparators, plus

15:47   23  placebo to a group that Merck chose to compare it to; right?

15:47   24  **A.**   It was a cross-study comparison, so that's where I would

15:47   25  call it crude.  It's not the standard type of formal analysis

| | | |
|---|---|---|
| 15:47 | 1 | with appropriate groups to compare. |
| 15:47 | 2 | Q.   Before we get to that, is it fair to say that the Vioxx |
| 15:47 | 3 | premarketing program was designed to address the question |
| 15:47 | 4 | primarily of gastrointestinal toxicity of Vioxx compared to |
| 15:47 | 5 | other NSAIDs? |
| 15:47 | 6 | A.   I think that the development program was intended to look |
| 15:48 | 7 | at the effectiveness of Vioxx and the indications for which |
| 15:48 | 8 | they were seeking approval, but the safety information that was |
| 15:48 | 9 | collected included gastrointestinal safety. |
| 15:48 | 10 | Q.   So it was an efficacy study for pain relief combined with |
| 15:48 | 11 | a toxicity study for gastrointestinal endpoints? |
| 15:48 | 12 | A.   Well, I think the FDA would look at it as an effectiveness |
| 15:48 | 13 | study for the indications that it was seeking.  The safety |
| 15:48 | 14 | information was being collected for gastrointestinal toxicity. |
| 15:48 | 15 | There were various ways that was being looked at. |
| 15:48 | 16 | What was that second part of your question? |
| 15:48 | 17 | Q.   It was to study efficacy, meaning pain relief, and |
| 15:48 | 18 | toxicity, meaning gastrointestinal effects.  Those were the |
| 15:48 | 19 | endpoints for which the studies were powered. |
| 15:48 | 20 | A.   Well, you would have to look at each study to see which |
| 15:48 | 21 | ones were for what.  But, yes, the program included efficacy |
| 15:49 | 22 | studies for the various indications, and it included some |
| 15:49 | 23 | safety studies that were specific to GI.  And, of course, it |
| 15:49 | 24 | included safety information throughout all the trials for |
| 15:49 | 25 | various other safety endpoints. |

| 15:49 | 1 | **Q.**   What does the word *powered* mean? |
| 15:49 | 2 | **A.**   *Powered* is generally used to mean where you develop a |
| 15:49 | 3 | sample size to have the power to detect a difference between |
| 15:49 | 4 | one group to another. |
| 15:49 | 5 | **Q.**   When a clinical trial is designed, the statisticians |
| 15:49 | 6 | create a power calculation with a certain expectation of the |
| 15:49 | 7 | rates of events and the size of the population and duration |
| 15:49 | 8 | that will combine to provide sufficient power to hopefully |
| 15:49 | 9 | detect an effect if there is an effect to detect? |
| 15:49 | 10 | **A.**   You're talking about Phase III trials? |
| 15:49 | 11 | **Q.**   Yes. |
| 15:49 | 12 | **A.**   Yes. |
| 15:49 | 13 | **Q.**   But none of the trials before -- let's put it this way: |
| 15:50 | 14 | No trial at any time, since the creation of Vioxx to today, was |
| 15:50 | 15 | ever designed and powered to detect a difference in heart |
| 15:50 | 16 | attack risk between Vioxx and placebo, was it? |
| 15:50 | 17 | **A.**   I think we would have to look at the proposal for pooling |
| 15:50 | 18 | in that -- the prespecified proposal for pooling the |
| 15:50 | 19 | placebo-controlled trials postapproval that was looking to |
| 15:50 | 20 | collect an appropriate number of events to have the power.  But |
| 15:50 | 21 | an individual study designed for that as the primary safety -- |
| 15:50 | 22 | or the primary objective and outcome, that's true. |
| 15:50 | 23 | **Q.**   When you referred in the beginning of your answer to the |
| 15:50 | 24 | pooling, were you referring to Protocol 203? |
| 15:50 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 15:50 | 1 | **Q.**   Protocol 203 was submitted for a review by the FDA in |
| 15:50 | 2 | approximately December 2002; correct? |
| 15:50 | 3 | **A.**   I forget when those discussion began or when the protocol |
| 15:51 | 4 | specifically came in.  If you'd like to show me that -- or I |
| 15:51 | 5 | can accept that. |
| 15:51 | 6 | **Q.**   It was never analyzed before Vioxx was off the market; |
| 15:51 | 7 | correct? |
| 15:51 | 8 | **A.**   No.  The studies that went into Protocol 203 were ongoing |
| 15:51 | 9 | at the time of putting together the proposal for pooling and |
| 15:51 | 10 | looking and, of course, they were stopped. |
| 15:51 | 11 | **Q.**   Those studies involved polyps, prostate cancer, and colon |
| 15:51 | 12 | cancer, and they were powered for those endpoints when they |
| 15:51 | 13 | were designed; right? |
| 15:51 | 14 | **A.**   Each of the individual studies was powered for the |
| 15:51 | 15 | effectiveness or indications for which they were being |
| 15:51 | 16 | performed, correct. |
| 15:51 | 17 | **Q.**   The document you have been handed is the September 16, |
| 15:52 | 18 | 1998 Federal Register entry referring to an International |
| 15:52 | 19 | Conference on Harmonization guidance on statistical principles |
| 15:52 | 20 | for clinical trials.  I think it's also known as E9; is that |
| 15:52 | 21 | right? |
| 15:52 | 22 | **A.**   That's correct. |
| 15:52 | 23 | **Q.**   Have you seen this one before? |
| 15:52 | 24 | **A.**   Yes. |
| 15:52 | 25 | **Q.**   Have you worked with it? |

| | | |
|---|---|---|
| 15:52 | 1 | **A.**   Not for this litigation, but I certainly have seen it and |
| 15:52 | 2 | worked with it during my time at the FDA. |
| 15:52 | 3 | **Q.**   Have you seen the reference at paragraph 3.5 on page 49591 |
| 15:52 | 4 | under the paragraph heading "Sample Size"? |
| 15:52 | 5 | **A.**   Yes. |
| 15:52 | 6 | **Q.**   Do you see that the ICH guideline there says:  "The number |
| 15:52 | 7 | of subjects in a clinical trial should always be large enough |
| 15:52 | 8 | to provide a reliable answer to the questions addressed"? |
| 15:53 | 9 |           Is that right? |
| 15:53 | 10 | **A.**   Correct. |
| 15:53 | 11 | **Q.**   Do you see the last sentence of that paragraph says:  "For |
| 15:53 | 12 | example, a trial sized on the basis of safety questions or |
| 15:53 | 13 | requirements or important secondary objectives may need larger |
| 15:53 | 14 | numbers of subjects than a trial sized on the basis of the |
| 15:53 | 15 | primary efficacy"? |
| 15:53 | 16 |           Is that right? |
| 15:53 | 17 | **A.**   Correct. |
| 15:53 | 18 | **Q.**   Now, this provision is not referenced in your report or |
| 15:53 | 19 | any of your prior testimony about Vioxx, is it? |
| 15:53 | 20 | **A.**   I don't think I have been asked about the E9 document in |
| 15:53 | 21 | prior work with Vioxx, no. |
| 15:54 | 22 |           **MR. ARBITBLIT:**  Your Honor, probably I should keep |
| 15:54 | 23 | trying to identify these rather than catch up later.  Is there |
| 15:54 | 24 | a number that we stopped at as far as -- these don't have |
| 15:54 | 25 | prespecified numbers. |

15:54   1            **THE DEPUTY CLERK:**  Yes.  Your next number would be

15:54   2   809.

15:54   3            **MR. ARBITBLIT:**  809.  Can we introduce the first one,

15:54   4   which was E1, ICH standards E1, as 809, Your Honor.

15:54   5            **THE COURT:**  Let it be admitted.

15:54   6            **MR. ARBITBLIT:**  The second one was E9 from the

15:54   7   Federal Register.  That would be 810.

15:54   8            **THE COURT:**  Admitted.

15:55   9            **MR. ARBITBLIT:**  If we could have this one marked for

15:55   10  identification as 811.

15:55   11  **BY MR. ARBITBLIT:**

15:55   12  **Q.**   It is guidance for industry premarketing risk assessment.

15:55   13  Is this a document you're familiar with, Doctor?

15:55   14  **A.**   Yes.  The date is not on this one, but the cover page

15:55   15  would have a date.  It's from 1995.

15:55   16           **THE COURT:**  Admitted.

15:55   17           **MR. ARBITBLIT:**  Thank you, Your Honor.

14:40   18  **BY MR. ARBITBLIT:**

15:55   19  **Q.**   Turning to page 6 of the document, there's some statements

15:55   20  about the size of the premarketing safety database.  Do you see

15:55   21  those?

15:55   22  **A.**   Yes.

15:56   23  **Q.**   Do you see that there are some factors listed about what's

15:56   24  the appropriate size of the safety database supporting a new

15:56   25  product?  Right?

| | | |
|---|---|---|
| 15:56 | 1 | **A.**   Correct. |
| 15:56 | 2 | **Q.**   One of them is its novelty; right? |
| 15:56 | 3 | **A.**   Correct. |
| 15:56 | 4 | **Q.**   One of the big deals about COX-2 inhibitors was their |
| 15:56 | 5 | novelty; right? |
| 15:56 | 6 | **A.**   Correct. |
| 15:56 | 7 | **Q.**   There were a lot of things that could happen with a novel |
| 15:56 | 8 | drug that are unpredictable; right? |
| 15:56 | 9 | **A.**   Correct. |
| 15:56 | 10 | **Q.**   The second bullet is the availability -- let's go back a |
| 15:56 | 11 | second. |
| 15:56 | 12 |          When they say the appropriate size of the database, |
| 15:56 | 13 | that one of the factors is its novelty, what they are saying is |
| 15:56 | 14 | that if you haven't looked at this kind of drug before, you |
| 15:56 | 15 | might need to look at what it does to more people; right? |
| 15:56 | 16 | **A.**   Yes. |
| 15:56 | 17 | **Q.**   Another factor is the availability of alternative |
| 15:56 | 18 | therapies; right? |
| 15:56 | 19 | **A.**   Yes. |
| 15:56 | 20 | **Q.**   At the time, there were other NSAIDs.  By the time Vioxx |
| 15:56 | 21 | came out, there was also Celebrex, a COX-2 inhibitor; right? |
| 15:56 | 22 | **A.**   Correct. |
| 15:56 | 23 | **Q.**   The intended population is another factor.  This was |
| 15:56 | 24 | intended for a population of elderly patients with arthritis |
| 15:57 | 25 | and lots of cardiovascular morbidities; right? |

DAILY COPY

| | | |
|---|---|---|
| 15:57 | 1 | **A.**   It's intended to be used as labeled, for osteoarthritis, |
| 15:57 | 2 | correct. |
| 15:57 | 3 | **Q.**   Its intended duration of use was chronic for those |
| 15:57 | 4 | patients who need it; right? |
| 15:57 | 5 | **A.**   Correct.  Well, for the osteoarthritis patients. |
| 15:57 | 6 | **Q.**   So in the middle of the next paragraph, there's a |
| 15:57 | 7 | statement:  "A larger safety database may be appropriate if a |
| 15:57 | 8 | product's preclinical assessment or human clinical pharmacology |
| 15:57 | 9 | studies identifies signals of risk that warrant additional |
| 15:57 | 10 | clinical data to properly define the risk." |
| 15:57 | 11 | Right? |
| 15:57 | 12 | **A.**   Correct. |
| 15:57 | 13 | **Q.**   If you go over to page 7, there's some reference to the E1 |
| 15:57 | 14 | document that we just talked about.  Going on at paragraph 3 at |
| 15:57 | 15 | the bottom of page 7, there's a statement:  "A larger database |
| 15:58 | 16 | would help make risk/benefit decisions in situations when the |
| 15:58 | 17 | benefit from the product" -- and then you go over to the next |
| 15:58 | 18 | page and it continues -- "is of uncertain magnitude; e.g., |
| 15:58 | 19 | efficacy determination on a surrogate endpoint." |
| 15:58 | 20 | Do you see that? |
| 15:58 | 21 | **A.**   Yes. |
| 15:58 | 22 | **Q.**   What is a surrogate endpoint? |
| 15:58 | 23 | **A.**   A surrogate endpoint is something less than the actual |
| 15:58 | 24 | clinical outcome; example, hypertension is a surrogate endpoint |
| 15:58 | 25 | for stroke. |

