1                      UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA

2

   **************************************************************

3

IN RE: VIOXX PRODUCTS          MDL No. 1657

4  LIABILITY LITIGATION          Section: "L"
                            New Orleans, Louisiana

5                          Wednesday, April 21, 2010

6   **************************************************************

7  ***THIS DOCUMENT RELATES TO:***

8  State of Louisiana, ex rel
   James D. Caldwell, Jr.,

   Attorney General

9

       versus

10

Merck

11

Case No. 05-CV-3700

12  **************************************************************

13              TRANSCRIPT OF TRIAL PROCEEDINGS
         HEARD BEFORE THE HONORABLE ELDON E. FALLON

14             UNITED STATES DISTRICT JUDGE
                   DAY 8

15

16

17  <u>APPEARANCES:</u>

18

FOR THE LOUISIANA DEPARTMENT

19  OF HEALTH AND HOSPITALS:
                          DUGAN LAW FIRM

20                          BY:  JAMES R. DUGAN, II, ESQ.
                          650 Poydras St., Suite 2150

21                          New Orleans, LA 70130

22

                          MURRAY LAW FIRM

23                          BY:  STEPHEN B. MURRAY, JR., ESQ.
                             DOUGLAS R. PLYMALE, ESQ.

24                               JUSTIN BLOOM, ESQ.
                          650 Poydras St., Suite 1100

25                          New Orleans, LA 70130

```
 1
                                 LIEFF CABRASER HEIMANN & BERNSTEIN
 2                               BY:  DONALD C. ARBITBLIT, ESQ.
                                 Embarcadero Center West
 3                               275 Battery Street, Suite 3000
                                 San Francisco, CA 94111-3339
 4

 5

 6   FOR MERCK:                  GOLDMAN ISMAIL TOMASELLI
                                 BRENNAN & BAUM
 7                               BY:  TAREK ISMAIL, ESQ.
                                 1 North Franklin St., Suite 625
 8                               Chicago, IL 60606

 9                               BAKER BOTTS
                                 BY:  TRAVIS J. SALES, ESQ.
10                               One Shell Plaza
                                 910 Louisiana
11                               Houston, TX 77002-4995

12
                                 O'MELVENY & MYERS
13                               BY:  SCOTT M. VOELZ, ESQ.
                                 400 South Hope Street
14                               Los Angeles, CA 90071-2899

15

16
     Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR
17                               500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana 70130
18                               (504) 589-7776

19

20       Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

1                           I N D E X

2

3    CLOSING ARGUMENTS:                        PAGE/LINE:

4

5    By Mr. Murray                             1348/24

6

7    By Mr. Ismail                             1368/25

8

9    By Mr. Murray                             1394/6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                 (WEDNESDAY, APRIL 21, 2010)

 3                      (MORNING SESSION)

 4

 5      (OPEN COURT.)

 6            THE COURT:  Be seated, folks.  Good morning, ladies and

 7      gentlemen.  I apologize for being a little late.  I had some

 8      motions, gave oral argument, and ran over a little bit.  We have

 9      some housekeeping matters?

10            MR. O'DONOGHUE:  Your Honor, just very quickly, we

11      previously Defense Exhibits 40A and B have admitted with the

12      testimony of Dr. Morrison.  We have offered Defense Exhibit 40 in

13      its entirety, that's in your ruling reserved category.

14            THE COURT:  All right.  Okay.  Anything from your

15      standpoint?  Housekeeping?  Nothing.

16            I understand that there was a motion to exclude the

17      testimony of Terry D. Leach and that wasn't admitted, the testimony

18      wasn't offered.  It's record document 35799, so I'll deny that as

19      moot.

20            Also there's a motion to exclude the testimony of

21      Dr. Topol, and I understand that that was not offered, so that is

22      also denied as moot.  And it's record document 36651.

23            Okay.  Let me hear from the plaintiff.

24            MR. MURRAY:  Good morning, your Honor.  We've come to the

25      end of a long road and your Honor has listened to quite a bit of
```

1    testimony on quite a number of subjects, and I wish I could say

2    that everything your Honor has heard was germane to issues that are

3    in this case.  But that's simply not the case.

4            This case is not about black box warnings.  It's not

5    about the FDA, what the FDA should or should not have done.  It's

6    not even really about what Merck knew and when Merck knew it.  This

7    is a redhibition claim and it's about three simple things:  Was

8    there a defect, whether the State would have refused to pay for

9    Vioxx had it known of the defect, and whether the State knew of the

10   defect.

11           And, your Honor, the preponderance of the evidence is

12   with the plaintiffs on all three questions.

13           Question one is the defect.  A reasonable buyer in the

14   State's position would not have purchased Vioxx had it known of the

15   defect, the defect that prompted removal of Vioxx from the market,

16   the defect that is a serious risk of heart attacks, worse than any

17   other NSAID, which outweighs any GI benefit in a drug with no

18   proven efficacy beyond traditional NSAIDs.

19           Your Honor, what we are talking about here when you

20   assess the risk versus the benefit and whether there's a defect,

21   you have to remember what we're talking about, we're talking about

22   a pain pill that is no more effective, been shown to be no more

23   effective than other NSAIDs.  We are not talking about a cure for

24   cancer, we're not talking about a cure for AIDS or diabetes, we are

25   talking about a pain pill that's no more effective than other pain

1    pills, and that dramatically increases of risk of heart attack and

2    death.

3         Scientific evidence presented to this court

4    overwhelmingly supports that conclusion.  First your Honor's heard

5    the evidence of the cardiovascular risk.  Dr. David MacGregor has

6    testified to this court, my opinion is that Vioxx is the most

7    cardiotoxic drug among the NSAIDs.  To rebut Dr. MacGregor, the

8    defendants have brought Dr. Eiswirth, a doctor who has never

9    published in the field of cardiovascular risk associated with

10   NSAIDs or COX-2s, a doctor who believes that no one has ever had a

11   heart attack because of Vioxx.  Dr. Eiswirth's opinions fly in the

12   face of nearly every current published authority on the question of

13   whether Vioxx causes heart attacks.

14        Tellingly, his decision was rejected by 32 out of 32 FDA

15   advisory panel members who found in February of 2005 that the

16   available data support a conclusion that Vioxx significantly

17   increases the risk of cardiovascular events.  Tellingly, that same

18   panel recognized the blood pressure and the heart failure data is

19   compelling indicating it, Vioxx, is substantially worse than other

20   COX-2s.

21        Now, Merck will point you to the April 2005 FDA memo

22   which Merck contends supports the conclusion that Vioxx has the

23   same CV risk as other NSAIDs.  Your Honor, if the FDA really

24   believed that and it meant to say that, Vioxx would be on the

25   market today.

1        Then we come to the GI benefit.  The supported reason for

2    taking Vioxx -- purported reason for taking Vioxx.  Dr. David Y.

3    Graham imminently respected, gastroenterologist, one of the top 50

4    gastroenterologists in the country according to the

5    Gastroenterology Association who had published on the effect of

6    COX-2s on the gastroento -- GI system has testified to this court

7    when asked, "Have you formed an opinion as to whether Vioxx differs

8    substantially from other NSAIDs in term of its gastric toxicity?"

9    His opinion, "I have.  And it's not."  The benefit, your Honor, the

10   benefit that's supposedly justifies exposing patients to this heart

11   attack risk simply isn't there.

12       Now, defendants have brought the testimony of Dr. Sales

13   who is also a gastroenterologists, albeit one who has never

14   published on the issue of COX-2 inhibitors.  Dr. Sales relied on

15   studies that showed unrealistic -- used unrealistically high doses

16   of NSAIDs and insignificant outcomes.  Dr. Sales ignored

17   unpublished Langman study data that at the end of the study Vioxx

18   patients had more PUB events than all NSAIDs combined.

19       Your Honor, the risk of heart attacks in Vioxx greatly

20   outweigh the pain benefit which is no better than any other NSAID

21   and the purported GI benefit which has not been shown to be better

22   than any other NSAID.  Dr. Avorn has concluded this as well.

23   Dr. Avorn testified to this court by deposition that the risk of

24   Vioxx outweigh the benefits, and that's even assuming that the GI

25   benefits are there.  Plaintiffs have satisfied their burden by a

1    preponderance of the evidence with respect to the question, first

2    question, the existence of a defect.

3            Brings us to the second question, would LDHH, Louisiana

4    Department of Health and Hospitals, have refused to pay for Vioxx

5    had it been aware of this defect.

6            The uncontroverted testimony of Secretary Hood on this

7    issue is that if he had known of the defect in Vioxx, that is that

8    serious risk of heart attacks outweighed a minimal GI benefit in an

9    a pain relieve no more effective than other NSAIDs, he would have

10   excluded it from LDHH's formulary.

11           That testimony is credible and uncontested.

12           Now, the defendants will point you to the testimony of

13   certain employees of LDHH who were under Secretary Hood -

14   Terrebonne, Castille, Bearden and Biglane - and suggest that these

15   witnesses do not agree with Dr. -- with Secretary Hood.  The truth

16   of the matter is that not one of those witnesses testified contrary

17   to Secretary Hood.  Not one testified that LDHH did not have the

18   will or the authority to adopt a restrictive formulary in response

19   to a defective drug.

