IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| STATE OF OKLAHOMA, *ex rel* OKLAHOMA HEALTHCARE AUTHORITY, | ) MDL No. 1657 ) ) ) SECTION L |
| Plaintiff | ) ) JUDGE ELDON E. FALLON |
| vs. | ) ) MAGISTRATE JUDGE ) KNOWLES |
| MERCK & CO., INC., | ) ) ) |
| Defendant | ) |

<u>PLAINTIFF, STATE OF OKLAHOMA, ex rel OKLAHAMA HEALTHCARE AUTHORITY'S FIRST REQUESTS FOR ADMISSIONS TO DEFENDANT, MERCK & CO., INC.</u>

To: Defendant, Merck, Sharp & Dohme, Corp. (Merck"), by and through their attorney of record, Richard L. Josephson, BAKER BOTTS, L.L.P., 910 Louisiana Street, Houston, Texas 77002.

Pursuant to FED R. CIV. P. 33, 34 and 36, and Pretrial Order No. 39a, Plaintiffs hereby propound the following requests for admission, interrogatories, and requests for production to Defendant Merck, Sharp & Dohme, Corp. (Merck") and requests that the responses to these requests and interrogatories be served upon counsel for Plaintiffs within thirty days from the date of service hereof.

Respectfully submitted,

Shelly A. Sanford, PLLC

*[signature]*

Shelly A. Sanford
Federal Bar No. 784904
1500 McGowen, Ste. 150
Houston, TX 77004
Tel: 713-524-6677
Fax: 713-524-6611

ATTORNEYS FOR PLAINTIFF

1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **Plaintiff, State of Oklahoma, ex rel. Oklahoma Healthcare Authority's First Requests for Admissions to Defendant, Merck & Co., Inc.** has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 18th day of November, 2010.

_____
Shelly A. Sanford

# DEFINITIONS

1. "Defendant" or "Defendants," "you" or "your" mean any of the employees, agents, representatives, or attorneys of Merck, Sharp & Dohme, Corp. and or Merck & Co., Inc.
2. "Relate" or "relating to" includes referring to, mentioning, reflecting, containing, pertaining to, evidencing, involving, discussing, responding to, supporting, opposing, constitution or being a draft, copy or summary of, in whole or in part.
3. The terms "Document" or "Documents" include, but are not limited to, Communications of any kind, including originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including, but without limitation, databases, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, telefax, telex, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, inter-office and intra-office communications, notations of any sort of conversations, bulletins, printed matter of any type, computer print-outs, invoices, worksheets, and all forms of drafts, notations, workings, alterations, modifications, changes and amendments of any of the foregoing, geographical or aural records or representations of any kind (including , but without limitation, photographs, charts, microfiche, microfilm, videotape, records and motion pictures) and electronic, mechanical or electrical records or representations of any kind pursuant to the Federal Rules of Civil Procedure (including, but without limitation, tapes, cassettes, discs and recordings).
4. "Communication" means any act, action, oral speech, written correspondence, contact, expression of words, thoughts, and/or ideas, or transmission or change of date or other information to another person, whether orally, person-to-person, in a group, by telephone, letter, personal delivery, telex, facsimile, and/or any other process, electronic or otherwise. Communications in writing shall include, without limitation, printed, typed, handwritten, electronic or other readable documents.
5. "Vioxx" refers to the drug rofecoxib sold by Merck under the registered trademark VIOXX®.
6. The singular herein includes the plural and vice versa; the words "and" and "or" shall be construed as "and/or" in order to bring all information within the scope of the Request or Interrogatory. The words "each," "all," and "any" mean "any and all" or "each and every."
7. "Including" means "including but not limited to" and "including without limitation."
8. "Drug Utilization Board" or "DUR" shall mean all those who have been named, listed, identified, as having served on the Drug Utilization Board or DUR from the time Merck filed for FDA approval for Vioxx to the time Merck withdrew Vioxx from the market.
9. "Food and Drug Administration' or "FDA" shall mean the United States Food and Drug Administration and any department, agent, director, officer, representative or employee thereof.
10. "Healthcare Professional" shall include any licensed physician or other medical person licensed to prescribe or dispense Vioxx to any individual.

