**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  VIOXX** | **MDL NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | **SECTION: L** |
| | **JUDGE FALLON** |
| **THIS DOCUMENT RELATES TO:** | **MAGISTRATE JUDGE KNOWLES** |
| *District of Columbia ex rel. Kenneth Walker v. Merck & Company*; Case No. 08-4148 | |

**PLAINTIFF KENNETH WALKER'S OPPOSITION TO
DEFENDANT'S MOTION FOR ORDER TO SHOW CAUSE
WHY RELATOR'S FALSE CLAIMS ACT CLAIM SHOULD NOT BE DISMISSED**

**Introduction**

Defendant Merck Sharp & Dohme Corp.  ("Merck") in essence seeks to dismiss Count I of Plaintiff's Complaint (Rec. Doc. 55437), which makes allegations under the D.C. False Claims Act, D.C. Code § 2-308.14 et. seq.  (Def. Mem. page 1)  Defendant claims that this action is barred by D.C. law, because the allegations and transactions underlying his claim were disclosed by the media, and, according to Defendant, Mr. Walker is not an original source. (Def. Mem. page 2).

Defendant attempts to invoke what is commonly referred to as the Public Disclosure Bar. *See*, *Grayson v. AT&T*, 980 A.2d 1137, 1145 (DC 2010).  In addressing the Public Disclosure Bar, the Court must first consider "whether the news media or article *publicly disclosed*

1

*allegations or transactions of fraud.*" *Grayson,* 980 A.2d. at 1145, 1148. [Emphasis added] "'[A]llegations and transactions' must be placed in the public domain to trigger the public disclosure bar." *Id.* at 1148.  The next consideration is whether the complaint was "based upon" this information.  *Id.*  If the answers to these questions are in the affirmative, then the Court must determine whether the Relator is an original source, because only the Government or an original source can bring an action based upon a Public Disclosure. *Id.*,at page 1152.[1]

Defendant never discusses whether the articles cited as public disclosures contain "allegations and transactions" of fraud as defined by the False Claims Act. (*See* Def. Mem. page 5)  Rather, Defendant assumes that this is so,[2] and proceeds to the next two issues whether the complaint is based upon these transactions and whether Mr. Walker is an original source. (Def, Mem. pages 2 – 5).  This is where Defendant's analysis fails.  A close examination of the cited

---

[1]  *Grayson* is also useful because the court discusses the D.C. Consumer Protection Procedures Act, D.C. Code §28-3904(e) and (f)) that make it illegal to engage in unlawful trade practices, including deceptive marketing practices. Plaintiff Kenneth Walker relies upon this statute in Count II of his complaint. *See*, Complaint ¶ 51 to 59. Plaintiff urges the court to take note that the causation arguments raised by Merck in the Consumer Fraud action would not succeed under the laws of the District of Columbia, which permits recovery whether or not "any consumer is in fact misled, deceived or damaged." *Id*, at § 28-3904.  Moreover, while the District of Columbia Court of Appeals is considering *Grayson*, *en banc*, Mr. Walker has standing to bring this action under either theory presented to the *Grayson En Banc* panel, because he sustained damage as defined by the court each time he expended his own funds (Complaint ¶ 15) to pay for Vioxx medication. *Compare* D.C. Code § 28-3905 (k)(1) (2010) to D.C. Code 28-3905(k)(1)(1999); and *See*, *Snowder v. District of Columbia*, 949 A.2d. 590, 603, n. 10 (D.C. 2008); *Friends of Tilden Park, Inc. v. District of Columbia*, 806  A.2d. 1201, 1207-08 (D.C. 2002); *Wells v. Allstate Ins. Co*., 210 F.R.D. 1, 8 (D.D.C. 2002).

