1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  VIOXX PRODUCTS              *
                LIABILITY LITIGATION     *
5                                        *
     This Document Relates to:           *     MDL No. 1657
6                                        *
         STATE OF LOUISIANA, ex rel.     *     Section L
7        JAMES D. CALDWELL JR.,          *
         Attorney General                *     New Orleans, Louisiana
8                                        *
             versus                      *     March 22, 2010
9                                        *
         MERCK & CO., INC.               *
10                                       *
         Case No. 05-CV-3700             *
11   *   *   *   *   *   *   *   *   *   *   *   *   *

12

13                    PROCEEDINGS BEFORE THE
                      HONORABLE ELDON E. FALLON
14                    UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16

17   For the Plaintiffs:          Murray Law Firm
                                   BY:  STEPHEN B. MURRAY JR., ESQ.
                                   650 Poydras Street, Suite 2150
18                                 New Orleans, Louisiana 70130

19   For the Defendant:           Skadden Arps, LLP
                                   BY:  JOHN H. BEISNER, ESQ.
20                                 1440 New York Avenue NW
                                   Washington, D.C. 20005
21

22   Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room HB-406
                                   New Orleans, Louisiana 70130
23                                 (504) 589-7778

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

1       **PROCEEDINGS**

2       **(March 22, 2010)**

3              (WHEREUPON the following proceedings were held in

4       chambers with the parties participating by telephone.)

5              **THE COURT:**  Hello.  Good morning.  This is

6       Judge Fallon.  Who do I have on the line for the plaintiffs?

7              **MR. MURRAY JR.:**  Good morning, Your Honor.  Stephen

8       Murray Sr., Stephen Murray Jr., Jim Dugan, Doug Plymale, Justin

9       Bloom, and David Franco for the plaintiffs.  Stephen Murray Jr.

10      will be handling the oral argument, Your Honor.

11             **THE COURT:**  Let me hear from the defendants.

12             **MR. BEISNER:**  Good morning, Your Honor.  This is John

13      Beisner.  On the line with me are Doug Marvin, Tarek Ismail,

14      and Travis Sales.

15             **THE COURT:**  Just by way of a little background, on

16      July 6, 2005, the Louisiana attorney general filed suit against

17      Merck in state court seeking injunctive relief and damages.  On

18      August 5, 2005, Merck removed the case, after which it was

19      transferred to MDL 1657.

20             The plaintiffs, in their complaint, seek

21      multiple forms of relief on behalf of both the state and its

22      citizens for damages that they allege were sustained as a

23      result of the drug Vioxx and Merck's actions in connection with

24      the manufacturing, advertising, marketing, and distribution of

25      Vioxx.

1          The case has proceeded for some time and it is

2    now set for trial on April 12, 2010.  We are now a couple or

3    three weeks from trial.  Motions for summary judgment are set

4    for tomorrow, namely, March 23.

5          On March 9, the plaintiffs filed an answer in

6    response to the summary judgment and attached to that response

7    some six affidavits from six witnesses.  Four of the affidavits

8    were from members of the Louisiana Department of Health &

9    Hospitals, the P&T committee, three of whom had never been

10   deposed or, for that matter, designated as fact witnesses --

11   these are Culotta, Doskey, and Lutz -- and one of whom was

12   deposed and identified as Mr. Hood.  The other two affidavits

13   are from previously designated and previously deposed experts

14   that seek to supplement their prior reports and deposition

15   testimony of these experts.  These individuals are Leach and

16   Abramson.

17         The Court notes that the discovery deadline in

18   the case was February 9, 2010.  Merck seeks to strike these

19   affidavits as well as the plaintiffs' new witness list, arguing

20   that they're untimely and that there's no good cause shown for

21   why they should be allowed in view of their untimely position.

22   Further, Merck argues that allowing the affidavits would be

23   prejudicial.

24         The plaintiffs take the position that the

25   discovery aspect of the case was concluded after the deadline

1    for giving reports of the experts and at prior conferences it
2    was indicated by the Court and understood by counsel that if
3    something came up, they would be able to supplement their
4    reports, at least that's their position, and they have done so,
5    although they argue that this is really not a supplementation
6    and it's not inconsistent.

