UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: VIOXX<br>Products Liability Litigation | MDL No. 1657<br>SECTION: L |
| "This Document Relates to All Cases" | Judge Fallon<br>Mag. Judge Knowles |

## SUPPLEMENTAL OBJECTION OF DANIEL E. BECNEL, JR. TO PLAINTIFFS' COMMON BENEFIT FEE AWARD

NOW COMES Daniel E. Becnel, Jr., Attorney at Law, who files this Supplemental Objection to the Plaintiffs' Common Benefit Fee Award to reassert my objection to my fee allocation in the above-captioned matter, initially in the amount of $97,076.50. The basis of this objection is as follows:

I provided testimony to the Fee Committee, which was transcribed by the PSC's court reporter, which I am attaching herewith (Exhibit "C" of my original objection).

Although my fee award was increased from $97,076.50 to $455,000.00, there was allegedly no basis for any additional fee, based on Mr. Herman's statement that my submission of over 16,167.50 hours included many hours submitted by contract lawyers I hired at the request of the PSC and other lawyers, who were working on this case prior to the formation of a PSC to obtain and review documents which were produced in state court litigation in both Alabama, as well as New York, New Jersey and the Seeger Weiss office.

1

Not only was it repeatedly requested that my firm do work, but my office was assured that the only people who would take and participate in depositions were people who reviewed documents. As the Court and the Special Master can see from the lawyers I provided to do work on this case, many have extensive experience as judicial law clerks, as lawyers who worked on the Tobacco Litigation for years, and even a retired judge who has worked for me since his retirement. Enclosed herein is a copy of my objection filed December 6, 2010 (Exhibit "D").

I became involved in the Vioxx Litigation through my good friend, Jerry Parker, who was one of the first attorneys to litigate Vioxx cases. He initially referred his cases to Michael Papantonio, who decided they were not meritorious and thus referred them to Chris Seeger.

I also became aware that Carlene Lewis was handling the first case in Texas through her work at ATLA (now AAJ). She brought Mark Lanier into the case and he helped try the first case with a plaintiff's verdict. Ms. Lewis was a pioneer in the Vioxx Litigation and, in fact, she was appointed by this Court to the Plaintiffs' Steering Committee. Although she died shortly after her ground breaking verdict with Mr. Lanier, she sent me a card shortly after a meeting to organize that case, which was even prior to the argument before the MDL Panel. This confirms my early involvement in this litigation. (See attached marked Exhibit "E")

Not only did I work closely with Ms. Lewis on the theory of the case, but I also took her and Shelly Sanford (her partner at the time) to dinner with many of my experts including, Dr. Daniel Acosta, Jr., Ph.D., from the Department of Pharmacology and Toxicology at the University of Texas and The University of Cincinnati, who authored a chapter entitled *Toxic Responses of the Heart and Vascular System* in the book *Casarett & Doull's Toxicology, The Basic Science of Poison's;* Dr. John Markis, a Harvard cardiologist; Dr Cyril Wecht, a forensic pathologist and an attorney; and Dr.

Suzanne Parisian, an FDA expert who authored a book on the FDA and also a pathologist and a FDA employee for several years.

I personally argued the case before the MDL Panel after a meeting in Houston to try to obtain a consensus of where the MDL should go. Even though most of the people who were ultimately appointed to the Plaintiffs' Steering Committee attended this meeting, I was the sole individual who filed for and argued that the case should go to this Court. In fact, most of the others urged me **not** to argue for this Court. That included both Lead Counsels (Andy Birchfield and Chris Seeger), Liaison Counsel (Russ Herman), as well as others on the Plaintiffs' Steering Committee.

