## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE VIOXX PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1657 |
| | SECTION L |
| This Document Relates To: All Actions | JUDGE FALLON |
| | MAGISTRATE JUDGE KNOWLES |
| | **LOCKRIDGE GRINDAL NAUEN'S OBJECTION TO FEE ALLOCATION** |

The firm of Lockridge Grindal Nauen P.L.L.P. ("Lockridge") objects to the fee allocation of $350,000[1]. The Lockridge Firm submitted a lodestar of $2,422,513, primarily for work done identifying and qualifying plaintiffs' expert witnesses, in formulating cross-examination materials to be used against defendant's expert witnesses, and attending several trials at the request of one of plaintiff's co-lead counsel, and was awarded about 14% of that amount, or $350,000. This shocking reduction was undertaken following the leadership's submission of this time when seeking a fee award and multiplier from this Court. Now, notwithstanding the exceptionally high level scientific-related and trial work which was done at the express request of Lead Counsel and compensated for by this Court, the Leadership has done an about face and now asks this Court to severely discount the work. Lockridge believes that the scientific and trial work, accomplished at the direction of the leadership, is exactly the type of work that is

---

[1] This is down from the $364,000 allocated before the initial objection was filed.

432789.1

to be rewarded in MDL especially where, as here, there is ample money awarded by the Court to satisfy all lodestar and still provide a healthy multiplier to the leadership firms.

Bert Black from Lockridge spent over 3,000 hours working on this case. Mr. Black, who has a national reputation for expertise on scientific evidence and Daubert issues, became well-versed on the particular science and statistics of Vioxx injuries by:

- reviewing extensive scientific literature;
- reviewing documents relevant to the expert reports;
- participating on committees to help develop the factual underpinnings of the reports and supporting testimony;
- identifying and helping to retain experts (at least two of whom would not have been available but for Mr. Black's contacts and efforts);
- conferring directly with several MDL experts to aid in the drafting of reports and indirectly with other counsel with regard to other experts;
- defending against Daubert motions and drafting plaintiffs' Daubert motions;
- preparing experts for their depositions and defending depositions; and
- working with the trial teams for three trials and with the experts who testified at those trials.

Mr. Black made himself and his expertise extensively available to other Plaintiffs' counsel in the MDL by serving on the Science Committee, the Epidemiology Subcommittee, and the Daubert Committee. In addition, Mr. Black conducted specific research projects for this litigation. For example, he drafted an outline or PowerPoint presentation of the Plaintiffs' "science story" for the Science Committee. Mr. Black argued several Daubert motions (both plaintiffs' and opposition to defendant's) before Judge Fallon prior to the New Orleans/Irvin Plunkett trial. Mr. Black prepared for and also presented on experts Dr. Richard Kapit, Dr. Janet Arrowsmith-Lowe, Dr. Silver and

Dr. Lanza at these Daubert hearings. Other specific examples of Mr. Black's contributions include:

- completion of a project analyzing adverse event reporting by healthcare providers related to cerebrovascular events and the response by Merck;
- extensive research into the avenues to defeat the hypertension defense;
- establishing causation and defeating individualized causation defenses;
- exploring the role of aspirin as a justification for using COX-2 inhibitors and its role in preventing or lessening the impact of myocardial infarctions;
- exploring the Fitzgerald hypothesis and the manner in which it could be used to bolster Plaintiffs' claims;
- developing the distinction between the different types of plaque and how differing stabilities might play into proving or disproving causation;
- becoming well-versed in the COX-1 endothelium issue;
- developing a chronology of labeling and labeling changes together with the timing and sufficiency of each warning, a major project not undertaken by other lawyers working on the case;
- helping to develop baselines and models addressing the percentage of cardiovascular events in the general population verses Vioxx population issue; and
- exploring fraud in clinical trials and related publication of literature together with an analysis of the trials that were prematurely stopped for marketing reasons or information was not shared with the FDA.

Mr. Black contributed substantial work in preparing Plaintiffs' expert reports, and preparing experts for deposition and trial testimony. Plaintiffs' experts whose reports, depositions or testimony he directly worked on include, for example, Dr. Colin Funk, Dr. Richard Kapit, Dr. Robert Fletcher, Dr. Benedict Lucchesi (response to Daubert motion), and Dr. Lemual Moye.

Mr. Black also worked on Defendants' expert depositions, preparing information and cross-examination questions, including experts Dr. Janet Arrowsmith-Lowe (for both the Irvin Plunkett and Barnett cases), Dr. Alise Reicin, Dr. Barry Rayburn and Dr. Nicholas Flavahan.

