**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | § § § § § § § § § § § | MDL NO. 1657<br><br>SECTION L<br><br>JUDGE FALLON<br>MAGISTRATE JUDGE KNOWLES<br><br>**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION OF COMMON BENEFIT FUND FEES** |

MAY IT PLEASE THE COURT:

KATHRYN SNAPKA ("KS"), individually and as successor to the interest of SNAPKA, TURMAN & WATERHOUSE, LLP, files this objection to the fee allocation recommended for her by The Fee Allocation Committee ("FAC") as published by this Court's Order of January 20, 2011.

1.      KS objects to the $75,000.00 allocated her by FAC.

2.      KS objects because the court clearly instructed the FAC to provide the allocations in a complete honest and transparent manner.  This has not occurred.  The court ordered 6.5% of the settlement to be set aside for common benefit fee for a total of $315,250,000 to be distributed.  However, the allocations provided by the FAC total $311,885,032.  No accurate accounting has been provided.  Additionally, as will be discussed below, information vital to understanding the methodology actually used by the FAC to reach these allocation has not been provided.  Therefore, conditions precedent to formulating an informed objection or an informed request are unavailable.  KS reserves her rights to make further objection and fee request when

1

these conditions have been fulfilled.

3.      While FAC makes very abstract statements about its process, it provides virtually no information that concretely describes its allocation methodology. This flaw violates governing jurisprudence, including all of the precedent on which FAC says it relies.  KS requests that her allocation be determined by a transparent procedure which includes as a minimum (1) an articulated methodology for allocating the funds, (2) a process that is transparent for all involved including the claimants in this litigation and the public at large and (3) procedural protections in place during the FAC allocation process that at the very least recognize and address the obvious conflict of interest that results from every member of FAC also having an interest in the very funds that they are allocating.  KS requests that the articulated allocation methodology be founded as much as possible on defined, clear and understandable criteria that are grounded on an objective foundation; thereby, reducing both the possibility and appearance of FAC allocating arbitrarily, capriciously and motivated by conflict of interest.  KS requests that under no circumstances should the allocation process be subject to even the appearance that allocations are not merit based and derived from a process that follows governing precedent—not just in word, but in fact.  KS requests that the allocation process for the distribution of the common benefit funds be guided by the same factors that determined the existence of and the size of the common benefit fund.  These requests are fundamental to a process that allocates funds to attorneys when those funds would otherwise go to the claimants.  An allocation process that does not meet these requests does not comply with the law, violates the Due Process Clause of the United States Constitution and projects an unnecessarily negative image of the legal profession. Approving this process and these allocations would be an abuse of discretion.  If the process used by FAC had met these requests, KS would not object.  It did not and she does object.

4.      The Order publishing the FAC allocation requires objectors to state the amount of their request. KS requests an allocation of $12,000,000.  KS was not privy to the allocation process that still remains shrouded in mystery.  It is now, at last, known that FAC members awarded themselves over 70% of the more than $311 million dollars allocated from the common benefit fund.[1]  It is also known that FAC allocated only 0.0024% of those same funds to KS although she was among the first lawyers to pursue this litigation, worked on it tirelessly and continuously, and was one of the very few lawyers in the entire country to serve as an active counsel in a case in which the plaintiff won a jury trial.  KS cannot reconcile her allocation with that of others—particularly those who sit on FAC.[2]  KS suggested allocation of $12,000,000 is comparable to the awards allocated to counsel who claimed participation in the other tried cases in this litigation.  KS suggests this number, because she is ordered to provide a number, and candidly states that this number is based on information inadequate to fully and properly evaluate her allocation.  This limitation on information is a direct result of the lack of transparency and secrecy that is a defining element of the FAC allocation process and a fundamental flaw in that process.  FAC members, for example, did not even support their enormous self-allocations with transcribed presentations justifying the largess they bestowed on themselves; a presentation that KS performed under FAC scrutiny and questioning.

5.      KS, in contrast to the FAC process, has not written a number down in secret that resulted from a secret process.  She has "shown her work."  KS, for example, supplied the following to FAC:

A.      KS submitted details of her work in her Fee Application.  ***See Exhibit* B.**

B.      KS appeared before FAC in a transcribed proceeding to present information about

---

[1] Without explanation, more than $3.5 million of the fund was not allocated at all.

[2] See chart attached as ***Exhibit* A.**

her work and to respond to questions from FAC.  *See Exhibit* **C.**

C.    KS further described her work and her concerns about the FAC allocation process in her objections to the preliminary FAC allocation.  *See Exhibit* **D.**

6.    The information provided to FAC by KS evidenced that her substantial contribution to the common benefit included and was not limited to the following:

A.    In 2003 KS was one of the first lawyers in the country to recognize the potential basis of the claims involved in this litigation and was one of the first to agree to accept representation of persons who sought her legal expertise in pursuing these claims.  KS was then and remains a lawyer with unquestioned experience, expertise and success in pharmaceutical trial work.

