**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | § § § § § § § § § § § | MDL NO. 1657<br><br>SECTION L<br><br>JUDGE FALLON<br>MAGISTRATE JUDGE KNOWLES<br><br>**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION OF COMMON BENEFIT FUND FEES** |

**EXHIBIT A**

**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION
OF COMMON BENEFIT FUND FEES**

| | |
|---|---|
| 1 | Allocation for Common Benefit Fee | 315,250,000.00 |
| 2 | Total Common Benefit Fees Awarded | 311,984,930.00 |
| 3 | Allocation to PSC/FAC Members | 286,035,000.00 |
| 4 | Allocation to FAC Members | 230,000,000.00 |
| 5 | Allocation to PSC (but not FAC) Members | 56,035,000.00 |
| 6 | Allocation to Non-PSC/FAC Members | 25,874,930.00 |
| 7 | Allocation to Snapka, Turman & Waterhouse | 75,000.00 |
| 8 | Allocation to Escobedo Tippet | - |



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | § § § § § § § § § § § | MDL NO. 1657<br><br>SECTION L<br><br>JUDGE FALLON<br>MAGISTRATE JUDGE KNOWLES<br><br>**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION OF COMMON BENEFIT FUND FEES** |

## EXHIBIT B

**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION OF COMMON BENEFIT FUND FEES**

# KATHRYN SNAPKA
### THE SNAPKA LAW FIRM

**KATHRYN SNAPKA**
Board Certified
Personal Injury Trial Law
Texas Board of Legal Specialization

606 N. Carancahua, Suite 1511 (78476)
P.O. Drawer 23017
Corpus Christi, Texas 78403
Phone: (361) 888-7676
Telecopier: (361) 884-8545

**A. ANITA SHAHANI**
Associate

June 30, 2008

**VIA E-MAIL: regina@hhkc.com**
Plaintiffs' Fee Committee
**HERMAN, HERMAN, KATZ & COTLAR, L.L.P.**
820 O'Keefe Avenue
New Orleans, LA 70113

Dear Plaintiffs' Fee Committee:

I am electronically forwarding my time and, pursuant to a conversation with Kristine Megna of Wegmann-Dazet, the accountant in Metairie, Louisiana, I have divided the billing by case and on a yearly basis.

I have read the Court's relevant Pretrial Orders and I would like to set forth my reasons for submitting the billing enclosed.

First and foremost, I did not submit time for any cases which were handled in due course of litigation. The only cases for which I submitted time were those which were either tried, developed and set for trial or had implications for the MDL as whole. In addition, I submitted time records for my service as Texas Notice Counsel in the Texas Consolidated Proceedings and as a member of the Plaintiffs' Steering Committee for the Texas Consolidated Proceedings, which were submitted under one grouping.

## FELICIA GARZA

In the course of my relationship with the Law Firm of Hockema, Tippit & Escobedo, I was first involved in the Garza matter in the Spring of 2004. Joe Escobedo and David Hockema had been primarily involved in the discovery up to that point and had obtained extensive document discovery as well as deposed a large number of corporate witnesses.

This matter was originally set and ready for trial February 14, 2005. However, Merck removed this lawsuit for a second time within thirty (30) days of trial and after an Emergency Motion for Remand, Judge Fallon remanded this case for trial on November 23, 2005

Plaintiffs' Fee Committee
June 30, 2008
Page 2
--------------------------------

This case was tried from January of 2006 through April 2006 on a rotating docket and a verdict for Plaintiff was returned in April 21, 2006. This matter was recently reversed and rendered by the San Antonio Court of Appeals and further legal proceedings continue.


## CHARLES ZAJICEK

I was initially contacted in early 2003 regarding the death of Vanessa Zajicek after her ingestion of Vioxx. Because this matter was filed prior to the formation of the Texas MDL, it was not a part of the MDL and therefore, this matter was set for trial and discovery was conducted both in conjunction with and independent of coordinated proceedings. At virtually every MDL hearing, the matter of the Zajicek trial was noted and discussed and, indeed, was set for trial in February of 2008 at the time of the settlement on November 9, 2007.


## JACOB NETTLES

Nettles was a case which was originally remanded back to state court but was removed again into the Federal MDL and occupied a small category which came to be representative of the "double removal" cases - that is, cases which had been removed, remanded and removed again by Merck to avoid further proceedings in those matters. Our firm attended several MDL status conferences in order to urge the Court to remand that specific category of cases.

## ALICIA GOMEZ

Merck filed preemption motions in two cases in the Federal MDL, *Gomez v. Merck* and *Arnold v. Merck*. I was involved in preparing a Response to the Motion for Preemption and arguing at the hearing on the Motion for Preemption. The Motion for Summary Judgment based on preemption was ultimately denied by Judge Fallon.


## MDL 1657

I was a speaker at several conferences and, in fact, was the co-chair of the Mealey's Vioxx Conference in December of 2006, along with Paul Pennock. In addition, our firm made itself and the discovery and the trial transcripts from the Garza case available to lawyers throughout the country.

Plaintiffs' Fee Committee
June 30, 2008
Page 2
-------------------------------

## BENAVIDES & ELLER

These cases are included for submission as they were cases from 2003 representing some of the very early cases in which medical research into the effects of Vioxx were conducted. The billing for these cases is very low, however, they were instrumental in establishing the pattern of damage caused by Vioxx.

Please note that ONLY LAWYER TIME HAS BEEN SUBMITTED. The primary Vioxx paralegal who assisted during the Garza trial is no longer available and I did not feel that I could reliably reconstruct paralegal time. In addition, all available legal assistants were occupied preparing Vioxx claim packets for submission by the July 1, 2008 deadline.

Should you have any questions regarding theses bills or why certain matters were included in them, please do not hesitate to contact me. In reconstructing these bills, I have utilized the files contained within my office as well as printing out the index to more than 15,000 emails that cover this time period. Any or all of this information is available for your review and substantiation.

Again, please do not hesitate to contact me if you have any questions.

Very truly yours,

THE SNAPKA LAW FIRM

Kathryn Snapka

KS:ag

cc:

VIA E-MAIL: kmegna@wdco.biz
Kristine Megna
WEGMANN-DAZET
111 Veterans Blvd., Suite 1660
Metairie, LA 70005

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | § § § § § § § § § § § | MDL NO. 1657<br><br>SECTION L<br><br>JUDGE FALLON<br>MAGISTRATE JUDGE KNOWLES<br><br>**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION OF COMMON BENEFIT FUND FEES** |

## EXHIBIT C

**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION
OF COMMON BENEFIT FUND FEES**

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

VIOXX FEE COMMITTEE PRESENTATION

HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY

DECEMBER 3, 2008

HOUSTON, TEXAS

FIRM:            THE SNAPKA LAW FIRM
                 Kathryn Snapka, Esquire
                 Anita Shahani, Esquire

BEFORE FEE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

EDWARD F. BLIZZARD, ESQUIRE
Blizzard, McCarthy & Nabers

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.

