UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL 1657 |
| | : | |
| PRODUCTS LIABILITY | : | |
| LITIGATION | : | SECTION L |
| | : | |
| THIS DOCUMENT RELATES | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |
| TO ALL CASES | : | |
| | : | |
| FILER: Escobedo, Tippit & Cardenas, L.L.P. | : | February 4, 2011 |

## ESCOBEDO, TIPPIT & CARDENAS, L.L.C'S OBJECTION TO RECOMMENDED COMMON BENEFIT AWARD

Joe Escobedo, Jr.
State Bar No. 06665850
Luis Cardenas
State Bar No. 24001837
**ESCOBEDO, TIPPIT & CARDENAS, L.L.P.**
3900 N. 10th Street, Suite 950
McAllen, Texas   78501
Telephone: (956) 618-3357
Telecopier: (956) 618-3361

**ATTORNEYS FOR ESCOBEDO, TIPPIT & CARDENAS, L.L.C**

## TABLE OF CONTENTS

**SECTION**                                                                                                       **PAGE NO.**

**I.**     **INTRODUCTION & E.T.C.'S COMMON BENEFIT WORK** ........................ **3**

    A.     OBJECTION SUMMARY. .............................................................. 3

    B.     GARZA VS. MERCK BACKGROUND ................................................ 4

    C.     DEPOSITIONS AND DISCOVERY ................................................... 7

    D.     EXPERTS .............................................................................. 9

    E.     TRIAL .................................................................................. 9

    F.     COMMITTEE MEMBER OPINIONS ................................................ 10

**II.**    **OBJECTIONS** ......................................................................... **12**

    A.     THE COMMITTEE'S POINT SYSTEM IS NOT SUPPORTED BY
        ESTABLISHED JURISPRUDENCE .................................................. 13

        1.     THE LODESTAR METHOD WITH APPROPRIATE JOHNSON
            ADJUSTMENTS ............................................................ 14

            a.     THE MASTER SETTLEMENT AGREEMENT ............................ 16

            b.     PRE-TRIAL ORDER 6D ................................................ 17

        2.     THE COMMITTEE'S METHODOLOGY AND RESULTING FORMULA
            DOES NOT COMPLY WITH LODESTAR/*JOHNSON* ANALYSIS ..................... 18

        3.     THE COMMITTEE'S CATEGORIES OF PARTICIPATION ARE
            CONTRARY TO *JOHNSON* AND PREVAILING LAW ........................... 21

            a.     MEMBERSHIP IN THE COMMITTEE WAS OVERVALUED .............. 23

            b.     THE PRESENTATION OF CLIENTS WAS IGNORED AND
                FINANCIAL RISK WAS MISEVALUATED ............................... 24

        4.     PRIVATE FEE-SHARING AGREEMENTS ARE NOT ACCOUNTED
            FOR IN THE COMMITTEE'S FORMULA ........................................ 25

    B.     THE COMMITTEE RECOMMENDED ALLOCATION IS NOT ENTITLED
        TO ANY PRESUMPTIVE DEFERENCE ............................................. 25

**III.**   **SUGGESTED ALLOCATION** ...................................................... **26**

MAY IT PLEASE THE COURT:

Claimant Escobedo, Tippit & Cardenas, L.L.P. respectfully submits this objection to the proposed allocation of common benefit fees by the Fee Allocation Committee (the "Committee") on January 20, 2011. Pursuant to the procedure set out by the Court in its January 20, 2011 Order, ESCOBEDO, TIPPIT & CARDENAS, L.L.C. ("E.T.C.") herein objects to the Committee's preliminary and final recommended award for the following reasons:

## I.   INTRODUCTION & E.T.C.'S COMMON BENEFIT WORK

### A.   OBJECTION SUMMARY.

E.T.C initially submitted its objection to the Committee's "preliminary allocation". In its preliminary allocation, the committee's recommended award to E.T.C. was **$1,164,917.97**. See Fee Allocation Committee's Common Benefit Fee Award Form attached hereto as Exhibit "A". After E.T.C. objected to the allocation, the Committee revised its recommended award to E.T.C. to **$0**. This alone merits condemnation of the arbitrary and capricious actions of this Committee. In a span of a little over a month, the value of E.T.C.'s common benefit work decreased in value from over a million dollars to zero. The only thing that changed during that time frame was that E.T.C. objected to the preliminary award.

This sort of disparity (from $1.2 million to $0) might be understandable if it resulted from the complete disallowance of E.T.C.'s time. However, the Committee long ago accepted E.T.C.'s hours as legitimate based upon Phil Garrett's, the accountant hired to audit the hours submitted, audit. In fact, the Committee used those hours in its overall calculation of common benefit time, and then used that time to justify an award of $312,000,000 in common benefit attorneys fees. Further, this Court expressly approved the hours in making its attorneys fee award. *See* October 19, 2010, Order & Reasons at page 33. Therefore, there is no justification for awarding E.T.C. **$0.**

Further, this Committee and Court approved E.T.C.'s expenses related to the *Garza* case. In Pretrial Order No. 51, this Court approved the reimbursement of E.T.C.'s reasonable common benefit expenses in the *Garza* case. The Order was based upon the Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses [Doc. 17642] and Plaintiffs' Liason Counsel's Supplemental Memorandum in Support of Reimbursement of Common Benefit Expenses [Doc. 21543]. It is absurd to argue that E.T.C.'s expenses in the Garza case were for the common benefit but its time in prosecuting and trying the Garza case are not. It is clear that the Committee's final award of **$0** is meant to coerce and punish E.T.C. for objecting to the preliminary award. Such heavy-handedness should not be tolerated in this proceeding.

E.T.C. objects to the recommended award in the December 20, 2010, communication. That E.T.C. also objects to the final award of **$0** should go without saying. The recommended award does not fairly represent the significant common benefit contribution derived from E.T.C.'s prosecution of the *Garza v. Merck* case and resulting jury verdict. Pursuant to the following factors listed by the Court in **Pretrial Order No. 6(D)**, it is clear that the Committee has vastly undervalued the impact of the *Garza* case:

(A)   "Activities surrounding trials of individual Vioxx claimants, including bellweather trials and **non-MDL trials that impacted proceedings on a common benefit level**";

(B)   **"Whether counsel was already involved in the Vioxx litigation prior to the withdrawal of Vioxx** from the market on September 30, 2004";

(C)   **"Whether counsel was involved in the Vioxx litigation prior to the JPMDL**, and the time and expense incurred during such time that was for the common benefit" and

(D)   "Whether counsel made significant contributions to the funding of the litigation".

