# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| THIS DOCUMENT RELATES | * | JUDGE FALLON |
| TO ALL CASES | * | MAG. JUDGE KNOWLES |
| | * | |
| FILER: Robert E. Arceneaux/Pascal Calogero, Jr. | * | February 2, 2011 |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JOINT OBJECTION OF ERIC WEINBERG, CHRIS PLACITELLA
AND COHEN, PLACITELLA AND ROTH TO THE
FEE ALLOCATION COMMITTEE'S JAN. 20, 2010 RECOMMENDATION

Robert E. Arceneaux, La Bar No. 01199
ROBERT E. ARCENEAUX LLC
47 Beverly Garden Drive
Metairie, LA 70001
(504) 833-7533 office
(504) 833-7612 fax
rea7001@cox.net

Pascal F. Calogero, Jr., La. Bar No. 03802
AJUBITA, LEFTWICH & SALZER, L.L.C.
1100 Poydras Street
New Orleans LA 70163-1950
(504) 582-2300 office
(504) 582-2310 fax
pcalogero@alsfirm.com

MARGARET E. WOODWARD, La. Bar No. #13677
3701 Canal Street, Suite C
New Orleans, Louisiana 70119
(504) 301-4333 office
(504) 301-4365 fax
mewno@aol.com

Attorneys for Eric H. Weinberg, Chris Placitella, and Cohen, Placitella and Roth

## **TABLE OF CONTENTS**

Comparison chart between FAC Recommendation and lodestars,
 showing effective multipler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.   The FAC's Methodology, and Resulting Formula, Is Unlawful and Has Produced an
            Insupportable Result. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            1.   Lodestar Is the Starting Point of Any Proper Analysis; Adjusted Loadstar
                 Produces the Final Allocation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                 a.   Overwhelming Precedent Required the Fac to Base its Allocation on
                      a Lodestar Calculation, with Appropriate *Johnson* Adjustments. . 5

                 b.   The MSA and this Court's Orders Correctly Ordered the Fac to Use
                      the Lodestar/*Johnson* Factors. . . . . . . . . . . . . . . . . . . . . . . . 8

            2.   The FACc's Methodology and Resulting Formula Are Far Removed from
                 Any Type of Lodestar/*Johnson* Analysis. . . . . . . . . . . . . . . . . . . . 11

                 a.   A Lodestar Analysis Was Not Conducted or Used at All. . . . . . . 11

                 b.   The Point System Does Not Even Remotely Reflect a Correct
                      Application of the *Johnson* Factors. . . . . . . . . . . . . . . . . . . . 16

            3.   Under the Pretense of Objectivity, the FAC's Utterly Subjective Formula
                 Weighs Categories of Participation in Measures Contrary to *Johnson*, and
                 Also out of Balance with Prevailing Law. . . . . . . . . . . . . . . . . . . . . 20

                 a.   Committee Membership and "Leadership" Are Grossly Overvalued.
                      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                 b.   Discovery, Procurement of Experts, and the Development of the
                      Scientific Case, Was Grossly Undervalued. . . . . . . . . . . . . . . 25

                 c.   Trial Participation and Success Was Overvalued. . . . . . . . . . . 28

                 d.   Settlement Work Was Overvalued . . . . . . . . . . . . . . . . . . . . . 30

                 e.   Client Representation Was Ignored; Financial Risk Was
                      Misevaluated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

4.    The FAC Has Used the Common Benefit Fund and Formula to Settle Claims by Various Attorneys Without Court Authority. . . . . . . . . . . . . . . . . . 33

5.    The FAC Formula Does Not Account for or Disclose Private Fee-sharing Agreements., Which Change  the Amount of the Actual Allocation Many Claimants Will Ultimately Receive . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

6.    The Recommended Allocations to Claimants Demonstrate How the FAC's Insupportable Methodology and Formula Have Produced an Unsustainable Result. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

7.    The FAC's Recommended Allocation Is Not Entitled to Any Presumptive Weight or Deference, and in Fact, Due to its Fundamental Flaws, Is Essentially Meaningless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

8.    A Proper Allocation  Cannot Be Proposed at this Time Because of the Need for Discovery, but Claimants Suggest That $33,000,000 must Be Reserved to Satisfy Their Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B.    This Court Has No Authority, Through a FAC or Otherwise, to Either Grant or Limit a Common Benefit Award of Fees Generated in State Court Cases for Work Done in State Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1.    This Court's Authority, Either as an  MDL Transferee Court, or as an Article III Court, Does Not Extend to Cases Pending in State Court, Nor to Fees Generated Therefrom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

2.    There Is No Basis for this Court's Exercise of Jurisdiction over the Contractually Paid Assessments Emanating from State Court Cases. . . . 42

a.    There Is No General or Inherent Jurisdiction. . . . . . . . . . . . . . . 42

b.    The Master Settlement Agreement Cannot Imbue this Court with Jurisdiction it Does Not Otherwise Enjoy. . . . . . . . . . . . . . . . . . 49

3.    Common Benefit Compensation for State Court Litigation must Be Fixed by State Court Judges, Who Are the Only Ones Who Have Jurisdiction over the Fees Generated in Those Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

4.    This Court's Lack of Jurisdiction Is Properly Raised at this Time. . . . . . 52

III.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Summary of Common Benefit Work Performed
by Chris Placitella and Eric Weinberg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appendix 1

ii

| | | | | |
|---|---|---|---|---|
| Alley, Clark, Greiwe & Fulmer | $365,000.00 | 1,611.25 | $226.53 | 0.511 |
| Alvarez Law Firm | $15,000.00 | 30.00 | $500.00 | 1.128 |
| Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C. | $3,400,000.00 | 8,430.00 | $403.32 | 0.910 |
| Anastopoulo & Clore LLC | $15,000.00 | 607.25 | $24.68 | 0.056 |
| Andrews & Thornton | $600,000.00 | 2,005.00 | $299.25 | 0.675 |
| ███████████████ | ███████████ | ██████ | ███████ | █████ |
| Audet & Partners LLP | $1,165,000.00 | 7,666.00 | $151.97 | 0.343 |
| Aylstock, Witkin, Kreis & Overholtz LLC | $225,000.00 | 841.50 | $267.38 | 0.603 |
| Balkin & Eisbrouch | $15,000.00 | 25.75 | $582.52 | 1.314 |
| Balser, Brian K., Co., LPA | $130,000.00 | 592.25 | $219.50 | 0.495 |
| Barnow | $15,000.00 | 67.25 | $223.05 | 0.503 |
| Barrios, Kingsdorf & Casteix, LLP | $1,700,000.00 | 3,439.25 | $494.29 | 1.115 |
| Bartimus, Frickleton, Robertson & Gorny | $15,000.00 | 30.00 | $500.00 | 1.128 |
| Becnel Law Firm, LLC | $455,000.00 | 13,038.25 | $34.90 | 0.079 |
| Bencomo | $327,500.00 | 1,513.50 | $216.39 | 0.488 |
| Bossier & Associates, PLLC | $20,000.00 | 102.50 | $195.12 | 0.440 |
| Branch Law Firm | $0.00 | 7,087.50 | $0.00 | 0.000 |
| Brandi Law Firm | $970,000.00 | 5,214.95 | $186.00 | 0.420 |
| Brown & Crouppen, PC | $73,000.00 | 783.75 | $93.14 | 0.210 |
| Bruce E. Dean | $0.00 | 10.50 | $0.00 | 0.000 |
| Burg, Simpson, Eldredge, Hersh & Jardine, PC | $500,000.00 | 2,599.75 | $192.33 | 0.434 |
| Cafferty Faucher | $30,000.00 | 207.50 | $144.58 | 0.326 |
| Capshaw Goss | $0.00 | 152.50 | $0.00 | 0.000 |
| Carey & Danis, LLC | $0.00 | 5,518.25 | $0.00 | 0.000 |
| Charfoos | $0.00 | 396.75 | $0.00 | 0.000 |
| Childers, Buck & Schlueter | $750,000.00 | 2,003.75 | $374.30 | 0.844 |
| Cohen Milstein | $500,000.00 | 4,964.00 | $100.73 | 0.227 |
| Cohen, Placitella & Roth, PC | $100.00 | 2,790.75 | $0.04 | 0.000 |
| Cunard law Firm | $0.00 | 1,321.00 | $0.00 | 0.000 |
| Cuneo, Gilbert & LaDuca LLP | $0.00 | 0.00 | $0.00 | 0.000 |
| Dugan & Browne | $0.00 | 114.25 | $0.00 | 0.000 |

| Firm | | | | |
|---|---|---|---|---|
| Engstrom, Lipscomb & Lack | $390,000.00 | 6,866.95 | $56.79 | 0.128 |
| Escobedo Tippet | $0.00 | 14,886.75 | $0.00 | 0.000 |
| Fayard and Honeycutt | $15,000.00 | 416.00 | $36.06 | 0.081 |
| Fibich, Hampton & Leebron, LLP | $610,000.00 | 2,021.25 | $301.79 | 0.681 |
| Freese & Goss, PLLC | $0.00 | 794.00 | $0.00 | 0.000 |
| Friedman Law Offices | $6,500.00 | 20.50 | $317.07 | 0.715 |
| [illegible shaded row] | [illegible] | 1,251.00 | [illegible] | 0.474 |
| Gallagher law Firm (TX) | $40,000.00 | 1,219.50 | $32.80 | 0.074 |
| Gancedo & Nieves LLP | $600,000.00 | 3,649.25 | $164.42 | 0.371 |
| Gianni-Petoyan, Attorneys at Law | $30,000.00 | 314.75 | $95.31 | 0.215 |
| Goldenberg Heller | $0.00 | | | 0.000 |
| Hagens Berman | $0.00 | 236.00 | $0.00 | 0.000 |
| Heins Mills | $4,000.00 | 12.50 | $320.00 | 0.722 |
| Heninger, Garrison, Davis LLC | $1,000,000.00 | 5,044.00 | $198.26 | 0.447 |
| Hovde Dassow & Deets, LLC | $1,165,000.00 | 8,546.50 | $136.31 | 0.308 |
| Irpino | $877,000.00 | 2,920.00 | $300.34 | 0.678 |
| Jacobs Burns | $0.00 | | | 0.000 |
| John Hornbeck | $300,000.00 | 1,390.00 | $215.83 | 0.487 |
| Johnson & Perkinson | $15,000.00 | 847.00 | $17.71 | 0.040 |
| Jones Verras | $30,000.00 | 841.00 | $35.67 | 0.080 |
| Kasowitz, Benson, Torres & Friedman lllP | $1,100,000.00 | 4,395.40 | $250.26 | 0.565 |
| Keller Rohrback | $0.00 | 323.00 | $0.00 | 0.000 |
| Kerpsack | $10,000.00 | 54.50 | $183.49 | 0.414 |
| [illegible shaded row] | $4,000,000.00 | 25,[illegible] | $157.[illegible] | 0.35[illegible] |
| Labaton Sucharow | $0.00 | 389.00 | $0.00 | 0.000 |
| Langston Law Firm | $0.00 | 597.50 | $0.00 | 0.000 |
| Lewis & Roberts, PLLC | $0.00 | 3,208.00 | $0.00 | 0.000 |
| Levin, Simes, Kaiser & Gornick, LLP | $15,000.00 | 90.00 | $166.67 | 0.376 |
| [illegible shaded row] | [illegible] | [illegible] | [illegible] | [illegible] |
| Lieff, Cabraser, Heimann & Bernstein, LLP | $6,000,000.00 | 24,391.00 | $245.99 | 0.555 |

IV

| | | | | |
|---|---|---|---|---|
| Lockridge, Grindal, Nauen PLLP | $350,000.00 | 4,712.50 | $74.27 | 0.168 |
| Locks Law Firm, LLC | $585,000.00 | 8,881.50 | $65.87 | 0.149 |
| Lopez, Hodes, Restaino, Milman & Skikos | $1,500,000.00 | 5,104.25 | $293.87 | 0.663 |
| Lundy & Davis | $100,000.00 | 550.00 | $181.82 | 0.410 |
| Martin & Jones | $0.00 | 1,943.00 | $0.00 | 0.000 |
| Matthews & Associates | $1,400,000.00 | 10,668.50 | $131.23 | 0.296 |
| Mithoff Law Firm | $15,000.00 | 16.00 | $937.50 | 2.115 |
| Morelli Ratner PC | $750,000.00 | 1,833.50 | $409.05 | 0.923 |
| Motley Rice LLC | $195,000.00 | 3,289.50 | $59.28 | 0.134 |
| Murray Law Firm | $162,000.00 | 2,203.50 | $73.52 | 0.166 |
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓ |
| Panish & Shea | $1,640,000.00 | 3,975.75 | $412.50 | 0.931 |
| Price, Waiuckauski & Riley, LLCC | $15,000.00 | 756.00 | $19.84 | 0.045 |
| Richardson, Patrick, Westbrook & Brickman | $15,000.00 | 111.50 | $134.53 | 0.303 |
| Robert J. DeBry | $15,000.00 | 31.00 | $483.87 | 1.092 |
| Robert M. Becnel | $30,000.00 | 924.25 | $32.46 | 0.073 |
| Robins, Kaplan, Miller & Ciresi LLP | $850,000.00 | 2,400.75 | $354.06 | 0.799 |
| ▓▓▓▓, ▓▓▓▓▓▓ & ▓▓▓▓▓▓▓ | $6,000,000.00 | 21,440.25 | $279.75 | 0.632 |
| Roda Nast, P.C. | $45,000.00 | 1,267.75 | $35.50 | 0.080 |
| Sanders, Viener, Grossman, LLP | $15,000.00 | 112.50 | $133.33 | 0.301 |
| ▓▓▓▓▓, ▓▓▓▓ & ▓▓▓▓ ▓▓▓▓▓▓▓▓▓ ▓▓▓ ▓▓▓ ▓▓▓▓▓▓▓ ▓▓▓▓ ▓/▓/▓▓ | $4,500,000.00 | 19,622.00 | $225.00 | 1.091 |
| Sheller, P.C. | $65,000.00 | 1,824.25 | $35.63 | 0.080 |
| Silverman & Fodera | $73,000.00 | 327.00 | $223.24 | 0.504 |
| Singleton Law Firm | $180,000.00 | 2,388.75 | $75.35 | 0.170 |
| Snapka, Turman & Waterhouse, LLP | $75,000.00 | 2,926.50 | $25.63 | 0.058 |
| Ted Kanner | $1,350.00 | 6.75 | $200.00 | 0.451 |
| Texas Consortium | $20,095,000.00 | 21,002.25 | $956.80 | 2.158 |
| Barios, Kohn & Elliot, LLC | | 5,575.50 | | |
| Williams Kherkher | | 9,032.00 | | |
| Provost Umphrey | | 274.25 | | |
| Watts Law Firm | | 3,530.50 | | |
| Grant Kaiser | $0.00 | 2,589.00 | $0.00 | |
| The Holman law Firm | $0.00 | 212.50 | $0.00 | 0.000 |

| | | | | |
|---|---|---|---|---|
| Ury & Moskow LLC | $0.00 | 3.00 | $0.00 | 0.000 |
| Weinberg, Eric H., law Firm of | $220,000.00 | 10,361.75 | $21.23 | 0.048 |
| White, Meany & Wetherall | $0.00 | 1,412.75 | $0.00 | 0.000 |
| Whitehead law Firm | $45,000.00 | 504.75 | $89.15 | 0.201 |
| Williamson & Williams | $15,000.00 | 84.25 | $178.04 | 0.402 |
| Wold | $580.00 | 4.25 | $136.47 | 0.308 |
| Zimmerman, Reed PLLP | $0.00 | 204.75 | $0.00 | 0.000 |
| Zink, Diane K. | $0.00 | 0.00 | $0.00 | 0.000 |
| **TOTALS** | **$311,885,030.00** | **563,289.80** | | |

MAY IT PLEASE THE COURT:

Claimants, Chris Placitella and the firm of Cohen Placitella and Roth ("Placitella") and Eric Weinberg and the firm of the Law Offices of Eric Weinberg "Weinberg") respectfully submit this objection to the proposed allocation of common benefit fees issued by the Fee Allocation Committee ("FAC") on Jan. 20, 2011.

## I.    INTRODUCTION

Chris Placitella, Eric Weinberg and their law firms object to the allocation of common benefit attorney's fees recommended by the FAC. While we describe below the flaws in the FAC's methodology and the outcome of that process, we offer a brief overview of the work done by Claimants and the obvious contribution of that work to the resolution of these cases. As evidenced in the attachments, their work was lauded by their colleagues as instrumental to successes in New Jersey and elsewhere, and was extensively incorporated into the MDL trial packet.

Mr. Placitella undertook to uncover Merck's marketing fraud. Building on documents that reflected Merck's concern about the cardiotoxicity of Vioxx, he sought to expose Merck's fraudulent messaging of safety in the face of what it knew to be damning scientific evidence to the contrary. Placitella took the depositions of Merck's senior marketing executives including Jan Weiner, Mary Blake, and Charlotte Mckines. Through their testimony he established the following critical facts, among others: that in almost 2 billion messages, Merck never once told doctors or patients that the adverse results from Vigor could be explained by the fact that Vioxx could cause heart attacks, even though it acknowledged that concern inside the company; that using Dorothy Hamill as a spokesperson in the direct-to-consumer advertising was unethical and improper because she had a bleeding ulcer and was therefore contraindicated for Vioxx; and that overcoming obstacles as described in Merck in-house teaching tools – 'doing no harm to Vioxx'- was the critical mission of

Merck instead of truthfully warning of the risks.

Mr. Placitella's discovery went further as he fought to enforce subpoenas against Merck's outside marketing vendors and secure clips that were cut from released videos. These included breakthrough statements: one of the authors of Vigor, Loran Laine, declared that the number of fatal GI bleeds Merck was relying on were bogus; and one of Merck's internal cardiologists, Laura Demopolous, told the advertising department that it would be wrong to respond to the upcoming release of the Topol article by making a blanket statement that Merck continued to stand behind the safety of Vioxx.

Mr. Weinberg delved deeply into the scientific evidence. He worked with John Kostis, a cardiologist frequently called upon to consult with the pharmaceutical industry. Together with several other medical experts, they developed a scientifically based model to measure specific causation. Weinberg also performed groundbreaking work with David Madigan, a world-renowned biostatistician. Merck had relied on placebo controlled SAS data from Alzheimer studies for its claim that Vigor overstated the MI risk of Vioxx. Mr. Weinberg and Dr. Madigan showed, to the contrary, that the underlying data proved a statistically significant risk of MI, of cardiovascular thrombotic deaths, and disturbing trends in the risks of conversion of Vioxx users to Alzheimer's from dementia, as well as other adverse effects.

