# EXHIBIT A

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 1

- - -
VIOXX FEE COMMITTEE PRESENTATION
- - -
DECEMBER 1, 2008
- - -
HIGHLY CONFIDENTIAL
FEE COMMITTEE ATTORNEYS' EYES ONLY
- - -
ATLANTIC CITY, NEW JERSEY
- - -

FIRM: ANAPOL SCHWARTZ WEISS & COHAN
     Sol Weiss, Esquire
     Gregory S. Spizer, Esquire


BEFORE COMMITTEE MEMBERS:

ANDY D. BIRCHFIELD, ESQUIRE
Beasley Allen Crow Methvin Portis & Miles, PC

THOMAS V. GIRARDI, ESQUIRE
Girardi & Keese

RUSS M. HERMAN, ESQUIRE
Herman, Herman, Katz & Cotlar, LLP

W. MARK LANIER, ESQUIRE
The Lanier Law Firm

ARNOLD LEVIN, ESQUIRE
Levin, Fishbein, Sedran & Berman

TROY RAFFERTY, ESQUIRE
Levin, Papantonio, Thomas, Mitchell,
Echsner & Proctor, P.A.

CHRISTOPHER A. SEEGER, Esquire
Seeger Weiss, LLP

PERRY WEITZ, ESQUIRE
Weitz & Luxenberg, P.C.


COURT REPORTER:   Linda L. Golkow, RDR

    877.370.3377 - DEPS@GOLKOW.COM

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 2

1      ---
2           MR. WEISS: You've all seen
3      what I've submitted, and all I did
4      submit was common benefit. By
5      that I mean, I did not submit,
6      except for the Hatch case, any
7      time on any individual case even
8      though some of them Chris used to
9      get ready for trial to drive the
10     litigation.
11          The second thing, none of
12     the 200-plus depositions we took,
13     either of the reps, the treaters,
14     are included in our submission to
15     common benefit.
16          MR. SEEGER: Sol, did you
17     submit a three-page affidavit? Is
18     that what you are talking about?
19          MR. WEISS: No. Benefit.
20          MR. LEVIN: He's talking
21     about time submission.
22          MR. SEEGER: Okay.
23          MR. WEISS: So, the only
24     thing I did submit, again, is

Page 3

1      liaison work of being the
2      architect, along with Dave, of
3      let's keep Merck busy by doing the
4      detail setup. My office did
5      monitor I guess the 20 million
6      pages of detail documents that
7      came in. We actually got copied,
8      and we checked to make sure, when
9      they started to get the same
10     detailer two or three times, and
11     they would go to Higbee and claim
12     they needed months and months and
13     months, we would go, oh, no, here
14     they are, here are the pages.
15          We also did a template for
16     New Jersey, and that's included,
17     all of the detail docs, that is,
18     all of the bulletins they got
19     every day, electric bulletins that
20     was actually embedded into, I
21     guess it was a Word monthly
22     calendar. Our staff did that.
23     So, all you had to do was take a
24     look at the records you got from

Page 4

1      Merck for your prescribing
2      physician, plug it into the chart,
3      and you could then overlay what
4      the reps knew, what they knew and
5      when they told their docs. We
6      actually talked to Jerry about
7      some of that stuff.
8           We did take some of the
9      early depositions that we took,
10     and we gave them to people like
11     Jerry and a couple others, and we
12     actually came up with, it must
13     have been five or six-hour
14     questions that Merck was asking
15     all of the treating doctors, all
16     of the prescribing docs. That's
17     in there.
18          But, essentially, it's my
19     work as liaison, Dave's work in
20     helping Chris, and I helped a
21     little bit in the first trial.
22          MR. SEEGER: Dave Jacoby, so
23     they know when you say "Dave."
24          MR. WEISS: My partner, Dave

Page 5

1      Jacoby.
2           Greg was in charge of doing
3      all of the individual case stuff.
4      Greg also did work from LMI, and
5      we did find them cheating. LMI in
6      New Jersey, I guess they used them
7      in the MDL too, Merck used them to
8      get records. We found some LMI
9      people actually writing letters to
10     the prescribers and treaters
11     saying that the Court ordered them
12     to relook through their documents
13     because not all the records were
14     there. We caught them, and we had
15     a little brew ha-ha in front of
16     Higbee, very private, because they
17     were very embarrassed.
18          So, that's what we did.
19     Anything else, I'm here to answer
20     questions.
21          MR. SEEGER: This is the
22     most refreshing presentation
23     that's over quickly.
24          MR. LANIER: If you get