1296

| 15:59 | 1 | **Q.**   Exhibit LAAG-72 is the excerpt from primary review of NDA |
| 15:59 | 2 | 21042 concerning Vioxx, osteoarthritis.  You're familiar with |
| 15:59 | 3 | this document? |
| 15:59 | 4 | **A.**   Yes.  I believe this was prepared for the advisory |
| 15:59 | 5 | committee discussion prior to approval. |
| 15:59 | 6 | **Q.**   In the overall conclusions on the last page of the |
| 15:59 | 7 | document, do you see the statement, the overall conclusion: |
| 15:59 | 8 | "Although the large differences in endoscopically defined |
| 15:59 | 9 | gastroduodenal ulcer rates between rofecoxib at the doses of 25 |
| 15:59 | 10 | and 50 milligrams QD" -- that's once a day? |
| 16:00 | 11 | **A.**   Yes. |
| 16:00 | 12 | **Q.**   -- "and ibuprofen 800 milligrams TID" -- that's three |
| 16:00 | 13 | times a day? |
| 16:00 | 14 | **A.**   Yes. |
| 16:00 | 15 | **Q.**   -- "suggested a substantial difference in safety profile, |
| 16:00 | 16 | analyses of meaningful clinical GI endpoints were not |
| 16:00 | 17 | demonstrative of clinically significant differences between |
| 16:00 | 18 | rofecoxib, ibuprofen, and diclofenac." |
| 16:00 | 19 | Did I read that correctly? |
| 16:00 | 20 | **A.**   Yes. |
| 16:00 | 21 | **Q.**   That was the conclusion stated by the reviewer, |
| 16:00 | 22 | Dr. Villalba; right? |
| 16:00 | 23 | **A.**   Correct. |
| 16:00 | 24 | **Q.**   Did you say that you trained Dr. Villalba? |
| 16:00 | 25 | **A.**   I said that she took the training course. |

DAILY COPY

| | | |
|---|---|---|
| 16:00 | 1 | **Q.**   The training course that you designed? |
| 16:00 | 2 | **A.**   Yes.  It was a training course that was a weeklong course |
| 16:00 | 3 | initially offered about four times a year.  I was the chair of |
| 16:00 | 4 | that training course.  I wasn't always there for every single |
| 16:00 | 5 | lecture.  I gave quite a few of them.  I remember Dr. Villalba |
| 16:01 | 6 | participating in that course. |
| 16:01 | 7 | **MR. ARBITBLIT:**  May we have this marked as 812. |
| 23:59 | 8 | **BY MR. ARBITBLIT:** |
| 16:01 | 9 | **Q.**   Dr. Rarick, this is a transcript from February 8, 2001, |
| 16:01 | 10 | arthritis advisory committee meeting.  Have you seen this |
| 16:01 | 11 | before? |
| 16:01 | 12 | **A.**   Yes, I have. |
| 16:01 | 13 | **Q.**   Have you seen Dr. Villalba's comment on page 118, bottom |
| 16:01 | 14 | paragraph? |
| 16:02 | 15 | **A.**   Yes. |
| 16:02 | 16 | **Q.**   Dr. Villalba says in the middle of that paragraph: |
| 16:02 | 17 | "Actually, the p-values are kind of irrelevant in that when we |
| 16:02 | 18 | look at safety, we don't look for statistical significance |
| 16:02 | 19 | differences; we look for trends." |
| 16:02 | 20 | Did I read that correctly? |
| 16:02 | 21 | **A.**   Yes. |
| 16:02 | 22 | **Q.**   Is that consistent with the training that you provided to |
| 16:02 | 23 | Dr. Villalba? |
| 16:02 | 24 | **A.**   Yes. |
| 16:02 | 25 | **Q.**   If it's statistically significant, maybe it's even more |

16:02  1  meaningful; but if you see a trend when you're looking at

16:02  2  safety questions, that's something to pay attention to.  Right?

16:02  3  **A.**   I think all safety information is important to pay

16:02  4  attention to.

16:02  5  **Q.**   Dr. Villalba also said at page 117 at line 16:  "Overall

16:02  6  safety was in favor of naproxen."

16:02  7         Right?

16:02  8  **A.**   That's what it states.

16:03  9  **Q.**   At the bottom of the page, Dr. Villalba said:  "Here, we

16:03  10  have dropouts due to adverse events.  Again, the number is

16:03  11  similar, but if you go by category, the number of

16:03  12  cardiovascular events specifically is higher in rofecoxib than

16:03  13  in naproxen, and that makes the total number similar."

16:03  14         Right?

16:03  15  **A.**   Correct.

16:03  16  **Q.**   At page 124, Dr. Villalba referred to the Alzheimer's

16:03  17  studies.  What she said was:  "I did not include in the slide

16:03  18  the Alzheimer's studies, and I have not reviewed those studies,

16:03  19  but the number of patients included in those studies was less

16:03  20  than 1,000 patients per arm, the two of them together.

16:03  21  Therefore, these studies were not powered to show any

16:03  22  difference with placebo."

16:04  23         Did I read that correctly?

16:04  24  **A.**   You read that correctly.

16:04  25  **Q.**   And 1,000 patients per arm is actually about

16:04   1   two-and-a-half times larger than the placebo arm of the primary
16:04   2   safety analysis of the six-week studies that you looked at
16:04   3   earlier that had 412 patients; correct?
16:04   4   A.   You're asking if the Phase III Alzheimer's studies are as
16:04   5   large as the Phase I and II -- or as osteoarthritis?  Is that
16:04   6   what you're asking?
16:04   7   Q.   I'll try to be more clear.  I'll withdraw that question.
16:04   8        Dr. Villalba is saying here that 1,000 patients per
16:04   9   arm was not powered to show a difference with placebo; correct?
16:04   10  A.   I would have to see her slide and look at the context, but
16:04   11  that is what she states, yes.
16:04   12  Q.   In the primary safety analysis that was Merck's integrated
16:04   13  safety summary in November 1998, those six-week studies had 412
16:04   14  placebo patients; correct?
16:05   15  A.   I think that's the number we looked at, yes.
16:05   16  Q.   What is MedDRA?
16:05   17  A.   MedDRA is a medical dictionary of adverse event terms.  It
16:05   18  describes sort of top-line terms and then subheadings of terms
16:05   19  that are used for adverse event reporting.
16:05   20  Q.   Is it a standard in the pharmaceutical industry to report
16:05   21  adverse events according to the body systems set forth in
16:05   22  MedDRA?
16:05   23  A.   I don't know if there's any -- I don't know if the ICH
16:05   24  describes it as a standard, but I know it is one of the
16:05   25  dictionaries that is accepted by many regulatory bodies as the

| | | |
|---|---|---|
| 16:05 | 1 | standard. |
| 16:05 | 2 | **Q.**   Do you know if Merck used that? |
| 16:05 | 3 | **A.**   I believe they did. |
| 16:05 | 4 | **Q.**   Have you looked at the cardiovascular system results in |
| 16:05 | 5 | the integrated safety summary for Vioxx during your work on |
| 16:05 | 6 | this case? |
| 16:05 | 7 | **A.**   Yes. |
| 16:05 | 8 | **Q.**   The cardiovascular system under MedDRA would include |
| 16:06 | 9 | hypertension; correct? |
| 16:06 | 10 | **A.**   Yes, it does. |
| 16:06 | 11 | **Q.**   Because hypertension has cardiovascular effects? |
| 16:06 | 12 | **A.**   Correct. |
| 16:06 | 13 | **Q.**   It would include edema, which is swelling or water |
| 16:06 | 14 | retention, that can result in the heart having to work harder; |
| 16:06 | 15 | right? |
| 16:06 | 16 | **A.**   It does have that element, yes. |
| 16:06 | 17 | **Q.**   It would also include heart attack, which is obviously a |
| 16:06 | 18 | cardiovascular term? |
| 16:06 | 19 | **A.**   Yes. |
| 16:06 | 20 | **Q.**   And it would include cerebrovascular accident, which is a |
| 16:06 | 21 | stroke or problem with a thrombosis in the brain? |
| 16:06 | 22 | **A.**   Yes. |
| 16:06 | 23 | **Q.**   It would include TIA, which a transient ischemic attack, |
| 16:06 | 24 | or a shorter version of a stroke? |
| 16:06 | 25 | **A.**   Yes.  I don't know if there's a distinction between |

| | | |
|---|---|---|
| 16:06 | 1 | cerebrovascular and cardiovascular, but those are terms that |
| 16:06 | 2 | are considered cardiovascular events. |
| 16:06 | 3 | **Q.** It would include unstable angina? |
| 16:06 | 4 | **A.** Yes. |
| 16:06 | 5 | **Q.** The integrated safety summary that you have in your binder |
| 16:06 | 6 | has a report of the number of patients with clinical adverse |
| 16:07 | 7 | experiences by body system at page 4178. If you could turn to |
| 16:07 | 8 | that page, please. |
| 16:07 | 9 | **A.** Okay. |
| 16:07 | 10 | **Q.** Do you see that for Vioxx both 12.5 milligrams and |
| 16:07 | 11 | 25 milligrams had statistically significant increased risk of |
| 16:07 | 12 | cardiovascular system adverse experiences compared to placebo? |
| 16:07 | 13 | **A.** Yes. |
| 16:07 | 14 | **Q.** That rate is 7.6 percent in both arms compared to |
| 16:07 | 15 | 3.4 percent in placebo; correct? |
| 16:07 | 16 | **A.** Correct. |
| 16:07 | 17 | **Q.** Those double asterisks next to the 7.6 are what indicates |
| 16:08 | 18 | statistical significance; right? |
| 16:08 | 19 | **A.** At a "p" less than .01 level, yes, versus placebo. |
| 16:08 | 20 | **Q.** So one star would be "p" less than .05, and two stars |
| 16:08 | 21 | would be "p" less than .01? |
| 16:08 | 22 | **A.** Correct. |
| 16:08 | 23 | **Q.** The lower the p-value, the more reliable the result; |
| 16:08 | 24 | correct? |
| 16:08 | 25 | **A.** Correct. |

| | | |
|---|---|---|
| 16:08 | 1 | **Q.**   Because it's more highly significant? |
| 16:08 | 2 | **A.**   Correct. |
| 16:08 | 3 | **Q.**   If you repeated it a bunch more times, you would be more |
| 16:08 | 4 | likely to get the same results? |
| 16:08 | 5 | **A.**   Correct. |
| 16:08 | 6 | **Q.**   If you look at the two comparators that are in the |
| 16:08 | 7 | six-week study, neither ibuprofen nor nabumetone had a |
| 16:08 | 8 | statistically significant increased risk of cardiovascular |
| 16:08 | 9 | system endpoints compared to placebo; is that right? |
| 16:08 | 10 | **A.**   No.  If you look at the top of that column, the little |
| 16:08 | 11 | cross indicates that those comparisons were only performed for |
| 16:08 | 12 | the placebo versus Vioxx.  A statistical comparison was not |
| 16:08 | 13 | made for either ibuprofen or nabumetone. |
| 16:08 | 14 | **Q.**   Thank you for explaining that.  I see that you are |
| 16:09 | 15 | correct. |
| 16:09 | 16 | **MR. ARBITBLIT:**  That's at the bottom of the table on |
| 16:09 | 17 | the next page, Your Honor. |
| 16:09 | 18 | **BY MR. ARBITBLIT:** |
| 16:09 | 19 | **Q.**   So the statistical comparisons were not performed for the |
| 16:09 | 20 | comparators, but you do see that numerically Vioxx, in both |
| 16:09 | 21 | arms, has a higher percentage than either ibuprofen or |
| 16:09 | 22 | nabumetone:  6 percent for ibuprofen; 7 percent for nabumetone; |
| 16:09 | 23 | 7.6 for each of the Vioxx arms.  Correct? |
| 16:09 | 24 | **A.**   Yes, those are numerical differences. |
| 16:09 | 25 | **Q.**   But as to placebo, it's statistically significantly |