20           They never testified to that issue, because Merck never

21   asked them that question.  Merck never asked whether they could

22   adopt an exclusive formulary to deal with a defective drug.  Merck

23   only asked them whether or not the formulary program as it existed

24   did not allow exclusions of drugs.

25           But what every single one of these witnesses did testify

1    to, your Honor, every single one testified that ultimately the

2    formulary decisions were those of Secretary Hood and that they

3    would defer to Secretary Hood's judgment on those matters.

4            Second Hood's testimony is not controverted.

5            In Hood's testimony about what he would have done is

6    consistent with the broad discretion granted state Medicaid

7    authorities to protect the welfare of Medicaid recipients.  In the

8    case of *Pharmaceutical Research and Manufacturers of America v.*

9    *Walsh*, United States Supreme Court case, the Supreme Court

10   concluded, "We have made it clear that the Medicaid Act gives the

11   State substantial discretion to choose the proper mix of amount,

12   scope, and duration limitations on coverage, as long as care and

13   services are provided in the best interest of recipients."

14           Secretary Hood testified that he believed that excluding

15   a drug, a defective drug, such as Vioxx, would have been within his

16   authority to protect the welfare of Medicaid recipients.

17           The only evidence offered to contradict Hood, the only

18   testimony to contradict Secretary Hood is that of former drug rep

19   and former Florida Medicaid employee turned hired expert Wells.

20   Mr. Wells has no experience in Louisiana, he testified that he has

21   no knowledge of the powers granted by the Louisiana legislature, he

22   testified at some length to the federal regulations and what those

23   federal -- what powers those federal regulations extend to the

24   states.  But his testimony in that regard has been uniformly

25   rejected by federal courts, including this court.

1        Your Honor, Secretary Hood is more knowledgeable about
2    what LDHH would have and could have done in response to knowledge
3    of a defect in Vioxx than is Mr. Wells, a former Florida Medicaid
4    employee, former drug rep.
5        Now, we've heard Merck's arguments about why Secretary
6    Hood's testimony is not credible.  Merck's arguments about why the
7    State wouldn't or couldn't have excluded Vioxx from its formulary.
8    First argument is that the State lacked the facilities in order to
9    do so.  Your Honor, the facilities to exclude Vioxx as required by
10   the federal statutes by placing it on an exclusive formulary were
11   in place.  They would have been no more onerous than what the State
12   was doing with respect to its PDL.
13       Most importantly, Section D4 allows the use of a DUR
14   board to make the clinical decisions.  Your Honor, the State had up
15   and running and had had up and running for several years before
16   June 13, 2001, a DUR board.  Which means that on the date that the
17   State was empowered to adopt an exclusive formulary by the
18   Louisiana legislature, it had the facility in place in order to
19   make the determination.  And, your Honor, if the defect had been
20   known, that determination would have been consistent with Secretary
21   Hood's testimony that the State would not have allowed for
22   reimbursement to Vioxx.
23       Now, in order to restrict a drug there are two things
24   that a state has to do:  First it has to do a clinical review based
25   on clinical factors, and then it has to publish its reasons.

1    That's it.  The State has been doing just that.  It's done it with

2    respect to its Preferred Drug List, it's done a clinical review,

3    even though under the federal statute it's not required to do so,

4    it's done so.  The State has published its reasons for allowing or

5    excluding drugs -- I'm sorry, from its PDL.  The State could have

6    done that, it could have adopted an exclusionary PDL and Secretary

7    Hood has testified that they would have done it.

8         Now, Merck has said that, well, the decision to exclude a

9    drug has to be based on significant clinical benefit, and the label

10   doesn't support that.  The label as it existed in April of 2002.

11   Well, your Honor, your Honor has heard from Dr. Rarick and

12   Dr. Kessler who both agree that the manufacturer has a continuing

13   duty to be aware of defects in its product and to update its labels

14   to disclose those defects.

15        So if this court accepts plaintiff's evidence, which we

16   believe it must, that there is a defect, then the label would have

17   been different, the label would have disclosed that defect.  In

18   fact, the label by law would have been required to disclose that

19   defect.  And the label, as such, would have shown that Merck -- I'm

20   sorry, that Vioxx was significantly clinically worse than any drugs

21   on the formulary.  And would have supported an exclusionary

22   decision.

23        And then Merck says, well, there are political hurdles,

24   there are political hurdles that would have prevented the State

25   from implementing a restrictive formulary.  Secretary Hood

1    testified, and there is no evidence in the record to contradict

2    Secretary Hood's testimony, that those political hurdles would not

3    have been in place with respect to excluding a defective drug in

4    order to protect Louisiana Medicaid recipients.  Secretary Hood

5    explained the difference between a 1980s type restrictive formulary

6    to which there was political adversity versus a restrictive

7    formulary for the sole purpose of avoiding exposure to a defective

8    drug, which Secretary Hood believes, consistent with common sense,

9    there would have been no opposition to.

10          In fact, in order to disbelieve Secretary Hood, one would

11   have to believe that this state would put philosophical qualms over

12   the adoption of restrictive formularies over protecting patients

13   from an unnecessary risk of heart attacks and deaths.  Merck has

14   not brought a single Louisiana witness, not one legislature, no one

15   from LDHH, no one from the P&T Committee, no one from the DUR

16   board, no one from the State of Louisiana to say that they would

17   not have supported Secretary Hood's recommendation to exclude

18   coverage for a defective drug.

19          Finally Merck says, well, the P&T Committee would not

20   have supported Dr. Hood -- Secretary Hood because the P&T Committee

21   relies on the FDA with respect to questions of safety and efficacy.

22   Merck has presented no evidence whatsoever that the P&T Committee

23   would not have supported Secretary Hood in his decision.  The only

24   member of the P&T Committee to testify on this issue is Secretary

25   Hood.  Merck suggests that the P&T Committee would not have been

1    willing to act because such action would have been contrary to the

2    FDA.

3         No one has testified that the P&T Committee would not

4    have recommended exclusion of the drug with a known defect just

5    because the FDA hadn't yet acted.  It is pure speculation to

6    suggest that the P&T Committee would have done so.  Hood, who was a

7    member of the P&T Committee, said that he would have acted.

8         The evidence is also that Merck would have been required

9    to update its label in order to disclose the defect.  And the

10   evidence is that since FDA was made aware of the defect, FDA has

11   not approved return of Vioxx to the market.  Hence, Merck's

12   suggestion that the FDA would have somehow the FDA's decisions or

13   rather that the P&T Committee would have somehow felt constrained

14   by the actions of the FDA is not supported by the evidence.

15        Finally, they say, well, look at what the State did with

16   regard to other drugs.  What the State did with regard to drugs

17   such as Celebrex that were not removed from the market is

18   irrelevant, your Honor.  As your Honor has said many times, this

19   case is not about Celebrex.  The evidence in this record is that

20   Celebrex is a worse actor than Vioxx.  Celebrex is still on the

21   market.

22        But tellingly, even though Celebrex is still on the

23   market and even though it still has preferred formulary placement,

24   the State has imposed significant restrictions on access to

25   Celebrex based on cardiovascular concerns.  That shows that the

1  State is concerned and is ready to take action with respect to CV

2  risks.  Even in a drug which is not shown to be as dangerous as

3  Vioxx.  The fact that the State took such action with respect to

4  Celebrex, which is not shown to be as dangerous as Vioxx, and even

5  the fact that Celebrex is there and available for patients,

6  supports the State's assertion that it would have removed Vioxx

7  from its formulary reimbursement.

8         Your Honor, Hood's position that he would have removed

9  Vioxx and made it -- made sure it wasn't available to Louisiana

10  Medicaid patients is entirely reasonable.  Merck itself made the

11  ultimate formulary decision when it decided that Vioxx should be

12  made available to no one by removing it from the market.

13  Withdrawing Vioxx from the market had to be much more unpalatable

14  to Merck than excluding reimbursement would have been to Louisiana

15  Department of Health and Hospitals, but Merck did it.  To date, the

16  FDA has not approved bringing Vioxx to the market, back to the

17  market, and Merck has not done so.

18         Your Honor, the State would have exercised its broad

19  discretion to protect Medicaid patients by excluding Vioxx from its

20  formulary.  That resolves Question 2 in favor of the plaintiffs,

21  and brings us to Question 3, whether or not the state was aware of

22  the defect.

23         There is no evidence that LDHH was aware of the defect.

24  In fact, if this court accepts Merck's position in a brief recently

25  filed with the court, and I quote, "Mr. Hood's testimony, taken as

1   a whole, reveals that he has no idea whether Vioxx had a defect

2   that would have prompted him to seek changes to the Louisiana

3   Medicaid pharmacy program."  Your Honor, that judicial admission

4   should be the end of the inquiry as to whether or not the State was

5   aware of the defect.