3

## GENERAL INSTRUCTIONS

1. Each Request for Admission, Request for Production, and Interrogatory is to be read, construed, and responded to separately and independently or being limited by any other Requests or Interrogatories.

2. The terms "and" and "or" are to be construed either disjunctively or conjunctively, whichever is appropriate, so as to bring within the scope of these Request for Admissions, Requests for Production, and Interrogatories any information or documents that might otherwise be considered to be beyond its scope.

3. The singular form of a word is to be interpreted as plural and the plural form of a word shall be interpreted as singular, whichever is appropriate, so as to bring within the scope of these Requests for Admissions, Requests for Production, and Interrogatories any information or documents that might otherwise be considered to be beyond its scope.

4. In the event you file a proper and timely objection to a portion of a Request for Admission, Request for Production, or Interrogatory, please respond to all portions of the Request or Interrogatory that do not fall within the gambit of your objection.

5. If you are uncertain as to the meaning of any of the following Requests for Admission, please state your understanding as to the meaning of the Request and indicate whether that Request, as understood by you, is admitted or denied.

6. Each Request for Production herein extends to any documents or information in the possession, custody or control of any of the employees, agents, representatives, or attorneys of Merck and/or Defendant (as defined above), including any of the attorneys or law firms that purport to represent either in this litigation.

7. Each and every non-identical copy of a document, whether different from the original because of indications of the recipient(s), handwritten notes, marks, attachments, marginalia, or any other reason, is a separate document that must be produced.

8. If you object to any portion of a Request or Interrogatory on the ground of privilege, answer the non-privileged portion of the Request or Interrogatory by providing such non-privileged information as is responsive.

9. If you object to any portion of a Request on any ground other than privilege, you should still provide documents responsive to the remaining non-objectionable portion.

4

10. Separately for each Request or Interrogatory to which you object in whole or in part, describe in detail and itemize each basis of your objection.

11. If the basis of an objection to any Request or Interrogatory, or any portion thereof, is a statute, contract or other agreement, or any other obstacle to production that you claim is based in the law, please identify the basis of that purported obstacle with specificity.

12. Where the basis of an objection to production is that a document features legally-protected confidential identifying information, please indicate this specifically, and state whether such information is capable of being redacted. If redaction is possible, redacted versions should be produced.

13. Each Request herein shall be construed independently, and no Request shall be viewed as limiting the scope of any other Request. Please indicate where any portion of your document production in response to a Request has been covered in your production in response to another Request, and please specify the Request numbers at issue.

14. Each Request herein shall not encompass a time limit unless expressly stated in a specific Request.

15. These Requests are continuing in nature and you should file supplemental answers as additional information or documents become known to you.

16. If you claim that any document responsive to any Request for Production is lost or destroyed, (a) identify and describe such document, (b) describe how the document was lost or destroyed, and (c) identify when the document was lost or destroyed.

17. If you claim that any documents responsive to any Request are already in the possession of any Defendant, please identify the document with sufficient specificity to allow Defendant to locate the document.

## FIRST REQUEST FOR ADMISSIONS TO DEFENDANT

Admission Number 1:   On May 20, 1999, responsive to Merck's application, the FDA approved the sale and distribution of Vioxx, the brand name for rofecoxib, by Merck.

**Response:**

Admission Number 2:  The Merck sales staff told physicians that Vioxx would decrease the GASTROINTESTINAL complications commonly associated with traditional NSAIDs because it did not alter COX-1 enzymes, and reduce pain and inflammation by selectively inhibiting the COX-2 enzymes.

**Response:**

Admission Number 3:  COX-2 produces prostacyclin, which dilates blood vessels and is a potent anti-aggregator of platelets.

**Response:**

Admission Number 4:   Selective inhibition of COX-2 reduces systemic levels of prostacyclin and permits unopposed production of thromboxane, resulting in a prothrombotic state, or a tendency to clot.

**Response:**

Admission Number 5:  Vioxx did not eliminate the risk of adverse GASTROINTESTINAL side effects, including serious complications, perforations, bleeds, and ulcers in the GASTROINTESTINAL tract.

**Response:**

Admission Number 6:   Unlike nonselective cyclooxygenase inhibitor NSAIDs, Vioxx contributes to the aggregation of blood platelets, thereby increasing blood clotting.