[2] To support its position, Defendant first discusses whether Mr. Walker qualifies as an original source. (Def. Mem. page 3)  However, it is not until the last page of its Memorandum that Defendant identifies the articles that allegedly create the Public Disclosure. (Def. Mem. page 5) The VIGOR Study, New England Journal of Medicine Article, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis" (November 23, 2000) is referenced twice.  (Comp. ¶ 28, ¶ 32)  The New York Times article, "Doubts Are Raised on Safety of 2 Popular Arthritis Drugs" (May 22, 2001) (Comp. ¶ 37) is also referenced (Def. Mem. page 5) This approach improperly puts the cart before the horse.

articles shows that they do not contain allegations or transactions of fraud, and therefore, the
Public Disclosure Bar has not been triggered, and the Court's analysis need not extend any
further. *Grayson* at page 1148. On this basis, Defendant's motion must be denied.

1. **The Studies/Articles**

The cited articles discuss newly emerging information suggesting that Vioxx has
additional risks associated with the taking of the medication. (Def. Mem. page 5) For example,
the New York Times article states:

> Research presented to the Food and Drug Administration earlier
> this year showed that patients taking Vioxx, a Merck & Company
> drug, had a higher, but still relatively low, risk of heart attacks than
> patients taking an older pain reliever. The study received little
> public attention at the time, but the F.D.A. is considering whether
> to add information on possible cardiovascular side effects to both
> drugs' labels.

The article, however, does not state that Merck intentionally withheld information or that Merck
engaged in any nefarious conduct in its marketing efforts. The New England Journal of Medicine
study, the authors reported similar results from their analysis:

> Rofecoxib and naproxen had similar efficacy against rheumatoid
> arthritis. During a median follow-up of 9.0 months, 2.1 confirmed
> gastrointestinal events per 100 patient-years occurred with
> rofecoxib, as compared with 4.5 per 100 patient-years with
> naproxen (relative risk, 0.5; 95 percent confidence interval, 0.3 to
> 0.6; P<0.001). The respective rates of complicated confirmed
> events (perforation, obstruction, and severe upper gastrointestinal
> bleeding) were 0.6 per 100 patient-years and 1.4 per 100 patient-
> years (relative risk, 0.4; 95 percent confidence interval, 0.2 to 0.8;
> P=0.005). The incidence of myocardial infarction was lower
> among patients in the naproxen group than among those in the
> rofecoxib group (0.1 percent vs. 0.4 percent; relative risk, 0.2; 95
> percent confidence interval, 0.1 to 0.7); the overall mortality rate

> and the rate of death from cardiovascular causes were similar in
> the two groups.

Again, this article does not criticize Merck or accuse Merck of engaging in a plan or scheme to distort or hide the truth from the public. In essence, these article report facts presented as newly emerging information about Vioxx, while making no attempt to address marketing malfeasance on Merck's part. *See*, *U.S. ex. rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d. 645, 654 (DC. Cir. 1994) ("The language employed…[by the Public Disclosure Bar]…suggests that Congress sought to prohibit qui tam actions only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.")

2.      **The Public Disclosure Bar**

The D.C. False Claims Act was in large part modeled after the Federal False Claims Act. *See*, 31 U.S.C. § 3729, et. seq.  The Public Disclosure Bar can be found in D.C. Code § 2-308.15 (c)(2)(A). There it states:

> No person may bring an action pursuant to subsection (b) of this
> section based upon allegations or transactions in a criminal, civil,
> or administrative proceeding, investigation, or report, or audit
> conducted by or at the request of the Council, the Auditor, the
> Inspector General, or other District or federal agency; or upon
> allegations or transactions disclosed by the news media, unless the
> person bringing the action is an original source of the information.