7                    As I understand some of the arguments that the
8    defendant raises with regard to those individuals who had been
9    listed and had been deposed:  They add new information and/or
10   they supply inconsistent information.  They have given their
11   depositions and they say one thing and now they are taking a
12   different position in their affidavits.  Merck feels that this
13   comes too late and that it is prejudicial.

14                   I will hear from the parties.  I have looked
15   over your material.  I have read it, of course.  I will listen
16   to anything else you need to say.

17                   John, you are arguing for the movant?
18        MR. BEISNER:  Yes, I am, Your Honor.  For the
19   reporter's benefit, this is John Beisner.

20                   Let me just make a few points.  First,
21   Your Honor, I think you have laid out the historical record,
22   making the point that we were really in the home stretch in
23   this case in preparing for trial, and then we encountered a
24   situation where the plaintiffs in the case sort of dropped a
25   bomb by adding these new affidavits.

1          As Your Honor summarized, we think this violates

2   the Federal Rules and the Court's scheduling order.  There was

3   no request made or justification really offered.  They just

4   filed these.  Although we don't think, in the final analysis,

5   these additions will influence or alter the outcome, we think

6   that allowing the state to proceed under this path would have a

7   pretty devastating effect on our trial preparation efforts.

8          In particular, we think it would require us to

9   reopen discovery.  We definitely would need to take the

10  depositions of the three new fact witnesses.  We also have the

11  issue that there are 22 other members of the P&T committee who

12  have never been deposed who would have participated in these

13  issues that are being focused upon by the three new fact

14  witnesses.  If we have to take those depositions, you know, we

15  took only five or six fact depositions in this case, so we are

16  really talking about tripling or quadrupling the number of fact

17  depositions that we would need to be taking in this case.

18          So that impact is quite substantial.  We would

19  need to retake the depositions of the three witnesses that are

20  trying to propose to change their testimony.  I think, frankly,

21  we would want to revise our *Daubert* motions because the experts

22  are adding to the opinions that they are trying to place before

23  the Court.  In some respects, I think we would need to file

24  revised expert reports to meet some of the new contentions.

25  And, of course, that in turn might lead to the need for

1    depositions going the other direction.

2                    The fallout really doesn't stop there.  We think

3    that if this new evidence would have been in the record

4    earlier, we would have approached a number of things

5    differently in preparing for trial and are quite concerned

6    about all of this change that is occurring here at the last

7    moment.

8                    What we are concerned about here and the reason

9    this development is rather galling to us is that at conference

10   after conference, the AG's counsel has stood up and told the

11   Court, "We are ready for trial."  Trusting that representation,

12   the Court set a pretty aggressive trial preparation schedule.

13   We have invested considerable time and effort in meeting that

14   schedule.  Now, at the last minute, we are facing all of these

15   changes that we need to deal with.

16                   Let me just focus very briefly, Your Honor, on

17   the specific issues that we are facing with these affidavits.

18   Let me start with the three new fact witnesses.

19                   Each of these affidavits is substantially

20   similar to the other two, and I'm referring here to doctors

21   Culotta, Doskey, and Lutz.  The gist of each is that had the

22   P&T member known more about the risk in Vioxx, he would have

23   voted either to keep it off the PDL or implemented a DUR

24   program to limit Vioxx prescriptions.  Both sides have long

25   known the potential relevance of testimony by former P&T

1    members, and there's no reason why these three affiants

2    couldn't have surfaced with their virtually identically worded

3    revelations before discovery closed.

4                   As the Court knows, the state's initial witness

5    list included 70 witnesses as well as a generic category for,

6    quote, representatives of the Louisiana P&T committee.  We

7    objected to that vague designation, and the Court heard

8    arguments of sorts in chambers on this issue and told the state

9    that individual designations would be required.  As a result,

10   the state ultimately amended its fact witness list back in

11   December, and it deleted this generic category and didn't list

12   anybody specifically from the P&T committee.  In our view, at

13   that point the state lost its opportunity to rely on testimony

14   by P&T committee members.

15                  Your Honor, I note that it's, to us, somewhat

16   ironic that the plaintiffs say that their tardiness should be

17   excused because of the suggestion they were somehow surprised

18   by things in our summary judgment motion going to the question

19   of whether misrepresentations were made, but that's the heart

20   of the case.  That allegation appears in the plaintiffs'

21   complaint numerous times.