Although I filed one of the first federal cases in the Vioxx Litigation, most others did not want the case in federal court, preferring state courts in Texas, New Jersey, Pennsylvania and California. After the MDL Panel sent the case to this Court, I organized the first meeting in an attempt to reach a consensus on Lead Counsel and a proposed Committee. I was asked by Jerry Meunier to support him to be Liaison Counsel. I agreed to do this and promoted his appointment to all lawyers involved. While I had no objection to Russ Herman, he advised me that after the Tobacco verdict and the Propulsid case, he and his wife wanted to teach and travel the southwest United States, Israel, and other places and become involved in archeological digs. He said he promised his wife that he would retire. It was with this in mind that I agreed to support Mr. Meunier, who has exceptional organizational abilities and has worked with me for years in the Gaylord Litigation.

Because I did not support Mr. Herman's appointment as Liaison Counsel and because I was on the Executive Committee in the Propulsid Litigation and criticized him for never having held an Executive Committee meeting, I was "black listed" by him. An example of this treatment by Mr.

Herman is the original fee I was awarded herein --- $97,076.50 which amounts to only $6.00 per hour (which is not even minimum wage).

At the meeting to organize leadership, Jerry Parker and Chris Seeger immediately chartered a jet to attend the organizational meeting because Mr. Seeger thought he might be left out considering his involvement in the State Court litigation. Contrary to his belief, I nominated both Chris Seeger and Andy Birchfield to be Lead Counsel. I was informed that Mr. Herman had changed his mind concerning his involvement once Judge Eldon Fallon was picked as the MDL Judge, and that he now wanted to be Liaison Counsel. It should be noted that Mr. Herman did not even attend the organizational meeting even though he was invited. This meeting took place at Antoine's and was paid for by me.

As the MDL proceeded, I sent two carloads of lawyers to Montgomery, Alabama each week to review documents. The attorneys working for me all lived in the New Orleans metropolitan area. They would wake up Monday mornings at 2:30 a.m. and drive five hours to begin work at 8:00 a.m. at the Beasely Allen Firm in Montgomery. They would work until 5:00 p.m each day, and return home on Friday evening, getting home at approximately 10:00 p.m. on Friday night. During this period of time they worked on no other cases or projects, instead focusing their full attention on Vioxx document review. I funded hotels, transportation, meals and incidental costs for this team of lawyers on a weekly basis. Every week I provided hotel accommodations in Montgomery near Beasely, Allen. This was because Chris Seeger had trial settings in New Jersey and Andy Birchfield was moving toward a trial setting in Alabama and both needed documents reviewed immediately. When they worked in the New Orleans depository, they worked similar hours but obviously did not have to travel. I provided more lawyers to review documents than anyone else.

4

I also reviewed "hot documents" with the understanding that because our office was doing most of the document review, we would receive major deposition assignments, as I had done in the Breast Implant Litigation, MDL No. 926, the Pedicle Screw Litigation, MDL No. 1014, and the National Tobacco case (*Castano*).

Without repeating my initial submission, please see Exhibits "A" and "B" which are made a part of this objection. One simply needs to review the awards of the members of the Fee Allocation Committee for an illustration of the disparity in awards:

| | |
|---|---|
| Blizzard Law Firm | $11,600,000.00 |
| Girardi & Keese | $20,100,000.00 |
| Herman Law Firm | $32,500,000.00 |
| (Ashcraft and Gerel, LLP, a part of the Herman Law Firm) | $ 9,000,000.00 |
| For a total of | $41,500,000.00 |
| Lanier Law Firm | $27,000,000.00 |
| Levin, Fishbein | $21,400,000.00 |
| Levin, Papantonio | $15,600,000.00 |
| Seeger, Weiss | $40,900,000.00 |
| Weitz & Luxenburg | $20,000,000.00 |

The Fee Committee alone received $197,000,000.00 of the $315,000,000.00 award made by the Court at 6.5% (62.5% of the total fee). A number of the lawyers did not contribute much to the common benefit fund because they had very few cases. For example, my firm put into the common benefit fund $587,365.85 .

As a further example, a solo practitioner who shares office space, Anthony Irpino, whose brother worked for Mr. Herman, was awarded $877,000.00 yet my entire office with over 16,167.50

hours, now has been raised to only $455,000.00 ($28.14 per hour). No one to my knowledge who has taken such a risk has ever been awarded such a ridiculously low rate considering the qualifications of the people who did this work.