In addition, Mr. Black provided scientific and strategic work for three important bellwether trials. At the request of Andy Birchfield, Mr. Black went to Houston to assist in the second Irvin Plunkett trial. His work included preparing expert direct and cross-examination questions, providing strategic input, preparing experts to testify, and assisting with other trial preparation.

At the request of Mark Robinson and Andy Birchfield, Mr. Black assisted in the Barnett trial. He participated in telephone conferences with Mark Robinson and Ted Wacker, and a meeting with Ted Wacker, regarding expert and trial preparation. He researched statistics, including significance testing for potential cross-examination of expert Dr. Alise Reicin. He worked on atherogenesis issues, and the cross-examination of defense expert Nicholas Flavahan.

At the request of Mark Robinson, Mr. Black also assisted in developing strategy for the Berwick case. He researched and wrote a memorandum on labeling, participated in numerous conference calls about trial preparation issues, and circulated a draft memorandum to Ted Wacker, Dan Sigelman, Don Arbitblit and Mark Robinson, and provided a final memorandum to co-counsel. At Mr. Robinson's request he worked directly with expert Dr. Suzanne Parisian. This work of Mr. Black is precisely the type of high level activity outlined in the Recommendation of Fee Allocation Committee filed January 20, 2011 and which it said should be compensated.

Partner Robert Shelquist consulted on MDL and science issues with Mr. Black. He reviewed medical journal articles and analyzed scientific articles. When asked, he

432789.1                                    4

conferred with other lawyers regarding scientific issues, MDL trial issues, expert issues, the Plaintiffs' science story, deposition strategy, and trial strategy.

Partner (then associate) Yvonne Flaherty consulted with Mr. Black on MDL expert, science, Daubert, deposition and trial strategies. She assisted Mr. Black with his numerous committee assignments. She reviewed and analyzed MDL pre-trial orders, status conference reports, and other MDL submissions, and provided Mr. Black with insight and analysis on the Plaintiffs' Science memos, strategies regarding experts and motions.

Associate Elizabeth R. Odette, provided over 500 hours of research work and trial and deposition assistance. Her research included issues surrounding the FDA, as well as FDA labeling issues, for the trial teams identified above. Her work included:

- researching the International Conference on Harmonization and FDA guidelines for Population Size of Safety Studies;
- researching and drafting motions to exclude defendants' trial experts, including Drs. Arrowsmith-Lowe, Lucchesi and Kapit;
- researching the FDA "controlling science" principles, data on the VIGOR and approve studies,
- cataloguing and characterizing FDA and Merck correspondence; and
- analyzing the sufficiency of FDA notice to physicians about label warning changes.

Ms. Odette also prepared exhibits for the Arrowsmith-Lowe deposition and second chaired that deposition in New Mexico in October 2005 prior to the Irvin Plunkett trial. She assisted in researching for and drafting a motion to exclude the testimony of Dr. Arrowsmith-Lowe.

Ms. Odette prepared direct examination questions and anticipated cross-examination questions for Plaintiffs' expert Dr. Kapit. She prepared cross-examination

questions for defense expert Dr. Arrowsmith-Lowe for the Irvin Plunkett case. She researched all Plaintiffs' expert witnesses to determine defense strategies. She attended the Irvin Plunkett trial, in Houston, where she prepared motions and submissions for the trial team, including assistance in drafting a motion to reconsider Dr. Baldwin's causation testimony and researching Rules 59 and 60 for the benefits of filing a motion following a trial verdict. She researched potential exhibits and documents to be reviewed for experts Drs. Fletcher and Reicin. She also reviewed the deposition of expert Dr. G. Curfman and prepared responses to defense objections.

Paralegal Tinzing Artmann prepared Plaintiff expert report notebooks, gathered, organized and reviewed defense expert reports, organized deposition exhibits, organized medical journal articles, prepared a chronological report of hypertension related documents, and prepared CDs of documents concerning hypertension, FDA concealment, as well as expert documents, and provided them to co-counsel. In addition, she attended the deposition of expert Dr. Arrowsmith-Lowe in June 2006 in New Mexico prior to the Barnett trial identified above.

Clearly, the Lockridge firm, and most specifically, Bert Black, was working at the request of Lead Counsel in trial settings and was at the forefront of much of the difficult and complex scientific and expert issues in this case and had an important role in at least three of the cases that actually went to trial.