B.    From the time KS became interested in this particular litigation, she has researched the scientific literature, consulted with physicians who prescribed the medication and learned of the methods by which the medication was marketed.  She has consistently worked to share her information with all in the effort to build an ever stronger case for claimants.

C.    KS' early work on this litigation, which pre-dated the formation of this federal MDL and also predated the participation of most FAC members, included visits with other lawyers interested in this litigation for the purpose of discussing the development of this litigation, including the critical development the science and expert witness opinion.

D.    KS learned of the *Garza* case from David Hockema, a fellow trial lawyer who she has known and worked with for more than 2 decades.  KS was asked to join the *Garza* trial team that included her, David Hockema, and Joe Escobedo.  The *Garza* case was tried from January 24, 2006 until the jury reached a $32 million plaintiff verdict on April 21, 2006.  *Garza* was one of the very few plaintiff jury verdicts in this litigation.  KS served throughout the trial as one of

4

three active trial counsel.  Her work in the trial included jury selection, presentation of plaintiff's cardiologist and the son of the plaintiff, and cross-examination of Dr. Wheeler.  KS was to cross-examine Alise Reicin, prepared to do so, but, interestingly and significantly, this was the only case tried by defendant in which the defense made the judgment not to call Dr. Reicin and expose her to cross-examination.

       E.      KS realized the significance of this litigation long before the *Garza* verdict, and committed her resources almost exclusively to this litigation.  Specifically, KS declined opportunities to accept representation from clients in litigation involving Zyprexa, Oxycontin, Prempro and Trasylol.

       F.      KS in 2004 initiated a conference of Texas pharmaceutical lawyers to organize and develop this litigation.  This was followed by an additional meeting attended by lawyers outside of Texas including Andy Birchfield and Paul Sizemore, and later Texas meetings in 2005.

       G.      KS began to speak at national events to share information about Vioxx.

H. The Supreme Court of Texas appointed KS the initial Plaintiffs' Liaison Counsel after the Texas Vioxx litigation was consolidated.  She served throughout the consolidation on the Texas Steering Committee.

       H.      KS had cases that were not abated by the Texas preemption order, because they predated the consolidation. *Zajicek* and *Eller*, for example, were trial set cases that KS prosecuted relentlessly.

Failure to compensate lawyers like KS, who although not a member of PSC or FAC, clearly did substantial work for the common benefit that directly contributed to the eventual Global Settlement, and positively affected the size of that settlement amount both (1) conflicts with the

Court's position that all interested counsel were invited to aid in the common benefit and (2) will have a chilling effect on similar efforts by attorneys outside the control group in future mass tort litigation.

I.       KS attended meetings of the Joint Panel that led to the formation of the federal MDL.  She applied for appointment to the Plaintiffs' Steering Committee, but others were chosen.  KS, nevertheless, remained highly involved in the federal MDL from inception until the present day.  She has faithfully attended scheduled status conferences, made clear her desire and willingness to help, and made valuable contributions to the federal MDL efforts and the claimants involved in this litigation.  At times she did this over significant resistance by members of the PSC.  For example, KS participated in the argument in the *Alicia Gomez* case in which she served as lead counsel.  She began briefing the issue and was told that others would brief and argue the case.  She protested the idea of others presenting her argument and she indeed briefed and argued the factual background in the *Garza* preemption response.  KS was also the first to question the ethical issue related to the requirement of recommending the settlement to all clients.  This ultimately led to resolution of the issue which resulted in increased participation in the settlement program.  Further, she analyzed the EI program and recognized the need for an appeal process which was eventually incorporated into the EI program, thus providing greater protection and due process for claimants who suffered extraordinary injury.

7.       KS knows and can demonstrate the numerous times other lawyers involved in this litigation, including PSC and FAC members, have acknowledged her efforts for the common benefit and, in some cases, have even taken credit for her efforts and ideas.  The following are examples:

A.       PSC and FAC lawyers have acknowledged on multiple occasions, notably in

arguments justifying the amount of the common benefit fund, the importance of bellwether cases in general and *Garza* particular. In fact, bellwether cases, even the many bellwether cases lost in this litigation have been uniformly extolled as a major factor in generating the global settlement and justifying the existence of and the amount of the common benefit fund. *Garza* was one of only five cases tried in this entire litigation that won a plaintiff jury verdict.

B.     Lawyers involved in this litigation, including PSC and FAC members, have credited the recognition of and the resolution of ethical concerns first raised by KS as critical to achieving the global settlement from which the common benefit fund derives.