COURT REPORTER:  Linda L. Golkow, RDR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 - DEPS@GOLKOW.COM

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1      - - -
2      MR. BIRCHFIELD: Kathy, we
3  appreciate you being here. As you
4  know, everything is being
5  transcribed. Judge Fallon wanted
6  to make sure that everybody is
7  aware of the Murphy Oil decision
8  and the criteria that he's set out
9  in that order. Transparency is
10 key, and so we have a transcript
11 that will be available for his use
12 for whatever he decides is
13 appropriate.
14     Know that everything is
15 being taken down, and the floor is
16 yours.
17     MS. SNAPKA: Great.
18     As I hope y'all remember, I
19 was involved in Vioxx back -- I
20 started in 2003. I was initially
21 contacted with regard to four
22 cases, Benavides, Eller, Zajicek
23 and -- three cases and Garza. I
24 became involved in Garza in 2004,

Page 3

1  but I'll get to that in a second.
2      Do I need to attach by
3  reference my affidavit and the
4  cover letter to the hours,
5  incorporate this?
6      MR. HERMAN: No.
7      MS. SNAPKA: I didn't know
8  how formal we were being about
9  that sort of thing.
10     I started in 2003 to
11 investigate the medical causation
12 and had many conversations with
13 experts that I had used before,
14 people literally in the field with
15 their experiences with marketing,
16 the heavy-handed marketing that
17 was done. Zajicek looked to be
18 the best case. It was a good case
19 with no risk factors in a
20 favorable venue, and I began
21 preparing -- I filed my cases and
22 began preparing Zajicek for trial.
23     In the meantime, because
24 I've worked with them for years,

Page 4

1  the law firm of Hockema Tippit &
2  Escobedo, as they were known at
3  the time, I was talking to David
4  Hockema, and David said his
5  partner, Joe Escobedo, was working
6  on a Vioxx case in Starr County,
7  and they were further along than I
8  was. He said, you've done
9  pharmaceutical litigation, because
10 I had done a fen-phen case, and he
11 said, why don't you try the case
12 with us. So, I said, that was
13 fine, I would bring what I had,
14 they would bring what they had.
15     I talked to Joe about the
16 depositions, the corporate
17 depositions that he had done. One
18 of the things that was happening
19 was, particularly when Shelly was
20 taking the depositions, they were
21 saying, I don't know, I'm not
22 sure, you would have to talk to
23 somebody else who would know that.
24 So, Joe was actually one of the --

Page 5

1  he was the first person to take
2  Bold, Tacconi, Silverstein and, of
3  course, Santanello. He was the
4  first one to take the documents we
5  had distilled from the production
6  and take those depositions first.
7  I think they became obviously
8  critically important later.
9  Santanello was used in both Mark's
10 trial with the corporate rep and
11 in the Garza trial as the
12 corporate rep.
13     We prepared Garza and had a
14 trial setting, and we were getting
15 the case ready for trial. It was
16 set for trial in November of 2004.
17 As you all know, it was removed,
18 remanded, and then I got the
19 Zajicek case -- as I said, I was
20 working both Zajicek, Eller, and
21 Benavides was not a strong case, I
22 did some research into it, but it
23 was not -- the plan was to try
24 Garza first and then to try

2 (Pages 2 to 5)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1  Zajicek.
2      MR. BIRCHFIELD:  Where was
3  Zajicek pending?
4      MS. SNAPKA:  It was in
5  Jackson County, Texas.  As you
6  know, Andy, it was the case where
7  we went and visited with the
8  medical examiner, and he actually
9  was able to -- kept the blood and
10  was able to run it some years
11  after her death and found
12  rofecoxib in the blood.  So, I
13  think that had an impact, I
14  understand later on, from what you
15  told me.
16      MR. BIRCHFIELD:  There's a
17  clause in the settlement agreement
18  just for that case.
19      MS. SNAPKA:  That's right.
20  I never understood why other
21  people didn't do the same test,
22  because I thought it would be very
23  instructive on cases where
24  autopsies were performed and blood

Page 7

1  was retained, but anyway, they may
2  have.
3      So, we were prepared for
4  trial, we were ready to go to
5  trial, and Merck got a continuance
6  granted in November of 2004.  We
7  got a resetting for February of
8  2005.  And after the withdrawal --
9  I'm just going to go in sequential
10  order because it is more logical
11  for me to do that.
12      At the time of the
13  withdrawal, I knew that Vioxx was
14  going to be important litigation.
15  And so what I did was, I had
16  already been in contact with
17  Shelly, I knew that she was
18  working with you, Mark.
19      MR. BIRCHFIELD:  Shelly
20  Sanford?
21      MS. SNAPKA:  Yes.  And
22  actually had been out to visit
23  David.
24      MR. BIRCHFIELD:  David

Page 8

1  Miceli?
2      MS. SNAPKA:  That's right.
3  David Miceli.  And so what I did
4  was, as far as Texas was
5  concerned, knowing from the
6  fen-phen litigation that the Texas
7  litigators would be and should be
8  out front in this litigation, I
9  set up a meeting at the Four
10  Seasons Hotel in October of 2004
11  and tried to get everybody I could
12  think of and encourage them to get
13  everybody they could think of so
14  that we could share the
15  depositions, the theories, what we
16  knew from preparing for the Garza
17  trial.
18      I remember I talked to Maura
19  from your office, Mark, and you
20  were in trial, and I think we
21  moved it, but y'all still weren't
22  able to make it, unfortunately,
23  for that meeting.
24      MR. LANIER:  Nine week

Page 9

1  trial.
2      MS. SNAPKA:  We had probably
3  40 people, and I thought that was
4  important to get everybody
5  together and everybody connected,
6  show them what we had and make
7  available what we had learned
8  through the deposition process,
9  but most importantly, the
10  documents that we had gleaned from
11  going through the millions of
12  pages of production as y'all are
13  aware.
14      I organized another meeting
15  December 8th, and I was trying to
16  remember -- one of the things I
17  would like to point out is the
18  hours I reconstructed are only
19  attorney hours.  The legal
20  assistant, who was my prime legal
21  assistant during this time period,
22  left to go sell real estate.  I
23  did not feel competent that I
24  could accurately represent legal

3  (Pages 6 to 9)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 10

1 assistant time, so, for the time
2 period that I've submitted, those
3 are only attorney hours, period.
4 Nothing else.
5       In any event, I know that
6 you and Paul, Andy, you and Paul
7 Sizemore came to one of the
8 meetings that we had in Houston
9 because I was trying to get
10 everybody that I could think of
11 together so that we could share
12 and present a unified and united
13 front.
14       I was also desperately
15 trying to get the Garza case to
16 trial because I knew the case, I
17 knew the case well, I knew that it
18 was in a really great venue, and
19 even though there were a lot of
20 risk factors which I thought was
21 critical to push that case for
22 trial, because it would
23 demonstrate that the target group
24 for Vioxx was going to be the most

Page 11

1 affected, and I knew that we could
2 make that case based upon the
3 distinct fact pattern of Garza.
4       As you know, the MDL was
5 created, Merck removed it again,
6 less than 30 days before trial,
7 and everything sort of ground to a
8 halt at that time.
9       MR. BIRCHFIELD: Just so you
10 know, Kathy, we just met with Joe
11 Escobedo, and Russ outlined for
12 him your tremendous effort, the
13 effort that both of y'all made in
14 getting that case remanded. Joe
15 took us through the timeline of
16 the incredible struggle, the
17 timeline of getting that case
18 remanded and getting it sent back.
19 Let me tell you what Russ said to
20 Joe. I mean, your effort in
21 getting that case remanded was
22 spectacular. You dogged it all
23 the way.
24       MR. HERMAN: I thought you

Page 12

1 were tenacious, persistent, and
2 without you pushing that at every
3 PSC meeting and every status
4 conference, that case might still
5 be lingering now.
6       MS. SNAPKA: Thank you very
7 much. I appreciate that
8 recognition. It means a lot to
9 me.
10      MR. BIRCHFIELD: Joe
11 provided us with a detailed
12 timeline of the Garza case.
13      MS. SNAPKA: I will say that
14 Joe is a tremendous lawyer, and he
15 is the one who literally looked at
16 every page of that production when
17 we were putting the case together.
18 I can't say enough about what he
19 personally did as far as getting
20 that prepared. We were
21 prepared -- that was what was so
22 frustrating for me personally, is,
23 we were prepared to go to trial.
24 We were ready to go, and then we

Page 13

1 did go.
2       In the meantime, what I was
3 doing was continuing -- I was
4 named by the Texas Supreme Court
5 as the plaintiffs' liaison
6 counsel, and then I continued in
7 that role, and we had -- and I
8 don't want to misrepresent, but it
9 was the first or second hearing I
10 think I was replaced by Tommy
11 Fibich as liaison, which certainly
12 made sense, because Tommy is in
13 Houston. But I continued on the
14 Texas MDL, flying back and forth
15 and trying to push four trials.
16      In the meantime, I had
17 referred many other cases and
18 wanted to pick the best cases to
19 try. In that mix was the Nettles
20 case, which was a young man who
21 suffered a catastrophic stroke. I
22 was developing that case, meeting
23 with his neurologist, meeting with
24 his treating physicians,