B.   *GARZA VS. MERCK* BACKGROUND.

The *Garza* case was a noteworthy "non-MDL trial that impacted proceedings on a common benefit level" for a number of reasons. Foremost, the *Garza* case was significant because it was one of the first cases to be filed and prosecuted. Merck had two (2) main arguments in defending the

case: (1) Mr. Garza's age, weight and prior cardiovascular problems were the real cause of his heart attack; and (2) there was no evidence to support the contention that short term usage of Vioxx could cause heart attacks. As for the former, we did not try to hide Mr. Garza's prior cardiovascular problems. Instead, we used his condition as a powerful argument for the inclusion of warnings as Mr. Garza was the last person to whom Vioxx should have been prescribed. We introduced evidence relating to Merck's knowledge of Vioxx's pro-thromobotic tendencies. The jury saw evidence of Merck's marketing of the drug to cardiologists, where the very nature of their practice would be treating  patients to whom Vioxx should never have been given. We were also the only trial to establish the cardiac risk from short-term usage; we proved that risk existed with Merck's own studies and our experts' testimony.

The trial resulted in a verdict of $32 million. By state law, the punitive damages were reduced, and a judgment in the amount of over $7 million was signed by the Court. On December 10, 2008, the San Antonio Court of Appeals reversed and remanded the Garza case for a new trial. *Merck v. Garza*, 277 S.W.3d 430 (Tex. App. – San Antonio 2008). **However, in a published opinion, the Court of Appeals held that there was legally sufficient evidence in the results of the clinical trials to support a finding of general causation. E.T.C. believes that this is the only appellate opinion that has concluded that there is sufficient evidence upholding a verdict that Vioxx is pro-thrombotic.** The Court of Appeals also held that the Garza plaintiffs had established specific causation, based on an autopsy of the decedent as compared with medical tests which had been done on the decedent within a month prior to his death. Lastly, the Court of Appeals held that the evidence was sufficient to establish the plaintiffs' warnings cause of action.

The *Garza* case clearly made a substantial contribution to the outcome of this litigation. A substantial portion of the "smoking gun" documents that received media attention had been used by

Joe Escobedo in the depositions of the Merck corporate representatives that were taken prior to the drug being taken off the market and prior to the formation of the MDL. The Firm was able to prosecute the case against an army of defense lawyers by having all the firm's lawyers commit themselves to the case and trial.

E.T.C. was clearly "already involved in the Vioxx litigation prior to the withdrawal of Vioxx from the market on September 30, 2004." E.T.C. was retained by the Garza family on April 15, 2002. After retaining expert witnesses against both the prescribing doctors and Merck, the lawsuit was filed in the 229th District Court, Starr County, Texas on March 10, 2003.

Similarly, E.T.C. was clearly "involved in the Vioxx litigation prior to the JPMDL" and incurred substantial "time and expense during such time that was for the common benefit". As shown below, E.T.C. engaged in substantial discovery prior to the formation of this MDL in February 2005. Indeed, E.T.C. had the case set and ready for trial prior to the formation of the MDL.

After being retained by the Garza family in 2002, E.T.C. proceeded to investigate the merits of the claim that Vioxx was pro-thrombotic. E.T.C. obtained all public FDA documents on the drug, including but not limited to the NDA and related documents, FDA letters, and documents relating to the FDA Arthritis Advisory Committee. We also reviewed and accumulated Merck's press releases relating to Vioxx and all relevant scientific journal articles. We also conferred with the handful of other plaintiffs' lawyers who had these cases at the time via telephone conferences.

On April 16, 2003, the defendants removed the case to federal court alleging that the local doctors had been fraudulently joined. After extensive work on the motion to remand, the case was remanded back to state court on August 1, 2003. Thereafter, an intense discovery period ensued. As a result of the filing of over 10 motions to compel, Merck produced millions of pages of documents and prior depositions. The documents and depositions were reviewed by our lawyers and

summaries were prepared via our case management software. Throughout this review, we cooperated and shared work product with the few other Plaintiffs' lawyers that had Vioxx cases at the time.

### C. DEPOSITIONS AND DISCOVERY.

On April 27, 2004, we started taking depositions of Merck corporate representatives. In this case alone, we deposed ten (10) corporate representatives on various areas relating to Vioxx. The corporate representatives that we deposed in the *Garza* case are:

| | |
|---|---|
| (a) Linda Hostelley: | Ms. Hostelley was the Executive Director of Adverse Experience Reporting and was deposed on adverse experiences. |
| (b) Leonard Tacconi: | Mr. Tacconi was Merck's Executive Director for Corporate Communications. Mr. Tacconi was deposed primarily on issues of physician and consumer advertising and marketing. **We were the first to depose Mr. Tacconi**. |
| (c) Deborah Shapiro: | Ms. Shapiro was a critical witness who was tendered as a corporate representative for Merck on various areas relating to the VIGOR clinical trial. Specifically, Ms. Shapiro testified on the Data Safety Monitoring Board (DSMB) for the VIGOR trial and various substantial emails from the DSMB to Merck relating to CV concerns. Lastly, Ms. Shapiro testified on the submission and peer review process of the article entitled Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib (a/k/a the Konstam article). The Konstam article was a critical piece of Merck's defense of Vioxx; we were able to question the validity of the article by noting the numerous ties between the authors and Merck and pointing out the unusual fact that within a time period of 24 hours, this article was reviewed by staff, peer-reviewed and accepted for publication. |
| (d) James Dunn: | Mr. Dunn was deposed on the issue of what Merck was instructing its sales representatives to tell doctors about the cardiovascular risks associated with Vioxx. Through his testimony, we were able to prove that Merck began a disinformation campaign about Vioxx' cardiovascular risks after the VIGOR trial. Mr. Dunn was also questioned about the Sept. 17, 2001 FDA Warning Letter in which the FDA |

chastised Merck for allowing its sales representatives to misrepresent the risks associated with Vioxx.