Claimants freely shared this and other work with lawyers trying cases in state courts in New Jersey, Texas, and California, and with the MDL lawyers. They volunteered their time to those on trial to prepare experts, to outline proofs regarding Merck's fraudulent marketing scheme, and to review legal issues underlying jury instructions. Their work led to jury findings that Merck committed consumer fraud in four of the five cases tried in New Jersey. The value of their contributions to the litigation is reflected in numerous contemporaneous expressions of appreciation,

gratitude and respect both for their work and for their willingness to serve the common good.  Many

of those plaudits came from those who, as reflected in the recommended distributions, now

minimize the value of their contributions.

Claimants' work in this litigation was groundbreaking and contributed substantially to the

common benefit: it went to the heart of Vioxx risks and of Merck's fraudulent attempts to mask

those risks.   The work was shared without seeking a fee interest in any case in which it was used

or in which they worked.  Only a flawed methodology could produce so gross an undervaluation of

its worth as the FAC has proposed.  Therefore, Claimants object to the proposed allocation.

## II.   OBJECTIONS

### A   THE FAC'S METHODOLOGY, AND RESULTING FORMULA, IS UNLAWFUL AND HAS PRODUCED AN INSUPPORTABLE RESULT.

The FAC proposes a point system for the allocation of fees which departs dramatically from

established jurisprudence and the directives of this Court for an objectively-based assessment of

counsel's respective contributions to the common benefit.

A substantial body of case law has developed to guide the difficult allocation of attorneys'

fees across a large pool of lawyers making different contributions to the common cause.  This Court

has repeatedly adverted to the established wisdom, and has repeatedly advised the FAC to draw on

its principles in creating a formula for allocation.

While every common fund case presents unique characteristics which inevitably warrant

adjustment of the broad-based criteria and the injection of subjective elements of valuation, the

further the departure from the case-tested norm, the greater the risk of unfairness and reversible

error.  In this case, the FAC (represented by 9 of the 109 firms in the pool) proposes to give itself

$230,000,000, or 73% of the total available fund of $312,000,000.  While a disproportionate

allocation of fees has been approved in cases where a fee allocation committee contributed a disproportionate percentage of the effort, this, respectfully, is not the case here.

It is apparent that the FAC achieved its disproportionate allocation by disregarding the *time* each attorney contributed to the common benefit, notwithstanding that time is the essential controlling variable mandated by the analysis set forth by the Fifth Circuit Court of Appeal. Instead, the FAC employed a more subjective analysis of "contributions" according to a novel, unapproved, clearly unsustainable, and as-yet unrevealed point grid, which yields stratospheric hourly rates for some and nominal rates for a great many others. Under the FAC's proposal, Claimants would be compensated at $21/hr. (Weinberg) and $100/hr. (Cohen Placitella). As a point of comparison, Phil Garrett, the accountant hired to audit the hours submitted, arrived at a blended hourly rate of $443.23.

But it gets much worse. A comparison of Claimants' fees to those at the top of the proposed allocation reveals disparities which are devoid of any objective justification. At the high end, the FAC's top-compensated firm would be paid a blended rate of $2205/hr., more than 100 times the hourly rate recommended for Claimant Eric Weinberg. While the case law supports a multiplier of as much as five to one among attorneys whose contributions to the common benefit differ in value, the spread proposed by the FAC is beyond any defensible pale, particularly when one factors in the substance of the work done by Claimants and its impact on the litigation.

Because discovery has been deferred until after the filing of objections and Claimants lack information that is critical to an understanding of the formula's inner-workings, the objection filed herein is not complete. It is based upon what is known thus far. The FAC has refused to produce the key that would unlock its formula, and therefore Claimants cannot demonstrate precisely how the FAC made its allocation. They can, however, show how radically it departs from an approved

analysis, how unjustly it apportions the fees, and how clearly the case law has paved the avenue to

a complete reallocation of attorneys' fees in this action. Claimants reserve the right to supplement

this objection with additional grounds, or amend statements made herein if inaccurate or incomplete,

as discovery proceeds and information gathered reveals how this shockingly lopsided and utterly

unprecedented recommendation was actually generated.

1.   **LODESTAR IS THE STARTING POINT OF ANY PROPER ANALYSIS; ADJUSTED LOADSTAR PRODUCES THE FINAL ALLOCATION.**

a.   **OVERWHELMING PRECEDENT REQUIRED THE FAC TO BASE ITS ALLOCATION ON A LODESTAR CALCULATION, WITH APPROPRIATE *JOHNSON* ADJUSTMENTS.**

The process of dividing or allocating common benefit fees among competing counsel, even

if a limited fund is to be disbursed, is no different from the process of making any other kind of

attorney fee award. In all cases, the district court has discretion subject to a few notable constraints:

> We review the district court's award of attorneys' fees for abuse of discretion. "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." The record must "clearly indicate[ ] that the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation."

*In re High Sulfur Content Gasoline Products Liability Litigation*, NO. 09-30313 ,384 Fed.Appx. 299

(5th Cir., 2010) (*"High Sulphur II"*), citing *In re High Sulfur Content Gasoline Prods. Liab. Litig.*

(*"High Sulfur I"*), 517 F.3d 220, 227 (5th Cir.2008), and *Grigson v. Creative Artists Agency L.L.C.*,

210 F.3d 524, 528 (5th Cir.2000). *See also Cobb v. Miller*, 818 F.2d 1227, 1232 (5th Cir.1987)

("[W]hile our cases indicate that the district court must utilize the *Johnson* factors in its analysis on

the issue of attorney's fees, we are not required to reverse summarily a district court finding which

omits discussion of one of the *Johnson* factors so long as the record clearly indicates that the district

court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation.").

In all cases within the Fifth Circuit, including allocation of common fund fees, the starting point of any proper analysis must be a "lodestar" calculation:

> This Circuit utilizes the "lodestar method" to calculate attorneys' fees. Initially, the district court must determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating lawyer. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), *cert. denied*, 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 113 (1995). The lodestar is then computed by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Id.*

*Forbush v. J.C. Penney Co.*, 98 F.3d 817 (5th Cir. 1996).

While the lodestar calculation is somewhat flexible, it is the fundamental basis of any award of attorneys fees: "The district court may. . . adjust the lodestar upward or downward depending on the respective weights of the twelve [*Johnson*] factors," but failure to base an award (or allocation) of fees upon a lodestar calculation in the first instance is reversible error. *See Riley v. City of Jackson, Miss.*, 99 F.3d 757, 760 (5th Cir.1996) ("A review of the district court's decision awarding the Appellants a token amount of attorneys' fees discloses that the court bypassed considering each of the factors enunciated in *Johnson*. Nor did the district court make any attempt to determine a reasonable number of hours or a reasonable hourly fee for each of the Appellants' attorneys involved in this case. Consequently, we find the district court erred in avoiding this analysis.").

The *Johnson* factors referred to in *High Sulfur II* and *Forbush* are those expressed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989):

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client

or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the political "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases).

*High Sulfur II*, at *1 n.3.

Since the original formulation, the *Johnson* factors have undergone some adjustment. "The Supreme Court has limited greatly the use of the second, third, eighth, and ninth factors" because these factors are already presumably reflected in the lodestar, either in the hours reported or the rate charged. *Walker v. U.S. Dept. of Housing and Urban Development*, 99 F.3d 761, 771 n. 12 (5th Cir. 1996), citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986), quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir.) ( *Shipes II*), *cert. denied*, 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993) (" '[N]ovelty [and] complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of representation,' and the 'results obtained' from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award."). The lodestar cannot be adjusted due to a consideration that is already reflected in the lodestar itself, because any other result would result in double-dipping.

> There exists a strong presumption of the reasonableness of the lodestar amount. After calculating the lodestar, the court may decrease or enhance the amount based on the relative weights of the twelve factors set forth in Johnson. "[O]f the Johnson factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel." The lodestar may not be adjusted due to a Johnson factor, however, if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting.

*Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 800 (5th Cir.2006), citing *Heidtman v. County of El Paso*, 171 F.3d 1038, 1043 (5th Cir.1999), which contains a good summary of the applicable rules:

This Court uses the "lodestar" method to calculate attorney's fees. *Fender v. Zapata Partnership, Ltd.*, 12 F.3d 480, 487 (5th Cir.1994). A lodestar is calculated by multiplying the number of hours reasonably expended by an appropriate hourly rate in the community for such work. *Shipes v. Trinity Industries*, 987 F.2d 311, 319-20 (5th Cir.1993). After making this calculation, the district court may decrease or enhance the lodestar based on the relative weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974). The lodestar may not be adjusted due to a *Johnson* factor, however, if the creation of the lodestar award already took that factor into account. *Shipes*, 987 F.2d at 319-20. Such reconsideration is impermissible double-counting. *Id.*

171 F.3d at 1043.[1]

### b.    THE MSA AND THIS COURT'S ORDERS CORRECTLY ORDERED THE FAC TO USE THE LODESTAR/*JOHNSON* FACTORS.

Before the FAC entered the picture, this Court was on track to apply the Fifth Circuit's mandatory lodestar/*Johnson* factor method of allocating attorneys fees.  In the Master Settlement Agreement ("MSA"), the parties provided the following:

Funds within the Settlement Fee and Cost Account shall be administered by the Honorable Eldon E. Fallon and all awards therefrom will be subject to approval, upon due consideration by him in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson, and in accordance with established Fifth Circuit precedent, *e.g., Blum v. Stenson*, 465 U.S. 886, 900 (1984); *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 583 n. 15 (5th Cir.1980); ***Johnson v. Ga. Highway Express, Inc.***, 488 F.2d 714, 717-19 (5th Cir.1974); *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 851-52 & n. 5 (5th Cir.1998); ***Forbush v. J.C. Penney Co.***, 98 F.3d 817, 823 (5th Cir.1996); *Turner v.*

---

[1]One must distinguish between the methodology for determining the amount of common benefit fees that can be assessed against the plaintiffs with an award of fees to the lawyers. The courts, including the Fifth Circuit, are moving to a "percentage of the fund" approach, with a lodestar cross check for the former, which is what the Court did in its  October 19 order. In this regard, the PLC noted in its Memorandum, at p. 35, criticism of the lodestar methodology for the initial assessment. *In re Educational Testing Service, Etc.,* 447 F.Supp.2d 612, 628 (E.D.La. 2006)("The method has been called difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation."). But, we have seen no cases that say in the allocation of  fees, among several attorneys entitled to share in a fee award, or making any fee award, there is any methodology other than lodestar tempered by the *Johnson* Factors.  Moreover, Phil Garrett has already completed the audit of hours and work submitted by Claimants and counsel seeking common benefit fees that makes use of the lodestar method relatively simple now.

*Murphy Oil USA, Inc.*, 472 F.Supp.2d 830 (E.D.La. 2007).

Paragraph 9.2.3 9 (emphasis added).  The agreement further provided that

> In making its recommendation **the "Allocation Committee" is to review the contemporaneous time records, or properly reconstructed time records and expense reports of all plaintiffs' counsel that request compensation for common benefit work, as audited by the CPA firm of Wegman Dazett**. The Allocation Committee shall take into consideration the common benefit work of counsel in the MDL, and the work of counsel in the state litigations in Texas, California and New Jersey. **The Allocation Committee shall be guided by these objective measures of common benefit counsel's contributions**, in addition to their subjective understanding of the relative contributions of counsel towards generating the Settlement Fund **in accordance with established fee jurisprudence** and subject to the approval of the Honorable Eldon E. Fallon in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson.

Paragraph 9.2.4 (emphasis added).

In its Pre-Trial Order 6D, this Court acknowledged these terms by stating the following:

> **The Settlement Agreement contemplates that the Allocation Committee will review the contemporaneous time records or properly reconstructed time records and expense reports of all plaintiffs' counsel that submitted or request compensation for common benefit work and to take into consideration the time and common benefit work of counsel in the MDL and of counsel in the state consolidated litigations in Texas, California, New Jersey, as well as other applicable state courts.**  The Settlement Agreement also provides that the Allocation Committee shall evaluate common benefit counsel's contributions, using objective measures and the committee's subjective understanding of the relevant contributions of counsel toward generating the Settlement Fund in accordance with established fee jurisprudence, and make a Recommendation to the Court for consideration in consultation with Judges Chaney, Higbee, and Wilson. As the Allocation Committee implements PTO No. 32 and Section 9.2.4 of the Settlement Agreement and makes a Recommendation to the Court regarding allocation of attorneys' fees, the committee's considerations should be governed and guided by this comprehensive statement of general principles. The over-arching guideline that the Allocation Committee is to consider is the contributions of each common benefit attorney to the outcome of the litigation. In addition, **under existing fee jurisprudence, certain procedural as well as substantive factors should be considered in making an allocation recommendation.** The committee shall take into account Pretrial Order No. 6's directives regarding the procedural aspects of the presentations and mechanisms whereby petitioning attorneys may submit written and oral presentations for the committee's consideration. **Substantively, the committee should look to general fee jurisprudence to identify the factors that should be**

> **applied in making appropriate allocations. The *Johnson* factors are applicable to this litigation and should be considered in addition to other matters considered by the courts to evaluate fee allocations.**

(emphasis added).

This approach was consistent with that taken by this Court in previous cases. In addressing the related question of the appropriate method to be used to decide the total amount of common benefit fees to be allocated, it previously held that, even though lodestar/*Johnson* is not required, and "percentage of the fund" is acceptable as a sanctioned method, "the application of the *Johnson* factors is helpful to determine whether the benchmark percentage is reasonable given the circumstances of the case (and also necessary according to Fifth Circuit precedent). . .." *Turner v. Murphy Oil USA, Inc.*, ("*Murphy Oil I*") 472 F.Supp.2d 830 , 867 (E.D.La. Jan 30, 2007). Subsequently, when allocating the common fund, this Court followed the lodestar/*Johnson* approach, with some minor modifications. Despite those modifications, and its skepticism about lack of contemporaneously recorded time records, it is clear from the decision that time expended, and the appropriate hourly rate, adjusted by various *Johnson* factors, was at the heart of the court's decision with regard to every claimant's fee award:

> The work that an attorney devotes to a class action is generally the principal factor by far in determining the attorneys' portion of the common benefit fee. Indeed, in the present case, this is the factor that plays the dominant role in determining the proper allocation of the fee. First, a few general comments are appropriate to frame the discussion. The attorney labor portion of the Court's consideration consists of two sub-parts: time and type of work.

*Turner v. Murphy Oil USA, Inc.*, ("*Murphy Oil II*"), 582 F.Supp.2d 797, 801 n.8 (E.D.La. Oct 06, 2008).

>    2.    **THE FAC'S METHODOLOGY AND RESULTING FORMULA ARE FAR REMOVED FROM ANY TYPE OF LODESTAR/*JOHNSON* ANALYSIS.**

In its memorandum in support of an award of common benefit fees, the PLC assured this Court that:

> [i]n due course, the Allocation Committee's recommendation will be presented that will address the relative input and value of services provided by fellow common benefit attorneys as dictated by existing jurisprudence. *See, e.g., High Sulpher Content Gasoline Products Liability Litigation,* 517 F. 2d 220 (5th Cir. 2008); *Turner v. Murphy Oil USA, Inc.,* 2008 WL 4661806 (E.D.La. Oct. 6, 2008).

Memornadum in Support of Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses, Record Doc.17642, p.5, n. 4 (hereinafter "Memorandum"). Because Claimants do not have the completed grid which would demonstrate how the allocation was actually derived, they cannot know the full details of what the FAC did. But from what they do know, the FAC's flawed methodology reneged on its promised to "address the relative input and value of services provided by fellow common benefit attorneys as dictated by existing jurisprudence." The resulting recommendation is worthless.

### a.      A LODESTAR ANALYSIS WAS NOT CONDUCTED OR USED AT ALL.

The FAC seemingly disregarded *Johnson* and the lodestar method, and devised a novel approach to fee allocation. It crafted a point system in which hours expended for the common benefit, and therefore the lodestar methodology, apparently play no role whatsoever. Instead, the FAC claims to have considered all counsel's relative contributions to the common benefit according to their "worth," regardless of the time it took to create any particular contribution. The point system gives a nod to this Court's requirement of objectivity by listing a long series of ostensibly concrete contributions, in discovery, trial, and settlement negotiation, for example, further broken down into ostensibly logical subcategories, weighted by level of involvement in these activities. As outlined below, the weight placed on these activities was anything but objective.

Again, because the FAC refused to disclose how they distributed the points across their final

grid or the value of each point -- the indispensable keys to unlocking the proposed allocation --
Claimants cannot show exactly how the system worked. They can easily demonstrate, however, the
unfairness of the FAC's proposed allocation, when cross-checked against the lodestar method. The
attached chart, prepared by Claimants, reintroduces the hours audited and reported by Phil Garrett,
then compares them to the FAC's recommended allocations. What emerges therefrom is a picture
of the gross inequity of the FAC's method: Weinberg, a highly-capable and experienced litigator,
who devoted years of intensive, paradigm-shifting effort to the common benefit, compensated at
$21/hr., less than he earned thirty years ago as a truck driver to help defray the costs of his law
school education, while other lawyers are to be paid more than 100 times that rate.

     This sort of disparity, replayed in line after line of the FAC's recommendation, might be
understandable if it resulted from the disallowance of large chunks of time. For instance, if the FAC
had determined that 95% of Weinberg's time did not in fact serve the common benefit, then it could
fairly compensate him for only the remaining 5% of his time, with an allocation that would have at
least approached Garrett's blended hourly rate of $443.23.

     But the FAC long ago accepted Weinberg's hours as legitimate based upon Mr. Garrett's
audit. Indeed it used those hours in its overall calculation of common benefit time, and then used
that time to justify an award of $312,000,000 in common benefit attorneys fees. This Court, too,
expressly approved the hours in making its attorneys fee award. *See* Order and Reasons, Oct. 19,
2010, at 33 . Because the hours were decidedly dedicated to the common benefit and because there
is no possible justification for paying lawyers $21/hr., what a lodestar cross-check starkly reveals
is that the FAC has effectively cancelled out 95% of Weinberg's time. Worse, it has effectively
given to others (mostly members of the FAC) the time it took away from Weinberg, creating ratios

of more than 100 to 1 between its most favored recipients and Claimant Weinberg.[2]

Even though we do not yet have the key to the point system, there is no need to speculate about the FAC's abandonment of the lodestar method of fee allocation. In its recommendation to this Court, dated January 20, 2011, it stated that it did not base its recommendation on hours or lodestar, but professed that it used lodestar as a "cross check."

> Therefore, the Committee has given due consideration to the time submitted by each common benefit fee applicant, but **the number of hours submitted was not the dominant factor**. Instead, **hours were used to cross-check** the amount of the recommended allocation.