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 6

1  credit for the presentation, Sol,
2  you are an all right guy.
3      MR. WEITZ:  Sol, how many
4  cases did you submit to the
5  settlement, approximately?
6      MR. WEISS:  Well, that's a
7  hard question to answer.  As
8  primary counsel?
9      MR. LEVIN:  As primary.
10     MR. WEISS:  About 800.  And
11 then we have cases where we are
12 not primary, we are local counsel
13 with Birchfield.  There are 90
14 cases that we have an arrangement
15 with Sheller.  We did a lot of his
16 work behind the scenes for
17 Sheller.  We get a piece of
18 Sheller's fees.
19     Whatever is left that you
20 don't have in diet drugs, I get.
21 There's other firms in
22 Philadelphia that we do their mass
23 tort work quietly, and we have a
24 piece of all of those cases.  So,

Page 7

1  I'm going to say, Perry, when you
2  add it all up, we are over 1,000.
3      MR. WEITZ:  And as far as
4  individual workup of cases that
5  were on Judge Higbee's trial
6  docket, how many of those cases
7  would you say that your firm
8  worked up?
9      MR. SPIZER:  Trial or
10 discovery?
11     MR. WEITZ:  Trial or
12 discovery that you actually did
13 trial prep work?
14     MR. WEISS:  Abdul Malik and
15 Kimmelman were worked up the same
16 time we worked up Humeston.
17     MR. SEEGER:  And then Hatch.
18     MR. SPIZER:  Hatch.
19     MR. WEISS:  Hatch was a
20 standalone case.  We worked all
21 the way through until we got four
22 records they found that he was on
23 Celebrex and not Vioxx.
24     MR. WEITZ:  That was the

Page 8

1  scuba diver.
2      MR. WEISS:  That was the
3  scuba diver.
4      Rodemoyer was worked up in a
5  group of 39, along with another
6  one, all the way through trial.
7      MR. SPIZER:  We were going
8  to trial January of '08 on
9  Rodemoyer, George Biehls and
10 Gisela Levinson -- wait, there
11 were six, actually.
12     MR. WEISS:  There were four
13 in Pennsylvania and four in New
14 Jersey.  So, we had eight of
15 the -- we had two of the four
16 trials going in January.  And they
17 were fully worked up.
18     MR. SPIZER:  We had two
19 states, Pennsylvania and New
20 Jersey.
21     MR. WEISS:  We also worked
22 up and vetted some experts that
23 were used in New Jersey.  I don't
24 know if you used them in the MDL

Page 9

1  or not.  One guy, Stuart Rich.
2      MR. SPIZER:  Steve Rich.
3      MR. WEISS:  Steve Rich, who
4  we really controlled.  Some people
5  tried to burn him out, but we kept
6  him pretty well focused.  The guy
7  that you used in Humeston, and I
8  know that someone else used him.
9      MR. SEEGER:  What was he?
10     MR. WEISS:  Cardiologist.
11     MR. SEEGER:  DePace.
12     MR. WEISS:  We worked DePace
13 up.
14     I helped Eric with Madigan
15 to some extent.  I helped Eric
16 with Kostis to a large extent.
17 Kostis did an analysis that he
18 superimposed Framingham over VIGOR
19 and APPROVe.
20     MR. RAFFERTY:  Who did that?
21     MR. WEISS:  John Kostis is
22 the head of cardiology at Robert
23 Wood Johnson Memorial Hospital,
24 which is the teaching hospital at

3 (Pages 6 to 9)

Page 10

1  Rutgers.
2      MR. SEEGER: How would you
3  say that Kostis' work, just focus
4  on him for a second, contributed
5  to the common benefit?
6      MR. WEISS: It helped us
7  understand if you are going to try
8  a case with a lot of risk factors,
9  how Vioxx was probably one of the
10 leading risks percentage wise, and
11 he could actually tell you why.
12     He looked at, I think it was
13 1,000 clients, I think a third of
14 them were ours, or it turned out
15 to be that way. We submitted all
16 the medical records. They were
17 tabulated. Kostis looked at them,
18 the risk factors and the length of
19 time you were on Vioxx, and then
20 looked at APPROVe, looked at
21 VIGOR, looked at ADVANTAGE, looked
22 at VICTOR, and was able to
23 identify the risks on the Vioxx
24 arm in those trials versus these