| | | |
|---|---|---|
| 16:09 | 1 | different? |
| 16:09 | 2 | A.   Correct. |
| 16:09 | 3 | Q.   That's an endpoint that includes hypertension, edema, and |
| 16:09 | 4 | thrombotic events; right? |
| 16:09 | 5 | A.   Yes, amongst others, likely. |
| 16:09 | 6 | Q.   Have you ever seen this information published by Merck in |
| 16:09 | 7 | any form; that there was a statistically significant increased |
| 16:09 | 8 | risk of cardiovascular system adverse events, including |
| 16:09 | 9 | hypertension, edema, and thrombotic events, compared to placebo |
| 16:09 | 10 | that was known before it was marketed? |
| 16:10 | 11 | A.   The label certainly reflects that information.  I don't |
| 16:10 | 12 | know if it has the asterisk about statistical significance, but |
| 16:10 | 13 | it's in the label. |
| 16:10 | 14 | Q.   Do you have the label?  I would like you to show me where |
| 16:10 | 15 | that is.  I would like you to show me where you see in the |
| 16:10 | 16 | label that there was a 7.6 percent statistically significant |
| 16:10 | 17 | increased risk of the MedDRA definition of cardiovascular |
| 16:10 | 18 | system adverse events compared to placebo. |
| 16:10 | 19 | A.   I think I said I don't know if the statistical |
| 16:10 | 20 | significance was described in the label, but that the results |
| 16:10 | 21 | showing the hypertension and other cardiovascular events that |
| 16:10 | 22 | you're talking about are described in the label. |
| 16:10 | 23 | Q.   They're split up into different categories, aren't they? |
| 16:10 | 24 | A.   Correct. |
| 16:10 | 25 | Q.   Hypertension is reported at 3.5 percent versus 3.0 percent |

| | | |
|---|---|---|
| 16:10 | 1 | for ibuprofen; right? |
| 16:10 | 2 | A.   Well, yes, but it's not only in the table.  There's a |
| 16:10 | 3 | discussion, I believe, of renal effects, which goes through |
| 16:10 | 4 | discussion of hypertension and things like that.  If you would |
| 16:11 | 5 | like to go to the label, let me find that for you. |
| 16:11 | 6 | Q.   There is no place in the label where all of the events are |
| 16:11 | 7 | recorded together as a statistically significant difference |
| 16:11 | 8 | with placebo; correct? |
| 16:11 | 9 | A.   No.  They just describe the clinical trials at doses of |
| 16:11 | 10 | 12.5 and 25.  They show renal effects, for example, |
| 16:11 | 11 | hypertension and edema, similar to those observed with |
| 16:11 | 12 | comparator NSAIDs.  And then it goes on:  "These occur with |
| 16:11 | 13 | increased frequency with chronic use of Vioxx at doses above |
| 16:11 | 14 | the 12.5-to-25-milligram range." |
| 16:11 | 15 |         As you described in the table of adverse events, |
| 16:11 | 16 | hypertension is provided at Vioxx at 3.5 and placebo at 1.3, |
| 16:11 | 17 | and then it goes on.  There's other sections that describe the |
| 16:11 | 18 | CV events. |
| 16:11 | 19 | Q.   The CV events are described under an adverse events |
| 16:11 | 20 | section, regardless of causality, with incidence rates of less |
| 16:12 | 21 | than .1 percent; right? |
| 16:12 | 22 | A.   Well, there's also a section of .1 to 1.9 percent that |
| 16:12 | 23 | includes CV events. |
| 16:12 | 24 | Q.   It does not include heart attack or stroke above 0.1? |
| 16:12 | 25 | A.   No.  I'm sorry.  I thought you said CV events. |

| | | |
|---|---|---|
| 16:12 | 1 | **Q.**   So the FDA recommends that the issue of whether a larger |
| 16:12 | 2 | study is needed to address a safety concern be addressed at the |
| 16:12 | 3 | end of Phase II meeting, according to the guidance for industry |
| 16:12 | 4 | at page 8; correct? |
| 16:12 | 5 | **A.**   Which guidance are you speaking to? |
| 16:12 | 6 | **Q.**   The guidance for industry premarketing risk assessment, |
| 16:12 | 7 | page 8. |
| 16:13 | 8 | **A.**   Yes. |
| 16:13 | 9 | **Q.**   That end of Phase II meeting had already happened in 1996 |
| 16:13 | 10 | for Vioxx, a year before Protocol 023 revealed the concerns |
| 16:13 | 11 | over imbalance of thromboxane and prostacyclin; right? |
| 16:13 | 12 | **A.**   Yes.  The end of Phase II meeting occurred prior to that |
| 16:13 | 13 | date. |
| 16:13 | 14 | **Q.**   Going to the ISS, the integrated safety summary, you |
| 16:13 | 15 | testified earlier about the discussion of Protocol 023. |
| 16:14 | 16 | **MR. ARBITBLIT:**  Which was the document that had |
| 16:14 | 17 | Dr. Villalba's discussion?  Do you recall which one?  I can |
| 16:14 | 18 | find it while we are going -- okay.  There it is.  It's at |
| 16:14 | 19 | DX-993. |
| 16:14 | 20 | **THE WITNESS:**  Okay. |
| 16:14 | 21 | BY MR. ARBITBLIT: |
| 16:14 | 22 | **Q.**   You read the first paragraph under thromboembolic and |
| 16:14 | 23 | vascular safety; right? |
| 16:14 | 24 | **A.**   Yes.  I think we read the first, and then at the end we |
| 16:14 | 25 | read the final two, I believe. |

| | | |
|---|---|---|
| 16:14 | 1 | **Q.**   Now, what Villalba is saying in that first paragraph is |
| 16:14 | 2 | that Vioxx does not act like aspirin; right?  It does not |
| 16:14 | 3 | inhibit platelet function? |
| 16:14 | 4 | **A.**   Right.  It's says it's selected to COX-2.  It doesn't do |
| 16:14 | 5 | the COX-1, so it doesn't act as a COX-1/COX-2. |
| 16:14 | 6 | **Q.**   Now, do you understand that there's a difference between |
| 16:15 | 7 | something that acts like aspirin to prevent heart attacks and |
| 16:15 | 8 | something that acts like a platelet aggregator to cause heart |
| 16:15 | 9 | attacks? |
| 16:15 | 10 | **A.**   Yes. |
| 16:15 | 11 | **Q.**   Do you see any reference in Dr. Villalba's summary that |
| 16:15 | 12 | would lead you to believe that she -- I'll withdraw that.  That |
| 16:15 | 13 | wasn't clear. |
| 16:15 | 14 |         Does Dr. Villalba's summary refer to the risk that |
| 16:15 | 15 | Vioxx could cause heart attacks as opposed to Vioxx not acting |
| 16:15 | 16 | like aspirin to prevent them?  Do you see it in the document? |
| 16:15 | 17 | That's my only question. |
| 16:15 | 18 | **A.**   In Dr. Villalba's document? |
| 16:15 | 19 | **Q.**   Yes. |
| 16:15 | 20 | **A.**   Specifically talking about that mechanism, no. |
| 16:15 | 21 | **Q.**   In the integrated safety summary, where Merck talks about |
| 16:15 | 22 | the effects of COX-2 inhibition, do you see any statement by |
| 16:15 | 23 | Merck that an imbalance between thromboxane and prostacyclin |
| 16:15 | 24 | could cause heart attacks as opposed to not preventing them as |
| 16:15 | 25 | an aspirin substitute? |

16:16  1  **A.**   Well, let me correct my previous statement.

16:16  2  Dr. Villalba's comment here, as well as the ISS, talks about

16:16  3  the theoretical concern of increased thromboembolic events.

16:16  4  You're right.  I don't see that she says specifically because

16:16  5  of prostacyclin thromboxane.  She talks about platelet

16:16  6  aggregation, but that's what prostacyclin and thromboxane are

16:16  7  about.

16:16  8          And you will also recall that we used this document,

16:16  9  but we could have also pulled up Dr. Farrell's document, who

16:16  10 specifically discusses platelet aggregation issues in the

16:16  11 original NDA submission, to go further into the theories of

16:16  12 prostacyclin and thromboxane.  This was to show that there was

16:16  13 disclosure of the possibility of increased thrombotic risk with

16:16  14 Vioxx and that the FDA was aware of it.

16:16  15 **Q.**   What Dr. Villalba is saying is that there was a lack of

16:16  16 effect of COX-1 inhibition on platelet function, which would

16:16  17 mean that she is saying it does not act like aspirin to prevent

16:17  18 heart attacks; right?

16:17  19 **A.**   That's what that line is saying, yes.

16:17  20 **Q.**   In the integrated safety summary itself, where Merck

16:17  21 discusses the risks of COX-2 inhibition, beginning at the page

16:17  22 ending 4104, "potential risks based upon specific

16:17  23 cyclooxygenese-2 inhibition," is there any reference to the

16:17  24 statements that we saw in the internal documents that there was

16:17  25 a concern that Vioxx could cause heart attacks?

DAILY COPY

16:17    1    **A.**   Tell me exactly where -- you are reading at 105, I take

16:17    2    it?

16:17    3    **Q.**   I'm reading the section on pages 4104 and going on to the

16:18    4    end of that section on 4110.  There's a lot of discussion about

16:18    5    what COX-2 can and can't do.  My question is very simple:  Is

16:18    6    there a statement that COX-2 inhibition can cause heart attacks

16:18    7    in those six pages?

16:18    8    **A.**   I don't know about in these six pages, but in --

16:18    9    **Q.**   That's my question, ma'am.

16:18   10    **A.**   In the ISS, there's quite a bit of discussion about the

16:18   11    theoretical concern of increased thrombotic events, which

16:18   12    includes heart attack.

16:18   13    **Q.**   Show me the ISS that you're referring to.  Show me the

16:18   14    page.

16:18   15    **A.**   Just a moment.  You have to give me a minute.  I think we

16:19   16    just talked about it.  I think it was 2.3.3 something.  Just a

16:19   17    moment.

16:19   18    **Q.**   If you're thinking of around the end of the document --

16:19   19    **A.**   Yes.  Here we are.  2.3.3.4:  "Theoretically, there may be

16:19   20    a risk for thromboembolic cardiovascular adverse experiences

16:19   21    with long-term treatment with COX-2 specific inhibitor compared

16:19   22    to long-term NSAID therapy."

16:19   23    **Q.**   Where are you reading from?

16:19   24    **A.**   Bates number ends at 4400.