6         But we can go further.  Merck asserts that itself was

7   unaware of any defect, was unaware of any excess cardiovascular

8   risk until discontinuation of the APPROVe study prompted removal of

9   Vioxx from the market.  At most the evidence shows that at some

10  point in the spring of 2002 through the removal in September of

11  2004, LDHH was aware of a potential heart attack risk of unknown

12  significance and was believed that that risk was outweighed by the

13  GI benefits.  Your Honor, that's not knowledge of the defect.

14        I would also point out to your Honor that in June 13 of

15  2001, the point at which the state was first empowered to act,

16  there was no Provider Synergies monograph providing even any

17  awareness as to a potential unknown -- risk of unknown

18  significance.  There was no label alerting the State to a potential

19  CV risk.

20        But even after 2002, the label and the Provider Synergies

21  monographs only said that the CV risk was unknown and the GI

22  benefits were significant.

23        About the CV risk, if we read the label, the label says,

24  "The significance of the cardiovascular findings from these three

25  studies, VIGOR and two placebo-controlled studies, is unknown.

1   Provider Synergies made the exact same conclusion that Merck made

2   in its letter, "the significance of this potential cardiovascular

3   risk is unknown."  It reported that to the State in 2002, it

4   reported that to the State in 2003, it reported that to the state

5   in 2004.  It certainly did not alert the State to the existence of

6   a defect such that the cardiovascular risks, the established

7   cardiovascular risks outweighed the GI benefits associated with the

8   drug.

9        Now, defendants have made much of the fact that the

10  Provider Synergies monographs cited to the Mukherjee article in

11  JAMA in 2001.  But the citation to the Mukherjee article, your

12  Honor, discounts that article, it says that such meta-analysis must

13  be viewed with caution.  And then it follows reference to that

14  article with two studies that Merck -- two Merck sponsored studies

15  that purport to show that there is no significant risk.  Those two

16  Merck sponsored studies conveyed the marketing message that there

17  was no increased risk.

18       Contrasting the Mukherjee study with the two Merck

19  sponsored studies, there is no wonder that the Provider Synergies

20  and ultimately the P&T Committee and ultimately LDHH concluded that

21  the risks were unknown and a risk would have been outweighed by the

22  benefit.

23       Now, let's look at what the label said about the benefit.

24  The label said VIGOR shows a 50 percent reduction in PUBs over

25  Naproxen in all patients.  It cited to the Laine study which showed

1    reduction in GI events over ibuprofen, it cited to the Laine study

2    which showed results comparable to placebo.  The Provider Synergies

3    cited to the exact same things.  And Valerie Taylor of Provider

4    Synergies testified that she understood the label to say that the

5    benefit was in all patients, not just the steroid group.

6         Tellingly, when the label in Provider Synergies discussed

7    this GI benefit, they did not qualify it by saying the benefit was

8    unknown.  They said the benefit was there.  So in doing its risk

9    benefit analysis, the State was not made aware of a defect, it was

10   only made aware that there was a significant, supposedly

11   significant GI benefit, which was not questioned, and a cardiac

12   risk, potential cardiac risk which was unknown.

13        Now, Merck makes much of the argument that the Provider

14   Synergies monographs and the labels were reasonable given the

15   knowledge or the state of knowledge and the state of the science

16   "at the time" that those materials were produced.  Your Honor, no

17   witness on behalf of Merck has said that those materials provided

18   adequate information of the risk as it's known now.  And, your

19   Honor, Merck is not allowed to make the "at the time" argument

20   under Louisiana law.

21        Article 2545 deems Merck, not presumes, deems Merck to

22   know of the defect.  FDA principles don't allow Merck to make the

23   "at the time" argument because the manufacturer consistent with

24   Louisiana Article 2545 has the duty to investigate and to know of

25   risks associated with its products.

1          Finally, fundamental fairness doesn't allow the "at the

2    time" argument.  Because Merck is responsible for what information

3    was made available in its label.  Merck chose what studies to

4    conduct and what studies not to conduct.  Merck has the

5    responsibility to investigate known risks before exposing patients,

6    and Merck chose to ignore the recommendations of Merck Research Lab

7    president Edward Scolnick that Merck conduct a CV outcome study to

8    answer the question.

9          THE DEPUTY CLERK:  Mr. Murray, you've used 25.

10         MR. MURRAY:  Thank you very much.

11         Provider Synergies monographs did not disclose the risks,

12   even those risks that were known to Merck "at the time" because

13   Merck had not published that information, your Honor.  Merck had

14   studies that showed GI events worse than NSAIDs that it didn't

15   publish, Merck had studies that showed increased risk over placebo

16   by the time the Reicin, Konstam and Weir articles were published,

17   but it didn't say we've proven that there is an increased risk over

18   placebo.

19         Merck didn't publish that the VIGOR study showed a 27

20   percent greater hospitalization rate due to CV hospitalizations in

21   Vioxx patients.  Merck didn't disclose that the VIGOR benefits for

22   most serious events in steroid use were in steroid users only.  And

23   Merck did not disclose in the published literature that Merck had

24   chosen not to conduct a CV outcome study in spite of a

25   recommendation by Merck Research Lab president.

1    Your Honor, any effort to get at the truth was obscured

2    by Merck's message, which was conveyed both through calls directly

3    on Provider Synergies and the P&T Committee members and also

4    through Merck sponsored published literature.

5    Valerie Taylor said that she didn't rely on Merck's

6    marketing, that she relied on the published literature.  But, your

7    Honor, Merck's marketing message and the published literature were

8    one in the same.  Merck's studies were dictated by marketing needs.

9    I refer your Honor to LAAG 590.  Which stated:  "The purpose of the

10   Vioxx Stage IV program review is to update the PAC on the current

11   competitive environment, and to review the critical issues for

12   Vioxx in the marketplace and the plans to address them.  This

13   discussion will include prioritization, strategy, and budget for

14   ongoing and new 2001 Vioxx clinical studies.  It was the need in

15   the marketplace that drove Merck research, not concern over

16   cardiovascular events.

17   Addressing the need in the marketplace -- next slide,

18   please -- is what brought them to their -- what dictated their GI

19   studies.  Addressing the need in the marketplace in order to

20   neutralize non-GI concerns is what drove the other studies they

21   conducted.

22   Next slide.  Their purpose for conducting studies was to

23   neutralize non-GI safety concerns.  That was a marketing purpose,

24   your Honor.

25   And finally, I will turn your Honor to a memo about the

1  Reicin study.  The Reicin study relied in Valerie Taylor Provider

2  Synergies monograph in showing that the results of the Mukherjee

3  study were not reliable.  Your Honor, on the Reicin study, we have

4  an internal memo that states from Merck this manuscript was revised

5  multiple times based on marketing input and this was of the highest

6  priority to U.S. Human Health.  The department -- division of

7  Merck.

8          Your Honor, not only did they get that message that,

9  Merck message from the studies conducted and sponsored by Merck for

10 marketing purposes, they got the Merck message from the regional

11 medical directors who called on Provider Synergies and P&T

12 Committee members.  Kerry Edwards was a regional medical director

13 who called on Provider Synergies.  Valerie Taylor said that she had

14 no reason to doubt information that she received from any

15 pharmaceutical manufacturer.

16          We know that Kerry Edwards spoke to Valerie Taylor and

17 addressed her concerns on multiple occasions, at least once or

18 twice a year.  He said that every time he spoke to her she raised

19 cardiovascular concerns and he responded.

20          Now, he can't remember what he said, your Honor, but I

21 would submit to your Honor that what he said is consistent with the

22 Merck scientific marketing plan, which is in the record before your

23 Honor.

24          Fran Kaiser called on P&T Committee members.  Fran

25 Kaiser, also a doctor, a regional medical director with Merck,

1    could not recall exactly what she told Louisiana P&T Committee

2    members.  But again, I would submit to you that what she told them

3    was consistent with Merck's national plan for scientific

4    communications.

5          And we don't have to take my word for it, your Honor,

6    because both Edwards and Kaiser testified that any message they

7    would have delivered would have come from headquarters.

8          Here we can see the scientific communication plan for

9    Vioxx, and that plan included, emphasizing the GI benefits,

10   minimizing the CV risks.

11         Finally the sales force called on P&T Committee members.

12   We know that they targeted P&T Committee members before and after

13   their meetings.  And, your Honor, we point you to LAAG 393, which

14   instructs those sales force members on how to conduct their

15   meetings.  They were to deliver the core messages with respect to

16   Vioxx and they were to completely resolve physician concerns

17   regarding renal and cardiovascular issues using such materials as

18   the CV card and other materials that are in the record.

19         This memo, which was in Warren Lambert's, who was the

20   sales marketing guy for the area, this was in his custodial file,

21   says the same thing.  Obstacle handling messages, this is the

22   message that went to Provider Synergies -- I'm sorry, that went to

23   the P&T Committee when the sales force called on them.

24         THE DEPUTY CLERK:  Mr. Murray, you've used 31.

25         MR. MURRAY:  Thank you, very much.

1        Your Honor, there is no evidence that Provider Synergies

2   or the P&T ever received from any sources of information available

3   to them published literature, label, RMD presentations, sales

4   presentations, anything other than the message that the CV risk was

5   unknown and the GI benefit was significant.

6        Your Honor, with respect to question three, the

7   preponderance of the evidence is in plaintiff's favor.