**Response:**

Admission Number 7:  On December 16, 1994, Merck filed an Investigational New Drug Application (an "IND") for Vioxx with the FDA. This IND included data and analyses from approximately two years worth of pre-clinical testing.

**Response:**

Admission Number 8: In May 1996, Merck announced that it was developing a selective COX-2 inhibitor.

**Response:**

6

Admission Number 9: In May of 1996, Merck faced patent expirations on three of its ten most successful drugs (in terms of revenue), including Mevacor, Pepcid, and Prilosec.

**Response:**

Admission Number 10: In May of 1996, Merck's competitors, Monsanto and Pfizer, were developing a competitive selective COX-2 inhibitor, Celebrex® ("Celebrex").

**Response:**

Admission Number 11: In 1996, Merck announced the initiation of its clinical trials for MK-966, the internal designation for Vioxx.

**Response:**

Admission Number 12: In September 1996, nearly three years before the drug was marketed, the Vioxx Project Team Minutes acknowledged reports of cardiovascular (CV) adverse events, registering "another case of unstable angina in an early... clinical trial."

**Response:**

Admission Number 13: The Preliminary Report on Rheumatoid Arthritis Protocol 017 reported six (6) serious CV adverse events for Vioxx compared with two (2) for placebo.

**Response:**

Admission Number 14: The Vioxx Gastrointestinal Outcomes Research, or "VIGOR," was designed specifically to demonstrate the GASTROINTESTINAL superiority of Vioxx as compared to another of the NSAID competitors, naproxen.

**Response:**

Admission Number 15: On November 21, 1996, a Merck internal memorandum, discussing the design of the VIGOR trial, suggested that participants be permitted to use aspirin during the study to moot the cardiovascular risks of Vioxx because, "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in the Vioxx group.

**Response:**

Admission Number 16: In October 1997, Merck sponsored a clinical study in healthy human subjects led by Dr. Garrett Fitzgerald from the University of Pennsylvania. The study was known as Protocol 023.

**Response:**

Admission Number 17:   During Protocol 023, Dr. Fitzgerald observed that patients taking Vioxx had significantly lower levels of prostacyclin metabolites in their urine than patients taking placebo.

**Response:**

Admission Number 18:  By 1998, Merck knew that use of Vioxx could result in increased platelet aggregation (blood clotting) and, thus, could cause increased rates of heart attacks and strokes.

**Response:**

Admission Number 19:   On May 20, 1999, the FDA required that Vioxx carry the traditional warning concerning GASTROINTESTINAL safety risks that accompanied all NSAIDs.

**Response:**

Admission Number 20:  Even though Merck received no FDA approval to claim superior GASTROINTESTINAL safety, Merck promoted, marketed, sold, and distributed Vioxx as a much safer and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen with regards to GASTROINTESTINAL health and safety.

**Response:**

Admission Number 21:   In 1997, Merck consistently represented that approximately 16,500 patients taking NSAIDs died from toxic GASTROINTESTINAL side effects each year even though its own expert(s) contended this number was far in excess of the true number.

**Response:**

Admission Number 22:  Following the completion of the VIGOR trial, Merck produced a series of "video news releases" about the study alleging GASTROINTESTINAL protective effects with no mention of cardiovascular risk.

**Response:**

Admission Number 23:   The potential for cardiovascular risk of selective COX-2 inhibitors was known to Merck long before the FDA granted market approval in May of 1999.

**Response:**

8

Admission Number 24:  By 1997, and prior to the submission of the New Drug Application (the "NDA") for Vioxx, Merck was aware that, by inhibiting COX-2, Vioxx altered the homeostatic balance between prostacyclin synthesis and thromboxane and thereby increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it.

**Response:**

Admission Number 25: On November 23, 1998, Merck submitted an NDA to the FDA for Vioxx, omitting information about the extent of the Myocardial infarction risks associated with Vioxx.

**Response:**

Admission Number 26:  Once Vioxx was approved, scores of sales representatives fanned out across the country with samples, asserting that Vioxx had a better safety profile than other NSAIDs.

**Response:**

Admission Number 27:  At the time the drug was approved, Merck's labeling indicated that Vioxx, taken at the 12.5mg, 25 mg, and 50 mg daily dosage, "was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than with treatment with ibuprofen 2400 mg daily."