The D.C. Court of Appeals in *Grayson*, *supra*, embraces the test (X+Y=Z) to determine whether a public disclosure has occurred. *Grayson*, at page 1148.  This test was first announced in the District of Columbia by the Circuit Court in *U.S. ex. rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d. 645 (DC. Cir. 1994), and the D.C. Court of Appeals acknowledges this at 1148,

footnote 42.  Faced with interpreting the Public Disclosure Bar in the Federal False Claims Act

(31 U.S.C. § 3730(e)(4)(A), the *Springfield* court stated:

> First, the reviewing court must ascertain whether the "allegations
> or transactions" upon which the suit is based were "public[ly]
> disclos[ed]" in a "criminal, civil, or administrative hearing, in a
> congressional, administrative, or Government Accounting Office
> report, hearing, audit or investigation, or from the news media." 31
> U.S.C. Sec. 3730(e)(4)(A). If--and only if--the answer to the first
> question is affirmative, *See Wang v. FMC Corp*., 975 F.2d 1412,
> 1416 (9th Cir.1992), will the court then proceed to the "original
> source" inquiry, under which it asks whether the qui tam plaintiff
> "has direct and independent knowledge of the information on
> which the allegations are based." 31 U.S.C. Sec. 3730(e)(4)(B)." *Id*
> at page 651.

The court concluded that Congress only intended to bar actions when "either the allegations of

fraud or the critical elements of the fraudulent transaction themselves were in the public

domain." *Id*. at 654.  To further illuminate the point the court stated:

> Both plain meaning and a consideration of the aims of the statute
> direct this conclusion. The legislative history is admittedly silent
> with regard to the significance Congress attached to its choice of
> words in this much-amended section. [8] However, in common
> parlance, the term "allegation" connotes a conclusory [citation
> omitted] statement implying the existence of provable supporting
> facts. *See*, WEBSTER'S THIRD NEW INTERNATIONAL
> DICTIONARY 55 (1976). The term "transaction" suggests an
> exchange between two parties or things that reciprocally affect or
> influence one another. *See* id. at 2425. On the basis of plain
> meaning, and at the risk of belabored illustration, if $X + Y = Z$, Z
> represents the allegation of fraud and X and Y represent its
> essential elements. In order to disclose the fraudulent transaction
> publicly, the combination of X and Y must be revealed, from
> which readers or listeners may infer Z, i.e., the conclusion that
> fraud has been committed. The language employed in Sec.
> 3730(e)(4)(A) suggests that Congress sought to prohibit qui tam
> actions only when either the allegation of fraud or the critical
> elements of the fraudulent transaction themselves were in the
> public domain. At page 654.

Having announced this principle, the court reversed the lower court decision because the only items in the public domain were facially valid vouchers. *Id*. at 656.  Even though publically available telephone records that might have also illuminated the fraud were in the public domain, the court remained unconvinced. *Id.* The court stated, "[r]ecognizing that the task of determining whether 'allegations or transactions' have been 'public[ly] disclos[ed]' will never be cut-and-dried, we nonetheless are confident in this case that the information put in the public domain by the discovery filing did not present so clear or substantial an indication of foul play as to qualify as either an allegation of fraud or a fraudulent transaction upon which a qui tam suit could be based." *Id*.

Courts that have addressed this issue have applied *Springfield Terminal* and concluded that in order to trigger the Public Disclosure Bar, news media articles or studies must include a reference to the actual allegation of fraud or contain the elements of fraud as represented by the $X + Y = Z$ formula. *See*, **U.S. ex. rel Findley v. FPC Boron Employees Club** 105 F.3d 675, 679 (DC Cir. 1997) (Media public disclosures raises "the specter of 'foul play' by acknowledging the questionable legality of permitting federal employees to use federal facilities for the provision of vending services and retaining revenue from such services"); *U.S. v. Catholic Healthcare West*, 445 F.3d 1147, 1153 (9th Cir., 2006) (Media public disclosures "publicize the basic allegations made in the three lawsuits…[and]…suggest that the alleged fraudulent activity is even more widespread."); *U.S. ex rel. Feingold v. Adminastar Federal, Inc*., 324 F.3d 492 (7th Cir., 2003) (Media public disclosures describe criminal indictments and allegations of fraud); **U.S. ex. rel.** *Ervin v. Hamilton Securities*, 332 F. Supp. 2d 1, 6 (DDC 2003) (Media reports "described 'possible bid-rigging in HUD note sales organized by Hamilton Securities Group"); **U.S. ex rel** *Hocket v. Columbia* 498 F. Supp. 2d 25, 48 (DDC 2007) (Media reports revealed that "certain

specific Columbia facilities had engaged in certain specific techniques for defrauding Medicare.")