22                  It's also interesting that plaintiffs first

23   raised the notion of adding fact witnesses and supplementing

24   the expert reports on February 9.  I say it's ironic for two

25   reasons because that's before we filed our summary judgment

1   motion; it's also the day the discovery in the case closed.  So
2   that's a great source of concern to us.

3              With respect to the affidavits of Abramson,
4   Leach, and Hood, we think that each of these affidavits in one
5   way or another attempt to argue that the P&T committee would
6   have acted differently if the alleged risks of Vioxx would have
7   been known.  So in that sense, they are a direct response to
8   Merck's summary judgment brief.

9              The plaintiffs' opposition paper suggests that
10  somehow these are minor changes and extensions of positions
11  that were taken earlier, but each offers, really, brand-new
12  opinions.  Abramson, for example, seeks to offer new opinions
13  about the information provided by Merck about Vioxx and the P&T
14  committee.  He now says had the P&T committee known the truth
15  about Vioxx, as he puts it, it would have been available only
16  to a small number of Louisiana Medicaid recipients, if any at
17  all.  None of this was in his report or suggested in his
18  deposition testimony.  It's all brand-new.

19             Leach claims in his new affidavit that Merck
20  failed to provide relevant information to the Louisiana P&T
21  committee.  He says the DUR board would have acted to restrict
22  reimbursement for Vioxx if the alleged risks had been known,
23  and this is a complete 180-degree turn from his prior
24  testimony.  At his deposition, Mr. Leach said he had no reason
25  to conclude the P&T committee would have done anything

 1    differently if more risk information had been available, and he

 2    didn't have much of anything to say about the DUR program in

 3    Louisiana.

 4              Mr. Hood has also reversed course.  I should

 5    note he is a fact witness, not an expert.  So I don't mean to

 6    suggest his opinions changed, but his testimony changed.  At

 7    his deposition, he said he had no evidence that the LDHH was

 8    misled in any way regarding Vioxx.  He is saying this as the

 9    head of that institution during the relevant period.  Now he

10    says that he would not have approved Vioxx for placement on

11    Louisiana's PDL if he had been aware of the drug's alleged

12    risks and a number of other points.  In short, in the

13    deposition he was pretty much a blank slate, and now he is just

14    filled with fact information that's set forth in his affidavit.

15              I think it's telling, Your Honor, that in their

16    brief plaintiffs seek to excuse this by saying, "Plaintiffs

17    have no obligation to educate fact witnesses prior to their

18    depositions."  This is a fact witness.  He was deposed on

19    February 8, the day before discovery ended.  We had a right to

20    expect that if a fact witness was presented at that time that

21    we would be able to discover what the fact witness had to say,

22    but he was a blank slate in the deposition.  Now he has

23    advanced all of these positions that are quite inconsistent

24    with what he said during his deposition.  We believe just

25    solely for the purpose of meeting the summary judgment motion

1 and as is noted in the *Thurmond* case from the Fifth Circuit and

2 a number of others, this is just an inappropriate development.

3 You can't defeat a summary judgment motion by submitting an

4 affidavit that contradicts prior testimony in this way.  So we

5 believe, Your Honor, that for all of these reasons these

6 additional affidavits should be stricken.

7                One additional point I would note, Your Honor,

8 is on this point about a continuance, whether that is a

9 solution here, we think that in the *Hamburger* case it's notable

10 that the inquiry that the Court made there was whether trying

11 to deal with this issue through a continuance would have

12 resulted in additional delay and increase the expense of

13 defending the lawsuit.  That's what the Fifth Circuit looked

14 at, citing the *Geiserman* case.

15                We think there's no dispute that that would

16 occur here.  We would be required to take far more fact

17 depositions than we did during the regular discovery process in

18 this case.  We would be required to go back and do a number of

19 things.  We don't think that we could maintain the trial date

20 that's set in this case if we are required to deal with all

21 this additional evidence that the state is trying to bring in

22 at this point.

23                **THE COURT:**  Okay.  Stephen, do you have a response?

24                **MR. MURRAY JR.:**  I do, Your Honor.  I would like to

25 begin, Your Honor, by noting that because of the scheduling

1   that we had in place, we took depositions of fact witnesses

2   after expert reports.  When we did that and when Your Honor

3   imposed that schedule, Your Honor noted specifically that there

4   may indeed be a need to supplement testimony as that happened.