For instance, the only successful trial in federal court was handled by Mark Robinson with the assistance of Rebecca Todd of my office and Mr. Robinson's staff and experts. I worked with Mr. Robinson and we took most of the major depositions in the Tobacco Litigation, including economic, toxicology, and medical experts. Mr. Robinson even had Ms. Todd go to California to assist him with documents in preparation for his trial. I paid for her transportation and all other related costs. She was also charged with the responsibility of handling the plaintiff in preparation of and during the trial and worked late into each evening during the trial. Apparently her time working in New York at Mr. Seeger's office, in Montgomery for months, in California and in New Orleans was only worth $28.14 per hour.

This is blatantly unfair and not based on any objective criteria by the Fee Committee. It is certainly not based on any enumerated *Johnson* Factors. Not one person in my office was ever given an assignment to even second chair a deposition. My lawyers were instead asked to summarize a large number of the depositions taken. Every time there was a meeting, the PSC begged for people to do document review and our office took on these tasks with the anticipation of playing a major role in depositions and/or trials.

When I was asked to appear before Mr. Herman and Mr. Birchfield I made no presentation whatsoever because I had been told that there was no basis for me to receive a higher award than $97,076.50 and that Mr. Herman did not believe that I was entitled to more. They asked me to give them the figure I requested. I gave them the figure of $4,041,875.00.

I was also "black listed" because I suggested that the original fee for people doing common benefit work should be only 2% for fees and 2% for costs. This was adopted by most of us who had a great number of cases and we signed an agreement to that effect. When it became obvious that certain members of the PSC had very few cases and thus would not contribute much in the way of a common benefit fund, they raised the common benefit assessment significantly, to which I objected. I was constantly asked by both Mr. Herman and Mr. Levin to withdraw my objection, which I refused to do. As a result of my not being on the Plaintiffs' Steering Committee, referral lawyers throughout the country, who had previously advised me that they would refer all of their Vioxx cases to me, decided to refer their cases to others.

It should be noted that while most of the metro New Orleans law firms were horribly affected by Hurricane Katrina, my office was closed for only one day. Mr. Herman not only lost his law office, which was virtually destroyed, but had to move it to Atlanta for a number of months and, thereafter, sub-leased an office from Sessions, Fishman. The New Orleans document depository was also moved there and many of my lawyers continued to work through the Hurricane Katrina period at Beasely Allen in Montgomery and, thereafter, at the temporary Sessions, Fishman sub-leased space. Because I had numerous buildings available in Reserve and LaPlace, equipped with desks, computers, and the like, I offered the Plaintiffs' Steering Committee the use of my office, at no cost, to keep the document review going for those people in the area who could continue working. This offer was rejected.

It should also be noted that my offices in Reserve and in LaPlace were only minimally affected by Hurricane Katrina and, in fact, most of Reserve did not lose electricity, sewerage, etc. After three or four days, the entire Parish of St. John the Baptist served as an evacuation point for most of the metro area affected by Hurricane Katrina.

I respectfully request an opportunity to conduct discovery and to present evidence to demonstrate that lawyers who received large sums of money were simultaneously working on multiple other cases and submitting time sheets for work in them in both State and Federal Courts, including many MDL's.

Respectfully submitted,

s/Daniel E. Becnel, Jr.
DANIEL E. BECNEL, JR. (#2926)
LAW OFFICES OF DANIEL E. BECNEL, JR.
P. O. Drawer H
106 West Seventh Street
Reserve, LA 70084
Telephone (985) 536-1186
Facsimile (985) 536-6445

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Supplemental Objection of Daniel E. Becnel, Jr. to Plaintiffs' Common Benefit Fee Award has been served on all parties by ECF and by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No. 8, on this __26th__ day of January, 2011.

s/Daniel E. Becnel, Jr.
DANIEL E. BECNEL, JR.