While the allocation of attorneys' fees among counsel by co-lead counsel may be entitled to some deference, this deference is limited and must be viewed in light of the significant conflict of interest involved when those determining the attorney fee

allocation benefit from their own determination.  *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82 (2d Cir. 2010) ("We recognize that lead counsel has an incentive to under compensate non-lead counsel, as such compensation typically decreases lead counsel's own recovery.").  As discussed in *In re Diet Drugs*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring):

> [C]ounsel have inherent conflicts.  They make recommendations on their own fees and thus have a financial interest in the outcome.  How much deference is due the fox who recommends how to divvy up the chickens? . . . Such a direct conflict of interest strongly suggests that affording substantial deference is inappropriate.

*See also Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct 2343, 2350 (2008) ("[C]onflict should 'be weighed as a factor in determining whether there is an abuse of discretion.'" (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989))).  The allocating attorneys "will have abused [their] discretion if [they] relied on clearly erroneous findings of fact or failed to consider a relevant factor."  *In re Vitamins Antitrust Litig.*, 398 F.Supp. 2d. 209, 225 (D.D.C. 2005).  *See,* generally, *Turner v. Murphy Oil*, 582 F.Supp.2d 797 (E.D. La. 2008).

All reviews of attorney fee awards must ensure that the fee is reasonable.  *See Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir. 1984); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (stating that the standard for evaluating fee awards is reasonableness).  The Court should engage in an <u>independent</u> inquiry as to the sufficiency of fee awards.  As the First Circuit Court of Appeals has stated, "we remain convinced that independent inquiry by the trial judge is a vital component of the fee setting process."  *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 527 (1st

Cir. 1991). For the common fund doctrine to function, "it is essential that the court supervise class counsel's performance and carefully scrutinize its fee application." *In re Cendant Corp. Sec. Lit.*, 404 F.3d 173 (3d Cir. 2005); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ("[A] thorough judicial review of fee applications is required in all class action settlements."). Independent scrutiny ensures "a meaningful review of the fairness of the allocation and the overall reasonableness of fees" for all parties. *Victor*, 2010 WL 4008744 at *7.

Additionally, where the class members do not agree with the lead counsel's allocation of an attorney fee award, the court must ultimately determine the reasonableness of the allocation. *In re Diet Drugs*, 2002 WL 32154197 (E.D. Pa. 2002) (citing *In re Copley Pharm., Inc.*, 50 F.Supp. 2d 1141, 1148 (D. Wyo. 1999)); *In re Indigo Sec. Litig.*, 995 F.Supp. 233, 235 (D. Mass. 1998). A court's duty in this regard has been discussed by several courts:

> In a class action, whether the attorneys' fees come from a common fund or are otherwise paid, the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper. This duty of the court exists independently of any objection.

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 730 (3d Cir. 2001) (quoting *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328 (9th Cir. 1999)); see *also Wells v. Dartmouth Bancorp, Inc.*, 813 F.Supp. 126, 128 (noting problem of lack of adversarial process in determination of attorneys' fees in class action and requiring judicial scrutiny).

As Judge Donovan Frank noted in *In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*, 2008 WL 5382338 (D. Minn.): "The court believes that

law firms should be compensated for the work that they were assigned to do before firms that bore a large risk are granted an enhancement for that risk." The Court further faulted the Lead Counsel in that case saying that the Lead Counsel "appears to have viewed the multiplier for the top ten firms as more important than compensating those who did legitimate, compensable work."

And finally, the Court said:

> The Court believes that law firms should be compensated for the work that they were assigned to do before firms that bore a large risk are granted an enhancement for that risk. If this were not the case, then in future MDLs, firms would have little incentive to do the "worker bee" work.

*Id*. at *8.

In conclusion, the Lockridge firm asks that it be awarded at least $1,211,250, or approximately 50% of its lodestar.[2]

Dated:  February 3, 2011            **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**


                                    s/   Richard A. Lockridge
                                    Richard A. Lockridge
                                    Robert K. Shelquist
                                    Yvonne M. Flaherty
                                    100 Washington Avenue South
                                    Suite 2200
                                    Minneapolis, MN  55401

---

[2] It should be emphasized that all of the Lockridge firm time was kept contemporaneously on a quarter hour basis and was reported monthly to Herman Herman Katz & Cotlar.

432789.1                                    9

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Lockridge Grindal Nauen's Objection to Fee Allocation has been served upon all parties by electronically uploading the same to LexisNexis File & Service Advanced in accordance with Pretrial No. 8, and via e-mail and U.S. Mail to Russ Herman and Andy Birchfield, on this 3rd day of February, 2011.

/s/ Richard A. Lockridge