C.     The successful preemption result to which KS made valuable contributions, including participation, over the resistance of the PSC, in the argument opposing the motion, unquestionably resulted in common benefit.

D.     KS' groundbreaking usage of retained autopsy samples to prove Vioxx ingestion was deemed critical and included in the Vioxx settlement program.

E.     During course of her active, deep and lengthy involvement in this litigation KS has been complimented, not criticized, for her commitment, contribution and accomplishments.

8.     Despite this, FAC initially allocated KS only a small percentage of the common benefit fund.  When she filed an objection, as was her right, her percentage was inexplicably dropped more than 80% and resulted in an absurdly small award that, looking at hours alone, reduced her effective hourly rate to about $25.00 an hour.  This is compared with allocations that also inexplicably resulted in effective hourly rates for others of more than $2,200.

9.     The FAC allocation to KS is evidence of an arbitrary and capricious process that at least in appearance had an added element of punishment (or disincentive) for KS exercising her right to object to her allocation and the process that produced it.  The following is proven by

even the limited information available at this time:

    A.      Clearly, the KS allocation and the process that produced it did not utilize reported hours in any objective manner in calculating allocations.  The wild swing in effective hourly rates evidences the lack of significance of hours reported in the FAC allocation process and the appearance that, when used at all, the assignment of value for those hours was entirely arbitrary.[3]

    B.      Similarly, FAC assigned no value to the success achieved in the *Garza* bellwether trial in which she actively participated.  This is true despite the uncontestable fact that *Garza* itself was used by the Chairman of FAC as a justification for the size of the common benefit fund.  Moreover, it is beyond dispute that *Garza* was a significant contribution to the common benefit.  A substantial settlement of multi-billion dollars does not occur unless the defending party perceives that its overall exposure justifies the settlement.  Cases tried to a successful plaintiff verdict unquestionably influence a defendant's perception of the cost and risk involved in continued litigation.  In this litigation, 18 cases were tried to a jury verdict.  Only 5 resulted in a plaintiff verdict.  *Garza* was one of the five wins, yet KS' allocation—stated mildly—pales in comparison to the allocations of the many others claiming to have played roles in the other bellwether trials—even those many trials that resulted in clear cut defense verdicts.[4]

    C.      The KS allocation, when compared with those who claimed participation in bellwether cases other than *Garza,* is also inexplicable and evidence of an arbitrary process that, at least in appearance, is influenced by something other than a fair and objective measure of value freed from conflict of interest or other impermissible motivations.

---

[3] Moreover, KS has explained that her reported hours were extremely conservative and she complied with the ordered cut off period.

[4] This does nothing to diminish the merit of those who unsuccessfully litigated cases.  Plaintiff defeats, however, are of questionable value to the common benefit without plaintiff wins.  Multi-billion dollar settlements are unlikely in presence of an unbroken string of plaintiff defeats.

D.      The same is true of FAC's failure to assign any significant value to the many other contributions KS made to the common benefit of this litigation. Strikingly, KS's contribution to the identification of and the resolution of the ethical concerns raised by the proposed Global Settlement is ignored in FAC's allocation to KS, while some FAC members extol its importance and take credit for it.

10.     Nor can FAC support its allocation to KS on any shortcomings in her work.  The only words of critique of KS, known to KS or reflected in information made available to KS, were vague implications made to her counsel during the objection process that KS did not cooperate by making *Garza* material available and an even more vague reference to the effect that KS had somehow lost standing to claim a portion the common benefit.  Discovery will demonstrate that *Garza* materials were possessed by the PSC, and KS did not withhold any information; instead, her record of participation in this litigation demonstrates a desire to share information.  As to any belief that KS is not in equal standing with all other fee applicants, this appears absolutely unfounded based on a review of the available materials. Certainly, this cannot be a reference to the remand of *Garza.*  This remand was accomplished with full knowledge and without opposition by the PSC. Without the *Garza* remand, this litigation would have had one fewer plaintiff verdict.  If the comment about standing had any relationship to the proceedings in which Mr. Stratton was appointed liaison, this issue too is mistaken.  Mr. Stratton apparently met with PSC and FAC members in some sort of negotiation that has no court approval.[5]

11.     Further evidence of the arbitrary and capricious nature of the allocation process includes the following:

A.      FAC allocations fail to allocate more than a $3.5 million of the common benefit

---

[5] KS has received but has not negotiated checks from Mr. Stratton, having never been given a clear understanding of the source of the funds or the ability of anyone to distribute funds without court order.  As far as the FAC allocation is concerned, none of these or any other criticisms of KS have been brought to her attention.

funds to anyone.  No explanation is given for this.