4 (Pages 10 to 13)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1  proceeding with what I could
2  there.
3       I was also working on
4  Zajicek, because it was not
5  constrained by any of the Texas
6  MDL.  After we got it back out of
7  the Texas MDL, both Eller and
8  Zajicek, since they were pre-MDL
9  cases, both of those cases were
10 not subject to the constrictions
11 of time on either of the Texas MDL
12 or the federal MDL.  So, we
13 continued to pursue discovery,
14 retention and consultation with
15 experts.  And while we sought
16 remand -- Russ, you were there at
17 the emergency motion for remand in
18 July of 2005.  And then, of
19 course, your unfortunate
20 experience with the hurricane sort
21 of brought that to a standstill.
22      But we continued on with
23 discovery in Nettles and Zajicek.
24 And then of course in November, we

Page 15

1  got the great news that Garza got
2  the remand.
3       And honestly from that point
4  until we got the verdict, that was
5  what we did.  We prepared for
6  Garza, and I'm sure if -- I don't
7  want to duplicate what you've
8  heard, but we have an odd system
9  in Starr County where you start
10 trial for a week --
11      MR. LEVIN:  We heard.
12      MS. SNAPKA:  It is not like
13 you can say, okay, I'm going to
14 take a break and go try another
15 case and then come back.  So, what
16 you do is you get your daily copy,
17 and you plan what you are going to
18 do next.  There was a week in
19 there that is not accounted for
20 when my son had a tonsillectomy in
21 Houston.  Other than that -- other
22 than the tonsillectomy, I was back
23 at it.  And we stayed with the
24 Garza trial, and I outlined what

Page 16

1  we did.  I selected the jury, I
2  put on our cardiologist, I
3  cross-examined Dr. Wheeler, I put
4  on a plaintiff or two, and I was
5  supposed to cross-examine Dr.
6  Reicin.  And I kept asking over
7  and over again, are you going to
8  bring her?  And that's the one
9  case they didn't bring her in.
10 So, I didn't get to cross-examine
11 her, which was a huge
12 disappointment to me.
13      After that, sometime during
14 that time period, they had
15 selected Arnold and Gomez for a
16 preemption motion, and I told
17 Anita to drop everything and begin
18 briefing.  We had briefed quite a
19 lot of it because she had filed
20 several responses in other cases,
21 and then we started to coordinate
22 with your office, Arnold.  I know
23 I was very protective because my
24 feelings always --

Page 17

1       MR. LEVIN:  It was your
2  client.
3       MS. SNAPKA:  It is my client
4  and my case, and I appreciate very
5  much the assistance, but I also
6  appreciate the fact that I was
7  allowed to speak and certainly
8  present the facts.
9       MR. LEVIN:  Collectively, we
10 did it.
11      MS. SNAPKA:  Collectively,
12 we did it.
13      Then when Nettles was
14 removed, again, I was there to try
15 and pull Nettles back because it
16 was the double remand case.  Andy,
17 you had some double remand cases,
18 and my goal was to get these cases
19 back to demonstrate that Merck was
20 simply trying to avoid going to
21 trial and would do anything.  I
22 have the transcripts where it was
23 discussed.  Even though it never
24 got remanded, I was there in my

5  (Pages 14 to 17)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1  spot to try to get them remanded.
2      Zajicek proceeded, and we
3  actually -- the first trial
4  setting for Zajicek was actually
5  October of 2005. Since the plan
6  was to try Garza first, we ended
7  up moving the Zajicek trial. It
8  was set for trial in February of
9  2008. It was set for trial at the
10 time that the settlement was
11 announced.
12     At the point at which
13 Zajicek -- where we were was, we
14 were going to do some genetic
15 testing on Vanessa Zajicek's blood
16 to eliminate the genetic tendency
17 toward arrhythmia because we
18 believed she didn't have it. So
19 we were actually scheduled for a
20 hearing at the end of November on
21 the testing of the blood to again
22 eliminate that as a possibility
23 for her arrhythmia and sudden
24 cardiac death.

Page 19

1      I was under the impression
2  that I was supposed to just stop
3  at November 9th, and I could be
4  wrong about that.
5      MR. HERMAN:  Well, why don't
6  you tell us since November 9 what
7  activities you've had.
8      MS. SNAPKA:  The primary
9  activity, honestly, I believed --
10 I was sitting in court when the
11 settlement was announced. Of
12 course, I had no idea --
13 everybody was rumoring, and there
14 were people calling me saying send
15 us all of your cases, there's
16 going to be a settlement or
17 whatever. So, as the settlement
18 was being explained, the one thing
19 that concerned me greatly was the
20 requirement that the attorney was
21 obligated to recommend the
22 settlement to all clients. I
23 believed in my heart that that was
24 a violation of Texas ethics. And

Page 20

1  although I was clearly not part of
2  the plaintiffs' negotiating
3  committee, I believed that I had a
4  duty and responsibility to say
5  something. I understood that Lynn
6  Baker had been retained, and so I
7  was the one that called Charlie
8  Silver, the professor who hired
9  Lynn Baker, and I said, I need you
10 to review this. I had a
11 conversation with Ed, and Ed kept
12 saying no, no, it is okay, we
13 talked to Lynn about it. I
14 nonetheless wanted independent
15 confirmation that the settlement
16 was as good as it could be and
17 that everybody in the nation
18 could, without reservation,
19 participate in the settlement.
20     So, I personally retained
21 Charlie Silver, and then within a
22 day or two, Tommy Fibich joined me
23 in retaining Charlie Silver. Then
24 there were several other people

Page 21

1  who also, we discussed it. We
2  went to New Jersey and met with
3  Judge Higbee. I believe that
4  there were some --
5      MR. SEEGER:  Which I
6  arranged for you.
7      MS. SNAPKA:  Absolutely,
8  Chris, thank you very much. What
9  I appreciated from the committee
10 was that even though it was
11 difficult to discuss, that I think
12 everybody kept in mind that what
13 we were trying to do was to make
14 this settlement one that everyone
15 without reservation could enter
16 into and not feel that they had
17 any qualms whatsoever about it,
18 and I think we ended up
19 accomplishing that.
20     MR. BIRCHFIELD:  Your
21 initial reaction is certainly
22 understandable. You got the
23 settlement agreement, and it had
24 to be for all clients. But what

6 (Pages 18 to 21)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1   you were not able to distill at
2   that moment is that we had been
3   working for 11 months to make sure
4   that it would be a settlement that
5   would work and would be in the
6   interest of every client
7   regardless of risk factors and all
8   of that. And so that's why your
9   reaction was understandable.
10      MR. HERMAN: Let me add what
11  I said earlier today in another
12  presentation.
13      First of all, throughout our
14  negotiations, Ed Blizzard was in
15  the forefront particularly in
16  terms of the Texas potential
17  ethics situation. There wasn't
18  anything put on paper without the
19  retention of three ethics experts,
20  and Lynn Baker, actually, along
21  with two other ethics experts,
22  drafted the language of the
23  agreement.
24      Once the agreement went into

Page 23

1   effect and Judge Higbee, Judge
2   Fallon and Judge Chaney looked at
3   it and it passed muster with them,
4   our collective feeling was not
5   that the lawyers in Texas were out
6   of line in getting the ethics
7   opinions that they needed to
8   satisfy themselves and their
9   clients.
10      MR. SEEGER: I agree with
11  that, by the way.
12      MR. HERMAN: We had a full
13  day meeting in Atlanta. I believe
14  that Professor Silver was there.
15  I know that also they brought
16  Harry Potter in. So, I want you
17  to know that we don't have an
18  adverse reaction at all to that
19  being done. As a matter of fact,
20  once the Texas concern, legitimate
21  concern, was resolved --
22      MR. SEEGER: I have to stop
23  you there, because there's
24  something very important, Kathy,

Page 24

1   I'm sorry, but just because we are
2   making a record.
3      The agreement had not been
4   changed. There are people that
5   have this impression. It says
6   exactly what it says. It says
7   exactly what we intended it to
8   say. I think at the end of the
9   day, what happened was, we had
10  some letters passed around, some
11  documents clarifying, saying this
12  is how we understand this.
13      MS. SNAPKA: The
14  interpretation.
15      MR. SEEGER: That was really
16  because you guys had a concern
17  with it. But the document, we
18  were very comfortable in the
19  beginning and still are. This
20  sounds like a technicality --
21      MR. HERMAN: After the
22  various points were expressed, it
23  not only had a good effect and a
24  better understanding for Texas,