(e) Bernadette McKeon

Ms. McKeon was deposed on all Physician Information Requests (PIR) relating to CV risks of Vioxx, including to CV AE s during the VIGOR trials. **We were also the first to depose Ms. McKeon and her deposition was requested after deposing James Dunn**. Mr. Dunn had only general knowledge about the PIR. After Mr. Dunn's deposition, we filed a motion to compel Merck to produce an appropriate corporate representative on the PIR process, and Ms. McKeon's deposition was the result of those efforts.

(f) Alise Reicin

While we were not the first to depose Ms. Reicin, we were the first to depose her for 8 hours. We filed a Motion to Modify the Deposition Time Limit for Ms. Reicin due to her extensive knowledge of the cardiovascular risks of Vioxx.

(g) Thomas Casola

Mr. Casola was deposed on the 12/16/99 FDA Untitled Letter (improper promotional items), the 12/12/2000 FDA Inquiry Letter (Dr. Holt's conferences) and 9/17/01 FDA Warning Letter. This evidence was crucial in proving a pattern by Merck of misrepresenting the efficacy and side effects of Vioxx.

(h) Thomas Bold

**We were the first to depose Thomas Bold**. His deposition arose from the fact that Linda Hostelley admitted in her deposition that her group did not look for signals or trends in reported adverse experiences. Mr. Bold was with a group with Merck known as Clinical Risk Management & Surveillance Group (a/k/a the "Physician's Group") and was charged with determining whether the adverse experiences with Vioxx at the time indicated a trend for cardio-vascular risks. **Mr. Bold was subsequently deposed in the *In re: Vioxx Litigation*. Mr. Bold's testimony in our deposition was referred to numerous times in the subsequent deposition.**

(i) Arturo Gonzales

Mr. Gonzales was a Merck sales representative that had provided Vioxx samples to Mr. Garza's treating cardiologists. Mr. Gonzales was deposed extensively about all the sales representative documents relating to the cardiovascular risks of Vioxx.

(j) Juan de la Fuente

Mr. de la Fuente was another Merck sales representative who called on Mr. Garza's treating cardiologists.

D.   EXPERTS.

We were responsible for discovering and developing expert witnesses to prove up our allegations against Merck.  While we interviewed and hired numerous experts, we settled on three experts to use at trial.  Our experts were S. Albert Edwards (FDA labeling expert), Donald Marks (cardiology), and Americo Simonini (cardiology). Mr. Edwards was very effective in explaining to the jury that pursuant to FDA regulations, Merck had authority to change the label on its own without waiting for FDA approval.  This was crucial testimony because one of Merck's defenses was that its hands were tied on including the VIGOR data in the label immediately after the trial because the FDA took a long time to approve the label change.  Dr. Simonini was so effective that he was subsequently hired and used by PSC lawyers Tom Girardi in the *Grossberg* trial and Levin Papantonio in the *Kozic* case.

We believe Garza was the only case in which Merck's testifying experts had produced reports prior to the removal of Vioxx from the market.  This was extremely significant in that all of Merck's experts opined in their reports that there was no evidence whatsoever that Vioxx had prothrombotic tendencies.  The following Merck experts were deposed: John Gaziano, Craig Pratt, Merlin Wilson, Thomas Wheeler and Janet Arrowsmith-Lowe.

**All of these depositions were made available by us to other lawyers prosecuting Vioxx cases and were provided to the MDL.**

E.   TRIAL.

Following the withdrawal of the drug Vioxx from the market on September 30, 2004, we were prepared to be the first Vioxx trial in the country.  The *Garza* case was set for trial on November 8, 2004, but was continued at Merck's request to February 14, 2005. On January 18, 2005, Merck removed the case to federal court for a second time.  We were able to get the case

remanded back to state court on November 22, 2005, when Judge Fallon granted our remand motion. At the time, it was the first remand granted by Judge Fallon where the removal was allegedly based upon the fraudulent joinder of the prescribing doctors.

Thereafter, trial began on January 23, 2006. Due to the Court's calendar conflicts, the case was tried one week per month. The case took four (4) weeks to try. The firm incurred close to a half a million dollars in expenses in prosecuting the case. **Close to 15,000 hours of work was done on the *Garza* case by our attorneys and legal staff**.

Additionally, the Committee has failed to acknowledge the significant contribution of E.T.C. who was forced into a public relations battle with Merck following the second remand and setting for trial in early 2006. Unlike some of the early trials, no "gag order" was imposed by the trial court in the Garza case. Prior to trial, Merck began a consorted campaign emphasizing Mr. Garza's age (71), short term use of the drug and other significant cardiovascular risk factors including a prior bypass. E.T.C. was forced to respond in a public relations fight in the national media which continued through the four month trial and occasionally thereafter.

As stated above, clearly E.T.C. made "significant contributions to the funding of the litigation". The *Garza* case was solely and completely financed by the Firm, including the expenses for the current appeal.

F.    <u>COMMITTEE MEMBER OPINIONS.</u>

Prior to its final recommendation of **$0** for E.T.C., members of the Fee Allocation Committee had recognized the value of the *Garza* case to the common benefit. In the January 19, 2009 <u>Affidavit of Russ M. Herman in Support of the Plaintiffs' Liason Counsel's Memorandum in Support of Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses</u>, Mr. Herman referred to the *Garza* $32 million verdict as "substantial". Mr. Herman swore to this

Court that the *Ernst* and *Garza* "verdicts helped to establish that liability could be obtained despite Merck's formidable defenses." According to Mr. Herman's sworn affidavit, "All of these state litigations generated significant discovery, expert development, document production, and motion practice which **directly contributed to the global resolution of this case.**" *See* Affidavit of Russ M. Herman at 8.  Further, Mr. Herman referred to the fact that "[t]here were literally thousands of oral and written ruling on issues in this MDL." Mr. Herman decided to refer to 51 opinions that he deemed substantial; one of these opinions was the November 23, 2005 "order and reasons granting motion to remand in *Felicia Garza, et. al. V. Michael D. Evans, M.D., et.al.*" *See* Affidavit of Russ M. Herman at 18-21.  In our presentation before the Committee, Mr. Herman commented on the remand motion and stated that it was important that we "were tenacious in getting this case sent back." *See* Presentation of Escobedo, Tippit & Cardenas, L.L.P. at page 7.  Lastly, in his sworn affidavit, Mr. Herman referred to the *Garza* trial as one of the sixteen "Bellwether Trials". *See* Affidavit of Russ M. Herman at 28-31.  It should be noted that of the sixteen Bellwether Trials, the *Garza* trial was one of only five that resulted in a verdict for the plaintiffs.