Recommendation of the Fee Allocation Committee (Docket Entry No. 60391), at 2.  The justification given was that hours were not contemporaneously recorded, and therefore not considered accurate or reliable. Of course this would be true in many case where plaintiffs' lawyers are awarded fees, whether under a statutorily authorized fee shift, or a "common fund" allocation. Yet, the Fifth Circuit has mandated that the lodestar be the starting point of any such award or allocation. The lack of contemporaneous time records does not dispense with the need to resort to the lodestar as the starting point of any fee analysis:

> The failure to provide contemporaneous time records does not require the district court to deny an award of fees entirely if there was an adequate reconstruction of time spent on the litigation. Yohay v. City of Alexandria Employees Credit Union, Inc., 827 F.2d 967, 974 (4th Cir.1987) ( citing Kennecott Corporation v. Environmental Protection Agency, 804 F.2d 763, 767 (D.C.Cir.1986) (per curiam)). If the Court is satisfied that such non-contemporaneous records were adequately reconstructed, no reduction is warranted. Id. Here, the Court finds that counsel have methodically attempted to reconstruct their expenditures of time in this extended litigation, with the result being a detailed, comprehensive, and reasonable

---

[2]In its October 19th Order and Reasons, this Court stated at note 22 that its approval and acceptance of Garrett and the FAC's audited lodestars is "sufficient for the purposes of the rough lodestar cross-check. . ., but does not preclude the Allocation Committee or the Court from disallowing any particular submissions of common benefit time when allocating the common benefit fee award." However, Claimants do not read that statement as authorizing the FAC to lop off 95% of Weinberg's hours, reassign it to others, and claim that *they* should be compensated for work *he* performed.

reconstruction of the tasks performed in the case and the hours expended on those delineated functions. If anything, the reconstructed hours claimed are overly conservative.

*U.S., ex rel. Abbott-Burdick v. University Medical Associates*, (NO. 2:96-1676-12) 2002 WL 34236885, \*17 (D. C. S.C. May 23, 2002).

> Defendants correctly state that the Court should normally rely on contemporaneously-kept time records, but **may also base a fee award on "reconstructed" time records, if such records detail "how the time in fact expended was conservatively reconstructed by reference to pleading files, the time records of other attorneys, and other contemporaneous documents."** *Grinnell II, supra,* 560 F.2d at 1102-03. **In short, if the Court finds the reconstruction to have been carefully done, it may conclude that the hours claimed are fair and reasonable, and proceed to calculate the "lodestar."**

*Bradford v. Blum*, 507 F.Supp. 526, 532 (D.C. N.Y. 1981) (emphasis added).

Like the *Bradford* court, this Court carefully scrutinized any reconstructed time records, and concluded they are fair and reasonable; thus, they can properly be used to make a lodestar calculation. The hours reported in this case were audited by Phil Garrett, who took his job very seriously (the audit cost more than $700,000 according to the affidavit he submitted when he presented it to the Court). The Court accepted those hours as accurate in its Order and Reasons of October 19, 2010, at 33.[3]

At this late juncture, perceived inflation or deflation of a given attorney's hours cannot justify a wholesale rejection of the lodestar methodology. What might reasonably occur, however, is an adjustment of the multiplier based on dramatic and substantiated errors of entry. At a later date, Claimants expect to propose such an adjustment of their own rates based upon their failure to

---

[3] If the PSC disbelieved any of the hours claimed, it should have excluded them from the collective lodestar it offered to this Court as justification for its request of more than $370,000,000 in aggregate common benefit fees.

-14-

enter a wealth of time in their reconstructed time submissions.[4] This explains in part how Claimants accomplished so much in the relatively limited number of hours they reported: they seriously under-reported their time.

If hours were used as a "cross check," as the FAC purports to have done, then the widely disparate results of its recommendation suggests that there must be other factors beyond the lodestar that informed the secret point system the FAC admits it used as its primary tool of allocation. "The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, i.e., to 'ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple.'" *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 751-752 (D.C. Tex. 2008), citing *In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 285 (3d Cir.2001). Thus, "[t]he lodestar cross-check serves the purpose of alerting the trial judge . . . when the multiplier is too great...." *Id.*, at 752. Given the incredible multiplier range embedded in the FAC's recommended allocation, the cross-check should have caused it to go back to the drawing board, rather than proceed to recommend its insupportable division to this Court.

---

[4]Claimants reconstructed their time from a careful review of their own records, but determined always to err on the side of caution. When they began to review other lawyers' submissions, however, they discovered hundreds of entries by others referencing meetings, consultation, and even depositions with Claimants which Claimants had overlooked in their own submissions.

### b. THE POINT SYSTEM DOES NOT REFLECT A CORRECT APPLICATION OF THE *JOHNSON* FACTORS.

The FAC claims that it gave a nod to various *Johnson* factors, *see* Recommendation, at 1, and it even includes a column on the grid for application of a *Johnson* multiplier to the points (not any lodestar) calculated by the Committee. However, when one digs deeper into the FAC's contention, it is obvious that the *Johnson* factors were not considered or applied, and that the multiplier used to adjust the points awarded was nothing more than a second subjective readjustment of the already subjectively awarded points based upon considerations and factors that are completely unknown.

The Point System Guide, which was the foundation of the FAC's analysis, does not contain a single category that reflects any one of the *Johnson* factors. The Guide lists the following categories as the only basis for compensation under the FAC's formula:

- Key Leadership -125 maximum points

- Trials -150 maximum points

- Settlement Negotiations -100 maximum points

- Law and Briefing -100 maximum points

- Settlement Implementation and Post-Settlement Issues -100 maximum points

- Discovery, Science and Experts - 50 maximum points

- Committee Leadership and Participation - 50 maximum points

- Funding -75 maximum points (PSC assessment and case contributions)

- Case Management - 25 maximum points

These categories serve as a substitute for the 12 *Johnson* Factors, which are (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of

the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the political "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

It should be noted that *Johnson* factor (1) is "time and labor involved," which is of course the basis of any lodestar- and which is completely missing from the FAC's formula. If the FAC's delineations represent its conception of the *Johnson* categories, then double dipping occurred when it awarded points under its categories, and then additionally applied a *Johnson*-like multiplier to adjust the points awarded in these categories.

The reality is that when the FAC tossed out the hours, it also tossed out many of the *Johnson* factors which are supposed to weigh into the lodestar that attaches to those hours, such as, "the customary hourly rate," and "the experience, reputation, and ability of the attorneys" logging the hours. Undersigned counsel's lodestar cross-check did not even attempt to reintroduce the other factors, however, because the FAC made it impossible.[5] The attached time chart, therefore, mashes together the times of top-level lawyers with those of paralegals and law clerks.

What this means is that the ratio of disparity may be *significantly higher from top to bottom than 100 to 1*. In the Cohen Placitella firm, the great majority of hours, 3682.4, were entered by high-level attorneys performing demanding tasks. In Eric Weinberg's case, 6,150 of his 10,361.75

---

[5] Ordered by the Court to produce Garrett's time records, the FAC delivered the hours in a devilishly unusable format: on a chart that listed each worker *alphabetically*- not even sorted by firm. The material was also saved into pdf, so that it could not be rearranged into a sensible list. Undersigned counsel requested the information in workable form but have not yet received it. Therefore, to construct their time chart, accompanying this motion, they had to reenter the original data. They were unwilling to reenter every piece of data previously entered by Garrett, a task for which Garrett charged $700,000, simply because the FAC has not yet deigned to produce it.

hours were entered by him personally. The contributions of these lawyers cannot fairly be compared to the administrative efforts of staff.

Yet the FAC's allocation assigns points for categories of *work* without any consideration of categories of *worker*. When undersigned counsel performed their lodestar cross-check, they could differentiate discovery hours, for example; but according to the FAC's calculus, a paralegal sorting discovery documents was no less valuable than a seasoned trial attorney taking an expert deposition. Indeed, in the case of Placitella and Weinberg, most of their work was *already* valued at considerably less than the efforts of most paralegals. For example, the Herman firm logged in nearly 30,000 hours, much of it likely performed by administrative staff[6], who earned an average of $1102/hr. for their efforts, an exponentially higher rate than the work of these highly experienced and qualified lawyers.   Assuming, as seems likely, that the FAC's top-earning firms did not *pay* their paralegals $1100 or $2200 an hour, the attorneys' rates were probably considerably higher than the blended rates reported.  For example, if half of the Gainsberg firm's work was performed by paralegals and law clerks earning $50/hr., that would amount to only $30,500 of the recommended allocation of $2,690,000; the remaining 610 hours of lawyer time would then be compensated not at the already whopping blended rate of $2200, but instead at a rate of $4,360/hr.,  or 208 times the rate allocated for Eric Weinberg's work.

We will not reprise the entire PLC *Johnson* analysis here but note its  final observation about the last *Johnson* criterion:

12. Awards in Similar Cases.

All but two of the *Johnson* fee adjudication factors are abstract in that they do not purport to have any mathematical correlation to the computation of an appropriate

---

[6] *See,* n. 6, *supra.* The alphabetical listings provided by the FAC, not arranged by firm, do not lend themselves to an identification of staff.

> percentage award. The final *Johnson* factor provides guidance as to how to concretize abstract consideration of the other factors into a definitive percentage award. That factor prescribes consideration of "awards in similar cases." *Johnson.* 448 F.2d at 719. Such consideration is a dominant feature of contemporary percentage-of-the-fund fee adjudication. *See, e.g., Enron, supra; Murphy Oil, supra.*

Memorandum, p. 65.

Consideration of "awards in similar cases" is supposed to be a dominant feature of contemporary fee allocation. We challenge the FAC to show the Court an approved allocation based on multipliers of 100 to 1.

The failure of the FAC's categories to represent any *Johnson* factors is best proved by the result achieved. No proper application of the *Johnson* criteria could support the multipliers of 100 and greater applied by the FAC. Multipliers of 2 and 3 appear commonplace in the case law, and have been approved up to 5. The FAC was well aware of the acceptable range because it charted a number of cases with a multipliers ranging from 2 to 5. *See* Memorandum, at 34-35, There has never been a case that used the *Johnson* factors to produce a range of multipliers that is more than 100:1.[7] In fact, in its request for common benefit fees, the PLC contemplated a tight range of multipliers:

> This [claimed 8%] percentage represents a multiple of 1.21 to 1.79 times the composite lodestars of the several common benefit counsel participating in this petition (using the highest billing rate standard and actual billing rate standards, respectively).

Memorandum, at 51. How this narrow range moved to the a range of .04 for Johnson and Perkins to 4.9 for Gainsburg, Benjamin (this excludes the 24 firms that received a multiplier of "0" because they received no recommended award at all) remains something of a mystery, but the discussion

---

[7]*Murphy Oil II, supra,* approved a high to low ratio of 5 to 1 for an excellent result achieved by a small core of laboring oarsmen. This case, as will be discussed below, was not *Turner*, and nothing warrants the yawning gulf the FAC has established between its members and Claimants.

below attempts to shed some light on the FAC's radical departure from the established norm.

### 3. UNDER THE PRETENSE OF OBJECTIVITY, THE FAC'S SUBJECTIVE FORMULA WEIGHS CATEGORIES OF PARTICIPATION IN MEASURES CONTRARY TO *JOHNSON*, AND ALSO OUT OF BALANCE WITH PREVAILING LAW.

Not every hour of attorney time, it goes without saying, is the same. Courts have struggled mightily with the difficult task of determining how to compensate time in complex litigation involving hundreds of lawyers and staff performing different tasks in different places. The *Johnson* factors developed over years of fee-allocating experience, and have maintained their credibility for the simple reason that they reflect a certain time-tested wisdom about how lawyers work and how their efforts should be comparatively valued.

The FAC determined to chart a different course. In disregarding the collective wisdom of the case law, it fails to achieve the type of fair, objective division of fees that is the goal of every accepted methodology. Like any new invention, the FAC's untested model shows some significant design flaws. These are likely to multiply when the hidden code is produced. For brevity's sake, only a few significant inequities are illustrated here.

To start, the FAC's point system is seemingly keyed to the efforts of the FAC's members. The point rating system awarded the highest points to leadership roles, settlement participation, and trials. On its face, this appears to be an objective allocation. In fact, all of the categories represented in the point system appear reasonably objective.

Subjectiveness, however, creeps in when one considers the *number* of points awarded to the various categories.

For instance, a top "leader" might earn a maximum of 150 points for his role, while the highest level of contribution in "discovery, science, and experts," *combined,* could only earn a

maximum of 50 points. Lumping together into a single low-rated category all work on discovery, all on science, and all on experts- which many would place at the heart of a pharmaceutical liability action- is a highly subjective judgment about the worth of those tasks. At the same time, it is a highly questionable judgment because the attorneys who developed and refined the evidence establishing the basis for Merck's liability could only hope to receive 1/3 the amount awarded to the administrative "leaders." There would need to be much more, in our view, to justify relegating the work that exposed Merck's liability in this case to the lowest-valued tier of effort.

Compounding the disparity is the fact that "leaders" likely participated in multiple categories of effort, racking up top points for leadership, more top points for trial participation, more top points for settlement, and perhaps a smattering of points in every other category as well. Those who "only" prepared the evidence that went to trial and drove the settlement, however, could earn only 50 points for their efforts, no matter how much "discovery/science and/experts" they did.

The disparity would not be so dramatic if, as often occurs in MDL cases, the "leaders" were also the attorneys developing the discovery, science, and experts. But in this case, the contributions to those categories were made by entirely different ranks of lawyers. Moreover, as a corollary to this circumstance, "leadership" roles in many instances consisted of low-stress and low-risk administrative work, while the most demanding and riskiest work was performed by those in the trenches. Not surprisingly, Claimants contributed most heavily to the lowly-ranked (in the FAC's analysis) discovery/science/expert category. The attached summary of Claimants' contributions to the common benefits details how, over a period of years, they worked diligently, doggedly, unceasingly, and, in the words of colleagues including PSC and FAC members, invaluably and brilliantly, to develop large segments of the case that drove the settlement. Claimants' witnesses became MDL witnesses. Their exhibits became MDL exhibits. In some instances, it appears that

MDL counsel have sought credit for the work done by Claimants. But there was no "leadership" category for "discovery, science and experts." Therefore the sweat that generated their highly-regarded work product now beads the brows of the FAC's members, along with the fees Claimants' efforts earned.

Of further concern are the numerical allocations themselves. When undersigned counsel began examining the FAC's recommendation in a (failed) effort to decode it, one of the first things to leap from the page was the odd roundness of the numbers in the recommended allocations. One would expect an objective point system, composed of many categories and dispersed across a large number of people, to produce uneven numbers. And that is true of the allocations for some, especially those at the bottom. But the members of the FAC and those in other key positions are slated to receive tidy sums like $6,000,000, $9,000,00, or $20,000,000. Exactly. One might expect some rounding to avoid messy math in the small change. A certain amount of rounding could be simply and unobjectionably achieved by the push of a button. But to the ninth and tenth decimal? Mathematically, how did it work out that way? The tidiness of the amounts awarded to those at the top strongly suggests some sort of predetermination, a fact likely to be proved during upcoming discovery. Perhaps this is how the FAC used its *Johnson* multiplier, enigmatically referenced at the head of a blank column on the grid it refused to produce: as a reverse-engineered means of making the numbers come out "right." The gross size of the amounts recommended to those at the top, and the paltry sums for those at the bottom, are explained, in part, by errors such as the ones discussed below.

### a.   COMMITTEE MEMBERSHIP AND "LEADERSHIP" ARE GROSSLY OVERVALUED.

Perhaps the leading case on common benefit fee division, and certainly the most cited, is the

First Circuit's decision in *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire*

*Litigation*, 56 F.3d 295 (1st Cir. 1995), a mass-disaster case arising from a hotel fire when it

awarded 70% of the fees to members of the plaintiffs' steering committee (PSC) and 30% to the

individually retained plaintiffs' attorneys (IRPAs). The court of appeals was uneasy with the way

in which the lower court "cut the fee pie, and the size and shape of the resultant wedges":

> First, we are troubled by the implications of a scheme in which the trial judge selects
> a chosen few from many lawyers who volunteer, assigns legal tasks to those few
> (thereby dictating, albeit indirectly, the scope of the work remaining to be done by
> the many), and then, in awarding fees, heavily penalizes the very lawyers to whom
> he has relegated the "lesser" duties. Courts must recognize that while such an
> arrangement may be a necessary concomitant to skillful case management of mass
> tort suits, it nevertheless significantly interferes with an attorney's expectations
> regarding the fees that his or her client has agreed to pay. Conversely, lead counsel
> are typically volunteers, as in this case, and, as such, they have no right to harbor any
> expectation beyond a fair day's pay for a fair day's work if a fee fund develops … .
> We believe a trial court should take these differing expectations into account in
> allocating fees. Here, the judge's rescript does not suggest that he factored these
> expectations into the decisional calculus.
>
> Courts must also be sensitive to a second facet of economic reality: the power to
> appoint lead counsel gives the trial judge an unusual degree of control over the
> livelihood of the lawyers who practice before the court. Though such appointments
> are often an administrative necessity in complex litigation, and disproportionate fees
> are at times an unavoidable consequence of the classic common fund "free rider"
> problem, … the judge must attempt to avoid any perception of favoritism.

56 F.3d 295 at 309–12 (footnotes omitted).[8]

---

[8]The perfidy of committee assignments, and how they can be and perhaps were, used as a method
of rewarding favored persons with the possibility of higher fees, or punishing those in disfavor, is
illustrated by an example: Claimant Harry Roth *was slated for a seat on the AG litigation
negotiating committee,* which presumably would have earned him some points for both committee
membership and settlement work (and more importantly assured that his client's unique claims
would be given voice); but he was summarily evicted from the proposed committee post because
his firm hired the undersigned, who filed the first request for information that was granted by this
Court pursuant to *In re High Sulfur I.* In fact, he was told in writing that his "objection" to the
allocation had caused "problems" that cost him his seat, even though no allocation had yet been
made that could be the subject of an objection. All that had been done was to request information.
As an aside, after the preliminary allocation was released, and Mr. Roth's firm did object, his
(continued...)

No one disputes that committee service is deserving of compensation – committees are necessary to the efficient function of the MDL and coordinated litigation model, and attorneys cannot be expected to serve unless they are paid. Moreover, for those on committees who use their seats as an opportunity to do substantial and meaningful work, significant compensation is no doubt due. But, the formula used by the FAC herein rewards committee membership, in some cases more than once, and subjective decides how much of a reward is due based upon its own personal evaluation of the merit of their own contributions. Out of a maximum of 775 points which might be awarded to a claimant, 450 were reserved to those who served a leadership role or on committees. And, a large number of  points could be awarded merely for service, completely unrelated to whether any work was done or the quality of that work.  (Without the completed grid, undersigned counsel cannot determine whether this was done, but regardless, the inequities of the point system are legion.)  Given the massive weight assigned to committee work and leadership, it is hardly surprising that the FAC's aggregate recommended allocation to its members is so high.