Page 11

1  people. And it was pretty
2  amazing. It turned out that for
3  about 85 percent of the population
4  he looked at, of those who smoked,
5  Vioxx was the larger risk for a
6  heart attack than smoking.
7      And as you know, Chris, the
8  problem was twofold. Initially
9  Kostis wanted to be the settlement
10 recruiter and wanted Merck to
11 adopt his philosophy, and then he
12 finally agreed he was going to
13 testify at the latest trials. But
14 they were obviously -- they were
15 settled.
16     MR. LEVIN: I'm working on
17 the hours here. Your hours are
18 under review. They haven't been
19 rejected. They are under review.
20 Have you been contacted by the
21 accountants with regard to
22 anything? It could be because of
23 the time that they were submitted.
24     MR. WEISS: The first thing

Page 12

1  we were contacted about, Arnie,
2  was that the sheets that I used
3  were not the sheets that you used,
4  and we redid them.
5      MR. LEVIN: That's probably
6  the reason, because you have about
7  6,900 hours and $561,000 in costs.
8      MR. WEISS: That's right.
9  Let me tell you about the costs so
10 you know. Costs were in the
11 Hatch. Case, Chris and I went out
12 to Palo Alto and spent two weeks
13 with Rodney. I had Rich and
14 another expert that we developed.
15 That's common benefit, because
16 other people used him.
17     MR. LEVIN: These are expert
18 fees?
19     MR. WEISS: Expert fees. I
20 had a copy of every transcript in
21 New Jersey. I also ordered
22 transcripts from Linda. I wanted
23 every transcript. Every
24 transcript we got electronically,

Page 13

1  and Linda embedded and also tied
2  the transcript to the CD, which we
3  had.
4      MR. LEVIN: When I look at
5  the submissions that are under
6  review, it says MDL time and Hatch
7  time. Now, is the MDL time really
8  New Jersey litigation time?
9      MR. WEISS: It is. It is
10 7300 time.
11     MR. LEVIN: Could you make
12 sure that the accountant corrects
13 that? Not because it matters.
14 The reason I'm saying that is, I
15 want to draw and have two charts
16 showing state litigation on one
17 side and MDL litigation on the
18 other. And you guys are the --
19     MR. WEISS: You guys made me
20 resubmit the time sheets --
21     MR. LEVIN: I didn't make
22 you.
23     MR. WEISS: Let me finish --
24 -- MDL 1657. So all of the New

4 (Pages 10 to 13)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 14

1  Jersey time had to be resubmitted.
2      MR. LEVIN: Is that the way
3  we're doing it?
4      MR. SEEGER: I think that's
5  the way it's been.
6      MR. WEISS: So you'll know,
7  I also had to give him, because I
8  keep contemporaneous time records,
9  they are the designation for Vioxx
10 common benefit is 73 with four
11 zeros at the end.
12     MR. LEVIN: And that is New
13 Jersey time, but --
14     MR. WEISS: That's all New
15 Jersey.
16     MR. LEVIN: This is for me.
17 I'm not being critical.
18     MR. WEISS: I understand.
19 You are never critical with me.
20     MR. LEVIN: Yes, I have
21 been.
22     I want to be able to get
23 those hours out to show how much
24 the state lawyers did so that it

Page 15

1  is not messed up in the MDL time.
2      MR. WEISS: So you
3  understand, none of my time was in
4  the MDL. I did this with Chris
5  and Andy going back to when it was
6  removed from the market, I said I
7  was staying out of the MDL.
8      MR. LEVIN: You mentioned
9  Madigan. Was that time included
10 in the MDL time for you, when you
11 were working with Eric?
12     MR. WEISS: Any time I
13 worked on common benefit, it was
14 7300, yes.
15     MR. LEVIN: But you
16 considered that common benefit,
17 working with Madigan?
18     MR. WEISS: Absolutely.
19     MR. HERMAN: Let me ask you
20 a question about Eric Weinberg.
21 You were co-lead in New
22 Jersey?
23     MR. WEISS: Yes.
24     MR. HERMAN: What