16:19   25    **Q.**   Reading the rest of that statement where COX-1 inhibition

DAILY COPY

| | | |
|---|---|---|
| 16:19 | 1 | inhibits platelet aggregation; right? |
| 16:19 | 2 | A.   Right.  So Merck is specifically describing that there |
| 16:20 | 3 | could be an increased risk of thrombotic events. |
| 16:20 | 4 | Q.   Compared to having something that inhibits platelet |
| 16:20 | 5 | aggregation; right? |
| 16:20 | 6 | A.   Yes.  That's what that states. |
| 16:20 | 7 | Q.   Right.  But it does not state that Vioxx could cause |
| 16:20 | 8 | platelet aggregation resulting in a heart attack, does it? |
| 16:20 | 9 | A.   Well, it provided that information, if that's how you |
| 16:20 | 10 | interpret FitzGerald, as the study report, as well as an |
| 16:20 | 11 | abstract prior to approval, but it doesn't say in the ISS in |
| 16:20 | 12 | the way that you're stating. |
| 16:20 | 13 | Q.   Where does Protocol 023 say that thromboxane staying the |
| 16:20 | 14 | same while prostacyclin goes down could cause a heart attack? |
| 16:20 | 15 | A.   I think the published article was provided to the FDA |
| 16:20 | 16 | where, I believe, in the conclusion paragraph, it says: |
| 16:20 | 17 | "Therefore, there is a concern."  I can't quote it off the top |
| 16:20 | 18 | of my head, but it's submitted. |
| 16:20 | 19 | Q.   That was published contemporaneous with the drug coming on |
| 16:20 | 20 | the market, right, May 1999? |
| 16:20 | 21 | A.   I don't remember when the abstract was submitted to the |
| 16:20 | 22 | FDA or the publication specifically, but I remember that the |
| 16:21 | 23 | date was prior to approval.  I believe the study was submitted |
| 16:21 | 24 | along with the VIGOR study protocol in 1999. |
| 16:21 | 25 | Q.   Doctor, you testified about some excerpts from the senate |

| | | |
|---|---|---|
| 16:21 | 1 | finance committee, Defense Exhibit 442; right? |
| 16:21 | 2 | **A.**   Yes. |
| 16:21 | 3 | **Q.**   Did you happen to read the testimony of Dr. Psaty |
| 16:21 | 4 | beginning at the page ending 0063? |
| 16:21 | 5 | **A.**   I have read that, yes. |
| 16:21 | 6 | **Q.**   Dr. Psaty identifies himself as a practicing general |
| 16:21 | 7 | internist and cardiovascular disease epidemiologist with |
| 16:21 | 8 | expertise in pharmacoepidemiology and drug safety, who has no |
| 16:21 | 9 | financial interest in this matter; correct? |
| 16:21 | 10 | **A.**   That's what it states. |
| 16:22 | 11 | **Q.**   Dr. Psaty's comments are interspersed with those of other |
| 16:22 | 12 | people at the hearing; right? |
| 16:22 | 13 | **A.**   Yes. |
| 16:22 | 14 | **Q.**   Dr. Psaty's view of the premarket activity concerning |
| 16:22 | 15 | Vioxx is stated at page 0092.  Please turn to that page. |
| 16:22 | 16 | Dr. Psaty says:  "Well, the biological mechanisms |
| 16:22 | 17 | that were known in 1998 suggested two things:  One, the |
| 16:22 | 18 | possibility of a GI benefit; and, two, the possibility of |
| 16:22 | 19 | cardiovascular harm.  In order to understand the public health |
| 16:22 | 20 | consequences of widespread use of Vioxx, I would have |
| 16:22 | 21 | recommended a complete, symmetrical, and fair evaluation of the |
| 16:22 | 22 | hypothesized GI benefits and risks." |
| 16:23 | 23 | Did I read that correctly? |
| 16:23 | 24 | **A.**   Yes, you did. |
| 16:23 | 25 | **Q.**   The FDA never told Merck not to do such a study, did it? |

16:23    1    **A.**    I'm sorry.  What was such a study?

16:23    2    **Q.**    Did the FDA ever tell Merck:  "Don't do a complete,

16:23    3    symmetrical, and fair evaluation of the hypothesized GI

16:23    4    benefits and risks or cardiovascular risks" before Vioxx was on

16:23    5    the market?

16:23    6    **A.**    Your question is:  Did they ever tell them not to do a

16:23    7    study?

16:23    8    **Q.**    Yes.  Did FDA ever tell Merck not to do the study?

16:23    9    **A.**    Correct.

16:23    10   **Q.**    They didn't tell them that, did they?

16:23    11   **A.**    I don't even know how to answer that negative question.

16:23    12   Did they tell them not to do a study?  Like, did they propose a

16:23    13   study and they told them not to do it?  I don't know how to

16:23    14   answer a negative.

16:23    15   **Q.**    Merck didn't propose doing a cardiovascular endpoint study

16:23    16   before Vioxx was on the market; correct?

16:23    17   **A.**    I think this was an evaluation of the GI benefits and

16:24    18   risks that Dr. Psaty is describing here.

16:24    19   **Q.**    Well, he is also talking about cardiovascular harm; right?

16:24    20   The possibility of cardiovascular harm is referenced there and

16:24    21   in his next comment.  I'll withdraw the question and read you

16:24    22   the next comment.

16:24    23           "Well, there were a number of Vioxx studies, and

16:24    24   consistently the early Vioxx studies, right through the VIGOR

16:24    25   trial, were designed to maximize the ability or the chance of

16:24   1   finding a GI benefit and minimize the chance of finding
16:24   2   cardiovascular harm.  The attentions to risks and benefits were
16:24   3   not symmetrical.  These features include short studies, small
16:24   4   studies, the exclusion of patients of high risk, the inclusion
16:24   5   of venous thromboembolism as a thromboembolic event.  This does
16:24   6   not make good medical, scientific sense.  Fundamentally, they
16:24   7   chose not to ask the question about cardiovascular answers, but
16:24   8   the lack of evidence about a drug is not evidence that the drug
16:24   9   is safe."
16:24   10          Did I read that correctly?
16:24   11   **A.**   Yes.
16:25   12   **Q.**   Now, Dr. Villalba said:  "It's impossible to answer with
16:25   13   complete certainty whether the risk of cardiovascular and
16:25   14   thromboembolic events is increased in patients on rofecoxib.  A
16:25   15   larger database will be needed to answer this and other safety
16:25   16   comparison questions."
16:25   17          Right?
16:25   18   **A.**   Yes.
16:25   19   **Q.**   There was nothing that FDA ever did that stopped Merck
16:25   20   from conducting a clinical trial to develop a larger database
16:25   21   to answer that and other safety comparison questions before
16:25   22   selling Vioxx to the public; correct?
16:25   23   **A.**   Correct.  Correct.
16:25   24   **Q.**   Now, when you looked through the documents about the
16:25   25   Watson study, did you notice how hurried it was?

| | | |
|---|---|---|
| 16:25 | 1 | **A.**   I don't know what you mean by *hurried*.  It was a quick |
| 16:26 | 2 | look at a question to get a quick answer. |
| 16:26 | 3 | **Q.**   Well, it was a study that was -- apparently, a task force |
| 16:26 | 4 | met on December 3, 1997, and directed Dr. Watson to come up |
| 16:26 | 5 | with an answer by the January 7 meeting of the clinical |
| 16:26 | 6 | development oversight committee; right? |
| 16:26 | 7 | **A.**   Correct.  It was a quick and crude look. |
| 16:26 | 8 | **Q.**   It wasn't very expensive either? |
| 16:26 | 9 | **A.**   And I would quibble with your concept that it was a study |
| 16:26 | 10 | that he had to do, but he did do a comparison in that time |
| 16:26 | 11 | frame, yes. |
| 16:27 | 12 | **THE COURT:**  Do you want the computer on? |
| 16:27 | 13 | **MR. ARBITBLIT:**  Yes.  Thank you. |
| 16:27 | 14 | BY MR. ARBITBLIT: |
| 16:27 | 15 | **Q.**   The document you have been handed -- |
| 16:27 | 16 | **MR. ARBITBLIT:**  -- which I would like to have marked |
| 16:27 | 17 | as 813, I believe. |
| 16:27 | 18 | **THE DEPUTY CLERK:**  Did you mean to offer 812? |
| 16:27 | 19 | **MR. ARBITBLIT:**  Yes.  812 would be offered, |
| 16:27 | 20 | Your Honor. |
| 16:27 | 21 | **THE COURT:**  Admitted. |
| 16:27 | 22 | BY MR. ARBITBLIT: |
| 16:27 | 23 | **Q.**   Now, 813 is an agenda from December 3, 1997, concerning |
| 16:27 | 24 | the CVD task force, the meeting to discuss thrombotic CVD |
| 16:28 | 25 | events; right? |

DAILY COPY

| | | |
|---|---|---|
| 16:28 | 1 | **A.**   This is a COX-2 cardiovascular AE task force |
| 16:28 | 2 | teleconference agenda.  Is that what you're asking? |
| 16:28 | 3 | **Q.**   Yes. |
| 16:28 | 4 | **A.**   Yes, that's what this is. |
| 16:28 | 5 | **Q.**   Next to the meeting objectives, it says:  "January 7, 1998 |
| 16:28 | 6 | CDOC report." |
| 16:28 | 7 | Right? |
| 16:28 | 8 | **A.**   I can't make out the language of that CDOC.  But if that's |
| 16:28 | 9 | what you say that says, yes. |
| 16:28 | 10 | **Q.**   Down below, the discussion of the plan methods and issues |
| 16:28 | 11 | includes a statement:  "Are Fosamax and Proscar placebo |
| 16:28 | 12 | patients appropriate as controls?" |
| 16:28 | 13 | Right? |
| 16:28 | 14 | **A.**   That's what it states. |
| 16:28 | 15 | **Q.**   That's checked off, which would mean they talked about it; |
| 16:28 | 16 | right? |
| 16:28 | 17 | **A.**   I have no idea what that checkmark means here. |
| 16:28 | 18 | **Q.**   Do you see any statement on here that somebody thought |
| 16:28 | 19 | Fosamax and Proscar were not appropriate? |
| 16:28 | 20 | **A.**   It's just the question.  I don't see the answer. |
| 16:29 | 21 | **Q.**   The next document is the minutes for the December 1998 -- |
| 16:29 | 22 | actually, it's 1997.  The document says "January 9, 1998," so |
| 16:29 | 23 | it's the minutes for the December 1997 project team meeting; |
| 16:30 | 24 | right? |
| 16:30 | 25 | **A.**   Yes, it appears to be minutes from a December 9, 1997 |

DAILY COPY

| | | |
|---|---|---|
| 16:30 | 1 | Vioxx project team meeting. |
| 16:30 | 2 | **Q.**   That Vioxx project team appears to have a couple hundred |
| 16:30 | 3 | people on it, right, with all those names in small print? |
| 16:30 | 4 | **A.**   I don't know if those were the team or just the people |
| 16:30 | 5 | that are on the distribution list. |
| 16:30 | 6 | **Q.**   They're all copied on this? |
| 16:30 | 7 | **A.**   Yes. |
| 16:30 | 8 | **Q.**   So if you turn to the page ending 1405 -- |
| 16:30 | 9 | **A.**   Yes . |
| 16:30 | 10 | **Q.**   -- you see a reference to time pressures with the Searle |
| 16:30 | 11 | shenanigans; right? |
| 16:30 | 12 | **A.**   What page are you on? |
| 16:30 | 13 | **Q.**   1405.  Ed Scolnick's year-end message to the project team. |
| 16:30 | 14 | The second sentence includes "time pressures" and "Searle |
| 16:30 | 15 | shenanigans"; right? |
| 16:30 | 16 | **A.**   I'm sorry.  I still don't know where you are. |
| 16:30 | 17 | **Q.**   Critical issues -- |
| 16:30 | 18 | **A.**   Critical issues. |
| 16:30 | 19 | **Q.**   Roman numeral II(a), second sentence, reference to "time |
| 16:31 | 20 | pressures" and "Searle."  Right? |
| 16:31 | 21 | **A.**   Yes.  "With the time pressures with the Searle shenanigans |
| 16:31 | 22 | in France and the national meeting" -- that's what it states. |
| 16:31 | 23 | **Q.**   You know that Merck was in a race with Searle to get to |
| 16:31 | 24 | the market first with their COX-2 inhibitor; right? |
| 16:31 | 25 | **A.**   I know the development programs were ongoing at the same |

DAILY COPY

16:31  1   time.

16:31  2   Q.   You know that Merck cared a lot about getting there first;

16:31  3   right?

16:31  4   A.   I looked at the regulatory history.  I know when it was

16:31  5   submitted and approved.  I recall that Searle was also

16:31  6   submitted around the same time and approved a little bit

16:31  7   before, but I don't have any reason to talk about the race

16:31  8   itself.

16:31  9   Q.   You know they asked for expedited review, don't you?

16:31  10  A.   I believe that the FDA determined both the Searle product

16:31  11  and the Merck product fit the category for a priority review

16:32  12  designation.

16:32  13  Q.   So Merck asked to get the product reviewed and approved as

16:32  14  quickly as possible?

16:32  15  A.   No.  They asked if they were an appropriate priority

16:32  16  review designation, and the FDA determined that they were.

16:32  17  Q.   Which would mean that they would get approved sooner than

16:32  18  otherwise?