8        Finally, Merck will suggest that the FDA is somehow a

9   defense to this.  I find it highly ironic that Merck is now trying

10  to hide behind the FDA.  Merck who ignored the FDA's precautions,

11  who fought with the FDA on its recommendations for a label, and who

12  referred to FDA reviewers as grade D high school students is now

13  trying to hide behind the FDA.

14       FDA approval does not relieve the manufacturer of its

15  state law duties.  Merck is ultimately responsible for the safety

16  of its product, not the FDA.  Whether the FDA approved the product

17  label before the defect was known is immaterial.  The question

18  is -- before the court is what would have happened after the defect

19  was known; and, your Honor, now that the defect is known, the FDA

20  has not allowed Merck to return the drug to the market.

21       We're not suggesting to your Honor that we should win

22  because the FDA should not have approved the drug in the first

23  place, that's not our case.  However, they shouldn't be able to win

24  by arguing that the FDA did approve the drug.

25       Finally, your Honor, we believe that we have satisfied

1   all three elements of redhibition, and that brings us to the

2   redhibitory remedy.  Under Article 2545 we are entitled to a return

3   of the purchase price.  I would note that the return of the

4   purchase price is not damages.  We're not looking at the economic

5   injury, we are looking at the redhibitory remedy.  LDHH had the

6   ability as of June 13, 2001, to exclude coverage for Vioxx and the

7   amount of reimbursements from June 13, 2001, to September 30th,

8   2004 is the proper measurement of the redhibition remedy and that

9   is $11.17 million.

10          Now, Merck argues that approximately $900,000 of that

11  amount is pharmacy fees, which Merck shouldn't have to pay.  Your

12  Honor, pharmacy dispensing fees are the reasonable costs associated

13  with the sale, and under Article 2545 the defendant is responsible

14  for reasonable costs associated with the sale.

15          Finally, Merck has not offered any evidence to meet its

16  burden that that amount should be reduced in order to reflect the

17  value received, if any, by the State for Vioxx.  Your Honor has

18  made its own conclusion with respect to the summary judgment motion

19  in reference to the *Guar Gum* case.

20          I would also note, your Honor, that there is no evidence

21  in this record that Vioxx -- that the State received value or what

22  the amount of that value was.  The only evidence as to what value

23  may have been received from -- by the State, arguably, only

24  evidence that even touches that issue, is the evidence of

25  Dr. Wiggins.  Dr. Wiggins testified that the State got 100 percent

1    of what it paid for Vioxx because if it hadn't paid for Vioxx, it

2    would have paid for some other drugs.

3            Well, first of all -- which were equally expensive as

4    Vioxx.  First of all, that premise is fundamentally flawed because

5    when Vioxx came off the market, not all prescriptions went to

6    Celebrex.  Now Dr. Wiggins says that's for reasons other than

7    disclosure of the defect, but I would submit, your Honor, that

8    Dr. Wiggins is not in a position to make that conclusion.

9            But in any event, where the other expenditures went is

10   not relevant to the redhibition question.  More importantly, there

11   is no evidence whatsoever, even from Dr. Wiggins, as to what the

12   value received by the State was assuming the product had a defect

13   for which the State would have refused to pay.  Dr. Wiggins

14   clarified that absolutely in his testimony when he said, "if one

15   were to say those positive characteristics don't exist in Vioxx,

16   they simply don't and the doctors were mistaken in the first place

17   to buy Vioxx, then the analysis wouldn't apply."

18           Your Honor, we have met our burden to demonstrate that

19   the State is entitled to a full reimbursement of the money that it

20   spent on Vioxx from June 31st to the removal of the drug in 2004,

21   and we would ask that your Honor enter judgment for that amount.  I

22   thank you.

23           THE COURT:  Thank you, counsel.  Let me hear from the

24   defendant.

25           MR. ISMAIL:  Good morning.  The State's failure of proof

1    in this trial has been profound.  The court has repeatedly advised

2    the State it has a threshold burden under the Medicaid aspects of

3    this lawsuit before it even gets to its burden under redhibition.

4    Specifically to avoid problems of aggregate proof and to

5    demonstrate causation under any theory, the state must show that it

6    could have had the ability and would have exercised that ability to

7    completely restrict Vioxx reimbursement within Medicaid.  Without

8    such a showing, the court need not even get to the elements of

9    redhibition.

10           The question of could have and would have has both a

11   federal Medicaid component and a state law and DHH component.  The

12   plaintiff has failed to offer any proof, let alone sufficient proof

13   on several aspects of the threshold inquiry.  And even if the court

14   does elect to get to the elements and the questions of redhibition,

15   the State has not met its burden under that cause of action in

16   several ways.

17           The first the could have/would have threshold question.

18   And the beginning point of that inquiry is the federal Medicaid

19   statute, which your Honor has addressed in the motion for summary

20   judgment and has identified the limited means to which a state can

21   restrict Medicaid reimbursement.  And the court found that the only

22   one that's even potentially applicable here is the exclusive

23   formulary concept.

24           And your Honor set forth exactly what that provision was

25   in the opinion on summary judgment, and that is 1396r-8(D)(4)(C),

1    and that provides that if a state has an exclusive formulary -- and

2    keep in mind Louisiana never did -- but if the State had an

3    exclusive formulary, a drug can be excluded from that formulary if

4    and only if, based on the drug's labelling, the drug does not have

5    a significant, clinically meaningful therapeutic advantage in terms

6    of safety, effectiveness or clinical outcome.

7             As to that standard, your Honor, you put the target up

8    for the plaintiff, they never even took aim, let alone hit it.

9    They presented no evidence to this court about this standard as to

10   whether Vioxx was even excludable under an exclusive formulary that

11   they never even had.  The only witness who addressed therapeutic

12   advantage that they proffered, Dr. Graham, the gastroenterologist,

13   he compared Vioxx to placebo, et cetera.

14            But he was asked with regard to the GI benefits.  "With

15   regard to the GI profile or benefit, no doubt in your mind that

16   with regard to at least a subgroup of people who are on steroids,

17   Vioxx would be superior to traditional NSAIDs; correct?"  His

18   answer, "That's what the data showed."  And that's what he

19   believed.  The therapeutic advantage that Dr. Graham testified to

20   alone would be sufficient to remove Vioxx as an excludable drug

21   under 1396.

22            Now, the remainder of their witnesses never were asked a

23   question and never did provide an opinion.  Drs. MacGregor,

24   Abramson, Kessler, they never were asked whether there was a

25   therapeutic advantage for Vioxx or not, based on the drug's

1    labelling.  They never even were asked based on the hypothetical

2    label the State now says should have been in place.  Of course

3    that's not what the statute provides.  The statute does not allow a

4    state to substitute its judgment for that of the FDA as to what the

5    label should read.

6         But then you heard plenty of witnesses this week that

7    Merck called.  You heard Dr. Parnell who is a prescriber and treats

8    patients in acute and chronic pain, and he identified clinically

9    meaningful therapeutic advantages for the drug.  With respect to

10   its dosing frequency, the avoidance of certain allergic reactions,

11   you heard Dr. Eiswirth describe the clinically meaningful advantage

12   of not complicating bleeding risks, and that's important in his

13   patients who are on anticoagulants.

14        You heard about the avoidance of the interaction with

15   aspirin.  You heard Dr. Sales testify to the gastrointestinal

16   benefit.  And you heard from Dr. Rarick that all of these

17   clinically meaningful therapeutic advantages are based on the

18   drug's labelling.  And because the State offered zero proof on this

19   question and given the ample proof to the contrary, Vioxx simply

20   was not excludable, even if the state had an exclusive formulary.

21        But even if you get past that section, your Honor, any

22   exclusive formulary that will be adopted in the Medicaid program

23   must have a prior authorization requirement.  Paragraph (D) of that

24   same section of the statute says, "The State plan must permit

25   coverage of the drug excluded from the formulary, must have a prior

1   authorization program consistent with paragraph (5)."  Now, I know

2   we heard from the State lawyers here that, gee, the State could

3   have adopted a prior authorization program so onerous that no

4   prescriptions would be allowed.  But, your Honor, they didn't

5   explain to you how that could happen under federal Medicaid.  You

6   will recall when Dr. -- or Mr. Hood was here when I was asking him

7   questions, how could you restrict under the federal Medicaid regime

8   Vioxx sales completely, he took a pass, he didn't know.  What the

9   federal Medicaid regime would have done to this concept of

10  completely restricting sales of a drug.  They didn't bring any

11  other witness to explain how that would happen.

12          One thing we do know is the prior authorization system

13  the State does have in place is a soft one and that's consistent

14  with the State's objective of having room for physicians to

15  prescribe medicines according to their clinical judgment.  This is

16  the testimony of Mr. Bearden who was the state Medicaid director,

17  and he describes the program in place at the University of

18  Louisiana - Monroe who were administering the PA program, and he

19  says, "I think you described that as one in which, generally

20  speaking, if a physician wanted to write a prescription for a drug

21  that required a prior approval, prior authorization, the State

22  would allow that for the majority of the time."