**Response:**

Admission Number 28:  Merck had access to the data contained in the APPROVe study for over a year before it was published in the New England Journal of Medicine on March 17, 2005.

**Response:**

Admission Number 29:  From 1996 through 1998, Merck issued dozens of public statements that pre-publicized the efficacy and gastrointestinal safety of Vioxx while omitting any mention of cardiovascular risks.

**Response:**

Admission Number 30:  In the *Merck & Co., Inc. 1998 Annual Report*, CEO Raymond Gilmartin wrote that "[i]n 1998, to prepare for the introduction of Vioxx, as well as to meet other marketing challenges, we began adding 700 new and talented professional representatives to our already strong U.S. sales force."

**Response:**

Admission Number 31:  In order to achieve formulary status/access for Vioxx which was equal to or better than Celebrex and branded NSAIDs, Merck recognized that placement on the formularies of the private and governmental third party payers was critical to successful market share.

**Response:**

Admission Number 32:  In order to get and keep Vioxx on the formularies of the private and governmental third party payors, Merck funded studies designed to demonstrate that Vioxx was more cost-effective than other NSAIDs as a result of its decreased GI toxicity.

**Response:**

Admission Number 33:  While Vioxx was on the market, Merck sent summaries of the positive clinical findings it funded to formularies to demonstrate that the increased cost of Vioxx was more than off-set by costs associated with Gastrointestinal toxicity.

**Response:**

Admission Number 34:  None of the materials and summaries of clinical studies sent to private and governmental third party payors, medical care organizations, or prescription benefit managers even remotely raised the potentially devastating cardiovascular and cerebrovascular side effects.

**Response:**

Admission Number 35: Merck's pre-release marketing projections for Vioxx proposed a wholesale price of $2.02 per tablet - about one hundred times the cost of a generic ibuprofen, generic naproxen, or aspirin.

**Response:**

Admission Number 36:  On April 20, 1999, the Advisory Committee recommended approval of Vioxx for the relief of the signs and symptoms of osteoarthritis and acute pain but, in light of Merck's failure to substantiate its claims of the GASTROINTESTINAL superiority of Vioxx, required that its package insert bear the same GASTROINTESTINAL warnings as traditional NSAIDs.

**Response:**

Admission Number 37:  Upon receiving market approval of Vioxx, Merck began to aggressively promote Vioxx with at least 4,500 Merck sales representatives contacting potential customers.

**Response:**

10

<u>Admission Number 38:</u>  In 2000, Merck spent nearly $161 million on direct-to-consumer advertising for Vioxx.

**Response:**

<u>Admission Number 39:</u>  From 2000 until 2004, until market withdrawal, Merck spent over $400 million to market Vioxx directly to consumers.

**Response:**

<u>Admission Number 40:</u>  On July 16, 1999, the FDA's Division of Drug Marketing, Advertising, and Communications ("FDA-DDMAC") issued a letter to Merck, warning that its advertisements failed to provide adequate risk information. The FDA-DDMAC informed Merck that certain of its Vioxx promotional materials were "lacking in fair balance or [are] otherwise misleading."

**Response:**

<u>Admission Number 41:</u>  On December 16, 1999, the FDA-DDMAC issued a letter to Merck, stating that its promotional pieces entitled "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX and "Vioxx vs. Celebrex Poem" were "false or misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

**Response:**

<u>Admission Number 42:</u>  "Dodge Ball Vioxx" was the name of a Merck sales representative training bulletin.

**Response:**

<u>Admission Number 43:</u>  In "Dodge Ball Vioxx," there was a list of hypothetical questions doctors might ask the sales representative about Vioxx, such as, "I am concerned about the cardiovascular effects of Vioxx" or "the competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex." Merck's instructions to be followed in response to these questions consisted of but a single word: "DODGE!"

**Response:**

<u>Admission Number 44:</u>  Merck disseminated a pamphlet to physicians called the "Cardiovascular Card," which was given to sales representatives to convince physicians that Vioxx did not increase their patients' risk of serious cardiovascular illness or death.

**Response:**

11

Admission Number 45:   In 2001, after the FDA Advisory Committee voted in favor of informing doctors of the increased incidence of cardiovascular events seen in the VIGOR study, Merck continued to instruct its sales representatives to continue to use the Cardiovascular Card.