### 3.   The articles referenced by Defendant do not trigger the Public Disclosure Bar

Comparing the VIGOR Study and the N.Y. Times article that Defendant cites as the basis for their Public Disclosure argument in the case at bar to the media reports that triggered the Public Disclosure Bar above, it is clear that these materials do not contain the type of information that other courts have relied upon to trigger the public disclosure bar.   They do not contain the completed allegations of fraud. *Compare*, *U.S. ex. rel Findley v. FPC Boron Employees Club, supra; U.S. v. Catholic Healthcare West, supra;* U.S. *ex rel. Feingold v. Adminastar Federal, Inc* , *supra*; *U.S. ex. rel. Ervin v. Hamilton Securities, supra; U.S. ex. rel Hocket v. Columbia, supra.*  Specifically, the articles and studies do not discuss an audit, court case, or investigation in which Merck was accused of falsely misleading medical providers to obtain payment.  In addition, the articles do not contain the elements of fraud.  *Springfield Terminal*, *supra* at page 654 ("The language employed in Sec. 3730(e)(4)(A) suggests that Congress sought to prohibit qui tam actions only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain").

These are medical studies that present what *Springfield Terminal* referred to as "the true state of facts," which is not enough on its own.  *Springfield*, *supra*, at page 655 ("Fraud requires recognition of two elements: a misrepresented state of facts and a true state of facts. The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud.")  To complete the picture, the referenced articles need to also contain the misrepresented version of the facts. *Id*. The cited articles do not mention

or discuss a "misrepresented state of facts" nor do they "present so clear or substantial an indication of foul play as to qualify as either an allegation of fraud or a fraudulent transaction upon which a qui tam suit could be based." *Springfield Terminal*, *supra*, at page 656.

Having failed to demonstrate that a Public Disclosure has occurred, Defendant's Motion to Dismiss is without merit and must be denied.[3]

Dated:  December 9, 2010                    Respectfully submitted,

                                            MCKNIGHT & KENNEDY, LLC

                                            BY:/s/ H. Vincent McKnight, Jr.
                                            H. Vincent McKnight, Jr.
                                            D.C. Bar No. 293811
                                            8601 Georgia Avenue
                                            Suite 1010
                                            Silver Spring, MD 20910
                                            (301) 565-5281

---

[3]     Under *Springfield Terminal*, *supra*, if the court determines that the public disclosure bar has been triggered, it then must decide whether the claim was "based upon" the public disclosure. *Id* at page 653.  It is highly unlikely that Merck can prove this.  Between 1998 and 2005, the District of Columbia was the *only* entity in the country that *did not* use a formulary or a preferred drug list. *See*, Complaint ¶ 20 - 27.  Because of this, each decision to approve or disapprove Vioxx for Medicaid patients in the District of Columbia occurred on a case-by-case basis. *Id*.  This creates a unique context.  Given this, the proximate causation arguments successfully advanced by Merck in *State of Louisiana, ex. rel. James D. Caldwell v. Merck*, Case No. 05-3700, have no bearing under the Medicaid procedures in place in the District of Columbia. Moreover, there is no evidence that any allegations or transactions of fraud by Merck in this very unique context were ever publicly disclosed before Mr. Walker initiated his claim.

## Certificate of Service

I herby certify that the above and foregoing Opposition to Defendant's Motion for Order to Show Cause Why Relator's False Claims Act Claim Should Not be Dismissed has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court for the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 9th day of December, 2010.

/s/ H. Vincent McKnight, Jr.
H. Vincent McKnight