5              As is often the case in discovery, we learned

6   facts that required not only the supplementation of expert

7   reports but also brought to our attention additional testimony

8   from witnesses, in particular the three members of the P&T

9   committee who we have additional depositions from.  We have

10  supplemented as we learned of new testimony that is pertinent

11  and very important to the case, particularly in light of

12  certain positions that Merck has taken which Merck knows are

13  fictitious, and we have a right to rebut their fictitious

14  positions.

15             At the beginning of this case, we saw it as one

16  of fraudulent nondisclosure; not so much what Merck told to

17  members of LDHH or to members of the P&T committee but more

18  what was not told and what was not made available by Merck in

19  the public literature.

20             We learned in the course of discovery in

21  deposing people like Fran Kaiser, who wasn't deposed until

22  January 29, and Warren Lambert, who wasn't deposed until

23  December, that Merck actually affirmatively called on members

24  of the P&T committee, that they targeted members of the P&T

25  committee.  Merck was aware of this fact.  We found that out

1    during the course of discovery.  When we did, we asked for
2    Merck's call notes.
3                  What's interesting is we asked for Merck's call
4    notes way back in May of 2009.  We said, "Give us all the
5    Louisiana call notes."  Merck gave us 270,000 call notes.
6    Incredibly, they did not include among what they produced to us
7    the call notes that they had that showed that they had called
8    on members of the P&T committee.  We didn't get those until we
9    asked for them specifically.
10                 We looked through the call notes.  We said,
11   "Well, it looks like they didn't really call on P&T committee
12   members."  Then we start deposing people, find out that they
13   did target P&T committee members, and that's when we said,
14   "Wait a minute.  Do you guys have any call notes for these
15   guys?" and they produced them.  When they produced those
16   specific call notes in a specific request from us, that's when
17   we started to contact these people, and that's why we weren't
18   able to list them on our witness list earlier.
19                 Your Honor, I would like to take these witnesses
20   in the opposite order from which Mr. Beisner addressed them.  I
21   would like to begin with Mr. Hood.  Now, they have known Hood
22   has always been on our witness list.  They had an opportunity
23   to depose Mr. Hood.  Interestingly, they had an opportunity to
24   depose Mr. Hood with expert reports in hand.  They knew what
25   our theory of the case was going to be, they knew what our

1    fraudulent concealment allegations were, they knew what our

2    experts had said Merck failed to disclose, but they didn't ask

3    any of those questions.  They never asked Mr. Hood at his

4    deposition:  "Mr. Hood, what, if anything, would you have done

5    differently if it would have been disclosed to you?"

6              I'm sorry, Your Honor, I'm looking for my copy

7    of Mr. Hood's deposition.

8              "If it had been disclosed to you, as Mr. Hood

9    now testifies in his affidavit, that Vioxx was not safe and

10   effective when approved in 1999 due to the" -- that comes

11   straight from Kessler's report.  They didn't ask him that.

12             They didn't ask Mr. Hood:  "What would you have

13   done if Merck had disclosed to you that Merck was aware that

14   Vioxx has the potential to induce cardiovascular side effects

15   and failed to adequately investigate that question?"

16             That comes right out of the McGregor, Kessler,

17   and Abramson reports that Merck had.  Merck chose what it asked

18   that witness.  When it asked that witness, "Do you have any

19   evidence that the state was mislead?" Mr. Hood testifying

20   honestly that the only evidence -- because he doesn't have any

21   evidence.  He doesn't know what misled.  He knows what he was

22   not told, if you ask him what he was not told, but he doesn't

23   have any personal knowledge about any of these facts about

24   which the experts have opined.  The only source of that

25   knowledge would be from information that he learned from

1   lawyers and that's privileged and not evidence.  The only
2   evidence that he is capable of giving is his own personal
3   knowledge and that's exactly what he did.

4           Merck didn't ask him the questions necessary to
5   determine what's in his affidavit, to determine what he would
6   have done differently if Merck had provided information that
7   Merck failed to provide.  And there is absolutely no
8   inconsistency between his deposition testimony and his
9   affidavit where he is finally asked and addressed the question:
10  "What information were you not provided, and what would you
11  have done if you did not have that information?"