     B.     Apparently, FAC is "negotiating" with some objectors to resolve disputes. The basis on which negotiated arrangements are reached is unknown. FAC has never approached KS to discuss a resolution of her objections. KS, on the other hand, has been informed that FAC members may have spoken of her to others and may have used negotiating tactics such as economic disincentives, to, intentionally or unintentionally, induce other fee applicants to accept FAC allocations.  Much of this remains for discovery, but it is undeniable that KS has not been approached by any member of FAC to discuss resolution of her concerns or about a process for conducting negotiations that are fair to KS and other fee applicants.

     12.     The FAC allocation process is so obviously flawed that its enforcement would result in an unavoidable abuse of discretion.  The attempt to shift the burden of making fair allocations to the objectors and a Master worsens rather than helps the fundamentally flawed allocation process.[6]

     13.     The little information made available to KS by FAC, coupled with the ineffable, but undeniable, disparity in allocations—"different pay" for the "same or similar work"— proves FAC, unless it can explain its process, is (1) operating from a position of an unfettered conflict of interest, and (2) allocating arbitrarily and without an objective foundation.  The appearance is that FAC is allocating based on their own perceptions, impressions, emotions, opinions and apparent mistakes about facts.  By appearance, FAC is influenced by their own self interest,  as reflected in the handsome allocations they awarded to themselves.

     14.     The mysterious "grid" is powerful evidence of the flawed process. FAC represented that it developed a "grid" as the basis for all allocations, but the results contradict this

---

[6] The starting point must be a fair methodology for arriving at allocations based on merit and free of conflict of interest.  After the fact "fixes" focused solely on objectors are unworkable and unfairly shift cost and responsibilities to those who object.  The result is, intentionally or not, improperly coercive.

representation.  (The "grid" concept cannot be addressed here because completed grids, if any, have not been produced—and that which has been made available—a template for a grid—contain categories that are (1) weighted in favor of FAC and PSC members and (2) are so subjective that they can be manipulated to achieve any almost any result.  What can be discussed here is that a "grid" of any objective merit could not be used to achieve the obvious disparities in the allocations made by FAC.  Focusing only on KS, for example, if a grid was used to determine her original FAC allocation, how could KS' allocation have been so dramatically reduced in the final recommendation?  Did FAC use a different grid?  Were her grid numbers simply changed dramatically for unexplained reasons? Was the "grid" abandoned?  Was a grid ever used?  If a grid was used at all, the precipitous decline in KS' allocation following her objection is evidence that the grid, if used, was obviously flawed and result oriented.  Again, the impression that can fairly be drawn by this by all, including the public at large, is that very large sums of money are being arbitrarily distributed, primarily to those who are in control of the distribution, and those who raise questions or otherwise are not in the favor of the distributing group must go along or suffer significant monetary punishment.

## Conclusion

Consistent with the above, KS asks that FAC increase her allocation to fairly recognize, at the very least, the contribution *Garza* made to the overall settlement.  KS further asks that the entire FAC process be reexamined to correct flaws that will otherwise result in an abuse of discretion if the recommendations are adopted and flaws of such significance that they arise to unlawful taking and procedural deficiencies that violate the Due Process Clause of United States Constitution.

11

Respectfully submitted,

/s/ *Kathryn Snapka*

Kathryn Snapka
State Bar No. 18781200
Federal ID No. 1617
THE SNAPKA LAW FIRM
606 N. Carancahua, Suite 1511 (78401-0688)
P.O. Drawer 23017
Corpus Christi, Texas 78403
Telephone:  361-888-7676
Facsimile:  361-884-8545
Email:  ksnapka@snapkalaw.com

**Attorney for Kathryn Snapka:**
Jack E. Urquhart
Texas Bar No. 20415600
Federal ID No. 2082
Clark, Thomas & Winters, P.C.
3000 Weslayan, Suite 350
Houston, Texas 77027
Telephone:  713-621-0200
Facsimile:  713-621-0204
Email:  jeu@ctw.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Kathryn Snapka's Objection to the FAC's Allocation of Common Benefit Fund Fees has been served on all parties and the following counsel by electronically uploading the same to LexisNexis File & Service Advanced in accordance with Pretrial No. 8 and/or in a manner authorized by FRCP 5(b)(2) or via the Court's CM/ECF system on this 4th day of February 2011.

Russ M. Herman
HERMAN, HERMAN, KATZ & COTLAR, L.L.P.
820 O'Keefe Avenue
New Orleans, LA 70113
Email: rherman@hhkc.com

Andy Birchfield
BEASLEY, ALLEN, P.C.
218 Commerce Street
Montgomery, AL 36104
Email: andy.birchfield@beasleyallen.com

/s/ *Kathryn Snapka*
Kathryn Snapka