Page 25

1   but also for the country. Because
2   there were other folks from other
3   states that were looking for a way
4   to criticize, and they had sort of
5   latched on to this issue. When it
6   was resolved and the document was
7   fully understood, it went away for
8   everybody.
9      MS. SNAPKA: And I know I
10  wasn't popular. I understand
11  that.
12      MR. LEVIN: You were never
13  not popular.
14      MR. SEEGER: I hope we're
15  not leaving you with that
16  impression, but you were very
17  helpful.
18      MS. SNAPKA: To the simple
19  extent that we are talking about
20  common benefit work done, I would
21  hope that my concerns and my
22  actions that I took in hiring
23  Charlie initially and then getting
24  everybody together to talk about

7 (Pages 22 to 25)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 26

1  it were viewed as ultimately
2  beneficial. That's my purpose in
3  discussing it. That's all I'm
4  saying. That's what I meant.
5      MR. LEVIN: We understand.
6      MR. HERMAN: I think you can
7  be assured of that.
8      MS. SNAPKA: Because you
9  said, go ahead and talk about what
10 it was after that. That's what I
11 would say, is whatever I did
12 initially and ultimately in
13 working with everybody to get it
14 to where it is right now. That's
15 what I'm trying to say.
16     MR. BIRCHFIELD: Kathy, how
17 many cases have you submitted to
18 the settlement program?
19     MS. SNAPKA: All of my
20 clients elected to go into the
21 settlement program, which is 87.
22     MR. WEITZ: Other than
23 Nettles and Zajicek, did you have
24 any other cases that were on

Page 28

1  originally filed in Beaumont, and
2  then it was removed to Federal
3  Court. Judge Crone remanded it.
4  It went back to Beaumont, to
5  Jefferson County, and then it went
6  into the Texas MDL where it was
7  removed again, and then it was in
8  the Federal MDL. But there was
9  extensive discovery done on the
10 case. Nettles was one of the
11 cases that was a Texas pick for
12 stroke.
13     MR. BLIZZARD: But it was in
14 the Federal MDL ultimately? Where
15 was it in terms of discovery when
16 it was removed the last time to
17 the federal MDL?
18     MS. SNAPKA: The treating
19 physician, we had retained the
20 experts and designated them, the
21 case specific experts. I believe
22 the case was removed at that time.
23     MR. BLIZZARD: Depo of the
24 plaintiff. Were there depos of

Page 27

1  trial --
2      MS. SNAPKA: Yes. Eller.
3  In fact, what's really funny is,
4  Eller is still set for trial.
5  That's a very interesting one.
6  And I talked to Phil Wittmann
7  after that to say, you reported no
8  trial settings, but we actually do
9  have a trial setting in Eller.
10 It's a quirk, but, yes. Eller has
11 been and continues to be set for
12 trial.
13     MR. BIRCHFIELD: Have you
14 submitted Eller in the settlement?
15     MS. SNAPKA: Yes. Eller is
16 submitted, but the judge refused
17 to dismiss it while the settlement
18 was pending because --
19     MR. BIRCHFIELD: In case it
20 doesn't pass the gates?
21     MS. SNAPKA: That's correct.
22     MR. BLIZZARD: Where was
23 Nettles pending?
24     MS. SNAPKA: It was

Page 29

1  other experts?
2      MS. SNAPKA: Only of the
3  treating/prescribing physician,
4  who had given him the Vioxx.
5      But to the extent that there
6  were double removal cases, and I
7  was, again, trying to demonstrate
8  a pattern with Merck trying to
9  avoid trials, I was up there every
10 time being annoying.
11     MS. SHAHANI: Or dispatching
12 me to do that.
13     MS. SNAPKA: If I couldn't
14 be there.
15     I believe that anything post
16 November 9 is pretty much taken
17 up -- I've already discussed the
18 issues, and that would be the only
19 thing that I would be submitting
20 additionally. I don't know if I
21 can or will and whatever.
22     MR. BIRCHFIELD: Any other
23 questions?
24     MR. SEEGER: No.

8 (Pages 26 to 29)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 30

1    MR. BLIZZARD: I was just
2   going to point out that currently
3   your hours are under review by the
4   accountant at least according to
5   this report that we have, and the
6   expenses are being shown as being
7   under review also. Is there
8   anything we can do to help with
9   that?
10    MR. LEVIN: He's probably
11   working on that because if you
12   were in trouble, they would be
13   rejected.
14    MS. SNAPKA: That's good to
15   know. Let me just say that --
16    MR. BIRCHFIELD: Don't panic
17   if you get a rejection letter.
18   Just respond quickly and get us
19   involved. It has happened quite
20   frequently. You just need to work
21   at it.
22    MR. SEEGER: We'll give you
23   Arnold's cell phone number.
24    MS. SNAPKA: I think I have

Page 31

1   it, actually.
2    One of the things they did
3   do is they rejected all of my
4   hours prior to the MDL, and I went
5   nuts.
6    MR. SEEGER: They did with
7   me too, though. We all went
8   there.
9    MR. LEVIN: They were
10   working under guidelines of the
11   MDL. And then when all the state
12   litigants came in, it took them a
13   while to get oriented.
14    MS. SNAPKA: I'll let y'all
15   know.
16    In 28 years of practicing
17   law, what I found with every type
18   of case is that corporations will
19   recognize, assess and contain
20   their risk only after trial or if
21   there's a threat of trial or
22   during trial. I say that as a
23   perspective from a trial lawyer.
24   I was trained at Baylor like Ed

Page 32

1   was, and they taught us to try
2   cases. That's all I know how to
3   do. I'm not good at the other
4   stuff. That was the one thing
5   that I thought, as far as a common
6   benefit, was they had me sort of
7   as a loose cannon out there.
8   Every time I possibly could, I was
9   going to push for a trial. That's
10   where I was headed. My only
11   regret is I didn't get to try more
12   cases.
13    Do y'all have any questions?
14    MR. SEEGER: I think we
15   asked them.
16    MS. SNAPKA: Thank you.
17    MR. BIRCHFIELD: Thank you,
18   Kathy.
19      - - -
20
21
22
23
24

Page 33

1     C E R T I F I C A T E
2
3    I, LINDA L. GOLKOW, a Notary
4   Public and Certified Court Reporter of
5   the State of New Jersey, Registered
6   Diplomate Reporter, Federally-Approved by
7   the United States District Court of
8   Pennsylvania, do hereby certify that the
9   foregoing is a correct transcript of the
10   testimony as taken stenographically by
11   and before me at the time, place and on
12   the date hereinbefore set forth.
13    I DO FURTHER CERTIFY that I
14   am neither a relative nor employee nor
15   attorney nor counsel of any of the
16   parties to this action, and that I am
17   neither a relative nor employee of such
18   attorney or counsel, and that I am not
19   financially interested in the action.
20
21
22    Linda L. Golkow, RDR, CRR, CCR
     Notary Number: 1060147
23    Notary Expiration: 1.2.10
     CCR Number: 30X100176200
24

9  (Pages 30 to 33)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

**A**

able 6:9,10 8:22
22:1
Absolutely 21:7
accomplishing
21:19
accountant 30:4
accounted 15:19
accurately 9:24
action 33:16,19
actions 25:22
activities 19:7
activity 19:9
add 22:10
additionally 29:20
adverse 23:18
affidavit 3:3
agree 23:10
agreement 6:17
21:23 22:23,24
24:3
ahead 26:9
Allen 1:9
allowed 17:7
Andy 1:9 6:6 10:6
17:16
Anita 1:7 16:17
announced 18:11
19:11
annoying 29:10
anyway 7:1
appreciate 2:3 12:7
17:4,6
appreciated 21:9
appropriate 2:13
Arnold 1:16 16:15
16:22
Arnold's 30:23
arranged 21:6
arrhythmia 18:17
18:23
asked 32:15
asking 16:6
assess 31:19
assistance 17:5
assistant 9:20,21