In Andy Birchfield's submission, he stated "In this litigation, bellwether trials proved to be critical, perhaps even the most critical factor in establishing conditions conducive to resolution." See Affidavit of Andy Birchfield.  During E.T.C.'s presentation before the Committee, Andy Birchfield made the following statement on the record: "Joe, we're all very familiar with the *Garza* case and your work in getting that case remanded and pushed through trial and the good verdict." *See* Presentation of Escobedo, Tippit & Cardenas, L.L.P. at page 20.

Similarly, this Court recognized the "approximately thirteen additional Vioxx-related cases ... tried before juries in the state courts of Texas...." as bellwether trials. *See* October 19, 2010 Order & Reasons at page 6.

Pursuant to the Committee's own Point System Guide, attorneys responsible for "1 bellwether trial with excellent result" is entitled to 60 points. Mr. Herman has admitted that the Garza trial was a bellwether trial. While E.T.C. disputes that its contribution to the common benefit is limited to 60 points, there is absolutely no justification by the Committee for the fact that E.T.C. has been awarded **$0** despite being responsible for a bellwether trial with excellent results.

## II.    OBJECTIONS

E.T.C. specifically objects to the secret process and procedures used by the Fee Allocation Committee as being in violation of U.S. Constitution and in violation of our lawyer's procedural and substantive due process rights. No information of useful value about the process and/or procedure used by the Committee in deciding the recommended award has been disclosed. In fact, nothing had been disclosed about the Committee's process and procedure until December 14, 2010. That information does not include sufficient information to understand and evaluate the Committee's process and procedure. As such, E.T.C. is forced to provide an objection to the award and suggest a proper allocation without the required information and documentation.

E.T.C. further objects to the inherent conflict of interest that is raised by the fact that members of the Committee are themselves making applications for a common benefit award. The procedures used by the Fee Allocation Committee, specifically the use of its "Points System Guide" highlight this conflict of interest. Areas which apply almost exclusively to the members of the committee were subjectively assigned higher point totals than areas that would apply to the applicants in general. The "Points System Guide" used by the committee is arbitrary and capricious and in violation of federal and state due process requirements.

A.   THE COMMITTEE'S POINT SYSTEM IS NOT SUPPORTED BY ESTABLISHED JURISPRUDENCE.

The Committee proposes a point system for the allocation of fees which departs dramatically from established jurisprudence and the directives of this Court for an objectively-based assessment of counsel's respective contributions to the common benefit.

While every common fund case presents unique characteristics which inevitably warrant adjustment of the broad-based criteria and the injection of subjective elements of valuation, the further the departure from the case-tested norm, the greater the risk of unfairness and reversible error. In this case, the FAC (comprised of 9 of the 109 firms in the pool) proposes to give itself $230,000,000, or 73% of the total available fund of $312,000,000.   While a disproportionate allocation of fees has been approved in cases where a fee allocation committee contributed a disproportionate percentage of the effort, this, respectfully, is not the case here.

It is apparent that the FAC achieved its disproportionate allocation by disregarding the *time* each attorney contributed to the common benefit, notwithstanding that time is the essential controlling variable mandated by the analysis set forth by the Fifth Circuit Court of Appeal.  Instead, the FAC employed a more subjective analysis of "contributions" according to a novel, unapproved, clearly unsustainable, and as-yet unrevealed point grid, which yields stratospheric hourly rates for some and nominal rates for a great many others.  At the high end, the FAC's top-compensated firm would be paid a blended rate of $2,205/hr.

Because discovery has been deferred until after the filing of objections and E.T.C. lacks information that is critical to an understanding of the formula's inner-workings, the objection filed herein is not complete.  It is based upon what has been disclosed thus far.  The FAC has refused to produce the key that would unlock its formula, and therefore E.T.C. cannot demonstrate precisely how the FAC made its allocation.  They can, however, show how radically it departs from an

approved analysis, how unjustly it apportions the fees, and how clearly the case law has paved the avenue to a complete reallocation of attorneys' fees in this action.   E.T.C. reserves the right to supplement this objection with additional grounds, or amend statements made herein if inaccurate or incomplete, as discovery proceeds and information gathered reveals how this shockingly lopsided and utterly unprecedented recommendation was actually generated.

1.   THE LODESTAR METHOD WITH APPROPRIATE *JOHNSON* ADJUSTMENTS.

The process of dividing or allocating common benefit fees among competing counsel, even if a limited fund is to be disbursed, is no different from the process of making any other kind of attorney fee award.  In all cases, the district court has discretion subject to a few notable constraints:

> We review the district Court's award of attorneys' fees for abuse of discretion. "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous."  The record must "clearly indicate[] that the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation.

*In re High Sulfur Content Gasoline Products Liability Litigation,* NO. 09-30313, 384 Fed. Appx. 299 (5th Cir., 2010)("High Sulphur II"), citing *In re High Sulfur Content Gasoline Prods. Liab. Litig. ("High Sulfur I"),* 517 F.3d 220, 227 (5th Cir. 2008), and *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir. 2000).

In all cases within the Fifth Circuit, including allocation of common fund fees, the starting point of any proper analysis must be a "lodestar" calculation:

> This Circuit utilizes the "lodestar method" to calculate attorneys' fees.  Initially, the district court must determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating lawyer.  *Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 324* (5th Cir.), cert. denied, 516 U.S. 862, 116 S. Ct. 173, 133 L.Ed.2d 113 (1995).  The lodestar is then computed by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Id.*

*Forbush v. J.C. Penney Co.,* 98 F.3d 817 (5th Cir. 1996).