While human nature may lead a member of the FAC to value the work he painfully experienced above the unfelt struggles of his comrades-at-arms, the use of objective criteria is meant to moderate this inbred bias.  The FAC's return to a largely subjective analysis explains how it, like the *Dupont Hotel Fire* lawyers, gave itself much too big a slice of the pie.  Those appointed by this Court to serve in committee and leadership roles can be adequately compensated without pillaging the fund – the fund is large enough for all to have their fair shares.

---

[8](...continued)
allocation decreased from $533,920.74 to $500,000 in the final allocation that was submitted to the Court. As of this point a committee has not yet been assigned given the pending stay.

### b.   DISCOVERY, PROCUREMENT OF EXPERTS, AND THE DEVELOPMENT OF THE SCIENTIFIC CASE, WAS GROSSLY UNDERVALUED.

The MDL system is designed to coordinate the work of readying cases for trial, not merely to combine cases for settlement. Indeed, one of the potential abuses of class actions is that a certain breed of lawyer may attempt to move directly from the assertion of a claim to a demand for settlement, using the threat of multiple claims to advance that unsavory objective. As *High Sulfur* observed, "the most commonly feared abuse [in class action litigation] is the possibility that Rule 23 encourages strike suits promoted by attorneys who are simply seeking fat fees." 517 F.3d at 228 (citation omitted). The MDL procedures are designed to aid legitimate trial preparation, not add another arrow to the quiver of a potential strike suit.

Title 28 U.S.C. § 1407(a) provides in relevant part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district **for coordinated or consolidated pretrial proceedings**. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. **Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred** unless it shall have been previously terminated ....

(Emphasis added). While it is true that the Supreme Court has stated that the phrase "coordinated or consolidated pretrial proceedings" is to be interpreted broadly, it is not so broad as to allow a transferee court to ignore the rules of venue or remand, and simply assign cases to itself for trial, as trial and ultimate case resolution is not necessarily the purpose the MDL procedure and is not inherent in it. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) (federal district court conducting pretrial proceedings pursuant to multidistrict litigation statute has no authority to invoke change-of-venue statute to assign

transferred case to itself for trial).

It is impossible to reconcile the FAC's Point Guide with this view of the proper role of MDLs – methods of engaging in pre-trial work, such as discovery and case preparation. While it is now commonplace that cases pending in an MDL get resolved through a global settlement of some sort, to ignore the fact that the *purpose* of MDL work is to prepare cases for trial, not to try bellwether cases for settlement purposes, or to engage in settlement discussions, is to pervert their purpose. To reward those latter types of work more than the former suggests that the real purpose of coordination of cases and the MDL procedure is not to prepare cases to be returned to transferor courts for trial, but instead simply to amass cases in one place in order to facilitate settlement. *Lexecon* tells us differently, when it states that the proper "venue [for expanding the power or focus of an MDL court] remains the floor of Congress."   523 U.S. at 40,  118 S.Ct. 964.

Moreover, despite the fact that most MDLs do in fact end in global settlements, they would not do so without the discovery and case preparation necessary for plaintiffs' counsel to build their cases. And, in drug pharmaceutical litigation, the development of the scientific case,   the procurement of and preparation of expert witnesses, and the development of evidence of the company's marketing fraud is not only important, but is key. For example, in *Murphy Oil II*, this Court awarded the second highest fee allocation to the attorney who "was in charge of the discovery efforts and guided the deposition process," work which was "a key to attacking the Murphy defenses and pushing the defendant to a settlement." *Turner v. Murphy Oil USA, Inc.*, 582 F.Supp.2d 797, 813 (E.D.La. Oct 06, 2008).

The PSC echoed these sentiments when it made these statements in its application for common benefit fees:

> As Merck strenuously defended the safety profile of Vioxx based upon published medical literature in highly regarded medical journals, the common benefit attorneys

were confronted with a strong adversary that was well entrenched with powerful defenses. Undaunted by their adversary, **common benefit counsel carefully dissected the clinical trial data and developed the complex scientific arguments necessary to controvert Merck's medical arguments. These arguments were highly technical and difficult,** yet due to the perseverance of common benefit counsel corrections to the public's knowledge of the flawed science created by Merck was accomplished. *See Correction,* N Engl J Med 2006; 355(2): 221.

Memorandum, at 55 (emphasis added).

Given the purpose of the MDL procedure, the relevance and importance of discovery and development of the technical case in complex drug products liability litigation, and the PSC's own statements that its greatest work was in rebutting Merck's attempt to play a scientific shell game and hide the grave risk of Vioxx, it is shocking that the maximum points that any lawyer could get for such critical work is 50, or 6% of the total point available. The lawyers who engaged in such labors – frequently tedious and always demanding – should not be penalized because they did not insinuate themselves into leadership positions that provided a platform for touting their self-worth. These lawyers did their work largely outside the purview of the court and public, plowing through mountains of records and data sets, studying volumes of scientific and medical texts, and locating and working with experts to build the best case to put before the jury. Their unsung work is and was essential to driving Merck to the settlement table despite its public avowal to try each and every case. One would hope that such efforts would be well rewarded when they bore fruit, as they did here. Certainly, this Court contemplated that they would be, when it repeatedly advised that any attorneys who wanted to work in the case and who coordinated their efforts with the PLC would be compensated for doing so. But the FAC appears to have taken a different view.

To be sure, many of the hours of the up-front lawyers in this litigation contributed significantly to the scientific case. But this Court should not be deceived into thinking that the huge sums they are slated to receive are solely for that work, or that they performed that work in a

vacuum. Rather, the recommended rewards are a consequence of the FAC's creation and weighting of categories in which they received massive points.

Ascribing motive to the FAC's evaluation of the category of "discovery, science and experts" does not advance the evaluation of their effort. It is important to note, though, that the lion's share of work was done in the area of "discovery, science and experts." To compensate that crucial work fairly would have cut into the huge bonuses the MDL elite propose for themselves. As the attachment hereto reveals, Claimants Weinberg and Placitella toiled in quiet seclusion with the encouragement and admiration of their colleagues; they developed the scientific and marketing case that the PSC touts in its request for common benefit fees, but now refuses to pay for. Claimants took the lead on the cardiology/specific causation work that helped win trials in New Jersey and developed and shared FDA and marketing research, discovery, and analysis that undermined Merck's defenses. The shifting of invaluable work into the column of case leaders is unconscionable, and will not withstand even cursory review.

### c.   TRIAL PARTICIPATION AND SUCCESS WAS OVERVALUED.

The FAC gives much credit for trial successes, but completely ignores the other side of the coin.   In the MDL and elsewhere, case after Vioxx case was tried, and most were *lost*. Bewilderingly, the FAC's point system awards high marks for trying a losing case. But in practice, the upshot of these losses was to strengthen Merck's hand and discourage the sort of investment of time and money the plaintiffs' bar had previously devoted to their Vioxx cases. While trial losses may place ongoing pressure on a defendant, a single losing trial, to which the FAC assigns a point value of 40, does not, by any reasonable calculus, warrant receipt of more than 5% of the entire common benefit fund.   This is particularly apparent when the rewards for such questionable

accomplishments are compared to that of attorneys who strove long and mightily to develop *winning* strategies, and who received a maximum of 50 points for all their work.

As the attached summary of Claimants' contributions shows, they offered a notable exception to the string of trial losses. Instead of backing off after setbacks on the national stage, a consortium of lawyers in New Jersey redoubled their efforts, dug deeper, studied harder, developed new experts and lines of analysis, and sought new ways of establishing the liability they believed Merck should bear. Their efforts paid off in winning trials. And then for the common benefit, they shared the means by which they had achieved these successes. If the FAC gave them any credit for pressing on successfully at the time of greatest risk, the credit is certainly not reflected in their proposed compensation.

Another unfairness in the FAC's weighting of its losing "bellwether" trials in the MDL , is the fact that New Jersey cases were ready to be tried, but were deferred, by the PSC's design and at its request, so that the MDL cases could move forward first.

> In Vioxx, the bellwether process was simplified by certain circumstances.... [B]oth the PSC and the DSC wanted an early MDL trial. State cases were ready for trial in Texas and New Jersey. The PSC, the DSC, and the Court did not want the state cases to get too far ahead of the MDL in the actual trial of cases. These factors opened up the field of eligible cases for early MDL trials considerably, resulting in counsel having a much easier time agreeing upon appropriate bellwether cases for early trial.

1 Pharmaceutical and Medical Device Litigation § 17:5 (2010). The New Jersey consortium cooperated in this program for the common benefit. It would be singularly unfair to penalize their cooperation by discounting their time in readying their own cases for trial.

### d.   SETTLEMENT WORK WAS OVERVALUED

The FAC gives great weight (up to 100 points) to the time spent settling the case, an endeavor that was virtually risk-free. As Judge John Grady has observed, "[m]any of the cases

resulting in the largest settlements are undertaken on the assumption that there will be a settlement rather than a trial." In these instances, he concludes, "actual risk of nonpayment for the attorney's services is minimal or entirely absent." John F. Grady, "Reasonable Fees: A suggested Value-Based Analysis for Judges," 84 F.R.D. 131, 136 (1999). By the time the PSC undertook settlement negotiations, a settlement was a foregone conclusion. That is not to say that the work was not difficult or time consuming, only that it did not merit compensation at a rate exceeding the more difficult and riskier work of discovery and expert witness development that brought Merck to the table.

Settlement administration, which is less onerous than settlement itself, could earn the taskmasters *another* 100 points. As this Court observed in *Turner*, such efforts are not of equal value to settlement work: "the hours spent by counsel after the approval of the settlement agreement did not aid in the creation of the settlement fund, and, as a result, this Court concludes it cannot treat the hours spent by those administering the settlement program on a par with the hours spent by counsel who helped create the settlement and the Common Benefit Fund." *Turner*, 582 F. Supp.2d at 811.

Under the FAC's approach, however, such work was worth fully twice the entire "Discovery/Science/Expert" category, which it valued at a maximum of 50 points. And someone who participated in settlement negotiations *and* implementation could earn 200 points, four times the foundational work on "Discovery/Science/and Experts." This sort of subjective aggrandizement of relatively undemanding work helps explain the inequities of the proposed allocation.

    **e.**    **CLIENT REPRESENTATION WAS IGNORED; FINANCIAL RISK WAS MISEVALUATED.**

In the *Dupont Hotel Fire Litigaion*, one of the factors that troubled the First Circuit greatly

was the apparently slim credit accorded to bringing in and managing the clients, whose claims after all are what actually drive a settlement. No amount of good committee work will cause a settlement unless some lawyers take on the significant financial risks of signing up clients and agreeing to try their cases if no global settlement occurs. Of course, committee members do not incur this risk. Their financial contribution is limited to the amount they pay to a cost fund to seed the litigation.

As the First Circuit stated:

> Last—but far from least—we are persuaded, on whole-record review, that it is simply unreasonable to award 70% of the aggregate fees to the attorneys who managed the litigation, leaving only 30% of the Fund to those who brought in the clients and worked hand-in-hand with them throughout the pendency of this long safari of a case. Because mass tort cases are a breed apart, it is difficult to envision situations in which, if fees are divided between lead counsel and individually retained counsel under a POF formula, the latter will not be entitled to at least half the fees.

56 F.3d 295 at 309–12 (footnotes omitted).

The only consideration for "risk" in the FAC's formula is the one that was exclusively borne by it – the financial risk of funding the PSC's work. The other part of the risk equation, the much greater, both in terms of potential exposure and in terms of uncertainty – was borne by the lawyers who actually signed up clients and agreed to try their cases if no settlement were reached. Yet, no points were awarded for the value of this financial commitment to the global settlement, a contribution which seems likely to have been as substantial as all the litigation effort given the losses; it is entirely possible that it was not Merck' fear of losing cases alone that drove the settlement, as much as its actuaries' desires to clear a large potential liability from its books arising from the number of cases pending.[9]

---

[9] One of the considerations that the FAC has advaced for their disproportionate share of the fees is the sacrifice of client representation so that they could serve the needs of the PLC. This consideration would be less compelling if it is revealed through discovery that, through side deals,
(continued...)

In Pre-Trial Order 6(D), this Court clearly contemplated that the FAC would consider risk factors in its allocation. The Court directed all counsel to address in their affidavits, *inter alia*:

- The consistency, quantum, duration, and intensity of each firm's commitment to the litigation;

- Whether counsel was already involved in the Vioxx litigation prior to the withdrawal of Vioxx from the market;

- Whether counsel was involved in the litigation prior to the JPMDL, and the time and expense incurred during such time that was for the common benefit; and

- Any other relevant factors.

Order, 9/15/08, at 4-5. Claimants addressed these and the "other relevant factor" of their sustained dedication to the litigation after it had become less attractive; but the FAC ignored the  risks this Court properly identified as relevant.

---

[9](...continued)

these firms  retained an interest in the fees generated by those surrendered clients, such as with his other related or partner firms.  Moreover, lack of representation of clients is a negative factor, and might even have been a ground upon which attorneys should not have been given leadership responsibility. *See* C. Darby, *Trends and Problems in the Appointment and Compensation of Common Benefit Counsel in Complex Multi-district Litigation: an Empirical Study of Ten Mega MDLs* (July 2010) (cited by this Court in is October 19, 2010 Orders and Reasons at 18 n.4), at 37 ("Although not indicated in the MCL4th, an important qualification for service in the leadership of the MOL was the representation of active plaintiffs in the federal cases. This was required specifically in Vioxx, Baycol and Bextra, but not PPA, Prempro or Zyprexa.").

4.    **THE FAC HAS USED THE COMMON BENEFIT FUND AND FORMULA TO SETTLE CLAIMS BY VARIOUS ATTORNEYS WITHOUT COURT AUTHORITY.**

Another serious flaw with the FAC's allocation is its apparent use of the common fee fund to resolve disputes with previous objectors. For example, the Vioxx Litigation Consortium's previous attack upon this Court's 32% cap on attorneys fees was dropped while pending on appeal, and the reason for this move appears obvious from the Point Guide. Work from Texas state court litigation is specifically awarded extra points that are not awarded for work in either New Jersey or California. Singling out the contributions of Texas counsel while overlooking the substantial efforts of other state attorneys, including Claimants who supported the Texas group, makes no sense unless Texas made some truly unique contribution.   That contribution appears to have been the VLC's decision to drop its appeal.

Similarly, the Chairman of the FAC has informed the undersigned that some of the common fee fund awarded by this Court in its October 19, 2010 order is to be used to pay the "Stratton group, " presumably referring to those persons who objected to the PSC's request for a fee fund based upon an 8% assessment, represented by their liaison counsel Mike Stratton. Of the $315,250,000 awarded by this Court, only $311,885,030.00 has been recommended for allocation. This may mean that the PSC has valued the Stratton Group's willingness to withdraw its objection as a "common benefit" to the settlement class, since it is paying for that withdrawal out of the fund reserve for work done for the common client benefit, and it may values that "work" to the tune of $3,364,970.00, or more than 4.67 times what has been recommended to compensate Claimants for their grueling nose-to-the-grindstone discovery of scientific and marketing matters.

5.   **THE FAC FORMULA DOES NOT ACCOUNT FOR OR DISCLOSE PRIVATE FEE-SHARING AGREEMENTS., WHICH CHANGE THE AMOUNT OF THE ACTUAL ALLOCATION MANY CLAIMANTS WILL ULTIMATELY RECEIVE.**

Hidden within the FAC's fee allocation are multiple fee sharing arrangements that bear significantly on the fairness of the allocation. For example, the firm that received the third-highest hourly rate, Ashcraft & Gerel, LLP ($1325/hr.) is in partnership with FAC member Russ Herman, seventh-rated at $1102/hr. The partnership raises an important question to be raised in discovery: what fee-sharing agreements existed between these and other firms.

6.   **THE RECOMMENDED ALLOCATIONS TO CLAIMANTS DEMONSTRATE HOW THE FAC'S INSUPPORTABLE METHODOLOGY AND FORMULA HAVE PRODUCED AN UNSUSTAINABLE RESULT.**

The attached summary of Claimants' work shows that it was meaningful, and heavily relied upon by the very lawyers who stand to receive top compensation from the common fee fund. Nonetheless, the FAC proposes to reward Claimants' efforts by capturing an enormous share of their time and reapportioning it among its members, partners, and friends. The FAC (represented by 9 of the 109 firms in the pool) proposes to give itself a stunning $230,000,000 of the total available fund of $312,000,000. This represents fully 73% of the total attorneys' fee award, distributed among less the 10% of the pool of lawyers, who contributed less than 43% of the common benefit hours.[10]

The refutation to this gross disparity, if any is needed, can be found in the PSC's own words

---

[10]In *In re: High Sulfur Content Gasoline Products Liability Litigation, supra,* the Court's indignation was aroused by "an order that awarded *almost half* of the $6.85 million fee to the five members of the fee committee and their law firms." (Emphasis supplied). It is not difficult to anticipate how the Fifth Circuit might react to the FAC's allocation of 73% of the award here to themselves and their favored firms.

from its application for fees:

> The skill demonstrated by the common benefit counsel in this litigation is not established by *ipse dixit*. Rather, it has been acknowledged by the Court and its coordinated brothers and sisters of the bench and demonstrated by the common benefit counsel's success in confronting the difficult and complex issues presented by this litigation and in ultimately obtaining so much relief for so many individuals. At the presentation of the Settlement Agreement Judge Higbee favorably commented on the skill of plaintiffs' counsel:
>
>> This is a resolution where people have sat down, some of the most intelligent lawyers in the country, have sat down and advocated for their client's position .... The plaintiffs' lawyers were some of the top lawyers in the country, have in fact fought hard for their clients, and in fact have done everything in their power to protect their clients and to advocate their client's positions. In the end, they came together and spent a long, long time coming to what they believe and what I believe, having looked it over, is a fair resolution of this huge dispute.

Memorandum, at 57-58.

Judge Higbee's words not only *could be* used to describe Claimant Eric Weinberg, she *was* describing Weinberg, part of the New Jersey consortium who practiced before her. As Sol Weiss, co-lead of the New Jersey consortium commented in his testimony to the FAC, "Eric [Weinberg] was the guy who was working up experts and science," and "Eric was one of the lead people that worked the science." (Tr., 12/1/08, pp. 16, 19). In that regard, Mr. Weiss said, Weinberg "was instrumental [in developing] . . .cardiologists that were very good," and in taking "a bunch of Merck's expert cardiologists. . .We gave you [the PSC] the transcripts, . . .with our pleasure." *Id.,* at 19. Similarly, according to Washington D.C.-based attorney Daniel Sigelman, "Eric was interested in the panoply of all things that Vioxx did. And I think that we were thinking in a creative way of whether we could get into other things in terms of risk/benefit." (Tr., 12/1/08, p. 29). That creative approach, said Mr. Sigelman, led them to the "momentous finding" of Merck's deceptive manipulation of its clinical trial test results for Vioxx. *Id.,* at 26. Chris Placitella's discovery on

Merck's marketing of Vioxx, which created the marketing case that was successfully used in numerous trials, and which attorney Mark Lanier has admitted in a recent seminar was the basis for his three wins in Vioxx cases. These are only examples of the invaluable work Judge Higbee saw Claimants perform, and which she considered to be a driving force in the global settlement.