Page 16

1  specifically did you assign him to
2  do?
3      MR. WEISS: Eric was the guy
4  who was working up experts and
5  science. For example --
6      MR. HERMAN: You assigned
7  him to work up specific experts?
8      MR. WEISS: Absolutely.
9      MR. HERMAN: When he worked
10 them up, where did that work
11 product go?
12     MR. WEISS: It went to me,
13 and it went to Dave Buchanan.
14     MR. HERMAN: Okay.
15     MR. WEISS: So you will
16 know, for example, Madigan was
17 used by the MDL people. Elizabeth
18 Cabraser used Madigan's report in
19 the Sinclair class action.
20     MR. SEEGER: Dave was
21 involved in this?
22     MR. WEISS: Yes.
23     MR. LEVIN: Sinclair was the
24 head of the monitoring of the New

Page 17

1  Jersey state litigation?
2      MR. WEISS: Yes.
3      MR. HERMAN: Liz Cabraser, I
4  want to make sure I understand,
5  used Madigan in what?
6      MR. WEISS: In the medical
7  monitoring Vioxx class action in
8  New Jersey. And I know Rich was
9  used by some people in the MDL, at
10 least they wanted to use him, and
11 I said okay. I had to make sure
12 that they didn't make him go where
13 he wasn't qualified. But there's
14 a couple of others.
15     DePace was used, I think by
16 some people in the MDL, but I know
17 he was also used by other people
18 in New Jersey. I know he was used
19 in the MDL. He's the
20 cardiologist.
21     MR. HERMAN: Well, at this
22 point, I'm just trying to get a
23 handle on who was assigned to do
24 what.

5 (Pages 14 to 17)

Golkow Technologies, Inc. - 1.877.370.DEPS

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 18

1   MR. WEISS: Eric's job was
2   to work the science in New Jersey.
3       MR. HERMAN: Who else was
4   assigned to do that? Was he the
5   only one?
6       MR. WEISS: It is hard to
7   say, Russ, because we didn't do it
8   the same way that you guys did it
9   or I do it in MDLs. Eric was one
10  of the lead people that worked the
11  science. Dave Buchanan worked the
12  science.
13      MR. HERMAN: Did your firm
14  have Bextra and Celebrex cases
15  also?
16      MR. WEISS: Yes.
17      MR. HERMAN: Was Madigan
18  used in those cases?
19      MR. WEISS: Not by me, they
20  were used by Perry.
21      MR. HERMAN: I'm sorry?
22      MR. WEISS: He was used by
23  Perry, not us. And all my Bextra
24  cases were with Mark. I think

Page 19

1   every one but two were in New York
2   State Court, right, Mark?
3       MR. LANIER: Yes, sir.
4       MR. WEISS: We did develop
5   some other cardiologists that were
6   very good like Altobelli, a young
7   well-qualified cardiologist who
8   actually reviewed cases for trial
9   and was going to testify at trial.
10  Eric was instrumental on doing
11  that. I helped. We took a whole
12  bunch, and I think they are in
13  this. We took a bunch of Merck's
14  expert cardiologists in Kimmelman,
15  Humeston, the second round, in the
16  third round. We gave you the
17  transcripts. I know you guys had
18  them, with our pleasure.
19      I actually worked with
20  Hornbeck doing Flavahan.
21      MR. SEEGER: Flavahan.
22      MR. WEISS: What a favorite
23  he was. Remember him, Mark?
24      MR. LANIER: He was a joke.