16:32  19  A.   No.  It means that the review clock is six months, and

16:32  20  could lead to approval, approvable, or nonapproval, but that

16:32  21  the review clock itself would be a six-month review for an

16:32  22  action to be taken.

16:32  23  Q.   Now, have you seen any documents that talk about the

16:32  24  urgency of getting the Watson analysis done?

16:33  25  A.   You'll have to show me what you're speaking to.  I have

| | | |
|---|---|---|
| 16:33 | 1 | seen documents about the Watson analysis. |
| 16:34 | 2 | **MR. ARBITBLIT:**  This next document, could we have it |
| 16:34 | 3 | marked as 814.  Can we offer 813, Your Honor. |
| 16:34 | 4 | **THE COURT:**  Admitted. |
| 16:34 | 5 | **BY MR. ARBITBLIT:** |
| 16:34 | 6 | **Q.**   This is an e-mail from James Bolognese.  It refers to |
| 16:34 | 7 | "helping Doug complete his CDOC assignment comparing serious CV |
| 16:34 | 8 | adverse event incidents on Vioxx versus Proscar and Fosamax." |
| 16:34 | 9 | Do you see that? |
| 16:34 | 10 | **A.**   Is it on the screen? |
| 16:34 | 11 | **Q.**   It's in the first paragraph under Elliott, Bryan, Shawn, |
| 16:34 | 12 | Eric. |
| 16:34 | 13 | **A.**   Yes.  "The attachment was created by me to help Doug |
| 16:34 | 14 | complete his CDOC assignment comparing serious CV AE incidents |
| 16:35 | 15 | on MK-0966 versus that on Proscar and Fosamax." |
| 16:35 | 16 | That's what it says. |
| 16:35 | 17 | **Q.**   Now, in the second paragraph, where it's starting with |
| 16:35 | 18 | the -- actually, it starts with:  "Judy, please put the |
| 16:35 | 19 | following agenda item on the CCB meeting." |
| 16:35 | 20 | Do you see where Mr. Bolognese was doing this and |
| 16:35 | 21 | saying:  "It's certainly not the job of the statistics group, |
| 16:35 | 22 | although I did it this time because of the urgency"? |
| 16:35 | 23 | Do you see that? |
| 16:35 | 24 | **A.**   I don't know what he is speaking to.  He is also talking |
| 16:35 | 25 | about data in CWP3.  But, yes, I see that he wrote that, yes. |

| | | |
|---|---|---|
| 16:35 | 1 | **Q.**   Nothing the FDA said or did gave rise to the urgency that |
| 16:35 | | Merck felt to conduct the Watson analysis; right? |
| 16:35 | 3 | **A.**   I don't know what your question is.  The FDA did not ask |
| 16:35 | 4 | for the Watson analysis. |
| 16:35 | 5 | **Q.**   In fact, the FDA had a meeting -- |
| 16:36 | 6 | **MR. ARBITBLIT:**  Do you have the February 9, '98 -- |
| 16:36 | 7 | probably not yet.  The February 9, '98 memo, is that marked |
| 16:36 | 8 | as -- |
| 16:36 | 9 | **THE DEPUTY CLERK:**  February 9, '98 is marked as one |
| 16:36 | 10 | of the 800s. |
| 16:37 | 11 | **MR. ARBITBLIT:**  I've got it. |
| 16:37 | 12 | **BY MR. ARBITBLIT:** |
| 16:37 | 13 | **Q.**   So this is a February 9, 1998 project team minutes |
| 16:37 | 14 | executive summary memo.  Have you seen this before? |
| 16:37 | 15 | **A.**   Yes, but the minutes are for a January 12, 1998 meeting. |
| 16:37 | 16 | **Q.**   It refers to an outcome of a pre-NDA meeting with the FDA, |
| 16:37 | 17 | right, under the first critical issues? |
| 16:37 | 18 | **A.**   Yes. |
| 16:37 | 19 | **Q.**   It says:  "FDA provided the generic advice that not being |
| 16:37 | 20 | first to file does not automatically preclude an expedited P1 |
| 16:38 | 21 | review." |
| 16:38 | 22 | Right? |
| 16:38 | 23 | **A.**   Correct. |
| 16:38 | 24 | **Q.**   Now, at this meeting, do you see any evidence that Merck |
| 16:38 | 25 | told the FDA:  "We are in the process of investigating whether |

16:38  1   we have a cardiovascular thrombotic risk of our new COX-2

16:38  2   inhibitor?"

16:38  3   A.   This is not meeting minutes from the FDA meeting.

16:38  4   Q.   Do you see any evidence anywhere in all the 100,000 pages,

16:38  5   or however many you have reviewed, that Merck told the FDA:

16:38  6   "We are looking into an analysis by Doug Watson of whether we

16:38  7   have a cardiovascular risk with Vioxx?"

16:38  8   A.   No.  They never described the Watson comparison.

16:38  9   Q.   Now, if you look further, it says that, in this January 12

16:38  10  meeting, the results of the analysis have already been --

16:39  11  A.   Can you tell me where you are reading from.

16:39  12  Q.   Yes, ma'am.  Sorry.  9949.

16:39  13  A.   Okay.

16:39  14  Q.   Now they have already got the results; right?

16:39  15  A.   Tell me where you are reading.

16:39  16  Q.   9949:  Results of the analysis of the incidence of

16:39  17  cardiovascular disease, they already have those now on

16:39  18  January 12?

16:39  19  A.   I apologize.  I still don't know where you are.

16:39  20  Q.   Do you see page 9949?

16:39  21  A.   Yes.

16:39  22  Q.   Paragraph D at the top.

16:39  23  A.   Oh, I'm sorry.  I was reading the text.  "The result of

16:39  24  the analysis of the incidence of cardiovascular disease SAEs in

16:39  25  the Vioxx clinical trials, see attachment 1," yes.

| | | |
|---|---|---|
| 16:39 | 1 | **Q.**   So what Merck did was started the Watson analysis on |
| 16:39 | 2 | December 3 and finished it before January 12 but did not design |
| 16:39 | 3 | a cardiovascular endpoint study to evaluate the risk of Vioxx; |
| 16:40 | 4 | is that right? |
| 16:40 | 5 | **A.**   That wasn't the conclusion of the memo. |
| 16:40 | 6 | **Q.**   My question may not have been clear.  The Watson analysis |
| 16:40 | 7 | was done in about a month; right? |
| 16:40 | 8 | **A.**   I don't remember when it was finalized, but clearly they |
| 16:40 | 9 | are discussing it here. |
| 16:40 | 10 | **Q.**   You do understand that if Merck designed a cardiovascular |
| 16:40 | 11 | endpoint study instead of doing the Watson analysis, it would |
| 16:40 | 12 | have slowed down the Vioxx train? |
| 16:40 | 13 | **A.**   I'm sorry.  That's not the Watson analysis.  The Watson |
| 16:40 | 14 | analysis is to look at the current state of the clinical trials |
| 16:40 | 15 | for Vioxx and ascertain whether there was a cardiovascular risk |
| 16:40 | 16 | signal or issue that needed to be explored by potentially |
| 16:40 | 17 | stopping the development program, stopping the trials.  The |
| 16:41 | 18 | conclusion was that there wasn't an alarming risk to be |
| 16:41 | 19 | concerned about and that they should look at the trials once |
| 16:41 | 20 | they were unblinded.  That was the memo. |
| 16:41 | 21 |          **MR. ARBITBLIT:**  I move to strike that as |
| 16:41 | 22 | nonresponsive. |
| 16:41 | 23 | **BY MR. ARBITBLIT:** |
| 16:41 | 24 | **Q.**   Doctor, a cardiovascular endpoint study would have taken |
| 16:41 | 25 | time to reach an answer; right? |

DAILY COPY

16:41  1   **A.**   I don't know what you mean by a cardiovascular endpoint

16:41  2   study.  The memo calls to look carefully at cardiovascular

16:41  3   endpoints in all of the ongoing trials.  As you know, they then

16:41  4   proceeded to put together a standard operating procedure for

16:41  5   cardiovascular endpoint analysis.  I don't know what you mean

16:41  6   by a cardiovascular endpoint study.

16:41  7   **Q.**   Let's go back to the ICH and a clinical trial design.  As

16:42  8   paragraph 3.5 of ICH 9 says:  "The number of subjects in a

16:42  9   clinical trial should always be large enough to provide a

16:42  10   reliable answer to the questions addressed."

16:42  11       Right?

16:42  12  **A.**   Correct.

16:42  13  **Q.**   If Merck had decided in late 1997 to conduct a study that

16:42  14  met that description, that would have taken time.  That would

16:42  15  have delayed the request for approval of the drug; correct?

16:42  16  **A.**   If they felt that the information that they were providing

16:42  17  to the FDA wasn't adequate and they needed to get more, yeah,

16:42  18  that would have taken more time.

16:43  19  **Q.**   Now, the FDA, as you have written, focuses extensive

16:43  20  effort on ensuring the safety and efficacy of drugs; right?

16:43  21  **A.**   Yes.

16:43  22  **Q.**   But drugs get through that process and, ultimately, it's

16:43  23  the manufacturer that's responsible for the safety of its drug;

16:43  24  right?

16:43  25  **A.**   Yes.

16:43   1   **Q.**   You testified to class effects; right?  For example,
16:43   2   there's a statin class; right?
16:43   3   **A.**   There's various classes of drugs, yes.
16:43   4   **Q.**   There are drugs that are in the same class, but that
16:43   5   doesn't mean they have the same risk; right?
16:43   6   **A.**   That can happen, yes.
16:43   7   **Q.**   For example, Baycol was a member of the statin class?
16:43   8   **A.**   Yes, it was.
16:43   9   **Q.**   But Baycol was withdrawn from the market because it had a
16:44  10   higher risk of muscle damage and kidney failure than other
16:44  11   drugs in the same class; correct?
16:44  12   **A.**   I believe it was voluntarily withdrawn from that finding.
16:44  13   I haven't looked at that data recently to know if that is an
16:44  14   FDA conclusion that it had a higher risk.
16:44  15   **Q.**   It was withdrawn after findings and reports that it had a
16:44  16   higher reporting rate of kidney failure; right?
16:44  17   **A.**   It was rhabdomyolysis.  I just haven't looked at that data
16:44  18   recently to recall exactly where it fit in the --
16:44  19           **THE COURT:**  Just a moment.  There's an objection.  He
16:44  20   feels it's irrelevant because it's a different drug.
16:44  21           **MR. SALES:**  Your Honor, also, we have been going over
16:44  22   an hour with that cross and we are getting into Baycol and all
16:44  23   the --
16:44  24   **BY MR. ARBITBLIT:**
16:44  25   **Q.**   My point was simply to say that there are classes, but

| | | |
|---|---|---|
| 16:44 | 1 | that not all members of the class have the same risks.  Right? |
| 16:45 | 2 | A.   You would have to look at that on a case-by-case base for |
| 16:45 | 3 | the class.  But, yes, class labeling can include that there are |
| 16:45 | 4 | members of the class -- slightly different wording about risks |
| 16:45 | 5 | than other members of the class.  It depends on the data. |
| 16:45 | 6 | Q.   Now, you have written in your report that Merck acted |
| 16:45 | 7 | responsibly and promptly to report the results of VIGOR to the |
| 16:45 | 8 | FDA; right? |
| 16:45 | 9 | A.   Yes. |
| 16:45 | 10 | Q.   Have you seen any documents that told you about why Merck |
| 16:46 | 11 | wanted to do that quickly? |
| 16:46 | 12 | A.   I'm not what you mean by "why."  I can describe the |
| 16:46 | 13 | timeline to you. |
| 16:46 | 14 | Q.   I will withdraw and try again. |
| 16:46 | 15 |      Have you ever seen the VIGOR closeout plan? |
| 16:46 | 16 | A.   I'm not sure.  I would have to see it. |
| 16:47 | 17 | Q.   I'm going to move on to a different subject.  The document |
| 16:47 | 18 | is not coming up. |
| 16:48 | 19 |      Have you seen this scientific advisory board document |
| 16:48 | 20 | before? |
| 16:48 | 21 | A.   Yes, I have. |
| 16:48 | 22 | Q.   This was the May 1998 document where Merck informed the |
| 16:48 | 23 | scientific advisors of some of the information about Vioxx; |
| 16:48 | 24 | right? |
| 16:48 | 25 | A.   Yes. |

DAILY COPY

1324

| 16:48 | 1 | **Q.**    At page 17 ending in 2742 of the document -- |
|---|---|---|

16:48    1    **Q.**    At page 17 ending in 2742 of the document --

16:48    2    **A.**    Yes.