23          Ms. Terrebonne, the pharmacy director went further.  She

24  said, "If a doctor wanted to prescribe a drug that required a prior

25  authorization, do you know if ULM ever rejected that request?  Her

1    answer, "They did not."  And then they confirmed that the reason

2    the State doesn't reject a doctor's request for prior authorization

3    for a particular drug is because the State defers to the medical

4    judgment of prescribing physicians to determine what's in the best

5    interest of the patient.

6            So that's the system they have.  They brought you no one

7    to explain how that system could have been different in this world

8    in which they're trying to exclude completely reimbursement for a

9    Medicaid -- a covered drug under Medicaid.

10           And the other thing you heard, your Honor, is that there

11   is no such thing as a sham prior authorization program, one in

12   which that's in name only and doesn't actually allow for any use of

13   a drug.  This is the testimony of Mr. Jerry Wells, whose testimony

14   is uncontroverted in this case.  They never called a witness of

15   their own, an expert to describe a different interpretation.  And

16   as we said, Mr. Hood had nothing to offer about the federal aspects

17   of this.

18           Mr. Wells was asked, "Can you have a prior authorization

19   program that is in name only that does not permit restrictions,

20   does not permit coverage of a drug under any event?"  His answer,

21   "It is my understanding and it was our understanding as a group of

22   pharmacy administrators that prior authorization meant that you set

23   criteria that would ultimately allow coverage of the drug.  You

24   didn't want for the state agency to be interposed between the

25   doctor and the patient.  You might set some criteria but ultimately

1    you would allow access."

2         And of course that makes perfect sense, and again, it's

3    uncontroverted here through any record evidence that the State has

4    submitted.

5         And your Honor, the statute itself really does end this

6    inquiry with respect to prior authorization.  Under this question

7    of individual prescribing decisions and the preclusion to rely on

8    aggregate proof is a reasoning that the court has adopted.  So long

9    as there is a mechanism for which the State is compelled to

10   reimburse Vioxx, the State cannot recover for its reimbursement

11   because then you're into this individual decisions by individual

12   doctors for individual patients.

13        Well, the statute, recall that prior authorization

14   referred to paragraph (5) and this is the prior authorization

15   program.  Any prior authorization program under an exclusive

16   formulary must provide for at least a 72-hour supply of any drug

17   that is requested.  So long as it's a covered drug, as was Vioxx

18   under the Medicaid program, the State must, federal law requires it

19   to allow at least a 72-hour supply.  They had no discretion.  And

20   of course you've heard about the acute indications for Vioxx for

21   acute pain, dysmenorrhea, migraine.  The State would have had to

22   reimburse Vioxx even if it adopted the exclusive formulary it never

23   even had during the time period in question.

24        And once we're here, Judge, once they have to reimburse

25   Vioxx for at least some amount of the description prescriptions,

1    you're talking individual decisions by individual doctors for

2    individual patients.

3           That's the federal component.  You didn't hear much from

4    Mr. Murray just now about could they have even done this under

5    federal law.  In fact, I think he said Mr. Hood would have excluded

6    Vioxx from the formulary.  What formulary?  They never had one.

7    They had a Preferred Drug List.  They didn't even adopt one and

8    they couldn't have excluded Vioxx from it to begin with.

9           But then you turn to state law and the state enabling

10   statute, they have to show that they had the ability under state

11   law to even adopt a formulary.  And, your Honor, I believe the

12   State has consistently misrepresented the court's summary judgment

13   opinion on this question at page 12 your Honor wrote:  "Read in the

14   light most favorable to the plaintiff, the new statutory provision,

15   Act 395, gives LDHH discretion to establish a restricted

16   formulary."  The court correctly did not find as a matter of law or

17   fact the State had this power, rather in the context of our motion

18   for summary judgment reading the record most favorable to the

19   plaintiff, allowed the plaintiff to come forward and bring proof.

20          But we've now seen the proof.  And what did we learn?

21   Well, we learned a lot about Act 395, how it was adopted and how it

22   was implemented at the time.

23          One thing we know is that none of the departmental

24   witnesses actually believed they had the power at the time to adopt

25   a restrictive or exclusive formulary.  You saw the submitted

1   testimony of witness after witness from Merck that Merck put up of

2   DHH witnesses.  This is Mr. Castille, who by the way was the former

3   general counsel of DHH, was the undersecretary at the time he gave

4   this testimony.  "The state could not, for example, have done what

5   FDA could do and take the drug off the market.  We, obviously, do

6   not have that authority.  So to the extent we placed them on a

7   non-preferred list, that was the most restrictive thing we could

8   do.  Ms. Terrebonne, was there anymore difficult step for a

9   prescriber to take to be able to prescribe a medication than one

10  that was on the prior approval or not on the PDL list after 2002?

11  Her answer, no.

12       Mr. Bearden, "was not being on the PDL and requiring a

13  prior authorization the most restrictive system that could be in

14  place during closed formulary period?  Yes:  Dr. Biglane.  Also

15  confirmed that we're talking about the period after Act 395, we're

16  not talking about the pre-2002 period, they all confirmed in their

17  mind the most restrictive thing we could do is a PDL.

18       Another thing we heard, we learned about this act during

19  this trial is there was a great deal of political pressure for the

20  department to not develop a restrictive formulary.  Mr. Hood

21  confirmed that in his sworn testimony.  At the end of the day, and

22  I think you referred to this with Mr. Murray, you did not consider

23  moving to a restrictive formulary because a prior authorization

24  procedure is more palatable; correct?  He says, correct.  The key

25  factor that led you, as secretary, to conclude that a restrictive

 1    formulary was not in the best interest of Louisiana was that a PDL

 2    system ensured passage of some sort of program to save the State

 3    money; true?  He answers, correct.

 4         I think that was the selling point of Act 395, and of

 5    course we did exactly that.  We had a PDL with prior authorization.

 6    That was the selling point.  That's what they thought they were

 7    asking for and that's what they understood they were getting, a PDL

 8    system.

 9         Clearly none of the folks involved wanted a restrictive

10    formulary, thought they could do one or even considered it a good

11    idea.  We also heard that Mr. Hood took his cue from the

12    legislative oversight committees, understandably, who were

13    instrumental in passing this act and who were approving his actions

14    of what formulary system or PDL he would adopt.  And as to that:

15         (WHEREUPON, A VIDEO CLIP WAS PLAYED AS FOLLOWS:)

16         THE CHAIRMAN:  I mean there is nothing different from what

17         pharmacopeia, whatever you want to say.  We didn't do anything

18         different other than say it's a preferred provider list.

19         MRS. SCHWEGMANN:  No, but they sat here and said that if they

20         were strictly going by the word formulary, that they could say

21         automatically these drugs are excluded --

22         THE CHAIRMAN:  That's correct, that's correct --

23         MRS. SCHWEGMANN:  -- and no way no how.

24         THE CHAIRMAN:  We never intended to do that.  The legislative

25         intent was never presented that way.  None of it was ever

1    voted on it that way and I would have never even authored the

2    bill with that type of language.  Our intent...

3    MRS. SCHWEGMANN:  But...

4    THE CHAIRMAN:  I understand.  It's semantics of words.  I

5    concede that to you.

6    MRS. SCHWEGMANN:  Ok, so, what we're saying is, that we are,

7    um, if someone wants to call this a drastic change, the way we

8    have interpreted it, is a less drastic change than if we were

9    going by the word, if we took it literally.  Is that correct?

10   DHH ATTORNEY:  Right.

11   MRS. SCHWEGMANN:  Than what we have now?

12   DHH ATTORNEY:  Right.

13   MRS. SCHWEGMANN:  Okay.

14   (WHEREUPON, THE VIDEO CLIP WAS CONCLUDED.)

15        MR. ISMAIL:  You have the author of the bill saying I

16   never would have submitted this bill if it were going to be

17   interpreted to allow the creation of a restricted formulary.  You

18   have him saying that I know there's semantics and you can pick

19   apart the language of the bill, perhaps eight years later and say

20   that, gee, we think we could have had certain powers under the act,

21   but that's not what they thought they were doing at the time.

22        In fact, you had in the final comments, which this is a

23   group of DHH folks who are getting their direction from the

24   legislature, if anyone wants to come back and argue that this is

25   some sort of drastic change, that's not the way we're interpreting

1    it.  And the change was from an open formulary to a PDL, not from

2    an open formulary to one that allows complete restriction of

3    coverage.

4            Now, not surprisingly -- oh, so we have this, we have

5    this testimony here or this evidence here, and the question is why

6    was this opposition to the restrictive formulary concept?  Well, we

7    heard from Mr. Hood about that failed experiment in the 1980s, in

8    which the State had a closed formulary for Medicaid.  And no one

9    wanted to return to that concept that they had for the formulary,

10   for the pharmacy program.

11           Mr. Hood made clear, talking about that failed

12   experiment, there were lots of people opposed to that system,

13   right?  He says lots.  Not just pharmaceutical manufacturers but as

14   we described, doctors in this state, pharmacists in this state, and

15   patient advocates in this state, right?  And he says, right.

16           And not surprisingly, your Honor, given the opposition

17   from several different groups to the adoption of a restricted

18   formulary, Mr. Hood himself gave assurances at the time the State

19   would always allow a prior authorization mechanism.