**Response:**

Admission Number 46:   A report prepared for Henry A. Waxman (the "Waxman Report"), attached hereto as Exhibit A, states: "In 2003, the Office of Chief Counsel circulated language inside FDA proposing that agency approval of a drug should preempt state lawsuits. In response, Dr. John Jenkins, Director of the Office of New Drugs (OND) in the Center for Drug Evaluation and Research (CDER), provided comments to Jane Axelrad, Associate Director for Policy in CDER. On May 22, 2003, Dr. Jenkins wrote: 'The premise of the basis for much of the argument for why we are proposing to invoke preemption seems to be based on a false assumption that the FDA approved labeling is fully accurate and up-to-date in a real time basis. We know that such an assumption is false. Even if the sponsor exercises due diligence to identify new risks after approval of a drug and submits requested changes in risk information to FDA in a timely manner, there will always be a delay before such information appears in the package insert, even in the case of a CBE supplement. So, it is unwise to suggest that FDA approved labeling is always up-to-date and always contains a full and complete listing of all pertinent risk information. Even in the best case scenario of a diligent sponsor and a CBE supplement, the new risk information will not be available in the bottle or in printed materials like the PDR for some period of time.'"

**Response:**

Admission Number 47:   Congressman Waxman, following the VIGOR study, states in the New England Journal of Medicine ("NEJM"), that:"The next day, Merck sent a bulletin to its rofecoxib sales force of more than 3000 representatives. The bulletin ordered, 'DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE ... OR THE RESULTS OF THE ... VIGOR STUDY.' It advised that if a physician inquired about VIGOR, the sales representative should indicate that the study showed a gastrointestinal benefit and then say, 'I cannot discuss the study with you.'"

**Response:**

Admission Number 48:   In January 1999, Merck initiated the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study comparing Vioxx's efficacy and Gastrointestinal safety profile to a single other NSAID, naproxen.

**Response:**

Admission Number 49:   The VIGOR studies data demonstrated a statistically higher incidence of heart attacks among those who ingested Vioxx.

**Response:**

12

Admission Number 50: Merck's preliminary internal calculations, following VIGOR, demonstrated at least a four-fold increase of acute myocardial infarction ("MI") with once-daily 50 mg doses of Vioxx compared with twice daily 500 mg doses of naproxen (0.4% compared with 0.1% with naproxen).

Response:

Admission Number 51: Despite having information regarding the cardiotoxicity of Vioxx, Merck did not mention the VIGOR results in its label for over two years.

Response:

Admission Number 52: On May 22, 2001, Merck issued a PR Newswire press release that stated; "In response to news and analyst reports of data the Company released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx."

Response:

Admission Number 53: In 2004, the U.S. Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") launched investigations of Merck's handling of Vioxx, and in February of 2008, the DOJ announced a settlement for more than $650 million to resolve claims of fraudulent price reporting and kickbacks by Merck involving Vioxx.

Response:

Admission Number 54: According to some Merck internal documents, projections estimated, at least, a $229 million loss in sales in 2002 and a loss in market share of, at least, 10 to 20 percent in market share could be anticipated if and when Merck would be required to include the cardiovascular risks in the Vioxx label.

Response:

Admission Number 55: During the time period that Vioxx was on the market, specifically in the State of Oklahoma, Merck sales representatives engaged in direct contact with Drug Utilization Review Board members, State Health officials, and members of the College of Pharmacy to ensure Vioxx was compensated in the Oklahoma Medicaid program.

Response:

Admission Number 56: During the time period that Vioxx was on the market, specifically in the State of Oklahoma, Merck sales representatives engaged in direct contact with Physicians and other Healthcare Professionals to ensure Vioxx was compensated in the Oklahoma Medicaid program.

13

**Response:**

Admission Number 57: During the time period that Vioxx was on the market, specifically in the State of Oklahoma, Merck engaged in communication with members of the DUR and/or College of Pharmacy about the efficacy of Vioxx.

**Response:**

Admission Number 58: During the time period that Vioxx was on the market, specifically in the State of Oklahoma, Merck engaged in communication with members of the DUR and/or College of Pharmacy about the efficacy of Vioxx vis-à-vis other NSAIDs.