12          There's no inconsistency whatsoever, and Merck
13  had everything that they needed from day one -- because they
14  had the expert reports -- to ask those questions, and they
15  chose not to do it.  So there's absolutely no reason whatsoever
16  to strike Hood.  He was deposed.  They had every opportunity to
17  ask him about these very questions, and they chose for
18  strategic reasons not to do it.

19          Now, moving on to our two experts, to Dr. Leach
20  and Dr. Abramson.  Dr. Leach did not have the benefit of any
21  depositions except for Ben Bearden.  He didn't know what, if
22  anything, Louisiana had been told at the time that his
23  deposition was taken, at the time that he issued his report.
24  That discovery had not yet taken place.  That was one of the
25  problems with asking that particular witness, who was a P&T

1    committee expert, a formulary expert -- there was a real

2    problem with asking him to give his opinion before any

3    Louisiana discovery had taken place.

4              As soon as the discovery was completed and he

5    had the information, he updated and supplemented his report

6    exactly as Your Honor anticipated would be necessary.  He

7    updated it not just with affidavits from these supposedly new

8    witnesses, one of whom is Secretary Hood, who Merck had the

9    opportunity to depose; he updated them with depositions of

10   Merck employees such as Warren Lambert, such as Fran Kaiser,

11   such as Valerie Taylor, who is not a Merck employee, but she

12   was a Provider Synergies employee.

13             It wasn't until those depositions were taken

14   that he had the information necessary to render those opinions.

15   Those opinions are consistent with his original testimony,

16   which was fairly generic, we'll admit, as to what sort of

17   information P&T committees rely upon; but once he had the

18   specifics, he supplemented it exactly as Your Honor anticipated

19   would be necessary.

20             Dr. Abramson did the exact same thing.  Now,

21   they keep saying Dr. Abramson's opinions are all founded on the

22   P&T committee members' new affidavits.  Well, as I explained,

23   Secretary Hood's affidavit is not new.  It does not contradict

24   the prior testimony.  He is not a new witness.  Again, if you

25   read Dr. Abramson's supplemental report, it refers only

 1    tangentially to the affidavits of P&T committee members.  The
 2    primary focus is on the depositions of Fran Kaiser and Valerie
 3    Taylor, neither of whom were taken until January of 2010, just
 4    weeks before the summary judgment motion was filed.
 5              Your Honor, finally, with respect to the last
 6    two witnesses, I have told you about the call notes -- I'm
 7    sorry, the last three witnesses, the actual P&T committee
 8    members, I have told you about the call notes issue.  I have
 9    told you about the fact that we were not aware until we got
10    into discovery that those individuals actually had been
11    directly called on by Merck.
12              When we found that out, we contacted them.  We
13    got the call notes, identified which ones had been called,
14    contacted them and found out that, yes, in fact they would
15    testify consistent with Secretary Hood.  They were unaware of
16    Merck's nondisclosures, nondisclosures that Merck has been
17    aware of all the time, and Merck was aware that they had called
18    on those individuals.
19              Your Honor, those three witnesses, however, are
20    necessary to rebut a fiction that Merck raised in its papers.
21    Merck suggested, contrary to what their own documents have
22    shown, that representatives of pharmaceutical companies played
23    no role in discussions among P&T committee members.
24              Your Honor, now I'm quoting from page 10 of
25    their summary judgment motion.  They made the affirmative

1   representation that:  "Further, the P&T committee did not rely

2   on materials prepared by pharmaceutical companies as part of

3   its decision-making process regarding the PDL."

4           They represented, Your Honor:  "In particular,

5   the P&T committee did not rely on any representations by Merck

6   regarding Vioxx before making any recommendation pertaining to

7   the PDL."

8           Those are fiction.  Merck knew them to be

9   fictions.  We didn't find out that they had done that until

10  discovery was well underway, after our deadlines for

11  identifying witnesses.  We found out that, no, this wasn't just

12  a case of nondisclosure, this was a case of affirmative

13  misrepresentations by Merck directly to P&T committee members,

14  and yet Merck continues to misrepresent to this Court that no

15  one on the P&T committee ever saw any Merck messages.  It is

16  absolutely critical that we be allowed to bring the P&T

17  committee members who were specifically targeted by Merck

18  before the Court to rebut this fiction, and that is what we

19  have done, Your Honor.