10:1
assured 26:7
Atlanta 23:13
attach 3:2
attorney 9:19 10:3
19:20 33:15,18
ATTORNEYS 1:3
autopsies 6:24
available 2:11 9:7
avoid 17:20 29:9
aware 2:7 9:13

**B**

back 2:19 11:18
13:14 14:6 15:15
15:22 17:15,19
28:4
Baker 20:6,9 22:20
based 11:2
Baylor 31:24
Beasley 1:9
Beaumont 28:1,4
began 3:20,22
beginning 24:19
believe 21:3 23:13
28:21 29:15
believed 18:18 19:9
19:23 20:3
Benavides 2:22
5:21
beneficial 26:2
benefit 25:20 32:6
Berman 1:17
best 3:18 13:18
better 24:24
BIRCHFIELD 1:9
2:2 6:2,16 7:19,24
11:9 12:10 21:20
26:16 27:13,19
29:22 30:16 32:17
Blizzard 1:10,11
22:14 27:22 28:13
28:23 30:1
blood 6:9,12,24
18:15,21
Bold 5:2

break 15:14
briefed 16:18
briefing 16:18
bring 4:13,14 16:8
16:9
brought 14:21
23:15

**C**

C 33:1,1
called 20:7
calling 19:14
cannon 32:7
cardiac 18:24
cardiologist 16:2
case 3:18,18 4:6,10
4:11 5:15,19,21
6:6,18 10:15,16
10:17,21 11:2,14
11:17,21 12:4,12
12:17 13:20,22
15:15 16:9 17:4
17:16 27:19 28:10
28:21,22 31:18
cases 2:22,23 3:21
6:23 13:17,18
14:9,9 16:20
17:17,18 19:15
26:17,24 28:11
29:6 32:2,12
catastrophic 13:21
causation 3:11
CCR 33:22,23
cell 30:23
certainly 13:11
17:7 21:21
Certified 33:4
certify 33:8,13
Chaney 23:2
changed 24:4
Charlie 20:7,21,23
25:23
Chris 21:8
CHRISTOPHER
1:20
clarifying 24:11

clause 6:17
clearly 20:1
client 17:2,3 22:6
clients 19:22 21:24
23:9 26:20
collective 23:4
Collectively 17:9
17:11
come 15:15
comfortable 24:18
committee 1:1,3,8
20:3 21:9
common 25:20
32:5
competent 9:23
concern 23:20,21
24:16
concerned 8:5
19:19
concerns 25:21
conference 12:4
CONFIDENTIAL
1:2
confirmation 20:15
connected 9:5
constrained 14:5
constrictions 14:10
consultation 14:14
contact 7:16
contacted 2:21
contain 31:19
continuance 7:5
continued 13:6,13
14:13,22
continues 27:11
continuing 13:3
conversation 20:11
conversations 3:12
coordinate 16:21
copy 15:16
corporate 4:16
5:10,12
corporations 31:18
correct 27:21 33:9
Cotlar 1:14
counsel 13:6 33:15

33:18
country 25:1
County 4:6 6:5
15:9 28:5
course 5:3 14:19,24
19:12
court 1:23 13:4
19:10 28:3 33:4,7
cover 3:4
created 11:5
criteria 2:8
critical 10:21
critically 5:8
criticize 25:4
Crone 28:3
cross-examine 16:5
16:10
cross-examined
16:3
Crow 1:9
CRR 33:22
currently 30:2

**D**

D 1:9
daily 15:16
date 33:12
David 4:3,4 7:23,24
8:3
day 20:22 23:13
24:9
days 11:6
death 6:11 18:24
December 1:4 9:15
decides 2:12
decision 2:7
demonstrate 10:23
17:19 29:7
Depo 28:23
depos 28:24
deposition 9:8
depositions 4:16,17
4:20 5:6 8:15
DEPS@GOLKO...
1:24
designated 28:20

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 35

desperately 10:14
detailed 12:11
developing 13:22
difficult 21:11
Diplomate 33:6
disappointment 16:12
discovery 14:13,23 28:9,15
discuss 21:11
discussed 17:23 21:1 29:17
discussing 26:3
dismiss 27:17
dispatching 29:11
distill 22:1
distilled 5:5
distinct 11:3
District 33:7
document 24:17 25:6
documents 5:4 9:10 24:11
dogged 11:22
doing 13:3
double 17:16,17 29:6
Dr 16:3,5
drafted 22:22
drop 16:17
duplicate 15:7
duty 20:4

**E**

E 33:1,1
earlier 22:11
Echsner 1:19
Ed 20:11,11 22:14 31:24
EDWARD 1:10
effect 23:1 24:23
effort 11:12,13,20
either 14:11
elected 26:20
eliminate 18:16,22
Eller 2:22 5:20

14:7 27:2,4,9,10 27:14,15
emergency 14:17
employee 33:14,17
encourage 8:12
ended 18:6 21:18
enter 21:15
Escobedo 4:2,5 11:11
Esquire 1:6,7,9,10 1:12,13,15,16,18 1:20,21
estate 9:22
ethics 19:24 22:17 22:19,21 23:6
event 10:5
everybody 2:6 8:11 8:13 9:4,5 10:10 19:13 20:17 21:12 25:8,24 26:13
exactly 24:6,7
examiner 6:8
expenses 30:6
experience 14:20
experiences 3:15
experts 3:13 14:15 22:19,21 28:20,21 29:1
Expiration 33:23
explained 19:18
expressed 24:22
extensive 28:9
extent 25:19 29:5
EYES 1:3

**F**

F 1:10 33:1
fact 11:3 17:6 23:19 27:3
factors 3:19 10:20 22:7
facts 17:8
Fallon 2:5 23:2
far 8:4 12:19 32:5
favorable 3:20
February 7:7 18:8

federal 14:12 28:2 28:8,14,17
Federally-Appro... 33:6
FEE 1:1,3,8
feel 9:23 21:16
feeling 23:4
feelings 16:24
fen-phen 4:10 8:6
Fibich 13:11 20:22
field 3:14
filed 3:21 16:19 28:1
financially 33:19
fine 4:13
firm 1:6,6,15 4:1
first 5:1,4,6,24 13:9 18:3,6 22:13
Fishbein 1:17
floor 2:15
flying 13:14
folks 25:2
forefront 22:15
foregoing 33:9
formal 3:8
forth 13:14 33:12
found 6:11 31:17
four 2:21 8:9 13:15
frequently 30:20
front 8:8 10:13
frustrating 12:22
full 23:12
fully 25:7
funny 27:3
further 4:7 33:13

**G**

Garza 2:23,24 5:11 5:13,24 8:16 10:15 11:3 12:12 15:1,6,24 18:6
gates 27:20
genetic 18:14,16
getting 5:14 11:14 11:17,18,21 12:19 23:6 25:23

Girardi 1:12,12
give 30:22
given 29:4
gleaned 9:10
go 7:4,9 9:22 12:23 12:24 13:1 15:14 26:9,20
goal 17:18
going 7:9,14 9:11 10:24 15:13,17 16:7 17:20 18:14 19:16 30:2 32:9
Golkow 1:23,24 33:3,22
Gomez 16:15
good 3:18 20:16 24:23 30:14 32:3
granted 7:6
great 2:17 10:18 15:1
greatly 19:19
ground 11:7
group 10:23
guidelines 31:10
guys 24:16

**H**

halt 11:8
happened 24:9 30:19
happening 4:18
Harry 23:16
headed 32:10
heard 15:8,11
hearing 13:9 18:20
heart 19:23
heavy-handed 3:16
help 30:8
helpful 25:17
hereinbefore 33:12
Herman 1:13,14,14 3:6 11:24 19:5 22:10 23:12 24:21 26:6
Higbee 21:3 23:1
HIGHLY 1:2

hired 20:8
hiring 25:22
Hockema 4:1,4
honestly 15:3 19:9
hope 2:18 25:14,21
Hotel 8:10
hours 3:4 9:18,19 10:3 30:3 31:4
Houston 1:5 10:8 13:13 15:21
huge 16:11
hurricane 14:20