While the lodestar calculation is somewhat flexible, it is the fundamental basis of any award of attorneys fees: "The district court may...adjust the lodestar upward or downward depending on the respective weights of the twelve [*Johnson*] factors," but failure to base an award (or allocation) of fees upon a lodestar calculation in the first instance is reversible error. *See Riley v. City of Jackson, Miss.,* 99 F.3d 757, 760 (5th Cir. 1996) ("A review of the district court's decision awarding the Appellants a token amount of attorneys' fees discloses that the court bypassed considering each of the factors enunciated in *Johnson.* Nor did the district court make any attempt to determine a reasonable number of hours or a reasonable hourly fee for each of the Appellants' attorneys involved in this case. Consequently, we find the district court erred in avoiding this analysis.").

The *Johnson* factors referred to in *High Sulfur II* and *Forbush* are those expressed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 109 S. Ct. 939, 103 L.Ed2d 67 (1989):

> (1)the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the political "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*High Sulfur II,* at *1 n.3.

Since the original formulation, the *Johnson* factors have undergone some adjustment. "The Supreme Court has limited greatly the use of the second, third, eighth, and ninth factors" because these factors are already presumably reflected in the lodestar, either in the hours reported or the rate charged. *Walker v. U.S. Dept. of Housing and Urban Development,* 99 F.3d 761, 771 n. 12 (5th Cir. 1996), citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565,

106 S.Ct. 3088, 3098, 92 L.Ed. 2d 439 (1986), quoting *Shipes v. Trinity Indus.,* 987 F.2d 311, 320

(5th Cir.) (Shipes II), *cert. denied,* 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed2d 450 (1993) ("'[N]ovelty

[and] complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of

representation,' and the 'results obtained' from the litigation are presumably fully reflected in the

lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award.").

a.    THE MASTER SETTLEMENT AGREEMENT.

> In the Master Settlement Agreement ("MSA"), the parties provided the following:
> Funds within the Settlement Fee and Cost Account shall be administered by the
> Honorable Eldon E. Fallon and all awards therefrom will be subject to approval,
> upon due consideration by him in consultation with the Honorable Victoria G.
> Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson, and in
> accordance with established Fifth Circuit precedent, *e.g., Blum v. Stenson,* 465 U.S.
> 886, 900 (1984); *Cooper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575, 583 n. 15
> (5th Cir. 1980); ***Johnson v. Ga. Highway Express, Inc.,*** 488 F. 2d 714, 717-19 (5th
> Cir. 1974); *Strong v. BellSouth Telecomms, Inc.,* 137 F.3d 844, 851-52 & n. 5 (5th
> Cir. 1998); ***Forbush v. J.C. Penney Co.,*** 98 F.3d 817, 823 (5th Cir. 1996); *Turner v.*
> *Murphy Oil USA, Inc.,* 472 F. Supp.2d 830 (E.D. La. 2007).

Paragraph 9.2.3 9 (emphasis added).  The agreement further provided that

> In making its recommendation **the "Allocation Committee" is to review the**
> **contemporaneous time records, or properly reconstructed time records and**
> **expense reports of all plaintiffs' counsel that request compensation for common**
> **benefit work, as audited by the CPA firm of Wegman Dazett.** The Allocation
> Committee shall take into consideration the common benefit work of counsel in the
> MDL, and the work of counsel in the state litigations of Texas, California and New
> Jersey. **The Allocation Committee shall be guided by these objectives measures**
> **of common benefit counsel's contributions,** in addition to their subjective
> understanding of the relative contributions of counsel towards generating the
> Settlement Fund **in accordance with establised fee jurisprudence** and subject to
> the approval of the Honorable Eldon E. Fallon in consultation with the Honorable
> Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy
> Wilson.

Paragraph 9.2.4 (emphasis added).

b.    PRE-TRIAL ORDER 6D.

In its Pre-Trial Order 6D, this Court acknowledged these terms by stating the following:

**The Settlement Agreement contemplates that the Allocation Committee will review the contemporaneous time records or properly reconstructed time records and expense reports of all plaintiffs' counsel that submitted or request compensation for common benefit work and to take into consideration the time and common benefit work of counsel in the MDL and of counsel in the state consolidated litigations in Texas, California, New Jersey, as well as other applicable state courts.**    The Settlement Agreement also provides that the Allocation Committee shall evaluate common benefit counsel's contributions, using objective measures and the committee's subjective understanding of the relevant contributions of counsel toward generating the Settlement Fund in accordance with established fee jurisprudence, and make a Recommendation to the Court for consideration in consultation with Judges Chaney, Higbee, and Wilson.  As the Allocation Committee implements PTO No. 32 and Section 9.2.4 of the Settlement Agreement and makes a Recommendation to the Court regarding allocation of attorneys' fees, the committee's considerations should be governed and guided by this comprehensive statement of general principles. The over-arching guideline that the Allocation Committee is to consider is the contributions of each common benefit attorney to the outcome of the litigation.  In addition, **under existing fee jurisprudence, certain procedural as well as substantive factors should be considered in making an allocation recommendation.**  The committee shall take into account Pretrial Order No. 6's directive regarding the procedural aspects of the presentations and mechanisms whereby petitioning attorneys may submit written and oral presentations for the committee's consideration. **Substantively, the committee should look to general fee jurisprudence to identify the factors that should be applied in making appropriate allocations. The *Johnson* factors are applicable to this litigation and should be considered in addition to other matters considered by the courts to evaluate fee allocations.**

(emphasis added).                                    °

This approach was consistent with that taken by this Court in previous cases.  In addressing the related question of the appropriate method to be used to decide the total amount of common benefit fees to be allocated, it previously held that, even though lodestar/*Johnson* is not required, and "percentage of the fund" is acceptable as a sanctioned method, "the application of the *Johnson* factors is helpful to determine whether the benchmark percentage is reasonable given the circumstances of the case (and also necessary according to Fifth Circuit precedent)..." *Turner v.*

*Murphy Oil USA, Inc., ("Murphy Oil I")* 472 F.Supp.2d 830, 867 (E.D.La. Jan. 30, 2007).