7.  **THE FAC'S RECOMMENDED ALLOCATION IS NOT ENTITLED TO ANY PRESUMPTIVE WEIGHT OR DEFERENCE, AND IN FACT, DUE TO ITS FUNDAMENTAL FLAWS, IS ESSENTIALLY MEANINGLESS.**

In *Murphy Oil II*, this Court approved the use of the allocation committee approach to recommend division of fees, but noted the following:

> The Fifth Circuit has approved of the appointment of such a fee committee. However, when a fee committee is appointed, the Court must maintain close supervision of the committee and "closely scrutinize" any recommendation from the committee. *In re High Sulfur Content Gasoline Products Liab. Litig.*, 517 F.3d 220, 235 (5th Cir.2008). This is so because there are conflicts of interest inherent in appointing a fee committee: the members of the committee suggest to the court a division of a limited fund among themselves and other firms. *In re High Sulfur Content*, 517 F.3d at 235 (citing *In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3d Cir.2005) (Ambro, J., concurring)).

582 F.Supp.2d at, 801 n.8. Indeed, as the Fifth Circuit also stated in the quoted case:

> [O]ur precedents do not permit courts simply to defer to a fee allocation proposed by a select committee of attorneys, in no small part, because *235 "counsel have inherent conflicts." *In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3d Cir.2005) (Ambro, J., concurring). As Judge Ambro noted, "They make recommendations on their own fees and thus have a financial interest in the outcome. **How much deference is due the fox who recommends how to divvy up the chickens?"**

*In re High Sulfur Content* II , 517 F.3d at 234-35 (emphasis added).

In conclusion, the *High Sulfur* court declared that "[s]uch a direct conflict of interest [created by an allocating committee's 'dividing a limited fund among themselves and other firms] strongly suggests that affording substantial deference is inappropriate." 517 F.3d at 235, quoting *In re Diet*

*Drugs*, 401 F. 3d at 173-174 (Ambro, J., concurring).

Deference is particularly unwarranted here. The Fifth Circuit attaches "a strong presumption [to] the reasonableness of the lodestar amount," *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 800, which the FAC has removed from its equation.

> **8.   A PROPER ALLOCATION   CANNOT BE PROPOSED AT THIS TIME BECAUSE OF THE NEED FOR DISCOVERY, BUT CLAIMANTS SUGGEST THAT $33,000,000 MUST BE RESERVED TO SATISFY THEIR CLAIMS.**

Claimants are mindful of this Court's directive that objections to the FAC's recommendations include a specific dollar amount to which each Claimant believes he is entitled. As undersigned counsel have stated in a number of recent requests for additional data, the FAC's lack of transparency to this point has made compliance with this Court's directive impossible. Accordingly, Claimants object to this component of the Court's January 20, 2011 Order (Docket Entry No. 60391).

This is because Claimants cannot calculate their slice of the pie except in relation to all other slices. "Allocation means proportion; how does the share lead counsel is taking compare to the shares others are getting?" *In re Vitamins Antitrust Litig.*, 398 F. Supp.2d 209 , 234 (D.D.C. 2005). At this juncture, Claimants do not know what their share should be; they only want to be treated fairly and compensated under a lawful allocation, which as we have demonstrated above most certainly has not occurred in the FAC's recommendation.

The problem is heightened from that the finite pie to be divided. If Claimants' fees were not to be drawn from a limited fund, they could responsibly claim any amount supported by the value their time contributed to the common benefit. But the fees to be allocated here *are* drawn from a limited fund, which means that any inflated claim perforce inflicts damage on other worthies. This

is why courts, including this Court, have so often emphasized the importance of a comparative analysis in limited fund cases.

Reluctant to defy this Court's order, however, Claimants are compelled to make a suggestion as to what their compensation should be. In an effort to ensure that they do not waive any right to sums to which they might later be found entitled, but to limit their demand to something justifiable and not simply pick a number out of the air, Claimants propose that the analysis should begin with a lodestar and then apply a multiplier. The lodestar must be based upon the blended average rate accepted by this Court, in order to compare apples to apples (we do not yet have the actual rates charged by the other claimants in order to calculate actual lodestars. As to multiplier, Claimants will apply the highest one embedded in the FAC's allocation 4.97 percent. Since they do not know what led to this rate, and see nothing that differentiates their work from that performed by the firm that received that rate, they see no reason to offer a use a lower one at this time. This produces the following amounts:

> Eric Weinberg- hours (10,361.75) X blended hourly rate ($443.23) X multiplier (4/97)
> $22,892.945.00
>
> Cohen, Placitella- hours (4,964) X blended hourly rate ($443.23) X multiplier (4.97)
> $10,952,746.00

These figures are indefensible in that they do not take into account the contributions of the other attorneys who are to share the limited fund.  On the other hand, they far more closely approximate the methodology dictated by the jurisprudence than the FAC's calculations.  They are offered with all respect for this Court's Order, but also at the same time to ensure that Claimants rights are fully protected by offering a number that might "leave money on the table."  Claimants do not want anything more than their fair share. When it is possible to assign a more reliable number to that slice of the pie, they will of course promptly do so.

    **B.**    **THIS COURT HAS NO AUTHORITY, THROUGH A FAC OR OTHERWISE, TO EITHER GRANT OR LIMIT A COMMON BENEFIT AWARD OF FEES GENERATED IN STATE COURT CASES FOR WORK DONE IN STATE COURT.**

        **1.**    **THIS COURT'S AUTHORITY, EITHER AS AN MDL TRANSFEREE COURT, OR AS AN ARTICLE III COURT, DOES NOT EXTEND TO CASES PENDING IN STATE COURT, NOR TO FEES GENERATED THEREFROM.**

"[F]ederal courts are courts of limited jurisdiction, having 'only the authority endowed by the Constitution and that conferred by Congress.'" *Epps v. Bexar-Medina-Atascosa Counties Water Improvement Dist. No. 1*, 665 F.2d 594, 595 (5th Cir.1982), quoting *Save The Bay, Inc. v. United States Army*, 639 F.2d 1100, 1102 (5th Cir. 1981). Absent jurisdiction conferred by statute, district courts lack power to consider claims. *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994).

This Court's status as an MDL transferee court gives it no jurisdiction or authority over state court cases. "One of the most significant limitations on the effectiveness of transfer by the Judicial Panel on Multidistrict Litigation is the inability, on jurisdictional grounds, to transfer state and federal cases for coordinated proceedings. " *Man. Complex Lit.* § 20.3. *See also The Mechanics of Motion Practice Before the Judicial Panel on Multidistrict Litigation*, 175 F.R.D. 589, 603 (02/1998) ("The Panel has no power over state court actions."). *See e.g.*, *In re Celotex Corp. "Technifoam" Products Liability Litigation*, 68 F.R.D. 502, 504 n.2 (J.P.M.L. 1975) ("The Panel, of course, does not have the power under Section 1407 to consider the propriety of coordinated or consolidated pretrial proceedings in state court actions...."); *Coy Chiropractic Health Center, Inc. v. Travelers Cas. & Surety Co.*, (NO. 06-CV-678 DRH) 2007 WL 2219102, *2 (S.D.Ill. Jul 27, 2007) (JPML cannot transfer actions that are pending in state court).

The Multidistrict Litigation Manual addresses the issue, and categorically concludes that there is no federal jurisdiction over parallel state court cases. § 3:13 is entitled: " Limitations on Panel's power—No power over state court cases."

> The Panel has no authority over actions pending in state courts. This limitation on the Panel's authority is part of the inherently limited jurisdiction of federal courts and is therefore fundamentally inflexible.

*Multidistrict Lit. Man.* § 3:13 (2009)

The lack of jurisdiction extends to assessment of attorneys fees to compensate for "common benefit work." The most recent case on this issue is the decision of Judge Perry in *In re Genetically Modified Rice Litigation*, which this Court cited with approval on other points in its October 19, 2010 Order and Reasons:

> Plaintiffs' leadership group asks me to include the state court cases in this order, so that defendants would be required to hold back and contribute a portion of any settlements or judgments from those cases as well as from the MDL cases. As stated above, I do not have jurisdiction to do this.

> The leading case on this question is *In re Showa Denko K.K. L-Tryptophan Products Liability Litigation-I*, 953 F.2d 162 (4th Cir.1992). In that case the Fourth Circuit Court of Appeals reviewed an MDL district court's order of a set-aside that applied not only to the cases transferred to the MDL court, but also to state cases, non-transferred federal cases, and unfiled claims that might be settled and not litigated. The Fourth Circuit found that the trial court did not have jurisdiction to order the contributions from parties who were not before it. The court stated that the authority to consolidate cases before one MDL judge "is merely procedural and does not expand the jurisdiction of the district court to which the cases are transferred." *Id.* at 166-67. Most cases considering this issue have reached the same conclusion.

> In *Hartland v. Alaska Airlines*, 544 F.2d 992, 1001 (9th Cir.1976), the Ninth Circuit reversed a similar district court order, holding that the court "had not even a semblance of jurisdiction" to order non-parties to contribute to a common benefit fund. Accord *In re Zyprexa Products Liability Litigation*, 467 F.Supp.2d 256 (E.D.N.Y.2006); *In re Baycol Products Litigation*, No. MDL 1431, 2004 WL 190272 (D.Minn. Jan. 29, 2004); *In re Linerboard Antitrust Litigation*, 292 F.Supp.2d 644, 663-64 (E.D.Pa.2003). * * * I have no jurisdiction over the state cases and I cannot order the defendants to withhold amounts they may end up owing the state plaintiffs.

-40-

*In re Genetically Modified Rice Litigation,* (NO. 4:06 MD 1811 CDP) 2010 WL 716190, at *4-5

(E.D.Mo. Feb 24, 2010).[11]  *See also In re Baycol Products,* (NO. MDL 1431) 2004 WL 1058105

(D.C Minn. May 03, 2004) ("The Court concurs with the *Showa Denko* and *Linerboard* [292

F.Supp.2d 644, 664 (E.D.Pa.2003)] courts: 'a transferee court's jurisdiction in multi-district litigation

is limited to cases and controversies between persons who are properly parties to the cases

transferred.' *Showa Denko,* 953 F.2d at 165-66; *Linerboard,* 393 F.Supp.2d at 664.)".

This is not to say that the assessments Claimants have paid are unlawful, or should be

returned. They agreed to pay the assessment in the Master Settlement Agreement, and they are

contractually obligated to pay those amounts. As this Court stated in its October 19th Order:

> In addition to equity, quantum meruit, and inherent managerial authority, the Court
> derives express authority in this case from the terms of the Settlement Agreement
> entered into by the parties and consented to by their primary attorneys. Section 9.2
> of the Settlement Agreement governs common benefit fees and expressly authorizes
> the Court to determine common benefit attorneys' fees. Settlement Agreement §
> 9.2.5  In fact the PLC asks the Court to exercise the aforementioned authority and
> award common benefit fees under the terms of the Settlement Agreement.

Order and Reasons, Oct 19, 2011, at 6.

This statement is, with all due respect, only partially correct. The imposition of an

assessment against all those participating in the settlement is a matter of contract law, and

accordingly the assessments were properly collected. The statement errs, however, in its conclusion

that, simply because the parties could agree to pay the assessment, they could also give this Court

---

[11]Interestingly, Judge Perry disposed of an argument made to her that the instant case was authority
for the proposition that she had jurisdiction over state cases by finding that in "*In re Vioxx Products
Liability Litigation,* 650 F.Supp.2d 549 (E.D.La.2009), ... the court there appears to have been
granted the necessary authority by a settlement agreement. In any event, although it states that an
MDL proceeding may be treated as a "quasi-class action," it does not support the argument that I
can act without jurisdiction.." *In re Genetically Modified Rice Litigation, supra,* at *5 n.4. Further,
as discussed *infra,* this Court was not granted the necessary authority by the MSA.

any, much less exclusive, jurisdiction over how those assessments would be disbursed. For assessments emanating from cases pending in this MDL, this Court undoubtedly has authority over those funds. But, for assessments emanating from cases that were pending in state court, this Court has no jurisdiction to allocate or disburse those funds. As will be explained below, that authority rests exclusively with the parties to the Settlement Agreement, and absent unanimous consent, it is vested in those courts in which the cases that generated the funds were pending – in Claimants' case, New Jersey state court.

<blockquote>

**2.     THERE IS NO BASIS FOR THIS COURT'S EXERCISE OF JURISDICTION OVER THE CONTRACTUALLY PAID ASSESSMENTS EMANATING FROM STATE COURT CASES.**

**a.     THERE IS NO GENERAL OR INHERENT JURISDICTION.**

</blockquote>

This Court expressed the view that in addition to the powers granted under the MSA, it has jurisdiction over the state court cases under some reservoir of "inherent" authority.  In its order capping attorneys fees, this Court found that it had  "equitable authority over the settlement" and "inherent authority to exercise ethical supervision over the parties," as well as "express authority under the terms of the Settlement Agreement" to review all fee contracts for reasonableness "regardless of whether the claimants filed their cases in state or federal courts," citing *In re Guidant*, 2008 WL 682174, at *19 (capping contingent fees in global settlement pursuant to "the Court's general equitable powers, the Court's inherent authority to exercise ethical supervision over [the] global settlement, and the Court's inherent authority to review contingency fees for fairness"). Order and Reasons, 8/27/08 (Docket Entry No. 15722), at 14.[12] It expanded that power to supervise

---

[12]It may be that this Court did in fact have jurisdiction to cap attorney fees in state court cases by virtue of the personal jurisdiction it had over the lawyers who made appearances in the MDL. Its authority to regulate the bar and supervise attorneys before it may be broad enough to allow it to
(continued...)

and administer the contractually paid assessments, regardless of their source, pursuant to "its inherent authority over the MDL proceedings," as well as the powers granted under the MSA, citing *the Manual for Complex Litigation* (Fourth) §§ 10.224, 14.215-16, 14.231-.216 (2004).  Order and Reasons, 10/19/10 (Docket Entry No. 54040), at 7 and n.11

With all due respect, there is no such reservoir of "inherent" authority to exercise jurisdiction over state court litigation that otherwise does not meet the jurisdictional requirements of 28 U.S.C. §1331 (federal question) or 28 U.S.C. §1332 (diversity of citizenship).  Undoubtedly, federal courts do possess "inherent" powers necessary to preside over the cases otherwise before them , such as the power to sanction for vexatious or abusive conduct. *See  Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). But these powers are extremely limited, and certainly do not extend to cases that are not before the Court. *See Crowe v. Smith*, 151 F.3d 217 (5th Cir. 1998), *cert. denied*, 526 U.S. 1158, 119 S.Ct. 2047, 144 L.Ed.2d 214 (1999), quoting *Chambers, supra*, 501 U.S. at 42, 111 S.Ct. 2123 ("The inherent power 'is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function.'"). They do not serve as an independent basis of jurisdiction.[13] As the Second Circuit

------

(...continued)

make sure that these attorneys did not overcharge their clients in state court cases. However, the existence of this authority, which is a matter of regulating legal ethics, is not at issue herein, and has no relationship with the asserted authority to divide up a fund that the lawyers had no ethical obligation to create, have no ethical obligation to share, and which exists only because of their private contractual agreement. Moreover, this Court noted in its order that its authority did not supersede state authority where state law was more restrictive. *See* Order and Reasons, 8/27/09 (Docket Entry No. 15722) , at n.15. This is the case in New Jersey, where court rules are more restrictive than this Court's 32% cap. *See* New Jersey Court Rule 1:21-7B.

[13]The only exception may be the Supreme Court's power to review the constitutionality of acts of Congress, *see Marbury v. Madison*, 1 Cranch, 137, 158, 161, 2 L.Ed. 60 (1803), but even that power does not extend to lower federal courts, which are purely creatures of the legislative branch.

-43-

observed in discussing the scope of inherent power:

> "[t]he lower federal courts are creatures of statute." *Armstrong*, 470 F.3d at 102. As such, their "jurisdiction is defined by written law, [and] cannot transcend that jurisdiction." *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 93, 2 L.Ed. 554 (1807).

*Xiao Xing Ni v. Gonzales*, 494 F.3d 260, 266 (2nd Cir. 2007). Indeed, even the expressly granted

power to issue writs "in aid of jurisdiction" under the All Writs Act, 28 U.S.C. § 1651(a),[14] does not

grant jurisdiction to federal courts over cases not otherwise before them. *See U.S. v. Denedo*, – US

--, 29 S.Ct. 2213, 2222, 173 L.Ed.2d 1235 (2009) (The All Writs Act and the extraordinary relief

the statute authorizes are not a source of subject-matter jurisdiction); *Texas v. Real Parties in*

*Interest*, 259 F.3d 387, 392 (5th Cir.2001), *cert. denied*, 534 U.S. 1115, 122 S.Ct. 924, 151 L.Ed.2d

887 (2002) ("[A]lmost 200 years of Supreme Court precedent establishes that the Act, originally

enacted as part of the Judiciary Act of 1789, cannot serve as an independent basis of jurisdiction.").

> *In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*, (No. mdl-

05-1708), 2008 WL 682174 (D.C. MN Mar 07, 2008), does not support the existence of jurisdiction

here. In that case, Judge Donovan had entered a pre-trial order, applicable to federal and state cases,

that any attorney who signed an agreement to pay an assessment into a common fee fund would

have access to the MDL work product. In discussing his power to do so, he relied upon the

following Supreme Court cases for his "unjust enrichment" conclusion:

> *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) ("[P]ersons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.... **Jurisdiction over the fund involved in the litigation** allows a court to prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit."); *Hall v. Cole*, 412 U.S. 1, 5-6, 93 S.Ct. 1943, 36

---

[14] "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

L.Ed.2d 702 (1973) (stating that one exception to the American rule "involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where **the court's jurisdiction over the subject matter of the suit** makes possible an award that will operate to spread the costs proportionately among them' ") (quoting *Mills v. Elec. Auto-Lite*, 396 U.S. 375, 393-94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)).