Page 20

1   Put that on the record. He was a
2   joke, he was. Had a really good
3   accent.
4       MR. WEISS: That's the guy
5   we caught with the article that
6   was very critical on COX-2s in
7   some offbeat publication.
8       Any other questions for us
9   or anybody else, guys?
10      MR. SEEGER: No. No, sir.
11  Thank you.
12      MR. WEISS: Again, if you
13  are counting time for the detail
14  people, and if you are counting
15  time for all the trial cases that
16  we worked up, they are not here.
17  So, if that's part of the package,
18  I would like an opportunity to
19  submit the extra time.
20      MR. SEEGER: Submit it.
21      MR. HERMAN: Submit it.
22      MR. LEVIN: I think you
23  ought to submit it.
24      MR. HERMAN: Just identify

Page 21

1   it when you do.
2       MR. LEVIN: Because it will
3   be helpful.
4       MR. WEISS: So, I'm going to
5   give you the time for those cases
6   we worked up for trial, and also
7   you want the detail time, too?
8       MR. LEVIN: It was part of
9   Judge Higbee's plan to work them
10  up.
11      MR. WEISS: Yes. There was
12  12, then 29, then there was 39,
13  and, for example, Andy, do you
14  remember the first cases we worked
15  up way, way back when?
16      MR. HERMAN: Well, Sol, in
17  fairness to you, other people are
18  submitting those hours, and I
19  think you ought to do it also.
20      MR. WEISS: I understand,
21  but I was told they weren't
22  counting. That's why I didn't do
23  them.
24      MR. HERMAN: Submit them.

6 (Pages 18 to 21)

HIGHLY CONFIDENTIAL - FEE COMMITTEE ATTORNEYS' EYES ONLY

Page 22

1  MR. LEVIN: They are
2  counting them now.
3  MR. HERMAN: Those that were
4  worked up for trial.
5  MR. WEISS: So, you want
6  them on these forms?
7  MR. LEVIN: Yes.
8  MR. WEISS: It is going to
9  say MDL 16 --
10  MR. LEVIN: Just write a
11  cover letter to the accountant
12  saying this is a supplemental
13  submission dealing with such and
14  such.
15  MR. HERMAN: It is not my
16  rule, but Arnold wants your blood
17  type, your thumbprint, your eye.
18  Send them as soon as you can get
19  them in, Sol.
20  MR. WEISS: It will take a
21  couple of weeks.
22  MR. HERMAN: Within a week?
23  MR. LEVIN: Could you do it
24  faster?

Page 23

1  MR. WEISS: Those individual
2  cases are not on time sheets.
3  MR. LEVIN: Okay. Well, as
4  fast as you can.
5  MR. WEITZ: But it is not
6  your individual inventory of cases
7  --
8  MR. WEISS: No, no.
9  MR. LEVIN: He just didn't
10  keep the time.
11  MR. WEISS: In other words
12  if we had a case called for trial,
13  I don't have my people keep time
14  sheets. I only keep time sheets
15  on stuff I think is the common
16  benefit.
17  MR. HERMAN: You know what
18  you ought to do?
19  MR. WEISS: What's that?
20  MR. HERMAN: You ought to
21  say, estimate these hours the best
22  you can as an estimate and send
23  them in.
24  MR. WEISS: Anything else?

Page 24

1  (No response.)
2  MR. SEEGER: Thank you.
3  MR. HERMAN: Thank you.
4  - - -

Page 25

1  C E R T I F I C A T E
2
3  I, LINDA L. GOLKOW, a Notary
4  Public and Certified Court Reporter of
5  the State of New Jersey, Registered
6  Diplomate Reporter, Federally-Approved by
7  the United States District Court of
8  Pennsylvania, do hereby certify that the
9  foregoing is a correct transcript of the
10  testimony as taken stenographically by
11  and before me at the time, place and on
12  the date hereinbefore set forth.
13  I DO FURTHER CERTIFY that I
14  am neither a relative nor employee nor
15  attorney nor counsel of any of the
16  parties to this action, and that I am
17  neither a relative nor employee of such
18  attorney or counsel, and that I am not
19  financially interested in the action.
20
21  _____
22  Linda L. Golkow, RDR, CRR, CCR
23  Notary Number: 1060147 Exp. 1.2.10
24  CCR Number: 30X10017620

7 (Pages 22 to 25)

Golkow Technologies, Inc. - 1.877.370.DEPS

## CERTIFICATE OF SERVICE

I hereby certify that the within and foregoing Motley Rice's Objection to the Vioxx Fee Allocation Committee's Common Benefit Fee Recommendation has been filed and served via LexisNexis File & Serve upon all parties by electronically uploading the same to LexisNexis File & Serve Advance in accordance with Pre Trial Order No. 8, on this 4th day of February, 2011.

_____
Carmen Sessions Scott