16:48    3    **Q.**    -- you have referred in your report to the "strong mandate

16:48    4    for introduction of Vioxx into medical practice as soon as

16:48    5    feasible."

16:49    6              Right?  You have quoted that in your report.

16:49    7    **A.**    Yes, it's in my report.

16:49    8    **Q.**    But just above that, in the same paragraph, the advisory

16:49    9    board said:  "The above considerations regarding hypothetical

16:49   10    adverse effects and potential unexpected therapeutic benefits

16:49   11    of Vioxx are part of the scientific intelligence gathering

16:49   12    appropriate to the development of any truly novel

16:49   13    pharmacological entity and should be addressed in parallel with

16:49   14    the conclusion of the process of acquisition and analysis of

16:49   15    the data that would place this drug in the hands of patients."

16:49   16              Did I read that correctly?

16:49   17    **A.**    Yes.

16:49   18    **Q.**    So this is May 1998.  There was a year between this date

16:49   19    and when the product was marketed; right?

16:49   20    **A.**    Correct.

16:49   21    **Q.**    During that year, did Merck conduct any clinical trials to

16:50   22    investigate cardiac risks?

16:50   23    **A.**    Well, it was analyzing the cardiac risks from the trials

16:50   24    it was providing to the FDA for the original NDA.  I believe

16:50   25    there were some ongoing trials.  And, of course, the VIGOR

1325

16:50  1    study was being proposed prior to approval, which included

16:50  2    cardiovascular events.  And, of course, they put together their

16:50  3    CV SOP subsequent to this meeting.

16:50  4    **Q.**   The CV SOP that was suggested in May 1998 was not approved

16:50  5    until August 30, 1999, and did not result in any analysis of

16:50  6    data until the VIGOR results in 2000; right?

16:50  7    **A.**   Right.  It was a prospectively defined adjudication

16:50  8    program, although it did go back and look at a few things

16:50  9    retrospectively.

16:51  10   **Q.**   Do you know how to calculate a relative risk from

16:51  11   patient-years and numbers of events?

16:51  12   **A.**   Well, you would have to give me an example.  I know the

16:51  13   FDA reviewer certainly did that a lot in this example.  I don't

16:51  14   know if I can just do it on the fly.

16:51  15   **Q.**   Could you do it with the data from the ISS showing the

16:51  16   number of events on Vioxx versus placebo if you knew the mean

16:51  17   number of days of exposure was 40 days and you multiplied that

16:51  18   by the patient population and got the patient-years for your

16:51  19   denominators and your event rates for numerators?

16:51  20   **A.**   I'm not sure what you're asking me to do.

16:51  21          **MR. ARBITBLIT:**  Your Honor, may I do that on the

16:51  22   board?

16:51  23          **THE WITNESS:**  Are you talking about a Kaplan-Meier

16:51  24   cumulative rate, or you're talking about relative risk?

       25

                              DAILY COPY

1326

| | | |
|---|---|---|
| 16:51 | 1 | **BY MR. ARBITBLIT:** |
| 16:52 | 2 | **Q.**   Do you agree that the number of events in the Vioxx |
| 16:52 | 3 | six-week primary safety analysis were 5 plus 6 plus 1 plus 1, |
| 16:52 | 4 | or 13? |
| 16:52 | 5 | **A.**   These are patients with thromboembolic cardiovascular |
| 16:52 | 6 | adverse experiences.  Yes, you can add them up that way. |
| 16:52 | 7 | **Q.**   For placebo, there was one event; correct? |
| 16:52 | 8 | **A.**   Yes. |
| 16:52 | 9 | **Q.**   And the ISS is -- |
| 16:52 | 10 | **A.**   Can you tell me again what page that is so I can look at |
| 16:52 | 11 | it. |
| 16:52 | 12 | **Q.**   Yes.  That's page E-329. |
| 16:52 | 13 |       Then if you look at page 4124 of the same document, |
| 16:53 | 14 | you can see the mean duration of treatment. |
| 16:53 | 15 | **A.**   You're just going to use a mean for the whole group, or do |
| 16:53 | 16 | you know each dose? |
| 16:53 | 17 | **Q.**   The mean is the data we have.  You can calculate |
| 16:53 | 18 | patient-years; right? |
| 16:53 | 19 | **A.**   For the entire population.  You can't by dose. |
| 16:53 | 20 | **Q.**   So you have got 1,780 patients on Vioxx times 40 average |
| 16:53 | 21 | days.  I'm not going to do that in my head.  That gives you |
| 16:54 | 22 | 71,200 days of exposure.  If you divide that by 365, you would |
| 16:54 | 23 | get the number of patient-years; correct?  195? |
| 16:54 | 24 | **A.**   I don't know if I want to agree with this kind of math. |
| 16:54 | 25 | The table itself -- |

| | | |
|---|---|---|
| 16:54 | 1 | **Q.**   Well, is the math correct, ma'am? |
| 16:54 | 2 | **A.**   Just the math? |
| 16:54 | 3 | **Q.**   So in Vioxx you have 13 events in 195 patient-years; |
| 16:54 | 4 | right? |
| 16:54 | 5 | **A.**   Possibly. |
| 16:54 | 6 | **Q.**   In placebo you have 412 patients times 40 and that's -- |
| 16:54 | 7 | **MR. SALES:**  Your Honor, I hate to interrupt. |
| 16:54 | 8 | **THE WITNESS:**  I don't know if that 40 is the -- I |
| 16:54 | 9 | would just have to go back to understand these -- |
| 16:54 | 10 | **MR. SALES:**  The witness has said she doesn't think |
| 16:55 | 11 | this is an appropriate analysis, and for him to do math in |
| 16:55 | 12 | front of this -- |
| 16:55 | 13 | **THE COURT:**  We are going to have to get the basis for |
| 16:55 | 14 | it.  If she disagrees with the very basis, it's a problem. |
| 16:55 | 15 | **MR. SALES:**  I object.  There's no foundation for |
| 16:55 | 16 | this. |
| 16:55 | 17 | **THE WITNESS:**  I think the reviewers at the FDA |
| 16:55 | 18 | described the review of CV events and say there may have been a |
| 16:55 | 19 | dose-response versus placebo, but it's not statistically |
| 16:55 | 20 | significant.  If you look at this table, it has statistical |
| 16:55 | 21 | significance discussion in its table.  So I'm not sure where |
| 16:55 | 22 | you want to go here. |
| 16:55 | 23 | The reviewers did it by dose.  They did it by |
| 16:55 | 24 | dose-response.  They specifically state there may be an issue, |
| 16:55 | 25 | especially at higher doses, in their original review.  So I |

DAILY COPY

16:55 1   just don't want to accept that this is 13 out of 195 when the

16:55 2   Vioxx doses are anywhere from 5 to 125.  I just don't know

16:55 3   enough about your 40 to know that that's how you would get your

16:56 4   patient-years.

16:56 5   BY MR. ARBITBLIT:

16:56 6   Q.   Have you seen what Dr. Reicin did to combine all the

16:56 7   patients and all the doses of Vioxx to compare to placebo in

16:56 8   exactly the manner that this appears, which is the

16:56 9   patient-years on the denominator and the events in the

16:56 10  numerator, and then calculated a relative risk?

16:56 11  A.   I don't remember how she calculated her patient-years.  I

16:56 12  would have to look at that publication or submission.  You're

16:56 13  talking about the II(b) and III osteoarthritis pool?

16:56 14  Q.   Yes.

16:56 15  A.   I just don't remember if she did it by dose per

16:56 16  patient-year.  I don't recall.  You would have to show me the

16:56 17  article.

16:56 18        MR. ARBITBLIT:  Your Honor, I would ask that I

16:56 19  complete the calculation.  It's very straightforward.

16:56 20        THE COURT:  The basis is a problem.  The witness is

16:56 21  not agreeing with you.  We are just going down a road that is

16:57 22  not meaningful at this point.  It just really isn't.  You may

16:57 23  be able to do that -- well, this is the last witness.  Let's

16:57 24  get into something else, Counsel.  I'll take a 10-minute break

16:57 25  at this time and come back.  Let's see if we can finish this

DAILY COPY

16:57   1   witness.

16:57   2           THE DEPUTY CLERK:  Everyone rise.

16:57   3           (WHEREUPON the Court took a brief recess.)

17:01   4           THE DEPUTY CLERK:  Everyone rise.

17:06   5           THE COURT:  Be seated, please.

17:06   6               Counsel, let's try to move this a bit.

17:06   7           MR. ARBITBLIT:  Yes, Your Honor.

17:06   8           THE COURT:  It's bogging down.  I'll let you do that

17:06   9   as a proffer, but let's move on to something else.

17:06   10          MR. ARBITBLIT:  Should I do that after this is done?

17:06   11          THE COURT:  Yes.

17:06   12          MR. ARBITBLIT:  Thank you.  I would like to offer 72,

17:06   13  which was the FDA November '98 review.

17:06   14          THE COURT:  Let it be admitted.

17:07   15  BY MR. ARBITBLIT:

17:07   16  Q.   This is a document marked as P1.1734, a Merck document

17:07   17  with a title "Drug Regulations:  The Essentials."  Have you

17:07   18  seen this in your review of documents?

17:07   19  A.   I'm not sure.

17:07   20  Q.   If you could turn, please, to pages 37 and 38, which have

17:07   21  the Bates numbers ending in 2099 and 2100.

17:07   22  A.   I think every other page is upside down, but I have it

17:07   23  here, yes.

17:07   24  Q.   I apologize for that.  Do you see 2099 describes what a

17:07   25  warning is and that 2100 describes what precautions are?

17:08  1    **A.**   Do you know the date of this document?

17:08  2    **Q.**   It says 2000 on the back.

17:08  3    **A.**   I just want to orient myself.  You say it's a Merck

17:08  4    document from 2000, and we are going to page 37 and 38.  It

17:08  5    appears to be a section about information required in labeling,

17:08  6    yes.

17:08  7    **Q.**   Do you see that under the heading "Warnings" the language

17:08  8    is:  "Serious adverse reactions and potential safety hazards,

17:08  9    any limitations in use imposed by them, and steps that should

17:08  10   be taken if they occur, are discussed in this section.  FDA

17:08  11   regulations also require that the labeling be revised to

17:08  12   include a warning as soon as there is reasonable evidence of an

17:08  13   association of a serious hazard with a drug.  A causal

17:08  14   relationship need not have been established."

17:08  15          Correct?

17:08  16   **A.**   That's what it says.

17:08  17   **Q.**   Is that consistent with your reading of Section 201.57?

17:09  18   **A.**   Yeah.  I think in 2000 that was the wording.

17:09  19   **Q.**   Then, on the next page, does it describe precautions as

17:09  20   follows:  "This section of the labeling usually includes the

17:09  21   following subsections:  General information that the

17:09  22   health-care provider should provide to patients," etc.?

17:09  23   **A.**   That's what this says.