20   (WHEREUPON, A VIDEO CLIP WAS PLAYED AS FOLLOWS:)

21   SECRETARY HOOD:  There was brought up the concern about would

22       this be a replay of the 1989 formulary that was put into

23       effect.  The answer is no.  There was no prior authorization

24       in 1989.  That meant that it was either you use the drug on

25       the list or you don't get the drug, period.  But that's not

1     the case now.  We do have prior authorization.

2         (WHEREUPON, THE VIDEO CLIP WAS CONCLUDED.)

3              MR. ISMAIL:  So what was the realty at the time?  You had

4     lots of folks opposed to a restrictive or exclusive formulary, you

5     had assurances from the department that's not the direction we're

6     going.

7              Another reality at the time is that Vioxx always was FDA

8     approved as safe and effective.

9              Now, I heard Mr. Murray say over and over again that if

10    Mr. Hood only learned the drug was defective, if he only learned

11    the drug was defective but the reality at the time was the drug

12    carried and had FDA approval, and that was reaffirmed four

13    different times when the drug use was expanded by FDA, that it was

14    safe and effective.

15             The State LDHH or the P&T Committee has never bucked an

16    FDA determination of safety and efficacy.  It's never happened.

17    And as they confirmed, they defer and look to the FDA for guidance

18    on the safety and efficacy of medications.  So the reality is, no

19    one wanted a restrictive formulary and during this period Vioxx

20    always remained FDA approved as safe and effective.

21             Their case cannot survive in that reality, could

22    have/would have inquiry, so they put up a different hypothetical

23    and they say:  What if the State knew different information about

24    Vioxx in and they threw up lots of things in this trial, you heard

25    about osteoarthritis study blocks, you heard about Alzheimer's, you

1  saw lots of Merck internal e-mails, we saw some this morning.  We

2  heard yesterday about some study with 125 milligrams of Vioxx that

3  was done in the 1990s.

4          And they say, well, gee, if only the State knew some

5  bucket of information, clinical information about Vioxx, it may

6  have made a decision different than the FDA, they determined that

7  the risks outweighed its benefits.

8          Well, as to that question, Judge, they have no proof.

9  They brought you one witness, Mr. Hood.  Not a doctor, not a

10  medical professional, and one who confirmed, "You are not qualified

11  to assess the risks and benefits of prescription pharmaceuticals

12  yourself; correct?  A. Correct.  As to clinical issues of safety

13  and efficacy, you deferred to the medical professionals on the P&T

14  Committee; true?  A. True."

15          So as to this hypothetical world that they brought, one,

16  that's not based in reality because they never had a formulary,

17  never thought it was a good idea, and the drug was safe and

18  effective according to FDA.  But as to this hypothetical they've

19  posed, Mr. Hood can't answer what they would have done.  And, in

20  fact, one thing we know for sure is that David Hood would not make

21  his own independent clinical assessment about scientific

22  information and make a decision about a drug without receiving

23  input from the P&T Committee; right?  His answer, "that's correct.

24  I would never do that."  He did not, could not, and would not make

25  those clinical assessments himself.

1    And so here is the problem.  We have a witness, their

2    only witness who says I wouldn't have made this decision myself.

3    But there was no one else who can fill in that factual void.  They

4    had a witness from Provider Synergies but they never asked her,

5    what would you have done had you learned X, Y and Z?  No proof.

6    There's no proof as to what the P&T Committee would have done with

7    X, Y and Z.

8    It's not the question of what would the committee do had

9    they learned Vioxx was "defective" in Mr. Murray's argument, the

10   question that they're posing is what would they have learned --

11   what would they have done had they learned different information

12   than they already had about the drug?  This collection of clinical

13   aspects that they say they should have known.  And there's simply

14   no proof to show what the State would have done, which is their

15   burden, under this question.

16   Now, that's just on the clinical aspects.  Then you get

17   to the question of what was the State's authority.  And again, they

18   brought one person, Mr. Hood.  And he said, and he can sincerely

19   believe, your Honor doesn't have to find this part of his testimony

20   not credible, "I would have done everything in my power had someone

21   advised me, I couldn't make the decision, but if someone told me

22   something I would have acted."  But he couldn't enumerate what his

23   powers were, he had no idea how he could have acted within the

24   context of Medicaid.  He didn't know what his enumerated powers

25   were under the act.  He just said I would have done something.

1          And when you ask him, well, what would you have done?  He

2     says I would have called a lawyer.  You ask him who, he suggested

3     me at one point, but then he suggested he would call the Attorney

4     General or folks within DHH.  Maybe he would have called

5     Mr. Castille, the former general counsel, we already know what he

6     thinks about the State's ability to restrict.

7          But one thing we know for certain is the factual record

8     is empty as to what this advice would have been to Mr. Hood.  And

9     your Honor, you can't -- it's not a reasonable inference from a

10     completely empty record that someone would have told Mr. Hood, you

11     know what, Mr. Hood, you can completely restrict Vioxx and create a

12     restricted formulary.  We've already seen no one at the time

13     thought they could do that, no one thought it was a good idea,

14     given the unpalatable nature of that question, that's not a

15     reasonable inference from a completely void factual record.

16          So we have a failure of proof on the clinical aspect, we

17     have failure to prove on the authority aspects, as to what the

18     State would have done.

19          And the State has another major practical problem here as

20     well, because one thing that we've learned about the PDL and the

21     adoption of it is that the State wanted a means to control pharmacy

22     costs, while still allowing physicians the room to prescribe

23     medicines.  That was -- that's what they thought they were getting

24     and that's what they wanted.

25          And by all accounts the PDL system has worked well for

1    the State, it's still around today, it's been in place for the last

2    eight years, the State has been allowed to save money through those

3    supplemental rebates that were very important to the adoption of

4    this act.

5         So in their hypothetical world what they want the court

6    to believe that had Mr. Hood learned different information about

7    one FDA approved drug, the State would have scrapped its entire

8    pharmacy benefit program, that they would have thrown away the

9    ability to do a Preferred Drug List, that they would have thrown

10   away the ability to have supplemental rebates, that they would have

11   thrown away the cost savings that come with that program.  And what

12   would they have done in their hypothetical world?  They want you to

13   believe they would have done all of that and return to a closed

14   formulary that they were so desperate to get away from in the 1980s

15   and so desperately wanted to avoid in 2001.

16        They have no witness, your Honor to sponsor that far

17   fetched theory, and there's no basis upon which that from this

18   record that anyone can infer that that's what the State would have

19   done had they had different information about Vioxx.

20        But we don't even need to guess what the State would have

21   done, because as we've pointed out during this trial, we have a

22   perfect test case, and that is the situation with Celebrex.  Here

23   we have a COX-2 inhibitor that carries a black box cardiovascular

24   warning, that carries an FDA determination that the cardiovascular

25   risks of Celebrex are equivalent to that of Vioxx, and an FDA

1    determination that it's Vioxx, not Celebrex, that has the

2    gastrointestinal advantage.  And that since 2005 Celebrex has

3    carried the black box.

4            Now recall that Dr. Kessler, their expert, took the stand

5    and he said the October 2001 label proposal from FDA, your Honor

6    will remember this is the label proposal that prompted the colorful

7    reaction from Dr. Scolnick, that that label in Dr. Kessler's view

8    would have been adequate.  Now implicit in that admission from

9    Dr. Kessler is the benefits outweigh the risks because then the

10   drug would be allowed to be marketed under that label.  But he

11   says, okay that label would have been fine.  Merck should have

12   adopted that label.  But that was a cardiovascular warning, not

13   even a black box.

14           So now we have this Celebrex black box.  And what did the

15   State do?  Well, your Honor's already seen the proof, and what the

16   State did as late as 2008, 2009, they kept Celebrex and put

17   Celebrex on the preferred drug list.  Mr. Murray just said this

18   isn't a good example because Celebrex is still on the market.  But

19   that's the reality in Vioxx, too, from '99 to 2004, it's the exact

20   same situation.  It's on the market, they say it should have had

21   much more information about cardiovascular risks, they have that

22   situation with Celebrex.  They didn't adopt a restrictive

23   formulary, they made it preferred on their list.

24           And then we saw another test case on Monday, this drug

25   diclofenac, and I think counsel called it cardiotoxic, he put up a

1    table and says, look, it has the highest relative risk on that

2    table, it carries the cardiovascular black box warning, and it's a

3    nonselective NSAID so it has no GI benefit.  So with that test

4    case, we learned that drug is also preferred here in Louisiana.

5            You heard the testimony of Mr. Wells that there are lots

6    of drugs in the Louisiana preferred drug list that carry

7    cardiovascular warning information, and those drugs are reimbursed

8    freely both on the PDL and through prior authorization.  And

9    Mr. Hood confirmed, "notwithstanding any publicized risk

10   information about any drug, the State never even considered moving

11   to a system of trying to completely restrict Medicaid reimbursement

12   for an FDA approved drug?  And he says, "I think that's correct."

13           Not surprisingly, that testimony is not surprising,

14   because as Mr. Wells has confirmed, "Has any state ever instituted

15   an exclusive formulary in which no reimbursement is permitted under

16   any circumstance based on the safety concerns of one drug?"  His

17   answer, "No."