**Response:**

Admission Number 59: During the time period that Vioxx was on the market, specifically in the State of Oklahoma, when Merck engaged in communication with members of the DUR and/or College of Pharmacy about Vioxx, it did not warn members of the DUR and/or College of Pharmacy about the increased risks of cardiotoxicity and/or increased risks of cardiovascular disease and/or increased risk of myocardial infarction and/or the increased risks of cerebrovascular accident.

**Response:**

Admission Number 60: During the time period that Vioxx was on the market, specifically in the State of Oklahoma, when Merck engaged in communication with members of the Physicians and other Healthcare Professionals, it did not warn those Physicians and other Healthcare Professionals about the increased risks of cardiotoxicity and/or increased risks of cardiovascular disease and/or increased risk of myocardial infarction and/or the increased risks of cerebrovascular accident.

**Response:**

Admission Number 61: During the time period that Vioxx was on the market, specifically in the State of Oklahoma, Merck engaged in communication with members of the DUR and/or College of Pharmacy about Vioxx, soliciting assistance during the periods of debate and/or public comment on whether Vioxx should be a covered drug under the Oklahoma Medicaid program.

**Response:**

Admission Number 62: During the time period that Vioxx was on the market, specifically in the State of Oklahoma, Merck engaged in communication with members of the DUR and/or College of Pharmacy about Vioxx, soliciting members assistance during the periods of debate and/or public comment to prevent the DUR from placing Vioxx in the second Tier of drugs requiring preauthorization or having other prerequisites to qualify for reimbursement.

14

**Response:**

<u>Admission Number 63:</u>  During the time period that Vioxx was on the market, specifically in the State of Oklahoma, Merck engaged in direct communication with thousands of Oklahoma Healthcare Professionals concerning Vioxx.

**Response:**

<u>Admission Number 64:</u>  During the time period that Vioxx was on the market, specifically in the State of Oklahoma, Merck specifically sought to insure Vioxx was covered by the Oklahoma Medicaid Program with as few restrictions on prescribing physicians as possible.

**Response:**

<u>Admission Number 65:</u>  The available data reviewed for the Memorandum you attached as Exhibit B to your RFA's to the State of Oklahoma did not include a review of any data after the date of the Memorandum, April 6, 2005.

**Response:**

<u>Admission Number 66:</u>  The Memorandum referenced in the previous request (your Exhibit B to RFA's to the State of Oklahoma is not an official position taken by the FDA as a governmental entity.

**Response:**

<u>Admission Number 67:</u>  After September 30, 2004, Arcoxia, your next-generation cox-2 inhibitor, was not approved for marketing in the United States.

**Response:**
<u>Admission Number 68:</u>  You could have presented to FDA a Changes Being Effected (CBE) Vioxx label at any time while it was approved for marketing in the United States.

**Response:**

<u>Admission Number 69:</u>  You had uniform marketing practices in place across the United States for the marketing of Vioxx for the entire time it was on market.

**Response:**

<u>Admission Number 70:</u>  Sales representatives at Merck for Vioxx were governed by uniform, company-wide marketing procedures from which they could not diverge.

**Response:**

<u>Admission Number 71:</u>  You did not inform the Oklahoma HCA of the doubling of the risk of Myocardial Infarction from Vioxx at the 25 mg dose in 1999.

**Response:**

<u>Admission Number 72:</u>  You did not inform the Oklahoma HCA of the doubling of the risk of Myocardial Infarction from Vioxx at the 25 mg dose in 2000.

**Response:**

<u>Admission Number 73:</u>  You did not inform the Oklahoma HCA of the doubling of the risk of Myocardial Infarction from Vioxx at the 25 mg dose in 2001.

**Response:**

<u>Admission Number 74:</u>  You did not inform the Oklahoma HCA of the doubling of the risk of Myocardial Infarction from Vioxx at the 25 mg dose in 2002.

**Response:**

<u>Admission Number 75:</u>  You did not inform the Oklahoma HCA of the doubling of the risk of Myocardial Infarction from Vioxx at the 25 mg dose in 2003.

**Response:**

<u>Admission Number 76:</u>  You did not inform the Oklahoma HCA of the doubling of the risk of Myocardial Infarction from Vioxx at the 25 mg dose in 2004.

**Response:**

<u>Admission Number 77:</u>  Celebrex at its most common dose is a less potent platelet-aggregator than Vioxx at its most common dose.

**Response:**