20          The prejudice to Merck is *de minimis* compared to

21  the prejudice of allowing them to continue to perpetrate this

22  fiction on this Court and the prejudice that has been created

23  by Merck's failure to disclose call notes earlier in this

24  litigation that would have indicated that there were actually

25  affirmative calls on members of the P&T committee.

1          Your Honor, their testimony is entirely

2     consistent with the theory of the case that has been before

3     Merck since day one that they had full advantage of prior to

4     the beginning of discovery because they had our expert reports

5     that we were required to give them before discovery.  Merck

6     certainly could have called those individuals in order to

7     support this fiction if they thought it would have done so.

8     They didn't.

9          **THE COURT:**  Okay.

10          **MR. MURRAY JR.:**  They have been identified as soon as

11    we were able to do it.  The prejudice to Merck compared to the

12    prejudice of excluding this critical testimony is *de minimis*.

13    We have offered these individuals for depositions.  They can

14    certainly take those individuals for depositions.  We have more

15    than three weeks before this trial begins.

16          Frankly, that's what the Court should do, allow

17    them to take the depositions of these additional individuals.

18    We have even offered to allow them to redepose Secretary Hood,

19    even though they had an opportunity to depose him and chose not

20    to ask him the questions that, frankly, they could have and

21    should have asked him when he was deposed the first time.  We

22    don't think any of the affidavits should be stricken.

23          **THE COURT:**  Okay.  Thank you.

24          Any response, John?

25          **MR. BEISNER:**  Your Honor, just a couple of points on

1    this.

2                  With respect to the call notes issue, this to me

3    is quite ironic.  You are talking about members of the P&T

4    committee.  These are personnel affiliated with the state,

5    clearly at the core of the case, and to suggest that the state

6    had no way of knowing whether there was any contact between

7    Merck and those individuals, assuming there was such contact,

8    that they had no way of determining that until they took the

9    depositions of Merck personnel just is not credible.

10                  They had P&T people that they listed in a

11   generic category on the list.  You're talking about

12   misrepresentation to the state.  We think that before you filed

13   the lawsuit, you might have asked personnel were there any

14   misrepresentations made.  To say that you didn't know there was

15   any contact between Merck and representatives of the state

16   until you took Merck personnel depositions just is not

17   credible.

18                  This should not have unfolded in this way.  I

19   don't think there's a suggestion here that the call notes were

20   not requested from us until the last minute.  We provided them

21   promptly.  But to suggest that none of this could have been

22   developed, that no one would have asked state personnel what

23   contact they had with the company until it came up in a Merck

24   deposition is just not credible in terms of the way this

25   litigation has unfolded.

1          Your Honor, with respect to the Hood deposition,

2     the suggestion that, "Well, the problem here is that Merck

3     didn't ask him what he didn't know," I don't understand what

4     sort of question that would be.  He testified with ambiguity

5     that Louisiana implemented a preferred dug list regime

6     primarily to control costs and that costs and efficacy were the

7     main concerns of the committee in deciding what drugs to put on

8     the list.  He said during his deposition, in response to a

9     specific question, that he had no evidence that LDHH was misled

10    in any way and he didn't know how the DUR program worked.

11         Now, all of the sudden, he says in his affidavit

12    that the P&T committee's primary concern was with the clinical

13    aspects of safety and efficacy of drugs, a completely different

14    statement from what he was making earlier.  He said that he

15    would not have approved Vioxx for placement on Louisiana's PDL

16    or approved coverage of the drug at all if he had been aware of

17    the risks that are alleged here, and then he goes in to talk

18    about what he would have done with the DUR program, something

19    that during the deposition he said he didn't really know

20    anything about.

21         I think that the state knows that they have

22    completely changed the game here.  Again, I go back to the

23    statement in the brief that they filed saying, "Plaintiffs have

24    no obligation to educate fact witnesses prior to their

25    deposition," and clearly that's what happened here.  They put

 1   in Hood in the deposition in a complete "know nothing"

 2   category, had no views, had nothing to respond on these issues,

 3   and then now suddenly he has been educated, as the brief puts

 4   it, and they're expecting we need to deal with these

 5   consequences.  Thank you, Your Honor.