**I**

idea 19:12
impact 6:13
important 5:8 7:14 9:4 23:24
importantly 9:9
impression 19:1 24:5 25:16
incorporate 3:5
incredible 11:16
independent 20:14
initial 21:21
initially 2:20 25:23 26:12
instructive 6:23
intended 24:7
interest 22:6
interested 33:19
interesting 27:5
interpretation 24:14
investigate 3:11
involved 2:19,24 30:19
issue 25:5
issues 29:18

**J**

Jackson 6:5
Jefferson 28:5
Jersey 21:2 33:5
Joe 4:5,15,24 11:10 11:14,20 12:10,14

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 36

joined 20:22
judge 2:5 21:3 23:1
  23:1,2 27:16 28:3
July 14:18
jury 16:1

**K**

Kathryn 1:6
Kathy 2:2 11:10
  23:24 26:16 32:18
Katz 1:14
Keese 1:12
kept 6:9 16:6 20:11
  21:12
key 2:10
knew 7:13,17 8:16
  10:16,17,17 11:1
know 2:4,14 3:7
  4:21,23 5:17 6:6
  10:5 11:4,10
  16:22 23:15,17
  25:9 29:20 30:15
  31:15 32:2
knowing 8:5
known 4:2

**L**

L 1:23 33:3,22
language 22:22
Lanier 1:15,15
  8:24
latched 25:5
law 1:6,15 4:1
  31:17
lawyer 12:14 31:23
lawyers 23:5
learned 9:7
leaving 25:15
left 9:22
legal 9:19,20,24
legitimate 23:20
letter 3:4 30:17
letters 24:10
Levin 1:16,17,18
  15:11 17:1,9
  25:12 26:5 30:10

31:9
liaison 13:5,11
Linda 1:23 33:3,22
line 23:6
lingering 12:5
literally 3:14 12:15
litigants 31:12
litigation 4:9 7:14
  8:6,8
litigators 8:7
LLP 1:14,20
logical 7:10
looked 3:17 12:15
  23:2
looking 25:3
loose 32:7
lot 10:19 12:8
  16:19
Luxenberg 1:22
Lynn 20:5,9,13
  22:20

**M**

M 1:13
making 24:2
man 13:20
Mark 1:15 7:18
  8:19
marketing 3:15,16
Mark's 5:9
matter 23:19
Maura 8:18
McCarthy 1:11
MDL 11:4 13:14
  14:6,7,11,12 28:6
  28:8,14,17 31:4
  31:11
mean 11:20
means 12:8
meant 26:4
medical 3:11 6:8
meeting 8:9,23 9:14
  12:3 13:22,23
  23:13
meetings 10:8
MEMBERS 1:8

Merck 7:5 11:5
  17:19 29:8
met 11:10 21:2
Methvin 1:9
Miceli 8:1,3
Miles 1:9
millions 9:11
mind 21:12
misrepresent 13:8
Mitchell 1:18
mix 13:19
moment 22:2
months 22:3
motion 14:17 16:16
moved 8:21
moving 18:7
Murphy 2:7
muster 23:3

**N**

Nabers 1:11
named 13:4
nation 20:17
need 3:2 20:9 30:20
needed 23:7
negotiating 20:2
negotiations 22:14
neither 33:14,17
Nettles 13:19 14:23
  17:13,15 26:23
  27:23 28:10
neurologist 13:23
never 6:20 17:23
  25:12
New 21:2 33:5
news 15:1
Nine 8:24
Notary 33:3,22,23
November 5:16 7:6
  14:24 18:20 19:3
  19:6 29:16
number 30:23
  33:22,23
nuts 31:5

**O**

obligated 19:21
obviously 5:7
October 8:10 18:5
odd 15:8
office 8:19 16:22
Oil 2:7
okay 15:13 20:12
once 22:24 23:20
opinions 23:7
order 2:9 7:10
organized 9:14
oriented 31:13
originally 28:1
outlined 11:11
  15:24

**P**

page 12:16
pages 9:12
panic 30:16
Papantonio 1:18
paper 22:18
part 20:1
participate 20:19
particularly 4:19
  22:15
parties 33:16
partner 4:5
pass 27:20
passed 23:3 24:10
pattern 11:3 29:8
Paul 10:6,6
PC 1:9
pending 6:3 27:18
  27:23
Pennsylvania 33:8
people 3:14 6:21
  9:3 19:14 20:24
  24:4
performed 6:24
period 9:21 10:2,3
  16:14
PERRY 1:21
persistent 12:1
person 5:1
personally 12:19

12:22 20:20
perspective 31:23
pharmaceutical 4:9
Phil 27:6
phone 30:23
physician 28:19
  29:3
physicians 13:24
pick 13:18 28:11
place 33:11
plaintiff 16:4 28:24
plaintiffs 13:5 20:2
plan 5:23 15:17
  18:5
point 9:17 15:3
  18:12 30:2
points 24:22
popular 25:10,13
Portis 1:9
possibility 18:22
possibly 32:8
post 29:15
potential 22:16
Potter 23:16
practicing 31:16
preemption 16:16
prepared 5:13 7:3
  12:20,21,23 15:5
preparing 3:21,22
  8:16
present 10:12 17:8
presentation 1:1
  22:12
pretty 29:16
pre-MDL 14:8
primary 19:8
prime 9:20
prior 31:4
probably 9:2 30:10
proceeded 18:2
proceeding 14:1
process 9:8
Proctor 1:19
production 5:5
  9:12 12:16
professor 20:8

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 37

23:14
program 26:18,21
protective 16:23
provided 12:11
PSC 12:3
Public 33:4
pull 17:15
purpose 26:2
pursue 14:13
push 10:21 13:15
  32:9
pushing 12:2
put 16:2,3 22:18
putting 12:17
P.A 1:19
P.C 1:22

Q
qualms 21:17
questions 29:23
  32:13
quickly 30:18
quirk 27:10
quite 16:18 30:19

R
R 33:1
RAFFERTY 1:18
RDR 1:23 33:22
reaction 21:21 22:9
  23:18
ready 5:15 7:4
  12:24
real 9:22
really 10:18 24:15
  27:3
recognition 12:8
recognize 31:19
recommend 19:21
reconstructed 9:18
record 24:2
reference 3:3
referred 13:17
refused 27:16
regard 2:21
regardless 22:7

Registered 33:5
regret 32:11
Reicin 16:6
rejected 30:13 31:3
rejection 30:17
relative 33:14,17
remand 14:16,17
  15:2 17:16,17
remanded 5:18
  11:14,18,21 17:24
  18:1 28:3
remember 2:18
  8:18 9:16
removal 29:6
removed 5:17 11:5
  17:14 28:2,7,16
  28:22
rep 5:10,12
replaced 13:10
report 30:5
reported 27:7
Reporter 1:23 33:4
  33:6
represent 9:24
requirement 19:20
research 5:22
reservation 20:18
  21:15
resetting 7:7
resolved 23:21 25:6
respond 30:18
responses 16:20
responsibility 20:4
retained 7:1 20:6
  20:20 28:19
retaining 20:23
retention 14:14
  22:19
review 20:10 30:3,7
right 6:19 8:2
  26:14
risk 3:19 10:20
  22:7 31:20
rofecoxib 6:12
role 13:7
rumoring 19:13

run 6:10
Russ 1:13 11:11,19
  14:16

S
Sanford 7:20
Santanello 5:3,9
satisfy 23:8
saying 4:21 19:14
  20:12 24:11 26:4
says 24:5,6,6
scheduled 18:19
Seasons 8:10
second 3:1 13:9
Sedran 1:17
Seeger 1:20,20 21:5
  23:10,22 24:15
  25:14 29:24 30:22
  31:6 32:14
selected 16:1,15
sell 9:22
send 19:14
sense 13:12
sent 11:18
sequential 7:9
set 2:8 5:16 8:9
  18:8,9 27:4,11
  33:12
setting 5:14 18:4
  27:9
settings 27:8
settlement 6:17
  18:10 19:11,16,17
  19:22 20:15,19
  21:14,23 22:4
  26:18,21 27:14,17
Shahani 1:7 29:11
share 8:14 10:11
Shelly 4:19 7:17,19
show 9:6
shown 30:6
Silver 20:8,21,23
  23:14
Silverstein 5:2
simple 25:18
simply 17:20