Subsequently, when allocating the common fund, this Court followed the lodestar/*Johnson* approach,

with some minor modifications. Despite those modifications, and its skepticism about lack of

contemporaneously recorded time records, it is clear from the decision that time expended, and the

appropriate hourly rate, adjusted by various *Johnson* factors, was at the heart of the court's decision

with regard to every claimant's fee award:

> The work that an attorney devotes to a class action is generally the principal factor
> by far in determining the attorneys' portion of the common benefit fee. Indeed, in the
> present case, this is the factor that plays the dominant role in determining the proper
> allocation of the fee. First, a few general comments are appropriate to frame the
> discussion. The attorney labor portion of the Court's consideration consists of two
> sub-parts: time and type of work.

*Turner v. Murphy Oil USA, Inc., ("Murphy Oil II"),* 582 F.Supp.2d 797, 801 n.8 (E.D.La. Oct. 06,
2008).

2.      THE COMMITTEE'S METHODOLOGY AND RESULTING FORMULA DOES
        NOT COMPLY WITH LODESTAR/*JOHNSON* ANALYSIS.

In its memorandum in support of an award of common benefit fees, the PLC assured this

Court that:

> [i]n due course, the Allocation Committee's recommendation will be presented that
> will address the relative input and value of services provided by fellow common
> benefit attorneys as dictated by existing jurisprudence. *See, e.g., High Sulphur
> Content Gasoline Products Liability Litigation,* 517 F.2d 220 (5th Cir. 2008); *Turner
> v. Murphy Oil USA, Inc.,* 2008 WL 4661806 (E.D.La. Oct. 6, 2008).

Memorandum in Support of Motion for Award of Plaintiffs' Common Benefit Counsel Fees and

Reimbursement of Expenses, Record Doc. 17642, p.5, n. 4 (hereinafter "Memorandum"). Although

E.T.C. does not have the completed grid which would demonstrate how the allocation was actually

derived, it is clear that a lodestar analysis was not conducted or used by the Committee.

In the Committee's recommendation to this Court, dated January 20, 2011, it stated that it

did not base its recommendation on hours or lodestar, but professed that it used lodestar as a "cross

check."

> Therefore, the Committee has given due consideration to the time submitted by each
> common benefit fee applicant, but **the number of hours submitted was not the
> dominant factor.** Instead, **hours were used to cross-check** the amount of the
> recommended allocation.

Recommendation of the Fee Allocation Committee (Docket Entry No. 60391), at 2. The justification

given was that hours were not contemporaneously recorded, and therefore not considered accurate

or reliable. Of course this would be true in many cases where plaintiffs' lawyers are awarded fees,

under a "common fund" allocation. Yet, the Fifth Circuit has mandated that the allocation of

contemporaneous time records does not dispense with the need to resort to the lodestar as the starting

point of any fee analysis:

> The failure to provide contemporaneous time records does not require the district
> court to deny an award of fees entirely if there was an adequate reconstruction of time
> spent on the litigation. *Yohay v. City of Alexandria Employees Credit Union, Inc.,*
> 827 F.2d 967, 974 (4th Cir.1987) (citing Kennecott Corporation v. Environment
> Protection Agency, 804 F.2d 763, 767 (D.C. Cir. 1986) (per curiam)). If the Court
> is satisfied that such non-contemporaneous records were adequately reconstructed,
> no reduction is warranted, Id. Here, the Court finds that counsel have methodically
> attempted to reconstruct their expenditures of time in this extended litigation, with
> the result being a detailed, comprehensive, and reasonable reconstruction of the tasks
> performed in the case and the hours expended on those delineated functions. If
> anything, the reconstructed hours claimed are overly conservative.

*U.S., ex rel. Abbott-Burdick v. University Medical Associates,* (No. 2:96-1672-12) 2002 WL

34236885, *17 (D.C.S.C. May 23, 2002).

> Defendants correctly state that the Court should normally rely on contemporaneously-
> kept time records, but **may also base a fee award on "reconstructed" time
> records, if such records detail "how the time in fact expended was
> conservatively reconstructed by reference to pleading files, the time records of
> other attorneys, and other contemporaneous documents."** *Grinnell II, supra, 560
> F.2d at 1102-03.* In short, **if the Court finds the reconstruction to have been
> carefully done, it may conclude that the hours claimed are fair and reasonable,
> and proceed to calculate the "lodestar."**

*Bradford v. Blum,* 507 F. Supp. 526, 532 (D.C.N.Y. 1981) (emphasis added).

Like the *Bradford* court, this Court, carefully scrutinized any reconstructed time records, and concluded they are fair and reasonable; thus, they can properly be used to make a lodestar calculation. The hours reported in this case were audited by Phil Garrett. The Court accepted those hours as accurate in its Order and Reasons of October 19, 2010, at 33.

If hours were used as a "cross check," as the Committee purports to have done, then the widely disparate results of its recommendation suggest that there must be other factors beyond the lodestar that impacted the secret point system the Committee admits it used as its primary tool of allocation. "The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, i.e., to 'ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple.'" *In re Enron Corp. Securities, Derivatives & ERISA Litigation,* 586 F.Supp.2d 732, 751-752 (D.C. Tex. 2008), citing *In re Cendant Corp. Sec. Litig.,* 264 F.3d 201, 285 (3d Cir.2001). Thus, "[t]he lodestar cross-check serves the purpose of alerting the trial judge...when the multiplier is too great..." *Id.,* at 752. Given the incredible multiplier range embedded in the Committee's recommended allocation, the cross-check should have caused the Committee to conclude that its analysis was untenable.