*In re Guidant, supra*, at \*4 (emphasis added). Clearly Judge Donovan did not suggest, or hold, that the need to prevent "unjust enrichment" gave rise to jurisdiction he did not otherwise enjoy. He had jurisdiction because a fund was created as a result of the order he issued in cases in which he had jurisdiction, offering to share the benefit of those cases with state court lawyers *who signed on to share work.*[15]

Such jurisdiction does not exist here. The fund that the Court proposes to divide was not created as a result of any order entered by it in cases otherwise before it. Pre-trial Order 19's "early bird special" Participation Agreement arrangement was recommended by the PSC precisely to induce attorneys with state court cases that would otherwise be beyond this Court's jurisdiction to agree to pay an assessment. *See* C. Darby, *supra*, at 46. However, that assessment scheme was superseded by a higher assessment of 8% in the MSA, which assessment was purely a matter of private agreement between the parties to that settlement. For cases which were not pending before this Court, it cannot be fairly said that any moneys assessed from those cases arose out of litigation over which this Court had jurisdiction. Accordingly, unlike in *Guidant*, disposition of those funds is not within the authority of this Court.

---

[15]This approach is not unusual. A recent study of "mega MDLs" by the Federal Judicial Center noted that, in the ten largest MDLs to date, including Vioxx, "[i]n the cases where a common benefit fund was authorized or established, assessment rates for common benefit work depended on whether the settlement occurred in a federal case consolidated in the MDL or in a related state court case where the plaintiff had agreed to the assessment in exchange for common discovery." C. Darby, *Trends and Problems in the Appointment and Compensation of Common Benefit Counsel in Complex Multidistrict Litigation: an Empirical Study of Ten Mega MDLs* (July 2010), at 45.

Moreover, the principles of unjust enrichment which drove the *Guidant* result are inapposite here. Claimants Placitella and Weinberg and many others like them never signed any of Pre-Trial Order 19's Participation Agreements; nor did they agree to the assessment imposed by Pre-Trial Order 37 as a price for access to the MDL trial package. Because Claimants did not accept the PLC's offer to share in its work product, the PLC withheld its product while simultaneously sharing in Claimants' work product.

Instead of relying on the inapposite *Guidant*, the Court should have been guided by Judge Weinstein's decision in the *Zyprexa* MDL. There, the PSC that was created after a global settlement had been announced (PSC II) sought to have an assessment order entered that would allow compensation for work done by them post-settlement on remaining or new cases. Judge Weinstein, granted their request, but refused to include cases pending in state court:

> PSC II seeks to hold back for use in the common benefit fund a percentage of attorneys' fee recoveries in state cases where the state plaintiffs' attorney also represents federal plaintiffs. The question of a federal court's power to impose a compensation scheme on state plaintiffs has apparently not been decided by the Court of Appeals for the Second Circuit. The only Court of Appeals to have squarely addressed the issue held that "a transferee court's jurisdiction in multi-district litigation is limited to cases and controversies between persons who are properly parties to the cases transferred, and any attempt without service of process to reach others who are unrelated is beyond the court's power." *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.*, 953 F.2d 162, 165-66 (4th Cir.1992).
>
> \* \* \* \* \*
>
> **The issue of assessing state cases with the costs of a discovery process that benefits all cases, state and federal, should, in the first instance, be left to state court judges**. This court has suggested that the parties voluntarily resolve the issue of payment for PSC II's work by agreeing that attorneys in state cases will assume an equitable proportionate share of the costs of discovery in this litigation.

*In re Zyprexa Products Liability Litigation*, 467 F.Supp.2d 256, 268-69  (D.C. N.Y., 2006)

(emphasis added).[16]

Aside from *Guidant*, the other authority relied upon by this Court – sections from the *Manual for Complex Litigation* – do not stand for the proposition that it has jurisdiction over fees generated from state court cases. § 10.224 discusses the obligation of the court to individually screen those appointed for committee positions, and the criteria that should be used to guide that determination. § 14.215 and 14.216 state that early on in the litigation the court should set forth the means and guidelines for compensating those appointed to committee positions, and that this should cover expenses as well as fees. § 14.231 discusses various options available to the Court for reviewing fee requests, such as sampling of billing records, auditing, or use of special masters. None of these sections, or anything else in the *Manual,* suggests that there is an inherent reservoir of unspecified jurisdiction over state court cases that transferee courts that transcend Article III of the Constitution and are more expansive than those expressly granted by Congress.

Perhaps this Court's assumption that jurisdiction exists  arises from the view that because this MDL has devolved into a "quasi class action," it possesses all the powers of a court managing a properly certified class.  *See* Order and Reasons, 8/27/08 (Docket Entry No. 15722), at 9 ("[T]he Court finds that the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness."). Were this a class action, undoubtedly all those persons who opted into the class by partaking in the settlement would subject their claims and cases to this Court's jurisdiction, including cases already filed and pending in state court. But, this is not a class action. In order for it to be one, it would have had to be eligible for certification as a litigation class, which this Court expressly held was not the

---

[16]*See* note 12, *supra* for the conclusion of the *Zyprexa* story.

-47-

case. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997;

Order and Reasons (#8875), 11/22/06, denying class certification. Further, had it been certified as

a class, the MSA could not have been implemented absent notice, an opportunity to opt out, and

most importantly, a fairness hearing, none of which occurred.

    While it is laudable for this Court to attempt to craft a method by which federal and state

claims could be settled globally subject to the jurisdiction of only one Court, it cannot create a

solution not sanctioned by either the Constitution or by Congress. As the Supreme Court made clear

when severely limiting the use of "settlement only" classes, despite their obvious advantage as a

means of efficient management of mass tort litigation:

> The Rules Enabling Act underscores the need for caution. As we said in *Amchem*,
> no reading of the Rule can ignore the Act's mandate that "rules of procedure 'shall
> not abridge, enlarge or modify any substantive right,' " *Amchem*, 521 U.S., at 613,
> 117 S.Ct. 2231 (quoting 28 U.S.C. § 2072(b)).

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845, 119 S.Ct. 2295, 2314, 144 L.Ed.2d 715 (1999). Given

that the MSA does not even represent a class settlement, it is hard to understand how its existence

can enlarge this Court's jurisdictional base to encompass state court cases.

    Finally, comment should be made upon the view that the foundation of this Court's

jurisdiction might be the existence of a "fund" over which it has authority.   While this Court may

have *possession* of a fund, that fact is distinct from the question of whether it has *jurisdiction* to

adjudicate its allocation or distribution.[17] Such jurisdiction over funds exists only if they arise from

---

[17]There is a "fund" only the loosest sense of the term – an aggregation of individual payments into
a common account. There is no "fund" in the way that term is commonly used in common benefit
cases – an undivided sum of money to which multiple plaintiffs have a claim. Here, each plaintiff's
settlement was an individual, private, contractual arrangement, producing discreet recovery for him
or her. This Court ordered that a portion of those individual settlements be held back and placed
into a single account. The merging of those individual contributions does not create a "fund" as that
    (continued...)

cases in which this Court otherwise had subject matter jurisdiction – *i.e.*, the MDL cases.  This is because *in rem* jurisdiction is a species of personal, not subject matter, jurisdiction. *See Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F.Supp.2d 656, 656 n.1. D.C. Mich 2001), noting the confusion over, but distinguishing, subject matter and *in rem* jurisdiction.  "It is well-settled that subject matter jurisdiction and *in rem* jurisdiction are distinct." *Kristensons-Petroleum, Inc. v. Sealock Tanker Co., Ltd.*, 304 F.Supp.2d 584, 589 (D.C. N.Y. 2004), citing *inter alia Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 296-97, 298 (2d Cir.2002).  Accordingly, neither the existence of a "fund", not this Court's possession of it pursuant to previously issued orders, can bootstrap the fund into this Court's jurisdiction.

### b.   THE MASTER SETTLEMENT AGREEMENT CANNOT IMBUE THIS COURT WITH JURISDICTION IT DOES NOT OTHERWISE ENJOY.

The terms of the MSA appear to support this Court's exercise of jurisdiction over state court cases not pending before it.  For example, in Pretrial Order 51, appointment the FAC, the Court stated that "Section 9.2.2 of the Settlement Agreement provides that "Common Benefit Attorneys shall [also] be entitled to reimbursement of their reasonable common benefit expenses" and that "Reimbursement of these expenses shall be deducted from the client's net recovery."

However, parties may not confer jurisdiction by stipulation. *California v. LaRue*, 409 U.S. 109, 112, n 3, 93 S.Ct. 390, 393 n.3, 34 L.Ed.2d 342 (1972).  Parties can never consent to federal subject matter jurisdiction, and lack of such jurisdiction is defense which cannot be waived. *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996).  Thus, for example, there is no federal jurisdiction in a suit

---

[17](...continued)
term is contemplated by the common fund doctrine.

that, "[s]tripped to its essentials, [sought] enforcement of state-created contract rights, even though those right were recognized in a federal judgment, under either federal question jurisdiction or All Writs Act. *See Epps v. Bexar-Medina-Atascosa Counties Water Improvement Dist. No. 1*, supra 665 F.2d at 594-95.

Likewise, there is no federal jurisdiction here with regard to continued "administration" of the purely private settlement, no matter how much it looks like a class action, no matter how many lawsuits it resolved, and no matter that the parties would like the federal court to assume jurisdiction. The settlement creates contractual rights under state law. To the extent that there is any lingering jurisdiction, it exists only in the courts in which cases resolved by the settlement were pending. Even if all the cases resolved by the MSA were federal cases, this Court would not have automatic ancillary jurisdiction. *See In Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 378-382, 114 S.Ct. 1673, 1676-77, 128 L.Ed.2d 391 (1994), where the Supreme Court held district courts do not have inherent power, that is, automatic ancillary jurisdiction, to enforce an agreement settling federal litigation.[18] *A fortiori*, it does not have jurisdiction over assessments emanating out of cases over which it never had jurisdiction to begin with.

**3.    COMMON BENEFIT COMPENSATION FOR STATE COURT LITIGATION MUST BE FIXED BY STATE COURT JUDGES, WHO ARE THE ONLY ONES WHO HAVE JURISDICTION OVER THE FEES GENERATED IN THOSE CASES.**

There is no dispute that the assessment agreed to in the MSA is due as a matter of contract

---

[18]Ancillary jurisdiction to enforce a settlement agreement exists only "if the parties' obligation to comply with the terms of the settlement agreement [is] made part of the order of dismissal – either by ... a provision 'retaining jurisdiction' over the settlement agreement ... or by incorporat[ion of] the terms of the settlement agreement in the order." *Kokkonen, surpa*, 511 U.S. at 381, 114 S.Ct. at 1677.

law, and to the extent that no one has challenged this Court's finding that 6.5% is a more reasonable

sum than the 8% specified, the MSA has been modified by the agreement of the parties. However,

the parties cannot agree to grant this Court jurisdiction over that fund. To the extent that a large

portion of it was generated in state court litigation pending in various jurisdictions, the state court

judges have exclusive jurisdiction to enter orders relating to how the fees generated from their cases

should be disbursed. With regard to New Jersey, where all of claimant Weinberg's and Placitella's

cases were pending,[19] and which state's litigation generated the largest contribution to the fund,

Judge Higbee is the proper judge to determine how assessments paid from New Jersey state court

cases should be allocated. Cf. *Miener By and Through Miener v. Missouri Dept. of Mental Health*,

62 F.3d 1126, 1127 (8th Cir. 1995), citing *Kokkonen, supra* ("[The] enforcement of the settlement

agreement is for state courts, unless there is some independent basis for federal jurisdiction.'").[20]

---

[19]Neither Weinberg nor Placitella had any clients with cases that were transferred to the MDL.

[20]There is no question of Judge Higbee's authority. New Jersey Court Rule 4:38A, implemented by Directive 7-09 of the New Jersey Supreme Court, grants courts presiding over consolidated litigation, such as Vioxx, broad powers. This includes the power to assess and award common benefit fees. *See Sutter v. Horizon Blue Cross Blue Shield of New Jersey*, 406 N.J.Super. 86, 104, 966 A.2d 508, 519 (2009). In fact, on one occasion at least Judge Higbee has already used this authority, where on Nov. 5, 2009, she adopted this Court's Pre-Trial Order 51 imposing a 1% assessment against client recovery.

### 4. THIS COURT'S LACK OF JURISDICTION IS PROPERLY RAISED AT THIS TIME.

28 U.S.C. § 1291 provides that a decision may not be appealed unless it is "final."

A decision is "final" within the meaning of section 1291 if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 373, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981) (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978)).

*Southern Travel Club, Inc. v. Carnival Air Lines, Inc.*, 986 F.2d 125, 129-130 (5TH Cir 1993).

The judgment that will be issued by this Court either approving, rejecting or modifying the FAC's recommended allocation is the first judgment which has the potential of having appealable "finality" with regard to the fees assessed under the MSA.[21] Thus far, this Court has not issued an order or judgment awarding a sum certain to any person or entity who has standing to appeal. Its October 19, 2010 Order was not "final" because it fixed the amount of a fund, but did not award that fund to a juridical person with standing to contest its ruling "[A]n order awarding attorney's fees or costs is not reviewable on appeal until the award is reduced to a sum certain." *Southern Travel Club, Inc. v. Carnival Air Lines, Inc., supra*, 986 F.2d at 130 (5TH Cir 1993). "Where an order does not finally dispose of a fee petition" and neither "determines ... the total amount of fees due ... nor [the] absolute entitlement to attorney's fees," the judgment is not final. *Pigford v. Veneman, supra*, 369 F.3d at 547, quoting *Rosenfeld v. U.S.*, 859 F.2d 717, 720 (9th Cir. 1988), and citing *Trout v. Garrett*, 891 F.2d 332, 335 (D.C.Cir. 1989).

---

[21]The judgment may not be "final" if this Court were to, for example, disburse some of funds at issue, but not all, or remand the matter back to the Special Master for further findings, even if part of his report was adopted. *See e.g., In re Diet Drugs Products Liability Litigation*, 401 F.3d 143 (3rd Cir. 2005); *Pigford v. Veneman*, 369 F.3d 545 (D.C. Cir. 2004).

These principles are illustrated in operation in a context similar to the posture of the instant

case in the *Zyprexa* litigation. Recall that Judge Weinstein refused to impose an assessment against

cases pending in state court. However, he did impose an assessment against state court cases that

were removed to federal court even if improvidently removed. If those cases happened to settle

before he considered a motion to remand, the assessment was imposed because the cases were then

before him. One attorney, who had over 2000 clients which fell into this catch-trap, sought an appeal

from Judge Weinstein's imposition of an assessment against his state court cases improvidently

removed to federal court. The Second Circuit found that the appeal was improper because there was

no final judgment from which to appeal – funds had been withheld, but there was no order

disbursing them. *See In re Zyprexa Products Liability Litigation*, 594 F.3d 113 (2nd Cir. 2010). "As

of the date of oral argument, however, the court below had not awarded any fees or costs out of the

fund. Mulligan acknowledges that it will have the opportunity to oppose any award of fees in the

event fee applications are filed." 594 F.2d at 121.  This is precisely the situation in this case up to

now, where there has been no order from this Court making any award out of the common fee fund.[22]

Accordingly, now is the appropriate time to raise this Court's jurisdiction over the non-MDL

portion of the MSA's common fee fund. Assuming that the issue of subject matter jurisdiction could

---

[22]There is a coda to the *Zyprexa* case that might illustrate the path forward once that occurs. In
dismissing the appeals, the Second Circuit also refused to convert the appeals into a writ of
mandamus, finding that a showing of exigency sufficient to justify the extraordinary writ had not
been made. Once a disbursement ordered issued, the situation might well be different. *See* 594 F.2d
at 134, Kaplan, J. Concurring ("At least until the district court actually awards fees out of the
common benefit fund, however, Mulligan cannot demonstrate a need for traditional mandamus
because it has not yet suffered any injury."). While Judge Kaplan ultimately concluded that in his
view mandamus would not lie because the district court committed no error in assessing cases
pending before it even if improvidently removed, that conclusion is not relevant here since claimants
cases, nor the bulk of the New Jersey cases, were ever removed – New Jersey is Merck's principal
place of business.

ever be subject to a claim of waiver, there has been no issue before this Court where the issue would have been appropriate to raise because nothing thus far has had the potentiality of finality. Moreover, since no prior judgments were final, none of them could constitute *res judicata* on the issue of jurisdiction. For this reason, claimants are free to and feel constrained to question the authority of this Court to administer the MSA's common fee fund insofar as it contains funds generated from state court cases.[23] Despite their respect for this Court's authority, and their admiration of its valiant attempt to craft a path to global resolution in a single jurisdiction, their position as officers of the court constrain them to point out that the jurisdiction to attain that goal simply does not exist here.

## III.   CONCLUSION

The FAC has reinvented the wheel of MDL fee allocation formulas, concealed its wheel within coded gears designed to obfuscate its square shape, and then outfitted the juggernaut with spokes designed to prevent close scrutiny of its own ride to riches. But the numbers cannot lie: there is something seriously wrong with an inordinate concentration of fees among those who prepared the allocation, achieved at the expense of those whose work contributed heavily to the outcome of the litigation. Even from the uncomfortable distance to which the FAC has removed Claimants' examination of their allocation, this much can be seen: the FAC's wheel cannot be repaired; it must be replaced, opening the door for an equitable and legal allocation. As regards fees generated from cases pending in New Jersey state court but included in the global settlement, that

---

[23]Concurrently with the filing of this objection, claimants have filed in the New Jersey consolidated litigation, a motion for Judge Higbee to direct Phil Garrett to calculate how much of the MSA fund is attributable to cases pending in New Jersey Courts, and to set a deadline for the filing of claims for those funds.

allocation must be performed b the New Jersey state court judge who presided over those cases prior to their resolution – the Hon. Carol Higbee.

Respectfully submitted:

_Robert E. Arceneaux_

_____
Robert E. Arceneaux, La Bar No. 01199
ROBERT E. ARCENEAUX LLC
47 Beverly Garden Drive
Metairie, LA 70001
(504) 833-7533 office
(504) 833-7612 fax
rea7001@cox.net

Pascal F. Calogero, Jr., La. Bar No. 03802
AJUBITA, LEFTWICH & SALZER, L.L.C.
1100 Poydras Street
New Orleans LA 70163-1950
(504) 582-2300 office
(504) 582-2310 fax
pcalogero@alsfirm.com

MARGARET E. WOODWARD, La. Bar No. #13677
3701 Canal Street, Suite C
New Orleans, Louisiana  70119
(504) 301-4333 office
(504) 301-4365 fax
mewno@aol.com

Attorneys for Eric H. Weinberg, Chris Placitella, and Cohen, Placitella and Roth

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Joint Motion To Suspend has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, February 2, 2011.