17:09  24   **Q.**   Have you seen any documents about whether Merck cared

17:09  25   whether it was a warning or a precaution?

| | | |
|---|---|---|
| 17:09 | 1 | **A.**   I don't know what you're -- I think that the warnings and |
| 17:09 | 2 | precautions are described in 201.57, as these seem to reflect. |
| 17:09 | 3 | Is that what you're asking? |
| 17:10 | 4 | **MR. ARBITBLIT:**  Can we marking this as 815 or 816? |
| 17:10 | 5 | **THE DEPUTY CLERK:**  It's 815.  Did you mean to offer |
| 17:10 | 6 | 814? |
| 17:10 | 7 | **MR. ARBITBLIT:**  Yes.  I would offer 814, the |
| 17:10 | 8 | regulations document, Your Honor. |
| 17:10 | 9 | **THE COURT:**  Let it be admitted. |
| 17:10 | 10 | **BY MR. ARBITBLIT:** |
| 17:10 | 11 | **Q.**   815 is an e-mail dated November 8, 2001, from Ed Scolnick |
| 17:10 | 12 | to Douglas Green, Bonnie Goldmann, and Peter Kim."  Have you |
| 17:11 | 13 | seen this before? |
| 17:11 | 14 | **A.**   Yes. |
| 17:11 | 15 | **Q.**   Does Dr. Scolnick write here:  "Twice in my life I have |
| 17:11 | 16 | had to say to the FDA 'That label is unacceptable.  We will not |
| 17:11 | 17 | under any circumstances accept it'"?  Did he say that? |
| 17:11 | 18 | **A.**   That's what he writes here. |
| 17:11 | 19 | **Q.**   In the next paragraph, he says:  "And I assure you I will |
| 17:11 | 20 | not sign off on any label that had a cardiac warning." |
| 17:11 | 21 | Did I read that correctly? |
| 17:11 | 22 | **A.**   That's what that says. |
| 17:12 | 23 | **MR. ARBITBLIT:**  There was a document introduced this |
| 17:12 | 24 | morning that I would like to see if I can identify just for a |
| 17:12 | 25 | couple more minutes, Your Honor.  It was the consultant's |

| 17:12 | 1 | meeting September 28, 1996.  Is that available? |
| 17:12 | 2 | THE DEPUTY CLERK:  I would have to know the number. |
| 17:12 | 3 | MR. ARBITBLIT:  It's September 28, 1996.  Are the |
| 17:13 | 4 | exhibits handy? |
| 17:13 | 5 | THE DEPUTY CLERK:  Yes. |
| 17:13 | 6 | MR. ARBITBLIT:  Your Honor, I am down to my last copy |
| 17:13 | 7 | of it, but I would like to just approach the witness. |
| 17:13 | 8 | THE COURT:  Put it on the overhead. |
| 17:13 | 9 | THE DEPUTY CLERK:  I think you turned it off up at |
| 17:13 | 10 | the top. |
| 17:13 | 11 | THE COURT:  Right. |
| 17:14 | 12 | MR. ARBITBLIT:  Thank you. |
| 17:14 | 13 | BY MR. ARBITBLIT: |
| 17:14 | 14 | Q.   Just the front page of this is the consultants meeting |
| 17:14 | 15 | with Merck about Vioxx, September 28, 1996.  There was |
| 17:14 | 16 | discussion about the dosing of Vioxx and the comparators in the |
| 17:14 | 17 | osteoarthritis trials; right?  You discussed that earlier, just |
| 17:14 | 18 | to place you in the -- |
| 17:14 | 19 | A.   Are you discussing the Phase III trials for osteoarthritis |
| 17:14 | 20 | dosing of the comparators?  Yes, we have discussed that. |
| 17:14 | 21 | Q.   Yes.  And one of the consultants that Merck met with on |
| 17:14 | 22 | that date was a Dr. Walter Eversmeyer, who had conducted a |
| 17:14 | 23 | study of nabumetone, another NSAID, which involved titration of |
| 17:15 | 24 | doses rather than using the same dose for everyone. |
| 17:15 | 25 | In particular, here's Dr. Eversmeyer's paper, that's |

DAILY COPY

17:15  1   part of the consultants document, which says, "The comparator
17:15  2   for safety of nabumetone 1,000 to 2,000 milligrams a day,
17:15  3   versus diclofenac 100 to 200 milligrams a day, naproxen 500 to
17:15  4   1500, and ibuprofen 1,200 to 3,200, was evaluated in a 12-week
17:15  5   study."
17:15  6           Now, there's nothing wrong in a design that gives a
17:15  7   range of doses, is there?
17:15  8   A.   I don't know what you mean by "wrong."
17:15  9   Q.   FDA wouldn't have said that's an invalid study if Merck
17:15  10  had done something similar to what this consultant told them he
17:15  11  had done, by giving patients a chance to take 1,200 milligrams
17:15  12  a day and only increase if they needed it?
17:16  13  A.   Well, the FDA would respond that that would be -- it
17:16  14  would -- the prescribing of comparators should be done as per
17:16  15  the label for those comparators.  I don't know the labeling of
17:16  16  all those comparators as to whether titration is done.
17:16  17          Of course, the protocols, as we described, required
17:16  18  that people be on stable doses of comparators prior to being --
17:16  19  so I think the design of those were parallel stable doses of
17:16  20  approved products at approved doses.
17:16  21  Q.   The stable doses for ibuprofen could have been as low as
17:16  22  1,200 milligrams; correct?
17:16  23  A.   I think if you look at the osteoarthritis labeling for
17:16  24  ibuprofen prescription, there may be a range.  And I don't
17:16  25  remember if it states what the norm is.  But, again, these are

DAILY COPY

17:16  1   patients that had to have already been on a stable dose of

17:16  2   ibuprofen and a certain dose for the last 30 days, and you

17:16  3   would want to make sure their effectiveness was maintained in

17:17  4   the osteoarthritis study.

17:17  5   **Q.**   When you looked at the chart showing the therapeutic range

17:17  6   of the various NSAIDs --

17:17  7   **A.**   Well, let me clarify.  That wasn't -- I didn't look at

17:17  8   each label to know that that was the therapeutic range.  Those

17:17  9   were the ranges of the stable doses that the patients needed to

17:17  10  have been on for the month prior for them to be enrolled or

17:17  11  included in the osteoarthritis studies because those would be

17:17  12  the patients that it had been determined needed to be on a

17:17  13  stable dose of a comparator, either being that diclofenac

17:17  14  50 milligrams three times a day or ibuprofen at 800 milligrams

17:17  15  three times a day.

17:17  16  **Q.**   So that appendix that Merck's counsel showed you

17:17  17  earlier --

17:17  18  **A.**   Correct.

17:17  19  **Q.**   -- included the ibuprofen range of 1,200 and up; right?

17:17  20  **A.**   Correct.

17:17  21  **Q.**   And you have no information, as you sit here today, as to

17:18  22  how many of the patients were on 1,200 ibuprofen as opposed to

17:18  23  any other dose?

17:18  24  **A.**   Before they entered the studies?  I don't recall that

17:18  25  information.

DAILY COPY

17:18  1   **Q.**   Once they entered the study, they were all on 2,400;

17:18  2   right?

17:18  3   **A.**   Yes.  As equal potent doses for effectiveness

17:18  4   determinations with Vioxx.

17:18  5   **Q.**   And the same thing would be true for naproxen, that the

17:18  6   patients could have been on 500 milligrams or higher?

17:18  7   **A.**   For osteoarthritis, prior to enrollment in the trials,

17:18  8   yes.

17:18  9   **Q.**   And for diclofenac, 100 or higher?

17:18  10  **A.**   Yes.

17:18  11  **Q.**   Is it correct that the Vioxx label does not say what the

17:18  12  result is for a comparison of the steroid users versus

17:19  13  nonsteroid users for the complicated PUBs endpoint?

17:19  14  **A.**   Complicated alone, correct.

17:19  15  **Q.**   Have you gone through the VIGOR clinical study report of

17:19  16  the VIGOR trial in its entirety?

17:19  17  **A.**   I believe so, yes.

17:19  18  **Q.**   Is it correct that Merck did not provide to the FDA the

17:19  19  comparison between steroid users and nonsteroid users for the

17:19  20  complicated PUBs endpoint?

17:19  21  **A.**   It provided it for the primary endpoint, which was all

17:19  22  confirmed PUBs.

17:19  23  **Q.**   But not for the secondary endpoint of complicated PUBs?

17:19  24  **A.**   Well, it provided the data, but you're correct:  It did

17:19  25  not provide a specific table or analysis of that secondary

1336

| | | |
|---|---|---|
| 17:19 | 1 | endpoint for that subgroup. |
| 17:20 | 2 | Q.   The 8 versus 3 Alzheimer's mortality that appeared on the |
| 17:20 | 3 | 2002 label was only for on-drug; right? |
| 17:20 | 4 | A.   Correct. |
| 17:20 | 5 | Q.   The off-drug mortality, cardiovascular mortality, do you |
| 17:20 | 6 | know what those numbers are? |
| 17:20 | 7 | A.   I don't have that on the tip of my head.  I know those |
| 17:20 | 8 | packages were submitted to the FDA, and they did further |
| 17:20 | 9 | reviews of that, but I don't know the numbers off the top of my |
| 17:20 | 10 | head. |
| 17:20 | 11 | Q.   Have you seen the article written by Dr. Ptsay, whose |
| 17:20 | 12 | testimony we looked at at the hearing, and Dr. Kronmal, who is |
| 17:20 | 13 | one of the plaintiff's consultants, in the *Journal of the* |
| 17:20 | 14 | *American Medical Association*, indicating that the results for |
| 17:20 | 15 | heart disease mortality was 21 versus 6, with a statistically |
| 17:20 | 16 | significant increased risk? |
| 17:20 | 17 | A.   I can't quote that article specifically, but if you would |
| 17:21 | 18 | like to show it to me and it says that, I'm sure I could read |
| 17:21 | 19 | that. |
| 17:21 | 20 | Q.   Have you seen it before, ma'am? |
| 17:21 | 21 | A.   I believe so. |
| 17:21 | 22 | Q.   Have you written to *JAMA* to comment on it at all? |
| 17:21 | 23 | A.   Oh, no.  I rely on the FDA -- the submissions and the |
| 17:21 | 24 | review by the FDA, but I have seen that article, and I know the |
| 17:21 | 25 | numbers are obviously higher than 8 and 3. |

DAILY COPY

| | | |
|---|---|---|
| 17:21 | 1 | **Q.**   Those higher numbers than 8 and 3 never appeared on the |
| 17:21 | 2 | label, did they? |
| 17:21 | 3 | **A.**   No. |
| 17:21 | 4 | **Q.**   There was discussion about the advisory committee and the |
| 17:21 | 5 | vote of 17 to 15 that, under certain circumstances, Vioxx might |
| 17:21 | 6 | be able to come back on the market; right? |
| 17:21 | 7 | **A.**   You're speaking to the February 2005 advisory committee. |
| 17:21 | 8 | Yes, there was a vote. |
| 17:22 | 9 | **Q.**   Merck has never met those conditions, has it? |
| 17:22 | 10 | **A.**   I'm not sure what you mean. |
| 17:22 | 11 | **Q.**   Vioxx is not back on the market, is it? |
| 17:22 | 12 | **A.**   You're correct.  Merck has not submitted an application |
| 17:22 | 13 | for remarketing of Vioxx. |
| 17:22 | 14 | **Q.**   Are you familiar with the publication in the *New England* |
| 17:22 | 15 | *Journal of Medicine* that reported on the financial ties of the |
| 17:22 | 16 | committee members? |
| 17:22 | 17 | **A.**   Yes. |
| 17:22 | 18 | **Q.**   Do you know, then, that 10 of the members of that |
| 17:22 | 19 | committee had financial ties to the pharmaceutical industry; |
| 17:22 | 20 | and that if those 10 votes were not counted, the vote would |
| 17:22 | 21 | have been 14 to 8 against the reintroduction of Vioxx to the |
| 17:22 | 22 | market?  Is that right? |
| 17:22 | 23 | **A.**   I know about that article, but I also know of the process |
| 17:22 | 24 | for vetting committee members and who can vote and who can be |
| 17:22 | 25 | at the table at the FDA. |

17:22   1        MR. ARBITBLIT:  I move to strike the nonresponsive

17:22   2   portion.

17:22   3   BY MR. ARBITBLIT:

17:22   4   Q.   Do you know if the members identified with financial ties

17:22   5   had not been on the committee, the vote would have been against

17:23   6   returning Vioxx to the market?