18           THE DEPUTY CLERK:  Mr. Ismail, you've used 30 minutes.

19           MR. ISMAIL:  Thank you.

20           So your Honor, if the inquiry here is what a reasonable

21   DHH do under the, what the plaintiff lawyers are saying the State

22   of Louisiana would have done, it's 50 to zero.  Their theory is 0

23   for 50, it's never happened that a state has changed its formulary

24   system, created a restricted formulary to exclude one FDA approved

25   drug.

1          Your Honor, that's the could have/would have question,

2     the threshold burden for just causation for the State to prove

3     under both Medicaid, federal Medicaid and state law components.

4          I'd like to turn now to the elements of redhibition.  The

5     State has elected to pursue a recessionary remedy, they want their

6     expenditures back, that requires them to prove that the thing, in

7     this case Vioxx, is absolutely useless for its intended purpose.

8     They offered no testimony on that issue.  Dr. Kessler testified to

9     signals he thought were missed.  That's not a redhibition opinion,

10    that's a negligence opinion.

11         Dr. Graham -- notwithstanding our disagreement with

12    Dr. Kessler, it's just not on point.

13         Dr. Graham certainly opined as to gastrointestinal risks,

14    mostly against placebo, but that's not a redhibition opinion

15    either.  In fact, he acknowledged the benefit for at least a subset

16    of patients.

17         Dr. MacGregor certainly testified he thought Vioxx

18    increases cardiovascular risks.  But, Judge, that's not a

19    redhibition opinion either because every prescription drug has side

20    effects, and it cannot be the case that the presence of a side

21    effect is the same as redhibitory defect because otherwise every

22    single over the counter prescription drug would have a defect.

23         The standard is different, they have to show that it's

24    useless for its intended purpose.  Dr. Abramson didn't offer that

25    opinion.  In fact, his testimony was that the vast majority of

1    people who took Vioxx suffered no adverse events as a result, and

2    that he thinks it's certainly true that there are patients who took

3    Vioxx who received greater efficacy than they would have had they

4    taken other options.

5           So the State didn't offer proof on the actual standard

6    for redhibition.  And you heard this week from Dr. Parnell that it

7    was in his opinion that Vioxx worked for its intended purpose of

8    treating acute and chronic pain, and that that opinion applied to

9    Medicaid recipients as well.

10          Turning to the question of damages, your Honor, which we

11   don't believe under either the threshold question of Medicaid or

12   even this question of defect the court even needs to reach; but

13   what the State has done here is they've put in one number, the

14   total expenditures from June 13th, '01 to the date of withdrawal.

15   And their expenditure theory lead needs to match their causation

16   theory, they can't include expenditures from the period before a

17   formulary change could have happened, which they didn't even show

18   you how on formulary change could have happened or would have

19   happened.

20          But the date of enactment of Act 395 doesn't govern that

21   time period, because as Mr. Hood confirmed, although the statute

22   was passed on that date, lots of things need to happen, there was

23   no P&T Committee -- and by the way, the DUR board couldn't have

24   done this.  If you look at Act 395, it defines the P&T Committee

25   and actually with very specificity who needs to be on it, not the

 1   DURB and have to be appointed by the governor.  They need to meet,

 2   bylaws, review drugs, make their recommendation.

 3            And as Mr. Hood confirmed, and the statute is clear, they

 4   had to go back to the legislature for approval.  And as he says, so

 5   all of that had to occur before you could change the open formulary

 6   system, correct?  And he says, "Correct."  And in reality, Judge,

 7   that took a year.  So their damage number, there's just a failure

 8   of proof, it doesn't match their burden to matching that to the

 9   causation theory.

10            Your Honor, on 2545, if the buyer has received value and

11   the seller can show that, the seller is entitled to an offset.

12            And here we are, we get to this question of redhibition.

13   You have a drug that worked for the patients.  And that's what

14   presumptively dealing with here.  For those folks who had an

15   adverse event while taking the drug, there is a different remedy

16   for both them and the State, so we're talking about folks here who

17   the medical experts agree the drug worked.  And they also agree

18   that those patients needed treatment.  They couldn't have had no

19   treatment as an option.

20            And so the State got the value of treating those

21   patients with an effective medication and also avoided having to

22   reimburse alternative therapies.  And Dr. Wiggins explained that

23   actually the value of that cost avoidances exceeded what the State

24   paid on Vioxx.  And that testimony was not controverted.

25            And really the State's theory here is a complete

1  windfall.  We paid for a drug, it works, we later sued to get our

2  money back, and then no one has to ask what the compensating

3  expenditures would have been.

4        Finally on redhibition, your Honor, the plaintiff has not

5  met its burden of showing that they were unaware of the alleged

6  defect.  Now I heard Mr. Murray say, I forget the phrase he used,

7  but essentially, I think he called it the "at the time" argument.

8  We're dealing with prescription drugs where the science is

9  evolving, their own experts admit as much.  You have one thing you

10 know about prescription drugs is there's going to be more studies,

11 you're going to learn different things about clinical aspects,

12 efficacy, dosing, side effects, drug interactions, and it cannot be

13 the case that redhibition gives a permanent recessionary right,

14 that if new information comes out about a drug, whatever it is,

15 that everyone who has purchased the drug before then automatically

16 getting their money back, particularly in a case like this where

17 the drug worked.

18       There's no permanent right to recision on a prescription

19 pharmaceutical.  You have to look at the information based at the

20 time, was the State aware of the scientific information about this

21 alleged defect at the time.

22       Well, we looked at the monographs, we called

23 Drs. Eiswirth and Sales, they explained to the court why those were

24 a fair and accurate summary of the state of the science.  The

25 State's lawyers have taken a curious approach, they decided to bash

1    Provider Synergies, we heard it again today.  It cites Mukherjee

2    but didn't put in the right numbers, doesn't put in the Fitzgerald

3    hypothesis, why did they cite that gastrointestinal study on Vioxx?

4         Along the way the State has forgotten who Provider

5    Synergies works for.  Those aren't Merck monographs, that's not a

6    Merck agent, they hired them.  And they're still working for the

7    State today.  So the question isn't whether Provider Synergies did

8    a great job or not preparing the monographs, they decided they were

9    going to hire this group of professionals to summarize the data for

10   the P&T Committee.  Our folks looked at those monographs and said

11   that fairly informs the scientific information at the time.

12   Dr. Taylor --

13        And the only opposition to that from the State is

14   Dr. Abramson.  Now, Dr. Abramson, because none of their other

15   witness had anything to say about Louisiana.  Now, Dr. Abramson

16   certainly is not sufficient to meet the State's burden here.  He's

17   never been on a P&T Committee, he hasn't practiced medicine in

18   eight years, he confessed unfamiliarity with the actual decision

19   making process of the P&T.

20        And there's other aspects of Dr. Abramson's testimony as

21   well, recall your Honor that when he applied the Abramson standard

22   to Celebrex, what did he say?  He said, "Under the same approach I

23   applied to Vioxx, Celebrex also should not be used."  He thought

24   that drug should not be preferred and the vast, vast minority of

25   the patient would that drug be appropriate.

1    So it's not just Dr. Eiswirth and Dr. Sales who disagree

2 with Dr. Abramson, the State's own P&T Committee disagrees with him

3 because Celebrex has been preferred.  And it's not just

4 Dr. Eiswirth and Dr. Sales and the State's own P&T Committee, it's

5 the FDA as well.  Because you'll recall, your Honor, when

6 Dr. Abramson was doing his own direct examination, he had that

7 slide show and he kept going through, and he kept saying, the State

8 should have known that, the State should have known that, where was

9 that information coming from?  They were coming from FDA

10 submissions and FDA analysis.

11    Well, we have the doctors and scientists at FDA who

12 reviewed that information in realtime, and they came to a different

13 conclusion than Dr. Abramson.  They said that that information,

14 which they considered -- after considering that information that

15 the benefits of Vioxx still outweighed its risks, and they approved

16 the drug as safe and effective in '99, again in 2002, and twice in

17 2004 for expanded use of the drug.

18    So Dr. Abramson is not sufficient to challenge the

19 adequacy of the information provided to Provider Synergies, and

20 then you have all of the testimony from the DHH folks, and from

21 Dr. Taylor from Provider Synergies who said I informed them of the

22 CV risk and the GI risk and the State's folks who said we were

23 aware of it, even Mr. Hood said that.

24    THE DEPUTY CLERK:  Mr. Ismail, five minutes.

25    MR. ISMAIL:  Thank you.

1        And as to the question on the FDA, contrary to the

2   promise made in plaintiff's opening, no one came in here to say the

3   FDA got it wrong.  And the FDA looked at the exact same information

4   Dr. Abramson did and came to different conclusions about the safety

5   and efficacy.  And that's the reality of the way Vioxx was

6   positioned at the time throughout the period in which it was being

7   reimbursed by Louisiana Medicaid.