 6          **THE COURT:**  Okay.  Thank both of you-all.  I am

 7   familiar with this case.  I've been with it a time or two

 8   before.

 9              All of us know that in a matter of this sort, I

10   first look to Rule 37(c)(1), which focuses the Court on the

11   following.  It says that if a party fails to provide

12   information or identify a witness as required by 26(a) or

13   26(e), the party is not allowed to use that information or

14   witness to supply evidence on a motion, at a hearing, or for

15   that matter even at a trial unless -- *unless* -- the failure was

16   substantially justified or is harmless.

17              Now, the question of harmless is I don't think

18   an issue here.  If it helps one side, it generally does not

19   help the other side.  So the harmless part I don't see as an

20   issue but rather a question of whether it was justified.

21              Now, I look at the *Hamburger* case by the

22   Fifth Circuit, which focuses the Court on a couple of things.

23   One, it instructs the trial court to determine whether or not

24   to preclude the testimony should be a weighing exercise.  You

25   should consider the explanation for the failure to identify the

1    witness or the importance of the testimony, the potential

2    prejudice in allowing the testimony, and the availability of a

3    continuance to cure such prejudice.

4                I don't see the latter as being available.  This

5    case has been going on too long.  It's not fair to either party

6    to continue this case.  It's not fair to the system to continue

7    this case.  We have had over 50,000 claims filed.  Many of the

8    claims have been resolved.  We have had a number of trials,

9    both in state and federal courts, and to put this off a longer

10   time is not fair to either party.  So I look at the other three

11   areas:  The explanation for the failure to identify the

12   witness, the importance of the testimony, and the potential

13   prejudice in allowing the testimony.

14               I see the witnesses as being somewhat different.

15   I don't think it's appropriate to add new witnesses at this

16   stage in the game.  I think for either side to come up with new

17   witnesses at this stage is extremely prejudicial to the other

18   side and I don't feel that that is appropriate.  Culotta,

19   Doskey, and Lutz, they have not been deposed, they have not

20   been listed in the witness list, so I'm going to strike those

21   witnesses and their affidavits.

22               I see Hood, Leach, and Abramson somewhat

23   differently.  The thrust of the defendant's position is that

24   they have changed their testimony or added something to their

25   testimony.

1          I look at the affidavit of Abramson.  In his

2   deposition and in his report, he takes the same position.  He

3   says that nobody was advised of this information and the

4   misrepresentation was inappropriate.  Now, in his affidavit he

5   lists a couple of people, but I don't find that that's

6   inconsistent.  I think that he has been deposed.  The same way

7   with Hood.  He can be impeached at trial.

8          For that matter, if the parties feel that they

9   would like to revisit Hood, Leach, and Abramson with

10  depositions, that's a doable thing as long as it's limited to

11  the, quote, new information, whether or not it is new

12  information.

13         So I'm not going to strike Hood, Leach, and

14  Abramson's affidavits and they can testify.  They have been

15  listed.  They have even been deposed.

16         It's a strategic issue that, Tarek, you're going

17  to have to focus on, whether or not to depose them again or

18  whether simply to take the position to impeach them on what

19  they said, but that's a question that the litigators have to

20  deal with.  If you need to revisit them in the form of a

21  deposition, that's a doable thing as long as the deposition is

22  limited to the so-called new information.

23         So, in short, I exclude Culotta, Doskey, and

24  Lutz.  I do not exclude Hood, Leach, and Abramson.

25         Thank you very much folks.  I've got the summary

1    judgment coming up tomorrow.  I'm in the middle of looking at

2    some of the cites that you-all have given to me.  Hopefully,

3    everybody will be ready at that particular point.  Thank you

4    very much.

5              **MR. MURRAY JR.:**  Thank you, Your Honor.

6              **MR. BEISNER:**  Thank you.

7              (WHEREUPON the Court was in recess.)

8                               * * *

9                           **CERTIFICATE**

10             I, Toni Doyle Tusa, CCR, FCRR, Official Court

11   Reporter for the United States District Court, Eastern District

12   of Louisiana, do hereby certify that the foregoing is a true

13   and correct transcript, to the best of my ability and

14   understanding, from the record of the proceedings in the

15   above-entitled and numbered matter.

16

17

18                              s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
19                              Official Court Reporter

20

21

22

23

24

25