sitting 19:10
situation 22:17
Sizemore 10:7
Snapka 1:6,6 2:17
  3:7 6:4,19 7:21
  8:2 9:2 12:6,13
  15:12 17:3,11
  19:8 21:7 24:13
  25:9,18 26:8,19
  27:2,15,21,24
  28:18 29:2,13
  30:14,24 31:14
  32:16
somebody 4:23
son 15:20
sorry 24:1
sort 3:9 11:7 14:20
  25:4 32:6
sought 14:15
sounds 24:20
speak 17:7
specific 28:21
spectacular 11:22
spot 18:1
standstill 14:21
Starr 4:6 15:9
start 15:9
started 2:20 3:10
  16:21
state 31:11 33:5
states 25:3 33:7
status 12:3
stayed 15:23
stenographically
  33:10
stop 19:2 23:22
stroke 13:21 28:12
strong 5:21
struggle 11:16
stuff 32:4
subject 14:10
submitted 10:2
  26:17 27:14,16
submitting 29:19
sudden 18:23
suffered 13:21

supposed 16:5 19:2
Supreme 13:4
sure 2:6 4:22 15:6
  22:3
system 15:8

T
T 33:1,1
Tacconi 5:2
take 5:1,4,6 15:14
taken 2:15 29:16
  33:10
talk 4:22 25:24
  26:9
talked 4:15 8:18
  20:13 27:6
talking 4:3 25:19
target 10:23
taught 32:1
technicality 24:20
TECHNOLOGI...
  1:24
tell 11:19 19:6
tenacious 12:1
tendency 18:16
terms 22:16 28:15
test 6:21
testimony 33:10
testing 18:15,21
Texas 1:5 6:5 8:4,6
  13:4,14 14:5,7,11
  19:24 22:16 23:5
  23:20 24:24 28:6
  28:11
thank 12:6 21:8
  32:16,17
theories 8:15
thing 3:9 19:18
  29:19 32:4
things 4:18 9:16
  31:2
think 5:7 6:13 8:12
  8:13,20 10:10
  13:10 21:11,18
  24:8 26:6 30:24
  32:14

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 38

Thomas 1:12,18
thought 6:22 9:3
    10:20 11:24 32:5
threat 31:21
three 2:23 22:19
time 4:3 7:12 9:21
    10:1,1 11:8 14:11
    16:14 18:10 28:16
    28:22 29:10 32:8
    33:11
timeline 11:15,17
    12:12
Tippit 4:1
today 22:11
told 6:15 16:16
Tommy 13:10,12
    20:22
tonsillectomy 15:20
    15:22
trained 31:24
transcribed 2:5
transcript 2:10
    33:9
transcripts 17:22
Transparency 2:9
treating 13:24
    28:18
treating/prescrib...
    29:3
tremendous 11:12
    12:14
trial 3:22 5:10,11
    5:14,15,16 7:4,5
    8:17,20 9:1 10:16
    10:22 11:6 12:23
    15:10,24 17:21
    18:3,7,8,9 27:1,4
    27:8,9,12 31:20
    31:21,22,23 32:9
trials 13:15 29:9
tried 8:11
trouble 30:12
TROY 1:18
try 4:11 5:23,24
    13:19 15:14 17:14
    18:1,6 32:1,11

trying 9:15 10:9,15
    13:15 17:20 21:13
    26:15 29:7,8
two 16:4 20:22
    22:21
type 31:17

## U

ultimately 26:1,12
    28:14
understand 6:14
    24:12 25:10 26:5
understandable
    21:22 22:9
understanding
    24:24
understood 6:20
    20:5 25:7
unfortunate 14:19
unfortunately 8:22
unified 10:12
united 10:12 33:7
use 2:11

## V

V 1:12
Vanessa 18:15
various 24:22
venue 3:20 10:18
verdict 15:4
viewed 26:1
violation 19:24
Vioxx 1:1 2:19 4:6
    7:13 10:24 29:4
visit 7:22
visited 6:7

## W

W 1:15
want 13:8 15:7
    23:16
wanted 2:5 13:18
    20:14
wasn't 22:17 25:10
way 11:23 23:11
    25:3
week 8:24 15:10,18

Weiss 1:20
Weitz 1:21,22
    26:22
went 6:7 21:2 22:24
    25:7 28:4,5 31:4,7
weren't 8:21
We'll 30:22
we're 25:14
whatsoever 21:17
Wheeler 16:3
withdrawal 7:8,13
Wittmann 27:6
work 22:5 25:20
    30:20
worked 3:24
working 4:5 5:20
    7:18 14:3 22:3
    26:13 30:11 31:10
wrong 19:4

## Y

years 3:24 6:10
    31:16'
young 13:20
y'all 2:18 8:21 9:12
    11:13 31:14 32:13

## Z

Zajicek 2:22 3:17
    3:22 5:19,20 6:1,3
    14:4,8,23 18:2,4,7
    18:13 26:23
Zajicek's 18:15

## 1

1.2.10 33:23
1060147 33:22
11 22:3

## 2

2003 2:20 3:10
2004 2:24 5:16 7:6
    8:10
2005 7:8 14:18 18:5
2008 1:4 18:9
28 31:16

## 3

3 1:4
30 11:6
30X100176200
    33:23

## 4

40 9:3

## 8

8th 9:15
87 26:21
877.370.3377 1:24

## 9

9 19:6 29:16
9th 19:3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  VIOXX PRODUCTS LIABILITY LITIGATION | § § § § § § § § § § § | MDL NO. 1657<br><br>SECTION L<br><br>JUDGE FALLON<br>MAGISTRATE JUDGE KNOWLES<br><br>**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION OF COMMON BENEFIT FUND FEES** |

**<ins>EXHIBIT D</ins>**

**KATHRYN SNAPKA'S OBJECTION TO THE FAC'S ALLOCATION OF COMMON BENEFIT FUND FEES**

# Vioxx MDL 1657—Kathryn Snapka Common Benefit Attorney

TO:    THE FEE ALLOCATION COMMITTEE ("FAC") CARE OF:

Russ M. Herman
Chairman of the Fee Allocation Committee
820 O'Keefe Avenue
New Orleans, LA 70113
Email: rherman@hhkc.com

Andy Birchfield
Secretary of the Fee Allocation Committee
218 Commerce Street
Montgomery, AL 36104
Email: andy.birchfield@beasleyallen.com

**PREFACE:**

Kathryn Snapka's objections begin with this preface. All are aware that those allocating common benefit funds do not have significant formal specific direction from authoritative sources, e.g., case law or the Manual for Complex Litigation. Therefore, Fee Allocation Committee members face a challenge. The objections that follow should be viewed in the light that Kathryn Snapka understands this challenge. Nevertheless, Kathryn Snapka's award of less than two-tenths of one percent of the common benefit fund is convincing evidence of a process and procedure that is fatally flawed. Kathryn Snapka was one of three lead lawyers who tried and won one of the very few plaintiff verdicts in this litigation and made significant additional contributions to federal and state consolidated actions that unquestionably benefited the settlement result and the amount of the common benefit fund. The amount suggested by the committee on its face is inadequate.

**OBJECTIONS:**

The following are objections of Kathryn Snapka ("KS"), individually and as successor to the interests in this matter of Snapka, Turman & Waterhouse, L.L.P., to the December 2, 2010 communication from the Fee Allocation Committee ("12/02/10 Communication") that is attached as Exhibit 1.

1. KS objects to the "recommended award" in the 12/02/10 Communication. It does not fairly represent her proportionate contribution to the generation of the settlement and the common benefit fund.

2. KS objects to the still secret process used by FAC. This secret process and procedure does not comply with the case law, is fundamentally unfair, is an unlawful taking of property forbidden by the United States Constitution, and is a violation of substantive and procedural due process protected by the United States Constitution.

3. KS specifically objects to the secrecy of the process and procedures employed thus far by FAC, which is itself improper, and is made more pronounced by the inherent conflict of interest of each member of FAC. All of the members of FAC have an interest in the common benefit fund and will therefore recommend their own allocations from the same fund. It appears that FAC has made no provision for directly addressing that conflict of interest.