The Point System Guide, which was the foundation of the Committee's analysis, does not contain a single category that reflects any one of the *Johnson* factors. The Guide lists the following categories as the only basis for compensation under the Committee's formula:

(1)   Key Leadership – 125 points
(2)   Trials – 150 maximum points
(3)   Settlement Negotiations – 100 maximum points
(4)   Law and briefing – 100 maximum points
(5)   Settlement Implementation and Post-Settlement Issues – 100 maximum points
(6)   Discovery, Science and Experts – 50 maximum points
(7)   Committee Leadership and Participation – 50 maximum points
(8)   Funding – 75 maximum points (PSC assessment and case contributions)
(9)   Case Management – 25 maximum points

These categories serve as a substitute for the 12 *Johnson* Factors. The first *Johnson* factor is "time and labor involved," which is of course the basis of any lodestar. This factor is completely missing from the Committee's formula.

When the Committee tossed out the hours, it also tossed out many of the *Johnson* factors which are supposed to weigh into the lodestar that attaches to those hours, such as, "the customary hourly rate," and "the experience, reputation, and ability of the attorneys" logging the hours. The Committee's allocation assigns points for categories of work without any consideration for who performed the work.

The failure of the Committee's categories to represent any *Johnson* factors is best proved by the result achieved. No proper application of the *Johnson* criteria could support the multipliers of 100 and greater applied by the Committee. Multipliers of 2 and 3 appear commonplace in the case law, and have been approved up to 5. *See Murphy Oil II, supra*. The Committee was well aware of the acceptable range because it cited a number of cases with multipliers ranging from 2 to 5. *See* Memorandum at 34-35. In fact, in its request for common benefit fees, the PLC contemplated a tight range of multipliers:

> This [claimed 8%] percentage represents a multiple of 1.21 to 1.79 times the composite lodestars of the several common benefit counsel participating in this petition (using the highest bililng rate standard and actual billing rate standards, respectively).

Memorandum, at 51.

### 3.   THE COMMITTEE'S CATEGORIES OF PARTICIPATION ARE CONTRARY TO *JOHNSON* AND PREVAILING LAW.

The *Johnson* factors are developed over years of fee-allocating experience, and have maintained their credibility for the simple reason that they reflect a certain time-tested wisdom about how lawyers work and how their efforts should be comparatively valued. The Committee's

methodology fails to achieve the type of fair, objective division of fees that is the goal of *Johnson* and the prevailing law.

The Committee's point system awards the highest points to leadership roles and settlement participation, areas which apply almost exclusively to Committee members. For instance, a top "leader" might earn a maximum of 150 points for his role, while the highest level of contribution for prosecution of a bellwether trial with excellent results, could only earn a maximum of 60 points.

What makes it worse is the fact that Committee members likely participated in multiple categories of effort, racking up top points for leadership, more top points for settlement, and perhaps points in every other category as well. Those who "only" tried a bellwether trial with excellent results, however, could earn only 60 points for their efforts no matter the fact that members of the Committee have admitted that trials drove the settlement in the case.

Further, the roles of some Committee members in many instances consisted of low-stress and low-risk administrative work, while the most demanding and riskiest work was performed by those in the trenches prosecuting a case against Merck's army of lawyers.

An additional concern are the numerical allocations themselves. One would expect an objective point system, composed of many categories and dispersed across a large number of people, to produce uneven numbers. However, members of the Committee and those in other key positions are slated to receive sums such as $6,000,000, $9,000,000, $20,000,000. The tidiness of the amounts awarded to those at the top strongly suggests some sort of predetermination, a fact likely to be proved during upcoming discovery.

a.     MEMBERSHIP IN THE COMMITTEE WAS OVERVALUED.

One of the leading cases on common benefit fee division is the First Circuit's decision in *In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295 (1st Cir. 1995), a mass-disaster case arising from a hotel fire when it awarded 70% of the fees to members of the plaintiffs' steering committee (PSC) and 30% to the individually retained plaintiffs' attorneys (IRPAs).  The court of appeals disapproved of the way in which the lower court awarded the common benefit fees:

> First, we are troubled by the implications of a scheme in which the trial judge selects a chosen few from many lawyers who volunteer, assigns legal tasks to those few (thereby dictating, albeit indirectly, the scope of the work remaining to be done by the many), and then, in awarding fees, heavily penalized the very lawyers to whom he has relegated the "lesser" duties. Courts must recognize that while such an arrangement may be a necessary concomitant to skillful case management of mass tort suits, it nevertheless significantly interferes with an attorney's expectations regarding the fees that his or her client has agreed to pay. Conversely, lead counsel are typically volunteers, as in this case, and, as such, they have no right to harbor any expectation beyond a fair day's pay for a fair day's work in a fee fund develops.... We believe a trial court should take these differing expectations into account in allocating fees. Here, the judge's rescript does not suggest that he factored these expectations into the decisional calculus.
>
> Courts must also be sensitive to a second facet of economic reality: the power to appoint lead counsel gives the trial judge an unusual degree of control over the livelihood of the lawyers who practice before the court. Though such appointments are often an administrative necessity in complex litigation, and disproportionate fees are at times an unavoidable consequence of the classic common fund "free rider" problem, ... the judge must attempt to avoid any perception of favoritism.

56 F.3d 295 at 309-12 (footnotes omitted).

E.T.C. does not dispute that committee service is deserving of compensation in that committees are necessary to the efficient function of the MDL and coordinated litigation model, and attorneys cannot be expected to serve unless they are paid.  However, the formula used by the Committee herein grossly overvalues committee membership.  Out of a maximum of 775 points which might be awarded to a claimant, 450 were reserved to those who served a leadership role or

on committees. And, a large number of points could be awarded merely for service, completely unrelated to whether any work was done or the quality of that work.  Given the massive weight assigned to committee work and leadership, it is hardly surprising that the Committee's aggregate recommended allocation to its members is so high.  This is exactly the situation that the Fifth Circuit condemned in the *Dupont Plaza Hotel* case.

b.    THE REPRESENTATION OF CLIENTS WAS IGNORED AND FINANCIAL RISK WAS MISEVALUATED.

In the *Dupont Hotel Fire Litigation*, one of the factors that troubled the First Circuit greatly was the apparently slim credit accorded to bringing in and managing the clients, whose claims after all are what actually drive a settlement. No amount of good committee work will cause a settlement unless some lawyers take on the significant financial risks of signing up clients and agreeing to try their cases.  Of course, committee members do not incur this risk.