*Robert E. Arceneaux*

_____

## Summary of Common Benefit Work
## Performed by Chris Placitella and  Eric Weinberg

Shortly after the withdrawal of Vioxx from the market, a small group of law firms representing over 7,500 plaintiffs decided to concentrate their efforts as a consortium in the New Jersey litigation before the Honorable Carol E. Higbee, J.S.C., and agreed to work together through discovery and trials for the common benefit of all.[1]  This small group of firms was the most successful litigating group in the entire Vioxx litigation.  It won five of the six cases tried: four resulted in consumer fraud verdicts and three resulted in personal injury verdicts.  The unparalleled success of the New Jersey effort, which was achieved through an enormous commitment of time and money, created considerable pressure on Merck to settle the Vioxx litigation, all to the common benefit.        Chris Placitella and Eric Weinberg were key players in the New Jersey effort.[2]  Much of their work, described as "paradigm- shifting,"[3] by colleagues and key scientists in the litigation, was undertaken at a time of increased risk, when losses in the MDL and elsewhere were discouraging intensive effort and investment in the cause.

---

[1] This participation was facilitated through Judge Higbee's appointment as the presiding judge over coordinated litigation, including all the filed Vioxx cases, a procedure allowed under New Jersey law. Judge Higbee appointed Christopher Seeger and Sol Weiss as co-lead counsel to guide the litigation efforts. Weiss has acknowledged that Weinberg occupied the role of "leader" in the effort with regard to all scientific matters with regard to Vioxx. Placitella's market work eventually produce a devastating video exhibit that has been described as responsible for plaintiff's victories in a least four trials, and which is part of the MDL trial package.

[2] While Placitella and Weinberg were never appointed by the Court to any leadership roles, the e-mails from co-counsel, as well as the testimony given by attorneys at the FAC's hearings, will substantiate that the New Jersey group looked to, and relied upon, Placitella's marketing work and Weinberg's work on the science of the Vioxx litigation.  While we have not included any specific references to proof in this summary, no reader should  be misled into thinking it is mere puffery. Every fact asserted herein stands ready to be proved by objective evidence from independent sources.

[3] Only a small part of the work done in a mass tort actually defines or redefines the case.  When that occurs, it is literally a shifting of the paradigm of the case.  "Paradigm-shifting" work is that which significantly alters the course of litigation in ways that benefit all plaintiffs.

Placitella and Weinberg freely shared their work with colleagues in other jurisdictions, including the MDL PSC, despite the fact that the PSC refused to support the efforts of the New Jersey consortium, because it would not agree to participate in a fee-sharing agreement. The recommendations of the Fee Allocation Committee have added insult to injury, refusing to acknowledge or compensate the work so eagerly claimed by the PSC for the benefit of the MDL plaintiffs, much of it performed in New Jersey State court cases by attorneys in New Jersey, by attorneys who were never appointed to any positions of "leadership" or to any committee in the MDL's PSC.

### EXPERIENCE

Both Placitella and Weinberg have extensive experience in pharmaceutical drug litigation. Both have served on MultiDistrict Litigation Plaintiff Steering Committees. Both have litigated cases involving FDA approved products at trial. Both have represented hundreds if not thousands of clients, retained world class experts, shared valuable work product with colleagues, and have effectively prosecuted cases against pharmaceutical industry defendants in creative and effective ways. Placitella was one of the lead negotiators in the diet drug litigation that produced a 3.75 billion dollar global settlement. Weinberg recently was retained by a global pharmaceutical company to mediate dozens of drug liability cases, a mark of the respect with which he is held by his adversaries.

But the proof is really in the pudding: the scientific evidence they developed, the expert witnesses they produced, the reports they refined, and the exhibits they created say more than any CV could about the experience that underlay their efforts.

## KEY CONTRIBUTIONS TO THE COMMON BENEFIT

Placitella's and Weinberg's contributions to the Common Benefit fall into the following areas:

1.  Developing evidence of marketing fraud by Merck, through intensive investigation, depositions of senior Merck marketing executives, expert analysis, and creative production of exhibits, which were nationally recognized as essential to the plaintiffs' successes.

2.  Refuting Merck's misleading and misconceived studies and creating what has been described as the best scientific analysis of Merck's liability.

3.  Creating a scientifically-based model to measure specific causation, which served as the template for the Vioxx settlement model.

4   Taking the lead to organize all New Jersey counsel on discovery, expert witness development, trial, case analysis and case management issues from 2005 through 2007.

5.  Developing and educating experts for trials in Texas.

6.  Participating in multiple trials in New Jersey, providing experts and other witnesses, exhibits, analysis, and consultation.

7.  Overcoming defeats in *Humeston I* and *Perez* with a new jury charge and evidence of consumer fraud.

8.  Conducting expedited wave discovery in dozens of cases positioned as potential trial cases, and participating as first or second chair or in supporting roles in over thirty common benefit depositions.

9.  Freely sharing their work with all comers, including members of the PSC, without reciprocity.

# Time Line of Placitella & Weinberg Common Benefit Pre Trial Discovery

| Date & Time | Fact Text |
|---|---|
| Wed 01/19/2005 | Chris Placitella participates in Wendy Dixon deposition |
| Thu 01/20/2005 | Chris Placitella participates in Wendy Dixon deposition |
| Fri 01/21/2005 | Eric Weinberg sends Lanier Law Firm expert notes for Scolnick deposition |
| Sat 01/22/2005 | Chris Placitella supplies Weitz & Luxenburg with labeling regs supporting liability for failure to warn and overcoming presumptions on accuracy of labeling |
| Sun 02/20/2005 | Eric Weinberg works with Sol Weiss to obtain SAS data |
| Mon 02/21/2005 | Eric Weinberg consults with FDA regulatory expert on FDA enforcement issues |
| Fri 02/25/2005 | Eric Weinberg sends Lanier Law Firm expert FDA - FOIA information |
| Sat 03/05/2005 | Eric Weinberg expert provides Chris Seeger with FDA PowerPoint provided by expert Kostis |
| Tue 03/08/2005 | Eric Weinberg expert John Kostis helps analyze Merck profit plan |
| Tue 03/08/2005 | John Kostis helps with analyzing Merck discovery |
| Thu 03/10/2005 | Eric Weinberg corresponds with Chris Seeger about expert |
| Thu 03/10/2005 | Eric Weinberg assists David Buchanan with MDL expert Wayne Ray |

Appendix 4

| Date & Time | Fact Text |
|---|---|
| Mon 03/14/2005 | Eric Weinberg provides input to Chris Seeger and Sol Weiss concerning upcoming Anstice deposition |
| Tue 03/15/2005 | Eric Weinberg on conference call with David Buchanan and Dr. Ray to go over expert report of Wayne Ray |
| Thu 03/17/2005 | Weinberg provides information to Chris Seeger and Sol Weiss on Targum review |
| Wed 03/23/2005 | Eric Weinberg provides Seeger Trial expert assistance with his report |
| Wed 03/23/2005 | Chris Placitella sends Chris Seeger and Sol Weiss a summary of evidence relating to Naproxen fraud |
| Thu 03/24/2005 | Chris Placitella attends Gilmartin deposition. Seeger is lead |
| Fri 03/25/2005 | Eric Weinberg sends Lanier Law Firm expert information requested |
| Fri 03/25/2005 | Eric Weinberg assists Lanier Law Firm Expert on BMI letters from 2002 |
| Sat 03/26/2005 | Eric Weinberg corresponds with Chris Seeger and Lanier Law Firm regarding work that needs to be done concerning Alzheimer's study |
| Mon 03/28/2005 | Chris Placitella obtains ethics opinion concerning contacting witnesses |
| Thu 03/31/2005 | Buchanan asks Eric Weinberg for help finding regulatory expert |
| Sat 04/02/2005 | Eric Weinberg and Chris Placitella supply Chris Seeger, Lanier Law Firm and Weitz & Luxemburg with information on Advantage studies |
| Tue 04/05/2005 | Eric Weinberg assists Expert and Lanier Law Firm with Alzheimer's CV data |
| Fri 04/08/2005 | Eric Weinberg expert John Kostis reviews Expert report |

| Date & Time | Fact Text |
|---|---|
| Fri 04/08/2005 | Eric Weinberg has Expert report reviewed by pharmacologist |
| Tue 04/12/2005 | Eric Weinberg travels to DC to meet with two former FDA compliance officers as potential experts |
| Fri 04/15/2005 | Eric Weinberg corresponds with Chris Seeger concerning information obtained from FDA compliance officers |
| Sun 04/17/2005 | Eric Weinberg assists Chris Seeger with analyzing Vioxx Alzheimer's studies |
| Mon 04/18/2005 | Chris Seeger corresponds with Chris Placitella about deposition scheduling of marketing depositions |
| Tue 04/19/2005 | Eric Weinberg conferences with Robinson about Singh and marketing |
| Mon 04/25/2005 | Eric Weinberg supplies NJ consortium information on the Alzheimer's studies |
| Fri 04/29/2005 | Placitella outlines marketing discovery strategy |
| Mon 05/23/2005 | Judge Higbee at conference indicates she will not slow down for the MDL |
| Mon 06/13/2005 | Placitella defends Expert deposition |
| Tue 06/28/2005 | Chris Placitella holds seminar for NJ counsel |
| Mon 07/11/2005 | MDL assures CMP no assessment for working on discovery together |
| Mon 07/18/2005 | From Chris Placitella to NJ group:"Please see the attached time line of testimony concerning Merck's knowledge." |
| Mon 07/18/2005 | Chris Placitella circulates summary of why naproxen theory bogus. |

Appendix 6

| Date & Time | Fact Text |
|---|---|
| Mon 07/18/2005 | CMP marketing analysis sent to all NJ Counsel |
| Mon 07/18/2005 | Lanier Law Firm expert agrees  Alzheimers studies most important part of medical case |
| Tue 07/19/2005 | CMP keeping everyone in loop on theories of PR, excerpting testimony from top executives |
| Tue 07/26/2005 | Assistance to Lanier Law Firm in Ernst including Kostis review of medicine |
| | Eric Weinberg sends Lanier Law Firm help on testimony |
| Sat 07/30/2005 | Eric Weinberg provides Expert with FDA documents |
| Wed 08/03/2005 | Chris Placitella takes lead on McKinnes deposition |
| Fri 08/05/2005 | Chris Placitella takes lead on Dixon deposition for NJ |
| Sat 08/06/2005 | Eric Weinberg helps Tisi (MDL) prepare for Honig deposition |
| Sun 08/07/2005 | CMP nullifies defense witness Wendy Dixon in deposition |
| Mon 08/08/2005 | Eric Weinberg lead on Honig Deposition |
| Tue 08/09/2005 | Eric Weinberg lead on Honig Deposition |
| Wed 08/10/2005 | Placitella takes lead on Jan Weiner deposition, Weinberg second chair |
| Wed 08/10/2005 | Eric Weinberg reports to NJ lawyers key testimony from Weiner |
| Thu 08/11/2005 | Placitella takes lead on Jan Weiner deposition, Weinberg second chair. Chris Seeger asks Chris Placitella to cover topic in Weiner deposition |

Appendix 7

| Date & Time | Fact Text |
|---|---|
| Thu 08/11/2005 | Eric Weinberg exchange with Expert and Chris Seeger regarding Merck witness Honig |
| Fri 08/12/2005 | Placitella takes lead on Ian Weiner deposition, Weinberg 2d chair |
| Sat 08/13/2005 | Weiner transcript copied to Lanier, Seeger acknowledges CMP work as "excellent" |
| Fri 08/19/2005 | EW retains ethics expert for common benefit about contacting certain witnesses |
| Sat 08/20/2005 | Seeger accepts Chris Placitella offer to digest and cut depositions for Dixon, McKines, Gertz, and Weiner |
| Mon 08/22/2005 | Chris Placitella reports to Sol Weiss and Chris Seeger the positions taken by Merck in marketing depositions concerning the validity of press releases |
| Thu 08/25/2005 | CMP helps with Westrick deposition |
| Sat 08/27/2005 | Eric Weinberg helps Expert with access to FDA information |
| Tue 08/30/2005 | Chris Placitella second chair at Westrick deposition. Motley lead |
| Tue 09/06/2005 | CMP outlines PR and marketing discovery plan for NJ |
| Fri 09/09/2005 | Chris Placitella takes McKines deposition |
| Mon 09/12/2005 | CMP arranges NJ discovery meeting while Trial is going on. MDL member attended. |
| Fri 09/16/2005 | Eric Weinberg provides draft of warning flag PowerPoint |

| Date & Time | Fact Text |
|---|---|
| Sat 09/24/2005 | Chris Placitella explains to Chris Seeger, Sol Weiss and others how Merck knew its communication campaign was misleading |
| Mon 09/26/2005 | Robinson of MDL asks Eric Weinberg for PowerPoint work product of Chris Placitella on marketing |
| Fri 09/30/2005 | Chris Placitella provides Weitz & Luxemburg his entire database to help prepare for trial |
| Tue 10/04/2005 | W&L documents review and reliance on case map data base prepared by Placitella in its fee application |
| Wed 10/05/2005 | Chris Seeger characterizes Chris Placitella document discovery as "huge" |
| Sun 10/09/2005 | Placitella email to Eric Weinberg then to Chris Seeger cross examination materials |
| Mon 10/10/2005 | Chris Placitella to take the lead in pursuing discovery of Merck |
| Thu 10/20/2005 | Chris Placitella serves multiple notices,takes lead on marketing discovery with Chris Seeger consent |
| Thu 10/20/2005 | NJ lawyers met at Weitz & Luxemburg and agreed to joint discovery and trial strategy |
| Thu 10/20/2005 | DWJ associates notifies Chris Placitella that it will be producing 90 hours of video. Placitella requests help in reviewing |
| Thu 10/20/2005 | Seeger asks Chris Placitella to review 90 hours of video that ultimately produced the Laine and Demopoulos videos |
| Sat 10/22/2005 | Seeger acknowledges Chris Placitella contribution |
| Fri 11/04/2005 | NJ consortium discuss trial cases |

Appendix 9

| Date & Time | Fact Text |
| --- | --- |
| Fri 11/04/2005 | Eric Weinberg second chair deposition - Gregory J. Coram |
| Sun 11/06/2005 | Chris Placitella updates Sol Weiss and Chris Seeger on all outstanding discovery and subpoenas pending relating to marketing |
| Mon 11/07/2005 | AP reports on NJ consortium strategy of tracking cases for trial, referring to |
| Wed 11/08/2005 | "Placitella and his team - which includes Lanier, Sol Weiss. . ." |
| Tue 11/08/2005 | Chris Placitella circulates to NJ group Trial & Discovery Organization plan |
| Tue 11/08/2005 | Service of subpoena on STI and correspondence with its attorneys |
| Wed 11/09/2005 | Eric Weinberg provides Chris Seeger with summary of current DTC law |
| Thu 11/10/2005 | Discovery & Case selection meeting with Chris Seeger, Weitz & Luxenburg and Lanier Law Firm |
| Wed 11/16/2005 | Case selection review with the Lanier Law Firm Lanier Law Firm and Weitz & Luxenburg |
| Fri 11/18/2005 | Lanier Law Firm asks Eric Weinberg for FDA expert and Eric Weinberg supplies names with critiques |
| Tue 11/22/2005 | "I know you're busy and you've been doing and getting great stuff in this case, you're an asset. . ." Chris Seeger to Chris Placitella |
| Tue 11/29/2005 | Mary Elizabeth Blake deposed by Chris Placitella as lead, Weinberg 2d chair |
| Thu 12/01/2005 | Correspondence concerning forcing STI production |

| Date & Time | Fact Text |
|---|---|
| Fri 12/02/2005 | Tina Nieves lists conference with Chris Placitella who assists with bringing MDL expert up to speed as part of her common benefit fee application. Note: Robinson on call |
| Fri 12/02/2005 | Chris Placitella to Robinson, Herman "Today I put in the mail to Mark, Andy and Chris a cd of all of the Vioxx print adds integrated with the commercials in chronological order by publication and broadcast." |
| Wed 12/07/2005 | Chris Placitella discovers and shares "03-23-2001 Public Affairs Communications Plan" |
| Tue 12/13/2005 | Eric Weinberg provides Lanier Law Firm with Vigor results analysis |
| Mon 12/19/2005 | Seeger agrees Placitella should share his work product with MDL Seeger: "This is an excellent gesture. . . ." |
| Tue 12/20/2005 | Chris Placitella sends RobinsonCalcagnie, Seeger, Birchfield and Hermann Blake deposition which ends up in MDL Trial Package |
| Mon 01/02/2006 | Trial team concerning Chris Placitella discovery on Laine: "priceless.. great find." |
| Wed 01/11/2006 | Very good Chris--you are the sales and marketing guru--let me know if you need me to do anything. |
| Mon 01/16/2006 | Eric Weinberg provides medical discovery information to Lanier Law Firm, Weitz & Luxemburg and MDL |
| Mon 01/16/2006 | Richard Arsenault lists review of Placitella e mail concerning Blake deposition in his MDL fee submission. |
| Mon 01/16/2006 | Chris Placitella provides Lanier Law Firm with Tom Nesi expert report at no cost |
| Fri 01/20/2006 | Eric Weinberg takes charge of STI document review |
| Fri 01/20/2006 | Chris Placitella fights to get Demopoulos deposition |

| Date & Time | Fact Text |
| --- | --- |
| Fri 01/20/2006 | Chris Placitella updates Chris Seeger on STI production and document review |
| Sun 01/22/2006 | Chris Seeger lists coordination with Eric Weinberg of NEJM in fee application. There are many such entries on this subject. |
| Mon 01/23/2006 | Emergent application in Pa state court to force Demopoulos deposition |
| Tue 01/24/2006 | Curfman deposition by Kline. Eric Weinberg attends for NJ |
| Wed 01/25/2006 | Jo Jerman deposed. Lead by Papantonio. Chris Placitella there for NJ |
| Sat 02/04/2006 | Leif Cabrazer fee application lists conversations with Chris Placitella concerning data analysis |
| Sun 02/05/2006 | Levin Fishbein of MDL PSC asks Chris Placitella for direct to consumer work product |
| Tue 02/07/2006 | Eric Weinberg helps Weitz & Luxemburg on risk issues in McDarby case |
| Wed 02/08/2006 | WL rely upon EW for new trial witness, Quan, Merck biostatistician |
| Thu 02/09/2006 | Mary Elizabeth Blake deposed by Chris Placitella as lead |
| Sun 02/12/2006 | Chris Placitella works with Weitz & Luxemburg on Tom Nesi the public relations expert |
| Mon 02/13/2006 | Laura Demopoulos deposed. Lanier Law Firm, Chris Placitella, and Eric Weinberg share lead. |
| Tue 02/14/2006 | Eric Weinberg takes lead in Quan deposition; Weitz & Luxemburg relies upon him "Cona, Quan déposition, documents, Relkin" |
| Wed 02/15/2006 | Robinson of MDL contacts Chris Placitella about coordinating response to Ogilvy production. |