17:23   7   A.   Well, I know that those financial ties would have been

17:23   8   vetted by the FDA, so I just can't respond to that.  Because

17:23   9   I'm aware of the process of vetting for financial interests,

17:23   10  I'm aware of the process for vetting for appearances of

17:23   11  conflict of interest, I'm aware of the disclosures that are

17:23   12  provided at the beginning of those advisory committees about

17:23   13  those decisions, so I just simply can't respond to how I would

17:23   14  know who voted for which --

17:23   15       THE COURT:  I understand her answer is "I don't

17:23   16  know."

17:23   17       THE WITNESS:  Okay.  Sorry.

17:23   18       MR. ARBITBLIT:  Thank you, Your Honor.

17:23   19       THE COURT:  Anything further?

17:23   20  BY MR. ARBITBLIT:

17:23   21  Q.   Do you know whether Merck attempted to resubmit Vioxx for

17:23   22  approval?

17:23   23  A.   I am not aware of a submission for remarketing of Vioxx.

17:23   24       MR. ARBITBLIT:  Thank you, Your Honor.

17:23   25       THE COURT:  Any redirect?

DAILY COPY

| | | |
|---|---|---|
| 17:23 | 1 | **MR. SALES:**  No further questions, Your Honor. |
| 17:23 | 2 | **THE COURT:**  You're excused.  Thank you, ma'am. |
| 17:23 | 3 | **THE WITNESS:**  Thank you. |
| 17:23 | 4 | **THE COURT:**  Any other witnesses? |
| 17:23 | 5 | **MR. ARBITBLIT:**  I may have to put in a document or |
| 17:23 | 6 | two, Your Honor. |
| 17:24 | 7 | **MR. MURRAY:**  Your Honor -- |
| 17:24 | 8 | **THE COURT:**  Any other witnesses? |
| 17:24 | 9 | **MR. ISMAIL:**  Not live, Your Honor.  We have one or |
| 17:24 | 10 | two further depositions to submit, Dr. Morrison's trial |
| 17:24 | 11 | testimony in lieu of him appearing live, and -- Dr. Morrison is |
| 17:24 | 12 | the last tendered trial testimony by written submission. |
| 17:24 | 13 | **THE DEPUTY CLERK:**  Can I have the dates, please? |
| 17:24 | 14 | **MR. O'DONOGHUE:**  12-18-2003, 2-16-2005, 2-18-2005, |
| 17:24 | 15 | 8-11-2006, 11-7-2006, 11-8-2006. |
| 17:24 | 16 | **THE DEPUTY CLERK:**  That's of Briggs Morrison? |
| 17:24 | 17 | **MR. O'DONOGHUE:**  Correct.  We will be filing with the |
| 17:24 | 18 | Court a page/line designation of objections to those, as well |
| 17:24 | 19 | as a transcript of objections to those, to fulfill the |
| 17:24 | 20 | obligation for the stipulation for the admission of that |
| 17:24 | 21 | testimony. |
| 17:24 | 22 | **THE COURT:**  Okay.  Do you have some housekeeping? |
| 17:25 | 23 | **MR. ARBITBLIT:**  Yes, Your Honor.  There are two |
| 17:25 | 24 | documents, LAAG-72 -- |
| 17:25 | 25 | **THE DEPUTY CLERK:**  You put that in already. |

DAILY COPY

17:25  1          **MR. ARBITBLIT:**  Okay.  The last one was 815, which

17:25  2     was the e-mail from Scolnick.

17:25  3          **THE DEPUTY CLERK:**  You need to offer 814 too.

17:25  4          **MR. ARBITBLIT:**  814?

17:25  5          **THE DEPUTY CLERK:**  814 and 815.

17:25  6          **MR. ARBITBLIT:**  What was 814?

17:25  7          **THE DEPUTY CLERK:**  I'm sorry.  815.  I had it as an

17:25  8     11-8-01 e-mail from Scolnick.

17:25  9          **MR. ARBITBLIT:**  That's 815.

17:25 10          **THE COURT:**  Admitted.

17:25 11          **MR. MURRAY:**  Your Honor, I'm not sure whether I have

17:25 12     a housekeeping matter or not because I believe this has already

17:25 13     been done.  At the close of plaintiff's evidence, there were a

17:25 14     number of documents that we submitted -- I believe that it's

17:25 15     been done on the record -- awaiting Your Honor's ruling on

17:25 16     those documents, and the parties submitted a grid of objections

17:25 17     and responses.

17:25 18          We have since cleaned that grid up, and we have

17:25 19     a cleaner copy to actually make as the record copy since the

17:26 20     other one had a lot of handwritten notes.  If we have not done

17:26 21     so, I would move to formally move those documents.  I believe

17:26 22     we have, but I would like to present the Court with the record

17:26 23     copy of the grid.

17:26 24          **THE COURT:**  Let's see what we have first.

17:26 25          **THE DEPUTY CLERK:**  Judge, I'm still going through it,

DAILY COPY

| | | |
|---|---|---|
| 17:26 | 1 | but I just wanted to call out that two of them that you have |
| 17:26 | 2 | offered were admitted today, and that's LAAG-72 and LAAG-129, |
| 17:26 | 3 | which was admitted yesterday.  Judge, it's a 20-page document. |
| 17:26 | 4 | THE COURT:  What we will have to do is just submit |
| 17:26 | 5 | those, and then I'll rule on them. |
| 17:26 | 6 | MR. MURRAY:  I believe they have already been |
| 17:26 | 7 | submitted.  I just wanted to substitute this cleaned-up copy of |
| 17:26 | 8 | the grid. |
| 17:26 | 9 | THE COURT:  Let's just make sure we have the right |
| 17:26 | 10 | one. |
| 17:27 | 11 | MR. ARBITBLIT:  I do have a copy of the *New England* |
| 17:27 | 12 | *Journal of Medicine* article on the financial conflicts of |
| 17:27 | 13 | interest that I wanted to proffer.  I did not have it in my |
| 17:27 | 14 | binder when the witness was on the stand, but here it is. |
| 17:27 | 15 | THE COURT:  I'll admit that as a -- |
| 17:27 | 16 | MR. ISMAIL:  Your Honor, that's hearsay.  It's triple |
| 17:27 | 17 | hearsay. |
| 17:27 | 18 | THE COURT:  Let me take a look at it first. |
| 17:27 | 19 | THE DEPUTY CLERK:  What are you marking that as? |
| 17:27 | 20 | MR. SALES:  It's hearsay and not a learned treatise. |
| 17:27 | 21 | THE COURT:  Yes.  No, that's exactly right.  I'm not |
| 17:27 | 22 | going to allow this.  Robert Steinbrook is an article -- I |
| 17:27 | 23 | can't tell where.  *New England Journal*, is it? |
| 17:27 | 24 | MR. ARBITBLIT:  Yes, Your Honor. |
| 17:28 | 25 | THE COURT:  I understand.  You can mark that.  Put |

| | | |
|---|---|---|
| 17:28 | 1 | that in as Proffer 2. |
| 17:28 | 2 | **THE DEPUTY CLERK:**  Judge, wait.  If that's plaintiff, |
| 17:28 | 3 | we already have Proffer 1, 2, and 3. |
| 17:28 | 4 | **THE COURT:**  Proffer 4, then. |
| 17:28 | 5 | It's clearly 801.  I don't see any exception for |
| 17:28 | 6 | it going in.  It's not anything that can be used or admitted. |
| 17:28 | 7 | It has some relevance insofar as credibility, but the admission |
| 17:28 | 8 | of it is problematic.  I will exclude it and allow it as a |
| 17:28 | 9 | proffer. |
| 17:29 | 10 | Does that conclude the plaintiff on this |
| 17:29 | 11 | witness? |
| 17:29 | 12 | **MR. ARBITBLIT:**  Yes, Your Honor. |
| 17:29 | 13 | **THE COURT:**  From the defendant, any other witnesses? |
| 17:29 | 14 | We have talked about the admission of the testimony of Briggs |
| 17:29 | 15 | Morrison, and counsel is going to supply the Court with the |
| 17:29 | 16 | information. |
| 17:29 | 17 | **MR. O'DONOGHUE:**  Your Honor, just to be clear, we are |
| 17:29 | 18 | filing testimony designations of Dr. Biglane, Mr. Fevurly, |
| 17:29 | 19 | Dr. Morrison, Dr. Reicin.  The dates for Dr. Reicin, just to |
| 17:29 | 20 | make sure they are clear, because -- |
| 17:29 | 21 | **THE DEPUTY CLERK:**  I had Fevurly, Turner, and Reicin. |
| 17:29 | 22 | Who are you adding to that? |
| 17:29 | 23 | **MR. O'DONOGHUE:**  Just Morrison. |
| 17:29 | 24 | **THE DEPUTY CLERK:**  That's the trial testimony that |
| 17:29 | 25 | you just talked about? |

DAILY COPY

17:29  1      **MR. O'DONOGHUE:**  Correct.  With Dr. Reicin, though, I

17:29  2  believe we entered in the wrong dates, or there was a mistake

17:29  3  on the dates of testimony, so I just want to make sure those

17:29  4  are clear on the record.

17:29  5      **THE DEPUTY CLERK:**  I'll tell you what was put into

17:29  6  the record already if you want to make changes:  March 2, 2005;

17:29  7  March 3, 2005; March 23, 2005; May 27, 2005; August 19, 2005;

17:30  8  September 21, 2006; and September 29, 2006.

17:30  9      **MR. O'DONOGHUE:**  Correct.  September 29 should, in

17:30  10  fact, be September 20, 2006.  That is the proffered testimony.

17:30  11  In relationship to exhibits, all the depositions have been

17:30  12  filed, both plaintiff's and the defendant's.

17:30  13      **THE DEPUTY CLERK:**  Excuse me, Judge.  That's another

17:30  14  list.  The plaintiff's list was quite voluminous.  You don't

17:30  15  want them to read them all out?

17:30  16      **THE COURT:**  No, no.  You have got the list of the

17:30  17  exhibits?  Let's tender that.  We'll put it in the same way as

17:30  18  with the plaintiff's, with ruling reserved.

17:30  19      **MR. O'DONOGHUE:**  That's it.

17:30  20      **THE COURT:**  Then the defendant rests?

17:30  21      **MR. VOELZ:**  Yes, Your Honor.  I just want to do one

17:30  22  housekeeping matter.  We had agreed with the plaintiff that we

17:30  23  would do the amended findings of fact and conclusions of law.

17:31  24  We can certainly file them by Friday at 2 p.m.

17:31  25      **THE COURT:**  From the plaintiff's standpoint, any

17:31   1   rebuttal?

17:31   2           MR. MURRAY:  I'm looking around to make sure.  None

17:31   3   that I know of, Your Honor.

17:31   4           THE COURT:  So, then, the plaintiff rests.

17:31   5           I asked you-all to meet with Gaylyn and make

17:31   6   sure I have got all of the exhibits that you need in there, in

17:31   7   the form and fashion that you need them, and then I'll hear

17:31   8   closing argument at 10:30 tomorrow.

17:31   9           MR. MURRAY:  45 minutes a side?  Is that what --

17:31   10          THE COURT:  Yes, that's what I was looking at.  The

17:31   11  plaintiff goes first, then the defendant, then followed by the

17:31   12  plaintiff.  Let Gaylyn know the time.  I'll give you a time

17:32   13  where she can give you an alert.  Thank you very much.  Court

17:32   14  will stand in recess.

17:32   15          THE DEPUTY CLERK:  Everyone rise.

17:32   16          (WHEREUPON the Court was in recess for the evening.)

17:32   17                          * * *

        18                       **CERTIFICATE**

        19          I, Toni Doyle Tusa, CCR, FCRR, Official Court
            Reporter for the United States District Court, Eastern District
        20  of Louisiana, do hereby certify that the foregoing is a true
            and correct transcript, to the best of my ability and
        21  understanding, from the record of the proceedings in the
            above-entitled and numbered matter.

        22

        23

        24                              s/ Toni Doyle Tusa
                                        Toni Doyle Tusa, CCR, FCRR
        25                              Official Court Reporter


                              DAILY COPY