8        Finally, your Honor, the court extended the State one

9   path forward for this case, but now the proof is in and the State

10  has had a complete failure of proof on that path in several

11  respects.  They have no proof on the excludability of Vioxx under

12  the Medicaid, federal Medicaid program, they never addressed the

13  prior authorization requirement under federal Medicaid, including

14  the 72 hour mandate; they have advanced a far fetched factual

15  theory as to what the State could have and would have done, that's

16  completely at odds with the reality that existed at the time; and

17  they did so with a witness who couldn't answer either what the

18  clinical information would have meant or what the legal -- what he

19  understood his authority would have been.

20       And the State also has also failed to carry its burden

21  under the elements of redhibition with respect to the existence of

22  a defect, knowledge and as to damages.

23       Your Honor, any one of these failures defeats entirely

24  the State's case.  But we have all of them, and what they amount to

25  is an overwhelming legal and factual record that we believe

1    entitles Merck to judgment on this matter.  Thank you.

2              THE COURT:  Thank you, counsel.

3              Rebuttal.  How much time does he have?

4              THE DEPUTY CLERK:  Ten minutes, Judge.

5              THE COURT:  You have ten minutes on rebuttal.

6              MR. MURRAY:  Thank you, your Honor.

7              Your Honor, the overriding purpose of the state and

8    federal Medicaid acts is to promote the health and well-being of

9    Medicaid recipients.  It defies all logic to suggest that by

10   signing a Medicaid agreement, a manufacturer is granted a license

11   to market a defective product to a state Medicaid association.  It

12   defies all logic to suggest that the state Medicaid association has

13   no ability to protect its citizens from a defective product.

14             And, your Honor, the law doesn't state that.  The law

15   makes it clear, the case law that is interpreted the Medicaid

16   statute, the federal Medicaid statute, makes it clear that a state

17   does have the ability to completely exclude a drug.  I would refer

18   your Honor to the *Meadows* case and *Levine* case, both of which have

19   looked at the prior authorization requirement that Mr. Ismail

20   pointed you to in the exclusionary formulary provisions.

21             And, yes, it does state that the State has to make

22   available a prior authorization, but it doesn't leave the

23   determination in the hands of the doctor.  It says, yeah, the

24   state's got to consider it, the doctor can call and say, well, here

25   is why I think you ought to prescribe it.  The State still gets to

1    say, no, I am not going to pay for it.

2            Now, interesting, so the federal statutes make clear the

3    State has the ability to exclude coverage for a defective drug.

4            Interestingly, Mr. Ismail talked a little bit about the

5    legislative history of 395 but he said nothing about the language

6    of 395.  Article 395 extends to the State, extends to the secretary

7    of Medicaid the full ability to exclude or restrict coverage in

8    accordance with federal law.  That's the very first article of

9    Article 395.  It does so without restriction.

10           You can look at the legislative history and you can take

11   one piece of legislative history, and, your Honor, there's a reason

12   why we're not allowed to look at legislative history in

13   interpreting laws and that's because you can look at what any

14   Senator says about an act or any representative says about an act

15   and you have that act say just about anything you want.

16           The truth of the matter, your Honor, is we have to look

17   at the act and the act extends full authority to exclude a drug in

18   conformity with the federal regulations, and the courts have held

19   that state's have that authority if they can show that there is a

20   clinical disadvantage to the drug.  And we certainly have met that

21   burden, your Honor, to show that there is a clinical disadvantage

22   and that the State was not aware of that clinical disadvantage.

23           Now, again, they cited you to the testimony of

24   Terrebonne, Castille and Bearden as I predicted they would.  None

25   of those witnesses were asked what could you do with a defective

1  drug, none of them were asked, does 395 give you the power to

2  exclude coverage?  They weren't asked, there's no testimony

3  contrary to Dr. Hood in that regard.

4       Now, Merck says the P&T Committee, you have to look at

5  what the P&T Committee would have done.  Merck didn't bring any

6  doctors from the P&T Committee.

7       What we have is evidence, your Honor, that the defect

8  exists, that the benefits are vastly outweighed by the deadly

9  propensities of the drug.  You don't need a doctor to make that

10 conclusion.  We had doctors make that conclusion and now the State

11 is presumed to know of it.  We don't need to see what the P&T

12 Committee would have done because under the law we look at what the

13 State would have done, not what the P&T Committee would have done,

14 and we've provided you with that witness.

15      So there's evidence of a defect, there's evidence that

16 the State would have done something different, that meets our

17 burden in redhibition.

18      Now, as predicted, Merck said a lot about the FDA again.

19 One of the things that Merck said is that Dr. Kessler testified

20 that the 2001 label was adequate.  That's not at all what

21 Dr. Kessler said.  Dr. Kessler said the drug never should have been

22 on the market because they failed to investigate a CV risk; and had

23 they done so, they would have found out before they brought the

24 drug to the market instead of in 2004 that the drug had an

25 unacceptable CV risk and they wouldn't have exposed patients to it.

1          What Kessler said about the label is indicative of

2     Merck's consistent refusal to do anything responsible with respect

3     to this drug.  It was indicative of their refusal to meet their

4     responsibilities to insure that they had a safe drug.  But he

5     certainly didn't say that that label was adequate

6          THE DEPUTY CLERK:  Mr. Murray, five minutes.

7          MR. MURRAY:  Thank you.

8          Now, we're dealing with a "but for" world, your Honor,

9     and it's very interesting the way Merck wants to approach that "but

10    for" world.  In Merck's approach of the "but for" world -- remember

11    the "but for" world is the world where the defect to which

12    Dr. Graham, Dr. Avorn, and Dr. MacGregor all testified existed.

13         The way Merck wants to approach that "but for" world is

14    that Secretary Hood is the lone guy in the wilderness who has that

15    knowledge.  And that's not the way "but for" worlds work.  The "but

16    for" world is that everyone knows.  And if everyone knows the "but

17    for" world is going to be dramatically different than the world

18    that Merck created when Merck decided not to adequately test the

19    drug, when Merck decided to put the drug on the market in spite of

20    flags of CV risk, and when Merck exposed citizens to the risk of

21    heart attack.

22         Now, Mr. Ismail says we really should look at the "at the

23    time" burden of proof because the "at the time" burden is the way

24    to go.  It's unfair to ask a manufacturer of a drug to know what is

25    wrong with his drug before studies reveal what could have happened.

1    Your Honor, that's exactly what Article 2545 says you have to do.

2    You have to deem Merck to know what's wrong with its products.

3         And that is fair.  And that is necessary because

4    defendants can't do what Merck did.  They can't put their heads in

5    the sand and pretend like there's nothing wrong with a drug when

6    they have every reason to believe that there is something wrong.

7    They can't wait for the bodies to stack up, your Honor.  And that's

8    what Merck did.

9         Now, Merck says we're 50 and 0 or 0 and 50, no state has

10   ever adopted an exclusive formulary to deal with a defective drug.

11   Your Honor, no manufacturer has ever admitted that a drug was

12   defective before they removed it from the market.  Mr. Wells was

13   not aware of that situation ever happening, Secretary Hood was not

14   aware of that situation happening.  Merck has not presented a

15   single instance where that situation happened.

16        And, your Honor, we would submit that if the situation

17   happened and the states would have done consistent with their duty

18   to promote the health and well-being of their citizens restricted

19   access to the drug, not paid for the drug.

20        Now, Mr. Ismail suggests that in order to do that they

21   would have to scrap the whole prior authorization program.  There's

22   been no evidence of that.  No evidence whatsoever.  All they would

23   have had to do is say for this one drug, we're going to exclude.

24   They could have left everything the same with everything else.

25   They had the ability to do that on June 13, 2001, they had all of

1   the mechanisms in place.

2           And let's assume that you had to wait until the P&T

3   Committee was established in order to do that.  And we have

4   evidence in the record that the P&T Committee was established as of

5   August of 2001, just two months, 60 days, less than 60 days.

6   You're dealing -- and they have offered no evidence whatsoever of

7   what the amount would be less than $11.17 million if the state

8   expended had the P&T Committee not made its decision until later,

9   had the State not excluded until that delay.

10          Your Honor, there's no evidence in the record, we have

11  met our burden with respect to redhibition, and we are entitled to

12  full recovery of the amount that we submitted to your Honor.  Thank

13  you.

14          THE COURT:  Thank you very much, counsel.  Okay.

15          THE DEPUTY CLERK:  We decided on Wednesday, Judge, the

16  28th at noon.

17          THE COURT:  I understand that the findings of fact and

18  conclusions of law will be due on Wednesday by noon, what is the

19  date?

20          THE DEPUTY CLERK:  April 28th.

21          THE COURT:  All right.  Thank you very much.  I will mark

22  the matter submitted.  The court will stand in recess.

23          THE DEPUTY CLERK:  Everyone rise.

24      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

25

1

2                                    * * * * * *

3

4

5                              REPORTER'S CERTIFICATE

6

7      I, Karen A. Ibos, CCR, Official Court Reporter, United States

8    District Court, Eastern District of Louisiana, do hereby certify

9    that the foregoing is a true and correct transcript, to the best of

10   my ability and understanding, from the record of the proceedings in

11   the above-entitled and numbered matter.

12

13

14

15                              Karen A. Ibos, CCR, RPR, CRR

16                              Official Court Reporter

17

18

19

20

21

22

23

24

25