4. KS objects because no information of useful value has been disclosed by FAC about the process and procedure used by FAC to make allocations. In fact, nothing at all was disclosed to KS about FAC's process and procedure until December 14, 2010, and the information presented, although voluminous and impossible to digest in 2 days, does not include any information sufficient to understand or evaluate FAC's process and procedure. The most concrete information – the amount suggested for KS – is compelling evidence of a flawed process. The award is clearly disproportionate to her objective contribution to the settlement as a whole.

2

5. KS objects because the little information finally made available 2 days ago strongly indicates that FAC's process and procedures are arbitrary and capricious. FAC has employed in some form or fashion a "grid" that on it's face does not include elements required by law and instead relies on subjective factors that are weighted heavily in favor of members of FAC.

6. KS objects because the little information made available to her by FAC strongly indicate that FAC is not relying on objective factors but on their own perceptions, impressions, emotions, opinions and mistakes about facts. They are strongly influenced by their own interest, and have not put in place an effective check and balance mechanism.

7. KS objects because what little information that is available to her strongly indicates that FAC is in essence relying on its own "expert opinion" or "say so" without disclosing that it is following any reliable or generally accepted methodology for support of its process, procedures and ultimate recommendations.

8. KS objects to FAC's demand that KS state "the specific amount of the benefit to which [she] believes [she is] entitled," because KS has been denied access to information critical to that determination. Specifically, she has no information about how FAC valued her specific contributions as compared with how it valued the contribution of others. KS does know the contributions she made to the common benefit. She knows the multiple occasions on which members of FAC in various forums have admitted the value of her contributions to the common benefit. She knows, as does FAC, the significance of the *Garza* verdict to the generation of the settlement and the common benefit fund. She does not know, however, how her FAC allocation compares with that of others comparably situated. As one of three lead lawyers in one of only five cases tried in this entire litigation that won a plaintiff jury verdict, she should be awarded a sum that is comparable to that awarded to lead lawyers in the only other cases tried to a successful plaintiff jury verdict. Since the FAC awards of others remain undisclosed, KS is not able to evaluate her FAC recommended award with that of others, but suspects the *Garza* lawyers award was far lower than that awarded to lawyers who played a lead role in other winning cases.

## SUGGESTED ALLOCATION

Forced to state a fee allocation amount in the absence of adequate information and time in which to fully and fairly calculate an alternative allocation, KS suggests an allocation of $31,000,000 to the *Garza* trial team – KS, David Hockema and Joe Escobedo.

## BASIS OF ALLOCATION SUGGESTION

The application of the *Johnson* factors justify this amount.

KS' work in *Garza* alone, and the unquestionable fact that this rare plaintiff verdict contributed substantially to the generation of the common benefit of this litigation, justifies this award request.

KS joined the trial team for the *Felicia Garza v. Merck (Garza case)* in early 2004. The *Garza* case was one of only five cases successfully tried by plaintiff attorneys in this litigation. KS's role in the *Garza* trial included, but was not limited to, the presentation of the cardiologist **who proved specific causation** and the cross-examination of key defense expert witnesses. At the time KS began her participation in *Garza*, she and that trial team was operating completely at their own "risk." A federal or state MDL did not exist.

Clearly, a substantial settlement like this will not occur unless the defending party perceives that its overall exposure justifies the settlement. Cases tried to a successful plaintiff verdict unquestionably influence a defendant's perception of the cost and risk involved in continued litigation. In this litigation, 18 cases were tried to a jury verdict. Only 5 resulted in a plaintiff verdict. At a minimum, the lead lawyers in the only five cases that were won should reasonably expect that their combined contribution to the overall settlement is 50%. Applying this to the common benefit fund yields approximately $31,000,000 for each case.

This does nothing to diminish the merit of other work, including Plaintiff attorneys who unsuccessfully litigate cases. Plaintiff defeats, however, are of questionable value to the common benefit without plaintiff wins. To take a contrary position is to argue that a multi-billion dollar settlement is primarily, if not exclusively, the result of Plaintiff's pressing meritless litigation.

Beyond *Garza*, KS had significant involvement in the MDL, and would have had greater involvement if MDL leadership had but asked. She did not refuse any significant request made of her by MDL leadership. Contrary, to information told to KS' counsel by FAC members, KS confirms that she readily provided all information, including information about *Garza*, to the MDL. KS regularly attended and participated in MDL status conferences. KS argued or briefed significant issues in the MDL. **All KS cases, but for *Garza*, were resolved in the MDL.**

Again, contrary to information told to Plaintiffs counsel by FAC members, KS confirms that she never agreed to opt out of MDL participation by accepting "settlement" money for doing so. Nor did she refuse to assist in preparation of a "trial package." Simply stated, KS performed all tasks requested of her by MDL plaintiff leadership that were not inconsistent with her professional responsibilities to the clients who chose her to represent them. KS's leadership role in reforming the Extraordinary Injury Fund appeal process is just one example of her substantial contribution to the MDL.

Additionally, KS had significant involvement in the Texas Consolidated litigation. KS was originally appointed liason counsel by the Texas Supreme Court in these cases and served on the Plaintiff's Steering Committee. Out of the waves of cases set for trial in the Texas MDL, KS had three.

## CONCLUSION

Consistent with the above, KS asks that FAC increase her allocation to fairly recognize, at the very least, the contribution *Garza* made to the overall settlement. KS further asks that FAC evaluate its process and procedures, and make them transparent. Minimally, FAC should include specific mechanisms to protect against the reality and perception that FAC has an unfettered conflict of interest.

Very truly yours,

Jack E. Urquhart
Clark, Thomas & Winters
*A Professional Corporation*
3000 Weslayan, Suite 350
Houston, Texas 77027
(713) 621-0200 office
(713) 621-0204 fax
Email: jeu@ctw.com

JEU:sgs

Attachments

cc:   Kathryn Snapka

6

## Exhibit 1

| COMMON BENEFIT FEES AWARD FORM |
|---|
| **A. INSTRUCTIONS** |

1. The Fee Allocation Committee has completed its review of your application for common benefit fees under the terms of the Vioxx Settlement Agreement.
2. The Committee will recommend to Judge Fallon that you be awarded the common benefit fee indicated in this Form (the "Recommended Award").
3. Pursuant to Pretrial Order 6D, you must respond to accept or object to the Recommended Award within 14 days. Accordingly, you must return this completed Form no later than **December 16, 2010.**
4. If you accept the Recommended Award, indicate your acceptance by checking in the appropriate box in Section B below.
5. If you object to the Recommended Award, indicate your objection by checking the appropriate box in Section B below, fill in specific amount of common benefit award to which you believe you are entitled and attach to this From an Objection to Recommended Award stating in detail the basis of your objection and for the award requested.
6. Sign this Form in the appropriate space in Section C below.
7. Return this completed Form (and attachment, if there is an Objection) by (1) email; **and** (2) mail or overnight delivery no later than **December 16, 2010,** to:

Russ M. Herman
Chair of the Fee Allocation Committee
820 O'Keefe Avenue
New Orleans, LA 70113
rherman@hhkc.com

Andy Birchfield
Secretary of the Fee Allocation Committee
218 Commerce Street
Montgomery, AL 36104
andy.birchfield@beasleyallen.com

| **B. RECOMMENDED AWARD AND RESPONSE** | |
|---|---|
| **Recommended Award:** | $582,458.99 |

Response to Recommended Award: Check only one of the following:

☐ I accept the Recommended Award as my award of common benefit fees.

☑ I object to the Recommended Award and request this amount as ▮▮▮▮▮▮▮: the award for the Garza trial team of Kathryn Snapka, David Hockema and Joe Escobedo. (NOTE: You must attach an Objection stating in detail the basis of the objection and for the award requested.)

$ 31,000,000.00

| **C. SIGNATURE** | | | | | |
|---|---|---|---|---|---|
| Signature | *Kathryn Snapka* | | Date | 12 / 15 / 2010 (month) (day) (year) | |
| Printed Name | First *Kathryn* | | MI | Last *Snapka* | |
| Firm Name | Snapka, Turman & Waterhouse, L.L.P. | | | | |

#379620