In Pre-Trial Order 6(D), this Court clearly contemplated that the Committee would consider risk factors in its allocation. The Court directed all counsel to address in their affidavits some of the following:

(A)    "Activities surrounding trials of individual Vioxx claimants, including bellweather trials and **non-MDL trials that impacted proceedings on a common benefit level**";

(B)    "**Whether counsel was already involved in the Vioxx litigation prior to the withdrawal of Vioxx** from the market on September 30, 2004";

(C)    "**Whether counsel was involved in the Vioxx litigation prior to the JPMDL**, and the time and expense incurred during such time that was for the common benefit" and

(D)    "Whether counsel made significant contributions to the funding of the litigation".

Order, 9/15/08, at 4-5. Claimants addressed these factors above. The committee ignored the risks this Court properly identified as relevant.

4.    PRIVATE FEE-SHARING AGREEMENTS ARE NOT ACCOUNTED FOR IN THE COMMITTEE'S FORMULA.

Multiple fee sharing arrangements that bear significantly on the fairness of the Committee's fee allocation have not been disclosed. For example, the firm that received the third-highest hourly rate, Ashcraft & Gerel, LLP ($1325/hr.) is in partnership with Committee member Russ Herman, seventh-rated at $ 1102/hr. The partnership raises an important question to be raised in discovery: what fee-sharing agreements existed between these and other firms.

B.    THE COMMITTEE RECOMMENDED ALLOCATION IS NOT ENTITLED TO ANY PRESUMPTIVE DEFERENCE.

In *Murphy Oil II*, this Court approved the use of the allocation committee approach to recommend division of fees, but noted the following:

> The Fifth Circuit has approved of the appointment of such a fee committee. However, when a fee committee is appointed, the Court must maintain close supervision of the committee and "closely scrutinize" any recommendation from the committee. *In re High Sulfur Content Gasoline Products Liab. Litig.*, 517 F.3d 220, 235 (5th Cir. 2008). This is so because there are conflicts of interest inherent in appointing a fee committee: the members of the committee suggest to the court a division of a limited fund among themselves and other firms. *In re High Sulfur Content*, 517 F.3d at 235 (citing *In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3d Cir.2005) (Ambro, J., concurring)).

582 F.Supp.2d at, 801 n.8. Indeed, as the Fifth Circuit also stated in the quoted case:

> [O]ur precedents do not permit courts simply to defer to a fee allocation proposed by a select committee of attorneys, in no small part, because *235 "counsel have inherent conflicts." *In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3d Cir.2005) (Ambro, J., concurring). As Judge Ambro noted, "They make recommendations on their own fees and thus have a financial interest in the outcome. **How much deference is due the fox who recommends how to divvy up the chickens??**"

*In re High Sulfur Content II*, 517 F.3d at 234-35 (emphasis added).

In conclusion, the *High Sulfur* court declared that "[s]uch a direct conflict of interest [created by an allocating committee's 'dividing a limited fund among themselves and other firms] strongly

suggests that affording substantial deference is inappropriate." 517 F.3d at 235, quoting *In re Diet Drugs*, 401 F. 3d at 173-174 (Ambro, J., concurring).

Deference is particularly unwarranted here. The Fifth Circuit attaches "a strong presumption [to] the reasonableness of the lodestar amount," *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 800, which the FAC has removed from its equation.

## III.   SUGGESTED ALLOCATION

Subject to the objections discussed above, E.T.C. suggests an allocation of $19,125,000. This amount is consistent with the amounts awarded to other law firms with winning trial results. As detailed herein, the application of the *Johnson* factors justify this amount.  *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  The evidence on the relevant *Johnson* factors as they relate to E.T.C. is as follows:

(A)   The time and labor required.  The time and labor, as detailed in Paragraph 3 and 4 above, required in prosecuting the Garza case were substantial;

(B)   The novelty and difficulty of the questions. The novelty and difficulty of the issues cannot be disputed.  As detailed above, E.T.C. began prosecuting the Garza case years before the withdrawal of the drug from the market and the formation of this MDL;

(C)   The skill requisite to perform the legal service properly.  The skill required to perform the legal service properly was very high as indicated by the quality of lawyers involved in this litigation;

(D)   The preclusion of other employment by the attorney due to acceptance of the case. There is substantial evidence in this objection and E.T.C.'s affidavit and testimony to support the preclusion of other employment by the the firm due to acceptance of the case;

(E)   The amount involved and the results obtained.  As detailed above, E.T.C. was responsible for all the funding of the Garza case and the results obtained were excellent. The MDL certainly benefited from E.T.C.'s work, contributions and the successful result inn building its case against Merck;

(F)   The experience, reputation and ability of the attorneys.  E.T.C.'s lawyers have extensive experience in products liability litigation.  This verdict was one of numerous verdicts obtained by the firm's lawyers in excess of $10 million;

(G)   The "undesirability" of the case.  At the time E.T.C. began working on the Garza case, very few lawyers across the country were willing to take a Vioxx case against Merck.

In conclusion, Vioxx cases tried to a successful jury verdict unquestionably contributed to the common benefit in that the verdicts helped establish that liability could be obtained despite Merck's formidable defenses.  At the very least, the *Garza* case and its counsel should be treated comparably to other lead lawyers in successful cases.  As such, E.T.C. asks that the Committee increase its allocation to fairly recognize the contribution that the Garza case made to the overall settlement.

DATED:        February 4, 2011.

                    Respectfully submitted,

                    **ESCOBEDO, TIPPIT & CARDENAS, LLP**
                    3900 N. 10th Street, Suite 950
                    McAllen, Texas 78501
                    (956) 618-3357 – phone
                    (956) 618-3361 – telecopier

                    By: _____
                         Joe Escobedo
                         State Bar No. 06665850


        **Co-Counsel:**

                    David Hockema
                    **HOCKEMA & LONGORIA, LLP**
                    600 E. Nolana Ave.
                    McAllen, Texas  78504
                    (956) 631-9112 – phone
                    (956) 630-9472 – telecopier