| Date & Time | Fact Text |
|---|---|
| Fri 02/17/2006 | Laura Demopoulos deposed. Eric Weinberg lead. Chris Placitella second chair. |
| Sat 02/18/2006 | "Subject: RE: Merck's knowledge of diabetics thx Eric this will be very helpful" |
| Mon 02/20/2006 | Eric Weinberg helps Weitz & Luxemburg & Lanier Law Firm with their main expert, Krumholz |
| Mon 02/20/2006 | Eric Weinberg assists Weitz & Luxemburg and MDL with finding evidence |
| Thu 02/23/2006 | "A surprising discovery" |
| Wed 02/22/2006 | Weinberg fights with Merck for Lanier Law Firm |
| Fri 02/24/2006 | Lanier Law Firm, Chris Seeger both supporting decision to pursue |
| Tue 02/28/2006 | Lanier Law Firm in WSJ discusses importance of Demopoulos evidence. |
| Fri 03/03/2006 | Evidence provided for Cona & McDarby cases |
| Fri 03/10/2006 | Eric Weinberg gets causation expert for trial case of Sol Weiss |
| Tue 03/14/2006 | Altobelli, Expert, Cona/McDarby |
| | Eric Weinberg expert helps Lanier Law Firm expert in trial case |
| | Eric Weinberg deposes Dr Quan |
| Tue 04/04/2006 | Chris Placitella asks Chris Seeger to put Lahner deposition on case management agenda. Subsequently argued by Chris Placitella |
| Tue 04/04/2006 | Chris Placitella send Shelley Sanford brief related to Joanne Lahner |
| Sat 04/15/2006 | EW expert assists on Hatch Trial case (Anapol case) |
| Tue 04/18/2006 | EW helps with specific causation report in McFarland trial case(Seeger case) |
| Tue 04/18/2006 | Email acknowledges EW and  Placitella part of the go to group |

| Date & Time | Fact Text |
|---|---|
| Mon 05/01/2006 | Lanier Law Firm asking for Weinberg help reviewing files |
| Mon 05/22/2006 | Meeting at Placitella's offices with Seeger, Weitz & Luxenburg, Lanier Law Firm, Anapol (Sol Weiss),to meet with Placitella experts Kostis, Madigan and Lenrow, to review liability and case specific evidence. |
| Thu 06/22/2006 | BeasleyAllen2006-06Barnett trial submission indicates Weiner & Demopolis used in trial |
| Mon 06/26/2006 | CA Vioxx group to Chris Placitella: The CA Vioxx trial attorneys accepted your Mary Blake "gift" a few minutes after it was offered. |
| Tue 07/18/2006 | Eric Weinberg second chair - Dr. Ned Braunstein |
| Fri 08/04/2006 | Robinson Calcagnie meets with trial consultants to discuss Blake and Weiner. Other entries indicate video played at trial. |
| Thu 09/07/2006 | Seeger calls for PR campaign which Eric Weinberg later organized |
| Thu 10/12/2006 | Eric Weinberg first chair deposition Donald Nicholson, Ph.D.on Merck Nitric Oxide collaboration |
| Wed 11/08/2006 | MDL leadership meet with Kostis and Chris Placitella in Eric Weinberg offices and learn about resolution model while negotiations with Merck were underway |
| Tue 01/16/2007 | EW working with MDL on NEJM |
| Tue 01/16/2007 | "Subject: Re: Curfman I second Mark's sentiments. Eric, your work in this case has been outstanding. Thanks." |
| Tue 02/06/2007 | Weinberg gives critical help with Krumholz in Hermans/Humeston |

| Date & Time | Fact Text |
|---|---|
| Wed 02/07/2007 | Chris Placitella explains to Chris Seeger and others how marketing practices will show fraud on FDA |
| Mon 02/12/2007 | Eric Weinberg arranges to have Kostis review Lanier trial case autopsy report |
| Thu 02/15/2007 | Eric Weinberg expert helps Lanier Law Firm trial expert on presentation |
| Fri 06/08/2007; Fri 06/15/07 | Eric Weinberg & Chris Placitella share expert and work product with MDL. >We have a working meeting for next Friday at Cohen Placitella Roth in Philadelphia. This will be a meeting to discuss strategies, collaboration and work product for trial. We are working separately but apparently relatedly on uncovering the truth about the Alzheimer's studies; the true risks to arthritis patients; and the extensive marketing fraud. Dan Sigelman has done a tremendous amount of work on these issues. Chris has developed the marketing case in ways not yet understood by most lawyers or courts. Mark has been focusing on the 2002 label, and may give an overview of how he won the Barnett case." |
| | Meeting in Philadelphia organized by Weinberg and Placitella with trial counsel in pending NJ cases and MDL attorneys Robinson, Arbitblit and Texas counsel. Weinberg brings Dr. Madigan but email from Russ Herman instructs MDL attorneys not to share work product with MDL counsel; MDL attorneys meet with Dr. Madigan and hear presentations but MDL expert does not attend as promised and MDL attorneys do not share any MDL information with NJ counsel |
| Mon 06/18/2007 | NJ lawyers sending hundreds of cases to Eric Weinberg and Chris Placitella expert for review and analysis |
| Mon 06/18/2007 | W&L asks Eric Weinberg & CMP if they can join in project with Dr. Madigan and offer his evidence in NJ trials regarding analysis of SAS data |
| Sun 06/24/2007 | Lanier Law Firm expert apprises Lanier Law Firm of new evidence out of UK discovered by Eric Weinberg |
| Fri 07/06/2007 | NJ had joint strategy meetings & decided what cases would go first and that everyone would work on them together. |
| Wed 07/11/2007 | NJ attorneys defer to Eric Weinberg for depositions |
| Mon 07/16/2007 | Marc Robinson of MDL PSC shows clips of Placitella's Weiner and Blake depos at the ATLA STEP program on over-promotion. |

| Date & Time | Fact Text |
|---|---|
| Wed 07/18/2007 | Weinberg deposition L. Gordon Letts, Ph.D.on Merck Nitric Oxide collaboration |
| Thu 07/19/2007 | Attack Alz Studies Seeger, Lanier Law Firm on notice of Weinberg strategy |
| Wed 07/25/2007 | Lieff Cabraser notes consult with Eric Weinberg in protocol 203 |
| Fri 07/27/2007 | Lieff Cabraser 2005-09-30 notes consult with Weinberg on Alzheimer's. Other entries to this effect as well. |
| Sun 07/29/2007 | Hermann email makes clear PSC's intention not to provide NJ with MDL work product |
| Tue 07/31/2007 | Lieff Cabraser 2005-09-30 notes consult with Madigan through Eric Weinberg |
| Mon 08/06/2007 | Ashcraft & Gerel 2007-08-31 lists work with Eric Weinberg on Block deposition |
| Wed 08/08/2007 | Weinberg first chair deposition of Gilbert Block MD regarding Merck Alzheimer's Studies; Tisi of MDL acknowledges Eric Weinberg did "great job" at Block deposition |
| Fri 10/12/2007 | Lanier Law Firm expert reviews FOIA order obtained by Eric Weinberg and circulates as important |
| Fri 10/19/2007 | Eric Weinberg organizes meeting to assist NJ counsel with issues in wave cases . NJ consortium meets later that day. |
| Sat 12/29/2007 | MDL borrows from Eric Weinberg on settlement model |
| Mon 03/10/2008 | Lopez converses with Placitella about Loren Laine |
| Thu 12/11/2008 | Russ Herman asks Eric Weinberg for all materials related to David Madigan and issue of bone healing because there was an orthopedic issue that had arisen in an MDL case |
| Wed 07/15/2009 | Expert, Lanier Law Firm expert, asks Eric Weinberg for help |

Appendix 16

## Time Line of Assistance Provided by Placitella & Weinberg to the MDL

| Date & Time | Fact Text |
|---|---|
| To Be Determined | Lieff Cabraser 2005-09-30 Presentations002.27 acknowledges that Eric Weinberg responsible for David Madigan |
| To Be Determined | MDL Trial Package lists the depositions of Demopoulos, Mckinnes, Weiner and Blake. All taken by Chris Placitella |
| To Be Determined | According to Robinson the admissibility of the Depositions of Blake, Weiner and Demopoulos by Fallon in the Barnett case and relied upon by Pachman the marketing expert |
| Mon 12/13/2004 | Roda Nast fee submission contains numerous entries of reviewing e mails and information supplied by Chris Placitella |
| Wed 02/09/2005 | Roda fee application notes review of Chris Placitella e mail re new information |
| Thu 03/10/2005 | Eric Weinberg assists Chris Seeger with MDL expert Wayne Ray |
| Wed 04/13/2005 | Fayard & Honeycutt 2005-05-31  fee application  lists review of articles supplied by Chris Placitella as well as other updates, |
| Mon 04/18/2005 | Robinson Calcagnie 2005-05-31 in fee application lists conference with Eric Weinberg in Singh analysis |
| Tue 04/19/2005 | Eric Weinberg conferences with Robinson about Singh and marketing |
| Sat 07/02/2005 | Chris Placitella  shares early work product with MDL |
| Mon 07/11/2005 | MDL assures CMP no assessment for working on discovery together |
| Mon 07/18/2005 | Eric Weinberg responds to MDL call for help with Vilalba review |
| Thu | Exchange with Sanford shows Chris Placitella assisting MDL by providing information during trial |

| Date & Time | Fact Text |
|---|---|
| Sat 07/21/2005 | Eric Weinberg helps Tisi (MDL) prepare for Honig deposition |
| Mon 08/06/2005 | Robinson Calcagnie 2005-05-31 fee application lists time for summarizing depositions of Weiner, Mckinnes, Blake taken by Chris Placitella |
| Fri 08/22/2005 | MDL member lists review of Placitella project as part of fee submission |
| Mon 09/09/2005 | CMP arranges NJ discovery meeting while Trial is going on. MDL member attended. |
| Fri 09/12/2005 | Leif Cabrazer lists in fee application review of information learned at Placitella meeting |
| Thu 09/16/2005 | PSC member Robinson Calcagnie 2005-09 lists conversations with Chris Placitella concerning marketing in fee application |
| Sat 09/22/2005 | PSC member Robinson Calcagnie 2005-09 lists review of Chris Placitella marketing power point |
| Mon 09/24/2005 | Robinson of MDL asks Eric Weinberg for work product of Chris Placitella on marketing |
| Wed 09/26/2005 | PSC Robinson Calcagnie 2005-09 lists review of Mckinnes depositions and summaries taken by Chris Placitella as part of fee application |
| Fri 09/28/2005 | Tina Nieves confers with Chris Placitella who assists with bringing MDL expert up to speed Note: Robinson on call |
| Fri 12/02/2005 | Chris Placitella to Robinson, Herman re mailing cd of all of the Vioxx print ads integrated with the commercials in chronological order by publication and Broadcast. |
| Fri 12/02/2005 | Robinson presentation on sales at Mealeys concerning Vioxx marketing |
| Mon 12/09/2005 | Seeger agrees Placitella should share his work product with MDL |
| 12/19/2005 | |

Appendix 18

| Date & Time | Fact Text |
|---|---|
| Tue 12/20/2005 | Chris Placitella sends RobinsonCalcagnie, Seeger, Birchfield and Hermann Blake deposition which ends up in MDL Trial Package |
| Mon 01/16/2006 | Eric Weinberg provides medical discovery information to Lanier Law Firm, Weitz & Luxemburg and MDL |
| Mon 01/16/2006 | Richard Arsenault lists review of Placitella e mail concerning Blake deposition in his MDL fee submission. |
| Mon 01/16/2006 | Report of meeting with Chris Placitella expert Tom Nesi for use a t trial |
| Sun 01/22/2006 | Chris Seeger lists coordination with Eric Weinberg of NEJM in fee application. There are many such entries on this subject. |
| Tue 01/24/2006 | Proposed amendment to PTO 19 to prevent any assessment for NJ consortium |
| Sat 02/04/2006 | Leif Cabrazer confers with Chris Placitella concerning data analysis |
| Sun 02/05/2006 | Levin Fishbein of MDL PSC asks Chris Placitella for direct-to-consumer Merck ads |
| Wed 02/08/2006 | Leif corresponds with Chris Placitella concerning VIGOR |
| Sat 02/11/2006 | Leif corresponds with Placitella concerning discovery |
| Sat 02/11/2006 | Lieff Cabraser 2005-09-30 fee submission lists exchanges with Weinberg on many issues . this one includes Quan |
| Mon 02/20/2006 | Eric Weinberg assists Weitz & Luxemburg and MDL with finding evidence |
| Mon 02/20/2006 | Evidence that CMP destroyed key MDL defense witness |
| Tue 02/27/2006 | email warning MDL away from Laine |
| Tue 02/28/2006 | Chris Placitella send Shelley Sanford brief related to Joanne Lahner |

Appendix 19

| Date & Time | Fact Text |
|---|---|
| Thu 04/04/2006 | Beasley/Allen2006-06Barnett trial submission indicates Weiner & Demopolis used in trial |
| Mon 06/22/2006 | CA Vioxx group to Chris Placitella<br>The CA Vioxx trial attorneys accepted your Mary Blake "gift" a few minutes after it was offered. |
| Fri 06/26/2006 | Robinson Calcagnie 2005-05-31 fee petition shows the Robinson meets with trial consultants to discuss Blake and Weiner. Other entries indicate video played at trial. |
| Wed 08/04/2006 | MDL leadership sat with Kostis and Chris Placitella in Eric Weinberg offices and learned about his resolution model when negotiations with Merck were secretly underway |
| Tue 11/08/2006 | EW working with MDL on NEJM |
| Fri 01/16/2007 | Eric Weinberg & Chris Placitella share expert and work product with MDL |
| Mon 06/08/2007 | Marc Robinson of MDL PSC shares Placitella Weiner and Blake depos at the ATLA STEP program on over-promotion. |
| Wed 07/16/2007 | Lieff Cabraser 2005-09-30  of MDL PSC in fee application admits consulting with Eric Weinberg in protocol 203 |
| Fri 07/25/2007 | Lieff Cabraser 2005-09-30 admits consulting Weinberg on Alzheimer's. Other entries to this affect as well. |
| Sun 07/27/2007 | Hermann makes clear that NJ never was provided with MDL work product |
| Tue 07/29/2007 | Lieff Cabraser 2005-09-30 in fee application admits consulting with Madigan through Eric Weinberg |
| Mon 07/31/2007 | Ashcraft & Gerel 2007-08-31 fee application lists work with Eric Weinberg on Block deposition |
| Wed 08/06/2007 | Tisi of MDL acknowledges Eric Weinberg did "great job" at Block deposition |

| Date & Time | Fact Text |
|---|---|
| Sat 12/29/2007 | MDL borrows from Eric Weinberg on settlement model |
| Mon 03/10/2008 | Lopez as part of common benefit application lists conversation with Placitella about Loren Laine |
| Tue 12/09/2008 | Weinberg followed up with Russ Herman after giving oral presentation to the Fee Committee on 12/1/08 to obtain information for MDL. |
| Thu 12/11/2008 | Russ Herman asks Eric Weinberg for all materials related to David Madigan and issue of bone healing |
| ??/??/2009 | Robinson lists Placitella Weiner deposition in his fee application and actually quotes from the deposition |
| Thu 01/08/2009 | Eric Weinberg sends information to Herman related to osteoporosis and fracture healing. |

## Time Line of Depositions Taken by Placitella & Weinberg

| Date & Time | Fact Text | Source(s) |
|---|---|---|
| Wed 01/19/2005 | Chris Placitella participates in Wendy Dixon deposition | |
| Thu 01/20/2005 | Chris Placitella participates in Wendy Dixon deposition | |
| Wed 03/02/2005 | Eric Weinberg attends Reicin deposition. Witness examined by others. | |
| Tue 03/22/2005 | Dr Edward Scolnick deposed by David Dave Buchanan Eric Weinberg attended | |

| Date | Activity |
|------|----------|
| Thu 03/24/2005 | Chris Placitella and Eric Weinberg attend Gilmartin deposition. Seeger is lead |
| Mon 06/13/2005 | Placitella defends Expert deposition |
| Wed 08/03/2005 | Chris Placitella takes lead on McKinnes deposition |
| Thu 08/04/2005 | Chris Placitella takes lead on McKinnes deposition |
| Sat 08/06/2005 | Eric Weinberg helps Tisi (MDL) prepare for Honig deposition |
| Fri 08/05/2005 | Chris Placitella takes lead on Dixon deposition for NJ |
| Mon 08/08/2005 | Eric Weinberg second chair on Honig Deposition, Tisi is lead |
| Wed 08/10/2005 | Placitella takes lead on Jan Weiner deposition<br>Eric Weinberg second chair |
| Thu 08/11/2005 | Placitella takes lead on Jan Weiner deposition<br>Eric Weinberg second chair |
| Fri 08/12/2005 | Placitella takes lead on Jan Weiner deposition<br>Eric Weinberg second chair |
| Tue 08/30/2005 | Chris Placitella second chair at Westrick deposition. Motley lead |
| Thu 09/01/2005 | Eric Weinberg defends Tom Nesi deposition |

Appendix 22

| | |
|---|---|
| Fri 09/09/2005 | Chris Placitella first chair Charlotte McKines deposition |
| Fri 11/14/2005 | Eric Weinberg second chair Gregory J. Coram deposition, Jerry Kristal first chair |
| Tue 11/29/2005 | Mary Elizabeth Blake deposed by Chris Placitella as lead Eric Weinberg second chair |
| Tue 01/24/2006 | Curfman deposition by Don Arbitblit. Eric Weinberg present for NJ |
| Wed 01/25/2006 | Jo Jerman deposed. Lead by Papantonio. Chris Placitella second chair for NJ |
| Thu 02/09/2006 | Mary Elizabeth Blake deposed by Chris Placitella as lead Eric Weinberg second chair |
| Mon 02/13/2006 | Laura Demopoulos deposed. Lanier Law Firm, Eric Weinberg, Chris Placitella share leading roles. |
| Fri 02/17/2006 | Laura Demopoulos deposition continues. Weinberg first chair |
| Tue 03/14/2006 | Eric Weinberg first chair deposition of Dr Hui Quan |
| Thu 05/25/2006 | Laura Demopoulos deposed. Lanier Law Firm lead. Chris Placitella and Eric Weinberg second chair. |
| Tue 07/18/2006 | Eric Weinberg second chair Dr Ned Braunstein, Dan Sigelman first chair |
| Wed 07/19/2006 | Eric Weinberg second chair Dr Ned Braunstein, Dan Sigelman first chair |

Appendix 23

| Thu 10/12/2006 | Eric Weinberg first chair deposition of Donald Nicholson | | |
| Wed 01/17/2007 | Curfman deposition by Tom Kline, Eric Weinberg present for NJ | | |
| Wed 07/18/2007 | Eric Weinberg first chair deposition of L Gordon Letts | | |
| Tue 08/07/2007 | Eric Weinberg first chair deposition of Gilbert Block MD | | |
| Tue 10/30/2007 | Eric Weinberg first chair deposition of Gilbert Block MD | | |